Hearing Date:  November 19, 2013
Hearing Time:  10:00 a.m. ET

**POLSINELLI**
Daniel J. Flanigan, Esq.
900 Third Avenue, 21st Floor
New York, New York 10022
(212) 684-0199 (Telephone)
(212) 759-8290 (Facsimile)
*Bankruptcy Counsel for Class Claimants*

**WALTERS, BENDER,
STROHBEHN & VAUGHAN**
R. Frederick Walters, Esq.
2500 City Center Square
1100 Main
Kansas City, Missouri  64105
(816) 421-6620 (Telephone)
(816) 421-4747 (Facsimile)
*Co-Lead Counsel for Class Claimants*

**CARLSON LYNCH LTD.**
R. Bruce Carlson, Esq.
115 Federal Street, Suite 210
Pittsburgh, Pennsylvania 15212
(412) 322-9243 (Telephone)
(412) 231-0246 (Facsimile)
*Co-Lead Counsel for Class Claimants*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | Case No. 12-12020 (MG) |
| Debtors. | **(Jointly Administered)** |

## NOTICE OF MOTION AND APPLICATION BY
## CLASS COUNSEL FOR AWARD OF ATTORNEYS' FEES
## AND LITIGATION COSTS AND EXPENSES

**PLEASE TAKE NOTICE** that upon the accompanying Motion and Application for

Award of Attorneys' Fees and Litigation Costs and Expenses, the Declarations of Counsel, and

the exhibits attached thereto, and the other documents, pleadings and matters of record, the

undersigned counsel, as Co-Lead Counsel for the Class Claimants and Bankruptcy Counsel for

the Class Claimants respectfully move this Court before the Hon. Martin Glenn, United States

Bankruptcy Judge, Courtroom 501 at the courthouse located at One Bowling Green, New York,

New York 10004 on November 19, 2013 at 10:00 a.m. (Eastern) or as soon thereafter as counsel

may be heard, for award of attorneys' fees and reimbursement of litigation costs and expenses,

and for such other relief as the Court deems just and proper.

Dated: New York, New York
November 4, 2013

/s/ Daniel J. Flanigan
**POLSINELLI**
Daniel J. Flanigan, Esq.
900 Third Avenue, 21st Floor
New York, New York 10022
(212) 684-0199 (Telephone)
(212) 759-8290 (Facsimile)
*Bankruptcy Counsel for*
*Class Claimants*

/s/ R. Fredrick Walters
**WALTERS, BENDER,**
**STROHBEHN & VAUGHAN**
David M. Skeens, Esq.
2500 City Center Square
1100 Main
Kansas City, Missouri 64105
(816) 421-6620 (Telephone)
(816) 421-4747 (Facsimile)
*Co-Lead Counsel for Class Claimants*

/s/ R. Bruce Carlson
**CARLSON LYNCH LTD.**
R. Bruce Carlson, Esq.
115 Federal Street, Suite 210
Pittsburgh, Pennsylvania 15212
(412) 322-9243 (Telephone)
(412) 231-0246 (Facsimile)
*Co-Lead Counsel for Class Claimants*

**Hearing Date:  November 19, 2013**
**Hearing Time:  10:00 a.m. ET**

**POLSINELLI**
Daniel J. Flanigan, Esq.
900 Third Avenue, 21st Floor
New York, New York 10022
(212) 684-0199 (Telephone)
(212) 759-8290 (Facsimile)
*Bankruptcy Counsel for Class Claimants*

**WALTERS, BENDER,
STROHBEHN & VAUGHAN**
R. Frederick Walters, Esq.
2500 City Center Square
1100 Main
Kansas City, Missouri  64105
(816) 421-6620 (Telephone)
(816) 421-4747 (Facsimile)
*Co-Lead Counsel for Class Claimants*

**CARLSON LYNCH LTD.**
R. Bruce Carlson, Esq.
115 Federal Street, Suite 210
Pittsburgh, Pennsylvania 15212
(412) 322-9243 (Telephone)
(412) 231-0246 (Facsimile)
*Co-Lead Counsel for Class Claimants*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | Case No. 12-12020 (MG) |
| Debtors. | (Jointly Administered) |

**MEMORANDUM OF LAW IN SUPPORT OF
CLASS COUNSEL'S MOTION AND APPLICATION FOR
AWARD OF ATTORNEYS' FEES AND LITIGATION COSTS AND EXPENSES**

## TABLE OF CONTENTS

I.    OVERVIEW OF APPLICATION AND SUPPORTING MATERIALS........................... 1

II.   APPLICABLE LEGAL STANDARDS ..................................................................4

      A.    PROCEDURAL REQUIREMENTS ....................................................4

      B.    THE PERCENTAGE OF THE FUND APPROACH IS PROPER ........................6

III.  THE  PROCEDURAL  HISTORY  OF  THE  KESSLER  MATTER  AND
      PLAINTIFFS' CLAIMS AGAINST RFC.........................................................10

IV.   THE REQUESTED FEE AND EXPENSE AWARDS ARE REASONABLE ...............16

      A.    The 35% Fee is Within the Range of Fees Customarily Awarded in Class
            Action Settlements.................................................................................16

      B.    The 35% Fee is Reasonable When Cross-Checked Against the Lodestar
            Amounts.................................................................................................18

      C.    A  Review  Of  Relevant  *Goldberger*  Factors  Demonstrates  That  The
            Requested Attorneys' Fee Award Is Fair And Reasonable. .................19

            1.    The time and labor expended by counsel...................................19

            2.    The magnitude and complexities of the litigation.....................20

            3.    The risk of the litigation .......................................................21

                  a.    There has been tremendous risk of non-recovery in the 13
                        years Plaintiffs have been pursuing claims against RFC
                        on a contingency fee basis. ......................................21

                  b.    Risk in establishing liability a classwide basis .............23

                  c.    There has been a risk that the Plaintiffs would fail to certify
                        their claims for class treatment. .....................................24

                  d.    Plaintiffs face a number of risks in establishing damages on
                        a classwide basis. ..........................................................25

                  e.    Trial and appeal risk.......................................................26

                  f.    Plaintiffs  face  a  number  of  risks  in  collecting  on  any
                        judgment awarded against RFC....................................27

4.      The quality of the representation ................................................................27

5.      The requested fee in relation to the settlement ..........................................29

6.      Public policy favors the fee request ...........................................................30

7.      The Settlement Class's Reaction to the Fee Request................................30

V.      CLASS COUNSEL SHOULD BE REIMBURSED FOR REASONABLY
        INCURRED LITIGATION COSTS AND EXPENSES ...................................................33

VI.     CONCLUSION............................................................................................................34

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Alston v. Countrywide Financial Corp.*, 585 F.3d 753 (3rd Cir. 2009)..........................................23

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................................30

*Anwar v. Fairfield Greenwich Ltd.*, 2012 WL 1981505 (S.D.N.Y. 2012) ....................................33

*Beckman v. KeyBank, N.A.*, 2013 WL 1803736 (S.D.N.Y. April 29, 2013) ....................7, 16, 18

*Behrens v. Wometco Enter., Inc.*, 118 F.R.D. 534 (S.D. Fla. 1988) ........................................22, 28

*Boeing v. Van Gemert*, 444 U.S. 472 (1980) ..........................................................................6, 8

*Cassese v. Williams*, 503 Fed. Appx. 55 (2nd Cir. 2012) ............................................................33

*Charron v. Wiener*, 2013 WL 5420976 (2nd Cir. Sept. 30, 2013) ...............................................33

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2nd Cir. 1974)............................................21, 22

*Davis v. J.P. Morgan Chase & Co.*, 827 F.Supp.2d 172 (W.D.N.Y. 2011) ..................................18

*D'Amato v. Deutsche Bank*, 236 F.3d 78 (2nd Cir.2001) ............................................................31

*DiFelice v. US Airways, Inc.*, 436 F.Supp.2d 756 (E.D. Va. 2006)...............................................27

*Freeman v. Quicken Loans, Inc.*, ___U.S.___, 132 S.C.t. 2034 (2012) ........................................23

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2nd Cir. 2000)........................................ *passim*

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ..........................................................................16, 28

*In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 WL 3077396  (E.D.N.Y. 2009) ..............31

*In re American Reserve Corporation*, 840 F.2d 487 (7th Cir. 1988)......................................24, 25

*In re BGI, Inc.*, 465 B.R. 365 (Bankr. S.D.N.Y. 2012) ............................................6, 7, 16, 19, 20

*In re Charter Company,* 876 F.2d 866 (11th Cir. 1989)................................................................25

*In re Chateaugay*, 104 B.R. 626 (S.D.N.Y. 1989).......................................................................25

*In re Community Bank of Northern Virginia*, 418 F.3d 277 (3rd Cir. 2005)................................12

*In re Community Bank of Northern Virginia,* 622 F.3d 275 (3rd Cir. 2010)................................13

*In re Community Bank of Northern Virginia*, 2013 WL 3279551
(W.D. Pa. June 27, 2013)................................................................................................24

*In re Connaught Group, Ltd.*, 491 B.R. 88, 97 (Bankr. S.D.N.Y. 2013)......................................25

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 2010 WL 4537550 (S.D.N.Y. 2010)........16, 21, 22

*In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,*
55 F.3d 768 (3rd Cir. 1995) .............................................................................................8

*In re Giant Interactive Group, Inc. Sec. Litig.*, 279 F.R.D. 151 (S.D.N.Y. 2011) ............17, 21, 22

*In re Initial Public Offering Sec. Litig.*, 671 F.Supp.2d 467 (S.D.N.Y. 2009).........................8, 16

*In re Livaditis*, 122 B.R. 330 (Bankr. N.D. Ill. 1990)...................................................................25

*In re Marsh ERISA Litig.,* 265 F.R.D. 128 (S.D.N.Y. 2010) .......................................................16

*In re Transunion Corp. Priv. Litig.*, 629 F.3d 741 (7th Cir. 2011)...............................................21

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
724 F. Supp. 160 (S.D.N.Y. 1989) ....................................................................................7

*Klein ex rel. SICOR, Inc. v. Salvi*, 2004 WL 596109 (S.D.N.Y. Mar. 30, 2004), *aff'd sub nom.*
*Klein v. Salvi*, 115 F. App'x 515 (2d Cir. 2004) ...............................................................9

*Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir. 1995) ........................................................................27

*Malchman v. David*, 588 F. Supp. 1047 (S.D.N.Y. 1984)............................................................33

*Maley v. Del Global Technologies Corp.,* 186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................ *passim*

*Missouri v. Jenkins*, 491 U.S. 274 (1989)....................................................................................7

*Nelson v. IPALCO Enterprises, Inc.*, 480 F. Supp. 2d 1061 (S.D. Ind. 2007) .............................27

*New England Carpenters Health Benefits Fund v. First Databank, Inc.,*
2009 WL 2408560 (D. Mass. 2009) ................................................................................18

*Robbins v. Koger Props. Inc.,* 116 F.3d 1441 (11th Cir. 1997)....................................................27

*Trustees v. Greenough*, 105 U.S. 527 (1881) ..............................................................................6

*Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96 (2nd Cir. 2005).......................................8

*Wenzel v. Partsearch Technologies, Inc. (In re Partsearch Technologies, Inc.),*
453 B.R. 84 (Bankr. S.D.N.Y. 2011) ........................................................................6

*Willix v. Healthfirst, Inc.*, 2011 WL 754862 (E.D.N.Y. 2011) .....................................16

*Yuzary v. HSBC Bank USA, N.A.*, 2013 WL 5492998 (S.D.N.Y. Oct. 2, 2013) .................7, 8, 16

## Federal Statutes

11 U.S.C. § 105 ....................................................................................................1

## Federal Rules of Civil Procedure

Rule 23(h) .....................................................................................................1, 4, 5, 6

Rule 54(d)(2)........................................................................................................4

## Federal Rules of Bankruptcy Procedure

Rule 7023 ...............................................................................................1, 14, 15, 24

Rule 9019 .......................................................................................................1, 15

## Federal Regulations

12 C.F.R. § 226.2.................................................................................................12

## Other Authorities

Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* (4th ed. 2002)

§ 11:41 .....................................................................................................31

§ 13:76 .......................................................................................................8

§ 14:6 .......................................................................................................28

*Manual For Complex Litigation (Fourth)*, §14.121 (2004)......................................8, 28

H. Newberg, Attorney Fee Awards, §1.09 (1986) ...................................................21

## I.        OVERVIEW OF APPLICATION AND SUPPORTING MATERIALS

In connection with the Motion and Application for Award of Attorneys' Fees and Litigation Costs and Expenses, and consistent with the Proposed Final Approval Order In Connection With Joint Motion Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 7023 and 9019 For An Order (1) Granting Class Certification for Purposes of Settlement Only, (2) Appointing Class Representative and Class Counsel for Purposes of Settlement Only, (3) Preliminarily Approving the Settlement Agreement Between Plaintiffs, On Their Own Behalf and On Behalf of the Class of Similarly Situated Persons, and the Debtors, (4) Approving the Form and Manner of Notice to the Class, (5) Scheduling a Fairness Hearing to Consider Approval of the Settlement Agreement on a Final Basis and Related Relief and (6) Approving the Settlement Agreement on a Final Basis and Granting Related Relief [Doc. 4451] (the "**Proposed Final Approval Order**" and "**Preliminary Approval Motion**") and the provisions of the Amended Kessler Settlement Agreement dated August 21, 2013[1] ("**Agreement**") and applicable law, **Class Counsel** respectfully request, pursuant to Federal Rule 23(h) and Bankruptcy Rule 7023, the following: (1) an award of attorneys' fees in the amount of 35% of the **Kessler Net Recovery**[2] which Kessler Net Recovery is determined  by deducting any expense and incentive awards from the Kessler Gross Recovery, and (2) an award of their unreimbursed litigation costs and expenses in the amount of  $719,759.41. The Debtors and the Official Committee of Unsecured Committee (**"Creditors' Committee"**) do not object to this request.

---

[1] The parties to the Amended Kessler Settlement Agreement are Plaintiffs Rowena Drennen, Flora Gaskin, Roger Turner, Christie Turner, John Picard and Rebecca Picard, on behalf of themselves and similarly situated class members, defined as the "Kessler Settlement Class" or "Kessler Class Claimants", and the Debtors, including Residential Capital, LLC ("ResCap"), Residential Funding Company, LLC ("RFC") and GMAC Residential Holding Company, LLC ("GMAC Holding") (collectively the "Settling Defendants").

[2] The terms that first appear as capitalized and bolded terms are defined in the Amended Kessler Settlement Agreement, which definitions are incorporated herein by reference.

As set forth in the Amended Kessler Settlement Agreement, (**"Agreement"**) the claims asserted by the **Kessler Settlement Class** are being reduced and allowed as a non-subordinated general unsecured claim against RFC (the "**Allowed Claim**") in the amount of $300 million. Payments pursuant to the Allowed Claim will be made through a **Borrower Claims Trust** that is to be established pursuant to the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. (the **"Plan"**) and the Creditors' Committee and funded with no less than $57.6 million in cash and subject to the **Borrower Claims Trust True-Up**. The Kessler Settlement Class will receive the **Kessler Gross Recovery** from the Borrower Claims Trust in accordance with the terms of the Plan and the Agreement.   Costs and expenses and incentive awards will be deducted from the Kessler Gross Recovery to determine the Kessler Net Recovery from which an award of attorney fees will be deducted to determine the **Kessler Net Recovery Distribution**.   At this time, the specific dollar amount of the Kessler Gross Recovery is unknown because the borrower claims against the RFC debtor and GMACM debtor are not yet all reduced to allowed claims so the proportion that will be distributed to the Kessler Settlement Class as the Kessler Gross Recovery from the initial $57.6 million funding of the Borrower Claims Trust cannot be known with exactitude.  Further there are additional possible deductions for funding the administrative reserve for trust operations that may reduce the initial $57.6 million funding and thereby potentially reduce the Kessler Gross Recovery.  It is estimated, however, that the Kessler Gross Recovery will be at a minimum 9% of the $300 million Allowed Claim or $27 million because that is the percentage distribution referenced in the Plan and the Borrower Claims Trust.  Given an estimated minimum $27 million Kessler Gross Recovery, Class Counsel estimates that the proposed fee award will be $9,172,709.21 if the requested incentive and expense awards of $72,500.00 and $719,759.41 are awarded. Of course,

the fee award will increase by $350,000 (.35 x $1 million) for every million dollars that the Kessler Gross Recovery exceeds the estimated $27 million minimum.

Additionally, under the terms of the Agreement and the Plan, certain **Insurance Rights** in and to certain **Policies** will be assigned to the Kessler Settlement Class. In the event the Kessler Settlement Class collects on any of the assigned Insurance Rights, the Borrower Claims Trust is entitled, pursuant to the Agreement, to be reimbursed a proportion of the previous Borrower Claims Trust distributions received by the Kessler Settlement Class claimants (the "**Give Back**"). *See* Agreement at § 5.e. Under the Give Back the Kessler Settlement Class shall return a proportionate amount (such proportionate amount determined by dividing the recovery amount under the Insurance Rights by the Allowed Claim) of any prior distributions from the Borrower Claims Trust Assets made on account of any recoveries of the Kessler Settlement Class from the Borrower Claims Trust. *See* Agreement at § 5.e.; Plan at § IV.F.6. Any such Give Back will be added to the Borrower Claims Trust and made available to any borrowers, including the Kessler Settlement Class, who have allowed claims against RFC in proportion to their allowed claim as compared to all borrowers allowed claims against RFC. Therefore, pursuant to this formula, the same proportionate 35% attorney fee will apply to any Give Back. And, to be clear, because there has not been any recovery on the Insurance Rights this Application does not include within its scope any request for attorneys' fees that may relate to any recovery with respect to the Insurance Rights. In the event of any such recovery, Class Counsel will separately petition the appropriate Court for an award of attorneys' fees, litigation expenses and court costs.

The requested common fund percentage fee award and cost and expense reimbursement are consistent with well-established precedent in this Court and the Second Circuit. Class

Counsel have obtained a significant recovery for the Kessler Settlement Class, thereby avoiding further delay in this longstanding litigation and eliminating the considerable challenges regarding liability, class certification, damages, and the additional difficulties presented in the context of this complex bankruptcy proceeding. While the requested fee and costs are reasonable and appropriate when compared to Class Counsel's lodestar and expenses generated solely after the Debtor filed for bankruptcy protection on May 14, 2012, the requested fee award and expense and cost reimbursement are particularly reasonable when considered in the light of Class Counsel's total lodestar in the very long, unique, and complex history of the Kessler matter extending back to the early 2000s.[3]

## II.    APPLICABLE LEGAL STANDARDS.

### A.    PROCEDURAL REQUIREMENTS

1.    Rule 23(h) of the Federal Rules of Civil Procedure reads as follows:

Attorney's Fees and Nontaxable Costs.  In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

(1)    A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2)    A class member, or a party from whom payment is sought, may object to the motion.

(3)    The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

---

[3] In support of this Application, Class Counsel relies upon the separate Declarations of Co-Lead Counsel for the Class Claimants, R. Frederick Walters (**Exhibit 1**); R. Bruce Carlson (**Exhibit 2**); Scott C. Borison (**Exhibit 3**); John W. Sharborough (**Exhibit 4**); Andrew W.  Hutton (**Exhibit 5**); Daniel J. Flanigan (**Exhibit 6**); Robert S. Wood (**Exhibit 7**); and Daniel O. Meyers (**Exhibit 8**).

4

(4)     The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

2.     In turn, Federal Rule 54(d)(2), titled "Attorney's Fees," states:

(A)     *Claim to Be by Motion.* A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages.

(B)     *Timing and Contents of the Motion.* Unless a statute or a court order provides otherwise, the motion must:

(i)     be filed no later than 14 days after the entry of judgment;

(ii)     specify the judgment and the statute, rule, or other grounds entitling the movant to the award;

(iii)     state the amount sought or provide a fair estimate of it; and

(iv)     disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made.

3.     In this matter, each of these procedural requirements has been satisfied.

4.     First, Class Counsel timely applied for these awards by separate motion consistent with the Court's order preliminarily approving the class action settlement. [Doc. 4808; *see also* Doc. 5360]  As set forth in this Motion and Application, Class Counsel requests an award of attorneys' fees equal to 35% of the amount of the Kessler Net Recovery, which amount is the remainder from the Kessler Gross Recovery after deduction of any amounts awarded for litigation costs and expenses and incentive awards to the named Plaintiffs.  The specific amount requested is an estimate given that the amount of the Kessler Gross Recovery has not yet been specifically determined.  As set forth in detail below, the requested fee and expense awards are "reasonable" as Rule 23(h) requires.[4]

---

[4] Further, the awards were agreed to by the named Plaintiffs and expressly addressed in the Settlement Agreement, at §7.  Furthermore, neither the Debtors nor the Creditors' Committee object to the requested fee award and expense reimbursement.

5.      Second, notice of the intention of Class Counsel to apply for the above awards was given to the Kessler Settlement Class by the Debtors' Noticing Agent, Tilghman & Co., through the direct mailing of the Court-approved *Notice of Proposed Class Action Settlement and of Settlement Hearing. See* Doc. 5591 (Affidavit of L. Stephen Tilghman Pursuant to Paragraph 13 of Order (Doc. 4808) Granting Preliminary Approval of Kessler Settlement Agreement).

6.      Third, via such notice, members of the Kessler Settlement Class were afforded an opportunity to object to the proposed fee award.  There are 44,535 loans at issue and over 70,000 class members.  Only the borrowers on a single loan out of the 44,535 loans have objected to the requested attorneys' fee award, *see* Doc. 5434 (the "Sinclair Objection"), which objection is addressed insofar as relevant to this Motion below.[5]  Relatedly, borrowers as to only three loans seek to be excluded from the Kessler Settlement Class.  *See* Rule 23(h)(2).

7.      Fourth, the Final Fairness Hearing has been scheduled for November 19, 2013, at which time the Court will consider this Application. *See* Rule 23(h)(3).

8.      Fifth, the Court has not referred this Application to a Special Master. *See* Rule 23(h)(4).

## B.      THE PERCENTAGE OF THE FUND APPROACH IS PROPER

9.      In the Second Circuit, courts have discretion to employ either the "percentage of the fund" or the "lodestar" method to determine a reasonable attorneys' fee pursuant to Rule 23(h).  *See Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 50 (2nd Cir. 2000); *In re BGI, Inc.,* 465 B.R. 365, 383 (Bankr. S.D.N.Y. 2012); *Wenzel v. Partsearch Technologies, Inc. (In re Partsearch Technologies, Inc.),* 453 B.R. 84, 105 (Bankr. S.D.N.Y. 2011). The percentage of the fund approach applies where counsel secures a "common fund" for the benefit of a class and is

---

[5]   The Sinclair Objection was filed twice as Docket Nos. 5434 and 5592.

entitled to be compensated from the funds recovered. The court simply sets the fee as a percentage of the common fund recovered for the class. *See Trustees v. Greenough*, 105 U.S. 527 (1881); *Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980).

10.     The lodestar, in contrast, is comprised of the number of hours expended by counsel multiplied by the current hourly billing rate of counsel. *Maley v. Del Global Technologies Corp.,* 186 F. Supp. 2d 358, 374 (S.D.N.Y. 2002).[6] The lodestar is then enhanced by an appropriate multiplier to reflect a number of factors, including the contingent nature of success and the quality of the representation. *Id.* "Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers." *Yuzary v. HSBC Bank USA, N.A.*, 2013 WL 5492998, *10 (S.D.N.Y. Oct. 2, 2013) (quoting *Beckman v. KeyBank, N.A.*, 2013 WL 1803736, *13-14 (S.D.N.Y. April 29, 2013) (citing cases).

11.     Regardless of which method is employed, the proposed award of attorneys' fees must qualify as reasonable according to six factors:

(1) the time and labor expended by counsel;

(2) the magnitude and complexities of the litigation;

(3) the risk of the litigation ...;

(4) the quality of representation;

(5) the requested fee in relation to the settlement; and

(6) public policy considerations.

*Goldberger,* 209 F.3d at 50 (citation and internal quotations omitted); *see also In re BGI, Inc.*, 465 B.R. 365, 383 (Bankr. S.D.N.Y. 2012); *In re Union Carbide Corp. Consumer Prods. Bus.*

---

[6] The U.S. Supreme Court has approved the use of current rates, rather than the historical rate for the time period in which the work was performed. *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989). The use of current rates help "compensate for the delay in receiving compensation, the inflationary losses, and the loss of interest." *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F.Supp. 160, 163-64 (S.D.N.Y. 1989) (internal citations omitted).

*Sec. Litig.,* 724 F. Supp. 160, 163 (S.D.N.Y. 1989). Put another way, these same factors guide both the determination of an appropriate fee percentage or an appropriate multiplier under a lodestar computation. *See Goldberger,* 209 F.3d at 48.

12.     Of these two methodologies, the percentage of the fund approach is employed by the majority of circuits in awarding fees in class action settlements. *See Manual For Complex Litigation (Fourth),* at §14.121, at 187 (2004) (commenting that "the vast majority of courts of appeals now permit or direct district courts to use the percentage-fee method in common fund cases"). "The trend in this Circuit is toward the percentage method." *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2nd Cir. 2005). When utilizing the common fund approach, courts will compare the percentage recovery to the calculated base lodestar amount to cross-check whether the equivalent multiplier is also reasonable. *See Wal–Mart,* 396 F.3d at 121.

13.     The percentage of the fund approach is favored because it best reflects the uncertainty and risk of contingent fee litigation. Indeed, the Second Circuit has specifically noted that the percentage of the fund method "more faithfully adheres to market practice." *Goldberger,* 209 F.3d at 50 (quoting *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 820 (3d Cir. 1995)). The percentage of the fund approach is based on the principle that those who benefit from the prosecution of a lawsuit will be unjustly enriched if they do not share the costs. *See Boeing,* 444 U.S. at 478 ("The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense."); Alba Conte & Herbert B. Newberg, *Newberg on Class Actions,* at §13:76 (4th ed. 2002) ("It is an equitable doctrine based on the rationale that successful litigants would be unjustly enriched if their attorneys were not compensated from the fund created for the litigants."). Further, the percentage method "directly aligns the interest of the

class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 480 (S.D.N.Y. 2009).

14.    The lodestar has some inherent problems and it is therefore less favored.  As courts have noted, use of "the lodestar creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet-eyed review of line-item fee audits."  *Id.* at 479-80*; Yuzary*, 2013 WL 5492998, *10-11.  The use of the percentage of the fund approach obviates the need for the court to diligently scrutinize counsel's billing records in order to make what are essentially post-hoc decisions assessing or "second-guessing" the reasonableness of hours expended in light of legal strategies and the exigencies of the moment, and reasonableness of the attorneys' hourly rates, which may differ by locale.[7]  See *Klein ex rel. SICOR, Inc. v. Salvi*, 2004 WL 596109, *6 (S.D.N.Y. Mar. 30, 2004), *aff'd sub nom. Klein v. Salvi*, 115 F. App'x 515 (2d Cir. 2004) ("District judges also disliked the time and effort that it took to review the time charges submitted to them, and often considered it inappropriate to second-guess what should, and should not, have been done in prosecuting a case.") (citing *Goldberger,* 209 F.3d at 48–49).

15.    Regardless of methodology, as more fully demonstrated below, the requested fee award is reasonable.

---

[7] When the lodestar is utilized as a cross-check, the Court's review of the hours expended by counsel is less detailed.  *In re IPO Sec. Litig.*, 671 F.Supp.2d 467, 506 (S.D.N.Y. 2009) (citing *Goldberger*, 209 F.3d at 50) ("Because the lodestar is being used merely as a cross-check, it is unnecessary for the Court to delve into each hour of work that was performed by counsel to ascertain whether the number of hours reportedly expended was reasonable.").  Accordingly, Counsel have not separately itemized each of the attorneys' and law firm's lodestar totals for the history of the bankruptcy and MDL Litigation.  That information is available at the Court's request.

### III.    THE PROCEDURAL HISTORY OF THE KESSLER MATTER AND PLAINTIFFS' CLAIMS AGAINST RFC

16.    Plaintiffs' claims were litigated against RFC for more than ten years prior to the ResCap bankruptcy filing.  The Kessler Settlement with RFC, therefore, is not simply the result of efforts from May 14, 2012 forward but is the culmination of ten years of complex litigation against RFC and two bank defendants, Community Bank of Northern Virginia ("**CBNV**") and Guaranty National Bank of Tallahassee ("**GNBT**"). Plaintiffs submit that while the efforts of Class Counsel before this Court alone during the bankruptcy proceeding entirely support the fee request, the propriety of such a request is particularly appropriate when the entire litigation effort against RFC is considered.

17.    When ResCap took itself and a host of related companies, including RFC, into bankruptcy in May 2012, the now partially settled Kessler matter consisted of four putative class actions against RFC and others that were pending in the United States District Court for the Western District of Pennsylvania as part of a multidistrict proceeding styled *In re Community Bank of Northern Virginia Second Mortgage Lending Practice Litigation*, MDL No. 1674, Case Nos. 03-0425, 02-1201, 05-0688, 05-1386 (the "MDL Class Action").

18.    The MDL proceeding originally began as six separate actions filed by Co-Lead Counsel Bruce Carlson (now of Carlson Lynch) and others in Pennsylvania courts (the "**Pittsburgh Litigation**").   The first such action, known as *Davis v. Community Bank of Northern Virginia, et al.*, was filed on May 1, 2001. The *Davis* plaintiffs asserted class claims for, among other things, a violation of the fee split and disclosure provisions of the Real Estate Settlement Procedures Act ("**RESPA**"), 12 U.S.C. § 2607(b). A number of other cases filed by Mr. Carlson and others followed against CBNV and/or GNBT, all of which focused on the RESPA fee split and kickback claims. Through removal or direct filings in federal court, all

these Pennsylvania cases were pending in the U.S. District Court for the Western District of Pennsylvania. In support of the Pittsburgh Litigation, counsel for the plaintiffs and their consultants performed an extensive investigation. The investigation included the following, *inter alia*,:  the review of hundreds of loan files; the review of in excess of ten thousand pages of documents generated in various regulatory proceedings; interviews of more than twenty witnesses; extensive meetings with former insiders in the alleged second mortgage scheme; frequent conversations with various journalists who were investigating the conduct at issue; and multiple conversations with regulators who were investigating the conduct at issue.

19.    The actions of the Banks and RFC were also the focus of other lawsuits and investigations elsewhere. *See* Declaration of R. Frederick Walters (**Exhibit 1**), at ¶26. In Missouri, Co-Lead Counsel Fred Walters and Walters Bender Strohbehn & Vaughan, P.C. ("**Walters Bender**") filed a Missouri class action against CBNV and RFC in June 2001 alleging claims for violations of Missouri's Second Mortgage Loans Act ("**MSMLA**"). On April 3, 2003, Walters Bender filed a putative class action in Missouri state court against GNBT for violations of the MSMLA.  While the two Missouri cases were not successful (Defendants obtained dismissals based on certain preemption arguments), Walters Bender and others were aggressively challenging the mortgage lending practices of these banks and RFC's liability as an assignee. *Id.*

20.    In July 2003, the Banks and RFC agreed to settle the Pittsburgh Litigation (the "**First Settlement**"). The First Settlement contemplated a common fund in the approximate amount of $33 million.  The First Settlement was preliminarily approved on July 1, 2003.

21.    On October 1, 2003, a number of class members represented by Walters Bender filed objections to the settlement and also moved to intervene as proposed class representatives. The primary concern of the objectors was that the settlement released claims under the Truth in

Lending Act ("**TILA**") and HOEPA (15 U.S.C. § 1602 and Regulation Z at 12 C.F.R. § 226.2) without adequate compensation. On December 4, 2003, the district court approved the class action settlement.

22.     The Objectors appealed the approval of the settlement to the Third Circuit.  As a result of the considerable efforts on both sides of the appeal, on August 11, 2005, the Third Circuit issued a lengthy precedential opinion vacating the settlement and remanding the case to the district court. *In re Community Bank of Northern Virginia*, 418 F.3d 277 (3rd Cir. 2005)("*In re CBNV I*").[8]  Notably, while the settlement was vacated, the Third Circuit generally endorsed the class treatment of the RESPA and TILA/HOEPA claims upon remand.

23.     Following the 2005 remand, the parties actively litigated the case to determine the "viability" of the TILA/HOEPA claims championed by the Objectors.  This included extensive work with expert witnesses to establish the factual predicates for the TILA/HOEPA claims, which efforts remained relevant to the ongoing prosecution of and now settlement of the Kessler Settlement Class claims.

24.     In July 2006, plaintiffs represented by Carlson Lynch filed a motion for preliminary approval of a second settlement that provided additional compensation to the Kessler Settlement Class members for the TILA/HOEPA claims (the "**Second Settlement**").  The Second Settlement contemplated a common fund of approximately $47 million.  The district court granted preliminary approval of the Second Settlement on January 25, 2008.

25.     Borrowers represented by Walters Bender objected to the Second Settlement,

---

[8] In 2004, while the appeals of the district court's settlement approval and attendant rulings were pending, Walters Bender filed an action captioned as *Hobson, et al. v. Irwin Union Bank and Trust, Co., et al.* in the Northern District of Alabama. In the *Hobson* action, Plaintiffs engaged in a substantial amount of discovery.  On May 5, 2005, the JPMDL transferred the *Hobson* action to the MDL in Pittsburgh. After the Third Circuit's opinion in *In re CBNV I* became final, the Hobson Plaintiffs filed a Motion for Class Certification, as well as a Motion for Appointment of Interim Lead Class Counsel and a Proposed Second Amended Class Action Complaint, in the Pittsburgh MDL. Walters Declaration, at ¶¶30-32.

asserting that the additional compensation for the TILA/HOEPA claims remained inadequate. The district court granted final approval of the Second Settlement on August 14, 2008. On behalf of objecting class members, Walters Bender led a second appeal of the district court's approval of the settlement to the Third Circuit.

26.    On October 20, 2010, the Third Circuit issued a second lengthy opinion, again vacating the district court's order certifying the class and granting final approval of the Modified Settlement. *See In re Community Bank of Northern Virginia, et al.,* 622 F.3d 275 (3d Cir. 2010) ("***In re CBNV II***"). Again, despite the remand, the Third Circuit endorsed the class treatment of the asserted claims.

27.    Following remand in early 2011, counsel for the previously settling plaintiffs (led by Carlson Lynch) and counsel for the objectors (led by Walters Bender) had extensive conversations before ultimately concluding that the best interests of the class dictated that all plaintiffs, and all counsel for plaintiffs, collaborate so that all of the interests of the putative class members were fully aligned and there could be no credible claim that the interests of the class were not being adequately represented. When notified of this alliance, counsel for RFC and the Banks exercised their rights under the abandoned settlement agreement to compel additional mediation. That mediation was not successful.

28.    After the failed mediation, the district court appointed Bruce Carlson and Carlson Lynch and Fred Walters and Walters Bender as interim class counsel in the multidistrict litigation. Plaintiffs then filed a Joint Consolidated Amended Complaint on October 4, 2011, and their First Amended RICO Case Statement on October 18, 2011.[9] RFC and the Bank Defendants

---

[9] At the time of RFC's bankruptcy, the Plaintiffs in the multidistrict proceeding were asserting putative class action claims for: (1) Violations of RESPA for kickbacks, unearned fees and impermissible business relationships; (2) Violations of the TILA and HOEPA for inaccurate and understated material disclosures; (3) Violations of other disclosure and substantive requirements of TILA and HOEPA; and (4) Violations

filed motions to dismiss all of Plaintiffs' claims. Those expansive motions were being briefed at the time of RFC's bankruptcy on May 14, 2012.

29.     Upon notice of ResCap's bankruptcy filing, Class Counsel traveled to New York and participated in the first day's proceedings including seeking and obtaining appointment to the Unsecured Creditors Committee ("**Creditors' Committee**").  Class Counsel also retained Dan Flanigan and Polsinelli Shughart as bankruptcy counsel to assist with the representation of the Kessler Settlement Class against the Settling Defendants before this Court.

30.     Since being appointed to the Creditors' Committee, Class Counsel have been active participants in the bankruptcy proceedings on behalf of the Kessler Settlement Class.  In addition to attending all Creditors' Committee meetings (either in person or telephonically) and related proceedings, Class Counsel filed and fully briefed its Motion to Apply Bankruptcy Rule 7023 and Certify Claims [Doc. 2047].

31.     Beginning in April 2013, the Debtors, the Named Plaintiffs' counsel, and representatives of the vast majority of the Debtors' significant creditors participated in mandatory Plan mediation sessions ordered by this Court [Doc. Nos. 2519, 3101 and 3877]. The mediation sessions ultimately resulted in a proposed global resolution dated May 14, 2013, in the form of a Plan Support Agreement ("**PSA**") by and among the Debtors, the Creditors' Committee, the Consenting Claimants and Ally Financial Inc. ("**Ally**"). *See* Walters Declaration, [Doc. 4451-2], at ¶3.  The Kessler Settlement Class is among the Consenting Claimants and Class Counsel participated directly in the many mediation sessions and related meetings held in New York City and telephonically that ultimately resulted in the PSA.  However, the Kessler claims were not settled as part of these original mediation sessions.

---

of the Racketeer Influenced and Corrupt Organizations Act ("RICO") for racketeering activities used to perpetuate and further a predatory lending scheme.

32.     The PSA was not conditioned upon the Kessler Settlement Class and the Settling

Defendants achieving a settlement or the successful execution of the Agreement. Indeed, had the

settlement not been reached, the Kessler Settlement Class had the right to withdraw from the

PSA. However, as contemplated by the PSA, the Parties continued their settlement discussions

and engaged in extensive formal negotiations. These efforts included an all-day session held on

June 18, 2013, at which representatives of the Parties and the Creditors' Committee participated.

These efforts resulted in an agreement in principle as to the primary components of the

settlement. *See* Thompson Affidavit [Doc. 4451-1], at ¶13; *See* Walters Declaration [Doc. 4451-

2], at ¶4. Over the next few weeks, counsel to the Parties and the Creditors' Committee

participated in extensive negotiations and drafting sessions that culminated in the Agreement.

*See id.* at ¶14.   This effort also required the engagement of separate Allocation Counsel to

negotiate via mediation allocation amounts to those Kessler Settlement Class members that rely

upon equitable tolling for their RESPA and TILA/HOEPA claims and those that do not. *See*

Walters Declaration [Doc. 4451-2], at ¶¶6-23.

33.     On August 23, 2013, this Court entered its Order Pursuant to Rule 7023 and 9019

of the Federal Rules of Bankruptcy Procedure (1) Preliminarily Approving Settlement

Agreement Between Named Plaintiffs, Individually And As Representatives Of The Kessler

Settlement Class, And The Settling Defendants; (2) Granting Class Certification For Purposes Of

Settlement Only; (3) Approving The Form And Manner Of Notice To Kessler Settlement Class

Members Of The Settlement Agreement; (4) Scheduling A Fairness Hearing To Consider Final

Approval Of The Settlement Agreement; And (5) Granting Related Relief.  [Doc. 4808]

34.     Upon approval by this Court, the Agreement will resolve all issues among

Settling Defendants, Named Plaintiffs and the other members of the Kessler Settlement Class

relating to the 44,535 second mortgage loans at issue. *See* Thompson Affidavit [Doc. 4451-1], at ¶15; Walters Declaration [Doc. 4451-2], at ¶5.

## IV.    THE REQUESTED FEE AND EXPENSE AWARDS ARE REASONABLE

35.    Class Counsel seeks an award of reasonable attorneys' fees that constitutes 35% of the Kessler Net Recovery.[10]  The Court should grant the requested attorneys' fee and expense awards because, for the reasons set forth below, they are fair, reasonable, and legally permitted.[11]

### A.    The 35% Fee is Within the Range of Fees Customarily Awarded in Class Action Settlements

36.    As an initial matter, the 35% request is objectively reasonable in that it is within the range of fees that have been awarded in connection with the settlement of complex class action cases, including those settled within this Circuit.[12]  The requested fee percentage of 35%

---

[10] From any fee award Class Counsel will compensate Allocation Counsel based upon a lodestar for their time actually expended.  As the Court will recall, there are sub-classes based upon the date a particular class member's loan was originated, *i.e.*, those originated pre-May 1, 2000 and those originated on May 1, 2000 and thereafter, as the loans originated prior to May 1, 2000 were subject to an additional statute of limitations defense that would be complete timely only after application of equitable tolling.  As a result, Allocation Counsel was retained to represent each sub-class solely upon the issue of allocation (Arthur H. Stroyd, Jr. for the pre-May 1, 2000 sub-class and Richard H. Ralston for the sub-class that obtained loans on or after May 1, 2000).  Each allocation counsel was provided with information to inform them of the factual circumstances and case law related to equitable tolling.  Using that information, allocation counsel mediated the issue and agreed to an 18.5% reduction of those class member claims relying on equitable tolling.

[11] The Agreement of the Settling Defendants and the Creditors' Committee not to object to Class Counsel's fee application should be afforded substantial deference. *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (holding that an agreed-to fee is an ideal situation because "[a] request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee.").

[12] *See, e.g.*, *In re BGI, Inc.*, 465 B.R. at 383 (approving an attorneys' fee award of 33.3% of the settlement amount recovered on behalf of the class); *Yuzary v. HSBC Bank USA, N.A.*, 2013 WL 5492998, *9 (31.7% attorneys' fee); *Beckman v. KeyBank, N.A.*, 2013 WL 1803736, *8-9 (33 1/3% attorneys' fee); *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 480 (S.D.N.Y. 2009) (awarding 33 1/3% fee on recovery of $586 million); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 149 (S.D.N.Y. 2010) (one-third fee of $35 million settlement was reasonable); *Willix v. Healthfirst, Inc.*, 2011 WL 754862, *7 (E.D.N.Y. February 18, 2011) (awarding 33 1/3% fee on $7,675,000 settlement; "Class Counsel's request for 33 1/3% of the [$7,675,000 Settlement] Fund is reasonable and consistent with the norms of class litigation in this circuit."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, *24 (S.D.N.Y. 2010) (fee award of 30% of net settlement fund was reasonable); *In re Giant Interactive Group, Inc. Sec. Litig.*, 279 F.R.D. 151, 166 (S.D.N.Y. 2011) (awarding 33% of $13 million fund); *Maley v. Del Global*

16

from the Kessler Net Recovery in this matter is much less than the percentages awarded in a

number of other recent class action settlements involving consumer claims related to second

mortgages just like these for violations of Missouri's Second Mortgage Loans Act. *See* Walters

Declaration, at ¶49.    Similar to this matter, those class action cases involved a high risk of non-

recovery and protracted litigation before a settlement was reached. Walters Declaration, at ¶49.[13]

---

*Technologies Corp.*, 186 F. Supp. 2d 358, 374 (S.D.N.Y. 2002) (awarding 33% of settlement valued at approximately $11.5 million).    See also the following relevant consumer class actions in Maryland in which fee percentages in excess of 35% were awarded: *Driscoll v. Navy Federal Credit Union*, Case No. 1:13-cv-00137-BPG (D. Md.) (40%); *Castillo v. Nagle & Zaller*, Case No. 12-02338 –WDQ (D. Md.) (40%); *Gardner v. MCTFCU*, Case No. 10-02781-BPG (D. Md.) (40%); *Bradshaw v. Hilco Receivables, LLC.*, 10-0113- RDB, (D. Md.)(40%); *Veiga, et al., v. Suntrust Bank*, 09-2815-PGW, (D. Md.) (40%); *Baker v. Sunshine Financial Group, LLC.*, 11-02028-PWG (D. Md.) (40%); *Tyeryar v. Main St. Acquisition Corp.*, 11-00250-CCB (D. Md.) (40%); *Johnson v. Midland Funding, LLC.*, 09-2391-ELH (D. Md.) (39%); *Proctor, et al. v. Metropolitan Money Store Corp*, et al., 07-1957-RWT (D. Md.) (35%).
[13] *See Gilmor v. Preferred Credit Corp.*, Case No. 10-0189-CV-W-ODS (W.D. Mo.)(court approved nine separate class action settlements with various defendants, one with an attorneys' fee award of 43.6% and the other eight with an attorneys' fee award of 45%); *DeAnthony Thomas, et al. v. U.S. Bank, N.A., et al.*, Case No. 1216-CV20561 (Mo. Cir. Ct. November 16, 2012) (Jackson County – Div. 16) (approving $92 million class action settlement with attorneys' fee award of 45%); *Jack L. Beaver, et al, v, U.S. Bank, National Association, et al.*, Case No. 1216-CV21345 (Mo. Cir. Ct. November 26, 2012) (Jackson County – Div. 16) (approving $68.3 million class action settlement with attorneys' fee award of 45%); *Thompson, et al. v. Sovereign Bank, N.A.*, Case No. 1216-CV09804 (Mo. Cir. Ct. September 6, 2012) (Jackson County – Division 16) (finally approving class action settlement with an attorneys' fee award of 46.34%); *Mitchell v. Residential Funding Corporation, et al.*, Case No. 03-CV-220489-01 (Mo. Cir. Ct. July 13, 2012) (Jackson County – Division 4) (finally approving class action settlement with Wells Fargo Bank, N.A., with an attorneys' fee award of 50%; court noted that 50% was "reasonable and by no means unusual for a contingency fee case of this length, magnitude, and type" in case that had been pending for more than nine years); *Mitchell v. Residential Funding Corporation, et al.*, Case No. 03-CV-220489-01 (Mo. Cir. Ct. August 17, 2012) (Jackson County – Division 4) (finally approving class action settlement with Household Finance Corporation III, with an attorneys' fee award of 50% and noting that 50% was "reasonable and by no means unusual for a contingency fee case of this length, magnitude, and type" in case that had been pending for more than nine years); *Mitchell v. Residential Funding Corporation, et al.,* Case No. 03-CV-220489-01 (Mo. Cir. Ct. April 16, 2012) (Jackson County – Division 4) (preliminarily approving class action settlement with Residential Funding Company, LLC, in which Class Counsel sought an attorneys' fee award of 45% - final approval was delayed, however, due to the instant bankruptcy filing by RFC); *Shokere, et al. v. Residential Funding Company, LLC, et al.*, Case No. 1116-CV30478 (Mo. Cir. Ct. March 12, 2012) (Jackson County – Div. 15) (finally approving class action settlement with an attorneys' fee award of 40%); *Couch, et al., v, SMC Lending, Inc., et al.*, Case No. CV100-4332 CC (Mo. Cir. Ct. Oct. 19, 2011) (Clay County – Div. 3) (finally approving class action settlement with an attorneys' fee award of 40%); *Baker, et al. v. Century Financial Group, Inc. et al.*, Case No. CV100-4294 (Mo. Cir. Ct. October 19, 2011 and October 29, 2013) (Clay County – Div. 3) (finally approving class action settlements with attorneys' fee awards of 40% and 47%).

**B.    The 35% Fee is Reasonable When Cross-Checked Against the Lodestar Amounts**

37.    The reasonableness of Class Counsel's requested fee award is confirmed when that amount is cross-checked by reference to Class Counsel's lodestar amount. Class Counsel have expended 6,213.78 total hours of attorney and paralegal time in the prosecution of their Class proof of claims against RFC since it filed for bankruptcy on May 14, 2012.[14] Walters Declaration, at ¶60. Class Counsel's total lodestar, based upon these hours multiplied by each firm's current hourly rates for their respective attorneys, is $3,134,427.50.[15] Walters Declaration, at ¶60. The total estimated fee requested by Class Counsel in this case since May 14, 2012 of $9,172,709.21 the represents a lodestar multiplier of 2.93. Walters Declaration, at ¶61.

38.    This multiplier is also well within the range of multipliers awarded in this circuit. In fact, as noted, courts "regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers." *Beckman v. KeyBank, N.A.*, 2013 WL 1803736, *13-14 (listing cases and approving a lodestar multiplier of approximately 6.3 and equal to 33 1/3% sought by class counsel); *see also Visa*, 396 F.3d at 123 (upholding multiplier of 3.5 as reasonable and explaining that "multipliers of between 3 and 4.5 have become common" in common fund class actions).[16]

39.    Notably, the above lodestar totals relate *only* to time since May 14, 2012. As detailed above, the recovery against RFC as to which this attorney fee award is requested is not the result of only some 17 months of work in this matter. Rather, the settlement is the result of

---

[14] In addition, a substantial number of unrecorded hours were expended by non-timekeepers, *i.e.*, administrative personnel employed by Class Counsel.

[15] Each firm's contribution to the total lodestar is set forth on Class Counsel's Summary of Hours and Lodestar attached as **Exhibit 9.**

[16] *See also Davis v. J.P. Morgan Chase & Co.,* 827 F. Supp. 2d 172, 184–86 (W.D.N.Y. 2011) (awarding multiplier of 5.3); *New England Carpenters Health Benefits Fund v. First Databank, Inc.,* 2009 WL 2408560, at *2 (D. Mass. 2009) (awarding multiplier of 8.3); *Maley,* 186 F. Supp. 2d at 371("modest multiplier" of 4.65 was "fair and reasonable").

years and years of litigation with RFC.  The total hours of attorney and paralegal time incurred

prior to RFC's Bankruptcy is 33,167.15 hours with a lodestar of $16,999,876.70. Walters

Declaration, at ¶ 65. Those figures, if included and combined with the post RFC bankruptcy

hours and lodestar, would represent a total lodestar of $20,134,304.20 and a negative lodestar

multiplier of .46. Walters Declaration, at ¶ 63.

> C.    **A Review Of Relevant *Goldberger* Factors Demonstrates That The Requested Attorneys' Fee Award Is Fair And Reasonable.**

40.    In determining whether the proposed attorneys' fees are reasonable, the Court

considers the following factors:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation…; (4) the quality of the representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50; *In re BGI, Inc.,* 465 B.R. at 383; *In re Partsearch Technologies,*

*Inc.,* 453 B.R. at 105.  Each of these factors supports the propriety of the requested fee award.

> 1.    **The Time and Labor Expended By Counsel**

41.    The time and labor expended by Class Counsel since RFC filed for bankruptcy on

May 14, 2012 – some 6,213.78 hours – supports the propriety of the proposed attorneys' fee

award.[17] Walters Declaration**,** at ¶64.  Moreover, during the course of litigation prior to May

2012 – going back approximately twelve (12) years – Class Counsel expended 33,167.15 hours

of attorney and paralegal time in investigating and prosecuting the claims of the Kessler

Settlement Class in multi-district litigation pending in the U.S. District Court for the Western

District of Pennsylvania, the Third Circuit Court of Appeals, various state courts and now before

this Court. Walters Declaration, at ¶ 65. As the results suggest, Counsel's work was of a high

quality and appropriate given the demands of this litigation.

---

[17] This figure does not include time expended to prepare this fee application.

## 2.    The Magnitude and Complexities of the Litigation

42.    The factual and legal issues presented by this litigation are complex and risky. The risk is demonstrated by the fact that certain of the cases filed by Class Counsel have been lost at both the trial court level and through the relevant courts of appeal.  Nonetheless, counsel continued to pursue these claims aggressively, including the considerable effort expended in this Court.

43.    The extensive history of this action is not typical. This history also distinguishes this proposed class settlement from those recent settlements with which the Court has recent familiarity, *In re BGI* and *In re Partsearch Technologies, Inc*., which involved post-bankruptcy claims for violations of federal and state Worker Adjustment and Retraining Notification Acts. In this case, by contrast, Class Counsel have been engaged in litigation relating to these claims for over 12 years, including multiple trips to federal courts of appeal in both the Third and Eighth Circuits.

44.    Plaintiffs' legal claims raise complex issues under federal law. The loans involved are "high-cost" loans under the Home Ownership and Equity Protection Act ("HOEPA"), and each of the 44,535 separate loan transactions was governed by and subject to the Real Estate Settlement Procedures Act, ("RESPA"), the Truth in Lending Act ("TILA"), and HOEPA.  The claims against the Settling Defendants are premised on violations of these complex consumer protection statutes as well the Racketeer Influenced and Corrupt Organizations Act ("RICO").  By way of example of this case's magnitude and complexity, the Joint Consolidated Amended Class Action Complaint is 112 pages and contains 529 numbered paragraphs that set forth the facts and legal theory behind Plaintiffs' claims related to their second mortgage loans.  The accompanying First Amended RICO Case Statement is 154 pages

and details the elements of Plaintiffs' RICO claims.  There can be no dispute that this is a very

large and complex class action, and that factor supports the requested attorneys' fee award.

### 3.    The Risk of The Litigation

#### a.    Contingency Fee Risk – In General

45.    The substantial amount of risk assumed by Class Counsel in undertaking this

action justifies the attorneys' fees requested.  *See, e.g., City of Detroit v. Grinnell Corp.*, 495

F.2d 448, 470 (2d Cir. 1974); *In re Transunion Corp. Priv. Litig.*, 629 F.3d 741, 746 (7th Cir.

2011) ("a higher risk of loss does argue for a higher fee"); *see also In re Flag Telecom,* 2010

WL 4537550, at *27 ("Courts in the Second Circuit have recognized that the risk associated

with a case undertaken on a contingent fee basis is an important factor in determining an

appropriate fee award.").  While litigation risk can take many forms, key among those is the risk

of non-payment.  "The most salient [factor] is the attorneys' risk in accepting a case on a

contingency fee for, as the Second Circuit has noted, '[n]o one expects a lawyer whose

compensation is contingent upon his success to charge, when successful, as little as he would

charge a client who in advance had agreed to pay for his services, regardless of success.'" *In re*

*Giant Interactive Group, Inc. Sec. Litig.,* 279 F.R.D. 151, 166 (quoting *City of Detroit v.*

*Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974)); *see also Maley v. Del Global Technologies*

*Corp.*,186 F. Supp. 2d 358, 374 (S.D.N.Y. 2002) (it is "imperative that the filing of …

contingent [class action] lawsuits not be chilled by the imposition of fee awards which fail to

adequately compensate counsel for the risks of pursuing such litigation and the benefits that

would not otherwise have been achieved but for their persistent and diligent efforts"); H.

Newberg, *Attorney Fee Awards*, §1.09 (1986) (footnote omitted) ("[C]ourts have been careful to

award a fully compensable reasonable fee based on the underlying economic inducement for

class action lawyers to pursue potentially expensive or complex common fund class litigation. These lawyers assume the risk of no compensation unless they successfully confer common fund benefits on the class, based on their reasonable expectation that they will share in the recovery in a fair proportion, in contrast to receiving a fee based initially on time expended criteria that failed to give the results obtained factor primary consideration.").

46.     The fact that such a fee may result in a premium over what the attorneys' hourly rates would produce is a "premium" the market is willing to pay for winning contingency cases. *See In re Giant Interactive Group, Inc. Sec. Litig.*, 279 F.R.D. 151, 166 (quoting *Grinnell Corp.*, 495 F.2d at 470).  Contingent fees exceeding the market value of services rendered on a "non-contingent" basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis, regardless of whether they win or lose. As one court observed: "If this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing." *Behrens v. Wometco Enter., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990).

47.     Class Counsel have pursued these claims against RFC for over 12 years – in state courts and federal courts including the resulting multidistrict proceeding and in this bankruptcy proceeding. And unlike counsel for the defendants, Class Counsel have not received any compensation or reimbursement for any of their time or for the expenses incurred since they began pursuing the claims of the Kessler Settlement Class more than 12 years ago.  *In re Flag Telecom,* 2010 WL 4537550, at \*27 (evaluating risk: "[u]nlike counsel for Defendants, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, Lead Counsel

have not been compensated for any time or expenses since this case began…"). As the tortured history of this case demonstrates, the risk of no recovery in complex cases of this type is real, and this very significant and most basic of risk factors justifies the requested fee.

### b.    Risk In  Establishing Liability

48.    Another substantial risk assumed by Class Counsel in undertaking this representation is whether liability could be established on behalf of the class.  At the time Class Counsel first undertook representation of these aggrieved borrowers from across the nation, while it appeared that the originating Banks were participating in a massive predatory and illegal lending scheme and selling those loans to RFC, the scope of such wrongdoing was not commonly perceived. That is, although these abusive practices are well known today, the public was not as aware of such problems when litigation began over 12 years ago. *See Goldberger,* 209 F.3d at 55 ("It is well-established that litigation risk must be measured as of when the case is filed"). As such, litigation involving predatory lending schemes like the one alleged here was more novel at that time, and therefore presented uncertainties.

49.    Part of that uncertainty came from the fact that the noted statutory actions were not all that common and were afforded differing treatment in differing jurisdictions. Indeed, since these cases were first filed, decisional law has evolved to the benefit of the Kessler Settlement Class and to its detriment.  For example, on May 24, 2012 the United States Supreme Court entered a decision in *Freeman v. Quicken Loans, Inc*., __U.S.__, 132 S.C.t. 2034 (2012), which negatively impacted the Class' RESPA claims. In October 2009, the Third Circuit  entered its decision in *Alston v. Countrywide Financial Corp.*, 585 F.3d 753 (3rd Cir. 2009), which favorably impacted the Class' RESPA claims.

23

50.     Such issues were tested by the well-represented Defendants in their various motions to dismiss filed in the consolidated proceedings in the MDL Court, which were not resolved at the time of RFC's bankruptcy.  To that point, the eventual ruling by the district court did dismiss some of the class claims in its June 2013 Memorandum Opinion. *See In re Community. Bank of N. Virginia Mortgage Lending Practices Litig.*, MDL 1674, 2013 WL 3279551 (W.D. Pa. June 27, 2013).

**c.     There Is a Risk that The Claims Would Not be Certified As a Class Action**

51.     Throughout the underlying litigation and during this bankruptcy the Kessler Settlement Class also faced the risk that Class Counsel would fail to obtain class certification. Absent certification, the likely recovery to the named plaintiffs only (if obtained) would be miniscule in comparison to the time, work, and effort necessary to obtain the recovery. Because of this possibility, the risk of non-certification made this litigation a high risk undertaking that most attorneys would not have accepted.

52.     Every Rule 23(b)(3) class case (like this case) must establish numerosity, typicality, commonality, adequacy, and predominance, and those requirements present substantial risks. These hurdles are all the more difficult to clear in complex class action cases with multiple plaintiffs and defendants and that involve some 44,535 transactions.  To that point, both Third Circuit opinions in the underlying MDL Litigation turned on class certification issues. *See generally In re CBNV I* and *In re CBNV II.*

53.     Moreover, while class actions are certainly authorized in the bankruptcy context, as Plaintiffs explained in their Memorandum in Support of Motion to Apply Bankruptcy Rule 7023 and to Certify Class Claims [Doc. 2045], there has been some judicial hostility to the application of Rule 23 to claims administration in the bankruptcy context. S*ee, e.g., In re*

*American Reserve Corporation*, 840 F.2d 487 (7th Cir. 1988); *In re Charter Company,* 876 F.2d 866 (11th Cir. 1989); *In re Chateaugay*, 104 B.R. 626, 632 (S.D.N.Y. 1989).[18]   And even if initially successful in obtaining certification, there is a continuing risk that the class may be decertified via motion practice or as the result of an appeal under Fed. R. Civ. P. 23(f) or after trial.  And again, this very case demonstrates that point.   In the ongoing matter in the Western District of Pennsylvania, on July 31, 2013, the district court granted class certification for the claims against PNC Bank.  PNC then sought a permissive appeal under Rule 23(f), and that petition was granted on October 23, 2013, by the Third Circuit.

54.    In short, the risk presented by the uncertainty of certification, which is always present, illustrates again the high level of risk these cases present to plaintiffs and their counsel and supports the requested fee.

### d.    The Risk of Establishing Damages On a Classwide Basis

55.    Another significant risk assumed by Class Counsel in undertaking representation of the class was the amount of damages that they could establish on behalf of the class.  "Even if the Class were able to overcome a motion to dismiss, a motion for summary judgment and a jury verdict, they would still confront the question of the amount of damages, if any, incurred by the Class." *Maley,* 186 F. Supp. 2d at 372.   At the time the case was filed, Class Counsel did not have the loan documentation or payment histories that would inform them as to amount of the illegal fees and interest that the Class Members collectively paid. This lack of information as to the illegal fees charged and paid on the loans persisted throughout the bankruptcy proceedings. The Agreement accommodates this risk by providing that the Kessler Settlement Class Members

---

[18] There are, of course, decisions supporting certification. *See In re Connaught Group, Ltd.*, 491 B.R. 88, 97 (Bankr. S.D.N.Y. 2013); *In re Chateaugay Corp.*, 104 B.R. 626 (S.D.N.Y. 1989); *In re Livaditis*, 122 B.R. 330 (Bankr. N.D. Ill. 1990).

will recover a proportionate share of the amount defined in the Agreement as the Kessler Net
Recovery Distribution.  That individual proportionate amount is determined by computing each
Kessler Settlement Class Member's individual damages which is comprised of the sum of (1) the
fees paid on the loan which are determined by a formula that estimates the fees paid in
connection with each loan based upon the interest rate and other loan parameters and (2) the
actual interest paid for each Class Member's loan.  The individual Kessler Settlement Class
Member damages are then discounted per the allocation percentage where required.  Then each
Kessler Settlement Class Member's individual damages as discounted, if applicable, are
compared to the sum of all Kessler Settlement Class Member individual damages as discounted,
if applicable, to determine each Kessler Settlement Class Member's proportionate share of the
Kessler Net Recovery Distribution.  *See* Agreement at § 6.

56.    Furthermore, Class Counsel had to develop a methodology for presenting proof of
damages that would be admissible and understandable at trial.  In addition, Class Counsel had to
develop factual evidence to support the damage methodology.  It has been difficult to prepare
these methodologies and to develop this evidence given the lack of fee data for a majority of the
loans.

### e.    Trial and Appeal Risk

57.    Next, even if the claims of the class were to proceed to trial and Class Counsel
were able to present admissible evidence of and establish damages, juries can be unpredictable
and there would be no guarantee that Plaintiffs would prevail at trial. Or, even if Plaintiffs were
to be successful at trial, there would be no guarantee that a favorable verdict would be upheld on
appeal. "[E]ven if all other hurdles were overcome, there was the possibility of appeal.  As
pointed out in *In re Werner,* '[a]n appeal could seriously and adversely affect the scope of an

ultimate recovery, if not recovery itself.'" *Maley,* 186 F. Supp. 2d at 372 (quoting *In re Werner,*

618 F. Supp. at 748); *see also Kuper v. Iovenko,* 66 F.3d 1447 (6th Cir. 1995) (affirming defense

verdict); *Nelson v. IPALCO Enterprises, Inc.,* 480 F. Supp. 2d 1061 (S.D. Ind. 2007) (defense

verdict); *DiFelice v. US Airways, Inc.,* 436 F. Supp. 2d 756 (E.D. Va. 2006) (same); *Robbins v.*

*Koger Props. Inc.,* 116 F.3d 1441 (11th Cir. 1997) (reversing an $81 million jury verdict).

> **f.    The Risk of Non-Collection of Any Judgment Awarded Against RFC**

58.    The Kessler Settlement Class and Class Counsel faced another risk in connection

with the ability to collect upon any judgment obtained.  Obviously, a substantial judgment is

simply a pyrrhic victory if there are no solvent defendants from which to collect or when the

recovery is merely "pennies on the dollar."

59.    And yet again, the history of this case proves this point.  At one point, RFC was a

highly solvent defendant and now the Kessler Settlement Class, as with the other creditors of the

Debtors, is receiving only pennies on the dollar for their claims.[19]  Admittedly, the possibility of

a recovery from the Policies could substantially increase the Kessler Settlement Class recovery,

but that is hardly assured.

> **4.    The Quality of the Representation**

60.    The quality of representation provided to the Kessler Settlement Class is another

factor that justifies the proposed attorneys' fee award.   The attorneys working on this matter have

had many years of experience dealing with complex class actions, especially those concerning

predatory lending and second mortgage loan litigation. *See* Declarations **Exhibits 1** through **8**.   To

that end, the substantial recovery obtained on behalf of the Class in this bankruptcy proceeding

---

[19] This point is unfortunately also borne out in the continuing MDL litigation.  Half the class is no longer part of the case because one of the originating lenders, Guaranty National Bank of Tallahassee, failed, as did another defendant, Irwin Union Bank, which, like RFC, was a purchaser of many of the loans made as part of the predatory lending scheme.

demonstrates the quality of the representation provided by Class Counsel and supports the appropriateness of the requested award. *See Hensley v. Eckerhart,* 461 U.S. 424, 436 (1983) ("critical factor is the degree of success obtained"); *Behrens*, 118 F.R.D. at 547-48 ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained."); *Howes*, 668 F. Supp. at 1025 ("Weight assigned to the monetary results achieved should predominate over all other criteria in making attorney's fee awards in common fund cases."). "Generally, the factor given the greatest emphasis [when the award is a percentage of a fund] is the size of the fund created, because a 'common fund is itself the measure of success… [and] represents the benchmark from which a reasonable fee will be awarded.'" Manual for Complex Litigation (Fourth) § 14.121 (2004) (quoting Alba Conte & Herbert B. Newberg, *Newberg on Class Actions*, at §14:6 (4th ed. 2002)).

61.     As part of the settlement, the Kessler Settlement Class will be granted an allowed claim of $300 million against RFC. Based on an estimated $27 million minimum Kessler Gross Recovery after deduction of the requested incentive fees and expenses and after deduction of the requested 35% attorneys' fee applied to the Kessler Net Recovery, the minimum estimated Kessler Net Recovery Distribution should be $17,035,031.38. Based on this estimate, the members of the Kessler Settlement Class who obtained the 44,535 class loans will receive an average settlement payment of $382.51. These are not *de minimus* amounts, certainly not in the bankruptcy context, and certainly not in a large bankruptcy case involving 44,535 loans and 70,000 class members. Further, this average distribution will increase by $14.60 per loan for each million dollar increase in the Kessler Gross Recovery above the estimated minimum.

62.     Moreover, as part of the settlement, the Settling Defendants have agreed to assign certain Insurance Rights with respect to certain Policies which may provide $300 million in

coverage for the conduct at issue. That is a very large potential future recovery for the Kessler

Settlement Class, and the Kessler Settlement Class members are the only potential claimants for

this coverage.[20]

63.    Additionally, the recovery obtained on behalf of the Kessler Settlement Class was

in the face of significant opposition presented by attorneys that are among the best in the

country. *See, e.g., Maley,* 186 F.Supp.2d 358, 373 ("The quality of opposing counsel is also

important in evaluating the quality of the services rendered by Plaintiffs' Class Counsel.").

64.    Here, Class Counsel were able to negotiate the instant settlement with counsel

from nationally-recognized defense firms, Morrison Foerster and Bryan Cave.

65.    In sum, the experience, reputation, and ability of Class Counsel were substantial

factors in obtaining the settlement.  Less experienced or able counsel would not likely have

taken the case or have had the dedication and resources to continue representation over a period

of approximately 12 years, let alone achieved the results Class Counsel did.  As such, the quality

of representation factor substantiates the propriety of the requested fee award.

**5.    The Requested Fee in Relation to the Settlement**

66.    This factor also supports Class Counsel's request.  As has been noted, the

requested fee is within the range of fees awarded in class actions in this district. Moreover, the

proposed 35% fee is also less than the percentage awarded as attorneys' fees in similar second

mortgage litigation. These second mortgage cases are analogous to the litigation that led to the

Kessler Settlement, as they all involved extensive and protracted litigation concerning violations

related to second mortgage lending, and they are appropriate benchmarks for determining what a

---

[20] As previously noted, in the event the Kessler Settlement Class collects on any of the Insurance Rights, they are obligated to reimburse the Borrower Claims Trust a proportion of the previous Borrower Claims Trust distributions received by the Kessler Settlement Class claimants. *See* Settlement Agreement at § 5. This "Give Back" has a potential to provide the Kessler Settlement Class Members with additional monetary recovery.  *See* Plan at § IV.F.6.

reasonable fee may be for settlements involving predatory lending and second mortgage litigation.    The requested fee is clearly reasonable and appropriate in relation to the size of the settlement.

### 6.    Public Policy Favors the Fee Request

67.    The Court should also consider public policy.  Consumer plaintiffs rarely have the financial resources to pay a fixed hourly rate for legal services. Contingency fees and class action litigation make it feasible for individual consumers to have access to the courts and to counsel who possess the experience and ability necessary to take on complex and novel cases at a substantial risk of loss. Class Counsel should be rewarded when they succeed in such cases.

68.    Indeed, the role of class actions in the public interest has long been noted. As the Supreme Court has recognized, without a class action, small claimants individually lack the economic resources to vigorously litigate their rights. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997).  Private attorneys with skill and experience should be encouraged to take the risks required to represent those who would not otherwise be protected from acts of predatory lending. Awarding the requested fees and expenses would be fully consistent with important public policy considerations and would encourage lawyers and law firms to continue to advance funding for similar contingent litigation in the future.

### 7.    The Settlement Class's Reaction to the Fee Request

69.    In addition to the above factors, courts in the Second Circuit also consider the reaction of the class to the fee request in determining an appropriate and reasonable fee award. *See Veeco*, 2007 WL 4115808, at *10.  To date, only two class members as to one loan (out of 44,535 total loans) have objected to the terms of the proposed settlement and to Class Counsel's fee request.  That there was only a single objection out of 44,535 from the Kessler Settlement

Class demonstrates that the Kessler Settlement Class as an overwhelming whole is more than willing to pay the proposed attorneys' fee and that fact demonstrates the reasonableness of the requested fee. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 86–87 (2d Cir.2001) (holding that "[t]he District Court properly concluded that this small number of objections [18 where 27,883 notices were sent] weighed in favor of the settlement."); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 WL 3077396, *8 (E.D.N.Y. 2009) ("The small number of objectors to the settlement weighs heavily in favor of approval."); Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11:41, at 108 (4th ed. 2002) ("[A] certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members. If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."). Thus, the fact that only Class Members for one loan out of 44,535 filed an objection is strong support for the proposed fee.

70.    Moreover, even that sole objection, the Sinclair Objection [Doc. 5434], is baseless.  The objection asserts that the 35% fee is "prohibitively high" because the "benchmark created by the Ninth Circuit is at most 25%." *See* Sinclair Objection, [Doc. 5434] at p.2.  In fact, the Second Circuit has rejected this very proposition.  In *Goldberger*, the Second Circuit acknowledged its awareness of "benchmark" figures, including those of the Ninth Circuit, but flatly rejected the notion that there is a "benchmark" or standard fee percentage that courts should use in common fund cases, declaring that "[w]e are nonetheless disturbed by the essential notion of a benchmark." *Goldberger*, 209 F.3d at 51-52.  Rather, the Second Circuit in *Goldberger* held that "[w]hat constitutes a reasonable fee is properly committed to the sound discretion of the district court" because it is "intimately familiar with the nuances of the case, [and] is in a far better position to make [such] decisions than is an appellate court, which must work from a cold

record." *Id*. (internal citations omitted).

71.     The Sinclair Objection's other assertions regarding the fee application demonstrate a patent unfamiliarity with the terms of the Settlement and the actual fee amount sought.   The objection asserts that "class counsel and defense counsel have agreed to a $300 million dollar settlement fund and that the Defendant will pay up to $1.5 million dollars in expenses and/or costs to class counsel as well as an additional 35% of the Kessler Net Recovery meaning class counsel will get up to $79.1 million dollars in fees alone." *See* Sinclair Objection, [Doc. 5434) at p.2. This statement is inaccurate for a variety of reasons.   Most fundamentally, there is no "$300 million settlement fund" nor does Class Counsel seek "$79.1 million" in attorneys' fees.  The Settlement only provides for a $300 million Allowed Claim and the Kessler Gross Recovery will be about 9% of that amount because of the RFC distribution percentage, or an estimated minimum of $27 million.   That estimated $27 million minimum Kessler Gross Recovery is reduced by the requested incentive fees and expenses to determine the Kessler Net Recovery, which is the amount against which the 35% attorney fee percentage is applied, resulting in an estimated attorneys' fee of $9,172,709.21 not "$79.1 million."   It is entirely unclear where the "$79.1 million" attorney fee figure referenced in the Sinclair Objection comes from.

72.     Without question, the Sinclair Objection is without merit and should in no way alter the Court's Final Approval of the Kessler Settlement, including the requested attorneys' fee award.[21]   The additional assertions in the Sinclair Objection that are unrelated to the attorneys'

---

[21] The Sinclair Objection also objects to the fee award because of "the failure of class counsel to make a detailed attorneys' fee and expense application within a reasonable and adequate amount of time for objectors to evaluate the fee and expense application." *See* Sinclair Objection, [Doc. 543] at p.2. This objection is baseless for numerous reasons. First, the Second Circuit has plainly rejected the assertion that a class member raising objections to an attorney fee application has any unique right of access to attorney fee records or ability to delay a Fairness Hearing in order to muster factual merit for such objections. *See,*

fees are addressed in the Kessler Settlement Classes' Reply and should likewise be rejected.

## V. CLASS COUNSEL SHOULD BE REIMBURSED FOR REASONABLY INUCRRED LITIGATION COSTS AND EXPENSES

73.      The Court also should approve as fair and reasonable the requested litigation costs and expenses in the amount of $719,759.41. *See* Costs and Expenses Summary attached hereto as **Exhibit 10.**    Notably, that amount is significantly less than the "not to exceed" figure of $1.5 million that was noticed to the Kessler Settlement Class via the Class Notice.

74.      These expenses are of the type customarily incurred in the prosecution of this type of litigation. These expenses were incurred and advanced (and continue to be incurred and advanced) as a part of the prosecution of the claims related to the 44,535 loans that comprise the Kessler Settlement Class. Walters Declaration, at ¶ 94.   "Courts routinely note that counsel is entitled to reimbursement from the common fund for reasonable litigation expenses." *Anwar v. Fairfield Greenwich Ltd.*, 2012 WL 1981505, at *3 (S.D.N.Y. June 1, 2012).   The amount requested is comprised of payments for such expenses as photocopies, mailings, computerized factual and legal research (*e.g.,* Pacer and Westlaw), expert witness fees and reports, depositions, and travel in connection with the prosecution of the claims of the Kessler Settlement Class. These are all expenses that would normally be "billed" to a client as part of any contingency fee agreement, and the amount of these expenses is reasonable.  *See id.* (reimbursing expenses such

---

*e.g., Charron v. Wiener*, 2013 WL 5420976 at *3 (2nd Cir. Sept. 30, 2013) (objectors to class action settlement have no automatic right to discovery or evidentiary hearing to substantiate their objections); *Cassese v. Williams*, 503 Fed.Appx. 55, 57-58 (2nd Cir. 2012) (rejecting objectors arguments that requiring objections to be filed before the fee motion violated due process); *Malchman v. David*, 588 F. Supp. 1047, 1061 (S.D.N.Y. 1984) ("discovery by objectors "not warranted where the court has sufficient materials already before it to evaluate the settlement and fee application, and where the objectors have failed to make cogent factual objections which indicate the need for discovery") . Second, because the Court is an expert on attorneys' fees, it is unclear what type of "evaluation" an objector would perform on any fee application or what benefit the objection serves to the Class.  The *pro se* objectors have no unique expertise regarding  fee requests in class actions, and, as their other objections suggest that they are unfamiliar with both the litigation and the proposed settlement.  *See Cassese*, 503 F.App'x at 58.

as "mediation fees, expert witness fees, electronic legal research, photocopying, postage, and travel expenses, each of which is the type 'the paying, arms' length market' reimburses attorneys."). The fact that Class Counsel was willing to advance the litigation expenses and costs with their own funds, with no guarantee of reimbursement and contingent completely on the success of the litigation, evidences that the expenditures were reasonable and necessary. Class Counsel's expenses in the amount of $719,759.41 should be reimbursed.

## VI.    CONCLUSION

For all of the reasons set forth above, Class Counsel respectfully requests that the Court award them attorneys' fees, litigation expenses and court costs to be paid pursuant to the parties' Agreement and applicable law as follows: (a) 35% of the Kessler Net Recovery obtained on behalf of the Settlement Class which Kessler Net Recovery is determined by deducting from the Kessler Gross Recovery the amounts awarded for (1) incentive awards and (2) expense and cost awards; and (b) approve the payment of Allocation Counsel and the Allocation Mediator in the amount of their respective billings and direct that such sums be paid by Class Counsel from the fee award; and (c) for any other relief the Court deems just and proper.

Dated: New York, New York
November 4, 2013

/s/ Daniel J. Flanigan
**POLSINELLI**
Daniel J. Flanigan, Esq.
900 Third Avenue, 21st Floor
New York, New York 10022
(212) 684-0199 (Telephone)
(212) 759-8290 (Facsimile)
*Bankruptcy Counsel for*
*Class Claimants*


/s/ R. Bruce Carlson
**CARLSON LYNCH LTD.**
R. Bruce Carlson, Esq.
115 Federal Street, Suite 210
Pittsburgh, Pennsylvania 15212
(412) 322-9243 (Telephone)
(412) 231-0246 (Facsimile)
*Co-Lead Counsel for Class Claimants*

/s/ R. Fredrick Walters
**WALTERS, BENDER,**
**STROHBEHN & VAUGHAN**
David M. Skeens, Esq.
2500 City Center Square
1100 Main Street
Kansas City, Missouri  64105
(816) 421-6620 (Telephone)
(816) 421-4747 (Facsimile)
*Co-Lead Counsel for Class Claimants*

## **EXHIBITS**

| 1 | Declaration of R. Frederick Walters |
|---|---|
| 2 | Declaration of R. Bruce Carlson |
| 3 | Declaration of Scott C. Borison |
| 4 | Declaration of John W. Sharborough |
| 5 | Declaration of Andrew W.  Hutton |
| 6 | Declaration of Daniel J. Flanigan |
| 7 | Declaration of Robert S. Wood |
| 8 | Declaration of Daniel O. Meyers |
| 9 | Class Counsel's Summary of Hours and Lodestar |
| 10 | Class Counsel's Summary of Litigation Costs and Expenses |