# EXHIBIT "D"

1

MAINE DISTRICT COURT, DISTRICT NINE
DIVISION OF NORTHERN CUMBERLAND

- - -

FEDERAL NATIONAL            :
MORTGAGE ASSOCIATION    : DOCKET NO.
          Plaintiff    : BRI-RE-09-65
                           :
     V.                    :
                           :
NICOLE M. BRADBURY         :
          Defendant:
     and                   :
GMAC MORTGAGE, LLC         :
d/b/a DITECH, LLC.COM      :
and BANK OF AMERICA, NA:
     Parties in Interest:

- - -

June 7, 2010

- - -

     Oral deposition of JEFFREY D.
STEPHAN, taken pursuant to notice, was
held at the law offices of LUNDY FLITTER
BELDECOS & BERGER, P.C., 450 N. Narberth
Avenue, Narberth, Pennsylvania 19072,
commencing at 10:10 a.m., on the above
date, before Susan B. Berkowitz, a
Registered Professional Reporter and
Notary Public in the Commonwealth of
Pennsylvania.

- - -

2

APPEARANCES:

BRIAN M. FLEISCHER, ESQUIRE
FLEISCHER, FLEISCHER & SUGLIA, P.C.
        Plaza 1000 at Main Street
        Suite 208
        Voorhees, New Jersey   08043
        (856) 489-8977
        bfleischer@fleischerlaw.com
        Counsel for GMAC


THOMAS A. COX, ESQUIRE
LAW OFFICES OF THOMAS A. COX
        P.O. Box 1315
        Portland, Maine 04104
        (207) 749-6671
        tac@gwi.net
        Counsel for Defendant,
        Nicole M. Bradbury


VIA TELEPHONE:
JULIA G. PITNEY, ESQUIRE
DRUMMOND & DRUMMOND
        One Monument Way
        Portland, Maine 04101
        (207) 774-0317
        JPitney@ddlaw.com
        Counsel for GMAC and Fannie Mae

1

2          (Document marked Exhibit-1

3      for identification.)

4              -    -    -

5          (It is hereby stipulated and

6      agreed by and between counsel that

7      sealing, filing and certification

8      are waived; and that all

9      objections, except as to the form

10     of questions, be reserved until

11     the time of trial.)

12             -    -    -

13         JEFFREY D. STEPHAN, after

14     having been duly sworn, was

15     examined and testified as follows:

16             -    -    -

17         MS. PITNEY:   I would like to

18     put on the record that we

19     requested a stipulation, and

20     Attorney Cox has denied our

21     request for that stipulation.   And

22     that would be a stipulation that

23     this deposition transcript be used

24     for this case, FNMA versus

25     Bradbury, only.

STEPHAN

1

2          MR. COX:  Mr. Fleischer, we

3    understand that Julia Pitney

4    represents the plaintiff in this

5    case.  Who do you represent today?

6          MR. FLEISCHER:  I believe

7    Ms. Pitney both represents Fannie

8    Mae and GMAC, and I am here on

9    GMAC's behalf.

10          MR. COX:  GMAC is neither a

11    plaintiff nor defendant in this

12    case, so we may have some issues

13    around that, but we'll cross that

14    bridge when we get to it.

15              -   -   -

16             EXAMINATION

17              -   -   -

18    BY MR. COX:

19          Q.    Mr. Stephan, for the record,

20    would you state your full name, please?

21          A.    Jeffrey Stephan.

22          Q.    How old are you?

23          A.    I am 41, in June.

24          Q.    You live in Sellersville,

25    Pennsylvania?

```
 1                    STEPHAN
 2          A.    That is correct.
 3          Q.    Have you had your deposition
 4    taken previously?
 5          A.    In other cases, yes.
 6          Q.    How many other cases?
 7          A.    This will be my third time.
 8          Q.    What other cases were you
 9    deposed in, to your recollection?
10          A.    In what kind of cases?
11          Q.    Well, can you remember the
12    names of the cases?
13          A.    No, I don't.
14          Q.    When is the last time that
15    you've had your deposition taken?
16          A.    I would approximate two,
17    three months ago.
18          Q.    Was that in Florida?
19          A.    No.  That was in New Jersey.
20          Q.    That would have been in
21    2010?
22          A.    Yes.
23          Q.    Then you were deposed in
24    Florida in December of 2009?
25          A.    That is correct.
```

STEPHAN

2    Q.    When was the other

3    deposition, the third deposition?

4    A.    This one today is the third.

5    Q.    Have you testified in court

6    as a witness before?

7    A.    No.

8    Q.    Did you review any documents

9    to prepare for this deposition?

10    A.    Yes.

11    Q.    What documents did you

12    review?

13    A.    I looked at the deposition

14    that was sent to me.  And I went over the

15    Complaint with Brian.

16    THE WITNESS:  When was that,

17    Thursday, Wednesday?

18    MR. FLEISCHER:  You're

19    directed not to say anything with

20    regard to what we spoke about,

21    but, yes, you can answer to what

22    you looked at.

23    THE WITNESS:  Yes.

24    MS. PITNEY:  I'm sorry to

25    interrupt.  I'm just having a

```
1                     STEPHAN
2          little difficulty hearing you.  Is
3          there any way to push the phone a
4          little closer to Mr. Stephan?
5               MR. FLEISCHER:  Okay.  And,
6          Julia, let me know during the
7          course if there's still a problem.
8               MS. PITNEY:  You were doing
9          fine, and then it got a little
10         fuzzy.
11              THE WITNESS:  I'll talk
12         louder.
13              MS. PITNEY:  Thank you.
14   BY MR. COX:
15         Q.    What deposition did you look
16   at?
17         A.    The deposition for this
18   case.
19         Q.    The Deposition Notice?
20         A.    Right, the Deposition
21   Notice.
22         Q.    It was not another
23   deposition transcript --
24         A.    No.
25         Q.    -- that you were referring
```

8

1                    STEPHAN

2    to?

3           A.    No.

4                 MR. FLEISCHER:   Let him

5           finish the question, and then

6           respond, because it makes it

7           cleaner for the transcript.

8                 THE WITNESS:   Thank you.

9    BY MR. COX:

10          Q.    What is your educational

11   background?

12          A.    I have a four-year degree at

13   Penn State University in liberal arts.

14          Q.    When did you go to work for

15   GMAC?

16          A.    I began work at GMAC

17   September 30th of '04.

18          Q.    What was your work history,

19   in a summary form, before you went to

20   work for GMAC?

21          A.    I have done collections and

22   mortgage foreclosures for other

23   companies.

24          Q.    Who have you done mortgage

25   foreclosure work for?

STEPHAN

1

2    A.    ContiMortgage, Fairbanks
3  Capital, GMAC.

4    Q.    The first one, I'm not sure
5  about.  Is that Conti, C-O-N-T-E (sic)?

6    A.    C-O-N-T-I.

7    Q.    What period of time did you
8  work for ContiMortgage?

9    A.    I began there in '92.  I
10  believe I left there in '98.

11    Q.    What years, approximately,
12  did you work for Fairbanks Capital?

13    A.    '98 to '04.

14    Q.    You work in the GMAC
15  Mortgage office in Fort Washington,
16  Pennsylvania; is that correct?

17    A.    That is correct.

18    Q.    Approximately, how many
19  people work in that office?

20    A.    I can't estimate the number
21  of people.  I can say my department,
22  approximately 50 to 60 people.

23    Q.    What's the name of your
24  department?

25    A.    Foreclosures.

STEPHAN

Q.    When you began working for
GMAC Mortgage in 2004, what position did
you begin working in?

A.    I was a foreclosure
specialist.

Q.    What kinds of duties did
that involve?

A.    That involved the day-to-day
handling and servicing of a portfolio of
loans that fell into a foreclosure
category.

Q.    What kinds of duties did you
carry out with respect to those matters?

MS. PITNEY:  Object to form.

MR. COX:  You have to
answer.

MS. PITNEY:  You can answer
the question.

THE WITNESS:  The everyday
servicing of the file, from
contacting the attorney, supplying
an attorney who's handling a case
within my portfolio with any
information they may need, a copy

11

STEPHAN

1

2      of documents that may be needed

3      through a fax form or e-mail form,

4      the calculation of figures for

5      judgments, reporting sale results

6      at that time, and properly

7      conveying properties to the proper

8      departments for post sale action.

9   BY MR. COX:

10      Q.      How long did you hold the

11   position of foreclosure specialist?

12      A.      With GMAC, three years.

13      Q.      So you would have assumed a

14   new position sometime in 2007?

15      A.      Yes.

16      Q.      What position did you assume

17   in 2007?

18      A.      I became a team lead within

19   the foreclosure department.

20      Q.      What duties did you assume

21   as the team lead in the foreclosure

22   department?

23      A.      At that time, GMAC

24   segregated our department into teams, and

25   I was put into place as the supervisor or

STEPHAN

1  team lead for our bidding team, which

2  would be a team of individuals who

3  calculate the bids for sales.

4          Q.    Calculate the bids for sales

5  of mortgage --

6          A.    Foreclosure sales.

7          MR. FLEISCHER:  Again, let

8          him finish the question.

9  BY MR. COX:

10          Q.    Just so I can understand it,

11  your role in that position was to help

12  GMAC calculate what it was going to bid

13  at any given foreclosure sale?

14          A.    That would be correct.

15          Q.    The foreclosure

16  department -- is that what it's called?

17          A.    Yes.

18          Q.    That has units within it?

19          A.    Yes.

20          Q.    And when you were doing the

21  bidding work, what unit were you a part

22  of at that time?

23          A.    The bid team.

24          Q.    How long did you serve on

STEPHAN

the bid team?

        A.    I'm going to estimate six

months to a year, at the most.

        Q.    Does it sound roughly

correct that sometime in 2008, you

assumed a new position?

        A.    Yes.

        Q.    What was the next position

that you held after working on the bid

team?

        A.    My present position, which

is the team lead of the document

execution team.

        Q.    Is there also a service

transfer unit?

        A.    Yes, there is.

        Q.    Are you the team lead of

that as well?

        A.    Yes, I am.  That falls into

the document execution team.

        Q.    So I talk your language,

there's a foreclosure department?

        A.    Yes.

        Q.    And the subdivisions within

STEPHAN

1   that, do you call them teams or units?

2        A.    Teams.

3        Q.    So there's a foreclosure

4   department, and then within it are a

5   group of teams that do different

6   functions; is that correct?

7        A.    That is correct.

8        Q.    What does the document

9   execution team do?

10            MR. FLEISCHER:  Objection as

11       to form.

12            THE WITNESS:  Can you

13       rephrase that?

14  BY MR. COX:

15       Q.    What are the functions of

16  the document execution team?

17       A.    The functions of my document

18  execution team is, I have staff that

19  prints documents, from our computer

20  system, that are submitted from our

21  attorney network.  I have staff, also, on

22  that team who prepares the documents

23  which have already received figures from

24  our attorneys.  So there are completed

15

STEPHAN

1
2   documents.  They fill in the blanks, they
3   stamp names.  They ensure that all of the
4   notary lines are completed properly once
5   it's returned from the notary.  And that
6   staff also is in charge of making sure
7   they Federal Express the document back to
8   the designated attorney within our
9   network.
10          Q.    What does the service
11  transfer team do?
12          A.    The service transfer team
13  receives a list of loans from our
14  transfer management team, which is
15  located in Iowa.  The service transfer
16  team within foreclosure only handles
17  loans that fall into a bankruptcy or
18  foreclosure category.  They prepare files
19  or CDs, and transfer them to the new
20  servicer.  So they're loans that are
21  either acquired, or they're loans that
22  are being transferred to a new servicer
23  for service.
24          Q.    How many employees are on
25  the document execution team?

```
1                   STEPHAN
2        A.      14.
3        Q.      Including yourself?
4        A.      No; including me, 15.
5        Q.      What training have you
6   received from GMAC to function in your
7   capacity as the team lead for the
8   document execution team?
9               MS. PITNEY:  Object to form.
10  BY MR. COX:
11       Q.      Let me restate the question.
12  Have you received any training from GMAC
13  to use in conjunction with your
14  performance as the team lead for the
15  document execution team?
16       A.      Yes.
17       Q.      What training have you
18  received?
19       A.      I received side-by-side
20  training from another team lead to
21  instruct me on how to review the
22  documents when they are received from my
23  staff.
24       Q.      Who was that person?
25       A.      That person, at the time, I
```

17

```
1                    STEPHAN
2    believe was a gentleman by the name of
3    Kenneth Ugwuadu, U-G-W-U-A-D-U.  He is no
4    longer with GMAC.
5            Q.    How long did that training
6    last?
7            A.    Three days.
8            Q.    Were there any written or
9    printed training materials or manuals
10   used as a part of that training?
11           A.    No.
12           Q.    Again, just so I understand
13   what your testimony was, that training
14   involved your learning how to review the
15   documents that were being processed
16   through your hands; is that correct?
17           A.    That's correct.
18           Q.    What were you trained to do
19   with respect to those documents by that
20   gentleman?
21           A.    Basically, how to review the
22   system, which I already basically knew
23   from preparing documents in my prior
24   position before becoming a team lead.  So
25   it was more or less a rehash, let's say,
```

STEPHAN

or retraining, to confirm that I was

looking at things correctly in the

system.

Q.     When you refer to a system,

you're referring to a computer system?

A.     Yes.

Q.     Other than what you might

call it when you're not happy, does that

system have a name?

A.     Yes.   That system is called

Fiserv, F-I-S-E-R-V.

Q.     Have you received any

training on how to use that system?

A.     Yes, when I was hired.

Q.     Are there any manuals or

training materials associated with your

training on that system?

A.     Yes, there is.

Q.     Do you have those manuals in

your possession?

A.     Presently, no.

Q.     Do they exist in your office

at GMAC?

A.     I honestly don't know.

STEPHAN

1

2          Q.      In your role as team lead

3    for the document execution team, do you

4    have any duties with respect to the

5    receipt, application, or counting for

6    loan payments?

7          A.      No.

8                  MS. PITNEY:   Object to the

9          form of the question.

10   BY MR. COX:

11         Q.      What department has that

12   responsibility?

13         A.      To my understanding, that

14   would be customer service.  And within

15   customer service, I believe there is a

16   cash unit.

17         Q.      Have you ever worked in that

18   cash unit?

19         A.      No.

20         Q.      Have you ever worked in that

21   customer service department?

22         A.      No.

23         Q.      Have you ever had any

24   training in how that department and unit

25   work?

```
                        STEPHAN
 1
 2        A.    No.
 3        Q.    In your capacity as team
 4   lead for the document execution team, do
 5   you have any responsibility for data
 6   entry into the computer system regarding
 7   payments received by GMAC?
 8        A.    No.
 9        Q.    In your capacity as the team
10   lead for the document execution team, do
11   you have any role in the foreclosure
12   process at GMAC, other than the signing
13   of documents?
14             MR. FLEISCHER:  Objection as
15        to the form of the question.
16             THE WITNESS:  Can you
17        rephrase?
18   BY MR. COX:
19        Q.    In your capacity as the team
20   lead for the document execution team, do
21   you have any role in the foreclosure
22   process, other than the signing of
23   documents?
24        A.    No.
25        Q.    I'm going to hand you what
```

STEPHAN

1  we have marked as Deposition Exhibit

2  Number 1, which is your affidavit in this

3  case, dated August 5, 2009.

4          MS. PITNEY:  Excuse me, Tom.

5      This is Julia.  Am I to presume

6      that this is the only exhibit

7      you're going to be introducing?

8      Because I haven't received any

9      exhibits that you plan to produce

10     at this deposition today.

11         MR. COX:  I had no idea you

12     were going to be participating

13     today, Julia.

14         MS. PITNEY:  Well, I

15     represent the plaintiff.  It

16     shouldn't come as any surprise.

17         MR. COX:  We're not going to

18     have a debate on the record.  The

19     exhibits are here.  You're welcome

20     to come see them.  I had no idea

21     that you were going to participate

22     in this fashion.

23         MS. PITNEY:  You had no

24     idea?

STEPHAN

1

2      MR. COX:  I'm not going to

3  have this exchange on the record

4  with you.  If you want to go off

5  the record for a minute, I'll be

6  happy to do it.

7      MS. PITNEY:  No, we're going

8  to stay right on the record, Tom.

9      MR. COX:  That's fine.

10      MS. PITNEY:  Is it your

11  intent to introduce these exhibits

12  that have not been produced to the

13  opposing party?

14      MR. COX:  I'm not going to

15  respond to that.  I will entertain

16  objections that you are going to

17  make.  But I'm not going to

18  respond to your questions on the

19  record.

20      MS. PITNEY:  I'm going to

21  object to each and every exhibit.

22      MR. COX:  That's your right

23  to do that.

24  BY MR. COX:

25      Q.   I've handed you Deposition

1                   STEPHAN

2   Exhibit Number 1, Mr. Stephan.   Is that a

3   document signed by you?

4           A.    Yes, that is my signature.

5           Q.    And that's dated August 5,

6   2009?

7           A.    That is correct.

8           Q.    Do you have any memory of

9   signing that document?

10          A.    No, I do not.

11                MS. PITNEY:  I'd like to

12                take a brief break and speak with

13                Attorney Fleischer separately.

14                There's no question pending.

15                (Whereupon, a short recess

16                was taken.)

17                MR. COX:  I gather you have

18                something you want to say on the

19                record, Julia?

20                MS. PITNEY:  Yes.  I object

21                to not being provided copies of

22                the documents that you intend to

23                introduce in this deposition.  And

24                in an effort to make things more

25                efficient, my proposal is that --

STEPHAN

1   
2   I understand there's not a large
3   number of documents.  I propose
4   that we have Attorney Fleischer
5   fax them to me, or e-mail, in
6   bulk, or we're going to have to
7   stop.  I would object.  And each
8   time I'm going to stop and have
9   each document sent to me.
10          MR. COX:  Your objection is
11   noted.
12          MR. FLEISCHER:  Why don't we
13   at least just deal with the one
14   document that's in front of us at
15   this point, which is the
16   affidavit, and then we'll address
17   each one as they come up.
18          MS. PITNEY:  Fair enough.
19   BY MR. COX:
20          Q.    Mr. Stephan, you've
21   testified that in addition to yourself,
22   there are 14 other employees in your
23   document execution team.
24          A.    That is correct.
25          Q.    You have a title of limited

STEPHAN

1
2  signing officer; is that correct?

3       A.    That is correct.

4       Q.    How long have you been a

5  limited signing officer for GMAC

6  Mortgage?

7       A.    I'm going to estimate, two

8  years.

9       Q.    Are there any other limited

10  signing officers among the 14 people on

11  your team?

12       A.    No, not amongst my 14

13  people.

14       Q.    Exhibit-1, on the bottom of

15  the first page, says: I have under my

16  custody and control the records relating

17  to the mortgage transaction referenced

18  below.

19           What records does GMAC

20  maintain with respect to mortgage

21  transactions?

22           MS. PITNEY:  Object to the

23       form.

24           THE WITNESS:  Please

25       rephrase.

26

STEPHAN

1

2    BY MR. COX:

3          Q.    What records does GMAC

4    maintain with respect to mortgage loans?

5          A.    We keep our records for the

6    foreclosure department and the rest of

7    the company on our Fiserv system for

8    availability throughout our company.

9          Q.    Do paper records exist

10   anywhere within GMAC Mortgage?

11         A.    Yes, they do.

12         Q.    Where do they exist?

13         A.    I believe they are housed

14   either in our Iowa office or in

15   Minnesota, or with any of our custodians

16   involved within the company.

17         Q.    Do you have any

18   responsibilities for making entries in

19   the Fiserv system?

20         A.    Other than just usual notes,

21   no.

22         Q.    What kind of usual notes do

23   you enter?

24         MS. PITNEY:    Object.    I'm

25         objecting to the form of the

1       STEPHAN

2       question.  And, furthermore, I'm

3       objecting to the extent that

4       you're basically asking him an

5       incredibly broad-based question

6       here, Tom.  If you want to ask him

7       about this case and any entries he

8       made with respect to this case,

9       then that's fine.  But your

10      question is pretty sweeping there.

11  BY MR. COX:

12      Q.    What is your usual business

13  practice and routine with respect to

14  making usual notes in the Fiserv system?

15      A.    If a customer were to call

16  in, I would make a note in our computer

17  system.

18      Q.    Do customers call you in

19  your capacity as team lead for the

20  document execution team?

21      A.    No, they do not.

22      Q.    So if that's the only kind

23  of notes that you would make in the

24  system, is it fair to say that you don't

25  make notes in that system?

```
 1                    STEPHAN
 2        A.    That would be correct.
 3        Q.    And you have no role in the
 4   entry of any other data into that system;
 5   isn't that correct?
 6        A.    That is correct.
 7        Q.    What department maintains
 8   that system?
 9              MR. FLEISCHER:  Objection as
10        to form.
11   BY MR. COX:
12        Q.    Do you know what department
13   maintains that system?
14        A.    The system is used by the
15   entire company.
16        Q.    Do you know what department
17   maintains the security for that system?
18        A.    The IT department.
19        Q.    Where is that located?
20        A.    Throughout the entire
21   country.
22        Q.    Do you know what department
23   makes entries into that system?
24        A.    Numerous departments.
25        Q.    Do you know what departments
```

29

1                    STEPHAN

2    have the ability to change entries in

3    that system?

4          A.     Nobody has the ability to

5    change an entry in the system, as far as

6    a note would go.

7          Q.     What do you mean by that?

8          A.     Such as if a customer calls

9    in, you type in the system. Once you

10   type it, it's entered.

11         Q.     Does GMAC keep a paper

12   record of loan payments made by mortgage

13   customers?

14         A.     I do not know.

15         Q.     I think you said that the

16   cash department receives payments --

17   customer payments; is that correct?

18         A.     To my knowledge, yes.

19         Q.     That's the department that

20   you've said you have not worked in; is

21   that correct?

22         A.     That is correct.

23         Q.     So you don't have firsthand

24   knowledge about how it operates; is that

25   correct?

30

STEPHAN

1

2         A.      That is correct.

3                MS. PITNEY:   Object.

4   BY MR. COX:

5         Q.      Do you have any knowledge

6   about how the data relating to those

7   payments are entered into the system?

8         A.      I do not have that

9   knowledge.

10        Q.      Do you have any knowledge

11  about how GMAC ensures the accuracy of

12  the data entered into the system?

13        A.      No, I do not.

14        Q.      Do you have any knowledge as

15  to what measures GMAC takes to preserve

16  the integrity and security of the system?

17        A.      No, I do not.

18               MS. PITNEY:   Object to the

19        form of that question.

20  BY MR. COX:

21        Q.      In your capacity as team

22  lead for the document execution team,

23  what kinds of documents do you sign?

24        A.      The types of documents I

25  sign are assignments of mortgage,

STEPHAN

numerous types of affidavits, deeds that
need to be done post sale, a substitution
of trustees.  And that covers it in a
general span.

Q.    You said you sign a variety
of affidavits.  What kinds of affidavits
do you sign?

A.    I sign judgment affidavits
for judicial foreclosure actions.  I will
sign an affidavit verifying military
duty.  I sign affidavits in reference to
-- if GMAC has exhausted all options
through lost mitigation upon reviewing
notes in our Fiserv system.  That's a
general description of different types
of affidavits.

Q.    Your document execution team
provides documents for foreclosures in
what states?

A.    Throughout the country.

Q.    Are there other document
execution teams within the GMAC system?

A.    I believe our bankruptcy
unit also has a document execution team.

STEPHAN

Q.    That's the only other document execution team that you're aware of?

A.    To my knowledge, yes.

Q.    When you referred in one of your answers a few moments ago to judgment affidavits, are you referring to the type of affidavit in front of you, as Deposition Exhibit-1?

A.    That is a similar type of affidavit, yes.  This states Affidavit in Support of the Plaintiff's Motion for Summary Judgment.

Q.    Have you received any training regarding the summary judgment process in judicial foreclosure states?

A.    No.

Q.    Do you have any knowledge as to what a summary judgment affidavit is used for in the State of Maine?

MR. FLEISCHER:  Objection as to form.

BY MR. COX:

Q.    Would you please answer the

33

```
 1                    STEPHAN

 2   question?

 3            A.    To my knowledge, a borrower

 4   would have filed a contested answer.    And

 5   this would be our next step within the

 6   process, to confirm the amount that is

 7   due to support the summary judgment.

 8            Q.    Do you understand how the

 9   affidavit is used, that is, Deposition

10   Exhibit Number 1?

11                MS. PITNEY:    Objection.

12            Tom, you're getting dangerously

13            close here to the privileged area.

14            I mean, this affidavit, in itself,

15            was prepared in preparation for

16            litigation -- in litigation; not

17            even preparation for it, but

18            during litigation.

19                MR. COX:    I have not the

20            slightest interest in getting into

21            attorney/client privilege.    I'll

22            rephrase the question.

23   BY MR. COX:

24            Q.    Do you have any knowledge of

25   how summary judgment affidavits are used
```

34

STEPHAN

1

2    in judicial foreclosure states?

3         A.    No.

4         Q.    Are you aware that they are

5    given to a judge?

6         A.    Yes.

7         Q.    And do you understand that

8    the judge relies upon them?

9         A.    Yes.

10        Q.    At the time that you

11   executed Deposition Exhibit-1 on August

12   5, 2009, you were, at that time, in your

13   position as team lead for the document

14   execution department?

15        A.    Yes.

16        Q.    Has the manner in which you

17   perform your duties as the team lead for

18   the document execution department changed

19   in any way over the period from August 5,

20   2009 to the present date?

21        A.    No.

22        Q.    Has your job description

23   changed in any manner during that time?

24        A.    I assumed the responsibility

25   at that time of also handling the service

1                STEPHAN

2   transfer team as an additional

3   responsibility; other than document

4   execution, no.

5            Q.    In your usual business

6   practice as a team lead for the document

7   execution team, how does a summary

8   judgment affidavit come to you, such as

9   the one that is Deposition Exhibit Number

10  1?

11           MS. PITNEY:   Objection.

12           Tom, if you'd like to ask him

13           about how this specific affidavit

14           came to him, that's fine.  But,

15           again, you're asking way too

16           broad.

17  BY MR. COX:

18           Q.    Do you know how this

19  specific affidavit got to you, Mr.

20  Stephan?

21           A.    We have a process in place

22  that if our attorney network needs an

23  affidavit, they will upload it into our

24  system, which is called LPS.  We have

25  another system, which is a communication

36

STEPHAN

1

2   tool, between our attorneys.  They load

3   it into a process called signature

4   required.

5           MS. PITNEY:  Jeff, I'm going

6       to interrupt you right there.  To

7       the extent that this answer or

8       anything else that you say has to

9       do with your communication between

10      you and your attorney -- GMAC and

11      its attorney, it's attorney/client

12      privilege.

13          THE WITNESS:  So I won't

14      answer.

15          MR. COX:  Well, let's go

16      back and ask the question again.

17          MS. PITNEY:  He's answered

18      the question.  He gets the

19      affidavit from the attorney.

20  BY MR. COX:

21      Q.    What is the LPS system?

22      A.    That is a communication tool

23  with our attorney network.

24      Q.    Is LPS a separate company?

25      A.    Yes.

STEPHAN

1
2            MS. PITNEY:  Objection.  The
3       means by which he communicates any
4       details about -- the means by
5       which he communicates with his
6       attorneys is privileged.
7  BY MR. COX:
8       Q.    What does LPS do?
9            MS. PITNEY:  I'm going to
10      object again on privilege grounds.
11      Same objection.  Do not answer
12      that question.
13           THE WITNESS:  Okay.
14  BY MR. COX:
15      Q.    Is the source of what you
16  know about what LPS does based upon any
17  communication that you've had with
18  lawyers?
19      A.    Sorry.  Please rephrase
20  that.  I don't understand your question.
21      Q.    Do you know what LPS does
22  with respect to documents processed by
23  your unit?
24           MS. PITNEY:  Objection.
25      Same objection.

STEPHAN

1

2          MR. COX:  He can answer that

3     yes or no.

4          THE WITNESS:  I still don't

5     understand what you're asking.

6  BY MR. COX:

7          Q.    You've mentioned LPS.

8          A.    Right.

9          Q.    That's a separate company;

10 is that correct?

11         A.    It's a system that we have

12 acquired from a company by the name of

13 Fidelity, in order to have communication

14 between our attorneys.

15         Q.    Do you have any memory of

16 specifically receiving Deposition

17 Exhibit-1?

18         A.    No.

19         Q.    Again, I'm asking you, based

20 upon that, to describe what the usual

21 business practice is within your unit, as

22 far as how affidavits, such as Deposition

23 Exhibit-1, come to you.

24         A.    Our attorney will load it to

25 the LPS system.  Members of my team will

```
 1              STEPHAN
 2   print it.  Other members will prepare it.
 3   The figures have already been loaded from
 4   our network of attorneys.  So my team
 5   does not have any input on the affidavit,
 6   other than filling in my name.  They
 7   bring it to me.  I review it against our
 8   Fiserv system, execute it, hand it back.
 9   They get it notarized.  It's Federal
10   Expressed back to the individual attorney
11   asking.
12          Q.    Do you keep a log of any
13   sort of what documents you execute?
14              MS. PITNEY:  I'm sorry.  Can
15          you repeat the question, Tom?  I
16          could not hear that.
17   BY MR. COX:
18          Q.    Do you keep a log of any
19   sort of what documents you execute?
20              MS. PITNEY:  Objection.
21          Work product.  Any type of log
22          that he keeps relative to these
23          affidavits is prepared in
24          preparation for litigation; to the
25          extent that one even exists.
```

```
1                    STEPHAN
2              MR. COX:  He can answer the
3         question of whether or not he
4         keeps a log, before I ask him what
5         goes into the log.
6              MS. PITNEY:  Fine.
7              THE WITNESS:  No, I don't
8         have a log.
9    BY MR. COX:
10        Q.    Does anybody keep a log of
11   what documents you sign?
12             MS. PITNEY:  Object to the
13        form of that question.
14             THE WITNESS:  Please
15        rephrase.
16   BY MR. COX:
17        Q.    Do you know if anybody keeps
18   a log of what documents you execute?
19        A.    We have notaries in our
20   department, approximately six, who keep a
21   log for what they notarize.
22        Q.    These are notaries within
23   your department?
24        A.    That is correct.
25        Q.    As I understand it, the
```

STEPHAN

1  first step is, in your department, a
2  document comes in on the LPS system from
3  the outside lawyer; is that correct?
4       A.    That is correct.
5       Q.    And then an employee in your
6  department prints it out; is that
7  correct?
8       A.    That is correct.
9       Q.    And then you said that the
10 employee prepares the document.  What
11 does that mean?
12           MS. PITNEY:  Objection.  The
13           document is prepared for
14           litigation.  It is privileged.
15           How it is prepared is privileged.
16           Do not answer that question.
17 BY MR. COX:
18       Q.    Do your employees have any
19 direct communication with outside
20 counsel?
21       A.    Yes, through the LPS system.
22           MS. PITNEY:  Objection.  How
23           and what he communicates with his
24           attorney is privileged, Tom.

1                    STEPHAN

2                    MR. COX:  I haven't asked

3              for the content.  I asked if it

4              happens.

5    BY MR. COX:

6              Q.    Would you answer the

7    question, please?

8              A.    Yes, through the LPS system.

9              Q.    Is anything done to a

10   document submitted to the LPS system by

11   an outside lawyer before it reaches your

12   hands?

13                   MS. PITNEY:  Objection.

14             Preparation of the document is

15             privileged.  It's for litigation.

16             Do not answer the question.

17   BY MR. COX:

18             Q.    Is the document that is

19   received in the LPS system from outside

20   counsel presented to you in exactly the

21   form that it is received in from outside

22   counsel?

23                   MS. PITNEY:  Objection.

24             Same objection.

25                   MR. COX:  Is it an

43

STEPHAN

```
1                    STEPHAN
2         objection, or are you instructing
3         him not to answer?
4              MS. PITNEY:  I'm instructing
5         him not to answer, to the extent
6         you're asking him questions about
7         a document that was prepared
8         specifically during the course of
9         litigation.  It's protected by
10        privilege, and you can't ask him
11        questions about it.
12  BY MR. COX:
13        Q.    Deposition Exhibit-1 has
14  your name stamped on it with a stamp; is
15  that correct?
16        A.    That is correct.
17        Q.    And below your name, the
18  words "limited signing officer" appear;
19  is that correct?
20        A.    That is correct.
21        Q.    Who puts that stamp on these
22  affidavits?
23        A.    My team.
24        Q.    On this particular
25  affidavit, your name and title is stamped
```

44

STEPHAN

1    twice on the first page, and once on the

2    signature page for you; is that correct?

3         A.     That is correct.

4         Q.     And then it's stamped again

5    on the notary page; is that correct?

6         A.     That is correct.

7         Q.     So as I understand it, an

8    affidavit, such as Deposition Exhibit-1,

9    is initially prepared by outside counsel?

10        MS. PITNEY:  Objection.

11   BY MR. COX:

12        Q.     Is that correct?

13        A.     Yes, that is correct.

14        Q.     Does anybody on your team

15   verify the accuracy of any of the

16   contents of the affidavit before it

17   reaches your hands?

18        MS. PITNEY:  Objection

19            again.  How the document is

20            prepared -- you can ask him

21            questions about the document and

22            what's stated in the document.

23            The preparation of the document,

24            which is prepared for litigation,

45

STEPHAN

1
2          is privileged.  Do not answer the
3          question, Jeff.
4    BY MR. COX:
5          Q.    Mr. Stephan, do you recall
6    testifying in your Florida deposition in
7    December, with regard to your employees,
8    and you said, quote, they do not go into
9    the system and verify the information as
10   accurate?
11         A.    That is correct.
12             MS. PITNEY:  I'm sorry.
13         Tom, could you please repeat what
14         you just said?  I just couldn't
15         hear.
16             MR. COX:  Quote:  They do
17         not go into the system and verify
18         the information as accurate.
19   BY MR. COX:
20         Q.    Is that correct?
21         A.    That is correct.
22             MR. FLEISCHER:  Tom, can you
23         reference what litigation that was
24         in, do you know?
25             MR. COX:  The Florida case

STEPHAN

1    that he testified in.

2            MR. FLEISCHER:  I just

3    thought you might have a reference

4    there.

5            MR. COX:  I'll get it

6    shortly.

7    BY MR. COX:

8        Q.    Do you and your 14-person

9    team all work in the same physical space?

10       A.    Yes.  We're all in the same

11   department.

12       Q.    Do you have an office or a

13   cubicle, or what?

14       A.    Cubicle.

15       Q.    Do the employees bring

16   documents to you to sign?

17       A.    That is correct.

18       Q.    How many do they bring to

19   you at a time, on average?

20       A.    For a month, anywhere from

21   six to 8,000 documents.

22       Q.    Do you recall testifying in

23   your Florida deposition in December that

24   you estimated it was 10,000 documents a

STEPHAN

1

2  month?

3         A.    I do not recall.  I'm going

4  off of numbers within the past month or

5  so.

6         Q.    Have those numbers gone down

7  in the past month or so?

8         A.    There has been a decrease.

9         Q.    Back in December, were you

10  signing in the range of 10,000 documents

11  a month?

12         A.    I may have been.

13         Q.    Back in August of 2009,

14  roughly, how many documents a month were

15  you signing?

16         A.    I cannot estimate.  I don't

17  know.

18         Q.    Do you believe that it was

19  more or less than the number you were

20  signing in December?

21         A.    I'm going to assume, more.

22         Q.    And on a given day, I

23  understand an employee brings you a group

24  of documents for you to sign; is that

25  correct?

48

STEPHAN

1

2      A.      That would be correct.

3      Q.      Roughly, how many are

4  brought to you in a group, on average?

5      A.      Throughout a day, I believe

6  we are averaging approximately 400 new

7  requests coming in from our attorney

8  network.  So I would say approximately

9  400 per day.

10      Q.      This sounds very basic.

11  But, physically, are you handed a pile of

12  100 documents, 300 documents?  How does

13  that work?

14      A.      They bring them to me in

15  individual folders from each one of the

16  members of my team.  I do not count how

17  many are in the files.

18      Q.      So each team employee has a

19  folder of document; is that correct?

20      A.      That is correct.

21      Q.      When you receive a summary

22  judgment affidavit to be signed by you,

23  is it accompanied by any other documents

24  relating to the loan?

25      MS. PITNEY:  Objection.  The

```
 1                STEPHAN
 2    document is prepared for
 3    litigation.  And anything he does
 4    when he's preparing it is
 5    privileged.
 6         MR. COX:  Are you telling
 7    him not to answer?
 8         MS. PITNEY:  I am.  Tom, if
 9    you want to ask him about general
10    procedures, which you have been,
11    then I'm not going to object as
12    much.  But if you want to ask him
13    about what goes into preparing a
14    document that was used for summary
15    judgment, that's clearly prepared
16    for litigation, and it's
17    privileged and protected.
18         MR. COX:  I think you
19    haven't heard my question, Julia.
20    I'll state it again.
21 BY MR. COX:
22         Q.   When you receive a summary
23 judgment document for your execution, is
24 it accompanied by any other documents?
25         MS. PITNEY:  My objection is
```

50

```
 1                STEPHAN
 2        -- you can answer that question,
 3        Jeff.
 4             THE WITNESS:  There are
 5        times when it has the Complaint
 6        connected.  There are times when
 7        it is brought to me just as the
 8        affidavit.
 9  BY MR. COX:
10        Q.    When you say that there are
11  times when it comes to you with a
12  Complaint connected, you mean attached as
13  an exhibit?
14        A.    Such as this one, yes.
15        Q.    When you say "this one,"
16  you're referring to Deposition Exhibit-1?
17        A.    Yes, that is correct.
18        Q.    Deposition Exhibit-1 has
19  several exhibits attached to it; is that
20  correct?
21             MS. PITNEY:  Could you
22        please tell me what the exhibits
23        that are attached are, because I
24        don't have the benefit of having
25        them in front of me?
```

51

1          STEPHAN

2          THE WITNESS:  Exhibit-A is a

3    copy of the note and the --

4          MR. COX:  Julia, this is

5    your summary judgment affidavit.

6          MS. PITNEY:  I'm not

7    doubting that it is.  I just don't

8    know what these other exhibits

9    attached are.

10          MR. COX:  Don't you have

11    your copy?

12          MS. PITNEY:  You're the one

13    verifying if they're the same as

14    the one I'm looking at, Tom.

15          THE WITNESS:  Exhibit-B is

16    the mortgage.  Exhibit-C is the

17    assignment of note and mortgage.

18    Exhibit-D -- I believe we're

19    looking at the demand, or the

20    breach letter.  And those are the

21    four documents that are connected

22    to this affidavit of summary

23    judgment.

24  BY MR. COX:

25          Q.    In your usual practice, are

```
                    STEPHAN
 1
 2   those exhibits attached to the affidavit
 3   at the time that you sign them?
 4             MS. PITNEY:  Objection.
 5        You're asking about a document
 6        that was prepared by an attorney.
 7        Anything that comes with it that
 8        he's asked to review is
 9        privileged -- the communication
10        between a client and an attorney.
11        Do not answer the question.
12   BY MR. COX:
13        Q.    Mr. Stephan, would you
14   please look at Paragraph 3 of Exhibit-1.
15   Do you see there the statement:  That a
16   true and correct copy of which is
17   attached hereto is Exhibit-A?
18        A.    Where are you looking?
19        Q.    Paragraph 3.  Do you see
20   that statement?
21        A.    Yes, I do.
22        Q.    When you sign an affidavit
23   such as Exhibit-1, are the exhibits
24   attached to it?
25             MS. PITNEY:  Objection.  A
```

STEPHAN

1
2      document that's provided to him by
3      an attorney is privileged.
4          MR. COX:  Are you telling
5      him not to answer that question?
6          MS. PITNEY:  Yes.  I'll say
7      again, Tom, if you would like to
8      ask him about the facts that are
9      in the affidavit, the details
10     about this loan -- which I might
11     remind you involves a woman by the
12     name of Nicole Bradbury -- then
13     I'm sure Jeff will answer your
14     question?
15         MR. COX:  Well, he has the
16     affidavit in front of him in this
17     case.  And the affidavit which he
18     swore to says a true and correct
19     copy of the note is attached to
20     it.  And I'm asking him if that
21     document was attached to it at the
22     time that he signed it.
23 BY MR. COX:
24         Q.    Would you please answer that
25 question?

STEPHAN

1

2      A.    To my knowledge, I do not

3  recall.

4      Q.    Is it your usual business

5  practice to have exhibits attached to

6  affidavits that you sign?

7      A.    Yes.

8      Q.    All exhibits?

9          MS. PITNEY:  Object to form.

10          THE WITNESS:  I do not know.

11  BY MR. COX:

12      Q.    When you sign a summary

13  judgment affidavit, do you check to see

14  if all the exhibits are attached to it?

15      A.    No.

16      Q.    Does anybody in your

17  department check to see if all the

18  exhibits are attached to it at the time

19  that it is presented to you for your

20  signature?

21      A.    No.

22      Q.    When you sign a summary

23  judgment affidavit, do you inspect any

24  exhibits attached to it?

25      A.    No.

STEPHAN

1

2      MS. PITNEY:  Could you

3   repeat the question, Tom?  Did you

4   say -- or can you have it read

5   back, please?

6      (Whereupon, the pertinent

7   portion of the record was read.)

8      MS. PITNEY:  Object to the

9   form.

10  BY MR. COX:

11     Q.    What happens to an affidavit

12  in your department after you sign it?

13     MS. PITNEY:  Objection.

14  What happens to the document

15  afterwards is -- it's in the

16  course of litigation.  The same

17  objection as I said before.  Where

18  it goes is privileged.

19     MR. COX:  Where it goes is

20  not a communication.  It is not

21  privileged.

22     MS. PITNEY:  You don't know

23  that.

24     MR. COX:  Pardon me?

25     MS. PITNEY:  You don't

STEPHAN

1
2   necessarily know that.

3           MR. COX:   The physical

4   movement of a document is not a

5   communication.  It's a fact.

6  BY MR. COX:

7           Q.    My question to you is, where

8  does a summary judgment go after you sign

9  it?

10          A.    After I sign it, it is

11  handed back to my staff.  My staff hands

12  it to a notary for notarization.  It is

13  then handed back to my staff.  They send

14  it back to the network attorney

15  requesting any type of affidavit.

16          Q.    So you do not appear before

17  the notary; is that correct?

18          A.    I do not.

19          Q.    What does your staff do with

20  a summary judgment affidavit, such as

21  Deposition Exhibit-1, after it receives

22  it back from the notary?

23          A.    They go into our LPS system,

24  close out process, stating it's being

25  sent back to --

STEPHAN

MS. PITNEY:  Objection.

Sorry.  I don't mean to interrupt

you, Jeff.  I'm going to instruct

you not to answer anything else,

because you've already testified

that the LPS system is the means

by which you communicate with your

attorney.  The attorney/client

communication is privileged.  So

don't continue to answer the

question.

Actually, if there is no

question, pending, I'd like to

take a brief break to discuss

something with Brian Fleischer.

(Whereupon, a short recess

was taken.)

BY MR. COX:

Q.    Mr. Stephan, do you recall

testifying in your Florida deposition in

December that you rely on your attorney

network to ensure that the documents that

you receive are correct and accurate?

A.    That is correct.

```
              STEPHAN
 1

 2         Q.    And is that, in fact, the

 3  case?

 4         A.    Yes.

 5         Q.    And your department does not

 6  do any independent accuracy check of

 7  those records; isn't that correct?

 8              MR. FLEISCHER:  Objection as

 9         form.

10              THE WITNESS:  Can you

11         rephrase?

12  BY MR. COX:

13         Q.    Your department does not do

14  any independent check of the accuracy of

15  the information on the summary judgments

16  coming to you; isn't that correct?

17         A.     I review, quickly, the

18  figures.  Other than that, that's about

19  it.

20         Q.    Do you recall testifying in

21  your Florida deposition in December, that

22  the affidavits that you sign are not

23  based upon your own personal knowledge?

24         A.     I do not recall.

25              MS. PITNEY:  Objection to
```

                         STEPHAN

1                  the form.
2
3    BY MR. COX:
4         Q.    You do not recall that?
5         A.    I do not recall.
6         Q.    When you receive a summary
7    judgment affidavit from one of your staff
8    members, what do you do with it?
9         A.    I will first review it
10   against our computer system, which is
11   Fiserv, in general terms, to verify that
12   the figures are correct.  And then I will
13   execute it and hand it back to my staff
14   to have it notarized.
15        Q.    You say "in general terms"
16   you review it.  What do you mean?
17             MS. PITNEY:  Objection.
18             THE WITNESS:  I compare the
19             principal balance.  I review the
20             interests.  I take a look at the
21             late charges.  I look at the
22             outstanding escrow amounts.  When
23             I say "general terms," I mean I'm
24             not looking at the escrow and
25             breaking it down to the penny.