# EXHIBIT "E"

**IN THE CIRCUIT COURT FOR THE 15TH JUDICIAL CIRCUIT,
IN AND FOR PALM BEACH COUNTY, FLORIDA**

GMAC MORTGAGE, LLC,

    Plaintiff,

vs.

ANN M NEU A/K/A ANN MICHELLE
PEREZ; DOUGLAS WILLIAM NEU;
UNKNOWN TENANT (S) IN POSSESSION
OF THE SUBJECT PROPERTY,

    Defendants.

_____/

GENERAL JURISDICTION
DIVISION

CASE NO.
50 2008 CA 040805XXXX MB

Division: AW

**NOTICE OF FILING
DEPOSITION**

      Defendant, ANN M. NEU files the attached Deposition of Jeffrey Stephan taken December 10, 2009. The transcript is filed in support of further proceedings in this case and for purposes of appeal.

Dated: January 8, 2010.

                **ICE LEGAL, P.A.**
                Counsel for Defendant
                1975 Sansburys Way, Suite 104
                West Palm Beach, FL 33411
                Telephone (561)793-5658
                Facsimile (866) 507-9888

      By:                      

            CHRISTOPHER T. IMMEL
            Florida Bar No. 0066204

CASE NO. 50 2008 CA 040805XXXX MB

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by mail

this January 8, 2010 to all parties on the attached service list.

**ICE LEGAL, P.A.**
Counsel for Defendant
1975 Sansburys Way, Suite 104
West Palm Beach, FL 33411
Telephone (561)793-5658
Facsimile (866) 507-9888

By: _____

CHRISTOPHER T. IMMEL
Florida Bar No. 0066204

## SERVICE LIST

Alejandra Arroyave, Esq.
LAPIN & LEICHTLING
255 Alahambra Circle Suite 800
Coral Gables, FL 33134
1-305-569-4107
*Plaintiff's counsel*

**Consor & Associates**
Reporting and Transcription, Inc.

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 50 2008 CA 040805XXXX MB

GMAC MORTGAGE, LLC,

        Plaintiff,

-vs-

ANN M NEU A/K/A ANN MICHELLE
PEREZ; DOUGLAS WILLIAM NEU;
UNKNOWN TENANT (S) IN
POSSESSION OF THE SUBJECT
PROPERTY,
        Defendants.

---

DEPOSITION OF JEFFREY STEPHAN

Thursday, December 10, 2009
1:00 p.m. - 2:30 p.m.

Consor & Associates
1655 Palm Beach Lakes Blvd., Ste. 500
West Palm Beach, Florida 33401

Reported By:
Jamie Reynolds Bentley, Court Reporter
Notary Public, State of Florida
Consor & Associates
1655 Palm Beach Lakes Blvd., Suite 500
West Palm Beach, Florida 33401
(561)682-0905

# Consor & Associates
Reporting and Transcription, Inc.

```
 1    APPEARANCES:

 2    On behalf of the Plaintiff:

 3        ALEJANDRA ARROYAVE, ESQ.

          Lapin & Leichtling

 4        225 Alahamra Circle

          Suite 800

 5        Coral Gables, Florida 33134

          (305) 569-4100

 6

 7

 8    On behalf of the Defendant:

 9        CHRISTOPHER IMMEL, ESQ.

          Ice Legal, P.A.

10        1975 Sansbury's Way

          Suite 104

11        West Palm Beach, Florida 33411

          (561) 798-5658

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Censor & Associates
Reporting and Transcription, Inc.

```
1                          - - -
2                      I N D E X
3                          - - -
4
5   WITNESS:         DIRECT      CROSS      REDIRECT      RECROSS
6   JEFFREY STEPHAN
    BY MR. IMMEL           4                               54
7
    JEFFREY STEPHAN
8   BY MS. ARROYAVE               51
9
10                         - - -
11                  E X H I B I T S
12                         - - -
13
    NUMBER                             PAGE
14
15  DEFENDANT'S   EX. A          17
    DEFENDANT'S   EX. B          24
16  DEFENDANT'S   EX. C          26
    DEFENDANT'S   EX. D          30
17  DEFENDANT'S   EX. E          32
    DEFENDANT'S   EX. F          33
18  DEFENDANT'S   EX. G          37
    DEFENDANT'S   EX. H          37
19  DEFENDANT'S   EX  I          38
    DEFENDANT'S   EX. J          40
20  DEFENDANT'S   EX. K          41
    DEFENDANT'S   EX. L          44
21  DEFENDANT'S   EX. M          46
    DEFENDANT'S   EX. N          49
22
23
24
25
```

**Consor & Associates**
Reporting and Transcription, Inc.

Page 4

P R O C E E D I N G S

&mdash; &mdash; &mdash;

3    Deposition taken before Jamie Reynolds Bentley, Court

4    Reporter and Notary Public in and for the State of Florida

5    at Large, in the above cause.

&mdash; &mdash; &mdash;

7    THE COURT REPORTER: Do you swear or affirm that

8    the testimony you are about to give will be the truth,

9    the whole truth and nothing but the truth?

10    THE WITNESS:  I do.

11    Thereupon,

12    (JEFFREY STEPHAN)

13    having been first duly sworn or affirmed, was examined

14    and testified as follows:

15    DIRECT EXAMINATION

16    BY MR. IMMEL:

17    Q.   All right.  We are here on GMAC Mortgage, LLC

18    versus Neu.  This is the deposition of Jeffrey Stephan.

19    I'm sure your attorney has gone over things with you a

20    little bit.  But if you could just keep one thing in

21    mind, to answer, not to simply nod your head or anything

22    like that.  We need for your answers to be clear for the

23    court reporter that way.

24    A.   Yes.

25    Q.   Could you please state your name for the



**Consor & Associates**
Reporting and Transcription, Inc.

Page 5

1   record.

2       A.   My name is Jeffrey Stephan.

3       Q.   Okay.  And who do you work for?

4       A.   GMAC, LLC.

5       Q.   And is there a difference between GMAC, LLC

6   and GMAC Mortgage, LLC?

7       A.   GMAC, LLC -- I'm trying to think of the word

8   to use -- the most recent name.

9       Q.   Okay.

10      A.   It's GMCA Mortgage Corporation.

11      Q.   Okay.

12      A.   I'm not sure how you would word that.

13      Q.   Okay.  So are they -- does GMAC, LLC -- now

14  has that basically taken over these other entities --

15      A.   Yes.

16      Q.   -- that formerly existed?

17      A.   Yes.

18      Q.   So these entities no longer currently exist?

19      A.   Right.

20      Q.   Okay.  And how long then have you been

21  employed by GMAC, LLC?

22      A.   Five years.

23      Q.   Okay.  And prior to that, it was GMAC Mortgage

24  and GMAC Corporation?

25      A.   That was as the whole five years.

**Onsor & Associates**
Reporting and Transcription, Inc.

Page 6

1    Q.    Oh, okay.

2    A.    Yes.

3    Q.    As the whole five years.  And what is your

4    title?

5    A.    I'm a team leader in the foreclosure

6    department.

7    Q.    Okay.  And what are your responsibilities?

8    A.    I am the team lead of the document execution

9    unit.

10    Q.    Okay.

11    A.    And also the service transfer unit.

12    Q.    And so what type of documents do you

13    ordinarily execute?

14    A.    I execute on a daily basis assignments of

15    mortgage, affidavits of any type that might be needed,

16    deeds.  Any type of the document that would need a

17    signature of an officer of GMAC.

18    Q.    Okay.  And who do you report to?

19    A.    I report to Margie Kwiatanowski.

20    Q.    Could you spell that?

21    A.    Yes.  It's K-W-I-A-T-A-N-O-W-S-K-I.

22    Q.    Okay.  And approximately how many employees

23    does GMAC Mortgage, LLC have?

24    A.    I couldn't guess.  I don't know.

25    Q.    Sure.  Okay.  And as part of your

### Consor & Associates
Reporting and Transcription, Inc.

1    responsibilities, you execute assignments as a vice

2    president of MERS?

3          A.    Yes, that's correct.

4          Q.    And in executing affidavits as a vice

5    president, do you receive any compensation from MERS?

6          A.    No.

7          Q.    Have you had any training from MERS?

8          A.    No.

9          Q.    Okay.   How many documents would you say you

10   sign on an average week as far as executing affidavits

11   and things of that nature?

12         A.    It's very tough to estimate that to be honest

13   with you.

14         Q.    In a given month, would that be easier to say

15   --

16         A.    I would say --

17         Q.    -- one hundred, 500?

18         A.    -- in a month, my team brings to me

19   approximately, I'd say a round number of 10,000.   That's

20   just an estimate, of course.

21         Q.    Okay.   And so, 10,000 your team brings to you.

22   How many people do you oversee?

23         A.    A team of 13 people.

24         Q.    Okay.   Now, would these people be given the

25   duties of actually preparing the documents that you

**Censor & Associates**
Reporting and Transcription, Inc.

Page 8

1   ultimately sign and execute?

2        A.   They would review the document that is given

3   to them through our computer systems.

4        Q.   Okay.

5        A.   So they don't actually prepare it per se.

6   They review it for the accuracy of what type of entity

7   I'm signing as.

8        Q.   Okay.  How many different entities do you sign

9   as?

10             MS. ARROYAVE:   Objection:   Form.

11   BY MR. IMMEL:

12        Q.   Can you name what entities you sign --

13        A.   I sign presently as MERS.

14        Q.   Okay.

15        A.   And under MERS as vice president or an

16   assistant secretary.  Also, I sign for GMAC Mortgage.

17   And to be honest with you, it's too many entities for me

18   to actually quote under GMAC.  But it is as a limited

19   signing officer.

20        Q.   Okay.  And earlier you stated that right now

21   it's GMAC, LLC.

22        A.   Uh-huh.

23        Q.   You do still currently sign documents as GMAC

24   Mortgage, LLC?

25        A.   Yes, I do.

**Censor & Associates**
Reporting and Transcription, Inc.

Page 9

1    Q.   Okay.  And also as a corporation --

2    A.   Yes.

3    Q.   -- and some of the others that we've seen your

4    signature on?

5    A.   Yes, I do.

6    Q.   Okay.  Where then does the information that

7    goes into the system that your team reviews --

8    A.   Yes.

9    Q.   -- where does that information come from?

10   A.   The process that we use is -- and this is to

11   my knowledge -- a file is referred to a foreclosure

12   attorney stating exactly what entity would be needed

13   through the referral unit.  And at that point, the

14   attorney receives the file to proceed with the

15   foreclosure.  That foreclosure name is generated upon

16   GMAC supplying it on the referral.  I'm not 100 percent

17   sure of what that process is.

18   Q.   Okay.

19   A.   The documentation, as you stated, that you're

20   asking about, is given to us after the attorney has been

21   instructed on what name to foreclose in.

22   Q.   And who instructs the attorney as to what name

23   to foreclose it in?

24   A.   It comes to our referral unit.  Which is

25   another process to my knowledge.

# Censor & Associates
### Reporting and Transcription, Inc.

1   Q.   Okay.  Approximately, if 10,000 are signed in

2   a given month, you know, on an average, how long would

3   you say you spend executing each one and actually

4   signing?

5   A.   It's tough to say.

6   Q.   Okay.  Would it be accurate to say that when

7   these documents have been presented to you by your team

8   --

9   A.   Uh-huh.

10   Q.   -- you take the face value that they are --

11   they have been checked by your team?

12   A.   That would be a correct statement, yes.

13   Q.   So these documents wouldn't be actually

14   executed on your own personal knowledge?

15   A.   Right.

16   Q.   It would be based on knowledge that came

17   through --

18   A.   Right.

19   Q.   -- the chain --

20   A.   I'm sorry.

21   MS. ARROYAVE:  Can I interrupt just for a

22   second?  I just want to make sure that he finishes

23   his question before you answer.

24   THE WITNESS:  Sure.  Sorry.

25

Consor & Associates
Reporting and Transcription, Inc.

Page 11

1   BY MR. IMMEL:

2       Q.   Yes, yes, that's true, too.

3           So the information that your team obtains

4   isn't based on their personal knowledge either, it's

5   located within the computer networks?

6           MS. ARROYAVE:  Objection: Form.

7   BY MR. IMMEL:

8       Q.   The information on the documents that you

9   execute is stored within your data base?

10      A.   No, somewhere else.

11      Q.   No.  Okay.  The information then is that --

12  your team, they get that from a computer network that

13  you have, correct?

14      A.   No.

15      Q.   Where does your team get that information?

16      A.   That information is first given to the

17  attorney to foreclose under which name as needed.  If we

18  are stating some type of assignment, for example, the

19  attorney, to my knowledge, and I'm not 100 percent sure

20  of their process because I don't work for the attorney,

21  they would do a title check to verify what name the lien

22  is presently in.

23      Q.   Okay.

24      A.   At that point is when it would initial if an

25  assignment would be needed or not.

**Censor & Associates**
Reporting and Transcription, Inc.

Page 12

1       Q.  So at the direction of the attorney, your team

2  creates these documents and then you execute them?

3         MS. ARROYAVE:  Objection:  Form.

4  BY MR. IMMEL:

5       Q.  So your team executes documents at the request

6  of attorneys?

7         MS. ARROYAVE:  Objecting:  Form.  You can

8      still answer it if you understand the question.

9  BY MR. IMMEL:

10      Q.  Do you understand what I'm asking?

11      A.  Yes, I understand what you're asking.  My team

12  does not create any documents.

13      Q.  These documents are then sent from the

14  attorney?

15      A.  Yes.

16      Q.  Okay.  And you're -- so then the team that you

17  oversee --

18      A.  Uh-huh.

19      Q.  -- simply reviews them for accuracy?

20      A.  That's correct.

21      Q.  Okay.  And how do they verify the information

22  is accurate?

23      A.  They do not go into the system and verify the

24  information as accurate.  We are relying on our attorney

25  network to ensure that they are asking for the correct

# Censor & Associates
### Reporting and Transcription, Inc.

Page 13

1   information.

2       Q.   So the attorney creates these documents and

3   you are relying that the attorney is correct?

4       A.   Yes.

5           MS. ARROYAVE:  Objection:  Form.

6   BY MR. IMMEL:

7       Q.   Okay.  And then they are required to be

8   notarized.  Are they notarized in your office?

9       A.   Yes.

10      Q.   Is the notary present with you or is it down

11  the hall?

12      A.   The notary is in the same department.

13      Q.   Same department.  Okay.  Are they physically

14  present when you (sic) notarize this -- or when they

15  notarize and then you execute it?

16      A.   No, they are not physically present.  But I

17  will -- I do deliver them to the notary.

18      Q.   All right.

19      A.   And I wait for them to notarize it to hand

20  them back to my team.

21      Q.   Okay.  All right.  What department then?  You

22  said your department?

23      A.   Right.

24      Q.   And as part of their job responsibilities,

25  would notarizing be their sole responsibility, or do

**Censor & Associates**
Reporting and Transcription, Inc.

Page 14

1   they have other responsibilities?

2        A.   They have other responsibilities.

3        Q.   Are any of the members of your team, people

4   that also notarize documents that you execute?

5        A.   Yes.

6        Q.   Yes.  Okay.  Is there a job requirement that

7   certain employees become notaries?

8        A.   I don't know.

9        Q.   Okay.  And what type of -- what level of a

10  type of employee would it typically be that is a notary?

11       A.   I don't know that either.

12       Q.   All right.  Does the company pay for the

13  process of becoming a notary or the renewal fees?

14       A.   Yes.

15       Q.   Okay.  If a notary feels that they are being

16  asked to notarize something that's done improperly, is

17  there a process which they can, you know, raise that to

18  anybody's attention?

19       A.   I honestly don't know.

20       Q.   You are not sure.  Do you notarize any

21  assignments of mortgage or other documents yourself?

22       A.   No.

23       Q.   Are you a notary?

24       A.   No.

25       Q.   How are witnesses ordinarily chosen?

CENSOR & Associates
Reporting and Transcription, Inc.

Page 15

1           MS. ARROYAVE:  Object:  Form.

2           Chosen for what?

3    BY MR. IMMEL:

4       Q.   The witnesses to, say, the assignments of the

5    mortgage, and the witnesses of things that you execute.

6       A.   They are just chosen randomly.

7       Q.   Chosen randomly.  Okay.  Approximately how

8    many days a week do you spend executing assignments,

9    affidavits, and the various documents that you execute?

10      A.   Five.

11      Q.   Five.  Okay.  Are there any specific days

12   where it's one day these types of documents, this type

13   of documents, or can it be just a mix?

14      A.   It's a mix.

15      Q.   Okay.  Approximately how many documents would

16   you say are presented to you by your team at a given

17   time?  Is it one at a time, or ten at a time?

18      A.   It is done in bulk.

19      Q.   Done in bulk.

20      A.   I could not quote you the exact number.

21      Q.   Okay.  Going back to the signing officer as

22   Mortgage Electronic Registration Systems, you said that

23   you are -- you sign as both vice president and as an

24   assistant secretary?

25      A.   That is correct.

**Censor & Associates**
Reporting and Transcription, Inc.

Page 16

1      Q.   Is there any basis for one -- you sign as one

2  versus the other?

3      A.   The majority of the time I sign as a vice

4  president.  Most times we do not need an assistant

5  secretary, unless they are asking for a second signature

6  on any type of an affidavit or assignment.

7      Q.   Okay.  And, again, you are not paid by MERS.

8  Do you hold any other responsibilities with MERS that

9  would be consistent with having the title of a vice

10 president?

11     A.   No.

12     Q.   No.  Okay.  So you don't attend any board

13 meetings for MERS?

14     A.   No.

15     Q.   You don't report to the secretary of MERS or

16 any other people at MERS?

17     A.   No.

18     Q.   How did you become a MERS representative?  Did

19 you request to be a vice president of MERS?

20     A.   I received the responsibility as being the

21 team lead for document executing.  It was assigned to me

22 by our legal area.

23     Q.   Okay.  All right.  So your responsibilities as

24 a vice president of MERS to execute the assignments is

25 really your job perspective, or an aspect of your job at

**Censor & Associates**
Reporting and Transcription, Inc.

Page 17

1    GMAC Mortgage, LLC or GMAC, LLC?

2         A.   That is correct.

3         Q.   Okay.  And you've never been to any MERS

4    offices or their headquarters?

5         A.   No.

6         Q.   Are you aware of why you were given the title

7    of vice president versus assistant secretary or...

8         A.   No, I'm not aware of that.

9         Q.   Okay.  All right.  I have here the assignment

10   of mortgage which you executed in this case.

11        A.   Okay.

12             MR. IMMEL:  I'll enter that as Exhibit A.

13             (Defendant's Exhibit Letter A  was marked for

14        identification.)

15             MR. IMMEL:  I have a copy for you, as well.

16             THE WITNESS:  Thank you.

17   BY MR. IMMEL:

18        Q.   In the top left-hand corner it says, Record

19   and return to offices of Marshall C. Watson.

20             Based on your earlier statements, it's

21   accurate to say that attorneys at Marshall C. Watson

22   created the information on this document?

23             MS. ARROYAVE:  Objection:  Form.

24             THE WITNESS:  That would be correct.

25

Censor & Associates
Reporting and Transcription, Inc.

Page 18

1   BY MR. IMMEL:

2       Q.   Okay.  And who -- so an attorney chose the

3   date of the 4th day of March, 2009.

4            Can you tell me the date actually.  Whether

5   that's the 3rd or the 5th of March.

6       A.   To me it seems to be the 5th.

7       Q.   Okay.

8       A.   Actually, excuse me, let me change that.  It

9   would have to be the 3rd, because the notary did it on

10   the 4th.

11      Q.   Okay.  And that is your signature on this

12   document?

13      A.   That is correct.

14      Q.   Okay.  Is it commonplace then for the notary

15   to notarize a document the day after you've apparently

16   executed it?

17           MS. ARROYAVE:  Objection:  Form.

18           THE WITNESS:  I would say, yes, it would be

19       common.

20   BY MR. IMMEL:

21      Q.   Okay.  So typically when you hand these off to

22   the notary, and then they kind of catch up?

23      A.   Uh-huh.  Yes.

24      Q.   Okay.  The witnesses, Heather Reinhart, do you

25   know her personally?

**Censor & Associates**
Reporting and Transcription, Inc.

Page 19

1    A.    Yes, she is one of my employees.

2    Q.    Is she on your team?

3    A.    Yes.

4    Q.    Is it possible that she would have been one of

5    the people who reviewed this for accuracy?

6    A.    That is possible.

7    Q.    And the other person appears to be Tyra

8    Wilks --

9    A.    Wilson.

10   Q.    Tyra Wilson.   Okay.   Is she also a member of

11   your team?

12   A.    Yes.

13   Q.    And you know her personally, as well?

14   A.    Yes.

15   Q.    The notary, Susan Turner, is she a member of

16   your team?

17   A.    No, she is not.

18   Q.    Do you know her personally?

19   A.    Yes.

20   Q.    It says here that you personally appeared

21   before her on the 4th day of March.   Is it possible that

22   you executed then on the 3rd, and handed it to her and

23   then you weren't personally in front of her at the time

24   she notarized this?

25   A.    I don't know.   I can't recollect.

# Censor & Associates
### Reporting and Transcription, Inc.

1     Q.   All right.  And how did you determine on this

2  to execute it to GMAC Mortgage, LLC?

3          MS. ARROYAVE:  Objection:  Form.

4          THE WITNESS:  I'm not sure if I understand the

5     question.

6  BY MR. IMMEL:

7     Q.  Okay.  Did you have any say in the creation of

8  who MERS would assign this to?

9     A.  No.

10    Q.  No.  Your attorney, the Law Office of Marshall

11  C. Watson, determined that?

12    A.  No.

13    Q.  No.

14    A.  That is, as I stated earlier, when the

15  foreclosure referral goes out, the referral unit

16  determines what entity they should be foreclosing on.

17    Q.  Okay.  And the foreclosure referral unit that

18  you speak of, is that part of your department?

19    A.  Yes.

20    Q.  Okay.  So would they have records that they

21  are able to refer to to determine who the new mortgagee

22  should be according to these assignments?

23    A.  Yes.

24    Q.  And who -- do you have a name of any person

25  that keeps those documents?

# Consor & Associates
### Reporting and Transcription, Inc.

1      A.   The team lead for that would be Brenda.

2      Q.   Brenda?

3      A.   Her last name is Staehle, S-T-A-E-H-L-E.

4      Q.   Okay.

5      A.   I think that's the way it's spelled.

6      Q.   Can you tell me -- you really don't have any

7   knowledge or information as to who should be the

8   mortgagee?  According to this document, you take it for

9   face value; is that correct?

10          MS. ARROYAVE:  Objection:  Form.

11          THE WITNESS:  Can you explain that further?

12   BY MR. IMMEL:

13      Q.   You take it for face value that GMAC Mortgage,

14   LLC is expected to be the mortgagee?

15          MS. ARROYAVE:  Objection:  Form.

16   BY MR. IMMEL:

17      Q.   Who would have information who -- who MERS

18   should assign this to?  Would it be you or Brenda

19   Staehle?

20      A.   Brenda Staehle would be the individual or her

21   team to refer the files, and they determine what name

22   should be foreclosing in.

23      Q.   Okay.  So everything from that point on is

24   based on the presumption that her team has ascertained

25   those things to be correct?

# Censor & Associates

### Reporting and Transcription, Inc.

1        A.    That is correct.

2              MS. ARROYAVE:  Objection:  Form.

3    BY MR. IMMEL:

4        Q.    All right.  Okay.  So on March 5th, 2009,

5    you're not aware --

6        A.    I believe it's the 3rd.

7        Q.    March 3rd.  I'm sorry.  March 3rd, 2009,

8    you're not aware of any physical transfer of the

9    mortgage?

10       A.    Can you rephrase that?  I'm not following.

11       Q.    Are you aware of any reason why the assignment

12   of mortgage had to be executed on March 5th, 2009 -- or

13   the 3rd, 2009?  I'm sorry.

14       A.    We have a process that's set up with our

15   attorney network.  And Marshall Watson is in that

16   attorney network.  The file is referred to them with a

17   certain name to proceed with the foreclosure in.  They

18   will pull title.  And whatever they see title is in, in

19   order to proceed in the proper name, they need to get an

20   assignment.  In this instance it's MERS to GMAC.

21       Q.    Okay.  Are the assignments supposed to be

22   completed prior to the filing of the foreclosure

23   lawsuit?

24             MS. ARROYAVE:  Objection:  Form.

25

nsor & Associates
Reporting and Transcription, Inc.

Page 23

1    BY MR. IMMEL:

2         Q.    Are you aware if it's a company policy at

3    least?

4         A.    I don't know.

5         Q.    Okay.  So as this assignment of mortgage, on

6    the face of it, transfers from Mortgage Electronic

7    Registration Systems as nominee for Mortgage Investors

8    Corporation to GMAC Mortgage, LLC on March 3rd, 2009,

9    would it be accurate to say that prior to that, this

10   assignment, Mortgage Electronic Registration Systems was

11   the mortgagee?

12        A.    No.

13        Q.    No.  Okay.  Why would that not be accurate to

14   say?

15        A.    Mortgage Electronic Registration, to my

16   knowledge, is an origination entity to allow the passing

17   of assignments through performing loans to make it more

18   easier, I guess you would say, to transfer amongst

19   different companies.  MERS does not own loans.

20        Q.    They wouldn't own the loan.  But they would

21   own the mortgage; is that correct?

22             MS. ARROYAVE:  Objection:  Form.

23             THE WITNESS:  It's not correct, no.

24   BY MR. IMMEL:

25        Q.    No.  So they are the named mortgagee, so that

### Censor & Associates
Reporting and Transcription, Inc.

Page 24

1   when the note is passed from entity to entity it doesn't

2   have to be rerecorded?

3       A.   That is to my knowledge, yes.

4       Q.   All right.  On this it also says that MERS is

5   assigning the mortgage together with the note.  I don't

6   know if you see that line there.  It's right there

7   (indicating).

8            As you just stated, MERS has no interest in

9   the note ever; is that correct?

10      A.   I honestly don't know.

11      Q.   Oh, okay.  As far as you're aware --

12      A.   Yes.

13      Q.   -- MERS doesn't --

14      A.   As far as I'm aware.  (Witness nods head.)

15      Q.   Okay.  Are you aware of whether that's common

16  language to exist in the assignments that you execute?

17      A.   I honestly don't know.

18      Q.   You're not sure.  Okay.  All right.

19           MR. IMMEL:  And I have a copy of the first

20           page of the mortgage here.  Which I'll enter as

21           ExhibitB.

22               (Defendant's Exhibit Letter B was marked for

23           identification.)

24  BY MR. IMMEL:

25      Q.   If you will notice it says that the mortgagee

**ensor & Associates**
Reporting and Transcription, Inc.

Page 25

1    according to the mortgage is Mortgage Electronic

2    Registration Systems.

3              I believe it's right down there (indicating).

4         A.   I disagree with that interpretation.

5              MS. ARROYAVE:  Was there a question?

6              MR. IMMEL:  Yes.

7              MS. ARROYAVE:  What was the question?

8    BY MR. IMMEL:

9         Q.   According to the mortgage, it says that MERS

10   is the mortgagee?

11        A.   My interpretation, it says right in the same

12   paragraph, it says they are a nominee for the lender or

13   the lender successors.

14        Q.   Right.  Okay.  They are the mortgagee as

15   nominee --

16        A.   Uh-huh.

17        Q.   --  for the lenders?

18        A.   Yes.

19        Q.   Okay.  But they are a different entity from

20   the lender and lender successors and things?

21        A.   Yes.

22        Q.   Okay.  What does nominee in that regards mean?

23        A.   I don't know.

24        Q.   Okay.  We can move on from there.

25              I have here -- which I'll enter as Exhibit

**ensor & Associates**
Reporting and Transcription, Inc.

```
1    C -- some discovery that we received from MERS.

2              (Defendant's Exhibit Letter C was marked for

3         identification.)

4    BY MR. IMMEL:

5         Q.    And if you will turn to the second page.  It

6    is the document entitled, Min Summary.

7              And have you ever seen these records before?

8         A.    No, I have not.

9         Q.    So in executing the assignments of mortgage on

10   behalf of MERS, do you consult any of MERS' records?

11        A.    No.

12        Q.    And you are not able to tell me what any of

13   these entries would then mean?  This is the first time

14   you have seen this type of information?

15        A.    In this format, yes.

16        Q.    Okay.  Have you seen this type of information

17   in other formats?

18        A.    Some of it.  I understand what they mean as

19   far as the acronyms in there.

20        Q.    Okay.  Based on your understanding, the

21   investor says -- the investor is identified as

22   Government National Mortgage Association - Ginnie Mae.

23   What does the word "investor" mean in MERS' acronym?

24   Are you aware?

25        A.    I'm not sure how I can explain it.  GMAC would
```

**Censor & Associates**

Reporting and Transcription, Inc.

1    be the holder and the owner of the mortgage.  GMAC would

2    be the investor who is in the organization that

3    contributed the fund.  That's really the only way I can

4    explain the relationship of an investor and servicer.

5         Q.   Okay.

6         A.   But that's only to my knowledge.  I mean, I

7    don't work in that fashion.

8         Q.   Okay.  So the servicer is supposed to take on

9    the day-to-day activities of administering the mortgage

10   of loan and collecting payments and so forth?

11        A.   That would be correct.

12        Q.   And they do that on behalf of the investor who

13   loaned the monies?

14        A.   Yes.

15        Q.   Okay.  And any monies that are received from

16   the servicers, would they really be for the investor

17   then to pay him back the loan?

18        A.   I don't know.

19        Q.   Okay.  And as custodian, also, that would mean

20   that they are in possession of the mortgage file,

21   essentially, the note and any other applicable

22   documents?

23        A.   That's correct.

24        Q.   Okay.  All right.  Where it has the pool

25   number and it is blacked out.  Do you know what the pool

**nsor & Associates**
Reporting and Transcription, Inc.

1   number refers to?

2        A.   No, I don't.

3        Q.   No.   Okay.   And what about the investor loan

4   number?

5        A.   Yes, I understand what that is.

6        Q.   And what would that relate to?

7        A.   Every investor would have their own loan

8   number.   The same as GMAC would have their own loan

9   number to classify the different files.

10        Q.   Okay.   And are you aware of how a mortgage

11   that has been securitized, a mortgage note that's been

12   securitized, would be reflected on something like this,

13   on this summary?

14        A.   I am not familiar.

15        Q.   You are not familiar.   Okay.   Are you aware of

16   anyone at GMAC Mortgage, LLC that has access to these

17   MERS documents and records?

18        A.   No, I'm not.

19        Q.   You are not aware.   Okay.   Are you aware of

20   anybody at GMAC that would have a responsibility to

21   update the MERS documentation?

22        A.   No.

23        Q.   Okay.   So the various individuals at GMAC that

24   execute assignments on behalf of MERS have no

25   responsibility to update the MERS' system that they had

**Censor & Associates**
Reporting and Transcription, Inc.

Page 29

1    actually done those assignments or anything like that?

2        A.    That would be correct.

3        Q.    Okay.  Are you aware then of how the MERS'

4    system is updated?

5        A.    No.

6        Q.    Okay.  As a vice president, do you owe a

7    fiduciary duty to the original lender to ensure that the

8    mortgage is assigned to the proper entity?

9            MS. ARROYAVE:  Objection: Form.

10            THE WITNESS:  I actually don't understand your

11            question.

12    BY MR. IMMEL:

13        Q.    Do you own any duty to the -- when you assign

14    these mortgages, you execute them as -- for MERS as

15    nominee for a particular entity, correct?

16        A.    That would be correct.

17        Q.    Do you owe any responsibility then to that

18    particular entity that MERS is nominee for to ensure

19    that the mortgage is transferred to the new correct

20    entity?

21        A.    I don't know.

22        Q.    Okay.  All right.

23            MR. IMMEL:  I have the corporate resolution

24            here.  Which I'll enter it as Exhibit D.

25

**Consor & Associates**
Reporting and Transcription, Inc.

Page 30

1           (Defendant's Exhibit Letter D was marked for

2           identification.)

3    BY MR. IMMEL:

4           Q.   Have you seen this document before?

5           A.   Yes, I have.

6           Q.   When was the first time you saw it?

7           A.   I'm sorry, I can't say.  I don't recollect.

8           Q.   You're not sure.  Is it fair to say it was

9    quite a while ago?

10          A.   Yes.

11          Q.   Did you have any role in creating it or

12   negotiating it?

13          A.   No, I did not.

14          Q.   No.  Okay.  The first paragraph says that you

15   are authorized to assign a lien of any mortgage loan

16   registered on the MERS register to the member.

17               Who would be the member according to this?

18   Would that be GMAC Mortgage, LLC?

19          A.   I don't know.

20          Q.   Okay.  Assign the lien, in paragraph 2, of any

21   mortgage loan naming MERS as the mortgagee when the

22   member is also the current promissory note-holder, or if

23   the mortgage loan is registered on the MERS system, is

24   shown to be registered to the member.

25               When you are assigning liens, you already

**Censor & Associates**
Reporting and Transcription, Inc.

1    stated that you don't consult with any of the MERS

2    records to determine whether or not it's registered to

3    who -- whoever?

4         MS. ARROYAVE:  Objection:  Form.  Asked and

5         answered.  Mischaracterization of prior testimony.

6    BY MR. IMMEL:

7         Q.   Okay.  You don't consult MERS system when

8    assigned these liens?

9         A.   Yes.

10        MS. ARROYAVE:  Asked and answered.

11   BY MR. IMMEL:

12        Q.   All right.  Okay.  But is it fair to say that

13   you don't ascertain whether the member is the current

14   promissory note-holder when you assign the lien?

15        A.   That would be correct.

16        Q.   And you also don't know if the mortgage loan

17   is registered on the MERS system?

18        A.   We are relying on our attorney network when

19   they check the title --

20        Q.   Okay.

21        A.   -- to verify what title it is presently in.

22   If it is MERS, we would sign for MERS.

23        Q.   Okay.

24        MR. IMMEL:  Exhibit E.

25

**Censor & Associates**
Reporting and Transcription, Inc.

Page 32

1            (Defendant's Exhibit Letter E was marked for

2        identification.)

3    BY MR. IMMEL:

4        Q.    Here is the GMAC Mortgage, LLC certificate of

5    assistant secretary.  Here you go.

6            And you are considered a limited signing

7    officer giving you basically the same responsibility as

8    a junior officer?

9            MS. ARROYAVE:  Objection:  Form.

10           THE WITNESS:  I don't know if that's a correct

11       statement.

12   BY MR. IMMEL:

13       Q.    Okay.  Are you familiar with this document?

14       A.    I have a copy of this document.  Which to my

15   recollection means that next to my name it gives me the

16   authority to sign for GMAC and its entities as a limited

17   signing officer.

18       Q.    Okay.  In this case, you also filed an

19   affidavit of lost original document?

20           MS. ARROYAVE:  Objection:  Form.

21   BY MR. IMMEL:

22       Q.    Okay.  And you executed this document.  Is

23   this your signature?  Here is a copy of it.

24           MR. IMMEL:  I'll enter this as Exhibit F, I

25       believe.

**Gensor & Associates**

Reporting and Transcription, Inc.

Page 33

```
 1              (Defendant's Exhibit Letter F was marked for

 2          identification.)

 3              THE WITNESS:  Yes, that is my signature.

 4      BY MR. IMMEL:

 5          Q.   Okay.  And you signed this affidavit claiming

 6      that at the time plaintiff was not presently in custody

 7      or control of plaintiff or any of plaintiff's agents,

 8      and that would be the note that was not in your -- their

 9      custody or control?

10          A.   Yes.  Once again, we have a process in place

11      where if our attorney needs an original document, they

12      open up a request in our system.  At that time, we have

13      another unit -- which is not located in Pennsylvania

14      where I am located -- contact custodians, contact their

15      own records, go to different investors.  They do not do

16      an affidavit of this fashion unless they've exhausted

17      all efforts.

18          Q.   Okay.  Would it be fair to say that you're not

19      involved in any of those efforts?

20          A.   That is fair to say.

21          Q.   Okay.  Why then do they ask you to execute the

22      affidavit of lost document -- lost original document?

23          A.   They asked me to execute this for the

24      foreclosure department.  Because after conversations

25      between the attorney and this other department, they
```

# Consor & Associates
### Reporting and Transcription, Inc.

1    determine that it is not available.  I am the

2    foreclosure team lead that handles document execution.

3         Q.   Okay.  So would it be accurate to say that the

4    department that actually searches for the lost note

5    would have a better understanding of why it's lost and

6    where the search occurred?

7         A.   That is a fair statement.

8         Q.   Okay.  It says that the copy of said note

9    attached to the complaint is a true and correct and

10   substantial copy of the lost or destroyed note.

11        Do you review any documents before executing

12   the affidavits of lost original documents?

13        A.   No, I do not.  I review this.  Let me change

14   this.  Excuse me.  I do review this.  However, I do not

15   review any documents.  I rely, once again, on my

16   attorney network who is requesting the document, and

17   communications between the departments to determine if

18   it's -- if a lost affidavit is needed.

19        Q.   Okay.  So the portion that sets claims in

20   paragraph 1:  Affiant has custody and personal knowledge

21   of the account pertaining the original mortgage loan

22   instruments.  Affiant has actual and personal knowledge

23   of the facts stated herein and is authorized to make

24   this affidavit.  Would that be accurate?

25        A.   Yes, that is accurate.