Consor & Associates
Reporting and Transcription, Inc.

Page 35

1   Q.   You being the affiant have custody and
2   personal knowledge of the account pertaining to the
3   original mortgage loan instruments?
4        MS. ARROYAVE:  Object to the form.  Go ahead.
5        THE WITNESS:  I do not have the specific
6   knowledge to this one account.  But I understand
7   what the other department does in general to try to
8   locate these documents.
9   BY MR. IMMEL:
10  Q.   Okay.  All right.  And so in this particular
11  case, the -- there was no note attached to the
12  complaint.  You would have no way of ascertaining that
13  because you don't actually review?
14  A.   That, once again, is determined by our
15  attorneys' office.
16  Q.   Okay.  I'm going to just -- I have a
17  substantial copy of the complaint.  And just to show
18  that there is no note attached to it, that was the
19  original filing of the complaint.
20       You have never reviewed that, nor do you
21  review any other note to determine whether it is, in
22  fact, a true, correct and substantial copy of the lost
23  or destroyed note?
24       MS. ARROYAVE:  Objection:  Form.
25       THE WITNESS:  Can you rephrase that for me?  I

Censor & Associates
Reporting and Transcription, Inc.

Page 36

1    don't completely follow what you are saying.
2    BY MR. IMMEL:
3        Q.   When you execute the affidavit of lost
4    original document, and make the claim that you've seen a
5    copy of the note that is attached and that's a
6    substantial copy, you really have no basis for making
7    that claim.
8            THE WITNESS:  I'm still not following.
9            MS. ARROYAVE:  Objection: Form.
10   BY MR. IMMEL:
11       Q.   When the complaint in this case was filed,
12   there was no note attached to the complaint, correct?
13       A.   From what you have just handed to me, there is
14   no note.
15       Q.   Okay.  Based on what I've provided you.
16       A.   Yes.
17       Q.   Do you normally review notes to make sure that
18   they are a true copy of the lost note?
19           MS. ARROYAVE:  Objection: Form.
20           THE WITNESS:  That is -- no, I do not.  It is
21       not in my position.
22   BY MR. IMMEL:
23       Q.   It's not in your position.
24           MR. IMMEL:  All right.  I guess I can enter
25       this a Exhibit G.

Consor & Associates
Reporting and Transcription, Inc.

Page 37

1        (Defendant's Exhibit Letter G was marked for
2    identification.)
3  BY MR. IMMEL:
4        Q.   And going back, just for a second, to the lost
5  note affidavit. That is your signature?
6        A.   Yes, that's correct.
7        Q.   And your understanding is that the attorney
8  representing -- from your network drafts this?
9        A.   That is correct.
10       Q.   Okay.
11            MR. IMMEL: This is going to be Exhibit H.
12            (Defendant's Exhibit Letter H was marked for
13   identification.)
14 BY MR. IMMEL:
15       Q.   This is a copy of the note filed after the
16  complaint in this case. I don't have the notice of
17  filing page.
18            Have you ever seen this document before?
19       A.   I have seen these documents. I have not seen
20  this document.
21       Q.   Okay. And this wouldn't have been the
22  document that you reviewed in executing the lost note
23  affidavit?
24       A.   No. We do not -- once again, we do not review
25  the note. Our attorney determines that the note is not

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

Page 38

1    available through our processes.

2        Q.    Okay.

3              MR. IMMEL:    This would be Exhibit I.

4              (Defendant's Exhibit Letter I was marked for

5        identification.)

6    BY MR. IMMEL:

7        Q.    This is the newly found note.  Here.  And as

8    you can see, if you could compare the two notes, one has

9    a couple of additional endorsements.  Whereas, the

10   previous one did not.  Is that correct?

11       A.    That is what I observe here, yes.

12       Q.    Okay.  In the review of the two notes and the

13   endorsements that are on them, have you seen this type

14   of situation before where one note that's been filed in

15   the case is partially endorsed and the other is a more

16   complete record of endorsements?

17       A.    No, I have not.

18       Q.    In following along the endorsements, can you

19   determine who was the last owner of the note prior to

20   your companies?

21       A.    I'm sorry.  Can you rephrase that for me?

22       Q.    Can you determine who GMAC Mortgage, LLC has

23   acquired the mortgage note from?

24       A.    The first endorsement I see here has a date.

25   It says, Mortgage Investor Corporation.  It's signed on

1    February 27th, I believe, that's 2002.

2        Q.    All right. And they were the original lender.
3    And then, as you can see, there is another endorsement
4    there to, I believe, GMAC Mortgage Corporation. And
5    there is also one GMAC Bank. Correct?

6        A.    That is correct according to the observation
7    that I see on this document.

8        Q.    So would you need an assignment from -- why do
9    you assign the MERS -- as a vice president of MERS, why
10   do you assign the MERS -- I'm sorry. Let me start over
11   there.

12            Why do you execute the assignment of mortgage
13   on behalf of MERS as nominee for the original lender and
14   not the last lender?

15            MS. ARROYAVE:    Objection: Form.

16            THE WITNESS:    Because as you stated, it's an
17       assignment of mortgage. It's not an assignment of
18       note.

19   BY MR. IMMEL:

20       Q.    Right.

21       A.    That's the only way I can answer that. The
22   mortgage itself, which we've both reviewed, states that
23   it's MERS as a nominee for Mortgage Investor
24   Corporation.

25       Q.    Okay. So would you agree then that as the

Page 40

1   note was transferred through these endorsements to new
2   note-holders and owners that MERS remained the
3   mortgagee?
4           MS. ARROYAVE:  Objection:  Form.
5           THE WITNESS:  I wouldn't have that knowledge.
6   BY MR. IMMEL:
7       Q.  Okay.  It's your understanding that MERS does
8   not assign the mortgage every time the note is
9   transferred; is that correct?
10          MS. ARROYAVE:  Objection:  Form.
11          THE WITNESS:  I wouldn't have that knowledge
12      either.
13  BY MR. IMMEL:
14      Q.  Okay.  All right.  Do you know who would have
15  that knowledge?
16      A.  No, I do not.
17      Q.  Okay.  All right.
18          MR. IMMEL:  And we have here defendant's
19      request for production regarding the Jeffrey
20      Stephan documents.  That will be Exhibit J.
21          (Defendant's Exhibit Letter J was marked for
22      identification.)
23  BY MR. IMMEL:
24      Q.  Have you seen that document before?
25      A.  I have not seen this document until recently

1   when I found out that I was coming here.

2   Q.   Okay.  And also we have the response to the

3   request for production regarding the Jeffrey Stephan

4   document.

5   MR. IMMEL:  That will be marked as Exhibit K.

6   (Defendant's Exhibit Letter K was marked for

7   identification.)

8   BY MR. IMMEL:

9   Q.   I'm going to direct you to paragraph 5 where

10  there has been an objection based on our request for all

11  MERS system documents, records, computer data, or other

12  MERS information reviewed by Jeffrey Stephan prior to

13  executing the assignment of mortgage filed in this case

14  to determine the proper SNE.

15       It's been objected to as vague and ambiguous

16  and improperly presumes that plaintiff has custody or

17  control over any MERS system documents.

18       As a MERS vice president, you don't have

19  access to any MERS system documents?

20  A.   No, I do not.

21  Q.   Okay.

22  A.   I do not work for MERS.

23  Q.   Okay.  And so you don't actually review any

24  documents prior to executing the assignment of mortgage?

25  MS. ARROYAVE:  Asked and answered.

Consor & Associates
Reporting and Transcription, Inc.

Page 42

BY MR. IMMEL:

Q. Okay. And are there any -- do you receive any letters, e-mails, or other correspondence from other departments that have given you any instruction on any of the documents which you execute?

A. No.

Q. No. And in paragraphs -- request No. 7, as far as the search for the lost note, you didn't actually partake in that search. So you are not aware of any of the locations searched, other than by other people?

A. That's correct.

Q. Do you know who those people would be that searched for the note?

A. There is a team that's in our Minnesota office. I am not familiar with who would actually search for the said document.

Q. What is the name of that team? Do you know the name of that team?

A. I don't have a formal name for them. I call them document control. But that's my own name for them.

Q. Okay. All right. You said that the attorneys representing you prior in this case only ask you to execute the lost note affidavit after a substantial effort has occurred?

MS. ARROYAVE: Objection. That goes into the

Page 43

1    attorney-client privilege.
2    BY MR. IMMEL:
3        Q.   As far as you understand, a substantial search
4    for the lost note has already occurred by various people
5    within your team, other teams within GMAC at the request
6    of the attorneys?
7        A.   Within GMAC the lost note affidavit or lost
8    instrument affidavit would not be executed until
9    everything has been exhausted.
10       Q.   Okay.  Is it common for a lost note affidavit
11   to be executed and then later the note to be found?
12       A.   I don't know.
13       Q.   You're not sure.  Okay.  Earlier you were
14   mentioning that now you work for GMAC, LLC; is that
15   correct?
16       A.   That is correct.
17       Q.   And you still execute documents as GMAC
18   Mortgage, LLC limited signing officers, as well?
19       A.   That's the same thing you just stated.
20       Q.   Right.  One they dropped the name -- the
21   mortgage from the name, and one they haven't; is that
22   correct?
23       A.   No.
24       Q.   No.
25       A.   One they dropped corporation and changed it to

Page 44

1   LLC.
2       Q.  Oh, okay.
3       A.  They became a limited liability company.
4   That's what LLC stands for.
5       Q.  Okay. You said that there was an -- initially
6   there was a referral from the referral department to the
7   attorneys?
8       A.  That would be correct.
9       Q.  Do you ever review any of those documents in
10  your duties as executing these other documents?
11      A.  No.
12      Q.  So I'm going to turn to the -- this is the
13  note of authenticity ownership interrogatories limited
14  answers. Here you are.
15      MR. IMMEL: That will be Exhibit L.
16      (Defendant's Exhibit Letter L was marked for
17      identification.)
18  BY MR. IMMEL:
19      Q.  Do you know, I think, it is Juan A. Aquirre?
20      A.  I do not know him. But I am familiar with his
21  name.
22      Q.  Okay. Are you familiar with his duties? He's
23  a senior litigation analyst.
24      A.  Yes.
25      Q.  Do you know if he's a senior litigation

1   analyst for GMAC Mortgage, LLC, or are there other
2   entities that he works for?
3       A.   I honestly do not know.
4       Q.   Okay.  Would he be part of the document team
5   in Minnesota that may find a note?
6       A.   No.
7       Q.   No.  Okay.  Would he be somebody, do you know,
8   if in his duties he's somebody that searches for lost
9   documents?
10      A.   No.
11      Q.   Okay.
12           MS. ARROYAVE:  Is that, no, you don't know?
13           THE WITNESS:  No.  He does not do that.
14  BY MR. IMMEL:
15      Q.   He doesn't do that.  Do you know what his
16  duties are?
17      A.   As it states here, he is a senior litigation
18  analyst.  I'm not sure of what his exact
19  responsibilities would be.
20      Q.   Okay.  But searching for lost documents
21  wouldn't be one of his responsibilities, more than
22  likely?
23      A.   No, it would not be.
24      Q.   Okay.  And here are plaintiff's amended
25  answers.  Okay.

Page 46

1  MR. IMMEL: I'll mark it as Exhibit M.

2  (Defendant's Exhibit Letter M was marked for

3  identification.)

4  BY MR. IMMEL:

5  Q. It asks to identify all persons and/or

6  entities who are the current beneficial owners of, or

7  who have a beneficial or equitable interest in the

8  promissory note. And Federal National Mortgage

9  Association has been identified, Fannie Mae.

10  Are you aware -- and then if you look at No.

11  3, it says, Please identify all person and/or entities

12  who are current legal owners of, or who have legal

13  interest in the promissory note.

14  A. I don't have the same affidavit you have.

15  Q. Okay. Defendant's note. Do you have the

16  mortgage loan?

17  A. That's the mortgage loan.

18  Q. Okay.

19  MS. ARROYAVE: What has been introduced? Has

20  this set of interrogatory been --

21  MR. IMMEL: Yes.

22  MS. ARROYAVE: But not the other?

23  MR. IMMEL: No. This was also entered,

24  correct?

25  THE COURT REPORTER: I think it was the last

Consor & Associates
Reporting and Transcription, Inc.

Page 47

1       one.
2   BY MR. IMMEL:
3       Q.  So if you look at paragraphs 2 and 3, can you
4   explain to me why Fannie Mae would have the beneficial
5   or equitable interest in the promissory note, based on
6   your understanding?
7           MS. ARROYAVE:  Objection.  It calls for a
8       legal conclusion.
9           THE WITNESS:  No, I can't.
10  BY MR. IMMEL:
11      Q.  And earlier when we discussed the MERS
12  documentation where Ginnie Mae was identified as the
13  investor, would it be fair to say that the beneficial or
14  equitable interest would actually lie with the person
15  who made the loan?
16          MS. ARROYAVE:  Objection.  It calls for a
17      legal conclusion.
18          THE WITNESS:  I don't have that knowledge.
19  BY MR. IMMEL:
20      Q.  Okay.  And based on the MERS documentation
21  that I presented to you earlier, where the investor was
22  identified as Ginnie Mae.  In paragraph 5 here, they are
23  identifying Fannie Mae as the investor.
24          Do you have any understanding of -- as to why
25  those two things would --

1   A.   No, I don't.

2   Q.   -- there would be a discrepancy there? Okay.

3   All right.

4         And going back to the mortgage loan ownership

5   and the interrogatories one more time. Can you explain

6   why one entity would have the beneficial interest and

7   another entity would have a legal interest --

8         MS. ARROYAVE: Objection. It calls for a

9         legal conclusion.

10  BY MR. IMMEL:

11  Q.   -- based on your company's protocols?

12  A.   I don't have that knowledge.

13  Q.   Okay. GMAC Mortgage owns some loans and

14  services other; is that correct?

15  A.   To my knowledge that would be a correct

16  statement.

17  Q.   Okay. Do they -- and then in other instances,

18  they both own loan and service the loan?

19  A.   That would be a fair statement.

20  Q.   Okay. Is it possible that GMAC Mortgage is

21  the servicer for this loan and another entity -- whether

22  it be Fannie Mae, Ginnie Mae, or any other entity --

23  perhaps is the owner and GMAC is just the servicer?

24  A.   That's possible. But I'm not familiar enough

25  to say yes or no.

Consor & Associates
Reporting and Transcription, Inc.

Page 49

1 Q. Okay. All right. I'm just going to go over
2 the notice of taking the deposition duces tecum.
3 (Defendant's Exhibit Letter N was marked for
4 identification.)
5 BY MR. IMMEL:
6 Q. All right. This is -- and just for the
7 record, Exhibit A, if you would turn to that. This is a
8 list of the documents that we requested that you bring.
9 A request for production. And you provided some of them
10 earlier.
11 I just wanted to go over it and see if you
12 brought any of these documents today, or if you were
13 just relying on what was produced in the request for
14 production. Okay?
15 The deponent's most recent curriculum vitae?
16 A. I didn't feel I needed to bring that. That's
17 personal.
18 Q. Okay. You actually provided the corporate
19 resolution for MERS and for GMAC. You presented the
20 list of certifying officers. And the MERS system
21 documents records, you already stated that you don't
22 have any access.
23 Your team brings you the documents. And you
24 don't receive any direct communication from the
25 attorneys that draft them?

Consor & Associates
Reporting and Transcription, Inc.

Page 50

1   A.   The only type of communication I would receive
2   from an attorney is if a document is late in being
3   returned.
4   Q.   Okay.  All right.  And it would be fair to say
5   that your primary responsibility is to create and
6   execute these documents, not to actually do any of the
7   underlying duties of ascertaining specific knowledge or
8   information about them, correct?
9        MS. ARROYAVE:  Objection:  Form.  Asked and
10       answered.
11       THE WITNESS:  And the answer to that would be,
12       no.
13       MR. IMMEL:  All right.  I think that's most of
14       it.  Just let me have on second to review, but I
15       think that's most of it.  All right.  I think that
16       should do it for today.
17       Thank you very much for traveling here.
18       MS. ARROYAVE:  I have a few questions.
19       MR. IMMEL:  Yeah.  I'm sorry about that.
20       MS. ARROYAVE:  You can't have all of the fun.
21  Can I look at the exhibits?
22          CROSS (JEFFREY STEPHAN)
23  BY MS. ARROYAVE:
24  Q.   I'm going to show you what has been previously
25  marked as Defendant's Exhibit C to your deposition.

Consor & Associates
Reporting and Transcription, Inc.

Page 51

1       Do you have any knowledge of how this document

2   is created?

3       A.  No.

4       Q.  Do you have any knowledge as to whether the

5   information in this document is accurate?

6       A.  No.

7       Q.  Do you know how this is prepared?

8       A.  No.

9       Q.  Okay.  Let me show you what has been

10  previously marked as Defendant's Exhibit A to your

11  deposition.  It is the assignment of mortgage.

12      The information that is used to prepare this

13  mortgage is kept in GMAC Mortgages' business records; is

14  that correct?

15      A.  Yes.

16      Q.  And these business records from where this

17  information came from were created by persons in GMAC

18  Mortgage, employees of GMAC Mortgage, right?

19      A.  Yes.

20      Q.  And the information was entered into the

21  computer system by these GMAC Mortgage employees at the

22  time that they became aware of the information?

23      A.  Yes.

24      Q.  And they had a business duty to enter the

25  information into the computer system; is that correct?

**Censor & Associates**
Reporting and Transcription, Inc.

Page 52

1      A.   Yes.

2      Q.   And this information, these business records are kept within the course and scope of GMAC's regularly conducted business activities; is that correct?

5      A.   I'm going to say yes.

6      Q.   Okay. I'm going to show you what has been previously marked as Defendant's Exhibit F to your deposition. And it's the affidavit of lost original document.

           Is the information you used to prepare this lost original document kept in GMAC Mortgages' business records?

13      A.   I don't understand the question.

14      Q.   Okay. The information in the lost original document, is that -- GMAC Mortgage is the owner and holder of the note, correct?

17      A.   Yes.

18      Q.   Is that information kept within the course and scope of GMAC's business records?

20      A.   Yes.

21      Q.   And the information in GMAC's business records are entered by persons with knowledge of the information that GMAC is the owner of the note?

24      MR. IMMEL: Objection: Leading.

25      THE WITNESS: Can you rephrase it? I'm not

1     sure if I follow what you are saying.
2 BY MS. ARROYAVE:
3     Q. The business records that GMAC has regarding
4 whether it is the original -- whether it is the owner of
5 the note, was entered by persons that have personal
6 knowledge of whether GMAC is the owner of the note; is
7 that correct?
8     A. I honestly don't know. I do not work in those
9 departments.
10     Q. Okay.
11     MS. ARROYAVE: I have nothing further.
12     REDIRECT (JEFFREY STEPHAN)
13 BY MR. IMMEL:
14     Q. I would just ask: The assignment of the
15 mortgage and the information on it, this is not created
16 by anyone at -- this specific document isn't actually
17 created by a member or a worker for GMAC Mortgage, it is
18 actually created by the attorney?
19     A. Yes.
20     Q. Okay. So the attorney would have to be
21 relying on business records of GMAC Mortgage in forming
22 this?
23     A. That would be correct.
24     Q. Okay. And as to the lost note, this too is
25 created by the attorney, correct?

Consor & Associates
Reporting and Transcription, Inc.

Page 54

1    A.    That is correct.

2    Q.    Okay.

3          MR. IMMEL: All right. That does it.

4          MS. ARROYAVE: That's it.

5          MR. IMMEL: All right. Thank you.

6          MS. ARROYAVE: We will read.

7          THE COURT REPORTER: Okay.

8          (Witness excused.)

9          (Deposition was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25