**Hearing Date and Time: November 19, 2013 at 9:00 a.m. (Prevailing Eastern Time)**
**Opposition Date: November 15, 2013 at 4:00 p.m. (Prevailing Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |
| | |
| RESIDENTIAL CAPITAL, LLC; et al., | |
| Plaintiffs, | |
| v. | Adv. Case No. 13-01343 (MG) |
| UMB BANK, N.A., IN ITS CAPACITY AS INDENTURE TRUSTEE FOR THE 9.625% JUNIOR SECURED GUARANTEED NOTES, et al., | |
| Defendants. | |
| | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the estate of the Debtors, | |
| Plaintiffs, | |
| v. | Adv. Case No. 13-01277 (MG) |
| UMB BANK, N.A., AS SUCCESSOR INDENTURE TRUSTEE UNDER THAT CERTAIN INDENTURE, dated as of June 6, 2008, et al., | |
| Defendants. | |

**NOTICE OF THE DEBTORS' AND OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS' MOTION IN LIMINE**
**TO EXCLUDE THE EXPERT TESTIMONY OF**
**JUDGE RAYMOND T. LYONS AT TRIAL**

**PLEASE TAKE NOTICE** that upon the *Memorandum of Law in Support of the Debtors' and Official Committee of Unsecured Creditors' Motion in Limine to Exclude the Expert Testimony of Judge Raymond T. Lyons at Trial*, dated November 12, 2013, the *Declaration of Norman C. Simon in Support of the Debtors' and Official Committee of Unsecured Creditors' Motion in Limine to Exclude the Expert Testimony of Judge Raymond T. Lyons at Trial*, dated November 12, 2013, and the exhibits attached thereto, and all prior proceedings herein, Plaintiffs, Residential Capital, LLC, GMAC Mortgage LLC, Residential Funding Company, LLC, and each of their affiliated debtors and debtors in possession, together with Plaintiff, Official Committee of Unsecured Creditors, hereby move this Court for entry of an order excluding at the trial of these adversary proceedings testimony from Judge Raymond T. Lyons, an experts offered by Defendants, UMB Bank, N.A. ("UMB") and the Ad Hoc Group of Junior Secured Noteholders (the "JSNs" and collectively with UMB, "Defendants").

**PLEASE TAKE FURTHER NOTICE** that any opposition to the relief sought herein must be made in writing, conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Notice, Case Management, and Administrative Procedures approved by the Bankruptcy Court, be filed electronically by registered users of the Bankruptcy Court's electronic case filing system, and be served, so as to be received no later than **November 15, 2013 at 4:00 p.m. (Prevailing Eastern Time)**, upon (a) counsel to the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attention: Gary S. Lee, Charles L. Kerr, Darryl Rains, and J. Alexander Lawrence) and Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY 10178 (Attn: Steven J. Reisman, Theresa A. Foudy, and Michael Moscato); (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York NY

10004 (Attention: Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (c) the Office

of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue

NW, Washington, DC 20530-0001 (Attention: US Attorney General, Eric H. Holder, Jr.); (d)

Office of the New York State Attorney General, The Capitol, Albany, NY 12224-0341

(Attention: Nancy Lord, Esq. and Enid N. Stuart, Esq.); (e) Office of the U.S. Attorney for the

Southern District of New York, One St. Andrews Plaza, New York, NY 10007 (Attention:

Joseph N. Cordaro, Esq.); (f) counsel for Ally Financial Inc., Kirkland & Ellis LLP, 153 East

53rd Street, New York, NY 10022 (Attention: Richard M. Cieri and Ray Schrock); (g) counsel

for the Official Committee of Unsecured Creditors, Kramer Levin Naftalis & Frankel LLP, 1177

Avenue of the Americas, New York, NY 10036 (Attention: Kenneth H. Eckstein, Philip Bentley,

P. Bradley O'Neill and Norman C. Simon), and Pachulski Stang Ziehl & Jones LLP, 780 Third

Avenue, 36th Floor New York, NY 10017 (Attn: Robert J. Feinstein and John A. Morris).

   **PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written

objection to the relief requested in the Motion, the Bankruptcy Court may deem any opposition

waived, treat the Motion as conceded, and enter an order granting the relief requested in the

Motion without further notice or hearing.

Dated: November 12, 2013

MORRISON & FOERSTER LLP

 /s/  Gary S. Lee
Gary S. Lee
Charles L. Kerr
Darryl Rains
J. Alexander Lawrence
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

-and-

CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP

 /s/ Steven J. Reisman
Steven J. Reisman
Theresa A. Foudy
Michael Moscato
101 Park Avenue
New York, New York 10178
Telephone:  (212) 696-8860
Facsimile:  (212) 697-1559

*Counsel to the Debtors and
Debtors in Possession*

KRAMER LEVIN NAFTALIS
& FRANKEL LLP

 /s/ Kenneth H. Eckstein
Kenneth H. Eckstein
Philip Bentley
P. Bradley O'Neill
Norman C. Simon
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000

-and-

PACHULSKI STANG ZIEHL
& JONES LLP

 /s/ Robert J. Feinstein
Robert J. Feinstein
John A. Morris
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777

*Counsel to the Official Committee of
Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |
| RESIDENTIAL CAPITAL, LLC; et al., | |
| Plaintiffs, | |
| v. | |
| UMB BANK, N.A., IN ITS CAPACITY AS INDENTURE TRUSTEE FOR THE 9.625% JUNIOR SECURED GUARANTEED NOTES, et al., | Adv. Case No. 13-01343 (MG) |
| Defendants. | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the estate of the Debtors, | |
| Plaintiffs, | |
| v. | Adv. Case No. 13-01277 (MG) |
| UMB BANK, N.A., AS SUCCESSOR INDENTURE TRUSTEE UNDER THAT CERTAIN INDENTURE, dated as of June 6, 2008, et al., | |
| Defendants. | |

**DECLARATION OF NORMAN C. SIMON IN SUPPORT OF**
**THE DEBTORS' AND OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS' MOTION IN LIMINE**
**TO EXCLUDE THE EXPERT TESTIMONY OF**
**JUDGE RAYMOND T. LYONS AT TRIAL**

I, Norman C. Simon, hereby declare as follows:

1.    I am a partner at the law firm of Kramer Levin Naftalis & Frankel LLP, counsel for Plaintiff the Official Committee of Unsecured Creditors (the "Committee") in the above-captioned matters.

2.    I submit this declaration to provide the Court with true and correct copies of the following documents in support of the Motion in Limine, submitted by the Plaintiffs in the above-captioned adversary proceedings, to exclude the expert testimony of Judge Raymond T. Lyons:

| | |
|---|---|
| Exhibit 1. | Expert Report of Raymond T. Lyons, Esq. |
| Exhibit 2. | Transcript of the deposition of Raymond T. Lyons, November 11, 2013. |

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Executed on November 12, 2013

Norman C. Simon

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et. al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |

_____)

**EXPERT REPORT OF RAYMOND T. LYONS, ESQUIRE**

**Dated: October 18, 2013**

**Page**

I.    THE OPINION OF RAYMOND T. LYONS, ESQUIRE..................................... 1

    A.    THE EXPERT............................................................................................ 1

        1.    Retention ...................................................................................... 1

        2.    Qualifications ............................................................................... 1

        3.    Limitations ................................................................................... 2

    B.    ORGANIZATION OF THE OPINION....................................................... 2

    C.    THE INVESTIGATION ............................................................................ 2

    D.    METHODOLOGY OF EXPERT AND SUMMARY OF CONCLUSIONS......... 3

        1.    Legal Conclusions........................................................................ 3

        2.    Citations to Examiner's Report..................................................... 3

        3.    Summary of Conclusions.............................................................. 4

    E.    DETAILED REVIEW OF EXPERT OPINION REGARDING
        SETTLEMENT VALUES OF POTENTIAL ESTATE CLAIMS ........................ 6

        1.    Claims of GMAC Mortgage and ResCap Relating To The MMLPSA,
            Pipeline Swap, MSR Swap, and Broker Agreement................................... 8

            a.    Misallocation of Net Revenues on Loans Brokered by GMAC
                Mortgage .................................................................................. 8

            b.    Failure to Pay Value of Purchased MSRs and Correspondent
                Loan MSRs to GMAC Mortgage under the MSR Swap .............. 15

            c.    Representation and Warranty Liabilities Under the 2001 and
                2006 MMLPSAs ........................................................................ 22

            d.    Application of the Pipeline Swap To The "Funding To Sale"
                Period And To Ally Bank-Originated Loans ................................ 24

            e.    Failure To Obtain Independent Director Approval...................... 27

        2.    Government Settlements........................................................................ 28

        3.    Causes of Action Relating To Use And Allocation Of ResCap's Tax
            Attributes................................................................................................ 34

i

4.    Minnesota Insider Preference Claims ....................................................... 41

5.    Ally Bank Transactions............................................................................... 45

      a.    2006 Bank Restructuring ................................................................ 45

      b.    2008 Bank Transaction and 2009 Bank Transaction .................. 49

6.    ResCap's Directors And Officers ............................................................ 51

7.    Single Entity Theories Of Liability.......................................................... 54

      a.    Piercing The Corporate Veil ......................................................... 54

      b.    Substantive Consolidation ............................................................ 56

8.    Debt Re-characterization ........................................................................ 58

9.    Equitable Subordination And Equitable Disallowance............................ 59

10.   Constructive Trust Claim ......................................................................... 61

11.   Prepetition Asset Sales............................................................................. 62

12.   Financing Affiliate Transactions.............................................................. 66

F.    VALUE OF SETTLED ESTATE CAUSES OF ACTION ................................. 70

G.    OPINION REGARDING PROPOSED POST-PETITION
      TRANSACTIONS AND AGREEMENTS............................................................ 72

H.    OPINION REGARDING SETTLEMENT VALUES OF POTENTIAL
      THIRD PARTY CLAIMS ................................................................................... 72

1.    Third Party Claims Against AFI ............................................................... 73

      a.    RMBS Claims ............................................................................... 73

      b.    Fraudulent Transfer Claim............................................................ 79

2.    Third Party Claims Against Ally Securities.............................................. 81

3.    Third Party Claims Against Ally Bank...................................................... 84

4.    Unsecured Noteholder Causes Of Action ................................................. 86

      a.    Tortious Interference Under 2005 Indenture ................................ 86

|   |   | b. | Claims Related To The 2006 Bank Restructuring ........................ 88 |
|   | 5. |   | Junior Secured Noteholder Causes Of Action .......................................... 92 |

I.    OPINION REGARDING CONSIDERATION FOR RELEASES AND
      CONCLUSION REGARDING ALLOCATION OF SETTLEMENT FUND ..... 93

II.   EXHIBIT A ...................................................................................................................... 1

## I.    THE OPINION OF RAYMOND T. LYONS, ESQUIRE

### A.    THE EXPERT

#### 1.    Retention

I prepared, with the assistance of Fox Rothschild LLP ("Fox Rothschild"), this opinion (the "Opinion") at the request of (a) White & Case LLP and Milbank, Tweed, Hadley & McCloy LLP, co-counsel to (i) the Ad Hoc Group of Junior Secured Noteholders ("Ad Hoc Group") of the 9.625% Junior Secured Guaranteed Notes due 2015 ("JSNs") and (ii) UMB Bank, N.A. as Trustee for the JSNs ("Notes Trustee"), and (b) Akin Gump Strauss Hauer Feld LLP, as special litigation counsel to the Trustee relating to the Chapter 11 proceedings of Residential Capital, LLC ("ResCap", the "Company" or the "Debtors") in the United States Bankruptcy Court for the Southern District of New York, Case No. 12-12020. I was asked to provide my opinion as to the reasonable settlement value of each of the claims identified in the Report of Arthur J. Gonzalez, Esquire, As Examiner, released June 26, 2013 ("Examiner's Report"). I have also been asked to give my opinion as to the reasonable allocation of the $2.1 billion dollar settlement fund provided by AFI among the various settled claims. I and Fox Rothschild are being compensated at Fox Rothschild's usual and customary hourly billing rates.

#### 2.    Qualifications

Prior to joining Fox Rothschild on July 1, 2013, I served as a United States Bankruptcy Judge for the District of New Jersey for over 14 years. I conducted settlement conferences in cases assigned to me and for my colleagues in the District of New Jersey. While on the bench I was authorized by the Court of Appeals for the Third Circuit to serve as mediator in the U.S. Bankruptcy Court for the District of Delaware. Among the matters I mediated in Delaware was the plan of reorganization for Washington Mutual, Inc. involving twenty-two classes of claims and interests and $7 billion in distributions.

I completed the forty-hour Bankruptcy Mediation Training program in the first class conducted by the American Bankruptcy Institute and St. John's University School of Law. I am a member of the Dispute Resolution Section of the New Jersey State Bar Association and the Justice Marie L. Garibaldi ADR Inn of Court. I am on the Roster of Mediators for the American Arbitration Association (AAA), the CPR Panel of Distinguished Neutrals for the International Institute For Conflict Prevention and Resolution (CPR), and the Panel of Arbitrators and Mediators for Federal Arbitration, Inc. (FedArb). I am also on the court-annexed Panel of Mediators in the U.S. Bankruptcy Courts for the Southern District of New York, the Eastern District of New York, the District of Delaware and the Western District of Pennsylvania.

Before taking the bench, I was in private practice for more than 25 years as a commercial lawyer with a concentration in chapter 11 bankruptcy. I taught banking law as an adjunct professor at Seton Hall University School of Law. I received my J.D. from Seton Hall University School of Law and my LL.M. in tax law from New York University School of Law.

Other than the opinions that I have written in my position as a United States Bankruptcy Judge, I have not authored any publications in the last 10 years.  I have not testified as an expert either at trial or by deposition in the last four years.

### 3.    Limitations

The opinions expressed herein represent my reasonable professional judgment as to the matters expressed herein, based upon the facts presented in the Examiner's Report and are not guarantees that a court would reach any particular result.  In fact, the opinion of settlement amount for each claim is not intended to predict the legal outcome of the claim but rather to estimate the settlement value based on the possibility of various alternative legal outcomes.

My Opinion is limited to the matters stated herein.  No opinion is implied or may be inferred beyond the matters expressly stated.  The Opinion is given as of the date hereof, and I expressly disclaim any obligation to update or supplement my opinions contained herein to reflect any facts or circumstances that may hereafter come to my attention or any changes in laws which may hereafter occur.

### B.    ORGANIZATION OF THE OPINION

For ease of reference I have organized the Opinion using, for the most part, the same sections as Section I of the Examiner's Report.  Section A sets out the background relating to my employment as the expert, my qualifications, the scope of my retention and opinion, and the limitations of the Opinion.  Section B discusses the Organization of the Opinion.  Section C explains the Examiner's investigation.  Section D explains the methodology employed in arriving at my Opinion regarding the settlement values of the potential claims of the estate and the potential claims of third parties and a summary of my Opinion.  Section E follows the outline of potential Estate Causes of Action as set forth in Summary Section I.E of the Examiner's Report, and sets forth my opinion regarding the likely settlement amount of each claim.  Section F contains a chart of all Estate Causes of Action identified by the Examiner with my opinion on the reasonable settlement value of each claim. Section G relates to the proposed post-petition transactions and agreements.  Section H follows the outline of potential third party claims as set forth in Summary Section I.H of the Examiner's Report and contains my opinion concerning the reasonable settlement value of each of those claims. Section I contains my opinion regarding the reasonable allocation of the $2.1 billion dollar settlement fund provided by AFI among the various settled claims.

### C.    THE INVESTIGATION

The Examiner did an evaluation of the facts, including review and examination of almost nine million pages of documents produced by twenty-three different parties, ninety-nine formal interviews of eighty-three witnesses, sixty-six meetings with interested parties, and review of multiple written submissions from a dozen parties.  Unless specifically noted, I have relied on the factual findings of the Examiner in reaching my opinion regarding the settlement values of the claims identified by the Examiner.

To the extent that a potential claim identified by the Examiner in his report referenced a pertinent contract or order, such contract or order was reviewed to confirm the Examiner's interpretation of the terms and effect of that contract or order. A list of the documents that were reviewed in order to render my Opinion is attached hereto as Exhibit A.

## D.   METHODOLOGY OF EXPERT AND SUMMARY OF CONCLUSIONS

To render my Opinion, the Examiner's Report has been carefully reviewed in full to assign a settlement value to each of the potential causes of action identified in the Examiner's Report and to allocate the $2.1 billion settlement fund to those settled claims. Importantly, as noted by the Examiner, given the expansive evidence and data reviewed and the nature of sometimes unsettled legal issues raised by many of the claims, the Examiner's assessment of the likelihood of success of each cause of action is inherently imprecise. The Examiner's Report contains nuanced conclusions and therefore, the Examiner cautions against applying probabilities or mathematical models to the results contained in his report.

I have heeded this caution and have applied a non-formulaic, nuanced approach to determining the reasonable settlement value of each claim and the allocation of the $2.1 billion settlement fund provided by AFI among the various settled claims. Although under the absolute priority rule, I could have allocated the settlement first to secured claims such as the JSNs, and second to unsecured claims, instead I made allocations pro rata based on the reasonable value of each of the claims. I did so based on my 25 years of experience as a practitioner, my 14 years of experience as a U.S. Bankruptcy Judge for the District of New Jersey, as well as my experience as a mediator. When appropriate, I have provided more than one method in arriving at my opinion regarding the reasonable settlement amount of a claim. For example, I applied a discounting method focused on the likely outcome or merits of a particular issue and my perception of the motivation of the parties to arrive at a reasonable settlement value of the cause of action. I also applied a likely settlement negotiation scenario to arrive at a settlement value from a second approach. If the settlement value of a particular claim was less than or equal to 1% of the gross value of the $2.1 billion dollar settlement fund provided by AFI (approximately $21 million), I deemed that claim to be not material for purposes of allocating the $2.1 billion settlement fund to the claims.

### 1.   Legal Conclusions

I reviewed each of the legal conclusions of the Examiner and I generally reviewed the statutory and case law cited by the Examiner in support of each potential claim discussed in the Examiner's Report. Unless specifically noted, I agree with and rely on the legal conclusions reached by the Examiner as set forth in his Examiner's Report in rendering my Opinion.

### 2.   Citations to Examiner's Report

For each claim, I have listed the references to relevant information in the Examiner's Report. However, for ease of reading, for the most part I have not pin cited the reference to the Examiner's Report. Unless specifically noted, I agree with the Examiner and rely on the factual conclusions reached by the Examiner as set forth in his Examiner's Report in rendering my Opinion. In addition,

the capitalized terms not defined in this Opinion shall have the meaning as defined in the Examiner's Report and the Appendix thereto.

### 3.    Summary of Conclusions

After reviewing each of the causes of action identified in the Examiner's Report, in my opinion the reasonable settlement value of the Estate Causes of Action is $1,920.0 million and the reasonable settlement value of the Third Party Claims is $480 million for a total reasonable settlement value of all claims and causes of action of $2,400.0 million.  In my opinion the settlement fund of $2.1 billion to be paid by AFI should be allocated to the reasonable settlement value of each claim *pro rata*.

| **Claims** | **Potential Damages** *(in millions)* | **Reasonable Settlement Amount** *(in millions)[1]* | **Percentage of Potential Damages** | **Allocation from $2.1 billion AFI Settlement Fund** *(in millions)* | **Percentage of Potential Damages** |
|---|---|---|---|---|---|
| ***ESTATE CAUSES OF ACTION*** | | | | | |
| Breach of Contract for Misallocation of Net Revenues on Loans brokered by GMAC | $520.5 | **$268.2** | **51.5%** | **$234.6** | **45.1%** |
| Breach of Contract for Failure To Pay Value of Purchased MSRs | $1,725.0 | **$387.2** | **22.4%** | **$338.8** | **19.6%** |
| Preferential Transfer relating to DOJ/AG Consent Order | $109.6 | **$60.0** | **54.7%** | **$52.5** | **47.9%** |
| Preferential Transfer relating to 2012 Letter Agreement and A&R Servicing Agreement | $48.4 | **$32.0** | **66.1%** | **$28.0** | **57.9%** |

---

[1] Zeros are omitted for any settlement value that does not meet my threshold for materiality ($21 million).

| Claims | Potential Damages (in millions) | Reasonable Settlement Amount (in millions)[1] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (in millions) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| Breach of contract regarding the First 2009 Tax Allocation Agreement | $1,770.0 | $713.7 | 40.3% | $624.5 | 35.3% |
| Minnesota Insider Preference Claims | $566.0 | $328.9 | 58.1% | $287.8 | 50.8% |
| Fraud related to 2006 Bank Restructuring | $569.0 | $130.0 | 22.8% | $113.8 | 20.0% |
| **TOTAL** | | **$1,920.0** | | **$1,680.0** | |
| **THIRD PARTY CAUSES OF ACTION** | | | | | |
| Third Party Claims against AFI | | | | | |
| a. RMBS Claims, including veil-piercing, control person liability, aiding and abetting fraud | $20,000.0[2] | $480.0 | 2.4% | $420.0 | 2.1% |
| **GRAND TOTAL** | | **$2,400.0** | | **$2,100.0** | |

---

[2] The Examiner did not quantify the potential damages for the Third-Party RMBS Claims against AFI.

### E.    DETAILED REVIEW OF EXPERT OPINION REGARDING SETTLEMENT VALUES OF POTENTIAL ESTATE CLAIMS

In reaching an opinion concerning the likely settlement value of each of the Estate Causes of Action, I have considered a number of factors, including the factors relevant in determining whether the settlement is fair and equitable, the *Iridium* factors.[3]

Bankruptcy Rule 9019 provides that after notice and a hearing, "the court may approve a compromise or settlement."  In determining whether to approve a settlement, the court must determine whether the settlement is "fair, equitable and in the best interests of the estate."[4]  To determine whether a proposed compromise is fair and equitable, the court must review all facts necessary to (i) determine the probabilities of success should the claim be litigated, (ii) estimate the complexity, expenses and duration of litigating the claims, (iii) evaluate the possible difficulties of collecting on a judgment and all other factors relevant to an assessment of the settlement.[5]

In *Iridium*, the Second Circuit enumerated seven factors that should be evaluated in determining whether a settlement is fair and equitable and should be approved under Bankruptcy Rule 9019. Those factors are:

- The balance between the litigation's possibility of success and the settlement's future benefits;
- The likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment;
- The paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement;
- Whether other parties in interest support the settlement;
- The competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement;
- The nature and breadth of releases to be obtained by officers and directors; and
- The extent to which the settlement is the product of arm's length bargaining.[6]

I have considered each of these factors, as relevant, in determining the likely settlement amount of each claim identified by the Examiner.  For all of the Estate Causes of action I assumed that collection is not a significant factor.

---

[3] *Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007)(citing *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006); *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992).

[4] *TMT Trailer Ferry,* 390 U.S. at 424-25.

[5] *Id.*

[6] *Iridium*, 478 F.3d at 462.

In arriving at the likely settlement amount for each of the potential claims identified by the Examiner, I have also considered the likely motivation of the particular litigants regarding the decision to settle the claims. Estate causes of action are likely to be pursued by a fiduciary such as a liquidating trustee or a committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to reduce litigation costs and expedite distributions to creditors.

In assessing the likely settlement value of a potential claim identified by the Examiner, I have also considered the state of the law post-*Stern v. Marshall*.[7] There are many procedural hurdles that attend bankruptcy litigation, including the constitutional authority of a bankruptcy judge to render a final judgment in a state law contract dispute or a tort claim, federal statutory claims such as securities law claims, or an avoidance action under the Bankruptcy Code or state law such as a preference or a fraudulent transfer action. In addition, litigation of estate claims raises procedural issues of withdrawal of the reference and demands for a jury trial (the "Procedural Factors"). The Supreme Court has granted certiorari in the *Bellingham* case,[8] a Ninth Circuit case holding that fraudulent conveyance claims against non-creditors cannot be adjudicated by non-Article III judges. Thus, the Supreme Court may finally resolve these issues and offer both lower Article III courts and bankruptcy courts further guidance on the scope of a bankruptcy judge's authority.

Although *Stern v. Marshall* initially resulted in litigants requesting the withdrawal of the reference resulting in delay of the proceedings, the District Court for the Southern District of New York attempted to ameliorate these procedural roadblocks by entry of its Amended Standing Order of Reference on January 31, 2012. The Standing Order provides that if a bankruptcy judge or district judge determines that the entry of a final order or judgment by the bankruptcy judge would not be consistent with Article III of the United States Constitution in a particular proceeding referred under the standing order and determined to be a core matter, the bankruptcy judge shall hear the proceeding and submit proposed findings of fact and conclusions of law to the district court unless otherwise ordered by the district court. This procedure is the same procedure currently prescribed by 28 U.S.C. § 157(c) relating to non-core matters. Nevertheless, parties must still evaluate which is their preferred forum and take steps they deem in their best interest.

Also, the parties will have the right to a jury trial in many of the estate claims identified by the Examiner such as contract disputes and securities law claims. It is anticipated that some parties may request a jury trial. Many of the procedural issues pertaining to bankruptcy litigation will be present in the estate claims identified by the Examiner. They add complexity, risk, uncertainty, delay and expense to the litigation which must be factored into the evaluation of a reasonable settlement amount.

---

[7] 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011).
[8] *Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 702 F. 3d 553 (9th Cir. 2012).

1.      **Claims of GMAC Mortgage and ResCap Relating To The MMLPSA, Pipeline Swap, MSR Swap, and Broker Agreement**

a.      *Misallocation of Net Revenues on Loans Brokered by GMAC Mortgage*

**Examiner's Report References:**

Section I.E pages I-8 to I-9

Section V.B.6 pages V-123 to V-154

Section VII.L pages VII.L-64 to VII.L-66

**Description:**

The implementation of the agreements between GMAC Mortgage and Ally Bank concerning the allocation of revenues on loans GMAC Mortgage brokered to Ally Bank between January 1, 2009 and April 30, 2012.

**Background:**

In 2008, ResCap was facing severe liquidity issues, while Ally Bank maintained excess liquidity and was searching for ways to grow its business. As a solution to those issues, in March 2008, ResCap and Ally Bank personnel began work on the "Brokering Consumer Loans to Bank" project. Prior to the project, the Bank's ability to purchase loans originated by GMAC Mortgage were subject to the "250.250 exception" limit which capped it at 50% of GMAC Mortgage's preceding twelve-month rolling production. Loans brokered to Ally Bank by GMAC Mortgage and then originated by Ally Bank would not be subject to this limit. Under the parties' then-existing agreement, Ally Bank recognized as revenue only the "net interest carry" for the period the loan was on Ally Bank's books. GMAC Mortgage realized the benefit of any points or other origination fees charged.

Contemporaneous e-mails among Albert Celini (an Ally Bank official and its "Sponsor" of the Brokering Consumer Loans to Bank Project), his subordinate Debra Scott (Bank Project Leader), and Matthew Whitehead (a ResCap representative) reflect a mutual understanding that the parties intended to maintain the same economics that had been in place for loans sold under the 250.250 program. The parties' agreement is further reflected in a slide presentation dated November 19, 2008, entitled "Brokering Consumer Loans 2 Bank Project (BCL2B), Legal Entity Revenue, Expense, and Broker Fee Proposal" (the "BCL2B Presentation"). The BCL2B Presentation states, among other things, that Ally Bank would "recognize" origination income, overage/shortage or pricing subsidies, broker fees, and underwriting expense, these items would be deferred and capitalized, and, upon the sale of the loan, their resulting economic effects would be transferred to GMAC Mortgage through the Master Mortgage Loan Purchase and Sale Agreement ("MMLPSA") and Pipeline Swap. Ally Bank would retain net interest carry, and would retain the mortgage servicing rights ("MSRs") upon sale of the loan. From an accounting standpoint, the deferred loan

8

origination fees and expenses, including broker fees, was governed by Statement of Financial Accounting Standards No. 91 ("FAS 91").

To achieve this goal on the loans brokered to Ally Bank by GMAC Mortgage, origination fees (*e.g.*, discount points) would be paid by the borrower to Ally Bank, and Ally Bank would then defer and capitalize that income. This would reduce the cost basis of the loan, which, under the Pipeline Swap and MMLPSA, would in turn reduce the price charged to GMAC Mortgage when it purchased the loan from GMAC Bank. Similarly, any brokerage fee paid by GMAC Bank to GMAC Mortgage would also be deferred and capitalized, which, under the Pipeline Swap and MMLPSA, would increase GMAC Mortgage's purchase price of the loan. In this way, Ally Bank was able to recoup the brokerage fees.

On November 20, 2008, GMAC Mortgage and its subsidiary, Ditech, LLC, as brokers and GMAC Bank, predecessor to Ally Bank, entered into the Broker Agreement, which is the only new written agreement into which the parties entered in connection with BCL2B. The Broker Agreement does not specify the fee that is to be paid to GMAC Mortgage for acting as a broker. However, Celini stated that any change in the pre-Broker Agreement economics (or any change in the accounting that required such a change) would have required "a change in affiliate agreements" then in place.

GMAC Bank and GMAC Mortgage initially allocated revenue and expense as agreed when they implemented the Broker Agreement. That is, from January 1, 2009 to July 31, 2009 (when Ally Bank elected an accounting change discussed below), Ally Bank realized only the net interest carry on the loans, while also retaining the MSRs on the increased volume of loans passing through Ally Bank by virtue of avoiding the 250.250 limits. GMAC Mortgage, through the impact of FAS 91 deferrals, continued to reap the benefit of points and other origination-related revenues, as well as the impact of capitalized expenses. The accounting for sample loans from this period produced by the Debtors confirms the above-described treatment, and matched the sample loan-level accounting provided by the BCL2B Presentation. For the period January 1, 2009 through July 31, 2009, the net benefit to GMAC Mortgage from adjusting the purchase price of the brokered loans by the FAS 91 deferrals was $47.2 million. In other words, GMAC Mortgage received net revenue of $47.2 million on the loans that it brokered to GMAC Bank under the Broker Agreement during this period.

Effective August 1, 2009, Ally Bank implemented an accounting change to convert to fair-value accounting. As a consequence of this accounting change, beginning August 1, 2009, rather than realizing the benefit of points and the gain on sale as the parties had agreed (and as it had received under the 250.250 program and for third-party brokered loans), GMAC Mortgage instead received the cost-based, below market broker fee (which, since it was no longer capitalized, GMAC Mortgage did not have to repay to Ally Bank when it purchased the loan). However, GMAC Mortgage had agreed to such a fee with the understanding that, whatever the fee charged, the fee would be a "wash" because of the FAS 91 deferrals, and with the expectation that it would continue to receive the benefit of the FAS 91 deferrals. The Examiner illustrated the changed allocation of revenues resulting from Ally Bank's August 1, 2009 change to fair-value accounting as follows:

9



EXHIBIT V.B.6.d
**Accounting for Loans Brokered by GMAC Mortgage to the Bank
Pre and Post Fair Value Election**

GMAC Mortgage    Ally Bank

|  | Pre-Fair Value Election | Post-Fair Value Election |
|---|---|---|
| Points collected | GMACM | BANK |
| Lender paid closing costs | GMACM | BANK |
| "Day one" gain | GMACM | BANK |
| Net interest carry | BANK | BANK |
| Gain on sale to third party | GMACM | GMACM |
| Broker fee (at cost) | N/A | GMACM |

*Source: Broker to Bank Contract Accounting Review, at 2 [EXAM12253506] (attached to e-mail from J. Cortese to C. Dondzila, J. Young, J. Whitlinger, and J. Andrews (Feb. 27, 2012) [EXAM12253505].*

There appears to be no evidence that this change in the underlying economics was understood and agreed to by GMAC Mortgage, or that the parties even recognized at the time that the fair-value election would have the effect described above, which was to allow Ally Bank to keep a significant portion of the gain on sale while still assuming no representation and warranty exposure or hedge exposure, and while paying a below-market broker fee in the bargain. Instead, the matter appears to have come to light in December 2011 when Adam Glassner, Ally Bank Senior Managing Director, noticed "the revenue recognition by legal entity was more in the bank and less in ResCap," which he thought erroneous in light of his understanding that GMAC Mortgage was supposed to receive the entire gain on sale.

Upon this discovery, Glassner reached out to James Whitlinger, then Chief Financial Officer, Mortgage Operations, ResCap, and James Young, Chief Financial Executive, Ally Bank. Ally Bank and AFI began a review into the appropriate allocation of revenue under the Broker Agreement, MMLPSA, and Pipeline Swap. Ally Bank personnel initially concluded that the intent of the Brokering Consumer Loans to Bank Project was that Ally Bank was not to receive gain on sale revenue, yet Ally Bank was currently recording a piece of gain on sale.

Despite the initial reactions which favored GMAC Mortgage retaining the entire gain on sale, KPMG (retained by AFI General Counsel William Solomon on AFI's behalf) and an Ally Bank investigation both concluded that the accounting methods employed by Ally Bank after August 1, 2009 were consistent with the agreements between the parties. However, KPMG's report does not acknowledge the BCL2B Presentation's explicit references to FAS 91 deferrals of fees and expenses and does not address the sample accounting provided with the BCL2B Presentation or the fact that it aligns with the accounting treatment implemented from January 1, 2009 to July 1, 2009 by those who had just negotiated the broker arrangement, but not with the accounting treatment implemented after Ally Bank's fair-value election.

Joe Cortese (for Ally Bank) and Cathy Dondzila (for ResCap) also prepared virtually identical, internal accounting memos concluding that the revenue recognition for January 1, 2009 to July 31, 2009, "was done in error." Interestingly, the memos state that there were "conflicting

corporate evidential documents" and recognize that there was some support in the documents that Ally Bank was not to receive any gain on sale revenue.    Importantly, the accounting method employed during January 1, 2009 through July 31, 2009 was in accordance with GAAP, and neither memo claimed otherwise.

Subsequently, in March 2012 and at the insistence of Ally Bank, GMAC Mortgage paid Ally Bank $51.4 million, representing the $47.2 million received for the January 1, 2009 to July 31, 2009 time period, plus interest.  From the August 1, 2009, fair value election through April 2012, Ally Bank retained additional revenues that would have been allocated to GMAC Mortgage under the revenue allocation implemented from January 1, 2009 through July 31, 2009, illustrated by the Examiner as follows:

EXHIBIT V.B.6.g

**Amounts Retained by Ally Bank But Owed to GMAC Mortgage Under the Revenue Allocation Implemented Between January 1, 2009, and July 31, 2009**

August 2009 – April 2012

*($ in Thousands)*

| | 2009 | 2010 | 2011 | YTD April 2012 | Total |
|---|---|---|---|---|---|
| Loan discount (net, borrower and lender paid) | $ 144,503 | $ 40,461 | $ 10,540 | $ 513 | $ 196,017 |
| Loan discount (Capital Markets Required Price) | 209 | 113,920 | 158,852 | 137,775 | 410,756 |
| Non-broker activity | 853 | 178 | 635 | - | 1,667 |
| Loan discount income | 145,566 | 154,559 | 170,028 | 138,288 | 608,440 |
| Loan processing fee income | 44,268 | 47,419 | 46,709 | 12,267 | 150,663 |
| Pricing adjustments | (7,551) | (9,064) | (9,831) | (3,816) | (30,262) |
| Overage/shortage | 17 | - | - | - | 17 |
| Origination fee | 16,801 | (666) | (13) | (17) | 16,104 |
| Broker fee expense | (78,089) | (64,543) | (55,622) | (30,416) | (228,670) |
| Total FAS 91 deferral at origination for the period January 1, 2009 to YTD April 2012 | $ 121,010 | $ 127,704 | $ 151,270 | $ 116,306 | $ 516,291 |
| FAS 91 deferral at origination for the period January 1, 2009 to July 31, 2009 | (47,180) | - | - | - | (47,180) |
| Total amount retained by Ally Bank but owed to GMAC Mortgage under the revenue allocation implemented from Jan. 1, 2009 – July 31, 2009 [1] | $ 73,830 | $ 127,704 | $ 151,270 | $ 116,306 | $ 469,111 |

[1]  Under this allocation, Ally Bank receives interest carry only and GMAC Mortgage receives the effect of income and expense items that would have been deferred under FAS 91 before the fair value election consistent with the original accounting allocation for the period January 1, 2009 through July 31, 2009.

Source:   Exam Requested Loan Origination Revenue [ALLY_0402447]; Broker to Bank Contract Accounting Review, at 2 [EXAM12253506] (attached to e-mail from J. Cortese to C. Dondzila, J. Young, J. Whitlinger, and J. Andrews (Feb. 27, 2012) [EXAM12253505].

As illustrated above, from August 2009 to April 2012, Ally Bank retained a further $469.1 million that would have been paid to GMAC Mortgage had the revenue allocation originally agreed to remain in place.  This amount is in addition to the $51.4 million paid by GMAC Mortgage to Ally Bank in March 2012 for amounts received by GMAC Mortgage for the period January 1, 2009 through July 31, 2009.

**Examiner's Analysis and Conclusions:**

1.    The Examiner concluded that it is likely that Ally Bank's August 1, 2009 conversion to fair-value accounting resulted in a breach by Ally Bank of the parties' agreement, documented in the MMLPSA and Pipeline Swap and in the parties' communications and documentation concerning the Brokering Consumer Loans to Bank Project and in their subsequent conduct from January 1, 2009 to July 31, 2009.

2.    The Examiner concluded that it is likely that GMAC Mortgage would prevail on a contractual claim that the allocation of revenues from January 1, 2009 to July 31, 2009 was proper, and that it is therefore entitled to payment of the revenues misallocated to Ally Bank from and after August 1, 2009.

3.    The Examiner concluded that GMAC Mortgage's contract claim under the MMLPSA, Pipeline Swap, and the parties' agreement about the combined effect of those contracts is estimated at $520.5 million, consisting of: (i) $51.4 million, representing return of GMAC Mortgage's March 2012 payment to Ally Bank for amounts received by GMAC Mortgage between January 1, 2009 and July 31, 2009; and (ii) $469.1 million in additional revenues (net of expenses including the below-market broker fee) that GMAC Mortgage would have received had the parties' agreed-upon revenue allocation been respected from August 1, 2009 to April 30, 2012.

4.    The Examiner concluded that although it is unclear which interest rate would apply to these circumstances, the pertinent rate (possibly 9% per annum under New York law or 5% above the Federal Reserve discount rate under Delaware law) would be applied to the $51.4 million component repaid to Ally Bank from the repayment date, and to the $469.1 million in revenues retained by Ally Bank for the period August 1, 2009 through April 30, 2012, from the date on which each of the constituent portions of those revenues was due to GMAC Mortgage (*i.e.*, the sale date of the pertinent loan).

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a bankruptcy fiduciary such as a trustee or committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to expedite distributions to creditors.  All of the procedural hurdles that attend bankruptcy litigation would be present in this case including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law contract dispute, (ii) withdrawal of the reference, and (iii) demand for a jury trial.  In addition, all litigation carries risk uncertainty and expense.  As a result, it is highly likely that any settlement would reflect a discount of 20% from the face value of the claim.

The Examiner concludes that GMAC Mortgage's claim would be predicated on the MMPLSA (governed by Delaware law), and the Pipeline Swap (governed by New York law), and

the parties' agreements reflected in the documentation of the BCL2B. The possible application of the law of two different states would increase the complexity of this litigation and likely allow either side to argue for the application of the law most beneficial to it on a particular issue. In addition, the MMPLSA contains a choice of venue provision calling for resolution of related disputes in the United States District Court for the District of Delaware, which would allow for even more preliminary jurisdictional and venue related disputes than ordinarily present in bankruptcy litigation.

Although the Examiner concludes that GMAC Mortgage would likely prevail on a claim for breach of the parties' agreement, he concedes it is possible that the contemplated allocation of revenues was not mandated by the terms of the 2008 MMLPSA and Pipeline Swap. If so, GMAC Mortgage would need to prove that the contemporaneous Brokering Consumer Loans to Bank Project documentation and the parties' ensuing implementation of the arrangement constituted a written modification of those agreements to provide for the contemplated revenue allocation. Because the 2008 MMLPSA requires that any modification include a signed writing, GMAC Mortgage would need to rely upon the case law that permits modifications to agreements even if such modifications do not comply with the terms set forth for modifications in the original agreement. Although permissible, pursuing a claim based upon an alleged modification to an agreement that does not comply with that agreement's requirements for modifications is substantially more difficult than pursuing a claim based upon a straightforward breach of the agreement's terms. For example, in *Continental Insurance Company v. Rutledge & Company, Inc.,*[9] which the Examiner cites for the general proposition that contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision, the court refused to enforce an alleged non-written contractual modification based on the parties' prior course of dealing because the parties' prior course of conduct demonstrated that they did, in fact, amend the agreement in writing.[10] Here, the parties similarly amended and restated the MMLPSA, in writing, on at least June 1, 2007 and July 1, 2008. Thus, even though the Examiner concludes that GMAC Mortgage would likely prevail on such a claim, the claim is not without risk. Nonetheless, the parties' conduct before and after the implementation of the BCL2B and the limited scope of the KPMG Report (which does not cover the accounting for the transaction prior to the fair value election), would likely overcome AFI's arguments in this regard. I estimate that the existence of disputed facts, associated risk, and likely need for substantial discovery to develop and resolve those disputed facts, would further reduce the settlement value of the claim by 30%.

Even though AFI would likely dispute the claim, the magnitude of the claims (at $520.5 million) would likely be a strong motivating factor for AFI to settle. In addition, the likelihood of success identified by the Examiner would also incline AFI toward a substantial settlement. Legal fees and expenses in prosecuting and defending the claim would run into the tens of millions of

---

[9]  750 A.2d 1219 (Del. Ch. 2000).

[10]  To the extent the Pipeline Swap, which is governed by New York law, needs to be amended or modified, New York law similarly permits oral modifications to written contracts that purport to prohibit oral modifications, albeit under a slightly different standard. *See O'Reilly v. NYNEX Corp.*, 693 N.Y.S.2d 13 (N.Y. App. Div. 1999); *Rose v. Spa Realty Assoc.*, 366 N.E. 2d 1279 (N.Y. 1977)); *Honeywell Int'l. Inc. v. Air Prods & Chems, Inc.*, 872 A.2d 944 (Del. 2005) (applying New York law).

dollars, but pale in comparison to the magnitude of the claims. However, the MMPLSA contains a fee-shifting provision in § 8.13, which adds additional litigation risk.

The Examiner noted that there is "ample fodder" for an argument that the initial reaction of those reviewing the revenue allocation issue in 2011 was squelched, and that the resulting reports in 2012 labeling the initial allocation in GMAC Mortgage's favor from January 1, 2009 to July 31, 2009 an accounting error, was the product of a desire to avoid restating Ally Bank's financials and the regulatory scrutiny that would have ensued, rather than a fair and objective attempt to resolve the matter. I agree with that conclusion, and if developed through discovery, this argument would provide GMAC Mortgage with a compelling story of cover-up and wrongdoing that could significantly impact the fact finder's decision and further incentivize AFI to settle.[11]

As the Examiner notes, under either New York or Delaware law, GMAC Mortgage would be entitled to prejudgment interest if successful on its contractual claim for misallocation of net revenues on loans it brokered to Ally Bank. The potentially applicable interest rates are not insignificant (9% under New York Law, and 5% above the Federal Reserve discount rate under Delaware law), and would amount to tens of millions of dollars per year when applied to the total $520.5 million claim. Interest would run on the $51.4 million payment from GMAC Mortgage from the date of that payment in March 2012. Interest on the $469.1 component of the claim for amounts that GMAC Mortgage should have received between August 1, 2009 and April 30, 2012 would ordinarily run from the date on which each of the constituent portions of those revenues was due to GMAC Mortgage. Given the significant amounts involved, the parties would likely submit expert calculations of the interest due on the $469.1 million component of the claim, but it is also possible that a court, applying New York law, would select a single reasonable intermediate date or, if it could not determine a single reasonable intermediate date, to fix interest from the date of commencement of the action.[12] However, cases rarely settle for full value of the claim and less frequently settle for full value of the claim, plus interest. I estimate that the likelihood of interest at a rate of between 5.5% and 9% per annum for a period of, as to some portions of the claim, up to four years, adds 15% to the settlement value of the claim.

Under these circumstances, I would expect plaintiff's initial settlement demand to be at $540 million, approximately 90% of the gross amount of the claim (of approximately $600 million, including interest and attorneys' fees), and defendant's initial offer at $90 million, approximately 15% of the claim. Taking into account the discounts and enhancements identified above, as well as the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate the fair and likely settlement of the misallocation of net revenues on loans brokered by GMAC Mortgage claim at $268.2 million.

---

[11]  The Examiner also notes that it may be possible to fashion a breach of fiduciary duty claim against ResCap officials who apparently succumbed to AFI's and Ally Bank's desires, but that such a claim faces a variety of substantial obstacles and would appear to be wholly redundant of the recoveries the Examiner concludes are already available to Debtors under contract law. Accordingly, the analysis of the claim for Misallocation of Net Revenues on Loans Brokered by GMAC Mortgage does not include any value for such a claim of breach of fiduciary duty.

[12]  *See, e.g., Gelco Builders & Burjay Constr. Corp. v. Simpson Factors Corp.*, 60 Misc. 2d 492 (N.Y. Sup. Ct. 1969).

| | |
|---|---|
| Potential Damages: | $520.5 million |
| Reduced by: | |
| 20% inherent risk= | $416.4 million |
| 30% risk for possible pursuit of claim under modification theory= | $291.5 million |
| 20% risk based on disputed facts & GMAC Mortgage approval of allocation to be challenged= | $233.2 million |
| Increased By: | |
| 15% for interest= | $268.2 million |

> ### b.    *Failure to Pay Value of Purchased MSRs and Correspondent Loan MSRs to GMAC Mortgage under the MSR Swap*

**Examiner's Report References:**

Section I.E.b pages I-10

 Section III.F.3.c pages III-93

Section V.B.9 pages V-157 to V-184

Section V.B.12 pages V-199 to V-209

Section VII.L.2 pages VII.L-29

Section VII.L-66 to VII.L-73

**Description:**

The implementation, between September 2007 and April 2012, of the agreement between GMAC Mortgage and the federal savings bank now known as National Motors Bank FSB ("Old GMAC Bank")/Ally Bank concerning the application of the MSR Swap,[13] the 2010 Net Funding Schedule,[14] and the April 2011 MSR Swap Confirmation[15] to mortgage servicing rights (MSRs) (i)

---

[13] The "MSR Swap" means the ISDA Master Agreement between GMAC Mortgage and GMAC Bank, dated June 12, 2007, including the FMV Schedule thereto, dated August 31, 2007 and the Net Funding Schedule thereto, dated August 31, 2007.

[14] The "2010 Net Funding Schedule" means the Schedule to the ISDA Master Agreement (Net Funding) between GMAC Mortgage and GMAC Bank, dated July 1, 2010.

arising from loans Ally Bank purchased from correspondents and (ii) to MSRs that Ally Bank purchased from third parties.

**Background:**

When ResCap was formed, its subsidiaries GMAC Mortgage and RFC owned substantial portfolios of MSRs, which are contractual rights to service loans and receive the related fees and certain ancillary income. Since at least 2005, ResCap and Ally Bank had considered entering into an arrangement whereby Ally Bank would hold MSRs in order to, among other things, realize savings associated with no longer financing MSRs through regular lending channels. The Examiner observed that, "[f]rom early on, the personnel involved contemplated that the movement of the MSRs to Ally Bank would be accompanied by a 'total return swap,' transferring the MSRs' economics (positive and negative) back to ResCap in exchange for providing Ally Bank a fixed rate of return." Examiner's Report, at V-159.

The FDIC eventually approved Ally Bank's retention of MSRs on loans sold by Ally Bank to GMAC Mortgage, but repeatedly refused to approve Ally Bank's acquisition of existing MSRs from ResCap entities. In addition, the regulators opposed Ally Bank's retention of the MSRs without the protection of the MSR Swap, which went into effect on August 31, 2007. The original MSR Swap is documented on an ISDA Master Agreement and two Schedules – the FMV Schedule and the Net Funding Schedule, each dated August 31, 2007.

First, under the FMV Schedule, changes in the "FMV Change," defined as "FAS 156 mark to market for the Valuation Period as recorded by [Ally Bank] against the mortgage servicing right asset," were measured each business day. If the FMV Change was positive, then Ally Bank owed GMAC Mortgage the amount of the increase. Conversely, if the FMV Change was negative, GMAC Mortgage owed Ally Bank the amount of the decrease.[16]

Simultaneously, under the Net Funding Schedule, Ally Bank was required to pay GMAC Mortgage all the servicing income it received on its portfolio of MSRs, net of expenses incurred, which included the fees paid to GMAC Mortgage under the Original Servicing Agreement for Bank-owned MSRs. In return, the Net Funding Schedule required GMAC Mortgage to pay Ally Bank a "Funding Fee," which was a LIBOR-based fixed rate payment calculated on the value of the MSRs and servicing revenues. In essence, the combined effect was to transfer the MSRs' economics (positive and negative) to GMAC Mortgage under the FMV Schedule in exchange for a LIBOR-based fixed rate payment to Ally Bank under the Net Funding Schedule.

On its face, the FMV Schedule required that _all_ increases in the value of Ally Bank's mortgage servicing right assets flow to GMAC Mortgage, without distinguishing among MSRs arising from Bank-originated loans, purchased MSRs, and MSRs arising from purchased loans. In practice, however, Ally Bank paid to GMAC Mortgage only for increases related to Bank-originated

---

[15]   The "April 2011 MSR Swap Confirmation" means the Confirmation of the Total Return Swap Relating to Mortgage Servicing Rights of Ally Bank, dated April 1, 2011.

[16]   2007 FMV Schedule, parts 6(a)(vii), 6(d) [RC00027822].

loans; it did not include increases related to MSRs arising from correspondent loans Ally Bank had purchased or to MSRs purchased separately. Instead, for correspondent loans, Ally Bank paid the capitalized value of excess servicing rights to GMAC Mortgage, but not the capitalized value of the MSRs themselves. The capitalization and purchase of new MSRs was always handled in this fashion from the August 2007 inception of the MSR Swap, despite the plain language of the FMV Schedule. In contrast, when GMAC Mortgage paid the LIBOR-based Funding Fee, the value of the newly recognized MSRs (including both MSRs on loans Ally Bank sold to GMAC Mortgage and MSRs that Ally Bank periodically purchased from third parties) was included in the amounts used to calculate the Funding Fee.

Although, individuals who had subsequent involvement with the MSR Swap, including Joe Cortese (for Ally Bank) and James Young (for ResCap), offered conflicting explanations for the parties' differing treatment of MSR capitalization under the MSR Swap, the Examiner concluded that none of these explanations perfectly explains the parties' actions.

In April 2011, the parties entered into the MSR Swap Confirmation, which covered the previously separately-documented FMV Swap and Net Funding Swap. After reviewing these changes, the Examiner concluded that the April 2011 MSR Swap Confirmation is, if anything, even clearer than the original MSR Swap and FMV Schedule that it applies not just to MSRs on bank-originated loans, but to all MSRs, including purchased MSRs and correspondent-loan MSRs.

ResCap's records indicate that Ally Bank paid GMAC Mortgage a total of $699.7 million over the duration of the MSR Swap from September 2007 through termination in April 2012. The Examiner illustrated the key financial elements of the MSR Swap, on an annual basis, as follows:

EXHIBIT V.B.12.b(1)—5

**MSR Swap – Key Financial Elements**

September 2007 – April 2012

($ in Millions)

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Total |
|---|---|---|---|---|---|---|---|
| FMV change - interest rate [1] | $ (0.0) | $ (296.4) | $ 257.8 | $ 171.7 | $ (430.0) | $ (0.2) | $ (297.3) |
| FMV change - amortization [1] | - | – | (117.9) | (318.2) | (364.1) | (127.2) | (927.4) |
| Funding fees (LIBOR +) | (0.4) | (14.0) | (9.1) | (23.5) | (59.6) | (16.1) | (122.6) |
| Gain on new cap - MSR | 8.6 | 53.4 | 77.6 | 136.1 | 61.6 | 27.0 | 364.2 |
| Gain on new cap - excess servicing | 14.6 | 219.5 | 95.9 | 209.9 | 69.4 | 10.9 | 620.2 |
| Net servicing fees | 3.9 | 102.2 | 177.3 | 294.0 | 362.8 | 122.2 | 1,062.5 |
| Total cash settlement paid to GMAC Mortgage | $ 26.6 | $ 64.7 | $ 481.6 | $ 469.9 | $ (360.0) | $ 16.7 | $ 699.7 |

[1] For 2007 to 2008, economic amortization was not calculated separately from changes to interest rate assumptions.
Source: ResCap - MSR Cash Summary [EXAM00231039]; OMSR Values [EXAM00339036].

The value of Ally Bank's MSR asset attributable to correspondent loans and purchased MSRs, which were not paid to GMAC Mortgage under the MSR Swap despite the plain language of the MSR Swap and the MSR Swap Confirmation, and thus the value of GMAC Mortgage's potential contract claim under those agreements, totals $1.725 billion, illustrated by the Examiner as follows:

EXHIBIT V.B.10.b(2)

**Additions to the Value of Ally Bank's MSR Asset Attributable to Correspondent Loan MSRs and Purchased MSRs**

*($ in Thousands)*

| | Sep. 2007 - Dec. 2008[1] | Jan.2009 - Mar. 2011 | Apr. 2011 - Mar. 2012 | Total |
|---|---|---|---|---|
| New capitalizations - purchased MSRs | $ 421,860 | $ 256,239 | $ 28,986 | $ 707,085 |
| New capitalizations - originated and correspondent loan MSRs | 19,035 | 923,463 | 404,805 | 1,347,303 |
| Sub-total new capitalization | 440,895 | 1,179,702 | 433,790 | 2,054,387 |
| New capitalizations - excess servicing (originated and correspondent) | 271,602 | 325,647 | 62,153 | 659,402 |
| Gain paid to GMAC Mortgage on new capitalizations | (310,934) | (578,364) | (99,152) | (988,450) |
| Additions attributable to correspondent loan MSRs and purchased MSRs | $ 401,563 | $ 926,985 | $ 396,791 | $1,725,340 |

[1] *Period before the 2009 Bank Transaction; monthly data not available for January 2009.*

*Source: MSR Swap Review, dated May 2012 [ALLY_0368244]; MSR Rollforward YTD 2009, dated Dec. 31, 2009 [EXAM00232590]; MSR Rollforward YTD 2010, dated Dec. 31, 2010 [EXAM00232591]; MSR Rollforward YTD 2011, dated Dec. 31, 2011 [EXAM00232592].*

**Examiner's Analysis and Conclusions:**

1.      The Examiner concluded that GMAC Mortgage has a potential claim that Ally Bank breached the MSR Swap's requirements by failing to pay to GMAC Mortgage the value of MSRs arising from loans Ally Bank purchased from correspondents or for purchased MSRs.  The value of the MSRs, and thus the base value of GMAC Mortgage's potential claim, is approximately $1.725 billion, including $1.329 billion for the period before the April 2011 revision of the MSR Swap.

2.      The Examiner concluded that James Young's attempt to reconcile the parties' practices with the terms of the MSR Swap (by asserting that increases in the value of Ally Bank's MSR portfolio due to newly recognizes MSRs were not required to be paid under the MSR Swap's FMV Schedule) is not likely to prevail.

3.      The Examiner concluded that the parties consistently applied the MSR Swap in a way that is at odds with its language.

4.      The Examiner concluded that the MSR Swap is governed by New York law.

5.      The Examiner concluded that the doctrine of modification is not the proper rubric for analysis, at least before the April 2011 revisions, because there is no suggestion of an agreement after the MSR Swap was adopted to alter its terms.  In addition, it does not appear that a modification in which GMAC Mortgage simply gave up the right to receive the newly recognized value of correspondent-loan MSRs and purchased MSRs would be supported by mutual consideration.

6.    The Examiner concluded that Ally Bank may have substantial arguments that the MSR Swap would not have withstood regulatory scrutiny had it been applied to require payment of the value of purchased and correspondent-loan MSRs upon recognition.

7.    The Examiner concluded that based on the available evidence and the exacting standard which governs the application of the doctrine of mistake, although a close question, a court more likely than not would reform the pre-April 2011 MSR Swap to require payment of the value of newly recognized MSRs only for those MSRs on which Ally Bank recognized a gain (*i.e.*, not for the $1.329 billion attributable to purchased MSRs and purchased-loan MSRs).

8.    The Examiner concluded that while a close question, a court more likely than not would reform the April 2011 MSR Swap Confirmation under the doctrine of mistake to require payment of the value of newly recognized MSRs only for those MSRs on which Ally Bank recognized a gain (*i.e.*, not for the $396 million attributable to purchased MSRs and purchased-loan MSRs).

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a bankruptcy fiduciary such as a trustee or committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to save cost and expedite distributions to creditors. All of the procedural hurdles that attend bankruptcy litigation would be present in this case including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law contract dispute, (ii) withdrawal of the reference, and (iii) demand for a jury trial. In addition, all litigation carries risk uncertainty and expense. As a result, it is highly likely that any settlement would reflect a substantial discount ( of  30% ) from the face value of the claim.

GMAC Mortgage would base its claim on the straightforward terms of the MSR Swap, both before and after the April 2011 revisions. As the Examiner notes, by their terms, the relevant provisions turn on the value of the MSRs on Ally Bank's balance sheet, not on whether Ally Bank has recognized a gain on the asset in its income statement, and therefore facially apply to all of Ally Bank's MSR assets. Due to the relative ease with which GMAC Mortgage could meet its initial burden, it would likely initiate settlement discussions with an aggressive opening demand of  60% of the total claim amount, approximately $1 billion.

At that point, the burden would be on AFI to prove its affirmative defenses under either of the theories primarily highlighted by the Examiner: mistake and modification. The Examiner concludes that AFI would likely succeed on the close question of a defense under the doctrine of mistake, despite the exacting standard which governs that doctrine. However, that same "exacting standard" would likely have a significant impact on the parties' settlement positions and the ultimate settlement value of this claim. Under New York law, AFI would need to establish mutual mistake

by clear and convincing evidence in order to overcome a "heavy presumption that a deliberately prepared and executed [agreement] manifest[s] the true intention[s] of the parties, . . . especially between counseled businessmen."[17]  This would require AFI to show that both Ally Bank and GMAC Mortgage shared the same erroneous belief that the MSR Swap would not require Ally Bank to pay GMAC Mortgage the value of MSRs Ally Bank purchased separately or of MSRs arising from correspondent loans Ally Bank purchased.[18]

AFI may face evidentiary difficulties proving mutual mistake because, as the Examiner noted, the recollection of the participants to the negotiation of the MSR Swap, particularly with respect to the issue of the treatment of newly recognized MSRs, was limited.  However, the Examiner concluded that the documentary evidence (other than the MSR Swap itself) supports application of the doctrine of mistake, as does the parties' conduct and the disparate economic effect of transferring the newly recognized value of purchased MSRs and correspondent-loan MSRs to GMAC Mortgage.  Indeed, the parties' mutual and uniform performance under the MSR Swap, throughout its entire term, in a manner inconsistent with its terms but consistent with what AFI would argue was their true understanding, would weigh heavily in favor of AFI's efforts to reform the MSR Swap under the doctrine of mistake.  The regulatory scrutiny and concerns raised by Ally Bank's regulators concerning the MSR Swap, as applied, also supports a claim of mutual mistake.[19]  Nonetheless, AFI would likely attach significant settlement value to this claim in recognition of the decidedly demanding burden it would need to overcome to reform the MSR Swap.  In addition, both parties would likely recognize that AFI would most likely succeed, if at all, only after a trial, because mistake turns on the parties' intent and "[q]uestions of intent . . . are usually inappropriate for disposition on summary judgment."[20]  Thus, AFI would need to factor the substantial costs and risk associated with trial into its settlement analysis.  The magnitude of the claims (at $1.725 billion), combined with the high likelihood that AFI would need to take the claim to trial to prevail, would likely be a strong motivating factor for AFI to settle.  In view of the foregoing procedural and evidentiary hurdles, but accepting the Examiner's conclusion that, although a close question, AFI would more likely than not succeed in reforming the MSR Swap based on the doctrine of mistake to apply to only Bank-originated MSRs, I estimate that the settlement value of this claim would be reduced by 55%.

The Examiner concludes that the doctrine of modification is inapplicable to the parties' dealings with respect to this claim for several reasons, including, among others, the lack of any suggestion of an agreement after the MSR Swap was adopted to alter its terms and the likely lack of mutual consideration for a modification in which GMAC Mortgage simply gave up the right to

---

[17]  *See Healy v. Rich Products Corp.*, 981 F.2d 68, 73 (2d Cir. 1992) (citations and internal quotations omitted).

[18]  *Id.* (mutual mistake occurs when both parties "[s]hare the same erroneous belief and their actions do not in fact accomplish their mutual intent.") (citations omitted); *K.I.D.E. Assocs., Ltd. v. Garage Estates Co.*, 720 N.Y.S.2d 114, 116 (N.Y. App. Div. 2001) (proponent of reformation must show not only that mistake exists, but exactly what was really agreed upon between the parties, particularly where negotiations were conducted by sophisticated, counseled parties).

[19]  As discussed by the Examiner and in more detail below, these same regulatory concerns may provide AFI with arguments in support of a defense that the MSR Swap would not have withstood regulatory scrutiny if applied to correspondent loan MSRs and purchased MSRs.

[20]  *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., v. Turtur*, 892 F.2d 199, 205 (2d Cir. 1989).

receive the newly recognized value of correspondent-loan MSRs and purchased MSRs.[21]    AFI would also likely face difficulties proving a modification of the MSR Swap where the parties subsequently confirmed the MSR Swap through the April 2011 MSR Swap Confirmation, but did not at that time revise the agreement in a manner consistent with the purported modification.  AFI would likely nonetheless pursue a modification defense as an alternative to a mistake defense.  The mere availability of a second plausible theory under which AFI could achieve the same successful result, even if it was unlikely to ultimately succeed under the doctrine of modification, would reduce the settlement value of the claim by approximately 5%.

The settlement value of the claim would be further reduced by the possibility of AFI successfully defending the claim on the grounds that the MSR Swap, if applied to correspondent loan MSRs and purchased MSRs, would not have withstood regulatory scrutiny.  The MSR Swap was implemented and subsequently revised with the involvement and approval of Ally Bank's regulators, who, at its inception, refused to approve Ally Bank's acquisition of existing MSRs from ResCap entities and apparently insisted on the protection of the MSR Swap as a condition of Ally Bank retaining MSRs.  Later, the parties agreed to increase the interest rate applicable to the Funding Fee paid by GMAC Mortgage to Ally Bank pursuant to the 2010 Net Funding Schedule in what the Examiner describes as a partially successful effort to appease the regulators.  In light of these facts, the Examiner notes that Ally Bank would have substantial arguments that the arrangement would not have withstood regulatory scrutiny had it been applied to require payment of the value of purchased and correspondent-loan MSRs upon recognition.  This possible defense would reduce the settlement value of the claim by approximately 20-30%.

Under these circumstances, I would expect plaintiff's initial settlement demand to be at approximately 60% of the gross amount of the claim (approximately $1.725 billion), *i.e.*, $1 billion, and defendant's initial offer at approximately 10% of the claim, *i.e.*, $175 million.  Taking into account the discounts and enhancements identified above, as well as the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate the fair and likely settlement of the failure to pay value of purchased MSRs under MSR Swap claim at $387.2 million.

| | |
|---|---|
| Potential Damages: | $1,725.0 million |
| Reduced By: | |
| 30% inherent risk= | $1,207.5 million |
| 55% risk associated with mutual mistake defense= | $543.4 million |
| 5% risk associated with modification defense= | $516.2 million |
| 25% risk associated with regulatory-based defense= | $387.2 million |

---

[21] *See Estate of Anglin v. Estate of Kelley*, 705 N.Y.S.2d 769 (N.Y. App. Div. 2000) (any change in an existing contract must have a new consideration to support it) (citations omitted).

c.    *Representation and Warranty Liabilities Under the 2001 and 2006
MMLPSAs*

**Examiner's Report References:**

Section I.E.c pages I-10

V.B.3.a, b pages V-96 to V-109

VII.L.2.a pages VII.L-29 to VII.L-55

**Description:**

The potential liability of AFI or Ally Bank for representations and warranties provided by Old GMAC Bank in the 2001 MMLPSA and by Ally Bank in the 2006 MMLPSA.

**Background:**

Under the terms of the 2001 MMLPSA, Old GMAC Bank provided representations and warranties for all mortgage loans sold pursuant to its terms, while under the 2006 MMLPSA, Ally Bank provided representations and warranties only for second lien loans sold to GMAC Mortgage. ResCap/GMAC Mortgage later assumed financial responsibility for repurchase and representation and warranty liabilities on loans purchased from Old GMAC Bank and Ally Bank under the MMLPSA. The Examiner analyzed whether ResCap/GMAC Mortgage have claims against AFI and/or Ally Bank with respect to such liabilities based upon the representations and warranties provided by Old GMAC Bank under the 2001 MMLPSA and by Ally Bank under the 2006 MMLPSA.

As to loans purchased from Old GMAC Bank under the 2001 MMLPSA, the liabilities assumed by ResCap/GMAC Mortgage include: (i) charge-offs incurred as a result of loans repurchased from investors; (ii) a portion of the settlements with Fannie Mae and Freddie Mac in 2010; and (iii) a portion of the related 2013 "cure" settlements with Fannie Mae and Freddie Mac. The potential claims against AFI/Ally Bank for representations and warranties provided by Old GMAC Bank in the 2001 MMLPSA and by Ally Bank in the 2006 MMLPSA would also include a portion of the Trust R&W Claims covered by the $8.7 billion proposed RMBS Trust Settlement Agreement.

Based upon an analysis of available records, the Examiner's Professionals estimate that the total dollar amount of representation and warranty and settlement liabilities incurred by GMAC Mortgage that would comprise the potential representation and warranty claims against AFI/Ally Bank under the 2001 and 2006 MMLPSAs total approximately: (i) $278.2 million in charge-offs as a result of repurchases, and the 2010 settlements and 2013 "cure" settlements with Freddie Mac and Fannie Mae, relating to First Lien Loans sold by Old GMAC Bank under the 2001 MMLPSA; (ii) $5.1 million for charge-offs as a result of repurchases of Second Lien Loans sold by Old GMAC Bank under the 2001 MMLPSA; (iii) no more than $400 million relating to First and Second Lien Loans sold by GMAC Bank under the 2001 MMLPSA that are included in the securitizations that

22

comprise the Trust R&W Claims; and (iv) less than $86.1 million relating to Second Lien Loans sold by Ally Bank under the 2006 MMLPSA that are included in the securitizations that comprise the Trust R&W Claims. For a variety of reasons detailed in the Examiner's report, including limitations in the available data, the estimated values of these potential liabilities are likely overstated.

**Examiner's Analysis and Conclusions:**

1.    Ally Bank was not a party to, and did not assume, the 2001 MMLPSA, and is unlikely to be held liable on successor liability or indemnification theories.

2.    It is likely that representation and warranty claims would be time-barred under the 2001 MMLPSA's two-year "survival" provision.

3.    For first lien loans (but not second lien loans), the evidence supports the proposition that the 2001 MMLPSA was modified to eliminate representation and warranty liability.

4.    The Examiner concluded that it is unlikely that any claim against AFI or Ally Bank for loan representations and warranties under the 2001 MMLPSA would prevail.

5.    The Examiner concluded that while Ally Bank likely would be held to have provided representations and warranties for second lien loans under the 2006 MMLPSA, representation and warranty (or indemnification) claims against Ally Bank for second lien loans sold under the 2006 MMLPSA are unlikely to prevail because they would be time-barred under the two-year "survival" provision in the 2006 MMLPSA.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Because Ally Bank is not a party to the 2001 MMLPSA and did not assume that agreement in the 2006 Bank Restructuring, ResCap would face many obstacles pursuing a claim against Ally Bank or AFI based on representations and warranties in the 2001 MMLPSA. The Examiner's well-reasoned analysis concludes that ResCap is unlikely to prevail on contractual claims under the 2001 MMLPSA, which would require ResCap to show either that (1) Ally Bank is responsible for the liabilities of Old GMAC Bank under a theory of successor liability; or (2) AFI is responsible for Old GMAC Bank's liabilities under (a) the indemnification provided in connection with the OTS approval of the 2006 Bank Restructuring or (b) the indemnification provisions of the 2005 Operating Agreement or the 2006 Amended Operating Agreement. Because ResCap would likely be unable to meet the elements of any of the recognized exceptions to the general rule of no successor liability, those claims do not add materially to the settlement value of the claims for representation and warranty liabilities under the 2001 MMLPSA. The potential claims based upon indemnification provided in connection with the OTS approval of the 2006 Bank Restructuring similarly add minimal, if any, settlement value to these claims based upon the OTS's non-objection letter with

23

respect to the indemnification proposed by AFI, which was narrower than that initially requested by OTS and would not subject AFI to liability under the 2001 MMLPSA. The potential claims based upon the indemnification provisions of the 2005 Operating Agreement or the 2006 Amended Operating Agreement are similarly weak and add only minimal settlement value based upon the plain language of those agreements as applied to the relevant facts.

More fundamentally, any claims against AFI or Ally Bank based upon the 2001 and 2006 MMLPSAs are unlikely to succeed because they are likely time-barred under the two-year "survival" provisions in those agreements, which the Examiner found would have resulted in the expiration of representations and warranties in those agreements, at latest, in November 2008 and June 1, 2009, respectively. In the face of such strong defenses based upon the "survival" clauses, which could likely be presented to a court as a motion to dismiss, AFI/Ally Bank would be unlikely to place significant settlement value on claims against them based upon representations and warranties in the 2001 and 2006 MMLPSAs.

The Examiner also concludes that it is more likely than not that AFI/Ally Bank would prevail on a claim that the 2001 MMLPSA had been modified to eliminate representations and warranties with respect to First Lien Loans, which would significantly reduce the potential total value of the claims based upon representations and warranties in the 2001 MMLPSA. Contractual modification is a fact-sensitive issue. Thus, if it was the only defense available to AFI/Ally Bank, they would likely place substantial settlement value on the claims under the 2001 MMLPSA, recognizing that even a nuisance value settlement should account for the anticipated expense of substantial discovery needed to develop that defense. Here, however, and as set forth above, AFI/Ally Bank have other strong defenses to potential claims based upon representations and warranties in the 2001 and 2006 MMLPSAs, particularly the "survival" clause defenses, which could likely be presented to the court without undertaking the type of costly discovery that would be involved in a contractual modification defense.

Under these circumstances, I would expect the defendants' initial settlement offer to be based largely on the anticipated cost of defense in preparing a motion to dismiss the claims as time-barred, and therefore not material for purposes of this Opinion.

> ### d.    Application of the Pipeline Swap To The "Funding To Sale" Period And To Ally Bank-Originated Loans

**Examiner's Report References:**

Section I.E.1.d pages I-10-11

Section V.B.4, 5, and 10 pages V-114 to V-123 and V-178 to V-188

Section VII.L.2.c pages VII.L-58 to VII.L-64

**Description:**

Potentially there is a claim against AFI for applying the Pipeline Swap to the time period between the funding and the sale of loans and to loans originated by Ally Bank, notwithstanding contract language to the contrary.

**Background:**

GMAC Mortgage purchased and originated conforming loans with the intent to sell them to government-sponsored entities (GSE) while retaining the associated mortgage servicing rights (MSRs). Over time, GMAC's production came increasingly from Ally Bank. By 2009, almost all the loan production was being channeled through Ally Bank, which retained the MSRs on loans sold to Fannie Mae and Freddie Mac (but not to Ginnie Mae).

GMAC Mortgage and Ally Bank entered into a number of agreements related to this business. One of these Agreements was the Pipeline Swap, a derivative transaction in which GMAC Mortgage assumed certain risks and rewards related to changes in the market value of certain Ally Bank loans. Until 2008, the Pipeline Swap covered only Ally Bank's HFI portfolio. The swap was designed to insulate Ally Bank from changes in the market value of loans (typically due to interest rate changes) between rate lock and the funding of the loan. The Examiner noted that considering the original Pipeline Swap on its own, GMAC Mortgage would realize neither profit nor suffer loss assuming that its hedges were effective, although it presumably incurred some incremental hedging expense.

In 2005, the Pipeline Swap was amended to eliminate loans originated by Ally Bank, thereby limiting it to loans purchased by Ally Bank. The Pipeline Swap was not effective from April 2006 to April 2007, but was renewed effective May 1, 2007.

In July 2008, GMAC Mortgage and Ally Bank amended the Pipeline Swap because the FDIC was urging Ally Bank to document its hedges more thoroughly. Ally Bank's HFS loans were added to the Pipeline Swap, although it remained limited to purchased loans, and was not applicable to originated loans.

In addition, the Pipeline Swap continued to apply only to the period from rate lock until funding. In order for the loans to be fully hedged by the Pipeline Swap, however, the Swap would have needed to cover the period not just from rate lock to funding, but from rate lock to sale. Despite the fact that no change was made to the Pipeline Swap to extend the time period covered, many of the people involved believed that it did cover the entire period from rate lock to sale.

At the same time, the 2008 MMLPSA revised the pricing of first mortgage loans to a cost basis. Despite this, and based on the apparently mistaken understanding that the Pipeline Swap applied for the entire period from rate lock to sale, the loans were accounted for on a hedge-accounting basis, "marked to market," and sold to GMAC mortgage at market value, rather than at Ally Bank's cost. The combined effect was to preserve the same economics that had prevailed under prior version of the MMLPSA.

If, however, the July 2008 Pipeline Swap Schedule had been applied as written and covered only the period from rate lock to funding, rather than sale, then (1) application of hedge fund accounting would be improper under GAAP, so that the MMLPSA pricing would not be a marked to market price, and (2) the risks and rewards of changes in fair market value of the loans between funding and sale of the loans would reside with Ally Bank, not GMAC Mortgage. Further, the Pipeline Swap did not include brokered loans originated by Ally Bank, but it was applied to such loans.

In 2011, in response to FDIC pressure, the parties again amended the Pipeline Swap and related agreements. The 2011 Amendment extended the time period of the swaps to cover the time from funding to sale. It did not address the omission of loans originated by Ally Bank, however.

**Examiner's Analysis and Conclusions:**

1.      With respect to extending the time period from funding to sale, although it is a close question, the Examiner found it more likely than not that the court would reform the Pipeline Swap under the doctrine of mutual mistake to include that time period. Therefore, while it is a close question, a claim for breach based on the extension of the Pipeline Swap is unlikely to prevail.

2.      With respect to both extending the time period of the Pipeline Swap from funding to sale and extending it to loans originated by Ally Bank, it is likely that the court would find that the Pipeline Swap was modified to include both. Therefore, a claim for breach is unlikely to succeed.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions. The Examiner does not quantify any harm to GMAC Mortgage from the alleged breaches of the Pipeline Swap, and the Examiner further notes that, except for un-quantified incremental hedging costs, the economic effect on GMAC Mortgage was neutral, assuming that GMAC Mortgage's hedging was effective.

**Settlement Considerations:**

As the Examiner notes, the extension of the Pipeline Swap to include the period between funding and sale and to include loans originated by Ally Bank does not comply with the plain language of the relevant agreements. On their face, therefore, these appear to be strong breach of contract claims. However, as the Examiner found, they are unlikely to succeed due to strong affirmative defenses.

First, as to the extension of the Pipeline Swap to the time period from funding to sale, the Examiner found that the claim would not succeed because the contract would be reformed under the doctrine of mutual mistake. As noted by the Examiner, the parties drafting the Pipeline Swap agreements appeared not to have understood the effect of the language they chose. More importantly, ending the Pipeline Swap at the time of funding made little business sense. As a practical matter, GMAC Mortgage hedged the risk in the market as though it had assumed the risk for the entire time, further indicating the intent of the parties.

26

As acknowledged by the Examiner and discussed elsewhere in this report, however, the burden for establishing mutual mistake is high and would be on AFI. This creates risk that a reformation argument would not succeed and a breach would be found. Therefore, if no other affirmative defenses existed and damages from the breach could be shown, this claim would still have settlement value.

Second, as to both the extension of the Pipeline Swap to the time period from funding to sale and to loans originated by Ally Bank, there is substantial evidence that the parties modified the contract to include these. Specifically, as noted by the Examiner, the written record of the Brokering Customer Loans to Bank Project supports the view that the parties intended the Pipeline Swap to apply to brokered loans and to the "funding to sale" period. This strong written evidence, including e-mails, makes it likely that a court would find that the parties modified the Pipeline Swap, so there is no breach. Crucially, while AFI would bear the burden of proof on a claim of modification, it would not be a heightened burden. Therefore, given the high likelihood of establishing this defense as to both potential breaches, this claim has little settlement value.

Buttressing this analysis, the Pipeline Swaps appear to have been economically-neutral for GMAC Mortgage. Therefore, even if the claims had merit, the damages, if any, would be less than $21 million the threshold for materiality I have used for the purposes of my report. Accordingly, these claims are not assigned any material settlement value.

### e. Failure To Obtain Independent Director Approval

**Examiner's Report References:**

Section I.E.1.e page I-11

Section VII.L.2.b  pages VII.L-56 to VII.L-58

**Description:**

Whether there is a viable claim for failure to obtain independent director approval of various agreements and amendments to agreements that occurred between the inception of the 2005 Operating Agreement and November 2010.

**Background:**

The 2005 Operating Agreement and the 2006 Amended Operating Agreement barred any transactions between ResCap and GMAC affiliates that were not consistent with what parties would agree to at arm's length and for fair value unless waived by the independent directors. The MMLPSA, Pipeline Swap, and MSR Swap were not entered into on terms that were available in the market and to which parties at arm's length would have agreed. Yet there was no independent director approval of these transactions.

27

**Examiner's Analysis and Conclusions:**

1.      The agreements at issue did not appear to result in losses for GMAC Mortgage, were not economically unfair to ResCap, and did not materially and adversely affect ResCap's creditors.

2.      Neither AFI nor Ally Bank was involved in the decision whether to seek independent director approval.

3.      The rights of third-party beneficiary creditors are limited to specific enforcement of the requirement of independent director approval, and money damages are specifically foreclosed.

4.      Claims resulting from the lack of independent director approval of these transactions are unlikely to succeed.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions sets forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

The issues identified by the Examiner make it highly unlikely that claims regarding the failure to obtain independent director approval will succeed.  Because the agreements at issue were not unfair to ResCap or the creditors, there are no damages and no likelihood of recovery.  Even if there were, such damages would be barred by the contractual provisions barring monetary damages and limiting the remedy to specific performance.  Accordingly, these claims are not material and do not add any settlement value.

## 2.      Government Settlements

### *$109.6 Million Preference Claim*

**Examiner's Report References:**

Section I.E.2 pages I-12 to I-13

Section V.C pages V-210 to V-299

Section VII.F.5 pages VII.F-1 to VII.F-154

**Description:**

Whether the obligations of the Debtors and AFI were appropriately allocated with respect to two settlements between governmental entities on the one hand, and AFI, ResCap and certain of their subsidiaries on the other hand.  This claim analysis reviews the potentially preferential payment of approximately $109.6 Million made by GMAC Mortgage on March 14, 2012 pursuant to the DOJ/AG Consent Judgment.

**Background:**

Pursuant to the DOJ/AG Consent Judgment (the "Judgment") memorializing the DOJ/AG Settlement between the Department of Justice and various state Attorneys General on the one hand, and AFI, ResCap and GMAC Mortgage, on the other, GMAC Mortgage paid approximately $109.6 million to the government on March 14, 2012 (within 90 days of the Petition Date of May 14, 2012). The Judgment provides that the Defendant (defined, collectively, as AFI, ResCap and GMAC Mortgage) shall pay the "$109.6 million hard dollar payment". ResCap, through GMAC Mortgage, paid the entire $109.6 million on March 14, 2012. The Examiner evaluated whether the approximately $109.6 million payment may be avoidable as a preference under Code section 547 and recoverable from AFI "as an entity for whose benefit such transfer was made . . .."

**Examiner's Analysis and Conclusions:**

1.    AFI is liable, together with ResCap, GMAC Mortgage and RFC, for payment of the full amount of the $109.6 million Judgment.

2.    AFI received a direct, ascertainable and quantifiable benefit of $109.6 million by being relieved of the obligation to make that payment if ResCap did not.

3.    It is likely that an action against AFI to recover the March 14, 2013 payment of $109.6 million as a preferential transfer under Bankruptcy Code section 547 and 550 would prevail.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee. This type of plaintiff is typically motivated to reach an early resolution of disputes in order to save costs and expedite distributions to creditors.

The Examiner reviewed the potential defenses which could be raised. In reviewing potential defenses, the Examiner addressed, *inter alia*, whether AFI was liable for the $109.6 million payment in light of Exhibit I attached to the Judgment which provides that ResCap, GMAC Mortgage and RFC shall pay the $109.6 million payment but is silent as to AFI's payment obligation. Because of the debt forgiveness under the credit facilities provided by AFI, the Examiner also considered whether the "Earmarking Doctrine" would protect AFI from liability under Bankruptcy Code section 550, as well as other issues and potential defenses. The Examiner concluded, after his review and analysis of the interaction, relationship and effect of the relevant judgments, orders and agreements, that AFI was liable for the entire approximately $109.6 million obligation and that, accordingly, the payment thereof by GMAC Mortgage is avoidable as a preference under Bankruptcy Code section 547 and recoverable from AFI as the entity for whose benefit the payment was made.

AFI would most likely vigorously defend the claim and raise all of the issues and potential defenses addressed by the Examiner.  Although the Examiner concludes that the preference claim is likely to be successful, all litigation carries risk, uncertainty and expense.  Similarly, AFI would also incur significant legal cost and expense to defend this claim.

Given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand at $98.6 million, approximately 90% of the total amount of the claim, and defendant's initial offer at $16.4 million, approximately 15% of the total claim.  Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate a fair settlement of this preference claim at approximately $60 million.

### *$48.4 Million Preference Claim*

**Examiner's Report References:**

Section I.E.2 pages I-12 to I-13

Section V.C pages V-210 to V-299

Section VII.F.5 pages VII.F-1 to VII.F-154

**Description:**

Whether the obligations of the Debtors and AFI were appropriately allocated with respect to two settlements between governmental entities on the one hand and AFI, ResCap and certain of their subsidiaries on the other hand.  This claim analysis reviews the payments totaling approximately $48.4 million made by GMAC Mortgage on May 10 and 11, 2012 pursuant to the terms of the various agreements under which GMAC Mortgage was required to indemnify Ally Bank for losses incurred as a result of certain loan modifications in connection with the government settlements.

**Background:**

Pursuant to the terms of the January 30 Letter Agreement and the A&R Servicing Agreement, GMAC Mortgage was permitted to modify certain Ally Bank loans to a greater extent than permitted under the Original Servicing Agreement, but GMAC Mortgage was required to indemnify Ally Bank for losses incurred resulting from such loan modifications to the extent they exceeded the modifications permitted under the Original Servicing Agreement.  The A&R Servicing Agreement, however, was not actually executed until after the May 10 and 11, 2012 payments were made.

**Examiner's Analysis and Conclusions:**

1.      It is likely that an action on behalf of GMAC Mortgage against Ally Bank to avoid and recover the May 10 and 11, 2012 payments as preferential transfers under Bankruptcy Code sections 547 and 550 would prevail.

2.      Even though the A&R Servicing Agreement was not executed until after the subject payments were made, GMAC Mortgage was required to make those payments pursuant to the terms of the January 30 Letter Agreement.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee.  This type of plaintiff is typically motivated to reach an early resolution of disputes in order to save costs and expedite distributions to creditors.

In determining that a preference action to avoid and recover the payments made to Ally Bank would likely prevail, the Examiner concluded that the evidence supports the proposition that Ally Bank, for whose benefits the payments were made, was a creditor of GMAC Mortgage and that the payments were made on account of an antecedent debt within 90 days prior to the Petition Date.  The Examiner also analyzed the potential defenses which could be raised and primarily focused on whether GMAC Mortgage was obligated to pay Ally Bank since the A&R Servicing Agreement was not executed prior to the payments made on May 10 and 11, 2012.  However, the Examiner also concluded that pursuant to the January 30 Letter Agreement, GMAC Mortgage was obligated to indemnify Ally Bank.

Ally Bank would most likely defend the claim and raise the foregoing issue (as well as requiring the trustee to meet its evidentiary burden on all other elements of a preference action).  Although the Examiner concludes that the preference claim is likely to be successful, all litigation carries risk, uncertainty and expense.  Similarly, Ally Bank would also incur significant legal cost and expense to defend this claim.

Given the likelihood of success identified by the Examiner with a claim of $48.4 million, I would expect the plaintiff's initial settlement demand at $43.6 million, approximately 90% of the total amount of the claim and defendant's initial offer at $7.3 million, approximately 15% of the total claim.  Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate a fair settlement of this preference claim at approximately $32 million.

### *$12.9 Million Post-petition Transfer*

**Examiner's Report References:**

Section I.E.2 pages I-13

Section V.C pages V-210 to V-291

Section VII.F.7 pages VII.F-148 to VII.F-151

**Description:**

Whether the obligations of the Debtors and AFI were appropriately allocated with respect to two settlements between governmental entities on the one hand and AFI and ResCap and certain of their subsidiaries on the other hand. This claim analysis reviews the approximate post-petition payment of $12.9 million made by Debtors to Ally Bank on June 13, 2012 pursuant to the terms of the various agreements under which GMAC Mortgage was required to indemnify Ally Bank for losses incurred as a result of certain loan modifications in connection with the government settlements. The post-petition payment, however, was for indemnification obligations for loan modifications which were performed prepetition.

**Background:**

Pursuant to the terms of the January 30 Letter Agreement and the A&R Servicing Agreement, GMAC Mortgage was permitted to modify certain Ally Bank loans to a greater extent than permitted under the Original Servicing Agreement, but GMAC Mortgage was required to indemnify Ally Bank for losses incurred resulting from such loan modifications to the extent they exceeded the modifications permitted under the Original Servicing Agreement. On May 12, 2012, that certain Interim Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreements in the Ordinary Course of Business [Dkt. No. 90] ("Interim Order") was entered.

**Examiner's Analysis and Conclusions:**

1.      The approximately $12.9 million payment was not made in the ordinary course of Debtors' business and, therefore, could only be made by the Debtor if the Bankruptcy Court authorized the Debtor to make such post-petition payments after notice and a hearing pursuant to Bankruptcy Code Section 363.

2.      While a close question, it appears more likely than not that the Interim Order did not authorize the Debtors to make payments to satisfy obligations incurred prepetition.

3.      While a close question, it is more likely than not that the approximately $12.9 million post-petition payment relating to obligations incurred prepetition may be avoided under Bankruptcy Code section 549(a).

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee. This type of plaintiff is typically motivated to reach an early resolution of disputes in order to save costs and expedite distributions to creditors.

In determining that an action to avoid the post-petition payment made to Ally Bank would more likely than not prevail, the Examiner concluded that the obligation to make a post-petition indemnification payment, which stemmed from GMAC Mortgage's responsibilities under a one-time settlement agreement with the government, would not be considered an ordinary course payment and, therefore, could only be made if authorized by the Bankruptcy Court.

The Examiner reviewed the Interim Order which authorized the Debtors' "to continue to perform under the terms of the [A&R] Servicing Agreement…" and considered the argument that such broad language could cover the $12.9 million payment on account of a prepetition obligation. However, the motion seeking entry of the Interim Order did not specifically mention these obligations and stated that the Debtors "were not seeking to pay any prepetition claims through or pursuant to the [A&R] Servicing Agreement." The Examiner concluded that this representation clarifies any ambiguity found in the Interim Order regarding whether payments with respect to prepetition obligations were authorized. The Examiner considered other arguments, including, without limitation, the fact that the agreement which contained the indemnity provisions was attached to the motion, but concluded that the indemnification obligation was not conspicuously disclosed in the motion or exhibits thereto, and there was no mention of the amount of payments to be made. Therefore, the Examiner concluded that, while it is a close question, based on the Debtors' express representations in the motion and lack of disclosure it appears more likely than not that the Interim Order did not authorize the Debtors to make payments to satisfy obligations incurred prepetition.

Ally Bank would most likely defend the claim and raise the foregoing issue (as well as other issues noted and considered by the Examiner). The Examiner concludes that, although a close question, a claim to recover the post-petition payment is more likely than not to prevail, all litigation carries risk, uncertainty and expense. Similarly, Ally Bank would also incur significant legal cost and expense to defend this claim.

Given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand at $10.3 million, approximately 80% of the total amount of the claim and defendant's initial offer at $1.9 million, approximately 15% of the total claim. Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate a fair settlement of this post-petition transfer claim at $7.1 million. Accordingly, this claim is not assigned any material settlement value and will not be included in the allocation of the $2.1 billion settlement fund.

3.    **Causes of Action Relating To Use And Allocation Of ResCap's Tax Attributes**

*First and Second 2009 Tax Allocation Agreements*

**Examiner's Report References:**

Section I.E pages I-13 to I-14

Section V.D pages V-300 to V-344

Section VII.K pages VII.K-1 to VII.K-49

**Description:**

The historical and prospective use and allocation, between ResCap and AFI, of ResCap's tax attributes.

**Background:**

As required by the November 2006 sale of 51% of AFI to Cerberus Capital Management, LP ("Cerberus"), ResCap was converted into a limited liability company and with AFI's consent, became a disregarded entity for federal income tax purposes in the fall of 2006. ResCap remained a disregarded entity, treated as a division of AFI from December 1, 2006 through June 30, 2009.

The 2006 Amended Operating Agreement required that "ResCap and GMAC shall maintain in effect an income tax allocation agreement that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap."[22]

Between July 1, 2009 and November 2, 2009, ResCap became a partnership for federal income tax purposes. It reverted to disregarded entity status on November 2, 2009 to preserve substantial tax losses that would be generated by Ally Bank and its wholly-owned subsidiary, GMACB Asset Management Corporation.

In connection with this reversion, AFI suggested and drafted the First 2009 Tax Allocation Agreement. In December 2009, William Marx, Executive Director Tax Operations and Analysis at AFI, notified both AFI and ResCap that under the proposed tax allocation agreement, any deviation from strict stand-alone accounting would "in all cases be either neutral or more beneficial to ResCap." Consistent with that statement, AFI drafted the First 2009 Tax Allocation Agreement to treat ResCap generally as if it were a stand-alone taxpayer, except that it treated ResCap more favorably in that it entitled ResCap to be paid for its tax benefits that AFI could currently use even if ResCap could not currently use the benefits on a stand-alone basis. The proposed agreement provided that ResCap would be compensated based on AFI's use of ResCap's tax benefits, not hypothetical use by GMAC Mortgage Group LLC, a disregarded entity. The proposed agreement

---

[22] 2006 Amended Operating Agreement, at § 2(b)(iii), [ALLY_0041818].

further provided that AFI would reimburse GMAC Mortgage Group LLC to the extent the Group would have to compensate ResCap for AFI's use of ResCap's tax benefits.

ResCap's legal staff advised the board that it believed that First 2009 Tax Allocation Agreement was "on terms consistent with those that parties at arms' length would agree to and for fair value." The ResCap Board unanimously approved the First 2009 Tax Allocation Agreement at its regularly-scheduled board meeting on August 6, 2010.

On September 9, 2010, Marx prepared a memorandum with instructions for executing the First 2009 Tax Allocation Agreement (and similar agreements) to among others, David DeBrunner, Chief Accounting Officer and Corporate Controller of AFI, and James Young, the CFO of ResCap. The memorandum and agreements were delivered promptly to DeBrunner, who executed the First 2009 Tax Allocation Agreement on behalf of AFI on or about September 13, 2010. Debrunner believed he was acting pursuant to "delegated authority". The First 2009 Tax Allocation Agreement was not approved by the board of directors of AFI, but that practice was consistent with "Ally Accounting Policy 3330" which provided that "[a]ll tax sharing agreements must be approved by the respective boards of directors *or appropriate management designee.*" [23] The memorandum and accompanying agreements were apparently not delivered to Young until approximately October 15, 2010.

In the meantime, AFI began calculating the amounts due to ResCap for 2009 under the First 2009 Tax Allocation Agreement and realized the amounts due to ResCap would be substantial, *i.e.*, approximately $250 million for 2009 and $400 million for 2010. Starting on October 13, 2010, Marx raised his concerns and the possibility of proposing a less-favorable tax allocation agreement to ResCap with James Mackey, the CFO of AFI. The Examiner noted that Marx, on his own initiative, attempted to hold up the completion of the execution of the First 2009 Tax Allocation Agreement, collecting and destroying the partially-executed versions. In addition, it appears that Marx or Mackey (or both) spoke to Young and told him that the agreement had not been fully discussed or vetted within AFI. As a result, Young never signed the First 2009 Tax Allocation Agreement

AFI provided ResCap with proposed revisions to the First 2009 Tax Allocation Agreement (the "Second 2009 Tax Allocation Agreement"). The proposed Second 2009 Tax Allocation Agreement removed ResCap's right to receive compensation from AFI for AFI's use of ResCap's tax benefits. In addition, ResCap became liable to pay AFI for tax on excess inclusion income, which totaled approximately $50 million from 2009 to 2012.

The ResCap Board and Independent Directors reviewed the Second 2009 Tax Allocation Agreement. Counsel for the Independent Directors advised that the Second 2009 Tax Allocation Agreement seemed "very unfair" to ResCap. Nevertheless, after certain revisions were made, the Independent Directors believed that the fairness concerns had been resolved and the ResCap board approved the transaction, which was executed by all parties in 2011.

---

[23] Ally Accounting Policy 3330, Issued by Director of Accounting Policy, Effective June 1, 2011 (emphasis added), [EXAM12354093].

Although the Second 2009 Tax Allocation Agreement appears to be a pure stand-alone agreement in that ResCap is obligated to pay to AFI its hypothetical separate tax liability each year, the Examiner found that a closer look reveals that it is significantly worse for ResCap in that there is nothing in the agreement that would require AFI to pay ResCap any refund ResCap might be entitled to on a stand-alone basis.  In addition, the Second 2009 Tax Allocation Agreement does not meet the requirement of the 2006 Amended Operating Agreement that it "shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap."  Nor does it meet the standard set by the ResCap board when it approved the First 2009 Tax Allocation Agreement, *i.e.*, that the agreement be "on terms not more disadvantageous in any material respect to the holders of [ResCap's] notes than those existing tax allocation agreement(s) [it is] intended to replace[.]"

**Examiner's Analysis and Conclusions:**

1.      While a close case, it is more likely than not that the First 2009 Tax Allocation Agreement was a valid, binding, and enforceable contract against AFI.

2.      While a close question, it is more likely than not that ResCap's CFO did not breach his fiduciary duties by failing to execute the First 2009 Tax Allocation Agreement.

3.      It is likely that the Second 2009 Tax Allocation Agreement constituted a fraudulent transfer of the contract benefits belonging to ResCap under the First 2009 Tax Allocation Agreement.

4.      While a close question, it is more likely than not that the Second 2009 Tax Allocation Agreement would not be set aside on equitable theories related to overreaching.

5.      While a close question, it is more likely than not that ResCap's Board of Directors did not breach its fiduciary duties by approving the Second 2009 Tax Allocation Agreement.

6.      The benefits that ResCap would have received under the First 2009 Tax Allocation Agreement but for the Second 2009 Tax Allocation Agreement are estimated at $1.77 billion.[24]

7.      Even if the First 2009 Tax Allocation Agreement is not enforceable, it is likely that ResCap could recover the payments made to AFI under the Second 2009 Tax Allocation Agreement in the approximate amount of $50 million as a constructively fraudulent conveyance.

8.      It is likely that the Second 2009 Tax Allocation Agreement would be found to be in violation of the 2006 Amended Operating Agreement.

---

[24] It should be noted that the Examiner's estimate was based on the assumption that AFI would be making a $750 million contribution contemplated by the terminated AFI Settlement and Plan Sponsor Agreement.  If a $2.1 billion dollar contribution was assumed, the benefits that ResCap would have received under the First 2009 Tax Allocation Agreement but for the Second 2009 Tax Allocation Agreement would have been greater.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This contract claim would likely be pursued by a bankruptcy fiduciary such as a trustee or committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to expedite distributions to creditors. All of the procedural hurdles that attend bankruptcy litigation would be present in this case, including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law contract dispute and a fraudulent transfer action, (ii) withdrawal of the reference, and (iii) demand for a jury trial. In addition, all litigation carries risk, uncertainty, and expense. As a result, it is highly likely that any settlement would reflect a discount of 20% from the face value of the claim.

The plaintiff would have to establish that the First 2009 Tax Allocation Agreement was binding on AFI, which the Examiner evaluates as a close case. Among the evidentiary and substantive issues highlighted by the Examiner are: (a) the lack of approval by AFI's board or senior management; (b) the testimony of participants that neither side considered the First 2009 Tax Allocation Agreement binding; (c) fading memories and unavailability of witness to events that occurred in 2009 and 2010; (d) lack of signature by ResCap; and (e) the destruction of partially signed copies. Because this is a close question, the risk involved in this threshold determination substantially lowers the maximum settlement value of the claim by 40%, even before the inherent risks of litigation are considered.

If the First 2009 Tax Allocation Agreement were deemed to be binding on AFI, then the failure of ResCap's CFO to execute the First 2009 Tax Allocation Agreement is of no moment. The failure to sign only matters if the First 2009 Tax Allocation Agreement is not binding. In that case, there is a possibility of a claim for breach of fiduciary duty against ResCap's CFO, who is one of the released parties. Based on the Examiner's finding that it is more likely than not that ResCap's CFO did not breach his fiduciary duties, with which I concur, this claim adds only minimal settlement value.

Even if the First 2009 Tax Allocation Agreement were deemed to be binding on AFI, that agreement was superseded by the Second 2009 Tax Allocation Agreement. Thus, to prevail on a claim for breach of contract damages related to the First 2009 Tax Allocation Agreement, the plaintiff would also have to convince the court to set aside the Second 2009 Tax Allocation Agreement. Although the Examiner concludes that the Second 2009 Tax Allocation Agreement is likely to be set aside as a fraudulent transfer, there are still significant risks associated with that claim. As the Examiner noted, AFI would likely argue that ResCap received substantial capital contributions and other assistance from AFI around the time of the Second 2009 Tax Allocation Agreement which could represent reasonably equivalent value for the transaction. Notwithstanding the Examiner's conclusion that he was unable to connect these contributions to the Second 2009 Tax Allocation Agreement, this issue creates further risk for the plaintiff. In addition, as noted above, the First 2009 Tax Allocation Agreement was overly favorable to ResCap. Undoubtedly, AFI would

vigorously defend the claim and raise the issues highlighted by the Examiner. Therefore, the value of the claim would be further reduced by 20%.

If the First 2009 Tax Allocation Agreement were to be found non-binding on AFI, the plaintiff could, nevertheless, seek to set aside the Second 2009 Tax Allocation Agreement as a fraudulent transfer. The Examiner concludes that ResCap did not receive reasonably equivalent value because there was no possibility for ResCap to ever receive a payment thereunder. However, the payments of approximately $50 million are not material in this context because the value of the settlement amount of such payments would be less than $21 million and therefore does not merit separate valuation for settlement purposes. The payments made are included in the total recovery if the First 2009 Tax Allocation Agreement is upheld.

The Examiner also considered whether the Second 2009 Tax Allocation Agreement could be set aside on an overreaching theory. As part of his analysis, the Examiner found that the violation of the 2006 Amended Operating Agreement was further evidence that the Second 2009 Tax Allocation Agreement was unfair and evidenced overreaching. This theory is an alternative argument which only matters if the Second 2009 Tax Allocation Agreement is not set aside as a fraudulent transfer. Because the Examiner concluded that the Second 2009 Tax Allocation Agreement is likely to be set aside as a fraudulent transfer, this theory is unlikely to come into play. Moreover, even if it did come into play, the Examiner concluded that this claim was more likely than not to fail. Accordingly, this claim adds minimal settlement value.

Likewise, the Examiner considered whether ResCap's board breached its fiduciary duties by approving the Second 2009 Tax Allocation Agreement. Again, this is an alternative theory which only applies if the Second 2009 Tax Allocation Agreement is not set aside as a fraudulent transfer. Because the Examiner concluded that the Second 2009 Tax Allocation Agreement is likely to be set aside as a fraudulent transfer, this theory is unlikely to come into play. As above, even if this claim did come into play, the Examiner concluded that it was more likely than not to fail. As a result, this claim also adds minimal settlement value. I estimate that, together, the three alternative theories add 5% to the settlement value of the claim.

On the other side, even assuming that AFI would dispute the Examiner's calculation, the magnitude of the claims ($1,770 million) would likely be a strong motivating factor for AFI to settle. In addition, the likelihood of success identified by the Examiner would also incline AFI toward a substantial settlement. Legal fees and expenses in prosecuting and defending the claim would run into the tens of millions of dollars, but pale in comparison to the magnitude of the claims. Accordingly, I conclude that AFI would make a substantial offer to resolve these claims.

Under these circumstances, I would expect plaintiff's initial settlement demand to be $1,500 million, approximately 85% of the gross amount of the claim, and defendant's initial offer to be $265 million, approximately 15% of the claim. The back and forth of the negotiation process would ensue taking into account the discounts and enhancements identified above, as well as the relative bargaining power of the parties. The anticipated settlement range would be between $750 million, 50% of the plaintiff's initial demand, and $530 million, twice the defendant's initial offer, with a likely value of $713.7 million, calculated as follows:

| | |
|---|---|
| Potential Damages: | $1,770.0 million |
| Reduced By: | |
| 20% inherent risk = | $1,416.0 million |
| 40% on enforceability = | $849.6 million |
| 20% on fraudulent transfer = | $679.7 million |
| Increased By: | |
| 5% for alternative theories = | **$713.7 million** |

### *Claim re 2005 Tax Allocation Agreement*

**Examiner's Report References:**

Section VII.K pages VII.K-1 to VII.K-17

Section V.D pages V-300 to V-345

**Description:**

Whether ResCap has a contractual claim against AFI under the Implemented 2005 Tax Allocation Agreement.

**Background:**

From March 2005 through November 30, 2006 ResCap was included in the GM consolidated federal income tax return. During this period, AFI and ResCap were parties to the Implemented 2005 Tax Allocation Agreement, pursuant to which ResCap was entitled to be compensated by AFI to the extent that ResCap's NOLs and other tax benefits were used by both GM and AFI to reduce each of their separate group tax liabilities. In the case of AFI, this was a hypothetical computation. ResCap received a payment from AFI of $85.9 million for GM's and AFI's use of ResCap tax benefits for the tax year ending November 30, 2006. It was later determined that ResCap generated potential tax savings for GM of $101 million for that tax year so that ResCap still had a contingent right to the remaining $15.1 million in potential tax savings, which would become fixed if and when GM used the tax benefits. During the Examiner's investigation, GM confirmed that it used all of ResCap's tax benefits that were originally unused by GM in 2006; however, the Implemented 2005 Tax Allocation Agreement was terminated prior to GM's use of ResCap's tax attributes.

**Examiner's Analysis and Conclusions:**

It is likely that a contract claim in the approximate amount of $15.1 million against AFI arising under the Implemented 2005 Tax allocation Agreement would prevail.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This cause of action would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee. This type of plaintiff is typically motivated to reach an early resolution in order to save cost and expedite distributions to creditors.

As part of his extensive analysis of estate causes of action arising out of ResCap's tax sharing arrangements, the Examiner considered whether ResCap has a contract claim against AFI based on the tax benefits that were generated by ResCap and passed to, but unused by, GM in 2006. The Implemented 2005 Tax Allocation Agreement required that both GM and AFI be able to use ResCap tax benefits before ResCap would be entitled to compensation for use of its tax benefits (as opposed to the more standard construction which would require that only AFI use ResCap's tax benefits for ResCap to receive compensation). The Examiner also considered whether the claim would be time barred under applicable law. The Examiner concluded that ResCap's right to payment on account of its 2006 tax benefits was unaffected by the subsequent termination of the Implemented 2005 Tax Allocation Agreement as the agreement itself provided that even if it terminated, it would "continue to apply" to determine the parties' respective rights and obligations for the 2006 tax year and that ResCap's right to payment against AFI, albeit contingent and conditional, arose when it performed under the Implemented 2005 Tax Allocation Agreement (*i.e.*, when it generated tax benefits through November 30, 2006 that passed to GM).

Although the Examiner concludes that a claim to recover the $15.1 million contract claim is likely to prevail, all litigation carries risk, uncertainty and expense. AFI would incur legal cost and expense to defend this claim which it is likely to lose.

Given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand at approximately 85% of the total amount of the claim (approx. $12.8 million) and defendant's initial offer at approximately 15% (approx. $2.3 million). Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate a fair settlement of this contract claim at approximately $7 million. Accordingly, this claim is not material and will not be accorded any proposed allocation of the settlement fund.

### 4.    Minnesota Insider Preference Claims

**Examiner's Report References:**

Section I.E.4 pages I-14 to I-16

Section VII.F.4 pages VII.F-26 to VII.F-95

Section VII.F.6 pages VII.F-122 to VII.F-148

**Description:**

Application of Minnesota's substantive fraudulent transfer law to transfers made by ResCap and RFC to AFI and its affiliates, including GMAC Commercial Finance LLC ("GMAC CF").

**Background:**

The Examiner reviewed seven transactions or loan facilities between ResCap as the borrower and AFI or AFI's affiliates, including GMAC CF : (1) the Secured Revolver Facility; (2) the A&R Line of Credit Facility; (3) the Secured MSR Facility; (4) the Servicing Advance Factoring Facility; (5) the Resort Finance Facility; (6) the 2008 Bank Transaction; and (7) the 2009 Bank Transaction (collectively, the "Transactions") to determine whether they implicate potential claims under Minnesota's Insider Preference Statute.

**Examiner's Legal Analysis and Conclusions:**

1.    The Bankruptcy Court would likely apply Minnesota's Insider Preference statute to transfers made by ResCap and RFC to AFI in the six years prior to ResCap's bankruptcy filing.

2.    Minnesota's version of the UFTA has an Insider Preference cause of action. A transfer is fraudulent under Minnesota's Insider Preference statute if: (1) there exists a creditor of the transferor-debtor whose claim arose before the transfer, (2) the transfer was made to an insider of the debtor, (3) the transfer was made for an antecedent debt, (4) the debtor was insolvent at the time of the transfer, and (5) the insider had reasonable cause to believe the debtor was insolvent.

3.    Although a close call, the Minnesota Insider Preference statute allows a "substantially contemporaneous" limitation to the antecedent debt requirement despite the express wording of the statute.

4.    The Minnesota Insider Preference statute has four defenses: good faith transferee; new value; ordinary course; and, good faith effort to rehabilitate the Debtor.

5.    All of AFI's potential insider preference liability stems from the A&R Line of Credit Facility either because payments under the other loan facilities do not meet all the elements of a preference or are offset by new value contributions.

41

6.      The Subsequent New Value Defense is available to AFI and, although a close call, it likely will be applied as a netting out of all value given against all transfers made during the subject transfer period.  The value of non-cash contributions would be an issue.

7.      Under Minnesota's Insider Preference statute, only the parties' history of dealings is to be considered in determining ordinary course of dealings.  All of the transfers between the Debtors and AFI occurred post-insolvency, and thus the Examiner concluded that AFI would be unlikely to prevail on an ordinary course defense.

8.      It is likely that AFI would not be able to establish the good faith effort to rehabilitate defense.

9.      While Minnesota's Insider Preference statute allows for a six-year reach-back period from the Petition Date, the Examiner concluded that prior to December 30, 2009, AFI provided new value to ResCap and RFC which, taken as a whole as against extensions of credit, exceeded the value of the transfers made by ResCap and RFC to AFI during that same period.

10.      From December 30, 2009 to the Petition Date, RFC made transfers to AFI under the A&R Line Of Credit Facility totaling approximately $650 million, and AFI extended new value to RFC totaling approximately $116 million. GMAC Mortgage and certain of the other Debtors entered into the A&R Line of Credit Facility as well.  The estimated Insider Preference liability for AFI to RFC is $534 million.

11.      GMAC CF, a wholly-owned subsidiary of AFI, has approximately $32 million in potential Insider Preference liability with a potential offset of $1.5 million for new value.  However, the Debtors' records are unclear as to whether the transfers were made by RFC or GMAC Mortgage.  To the extent the transfers were made by GMAC Mortgage the Minnesota Insider Preference statute would not apply because Pennsylvania law applies to the GMAC Mortgage.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  I believe it noteworthy that the Examiner was unable to find Minnesota state law directly interpreting Minnesota's ordinary course defense.  The Examiner predicts that, in the absence of a baseline course of dealings predating the financial turmoil, AFI would be unable to look to Minnesota's ordinary course of dealings defense. I believe that application of this narrow reading of the statute overlooks the policy underlying preference defenses to protect creditors who continue to transact business with companies in financial distress.  Moreover, under Bankruptcy Code section 547(c)(2)(A), some bankruptcy courts have deemed transfers to be in the ordinary course which occurred only during the preference period.  Although looking to industry practices is not available under Minnesota's UFTA, AFI may nonetheless argue that its dealings with ResCap and RFC during the look-back period should be treated as ordinary course even though ResCap and RFC were in dire financial straits throughout the period.

**Settlement Considerations:**

### Claims Against AFI

This cause of action likely would be pursued by a bankruptcy fiduciary such as a committee or a post-confirmation trustee. Although the Examiner concludes that Bankruptcy Code section 546(e)'s safe harbor likely does not apply to these transactions, if the court were to deem the safe harbor applicable, then an estate fiduciary might not be able to pursue these claims; these claims may then be pursued by a non-estate fiduciary, such as a creditor (pursuant to the *Tribune* work-around). The dynamics of settlement may change in the event a creditor seeking its own recovery were substituted for a fiduciary looking to maximize recovery for a broader group of creditors.

Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to expedite distributions to creditors. All of the procedural hurdles that attend bankruptcy litigation would be present in this case, including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law fraudulent transfer action, (ii) withdrawal of the reference, and (iii) demand for a jury trial. AFI would most likely vigorously defend the claim and raise all of the issues and potential defenses addressed by the Examiner. Although the Examiner concludes that the preference claim is likely to be successful, all litigation carries risk, uncertainty and expense. Similarly, AFI would also incur significant legal cost and expense to defend this claim. As a result, given the foregoing factors and the initial face-amount of the claim, I believe that it is highly likely that any settlement would reflect a substantial discount of 30% on the face value of the claim, reducing the claim to $373.8 million.

Further, the Examiner's report details several issues in litigating these Insider Preference Claim that would reduce the settlement value of the claim. First, the Examiner's choice-of-law analysis, which determined Minnesota law to be applicable, is certainly well-reasoned but not an absolute. In the event that the court does not apply the Minnesota Insider Preference statute, AFI will have a stronger ordinary course defense to a preference claim. Likewise, the Bankruptcy Code section 546(e) safe-harbor may arguably remain available to AFI, though a creditor work-around may nonetheless allow for the later prosecution of this claim against AFI by a non-estate fiduciary, thus reducing the strength of the preference claim. Based on these additional issues, I believe that an additional discount of 20% of the claim is warranted, further reducing the claim to $299.0 million.

On the other hand, the Examiner's claim value of $534 million is conservative and there is the possibility, although likely remote, that the court would not net out all transfers between ResCap and AFI, thereby potentially increasing AFI's Insider Preference exposure. Also, there are numerous transfers that the Examiner concludes do not meet all the elements of a preference or are offset by new value contributions; however, the plaintiff would argue otherwise. This is a potential risk of additional exposure to AFI, and thus I have ascribed a 10% increase in value of the settlement amount, bringing the overall likely settlement value of the AFI claims to $328.9 million.

Potential Damages:                                          $534.0 million

Reduced By:

43

| | |
|---|---|
| 30% inherent risk= | $373.8 million |
| 20% for choice of law= | $299.0 million |
| Increased By: | |
| 10% for no netting of transfers= | $328.9 million |

As an alternative method of determining settlement value, given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand at $480.6 million, approximately 90% of the total amount of the claim, and defendant's initial offer at $80.1 million, approximately 15% of the total claim. Taking into account the relative bargaining power of the parties, the back and forth to be expected in the negotiating process, the strong merits of this insider preference claim, and the risk of additional exposure, I expect a reasonable settlement at the upper end of the range at approximately $300 million.

### Claims against GMAC CF

With respect to the Insider Preference claims of approximately $32 million against GMAC CF, I believe that the sole defense raised by the Examiner was the new value offset of $1.5 million, reducing the claim to $30.5 million. As with the AFI Insider Preference claims, applying the same discounts and enhancements as above, likely settlement value of the GMAC CF claim is reduced to $18.8 million.

| | |
|---|---|
| Potential Damages: | $30.5 million |
| Reduced By: | |
| 30% inherent risk= | $21.4 million |
| 20% for choice of law= | $17.1 million |
| Increased By: | |
| 10% for no netting of transfers= | $18.8 million |

As an alternate method of determining settlement value, given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand to be $28.4 million, approximately 90% of the total amount of the claim, and defendant's initial offer at $4.7 million, approximately 15% of the total amount of the claim. Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate that a fair settlement of this preference claim at approximately $18 million. This is below the materiality threshold of $21 million. In addition, the Examiner was unable to determine from the Debtors' records whether the transfers were made by RFC or GMAC Mortgage. To the extent the transfers were made by GMAC Mortgage Pennsylvania law would apply, not the Minnesota Insider Preference statute with the longer reach back period. Accordingly, these claims are not assigned any material settlement value.

44

5.        **Ally Bank Transactions**

a.        *2006 Bank Restructuring*

**Examiner's Report References:**

Section I.E.5.a pages I-16 to I-19

Section V.A.1.a pages V-1 to V24

Section V.A.2.a and b pages V-44 to V-70

Section VII.F.6.d pages VII.F-134 to VII.F-142

Section VII.E.2 pages VII.E-28 to VII.E-40

Section VII.L.1 pages VII.L-1 to VII.L-28

**Description:**

ResCap exchanged 100% ownership of Old GMAC Bank, a valuable asset, for non-voting shares in IB Financial, the holding company of Ally Bank, which were much less valuable, in a transaction where ResCap's Independent Directors were not informed of, and perhaps misled about, viable alternate structures that would have preserved the full value of Old GMAC Bank for ResCap.

**Background:**

In 2005 AFI and ResCap sought to separate from GM to reduce their high cost of funds due to GM's poor credit rating. Cerberus agreed to acquire 51% of AFI, which would accomplish the desired separation from GM. One glitch was that ResCap owned a federal savings bank, *i.e.*, Old GMAC Bank. If Cerberus acquired indirect ownership of a federal savings bank, it would become subject to the Bank Holding Company Act (BHCA), an undesirable consequence for Cerberus. Fortunately, AFI owned a Utah industrial bank, GMAC Automotive Bank. Indirect ownership of that industrial bank would not implicate the BHCA. A plan was devised to transfer the assets and liabilities from the federal savings bank to the industrial bank and avoid Cerberus becoming subject to the BHCA. Various structures for ownership of the industrial bank were discussed to account for the value and earnings contributed by ResCap. A structure was developed whereby ResCap was given non-voting shares in IB Financial, a new holding company for the industrial bank. However, AFI retained 100% of the voting shares in IB Financial. AFI wanted to retain 100% of the voting rights to accommodate GM's request for a call option on the automotive finance business. ResCap's Independent Directors were told that this arrangement was necessary to consummate the desired deal with Cerberus, but were not told that Cerberus' agreement placed no restriction on ResCap receiving voting shares and that AFI devised the structure to appease GM. The Independent Directors were also not shown a memo from ResCap's General Counsel suggesting that the proposed structure would violate a 2005 Operating Agreement for the benefit of ResCap's creditors that required Independent Director approval of transactions not at arm's length and at fair value. Nor were they

45

told that alternate structures were possible, or that ResCap's CEO had proposed giving ResCap voting control of the industrial bank. Nevertheless, ResCap's board, including the Independent Directors, unanimously approved the transaction. The Examiner estimates that the loss of equity value of the non-voting shares versus the equity in the federal savings bank was between $533 million and $608 million. Giving credit for the benefit to ResCap of lower borrowing costs after the Cerberus deal, the Examiner estimated that the net difference in value to ResCap was a loss of between $390 million and $465 million. The Examiner included $360 million of cash and mortgages contributed by ResCap to the industrial bank, for which it received no stock or other consideration, in his calculations of net difference in value.

**Examiner's Analysis and Conclusions:**

1.      While a close question, it is more likely than not that a fraud claim by ResCap against AFI related to the 2006 Bank Restructuring would not prevail in light of the *in pari delicto* defense and the *Wagoner* Rule.

2.      While a close question, it is more likely than not that a breach of contract claim under the 2005 Operating Agreement by ResCap against AFI related to the 2006 Bank Restructuring would not prevail in light of the *in pari delicto* defense and the *Wagoner* Rule.

3.      It is unlikely that a claim for tortious interference with the 2005 Operating Agreement would prevail against AFI related to the 2006 Bank Restructure because only a non-party may be liable for interfering with a contract.

4.      A fraudulent transfer claim against AFI based upon actual intent is unlikely to prevail with respect to the 2006 Bank Restructure because the evidence does not support actual intent to hinder, delay or defraud creditors.

5.      It is unlikely that a constructive fraudulent conveyance action against AFI would prevail with regard to the 2006 Bank Restructure because ResCap was not financially distressed.

6.      While a close question, it is more likely than not that a claim for breach of fiduciary duties against dual-affiliated ResCap insiders would not prevail.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions. Moreover, since the date of the Examiner's Report, the Second Circuit has reaffirmed the *in pari delicto* doctrine and the *Wagoner* rule in *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Investment Securities, LLC).*[25] I further note that the Examiner did not consider the possibility or likelihood of punitive damages on the fraud claim.

---

[25]   721 F.3d 54 (2d Cir. 2013).

**Settlement Considerations:**

The Examiner posited two different sets of possible values for these claims. First, the Examiner estimated the loss of equity value to ResCap at between $530 million and $608 million. Giving credit for the benefit to ResCap of the reduction in the cost of the lower borrowing costs, the net difference in value was between $390 million and $465 million. However, the core of the Examiner's conclusion was that alternative structures for completing the Cerberus transaction and reducing ResCap's borrowing costs were available. If these structures had been utilized, ResCap would still have received the lower borrowing costs without the loss of equity value. The measure of damages for both fraud and breach of contract claims is to put the injured party in the same position it would have been in but for the fraud or breach. Accordingly, for purposes of valuing settlement, I used the midpoint of the higher range of values, which was $569 million.

This claim would likely be pursued by a bankruptcy fiduciary such as a trustee or committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to save cost and expedite distributions to creditors. All of the procedural hurdles that attend bankruptcy litigation would be present in this case, including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law contract dispute and a fraudulent transfer action, (ii) withdrawal of the reference, and (iii) demand for a jury trial. In addition, all litigation carries risk, uncertainty, and expense. As a result, it is highly likely that any settlement would reflect a substantial discount (30%) from the face value of the claim.

The Examiner concluded that, while a close question, both the fraud and contract claims were likely to be barred by the *in pari delicto* doctrine and the *Wagoner* rule. The Examiner's conclusion is supported by the evidence and case law. As a result, any settlement would reflect a discount of over half the settlement value for these defenses, and I estimate settlement value using a 60% discount.

In addition, the Examiner correctly noted other problems with the claims even if the plaintiffs could get past the *in pari delicto* doctrine and the *Wagoner* rule. On the contract claim, the Examiner acknowledged that AFI could use the "sole obligation" language in Section 7 of the 2005 Operating Agreement to bar a claim under that Agreement. Although the Examiner concluded that the plaintiffs could defeat this defense by reliance on the implied duty of good faith and fair dealing, this issue creates further risk for plaintiffs. In addition, claims based on the implied duty of good faith and fair dealing are inherently risky, as they depend not on specific contract language, but on the finder of fact's subjective view of the conduct. Likewise, the Examiner also noted that if Minnesota law applies to the fraud claim, the *per curiam* decision of the Minnesota Supreme Court in the case of *Blenda Life Corp. v. Blenda Life, Inc.,*[26] appears to establish a blanket bar to a claim by a subsidiary against a parent. Although the Examiner was unsure whether a court would follow this decision, which has not been cited for this proposition since, and although this case would not apply to the contract claim which is governed by New York law, this issue creates further risk for the plaintiffs. Accordingly, any settlement would likely reflect a discount of an additional 25% due to risks on the merits.

---

[26] 196 N.W.2d 925, 927 (Minn. 1972) (per curiam).

The Examiner next concluded that a claim of tortious interference against AFI was not likely to succeed, based on the fact that a party cannot be liable for tortiously interfering with its own contract. I did not attribute any settlement value to this claim.

The Examiner also considered the possibility of breach of fiduciary duty claims against ResCap insiders (who also had dual affiliations with AFI) for concealing information from the independent directors.[27]  In favor of the claim, the Examiner identified substantial evidence that material information regarding alternative structures was withheld. However, the Examiner also noted that because ResCap was not insolvent at the time, it is unclear that these insiders had a fiduciary duty to disclose this information. Moreover, there is a substantial risk that any such fiduciary duty claims are time-barred. Even if plaintiffs could surmount these hurdles, the harm from the alleged breaches is unclear, as the independent directors may have approved the transaction even if the information was not withheld. These arguments make a breach of fiduciary duty claim unlikely to succeed. Nevertheless, the Examiner found it to be a close question and I thus estimate that the existence of this alternative theory of recovery adds 10% to the settlement value of the claim.

On the other hand, even assuming that AFI would dispute the Examiner's calculation, the magnitude of the claims ($569 million) would likely be a strong motivating factor for AFI to settle. In addition, the fact that these are close issues would also incline AFI toward a substantial settlement. Legal fees and expenses in prosecuting and defending the claim would run into the tens of millions of dollars. Accordingly, I conclude that AFI would make a substantial offer to resolve these claims.

Under these circumstances, I would expect plaintiff's initial settlement demand to be $320 million, approximately 55% of the gross amount of the claim, and defendant's initial offer at $60 million, approximately 10% of the claim. The back and forth of the negotiation process would ensue, taking into account the discounts and enhancements identified above, as well as the relative bargaining power of the parties. The anticipated settlement range would be between $156 million, 50% of the plaintiff's initial demand, and $120 million, twice the defendant's initial offer, with a likely settlement value of $130.0 million, calculated as follows:

| | |
|---|---|
| Potential Damages: | $569 million |
| Reduced By: | |
| 30% inherent risk = | $398.3 million |
| 60% on in *pari delicto*/merits = | $159.3  million |

---

[27] The Examiner also considered a claim for breach of fiduciary duty against the independent directors, but concluded that it was unlikely to succeed because the independent directors did conduct some due diligence, reasonably relied on the advice of outside counsel, and would likely be exculpated under ResCap's charter. In view of the minimal likelihood of success, this claim does not add any settlement value.

| | |
|---|---|
| 25% merits= | $119.5 million |

Increased By:

| | |
|---|---|
| 10% for breach of fiduciary theory alternative= | $130.0 million* |

\* As noted above we have rounded down from $131.4 million to $130 million

### b.    *2008 Bank Transaction and 2009 Bank Transaction*

**Examiner's Report References:**

Section I.E.5.b pages I-19 to I-20

Section V.A.1.b and c pages V-24 to V-44

Section V.A.2.c and d pages V-70 to V-89

Section VII.F.6.d pages VII.F-134 to VII.F-148

**Description:**

*2008 Bank Transaction*.  At a time when it was insolvent, ResCap issued new ResCap Preferred Interests, convertible into Preferred Interests in IB Finance (the holding company for Ally Bank), in exchange for ResCap bonds that AFI had purchased on the open market.  ResCap retained the right to redeem the IB Finance Preferred Interests.

*2009 Bank Transaction*. At a time when it was insolvent, ResCap sold its remaining non-voting Class M stock in IB Finance (the holding company for Ally Bank) to AFI and surrendered its right to redeem the IB Finance Preferred Interests.  In exchange, AFI contributed to ResCap Senior Secured Notes of ResCap.

**Background:**

In March 2008, ResCap was experiencing liquidity problems and projected that it would be in breach of a Tangible Net Worth ("TNW") covenant as of March 31, 2008.  AFI devised a plan to contribute ResCap bonds that AFI had acquired at a discount on the open market in exchange for newly issued Preferred Interests in ResCap that would be convertible into Preferred Interests in IB Finance, the holding company for Ally Bank.  If AFI exercised its conversion rights, ResCap's nonvoting Class M tracking shares in IB Finance would be reduced *pro tanto*; however, ResCap retained the right to redeem the IB Finance Preferred Interests. ResCap's outside counsel reviewed and recommended the transaction and its outside financial advisors opined that the deal was at arm's length and for fair value. A similar exchange occurred in June 2008. The Examiner's advisors value the debt contributed to ResCap at $841 million and the value of the Preferred Interest with conversion rights transferred by ResCap at between $571 million and $714 million.

In 2009, ResCap continued to experience liquidity pressure and teetered on the brink of breaching its TNW covenant. AFI again contributed ResCap bonds it had acquired on the open market and extended the maturity of the Initial Line of Credit Facility. In exchange, ResCap transferred its remaining IB Finance non-voting Class M tracking stock and its right to redeem the IB Finance Preferred Interests. The Examiners valued the debt received by ResCap at $600 million and the stock and rights given up by ResCap at between $106.5 million and $217.5 million.

After the 2009 Bank Transaction, equity of the Mortgage Bank which the Class M shares tracked became negative and remained so up until April 30, 2013. Even in hindsight, the 2008 and 2009 Bank Transactions were favorable to ResCap.

**Examiner's Analysis and Conclusions:**

1.      Although the transfer was to an insider at a time when ResCap was in financial distress, the weight of the evidence does not support a finding of actual intent to hinder, delay or defraud ResCap's creditors in connection with the 2008 Bank Transaction. An action to set aside the transfer as an actual fraudulent transfer is not likely to prevail.

2.      ResCap received more than reasonably equivalent value in the 2008 Bank Transaction, making it unlikely that a constructive fraudulent transfer action would be successful.

3.      Although the transfer was to an insider at a time when ResCap was in financial distress, the weight of the evidence does not support a finding of actual intent to hinder, delay or defraud ResCap's creditors in connection with the 2009 Bank Transaction. An action to set aside the transfer as an actual fraudulent transfer is not likely to prevail.

4.      ResCap received more than reasonably equivalent value in the 2009 Bank Transaction, making it unlikely that a constructive fraudulent transfer action would be successful.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Actions to set aside the 2008 and 2009 Bank Transactions as fraudulent transactions are outside the two-year look-back period of Bankruptcy Code section 548. The Examiner determined that these claims would be brought, if at all, under the Minnesota UFTA by a bankruptcy fiduciary using the strong arm provisions of Bankruptcy Code section 544. In light of the Examiner's conclusion that ResCap received reasonably equivalent value in each transaction, I believe that these claims would probably not be pursued. Therefore I ascribe no settlement value to the potential fraudulent transfer actions relating to the 2008 Bank Transaction or the 2009 Bank Transaction.

### 6.    ResCap's Directors And Officers

**Examiner's Report References:**

Section I.E.6 pages I-20 to I-23

Section IV pages IV-1 to IV-69

Section VII.E pages VII.E-1 to VII.E-43

Section VII.K.2.b pages VII.K-31 to VII.K-37

Section VII.K.2.f  pages. VII.K-45 to VII.K-50

**Description:**

Whether any of ResCap's directors or officers are liable for breaches of fiduciary duty. Relatedly, whether AFI is liable for aiding and abetting any such breach of fiduciary duty.

**Background:**

The Examiner considered whether ResCap's directors or officers might be liable for breaches of fiduciary duty regarding several transactions and events, including: (a) the 2006 Bank Restructure; (b) the Second 2009 Tax Allocation Agreement; (c) James Young's failure to sign the First 2009 Tax Allocation Agreement; (d) the prepetition asset sales; (e) the January 30 Letter Agreement, and the A&R Servicing Agreement and the $48 million indemnity payment thereunder; (f) the work of the Special Review Committee, the AFI Settlement and  Plan Sponsor Agreement; and (g) the RMBS Trust Settlement Agreements.  The Examiner also considered whether AFI could be liable for aiding and abetting any such breaches of fiduciary duties.

**Examiner's Analysis and Conclusions:**

1.    Although troubling facts exist, no claims for breach of fiduciary duty by ResCap's directors and officers are likely to prevail.

(a)    *2006 Bank Restructure*

2.    Potential breach of fiduciary claims with regard to the 2006 Bank Restructure exist because fiduciaries with dual affiliations to AFI and ResCap may have purposefully concealed material information from ResCap's Independent Directors.  However, the Examiner is dubious that the dual-affiliated fiduciaries had a duty to disclose to the Independent Directors because their primary duty was to the parent, AFI, so long as ResCap was solvent, which it was in 2006, and there was no apparent self-dealing.  In addition,  it is likely that the applicable statute of limitations expired before ResCap's bankruptcy filing.  Although the actions of the fiduciaries are troubling, breach of fiduciary claims related to the 2006 Bank Restructure, while a close question, are more likely than not to fail because of an absence of a duty to disclose and because the claims are untimely.

3.      The Independent Directors potentially breached their fiduciary duty with regard to the 2006 Bank Restructure by failing to adequately investigate the option for ResCap to receive voting stock in the industrial bank and by not seeking a fairness opinion.  However, it is unlikely that a claim against the Independent Directors for breach of fiduciary duty would prevail because they relied on the advice of counsel and the candor of their co-fiduciaries.

### (b)      Second 2009 Tax Allocation Agreement

4.      Although the Second 2009 Tax Allocation Agreement was very unfair to ResCap, there was a thorough review process with the assistance of able advisors and there is no evidence to suggest a breach of the duty of loyalty or an intention to act against ResCap's best interests.  The Examiner therefore concluded that, while a close question, a potential breach of fiduciary claim relating to the Second 2009 Tax Allocation Agreement would more likely than not be unsuccessful.

### (c) Young's Failure to Sign First 2009 Tax Allocation Agreement

5.      The evidence does not establish that Mr. Young intentionally (a) refrained from signing the First 2009 Tax Allocation Agreement with a purpose other than to advance the best interests of ResCap, or (b) acted in dereliction of his duties.  The Examiner accordingly concluded that a claim of breach of fiduciary duty against him, while a close question, would more likely than not be unsuccessful.

### (d)      Prepetition Asset Sales

6.      Breach of fiduciary claims related to the prepetition asset sales are unlikely to prevail. Although the transactions occurred in a hurried manner, there is no evidence that the fiduciaries lacked adequate information on which to base their decisions.  In addition, ResCap may have benefited from the time pressure of the transactions and it received fair value in each case.

### (e)      January 30, Letter Agreement and the A&R Servicing Agreement and the $48 million Indemnity Payment Thereunder

7.      The January 30 Letter Agreement was the result of extensive arm's length negotiations and informed decisions.  It provided fair value to ResCap and allowed it to continue operating despite liquidity challenges. A breach of fiduciary claim related to the January 30 Letter Agreement is therefore unlikely to be successful.

8.      While a close question, the Examiner concludes it is more likely than not that a breach of fiduciary claim related to the $48.4 million payment from ResCap to AFI for indemnification obligations without board authorization would not prevail because it was a reasonable exercise of business judgment by ResCap's executive.

9.      The Examiner also concluded that potential breach of fiduciary claims relating to the A&R Servicing Agreement would not be likely to prevail.  The A&R Servicing Agreement was the product of extensive negotiations with both sides represented, and was at arm's length and for fair value.

*(f)    The Work of the Special Review Committee, the AFI Settlement and  Plan Sponsor Agreement*

10.    The Examiner concluded that although the work of the Special Review Committee was flawed and tainted by conflict of interest, a breach of fiduciary duty claim will more likely than not fail, although it is a close question. The Independent Directors on the Special Review Committee were disinterested and they relied heavily on counsel. The business judgment rule will likely preclude a breach of fiduciary duty claim.

11.    Likewise, the Examiner concluded that the AFI Settlement and Plan Sponsor Agreement, although flawed, do not support claims for breach of fiduciary duty.  Relying on the advice of counsel, ResCap's board concluded that the AFI Settlement was reasonable in light of the challenging and complex legal issues. The business judgment rule will likely preclude a breach of fiduciary claim.

*(g)    The RMBS Trust Settlement Agreements*

12.    The Examiner also found that the RMBS Trust Settlement Agreements were hurriedly approved with possibly flawed advice. However, the negotiations were conducted at arm's length by counsel upon whom the board reasonably relied.  While a close question, it is more likely than not that a breach of fiduciary claim related to the RMBS Trust Settlement Agreements would not prevail.

13.    Since none of the predicate breach of fiduciary claims is likely to prevail, the Examiner did not believe there is a viable claim of aiding and abetting a breach of fiduciary duty.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Many of the events and transactions that may give rise to potential breach of fiduciary claims are analyzed separately for reasonable settlement value elsewhere in this report.  Specifically, the claims for breaches of fiduciary duty claims relating to the 2006 Bank Restructure, the 2009 Tax Allocation Agreements, the pre-petition asset sales, the $48.4 million payment, and the RMBS Trust Settlement Agreements are addressed in those sections.  The existence and settlement value of breach of fiduciary duty claims related to those events or transactions are considered in those sections.  Because duplicative damages are not available for such claims, these claims do not have additional settlement value above and beyond what is considered in the underlying transactions.

As for the remaining claims, claims for breach of fiduciary duty are expensive to litigate and are susceptible to threshold issues and strong defenses.  Specifically, as the Examiner noted, claims for breach of fiduciary duty will have to overcome standing obstacles under Delaware law, and likely will have to be brought derivatively.  In addition, the Examiner observed that the defendants

will likely rely on the business judgment rule, experts, and exculpatory clauses to defend against such claims.  As a result, the settlement value of any claim for breach of fiduciary duty is subject to a significant discount of 40%, from its face value.

Turning to specific claims, the Examiner found that breach of fiduciary duty claims based on the January 30 Letter Agreement were not likely to succeed, as it was subject to extensive arm's length negotiation and ResCap received fair value.  Given the cost of bringing such a claim, as well as the availability of the defenses noted above, such a claim is unlikely to be brought and does not add any settlement value.

Similarly, the Examiner found that claims regarding the A&R Servicing Agreement were not likely to prevail.  The Examiner observed that the A&R Servicing Agreement was entered into at arm's length and for fair value, and it was critical to GMAC Mortgage's valuable servicing platform, so that the lack of approval by the GMAC Mortgage Board is not likely to be significant.  Given the cost of bringing such a claim, as well as the availability of the defenses noted above, such a claim is unlikely to be made and does not add any settlement value.

Finally, the Examiner found that fiduciary duty claims related to the AFI Settlement and Plan Sponsor Agreement were not likely to succeed.  The Examiner noted that the performance of the board was incomplete and tainted by conflicts of counsel.  At the same time, the Examiner found that the board and the independent directors reasonably relied on the advice of outside counsel and that they were entitled to defer to that expertise.  Accordingly, such a claim is not likely to be brought and does not add any settlement value.

Because these claims are subject to significant defenses, not likely to prevail, and not likely to be brought, they are not material and do not add any settlement value.

### 7.    Single Entity Theories Of Liability

#### a.    *Piercing The Corporate Veil*

**Examiner's Report References:**

Section I.E.7.a pages I-23 to I-25

Section VII.A pages VII.A-1 to VII.A-64

**Description:**

Whether ResCap and AFI operated as a single economic entity in an unjust or unfair manner such that a claim could be successfully asserted on behalf of ResCap to pierce its corporate veil, thereby making AFI liable for all of ResCap's debts.

**Background:**

ResCap was a wholly owned subsidiary of AFI.  The Examiner's Investigation uncovered evidence of certain indicia that ResCap and AFI operated as a single economic entity.  ResCap's

conduct in connection with a number of Affiliate Transactions (*e.g.*, the 2006 Bank Restructuring, the MSR Swap, the Pipeline Swap, the First 2009 Tax Allocation Agreement, the Second 2009 Tax Allocation Agreement, and the allocation of liability in connection with the FRB/FDIC Settlement and the DOJ/AG Settlement) departed in some important respects from appropriate corporate formalities, including the requirements of ResCap's own operating agreements.

**Examiner's Analysis and Conclusions:**

1.      The application of Delaware law to the assessment of potential veil-piercing claims is consistent with the weight of authority in the Second Circuit.

2.      Delaware law recognizes the existence of a claim on behalf of a debtor to pierce its own corporate veil.

3.      An "alter ego" claim constitutes property of the debtor corporation, and the debtor-in-possession or bankruptcy trustee has exclusive standing to assert the claim.

4.      A debtor that succeeds in piercing its own corporate veil may hold its parent liable for all of its debts.

5.      In order to pierce the corporate veil and establish alter ego liability under Delaware law, a plaintiff must show (1) that the parent and subsidiary operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present. The fact that the subsidiary is a limited liability company does not change the analysis.

6.      Factors considered by courts applying Delaware law to determine whether a parent and its subsidiary should be deemed a "single economic entity" include: (1) undercapitalization, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of the debtor corporation at the time, (5) siphoning off of the corporation's funds by the dominant parent, (6) absence of corporate records, and (7) the fact that the corporation is merely a façade for the operations of the dominant parent.

7.      The evidence does not support the proposition that ResCap was inadequately capitalized or insolvent at or around its formation.

8.      The evidence does not support the proposition that AFI siphoned assets from ResCap.

9.      The Examiner did not afford any weight to ResCap's nonpayment of dividends.

10.      The Examiner concluded that the evidence supported the proposition that ResCap failed to follow or followed inconsistently, certain appropriate corporate formalities.

11.      The Examiner concluded that a court would likely find that the operations of ResCap and AFI would be consistent with the operations of a subsidiary and its parent.

12.      The Examiner does not consider any theory of injustice or unfairness likely to succeed.

55

13.    Any veil-piercing claims asserted on behalf of ResCap against AFI are unlikely to prevail.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Based upon the Examiner's factual and legal conclusions, it would initially seem that if this claim were pursued by a bankruptcy fiduciary, such as a trustee or a committee, it would likely be pursued on a contingent fee basis in view of the uphill battle evidenced by the Examiner's conclusions. However, there are third party contingent claims against AFI for RMBS litigation in the tens of billions of dollars. Thus, I believe that a creditors' committee and third party plaintiffs would work together to overcome any "standing" issues to receive authority from a court to pursue the single entity claim theories, including veil-piercing and alter ego, on behalf of the estate. Despite the fact that the Examiner concludes, and I agree, that veil-piercing and alter ego claims are unlikely to succeed, I conclude there is significant settlement value not to exceed $480 million as discussed in the Third Party RMBS litigation analysis below.

### b.    Substantive Consolidation

**Examiner's Report References:**

Section I.E.7.b  page I-25

Section VII.A.2  pages VII.A-65 to VII.A-85

**Description:**

Whether there is evidence to support the consolidation of AFI into the estate of ResCap or any other subsidiary.

**Background:**

Substantive consolidation is an equitable doctrine pursuant to which the assets and liabilities of affiliated entities are treated as one for purposes of a bankruptcy case. Intercompany claims of the consolidated debtors are eliminated, the assets of the consolidated debtors are treated as common assets, and the claims of outside creditors against any of the debtors are treated as claims against the consolidated entity. The only finding of the Examiner in support of substantive consolidation is the absence of certain corporate formalities. However, the Examiner uncovered no credible evidence that creditors dealt with ResCap and AFI as a single entity. Trading activity in ResCap bonds, CDS pricing and credit ratings, consolidated financial statements, and lack of guarantees (although guarantees might negate single entity status) were considered by the Examiner.

**Examiner's Analysis and Conclusions:**

1.      Controlling Second Circuit law regarding substantive consolidation is set forth in the *Augie/Restivo*[28] case and requires that either (i) creditors dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit, or (ii) the entities' affairs are so entangled that substantive consolidation would benefit all creditors.

2.      While a close question, it is more likely than not that a court would find that ResCap and AFI operated as a single economic entity.

3.      However, there is no evidence that creditors relied upon ResCap and AFI being a single economic entity.

4.      The evidence does not support the proposition that AFI and ResCap's affairs were hopelessly entangled.

5.      It is unlikely that a motion for substantive consolidation on either theory would prevail.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions. Both tests for substantive consolidation are fact specific.

**Settlement Considerations:**

If a claim for substantive consolidation were successful, creditors of ResCap would share in the assets of AFI *pari passu* with AFI's creditors (and vice versa) thereby significantly enhancing their recovery. Because of the fact intensive nature of substantive consolidation, it may be possible for a trustee or other estate representative to withstand a motion to dismiss, although based on the facts found by the Examiner, the likelihood of such success is minimal.

However, there is always the chance that litigation with a low probability of success will prevail and so the risk to AFI and its creditors increases. There are third party contingent claims against AFI for RMBS litigation in the tens of billions of dollars. Despite the fact that the Examiner concludes, and I agree, that a substantive consolidation claim is unlikely to succeed, I conclude there is significant settlement value not to exceed $480 million as discussed in the Third Party RMBS litigation analysis below.

---

[28] *Union Savings Bank v. Augie/Restivo Baking Company, Ltd. (In re Augie/Restivo Baking Company, Ltd.)*, 860 F.2d 515 (2d Cir. 1988).

### 8.    Debt Re-characterization

**Examiner's Report References:**

Section I.E.8 pages I-25 to I-26

Section VII.B pages VII.B-1 to VII.B-27

Section V.E.3, 5, and 8 pages V-357 to V-362, V-368 to V-372 and V-377 to V-379

Section VI.B.2 and 3 pages VII.B-1 to VII.B-13

**Description:**

Whether any of the claims held by AFI are subject to re-characterization as equity.

**Background:**

AFI holds two categories of claims: (1) claims under the A&R Secured Revolver Loan Agreement (approximately $747 million) and under the A&R Line of Credit Agreement (approximately $380 million); and (2) claims with respect to Unsecured Notes and Senior Secured Notes (aggregating $2.4 billion in face principal amount) that were exchanged by AFI for, among other things, ResCap Preferred Interests in the 2008 Bank Transaction and ResCap's remaining IB Finance Class M Shares in the 2009 Bank Transaction.

**Examiner's Analysis and Conclusions:**

1.      It is unlikely that an effort to re-characterize the AFI Secured Revolver Facility claims as equity would prevail.

2.      It is unlikely that an effort to re-characterize the AFI Line of Credit Agreement claims as equity would prevail.

3.      It is unlikely that an effort to retroactively re-characterize the Unsecured Notes and the Senior Secured Notes used by AFI as consideration in connection with the 2008 Bank Transaction and the 2009 Bank Transaction would prevail.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This cause of action would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee. This type of plaintiff is typically motivated to reach an early resolution in order to save cost and expedite distributions to creditors.

58

The Examiner evaluated each of the AFI Secured Revolver Facility, the AFI Line of Credit Agreement, the Unsecured Notes and the Senior Secured Notes used by AFI as consideration in connection with the 2008 Bank Transaction and the 2009 Bank Transaction  (i) in light of the evidence related to the material of issue whether the parties intended them to be debt or equity, (ii) application of the factors courts generally consider in determining whether to re-characterize claims as equity (the "*Autostyle* Factors"), and (iii) possible defenses.  The facts and the application of the *Autostyle* Factors (as well as some other factors) support a determination that the all of the claims and notes constitute debt that cannot be re-characterized as equity.[29]  Significantly, the Examiner's investigation did not reveal any evidence that the parties ever intended, considered or treated the loans as anything other than loans.

The Examiner also considered possible defenses including, *inter alia*, the statute of limitations.

AFI would most likely vigorously defend any re-characterization action because, as set forth above, the facts and the law are almost exclusively in its favor.

Although it appears that AFI would successfully defend such actions, all litigation carries some risk, uncertainty and expense regardless of how strong a case may be.  Thus, AFI may be willing to offer a small settlement ("nuisance settlement") to prevent the limited possibility of losing the litigation, which settlement would be less than $10 million and therefore not material to the allocation of the $2.1 billion settlement fund.  Alternatively, the fiduciary is unlikely to be willing to incur significant legal cost and expense to pursue these complex actions which are unlikely to prevail.

Given the Examiner's factual and legal conclusions, I believe there is no material settlement value to these claims.

### 9.    Equitable Subordination And Equitable Disallowance

**Examiner's Report References:**

Section I.E.9 pages I-26 to I-28

Section VII.C  pages VII.C-1 to VII.C-18

Section VII.D  pages VII.D-1 to VII.D-3

---

[29] I note that the Court of Appeals for the Tenth Circuit in *Sender v. Bronze Group, Ltd.* (*In re Hedged-Investment Assocs., Inc.*), 380 F.3d 1292 (10th Cir. 2004) discussed many of the *Autostyle* Factors plus some additional factors such as the right to enforce payment, the intent of the parties, failure of debtor to repay on due date, and  participation in management, and did not include some of the *Autostyle* Factors such as sinking fund for interest, or security for payment.  However, the Examiner separately considered some of *Sender's* additional factors such as the intent of the parties and right to enforce payment.  Also, in support of his statement that "courts would likely undertake an analysis of the *Autostyle* factors", the Examiner cited *In Re BH S&B Holdings LLC*, 420 B.R. 112 (2009), a Bankruptcy Court case from the Southern District of New York.

**Description:**

Creditors assert that AFI's claims against ResCap, including $747 million under the A&R Secured Revolver and $380 million under the A&R Line of Credit, should be subordinated or disallowed to the claims of all other creditors under Bankruptcy Code section 510(c).

**Background:**

The Examiner investigated the following matters for evidence of inequitable conduct by AFI, harm to other creditors, or unfair advantage to AFI: (1) the 2006 Bank Restructuring, (2) the Second 2009 Tax Allocation Agreement, (3) the misallocation of revenues on brokered loans, (4) ResCap's forgiveness of subsidiary indebtedness and the 2009 Bank Transaction, (5) the Line of Credit Facilities, and (6) alter ego, asset stripping and aiding and abetting breach of fiduciary claims.

**Examiner's Analysis and Conclusions:**

1.     ResCap and its creditors were harmed by AFI's inequitable and unfair conduct in connection with the 2006 Bank Restructuring in an amount of between $390 million and $608 million.

2.     ResCap and its creditors were harmed by AFI's inequitable and unfair conduct in connection with the Second 2009 Tax Allocation Agreement in the approximate amount of $50 million.

3.     It is more likely than not that ResCap and its creditors were harmed by AFI and Ally Bank in the amount of approximately $520.5 million with respect to the misallocation of revenues on the brokered loans.

4.     AFI, however, provided ResCap with substantial capital support totaling in excess of $8 billion in the form of cash contributions, debt forgiveness, and contributions of other assets.

5.     While a close case, it is more likely than not that equitable subordination of AFI's claims would not prevail.

6.     Equitable disallowance requires a showing of more serious conduct than that necessary for equitable subordination.

7.     It is unlikely that equitable disallowance of AFI's claims would prevail.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Each of the claims in which inequitable conduct was found by the Examiner is also ascribed value separately by the Examiner, therefore, each of those claims is evaluated separately for settlement purposes in this report and ascribed significant settlement value. However, I believe that the prospect that AFI's claims might be equitably subordinated or equitably disallowed adds little to the evaluation of those claims and has no independent settlement value on its own.

<h2 style="text-align:center">10.    Constructive Trust Claim</h2>

**Examiner's Report References:**

Section I.E.10 page I-28

Section VII.I  pages VII.I-1 to VII.I-17

**Description:**

Whether a constructive trust should be imposed on ResCap's interest in the mortgage division of Ally Bank or on proceeds of TARP funds that AFI received by virtue of its relationship with ResCap.

**Background:**

The Examiner considered whether AFI orchestrated the "Ally Bank Transactions," which consist of the 2006 Bank Restructuring, the 2008 Bank Transaction, and the 2009 Bank Transaction, to strip ResCap of its assets, resulting in AFI being unjustly enriched. The details of these transactions are discussed elsewhere in this report.

The Examiner also considered whether the Troubled Asset Relief Program ("TARP") funds received by AFI were received, at least in part, as a result of ResCap's financial difficulties, such that ResCap was an intended beneficiary of these funds and AFI was unjustly enriched by the retention of these funds. AFI received a total of $17.2 billion under TARP, but the Examiner's focus was on the first $5.7 billion received.

**Examiner's Analysis and Conclusions:**

1.    A constructive trust claim is unlikely to prevail with regard to the Ally Bank Transactions. First, claims regarding the 2006 Bank Restructuring are governed by the 2005 Operating Agreement and the indenture governing the Unsecured Notes, and claims for unjust enrichment and a resulting constructive trust do not apply where the relationship is governed by an express contract. Second, the Examiner found that ResCap received reasonably equivalent values in the 2008 Bank Transaction and the 2009 Bank Transaction, negating any claim against AFI for unjust enrichment.

2.      A constructive trust claim is unlikely to prevail for the TARP funds. The evidence shows that the funds went to AFI because of AFI's involvement in the automotive business, not because of ResCap.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Regarding the 2006 Bank Restructuring, it is black-letter law that there can be no unjust enrichment when the claims at issue are governed by a written contract. Accordingly, constructive trust or unjust enrichment claims are highly unlikely to succeed. Moreover, as discussed elsewhere in the report, ResCap has much stronger claims regarding the 2006 Bank Restructuring. Therefore, the unjust enrichment/constructive trust theory does not add materially to the settlement value of those claims.

Similarly, based on the Examiner's well-supported finding that ResCap received fair value in the 2008 Bank Transaction and the 2009 Bank Transaction, a constructive trust claim regarding those transactions is highly unlikely to succeed. I discuss elsewhere that fraudulent transfer claims regarding the 2008 Bank Transaction and the 2009 Bank Transaction would not likely be pursued in light of the Examiner's determination that ResCap received reasonably equivalent value. For the same reason I do not believe that a constructive trust claim would be pursued.

Regarding the TARP funds, the Examiner found significant evidence that the TARP funds were given to AFI not because of ResCap but because of the government's interest in preserving the automotive industry. As a result, the claim is highly unlikely to succeed and AFI would likely be successful in having any claim dismissed on summary judgment. The only countervailing consideration is the sheer size of the claim - $5.7 billion. To avoid the risk of liability as to this large number and the cost of litigating the claim, AFI would likely be willing to settle this for nuisance value, which I believe would be less than $21 million and therefore not material for purposes of the allocation of the $2.1 billion settlement fund.

## 11.    Prepetition Asset Sales

**Examiner's Report References:**

Section I.E.11 page I-29

Section V.F pages V-383 to V-468

Section VII.F.6  pages VII.F-122 to VII.F-147

**Description:**

Whether any of seven prepetition asset sale transactions constitute constructive fraudulent transfers.

**Background:**

The Examiner reviewed the following sales of assets to affiliates of ResCap ("Prepetition Asset Sales"):

(a)    *Health Capital Sale by RFC to GMAC CF in August 2007*

*The sale of substantially all assets and operations of Health Capital for $900.5 million;*

(b)    *June 2008 Model Home Sale by GMAC MHF to Cerberus*

The sale of 1,614 model homes and 127 lots for $230 million plus Class B Junior Preferred Shares in CMH;

(c)    *Resort Finance Sale by RFC and GMAC Canada to GMAC CF in July 2008*

Sale of substantially all of Resort Finance for cash consideration of $96.1 million (later increased to $111.1 million) plus the assumption of $1,125 billion of debt;

(d)    *Excess Servicing Rights Sales by GMAC Mortgage to Cerberus in July 2008*

Following two auctions, the sale to Cerberus, as highest bidder, of certain excess servicing rights on (i) Freddie Mac Loans with $13.8 billion unpaid principal balance, and (ii) Fannie Mae loans with $24.8 billion unpaid principal balance, capturing, respectively, $591.2 and $981.9 million notional interest-only securities;

(e)    *September 2008 Model Home Sale by DOA Holding Properties, LLC to Cerberus*

Following an auction, the sale of two pools of model home assets for net cash proceeds of $59.2 million;

(f)    *ResMor Sale by GMAC Canada to AFI in January 2009*

Sale of all outstanding shares in ResMor for C$82 million (approximately $67 million as of December 31, 2008); and

(g)    *US/UK Broker-Dealer Sale by RFC to AFI in May 2009*

Sale of RFC's interests in Ally Securities and RFCIL for $42.3 million and $18.1 million, respectively, plus payment to RFC of an amount equal to the entire outstanding principal due and payable under an existing $50 million subordinated loan between RFC and Ally Securities.

**Examiner's Analysis and Conclusions:**

1.      The evidence supports the proposition that RFC, GMAC Canada, GMAC Mortgage and their affiliate sellers received reasonably equivalent value in each of the Prepetition Asset Sales, with the possible exception of the June 2008 Model Home Sale by GMAC MHF to Cerberus.

2.      While a close question with respect to the June 2008 Model Home Sale, it is more likely than not that a constructive fraudulent transfer claim against Cerberus would not succeed under existing law.

3.      It is more likely than not that a court would find that the value received by RFC as the equity owner of GMAC MHF, as well as by GMAC MHF, would constitute reasonably equivalent value.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

These causes of action would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee.  This type of plaintiff is typically motivated to reach an early resolution of disputes in order to save costs and expedite distributions to creditors.

The Examiner evaluated each of the Prepetition Asset Sales to determine if any would constitute a constructive fraudulent transfer under applicable law, focusing on whether or not the selling Debtor(s) received "reasonably equivalent value" for the transfer.  In that regard the Examiner addressed three fundamental questions: (i) what was the form and value of the property transferred by the Debtor(s); (ii) did the Debtor(s) receive value in exchange for the property transferred, and, if so, in what form and amount; and (iii) was the value received by Debtor(s) a reasonably equivalent in exchange for the property transferred.

With respect to each of the following Prepetition Asset Sales, the Examiner concluded as follows:

(a)      *Health Capital Sale by RFC to GMAC CF in August 2007*

Based on his analysis and the totality of the circumstances, including, without limitation, the valuation prepared by Houlihan Lokey and other market indicators, the evidence supports the proposition that RFC received reasonably equivalent value in this sale.

(b)      *June 2008 Model Home Sale by GMAC MHF to Cerberus*

Although RFC received at least $30 million less than the Fair Market Value, based on the totality of the circumstances, it is more likely than not that a court would find that the value received by RFC would constitute reasonably equivalent value in this sale.

      (c)     *Resort Finance Sale by RFC and GMAC Canada to GMAC CF in July 2008*

Based the totality of the circumstances, including, without limitation, the Houlihan Lokey valuation, the Morgan Stanley Fairness opinion, prior sales attempts by Bear Stearns, Morgan Stanley's orderly liquidation analysis, and various adjustments to the calculation of the purchase price, the evidence supports the proposition that RFC and GMAC Canada received reasonably equivalent value in this sale.

      (d)     *Excess Servicing Rights Sales by GMAC Mortgage to Cerberus in July 2008*

Based on the totality of the circumstances, including, without limitation, the nature of the auctions, Pentalpha's memorandum, and market conditions at the time of the auctions, the evidence supports the proposition that GMAC Mortgage received reasonably equivalent value in this sale.

      (e)     *September 2008 Model Home Sale by DOA Holding Properties, LLC to Cerberus*

Based on the totality of the circumstances, including, without limitation, an auction process including non-affiliated bidders conducted by a nationally recognized broker in an arm's length manner, the degree of differential between the bids received and the temporal and contingent factors surrounding such bids, the evidence supports the proposition that RFC (as the owner of GMAC Canada), and GMAC Canada received reasonably equivalent value in this sale.

      (f)     *ResMor Sale by GMAC Canada to AFI in January 2009*

Based on the totality of the circumstances, including, without limitation, the fairness opinions by Goldin Associates and Sandler O'Neill, the GMAC Canada investment in ResMor in the prior year and other market indicators, the evidence supports the proposition that RFC as the owner of GMAC Canada, and GMAC Canada, received reasonably equivalent value in this sale.

      (g)     *US/UK Broker-Dealer Sale by RFC to AFI in May 2009*

Based on the totality of the circumstances, including, without limitation, the Goldin Associates valuation analyses and fairness opinion, and prevailing market indicators, the evidence supports the proposition that RFC received reasonably equivalent value in this sale.

The purchasers (AFI and Cerberus) would most likely vigorously defend any fraudulent transfer actions because, as set forth above, the facts and the law are almost exclusively in their favor as to all of the above transactions, with the possible exception of the June 2008 Model Home Sale transaction, and with respect to that sale the Examiner has concluded it is unlikely to prevail.

Although it appears that the purchasers would successfully defend such actions, all litigation carries some risk, uncertainty and expense regardless of how strong a case may be. Alternatively, the fiduciary is unlikely to incur significant legal cost and expense to pursue what would be complex actions which are unlikely to prevail.

Thus, Cerberus may be willing to offer a small settlement ("nuisance settlement") with respect to the June 2008 Model Home Sale transaction to prevent the small possibility of losing the litigation. However, considering that the upside to the fiduciary in that transaction is likely to be no more than $30 million, the fiduciary must also consider the cost and benefit in pursuing same.

Given the Examiner's factual and legal conclusions, I believe there is no material settlement value to these claims.

## 12.    Financing Affiliate Transactions

**Examiner's Report References:**

Section I.E.12  page I-29

Section V.E pages V-350 to V-383

Section VII.F pages VII.F-1 to VII.F-154

**Description:**

Whether the terms of material prepetition financing Affiliate Transactions were entered into at arm's length and on balance were more favorable to ResCap than would have been obtained in third party financings of comparable size and nature.

**Background:**

The Examiner reviewed the following prepetition financing Affiliate Transactions ("Financing Affiliate Transactions"):

      (a)     Resort Finance Facility;

      (b)     Secured MSR Facility;

      (c)     Secured Revolver Facility;

      (d)     Servicing Advance Factoring Facility;

      (e)     Initial Line of Credit Facility;

      (f)     ResMor Loan Facility;

      (g)     Second Line of Credit Facility;

      (h)     Amended and Restated Credit Facilities; and

      (i)     BMMZ Repo Facility.

**Examiner's Analysis and Conclusions:**

All of the these Financing Affiliate Transactions were entered into at arm's length and on balance were more favorable to ResCap than would have been obtained in the third-party financings of comparable size and nature.[30]

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

The Examiner evaluated the Financing Affiliate Transactions to determine if each was entered at arm's length or were less favorable to ResCap than would have been obtained in the third-party financings of comparable size and nature.

With respect to each of the following Financing Affiliate Transactions, the Examiner found as follows:

(a)     *Resort Finance Facility*

This facility entered by RFC, as borrower, with AFI, as lender, was intended to be bridge financing while ResCap searched for a third party to purchase its Resort Finance business (at the time there were already discussions with third parties for such sale). Bear Stearns issued a fairness opinion concluding that the financial terms and conditions were no less favorable to RFC than the financial terms and conditions that would be expected to be obtained in a comparable financing with an unaffiliated third party at arm's length.

(b)     *Secured MSR Facility*

This facility, entered by RFC and GMAC Mortgage as borrowers, and ResCap as guarantor, with AFI, as lender, was to provide additional liquidity.  At the time, Barclays contemplated providing RFC with a secured facility and sent a term sheet.  However, ResCap's liquidity needs were imminent and several months of negotiations could have been required to complete and syndicate a facility with Barclays.  This led to a proposal for AFI to provide the Secured MSR Facility as a bridge to the Barclays facility.  Morgan Stanley viewed the terms favorably, concluding, among other things, that the facility provided materially better economic terms than the proposed Barclays facility and existing facilities and was more attractive than facilities available in the then current marketplace.  The search for a lender to refinance this facility proved to be futile.  AFI ultimately forgave all indebtedness under this facility.

---

[30] The Examiner noted that notwithstanding this conclusion, certain of Financing Affiliate Transactions implicate potential Estate Causes of Action as discussed in Section VII.F (each of which are discussed in other sections of this report).

*(c)*   *Secured Revolver Facility*

This facility, entered by RFC and GMAC Mortgage as borrowers, ResCap and various ResCap Subsidiaries as guarantors, and AFI as lender, was required to provide more liquidity due to looming credit maturities and capital needs. Two of the maturing credit facilities were (i) the unsecured JP Morgan 364 Day Facility of $875 million and (ii) the JP Morgan 2005 Term Loan Facility in the amount of $1.75 billion. On the closing date of this facility, AFI converted approximately $1.3 billion of term loans under the JPMorgan 2005 Term Loan Facility (that AFI obtained through assignment) into the equivalent amount of the Secured Revolver Facility and $450 million was borrowed thereunder to repay the principal of the JPMorgan 2005 Term Loan Facility. Also, this facility was used to pay the $1.75 billion cash portion of the ResCap tender and bond exchange (pursuant to which $8.6 million in unsecured ResCap notes were exchanged for approximately $5.6 million of the Senior Secured Notes and Junior Secured Notes). As a result, the Secured Revolver Facility was fully drawn in the amount of $3.5 billion with the proceeds used to exchange direct unsecured ResCap obligations owed to unaffiliated parties. The Secured Revolver Loan Agreement was amended and restated by the A&R Secured Revolver Loan Agreement.

*(d)*   *Servicing Advance Factoring Facility*

ResCap, seeking to monetize certain non-GSE Servicing Advances, entered this facility with GMAC CF which was structured as a "true sale" of receivables and not financing. GMAC CF was reluctant to enter into this facility, but after intensive negotiations, agreed to an 85% advance rate which provided RFC and GMAC Mortgage with greater liquidity than they would have if they borrowed against the same assets under the Secured Revolver Facility. AFI entered into a collateral release agreement with respect to the Servicing Advances. Morgan Stanley delivered a fairness opinion with respect to this facility which concluded that the purchase price for the initial and contemplated subsequent purchase of receivables were fair to RFC. This facility contained provisions commonly found in receivables factoring transactions and other representations, warranties, termination events and indemnification provisions standard for receivables factoring transactions between unaffiliated parties.

*(e)*   *Initial Line of Credit Facility*

Despite a first lien secured credit facility and second and third lien secured bonds, due to the favorable permitted lien and collateral release provisions in the Secured Revolver Loan Agreement, Senior Secured Notes Indenture and Junior Secured Notes Indenture, PATI and RATI, as borrowers, were able to enter this facility, guaranteed by ResCap, with AFI as lender, in the amount of $430 million. Failing to find unaffiliated lenders, AFI became the lender of last resort for this facility. This facility exemplified an affiliate transaction more favorable to the borrowers than would have been obtained in a syndicated credit facility with unaffiliated lenders, and it would be extremely unlikely for a single lender to provide this facility. This facility was amended and restated by the A&R Line of Credit Facility.

### (f)    ResMor Loan Facility

GMAC Canada entered into this facility with AFI in the amount of CDN $82 million. At the same time, AFI as purchaser, entered into a purchase agreement to purchase from GMAC Canada, as seller, the stock of 1020491 Alberta Ltd. and ResMor.  The principal amount of this loan was intended to be repaid at the closing on the sale by setting it off against the purchase price.  The sale closed and the loan was repaid as contemplated.  Goldin Associates rendered a fairness opinion stating that the ResMor Sale was fair, from a financial point of view, to ResCap and its creditors (other than AFI).  This facility contained very basic representations, warranties and covenants and the events of default were standard for facilities of comparable size and nature.

### (g)    Second Line of Credit Facility

Instead of increasing the Line of Credit commitment amount, AFI, as lender, provided PATI and RAHI, as borrowers, with this facility in the initial amount of $370 million on substantially similar terms to the Initial Line of Credit Facility (and together with the Second Line of Credit Facility, the "Line of Credit Facilities").  This facility was later increased to $470 million.  On December 30, 2009 this facility and the Initial Line of Credit Facility were combined into the A&R Line of Credit Facility.  Goldin Associates provided a fairness opinion concluding the terms of the documents were fair to ResCap and its creditors (other than AFI) and provided a further fairness opinion for the amendment of this facility to increase it.  The provisions of this facility exemplified an affiliate transaction more favorable to the borrowers than would have been obtained in a third party financing.  Goldin Associates delivered a favorable fairness opinion in connection with the increase of the cumulative commitment under the Line of Credit Facilities up to an additional $500 million.  Just before the consolidation of the Line of Credit Facilities, this facility was increased from $470 million to $670 million.

### (h)    Amended and Restated Credit Facilities

The Line of Credit Facilities were combined into one agreement and the Secured Revolver Loan Agreement was amended and restated to convert $1.55 billion of Secured Revolver Facility Revolver Loans into Secured Revolver Facility Term Loans.   After assignments of obligations, the new borrowers under the A&R Line of Credit were GMAC Mortgage and RFC,  and they were required to provide a solvency representation which was similar to the solvency representation for the A&R Secured Revolver Loan Agreement.   The A&R Line of Credit Agreement contained representations, warranties, covenants, events of default and indemnification provisions that were standard for facilities of comparable size and nature (and would be typical for a syndicated credit facility with unaffiliated lenders).  Provisions exemplifying an affiliate transaction that were more favorable to the borrowers, were the same as those under the Line of Credit Facilities.

### (i)    BMMZ Repo Facility

GMAC Mortgage and RFC had each entered separate financing agreements with Citibank and Goldman Sachs in the form of mortgage loan repurchase facilities with an aggregate commitment of $300 million.  ResCap guaranteed these obligations.  AFI proposed to ResCap a

69

new mortgage loan repo facility to be provided by one of its Subsidiaries, BMMZ, on substantially the same terms as proposed by Citibank, but with some advantages to ResCap including no commitment fee, more favorable advance rates, and no aggressive amortization schedule. Goldin Associates was engaged to provide an analysis of the terms of the Citibank proposal and of the AFI proposal, and to provide a fairness opinion. Goldin Associates concluded that this facility contained terms that were at least as favorable to ResCap and its creditors (other than AFI) as those that could reasonably be obtained by ResCap from an unaffiliated third party lender. This facility contained closing conditions, representations, warranties, events of default and indemnification provisions that were generally customary for a repo facility. This facility terminated in connection with the transactions consummated under the Barclays DIP Financing Agreement.

The Examiner determined, and I concur, that each of these Financing Affiliate Transactions were entered into at arm's length and on balance were at least as favorable to ResCap than would have been obtained in the third-party financings of comparable size and nature. The Examiner does not discuss any potential causes of action in this section of his Examiner's Report. However, he does note that certain of the Financing Affiliate Transactions are implicated in potential fraudulent transfer Estate Causes of Action, for example, but not by way of limitation, the Minnesota Insider Preference claims, however, the settlement value of those potential Estate Causes of Action are addressed elsewhere in this Opinion.

### F.    VALUE OF SETTLED ESTATE CAUSES OF ACTION

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|
| ***ESTATE CAUSES OF ACTION*** | | | |
| Breach of Contract for Misallocation of Net Revenues on Loans brokered by GMAC | $520.5 | **$268.2** | **51.5%** |
| Breach of Contract for Failure To Pay Value of Purchased MSRs | $1,725.0 | **$387.2** | **22.4%** |
| Breach of Representations and Warranties under 2001 and 2006 MMLPSAs | No Amount Given | | |
| Breach of Contract Claims relating to Pipeline Swap | No Amount Given | | |
| Breach of 2005 Operating Agreement or 2006 Amended Operating Agreement in connection with MMLPSA, Pipeline Swap or MSR Swap | No Amount Given | | |

70

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|
| Preferential Transfer relating to DOJ/AG Consent Order | $109.6 | **$60.0** | **54.7%** |
| Preferential Transfer relating to 2012 Letter Agreement and A&R Servicing Agreement | $48.4 | **$32.0** | **66.1%** |
| Unauthorized Post-petition Transfer relating to Indemnification Obligations under A&R Servicing Agreement | $12.9 | | |
| Breach of contract regarding the First 2009 Tax Allocation Agreement | $1,770.0 | **$713.7** | **40.3%** |
| Constructive Fraudulent Transfer relating to 2nd 2009 Tax Allocation Agreement | $50.0 | | |
| Contract Claim re 2005 Tax Allocation Agreement | $15.1 | | |
| Minnesota Insider Preference Claims | $566.0 | **$328.9** | **58.1%** |
| Fraud related to 2006 Bank Restructuring | $569.0 | **$130.0** | **22.8%** |
| Tortious Interference with Contract relating to 2006 Bank Restructuring | No Amount Given | | |
| Fraudulent Transfer in connection with Ally Bank Transactions | No Amount Given | | |
| Miscellaneous Breach of Fiduciary Duty Claims against ResCap's D&Os | No Amount Given | | |
| Aiding and Abetting Breach of Fiduciary Duty against AFI (other than re 2006 Restructuring) | No Amount Given | | |
| Single Entity theories of liability regarding AFI and ResCap and/or affiliates, including Piercing Corp Veil and Substantive Consolidation | No Amount Given | | |

71

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|
| Debt Re-characterization | No Amount Given | | |
| Equitable Subordination and Disallowance | No Amount Given | | |
| Constructive Trust | No Amount Given | | |
| Constructive Fraudulent Transfer Against Cerberus relating to 2008 Model Home Sale | $30.0 | | |
| Fraudulent Transfer relating to Prepetition Asset Sales (other than 2008 Model Home Sale) | No Amount Given | | |
| Financing Affiliate Transactions | | | |
| **TOTAL** | | **$1,920.0** | |

## G.    OPINION REGARDING PROPOSED POST-PETITION TRANSACTIONS AND AGREEMENTS

This section of the Examiner's Report did not address any potential claims.

## H.    OPINION REGARDING SETTLEMENT VALUES OF POTENTIAL THIRD PARTY CLAIMS

In reaching an opinion concerning the likely settlement value of each claim, I have considered a number of factors, including the factors identified by the Supreme Court in *Protective Committee For Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*[31] applicable to settlement negotiations outside of bankruptcy. Parties will consider: (i) the probabilities of success should the claim be litigated, (ii) the complexity, expenses and duration of litigating the claims, (iii) the possible difficulties of collecting on a judgment and all other factors relevant to an assessment of the settlement as well as factors relevant in determining the motivations of the particular parties to the litigation regarding settlement posture.

---

[31] 390 U.S. 414, 424-25 (1968).

### 1.    Third Party Claims Against AFI

### *a.    RMBS Claims*[32]

**Examiner's Report References:**

Section I.H pages I-36 to I-39

Section VIII.C pages VIII-27 to VIII-109

Section VIII.D pages VIII-201 to VIII-202

Appendix VIII.D.1 page 1

**Description:**

The third-party liability claims ("RMBS Claims") against AFI, whether by investors or financial guaranty insurers (collectively, "Third-Party Claimants"), arising out of the issuance of residential mortgage-backed securities ("RMBS") by ResCap.

**Background:**

The RMBS Claims, estimated in the tens of billions of dollars, are the largest potential liability against AFI as the parent of ResCap. Between approximately 2004 and 2007, ResCap issued 392 private label RMBS securitizations with an original deal balance of $221 billion. (Ally Securities was an underwriter on 105 of those securitizations; Ally Bank acted as loan custodian on approximately 34 of them.) A total of 38 separate suits have been brought by investors such as public pension funds, insurance companies, and others in federal and state courts throughout the country naming AFI as a defendant. Primarily, those suits allege false or misleading statements or omissions of material fact by ResCap in connection with the issuance of the RMBS securitizations in violation of the Securities Act of 1933, the Securities Exchange Act of 1934, various state securities acts and common law. The monoline insurers also have overlapping contract claims for breach of representations and warranties. The Examiner did not consider claims by the RMBS Trusts asserting breach of contract for failure to repurchase defective loans because the Debtors proposed to treat those claims in a separate settlement.

The Third-Party Claimants seek to impose liability on AFI under one or more of the following theories: (i) piercing of the corporate veil or alter ego; (ii) "control person" liability for ResCap's primary violation of federal or state securities laws; and (iii) common-law aiding and abetting fraud by ResCap. Total damages reported by Third-Party Claimants to the Examiner for the RMBS Claims are approximately $6.3 billion, although the number is likely much higher in light of the fact that, as of March/April 2012, the outstanding principal balance of the RMBS issued by

---

[32] The Examiner's Report discusses non-RMBS claims related to mortgage origination, servicing, foreclosure, insurance and other consumer type claims. He concludes that most would not survive a motion to dismiss. Accordingly, no settlement value has been ascribed to the non-RMBS third party claims against AFI.

ResCap was $62.4 billion, with estimated lifetime losses of $43.8 billion.  The RMBS Claims are at various stages of the litigation process, with most at or just beyond the motion-to-dismiss stage and none having reached trial.

**Examiner's Analysis and Conclusions:**

1.      It is unlikely that any pending or potential claims seeking to hold AFI liable for RMBS Claims asserted against ResCap under a veil-piercing or alter ego theory will prevail.

2.      Even if the requisites for veil-piercing against AFI could be established, the Third-Party Claimants may lack standing because the veil-piercing claim belongs to the bankruptcy estate under applicable Delaware law.

3.      While a close question, it is more likely than not that the Third-Party Claimants will not be able to establish "control person" liability against AFI under various federal and state securities laws for primary violations of those laws by ResCap.

4.      Even if the requisites for "control person" liability against AFI could be established, certain of those claims could be time-barred by applicable statutes of limitations or repose.

5.      It is unlikely that the Third-Party Claimants will be able to establish liability against AFI under common law claims of aiding and abetting fraud by ResCap in connection with the issuance of RMBS.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  With respect to AFI's potential control person liability, the inquiry in each case asserting such claims is fact-intensive.  Therefore, it is not possible at this point to conclude definitively whether control person liability will be found in any particular case.

**Settlement Considerations:**

The RMBS Claims are being pursued primarily by large institutional investors – insurance companies and pension funds – as well as monoline financial guaranty insurers.  As such, they have the motivation and the means to prosecute full-scale, no-holds-barred litigation against AFI that could take many years and hundreds of millions of dollars to reach conclusion. Considering the size of the claims, the time and expense to conduct this complex litigation, the inherent risk warrants a discount of 50%.

The Examiner concludes, and I agree, that under applicable Delaware law efforts to impose liability on AFI on a veil-piercing or alter ego theory are unlikely to succeed.  Delaware law is highly protective of the corporate form, which can be pierced only by a showing that ResCap and AFI operated as a single economic entity *and* by the presence of an overall element of injustice or unfairness.  Delaware law requires consideration of multiple factors in determining whether to pierce

74

a corporate veil: "(1) undercapitalization, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of the debtor corporation at the time, (5) siphoning off of the corporation's funds by the dominant parent, (6) absence of corporate records, and (7) the fact that the corporation is a mere façade for the operations of the dominant parent." The Examiner's extensive consideration of the evidence strongly militates against piercing the corporate veil here. This warrants a 70% discount in the value of the claims.

Furthermore, even if ResCap and AFI could be deemed to be a single economic entity, Third-Party Claimants would still need to show "injustice or unfairness" in the use of the corporate form. While the Examiner concludes that ResCap was left with unreasonably small capital and became balance sheet insolvent in 2007, this was due to sizeable operating losses beginning in the last quarter of 2006, not misconduct by AFI such as initial undercapitalization or siphoning of funds. In short, the Third-Party Claimants are unlikely to be able to show that AFI used ResCap as part of a corporate "shell game."

The value of the veil-piercing theory is lessened more by the likelihood that, even assuming veil-piercing is warranted, the Third-Party Claimants lack standing to assert it. I agree with the Examiner that, under Delaware law, a veil-piercing claim generally belongs to the estate of the debtor, and not to creditors, at least where the harm suffered is "generalized" to all creditors. However, as discussed above, I anticipate that the standing issue can be finessed by the Third-Party Claimants cooperating with an estate fiduciary to pursue the veil-piercing theory. Nevertheless, in light of the discount already applied to the veil-piercing theory, I do not make any additional discount for the plaintiffs' standing issue since I anticipate an easy resolution.

With respect to "control person" liability, the Examiner concludes that while it is a close question, it is more likely than not that the Third-Party Claimants will not be able to establish "control person" liability against AFI for the primary violations of ResCap in connection with the RMBS securitizations. "Control person" liability can arise under Section 15 of the Securities Act, Section 20 of the Securities Exchange Act or their state analogues and impose liability for material misstatements, omissions or fraud committed by a primary violator. After extensively analyzing the available evidence, the Examiner concludes that the Third-Party Claimants are unlikely to be able to establish that AFI exercised the requisite control over ResCap *with respect to the RMBS securitizations* during the relevant 2004-2007 period. While I agree with the Examiner's analysis, "control person" issues are particularly fact-intensive, discovery in the various cases is incomplete, and different fact-finders are likely to weigh competing evidence differently. Accordingly, although these claims are more likely than not to fail, I discount the settlement value of the claims by only 60%.

Likewise, there appear to be strong arguments, especially in RMBS claims brought by investors, that some of their claims are barred by applicable statutes of limitations or repose. These also are fact-intensive questions, however, and not subject to definitive analysis at this point. The closeness of these questions leads us to discount the value of the RMBS Claims by 60% based on the statute of limitations.

The Examiner also concludes that the Third-Party Claimants are unlikely to prevail against AFI on the RMBS Claims on the common-law theory that AFI aided and abetted fraud by ResCap.

Such claims have been asserted in 14 of the 38 cases, 10 in RMBS Insurer Actions, four in RMBS Investor Actions. These claims are subject to higher burdens of proof and the heightened pleading requirements of Fed. R. Civ. P. 9. They require a showing of (1) the existence of fraud by ResCap, (2) actual knowledge of the fraud by AFI, and (3) AFI's substantial assistance in the commission of that fraud. While the existence of actual fraud by ResCap was beyond the Examiner's scope of investigation, the Examiner was presented with no evidence of AFI's actual knowledge of fraudulent conduct by ResCap. Nor was there any evidence that AFI provided substantial assistance to ResCap in committing the fraud as opposed to providing capital support and general corporate functions and services, which cannot be deemed to be the proximate cause of ResCap's fraud. Therefore, I do not attribute any settlement value to this theory.

While it was not possible for the Examiner to establish with precision the value of the RMBS Claims, at least $6.3 billion in alleged damages has been asserted by Third-Party Claimants. The Examiner states that as of March/April 2012, the outstanding principal balance of RMBS was $62.4 billion and the estimated lifetime losses were $43.8 billion.[33] This data appears in the Declaration of Frank Sillman in support of the Debtors' motion to approve the RMBS Trust Settlement Agreements. Mr. Sillman also calculated the Debtors' potential repurchase requirements to RMBS Trusts for defective mortgages at $6.7 billion to $10.3 billion. Of course, he assumed that the Trusts could prove that the Debtors breached the representations and warranties in the governing agreements. Also, he was focused on the Debtors' potential exposure, not the parent company AFI which was not a party to the governing agreements.

In the Appendix, the Examiner lists the RMBS Claims Damages to the extent he could obtain information. I note that of the eighteen Parties/Actions listed, only three asserted damages greater than $1 billion: (i) AIG, Allstate, Mass Mutual and Prudential - $1.5 billion, (ii) FGIC - $1.85 billion, and (iii) MBIA Insurance Company - $2 billion. Nine of the other listed Parties/Actions with damage amounts shown are less than $100 million. Only three others are over $100 million with the highest of those being $293 million. Given the magnitude of the expected lifetime losses of $43.8 billion, and the magnitude of claims that could be asserted by investors, purchasers, and insurers, it is reasonable and conservative to estimate for settlement purposes that the total of the RMBS claims is in the range of $20 billion.

Since the Examiner Scope Approval Order directs him not to attempt to independently quantify the Third-Party RMBS damages, I have looked for publicly available information on settlements in similar or analogous cases.

Cornerstone Research publishes an annual review of Securities Class Action Settlements. Their data is focused on suits brought by securities purchasers alleging fraudulent inflation in the price of a corporation's common stock. I have reviewed the 2012 Review and Analysis.[34] The year

---

[33] "RMBS Claims" is defined by the Examiner as "claims against the Debtors and the AFI Defendants on account of residential mortgage-backed securities." Examiner's Report, VIII-2.

[34] Ellen M. Ryan & Laura E. Simmons, *Sec. Class Action Settlements, 2012 Review and Analysis* (Cornerstone Research, Inc., Boston, MA), 2013.

2012 saw an extraordinary number of settlements in excess of $100 million that Cornerstone Research classifies as "mega-settlements," a significant portion of which were related to the credit crisis. Many of the larger cases take three to five years to settle indicating that they commenced in 2007 to 2009 when the stock price of financial corporations was impacted by their ownership or issuance of RMBS during the financial crisis. Approximately one-third of settlements in 2012 were for issuers in the financial industry and they rank highest in median settlement value.

Cornerstone Research posits that "estimated damages" is the most important factor in determining settlement amounts. Mega-settlements traditionally settle for a smaller proportion of estimated damages. Settlements as a percentage of estimate damages typically decrease as estimated damages increase. Larger cases tend to settle for smaller proportions of losses. For cases with estimated damages in excess of $5 billion, the median settlement amount was 1.3% of the estimated damages. Institutional investors as lead plaintiffs, particularly public pension funds, tend to be associated with significantly higher settlement amounts according to Cornerstone Research. Also, the later the stage at which the litigation settles, the higher the settlement values. Cases that survive motions to dismiss or summary judgment motions tend to settle for higher amounts.

NERA Economic Consulting published *Recent Trends in Securities Class Action Litigation: 2012 Full-Year Review*.[35] Among the highlights is that financial institutions are no longer the focus of new filings, indicating that the wave of credit-crisis related litigation ended in 2012. The stage of the litigation, *i.e.* whether it has survived a motion to dismiss, summary judgment, or class certification, is important in settlement of securities class action litigation. Most cases are resolved before a class certification motion has been filed or decided. Investor losses are a powerful predictor of settlement size. There are only a handful of cases each year with investor losses greater than $10 billion. As of the end of 2012, only ten securities class action cases ever have settled for over $1 billion. Larger cases settle for a smaller percentage of investor losses. The median ratio of settlement to investor losses decreases as investor losses increase. The median settlement for cases with investor losses over $1 billion has been 0.7% of the investor losses. Where the lead plaintiff is an institutional investor, especially a public pension fund, settlements tend to be larger.

The D&O Diary[36] publishes a list titled *Subprime and Credit Crises-Related Lawsuits, Settlements, Dismissals and Denials*. Of the sixty settlements listed, only one exceeded $1 billion. That settlement was the Bank of America/Merrill Lynch Merger Case for $2.43 billion, which is an outlier. Five cases settled for between $500 million and $730 million: Citigroup Bondholders Action - $730 million, Wachovia Preferred Securities and Bond/Notes Litigation - $627 million, Countrywide Financial - $624 million; Citigroup - $590 million; and Countrywide Mortgage Backed Securities Action - $500 million. Both Citigroup cases and the Wachovia case were brought by purchasers of common stock or bonds issued by the defendant/parent corporation, not mortgage backed securities ("MBS"). Although the price of the stock or bonds were allegedly overstated by

---

[35] Dr. Renzo Comolli, *et al.*, *Recent Trends in Securities Class Action Litigation: 2012 Full-Year Review* (NERA Economic Consulting, New York, NY), Jan., 2013.

[36] Kevin M. LaCroix, *The D&O Diary Subprime and Credit Crisis-Related Lawsuits Settlements, Dismissals and Denials* (RT ProExec, Beachwood, OH) April, 2013.

the defendants' inaccurate statements regarding subprime and other mortgage products, the plaintiffs were not purchasers of MBS as are those pursuing ResCap and AFI.

In valuing ResCap as part of the solvency analysis, the Examiner's Financial Advisors identified Countrywide, Washington Mutual (WaMu) and Indybank as similar institutions to ResCap. Indybank is not listed as a party to a settlement in the D&O Diary, but Countrywide and WaMu are. The Countrywide Financial settlement for $624 million was a class action by purchasers of common stock and notes issued by Countrywide, not MBS. Although plaintiffs allege that Countrywide did not accurately disclose problems with its mortgage business and portfolio that lead to an overstatement of stock value, that litigation is not exactly similar to the Third-Party RMBS claims against AFI.

The Countrywide Mortgaged Back Securities Action in the U.S. District Court for the Central District of California (2:10-CV-00302) that settled for $500 million is analogous to the Third-Party RMBS claims against ResCap and AFI. The Countrywide MBS settlement involved 429 MBS with an original issue principal of $351 billion. The Examiner's Report states that ResCap issued 392 RMBS with an original deal balance of $221 billion. A settlement of ResCap's RMBS Claims on a proportional basis would be approximately $315 million.

The Washington Mutual Securities Multi-District Litigation settled for $208.5 million. Once again the plaintiffs were purchasers of securities issued by the parent company, Washington Mutual, Inc. (WMI) and not MBS. Because Washington Mutual Bank had been seized and sold by the FDIC, and the parent company, WMI, was in bankruptcy, the settlement fund consisted of contributions by the Directors and Officers insurance carriers ($105 million), the underwriters ($85 million) and the auditors ($18.5 million). This is not indicative of reasonable settlement value of the secondary liability of AFI for RMBS issued by ResCap.

I mediated an objection in the bankruptcy case of WMI to the claim of the MBS plaintiffs who sued WaMu's securities subsidiary that was not a debtor in bankruptcy. That securities subsidiary had been acquired by JPMorgan Chase but had limited resources of its own. That underlying action involving hundreds of millions of dollars in alleged damages, settled for $26 million.

Under these circumstances, even assuming that the gross value of the RMBS Claims is $20 billion, the unlikelihood of the Third-Party Claimants prevailing on two of their three major theories (veil-piercing/alter ego and aiding and abetting fraud), the questionable likelihood of prevailing on their third major theory ("control person" liability), the statute of limitations defenses, and the significant cost, time and uncertainty of pursuing 38 separate cases, militate in favor of a deeply discounted settlement value. Securities litigation is like a game of *Survivor*. If plaintiff can survive a motion to dismiss, class certification or summary judgment, it is likely to reach a settlement with the amount increasing at each stage. Some of the pending cases against AFI have survived motions to dismiss and thus are prime candidates for settlement. Moreover, similar claims against other RMBS issuers such as Countrywide (whose liability is primary, not secondary like AFI's) have settled recently in the range of 0.14% of the original deal balance. Analysis of settlements of securities class actions by Cornerstone Research and NERA Economic Consulting consistently find that settlements in securities class actions seeking in excess of $10 billion in damages average less

than 0.5% of claimed damages, and those are against the issuer, not a parent company.  If AFI had the time and inclination to litigate its contingent exposure to ResCap's RMBS Claims, it could end up with a total cost less than the $500 million paid by Countrywide.

On the other hand, AFI has some unique motivations that may influence its willingness to make a substantial payment to obtain the solid gold release it seeks in a confirmed plan of reorganization.  AFI professes a great desire to repay the American taxpayers for the assistance provided in the TARP program and elsewhere.  The looming specter of huge, unliquidated, contingent liabilities associated with ResCap preclude AFI from an initial public offering (IPO) or other alternatives to allow the U.S. government to monetize its stake in AFI and permit AFI to return to private ownership.  Considering the massive size of the claims, the not-inconsequential risk that plaintiffs will prevail at least on the issue of control person liability, the time and cost required to defend the 38 cases, and the prospect of additional actions being filed, the RMBS Claims are not devoid of substantial settlement value.  Taking into account the factors discussed above, especially the Countrywide settlement of larger, primary claims at $500 million, I ascribe a settlement value of no more than $480 million to the RMBS Claims, calculated as follows:

| | |
|---|---|
| Potential Damages: | $20,000 million |
| Reduced By: | |
| 50% inherent risk = | $10,000 million |
| 70% veil-piercing alter ego risk = | $3,000 million |
| 60% risk on control person theory = | $1,200 million |
| 60% statute of limitations risk = | $480 million |
| Total Settlement Value = | **$480 million** |

### b.    Fraudulent Transfer Claim

**Examiner's Report References:**

Section I.H.1.b page I-39

Section VIII.D.5 pages VIII-207 to VIII-215

**Description:**

Whether transfers of funds from Ally Securities to AFI can be recovered as fraudulent transfers.

**Background:**

On April 16, 2012, Ally Securities transferred $200 million to AFI.  On August 20, 2012 Ally Securities transferred $25.5 million to AFI.  Ally Securities characterized the two transfers to AFI as "distributions of excess capital"; thus, these transfers were payments of dividends to Ally's sole member.

**Examiner's Analysis and Conclusions:**

1.    The Examiner's Financial Advisers determined that Ally Securities' total capital following the transfers was $49.5 million and $16.3 million, respectively.  Since Ally Securities was then a defendant in ten RMBS-related lawsuits involving billions of dollars, the Examiner concluded that a reasonable quantification of these contingent liabilities would likely overwhelm Ally Securities' equity on the transfer dates and that Ally Securities was insolvent on the transfer dates.

2.    The transfers were not made for reasonably equivalent value.

3.    It is likely that the transfers could be avoided as constructively fraudulent transfers.

4.    While a close question, it is more likely than not that these transfers were actual fraudulent transfers.

5.    It unlikely that a court would determine that these transfers constituted unlawful dividends.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  The determinations of the amount of the contingent liability and of actual fraud are fact intensive.

**Settlement Considerations:**

Consideration of the avoidance of these transfers is only relevant to the evaluation of the reasonable settlement value of RMBS actions against Ally Securities, which are evaluated elsewhere in this report.  The Examiner notes that Ally Securities has an equity value that is dwarfed by the potential third party RMBS claims.  However, those third party creditors would seek to augment the funds available to Ally Securities by avoiding the transfers from Ally Securities to AFI discussed in this section. If any one of the three recovery theories discussed by the Examiner is successful, Ally Securities, or its representative, would be able to recover $225.5 million from AFI.  Although the actual fraud theory is fact intensive and the unlawful dividend theory is unlikely to prevail, the constructive fraudulent theory appears strong.

I would expect the plaintiff to open with a settlement demand of $191.7 million, approximately 85% of the amount in controversy.  AFI would likely initially offer to settle the litigation for $33.8 million, 15% of the amount in controversy.  Due to the strength of the law and

the facts, I would expect an ultimate settlement of approximately $157.9 million, 60% of the amount in controversy. This fraudulent transfer claim is only relevant to the potential liability of Ally Securities for third party claims which would be considered in all of the third party claims against AFI. Thus, this fraudulent transfer claim has no independent settlement value.

## 2.    Third Party Claims Against Ally Securities

**Examiner's Report References:**

Section I.H pages I-39 to I-41

Section VIII.C pages VIII-109 to VIII-129

Section VIII.D pages VIII-201 to VIII-203

**Description:**

Evaluation of the RMBS Claims against Ally Securities by Third-Party Claimants arising out of Ally Securities' role as an underwriter of RMBS issued by ResCap.

**Background:**

Between approximately 2004 and 2007, ResCap issued 392 RMBS securitizations with an original deal balance of $221 billion. Ally Securities acted as lead or co-lead underwriter on 105 of them with a principal balance of $57.2 billion, and also served as co-underwriter on an additional 131 of them. Suits by Third-Party Claimants against Ally Securities primarily allege claims for violations of Sections 11 and 12(a)(2) of the Securities Act of 1933 and analogous state statutes, fraud and fraudulent inducement, aiding and abetting fraud, and negligent misrepresentation. The RMBS Claims are at various stages of the litigation process, with most at or just beyond the motion-to-dismiss stage and none having reached trial.

**Examiner's Analysis and Conclusions:**

1.    Neither ResCap nor AFI challenges that the Third-Party Claimants have standing to bring their securities law claims against Ally Securities or that Ally Securities' participation in the securitizations suffices to give rise to potential liability.

2.    The claims of fraud and fraudulent inducement are similar to the securities claims because they are based on misrepresentations and omissions in the RMBS Offering Documents, but more difficult to prove because they require proof of Ally Securities' knowledge of the fraud and intent to defraud, along with justifiable reliance and damages causation.

3.    No evidence supports the assertions that Ally Securities knowingly made untrue or misleading material statements, but such claim requires further factual development.

4.    The claims of aiding and abetting fraud require proof of an underlying fraud, knowledge of the fraud by Ally Securities and substantial assistance to ResCap in perpetrating the

81

fraud.  If the Third-Party Claimants can show a fraud, they are likely to prevail against Ally Securities on a claim of aiding and abetting.

5.      A claim of negligent misrepresentation turns on the issue of whether a plaintiff can establish a special relationship between itself and Ally Securities, an inquiry beyond the scope of the Examiner's Investigation.  Nevertheless, in most transactions between sophisticated corporate parties, no duty of care is required.

6.      While Ally Securities participated as lead or co-lead underwriter on 105 RMBS deals with an original principal balance of $57.2 billion and acted as co-underwriter on 131 more securitizations, its limited net equity ($11.7 million as of December 31, 2012) may make it difficult for Third-Party Claimants to collect.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  The ultimate issue of whether the RMBS Offering Materials contained misstatements or omissions of material fact was beyond the scope of the Examiner's Investigation.  AFI likely received two avoidable fraudulent transfers totaling $225.5 million in 2012.  The reasonable settlement value of those claims should be added to Ally Securities' net equity in evaluating collectability.

**Settlement Considerations:**

Despite the overall enormity of the Third-Party RMBS Claims (billions of dollars), I believe that the settlement value of the claims against Ally Securities for its role as underwriter is ultimately affected more by its relative lack of resources to satisfy a judgment than the  actual merits of the claims themselves and, therefore, the settlement value is small.

Each of the RMBS Claims against Ally Securities requires a factually-intensive inquiry with respect to each deal in which it was involved as an underwriter to determine whether the RMBS Offering Documents contained untrue misstatements or omissions of material fact.

Claims for violations under Section 11 of the Securities Act do not require a plaintiff to allege or prove scienter, reliance or loss causation; a plaintiff need only show purchase of a registered security from the issuer or in the aftermarket following an offering, participation by the defendant in the offering sufficient to give rise to liability (almost always the case for an underwriter), and that the registration statement contained an untrue statement of material fact or omitted a material fact required to be stated therein or necessary to make the registration statement not misleading.

Section 12(a)(2) of the Securities Act requires a showing that the defendant is a "statutory seller," the sale was effectuated by prospectus or oral communication, and the prospectus or oral communication contained an untrue statement of material fact or omitted to state a material fact necessary to make the statements not misleading.

A plaintiff's burden of proof under section 11 and 12(a)(2) of the Securities Act is a preponderance of the evidence, while a defendant such as Ally Securities bears the burden of proving affirmative defenses such as due diligence (*e.g.*, after reasonable investigation, the defendant believed the statements in the registration statement were true and there was no omission to make the statements not misleading) or loss causation (*e.g.*, a plaintiff's losses are not attributable to the misrepresentations, but rather to a general market decline).

Of all of the Third-Party RMBS Claims against Ally Securities, the Examiner concludes that the securities law claims have some viability.

The essentially identical common-law claims of fraud and fraudulent inducement place a much higher burden on a plaintiff. They require a showing by clear and convincing evidence of (1) a misrepresentation or omission of material fact which was false and known by the defendant to be false, (2) made with an intention to induce reliance, (3) justifiable reliance thereon, and (4) damages caused by the misrepresentation. It is likely that Ally Securities will argue that the sophistication of the Third-Party Claimants will make it difficult for them to establish justifiable reliance. The lack of proof at this stage of Ally Securities' actual knowledge of the statements' falsity, combined with the difficulty in establishing justifiable reliance, causes us to discount the settlement value of these claims significantly.

Aiding and abetting fraud requires (1) existence of a fraud, (2) knowledge of the fraud by the defendant, and (3) substantial assistance to the one committing the fraud. Although only one Third-Party Claimant (MBIA) has asserted such a claim against Ally Securities so far, I agree with the Examiner that if the existence of a fraud by ResCap is proved, a claim of aiding and abetting is likely to prevail.

Claims of negligent misrepresentation, however, are likely not to succeed. The key element to a negligent misrepresentation claim is demonstrating a duty of care owed by the defendant to the plaintiff. Most courts that have considered the question have found that sophisticated parties engaged in RMBS transactions do not owe one another a duty of care and have dismissed negligent misrepresentation claims at the pleadings stage. I do not attribute any settlement value to such claims.

Ordinarily, the sheer size of the Third-Party RMBS Claims, and the relative ease of prevailing at least on a securities law claim if an untrue statement or omission of material fact is established, would be cause for attributing a high settlement value to the Third-Party RMBS Claims against Ally Securities. That would be offset by ordinary litigation uncertainty and costs, although in this instance, Ally Securities' small equity ($11.7 million as of December 31, 2012), not to mention the probability that most if not all of that could be consumed by defense costs, dictates a very low settlement value. Ally Securities equity could be augmented by avoiding transfers to AFI in the amount of $225.5 million made in 2012, the reasonable settlement value of which I have estimated at $157.9 million.

The claims have a face value of $1 billion, which is reduced by 50% for inherent risk, and 20% for the difficulty of prevailing on the securities claims, for a merits value of $400 million.

I anticipate that settlement discussions would quickly switch focus away from the merits of the claim to collectability. If the maximum fund available is Ally Security's net equity of $11.7 million plus $157.9 million, the reasonable settlement value of the fraudulent transfer claim against AFI, the reasonable settlement value at 10% of the funds available, approximately $16 million, is appropriate in light of the dubious merits and risk of litigation.

Because the settlement value of these claims is less than $21 million, it is not material in light of the magnitude of the $2.1 billion settlement fund, and because I believe these claims are duplicative of claims made against ResCap and AFI, I ascribe no value to Third Party Claims against Ally Securities for purpose of allocating the settlement fund.

### 3.    Third Party Claims Against Ally Bank

**Examiner's Report References:**

Section I.H pages I-41 to I-42

Section VIII.C pages VIII-129 to VIII-150

Section VIII.D pages VIII-201 to VIII-203

**Description:**

Evaluation of the RMBS Claims against Ally Bank by Third-Party Claimants arising out of Ally Bank's role as a loan originator and custodian of mortgage loan notes in connection with RMBS issued by ResCap.

**Background:**

Between approximately 2004 and 2007, ResCap issued 392 RMBS securitizations with an original deal balance of $221 billion. Ally Bank and its predecessor, Old GMAC Bank, acted as loan custodian for approximately 34 of those deals representing a principal balance of a $21.7 billion. Ally Bank was original loan custodian on six of the deals; Old GMAC was original custodian on 28. Ally Bank also acted as a loan originator in some 124 instances, in the approximate amount of $16 billion. As a custodian, Ally Bank entered into contracts to hold and review the mortgage notes underlying the securitizations and to give various notices to the loan servicer, trustee and monoline insurer. The principal direct claims asserted against Ally Bank are (1) breach of contract for failing to provide proper notice or certifications under the custodial agreements and (2) aiding and abetting fraud by ResCap.

**Examiner's Analysis and Conclusions:**

1.    There is no evidence that Ally Bank breached its obligations under the custodial agreements to gather, review and certify mortgage notes, although the Examiner did not audit individual mortgage notes. There is also no evidence that Ally Bank breached obligations to the

trustees and monoline insurers to alert them to breaches of representations and warranties related to the securitizations.

2.      The Examiner reaches no conclusion with respect to the existence of an underlying fraud by ResCap, but notes that the Third-Party Claimants proffered no evidence of Ally Bank's actual knowledge of the alleged fraud.  The Examiner also notes, however, that discovery has been limited and that evidence exists showing Ally Bank was "intricately involved" in the operations of ResCap.  Likewise, if ResCap engaged in fraud, there is evidence that Ally Bank's financing activities constituted "substantial assistance" to that fraud.

3.      Under applicable Utah law, it is unlikely that Ally Bank will be found to be a successor in liability of Old GMAC Bank and, therefore, the RMBS Claims against it would be limited to securitizations containing loans sold by Ally Bank after the 2006 Bank Restructuring.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Under Pennsylvania law, which governs the custodial agreements, a claim for breach of contract requires three elements:  (1) existence of a contract; (2) breach of its terms; and (3) damages.  Although the mortgage notes themselves were not audited by the Examiner, there is no evidence that Ally Bank breached its contractual obligations to obtain, review and certify the mortgage notes underlying the securitizations.  While the Third-Party Claimants allege that Ally Bank also breached its obligation to notify them of breaches of representations and warranties in the loan purchase agreements, Ally Bank was not required to look for breaches, only report them if it learned of them.  There is no evidence that Ally Bank had actual knowledge of any breaches of representations and warranties by ResCap.  Accordingly, I ascribe no settlement value to this claim.

With respect to the aiding and abetting claims, controlling New York law requires (1) the existence of an underlying fraud, (2) actual knowledge of the fraud, and (3) substantial assistance in committing the fraud.  Even assuming a fraud by ResCap (which the Examiner does not), the Third-Party Claimants have not identified any evidence showing actual knowledge of the fraud by Ally Bank, although discovery has been limited and Ally Bank and ResCap were closely connected, with overlapping leadership and working cooperation between personnel.  There is evidence that Ally Bank's financing activities provided "substantial assistance" to ResCap since Ally Bank was created to serve as a funding conduit for ResCap's securitization activity by providing loan originations. Given the lack of evidence of actual knowledge of the underlying fraud, albeit with limited discovery, this claim has minimal settlement value.

Moreover, it is unlikely that Ally Bank will be deemed to be a successor to the liability of Old GMAC Bank, so even if Ally Bank it is found liable, that liability would be limited to securitizations containing loans sold by Ally Bank after the 2006 Bank Restructuring, further reducing the already tenuous settlement value of the claims.

Under these circumstances, I conclude that these claims are not material and have only nominal settlement value.

### 4.    Unsecured Noteholder Causes Of Action

#### a.    *Tortious Interference Under 2005 Indenture*

**Examiner's Report References:**

Section I.H.4.a pages I-42 to I-43

Section VIII.C.5.a pages VIII-163 to VIII-190

**Description:**

Whether AFI tortiously interfered with the 2005 Indenture by causing ResCap to transfer all or substantially all of its assets in violation of the 2005 Indenture.

**Background:**

In the 2005 Indenture, ResCap covenanted not to transfer "all or substantially all" of its assets, with certain exceptions. The Unsecured Noteholders allege that AFI induced ResCap to breach this covenant by entering into a series of transactions in furtherance of a pre-arranged plan which resulted in the transfer of substantially all of ResCap's assets. Those transactions include ResCap's forgiveness of indirect and direct debts owed by certain subsidiaries, including GMAC Mortgage and RFC, and the 2009 Bank Transaction. Although none of the transactions would trigger the covenant when considered individually, the Unsecured Noteholders contend that the transactions should be aggregated for purposes of determining whether ResCap transferred substantially all of its assets.

**Examiner's Analysis and Conclusions:**

1.    The Unsecured Noteholders would likely have standing to pursue this claim.

2.    Although it is a close question, it is more likely than not that the transactions would not be aggregated.

3.    Even if the transactions were aggregated, although it is a close question, a court would more likely find that the transactions did not result in a breach of the covenant.

4.    Even if a court found a breach of the covenant, it is unlikely that a claim for tortious interference would prevail because the Examiner did not uncover any evidence that AFI intended to cause a breach and because AFI has an economic justification defense, as it acted to protect its own interests.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would be pursued by the Unsecured Noteholders at their own expense. Given the high hurdles found by the Examiner, the Unsecured Noteholders would likely be motivated to reach an early resolution of disputes in order to expedite distributions. All of the procedural hurdles that attend bankruptcy litigation would be present in this case including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law action, (ii) withdrawal of the reference, and (iii) demand for a jury trial. In addition, all litigation carries risk, uncertainty, and expense. As a result, it is highly likely that any settlement would reflect a substantial discount (30%) from the face value of the claim.

Before reaching the merits of their claim, the Unsecured Noteholders would first need standing to bring this claim. Although the Examiner concluded that the Unsecured Noteholders would have standing, he recognized standing as a serious threshold issue, which could be resolved against the Unsecured Noteholders, thereby creating additional risk and reducing the settlement value of the claim by 10%.

Once the merits are reached, the Examiner identified three hurdles that the Unsecured Noteholders would have to overcome to establish a claim of tortious interference: (1) whether to aggregate the challenged transactions; (2) whether the transactions, if aggregated, resulted in a transfer of substantially all of the assets in breach of the covenant; and (3) whether, if a breach were found, AFI intentionally procured the breach. The Unsecured Noteholders would have to win each of these issues to prevail on this claim.

First, under the leading *Sharon Steel*[37] case, whether to aggregate the challenged transactions is a fact-intensive inquiry dependent on whether the challenged liquidation was piecemeal or part of a preconceived plan. The Examiner found substantial facts indicating that the challenged transactions were not part of a preconceived plan. Accordingly, the Examiner concluded that it was more likely than not that the transactions would not be aggregated. The Examiner also concluded that the court would not apply the step-transaction doctrine advocated by the Unsecured Noteholders. AFI would no doubt litigate these issues thoroughly, raising the arguments and facts identified by the Examiner. Accordingly, the more-likely-than-not risk of not prevailing on this issue lowers the settlement value of the claim by 60%.

Second, even if the transactions were aggregated, the Unsecured Noteholders would have to show that the aggregated transactions resulted in the transfer of substantially all of ResCap's assets, resulting in a breach of the covenant. On a quantitative basis, the Examiner found that the transfers

---

[37] See *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982).

were approximately 50% of the book value of the operating assets and the total assets, which is most likely not sufficient to constitute a transfer of substantially all of ResCap's assets. On the other hand, on a fair market value basis, the transfers amounted to 34% of the total assets, but 100% of the operating assets. Because the quantitative analysis was unclear, the Examiner also conducted a qualitative analysis, and concluded it did not support the Unsecured Noteholders' claim. Therefore, while it is a close question, the Examiner concluded that it is more likely than not that the Unsecured Noteholders would not be able to establish this element. Again, AFI would litigate these issues thoroughly, using the points made by the Examiner. As a result, the substantial risk of not prevailing on this issue lowers the settlement value of the claim by another 60%.

Third, even if the aggregated transactions breached the covenant, the Unsecured Noteholders would have to show that AFI intentionally procured the breach without justification. However, the Examiner's Investigation did not uncover any evidence that AFI intended to cause such a breach. Moreover, the evidence reviewed by the Examiner showed that AFI's alleged interference was to protect its own economic interest in ResCap. As the Examiner notes, absent evidence of malice, fraud, or illegality, acting to protect an economic interest is a complete defense to the tortious interference claim. The Examiner found no evidence of malice, fraud, or illegality. The minimal likelihood that the Unsecured Noteholders would prevail on these issues reduces the settlement value of the claim by an additional 90%.

Because the likelihood of success is so low, any settlement offer from AFI would likely be a nuisance or cost of litigation settlement and therefore, not material.

### b.    Claims Related To The 2006 Bank Restructuring

**Examiner's Report References:**

Section I.H.4.b page I-43

Section VIII.C.5.b pages VIII-190 to VIII-201

**Description:**

Whether the Unsecured Noteholders have viable claims against AFI arising out of the 2006 Bank Restructuring.

**Background:**

The 2006 Bank Restructuring and potential estate claims against AFI are discussed in detail at Section E.5. The Examiner observed that the Unsecured Noteholders, as third-party beneficiaries, could have claims for breach of the 2005 Operating Agreement by AFI. The Examiner also considered whether misrepresentations or omissions by AFI to ResCap and its directors could give rise to fraud claims by the Unsecured Noteholders on the ground that the Unsecured Noteholders were harmed by ResCap's detrimental reliance. However, there is no claim here that misrepresentations or omissions were made directly to the Unsecured Noteholders, or that they relied on any such misrepresentations or omissions.

88

**Examiner's Analysis and Conclusions:**

1.      The Unsecured Noteholders would have standing to assert these claims.

2.      A breach of contract claim would likely be barred by the statute of limitations.

3.      While a close question, it is more likely than not that a fraud claim against AFI would not be barred by the statute of limitations.

4.      A fraud claim by the Unsecured Noteholders against AFI related to the 2006 Bank Restructuring would not prevail under Minnesota law because Minnesota law does not recognize claims based on reliance by third parties.

5.      Although it is a close question, it is more likely than not that a fraud claim by the Unsecured Noteholders against AFI related to the 2006 Bank Restructuring would not succeed under New York law because it is not clear if New York would recognize a claim based on third-party reliance and it is not clear that the Unsecured Noteholders could make out such a claim.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I largely agree with the Examiner's analysis and conclusions, subject to two qualifications.

First, the Examiner concluded that the Unsecured Noteholders would have standing for two reasons: (1) they suffered a particularized injury under the 2005 Operating Agreement; (2) because *Wagoner* and the *in pari delicto* defense would bar the estate from bringing these claims (see Section E.5), the Unsecured Noteholders would have standing.  I find only the second of these persuasive as to the fraud claim, which is the only possibly viable claim.

The case law cited by the Examiner makes clear that for a creditor to have standing to bring a claim against third parties outside of the bankruptcy proceeding, it must be suing for separate and distinct injuries it suffered directly, not for injuries to the debtor or the estate that harmed all creditors.[38]  Where, however, the injury alleged is not particularized to the plaintiff, but rather is a generalized injury to the debtor that affects all creditors, then the creditor does not have standing.[39] The Examiner stated that a court would more likely than not find that the Unsecured Noteholders could allege a particularized injury here because of the Unsecured Noteholders' rights under the 2005 Operating Agreement, *i.e.*, because they are third-party beneficiaries of that agreement.[40]

---

[38] *See Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1101 (2d Cir. 1988); *Fisher v. Apostolou*, 155 F.3d 876, 881 (7th Cir. 1998).

[39] *See St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.*, 884 F.2d 688, 701 & 705-06 (2d Cir. 1989); *Securities Investor Protection Corp. v. Bernanrd L. Madoff Investment Securities, LLC (In re Madoff)*, 429 B.R. 423, 431 (Bankr. S.D.N.Y. 2010).

[40] Examiner's Report, VIII-191, fn. 1034.

While that may create a particularized injury as to the breach of contract claim,[41] the Unsecured Noteholders' contract claims are barred by the statute of limitations and do not add value, as discussed below.

The key question, therefore, is whether there is any particularized injury with regard to the fraud claim which would confer standing on the Unsecured Noteholders. The alleged fraud claim is not based on an allegation that AFI made a misrepresentation or a material omission to the Unsecured Noteholders. Nor is there any allegation that the Unsecured Noteholders relied in any way on any such misrepresentation or omission. Rather, this fraud claim is based on reliance by ResCap. The injury allegedly resulting from ResCap's reliance is the loss in value to ResCap, because ResCap did not receive fair value in exchange for the 2006 Bank Restructuring, thereby reducing the fund from which ResCap's debts could be paid. Therefore, the injury is not a direct and particularized injury to the Unsecured Noteholders, but rather an injury to ResCap and a generalized injury to all the creditors, so that the Unsecured Noteholders would likely not have standing.[42]

I find the alternative ground for standing to bring a fraud claim more persuasive. As discussed in Section E.5, the Examiner found that, although it is a close question, it is more likely than not that the estate could not bring a fraud claim because of the *Wagoner* rule and the *in pari delicto* defense. If those defenses applied, then the estate could not bring the claim, but the Unsecured Noteholders could.[43] Thus, the Unsecured Noteholders would have standing only to the extent that the estate were barred from bringing the claim.

Second, the Examiner did not expressly consider who would benefit from a recovery on these claims. As discussed above, the alleged fraud claim is not based on an allegation that AFI made a misrepresentation or a material omission to the Unsecured Noteholders, or that there was any reliance by the Unsecured Noteholders. Again, the harm was that ResCap did not receive fair value in the 2006 Bank Restructuring. This is an injury to all creditors, not a particularized injury to the Unsecured Noteholders. Moreover, the only reason I believe that the Unsecured Noteholders are likely to have standing to pursue this claim is because, although it is a close question, the estate is likely barred from bringing it under *Wagoner*. Therefore, if there were a recovery on the fraud claim, I believe that the recovery would inure to the benefit of the estate and all its creditors, not just the Unsecured Noteholders. As a result, the claims of the Unsecured Noteholders are duplicative of the estate's claims regarding the 2006 Bank Restructuring, which I consider at length in Section 5.E, above. Because these claims are duplicative of the estate's claims, and because the benefit would inure to the estate regardless of whether it is brought by the estate or the Unsecured Noteholders, I only analyze here whether the alternative claims of the Unsecured Noteholders would add any value to the estate's claims.

---

[41] Even as to the breach of contract claim, it is worth noting that the Unsecured Noteholders' remedies as third-party beneficiaries are limited to specific enforcement of the provisions of the 2005 Operating Agreement. Examiner's Report, III-21-22.

[42] *See St. Paul*, *supra*, 884 F.2d at 705-06 (holding that challenge to actions that allegedly reduced the fund from which debtor's debts would be paid was not a particularized harm allowing a claim to be brought outside of bankruptcy).

[43] *See In re The Bennett Funding Group, Inc.*, 336 F.3d 94, 102 (2d Cir. 2003).

**Settlement Considerations:**

As to the breach of contract claim, the Examiner concluded that the Unsecured Noteholders' breach of contract claims would be barred by the statutes of limitation. Because this would be a complete bar to the claim and easily established by AFI, the breach of contract claims by the Unsecured Noteholders do not add any settlement value to the estate's claims.

The third-party fraud claim faces a number of difficult hurdles. As a threshold matter, the Examiner considered whether such a claim was viable under both Minnesota law and New York law. The Examiner first concluded that it was not viable under Minnesota law because Minnesota does not recognize a fraud claim based on reliance by a third party. He also concluded that if the claim were brought in New York, the court would apply Minnesota law, which would bar the claim. Thus, if the fraud claim were brought in New York, it would fail and does not add any settlement value to the estate's claims.

The Examiner considered the possibility that New York law would apply if the Unsecured Noteholders could bring the fraud claim in Minnesota. For the reasons discussed above and in *St. Paul*,[44] I believe that it is unlikely that the court would allow the claim to be brought in Minnesota outside of the bankruptcy. This severely limits any settlement value to the claim. But even if the Unsecured Noteholders were allowed to bring this claim in Minnesota, the Examiner found that, although it is a close question, the fraud claim would more likely than not fail. The Examiner concluded that if the fraud claim were brought in Minnesota, New York law would apply. The Examiner found that it was unclear whether New York law would recognize a fraud claim based on reliance by a third party; the law supporting that theory had a "somewhat checkered" history and has been rejected by the Second Circuit. Moreover, even if the Unsecured Noteholders could get over that hurdle, they would still have to establish the remaining elements of a fraud claim. Together these factors render the third-party fraud claim of minimal settlement value, even if it were allowed to be brought outside the bankruptcy.

The Examiner also considered whether the statute of limitations would bar a fraud claim. Although the Examiner found it a close question, he concluded it was more likely than not that the statute of limitations would not bar the claim. Nonetheless, because this is a significant risk, and would completely bar the claim if AFI prevailed, it further detracts from the settlement value.

To gain a recovery on their third-party fraud claim, the Unsecured Noteholders would have to establish standing, obtain permission to bring the claim outside the bankruptcy, have New York law apply, have the court apply a questionable interpretation of New York law, establish the elements of a fraud claim, and defeat a statute of limitations argument. In light of these substantial hurdles, I do not believe that the third-party fraud claim by the Unsecured Noteholders adds materially to the settlement value of the estate's claims regarding the 2006 Bank Restructuring.

---

[44] 884 F.2d 688, 705-06 (2d Cir. 1989).

### 5.    Junior Secured Noteholder Causes Of Action

**Examiner's Report References:**

Section I.H.5 pages I-43 to I-44

Section V.E pages V-350 to V-383

**Description:**

Whether ResCap and AFI breached the Secured Revolver Loan Agreement, the Junior Secured Notes Indenture, the Senior Secured Notes Indenture, or the Intercreditor Agreement by either: (1) entering into the Line of Credit Facilities; or (2) releasing the liens on certain assets securing the Secured Revolver Facility, the Junior Secured Notes, and the Senior Secured Notes, and having such assets secure the Line of Credit Facilities.

**Background:**

Due to persistent liquidity shortages, ResCap entered into a series of financing transactions between 2007 and 2010.  In particular, in late 2008, facing liquidity shortfalls, two ResCap affiliates (PATI and RAHI) entered into the Initial Line of Credit Facility, with AFI as lender in the amount of $430 million.  ResCap guaranteed the Initial Line of Credit Facility on a full recourse basis. Although ResCap had attempted to find unaffiliated lenders for this transaction, it was unable to do so and AFI was the lender of last resort.  In order to have collateral available to secure the Initial Line of Credit Facility, collateral had to be released from other credit facilities, *i.e.*, the Secured Revolver Facility, the Senior Secured Notes, and the Junior Secured Notes.  In a typical case, this would have been an impediment to a new line of credit.

In June 2009, PATI and RAHI entered into a Second Line of Credit Facility with AFI for an additional $370 million on substantially similar terms to the Initial Line of Credit Facility.  Goldin Associates rendered a fairness opinion in connection with the Second Line of Credit Facility, finding it fair to ResCap and its creditors (other than AFI).  In late 2009, the amount available under the Line of Credit Facilities was increased, and Goldin Associates again issued a favorable fairness opinion. Finally, in late 2009, the Line of Credit Facilities were combined into one agreement and the Secured Revolver Loan Agreement was amended and restated.  Under the Amended and Restated Line of Credit Facility, RFC and GMAC Mortgage replaced PATI and RAHI as the borrowers.

**Examiner's Analysis and Conclusions:**

The Examiner concluded that the evidence does not support the allegations made by the Ad Hoc Group of Junior Secured Noteholders that either: (1) entering into the Line of Credit Facilities; or (2) releasing the liens on certain assets securing the Secured Revolver Facility, the Junior Secured Notes, and the Senior Secured Notes, and having such assets secure the Line of Credit Facilities, violated the terms of the Secured Revolver Loan Agreement, the Junior Secured Notes Indenture, the Senior Secured Notes Indenture, or the Intercreditor Agreement.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

The Examiner found that the evidence does not support the allegations of breach of the Secured Revolver Loan Agreement, the Junior Secured Notes Indenture, the Senior Secured Notes Indenture, or the Intercreditor Agreement. Accordingly, this claim is not assigned any settlement value.

## I.    OPINION REGARDING CONSIDERATION FOR RELEASES AND CONCLUSION REGARDING ALLOCATION OF SETTLEMENT FUND

**Examiner's Report:**

Section I.I pages I-44

Section IX pages IX-1 to IX-28

**Description:**

In order to provide guidance to the parties, the Examiner reviewed the terminated AFI Settlement and Plan Sponsor Agreement to determine whether the Debtor Release and Third-Party Release would have been warranted based upon AFI's contributions.

A new settlement has been reached that is embodied in a Plan Support Agreement dated May 13, 2013 and provides for AFI to contribute $2.1 billion in exchange for a broad release in a confirmed plan of reorganization. I opine on the reasonable allocation of that fund among the causes of action that have material settlement value.

**Background:**

The terminated AFI Settlement and Plan Sponsor Agreement proposed to settle all Estate Causes of Action and Third Party Claims against the AFI Released Parties in exchange for a cash contribution from AFI to the Debtor of $750 million plus other non-cash contributions. No party in interest or creditor group, other than the RMBS Institutional Investors, supported the terminated AFI Settlement and Plan Support Agreement. Ultimately, the Debtor withdrew from the AFI Settlement and Plan Sponsor Agreement.

The Bankruptcy Court directed the parties to mediation before the Hon. James M. Peck, U.S. Bankruptcy Judge. When the Examiner was ready to release his report, the parties asked that it be delayed to afford them the opportunity to complete mediation. Following extensive marathon mediation sessions, on May 13, 2013 a Plan Support Agreement was reached among the Debtors, AFI, the Creditors Committee and certain Consenting Claimants. Under the Plan Support Agreement, AFI is to contribute $2.1 billion to the Debtors in exchange for a broad release of the

AFI Released Parties upon confirmation of a plan of reorganization.  On June 26, 2013, the Bankruptcy Court granted the Debtors' motion for approval to enter into the Plan Support Agreement.

**Examiner's Analysis and Conclusions:**

1.      A court would consider the *Iridium* factors in deciding whether to approve the terminated AFI Settlement and Plan Sponsor Agreement.

2.      Creditor support, a major consideration in the approval of settlements, was lacking.

3.      It is extremely difficult to confirm a plan with a third-party release absent consent of substantially all of the third party claimants.

4.      The evidence does not support ascribing significant value to AFI's non-cash contributions under the terminated AFI Settlement and Plan Sponsor Agreement.

5.      The cash contribution of $750 million and the non-cash contributions from AFI were inadequate to support a release of the Estate Causes of Action, let alone the Third Party Claims.

6.      It is unlikely that a court would have approved the terminated AFI Settlement and Plan Sponsor Agreement.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  My opinion on the reasonable settlement value of each of the Estate Causes of Action, when added together, totals $1,920.0 million and is consistent with the Examiner's conclusion that $750 million was insufficient consideration to support releases of the Estate Causes of Action, let alone the Third Party Claims.

**Conclusion:**

In the following chart, I have compiled my assessment of the reasonable settlement value of each of the Estate Causes of Action and the Third Party Claims.  In my opinion, the reasonable settlement value of Estate Causes of Action is $1,920.0 million and the reasonable settlement value of the Third Party Claims is $480 million. Although under the absolute priority rule, I could have allocated the settlement first to secured claims such as the JSNs, and second to unsecured claims, instead I made allocations pro rata based on the reasonable value of each of the claims.  Because in determining the reasonable settlement amount of each claim I have taken into account the merits of the claim, the motivations of the parties to settle, the time and expenses associated with litigation and all of the other relevant factors relative to a reasonable settlement value, there is no reason to apply these factors again, and therefore, I have allocated the settlement fund of $2.1 billion among the reasonable settlement values for each claim on a *pro rata* basis.

The $2.1 billion settlement fund is smaller than my estimate of the reasonable settlement value of the claims done on a claim-by-claim basis, and it may be that in this instance the sum of the parts is greater than the whole. Also, the magnitude of the settlement fund that AFI has agreed to contribute, *i.e.*, $2.1 billion, and the opportunity to resolve numerous claims at one time in the context of a bankruptcy, may warrant a discount. Overall I feel that my assessment of the reasonable settlement value of each individual claim, when combined and compared with the settlement fund of $2.1 billion, is appropriate. I have allocated the settlement fund of $2.1 billion among the reasonable settlement values.

| Claims | Potential Damages (in millions) | Reasonable Settlement Amount (in millions)[45] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (in millions) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| ***ESTATE CAUSES OF ACTION*** | | | | | |
| Breach of Contract for Misallocation of Net Revenues on Loans brokered by GMAC | $520.5 | **$268.2** | **51.5%** | **$234.6** | **45.1%** |
| Breach of Contract for Failure To Pay Value of Purchased MSRs | $1,725.0 | **$387.2** | **22.4%** | **$338.8** | **19.6%** |
| Breach of Representations and Warranties under 2001 and 2006 MMLPSAs | No Amount Given | | | | |
| Breach of Contract Claims relating to Pipeline Swap | No Amount Given | | | | |

---

[45] Zeros are omitted for any settlement value that does not meet my threshold for materiality ($21 million).

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*)[45] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| Breach of 2005 Operating Agreement or 2006 Amended Operating Agreement in connection with MMLPSA, Pipeline Swap or MSR Swap | No Amount Given | | | | |
| Preferential Transfer relating to DOJ/AG Consent Order | $109.6 | **$60.0** | **54.7%** | **$52.5** | **47.9%** |
| Preferential Transfer relating to 2012 Letter Agreement and A&R Servicing Agreement | $48.4 | **$32.0** | **66.1%** | **$28.0** | **57.9%** |
| Unauthorized Post-petition Transfer relating to Indemnification Obligations under A&R Servicing Agreement | $12.9 | | | | |
| Breach of contract regarding the First 2009 Tax Allocation Agreement | $1,770.0 | **$713.7** | **40.3%** | **$624.5** | **35.3%** |
| Constructive Fraudulent Transfer relating to 2nd 2009 Tax Allocation Agreement | $50.0 | | | | |
| Contract Claim re 2005 Tax Allocation Agreement | $15.1 | | | | |

| Claims | Potential Damages (in millions) | Reasonable Settlement Amount (in millions)[45] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (in millions) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| Minnesota Insider Preference Claims | $566.0 | $328.9 | 58.1% | $287.8 | 50.8% |
| Fraud related to 2006 Bank Restructuring | $569.0 | $130.0 | 22.8% | $113.8 | 20.0% |
| Tortious Interference with Contract relating to 2006 Bank Restructuring | No Amount Given | | | | |
| Fraudulent Transfer in connection with Ally Bank Transactions | No Amount Given | | | | |
| Miscellaneous Breach of Fiduciary Duty Claims against ResCap's D&Os | No Amount Given | | | | |
| Aiding and Abetting Breach of Fiduciary Duty against AFI (other than re 2006 Restructuring) | No Amount Given | | | | |
| Single Entity theories of liability regarding AFI and ResCap and/or affiliates, including Piercing Corp Veil and Substantive Consolidation | No Amount Given | | | | |
| Debt Re-characterization | No Amount Given | | | | |
| Equitable Subordination and Disallowance | No Amount Given | | | | |

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*)[45] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| Constructive Trust | No Amount Given | | | | |
| Constructive Fraudulent Transfer Against Cerberus relating to 2008 Model Home Sale | $30.0 | | | | |
| Fraudulent Transfer relating to Prepetition Asset Sales (other than 2008 Model Home Sale) | No Amount Given | | | | |
| Financing Affiliate Transactions | | | | | |
| **TOTAL** | | **$1,920.0** | | **$1,680.0** | |

### *THIRD PARTY CAUSES OF ACTION*

| Claims | Potential Damages | Reasonable Settlement Amount | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund | Percentage of Potential Damages |
|---|---|---|---|---|---|
| Third Party Claims against AFI | | | | | |
| a. RMBS Claims, including veil-piercing, control person liability and aiding and abetting fraud | $20,000.0 | **$480.0** | **2.4%** | **$420.0** | **2.1%** |

| Claims | Potential Damages (in millions) | Reasonable Settlement Amount (in millions)[45] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (in millions) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| b. Fraudulent Transfer Claims for Payments of $200 M and 25.5 M | | | | | |
| Third Party Claims against Ally Securities, including Fed and State Securities law, common law fraud, aiding and abetting fraud, and negligent misrepresentation | | | | | |
| Third Party Claims against Ally Bank | | | | | |
| Unsecured Noteholder Causes of Action, including tortious interference under 2005 Indenture and claims relating to the 2006 Bank Restructuring | | | | | |
| Junior Noteholder Causes of Action | | | | | |
| *Total  Third Party Claims* | | $480.0 | | $420.0 | |
| *GRAND TOTAL* | | $2,400.0 | | $2,100.0 | |

After reviewing each of the causes of action identified in the Examiner's Report, in my opinion the reasonable settlement value of the Estate Causes of Action is $1,920.0 million and the reasonable settlement value of the Third Party Claims is $480 million for a total reasonable settlement value of all claims and causes of action of $2,400.0 million. In my opinion the settlement fund of $2.1 billion to be paid by AFI should be allocated to the reasonable settlement value of each claim *pro rata*.

October 18, 2013

Raymond T. Lyons

**EXHIBIT A**

**Documents Reviewed**

1.      *Report of Arthur J. Gonzales, as Examiner, released June 26, 2013*

2.      *Documents*[1]

(a)     Implemented 2005 Tax Allocation Agreement
(b)     Other 2005 Tax Allocation Agreement
(c)     2006 Tax Allocation Agreement
(d)     First 2009 Tax Allocation Agreement
(e)     Second 2009 Tax Allocation Agreement
(f)     2001 MMLPSA
(g)     March 2008 Pipeline Swap Schedule
(h)     July 2008 Pipeline Swap Schedule
(i)     Amended and Restated Schedule to the 2002 ISDA Master Agreement
        dated April 1, 2011
(j)     2006 MMPLSA
(k)     2007 MMPLSA
(l)     2005 Operating Agreement
(m)     2008 MMPLSA
(n)     2010 Net Funding Schedule
(o)     April 2011 MSR Swap Confirmation
(p)     MSR Swap
(q)     2006 Amended Operating Agreement
(r)     November 20, 2008 Broker Agreement
(s)     First Priority Security Agreement
(t)     Junior Notes Indenture
(u)     Senior Secured Notes Indenture
(v)     Intercreditor Agreement
(w)     Initial Line of Credit Agreement
(x)     Second Line of Credit Agreement
(y)     A&R Line of Credit Agreement
(z)     Ally Accounting Policy 3330 – Accounting for Income Taxes, effecrtive
        October 1, 2010
(aa)    FMV Schedule
(bb)    Secured Revolver Loan Agreement

---

[1] Unless otherwise noted with an asterisk, the documents listed in this Exhibit are defined in the Appendix to the Examiner's Report.

3.     **_Reports Regarding Securities Settlements_**

    a.   **_The D&O Diary_** – Subprime and Credit Crisis-Related Lawsuits, Settlements, Dismissals and Denials – April 30, 2013 (Kevin LaCroix)

    b.   **_NERA Economic Consulting_** – Recent Trends in Securities Class Action Litigation:  2012 Full-Year Review – January 29, 2013 (Dr. Renzo Comoli, Sukaina Klein, Dr. Roald I. Miller and Svetlana Starykh)

    c.   **_Cornerstone Research (Economic and financial Consulting and Expert Testimony)_** – Securities Class Action Settlements - 2011 Review and Analysis

4.     **_Related Mortgage Backed Securities Settlements_**

    a.   **_In re Residential Capital, LLC, et al._** (U.S. Bankruptcy Court, Southern District of New York, Case No. 12-12020 MG)

      (1)   Reply Declaration of Jeffrey A. Lipps (Docket No. 2805)

      (2)   Direct Testimony of Jeffrey A. Lipps (Docket No. 4433)

    b.   **_In re Citigroup Inc. Securities Litigation._** (U.S. District Court, Southern District of New York, Case No. 07:cv-09901)

      (1)   Order Preliminarily Approving Proposed Settlement and Providing for Notice dated August 29, 2012 (Docket No. 156)

      (2)   Final Judgment and Order of Dismissal With Prejudice dated August 1, 2013 (Docket No. 276); *also see b(1) below*

    c.   **_In re Citigroup Inc. Securities Litigation._** (U.S. District Court, Southern District of New York, Case No. 09 MD 2070)

      (1)   Opinion dated August 1, 2013 (Docket No. 275)

    d.   **_In re Citigroup Inc. Bond Litigation_**. (U.S. District Court, Southern District of New York, Case No. 08-Civ. 9522)

      (1)   Final Opinion and Order dated August 20, 2013 (Docket No. 180)

    e.   **_Maine State Retirement System, et al. v. Countrywide Financial Corporation._** (U.S. District Court, Central District of California, Case No. 10-cv-00302); **_David H. Luther, et al. v. Countrywide Financial Corporation._** (U.S. District Court, Central District of California, Case No. 12-cv-05125); **_Western Conference of Teamsters Pension Trust Fund, et al. v. Countrywide Financial_**

2

*Corporation, et al.* (U.S. District Court, Central District of California, Case No. 12-cv-05122)

   (1)    Order Granting Preliminary Approval to Settlement and Directing Dissemination of Notice to the Class

   (2)    Notice of Pendency and Proposed Settlement of Class Actions, Fairness Hearing and Motion for an Award of Attorneys' Fees and Litigation Expenses

f.    ***George Pappas, et al. and Countrywide Financial Corp., et al. v. The Bank of America 401(k) Plan for Legacy Companies as a Successor to the Countrywide Financial Corporation 401(k) Savings and Investment Plan.*** (United States Court of Appeals for the Ninth Circuit, Case No. 11-55570)

   (1)    Mandate dated June 20, 2013 (Docket No. 1104)

g.    ***Countrywide Financial Corporation Securities Litigation*** (U.S. District Court, Central District of California, Western Division Lead, Case No. CV 07-05295)

   (1)    Notice of Pendency and Proposed Settlement of Class Action and Fairness Hearing

h.    ***In re Washington Mutual Mortgage Backed Securities Litigation***. (U.S. District Court, Western District of Washington, Case No. 09-cv-00037)

i.    ***In re Washington Mutual, Inc. Securities Litigation***. (US District Court for the Western District of Washington at Seattle, Case No. 2:08-md-1919 MJP, Lead Case No. C08-387-MJP)

   (1)    Stipulation and Agreement of Settlement with Individual Officer and Director Defendants and with Washington Mutual, Inc. (Exhibit 1 to Docket No. 308)

   (2)    Stipulation and Agreement of Settlement with the Underwriter Defendants (Exhibit 2 to Docket No. 308)

   (3)    Stipulation and Agreement of Settlement with Defendant Deloitte & Touche LLP (Exhibit 3 to Docket No. 308)

   (4)    [Proposed] Order Preliminarily Approving Proposed Settlements and Providing for Notice (Exhibit 3 to Docket No. 308)

j.    ***United States of America, et al. v. Bank of America Corp., et al.*** (United States District Court for the District of Columbia, Case No. 12-0361)

   (1)    Consent Judgment

3

(2)     Earmark and Indemnification Agreement

k.   ***Ally Financial Inc., Residential Capital, LLC and GMAC Mortgage LLC***
(United States of America before the Board of Governors of the Federal Reserve
System, Washington, D.C., Docket No. 12-006 CMP-HC & 12-006 CMP DEO)

(1)     Order of Assessment of a Civil Money Penalty Issued Upon Consent
Pursuant to the Federal Deposit Insurance Act, as Amended

(2)     January 30, 2012 letter re: Terms of Support Relating to Possible
DOJ/State Attorneys' General Settlement

l.   ***Ally Financial Bank Inc., Ally Bank, Residential Capital, LLC and GMAC
Mortgage, LLC*** (United States of America before the Board of Governors of the
Federal Reserve System, Washington, D.C. and Federal Deposit Insurance
Corporation, Washington, D.C., Docket No. 11-020-B-HC and 11-020-B-DEO)

(1)     Consent Order

4

# EXHIBIT 2

Page 1

1

2      UNITED STATES BANKRUPTCY DISTRICT COURT

       FOR THE SOUTHERN DISTRICT OF NEW YORK

3

       -------------------------------------------

4

       In Re:

5

       RESIDENTIAL CAPITAL, LLC, et al.,

6

                         Debtors,

7      -------------------------------------------

8      (Caption Continued on following page.)

9

10

11

12            VIDEOTAPED DEPOSITION OF

13               RAYMOND T. LYONS

14          MONDAY, NOVEMBER 11, 2013

15               10:00 a.m.

16

17

18

19

20

21

22

23      REPORTED BY:

24   ADRIENNE MIGNANO, RPR

25   JOB NUMBER:  67903

```
 1
 2      ------------------------------------------
 3      RESIDENTIAL CAPTIAL, LLC, et al.,
 4                          Plaintiffs,
 5
                            Chapter
 6                          Case No. 12-12020(MG)
                            Jointly Administered
 7                  vs.
 8      UMB BANK, N.A., as successor indenture
        trustee under that certain indenture, dated
 9      as of June 6, 2008; and WELLS FARGO BANK,
        N.A., third priority collateral agent under
10      that certain Amended and Restated Third
        Priority Pledge and Security Agreement and
11      Irrevocable Proxy, dated as of December 30,
        2009,
12                          Defendants.
13                          Adversary Proceeding
                            No. 13-01343(MG)
14      ------------------------------------------
15      OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
        on behalf of the estates of the Debtors,
16
                            Plaintiff,
17
                    vs.
18
        UMB BANK, N.A., as successor indenture
19      trustee under that certain indenture, dated
        as of June 6, 2008; and WELLS FARGO BANK,
20      N.A., third priority collateral agent and
        collateral control agent under that certain
21      Amended and Restated Third Priority Pledge
        and Security Agreeemeent and Irrevocable
22      Proxy, dated as of December 30, 2009,
23                          Defendants.
24                          Adversary Proceeding
                            No. 13-01277(MG)
25      ------------------------------------------
```

Page 3

1

2

3                          November 11, 2013

4                          10:00 a.m.

5

6              Videotaped deposition of RAYMOND

7      T. LYONS, held at the offices of MILBANK

8      TWEED HADLEY & McCLOY, One Chase Manhattan

9      Plaza, New York, New York pursuant to

10     Notice, before Adrienne M. Mignano, a Notary

11     Public of the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1

2      A P P E A R A N C E S:

3

4      KRAMER LEVIN NAFTALIS & FRANKEL

5      Attorneys for Plaintiff

6              1177 Avenue of the Americas

7              New York, New York 10036

8      BY:     NORMAN SIMON, ESQ.

9              KURT DENK, ESQ.

10             SAM KOCH, ESQ.

11             NATHAN HAMERMAN, ESQ.
               (Telephonically)

12

13     KIRKLAND & ELLIS

14     Attorneys for Ally Financial

15             655 Fifteenth Street N.W.

16             Washington, D.C.  20005

17     BY:     JUDSON BROWN, ESQ.

18

19     MILBANK TWEED HADLEY & McCLOY

20     Attorneys for Ad Hoc Committee JSN
       Noteholder Notes Trustee

21
               1850 K Street  NW

22
               Washington, D.C.  20006

23

24     BY:     DAVID COHEN, ESQ.

25             MATTHEW MADDOX, ESQ.

Page 5

1

2      A P P E A R A N C E S (Cont'd)

3

4      MORRISON FOERSTER

5      Attorneys for Debtors

6              1290 Avenue of the Americas

7              New York, New York  10104

8      BY:      JAMES BEHA II, ESQ.

9

10     JONES DAY

11     Attorneys for FGIC

12              222 East 41st Street

13              New York, New York  10017

14     BY:      RICHARD WYNNE, ESQ.

               (Telephonically)

15

16

       CLEARY GOTTLIEB STEEN & HAMILTON

17

       Attorneys for Wilmington Trust, NA as

18     Indentured Trustee

19              One Liberty Plaza

20              New York, New York  10005

21     BY:      JEREMY OPOLSKY, ESQ.

               (Telephonically)

22

23

24

25

Page 6

1

2      A P P E A R A N C E S (Cont'd)

3

4      ALSTON & BIRD

5      Attorneys for Wells Fargo Bank as Trustee

6              90 Park Avenue

7              New York, New York  10016

8      BY:     WILLIAM HAO, ESQ.
               (Telephonically)

9

10

       LEWIS KRUGER, ESQ.

11

       Chief Restructuring Officer of Debtors

12

               1290 Avenue of the Americas

13

               New York, New York  10104

14

               (Telephonically)

15

16

       CADWALADER WICKERSHAM & TAFT

17

       Attorneys for MBIA

18

               One World Financial Center

19

               New York, New York  10281

20

       BY:     CASEY SERVAIS, ESQ.

21             (Telephonically)

22

23

24

25

1

2

3         IT IS HEREBY STIPULATED AND AGREED, by

4    and between the attorneys for the respective

5    parties herein, that filing and sealing of

6    the transcript be waived, and the same are

7    hereby waived.

8         IT IS FURTHER STIPULATED AND AGREED

9    that all objections, except as to the form

10   of the question, shall be reserved to the

11   time of the trial.

12        IT IS FURTHER STIPULATED AND AGREED

13   that the within deposition may be sworn to

14   and signed before any officer authorized to

15   administer an oath, with the same force and

16   effect as if signed and sworn to before the

17   Court.

18

19

20

21

22

23

24

25

Page 8

1

2          THE VIDEOGRAPHER:  Good morning.

3    This marks the start of tape labeled

4    number one of the videotaped

5    deposition of Raymond T. Lyons in the

6    matter of In Re:  Residential Capital

7    LLC, et al., in the United States

8    Bankruptcy Court, Southern District of

9    New York.

10         The deposition today is being

11   held in the offices of Milbank Tweed,

12   at one Chase Manhattan Plaza in New

13   York, New York, on November 11, 2013,

14   at approximately 10:16 a.m.

15         My name is Kevin Marth.  I'm the

16   legal videographer today representing

17   TSG Reporting.  Our court reporter

18   today is Ms. Adrienne Mignano also

19   representing TSG.

20         Counsel's appearances will be

21   noted on the stenographic record.

22   Shall we get the attorneys on the

23   phone.

24         MR. COHEN:  Will counsel on the

25   phone please identify themselves for

Page 9

1

2        the record.

3                MR. WYNNE:  Richard Wynne of

4        Jones Day, for FGIC.

5                MR. HAO:  William Hao, Alston &

6        Byrd for Wells Fargo Bank, as Trustee.

7                MR. KRUGER:  Lewis Kruger, Chief

8        Restructuring Officer of the Debtors.

9                MR. ADAMS:  Good morning.  Jason

10       Adams, Kelly Drye, on behalf of UNB.

11               MR. OPOLSKY:  Jeremy Opolsky,

12       Cleary Gottlieb, on behalf of

13       Wilmington Trust.

14               MR. SERVAIS:  This is Casey

15       Servais of Cadwalader, representing

16       MBIA.

17               MR. COHEN:  Anyone else?

18               (No verbal response)

19               THE VIDEOGRAPHER:  Will the

20       court reporter please swear in the

21       witness and you may proceed.

22   R-A-Y-M-O-N-D   T.   L-Y-O-N-S, called as

23           a witness, having been duly sworn

24           by a Notary Public, was examined and

25           testified as follows:

Page 10

1                        Lyons

2      EXAMINATION BY

3      MR. SIMON:

4           Q      Good morning, Judge Lyons.

5           A      Good morning.

6           Q      Have you been deposed before?

7           A      Yes, I have.

8           Q      And I take it --

9           A      Can I ask you to not use the

10     title judge.  I appreciate the respect,

11     but I'm uncomfortable with it in the

12     circumstance.

13          Q      I will be happy to accommodate

14     you.  I think you have earned it, but I'm

15     happy to accommodate you.

16          A      Mr. Lyons is fine in this

17     circumstance.

18          Q      With that then, Mr. Lyons, I

19     take it you're familiar with the rules of

20     a deposition?

21          A      Yes.

22          Q      Can you tell me how you came to

23     be retained as an expert in this matter?

24          A      Yes.  I received a call from

25     Jerry Uzzi of Milbank.

1                          Lyons

2          Q       And when was that?

3          A       September 18, 2013.

4          Q       And what did he -- can you tell

5     me what you recall of that phone

6     conversation?

7          A       What I recall of it, yes.

8                  Mr. Uzzi asked me if I would be

9     available to serve as an expert witness in

10    a matter.  Told me there was a very tight

11    deadline that had to be met, because --

12    and the expert report was due to be

13    exchanged on October 18, 2013; and

14    generally described the nature of the

15    assignment.  And the assignment was

16    described as coming up with a -- opining

17    as to the reasonable settlement value of

18    the causes of action that were identified

19    in the examiner report of Arthur Gonzales,

20    and then allocating the 2.1 billion dollar

21    settlement fund that AFI proposed to

22    contribute among the claims.

23         Q       Was there anything else that you

24    recall being asked to opine on in that

25    first conversation?

Page 12

Lyons

1
2      A      Not that I recall.

3      Q      Okay.

4             And when you were asked to give

5      an opinion about the examiner's report,

6      were you familiar with the fact that Judge

7      Gonzales had issued an examiner's report

8      in the bankruptcy case?

9      A      Yes, I was aware with that.

10     Q      And you're familiar with the

11     ResCap bankruptcy?

12     A      Generally yes, I knew it was an

13     ongoing bankruptcy case.

14     Q      Okay.

15            And how did you become familiar

16     with the bankruptcy and the fact that

17     Judge Gonzales had issued a report?

18     A      Just through general press, Wall

19     Street Journal, New York Times, and also

20     Law360.

21     Q      And had you read the examiner's

22     report either in whole or in part prior to

23     that conversation?

24     A      Yes.

25     Q      Tell me what you recall.  Did

Page 13

1                          Lyons

2      you read all of it prior to the

3      conversation?

4          A      No.

5          Q      What parts do you recall reading

6      prior to that call?

7          A      I recall reading, not reading

8      thoroughly, but skimming part one, the

9      summary.

10         Q      Anything else?

11         A      That's all.

12         Q      Do you recall whether you formed

13     any impressions after reading Part 1, the

14     summary, prior to that call?

15         A      Yes.

16         Q      Can you tell me what they were?

17         A      Sure.

18         MR. COHEN:   Let's get whoever

19         joined identify themselves for the

20         record.

21         MR. HAMERMAN:   Natan Hamerman

22         from Kraemer Levin.

23         A      My impression was that this was

24     a mammoth undertaking that Arthur Gonzales

25     had undertaken, and that the report that

1                          Lyons

2      he delivered seemed to be comprehensive,

3      at least the summary that I read, prior to

4      September 18th.

5          Q     Do you recall reading in Part I

6      prior to your retention in this matter a

7      summary of certain of the estate claims

8      that the examiner evaluated?

9          A     I can't say that I recall that

10     right now, but I'm sure I did.

11         Q     And with respect to third-party

12     claims, do you generally recall that there

13     was an evaluation being conducted of

14     third-party claims?

15         A     Yes.

16         Q     Okay.

17               As you sit here today, do you

18     have any recollection of any impressions

19     that you formed with respect to any of the

20     particular claims that were set forth in

21     the summary in Part 1?

22         A     No, I don't think so.

23         Q     Following that call, did you

24     agree to serve as an expert in this case?

25         A     Yes, I did.

1                           Lyons

2        Q      And did you prepare a report in

3    connection with your services as an

4    expert?

5        A      Yes.

6        Q      Did you write the report

7    yourself?

8        A      I wrote a good deal of it, but I

9    did not do it alone.

10            MR. SIMON:  I'm going to ask the

11        court reporter to mark as Lyons'

12        Exhibit 1 a document entitled Expert

13        Report of Raymond T. Lyons, Esquire.

14            (Expert Report of Raymond T.

15        Lyons, Esquire, was marked as Lyons

16        Exhibit 1 for identification, as of

17        this date.)

18    BY MR. SIMON:

19        Q      Mr. Lyons, is this the report

20    that you prepared in connection with your

21    retention as an expert in this matter?

22        A      It appears to be, yes.

23        Q      You said you did not write all

24    of it yourself.  Can you tell me what

25    percentage of the report you personally

Page 16

1                    Lyons

2    authored?

3       A    No, I would just be guessing if

4    I did that.

5       Q    Can you generally tell me is it

6    greater than 50 percent, less than 50

7    percent?

8       A    I really can't tell you.  I

9    can't estimate whether it is more or less

10   than 50 percent.  I would say, if I had to

11   guess, probably less than 50 percent of

12   the words that are in this were originally

13   put in my me.

14      Q    So to the extent that the words

15   were not put in by you, who would have

16   prepared the remainder of the report that

17   was not personally prepared by you?

18      A    There was a team of my

19   colleagues that worked with me to prepare

20   the report.

21      Q    How much time would you estimate

22   that you spent in preparation of the

23   report?

24      A    I think I actually looked at the

25   billing records, and I think I put in

                              Lyons

1

2    about 200 hours through September and

3    October.

4         Q    Well, I'll represent it was 206

5    on your time sheet.

6              My question is with respect to

7    the preparation of the report versus other

8    work you may have done in connection with

9    your retention as an expert, the actual

10   drafting of the report, can you tell me

11   what portion of time, how many hours

12   roughly of the 206 you think were

13   allocated to preparing your report?

14             MR. COHEN:  Object to the form.

15             Give me a minute before you

16        answer so I'll have an opportunity to

17        object.

18             THE WITNESS:  Certainly.

19             MR. SIMON:  So let me rephrase.

20        Q    Of the 206 hours, do you have a

21   sense or an estimate of how many were

22   accounted to drafting the report,

23   personally drafting?

24             MR. COHEN:  Object to the form.

25        A    I can only give you my sense.  I

Page 18

Lyons

1
2   spent a lot of time reading, reading the
3   expert's report and so that took a lot of
4   time.  I did spend a lot of time myself in
5   writing and editing.  So between the two,
6   I would say reading probably took up the
7   bulk of the time, more than 50 percent,
8   writing slightly less than 50 percent.
9   And, of course, discussing with my
10  colleagues.
11       Q    Okay.
12            Are you aware of any errors in
13  the report as you sit here today?
14       A    I am not aware of any, but I
15  wouldn't doubt that there are.  It is a
16  human endeavor.
17       Q    When you say you "wouldn't doubt
18  that they are", apart from the fact that
19  it is a human endeavor, are there any
20  other reasons why you wouldn't doubt that
21  there are errors in the report?
22       A    No.
23       Q    Can you turn to Section A1 of
24  the report, which begins on page 1.
25       A    Yes.

Page 19

Lyons

1

2      Q      And that section is titled

3      "Retention".

4      A      Yes.

5      Q      And you state there that you

6      prepared the report with the assistance of

7      Fox Rothchild, and you said it was

8      prepared at the request of a number of

9      entities, and the first is White & Case?

10      A      Yes.

11      Q      Have you met representatives of

12      White & Case, met with them in connection

13      with preparing your report?

14      A      No.

15      Q      Did you have any previous

16      association with the White & Case firm?

17      A      Yes.

18      Q      And what was that?

19      A      White & Case was involved in a

20      case that I mediated in the District of

21      Delaware, and they were also involved as

22      counsel for petitioning creditors in the

23      case where I was the presiding judge in

24      the District Court of New Jersey.

25      Q      Let's start with the case that

Page 20

1                         Lyons

2     you mediated.

3              Do you recall which counsel were

4     involved from White & Case in that matter?

5         A     Yes.  Jerry Uzzi was involved in

6     that matter.  He is the only one that I

7     can remember from White & Case in that

8     matter.

9         Q     And the case where you were

10    presiding judge in the District of New

11    Jersey, do you recall any of the White &

12    Case lawyers involved in that matter?

13        A     There were several.  Besides

14    Mr. Uzzi, as well I remember Chris

15    Shore -- and I'm sorry I can't remember,

16    there were several other attorneys at

17    White & Case that made appearances in

18    Court.

19        Q     Do you have a social

20    relationship with Mr. Uzzi?

21        A     No.

22        Q     So you know him strictly in a

23    professional capacity?

24        A     Correct.

25        Q     Did you have any conversations

Page 21

Lyons

1    with Mr. Uzzi about this case prior to the

2    phone call where he called you to serve as

3    an expert?

4       A    No.

5       Q    And Mr. Shore you mentioned.

6       A    Yes.

7       Q    Do you know Mr. Shore apart from

8    his appearance before you in the District

9    of New Jersey?

10       A    No.

11       Q    Did you have any conversations

12    with him in connection with your retention

13    in this matter or the work that you did?

14       A    I don't think I spoke to Chris

15    Shore directly in connection with the

16    ResCap case.

17       Q    Do you recall corresponding with

18    Mr. Shore at any point?

19       A    Yes.

20       Q    And what subject matter did you

21    correspond about?

22       A    The engagement letter.

23       Q    And anything in particular that

24    you recall about that correspondence?


Page 22

Lyons

1
2     A     Nothing other than trying to
3     finalize the terms of the engagement
4     letter.
5     Q     And were there any issues in
6     particular that you recall that needed to
7     be finalized in terms of the engagement
8     letter?
9     A     Well, the mechanics of payment.
10    We would -- it ended up the mechanics
11    would be that Fox Rothchild would submit a
12    bill to White & Case, who would include
13    our fees as a disbursement when they
14    billed the bank as trustee.  The bank as
15    trustee has the funds to pay the expenses
16    of this litigation.
17    Q     And why, if you know, was it
18    structured in that way?
19    A     I don't know for sure.  One of
20    the things that was told to me was that
21    the bank as trustee had a significant
22    procedural hurdle to go through to retain
23    counsel, that would take time, and it
24    would be more expeditious for White & Case
25    to retain us or engage us, and then they

Page 23

1                              Lyons

2      had already been retained and had the

3      payment arrangement with the bank in

4      place.  So that would facilitate what I

5      hope will be prompt payment.

6           Q      And did any of the lawyers at

7      White & Case have a role in drafting your

8      report?

9           A      My report, no, not that I'm

10     aware of.

11          Q      And did they have -- did you

12     consult with them at all in formulating

13     your opinions in this case?

14          A      No.

15          Q      Okay.  Let me ask the same

16     question about Milbank.

17                 Have you met with

18     representatives of Milbank in connection

19     with preparing your report?

20          A      In connection with preparing the

21     report, I did not meet in person with

22     anyone from Milbank.

23          Q      Did you have any phone

24     conversations with folks from Milbank?

25          A      At the beginning of the

Page 24

Lyons

1

2  engagement, I had the one telephone call I

3  mentioned to you, and one or two follow-up

4  calls before we actually got the

5  engagement letter signed.

6      Q    Do you recall with whom those

7  follow-up calls were with?

8      A    I believe I spoke to Mr. Uzzi

9  once again.  I believe I spoke to

10 Mr. Cohen.  I remember the name Dan Perry.

11 And at one point, I spoke to a woman,

12 Rachel Fissel, F-I-S-S-E-L.

13     Q    Okay.

14         Did you have any previous --

15 putting aside Mr. Uzzi, before he was at

16 Milbank, did you have any association with

17 any Milbank lawyers prior to your

18 engagement in this matter?

19     A    Not that I can recall.

20     Q    And was anyone at Milbank

21 involved in the drafting of your report?

22     A    Not in the drafting, but we

23 did -- my colleagues got comments from

24 some of the attorneys at Milbank on the

25 draft report.

Page 25

Lyons

1

2    Q    Do you recall which attorneys --

3    A    Which attorneys at Milbank?

4    Q    -- provided comments on your

5    report?

6    A    I believe that much of the

7    communication was done by Ms. Fissel, and

8    Mr. Maddox may have been involved in

9    providing some of the background

10   documents, such as contracts or

11   certifications, court pleadings, et

12   cetera, that we looked at, orders, but I

13   think mostly the communications came

14   through Ms. Fissel.

15   Q    And to your knowledge, was any

16   portion of your report drafted by anyone

17   at Milbank?

18   A    There was no original drafting

19   done by anyone at Milbank that I'm aware

20   of.  There were some written comments that

21   were provided.

22   Q    And do you know if those were

23   incorporated as you sit here today?

24   A    Some of them were; some of them

25   were not.

Lyons

1

2     Q     Okay.  Let me ask you the same

3     question with regard to Akin Gump, the

4     same series of questions.

5              Had you met with any

6     representatives --

7              MR. SIMON:  Withdrawn.

8     Q     Have you met with any Akin Gump

9     lawyers in connection with preparing your

10    report?

11    A     No.

12    Q     Did you have any previous

13    association with the Akin Gump firm prior

14    to being retained in this matter?

15             MR. COHEN:  Objection to the

16        form.

17    A     Akin Gump I believe was also

18    involved in the matter that I mediated for

19    the judge in the District of Delaware.

20    I'm trying to recall whether Akin, whether

21    anyone from Akin Gump has ever appeared in

22    the matter in New Jersey where I was a

23    judge.  I can't recall offhand.

24             And I also sat in the District

25    of Delaware as a visiting judge, and it is

                          Lyons

1        quite likely that Akin Gump was involved

2        in some of those cases, but I don't recall

3        specifically.

4            Q     Are there any Akin Gump lawyers

5        with whom you had a previous association

6        that was involved in the ResCap case to

7        your knowledge?

8            A     No.

9            Q     And did Akin Gump have any

10       involvement in the drafting of your

11       report?

12           A     No.

13           Q     Or commenting on your report?

14           A     No, not that I'm aware of.

15           Q     Okay.

16               In your retention section, you

17       note that White & Case and Milbank Tweed

18       are co-counsel to the ad hoc group of

19       junior secured noteholders?

20           A     Yes.

21           Q     Did you meet with any -- I'm

22       going to refer to them as the JSNs.

23           A     Yes.

24           Q     Did you meet with any

Page 28

1                          Lyons

2      representatives of the JSNs in connection

3      with your work in that matter?

4          A      Did not meet with any

5      representative of the JSNs, no.

6          Q      Did you receive any comments on

7      your report from any -- putting aside

8      lawyers -- any of the JSNs?

9          A      I did not receive any direct

10     comments from anyone who is not a lawyer

11     representing the JSNs.

12         Q      Do you know whether any of your

13     colleagues who assisted you in the

14     preparation of the report received

15     comments from any of the JSNs?

16         A      I believe that there were

17     comments from the JSNs, but I don't

18     believe they came directly to any of my

19     colleagues.  I think they all came through

20     attorneys at Milbank.  Again, primarily it

21     was Ms. Fissel who was communicating with

22     my colleagues.

23         Q      As you sit here today, do you

24     recall any of the specific comments that

25     were provided by the JSNs?

Page 29

Lyons

1

2      A      I remember that somebody at the

3   client picked up a math error that I made,

4   which is embarrassing since I was a math

5   major in college.  But arithmetic was

6   never my strong suit.

7      Q      Do you recall the nature -- I'm

8   sorry.  Go ahead.

9      A      It was not a transposition, but

10  putting numbers in the wrong column.

11     Q      Do you recall which claim that

12  mathematical error occurred with respect

13  to?

14     A      No.  I think it was in the

15  charts.  It was like the first two or

16  three claims that I had, as I said, put

17  the wrong number in the wrong column.

18     Q      And that was corrected by the

19  time you submitted your report?

20     A      Yes.

21     Q      Let me ask you the same question

22  about UMB Bank, which is also referenced

23  in the first paragraph of your report.

24     A      Yes.

25     Q      Did you meet with

Lyons

1

2    representatives from UMB Bank in

3    connection with preparing your report?

4        A     No.

5        Q     And the same question with

6    respect to the drafting of your report.

7                Was anyone from UMB Bank

8    involved in either preparing or commenting

9    on your report to your knowledge?

10       A     No, not the report.

11       Q     I wanted to ask you one more

12   question about Mr. Uzzi.

13       A     Yes.

14       Q     Did you have any conversations

15   with Mr. Uzzi about your impressions of

16   the examiner's report?

17       A     I don't recall any.

18       Q     Did you have any conversations

19   with him about anything else in connection

20   with what you were asked to do in this

21   case?

22       A     Well, Mr. Uzzi did explain to me

23   who his client was and what his client's

24   position was as a junior secured creditor.

25       Q     And what did he tell you in that

Page 31

Lyons

1   regard?

2   A       He told me that he represented a

3   client that was -- or a group of clients

4   that held a junior secured position, and

5   that there was an issue as to whether

6   there was sufficient collateral to cover

7   not only the principal but interest and

8   fees in connection with the client's

9   position.

10  Q       Did you have any discussions

11  with Mr. Uzzi about any liens that the JSN

12  might have to any particular claims at

13  issue in this matter?

14  A       He described to me that his

15  client's position was that they had liens

16  on certain claims, intercompany claims

17  between the debtors and non-debtor related

18  entities, and that that claim was

19  disputed.

20  Q       Did he mention anything else in

21  terms of what liens his client might hold?

22  A       No, I don't think so.  As I

23  recall, I don't think there was any

24  concern that the collateral exceeded --

Lyons

2     the value of collateral exceeded the

3     principal claims.  I think there was an

4     issue between his client and other people

5     in the case as to whether there was

6     sufficient value in collateral to cover

7     the interest, and that his client was

8     arguing that its lien extended to

9     intercompany claims.

10         Q     Did he also tell you his client

11    was taking the position the lien extended

12    to either the entirety or a portion of the

13    global settlement in this case?

14         A     No.

15         Q     Did you have an understanding at

16    some point that JSNs were taking that

17    position?

18         A     That's not my understanding, no.

19         Q     Okay.

20               Do you recall anything else

21    about your conversations with Mr. Uzzi?

22         A     No.  On that last point, I think

23    he told me that there were also

24    third-party claims against AFI, and, as I

25    said I was vaguely familiar with that from

Lyons

1
2    having perused the examiner's report, and

3    that there were avoidance actions that

4    were reported on by Arthur Gonzales, and

5    that his client was not asserting liens

6    upon avoidance actions.

7        Q      Did he tell you whether his

8    client was asserting liens with respect to

9    any of the other claims that were set

10   forth in the examiner's report?

11       A      That's the extent of what I

12   recall hearing from Mr. Uzzi.

13       Q      All right.

14              Let me direct your attention to

15   the last portion of the paragraph on

16   retention.

17       A      Yes.

18       Q      And you set forth there what you

19   were asked to provide an opinion on in

20   this case?

21       A      Yes.

22       Q      And you state that you were

23   asked to provide an opinion as to the

24   reasonable settlement value of each of the

25   claims identified in the examiner's

1                          Lyons

2     report, and also asked to give an opinion

3     as to the reasonable allocation of the 2.1

4     billion dollar settlement fund provided by

5     AFI among the various settled claims.

6          A     Yes.

7          Q     Does that accurately set forth

8     the opinions that you were asked to and

9     are offering in this case?

10         A     Yes.

11         Q     Are there any other opinions

12    that you are offering in this matter?

13         A     No.

14         Q     Are you opining that the

15    examiner's factual or legal analyses as

16    reflected in his report are correct?

17         A     I'm assuming that they are

18    correct.

19               Well, I'm sorry, the factual --

20    let me break that down because you had two

21    parts to that.

22         Q     Let me ask it in two parts then.

23         A     Sure.

24         Q     Are you offering an opinion that

25    the examiner's factual conclusions are

1                    Lyons

2     correct?

3          A     No.  I accepted the factual

4     conclusions, because after having read

5     portions of the report, it was clear to me

6     that this was a comprehensive, thorough

7     investigation that was done by Arthur

8     Gonzales, and that I knew it took him a

9     long time to do that, and it didn't seem

10    to be either useful or economic to attempt

11    to redo what Arthur Gonzales had done in

12    terms of factual investigation.

13         Q     And so you assumed -- you

14    assumed that all of his facts were correct

15    for purposes of formulating your opinions

16    in this case?

17         A     That's correct.

18         Q     Now let me ask you with respect

19    to the examiner's legal conclusions.

20         A     Yes.

21         Q     Did you --

22               MR. SIMON:  Withdrawn.

23         Q     Are you offering an opinion that

24    the examiner's legal conclusions as

25    reflected in the report are correct?

Page 36

Lyons

1

2      A      Well, I reviewed each of the

3  legal conclusions that Mr. Gonzales made,

4  and except where noted, agreed with his

5  legal conclusions.  So I didn't accept

6  them as I did with the facts.

7      Q      So with respect to those, and

8  just to clarify, Mr. Lyons, with respect

9  to each of those legal conclusions, you

10  did in fact at least agree in part with

11  all of the legal conclusions that the

12  examiner set forth in his report?

13      A      Yes.

14          MR. COHEN:  Object to the form.

15  You have to give me a minute.

16          THE WITNESS:  Sure.  I'm sorry.

17      Q      And that was a yes?

18      A      Yes.  As I said, I think in the

19  report I've identified my -- I've tried to

20  itemize the legal conclusions that I

21  gleaned from reading the examiner's

22  report, and then stated whether I agreed

23  or not.  I think in almost every instance

24  I agreed either totally or with minor

25  quibbles, I would say.

1                           Lyons

2        Q     And actually to be clear, in

3    every instance, you agreed or agreed with

4    minor quibbles, correct?

5        A     Correct.

6              MR. COHEN:  Object to the form.

7        Q     And now you can answer.  I think

8    you did, correct?

9        A     Let me repeat my answer.  Yes, I

10   believe that's correct.

11       Q     And so with respect to what you

12   characterize as the quibbles that you

13   offered, that was additional legal opinion

14   that you were offering?

15       A     Well, not offering a legal

16   opinion.  Those are matters that I took

17   into consideration in attempting to arrive

18   at a reasonable settlement value.  And the

19   merits of the claim is one of the factors,

20   an important factor, in coming up with a

21   reasonable settlement value.

22       Q     But I'm speaking specifically to

23   the legal analysis, the additional

24   commentary on legal analysis that you

25   included in your report.

Page 38

1                         Lyons

2        A     Yes.

3        Q     How would you characterize that

4    if not an opinion?

5        A     I would just characterize it as

6    making an assessment of the likely merits

7    of the claim.

8        Q     Based on the law?

9        A     Yes, based on the law.

10        Q     So applying the facts as you

11    assumed them to the law?

12        A     I would say it the other way

13    probably.

14        Q     Let me clarify that question.

15        A     Yes.

16        Q     Applying the facts as you

17    assumed them to the law as you interpreted

18    it.

19              Is that a fair statement?

20              MR. COHEN:   Object to the form.

21        A     I would say it the other way

22    around.  Applying the law as I interpreted

23    it to the facts that were stated by Judge

24    Gonzales, which I assumed are correct.

25        Q     What's the difference between

Page 39

Lyons

1

2    your formulation and my formulation?

3         A     You said applying the facts to

4    the law.  I said applying the law to the

5    facts.

6         Q     Apart from the actual black and

7    white difference, what is the import of

8    the difference, if any?

9         A     I'm not sure that there is.

10        Q     You mentioned before the call

11   you were familiar with -- the first call

12   that you received in this matter, you were

13   familiar with the ResCap proceeding?

14        A     Yes.

15        Q     What was your understanding of

16   the nature of the ResCap bankruptcy

17   action?

18        A     I knew it was a subsidiary of

19   what I knew as GMAC, which I guess is now

20   known as Ally Financial.  I knew that

21   historically GMAC had been identified as

22   an auto finance company, but obviously it

23   was much more than that.  You know, it

24   grew out of General Motors, as we know,

25   and that the problems in the mortgage

Page 40

Lyons

1    business were something that Ally

2

3    Financial wanted to put behind it.

4         Q      How did you know that?

5         A      Just from reading the press.

6         Q      Did you read any decisions that

7    were rendered by the court in the ResCap

8    matter prior to your retention in this

9    matter?

10        A      I don't recall doing that, no.

11        Q      Did you read any after your

12   retention?

13        A      Yes.

14        Q      Which ones do you recall

15   reading?

16        A      I believe I read the decision

17   approving the -- I think it is called the

18   plan support agreement; I believe I read

19   the decision regarding the settlement with

20   FGIC; and at this point, that's all I can

21   recall.

22        Q      You know that Judge Glenn is the

23   judge assigned to this case?

24        A      Yes, I do.

25        Q      Do you know Judge Glenn

Page 41

1                         Lyons

2     personally?

3          A     I've met Judge Glenn, yes.

4          Q     Tell me the occasion or

5     occasions on which you met him.

6          A     They were all on professional

7     occasions.  They would primarily be at --

8     the Federal Judicial Center holds an

9     annual workshop for bankruptcy judges, and

10    most of the bankruptcy judges in the

11    country attend.  Many years there are two,

12    and they kind of split the judges.  Some

13    years there is only one workshop and

14    mostly judges attend.  So I met Judge

15    Glenn in connection with those.

16              And I think I met him -- I don't

17    recall seeing him at any American

18    Bankruptcy Institute events, but I

19    wouldn't doubt it.  And also in the City

20    of New York, organizations such as the New

21    York Institute of Credit, or I think

22    that's probably -- New York Institute of

23    Credit, maybe the Turner Management

24    Association, there may be events where he

25    and I attended and we've, you know,

Page 42

1                        Lyons

2     exchanged greetings.

3          Q     And do you have a view of Judge

4     Glenn, his reputation as a judge?

5                MR. COHEN:  Object to the form.

6                MR. SIMON:  Withdrawn.

7          Q     Do you have a personal view of

8     Judge Glenn's ability as a judge?

9          A     Just from meeting him in these

10    professional occasions, I don't believe

11    I've ever observed him acting in his role

12    as a judge.  But, you know, he seemed to

13    be highly intelligent, an affable

14    professional, and my impression is that he

15    is a very fine and respected judge.

16         Q     And is there any specialized

17    knowledge that you believe that you bring

18    to this case that will assist Judge Glenn

19    as the trier of facts that he doesn't

20    already possess?

21         A     Well, I think that I have

22    probably had more experience as a mediator

23    than most bankruptcy judges.

24         Q     Anything else?

25         A     I don't know what Judge Glenn's

Page 43

Lyons

1    experience is in particular types of

2    matters, other than general bankruptcy

3    cases and Chapter 11 in particular.  But I

4    did have the opportunity to mediate a

5    claim that was brought by investors in

6    mortgage-backed securities.

7    Q     And when was that?

8    A     That was in about 2012.

9    Q     And what was that matter?

10   A     The Washington Mutual parent

11   company Chapter 11 in Delaware.

12   Q     And in your role as a mediator

13   in -- I'm going to refer to it as WAMU

14   here.

15   A     Sure.

16   Q     In the WAMU matter, did you

17   allocate values between and among claims

18   that were part of that settlement?

19   MR. COHEN:  Objection.

20   To the extent that you are bound

21   by confidentiality in that mediation,

22   I'd like you to be sensitive to those

23   confidentiality restrictions.

24   THE WITNESS:  Sure.

Page 44

Lyons

1

2      A      No, the issues in the -- the

3   matter that I mentioned to you, the

4   mortgage-backed securities, was a claim,

5   it was an objection to a claim, and so

6   there was only one claim involved that did

7   not involve allocating monies.

8            The -- one of the other

9   mediations I was involved with was the

10  plan mediation.  And the result of that is

11  reflected in a public document, which is

12  the Plan and Disclosure Statement.  And

13  one of the issues was how assets that

14  were -- that belonged to the debtor would

15  be distributed in the waterfall of claims

16  against Washington Mutual, and there were

17  numerous classes of claims.

18            So it is not the same type of

19  analysis that was -- that I had to

20  undertake in the ResCap matter, but to the

21  extent that funds had to flow down to

22  different classes of creditors, I would

23  say that issue was involved in the WAMU

24  case.

25      Q      And thinking back at all of the

Lyons

1

2      mediation experience that you've had, is

3      there any matter in which you were

4      involved that involved the same type of

5      analysis that you had to undertake in the

6      ResCap matter?

7              MR. COHEN:   Object to the form.

8          A     To the extent that there was an

9      analysis of reasonable settlement value of

10     a particular claim, that is a typical

11     activity that I undertook in connection

12     with every matter that I have mediated.

13         Q     But --

14         A     To the extent --

15         Q     I'm sorry, I didn't mean to cut

16     you off.

17         A     The second part of my opinion is

18     to allocate funds among various claims.  I

19     can't think of a particular instance now,

20     but I'm sure that I have been involved in

21     settlement discussions where there was

22     more than one claimant and a fund to be

23     allocated among the claimants.

24         Q     But you can't recall as you sit

25     here today?

Page 46

                              Lyons

1

2       A     I can't recall exactly any

3   particular instance, but I'm sure it has

4   happened.

5       Q     Okay.

6             Do you recall as you sit here

7   today any instance that would have had a

8   dollar value of in excess of two billion

9   dollars that needed to be allocated

10  between and among individual claims?

11      A     Well, the Washington Mutual case

12  had seven billion dollars to be spread

13  among the various classes of creditors.

14      Q     But to be clear, I just want to

15  understand your testimony, you told me

16  that's not the same exercise that you

17  performed here in the WAMU case, right?

18            MR. COHEN:   Objection.

19  Mischaracterized his testimony.

20      A     The exercises were different.

21      Q     So my question is:  With respect

22  to the exercise you performed here, is

23  there any matter that you can recall

24  where --

25            MR. SIMON:  Withdrawn.

Page 47

Lyons

1

2      Q      I think you testified with

3  respect to the exercise that you did here,

4  there might have been an instance where

5  you did that, but you can't recall

6  specifically the name of it; is that

7  right.

8            MR. COHEN:   Objection.   Vague.

9      A      Right.

10     Q      So my question is:   Do you

11  remember the dollar value to the extent

12  there was a matter where you performed the

13  exercise that you did in this case.

14     A      No.

15     Q      And when you're a mediator, I

16  take it that before you form any judgment

17  with respect to the value of a particular

18  claim, you would want to hear from both

19  sides that have a stake in that claim; is

20  that right?

21     A      That's correct.

22     Q      And did do you that here?

23     A      I did not hear from any of the

24  claimants or the defendants.

25     Q      Moving on in Exhibit 1 to the --

Page 48

1                          Lyons

2     well, actually before we do that, sir, you

3     mentioned you had read two decisions of

4     Judge Glenn after your retention.

5               And the first was the plan

6     support agreement decision.

7         A     Yes.

8         Q     Why did you read that?

9         A     I read that because part of

10    Judge Gonzalez's examiner's report opined

11    that it was unlikely that the 750 million

12    dollar contribution by AFI would be

13    approved by a bankruptcy court as an

14    adequate consideration, and I wanted to

15    see what happened, what the outcome was of

16    the new plan support agreement where the

17    amount of contributions greatly increased

18    to 2.1 billion dollars.

19        Q     And what was the outcome?

20        A     It was approved.  It was

21    approved subject to confirmation of the

22    plan.

23        Q     Did you rely on the judge's

24    decision with respect to the plan support

25    agreement in connection with your

Page 49

                           Lyons
1
2    retention to this matter?

3              MR. COHEN:   Object to the form.

4              MR. SIMON:   Withdrawn.

5        Q    Did you rely on Judge Glenn's

6    opinion with respect to the plan support

7    agreement in forming any of your opinions

8    in this matter?

9        A    No, I don't believe so.

10       Q    Did you have a view of whether

11   Judge Glenn was correct in approving the

12   plan in that decision?

13       A    The plan support agreement?

14            As I recall, the decision was

15   very limited, and going from memory, I

16   believe that the Judge Glenn decision --

17   Judge Glenn's decision was that he

18   approved the debtors entering into the

19   plan support agreement, but he preserved

20   for confirmation the issues of whether the

21   contribution was adequate to support the

22   release that was being sought in the

23   proposed plan.

24       Q    Did you have -- as you sit here,

25   do you recall any other reactions you had

Page 50

1                           Lyons

2       after reading the judge's decision in

3       connection with the plan support

4       agreement?

5           A       The other thought that I had was

6       the initial plan support agreement did not

7       have the support of creditors.   It was

8       objected to, and eventually the debtors

9       withdrew from that agreement.

10              Judge Gonzales commented that

11      under the Iridium factors support of the

12      constituencies was an important factor,

13      and I believe in Judge Glenn's opinion, he

14      pointed out that the new plan support

15      agreement did enjoy the support of a

16      number of constituents, although not all.

17          Q       And do you consider that

18      significant?

19              MR. COHEN:   Object to the form.

20          Vague.

21              MR. SIMON:   Withdrawn.

22          Q       Given your experience as a

23      bankruptcy judge, do you consider it

24      significant that a majority of the

25      creditors supported the plan?

Page 51

1                           Lyons

2               MR. COHEN:  Object to the form.

3       Vague.

4       A       Well, that is one of the very

5       important, the Iridium factors, is support

6       of the constituents in the case.

7       Q       Now, you mentioned the Iridium

8       factors in your report, right?

9       A       Yes.

10      Q       And why do you do that?

11      A       Because the Iridium factors

12      relate to whether a court would approve a

13      proposed settlement where there is a cause

14      of action pursued by a fiduciary in a

15      bankruptcy case.  And in arriving at what

16      I believed is reasonable settlement value

17      for each claim, I thought it was important

18      to consider the Iridium factors.

19      Q       And Judge Glenn himself will

20      need to apply those factors in considering

21      whether or not to approve the global

22      settlement, won't he?

23      A       I would -- yes, I would say so.

24      Q       Do you think that Judge Glenn

25      needs help in application of the Iridium

Page 52

Lyons

1  factors in his analysis?

2              MR. COHEN:   Object to the form.

3      A      No, I don't think that Judge

4  Glenn needs help in his application of the

5  Iridium factors to the overall settlement.

6      Q      You also said that you reviewed

7  the FGIC elements decision?

8      A      Yes.

9      Q      Why did you do that?

10      A      I think that was primarily out

11  of curiosity, because I think it came up

12  in a Law360 article, and I just wanted to

13  see what was going on with that.

14      Q      Did you rely on Judge Glenn's

15  FGIC settlement decision in any way in

16  forming your opinions in any way in this

17  case?

18      A      No, I did not.

19      Q      Do you recall having any

20  reaction to the judge's decision after

21  reading it?

22      A      No, I do not.

23      Q      You mentioned earlier that a

24  number of your colleagues at Fox Rothchild

Page 53

1                         Lyons

2      assisted you in your work in this case?

3           A     Yes.

4                 MR. SIMON:   I want to introduce

5           as Exhibit 2, or have the court

6           reporter mark as Exhibit 2, a document

7           that was produced by Milbank which is

8           captioned "In Re:   Residential Capital

9           LLC Billing Summary".

10                (Document titled "In Re:

11          Residential Capital LLC Billing

12          Summary", was marked as Lyons Exhibit

13          2 for identification, as of this

14          date.)

15     BY MR. SIMON:

16          Q     Mr. Lyons, have you seen this

17     document before?

18          A     Yes.

19          Q     And what is it?

20          A     It is a listing of each of the

21     persons at Fox Rothchild who worked with

22     me on the expert opinion; the hours that

23     each person worked from the beginning,

24     which started on September 18th, through

25     the end of October; the hourly rate for

Page 54

Lyons

1
2      each person; and then the extension of the

3      total amount billed for that person.

4           Q      Okay.

5                  There is one individual on this

6      list that has a few more hours than you

7      have incurred on that matter, and that is

8      Martha Chovanes?

9           A      Yes.

10          Q      Who is Ms. Chovanes?

11          A      Martha Chovanes is a counsel at

12     Fox Rothchild.

13          Q      And what was her work on this

14     matter to your knowledge?

15          A      Her work was in coordinating the

16     work of everybody else in this case.  She

17     did some drafting, but not on any

18     particular issue, mostly introductory,

19     conclusory sections she did some drafting

20     on.  She did some editing on probably each

21     of the sections, but she kept track of who

22     was working on each issue, and then as

23     each segment was completed, incorporating

24     that into the final document.

25          Q      Did you consult with Ms.

Page 55

Lyons

1

2    Chovanes in connection with forming any of

3    your opinions in this matter?

4        A     I'm sure I did.

5        Q     Do you recall specifically

6    which?

7        A     No.

8        Q     Who is Hal Baume?

9        A     Hal Baume is a partner in the

10   firm.  His office is in Princeton, where I

11   am, and his specialty is bankruptcy.

12       Q     And what was his role in

13   connection with this matter?

14       A     He worked on a number of the

15   sections that related to bankruptcy type

16   issues.

17       Q     Do you have some examples of

18   which those were?

19       A     Yes.  The government settlement

20   avoidance action.  It was the second

21   avoidance action that occurred right

22   before the filing in May of 2012.

23           And he also worked on debt

24   recharacterization.  He worked on the

25   affiliate pre-petition asset sales.  He

Page 56

Lyons

1
2    worked on the affiliate financing

3    transactions.  Those are the ones that

4    come to mind now for Mr. Baume.

5        Q    When you say he worked on those,

6    what was the nature of his work?

7        A    Reading examiner's report;

8    drafting the section of the opinion that

9    related to those particular issues;

10   discussing them with me; and then

11   finalizing those sections of the report.

12       Q    Did you personally read the

13   sections of the report that correlated to

14   those that Mr. Baume read and analyzed?

15       A    The section of the examiner's

16   report?

17       Q    Those particular sections.

18       A    Of the examiner's report, you're

19   talking about?

20       Q    Yes.

21       A    Yes, I did.

22       Q    And the opinions that were set

23   forth in the sections that Mr. Baume

24   drafted --

25       A    Yes.

Page 57

1                          Lyons

2          Q      -- do those reflect his

3      opinions?

4          A      Those reflect my opinions.

5          Q      As informed by him?

6          A      Exactly.

7          Q      And who is Thomas Cunniff?

8          A      Mr. Cunniff is a partner.  He

9      also is located in the Princeton office

10     and he is a commercial litigator.

11         Q      Does he have any bankruptcy

12     experience to your knowledge?

13         A      To my knowledge, no -- yes, I

14     think he has worked with Mr. Baume on some

15     occasions where Mr. Baume was involved in

16     a bankruptcy matter that was also

17     litigated.

18         Q      But apart from that, you're not

19     aware of any bankruptcy expertise that

20     Mr. Cunniff has?

21         A      No.

22         Q      What was his role in this

23     matter?

24         A      He worked on a number of the

25     non-bankruptcy causes of action, so

Page 58

Lyons

1

2    contract type claims, some fraud claims.

3        Q    Which contract claims do you

4    recall Mr. Cunniff working on?

5        A    He worked on the misallocation

6    of revenue claim, the MSR Swap claim, and

7    the contracts related to the -- that were

8    related to those two, there were others,

9    the Pipeline Swap, brokerage agreement,

10   all of those things that are kind of in

11   Section 1A through, I think, D of my

12   report.

13        He also worked on the unsecured

14   noteholders claim I recall.  He had some

15   involvement in the third-party claims.

16   And I would have to look through the rest

17   of it to recall what his involvement was,

18   but in general I would say commercial

19   litigation, non bankruptcy type of

20   matters.

21        Q    And when you say he worked on

22   those sections, what did he do exactly?

23        A    He reviewed the examiner's

24   report; in some cases he did the initial

25   drafting of a section of the report and

Lyons

1        discussed it with me; and worked to

2        finalize particular sections of my report.

3        Q    Do you recall whether he

4        expressed any view where he differed with

5        the conclusions set forth by Judge

6        Gonzales on any of the contract claims in

7        the report?  And when I say "he", I'm

8        referring to Mr. Cunniff.

9        A    Mr. Cunniff, yes.

10            Contract claims, let's see, I

11       recall specifically the unsecured

12       noteholders claim was the subject of

13       discussion between me and Mr. Cunniff.

14            There was the claim that was

15       described in the examiner's report that I

16       was really not familiar with.  There was a

17       claim for reliance by a third-party on a

18       representation that had not been made to

19       the third-party.  And Arthur Gonzales in

20       his report described how there were choice

21       of law problems with that cause of action,

22       and the cause of action, it was not clear

23       that it was even a viable cause of action.

24            One of the statements in the

Page 60

Lyons

2  examiner's report was his opinion that the

3  damages suffered by the unsecured

4  noteholders would be particularized

5  damages that would relate only to them or

6  to a particular noteholder, and not

7  damages that were general.  In other

8  words, damages that were caused to the

9  debtor that would impact on the recovery

10  of all creditors.

11        And Mr. Cunniff and I discussed

12  that, and that's one area where we

13  disagree with Judge Gonzales.  We felt

14  that the damages, if there was a viable

15  cause of action that the damages would be

16  generalized.  The conundrum was that

17  because of the Wagoner Rule, fiduciary --

18  a state fiduciary could not pursue those

19  claims in Judge Gonzalez's view and in my

20  view.  And if you read Wagoner, Wagoner

21  says that the debtor doesn't have

22  standing, but creditors have standing.

23        And so we came to the conclusion

24  that if Wagoner were applied and creditors

25  were allowed to pursue it, they would be

Page 61

Lyons

1
2    pursuing generalized damages, and that any
3    recovery would have to go for the benefit
4    of all creditors, not just the named
5    plaintiff.
6        Q    And does that differ from Judge
7    Gonzalez's opinion?
8        A    I believe so, yeah.
9        Q    And is that set forth in your
10   report?
11       A    Yes.
12       Q    With respect to the contract
13   claim on misallocation of net revenues
14   that's discussed in your report.
15       A    Yes.
16       Q    Do you recall whether or not you
17   and Mr. Cunniff had any disagreements
18   about the factual or legal analysis
19   contained in that section?
20       A    No, I don't recall any
21   disagreements there.
22       Q    And the same question with
23   respect to the MSR Swap claim.
24       A    Yeah, mr. Cunniff and I
25   discussed that, and the defense that Judge

Page 62

Lyons

1

2      Gonzales describes that would be raised by

3      AFI is that there was mutual mistake made,

4      or that the contract had been amended

5      through a course of dealing, and --

6          Q      Modified through a course of

7      dealing, right, modification?

8          A      Modified.   Right.

9               And Mr. Cunniff and I -- and I

10     think that Judge Gonzales came to the

11     conclusion that that defense was a close

12     case, but in our assessment, we felt that

13     that defense was a little bit more

14     difficult of a burden to carry for AFI

15     than we gleaned from reading the

16     examiner's report.

17         Q      Both you -- I'm sorry?

18         A      Let me just say it another way.

19              Trying to prove that a contract

20     should be reformed or that a modification

21     exists, we felt was a difficult burden of

22     proof.  And it's been a number of years

23     now since those transactions took place,

24     and it appeared that a lot of the

25     personnel who were involved, their

Page 63

Lyons

2  memories were fading and it would be a

3  challenge where the burden of proof is on

4  AFI to show that the contract should be

5  reformed or that it had been modified.

6      Q     And just to be clear, you and

7  Mr. Cunniff both shared that view?

8      A     Yes.

9      Q     And that was based on your

10  assessment of the difficult legal hurdle

11  that would be involved with that defense?

12      A     With the defense, right.

13      Q     So it is your opinion of the

14  legal challenge that would have been faced

15  by a litigant bringing that defense?

16          MR. COHEN:   Object to the form.

17      A     Right.

18      Q     Who is Gerald Arth?

19      A     Mr. Arth is a partner in the

20  firm, and his office is in Philadelphia,

21  and he is a litigator.

22      Q     And what was his role in

23  connection with this project?

24      A     Mr. Arth worked primarily on the

25  third-party claims, mostly the third-party

Page 64

                          Lyons

1
2    RMBS claims against AFI.

3       Q     And, again, the nature of his

4    work would have been drafting, reading and

5    analyzing similar to the other folk we've

6    talked about?

7       A     Yes.

8       Q     And do you recall having any

9    disagreements with Mr. Arth about any of

10   the conclusions reached by Judge Gonzales

11   in the sections that Mr. Arth worked on.

12          MR. COHEN:   Object to the form.

13   Vague.

14      A     Well, Judge Gonzales concludes

15   that the alter ego single entity type

16   theories are unlikely to be successful

17   against AFI, and that the control person

18   securities issues are more likely than not

19   to be unsuccessful.   And if one were to

20   look only at those, one would probably

21   minimize the amount of the third-party

22   claims.   However, Judge Gonzales was not

23   able to quantify the amount of third-party

24   claims.   So we attempted to estimate from

25   the information that was available in

Page 65

<center>Lyons</center>

1    Judge Gonzalez's report a reasonable

2    value, and because it seemed that they

3    were potentially tens of billions of

4    dollars of claims, despite the

5    questionable legal merits of the claims,

6    we still felt that they had substantial

7    settlement value.

8        Q      You said Judge Gonzales was

9    unable to quantify the third-party claims?

10       A      And I believe his charge was not

11   to quantify.

12       Q      I was going to ask you if you

13   knew, in fact, he was asked not to do

14   that.

15       A      Yes.

16       Q      You knew that?

17       A      Yes, he states that a number of

18   times in his report.

19       Q      And now I think you mentioned in

20   the beginning of your answer that

21   Mr. Geron --

22       A      Geron?

23       Q      I'm sorry, Mr. Arth we were

24   talking about.

Page 66

1                        Lyons

2              Mr. Arth worked on the alter ego

3      analysis?

4          A      In the third-party claims, part

5      of it is the single entity type of the

6      claim that AFI should be responsible for

7      the alleged wrongdoing of one or more of

8      the debtor entities.

9          Q      Is an alter ego claim a

10     third-party claim?

11             MR. COHEN:   Object to the form.

12         A      Part of the third-party claim is

13     an alter ego claim.

14         Q      But isn't it true that an alter

15     ego claim actually belong -- can belong to

16     the debtor?

17         A      Yes.

18         Q      So why did you analyze in your

19     report the alter ego claim in conjunction

20     with the third-party control person claim?

21         A      Because those, alter ego was

22     part of the theories that the

23     third-parties were asserting against AFI.

24         Q      In fact, you know whether or not

25     the debtors raised an independent alter

Page 67

                            Lyons

1

2      ego claim against AFI?

3           A     I know that Judge Gonzales

4      talked about the debtors having an alter

5      ego claim against AFI.

6           Q     But you don't know that for a

7      fact?

8           A     I don't know.

9                 MR. COHEN:   Objection to the

10          form.  Mischaracterizes the testimony.

11          A     I don't recall that the debtors

12     had filed any alter ego claim.

13          Q     Do you know whether the

14     committee filed an STN motion in this

15     case?

16          A     What's an STN motion?

17          Q     A motion for standing to pursue

18     claims on behalf of the estate.

19          A     No, I don't know that.

20          Q     Who is Mr. Geron?

21          A     Ron Geron is the way you

22     pronounce it, is a partner in the New York

23     office, and he is a bankruptcy

24     professional.

25          Q     And what was his role in this

Lyons

1

2    work, in this project?

3        A    He was limited to one primary

4    issue, and that was the Minnesota Insider

5    Preference claim.

6              I also spoke to Mr. Geron in

7    general about settlement ranges for

8    preference matters.  He is a Chapter 7

9    Trustee and often represents fiduciaries

10   in bankruptcy avoidance litigation.

11       Q    And he is not admitted in

12   Minnesota to your knowledge, is he?

13       A    Not to my knowledge.

14       Q    Do you know whether he consulted

15   any Minnesota practitioners in connection

16   with his work on the Minnesota preference

17   action?

18       A    I don't believe that he did.

19       Q    Did you?

20       A    No, I did not.

21       Q    And the Minnesota preference

22   action is an avoidance claim, correct?

23       A    Yes.

24       Q    And do you recall whether you

25   and Mr. Geron had any disagreement with

Page 69

1                          Lyons

2    respect to the examiner's conclusions on

3    the claims that he was involved with?

4        A     Yes, Mr. Geron was -- thought

5    that the ordinary course defense was a

6    little more viable than the examiner

7    allowed in his report.

8              But Arthur Gonzales took the

9    position that any course of dealing after

10   the debtor was in financial distress would

11   not be considered ordinary course, and

12   under the Minnesota Insider Preference

13   Statute, that extended back six years.

14             Mr. Geron felt that it was a

15   policy underlying the ordinary course

16   defense to encourage parties to continue

17   to do business with a debtor, and that he

18   felt there was more viability to that

19   ordinary course defense than Arthur

20   Gonzales did.

21       Q     And, in fact, in your report,

22   did you include any discussion about the

23   ordinary course defense?

24       A     Yes.

25       Q     And what do you recall opining

Page 70

Lyons

1  in that regard?

3      A     Just what I just stated.

4      Q     And actually was that an

5  opinion, or were you offering a legal

6  opinion on that point?

7      A     No, it was a factor on the

8  altered merits of the case and defenses

9  that we evaluated in coming to a

10  reasonable settlement value for that

11  claimant.

12      Q     And in evaluating that factor,

13  you have no specialized knowledge of

14  Minnesota's UFTA statute, do you?

15      A     No specialized knowledge, no.

16      Q     Are you aware that not a single

17  party alleged a claim under the Minnesota

18  Insider Preference Statute against AFI at

19  any time?

20      A     No.

21      Q     Are you aware that not a single

22  party in their submissions to the examiner

23  addressed the Minnesota Insider Preference

24  Statute until they were expressly invited

25  to do so by the examiner?

1                           Lyons

2          A     I'm not aware of that.

3          Q     Did you know that the examiner

4     requested and that the court approved the

5     retention of Minnesota counsel in

6     connection with Judge Gonzalez's work?

7          A     I saw that Minnesota counsel was

8     retained by the examiner.  I don't recall

9     any discussion about getting court

10    approval, but I would assume that it was

11    done.

12         Q     And do you know that the first

13    time the parties were asked by the

14    examiner to address the Minnesota

15    Preference issue was on May 1, 2013?

16         A     I don't believe I was aware of

17    that.

18         Q     And when the parties were asked

19    to do so, they were told that the examiner

20    has determined that the issue warranted

21    giving the parties an opportunity to

22    submit their views.

23               Did you know that?

24         A     No.

25         Q     And do you know when Judge Peck

1                          Lyons

2      was appointed a mediator in this case?

3          A     I believe it was towards the

4      latter part of 2012.

5          Q     Okay.

6                 I'll represent to you it was

7      five months prior to the request on May 1

8      for the parties to address the Minnesota

9      Preference claim.

10                And you have no basis to know

11     whether the parties were aware of the

12     possibility of a viable claim under

13     Minnesota law, much less consider the

14     value of that claim during negotiations

15     over the global settlement, right?

16                MR. COHEN:   Object to the form.

17         A     I'm not aware of those facts.

18         Q     Did Mr. Geron do anything else

19     in connection with the report, your

20     report?

21         A     The Minnesota Insider Preference

22     issue he worked on, and, as I said, I also

23     spoke to him about his experience with

24     settling avoidance actions.

25         Q     And what did he tell you in that

Page 73

1                          Lyons

2     regard?

3          A      That avoidance actions, first of

4     all, that he anticipates a new value

5     defense on the preference action, and

6     attempts to give the defendant credit

7     where he believes that there is a viable

8     new value defense.

9                 So rather than the gross number

10    of transfers that went from the debtor to

11    the defendant in the 90 days, he nets out

12    new value, starts his negotiation with a

13    net claim.

14                And that he -- often his initial

15    demand, depending on how strongly he feels

16    about the case, will be in the

17    neighborhood of 80 to maximum 90 percent

18    of the net gross claim, net gross claim is

19    not -- let's say the claim after giving

20    credit for new value defense.

21         Q      Did you consider it important to

22    consult with Mr. Geron about his

23    experience with settling avoidance

24    actions?

25         A      I thought it was informative,

Page 74

1                         Lyons

2    yes.

3         Q    Is there anyone else that you

4    consulted with at Fox Rothchild to ask

5    about their experience in settling claims?

6         A    Yes.

7         Q    Who?

8         A    Vincent Poppiti.

9         Q    Anyone else?

10        A    I think I had a brief

11   conversation with Abe Rich, who is a

12   co-chairman of the firm.

13        Q    It must have been very brief?

14        A    Yes, he didn't bill it.  I

15   probably billed for it, he did not.

16        Q    Why did you want to consult with

17   other partners at your firm about their

18   experience with settling actions?

19        A    Vincent Poppiti was a judge, a

20   Delaware State Court judge, and he has

21   been with Fox Rothchild longer than I

22   have.  He has been there a few years, I

23   believe.  And his practice is focused on

24   mediation and arbitration.

25        Q    And do you respect Judge

1                          Lyons

2    Poppiti?

3         A     Yes, I do.

4         Q     And so he has a great deal of

5    experience with mediation?

6         A     He does, yes.

7         Q     He was the former chief judge of

8    the Family Court in Delaware; you knew

9    that?

10        A     I did not know that, no.

11        Q     I actually appeared before him

12   in 1999 in a pro bono case, and he was an

13   associate judge of the Superior Court of

14   Delaware.

15             Did you know that?

16        A     I did not.  I knew he was on the

17   Delaware Court.  I didn't know which

18   positions he held.

19        Q     Did you discuss with Judge

20   Poppiti your methodology and what you were

21   opining on in this case?

22        A     Yes.

23        Q     Did he express any views to you

24   about it?

25        A     He thought that my approach was

1                              Lyons

2       appropriate.

3            Q      Anything else that you recall

4       discussing with him about your methodology

5       or opinions?

6            A      No.

7            Q      And did you discuss your work on

8       more than one occasion with Mr. Poppiti or

9       just one time?

10           A      I think it was only once.

11           Q      Did you know that in 2010, Judge

12      Poppiti served as a Special Master in a

13      case called In Re: Intel Corporation, and

14      he issued a report where he recommended

15      granting a Daubert motion to exclude the

16      testimony of the plaintiff's expert

17      witness?

18           A      No, I'm not aware of that.

19           Q      You didn't talk about that?

20           A      No.

21           Q      Okay.

22                  And he concluded in that case,

23      or did you know that he concluded that

24      opinions offered by the expert were not

25      based on methods and procedures of

Page 77

Lyons

science, but rather on unreliable

analysis, and so for that reason, it

violated the Daubert standard.

Did you know that?

A    I did not know that.

Q    Do you know what the Daubert

standard is?

A    Yes.

Q    What is it?

A    Daubert standard is named after

a U.S. Supreme Court decision in which the

court held that the trial judge should be

a gatekeeper as to the admissibility of

expert opinion.

Q    And is there a standard by which

the gatekeeping function should be

conducted?

A    I believe there are two factors

to consider.  One is relevance of the

opinion being offered to the issues, and

secondly is reliability.

Q    And during your time on the

bench, have you ever excluded expert

testimony based on Daubert that you

1                        Lyons

2    recall?

3         A     Yes.

4         Q     Tell me about -- was it in a

5    single case or more than one case?

6         A     I can only recall one case.  I'm

7    sorry, two cases I recall.

8         Q     Can you tell me the first?

9         A     The first I recall, the oldest

10   that I recall was when I was sitting as a

11   visiting judge in Delaware, there was an

12   issue about conflict with a proposed

13   debtor's counsel, and the debtor's counsel

14   called a professor from the law school to

15   testify as to whether or not the debtor's

16   counsel had a conflict of interest.  And I

17   did not permit the professor to testify

18   because I felt that I did not need any

19   assistance, I was the finder of fact, and

20   I felt that I did not need assistance in

21   determining whether there was a conflict

22   of interest.

23        Q     Do you remember the name of that

24   case?

25        A     Yes, that was Big V.

Page 79

1                        Lyons

2       Q     And you said there was a second

3  case where you excluded an expert?

4       A     Yes.

5       Q     And what was that case?

6       A     It was a case in the District of

7  New Jersey.

8       Q     Is that the O'Brien case?

9       A     O'Brien, no.

10      Q     Okay.

11            Which case was it?

12      A     What did I do in O'Brien?

13      Q     We'll get there.

14      A     It was the Zeiss Investment

15  Limited Case.

16      Q     Uh-huh.

17      A     And the plan proponents offered

18  an expert, and I granted a motion in

19  limine to preclude that expert's

20  testimony.

21      Q     And do you recall the grounds on

22  which you excluded the testimony?

23      A     My recollection now a couple of

24  years later is that there were two

25  grounds.

Page 80

Lyons

1

2          One was that the particular

3  individual who was testifying was not the

4  most qualified among the individuals in

5  the firm to opine on the relevant issue.

6  And, secondly, in voir dire, I found that

7  the witness was not able to explain the

8  source of some of the information that was

9  relied upon in reaching the opinion.

10     Q     What was the ground on which you

11  considered the individual as not the most

12  fit in his firm to offer an opinion?

13     A     What was the ground?

14     Q     Yes.  Why was it that you

15  concluded that he was not the most fit in

16  his firm to give the opinion?

17     A     Because it was based on his

18  testimony that in order to answer the

19  question that was posed or to opine on the

20  issue, that he consulted with people in a

21  department within the firm that

22  specialized in evaluating those particular

23  assets, and that was not his area of

24  expertise.

25     Q     Going back to Judge Poppiti for

Page 81

1                      Lyons

2    a moment and his decision in In Re: Intel,

3    he wrote there, "In order to prove

4    reliability by a preponderance of the

5    evidence, one most prove that the expert's

6    opinion is based on the methods and

7    procedures of science rather than on

8    subjective belief or unsupported

9    speculation, and that the expert has good

10   grounds for his or her believe."

11          Do you believe with that

12   premise?

13          MR. COHEN:  Objection.  If you

14      have a document that we can verify

15      that quote.  If you just want to make

16      a statement and say do you agree with

17      the statement or not, that's something

18      different.

19          MR. SIMON:  I'm representing

20      that this is a quote from a decision

21      by Judge Poppiti.  I don't feel I need

22      to put it in the record.

23      Q     Do you agree with that

24   proposition?

25      A     I think it depends on the

Page 82

Lyons

1    context.

2

3        Q      And in what context would it be

4    appropriate to rely on an expert's opinion

5    that is not based on methods and

6    procedures of science, but rather

7    subjective belief?

8        A      Where the opinion is not a

9    scientific type of opinion.

10       Q      So it is your testimony that

11   under Daubert, it is appropriate for a

12   court to accept expert opinion based on

13   subjective belief?

14       A      Yes.

15       Q      And what is your basis for that

16   opinion?

17       A      Just some of the cases that I

18   have read following Daubert and --

19       Q      I'm sorry.

20       A      Well, the cases that I recall

21   reading distinguish between scientific and

22   statistical type of analysis where there

23   would be accepted methods, and other

24   matters where the opinion is based upon

25   the experience of the party and it is not

1                    Lyons

2      scientific.

3             So, for example, in preference

4      litigation, where there is a question of

5      whether something was in the ordinary

6      course of business, I have often permitted

7      a person to testify as to the ordinary

8      course of the particular type of business

9      where that person has been solely by

10     reason of experience familiar with what

11     happens in that business.

12        Q    And is it also your view that

13     under Daubert, there are instances where

14     it may be appropriate to accept an expert

15     opinion that is based on unsupported

16     speculation?

17             MR. COHEN:  Object to the form.

18        A    Unsupported speculation does not

19     sound to me that that would be an

20     acceptable expert opinion.

21             MR. SIMON:  We're going to need

22         to change the tape so we have to go

23         off the record.

24             THE WITNESS:  Okay.

25             MR. SIMON:  Do you want to take

Page 84

1                        Lyons

2        a break?

3                MR. COHEN:  Yes, why don't we.

4                THE VIDEOGRAPHER:  This marks

5        the end of tape number one.  We're

6        going off the record at 11:34 a.m.

7                (Thereupon, a recess was taken,

8        and then the proceedings continued as

9        follows:)

10               THE VIDEOGRAPHER:  This marks

11       the start of tape number two.  We're

12       back on the record at 11:49 a.m.

13   BY MR. SIMON:

14       Q    Mr. Lyons, going back to Judge

15   Poppiti for a moment, or Mr. Poppiti.

16            In addition to his prior service

17   as a judge, were you aware that he served

18   as Special Master and Special Master

19   Liaison for the United States District

20   Court for the District of Delaware in

21   patent and antitrust matters, and he has

22   done or did that from September 2004

23   through September 2011?

24       A    I knew that Judge Poppiti is

25   involved in intellectual property matters

Page 85

Lyons

1    with the District Court.  I didn't know

2    that he had the title that you have

3    mentioned.

4    Q     Okay.

5          And I just want to state for the

6    record, because I didn't have the full

7    citation, that the Special Master report I

8    referenced earlier authored by Mr. Poppiti

9    is In Re:  Intel Corp. MCDL Docket Number

10   05-1717, out of the District of Delaware.

11         Now, in that report, Judge

12   Poppiti noted that it is the District

13   Court's responsibility to perform "a

14   vigorous screening function to ensure that

15   scientific evidence is presented by the

16   expert witness that is relevant, reliable

17   and helpful to the trier of fact".

18         Do you agree with that premise?

19         MR. COHEN:  Object to the form.

20   A     In the context of scientific

21   evidence, yes.

22   Q     Do you think that's true with

23   respect to any other kind of expert

24   testimony that's offered to a District

Page 86

Lyons

1    Court?

2         MR. COHEN:   Object to the form.

3    A    Well, you said reliable,

4    relevant and helpful, and I would say yes,

5    that's true with regard to all expert

6    testimony.

7    Q    So you accept that premise?

8    A    Yes.

9    Q    And how is -- how did you ensure

10   that your expert opinions in this case are

11   relevant, reliable and in your view

12   helpful to the trier of fact?

13   A    With regard to relevance, it

14   seemed to me that it was relevant to

15   allocate the gross settlement fund of 2.1

16   billion dollars among the potential claims

17   that existed against AFI.

18   Q    Why is that?

19   A    Because I understood that there

20   were conflicting claims to the settlement

21   fund, and that the nature of the claim

22   that would give rise to a payment by AFI

23   could impact on which party, which

24   claimant could assert a right to that

Page 87

1                          Lyons

2      fund.

3           Q      Are you aware that Judge Glenn

4      has already agreed that the Ally

5      contribution need not and cannot be

6      allocated among the many causes of action

7      it resolves or among the debtors receiving

8      it?

9                MR. COHEN:  Object to the form.

10          A      No, I'm not aware of it.

11          Q      Well, if he had made that

12     determination, don't you think he is

13     better positioned in this case to do so

14     than you?

15               MR. COHEN:  Object to the form.

16          A      If I had made that

17     determination, don't I think he is in a

18     better position to do what?

19          Q      If in fact Judge Glenn made the

20     determination that the Ally contribution

21     need not and cannot be allocated among the

22     causes of action, the individual causes of

23     action, do you agree with me that he is

24     better positioned to make that

25     determination in these cases than you?

Page 88

Lyons

1

2          MR. COHEN:  Object to the form.

3     A     If he -- obviously he is the

4     judge.  If he has made that determination,

5     that's his determinations.

6     Q     And you would accept it?

7     A     I have no authority to do

8     anything with regard to a determination

9     that he has made.

10    Q     And so you would accept that

11    determination if, in fact, it were made by

12    Judge Glenn?

13    A     I'm not --

14          MR. COHEN:  Object to the form.

15          THE WITNESS:  I'm sorry.

16    Q     You can answer.

17          MR. COHEN:  You can answer.

18          THE WITNESS:  I have to pause.

19    A     I'm really not in a position to

20    say whether I accept and reject Judge

21    Glenn's opinion.

22    Q     Well, would you agree that Judge

23    Glenn has greater familiarity with the

24    parties in these cases than you?

25    A     That sounds like a fair

Page 89

Lyons

1         Lyons

2    characterization, yes.

3         Q      And would you also say it is a

4    fair characterization that Judge Glenn has

5    greater familiarity with the issues

6    involved in these cases than you?

7         A      That I don't know about.

8         Q      Do you have any reason to

9    dispute that Judge Glenn has greater

10   familiarity with the totality of the

11   issues in this case than you?

12              MR. COHEN:   Object to the form.

13        A      No, I have no reason to dispute

14   that.

15        Q      And I take it that you have no

16   reason to dispute that Judge Glenn has

17   greater familiarity with the stakes at

18   issue in this litigation?

19              MR. COHEN:   Object to the form.

20        Vague.

21        A      The stakes, are you talking

22   about -- I'm sorry, what do you mean by

23   stakes?

24        Q      What that -- the financial

25   impact of this settlement and the various

Page 90

Lyons

1

2      claims that have been made in the

3      bankruptcy, the various claims that have

4      been made with respect to monies owed

5      various parties from the estate.

6              Would he have better knowledge

7      than you of that?

8          A    I really don't know, but I

9      assume so having presided over this case

10     for more than a year that Judge Glenn is

11     more familiar with what's happened in the

12     case than I am.

13         Q    And you said the first time you

14     were asked to read and give opinions on

15     the examiner's report was in September of

16     this year, right?

17         A    That's correct.

18         Q    And so given that Judge Glenn

19     has had experience with this case for a

20     far longer amount of time than you, would

21     you agree that he more likely than not has

22     greater familiarity with the claims at

23     issue in this case than you?

24         A    That I can't say.

25         Q    Do you have any reason to

Page 91

1                          Lyons

2      dispute it as you sit here today?

3           A      To dispute it, I just don't

4      know.  I know that Judge Gonzales is the

5      one who identified all these claims and

6      analyzed them, investigated them, analyzed

7      them.  I don't know what Judge Glenn has

8      done with respect to any particular claim.

9           Q      Well, separate and apart from

10     the examiner's report, you understand that

11     at various times various of the parties'

12     positions have been presented to the court

13     in one way or another in these cases?

14          A      I assume that that is so.  Yes,

15     I'm aware that parties have made their

16     positions known to the court.

17          Q      And you have not read all the

18     briefing or pleadings that have been

19     submitted in this case, have you?

20          A      I have not.

21          Q      And presumably Judge Glenn has,

22     you would hope, correct?

23          A      I would presume so, yes.

24          Q      You would expect, right?

25          A      I would expect so.

Page 92

Lyons

1

2     Q    And so given that, would you
3     agree with me that the judge more likely
4     than not has greater expertise to assess
5     the various claims that are at issue in
6     this case than you?
7     A    I wouldn't necessarily agree
8     with that, because I don't know that each
9     of these claims has been presented to
10    Judge Glenn with all of the investigation
11    that was done by Arthur Gonzales.
12         So, for example, you pointed out
13    the Minnesota Insider Preference case that
14    apparently Judge Gonzales identified late
15    in the game.  I don't know whether Judge
16    Glenn has had anything to do with the
17    Minnesota Insider Preference case.
18    Q    Well, what are you adding beyond
19    what Judge Gonzales offered in the
20    examiner's report to Judge Glenn?
21    A    I think I'm adding my experience
22    and expertise in assessing the reasonable
23    settlement value of a particular cause of
24    action.
25    Q    And in reaching your conclusions

Page 93

Lyons

1

2  about the reasonable settlement value, you

3  consulted with certain of your colleagues,

4  correct?

5      A     That's correct.

6      Q     And that's because they've

7  helped to inform your view; is that right?

8      A     They did, yes.

9      Q     Is Judge Glenn not capable of

10  consulting with certain of his colleagues

11  on the bench to ask about their experience

12  with placing value on settlements?

13          MR. COHEN:  Object to the form.

14      A     I'm sure Judge Glenn was able to

15  do that.

16      Q     So you testified that one of the

17  important qualifications of a reliable

18  expert report is that it be relevant?

19      A     Yes.

20      Q     You also said it needs to be

21  reliable.

22          And can you tell me how your

23  opinions in this case are reliable?

24      A     Yes.  I think that I had focused

25  on each of the claims that was identified

Page 94

1                          Lyons

2       by Arthur Gonzales in the examiner's

3       report; reviewed the legal analysis that

4       he had; and applied my experience to -- in

5       having been a judge for 14 years, having

6       performed mediations, and prior to taking

7       the bench having been a commercial

8       attorney for 25 years or so, applied that

9       experience to trying to opine on the

10      reasonable settlement value of each

11      particular claim.

12          Q      And I think you told me earlier

13      that as a mediator, you always listened to

14      all sides in a matter before forming a

15      judgment with respect to the merits of a

16      particular claim?

17          A      That's true.

18          Q      Is the same true with respect to

19      conducting settlement conferences, would

20      you hear from all sides before making a

21      determination on the value of the claim at

22      issue?

23          A      That's true.

24          Q      And so what is it about your

25      experience, which I give you that you have

Page 95

Lyons

1   a lot of, but what is it about your

2   experience that makes your opinions

3   reliable in this case?

4   A     I think it is just that I have

5   that experience; I've been involved in

6   numerous matters that have settled; and

7   have observed how the settlement process

8   works and where the likely settlement

9   value is -- has been achieved in those

10  matters that have settled.

11  Q     And if someone wanted to test

12  the veracity of your judgments, how would

13  they go about doing that?

14       MR. COHEN:  Object to the form.

15  A     I think by doing what you're

16  doing, asking me questions on how I came

17  to the conclusions that I did.

18  Q     So why don't I do that.

19       You applied two methodologies in

20  your report.  One was characterized as the

21  discounting methodology, right?

22  A     Yes, I think litigation discount

23  method.

24  Q     And the other was characterized

Page 96

Lyons

1

2    as the likely settlement negotiation

3    method?

4        A     Correct.

5        Q     And were there any other methods

6    that you employed in your report besides

7    those two?

8        A     When it came to the third-party

9    RMBS claims against AFI, I looked at --

10   looked for comparable cases and the

11   settlement data in comparable cases.

12       Q     Did you do anything else

13   methodologically speaking?

14       A     That was the different one.  The

15   RMBS claims were different from the rest

16   of the claims.

17       Q     So the totality of your

18   methodologies, putting aside the RMBS

19   third-party claims where you just

20   testified to what you did, the remainder

21   of your report is limited to the

22   litigation discount methodology and the

23   likely settlement negotiation methodology.

24             Is that a fair characterization?

25       A     Yes.

Lyons

1

2      Q      Let's start with the discount,

3  litigation discount methodology.

4      A      Yes.

5      Q      What objective basis did you

6  have for applying that methodology?

7      A      I'm not sure what you mean by

8  that.

9      Q      Well, is it located in any text

10 or treatise or report?

11     A      The litigation discount method I

12 believe is employed regularly by parties

13 in litigation in trying to come up with a

14 reasonable settlement value.  I've

15 observed it being employed by people.

16     Q      Well, other than -- I'm sorry,

17 didn't mean to cut you off.  Go ahead.

18     A      I've been instructed in

19 mediation training to use that type of

20 analysis to assist parties in evaluating

21 their own position.

22     Q      So when you say you're

23 instructed on that methodology in

24 mediation training, were you instructed on

25 what values that you should assign in

Page 98

Lyons

1

terms of a discount to particular causes

2

of action?

3

A       No.

4

Q       Okay.

5

So, again, I'll ask the

6

question:  Other than your own experience,

7

can you point to anything that would tell

8

one how to go about determining what

9

percentages to apply to result in a

10

discount value in your methodology?

11

A       Well, I think that it has to be

12

issue by issue, it's issue specific, and

13

the discount that is applied to any

14

particular issue depends upon the analysis

15

of the person applying the discount and

16

that person's assessment of the relative

17

merits of that issue and the other factors

18

that go into coming up with a reasonable

19

settlement amount.

20

Q       So by definition, it very well

21

could vary by the person applying the

22

discount, right?

23

A       I believe that's so.

24

Q       And so, for example, if we asked

25

Page 99

Lyons

1      a different bankruptcy judge with 25 years

2      of experience, he or she might come up

3      with different numerical values to apply

4      as discounts; is that right?

5              MR. COHEN:  Objection.

6          Mischaracterizes the witness's

7          experience.

8              MR. SIMON:  Withdrawn.

9      Q       If we asked another former

10     bankruptcy judge with many years of

11     experience, including in mediation and

12     settlement conferences, he or she may well

13     come up with different percentages to

14     discount in the discount methodology,

15     correct?

16     A       That is true.

17     Q       And in your instance --

18             MR. SIMON:  Withdrawn.

19     Q       And with respect to your report,

20     have your percentages been verified by

21     anyone else other than yourself?

22     A       And my colleagues that I have

23     discussed it with.  You know, it was all

24     just myself and my colleagues coming to

Page 100

Lyons

1

2    our best judgment as to which percentage

3    discount should be applied to each

4    particular issue.

5         Q    And have you ever offered expert

6    testimony applying this methodology

7    before?

8         A    No.

9         Q    Have you ever accepted during

10   your time on the bench any expert

11   testimony that uses the discount

12   methodology, the litigation discount

13   methodology as set forth in your report?

14        A    It was expert testimony.  I

15   presided over motions to prove settlement

16   that were contested, and I've heard from

17   the parties who were advocating approval

18   of the settlement and parties in

19   opposition to approval of the settlement,

20   and I'm not sure I can identify a

21   particular instance, but I am sure that

22   the parties on each side have addressed

23   issues and the merits of issues and

24   likelihood of success on a particular

25   issue and expressed that in terms of

1                          Lyons

2    percentage.

3        Q      And that's because it is

4    important to hear directly from the

5    parties in order to understand their

6    respective views and the weight of the

7    value of the settlement, right?

8              MR. COHEN:  Object to the form.

9        A      Well, in a 9019 settlement,

10   you're only going to hear from people who

11   have a stake in the outcome.  Those are

12   the only ones that would have standing to

13   advocate either for approval of the

14   settlement or against the approval of the

15   settlement.

16       Q      And would you agree with me that

17   it is an important factor in determining

18   the settlement value of a claim to hear

19   the respective views of the parties as to

20   the value of that claim?

21             MR. COHEN:  Object to the form.

22       A      Yes.

23             And can I tell you about hearing

24   an expert opinion about settlement value

25   that just occurred to me?

<center>Lyons</center>

1

2      Q      Sure.  But can you answer that

3      question?  Did you answer that question

4      first?

5      A      I did.

6      Q      You said yes.  So now you can

7      tell me.

8      A      You asked me if I've ever heard

9      of an expert testifying, and it just

10     occurred to me that I have.

11             There was a proceeding brought

12     by a Chapter 7 Trustee to avoid a transfer

13     from a debtor, a female debtor, to her

14     ex-spouse that was made in connection with

15     the settlement of a matrimonial matter.

16     And the plaintiff trustee called as an

17     expert an experienced matrimonial attorney

18     who opined that the settlement amount that

19     the debtor had paid to her ex-spouse was

20     beyond the range of reasonable settlement

21     considering all of the issues involved in

22     that case.

23     Q      Actually, let me turn for a

24     moment to your other methodology.

25     A      Yes.

Page 103

1                              Lyons

2         Q       And what was the other

3    methodology?

4         A       The expected mediation scenario.

5         Q       Right.

6                 And can you describe that

7    methodology for me please?

8         A       Yes.  That methodology is based

9    upon my experience in observing mediation

10   in terms of how the offer/counteroffer

11   process works.  And my observation is that

12   to begin the process, first the plaintiff

13   has to quantify the claim, and then the

14   plaintiff makes the first settlement

15   demand, which is never the full amount of

16   the claim, it is always discounted

17   somewhat.

18                In response to that, the

19   defendant makes the first counteroffer,

20   and then the process goes back and forth

21   where the plaintiff will reduce the demand

22   and the defendant will increase the

23   counteroffer, and ultimately resolve --

24   ultimately arrive at a settlement amount

25   in those cases where the matter settles.

Page 104

1                        Lyons

2        Q     And what objective basis did you

3    have for applying that methodology in this

4    case?

5        A      My observation of settlement

6    negotiations.

7        Q      There is no text or treatise or

8    report that you can point to that

9    discusses the likely settlement

10   negotiation methodology, is there?

11       A      Well, again, in mediation

12   training I participated in, that scenario

13   was discussed and the observation of the

14   mediation trainers as to how that scenario

15   goes in many of the cases that they have

16   observed.  I think that would be the

17   extent of it.

18              So I think your question was is

19   that method reported anywhere, and to my

20   experience, it was included in the

21   mediation training that I participated in.

22       Q      And how did you conclude the

23   correct percentages to apply in your

24   likely settlement negotiation methodology?

25       A      The initial offer and demand

Lyons

1    were predicated on all of the leading

2    factors, but I would say the most

3    important is the likelihood of success on

4    the merits.

5            And the one factor that -- one

6    Iridium factor that I decided not to

7    consider in this case with one exception

8    was difficulty in collection,

9    collectability of a claim.  I assumed

10   without knowing that AFI had the ability

11   to pay any of the individual claims that

12   were brought against it, and I knew that

13   AFI had agreed to put up 2.1 billion

14   dollars, which at the end of the day came

15   within the same range as I came up with

16   for all the claims, so I did not consider

17   collectability in that.

18           The one exception where

19   collectability was an issue was in the

20   third-party claims against Ally

21   Securities, and that did factor into the

22   analysis of both the discount --

23   litigation discount method and the

24   mediation scenario method.

Page 106

                              Lyons

1

2      Q    So is it fair to say to come up

3  with the percentages, you essentially

4  apply the facts to the law, the Iridium

5  factors; is that fair?

6           MR. COHEN:  Object to the form.

7      A    I would say I applied the law to

8  the facts.

9      Q    And as we said earlier, in terms

10  of the import, there is no difference,

11  correct?

12     A    I guess it depends on your

13  approach, but I kind of start with

14  learning the facts and then looking at the

15  law and applying the law to the facts.

16     Q    And that's what you did in order

17  to come up with the percentages here in

18  your --

19     A    Yes.

20     Q    Let me restate the question.

21          So you applied the law to the

22  facts in order to come up with the

23  percentages that you used in your report

24  as part of the likely settlement

25  negotiation methodology?

1                          Lyons

2        A     Yes, analyzing what I considered

3    the likely merits of the particular

4    claims.

5        Q     And you said you typically start

6    by learning the facts before you apply the

7    law to the facts.

8              Is that a fair statement?

9        A     Well, the reason I said that is

10    when I wrote opinions, I always wrote the

11    factual part first, and then had a

12    discussion section where I applied the law

13    to the facts.

14        Q     And when you wrote opinions, you

15    did that predicated on each of the

16    respective parties submitting their

17    respective positions to you with respect

18    to the facts, right?

19        A     Evidence, yes.

20        Q     Evidence, and then arguments

21    based on that evidence, right?

22        A     Correct.

23        Q     And then you as the trier of

24    fact would make a determination as to how

25    in your view the matter should be decided;

1                          Lyons

2      is that right?

3           A      That's correct.

4           Q      And presumably that's what Judge

5      Gonzales did in this matter, right?

6           A      In this matter?  No, Judge

7      Gonzales was not making a decision,

8      initial determination.  He was presenting

9      a report on his investigation of potential

10     intercompany claims and third-party claims

11     against the non-debtor affiliates.

12          Q      Right.

13                 But he did reach certain

14     conclusions and make certain

15     recommendation as to the likelihood of

16     success with respect to estate and

17     third-party claims, right?

18          A      Yes, he did.

19          Q      And in doing that, he assessed

20     the evidence, right?

21          A      Yes, he did.

22          Q      And he did that through the form

23     of receiving submissions from parties that

24     discussed the evidence, correct?

25          A      Yes, I believe he did.

1                        Lyons

2        Q    And he did that through

3    interviewing many witnesses, correct?

4        A    Yes.

5        Q    And he did that by reviewing

6    millions and millions of documents, right?

7        A    Pages of documents, yes.

8        Q    Did you do any of that in this

9    case?

10       A    I reviewed some of the

11   contracts.  I did not interview any

12   witnesses.

13       Q    Okay.

14            So in terms of learning the

15   facts, just so we're clear here, what you

16   did is assumed the facts that Judge

17   Gonzales found to be reliable, correct?

18       A    I assumed the facts that Judge

19   Gonzales reported in his examiner's report

20   based upon his thorough investigation.

21       Q    Well, he characterized his own

22   findings as imprecise, did he not?

23       A    He did.  I think he said

24   "inherently imprecise".

25       Q    And do you have any reason to

Page 110

1                          Lyons

2      doubt his own characterization of his work

3      as inherently imprecise?

4          A     No, I think that was accurate.

5          Q     And so by definition, isn't your

6      work inherently imprecise?

7                MR. COHEN:  Object to the form.

8          A     Yes.

9          Q     Now, it is also true that two

10     judges can look at the very same evidence,

11     and hear the very same arguments, and may

12     nevertheless reach different conclusions,

13     right?

14         A     That is true.

15         Q     And in this case, you actually

16     don't know the respective perspectives of

17     the parties as it relates to the evidence,

18     do you?

19               MR. COHEN:  Object to the form.

20         A     I think I do have some knowledge

21     as to the perspective of some of the

22     parties regarding the evidence.

23         Q     And which parties?

24         A     The debtor, I understand that

25     the Chief Restructuring Officer has some

                          Lyons

1

2    disagreement with Judge Gonzalez's view of

3    the facts and law.

4        Q     And what is your understanding

5    based upon?

6        A     Review of Mr. Kruger's --

7    transcript of Mr. Kruger's deposition that

8    occurred recently.

9        Q     When did you review Mr. Kruger's

10   deposition?

11       A     I think within the last week.

12       Q     Why?

13       A     Why?  It was provided to me by

14   Milbank.

15       Q     Upon reading Mr. Kruger's

16   deposition, did you -- did it lead you to

17   change any of your views expressed in your

18   report?

19       A     No.

20       Q     Is there any other deposition

21   testimony that you have read since

22   preparing your report?

23       A     Yes.

24       Q     Who else?

25       A     I think there were nine total

Lyons

1    depositions that I've reviewed.

2        Q    Can you name --

3        A    Let's see if I can name them

4    all.

5        Q    We only have seven hours.

6        A    Miss Duncilla.  Mr. Cortiz,

7    Mr. Marks, Mr. Kruger.  That's four,

8    right?  Mr. Rensy, Mr. Young.  Let's see,

9    and there is another in there I can't

10   remember.  And Mr. Fazio and Mr. Cheli.

11   And there is one more.  I think I've only

12   named eight.  There is one more I can't

13   remember off the top of my head.

14       Q    And is there anything that you

15   recall from any of those depositions that

16   caused you to change your views or

17   opinions as expressed in your report?

18       A    No.  I'm sorry, speaking too

19   quickly.

20       Q    Was there anything that you

21   learned in any of those depositions that

22   was new to you that you hadn't previously

23   read about in the examiner's report?

24       A    Yes.

1                        Lyons

2        Q      What do you recall in that

3    regard?

4        A      I recall Mr. Kruger's testimony

5    that he in participating in the mediation

6    did not attempt to value either the

7    intercompany claims or the third-party

8    claims, and he described his approach as a

9    top-down approach.

10            And if I can characterize how I

11   understood he was testifying, that his

12   goal was to see how much he could convince

13   AFI to contribute, and on the other hand,

14   how much would be acceptable to the other

15   constituents who would be receiving the

16   benefit of that contribution.  And if he

17   could make those two coincide, that would

18   result in a resolution without considering

19   the merits of any particular claim.

20       Q      Anything else you recall?

21            MR. COHEN:  Objection.  Vague.

22       Q      Anything else that you recall

23   learning from any of these depositions

24   that was different or new compared to what

25   you had read in the examiner's report?

Lyons

1

2       A       Yes.   Let's see, one of the

3  deponents testified about the impact of an

4  increase in the settlement fund from 750

5  million to 2.1 billion.  And he or she, I

6  don't remember which witness it was, said

7  that while the examiner spoke in terms of

8  cancelation of indebtedness income and how

9  that would be impacted by the amount

10  contributed by AFI, this witness did not

11  think that the tax impacts would be on

12  income basis, but would be on a capital

13  transaction basis.  And that made a

14  difference, although the direction of the

15  difference was still the same.  In other

16  words, the more that was contributed by

17  AFI, the more tax benefit would be

18  available to the parent companies on the

19  consolidated returns.

20       Q       Do you have any reason to

21  dispute -- and that was Mr. Aratakis I

22  believe that you may have read.

23       A       That's the name I didn't

24  mention.

25       Q       Do you have any reason to

1                          Lyons

2      dispute Mr. Aratakis's testimony that the

3      examiner's Cody analysis was not the

4      proper methodology to apply?

5          A     No, I do not know how that --

6      how the winding up of ResCap would be

7      reported, whether it would be a capital

8      transaction or whether there would be

9      cancelation of indebtedness income.

10         Q     By the way, in your report, you

11     stated that -- in Section B, that you were

12     giving the opinion as of the date of the

13     report, and you expressly disclaimed any

14     obligation to update or supplement your

15     opinions to reflect any facts or

16     circumstances that may hereafter come to

17     your attention or any changes in laws

18     which may hereafter occur.

19             Do you recall writing that?

20         A     Yes, I do.

21         Q     Why did you include that caveat

22     in your report?

23         A     Because I did not want to

24     undertake an ongoing obligation to

25     continue to investigate what was happening

Page 116

1                          Lyons

2      or to keep up with changes in the law.

3          Q      So why did you review the

4      various deposition transcripts that you

5      did following the date that you issued

6      your report?

7          A      Just because I was asked to.

8          Q      By counsel?

9          A      Yes.

10         Q      And had you found something that

11     materially changed your views in those

12     reports, would you nevertheless disclaim

13     an obligation to change your opinions in

14     the report?

15             MR. COHEN:  Objection.  Vague.

16         Calls for speculation.

17         A      I don't know, because I don't

18     think that I found anything that would

19     cause me to change my opinion.

20         Q      Now, you in rendering your

21     opinion, you mentioned --

22             MR. SIMON:  Withdrawn.

23         Q      I asked you if you knew anything

24     about the perspectives of the parties'

25     views of the claims in this case, and you

1                        Lyons

2       testified that you knew something about

3       the debtors based on those transcripts.

4               Is there any other basis on

5       which you -- actually --

6               MR. SIMON:  Withdrawn.

7       Q       The views that you may have

8       formed about the debtor's views of these

9       claims, those views were formed after you

10      gave your report in this case, correct?

11              MR. COHEN:  Objection

12          mischaracterizes the testimony.

13      Q       Well, by definition, they are

14      predicated on deposition testimony that

15      was taken after the date of your report,

16      correct?

17              MR. COHEN:  Objection.

18          Mischaracterizes the testimony.

19      A       Well, I think when I was

20      undertaking the project, I knew that there

21      was a dispute between the JSNs and other

22      parties.  I assume that the debtor would

23      be on the opposite side of the JSNs, and I

24      assume that the unsecured creditors would

25      be on the opposite side of the JSNs.

1                          Lyons

2          Q      Right.

3                 So my question is specifically

4      with respect to the views and the merits

5      of the claim, what knowledge, if any, did

6      you have of the debtor's views of the

7      merits of the claims prior to issuing your

8      report in this case?

9          A      Only what was contained in

10     Arthur Gonzalez's expert report.

11         Q      And is the same true with

12     respect to the views of Ally Financial?

13         A      Yes.

14         Q      And is the same true with

15     respect to the views as to the merits of

16     the claims with respect to the Committee

17     of Unsecured Creditors?

18         A      Let's see, I did see some expert

19     reports actually, I think they're

20     mentioned in the appendix to the report,

21     that had to do with the mortgage-backed

22     securities claims and the settlement of

23     the, I believe, the RMBS trust

24     settlements.  But I did know that the

25     committee had a different view than the

Page 119

Lyons

debtor with regard to the RMBS settlement.

Q    And what was the committee's

view with respect to the RMBS settlement

to your recollection?

A    That it was too high.

Q    And what was the debtor's view?

Is there anything else that you recall

about the committee's perspective on the

RMBS settlement that you learned prior to

rendering your report in this case?

A    No, I don't think so.

Q    Is there anything else to your

knowledge --

MR. SIMON:  Withdrawn.

Q    Is there anything else to your

recollection that you knew about the

committee's perspective on the estate

claims and the value thereof prior to

rendering your report in this case?

MR. COHEN:  Object to the form.

A    I can't think of anything that I

learned other than what's in the

examiner's report regarding the

committee's view of any particular estate

Page 120

Lyons

1

2   cause of action.

3       Q      And what about with respect to

4   the JSNs, what, if anything, did you know

5   about the JSNs' views of the claims prior

6   to issuing a report in the case?

7       A      I don't think I knew anything

8   about the JSNs' position regarding the

9   relative merits of any particular claim.

10      Q      The JSNs were provided an

11  opportunity, at least through their

12  counsel, to provide input on your final

13  report in the form of comments, correct?

14      A      Correct.

15      Q      And, in fact, the JSNs were

16  available to you, should you -- either

17  they or their counsel, should you want to

18  ask questions about their perspective of

19  the claims, correct?

20      A      Theoretically, I guess they

21  were.  I don't recall ever availing myself

22  of that theoretical possibility.

23      Q      But you could have if you wanted

24  to, right?

25      A      I would say theoretically I

1                           Lyons

2    could have, yes.

3        Q     And you had regular

4    communications both electronic and oral

5    with counsel to JSNs, right?

6            MR. COHEN:  Objection?

7        Mischaracterizes testimony.

8        A     I personally did not, but my

9    colleagues informed me that they had some

10   communications with counsel for the JSNs.

11       Q     And those are the same counsel

12   that helped you work on the report,

13   correct?

14       A     Yes.

15       Q     And that helped you formulate

16   your judgment and opinions in that report,

17   correct?

18       A     That's true.

19       Q     In reaching your opinions as to

20   the value of the claims, did you read any

21   statements made by AFI in the public

22   domain regarding the global settlement?

23       A     I don't recall reading any

24   statements.

25       Q     I think you testified earlier

Page 122

Lyons

1

2  today that you learned about the ResCap

3  case by reading news accounts?

4      A    Yes.

5      Q    Do you recall reading any news

6  accounts about the global settlement prior

7  to your issuance of your report?

8      A    I definitely read about it in

9  Law360.  And I may have seen it in the

10  Wall Street Journal and the New York

11  Times.

12      Q    And what, if anything, do you

13  recall reading about the global

14  settlement?

15      A    Just that it had been reached,

16  and the amount that was going to be

17  contributed.

18      Q    Anything else?

19      A    In the press reports, I think

20  the press reports may have mentioned that

21  there were, besides the debtor and AFI,

22  that there were other constituencies that

23  were part of the global settlement.

24      Q    Don't you think it would have

25  been helpful in rendering your opinions to

1                       Lyons

2       try to glean from statements of Ally

3       Financial its perspective with regard to

4       the settlements and the merits of the

5       claims?

6           A     The merits of the claims, I

7       didn't see any -- other than what was

8       provided to Arthur Gonzales for his

9       examiner's report, and I know that he

10      sought the input from all the parties,

11      including AFI, I did not seek any input

12      from any of the parties regarding the

13      merits of the claim.

14          Q     And why; why did you not?

15          A     I did not want to recreate what

16      Judge Gonzales had done.

17          Q     And to be clear, you didn't

18      personally review any submissions that

19      Judge Gonzales received from either AFI or

20      any other party, correct?

21          A     That's correct.

22          Q     Okay.

23                And I understand you were

24      sensitive to duplicating work, but can you

25      tell me why you did not think it important

Lyons

1
2    to see whether Ally Financial has

3    expressed any opinions in the public

4    domain regarding the nature of the global

5    settlement or why it decided to enter into

6    the global settlement?

7        A     Actually, I was told that there

8    was a mediation confidentiality, and that

9    the whatever happened during the mediation

10   was confidential and could not be

11   disclosed.

12            MR. SIMON:  I'm going to ask the

13        reporter to mark as Lyons' Exhibit 3,

14        a press release issued by Ally

15        Financial on May 23, 2013.  Captioned

16        "Ally Financial marks next step in

17        implementing the comprehensive ResCap

18        settlement".

19            (Press Release Issued by Ally

20        Bank, May 23, 2013, was marked as

21        Lyons Exhibit 3 for identification, as

22        of this date.)

23   BY MR. SIMON:

24        Q     Take whatever time you want,

25   Mr. Lyons, to look this over, but I'm

1                        Lyons

2       going to direct your retention to the

3       second page of this.

4                    Have you seen this press release

5       before?

6            A       I don't believe so.

7            Q       Can you look at page 2.

8                    Do you know who Michael

9       Carpenter is?

10           A       Let me just read for a minute.

11           Q       Sure.  Take your time.

12                   (Witness reviewing document)

13           A       Okay.  I've read it.  Thanks.

14           Q       Do you see on the second page of

15      the press release where Mr. Carpenter --

16      first of all, who is Mr. Carpenter?

17           A       He is identified here as the

18      chief executive officer.

19           Q       And apart from reading that

20      title, did you have a knowledge as to who

21      Mr. Carpenter was before today?

22           A       Yes, from the examiner's report.

23           Q       And he states in his press

24      release, "Reaching this comprehensive

25      agreement enable Ally to turn the page on

                              Lyons

1

2    the tumultuous chapter in its history that

3    was severely impacted by the issues in the

4    mortgage industry."

5              Do you see that?

6         A    Yes.

7         Q    Do you have any reason to

8    dispute that that is a bona fide belief by

9    Mr. Carpenter?

10        A    No.

11        Q    And moving on a paragraph or so

12   later, he says, "Reaching closure on the

13   ResCap matter is a critical step in

14   successfully completing our strategic

15   initiatives."

16             Do you see that?

17        A    No, where is that?

18        Q    It is the next to last

19   paragraph.  "Ally has paid 6.1 billion to

20   the treasury to date and reaching closure

21   on the ResCap matter" -- do you see that?

22        A    Yes.

23        Q    And, again, do you have any

24   reason to doubt the bonafides of that

25   statement by Mr. Carpenter?

Page 127

Lyons

1

2      A      No.

3      Q      And you didn't consider in

4   substance or form this press release prior

5   to rendering your judgment on the value of

6   the claims in this case, right?

7      A      In substance I did, yes.

8      Q      So what do you know about Ally's

9   strategic initiatives?

10     A      I knew that Ally wanted to put

11  the mortgage business behind it and wanted

12  to repay the TARP funds and get out from

13  under government control.  And I

14  considered that a motivation for AFI to

15  come up with a large settlement fund, as

16  it has.

17     Q      Do you know whether AFI hoped to

18  conduct an IPO in order to help pay back

19  funds to the U.S. Government?

20     A      That was my understanding, yes.

21     Q      And do you think it could have

22  done that with tens of billions of

23  liability hanging over its head?

24     A      I concluded that that contingent

25  liability was an impediment to an IPO.

1                            Lyons

2       Q     And would you agree with me that

3    2.1 billion dollars is a lot of money to

4    pay into a plan?

5       A     Yes.

6       Q     And putting aside the mass tort

7    context in the WAMU case, can you name

8    another bankruptcy where a parent company

9    has paid something along those lines to a

10   plan?

11      A     No.

12      Q     And in the mass tort context,

13   would you agree that large payments such

14   as that are often made to secure global

15   peace?

16      A     In the mass tort context.  Yes,

17   that's true.

18      Q     And would you agree that

19   similarly here, AFI might have been

20   willing to pay a large amount of money for

21   global peace?

22      A     I would expect that's true.

23      Q     As opposed to parsing between

24   and among any individual particular causes

25   of action that a litigant might lodge

1                        Lyons

2    against them?

3              MR. COHEN:   Objection.   Calls

4         for speculation.

5         A     Well, it seemed to me that the

6    only way for the parties to -- I shouldn't

7    say the only way.   That an appropriate way

8    for the parties to come to an amount for

9    the AFI contribution was to take into

10   consideration what claims could be brought

11   against AFI and the merits of those claims

12   and the value of those claims.

13        Q     You think in the mass tort

14   context that's how a global settlement is

15   sort of evaluated and reached?

16        A     In the mass torts context?

17        Q     Uh-huh.

18        A     Can you give me an example?

19        Q     No.  I'm just asking you

20   generally.

21             I think you testified that it's

22   common in that context, where there is

23   massive amounts of liability, for a

24   company to pay a large amount -- a

25   non-debtor company parent to pay a large

Page 130

1                        Lyons

2      amount of money into a plan to secure

3      global peace?

4          A      I don't think I said parent.

5          Q      For a company, for a company to

6      pay.

7          A      I was thinking of insurance

8      companies in the asbestos context --

9          Q      Fair enough.

10         A      -- to put money in and get the

11     benefit of a 5.4G order.

12         Q      To the extent AFI was motivated

13     by a global release in order to put behind

14     it the litigation maelstorm that it had

15     encountered coming out of the credit

16     crisis, you did not consider that

17     motivation in your analysis, did you?

18         A      I did.

19         Q      How?

20         A      With regard to the RMBS claims,

21     I considered that was the -- one of the

22     major motivations for AFI in coming up

23     with a large settlement fund, and I

24     ascribed a large value to those claims

25     even though the merits were very weak.

Lyons

1

2      Q     But, sir, isn't the liability

3   stemming from the credit crisis not merely

4   restricted to the RMBS claim?

5      A     The liability.  I would have to

6   look at the individual claims and see

7   which may have been impacted by the credit

8   crisis from AFI's point of view.

9      Q     So you don't know as you sit

10  here today?

11     A     I would have to look through

12  them, but the one that seems most

13  important to me are the RMBS claims.

14     Q     Can you look at the first page

15  of the release.

16           You see there in the second

17  paragraph of the first page, there is a

18  discussion of the release in the plan?

19     A     Yes.

20     Q     And there is a reference to the

21  fact that the major creditors agreed to

22  support the Chapter 11 plan in ResCap's

23  Chapter 11 cases that contained broad

24  releases for the benefit of Ally?

25           MR. COHEN:  Where are you

Page 132

1                           Lyons

2           reading?

3                   MR. SIMON:   It is the middle of

4           the second paragraph.

5                   (Witness reviewing document)

6           A     Yes, I've read the second

7    paragraph.

8           Q     And you see actually the release

9    is prominently presented in the press

10   release; it's right up front in the press

11   release.

12                  Do you see that?

13                  MR. COHEN:   Objection.   The

14          document speaks for itself.

15          Q     You would agree with me it is

16   the first thing that is discussed before

17   there is even a settlement amounts of was

18   case, right?

19          A     In the second paragraph?

20          Q     Yes.

21          A     Yes.

22          Q     As a bankruptcy judge, I think

23   you testified earlier you would agree that

24   to get a third-party release as a

25   practical matter, Ally needed to secure

Page 133

                          Lyons

1

2    the support of ResCap's major creditors?

3        A    Yes.

4        Q    And absent that consent, I take

5    you don't think that the plan could be

6    approved with a release?

7        A    To get a release, the standard

8    requires the consent of a significant

9    portion of the parties who would be giving

10   the release.

11       Q    Right.

12            And so without that, it is

13   unlikely to be approved, correct?

14       A    Without the support of the

15   substantial body of those parties who are

16   being asked to give a release, it is

17   unlikely that the release would be

18   approved.

19       Q    In this case, if one major

20   creditor objected, for example, MBIA or

21   AIG, do you think the Bankruptcy Court

22   would impose a release?

23       A    I really haven't thought about

24   that.

25       Q    You have no way of knowing that

Page 134

1                        Lyons

2     as you sit here today?

3              MR. COHEN:   Objection.

4        Mischaracterizes his testimony.

5        A     I would have to give it more

6     thought than to give you off the top of my

7     head an answer to that.

8              MR. COHEN:   Who just joined the

9        call?

10             MR. O'NEILL:   Brad O'Neill,

11       Kraemer Levin.

12       Q     Did you take into account at all

13    AFI's motivation to secure a broad

14    release?

15       A     Yes.

16       Q     How?

17       A     I think I just explained.

18    Primarily with regard to the RMBS claims,

19    I thought that AFI was very motivated to

20    obtain that broad release because it

21    wanted to put behind it the mortgage mess,

22    and it wanted to repay the taxpayers, and

23    it wanted to return to private ownership.

24    And in order to do that, it seemed to me

25    that AFI wanted to obtain a broad release

1               Lyons

2    and have all of those uncertainties behind

3    it.

4        Q     But to be clear, you don't have

5    any personal knowledge of just how much

6    AFI was willing to pay for a third-party

7    release, do you?

8        A     No.  Don't we all wish we knew

9    that?

10       Q     Do you have knowledge whether in

11   the absence of a release, AFI would have

12   been willing to settle at any amount?

13       A     At any amount.  I don't have

14   knowledge about that.

15       Q     So they might not have settled

16   at all without that release; isn't that

17   possible?

18       A     That is a possibility.

19       Q     In your experience as a

20   bankruptcy judge, are there sometimes

21   litigation milestones that could have an

22   impact on the value of settlement?

23       A     Yes.

24       Q     Can you give me some examples of

25   those?

1                          Lyons

2        A       A motion to dismiss.

3        Q       And how might that impact

4    settlement?

5        A       If the plaintiff survives a

6    motion to dismiss, that would impact the

7    assessment of each party on the relative

8    merits.

9        Q       And if a defendant thought it

10   likely that a plaintiff would survive a

11   motion to dismiss, would that have an

12   impact on settlement negotiations?

13       A       Before the motion was heard?

14       Q       Correct.

15       A       Yes.

16       Q       And what would that impact be?

17       A       It would tend to induce the

18   defendant to give greater value to the

19   merits of the claim and to the reasonable

20   settlement amount.

21       Q       And are there other litigation

22   milestones that could affect the impact or

23   that could impact the value of

24   settlements?

25       A       Yes.

1                          Lyons

2        Q     And can you tell me some others?

3        A     Motion for summary judgment.

4        Q     And could you explain the impact

5   that could have on settlement value?

6        A     Yes.  If a defendant were to

7   survive a motion for summary judgment,

8   again it would cause the parties to

9   reevaluate the merits of the -- I'm sorry,

10  if a plaintiff were to survive a motion

11  for summary judgment, it would cause the

12  parties to reevaluate their assessment of

13  the relative merits of the claim and the

14  reasonable settlement value.

15       Q     Can you turn to page 54 of Lyons

16  Exhibit 1, which is your report.

17             And here there is, toward the

18  bottom of the page, a number 7 for single

19  entity theories for liability.

20             Do you see that?

21       A     Yes.

22       Q     And the first is piercing the

23  corporate veil.

24             Do you see that?

25       A     I do.

Page 138

1                          Lyons

2        Q      Now, in this section, you noted,

3    "The examiner's investigation uncovered

4    evidence of certain indicia that ResCap

5    and AFI operated as a single economic

6    unit."

7        A      Yes.

8               MR. COHEN:   Objection.

9    Misstates the document.

10              MR. SIMON:   Entity.   Withdrawn.

11   My apologies?

12       A      Where are you reading from?

13   Sorry.

14       Q      "Single economic entity".

15       A      I have that.

16       Q      "ResCap's conduct in connection

17   with a number of affiliate

18   transactions" -- and there is a number

19   there listed there -- "departed in some

20   important respects from appropriate

21   corporate formalities."

22              Do you see that?

23       A      Yes.

24       Q      Can you tell me as you sit here

25   today the important respects in which any

1                          Lyons

2      of these affiliate transactions departed

3      from appropriate formalities?

4          A      The 2006 bank restructuring,

5      there was a failure to inform the

6      independent directors of ResCap that the

7      restructuring could be accomplished

8      without restricting ResCap to non-voting

9      stock.

10              The MSR Swap, the Pipeline Swap,

11     I believe that those agreements were

12     affiliate transactions that should have

13     gone to ResCap's board for approval but

14     did not, and approval by the independent

15     directors.  I don't believe that was done

16     in those cases.

17              The first 2009 tax allocation

18     agreement, that agreement had been

19     approved by ResCap's board, had been

20     signed by an appropriate representative of

21     AFI and submitted to ResCap's

22     representative for signature, and then it

23     was pulled back by AFI, and copies of

24     those signed documents were destroyed.

25              The second tax allocation

                          Lyons

1

2    agreement was signed as a substitute for

3    the first tax allocation agreement without

4    any additional consideration given to

5    ResCap, and was inferior to the first tax

6    allocation agreement from ResCap's point

7    of view.

8              Let's see.

9              The allocation of liability in

10   connection with the FRB/FDI settlement and

11   DOG -- excuse me -- DOJ/AG settlement.

12   The allocation gave ultimate

13   responsibility to ResCap when it appeared

14   that AFI had some independent basis for

15   liability, however, the source of funding

16   for those payments did ultimately come

17   from AFI down to the subsidiaries.

18        Q    Okay.

19             And are you done with your

20   answer?

21        A    I think I am, yes.

22        Q    And is that answer all

23   predicated on what you read in the

24   examiner's report?

25        A    Yes, I believe it is.

Page 141

Lyons

1

2      Q      And with respect to any claim,

3  but in particular the alter ego claim

4  you're aware of no facts, outside of what

5  was presented in the examiner's report,

6  that informs your view of the value of

7  that claim?

8      A      That's correct.

9      Q      And I earlier mentioned the fact

10  that the committee in this case had filed

11  a motion for standing to pursue claims

12  against AFI on behalf of the estate.

13          Do you recall that?

14      A      You did mention that.

15      Q      And I referred to that and you

16  hadn't heard the term as an STN motion?

17      A      Yes.

18          MR. SIMON:  I'm going to

19      introduce as Lyons Exhibit 4 a

20      document that is dated April 11, 2013.

21      It is a notice of motion of the

22      Official Committee of Unsecured

23      Creditors for entry of an order

24      authorizing the committee to prosecute

25      and settle certain claims on behalf of

                    Lyons

1

2       e debtor's estates, and it attaches a

3       memorandum of law in support of the

4       motion.

5               (Notice of Motion by Official

6       Committee of Creditors, dated April

7       11, 2013, marked as Lyons Exhibit 4

8       for identification, as of this date.)

9   BY MR. SIMON:

10      Q     Mr. Lyons, have you seen -- take

11  a moment to look at it of course, and let

12  me know if you have seen this document

13  before.

14              (Witness reviewing document)

15      A     I do not believe I have seen

16  this document before.

17      Q     Okay.

18              In your report, you note that an

19  alter ego claim constitutes property of

20  the debtor corporation, and the debtor in

21  possession or bankruptcy trustee has

22  exclusive standing to assert such a claim.

23              Is that an accurate statement of

24  one of your statements about the

25  examiner's analysis and conclusions?

Page 143

Lyons

1

2      A      Yes.   That is the examiner's

3      analysis, and I agree with that.   It is

4      not a proposition that's without dispute.

5      Q      But you accepted it for purposes

6      of your analysis?

7      A      I do.   I think the examiner's

8      analysis was correct.   I agreed with it.

9      Q      And do you know whether in this

10     case the debtor in possession consented to

11     the committee bringing claims on its

12     behalf against AFI?

13     A      I do not know.

14     Q      Can you take a look please at

15     paragraph 7 of the memorandum of law.

16            (Witness reviewing document)

17            Do you see in the third sentence

18     of paragraph 7, there is a reference to

19     the fact that the debtor has consented to

20     the committee's prosecution of the claims,

21     and thereby impliedly acknowledged the

22     claims are both substantial and worth

23     pursuing with estate resources?

24     A      I see that sentence, yes.

25     Q      Do you have any reason to

Page 144

1                          Lyons

2       dispute the fact that the debtor has

3       consented to the committee standing to

4       pursue actions against AFI in this case?

5              A      I was not aware of the debtor's

6       consent one way or the other.

7              Q      And do you know whether or not

8       such standing extended to pursuing an

9       alter ego claim?

10             A      I do not know that.

11             Q      If it had, would it impact your

12      findings in any way with respect to the

13      point that typically a debtor corporation

14      has exclusive standing to assert the

15      claim?

16             A      I don't think so.

17             Q      Can you tell me the elements of

18      an alter ego claim?

19             A      Yes.  That there is -- that the

20      entities operate as a single economic

21      unit; that there was some confusion on

22      behalf of parties dealing with the

23      entities as to whether there was a

24      separate existence; and also there must be

25      an unfair element to treating the entities

1                        Lyons

2      as separate.

3          Q      And you write in your report

4      that a debtor that succeeds in piercing

5      its own corporate veil may hold the parent

6      liable for all of its debt?

7          A      That's correct.

8          Q      And so in this instance, the

9      totality of debts that were owed exceeded

10     20 billion dollars, right?

11         A      Yes.

12         Q      And so if an alter ego claim

13     were successful, Ally Financial would be

14     essentially responsible for the totality

15     of in excess of 20 billion dollars in

16     debt, right?

17         A      As I understand it.  The 20

18     billion dollars, I assume you know what

19     you're talking about in terms of the

20     claims against the estate.  I'm not sure I

21     know all of the claims against the estate.

22         Q      Well, can you turn for a moment

23     to page 79 of your report?

24         A      Yes.

25         Q      And this is where you purported

1                          Lyons

2      to do your analysis of both the alter ego

3      claim and the control person claim.

4               Do you see the first line of

5      your analysis reads "Potential Damages"

6      page 79?

7      A      79.  No, I don't see that.

8      Q      Page 79 of your report.

9      A      Yes, I have it.

10     Q      In the middle of the page, it

11     says "potential damages"?

12     A      Oh, yes, okay.

13     Q      And do you see the figure there

14     is 20 billion dollars?

15     A      Yes.

16     Q      So would you agree with me your

17     alter ego analysis was predicated on

18     liabilities of 20 billion dollars,

19     potential liabilities?

20     A      No, only the RMBS liability was

21     potentially 20 billion dollars.

22     Q      So is your testimony that if the

23     committee were successful in its claim

24     against Ally Financial in an alter ego

25     theory, the sole liability that would

Page 147

Lyons

1

2   attach would be for RMBS liability?

3       A      No.

4       Q      So you're saying the 20 billion

5   dollars only reflects the RMBS liability

6   in your report?

7       A      In my report, yes.

8       Q      So it's actually greater than 20

9   billion dollars, the potential magnitude

10  of liability that Ally Financial would be

11  subject to should an alter ego theory

12  prevailed.

13      A      Yes, I think that's correct.

14      Q      And do you know whether or not

15  there is any statute of limitations for an

16  alter ego claim?

17      A      No, I do not.

18      Q      Now, you state at page 56 of

19  your report, if we can go back to that.

20             In the last sentence, under

21  "settlement considerations", that "despite

22  the fact that the examiner concludes and I

23  agree that veil piercing and alter ego

24  claims are unlikely to succeed, I conclude

25  there is significant settlement value not

Page 148

Lyons

1

2   to exceed 480 million as discussed in the

3   third-party RMBS litigation analysis

4   below."

5       A    Yes.

6       Q    What is your rationale for

7   including the discussion of the alter ego

8   claim that could be brought by the

9   committee in the third-party RMBS

10   litigation analysis in your report instead

11   of on a standalone basis?

12           MR. COHEN:   Object to the form.

13   Vague.

14       A    Because it was my understanding

15   that the RMBS claims were the largest

16   claims, potentially largest claims against

17   AFI and the debtors, and so that would be

18   the area where it seemed to me that AFI

19   would be motivated to settle those claims

20   and get a release even though the claims

21   may not have had the best merit.

22       Q    But to be clear, you're talking

23   about the liability for the RMBS claims as

24   20 billion, right?

25       A    That's what I estimated the

1                        Lyons

2     liability would be for attempting to

3     arrive at a reasonable settlement amount.

4          Q     And that's in your view the

5     biggest liability that was at issue, the

6     liability for those claims; is that fair?

7          A     That's what I gleaned from the

8     examiner's report, that the RMBS claims

9     were potentially the largest claims

10    against the debtors and against AFI.

11         Q     But if an alter ego claim were

12    successful --

13         A     Yes.

14         Q     -- the committee would be able

15    to get to Ally Financial to recover for

16    those liabilities, correct?

17         A     For all liabilities.

18         Q     Including the RMBS liabilities?

19         A     Including the RMBS, and any

20    other claims that were valid against the

21    debtor.

22         Q     And, frankly, it would not need

23    to prove a control person theory to do

24    that, would it?

25         A     That's correct.

Page 150

                        Lyons

1

2        Q     And, in fact, the alter ego

3   claim does not belong to a third-party,

4   does it?

5        A     As I said, we concluded that in

6   the bankruptcy context, the alter ego

7   claim belongs to the debtor under Delaware

8   law.

9        Q     In fact, you in your report

10  stated that you agreed with the examiner's

11  conclusion that third-party claimants may

12  lack standing with respect to an alter ego

13  claim because the veil piercing claim

14  belongs to the bankruptcy estate under

15  applicable law, right?

16       A     Yes.

17       Q     So, again, why didn't you do the

18  alter ego analysis on a standalone basis,

19  but instead include in the third-party

20  section of your report?

21       A     Well, I believe that I said that

22  I thought that the estate representative

23  would work together with the third-party

24  claimant, and that the -- in terms of

25  settlement value, most of the motivation

Page 151

Lyons

1

2      would come from the magnitude of the

3      third-party RMBS claims to resolve an

4      alter ego type of claim.

5          Q     Right.

6                And to be clear, the committee's

7      motion for alter ego would have gotten to

8      recovery for the magnitude of the RMBS

9      exposure, correct?

10         A     Yes.

11         Q     And so I'll ask you again:  Why

12     was it appropriate not to analyze the

13     alter ego claim on its own in your report?

14         A     Because I thought it would be a

15     joint effort frankly of the estate

16     representative and the RMBS claimants.

17         Q     Do you have any firsthand

18     knowledge of that?

19         A     No, that was my estimation of

20     how that would -- how those parties would

21     work together to induce AFI to make a

22     substantial payment to settle those

23     claims.

24         Q     Do you know whether the

25     committee's motion included any claims for

Page 152

1                           Lyons

2      control person liability?

3           A      I do not.

4           Q      Can you look at paragraph 3 of

5      the motion?  Could you read into the

6      record paragraph 3?

7           A      You're talking about on page 2?

8           Q      Yes.

9           A      "In short, the information

10     available to date paints a stark picture

11     of AFI's nomination control and abuse of

12     the debtors that supports strong claims

13     against the AFI defendants, including for

14     veil piercing.  Fraudulent conveyance,

15     indemnification, preferential transfer,

16     and equitable subordination, all of which

17     the committee is prepared to litigate

18     vigorously.  These claims present a real

19     threat that AFI ultimately will be liable

20     for unsecured liabilities of the debtors

21     of more than 20 billion dollars."

22          Q      Had you seen that statement

23     before today?

24          A      No.

25          Q      Nowhere in that paragraph does

Page 153

Lyons

1

2  it allege that the committee was seeking

3  to press a theory of control person

4  theory, does it?

5      A     I didn't see it in what I just

6  read.

7      Q     And does it say anywhere, by the

8  way, that the committee is seeking a

9  breach of contract claim in any respect?

10      A     In this paragraph 3?

11      Q     Right?

12      A     No.

13      Q     Are you aware whether the

14  committee ever asserted a breach of

15  contract claim against AFI?

16      A     I am not.

17      Q     Are you aware of any party that

18  asserted a breach of contract claim

19  against AFI?

20      A     No, I'm not.

21      Q     And you realize the examiner's

22  report in this case was issued after the

23  global settlement was reached by the

24  parties.

25          Do you know that?

1                        Lyons

2        A        I understand that the examiner's

3    report, there was a delay in issuing it to

4    allow the parties to complete the

5    mediation.  They completed the mediation

6    and then the report was made public.

7        Q        And that was so the report would

8    not have an impact on settlement

9    negotiations; is that fair?

10       A        That sounds right.  I don't

11   know, but I assume that is a fair

12   characterization.

13               MR. SIMON:  I think we need to

14          change the tape.  So it may make sense

15          to do that before we continue, and

16          break for lunch.

17               THE VIDEOGRAPHER:  This marks

18          the end of tape number two.  We're

19          going off the record at 1:01 p.m.

20               (Thereupon, a recess was taken,

21          and then the proceedings continued as

22          follows:)

23   A F T E R N O O N   S E S S I O N

24               THE VIDEOGRAPHER:  This marks

25          the start of tape number three.  We're

Page 155

1                          Lyons

2          back on the record at 1:42 p.m.

3     R-A-Y-M-O-N-D   T.   L-Y-O-N-S, resumed

4          and testified as follows:

5     EXAMINATION BY (Cont'd.)

6     MR. SIMON:

7          Q     Mr. Lyons.

8          A     Good afternoon.

9          Q     I don't recall if I asked you,

10    did you ultimately read the entirety of

11    the examiner's report from front cover to

12    back cover?

13         A     Yes, I did.  I can't say that I

14    read the appendix from front to back, but

15    I did read most of the appendix.

16         Q     And when did you do that, before

17    issuing your report, after, or a

18    combination?

19         A     Combination.

20         Q     How much had you read before

21    issuing your report?

22         A     Probably 90 percent.

23         Q     Do you recall which pieces,

24    which 10 percent you read after your

25    report?

Page 156

Lyons

1

2      A      It was primarily Section 6,

3    which was the evaluation section.   I

4    hadn't read that completely prior to

5    issuing the report.

6      Q      And why is that?

7      A      Frankly, it was the hardest for

8    me to get through.   It was pretty dry

9    material.   And I understood the conclusion

10   that was made about when the debtor became

11   balance sheet insolvent or unable to pay

12   its debts as they came due or had

13   unreasonably small capital.

14     Q      Do you recall when the examiner

15   determined that ResCap was balance sheet

16   insolvent?

17     A      I think it was at the end of

18   2007, balance sheet insolvent, December

19   31st balance, and the other two tests I

20   believe were in August of 2007.

21     Q      And I think you testified you

22   spent a little over half your time reading

23   the report of the 206 hours that you

24   spent?

25     A      That was my estimate.

Page 157

1                        Lyons

2      Q      So, frankly, if you kind of look

3   at the entirety of the report, it was

4   about three minutes per page of reading.

5              Is that a fair assessment of

6   sort of the time you spent reading the

7   report?

8      A      I'm a slow reader, so it's

9   probably so.

10     Q      But it is your testimony that

11  roughly 60 percent of your total time you

12  read the whole thing?

13     A      As I say, that is a -- that is

14  just an estimate without looking at the

15  actual time entries.

16     Q      And with respect to the

17  valuation, you did not do your own

18  independent evaluation of any of the

19  financials in the report, did you?

20     A      That's correct.

21     Q      So is it fair to say when you

22  issued the report in this case, not having

23  read the valuation section, you actually

24  didn't have a full understanding of the

25  examiner's analytical process as it

1                        Lyons

2      related to valuation?

3                 MR. COHEN:   Object to the form.

4           A     No, I knew what the process was.

5      I had looked through the Section 6.  So I

6      knew the methodology that had been used by

7      the examiner's financial advisors, but I

8      had not read line by line the detail of

9      it.

10          Q     And you're aware of the

11     admonition by the examiner that any reader

12     that wants to obtain a thorough

13     understanding of his analytical processes

14     and the reasoning supporting his

15     conclusion should review the report in its

16     entirety?

17          A     Yes.

18          Q     Did you not do that with respect

19     to Volume 6 of the report prior to issuing

20     your report?

21          A     Prior to issuing, I hadn't read

22     it line by line.

23          Q     You mentioned after issuing your

24     report, you read some deposition

25     testimony?

1                        Lyons

2        A       Yes.

3        Q       Did you look at any documents

4    after issuing your report that related to

5    this matter?

6        A       Not any new documents, no.

7        Q       Is there anything else apart

8    from the transcript --

9        A       I don't think so.  I can't

10   remember.  No.

11       Q       Sorry.

12       A       I'm trying to refresh my memory,

13   and I can't recall seeing any different

14   documents other than the transcripts after

15   issuing my report.

16       Q       You state in your report at page

17   7 that in arriving at the likely

18   settlement amount for each of the

19   potential claims identified by the

20   examiner, you consider the likely

21   motivation of the particular litigant

22   regarding the decision to settle the

23   claims?

24                MR. COHEN:  Can you show us

25        where on that page you're reading?

1                    Lyons

2          MR. SIMON:  Sure.  Page 7.  Let

3      me get my copy.  Very top of the page.

4          MR. COHEN:  Thank you.  First

5      paragraph.

6          (Witness reviewing document)

7      A     Yes, that's correct.

8      Q     And on what basis do you purport

9   to opine on the likely motivation of the

10  particular litigants regarding their

11  decision to settle the claims?

12     A     Well, I looked at the estate

13  causes of action as being pursued, I

14  thought by an estate representative.

15  Frankly, I didn't think it would be the

16  debtor in possession.  I thought it would

17  be a committee, or in the event that a

18  trustee were appointed, by a trustee.  And

19  my general perception of fiduciary

20  pursuing litigation is that they are

21  motivated to resolve the matter sooner

22  rather than later so that they can make

23  distribution to creditors who are waiting

24  anxiously to receive a distribution from

25  the estate.

Page 161

1                           Lyons

2         Q      To be clear, what did you mean

3    by the term "particular litigant" in that

4    sentence?

5         A      Looking at who would be the

6    plaintiff, who would be the defendant in

7    any particular claim.

8         Q      And in this instance, were you

9    referring specifically to AFI, for

10   example, as a particular litigant?

11        A      In the instance of certainly the

12   RMBS claims, the alter ego single entity

13   claims, I was focusing on the motivation

14   of AFI as a defendant.

15               But with regard to each of the

16   claims, I also tried to think about the

17   motivation of the defendant would be AFI

18   in each instance, except when Ally Bank

19   and Ally Securities were potential

20   defendants in some of the identified

21   causes of action, and whether they would

22   be motivated to reach a settlement in each

23   case.

24        Q      But prior to lunch, I think we

25   talked about the fact, you have no

Page 162

1                          Lyons

2      personal knowledge of any motivation on

3      AFI's part to enter into this global

4      settlement, do you?

5          A     I think it was set forth in the

6      examiner's report.

7          Q     The motivation of AFI was set

8      forth in the examiner's report?

9          A     I believe there is an indication

10     that AFI wanted to issue an IPO, and that

11     the existence of these large claims was

12     interfering with that.

13         Q     And that's the sole -- that's

14     the entirety of what you predicate your

15     assessment of the likely motivation of AFI

16     to resolve litigation on?

17             MR. COHEN:  Objection.

18         Mischaracterizes testimony.

19         A     No, that's not the entirety of

20     what I -- how I made an assessment of what

21     I perceive AFI's motivations to be.

22         Q     Well, you certainly didn't talk

23     to anybody from AFI?

24         A     Correct.

25         Q     And you didn't read anything in

Page 163

Lyons

1

2       the public domain that was put out by AFI

3       in the settlement, right?

4           A     Well, I read press reports about

5       the existence of the bankruptcy filing and

6       why it was, according to the press

7       reports, that AFI was anxious to have

8       ResCap resolved and put it behind them.

9           Q     But you're have third-hand

10      reports.  You didn't actually read any

11      statements put out by AFI with respect to

12      the global settlement, did you?

13          A     With respect to the global

14      settlement?

15          Q     I think you testified earlier --

16          A     I don't think so.  I don't

17      believe I saw that press release, but I

18      would suspect that that press release was

19      the basis for some articles that I read

20      about the settlement.

21          Q     And is there anything else

22      besides what you testified to that would

23      have informed your view of the particular

24      motivation of AFI in this case?

25          A     Anything else?  Not that I can

1                      Lyons

2      think of.  What I read in the examiner's

3      report and what I read in the press.

4          Q    I want to pick up on your

5      discounting methodology we had asked a few

6      questions about earlier today.

7          A    Yes.

8          Q    Did you consult with anyone as

9      to the appropriateness of that

10     methodology?

11         A    I consulted with my colleagues

12     at Fox Rothchild.

13         Q    Anyone outside of the firm?

14         A    Outside of Fox Rothchild, no, I

15     don't believe so.

16         Q    Are you aware of any criticisms

17     of the discounting methodology?

18              MR. COHEN:  Objection.  Vague.

19         A    No, I'm not.

20         Q    Isn't the discounting

21     methodology essentially your subjective

22     assessment of criteria that in your review

23     based on experience would either increase

24     or decrease the claim's chance of success?

25              MR. COHEN:  Object to the form.

Page 165

1                           Lyons

2        A      I would say that's an accurate

3    statement.

4        Q      And there is no theory or

5    technique that can be used to test your

6    opinions in that regard, is there?

7        A      There is not like scientific

8    experiment, correct.

9        Q      There is certainly no formula,

10   correct?

11       A      Not that I'm aware of, no.

12       Q      In fact, you say in your report

13   that your analysis is a non-formulaic

14   analysis, right?

15       A      Yes.

16       Q      And, frankly, your opinions as

17   to the motives of AFI, that too is really

18   based on nothing more than your own

19   personal belief as to what might have

20   motivated AFI?

21       A      No, I don't think so?  It wasn't

22   only my personal belief.

23       Q      The likely settlement

24   negotiation scenario that we talked about

25   earlier.

Page 166

1                        Lyons

2          A       Yes.

3          Q       The percentages that you applied

4    in that test, have they ever been tested

5    by anyone or verified by anyone?

6          A       No.  Again, it is not like a

7    scientific experiment.

8          Q       And has that methodology gained

9    acceptance among others doing litigation

10   settlement value analysis to your

11   knowledge?

12         A       I believe so, yes.

13         Q       Who?

14         A       Well, I know of other mediators

15   who participated in training that I

16   attended who use that type of analysis to

17   assist parties in evaluating their own

18   positions and the merits and reasonable

19   settlement value of their claims.

20         Q       You mentioned earlier the course

21   work that you have done in mediation, and

22   you said that again.

23                 Do you have any materials that

24   you kept from those courses?

25         A       Yes, I do.

Lyons

1

2        MR. SIMON:  And I'm going to

3    make a request that that material be

4    produced to us.

5        Q    Any materials that speak to the

6    discounting methodology or the likely

7    settlement negotiations scenario

8    methodology that you received in any of

9    the mediation work.

10       MR. COHEN:  We'll take it under

11   advisement.

12       Q    Are you aware of any criticisms

13   of the likely settlement negotiation

14   methodology?

15       A    No.

16       Q    And would you agree with me that

17   that methodology reflects your subjective

18   assessment of how a negotiation might

19   unfold between a hypothetical plaintiff an

20   a hypothetical defendant?

21       MR. COHEN:  Object to the form.

22       A    Yes, that is what I tried to do,

23   envision how a mediation discussion would

24   go between the plaintiff in the cause of

25   action I was reviewing and the defendant.

Page 168

Lyons

1

2       Q      And to be clear, the methodology

3   is not based on how actual negotiations

4   between AFI, the debtors, the committee,

5   and various other constituencies went; it

6   could not be because you have no personal

7   knowledge of that, right?

8       A      And it was also confidential.

9       Q      And there is nothing wrong with

10   the fact that the mediation was

11   confidential, right?

12      A      No, it is a highly desirable

13   feature of mediation, confidentiality.

14      Q      It is one that you as a

15   bankruptcy judge would endorse, a

16   former -- let me rephrase that -- you as a

17   former bankruptcy judge would endorse?

18      A      And as a mediator, I endorse.

19      Q      In the likely settlement

20   negotiations methodology, you discuss the

21   back and forth that will ultimately result

22   in a settlement dollar amount, right?

23      A      Yes.

24      Q      On what basis do you conclude

25   that the back and forth will yield that

Page 169

Lyons

1    particular result?

2         A    It is based upon my experience

3    and what I've observed in negotiations and

4    considering the factors that go into a

5    settlement analysis.  In this case,

6    primarily the merits of the claim often in

7    other context, collectability, and the

8    ability of the defendant to pay is much

9    more prominent than I considered it to be

10   in the AFI situation.

11        Q    And you would agree not every

12   negotiation is the same, right?

13        A    That's true.  I think there are

14   certain things that are prevalent, more

15   common, but the results can vary.

16        Q    And there may be particular

17   bargaining positions that a party might

18   have that might be very important to that

19   party in a given case?

20        A    That's a true statement.

21        Q    And that might well drive the

22   outcome of that particular negotiation,

23   right?

24        A    That's true.

1                        Lyons

2        Q     And you don't know as you sit

3    here today whether there is any particular

4    aspect of the global settlement that was

5    essential to, for example, AFI, do you?

6        A     Well, it is my perception that

7    getting a very broad release was very

8    important to AFI.

9        Q     But the relative weight of that

10   goal in the context of AFI's decision to

11   enter into a settlement, you have no way

12   of knowing how important that goal was

13   because you never talked to anyone from

14   AFI, right?

15       A     No, but I just read the press

16   release and that seemed to confirm my

17   impressions.

18       Q     But you hadn't read that when

19   you issued the report, correct, sir?

20       A     I hadn't read the press release,

21   but I read press reports about the ResCap

22   bankruptcy and AFI's position as being a

23   non-filing parent of this corporation.

24       Q     In your report, you mentioned

25   that where appropriate, you would use more

1                           Lyons

2     than one method to arrive at your opinion

3     as to reasonable settlement value?

4          A     Yes.

5          Q     How did you decide when it was

6     appropriate to use more than one approach

7     and when it was not?

8          A     Just by looking at the

9     circumstances of a particular claim.

10         Q     Well, you used the two

11    methodologies with respect to five of the

12    total causes of action that you analyzed,

13    right?

14         A     I don't know.  I have not gone

15    back and counted it.

16         Q     Do you recall which ones you

17    applied more than one methodology to,

18    which claims?

19         A     Not off the top of my head, no.

20         Q     Well, I'll represent to you that

21    there were five, and in four of the five,

22    you determined using discount methodology

23    that the claim should be valued exactly

24    the same as if you used the likely

25    settlement negotiation scenario method.

1                          Lyons

2              How do you explain that?

3      A      I reconciled the two methods.

4      Q      What do you mean by that?

5      A      After going through the two

6   methods, when I found that the numbers

7   were close, I reconciled and came up with

8   one number for the reasonable settlement

9   value.

10     Q      And so was the second

11  methodology then an independent

12  methodology or is it just really one

13  overall methodology?

14             MR. COHEN:  Object to the form.

15     A      I considered them to be

16  independent methodologies.

17     Q      But you harmonized them?

18     A      Reconciled is the word that I

19  used.

20     Q      You reconciled them?

21     A      Correct.

22     Q      Before reconciling them, do you

23  have any recollection of how far apart the

24  final values were for a given claim?

25             Let's take, for example, the net

1                          Lyons

2     revenue claim.  I think that's one of the

3     five where you do apply both

4     methodologies.

5                And with respect to that claim,

6     you came up with a total of 268.2 million

7     as a reasonable settlement amount.

8                Do you recall that?

9     A      Yes.

10    Q      And do you recall before

11    reconciling your two approaches, what

12    number you came up with on the discounting

13    methodology?

14    A      I do not recall.

15    Q      And where in your report does it

16    reflect your process for reconciling the

17    numbers that you got in the two

18    methodologies?

19    A      Well, it is reflected in the

20    fact that I'm using the settlement or the

21    mediation scenario method.  I came up with

22    the same number that's reflected in the

23    litigation discount method.

24    Q      Well, you say you came up with

25    the same number, but, in fact, did you

1                          Lyons

2      come up with the same number before you

3      reconciled the two?

4          A     Probably not, no.

5          Q     And, again, how is the reader to

6      discern from your report the manner in

7      which you went about reconciling the two

8      approaches?

9          A     I'm not sure that a reader

10     could.

11         Q     And why did you omit that

12     information from your report?

13         A     I didn't intentionally omit that

14     information.  That's just what I did.

15         Q     Do you have any notes that you

16     prepared that would reflect the values for

17     the respective methodologies prior to

18     reconciliation?

19         A     No.

20         Q     Did you destroy the notes --

21         MR. SIMON:  Withdrawn.

22         Q     How did you go about --

23         MR. SIMON:  Withdrawn.

24         Q     Can you describe for me your

25     process of reconciliation of these two

Page 175

Lyons

1

2     methods; how did you go about doing it?

3          A     Just by doing both methods,

4     seeing what the number produced in each

5     method, and where they were close,

6     choosing a number that seemed to be

7     reasonable.

8          Q     And when you did the number in

9     the discount method the first time, did

10    you write that down anywhere?

11         A     I don't think so.

12         Q     You just kept it in your head?

13         A     Yes.

14         Q     And then you would do the

15    methodology for the likely settlement

16    approach and keep that number in your

17    head?

18         A     Yeah, it was either in my head

19    or in the draft of the report.

20         Q     Well, at one point in time, did

21    the draft report have different numbers

22    for the claims in which you used both

23    methodologies?

24         A     I don't remember that happening

25    in the draft report.

1                          Lyons

2        Q      So to your recollection, every

3    time you reduced to writing in a draft

4    both methodologies, you had already done

5    the reconciliation?

6        A      I think so, yes.

7        Q      And you have no recollection as

8    you sit here today of ever reducing to

9    writing the pre-reconciliation numbers for

10   either of the methodologies for any claim?

11       A      Yes, that's true.

12       Q      Yes, you don't remember doing

13   that?

14       A      I don't remember doing that;

15   that's true.

16       Q      There is one instance in the

17   report where you have different numbers

18   for the two methods.

19             Do you know which claim that is?

20       A      Yes, I recall that one.

21       Q      Which one was it?

22       A      It was the 2006 bank

23   restructuring claim.

24       Q      And what page are you referring

25   to?

                          Lyons

1

2      A      I was looking at page 5.

3      Q      Can you tell me -- let me just

4   get there.

5             And where in your report do you

6   set out the two different values for the

7   discount methodology and the likely

8   negotiation methodology?

9      A      It starts on page 45.

10     Q      Okay.

11            And so it looks as though you --

12  page 45 you said, right?

13     A      Yes, that's where the discussion

14  of that is.

15     Q      And where is the methodology?

16     A      Settlement consideration starts

17  on page 47, and it concludes on the top of

18  page 49.

19     Q      And you conclude there using the

20  discounting methodology that the claim

21  rounds to 130 million, right?

22     A      Yes.

23     Q      And what did you determine it to

24  be using the settlement, the negotiation

25  settlement analysis?

1                      Lyons

2        A      130 million.

3        Q      So the same?

4        A      Yes.  But I think you'll see

5    that if you do the last calculation on the

6    discount method, it comes to 131.4 million

7    and I had rounded that to 130 million.

8        Q      I see.

9             Why with respect to this claim

10   did you actually give a disclaimer that

11   you had rounded down the 131.4 million in

12   order to reconcile it with -- in order to

13   reconcile the two methodologies?

14       A      Because in this one, actually

15   when I was doing the chart of all of the

16   claims, I picked up the 130 million dollar

17   and then plugged that in.  And going back

18   and looking at the discount litigation

19   discount method, I noticed that there was

20   a slight difference of 131.4.  Rather than

21   go back and change the chart, I went to

22   here and just said that I used the round

23   number in this particular instance.

24       Q      Is that because it was

25   ministerially easier to do that?

Page 179

                        Lyons

1

2       A     Yes, exactly.

3       Q     So from the perspective of your

4    methodology or analysis, there is no

5    particular reason that you did that?

6       A     No, it is just that I picked the

7    rounded number rather than the odd number,

8    and it wasn't worth my going back and

9    doing the arithmetic again.

10      Q     Was that the math error that you

11   testified was pointed out to you?

12      A     No, that was not it.

13      Q     What point in time relative to

14   issuing your report did you discover the

15   discrepancy between the numbers in the

16   chart?

17      A     That was pretty late in the

18   game.  I would say within the last week

19   before October 18th.

20      Q     Can you look at page 44 of your

21   report?

22      A     Yes.

23      Q     You'll see on page 44 that using

24   the discounting method on the Minnesota

25   Preference claim, you reached a figure of

Page 180

1                          Lyons

2    328.9 million.

3                  Do you see that?

4         A     Yes, I do.

5         Q     And in the text, you discuss

6    your alternative methodology and conclude

7    actually right below it, do you see the

8    paragraph right below?

9         A     Yes.

10        Q     And you conclude there that

11   using your alternative it should be 300

12   million.

13        A     Yes.

14        Q     Is there a reason why you didn't

15   reconcile those two numbers with respect

16   to this claim?

17        A     No, there is no reason why.

18        Q     Did you intend to and this was

19   just sort of a mistake?

20        A     Yes.

21        Q     What is your basis for

22   reconciling the two methodologies?

23        A     I wanted to come up with one

24   number for each claim.  I didn't think it

25   was productive to have alternate numbers

Page 181

Lyons

1

2  or ranges, and when the two methodologies

3  produced reasonable settlement numbers

4  that were compatible, I selected one of

5  them.

6      Q     Would you agree with me that the

7  fact that the different methodologies

8  yields different numbers in itself

9  suggests that the process of evaluating

10  the value of a settlement is inherently

11  subjective?

12          MR. COHEN:   Object to the form.

13      A     I think I used the term -- I

14  adopted the term that Arthur Gonzales

15  used, which is inherently imprecise.

16      Q     Fair enough.

17          And is there any basis, any

18  authority that states it is proper to

19  reconcile two different methodologies when

20  you're attempting to value a settlement

21  that you're aware of?

22          MR. COHEN:   Objection.  Vague.

23      A     Any authority?

24      Q     Text, treatise, report.

25      A     Not that I'm aware of, no.

1                    Lyons

2        Q      And have you -- and, again, you

3    did not set out anywhere in your report

4    the fact that you did this reconciliation

5    or how you did it, right?

6        A      I don't believe I did, no.

7        Q      So would it be possible for

8    anyone to verify the reconciliation

9    process that you used in this report if

10   they attempted to do so?

11       A      I guess you could ask me about

12   it.

13       Q      Well, sir, you can't remember

14   any of the numbers that you got when you

15   did independently for each of these claims

16   the discounting method versus the likely

17   settlement negotiation method, correct?

18       A      Right, I don't have any written

19   record of that.

20       Q      And nor can you remember as you

21   sit here today what the values were?

22       A      I'm not sure about that.

23       Q      Let's go through them.

24              Can you tell me for the first

25   claim that you used both approaches, which

                            Lyons

1

2    on your chart is the net revenue

3    misallocation breach of contract claim?

4         A    Yes.

5         Q    Can you tell me what you recall

6    the settlement discount analysis reflected

7    prior to the reconciliation?

8         A    Let's see.

9              My recollection is that the

10   mediation scenario method -- yeah, I don't

11   remember exactly the number that I came up

12   with there, but my best recollection is

13   that it was approximately 250 million

14   dollars.

15        Q    But to be clear, you can't

16   remember precisely what the number was,

17   right?

18        A    That's true.

19        Q    So there is no way for anyone

20   with any degree of precision to validate

21   the veracity of your reconciliation with

22   respect to the discount methodology versus

23   the settlement negotiation methodology on

24   the misallocation of net revenue claims;

25   is that correct?

1                       Lyons

2            MR. COHEN:   Object to the form.

3       A      That's true.

4       Q      And would that be the case for

5    the other claims in which you applied both

6    methodologies?

7       A      That no one can independently

8    determine how I reconciled them?   I think

9    that's probably accurate, yes.

10      Q      Do you have any understanding of

11   the nature of the claims on which the JSNs

12   contend that they have liens on in this

13   case?

14      A      The nature of the claims that

15   the JSNs contend they have liens?

16      Q      Yes.

17           MR. COHEN:   Objection.   Vague

18      and overbroad.

19      A      My general understanding is that

20   the contention is that their security

21   interest would attach to contract type of

22   claims.

23      Q      And what do you base that

24   understanding on?

25      A      What I learned from Mr. Uzzi in

Page 185

1                          Lyons

2       our first conversation.

3           Q      And to be clear, you're not

4       offering any expert opinion with respect

5       to that subject, are you?

6           A      I'm not opining as to the

7       validity of the JSN security agreement or

8       which collateral it attaches to.

9           Q      And with respect to the

10      examiner's report, there are essentially

11      three breach of contract claims to which

12      you ascribed a settlement value, right?

13          A      I'll accept your representation.

14          Q      Do you recall what they are?

15          A      Off the top of my head, I think

16      I know what they are.

17          Q      In fairness, there are like 29

18      claims.

19                 MR. COHEN:  You can look at the

20          report.

21          Q      Sure, you can look at your

22      chart.  Exhibit 1, you can take a look.

23                 But as I read it, there is a

24      breach of contract or a purported breach

25      of contract claim for misallocation of net

1                      Lyons

2    revenues.

3         A     Yes.

4         Q     To which you ascribed a

5    reasonable settlement value of 268.2

6    million?

7         A     Yes.

8         Q     A so-called breach of contract

9    for failure to pay the value of purchased

10   MSRs?

11        A     Yes.

12        Q     For 387.2 million settlement

13   value, you opine?

14        A     Yes.

15        Q     And then a so-called breach of

16   contract regarding the first 2009 tax

17   allocation agreements.

18        A     Correct.

19        Q     Which you opine is valued at

20   713.7 million?

21        A     Yes.

22        Q     Do you know whether any breach

23   of contract claim that was identified by

24   the examiner, or any potential breach of

25   contract claim actually had, in fact, been

Page 187

                         Lyons

1

2    asserted by any party against AFI?

3              MR. COHEN:  Object to the form.

4              MR. SIMON:  Let me clean that up

5        actually.

6        Q     Do you know whether the breach

7    of contract for misallocation of net

8    revenues claim that is set forth in the

9    examiner's report was ever alleged against

10   AFI by any party?

11             MR. COHEN:  Object to the form.

12       A     I don't believe I'm aware of any

13   pleading in which anybody asserted that

14   claim.  I do recall that late in the game,

15   I think it was in late 2011, one of the

16   employees questioned whether the revenues

17   from those brokered mortgages was being

18   accurately allocated between the ResCap

19   entities and Ally Bank.

20       Q     Do you know the name of that

21   employee?

22       A     Let's see.  I don't recall off

23   the top of my head, but I have seen his

24   name mentioned many times.  I believe it

25   starts with a G.

Page 188

1                          Lyons

2        Q     I'll help you out.

3              Does Mr. Glosner sound right?

4        A     Glosner, thank you.

5        Q     Glosner.

6              Do you know whether he was a

7    lawyer?

8        A     No, I didn't get any

9    understanding that he was a lawyer.

10       Q     Did you read in the examiner's

11   report anywhere where --

12             MR. SIMON:  Withdrawn.

13       Q     So that's the only claim that

14   you are aware of --

15             MR. SIMON:  Withdrawn.

16       Q     Putting aside the allegation by

17   Mr. Glosner that in his view there might

18   have been an inappropriate misallocation

19   of net revenues, I would like you to put

20   that aside.

21       A     Yes.

22       Q     Apart from that, are you aware

23   of any allegations against AFI on a breach

24   of contract theory for any of the three

25   claims that are discussed in the

                        Lyons

1

2    examiner's report that you analyzed as

3    breaches of contract?

4             MR. COHEN:  Object to the form.

5        A    As I said, I'm not aware of any

6    pleading having been filed asserting those

7    claims.  My understanding of what Arthur

8    Gonzales did is that he looked to the

9    parties to gain information about what

10   potential claims there are.

11             Now, you pointed out earlier

12   that the Minnesota Insider Preference

13   claim was one that apparently occurred to

14   Arthur Gonzales but to nobody else.  It

15   wouldn't have occurred to me.  I wasn't

16   aware that Minnesota had that statute.

17   Nevertheless, pardon my aside.  I

18   shouldn't do that.

19       Q    Actually, I should just say,

20   I'll say it on the record, Mr. Brown and I

21   were reminiscing the fun 72 hours that we

22   were scrambling to analyze the Minnesota

23   Preference Statute for the examiner.

24       A    In any event, I took it that the

25   claims that were identified by Arthur

1                          Lyons

2       Gonzales had a basis in information that

3       was provided by the parties, and I assumed

4       that the Creditors Committee would have

5       been a prime candidate for investigating

6       affiliate transactions and suggesting that

7       the examiner look into these particular

8       contracts to see whether they were

9       administered appropriately.

10          Q     Well, if I ask you to assume

11      that no entity ever threatened or did

12      bring such contract claims against AFI,

13      would that change your opinion in any

14      regard?

15          A     No, I don't think so.

16          Q     Why?

17          A     Because I believe it is a viable

18      claim and that it has settlement value.

19          Q     Well, do you think it is

20      rational that a party would pay a

21      substantial sum to settle a claim that no

22      one ever had threatened to bring against

23      it?

24          A     No, I believe that in order to

25      settle each claim, someone would have to

Page 191

1                          Lyons

2     assert the claim.

3          Q     And that wasn't -- I'm going to

4     represent to you that wasn't done here.

5          A     I understand that.

6          Q     And so I'll ask it again.

7                Does that change your opinion in

8     any regard?

9          A     No.

10         Q     Sir, did you not just testify

11    that in your belief in order to settle a

12    claim, someone would have had to have

13    asserted the claim; didn't you just tell

14    me that testimony?

15         A     Yes.  Yes, I did.

16         Q     And you do realize here that

17    global settlement --

18               MR. SIMON:  Withdrawn.

19         Q     That the examiner's report was

20    released after the global settlement was

21    executed?

22         A     Yes.

23         Q     And I've now represented to you,

24    I've told you you should assume that no

25    party ever raised the breach of contract

1                          Lyons

2     claims that were identified by the

3     examiner in his report?

4         A     No party ever raised it.

5         Q     Correct?

6         A     By way of pleadings.

7               MR. COHEN:  Is there a question?

8         Q     No party ever raised it by

9     pleading or anything else?

10              MR. COHEN:  You've answered the

11        witness's question.  Do you have a

12        question?

13              MR. SIMON:  Yes.

14        Q     I'm asking would it change your

15    opinion if those facts were true?

16              MR. COHEN:  Objection.

17        Incomplete hypothetical.

18        A     I don't think so.

19        Q     Why?

20        A     Because a claim has been

21    identified by Arthur Gonzales that has

22    some merit to it, and it is a -- if the

23    claim is successful, the magnitude of

24    damages is large, and I believe that that

25    claim has settlement value.  And I

Page 193

Lyons

1
2   understood that AFI was interested in

3   getting a broad release, which would have

4   included any claims from the debtor

5   entities.

6       Q    Well, a broad release for any

7   claim is very different than opining that

8   an Ally Financial sat in the room and

9   negotiated, it was parsing between and

10  among particular claims in assigning value

11  to each of those particular claims; isn't

12  that right?

13      A    I agree.

14      Q    And it may well be the case that

15  AFI was willing to pay money for a global

16  release, but hadn't contemplated a

17  particular contract?

18          MR. COHEN:   Objection.   Calls

19      for speculate.

20      A    Yes, that could be true.

21      Q    And, in fact, let's take the

22  Minnesota claim as an example.

23          As we just talked about, none of

24  the parties even thought about a Minnesota

25  Preference claim action?

1                       Lyons

2            MR. COHEN:  That's your

3       representation.

4       Q      I'm going to represent that to

5   you.

6       A      Okay.

7       Q      And I think you just

8   acknowledged that based on the fact that

9   the examiner invited the parties to brief

10  the issue a few days before the report was

11  issued suggests that it was something that

12  Judge Gonzales himself developed as a

13  potential cause of action.

14            Would you acknowledge that seems

15  like a good possibility?

16            MR. COHEN:  Objection.  Calls

17       for speculation.

18            MR. SIMON:  It seems like he is

19       capable of testifying to it.

20            I'm sorry, I withdraw the

21       comment.

22       Q      Go ahead.

23       A      Well, I believe that was your

24  suggestion.

25       Q      Well, assuming that's true, do

Page 195

1                          Lyons

2      you think it appropriate that a party

3      would pay money for a claim that hadn't

4      even been thought of, and so, therefore,

5      couldn't have entered any of the

6      discussions of the global settlement in

7      any way?

8                  MR. COHEN:   Objection.

9          Incomplete hypothetical.

10         A     I just don't know what happened

11     in the mediation sessions other than what

12     I read from Mr. Kruger.  And as I stated

13     earlier, my understanding of his approach

14     was a top-down approach, which was how

15     much money can I influence AFI to pay and

16     will that be enough to get the consent of

17     the people on the other side of the table.

18         Q     For global peace?

19         A     Without looking at the merits or

20     settlement value of any particular claim.

21     You just knew that there was a lot of

22     money out there.

23         Q     If, in fact, the goal was to

24     have global peace and move forward without

25     what Mr. Carpenter has characterized the

Page 196

Lyons

1
2     milestone litigation around the neck of

3     AFI, if that was the goal, why is it

4     appropriate to allocate the global

5     settlement between and among claims that

6     weren't even alleged by any party?

7                 MR. COHEN:   Object to the form.

8         A     It seems to me that where there

9     are parties that have different interest,

10    depending upon which claims are

11    compromised, if all claims are being

12    compromised for one gross number, that to

13    figure out who should get the money, you

14    need to ascribe a reasonable value to each

15    of the claims that's being released.

16        Q     Are you aware of any case in

17    which a court has traced settlement

18    proceeds to a particular claim where no

19    such claim had actually been asserted by a

20    party?

21        A     No, I'm not aware of any case.

22        Q     Let's go back to your alter ego

23    analysis, which is where we left off

24    before the break, on page 79 of your

25    report.

1                          Lyons

2               And on page 79, you applied to

3     the alter ego test your discount analysis;

4     is that right?

5          A      Page 79?

6          Q      Page 79 of the report.

7          A      Yes, that's the third-party RMBS

8     claims.

9          Q      Well, I believe you analyzed

10    together the alter ego and the third-party

11    RMBS control person claims, correct?

12         A      Yes.

13         Q      And so if you look at page 79,

14    it lays out, as I understand it, your

15    discount methodology for both alter ego

16    and the RMBS third-party claims, right?

17         A      Alter ego is part of the -- one

18    of the theories asserted by RMBS

19    plaintiffs.

20         Q      Right.

21               But as I think we established

22    before the break, it is also an

23    independent theory that was articulated at

24    a minimum by the committee, right?

25         A      Yes, I understand that.

Lyons

1

2      Q      And you in your analysis start

3  with a 20 billion dollar potential damages

4  figure, right?

5      A      That's right.

6      Q      I think you testified that that

7  is predicated on the liability exposure

8  for the RMBS?

9      A      Yes.

10      Q      And you reduce as the first step

11  in your discount methodology that figure

12  by 50 percent?

13      A      Yes.

14      Q      And that you say is because of

15  inherent risk?

16      A      Right.

17      Q      How did you conclude that 50

18  percent is the appropriate percentage to

19  reduce?

20      A      Looking at the size of the

21  claims that were involved here in

22  particular, and the relative merits of the

23  claim against AFI, which was not the

24  issuance of the securities, we felt that

25  an initial discount of 50 percent for

                         Lyons

1

2    inherent risk was appropriate.

3        Q     So just to be clear, your

4    testimony is that it felt like an

5    additional discount of 50 percent was

6    appropriate.  And I'm asking you the basis

7    for why you felt that was appropriate?

8        A     Did I use the word felt?

9        Q     You did.

10       A     I would say that the two primary

11   motivating factors in inherent risk were

12   the large size of the claims and the

13   complexity and effort that it would take

14   to pursue those claims against a party

15   that was not primarily responsible for the

16   alleged wrongdoing.

17       Q     And how did you conclude that 50

18   percent was correct and not, say, 60

19   percent?

20       A     That is just an assessment based

21   upon my reasonable judgment.

22       Q     Based on your subjective belief?

23             MR. COHEN:  Object to the form.

24       A     Based upon my experience and

25   applying that to this situation.

1                        Lyons

2        Q      But ultimately was it based on

3    any objective criteria?

4        A      No, it is not a formula that you

5    can do such as a scientific experiment or

6    statistical analysis.

7        Q      So you would agree that it is a

8    subjective -- you're offering your

9    subjective assessment of what in your mind

10   the discount should be, correct?

11       A      That is my judgment, yes.

12       Q      And if a person wanted to test

13   your subjective assessment, could they go

14   about doing that, and how would they go

15   about doing that?

16              MR. COHEN:  Object to the form.

17       A      No, there is no way to, for

18   example, perform a controlled experiment

19   that would yield the same results.

20       Q      Now, next in your discounted

21   analysis, you applied to the ten million

22   figure another reduction of 70 percent

23   which you attribute to veil piercing alter

24   ego risk?

25       A      Yes.

1                        Lyons

2        Q      Could you explain the 70 percent

3    reduction, the basis?

4        A      Yes.  We agreed with Arthur

5    Gonzales that the veil piercing alter ego

6    claims were unlikely to be successful, and

7    so we applied a large discount of 70

8    percent for that factor.

9        Q      And is that -- when you say

10    "we", who are you referring to?

11        A      Well, my colleagues and I.  I

12    should say I did.

13        Q      Did you have someone in

14    particular in mind with respect to your

15    colleagues in particular with regard to

16    the alter ego discounting analysis when

17    you say "we"?

18        A      Well, this part of the report,

19    besides myself, Mr. Arth worked on and

20    also Mr. Cuniff.

21        Q      Do you recall whether either/or

22    both of them had a different view of what

23    the appropriate percentage might be to

24    reduce the veil piercing claim?

25        A      I don't think there was any

1                          Lyons

2    disagreement, but we did discuss different

3    numbers, and this was our consensus that

4    we arrived that.  It was actually

5    ultimately my decision as to which number

6    to put down as a percentage.

7        Q     But it is fair to say that

8    reasonable minds could differ?

9        A     Oh, yes.

10       Q     Now, are you familiar with the

11   bases for the alter ego claim that was

12   articulated by the committee in its STN

13   motion?

14       A     I haven't read that other than

15   the portions you brought to my attention

16   today.

17       Q     I'm going to direct your

18   attention again to the motion, which is

19   Exhibit 4 I believe.

20       A     4, yes.

21       Q     Paragraph 6, which is on page 3,

22   I'm going to ask you if you would just

23   read into the record beginning with the

24   second sentence.

25             Actually let me read it to you

Lyons

1

2  because it might be easier for you to

3  absorb if I do that.  I'm just going to

4  read to you this paragraph, which I'll

5  represent to you is a summary of the alter

6  ego claim put forward by the committee.

7          "As set forth in detail below,

8  the facts adduced to date present a

9  textbook case for a veil piercing

10  liability.  AFI ran its mortgage

11  securitization business as a single

12  integrated operation under its total

13  direction, knowledge, domination and

14  control using the near complete overlap

15  between AFI and ResCap leadership to

16  impose its will on the debtors.  It used

17  this control initially to aggressively

18  expand ResCap's mortgage operations during

19  the years 2004 to '06 involving itself in

20  every aspect of the development and

21  marketing of ResCap's mortgage products,

22  including directing, encouraging and

23  facilitating allegedly wrongful

24  underwriting and representation and

25  warranty breaches that ultimately brought

                        Lyons

1

2    down the company.  Then anticipating the

3    impending collapse in the housing market,

4    AFI sought desperately to shield itself

5    from the disaster it had created syphoning

6    valuable assets from ResCap and embarking

7    on a series of transactions to which no

8    arm's length counterparty would have

9    agreed, designed to impose solely on the

10   debtors the mortgage related liabilties

11   for which AFI otherwise would have been

12   responsible.  These actions included AFI

13   seizure from ResCap of Old GMAC Bank for

14   less than fair value, its entry into

15   complicated mortgage purchase agreements

16   and swap transactions with GMAC designed

17   to permit AFI to invest its profitable

18   mortgage servicing rights while foisting

19   all related risk upon the debtors, its

20   stripping of certain other businesses for

21   less than fair value, and its entry into

22   settlements of regulators and agreements

23   designed to impose mortgage related

24   liabilities on the debtors alone."

25            My question is:  Have you ever

Page 205

                              Lyons

1    heard the alter ego claim against AFI

2    articulated in that manner before?

3        A     No, I have not.

4        Q     Now, I also want to direct your

5    retention to paragraph 34.

6        A     Lyons' 4?

7        Q     Yes.

8        A     Which number did you say?

9        Q     Page 14, paragraph 34.  You'll

10   see in that bar graph, there is a

11   reference to Mr. Marano.

12             Do you know who Mr. Marano is?

13             I'll let you get there, I

14   apologize.

15       A     Page 14, paragraph?

16       Q     34.

17             Do you know who Mr. Marano is?

18       A     It says here ResCap's CEO.

19       Q     Did you know that before reading

20   that?

21       A     I remember seeing his name in

22   Arthur Gonzales's report.

23       Q     And do you know what the

24   operating agreement is?

Page 206

Lyons

1    A    There were more than one I

2 believe operating agreement, but my

3 recollection is that when ResCap and AFI

4 wanted to separate themselves from GM's

5 bad credit rating, part of the process to

6 induce the rating agencies to look

7 favorably upon ResCap or AFI's

8 independently issue debt was the

9 existence -- or I should say ResCap's

10 independently issued debt, would be the

11 existence of an operating agreement.

12    Q    So is it your understanding that

13 the operating agreement was held out as a

14 means of separating ResCap and AFI?

15    A    Means of trying to make sure

16 that the intercompany transactions were

17 for fair value and at arm's length.

18    Q    And did you also understand that

19 the operating agreement was meant to

20 publicly represent that ResCap had been

21 walled off from AFI?

22    A    Well, I'm not sure that I would

23 adopt your characterization, but as I

24 understood it, that would -- I believe the

Page 207

1                        Lyons

2    rating agencies were the only ones that I

3    focused on when I read the report -- lead

4    the rating agencies to favorably rate

5    ResCap's debt because of the written

6    agreement that would make sure that

7    intercompany transactions were at fair

8    value and at arm's length, and I think

9    that also required independent directors.

10        Q      And are you aware that in

11   certain litigation where control person

12   allegations were raised against AFI, it

13   held the operating agreement out as a

14   defense to those allegations?

15        A      I'm not aware of that.

16        Q      Were you aware that Judge Cote

17   in a decision issued by the Southern

18   District of New York denied a motion to

19   dismiss that was submitted by Ally

20   Financial in a control person case?

21        A      I knew there was a motion to

22   dismiss that was denied in RMBS

23   litigation.  I don't believe I knew the

24   name of the judge, or I don't recall which

25   particular suit it was in.

Page 208

1                        Lyons

2          Q     Do you know the basis for the

3     denial?

4          A     I don't recall that, no.

5          Q     So do you recall whether in part

6     Judge Cote found that the operating

7     agreement --

8               MR. SIMON:   Withdrawn.

9          Q     Do you recall whether in part

10    Judge Cote found there were too many

11    issues of disputed fact to find the

12    operating agreement created actual

13    independence between ResCap and AFI?

14         A     I don't think I read that

15    detail.  I think I do recall Judge

16    Gonzales commenting on either one or more

17    motion to dismiss having been denied and

18    mentioning that there were disputed issues

19    of fact.

20         Q     And you reviewed no e-mails in

21    connection with your work, no

22    contemporaneous e-mails of AFI and ResCap

23    in connection with your work in this

24    matter, did you?

25         A     I don't believe I did, no.

<center>Lyons</center>

1

2      Q      Were you aware of the fact that

3   in a contemporaneous e-mail, Mr. Marano

4   characterized the operating agreement as a

5   "charade of a fig leaf"?

6      A      I don't remember hearing that

7   term.  Or I shouldn't say hearing.

8   Reading that term, pardon me.

9      Q      Do you think as a judge, if you

10  were determining, deciding a motion to

11  dismiss, and one of the central issues was

12  whether or not the operating agreement, in

13  fact, created independence between the

14  parent and the subsidiary, and the CEO of

15  the sub characterized that agreement as

16  "charade of a fig leaf", that might be a

17  disputed fact issue that should be better

18  resolved by trial than on motion?

19             MR. COHEN:  Objection.

20  Incomplete hypothetical.

21      A      I would -- the way you have

22  characterized it, I would agree with you.

23      Q      Can you direct your attention to

24  paragraph 37 of the STN motion.

25             Now, you understand, sir, that

1                          Lyons

2      when Ally Bank --

3                  MR. SIMON:    Withdrawn.

4          Q      Are you familiar with the Ally

5      Bank transfer?

6          A      Yes.

7          Q      What was that?

8          A      The original one in the 2006

9      bank restructure came about in connection

10     with the sale of 51 percent of AFI to

11     Cerburus, C-E-R-B-U-R-U-S, I believe.  And

12     I'm not sure I pronounced it correctly.

13     I've read it, but I don't know if I heard

14     anybody else ever pronounce it.

15                  At the time, ResCap owned a

16     federal savings bank, and the indirect

17     ownership of the federal savings bank

18     would have subjected Cerburus to the bank

19     holding company, however, AFI owned a Utah

20     industrial bank, and indirect ownership of

21     a Utah industrial bank would not implicate

22     the bank holding company, and in order to

23     avoid that becoming subjective to the Bank

24     Holding Company Act, Cerburus insisted

25     that the federal savings bank be

Page 211

Lyons

1   eliminated in the corporate tree.

2         So the device that was

3   improvised in order to accomplish that was

4   to have the federal savings bank transfer

5   its assets and liabilities to the Utah

6   industrial bank, and then the federal

7   savings bank was I think upstreamed, the

8   shell of that company was upstreamed to an

9   entity that would not be in the Cerburus

10  line of ownership.

11      Q    And do you know in connection

12  with that transfer, were you aware that

13  ResCap's general counsel authored a

14  memorandum analyzing the transaction and

15  the fairness of the transaction from

16  ResCap's perspective?

17      A    Yes, I believe I recall that.

18      Q    And do you recall what, if

19  anything, he concluded about the nature of

20  the transaction as it relates to the

21  operating agreement?

22      A    I don't recall exactly.  I

23  recall that he expressed concern that this

24  should be approved by the independent

Page 212

1                        Lyons

2    directors, and that the proposal to issue

3    non-voting stock was -- I would have to

4    review his statement again or the

5    recitation of the statement in Arthur

6    Gonzales's report, but my recollection is

7    that he raised that issue as something

8    that might not be considered arm's length

9    of the fair value.

10        Q     In fact, he concluded that the

11   transfer would violate the operating

12   agreement.

13              Were you aware of that?

14        A     If I looked at it again, I'm

15   sure that was.

16        Q     Are you aware if any changes

17   were made to the proposed transfer as

18   ResCap's general counsel opined that it

19   violated the terms of the operating

20   agreement?

21        A     There may have been some

22   changes, but it did not satisfactorily

23   address the issues that were raised by the

24   general counsel.

25        Q     Do you understand that once the

Page 213

1                         Lyons

2      transfer took place that Ally Bank no long

3      resided on the ResCap side of the ledger?

4          A     Yes, the federal savings bank's

5      assets were all transferred to the Utah

6      industrial bank, and the ownership of that

7      Utah industrial bank, all of the voting

8      shares were in AFI, non-voting shares were

9      in ResCap.

10         Q     And so -- and you know that --

11         A     I should add that there was a

12     tracking, supposedly a tracking element to

13     these non-voting shares that was meant to

14     give the economic benefits and loss of the

15     mortgage business in the -- that had been

16     transferred to the Utah bank to ResCap.

17         Q     Okay.

18               In connection with your work in

19     this matter, you reviewed at least one or

20     two versions of a mouthful of a document

21     called the Master Mortgage Loan Purchase

22     and Sale Agreement; is that right?

23         A     Yes.

24         Q     And I'm going to refer to that

25     as the MMLPSA?

Lyons

1

2      A      Yes.

3      Q      And on your Exhibit A of your

4   report, one of those versions was dated

5   December 15, 2001.

6           Do you recall that?  I mean,

7   I'll represent to you that it is.

8      A      Yes.

9      Q      I'm going to mark that was the

10  next exhibit.

11          (Master Mortgage Loan Purchase

12          and Sale Agreement, December 15, 2001,

13          was marked as Lyons Exhibit 5 for

14          identification, as of this date.)

15          MR. SIMON:  While we're doing

16          that, I'm going to also mark as the

17          next sequential Exhibit the 2008

18          version of the MMLPSA, which similarly

19          appeared on your Exhibit A as one of

20          the documents you reviewed in

21          preparing your opinions and report.

22          (Master Mortgage Loan Purchase

23          and Sale Agreement, 2008, was marked

24          as Lyons Exhibit 6 for identification,

25          as of this date.)

1                           Lyons

2              MR. COHEN:   These are 5 and 6?

3    BY MR. SIMON:

4         Q    So first what I would like to

5    do, do you know whether in 2001 --

6              MR. SIMON:   Withdrawn.

7         Q    You'll agree with me in 2001,

8    that was before the bank transfer?

9         A    Correct.

10        Q    So Ally Bank, then known as GMAC

11   Bank, and ResCap were essentially sister

12   companies both on the ResCap side of the

13   ledger, right?

14        A    2001, I don't think ResCap even

15   existed in 2001, did it?

16             MR. SIMON:   Withdrawn.

17        Q    GMAC Mortgage Corporation?

18        A    Yes.

19        Q    So I would like you to look in

20   this document at page 8 of the document,

21   which is Ally 18261.

22        A    I'm on page 8.

23        Q    Okay.

24             And do you see there there is an

25   article captioned "Representations and

Lyons

2  Warranties of Seller Relating to Mortgage

3  Loans"?

4      A    I see that, yes.

5      Q    What is your understanding of

6  a -- I'm going to refer to it as a rep and

7  warranty.  And will you take that to mean

8  representation and warranty?

9      A    Yes.

10     Q    What is your understanding of a

11 rep and warranty as it relates to the sale

12 of a mortgage loan?

13     A    It's promises that the seller,

14 in this case, is making with regard to

15 certain aspects of the loans that are

16 being sold.

17     Q    Promises that, for example, the

18 origination was done properly?

19     A    4.1 is captioned "Origination of

20 Mortgage Loans" and it has a

21 representation there.

22     Q    And that the information that's

23 used to approve the mortgage is to the

24 best of the seller's knowledge accurate.

25 That is a form of represent and warranty,

1                       Lyons

2      correct?

3           A      The next one, 4.1.  I'm reading

4      the caption's information, that's correct.

5           Q      Okay.

6                  And do you know as a matter of

7      practice in the mortgage industry, if a

8      mortgage is sold to a third-party, that

9      the reps and warranties generally flow

10     from the ultimate purchaser and then down

11     the chain to each party in the chain of

12     the mortgage transaction?

13          A      I understand what you're saying.

14          Q      So if, for example, pursuant to

15     this MMLPSA in 2001, Ally Bank were to

16     sell GMAC Mortgage a loan, and GMAC

17     Mortgage were to go out into the market

18     and sell that loan to a third-party, and

19     if there were a problem with that loan

20     relating to the origination, GMAC Mortgage

21     would have recourse back to Ally Bank for

22     any liability based on these reps and

23     warranties.

24                 Is that your general

25     understanding of the way the industry

Page 218

Lyons

1    worked?

2         A    Well, yes.  And you're referring

3    to GMAC Bank, it wasn't then known as Ally

4    Bank.

5         Q    Correct.  If I said Ally Bank,

6    yes.  So at this point in time, it was

7    called GMAC Bank.

8         A    Old GMAC Bank.

9         Q    So just to clean that up.  Based

10   on this document, in 2001, Old GMAC Bank

11   was liable through these reps and

12   warranties for any problems with the

13   origination of those loans that Ally Bank

14   originated and then sold to GMAC Mortgage.

15        Is that your understanding of

16   this document?

17        A    That would appear to be.  I

18   haven't read that section, but as I

19   understand your hypothetical, you're

20   saying that if GMAC Bank sold the mortgage

21   to GMAC Mortgage Corporation, and then

22   GMAC Mortgage then passed that mortgage

23   along in a chain to an ultimate purchaser,

24   and the ultimate purchaser discovered

1                          Lyons

2     problems in the origination of that loan,

3     the claims by the ultimate purchaser would

4     flow back through the chain and ultimately

5     reside in GMAC Bank as the seller under

6     this agreement.

7          Q     Correct.

8                And did you --

9          A     I assume --

10         Q     Go ahead.

11         A     If that was a loan originated by

12    GMAC Bank, I suppose there are loans of

13    GMAC Bank that are purchased, and then it

14    would pass that rep and warranty claim

15    back to its seller.

16         Q     But it is your understanding

17    that they would flow between buyer and

18    seller?

19         A     Between the two here, GMAC Bank

20    and GMAC Mortgage Corporation, without

21    looking for any other limitation in this

22    agreement, I agree with you.

23         Q     Did you understand that that was

24    a routine practice for a seller in the

25    mortgage business to issue reps and

Page 220

1                        Lyons

2    warranties when issuing the warranty?

3        A    Yes, that's my understanding.

4        Q    You looked at this document in

5    connection with the preparation of your

6    report.

7             Do you recall looking at Article

8    4 or did you not focus on it?

9        A    I did not.

10       Q    I would like you to now look at

11   Exhibit 6, which is a 2008 version of the

12   MMLPSA.

13       A    Yes.

14       Q    Now, by 2008, do you know

15   whether the bank transfer had occurred?

16       A    Yes, it had.

17       Q    And so by 2008, GMAC Bank is on

18   the Ally side of the ledger, correct?

19       A    Right.

20       Q    Can you take a look at Article

21   4, which is on page 7 of this version of

22   the MMLPSA?

23       A    Can I just look at one thing

24   here?

25       Q    Sure.

                              Lyons

1

2              (Witness reviewing document)

3        A      I just question GMAC Bank

4   because the same term is used as the name

5   of the seller as you point out.

6        Q      I'm going to ask you to assume

7   that both of these documents apply to what

8   is now known as Ally Bank.  Assume that

9   the 2001 version applied to GMAC Bank or

10  Ally Bank pre-transfer, and Exhibit 6

11  applies to the same entity, Ally Bank or

12  GMAC Bank, as it was then known

13  post-transfer.  Assume that.

14       A      That is my point.  I'm not sure

15  that I can assume that because I think

16  they are two different entities.

17       Q      I'm telling you you should

18  assume that for purposes of my question.

19            MR. COHEN:  And then decide

20       whether you can answer the question

21       based on that supposition.

22       Q      Why don't you explain to me why

23  you think they are two different entities?

24       A      Well, because the 2001 agreement

25  refers to GMAC Bank, a federal savings

1                           Lyons

2       bank, right?

3           Q      Well, because it was, right,

4       sir?

5           A      Right.

6           Q      That was the purpose of the

7       transfer?

8           A      Well, that was -- but the thing

9       is the assets of GMAC Bank went to the

10      industrial bank, which is in Utah.  And

11      the 2008 agreement is with the industrial

12      bank.  It happens to have the same name,

13      but I think it is a different entity, and

14      it may have acquired -- it did acquire the

15      assets of what you called Old GMAC Bank.

16          Q      Do you have any reason as you

17      sit here today to dispute the fact that

18      the GMAC Bank, the industrial bank that is

19      in Exhibit 6, was something -- was not an

20      Ally affiliate?

21          A      No, I didn't say that.

22          Q      Then we're on the same page.

23                 MR. COHEN:  I don't think you

24      are.

25          A      There were two affiliates, the

Page 223

1                          Lyons

2    Utah bank and the federal savings bank.

3         Q    Yes.

4         A    After 2006, the assets of the

5    federal savings bank went into the Utah

6    industrial bank.

7         Q    You reviewed the 2008 MMLPSA

8    today, right?

9         A    I think you're showing me the

10   one I referenced in my report.

11        Q    And in that report, what was

12   your understanding of what you were

13   reviewing and the entities involved with

14   respect to that contract that you've

15   offered opinions on in this case?

16        A    The 2008, which is marked

17   Exhibit 6, my understanding was that this

18   was -- the seller was GMAC Bank and

19   industrial bank from Utah.

20        Q    Sir, isn't this the contract

21   that you're predicating the breach of

22   contract claim on net misallocation of

23   revenues upon?

24        A    I believe it is.

25        Q    So is it your testimony that

1                           Lyons

2       this applies to any entity other than what

3       is known today as Ally Bank?

4            A     No.

5            Q     Okay.  So I want to make clear

6       that premise of my question that we're on

7       the same page on.

8                  The 2008 MMLPSA is an agreement

9       between what is known today as Ally Bank?

10           A     Yes.

11           Q     Which is no longer on the ResCap

12      side of the ledger?

13           A     Yes.

14           Q     And GMAC Mortgage, which was and

15      remains on the ResCap side of the ledger?

16           A     Yes.

17           Q     And can you now --

18           A     At the time of this, ResCap had

19      the non-voting shares.

20           Q     That's fine.  I agree with that.

21           A     Okay.

22           Q     But in terms of the -- we're on

23      the same page in terms of the

24      organizational flow.

25                 Can you please look at page 7,

Page 225

Lyons

and Article 4 that's there on page 7.

        A      Article 4 says "Reserved".

        Q      Had you noticed that when you

reviewed the agreement in connection with

preparing your report?

        A      I don't recall noticing that.

        Q      Do you know what the import of

that means or is?  Do you know what the

import of that is?

        A      At this point in time, I do not.

        Q      Well, sir, if I tell you that

all of the reps and warranties that were

in the 2001 version are removed in this

2008 version, isn't it fair to assume that

there were no reps and warranties made by

Ally Bank to GMAC Mortgage under this

agreement?

               MR. COHEN:  Object to the form.

        A      Yes, I recall.  I agree with

that statement.

        Q      Do you know when in time

approximately problems first started to

surface in the mortgage market?

        A      About 2007.

Page 226

1                          Lyons

2          Q      And do you know whether in

3     2007 -- do you know when in 2007?

4          A      No, I don't know.

5          Q      Do you know when Bear Stearns

6     collapsed?

7          A      I forget the month.

8          Q      It was June of 2007.

9                 Do you know in July of 2007 that

10    there was a version of the MMLPSA executed

11    between Ally Bank and GMAC Mortgage that

12    strips reps and warranties between the two

13    entities as to first level loans?

14         A      Yes, I believe I was aware of

15    the fact that the seller did not have rep

16    and warranty liabilities after that point

17    in time.

18         Q      And this version of the

19    agreement in 2008, by this point, you

20    would agree with me that the credit crisis

21    is sort of in full swing?

22         A      Yes.

23         Q      And in this version, all reps

24    and warranties are approved in the

25    contract between Ally Bank and GMAC

1                         Lyons

2    Mortgage, correct?

3         A      If you say so, without

4    examining.  That was my understanding,

5    that reps and warranty liability would

6    stop in the chain coming back from the

7    ultimate purchaser, it would stop at GMAC

8    Mortgage and not go to the bank.

9         Q      And you -- just to be clear, and

10   I'm not faulting you for this, but when

11   you reviewed these contracts, did you

12   appreciate the significance of this change

13   between the two contracts as it relates to

14   Article 4?

15        A      I appreciated the fact that the

16   seller was now unhooked for rep and

17   warranty liabilities with regard to these

18   sold loans.

19        Q      Did you give any thought to the

20   timing of the removal of the reps and

21   warranties and how that fit into the

22   overall framework of the mortgage market?

23        A      The timing that I understood was

24   that -- and how it relates to the mortgage

25   market was that GMAC Mortgage was unable

1                           Lyons

2      to get financing to continue its mortgage

3      origination business from independent

4      third-parties, and that at the same time,

5      Ally Bank was -- had some excess liquidity

6      and that this structure was used to allow

7      GMAC to continue to locate mortgage

8      customers and have those mortgages funded

9      by Ally Bank, but that Ally Bank was not

10     taking on the rep and warranty

11     responsibility that would be typical of

12     mortgage originator.

13          Q      But my question is:  Did you

14     think about the fact that those reps and

15     warranties were removed in the context of

16     what was happening overall in the mortgage

17     market, the fact that it was 2007, 2008

18     and the credit crisis was becoming known,

19     did you think about that at all?

20          A      Only in the context of GMAC

21     Mortgage's ability to get financing to

22     continue its business.

23          Q      So would you agree that without

24     the benefit of a party's explanation, for

25     example, the committee, you might not have

1                    Lyons

2    appreciated the significance of even some

3    of the documents that were reviewed, that

4    you reviewed and how they might fit into

5    the alter ego framework; is that fair?

6         A     That is a fair statement.

7         Q     Let me draw your attention to

8    paragraph 38 of the STN motion?

9         A     Paragraph 38?

10        Q     Yes.

11        A     I'm on page 17, paragraph 38.

12        Q     Okay.  Very good.

13              And there you will see another

14   reference to Mr. Marano.

15              Do you know what the MSR Swap

16   is?

17        A     Yes, I have an idea what it is.

18        Q     I'm going to spare asking you

19   what it is right now.

20              But do you see that there is an

21   internal e-mail where Mr. Marano concluded

22   that "Shifting the risk under the MSR Swap

23   bordered on an absurd transaction for GMAC

24   Mortgage and was silly."

25              Do you see that reference?

Page 230

                          Lyons

1

2       A      No, I don't.

3       Q      It is right before the redacted

4    reference in paragraph 38.

5       A      Oh, I see.  Let me just read

6    that sentence, please.

7               (Witness reviewing document)

8               Okay.  I've read that sentence.

9       Q      Is that something that you were

10   aware of previously?

11      A      I don't recall that, no.

12      Q      Mr. Marano is the CEO of ResCap

13   as you testified?

14      A      At some point in time he was.  I

15   think he had a number of positions.  Yes,

16   he was CEO.

17      Q      And to be clear, you did not

18   read any of the committee's STN motion

19   prior to giving your opinions in this

20   case?

21      A      That is correct.

22      Q      Frankly, you haven't read it

23   even as you sit here today?

24      A      I've read the portions that you

25   directed me to read.

1                          Lyons

2        Q     So none of the evidence or the

3   arguments marshaled by the committee in

4   support of its alter ego claim was

5   factored into your 70 percent discount for

6   the likelihood of success in alter ego,

7   was it?

8        A     Well, I believe that the

9   committee presented its position to Arthur

10  Gonzales.  And so to the extent that the

11  committee presented its position on the

12  alter ego claims, that would have been

13  factored into my analysis accepting the

14  factual investigation that Arthur Gonzales

15  did.

16       Q     So secondhand at best?

17       A     Yes.

18       Q     You have no firsthand input on

19  the committee's arguments in support of

20  alter ego that went into your conclusion

21  that the claim should get a 70 percent

22  discount for likelihood of success, do

23  you?

24             MR. COHEN:  Objection.  Vague.

25       A     I did not get any information

1                           Lyons

2      directly from the committee regarding its

3      position on the alter ego theory.

4                MR. SIMON:  We have to change

5           the tape, so let's take a break.

6                THE VIDEOGRAPHER:  This marks

7           the end of tape number three. we're

8           going off the record at 3:00 p.m.

9                (Thereupon, a recess was taken,

10          and then the proceedings continued as

11          follows:)

12               THE VIDEOGRAPHER:  This marks

13          the start of tape number four.  We're

14          back on the record at 3:22 p.m.

15     BY MR. SIMON:

16          Q    Mr. Lyons, would you agree with

17     me that the more a person knows about the

18     facts of a particular claim or a potential

19     claim, the more precisely he or she is

20     able to assess the likelihood of success

21     of that claim?

22          A    That sounds to me to be a

23     correct statement.

24          Q    Okay.

25               The more precisely one could

Page 233

Lyons

1    estimate the inherent risk in such claim;

2    do you agree with that statement?

3        A    I'm sorry, would your repeat

4    that?

5        Q    Would you agree similarly the

6    more a person knows about the facts of a

7    claim, the more precisely he or she can

8    estimate the inherent risk associated with

9    that claim in your discount analysis?

10       A    Yes.

11       Q    And the more precisely one could

12   estimate the likelihood of success of any

13   particular defense as to that claim?

14       A    With the introduction of the

15   more facts one knows?

16       Q    Correct.

17       A    Yes, I agree.

18       Q    And you'd agree I assume too

19   that the more facts one knows, the more

20   precisely one can estimate the likelihood

21   of success as to any particular alternate

22   theory of recovery?

23       A    That's true.

24       Q    Okay.

Page 234

1                          Lyons

2              And the opposite I take it would

3       be true too, the less a person knows about

4       the facts, the less they'd be able to, for

5       example, access the likelihood of success

6       of a claim?

7          A      Yeah, I think, you know, all of

8       your statements are theoretically true,

9       probably true in most circumstances.

10      Probably not universally true.

11         Q      Here, did your analysis take

12      into account the likelihood of surviving a

13      motion to dismiss with respect to any

14      claim?

15         A      I remember thinking about the

16      fact that some of the RMBS claims had

17      survived a motion to dismiss and that was

18      significant.  That comes to mind.

19         Q      You're aware the examiner in his

20      report stated that he considered

21      presenting his analysis in terms of

22      whether claims would be likely to survive

23      a motion to dismiss or a motion for

24      summary judgment, but he rejected that

25      approach?

1                      Lyons

2        A     Yes, I'm aware of that.

3        Q     Okay.

4              And you relied exclusively for

5     your factual inputs on the examiner's

6     factual conclusions, correct?

7        A     That's true.  In addition to the

8     documents that I reviewed.

9        Q     Which you said confirmed in your

10    view the findings of Judge Gonzales?

11       A     Yes, I can't recall offhand any

12    factual finding that I disagreed with

13    having reviewed documents.

14       Q     And surely as a former judge,

15    you would agree that this is a highly

16    factual dispute?

17       A     Well, which matter are you

18    speaking about?

19       Q     The entirety of the potential

20    claims.  I mean, would you agree with

21    me --

22              MR. SIMON:  Withdrawn.

23       Q     Would you agree with me that the

24    factual predicate for the claims analyzed

25    by the examiner as to estate and

Page 236

1                           Lyons

2       third-party claims are highly factually

3       detailed?

4               MR. COHEN:  Objection.  Vague

5           and overbroad.

6               MR. SIMON:  Withdrawn.

7       Q      Would you agree that the facts

8       are extremely complicated in many respects

9       in this case?

10              MR. COHEN:  Objection.  Vague

11          and overbroad.

12      A      In some of the respects the

13      facts are complicated, yes.

14      Q      Okay.

15              I think you even said with

16      respect to Volume VI, it was so dense you

17      couldn't read the whole thing before your

18      report was done and you needed to take the

19      extra time to do it after, right?

20      A      It's really --

21              MR. COHEN:  Objection.

22              THE WITNESS:  Go ahead.

23              MR. COHEN:  Objection.

24          Mischaracterizes testimony.

25      A      Yeah, it was really that it was,

Page 237

Lyons

1    number one, the -- I knew at the

2    conclusion as to solvency was.  And I had

3    read parts of Section 6, so I knew -- I

4    knew that what I thought were the

5    important conclusions that were drawn with

6    regard to solvency, and having looked at

7    Section 6, I put that on a low priority to

8    read in detail because I didn't think I

9    needed to understand the detail in order

10   to complete the report.  But secondly,

11   just as a matter of personal preference.

12       Q     And I did not mean to be

13   pejorative in the question.

14       A     No, but I did not enjoy reading

15   that as much as I enjoyed other sections.

16       Q     I was merely pointing to that as

17   an example of the factual depth of the

18   examiner's report.  You would agree with

19   me it's a very dense factual report, would

20   you not?

21       A     That I would agree with, yes.

22       Q     Okay.

23             And then as a judge, is it your

24   experience that the more complex facts

Page 238

Lyons

1    that are involved in a claim, the more

2    challenging it is to resolve on a motion

3    to dismiss, for example?

4        A    Well, I think it probably

5    depends.  For example, if it's a motion to

6    dismiss on statute of limitations grounds,

7    there are probably few facts that are

8    relevant to that motion.  And so there

9    could be lots of complex facts that

10   pertain to the events that transpired.

11   But might not be relevant to that motion.

12       Q    Right.

13       A    But if you're assessing the

14   whole claim and you have a long history of

15   intercompany dealings between affiliated

16   companies, I think -- I think your

17   statement is fair that there are going to

18   be a lot of factual presentations that

19   will impact on how that claim were decided

20   in litigation.

21       Q    And I think we talked about this

22   before, but you're not aware of any

23   statute of limitations that relates to an

24   alter ego claim, are you?

1                      Lyons

2       A     I am not.

3       Q     And so to the extent that a

4   motion might be decided on a statute of

5   limitations ground, that would not apply

6   to an alter ego claim to your knowledge?

7       A     To my knowledge, no.

8       Q     Okay.

9             And the risk of losing a motion

10  to dismiss might, as I think you've

11  testified earlier, make it more costly for

12  AFI to settle this matter, right?

13      A     I would say generally yes, if

14  the plaintiff losses a motion to dismiss,

15  the settlement value would be adjusted

16  upward.

17      Q     Right.  And so if a party

18  thought that there was a likelihood of

19  failure of knocking out a claim on a

20  motion to dismiss, that might incentivize

21  that party to reach a settlement before

22  such motion was decided, made or decided,

23  correct?

24      A     That might, yes.

25      Q     And did you consider the

1                        Lyons

2      consequence of losing a motion to dismiss

3      on an alter ego claim with $20 billion of

4      potential liability, more than $20 billion

5      of personal liability --

6              MR. SIMON:  Withdrawn.

7       Q      Did you consider the consequence

8      of losing a motion to dismiss on a veil

9      piercing claim with over $20 billion of

10     liability would have for AFI?

11      A      Would you say that again?  I'm

12     not sure I follow you.

13      Q      Sure.

14              In any of your analysis, did you

15     consider the consequence --

16              MR. SIMON:  Withdrawn.

17      Q      Did you consider the impact of

18     losing a motion to dismiss on a veil

19     piercing claim might have on AFI with

20     respect to settlement?

21      A      Yes.

22      Q      And can you describe -- that's

23     with respect -- I'm asking -- well, let me

24     ask the question again.

25              With respect to an alter ego

1                          Lyons

2     claim --

3          A     Yes.

4          Q     -- did you specifically consider

5     the impact that losing a motion to dismiss

6     on an alter ego claim might have on AFI

7     with respect to settlement?

8          A     Yes, I did.

9          Q     And can you tell me what you

10    considered in that regard?

11         A     I considered in that regard that

12    I knew that there was at least one motion

13    to dismiss that had been denied and

14    that AFI would be more inclined to settle

15    at a higher number because of that.

16         Q     Okay.

17               Do you know if that motion to

18    dismiss that was denied was an alter ego

19    claim or a controlled person claim?

20         A     You know, off the top of my

21    head, I don't recall.

22         Q     Can we go back to your

23    calculations of page 79 of your report.  I

24    think we talked about the 70 percent

25    reduction on the veil piercing alter ego

1                           Lyons

2      risk.

3              Can you tell me why you then

4      deducted from your three billion dollar

5      figure for an alter ego risk, why you made

6      a further reduction of 60 percent for a

7      control person theory risk?

8          A      I considered a control person

9      liability as an alternate theory in the

10     third-party claims, and agreed with the

11     examiner that it was more likely than not

12     that this claim would be unsuccessful.

13         Q      So let me --

14         A      And in light of that --

15         Q      And my apologies when I cut you

16     off, I don't mean to.  I'm looking at the

17     screen and when there's a pause -- my

18     apologies.

19         A      That's okay.  And I'm speaking

20     haltingly because I'm looking at the

21     report as well.

22              But after considering the

23     control person liability, alternate theory

24     of liability, and the assessment of the

25     likelihood of success, I determined that

1                          Lyons

2       it was warranted that an additional 60

3       percent discount be applied to the

4       settlement value.

5           Q      Now I can -- I'll ask the

6       question.

7           A      I'm really finished, yes.

8           Q      You mentioned that you

9       considered the control person liability as

10      an alternate theory of third-party claims?

11          A      Yes.

12          Q      So that's an alternate theory of

13      liability?

14          A      Alternate theory of liability by

15      the third-party RMBS claimants.

16          Q      And why did you subtract 60

17      percent if it's an alternative basis for

18      liability?

19          A      Why did I subtract?  That's

20      because that's how we -- that's how the

21      litigation discount model works.

22          Q      Well, can you explain the

23      difference in your analysis of the first

24      2009 tax allocation agreement?  You added

25      a five percent figure there to account for

Lyons

1

2       three alternative theories of recovery.

3       So what's the difference between the

4       alternative theory of recovery there,

5       which required an addition of five

6       percent, and the alternative theory of

7       recovery here which led you to decrease by

8       60 percent?

9            A     I don't know.  I would have to

10      look at that.

11           Q     Go ahead, you can.

12           A     Which page is that?

13           Q     Take whatever time you need.

14           A     Which page was that?

15           Q     It was the 2009 tax allocation,

16      the first agreement.

17                 Page 39, do you see there in the

18      chart, there is a line that says

19      "increased by five percent for alternative

20      theories"?

21           A     Yes.

22           Q     Okay.

23                 So can you explain why with

24      respect to the 2009 tax allocation

25      agreement under your methodology you

1                      Lyons

2      increased the discount -- you increased

3      the recovery by five percent to account

4      for alternative theories, but you

5      decreased it by 60 percent with respect to

6      your alter ego control person analysis?

7          A     You know, I'm not really sure at

8      this point.  My recollection is that you

9      had the 50 million dollar claim that was

10     an alternate claim and that was related to

11     the tax benefits that accrued in the first

12     half of 2009.  And that even if the court

13     were to conclude that the first tax

14     allocation agreement was not a binding

15     contract, that on the fraudulent

16     conveyance theory, they would -- ResCap

17     would still be able to recover back the 50

18     million dollars.  I believe that's it, but

19     I'm not sure on that.

20         Q     Well, as I understood it, it's

21     because there is different ways in which

22     the party might be able to get to

23     essentially the same recovery.

24              Is that a fair statement?

25         A     No, I really can't agree with

1                        Lyons

2       that at this point.

3           Q      Okay.

4                  You just don't know one way or

5       the other?

6           A      I really don't recall that

7       particular part of the analysis.

8           Q      Okay.

9                  But can I ask you when you

10      testified, when I asked you your basis for

11      subtracting the 60 percent on the control

12      person claim, you testified that you did

13      that because that's how the litigation

14      discount model works.

15                 Can I ask you how it is if the

16      model works in that way, how you can have

17      two completely contrasting approaches to

18      alternate theories of recovery, one where

19      you add and one where you subtract?

20          A      Right.

21                 MR. COHEN:   Objection.  Vague.

22          A      Yeah, I don't think that's a

23      true statement.

24          Q      Which is?

25          A      What you just said, that these

Page 247

Lyons

1

2    approaches are contrasting.

3        Q    Okay.

4        A    And I cannot explain at this

5    point what the five percent increase for

6    alternate theories was exactly.  I just

7    don't remember that.

8        Q    Okay.

9             Just so I'm clear, you --

10       A    But the general proposition that

11   because there are alternate theories in

12   one case you would apply the discount and

13   another case you would increase, I don't

14   think that's accurate.

15       Q    Okay.

16            But you can't explain as you sit

17   here why?

18       A    I can't explain that one, five

19   percent increase.  I just don't recall

20   that discussion.

21       Q    Well, more generally, can you

22   explain how it could be that you might add

23   a percentage to a claim that has

24   alternative theories of recovery in one

25   instance, but subtract if there's

1                         Lyons

2      alternative bases of recovery in another?

3           A      No, I can't.

4           Q      A control person claim, do you

5      know the elements for control person claim

6      to prove one?

7           A      I would have to look at the

8      report to refresh my memory.

9           Q      But they're different from the

10     elements to prove an alter ego claim,

11     right?

12          A      Yes.

13          Q      And it's not -- a control person

14     claim is not an estate claim, correct?

15          A      Correct.  A control person claim

16     is a securities law claim that would

17     belong to people who acquire the

18     securities.

19          Q      Third-parties?

20          A      Third-parties.

21          Q      And unlike an alter ego claim, a

22     control person claim does have a statute

23     of limitations, correct?

24          A      Yes.

25          Q      And I think you testified to

1                         Lyons

2       this, but the full recovery for the

3       liabilities, the $20 billion

4       liabilities --

5              MR. SIMON:  Withdrawn.

6        Q     The full recovery for the 20

7       plus billion dollar liabilities of ResCap

8       can be recovered independently on an alter

9       ego theory or on a control person theory,

10      correct?

11       A     Yes.

12       Q     And, in fact, the committee's

13      STN motion alleged no control person cause

14      of action that you saw, correct?

15             MR. COHEN:  Objection to the

16         form.

17       A     Well, I just want to go back and

18      think about your last question a little

19      bit.

20             I think the control person, the

21      extent of liability for control person is

22      limited to the securities claims.  The

23      extent of liability for the alter ego

24      theory, as you point out, would exceed the

25      securities claims with the other

1                          Lyons

2    non-securities type claims.

3         Q     So it could be greater?

4         A     It could be greater.

5         Q     Okay.

6               But let's talk for a moment the

7    portion of the overall liability

8    attributable to RMBS, the 20 billion

9    dollars.

10        A     Yes.

11        Q     May be recovered independently

12   on an alter ego theory?

13        A     Right.

14        Q     Or independently by a

15   third-party in a controlled person theory?

16        A     Yes, I think that's correct.

17        Q     So why do you deduct the 60

18   percent in your discount analysis from

19   your -- from the 3 billion dollar figure;

20   why is it appropriate to do that?

21        A     Because I think you're looking

22   at, again, an alternate theory and it

23   seems to me that each one has to be

24   analyzed and allocated at discount value.

25        Q     Well, it's actually not an

Page 251

1                          Lyons

2      alternate theory, it's a separate claim;

3      is it not?

4          A     No, I think it's an alternate

5      theory of liability.

6          Q     Well, it's different parties

7      that have standing to bring the claim,

8      correct?

9          A     That's correct.

10         Q     So, in other words, the

11     committee, for example, could not allege

12     an alter ego claim, and in the

13     alternative, a control person claim, it

14     has no standing to do that?

15         A     That's true.

16         Q     Right.

17               And so how is it an alternative

18     theory of recovery to the committee?

19         A     It's not.

20         Q     It's not.

21               And so isn't it fair, sir, that

22     you should have --

23               MR. SIMON:  Withdrawn.

24         Q     Wouldn't it be more accurate to

25     separate the alter ego claim from the

                           Lyons

1

2    control person claim in your discount

3    methodology?

4         A     I thought it was appropriate to

5    treat them together because I thought that

6    the largest amount of the claims, the

7    outstanding rate amount of claims were

8    with the third-party MBS claimant, and I

9    thought that although the alter ego, the

10   merits of the alter ego claim are weak,

11   that if the parties joined forces, that

12   they would be able to extract more

13   settlement value from ResCap than if they

14   pursued things separately.

15        Q     Well, your analysis, sir, had

16   the effect by combining them of lowering

17   the amount of settlement value that the

18   parties could get, correct?

19        A     I don't necessarily agree with

20   that because I looked at them together.

21        Q     Well, sir, if you had stopped

22   your analysis at the 70 percent reduction

23   for veil piercing, what would your value

24   for that claim have been?

25        A     What you see on the report.

1                        Lyons

2           MR. COHEN:  Objection.

3      Incomplete hypothetical.

4      A      What you see on the report.

5      Q      Which is?

6      A      I don't have the number in front

7  of me.

8      Q      Well, it says it's three billion

9  dollars.

10     A      Uh-huh.

11     Q      That was the line item for the

12 alter ego claim accounting for what you

13 characterized as 70 percent veil piercing

14 alter ego risk.

15           Do you know what the number was

16 when you combined the alter ego and

17 control person theories?

18     A      No.  What page are you looking?

19     Q      It's on page 79 of your report.

20     A      It went down from three billion

21 to 1.2 billion.

22     Q      Well, actually, sir, didn't it

23 go down further because you then applied a

24 statute of limitations risk?

25     A      Yes.

Page 254

1                          Lyons

2        Q     So what was the final number?

3        A     480 million.

4        Q     Right.

5              So instead of a three billion

6    dollar value, you brought the claim down

7    to a 480 million dollar value by combining

8    the third-party control person and alter

9    ego claims, right?

10       A     I would not agree with that.

11       Q     Well, sir, isn't that what your

12   report states?

13       A     No.

14       Q     Well, can you explain what it

15   states then?

16       A     I don't think you can stop at

17   the three billion dollar mark because the

18   analysis that we did was in connection

19   with the RMBS third-party claims.

20       Q     Okay.

21             So let me ask you this:  The

22   liability --

23             MR. SIMON:  Withdrawn.

24       Q     The value of an alter ego claim

25   just to reach the RMBS liability in your

                          Lyons

1

report is valued at three billion dollars,

2

correct?

3

     A     For summary value purposes in

4

that analysis, if you stop there, you get

5

to three billion dollars, correct.

6

     Q     Right.

7

           And if someone were to come to a

8

conclusion that it was inappropriate for

9

you to combine the alter ego control

10

person analysis, that's, in fact, the

11

number that your report would articulate

12

for the alter ego risk analysis as it

13

relates to RMBS alone would be three

14

billion dollars, right?

15

     A     If someone were to say it was

16

improper to combine them, I suppose so.

17

     Q     Okay.

18

           Can you explain -- actually --

19

           MR. SIMON:  Withdrawn.

20

     Q     Were you aware that at the

21

outset of these cases, the debtors had an

22

agreement with Ally to settle potential

23

causes of action for 750 million?

24

     A     Yes.

25

Lyons

1

2      Q      Okay.

3             Did you read that in the

4    examiner's report?

5      A      I did.

6      Q      Okay.

7             Were you aware that the original

8    750 million settlement agreement was

9    supported by the then constituted JSN

10   group represented by its current

11   professionals?

12     A      I'm not sure if that was in the

13   examiner's report or not.  That would be

14   the only place I knew about it.

15     Q      So you don't remember your

16   counsel or anyone telling you that fact?

17     A      Nobody told me anything outside

18   of the examiner's report with regard to

19   that.

20     Q      Does that have any impact or

21   influence over your views in this case if

22   I tell you to assume that's true?

23     A      I don't think so.

24     Q      Okay.

25             Can you explain for me the claim

Page 257

Lyons

2    that you analyzed, which in your chart is

3    called breach of contract for

4    misallocation for net revenues on loans

5    brokered by GMAC Mortgage?

6        A     Yes.  Let me just get to that

7    section.

8            MR. COHEN:  Tell us what page

9        you're on.

10           THE WITNESS:  Page 8.

11       Q     Actually, can you do it without

12   referring to your report?

13       A     Yes.

14       Q     Just generally tell me what the

15   claim is about?

16       A     Yes.  Sure.

17           The claim is about the

18   arrangement that was made at the time when

19   the mortgage company did not have access

20   to third-party funds to fund its mortgage

21   origination.  And there was a limitation

22   on how much of the loan production by the

23   mortgage company could be purchased by the

24   bank in a straight purchase and sale

25   transaction, limited by the banking

1                      Lyons

2    regulations.

3         Q     Do you know which regulations?

4         A     It was called the 250.250

5    regulation.

6         Q     Okay.

7         A     And I don't -- I'm not really

8    familiar with that.

9         Q     Regulation 23(a) or (b) ring a

10   bell?

11        A     Oh, yeah, Section 23(a), the

12   intercompany transaction, provisions of

13   the federal banking regulations.  To

14   address the problem to allow the mortgage

15   company to continue to make mortgage

16   loans, a proposal was developed that the

17   mortgage company would act as a broker and

18   the bank would act as the funder of the

19   mortgage loans.

20              However, the anticipation was

21   that most of these loans would be held for

22   sale so that subsequent to the origination

23   an arrangement would be made to sell them

24   to a securitization.

25              I guess at this point in time,

Page 259

Lyons

1

2    it was mostly the GSEs.  And the

3    allocation of the revenues, as the

4    examiner found as a fact and I accepted,

5    was that the bank would have what's termed

6    "net interest carry" but the other

7    economic benefits and detriments of these

8    mortgages would be borne by the mortgage

9    company.  I think that's it.

10        Q    So are you aware of the fact

11   that this claim was not asserted in the

12   committee's STN motion or asserted by any

13   other party prior to the issuance of the

14   examiner's report?

15            MR. COHEN:  Object to the form.

16        A    Yeah, I think you asked me that

17   before.

18        Q    I don't remember your answer.

19   You can answer again.

20        A    And no, I was not aware that --

21        Q    Okay.

22        A    -- it had not been asserted by

23   anyone.

24        Q    Okay.

25            Can you tell me what agreement

                            Lyons

1
2    or agreements serve as the basis for the

3    alleged breach of contracts?

4         A     It's primarily the MMLPSA.

5         Q     Any others?

6         A     There are other agreements that

7    are -- go together with this.  There's

8    some swap agreements and so forth that

9    deal with the change in value of the loan

10   in the interim while it was on the bank's

11   books as an owned asset and also the

12   mortgage servicing rights.

13        Q     Okay.

14              The MMLPSA has already been

15   marked.  That's Lyons' Exhibit 6.

16        A     Yes.

17        Q     It's the 2008 version, which is

18   the germane version, I take it?

19        A     I believe so, yes.

20        Q     Can you tell me which provision

21   in the MMLPSA you believe was breached?

22        A     Yeah, I believe it was the

23   purchase price.

24        Q     Can you actually physically show

25   it to me where in the contract?  Actually,

Page 261

1                       Lyons

2      you said purchase price?  I'll help you.

3      It's on page 3 in the definitions of the

4      definition labeled purchase price.

5           A      Right.

6           Q      Can you explain how that

7      provision is the provision that was

8      breached?

9           A      Purchase price, this I'm quoting

10     now from Section 1.24, "Purchase price

11     means (A) with respect to a first lien

12     mortgage loan, the cost basis plus

13     reserves associated with such first lien

14     mortgage loan; and (B) with respect to a

15     second lien mortgage loan, the market

16     value of such second lien mortgage loan."

17          Q      And can you explain to me how

18     that provision leads to a potential breach

19     of contract claim?

20          A      In the way in which the purchase

21     price was accounted for in the

22     intercompany books and records when

23     mortgages were sold back from the bank to

24     the mortgage company.  Initially in the

25     first half of 2009, the purchase price was

Page 262

Lyons

1
2    the cost basis, and, as I understand it, a

3    simple transaction that if it was a

4    $100,000 mortgage and the borrower paid

5    a point for the origination, so they paid

6    the $1,000, the cost of the mortgage on

7    the bank's book would be $100,000 less

8    $1,000 or $99,000.  And in connection with

9    the transaction, the bank paid a brokerage

10   fee to the mortgage company of, let's say,

11   $500, the cost basis would be increased by

12   the expenditure funds by the bank so it

13   would end up being a net cost basis of

14   $99,500.

15            When the mortgage was sold from

16   the bank back to the mortgage company, the

17   purchase price would be the cost basis,

18   99,500, and the net result of that would

19   be that the mortgage company would get the

20   benefit of the $1,000 point that had been

21   paid by the borrower and would suffer the

22   detriment of the -- actually, the $500 fee

23   would be a wash, because it would be paid

24   by the bank to the mortgage company, but

25   then when the mortgage company purchased

Page 263

Lyons

1   it back, they would increase the amount by

2   $500.  So that would be a wash.  And the

3   economic benefit of that $1,000 point paid

4   by the borrower would reside in the

5   mortgage company.

6               After July of 2009, the

7   accounting for that changed and the

8   benefit of the borrower points was kept by

9   the bank.

10      Q      And in what way did the

11  account --

12              MR. SIMON:  Well, actually,

13      withdrawn.

14      Q      You testified in your answer

15  that your understanding with respect to

16  the purchase price was based on the

17  company's books and records.  You didn't

18  look at any of the books and records of

19  the company in formulating your opinion?

20      A      No.  That was based upon how

21  the transactions were accounted for rather

22  than the amount of money that would pass

23  at a closing, that type of thing.  I did

24  not understand that there was a closing

1                        Lyons

2    where checks were written or anything like

3    that.

4                I understood that these -- the

5    ultimate sale of the loan was accounted

6    for on the books and records of the bank

7    without there being a closing.

8        Q    And you mentioned there was an

9    accounting change.  Can you describe what

10   that was?

11       A    I can tell you the label that

12   was put on it.

13       Q    What was that?

14       A    Fair value accounting.

15       Q    Okay.

16                Do you know if that's a

17   Generally Accepted Accounting Principle?

18       A    I actually believe that it's

19   mentioned in the examiner's report, and

20   also in some of the depositions that I

21   recently read.

22       Q    Okay.

23                So you would agree with me that

24   it's an accounting principle generally

25   accepted in the United States?

Page 265

                         Lyons

1

2        A     Based upon what I read.

3        Q     Okay.

4              And so with -- I'm going to ask

5    the question again.

6              Can you explain how the change

7    to fair value accounting resulted in a

8    breach of contract?

9        A     It's my understanding of the

10   fair value accounting, and I don't profess

11   to fully understand it, but the result of

12   changing to fair value accounting left an

13   economic benefit, such as the points paid

14   by a borrower with the bank, when

15   previously that would have gone to the

16   mortgage company.

17       Q     Do you know if there's anything

18   in the MMLPSA that requires that any

19   particular type of accounting method be

20   utilized --

21       A     Not that I'm aware of.

22       Q     -- utilized by the parties?

23       A     Not that I'm aware of.

24       Q     Okay.

25             And so on what basis do you

Page 266

1                          Lyons

2       opine --

3                   MR. SIMON:   Withdrawn.

4          Q       Are you opining in this case

5       that there was a breach of contract here?

6          A       No, I reached the same legal

7       conclusion as the examiner, that it's

8       likely that there was a breach of contract

9       claim.

10         Q       Okay.

11         A       And I used that in coming to a

12      reasonable settlement value.

13         Q       Okay.

14                 And on what basis do you

15      conclude that it is a reasonable --

16      reasonably likely that there is a breach

17      of contract claim here based on the change

18      in accounting method to fair value

19      accounting?

20         A       Because it appears, I think the

21      examiner concluded and it seems to be a

22      reasonable conclusion, that the intent of

23      the parties was that the economic benefits

24      and detriments of brokered loans would

25      belong to the mortgage company.

Page 267

                          Lyons

1

2        Q      Well, putting aside the intent

3   of the parties, can you point to a

4   provision in the contract that in your

5   view is a provision that was breached by

6   the accounting change to fair value

7   accounting?

8        A      Yes I believe it was the

9   purchase price as the cost basis.

10       Q      Okay.

11              Well, cost basis is a defined

12   term; is it not?

13       A      Yes, I believe it is.

14       Q      Okay.

15              And can you look at the

16   definition of cost basis, which is at 1.9?

17       A      Yes.  Go ahead.

18       Q      Go ahead.

19       A      "Cost basis means with respect

20   to a mortgage loan its net carrying value

21   as defined by accounting principles

22   generally accepted in the United States of

23   America as amended."

24       Q      And it goes on from there?

25       A      And it goes on.

Page 268

Lyons

1

2      Q      And you would -- I think you

3   just testified that you have no reason to

4   dispute that fair value accounting is a

5   generally accepted accounting principle in

6   the United States of America, correct?

7      A      That's what I've -- that's what

8   I've read, yes.

9      Q      Okay.

10          And were you aware that the FDIC

11   requested that this particular definition

12   of cost basis include the reference to

13   generally accepted principles of

14   accounting in the United States?

15      A      I don't recall reading that.

16      Q      Okay.

17          If I -- I'll represent to you

18   that Mr. Celini so testified.  You read

19   his transcript, right?

20      A      Yes.

21      Q      Okay.

22          You just don't recall that

23   particular testimony?

24      A      Correct.

25      Q      Okay, but you would agree with

Page 269

Lyons

1

2     me that if that's the case as a regulated

3     entity, a request from the FDIC would

4     carry significant weight with Ally Bank

5     Management; would you think?

6         A     Yes.

7         Q     Okay.

8               And, again, I guess I'll ask you

9     in what way you view this provision

10    violated by implementing a method of

11    accounting that by your testimony is an

12    accounting principle generally accepted in

13    the United States of America?

14        A     Because I think when the -- when

15    the agreement was made that the bank was

16    applying the -- was not applying the fair

17    value accounting method, and that the

18    parties agree that the price at which a

19    loan was sold back would be its cost

20    basis, and it says here in 1.9 the

21    definition, the unpaid principal balance

22    plus or minus any premium or discount

23    paid, net deferral fees or cost, accrued

24    interest and basis adjustments.

25        Q     Well, sir, you skipped over

Page 270

1                          Lyons

2    though.  The full sentence reads --

3               MR. COHEN:  Excuse me, you just

4         interrupted his answer.

5         Q     Okay.  Fair enough.

6               You can finish, but I'm going to

7    ask to you read it again.

8               MR. COHEN:  Can you give me the

9         full answer again, Mr. Lyons?

10        Q     I apologize for interrupting.

11        A     All right.

12              Well, I'm just looking at the

13   definition of cost basis.

14              It seemed to me that a

15   reasonable interpretation of this contract

16   was that it was consistent with the intent

17   of the parties to have the economics of

18   the transaction, except for the interest

19   carry reside with the mortgage company.

20   And by defining cost basis in this method,

21   that's what they attempted to accomplish.

22              For some reason, the bank

23   implemented an accounting change that

24   changed the economics of the transaction

25   without informing the other party to the

1                           Lyons

2       transaction and --

3           Q      Sorry.  I don't want to cut you

4       off.

5           A      And it seems to me that that

6       breached the contract, and that the

7       mortgage company was entitled to have the

8       contract enforced as originally written

9       and as originally intended.

10          Q      So your testimony is that for

11      some reason, the bank implemented an

12      accounting change that changed the

13      economics of the transaction without

14      informing the other party.  And on that

15      basis, you conclude that there was a

16      breach?

17          A      I think that's what the

18      examiner -- that's part of what the

19      examiner said, and I agree with his

20      conclusion.

21          Q      Well, do you know whether this

22      contract, this MMLPSA specifies that a

23      particular accounting principle must be

24      followed?

25          A      No, I don't think it does.  In

Page 272

Lyons

1
2    other words, whether there are alternate
3    ways to account for something, both of
4    which comply with GAAP, I don't think this
5    contract specifically addresses that.
6        Q    Okay.
7            Nor does it address if, in fact,
8    at the time that the contract was executed
9    there was one particular GAAP in place
10   that at some point in the future a party
11   might change to another GAAP accounting
12   principle.  There's nothing that precludes
13   the parties on the face of this document
14   from doing that, is there?
15       A    Nothing that precludes it, no, I
16   don't think so.
17       Q    In fact, didn't the examiner
18   concede it possible that the contemplated
19   allocation of revenues was not mandated by
20   the terms of the 2008 MMLPSA?
21       A    Yes.
22       Q    And he concluded the same with
23   respect to the Pipeline Swap, did he not?
24       A    I don't remember that.
25       Q    Well -- okay, let me refer you

<center>Lyons</center>

1    to page 13 of your report.  You see in the

2    first full paragraph of page 13, the

3    sentence beginning "Although the

4    examiner"?

5        A    Yes, I see that.

6        Q    Okay.

7        And do you see he concludes that

8    it's possible that neither the 2008 MMLPSA

9    nor the Pipeline Swap mandated the

10    contemplated allocation of revenues; do

11    you see that?

12        A    I don't think you --

13        Q    I'll read it actually into the

14    record.  This is the first paragraph,

15    first sentence.

16        A    Right.

17        Q    "Although the examiner concludes

18    that GMAC Mortgage," and this is your

19    report I'm reading, correct?

20        A    Yes.

21        Q    "Although the examiner concludes

22    that GMAC Mortgage would likely prevail on

23    a claim for breach of the parties'

24    agreement, he concedes it is possible that

Page 274

1                          Lyons

2        the contemplated allocation of revenues

3        was not mandated by the terms of the 2008

4        MMLPSA and the Pipeline Swap."

5            A     Yes.

6            Q     And do you agree with that

7        statement?

8            A     Yes, I wrote it.

9            Q     And you're not changing it any

10       respect as you sit here today?

11           A     No.

12           Q     By rendering your views on this

13       claim, by definition, are you not applying

14       law to facts?

15               I used your phrasing.  I would

16       have said facts to law before.

17           A     Right.

18               Yes, I think in the analysis I

19       definitely had to apply the law to the

20       facts to make a determination as to the

21       merits of the claim.

22           Q     In particular, you cite in your

23       report a case called Continental Insurance

24       out of the Delaware Chancery Court, right?

25           A     Yes.

Page 275

1                        Lyons

2       Q      Okay.

3              And with respect to that case,

4    you write in your report that, "The court

5    refused to enforce an alleged non-written

6    contractual modification based on the

7    parties' prior course of dealing because

8    the parties' prior course of conduct

9    demonstrated that they, in fact, amend the

10   agreement in writing".

11             You concluded that, right?

12      A      Yes.

13      Q      And here in the MMLPSA there was

14   no oral modification provision, correct?

15      A      Yes.

16      Q      Okay.

17             And are you aware of any case

18   where in the face of a no oral

19   modification clause a court nevertheless

20   found there to be a binding non-written

21   modification?

22      A      I can't cite a particular case,

23   but I know that there are cases that hold

24   that.

25      Q      During your time on the bench,

Page 276

                              Lyons

1

2      did you ever rule in favor of a party of a

3      contract claim premised on a modification

4      argument notwithstanding the existence of

5      a clause requiring that modifications be

6      made in writing?

7          A      I suspect that I did but I don't

8      recall.

9          Q      Why do you suspect that you did?

10         A      Just because it's a common --

11     common argument that a contract has been

12     modified.

13               My recollection is that despite

14     the existence of a provision in the

15     contract that says that modification it

16     can only be in writing, that that

17     provision itself can be modified orally

18     and that a contract with that provision

19     can be modified by an agreement that is

20     not in writing.

21         Q      But you can't name a case as you

22     sit here?

23         A      I'm sorry, I don't have a case.

24         Q      Now, you note in your report

25     that "If the contemplated allocation of

1                          Lyons

2      revenues was not mandated by the MMLPSA or

3      Pipeline Swap terms, then GMAC Mortgage

4      would need to prove that the

5      contemporaneous brokering consumer loans

6      to bank project documentation and the

7      parties ensuing implementation of the

8      arrangement constituted a written

9      modification to those agreements to

10     provide for the contemplated revenue

11     allocation."

12         A     Yes.

13         Q     And what basis, if any, did you

14     have of assessing the parties' intent in

15     that regard?

16         A     What was written by Judge

17     Gonzales in his report and he talked about

18     the presentations that were made that

19     demonstrated the economic impact of this

20     brokering and consumer loans to bank

21     project.

22         Q     Okay.

23              Well, you say in your report at

24     page 8 that the parties' agreement is

25     further reflected in a slide presentation

Page 278

1                     Lyons

2       dated November 19, 2008, entitled

3       "Brokering Consumer Loans To Bank

4       Project."

5            A     Yes.

6            Q     And is that the slide

7       presentation you're referring to?

8            A     I believe so, yes.

9            Q     Okay.

10                 Did you look at that document in

11      preparing your report?

12           A     I did not.

13           Q     Okay.

14                 Why not?

15           A     I didn't request it.

16           Q     Is there any particular reason

17      why you didn't?

18           A     No.

19                 MR. SIMON:  I'm going to have

20           the reporter mark as the next exhibit

21           Lyons 7.

22                 (Document, was marked as

23           Plaintiff's Lyons Exhibit 7 for

24           identification, as of this date.)

25      BY MR. SIMON:

                          Lyons

1

2       Q     Take a minute or as much time as

3  you need to thumb through it.  But I just

4  want to confirm that this is the document

5  that in your report you state reflects the

6  parties' agreement, right?

7       A     I don't know what this document

8  is, but --

9       Q     Well, let me represent to you

10  that the document in the examiner's report

11  that he relied upon for the statement you

12  cited is, in fact, this document.

13       A     Okay.  Then if that's so and to

14  the extent that I followed the examiner's

15  factual findings, then it's correct.

16       Q     Okay.

17            And so you would expect if this

18  document reflects the parties' agreement,

19  it's a final document, right?

20       A     It's a final document?

21       Q     It represents the final --

22            MR. SIMON:  Withdrawn.

23       Q     That with respect to the

24  brokering consumer loans to bank project,

25  this would represent the parties' final

Page 280

Lyons

1        agreement as to that particular project,

2        if the examiner is relying upon it?

3                MR. COHEN:   Object to the form.

4        Q       Let me just rephrase the

5        question.

6                MR. SIMON:   Let me withdraw it.

7        Q       The examiner in his report you

8        quoted characterized this slide deck as

9        the parties' -- as reflecting the parties'

10       agreement, correct?

11       A       Yes.

12       Q       Okay.  And that's what I meant

13       to get at.

14               Can you look for a moment at

15       page, Exam 75408 of this document, which

16       is I think also Slide 14 of the deck.

17               Can you read for me the header

18       at the top of that slide?

19       A       Open items and next steps.

20       Q       And did it include among the

21       next steps complete financing/accounting

22       business readiness model?

23       A       Which one is that?

24       Q       The second bullet under open

Page 281

1                         Lyons

2    issues.

3         A     I see complete additional --

4         Q     I'm sorry.  The first bullet

5    under next steps.

6         A     The first bullet under next

7    steps, okay.  That reads, "Complete

8    financing/accounting business readiness

9    model and provide weekly updates to stake

10   holders-ongoing."

11        Q     You have no way of knowing

12   whether those next steps were completed,

13   do you?

14        A     No, I don't.

15        Q     And you have no way of knowing

16   whether those open issues were resolved,

17   do you?

18        A     I don't know what they are so I

19   don't know.

20        Q     Would you agree with me that on

21   the face of this document being that it --

22   according to the document there's open

23   items and next steps, that this does not

24   necessarily reflect the parties'

25   agreement?

1                          Lyons

2            MR. COHEN:  Objection.

3        Mischaracterizes the document.  The

4        document speaks for itself.

5        Q     You can answer.

6        A     I'm not sure I can agree with

7    you on that.

8        Q     Well, you can't say either way,

9    can you?

10       A     I cannot.

11       Q     You state in your report at page

12   13 of the parties' conduct before and

13   after the implementation of the BCL2D

14   would likely overcome AFI's arguments in

15   this regard.

16            Do you recall that?

17       A     Yes.

18       Q     How could you possibly draw a

19   conclusion about the parties' conduct if

20   you have not personally evaluated it?

21            MR. COHEN:  Object to the form.

22       A     I'm relying upon the examiner's

23   report for those factual statements.

24       Q     And are you aware that Mr.

25   Celini testified that the broker to bank

Page 283

Lyons

1

2    project team consisted of maybe 30 or 40

3    people at various times and it involved

4    scenarios?

5        A    Yes, I remember reading that.

6        Q    And did you review the broker

7    agreement in connection with your analysis

8    of this claim?

9        A    No, I did not.

10       Q    Okay.

11           You did say in your report that

12   the broker agreement is the only new

13   written agreement into which the parties

14   entered in connection with the BCL2B

15   project; is that right?

16       A    Yes.

17       Q    Okay.

18           Why didn't you review it?

19       A    I personally didn't review it.

20   I'm not sure if a party, one of my

21   colleagues may have reviewed that.

22       Q    Okay.

23           And it is, in fact, on your

24   Exhibit A?

25       A    Yes.  So then one of my

Page 284

                          Lyons

1
2    colleagues would have reviewed it.

3        Q    But you don't recall personally

4    reviewing it?

5        A    I don't recall personally

6    looking at that.

7        Q    Okay.

8        A    Correct.

9            MR. SIMON:  I'm going to ask the

10           reporter to mark as the next exhibit a

11           copy of the broker agreement dated

12           November 20, 2008 between GMAC Bank

13           and GMAC Mortgage, LLC and Ditech,

14           LLC.

15           (Broker Agreement, was marked as

16           Lyons Exhibit 8 for identification, as

17           of this date.)

18   BY MR. SIMON:

19       Q    You would agree with me, sir,

20   that, and take as much time as you need,

21   but I think you said it in your report,

22   that this document does not specify the

23   fee to be paid to GMAC Mortgage for acting

24   as a broker, correct?

25       A    If I said that in the report,

Page 285

                        Lyons

1       I'm going to assume it's correct and I

2       haven't looked through the document,

3       but --

4           Q     Okay.

5           A     -- I take your representation

6       that it doesn't provide for a fee.

7           Q     So if it says it in your report

8       or the examiner's report, you accept that?

9           A     I accept that.

10              MR. COHEN:  Objection.

11          Mischaracterizes testimony.

12          Q     Well, I'm not asking

13      character -- I'm going to read -- I'm

14      going to ask a separate question because I

15      don't know exactly where it is but my

16      notes say you said it.

17              So if you said it or if Judge

18      Gonzales said it, you will accept the

19      premise that nowhere in this agreement

20      does it specify the fee to be paid for --

21      the broker fee to be paid?

22          A     I will accept that premise, yes.

23          Q     All right.

24              Can you look at paragraph 4 of

Page 286

1                        Lyons

2      the agreement at page 3.

3           A     Page 3, yes.

4           Q     And you see the section there

5      entitled "Broker Compensation"?

6           A     Yes.

7           Q     And are you aware that this

8      provision provides that "GMAC Bank shall

9      be permitted to make adjustments to the

10     compensation due the broker," and that's

11     GMAC Mortgage, "in the event that GMAC

12     Bank determines in its sole discretion

13     that the projected total amount of

14     compensation to be received by broker,"

15     GMAC Mortgage, "in the related loan

16     transaction would exceed that which is

17     commensurate with the amount normally

18     charged for similar goods, facilities and

19     services, keeping in mind the price

20     structures and practices in similar

21     transactions and in similar markets."

22                Do you see that?

23          A     I see that, yes.

24          Q     And did you consider that at all

25     in forming your opinion in connection with

1                              Lyons

2    the value of this so-called breach of

3    contract claim?

4         A     No, I did not.

5         Q     What term, if any, in the

6    broker's agreement do you contend was

7    breached?

8         A     I don't know without looking at

9    my report.

10        Q     Okay.

11              And I just want, just in

12   fairness because I was really not trying

13   to trick you, in your report at page 9,

14   the paragraph, the second full paragraph

15   on page 9?

16        A     Yes.

17        Q     I just want to point to the

18   second sentence of that paragraph reads,

19   "The broker agreement does not specify the

20   fee that is to be paid to GMAC Mortgage

21   for acting as a broker."

22              Did you write those words?

23        A     Yes.

24        Q     And you believe them to be true?

25        A     Yes.

Page 288

Lyons

1

2     Q     Can I direct your attention to

3     page 10 of your report?

4           And can you tell me once you get

5     there what is depicted in the figure at

6     the top of page 10?

7     A     That is an exhibit that I copied

8     from the examiner's report that depicts

9     the different items of revenue and expense

10    for the economics of a particular mortgage

11    purchase and sale transaction and how the

12    elements were allocated pre and post the

13    adoption of the fair value election.

14    Q     Okay.

15          On the fifth entry there, can

16    you read what it is?

17    A     Gain on sale to third-party.

18    Q     Right.

19          And do you see that pre-fair

20    value election which entity received the

21    gain on sale to third-party?

22    A     The mortgage company.

23    Q     And post-fair value election,

24    which entity received the gain on sale to

25    third-party?

                        Lyons

1

2       A       The mortgage company.

3       Q       Okay.

4               And can you tell me how you

5       reconcile that fact with your statement in

6       your report at page 10 that there appears

7       to be no evidence that the parties even

8       recognize that the fair value election

9       would have the effect to allow Ally Bank

10      to keep a significant portion of the gain

11      on sale?

12      A       Where is that sentence?

13      Q       This is on page -- it's actually

14      right below.  Right below the chart you

15      have a sentence there that starts with the

16      words "There appears to be no evidence

17      that this change in the underlying

18      economics was understood to have an impact

19      of Ally Bank keeping a significant portion

20      of the gain on sale."

21      A       Yes, actually I see that.

22      Q       So I'm asking if you can

23      reconcile the figure which shows gain of

24      sale of third-parties staying with GMAC

25      Mortgage with your first sentence under

Page 290

                        Lyons

1

2      the figure?

3          A      No, I think that's -- that may

4      be a mistake.

5          Q      Which is a mistake?

6          A      The -- what's written below the

7      chart.

8          Q      So you think it's a mistake

9      that -- well, what's the mistake?

10         A      Well, I think -- I'd have to

11     read it thoroughly, but I believe that the

12     change had to do with, for example, the

13     points collected being kept by the

14     mortgage company pre the change in

15     accounting and being kept by the bank

16     afterwards, and that the gain on sale to

17     third-party in this sentence is an

18     incorrect statement.  But I would really

19     like to read the whole discussion further.

20         Q      So do you think that the gain on

21     sale -- do you think it's a mistake to say

22     that there was a change in the gain on

23     sale that allowed Ally Bank to keep a

24     significant portion of it after the 2009

25     fair value election?

1                       Lyons

2             MR. COHEN:   Objection.

3        Mischaracterizes testimony.

4        Q       I'm asking if you can clarify

5    what you mean by mistake?

6        A       Well, may I read this --

7        Q       Sure.

8        A       -- section?

9             Okay.   I've read it and I am not

10   sure that my use of the term "gain on

11   sale" in page 10 was accurate.   But I

12   would have to review the examiner's report

13   again and see whether -- see whether the

14   use of that term was accurate or not in

15   light of the examiner's report.   But my

16   understanding is, I think, accurately

17   stated in page 9 as to what the economic

18   difference was and how the accounting

19   changed.

20             And it was primarily the

21   benefits of the points and the initial

22   revenue that would be recognized at the

23   initiation of the transaction rather than

24   the sale, the gain on the sale to a

25   third-party that was different before and

1                        Lyons

2      after the accounting change.  But I

3      don't -- I don't pretend to really

4      understand what fair value accounting is.

5          Q     Makes two of us.

6          A     Pardon me.  I'm starting to lose

7      my voice a little bit.

8          Q     Are you familiar with the

9      concept of discount pricing with respect

10     to mortgages?

11         A     No, I don't think so.

12         Q     How about premium pricing?

13         A     Premium pricing, yes, I believe

14     so.

15         Q     Do you know whether there was a

16     change in the mortgage market beginning in

17     2009 with respect to premium pricing?

18         A     Yes, I believe I read something

19     about that.

20         Q     And what do you think the nature

21     of the change was?

22         A     This is my understanding, and

23     believe me it's not an educated

24     understanding, but I'll tell you what I

25     understand; that a purchaser of a loan

1                          Lyons

2      would pay more than par value for the loan

3      because the interest rate, the stated

4      interest rate on the loan was above the

5      current market interest rate for some of

6      the loan.

7          Q      And do you know whether there

8      was a trend in the marketplace where

9      increasingly mortgages were premium priced

10     beginning in 2009?

11         A      Again, I believe I read that.

12         Q      Do you know what the impact

13     would be of a shift toward premium pricing

14     in terms of the origination fees on those

15     loans that were premium priced?

16         A      No, I do not know.

17         Q      Okay.

18             Do you know whether the

19     origination fees would be reduced if you

20     were using premium pricing instead of

21     discounting, discount pricing?

22         A      Yes, I believe that in the

23     premium pricing market, I don't believe

24     the borrower would be paying origination

25     fees and that the premium would be paid by

1                         Lyons

2     a subsequent purchaser.  That's my

3     understanding.

4         Q     Do you know the effect on gain

5     of sale of third-parties under premium

6     pricing?

7         A     I don't know, but if my

8     understanding is correct it would be a

9     gain on sale because of the premium.

10        Q     Right.

11              And do you think it would be

12    higher or lower than the discount pricing?

13        A     I would think it would be

14    higher.

15        Q     Okay.

16        A     Oh, I'm sorry.

17        Q     Let me help you out.

18        A     Yes.

19        Q     You read the examiner's report?

20        A     Right.

21        Q     You read all of it before your

22    report, right?

23        A     Yes.

24        Q     And that included Volume V,

25    which in great detail talks about the GMAC

1                     Lyons

2       Mortgage contracts, meet with Ally Bank

3       opening loan sales.

4            A     Yes.

5            Q     I'm going to give you a section

6       of the examiner's report, Section 5, pages

7       89 through 209.  And it's Section V, "B"

8       as in boy, I guess, starting at page V89.

9                  I'm actually not going to mark

10      this.  I don't think we need to mark it.

11                 MR. COHEN:  Can I get a copy?

12                 MR. SIMON:  Yes, I'm going to

13           give you a copy, of course.

14      BY MR. SIMON:

15           Q     I just want to allow you to

16      refresh your recollection.

17           A     Thank you.

18           Q     Okay.

19                 I'd like you to turn to page

20      V128, please.  And you see there the

21      examiner sets forth an exhibit which has a

22      comparison between discount point pricing

23      and premium pricing?

24           A     Yes.

25           Q     And do you see that the bank's

Page 296

                          Lyons

1    cost basis under discount pricing is lower

2    than the bank's cost basis under premium

3    pricing?

4        A     I see that.

5        Q     Okay.

6              Can you turn to the next page

7    which is 129?

8        A     Yes.

9        Q     And this is a discussion of a

10   scenario using premium pricing, and midway

11   through that paragraph there's a statement

12   after he sets forth a little bit about the

13   hypothetical, the examiner says, "This is

14   known as a no closing cost loan and is

15   considered premium pricing."

16             Do you see that?

17       A     No.  Where is it?

18       Q     The middle of the first

19   paragraph on page 129.

20       A     The middle of the first

21   paragraph?

22       Q     Yes.

23       A     Okay.  Now I see it.

24       Q     See it?  And what he goes on to

1                        Lyons

2      say is, "In this scenario," a premium

3      pricing scenario, "the bank's cost basis

4      is 203,500."  That's reflected in the

5      figure we just looked at.  "The increased

6      above par note rate will positively affect

7      the gain on sale recognized when the loan

8      is sold to investor."

9            Do you see that?

10     A      I do see that.

11     Q      And is it your understanding

12     that the gain on sale recognized when the

13     loan is sold to an investor is another way

14     of saying the gain on sale to

15     third-parties?

16     A      Yes.

17     Q      Okay.

18            And both before and after the

19     fair market accounting change, at least

20     according to the figure on page 10 of your

21     report, the gain on sale of third-parties

22     went to GMAC Mortgage, correct?

23     A      That's what that figure said,

24     yes.

25     Q      So isn't it true that if premium

                        Lyons

1

2    pricing were increasing in 2009, the

3    expectation would be that GMAC Mortgage

4    would receive more gain on sale to

5    third-parties?

6         A     That sounds reasonable to me.

7         Q     Okay.

8              And you have not quantified how

9    much GMAC Mortgage made in that regard,

10   correct?

11        A     That's correct.

12        Q     And you have no view one way or

13   the other as to how much they made?

14        A     I have no information.

15        Q     Turning to page -- you can give

16   that back to me now; that's why I don't

17   want to mark it.  Less for all us of to

18   carry out of here.

19             MR. COHEN:  You can have mine

20   too.

21        Q     On page 12 of your report, you

22   note that the examiner concluded that GMAC

23   Mortgage's contract claim under the

24   MMLPSA, the Pipeline Swap and the parties'

25   agreement about the combined effect of

Lyons

1

2     those contracts is estimated at a 520.5

3     million dollars; is that an accurate

4     statement?

5          A     That's number three?

6          Q     Yes.

7          A     Yes.

8          Q     Would you agree that an entity

9     might originate loans or broker loans but

10    would not likely do both for the same

11    loan?

12              MR. COHEN:   Object to the form.

13         A     That would be my understanding

14    that there are two different roles,

15    originating and brokering.

16         Q     And if GMAC Mortgage were given

17    the entire measure of damages set out

18    there, the 520.5 million as an ostensible

19    remedy for revenues improperly obtained by

20    the bank, the bank would get no return on

21    the deal at all, right?

22         A     No.  As I understand it, the

23    bank would continue to get what they call

24    a net interest carry.

25         Q     Well, if I represent to you that

Page 300

Lyons

1    the 520.5 million is comprised of both,

2    what would be earned for origination and

3    for brokering, assume that to be the case

4    with respect to that 520.5 million; if

5    GMAC Mortgage were to get the entirety of

6    that and left the bank with nothing with

7    respect to that loan, do you think that

8    would make any business sense?

9         MR. COHEN:   Objection.

10         Incomplete hypothetical and it assumes

11         the answer.

12    A       I guess if there were nothing in

13    the deal for the bank, it would not make

14    business sense for the bank to do the

15    deal.

16    Q       And do you think the bank's

17    regulators would ever approve an

18    arrangement where there was nothing in it

19    for the bank?

20    A       With an affiliated transaction,

21    probably not.

22    Q       Okay.

23         Now, under the MMLPSA, were you

24    aware that the committee actually

1                        Lyons

2       articulated a constructive fraudulent

3       transfer theory in its STN motion?

4            A     No.

5            Q     Well, the committee opined

6       that --

7                  MR. SIMON:   Withdrawn.

8            Q     The committee alleged that GMAC

9       Mortgage was forced to take on all of the

10      rep and warranty risk for loans originated

11      by Ally Bank?

12           A     Yes.

13           Q     Are you familiar with that?   Do

14      you recall hearing that earlier?

15           A     Yes.

16           Q     Okay.

17                 And that's in part by the

18      removal of the reps and warranties in the

19      MMLPSA that we looked at earlier.

20                 Do you recall looking at that?

21           A     Yes.

22           Q     And according to the examiner,

23      GMAC Mortgage was not getting sufficient

24      consideration, at least beginning in 2009,

25      for taking on that risk; is that a fair

1                       Lyons

2    statement?

3        A     Well, if the economics were not

4    as the examiner found was the agreement of

5    the parties, then that's true.

6        Q     Well, he did -- whatever the

7    agreement of the parties was the examiner

8    concluded that GMAC Mortgage was not

9    getting sufficient consideration to take

10   on that risk.  The reason --

11            MR. SIMON:  Withdrawn.

12       Q     Do you recall whether the

13   examiner concluded that the reason that

14   GMAC Mortgage was taking on the reps and

15   warranty risk, according to what the

16   examiner said, is because it was getting

17   all of the gain on sale?

18       A     All of the economic advantage.

19       Q     That's a better way of putting

20   it, that the reason that GMAC Mortgage was

21   taking on the reps and warranties was

22   because it was getting all the economic

23   advantage; that's what the examiner

24   concluded, right?

25       A     Yes.

1                         Lyons

2          Q     Okay.

3                And if, in fact, the -- GMAC

4     Mortgage was required to take on the reps

5     and warranties but was getting less than

6     the full economic advantage at a time when

7     it was insolvent, doesn't that sound like

8     the makings of a constructive fraudulent

9     transfer claim?

10               MR. COHEN:  Objection.  Form.

11         A     Yes, limited to the factors that

12    you just posited that does sound like a

13    fraudulent transfer claim.

14         Q     Okay.

15               And take a look, if you would,

16    at paragraph 64 of the STN motion, which I

17    think is Exhibit 4.

18         A     I'm sorry, which paragraph?

19         Q     64.

20               MR. COHEN:  It's page 29.

21         A     Okay.  I'm on page 29.

22         Q     And do you see there that the

23    committee alleges that the MPA, and we

24    called the MMLPSA the MPA for the sake of

25    brevity in our favor.

1                        Lyons

2        A     Good for you.

3        Q     "The MPA and swap transaction

4   similarly support both constructive and

5   actual fraudulent transfer claims.  The

6   transactions shifted to GMAC Mortgage

7   without fair consideration, virtually all

8   of Ally Banks' R&W risk.

9              While insolvent, GMAC Mortgage

10  was required to make massive overpayments

11  to Ally Bank under the MPA, absorb

12  substantial marked to market losses and to

13  asset amortization under the MSR Swap,

14  suffer significant volatility in its

15  earnings under the Pipeline Swap"; et

16  cetera.

17             Had you seen that allegation

18  before rendering your report in this case?

19       A     No.

20       Q     Did you consider, in fact,

21  whether this potential claim might have

22  factored into the global settlement?

23       A     I did not.

24       Q     Okay.

25             You weren't even aware of it

Page 305

1                         Lyons

2      when you were doing your analysis,

3      correct?

4           A     No, I was not.

5           Q     Let's take a look at page 15 of

6      your report.  And this is where you set

7      out your discounting methodology in

8      connection with the net misallocation

9      of revenue -- I'm sorry, the misallocation

10     of net revenue claim.

11          A     Yes.

12          Q     So you start with the damages

13     figure that we discussed, the 520.5

14     million, right?

15          A     Yes.

16          Q     And you assume that that figure

17     is correct?

18          A     Yes.

19          Q     Okay.  But you've done nothing

20     independently to assess whether or not

21     that 520.5 as a business matter is

22     appropriate or not?

23          A     That's correct.

24          Q     Okay.

25                Then you reduced that figure by

1                      Lyons

2    20 percent for inherent risk?

3        A    Yes.

4        Q    Why did you do that?

5        A    That's an initial settlement

6    evaluation.  Just general inherent risk in

7    any litigation and 20 percent was a small

8    discount in light of the strength of the

9    claim for the misallocation of revenues.

10       Q    Why in your view was the claim

11   strong?

12       A    It seemed to me that it made

13   sense.  The recitation of the facts that

14   were in the examiner's report made sense

15   to me that prior to this time period GMAC

16   Mortgage was originating loans and using

17   the Ally Bank or other sources to finance

18   holding those assets between the time of

19   origination and sale to a third-party.

20   Because of the turmoil in the market, that

21   financing method was no longer available.

22            However, under the first

23   scenario, the finance company would only

24   be getting interest from the mortgage

25   company for assisting in the finance of

Page 307

Lyons

1    this mortgage operation and that the

2    construct of this brokerage, brokering

3    loans to the bank was to achieve the same

4    economics as pre-existed the brokering

5    transaction.  And that that was consistent

6    with the presentations that were made and

7    would appear to be the understanding of

8    the parties.  But it seemed to me to be a

9    viable contract claim.  Of course it has

10   problems.

11        Q     When you say consistent with the

12   presentations that were made, having now

13   seen the presentation and seeing that by

14   appearances it does not seem as though

15   it's a final presentation.

16        Does it change your review in

17   any way in that regard?

18        A     No.

19        Q     Okay.

20        Why not 30 percent for inherent

21   risk?

22        A     It was just after discussing

23   this matter with my colleagues and looking

24   at the assessment by the examiner, and I

                        Lyons

1

2      believe I looked, the examiner thought

3      this was a claim that was likely to

4      succeed -- yes, I believe that's what he

5      said -- that 20 percent was an appropriate

6      discount.

7          Q     So do you think that the

8      likelihood of success predicted by the

9      examiner is a relevant factor in

10     determining the inherent risk percentage?

11         A     Yes.

12         Q     Can you explain why for the

13     Minnesota preference claim and the Ally

14     Bank fraud claims you used a 30 percent

15     inherent risk discount, when those claims

16     were given the same likelihood of success

17     by the examiner as this claim?

18         A     Yes, I mean, they're all

19     different claims and there were other

20     factors that I considered in doing the

21     inherent risk analysis in those

22     situations.

23         Q     Such as what?

24         A     I don't know, the Minnesota

25     Insider Preference thing was kind of a

Page 309

Lyons

1  novel issue to me.  And that was one of

2  the factors that I took into consideration

3  in doing the discount analysis.

4      Q    I'd like to ask you more but

5  we're going to lose the tape, so we have

6  to take a break.

7      A    Okay.

8          THE VIDEOGRAPHER:  This marks

9      the end of tape number four.  We're

10     going off the record at 4:39 p.m.

11         (Thereupon, a recess was taken,

12     and then the proceedings continued as

13     follows:)

14         THE VIDEOGRAPHER:  This marks

15     the start of tape number five.  We're

16     back on the record at 4:53 p.m.

17 BY MR. SIMON:

18     Q    Mr. Lyons.

19     A    Yes.

20     Q    We're going to continue

21 discussing your discounting method with

22 respect to the misallocation of revenues

23 claim.

24         You next applied a 30 percent

Page 310

1                          Lyons

2       reduction for risk of possible pursuit of

3       the claim under the modification theory.

4                 Could you explain your basis for

5       that?

6            A    Yes.  As we discussed

7       previously, the language of the contract

8       may not be crystal clear, and the

9       plaintiff would have to establish the

10      contract was modified, and I discounted

11      the reasonable settlement value by 30

12      percent to account for that factor.

13           Q    How did you come up with that

14      number?

15           A    It was just based upon my

16      experience and my discussions with my

17      colleagues.

18           Q    Why did you need to discuss with

19      your colleagues these percentages before

20      choosing a percentage?

21           A    I thought it was beneficial to

22      get input from other experienced people,

23      particularly litigators on contract

24      litigation claims.

25           Q    To be clear, everyone you

1                          Lyons

2      consulted with was in your own firm?

3          A      Everyone was in my own firm.

4          Q      So there were no external

5      authorities that you referenced in coming

6      up with your percentages?

7          A      That's correct.

8          Q      Any objective criteria treatises

9      or texts or anything out there apart from

10     your colleagues that you looked to in

11     forming your particular percentages that

12     you applied in your discounting

13     methodology?

14         A      No, there were no texts or any

15     outside sources that I consulted to select

16     a particular percentage that I applied to

17     any issues.

18         Q      So in your analysis on page 13

19     in the narrative, you don't supply a 30

20     percent number.

21             What you do in the text is you

22     assign a 20 percent discount owing to

23     likely disputation of facts, but in the

24     chart, you assign a 30 percent discount.

25             Can you explain the discrepancy?

1                          Lyons

2        A      I can only say that might be an

3   error just based upon what you said.

4        Q      Do you we know which is correct?

5        A      No, I don't.

6        Q      So it could be 30; it could be

7   20?

8        A      It is probably the chart is

9   correct.

10       Q      But you don't know?

11       A      I don't know as we're sitting

12  here today.

13       Q      How are we to make that

14  determination?

15       A      It could be just an error.

16       Q      Right.

17              How do we resolve the error?

18  Should we use the 20 or the 30?

19              MR. COHEN:  Object to the form.

20       Q      You can answer.

21       A      As I said, my initial reaction

22  is that the chart is probably the correct

23  one to use.

24       Q      So that would be the 20 percent?

25       A      Yes.

Page 313

                          Lyons

1

2       Q     Now, you added 15 percent for

3   interest, right?

4       A     Yes.

5       Q     Why did you do that?

6       A     This was -- I think this is the

7   one claim where the examiner identified

8   interest as a component of damages and

9   that there were different rates depending

10  on which state law applied.  And we also

11  found that in the contract, there was a

12  fee shifting provision.  I said 15 percent

13  for interest, there was also, and I think

14  I mentioned in the body of the text,

15  without consulting it, I think I also

16  mentioned the fee shifting as well.

17      Q     What does the fee shifting have

18  to do with the interest rate?

19      A     Fee shifting is in addition to

20  interest.

21      Q     So I'm asking specifically about

22  the line in your analysis that reads 15

23  percent for interest.

24      A     Right.

25      Q     Does the fee shifting provision

Page 314

Lyons

1

2   have anything to do with that line?

3       A       It probably should be included

4   in there as well.   It should be 15 percent

5   for interest and fees.

6       Q       And the fee shifting was either

7   party could have their fees shifted,

8   right?

9       A       Yes.

10       Q       So why isn't that a wash; why

11   would it increase or decrease?

12       A       Because I think this was

13   evaluating on a claim that was likely to

14   succeed.

15       Q       What component of the 15 percent

16   is attributable to the interest and what

17   component is attributable to the fee

18   shifting?

19       A       I think most of it is interest.

20       Q       Now, you stated that the

21   application of interest at a rate of

22   between 5.5 percent and 9 percent per

23   annum for a period could apply.

24       A       Yes.

25       Q       So why did you then apply a 15

1                          Lyons

2      percent -- well, assuming some of that

3      accounts for the fee shifting, but you

4      said most of it is the interest, it is

5      still higher than 5.5 percent, right?

6           A     Because there were several years

7      involved.

8           Q     Okay.

9                 Now let's turn to your likely

10     settlement negotiation methodology.

11          A     On page 14, is it?

12          Q     I think it is in the text, you

13     discussed that, right?

14                MR. COHEN:  He is asking which

15     page you're referring to.

16          Q     Oh, I'm sorry.

17                The pages are 12 to 15.

18          A     I think it is 14.

19          Q     14 is the negotiation.

20          A     Yes.

21          Q     Bottom of page 14.

22          A     Right.

23          Q     And you say there that you

24     expect the plaintiff's initial settlement

25     demands to be at 540 million, which is

1                          Lyons

2      approximately 90 percent of the gross

3      amount of the claim?

4          A      Yes.

5          Q      And on what basis did you

6      determine that it should be 90 percent?

7          A      I anticipated that the plaintiff

8      would assess this as a claim with

9      substantial merit, and would make the

10     initial demand at the high end of the

11     range, which is 90 percent.

12         Q      And you also opined that the

13     counter would be at 15 percent?

14         A      Yes.

15         Q      And on what basis did you make

16     that determination?

17         A      Again, I would consider that the

18     defendant would also -- certainly wouldn't

19     have the same assessment, but in relative

20     terms, the defendant would assess this as

21     a claim that has merit and would warrant a

22     substantial initial offer, 90 million

23     dollars, which is approximately 15 percent

24     of the gross value of the claim.

25         Q      And you go on to say that you

Page 317

Lyons

2    took into account the relative bargaining

3    power of the parties.

4            Do you see that?

5    A    Yes.

6    Q    How did you do that?

7    A    Just by assessing it.  And in a

8    case such as this, where you have a

9    defendant that I assume is financially

10   capable of funding a settlement, and you

11   have a plaintiff who is looking for money,

12   and in this case would be a would be an

13   estate representative, that the defendant

14   would have the upper hand in bargaining

15   power in that type of scenario.

16   Q    Is that all you considered in

17   assessing the relative bargaining power of

18   the parties?

19   A    Yes, I think so.

20   Q    Isn't that a fairly generic

21   description that can apply to all sorts of

22   situations when you're negotiating

23   settlement?

24   A    It could apply to many

25   situations.  In my experience, a lot of

Page 318

Lyons

1
2    these situations turn out the opposite,

3    that the defendant does not have the

4    financial wherewithal to fund a large

5    settlement and that leads to a deeply

6    discounted settlement value.

7        Q    So in that scenario, the

8    predicate of your settlement negotiation

9    methodology would just be flawed, right?

10           MR. COHEN:  Object to the form.

11       It mischaracterizes testimony, and

12       vague.

13       Q    In situations where you assume

14   that the defendant is capable of providing

15   financing, and on that basis, you

16   predicate 90 percent and 15 percent

17   figures.  In the situations where the

18   defendant, in fact, cannot do that, the

19   predicate is incorrect, correct?

20           MR. COHEN:  Objection.

21       Mischaracterizes the testimony.

22       A    I don't follow the question.

23       Q    You said that in your

24   experience, a lot of situations turn out

25   the opposite.

1                        Lyons

2        A      Yes.

3        Q      That the defendant does not have

4   the financial wherewithal to fund the

5   large settlement, right?

6        A      Yes.

7        Q      But your methodology, I think

8   you testified to, is predicated on an

9   assumption that the defendant can make a

10   large financial commitment, right?

11       A      In this case, we're talking

12   about AFI.

13       Q      But as a general matter, under

14   this methodology, do you generally

15   approach the analysis with an assumption

16   that the defendant is able to pay?

17       A      No, that's one of the factors

18   that one has to assess.

19       Q      I see.

20              So you initially make an

21   assessment of whether or not?

22       A      Yes.

23       Q      Well, that was the basis for my

24   misunderstanding.

25       A      Okay.

1              Lyons

2       Q     You also reference here that you

3  took into account the back and forth to be

4  expected in the negotiating process?

5       A     Yes.

6       Q     What do you mean by that?

7       A      The offers and counteroffers

8  where the demands and the offers that

9  would be presented.  In my experience, it

10  usually starts with the plaintiff making a

11  demand and the defendant makes an offer.

12  And the process goes back and forth.  It

13  is often shuttle diplomacy where the

14  mediator goes and meets separately with

15  the parties.

16       Q     So can you walk me through this?

17            MR. COHEN:  Were you finished

18  with your answer?

19            THE WITNESS:  Yes.

20       Q     Can you walk me through this

21  particular claim and the back and forth

22  that you in your methodology predict would

23  happen here?

24       A     No, I don't think so.  I don't

25  think I actually thought about what the

Page 321

Lyons

1
2  plaintiff's second demand would be or

3  reduced demand would be or what the

4  defendant's next offer would be.

5      Q    So how do you reach the 45

6  percent figure as a reasonable settlement

7  amount?

8      A    I thought that in this case, and

9  45 percent is what the percentage of 268

10 is compared to the whole claim, is that

11 what you're telling me?

12     Q    Yes.

13     A    I just anticipated that the

14 ultimate settlement amount would be

15 slightly less than half of the gross claim

16 and on a -- the claim, even one that has

17 merit and that I judge likely to succeed,

18 that the ultimate reasonable settlement

19 analysis in a situation like this would be

20 still less than 50 percent of the claim.

21     Q    And so all of the percentages

22 that we have talked about, both with

23 respect to the discount methodology and

24 the settlement negotiation methodology of

25 this claim, is it fair to say were based

Page 322

                          Lyons

1

2      on your experience and the assessment of

3      your team?

4          A      I think that's fair to say.

5          Q      And they are not based on any

6      specific objective numbers reported

7      elsewhere, correct?

8          A      That is correct.

9          Q      Let's move on to the second

10     contract claim that you identify as coming

11     out of the examiner's report.

12         A      Yes.

13         Q      And that is characterized as the

14     alleged failure to pay value of purchased

15     MSRs and correspondent loans?

16         A      Yes.

17         Q      Or MSRs to GMAC Mortgage under

18     the MSR Swap, right?

19         A      The MSRs on purchase and

20     correspondent loans.

21         Q      What is an MSR?

22         A      Mortgage servicing right.

23         Q      Do you have any understanding as

24     to whether the JSNs have a lien on MSRs?

25         A      I do not.

Page 323

                            Lyons

1

2        Q      Do you know that GSE related

3    MSRs were not pledged to the JSNs?

4        A      I don't think I know that.

5        Q      Do you have any understanding

6    whether PLS MSRs were released from JSN

7    claims?

8        A      No, I don't.

9               And PLS is private label

10   securities?

11       Q      Right.

12       A      You're talking about MSRs?

13       Q      Yes.

14       A      Okay.

15              No, I don't.  I do not know

16   whether those were released.

17       Q      And you're not offering any

18   opinions in that regard as to what liens

19   the JSNs may or may not have?

20       A      No.

21       Q      The examiner concluded this

22   claim was more likely not to prevail,

23   right?

24       A      Yes.

25       Q      And your discussion of the claim

Page 324

Lyons

1   in your report, which is at pages 15 to

2   21, you state "after reviewing the facts

3   and legal conclusions set forth in the

4   examiner's report" you agree with his

5   conclusions?

6   A     Yes.

7   Q     And so then I take it you too

8   would agree that this claim is likely not

9   to prevail in court, correct?

10  A     I think more likely than not.

11  Q     More likely than not?

12  A     Right.

13  Q     And do you know that this claim

14  2 was to the asserted by the committee in

15  its STN motion?

16  A     In its STN motion, the only

17  thing I know about the STN motion is what

18  you showed me, asked me to look at today.

19  Q     Well, I'll represent that

20  neither the committee or any other party

21  brought this claim against AFI prior to

22  the global settlement.

23         Assuming that to be true, does

24  it change your opinion in any respect with

Lyons

1

2    regard to this claim?

3        A    No.

4        Q    And you conclude with respect to

5    this claim, at page 17, that the value of

6    Ally Bank's MSR asset attributable to

7    correspondent loans and purchased MSRs

8    which were not paid to GMAC Mortgage under

9    the MSR Swap, despite the plain language

10   of the MSR Swap and MSR Swap

11   confirmations, is the basis for the claim.

12            Is that fair?

13       A    Yes.

14       Q    And can you tell me or show me

15   the contract provision that was violated

16   on its plain language according to what

17   you write here in the report?

18       A    I don't have that with me.

19       Q    I'm happy to show you any of the

20   documents on your Exhibit A that you

21   looked at.  If you can -- I'll give you

22   whatever you want if you can just point me

23   to the provision that you contend is

24   violated.  I'd like to know what it is.

25            MR. COHEN:  Object to the form.

1                        Lyons

2        A      I'm not sure that I can do that.

3        Q      You wouldn't be able to do that?

4        A      I'm not sure that I could.

5        Q      Did you ever look at it prior to

6    issuing your report?

7        A      The MSR, I looked at the -- this

8    was the standard form IDSA contract I

9    believe.  I did look at that, yes.

10       Q      But if I showed it to you, you

11   wouldn't necessarily be able to show me

12   which provision was violated?

13       A      Correct, yes.

14       Q      You write at page 19 that the

15   examiner concludes that AFI would likely

16   succeed on the close question of a defense

17   under the doctrine of mistake, despite the

18   exacting standard which governs that

19   doctrine?

20       A      Yes.

21       Q      So once again, you're applying

22   facts to law, or otherwise engaging in

23   legal analysis in that observation, right?

24       A      Yes.

25       Q      Did you study how often

Page 327

Lyons

1
2     bankruptcy courts in this circuit apply

3     the doctrine of mistakes?

4         A     Bankruptcy in this circuit, no,

5     I don't believe that I did.

6         Q     Or any court for that matter?

7         A     No.

8         Q     How about with respect to

9     modification, did you investigate the

10    frequency with which courts in this

11    circuit apply the doctrine of

12    modification?

13        A     The frequency with which, no, I

14    don't believe that I did or any of my

15    colleagues did.

16        Q     You wrote in your report at page

17    20 that the settlement value of the claim

18    would be further reduced by the

19    possibility of AFI successfully defending

20    the claim on the grounds that the MSR

21    Swap, if applied to correspondent loan

22    MSRs and purchased MSRs, would not have

23    withstood regulatory scrutiny?

24            MR. COHEN:  Excuse me, where are

25        you reading.

1                           Lyons

2              MR. SIMON:  Page 20.

3              MR. COHEN:  Page 20 where?

4              MR. DENK:  21.

5              MR. SIMON:  I'm sorry, page 21

6       in the middle.

7       A     First sentence of the first full

8    paragraph?

9       Q     Yes.

10             MR. COHEN:  Okay.  I'm with you.

11      Q     Do you agree with that

12   statement?

13      A     Yes, that's correct.

14      Q     And you, in fact, conclude that

15   the regulatory scrutiny and concerns that

16   were raised by the regulators supports,

17   further supports a claim of mutual

18   mistake, right?

19      A     Yes.

20      Q     Do you have any understanding of

21   the basis of the regulator's concerns?

22      A     Yes, the regulators would be

23   concerned when there is an affiliate

24   transaction that the bank is not being

25   treated on a fair basis as would be the

1                         Lyons

2      same in the third-party arm's length

3      transaction.

4           Q     Okay.

5                 And you opined that there should

6      be a 25 percent risk reduction associated

7      with the regulatory based offense on this

8      claim?

9           A     Yes.

10          Q     What was your basis for

11     ascribing a 25 percent figure to that

12     deduction?

13          A     Again, it was just a judgment

14     made after reviewing the examiner's report

15     and consulting with my colleagues.

16          Q     Are you aware that the examiner

17     concluded that enforcing the swap as

18     written as --

19                MR. SIMON:  Withdrawn.

20          Q     The predicate for this claim is

21     on the written terms of the swap?

22          A     Yes.

23          Q     Okay.  And let me just finish

24     the question.

25                On the written terms of the

1                          Lyons

2      swap, correspondent payments should have

3      been made.  That's the predicate for the

4      claim, right?

5           A     Correspondent and purchased

6      MSRs.

7           Q     And are you aware that the

8      examiner concluded that enforcing the swap

9      as written would make little economic

10     sense?

11          A     Yes.

12          Q     And further that requiring the

13     value of correspondent loan MSRs and

14     purchased MSRs to be transferred to GMAC

15     Mortgage under the swap would be difficult

16     to justify?

17          A     Yes.

18          Q     Would you agree with me that it

19     would not make economic sense for a bank

20     to pay twice for the same asset, one to a

21     correspondent and one to GMAC Mortgage?

22          A     Yes, I agree that makes economic

23     sense.

24          Q     It does not make economic sense?

25          A     It does not make economic sense.

Lyons

1

2      Q      And yet that's what would be

3   required if the MSR Swap were enforced in

4   accordance with its literal terms, right?

5      A      I believe that the MSR Swap, my

6   understanding of the way it would apply

7   would be to the increase in value of MSRs

8   on the bank's books, and I don't believe

9   that it would apply to the original

10  purchase price of the MSRs.

11     Q      In any event, you agree with the

12  examiner that it is unlikely to succeed,

13  this claim, right?

14     A      I agree, yes.

15     Q      You think it is rational for AFI

16  to pay 387.2 million dollars on a claim

17  that you concede is unlikely to succeed

18  and on the theory that the examiner

19  concluded makes little economic sense?

20     A      Yes.

21     Q      And on what basis?

22     A      Because the literal language of

23  the contract would lead to that result,

24  and it is a huge potential damage claim

25  the 1.725 billion.

Lyons

1

2       Q     Well, the examiner approached

3  the -- there was another claim that was

4  addressed by the examiner related to the

5  Pipeline Swap, right?

6       A     Yes.

7       Q     And that had to do with the

8  funding to sale period?

9       A     Yes.

10      Q     And didn't the examiner approach

11  that claim in the exact same way?

12            In fact, the examiner approached

13  the Pipeline Swap issue in exactly the

14  same way as he did with respect for the

15  breach of contract claim relating to the

16  correspondent MSRs, right?

17      A     I would have to take a look at

18  that again.

19      Q     Let me read you an excerpt in

20  the examiner's report at Section 7L72.

21  I'm referring in this excerpt to page 72,

22  the VII.L-72.

23            MR. COHEN:  Where on the page?

24            MR. SIMON:  The paragraph in the

25      middle of the page that begins --

Page 333

Lyons

1

2      Q      Let me as a preface say, I'll

3   represent to you that this is a section

4   discussing the correspondent loan MSR

5   issue that we have been talking about.

6      A      Okay.

7      Q      And in the middle of this page

8   starting with the word "accordingly," the

9   examiner writes, "Accordingly, as with the

10  application of the Pipeline Swap, based on

11  the available evidence and the exacting

12  standard which governs the application of

13  the doctrine of mistake, while it is a

14  close question, the examiner concludes

15  that a court more likely than not would

16  reform the pre-April 2011 MSR Swap to

17  require payment of the value of newly

18  recognized MSRs only for those MSRs in

19  which the bank recognized a gain."

20          Do you see that?

21      A      Yes, I do.

22      Q      As to the Pipeline Swap claim,

23  you concluded at page 26 of your report,

24  "As noted by the examiner, the parties

25  drafting the Pipeline Swap agreements

1                          Lyons

2       appeared not to have understood the effect

3       of the language that they chose.  More

4       importantly, ending the Pipeline Swap at

5       the time of funding made little business

6       sense."

7              Those were your words?

8       A    Yes.

9       Q    You go on to state, "Given the

10      high likelihood of establishing a defense

11      as to both potential breaches, the

12      Pipeline Swap claim had little settlement

13      value."

14             Do you recall that?

15      A    Yes.

16      Q    How do you reconcile the

17      difference in your approach on the

18      Pipeline Swap versus the correspondent MSR

19      claim when they were analyzed exactly the

20      same way by the examiner?

21      A    One major difference is that the

22      examiner did not quantify the Pipeline

23      Swap potential damage claim, but he did

24      quantify the MSR claim at 1.725 billion.

25      And I think that the magnitude of that

1                           Lyons

2      claim warrants -- the magnitude of the

3      claim together with the plain language of

4      the contract warrants settlement value,

5      even though it is a claim that is not

6      likely to succeed, and more likely than

7      not not to succeed.

8          Q     And on the same grounds as the

9      other claim?

10         A     Yes.

11         Q     So the only material difference

12     was the value of the exposure?

13         A     That's the only one that comes

14     to mind right now.

15         Q     There is no other basis on which

16     as you sit here you can distinguish

17     between the two?

18         A     As I sit here, that's correct.

19         Q     Looking at the discounting

20     methodology that you apply to the

21     correspondent MSR claim?

22         A     Yes.

23         Q     You started with 1.725 billion

24     potential damages?

25         A     Yes.

1                     Lyons

2        Q     And you decreased that by 30

3    percent?

4        A     Yes.

5        Q     Why did you do that?

6        A     That, again, was an initial

7    assessment of inherent risk in litigation

8    cost involved and those inherent type

9    factors, and I selected 30 percent just

10   because that seemed a reasonable discount

11   amount in my judgment.

12       Q     Now, in your analysis of the net

13   revenue contract claim that we discussed.

14       A     Yes.

15       Q     There you used a 20 percent

16   figure?

17       A     Right.

18       Q     Why only a 10 percent difference

19   between the claims when the examiner found

20   that claim likely to succeed and this one

21   not likely to succeed?

22       A     Because I think the other issues

23   that impacted the likelihood of success

24   were dealt with when they were discounting

25   other discounts that were applied to each

1                       Lyons

2      of the claims actually.

3           Q      And what were they?

4           A      I'm sorry, where is the MSR

5      claim?

6           Q      Page 18, I think.

7           A      I think that's the --

8           Q      Page 21.

9           A      We had the mutual mistake

10     defense and the modification defense and

11     the regulatory based defense.

12          Q      And why did you ascribe a value

13     of 55 percent to the mutual mistake

14     defense, but only five percent to the

15     modification defense?

16          A      Because this didn't seem like a

17     scenario where modification actually took

18     place.

19          Q      What do you base that on?

20          A      It was more likely that the

21     parties -- I'm sorry, I paused in my

22     answer, but that it was more likely that

23     when the parties drafted the contract that

24     they mistakenly included all MSRs in the

25     swap category where the bank would have to

1                          Lyons

2      pay for those, rather than just the MSRs

3      related to brokered loans from the GMAC

4      Mortgage Company, or loans that had been

5      originated by GMAC Mortgage Company.

6          Q     So are you saying that the

7      defense of mistake was more likely to

8      succeed than the defense of modification?

9          A     No, I think it is the other way

10     around.

11               I'm sorry, that the mutual

12     mistake defense was more likely to succeed

13     than the modification defense.

14         Q     So basically your deductions

15     with respect to this claim are predicated

16     on a legal analysis as to the likelihood

17     of success on the law to these defenses?

18         A     Likelihood of success on those

19     defenses in the factual context given

20     here.

21         Q     As applied to the law?

22         A     Yes.

23         Q     And looking at the likely

24     settlement negotiation methodology that

25     you used, you started with a 60 percent of

1                        Lyons

2      gross amount initial demand?

3          A     Yes.

4          Q     Why did you do that?

5          A     Because of the -- I think that

6      even a plaintiff would have agreed that in

7      light of the factors that we discussed,

8      the -- that it did not comport with what

9      seemed to be the intent of the parties,

10     that even the plaintiff would make a lower

11     initial demand.

12         Q     And you ultimately concluded

13     that 22 percent of the gross amount was a

14     reasonable settlement amount?

15         A     Yes.

16         Q     How did you reach that

17     determination?

18         A     Through both of the methods that

19     were applied here.

20         Q     And like the last claim, I take

21     it that the percentages that were applied

22     with respect to the alleged breach of

23     contract correspondent MSRs in both of

24     your methodologies were based on your own

25     experience and the assessment of your

                          Lyons

1

2    team?

3        A      That's correct.

4        Q      And they are not based on any

5    specific objective numbers reported

6    elsewhere, correct?

7        A      That is correct.

8        Q      Let's turn to the next purported

9    breach of contract claim that you

10   analyzed.

11       A      Okay.

12       Q      And that relates to the use and

13   allocation of ResCap's tax attributes?

14       A      Yes.

15       Q      And were you aware that this

16   claim 2 was not raised by the committee or

17   any other party prior to the issuance of

18   the examiner's report?

19       A      I'm not aware of that.

20       Q      And if I told you that that's

21   the case, does it change your opinions in

22   any regard?

23       A      No, it does not.

24       Q      Why not?

25       A      My understanding of Arthur

Lyons

1    Gonzales's duties were to investigate all

2    of the intercompany transactions to

3    determine whether they were viable causes

4    of action by the debtors against the

5    non-debtors, and I also understood that he

6    sought input from various constituencies

7    involved in the case as to what might be

8    fruitful areas of inquiry.  And so whether

9    or not anyone had asserted a claim under a

10    particular contract doesn't mean that a

11    potential claim does not exist.

12        Q     Right.

13        But you would agree that the

14    value of this claim, the potential

15    damages, was quite significant, correct?

16        A     On the tax line, yes.

17        Q     1.7 billion?

18        A     Correct.

19        Q     And the last claim we looked at,

20    2, the potential value was 1.7 billion,

21    right?

22        A     Yes.

23        Q     And it is your testimony that if

24    none of the parties in these negotiations

Page 342

Lyons

1

2    were thinking about or contemplating

3    claims based on those amounts and these

4    theories, it nevertheless impacted what

5    they did vis-a-vis the global settlement.

6            Is that your testimony.

7            MR. COHEN:  Object to the form.

8        Are you waiving mediation privilege?

9            MR. SIMON:  I'll withdraw the

10       question and ask in a hypothetical.

11       Q    In a hypothetical situation

12   where there is a two billion dollar

13   settlement, and you're trying to allocate

14   that between and among different claims,

15   it is your testimony that it is

16   appropriate to allocate significant value

17   to claims that none of those parties

18   contemplated, thought about or heard about

19   prior to entering into the testimony.

20           Is that your testimony.

21           MR. COHEN:  Objection.

22       Incomplete hypothetical.  Misstates

23       the witness's testimony.

24       A    I don't know that that is the

25   case.

Page 343

Lyons

1

2     Q     I'm asking you to assume it is.

3           MR. COHEN:   Objection.

4     Incomplete hypothetical.

5     A     To me, the examiner is an

6     important party here, and the examiner was

7     charged with investigating all of the

8     intercompany transactions and assessing

9     whether claims exist.  If he is the only

10    one that did that, that still to me means

11    that there is a claim that should be

12    evaluated and a reasonable settlement

13    value should be ascribed to that claim.

14    Q     Do you know whether the examiner

15    was a party to the negotiations?

16    A     I don't believe that he was.

17    Q     And so whether or not he is an

18    important party in the abstract, on what

19    basis do you contend that his views had

20    any influence on the global settlement in

21    this case?

22          MR. COHEN:   Object to the form.

23    A     I'm not sure that his views had

24    any influence, and I wasn't in the

25    negotiating room and I don't believe that

Page 344

1                         Lyons

2      he was either.

3          Q      So if the only manner in which

4      these claims were articulated to any of

5      the parties to this settlement were

6      through the examiner's views, how could

7      they have had any influence in the

8      negotiations in this case?

9                MR. COHEN:  Objection.  Assumes

10          facts not in evidence.

11         Q      And you can assume away.

12               MR. COHEN:  Objection.

13          Incomplete hypothetical.

14         A      I don't know what actually

15     influenced the parties who reached the

16     settlement agreement here other than what

17     I heard from Mr. Kruger, what I heard --

18     what I remembered in reviewing

19     Mr. Kruger's transcript, and that was that

20     he did not try to assess each individual

21     claim.

22               I think he said something to the

23     effect that that's what the examiner was

24     doing.  He didn't think it would be

25     productive to attempt to redo the

<sub>1</sub>                          Lyons

<sub>2</sub>      examiner's work, even though during the

<sub>3</sub>      negotiations he was unaware of the

<sub>4</sub>      conclusions that the examiner was about to

<sub>5</sub>      reach.

<sub>6</sub>          Q      I just want to ask you again,

<sub>7</sub>      your testimony was that you were not sure

<sub>8</sub>      that the views of the examiner had any

<sub>9</sub>      influence on the global settlement in this

<sub>10</sub>     case, correct?

<sub>11</sub>         A      The views of the examiner, I

<sub>12</sub>     don't think they did because the

<sub>13</sub>     examiner's report was withheld until the

<sub>14</sub>     negotiations were completed in the

<sub>15</sub>     mediation sessions.

<sub>16</sub>         Q      Can you tell me with respect to

<sub>17</sub>     the tax allocation claim your basis for

<sub>18</sub>     ascribing value to that claim?

<sub>19</sub>         A      Yes.

<sub>20</sub>                The tax allocation claim arises

<sub>21</sub>     out of two agreements that are referred to

<sub>22</sub>     as the first 2009 tax allocation agreement

<sub>23</sub>     and the second 2009 tax allocation

<sub>24</sub>     agreement.

<sub>25</sub>                And the basic assessment is that

1                        Lyons

2      the first 2009 tax allocation agreement

3      had ripened into a valid and binding

4      contract on the parties, particularly AFI,

5      and that the second tax allocation

6      agreement, which changed the tax

7      allocation and treated ResCap much less

8      favorably than the first tax allocation

9      agreement, constituted a fraudulent

10     conveyance and could be avoided.

11          Q     So you agree with the examiner

12     that a necessary predicate to prevail on a

13     claim for a breach of contract is that the

14     plaintiff would have to convince a court

15     to set aside the 2009, the second 2009 tax

16     allocation agreement?

17          A     Yes, I agree.

18          Q     So you would agree that 1.77

19     billion that you identify as the starting

20     point for a reasonable settlement amount

21     amounts to the proceeds of an avoidance

22     action?

23          A     No, I don't.  I think the

24     avoidance action allows you to disregard

25     the second tax allocation agreement, and

Page 347

1                        Lyons

2      you get damages by enforcement of the

3      first tax allocation agreement.

4          Q      Unless you can avoid it, you

5      can't have two agreements in effect at the

6      same time, can you?

7          A      In this case, the scenario is

8      set up so that before the -- before you

9      can enforce the first tax allocation

10     agreement, you first have to set aside the

11     second tax allocation agreement as a

12     fraudulent conveyance.

13         Q      You acknowledge in your report

14     that there are "significant risks"

15     associated with the claim, right?

16         A      Yes.

17         Q      And you note that "(a), if I

18     would likely argue that ResCap received

19     substantial capital contributions and

20     other assistance from AFI around the time

21     of the second 2009 tax allocation

22     agreement"?

23         A      Yes.

24         Q      And that could represent

25     reasonably equivalent value for the

                          Lyons

1

2    transaction, right?

3        A     Well, that would be the

4    argument, yes.

5        Q     Did you consider any other

6    arguments made by AFI in your opinion?

7        A     Whatever is set forth in the

8    opinion.

9        Q     So if it is not articulated

10   there in the examiner's report -- you said

11   whatever is set forth in the opinion, do

12   you mean the examiner's report?

13       A     Maybe you should restate.

14       Q     Did you consider any other

15   arguments made by AFI in forming your

16   opinions on the tax allocation claim?  And

17   you said in answer to that "If it is

18   articulated in your opinion."

19             Do you mean the examiner's

20   report?

21             MR. COHEN:  Or your expert

22       opinion?

23       Q     Let me start over.

24             Apart from what I just read to

25   you the examiner observed, did you

Page 349

Lyons

1    consider any other arguments made by AFI

2    in forming your opinion as to the value of

3    the tax allocation claim?

4         A    The only arguments made by AFI

5    that I considered would have been those

6    presented to the examiner and articulated

7    in his report.  I don't know if the one

8    about the capital contributions was the

9    only one, only argument articulated by

10   AFI.  I do believe that there are other

11   arguments, for example, that the first

12   2009 tax allocation agreement was not a

13   binding contract, for example.

14        Q    And that's based on something

15   that you read, or you're just offering

16   that independently?

17        A    No, I believe that's identified

18   in the examiner's report as the position

19   of AFI.

20        Q    Any other defenses that you

21   recall that AFI might have as you sit here

22   today to the tax allocation cause of

23   action?

24        A    Do you mind if I look at my

Page 350

                    Lyons

1

2    report?

3         Q    Not at all.

4              (Witness reviewing document)

5              While you do that, I'm going to

6    ask the court reporter to mark the next

7    exhibit.

8              (Exhibit 10 to Disclosure

9         Statement, was marked as Lyons Exhibit

10        9 for identification, as of this

11        date.)

12        A    No, having looked at my report

13   briefly, I don't see any arguments by AFI

14   that relate to the tax allocation claim.

15        Q    Did you review the disclosure

16   statement that was issued in this case?

17        A    No, I did not.

18        Q    Why not?

19        A    I did not -- well, I want to say

20   that I was pressed for time, but also I

21   just chose not to request that or look at

22   that.

23        Q    Are you aware that generally

24   disclosure statements would set forth the

25   perspectives of the varying parties that

1                          Lyons

2      were entering into or were proposing to

3      enter into a plan?

4          A     Yes.

5          Q     And you didn't think it was

6      helpful to see what those views were in

7      connection with this plan in forming your

8      opinions?

9                MR. COHEN:  Object to the form.

10         A     I did not make that -- I did not

11     go through that thought process.

12         Q     Do you know whether there was

13     any discussion of the examiner's report

14     and the impact, if any, of the examiner's

15     report to the global settlements contained

16     in the disclosure statement?

17         A     No, I do not.

18         Q     Can you now take a look at what

19     the reporter has marked as Exhibit 9.  I

20     will represent that this is an exhibit

21     from the disclosure statement, Exhibit 10

22     to the disclosure statement, and the

23     caption is "JSNs' Position on Examiner's

24     Report and Ally's Response".

25               Have you seen this document

Page 352

                              Lyons

1    before?  You can take a look through it.

2              (Witness reviewing document)

3         A     I don't believe that I have.

4    No, I don't believe that I have.

5         Q     Do you see on the third page of

6    the document, there is a line sort of

7    towards the bottom, with a footnote below

8    that?

9         A     Yes, I see that.

10        Q     And right below, the first

11   sentence there says, "The plan proponents

12   do not agree with the JSNs' view of the

13   examiner's report.  As set forth in detail

14   in the disclosure statement, the

15   examiner's report emphatically supports

16   and in no way undermines the

17   reasonableness of the Ally contribution

18   and the global settlements here."

19             Do you see that?

20        A     I do see that.

21        Q     Have you heard that before, that

22   that's the position of the plan

23   proponents?

24        A     No.

1                         Lyons

2         Q      And have you read -- I take it

3    you haven't read in any detail the reasons

4    why the plan proponents thinks that the

5    examiner's report helps rather than

6    undermines the global settlement here?

7         A      No, I have not.

8         Q      There is another paragraph that

9    starts with "in addition to the above"?

10        A      I do see that, yes.

11        Q      And it says, "In addition to the

12   above, in response to the JSNs'

13   assertions, Ally separately notes that the

14   JSNs also wholly fail to acknowledge that

15   the examiner's report concluded the

16   primary claims that Ally were likely to

17   fail.  While the examiner's report did

18   identify certain claims against Ally that

19   it concluded are more likely than not to

20   prevail, Ally asserts that all of those

21   claims involve close questions of fact and

22   law and are subject to strong defenses."

23            Do you see that?

24        A      I do see that.

25        Q      And it goes on to talk about the

Page 354

1                           Lyons

2      particulars of Ally's perspectives of

3      certain claims.

4               Do you see that?

5      A       I see the next sentence and I

6      see that the next sentence starts with

7      "for example".

8      Q       And that sentence "for example"

9      says, "One of those claims accounting for

10     566 million in potential damages relates

11     to the debtor's pre-petition repayments to

12     AFI on a line of credit extended from Ally

13     to the debtors."

14     A       Yes.

15     Q       And "The examiner's report found

16     that such payments may be potential

17     violations of the Minnesota Insider

18     Preference Statute.  But ally believes it

19     has strong defenses to those claims,

20     including that the repayments are made in

21     the ordinary course."  Right?

22     A       Yes.

23     Q       And you didn't read that to get

24     Ally's perspective on that claim prior to

25     issuing that report, right?

Page 355

                        Lyons

1

2       A     I did not.

3       Q     And then it says, "Another of

4    the claims relates to the allocation of

5    revenue regarding certain mortgage loans."

6             And that's one we discussed

7    already today, right?

8       A     Yes.

9       Q     And Ally says here that those

10   claims too in its view are subject to

11   numerous contractual defenses in the law

12   and the facts, right?

13      A     Yes.

14      Q     But you never independently

15   inquired of Ally as to its particular

16   defenses on the law or the facts about

17   that claim, right?

18      A     I never did an inquiry.

19      Q     If you turn the page, this

20   document goes on to talk about the fact

21   that the examiner's report identified up

22   to 1.78 billion in potential damages with

23   respect to claims it conceded are close

24   questions, but concluded that the debtors'

25   estates are more likely than not to

Page 356

1                       Lyons

2    prevail.  The bulk of those potential

3    damages, 1.77 billion, relates to a tax

4    allocation agreement between Ally and the

5    debtors, and that is in fact the tax

6    allocation claims that we were just

7    talking about, right?

8        A     Yes.

9        Q     It says in the next paragraph

10   that "Ally believes that the JSNs'

11   argument and their calculation of

12   potential damages is flawed as a matter of

13   fact and irrelevant as a matter of law.

14   According to Ally, as a matter of fact,

15   the JSNs' assertion rests on the flawed

16   premise that the estate would prevail on a

17   claim for reimbursement under a tax

18   allocation agreement.  Rather, Ally

19   believes that to succeed on such a claim,

20   a claimant must but cannot clear two

21   separate hurdles."

22            Do you see that?

23       A     I do see that.

24       Q     "First, a claimant must

25   successfully avoid the operative tax

Page 357

Lyons

allocation agreement between the parties,

an agreement that does not call for Ally

to reimburse ResCap for Ally's use of

ResCap's losses for tax purposes.

Did you consider that argument

in formulating your opinion on the value

of this claim?

A     I did consider that argument,

yes.

Q     And did you consider the next

sentence, which is that "Ally believes

that such an effort would fail for

numerous reasons, including the agreement

employs the approach preferred by

auditors, including Deloitte, and federal

regulators, including the SEC and the

department of the Treasury.  It uses the

approach required by GAAP accounting in

the absence of a tax allocation agreement

between parties.  ResCap received

reasonably equivalent value in executing

the tax allocation agreement, particularly

as compared to the previous operative tax

agreement executed in 2006.  Both sides

Page 358

Lyons

1

2  received good and sufficient

3  considerations and ResCap's board

4  independently evaluated and approved the

5  tax allocation agreement."

6          Do you see that?

7      A    I see that.

8      Q    Did you consider any of those

9  defenses in formulating your opinions with

10 respect to the tax allocation claim that

11 opined on in your report?

12     A    Yes.

13     Q    Which ones?

14     A    Let's see.

15         I considered the statement that

16 "it uses the approach required by GAAP

17 accounting in the absence of a tax

18 allocation agreement between the parties".

19     Q    Okay.

20     A    The next thing, the argument

21 that ResCap received reasonably equivalent

22 value in executing the tax allocation

23 agreement.

24     Q    So do you believe that ResCap

25 did receive reasonably equivalent value?

Lyons

1

2          A      No.

3          Q      So to be clear then, you didn't

4   understand AFI's defense in that regard

5   because AFI is contending that it did

6   receive reasonably equivalent value?

7               MR. COHEN:   Object to the form.

8          Mischaracterizes testimony.

9          A      I believe I did understand that

10   that was an argument that AFI advanced to

11   the examiner.   However, the next part of

12   that phrase after the comma, particularly

13   as compared to the previous operative tax

14   agreement executed 2006, I did not

15   consider that the argument was to compare

16   the second 2009 tax allocation agreement

17   with what existed prior to the first 2000

18   tax allocation agreement.

19               The next argument that both

20   sides received good and sufficient

21   considerations, I believe that was part of

22   the assessment as to whether there was

23   reasonably equivalent value given for the

24   second 2009 tax agreement.

25               And the last thing, that the

Page 360

1                           Lyons

2     ResCap's board independently evaluated and

3     approved the tax allocation agreement, and

4     here the party that wrote this is

5     referring to the second tax allocation

6     agreement, and I did consider that

7     ResCap's board did approve the second tax

8     allocation agreement.

9          Q      But you did not know or consider

10    that the second agreement is the approach

11    preferred by auditors including Deloitte,

12    did you?

13         A      I don't believe I -- that does

14    not sound familiar to me.

15         Q      Did you know or consider that

16    the second tax agreement approach is that

17    preferred by federal regulators, including

18    the SEC and Department of Treasury, did

19    you?

20         A      I don't know that to be a fact.

21         Q      If it is true, would you agree

22    that is a rather significant fact?

23              MR. COHEN:   Object to the form.

24         A      I would really have to know more

25    about the regulations.

1                       Lyons

2        Q      Well, do you think it is a fact

3    that would have an impact on the

4    settlement value of the claim if, in fact,

5    the second tax allegations agreement was

6    actually preferred by auditors and federal

7    regulators?

8              MR. COHEN:  Objection to the

9        form?

10       A      Say that again.

11       Q      Do you think it would have an

12   impact on the settlement value on your

13   calculation on the tax allocation claim if

14   it is a fact that the second agreement is

15   the approach preferred by auditors,

16   including Deloitte, and federal

17   regulators, including the SEC and

18   Department of Treasury?

19             MR. COHEN:  Object to the form.

20       A      If that were a fact, yes, it

21   would have an impact on the settlement

22   value.

23       Q      And you didn't account for that

24   fact in your analysis, correct?

25             MR. COHEN:  Object to the form.

Lyons

1

2      A      No.   I don't believe sitting

3   here today that I learned what Deloitte's

4   position was on tax allocation or whether

5   it was preferred by either the SEC or the

6   Department of Treasury.

7      Q      And now did you consider AFI's

8   arguments in this document with respect to

9   the first 2009 tax allocation agreement?

10  The arguments we just looked at pertained

11  to you said the second, right?

12     A      Well, the first -- the arguments

13  of AFI with regard to the first tax

14  allocation agreement are that no agreement

15  was ever reached, so AFI would totally

16  disregard that.

17     Q      Can I direct your retention to

18  the second paragraph?

19     A      Starting with the word "second"?

20     Q      Well.  I'm going to spare you

21  some of this.

22          MR. COHEN:  That's the third

23      paragraph actually.

24          MR. SIMON:  I'm sorry, the third

25      paragraph.  My mistake.

Page 363

1                           Lyons

2        Q      The second sentence starting

3   with the word "indeed".

4        A      Yes, I have it.

5        Q      It says, "Indeed, Ally believes

6   that such a claim" -- referring to -- I

7   think for context I am going to read the

8   prior sentence.

9              So what this paragraph says is,

10  "Ally asserts that even assuming a

11  claimant could avoid the operative tax

12  allocation agreement, it must then

13  establish that a previous draft of the tax

14  allocation agreement, which ResCap did not

15  sign, is a valid and enforceable contract,

16  which is a difficult burden for a claimant

17  to carry as the examiner's report

18  acknowledges in concluding that the issue

19  is a close question."

20             Do you see that?

21        A      I see that.

22        Q      And you too agree with that

23  proposition, right?

24        A      I agree with what the examiner

25  stated.  I'm not sure that this sentence

1                        Lyons

2    is an accurate characterization of what

3    the examiner stated, but to the extent

4    that -- what the examiner's conclusion is

5    as to the enforceability of that contract

6    is something that I agree with, with which

7    I agree.

8        Q    Do you take issue with the fact

9    that it would be a difficult burden for a

10   claimant to carry to enforce the first

11   agreement?

12       A    No, I agree with the assessment

13   that it is a close case, but it is more

14   likely than not that the first tax

15   allocation agreement was a valid and

16   binding contract.

17       Q    My question was:  Do you agree

18   with the fact --

19            MR. SIMON:  Withdrawn.

20       Q    Do you agree with the

21   proposition that it would be a difficult

22   burden for a claimant to carry proving

23   that the first agreement was a valid and

24   enforceable contract?

25       A    Well, I would say that there are

Page 365

                          Lyons

1

2      issues that the plaintiff would have to

3      overcome to prove that the first agreement

4      is a valid and binding contract.

5          Q     And would it be difficult to

6      overcome those issues?

7          A     Frankly, I don't think so.

8          Q     And why is that?

9          A     I don't think that the signature

10     by ResCap, which is the missing element,

11     is a crucial element in determining if

12     that was a valid and binding contract.

13         Q     And on what basis do you render

14     that conclusion?

15              MR. COHEN:  Object to the form.

16         Q     Is that an opinion you're

17     offering in this case?

18         A     That is an assessment of the

19     relative merits of the claim.

20         Q     On what basis do you make that

21     assessment?

22         A     My review of the facts.

23         Q     Have you reviewed any of the

24     facts firsthand in connection with this

25     claim?

Page 366

Lyons

2        MR. COHEN:  Object to the form.

3    A    I've reviewed the facts as set

4    forth in the examiner's report.

5    Q    And nothing else, right?

6    A    That's correct.  With regard to

7    this claim, I reviewed the agreements

8    themselves.

9    Q    And in your report, based on

10   your review of what the examiner stated,

11   you write at page 35 that, "Ally's

12   accounting policy 330 provided that all

13   tax sharing agreements must be approved by

14   the respective boards of directors or

15   appropriate management designee."

16        Do you recall that?

17   A    Yes.

18   Q    And do you recall who signed the

19   first agreement on behalf of Ally?

20   A    I believe it was DeBrunner.

21   Q    And who is he?

22   A    I forgot what his title was.

23   Q    Do you have any basis to know

24   whether he is an appropriate management

25   designee or not?

Page 367

1                         Lyons

2        A      I believe that the fact was that

3    Mr. Marks, who had drafted the agreement,

4    consulted with in-house counsel and was

5    advised that Mr. DeBrunner is an

6    appropriate representative to sign, and

7    that he was advised that no further

8    approvals were required.

9        Q      But you don't know either way

10   independently whether or not Mr. DeBrunner

11   was an appropriate management designee,

12   right?

13               MR. COHEN:  Objection to form.

14       A      No, I'm only relying on what was

15   in the examiner's report.

16       Q      And are you aware that AFI had a

17   separate policy requiring that capital

18   contributions in ResCap in excess of 50

19   million dollars required board approval?

20       A      I think I did hear that, yes.

21       Q      Do you know if that was done in

22   this case?

23               MR. COHEN:  Object to the form.

24       A      I do not know if that was done.

25       Q      Well, if it wasn't done, and if,

1                      Lyons

2    in fact, it was required, and if, in fact,

3    as a result of this agreement there would

4    have been a capital contribution in excess

5    of 50 million dollars made to ResCap,

6    wouldn't Mr. DeBrunner's act of signing

7    without board approval be ultra vires?

8              MR. COHEN:  Objection.

9         Incomplete hypothetical.  Calls for

10        speculation.

11        Q    You can answer the question.

12        A    I don't know if it would.

13        Q    It might be, right?

14             MR. COHEN:  Objection.  Calls

15        for speculation.

16        A    It might be.

17        Q    And you felt free to opine on

18   applying facts to law throughout the day

19   today, right, sir?

20        A    I'm sorry?

21        Q    Throughout the day today, you

22   felt it appropriate to take facts as given

23   to you and apply them to the law?

24        A    Take the facts and apply the law

25   to them, yes.

Page 369

Lyons

1

2        Q     I'm asking you to assume the

3    fact that there is a requirement of board

4    approval for capital contributions in

5    excess of 50 million dollars.

6        A     Yes.

7        Q     And assume that that didn't

8    happen.  And on that assumption, would you

9    concede it possible that the signature was

10   ultra vires?

11          MR. COHEN:  Objection.

12       Incomplete hypothetical.

13       A     Based upon that, yes, I would

14   consider it is possible that the signature

15   of Mr. DeBrunner was ultra vires.

16       Q     Going back to Exhibit 10, the

17   next sentence reads, "Ally believes that

18   such a claim would fail because the

19   parties did not intend to be bound by the

20   draft agreement until it was fully

21   executed by both sides which never

22   happened for legitimate business reasons,

23   including that Ally's board had not

24   approved the agreement or authorized

25   Ally's management to execute it.  And that

Page 370

Lyons

1

2   it would have led to an unprecedented

3   windfall for ResCap."

4            That is not a sentence you read

5   before rendering your opinion in this

6   case, is it?

7       A      That is true, I had not read

8   that sentence before.

9       Q      Had you read that, might you

10  have inquired about this point of required

11  board approval?

12      A      No, I don't think so.

13      Q      Why not?

14      A      I think I had heard that before

15  that there was an argument that this

16  contract required approval by Ally's

17  board.

18      Q      In the text portion of this

19  document, in the same paragraph, it goes

20  on to say that "Ally concludes that

21  because the parties never signed the draft

22  agreement and never intended to be bound

23  by it, a claim to establish its

24  enforceability would fail under

25  established Michigan law that the examiner

1                       Lyons

2     did not even address."

3                And it cites to a case Weygand v

4     Tringali, from Michigan 1970.

5                Are you familiar with that case?

6     A     No, I'm not.

7     Q     You certainly didn't review it

8     in connection with your analysis, did you?

9     A     No.

10    Q     Can you read the parenthetical

11    ascribed to that case?

12    A     "In cases where writing which

13    purports to evidence a contract between

14    several named persons has been signed by

15    less than all those named, it is often

16    found that the signers did not intend to

17    become contractually bound until all the

18    apparent parties sign and deliver the

19    writing".

20    Q     And if that is Michigan law,

21    that in fact would support AFI's defense

22    in this case, correct?

23    A     Not necessarily.

24    Q     But it could, couldn't it?

25    A     It could.

Page 372

                              Lyons

1

2        Q      You're not an expert on Michigan

3   law, are you?

4        A      I am not.

5        Q      Have you ever found there to be

6   a binding contract where one side executed

7   and there is evidence suggesting the

8   parties did not intend to be bound?

9        A      That's the key ingredient, it's

10  what's the intent of the parties.

11       Q      Right.

12       A      And I think that's what is the

13  key here, that it appears from assessing

14  all of the facts that the parties intended

15  to be bound.

16       Q      You haven't assessed all the

17  facts, correct?

18       A      All of the facts that were

19  stated in the examiner's report.

20       Q      The facts that the examiner

21  chose to present, right?

22       A      That the examiner chose to

23  present, correct.

24       Q      And to the extent it is not in

25  the report, you have no way of knowing

1                          Lyons

2      what other facts exist, right?

3          A      Other than reading the

4      deposition transcript subsequent to

5      issuing the report.

6          Q      So, for example, if there was an

7      Ally policy that required capital

8      contributions in excess of 50 million

9      dollars to be approved by the board, if

10     that were not included in the examiner's

11     report, you would have no way of knowing

12     that, right?

13         A      That's true.

14         Q      And so I'm going to repeat my

15     question:  Have you ever found there to be

16     a binding contract where only one side

17     executed and there is evidence suggesting

18     the parties did not intend to be bound?

19         A      As I said, your question assumes

20     a crucial fact that there is evidence that

21     the parties did not intend to be

22     contractually bound.  And I don't recall

23     ever dealing with a contract dispute where

24     there was evidence suggesting that the

25     parties did not intend to become

1                      Lyons

2    contractually bound.

3        Q     Mr. Lyons, isn't your entire

4    analysis predicated on assumption of

5    critical facts?

6              MR. COHEN:  Object to the form.

7        A     My analysis is predicated on the

8    my assumption that the facts as presented

9    by the examiner are accurate.

10       Q     So I'm asking you a

11   hypothetical.  Assuming that there is

12   evidence of intent suggesting parties did

13   not intend to be bound, have you ever

14   found as a judge in your experience there

15   to be a binding contract where only one

16   side executed and there are facts

17   suggesting the parties did not intend to

18   be bound?  Have you ever done that?

19             MR. COHEN:  That's a

20        hypothetical?

21             MR. SIMON:  Yes, I'm asking that

22        question.

23             MR. COHEN:  You're asking if he

24        did it as a judge or it a

25        hypothetical.

Page 375

1                              Lyons

2          Q      Do you recall ever doing that as

3     a judge?

4                 MR. COHEN:  That's not a

5          hypothetical.  That's a fact question.

6          Q      I'm giving you a hypothetical

7     set of facts and asking you to apply it to

8     your experience on the bench.

9                 Have you ever found that

10    circumstance to be a binding contract?

11                MR. COHEN:  Objection.

12                MR. SIMON:  I'll withdraw it and

13         ask it again.

14         Q      In your experience on the bench,

15    did you ever have a case where you found

16    there to be a binding contract where only

17    one side executed and in your judgment the

18    evidence suggested that the parties did

19    not intend to be bound?

20         A      No, I never had such a case.

21         Q      You understand that ResCap is a

22    disregarded entity for tax purposes,

23    right?

24         A      Yes.

25         Q      And so isn't it correct to say

Lyons

1

2     that any tax assets or liabilities belong

3     to Ally rather than ResCap?

4          A     I don't know if that is correct.

5          Q     You don't know either way?

6          A     I don't.

7          Q     Do you know if Ally has used any

8     tax credits relating to its interest in

9     ResCap?

10          A     I believe the examiner does

11    report that Ally or GM used certain tax

12    benefits that related to ResCap.

13          Q     Well, the 1.7 plus billion

14    dollar claim, is that predicated on tax

15    credits that were actually used or that

16    could be used?

17          A     Some of it that was actually

18    used and I believe some are projected to

19    be used.

20          Q     And with respect to the portion

21    that you believe is attributable to what

22    was projected to be used, do you know if,

23    in fact, they were used?

24          A     No, I do not.

25          Q     Wouldn't that be relevant to

Page 377

                        Lyons

1

2    calculating the value of this ostensible

3    claim?

4        A    I think the examiner does state

5    that his financial advisors contacted Ally

6    and General Motors, and found that

7    subsequent to the date of the 2009 -- the

8    two agreements, that certain tax

9    attributes of ResCap were used and

10   benefited the consolidated filing entity,

11   and that it was projected that within the

12   next year, I believe it was, that

13   traditional tax benefits would be used and

14   would benefit the consolidated return.

15       Q    Right.  So I'll repeat my

16   question.

17            Do you know if they were

18   actually used?

19       A    I think -- I can't state it more

20   accurately than I just did.  Some were

21   used and some were projected to be used.

22       Q    I'm specifically getting at the

23   ones that were projected to be used as of

24   the date of the examiner's report.

25            Do you know sitting here today

Page 378

1                          Lyons

2     whether those were actually used?

3         A     You mean subsequent to the

4     examiner's report?

5         Q     Correct?

6         A     I don't know what happened

7     subsequent to the examiner's report, no.

8         Q     And would that be relevant in

9     any way to calculating the value of this

10    claim whether or not, in fact, the

11    potential credits were actually used?

12                MR. COHEN:  Object to the form.

13        A     If the facts as projected or

14    contemplated turned out to be -- turned

15    out to change by subsequent events, yes,

16    that would be relevant.

17        Q     Can you explain what you mean by

18    that?

19        A     I don't think I can say it any

20    better than I just did.

21        Q     If you're saying they are not,

22    in fact, used, it could turn out to change

23    the value of the claim?

24        A     Yes.

25        Q     Okay.

1                    Lyons

2           In the examiner's calculation of

3    the 1.77 billion projected tax benefits,

4    do you know if you included the Ally

5    contributions of 750 million dollars?

6        A    Yes.

7        Q    And do you think that was

8    appropriate?

9        A    It is.  When I read it, it

10   seemed to me appropriate to attempt to

11   quantify what the tax impact would be if

12   that settlement were improved or approved,

13   excuse me.

14       Q    As you sit here today, do you

15   still think that that is appropriate?

16       A    I haven't learned anything that

17   suggests that it is not appropriate.

18       Q    Well, you understand that the

19   750 million contribution was given

20   premised on a release that would be

21   granted to Ally, correct?

22       A    Yes.

23       Q    And that release would

24   presumably extend to the tax allocation

25   claim, wouldn't it?

Page 380

Lyons

1

2      A      Yes.

3      Q      So why in your view would it be

4   appropriate to include the 750 million

5   payment in a claim that frankly would have

6   been released by that payment?

7      A      I see what you're saying.

8            I understand your point.   I

9   think it is a good point.

10     Q      Do you concede it may be an

11  error to include the 750?

12     A      Yes, I think you're right.   That

13  does make sense to me what you have

14  posited.

15     Q      I assume --

16     A      If the release, if part of the

17  payment was for a comprehensive release,

18  then it shouldn't be included in the

19  calculation of the damages for the tax

20  claim.   That makes sense to me.

21     Q      And I assume you would say the

22  same with respect to the 2.1 billion

23  assuming it is predicated on a release?

24     A      Correct.

25     Q      With respect to the tax

Lyons

1
allocation claims, can you look at your

2
discounting methodology that you applied,

3
which is on page -- I think it is 24.

4         A     Isn't it on 39?

5         Q     Yes, you're right.  Sorry.

6         A     Okay.

7         Q     Can you tell me your basis for

8
your initial inherent risk reduction of 20

9
percent here?

10        A     That was a similar just general

11
litigation type of risk in that it was a

12
large claim and that any settlement would

13
warrant a risk.  How I arrived at 20

14
percent, it was just my assessment that

15
that would be an appropriate percentage to

16
use for the inherent risk analysis.

17        Q     Can you tell me why --

18              MR. SIMON:  Withdrawn.

19        Q     You know that this claim is one

20
where the examiner -- when I say "this

21
claim", I'm referring to the tax

22
allocation claim -- the examiner concluded

23
that that was a close question, but more

24
likely to succeed, right?

1                          Lyons

2        A      Yes.

3        Q      And with respect to the

4   misallocation of net revenues claim, the

5   examiner concluded that was a claim that

6   was likely to prevail?

7        A      Right.

8        Q      Can you tell me why you used the

9   same inherent discount of 20 percent in

10  those claims?

11       A      No, I can't, except to tell you

12  that I attempted not to be formulaic.  So

13  I didn't do anything consistently based

14  upon whether the examiner said that it was

15  likely to succeed or more likely than not

16  to succeed, for example.  I tried to

17  ascribe a discount factor looking at each

18  particular claim, looking at the merits,

19  but, again, not opining any formulaic

20  formula to do the discounting.

21       Q      So it was completely subjective?

22       A      It was subjective based upon my

23  experience and my assessment of the

24  appropriate factor.

25       Q      And why based on your assessment

Page 383

Lyons

1
2      did you then discount 40 percent for risk

3      associated with the threshold question of

4      enforceability?

5          A      Enforceability I thought was a

6      question not so much because of the fact

7      that it wasn't signed, although that is a

8      significant factor, but that the main

9      participants seem to indicate on both

10     sides that they did not consider the

11     contract as enforceable at the time that

12     they were interviewed by the examiner.

13             So I don't recall reading about

14     any witness on the side of ResCap, for

15     example, who came forward and said to the

16     examiner, you know, that was an agreement

17     that we had and it shouldn't have been

18     taken away from us.

19         Q      You mentioned the interviews by

20     the examiner.  Are you aware of the fact

21     that there were transcripts of those

22     interviews?

23         A      I believe I learned that, yes.

24         Q      Did you ever see any

25     transcripts?

1                          Lyons

2          A      No, I did not.

3          Q      Do you know whether or not the

4    interviews were conducted under oath?

5          A      I think in the examiner's

6    reports, some of them were.

7          Q      I think there was one.

8          A      Right.

9          Q      So the others were not?

10         A      Right.

11         Q      In your view, do you think that

12   it matters whether or not testimony is

13   given under oath or not in conducting an

14   examination such as Judge Gonzales did?

15         A      I haven't thought about that.

16         Q      Can you give it some thought

17   right now and tell me what you think?

18                MR. COHEN:   Object to the form.

19         If you can.

20         A      I tell you off the top of the

21   head reaction to that would be that people

22   are likely to be more forthcoming and give

23   more accurate answers if they are not

24   under oath.  I recognize that I'm under

25   oath today.

Page 385

Lyons

1

2      Q      You anticipated my next question

3      sir.

4      A      It might apply to me.  But

5      witnesses in my experience tend to be more

6      guarded when they are put under oath than

7      if they were just sitting around and

8      answering questions.  The presence of a

9      court reporter, even though the testimony

10     is not under oath, might have -- might

11     influence somebody.  But this is just my

12     assessment of witnesses in my experience,

13     talking to people around the table,

14     finding out what happened, as opposed to

15     responding to questions under oath.

16     Q      Right.

17            But, of course, there are

18     ramifications of giving testimony under

19     oath which do not exist if you give

20     non-sworn testimony?

21     A      Yes, for example, perjury.

22     Q      Correct.

23            And so is it fair to say as a

24     judge, if you were deciding a matter,

25     would you accord more weight to testimony

Page 386

Lyons

2    that was given under oath than that which

3    was not?

4        A    I don't think so as a practical

5    matter myself.   I recognize that evidence

6    has to come in properly and should be

7    under oath, but I do believe that, as I

8    said, witnesses tend to be more guarded

9    and less forthcoming when they are under

10   oath.   Not so much because they fear

11   perjury, this is again just my

12   observation, but it is just more formal

13   setting.

14       Q    What if you had a question in

15   your mind as to the credibility of a

16   particular witness on an issue, in that

17   circumstance, would you seek to take the

18   testimony of that individual under oath?

19       A    If I were an attorney in a

20   proceeding.

21       Q    Or if you were a judge deciding

22   a proceeding, would you want that

23   witness's testimony under oath?

24       A    As a judge, I wouldn't have the

25   options.

Lyons

1

2     Q     If you did, assume you had the

3     options.

4     A     That's an assumption that --

5           MR. COHEN:   Incomplete

6     hypothetical.

7     A     It is not within the realm of

8     contemplation that a judge could receive

9     testimony that is not under oath.

10    Q     As a mediator, if there were an

11    issue of credibility that you were

12    deciding upon and you had sworn testimony

13    that was done under oath, would you accord

14    greater weight to that if there was a

15    credibility determination that you were

16    making where you had a question in your

17    mine about an issue?

18    A     Let me just preface it by saying

19    a mediator doesn't make a determination,

20    but I concede that a mediator will make

21    his or her own evaluation of a claim.

22          And I'm not sure whether I would

23    judge credibility, give greater weight to

24    testimony under oath than not in a

25    mediation setting.

1                          Lyons

2              MR. SIMON:  We have to change

3         the tape and I'm just about done, so

4         why don't we take this opportunity for

5         me to sort of look through my notes.

6              MR. COHEN:  How much time do we

7         have left?

8              THE VIDEOGRAPHER:  This marks

9         the end of tape number five.  We're

10        going off the record at 6:10 p.m.

11             (Thereupon, a recess was taken,

12        and then the proceedings continued as

13        follows:)

14             THE VIDEOGRAPHER:  This marks

15        the start of tape number six.  We're

16        back on the record at 6:24 p.m.

17   BY MR. SIMON:

18        Q    Mr. Lyons, I just want to ask

19   with respect to the tax allocation claim

20   analysis, like the other claims we talked

21   about today, the numbers and percentages

22   that are in your methodologies reflect

23   your personal judgments and those of your

24   peers, right?

25        A    Correct.

                              Lyons

1

2        Q      And they are not based on any

3    other objective criteria; correct?

4        A      That's correct.

5               MR. SIMON:   I have no further

6        questions, and I'll pass the witness.

7    EXAMINATION BY

8    MR. BROWN:

9        Q      Mr. Lyons, good evening.   My

10   name is Judson Brown.   I'm an attorney

11   with Kirkland & Ellis, and I represent

12   Ally Financial.

13              I'm going to ask you a few more

14   questions.   Okay?

15       A      Yes.

16       Q      I want to go back to a topic

17   that you discussed with Mr. Simon the

18   revenue allocation claim.

19              Do you remember that?

20       A      Yes.

21       Q      You mentioned earlier today that

22   that is a contract based claim; is that

23   correct?

24       A      That's correct.

25       Q      What contracts is the claim

Page 390

                        Lyons

1

2    based on?

3       A      Primarily the MMLPSA.

4       Q      Anything else?

5       A      There are attendant swap

6    contracts that are all part of the same

7    transaction.  The brokerage contract, the

8    MSR Swap and the Pipeline Swap.

9               I believe those are the

10   agreements that were implemented to

11   reflect the brokerage of loans to the bank

12   project.

13      Q      Is it your testimony that the

14   Pipeline Swap agreement was implemented to

15   reflect a brokerage of loans to the bank?

16      A      I think it was all part of the

17   inter-relationship between the mortgage

18   company and the bank.

19      Q      What does the broker agreement

20   itself have to do with the revenue

21   allocation claim?

22      A      I believe that the brokerage fee

23   earned under the brokerage contract should

24   be a net neutral after a loan had been

25   originated by the bank and then sold to

1                          Lyons

2      GMAC Mortgage and then subsequently sold

3      to a third-party.

4           Q      That's all pursuant to the

5      MMLPSA, correct?

6           A      That's correct.

7           Q      Can you identify anything in the

8      broker agreement that has an impact on the

9      revenue allocation claim?

10          A      I actually have not reviewed the

11     broker agreement in detail.  So as I sit

12     here now, I cannot do that.

13          Q      As you sit here right now, you

14     can't identify anything in the broker

15     agreement that has an impact on the

16     revenue allocation claim, correct?

17          A      I'm not aware of anything,

18     correct.

19          Q      You also identified the Pipeline

20     Swap.

21                 What is it that the Pipeline

22     Swap has to do with the revenue allocation

23     claim?

24          A      I don't believe that the

25     Pipeline Swap -- you know, I'm not sure of

Page 392

Lyons

the answer to that, how the Pipeline Swap

would be accounted for in the cost basis

or carrying value of the -- of a loan that

was funded by the bank.

Q     Sitting here right now, you

can't identify any impact that the

Pipeline Swap has on the revenue

allocation claim, correct?

A     That is correct.

Q     You also identified the MSR

Swap.

What is it that the MSR Swap has

to do about the revenue allocation claim,

Mr. Lyons?

A     I don't think the MSR Swap does

have anything to do with the revenue

allocation claim.

Again, I'm not an accountant but

based upon my understanding, I don't think

that the MSR Swap would factor into the

cost basis of the loan.

Q     Sitting here right now, the only

agreement that you can identify as

relevant to the revenue allocation claim

1                         Lyons

2       is the MMLPSA, correct?

3            A     As to the damages under that

4       claim, yes.

5            Q     Well, what about as to the

6       liability?

7            A     Well, I think that in trying to

8       discern the intent of the parties that it

9       is important to consider all of the

10      agreements that relate to the

11      inter-relationship between the bank and

12      the mortgage company for these loans that

13      were -- where the borrowers were located

14      by the mortgage company but were funded by

15      the bank.

16           Q     Now, you agree with me,

17      Mr. Lyons, that the revenue allocation

18      claim is a contract claim, right?

19           A     Yes.

20           Q     Before you ever get to the

21      intent of the parties, you look to the

22      terms of the contract, correct?

23           A     That's correct.

24           Q     And you only get to the intent

25      of the parties if the language of the

Page 394

Lyons

1    contract is not clear, correct?

3        A    Well, actually, the way I would

4    state the law is that your purpose in

5    interpreting contract is to find the

6    parties' intent.  And the first way that

7    you attempt to determine the parties'

8    intent is by reading the contract.

9            If it is clear from reading the

10   contract what the parties' intent was, you

11   don't need to take any additional

12   evidence.

13       Q    So let's look at the MMLPSA.

14           MR. COHEN:  Lyons 6.  The 2008

15       document?

16           MR. BROWN:  Yes, the 2008 one.

17           MR. COHEN:  Yes, that's Lyons 6.

18       Q    Mr. Lyons, do you have Lyons

19   Exhibit 6 in front of you?

20       A    Yes, I do.

21       Q    I believe you testified earlier

22   that the revenue allocation claim arises

23   based on the breach of the purchase price

24   definition in 1.24 of the MMLPSA; is that

25   correct?

1                        Lyons

2        A      I believe that is correct.

3        Q      Just so the record is clear,

4    that definition is purchase price means

5    (A), With respect to a first lien mortgage

6    loan, the cost basis plus reserves

7    associated with such first lien mortgage

8    loan and (B), with respect to a second

9    lien mortgage loan, the market value for

10   such second lien mortgage loan.

11             Do you see that?

12       A      I do see that.

13       Q      So with respect to second lien

14   loans, the purchase price is the market

15   value for the loan, correct?

16       A      That's what the contract says,

17   yes.

18       Q      With respect to the first liens,

19   the purchase price is the cost basis,

20   correct?

21       A      Plus reserves, yes.

22       Q      Cost basis plus reserves

23   associated with the first lien loan,

24   correct?

25       A      Yes, correct.

1                    Lyons

2        Q    Cost basis is a defined term,

3   right?

4        A    Yes.

5        Q    It is defined in paragraph 1.9

6   in the MMLPSA, correct?

7        A    Yes.

8        Q    That definition begins, "Cost

9   basis means with respect to a mortgage

10  loan its net carrying value is defined by

11  accounting principles generally accepted

12  in the United States of America as

13  amended."

14             It continues from there.

15             Do you see that?

16       A    I do see that.

17       Q    Do you understand accounting

18  principles generally accepted in the

19  United States of America to refer to U.S.

20  GAAP, G-A-A-P?

21       A    Yes; yes, I do.

22       Q    Now, Mr. Lyons, you're not an

23  accountant, correct?

24       A    That's correct.

25       Q    You're not an auditor, correct?

1                      Lyons

2       A     Correct.

3       Q     You're not trained in finance,

4   correct?

5       A     Correct.

6       Q     Do you see the phrase in the

7   definition of cost basis of net carrying

8   value?

9             Do you see that?

10      A     No, I do not see that.

11      Q     First line, "Cost basis means

12  with respect to a mortgage loan its net

13  carrying value".

14      A     Yes, I'm sorry.

15      Q     Do you see that?

16      A     I do see that.

17      Q     Net carrying value as defined by

18  GAAP, right?

19      A     Yes.

20      Q     Do you know what net carrying

21  value means, Mr. Lyons?

22      A     No, I don't.

23      Q     Are you aware that under GAAP if

24  an entity's accounting methodology is fair

25  value accounting, its net carrying value

1                          Lyons

2       is the fair value of the asset?

3            A      I'm not aware of that.

4            Q      Are you familiar with a lower of

5       cost or market accounting methodology?

6            A      I've heard the term, yes.

7            Q      What does that mean?

8            A      That an asset is given a value

9       at a particular point in time based upon

10      the lower or the cost -- the lower of the

11      cost of that asset as it was acquired by

12      the owner versus the market value of that

13      asset at the time that it is being valued

14      on the books.

15           Q      Have you heard that methodology

16      referred to as the LOCOM accounting

17      methodology, L-O-C-O-M?

18           A      I have.

19           Q      If an entity's chosen a LOCOM

20      accounting methodology, do you understand

21      what its net carrying value would be?

22           A      I can't say that I'm aware of

23      that, how that would work in each case.

24           Q      Are you aware of --

25                  MR. BROWN:  Strike that.

<div align="center">Lyons</div>

1

2     Q     You testified earlier that the

3    bank switched to fair value accounting in

4    August of 2009; is that correct?

5     A     Yes.

6     Q     Do you know why the bank elected

7    fair value accounting?

8     A     I don't recall whether that is

9    stated in the examiner's report.

10    Q     My question is a little bit

11    different.

12          Do you know why the bank elected

13    a fair value accounting methodology?

14    A     No, I don't recall at this time.

15    Q     Do you know whether ResCap had

16    chosen a fair value accounting methodology

17    as of August of 2009?

18    A     I do not.

19    Q     Do you know whether Ally

20    Financial had made a fair value accounting

21    election as of August 2009?

22    A     No, I do not.

23    Q     What was Ally Bank's accounting

24    methodology before it moved to fair value

25    accounting?

Page 400

                          Lyons

1

2        A      I believe it was lower cost or

3   market.

4        Q      For all assets held by the bank?

5        A      Only with regard -- my knowledge

6   is only with regard to the mortgages.

7        Q      And by mortgages you mean the

8   mortgages, the loans that were sold from

9   the bank to GMAC Mortgage?

10       A      Yes.

11       Q      What is the basis for that

12  understanding?

13       A      What I read in the examiner's

14  report.

15       Q      Do you know where the examiner's

16  report states that?

17       A      No.  I can't point to the page

18  and line at this point.

19       Q      Are you aware that the loans

20  that were sold from the bank to GMAC

21  Mortgage were held in what the bank called

22  a held for sale portfolio?

23       A      I've heard that term, yes.

24       Q      Also known as the HFS portfolio?

25       A      HFS, correct.

1                        Lyons

2        Q      Held for sale?

3        A      Right.

4        Q      Do you know that the bank had

5    made a hedge accounting election with its

6    HFS portfolio as of July 2008?

7        A      I do not.

8        Q      Do you know what hedge

9    accounting is?

10       A      No, I don't.

11       Q      Do you know what the net

12   carrying value of an asset would be if the

13   entity that owned that asset had made a

14   hedge accounting election with respect to

15   that asset?

16       A      No, I do not.

17       Q      What is net carrying value as

18   defined by GAAP?

19       A      That I don't know.

20       Q      Let's look at Lyons Exhibit 1,

21   it's your report.  Turn to page 8 for a

22   minute.

23              Let me know when you're there.

24       A      I'm on page 8.

25       Q      This is the section of your

Page 402

1                          Lyons

2       report in which you discuss the revenue

3       allocation claim, correct?

4            A     Yes.

5            Q     Let's look at the first

6       paragraph under background.  The next to

7       last sentence it begins, "Under the

8       parties".

9                  Do you see where I'm at?

10           A     I do.

11           Q     It says, "Under the parties'

12      then existing agreement, Ally Bank

13      recognized as revenue only the net

14      interest carry for the period the loan was

15      on Ally Bank's books".

16                 Do you see that?

17           A     I do see that.

18           Q     What is the then existing

19      agreement that you refer to, Mr. Lyons?

20           A     Let's see.  Let me just read the

21      whole paragraph.  I believe that refers to

22      the agreement between the parties prior to

23      the brokering loans to the bank project.

24           Q     What agreement is that?

25           A     I think there was a prior

                              Lyons

1  MMLPSA.

2      Q      Before the one that is Lyons

3  Exhibit 6?

4      A      I believe there was, yes.

5      Q      In this sentence that we just

6  looked at, what contract are you referring

7  to?

8      A      You know, I'm really not sure at

9  this point.

10     Q      Okay.

11            The broker arrangement between

12 the parties was implemented on January 1,

13 2009.

14            Do you know that?

15     A      Yes, I believe that's accurate.

16     Q      Before the parties entered into

17 that arrangement there would have been

18 approximately six months of 2008 in which

19 the 2008 MMLPSA, that is Lyons Exhibit 6,

20 would have been the existing MMLPSA

21 between the parties, correct?

22     A      This says amended and restated

23 as of July 1, 2008.  So I assume that's

24 correct, yes.

1                    Lyons

2        Q     So it would have been operative

3    for about six months before the brokerage

4    arrangement was implemented, correct?

5        A     That sounds correct, yes.

6        Q     Is that the then existing

7    agreement you're referring to in the

8    sentence we just looked at in your report?

9        A     As I said, I don't know.

10       Q     When Ally Bank --

11             MR. BROWN:  Strike that.

12       Q     Let's go back to that sentence.

13   You said, "Ally Bank recognized as revenue

14   only the net interest carried for the

15   period the loan that was on Ally Bank's

16   books".

17             Do you see that?

18       A     Yes.

19       Q     Who originated those loans?

20       A     I believe the prior practice was

21   that GMAC Mortgage originated those loans

22   and funded them and then sold them to the

23   bank who held them for a period until they

24   were then resold to GMAC Mortgage and then

25   resold ultimately to third-parties.

Page 405

Lyons

2      Q      Third-party investor, such as

3   GSE or some other private label?

4      A      GSE or a trust, private label

5   trust.

6      Q      GMAC Mortgage originated those

7   loans, correct?

8      A      That's my understanding.

9      Q      GMAC Mortgage would incur the

10  expenses associated with originating those

11  loans, correct?

12     A      Yes.

13     Q      And GMAC Mortgage would keep the

14  income related to originating those loans,

15  correct?

16     A      Such as points?

17     Q      Any other origination related

18  income?

19     A      That's my understanding.

20     Q      After the brokerage arrangement

21  was put in place who originated loans?

22     A      They were funded by the bank.

23     Q      Who originated the loans,

24  Mr. Lyons?

25     A      The origination would be by the

Page 406

1                          Lyons

2    bank.

3         Q      The bank originated and funded

4    the loans, correct?

5         A      Yes.

6         Q      Who bore the expenses for

7    originating those loans, Mr. Lyons?

8         A      Well, originally the bank would

9    bear the expenses for originating those

10   loans.

11        Q      Now, let's look at the next

12   paragraph.  It begins, contemporaneous

13   e-mails.

14               Do you see that?

15        A      Yes.

16        Q      You didn't review those, did

17   you?

18        A      I did not.

19        Q      What e-mails are you referring

20   to?

21        A      I do not know.  That is a

22   recitation of facts that were contained in

23   the examiner's report.

24        Q      Is that a verbatim recitation of

25   what the examiner's report said?

Page 407

1                        Lyons

2        A      I don't think it is verbatim but

3    it is probably pretty close.

4        Q      Do you know the time period when

5    those contemporaneous e-mails occurred?

6        A      It would have been, I believe,

7    towards the end or middle or end of 2008

8    is my recollection.

9        Q      The broker agreement -- we can

10   look at it again, but it was entered

11   November 20, 2008.

12            Does that sound right to you?

13       A      I see that in the next sentence

14   here, yes.

15       Q      Were the contemporaneous e-mails

16   from November 2008?

17       A      I'm sorry.  You said the broker

18   agreement?

19       Q      Yes.

20       A      I was looking at the sentence

21   about the slide presentation.

22       Q      We'll get to that in a minute.

23   The broker agreement was entered on

24   November 20, 2008; correct?

25            MR. COHEN:  It's Lyons Exhibit 8

Page 408

                        Lyons

1    if you need to look at the document.

2        A     I assume you're correct.

3        Q     Were the contemporaneous e-mails

4    you referred to in your report from

5    November of 2008?

6        A     I don't know that.

7        Q     Were they from October 2008?

8        A     I couldn't tell you sitting here

9    what the date of those e-mails were.

10       Q     You don't know whether they were

11   from August 2008?

12       A     I do not know.

13       Q     Do you know whether they

14   reflected the final agreement of the

15   parties?

16       A     It is my belief that the e-mails

17   and the presentation reflected the

18   understanding of the parties as to what

19   the economics of the transaction should be

20   between the bank and the mortgage company.

21       Q     What is the basis for that

22   belief?

23       A     The recitation of the facts in

24   the examiner's report.

<div align="center">Lyons</div>

1

2    Q    And that's it?

3    A    That's -- yes, that's the only

4 basis I have for that.

5    Q    Did you read the deposition of

6 Mr. Celini that occurred last Friday?

7    A    I did read it this week, yes.

8    Q    Did you see that Mr. Celini was

9 asked about one of these contemporaneous

10 e-mails from September 2008?

11    A    Yes.

12    Q    Did you see what Mr. Celini

13 testified to with respect to that

14 contemporaneous e-mail?

15    A    I did.

16    Q    What did he tell to, Mr. Lyons?

17    MR. COHEN:  Objection to the

18 form.

19    A    My recollection of his testimony

20 is that one of the e-mails, I don't know

21 which one it was, is that this was a

22 preliminary proposal and that things

23 changed afterwards.

24    Q    Let's go to the bottom of that

25 page 8.  There is a sentence that begins,

Page 410

                    Lyons

1    "From an accounting standpoint" and it

2    runs on to page 9.

3            Do you see where I'm at?

4    A    Yes.

5    Q    You write, "From an accounting

6    standpoint, the deferred loan origination

7    fees and expenses including broker fees

8    was governed by statement of financial

9    accounting standards number 91, FAS-91".

10           Do you see that?

11   A    I do see that.

12   Q    Are you familiar with FAS-91?

13   A    No, I'm not.

14   Q    Do you have any idea what FAS-91

15   provides?

16   A    No, I have not read that.

17   Q    Let's go to the bottom of page

18   9.  There is a paragraph that begins,

19   effective August 1, 2009.

20           Do you see where I'm at?

21   A    I see that, yes.

22   Q    The second sentence says, "As a

23   consequence of this accounting change

24   beginning August 1, 2009, rather than

1                            Lyons

2      realizing the benefit of points in the

3      gain on sale as the parties had agreed,

4      and as it had received under the 250/250

5      program and for third-party brokered

6      loans, GMAC Mortgage instead received the

7      cost based below market broker fee, which

8      since it was no longer capitalized, GMAC

9      Mortgage did not have to repay to Ally

10     Bank when it purchased the loan".

11              Do you see that?

12     A     I do see that.

13     Q     That sentence suggests that GMAC

14     Mortgage received only the broker fee

15     after August 1, 2009 and nothing else.

16              Is that correct?

17     A     It does suggest that, yes.

18     Q     That is not a correct statement

19     of what GMAC Mortgage received after

20     August 1, 2009, is it, Mr. Lyons?

21     A     I think that there may be an

22     error there on the gain on sale.

23     Q     GMAC Mortgage continued to

24     receive gain on sale to third-parties,

25     right?

1                              Lyons

2         A      I believe that's so.

3         Q      The next sentence you write,

4    "However, GMAC Mortgage had agreed to such

5    a fee with the understanding that whatever

6    the fee charged, the fee would be a wash

7    because of the FAS-91 deferrals.  And with

8    the expectation that it would continue to

9    receive the benefit of the FAS-91

10   deferrals".

11             Do you see that?

12        A      I do see that.

13        Q      What is the basis for that

14   statement?

15        A      What's the basis?

16             Well, my understanding of the

17   economics, as I stated earlier, was that

18   discount or points paid by a borrower in

19   connection with a loan would reduce the

20   cost basis of that loan, and that a fee

21   such as a brokerage fee would increase the

22   cost basis of that loan.

23             And so that if GMAC Mortgage had

24   received a brokerage fee from the bank,

25   then when it purchased the loan, purchased

1                          Lyons

2      the loan from the bank, the cost basis had

3      increased by the brokerage fee that it had

4      been paid, in essence GMAC would be --

5      would have no receipt of income at the end

6      of the day, nor would the bank have

7      incurred an expense at the end of the day

8      for that brokerage fee.

9          Q    Your understanding of those

10     economics is based solely on your review

11     of the examiner's report, correct?

12         A    That's correct.

13         Q    Now, you also discussed earlier

14     with Mr. Simon the MSR Swap.

15              Do you remember that?

16         A    Yes, I do.

17         Q    What is the MSR Swap?

18         A    Do you want me to tell you my

19     understanding of that?

20         Q    I would love it.

21         A    Okay.

22              My understanding of the MSR Swap

23     is that mortgage servicing rights can be

24     valued.  There is a value for them.  And

25     they can be valued periodically, I think

Page 414

1                         Lyons

2       as frequently as daily.  And that under

3       the MSR Swap, the benefit and burden of

4       any change in value would be borne by GMAC

5       Mortgage.

6           Q    Is that your total understanding

7       of the MSR Swap?

8                MR. COHEN:  Object to the form.

9           A    That's my understanding of the

10      economics of it.

11          Q    Are you aware of the documents

12      that comprise the MSR Swap?

13          A    Yes, I believe I have seen a

14      document and one or two schedules that

15      relate to that swap, yes.

16          Q    I'll represent to you that the

17      MSR Swap was initially entered in 2007.

18      At the time there was a master ISDA

19      agreement and two schedules; does that

20      sound right to you?

21          A    Yes.

22          Q    Did you review those documents?

23          A    I did.

24          Q    The MSR Swap claim is a breach

25      of contract claim, correct?

Page 415

1                          Lyons

2       A      That's correct.

3       Q      Is the claim based on a breach

4    on the master ISDA agreement, Mr. Lyons?

5       A      Yes.

6       Q      What provision of the master

7    ISDA agreement?

8       A      I can't tell you that.

9       Q      It is based on a breach of the

10   master ISDA, not one of the underlying

11   schedules; is that correct?

12      A      I don't know.  I considered them

13   to be part of the same thing.

14      Q      Do you know whether the breach

15   is of the master ISDA or one of the

16   underlying schedules?

17      A      No, I do not.

18      Q      You don't know which document is

19   the source for the breach of contract

20   claim, correct?

21      A      That is correct.

22      Q      The MSR Swap documents were

23   effectively merged into a 2011

24   confirmation; is that correct?

25             Is that your understanding?

Page 416

1                          Lyons

2         A      I'm sorry.

3         Q      The MSR Swap documents were

4    effectively merged into a 2011

5    confirmation; is that correct?

6         A      That I don't recall.

7         Q      Okay.

8                Are you aware that there was a

9    confirmation in 2011 with respect to the

10   MSR Swap?

11        A      As I say, as I sit here today, I

12   don't recall that fact.

13        Q      Let's look at page 17.  It's in

14   your report.

15        A      Uh-huh.

16        Q      Right in the middle.  There is a

17   paragraph it begins, "In April 2011."

18               Do you see that?

19        A      I do see that, yes.

20        Q      "In April 2011, the parties

21   entered into the MSR Swap confirmation,

22   which covered the previously, separately

23   documented F&B swap and net funding swap".

24               Do you see that?

25        A      I do see that, yes.

Lyons

1

2       Q      Did you review that MSR Swap

3   confirmation from 2011?

4       A      I don't recall reviewing that

5   actually.

6       Q      Can you identify the provision

7   of the 2011 swap confirmation that is the

8   source of the breach of contract claim?

9       A      No, I cannot.

10          MR. BROWN:  Mr. Lyons, I have

11      nothing further.

12          We have a few minutes left on

13      the tape but I think somebody on the

14      phone has a couple of questions for

15      you.  I don't know, maybe we can try

16      and get it before we have to switch

17      the tape.

18          MR. COHEN:  It's not the tape.

19      It's the record.  We've got four

20      minutes left before the deposition is

21      over.

22          MR. WYNNE:  This is Richard

23      Wynne representing FGIC.

24   EXAMINATION BY

25   MR. WYNNE:

1                          Lyons

2        Q     Mr. Lyons, I'll try to do this

3    quickly.

4              I believe you testified that you

5    have very substantial experience in

6    mediation and expertise; is that correct?

7        A     That's correct.

8        Q     Have you had confidentiality

9    orders entered in cases where you acted as

10   the mediator?

11       A     Yes.

12       Q     Have you, when you acted as a

13   judge, approved and entered

14   confidentiality orders?

15       A     Well, yes, mediation orders that

16   included a confidentiality provision, yes,

17   I did.

18       Q     What type of confidentiality

19   provisions were typically in the orders

20   either in cases you acted as the mediator

21   or cases where you were a judge sending

22   something to mediation?

23             MR. COHEN:  Objection to form;

24        compound and overbroad.

25       A     The confidentiality provisions

Page 419

1                          Lyons

2      generally provide that all communications

3      in connection with the mediation are

4      confidential, and that no party shall

5      introduce into evidence any communications

6      that were made in connection with the

7      mediation.  And that the mediator shall

8      not be called as a witness with regard to

9      anything that -- any communications that

10     took place in connection with the

11     mediation.

12         Q     Thank you.

13               In your opinion, was it

14     appropriate for there to be a

15     confidentiality order of that type in the

16     ResCap mediation that occurred in this

17     case?

18               MR. COHEN:  Object to form.

19

20           (Continued on the following

21            page to include the jurat.)

22

23

24

25

Page 420

1                        Lyons

2        A      Yes, I agree that a

3    confidentiality provision in the mediation

4    order would be -- was appropriate with

5    ResCap.

6              MR. WYNNE:  Thank you.  I have

7        no further questions.

8              MR. COHEN:  We have no

9        questions.

10             THE VIDEOGRAPHER:  This

11       concludes the deposition.  We're going

12       off the record at 6:55 p.m.

13

14

15                   _____

16                        RAYMOND T. LYONS

17

18   Subscribed and sworn to

19   before me this      day

20   of             , 2013.

21   _____

22

23

24

25

```
1
2        --------------- I N D E X ----------------
3     WITNESS           EXAMINATION BY        PAGE
4     RAYMOND T. LYONS
5                    MR. SIMON               10
6                    MR. BROWN              389
7                    MR. WYNNE             417
8
          ---------- INFORMATION REQUESTS ----------
9
      Discounting methodology or settlement  167
10    negotiations scenario methodology
      materials
11
12
          --------------- EXHIBITS ----------------
13
      LYONS                               FOR ID.
14
      Exhibit 1                              15
15         Expert Report of Raymond T. Lyons,
           Esquire
16
      Exhibit 2                              53
17         Document titled "In Re:
           Residential Capital LLC Billing
18         Summary"
19    Exhibit 3                             124
           Press Release Issued by Ally Bank,
20         May 23, 2013
21    Exhibit 4
           Notice of Motion                142
22
      Exhibit 5                             214
23         Master Mortgage Loan Purchase and
           Sale Agreement, December 15, 2001
24
      Exhibit 6                             214
25         Master Mortgage Loan Purchase and
```

Page 422

```
1
2      ---------------- EXHIBITS ----------------
3      LYONS                             FOR ID.
4      Exhibit 7                          278
           Document
5
       Exhibit 8                          284
6          Broker Agreement
7      Exhibit 9
           Exhibit 10 to Disclosure
8          Statement                      350
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 423

1

2                    C E R T I F I C A T E

3      STATE OF NEW YORK )

4                          :  SS

5      COUNTY OF NEW YORK)

6

7              I, Adrienne M. Mignano, a

8      Registered Professional Reporter and Notary

9      Public within and for the State of New York,

10     do hereby certify:

11             That RAYMOND T. LYONS, the

12     witness whose deposition is hereinbefore set

13     forth, was duly sworn by me and that such

14     deposition is a true record of the testimony

15     given by the witness.

16             I further certify that I am

17     not related to any of the parties to this

18     action by blood or marriage, and that I am

19     in no way interested in the outcome of this

20     matter.

21             IN WITNESS WHEREOF, I have

22     hereunto set my hand this 11th day of

23     November 2013.

24             _____

25                    ADRIENNE M. MIGNANO

1

2          DEPOSITION ERRATA SHEET

3          Our Assignment No. 67903

4    Case Caption:   In Re: Residential Capital
                    Bankruptcy Matter

5

6

7      DECLARATION UNDER PENALTY OF PERJURY

8

        I declare under penalty of perjury

9

     that I have read the entire transcript

10

     of my deposition taken in the captioned

11

     matter or the same has been read to me,

12

     and the same is true and accurate, save

13

     and except for changes and/or corrections,

14

     if any, as indicated by me on the

15

     DEPOSITION ERRATA SHEET hereof, with the

16

     understanding that I offer these changes

17

     as if still under oath.

18

19

     SIGNATURE_____DATE:_____

20          RAYMOND T. LYONS

21

22   Subscribed and sworn to on the _____ day of
     _____, 20__ before me,

23   _____

     Notary Public,

24   in and for the State of _____

25

Page 425

1
2                    DEPOSITION ERRATA SHEET
3       Page No._____Line No._____Change
        to:_____
4       Reason for
        change:_____
5
6       Page No._____Line No._____Change
        to:_____
7       Reason for
        change:_____
8
9       Page No._____Line No._____Change
        to:_____
10      Reason for
        change:_____
11
12      Page No._____Line No._____Change
        to:_____
13      Reason for
        change:_____
14
15      Page No._____Line No._____Change
        to:_____
16      Reason for
        change:_____
17
18      Page No._____Line No._____Change
        to:_____
19      Reason for
        change:_____
20
21      Page No._____Line No._____Change
        to:_____
22      Reason for
        change:_____
23
24      SIGNATURE:_____DATE:_____
                      RAYMOND T. LYONS
25

1
2                DEPOSITION ERRATA SHEET
3
      Page No._____Line No._____Change
4     to:_____
      Reason for
5     change:_____
6
      Page No._____Line No._____Change
7     to:_____
      Reason for
8     change:_____
9
      Page No._____Line No._____Change
10    to:_____
      Reason for
11    change:_____
12
      Page No._____Line No._____Change
13    to:_____
      Reason for
14    change:_____
15
      Page No._____Line No._____Change
16    to:_____
      Reason for
17    change:_____
18
      Page No._____Line No._____Change
19    to:_____
      Reason for
20    change:_____
21
      Page No._____Line No._____Change
22    to:_____
      Reason for
23    change:_____
24
      SIGNATURE:_____DATE:_____
25             RAYMOND T. LYONS