Gregory M. Petrick
Ingrid Bagby
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

-and-

Mark C. Ellenberg
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, DC 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

*Attorneys for MBIA Insurance Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| **RESIDENTIAL CAPITAL, LLC**, *et al.*, | : | |
| **Debtors.** | : | **Case No. 12-12020 (MG)** |
|  | : | |
|  | : | **(Jointly Administered)** |
|  | : | |
|  | : | |
|  | : | |

----------------------------------------------------------------x

**MBIA INSURANCE CORPORATION'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF CONFIRMATION OF THE JOINT CHAPTER 11
PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC, AND THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ........................................................................................................................1

      A.     The Debtors And Their RMBS Securitization Business.............................1

      B.     MBIA's Claims Against The ResCap Debtors ...........................................2

      C.     MBIA's Status As A Consenting Claimant .................................................4

ARGUMENT................................................................................................................................5

      A.     MBIA's Claims Do Not "Arise From" A Purchase Or Sale Of
           Securities For Purposes Of Section 510(b) ................................................5

      B.     Claims Based On The Obligation To Pay Fixed Amounts Pursuant
           To The Terms Of A Debt Instrument Are Not Within The Scope
           Of Section 510(b).......................................................................................8

      C.     In The Context Of The Global Settlement, The Debtors'
           Agreement To Allow Unsubordinated Claims Is Well Within The
           Range Of Reasonableness..........................................................................10

CONCLUSION...........................................................................................................................13

# TABLE OF AUTHORITIES

**Cases**                                                                                            Page(s)

In re Adelphia Commc'ns Corp., 327 B.R. 143 (Bankr. S.D.N.Y. 2005),
  aff'd sub nom. Ad Hoc Adelphia Trade Claims Comm. v. Adelphia Commc'ns
  Corp., 337 B.R. 475 (S.D.N.Y. 2006) ..................................................................................11

Am. Broad. Sys. Inc. v. Nugent (In re Betacom of Phoenix, Inc.), 240 F.3d 823
  (9th Cir. 2001) ..................................................................................................................7, 8

Anchorage Police & Fire Ret. Sys. v. Official Comm. of Unsecured Creditors of the
  Holding Co. Debtors (In re Conseco, Inc.), No. 03-CV-7054, 2004 WL 1459270
  (N.D. Ill. June 25, 2004)......................................................................................................11

Aristeia Capital, L.L.C. v. Calpine Corp. (In re Calpine Corp.), No. 07 Civ. 8493 (JGK),
  2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007) ...................................................................7, 9

Baroda Hill Invs., Ltd. v. Telegroup. Inc. (In re Telegroup, Inc.), 281 F.3d 133
  (3d Cir. 2002) .........................................................................................................................7

CIT Group, Inc. v. Tyco Int'l, Inc. (In re CIT Group, Inc.), 479 F. App'x 393,
  2012 U.S. App. LEXIS 18696 (2d Cir. Sept. 6, 2012) (affirming CIT Group Inc. v.
  Tyco Int'l Ltd. (In re CIT Group Inc.), 460 B.R. 633 (Bankr. S.D.N.Y. 2011).....................5, 6

CIT Group Inc. v. Tyco Int'l Ltd. (In re CIT Group Inc.), 460 B.R. 633 (Bankr.
  S.D.N.Y. 2011)...........................................................................................................5, 6, 7, 8

In re Cincinnati Microwave, Inc., 210 B.R. 130 (Bankr. S.D. Ohio 1997) ..................................11

In re Drexel Lambert Grp., Inc., 138 B.R. 717 (Bankr. S.D.N.Y.), aff'd sub nom.
  Lambert Brussels Assocs. L.P. v. Drexel Burnham Lambert Grp., Inc. (In re
  Drexel Burnham Lambert Grp., Inc.), 140 B.R. 347 (S.D.N.Y. 1992) ......................................11

In re Enron Corp., 341 B.R. 141 (Bankr. S.D.N.Y. 2006)............................................................8, 9

KIT digital, Inc. v. Invigor Group Limited (In re KIT digital, Inc.), No. 13-11298
  (Bankr. S.D.N.Y. Sept. 5, 2013)............................................................................................5, 6

MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 39 Misc. 3d 1220(A),
  2013 WL 1845588 (Sup. Ct. N.Y. Cnty. Apr. 29, 2013) .........................................................3

MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 963 N.Y.S.2d 21, 21-23 (App. Div. 1st
  Dept. 2013) .............................................................................................................................3

MBIA Ins. Corp. v. GMAC Mortgage, LLC, Index No. 600837/2010
      (Sup. Ct. N.Y. Cnty.)..................................................................................................3

MBIA Ins. Corp. v. Residential Funding Co., LLC, Index No. 603552/2008
      (Sup. Ct. N.Y. Cnty.)..................................................................................................3

In re Marketxt Holdings Corp., 361 B.R. 369 (Bankr. S.D.N.Y. 2007) ..........................8

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),
      478 F.3d 452 (2d Cir. 2007) ...............................................................................10, 12

In re Residential Capital, LLC, 497 B.R. 720 (2013) ...............................................10, 11

Rombro v. Dufrayne (In re Med Diversified, Inc.), 461 F.3d 251 (2d Cir. 2006).......7, 8

In re WorldCom, Inc., No. 02-13533 (Bankr. S.D.N.Y. Aug. 6, 2003) [Docket No. 8125] .........11

**Statutes & Rules**

N.Y. Ins. Law § 3105..........................................................................................................3

N.Y. Ins. Law § 3106..........................................................................................................3

Fed. R. Bankr. P. 9019......................................................................................................10

MBIA Insurance Corporation ("MBIA"), a creditor of the debtors in the above-captioned chapter 11 cases (the "Debtors") and a Consenting Claimant as that term is defined in the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, and the Official Committee of Unsecured Creditors (the "Plan"), respectfully submits this brief (the "Brief") in support of Plan confirmation.

## PRELIMINARY STATEMENT

MBIA submits this Brief in response to the objection (the "Objection") to Plan confirmation filed on October 22, 2013 by the Notes Trustee and the Ad Hoc Committee of Junior Secured Noteholders (collectively, the "JSNs") [Docket No. 5443].  In the Objection, the JSNs assert that MBIA's allowed unsecured claims in Class R-4, Class GS-4A, and Class RS-4 should be subordinated pursuant to section 510(b) of the United States Bankruptcy Code.  The Objection does not challenge the amount of the claims, just the absence of subordination.  As is explained in further detail below, the subordination objection is utterly without merit.

## BACKGROUND

### A.    The Debtors And Their RMBS Securitization Business

In order to finance their businesses, Debtors Residential Capital, LLC ("RFC") and GMAC Mortgage, LLC ("GMACM") periodically sold the residential mortgage loans they acquired or originated to separate trust vehicles.  These mortgage transfers occurred pursuant to purchase and sale agreements in which the selling entity made various representations and warranties about (i) the quality and documentation of the mortgage loans being sold to the trust and (ii) the underwriting standards applied in connection with acquisition of the mortgage loans. The trusts would pay for the loans by borrowing money from investors, in exchange for notes secured by a pledge of the purchased loans.  These notes are known as residential mortgage backed securities, or RMBS.

1

Between October 28, 2004 and May 30, 2007, MBIA agreed to provide financial guaranty insurance policies with respect to eight RMBS transactions associated with RFC and GMACM. In these policies, MBIA insures the contractual obligations of each relevant trust to pay the principal and interest due under the trust's secured notes. Thus, if the mortgages failed to generate sufficient funds to permit the trust to pay principal or interest due under an insured note, MBIA would fund the payment.

In each case where MBIA issued a policy, MBIA first entered into an insurance agreement with either RFC or GMACM, as applicable. The insurance agreements are subject to the New York Insurance Law. Similar to the mortgage purchase and sale agreements with the trusts, the insurance agreements contained representations and warranties by RFC or GMACM to MBIA concerning, among other things, (i) the quality and documentation of the mortgage loans sold to the relevant trust and (ii) the underwriting standards applied in connection with acquisition of the mortgage loans. MBIA issued the policies in reliance on these contractual representations and warranties and on other extra-contractual representations made by RFC and GMACM to induce MBIA to enter into the insurance agreements.

**B.**      **MBIA's Claims Against The ResCap Debtors**

Beginning in late 2007, MBIA observed that the mortgage loans in the trusts it had insured were experiencing extraordinarily high delinquency rates. These high delinquency rates resulted in reduced cash flows to the trusts, leaving the trusts unable to make required principal and interest payments under the secured notes. The trusts' inability to make the required payments in turn triggered MBIA's obligation to make payments pursuant to the insurance policies. MBIA has paid all such claims under its policies, to date. MBIA subsequently concluded that many of the loans – both individually and collectively – evidenced the fact that

2

the Debtors made numerous material misrepresentations that induced MBIA to enter the relevant

insurance agreements.  MBIA also concluded that many of the loans evidenced breaches of the

contractual warranties that the Debtors made to MBIA.

MBIA timely commenced two separate civil actions, one against RFC and one against

GMACM.[1]  In these actions, MBIA asserted various causes of action, including the following:

- Fraudulent Inducement To Enter Into Insurance Agreements:  RFC and GMACM made false statements and representations to MBIA, and thus fraudulently induced MBIA to enter into the MBIA insurance agreements and to issue the related insurance policies. This claim relies on the New York Insurance Law, which provides that a policy issued on the basis of fraudulent misrepresentations may be rescinded, or, alternatively, the insurer may be made whole through compensatory damages.  See N.Y. Ins. Law § 3105; MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 963 N.Y.S.2d 21, 21-23 (App. Div. 1st Dept. 2013).  New York Insurance Law further provides that the only causation proof necessary is proof that the policy would not have been issued either at all or on the same terms had the insurer known the true facts.  The insurer does not have to prove that the misrepresentations caused any specific injury or damages.  See id.; MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 39 Misc. 3d 1220(A), 2013 WL 1845588, at *4 (Sup. Ct. N.Y. Cnty. Apr. 29, 2013).

- Material Breach Of Contract (Insurance Agreement):  RFC and GMACM materially breached the MBIA insurance agreements in their entirety by denying MBIA the benefit of its bargain by, among other things, including tens of thousands of loans in the MBIA-insured trusts in breach of the contractual warranties to MBIA.  See N.Y. Ins. Law § 3106.

- Breach Of Contract (Repurchase Claims):  RFC and GMACM breached their contractual obligations to repurchase from the trusts individual loans that did not conform to the applicable representations and warranties.

- Breach Of Contract (Servicing):  RFC and GMACM breached their contractual obligations to properly service mortgage loans.

After the Debtors commenced the above-captioned chapter 11 cases, MBIA timely filed

six proofs of claim,[2] each in an amount in excess of $2.2 billion, reflecting principal and interest

---

[1] MBIA Ins. Corp. v. Residential Funding Co., LLC, Index No. 603552/2008 (Sup. Ct. N.Y. Cnty.) and MBIA Ins. Corp. v. GMAC Mortgage, LLC, Index No. 600837/2010 (Sup. Ct. N.Y. Cnty.).

payments MBIA had made or expected to make under the policies it had issued.  MBIA's proofs

of claim are based on substantially the same allegations and causes of action as MBIA's pre-

bankruptcy lawsuits against RFC and GMACM.  None of MBIA's claims against the Debtors are

based on state or federal securities law.  None of the claims are based on subrogation to the

rights of RMBS noteholders.[3]

In addition to its claims against the Debtors, MBIA filed a complaint against Ally

Financial Inc.  The complaint alleged that Ally aided and abetted the Debtors in their fraudulent

actions.

### C.    MBIA's Status As A Consenting Claimant

MBIA participated actively in the mediation process established by the Court's

December 26, 2012 Mediation Order [Docket No. 2519].  The global settlement that grew out of

the mediation, and which is embodied in the Plan, includes an agreement to give MBIA certain

allowed, unsubordinated claims.  On August 23, 2013, the Debtors and the Official Committee of

Unsecured Creditors filed the solicitation version of the Plan [Docket No. 4819-2], which defines

MBIA as one of the "Consenting Claimants."[4]    The Plan provides MBIA with allowed,

unsubordinated claims of $1.45 billion against RFC and GMACM, and $719 million against

ResCap, in accordance with the global settlement.  In addition, the global settlement provides for

the settlement of MBIA's direct claims against Ally, and the Plan provides that MBIA's claims

against Ally are released.

---

[2] Claim Nos. 5846 (against Homecomings Financial, LLC), 5847 (against Residential Capital, LLC), 5848 (against Residential Funding Mortgage Securities II, Inc.), 5849 (against Residential Funding Company, LLC), 5850 (against Residential Asset Mortgage Products, Inc.), and 5851 (against GMAC Mortgage, LLC).

[3] See MBIA's proofs of claim (Claim Nos. 5846, 5847, 5848, 5849, 5850, and 5851) and the complaints appended as Exhibit C (RFC complaint) and Exhibit D (GMACM complaint) thereto.

[4] Plan, Article I.A.62.

## ARGUMENT

### A.    MBIA's Claims Do Not "Arise From" A Purchase Or Sale Of Securities For Purposes Of Section 510(b)

In a recent decision – totally ignored by the JSNs – the United States Court of Appeals for the Second Circuit ruled that "the existence of a mere 'connection' between the claim and the purchase or sale of a security is not enough to support a finding that the claim 'arises from' the purchase or sale and should be subordinated unless the purposes of [section 510(b)] would be served [by subordination]." CIT Group, Inc. v. Tyco Int'l, Inc. (In re CIT Group, Inc.), 479 F. App'x 393, 395, 2012 U.S. App. LEXIS 18696, at *5 (2d Cir. Sept. 6, 2012) (affirming CIT Group Inc. v. Tyco Int'l Ltd. (In re CIT Group Inc.), 460 B.R. 633 (Bankr. S.D.N.Y. 2011)).

In CIT Group, the debtor and its former parent entered into a "Tax Agreement" prior to the debtor's bankruptcy filing as a means of "smoothing" an initial public offering of the debtor's stock. After filing for bankruptcy, the debtor rejected, and thus breached, the Tax Agreement, and the former parent filed a proof of claim based on this breach. The debtor sought to subordinate the claim under section 510(b) of the Code, but failed. Id. at 395. In the underlying Bankruptcy Court decision affirmed by the Second Circuit, the Bankruptcy Court readily acknowledged that there was, in fact, "a nexus" between the breached Tax Agreement and the issuance of the debtor's stock,[5] but the Court nonetheless *rejected* the debtor's argument that "a causal connection between the claim and a securities transaction is enough to require subordination." Id. at 395.[6] Indeed, the Bankruptcy Court went so far as to concede that the Tax Agreement "was arguably an integral part of the IPO," but nonetheless held that the claim for

---

[5] CIT Group, 460 B.R. at 639.

[6] See also KIT digital, Inc. v. Invigor Group Limited (In re KIT digital, Inc.), No. 13-11298 (Bankr. S.D.N.Y. Sept. 5, 2013) (noting that in CIT Group "there was a nexus" between the breach of contract claims and a sale of securities, "but that nexus was insufficient").

5

breach of the Tax Agreement was not subject to subordination, in part because the Tax Agreement was not, itself, a contract for the purchase or sale of securities. CIT Group Inc. v. Tyco Int'l Ltd. (In re CIT Group Inc.), 460 B.R. 633, 639-40 (Bankr. S.D.N.Y. 2011). Specifically, the Bankruptcy Court held that "[t]he fact that the Tax Agreement was part of a set of agreements . . . executed to facilitate the IPO, but that the IPO was the actual sale of the Reorganized Debtor's securities by [the debtor] to third-party purchasers, puts [the former parent's claim for breach of the Tax Agreement] outside even a broad reading of [section 510(b)]." Id. at 642.[7]  On appeal, the Second Circuit affirmed, "substantially for the reasons stated in [the Bankruptcy Court's] thoughtful and comprehensive . . . Memorandum of Opinion." CIT Group, 479 F. App'x at 395-96.

CIT Group is on all fours with this case, and is fully determinative of the outcome. Like the unsubordinated breach of contract claims in CIT Group, MBIA's claims relate to an agreement (the insurance agreement) that was one of a set of agreements facilitating the sale of mortgages to trusts, and the borrowing by those trusts through the issuance of RMBS. As in CIT Group, the facts that (i) the insurance agreement was not itself a contract for the purchase or sale of securities and (ii) the actual sale of securities was to third-party purchasers (i.e. the RMBS noteholders), and not to MBIA, places MBIA's claims well outside the ambit of section 510(b).

MBIA's damages are measured by the direct out of pocket payments it made and expects to make under its policies. Those payments fulfilled payment obligations of the trusts, not payment obligations of the Debtors. At least as importantly, MBIA's claims are based on the New York Insurance Law and state law contract theories, not the securities laws.

---

[7] See also id. (noting that section 510(b) did not apply in CIT Group, because the sale of securities was to "unnamed [third] parties in the outside world").

6

MBIA has not asserted a subrogation claim based on its policy payments to RMBS noteholders.  MBIA has not asserted damages based on the prices of the RMBS notes at any point in time.  To the extent the holders of the RMBS notes in the trusts MBIA insured have securities law claims, the noteholders still own those claims.

The JSNs' entire argument for subordination rests on the canard that MBIA has "asserted fraud and breach of contract claims with respect to the underlying securities."  Objection, at § 85.  This is a patent distortion of the claims that MBIA asserts.  The claims are based on direct contractual privity with RFC or GMACM, on duties owed directly to MBIA in connection with MBIA's issuance of the insurance policies, and on the New York Insurance Law.  Neither the "underlying securities" nor the securities laws have anything to do with MBIA's claims.  Once deprived of its distorted assumption of fact, the JSNs' entire legal argument collapses.

The cases relied on by the JSNs in no way require a different result.  Each of the claims subordinated in the cases cited by the JSNs in their Objection were asserted either by (i) a purchaser of the debtor's securities or (ii) a prospective purchaser who suffered damages as a result of being denied an opportunity to acquire the debtor's securities.[8]  See CIT Group, 460 B.R. at 642 (noting that "cases that have held that shareholder status is not necessary for subordination [under section 510(b)] have invariably been grounded on the deprivation of the

---

[8] See, e.g., Rombro v. Dufrayne (In re Med Diversified, Inc.), 461 F.3d 251, 254-59 (2d Cir. 2006) (subordination of claim for damages based on a breach of a right to receive stock under an executive termination agreement); Aristeia Capital, L.L.C. v. Calpine Corp. (In re Calpine Corp.), No. 07 Civ. 8493 (JGK), 2007 WL 4326738, at *13 (S.D.N.Y. Nov. 21, 2007) (subordination of claim for damages arising from the alleged elimination of the right to purchase common stock through the conversion of convertible notes); In re Enron Corp., 341 B.R. 141, 151; 161 (Bankr. S.D.N.Y. 2006) (subordinating claims based on loss of value of stock options purchased by employees); Baroda Hill Invs., Ltd. v. Telegroup. Inc. (In re Telegroup, Inc.), 281 F.3d 133, 137 (3d Cir. 2002) (subordinating claims asserted by purchasers of stock for damages based on the debtor's alleged breach the stock purchase agreement); Am. Broad. Sys. Inc. v. Nugent (In re Betacom of Phoenix, Inc.), 240 F.3d 823 (9th Cir. 2001) (claim for failure to convey stock in breach of a merger agreement).

7

opportunity to become a shareholder"). The JSNs fail to cite any cases in which a court

subordinated the claims of a claimant, like MBIA, who neither acquired nor sought to acquire

any of the relevant debtor's securities.

Indeed, the JSNs' principal precedent, Rombro v. Dufrayne (In re Med Diversified, Inc.),

461 F.3d 251 (2d Cir. 2006), involved subordination of a claim based on an alleged contractual

right to receive stock under an executive termination agreement. Not only is MBIA's claim

completely different, but Med Diversifed predates CIT Group. Thus, the limited reach of both

Med Diversified and section 510(b) is clear.

### B.    Claims Based On The Obligation To Pay Fixed Amounts Pursuant To The Terms Of A Debt Instrument Are Not Within The Scope Of Section 510(b)

The JSNs also assert that MBIA's claims are subject to section 510(b) subordination

because MBIA "assumed the same risk of loss as the ultimate purchasers of the RMBS."

Objection, at § 85. This argument also fails, however, because the only risk that MBIA assumed

was the risk that the trusts would fail to make monthly principal and interest payments. Claims

that are based on a debt issuer's obligation to pay fixed amounts pursuant to the terms of a debt

instrument are not subject to subordination under section 510(b). See, e.g., In re Marketxt

Holdings Corp., 361 B.R. 369, 388-90 (Bankr. S.D.N.Y. 2007) (holding that claims based on the

debtor's obligation to make payments on promissory notes were not subject to section 510(b)

subordination); In re CIT Group Inc. 460 B.R. at 643 (noting that the SDNY Bankruptcy Court,

in Marketxt, declined to subordinate a claim for a "fixed amount"); In re Enron Corp., 341 B.R.

141, 157 (Bankr. S.D.N.Y. 2006) (stating that "where the claim is for a fixed amount and does

not arise in parallel with the fortunes of the share price, the courts are inclined to read

section 510(b) narrowly"); see also Am. Broad. Sys. Inc. v. Nugent (In re Betacom of Phoenix,

8

Inc.), 240 F.3d 823, 829 (9th Cir. 2001) (contrasting shareholder claims subject to section 510(b) subordination with creditor claims for "repayment of a fixed debt," which are not subject to section 510(b) subordination).

Instead, courts generally read the phrase "damages" in section 510(b) to mean *only* "damages flowing from changes in the debtor's share price," *not* damages flowing from a failure to make payments on a debt instrument. Enron, 341 B.R. at 157 (noting that "[t]hough the statutory language [of section 510(b)] refers only to 'damages,' the courts reasonably read this to mean 'damages flowing from changes in the debtor's share price'"); see also Aristeia Capital, L.L.C. v. Calpine Corp. (In re Calpine Corp.), No. 07 Civ. 8493 (JGK), 2007 WL 4326738, at *13 (S.D.N.Y. Nov. 21, 2007) (holding that claims by holders of convertible notes based on an alleged loss of conversion rights were subject to subordination *because* the value of the conversion rights varied with the value of the debtor's common stock). Indeed, if it were otherwise, the JSNs' own claims would be subject to mandatory subordination under section 510(b), because the JSNs' claims are based on the Debtors' obligation to make principal and interest payments pursuant to debt instruments that are securities.

Notably, MBIA did *not* insure RMBS noteholders against any losses related to changes in the *price* of the Debtors' securities. Consequently, MBIA did not assume the only type of risk to which section 510(b) might apply.[9]

---

[9] Significantly, none of the cases cited by the JSNs involved the subordination of claims arising from an issuer's failure to make payments under a debt instrument. On the contrary, in one of the cases the JSNs cite, Calpine Corp., 2007 WL 4326738, at *2; *13, the SDNY Bankruptcy Court (as later affirmed by the District Court) *allowed* noteholder claims for payment of principal and interest as *general unsecured claims*, but subordinated noteholder claims that were based on an alleged right to convert the notes into common stock. The SDNY Bankruptcy Court's differing treatment of these two classes of claims clearly demonstrates that claims based on the alleged loss of an opportunity to acquire stock "arise from" the purchase or sale of a security for purposes of section 510(b), whereas claims like MBIA's, which are

C.      **In The Context Of The Global Settlement, The Debtors' Agreement
To Allow Unsubordinated Claims Is Well Within The Range Of
Reasonableness**

The Debtors' agreement to treat MBIA's claims as unsubordinated general unsecured

claims constitutes an essential building block of the Debtors' settlement with MBIA and of the

larger global settlement.  As such, the Debtors' agreement not to seek subordination of MBIA's

claims, like the other elements of the Debtors' settlement with MBIA, is subject to Bankruptcy

Rule 9019's "fair and equitable" standard for the approval of bankruptcy settlements.  See Fed.

R. Bankr. P. 9019; Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium

Operating LLC), 478 F.3d 452, 461-62 (2d Cir. 2007) (defining the "fair and equitable" standard

for approval of settlements under Rule 9019).

In the September 13, 2013 Memorandum Opinion and Order [Docket No. 5042]

approving the Debtors' settlement with monoline insurer FGIC, this Court ruled that the FGIC

Settlement was "fair, equitable, and in the best interests of the estates."  In re Residential Capital,

LLC, 497 B.R. 720, 750 (2013).  One of the aspects of the FGIC Settlement that the Court

approved was the allowance of FGIC's claims as *unsubordinated* general unsecured claims.  See

Id. at 751-52.

In their objection [Docket No. 4027] to the FGIC Settlement, the JSNs raised arguments

regarding section 510(b) that are virtually identical to the arguments raised in their Objection to

Plan confirmation.  Specifically, the JSNs asserted that the FGIC Settlement was unreasonable

because it settled claims that could otherwise be subordinated under section 510(b) of the

Bankruptcy Code.  See Residential Capital, 497 B.R. at 751.  The Court overruled the JSNs'

---

based on an issuer's obligation to pay principal and interest, do not "arise from the purchase or sale of a
security," and thus do not fall within the scope of section 510(b).

objection to the FGIC Settlement, however, stating that "it is far from clear that [FGIC's Claims] would be subordinated" and that "[a]t the very least, whether these claims should be subordinated would be hotly contested." Id. at 751 (citing CIT Group, Inc. v. Tyco Int'l, Inc., 479 F. App'x 393, 2012 U.S. App. LEXIS 18696, *4-5 (2d Cir. Sept. 6, 2012)). After citing numerous cases in which courts in this District have approved settlements involving claims that were *potentially* subject to subordination,[10] this Court distinguished the cases cited by the JSNs, pointing out that "in all of the cases cited by the JSNs, the claims at issue were *clearly* subject to subordination, and only one case involved a Rule 9019 motion." Id. at 752 (emphasis added).

In their pending Objection to Plan confirmation, the JSNs simply cite the same cases that this Court already distinguished in its opinion approving the FGIC Settlement.[11] Thus, in their Objection to Plan confirmation, just as in their earlier objection to the FGIC Settlement, "[t]he JSNs have failed to provide any authority holding that a court cannot approve a settlement where the claims could potentially be subordinated." Residential Capital, 497 B.R. at 752.

---

[10] See In re WorldCom, Inc., No. 02-13533 (Bankr. S.D.N.Y. Aug. 6, 2003) [Docket No. 8125] (approving a settlement that involved claims that may be subject to subordination); In re Adelphia Commc'ns Corp., 327 B.R. 143,168-70 (Bankr. S.D.N.Y. 2005), aff'd sub nom. Ad Hoc Adelphia Trade Claims Comm. v. Adelphia Commc'ns Corp., 337 B.R. 475, 478 (S.D.N.Y. 2006) (same); In re Drexel Lambert Grp., Inc., 138 B.R. 717, 719 (Bankr. S.D.N.Y.) (approving settlement resolving various employee ERISA and compensation claims "related principally to the purchase or acquisition of stock by employees or the divesture of stock by employees" over objections that those claims should be subordinated under section 510(b) where it was unclear whether ERISA overrode the mandates of section 510(b)), aff'd sub nom. Lambert Brussels Assocs. L.P. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.), 140 B.R. 347 (S.D.N.Y. 1992)).

[11] See Anchorage Police & Fire Ret. Sys. v. Official Comm. of Unsecured Creditors of the Holding Co. Debtors (In re Conseco, Inc.), No. 03-CV-7054, 2004 WL 1459270, at * 3 (N.D. Ill. June 25, 2004), and In re Cincinnati Microwave, Inc., 210 B.R. 130, 132-33 (Bankr. S.D. Ohio 1997), which are cited in Objection of the Ad Hoc Group of Junior Secured Noteholders to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees, and Certain Institutional Investors [Docket No. 4027], at § 32, and in the Objection at § 77. This Court further distinguished the Cincinnati Microwave case by noting that "[in Cincinnati Microwave] the court denied the motion because the settlement was not in the best interest of creditors; it did not determine that claims subject to subordination cannot be settled." Residential Capital, 497 B.R. at 752.

Indeed, as demonstrated above, MBIA's claims do not qualify as even "potentially" subject to subordination. Instead, the relevant case law indicates that MBIA's claims are clearly *not* subject to subordination. The Debtors' agreement to treat MBIA's claims as unsubordinated general unsecured claims is thus all the more reasonable in light of the fact that any effort by the Debtors to subordinate MBIA's claims would have had an extremely low "possibility of success." See <u>Iridium</u>, 478 F.3d at 462 (instructing courts, in approving a bankruptcy settlement, to consider "the litigation's possibility of success"). Accordingly, the Debtors' agreement not to subordinate MBIA's claims easily satisfies the Rule 9019 standard for approval of a bankruptcy settlement.

Moreover, MBIA also has agreed to release its direct claims against Ally and to dismiss the pending action against Ally. This further buttresses the reasonableness of the settlement.

For the same reasons, and for the reasons stated in the brief in support of confirmation submitted by the Plan Proponents, the entire global settlement should be approved, and all objections to confirmation overruled.

## CONCLUSION

Because the Plan appropriately treats MBIA's claims as general unsecured claims, and because the JSNs' contention that MBIA's claims are subject to mandatory subordination is without merit, MBIA respectfully asks the Court to overrule the Objection. For the reasons stated by the Plan Proponents, all other objections should be overruled, as well, and the Plan should be confirmed.

Dated: New York, New York
        November 12, 2013

**CADWALADER, WICKERSHAM & TAFT LLP**


By */s/ Mark Ellenberg*
Gregory M. Petrick
Ingrid Bagby
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

-and-

Mark C. Ellenberg
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, DC 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

*Attorneys for MBIA Insurance Corporation*