# EXHIBIT 1

12-12020-mg    Doc 5670-1    Filed 11/12/13    Entered 11/12/13 16:56:11    Exhibit
Pg 1 of 5

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

In re:
COMMUNITY BANK OF NORTHERN VIRGINIA
AND GUARANTY NATIONAL BANK OF
TALLAHASSEE SECOND MORTGAGE LOAN
LITIGATION

Case No. 03-425

Hon. Gary L. Lancaster

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

R. Bruce Carlson, Pa. I.D. #56657
**SPECTER SPECTER EVANS**
  **& MANOGUE, P.C.**
The 26th Floor
**LLC**
Koppers Building
Pittsburgh, Pennsylvania 15219
(412) 642-2300

A. Hoyt Rowell, III
Daniel O. Myers
**RICHARDSON, PATRICK,**
**WESTBROOK & BRICKMAN,**

1037 Chuck Dawley Blvd., Bldg. A
Mt. Pleasant, SC 29464
(843) 727-6500

*Co-Class Counsel*

48. EquityPlus paid the salaries of all of the employees of the mortgage operation, the substantial direct mail marketing costs, the office rent and all other overhead.

49. CBNV had no supervisory authority with respect to the increasingly massive EquityPlus lending operation which was generating a huge volume of loans in CBNV's name. Instead, EquityPlus operated its mortgage loan business, which was now making loans in CBNV's name, with complete autonomy.

50. EquityPlus contracted with Harte Hanks Direct Marketing of San Antonio, Texas, to support the massive direct mail campaign used to market the loans.

51. Prospective borrowers would apply with EquityPlus by phone and loan closing and funding typically occurred in as little as fifteen days from the initial phone call from the borrower.

52. EquityPlus sometimes disregarded federal notice and disclosure requirements in connection with the origination of these loans. On occasion, disclosures that should have been supplied to borrowers in advance of closing were not supplied until the time of closing.

53. Because borrowers were sometimes not provided with disclosures that required their signature either until the time of closing, or not at all, EquityPlus is rumored to have set up "tracing tables" in its offices on occasion, so that loan processors could forge borrowers' signatures on required documents.

54. On May 15, 1998, Defendant GMAC-RFC entered into an agreement with CBNV whereby it agreed to purchase all of the loans being originated by EquityPlus in CBNV's name. GMAC-RFC dealt almost exclusively with EquityPlus and the Shumway/Bapst operation, generally, as opposed to CBNV, with respect to all matters relating in any way to the origination of these loans and to GMAC-RFC's ultimate purchase of these loans.

55. While Plaintiffs believe that CBNV funded the loans, its ability to fund the loans was wholly dependent upon the fact that GMAC-RFC was committed to purchase the loans shortly after closing. In other words, CBNV did not have the financial wherewithal to provide the reserves that would have been required to hold these loans in its own portfolio.

56. Notwithstanding that the loans were made in the name of CBNV, GMAC-RFC at all material times knew that CBNV was a straw-party that had virtually no input with respect to the origination and underwriting of the loans. Representatives of GMAC-RFC were regular visitors to the EquityPlus operation, and GMAC-RFC was unambiguously aware of who was in charge of the operation. GMAC-RFC always dealt with the management and employees of EquityPlus regarding business issues that arose in connection with these loans, not with the management or employees of CBNV.

57. In addition, at all material times GMAC-RFC knew that contrary to the representations in the Settlement Statements used in connection with the loans, the overwhelming majority of the origination fees were being paid to EquityPlus, not CBNV.

58. Similarly, at all material times GMAC-RFC knew that contrary to the representations in the Settlement Statements, virtually no services were performed by the Shumway/Bapst controlled title companies in exchange for most of the fees for "title services" that were imposed upon the borrowers.

59. The Shumway/Bapst title companies, Title America, LLC, for CBNV loans and USA Title, LLC, for EquityGuaranty loans, did not have their own employees but instead shared employees with EquityPlus and EquityGuaranty.

9

60. The Shumway/Bapst title companies were not separately capitalized, but instead shared funds with EquityPlus and EquityGuaranty.

61. The Shumway/Bapst title companies did not manage their own business affairs, but instead were controlled completely by Messrs. Shumway and Bapst.

62. The Shumway/Bapst title companies operated solely as captives of EquityPlus and EquityGuaranty and did not otherwise compete in the marketplace for business.

63. GMAC-RFC's knowledge and level of participation is discussed in more detail below.

64. As mentioned above, CBNV was compensated for its willingness to permit the loans to be made in its name. This compensation was in two forms: 1) CBNV was paid the short term interest float on the loans between the time of funding and the date on which GMAC-RFC formally purchased the loans; and, 2) CBNV was paid 1-2 points of the average 10-12% (of the original principal balance) in origination fees collected in connection with each loan transaction.

65. Between approximately May of 1998 and December of 1999, CBNV derived significant income as a function of its agreement to permit EquityPlus to originate loans in the CBNV name.

66. By December of 1999, however, EquityPlus had concluded that CBNV was being too "greedy" with respect to the fees that it was receiving in exchange for nothing beyond its willingness to permit EquityPlus to make the loans in CBNV's name.

67. As a result, the owners of EquityPlus approached a second financially distressed bank – this time a national bank doing business as Guaranty National Bank of Tallahassee (hereinafter

10