# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br>COMMUNITY BANK OF NORTHERN<br>VIRGINIA AND GUARANTY NATIONAL<br>BANK OF TALLAHASSEE SECOND<br>MORTGAGE LOAN LITIGATION | : Case No. 03-425<br>:<br>:<br>: Hon. Gary L. Lancaster<br>:<br>: Electronically Filed |

**PLAINTIFFS' BRIEF ADDRESSING THE THIRD CIRCUIT
MANDATE THAT THE RECORD BE SUPPLEMENTED ON REMAND**

**I.     Introduction**

At issue here is the propriety of a proposed class action settlement with a cash value in excess of $33,000,000.00 negotiated on behalf of more than 44,000 residential mortgage borrowers residing throughout the country. The proposed settlement relates to multi-jurisdictional litigation that was commenced by class counsel beginning on May 1, 2001.[1] The litigation challenges the legality of certain settlement fees charged to consumers in connection with second mortgage loans.

The defendants in the case are Community Bank of Northern Virginia n/d/b/a Mercantile Bank (hereafter referred to as "CBNV"), Guaranty National Bank of Tallahassee (now represented by the FDIC as receiver—hereafter referred to as "GNBT") and Residential Funding Corporation (hereafter referred to as "RFC"). The two banks funded the loans in dispute, which

---

[1] The term "class counsel" refers to Bruce Carlson, of the law firm Carlson Lynch, LTD, and Hoyt Rowell and Daniel Myers of the law firm Richardson, Patrick, Westbrook and Brickman. These counsel acknowledge that there is disagreement about how the Third Circuit opinion impacted the District Court's Order conditionally certifying the class and appointing them as class counsel. In acknowledgement of this dispute, the term "class counsel" is used here not as a term of art, but for ease of reference.

418 F.3d at 307. On remand, however, class counsels' supplementation of the record will address these mischaracterizations by the objectors and correct any gaps in the record regarding the adequacy of their investigation.

### B. The Reality Of Class Counsels' Informal Investigation

While the appeal of this Court's order approving the settlement was pending before the Third Circuit, the objectors' filed a Motion for Leave to Supplement the Record on Appeal. In the motion, the objectors requested that the Third Circuit take judicial notice of various items, in relevant part including the pre-filed testimony of Michael Kevin Morin, a former insider who managed the direct mail marketing subsidiary of the Shumway Operation. Mr. Morin is also the former college roommate of the key principals in the Shumway Operation and knew them very well on a personal level.

In the pre-filed testimony, Mr. Morin says some fairly damning things about the former Shumway Operation, some of it based upon first hand knowledge, and most of it clearly reported to Mr. Morin in a manner that was several steps removed. Mr. Morin's testimony was proffered by the Virginia State Corporation Commission in opposition to a mortgage license application that was filed on behalf of Calusa Investments, the successor entity to the Shumway Operation.[11] Commenting on this material in their Motion to Supplement the Record On Appeal (before the Third Circuit), the objectors stated:

> The pre-filed testimony of Mr. Morin was obtained by the Virginia State Corporation Commission in connection with Calusa Investment's perhaps misguided attempt to obtain a mortgage broker's license in Virginia and was obtained by Appellant's through the Virginia State Corporation Commission's website . . . .

---

[11] Notwithstanding opposition to the application by the Virginia state regulators, said application was ultimately approved by Order dated December 13, 2004. Supplemental Compendium at Exhibit 10.

12

> This material is only a sample of what is now available, along with the hundreds of other exhibits and pages of testimony of "insiders," in the public domain through the website. This material leaves little question as to what information regarding the predatory lending scheme was available through discovery – the same discovery sought by Appellants and shut down by the district court **and the same discovery class counsel did not do**.[12]

(emphasis added). The problem with this characterization of class counsels' investigation – which was accepted by the Third Circuit – is that it is false.[13] In fact, class counsel Bruce Carlson began what was to become an ongoing dialogue with Michael Morin in January 2003, after Jonathan Finer, an investigative reporter for the Washington Post, called Carlson (in November 2002) to discuss the litigation and suggested that Mr. Morin was anxious to talk to him (Carlson) about the litigation.

On January 29, 2003, Carlson received an e-mail from Mr. Morin, in which he (Mr. Morin) indicated that he was a senior employee of the direct mail marketing subsidiary of the Shumway Operation between March 2001 and March 2002 and that further, he possessed "information which could be very useful to your efforts against that operation."[14] From the day of that e-mail forward, Carlson had very regular contact with Mr. Morin. Carlson first met face

---

[12] *See also*, Lead objectors' counsels' brief on appeal to the Third Circuit at n.3: "[A]dditionally, Appellants have referred the Court to the testimony of Michael Morin, a former executive within the Shumway Organization before the Virginia State Corporation Commission. This testimony is addressed in, and is the subject of, Appellants contemporaneously filed Motion to Supplement the Record on Appeal and for Judicial Notice. This testimony gives a clear and startling view of the Shumways' rouge [sic] lending operation and utter disdain for compliance with any lending laws or regulations."

[13] Ironically, while objectors' counsel attacked the adequacy of class counsels' investigation before the Third Circuit, they applauded the investigation when they appeared before this Court at the Fairness Hearing. Specifically, they stated: (objectors' counsel Vaughan): "Certainly Mr. Carlson has to be congratulated for the efforts that he did in uncovering this scheme . . . . Certainly he deserves a great deal of credit for that work;" (objectors' counsel Borison): "[I] also applaud their efforts, they did a lot of work, I am not taking anything away from them." FH Transcript at page 35, line 11, page 40, line 24, Supplemental Compendium at Exhibit 1.

[14] *See* January 29, 2003, e-mail from Mike Morin to Carlson attached to Supplemental Compendium at Exhibit 11.

13

to face with Mr. Morin in Northern Virginia on January 31, 2003.[15] Information provided by Mr. Morin, either directly or indirectly, permitted class counsel to corroborate facts developed in their prior investigation into the conduct in dispute.[16]

Unbeknownst to objectors' counsel, in addition to the testimony offered in connection with the Calusa license application, Mr. Morin also provided deposition testimony in another related regulatory matter during this same general time frame. Carlson was provided with a copy of the deposition subpoena in connection with that other matter.[17] While Carlson was vacationing with his family during the winter of 2003, Mr. Morin called Carlson on his (Carlson's) cell phone immediately after he (Mr. Morin) completed his deposition testimony in this other related regulatory matter, and discussed his testimony with Carlson in detail. In short, Carlson not only knew Mr. Morin, he knew him very well and conversed with him on a regular, at times daily, basis about Mr. Morin's knowledge of the events in dispute.

Furthermore, Carlson shared information developed in his investigation with the Virginia State Corporation Commission when lawyers for the Commission contacted him in connection with the Calusa license application. The regulatory investigation in connection with the Calusa application was driven by information developed in the first instance *by Carlson* and/or his investigator. Ironically then, not only is the pre-filed testimony of Mr. Morin **not** evidence of the inadequacy of class counsels' investigation, but in reality, the Virginia state regulators *learned the identity of Mr. Morin, and many other relevant witnesses, from class counsel.*[18]

---

[15] Carlson was accompanied by his investigator during this initial face-to-face meeting. See Carlson Supplemental Declaration at ¶ 4; Brian Thomas Affidavit at ¶ 53-54, Supplemental Compendium at Exhibits 3 and 12.

[16] *See* Thomas Affidavit at ¶ 53; Supplemental Carlson Declaration at ¶ 5, Supplemental Compendium at Exhibits 3and 12.

[17] Supplemental Compendium at Exhibit 13.

[18] Thomas Affidavit at Exhibit H, Supplemental Compendium at Exhibit 12.

14

In addition to Mr. Morin, class counsel and/or his investigator (Brian Thomas) did background checks regarding, and/or interviewed a large number of additional knowledgeable witnesses. Class counsel learned of the content of important written communications among the stakeholders in this litigation. These witnesses or sources included, *inter alia*, David Shumway, Lisa Perdue,[19] Theresa Ritter,[20] Jonathan Finer (Washington Post reporter), Rocky Scott (Tallahassee Democrat reporter), Tom Eck, Carl Mugnolo, James Bell, Lee Jacobsen, George Hopper, Mary Helms, Mary Jo Speier, Jerry Hartzell (a lawyer representing plaintiffs in another class action based upon the same transactions, who conducted his own personal investigation and discovery),[21] and a host of other loan officers, employees, and other sources, including: Joseph Malone, David Dickens, William Easby-Smith, Norman Hardee, Cyrus Katzen, Otis Poole, David Summers, James Thomson, Malcom Mitchell, Paul McGlone, Jack Grace, Linda

---

[19] Lisa Perdue handled the accounting functions for Title America and USA Title and indicated that the financial statements for the title companies were audited by public accounting firms on an annual basis. She stated the title companies at one time employed in excess of forty individuals, all of whom provided title services for CBNV, and then GNBT loans. *See,* Supplemental pre-filed testimony of Lisa Perdue, attached to Supplemental Compendium at Exhibit 14.

[20] *See* February 8, 2003, e-mail from Mike Morin to Carlson relaying the sum and substance of a conversation between Mr. Morin and Ms. Ritter, and suggesting that Carlson call Ms. Ritter, Supplemental Compendium at Exhibit 15.

[21] Lawyer Jerry Hartzell is an experienced complex litigation attorney, generally, and an experienced consumer finance attorney, specifically. He is the lawyer who took the deposition of Mary Jo Speier in connection with the transactions in dispute. He (Mr. Hartzell) originally filed "conditional objections" to the proposed settlement, on behalf of two North Carolina borrowers, which challenged certain of the administrative aspects of the proposed deal. However, he *never* challenged the monetary sufficiency of the proposed deal. To the contrary, he repeatedly endorsed the adequacy and reasonableness of the proposed settlement to Carlson, and confirmed that fact at the original Fairness Hearing, to wit: (Mr. Hartzell: "It does in fact accurately convey my belief that a $33 million settlement is not objectionable because of the amount.") *See* FH Transcript at page 27, line 11, Supplemental Compendium at Exhibit 1. The "conditional objections" filed by Mr. Hartzell on behalf of his North Carolina clients were ultimately withdrawn and he did not appeal this Court's Order approving the settlement.

15

Alexionok, David A. Barrett, Rica Barrett, Lawrence H. Fuchs, Kenneth Fuqua, Wilma Lauder, Marilyn Newton and Frederic Vroom.[22]

As noted above, then, in addition to the information provided by Mr. Morin and various other witnesses that was critical of the Shumway Operation, the banks and RFC in various respects, class counsel also developed information from witnesses who defended the conduct at issue, either in whole or in part. Most significantly for purposes of the current discussion, the investigation yielded information corroborating the fact that services were performed in exchange for title fees charged to borrowers at loan closing.[23]

Mr. Morin's testimony in connection with the Virginia licensure proceedings for Calusa Investments does not tell the whole story of his knowledge. The knowledge that he did *not* disclose in his testimony highlights an obvious problem with the TILA/HOEPA claims. Mr. Morin knew that there were employees who worked exclusively for the title companies and he knew that these individuals performed title services in connection with the loans at issue.[24]

The title companies that provided services in connection with the majority of the loans in dispute were real companies staffed by real people who performed real services. Mary Jo Speier, who was the president of Title America (which serviced the majority of the loans for CBNV) and USA Title (which serviced the majority of the loans for GNBT) is a lawyer. Ms. Speier was

---

[22] Thomas Affidavit at ¶ 50, Supplemental Compendium at Exhibit 12.

[23] The Shumway Operation was headquartered in a massive 80,000 square foot facility at 4501 Singer Court, Chantilly, Virginia. Class counsel Carlson personally visited the facility with his investigator and was familiar with the general lay out of the building. Though the employees of the various title companies were housed in this building, they were segregated from other employees in the Shumway Operation. Supplemental Carlson Declaration at ¶ 6; Thomas Affidavit at ¶ 62, Supplemental Compendium at Exhibits 3 and 12.

[24] In the Final Order granting Calusa Investment's Virginia license application, the presiding judge noted that most of Mr. Morin's testimony had been stricken as inadmissible, stating, "[w]e do not believe that the rank, uncorroborated hearsay allegations that were stricken upon objection constitute 'probative' evidence." *See Final Order at n. 2.* Supplemental Compendium at Exhibit 10.

16

deposed in a related case captioned *Bumpers v. Community Bank of Northern Virginia, et al.* Her testimony in that case is completely consistent with the information developed by class counsel in their investigation. The testimony describes, *inter alia,* the services provided in exchange for the Line 1102 and 1103 fees. Specifically, Ms Speier testified:

Q: Now, what did you understand that Title America was to do in its role as a title and settlement coordination company? What specific tasks was Title America to perform?

A: Okay. Title America was to accept orders for property reports or current owner searches.

And then they were to place those orders with abstractors. And what we did was we placed those orders with a company by the name of General American Corporation, by and large; and they have a network of abstractors all over the country that actually go to the courthouses and do the search.

The search was limited to a current owner search. And the results of the search would come back to Title America in the form of a – we called them property reports.

And what was contained in the property report was the deed record, the mortgage record, the judgment record, the tax record, and the legal description for this particular piece of property that would serve as security under the mortgage loan.

All right. So our function was to make sure those orders got out, that they were tracked, and that they came back in to a hub, Title America, sort of coordinating so that all of this then got disseminated back out to Community Bank of Northern Virginia.

Then what we were to do was to process that particular information, determine – knowing that Community Bank wanted to be in second position, to make sure that that – not to – you know, to process it to find out, okay, this has three mortgages on the report, and are these old mortgages that were never released? Are these active mortgages?

There is, you know, a million John Smith judgments for this Mr. John Smith, investigate the judgments, talk to the borrower. So process that report.

And then give the fruits of that process to Community Bank so that they could make a decision whether they wanted to lend on this transaction or

17

not.

If they made a decision that they wanted to lend on the transaction, then the next step at Title America was to coordinate the closing of the actual loan, the presentation and execution of the loan documents.

And they did that through independent contractors, a network of independent contractors across the country.

Then those documents were to come back to Title America once they were executed. We were to track them, make sure that they got back in time, log the package in, open it up, look to make sure that it was – you know, that the people signed where they were supposed to, the notary notarized correctly, that all of the documents were returned, and then get them back to the lender.

For instance, if a notary forgot to seal the documents, which can happen, if the borrower forgot to sign a particular line, we would then coordinate the effort to get that corrected.

Then once the loan was funded, Title America was responsible to disburse the loan funds.

And so they would have to assure that the money for this particular transaction made it into their trust account. They would have to reconcile and balance that money with the settlement statement.

They would have to cut the checks, package them up, get them to the borrower, or the mortgage company if you are paying off an existing second mortgage. They would obviously have to pay any type of liens they would pay off directly.

They would have to reconcile those trust accounts to make sure that they were – each individual transaction had its own ledger and that it balanced.

And then they had to coordinate the recordation of the mortgage. So They would forward the mortgage to the county courthouse. They would track it. They would make sure it got recorded. They took care of any rejection and cleaned those up to make sure it got recorded.

And then they would report back to Community Bank all the recording information and get those original mortgages returned back to Title America. And they were sent out back to Community Bank once they were recorded.

18

> So it was very departmentalized, very assembly line like, and that's what Title America did.
>
> \* \* \* \*
>
> Q: 1102 is title abstract or title search. What did that fee cover?
>
> A: That covered the actual search and then coordination of service to get that out to the abstractor get it back, get it printed, get it in-house.
>
> Q: 1103 it titled title examination. What fees did that cover?
>
> A: That included a review of the actual results of the abstract search and any resolution of title issues.[25]

The title companies employed over forty people. It is simply indisputable that they were performing title services in connection with the loans at issue, and it cannot be credibly disputed that the fees charged in connection with these services were "[f]ees for title examination, abstract of title, title insurance, property survey, *and similar purposes*," and thereby properly excludable from the Finance Charge calculation pursuant to Regulation Z.

The chronological history of class counsels' investigation is set forth in the Thomas Affidavit.[26] The investigation was thorough, extensive and more than adequate to permit class counsel to assess the strengths and weaknesses of the case against defendants. It is well-settled that so-called formal discovery does not warrant talismanic significance. *See, e.g., In re Cendant Corporation Securities Litigation*, 264 F.3d 201, 236 (3d Cir. 2001)("The objectors are correct that the settlement was reached early in the litigation, with discovery itself at an early stage. However, the merits of the liability case against Cendant were fairly clear . . . . Given the foregoing, it is unclear what depositions and interrogatories (with the requisite motions to

---

[25] Supplemental Compendium at Exhibit 16, page 51, line 16, through page 56 line 2; page 89, line 19, through page 90, line 4.
[26] Supplemental Compendium at Exhibit 12.

19

compel) would have added to the liability considerations . . . ."); *In re ATI Technologies, Inc. Securities Litigation,* 2003 WL 1962400, *2 (E.D. Pa. April 28, 2003)("Although formal discovery did not ensue after our July, 2002 decision, the Ryan Declaration details how the parties were able to assess their strengths and weaknesses before they began the mediation with Judge Hart. The Ryan Declaration at ¶ 13 details the thorough investigation plaintiffs' counsel undertook before reaching an agreement to the settlement."); *Bowling v. Pfizer,* 143 F.R.D. 141, 161 (S.D.Ohio 1992)("We can imagine an inadequate settlement with much discovery done; similarly, we can envision an outstanding settlement with little discovery done."); *In re Jiffy Lube Securities Litigation,* 927 F.2d 155 (4th Cir. 1991)(plaintiffs were sufficiently informed about the strength of the case as a result of evidence obtained through informal discovery); *Cotton v. Hinton,* 559 F.2d 1326, 1332 (5th Cir. 1977) )(approving settlement over objection that not enough discovery was conducted because plaintiffs were adequately informed despite fact that "very little formal discovery was conducted and that there is no voluminous record in this case."); *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 211 (5th Cir. 1981)("[W]e are not compelled to hold that formal discovery was a necessary ticket to the bargaining table. Because the plaintiffs did have access to information, this case cannot be characterized as an instance of the unscrupulous leading the blind.") As this now record evidence of the investigation unambiguously illustrates, any suggestion by the objectors that there was "collusion" between class counsel and RFC is not just frivolous, it is outrageous.

the case *sub judice* to be excluded from the Finance Charge so long as the services performed were consistent with the requirements of Regulation Z, 12 U.S.C. § 226.4(c)(7)(i), to wit: "[f]ees for title examination, abstract of title, title insurance, property survey, ***and similar purposes***." The supplemental record on remand will establish that when the proposed settlement was presented to this Court, class counsel were aware that title services were being performed that would plainly satisfy the Regulation Z definition.

### IV. The TILA/HOEPA Claims Advocated By The Objectors Are Plainly Not Suitable For Class Certification

The objectors' entire argument is predicated upon the assumption that the title fees in dispute were not "bona fide and reasonable" and therefore should not have been excluded from the Finance Charge. Despite their attempt to bootstrap their way into this position without acknowledging the actual controlling language from Regulation Z, the reality is that any determination of whether the subject fees were "bona fide and reasonable" is mired in individual issues which would destroy predominance under a Rule 23 analysis.

It is indisputable that services were actually performed in exchange for the fees at issue. The fees charged for these services varied across the universe of loans in dispute. To determine whether a fee charged in a given loan was "bona fide," it would be necessary to determine whether the services provided in connection with the loan fit within Regulation Z, specifically, whether the amount charged to the borrower was a "[f]ee for title examination, abstract of title, title insurance, property survey, ***and similar purposes.***"

In the context of the "title abstract" fee set forth at Line 1102 in the HUD-1s at issue, the objectors concede that a "property report" was obtained by or on behalf of the title company receiving the fees set forth at Lines 1102 and 1103, and that the title companies actually had to pay for the report, but they allege further that the title company "marked-up" the fee, and that

29

said mark-up renders the fee "unreasonable" by definition. However, the law requires a different analysis.

Specifically, every court that has opined on the issue has concluded that "reasonableness" is measured by comparing charges imposed by a particular creditor with the prevailing practices in the locality where the loan was made, irrespective of whether there has been a mark-up to the cost of some service provided by a third-party vendor. *See, e.g., Inge v. Rock Financial Corporation*, 388 F.3d 930, 939-940, *citing Brannam, supra., at 602, 606; see also, In re Grigsby*, 119 B.R. 479, 488 (E.D.Pa. Bankr. 1990), *vacated on other grounds by* 127 B.R. 759 (E.D.Pa. 1991)(*quoting R. Rohner, The Law of Truth In Lending, § 3.03[2][a], at 3-30 to 3-31 (1984))*. This issue, which is ignored by the objectors, has dispositive impact on the suitability of the TILA/HOEPA claims championed by the objectors for class treatment. To determine whether a given fee is "reasonable," it would be necessary to ascertain what services were performed in connection with the individual loan at issue and then do a market analysis regarding the fees charged for similar services in the hundreds of communities throughout the country where these loans were originated. It is not coincidental that the objectors' so-called title experts, with fifty years of experience in the title business between them, fail to acknowledge this very basic fact. Nor is it coincidental that though the objectors cite *Inge v. Rock Financial Corporation, supra.*, as their lead case on the "bona fide and reasonable" issue, they fail to acknowledge the language from that opinion that plainly states that "reasonableness" must be determined by a local market analysis. *See Objectors Viability Brief at 39.*

In the context of the "Title Examination" fee set forth at Line 1103 of the HUD-1s, again, the objectors concede (at least implicitly) that services were provided in exchange for the fee but argue that because no title insurance was issued, those services do not meet their expert's

30

preferred definition of the term "title examination." Once more, Regulation Z, the law that actually applies to this analysis, requires that each loan be evaluated to determine whether the fees charged for the title services that were undeniably rendered were "[f]ees for title examination, abstract of title, title insurance, property survey, *and similar purposes.*" Thus the objectors' experts' preferred definition of the term "title examination" is irrelevant, to the extent that it differs from the language of Regulation Z (which it plainly does).

Once you start down the path of having to deconstruct individual loan transactions – and that is plainly what is required in the context of the specific TILA/HOEPA claims being championed by the objectors – you run into abundant and uniform adverse class certification authority spawned in the yield spread premium litigation under RESPA. *See, e.g., Schuetz v. Banc One Mortgage Corporation*, 292 F.3d 1004, 1114 (9th Cir. 2003)("Yield spread premiums are not illegal per se, so whether they amount to a prohibited referral in any particular case depends upon the services provided by the broker and the total compensation paid for those services."); *Heimmermann v. First Union Mortgage Corporation*, 305 F.3d 1257 (11th Cir. 2002)(same); *O'Sullivan v. Countrywide Home Loans*, 319 F.3d 732 (5th Cir. 2003)(same).

The Eighth Circuit, lead objectors' counsels' home federal venue, reached the following holding regarding this issue:

> The plain language of RESPA, then, demands that there be a determination of which settlement services are provided in connection with each real estate settlement including such things as title searches, title examinations, the preparation of documents, property surveys, and other potential services . . . . It appears, therefore, that RESPA anticipates an inquiry into the services provided in order to determine whether a prohibited referral occurred in the first instance . . . . This loan-specific analysis is required to determine civil liability as well as to measure damages under RESPA . . . .
>
> Our only conclusion today is that the determination must be made on a loan-by-loan basis. Class certification being impracticable, the judgment of the district court is reversed . . . .

31

*Glover v. Standard Federal Bank*, 283 F.3d 953, 966 (8th Cir. 2002).

The analysis required in the yield spread premium cases is conceptually analogous to the loan specific analysis that is required to determine whether the title fees in dispute should be properly excluded from Regulations Z of TILA.[30]

The necessity of conducting a loan specific inquiry was integral to class counsels' decision not to pursue TILA/HOEPA claims.[31] Class counsel knew that "title services" were provided in exchange for the fees charged to the borrowers and knew that there was no way to prove a class-based TILA violation without deconstructing every loan transaction. This fact made it patently apparent that TILA/HOEPA claims would *not* be class-appropriate given the specific nature of the conduct in dispute.[32] In fact, the most telling aspect of the objectors'

---

[30] The legal authority invoked by objectors' actually supports class counsels' position on this issue. *See, e.g., Inge v. Rock Financial Corporation*, 388 F.3d 930 at 940: ("The relevant inquiry is . . . . whether the fee is reasonable given the prevailing practices in the relevant market, meaning reasonable given the prevailing practices of the industry in the locality.")

[31] Class counsel noted this fact at the original Fairness Hearing, wherein class counsel Carlson stated: "We had challenges with respect to certification. Those challenges are reflected by the abundance of recent authority in the RESPA yield spread premium context." *See* FH Transcript at pages 21, line 24 through page 22, line 2, Supplemental Compendium at Exhibit 1.

[32] The Court should note that a loan-specific analysis is *not* required for the RESPA claims advocated by class counsel in this litigation (in contrast to RESPA yield spread premium cases—though defendants would certainly raise other certification defenses). Instead, the relevant liability analysis focuses on the issue of whether there were kick-backs and/or fee-splits, or mark-ups, all of which can be readily demonstrated on a class basis without the necessity of deconstructing each individual loan transaction. For example, the allegedly illegal kick-back of origination fees challenged by class counsel was memorialized in a written document. An exemplar Mortgage Origination Agreement is attached to the Supplemental Compendium at Exhibit 18. Class counsel directs the Court's attention to paragraph 9 of the Agreement. This paragraph describes how the Shumway Operation would be compensated by way of "kick-backs" consisting of settlement fees collected from plaintiffs and the class in the banks' names. Pursuant to the terms of this Agreement, an illegal kick-back occurred in connection with every loan, irrespective of what specific settlement services might have been performed in connection with that loan. It is the fact of the kick-back or fee split, not the nature of the settlement services performed in connection with any individual loan, that renders this conduct unlawful. The

32

viability brief is its failure to cite even a single case certifying a TILA class wherein the "bona fide and reasonable" test is part of the required analysis.

A very recent opinion that specifically considers virtually identical TILA/HOEPA claims in the class context further illustrates this point. Specifically, Judge Herndon from the United States District Court for the Southern District of Illinois recently ***denied*** a motion for class certification in a precisely analogous situation. In that case, plaintiffs sought certification of a national TILA/HOEPA class, arguing that class members' APRs were understated because of a "bogus" fee for closing services. Refusing to certify the class, the court stated:

> Plaintiffs contend that class certification of a national class is proper based on the allegation that each putative class member paid a $450 fee for closing services attributed to the Johnson & Payne law firm on every second mortgage loan made by Mortgage Capital even though the Johnson & Payne law firm did not perform any such services. Plaintiffs further contend that Mortgage Capital obtained all or some of the fee. Defendants argue that Plaintiffs' motion must fail because the record demonstrates that the Johnson & Payne law firm provided a variety of different closing and title services that varied depending on the individual circumstances of each particular loan transaction. The Court agrees.
>
> The record contains testimony that demonstrates that the $450 fee was not a sham, but that the Johnson & Payne law firm provided services on every loan sent by Mortgage Capital. These declarations are from attorneys, Robert Payne, James A. Dooley, Robert Rivers, former attorneys with the Johnson & Payne law firm and the Johnson & Dooley law firm who performed work related to closing residential mortgage loan transactions. In addition, the record contains declarations from three former employees of the Johnson & Payne law firm, Rebecca Champaign, Sheila Elmore, and Janelle Soto, who worked on residential mortgage loan transactions. These declarations reveal that the Johnson & Payne law firm performed various services in connection with the making and the closing of Mortgage Capital loans and that such services varied from loan to loan.
>
> Based on the record, the Court finds that Plaintiffs failed to satisfy the commonality issue and, thus, failed to meet the requirements of Fed. R. Civ. P. 23(b)(3). Specifically, the Court finds that Plaintiffs' claims

---

participation of the Shumway Operation in the transactions at issue was never disclosed to plaintiffs and/or the class.

33

> cannot be adjudicated on a class-wide basis because each borrowers' claims and various defenses hinge on individualized documentary and testimonial evidence. These individual issues will predominate over any questions of law or fact common to the proposed class, such that class action is not the superior method available for the fair and efficient adjudication of the controversy. In effect, the Court would have to conduct 'mini' trials to determine the value of the services performed, the fees actually charged, whether such fees qualify as a finance charge, the amount of the fee, if any, remitted to Mortgage Capital and whether the inclusion of any overcharge in the calculation of the annual percentage rate would cause a material adjustment in the annual percentage rate. This places the Court in the position of considering each claimants' charges on a case by case basis. The Court rejects Plaintiffs' assertion that the Johnson & Payne fees only fit into the lump sum category . . . .

*Reiser v. Residential Funding Corporation*, Slip Op. at 7-9.[33]

The decision in *Reiser* demonstrates why lead objectors' counsel Walters Benders did ***not*** to pursue TILA/HOEPA claims in their own cases based upon the transactions in dispute, to wit: these cases cannot be properly certified as class actions. The *post hoc* invocation of these ostensible claims to attack the proposed settlement, notwithstanding that objectors' counsel have serially refused to assert these very same claims in their own cases, reinforces the lack of merit in their position before this Court.

**V.    Class Counsels' Litigation Strategy Revisited**

**A.    <u>Class Counsels' Litigation Strategy.</u>**

**1.    <u>Class Counsels' Strategy In The Specific Context Of This Litigation.</u>**

Throughout the course of this litigation, there has always been healthy debate among class counsel regarding how to best position plaintiffs' claims for success. When class counsel filed their initial cases challenging the conduct at issue, they sought only certification of state classes under state law (both statutory and common law). Increasingly, because of the availability of a fairly compelling federal preemption defense (the same defense that caused both

---

[33] Supplemental Compendium at Exhibit 19.