# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: COMMUNITY BANK OF NORTHERN VIRGINIA SECOND MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1674<br><br>Case No. 03-0425<br>Case No. 02-01201<br>Case No. 05-0688<br>Case No. 05-1386<br><br>Hon. Gary L. Lancaster |

THIS DOCUMENT RELATES TO ALL MDL ACTIONS

**PLAINTIFFS' JOINT CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Plaintiffs jointly amend all previously filed complaints in this multidistrict proceeding by substituting the following allegations of this *Joint Consolidated Amended Class Action Complaint* (sometimes the "*MDL Complaint*").

### I.   THE NATURE OF THIS ACTION

1.   This action is brought by a Plaintiffs' Class of residential mortgage borrowers against Community Bank of Northern Virginia ("CBNV")(a Virginia state-chartered, federally insured bank), now owned by PNC Bank, N.A., the Federal Deposit Insurance Corporation as receiver for Guaranty National Bank of Tallahassee ("GNBT") (a national bank)(collectively "the Banks"), and GMAC-Residential Funding Corporation n/k/a Residential Funding Company, LLC ("RFC").[1]

2.   The conduct being challenged in this action demonstrates the types of sharp practices that fueled the collapse of the American mortgage market.  The objective of the conspiracy at issue was to generate the highest possible volume of residential second mortgage

loans as a vehicle to extract exponentially excessive settlement fees from borrowers (Plaintiffs are challenging the practices that occurred in approximately 50,000 loan transactions). These loans had an average principal balance of approximately $35,000. Every borrower who was enticed to close one of these loans paid "origination" and "title" fees in excess of 12% of the original principal balance of the loan – as well as exorbitant interest rates that were largely unrelated to the credit worthiness of the borrowers.[2] The fees that were charged in connection with these loans were at least four times as high as the fees that would have been available to these borrowers in a true free market for settlement services that was not impeded by the presence of a fraudulent kick-back scheme.

3.      The kickback scheme at issue was conceived by brothers David, DeVan and Chris Shumway and Randy Bapst. The Shumway/Bapst "business plan" was to drive loan volume via a massive nationwide direct mail marketing campaign. Borrowers who were identified by the marketing campaign were referred to the Bank Defendants, who would process and originate the loans in their own names, and then kick-back the overwhelming majority of the settlement fees to companies controlled by Messrs. Shumway and Bapst (the entities controlled by Shumways and Bapst will hereafter be referred to generally as the "Shumway/Bapst Organization"), notwithstanding that the Shumway/Bapst Organization was not providing any compensable settlement services in connection with the loans.

4.      Defendant RFC (and in terms of loan volume to a lesser extent the other Investor Defendants) played a crucial role in the scheme. Specifically, RFC would purchase the loans

---

[1] RFC purchased the vast majority of the second mortgage loans at issue. A number of other entities, however, also purchased second mortgage loans originated by the Banks, including, Irwin Union Bank and Trust Company, Household Finance, Inc., Wilshire Funding Corporation, Fairbanks Capital Corporation and Morequity, Inc..

[2] During the period of time when GNBT was making the mortgage loans at issue -- from approximately April 2000 through August 2002 -- it originated more than 28,000 loans for a cumulative loan amount in excess of $1 billion. The vast majority of these loans, like the loans originated by CBNV, were sold to RFC on a correspondent basis.

2

from the Banks on a correspondent basis, shortly after the settlement of the loans. RFC profited from interest incurred while holding the loans in its own portfolio, and then again after it securitized pools of loans for sale on Wall Street. The capital provided by RFC was integral to the successful operation of the scheme, in that the Banks did not have sufficient capital to permit them to hold the loans in their own portfolios for any appreciable period of time.

5. The profits realized by the participants in the scheme were directly tied to loan volume, and every participant in the scheme ignored the unlawful aspects of the settlement practices at issue to maximize loan volume.

6. This action includes both a plaintiffs' and a defendants' class in connection with the second mortgage home loans made by the Banks. The class of Plaintiffs includes all persons obtaining high-cost, high-interest loans from CBNV and/or from GNBT. The loans at issue are all "high-cost" loans under the Home Ownership and Equity Protection Act, 15 U.S.C. § 1641 ("HOEPA").

7. In two prior opinions, the Third Circuit has confirmed that this matter can likely proceed as a class action. Specifically, two District Court orders approving previous proposed national settlements of the class claims at issue have been considered, vacated and remanded with instructions by the Third Circuit. In these opinions, the Third Circuit held that the claims at issue satisfy the numerosity, typicality and commonality elements of Rule 23(a), as well as the predominance and superiority elements of Rule 23(b)(3). *In re Community Bank of Northern Virginia,* 418 F.3d 277, 309-310 (3rd Cir. 2005). The Third Circuit offered detailed guidance regarding how to address potential adequacy issues under Rule 23(a)(4). *Id.* Any potential adequacy issue is resolved through the filing of this Joint Consolidated Amended Complaint.

3

87. Initially, RFC focused on buying and securitizing "jumbo" mortgages (mortgages with loan balances above the purchasing authority of Freddie Mac and Fannie Mae). Over time, it moved toward buying and securitizing other mortgage products including, in a very material way, second mortgage loans.

88. In the most simple terms, "securitization" refers to the process of packaging loans (not only mortgage loans) for sale as securities. Based on its business model, RFC's income was generated in two fundamental ways: 1) income derived from holding performing loans in inventory; and, 2) the more substantial income derived when loans are packaged and sold as securities. GMAC-RFC also derived income from loan servicing through other affiliated companies generally known as Homecomings.

89. Since RFC does not really originate mortgage loans directly, it is necessary for it to cultivate relationships with third-party loan "originators" to insure that RFC has access to a steady flow of loan "product" which will then generate income for RFC while it is held in inventory and subsequently packaged, and then generate even more income when the packages are sold as securities.

90. In 1990, RFC was acquired by General Motors Acceptance Corporation. Throughout the early and mid-1990's the company that had become GMAC-RFC expanded the variety of loan "products" that it would purchase and securitize.

91. By the late 1990's, profit margins derived from the securitizations of lower-risk loan products began to dissipate and many companies, including GMAC-RFC, began to securitize higher-risk loan products.

92. Eventually, GMAC-RFC achieved market dominance with respect to the purchase and securitization of higher-risk mortgage loans known as "125" loans, so-called

19

because the amount financed represented up to 125% of the value of the collateral securing the loan. These loans were also known as High-LTV (loan-to-value) loans. This "125" loan product was the marketing focus of the Shumway/Bapst Organization and, by 1999, the Shumway/Bapst operation had become the largest referral source for banks originating the "125" loan product that was ultimately purchased by RFC.

93. Because the Shumway/Bapst Organization was the largest source of referrals for loans in the 125% securitization market that GMAC-RFC had begun to dominate, and because the relationship was so profitable, GMAC-RFC turned a blind eye to the illegal settlement practices that pervaded the loans at issue.

94. The settlement fees collected in connection with the loans at issue were significant sources of revenue not only for the Banks and the Shumway/Bapst companies, but also for GMAC-RFC. More specifically, these fees were typically rolled into the principal of the loans and GMAC-RFC derived substantial interest income from these illegal fees while the loans were held in portfolio and then again as a function of the fact that the illegal fees padded the income received from GMAC-RFC when the loans were ultimately securitized.

95. Because GMAC-RFC derived substantial income from the unlawful settlement fees, GMAC-RFC actively worked with the Bank Defendants to expand the loan volume being generated by the operation.

96. GMAC-RFC directly participated in the fraudulent lending activities in that it provided the Bank Defendants with a continuing commitment to purchase all of the high-cost loan production, notwithstanding that it knew that the loans included unlawful terms.

97. As a function of its regular presence at the offices where the loans at issue were being solicited, referred and originated, as a function of the fact that it audited the financial

statements of CBNV and GNBT, and as a function or the fact that it received all of the original loan files, including the final Settlement Statements, when it purchased the loans at issue, and as a function of the fact that it audited the loans that it was purchasing, GMAC-RFC knew the precise extent to which every borrower was being defrauded in connection with the loans at issue.

### Other Investor Defendants

98. After CBNV began to wind down its relationship with the Shumway/Bapst Organization and RFC, it continued to originate loans through other "consultants" and sell such loans to other investor-purchasers like Irwin Union, Household Finance and Morequity. These loans had settlement terms that were very similar to the terms in the loans that were sold to RFC.

99. These other Investor-Defendants were also integral to CBNV's continued scheme. For example, in 2001, Irwin purchased 1610 loans from CBNV and throughout the scheme it purchased as many as 3,200 loans from CBNV.

### The Downfall of the GNBT – Shumway/Bapst Operation

100. In mid-2001, the Office of the Comptroller of the Currency ("OCC") performed an examination of GNBT. Its findings were set forth in a Report of Examination dated July 23, 2001. The OCC noted myriad deficiencies in GNBT's mortgage lending practices.

101. In January 2002, GNBT entered into a Letter Agreement with the OCC which placed tight controls on the Bank.

102. By this time, however, relations had also deteriorated with GMAC-RFC. By January of 2002, GMAC-RFC had become increasingly concerned about GNBT's loan origination practices.

103. Ultimately, GMAC-RFC determined that notwithstanding the substantial income

21