**ALLEN & OVERY LLP**
John Kibler
Jonathan Cho
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399

*Counsel to HSBC Bank USA, N.A., as Trustee
of Certain Residential Mortgage Backed
Securities Trusts*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | ) |
| | ) **Chapter 11** |
| Debtors. | ) |
| | ) **Jointly Administered** |

## DECLARATION OF FERNANDO ACEBEDO

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

I, Fernando Acebedo, hereby declare, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information and belief:

1. I am employed by HSBC Bank USA, N.A. ("**HSBC**"), and my current title is Vice President. I have personal knowledge of the facts set forth herein, except as to certain matters that I believe to be true based on (a) information provided by Duff & Phelps, LLC ("**Duff**"), (b) information about positions of parties in these Chapter 11 Cases contained in pleadings that I reviewed, reported to me by counsel, or learned during my participation in the Plan Mediation (defined below); and (c) my review of the business records of HSBC.

2. In my capacity as Vice President at HSBC, my responsibilities include, among other things, managing and overseeing matters relating to HSBC's role as trustee to various

residential mortgage-backed securities trusts, on behalf of which HSBC pursues repurchase claims resulting from breaches of representations and warranties made by sellers and other transaction parties related to mortgage loans within the portfolios of such trusts.

3. This Declaration is submitted in support of confirmation of the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al., and the Official Committee of Unsecured Creditors* dated August 23, 2013 (the "**Plan**").[1]

4. On May 13, 2013, the Debtors, Ally Financial Inc. ("**AFI**"), the Official Committee of Unsecured Creditors (the "**Committee**"), and the Consenting Claimants, including H, as RMBS Trustee,[2] entered into the Plan Support Agreement [ECF No. 3814, Ex. 3] (the "**Plan Support Agreement**"), pursuant to which they agreed to the terms of a proposed consensual Chapter 11 plan of reorganization and resolution of all claims and disputes between them as set forth in the Plan Term Sheet and the Supplemental Term Sheet, attached respectively as Exhibits A and B to the Plan Support Agreement.

5. The Debtors filed their Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants (the "PSA Motion") [ECF No. 3814] on May 23, 2013. By Order dated June 26, 2013 [ECF No. 4098], this Court approved the PSA Motion.

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan. For the convenience of the reader, in some cases the definitions found in the Plan are repeated herein or a citation to the Plan's definition of such term is given.

[2] As used herein, unless the context dictates otherwise, the term "RMBS Trustees" has the meaning ascribed to it in the Plan, to wit, HSBC; The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A. (together, "**BNY Mellon**"); Wells Fargo Bank, N.A. ("**Wells Fargo**"); Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas (together, "**Deutsche Bank**"); U.S. Bank National Association ("**U.S. Bank**"); and Law Debenture Trust Company of New York ("**Law Debenture**"), each solely in their respective capacities as trustee, indenture trustee, separate trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or other similar agencies.

2

**A.     HSBC's Role as Trustee**

6.     HSBC serves as trustee, indenture trustee, and/or other similar agencies (in any such capacity, the "**Trustee**") in respect of certain residential mortgage backed securities trusts identified in schedules attached to the Proofs of Claim listed below (collectively, the "**HSBC RMBS Trusts**"). As used herein, the term "HSBC" refers to HSBC solely in its capacity as Trustee, and this Declaration is made solely with respect to HSBC's role as Trustee of the HSBC RMBS Trusts.

7.     The HSBC RMBS Trusts are governed by one or more pooling and servicing agreements, indentures, highly integrated set of "servicing agreements," mortgage loan purchase agreements, deposit trust agreements, trust agreements, asset sale agreements, depositor sale agreements, administration agreements, yield maintenance agreements and other ancillary transaction documents (collectively, the "**Transaction Documents**").

8.     Pursuant to the Transaction Documents, one or more of the Debtors has obligations in various capacities, including as originator, seller, sponsor, depositor and similar capacities (collectively, "**Seller**"), and/or as servicer, subservicer, master servicer, back-up servicer, HELOC servicer, administrator, co-administrator, and similar capacities (collectively, "**Servicer**").

9.     In its capacity as Trustee, HSBC has authority to enforce repurchase claims against the Seller in respect of the HSBC RMBS Trusts and to vote such claims in connection with the Plan.

**B.     The Proofs of Claim**

10.     On or about November 16, 2012, HSBC, as Trustee, filed Proofs of Claim Nos. 5130–5255, 5710, and 5713 (the "**Proofs of Claim**"), asserting claims against certain of the Debtors, as Sellers and/or Servicers, on behalf of the HSBC RMBS Trusts.

3

**C.      The RMBS 9019 Motion and Retention of Duff**

11.    Among the claims and disputes resolved in the Plan Support Agreement and ultimately the Plan is a settlement (as further defined in the Plan, the "**RMBS Settlement**") that provides for the allowance, priority and allocation of (a) the claims of the RMBS Trusts against the Debtors arising from obligations or liability in respect of the origination and sale of mortgage loans to the RMBS Trusts (the "**RMBS R+W Claims**") and (b) the claims of the RMBS Trusts against the Debtors other than the RMBS R+W Claims (the "**RMBS Cure Claims**," together with the RMBS R+W Claims, as further defined in the Plan, the "**RMBS Trust Claims**").

12.    Shortly after these Chapter 11 Cases were filed, the Debtors filed a motion (as amended, the "**RMBS 9019 Motion**"[3]), seeking approval of the Original RMBS Settlement Agreements with the Institutional Investors. The Original RMBS Settlement Agreements related to the RMBS R+W Claims of 392 Original Settling RMBS Trusts and contemplated that the Original Settling RMBS Trusts would be granted an allowed aggregate claim of up to $8.7 billion, to be allocated in accordance with certain formulas set forth in exhibits to the Original RMBS Settlement Agreements.

13.    In connection with the RMBS 9019 Motion, certain of the RMBS Trustees involved with the Original Settling RMBS Trusts retained Duff to assist them in the Chapter 11 Cases, including in the identification, quantification, litigation, and/or resolution of the RMBS Trust Claims. Duff's analysis included those RMBS Trusts that were neither included among the Original Settling RMBS Trusts nor the subject of the 9019 RMBS Motion. HSBC later joined in the retention of Duff after it executed the Plan Support Agreement.

---

[3]    *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 320]; *Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 1176]; and the *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 1887]

4

**D.      Plan Mediation and the Plan Support Agreement**

14.     On December 6, 2012, the Debtors filed a motion seeking the entry of an order appointing a mediator to assist certain parties in interest in resolving various plan issues in furtherance of reaching a consensual Chapter 11 plan.[4]  On December 26, 2012, the Court appointed U.S. Bankruptcy Judge James M. Peck as Mediator.[5]

15.     The Plan Support Agreement – the terms of which are embodied in the Plan – was the result of an extensive mediation over the course of some five months (the "**Plan Mediation**") overseen by Judge Peck.  The communications and analyses relating to negotiations conducted during the Plan Mediation are confidential pursuant to the Mediation Order and therefore cannot be disclosed in detail.  In general, however, the integrated, global settlement associated with the Plan must be understood as the product of intense, arms-length negotiations conducted by and among sophisticated parties (including the RMBS Trustees) with differing and conflicting interests, advised by sophisticated advisors, under the close supervision and guidance of a sitting bankruptcy judge.

16.     HSBC was not party to the Original RMBS Settlement Agreements, and the HSBC RMBS Trusts were not among the Original Settling RMBS Trusts.  However, as an RMBS Trustee, HSBC participated in the Plan Mediation and entered into the Plan Support Agreement on May 13, 2013.  The HSBC RMBS Trusts constitute Additional Settling RMBS Trusts under the Plan.[6]

---

[4]    ECF No. 2357.

[5]    See December 26, 2012 Order Appointing Mediator [ECF No. 2519] (the "**Mediation Order**").  The Court later extended the term of the Mediator.

[6]    Defined at Art.I.A.2 of the Plan.  The Additional Settling RMBS Trusts were usually referred to as the Non-Settling Trusts prior to the Plan Support Agreement.

5

i.         RMBS R+W Claims of the HSBC RMBS Trusts

17.    The RMBS R+W Claims of the HSBC RMBS Trusts, as Additional Settling RMBS Trusts, are included in the RMBS Settlement contained in the Plan.[7] Such claims are entitled to distributions under the Plan and will receive treatment thereunder that is consistent with the treatment being accorded under the Plan to the RMBS R+W Claims of the Original Settling RMBS Trusts.

ii.        RMBS Cure Claims

18.    Negotiations in the Plan Mediation also led to the RMBS Cure Claims being included in the RMBS Settlement. In that regard, Duff analyzed potential liabilities of the applicable Debtors, as Servicer for the RMBS Trusts for which the RMBS Trustees act as Trustee or Master Servicer.[8]

19.    Duff attempted to quantify the Debtors' liability as Servicer for: (a) misapplied and miscalculated payments; (b) wrongful foreclosure and improper loss mitigation practices; and (c) extended foreclosure timing issues caused by improper or inefficient servicing behavior such as falsified affidavits, improper documentation, and improper collection practices. Duff concluded that the potential liability of the Debtors as Servicer for the three bases analyzed could

---

[7]    Art.IV.C.1 of the Plan provides:

*Modification of Original RMBS Settlement Agreements.* The Original RMBS Settlement Agreements are hereby expanded to include all RMBS Trusts holding RMBS Trust Claims and are otherwise modified as set forth herein.

[8]    In performing this analysis, Duff used publicly-available data on industry specific litigations and regulatory actions relating to residential mortgage servicing practices; reviewed the files of a large sampling of litigations specific to the Debtors; reviewed rating agency evaluation reports for the Debtors; accessed and reviewed a large sampling of the Debtors' records of servicing complaints for Debtor-serviced loans; and used publicly-available performance data on a sample of the RMBS Trusts. Duff presented its analysis relating to the quantification of the RMBS Cure Claims both orally and in writing to the RMBS Trustees.

6

be asserted in amounts up to as much as $1.1 billion, but that the assertion of such claims involved significant risk and uncertainty.[9]

20. As compromised and settled, the RMBS Cure Claims are included in the RMBS Settlement contained in the Plan. Under the Plan, the RMBS Cure Claims are allowed in an aggregate amount of $96 million, and the RMBS Cure Claims are further divided between (a) RMBS Trusts where the servicing agreement has been assumed and assigned by the Debtors by the Effective Date ("**Recognized Cure Claims**"), in which case the servicing claims are (or will be) listed on Schedules 1G or 1R to the Plan and (b) RMBS Trusts where the servicing agreement has not been assumed and assigned by the Debtors by the Effective Date ("**Recognized Unsecured Servicing Claims**"), in which case the claims will be listed on Schedules 4G or 4R.

### E. Factors Supporting the RMBS Settlement

21. The RMBS Settlement contained in the Plan is the product of a lengthy, highly contentious Plan Mediation and multifaceted Global Settlement that resulted in the Plan Support Agreement and now the Plan. Prior to entering into the Plan Support Agreement, HSBC, in its capacity as Trustee, considered not only the benefits and risks of the RMBS Settlement but also the benefits and risks associated with reaching an agreement regarding an overall consensual Chapter 11 plan, as well as the risks and uncertainties associated with litigating the RMBS Trust Claims in the absence of a consensual Chapter 11 plan.

---

[9] The RMBS Trustees were unable to obtain full discovery regarding potential RMBS Cure Claims, in part because the Debtors asserted that some of the information requested was not reasonably available. The amount of information and data that would be needed in order to assert the RMBS Cure Claims in a litigated proceeding is likely very large and the analysis of that information and data would likely be expensive, time-consuming, and may ultimately lack sufficient certainty to establish the validity of such claims in a contested proceeding. Furthermore, the Debtors may have viable defenses to the assertion and quantification of any RMBS Cure Claims, the resolution of which is uncertain.

i.        The AFI Contribution

22.    A significant facet of the Global Settlement contained in the Plan Support Agreement and the Plan is the resolution of claims against AFI and its $2.1 billion contribution to the Debtors' estates (the "**AFI Contribution**").  Prior to the Plan Mediation, AFI had been willing to make a contribution limited to $750 million, however, in the Plan Mediation, AFI increased that contribution to $2.1 billion.

23.    HSBC believes, based on information provided during the Plan Mediation, that unless all parties (including the RMBS Trustees) consented to an overall settlement that included the allowance and treatment of claims, it is unlikely that AFI would have agreed to make the AFI Contribution, leading to lengthy and expensive litigation with uncertain outcomes.  HSBC considered the substantial increase in the amount of the AFI Contribution, the certainty associated with fixing that contribution, the added value to the Debtors' estates and the impact on the recoveries of the RMBS Trusts resulting therefrom and the avoidance of the delay, expense and uncertainty associated with litigating AFI's liability to the Debtors' estates, to collectively be of significant benefit to the HSBC RMBS Trusts and the other RMBS Trusts.

ii.       Litigation Risks

24.    Until the Consenting Claimants agreed to the Plan Support Agreement, these Chapter 11 Cases were at the precipice of warfare by litigation.  Many disputes that had been simmering were about to erupt into litigation, and these potential litigations were anticipated to be lengthy and expensive, so much so that they could affect the recoveries of the RMBS Trusts.

25.    In particular, the Plan fixes claims that the RMBS Trustees expect would otherwise be contested and the subject of expensive and time-consuming claims litigation. The allowance of the repurchase claims of the RMBS Trusts, as contemplated by the RMBS Settlement and the Plan, obviates this risk by fixing the amount of, and distributions on, such

8

claims without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims.

26. The Plan also provides for the allowance of, and distribution on, the RMBS Cure Claims of the RMBS Trusts, including those of the HSBC RMBS Trusts. As set forth above, those claims were the subject of an analysis by Duff and were roughly quantified, but presentation of those claims would have required further discovery and analysis, likely leading to litigation over both the quantification of the claims and their relative priority. The treatment of the Servicing Claims represents a meaningful recovery to the RMBS Trusts possessing such claims, without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims.

27. Many of the contentious and complicated inter-creditor issues in these cases are also resolved by the Plan, including, among other things, the priority of certain claims asserted by the Monolines and by certain other securities claimants. In particular, both the amount of the claims of the Monolines and the relationship between those claims and the RMBS Trust Claims are the subject of disputes, and the resolution of all those disputes through litigation presents a general risk of delay and expense to all stakeholders, as well as a specific risk to the RMBS Trusts of dilution.

28. Lastly, the mounting costs of administration of these Chapter 11 Cases threaten to erode any distribution to unsecured creditors. Confirmation of the Plan would effectively end the continued accrual of such costs.

**F.      Allowance of, and Distributions on, the RMBS Trust Claims under the Plan**

i.            Allowed Amounts and Reasons for the Reallocation of Units

29. The allowance and treatment of RMBS Trust Claims is found at Article IV, Section C of the Plan, which provides, among other things, that:

9

> (a) Entry of the Confirmation Order shall constitute approval of the Allowed amount of the RMBS Trust Claims as non-subordinated Unsecured Claims, subject only to the Allowed Fee Claim, in the aggregate amounts of (i) $209.8 million against the GMACM Debtors; (ii) $7,091.2 million against the RFC Debtors; and (iii) $0 against the ResCap Debtors.

Plan Art.IV.C.2.

30. The aforesaid "Allowed amounts" were used by the Consenting Claimants during the negotiations that took place during the Plan Mediation, which resulted in the distributions to be made to the RMBS Trusts – *in the aggregate* – pursuant to the Plan Support Agreement (and now the Plan). However, there were certain significant differences between the "Allowed amounts" and the claims of the RMBS Trusts as determined by Duff, particularly with respect to (a) the aggregate amount of the RMBS R+W claims of the Additional Settling RMBS Trusts and (b) the aggregate amount of the Recognized Cure Claims. In addition, there were disputes between the Debtors and the RMBS Trustees regarding which Debtor was responsible for certain of those claims. Finally, as of the time the Plan Support Agreement was negotiated, there was substantial remaining due diligence needed to confirm that certain of these claims were properly asserted under the provisions of the governing documents of certain of the RMBS Trusts, and if they were, to determine the responsible Debtor under the governing documents.

31. Accordingly, the RMBS Trustees required the Plan to contain provisions that would allow the RMBS Trustees, after completing due diligence, to use the completed due diligence and Duff's final calculations of the RMBS Claims to re-allocate the Units that will be distributed based on the "aggregate amounts of (a) $209.8 million against the GMACM Debtors; and (b) $7,091.2 million against the RFC Debtors."[10] The re-allocation of Units from the RFC Pool to the GMACM Pool avoids significant distortions in distributions on account of the RMBS

---

[10] Art.IV.C.2(a) of the Plan.

10

Trust Claims, as finally calculated, that would otherwise occur if distributions were made based on the above-referenced "aggregate" allowed amounts contained in the Plan.

ii.     Reason for Calculation of "Weighted" Claims

32.     At the time the Plan Support Agreement was agreed to, the RMBS Trustees contemplated that RMBS Cure Claims of RMBS Trusts whose Servicing Agreements had been assumed would be paid first, in full, from cash distributed on the Units distributed under the Plan on account of the RMBS Trust Claims.[11]  Thereafter, it was learned that a priority distribution of cash proceeds would adversely affect the REMIC status of the applicable RMBS Trusts.  To avoid such an adverse tax effect while at the same time honoring the priority nature of a RMBS Cure Claim where the Servicing Agreement has been assumed and assigned, Art.IV.C.3(c) and (d) of the Plan implements the concept of an RMBS Trust's total "weighted claim."  In order to calculate the GMACM Weighted Claim of an RMBS Trust, the GMACM Recognized Cure Claim is valued at 100%, and the GMACM Recognized Original R+W Claims, the GMACM Additional R+W Claims and the GMACM Recognized Unsecured Servicing Claims, if any, are valued at percentage distribution available from the GMACM Pool after the calculations made by Duff described in the Plan.  After the Weighted Claims are calculated, distributions are made based on a RMBS Trust's *pro rata* share of all of the Weighted Claims in the GMAC Pool.  The same process applies to calculate the RFC Weighted Claim of an RMBS Trust.

iii.    Impact of Monoline Insurance and "Recognized" Claims

33.     Insured RMBS Trusts (other than those insured by FGIC and Ambac) have received, and in the future are assumed to receive, payment of their losses to the extent necessary to pay the principal and interest due to the insured tranches of such trusts directly from the

---

[11]     *See, e.g.*, Annex III to the Plan Support Agreement [ECF No. 3814].

11

applicable Monoline, which in most cases eliminates the need for any distribution to those RMBS Trusts given the structure of the Plan and the inter-related settlements contained in the Plan.[12] In such cases, the "recognized" claim of the RMBS Trust is set to zero, or is reduced, to take into account the full or partial payment of claims by the applicable Monoline, unless an exception applies.[13] The rights of Insured RMBS Trusts are reserved in the event that the applicable Monoline does not honor its obligations.[14]

**P.      Notices to Holders**

34.    HSBC, as Trustee, has provided notice of matters related to the RMBS Settlement, the Plan Support Agreement, and other significant events in ResCap's Chapter 11 Cases to the holders in the HSBC RMBS Trusts following its entry into the Plan Support Agreement.

35.    Further, I understand that certain of the RMBS Trustees jointly retained The Garden City Group, Inc. ("**GCG**") to provide certain administrative services in connection with noticing various Holders, including the facilitation of the dissemination of notices to the various Holders at the direction and on behalf of the RMBS Trustees and the creation and maintenance of a website for Holders that provides contact information for the RMBS Trustees, recent developments in the Chapter 11 Cases, links to relevant documents filed in the Chapter 11 Cases, and upcoming Court deadlines and hearing dates (the "**RMBS Trustee Website**").

36.    As further described in more detail in the Affidavit of Jose C. Fraga ("**Fraga Affidavit**"), which is being filed concurrently herewith, GCG has distributed to various Holders

---

[12]   In consideration for these payments, the Monolines are allowed significant claims against the applicable Debtors, on account of which they are anticipated to receive substantial distributions from such Debtors' estates.

[13]   The exceptions are described at Art.IV.C.3.(a)(iv) of the Plan.

[14]   Art.IV.C.4 of the Plan.

and has published on the RMBS Trustee Website the following notices, copies of which are attached to the Fraga Affidavit as Exhibits A and F through J thereto.

### G. Conclusion

37. For all of the foregoing reasons, HSBC believes that the Plan – including the RMBS Settlement, which were key elements to the Global Settlement, Plan Support Agreement and thus the Plan – is in the best interests of Investors in each of the RMBS Trust for which it acts, that HSBC and the other RMBS Trustees acted in good faith and in the best interests of the Investors in entering the Plan Support Agreement and performing their obligations thereunder and accordingly, consistent with its undertakings in the Plan Support Agreement and to the extent of its authority to do so, has voted in favor of the Plan, and urges that the Court enter the proposed Order confirming the Plan.

DATED this 12th day of November, 2013

/s/
Fernando Acebedo