**SEWARD & KISSEL LLP**
Dale C. Christensen, Jr.
Thomas Ross Hooper
Benay L. Josselson
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to Law Debenture Trust Company of*
*New York, as Separate Trustee of Certain*
*Residential Mortgage Backed Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC, *et al.*,** | ) |
| | ) **Chapter 11** |
| Debtors. | ) |
| | ) **Jointly Administered** |

<u>**DECLARATION OF THOMAS MUSARRA IN SUPPORT OF CONFIRMATION OF**</u>
<u>**JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC, ET AL.,**</u>
<u>**AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**</u>

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

     I, Thomas Musarra, hereby declare, pursuant to 28 U.S.C. § 1746, that the following is

true and correct to the best of my knowledge, information and belief:

     1.     I am Senior Vice-President of Corporate Trust at Law Debenture Trust Company

of New York ("**Law Debenture**"). I have personal knowledge of the facts set forth herein,

except as to certain matters that I believe to be true based on (a) information provided by Duff &

Phelps ("**Duff**"),[1] (b) information about positions of parties in these Chapter 11 Cases contained

---

[1]      Capitalized terms used herein without definitions have the meanings ascribed to them in the Plan. For the convenience of the reader, in some cases the definitions found in the Plan are repeated herein or a citation to the Plan's definition of such term is given.

in pleadings that I reviewed, or reported to me by counsel, or learned during my participation in the Plan Mediation (defined below); and (c) my review of business records of Law Debenture.

2.     In my capacity as Senior Vice-President of Corporate Trust, my responsibilities include, among other things, managing and overseeing matters relating to Law Debenture's role as "Separate Trustee" to various residential mortgage-backed securities trusts, on behalf of which Law Debenture pursues repurchase claims resulting from breaches of representations and warranties made by sellers and other transaction parties related to mortgage loans within the portfolios of the trusts.

3.     This Declaration is submitted in support of confirmation of the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, *et al.*, and the Official Committee of Unsecured Creditors (the "Plan").[2]

## A.     **The Separate Trustee**

4.     Law Debenture serves as separate trustee (in such capacity, the "**Separate Trustee**") in respect of certain RMBS Trusts which are identified in schedules attached to the Proofs of Claim described below (collectively, the "**Law Debenture RMBS Trusts**"). As used herein, the term "Law Debenture" refers to Law Debenture solely in its capacity as Separate Trustee, and this Declaration is made solely with respect to Law Debenture's role as Separate Trustee of the Law Debenture RMBS Trusts.[3]

---

[2]     On August 23, 2013, the Plan Proponents filed the *Notice of Filing of Corrected Solicitation Version of the Disclosure Statement and Joint Chapter 11 Plan* [Docket 4819] that attached, as Exhibit A, the solicitation version of the *Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors*, which included the Plan as Exhibit 1.

[3]     As used herein, unless the context dictates otherwise, the term "**RMBS Trustees**" has the meaning ascribed to it in the Plan, to wit, Law Debenture; The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A. (together, "**BNY Mellon**"); Wells Fargo Bank, N.A. ("**Wells Fargo**"); Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas (together, "**Deutsche Bank**"); U.S. Bank National Association ("**U.S. Bank**"); and HSBC Bank USA, N.A. ("**HSBC**"), each solely in their respective capacities as trustee, indenture trustee, separate trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or other similar agencies.

5.      The Law Debenture RMBS Trusts are governed by one or more pooling and servicing agreements, indentures, highly integrated set of "servicing agreements," mortgage loan purchase agreements, deposit trust agreements, trust agreements, asset sale agreements, depositor sale agreements, administration agreements, yield maintenance agreements and other ancillary transaction documents (collectively, the "**Transaction Documents**").

6.      Pursuant to the Transaction Documents, one or more of the Debtors has obligations in various capacities, including as originator, seller, sponsor, depositor and similar capacities (collectively, "**Seller**"), and/or as servicer, subservicer, master servicer, back-up servicer, HELOC servicer, administrator, co-administrator, and similar capacities (collectively, "**Servicer**").

7.      In its capacity as Separate Trustee, Law Debenture has authority to enforce RMBS R+W Claims[4] against the Seller in respect of the Law Debenture RMBS Trusts and to vote such claims in connection with the Plan.

8.      Wells Fargo, as trustee and/or indenture trustee to the Law Debenture RMBS Trusts, has filed several verified petitions for instructions in the administration of the Law Debenture RMBS Trusts pursuant to Minn. Stat. § 501B.16.  In each of those petitions, Wells Fargo sought the entry of an order authorizing Law Debenture, as Separate Trustee, to take actions against entities who, directly or indirectly, sold, transferred or assigned residential mortgage loans ("**Mortgage Loans**") to such Law Debenture RMBS Trusts, or who may be liable for breaches of representations or warranties related to the Mortgage Loans (collectively, the "**Potentially Responsible Parties**").

---

[4]      Art.I.A.257 of the Plan defines **RMBS R+W Claims** as "claims of the RMBS Trusts against the Debtors arising from any obligations or liability in respect of the origination and sale of mortgage loans to the RMBS Trusts."

9.    Specifically, each verified petition sought an order that, among other things, authorized the Separate Trustee:

> to take actions to enforce claims against the Potentially Responsible Parties, including but not limited to (i) demanding production of files and other information relating to the Mortgage Loans (the 'Loan Files') by the Potentially Responsible Parties or servicers of the Mortgage Loans ('Servicers'), (ii) commencing litigation or asserting claims to compel the Potentially Responsible Parties or Servicers to turn over Loan Files, (iii) making demands on the Potentially Responsible Parties to repurchase Mortgage Loans, (iv) commencing litigation to compel Potentially Responsible Parties to repurchase Mortgage Loans, and (v) taking any other actions authorized by the [Trust Agreements] to enforce a Potentially Responsible Party's obligation to repurchase Mortgage Loans (collectively, the 'Repurchase Claims'), to the extent of the powers of the Trustee, and to withdraw, compromise or settle the Repurchase Claims.

10.    Each of the verified petitions filed were granted.[5]    Promptly thereafter, Law Debenture accepted its responsibilities as Separate Trustee under the Instruments of

---

[5]    The RMBS Trusts that were the subject of such petitions, and the date the applicable petition was granted, are as follows:

| | |
|---|---|
| Harborview 2006-10 | 8/29/12 |
| Harborview 2007-3 | 8/29/12 |
| GMACM 2006-AR1 | 11/7/12 |
| GMACM 2006-J1 | 11/7/12 |
| GMACM 2000-HE2 | 11/8/12 |
| GMACM 2000-HE4 | 11/8/12 |
| GMACM 2002-HE1 | 11/8/12 |
| GMACM 2002-HE3 | 11/8/12 |
| GMACM 2002-HE4 | 11/8/12 |
| GMACM 2003-HE1 | 11/8/12 |
| GMACM 2003-HE2 | 11/8/12 |
| GMACM 2004-HE1 | 11/8/12 |
| GMACM 2004-HE2 | 11/8/12 |
| GMACM 2004-HE5 | 11/8/12 |
| GMACM 2004-VFT | 11/8/12 |

Appointment and Acceptance (each, an "**IAA**") attached to such verified petitions.  The IAAs provided, among other things, that:

> [T]he Separate Trustee shall ... have full power, right and authority to: i) pursue requests for mortgage loan files and related files/information; ii) commence litigation to compel servicers (or other applicable parties) to turnover mortgage loan files and related files/information; iii) demand repurchase or substitution of mortgage loans by mortgage loan sellers (or other applicable parties) and engage in settlement if applicable; iv) commence litigation to enforce Repurchase Claims and engage in settlement; and v) take such additional actions on behalf of the Certificateholders necessary or appropriate to give effect to (i) through (iv) above.

**B.**     **The Proofs of Claim and Notice of Cure Claims**

11.     On or about March 1, 2013, Law Debenture, as Separate Trustee, and Wells Fargo, as trustee and/or indenture trustee, jointly filed Proof of Claim Nos. 6604 through 6654 (the "**Proofs of Claim**").[6]

12.     On or about April 16, 2013, Wells Fargo, as trustee and/or indenture trustee for the Law Debenture RMBS Trusts, filed a Notice of Cure Claim [ECF No. 3454].

| | |
|---|---|
| GMACM 2005-AA1 | 11/8/12 |
| GMACM 2005-HE1 | 11/8/12 |
| GMACM 2005-HE2 | 11/8/12 |
| SARM 2007-3 | 5/2/13 |
| SARM 2007-6 | 5/2/13 |
| SASCO 2005-S6 | 7/24/13 |
| SASCO 2005-S7 | 7/24/13 |
| Carrington 2006-RFC1 | 9/4/13 |
| BSABS 2004-BO1 | 10/2/13 |
| Carrington 2007-RFC1 | 10/2/13 |

[6]     Wells Fargo and Law Debenture jointly filed such proofs of claim to the extent of their respective obligations as Trustee or Separate Trustee under the IAAs.  Subsequent to the submission of the Proofs of Claim, it was determined that certain of the Additional Settling RMBS Trusts for which Wells Fargo submitted Claim Numbers 6502-6552 also have RMBS R+W Claims against the Seller, and as a result, Law Debenture, in its capacity as Separate Trustee for these RMBS Trusts, has authority to vote such RMBS R+W Claims in connection with the Plan.

C.   **The RMBS 9019 Motion**

13.     Among the claims and disputes resolved in the Plan is a settlement (the "**RMBS Settlement**") that provides for the allowance, priority and allocation of the RMBS Trust Claims.[7]

14.     Shortly after these Chapter 11 Cases were filed, the Debtors filed a motion (as amended, the "**RMBS 9019 Motion**"[8]), seeking approval of the Original RMBS Settlement Agreements[9] with the Institutional Investors[10] (*i.e.*, the Steering Committee Consenting Claimants[11] and the Talcott Franklin Consenting Claimants[12]).  The Original RMBS Settlement Agreements relate to the RMBS R+W Claims of the 392 Original Settling RMBS Trusts.[13]

15.     Under the Original RMBS Settlement Agreements, the Original Settling RMBS Trusts would have been granted an allowed aggregate claim of up to $8.7 billion to be allocated in accordance with certain formulas set forth in Exhibit B to each of the Original RMBS Settlement Agreements.[14]  In support of the RMBS 9019 Motion, the Debtors submitted an

---

[7]      Defined at Art. I.A. 260 of the Plan.

[8]      *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 320]; *Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 1176]; and the *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 1887]

[9]      Defined at Art.I.A.194 of the Plan.

[10]     Defined at Art.I.A.131 of the Plan.

[11]     Defined at Art.I.A.278 of the Plan.

[12]     Defined at Art.I.A.280 of the Plan.

[13]     Holders in all 392 Original Settling RMBS Trusts were notified of the RMBS 9019 Motion, and all such Holders, and all other parties in interest in these Chapter 11 cases, had the opportunity to object to the RMBS 9019 Motion.

[14]     The RMBS 9019 Motion provided that "[w]hile the [Original Settlement Agreement] was negotiated by the Institutional Investors, the Trustees of each of the [Original Settling] RMBS Trusts will also evaluate the reasonableness of the settlement and can accept or reject the proposed compromise on behalf of each Trust."  *See* ECF No. 320 at ¶4.

expert report that calculated the Original Settling RMBS Trusts' RMBS R+W Claims at between $6.7 billion and $10.3 billion.[15]

## D.   The RMBS Trustees' Retention of Duff & Phelps

16.   I understand that in or about July 2012, Deutsche Bank, BNY Mellon, US Bank and Wells Fargo retained Duff to assist them in the Chapter 11 Cases, including in the identification, quantification, litigation, and/or resolution of the RMBS Trust Claims. Law Debenture later joined in the retention of Duff & Phelps after its appointment as Separate Trustee to assist it in the Chapter 11 Cases.

## E.   Objections to the RMBS 9019 Motion

17.   No party in interest filed an objection to the RMBS 9019 Motion claiming that the $8.7 billion allowed claim was too low. There were, however, several objections that the $8.7 billion number was too high. For example, the Committee's objection stated that the Debtors' liability for RMBS R+W Claims of the Original Settling RMBS Trusts was approximately $3.8 billion, and if certain legal defenses were considered, might be reduced to a range of $2.7 billion to $3.3 billion.[16] FGIC objected that the Debtors could not support the reasonableness of an allowed claim exceeding $4 billion, excluding the value of the claims that monoline insurers (each, a "**Monoline**") have against the Debtors, and that "the $8.7 Billion claim amount is excessive and unreasonable" and "grossly overstates the value of the settled claim."[17] MBIA similarly objected that the RMBS R+W Claims of the Original Settling RMBS Trusts, excluding the claims of the Monolines, were less than $3 billion and that the Original Settlement

---

[15]   *Declaration of Frank Sillman in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements*, ECF No. 320-8, at ¶¶ 68 and 69.

[16]   *Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* [ECF No. 2825], including the supporting Expert Report of Bradford Cornell, Ph.D [ECF No. 2829, Ex. A].

[17]   *Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF No. 2819].

Agreements provide a "windfall for certain Settling Trusts at the expense of both non-settling and settling creditors."[18]

18.     Only two holders in the Original Settling RMBS Trusts filed objections to the RMBS 9019 Motion.[19]  Those objections were limited to the manner in which the allowed claim was to be allocated among the Original Settling RMBS Trusts in the Original RMBS Settlement Agreements.  The crux of those two objections was that the allocation methodology in the Original RMBS Settlement Agreements failed to take into account the unique characteristics of the Original Settling RMBS Trusts and inappropriately used net losses as a proxy for viable RMBS R+W Claims.

**F.     The RMBS Trustees' Evaluation of the Original RMBS Settlement Agreements**

19.     Duff was initially asked by the RMBS Trustees to evaluate the reasonableness of the Original RMBS Settlement Agreements as they related to the RMBS R+W Claims of the Original Settling RMBS Trusts.

i.     Modification of the Original Claim Allocation Methodology

20.     As part of its analysis of the RMBS R+W Claims, Duff evaluated the Original Claim Allocation Methodology, which would have allocated RMBS R+W Claims among the Original Settling RMBS Trusts *pro rata* on the basis of the sum of the net losses that have been experienced and are estimated to be experienced by each such RMBS Trust through the date of its termination.

---

[18]     *See Objection of MBIA Insurance Corporation to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2810], including the Expert Declaration of C.J. Brown [ECF. No. 2811].

[19]     *See Objection to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2308]; *Limited Objection to Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2297].

21.    Based on Duff's suggestion, and after lengthy discussions with the Steering Committee Consenting Claimants, the Debtors and other parties in interest, the Original Claim Allocation Methodology was modified to provide for RMBS R+W Claims to be allocated *pro rata* based on differences among the RMBS Trusts (a) losses *and* (b) in the incidence of breaches of representations and warranties, as revealed by loan sampling and statistical work to be performed by Duff (the "**Revised Claim Allocation Methodology**").

22.    Duff advised the RMBS Trustees that it believed the Revised Claim Allocation largely addresses the substance of the objections to the RMBS 9019 Motion related to allocation methodology.    Consistent with Duff's recommendations, the Revised Claim Allocation Methodology is part of the RMBS Settlement that is contained in the Plan.

ii.    Review of Mortgage Files and Methodology Used

23.    To assess the reasonableness of the $8.7 billion settlement consideration and to implement the Revised Claim Allocation Methodology, Duff conducted a sampling review of more than 6,500 mortgage loan files provided by the Debtors.    In its review, Duff sought to identify breaches of representations and warranties made by the Debtors, using statistical methodologies to estimate the incidence of those breaches across the population of mortgage loans in the RMBS Trusts.    Duff also used historical information and financial analysis to calculate the total present and projected future losses of the RMBS Trusts that were associated with breaches of representations and warranties by the Debtors.

iii.    Trustees' Statement Regarding the RMBS 9019 Motion

24.    It is Law Debenture's understanding that the RMBS R+W Claims of the Original Settling RMBS Trusts, if litigated on an individual basis, would be subject to significant litigation risks and factual and legal defenses.    Many of those risks and defenses are identified in the Committee Objection and in the Steering Committee Investors' Statement in Support of

Settlement and Response to Settlement Objections [ECF No. 1739] (the "**Steering Committee Statement**").  As described in the Steering Committee Statement, the litigation of those claims would be an uncertain, expensive and protracted process, and even if such litigation were successful, it likely would deplete the Debtors' estates, and might result in diminished recoveries to all creditor constituencies, including the RMBS Trusts.  *See* Steering Committee Statement, ¶¶ 8, 28-32.

25.     In light of the conclusion of Duff regarding the estimated range of the RMBS R+W Claims of the Original Settling RMBS Trusts, and considering the substantial risks and defenses associated with litigating those claims in the absence of a consensual resolution, on or about February 4, 2013, Law Debenture, U.S. Bank, BNY Mellon and Deutsche Bank, responding to the Court's request that they advise the Court of their views concerning the Original RMBS Settlement Agreements in advance of the hearing on the RMBS 9019 Motion, filed the *RMBS Trustees' Statement Regarding Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of RMBS Trust Settlement Agreements* [ECF No. 2833] (the "**Trustees' Statement**").

26.     The Trustees' Statement stated, among other things, that:

> After careful consideration of relevant factors and analysis, including (a) the results of its review of a statistically significant number of loan files in the [Original] Settling [RMBS] Trusts provided by the Debtors, (b) the estimation of projected total collateral losses and underwriting breach rates in the [Original] Settling [RMBS] Trusts, (c) the estimation of likely agree rates with respect to the [Original] Settling [RMBS] Trusts (which take into account the litigation risk associated with the relative characteristics of the breach), and (d) consideration of causality factors (which take into account the litigation risk associated with a lack of causal relationship between the breach and loss), Duff advised [BNY Mellon, Deutsche Bank, U.S. Bank and Law Debenture] that the amount of [up to $8.7 billion] is within a reasonable range to settle the [Original] Settling [RMBS] Trusts' [RMBS R+W] Claims ...

Trustees' Statement, at ¶ 10.

27.     Those RMBS Trustees further stated in the Trustee Statement that:

Assuming no changes in the facts and controlling law underlying the [RMBS R+W] Claims, and subject to the RMBS Trustees' determination that all provisions of the [Original] RMBS Trust Settlement[s] are fair, equitable and reasonable to the Settling Trusts, the RMBS Trustees have determined that the Allowed Claim falls within a reasonable range to resolve the [Original] Settling [RMBS] Trusts' [RMBS R+W] Claims and the Debtors' proposed Revised Claim Allocation Methodology for allocating the Allowed Claim among the [Original] Settling [RMBS] Trusts is fair and equitable to those trusts.

*Id.* at ¶12.

28.     On May 23, 2013, the day the PSA Motion was filed,[20] the trial dates and other matters related to the RMBS 9019 Motion were adjourned.[21]

**G.     Plan Mediation and the Plan Support Agreement**

29.     On December 6, 2012, the Debtors filed a motion seeking the entry of an order appointing a mediator to assist certain parties in interest in resolving various plan issues in furtherance of reaching a consensual Chapter 11 plan.[22]  On December 26, 2012, the Court appointed U.S. Bankruptcy Judge James M. Peck as Mediator.[23]

30.     The Plan Support Agreement – the terms of which are embodied in the Plan – was the result of an extensive mediation over the course of some five months overseen by Judge Peck (the "**Plan Mediation**").  The communications and analyses relating to negotiations conducted during the Plan Mediation are confidential pursuant to the Mediation Order and therefore cannot be disclosed in detail.  In general, however, the integrated, global settlement associated with the Plan must be understood as the product of intense, arms-length negotiations conducted by and among sophisticated parties (including the RMBS Trustees) with differing and conflicting

---

[20]     ECF No. 3814.

[21]     See ECF Nos. 3815 and 3816.

[22]     ECF No. 2357.

[23]     See December 26, 2012 Order Appointing Mediator [ECF No. 2519] (the "**Mediation Order**").  The Court later extended the term of the Mediator.

interests, advised by sophisticated advisors, under the close supervision and guidance of a sitting

bankruptcy judge.

    i.    <u>RMBS R+W Claims of the Additional Settling RMBS Trusts</u>

    31.    It had been contemplated by the RMBS Trustees that the resolution of the RMBS

Trust Claims would need to include the RMBS R+W Claims of all RMBS Trusts for which they

acted,[24] and not just the RMBS R+W Claims of the Original Settling RMBS Trusts.

    32.    In furtherance of that objective, the RMBS Trustees, working together with Duff,

identified Additional Settling RMBS Trusts,[25] and in the context of the Plan Mediation, those

Additional Settling Trusts were brought into the RMBS Settlement.

    33.    As contemplated by the RMBS Trustees, the Plan allows for distributions to the

Additional Settling Trusts.  Thus, the RMBS R+W Claims of the Additional Settling RMBS

Trusts are included in the RMBS Settlement contained in the Plan,[26] and their claims will receive

treatment thereunder that is consistent with the treatment being accorded under the Plan to the

RMBS R+W Claims of the Original Settling RMBS Trusts.

    ii.    <u>RMBS Cure Claims</u>

    34.    Negotiations in the Plan Mediation also led to the RMBS Cure Claims being

included in the RMBS Settlement.  In that regard, Duff analyzed potential liabilities of the

---

[24]    The claims of each RMBS Trust are based on the applicable Transaction Documents and therefore only certain RMBS Trusts have RMBS R+W Claims.

[25]    Defined at Art.I.A.2 of the Plan.  Since the Additional Settling RMBS Trusts were not included in the 9019 RMBS Motion, they were usually referred to as the Non-Settling Trusts prior to the Plan Support Agreement.

[26]    Art.IV.C.1 of the Plan provides:

    *Modification of Original RMBS Settlement Agreements*. The Original RMBS Settlement Agreements are hereby expanded to include all RMBS Trusts holding RMBS Trust Claims and are otherwise modified as set forth herein.

applicable Debtor, as servicer for the RMBS Trusts for which the RMBS Trustees act as Trustee or Master Servicer.[27]

36.    Duff attempted to quantify the Debtors' liability as servicer for: (a) misapplied and miscalculated payments; (b) wrongful foreclosure and improper loss mitigation practices; and (c) extended foreclosure timing issues caused by improper or inefficient servicing behavior such as falsified affidavits, improper documentation, and improper collection practices.  Duff concluded that the potential liability of the Debtors as servicer for the three bases analyzed could be asserted in amounts up to as much as $1.1 billion, but that the assertion of such claims involved significant risk and uncertainty.[28]

36.    As compromised and settled, the RMBS Cure Claims are included in the RMBS Settlement contained in the Plan.  Under the Plan, the RMBS Cure Claims are allowed in an aggregate amount of $96 million, and the RMBS Cure Claims are further divided between (a) RMBS Trusts where the servicing agreement has been assumed and assigned by the Debtors by the Effective Date ("**Recognized Cure Claims**"), in which case the servicing claims are (or will be) listed on Schedules 1G or 1R to the Plan and (b) RMBS Trusts where the servicing agreement has not been assumed and assigned by the Debtors by the Effective Date

---

[27]    In performing this analysis, Duff used publicly-available data on industry specific litigations and regulatory actions relating to residential mortgage servicing practices; reviewed the files of a large sampling of litigations specific to the Debtors; reviewed rating agency evaluation reports for the Debtors; accessed and reviewed a large sampling of the Debtors' records of servicing complaints for Debtor-serviced loans; and used publicly-available performance data on a sample of the RMBS Trusts.  Duff presented its analysis relating to the quantification of the RMBS Cure Claims both orally and in writing to the RMBS Trustees.

[28]    The RMBS Trustees were unable to obtain full discovery regarding potential RMBS Cure Claims, in part because the Debtors asserted that some of the information requested was not reasonably available.  The amount of information and data that would be needed in order to assert the RMBS Cure Claims in a litigated proceeding is likely very large and the analysis of that information and data would likely be expensive, time-consuming, and may ultimately lack sufficient certainty to establish the validity of such claims in a contested proceeding.  Furthermore, the Debtors may have viable defenses to the assertion and quantification of any RMBS Cure Claims, the resolution of which is uncertain.

("**Recognized Unsecured Servicing Claims**"), in which case the claims will be listed on Schedules 4G or 4R.

## H.    <u>Factors Supporting the RMBS Settlement</u>

37.    The RMBS Settlement contained in the Plan is the product of a lengthy, highly contentious Plan Mediation and multifaceted Global Settlement that resulted in the Plan Support Agreement and now the Plan.    Prior to entering into the Plan Support Agreement, Law Debenture, in its capacity as Separate Trustee, considered not only the benefits and risks of the RMBS Settlement but also the benefits and risks associated with reaching an agreement regarding an overall consensual Chapter 11 plan, as well as the risks and uncertainties associated with litigating the RMBS Trust Claims in the absence of a consensual Chapter 11 plan.

### i.    <u>The AFI Contribution</u>

38.    One significant facet of the Global Settlement contained in the Plan is the resolution of claims against AFI and its $2.1 billion contribution to the Debtors' estates (the "**AFI Contribution**").    Prior to the Plan Mediation, AFI was willing to make a contribution limited to $750 million.[29]

39.    Law Debenture concluded that the Law Debenture RMBS Trusts would derive significant benefits from the substantial increase in the amount of the AFI Contribution; the certainty associated with fixing the AFI Contribution; the added value to the Debtors' estates by virtue of the AFI Contribution; and the avoidance of the delay and expense associated with litigation relating to AFI's liability to the Debtors' estates.

### ii.    <u>Litigation Risks</u>

40.    Until the Consenting Claimants agreed to the Plan Support Agreement, many disputes that had been simmering between the various parties in interest were about to erupt into

---

[29]    ECF No. 6-8.

litigation, and these potential litigations were anticipated to be lengthy and expensive, so much so that they could affect the recoveries of the RMBS Trusts.

41.     The Plan fixes the claims that the RMBS Trustees expect would otherwise be contested in time-consuming and uncertain proceedings.  Objections to the RMBS 9019 Motion, including those of FGIC, MBIA and the Committee will no longer be pressed.  The RMBS 9019 Motion will be resolved by the Plan, avoiding what would almost certainly have been a lengthy and expensive hearing.  Upon the conclusion of such hearing, while the Court might authorize the Debtors to perform the Original Settlement Agreements, it is also possible that the Court might sustain one or more of the objections filed to the RMBS 9019 Motion.  If the Court declined to grant the RMBS 9019 Motion, the allowance of repurchase claims of the Original Settling RMBS Trusts would be left to the expensive and uncertain process of claims litigation. Thus, allowance of the RMBS Trust Claims, as contemplated by the Plan, offers the benefits of such allowance without the risks attendant to that contested matter.

42.     In addition, the Plan fixes the amount of, and distributions under the Plan on, the claims of the Additional Settling Trusts without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims.

43.     The Plan also provides for the allowance of, and distribution on, the RMBS Cure Claims of the RMBS Trusts.  As set forth above, those claims were the subject of an analysis by Duff and were roughly quantified, but presentation of those claims would have required further discovery and analysis, likely leading to litigation over both the quantification of the claims and their relative priority.  The treatment of the Servicing Claims represents a meaningful recovery to the RMBS Trusts possessing such claims, without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims.

44.    Many of the contentious and complicated inter-creditor issues in these cases are resolved by the Plan, including, among other things, the priority of certain claims asserted by the Monolines and by certain other securities claimants.  In particular, both the amount of the claims of the Monolines and the relationship between those claims and the RMBS Trust Claims are the subject of disputes, and the resolution of all those disputes through litigation presents a general risk of delay and expense to all stakeholders, as well as a specific risk to the RMBS Trusts of dilution.

45.    Lastly, the ever-mounting costs of administration of these Chapter 11 Cases threaten to erode any distribution to unsecured creditors.  Confirmation of the Plan would effectively end the continued accrual of such costs.

iii.    Support of Other Constituencies

46.    The Institutional Investors, which hold significant, and for some RMBS Trusts controlling, investments in certificates issued by the RMBS Trusts, have communicated regularly with the RMBS Trustees and support the RMBS Settlement.  The Institutional Investors actively participated in the Plan Mediation and the negotiations that led to the overall settlement associated with the Plan Support Agreement and now contained in the Plan.  The Institutional Investors were aware of all of the compromises that emerged during the Plan Mediation and negotiations leading to the Plan Support Agreement and the Plan, and they communicated through their counsel that they fully supported the compromises made by the RMBS Trustees, as reflected in the Plan Support Agreement and the Plan.

I.    **The FGIC Settlement Agreement**

47.    During the Plan Mediation, BNY Mellon, U.S. Bank, Wells Fargo and Law Debenture (the "**FGIC RMBS Trustees**") were asked to consider a settlement proposal with

FGIC.[30]   Under that proposal, among other things, FGIC would pay to the RMBS Trusts that

were insured by FGIC (the "**FGIC RMBS Trusts**") a lump sum payment (the "**Commutation**

**Payment**") and forgo future premiums with respect to the **FGIC Policies**.[31]   In exchange, the

FGIC RMBS Trustees would release and discharge FGIC from all obligations and liabilities

under the FGIC Policies.  That proposal formed the basis of the **FGIC Settlement Agreement**,[32]

which is a central piece of the Plan.

48.    At the request of the FGIC RMBS Trustees, Duff conducted an analysis of the

economic terms of the FGIC Settlement Agreement and compared the Commutation Payment

(and the other benefits of the FGIC Settlement Agreement) to the discounted value of the stream

of payments each of the FGIC Insured RMBS Trusts would be projected to receive under the

Plan of Rehabilitation if the FGIC RMBS Trustees declined to enter into the FGIC Settlement

Agreement.

49.    Based on its analysis of the respective benefits to each of the FGIC Insured

RMBS Trusts of the FGIC Settlement Agreement and those that such trusts would enjoy under

the Plan of Rehabilitation, Duff advised the FGIC RMBS Trustees that the FGIC Settlement,

including the Commutation Payment, represented a reasonable resolution of the accrued and

unpaid claims and projected future claims against FGIC under the FGIC Policies.

---

[30]     On or about June 2012, the Superintendent of Financial Services of the State of New York filed a
rehabilitation petition on behalf of FGIC in the FGIC Rehabilitation Court, and was subsequently appointed by the
Court as rehabilitator (the "**Rehabilitator**") in a rehabilitation proceeding (the "**FGIC Rehabilitation
Proceeding**").  As a result of an injunction entered by the court in that proceeding (and earlier administrative action
taken by FGIC's regulator), the FGIC Insured RMBS Trusts were obligated to continue to pay premiums under
FGIC Policies, notwithstanding that FGIC was relieved of its obligations to pay claims made by the those trusts
under those same policies.  In or about June 2013, the Rehabilitator filed a revised First Amended Plan of
Rehabilitation for FGIC (the "**Plan of Rehabilitation**") which contemplated, among other things, payments over
time to policyholders in partial payment of claims under FGIC-issued insurance policies, including to the FGIC
Insured RMBS Trusts on account of the FGIC Policies.

[31]     Defined at Art.I.A.100 of the Plan.

[32]     Defined at Art.I.A.102 of the Plan.

50.    On June 7, 2013, the Debtors filed a motion seeking approval of the FGIC Settlement.[33]  Three sets of objections were filed,[34] and after a two day trial before this Court, two of the three objections were withdrawn.[35]  On September 13, 2013, this Court granted the motion to approve the FGIC Settlement.[36]

**J.    Allowance of, and Distributions on, the RMBS Trust Claims under the Plan**

i.    Allowed Amounts and Reasons for the Reallocation of Units

51.    The allowance and treatment of RMBS Trust Claims is found at Article IV, Section C of the Plan, which provides, among other things, that:

> (a)  Entry of the Confirmation Order shall constitute approval of the Allowed amount of the RMBS Trust Claims as non-subordinated Unsecured Claims, subject only to the Allowed Fee Claim, in the aggregate amounts of (i) $209.8 million against the GMACM Debtors; (ii) $7,091.2 million against the RFC Debtors; and (iii) $0 against the ResCap Debtors.

Plan Art.IV.C.2.

---

[33]    *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ECF No. 3929.

[34]    *Objection of the Ad Hoc Group of Junior Secured Noteholders to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ECF No. 4027; *Objection of Monarch Alternative Capital, LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ECF No. 4400; *Supplemental Objection of the Ad Hoc Group of Junior Secured Noteholders to the Debtors' FGIC Settlement Motion*, ECF No. 4401; and *Federal Home Loan Mortgage Corporation's Objection to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ECF No. 4406.

[35]    *Notice of Withdrawal of Objection of Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ECF No. 5020; *Notice of Withdrawal of Federal Home Loan Mortgage Corporation's Objection To Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ECF No. 5021.

[36]    *Memorandum Opinion and Order, and Findings of Fact and Conclusions of Law, Approving the FGIC Settlement Motion*, ECF No. 5042.  On September 20, 2013, the Court entered its *Order Granting Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among FGIC, the Debtors, the Trustees and the Institutional Investors*, ECF No. 5125.

52.    The aforesaid "Allowed amounts" were used by the Consenting Claimants during the negotiations that took place during the Plan Mediation, which resulted in the distributions to be made to the RMBS Trusts – *in the aggregate* – pursuant to the Plan Support Agreement (and now the Plan).    However, there were certain significant differences between the "Allowed amounts" and the claims of the RMBS Trusts as determined by Duff, particularly with respect to (a) the aggregate amount of the RMBS R+W claims of the Additional Settling RMBS Trusts and (b) the aggregate amount of the Recognized Cure Claims.    In addition, there were disputes between the Debtors and the RMBS Trustees regarding which Debtor was responsible for certain of those claims.    Finally, as of the time the Plan Support Agreement was negotiated, there was substantial remaining due diligence needed to confirm that certain of these claims were properly asserted under the provisions of the governing documents of certain of the RMBS Trusts, and if they were, to determine the responsible Debtor under the governing documents.

53.    Accordingly, the RMBS Trustees required the Plan to contain provisions that would allow the RMBS Trustees, after completing due diligence, to use the completed due diligence and Duff's final calculations of the RMBS Trust Claims to re-allocate the Units that will be distributed based on the "aggregate amounts of (a) $209.8 million against the GMACM Debtors; and (b) $7,091.2 million against the RFC Debtors."[37]    The re-allocation of Units from the RFC Pool to the GMACM Pool avoids significant distortions in distributions on account of the RMBS Trust Claims, as finally calculated, that would otherwise occur if distributions were made based on the above-referenced "aggregate" allowed amounts contained in the Plan.

---

[37]    Art.IV.C.2(a) of the Plan.

ii.    Reason for Calculation of "Weighted" Claims

54.    At the time the Plan Support Agreement was agreed to, the RMBS Trustees contemplated that RMBS Cure Claims of RMBS Trusts whose Servicing Agreements had been assumed would be paid first, in full, from cash distributed on the Units distributed under the Plan on account of the RMBS Trust Claims.[38]    Thereafter, it was learned that a priority distribution of cash proceeds would adversely affect the REMIC status of the applicable RMBS Trusts.    To avoid such an adverse tax effect while at the same time honoring the priority nature of a RMBS Cure Claim where the Servicing Agreement has been assumed and assigned, Art.IV.C.3(c) and (d) of the Plan implement the concept of an RMBS Trust's total "weighted claim."    In order to calculate the GMACM Weighted Claim of an RMBS Trust, the GMACM Recognized Cure Claim is valued at 100%, and the GMACM Recognized Original R+W Claims, the GMACM Additional R+W Claims and the GMACM Recognized Unsecured Servicing Claims, if any, are valued at percentage distribution available from the GMACM Pool after the calculations made by Duff described in the Plan.    After the Weighted Claims are calculated, distributions are made based on a RMBS Trust's *pro rata* share of all of the Weighted Claims in the GMAC Pool.    The same process applies to calculate the RFC Weighted Claim of an RMBS Trust.

iii.    Impact of Monoline Insurance and "Recognized" Claims

55.    Insured RMBS Trusts (other than those insured by FGIC and Ambac) have received, and in the future are assumed to receive, payment of their losses to the extent necessary to pay the principal and interest due to the insured tranches of such trusts directly from the applicable Monoline, which in most cases eliminates the need for any distribution to those RMBS Trusts given the structure of the Plan and the inter-related settlements contained in the

---

[38]    *See, e.g.*, Annex III to the Plan Support Agreement [ECF No. 3814].

Plan.[39]  In such cases, the "recognized" claim of the RMBS Trust is set to zero, or is reduced, to take into account the full or partial payment of claims by the applicable Monoline, unless an exception applies.[40]  The rights of Insured RMBS Trusts are reserved in the event that the applicable Monoline does not honor its obligations.[41]

**P.**     **Notices to Holders**

56.     Law Debenture and/or Wells Fargo have, in their respective capacities as Separate Trustee, trustee and indenture trustee, regularly provided notice of matters related to the RMBS 9019 Motion and other significant events in ResCap's Chapter 11 Cases to the holders in the Law Debenture RMBS Trusts.

57.     I further understand that certain of the RMBS Trustees, including Wells Fargo, jointly retained The Garden City Group, Inc. ("**GCG**") to provide certain administrative services in connection with noticing various Holders, including the facilitation of the dissemination of notices to the various Holders at the direction and on behalf of the RMBS Trustees and the creation and maintenance of a website for Holders that provides contact information for the RMBS Trustees, recent developments in the Chapter 11 Cases, links to relevant documents filed in the Chapter 11 Cases, and upcoming Court deadlines and hearing dates (the "**RMBS Trustee Website**").

58.     As further described in more detail in the Affidavit of Jose C. Fraga ("**Fraga Affidavit**"), which is being filed concurrently herewith, GCG has distributed to various Holders

---

[39]     In consideration for these payments, the Monolines are allowed significant claims against the applicable Debtors, on account of which they are anticipated to receive substantial distributions from such Debtors' estates.

[40]     The exceptions are described at Art.IV.C.3.(a)(iv) of the Plan.

[41]     Art.IV.C.4 of the Plan.

and has published on the RMBS Trustee Website the following notices, copies of which are

attached to the Fraga Affidavit as Exhibits PX-1581 and PX-1585 through PX-1590 thereto:

- On August 22, 2012, following the filing of the Chapter 11 Cases and the First Supplemental RMBS 9019 Motion, to the Investors in the Original Settling Trusts, a "Time Sensitive Notice Regarding a Proposed Settlement Between Residential Capital, LLC, et al. and the Settlement Trusts."

- On October 17, 24 and 31, 2012, at or about the time of the Second Supplemental RMBS 9019 Motion, to certain Investors which may have RMBS Trust Claims and for which Wells Fargo is Trustee, a notice titled "Time Sensitive Notice Regarding (a) Order Setting Last Date to File Claims Against Debtors Residential Capital, LLC and Certain of its Direct and Indirect Subsidiaries, and (b) Updates of Matters Relevant to Certain Certificateholders."

- On January 24, 2013 and February 1, 2013, to certain Investors which may have RMBS Trust Claims and for which Wells Fargo is Trustee, a "Time Sensitive Notice Regarding Sale of Debtors' Servicing Platform to Ocwen Loan Servicing, LLC."

- On April 8, 9 and 12, 2013, to certain Investors which may have RMBS Trust Claims and for which Wells Fargo is Trustee, a "Notice Regarding Closing of Sale of Debtors' Servicing Platform to Ocwen and Update of 9019 Settlement."

- On May 24, 2013, at or about the time of the PSA Motion, a "Time Sensitive Notice Regarding (a) Plan Support Agreement Among ResCap Debtors and the RMBS Trustees, Among Others, and (b) Settlement Agreement Among the Debtors, Financial Guaranty Insurance Company and Certain of the RMBS Trustees."

- On August 30, 2013, a "Time Sensitive Notice Regarding (a) Approval of Disclosure Statement for ResCap Chapter 11 Plan and (b) Hearing on Confirmation of Plan."

- On October 1, 2013, a "Time Sensitive Notice Regarding (A) Hearing on Information of Proposed ResCap Chapter 11 Plan and (B) Court Approvals of the FGIC Settlement Agreement."

59.    The FGIC RMBS Trustees have also published notices providing additional

information to the holders in those trusts regarding the FGIC Rehabilitation Proceeding, the

process for holders to object to the FGIC Settlement in the FGIC Rehabilitation Proceeding and

to obtain information on the cash amount FGIC will pay to a particular trust, and the approval of

the FGIC Settlement and holders' rights thereunder.  In the case of the Law Debenture RMBS Trusts that were insured by FGIC, notices were provided by Wells Fargo, as trustee or indenture trustee, to the Holders in those trusts.  The notices and certain pleadings in the FGIC Rehabilitation Proceeding have also been posted on the RMBS Trustee Website.

**K.**    **Conclusion**

60.    For all of the foregoing reasons, Law Debenture believes that (a) the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement and all the transactions contemplated by each of the foregoing, including the releases given therein, are in the best interests of the Investors in each RMBS Trust, each such RMBS Trust and the RMBS Trustees; (b) the RMBS Trustees acted reasonably, in good faith and in the best interests of the Investors in each RMBS Trust and each such RMBS Trust in (i) entering into the Plan Support Agreement, (ii) performing their obligations under the Plan Support Agreement, including voting in favor of the Plan, where applicable, and (iii) agreeing to, and performing under, the Global Settlement and each of the settlements embodied therein, including the RMBS Settlement and the FGIC Settlement Agreement; and (c) the RMBS Trustees' notice of the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement and all the transactions contemplated by each of the foregoing, including the releases given therein, was sufficient and effective in satisfaction of federal and state due process requirements and other applicable law to put the parties in interest in these Chapter 11 Cases and others, including the Institutional Investors and the Investors in each RMBS Trust, on notice of the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement and all the transactions contemplated by each of the foregoing, including the releases given therein; and, accordingly, consistent with its undertakings in the Plan Support

Agreement and to the extent of its authority to do so as Separate Trustee, Law Debenture has

voted in favor of the Plan, and urges that the Court enter the proposed Order confirming the Plan.

DATED this 12th day of November, 2013

_____

Thomas Musarra