**DECHERT LLP**
Craig P. Druehl
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and
The Bank of New York Mellon Trust Company,
N.A., as Trustee of Certain Mortgage-Backed
Securities Trusts*

**MORGAN, LEWIS & BOCKIUS LLP**
Glenn E. Siegel
Rachel Jaffe Mauceri
101 Park Avenue
New York, New York 10178
Telephone: (212) 309-6000
Facsimile: (212 309-6001

*Counsel to The Bank of New York Mellon and
The Bank of New York Mellon Trust Company,
N.A., as Trustee of Certain Mortgage-Backed
Securities Trusts*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | ) |
| | ) **Chapter 11** |
| **Debtors.** | ) |
| | ) **Jointly Administered** |

## DECLARATION OF ROBERT H. MAJOR

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

 I, Robert H. Major, hereby declare, pursuant to 28 U.S.C. § 1746, that the following is

true and correct to the best of my knowledge, information, and belief:

 1. I am employed by The Bank of New York Mellon Trust Company, N.A. ("**BNY**

**Mellon Trust Company**") and am authorized to conduct certain activities on behalf of The Bank

of New York Mellon, including the authorization to make this Declaration on behalf of both

BNY Mellon Trust Company and The Bank of New York Mellon (collectively, "**BNY Mellon**").

My current title at BNY Mellon Trust Company is Vice President.

 2. I have been employed by BNY Mellon Trust Company, as Vice President, since

2006. My responsibilities in this capacity include the administration of defaulted and distressed

structured finance transactions for which BNY Mellon acts as trustee, including, among other things, consulting with counsel, declaring events of default, sending notices of default and other significant events, communicating with transaction parties and investors and, in connection with the foregoing and in consultation with investors, exercising remedies.

3.    This Declaration is submitted in support of the confirmation of the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* (the "**Plan**").[1]  Unless otherwise indicated, I have personal knowledge of the facts set forth herein, except as to certain matters that I believe to be true based on (i) information provided by Duff & Phelps, LLC ("**Duff**"), (ii) information about positions of parties in these Chapter 11 Cases contained in pleadings that I reviewed or learned during my participation in this case, including the Plan Mediation (defined below); and (iii) my review of business records of BNY Mellon.

4.    On May 13, 2013, the Debtors, Ally Financial Inc. ("**AFI**"), the Official Committee of Unsecured Creditors (the "**Committee**"), and the Consenting Claimants, including BNY Mellon, as RMBS Trustee, entered into the Plan Support Agreement [ECF No. 3814, Ex. 3] (the "**Plan Support Agreement**"), pursuant to which they agreed to the terms of a proposed consensual Chapter 11 plan of reorganization and resolution of all claims and disputes between them as set forth in the Plan Term Sheet and the Supplemental Term Sheet, attached respectively as Exhibits A and B to the Plan Support Agreement.

---

[1]    On August 23, 2013, the Plan Proponents filed the *Notice of Filing of Corrected Solicitation Version of the Disclosure Statement and Joint Chapter 11 Plan* [ECF No. 4819] that attached, as Exhibit A, the solicitation version of the *Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors*, which included the Plan as Exhibit 1.  Capitalized terms used herein without definitions have the meanings ascribed to them in the Plan.  For the convenience of the reader, in some cases the definitions found in the Plan are repeated herein or a citation to the Plan's definition of such term is given.

5.       The Debtors filed their *Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants* (the "**PSA Motion**") [ECF No. 3814] on May 23, 2013.  By Order dated June 26, 2013 [ECF No. 4098], this Court approved the PSA Motion.

## A.       BNY Mellon's Role as Trustee

6.       BNY Mellon, serves as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee master servicer, custodian and/or other similar agencies (in any such capacity, the "**Trustee**") in respect of certain residential mortgage backed securities ("**RMBS**") trusts, whole loan servicing agreements, net interest margin trusts, other trusts and similar arrangements listed on Schedule A to the Proofs of Claim (defined below) (collectively, the "**BNY Mellon RMBS Trusts**").  As used herein, the term "**BNY Mellon**" refers to BNY Mellon only in the applicable capacity as Trustee.

7.       The BNY Mellon RMBS Trusts are governed by one or more pooling and servicing agreements, highly integrated sets of "servicing agreements," mortgage loan purchase agreements, deposit trust agreements, trust agreements, indentures, asset sale agreements, depositor sale agreements, administration agreements, yield maintenance agreements and other ancillary transaction documents (collectively, the "**Transaction Documents**").[2]

8.       Pursuant to the Transaction Documents, one or more of the Debtors has obligations in various capacities, including as originator, seller, sponsor, depositor and similar

---

[2]    The Transaction Documents have information and details specific to the particular BNY Mellon RMBS Trust they govern, but in large part, the Transaction Documents have the same or comparable provisions, particularly as they relate to the responsibilities and rights of the Trustee.  Attached hereto as Exhibit PX-1516 is a sample indenture that governs one of the BNY Mellon RMBS Trusts.  Exhibit PX-1516 is indicative of the indentures that govern certain of the BNY Mellon RMBS Trusts.  Attached hereto as Exhibit PX-1517 is a sample pooling and servicing agreement that governs one of the BNY Mellon RMBS Trusts.  Exhibit PX-1517 is indicative of the pooling and servicing agreements that govern certain of the BNY Mellon RMBS Trusts.

capacities (together, "**Seller**"), and/or as servicer, subservicer, master servicer, back-up servicer, HELOC servicer, administrator, co-administrator and similar capacities (collectively, "**Servicer**").

9.      In the appropriate capacity or capacities as provided for in the Transaction Documents, BNY Mellon has the right to enforce claims against the Seller and Servicer in respect of the BNY Mellon RMBS Trusts and to vote such claims in connection with the Plan.

**B.      The Proofs of Claim and the Notice of Cure Claims**

10.      On or about March 1, 2013, BNY Mellon filed proofs of claim (the "**Proofs of Claim**") against each applicable Debtor [Proof of Claim Nos. 6757[3]-67, 6772-79][4], asserting various claims, including, but not limited to, claims on account of indemnification by the Debtors under the Transaction Documents.  The Proofs of Claim asserted claims for all of the BNY Mellon RMBS Trusts.

11.      On or about April 16, 2013, BNY Mellon filed a *Notice of Cure Claim of The Bank of New York Mellon Trust Company N.A., as Trustee* [ECF No. 3456], a *Notice of Cure Claim of The Bank of New York Mellon, as Trustee* [ECF No. 3457] and a *Notice of Cure Claim of The Bank of New York Mellon Corporation in its Capacity as Master Servicer* [ECF No. 3455] (the "**Notices of Cure Claim**") asserting claims arising from the Debtors' failure to perform its obligations as Servicer under the Transaction Documents.  The Notices of Cure Claim applied to all BNY Mellon RMBS Trusts with cure claims.[5]

---

[3]      BNY Mellon filed Proof of Claim No. 6757 in its capacity as master servicer.

[4]      *See also Stipulation and Order Permitting Certain Parties to File Proofs of Claim After the Bar Date* dated November 6, 2012 [ECF No. 2095].

[5]      *See also Fourth Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements*, ECF No. 2528, at ¶ 15.

C.     **The RMBS Settlement and 9019 Motion**

12.     Among the claims and disputes resolved in the Plan Support Agreement and ultimately the Plan is a settlement (the "**RMBS Settlement**") that provides for the allowance, priority and allocation of the (a) the claims of the RMBS Trusts against the Debtors arising from obligations or liability in respect of the origination and sale of mortgage loans to the RMBS Trusts (the "**RMBS R+W Claims**")[6] and (b) the claims of the RMBS Trusts against the Debtors other than the RMBS R+W Claims (the "**RMBS Cure Claims**," together with the RMBS R+W Claims, as further defined in the Plan, the "**RMBS Trust Claims**").[7]

13.     Shortly after these Chapter 11 Cases were filed, the Debtors filed a motion (the "**Original RMBS 9019 Motion**"),[8] which was later amended (as amended, the "**RMBS 9019 Motion**")[9], seeking approval of the **Original RMBS Settlement Agreement**s[10] with the two groups of **Institutional Investors**[11] (the **Steering Committee Consenting Claimants**[12] and the **Talcott Franklin Consenting Claimants**[13]).  The Original RMBS Settlement Agreements relate

---

[6]     Art.I.A.257 of the Plan defines RMBS R+W Claims as "claims of the RMBS Trusts against the Debtors arising from any obligations or liability in respect of the origination and sale of mortgage loans to the RMBS Trusts."

[7]     The RMBS Trust Claims are also defined at Art. I.A. 260 of the Plan.

[8]     *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 320].

[9]     *Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 1176] and the *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreement* [ECF No. 1887].

[10]     Defined at Art.I.A.194 of the Plan.

[11]     Defined at Art.I.A.131 of the Plan.  The Institutional Investors collectively held, or were authorized investment managers for holders of, 25% or more of classes (or tranches) of certificates of several of the Original Settling RMBS Trusts.

[12]     Defined at Art.I.A.278 of the Plan.

[13]     Defined at Art.I.A.280 of the Plan.

to the proposed settlement of the **RMBS R+W Claims** of the 392 Original Settling RMBS Trusts.[14]

14.    Under the Original RMBS Settlement Agreements, the Original Settling RMBS Trusts would have been granted an allowed aggregate claim of up to $8.7 billion against those Debtors that acted as Sellers to be allocated in accordance with certain formulas set forth in Exhibit B to each of the Original RMBS Settlement Agreements.[15]   In support of the RMBS 9019 Motion, the Debtors submitted an expert report that calculated the Original Settling RMBS Trusts' RMBS R+W Claims at between $6.7 billion and $10.3 billion.[16]

**D.    BNY Mellon's Retention of Qualified Professionals and Experts**

15.    At the outset of these Chapter 11 Cases, BNY Mellon retained Dechert LLP and has been advised by Dechert LLP throughout these Chapter 11 Cases, including in connection with its consideration of the RMBS Settlement.  In October 2013, BNY Mellon retained Morgan Lewis & Bockius LLP.  Both Dechert LLP and Morgan Lewis & Bockius LLP are experienced and knowledgeable firms.

16.    At the outset of these Chapter 11 Cases and in light of the then-pending RMBS 9019 Motion, BNY Mellon and three other RMBS Trustees[17] (Deutsche Bank, Wells Fargo and

---

[14]    Investors in the Original Settling RMBS Trusts were notified of the RMBS 9019 Motion, and all such Investors, and all other parties in interest in these Chapter 11 Cases, had the opportunity to object to the RMBS 9019 Motion.

[15]    The Original RMBS 9019 Motion provided that "[w]hile the [Original Settlement Agreement] was negotiated by the Institutional Investors, the Trustees of each of the [Original Settling] Trusts will also evaluate the reasonableness of the settlement and can accept or reject the proposed compromise on behalf of each Trust."  *See* Original RMBS 9019 Motion at ¶4.

[16]    *Declaration of Frank Sillman in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements. See* [ECF No. 320-8] at ¶¶  68-69.

[17]    As used herein, unless the context dictates otherwise, the term "**RMBS Trustees**" has the meaning ascribed to it in the Plan, to wit, BNY Mellon; U.S. Bank National Association ("**U.S. Bank**"); Wells Fargo Bank, N.A. ("**Wells Fargo**"); Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas (together, "**Deutsche Bank**"); Law Debenture Trust Company of New York ("**Law Debenture**"); and HSBC Bank USA, N.A. ("**HSBC**"), each solely in their respective capacities as trustee, indenture trustee, separate trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or other similar

U.S. Bank) retained Duff as their financial advisor to, among other things, assist them in the identification, quantification, litigation and/or resolution of the RMBS Trust Claims.[18]

17.     Duff was retained after a rigorous selection process that involved, among other things, interviewing five potential advisory firms in person, selecting two finalists, and hearing follow up presentations by the two finalists.   Duff was selected based on (a) the firm's experience in handling similar types of engagements involving the evaluation of mortgage loan servicing agreements and loan origination agreements, bankruptcy litigation, restructuring, asset valuation, complex securitizations and RMBS loan repurchase actions and (b) the depth of resources available to the firm, including advisory services about bankruptcy issues generally.

**E.     Objections to the RMBS 9019 Motion**

18.     No party filed an objection to the RMBS 9019 Motion claiming that the $8.7 billion allowed claim was too low.   There were, however, several objections that the $8.7 billion amount was too high.   For example, the Committee's objection stated that the Debtors' liability for RMBS R+W Claims of the Original Settling RMBS Trusts was approximately $3.8 billion and, if certain legal defenses were considered, might be reduced to a range of $2.7 billion to $3.3 billion.[19]   FGIC objected that the Debtors could not support the reasonableness of an allowed claim exceeding $4 billion, excluding the value of the claims that monoline insurers (each, a "**Monoline**") have against the Debtors, and that "the $8.7 billion claim amount is excessive and unreasonable" and "grossly overstates the value of the settled claim."[20]   MBIA

---

agencies.  BNY Mellon, together with Deutsche Bank and U.S. Bank, as RMBS Trustees, are also members of the Official Committee of Unsecured Creditors (the "**Committee**").

[18]     Law Debenture and HSBC later joined in the retention of Duff.

[19]     *Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* [ECF No. 2825], including the supporting Expert Report of Bradford Cornell, Ph.D [ECF No. 2829, Ex. A] (the "**Committee Objection**").

[20]     *Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreement* [ECF No. 2819].

similarly objected that the RMBS R+W Claims of the Original Settling RMBS Trusts, excluding the claims of the Monolines, were less than $3 billion and that the Original RMBS Settlement Agreements would have provided a "windfall for certain Settling Trusts at the expense of both non-settling and settling creditors."[21]

19.    Only two Investors in the Original Settling RMBS Trusts filed objections to the RMBS 9019 Motion,[22] and these objections were limited to the manner in which the allowed claim was to be allocated among the Original Settling RMBS Trusts in the Original RMBS Settlement Agreements. The crux of those two objections was that the allocation methodology in the Original RMBS Settlement Agreements failed to take into account the unique characteristics of the Original Settling RMBS Trusts and inappropriately used net losses as a proxy for viable RMBS R+W Claims.

**F.    The RMBS Trustees' Evaluation of the RMBS R+W Claims of the Original Settling RMBS Trusts**

20.    The RMBS Trustees asked Duff to evaluate the reasonableness of the Original RMBS Settlement Agreements as they related to the RMBS R+W Claims of the Original RMBS Settling Trusts.

**(i)    Modification of the Original Claim Allocation Methodology**

21.    As part of its analysis of the RMBS R+W Claims, Duff evaluated the claim allocation methodology in the Original RMBS Settlement Agreements, which would have allocated RMBS R+W Claims among the Original Settling RMBS Trusts *pro rata* on the basis of

---

[21]    *Objection of MBIA Insurance Corporation to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF No. 2810], including the Expert Declaration of C.J. Brown [ECF No. 2811].

[22]    *See Objection of Triaxx Prime CDO 2006-1, LLC, Triaxx Prime CDO 2006-2, LLC, and Triaxx Prime CDO 2007-1, LLC to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF No. 2308]; *Limited Objection of Amherst Advisory & Management, LLC to Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF No. 2297].

the sum of the net losses that have been experienced and are estimated to be experienced by each

such RMBS Trust through the date of its termination.

22.     Based on Duff's suggestion, and after lengthy discussions with the Steering

Committee Consenting Claimants, the Debtors and other parties in interest, the claim allocation

methodology in the Original RMBS Settlement Agreements was modified (the "**Revised Claim**

**Allocation Methodology**") to provide for RMBS R+W Claims to be allocated *pro rata* based on

differences among the RMBS Trusts with respect to (i) losses *and* (ii) the incidence of breaches

of representations and warranties, as revealed by loan sampling and statistical work to be

performed by Duff.  Duff advised BNY Mellon and other the RMBS Trustees that it believed the

Revised Claim Allocation Methodology largely addressed the substance of the objections to the

RMBS 9019 Motion related to allocation methodology.   In light of Duff's analysis, BNY

Mellon, and the other RMBS Trustees, concluded that the Revised Claim Allocation

Methodology was reasonable.

23.     Consistent with Duff's recommendations, the Revised Claim Allocation

Methodology is part of the RMBS Settlement as embodied in Exhibits 9 and 13 to the Disclosure

Statement.

### (ii)     Valuation of Original Settling RMBS Trusts' RMBS R+W Claims

24.     To assess the reasonableness of the $8.7 billion settlement consideration in the

Original RMBS Settlement Agreements, Duff reviewed a sample of more than 6,500 mortgage

loan files provided by the Debtors.   In that review, Duff sought to identify breaches of

representations and warranties made by the Debtors, and used statistical methodologies to

estimate the incidence of those breaches across the population of mortgage loans in the RMBS

Trusts.  Duff also used historical information and financial analyses to calculate the total present

and projected future losses of the RMBS Trusts that were associated with breaches of representations and warranties by the Debtors. As a result of the significant work done by Duff, BNY Mellon and the other RMBS Trustees gained an understanding that the estimated range of RMBS R+W Claims for the Original Settling RMBS Trusts was between $6.5 billion and $10.2 billion.

### (iii)    The RMBS Trustees' Statement Regarding the RMBS 9019 Motion

25.    Absent approval of the RMBS Settlement, the RMBS R+W Claims would have to be asserted, litigated and liquidated on an individual basis. It is BNY Mellon's understanding that the individual RMBS R+W Claims of the Original Settling RMBS Trusts, if litigated on an individual basis, would be subject to significant litigation risks and factual and legal defenses. Many of those risks and defenses are identified in the Committee Objection and in the *Steering Committee Investors' Statement in Support of Settlement and Response to Settlement Objections* [ECF No. 1739] (the "**Steering Committee Statement**"). As described in the Steering Committee Statement, the litigation of those claims would be an uncertain, expensive and protracted process, and even if such litigation were successful, it likely would deplete the Debtors' estates, and result in diminished recoveries to all creditor constituencies, including the RMBS Trusts. *See* Steering Committee Statement, ¶¶ 8, 28-32.

26.    In light of the conclusion of Duff regarding the estimated range of the RMBS R+W Claims of the Original Settling RMBS Trusts, and considering the substantial risks and defenses associated with litigating those claims in the absence of a consensual resolution, on or about February 4, 2013, BNY Mellon, U.S. Bank, Deutsche Bank and Law Debenture, responding to the Court's request that they advise it of their views of the Original RMBS Settlement Agreements in advance of the hearing on the RMBS 9019 Motion, filed the *RMBS*

*Trustees' Statement Regarding Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of RMBS Trust Settlement Agreements* [ECF No. 2833] (the "**Trustees' Statement**").

The Trustees' Statement stated, among other things, that:

> After careful consideration of relevant factors and analysis, including (a) the results of its review of a statistically significant number of loan files in the [Original] Settling [RMBS] Trusts provided by the Debtors, (b) the estimation of projected total collateral losses and underwriting breach rates in the [Original] Settling [RMBS] Trusts, (c) the estimation of likely agree rates with respect to the [Original] Settling [RMBS] Trusts (which take into account the litigation risk associated with the relative characteristics of the breach), and (d) consideration of causality factors (which take into account the litigation risk associated with a lack of causal relationship between the breach and loss), Duff advised [BNY Mellon, Deutsche Bank, U.S. Bank and Law Debenture] that the amount of [up to $8.7 billion] is within a reasonable range to settle the [Original] Settling [RMBS] Trusts' [RMBS R+W] Claims . . . .

Trustees' Statement ¶ 10.

27.    Those RMBS Trustees further stated in the Trustees' Statement that:

> Assuming no changes in the facts and controlling law underlying the [RMBS R+W] Claims, and subject to the RMBS Trustees' determination that all provisions of the [Original] RMBS Trust Settlement[s] are fair, equitable and reasonable to the Settling Trusts, the RMBS Trustees have determined that the Allowed Claim falls within a reasonable range to resolve the [Original] Settling [RMBS] Trusts' [RMBS R+W] Claims and the Debtors' proposed Revised Claim Allocation Methodology for allocating the Allowed Claim among the [Original] Settling [RMBS] Trusts is fair and equitable to those trusts.

*Id.* ¶12.

28.    On May 23, 2013, the day the PSA Motion was filed, the trial dates and other matters related to the RMBS 9019 Motion were adjourned.[23]

**G.    Plan Mediation and the Plan Support Agreement**

29.    On December 6, 2012, the Debtors filed a motion seeking the entry of an order appointing a mediator to assist certain parties in interest in resolving various plan-related issues

---

[23]    *See* ECF Nos. 3815 and 3816.

in furtherance of reaching a consensual Chapter 11 plan.[24]  On December 26, 2012, the Court

appointed U.S. Bankruptcy Judge James M. Peck as Mediator.[25]

30.    The Plan Support Agreement[26] – the terms of which are embodied in the Plan –

was the result of an extensive and contentious mediation over the course of some five months

(the "**Plan Mediation**") overseen by Judge Peck.  The communications and analyses relating to

negotiations conducted during the Plan Mediation are confidential pursuant to the Mediation

Order and cannot be disclosed in detail.  In general, however, the RMBS Settlement, as well as

the FGIC Settlement Agreement (discussed below), must be understood as part of an integrated,

multifaceted Global Settlement that was the product of contentious, arm's length negotiations

conducted by and among sophisticated parties (including the RMBS Trustees) with differing and

conflicting interests, each advised by sophisticated advisors, conducted under the close

supervision and guidance of a sitting bankruptcy judge.

## H.    Allowance of, and Distributions on, the RMBS Trust Claims Under the Plan

### (i)    <u>Allowed Amounts and Reasons for the Reallocation of Units</u>

31.    Article IV, Section C of the Plan provides (among other things) that:

(a) Entry of the Confirmation Order shall constitute approval of the Allowed
amount of the RMBS Trust Claims as non-subordinated Unsecured Claims,
subject only to the Allowed Fee Claim, in the aggregate amounts of (i) $209.8
million against the GMACM Debtors; (ii) $7,091.2 million against the RFC
Debtors; and (iii) $0 against the ResCap Debtors.

---

[24]    ECF No. 2357.

[25]    ECF No. 2519.  The Court later extended the term of the Mediator.

[26]    Attached hereto as <u>Exhibit PX-1518</u> is the Declaration of Robert H. Major, dated June 10, 2013 [ECF No. 3940-1] (the "**Major PSA Declaration**"), in support of the (a) Joinder of Certain RMBS Trustees to Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants [ECF No. 3940] and (b) Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants [ECF No. 3814].  The Major PSA Declaration is incorporated herein by reference.

Plan Art.IV.C.2.

32.     The aforesaid "Allowed amounts" were used by the Consenting Claimants during the negotiations that took place during the Plan Mediation which resulted in the distributions to be made to the RMBS Trusts – *in the aggregate* – pursuant to the Plan Support Agreement and now the Plan.   There were certain significant differences, however, between the "Allowed amounts" and the claims of the RMBS Trusts as determined by Duff, particularly with respect to (i) the aggregate amount of the RMBS R+W claims of the Additional Settling RMBS Trusts and (ii) the aggregate amount of the Recognized Cure Claims.   In addition, there were disputes between the Debtors and the RMBS Trustees regarding which Debtor was responsible for certain of those claims.   Finally, as of the time the Plan Support Agreement was negotiated, there was substantial remaining due diligence needed to confirm that certain of the claims of the RMBS Trusts were properly asserted under the provisions of the Transaction Documents of the applicable RMBS Trusts, and if they were, to determine the responsible Debtor under the Transaction Documents.

33.     Accordingly, the RMBS Trustees required the Plan to contain provisions that would allow the RMBS Trustees, after completing due diligence, to use the completed due diligence and Duff's final calculations of the RMBS Claims to re-allocate the Units that will be distributed based on the "aggregate amounts of (a) $209.8 million against the GMACM Debtors; (b) $7,091.2 million against the RFC Debtors."[27]   The re-allocation of Units from the RFC Pool to the GMACM Pool avoids significant distortions in distributions on account of the RMBS Trust Claims, as finally calculated, that would otherwise occur if distributions were made based on the above-referenced "aggregate" allowed amounts contained in the Plan.

---

[27]    Art.IV.C.2(a) of the Plan.

(ii)     **Reason for Calculation of "Weighted" Claims**

34.     At the time the Plan Support Agreement was agreed to, the RMBS Trustees contemplated that the RMBS Cure Claims of RMBS Trusts whose Servicing Agreements had been assumed would be paid first, in full, from cash distributed on the Units distributed under the Plan on account of the RMBS Trust Claims.[28]     Thereafter, it was learned that a priority distribution of cash proceeds would adversely affect the REMIC status of the applicable RMBS Trusts.  To avoid such an adverse tax effect while at the same time honoring the priority nature of a RMBS Cure Claim where the Servicing Agreement has been assumed and assigned, Art.IV.C.3(c) and (d) of the Plan implements the concept of a RMBS Trust's total "weighted claim."  In order to calculate the GMACM Weighted Claim of an RMBS Trust, the GMACM Recognized Cure Claim is valued at 100%, and the GMACM Recognized Original R+W Claims, the GMACM Additional R+W Claims and the GMACM Recognized Unsecured Servicing Claims, if any, are valued at percentage distribution available from the GMACM Pool after the calculations made by Duff described in the Plan.  After the Weighted Claims are calculated, distributions are made based on a RMBS Trust's *pro rata* share of all of the Weighted Claims in the GMACM Pool.  The same process applies to calculate the RFC Weighted Claim of an RMBS Trust.

(iii)     **Impact of Monoline Insurance and "Recognized" Claims**

35.     Insured RMBS Trusts[29] (other than those insured by FGIC and Ambac) have received, and in the future are assumed to receive, payment of their losses to the extent necessary

---

[28]  *See, e.g.*, Annex III to the Plan Support Agreement [ECF No. 3814].

[29]  While the Transaction Documents of the Insured RMBS Trusts have information and details specific to the particular BNY Mellon RMBS Trust they govern, in large part the Transaction Documents have the same or comparable provisions, particularly as they relate to the responsibilities and rights of the Trustee.  Attached hereto as Exhibit PX-1519 is a sample indenture that governs one of the BNY Mellon FGIC Insured Trusts.  Exhibit PX-1519 is indicative of the indentures that govern certain of the Insured RMBS Trusts.  A sample pooling and servicing

to pay the principal and interest due to the insured tranches of such trusts directly from the applicable Monoline, which in most cases eliminates the need for any distribution to those RMBS Trusts given the structure of the Plan and the inter-related settlements contained in the Plan.[30] In such cases, the "recognized" claim of the RMBS Trust is set to zero, or is reduced, to take into account the full or partial payment of claims by the applicable Monoline, unless an exception applies.[31] The rights of Insured RMBS Trusts are reserved in the event that the applicable Monoline does not honor its obligations.[32]

      **(iv)**    **RMBS R+W Claims of the Additional Settling RMBS Trusts**

     36.    The RMBS Trustees have consistently contemplated that the resolution of the RMBS Trust Claims would need to include the RMBS R+W Claims of all RMBS Trusts for which they acted,[33] and not just the RMBS R+W Claims of the Original Settling RMBS Trusts. In the Plan, these additional RMBS Trusts are referred to as the "**Additional Settling RMBS Trusts**."[34] In that regard, the RMBS Trustees, working together with Duff, identified the

---

agreement that governs one of the BNY Mellon FGIC Insured Trusts is attached as <u>Exhibit 118</u> to the BNY Mellon FGIC 9019 Declaration (defined below) and incorporated by reference herein. <u>Exhibit 118</u> to the BNY Mellon FGIC 9019 Declaration (defined below) is indicative of the pooling and servicing agreements that govern certain of the Insured RMBS Trusts. Attached hereto as <u>Exhibit PX-1520</u> is a sample insurance policy that contains the contractual terms of the relationship between a Monoline and an Insured RMBS Trust. <u>Exhibit PX-1520</u> is indicative of the insurance policies that govern the contractual relationship between the Monolines and the Insured RMBS Trusts. Attached hereto as <u>Exhibit PX-1521</u> is a sample insurance and indemnity agreement for an Insured RMBS Trust. <u>Exhibit PX-1521</u>  is indicative of the insurance and indemnity agreements for the Insured RMBS Trusts.

[30]   In consideration for these payments, the Monolines are allowed significant claims against the applicable Debtors, on account of which they are anticipated to receive substantial distributions from such Debtors' estates.

[31]   The exceptions are described at Art.IV.C.3.(a)(iv) of the Plan.

[32]   Art.IV.C.4 of the Plan.

[33]   The claims of each RMBS Trusts are based on the applicable Transaction Documents and therefore only certain RMBS Trusts have RMBS R+W Claims.

[34]   Defined at Art.I.A.2 of the Plan. Because the Additional Settling RMBS Trusts were not included in the 9019 RMBS Motion, prior to the Plan Support Agreement they were usually referred to as the Non-Settling Trusts.

Additional Settling RMBS Trusts, and in the context of the Plan Mediation those Additional

Settling RMBS Trusts were folded into the RMBS Settlement.[35]

37.    Duff completed the calculation range of the RMBS R+W Claims of the

Additional Settling RMBS Trusts using the same methodologies it employed to quantify the

comparable claims of the Original Settling RMBS Trusts.  Duff presented its analysis of the

RMBS R+W Claims of the Additional Settling RMBS Trusts to the RMBS Trustees, including

BNY Mellon, both orally and in writing.

38.    As contemplated by the RMBS Trustees, the Plan allows for distributions to the

Additional Settling RMBS Trusts.  Thus, the RMBS R+W Claims of the Additional Settling

RMBS Trusts are included in the RMBS Settlement contained in the Plan, and their claims will

receive treatment thereunder that is consistent with the treatment being accorded under the Plan

to the RMBS R+W Claims of the Original Settling RMBS Trusts.

### (v)    **RMBS Cure Claims**

39.    Negotiations in the Plan Mediation also led to the Servicing Claims of the RMBS

Trusts being wrapped into the RMBS Settlement.  In order to assist the RMBS Trustees in

quantifying the range of potential RMBS Cure Claims, Duff analyzed potential liabilities of the

applicable Debtor, as servicer, for the RMBS Trusts for which the RMBS Trustees act as Trustee

or as servicer, subservicer, master servicer, back-up servicer, HELOC servicer, administrator, co-

administrator and similar capacities.[36]

---

[35]   Art.IV.C.1 of the Plan provides:

   *Modification of Original RMBS Settlement Agreements*. The Original RMBS Settlement Agreements are
   hereby expanded to include all RMBS Trusts holding RMBS Trust Claims and are otherwise modified as
   set forth herein.

[36]   In performing this analysis, Duff used publicly-available data on industry specific litigation and regulatory
actions relating to residential mortgage servicing practices; reviewed the files of a large sampling of lawsuits
specific to the Debtors; reviewed rating agency evaluation reports for the Debtors; accessed and reviewed a large
sampling of the Debtors' records of servicing complaints for Debtor-serviced loans; and used publicly-available

40.    Duff attempted to quantify the Debtors' liability as servicer as related to: (a) misapplied and miscalculated payments; (b) wrongful foreclosure and improper loss mitigation practices; and (c) extended foreclosure timing issues caused by improper or inefficient servicing behavior such as falsified affidavits, improper documentation, and improper collection practices. Duff concluded that the potential liability of the Debtors as Servicer for the three bases analyzed could be asserted in amounts up to as much as $1.1 billion, but that the assertion of such claims involved significant risk and uncertainty.[37]

41.    As compromised and settled, the RMBS Cure Claims are included in the RMBS Settlement contained in the Plan Support Agreement and the Plan.  Under the Plan, the RMBS Cure Claims are allowed in an aggregate amount of $96 million, and divided between (a) RMBS Trusts where the servicing agreement has been assumed and assigned by the Debtors by the Effective Date (the "**Recognized Cure Claims**"), in which case the claims are (or will be) listed on Schedules 1G or 1R to the Plan and (b) RMBS Trusts where the servicing agreement has not been assumed and assigned by the Debtors by the Effective Date (the "**Recognized Unsecured Servicing Claims**"), in which case the claims will be listed on Schedules 4G or 4R.

I.    **The FGIC Settlement Agreement**

42.    BNY Mellon, U.S. Bank, Wells Fargo and Law Debenture are trustees, indenture trustees or separate trustees in respect of forty-seven RMBS Trusts that were insured by FGIC (the "**FGIC Insured Trusts,**" and BNY Mellon, U.S. Bank, Wells Fargo and Law Debenture in

---

performance data on a sample of the RMBS Trusts.  Duff presented its analysis relating to the quantification of the RMBS Cure Claims both orally and in writing to the RMBS Trustees.

[37]    The RMBS Trustees were unable to obtain full discovery regarding potential RMBS Cure Claims, in part because the Debtors asserted that some of the information requested was not reasonably available.  The amount of information and data that the RMBS Trustees would need in order to assert the RMBS Cure Claims in a litigated proceeding is likely very large and the analysis of that information and data would likely be expensive, time-consuming, and may ultimately lack sufficient certainty to establish the validity of such claims in a contested proceeding.  Furthermore, the Debtors may have viable defenses to the assertion and quantification of any RMBS Cure Claims, the resolution of which is uncertain.

such capacities, the "**FGIC Trustees**").  BNY Mellon serves as the trustee or indenture trustee for certain FGIC Insured Trusts (the "**BNY Mellon FGIC Insured Trusts**").

43.    During the Plan Mediation, the FGIC Trustees were asked to consider a settlement proposal with FGIC.[38]  Under that proposal, among other things, FGIC would pay to the FGIC Insured Trusts a lump sum payment (the "**Commutation Payment**") and forgo future premiums, reimbursement or other amount otherwise payable to FGIC under the FGIC Policies.[39]  In exchange, the FGIC Trustees would release and discharge FGIC from all obligations and liabilities under the FGIC Policies.  That proposal formed the basis of the FGIC Settlement Agreement,[40] which is a central piece of the Global Settlement which forms the basis of the Plan Support Agreement and the Plan.

44.    At the request of the FGIC Trustees, Duff conducted an analysis of the economic terms of the FGIC Settlement Agreement and compared the Commutation Payment (and the other benefits of the FGIC Settlement Agreement) to the discounted value of the stream of payments each of the FGIC RMBS Trusts would be projected to receive under the FGIC Plan of Rehabilitation if the FGIC Trustees declined to enter into the FGIC Settlement Agreement.

45.    Based on its analysis of the respective benefits to each of the FGIC RMBS Trusts of the FGIC Settlement Agreement and those that such trusts would enjoy under the FGIC Plan

---

[38]    On or about June 2012, the Superintendent of Financial Services of the State of New York filed a rehabilitation petition on behalf of FGIC in the New York State Supreme Court (the "**FGIC Rehabilitation Court"**), and was subsequently appointed by the Court as rehabilitator (the "**Rehabilitator**") in a rehabilitation proceeding (the "**FGIC Rehabilitation Proceeding**").  As a result of an injunction entered by the FGIC Rehabilitation Court in the FGIC Rehabilitation Proceeding (and earlier administrative action taken by FGIC's regulator), the FGIC RMBS Trusts were obligated to continue to pay premiums under the FGIC Policies, notwithstanding that FGIC was relieved of its obligations to pay claims made by those trusts under those same policies.  In or about June 2013, the Rehabilitator filed a revised First Amended Plan of Rehabilitation for FGIC (the "**FGIC Plan of Rehabilitation**"), which contemplated, among other things, payments over time to policyholders in partial payment of claims under FGIC Policies, including to the FGIC RMBS Trusts on account of the FGIC Policies.  The FGIC Plan of Rehabilitation became effective on August 19, 2013.

[39]    Defined at Art.I.A.100 of the Plan.

[40]    Defined at Art.I.A.102 of the Plan.

of Rehabilitation, Duff advised the FGIC Trustees that the FGIC Settlement, including the
Commutation Payment, represented a reasonable resolution of the accrued and unpaid claims and
projected future claims against FGIC under the FGIC Policies.  As described in more detail in
my Declaration submitted in support of the FGIC 9019 Motion,[41] a copy of which is attached
hereto as Exhibit PX-1522 (the "**BNY Mellon FGIC 9019 Declaration**") and incorporated by
reference herein, in reliance on Duff's analysis and recommendation, BNY Mellon determined in
good faith that entering into the FGIC Settlement Agreement was in the best interests of the
FGIC Insured Trusts for which it serves as trustee.  BNY Mellon understood that the other FGIC
Trustees reached the same conclusion.

46.     My attached BNY Mellon FGIC 9019 Declaration describes in detail the facts and
circumstances evidencing that (a) BNY Mellon, and the other FGIC Trustees, acted reasonably
and in good faith in agreeing to the FGIC Settlement Agreement; (b) the FGIC Settlement
Agreement is in the best interests of each of the FGIC Insured Trusts (including the BNY Mellon
FGIC Insured Trusts) and each of the investors in those trusts; and (c) notice to the investors in
BNY Mellon FGIC Insured Trusts of the FGIC Settlement was sufficient.

47.     Three sets of objections were filed,[42] and after a two day trial before this Court,
two of the three sets of objections were withdrawn.[43]  On September 13, 2013, this Court granted
the motion to approve the FGIC Settlement.[44]

---

[41]   *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the
Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* (the "**FGIC 9019 Motion**") [ECF No. 3929],
to which the FGIC Trustees filed a joinder, the *Joinder of FGIC Trustees to the Debtors' Motion Pursuant to Fed. R.
Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain
Institutional Investors.*  [ECF No. 3982].

[42]   *Objection of the Ad Hoc Group of Junior Secured Noteholders to the Debtors' Motion Pursuant to Fed. R.
Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain
Institutional Investors* [ECF No. 4027]; *Objection of Monarch Alternative Capital, LP, Stonehill Capital
Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master
Fund Limited to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement*

**J.      Factors Supporting the Global Settlement**

48.      The RMBS Settlement, as well as the FGIC Settlement Agreement, are part of an integrated, multifaceted Global Settlement among numerous constituencies that was the product of an extensive and contentious Plan Mediation that resulted in the Plan Support Agreement, and ultimately the Plan.  Prior to entering into the Plan Support Agreement, BNY Mellon considered not only the benefits and risks of the RMBS Settlement and the FGIC Settlement Agreement, but also the benefits and risks associated with reaching an agreement regarding an overall consensual Chapter 11 plan, as well as the risks and uncertainties associated with litigating the RMBS Trust Claims in the absence of such a plan.

**(i)      The AFI Contribution**

49.      One significant facet of the Global Settlement contained in the Plan Support Agreement and the Plan is the resolution of claims against AFI and the quantification of its contribution to the Debtors' estates.  At the time of the RMBS 9019 Motion, AFI had been

---

among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors [ECF No. 4400]; *Supplemental Objection of the Ad Hoc Group of Junior Secured Noteholders to the Debtors' FGIC Settlement Motion* [ECF No. 4401]; and *Federal Home Loan Mortgage Corporation's Objection to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [ECF No. 4406].

[43]    *Notice of Withdrawal of Objection of Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited to□Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [ECF No. 5020]; *Notice of Withdrawal of Federal Home Loan Mortgage Corporation's Objection To Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [ECF No. 5021].

[44]    *Memorandum Opinion and Order, and Findings of Fact and Conclusions of Law, Approving the FGIC Settlement Motion* [ECF No. 5042].  On September 20, 2013, the Court entered its *Order Granting Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among FGIC, the Debtors, the Trustees and the Institutional Investors* [ECF No. 5125].

willing to make a contribution to the Debtors' estates of $750 million.[45]    During the Plan

Mediation, AFI increased its contribution to $2.1 billion (the "**AFI Contribution**").

50.    BNY Mellon believes that, unless all parties (including the RMBS Trustees)

consented to an overall settlement that included the allowance and treatment of claims, it is

unlikely that AFI would have agreed to make the AFI Contribution, leading to lengthy and

expensive litigation with uncertain outcomes.    BNY Mellon considered the following attributes

collectively to be of significant benefit to the RMBS Trusts: (a) the substantial increase in the

amount of the AFI Contribution; the certainty associated with fixing the AFI Contribution; (c)

the added value to the Debtors' estates by virtue of the AFI Contribution; and (d) the effect on

the recoveries of the RMBS Trusts resulting therefrom and the avoidance of the delay, and

expense and uncertainty associated with litigation relating to AFI's liability to the Debtors'

estates.

### (ii)    Litigation Risks

51.    Until the Consenting Claimants agreed to the Plan Support Agreement, these

Chapter 11 Cases were at the precipice with many simmering disputes about to erupt into

litigation anticipated to be lengthy and expensive, so much so that they could have affected the

recoveries of the RMBS Trusts, including the BNY Mellon RMBS Trusts.    The Plan Support

Agreement and the Plan resolve those disputes.

52.    The Plan presents five significant benefits with respect to the litigation risks that

would be present absent the Plan.    *First*, the Plan fixes claims that otherwise would be contested

in time-consuming and uncertain proceedings.    Notably, the Plan resolves objections to the

RMBS 9019 Motion, including those of FGIC, MBIA and the Committee, that raise issues that

---

[45]    *See Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings* [ECF No. 6].

would likely require significant expense and numerous hearings. Upon the conclusion of such hearings, while the Court might authorize the Debtors to perform under the Original RMBS Settlement Agreements, it is also possible that the Court might sustain one or more of the objections filed to the RMBS 9019 Motion. If the Court declined to grant the RMBS 9019 Motion, the allowance of the RMBS R+W Claims of the Original Settling RMBS Trusts would be left to the expensive and uncertain process of claims litigation. Thus, allowance of the RMBS Trust Claims, as contemplated by the Plan, offers the benefits of allowance consistent with the RMBS 9019 Motion, within the range of reasonableness for the Original Settling Trusts, without the attendant litigation risks attendant to that contested matter.

53.    *Second*, the Plan fixes the amount of, and distributions under the Plan on, the RMBS R+W Claims of the Additional Settling RMBS Trusts without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims.

54.    *Third*, The Plan also provides for the allowance of, and distribution under, the Plan on the RMBS Cure Claims of the RMBS Trusts. As set forth above, those claims were roughly quantified by Duff as their presentation of those claims would have required further discovery and analysis, likely leading to litigation over both the quantification of the claims and their relative priority. The treatment of the RMBS Cure Claims represents a meaningful recovery to the RMBS Trusts possessing such claims, without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims.

55.    *Fourth*, the Plan resolves many of the contentious and complicated inter-creditor issues in these Chapter 11 Cases, including, among other things, the priority of certain claims asserted by the Monolines and by certain other securities claimants. In particular, both the amount of the Monolines' claims and the relationship between those claims and the RMBS Trust

Claims are the subject of disputes, and the resolution of all those disputes through litigation presents both a general risk of delay and expense to all stakeholders as well as a specific risk of dilution to the RMBS Trusts.  Thus, the Plan, which resolves these inter-creditor claims, offers significant benefit to all stakeholders, as well as the RMBS Trusts.

56.    *Fifth,* the ever mounting costs of administration of these Chapter 11 Cases threatened to erode any distribution to unsecured creditors.  Confirmation of the Plan would effectively end the continued accrual of such costs.

### (iii)    Support of Other Constituencies

57.    The Institutional Investors, which hold significant and for some RMBS Trusts, controlling investments in certificates issued by the RMBS Trusts have regularly communicated with the RMBS Trustees and support the RMBS Settlement and the FGIC Settlement Agreement.  The Institutional Investors actively participated in the Plan Mediation and the negotiations that led to the Global Settlement associated with the Plan Support Agreement and now contained in the Plan.  The Institutional Investors were aware of all of the compromises that evolved during the Plan Mediation and negotiations leading to the Plan Support Agreement and now contained in the Plan, and they communicated through their counsel that they fully supported the compromises made by the RMBS Trustees, as reflected in Plan Support Agreement and now the Plan.

## J.    Notice to Investors in the BNY Mellon RMBS Trusts

58.    BNY Mellon has regularly provided to the Investors in the BNY Mellon RMBS Trusts those notices related to the RMBS 9019 Motion, the Plan Support Agreement, the FGIC Settlement Agreement and other significant events in the Chapter 11 Cases.[46]

---

[46]    In consideration for these payments, the Monolines are allowed significant claims against the applicable Debtors, on account of which they are anticipated to receive substantial distributions.

(i)      **Notices Solely from BNY Mellon**

59.      On July 6, 2012, BNY Mellon provided to certain Investors in the BNY Mellon

RMBS Trusts the "*Notice of Event of Default, Bankruptcy Filing by Residential Capital, LLC, et*

*al., and Proposed Settlement between Residential Capital, LLC, and certain Certificateholders*"

(the "**Initial Notice**") advising them of the filing of the Chapter 11 Cases, the events of default

under certain of the Transaction Document, the proposed sale of the Debtors' mortgage

origination and servicing businesses, and the Original RMBS 9019 Motion.    A copy of the

Initial Notice is attached hereto as Exhibit PX-1523.

60.      On June 4, 2013, BNY Mellon distributed to the Investors in the BNY Mellon

FGIC Insured Trusts a "*Time Sensitive Notice Regarding Settlement Agreement Among the*

*ResCap Debtors, Financial Guaranty Insurance Company and the FGIC Trustees*" (the "**Holder**

**FGIC Settlement Notice**"), a copy of which is attached as Exhibit 129 to the BNY Mellon

FGIC 9019 Declaration and incorporated by reference herein.    The Holder FGIC Settlement

Notice provided information regarding the FGIC Rehabilitation Proceeding, the FGIC Settlement

Agreement, the Investors in the BNY Mellon FGIC Insured Trusts' rights thereunder, the process

for those Investors to object to the FGIC Settlement Agreement in the Rehabilitation Proceeding

and how to obtain information on the cash amount FGIC would pay to a FGIC Insured Trust.    On

August 8, 2013, BNY Mellon distributed to the Investors in the BNY Mellon FGIC Insured

Trusts a "*Time Sensitive Notice Regarding Allocation of Certain Settlement Amounts under the*

*Settlement Agreement Among the ResCap Debtors, Financial Guaranty Insurance Company, and*

*the FGIC Trustees*"  (the "**Holder FGIC Settlement Allocation Notice**"), attached hereto as

Exhibit PX-1524.      The  Holder  FGIC  Settlement  Allocation  Notice  contained  updated

information regarding the allocation of the Commutation Payment under the FGIC Settlement

Agreement among the FGIC Insured Trusts.

### (ii)  Notices from The Garden City Group, Inc.

61.    Following the filing of the initial RMBS 9019 Motion, BNY Mellon, together

with Deutsche Bank, U.S. Bank and Wells Fargo, jointly retained an agent, The Garden City

Group, Inc. ("**GCG**"), to coordinate and facilitate notice to Investors in the RMBS Trusts

regarding the RMBS 9019 Motion, developments with respect to the RMBS 9019 Motion, and

other important events in the Chapter 11 Cases.

62.    On behalf of the RMBS Trustees, GCG provided certain administrative services

in connection with noticing various Investors, including the coordination and facilitation of the

dissemination of notices to the various Investors at the direction and on behalf of the RMBS

Trustees, and in connection with the creation and maintenance of a website for Investors that

provides, among other things, contact information for the RMBS Trustees, significant relevant

developments in the Chapter 11 Cases, links to relevant documents filed in the Chapter 11 Cases,

and relevant upcoming Court deadlines and hearing dates (the "**RMBS Trustee Website**").  As

further described in the Affidavit of Jose C. Fraga, sworn to on November 12, 2013 (the "**Fraga**

**Affidavit**"), filed contemporaneously herewith, on behalf of the RMBS Trustees, GCG has

distributed to various Investors and has published on the RMBS Trustee Website the following

notices, copies of which are attached as exhibits to the Fraga Affidavit:

- On August 22, 2012, following the filing of the Chapter 11 Cases and the First Supplemental RMBS 9019 Motion, GCG distributed a notice to the Investors in the Original Settling Trusts, a "Time Sensitive Notice Regarding a Proposed Settlement Between Residential Capital, LLC, et al. and the Settlement Trusts."

- On October 17, 24 and 31, 2012, at or about the time of the Second Supplemental RMBS 9019 Motion, GCG sent to certain Investors, which may have RMBS Trust Claims and for which BNY Mellon is Trustee, a notice entitled

"Time Sensitive Notice Regarding (a) Order Setting Last Date to File Claims Against Debtors Residential Capital, LLC and Certain of its Direct and Indirect Subsidiaries, and (b) Updates of Matters Relevant to Certain Certificateholders."

•   On January 24, 2013 and February 1, 2013, GCG distributed to certain Investors, which may have RMBS Trust Claims and for which BNY Mellon is Trustee, a "Time Sensitive Notice Regarding Sale of Debtors' Servicing Platform to Ocwen Loan Servicing, LLC."

•   On April 8, 9 and 12, 2013, GCG distributed to certain Investors, which may have RMBS Trust Claims and for which BNY Mellon is Trustee, a "Notice Regarding Closing of Sale of Debtors' Servicing Platform to Ocwen and Update of 9019 Settlement."

•   On May 24, 2013, at or about the time of the PSA Motion, GCG distributed a "Time Sensitive Notice Regarding (a) Plan Support Agreement among ResCap Debtors and the RMBS Trustees, among Others, and (b) Settlement Agreement among the Debtors, Financial Guaranty Insurance Company and Certain of the RMBS Trustees."

•   On August 30, 2013, GCG distributed a "Time Sensitive Notice Regarding (a) Approval of Disclosure Statement for ResCap Chapter 11 Plan and (b) Hearing on Confirmation of Plan."

•   On October 1, 2013, GCG distributed a "Time Sensitive Notice Regarding (A) Hearing on Information of Proposed ResCap Chapter 11 Plan and (B) Court Approvals of the FGIC Settlement Agreement."

## K.   Conclusion

63.   For all of the foregoing reasons, BNY Mellon believes that (a) the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement and all the transactions contemplated by each of the foregoing, including the releases given therein, are in the best interests of the Investors in each RMBS Trust, each such RMBS Trust and the RMBS Trustees; (b) the RMBS Trustees acted reasonably, in good faith and in the best interests of the Investors in each RMBS Trust and each such RMBS Trust in (i) entering into the Plan Support Agreement. (ii) performing their obligations under the Plan Support Agreement, including voting in favor of the Plan, where applicable, and (iii) agreeing to, and performing under, the Global Settlement and each of the settlements embodied therein, including the RMBS

Settlement and the FGIC Settlement Agreement; and (c) the RMBS Trustees' notice of the Plan

Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement

Agreement and all the transactions contemplated by each of the foregoing, including the releases

given therein, was sufficient and effective in satisfaction of federal and state due process

requirements and other applicable law to put the parties in interest in these Chapter 11 Cases and

others, including the Institutional Investors and the Investors in each RMBS Trust, on notice of

the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC

Settlement Agreement and all the transactions contemplated by each of the foregoing, including

the releases given therein, and, accordingly, consistent with its undertakings in the Plan Support

Agreement and to the extent of its authority to do so, BNY Mellon has voted in favor of the Plan

and urges that the Court enter the proposed Order confirming the Plan.

[signature on following page]

27

Dated this 12th day of November, 2013

_____
Robert H. Major