**<u>Exhibit PX-1522</u>**

**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Brian P. Maloney
Ryan Suser
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | ) |
| | ) **Chapter 11** |
| Debtors. | ) |
| | ) **Jointly Administered** |

**NOTICE OF FILING OF UNREDACTED DECLARATION OF**
**ROBERT H. MAJOR, AS OFFICER OF THE BANK OF NEW YORK**
**MELLON TRUST COMPANY, N.A., RMBS TRUSTEE, IN SUPPORT OF**
**DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019**

**PLEASE TAKE NOTICE** that The Bank of New York Mellon, The Bank of New

York Mellon Trust Company, N.A. (collectively, "<u>BNY Mellon</u>"), U.S. Bank National

1212020130815000000000054

Association ("<u>U.S. Bank</u>"), and Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>"), solely in their

respective capacities as trustee or indenture trustee for certain mortgage backed securities trusts

(collectively, the "<u>FGIC Trustees</u>") hereby file the unredacted version of the *Declaration of*

*Robert H. Major, as Officer of the Bank of New York Mellon Trust Company, N.A., RMBS*

*Trustee in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019* (the "**Declaration**").

The Declaration was previously filed in redacted form on July 31, 2013 (Docket No. 4438),

pursuant to the Court's *Order Regarding Exchange of Confidential Information* (Docket No.

4249) (the "**Confidentiality Order**").

Dated:  New York, New York
        August 15, 2013

**DECHERT LLP**
By: /s/ Glenn E. Siegel
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon
and The Bank of New York Mellon Trust
Company, N.A., as Trustee of Certain
Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
By: /s/ John C. Weitnauer
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as
Trustee of Certain Mortgage Backed
Securities Trusts*

**SEWARD & KISSEL LLP**
By: /s/ Mark D. Kotwick
Mark D. Kotwick
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association,
as Trustee of Certain Mortgage-Backed
Securities Trusts*

**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The*
*Bank of New York Mellon Trust Company, N.A., as*
*Trustee of Certain Mortgage-Backed Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC,** *et al.,* | ) |
| | ) **Chapter 11** |
| Debtors. | ) |
| | ) **Jointly Administered** |

**DECLARATION OF ROBERT H. MAJOR, AS OFFICER OF**
**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,**
**AS TRUSTEE OR INDENTURE TRUSTEE**

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

I, Robert H. Major, hereby declare, pursuant to 28 U.S.C. § 1746, that the following is

true and correct to the best of my knowledge, information, and belief:

1.     I am employed by The Bank of New York Mellon Trust Company, N.A. ("**BNY**

**Mellon Trust Company**") and am authorized to conduct certain activities on behalf of The Bank

of New York Mellon, including the authorization to make this Declaration on behalf of both

BNY Mellon Trust Company and The Bank of New York Mellon (collectively, "**BNY Mellon**").

My current title at BNY Mellon Trust Company is Vice President.  Unless otherwise indicated, I

have personal knowledge of the facts set forth herein, except as to certain matters that I believe

to be true based on (i) information provided by Duff & Phelps, LLC ("**Duff & Phelps**"), the

FGIC Trustees' financial advisor in the Chapter 11 Cases, (ii) information about positions of

parties in these Chapter 11 Cases contained in pleadings that I reviewed, or reported to me by

counsel, or learned during my participation in the Plan Mediation (defined below); and (iii) my

review of business records of BNY Mellon.

2.      I have been employed by BNY Mellon Trust Company in this capacity since

2006.  My responsibilities as Vice President include the administration of defaulted and

distressed structured finance transactions for which BNY Mellon acts as trustee, including,

among other things, consulting with counsel, declaring events of default, sending notices of

default and other significant events, communicating with transaction parties and investors, and,

in connection with the foregoing and in consultation with investors, exercising remedies.

3.      This Declaration is submitted in support of the Debtors' Motion Pursuant to Fed.

R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the

FGIC Trustees, and Certain Individual Investors, dated June 7, 2013 [ECF No. 3929] (the

"**FGIC Motion**").[1]  The **FGIC Trustees**[2] filed a Joinder to the FGIC Motion [ECF No. 3982].

---

[1]     I have previously submitted a declaration, dated June 10, 2013 (the "**Major PSA Declaration**") in
support of the (a) Joinder of Certain RMBS Trustees to Debtors' Motion for an Order Under Bankruptcy
Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan
Support Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants
(the "**PSA Joinder**") [ECF No. 3940-1] and (b) Debtors' Motion for an Order Under Bankruptcy Code
Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support
Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants (the
"**PSA Motion**") [ECF No. 3814].

[2]     The FGIC Trustees are BNY Mellon, U.S. Bank National Association ("**U.S. Bank**") and Wells Fargo
Bank, N.A. ("**Wells Fargo**"), each solely in their respective capacities as trustees or indenture trustees for
certain FGIC Insured Trusts.

The FGIC Motion seeks the entry of an order approving the **FGIC Settlement Agreement**[3]

attached as Exhibit 2 to the FGIC Motion [ECF No. 3929-2]. The FGIC Settlement Agreement,

dated May 23, 2013, is among the Debtors, FGIC, the FGIC Trustees and the Institutional

Investors.

       A.     *Introduction and Overview*

              **BNY Mellon Trust Company's Role as Trustee of Certain Trusts**

    4.     The FGIC Trustees serve as trustees or indenture trustees of the **FGIC Insured**

**Trusts**, all of which were established before 2008. The FGIC Insured Trusts issued residential

mortgage backed securities ("**RMBS**") or similar securities. FGIC, a monoline financial

guaranty insurance company, issued irrevocable insurance policies (the "**FGIC Policies**") for

certain classes of the securities (the "**Securities**") issued by the FGIC Insured Trusts, thereby

guaranteeing the payment of principal and interest due on the Securities. At the same time,

FGIC entered into an Insurance and Indemnity Agreement with one or more of the Debtors in

connection with each of the FGIC Insured Trusts (the "**Insurance Agreements**"). Pursuant to

the Insurance Agreements, a Debtor party agreed, among other things, to reimburse FGIC for

certain payments FGIC made under the Policies that resulted from the applicable Debtor's failure

to repurchase or substitute mortgage loans that breached one or more representations or

warranties contained in the applicable Governing Agreements.

---

[3]     Capitalized terms used in this declaration but not defined herein have the meanings ascribed to them in
the FGIC Motion. For the convenience of the reader, in some cases, definitions found in the FGIC
Motion are repeated here.

5.      BNY Mellon Trust Company serves as Trustee or Indenture Trustee in respect of

thirty-one of the forty-seven FGIC Insured Trusts that are the subject of the FGIC Settlement

Agreement (collectively, the "**BNY Mellon FGIC Trusts**").[4]

### The FGIC Rehabilitation Proceeding

6.      In or about June 2012, the Superintendent of Financial Services of the State of

New York filed a rehabilitation petition on behalf of FGIC in the Supreme Court of the State of

New York, County of New York (the "**Rehabilitation Court**"), and was subsequently appointed

by the Rehabilitation Court as rehabilitator (the "**Rehabilitator**") in that proceeding (the "**FGIC**

**Rehabilitation Proceeding**").  As a result of an injunction entered by the Rehabilitation Court,

the FGIC Insured Trusts were obligated to continue to pay premiums under the FGIC Policies,

but FGIC was relieved of its obligations to pay claims made under those same policies.

7.      On September 27, 2012, the Rehabilitator filed a proposed Plan of Rehabilitation

for FGIC (as amended, the "**Rehabilitation Plan**"), which was approved by the Rehabilitation

Court on June 11, 2013.  The Rehabilitation Plan does not provide for full payment of the claims

of policyholders; rather, it contemplates partial distributions to all of FGIC's policyholders,

including the FGIC Insured Trusts, on account of present and future claims, over a period of up

to forty years.

---

[4]     Attached as **Exhibit 116** is a sample Indenture that governs one of the BNY Mellon FGIC Trusts.
Exhibit 116 is indicative of the Indentures that govern certain of the BNY Mellon FGIC Trusts.  Attached
as **Exhibit 118** is a sample Pooling and Servicing Agreement that governs one of the BNY Mellon FGIC
Trusts.  Exhibit 118 is indicative of the Pooling and Servicing Agreements that govern certain of the BNY
Mellon FGIC Trusts.

**The FGIC Settlement Agreement**

8.      During the mediation process in these Chapter 11 Cases, the FGIC Trustees were

asked to consider a settlement proposal between the Steering Committee Group,[5] FGIC and

MBIA (the "**Settlement Proposal**").  The Settlement Proposal included, among other things, a

lump sum payment by FGIC to the FGIC Insured Trusts (the "**Commutation Payment**") in

satisfaction of any obligations of FGIC to make payments in the future (the "**Projected**

**Payments**") to the FGIC Insured Trusts under FGIC's Rehabilitation Plan.  Ultimately, the terms

of the Settlement Proposal, including the Commutation Payment, became the basis of the FGIC

Settlement Agreement.  Throughout the mediation process, the FGIC Trustees were represented

by counsel.  Duff & Phelps was also present at many of the mediation sessions, including those

concerning the negotiation of the FGIC Settlement Agreement. In the final FGIC Settlement

Agreement, the Commutation Payment was fixed at $253.3 million.

9.      The FGIC Trustees requested that their financial advisor in these Chapter 11

Cases, Duff & Phelps, review the financial terms of the Settlement Proposal and, in particular,

analyze the value of the Projected Payments under the Rehabilitation Plan with the Commutation

Payment and other value to the FGIC Insured Trusts under the FGIC Settlement Agreements.

Duff & Phelps did so, and as described in further detail below, in reliance on their analysis and

recommendation, BNY Mellon determined in good faith that entering into the FGIC Settlement

Agreement was in the best interests of the FGIC Insured Trusts.  BNY Mellon understood that

the other FGIC Trustees reached the same conclusion.

---

[5]      The Steering Committee Group was a group of institutional investors in the Original Settling Trusts,
        including FGIC Insured Trusts, represented by Gibbs & Bruns LLP.  The Talcott Franklin Group was
        another group of institutional investors in Original Settling Trusts, including FGIC Insured Trusts,
        represented by Talcott Franklin P.C. The Steering Committee Group, together with the Talcott Franklin
        Group, are referred to collectively as the "Institutional Investors."

10.     While the FGIC Trustees considered the merits of the FGIC Settlement

Agreement on a stand-alone basis, it is also an integral part of a Plan Support Agreement[6] that

paves the way for confirmation of a Chapter 11 bankruptcy plan that will produce additional

value for Investors in the FGIC Insured Trusts.  Specifically, under the Plan Support Agreement

and the global settlement it embodies, the FGIC Insured Trusts will receive a significant

distribution, estimated now to be approximately $92 million, from the Debtors' bankruptcy estate

on account of representation and warranty claims against the Debtors.  The FGIC Trustees also

considered this value in weighing whether to accept the FGIC Settlement Agreement.

**The Proofs of Claim and the Notice of Cure Claims**

11.     On or about March 1, 2013, BNY Mellon filed proofs of claim  against each

applicable Debtor [Proof of Claim Nos. 6760, 6764, 6759. 6777, 6761, 6763, 6767, 6762, 6765,

6768, 6774, 6772, 6766, 6769, 6758, 6773, 6775 and 6776] (the "**Proofs of Claim**") asserting,

among other things: (a) the Servicing Claims; (b) the Repurchase Claims and other breach of

representations and warranties claims; (c) claims for indemnification under the Transaction

Documents; and (d) claims for fraud and/or negligent misrepresentation arising from the conduct

of the Debtors acting as Seller under the Transaction Documents.  The Proofs of Claim asserted

claims for all of the BNY Mellon RMBS Trusts,[7] including the BNY Mellon FGIC Trusts.

---

[6]     "Plan Support Agreement means, collectively, the Plan Support Agreement and Plan Term Sheet, each dated May 13, 2013, and the Supplemental Plan Term Sheet, dated May 2013.  On June 26, 2013, the Court entered an order granting Debtors' request to enter into the Plan Support Agreement.  *See Order Granting Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into a Plan Support Agreement with Ally Financial Inc., The Creditors' Committee, and Certain Consenting Claimants* [ECF No. 4098].

[7]     The "BNY Mellon RMBS Trusts" are the residential mortgage backed trusts described in the Proofs of Claim.

6

12.      On April 16, 2013, BNY Mellon filed a Notice of Cure Claim of the Bank of New York Mellon Trust Company N.A., as Trustee [ECF No. 3456] and a Notice of Cure Claim of The Bank of New York Mellon, as Trustee [ECF No. 3457] (the "**Notices of Cure Claim**") asserting claims arising from Debtors' failure to perform its obligations as Servicer under the Transaction Documents, including but not limited to misapplication of payments, wrongful foreclosure, improper loss mitigation practices, and unreasonably long foreclosure timing caused by improper servicing practices.  The Notice of Cure Claim applies to all BNY Mellon RMBS Trusts with Cure Claims, including BNY Mellon FGIC Trusts.

### The RMBS 9019 Motion

13.      Shortly after these Chapter 11 Cases were filed, the Debtors filed a motion, which was later amended (as amended, the "**RMBS 9019 Motion**"),[8] seeking approval of the Debtors' agreements (collectively, as amended the "**RMBS Settlement Agreement**"[9]) with two groups of institutional investors.  The RMBS Settlement Agreement relates to the Repurchase Claims of 392 RMBS trusts (the "**Original Settling Trusts**").

14.      Under the RMBS Settlement Agreement, among other things, AFI would contribute $750 million to the Debtors' estates and the Original Settling Trusts would have been

---

[8]    *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 320], as amended and supplemented by *Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 1176] and the *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements*.  [ECF No. 1887].

[9]    The Third and Amended and Restated Settlement Agreements can be found at Exhibits 1 and 2 of the *Declaration of LaShann M. DeArcy in Further Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Settlement Agreements*.  [ECF No. 3222].

granted an allowed aggregate claim of up to $8.7 billion (the "**Allowed Claim**").[10]  FGIC, among others, opposed the RMBS Settlement Agreement, resulting in substantial litigation and uncertainty, including with respect to the size of the AFI contribution to the Debtors' estates; the size and priority of the Original Settling Trusts' Repurchase Claims; and the validity, priority and relationship of those claims to the claims asserted by FGIC and other monoline insurers.

> **B.**  **The FGIC Trustees Acted Reasonably and in Good Faith in Agreeing to Enter Into the FGIC Settlement Agreement**

15.  The process by which the FGIC Trustees determined to enter into the FGIC Settlement Agreement demonstrates that they acted reasonably and in good faith.

### BNY Mellon's Retention of Qualified Professionals and Experts

16.  BNY Mellon retained and has been advised throughout these Chapter 11 Cases, including in connection with its consideration of the FGIC Settlement Agreement, by Dechert LLP, an experienced and knowledgeable law firm.

17.  The analysis and comparison of the value of the Projected Payments to the FGIC Insured Trusts under the Rehabilitation Plan with the Commutation Payment and other value to the FGIC Insured Trusts under the FGIC Settlement Agreement involved sophisticated financial modeling and a level expertise beyond that possessed by BNY Mellon, as Trustee.  The Transaction Documents expressly contemplate in these circumstances that the FGIC Trustees, including BNY Mellon, are entitled to rely on the advice of an expert in evaluating the alternatives.

---

[10]  The RMBS 9019 Motion provided that "[w]hile the [Original Settlement Agreement] was negotiated by the Institutional Investors, the Trustees of each of the [Original Settling] Trusts will also evaluate the reasonableness of the settlement and can accept or reject the proposed compromise on behalf of each Trust."  *See* ECF No. 320 at ¶4.

18.     At the outset of these Chapter 11 Cases, BNY Mellon and three other RMBS

Trustees (Deutsche Bank,[11] US Bank and Wells Fargo), after a rigorous selection process,

retained Duff & Phelps as their financial advisor.  Duff & Phelps was selected over four other

qualified candidates based on (a) the firm's experience in handling similar types of engagements

involving the evaluation of mortgage loan servicing agreements and loan origination agreements,

bankruptcy litigation, restructuring, asset valuation, complex securitizations and RMBS loan

repurchase actions and (b) the depth of resources available to the firm, including advisory

services about bankruptcy issues generally.

19.     Duff & Phelps was uniquely situated to provide the FGIC Trustees with advice

concerning the economic terms of the Settlement Proposal and the Projected Payments under the

Rehabilitation Plan.  Not only is Duff & Phelps a well-respected financial advisor with expertise

in financial modeling and cash flow projections, but it has substantial experience in these

Chapter 11 Cases through its work on behalf of the RMBS Trustees.  Their work has included:

- Conducting a sampling review of more than 6,500 mortgage loan files provided by
  the Debtors in an effort to identify breaches of representations and warranties, and
  using statistical methodologies to estimate the incidence of those breaches across the
  population of mortgage loans in the Original Settling Trusts.  Duff & Phelps also used
  historical information and financial analysis to calculate the total present and
  projected future losses experienced by the Original Settling Trusts, including the
  forty-seven FGIC Insured Trusts.

- Evaluating the methodology in the RMBS Settlement Agreement regarding allocation
  to each of the Original Settling Trusts of the Allowed Claim which, in response to
  suggestions by Duff & Phelps, which, after lengthy discussions with the Steering
  Committee Consenting Claimants and the Debtors, was modified at Duff & Phelps'
  suggestion to provide for the Allowed Claim to be allocated pro rata based on
  differences among the Original Settling in the incidence of breaches of

---

[11]   "Deutsche Bank" means Deutsche Bank National Trust Company and Deutsche Bank Trust Company
Americas, each solely in its capacity as trustee, indenture trustee, securities administrator, co-
administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect of
certain of the Settling Trusts.

representations and warranties, as revealed by additional loan sampling and statistical
work to be performed by Duff & Phelps.

- Identifying RMBS trusts in addition to the Original Settling Trusts with RMBS Trust
  Claims (the "**Additional Settling Trusts**," together with the Original Settling Trusts,
  the "**Settling Trusts**"), and quantifying those claims so the Additional Settling Trusts
  could receive treatment that is consistent with the treatment being accorded to the like
  claims of the Original Settling Trusts.

- Analyzing potential liabilities arising from the Debtors' multiple roles as Servicer in
  the securitization process in order to assist the RMBS Trustees in quantifying
  potential Servicing Claims so that the Settling Trusts, including all forty-seven of the
  FGIC Insured Trusts, could receive an allowed claim on account of those claims.

**The Plan Mediation**

20.    The FGIC Settlement Agreement was agreed to as part of an extensive mediation
with numerous interested parties in these Chapter 11 Cases in an effort to reach a consensual
Chapter 11 Plan (the "**Plan Mediation**").  The Plan Mediation occurred over the course of some
five months beginning in December 2012 and was overseen by a sitting Bankruptcy Judge, the
Honorable James M. Peck.

21.    The communications and analyses relating to negotiations conducted during the
Plan Mediation are confidential by law and pursuant to court order,[12] and therefore cannot be
disclosed in detail.  In general, however, the integrated, global settlement associated with the
Plan Support Agreement (including the FGIC Settlement Agreement) is now part of the ResCap
Plan, and must be understood as the product of intense, arm's-length negotiations conducted
among sophisticated parties with differing and conflicting interests, under the close supervision
and guidance of a sitting bankruptcy judge.

---

[12]    *See* December 26, 2012 Order Appointing Mediator [ECF No.2519].

**Participation of the Institutional Investors**

22.     In evaluating the Settlement Proposal, the FGIC Trustees, including BNY Mellon,

considered that the Institutional Investors (which included investors in the FGIC Insured Trusts)

actively participated in the Plan Mediation and supported the Settlement Proposal, ultimately

becoming signatories to the FGIC Settlement Agreement.  Because of the confidentiality

provisions of the Mediation Order, the FGIC Trustees were unable to raise the Settlement

Proposal with investors in the FGIC Insured Trusts who were not participants in the Plan

Mediation.  That the Plan Mediation was occurring, however, was not confidential.

**Notice to Investors in the FGIC Insured Trusts of the FGIC Settlement Agreement**

23.     One of the reasons that the FGIC Settlement Agreement is now before this Court

is that none of the FGIC Trustees would agree to the Settlement Proposal unless investors in the

FGIC Insured Trusts were provided a full and fair opportunity to voice any objections they may

have to such a settlement, including that the FGIC Settlement Agreement is not in the best

interest of investors, and to be heard with respect to any such objections.  The FGIC Trustees

insisted that the FGIC Settlement Agreement require that prompt notice be given with respect to

the FGIC Settlement Agreement[13] and require approval of the FGIC Settlement Agreement by

the Bankruptcy Court.[14]

---

[13]    Section 4.02 of the FGIC Settlement Agreement provides:

Within seven (7) Business Days following execution by all Parties of this Agreement, the Debtors shall
file the 9019 Motion with the Bankruptcy Court and otherwise use commercially reasonable efforts to
promptly obtain the Bankruptcy Court Order.  Upon obtaining knowledge of the issuance of the
Bankruptcy Court Order, the Debtors shall promptly notify the other Parties.

[14]    Section 6.01 of the FGIC Settlement Agreement provides that a condition precedent to the effectiveness
of the FGIC Settlement Agreement is the signing of orders approving the Settlement Agreement by both
the Bankruptcy Court and the Rehabilitation Court and that such orders shall become final.  The FGIC

24.    From BNY Mellon's perspective, it was essential for the FGIC Settlement

Agreement to provide investors with notice and the opportunity to object.  Absent such

provisions, BNY Mellon would not have agreed to the FGIC Settlement Agreement, and would

not have determined that entering into the FGIC Settlement Agreement was in the best interests

of the FGIC Insured Trusts and their investors.

**Other Factors Evidencing Reasonableness of BNY Mellon's Conduct**

25.    BNY Mellon also had the benefit of sitting on the Official Committee of

Unsecured Creditors in the Chapter 11 Cases.  My role as BNY Mellon's representative on that

committee gave me an additional perspective of the overall bankruptcy proceedings and allowed

BNY Mellon to better evaluate the Settlement Proposal in the larger picture of the Chapter 11

Cases and understand the relative risks and benefits of proceeding under the FGIC Settlement

Agreement or the Rehabilitation Plan.

26.    Finally, BNY Mellon and its counsel had the benefit of the views of the other two

FGIC Trustees and their counsel in considering the Settlement Proposal.  Like BNY Mellon,

U.S. Bank and Wells Fargo are two of the largest and most sophisticated financial institutions in

the country and were represented by experienced counsel in this matter.  The three FGIC

Trustees, although similarly situated and assisted by the same financial advisor, independently

considered the Settlement Proposal.  BNY Mellon took into consideration in forming its views of

---

Settlement Agreement must also be approved by the Rehabilitation Court after notice.  Section 4.01 of the FGIC Settlement Agreement provides:

Within three (3) Business Days following execution by all Parties of this Agreement, the Rehabilitator, on behalf of FGIC, shall file the Affirmation with the Rehabilitation Court and otherwise use commercially reasonable efforts to obtain the Rehabilitation Court Order. The Rehabilitator shall endeavor to schedule the hearing on the Rehabilitation Court Order for a date that is no less than thirty-seven (37) days after the filing of the Affirmation. Upon obtaining knowledge of the issuance of the Rehabilitation Court Order, the Rehabilitator, on behalf of FGIC, shall promptly notify the other Parties.

the Settlement Proposal that U.S. Bank and Wells Fargo and their counsel were coming to

similar conclusions regarding the benefits of the FGIC Settlement Agreement as compared to the

Projected Payments to the FGIC Insured Trusts under the Rehabilitation Plan.

> ### C.        *The FGIC Settlement Agreement is in the Best Interests of the FGIC Insured Trusts and the Investors in Those Trusts*

**<u>Consideration of the FGIC Settlement Agreement and the Duff Report</u>**

27.        As mentioned above, in the context of the Plan Mediation, the FGIC Trustees

were asked to consider a Settlement Proposal that included, among other things, FGIC making

the Commutation Payment in lieu of the Projected Payments contemplated under the

Rehabilitation Plan.

28.        The FGIC Trustees requested that Duff & Phelps analyze and compare the

economic terms of the Commutation Payment against the Projected Payments under the

Rehabilitation Plan and provide a recommendation to the FGIC Trustees.  Duff & Phelps was not

asked to analyze how the amount of the Commutation Payment was determined, but rather how

the Commutation Payment and the broader Settlement Proposal compared to the Projected

Payments under the Rehabilitation Plan.

29.        In conducting its analysis, I understand that Duff & Phelps reviewed and analyzed

publicly available information and also signed a confidentiality agreement with FGIC pursuant to

which I understand that they had the opportunity to speak to FGIC's Chief Restructuring Officer

and Lazard Freres & Co. LLC ("**Lazard**"), the financial advisors to the FGIC Rehabilitator and

to receive additional information concerning the Rehabilitation Plan.  Duff & Phelps also

considered certain information provided by parties to the Plan Mediation.

30.     On or about May 8, 2013, I received from my counsel, which played an active role in considering the Settlement Proposal, draft discussion materials prepared by Duff & Phelps setting forth its analysis of the Settlement Proposal, a copy of which is attached hereto as **Exhibit 119**.  I had several questions about that analysis, all of which were answered by Duff & Phelps.

31.     Subsequently, on or about May 13, 2013, Duff & Phelps made a presentation to the FGIC Trustees and their counsel concerning the Settlement Proposal.  The presentation took place in New York and lasted about an hour.  I participated telephonically and viewed a presentation via a "webex."  Accordingly, I was able to view the PowerPoint slides Duff & Phelps had prepared concerning its presentation while participating via a conference call.  Although I was not physically present at the presentation, BNY Mellon's attorneys attended.

32.     During the presentation, representatives from Duff & Phelps walked the FGIC Trustees and their counsel through their analysis, using as a reference its PowerPoint slides.  During the presentation, questions were posed to Duff & Phelps, all of which, to my recollection, were answered.

33.     At the time of presentation, I was able to follow and understand Duff & Phelps' analysis.  My primary focus was on the conclusion concerning how the Commutation Payment, together with the other value to the FGIC Insured Trusts under the Settlement Agreement, compared to the Projected Payments under the Rehabilitation Plan.

34.     On or about May 15, 2013, Duff & Phelps issued the final version of their report to the FGIC Trustees, a copy of which is attached hereto as **Exhibit 123** (the "**Duff Report**").

The Duff Report was substantially similar to the draft materials I had received on May 10 and the materials presented during the May 13 presentation.

35.      In the final Duff Report, Duff & Phelps reduced to writing their conclusion that the $253.3 million Commutation Payment is within the reasonable range of the present value of the Projected Payments under the Rehabilitation Plan.  That conclusion had been presented during the May 13 presentation.  It also identifies the value associated with not having to pay premiums on the FGIC Policies going forward, as well as the fact that the FGIC Settlement Agreement, as part of the global settlement embodied in the Plan Support Agreement, resolves various outstanding disputes in the Chapter 11 Cases, including various potential litigations and inter-creditor disputes in the Chapter 11 Cases.

36.      The Duff Report states that it is Duff & Phelps' recommendation that the Settlement Proposal, and specifically the Commutation Payment, is within the range of reasonableness of the estimated Projected Payments under the Rehabilitation Plan.

### The Merits of the FGIC Settlement Agreement on a Stand-Alone Basis

37.      It was significant to me that the $253.3 million Commutation Payment was a fixed amount, while the estimated $150 million initial Projected Payment to the FGIC Insured Trusts was estimated and subject to change at the discretion of the Rehabilitator following the effective date of the Rehabilitation Plan.  In addition, while I understood there was the potential for future Projected Payments in excess of the Commutation Payment, there was no certainty of the amount of any future Projected Payments, or the timing of such payments.  In fact, I understand there is a risk that future Projected Payments may fall short of the amount of the Commutation Payment.  My concern over the uncertainty of payments from FGIC was informed

by, among other things, the fact that, (i) although the FGIC Insured Trusts continue to pay premiums under the FGIC Policies, they have received no payment on any claims made under the policies since late 2009 and (ii) FGIC was exposed to potentially large future claims relating to, among other things, municipal bonds that would have the effect of diluting the Projected Payments. The Settlement Proposal eliminated the risk and uncertainty associated with the Projected Payments in exchange for a certain recovery.

38. I also found significant that the Commutation Payment, by itself, was within the reasonable range of the estimated total Projected Payments under the Rehabilitation Plan ($190 million to $340 million). The Duff Report, however, also makes clear that there was value to the FGIC Insured Trusts in the Settlement Proposal in addition to the Commutation Payment. Specifically, as a result of the termination of the FGIC Policies under the FGIC Settlement Agreement, the FGIC Insured Trusts would be relieved from the payment of future premiums, estimated to be some $18 million in present value. I also understood under the Settlement Proposal that FGIC would forego its right to receive certain reimbursement amounts from the FGIC Insured Trusts pursuant to the waterfall provisions under the relevant Governing Documents, which would provide additional, although at the time unquantified, future value to the FGIC Insured Trusts.

39. Given Duff & Phelps' expertise and extensive experience in the Chapter 11 Cases, their access to FGIC and Lazard in connection with analyzing the Settlement Proposal and their May 13 presentation and the Duff Report, I had no reason to question the accuracy of Duff & Phelps' analysis, and nothing that has transpired since that time has changed my view in that regard.

16

**The Additional Value to the FGIC Insured Trusts Under the ResCap Plan**

40.     In addition to the stand-alone benefits, the FGIC Settlement Agreement is an integral component of the Plan Support Agreement (and now proposed ResCap Plan) which resolves the claims of substantially all of the major constituents in these Chapter 11 Cases and confers many benefits upon the Debtors' creditors, including the FGIC Insured Trusts.  If the ResCap Plan is confirmed, these benefits include, among other things, that the FGIC Insured Trusts will receive a significant distribution from the Debtors' bankruptcy estate, contemplated to be in excess of $90 million, on account of representation and warranty claims against the Debtors.  In the absence of the Plan Support Agreement and ResCap Plan (if approved), there is no assurance that these trusts would have received anything in respect of their claims against the Debtors.

41.     It is an express condition of the Plan Support Agreement that both the Bankruptcy Court and the Rehabilitation Court approve the FGIC Settlement Agreement.  Without the FGIC Settlement Agreement, the global settlement embodied in the Plan Support Agreement, including the favorable claim treatment of the FGIC Insured Trusts, would collapse.  The FGIC Insured Trusts would not receive the contemplated $90+ million distribution from the Debtors' bankruptcy estate if the FGIC Settlement Agreement was rejected in favor of proceeding under the Rehabilitation Plan.

42.     In the absence of the FGIC Settlement Agreement and the global settlement embodied in the Plan Support Agreement, the value of any future recovery, if any, by the FGIC Insured Trusts in the Chapter 11 Cases is highly uncertain.

- First, the proposed ResCap Plan secures the contribution by AFI to the Debtors' estates of $2.1 billion in value, which is a substantial portion of the assets that will be distributed to the creditors of the Debtors' estates (including the FGIC Insured Trusts).

- Second, at the time of the Plan Mediation, the Chapter 11 Cases were facing several potentially lengthy and expensive litigations that could have significantly diminished the recoveries of the Settling Trusts, including the FGIC Insured Trusts.

  - The proposed ResCap Plan fixes claims that the FGIC Trustees expect would otherwise be contested in time-consuming and uncertain proceedings. In the absence of the global settlement embodied in the Plan Support Agreement, the RMBS 9019 would likely require a lengthy and expensive hearing, the outcome of which is uncertain. If the Court declined to grant the RMBS 9019 Motion, the allowance of Repurchase Claims of the Original Settling Trusts (including thirty-seven FGIC Insured Trusts) would be left to the expensive and uncertain process of claims litigation. Allowance of the RMBS Trust Claims, as contemplated by the proposed ResCap Plan, offers the benefits of allowance consistent with the RMBS 9019 Motion without the risks attendant to that contested matter.

  - The proposed ResCap Plan also allows the Repurchase Claims of the Additional Settling Trusts, including ten FGIC Insured Trusts, without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims, which otherwise would occur absent a global settlement.

  - The proposed ResCap Plan allows the Servicing Claims of the Settling Trusts, including all of the FGIC Insured Trusts. The presentation of those claims otherwise would have required further discovery and analysis, likely leading to litigation over both the quantification of the claims and their relative priority.

- Third, many of the contentious and complicated inter-creditor issues in these cases are resolved by the proposed ResCap Plan, including disputes over the priority of claims asserted by FGIC and the other Monolines and by certain other securities claimants. In particular, both the amount of FGIC's claims and the relationship between those claims and the claims of the FGIC Insured Trusts are the subject of disputes, and the resolution of all those disputes through litigation presents both a general risk of delay and expense to all stakeholders as well as a specific risk to the FGIC Insured Trusts of dilution.

- Fourth, the ever mounting costs of administration of these Chapter 11 Cases threaten to erode any distribution to unsecured creditors (including the FGIC Insured Trusts). The proposed ResCap Plan effectively abates the continued accrual of such costs, thus increasing the amount of ultimate recoveries to all creditors, including the FGIC Insured Trusts.

43.    For the reasons described above, and based on the analysis provided by Duff & Phelps, BNY Mellon concluded that the FGIC Settlement Agreement was reasonable and in the

best interests of the FGIC Insured Trusts and their investors and agreed to accept it on behalf of
the FGIC Insured Trusts.

**D.    *Notice to Investors in the BNY Mellon FGIC Insured Trusts of the FGIC
Settlement Agreement was Sufficient***

44.    Notice of the FGIC Settlement Agreement, including notice of the FGIC

Settlement Agreement by the FGIC Trustees, including BNY Mellon, is sufficient and effective

to put the parties in interest in these Chapter 11 Cases, including the investors in the FGIC

Insured Trusts, on notice of the FGIC Settlement Agreement.

45.    BNY Mellon has regularly provided to investors in the BNY Mellon RMBS

Trusts, including the BNY Mellon FGIC Trusts, notice of matters related to significant events in

the these Chapter 11 Cases.  Following the filing of the RMBS 9019 Motion, BNY Mellon,

together with Deutsche Bank, US Bank and Wells Fargo, jointly retained an agent, The Garden

City Group, Inc. ("**GCG**"), to coordinate and facilitate notice to investors regarding important

events in the Chapter 11 Cases.

46.    On behalf of the RMBS Trustees, GCG provided certain administrative services

in connection with noticing various investors, including the coordination and facilitation of the

dissemination of notices to the various investors at the direction and on behalf of the RMBS

Trustees, and in connection with the creation and maintenance of a website for investors that

provides, among other things, contact information for the RMBS Trustees significant relevant

developments in the Chapter 11 Cases, links to relevant documents filed in the Chapter 11 Cases,

and upcoming Court deadlines and hearing dates (the "**RMBS Trustee Website**").

47.    GCG distributed to various investors and published on the RMBS Trustee

Website various notices.  Among those notices was a notice dated May 24, 2013 entitled "Time

Sensitive Notice Regarding (a) Plan Support Agreement Among ResCap Debtors and the RMBS
Trustees, Among Others, and (b) Settlement Agreement Among the Debtors, Financial Guaranty
Insurance Company and Certain of the RMBS Trustees," a copy of which is attached hereto as
**Exhibit 128**. This notice, among other things, described the terms of the PSA and the Term
Sheets, as well as the RMBS Settlement and the FGIC Settlement Agreement and the process by
which Holders could object to them.

48.    In addition, on June 4, 2013, BNY Mellon distributed a "Time Sensitive Notice
Regarding Settlement Agreement Among the ResCap Debtors, Financial Guaranty Insurance
Company and the FGIC Trustees" (the "**Holder FGIC Settlement Notice**"), dated June 4, 2013,
a copy of which is attached hereto as **Exhibit 129**. The Holder FGIC Settlement Notice was
provided by BNY Mellon to the investors in the eight BNY Mellon FGIC Trusts. The Holder
FGIC Settlement Notice provided additional information to the investors in those trusts regarding
the Rehabilitation Proceeding, the FGIC Settlement Agreement, their rights thereunder, the
process for investors to object to the FGIC Settlement Agreement in the Rehabilitation
Proceeding and how to obtain information on the cash amount FGIC will pay to a particular
trust. The Holder FGIC Settlement Notice and certain pleadings in the FGIC Rehabilitation
Proceeding have also been posted on the RMBS Trustee Website.

49.    As part of the notice process, and in order to provide additional information to
investors in the FGIC Insured Trusts concerning the FGIC Settlement Agreement, the FGIC
Trustees agreed to make available to those investors information concerning the allocable share
of the Commutation Payment that each such FGIC Insured Trust would receive under the FGIC
Settlement Agreement.

50. Finally, the schedules attached to the Disclosure Statement filed with ResCap Plan provide information concerning the estimated recoveries of the FGIC Insured Trusts on account of Repurchase Claims and Servicing Claims against the Debtors.

**E.** ***Continued Assessment of the Reasonableness of the FGIC Settlement Agreement***

51. Shortly after the FGIC Settlement Agreement became public, certain investors indicated their intent to object to the FGIC Settlement Agreement. As a result, the FGIC Trustees have continued to assess the reasonableness of the FGIC Settlement Agreement. The Objectors[15] have asserted that the FGIC Settlement Agreement is not in their best interest or in the best interests of the FGIC Insured Trusts because, in their view, the FGIC Insured Trusts would receive greater recoveries under the Rehabilitation Plan.

52. The FGIC Trustees asked Duff & Phelps to evaluate and consider the assertions of the Objectors. Duff & Phelps has done so and its conclusions are presented in the Expert Report of Allen M. Pfeiffer dated July 19, 2013 (the "**Pfeiffer Expert Report**"). Additionally, the FGIC Trustees consulted S.P. Kothari, currently the Gordon Y. Billard Professor in Management at the Sloan School of Management at the Massachusetts Institute of Technology ("**MIT**") as well as Deputy Dean of MIT's Sloan School of Management. S.P. Kothari presented an expert report, also dated July 19, 2013 (the "**Kothari Expert Report**").

53. I have reviewed and considered both the Pfeiffer Expert Report and the Kothari Expert Report and they confirm the conclusions set forth in the Duff Report. As a result, I

---

[15] The "Objectors" are CQS ABS Master Fund Limited, CQS ABS Alpha Master Fund Limited, Bayview Fund Management LLC, Monarch Alternative Capital LP, Stonehill Capital Management LLC and Federal Home Loan Mortgage Corporation in conservatorship.

continue to believe that the FGIC Settlement Agreement is reasonable and in the best interests of
the FGIC Insured Trusts and their investors.

54.     In addition to consulting with experts, in continuing to assess whether the
Settlement Agreement is in the best interests of the investors, I have considered how recent
events might impact payments under the Rehabilitation Plan.  In particular, I have considered
how the recent bankruptcy of the City of Detroit might impact the amount of future claims made
against FGIC.  FGIC has insured a number of municipal bonds issued by the City of Detroit.[16]
Future claims related to missed payments on those bonds will increase the number of claims
against FGIC, which will likely dilute the expected recoveries under the Rehabilitation Plan.

[signature on following page]

---

[16]     *See* Financial Guaranty Insurance Company, Quarterly Operating Review First Quarter 2013 at 9
*available at* http://www.fgic.com/investorrelations/financialreports/qor2013q1.pdf, attached hereto as
**Exhibit 170**.

Dated this 31st day of July, 2013

_____

Robert H. Major

## Exhibit 116

**EXECUTION COPY**

GMACM HOME EQUITY LOAN TRUST 2006-HE2,

Issuer,

and

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,

Indenture Trustee

———————————————

INDENTURE

———————————————

Dated as of June 29, 2006

GMACM HOME EQUITY LOAN-BACKED TERM NOTES

US_WEST:260042806.5

## RECONCILIATION AND TIE BETWEEN TRUST INDENTURE ACT OF 1939 AND INDENTURE PROVISIONS[*]

Trust Indenture

| Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 6.11 |
| (a)(2) | 6.11 |
| (a)(3) | 6.10 |
| (a)(4) | Not Applicable |
| (a)(5) | 6.11 |
| (b) | 6.08, 6.11 |
| (c) | Not Applicable |
| 311(a) | 6.12 |
| (b) | 6.12 |
| (c) | Not Applicable |
| 312(a) | 7.01, 7.02(a) |
| (b) | 7.02(b) |
| (c) | 7.02(c) |
| 313(a) | 7.04 |
| (b) | 7.04 |
| (c) | 7.03(a)(iii), 7.04 |
| (d) | 7.04 |
| 314(a) | 3.10, 7.03(a) |
| (b) | 3.07 |
| (c)(1) | 8.05(c), 10.01(a) |
| (c)(2) | 8.05(c), 10.01(a) |
| (c)(3) | Not Applicable |
| (d)(1) | 8.05(c), 10.01(b) |
| (d)(2) | 8.05(c), 10.01(b) |
| (d)(3) | 8.05(c), 10.01(b) |
| (e) | 10.01(a) |
| 315(a) | 6.01(b) |
| (b) | 6.05 |
| (c) | 6.01(a) |
| (d) | 6.01(c) |
| (d)(1) | 6.01(c) |
| (d)(2) | 6.01(c) |
| (d)(3) | 6.01(c) |
| (e) | 5.13 |
| 316(a)(1)(A) | 5.11 |
| 316(a)(1)(B) | 5.12 |
| 316(a)(2) | Not Applicable |
| 316(b) | 5.07 |
| 317(a)(1) | 5.04 |
| 317(a)(2) | 5.03(d) |
| 317(b) | 3.03(a) |
| 318(a) | 10.07 |

---

[*] This reconciliation and tie shall not, for any purpose, be deemed to be part of the within indenture.

CONFIDENTIAL

This Indenture, dated as of June 29, 2006, is between GMACM Home Equity Loan Trust 2006-HE2, a Delaware statutory trust, as issuer (the "Issuer"), and JPMorgan Chase Bank, National Association, as indenture trustee (the "Indenture Trustee").

## WITNESSETH:

Each party hereto agrees as follows for the benefit of the other party and for the equal and ratable benefit of the Noteholders and the Enhancer of the Issuer's Series 2006-HE2 GMACM Home Equity Loan-Backed Term Notes (the "Notes").

## GRANTING CLAUSE:

The Issuer hereby Grants to the Indenture Trustee on the Closing Date, as trustee for the benefit of the Noteholders and the Enhancer, all of the Issuer's right, title and interest in and to all accounts, chattel paper, general intangibles, contract rights, payment intangibles, certificates of deposit, deposit accounts, instruments, documents, letters of credit, money, advices of credit, investment property, goods and other property consisting of, arising under or related to whether now existing or hereafter created in any of the following: (a) the Initial Mortgage Loans and any Subsequent Mortgage Loans, and all monies due or to become due thereunder; (b) the Custodial Account, Note Payment Account, Pre-Funding Account and Capitalized Interest Account, and all funds on deposit or credited thereto from time to time; (c) all hazard insurance policies; and (d) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in respect of, any or all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, checks, deposit accounts, rights to payment of any and every kind, and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing (collectively, the "Trust Estate" or the "Collateral").

The foregoing Grant is made in trust to secure the payment of principal of and interest on, and any other amounts owing in respect of, the Notes, equally and ratably without prejudice, priority or distinction, and to secure compliance with the provisions of this Indenture, all as provided in this Indenture.

The foregoing Grant shall inure to the benefit of the Enhancer in respect of draws made on the Policy and amounts owing from time to time pursuant to the Insurance Agreement (regardless of whether such amounts relate to the Notes or the Certificates), and such Grant shall continue in full force and effect for the benefit of the Enhancer until all such amounts owing to it have been repaid in full.

The Indenture Trustee, as trustee on behalf of the Noteholders, acknowledges such Grant, accepts the trust under this Indenture in accordance with the provisions hereof and agrees to perform its duties as Indenture Trustee as required herein.

CONFIDENTIAL                                                        RC_FGIC9019_00002755

## ARTICLE I

### Definitions

Section 1.01   Definitions.   For all purposes of this Indenture, except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Definitions attached hereto as Appendix A, which is incorporated by reference herein. All other capitalized terms used herein shall have the meanings specified herein.

Section 1.02   Incorporation by Reference of Trust Indenture Act.   Whenever this Indenture refers to a provision of the Trust Indenture Act (the "TIA"), such provision is incorporated by reference in and made a part of this Indenture. The following TIA terms used in this Indenture have the following meanings:

"Commission" means the Securities and Exchange Commission.

"indenture securities" means the Notes.

"indenture security holder" means a Noteholder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Indenture Trustee.

"obligor" on the indenture securities means the Issuer and any other obligor on the indenture securities.

All other TIA terms used in this Indenture that are defined by TIA, defined by TIA reference to another statute or defined by Commission rule have the meaning assigned to them by such definitions.

Section 1.03   Rules of Construction. Unless the context otherwise requires:

(a) a term has the meaning assigned to it;

(b) an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect from time to time;

(c) "or" includes "and/or";

(d) "including" means "including without limitation";

(e) words in the singular include the plural and words in the plural include the singular;

(f) the term "proceeds" has the meaning ascribed thereto in the UCC; and

US_WEST:260042806.5                                2

(g) any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument or statute as from time to time amended, modified or supplemented and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein; references to a Person are also to its permitted successors and assigns.

## ARTICLE II

### Original Issuance of Notes

Section 2.01   Form.   The Notes, together with the Indenture Trustee's certificate of authentication, shall be in substantially the form set forth in Exhibit A, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may, consistently herewith, be determined by the officers executing the Notes, as evidenced by their execution thereof.   Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of such Note.

The Notes shall be typewritten, printed, lithographed or engraved or produced by any combination of these methods, all as determined by the Authorized Officers executing such Notes, as evidenced by their execution of such Notes.

The terms of the Notes set forth in Exhibit A are part of the terms of this Indenture.

Section 2.02   Execution, Authentication and Delivery.   The Notes shall be executed on behalf of the Issuer by any of its Authorized Officers.   The signature of any such Authorized Officer on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signature of individuals who were at any time Authorized Officers of the Issuer shall bind the Issuer, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of such Notes.

The Indenture Trustee shall upon Issuer Request authenticate and deliver Notes for original issue in an amount equal to the Initial Aggregate Note Balance.   The Class A-1, Class A-2, Class A-3 and Class A-4 Notes shall have initial principal or notional amounts of the Initial Class A-1 Note Balance, Initial Class A-2 Note Balance, Initial Class A-3 Note Balance and Initial Class A-4 Note Balance, respectively.

Each Note shall be dated the date of its authentication.   The Notes shall be issuable as registered Book-Entry Notes, and the Notes shall be issuable in minimum denominations of $25,000 and integral multiples of $1,000 in excess thereof.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication substantially in the form provided for herein executed by the Indenture Trustee by the manual signature of one of its

US_WEST:260042806.5                                        3

CONFIDENTIAL                                                        RC_FGIC9019_00002757

authorized signatories, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

## ARTICLE III

### Covenants

Section 3.01 Collection of Payments with Respect to the Mortgage Loans. The Indenture Trustee shall establish and maintain with itself the Note Payment Account in which the Indenture Trustee shall, subject to the terms of this paragraph, deposit, on the same day as it is received from the Servicer, each remittance received by the Indenture Trustee with respect to the Mortgage Loans. The Indenture Trustee shall make all payments of principal of and interest on the Notes, subject to Section 3.03 as provided in Section 3.05 herein from monies on deposit in the Note Payment Account.

Section 3.02 Maintenance of Office or Agency. The Issuer will maintain in the City of New York, New York, an office or agency where, subject to satisfaction of conditions set forth herein, Notes may be surrendered for registration of transfer or exchange, and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served. The Issuer hereby initially appoints the Indenture Trustee to serve as its agent for the foregoing purposes. If at any time the Issuer shall fail to maintain any such office or agency or shall fail to furnish the Indenture Trustee with the address thereof, such surrenders, notices and demands may be made or served at the Corporate Trust Office, and the Issuer hereby appoints the Indenture Trustee as its agent to receive all such surrenders, notices and demands.

Section 3.03 Money for Payments to Be Held in Trust; Paying Agent. As provided in Section 3.01, all payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Note Payment Account pursuant to Section 3.01 shall be made on behalf of the Issuer by the Indenture Trustee or by the Paying Agent, and no amounts so withdrawn from the Note Payment Account for payments of Notes shall be paid over to the Issuer except as provided in this Section 3.03. The Issuer hereby appoints the Indenture Trustee to act as initial Paying Agent hereunder. The Issuer will cause each Paying Agent other than the Indenture Trustee to execute and deliver to the Indenture Trustee an instrument in which such Paying Agent shall agree with the Indenture Trustee (and if the Indenture Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 3.03, that such Paying Agent will:

(a) hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(b) give the Indenture Trustee and the Enhancer written notice of any default by the Issuer of which it has actual knowledge in the making of any payment required to be made with respect to the Notes;

US_WEST:260042806.5      4

CONFIDENTIAL      RC_FGIC9019_00002758

(c)      at any time during the continuance of any such default, upon the written request of the Indenture Trustee, forthwith pay to the Indenture Trustee all sums so held in trust by such Paying Agent;

(d)      immediately resign as Paying Agent and forthwith pay to the Indenture Trustee all sums held by it in trust for the payment of Notes, if at any time it ceases to meet the standards required to be met by a Paying Agent at the time of its appointment;

(e)      comply with all requirements of the Code with respect to the withholding from any payments made by it on any Notes of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith; and

(f)      deliver to the Indenture Trustee a copy of the statement to Noteholders prepared with respect to each Payment Date by the Servicer pursuant to Section 4.01 of the Servicing Agreement.

The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, by Issuer Request direct any Paying Agent to pay to the Indenture Trustee all sums held in trust by such Paying Agent, such sums to be held by the Indenture Trustee upon the same trusts as those upon which the sums were held by such Paying Agent; and upon such payment by any Paying Agent to the Indenture Trustee, such Paying Agent shall be released from all further liability with respect to such money.

Subject to applicable laws with respect to escheat of funds, any money held by the Indenture Trustee or any Paying Agent in trust for the payment of any amount due with respect to any Note and remaining unclaimed for one year after such amount has become due and payable shall be discharged from such trust and be paid to the Issuer on Issuer Request; and the Noteholder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer for payment thereof (but only to the extent of the amounts so paid to the Issuer), and all liability of the Indenture Trustee or such Paying Agent with respect to such trust money shall thereupon cease; provided, however, that the Indenture Trustee or such Paying Agent, before being required to make any such repayment, shall at the expense and direction of the Issuer cause to be published once, in an Authorized Newspaper, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such publication, any unclaimed balance of such money then remaining will be repaid to the Issuer. The Indenture Trustee may also adopt and employ, at the expense and direction of the Issuer, any other reasonable means of notification of such repayment (including, but not limited to, mailing notice of such repayment to the Enhancer and Noteholders of the Notes which have been called but have not been surrendered for redemption or whose right to or interest in monies due and payable but not claimed is determinable from the records of the Indenture Trustee or of any Paying Agent, at the last address of record for each such Noteholder).

Section 3.04  Existence.  The Issuer will keep in full effect its existence, rights and franchises as a statutory trust under the laws of the State of Delaware (unless it becomes, or any successor Issuer hereunder is or becomes, organized under the laws of any other state or of the United States of America, in which case the Issuer will keep in full effect its existence, rights and

US_WEST:260042806.5                                5

CONFIDENTIAL                                                              RC_FGIC9019_00002759

franchises under the laws of such other jurisdiction) and will obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Notes, the Mortgage Loans and each other instrument or agreement included in the Trust Estate.

Section 3.05    Priority of Distributions; Defaulted Interest.

(a)  In accordance with Section 3.03(a) of the Servicing Agreement, the priority of distributions on each Payment Date from Principal Collections and Interest Collections with respect to the Mortgage Loans, any optional advance of delinquent principal or interest on the Mortgage Loans made by the Servicer in respect of the related Collection Period, any Policy Draw Amount deposited into the Note Payment Account (to be applied solely with respect to the payment of amounts described in clauses (i) and (vi) under this Section 3.05(a)), and any amounts transferred to the Note Payment Account from the Pre-Funding Account and Capitalized Interest Account pursuant to Sections 3.18 and 3.19 of the Servicing Agreement, is as follows:

(i)  from Interest Collections, to the Enhancer, the amount of the premium for the Policy and any unpaid premium for the Policy from prior Payment Dates, with interest thereon as provided in the Insurance Agreement;

(ii)  from Interest Collections, any Capitalized Interest Requirement pursuant to Section 3.19(b) of the Servicing Agreement and any Policy Draw Amount with respect to the Notes deposited into the Note Payment Account on such Payment Date pursuant to Section 3.28(a)(ii), to the Note Payment Account, for payment by the Paying Agent to the Noteholders, interest for the related Interest Period at the related Note Rate on the related Note Balance immediately prior to such Payment Date, excluding any Relief Act Shortfalls allocated thereto pursuant to Section 3.05(f), plus any such amount remaining unpaid from prior Payment Dates;

(iii)  from Principal Collections, for payment by the Paying Agent to the Noteholders, as a distribution of principal on the Notes, the Principal Distribution Amount for such Payment Date to be allocated to each Class of Notes as described in Section 3.05(b) below, until the Note Balances thereof have been reduced to zero;

(iv)  from Excess Spread, for payment by the Paying Agent to each Class of Notes, as a distribution of principal on the Notes, in the priority set forth in section 3.05(b), an amount equal to the Liquidation Loss Distribution Amount (excluding Liquidation Loss Amounts that have been allocated to the reduction of the Note Balance of the Notes pursuant to Section 3.05(c) hereof) until the Note Balance of each Class of Notes has been reduced to zero;

(v)  to the Enhancer, to reimburse it for prior draws made on the Policy, with interest thereon as provided in the Insurance Agreement;

(vi)  from Excess Spread, or payment by the Paying Agent to the Noteholders of the Class of Notes in the priority set forth in Section 3.05(b), the

US_WEST:260042806.5                               6

CONFIDENTIAL                                                   RC_FGIC9019_00002760

Overcollateralization Increase Amount, if any, until the Note Balance of each Class of Notes has been reduced to zero;

(vii)    to the Enhancer, any amounts owed to the Enhancer pursuant to the Insurance Agreement other than amounts specified in clauses (i) or (vi) above;

(viii)    to the Indenture Trustee, any amounts owing to the Indenture Trustee pursuant to Section 6.07 to the extent remaining unpaid; and

(ix)    any remaining amount, to the Distribution Account, for distribution to the holders of the Certificates by the Certificate Paying Agent in accordance with the Trust Agreement;

provided, that on the Final Payment Date, the amount that is required to be paid pursuant to clause (iii) above shall be equal to the Note Balance immediately prior to such Payment Date.

Amounts distributed to the Noteholders pursuant to the above clauses (ii), (iii), (iv) and (vi) from Interest Collections, Principal Collections and the Policy Draw Amount shall be treated for tax purposes as distributions with respect to the REMIC II Regular Interests A-1, A-2, A-3 and A-4, respectively. Amounts distributed pursuant to clause (ix) shall be treated as having been distributed to the REMIC II Regular Interest SB-IO.

On each Payment Date, the Paying Agent shall apply, from amounts on deposit in the Note Payment Account, and in accordance with the Servicing Certificate, the amounts set forth above in the order of priority set forth in Section 3.05(a).

Amounts paid to Noteholders shall be paid in respect of the Notes in accordance with the applicable percentage as set forth in Section 3.05(e). Interest on the Notes will be computed on the basis of a 360-day year consisting of twelve 30-day months. Any installment of interest or principal payable on any Note that is punctually paid or duly provided for by the Issuer on the applicable Payment Date shall be paid to the Noteholder of record thereof on the immediately preceding Record Date by wire transfer to an account specified in writing by such Noteholder reasonably satisfactory to the Indenture Trustee, or by check or money order mailed to such Noteholder at such Noteholder's address appearing in the Note Register, the amount required to be distributed to such Noteholder on such Payment Date pursuant to such Noteholder's Notes; provided, that the Indenture Trustee shall not pay to any such Noteholder any amounts required to be withheld from a payment to such Noteholder by the Code.

(b) The Principal Distribution Amount distributable pursuant to Section 3.05(a)(iii), Liquidation Loss Distribution Amounts distributable to the holders of the Notes pursuant to Section 3.05(a)(iv) and Overcollateralization Increase Amounts distributable to the holders of the Notes pursuant to Section 3.05(a)(vi) will be to the Class A-1, Class A-2, Class A-3 and Class A-4 Notes, in that order, in each case until the Note Balance thereof has been reduced to zero;

(c) Principal of each Note shall be due and payable in full on the Final Payment Date as provided in the applicable form of Note set forth in Exhibits A. All principal payments

US_WEST:260042806.5                                           7

on the Notes shall be made in accordance with the priorities set forth in Sections 3.05(a) and 3.05(b) to the Noteholders entitled thereto in accordance with the related Percentage Interests represented thereby. Upon written notice to the Indenture Trustee by the Issuer, the Indenture Trustee shall notify the Person in the name of which a Note is registered at the close of business on the Record Date preceding the Final Payment Date or other final Payment Date, as applicable. Such notice shall be mailed no later than five Business Days prior to the Final Payment Date or such other final Payment Date and, unless such Note is then a Book-Entry Note, shall specify that payment of the principal amount and any interest due with respect to such Note at the Final Payment Date or such other final Payment Date will be payable only upon presentation and surrender of such Note, and shall specify the place where such Note may be presented and surrendered for such final payment.

On each Payment Date, the Overcollateralization Amount available to cover any Liquidation Loss Amounts on such Payment Date shall be deemed to be reduced by an amount equal to such Liquidation Loss Amounts (except to the extent that such Liquidation Loss Amounts were covered on such Payment Date by a payment in respect of Liquidation Loss Amounts).

(d) With respect to any Payment Date, interest payments on the Notes will be reduced by any Relief Act Shortfalls for the related Collection Period on a pro rata basis in accordance with the amount of interest payable on the Notes on such Payment Date, absent such reduction.

CONFIDENTIAL                                                           RC_FGIC9019_00002762

Section 3.06   Protection of Trust Estate.

(a)     The Issuer shall from time to time execute and deliver all such
supplements and amendments hereto and all such financing statements, continuation statements,
instruments of further assurance and other instruments, and will take such other action necessary
or advisable to:

(i)     maintain or preserve the lien and security interest (and the priority
thereof) of this Indenture or carry out more effectively the purposes hereof;

(ii)     perfect, publish notice of or protect the validity of any Grant made
or to be made by this Indenture;

(iii)     cause the Trust to enforce any of the Mortgage Loans; or

(iv)     preserve and defend title to the Trust Estate and the rights of the
Indenture Trustee and the Noteholders in such Trust Estate against the claims of all
persons and parties.

(b)     Except as otherwise provided in this Indenture, the Indenture Trustee shall
not remove any portion of the Trust Estate that consists of money or is evidenced by an
instrument, certificate or other writing from the jurisdiction in which it was held at the date of the
most recent Opinion of Counsel delivered pursuant to Section 3.07 (or from the jurisdiction in
which it was held as described in the Opinion of Counsel delivered at the Closing Date pursuant
to Section 3.07, if no Opinion of Counsel has yet been delivered pursuant to Section 3.07) unless
the Indenture Trustee shall have first received an Opinion of Counsel to the effect that the lien
and security interest created by this Indenture with respect to such property will continue to be
maintained after giving effect to such action or actions.

The Issuer hereby designates the Indenture Trustee its agent and attorney-in-fact to
execute any financing statement, continuation statement or other instrument required to be
executed pursuant to this Section 3.06.

Section 3.07   Opinions as to Trust Estate.

On the Closing Date, the Issuer shall furnish to the Indenture Trustee and the Owner
Trustee an Opinion of Counsel at the expense of the Issuer stating that, upon delivery of the
Mortgage Notes relating to the Initial Mortgage Loans to the Indenture Trustee or the Custodian
in the State of Pennsylvania, the Indenture Trustee will have a perfected, first priority security
interest in such Mortgage Loans.

On or before December 31st in each calendar year, beginning in 2006, the Issuer shall
furnish to the Indenture Trustee an Opinion of Counsel at the expense of the Issuer either stating
that, in the opinion of such counsel, no further action is necessary to maintain a perfected, first
priority security interest in the Mortgage Loans until December 31 in the following calendar year
or, if any such action is required to maintain such security interest in the Mortgage Loans, such
Opinion of Counsel shall also describe the recording, filing, re-recording and refiling of this

US_WEST:260042806.5                9

CONFIDENTIAL                                                    RC_FGIC9019_00002763

Indenture, any indentures supplemental hereto and any other requisite documents and the execution and filing of any financing statements and continuation statements that will, in the opinion of such counsel, be required to maintain the security interest in the Mortgage Loans until December 31 in the following calendar year.

Section 3.08   Performance of Obligations; Servicing Agreement.

(a)   The Issuer shall punctually perform and observe all of its obligations and agreements contained in this Indenture, the Basic Documents and in the instruments and agreements included in the Trust Estate.

(b)   The Issuer may contract with other Persons to assist it in performing its duties under this Indenture, and any performance of such duties by a Person identified to the Indenture Trustee in an Officer's Certificate of the Issuer shall be deemed to be action taken by the Issuer.

(c)   The Issuer shall not take any action or permit any action to be taken by others that would release any Person from any of such Person's covenants or obligations under any of the documents relating to the Mortgage Loans or under any instrument included in the Trust Estate, or that would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any of the documents relating to the Mortgage Loans or any such instrument, except such actions as the Servicer is expressly permitted to take in the Servicing Agreement.

(d)   The Issuer may retain an administrator and may enter into contracts with other Persons for the performance of the Issuer's obligations hereunder, and performance of such obligations by such Persons shall be deemed to be performance of such obligations by the Issuer.

Section 3.09   Negative Covenants.   So long as any Notes are Outstanding, the Issuer shall not:

(a)   except as expressly permitted by this Indenture, sell, transfer, exchange or otherwise dispose of the Trust Estate, unless directed to do so in writing by the Indenture Trustee pursuant to Section 5.04 hereof;

(b)   claim any credit on, or make any deduction from the principal or interest payable in respect of, the Notes (other than amounts properly withheld from such payments under the Code) or assert any claim against any present or former Noteholder by reason of the payment of the taxes levied or assessed upon any part of the Trust Estate;

(c)   (i) permit the validity or effectiveness of this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to the Notes under this Indenture except as may be expressly permitted hereby, (ii) permit any lien, charge, excise, claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Trust Estate or

10

CONFIDENTIAL                                    RC_FGIC9019_00002764

any part thereof or any interest therein or the proceeds thereof or (iii) permit the lien of this Indenture not to constitute a valid first priority security interest in the Trust Estate; or

(d)    impair or cause to be impaired the Issuer's interest in the Mortgage Loans, the Purchase Agreement or in any other Basic Document, if any such action would materially and adversely affect the interests of the Noteholders or the Enhancer.

Section 3.10   Annual Statement as to Compliance.   The Issuer shall deliver to the Indenture Trustee, within 120 days after the end of each fiscal year of the Issuer (commencing with the fiscal year ending on December 31, 2006), an Officer's Certificate stating, as to the Authorized Officer signing such Officer's Certificate, that:

(a)    a review of the activities of the Issuer during such year and of its performance under this Indenture and the Trust Agreement has been made under such Authorized Officer's supervision; and

(b)    to the best of such Authorized Officer's knowledge, based on such review, the Issuer has complied with all conditions and covenants under this Indenture and the provisions of the Trust Agreement throughout such year, or, if there has been a default in its compliance with any such condition or covenant, specifying each such default known to such Authorized Officer and the nature and status thereof.

Section 3.11   Recordation of Assignments.   The Issuer shall enforce the obligation, if any, of the Sellers under the Purchase Agreement to submit or cause to be submitted for recordation all Assignments of Mortgages within 60 days of receipt of recording information by the Servicer.

Section 3.12   Representations and Warranties Concerning the Mortgage Loans.   The Indenture Trustee, as pledgee of the Mortgage Loans, shall have the benefit of (i) the representations and warranties made by GMACM in Section 3.1(a) and Section 3.1(b) of the Purchase Agreement, (ii) the benefit of the representations and warranties made by WG Trust 2003 in Section 3.1(d) of the Purchase Agreement and (iii) the benefit of the representations and warranties made by GMACM or WG Trust 2003, as applicable, in Section 2 of any Subsequent Transfer Agreement, in each case, concerning the Mortgage Loans and the right to enforce the remedies against GMACM or WG Trust 2003 provided in Section 3.1(e) of the Purchase Agreement, as applicable, to the same extent as though such representations and warranties were made directly to the Indenture Trustee.

Section 3.13   Assignee of Record of the Mortgage Loans.   As pledgee of the Mortgage Loans, the Indenture Trustee shall hold title to the Mortgage Loans by being named as payee in the endorsements or assignments of the Mortgage Notes and assignee in the Assignments of Mortgage to be delivered under Section 2.1 of the Purchase Agreement. Except as expressly provided in the Purchase Agreement or in the Servicing Agreement with respect to any specific Mortgage Loan, the Indenture Trustee shall not execute any endorsement or assignment or otherwise release or transfer such title to any of the Mortgage Loans until such time as the remaining Trust Estate may be released pursuant to Section 8.05(b).  The Indenture Trustee's

US_WEST:260042806.5                     11

CONFIDENTIAL                                         RC_FGIC9019_00002765

holding of such title shall in all respects be subject to its fiduciary obligations to the Noteholders hereunder.

Section 3.14   Servicer as Agent and Bailee of the Indenture Trustee.   Solely for purposes of perfection under Section 9-313 or 9-314 of the UCC or other similar applicable law, rule or regulation of the state in which such property is held by the Servicer, the Issuer and the Indenture Trustee hereby acknowledge that the Servicer is acting as agent and bailee of the Indenture Trustee in holding amounts on deposit in the Custodial Account pursuant to Section 3.02 of the Servicing Agreement that are allocable to the Mortgage Loans, as well as the agent and bailee of the Indenture Trustee in holding any Related Documents released to the Servicer pursuant to Section 3.06(c) of the Servicing Agreement, and any other items constituting a part of the Trust Estate which from time to time come into the possession of the Servicer. It is intended that, by the Servicer's acceptance of such agency pursuant to Section 3.02 of the Servicing Agreement, the Indenture Trustee, as a pledgee of the Mortgage Loans, will be deemed to have possession of such Related Documents, such monies and such other items for purposes of Section 9-313 or 9-314 of the UCC of the state in which such property is held by the Servicer.

Section 3.15   Investment Company Act.   The Issuer shall not become an "investment company" or under the "control" of an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended (or any successor or amendatory statute), and the rules and regulations thereunder (taking into account not only the general definition of the term "investment company" but also any available exceptions to such general definition); provided, however, that the Issuer shall be in compliance with this Section 3.15 if it shall have obtained an order exempting it from regulation as an "investment company" so long as it is in compliance with the conditions imposed in such order.

Section 3.16   Issuer May Consolidate, etc.

unless:
(a)   The Issuer shall not consolidate or merge with or into any other Person,

(i)   the Person (if other than the Issuer) formed by or surviving such consolidation or merger shall be a Person organized and existing under the laws of the United States of America or any state or the District of Columbia and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Indenture Trustee, in form reasonably satisfactory to the Indenture Trustee, the due and punctual payment of the principal of and interest on all Notes and to the Certificate Paying Agent, on behalf of the Certificateholders and the performance or observance of every agreement and covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein;

(ii)   immediately after giving effect to such transaction, no Event of Default shall have occurred and be continuing;

US_WEST:260042806.5                                    12

CONFIDENTIAL                                    RC_FGIC9019_00002766

12-12020-mg   Doc 5677-7   Filed 11/12/13   Entered 11/12/13 18:48:56   Exhibit
PX-1522 (Part 1)   Pg 42 of 50

(iii)    the Enhancer shall have consented thereto and each Rating Agency shall have notified the Issuer that such transaction will not cause a Rating Event, without taking into account the Policy;

(iv)    the Issuer shall have received an Opinion of Counsel (and shall have delivered copies thereof to the Indenture Trustee and the Enhancer) to the effect that such transaction will not have any material adverse tax consequence to the Issuer, any Noteholder or any Certificateholder;

(v)    any action that is necessary to maintain the lien and security interest created by this Indenture shall have been taken; and

(vi)    the Issuer shall have delivered to the Indenture Trustee an Officer's Certificate and an Opinion of Counsel each stating that such consolidation or merger and such supplemental indenture comply with this Article III and that all conditions precedent herein provided for relating to such transaction have been complied with (including any filing required by the Exchange Act).

(b)    The Issuer shall not convey or transfer any of its properties or assets, including those included in the Trust Estate, to any Person, unless:

(i)    the Person that acquires by conveyance or transfer the properties and assets of the Issuer the conveyance or transfer of which is hereby restricted shall (A) be a United States citizen or a Person organized and existing under the laws of the United States of America or any state, (B) expressly assumes, by an indenture supplemental hereto, executed and delivered to the Indenture Trustee, in form satisfactory to the Indenture Trustee, the due and punctual payment of the principal of and interest on all Notes and the performance or observance of every agreement and covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein, (C) expressly agrees by means of such supplemental indenture that all right, title and interest so conveyed or transferred shall be subject and subordinate to the rights of Noteholders of the Notes, (D) unless otherwise provided in such supplemental indenture, expressly agrees to indemnify, defend and hold harmless the Issuer against and from any loss, liability or expense arising under or related to this Indenture and the Notes and (E) expressly agrees by means of such supplemental indenture that such Person (or if a group of Persons, then one specified Person) shall make all filings with the Commission (and any other appropriate Person) required by the Exchange Act in connection with the Notes;

(ii)    immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(iii)    the Enhancer shall have consented thereto, and each Rating Agency shall have notified the Issuer that such transaction will not cause a Rating Event, if determined without regard to the Policy;

US_WEST:260042806.5                                    13

CONFIDENTIAL                                                    RC_FGIC9019_00002767

(iv)   the Issuer shall have received an Opinion of Counsel (and shall
have delivered copies thereof to the Indenture Trustee) to the effect that such transaction
will not have any material adverse tax consequence to the Issuer or any Noteholder;

(v)   any action that is necessary to maintain the lien and security
interest created by this Indenture shall have been taken; and

(vi)   the Issuer shall have delivered to the Indenture Trustee an Officer's
Certificate and an Opinion of Counsel each stating that such conveyance or transfer and
such supplemental indenture comply with this Article III and that all conditions precedent
herein provided for relating to such transaction have been complied with (including any
filing required by the Exchange Act).

Section 3.17   Successor or Transferee.

(a) Upon any consolidation or merger of the Issuer in accordance with
Section 3.16(a), the Person formed by or surviving such consolidation or merger (if other than
the Issuer) shall succeed to, and be substituted for, and may exercise every right and power of,
the Issuer under this Indenture with the same effect as if such Person had been named as the
Issuer herein.

(b) Upon a conveyance or transfer of all the assets and properties of the Issuer
pursuant to Section 3.16(b), the Issuer shall be released from every covenant and agreement of
this Indenture to be observed or performed on the part of the Issuer with respect to the Notes
immediately upon the delivery of written notice to the Indenture Trustee of such conveyance or
transfer.

Section 3.18   No Other Business.   The Issuer shall not engage in any business other than
financing, purchasing, owning and selling and managing the Mortgage Loans and the issuance of
the Notes and Certificates in the manner contemplated by this Indenture and the Basic
Documents and all activities incidental thereto.

Section 3.19   No Borrowing.   The Issuer shall not issue, incur, assume, guarantee or
otherwise become liable, directly or indirectly, for any indebtedness except for the Notes.

Section 3.20   Guarantees, Loans, Advances and Other Liabilities.   Except as
contemplated by this Indenture or the other Basic Documents, the Issuer shall not make any loan
or advance or credit to, or guarantee (directly or indirectly or by an instrument having the
effect of assuring another's payment or performance on any obligation or capability of so doing or
otherwise), endorse or otherwise become contingently liable, directly or indirectly, in connection
with the obligations, stocks or dividends of, or own, purchase, repurchase or acquire (or agree
contingently to do so) any stock, obligations, assets or securities of, or any other interest in, or
make any capital contribution to, any other Person.

Section 3.21   Capital Expenditures.   The Issuer shall not make any expenditure (by
long-term or operating lease or otherwise) for capital assets (either realty or personalty).

CONFIDENTIAL                                                    RC_FGIC9019_00002768

Section 3.22  Owner Trustee Not Liable for Certificates or Related Documents.  The
recitals contained herein shall be taken as the statements of the Issuer, and the Owner Trustee
and the Indenture Trustee assume no responsibility for the correctness of the recitals contained
herein.  The Owner Trustee and the Indenture Trustee make no representations as to the validity
or sufficiency of this Indenture or any other Basic Document, of the Certificates (other than the
signatures of the Owner Trustee or the Indenture Trustee on the Certificates) or the Notes, or of
any Related Documents.  The Owner Trustee and the Indenture Trustee shall at no time have any
responsibility or liability with respect to the sufficiency of the Trust Estate or its ability to
generate the payments to be distributed to Certificateholders under the Trust Agreement or the
Noteholders under this Indenture, including, the compliance by the Depositor or the Sellers with
any warranty or representation made under any Basic Document or in any related document or
the accuracy of any such warranty or representation, or any action of the Certificate Paying
Agent, the Certificate Registrar or any other person taken in the name of the Owner Trustee or
the Indenture Trustee.

Section 3.23  Restricted Payments.  The Issuer shall not, directly or indirectly, (i) pay
any dividend or make any distribution (by reduction of capital or otherwise), whether in cash,
property, securities or a combination thereof, to the Owner Trustee or any owner of a beneficial
interest in the Issuer or otherwise with respect to any ownership or equity interest or security in
or of the Issuer, (ii) redeem, purchase, retire or otherwise acquire for value any such ownership
or equity interest or security or (iii) set aside or otherwise segregate any amounts for any such
purpose; provided, however, that the Issuer may make, or cause to be made, (x) distributions to
the Owner Trustee and the Certificateholders as contemplated by, and to the extent funds are
available for such purpose under, the Trust Agreement and (y) payments to the Servicer pursuant
to the terms of the Servicing Agreement.  The Issuer will not, directly or indirectly, make
payments to or distributions from the Custodial Account except in accordance with this
Indenture and the other Basic Documents.

Section 3.24  Notice of Events of Default.  The Issuer shall give the Indenture Trustee,
the Enhancer and the Rating Agencies prompt written notice of each Event of Default hereunder
and under the Trust Agreement.

Section 3.25  Further Instruments and Acts.  Upon request of the Indenture Trustee, the
Issuer shall execute and deliver such further instruments and do such further acts as may be
reasonably necessary or proper to carry out more effectively the purposes of this Indenture.

Section 3.26  Statements to Noteholders.  On each Payment Date, each of the Indenture
Trustee and the Certificate Registrar shall make available to the Depositor, the Owner Trustee,
each Rating Agency, each Noteholder and each Certificateholder, with a copy to the Enhancer,
the Servicing Certificate provided to the Indenture Trustee by the Servicer relating to such
Payment Date and delivered pursuant to Section 4.01 of the Servicing Agreement.

The Indenture Trustee will make the Servicing Certificate (and, at its option, any
additional files containing the same information in an alternative format) available each month to
Securityholders and the Enhancer, and other parties to this Indenture via the Indenture Trustee's
internet website.  The Indenture Trustee's internet website shall initially be located at

CONFIDENTIAL                                          RC_FGIC9019_00002769

"www.jpmorgan.com/sfr." Assistance in using the website can be obtained by calling the Indenture Trustee's customer service desk at (877) 722-1095. Parties that are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The Indenture Trustee shall have the right to change the way the statement to Securityholders are distributed in order to make such distribution more convenient or more accessible to the above parties and the Indenture Trustee shall provide timely and adequate notification to all above parties regarding any such changes.

Section 3.28   Payments under the Policy.

(a) (i)   If the Servicing Certificate specifies a Policy Draw Amount for any Payment Date, the Indenture Trustee shall make a draw on the Policy in an amount specified in the Servicing Certificate for such Payment Date or, if no amount is specified, the Indenture Trustee shall make a draw on the Policy in the amount by which the amount on deposit in the Note Payment Account is less than interest due on the Notes on such Payment Date.

(ii)   The Indenture Trustee shall deposit or cause to be deposited such Policy Draw Amount into the Note Payment Account on such Payment Date to the extent such amount relates to clause (a) of the definition of "Deficiency Amount" or clause (b) of the definition of "Insured Payment".

(b)   The Indenture Trustee shall submit, if a Policy Draw Amount is specified in any statement to Securityholders prepared pursuant to Section 4.01 of the Servicing Agreement, the Notice (in the form attached as Exhibit A to the Policy) to the Enhancer no later than 12:00 noon, New York City time, on the second (2nd) Business Day prior to the applicable Payment Date.

Section 3.29   Replacement/Additional Enhancement. The Issuer (or the Servicer on its behalf) may, at its expense, in accordance with and upon satisfaction of the conditions set forth herein, but shall not be required to, obtain a surety bond, letter of credit, guaranty or reserve account as a Permitted Investment for amounts on deposit in the Capitalized Interest Account, or may arrange for any other form of additional credit enhancement; provided, that after prior notice thereto, no Rating Agency shall have informed the Issuer that a Rating Event would occur as a result thereof (without taking the Policy into account); and provided further, that the issuer of any such instrument or facility and the timing and mechanism for drawing on such additional enhancement shall be acceptable to the Indenture Trustee and the Enhancer. It shall be a condition to procurement of any such additional credit enhancement that there be delivered to the Indenture Trustee and the Enhancer (a) an Opinion of Counsel, acceptable in form to the Indenture Trustee and the Enhancer, from counsel to the provider of such additional credit enhancement with respect to the enforceability thereof and such other matters as the Indenture Trustee or the Enhancer may require and (b) an Opinion of Counsel to the effect that the procurement of such additional enhancement would not (i) adversely affect in any material respect the tax status of the Notes or the Certificates or (ii) cause the Issuer to be taxable as an association (or a publicly traded partnership) for federal income tax purposes or to be classified as a taxable mortgage pool within the meaning of Section 7701(i) of the Code.

CONFIDENTIAL    RC_FGIC9019_00002770

Section 3.30   Additional Representations of Issuer.

The Issuer hereby represents and warrants to the Indenture Trustee that as of the Closing Date (which representations and warranties shall survive the execution of this Indenture):

(a) This Indenture creates a valid and continuing security interest (as defined in the applicable UCC) in the Mortgage Notes in favor of the Indenture Trustee, which security interest is prior to all other Liens (except as expressly permitted otherwise in this Indenture), and is enforceable as such as against creditors of and purchasers from the Issuer.

(b) The Mortgage Notes constitute "instruments" within the meaning of the applicable UCC.

(c) The Issuer owns and has good and marketable title to the Mortgage Notes free and clear of any Lien of any Person.

(d) The original executed copy of each Mortgage Note (except for any Mortgage Note with respect to which a Lost Note Affidavit has been delivered to the Custodian) has been delivered to the Custodian.

(e) The Issuer has received a written acknowledgment from the Custodian that the Custodian is acting solely as agent of the Indenture Trustee for the benefit of the Noteholders and the Enhancer.

(f) Other than the security interest granted to the Indenture Trustee pursuant to this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Mortgage Notes. The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Mortgage Notes other than any financing statement relating to the security interest granted to the Indenture Trustee hereunder or any security interest that has been terminated. The Issuer is not aware of any judgment or tax lien filings against the Issuer.

(g) None of the Mortgage Notes has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Indenture Trustee, except for (i) any endorsements that are part of a complete chain of endorsements from the originator of the Mortgage Note to the Indenture Trustee, and (ii) any marks or notations pertaining to Liens that have been terminated or released.

(h) None of the provisions of this Section 3.30 shall be waived without the prior written confirmation from Standard & Poor's that such waiver shall not result in a reduction or withdrawal of the then-current rating of the Notes.

CONFIDENTIAL                                            RC_FGIC9019_00002771

ARTICLE IV

The Notes; Satisfaction And Discharge Of Indenture

Section 4.01   The Notes

(a) The Notes shall be registered in the name of a nominee designated by the Depository. Beneficial Owners will hold interests in the Notes through the book-entry facilities of the Depository in minimum initial Note Balances of $25,000 and integral multiples of $1,000 in excess thereof.

The Indenture Trustee may for all purposes (including the making of payments due on the Notes) deal with the Depository as the authorized representative of the Beneficial Owners with respect to the Notes for the purposes of exercising the rights of Noteholders of Notes hereunder. Except as provided in the next succeeding paragraph of this Section 4.01, the rights of Beneficial Owners with respect to the Notes shall be limited to those established by law and agreements between such Beneficial Owners and the Depository and Depository Participants. Except as provided in Section 4.08, Beneficial Owners shall not be entitled to definitive certificates for the Notes as to which they are the Beneficial Owners. Requests and directions from, and votes of, the Depository as Noteholder of the Notes shall not be deemed inconsistent if they are made with respect to different Beneficial Owners. The Indenture Trustee may establish a reasonable record date in connection with solicitations of consents from or voting by Noteholders and give notice to the Depository of such record date. Without the consent of the Issuer and the Indenture Trustee, no Term Note may be transferred by the Depository except to a successor Depository that agrees to hold such Note for the account of the Beneficial Owners.

In the event the Depository Trust Company resigns or is removed as Depository, the Indenture Trustee, at the request of the Servicer and with the approval of the Issuer may appoint a successor Depository. If no successor Depository has been appointed within 30 days of the effective date of the Depository's resignation or removal, each Beneficial Owner shall be entitled to certificates representing the Notes it beneficially owns in the manner prescribed in Section 4.08.

The Notes shall, on original issue, be executed on behalf of the Issuer by the Owner Trustee, not in its individual capacity but solely as Owner Trustee and upon Issuer Order, authenticated by the Note Registrar and delivered by the Indenture Trustee to or upon the order of the Issuer.

Section 4.02   Registration of and Limitations on Transfer and Exchange of Notes; Appointment of Certificate Registrar. The Issuer shall cause to be kept at the Indenture Trustee's Corporate Trust Office a Note Register in which, subject to such reasonable regulations as it may prescribe, the Note Registrar shall provide for the registration of Notes and of transfers and exchanges of Notes as herein provided. The Issuer hereby appoints the Indenture Trustee as the initial Note Registrar.

CONFIDENTIAL                                    RC_FGIC9019_00002772

Subject to the restrictions and limitations set forth below, upon surrender for registration of transfer of any Note at the Corporate Trust Office, the Issuer shall execute, and the Note Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes in authorized initial Note Balances evidencing the same aggregate Percentage Interests.

Subject to the foregoing, at the option of the Noteholders, Notes may be exchanged for other Notes of like tenor, in each case in authorized initial Note Balances evidencing the same aggregate Percentage Interests, upon surrender of the Notes to be exchanged at the Corporate Trust Office of the Note Registrar. Whenever any Notes are so surrendered for exchange, the Issuer shall execute and the Note Registrar shall authenticate and deliver the Notes which the Noteholder making the exchange is entitled to receive. Each Note presented or surrendered for registration of transfer or exchange shall (if so required by the Note Registrar) be duly endorsed by, or be accompanied by a written instrument of transfer in form reasonably satisfactory to the Note Registrar duly executed by, the Noteholder thereof or his attorney duly authorized in writing with such signature guaranteed by a commercial bank or trust company located or having a correspondent located in The City of New York. Notes delivered upon any such transfer or exchange will evidence the same obligations, and will be entitled to the same rights and privileges, as the Notes surrendered.

No service charge shall be imposed for any registration of transfer or exchange of Notes, but the Note Registrar shall require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any registration of transfer or exchange of Notes.

All Notes surrendered for registration of transfer and exchange shall be cancelled by the Note Registrar and delivered to the Indenture Trustee for subsequent destruction without liability on the part of either.

The Issuer hereby appoints the Indenture Trustee as Certificate Registrar to keep at its Corporate Trust Office a Certificate Register pursuant to Section 3.09 of the Trust Agreement in which, subject to such reasonable regulations as it may prescribe, the Certificate Registrar shall provide for the registration of Certificates and of transfers and exchanges thereof pursuant to Section 3.05 of the Trust Agreement. The Indenture Trustee hereby accepts such appointment.

Each purchaser of a Note, by its acceptance of the Note, shall be deemed to have represented that the acquisition of such Note by the purchaser does not constitute or give rise to a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code, for which no statutory, regulatory or administrative exemption is available.

Section 4.03   Mutilated, Destroyed, Lost or Stolen Notes. If (i) any mutilated Note is surrendered to the Indenture Trustee, or the Indenture Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, and (ii) there is delivered to the Indenture Trustee such security or indemnity as may be required by it and the Issuer to hold the Issuer and the Indenture Trustee harmless, then, in the absence of notice to the Issuer, the Note Registrar or the Indenture Trustee that such Note has been acquired by a bona fide purchaser, and provided that the requirements of Section 8 405 of the UCC are met, the Issuer shall execute,

US_WEST:260042806.5                    19

CONFIDENTIAL                                                                    RC_FGIC9019_00002773

and upon its request the Indenture Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a replacement Note of the same class; provided, however, that if any such destroyed, lost or stolen Note, but not a mutilated Note, shall have become or within seven days shall be due and payable, instead of issuing a replacement Note, the Issuer may pay such destroyed, lost or stolen Note when so due or payable without surrender thereof. If, after the delivery of such replacement Note or payment of a destroyed, lost or stolen Note pursuant to the proviso to the preceding sentence, a bona fide purchaser of the original Note in lieu of which such replacement Note was issued presents for payment such original Note, the Issuer and the Indenture Trustee shall be entitled to recover such replacement Note (or such payment) from the Person to whom it was delivered or any Person taking such replacement Note from such Person to whom such replacement Note was delivered or any assignee of such Person, except a bona fide purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer or the Indenture Trustee in connection therewith.

Upon the issuance of any replacement Note under this Section 4.03, the Issuer may require the payment by the Noteholder of such Note of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other reasonable expenses (including the fees and expenses of the Indenture Trustee) connected therewith.

Every replacement Note issued pursuant to this Section 4.03 in replacement of any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Issuer, whether or not the mutilated, destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this Section 4.03 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 4.04   Persons Deemed Owners.   Prior to due presentment for registration of transfer of any Note, the Issuer, the Indenture Trustee and any agent of the Issuer or the Indenture Trustee may treat the Person in whose name any Note is registered (as of the day of determination) as the owner of such Note for the purpose of receiving payments of principal of and interest, if any, on such Note and for all other purposes whatsoever, whether or not such Note be overdue, and none of the Issuer, the Indenture Trustee or any agent of the Issuer or the Indenture Trustee shall be affected by notice to the contrary.

Section 4.05   Cancellation.   All Notes surrendered for payment, registration of transfer, exchange or redemption shall, if surrendered to any Person other than the Indenture Trustee, be delivered to the Indenture Trustee and shall be promptly cancelled by the Indenture Trustee. The Issuer may at any time deliver to the Indenture Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any manner whatsoever, and all Notes so delivered shall be promptly cancelled by the Indenture Trustee. No Notes shall be authenticated in lieu of or in exchange for any Notes cancelled as provided in this Section 4.05, except as expressly permitted by this Indenture. All cancelled Notes may be held

US_WEST:260042806.5                                    20

CONFIDENTIAL                                                                  RC_FGIC9019_00002774

or disposed of by the Indenture Trustee in accordance with its standard retention or disposal policy as in effect at the time unless the Issuer shall direct by an Issuer Request that they be destroyed or returned to it; provided, however, that such Issuer Request is timely and the Notes have not been previously disposed of by the Indenture Trustee.

Section 4.06    Book-Entry Notes.  The Notes, upon original issuance, shall be issued in the form of typewritten Notes representing the Book-Entry Notes, to be delivered to The Depository Trust Company, the initial Depository, by, or on behalf of, the Issuer.  Such Notes shall initially be registered on the Note Register in the name of Cede & Co., the nominee of the initial Depository, and no Beneficial Owner shall receive a Definitive Note representing such Beneficial Owner's interest in such Note, except as provided in Section 4.08.  Unless and until definitive, fully registered Notes (the "Definitive Notes") have been issued to Beneficial Owners pursuant to Section 4.08:

(a) the provisions of this Section 4.06 shall be in full force and effect;

(b) the Note Registrar and the Indenture Trustee shall be entitled to deal with the Depository for all purposes of this Indenture (including the payment of principal of and interest on the Notes and the giving of instructions or directions hereunder) as the sole holder of the Notes, and shall have no obligation to the Beneficial Owners;

(c) to the extent that the provisions of this Section 4.06 conflict with any other provisions of this Indenture, the provisions of this Section 4.06 shall control;

(d) the rights of Beneficial Owners shall be exercised only through the Depository and shall be limited to those established by law and agreements between such Owners of Notes and the Depository or the Depository Participants.  Unless and until Definitive Notes are issued pursuant to Section 4.08, the initial Depository will make book-entry transfers among the Depository Participants and receive and transmit payments of principal of and interest on the Notes to such Depository Participants; and

(e) whenever this Indenture requires or permits actions to be taken based upon instructions or directions of Noteholders of Notes evidencing a specified percentage of the Note Balances of the Notes, the Depository shall be deemed to represent such percentage only to the extent that it has received instructions to such effect from Beneficial Owners or Depository Participants owning or representing, respectively, such required percentage of the beneficial interest in the Notes and has delivered such instructions to the Indenture Trustee.

Section 4.07    Notices to Depository.  Whenever a notice or other communication to the Noteholders of the Notes is required under this Indenture, unless and until Definitive Notes shall have been issued to Beneficial Owners pursuant to Section 4.08, the Indenture Trustee shall give all such notices and communications specified herein to be given to Noteholders of the Notes to the Depository, and shall have no obligation to the Beneficial Owners.

Section 4.08    Definitive Notes.  If (i) the Depositor determines that the Depository is no longer willing or able to properly discharge its responsibilities with respect to the Notes and the Depositor is unable to locate a qualified successor, (ii) the Depositor, with the prior consent of

CONFIDENTIAL                                                    RC_FGIC9019_00002775