Talcott J. Franklin (admitted pro hac vice)
Talcott Franklin P.C.
208 North Market Street, Suite 200
Dallas, Texas 75202
Phone: (214) 736-8730
Fax:    (877) 577-1356
tal@talfranklin.com

Aaron R. Cahn
Leonardo Trivigno
Carter, Ledyard & Milburn LLP
2 Wall Street
New York, New York 10005
Phone: (212) 732-3200
bankruptcy@clm.com

Thomas P. Sarb (admitted pro hac vice)
Robert Wolford  (admitted pro hac vice)
Miller Johnson
Calder Plaza Building
250 Monroe Avenue NW, Suite 800
Grand Rapids, MI 49503-2250
Phone: (616) 831-1748
sarbt@millerjohnson.com

*Attorneys for the Talcott Franklin Group*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Case No.:  12-12020 (MG) |
| | : | |
| | : | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, et al., | : | |
| | : | Jointly Administered |
| Debtors. | : | |

------------------------------------------------------------x

**TALCOTT FRANKLIN INVESTOR GROUP STATEMENT IN SUPPORT OF, AND IN
RESPONSE TO OBJECTIONS TO, JOINT CHAPTER 11 PLAN PROPOSED BY
RESIDENTIAL CAPITAL, LLC, ET AL AND THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS**

7314760.1

# TABLE OF CONTENTS

Page

Table Of Authorities ...................................................................................................... ii

A. Preliminary statement ................................................................................................1

B. Plan Objections ..........................................................................................................3

C. Efforts Of Counsel For Talcott Franklin Group In This Proceeding ........................5

D. Legal Argument ........................................................................................................10

    I.        The Allowed Fee Claim is reasonable, by any relevant standard. .........................10

             A.      11 U.S.C. § 1129(a)(4)............................................................................10

             B.      State Law. ................................................................................................12

             C.      Common Fund Doctrine. .........................................................................15

             D.      11 U.S.C. § 328........................................................................................16

             E.      11 U.S.C. § 330........................................................................................18

              F.      11 U.S.C. § 503(b)(3)(D) and § 503(b)(4)...............................................20

    II.      The Allowed Fee Claim does not diminish the recovery of other
             creditors....................................................................................................................21

    III.     The Allowed Fee Claim has been disclosed to all interested parties,
             and is almost universally supported. .......................................................................22

E. Conclusion................................................................................................................23

# TABLE OF AUTHORITIES

Page

**Cases**

*Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co., Inc.)*, 86
F.3d 364 (4th Cir. 1996) ................................................................ 16

*Blum v. Stenson*, 465 U.S. 886 (1984) .................................................. 17

*Boeing Co. v. Van Gemert*, 444 U.S. 472; 100 S.Ct. 745 (1980) ....................... 16, 17

*C & E Enterprises, Inc. v. Milton Poulos, Inc. (In re Milton Poulos, Inc.)*, 947
F.2d 1351 (9th Cir. 1991) ............................................................. 16

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d. Cir. 2000) .................... 17

*In re Adelphia Communications Corp.*, 441 B.R. 6 (Bankr. S.D.N.Y. 2010) ............... 22

*In re AMR Corp.*, No. 11-15463, 2013 Bankr. LEXIS 3809 (Bankr. S.D.N.Y.
Sept. 13, 2013) ........................................................................ 22

*In re Granite Partners, L.P.*, 213 B.R. 440 (Bankr. S.D.N.Y. 1997) ...................... 23

*In re Journal Register Co.*, 407 B.R. 520 (Bankr. S.D.N.Y. 2009) ........................ 11

*In re Kohl*, 421 B.R. 115 (Bankr. S.D.N.Y. 2009) ...................................... 21

*In re Lehman Bros. Holdings Inc.*, 487 B.R. 181 (Bankr. S.D.N.Y. 2013) ................. 22

*In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000) ............ 16, 19

*In re S & Y Enter., LLC*, 480 B.R. 452 (Bankr. E.D.N.Y. 2012) ....................... 22, 23

*In re Smart World Technologies, LLC*, 552 F.3d 228 (2d Cir. 2009) ...................... 19

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) ............... 21, 22

*Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
150 F.3d 503 (5th Cir. 1998) ......................................................... 11

*Mulligan Law Firm v. Zyprexa MDL Plaintiffs' Steering Comm. II (In re Zyprexa
Products Liability Litigation)*, 594 F.3d 113 (2d. Cir. 2010) ............................ 16

*Pitrat v. Reimers (In re Reimers)*, 972 F.2d 1127 (9th Cir. 1992) ......................... 18

*Riker, Danzig, Scherer, Hyland & Perretti v. Official Comm. Of Unsecured
Creditors (In re Smart World Techs., LLC)*, 552 F.3d 228 (2d Cir. 2009) ................ 18

7314760.1

Index of Authorities
(continued)

Page

*Seiler v. First Nat'l Bank of Babbitt (In re Benassi)*, 72 B.R. 44 (D. Minn. 1987) ...................... 19

*Solfanelli v. Meridian Bank (In re Solfanelli)*, 230 B.R. 54 (Bankr. M.D. Pa. 1999) ................................................................................................................ 19

**Statutes**

11 U.S.C. § 101(5) ....................................................................................................... 1

11 U.S.C. § 1102 ....................................................................................................... 20

11 U.S.C. § 1103 ................................................................................................. 16, 18

11 U.S.C. § 1129(a)(4) ...................................................................................... 4, 10, 24

11 U.S.C. § 327 .................................................................................................... 16, 18

11 U.S.C. § 328 ............................................................................................... 16, 17, 19

11 U.S.C. § 328(a) ................................................................................................ 16, 17

11 U.S.C. § 330 .............................................................................................. 18, 19, 20

11 U.S.C. § 503(b) ..................................................................................................... 20

11 U.S.C. § 503(b)(3)(D) ...................................................................................... 4, 20

11 U.S.C. § 503(b)(4) ........................................................................................... 4, 20

**Rules**

Michigan Rules of Professional Conduct, Rule 1.5 ..................................................... 13

New York Rules of Professional Conduct, Rule 1.5(a) .......................................... 12, 13

Tex. Disciplinary R. Prof. Conduct 1.04 ................................................................... 13

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The Talcott Franklin Investor Group ("Talcott Franklin Group") files this statement in support of, and in response to objections to, the Joint Chapter 11 Plan proposed by Residential Capital, LLC, et al and the Official Committee of Unsecured Creditors (the "Plan")[1].

## A. PRELIMINARY STATEMENT

1.      As of the Third Amended and Restated RMBS Trust Settlement Agreement dated as of September 20, 2012 (DN 1887-3, filed October 19, 2012), 57 investors designated in this case as the Talcott Franklin Group held or controlled 25% or more of one or more classes of interests in notes, bonds and/or certificates (collectively, the "RMBS Securities") in at least 193 of the approximately 392 trusts backed by residential mortgage loans held by certain of the RMBS Trusts[2].

2.      The Plan is an extraordinary and hard-fought for accomplishment in these Chapter 11 cases. It implements a global settlement consented to by all but one of the major creditor constituencies in this case, and will do so in a way that will maximize creditor recoveries. The alternative to the Plan is years of bitter litigation between disparate and conflicting creditor constituencies that would threaten to exhaust all of the Debtors' remaining

---

[1] All capitalized terms not defined in this Statement have the meanings ascribed to them in Article I of the Plan.

[2] The RMBS Trusts hold claims (each, a "RMBS Trust Claim"), as defined in § 101(5) of the Bankruptcy Code, against the Debtors, including claims arising out of alleged breaches of representations and warranties contained in Pooling and Servicing Agreements (the "PSAs"), Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and/or other agreements governing the sale and administration of residential mortgage loans sold to the Trusts (the "Governing Agreements"). The bases of the Trust Claims against certain Debtors include: (a) breaches of warranties about the quality, nature, history, and characteristics of the loans, and failures to remedy such breaches of warranty as required by the Governing Agreements of the RMBS Trusts in connection with sales of residential mortgage loans to the RMBS Trusts by certain of the Debtors; (b) failures to service those loans in accordance with the Governing Agreements; and (c) obtaining consideration from mortgage loan Originators for breaches of representations and warranties without providing compensation to the RMBS Trusts.

7314760.1

assets.  Most importantly, the Plan satisfies all of the requirements for confirmation under the Bankruptcy Code and Bankruptcy Rules.

3.  In addition to the Debtors and the Committee, the Plan is supported by the Consenting Claimants, the NCUAB, the RESPA Plaintiffs, and many others.  In addition, the objections of the FHFA, Freddie Mac, and a number of other parties have been resolved and those objections will be withdrawn.

4.  The fact that a consensual plan could be reached among these disparate creditor constituencies is a remarkable achievement, and only came about as a result of the significant compromises made by each of those creditor constituencies during the lengthy negotiation/mediation process led by Judge Peck.  This Plan, which incorporates the global settlement between the Plan Proponents, Ally, and the Consenting Claimants, provides the best alternative for creditors in these cases to collectively maximize their returns in an efficient and timely manner.

5.  When the Chapter 11 case was filed, the Debtors had in hand the initial RMBS Settlement Agreements with the Institutional Investors and Plan Support Agreements with the Institutional Investors, certain of the JSNs, and Ally.

6.  The Chapter 11 case, however, quickly collapsed into months of infighting over the Original RMBS Settlement Agreements, the size of Ally's contribution, and the respective priority or subordination of the claims of many disparate creditor constituencies.  Eventually, in February 2013, the Debtors allowed the May 13, 2012 Plan Support Agreement with Ally to expire and the Committee and the Debtors began their efforts to reach a global agreement on a Plan.

7. After the Debtors allowed the original Plan Support Agreement with Ally to expire and Ally withdrew its settlement offer from the table, and amidst continued litigation over the Original RMBS Settlement, the Talcott Franklin Group re-commenced the process of directing the RMBS Trustees to bring actions against Ally, with a commitment to indemnify the RMBS Trustees for such actions.

8. After the Talcott Franklin Group gave that direction, and based on mediation efforts led by Judge Peck, Ally came back to the table and the difficult and lengthy mediation process moved forward, culminating in the Plan Support Agreement between the Debtors, the Committee, Ally, and the Consenting Claimants that is the foundation of this Plan.

9. The contentious litigation during the first 12 months of the case between Debtors and the Committee, between the proponents of the Original RMBS Settlement and the objectors to that Settlement, and involving the respective rights of Ally, the Senior Unsecured Note Holders, the Junior Secured Noteholders, the Monolines, the Borrowers, the Private Securities Claimants, etc., demonstrates the depths to which this case will descend if the Plan is not confirmed.

10. The broad base of support of the Plan is evidenced not only by the very large number of creditor constituencies that actively support the Plan and the overwhelming percentage of creditors who have voted to accept the Plan, but also by the fact that very few substantive objections to confirmation remain pending before this Court.

## B. PLAN OBJECTIONS

11. As noted previously, the largely consensual Plan before the Court is strongly supported by every major creditor constituency in this case, with the exception of the JSNs, as being in the best interests of all creditors in this case. More importantly, the Plan satisfies all of the requirements of the Bankruptcy Code and Bankruptcy Rules.

3

12.     The Court, of course, has the detailed responses to objections and the legal arguments in favor of confirmation of the Plan Proponents before it with regard to those requirements.   The Talcott Franklin Group joins in the statements and responses of the Plan Proponents in support of confirmation of the Plan and will not repeat those arguments here.

13.     The United States Trustee has filed its Objection to the Plan at Docket No. 5412 (the "UST Objection").  Although the UST Objection is not addressed specifically to the RMBS Settlement or the Allowed Fee Claim of Institutional Investors' counsel incorporated in the RMBS Settlement under the Plan (5.7% of the distribution to the RMBS Trusts), it argues generally that any fees payable under the Plan should be approved by the Court as reasonable under § 1129(a)(4), or otherwise be approved under § 503(b)(3)(D) and § 503(b)(4) to the extent sought under that basis.

14.     Notably, no RMBS Investor has objected to the Plan, the RMBS Settlement incorporated in the Plan, or the Allowed Fee Claim for the attorneys for the Institutional Investors that is part of the RMBS Settlement and the Plan.[3]  Additionally, the Plan, the RMBS Settlement, and the Allowed Fee Claim have the support of all of the RMBS Trustees.

15.     The Allowed Fee Claim is not being paid by the Debtors.  Rather, it is to be paid out of the recovery of the RMBS Trusts under the Plan.  It does not diminish the recovery of any other creditor constituency under the Plan.

16.     To the extent that § 1129(a)(4) applies, the Allowed Fee Claim is subject to approval by this Court as part of both the Court's approval of the RMBS Settlement, as modified and incorporated in the Plan, and the Court's approval of confirmation of the Plan, which Plan expressly provides for the RMBS Settlement and the Allowed Fee Claim.  And the

---

[3] No party in interest has objected to the Allowed Fee Claim.

7314760.1

Court has before it an extensive record going to the reasonableness of the Allowed Fee Claim. *See* Declaration of Ralph Mabey in Support of Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al., and the Official Committee of Unsecured Creditors (the "Mabey Declaration"); Declaration of Talcott Franklin, attached to this Statement as **Exhibit A** (the "Franklin Declaration").

## C. <u>EFFORTS OF COUNSEL FOR TALCOTT FRANKLIN GROUP IN THIS PROCEEDING</u>

17.    The Original RMBS Settlement Agreement was the result of extended arms-length negotiations between the Talcott Franklin Group and the Debtors, and is at least the third major settlement agreement iteration. Franklin Declaration, ¶ 5.

18.    In 2011, some of the Talcott Franklin Group decided to pursue various claims against sellers and servicers of the RMBS Securities and their affiliates, including Ally. On behalf of those investors, attorneys from Talcott Franklin P.C. ("TFPC") contacted Ally and ResCap and began discussing a means to resolve their dispute. These contacts initially resulted in various back and forth discussions between TFPC and Tim Devine, head of litigation for Ally. Mr. Devine set up a meeting in Normandale, MN between TFPC and ResCap for February 28, 2012. In addition to Talcott Franklin, TFPC attorneys Jerry Phelps, Paul Snyder, and Sheri Deterling met with Tammy Hamzehpour, general counsel of ResCap, and other inside or outside counsel. Franklin Declaration, ¶ 6.

19.    At the meeting, TFPC made a presentation concerning the claims and defenses at issue, the manner in which certain TFPC attorneys had resolved the Fremont General repurchase claims in 2008-2011, and other legal and documentary issues reflected in the presentation. Franklin Declaration, ¶ 7.

7314760.1

20.    When negotiations failed to progress as hoped and bankruptcy rumors concerning ResCap surfaced, TFPC, on behalf of certain members of the Talcott Franklin Group (the "Directing Investors"), directed the Trustee of over 20 Trusts to commence an action against Ally asserting: (a) breaches of representations and warranties; (b) breaches of servicing obligations; (c) conversion; and (d) piercing the corporate veil. Franklin Declaration, ¶ 8.

21.    That direction regarding Ally was accompanied by an offer of reasonable indemnity as the Trustee might require against the costs, expenses, and liabilities to be incurred, which willingness to provide such indemnity was unique to the Directing Investors, and, as such, represented the only credible threat of suit against Ally on behalf of certain of the RMBS Trusts. Franklin Declaration, ¶ 9.

22.    As the sixty-day time limit for the Trustee to act on the direction ran, certain Debtors and Ally entered into a non-disclosure agreement with certain of the Talcott Franklin Group (the "NDA Investors"). The NDA Investors' negotiations with Ally and ResCap were focused on broad and significant goals that benefited all investors in the related RMBS Trusts. Some of the goals of the negotiations from the NDA Investors' perspective were to: (a) ensure a minimally disruptive servicing transition from ResCap entities to a prospective purchaser of the servicing rights and obligations, which would benefit both borrowers and the RMBS Trust investors, while maximizing the amounts obtained as part of any sale of servicing rights; (b) obtain as much of the proceeds of any sale of servicing rights as possible to compensate investors in the RMBS Trusts; (c) preserve claims against non-ResCap entities related to the servicing of the RMBS Trusts; (d) obtain compensation for the investors' claims, including the RMBS Trust Claims; (e) require Ally to contribute funds to pay investor claims; and (f) ensure that all investors in a RMBS Trust would have the opportunity to evaluate and

6

express a view regarding a settlement, and that a RMBS Trust could choose to "opt out" of the settlement under appropriate circumstances. Franklin Declaration, ¶ 10.

23.     Negotiations continued until Ally informed TFPC that ResCap was planning to file for Chapter 11 relief within the next few days. Shortly thereafter, the Talcott Franklin Group also learned that the Debtors were negotiating a settlement with the Steering Committee Group of RMBS Holders, that ResCap wanted to settle with both groups, and that the settlement would contain the provisions that TFPC had requested and with regard to which TFPC had already put RMBS Trusts in a position to enforce through the Directing Investors. Franklin Declaration, ¶ 11.

24.     On May 7, 2012, Paul Snyder and Jerry Phelps from TFPC met and/or spoke with representatives of the Debtors and their professionals. They discussed different scenarios of distributions in a liquidation setting to various claimant principals, based on assumptions and different amounts of possible Ally contributions. It also became apparent that ResCap and Ally were still negotiating with one another while they were negotiating with TFPC. Franklin Declaration, ¶ 12.

25.     TFPC was provided with a copy of a draft settlement agreement that Debtors proposed to enter into with the so-called Steering Committee Group of RMBS Holders. TFPC focused its attention during the short time-frame on the goals outlined above. Franklin Declaration, ¶ 13.

26.     During this time TFPC discussed with Morrison & Foerster various issues, including that certain servicing claims should be separate from breach of representation and warranty claims, that RMBS Trustees could not be forced to settle on time frames shorter than those allowed in the related PSAs, and that monoline involvement in the negotiations was

important. Because the draft settlement agreement reflected many of the provisions TFPC had been negotiating for and time was pressing, TFPC's concerns were narrowed down to two issues: (a) language that, in TFPC's estimation, waived claims against non-ResCap entities involved in servicing the Loans; and (b) that the short time frame for Trustee approval might not give other investors or the Trustees an adequate opportunity to evaluate and participate in the settlement. TFPC's negotiations at this point were entirely with Debtors' counsel on the terms of the settlement agreement, although TFPC had occasional discussions with Mr. Devine in which he urged TFPC's clients to enter the settlement. Franklin Declaration, ¶ 14.

27.    As a consequence, the NDA Investors did not enter into the initial settlement and the related Plan Support Agreement until the eleventh hour, when those issues were resolved to their satisfaction. On the first issue, the TFPC settlement agreement contained express language preserving claims against non-ResCap entities involved in the servicing of the Loans, which differed from the Steering Committee Group of RMBS Holders agreement. On the second issue, the NDA Investors accepted ResCap's language, as they rightly predicted that the planned 45-day approval process would ultimately be changed because, among other things, the PSAs at issue required a 60-day period for the Trustees to act. Franklin Declaration, ¶ 15.

28.    When the Talcott Franklin Group first began negotiating with the Debtors, the group consisted of less than 30 investors. A smaller sub-group of these investors were Directing Investors and/or NDA Investors. Between the filing of these bankruptcy cases and the Original RMBS Settlement Agreement, the Talcott Franklin Group increased to 57 investors. Franklin Declaration, ¶ 16.

29.    In early May 2012, TFPC engaged, with the Consent of the Talcott Franklin Group, Carter Ledyard & Milburn LLP and Miller Johnson Snell & Cummiskey, P.L.C.

7314760.1

as bankruptcy co-counsel to represent the Members in pursuing mortgage repurchase and servicing claims against the Debtors (with TFPC the three law firms are collectively "TFPC Group Counsel"). Franklin Declaration, ¶ 18.

30.    One of TFPC's goals in negotiating the RMBS settlement agreement, which was achieved, was to preserve each investors' right to evaluate the settlement agreement for itself and give notice to the related Trustee as to whether or not to enter it. Franklin Declaration, ¶ 19.

31.    As described in detail in the Franklin Declaration at ¶¶ 20 through 29, TFPC Group Counsel performed substantial and important work on behalf of the Talcott Franklin Group, and by extension the Debtors.

32.    For example, TFPC Group Counsel consolidated, coordinated and advised a diverse group of 57 certificateholders, which group could have provided contrary instructions to the trustees in nearly half of the trusts in the RMBS Settlement and threatened the RMBS Settlement. Franklin Declaration, ¶ 20. Additionally, the work of TFPC Group Counsel helped to gain assent to the various settlements, including the multiple revisions and addenda to the RMBS Settlement Agreement and the Plan, and maintain consensus within the group. Franklin Declaration, ¶¶ 21-23. TFPC Group Counsel made significant efforts to confirm and preserve consensus among its clients, and others, after finalizing the RMBS Settlement. Franklin Declaration, ¶¶ 26-27.

33.    Additionally, TFPC Group Counsel gave notice of default and directed trustees to sue Ally directly, which immediately preceded the first big shift towards a global settlement among all parties. Franklin Declaration, ¶ 25. TFPC Group Counsel also actively participated in mediation of the RMBS Settlement, and negotiation of the new Plan Support

9

Agreement, Term Sheet, Supplemental Term Sheet and Global Settlement that formed some of the bases of the Disclosure Statement and Plan.  Franklin Declaration, ¶ 29.

34.    TFPC Group Counsel made substantial efforts which not only benefitted its clients, but also the Debtors.  Additionally, estimated fees of TFPC Group Counsel will be roughly the same amount that they would charge on an hourly basis.  In other words, the expenses and attorney fees that make up the Allowed Fee Claim will not provide TFPC Group Counsel the type of premium that is typically awarded to lawyers working on a contingency fee basis.  Franklin Declaration, ¶ 31.

35.    For the above reasons, as well as the reasons set forth below, the Allowed Fee Claim is reasonable, under any applicable standard.

### D.  LEGAL ARGUMENT

**I.    THE ALLOWED FEE CLAIM IS REASONABLE, BY ANY RELEVANT STANDARD.**

**A.    11 U.S.C. § 1129(a)(4).**

36.    The Allowed Fee Claim is reasonable under section 1129(a)(4) of the Bankruptcy Code, to the extent it applies.  According to section 1129(a)(4), "[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."

37.    Section 1129(a)(4) does not define "reasonable," and there has been no clear test for reasonableness articulated by courts in the Second Circuit.  However, prevailing case law suggests courts should consider the totality of the circumstances.  For example, the

7314760.1

Fifth Circuit, in *Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,

150 F.3d 503, 517 (5th Cir. 1998), stated:

> What constitutes a reasonable payment will clearly vary from case
> to case and, among other things, will hinge to some degree upon
> who makes the payments at issue, who receives those payments,
> and whether the payments are made from assets of the estate. In
> the typical case, payments that are not payable from, or
> reimbursable by, the bankruptcy estate should not engender
> anything like the judicial scrutiny devoted to those that are payable
> out of the bankruptcy estate.

38.    Additionally, in *In re Journal Register Co.*, 407 B.R. 520, 538 (Bankr.

S.D.N.Y. 2009), the court thought it important that the payment be disclosed so creditors have

"an opportunity to factor the payments into their decision whether to accept the Plan." Also, the

court noted that creditors accepted the Plan "overwhelmingly," the creditors committee endorsed

the payment at issue as reasonable, and there was no suggestion that the payment was not in line

with the market. *Id.*

39.    The totality of the circumstances suggests the Allowed Fee Claim is

reasonable.  First of all, the Allowed Fee Claim is not being paid out of estate assets, but rather

out of the RMBS Trust Claims, which is fixed pursuant to the RMBS Settlement, so heightened

judicial scrutiny of the fee is not warranted.    Additionally, the Allowed Fee Claim was

negotiated by sophisticated parties, was incorporated into the RMBS Settlement which has been

approved by the RMBS Trustees, is supported by the parties to the Plan Support Agreement,

including the Debtors, the Official Committee of Unsecured Creditors, Ally, and the Consenting

Claimants, as part of the Global Settlement[4], and has been fully disclosed from the outset of and

---

[4] The Global Settlement, which includes the RMBS Settlement, is agreed to and supported by the Debtors, Ally, the
Official Committee of Unsecured Creditors, the RMBS Trustees, AIG Asset Management (U.S.), LLC, Allstate
Insurance Company, Financial Guaranty Insurance Company, the Kessler Class Claimants, Massachusetts Mutual
Life Insurance Company, MBIA Insurance Corporation, Prudential Insurance Company of America, the Supporting
Senior Unsecured Noteholders, Wilmington Trust, National Association and Paulson & Co., Inc., among others.

7314760.1

throughout the Chapter 11 cases. Also, as more fully described below, the Allowed Fee Claim is not just in line with the market, but is perhaps below the market percentage contingency fee in similar cases (see ¶ 52, below) and is reasonable in light of the actions of counsel for the Talcott Franklin Group described in ¶¶ 17 through 34, above, ¶ 42(a)-(h), below.

**B.    State Law.**

40.    Additionally, the Allowed Fee Claim is reasonable under relevant state law. According to the Model Rules of Professional Conduct, which have been adopted in Michigan, Texas and New York, contingency fees are permitted.

41.    According to the New York Rules of Professional Conduct, Rule 1.5(a)[5]:

> A lawyer shall not make an agreement for, charge, or collect an excessive or illegal fee or expense. A fee is excessive when, after a review of the facts, a reasonable lawyer would be left with a definite and firm conviction that the fee is excessive.

Additionally, factors to be considered in determining the reasonableness of a fee include:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent or made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by circumstances;
>
> (6) the nature and length of the professional relationship with the client;

---

[5] Model Rule 1.5, adopted in New York as part of Part 1200 of the Joint Rules of the Appellate Division (22 NYCRR Part 1200)

7314760.1

(7) the experience, reputation and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

Nearly identical versions of Rule 1.5 have also been adopted in Texas and Michigan.[6]

42.    Applying these factors to the Allowed Fee Claim confirms that the Allowed Fee Claim is reasonable and not excessive:

a.    <u>Time and labor required, novelty and difficulty of questions involved, and skill requisite to perform legal service properly.</u> Representing the Talcott Franklin Group required experienced, sophisticated legal counsel, given the complexity, size and scope of ResCap's operations, the number of RMBS Securities and Trusts involved, the number of individual loans covered by the RMBS Trusts, and the complexity of the various claims against sellers and servicers of the loans underlying the RMBS Securities, as well as claims against affiliates of those sellers and services, including Ally.    Additionally, the law governing litigating the RMBS Trust claims was evolving and uncertain, making any outcome of the litigation difficult to predict.

b.    <u>Likelihood that the acceptance of the employment will preclude other employment by the lawyer.</u>    In order to effectively represent the Talcott Franklin Group, counsel was required to gather reams of factual data, research many complex legal issues, attend numerous in-person meetings and conference calls with the clients and counsel for ResCap and Ally, review thousands of various pleadings and agreements, and prepare for and appear in court. These efforts required TFPC Group Counsel's time which necessarily limited engaging in representations of other potential clients.

c.    <u>Fee customarily charged in the locality for similar legal services.</u> The Allowed Fee Claim is well within the range of market comparables and is reasonable.    As explained at length by Ralph Mabey, expert employed by counsel for the Steering Committee, in class action cases with settlements greater than $1 billion, the average percentage fee ranged from 10.2% to 13.7%, which are significantly higher percentages than the 5.7% fee used to determine the Allowed Fee Claim. Mabey Declaration, ¶ 71.

---

[6] *See* Michigan Rules of Professional Conduct, Rule 1.5, and Tex. Disciplinary R. Prof. Conduct 1.04.

7314760.1

d.   <u>Amount involved and results obtained</u>.   TFPC Group Counsel worked to achieve: (i) a minimally disruptive servicing transition from ResCap entities to a prospective purchaser of the servicing rights and obligations; (ii) obtaining as much of the proceeds of any sale as possible to compensate RMBS Securities holders; (iii) preserving claims against non-ResCap, non-Ally entities; (iv) obtaining compensation for investor claims, including the claims of the RMBS Trusts; (v) requiring a contribution by Ally to fund payment of investor claims; (vi) ensuring that all investors in an RMBS Trust had an opportunity to evaluate any settlement, and could choose to "opt out" of the settlement under appropriate circumstances; (vii) assisting in the resolution of a number of inter-creditor disputes; (viii) participating in days long mediation sessions; (ix) supporting and contributing to a timely and largely consensual Plan.   These considerable efforts will result in an approximate projected recovery for the RMBS Trusts of $700 million.   Given the complexities of and number of competing parties involved in the Chapter 11 cases, the recovery is more than timely given that it should be realized in less than two years from the Petition Date.

e.   <u>Time limitations imposed by the client or circumstances</u>. Significant time limitations were imposed upon TFPC Group Counsel by the circumstances.   For example, the Debtors' prepetition funding was provided by Ally and Ally was not prepared to fund the Debtors after May 2012.   Additionally, once the Debtors filed their chapter 11 cases, the ability to maximize value would be impaired.   Further, in the absence of settlement, litigating the various RMBS Trust claims and inter-creditor disputes would consume a substantial amount of time and resources, and the longer the Debtors remained in Chapter 11 the higher the administrative costs would be that would dilute recoveries.

f.   <u>Nature and length of professional relationship with the client</u>. Members of Talcott Franklin Group had a good relationship with Talcott Franklin P.C., and its bankruptcy counsel Carter Ledyard & Milburn LLP and Miller Johnson, which enabled the Talcott Franklin Group to remain a cohesive group and render efficient and effective decisions throughout the Chapter 11 cases.

g.   <u>Experience, reputation, and ability of lawyers performing the services</u>.   TFPC Group Counsel are experienced, sophisticated attorneys, with relevant knowledge and skills particularly relevant to the issues involved in representing the Institutional Investors. Tal Franklin "wrote the book" on RMBS litigation.   Counsel was actively involved, well-informed and constructive, and their

contributions produced results for the Talcott Franklin Group which were consistent with the goals of their engagements.

h.    <u>Whether the fee is fixed or contingent</u>. The Allowed Fee Claim is a contingency fee which was negotiated by and between sophisticated parties, and is incorporated into the RMBS Settlement that the RMBS Trustees support. The contingency fee does not affect a class of persons unable to protect themselves, and there is no suggestion that anyone affected by the contingency fee has been exposed to unfair disadvantage. The Allowed Fee Claim was negotiated at arms-length by sophisticated parties who were represented by counsel, and was the result of lengthy, complex and difficult settlement negotiations. The parties supporting the RMBS Settlement, and by extension the Allowed Fee Claim, represent virtually all of the major constituents in the Chapter 11 cases.

*See* Franklin Declaration, at ¶¶ 20 – 29; also Mabey Declaration, at ¶ 71.

43.    Importantly, the Allowed Fee Claim, as it pertains to TFPC Group Counsel, has the strong support of RMBS Institutional Investors, as shown by the Declarations attached to this Statement as **Group Exhibit B.**

C.    **Common Fund Doctrine.**

44.    Additionally, similar to a class action or other litigation activity that generates a fund benefitting a class of parties, bankruptcy courts have authorized, under the "common fund doctrine," the payment of contingency fees to counsel for creditors from funds created or established as a result of such counsel's efforts. *See, e.g., C & E Enterprises, Inc. v. Milton Poulos, Inc. (In re Milton Poulos, Inc.)*, 947 F.2d 1351, 1353 (9th Cir. 1991); *Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co., Inc.)*, 86 F.3d 364, 370, 376-77 (4th Cir. 1996); *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327, 343-44 (Bankr. D. Md. 2000).

45.    Under the common fund doctrine, if an attorney's efforts result in a fund or benefit for the attorney's client and third parties, a court may award fees from that fund to prevent the unjust enrichment of those third parties and provide restitution to the parties (the attorney and client) who procured the benefit. *See, e.g., Boeing Co. v. Van Gemert*, 444 U.S.

7314760.1

472, 478; 100 S.Ct. 745 (1980); *Mulligan Law Firm v. Zyprexa MDL Plaintiffs' Steering Comm.*

*II (In re Zyprexa Products Liability Litigation)*, 594 F.3d 113, 128-29 (2d. Cir. 2010).

46.    In common fund cases, courts award "reasonable" fees, *Boeing*, 444 U.S.

at 478, and percentage awards are preferred, *Blum v. Stenson*, 465 U.S. 886, 900, n. 16 (1984).

Additionally, in the Second Circuit, courts determine percentage fees in common fund cases on a

case-by-case basis, and consider the following factors:

> (1) the time and labor expended by counsel; (2) the magnitude and
> complexities of the litigation; (3) the risk of the litigation; (4) the
> quality of representation; (5) the requested fee in relation to the
> settlement; and (6) public policy considerations.

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 49-50 (2d. Cir. 2000).

47.    These factors are detailed and described in subsection (B) above regarding

State Law considerations, and demonstrate that the Allowed Fee Claim is reasonable.

**D.    11 U.S.C. § 328**

48.    The Allowed Fee Claim is 5.7% of the Allowed RMBS Trust Claims.

Under the circumstances, a contingency fee of only 5.7% of the recovery secured by counsel for

the Institutional Investors is more than reasonable.[7]

49.    For professionals employed by or at the expense of a chapter 11 estate, the

Bankruptcy Code permits employment pursuant to a contingency fee arrangement. According to

11 U.S.C. § 328(a), a professional person may be employed under section 327 or 1103 of the

Bankruptcy Code "on any reasonable terms and conditions of employment, including on a

retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis."

---

[7] Counsel for Talcott Franklin Group, Talcott Franklin P.C., Carter Ledyard & Milburn, and Miller Johnson, have
reached an agreement with counsel for the Steering Committee, Gibbs & Bruns LLP and Ropes & Gray LLP, to
allocate the Allowed Fee Claim among the law firms, which is set forth in Exhibit 14 of the Plan Supplement.
Under that allocation, counsel for the Talcott Franklin Group will receive 17.25% of the total Allowed Fee Claim.

50.    Counsel for the Institutional Investors have not been employed by or at the expense of the chapter 11 estate. However, the contingent fee arrangement nonetheless satisfies the standards set forth in section 328 of the Bankruptcy Code, if it were to apply, and is otherwise reasonable.

51.    The Allowed Fee Claim was negotiated before the bankruptcy by sophisticated parties, took account of the complexity of facts and significant legal risks, uncertainties, costs and time requirements associated with the representation, and is at the lower end of the range of market comparable contingency fee arrangements. *See* Mabey Declaration, at Section VI(A)(1).

52.    Contingency fees that have been approved in chapter 11 cases are typically much higher than 5.7%. *See, e.g., Riker, Danzig, Scherer, Hyland & Perretti v. Official Comm. Of Unsecured Creditors (In re Smart World Techs., LLC)*, 552 F.3d 228 (2d Cir. 2009) (contingency fee of 33% of the first $1.5 million, and for amounts in excess of $1.5 million a sliding scale between 0% and 37% depending on the length of the litigation, approved); *Pitrat v. Reimers (In re Reimers)*, 972 F.2d 1127, 1128 (9th Cir. 1992) (40% contingency fee approved); *Seiler v. First Nat'l Bank of Babbitt (In re Benassi)*, 72 B.R. 44, 49 (D. Minn. 1987) (33% contingency fee approved); *Merry-Go-Round*, 244 B.R. at 330-333 (40% contingency fee approved); *Solfanelli v. Meridian Bank (In re Solfanelli)*, 230 B.R. 54, 72 (Bankr. M.D. Pa. 1999) (25% contingency fee approved).

53.    The Allowed Fee Claim is also not "improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions," as cautioned by section 328(a) of the Bankruptcy Code. This standard is "is a high hurdle to clear." *In re Smart World Technologies, LLC*, 552 F.3d 228, 235 (2d Cir. 2009). The potential

17

magnitude of the Allowed Fee Claim, the potential for settlement of the RMBS Trust claims against ResCap, the anticipated time period for, complexity of and risks in litigating the RMBS Trust claims against ResCap, the potential for negotiations and settlement in a potential chapter 11 case, and the expected resource commitment of counsel to the Institutional Investors were all capable of being anticipated, both at the time the contingency fee was negotiated and throughout the Chapter 11 cases while the RMBS Settlement and Plan were being negotiated.

     **E.**     **11 U.S.C. § 330.**

     54.     Section 330 of the Bankruptcy Code provides that, after notice and a hearing, the court may award a professional person employed under section 327 or 1103 "(A) reasonable compensation for actual, necessary services rendered by the … professional person, or attorney and by any paraprofessional person employed by any such person; and (B) reimbursement for actual, necessary expenses."

     55.     Section 330 of the Bankruptcy Code further provides:

(3) In determining the amount of reasonable compensation to be awarded to [a] … professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

18

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

56.     Section 328, not section 330, of the Bankruptcy Code addresses contingency fees, and counsel to the Talcott Franklin Groups was not retained as a professional person in the Chapter 11 cases.  However, the Allowed Fee Claim would nonetheless be reasonable under the standard set forth in section 330 of the Bankruptcy Code.

57.     Courts in the Second Circuit assessing the reasonableness of compensation under section 330 of the Bankruptcy Code begin with the "lodestar" test, which multiplies the reasonable number of hours expended times a reasonable billing rate, and then determine whether to apply any enhancements to the lodestar amount under *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-20 (5th Cir. 1974).

58.     The "Johnson Factors" include (1) the time and labor required for the matter; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the services appropriately; (4) the preclusion of the professional from taking other cases by working on the matter; (5) the customary fee involved in similar instances; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client; (8) the sums involved and the results obtained; (9) the experience and ability of the employed professional; (10) whether the case is desirable or not; (11) the length of the relationship between the professional and the client; and (12) what awards were granted in similar cases.  *Johnson*, 488 F.2d at 717-19. However, enhancements to the lodestar based on the Johnson Factors are "only appropriate in exceptional and rare circumstances and must be supported by detailed evidence and specific findings." *In re Kohl*, 421 B.R. 115, 131 (Bankr. S.D.N.Y. 2009).

19

59.    The Allowed Fee Claim would be reasonable under section 330 of the Bankruptcy Code even if it applied, including consideration of the *Johnson* Factors, for the reasons described above in subsection (B) regarding State Law considerations.

**F.    11 U.S.C. § 503(b)(3)(D) and § 503(b)(4).**

60.    The Allowed Fee Claim is reasonable under, and meets the standards set forth in, section 503(b)(3)(D) and (b)(4) of the Bankruptcy Code, to the extent the Court determines that it applies.[8]  According to section 503(b)(3)(D), after notice and a hearing, there shall be allowed administrative expenses  for the "actual, necessary expenses ... incurred by – (D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title."

61.    To make a substantial contribution, there must be actual demonstrable benefit to the estate as a whole. *In re S & Y Enter., LLC*, 480 B.R. 452, 462-64 (Bankr. E.D.N.Y. 2012); *In re Granite Partners, L.P.*, 213 B.R. 440, 446 (Bankr. S.D.N.Y. 1997).  To prove that such a benefit has been made, courts have required meaningful participation in the chapter 11 case that is neither disruptive nor duplicative, which fosters and advances the administration of the bankruptcy estate and reorganization process. *See, e.g., S & Y Enter.*, 480 B.R. at 464 ("applicant's efforts should advance the entire bankruptcy process, not just the outcome of the case, and should move the bankruptcy case toward a successful reorganization").

---

[8] Court have generally declined to apply the substantial contribution test of section 503(b) of the Bankruptcy Code when assessing reasonableness of fees in connection with a plan of reorganization. *See, e.g., In re AMR Corp.*, No. 11-15463, 2013 Bankr. LEXIS 3809, at *6-12 (Bankr. S.D.N.Y. Sept. 13, 2013) (fees may be reimbursed pursuant to settlement embodied in the plan without satisfying requirements of section 503(b)); *In re Lehman Bros. Holdings Inc.*, 487 B.R. 181, 189-92 (Bankr. S.D.N.Y. 2013) (same); *In re Adelphia Communications Corp.*, 441 B.R. 6, 9 (Bankr. S.D.N.Y. 2010) (same).

7314760.1

62.    The Talcott Franklin Group and their counsel have acted, both before and after the commencement of the Chapter 11 Cases, to foster the efficient and consensual resolution of the Chapter 11 Cases. As described in detail above in ¶¶ 17 through 34, the Talcott Franklin Group and their counsel have had a constructive role from pre-petition negotiations of the RMBS Settlement Agreement and the pre-petition Plan Support Agreement, to active participation in the mediation among the parties, to the negotiation of and procuring support for the Global Settlement and the Plan. Counsel for the Talcott Franklin Group consolidated and managed a diverse group of 57 certificateholders, any of whom could have threatened consensus and the RMBS Settlement, and consistently managed this large and diverse group, not only for the benefit of the Talcott Franklin Group, but also for the benefit of the Debtors.

63.    The Talcott Franklin Group and its counsel were actively involved in multiple, ongoing settlement negotiations involving the RMBS Trusts, the Monolines and other parties-in-interest. The settlement negotiations, and counsel's assistance in facilitating the mediation of disputes, resulted in the RMBS Settlement Agreement, Plan Support Agreement, Global Settlement and Plan, all of which helped to increase recoveries for creditors by avoiding timely and costly litigation. Additionally, TFPC Group Counsel brought significant, meaningful, substantive expertise to the table with respect to the RMBS Trusts and their claims, and helped educate parties-in-interest as to the issues involved, the size of such claims, and in structuring the settlements.

## II.    THE ALLOWED FEE CLAIM DOES NOT DIMINISH THE RECOVERY OF OTHER CREDITORS

64.    Although the beneficiaries of the Allowed Fee Claim will technically hold an "allowed claim" against the Debtors' estates, and distributions on such claims will be made

directly to the holders of the Allowed Fee Claim, payment of the Allowed Fee Claim will not reduce the recoveries to any other estate creditor.

65.     The Allowed Fee Claim is not in addition to the RMBS Trust Claims, but rather is part of, and allocated from, the RMBS Trust Claims fixed pursuant to the RMBS Settlement, and does not deplete the assets of the Debtors' estates.  In other words, the allocation of 5.7% of the RMBS Trust Claims to Institutional Investors' counsel reduces the amount of the allowed claim that is ultimately provided to the RMBS Trusts, but does not reduce recoveries to any other creditor constituency.

## III.    THE ALLOWED FEE CLAIM HAS BEEN DISCLOSED TO ALL INTERESTED PARTIES, AND IS ALMOST UNIVERSALLY SUPPORTED.

66.     The Allowed Fee Claim is part of the RMBS Settlement and is incorporated into the Plan as a non-severable provision of the RMBS Settlement.  It has been fully disclosed throughout the Chapter 11 cases, and all interested parties have had the opportunity to object to the Allowed Fee Claim.

67.     Notice of the Allowed Fee Claim has been provided numerous times:

a.     The Original Steering Committee RMBS Settlement filed on June 11, 2012, and each amendment, provide that counsel for the Institutional Investors will be allocated a percentage of the RMBS Trust Claims for their work relating to the Chapter 11 cases and RMBS Settlement.

b.     The Plan Support Agreement filed on May 23, 2013 discloses the fee arrangement.  Specifically, the fee is disclosed in the Supplemental Term Sheet For Proposed Chapter 11 Plan, which is attached as Exhibit B to the Plan Support Agreement.

c.     Certain of the Institutional Investors received direct notice of the settlement and the Allowed Fee Claim from the RMBS Trustees, through Garden City Group, before the motion regarding the Plan Support Agreement was filed.

d.     On May 24, 2013, the RMBS Trustees, through the Garden City Group, provided notice to Institutional Investors regarding the

Global Settlement, the Plan Support Agreement motion, the RMBS
Settlement and the FGIC settlement.

e.    The Plan and related Disclosure Statement was served on all
parties in interest in these Chapter 11 cases.

68.    The RMBS Trusts own the claims that are the subject of the RMBS
Settlement and which are being settled in connection with the Plan.  The RMBS Trustees, on
behalf of the RMBS Trusts, are the parties who may assert, settle and vote such claims.  The
RMBS Trustees were active participants in the settlement negotiations that led to the Plan
Support Agreement, and approval and inclusion of the Allowed Fee Claim in the RMBS
Settlement.  The RMBS Trustees have consented to, and support, the Allowed Fee Claim.

69.    In addition to having the support of the RMBS Trustees, the RMBS
Settlement, which includes the Allowed Fee Claim, has been endorsed by all parties to the Plan
Support Agreement and Global Settlement, as set forth above.  Importantly, no RMBS investor
has objected to the Allowed Fee Claim.

70.    Given the almost unanimous support of the RMBS Settlement, which
includes the Allowed Fee Claim, the Allowed Fee Claim is reasonable and should be approved as
reasonable by this Court.

### E.  CONCLUSION

The Plan satisfies all requirements of the Bankruptcy Code and Bankruptcy Rules.
Additionally, under any potential relevant standard, as described above, the Allowed Fee Claim
is reasonable.  Further, the Allowed Fee Claim will not reduce the recoveries to any other estate
creditor, is incorporated into the Plan as a non-severable provision of the RMBS Settlement, has
been fully disclosed throughout the Chapter 11 cases with all interested parties having had an
opportunity to object, and has almost unanimous support through the RMBS Settlement.  Given
the circumstances, the Plan should be confirmed and the Allowed Fee Claim should be approved

7314760.1

by the Court as reasonable under § 1129(a)(4), to the extent it applies, or any other applicable

provision of the Bankruptcy Code or state law.

Dated:  November 12, 2013                    Respectfully submitted,

                                             /s/ Aaron R. Cahn
                                             Aaron R. Cahn
                                             Leonardo Trivigno
                                             Carter, Ledyard & Milburn, LLP
                                             2 Wall Street
                                             New York, New York 10005
                                             Phone: (212) 732-3200
                                             bankruptcy@clm.com

                                             Talcott J. Franklin (pro hac vice)
                                             Talcott Franklin, P.C.
                                             208 North Market Street, Suite 200
                                             Dallas, Texas 75202
                                             Phone: (214) 736-8730
                                             Fax: (877) 577-1356
                                             tal@talfranklin.com

                                             Thomas P. Sarb (pro hac vice)
                                             Robert D. Wolford (pro hac vice)
                                             Miller Johnson
                                             250 Monroe Avenue, Suite 800
                                             P.O. Box 306
                                             Grand Rapids, Michigan 49501-0306
                                             (616) 831-1748
                                             sarbt@millerjohnson.com

                                             *Attorneys for the Talcott Franklin Group Investors*

7314760.1