# EXHIBIT A

Talcott J. Franklin (admitted *pro hac vice*)
Talcott Franklin P.C.
208 North Market Street, Suite 200
Dallas, Texas 75202
Phone: (214) 736-8730
Fax:    (877) 577-1356
tal@talfranklin.com

Aaron R. Cahn
Leonardo Trivigno
Carter, Ledyard & Milburn LLP
2 Wall Street
New York, New York 10005
Phone: (212) 732-3200
bankruptcy@clm.com

Thomas P. Sarb (admitted *pro hac vice*)
Robert Wolford  (admitted *pro hac vice*)
Miller Johnson
Calder Plaza Building
250 Monroe Avenue NW, Suite 800
Grand Rapids, MI 49503-2250
Phone: (616) 831-1748
sarbt@millerjohnson.com

*Attorneys for the TFPC Investors*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | |
|---|---|
| In re | Case No.:  12-12020 (MG) |
| | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | |
| Debtors. | Jointly Administered |

-------------------------------------------------------------x

**DECLARATION OF TALCOTT J. FRANKLIN IN SUPPORT OF
TALCOTT FRANKLIN INVESTOR GROUP STATEMENT IN SUPPORT OF,
AND IN RESPONSE TO OBJECTIONS TO, JOINT CHAPTER 11 PLAN
PROPOSED BY RESIDENTIAL CAPITAL, LLC**

I, Talcott J. Franklin, hereby declare, pursuant to 28 U.S.C. §1746 and under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1.      I am an attorney licensed in North Carolina, South Carolina (inactive), and Texas. I graduated *magna cum laude* from Washington & Lee University School of Law where I was Editor in Chief of the Washington & Lee Law Review and a member of the Order of the Coif. I began litigating cases where a Trustee brought suit against a mortgage loan seller for the repurchase of mortgage loans in 2002. In 2008, I co-authored, with Thomas F. Nealon III, MORTGAGE AND ASSET BACKED SECURITIES LITIGATION HANDBOOK (West 2008), in which I served as co-author on the following relevant chapters and sections: 2:8-20 (Overview of Claims Among Securitization Participants); 3 (Claims Arising Prior to and as of the Securitization Transaction Closing Date); 4 (Claims Arising After the Securitization Transaction Closing Date). In 2009, I amicably left my position as an equity partner and head of litigation in the Dallas office of Patton Boggs LLP (where I was also deputy head of litigation firm-wide) to found Talcott Franklin P.C. ("TFPC"), a firm primarily dedicated to representing investors in mortgage-backed securities.

A.      The TFPC Investors and Their Claims

2.      As of the Third Amended and Restated RMBS Trust Settlement Agreement dated as of September 20, 2012 (Dkt 1887-3, filed 10/19/12), 57 investors designated in this litigation as the "TFPC Investors" (the "TFPC Investors") held or controlled 25% or more of one or more classes of interests in notes, bonds and/or certificates (collectively, the "Securities") in at least 193 of the approximately 392 trusts backed by residential mortgage loans held by certain of the securitization trusts (the "RMBS Trusts"). The major creditor constituencies, except the JSNs,

2

have agreed to the Third Amended and Restated RMBS Trust Settlement Agreement (one for the TFPC Investors and one for other institutional investors) and approval is an integral part of the Plan confirmation.

3.    The RMBS Trusts hold claims (each, a "Trust Claim"), as defined in § 101(5) of the Bankruptcy Code, against the Debtors, including claims arising out of alleged breaches of representations and warranties contained in Pooling and Servicing Agreements (the "PSAs"), Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and/or other agreements governing the sale and administration of residential mortgage loans sold to the Trusts (the "Governing Agreements").

4.    The bases of the Trust Claims alleged against certain Debtors include: (a) breaches of warranties about the quality, nature, history, and characteristics of the loans, and failures to remedy such breaches of warranty as required by the Governing Agreements of the RMBS Trusts in connection with sales of residential mortgage loans to the RMBS Trusts by certain of the Debtors; (b) failures to service those loans in accordance with the Governing Agreements; and (c) obtaining consideration from mortgage loan Originators for breaches of representations and warranties without providing compensation to the Trusts.

**B.    The Settlement Negotiations Between the Debtors, AFI and the TFPC Investors.**

5.    Pursuant to the Third Amended and Restated RMBS Trust Settlement Agreement dated as of September 20, 2012 (the "RMBS Trust Settlement Agreement," to which the Unsecured Creditors Committee has agreed and which is part of the proposed Joint Plan presented to the Court) the TFPC Investors requested the Trustees of the RMBS Trusts to enter the RMBS Trust Settlement Agreement. The RMBS Trust Settlement Agreement is the result of

extended arms-length negotiations between the TFPC Investors and the Debtors, and is at least the third major settlement agreement iteration.

6.      In 2011, some of the TFPC Investors decided to pursue various claims against sellers and servicers of the Loans and their affiliates, including Ally Financial Inc. ("AFI").  On behalf of those investors, TFPC contacted AFI and Residential Capital LLC ("ResCap") and began discussing a means to resolve their dispute.  These contacts initially resulted in various back and forth discussions between TFPC and Tim Devine, who I believe remains head of litigation for AFI. Mr. Devine set up a meeting in Normandale, MN between TFPC and ResCap for February 28, 2012.  In addition to me, TFPC attorneys Jerry Phelps, Paul Snyder, and Sheri Deterling met with Tammy Hamzehpour, whom I understood to be general counsel of ResCap, and others who I believe were David Hagens, John Ruckdaschel, and Brad Smith, some of whom were inside or outside counsel.

7.      At the meeting, TFPC made a presentation concerning the claims and defenses at issue, the manner in which certain TFPC attorneys had resolved the Fremont General repurchase claims in 2008-2011, and other legal and documentary issues reflected in the presentation.

8.      When negotiations failed to progress as hoped and bankruptcy rumors concerning ResCap surfaced, TFPC, on behalf of certain members of the TFPC Investors (the "Directing Investors"), directed the Trustee of over 20 Trusts to commence an action against AFI asserting: (a) breaches of representations and warranties; (b) breaches of servicing obligations; (c) conversion; and (d) piercing the corporate veil.

9.      That direction regarding AFI was accompanied by an offer of reasonable indemnity as the Trustee might require against the costs, expenses, and liabilities to be incurred, which willingness to provide such indemnity was, to my knowledge, unique to the Directing

4

Investors, and, as such, represented the only credible threat of suit against AFI on behalf of the certain of the Trusts.[1]  A sample of notice of default and direction letters are attached as Exhibit 1 to this declaration.

10.    As the sixty-day time limit for the Trustee to act on the direction ran, certain Debtors and AFI entered into a non-disclosure agreement with certain of TFPC's clients (the "NDA Investors").  The NDA Investors' negotiations with AFI and ResCap were focused on broad and significant goals that benefited all investors in the related Trusts.  Some of the goals of the negotiations from the NDA Investors' perspective were to: (a) ensure a minimally disruptive servicing transition from ResCap entities to a prospective purchaser of the servicing rights and obligations, which would benefit both borrowers and the Trust investors, while maximizing the amounts obtained as part of any sale of servicing rights; (b) obtain as much of the proceeds of any sale of servicing rights as possible to compensate investors in the Trusts; (c) preserve claims against non-ResCap entities related to the servicing of the Trusts; (d) obtain compensation for the investors' claims, including the Trust Claims; (e) require AFI to contribute funds to pay investor claims; and (f) ensure that all investors in a Trust would have the opportunity to evaluate and express a view regarding a settlement, and that a Trust could choose to "opt out" of the settlement under appropriate circumstances.

11.    Negotiations continued until AFI informed TFPC that ResCap was planning to file for Chapter 11 relief within the next few days.  Shortly thereafter, the TFPC Investors also learned that the Debtors were negotiating a settlement with the Steering Committee Group of RMBS Holders, that ResCap wanted to settle with both groups, and that the settlement would

---

[1] MBIA had previously filed suit against certain of the Debtors, but had not filed suit against AFI. See MBIA Ins. Co. v. Residential Funding Co., LLC, Index No. 603552/08 (N.Y. Sup. Ct.).

contain the provisions that TFPC had requested and with regard to which TFPC had already put Trusts in a position to enforce through the Directing Investors.

### C.   The Settlement Agreement

12.     On May 7, 2012, Paul Snyder and Jerry Phelps from TFPC met and/or spoke with representatives of the Debtors and their professionals. They discussed different scenarios of distributions in a liquidation setting to various claimant principals, based on assumptions and different amounts of possible AFI contributions. It also became apparent that ResCap and AFI were still negotiating with one another while they were negotiating with TFPC.

13.     TFPC was provided with a copy of a draft settlement agreement that Debtors proposed to enter into with the so-called Steering Committee Group of RMBS Holders. TFPC focused its attention during the short time-frame on the goals outlined above.

14.     During this time TFPC discussed with Morrison & Foerster various issues, including that certain servicing claims should be separate from breach of representation and warranty claims, that RMBS Trustees couldn't be forced to settle on time frames shorter than that allowed in the related PSAs, and that monoline involvement in the negotiations was important. Because the draft settlement agreement reflected many of the provisions TFPC had been negotiating for and time was pressing, TFPC's concerns were narrowed down to two issues: (a) language that, in TFPC's estimation, waived claims against non-ResCap entities involved in servicing the Loans; and (b) that the short time frame for Trustee approval might not give other investors or the Trustees an adequate opportunity to evaluate and participate in the settlement. TFPC's negotiations at this point were entirely with Debtors' counsel on the terms of the settlement agreement, although TFPC had occasional discussions with Mr. Devine in which he urged TFPC's clients to enter the settlement.

15. As a consequence, the NDA Investors did not enter into the initial settlement and the related Plan Support Agreement until the eleventh hour, when those issues were resolved to their satisfaction. On the first issue, the TFPC settlement agreement contained express language preserving claims against non-ResCap entities involved in the servicing of the Loans, which differed from the Steering Committee Group of RMBS Holders agreement. On the second issue, the NDA Investors accepted ResCap's language, as they rightly predicted that the planned 45-day approval process would ultimately be changed because, among other things, the PSAs at issue required a 60-day period for the Trustees to act.

16. When the TFPC Investors first began negotiating with the Debtors, the group consisted of less than 30 investors. A smaller sub-group of these investors were Directing Investors and/or NDA Investors. Between the filing of these bankruptcy cases and the Third Amended and Restated RMBS Trust Settlement Agreement, the TFPC Investors increased to 57 investors.

17. Mr. Devine considered the involvement of TFPC clients in the prospect settlement as important. One of the voice mails he left for me is illustrative. On May 11, 2012:

> [...] The record in my mind will reflect that you have been very helpful and that you and I have spoken frequently and that we've had a series of discussions designed to sort of create value in a potential settlement here. [...] and I've said that to Gary and the team. [...] But I want to get you on board. [...] It becomes something completely different than a sort of a – a Gibbs and Bruns deal. Suddenly it becomes a deal with – you know – substantial investor support. And Tal, you're there at the table, Kathy Patrick is at the table, and some of our other key constituents are there. You guys will be at the forefront of the discussions. That's what I'm looking for – [unclear] if we can get this done. [...]

18. In early May 2012, TFPC engaged, with the Consent of the TFPC Investors, Carter, Ledyard & Milburn LLP and Miller Johnson Snell & Cummiskey, P.L.C. as bankruptcy co-counsel to represent the TFPC Investors in pursuing mortgage repurchase and servicing

claims against the Debtors (with TFPC the three law firms are collectively "TFPC Group Counsel").

19.     The TFPC Investors did not coordinate with the investors represented by Gibbs & Bruns and Ropes & Grays (i.e., the "Steering Committee Group" of RMBS Holders) during the negotiations of the Third Amended and Restated RMBS Trust Settlement Agreement and its predecessors. TFPC has never discussed the RMBS Trust Settlement Agreement with any member of that group of RMBS Holders. Further, TFPC did not discuss the RMBS Settlement Agreement with counsel for that group of RMBS Holders until after the Bankruptcy was filed and coordination among counsel became necessary. (The "Steering Committee" does not speak for the TFPC Investors or any group of investors other than the members of the "Steering Committee" group itself.) One of TFPC's goals in negotiating the settlement agreement, which was achieved, was to preserve each investors' right to evaluate the settlement agreement for itself and give notice to the related Trustee as to whether or not to enter it.

**D.     TFPC Group Counsel Performed Substantial and Important Work On Behalf Of Its Clients.**

20.     By the signing of the RMBS Trust Settlement Agreement, TFPC Group Counsel had consolidated and advised a diverse group of 57 certificateholders, any one of whom could have threatened consensus and the RMBS Settlement. This group could have provided contrary instructions to the trustees in nearly half of the trusts in the RMBS Settlement and threatened the RMBS Settlement. However, the TFPC Investors supported the Settlement. *See e.g.*, Exhibit 2, a direction to the Trustees to support the Settlement.

21.     TFPC Group Counsel has consistently advised this large and diverse group, despite the challenge posed by a diverse and numerous group of certificateholders. The work of gaining assent and maintaining consensus within the group has taken significant time, effort and

8

care. Moreover, the TFPC Group Counsel has understood the issues facing the Trustees and has worked closely with the Trustees to benefit the related certificateholders.

22.    For instance, TFPC Group Counsel has hosted dozens of conference calls with its clients to discuss the case, not to mention the countless hours of work its attorneys have spent talking to individual clients on the phone and in person, providing emailed advice, explanations, and information about the Bankruptcy, and providing proposed or filed documents relevant to the Bankruptcy.

23.    Further, TFPC Group Counsel has successfully gained assent to multiple revisions and addenda to the RMBS Settlement Agreement through numerous letters, email correspondence and phone calls with clients. Certain of the changes have been included into both the TFPC Investors' and the Steering Committee investors' settlement agreement documents.

24.    At the outset of its clients' disputes with Debtors, TFPC Group Counsel also preserved liability (and prevented exculpation) of third-party non-Debtor servicers - thus preserving significant potential claims on behalf of all certificateholders.

25.    By letters dated on or about April 18 and April 23, 2013, samples of which are attached as Exhibit 3, TFPC Group Counsel gave notice of default and directed trustees to sue AFI directly, which immediately preceded the first big shift towards a global settlement.

26.    Before finalizing or recommending its clients sign, TFPC Group Counsel also took many important behind-the-scenes efforts to confirm and preserve consensus, including making direct contact with RMBS Trustees to ensure their support for the RMBS Settlement.

27.    Further, after the RMBS Settlement Agreement was signed, TFPC Group Counsel engaged in behind-the-scenes consensus building at critical times when the RMBS Settlement

9

looked to be in peril, such as after certain parties sought to add a "HoldCo" provision to the proposed bankruptcy plan.

28.     TFPC Group Counsel also calculated and monitored statutes of limitation and negotiated for tolling those limitations to preserve leverage and the TFPC Investors' right to litigate if the settlement efforts ultimately fail.

29.     TFPC Group Counsel's constant efforts to protect its clients, and all certificateholders, cannot be neatly summarized.  However, TFPC Group Counsel also:

    a.  Monitored or participated in countless conference calls held by Debtors, the Consenting Claimants, the Unsecured Creditors' Committee and others to defend the RMBS Settlement and push all parties towards a global settlement and bankruptcy plan that benefitted its clients and all RMBS certificateholders;

    b.  Attended, in person or by telephone, all hearings in front of Judge Glenn about which its clients should have been aware and/or that might affect the RMBS Settlement and plan confirmation;

    c.  Actively participated in mediation of the RMBS Settlement and global settlement of major creditors in New York City over numerous days late into the night each day;

    d.  Managed discovery and subpoenas served on its clients from FGIC, MBIA, UCC and others, including managing an electronic discovery production pursuant to these requests;

    e.  Negotiated portions of the new Plan Support Agreement, Term Sheet and Supplemental Term Sheet that formed some of the bases of the Disclosure Statement and Plan, as amended;

    f.   Provided support, comments and revisions to Unsecured Creditors Committee regarding the revised Plan Support Agreement, Term Sheet, Supplemental Term Sheet, Plan, and Disclosure Statement.

    g.   Provided comments to each amended and restated RMBS Settlement Agreement and fought for provisions to benefit its clients and all certificateholders;

    h.   Managed and executed proofs of claim filing on behalf of clients, which included approximately 169 proofs of claim filed according to the detailed requirements of the Bankruptcy Code and negotiated the terms for their withdrawal upon the Effective Date of the Plan, once the Plan Support Agreement was approved;

    i.   Negotiated and monitored portions of the Disclosure Statement and Plan affecting the TFPC Investors; and

    j.   Monitored, reviewed and commented on proposed filings in the Bankruptcy affecting the TFPC Investors, communicating as appropriate to counsel for the appropriate party.

**F.**    <u>**Attorneys' Fees**</u>

30.    Attached to this Declaration as Exhibits 4a, 4b and 4c are billing rates for the attorneys who have worked on this matter. These are the rates each attorney receives for work on behalf of clients who pay for their services on an hourly basis.

31.    Our internal projections, which are admittedly based on a number of assumptions concerning the ultimate amount recovered by the RMBS Trusts and the additional time our group of attorneys will have to expend on the case, estimate that the fee we obtain will be roughly the same amount we would obtain if we were reimbursed for expenses and billed this case hourly. In other words, we currently project that our fee will not provide us with the type of premium

that is typically awarded to lawyers working on a contingency fee case in order to provide compensation for the risks inherent in such litigation.

32.    This fee is reasonable given: (a) the substantial efforts taken by TFPC Group Counsel; (b) the risk counsel took in agreeing to be paid if and only if the RMBS Settlement were approved and the bankruptcy plan were confirmed; and (c) the billing rates that are lower than the rates paid out of the bankruptcy estate to the New York firms involved in this litigation for lawyers of similar quality.[1]

I swear under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information and belief.

Dated:    November 11, 2013

_____
Talcott J. Franklin

---

[1] While this disparity of rates for TFPC and Miller Johnson is based primarily on geography, I note that even the rates of Carter Ledyard, a 159-year old New York law firm, are substantially lower than those of most of the firms who have filed fee applications in this case.

12

# EXHIBIT 1a

# TALCOTT FRANKLIN P.C.

208 NORTH MARKET STREET
SUITE 200
DALLAS, TEXAS 75202
214.736.8730
WWW.TALCOTTFRANKLIN.COM

SENDER'S DIRECT DIAL:
214.321.3838

April 27, 2012

DELIVERED BY HAND
Deutsche Bank Trust Company Americas
Corporate Trust Office
1761 East St. Andrew Place
Santa Ana, California 92705-4934
Attention: See Schedule 1 attached

Deutsche Bank Trust Company Americas
Corporate Trust Office
1761 East St. Andrew Place
Santa Ana, California 92705-4934
Attention: See Schedule 2 attached

> Re: Series Supplements to Standard Terms of Pooling and Servicing Agreement and Standard Terms of Pooling and Servicing Agreement (collectively, "PSA") regarding Mortgage Asset-Backed Pass-Through Certificates, Series shown on Schedule 1, for which the Trustee is Deutsche Bank Trust Company Americas ("Trustee").[1]

Dear Sir or Madam:

This firm represents Certificateholders who have provided proof of ownership under separate cover. This letter constitutes a notice of default under PSA §8.01(c)(iv) with respect to the issues discussed in this letter. Two types of Trusts are represented: Trusts for which Residential Funding Corporation ("RFC") is the current Master Servicer, and Trusts for which RFC is no longer the Master Servicer.

With respect to Trusts for which RFC was the prior Master Servicer, RFC defaulted on its obligations under 3.02(b), including a promise to use its best reasonable efforts to enforce the obligations of each Subservicer and Seller. This default continued throughout RFC's tenure as Master Servicer, and is continuing today as no claims have been filed and the Trusts have not received compensation for such defaults.

Further, with respect to Trusts for which RFC is currently the Master Servicer, media reports indicate that the Master Servicer may be defaulting on its payment obligations to other creditors. The Master Servicer's failings place the Trustee in the untenable situation of having to risk its own funds and/or incur personal financial liability in the performance of its duties as Trustee, without reasonable grounds for believing that repayment of funds or adequate indemnity against

---

[1] Capitalized terms not otherwise defined in this letter shall have the meanings ascribed to them in the PSA.

CONFIDENTIAL

TALCOTT FRANKLIN P.C.
April 27, 2012
Page 2

such risk is reasonably assured to it.  We recognize that this is untenable in the long term, particularly because the defaults are continuing and show no signs of abatement.

We appreciate your prompt attention to this matter.

Sincerely,

Talcott J. Franklin

Attachments

CONFIDENTIAL

TALCOTT FRANKLIN P.C.
April 27, 2012
Page 3

## SCHEDULE 1

Attention:  Residential Accredit Loans, Inc. Series 2004-QA1
Attention:  Residential Accredit Loans, Inc. Series 2004-QS1
Attention:  Residential Accredit Loans, Inc. Series 2005-QA9
Attention:  Residential Accredit Loans, Inc. Series 2005-QA13
Attention:  Residential Accredit Loans, Inc. Series 2005-QS6[2]
Attention:  Residential Accredit Loans, Inc. Series 2005-QS16
Attention:  Residential Accredit Loans, Inc. Series 2005-QS17
Attention:  Residential Accredit Loans, Inc. Series 2005-QS3[3]
Attention:  Residential Accredit Loans, Inc. Series 2005-QS5[4]
Attention:  Residential Accredit Loans, Inc. Series 2005-QS10
Attention:  Residential Accredit Loans, Inc. Series 2005-QS14
Attention:  Residential Accredit Loans, Inc. Series 2006-QH1
Attention:  Residential Accredit Loans, Inc. Series 2006-QO3
Attention:  Residential Accredit Loans, Inc. Series 2006-QO5
Attention:  Residential Accredit Loans, Inc. Series 2006-QO7
Attention:  Residential Accredit Loans, Inc. Series 2006-QO8
Attention:  Residential Accredit Loans, Inc. Series 2006-QS4
Attention:  Residential Accredit Loans, Inc. Series 2006-QS6
Attention:  Residential Accredit Loans, Inc. Series 2006-QS10
Attention:  Residential Accredit Loans, Inc. Series 2006-QS17
Attention:  Residential Accredit Loans, Inc. Series 2007-QA2
Attention:  Residential Accredit Loans, Inc. Series 2007-QH2
Attention:  Residential Accredit Loans, Inc. Series 2007-QH3
Attention:  Residential Accredit Loans, Inc. Series 2007-QH4
Attention:  Residential Accredit Loans, Inc. Series 2007-QO2
Attention:  Residential Accredit Loans, Inc. Series 2007-QO3
Attention:  Residential Accredit Loans, Inc. Series 2007-QO4

---

[2] Misidentified in PSA as Series 2004-QS6.

[3] Misidentified in PSA as Series 2004-QS16.

[4] Misidentified in PSA as Series 2004-QS5.

CONFIDENTIAL

TALCOTT FRANKLIN P.C.
April 27, 2012
Page 4

## SCHEDULE 2

Attention: Residential Funding Corporation Series 2004-QA1
Attention: Residential Funding Corporation Series 2004-QS1
Attention: Residential Funding Corporation Series 2005-QA9
Attention: Residential Funding Corporation Series 2005-QA13
Attention: Residential Funding Corporation Series 2005-QS6[5]
Attention: Residential Funding Corporation Series 2005-QS16
Attention: Residential Funding Corporation Series 2005-QS17
Attention: Residential Funding Corporation Series 2005-QS3
Attention: Residential Funding Corporation Series 2005-QS5[6]
Attention: Residential Funding Corporation Series 2005-QS10
Attention: Residential Funding Corporation Series 2005-QS14
Attention: Residential Funding Corporation Series 2006-QH1
Attention: Residential Funding Corporation, RALI 2006-QO3
Attention: Residential Funding Corporation, RALI 2006-QO5
Attention: Residential Funding Corporation, RALI 2006-QO7
Attention: Residential Funding Company, LLC, RALI 2006-QO8
Attention: Residential Funding Corporation Series 2006-QS4
Attention: Residential Accredit Loans, Inc. Series 2006-QS6[7]
Attention: Residential Funding Corporation Series 2006-QS10
Attention: Residential Funding Company, LLC Series 2006-QS17
Attention: Residential Funding Company, LLC, RALI 2007-QA2
Attention: Residential Funding Company, LLC, RALI 2007-QH2
Attention: Residential Funding Company, LLC, RALI 2007-QH3
Attention: Residential Funding Company, LLC, RALI 2007-QH4
Attention: Residential Funding Company, LLC, RALI 2007-QO2
Attention: Residential Funding Company, LLC, RALI 2007-QO3
Attention: Residential Funding Company, LLC, RALI 2007-QO4

---

[5] Misidentified in PSA as Series 2004-QS6.

[6] Misidentified in PSA as Series 2004-QS5.

[7] The same notice attention notation was listed twice in the RALI 2006-QS6 PSA, so the attention notation is listed in both schedules.

CONFIDENTIAL

# EXHIBIT 1b

# TALCOTT FRANKLIN P.C.

208 NORTH MARKET STREET
SUITE 200
DALLAS, TEXAS 75202
214.736.8730
WWW.TALCOTTFRANKLIN.COM

SENDER'S DIRECT DIAL:
214.321.3838

April 27, 2012

DELIVERED BY HAND
Deutsche Bank Trust Company Americas          Deutsche Bank Trust Company Americas
Corporate Trust Office                        Corporate Trust Office
1761 East St. Andrew Place                    1761 East St. Andrew Place
Santa Ana, California 92705-4934              Santa Ana, California 92705-4934
Attention: See Schedule 1 attached           Attention: See Schedule 2 attached

> Re: Series Supplements to Standard Terms of Pooling and Servicing Agreement and
> Standard Terms of Pooling and Servicing Agreement (collectively, "PSA") regarding
> Mortgage Asset-Backed Pass-Through Certificates, Series shown on Schedule 1, for
> which the Trustee is Deutsche Bank Trust Company Americas ("Trustee").[1]

Dear Sir or Madam:

This firm represents Certificateholders who hold in the aggregate not less than 25% of the related
Percentage Interests of various Classes of Certificates. The Certificateholders have previously
given to the Trustee a written notice of default and of the continuance thereof.

The Certificateholders request the Trustee to institute an action, suit or proceeding in its own
name as Trustee against Ally Financial Inc. and any other necessary affiliated entities based on
the grounds listed in this letter. After substantial research and significant expenditures of time
and resources, the Certificateholders have developed the following claims:

1. Breaches of representations and warranties;
2. Breaches of servicing obligations;
3. Conversion; and
4. Piercing the corporate veil.

Upon entry of an appropriate common interest agreement, the Certificateholders will provide the
Trustee with the results of their research.

---

[1] Capitalized terms not otherwise defined in this letter shall have the meanings ascribed to them in the PSA.

TALCOTT FRANKLIN P.C.
April 27, 2012
Page 2

This letter constitutes the Certificateholders' written request upon the Trustee under PSA §11.03(c)[2] to institute an action, suit or proceeding in its own name as Trustee. The Certificateholders offer the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein. However, we understand that in light of the complex nature of the matter and the complications and exigency created by RFC's financial condition, that the Trustee may view it to be in the best interests of Certificateholders to allow an action by the Certificateholders on behalf of the Trusts to proceed under PSA § 11.03(c).

Please contact the undersigned concerning these issues. Certifications of beneficial ownership have been provided under separate cover.

Sincerely,

Talcott J. Franklin
Attachments

---

[2] PSA 11.03(c) ("No Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of Certificates of any Class evidencing in the aggregate not less than 25% of the related Percentage Interests of such Class, shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding it being understood and intended, and being expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates of any Class shall have any right in any manner whatever by virtue of any provision of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of such Certificates of such Class or any other Class, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under this Agreement, except in the manner herein provided and for the common benefit of Certificateholders of such Class or all Classes, as the case may be. For the protection and enforcement of the provisions of this Section 11.03, each and every Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.").

TALCOTT FRANKLIN P.C.
April 27, 2012
Page 3

## SCHEDULE 1

Attention:  Residential Accredit Loans, Inc. Series 2004-QA1
Attention:  Residential Accredit Loans, Inc. Series 2004-QS1
Attention:  Residential Accredit Loans, Inc. Series 2005-QA9
Attention:  Residential Accredit Loans, Inc. Series 2005-QA13
Attention:  Residential Accredit Loans, Inc. Series 2005-QS6[3]
Attention:  Residential Accredit Loans, Inc. Series 2005-QS16
Attention:  Residential Accredit Loans, Inc. Series 2005-QS17
Attention:  Residential Accredit Loans, Inc. Series 2005-QS3[4]
Attention:  Residential Accredit Loans, Inc. Series 2005-QS5[5]
Attention:  Residential Accredit Loans, Inc. Series 2005-QS10
Attention:  Residential Accredit Loans, Inc. Series 2005-QS14
Attention:  Residential Accredit Loans, Inc. Series 2006-QH1
Attention:  Residential Accredit Loans, Inc. Series 2006-QO3
Attention:  Residential Accredit Loans, Inc. Series 2006-QO5
Attention:  Residential Accredit Loans, Inc. Series 2006-QO7
Attention:  Residential Accredit Loans, Inc. Series 2006-QO8
Attention:  Residential Accredit Loans, Inc. Series 2006-QS4
Attention:  Residential Accredit Loans, Inc. Series 2006-QS6
Attention:  Residential Accredit Loans, Inc. Series 2006-QS10
Attention:  Residential Accredit Loans, Inc. Series 2006-QS17
Attention:  Residential Accredit Loans, Inc. Series 2007-QA2
Attention:  Residential Accredit Loans, Inc. Series 2007-QH2
Attention:  Residential Accredit Loans, Inc. Series 2007-QH3
Attention:  Residential Accredit Loans, Inc. Series 2007-QH4
Attention:  Residential Accredit Loans, Inc. Series 2007-QO2
Attention:  Residential Accredit Loans, Inc. Series 2007-QO3
Attention:  Residential Accredit Loans, Inc. Series 2007-QO4

---

[3] Misidentified in PSA as Series 2004-QS6.

[4] Misidentified in PSA as Series 2004-QS16.

[5] Misidentified in PSA as Series 2004-QS5.

TALCOTT FRANKLIN P.C.
April 27, 2012
Page 4

## SCHEDULE 2

Attention:  Residential Funding Corporation Series 2004-QA1
Attention:  Residential Funding Corporation Series 2004-QS1
Attention:  Residential Funding Corporation Series 2005-QA9
Attention:  Residential Funding Corporation Series 2005-QA13
Attention:  Residential Funding Corporation Series 2005-QS6[6]
Attention:  Residential Funding Corporation Series 2005-QS16
Attention:  Residential Funding Corporation Series 2005-QS17
Attention:  Residential Funding Corporation Series 2005-QS3
Attention:  Residential Funding Corporation Series 2005-QS5[7]
Attention:  Residential Funding Corporation Series 2005-QS10
Attention:  Residential Funding Corporation Series 2005-QS14
Attention:  Residential Funding Corporation Series 2006-QH1
Attention:  Residential Funding Corporation, RALI 2006-QO3
Attention:  Residential Funding Corporation, RALI 2006-QO5
Attention:  Residential Funding Corporation, RALI 2006-QO7
Attention:  Residential Funding Company, LLC, RALI 2006-QO8
Attention:  Residential Funding Corporation Series 2006-QS4
Attention:  Residential Accredit Loans, Inc. Series 2006-QS6[8]
Attention:  Residential Funding Corporation Series 2006-QS10
Attention:  Residential Funding Company, LLC Series 2006-QS17
Attention:  Residential Funding Company, LLC, RALI 2007-QA2
Attention:  Residential Funding Company, LLC, RALI 2007-QH2
Attention:  Residential Funding Company, LLC, RALI 2007-QH3
Attention:  Residential Funding Company, LLC, RALI 2007-QH4
Attention:  Residential Funding Company, LLC, RALI 2007-QO2
Attention:  Residential Funding Company, LLC, RALI 2007-QO3
Attention:  Residential Funding Company, LLC, RALI 2007-QO4

---

[6] Misidentified in PSA as Series 2004-QS6.

[7] Misidentified in PSA as Series 2004-QS5.

[8] The same notice attention notation was listed twice in the RALI 2006-QS6 PSA, so the attention notation is listed in both schedules.

# EXHIBIT 2

# TALCOTT FRANKLIN P.C.

208 NORTH MARKET STREET
SUITE 200
DALLAS, TEXAS 75202
214.736.8730
WWW.TALCOTTFRANKLIN.COM

SENDER'S DIRECT DIAL:
214.321.3838

June 13, 2012

DELIVERY SPECIFIED IN EXHIBIT A

To the Trustees listed on Exhibit A

Attention: See Exhibit A

> Re:    Direction from the Clients listed on Exhibit F1 (the "Requesting
> Certificateholders") as to the Trusts listed on Exhibit F2 (the "Covered Trusts")
> concerning Residential Capital LLC and its direct and indirect subsidiaries
> (collectively "ResCap")

Dear Sir or Madam:

This firm represents the Requesting Certificateholders concerning the Covered Trusts. The
Covered Trusts are the subject of a settlement agreement, which can be accessed at
http://www.talcottfranklin.com/rescap/ResCap_Settlement_Documents.html (the "Settlement").[1]
The Settlement was entered on the eve of ResCap's bankruptcy filing in a case styled *In re
Residential Capital, LLC et al.*, No. 12-12020 (MG) (S.D.N.Y. Bankr. May 14, 2012) (the
"Bankruptcy"). You may access bankruptcy filings at http://www.kccllc.net/rescap.

We appreciated the opportunity to meet with each Trustee earlier this month. As you may recall
from that meeting, the Requesting Certificateholders support the Settlement and requested that
each Trustee accept it. As a follow up to that meeting, and to the extent permissible under the
documents governing your obligations as Trustee, this letter constitutes a direction to the Trustee
to accept the Settlement and the compromises set forth therein on behalf of each Covered Trust.

As we also said at the meeting, we understand that the Trustees have a process respecting this
issue. The Requesting Certificateholders support that process and are willing to actively
participate in it. To the extent that the Trustee believes additional directions, information, or
support are necessary in this matter, please contact the undersigned at the phone number
provided above.

---

[1] To save environmental resources, we are providing this links to referenced documents. If you would
prefer paper copies, are unable to access documents through the links, or intend to take the position that these links
are insufficient to provide you notice of the documents, please let us know.

TALCOTT FRANKLIN P.C.
June 13, 2012
Page 2

Proofs of beneficial ownership will be filed in the Bankruptcy under seal, with confidential access provided to the Trustees.

Sincerely,

Talcott J. Franklin

Attachments

TALCOTT FRANKLIN P.C.
June 13, 2012
Page 3

## EXHIBIT A

### Trustees

Delivery of this letter to each Trustee is by Federal Express, Overnight Delivery, and delivery to each Trustee's counsel is by email, at the following respective physical and electronic addresses.

The Bank of New York Mellon Trust Company, N.A.
c/o Dechert LLP
1095 Avenue of the Americas
New York, New York 10036-6797
Attn: Hector Gonzales, Esq. and Glen Siegel, Esq.

*Counsel for The Bank of New York Mellon Trust Company, N.A., as Trustee*
Dechert LLP
1095 Avenue of the Americas
New York, New York 10036-6797
Attn: Hector Gonzales, Esq. and Glen Siegel, Esq.
Emails: hector.gonzalez@dechert.com
        glenn.siegel@dechert.com

---

Wells Fargo Bank, N.A.
9062 Old Annapolis Rd.
Columbia, Maryland 21045
and
Wells Fargo Bank, N.A.
P.O. Box 98
Columbia, Maryland  21046
Attn: Corporate Trust Services

*Counsel for Wells Fargo Bank, N.A., as both Indenture Trustee and Trustee*
Alston & Bird LLP
90 Park Avenue
New York, NY 10016
Attn.: Martin G. Bunin, Esq. and William Hao, Esq.
Emails: marty.bunin@alston.com
        william.hao@alston.com

---

U.S. Bank National Association
U.S. Bank Global Corporate Trust Services
190 S. LaSalle Street
Chicago, IL 60603 | MK-IL-SL8T
Attn.: Mamta K. Scott, Vice President

TALCOTT FRANKLIN P.C.
June 13, 2012
Page 4

*Counsel for U.S. Bank National Association, as Pooling and Servicing Agreement Trustee*
Seward & Kissel LLP
One Battery Park Plaza
New York New York 10004
Attn.: Ronald L. Cohen, Esq.
Email: cohenr@sewkis.com

*Counsel for U.S. Bank National Association, as Indenture Trustee*
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178
Attn: James S. Carr, Esq. and Eric R. Wilson, Esq.
Emails: jcarr@kelleydrye.com
        ewilson@kelleydrye.com

Deutsche Bank Trust Company Americas
Corporate Trust Office
1761 East St. Andrew Place
Santa Ana, California 92705-4934
Attn.: ResCap Settlement

*Counsel for Deutsche Bank Trust Company Americas*
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178-0600
Attn.: James L. Garrity, Jr., Esq., Michael S. Kraut, Esq. and John M. Rosenthal, Esq.
Emails: jgarrity@morganlewis.com
        mkraut@morganlewis.com
        jrosenthal@morganlewis.com

### Exhibit F1

**Holdings Information**

Consenting Claimant Names

REDACTED





REDACTED

TALCOTT FRANKLIN P.C.
June 13, 2012
Page 7

## EXHIBIT F2

(Covered Trusts)
Excel spreadsheet enclosed

REDACTED

EXHIBIT F2 to Trustee Direction Letter (As of June 11, 2012)



| Deal Name | CUSIP | Class | Bond Original Face | Original Class Face | Percentage Interest | Trustee Name |
|---|---|---|---|---|---|---|

REDACTED

EXHIBIT F2 to Trustee Direction Letter (As of June 11, 2012)



| Deal Name | CUSIP | Class | Bond Original Face | Original Class Face | Percentage Interest | Trustee Name |
|---|---|---|---|---|---|---|

REDACTED

EXHIBIT F2 to Trustee Direction Letter (As of June 11, 2012)



| Deal Name | CUSIP | Class | Bond Original Face | Original Class Face | Percentage Interest | Trustee Name |
|-----------|-------|-------|--------------------|---------------------|---------------------|--------------|

REDACTED

EXHIBIT F2 to Trustee Direction Letter (As of June 11, 2012)



| Deal Name | CUSIP | Class | Bond Original Face | Original Class Face | Percentage Interest | Trustee Name |
|---|---|---|---|---|---|---|

REDACTED

EXHIBIT F2 to Trustee Direction Letter (As of June 11, 2012)



| Deal Name | CUSIP | Class | Bond Original Face | Original Class Face | Percentage Interest | Trustee Name |
|---|---|---|---|---|---|---|

# REDACTED

EXHIBIT F2 to Trustee Direction Letter (As of June 11, 2012)

| Deal Name | CUSIP | Class | Bond Original Face | Original Class Face | Percentage Interest | Trustee Name |
|---|---|---|---|---|---|---|



REDACTED

EXHIBIT F2 to Trustee Direction Letter (As of June 11, 2012)



| Deal Name | CUSIP | Class | Bond Original Face | Original Class Face | Percentage Interest | Trustee Name |
|-----------|-------|-------|--------------------|--------------------|--------------------|--------------|

# REDACTED

EXHIBIT F2 to Trustee Direction Letter (As of June 11, 2012)



| Deal Name | CUSIP | Class | Bond Original Face | Original Class Face | Percentage Interest | Trustee Name |
|---|---|---|---|---|---|---|

REDACTED

EXHIBIT F2 to Trustee Direction Letter (As of June 11, 2012)



| Deal Name | CUSIP | Class | Bond Original Face | Original Class Face | Percentage Interest | Trustee Name |
|---|---|---|---|---|---|---|

# EXHIBIT 3a

# TALCOTT FRANKLIN P.C.

DALLAS                                                                 DIRECT DIAL: 214.321.3838

April 18, 2013

**HAND DELIVERY AND EMAIL**

U.S. Bank National Association
U.S. Bank Global Corporate Trust Services
190 S. LaSalle Street
Chicago, IL 60603 | MK-IL-SL8T
Attn.: Mamta K. Scott, Vice President
mamta.scott@usbank.com

Re:    *Pooling and Servicing Agreements (individually and collectively, "PSA")[1] regarding
Mortgage Asset-Backed Pass-Through Certificates, Series shown on Schedule 1, for
which the Trustee is U.S. Bank National Association ("Trustee").[2]*

Dear Sir or Madam:

This firm represents Certificateholders who have provided proof of ownership under separate
cover. This letter constitutes a notice of default under the PSA with respect to the issues
discussed in this letter. Two types of Trusts are represented: Trusts for which a Debtor was the
Master Servicer as of the date said Debtor filed petitions in the bankruptcy styled *In re
Residential Capital, LLC, et al.*, No. 12-12020 (MG) (S.D.N.Y. Bankr. May 14, 2012) (jointly
administered) (the "Bankruptcy"), and Trusts for which a Debtor was no longer the Master
Servicer when the petitions were filed in the Bankruptcy.

During the time a Debtor was the Master Servicer of a Trust, the Debtor defaulted on its
obligations to use its best reasonable efforts to enforce the obligations of each Subservicer and/or
Seller under their Subservicing agreements and Seller agreements. Until the date the Bankruptcy
petition was filed, no breach of representations and warranties or servicing violations had been
enforced by the Debtor resulting in the Trusts receiving compensation for such defaults. To the
extent that the Debtor directly serviced Mortgage Loans, it failed to give required notices of
breaches of representations and warranties under the PSA. For both directly serviced and
subserviced Mortgage Loans, the Debtor breached the PSA by failing to properly service the

---

[1] Certain of the PSAs consist of Series Supplements to Standard Terms of Pooling and Servicing
Agreements and Standard Terms of Pooling and Servicing Agreements that jointly make up PSAs.

[2] Capitalized terms not otherwise defined in this letter shall have the meanings ascribed to them in the PSA.

# TALCOTT FRANKLIN P.C.

DALLAS                                                    DIRECT DIAL: 214.321.3838

Mortgage Loans. Finally, upon information and belief, the Debtor converted or enabled the conversion of funds or Mortgage Loans prior to the date the Bankruptcy petitions were filed. All of these Master Servicer defaults and actions caused the Certificateholders damages and other harm and are continuing.

For the avoidance of doubt, by this letter the Certificateholders do not intend to do any of the following: (a) cause the Trustee or others to enforce (or seek derivatively to enforce) any representations and warranties regarding the Mortgage Loans or regarding the servicing of the Mortgage Loans; (b) take or direct the Trustee to take any adverse action against any Debtor in the Bankruptcy, or (c) claim or trigger an additional Event of Default under a PSA.

We appreciate your prompt attention to this matter.

Sincerely,

Talcott J. Franklin

Attachment

cc:    U.S. Bank National Association       *(Delivered via Federal Express)*
       U.S. Bank Corporate Trust Services
       60 Livingston Avenue, EP-MN-WS3D
       St. Paul, Minnesota 55107-2292

       Seward & Kissell LLP                 *(Delivered via Email)*
       One Battery Park Plaza
       New York, New York 10004
       Ronald L. Cohen ( cohen@sewkis.com)
       Mark D. Kotwick (kotwick@sewkis.com)
       Arlene R. Alves  ( alves@sewkis.com)
       Attorneys for U.S. Bank National Association, as Trustee
       of certain Mortgage-Backed Securities Trusts

# TALCOTT FRANKLIN P.C.

DALLAS                                                              DIRECT DIAL: 214.321.3838

## SCHEDULE 1

Attn:  Structured Finance/RAAC Series 2007-SP2
Attn:  Structured Finance/RAAC Series 2007-SP3
Attn:  Structured Finance/RAAC Series 2007-RP4
Attn:  Structured Finance/RASC Series 2007-KS4

# EXHIBIT 3b

# TALCOTT FRANKLIN P.C.

DALLAS                                                      DIRECT DIAL: 214.321.3838

April 23, 2013

<u>HAND DELIVERY AND EMAIL</u>

U.S. Bank National Association
U.S. Bank Global Corporate Trust Services
190 S. LaSalle Street
Chicago, IL 60603 | MK-IL-SL8T
Attn.: Mamta K. Scott, Vice President
mamta.scott@usbank.com

**Re:**    *Pooling and Servicing Agreements (individually and collectively, "PSA")[1] regarding Mortgage Asset-Backed Pass-Through Certificates, Series shown on Schedule 1, for which the Trustee is U.S. Bank National Association ("Trustee").[2]*

Dear Sir or Madam:

This firm represents Certificateholders who hold in the aggregate not less than 25% of the related Percentage Interests of various Classes of Certificates.[3] The Certificateholders have previously given to the Trustee a written notice of default and of the continuance thereof.

The Certificateholders request the Trustee to institute an action, suit or proceeding in its own name as Trustee against Ally Financial Inc. and any other necessary affiliated entities based on the grounds listed in this letter. After substantial research and significant expenditures of time and resources, the Certificateholders have developed the following claims:

1. Breaches of representations and warranties;
2. Breaches of servicing obligations;
3. Conversion; and
4. Piercing the corporate veil / *alter ego.*

---

[1]Certain of the PSAs consist of Series Supplements to Standard Terms of Pooling and Servicing Agreements and Standard Terms of Pooling and Servicing Agreements that jointly make up PSAs.

[2]Capitalized terms not otherwise defined in this letter shall have the meanings ascribed to them in the PSA.

[3]A list of these certificateholders is being provided under separate cover under the protection and terms of the confidentiality agreement between TFPC investors and the Trustee.

# TALCOTT FRANKLIN P.C.

DALLAS                                                                 DIRECT DIAL: 214.321.3838

Upon entry of an appropriate common interest agreement, the Certificateholders will provide the Trustee with the results of their research.

This letter constitutes the Certificateholders' written request upon the Trustee under PSA §11.03(c)[4] to institute an action, suit or proceeding in its own name as Trustee. The Certificateholders offer the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein. However, we understand that in light of the complex nature of the matter and the complications and exigency created by RFC's financial condition, the Trustee may view it to be in the best interests of Certificateholders to allow an action by the Certificateholders on behalf of the Trusts to proceed under PSA § 11.03(c).

Please contact the undersigned concerning these issues. Confirmations of directing Certificateholders' beneficial ownership have been provided under separate cover under the protection and terms of the confidentiality agreement between TFPC investors and the Trustee.

Sincerely,

Talcott J. Franklin

Attachment

cc:    U.S. Bank National Association    *(Delivered via Federal Express)*
       U.S. Bank Corporate Trust Services
       60 Livingston Avenue, EP-MN-WS3D
       St. Paul, Minnesota 55107-2292

---

[4] PSA 11.03 (c)(" No Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of Certificates of any Class evidencing in the aggregate not less than 25% of the related Percentage Interests of such Class, shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding it being understood and intended, and being expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates of any Class shall have any right in any manner whatever by virtue of any provision of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of such Certificates of such Class or any other Class, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under this Agreement, except in the manner herein provided and for the common benefit of Certificateholders of such Class or all Classes, as the case may be. For the protection and enforcement of the provisions of this Section 11.03, each and every Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.")

208 NORTH MARKET STREET•SUITE 200•DALLAS, TEXAS 75202•214.736.8730 PH•877.577.1356 FAX
WWW.TALCOTTFRANKLIN.COM

# TALCOTT FRANKLIN P.C.

DALLAS                                                                    DIRECT DIAL: 214.321.3838

Seward & Kissell LLP                    *(Delivered via Email)*
One Battery Park Plaza
New York, New York 10004
Ronald L. Cohen ( cohen@sewkis.com)
Mark D. Kotwick (kotwick@sewkis.com)
Arlene R. Alves  ( alves@sewkis.com)
Attorneys for U.S. Bank National Association, as Trustee
of certain Mortgage-Backed Securities Trusts

# TALCOTT FRANKLIN P.C.

DALLAS                                                          DIRECT DIAL: 214.321.3838

## SCHEDULE 1

Attn:  Structured Finance/RAAC Series 2007-SP2
Attn:  Structured Finance/RAAC Series 2007-SP3
Attn:  Structured Finance/RAAC Series 2007-RP4
Attn:  Structured Finance/RASC Series 2007-KS4

# EXHIBIT 4a

### Billing Rates for TFPC Attorneys (effective January 1, 2012)*

| Attorney | Education | Licenses | Rate |
|---|---|---|---|
| Alexander Boone | J.D., 1995, Washington & Lee Univ.; B.A., 1992 Univ. of Virginia | Virginia | $575 |
| Shannon Brown | J.D., 1992, Washington & Lee Univ.; B.A., 1988, Middlebury Col. | North Carolina | $575 |
| Sheri Deterling | J.D., 1989, University of Texas; B.B.A., 1986, Cox School of Business, Southern Methodist University | Texas Washington (inactive) | $575 |
| Martha Evans | J.D., 1977; B.A., Mathematics 1973, Univ. of Texas | California; Texas | $575 |
| Tal Franklin | J.D., 1995, Washington & Lee Univ.; M.A., 1992, B.A., 1988, Univ. of Washington | North Carolina; South Carolina (inactive); Texas | $775 |
| Janet Laughlin | J.D., 1977, Boston Univ.; B.A., 1974, Brown Univ. | Texas | $575 |
| Jerry Phelps | J.D., 1974, St. John's Univ.; B.A., 1969, Univ. of Iowa | California (inactive); Illinois (inactive); Minnesota (inactive); New York (inactive); Texas | $575 |
| Dee Price | J.D., 1985, Boston Univ.; M.A., 1981 Marshall Univ. | West Virginia | $575 |
| Dylan Savage | J.D., 2010, Southern Methodist Univ.; B.S., Computer Science, 2001, Univ. of Texas at Arlington | Texas | $350 |
| Paul Snyder | J.D., 1990; B.S. 1982, Univ. of Kansas | Kansas; Missouri | $775 |
| Dennis Taylor | J.D., 1995, Washington & Lee Univ.; M.A., B.A., Marshall Univ. | West Virginia | $575 |
| Derek Witte | J.D., 2002, The John Marshall Law School Chicago; B.A. 1999, Marian Col. | Illinois; Michigan | $575 |

* The firm may add additional attorneys, whose rates will be consistent with those set forth above. Hourly rates are increased annually.

# EXHIBIT 4b

## MILLER JOHNSON ATTORNEY RATES

| Attorney Name | Rates |
|---|---|
| Jon R. Muth | $460.00 |
| Thomas P. Sarb | $450.00/$460.00 |
| Robert D. Wolford | $330.00/$350.00 |
| Rachel L. Hillegonds | $235.00/$245.00 |
| Dustin J. Jackson | $190.00 |
| Jason C. Miller | $190.00 |

# EXHIBIT 4c

## CARTER LEDYARD & MILBURN LLP ATTORNEY RATES

| Attorney | 2012 | 2013 |
|----------|------|------|
| Gadsden | $800 | $825 |
| Cahn | $735 | $750 |
| Trivigno | $350 | $500 |

| Attorney | 2012 | 2013 |
|----------|------|------|
| Michael Bauscher | $250 | $270 |
| Bryce Bernards | $265 | $285 |
| Melissa Erwin | $265 | $285 |