**ALSTON & BIRD LLP**

John C. Weitnauer (*pro hac vice*)
90 Park Avenue
New York, New York 10016-1387
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee*
*and Master Servicer of Certain Residential*
*Mortgage Backed Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC, *et al.*,** | ) |
| | ) **Chapter 11** |
| Debtors. | ) |
| | ) **Jointly Administered** |

**DECLARATION OF MARY L. SOHLBERG**

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

     I, Mary L. Sohlberg, hereby declare, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

     1.  I am employed by Wells Fargo Bank, N.A., and my current title is Vice President.  I have personal knowledge of the facts set forth herein, except as to certain matters that I believe to be true based on (i) information provided by Duff,[1] (ii) information about positions of parties in these Chapter 11 cases contained in pleadings that I reviewed, reported to me by counsel, or learned during my participation in this case, including the Plan Mediation (defined below); and (iii) my review of business records of Wells Fargo Bank, N.A.

---

[1]    Capitalized terms used herein without definitions have the meanings ascribed to them in the Plan.  For the convenience of the reader, in some cases the definitions found in the Plan are repeated herein or a citation to the Plan's definition of such term is given.

2.  This Declaration is submitted in support of confirmation of the Plan.[2]

A.    ***Wells Fargo Bank, N.A.'s Role as Trustee or Master Servicer***

3.  Wells Fargo Bank, N.A., serves as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee and/or other similar agencies (in any such capacity, the "**Trustee**") or as master servicer, securities administrator, custodian and/or other similar agencies (in any such capacity, the "**Master Servicer**") in respect of certain RMBS Trusts which are identified in schedules attached to the proofs of claims described below, collectively, the "**Wells Fargo RMBS Trusts**").  As used herein, the term "**Wells Fargo**" refers to Wells Fargo only in the applicable capacity as Trustee or Master Servicer.

4.  The Wells Fargo RMBS Trusts are governed by one or more pooling and servicing agreements, highly integrated set of "servicing agreements," mortgage loan purchase agreements, deposit trust agreements, trust agreements, indentures, asset sale agreements, depositor sale agreements, administration agreements, yield maintenance agreements and other ancillary transaction documents (collectively, the "**Transaction Documents**").

5.  The Transaction Documents have information and details that are specific to the particular transaction that they govern, but in large part, the Transaction Documents have the same or similar provisions, particularly as they relate to the responsibilities and rights of the Trustee or Master Servicer.  Attached hereto as **Exhibit PX-1546** and **Exhibit PX-1547** are true and correct copies of the Indenture and Servicing Agreement, respectively, for the GMACM Home Equity Loan Trust 2005-HE1 in which Wells Fargo serves as indenture trustee under an indenture.  Exhibits PX-1546 and PX-1547 are indicative of the indentures and servicing

---

[2]    On August 23, 2013, the Plan Proponents filed the *Notice of Filing of Corrected Solicitation Version of the Disclosure Statement and Joint Chapter 11 Plan* [ECF No. 4819] that attached, as Exhibit A, the solicitation version of the *Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors*, which includes the Plan as Exhibit 1.

agreements that govern certain of the Wells Fargo RMBS Trusts for which Wells Fargo acts as Trustee. Attached hereto as **Exhibit PX-1548** is a true and correct copy of the pooling and servicing agreement for the GMACM Mortgage Loan Trust 2006-AR1 in which Wells Fargo serves as trustee under a pooling and servicing agreement. Exhibit PX-1548 is indicative of the pooling and servicing agreements that govern certain of the Wells Fargo RMBS Trusts for which Wells Fargo acts as Trustee. Attached hereto as **Exhibit PX-1549** is a true and correct copy of the pooling and servicing agreement for the ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE4 in which Wells Fargo Serves as Master Servicer, and attached hereto as **Exhibit PX-1550** and **Exhibit PX-1551** are true and correct copies of the pooling and servicing agreement and assignment, assumption and recognition agreements, respectively, for the Banc of American Funding Corporation Trust, Mortgage Pass-through Certificates Series 2007-4, in which Wells Fargo serves as master servicer. Exhibits PX-1549, PX-1550 and PX-1551 are indicative of the pooling and servicing agreements and other transaction documents that govern certain of the Wells Fargo RMBS Trusts for which Wells Fargo acts as Master Servicer.

6. Pursuant to the Transaction Documents, one or more of the Debtors has obligations in various capacities, including as originator, seller, sponsor, depositor and similar capacities (together, "**Seller**"), and/or as servicer, subservicer, master servicer, back-up servicer, HELOC servicer, administrator, co-administrator, and similar capacities (collectively, "**Servicer**").

7. In the appropriate capacity or capacities as provided for in the Transaction Documents, and subject to the authority given to Law Debenture Trust Company of New York ("**Law Debenture**") as Separate Trustee (described below) for certain of the Wells Fargo RMBS Trusts, Wells Fargo has the authority to enforce claims against the Seller and Servicer in respect of the Wells Fargo RMBS Trusts and to vote such claims in connection with the Plan.

**B.      *The Appointment of Law Debenture as Separate Trustee***

8.   Wells Fargo filed several verified petitions for instructions in the administration of

certain of the Wells Fargo RMBS Trusts (including all of the Original Settling RMBS Trusts[3] for

which Wells Fargo serves as Trustee) pursuant to Minn. Stat. § 501B.16.   In each of those

petitions, Wells Fargo sought the entry of an order authorizing Law Debenture, as Separate

Trustee, to take actions against entities who, directly or indirectly, sold, transferred or assigned

residential mortgage loans ("**Mortgage Loans**") to such Wells Fargo RMBS Trusts, or who may

be liable for breaches of representations or warranties related to the Mortgage Loans

(collectively, the "**Potentially Responsible Parties**").

9.   Specifically, each verified petition sought an order that, among other things, would

authorize the Separate Trustee:

> to take actions to enforce claims against Potentially Responsible Parties, including
> but not limited to (i) demanding production of files and other information relating
> to the Mortgage Loans (the "Loan Files") by the Potentially Responsible Parties
> or servicers of the Mortgage Loans ("Servicers"), (ii) commencing litigation or
> asserting claims to compel the Potentially Responsible Parties or Servicers to turn
> over Loan Files, (iii) making demands on the Potentially Responsible Parties to
> repurchase Mortgage Loans, (iv) commencing litigation to compel Potentially
> Responsible Parties to repurchase Mortgage Loans, and (v) take any other actions
> authorized by the Indenture to enforce a Potentially Responsible Party's
> obligation to repurchase Mortgage Loans (collectively, the "Repurchase Claims")
> to the extent of the powers of the Trustee, and to withdraw, compromise or settle
> the Repurchase Claims.

10. Each of the verified petitions filed were granted.[4]   Promptly thereafter, Law

Debenture accepted its responsibilities as Separate Trustee under the Instruments of

---

[3]    Defined at Art.I.A.195 of the Plan.

[4]    The RMBS Trusts that were the subject of such petitions, and the date the applicable petition was granted, are
as follows:

| | |
|---|---|
| Harborview 2006-10 | 8/29/12 |
| Harborview 2007-3 | 8/29/12 |
| GMACM 2006-AR1 | 11/8/12 |

Appointment and Acceptance (each, an "**IAA**") attached to such verified petitions. The IAAs provided, among other things, that:

> the Separate Trustee shall ... have full power, right and authority to: i) pursue requests for mortgage loan files and related files/information; ii) commence litigation to compel servicers (or other applicable parties) to turnover mortgage loan files and related files/information; iii) demand repurchase or substitution of mortgage loans by mortgage loan sellers (or other applicable parties) and engage in settlement if applicable; iv) commence litigation to enforce Repurchase Claims and engage in settlement; and v) take such additional actions on behalf of the Certificateholders necessary or appropriate to give effect to (i) through (iv) above.

**C.   *The Proofs of Claim and the Notice of Cure Claims***

11. On or about March 1, 2013, (i) Wells Fargo, as Trustee, filed proofs of claim[5], (ii) Wells Fargo, as Trustee, and Law Debenture, as Separate Trustee, jointly filed proofs of claim[6], and (iii) Wells Fargo, as Master Servicer, filed proofs of claim.[7]

| | |
|---|---|
| GMACM 2006-J1 | 11/8/12 |
| GMACM 2000-HE2 | 11/8/12 |
| GMACM 2000-HE4 | 11/8/12 |
| GMACM 2002-HE1 | 11/8/12 |
| GMACM 2002-HE3 | 11/8/12 |
| GMACM 2002-HE4 | 11/8/12 |
| GMACM 2003-HE1 | 11/8/12 |
| GMACM 2003-HE2 | 11/8/12 |
| GMACM 2004-HE1 | 11/8/12 |
| GMACM 2004-HE2 | 11/8/12 |
| GMACM 2004-HE5 | 11/8/12 |
| GMACM 2004-VFT | 11/8/12 |
| GMACM 2005-AA1 | 11/8/12 |
| GMACM 2005-HE1 | 11/8/12 |
| GMACM 2005-HE2 | 11/8/12 |
| SARM 2007-3 | 5/2/13 |
| SARM 2007-6 | 5/2/13 |
| SASCO 2005-S6 | 7/24/13 |
| SASCO 2005-S7 | 7/24/13 |
| Carrington 2006-RFC1 | 9/4/13 |
| BSABS 2004-BO1 | 10/2/13 |
| Carrington 2007-RFC1 | 10/2/13 |

---

[5]   Claim Numbers 6502 – 6552.

[6]   Claim Numbers 6604 – 6654. Wells Fargo and Law Debenture jointly filed such proof of claim to the extent of their respective obligations as Trustee or Separate Trustee under the IAAs.

12. On or about April 16, 2013, Wells Fargo, as Trustee and Master Servicer, filed a Notice of Cure Claim.[8]

### D.    The RMBS 9019 Motion

13. Shortly after these Chapter 11 cases were filed the Debtors filed a motion,[9] which was later amended (as amended, the "**RMBS 9019 Motion**"[10]), seeking approval of the **Original RMBS Settlement Agreements**[11] with the **Institutional Investors**[12] (*i.e.*, the **Steering Committee Consenting Claimants**[13] and the **Talcott Franklin Consenting Claimants**[14]). The Original RMBS Settlement Agreements relate to the **RMBS R+W Claims**[15] of the Original Settling RMBS Trusts.[16]

14. Under the Original RMBS Settlement Agreements, the Original Settling RMBS Trusts would have been granted an allowed aggregate claim of up to $8.7 billion to be allocated in accordance with certain formulas set forth in Exhibit B to each of the Original RMBS

---

[7]    Claim Numbers 6553 - 6603. See *Stipulation and Order Permitting Certain Parties to File Proofs of Claim After the Bar Date* dated November 6, 2012 [ECF No. 2095].

[8]    *Notice of Cure Claim of Wells Fargo Bank, N.A. as Trustee and Master Servicer* [ECF No. 3454]. *See Fourth Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements*, ECF No. 2528, at ¶ 15.

[9]    *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 320].

[10]    *Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 1176] and the *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 1887].

[11]    Defined at Art.I.A.194 of the Plan.

[12]    Defined at Art.I.A.131 of the Plan. The Institutional Investors collectively held, or were authorized investment managers for holders of 25% or more of classes (or tranches) of certificates of various of the Original Settling RMBS Trusts.

[13]    Defined at Art.I.A.278 of the Plan.

[14]    Defined at Art.I.A.280 of the Plan.

[15]    Art.I.A.257 defines **RMBS R+W Claims** as "claims of the RMBS Trusts against the Debtors arising from any obligations or liability in respect of the origination and sale of mortgage loans to the RMBS Trusts."

[16]    Holders in all 392 Original Settling RMBS Trusts were notified of the RMBS 9019 Motion, and all such Holders, and all other parties in interest in these Chapter 11 cases, had the opportunity to object to the RMBS 9019 Motion. Certain of the objections are discussed below.

Settlement Agreements.[17]    In support of the RMBS 9019 Motion, the Debtors submitted an

expert report that calculated the Original Settling RMBS Trusts' RMBS R+W Claims at between

$6.7 billion and $10.3 billion.[18]

**E.    *Retention of Duff***

15. In light of the then-pending RMBS 9019 Motion, Wells Fargo and three other RMBS

Trustees (Deutsche Bank, BNY Mellon and U.S. Bank) retained Duff to assist them in the

Chapter 11 Cases, including in the identification, quantification, litigation and/or resolution of

the RMBS Trust Claims.[19]

**F.    *Objections to the RMBS 9019 Motion***

16. No one filed an objection to the RMBS 9019 Motion claiming that the $8.7 billion

allowed claim was too low.  There were, however, several objections that the $8.7 billion

number was too high.  For example, the Committee's objection stated that the Debtors' liability

for repurchase claims of the Original Settling RMBS Trusts was approximately $3.8 billion, and

if certain legal defenses were considered, might be reduced to a range of $2.7 billion to $3.3

billion.[20]    FGIC objected that the Debtors could not support the reasonableness of an allowed

claim exceeding $4 billion, excluding the value of the claims that monoline insurers (each, a

---

[17]    The RMBS 9019 Motion provided that "[w]hile the [Original Settlement Agreement] was negotiated by the Institutional Investors, the Trustees of each of the [Original Settling] Trusts will also evaluate the reasonableness of the settlement and can accept or reject the proposed compromise on behalf of each Trust."  *See* ECF No. 320 at ¶4.

[18]    *Declaration of Frank Sillman in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements*, ECF No. 320-8, at ¶¶ 68 and 69.

[19]    Duff was retained after a rigorous selection process that involved, among other things, interviewing five potential advisory firms in person, selecting two finalists, and hearing follow up presentations by the two finalists. Duff was selected based on (a) the firm's experience in handling similar types of engagements involving the evaluation of mortgage loan servicing agreements and loan origination agreements, bankruptcy litigation, restructuring, asset valuation, complex securitizations and RMBS loan repurchase actions and (b) the depth of resources available to the firm, including advisory services about bankruptcy issues generally.  Following its appointment as Separate Trustee for certain RMBS Trusts, Law Debenture joined in the retention of Duff.  In addition, Wells Fargo has been represented in these Chapter 11 cases by the law firm of Alston & Bird LLP.

[20]    *Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* [ECF No. 2825], including the supporting Expert Report of Bradford Cornell, Ph.D [ECF No. 2829, Ex. A].

"**Monoline**") have against the Debtors, and that "the $8.7 Billion claim amount is excessive and unreasonable" and "grossly overstates the value of the settled claim."[21]  MBIA similarly objected that the repurchase claims of the Original Settling RMBS Trusts, excluding the claims of the monoline insurers, were less than $3 billion and that the Original Settlement Agreements provide a "windfall for certain Settling Trusts at the expense of both non-settling and settling creditors."[22]

17. Only two holders in the Original Settling RMBS Trusts filed objections to the RMBS 9019 Motion,[23] and these objections were limited to the manner in which the allowed claim was to be allocated among the Original Settling RMBS Trusts in the Original Settlement Agreements. The crux of those two objections was that the allocation methodology in the Original Settlement Agreements failed to take into account the unique characteristics of the Original Settling RMBS Trusts and inappropriately used net losses as a proxy for viable repurchase claims.

### G.    *Reasonable Range of the Allowed Amount of RMBS R+W Claims of the Original Settling RMBS Trusts*

18. Duff was initially asked by the RMBS Trustees to evaluate the reasonableness of the Original RMBS Settlement Agreements as they related to the RMBS R+W Claims of the Original Settling RMBS Trusts.

---

[21]    *Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2819].

[22]    *See Objection of MBIA Insurance Corporation to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2810], including the Expert Declaration of C.J. Brown [ECF. No. 2811].

[23]    *See Objection to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2308]; *Limited Objection to Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2297].

(i).     Modification of the Original Claim Allocation Methodology

19. As part of its analysis of the RMBS R+W Claims, Duff evaluated the Original Claim Allocation Methodology, which would have allocated RMBS R+W Claims among the Original Settling RMBS Trusts *pro rata* on the basis of the sum of the net losses that have been experienced and are estimated to be experienced by each such RMBS Trust through the date of its termination.   Based on Duff's suggestion, and after lengthy discussions with the Steering Committee Consenting Claimants, the Debtors, and other parties in interest, the Original Claim Allocation Methodology was modified to provide for RMBS R+W Claims to be allocated *pro rata* based on differences among the RMBS Trusts (i) losses *and* (ii) in the incidence of breaches of representations and warranties, as revealed by loan sampling and statistical work to be performed by Duff.

(ii).     Review of Mortgage Files and Methodology Used

20. To assess the reasonableness of the $8.7 billion settlement consideration and to implement the Revised Claim Allocation Methodology, Duff conducted a sampling review of more than 6,500 mortgage loan files provided by the Debtors.   In that review Duff sought to identify breaches of representations and warranties made by the Debtors, and used statistical methodologies to estimate the incidence of those breaches across the population of mortgage loans in the RMBS Trusts.   Duff also used historical information and financial analysis to calculate the total present and projected future losses of the RMBS Trusts that were associated with breaches of representations and warranties by the Debtors.

(iii).    Trustees' Statement Regarding the RMBS 9019 Motion

21. On or about February 4, 2013, U.S. Bank, BNY Mellon, Deutsche Bank, and Law Debenture,[24] in furtherance of the Court's request that they advise the Court of their views of the Original RMBS Settlement Agreements in advance of the hearing on the RMBS 9019 Motion, filed the *RMBS Trustees' Statement Regarding Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of RMBS Trust Settlement Agreements* [ECF No. 2833] (the "**Trustees' Statement**").  The Trustees' Statement stated, among other things, that:

> After careful consideration of relevant factors and analysis, including (a) the results of its review of a statistically significant number of loan files in the [Original] Settling [RMBS] Trusts provided by the Debtors, (b) the estimation of projected total collateral losses and underwriting breach rates in the [Original] Settling [RMBS] Trusts, (c) the estimation of likely agree rates with respect to the [Original] Settling [RMBS] Trusts (which take into account the litigation risk associated with the relative characteristics of the breach), and (d) consideration of causality factors (which take into account the litigation risk associated with a lack of causal relationship between the breach and loss), Duff advised [BNY Mellon, Deutsche Bank, US Bank and Law Debenture] that the amount of [up to 8.7 billion] is within a reasonable range to settle the [Original] Settling [RMBS] Trusts' Repurchase Claims ...

Trustees' Statement, at ¶ 10.

22. Those RMBS Trustees further stated in the Trustee Statement that:

> Assuming no changes in the facts and controlling law underlying the Repurchase Claims, and subject to the RMBS Trustees' determination that all provisions of the [Original] RMBS Trust Settlement[s] are fair, equitable and reasonable to the Settling Trusts, the RMBS Trustees have determined that the Allowed Claim falls within a reasonable range to resolve the [Original] Settling [RMBS] Trusts' Repurchase Claims and the Debtors' proposed Revised Claim Allocation Methodology for allocating the Allowed Claim among the [Original] Settling [RMBS] Trusts is fair and equitable to those trusts.

*Id*. at ¶12.

---

[24]    As noted above, by February 4, 2013, for certain of the Wells Fargo RMBS Trusts, which included all of the Original Settling Trusts where Wells Fargo serves as Trustee, Law Debenture was serving as Separate Trustee; accordingly, Wells Fargo was not a party to the Trustees' Statement.

23. On May 23, 2013, the day the motion to approve the Plan Support Agreement (discussed below) was filed,[25] the trial dates and other matters related to the RMBS 9019 Motion were adjourned.[26]

### H.    Plan Mediation and the Plan Support Agreement

24. On December 6, 2012 the Debtors filed a motion seeking the entry of an order appointing a mediator to assist certain parties in interest in resolving various plan issues in furtherance of reaching a consensual Chapter 11 plan.[27]  On December 26, 2012, the Court appointed U.S. Bankruptcy Judge James M. Peck as Mediator.[28]

25. The Plan Support Agreement – the terms of which are embodied in the Plan – was the result of an extensive mediation over the course of some five months (the "**Plan Mediation**") overseen by Judge Peck.  The communications and analyses relating to negotiations conducted during the Plan Mediation are privileged and confidential by law and pursuant to agreement, and therefore cannot be disclosed in detail.  In general, however, the integrated, global settlement associated with the Plan must be understood as the product of intense, arms-length negotiations conducted by and among sophisticated parties with differing and conflicting interests, under the close supervision and guidance of a sitting bankruptcy judge.

26. The RMBS Settlement contained in the Plan is part of an integrated, multifaceted agreement among numerous constituencies that was born as the result of a lengthy, highly contentious Plan Mediation that resulted in the Plan Support Agreement, and now the Plan.  Prior to entering into the Plan Support Agreement, Wells Fargo considered (keeping in mind the respective responsibilities of Wells Fargo as Trustee and Law Debenture as Separate Trustee) the

---

[25]    ECF No. 3814.

[26]    *See* ECF Nos. 3815 and 3816.

[27]    ECF No. 2357.

[28]    ECF No. 2519.  The Court later extended the term of the Mediator.

benefits and risks associated with reaching an agreement regarding an overall consensual

Chapter 11 plan, as well as the risks and uncertainties associated with allowance of, and

distributions on, the RMBS Trust Claims in the absence of a consensual Chapter 11 plan.

**I.    *Allowance of, and Distributions on, the RMBS Trust Claims under the Plan***

(i).    <u>Allowed Amounts and Reasons for the Reallocation of Units</u>

27. Article IV, Section C of the Plan  provides (among other things) that:

(a) Entry of the Confirmation Order shall constitute approval of the Allowed amount of the
RMBS Trust Claims as non-subordinated Unsecured Claims, subject only to the Allowed Fee
Claim, in the aggregate amounts of (i) $209.8 million against the GMACM Debtors; (ii) $7,091.2
million against the RFC Debtors; and (iii) $0 against the ResCap Debtors.
Plan Art.IV.C.2.

28. The aforesaid "Allowed amounts" were used by the Consenting Claimants during the

negotiations that took place during the Mediation[29] which resulted in the distributions to be made

to the RMBS Trusts – *in the aggregate* – pursuant to the Plan Support Agreement (and now the

Plan).  However, there were certain significant differences between the "Allowed amounts" and

the claims of the RMBS Trusts as determined by Duff, particularly with respect to (i) the

aggregate amount of the RMBS R+W claims of the Additional Settling RMBS Trusts and (ii) the

aggregate amount of the Recognized Cure Claims.  In addition, there were disputes between the

Debtors and the RMBS Trustees regarding which Debtor was responsible for certain of those

claims.  Finally, as of the time the Plan Support Agreement was negotiated, there was substantial

remaining due diligence needed to confirm that certain of these claims were properly asserted

under the provisions of the governing documents of certain of the RMBS Trusts, and if they

were, to determine the responsible Debtor under the governing documents.

---

[29]    "Mediation" refers to the mediation process supervised by U.S. Bankruptcy Judge Peck that resulted in the Plan
Support Agreement (and now the Plan).  *See* Order Appointing Mediator, ECF No. 2519.

29. Accordingly, the RMBS Trustees required the Plan to contain provisions that would allow the RMBS Trustees, after completing due diligence, to use the completed due diligence and Duff's final calculations of the RMBS Claims to re-allocate the Units that will be distributed based on the "aggregate amounts of (i) $209.8 million against the GMACM Debtors; (ii) $7,091.2 million against the RFC Debtors."[30]  The re-allocation of Units from the RFC Pool to the GMACM Pool avoids significant distortions in distributions to the RMBS Claims, as finally calculated, that would otherwise occur if distributions were made based on the above-referenced "aggregate" allowed amounts contained in the Plan.

(ii).    Reason for Calculation of "Weighted" Claims

30. At the time the Plan Support Agreement was agreed to, the RMBS Trustees contemplated that servicing damage claims of RMBS Trusts whose Servicing Agreements had been assumed would be paid first, in full, from cash distributed on the Units distributed under the Plan on account of the RMBS Claims.[31]  Thereafter, it was learned that a priority distribution of cash proceeds would adversely affect the REMIC status of the applicable RMBS Trusts.  To avoid such an adverse tax effect while at the same time honoring the priority nature of a servicing damage claim where the Servicing Agreement has been assumed and assigned, Art.IV.C.3(c) and (d) of the Plan implements the concept of an RMBS Trust's total "weighted claim."   In order to calculate the GMACM Weighted Claim of an RMBS Trust, the GMACM Recognized Cure Claim is valued at 100%, and the GMACM Recognized Original R+W Claims, the GMACM Additional R+W Claims and the GMACM Recognized Unsecured Servicing Claims, if any, are valued at percentage distribution available from the GMACM Pool after the

---

[30]    Art.IV.C.2(a) of the Plan.

[31]    *See, e.g.*, Annex III to the Plan Support Agreement [ECF No. 3814].

calculations made by Duff described in the Plan. After the Weighted Claims are calculated, distributions are made based on a RMBS Trust's *pro rata* share of all of the Weighted Claims in the GMACM Pool. The same process applies to calculate the RFC Weighted Claim of an RMBS Trust.

      (iii).   Impact of Monoline Insurance and "Recognized" Claims

    31. Insured RMBS Trusts[32] (other than those insured by FGIC and Ambac) have received, and in the future are assumed to receive, payment of their losses to the extent necessary to pay the principal and interest due to the insured tranches of such trusts directly from the applicable Monoline, which in most cases eliminates the need for any distribution to those RMBS Trusts given the structure of the Plan and the inter-related settlements contained in the Plan.[33] In such cases, the "recognized" claim of the RMBS Trust is set to zero, or is reduced, to take into account the full or partial payment of claims by the applicable Monoline, unless an exception applies.[34] The rights of Insured RMBS Trusts are reserved in the event that the applicable Monoline does not honor its obligations.[35]

      (iv).   RMBS R+W Claims of the Additional Settling RMBS Trusts

    32. It consistently has been contemplated by the RMBS Trustees that the resolution of the RMBS Trust Claims would need to include the RMBS R+W Claims of all RMBS Trusts for

---

[32] Attached as **Exhibit PX-1552** and **Exhibit PX-1553** are a sample insurance agreement and insurance policy, respectively, that establish the terms of the contractual relationship between a Monoline and an Insured RMBS Trust. Exhibits PX-1552 and PX-1553 are indicative of the insurance policies that govern the contractual relationship between the Monolines and the Insured RMBS Trusts.

[33] In consideration for these payments, the Monolines are allowed significant claims against the applicable Debtors, on account of which they are anticipated to receive substantial distributions from such Debtors' estates.

[34] The exceptions are described at Art.IV.C.3.(a)(iv) of the Plan.

[35] Art.IV.C.4 of the Plan.

which they acted,[36] and not just the RMBS R+W Claims of the Original Settling RMBS Trusts. In the Plan, these additional RMBS Trusts are referred to as the Additional Settling RMBS Trusts.[37]

33.  As contemplated by the RMBS Trustees, the Plan also allows for distributions to the "**Additional Settling RMBS Trusts**[38]," which term includes all RMBS Trusts other than the Original Settling RMBS Trusts.  Thus, the RMBS R+W Claims of the Additional Settling RMBS Trusts are included in the RMBS Settlement contained in the Plan,[39] and their claims will receive treatment thereunder that is consistent with the treatment being accorded under the Plan to the RMBS R+W Claims of the Original Settling RMBS Trusts.

(v).    <u>Servicing Damage Claims of RMBS Trusts</u>

34.  Duff analyzed potential liabilities of the applicable Debtor, as servicer, for the RMBS Trusts for which the RMBS Trustees act as Trustee or Master Servicer.[40]

35.  Duff attempted to quantify the Debtors' liability as servicer as related to: (a) misapplied and miscalculated payments; (b) wrongful foreclosure and improper loss mitigation practices; and (c) extended foreclosure timing issues caused by improper or inefficient servicing

---

[36]    The claims of each RMBS Trusts are based on the applicable Transaction Documents and therefore only certain RMBS Trusts have Repurchase Claims.

[37]    Since the Additional Settling RMBS Trusts were not included in the 9019 RMBS Motion, prior to the Plan Support Agreement they were usually referred to as the Non-Settling Trusts.

[38]    Defined at Art.I.A.2 of the Plan.

[39]    Art.IV.C.1 of the Plan provides:

> *Modification of Original RMBS Settlement Agreements*. The Original RMBS Settlement Agreements are hereby expanded to include all RMBS Trusts holding RMBS Trust Claims and are otherwise modified as set forth herein.

[40]    In performing this analysis, Duff used publicly-available data on industry specific litigations and regulatory actions relating to residential mortgage servicing practices; reviewed the files of a large sampling of litigations specific to the Debtors; reviewed rating agency evaluation reports for the Debtors; accessed and reviewed a large sampling of the Debtors' records of servicing complaints for Debtor-serviced loans; and used publicly-available performance data on a sample of the RMBS Trusts.  Duff presented its analysis relating to the quantification of the servicing claims both orally and in writing to the RMBS Trustees.

behavior such as falsified affidavits, improper documentation, and improper collection practices. Duff concluded that the potential liability of the Debtors as servicer for the three bases analyzed could be asserted in amounts up to as much as $1.1 billion, but that the assertion of such claims involved significant risk and uncertainty.[41]

36. As compromised and settled, the servicing claims are included in the RMBS Settlement contained in the Plan. Under the Plan, the servicing claims are allowed in the aggregate amount of $96 million, and the servicing claims are further divided between (i) RMBS Trusts where the servicing agreement has been assumed and assigned by the Debtors by the Effective Date, in which case the servicing claims are (or will be) listed on Schedules 1G or 1R to the Plan and (ii) RMBS Trusts where the servicing agreement has not been assumed and assigned by the Debtors by the Effective Date, in which case the servicing claims will be listed on Schedules 4G or 4R.

**J.      *The FGIC Settlement Agreement***

37. During the Plan Mediation, BNY Mellon, U.S. Bank and Wells Fargo (the "**FGIC Trustees**") were asked to consider a settlement proposal with FGIC.[42]   Under that proposal,

---

[41]    The RMBS Trustees were unable to obtain full discovery regarding potential servicing claims, in part because the Debtors asserted that some of the information requested was not reasonably available.  The amount of information and data that would be needed in order to assert the servicing claims in a litigated proceeding is likely very large and the analysis of that information and data would likely be expensive, time-consuming, and may ultimately lack sufficient certainty to establish the validity of such claims in a contested proceeding.  Furthermore, the Debtors may have viable defenses to the assertion and quantification of any servicing claims, the resolution of which is uncertain.  For example, certain of the Transaction Documents provide that the servicer can be held liable only if it can be shown to have acted in a negligent or grossly negligent manner.

[42]    On or about June 2012, the Superintendent of Financial Services of the State of New York filed a rehabilitation petition on behalf of FGIC in **FGIC Rehabilitation Court**, and was subsequently appointed by the Court as rehabilitator (the "**Rehabilitator**") in a rehabilitation proceeding (the "**FGIC Rehabilitation Proceeding**").  As a result of an injunction entered by the court in that proceeding (and earlier administrative action taken by FGIC's regulator), the FGIC Insured RMBS Trusts were obligated to continue to pay premiums under FGIC Policies, notwithstanding that FGIC was relieved of its obligations to pay claims made by the those trusts under those same policies.  In or about June 2013, the Rehabilitator filed a revised First Amended Plan of Rehabilitation for FGIC (the "**Plan of Rehabilitation**") which contemplated, among other things, payments over time to policyholders in partial payment of claims under FGIC-issued insurance policies, including to the FGIC Insured RMBS Trusts on account of the FGIC Policies.

among other things, FGIC would pay to the RMBS Trusts that were insured by FGIC (the "**FGIC RMBS Trusts**") a lump sum payment (the "**Commutation Payment**") and forgo future premiums with respect to the **FGIC Policies**.[43]    In exchange, the FGIC RMBS Trustees would release and discharge FGIC from all obligations and liabilities under the FGIC Policies.  That proposal formed the basis of the **FGIC Settlement Agreement**,[44] which is a central piece of RMBS Settlement and the Plan Support Agreement.

38. At the request of the FGIC RMBS Trustees, Duff conducted an analysis of the economic terms of the FGIC Settlement Agreement and compared the Commutation Payment (and the other benefits of the FGIC Settlement Agreement) to the discounted value of the stream of payments each of the FGIC Insured RMBS Trusts would be projected to receive under the Plan of Rehabilitation if the FGIC RMBS Trustees declined to enter into the FGIC Settlement Agreement.

39. Based on its analysis of the respective benefits to each of the FGIC Insured RMBS Trusts of the FGIC Settlement Agreement and those that such trusts would enjoy under the Plan of Rehabilitation, Duff advised the FGIC RMBS Trustees that the FGIC Settlement, including the Commutation Payment, represented a reasonable resolution of the accrued and unpaid claims and projected future claims against FGIC under the FGIC Policies.  As described in more detail in my Declaration submitted in support of the FGIC Settlement, a copy of which is attached hereto as **Exhibit PX-1554** (my "**FGIC 9019 Declaration**") and incorporated by reference herein, in reliance on Duff's analysis and recommendation, Wells Fargo determined in good faith that entering into the FGIC Settlement Agreement was in the best interests of the FGIC Insured Trusts for which it serves as trustee.

---

[43]    Defined at Art.I.A.100 of the Plan.

[44]    Defined at Art.I.A.102 of the Plan.

40. On June 7, 2013, the Debtors filed a motion seeking approval of the FGIC Settlement.[45]  Three sets of objections were filed,[46] and after a two day trial before this Court, two of the three sets of objections were withdrawn.[47]  On September 13, 2013, this Court granted the motion to approve the FGIC Settlement.[48]

**K.    The AFI Contribution**

41. One significant facet of the global settlement contained in the Plan is the resolution of claims against AFI and its contribution to the Debtors' estates of $2.1 billion in value (the "**AFI Contribution**").  Pursuant to the Original 9019 Motion, AFI was willing to make a contribution limited to $750 million.[49]

42. Wells Fargo considered the substantial increase in the amount of the AFI Contribution; the certainty associated with fixing the AFI Contribution; the added value to the Debtors' estates by virtue of the AFI Contribution; and the avoidance of the delay and expense

---

[45]   *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ECF No. 3929.

[46]   *Objection of the Ad Hoc Group of Junior Secured Noteholders to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ECF No. 4027; *Objection of Monarch Alternative Capital, LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ECF No. 4400; *Supplemental Objection of the Ad Hoc Group of Junior Secured Noteholders to the Debtors' FGIC Settlement Motion*, ECF No. 4401; and *Federal Home Loan Mortgage Corporation's Objection to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ECF No. 4406.

[47]   *Notice of Withdrawal of Objection of Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ECF No. 5020; *Notice of Withdrawal of Federal Home Loan Mortgage Corporation's Objection To Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ECF No. 5021.

[48]   *Memorandum Opinion and Order, and Findings of Fact and Conclusions of Law, Approving the FGIC Settlement Motion*, ECF No. 5042.  On September 20, 2013, the Court entered its *Order Granting Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among FGIC, the Debtors, the Trustees and the Institutional Investors*, ECF No. 5125.

[49]   ECF No. 6-8.

associated with litigation relating to AFI's liability to the Debtors' estates, to collectively be of significant benefit to the RMBS Trusts.

**L.      Litigation Risks**

43. Until the Consenting Claimants agreed to the Plan Support Agreement, these Chapter 11 Cases were at the precipice – many disputes that had been simmering were about to erupt into litigation, and these potential litigations were anticipated to be lengthy and expensive, so much so that they could affect the recoveries of the RMBS Trusts.

44. *First*, the Plan fixes the claims that the RMBS Trustees expect would otherwise be contested in time-consuming and uncertain proceedings.  Objections to the RMBS 9019 Motion, including those of FGIC, MBIA, and the Committee will no longer be pressed.  The RMBS 9019 Motion will be resolved by the Plan, otherwise, the issues raised in that motion would likely require a lengthy and expensive hearing.  Upon the conclusion of such hearing, while the Court might authorize the Debtors to perform the Original Settlement Agreements, it is also possible that the Court might sustain one or more of the objections filed to the RMBS 9019 Motion.  If the Court declined to grant the RMBS 9019 Motion, the allowance of repurchase claims of the Original Settling RMBS Trusts would be left to the expensive and uncertain process of claims litigation.  Thus, allowance of the RMBS Trust Claims, as contemplated by the Plan, offers the benefits of allowance consistent with the RMBS 9019 Motion without the risks attendant to that contested matter.

45. *Second*, the Plan fixes the amount of, and distributions under the Plan on, the claims of the Additional Settling Trusts without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims.

46. *Third*, the Plan also provides for the allowance of, and distribution under the Plan on, the servicing claims of the RMBS Trusts.  As set forth above, those claims were the subject of an

analysis by Duff and were roughly quantified, but presentation of those claims would have required further discovery and analysis, likely leading to litigation over both the quantification of the claims and their relative priority. The treatment of the servicing claims represents a meaningful recovery to the RMBS Trusts possessing such claims, without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims.

47. *Fourth*, many of the contentious and complicated inter-creditor issues in these cases are resolved by the Plan, including, among other things, the priority of certain claims asserted by the Monolines and by certain other securities claimants. In particular, both the amount of the claims of the Monolines and the relationship between those claims and the RMBS Trust Claims are the subject of disputes, and the resolution of all those disputes through litigation presents both a general risk of delay and expense to all stakeholders as well as a specific risk to the RMBS Trusts of dilution. Thus, the Plan, which resolves these inter-creditor claims, offers significant benefit to the RMBS Trusts.

48. *Fifth,* the ever mounting costs of administration of these Chapter 11 Cases threaten to erode any distribution to unsecured creditors. Confirmation of the Plan would effectively end the continued accrual of such costs.

## M.    *Support of Other Constituencies*

49. The Institutional Investors, which hold significant, and for some RMBS Trusts controlling, investments in certificates issued by the RMBS Trusts were informed, involved, in regular communication with the RMBS Trustees and supportive of the RMBS Settlement contained in the Plan. The Institutional Investors were active participants in the Plan Mediation and the negotiations that led to the overall settlement associated with the Plan Support Agreement and now contained in the Plan. The Institutional Investors were aware of all of the compromises that evolved during the Plan Mediation and negotiations leading to the Plan

Support Agreement, and they communicated through their counsel that they fully supported the Plan Support Agreement and the Plan.

N.     *Notice to Holders in the Wells Fargo RMBS Trusts*

50. Wells Fargo has regularly provided to the Holders in the Wells Fargo RMBS Trusts notice of matters related to the RMBS 9019 Motion and other significant events in the Debtors' Chapter 11 Cases.

51. On August 10, 2012, Wells Fargo provided an informational notice to (i) Holders in the Original Settling RMBS Trusts for which Wells Fargo acts as Trustee, and (ii) Holders of the non-settling Wells Fargo RMBS Trusts for which Wells Fargo acts as Trustee, which advised of the Debtors' bankruptcy cases, various plan support agreements, the Original Settlement Agreement, and the proposed sale of the Debtors' mortgage origination and servicing, copies of which are attached hereto as **Exhibit PX-1555** and **Exhibit PX-1556**, respectively. These notices advised Holders how to obtain information in the Debtors' cases, urged them to carefully review the pleadings and to consult with their own advisors.

52. Following the filing of the initial RMBS 9019 Motion, after consultation with counsel, Wells Fargo determined that it was appropriate and prudent to jointly retain an agent together with the other similarly situated RMBS Trustees to coordinate and facilitate notice to the Holders, including the Holders in the Wells Fargo RMBS Trusts, regarding the RMBS 9019 Motion and other important events in the Chapter 11 Cases. Thus, Wells Fargo, together with BNY Mellon, Deutsche Bank and U.S. Bank, jointly retained an agent, The Garden City Group, Inc. ("**GCG**") to coordinate and facilitate notice to Holders in the RMBS Trusts regarding the RMBS 9019 Motion, developments with respect to the RMBS 9019 Motion, and other important events in the Chapter 11 Cases.

53. On behalf of the RMBS Trustees, GCG provided certain administrative services in connection with noticing various Holders, including the coordination and facilitation of the dissemination of notices to the various Holders at the direction and on behalf of the RMBS Trustees, and in connection with the creation and maintenance of a website for Holders that provides, among other things, contact information for the RMBS Trustees significant relevant developments in the Chapter 11 Cases, links to relevant documents filed in the Chapter 11 Cases, and upcoming Court deadlines and hearing dates (the "**RMBS Trustee Website**").

54. As further described in the Affidavit of Jose C. Fraga (the "**Fraga Affidavit**") filed contemporaneously herewith, on behalf of the RMBS Trustees, GCG has distributed to various Holders and has published on the RMBS Trustee Website the following notices, copies of which are attached as exhibits to the Fraga Affidavit:

- On August 22, 2012, following the filing of the Chapter 11 Cases and the First Supplemental RMBS 9019 Motion, to the Holders in the Original Settling Trusts, a "Time Sensitive Notice Regarding a Proposed Settlement Between Residential Capital, LLC, et al. and the Settlement Trusts."

- On October 17, 24 and 31, 2012, at or about the time of the Second Supplemental RMBS 9019 Motion, to certain Holders which may have RMBS Trust Claims and for which Wells Fargo is Trustee, a notice titled "Time Sensitive Notice Regarding (a) Order Setting Last Date to File Claims Against Debtors Residential Capital, LLC and Certain of its Direct and Indirect Subsidiaries, and (b) Updates of Matters Relevant to Certain Certificateholders."

- On January 24, 2013 and February 1, 2013, to certain Holders which may have RMBS Trust Claims and for which Wells Fargo is Trustee, a "Time Sensitive Notice Regarding Sale of Debtors' Servicing Platform to Ocwen Loan Servicing, LLC."

- On April 8, 9 and 12, 2013, to certain Holders which may have RMBS Trust Claims and for which Wells Fargo is Trustee, a "Notice Regarding Closing of Sale of Debtors' Servicing Platform to Ocwen Loan Servicing, LLC and Update of 9019 Settlement."

- On May 24, 2013, at or about the time of the PSA Motion, a "Time Sensitive Notice Regarding (a) Plan Support Agreement Among the ResCap Debtors and the RMBS Trustees, Among Others, and (b) Settlement Agreement

22

Among the Debtors, Financial Guaranty Insurance Company and Certain of the RMBS Trustees."

- On August 30, 2013, a "Time Sensitive Notice Regarding (a) Approval of Disclosure Statement for ResCap Chapter 11 Plan, and (b) Hearing on Confirmation of Plan."

- On October 1, 2013, a "Time Sensitive Notice Regarding (a) Hearing on Confirmation of Proposed ResCap Chapter 11 Plan, and (b) Court Approvals of the FGIC Settlement Agreement" (the "**October 1, 2013 Notice**").[50]

55. On June 5, 2013, Wells Fargo distributed a "Time Sensitive Notice Regarding Settlement Agreement Among the ResCap Debtors, Financial Guaranty Insurance Company and the FGIC Trustees," dated June 4, 2013, a copy of which is attached to my FGIC 9019 Declaration at Exhibit F.

56. On August 8, 2013, Wells Fargo distributed a "Time Sensitive Notice Regarding Allocation of Certain Settlement Amounts under the Settlement Agreement among the ResCap Debtors, Financial Guaranty Insurance Company, and the FGIC Trustees" dated August 8, 2013, a copy of which is attached hereto as **Exhibit PX-1557**.

## O.    *Conclusion*

57. For all of the foregoing reasons, Wells Fargo believes that (a) the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement and all the transactions contemplated by each of the foregoing, including the releases given therein, are in the best interests of the Investors in each RMBS Trust, each such RMBS Trust and the RMBS Trustees; (b) the RMBS Trustees acted reasonably, in good faith and in the best interests of the Investors in each RMBS Trust and each such RMBS Trust in (i) entering into the Plan Support Agreement, (ii) performing their obligations under the Plan Support Agreement,

---

[50] The October 1, 2013 Notice urged all recipients of that notice to review all prior notices sent by the Trustees as certain trusts identified on Schedule A to the October 1, 2013 Notice had not been listed on Schedule A to at least some of the Trustees' prior notices.

including voting in favor of the Plan, where applicable, and (iii) agreeing to, and performing

under, the Global Settlement and each of the settlements embodied therein, including the RMBS

Settlement and the FGIC Settlement Agreement; and (c) the RMBS Trustees' notice of the Plan

Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement

Agreement and all the transactions contemplated by each of the foregoing, including the releases

given therein, was sufficient and effective in satisfaction of federal and state due process

requirements and other applicable law to put the parties in interest in these Chapter 11 Cases and

others, including the Institutional Investors and the Investors in each RMBS Trust, on notice of

the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC

Settlement Agreement and all the transactions contemplated by each of the foregoing, including

the releases given therein, and, accordingly, consistent with its undertakings in the Plan Support

Agreement and to the extent of its authority to do so, Wells Fargo has voted in favor of the Plan,

and urges that the Court enter the proposed Order confirming the Plan.

Dated this 12th day of November, 2013

_Mary L. Sohlberg_

Mary L. Sohlberg