**Exhibit PX-1551**

[Assignment, Assumption and Recognition Agreement for
Banc of America Funding Corporation Trust,
Mortgage Pass-Through Certificates, Series 2007-4]

EXECUTION COPY

## ASSIGNMENT, ASSUMPTION AND RECOGNITION AGREEMENT

Assignment, Assumption and Recognition Agreement (the "Agreement"), dated May 31, 2007, is among Bank of America, National Association, a national banking association (the "Assignor"), Banc of America Funding Corporation, a Delaware corporation ("BAFC"), U.S. Bank National Association, a national banking association, not in its individual capacity, but solely, as trustee of the Banc of America Funding 2007-4 Trust (the "Assignee"), GMAC Mortgage, LLC, a Delaware limited liability company ("GMACM") and acknowledged by Wells Fargo Bank, N.A., a national banking association ("Wells Fargo Bank"), as master servicer of the Banc of America Funding Trust 2007-4;

WHEREAS, pursuant to that certain Assignment, Assumption and Recognition Agreement, dated as of August 4, 2004, by and among UBS Real Estate Securities Inc., the Assignor, GMACM, as servicer and ABN AMRO Mortgage Group, Inc. (the "UBS AAR Agreement"), which is attached in Appendix I hereto, the Assignor purchased the Mortgage Loans (as defined herein) from UBS Real Estate Securities Inc. and GMACM currently services the Mortgage Loans;

WHEREAS, GMACM has agreed to service the Mortgage Loans pursuant to (a) that certain Master Flow Sale and Servicing Agreement, dated as of August 1, 2003, by and between the Assignor (as successor in interest to Banc of America Mortgage Capital Corporation ("BAMCC")), as purchaser, and GMACM, as seller, (b) that certain Global Amendment to Sale and Servicing Agreements, dated as of September 1, 2005, by and among GMACM, BAMCC and the Assignor and (c) that certain Regulation AB Compliance Addendum to the Master Flow Sale and Servicing Agreement, dated as of January 1, 2006, by and between GMACM and the Assignor (collectively, the "Sale and Servicing Agreement"), each of which is attached in Appendix II hereto;

WHEREAS, on the date hereof, the Assignor is transferring all of its right, title and interest in and to the Mortgage Loans to BAFC;

WHEREAS, on the date hereof, BAFC is transferring all of its right, title and interest in and to the Mortgage Loans to the Assignee; and

WHEREAS, on the date hereof, Wells Fargo Bank, as master servicer (in such capacity, the "Master Servicer"), is entering into a Pooling and Servicing Agreement, dated the date hereof (the "Pooling Agreement"), among BAFC, the Master Servicer, Wells Fargo Bank, as securities administrator (the "Securities Administrator"), and the Assignee, pursuant to which the Master Servicer will supervise, monitor and oversee the servicing of the Mortgage Loans.

For and in consideration of the sum of one dollar ($1.00) and other valuable consideration the receipt and sufficiency of which are hereby acknowledged, and of the mutual covenants herein contained, the parties hereto hereby agree as follows:

1.    The Assignor hereby grants, transfers and assigns to BAFC, and BAFC hereby grants, transfers and assigns to the Assignee, all of the right, title and interest of the Assignor in, to and under the UBS AAR Agreement, the Sale and Servicing Agreement and the mortgage

loans delivered under the UBS AAR Agreement to the Assignor and listed on Exhibit A attached hereto (the "Mortgage Loans").

The Assignor specifically reserves and does not assign to BAFC or the Assignee any right, title and interest in, to or under any mortgage loan subject to the UBS AAR Agreement or the Sale and Servicing Agreement other than the Mortgage Loans.

2.    The Assignor warrants and represents to, and covenants with, BAFC, GMACM and the Assignee that:

a.    The Assignor is the lawful owner of the Mortgage Loans with the full right to transfer the Mortgage Loans free from any and all claims and encumbrances whatsoever;

b.    The Assignor has not received notice of, and has no knowledge of, any offsets, counterclaims or other defenses available to GMACM with respect to the UBS AAR Agreement, the Sale and Servicing Agreement or the Mortgage Loans;

c.    The Assignor has not waived or agreed to any waiver under, or agreed to any amendment or other modification of, the UBS AAR Agreement, the Sale and Servicing Agreement or the Mortgage Loans. The Assignor has no knowledge of, and has not received notice of, any waivers under or amendments or other modifications of, or assignments of rights or obligations under, the UBS AAR Agreement, the Sale and Servicing Agreement or the Mortgage Loans; and

d.    Neither the Assignor nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Mortgage Loans, any interest in the Mortgage Loans or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Mortgage Loans, any interest in the Mortgage Loans or any other similar security from, or otherwise approached or negotiated with respect to the Mortgage Loans, any interest in the Mortgage Loans or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action which would constitute a distribution of the Mortgage Loans under the Securities Act of 1933, as amended (the "Securities Act"), or which would render the disposition of the Mortgage Loans a violation of Section 5 of the Securities Act or require registration pursuant thereto.

3.    From and after the date hereof, GMACM shall (i) note the transfer of the Mortgage Loans to the Assignee in its books and records, (ii) recognize the Assignee as the owner of the Mortgage Loans and (iii) notwithstanding anything to the contrary contained in the UBS AAR Agreement or the Sale and Servicing Agreement, GMACM shall service the Mortgage Loans pursuant to the Sale and Servicing Agreement, as modified by Section 8 hereof, for the benefit of the Assignee.

4.    GMACM acknowledges that a REMIC election will be made with respect to he Mortgage Loans and that the Master Servicer, pursuant to the Pooling Agreement, will administer on behalf of the Assignee the terms and conditions of the Sale and Servicing

Agreement with respect to the Mortgage Loans. The Master Servicer shall be authorized to enforce directly against GMACM any of the obligations of GMACM to the Assignor or its assignees provided for in the Sale and Servicing Agreement relating to the Mortgage Loans including, without limitation, the right to exercise any and all rights of the Assignor (but not the obligations) under the Sale and Servicing Agreement to monitor and enforce the obligations of GMACM thereunder, the right to terminate GMACM under the Sale and Servicing Agreement upon the occurrence of an event of default thereunder, the right to receive all remittances required to be made by GMACM under the Sale and Servicing Agreement, the right to receive all monthly reports and other data required to be delivered by GMACM under the Sale and Servicing Agreement, the right to examine the books and records of GMACM, indemnification rights, and the right to exercise certain rights of consent and approval relating to actions taken by GMACM. All remittances by GMACM shall be made to the account or accounts designated by the Master Servicer to GMACM in writing from time to time. Wire remittances shall be sent to: WELLS FARGO BANK, N.A., ABA# 121000248, FOR CREDIT TO: SAS CLEARING, ACCT: 3970771416, FFC TO: BAFC 2007-4 # 53150800.

5.    GMACM hereby represents and warrants to each of the other parties hereto (i) that the representations and warranties of GMACM in Section 3.01 of the Sale and Servicing Agreement are true and correct in all material respects as of the date hereof with the same force and effect as though expressly made at and/or as of the date hereof, (ii) that it has serviced the Mortgage Loans in accordance with the terms of the UBS AAR Agreement, (iii) that it has taken no action nor omitted to take any required action the omission of which would have the effect of impairing any mortgage insurance or guarantee on the Mortgage Loans and (iv) that any information provided by it on or before the date hereof to any of the parties hereto is true and correct.

6.    GMACM hereby agrees that, in connection with each Mortgage Loan of which the related Mortgage has been recorded in the name of MERS or its designee, it shall take all actions as are necessary to cause the Assignee, as trustee of the Trust pursuant to the Pooling Agreement, to be shown as the owner of such Mortgage Loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.

7.    GMACM, BAFC and the Assignee hereby agree to the following modifications to the Sale and Servicing Agreement solely with respect to the Mortgage Loans:

a.    Article I. The definition of "Qualified Substitute Mortgage Loan" is hereby replaced in its entirety with the following:

"A mortgage loan eligible to be substituted by the Company for a Deleted Mortgage Loan which must, on the date of such substitution (i) have an outstanding principal balance, after deduction of all scheduled payments due in the month of substitution (or in the case of a substitution of more than one mortgage loan for a Deleted Mortgage Loan, an aggregate principal balance), not in excess of the principal balance of the Deleted Mortgage Loan; (ii) have a Mortgage Interest Rate not less than, and not more than 1% greater than the Mortgage Interest Rate of the Deleted Mortgage Loan; (iii) have a remaining term

3

to maturity not greater than and not more than one year less than that of the Deleted Mortgage Loan; (iv) comply with each representation and warranty set forth in Section 3.02; (v) be of the same type as the Deleted Mortgage Loan; (vi) have a FICO score not less than that of the Deleted Mortgage Loan, (vii) have an LTV not greater than that of the Deleted Mortgage Loan; (viii) have a credit grade not lower in quality than that of the Deleted Mortgage Loan and (ix) have the same lien status as the Deleted Mortgage Loan."

b.  <u>Section 3.01(i)</u>.  Section 3.01(i) is hereby amended by deleting "corporation" and "Commonwealth of Pennsylvania" and replacing them with "limited liability company" and "State of Delaware," respectively.

c.  <u>Section 3.01(iii)</u>.  Section 3.01(iii) is hereby amended by deleting "articles of incorporation or by-laws" and replacing them with "limited liability agreement."

d.  <u>Section 5.02</u>.  The second paragraph of Section 5.02 is hereby replaced in its entirety with the following:

"Not later than the fifth (5th) business day of each month, the Company shall deliver to the Owner a monthly remittance advice in the form set forth in <u>Exhibit E-1</u>, in a mutually agreeable electronic format, as to the remittance on such Remittance Date and as to the period ending on the last day of the month preceding such Remittance Date, a delinquency report in the form set forth in <u>Exhibit E-2</u>, and a realized loss report in the form set forth in <u>Exhibit E-3</u>, each in a mutually agreeable electronic format."

The exhibits referenced in this Section 7(d) are attached to this Agreement as <u>Exhibit B</u> hereto and replace <u>Exhibit E</u> to the Sale and Servicing Agreement in its entirety.

e.  <u>Section 5.03</u>.  The last sentence of the first paragraph of Section 5.03 is hereby replaced in its entirety with the following:

"The Company's obligation to make P&I Advances as to any Mortgage Loan shall continue through the earlier to occur of (a) the repurchase of the Mortgage Loan by the Company pursuant to Section 3.03 and (b) the Remittance Date following acquisition or disposition of title to the related Mortgaged Property through foreclosure or by delivery of a deed in lieu of foreclosure; provided, however, in connection with a securitization as contemplated under Article XII, the Company shall be obligated to make such advances through the Remittance Date prior to the date on which cash is received in connection with the liquidation of REO Property."

f.  Section 6.07.  Section 6.07 is hereby modified by replacing subsection (ii)  with the following:

53570.000282 EMF_US 10202735v4

"result in the imposition of a tax upon the REMIC (including but not limited to the tax on "prohibited transactions" as defined in Section 860F(a)(2) of the Code and the tax on "contributions" to a REMIC set forth in Section 860G(d) of the Code) unless the Company has received an opinion of counsel (at the expense of the party seeking to take such action) to the effect that the contemplated action will not endanger such REMIC status or result in the imposition of any such tax."

8.    The Assignee's address for purposes of all notices and correspondence related to the Mortgage Loans and the Sale and Servicing Agreement is:

> U.S. Bank National Association
> 209 S. LaSalle Street, Suite 300
> Chicago, Illinois 60604
> Attention: Structured Finance Trust Services, BAFC 2007-4

The Assignor's address for purposes of all notices and correspondence related to the Mortgage Loans and the Sale and Servicing Agreement is:

> Bank of America, National Association
> 214 North Tryon Street
> Charlotte, North Carolina 28255
> Attention: Managing Director

BAFC's address for purposes of all notices and correspondence related to the Mortgage Loans is:

> Banc of America Funding Corporation
> 214 North Tryon Street
> Charlotte, North Carolina 28255
> Attention: General Counsel and Chief Financial Officer

Wells Fargo Bank's address for purposes of all notices and correspondence related to its role as Master Servicer of the Mortgage Loans is:

> Wells Fargo Bank, N.A.
> 9062 Old Annapolis Road
> Columbia, Maryland  21045
> Attention: Client Manager - BAFC 2007-4

9.    It is expressly understood and agreed by the parties hereto that (i) this Agreement is executed and delivered by U.S. Bank National Association not individually or personally but solely as trustee on behalf of the Trust, in the exercise of the powers and authority conferred and vested in it under the terms of the Pooling Agreement, and (ii) under no circumstances shall U.S. Bank National Association be personally liable for the payment of any indebtedness or expenses of the Trust (including, without limitation, any fees, expenses or indemnities payable under the UBS AAR or the Sale and Servicing Agreement), or be liable for the breach or failure of any obligation, representation, warranty or covenant of the Trust under this Agreement or any other

related documents, as to all of which recourse shall be had solely to the assets of the Trust in accordance with the terms of the UBS AAR or the Sale and Servicing Agreement.

[Signatures Follow]

6

IN WITNESS WHEREOF, the parties have caused this Assignment, Assumption and Recognition Agreement to be executed by their duly authorized officers as of the date first above written.

Bank of America, National Association, as Assignor

By: _____
Name: Bruce W. Good
Title:   Principal


U.S. Bank National Association,
as Assignee


By: _____
Name:  Melissa A. Rosal
Title:   Vice President


Banc of America Funding Corporation


By: _____
Name:  Scott Evans
Title:   Senior Vice President


GMAC Mortgage, LLC,
as servicer


By: _____
Name:
Title:


Acknowledged and Agreed
as of the date first above written:


Wells Fargo Bank, N.A., as Master Servicer


By: _____
Name: Darron Woodus
Title:   Assistant Vice President


[BAFC 2007-4 -- GMACM AAR]

IN WITNESS WHEREOF, the parties have caused this Assignment, Assumption and Recognition Agreement to be executed by their duly authorized officers as of the date first above written.

Bank of America, National Association, as Assignor

By: _____
Name:  Bruce W. Good
Title:   Principal

U.S. Bank National Association,
as Assignee

By: _____
Name:  Melissa A. Rosal
Title:   Vice President

Banc of America Funding Corporation

By: _____
Name:  Scott Evans
Title:   Senior Vice President

GMAC Mortgage, LLC,
as servicer

By: _____
Name:
Title:

Acknowledged and Agreed
as of the date first above written:

Wells Fargo Bank, N.A., as Master Servicer

By: _____
Name:  Darron Woodus
Title:   Assistant Vice President

[BAFC 2007-4 -- GMACM AAR]

IN WITNESS WHEREOF, the parties have caused this Assignment, Assumption and Recognition Agreement to be executed by their duly authorized officers as of the date first above written.

Bank of America, National Association, as Assignor

By: _____
Name: Bruce W. Good
Title: Principal

U.S. Bank National Association,
as Assignee

By: _____
Name: Melissa A. Rosal
Title: Vice President

Banc of America Funding Corporation

By: _____
Name: Scott Evans
Title: Senior Vice President

GMAC Mortgage, LLC,
as servicer

By: _Patricia C. Taylor_
Name: Patricia C. Taylor
Title: Vice President

Acknowledged and Agreed
as of the date first above written:

Wells Fargo Bank, N.A., as Master Servicer

By: _____
Name: Darron Woodus
Title: Assistant Vice President

[BAFC 2007-4 -- GMACM AAR]

IN WITNESS WHEREOF, the parties have caused this Assignment, Assumption and Recognition Agreement to be executed by their duly authorized officers as of the date first above written.

Bank of America, National Association, as Assignor

By: _____
Name:  Bruce W. Good
Title:   Principal

U.S. Bank National Association,
as Assignee

By: _____
Name:  Melissa A. Rosal
Title:   Vice President

Banc of America Funding Corporation

By: _____
Name:  Scott Evans
Title:   Senior Vice President

GMAC Mortgage, LLC,
as servicer

By: _____
Name:
Title:

Acknowledged and Agreed
as of the date first above written:

Wells Fargo Bank, N.A., as Master Servicer

By: _____
Name:  Darron Woodus
Title:   Assistant Vice President

[BAFC 2007-4 -- GMACM AAR]

## **EXHIBIT A**

Schedule of Mortgage Loans

[Please refer to separate Excel file provided on this closing CD.]

A-1

## EXHIBIT B

# Exhibit E-1: Standard File Layout

| Column Name | Description | Decimal | Format Comment | Max Size |
|---|---|---|---|---|
| **Each file requires the following fields:** | | | | |
| SER_INVESTOR_NBR | A value assigned by the Servicer to define a group of loans. | | Text up to 20 digits | 20 |
| LOAN_NBR | A unique identifier assigned to each loan by the investor. | | Text up to 10 digits | 10 |
| SERVICER_LOAN_NBR | A unique number assigned to a loan by the Servicer. This may be different than the LOAN_NBR. | | Text up to 10 digits | 10 |
| SCHED_PAY_AMT | Scheduled monthly principal and scheduled interest payment that a borrower is expected to pay, P&I constant. | 2 | No commas(,) or dollar signs ($) | 11 |
| NOTE_INT_RATE | The loan interest rate as reported by the Servicer. | 4 | Max length of 6 | 6 |
| NET_INT_RATE | The loan gross interest rate less the service fee rate as reported by the Servicer. | 4 | Max length of 6 | 6 |
| SERV_FEE_RATE | The servicer's fee rate for a loan as reported by the Servicer. | 4 | Max length of 6 | 6 |
| SERV_FEE_AMT | The servicer's fee amount for a loan as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) | 11 |
| NEW_PAY_AMT | The new loan payment amount as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) | 11 |
| NEW_LOAN_RATE | The new loan rate as reported by the Servicer. | 4 | Max length of 6 | 6 |
| ARM_INDEX_RATE | The index the Servicer is using to calculate a forecasted rate. | 4 | Max length of 6 | 6 |
| ACTL_BEG_PRIN_BAL | The borrower's actual principal balance at the beginning of the processing cycle. | 2 | No commas(,) or dollar signs ($) | 11 |
| ACTL_END_PRIN_BAL | The borrower's actual principal balance at the end of the processing cycle. | 2 | No commas(,) or dollar signs ($) | 11 |
| BORR_NEXT_PAY_DUE_DATE | The date at the end of processing cycle that the borrower's next payment is due to the Servicer, as reported by Servicer. | | MM/DD/YYYY | 10 |
| SERV_CURT_AMT_1 | The first curtailment amount to be applied. | 2 | No commas(,) or dollar signs ($) | 11 |
| SERV_CURT_DATE_1 | The curtailment date associated with the first curtailment amount. | | MM/DD/YYYY | 10 |
| CURT_ADJ_ AMT_1 | The curtailment interest on the first curtailment amount, if applicable. | 2 | No commas(,) or dollar signs ($) | 11 |
| SERV_CURT_AMT_2 | The second curtailment amount to be applied. | 2 | No commas(,) or dollar signs ($) | 11 |
| SERV_CURT_DATE_2 | The curtailment date associated with the second curtailment amount. | | MM/DD/YYYY | 10 |
| CURT_ADJ_ AMT_2 | The curtailment interest on the second curtailment amount, if applicable. | 2 | No commas(,) or dollar signs ($) | 11 |

B-1

| | | | | |
|---|---|---|---|---|
| **Exhibit 1: Continued** | **Standard Loan Level File Layout** | | | |
| **Column Name** | **Description** | **Decimal** | **Format Comment** | **Max Size** |
| SERV_CURT_AMT_3 | The third curtailment amount to be applied. | 2 | No commas(,) or dollar signs ($) | 11 |
| SERV_CURT_DATE_3 | The curtailment date associated with the third curtailment amount. | | MM/DD/YYYY | 10 |
| CURT_ADJ_AMT_3 | The curtailment interest on the third curtailment amount, if applicable. | 2 | No commas(,) or dollar signs ($) | 11 |
| PIF_AMT | The loan "paid in full" amount as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) | 11 |
| PIF_DATE | The paid in full date as reported by the Servicer. | | MM/DD/YYYY | 10 |
| ACTION_CODE | The standard FNMA numeric code used to indicate the default/delinquent status of a particular loan. | | Action Code Key: 15=Bankruptcy, 30=Foreclosure, , 60=PIF, 63=Substitution, 65=Repurchase,70=REO | 2 |
| INT_ADJ_AMT | The amount of the interest adjustment as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) | 11 |
| SOLDIER_SAILOR_ADJ_AMT | The Soldier and Sailor Adjustment amount, if applicable. | 2 | No commas(,) or dollar signs ($) | 11 |
| NON_ADV_LOAN_AMT | The Non Recoverable Loan Amount, if applicable. | 2 | No commas(,) or dollar signs ($) | 11 |
| LOAN_LOSS_AMT | The amount the Servicer is passing as a loss, if applicable. | 2 | No commas(,) or dollar signs ($) | 11 |
| **Plus the following applicable fields:** | | | | |
| SCHED_BEG_PRIN_BAL | The scheduled outstanding principal amount due at the beginning of the cycle date to be passed through to investors. | 2 | No commas(,) or dollar signs ($) | 11 |
| SCHED_END_PRIN_BAL | The scheduled principal balance due to investors at the end of a processing cycle. | 2 | No commas(,) or dollar signs ($) | 11 |
| SCHED_PRIN_AMT | The scheduled principal amount as reported by the Servicer for the current cycle -- only applicable for Scheduled/Scheduled Loans. | 2 | No commas(,) or dollar signs ($) | 11 |
| SCHED_NET_INT | The scheduled gross interest amount less the service fee amount for the current cycle as reported by the Servicer -- only applicable for Scheduled/Scheduled Loans. | 2 | No commas(,) or dollar signs ($) | 11 |
| ACTL_PRIN_AMT | The actual principal amount collected by the Servicer for the current reporting cycle -- only applicable for Actual/Actual Loans. | 2 | No commas(,) or dollar signs ($) | 11 |
| ACTL_NET_INT | The actual gross interest amount less the service fee amount for the current reporting cycle as reported by the Servicer -- only applicable for Actual/Actual Loans. | 2 | No commas(,) or dollar signs ($) | 11 |
| PREPAY_PENALTY_ AMT | The penalty amount received when a borrower prepays on his loan as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) | 11 |
| PREPAY_PENALTY_ WAIVED | The prepayment penalty amount for the loan waived by the servicer. | 2 | No commas(,) or dollar signs ($) | 11 |

B-2

| | | | | |
|---|---|---|---|---|
| **Exhibit 1: Continued** | **Standard Loan Level File Layout** | | | |
| **Column Name** | **Description** | **Decimal** | **Format Comment** | **Max Size** |
| MOD_DATE | The Effective Payment Date of the Modification for the loan. | | MM/DD/YYYY | 10 |
| MOD_TYPE | The Modification Type. | | Varchar - value can be alpha or numeric | 30 |
| DELINQ_P&I_ADVANCE_AMT | The current outstanding principal and interest advances made by Servicer. | 2 | No commas(,) or dollar signs ($) | 11 |
| BREACH_FLAG | Flag to indicate if the repurchase of a loan is due to a breach of Representations and Warranties | | Y=Breach N=NO Breach Let blank if N/A | 1 |

B-3

## Exhibit E-2: Standard File Layout – Delinquency Reporting

| Column/Header Name | Description | Decimal | Format Comment |
|---|---|---|---|
| SERVICER_LOAN_NBR | A unique number assigned to a loan by the Servicer.  This may be different than the LOAN_NBR | | |
| LOAN_NBR | A unique identifier assigned to each loan by the originator. | | |
| CLIENT_NBR | Servicer Client Number | | |
| SERV_INVESTOR_NBR | Contains a unique number as assigned by an external servicer to identify a group of loans in their system. | | |
| BORROWER_FIRST_NAME | First Name of the Borrower. | | |
| BORROWER_LAST_NAME | Last name of the borrower. | | |
| PROP_ADDRESS | Street Name and Number of Property | | |
| PROP_STATE | The state where the  property located. | | |
| PROP_ZIP | Zip code where the property is located. | | |
| BORR_NEXT_PAY_DUE_DATE | The date that the borrower's next payment is due to the servicer at the end of processing cycle, as reported by Servicer. | | MM/DD/YYYY |
| LOAN_TYPE | Loan Type (i.e. FHA, VA, Conv) | | |
| BANKRUPTCY_FILED_DATE | The date a particular bankruptcy claim was filed. | | MM/DD/YYYY |
| BANKRUPTCY_CHAPTER_CODE | The chapter under which the bankruptcy was filed. | | |
| BANKRUPTCY_CASE_NBR | The case number assigned by the court to the bankruptcy filing. | | |
| POST_PETITION_DUE_DATE | The payment due date once the bankruptcy has been approved by the courts | | MM/DD/YYYY |
| BANKRUPTCY_DCHRG_DISM_DATE | The Date The Loan Is Removed From Bankruptcy. Either by Dismissal, Discharged and/or a Motion For Relief Was Granted. | | MM/DD/YYYY |
| LOSS_MIT_APPR_DATE | The Date The Loss Mitigation Was Approved By The Servicer | | MM/DD/YYYY |
| LOSS_MIT_TYPE | The Type Of Loss Mitigation Approved For A Loan Such As; | | |
| LOSS_MIT_EST_COMP_DATE | The Date The Loss Mitigation /Plan Is Scheduled To End/Close | | MM/DD/YYYY |
| LOSS_MIT_ACT_COMP_DATE | The Date The Loss Mitigation Is Actually Completed | | MM/DD/YYYY |
| FRCLSR_APPROVED_DATE | The date DA Admin sends a letter to the servicer with instructions to begin foreclosure proceedings. | | MM/DD/YYYY |
| ATTORNEY_REFERRAL_DATE | Date File Was Referred To Attorney to Pursue Foreclosure | | MM/DD/YYYY |
| FIRST_LEGAL_DATE | Notice of 1st legal filed by an Attorney in a Foreclosure Action | | MM/DD/YYYY |
| FRCLSR_SALE_EXPECTED_DATE | The date by which a foreclosure sale is expected to occur. | | MM/DD/YYYY |
| FRCLSR_SALE_DATE | The actual date of the foreclosure sale. | | MM/DD/YYYY |
| FRCLSR_SALE_AMT | The amount a property sold for at the foreclosure sale. | 2 | No commas(,) or dollar signs ($) |
| EVICTION_START_DATE | The date the servicer initiates eviction of the borrower. | | MM/DD/YYYY |
| EVICTION_COMPLETED_DATE | The date the court revokes legal possession of the property from the borrower. | | MM/DD/YYYY |
| LIST_PRICE | The price at which an REO property is marketed. | 2 | No commas(,) or dollar signs |

B-4

| | | | ($) |
|---|---|---|---|
| LIST_DATE | The date an REO property is listed at a particular price. | | MM/DD/YYYY |
| OFFER_AMT | The dollar value of an offer for an REO property. | 2 | No commas(,) or dollar signs ($) |
| OFFER_DATE_TIME | The date an offer is received by DA Admin or by the Servicer. | | MM/DD/YYYY |
| REO_CLOSING_DATE | The date the REO sale of the property is scheduled to close. | | MM/DD/YYYY |
| REO_ACTUAL_CLOSING_DATE | Actual Date Of REO Sale | | MM/DD/YYYY |
| OCCUPANT_CODE | Classification of how the property is occupied. | | |
| PROP_CONDITION_CODE | A code that indicates the condition of the property. | | |
| PROP_INSPECTION_DATE | The date a  property inspection is performed. | | MM/DD/YYYY |
| APPRAISAL_DATE | The date the appraisal was done. | | MM/DD/YYYY |
| CURR_PROP_VAL | The current "as is" value of the property based on brokers price opinion or appraisal. | 2 | |

B-5

53570.000282 EMF_US 10202735v4

## Exhibit E-3: Calculation of Realized Loss/Gain Form 332– Instruction Sheet

1.      The numbers on the form correspond with the numbers listed below.

Liquidation and Acquisition Expenses:

1.      The Actual Unpaid Principal Balance of the Mortgage Loan.  For documentation, an Amortization Schedule from date of default through liquidation breaking out the net interest and servicing fees advanced is required.

2.      The Total Interest Due less the aggregate amount of servicing fee that would have been earned if all delinquent payments had been made as agreed. For documentation, an Amortization Schedule from date of default through liquidation breaking out the net interest and servicing fees advanced is required.

3.      Accrued Servicing Fees based upon the Scheduled Principal Balance of the Mortgage Loan as calculated on a monthly basis. For documentation, an Amortization Schedule from date of default through liquidation breaking out the net interest and servicing fees advanced is required.

4-12.   Complete as applicable.  All line entries must be supported by copies of appropriate statements, vouchers, receipts, bills, canceled checks, etc., to document the expense.  Entries not properly documented will not be reimbursed to the Servicer.

13.     The total of lines 1 through 12.

2.      Credits:

14-21.  Complete as applicable.  All line entries must be supported by copies of the appropriate claims forms, EOBs, HUD-1 and/or other proceeds verification, statements, payment checks, etc. to document the credit.  If the Mortgage Loan is subject to a Bankruptcy Deficiency, the difference between the Unpaid Principal Balance of the Note prior to the Bankruptcy Deficiency and the Unpaid Principal Balance as reduced by the Bankruptcy Deficiency should be input on line 20.

22.     The total of lines 14 through 21.

Please note: For HUD/VA loans, use line (15) for Part A/Initial proceeds and line (16) for Part B/Supplemental proceeds.

3.      Total Realized Loss (or Amount of Any Gain)

23.     The total derived from subtracting line 22 from 13.  If the amount represents a realized gain, show the amount in parenthesis ( ).

53570.000282 EMF_US 10202735v4

## Exhibit E-3: Calculation of Realized Loss/Gain Form 332

WELLS FARGO BANK, N.A.
CALCULATION OF REALIZED LOSS/GAIN

Prepared by: _____          Date: _____

Phone: _____    Email Address:_____

| Servicer Loan No. | Servicer Name | Servicer Address |
|---|---|---|
| | | |

WELLS FARGO BANK, N.A. Loan No._____

Borrower's Name:_____

Property Address:_____

**Liquidation and Acquisition Expenses:**

| | | | |
|---|---|---|---|
| (1) | Actual Unpaid Principal Balance of Mortgage Loan | $_____ | (1) |
| (2) | Interest accrued at Net Rate | _____ | (2) |
| (3) | Accrued Servicing Fees | _____ | (3) |
| (4) | Attorney's Fees | _____ | (4) |
| (5) | Taxes | _____ | (5) |
| (6) | Property Maintenance | _____ | (6) |
| (7) | MI/Hazard Insurance Premiums | _____ | (7) |
| (8) | Utility Expenses | _____ | (8) |
| (9) | Appraisal/BPO | _____ | (9) |
| (10) | Property Inspections | _____ | (10) |
| (11) | FC Costs/Other Legal Expenses | _____ | (11) |
| (12) | Other (itemize) | $_____ | (12) |
| | Cash for Keys_____ | _____ | |
| | HOA/Condo Fees_____ | _____ | |
| | _____ | _____ | |
| | _____ | _____ | |
| | **Total Expenses** | $_____ | (13) |

**Credits**:

| | | | |
|---|---|---|---|
| (14) | Escrow Balance | $_____ | (14) |
| (15) | HIP Refund | _____ | (15) |
| (16) | Rental Receipts | _____ | (16) |
| (17) | Hazard Loss Proceeds | _____ | (17) |
| (18) | Primary Mortgage Insurance Proceeds | _____ | (18) |
| (19) | Pool Insurance Proceeds | _____ | (19) |
| (20) | Proceeds from Sale of Acquired Property | _____ | (20) |

B-7

(21)       Other (itemize)                                _____(21)

_____     _____

_____     _____

**Total Credits**                                 $_____(22)

**Total Realized Loss (or Amount of Gain)**        $_____(23)

B-8

## **APPENDIX I**

UBS AAR Agreement

[Attached hereto]

## ASSIGNMENT, ASSUMPTION AND RECOGNITION AGREEMENT

This is an Assignment, Assumption and Recognition Agreement (this "Agreement") made as of August 4, 2004 (the "Closing Date"), among UBS Real Estate Securities Inc. (the "Assignor"), Bank of America, N.A. (the "Assignee"), GMAC Mortgage Corporation (the "Servicer") and ABN AMRO Mortgage Group, Inc. (the "Company").

In consideration of the mutual promises contained herein, the parties hereto agree that the mortgage loans (the "Mortgage Loans") listed on Attachment 1 hereto, which are currently serviced by the Servicer for the benefit of the Assignor, pursuant to that certain Servicing Agreement, dated as of November 1, 2001, as amended by Amendment Number One, dated as of January 1, 2003 (collectively, the "Servicing Agreement"), between the Assignor and the Servicer, and which initially were purchased by the Servicer from the Company pursuant to that certain Master Loan Purchase and Interim Servicing Agreement, dated as of June 1, 2004, between the Company and the Servicer (the "Underlying Purchase Agreement") shall be assigned to Assignee in accordance with the terms of this Agreement. Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Underlying Purchase Agreement.

### Assignment and Assumption

1.    Assignor hereby grants, transfers and assigns to Assignee all of the right, title and interest of Assignor in the Mortgage Loans and, as to the extent of the Mortgage Loans, all of its right, title and interest in, to and under (a) the Underlying Purchase Agreement and related Assignment and Conveyance (the "Assignment and Conveyance"), dated as of June 29, 2004 (the "Original Closing Date), from the Company to the Servicer, and the Assignment, Assumption and Recognition Agreement (the "AAR"; together with the Underlying Purchase Agreement and the Assignment and Conveyance, the "Purchase Agreement"), dated as of June 29, 2004, among Assignor, Servicer and Company, pursuant to which Servicer assigned its rights under the Underlying Purchase Agreement (other than the related servicing rights) to the Assignor and (b) the Servicing Agreement. Assignor specifically reserves and does not assign to Assignee any right, title and interest in, to or under any mortgage loans subject to the Purchase Agreement or the Servicing Agreement other than those set forth on Attachment 1.

2.    Simultaneously with the execution of this Agreement, on the Closing Date, Assignee shall pay to Assignor for each Mortgage Loan the purchase price as calculated pursuant to the trade confirmation, dated as of May 7, 2004 (the "Trade Confirmation"), by and between Assignee and Assignor. Assignee shall pay the purchase price payable under the Trade Confirmation by wire transfer of immediately available funds to the account specified by Assignor. Assignee shall be entitled to (i) all scheduled payments of principal due on the Mortgage Loans after August 1, 2004 (the "Mortgage Loans Cut-off Date"), (ii) all other recoveries of principal collected after the Mortgage Loans Cut-off Date (provided, however, that all scheduled payments of principal due on or before the Mortgage Loans Cut-off Date and collected after the Mortgage Loans Cut-off Date shall belong to the Assignor) and (iii) all payments of interest on the Mortgage Loans minus that portion of any such interest payment that

1

is allocable to the period prior to the Mortgage Loans Cut-off Date.

Assignor shall deliver the Mortgage Loan Schedule and the electronic data file related to the Mortgage Loans to Assignee at least three (3) Business Days prior to the Closing Date. Upon the sale of the Mortgage Loans, the ownership of each Mortgage Note, the related Mortgage and the related Mortgage File and Servicing File shall vest immediately in Assignee. Notwithstanding anything to the contrary set forth in the Trade Confirmation, Assignor will, with respect to each Mortgage Loan, deliver, or cause to be delivered, the Mortgage Loan Documents to Wachovia Bank, National Association (the "Custodian") no later than five (5) Business Days prior to the Closing Date.

## Representations, Warranties and Covenants

3.    Assignor warrants and represents to Assignee as of the date hereof (or such other date set forth herein) that:

(a) Assignor has full power and authority to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions set forth herein. The consummation of the transactions contemplated by this Agreement is in the ordinary course of Assignor's business and will not conflict with, or result in a breach of, any of the terms, conditions or provisions of Assignor's governing documents or any legal restriction, or any material agreement or instrument to which Assignor is now a party or by which it is bound, or result in the violation of any law, rule, regulation, order, judgment or decree to which Assignor or its property is subject. The execution, delivery and performance by Assignor of this Agreement and the consummation by it of the transactions contemplated hereby, have been duly authorized by all necessary action on the part of Assignor. This Agreement has been duly executed and delivered by Assignor and, upon the due authorization, execution and delivery by Assignee, will constitute the valid and legally binding obligation of Assignor enforceable against Assignor in accordance with its terms except as enforceability may be limited by bankruptcy, reorganization, insolvency, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, and by general principles of equity regardless of whether enforceability is considered in a proceeding in equity or at law. The execution, delivery and performance by Assignor of this Agreement and the consummation of the transactions contemplated hereby do not require the consent or approval of, the giving of notice to, the registration with, or the taking of any other action in respect of, any state, federal or other governmental authority or agency, except such as has been obtained, given, effected or taken prior to the date hereof. There are no actions, suits or proceedings pending or, to the knowledge of Assignor, threatened, before or by any court, administrative agency, arbitrator or governmental body (i) with respect to any of the

2

transactions contemplated by this Agreement or (ii) with respect to any other matter that in the judgment of Assignor will be determined adversely to Assignor and, if determined adversely to Assignor, will materially and adversely affect its ability to perform its obligations under this Agreement;

(b) Attached hereto as Attachment 2 and Attachment 3 are true and accurate copies of the Purchase Agreement and the Servicing Agreement, respectively, and each of the Purchase Agreement and the Servicing Agreement is in full force and effect as of the date hereof and its provisions have not been waived, amended or modified in any respect, nor has any notice of termination been given thereunder;

(c) Assignor is the lawful owner of the Mortgage Loans with full right to transfer the Mortgage Loans (other than the servicing rights thereto) and any and all of its interests, rights and obligations under the Purchase Agreement and the Servicing Agreement as they relate to the Mortgage Loans, free and clear of any and all liens, claims and encumbrances; and upon the transfer of the Mortgage Loans to Assignee as contemplated herein, Assignee shall have good and marketable title to each and every Mortgage Loan, as well as any and all of Assignor's interests, rights and obligations under the Purchase Agreement and the Servicing Agreement to the extent of the Mortgage Loans, free and clear of any and all liens, claims and encumbrances;

(d) Assignor has not satisfied, canceled, or subordinated in whole or in part, or rescinded the Mortgage related to any Mortgage Loan, and Assignor has not released the Mortgaged Property from the lien of the Mortgage related to any Mortgage Loan, in whole or in part, nor has Assignor executed an instrument that would effect any such release, cancellation, subordination, or rescission;

(e) Assignor has not received notice of, and has no knowledge of, any offsets, counterclaims or other defenses available to Company with respect to the Mortgage Loans or the Purchase Agreement and or the Servicer with respect to the Servicing Agreement;

(f) Assignor has not waived or agreed to any amendment or other modification of, either the Purchase Agreement or the Servicing Agreement. Assignor has no knowledge of, and has not received notice of, any waivers under or any amendments or other modifications of, or assignment of rights or obligations under, the Purchase Agreement or the Servicing Agreement;

(g) No Confirmation, Assignment and Conveyance or other document related to the transfer of the Mortgage Loans executed by and between Assignor and the Company or the Servicer and related to one or more Mortgage Loans includes any restriction, condition or other provision that materially affects the Company's or the Servicer's obligations under the Purchase Agreement

3

or the Servicing Agreement with regard to a Whole Loan Transfer, Pass-Through Transfer or Agency Transfer, other than those restrictions, conditions and provisions set forth in the Purchase Agreement or the Servicing Agreement, as applicable;

(h) The information set forth in the Mortgage Loan Schedule attached hereto as Attachment 1 and the information contained on the related electronic data file delivered to Assignee by Assignor is complete, true and correct;

(i) No Mortgage Loan is a Buydown Loan (as defined in the Underlying Purchase Agreement);

(j) No Mortgage Loan is secured by a residential lease;

(k) No Mortgage Loan originated after March 7, 2003 secured by property located in the State of Georgia is classified as a "high cost home loan" under the Georgia Act, as amended;

(l) Article XVI, Section 50(a)(6) of the Texas Constitution is not applicable to the Mortgage Loan or the origination thereof. If the Mortgage Loan was originated in Texas, it is not a cash-out refinancing;

(m) No Mortgage Loan is a "pledged asset" mortgage loan;

(n) The Mortgagor related to each Loan has a debt-to-income ratio of less than or equal to 60%;

(o) With respect to each Mortgage Loan with an original principal balance of $1 million or more, (a) the related Mortgagor has a minimum Credit Score of greater than or equal to 700, (b) the LTV is less than or equal to 70%, (c) the related Mortgagor has a debt-to-income ratio of less than or equal to 50%, (d) there is a reserve of no less than six (6) months and (e) the related Mortgage Loan File includes (A) a full appraisal of the Mortgaged Property and (B) full loan origination documentation that includes income and asset verification forms; and

(p) No event has occurred following the Original Closing Date that would make any representation or warranty set forth in Section 7.02 of the Underlying Purchase Agreement, as amended hereby, untrue. For the purpose of making the representations and warranties contemplated in the prior sentence, each reference in Section 7.02 of the Underlying Purchase Agreement to (i) the "Cut-off Date" shall be deemed a reference to the "Mortgage Loans Cut-off Date", (ii) the "Mortgage Loan Schedule" shall be deemed to be a reference to Attachment 1 hereto, and (iii) to the "Closing Date" shall be deemed to be a reference to the date of this Agreement.

4

In the event that Assignor breaches a representation and warranty set forth in Sections 3 (g) through (p) hereof and such breach has a material and adverse effect on the value of the related Mortgage Loan or Assignee's interest therein, then Assignor shall repurchase such Mortgage Loan from Assignee at a repurchase price equal to the sum of (a) the purchase price percentage used to calculate the purchase price paid for such Mortgage Loan by Assignee on the date hereof times the Stated Principal Balance of such Mortgage Loan on the date of repurchase plus (b) accrued interest through the date of repurchase at the related net mortgage interest rate (the "Repurchase Price"); provided, however, to the extent that any defect with respect to any Mortgage Loan constituted a breach of any representation and warranty made by Company pursuant to the Underlying Purchase Agreement as of the Original Closing Date, no remedy shall be available to the Assignee from the Assignor with respect to such defect, notwithstanding the representations and warranties made by the Assignor herein.

4.    Assignee warrants and represents to, and covenants with, Assignor, Servicer and Company as of the date hereof that:

(a) Assignee agrees to be bound as "Purchaser" and "Owner" by all of the terms, covenants and conditions of the Purchase Agreement and Servicing Agreement, respectively, solely with respect to the Mortgage Loans, and from and after the date hereof, Assignee assumes for the benefit of each of Assignor, Servicer and Company all of Assignor's obligations as "Purchaser" and "Owner" under the Purchase Agreement and the Servicing Agreement, respectively, solely with respect to such Mortgage Loans; and

(b) Assignee has full power and authority to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions set forth herein. The consummation of the transactions contemplated by this Agreement is in the ordinary course of Assignee's business and will not conflict with, or result in a breach of, any of the terms, conditions or provisions of Assignee's governing documents or any legal restriction, or any material agreement or instrument to which Assignee is now a party or by which it is bound, or result in the violation of any law, rule, regulation, order, judgment or decree to which Assignee or its property is subject. The execution, delivery and performance by Assignee of this Agreement and the consummation by it of the transactions contemplated hereby, have been duly authorized by all necessary action on the part of Assignee. This Agreement has been duly executed and delivered by Assignee and, upon the due authorization, execution and delivery by Assignor, will constitute the valid and legally binding obligation of Assignee enforceable against Assignee in accordance with its terms except as enforceability may be limited by bankruptcy, reorganization, insolvency, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, and by general principles of equity regardless of whether enforceability is considered in a proceeding in equity or at law. The execution, delivery and

5

performance by Assignee of this Agreement and the consummation of the transactions contemplated hereby do not require the consent or approval of, the giving of notice to, the registration with, or the taking of any other action in respect of, any state, federal or other governmental authority or agency, except such as has been obtained, given, effected or taken prior to the date hereof. There are no actions, suits or proceedings pending or, to the knowledge of Assignee, threatened, before or by any court, administrative agency, arbitrator or governmental body (i) with respect to any of the transactions contemplated by this Agreement or (ii) with respect to any other matter that in the judgment of Assignee will be determined adversely to Assignee and, if determined adversely to Assignee, will materially and adversely affect its ability to perform its obligations under this Agreement.

5.    Company warrants and represents to, and covenants with, Assignor and Assignee as of the date hereof that:

(a) Attached hereto as Attachment 2 is a true and accurate copy of the Purchase Agreement, and the Purchase Agreement is in full force and effect as of the date hereof and its provisions have not been waived, amended or modified in any respect, nor has any notice of termination been given thereunder;

(b) Company hereby restates, as of the date hereof, the representations and warranties set forth in Section 7.01 of the Underlying Purchase Agreement with respect to Company, as if such representations and warranties were set forth herein in full. For purposes of making the representations and warranties contemplated in the foregoing sentence, each reference in Section 7.01 of the Underlying Purchase Agreement to the "Closing Date" shall be deemed to be a reference to the date of this Agreement. Assignee shall be entitled to all of the rights and benefits provided to the "Purchaser" under the Underlying Purchase Agreement in the event that any such representation and warranty is not true and correct as of the Closing Date or the Original Closing Date; and

(c) The servicing of the Mortgage Loans transferred from Company to Servicer on August 1, 2004 (the "Servicing Transfer Date").

6.    Servicer warrants and represents to, and covenants with, Assignor and Assignee as of the date hereof that:

(a) Attached hereto as Attachment 3 is a true and accurate copy of the Servicing Agreement, and the Servicing Agreement is in full force and effect as of the date hereof and its provisions have not been waived, amended or modified in any respect, nor has any notice of termination been given thereunder;

6

(b) From and after the Servicing Transfer Date, Servicer has serviced the Mortgage Loans in accordance with the terms of the Servicing Agreement, provided accurate statements pursuant to Section 5.02 thereof and otherwise complied with all covenants and obligations thereunder. Assignee shall be entitled to all of the rights and benefits provided to the "Owner" under the Servicing Agreement in the event that any such representation and warranty is not true and correct as of the Closing Date;

(c) Servicer has taken no action, nor omitted to take any required action the omission of, which would have the effect of impairing any mortgage insurance or guarantee on the Mortgage Loans;

(d) No Confirmation or other document related to the transfer of the Mortgage Loans executed by and between Servicer and Assignor and related to one or more Mortgage Loans includes any restriction, condition or other provision that affects the Servicer's obligations under the Servicing Agreement with regard to a Pass-Through Transfer or Agency Transfer, other than those restrictions, conditions and provisions set forth in the Servicing Agreement; and

(e) Servicer hereby restates, as of the date hereof, the representations and warranties set forth in Section 3.01 of the Servicing Agreement with respect to Servicer, as if such representations and warranties were set forth herein in full.

Assignee shall be entitled to all of the rights and benefits provided to the "Owner" under the Servicing Agreement in the event that any representation and warranty in Section 6(c) or (e) is not true and correct as of the Servicing Transfer Date or the date hereof.

<div align="center">Recognition of Assignee</div>

7.    From and after the date hereof, Servicer shall recognize the Assignee as owner of the Mortgage Loans and, with respect to each Mortgage Loan, on and after the Servicing Transfer Date, Servicer shall service such Mortgage Loan for, and provide all information and reports to, the Assignee pursuant to the Servicing Agreement (as modified herein), the terms of which are incorporated herein by reference. It is the intention of Assignor, Servicer and Assignee that this Agreement shall constitute a separate and distinct servicing agreement as described above and shall be binding upon and for the benefit of the respective successors and assigns of the parties hereto.

<div align="center">Modification of the Servicing Agreement</div>

8.    Assignee and Servicer hereby modify the Servicing Agreement with respect to the Mortgage Loans as follows:

<div align="center">7</div>

(a)    Article I is modified as follows:

(i) The definition of "Accepted Servicing Practices" is modified by inserting in the fourth line thereof, immediately following the language "Fannie Mae Guide" the language ", in compliance applicable federal, state and local law".

(ii) The definition of "Pass-Through Transfer" is modified by deleting the definition thereof in its entirety and replacing such definition with the following:

"Either (i) the sale or transfer of some or all of the Mortgage Loans by the Owner to a trust to be formed as part of a publicly issued or privately placed mortgage-backed securities transaction or (ii) a synthetic securitization in which some or all of the Mortgage Loans are included as part of the reference portfolio relating to such securitization."

(iii)    The following defined terms are inserted in alphabetical order into Article I:

"Agency Transfer: The sale or transfer by the Purchaser of some or all of the Mortgage Loans to Fannie Mae or Freddie Mac."

"Consumer Information: Information including, but not limited to, all personal information about a Mortgagor that is supplied to the Servicer by or on behalf of such Mortgagor."

"Monthly Remittance Advice: The report delivered by the Servicer to the Owner pursuant to Section 5.02 of this Agreement."

(b)    Section 4.01 is modified as follows:

(i) By inserting in the first sentence of the second paragraph of such section, immediately following the phrase "Consistent with the terms of this Agreement", the language "and subject to the REMIC Provisions if the Mortgage Loans have been transferred to a REMIC".

(ii) By inserting as the third paragraph of such section the following:

"The Servicer shall notify the Owner, in writing, of any waiver, modification, forbearance, postponement, indulgence or amendment with respect to any term of any Mortgage Loan and

8

the date thereof, and shall deliver to the Purchaser (or, at the direction of the Owner, the Custodian) for deposit in the related Mortgage File, an original counterpart of the agreement relating to such waiver, modification, forbearance, postponement, indulgence or amendment, promptly (and in any event within ten (10) Business Days) following the execution thereof; provided, however, that if any such waiver, modification, forbearance, postponement, indulgence or amendment is required by applicable law to be recorded, the Servicer (i) shall deliver to the Owner a copy thereof and (ii) shall deliver to the Owner such document, with evidence of notification upon receipt thereof from the public recording office."

(c)    Article IV is modified by inserting at the end thereof the following new section:

"Section 4.14 Reports and Returns to be Filed by the Servicer.

The Servicer shall file information reports with respect to the receipt of mortgage interest received in a trade or business, reports of foreclosures and abandonments of any Mortgaged Property and information returns relating to cancellation of indebtedness income with respect to any Mortgaged Property as required by Sections 6050H, 6050J and 6050P of the Code. Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by such Sections 6050H, 6050J and 6050P of the Code."

(d)    Section 5.02 is modified by deleting in its entirety the first paragraph of such section and replacing such paragraph with the following:

"Not later than the tenth (10th) Calendar Day of each month, the Servicer shall furnish to the Owner, with respect to the preceding month, a monthly collection report, a monthly paid in full report that summarizes Mortgage Loans paid in full during the Due Period and a monthly trial balance report that provides a trial balance as of the last day of the month preceding such Remittance Date in electronic format agreed upon by the Servicer and the Owner.

Not later than the fifth (5th) Business Day of each month, the Servicer shall furnish to the Owner a delinquency report and a Monthly Remittance Advice, in both a physical form and a mutually agreeable electronic format, as to the remittance on such Remittance Date and as to the period ending on the last day

9

of the month preceding such Remittance Date."

(e)    Section 6.06 is modified by deleting in its entirety from the second paragraph thereof each occurrence of the language "OTS, FDIC" and in each instance, replacing such language with "OCC".

(f)    Article VI is modified by inserting at the end thereof the following new sections:

"Section 6.09    Disaster Recovery/Business Continuity Plan.

The Servicer shall establish and maintain contingency plans, recovery plans and proper risk controls to ensure the Servicer's continued performance under this Agreement. The plans shall include, but not be limited to, testing, control functions, accountability and corrective actions to be immediately implemented, if necessary. The Servicer agrees to provide summaries of the plans to the Owner's regulators upon request.

Section 6.10    Security Measures/Compliance with Safeguarding Customer Information Requirements.

The Servicer has implemented and will maintain security measures designed to meet the objectives of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information published in final form on February 1, 2001, 66 Fed. Reg. 8616, and the rules promulgated thereunder, as amended from time to time (the "Guidelines"). The Servicer shall provide the Owner information regarding such security measures upon the reasonable request of the Purchaser, which information shall include, but not be limited to, any SAS 70 or similar independent audit reports, summaries of test results or equivalent measures taken by the Servicer with respect to its security measures, as agreed upon by the parties."

(g)    Section 7.01 is modified as follows:

(i) By deleting in its entirety therefrom the language "OTS, FDIC" and by replacing such language with "OCC".

(ii) By inserting the following as the new second paragraph thereof:

"Upon request from the Owner, the Servicer shall deliver no later than thirty (30) days after such request any Mortgage File or document therein, or copies thereof, to the Owner at the direction of the Owner. The Owner shall return any originals of

10

documents delivered pursuant to this Section no later than ten (10) days after receipt thereof. If the Servicer fails to furnish copies within the time period specified in this Section after the Owner has requested such copies and if the property secured by such Mortgage Loan subsequently becomes REO Property, the Servicer shall indemnify the Owner for losses incurred with respect to such Mortgage Loan."

(h)     Article VII is modified by inserting at the end thereof the following new section:

"Section 7.02  Cooperation with Third-party Service Providers.

The Servicer shall cooperate with the Owner in servicing the Mortgage Loans in accordance with the usual and customary requirements of any credit enhancement, risk management and other service providers and shall otherwise cooperate with the Purchaser in connection with such third-party service providers and the provision of third-party services; *provided, however,* that such requirements are reasonably acceptable to the Servicer and pose no greater risk, obligation or expense to the Servicer than otherwise set forth in this Agreement. Any additional costs and/or expenses will be paid by the requesting party."

(i)     Section 9.01 is modified by inserting as the last sentence thereof the following:

"If the Servicer obtains knowledge of an Event of Default, the Servicer shall notify the Owner."

(j)     Section 10.02 is modified as follows:

(i) By inserting in the heading thereof immediately prior to the language "Whole Loan Transfer" the language "Agency Transfer,".

(ii) By deleting in its entirety the first paragraph thereof and replacing such paragraph with the following:

"The servicer acknowledges and the Owner agrees that with respect to some or all of the Mortgage Loans, the Owner may effect (1) one or more Agency Transfers, (2) one or more Whole Loan Transfers, or (3) one or more Pass-Through Transfers."

(iii) By inserting in the second, third and fourth paragraphs thereof, immediately prior to each occurrence of the language "Whole Loan Transfer" the language "Agency Transfer,".

11

(iv) By inserting in the second and third paragraphs thereof, immediately prior to each occurrence of the language "Whole Loan Transfers" the language "Agency Transfers,".

(k)    Section 11.01 is modified by inserting as the fifth paragraph thereof the following:

> "In the event the Servicer is terminated pursuant to Section 9.01 hereof, the Owner shall be entitled to be reimbursed from the Servicer for all costs associated with the transfer of servicing, including, without limitation, any costs or expenses associated with the complete transfer of all servicing data and the completion, correction or manipulation of such servicing data as may be required by the Owner to correct any errors or insufficiencies in the servicing data or otherwise to enable the Owner to service the Mortgage Loans properly and effectively."

(l)    Section 11.10 is modified by inserting as the second paragraph thereof the following:

> "The Owner and the Servicer agree they (i) shall comply with all applicable laws and regulations regarding the privacy or security of Consumer Information, (ii) shall not collect, create, use, store, access, disclose or otherwise handle Consumer Information in any manner inconsistent with any applicable laws or regulations regarding the privacy or security of Consumer Information and (iii) shall not disclose Consumer Information to any affiliated or non-affiliated third party except to enforce or preserve its rights, as otherwise permitted or required by applicable law (or by regulatory authorities having jurisdiction in the premises) or, in the case of the Servicer, at the specific written direction of the Owner. Each party shall indemnify and defend the other party against, and shall hold the other party harmless from, any cost, expense, loss, claim or other liability that such other party may suffer as a result of or in connection with its failure to comply with or perform the obligations set forth in this section.    The restrictions set forth herein shall survive the termination of this Agreement.

<u>Miscellaneous</u>

9.    All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, postage prepaid, return receipt requested, or, if by other means, when received by the other party at the address as follows:

<div align="center">12</div>

In the case of Assignee,

Bank of America, N.A.
NC1-027-21-04
214 North Tryon Street, 21st Floor
Charlotte, North Carolina 28255
Attention: Managing Director
Telephone: (704) 388-3148
Facsimile: (704) 388-9668

In the case of Assignor,

UBS Real Estate Securities Inc.
1285 Avenue of the Americas, 11th Floor
New York, NY 10021
Attention: Steven Warjanka
Telephone: (212) 713-2466
Facsimile: (212) 713-2080

In the case of Servicer,

GMAC Mortgage Corporation
100 Witmer Road
Horsham, PA 19044
Attention: Mr. William Petersohn
Phone:        (215) 682-3109
Facsimile:   (215) 682-1353

In the case of the Company,

ABN AMRO Mortgage Group, Inc.
2600 West Big Beaver Rd.
Troy, Michigan 48084
Attn: Richard F. Geary
Facsimile No.: (248) 457-5071

With a copy to:

LaSalle Bank Corporation
Legal Department
2600 West Big Beaver Rd.
Troy, Michigan 48084
Attn: Thomas E. Reiss
Fax: (248) 637-2768

13

10.        Each party will pay any commissions it has incurred and the reasonable fees of its attorneys in connection with the negotiations for, documenting of and closing of the transactions contemplated by this Agreement.

11.        Except to the extent preempted by Federal Law, this Agreement shall be construed in accordance with the laws of the State of New York, without regard to conflicts of law principles, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

12.        No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

13.        This Agreement shall inure to the benefit of the successors and assigns of the parties hereto. Any entity into which Assignor, Assignee, Servicer or Company may be merged or consolidated shall, without the requirement for any further writing, be deemed Assignor, Assignee, Servicer or Company, respectively, hereunder.

14.        This Agreement shall survive the conveyances of the Mortgage Loans as contemplated in this Agreement.

15.        This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original and all such counterparts shall constitute one and the same instrument.

16.        In the event that any provision of this Agreement conflicts with any provision of either the Purchase Agreement or the Servicing Agreement with respect to the Mortgage Loans, the terms of this Agreement shall control.

<div align="center">

**[signature page to follow]**

</div>

14

The parties hereto have executed this Agreement as of the day and year first above written.

BANK OF AMERICA, N.A.
Assignee

By

Name: Bruce W. Good
Title:   Vice President


UBS REAL ESTATE SECURITIES INC.
Assignor

By:_____
Name:
Title:

By:_____
Name:
Title:

GMAC MORTGAGE CORPORATION
Servicer

By:_____
Name:
Title:

ABN AMRO MORTGAGE GROUP, INC.
Company

By:_____
Name:
Title:


AAR (UBS-Bank of America-ABN AMRO-GMAC)
August 2004

The parties hereto have executed this Agreement as of the day and year first above written.

BANK OF AMERICA, N.A.
Assignee

By:_____
Name:
Title:

UBS REAL ESTATE SECURITIES INC.
Assignor

By: _____
Name:       Vadim Khopel
Title:      Associate Director

By:_____
Name:       Sharon Joseph
Title:      Associate Director

GMAC MORTGAGE CORPORATION
Servicer

By:_____
Name:
Title:

ABN AMRO MORTGAGE GROUP, INC.
Company

By:_____
Name:
Title:

AAR (UBS-Bank of America-ABN AMRO-GMAC)
August 2004

The parties hereto have executed this Agreement as of the day and year first above written.

BANK OF AMERICA, N.A.
Assignee

By:_____
Name:
Title:

UBS REAL ESTATE SECURITIES INC.
Assignor

By:_____
Name:
Title:

By:_____
Name:
Title:

GMAC MORTGAGE CORPORATION
Servicer

By:_____
Name:    Frank G. Ruhl
Title:    Vice President

ABN AMRO MORTGAGE GROUP, INC.
Company

By:_____
Name:
Title:

The parties hereto have executed this Agreement as of the day and year first above written.

BANK OF AMERICA, N.A.
Assignee

By:_____
Name:
Title:


UBS REAL ESTATE SECURITIES INC.
Assignor

By:_____
Name:
Title:

By:_____
Name:
Title:


GMAC MORTGAGE CORPORATION
Servicer

By:_____
Name:
Title:


ABN AMRO MORTGAGE GROUP, INC.
Company

By:_____
Name: Mary Pat Sperlik
Title: First Vice President


AAR (UBS-Bank of America-ABN AMRO-GMAC)
August 2004

ATTACHMENT 1

MORTGAGE LOAN SCHEDULE

| LOANID | LNAME | FNAME | STREET | OCC | PROPTYPE | UNITS | OTERM | CORTERM | OLTV | OAPPVAL | PURCPRICE | ORATE | RATE | ODATE | S_MATDATE | OPANDI | NDDATE | PANDI | INDEX | PFRQ | RTRFRQ | FRTRDATE | NRTRDATE | MARGIN | FLOOR | CEILING | CAPINI | CAPINT | OBAL | COBAL | PURPOSE | DOC | FICO | SVCFEE | MERSID | NUMTIMESMORETHAN30DAYSPASTDUE | FPDATE | MI | SERVICER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 359044132 | HEINDL | LISA | 16276 TISBURY CIRCLE | Primary | SFR | 1 | 360 | 357 | 60.72 | 1,250,000.00 | 0 | 0 | 5.625 | 20040413 | 20340501 | 0 | 20040701 | 4,369.23 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 759,000.00 | 756,554.32 | R/T Refi | Full | 794 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044079 | MOW | BOYLE | 25619 CRESTFIELD DRIVE | Primary | PUD-Detached | 1 | 360 | 357 | 59.19 | 740,000.00 | 0 | 0 | 5.75 | 20040405 | 20340501 | 0 | 20040701 | 2,556.05 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 438,000.00 | 436,621.52 | R/T Refi | Full | 722 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044080 | FRANKLIN | JENELLE | 242 BELMONT AVENUE | Primary | 2-Family | 2 | 360 | 356 | 52.38 | 1,050,000.00 | 0 | 0 | 5.875 | 20040317 | 20340401 | 0 | 20040701 | 3,253.46 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 550,000.00 | 547,740.47 | C/O Refi | Full | 774 | 0.25 | | | 20040501 | NONE | GMACM |
| 359044081 | LINCOLN | ROBERT | 415 HELGA COURT | Primary | SFR | 1 | 360 | 357 | 44.74 | 970,000.00 | 0 | 0 | 5.375 | 20040412 | 20340501 | 0 | 20040701 | 2,430.28 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 434,000.00 | 432,534.49 | R/T Refi | Full | 778 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044064 | DOGGETT | MARY | 23 BRISTOL GREEN | Primary | PUD-Detached | 1 | 360 | 357 | 76.34 | 525,000.00 | 0 | 0 | 5.375 | 20040415 | 20340501 | 0 | 20040701 | 2,244.36 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 400,800.00 | 399,446.63 | R/T Refi | Full | 765 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044082 | THUNEN | GARY | 17898 TWO BAR ROAD | Primary | SFR | 1 | 360 | 357 | 58.15 | 761,000.00 | 0 | 0 | 5.75 | 20040331 | 20340501 | 0 | 20040701 | 2,582.31 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 442,500.00 | 441,107.35 | C/O Refi | Full | 795 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044088 | CHERIAN | GEORGE | 10955 AVENIDA DE LOS LOBOS | Primary | SFR | 1 | 360 | 357 | 75.4 | 500,000.00 | 0 | 0 | 5.5 | 20040412 | 20340501 | 0 | 20040701 | 2,140.56 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 377,000.00 | 375,756.39 | R/T Refi | Full | 721 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044091 | RANDOL | STEPHEN | 3465 COUNTRY HAVEN CIRCLE | Primary | SFR | 1 | 360 | 357 | 58.71 | 918,000.00 | 0 | 0 | 5.75 | 20040405 | 20340501 | 0 | 20040701 | 3,145.46 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 539,000.00 | 537,303.64 | R/T Refi | Full | 725 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044094 | HINKSON | ROBERT | 1450 FINLEY LANE | Primary | SFR | 1 | 360 | 357 | 34.48 | 1,450,000.00 | 0 | 0 | 5.375 | 20040413 | 20340501 | 0 | 20040701 | 2,799.86 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500,000.00 | 498,311.63 | R/T Refi | Full | 785 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044095 | CRITCHLOW | JANE | 35 LOS ALTOS SQUARE | Primary | Condo | 1 | 360 | 357 | 61.04 | 575,000.00 | 0 | 0 | 5.75 | 20040408 | 20340501 | 0 | 20040701 | 2,048.34 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 351,000.00 | 349,895.33 | R/T Refi | Full | 791 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044096 | SAADI | SAYYED | 21 RECODO | Primary | PUD-Detached | 1 | 360 | 357 | 63.12 | 930,000.00 | 0 | 0 | 5.5 | 20040409 | 20340501 | 0 | 20040701 | 3,332.92 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 587,000.00 | 585,063.65 | C/O Refi | Full | 702 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044098 | PENNELL | EVAN | 86 LEAVITT STREET | Investor | SFR | 1 | 360 | 357 | 67.61 | 710,000.00 | 0 | 0 | 5.5 | 20040412 | 20340501 | 0 | 20040701 | 2,725.39 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 480,000.00 | 478,416.59 | C/O Refi | Full | 789 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044099 | LEE | DAISY | 7747 COOLIDGE COURT | Primary | PUD-Detached | 1 | 360 | 357 | 48.13 | 800,000.00 | 0 | 0 | 5.5 | 20040409 | 20340501 | 0 | 20040701 | 2,185.99 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 385,000.00 | 383,729.97 | R/T Refi | Full | 777 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044100 | ANDERSON | JOHN | 8740 EAST MENLO CIRCLE | Primary | PUD-Detached | 1 | 360 | 357 | 71.84 | 625,000.00 | 0 | 0 | 5.375 | 20040407 | 20340501 | 0 | 20040701 | 2,514.27 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 449,000.00 | 447,483.86 | R/T Refi | Full | 744 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044101 | ARREOLA | JUAN | 19230 MARJORIE ROAD | Primary | SFR | 1 | 360 | 357 | 70 | 570,000.00 | 0 | 0 | 6 | 20040406 | 20340501 | 0 | 20040701 | 2,392.21 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 399,000.00 | 397,802.40 | C/O Refi | Full | 694 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044103 | MALCOLM | KIM | 31 BLAIR AVENUE | Primary | SFR | 1 | 360 | 357 | 58.45 | 657,000.00 | 0 | 0 | 5.75 | 20040407 | 20340501 | 0 | 20040701 | 2,240.92 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 384,000.00 | 382,791.47 | R/T Refi | Full | 775 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044104 | MEBANE | ERIC | 328 MINDANAO DRIVE | Primary | PUD-Detached | 1 | 360 | 357 | 61.65 | 990,000.00 | 0 | 0 | 5.625 | 20040406 | 20340501 | 0 | 20040701 | 3,513.23 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 610,300.00 | 608,333.46 | R/T Refi | Full | 722 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044066 | CAZES | DANIEL | 14 TAVO LANE | Primary | SFR | 1 | 360 | 357 | 68.92 | 555,000.00 | 0 | 0 | 5.375 | 20040408 | 20340501 | 0 | 20040701 | 2,141.89 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 382,500.00 | 381,208.40 | R/T Refi | Full | 792 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044105 | CRUCHININ | VADIM | 85-08 214 STREET | Primary | SFR | 1 | 360 | 357 | 79.78 | 550,000.00 | 546,500.00 | 0 | 5.375 | 20040420 | 20340501 | 0 | 20040701 | 2,441.47 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 436,000.00 | 434,527.77 | Purchase | Full | 782 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044106 | BATTS | LEE | 8623 OAK CHASE CIR | Primary | SFR | 1 | 360 | 357 | 62.33 | 600,000.00 | 0 | 0 | 5.5 | 20040413 | 20340501 | 0 | 20040701 | 2,123.53 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 374,000.00 | 372,766.28 | R/T Refi | Full | 749 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044107 | NARBAITZ | DANE | 2310 85TH PLACE NORTHEAST | Primary | SFR | 1 | 360 | 357 | 46.32 | 965,000.00 | 0 | 0 | 5.5 | 20040415 | 20340501 | 0 | 20040701 | 2,538.02 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 447,000.00 | 445,525.45 | R/T Refi | Full | 768 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044109 | LEWIS | LUZVIMINDA | 119 DESTRY COURT | Primary | SFR | 1 | 360 | 357 | 80 | 555,000.00 | 0 | 0 | 5.625 | 20040407 | 20340501 | 0 | 20040701 | 2,555.91 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 444,000.00 | 442,569.33 | R/T Refi | Full | 726 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044111 | MONTGOMERY | JOHN | 2003 VIA VINA | Primary | PUD-Detached | 1 | 360 | 357 | 55 | 700,000.00 | 0 | 0 | 5.625 | 20040407 | 20340501 | 0 | 20040701 | 2,216.28 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 385,000.00 | 383,759.43 | C/O Refi | Full | 791 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044084 | SINES | RONALD | 6014 BROOKLYN BRIDGE RD | Primary | SFR | 1 | 360 | 357 | 76.25 | 720,000.00 | 0 | 0 | 5.5 | 20040409 | 20340501 | 0 | 20040701 | 3,117.16 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 549,000.00 | 547,188.99 | R/T Refi | Full | 746 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044086 | MAY | ROBERT | 6908 FORDHAM COURT | Primary | SFR | 1 | 360 | 357 | 74.26 | 540,000.00 | 0 | 0 | 5.75 | 20040407 | 20340501 | 0 | 20040701 | 2,340.13 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 401,000.00 | 399,737.96 | C/O Refi | Full | 722 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046903 | MCDONALD | JOSEPH | 503 W ALISO ST | Primary | SFR | 1 | 360 | 357 | 53.28 | 650,000.00 | 0 | 0 | 5.625 | 20040417 | 20340501 | 0 | 20040701 | 1,993.50 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 346,300.00 | 345,184.13 | R/T Refi | Full | 712 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044113 | FUTCH | KEVIN | 2001 REGENT STREET | Primary | SFR | 1 | 360 | 357 | 80 | 550,000.00 | 545,000.00 | 0 | 5.5 | 20040406 | 20340501 | 0 | 20040701 | 2,475.56 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 436,000.00 | 434,561.67 | Purchase | Full | 732 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046905 | PITTNER | MARY | 27412 AVANTI DR | Primary | PUD-Detached | 1 | 360 | 356 | 56.95 | 878,000.00 | 950,000.00 | 0 | 5.375 | 20040402 | 20340401 | 0 | 20040701 | 2,799.86 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500,000.00 | 497,743.78 | Purchase | Full | 767 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046906 | LEVINE | DAVID | 510 ANITA ST | Primary | SFR | 1 | 360 | 357 | 58.36 | 1,250,000.00 | 0 | 0 | 5.75 | 20040409 | 20340501 | 0 | 20040701 | 4,257.16 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 729,500.00 | 727,204.12 | C/O Refi | Full | 634 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044115 | CIRANKO | J. | 18 BERRIAN PLACE | Primary | 2-Family | 2 | 360 | 357 | 65.68 | 807,000.00 | 0 | 0 | 5.75 | 20040412 | 20340501 | 0 | 20040701 | 3,092.94 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 530,000.00 | 528,331.96 | R/T Refi | Full | 674 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044117 | ROBERTS | DAVID | 2353 TELEGRAPH HILL | Primary | SFR | 1 | 360 | 357 | 69.19 | 800,000.00 | 0 | 0 | 5.75 | 20040331 | 20340501 | 0 | 20040701 | 3,230.08 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 553,500.00 | 551,758.00 | R/T Refi | Full | 695 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044067 | EVANS | JOHN | 24 HASKINS RANCH CIRCLE | Primary | PUD-Detached | 1 | 360 | 357 | 65.43 | 690,000.00 | 0 | 0 | 5.75 | 20040401 | 20340501 | 0 | 20040701 | 2,634.57 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 451,455.00 | 450,034.17 | R/T Refi | Full | 789 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044119 | KUTZ | RAYMOND | 532 FLOOD AVENUE | Primary | SFR | 1 | 360 | 357 | 80 | 725,000.00 | 725,000.00 | 0 | 5.75 | 20040408 | 20340501 | 0 | 20040701 | 3,384.72 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 580,000.00 | 578,174.62 | Purchase | Full | 791 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044068 | WALSH | DAVID | 9919 INDIAN QUEEN POINT ROAD | Primary | SFR | 1 | 360 | 357 | 59.44 | 720,000.00 | 0 | 0 | 5.25 | 20040416 | 20340501 | 0 | 20040701 | 2,363.43 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 428,000.00 | 426,520.76 | R/T Refi | Full | 763 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044120 | DINH | TRIEU | 1821 AVENIDA NAVIDAD | Primary | SFR | 1 | 360 | 357 | 73.43 | 749,000.00 | 0 | 0 | 5.375 | 20040414 | 20340501 | 0 | 20040701 | 3,079.84 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 550,000.00 | 548,142.81 | C/O Refi | Full | 742 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044069 | WEBER | CHARLES | 1860 NORTH PATRICK HENRY DR | Primary | SFR | 1 | 360 | 357 | 76.11 | 628,000.00 | 0 | 0 | 5.5 | 20040419 | 20340501 | 0 | 20040701 | 2,714.03 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 478,000.00 | 476,423.20 | R/T Refi | Full | 766 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044122 | JONES | M.D., | 79 EASTWOOD DRIVE | Primary | PUD-Detached | 1 | 360 | 357 | 79.59 | 725,000.00 | 0 | 0 | 5.25 | 20040408 | 20340501 | 0 | 20040701 | 3,186.22 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 577,000.00 | 575,005.77 | R/T Refi | Full | 703 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046945 | JENSEN | DENNIS | 1212 S SUNSET DR | Primary | SFR | 1 | 360 | 357 | 79.91 | 667,000.00 | 0 | 0 | 5.5 | 20040420 | 20340501 | 0 | 20040701 | 3,026.32 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 533,000.00 | 531,089.05 | R/T Refi | Full | 774 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046946 | WEIDHAAS | GREGORY | 29252 KESTREL LN | Primary | SFR | 1 | 360 | 356 | 60.23 | 855,000.00 | 0 | 0 | 5.375 | 20040329 | 20340401 | 0 | 20040701 | 2,883.85 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 515,000.00 | 512,676.13 | R/T Refi | Full | 775 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046803 | SHIEMBOB | EDWARD | 1 LONG BEACH AVE | Secondary | SFR | 1 | 360 | 357 | 60 | 750,000.00 | 0 | 0 | 5.5 | 20040423 | 20340501 | 0 | 20040701 | 2,555.05 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 450,000.00 | 448,515.57 | R/T Refi | Full | 723 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046804 | SIEGEL | STEVEN | 17 NORTH OAKS RD | Primary | SFR | 1 | 360 | 357 | 63.48 | 575,000.00 | 0 | 0 | 5.75 | 20040405 | 20340501 | 0 | 20040701 | 2,130.04 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 365,000.00 | 363,548.39 | R/T Refi | Full | 771 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046806 | DELLABELLA | ALLAN | 9363 HIGHWAY A1A | Secondary | Townhouse | 1 | 360 | 354 | 75 | 800,000.00 | 850,000.00 | 0 | 5.625 | 20040123 | 20340201 | 0 | 20040801 | 3,453.94 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 600,000.00 | 590,586.20 | Purchase | Full | 712 | 0.25 | | | 20040301 | NONE | GMACM |
| 359046807 | JANSSEN | RICHARD | 17290 CEDARCREST DR | Primary | SFR | 1 | 360 | 356 | 75.82 | 640,000.00 | 619,900.00 | 0 | 5.625 | 20040402 | 20340401 | 0 | 20040701 | 2,705.59 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 470,000.00 | 467,975.97 | Purchase | Full | 678 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046808 | KINNEAR | II, | 20 ROARING ROCK RD | Primary | SFR | 1 | 360 | 356 | 34.13 | 1,300,000.00 | 0 | 0 | 5.625 | 20040330 | 20340401 | 0 | 20040701 | 2,554.19 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 443,700.00 | 441,789.23 | R/T Refi | Full | 719 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046809 | GACKENBACH | DAVID | 12240 NORTH 128TH PL | Primary | PUD-Detached | 1 | 360 | 355 | 80 | 529,000.00 | 529,000.00 | 0 | 5.75 | 20040204 | 20340301 | 0 | 20040701 | 2,469.68 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 423,200.00 | 420,969.49 | Purchase | Full | 782 | 0.25 | | | 20040401 | NONE | GMACM |
| 359046810 | HALL | JOSEPH | 45 EWING ST | Primary | PUD-Detached | 1 | 360 | 357 | 69.15 | 542,000.00 | 541,541.00 | 0 | 5.625 | 20040414 | 20340501 | 0 | 20040701 | 2,155.83 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 374,500.00 | 373,293.28 | Purchase | Full | 733 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046811 | PIERCE | GEORGE | 2518 CRESTMONT PL W | Primary | SFR | 1 | 360 | 355 | 42.37 | 970,000.00 | 0 | 0 | 5.75 | 20040209 | 20340301 | 0 | 20040701 | 2,398.48 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 411,000.00 | 408,711.59 | R/T Refi | Full | 733 | 0.25 | | | 20040401 | NONE | GMACM |
| 359046813 | BURKE | WILLIAM | 27 CHILTON RD | Primary | SFR | 1 | 360 | 354 | 90 | 440,000.00 | 439,900.00 | 0 | 5.875 | 20040123 | 20340201 | 0 | 20040701 | 2,341.96 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 395,910.00 | 393,458.26 | Purchase | Full | 707 | 0.25 | | | 20040301 | MGIC | GMACM |
| 359046814 | RAPPAPORT | PAMELA | 330 E 75TH ST 5G | Primary | Condo - High | 1 | 360 | 357 | 79.92 | 780,000.00 | 777,000.00 | 0 | 5.75 | 20040415 | 20340501 | 0 | 20040801 | 3,623.99 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 621,000.00 | 619,045.58 | Purchase | Full | 706 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046815 | BERGH | CHARLES | 11462 E KORA WAY | Primary | PUD-Detached | 1 | 360 | 356 | 79.49 | 585,000.00 | 0 | 0 | 5.875 | 20040319 | 20340401 | 0 | 20040801 | 2,750.65 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 465,000.00 | 463,089.68 | R/T Refi | Full | 775 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046816 | HALL | DAVID | 41 RUSSELL ST | Primary | SFR | 1 | 360 | 356 | 38.27 | 980,000.00 | 0 | 0 | 5.625 | 20040324 | 20340401 | 0 | 20040801 | 2,158.71 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 375,000.00 | 373,385.10 | C/O Refi | Full | 699 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046817 | DUNEGAN | MICHAEL | 9635 PARK ST | Primary | SFR | 1 | 360 | 356 | 75 | 820,000.00 | 0 | 0 | 5.625 | 20040330 | 20340401 | 0 | 20040801 | 3,540.29 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 615,000.00 | 612,047.93 | C/O Refi | Full | 699 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046818 | LAYETTE | SHANNAN | 1840 ELIZABETH CT | Primary | PUD-Detached | 1 | 360 | 357 | 63.87 | 595,000.00 | 595,000.00 | 0 | 5.75 | 20040421 | 20340501 | 0 | 20040701 | 2,217.58 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 380,000.00 | 378,804.04 | Purchase | Full | 781 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046819 | COHEN | ERIC | 336 LINCOLN BL | Primary | SFR | 1 | 360 | 357 | 80 | 450,000.00 | 447,500.00 | 0 | 5.375 | 20040408 | 20340501 | 0 | 20040701 | 2,004.70 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 358,000.00 | 356,791.12 | Purchase | Full | 781 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046820 | VOLPENHEIN | SHELLEY | 6491 LILLY PAD CT | Primary | SFR | 1 | 360 | 356 | 79.99 | 582,964.00 | 0 | 0 | 5.875 | 20040331 | 20340401 | 0 | 20040701 | 2,758.34 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 466,300.00 | 464,384.34 | R/T Refi | Full | 723 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046821 | TIGER | JOHN | 4 BRALEY POINT RD | Primary | SFR | 1 | 360 | 357 | 40.13 | 1,540,000.00 | 0 | 0 | 5.625 | 20040402 | 20340501 | 0 | 20040701 | 3,557.56 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 618,000.00 | 616,008.64 | R/T Refi | Full | 737 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046822 | GOLDBERG | ADAM | 12 BRADFORD RD | Primary | SFR | 1 | 360 | 357 | 75 | 550,000.00 | 0 | 0 | 5.5 | 20040402 | 20340501 | 0 | 20040701 | 2,342.13 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 412,500.00 | 411,139.26 | C/O Refi | Full | 650 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046823 | OSTROSKY | GEORGE | 201 NARCISSUS AVE 801 | Primary | Condo - High | 1 | 360 | 357 | 80 | 600,000.00 | 465,000.00 | 0 | 5.75 | 20040416 | 20340501 | 0 | 20040701 | 2,170.89 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 372,000.00 | 370,719.66 | Purchase | Full | 673 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046824 | EBERT | MICHAEL | 4 CHRISTINA CT | Primary | SFR | 1 | 360 | 356 | 57.83 | 830,000.00 | 873,105.00 | 0 | 5.625 | 20040401 | 20340401 | 0 | 20040701 | 2,763.15 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 480,000.00 | 477,932.92 | Purchase | Full | 778 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046825 | PARIKH | BANKIM | 25 BONAVENTURE AVE | Primary | Townhouse | 1 | 360 | 356 | 57.86 | 700,000.00 | 0 | 0 | 5.625 | 20040325 | 20340401 | 0 | 20040701 | 2,331.41 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 405,000.00 | 403,255.90 | R/T Refi | Full | 775 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046827 | RUSOFF | ELLIOT | 106 LA VIDA CT | Secondary | PUD-Detached | 1 | 360 | 356 | 80 | 597,000.00 | 596,150.00 | 0 | 5.75 | 20040310 | 20340401 | 0 | 20040801 | 2,783.06 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 476,900.00 | 474,893.98 | Purchase | Full | 714 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046828 | ELLIOTT | MONICA | 1534 MAIN ST | Primary | SFR | 1 | 360 | 357 | 72.73 | 605,000.00 | 0 | 0 | 5.875 | 20040413 | 20340501 | 0 | 20040701 | 2,602.77 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 440,000.00 | 438,647.59 | R/T Refi | Full | 651 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046829 | BOUCHER | TIMOTHY | 293 S PLEASANT AVE | Primary | SFR | 1 | 360 | 357 | 76.02 | 663,000.00 | 0 | 0 | 5.875 | 20040416 | 20340501 | 0 | 20040801 | 2,981.35 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 504,000.00 | 502,300.35 | R/T Refi | Full | 658 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046830 | ESSER | TODD | W294 N7258 TAMRON LN | Primary | SFR | 1 | 360 | 356 | 50 | 750,000.00 | 0 | 0 | 5.75 | 20040303 | 20340401 | 0 | 20040701 | 2,188.40 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 375,000.00 | 373,410.84 | R/T Refi | Full | 794 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046831 | BURGESS | ANDREW | 2 HILL DR | Primary | SFR | 1 | 360 | 357 | 74.38 | 690,000.00 | 0 | 0 | 5.625 | 20040405 | 20340501 | 0 | 20040701 | 2,954.27 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 513,200.00 | 511,546.34 | C/O Refi | Full | 700 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046832 | SHUCK | KENNETH | 43439 KATLING SQ | Primary | PUD-Detached | 1 | 360 | 356 | 80 | 460,000.00 | 460,000.00 | 0 | 5.625 | 20040315 | 20340401 | 0 | 20040701 | 2,118.42 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 368,000.00 | 366,415.22 | Purchase | Full | 661 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046833 | DEBATES | RAYMOND | 34140 JEFFERSON ST | Primary | SFR | 1 | 360 | 356 | 80 | 535,000.00 | 0 | 0 | 5.625 | 20040304 | 20340401 | 0 | 20040801 | 2,463.81 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 428,000.00 | 426,156.86 | R/T Refi | Full | 786 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046834 | FELTNER | TERRY | 9032 GARY PL | Primary | PUD-Detached | 1 | 360 | 356 | 75.89 | 450,000.00 | 0 | 0 | 5.625 | 20040319 | 20340401 | 0 | 20040801 | 1,965.87 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 341,500.00 | 340,029.34 | R/T Refi | Full | 721 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046835 | ELWELL | MICHAEL | 707 MEADOWCREEK CIR | Primary | SFR | 1 | 360 | 357 | 68.55 | 700,000.00 | 692,900.00 | 0 | 5.75 | 20040416 | 20340501 | 0 | 20040701 | 2,771.97 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 475,000.00 | 473,505.07 | Purchase | Full | 690 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046836 | STEINBAUM | RICHARD | 43 LYNNBROOK RD | Primary | SFR | 1 | 360 | 356 | 52.45 | 1,400,000.00 | 0 | 0 | 5.75 | 20040331 | 20340401 | 0 | 20040701 | 4,285.47 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 734,350.00 | 730,120.10 | R/T Refi | Full | 770 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046943 | FEI | LU | 9362 CADDYSHACK CIR | Primary | SFR | 1 | 360 | 357 | 79.9 | 625,000.00 | 613,298.00 | 0 | 5.25 | 20040408 | 20340501 | 0 | 20040801 | 2,705.80 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 490,000.00 | 488,306.46 | Purchase | Full | 816 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046944 | RUE | JON | 5017 37TH AVE NE | Primary | SFR | 1 | 360 | 357 | 80 | 508,000.00 | 507,500.00 | 0 | 5.375 | 20040409 | 20340501 | 0 | 20040801 | 2,273.48 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 406,000.00 | 404,629.06 | Purchase | Full | 757 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046947 | CASTELLANOS | LARRY | 773 MORNINGHOME RD | Primary | SFR | 1 | 360 | 357 | 59.69 | 858,000.00 | 846,000.00 | 0 | 5.5 | 20040409 | 20340501 | 0 | 20040701 | 2,867.33 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 505,000.00 | 503,334.14 | Purchase | Full | 707 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046948 | TOTH | GREGORY | 135 PRESTON DR | Primary | SFR | 1 | 360 | 357 | 56.91 | 1,100,000.00 | 0 | 0 | 5.5 | 20040415 | 20340501 | 0 | 20040701 | 3,554.36 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 626,000.00 | 623,485.25 | R/T Refi | Full | 775 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046950 | PETROVA | LILJANA | 1349 POPPY HILLS DR | Primary | SFR | 1 | 360 | 357 | 60.22 | 680,000.00 | 0 | 0 | 5.25 | 20040409 | 20340501 | 0 | 20040701 | 2,261.27 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 409,500.00 | 408,084.70 | R/T Refi | Full | 753 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046951 | O' | NEILL, | 1714 WOODSIDE DR | Primary | PUD-Detached | 1 | 360 | 357 | 75 | 520,000.00 | 0 | 0 | 5.75 | 20040406 | 20340501 | 0 | 20040701 | 2,275.93 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 390,000.00 | 388,772.60 | C/O Refi | Full | 722 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046953 | HISSONG | BRYAN | 17 PAMELA | Primary | PUD-Detached | 1 | 360 | 356 | 36.73 | 1,225,000.00 | 0 | 0 | 5.625 | 20040327 | 20340401 | 0 | 20040701 | 2,590.45 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 450,000.00 | 448,062.13 | C/O Refi | Full | 691 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046954 | DOERBECKER | JAMES | 2641 PECONIC AVE | Primary | SFR | 1 | 360 | 357 | 75 | 525,000.00 | 0 | 0 | 5.25 | 20040402 | 20340501 | 0 | 20040801 | 2,174.30 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 393,750.00 | 392,389.14 | C/O Refi | Full | 749 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046955 | O'CONNOR | DAVID | 5051 GOLDEN ARROW DR | Primary | SFR | 1 | 360 | 356 | 49.72 | 880,000.00 | 0 | 0 | 5.625 | 20040331 | 20340401 | 0 | 20040701 | 2,518.78 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 437,550.00 | 435,665.75 | C/O Refi | Full | 759 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046956 | ESPINOZA | PETER | 806 DOROTHEA RD | Primary | SFR | 1 | 360 | 357 | 71.43 | 630,000.00 | 0 | 0 | 5.625 | 20040409 | 20340501 | 0 | 20040701 | 2,590.45 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 450,000.00 | 448,550.00 | C/O Refi | Full | 735 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046957 | MCGURK | FRED | 1550 10TH ST | Primary | SFR | 1 | 360 | 357 | 53.93 | 1,350,000.00 | 0 | 0 | 5.75 | 20040403 | 20340501 | 0 | 20040701 | 4,248.41 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 728,000.00 | 725,708.82 | R/T Refi | Full | 784 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046959 | POWERS | JAMES | 10529 TENNESSEE AVE | Primary | SFR | 1 | 360 | 357 | 66 | 750,000.00 | 0 | 0 | 5.5 | 20040403 | 20340501 | 0 | 20040701 | 2,810.56 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 495,000.00 | 493,367.11 | R/T Refi | Full | 797 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046960 | PETERSON | SCOTT | 3186 SUMMER FIELDS GREEN | Primary | SFR | 1 | 360 | 357 | 77.82 | 539,684.00 | 0 | 0 | 5.25 | 20040407 | 20340501 | 0 | 20040701 | 2,319.26 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 420,000.00 | 418,548.39 | R/T Refi | Full | 750 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046962 | STEWART | BRETT | 14 KYLE CT | Primary | PUD-Detached | 1 | 360 | 357 | 59.77 | 619,000.00 | 645,000.00 | 0 | 5.375 | 20040406 | 20340501 | 0 | 20040701 | 2,071.89 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 370,000.00 | 368,750.62 | Purchase | Full | 768 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046963 | WALLER | BRIAN | 2037 41ST COURT | Primary | SFR | 1 | 360 | 357 | 60.54 | 925,000.00 | 0 | 0 | 5.5 | 20040419 | 20340501 | 0 | 20040701 | 3,179.62 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 560,000.00 | 557,471.12 | R/T Refi | Full | 694 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046965 | VOGEL | RUBEN | 28 NEW DAWN | Primary | PUD-Detached | 1 | 360 | 357 | 40.98 | 1,525,000.00 | 0 | 0 | 5.375 | 20040402 | 20340501 | 0 | 20040701 | 3,499.82 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 625,000.00 | 622,889.37 | C/O Refi | Full | 757 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046967 | FANG | PETER | 9350 221ST PL NE | Primary | PUD-Detached | 1 | 360 | 357 | 74.9 | 518,000.00 | 517,990.00 | 0 | 5.375 | 20040407 | 20340501 | 0 | 20040701 | 2,172.69 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 388,000.00 | 386,689.83 | Purchase | Full | 794 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046968 | GRONE | ROBERT | 669 HAWBROOK AVE | Primary | SFR | 1 | 360 | 357 | 77.98 | 490,000.00 | 0 | 0 | 5.375 | 20040405 | 20340501 | 0 | 20040701 | 2,139.53 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 382,078.00 | 380,684.89 | R/T Refi | Full | 656 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046969 | MURRAY | WILLIAM | 39 W 488 ABBEY GLEN CT | Primary | PUD-Detached | 1 | 360 | 357 | 65.83 | 540,000.00 | 0 | 0 | 5.625 | 20040419 | 20340501 | 0 | 20040701 | 2,046.46 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 355,500.00 | 354,354.49 | R/T Refi | Full | 775 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046970 | EADES | K. | 2624 CIANA COURT | Primary | SFR | 1 | 360 | 357 | 79.97 | 610,232.00 | 0 | 0 | 5.375 | 20040421 | 20340501 | 0 | 20040801 | 2,732.66 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 488,000.00 | 486,352.15 | R/T Refi | Full | 757 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046971 | KELLY | CHRISTIAN | 1141 WISTERIA DRIVE | Primary | SFR | 1 | 360 | 357 | 73.08 | 650,000.00 | 0 | 0 | 5.25 | 20040412 | 20340501 | 0 | 20040701 | 2,622.97 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 475,000.00 | 473,358.31 | C/O Refi | Full | 693 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046972 | BLOSE | BRADLEY | 3124 FALCON ST | Primary | SFR | 1 | 360 | 357 | 60 | 750,000.00 | 0 | 0 | 5.5 | 20040417 | 20340501 | 0 | 20040701 | 2,555.05 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 450,000.00 | 447,965.61 | R/T Refi | Full | 779 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046973 | HSU | KAREN | 27403 GREEN HAZEL RD | Primary | PUD-Detached | 1 | 360 | 357 | 66.61 | 590,000.00 | 0 | 0 | 5.625 | 20040402 | 20340501 | 0 | 20040701 | 2,262.33 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 393,000.00 | 391,733.66 | R/T Refi | Full | 767 | 0.25 | | | 20040601 | NONE | GMACM |

| LOANID | LNAME | FNAME | STREET | OCC | PROPTYPE | UNITS | OTERM | CORTERM | OLTV | OAPPVAL | PURCPRICE | ORATE | RATE | ODATE | S_MATDATE | OPANDI | NDDATE | PANDI | INDEX | PFRQ | RTRFRQ | FRTRDATE | NRTRDATE | MARGIN | FLOOR | CEILING | CAPINI | CAPINT | OBAL | COBAL | PURPOSE | DOC | FICO | SVCFEE | MERSID | NUMTIMESMORETHAN30DAYSPASTDUE | FPDATE | MI | SERVICER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 359046974 | MALEK | ALBERT | 1565 HOLLISTER LN | Primary | SFR | 1 | 360 | 357 | 72.84 | 810,000.00 | 0 | 0 | 5.75 | 20040407 | 20340501 | 0 | 20040701 | 3,443.08 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 590,000.00 | 588,143.14 | C/O Refi | Full | 759 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046975 | COLE | THOMAS | 1428 DANA AVENUE | Primary | SFR | 1 | 360 | 357 | 63.59 | 1,550,000.00 | 0 | 0 | 5.5 | 20040402 | 20340501 | 0 | 20040701 | 5,596.13 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 985,600.00 | 982,348.75 | R/T Refi | Full | 779 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046976 | ETZ | BRYAN | 744 KNOLL DRIVE DR | Primary | SFR | 1 | 360 | 357 | 58.8 | 750,000.00 | 0 | 0 | 5.75 | 20040401 | 20340501 | 0 | 20040701 | 2,573.56 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 441,000.00 | 439,482.15 | C/O Refi | Full | 773 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046979 | MCLAREN | ANDREW | 24350 LONG VALLEY RD | Primary | PUD-Detached | 1 | 360 | 357 | 41.67 | 1,800,000.00 | 0 | 0 | 5.75 | 20040408 | 20340501 | 0 | 20040701 | 4,376.80 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 750,000.00 | 747,639.58 | C/O Refi | Full | 797 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046980 | BOZYKOWSKI | DENNIS | 11903 ZIRBEL CT | Primary | PUD-Detached | 1 | 360 | 357 | 46.46 | 820,000.00 | 0 | 0 | 5.625 | 20040407 | 20340501 | 0 | 20040701 | 2,193.25 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 381,000.00 | 379,664.58 | R/T Refi | Full | 753 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046981 | HAAS | MARK | 3513 WINNETKA DR | Primary | SFR | 1 | 360 | 357 | 74.98 | 660,000.00 | 0 | 0 | 5.75 | 20040419 | 20340501 | 0 | 20040701 | 2,888.10 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 494,900.00 | 493,342.45 | R/T Refi | Full | 743 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046982 | THOMAS | WILLIAM | 79388 LIGA | Primary | PUD-Detached | 1 | 360 | 357 | 48.63 | 915,000.00 | 915,000.00 | 0 | 5.5 | 20040406 | 20340501 | 0 | 20040801 | 2,526.66 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 445,000.00 | 443,532.06 | Purchase | Full | 721 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046985 | YANG | SEUNG | 5504 COREOPSIS CT | Primary | PUD-Detached | 1 | 360 | 357 | 79.9 | 648,315.00 | 0 | 0 | 5.75 | 20040408 | 20340501 | 0 | 20040801 | 3,022.91 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 518,000.00 | 516,369.73 | R/T Refi | Full | 790 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046986 | LEVIN | PAUL | 3101 STANFORD | Primary | SFR | 1 | 360 | 357 | 70 | 743,000.00 | 0 | 0 | 5.625 | 20040414 | 20340501 | 0 | 20040701 | 2,993.99 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 520,100.00 | 518,424.11 | C/O Refi | Full | 712 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046987 | KERNS | ROBERT | 13529 HERITAGE FARMS DR | Primary | PUD-Detached | 1 | 360 | 357 | 78.67 | 535,000.00 | 0 | 0 | 5.5 | 20040408 | 20340501 | 0 | 20040701 | 2,389.82 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 420,900.00 | 419,511.57 | R/T Refi | Full | 698 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046988 | KOSMONT | CHARLES | 436 LOCUST ST | Primary | SFR | 1 | 360 | 357 | 60.85 | 1,640,000.00 | 0 | 0 | 5.375 | 20040420 | 20340501 | 0 | 20040701 | 5,588.51 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 998,000.00 | 994,630.05 | R/T Refi | Full | 761 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046991 | RAMSEY | JOHN | 948 VIA DEL MONTE | Primary | SFR | 1 | 360 | 357 | 52.14 | 1,400,000.00 | 0 | 0 | 5.875 | 20040419 | 20340501 | 0 | 20040701 | 4,318.23 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 730,000.00 | 726,746.42 | R/T Refi | Full | 778 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046992 | BARELKA | ZENON | 1876 LAWNDALE RD | Primary | PUD-Detached | 1 | 360 | 357 | 60.83 | 725,000.00 | 0 | 0 | 5.375 | 20040414 | 20340501 | 0 | 20040701 | 2,469.47 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 441,000.00 | 438,975.58 | R/T Refi | Full | 728 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046994 | GOTTLIEB | SETH | 11171 REDHAWK ST | Primary | PUD-Detached | 1 | 360 | 357 | 62.06 | 970,000.00 | 0 | 0 | 5.5 | 20040407 | 20340501 | 0 | 20040701 | 3,418.09 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 602,000.00 | 600,014.16 | C/O Refi | Full | 756 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046996 | FICKETT | WILLIAM | 137 BEACH AVE | Primary | SFR | 1 | 360 | 357 | 49.6 | 1,260,000.00 | 0 | 0 | 5.625 | 20040414 | 20340501 | 0 | 20040701 | 3,597.85 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 625,000.00 | 622,986.10 | C/O Refi | Full | 734 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046998 | BAKER | GEORGE | 472 QUAIL DRIVE | Primary | PUD-Detached | 1 | 360 | 357 | 88.47 | 457,800.00 | 0 | 0 | 5.75 | 20040414 | 20340501 | 0 | 20040801 | 2,363.47 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 405,000.00 | 403,725.38 | R/T Refi | Full | 722 | 0.25 | | | 20040601 | UGRIC | GMACM |
| 359047000 | FISHER | THOMAS | 639 WESTBOROUGH PL | Primary | SFR | 1 | 360 | 357 | 63.83 | 590,000.00 | 0 | 0 | 5.875 | 20040409 | 20340501 | 0 | 20040701 | 2,227.73 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 376,600.00 | 375,329.59 | R/T Refi | Full | 766 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047002 | BURNS | DONALD | 901 PERSIMMON RIDGE DRIVE | Primary | SFR | 1 | 360 | 357 | 80 | 555,000.00 | 550,454.00 | 0 | 5.875 | 20040414 | 20340501 | 0 | 20040701 | 2,604.84 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 440,350.00 | 438,996.52 | Purchase | Full | 797 | 0.25 | | | 20040601 | NONE | GMACM |
| 359037413 | BABY | JOSE | 2059 BROOKSHIRE RD | Primary | SFR | 1 | 360 | 356 | 74.99 | 544,000.00 | 543,380.00 | 0 | 5 | 20040319 | 20340401 | 0 | 20040701 | 2,187.55 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 407,500.00 | 405,529.20 | Purchase | Full | 738 | 0.25 | | | 20040501 | NONE | GMACM |
| 359037415 | PENSIERO | JOSEPH | 10 BEAR RUN | Primary | SFR | 1 | 360 | 356 | 74.62 | 520,000.00 | 0 | 0 | 5.625 | 20040322 | 20340401 | 0 | 20040701 | 2,233.55 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 388,000.00 | 386,329.10 | C/O Refi | Full | 728 | 0.25 | | | 20040501 | NONE | GMACM |
| 359044123 | PHAM | ANH | 3082 ANCRUM COURT | Primary | SFR | 1 | 360 | 357 | 72.74 | 565,000.00 | 0 | 0 | 5.875 | 20040415 | 20340501 | 0 | 20040701 | 2,431.22 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 411,000.00 | 409,736.74 | R/T Refi | Full | 700 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044125 | LEWIS | ALISON | 4759 FERNRIDGE LANE | Primary | SFR | 1 | 360 | 357 | 75 | 655,000.00 | 655,000.00 | 0 | 5.375 | 20040415 | 20340501 | 0 | 20040701 | 2,750.86 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 491,250.00 | 489,591.18 | Purchase | Full | 719 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044126 | DENECOCHEA | ANDREW | 3364 WILLOW STREET | Primary | SFR | 1 | 360 | 357 | 58.57 | 700,000.00 | 0 | 0 | 5.625 | 20040408 | 20340501 | 0 | 20040701 | 2,360.19 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 410,000.00 | 408,678.89 | C/O Refi | Full | 672 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044127 | AKHLAGHPOUR | MEHRI | 4450 WINNETKA AVENUE | Primary | SFR | 1 | 360 | 357 | 61.45 | 900,000.00 | 895,000.00 | 0 | 5.625 | 20040406 | 20340501 | 0 | 20040701 | 3,166.11 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 550,000.00 | 548,227.77 | Purchase | Full | 737 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046908 | NORDAHL | THOMAS | 9341 WYOMING AVENUE SOUTH | Primary | SFR | 1 | 360 | 357 | 58.33 | 1,200,000.00 | 0 | 0 | 5.5 | 20040407 | 20340501 | 0 | 20040701 | 3,974.52 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 700,000.00 | 697,690.89 | C/O Refi | Full | 788 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044071 | GREY-HAMMIL | GINA | 39005 & 39023 NORTH BOULDER VIEW DRIVE | Primary | SFR | 1 | 360 | 357 | 79.38 | 650,000.00 | 0 | 0 | 5.75 | 20040416 | 20340501 | 0 | 20040701 | 3,011.24 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 516,000.00 | 514,376.02 | R/T Refi | Full | 750 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044129 | BROWN | DON | 1230 7TH AVENUE | Primary | SFR | 1 | 360 | 357 | 79.88 | 492,000.00 | 0 | 0 | 6.125 | 20040414 | 20340501 | 0 | 20040701 | 2,387.91 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 393,000.00 | 391,848.23 | C/O Refi | Full | 776 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044130 | GREEN | DORISULA | 18112 JERSEY AVENUE | Primary | SFR | 1 | 360 | 357 | 70 | 595,000.00 | 0 | 0 | 5.75 | 20040419 | 20340501 | 0 | 20040701 | 2,430.58 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 416,500.00 | 415,189.19 | C/O Refi | Full | 705 | 0.25 | | | 20040601 | NONE | GMACM |
| 359044072 | WEEKS | KENNETH | 37 WILDEWOOD DRIVE | Primary | SFR | 1 | 360 | 357 | 75.23 | 642,000.00 | 0 | 0 | 5.25 | 20040408 | 20340501 | 0 | 20040701 | 2,667.14 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 483,000.00 | 481,330.68 | R/T Refi | Full | 717 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046910 | KLIMA | JAMES | 8762 AINTREE LN | Primary | SFR | 1 | 360 | 357 | 80 | 635,000.00 | 630,000.00 | 0 | 5.5 | 20040416 | 20340501 | 0 | 20040701 | 2,861.66 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 504,000.00 | 502,337.42 | Purchase | Full | 667 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046911 | VOECHTING | JEFFREY | 67 ASHFORD | Primary | PUD-Detached | 1 | 360 | 356 | 65.03 | 715,000.00 | 0 | 0 | 5.5 | 20040401 | 20340401 | 0 | 20040701 | 2,640.22 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 465,000.00 | 461,755.88 | C/O Refi | Full | 680 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046912 | MACIAS | PATRICIA | 7249 WINTERWOOD LN | Primary | PUD-Detached | 1 | 360 | 357 | 80 | 512,000.00 | 512,000.00 | 0 | 6 | 20040419 | 20340501 | 0 | 20040701 | 2,455.76 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 409,600.00 | 408,370.59 | Purchase | Full | 717 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046913 | RHEE | EUGENE | 4831 SUSSEX DR | Primary | SFR | 1 | 360 | 357 | 58.55 | 795,000.00 | 0 | 0 | 5.625 | 20040408 | 20340501 | 0 | 20040701 | 2,679.68 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 465,500.00 | 464,000.04 | R/T Refi | Full | 758 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046914 | HAUTAU | TODD | 2138 VELEZ DR | Primary | SFR | 1 | 360 | 356 | 56.53 | 750,000.00 | 0 | 0 | 5.625 | 20040320 | 20340401 | 0 | 20040701 | 2,440.78 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 424,000.00 | 422,174.10 | C/O Refi | Full | 733 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046915 | FERTAL | LISA | 13 BUTTERCUP LN | Primary | SFR | 1 | 360 | 357 | 46.28 | 860,000.00 | 0 | 0 | 5.25 | 20040405 | 20340501 | 0 | 20040701 | 2,197.77 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 398,000.00 | 396,624.44 | R/T Refi | Full | 706 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046916 | DEVNEY | PATRICK | 4079 BLUFF STREET | Primary | SFR | 1 | 360 | 357 | 60.87 | 690,000.00 | 0 | 0 | 5.75 | 20040409 | 20340501 | 0 | 20040701 | 2,451.01 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 420,000.00 | 418,678.16 | R/T Refi | Full | 763 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046918 | BABICH | VINCENT | 31212 FLOWERIDGE DR | Primary | SFR | 1 | 300 | 296 | 54.24 | 850,000.00 | 0 | 0 | 5.5 | 20040329 | 20290401 | 0 | 20040701 | 2,830.94 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 461,000.00 | 457,965.26 | R/T Refi | Full | 676 | 0.25 | | | 20040501 | NONE | GMACM |
| 359047009 | JUPP | ROBIN | 817 30TH AVE S | Primary | SFR | 1 | 360 | 357 | 79.91 | 443,000.00 | 0 | 0 | 5.75 | 20040420 | 20340501 | 0 | 20040801 | 2,065.85 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 354,000.00 | 352,483.00 | R/T Refi | Full | 683 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047010 | GRIMES | EDWIN | 1526 35TH AVE | Primary | SFR | 1 | 360 | 357 | 26.51 | 1,660,000.00 | 0 | 0 | 5.625 | 20040402 | 20340501 | 0 | 20040801 | 2,532.89 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 440,000.00 | 438,582.21 | R/T Refi | Full | 802 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047011 | OLSON | RICHARD | 1831 HABBERTON AVE | Primary | SFR | 1 | 360 | 357 | 78.02 | 555,000.00 | 555,000.00 | 0 | 5.625 | 20040416 | 20340501 | 0 | 20040701 | 2,492.59 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 433,000.00 | 431,604.78 | Purchase | Full | 774 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047013 | KOVAL | PAUL | 11609 ADDISON ST | Primary | SFR | 1 | 360 | 357 | 80 | 652,000.00 | 652,000.00 | 0 | 5.625 | 20040331 | 20340501 | 0 | 20040701 | 3,002.62 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 521,600.00 | 519,919.29 | Purchase | Full | 783 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047016 | DACHISEN | LYNN | 8813 ONE PUTT PL | Secondary | PUD-Detached | 1 | 360 | 357 | 79.99 | 461,000.00 | 432,539.00 | 0 | 5.375 | 20040407 | 20340501 | 0 | 20040701 | 1,937.50 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 346,000.00 | 344,733.91 | Purchase | Full | 755 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047021 | TURK | ISAAC | 43785 APACHE WELLS TERR | Primary | PUD-Attached | 1 | 360 | 357 | 68.22 | 546,800.00 | 0 | 0 | 5.5 | 20040330 | 20340501 | 0 | 20040701 | 2,117.85 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 373,000.00 | 371,769.57 | C/O Refi | Full | 678 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047022 | HEARD | MATTHEW | 5575 CAMINO PONIENTE | Primary | SFR | 1 | 360 | 357 | 74.93 | 750,000.00 | 0 | 0 | 5.75 | 20040408 | 20340501 | 0 | 20040701 | 3,279.68 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 562,000.00 | 560,231.27 | C/O Refi | Full | 712 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047024 | YIP | BARBARA | 10 CLARK DR | Primary | SFR | 1 | 360 | 357 | 53.5 | 1,000,000.00 | 0 | 0 | 5.625 | 20040407 | 20340501 | 0 | 20040701 | 3,079.76 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 535,000.00 | 532,750.97 | R/T Refi | Full | 792 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047026 | MCCORMICK | GRANT | 595 ROSITA AVE | Primary | SFR | 1 | 360 | 357 | 70 | 1,200,000.00 | 0 | 0 | 5.5 | 20040420 | 20340501 | 0 | 20040701 | 4,769.43 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 840,000.00 | 837,229.05 | R/T Refi | Full | 763 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047027 | DEMOTT | BRIAN | 744 W SILVER TREE ST | Primary | SFR | 1 | 360 | 357 | 80 | 545,000.00 | 555,000.00 | 0 | 5.25 | 20040415 | 20340501 | 0 | 20040701 | 2,407.61 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 436,000.00 | 434,493.10 | Purchase | Full | 764 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047028 | STARK | THOMAS | 22014 REYNOLDS DR | Primary | SFR | 1 | 360 | 357 | 51.7 | 730,000.00 | 0 | 0 | 5.875 | 20040408 | 20340501 | 0 | 20040701 | 2,232.46 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 377,400.00 | 376,240.02 | R/T Refi | Full | 743 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047029 | GORDON | STEPHEN | 29 VIA MARIPOSA | Primary | PUD-Detached | 1 | 360 | 357 | 69.75 | 579,950.00 | 0 | 0 | 5.25 | 20040408 | 20340501 | 0 | 20040701 | 2,233.66 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 404,500.00 | 403,101.99 | C/O Refi | Full | 782 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047030 | PERRY | EDMUND | 4236 OLD BROOK TRL | Primary | SFR | 1 | 360 | 357 | 56.15 | 780,000.00 | 0 | 0 | 5.625 | 20040412 | 20340501 | 0 | 20040701 | 2,521.38 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 438,000.00 | 436,588.64 | R/T Refi | Full | 743 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047031 | KOMMINI | SUDHAKAR | 6918 142ND CT NE | Primary | SFR | 1 | 360 | 357 | 73.13 | 480,000.00 | 0 | 0 | 5.5 | 20040422 | 20340501 | 0 | 20040701 | 1,992.94 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 351,000.00 | 349,842.14 | R/T Refi | Full | 700 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047032 | UDELL | STUART | 134 RYDER AVE | Primary | SFR | 1 | 360 | 357 | 72.93 | 750,000.00 | 0 | 0 | 5.5 | 20040406 | 20340501 | 0 | 20040801 | 3,105.81 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 547,000.00 | 543,546.44 | R/T Refi | Full | 753 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047033 | WINTERS | ALAN | 3161 ARROWHEAD DR | Primary | SFR | 1 | 360 | 357 | 67.15 | 1,175,000.00 | 0 | 0 | 5.5 | 20040410 | 20340501 | 0 | 20040701 | 4,479.86 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 789,000.00 | 786,397.28 | R/T Refi | Full | 693 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047034 | ETCHEVERRY | LANCE | 1123 OZONE AVE | Primary | SFR | 1 | 360 | 357 | 63.29 | 790,000.00 | 0 | 0 | 5.625 | 20040416 | 20340501 | 0 | 20040701 | 2,878.28 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500,000.00 | 498,388.88 | C/O Refi | Full | 765 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047035 | ABULENCIA | ARMAND | 1 COBBLERS LN | Primary | SFR | 1 | 360 | 357 | 75 | 950,000.00 | 0 | 0 | 5.5 | 20040415 | 20340501 | 0 | 20040801 | 4,045.50 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 712,500.00 | 710,149.63 | C/O Refi | Full | 718 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047036 | FITZ | EDWARD | 8023 HEMET PL | Primary | SFR | 1 | 360 | 357 | 49.79 | 1,410,000.00 | 0 | 0 | 5.25 | 20040410 | 20340501 | 0 | 20040701 | 3,876.47 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 702,000.00 | 699,573.76 | R/T Refi | Full | 676 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047037 | ALI | KHAN, | 8528 N MENARD | Primary | SFR | 1 | 360 | 357 | 80 | 475,000.00 | 475,000.00 | 0 | 5.75 | 20040416 | 20340501 | 0 | 20040701 | 2,217.58 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 380,000.00 | 378,720.83 | Purchase | Full | 693 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047038 | WETZLER | NADIA | 1199 SPRUCE ST | Primary | SFR | 1 | 360 | 357 | 78.65 | 740,000.00 | 0 | 0 | 5.75 | 20040421 | 20340501 | 0 | 20040701 | 3,396.39 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 582,000.00 | 580,168.33 | R/T Refi | Full | 765 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047041 | DASGUPTA | SIDDHARTH | 2855 ZANE GREY TERRACE | Primary | SFR | 1 | 360 | 357 | 69.82 | 855,000.00 | 0 | 0 | 5.375 | 20040415 | 20340501 | 0 | 20040701 | 3,343.03 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 597,000.00 | 594,984.09 | R/T Refi | Full | 671 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047042 | BOHER | SUSAN | 21802 NE 104TH PL | Primary | SFR | 1 | 360 | 357 | 74.97 | 765,000.00 | 0 | 0 | 5.5 | 20040412 | 20340501 | 0 | 20040701 | 3,256.27 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 573,500.00 | 571,608.17 | C/O Refi | Full | 717 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047043 | DELATORRE | RODRIGO | 1201 BOLINAS BAY CT | Primary | PUD-Detached | 1 | 360 | 357 | 54.85 | 680,000.00 | 0 | 0 | 5.375 | 20040416 | 20340501 | 0 | 20040701 | 2,088.69 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 373,000.00 | 371,740.49 | C/O Refi | Full | 718 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047047 | GUDBRANSON | GREG | 311 SEA PINES RD | Primary | SFR | 1 | 360 | 357 | 59.5 | 600,000.00 | 0 | 0 | 5.75 | 20040414 | 20340501 | 0 | 20040701 | 2,083.36 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 357,000.00 | 355,876.43 | R/T Refi | Full | 748 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047048 | HAMILTON | KEITH | 5448 AVENIDA FIESTA | Primary | SFR | 1 | 360 | 357 | 69.57 | 1,150,000.00 | 0 | 0 | 5.5 | 20040412 | 20340501 | 0 | 20040801 | 4,542.31 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 800,000.00 | 797,361.01 | C/O Refi | Full | 775 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047049 | FEICK | WILLIAM | 1851 LAKEHURST CT | Primary | SFR | 1 | 360 | 357 | 73.95 | 595,000.00 | 0 | 0 | 5.5 | 20040413 | 20340501 | 0 | 20040801 | 2,498.27 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 440,000.00 | 438,548.56 | R/T Refi | Full | 773 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047050 | WU | THEODORE | 44 DOVER PLACE PL | Primary | PUD-Attached | 1 | 360 | 357 | 62.22 | 810,000.00 | 0 | 0 | 5.5 | 20040416 | 20340501 | 0 | 20040701 | 2,861.66 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 504,000.00 | 501,824.72 | R/T Refi | Full | 756 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047052 | KRISHNAMURTHY | NAGARAJAN | 23302 VISTA CARILLO | Primary | PUD-Detached | 1 | 360 | 357 | 54.4 | 875,000.00 | 0 | 0 | 5.5 | 20040407 | 20340501 | 0 | 20040701 | 2,702.68 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 476,000.00 | 474,429.79 | R/T Refi | Full | 779 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047053 | LIGHTSTONE | MICHAEL | 2181 OCASO CAMINO | Primary | SFR | 1 | 360 | 357 | 57.65 | 850,000.00 | 0 | 0 | 5.375 | 20040325 | 20340501 | 0 | 20040701 | 2,743.86 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 490,000.00 | 487,582.48 | C/O Refi | Full | 765 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047055 | LEE | DAVID | 1042 JACQUELINE WAY | Primary | SFR | 1 | 360 | 357 | 60.61 | 825,000.00 | 825,000.00 | 0 | 5.5 | 20040405 | 20340501 | 0 | 20040701 | 2,838.95 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500,000.00 | 498,350.62 | Purchase | Full | 788 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047056 | BROWN | RAFAEL | 1438 38TH AVE | Primary | SFR | 1 | 360 | 357 | 63.14 | 795,000.00 | 0 | 0 | 5.5 | 20040412 | 20340501 | 0 | 20040701 | 2,850.30 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 502,000.00 | 500,344.03 | R/T Refi | Full | 762 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047061 | SEELEY | DAVID | 17408 SANTA LUCIA ST | Primary | SFR | 1 | 360 | 357 | 79.44 | 535,000.00 | 535,000.00 | 0 | 5.5 | 20040412 | 20340501 | 0 | 20040701 | 2,413.10 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 425,000.00 | 423,592.35 | Purchase | Full | 721 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047062 | REDDINGTON | RICHARD | 2470 BAY VILLAGE COURT | Primary | PUD-Detached | 1 | 360 | 357 | 49.17 | 1,263,000.00 | 0 | 0 | 5.5 | 20040413 | 20340501 | 0 | 20040701 | 3,525.97 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 621,000.00 | 618,951.48 | R/T Refi | Full | 767 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047063 | ROONEY | CHRISTOPHER | 1 WEATHERLY CT | Primary | SFR | 1 | 360 | 357 | 53.85 | 650,000.00 | 0 | 0 | 5.75 | 20040419 | 20340501 | 0 | 20040701 | 2,042.50 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 350,000.00 | 348,898.49 | C/O Refi | Full | 700 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047064 | GOBILLOT | THEODORE | 3126 QUENBY ST | Primary | SFR | 1 | 360 | 357 | 76.07 | 685,000.00 | 0 | 0 | 5.5 | 20040423 | 20340501 | 0 | 20040701 | 2,958.75 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 521,100.00 | 519,381.02 | R/T Refi | Full | 807 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047065 | DOUMA | JESSE | 25951 N POPE PL | Primary | PUD-Detached | 1 | 360 | 357 | 70.31 | 640,000.00 | 0 | 0 | 5.5 | 20040409 | 20340501 | 0 | 20040701 | 2,555.05 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 450,000.00 | 448,510.57 | C/O Refi | Full | 682 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047066 | KIM | CHON | 234 HEATHER RIDGE CIR | Primary | SFR | 1 | 360 | 357 | 74.7 | 585,000.00 | 0 | 0 | 5.625 | 20040412 | 20340501 | 0 | 20040701 | 2,515.62 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 437,000.00 | 435,233.23 | R/T Refi | Full | 698 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047067 | PRICE | DANIEL | 935 RAINBOW TRL | Primary | SFR | 1 | 360 | 357 | 77.16 | 823,000.00 | 0 | 0 | 5.5 | 20040420 | 20340501 | 0 | 20040701 | 3,605.46 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 635,000.00 | 632,905.30 | R/T Refi | Full | 767 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047068 | TURKNETTE | KENNETH | 2092 MIDLOTHIAN DR | Primary | SFR | 1 | 360 | 357 | 64.29 | 1,400,000.00 | 0 | 0 | 5.375 | 20040415 | 20340501 | 0 | 20040701 | 5,039.74 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 900,000.00 | 896,960.96 | R/T Refi | Full | 752 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047069 | MULLIGAN | SARA | 530 E PROSPECT | Primary | SFR | 1 | 360 | 357 | 80 | 740,000.00 | 0 | 0 | 5.5 | 20040419 | 20340501 | 0 | 20040701 | 3,361.31 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 592,000.00 | 590,047.14 | R/T Refi | Full | 652 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047070 | STAHL | TYCHO | 1107 E BEECHWOOD DR NW | Primary | PUD-Detached | 1 | 360 | 357 | 76.44 | 630,000.00 | 0 | 0 | 5.625 | 20040419 | 20340501 | 0 | 20040701 | 2,772.36 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 481,600.00 | 480,020.27 | R/T Refi | Full | 767 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047071 | MYERS | LISA | 4185 E MADURA RD | Primary | SFR | 1 | 360 | 357 | 42.04 | 1,130,000.00 | 0 | 0 | 5.375 | 20040414 | 20340501 | 0 | 20040701 | 2,659.86 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 475,000.00 | 473,396.07 | R/T Refi | Full | 766 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047072 | BAKER | JAMES | 30232 VIA BORICA | Primary | SFR | 1 | 360 | 357 | 70.91 | 875,000.00 | 0 | 0 | 5.375 | 20040414 | 20340501 | 0 | 20040801 | 3,474.62 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 620,500.00 | 618,404.75 | R/T Refi | Full | 786 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047073 | BRODER | REBECCA | 426 E CANYON COUNTRY RD | Primary | SFR | 1 | 360 | 357 | 68.8 | 625,000.00 | 0 | 0 | 5.625 | 20040401 | 20340501 | 0 | 20040801 | 2,475.32 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 430,000.00 | 428,614.45 | C/O Refi | Full | 748 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047074 | SCHNEIDER | RONALD | 5315 JESSAMINE STREET | Primary | SFR | 1 | 360 | 357 | 74.23 | 570,000.00 | 0 | 0 | 5.375 | 20040414 | 20340501 | 0 | 20040701 | 2,369.24 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 423,100.00 | 421,671.31 | R/T Refi | Full | 791 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047075 | FUTORAN | ROBERT | 7917 E ALLUVIAL AVE | Primary | SFR | 1 | 360 | 357 | 68.87 | 775,000.00 | 726,000.00 | 0 | 5.25 | 20040415 | 20340501 | 0 | 20040801 | 2,761.02 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500,000.00 | 498,271.90 | Purchase | Full | 776 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047076 | CLARK | WALTER | 13 INNISBROOK LN | Primary | PUD-Detached | 1 | 360 | 357 | 61.54 | 1,300,000.00 | 0 | 0 | 5.5 | 20040416 | 20340501 | 0 | 20040701 | 4,542.31 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 800,000.00 | 797,361.01 | C/O Refi | Full | 733 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047077 | ROSS | ALAN | 1304 MILVIA STREET | Primary | SFR | 1 | 360 | 357 | 62.11 | 805,000.00 | 805,000.00 | 0 | 5.25 | 20040412 | 20340501 | 0 | 20040701 | 2,761.02 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500,000.00 | 498,271.90 | Purchase | Full | 802 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047078 | BEAULIEU | CHARLES | 15680 LA TIERRA DR | Primary | SFR | 1 | 360 | 357 | 74.99 | 782,000.00 | 781,688.00 | 0 | 5.375 | 20040406 | 20340501 | 0 | 20040701 | 3,282.55 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 586,200.00 | 580,184.66 | Purchase | Full | 798 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047079 | DUCHARME | CATHERINE | 5803 CAMINO NUBES | Primary | SFR | 1 | 360 | 357 | 70.17 | 590,000.00 | 0 | 0 | 5.625 | 20040415 | 20340501 | 0 | 20040701 | 2,383.22 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 414,000.00 | 412,665.99 | R/T Refi | Full | 779 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047080 | ZHANG | LAWRENCE | 4462 ARIEL AVE | Primary | SFR | 1 | 360 | 357 | 73.44 | 640,000.00 | 640,000.00 | 0 | 5.375 | 20040420 | 20340501 | 0 | 20040701 | 2,631.86 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 470,000.00 | 468,344.21 | Purchase | Full | 752 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047081 | PEREZ | EDUARDO | 1835 AVENIDA APRENDA | Primary | SFR | 1 | 360 | 357 | 70.87 | 635,000.00 | 0 | 0 | 5.625 | 20040414 | 20340501 | 0 | 20040701 | 2,590.45 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 450,000.00 | 448,550.00 | C/O Refi | Full | 791 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047083 | WILLIAMS | MICHAEL | 23668 VIA AVANT | Primary | SFR | 1 | 360 | 357 | 80 | 461,000.00 | 461,000.00 | 0 | 5.625 | 20040420 | 20340501 | 0 | 20040701 | 2,123.02 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 368,800.00 | 367,504.49 | Purchase | Full | 792 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047085 | VOLLMER | MARK | 10 VENETIAN WAY 1904 | Primary | Condo - High | 1 | 360 | 357 | 67.8 | 590,000.00 | 600,000.00 | 0 | 5.5 | 20040423 | 20340501 | 0 | 20040801 | 2,271.16 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 400,000.00 | 398,566.41 | Purchase | Full | 725 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047086 | GILLIHAN | PAUL | 6390 HILLS DR | Primary | SFR | 1 | 360 | 357 | 42.91 | 2,000,000.00 | 0 | 0 | 5.625 | 20040414 | 20340501 | 0 | 20040701 | 4,940.28 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 858,200.00 | 855,434.67 | R/T Refi | Full | 704 | 0.25 | | | 20040601 | NONE | GMACM |

| LOANID | LNAME | FNAME | STREET | OCC | PROPTYPE | UNITS | OTERM | CORTERM | OLTV | OAPPVAL | PURCPRICE | ORATE | RATE | ODATE | S_MATDATE | OPANDI | NDDATE | PANDI | INDEX | PFRQ | RTRFRQ | FRTRDATE | NRTRDATE | MARGIN | FLOOR | CEILING | CAPINI | CAPINT | OBAL | COBAL | PURPOSE | DOC | FICO | SVCFEE | MERSID | NUMTIMESMORETHAN30DAYSPASTDUE | FPDATE | MI | SERVICER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 359047087 | OVIATT | DANA | 8275 EAST BROOKDALE LANE | Primary | PUD-Detached | 1 | 360 | 357 | 69.92 | 740,000.00 | 0 | 0 | 5.5 | 20040424 | 20340501 | 0 | 20040801 | 2,937.74 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 517,400.00 | 515,693.23 | C/O Refi | Full | 757 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047088 | MACNEILL | JAMES | 8 SAN PEDRO | Primary | PUD-Detached | 1 | 360 | 357 | 56.05 | 660,000.00 | 659,900.00 | 0 | 5.375 | 20040408 | 20340501 | 0 | 20040701 | 2,071.33 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 369,900.00 | 368,650.96 | Purchase | Full | 720 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047089 | DESILVA | JOHN | 2833 VIA CARMEN | Primary | SFR | 1 | 360 | 357 | 61.78 | 585,000.00 | 0 | 0 | 5.75 | 20040415 | 20340501 | 0 | 20040801 | 2,109.03 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 361,400.00 | 360,195.66 | R/T Refi | Full | 717 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047090 | KLUSS | ROBERT | 52 CLUB VISTA | Primary | PUD-Detached | 1 | 360 | 357 | 43.18 | 1,100,000.00 | 0 | 0 | 5.875 | 20040415 | 20340501 | 0 | 20040801 | 2,809.80 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 475,000.00 | 473,156.84 | R/T Refi | Full | 752 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047091 | UYTTENDAELE | MATTHEW | 153 ERIE AVE | Primary | SFR | 1 | 360 | 357 | 74.57 | 690,000.00 | 0 | 0 | 5.75 | 20040413 | 20340501 | 0 | 20040701 | 3,002.48 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 514,500.00 | 512,880.76 | C/O Refi | Full | 782 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047092 | SHISHIDO | GLEN | 1828 CATLIN STREET | Primary | PUD-Detached | 1 | 360 | 357 | 79.79 | 708,134.00 | 0 | 0 | 5.625 | 20040421 | 20340501 | 0 | 20040701 | 3,252.46 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 565,000.00 | 563,179.43 | R/T Refi | Full | 733 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047093 | APFFEL | III, | 1010 DARCY DRIVE | Secondary | SFR | 1 | 360 | 357 | 78.63 | 550,000.00 | 0 | 0 | 5.5 | 20040426 | 20340501 | 0 | 20040701 | 2,455.40 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 432,450.00 | 430,855.90 | R/T Refi | Full | 749 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047096 | DAFESH | PHILIP | 1140 5TH ST | Primary | SFR | 1 | 360 | 357 | 69.43 | 965,000.00 | 0 | 0 | 5.25 | 20040412 | 20340501 | 0 | 20040801 | 3,699.76 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 670,000.00 | 667,684.37 | R/T Refi | Full | 776 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047099 | LINDSEY | WILLIAM | 1039 GETTYSVUE DR | Primary | SFR | 1 | 360 | 357 | 71.71 | 615,000.00 | 0 | 0 | 5.5 | 20040416 | 20340501 | 0 | 20040701 | 2,503.95 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 441,000.00 | 439,545.25 | R/T Refi | Full | 701 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047100 | HUGHART | JOHN | 600 WESTOVER AVE AVE | Primary | SFR | 1 | 360 | 357 | 53.78 | 1,200,000.00 | 0 | 0 | 5.375 | 20040416 | 20340501 | 0 | 20040701 | 3,613.49 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 645,300.00 | 643,108.38 | R/T Refi | Full | 783 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047102 | KUNZ | LORI | 1946 FERNDALE PLACE | Primary | SFR | 1 | 360 | 357 | 54.55 | 660,000.00 | 0 | 0 | 6 | 20040421 | 20340501 | 0 | 20040701 | 2,158.38 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 360,000.00 | 358,919.48 | C/O Refi | Full | 737 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047103 | DUFRENE | DANIEL | 239 N. MAPLEWOOD STREET | Primary | SFR | 1 | 360 | 357 | 75 | 490,000.00 | 0 | 0 | 5.625 | 20040421 | 20340501 | 0 | 20040801 | 2,115.54 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 367,500.00 | 366,315.81 | C/O Refi | Full | 743 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047104 | VALENCIA | FERNANDO | 1005 N MALIBU CANYON DR | Primary | SFR | 1 | 360 | 357 | 74.95 | 555,000.00 | 0 | 0 | 5.75 | 20040416 | 20340501 | 0 | 20040701 | 2,427.66 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 416,000.00 | 414,690.76 | R/T Refi | Full | 751 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047105 | ROBINSON | MICHAEL | 3228 BASSWOOD COURT | Primary | SFR | 1 | 360 | 357 | 80 | 650,000.00 | 650,000.00 | 0 | 5.5 | 20040412 | 20340501 | 0 | 20040801 | 2,952.50 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 520,000.00 | 518,284.65 | Purchase | Full | 688 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047106 | MERRITT | QUINN | 1528 GOODMAN AVE | Primary | SFR | 1 | 360 | 357 | 67.6 | 645,000.00 | 0 | 0 | 5.625 | 20040417 | 20340501 | 0 | 20040701 | 2,509.86 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 436,000.00 | 434,595.11 | C/O Refi | Full | 765 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047107 | RAPHAEL | DAVID | 5530 ALCOVE AVENUE | Primary | SFR | 1 | 360 | 357 | 74.62 | 725,000.00 | 0 | 0 | 5.75 | 20040402 | 20340501 | 0 | 20040701 | 3,157.13 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 541,000.00 | 539,297.35 | C/O Refi | Full | 706 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047108 | BELL | ELIZABETH | 5774 NE RAVENSWOOD CT | Primary | SFR | 1 | 360 | 357 | 80 | 550,000.00 | 549,000.00 | 0 | 5.5 | 20040409 | 20340501 | 0 | 20040701 | 2,493.73 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 439,200.00 | 437,751.19 | Purchase | Full | 726 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047109 | ENQUIST | ERIC | 9348 FAUNTLEROY WAY SW | Primary | SFR | 1 | 360 | 357 | 80 | 550,000.00 | 550,000.00 | 0 | 5.25 | 20040416 | 20340501 | 0 | 20040701 | 2,429.70 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 440,000.00 | 438,479.27 | Purchase | Full | 733 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047110 | BROOKS | TIMOTHY | 1312 SE COLONY WAY | Primary | PUD-Detached | 1 | 360 | 357 | 70.14 | 710,000.00 | 0 | 0 | 5.375 | 20040412 | 20340501 | 0 | 20040701 | 2,788.66 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 498,000.00 | 495,813.90 | R/T Refi | Full | 769 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047112 | TOLEDO | STEVE | 25955 VIA CATALINA | Primary | PUD-Detached | 1 | 360 | 357 | 75 | 595,000.00 | 0 | 0 | 5.75 | 20040420 | 20340501 | 0 | 20040701 | 2,604.19 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 446,250.00 | 444,845.56 | C/O Refi | Full | 664 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047113 | LANGE | MICHAEL | 1159 S SILVER STAR WAY | Primary | PUD-Detached | 1 | 360 | 357 | 72.71 | 545,000.00 | 0 | 0 | 5.75 | 20040408 | 20340501 | 0 | 20040801 | 2,312.41 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 396,250.00 | 394,993.10 | R/T Refi | Full | 789 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047114 | HODGE | OWEN | 15 VIA BABERA | Primary | PUD-Detached | 1 | 360 | 357 | 66.67 | 750,000.00 | 0 | 0 | 5.5 | 20040415 | 20340501 | 0 | 20040701 | 2,838.95 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500,000.00 | 498,350.62 | C/O Refi | Full | 792 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047115 | NORTHCRAFT | JEFFREY | 4 MAJESTIC OAK COURT | Primary | SFR | 1 | 360 | 357 | 62.56 | 1,250,000.00 | 0 | 0 | 5.5 | 20040417 | 20340501 | 0 | 20040701 | 4,440.11 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 782,000.00 | 779,196.34 | C/O Refi | Full | 695 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047116 | CEDERLIND | KIRK | 3174 TEXAS AVE | Primary | SFR | 1 | 360 | 357 | 69.45 | 550,000.00 | 0 | 0 | 5.375 | 20040416 | 20340501 | 0 | 20040701 | 2,139.09 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 382,000.00 | 380,710.09 | R/T Refi | Full | 716 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047117 | COLLIER | DOUGLAS | 5216 RIVER AVENUE | Primary | PUD-Detached | 1 | 360 | 357 | 61 | 700,000.00 | 0 | 0 | 5.75 | 20040416 | 20340501 | 0 | 20040701 | 2,491.86 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 427,000.00 | 425,656.12 | R/T Refi | Full | 763 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047118 | SMITH | IAN | 3203 10TH AVE W | Primary | SFR | 1 | 360 | 357 | 68.63 | 765,000.00 | 765,000.00 | 0 | 5.25 | 20040420 | 20340501 | 0 | 20040801 | 2,899.07 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 525,000.00 | 523,039.92 | Purchase | Full | 772 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047119 | LOEFFLER | MARK | 770 S STAIRVIEW CT | Primary | PUD-Detached | 1 | 360 | 357 | 73.85 | 650,000.00 | 0 | 0 | 5.25 | 20040403 | 20340501 | 0 | 20040701 | 2,650.58 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 480,000.00 | 478,341.02 | C/O Refi | Full | 664 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047120 | WESCOTT | DAVID | 155 N HARBOR DRIVE 1103 | Primary | Condo | 1 | 360 | 357 | 79.78 | 460,000.00 | 0 | 0 | 5.5 | 20040419 | 20340501 | 0 | 20040701 | 2,083.79 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 367,000.00 | 365,690.83 | R/T Refi | Full | 678 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047121 | GASSER | JOHN | 17 INTERLOCHEN DR | Primary | PUD-Detached | 1 | 360 | 357 | 78.23 | 620,000.00 | 0 | 0 | 5.625 | 20040414 | 20340501 | 0 | 20040701 | 2,791.93 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 485,000.00 | 483,437.22 | R/T Refi | Full | 756 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047122 | WARD | JONATHAN | 8 CONCHITO | Primary | PUD-Detached | 1 | 360 | 357 | 50.49 | 810,000.00 | 0 | 0 | 5.5 | 20040421 | 20340501 | 0 | 20040701 | 2,322.26 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 409,000.00 | 407,650.80 | C/O Refi | Full | 688 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047123 | KAUFMAN | DAN | 8391 HIDDEN PONDS ALCOVE | Primary | SFR | 1 | 360 | 357 | 67.83 | 600,000.00 | 0 | 0 | 5.625 | 20040419 | 20340501 | 0 | 20040701 | 2,342.92 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 407,000.00 | 405,385.73 | R/T Refi | Full | 801 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047124 | VALENTE | RICHARD | 9585 FIRWOOD | Primary | SFR | 1 | 360 | 357 | 80 | 592,000.00 | 565,000.00 | 0 | 5.875 | 20040416 | 20340501 | 0 | 20040801 | 2,673.75 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 452,000.00 | 450,610.72 | Purchase | Full | 687 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047126 | CAREY | PAUL | 4034 E THIRD AVE | Primary | SFR | 1 | 360 | 357 | 32.9 | 1,550,000.00 | 0 | 0 | 5.375 | 20040422 | 20340501 | 0 | 20040701 | 2,855.85 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 510,000.00 | 508,277.89 | R/T Refi | Full | 711 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047127 | RICE | JOHN | 3084 BUENA VISTA WAY | Primary | SFR | 1 | 360 | 356 | 52.95 | 950,000.00 | 0 | 0 | 5.5 | 20040331 | 20340401 | 0 | 20040701 | 2,855.98 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 503,000.00 | 500,782.56 | R/T Refi | Full | 790 | 0.25 | | | 20040501 | NONE | GMACM |
| 359047128 | BARBAREE | TRACEY | 1209 ROSETTE WAY | Primary | PUD-Detached | 1 | 360 | 357 | 80 | 455,000.00 | 450,502.00 | 0 | 5.375 | 20040421 | 20340501 | 0 | 20040701 | 2,018.14 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 360,400.00 | 359,081.20 | Purchase | Full | 785 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047129 | BAXTER | SR., | 120 PALMETTO RD | Primary | SFR | 1 | 360 | 356 | 44.74 | 780,000.00 | 0 | 0 | 5.5 | 20040401 | 20340401 | 0 | 20040801 | 1,981.58 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 349,000.00 | 347,461.47 | R/T Refi | Full | 703 | 0.25 | | | 20040501 | NONE | GMACM |
| 359047130 | BISHOP | LARRY | 11851 SUNBATHER LANE | Secondary | PUD-Detached | 1 | 360 | 357 | 80 | 603,500.00 | 599,000.00 | 0 | 5.5 | 20040422 | 20340501 | 0 | 20040801 | 2,720.84 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 479,200.00 | 477,482.59 | Purchase | Full | 756 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047131 | TIEN | MING-CHI | 1080 MARILLA AVE | Primary | SFR | 1 | 360 | 357 | 79.99 | 595,000.00 | 593,800.00 | 0 | 5.625 | 20040413 | 20340501 | 0 | 20040801 | 2,734.37 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 475,000.00 | 473,469.42 | Purchase | Full | 759 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047132 | BIENIEK | JOSEPH | 9 WARWICK DR | Primary | SFR | 1 | 360 | 357 | 74.99 | 477,000.00 | 0 | 0 | 5.75 | 20040405 | 20340501 | 0 | 20040701 | 2,087.44 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 357,700.00 | 356,574.24 | C/O Refi | Full | 690 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047133 | GRUWELL | MATTHEW | 1219 OLIVE BRANCH LN | Primary | SFR | 1 | 360 | 357 | 58.18 | 1,100,000.00 | 0 | 0 | 5.75 | 20040421 | 20340501 | 0 | 20040701 | 3,734.87 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 640,000.00 | 637,985.77 | R/T Refi | Full | 671 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047134 | SECREST | JR., | 3 BLALOCK WOODS DRIVE | Primary | SFR | 1 | 360 | 357 | 76.47 | 865,000.00 | 850,000.00 | 0 | 5.625 | 20040423 | 20340501 | 0 | 20040701 | 3,741.77 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 650,000.00 | 647,905.53 | Purchase | Full | 769 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047135 | JOHNSON | STACEY | 13521 GOSSAMER CT | Primary | SFR | 1 | 360 | 357 | 80 | 490,000.00 | 0 | 0 | 5.5 | 20040419 | 20340501 | 0 | 20040701 | 2,225.73 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 392,000.00 | 390,706.90 | R/T Refi | Full | 708 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047136 | HALLER | DANNY | 14811 MONROE ST | Primary | SFR | 1 | 360 | 357 | 75 | 445,000.00 | 0 | 0 | 5.5 | 20040419 | 20340501 | 0 | 20040701 | 1,895.00 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 333,750.00 | 332,649.03 | C/O Refi | Full | 677 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047138 | THOMPSON | RICHARD | 27401 VALDERAS | Primary | PUD-Detached | 1 | 360 | 357 | 55.56 | 675,000.00 | 0 | 0 | 5.875 | 20040420 | 20340501 | 0 | 20040701 | 2,218.27 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 375,000.00 | 373,847.38 | C/O Refi | Full | 757 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047139 | SOLAZZO | GARY | 1415 MCCULLOCH BL 105 | Secondary | PUD-Detached | 1 | 360 | 357 | 80 | 760,000.00 | 760,000.00 | 0 | 5.75 | 20040423 | 20340501 | 0 | 20040701 | 3,548.12 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 608,000.00 | 606,086.50 | Purchase | Full | 725 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047140 | DAY | EUGENE | 5791 WOODROSE WAY | Primary | SFR | 1 | 360 | 357 | 68.59 | 573,000.00 | 0 | 0 | 5.625 | 20040420 | 20340501 | 0 | 20040701 | 2,262.33 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 393,000.00 | 391,541.87 | R/T Refi | Full | 756 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047143 | SAITSKY | ERI | 1440 POPPY PEAK DR | Primary | SFR | 1 | 360 | 357 | 60.61 | 660,000.00 | 0 | 0 | 5.75 | 20040421 | 20340501 | 0 | 20040801 | 2,334.29 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 400,000.00 | 398,741.12 | R/T Refi | Full | 784 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047144 | NOUZILLE | JEAN-LUC | 6085 CHESEBRO RD | Primary | SFR | 1 | 360 | 357 | 49.55 | 1,100,000.00 | 0 | 0 | 5.625 | 20040412 | 20340501 | 0 | 20040701 | 3,137.33 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 545,000.00 | 543,243.87 | R/T Refi | Full | 760 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047146 | LEGEDZA | ULANA | 85 ATLAS AVE DR | Primary | SFR | 1 | 360 | 357 | 71.2 | 500,000.00 | 0 | 0 | 6 | 20040415 | 20340501 | 0 | 20040801 | 2,134.40 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 356,000.00 | 354,931.48 | R/T Refi | Full | 744 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047149 | LUNN | MALCOLM | 55 SOUTH GARNET BEND | Primary | PUD-Detached | 1 | 360 | 357 | 78.54 | 562,000.00 | 0 | 0 | 5.5 | 20040414 | 20340501 | 0 | 20040701 | 2,506.22 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 441,400.00 | 439,849.29 | R/T Refi | Full | 728 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047150 | SCOTT | DAVID | 7539 DIBBLE AVENUE NW | Primary | SFR | 1 | 360 | 357 | 77.55 | 490,000.00 | 0 | 0 | 5.25 | 20040423 | 20340501 | 0 | 20040701 | 2,098.37 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 380,000.00 | 378,434.47 | R/T Refi | Full | 779 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047151 | GOODMAN | DAVID | 24882 LUNA BONITA DRIVE | Primary | SFR | 1 | 360 | 357 | 55.83 | 600,000.00 | 0 | 0 | 5.75 | 20040416 | 20340501 | 0 | 20040701 | 1,954.97 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 335,000.00 | 333,945.68 | C/O Refi | Full | 795 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047152 | VAN | WINKLE, | 324 COLLARD WAY | Primary | SFR | 1 | 360 | 357 | 66.6 | 585,000.00 | 0 | 0 | 5.75 | 20040417 | 20340501 | 0 | 20040801 | 2,273.60 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 389,600.00 | 387,970.96 | R/T Refi | Full | 777 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047154 | KITAJI | JON | 5624 CARMEL VALLEY RD | Primary | SFR | 1 | 360 | 357 | 47.27 | 1,650,000.00 | 0 | 0 | 5.75 | 20040420 | 20340501 | 0 | 20040701 | 4,551.87 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 780,000.00 | 776,810.59 | C/O Refi | Full | 760 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047155 | JACOBSEN | THOMAS | 28953 CRESTRIDGE RD | Primary | SFR | 1 | 360 | 357 | 55.6 | 1,000,000.00 | 0 | 0 | 5.75 | 20040419 | 20340501 | 0 | 20040801 | 3,244.67 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 556,000.00 | 554,250.14 | C/O Refi | Full | 777 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047156 | ARVIDSON | JULIE | 1309 LAKE WASHINGTON BL S | Primary | SFR | 1 | 360 | 357 | 80 | 750,000.00 | 0 | 0 | 5.75 | 20040421 | 20340501 | 0 | 20040701 | 3,501.44 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 600,000.00 | 597,286.83 | R/T Refi | Full | 777 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047157 | MORDWINKIN | MARTA | 14600 SW 74TH CT | Primary | SFR | 1 | 360 | 357 | 80 | 545,000.00 | 545,000.00 | 0 | 5.75 | 20040421 | 20340501 | 0 | 20040701 | 2,544.38 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 436,000.00 | 434,627.81 | Purchase | Full | 724 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047158 | CLAUSNER | PAUL | 32221 DEL OBISPO STREET | Primary | SFR | 1 | 360 | 357 | 75.75 | 565,000.00 | 0 | 0 | 5.625 | 20040409 | 20340501 | 0 | 20040801 | 2,463.81 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 428,000.00 | 426,620.88 | R/T Refi | Full | 809 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047159 | SMITH | SERENA | 3601 E UNION ST | Primary | SFR | 1 | 360 | 357 | 73.99 | 865,000.00 | 0 | 0 | 5.25 | 20040407 | 20340501 | 0 | 20040801 | 3,534.10 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 640,000.00 | 637,788.05 | R/T Refi | Full | 778 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047160 | FORD | FRANCIS | 6319 SMOKE TREE AVE | Primary | SFR | 1 | 360 | 357 | 51.75 | 715,000.00 | 0 | 0 | 5.625 | 20040420 | 20340501 | 0 | 20040701 | 2,129.93 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 370,000.00 | 368,807.70 | C/O Refi | Full | 717 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047161 | DAYHUFF | COREY | 6470 LAKE TRAIL DR | Primary | SFR | 1 | 360 | 357 | 77.8 | 724,261.00 | 0 | 0 | 5.75 | 20040412 | 20340501 | 0 | 20040701 | 3,288.43 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 563,500.00 | 561,726.55 | R/T Refi | Full | 779 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047162 | HESSIAN | JOAN | 1015 W BAY AVE | Primary | SFR | 1 | 360 | 357 | 29.34 | 1,250,000.00 | 0 | 0 | 5.75 | 20040421 | 20340501 | 0 | 20040701 | 2,139.96 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 366,700.00 | 365,545.92 | R/T Refi | Full | 797 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047163 | ROURK | GREGORY | 43855 WABEEK CT | Primary | SFR | 1 | 360 | 357 | 79.98 | 555,000.00 | 0 | 0 | 5.75 | 20040408 | 20340501 | 0 | 20040701 | 2,590.48 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 443,900.00 | 442,502.95 | R/T Refi | Full | 719 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047168 | MCADAM | III, | 6662 OAK FOREST DRIVE | Primary | SFR | 1 | 360 | 357 | 67.14 | 700,000.00 | 0 | 0 | 5.75 | 20040412 | 20340501 | 0 | 20040701 | 2,742.79 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 470,000.00 | 468,520.81 | R/T Refi | Full | 783 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047169 | WONG | BO | 707 BILTMORE ST | Primary | PUD-Detached | 1 | 360 | 357 | 79.58 | 655,950.00 | 0 | 0 | 6 | 20040422 | 20340501 | 0 | 20040801 | 3,129.65 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 522,000.00 | 520,433.24 | R/T Refi | Full | 738 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047170 | AUFDENKAMPE | JOHN | 26200 PERDIDO BEACH BL 806 | Secondary | Condo - High | 1 | 360 | 357 | 80 | 530,000.00 | 530,000.00 | 0 | 5.75 | 20040427 | 20340501 | 0 | 20040801 | 2,474.35 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 424,000.00 | 422,665.58 | Purchase | Full | 739 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047171 | BOOMER | MICHAEL | 18635 PLUMOSA ST | Primary | SFR | 1 | 360 | 357 | 75 | 800,000.00 | 800,000.00 | 0 | 5.375 | 20040420 | 20340501 | 0 | 20040701 | 3,359.83 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 600,000.00 | 597,973.96 | Purchase | Full | 782 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047172 | BOWMAN | RANDY | 6637 NORTHAVEN RD | Primary | SFR | 1 | 360 | 357 | 80 | 700,000.00 | 699,000.00 | 0 | 5.75 | 20040426 | 20340501 | 0 | 20040701 | 3,263.34 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 559,200.00 | 557,438.40 | Purchase | Full | 740 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047173 | BUONAURO | RICHARD | 2930 ALDERWOOD COURT | Primary | PUD-Detached | 1 | 360 | 357 | 75 | 900,000.00 | 0 | 0 | 6.125 | 20040414 | 20340501 | 0 | 20040701 | 4,101.37 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 675,000.00 | 673,021.76 | C/O Refi | Full | 747 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047174 | BROWN | JAMES | 2800 ESTERO BL 1101 | Secondary | Condo - High | 1 | 360 | 357 | 75 | 715,000.00 | 700,000.00 | 0 | 6.125 | 20040421 | 20340501 | 0 | 20040701 | 3,189.96 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 525,000.00 | 523,461.36 | Purchase | Full | 761 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047175 | SHIMKUS | MICHAEL | 18404 MANSEL AVENUE | Primary | 2-Family | 2 | 360 | 357 | 80 | 740,000.00 | 740,000.00 | 0 | 5.875 | 20040420 | 20340501 | 0 | 20040701 | 3,501.90 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 592,000.00 | 590,180.42 | Purchase | Full | 732 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047176 | DEMPSEY | DANIEL | 375A BEACH CLUB TRL | Secondary | Condo - High | 1 | 360 | 357 | 80 | 480,000.00 | 480,000.00 | 0 | 5.75 | 20040421 | 20340501 | 0 | 20040701 | 2,240.92 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 384,000.00 | 382,791.47 | Purchase | Full | 792 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047177 | MCKAY | BRANDI | 6631 WEST 81ST STREET | Primary | SFR | 1 | 360 | 357 | 75 | 750,000.00 | 0 | 0 | 6.125 | 20040422 | 20340501 | 0 | 20040701 | 3,417.81 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 562,500.00 | 560,798.50 | C/O Refi | Full | 760 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047178 | LAC | TRIEU | 509 SOUTH ANTHONY STREET | Primary | SFR | 1 | 360 | 357 | 80 | 539,000.00 | 539,000.00 | 0 | 5.625 | 20040426 | 20340501 | 0 | 20040801 | 2,482.23 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 431,200.00 | 429,810.57 | Purchase | Full | 773 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046838 | BEGROW | LEE | 1905 LALONDE RD | Secondary | SFR | 1 | 360 | 356 | 65.03 | 780,000.00 | 0 | 0 | 5.75 | 20040331 | 20340401 | 0 | 20040701 | 2,960.17 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 507,250.00 | 505,035.71 | R/T Refi | Full | 749 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046839 | GU | JAY | 2293 PEARL LANE | Primary | SFR | 1 | 360 | 356 | 64.29 | 560,000.00 | 0 | 0 | 5.5 | 20040311 | 20340401 | 0 | 20040701 | 2,044.04 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 360,000.00 | 358,412.97 | C/O Refi | Full | 765 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046840 | NEVINS | DAVID | 33 VILLAS CIRCLE | Primary | SFR | 1 | 360 | 357 | 80 | 525,000.00 | 525,000.00 | 0 | 5.625 | 20040426 | 20340501 | 0 | 20040801 | 2,417.76 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 420,000.00 | 418,646.65 | Purchase | Full | 771 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046841 | GIROUX | MICHAEL | 12 BERGEN DRIVE | Primary | SFR | 1 | 360 | 357 | 95 | 372,000.00 | 370,000.00 | 0 | 5.875 | 20040414 | 20340501 | 0 | 20040801 | 2,079.26 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 351,500.00 | 350,419.61 | Purchase | Full | 761 | 0.25 | | | 20040601 | UGRIC | GMACM |
| 359047003 | WEIERS | CHAD | 2522 TOURNAMENT PLAYERS CIR S | Primary | SFR | 1 | 300 | 297 | 74.43 | 610,000.00 | 0 | 0 | 5.875 | 20040416 | 20290501 | 0 | 20040701 | 2,890.54 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 454,000.00 | 451,986.68 | R/T Refi | Full | 768 | 0.25 | | | 20040601 | NONE | GMACM |
| 359047007 | FRUMKIN | MICHAEL | 1075 ORTEGA RD | Secondary | SFR | 1 | 360 | 357 | 52.04 | 845,500.00 | 0 | 0 | 5.5 | 20040406 | 20340501 | 0 | 20040701 | 2,498.27 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 440,000.00 | 438,548.56 | R/T Refi | Full | 779 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046842 | FIELMAN | IVAN | 17 BURROUGHS AVE | Primary | SFR | 1 | 360 | 357 | 80 | 535,000.00 | 525,000.00 | 0 | 5.875 | 20040421 | 20340501 | 0 | 20040701 | 2,484.46 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 420,000.00 | 418,709.07 | Purchase | Full | 665 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046844 | HOLT-SMITH | MARILYN | 6357 HEATHERSTONE CT | Primary | SFR | 1 | 360 | 356 | 72.17 | 580,000.00 | 0 | 0 | 5.75 | 20040319 | 20340401 | 0 | 20040801 | 2,442.84 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 418,600.00 | 416,839.20 | R/T Refi | Full | 788 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046845 | BUCKIS | MARK | 5465 REDBARK PL | Primary | SFR | 1 | 360 | 357 | 70.19 | 570,000.00 | 569,900.00 | 0 | 5.5 | 20040420 | 20340501 | 0 | 20040701 | 2,271.16 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 400,000.00 | 398,680.49 | Purchase | Full | 789 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046846 | YI | JOSEPH | 7502 SUNNYSIDE AVE N | Primary | SFR | 1 | 360 | 357 | 49.01 | 755,000.00 | 0 | 0 | 5.75 | 20040402 | 20340501 | 0 | 20040701 | 2,159.22 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 370,000.00 | 368,835.53 | R/T Refi | Full | 785 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046847 | MUNN | JR., | 200 LIVE OAK DR | Primary | SFR | 1 | 360 | 356 | 77.11 | 849,000.00 | 843,000.00 | 0 | 5.25 | 20040331 | 20340401 | 0 | 20040701 | 3,589.32 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 650,000.00 | 646,998.09 | Purchase | Full | 765 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046848 | GRAHAM | MATT | 106 STATESMAN | Primary | SFR | 1 | 360 | 357 | 79.1 | 593,000.00 | 592,643.90 | 0 | 5.75 | 20040426 | 20340501 | 0 | 20040801 | 2,735.79 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 468,800.00 | 467,324.58 | Purchase | Full | 667 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046849 | KESSLER | LARRY | 3323 JUDITH DR | Primary | SFR | 1 | 360 | 357 | 77.38 | 840,000.00 | 855,000.00 | 0 | 5.625 | 20040406 | 20340501 | 0 | 20040701 | 3,741.77 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 650,000.00 | 647,905.53 | Purchase | Full | 718 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046850 | BEAZLEY | STUART | 30 CAITLIN CT | Primary | SFR | 1 | 360 | 357 | 80 | 525,000.00 | 525,000.00 | 0 | 5.625 | 20040407 | 20340501 | 0 | 20040701 | 2,417.76 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 420,000.00 | 418,646.65 | Purchase | Full | 767 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046851 | LOPRIORE | VINCENT | 12 UNDERWOOD RD | Secondary | SFR | 1 | 360 | 357 | 80 | 550,000.00 | 530,000.00 | 0 | 5.375 | 20040408 | 20340501 | 0 | 20040701 | 2,374.28 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 424,000.00 | 422,568.27 | Purchase | Full | 773 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046852 | HREN | THOMAS | 6415 RODRIGO ST #A | Primary | SFR | 1 | 360 | 356 | 75.96 | 522,500.00 | 0 | 0 | 5.75 | 20040325 | 20340401 | 0 | 20040701 | 2,316.21 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 396,900.00 | 395,230.46 | R/T Refi | Full | 701 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046854 | PETRIE | PHILIP | 14264 W DARTMOUTH AVENUE | Primary | PUD-Detached | 1 | 360 | 357 | 80 | 497,000.00 | 485,000.00 | 0 | 5.5 | 20040423 | 20340501 | 0 | 20040701 | 2,203.02 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 388,000.00 | 386,720.09 | Purchase | Full | 798 | 0.25 | | | 20040601 | NONE | GMACM |
| 359046855 | HAWKINS | ROY | 939 S FORT FISHER BL | Secondary | SFR | 1 | 360 | 356 | 62.63 | 603,500.00 | 0 | 0 | 5.625 | 20040316 | 20340401 | 0 | 20040701 | 2,175.98 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 378,000.00 | 376,372.18 | R/T Refi | Full | 764 | 0.25 | | | 20040501 | NONE | GMACM |
| 359046856 | SCHULER | MARTIN | 6401 ENSLEY LANE | Primary | PUD-Detached | 1 | 360 | 356 | 60.57 | 660,000.00 | 0 | 0 | 5.625 | 20040323 | 20340401 | 0 | 20040701 | 2,301.19 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 399,750.00 | 398,028.49 | R/T Refi | Full | 710 | 0.25 | | | 20040501 | NONE | GMACM |

| LOANID | LNAME | FNAME | STREET | OCC | PROPTYPE | UNITS | OTERM | CORTERM | OLTV | OAPPVAL | PURCPRICE | ORATE | RATE | ODATE | S_MATDATE | OPANDI | NDDATE | PANDI | INDEX | PFRQ | RTRFRQ | FRTRDATE | NRTRDATE | MARGIN | FLOOR | CEILING | CAPINI | CAPINT | OBAL | COBAL | PURPOSE | DOC | FICO | SVCFEE | MERSID | NUMITMESMORETHAN30DAYSPASTDUE | FPDATE | MI | SERVICER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 359046857 | WALTER | NORLAND | 4137 BEACH DRIVE SW | Primary | 2-Family | 2 | 360 | 357 | 69.38 | 1,045,000.00 | 0 | 5.75 | 20040426 | 20340501 | 0 | 20040701 | 4,230.90 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 725,000.00 | 722,718.28 | R/T Refi | Full | 799 | 0.25 | | 2 | 20040601 | NONE | GMACM |
| 359046858 | TRIPLETT | NEAL | 3644 LAUREL CREEK WAY | Primary | PUD-Detached | 1 | 360 | 357 | 80 | 620,000.00 | 600,000.00 | 0 | 5.75 | 20040419 | 20340501 | 0 | 20040801 | 2,725.39 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 480,000.00 | 478,416.59 | Purchase | Full | 749 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046859 | VAHLE | KIRBY | 54 WALKING RAIN RD | Secondary | SFR | 1 | 360 | 357 | 80 | 440,000.00 | 0 | 5.375 | 20040416 | 20340501 | 0 | 20040701 | 2,054.18 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 352,000.00 | 350,791.21 | R/T Refi | Full | 773 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046860 | ADAMS | CECIL | 540 DEERFIELD TRL | Primary | SFR | 1 | 360 | 357 | 62.7 | 917,000.00 | 0 | 5.375 | 20040416 | 20340501 | 0 | 20040701 | 3,219.83 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 575,000.00 | 573,058.40 | C/O Refi | Full | 691 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046861 | LARSON | MICHAEL | 4390 MCDONALD DRIVE CT N | Primary | SFR | 1 | 360 | 356 | 68.04 | 525,000.00 | 0 | 5.5 | 20040322 | 20340401 | 0 | 20040701 | 2,028.14 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 357,200.00 | 355,625.32 | R/T Refi | Full | 794 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046862 | CALLEN | THOMAS | 8195 POMPANO ST | Primary | SFR | 1 | 360 | 357 | 80 | 491,500.00 | 488,000.00 | 0 | 5.5 | 20040415 | 20340501 | 0 | 20040701 | 2,216.65 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 390,400.00 | 389,000.31 | Purchase | Full | 795 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046863 | KREIDEL | JOHN | 977 BEN HOGAN DR | Primary | SFR | 1 | 360 | 357 | 74.86 | 875,000.00 | 0 | 5.5 | 20040421 | 20340501 | 0 | 20040701 | 3,719.02 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 655,000.00 | 652,839.31 | R/T Refi | Full | 690 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046919 | CHEN | DONALD | 20 CORAL REEF | Primary | PUD-Detached | 1 | 360 | 357 | 29.61 | 1,425,000.00 | 0 | 5.75 | 20040330 | 20340501 | 0 | 20040701 | 2,462.68 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 422,000.00 | 420,671.86 | R/T Refi | Full | 751 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046920 | SANDERS | IAN | 1175 TERESA LN | Primary | SFR | 1 | 360 | 357 | 50.72 | 1,575,000.00 | 0 | 5.625 | 20040405 | 20340501 | 0 | 20040701 | 4,598.34 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 798,800.00 | 795,992.25 | R/T Refi | Full | 771 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046922 | FRANCHOCK | DARREN | 184 BEACH 131ST ST | Primary | SFR | 1 | 360 | 357 | 59.39 | 1,150,000.00 | 0 | 5.375 | 20040406 | 20340701 | 0 | 20040701 | 3,824.60 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 683,000.00 | 680,693.71 | R/T Refi | Full | 679 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359044074 | HALL | SIMON | 70 DRAKE ROAD | Primary | SFR | 1 | 360 | 357 | 59.09 | 1,100,000.00 | 1,100,000.00 | 0 | 5.625 | 20040415 | 20340501 | 0 | 20040701 | 3,741.77 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 650,000.00 | 647,905.53 | Purchase | Full | 786 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359044075 | LOPEZ | JOSE | 5811 ARROWHEAD DRIVE | Primary | SFR | 1 | 360 | 357 | 94.91 | 395,000.00 | 387,750.00 | 0 | 5.875 | 20040408 | 20340501 | 0 | 20040701 | 2,176.86 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 368,000.00 | 366,868.90 | Purchase | Full | 726 | 0.25 | | 0 | 20040601 | MGIC | GMACM |
| 359046923 | TEDESCO | RONALD | 525 BUFFLEHEAD DR | Primary | PUD-Detached | 1 | 360 | 357 | 18.16 | 1,900,000.00 | 0 | 5.375 | 20040420 | 20340501 | 0 | 20040701 | 1,931.90 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 345,000.00 | 343,835.03 | R/T Refi | Full | 781 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046924 | ABEL | DAVID | 1427 9TH ST | Primary | SFR | 1 | 360 | 357 | 57.09 | 1,750,000.00 | 0 | 5.5 | 20040331 | 20340401 | 0 | 20040601 | 5,672.21 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 999,000.00 | 995,704.56 | C/O Refi | Full | 704 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046925 | MINTER | TOMMY | 11224 LORENA LN | Primary | SFR | 1 | 360 | 357 | 75 | 809,000.00 | 0 | 5.75 | 20040405 | 20340501 | 0 | 20040701 | 3,540.83 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 606,750.00 | 604,840.42 | C/O Refi | Full | 776 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046927 | MUNSTER | NORAMAE | 743 W 38TH ST | Primary | SFR | 1 | 300 | 297 | 60.56 | 710,000.00 | 0 | 5.5 | 20040409 | 20290501 | 0 | 20040701 | 2,640.58 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 430,000.00 | 427,981.53 | R/T Refi | Full | 725 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046929 | SHOOK | LEE | 3064 SALISBURY RD | Primary | SFR | 1 | 360 | 357 | 59.17 | 845,000.00 | 0 | 5.375 | 20040405 | 20340501 | 0 | 20040701 | 2,799.86 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500,000.00 | 498,311.63 | C/O Refi | Full | 739 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046931 | COLLIER | CHRISTOPHER | 13885 SPRING VALLEY PKY | Primary | PUD-Detached | 1 | 360 | 357 | 70 | 500,000.00 | 0 | 5.625 | 20040407 | 20340501 | 0 | 20040901 | 2,014.80 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 350,000.00 | 348,269.39 | C/O Refi | Full | 743 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046933 | HALVORSEN | RANDALL | 6080 HICKORY CREEK ROAD | Primary | SFR | 1 | 360 | 357 | 74.11 | 705,000.00 | 0 | 5.5 | 20040409 | 20340501 | 0 | 20040801 | 2,966.70 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 522,500.00 | 520,776.40 | R/T Refi | Full | 800 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046934 | SHOENBERGER | PAUL | 1817 ORIOLE DRIVE | Primary | SFR | 1 | 360 | 356 | 60.24 | 680,000.00 | 0 | 5.5 | 20040331 | 20340401 | 0 | 20040701 | 2,325.66 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 409,600.00 | 407,794.32 | R/T Refi | Full | 791 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046938 | DA | ROSA | 787 ARMADA TER | Primary | SFR | 1 | 360 | 357 | 30.25 | 3,200,000.00 | 0 | 5.625 | 20040414 | 20340501 | 0 | 20040701 | 5,572.35 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 968,000.00 | 964,880.87 | R/T Refi | Full | 796 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046942 | DOMINGUEZ | LEONARDO | 51 BRIARWOOD COURT | Primary | SFR | 1 | 360 | 357 | 66.44 | 865,500.00 | 0 | 5.75 | 20040420 | 20340501 | 0 | 20040801 | 3,355.54 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 575,000.00 | 573,190.36 | C/O Refi | Full | 802 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046868 | MERRILL | PAUL | 31 HENDRIK HUDSON WAY | Primary | SFR | 1 | 360 | 357 | 94.99 | 359,000.00 | 359,000.00 | 0 | 5.625 | 20040412 | 20340501 | 0 | 20040701 | 1,962.99 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 341,000.00 | 339,901.21 | Purchase | Full | 772 | 0.25 | | 0 | 20040601 | GEMICO | GMACM |
| 359046869 | SCHNEEMAN | CHRISTOPHER | 1561 PARK CIR | Primary | SFR | 1 | 360 | 357 | 75 | 549,000.00 | 0 | 5.375 | 20040402 | 20340501 | 0 | 20040701 | 2,299.28 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 411,750.00 | 410,243.33 | C/O Refi | Full | 685 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046870 | YOKE | CHARLES | 15441 WEST ECHO CANYON DR | Secondary | PUD-Detached | 1 | 360 | 357 | 60.24 | 654,000.00 | 0 | 5.75 | 20040421 | 20340501 | 0 | 20040701 | 2,299.28 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 394,000.00 | 392,759.99 | R/T Refi | Full | 715 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046871 | NUNNALLY | BRENDA | 17608 GARDEN RIDGE CIRCLE AKA 1 | Primary | SFR | 1 | 360 | 356 | 71.64 | 550,000.00 | 0 | 5.625 | 20040401 | 20340401 | 0 | 20040701 | 2,268.09 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 394,000.00 | 392,299.65 | R/T Refi | Full | 740 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046872 | ELLIS | TERRY | 8682 E COUNTY HWY. 30-A 101 | Secondary | Condo | 1 | 360 | 356 | 80 | 540,000.00 | 520,000.00 | 0 | 5.5 | 20040330 | 20340401 | 0 | 20040801 | 2,362.00 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 416,000.00 | 414,166.11 | Purchase | Full | 735 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046873 | HALL | THOMAS | 497 COSGROVE ST NW | Primary | PUD-Detached | 1 | 360 | 357 | 80 | 520,000.00 | 520,000.00 | 0 | 5.375 | 20040416 | 20340801 | 0 | 20040801 | 2,329.48 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 416,000.00 | 414,595.29 | Purchase | Full | 720 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046874 | HUMMEL | GUY | 7025 19TH AVE NE | Primary | SFR | 1 | 360 | 357 | 79.74 | 725,000.00 | 0 | 5.5 | 20040405 | 20340501 | 0 | 20040701 | 3,282.67 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 578,150.00 | 575,940.08 | R/T Refi | Full | 772 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046875 | SOLLISH | RONALD | 13124 LUDLOW | Primary | SFR | 1 | 360 | 357 | 73.63 | 565,000.00 | 0 | 5.5 | 20040409 | 20340501 | 0 | 20040801 | 2,368.00 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 416,000.00 | 414,627.73 | R/T Refi | Full | 717 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046876 | MOGENTALE | ERIC | 6361 PELICAN BAY BL PH-4 | Secondary | Condo - High | 1 | 360 | 357 | 54.05 | 925,000.00 | 0 | 5.5 | 20040419 | 20340501 | 0 | 20040701 | 2,838.95 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500,000.00 | 498,350.62 | R/T Refi | Full | 746 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046877 | KESSMAN | LAWRENCE | 85 KERI WAY | Primary | SFR | 1 | 360 | 357 | 75 | 1,275,000.00 | 1,255,000.00 | 0 | 5.25 | 20040420 | 20340601 | 0 | 20040601 | 5,197.34 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 941,200.00 | 937,947.04 | Purchase | Full | 767 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046879 | UNDERBERGER | STEVEN | 708 MEXICO PLACE | Primary | SFR | 1 | 360 | 357 | 38.25 | 1,830,000.00 | 0 | 5.625 | 20040421 | 20340501 | 0 | 20040701 | 4,029.59 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 700,000.00 | 697,744.44 | R/T Refi | Full | 744 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046880 | NABAL | EDWIN | 1054 N ANTONIO CIR | Primary | SFR | 1 | 360 | 357 | 42.57 | 895,000.00 | 0 | 5.625 | 20040414 | 20340501 | 0 | 20040701 | 1,672.89 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 381,000.00 | 379,472.42 | R/T Refi | Full | 679 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046882 | KNIPP | LESLIE | 312 VIA PASQUAL | Primary | SFR | 1 | 360 | 357 | 68.42 | 950,000.00 | 0 | 5.75 | 20040402 | 20340501 | 0 | 20040701 | 3,793.22 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 650,000.00 | 647,954.32 | R/T Refi | Full | 685 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046883 | MUKHERJEE | JOY | 315 N FORSYTH | Primary | SFR | 1 | 360 | 357 | 47.62 | 1,050,000.00 | 0 | 5.5 | 20040414 | 20340501 | 0 | 20040701 | 2,838.95 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500,000.00 | 498,202.74 | Cons/Perm | Full | 746 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046884 | MOE | ANDREW | 1440 LINDA SUE LN | Primary | PUD-Detached | 1 | 360 | 357 | 63.91 | 665,000.00 | 0 | 5.75 | 20040401 | 20340501 | 0 | 20040701 | 2,480.18 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 425,000.00 | 423,486.77 | R/T Refi | Full | 701 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046885 | BROWN | MICHAEL | 22 PORTMARNOCH CT | Primary | SFR | 1 | 360 | 357 | 56 | 1,400,000.00 | 0 | 5.5 | 20040402 | 20340501 | 0 | 20040701 | 4,451.47 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 784,000.00 | 781,413.17 | R/T Refi | Full | 786 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046886 | DURNELL | JOHN | 1525 CHELSEA RD | Primary | SFR | 1 | 360 | 357 | 61.66 | 1,600,000.00 | 0 | 5.5 | 20040420 | 20340501 | 0 | 20040701 | 5,601.24 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 986,500.00 | 982,843.36 | R/T Refi | Full | 759 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046887 | TODD | RICHARD | 1056 TELLEM DR | Primary | SFR | 1 | 360 | 357 | 42.06 | 1,750,000.00 | 0 | 5.375 | 20040408 | 20340501 | 0 | 20040701 | 4,121.39 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 736,000.00 | 733,435.42 | R/T Refi | Full | 765 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046888 | TUCKER | ANN | 430 S LAKE JESSUP AVE | Primary | SFR | 1 | 360 | 357 | 70.79 | 600,000.00 | 0 | 5.5 | 20040408 | 20340501 | 0 | 20040701 | 2,411.68 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 424,750.00 | 423,348.87 | R/T Refi | Full | 717 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046889 | VITTIMBERGA | KERRI | 4 SOMERSET DR | Primary | SFR | 1 | 360 | 357 | 72.78 | 850,000.00 | 0 | 5.375 | 20040412 | 20340501 | 0 | 20040701 | 3,463.98 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 618,600.00 | 616,510.90 | C/O Refi | Full | 703 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046890 | ANDREWS | JOHN | 32702 ROSEMONT DR | Primary | SFR | 1 | 360 | 356 | 63.06 | 800,000.00 | 0 | 5.625 | 20040319 | 20340401 | 0 | 20040701 | 2,904.59 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 504,500.00 | 501,931.17 | R/T Refi | Full | 742 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046891 | MOE | ERIC | 12805 SHOREWOOD DR SW | Primary | SFR | 1 | 360 | 357 | 77.41 | 518,000.00 | 0 | 5.5 | 20040406 | 20340501 | 0 | 20040701 | 2,276.83 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 401,000.00 | 399,382.79 | R/T Refi | Full | 650 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046893 | PAVLOVIC | DRAGAN | 20421 HARRY RD | Primary | SFR | 1 | 360 | 357 | 37.08 | 1,200,000.00 | 0 | 5.625 | 20040405 | 20340501 | 0 | 20040701 | 2,561.67 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 445,000.00 | 442,730.24 | R/T Refi | Full | 673 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046895 | COLLINS | JEREMY | 12335 FREDERICKSBURG DRIVE | Primary | SFR | 1 | 360 | 357 | 69.72 | 1,250,000.00 | 0 | 5.625 | 20040408 | 20340601 | 0 | 20040801 | 5,016.85 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 871,500.00 | 868,607.87 | R/T Refi | Full | 727 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046896 | BEAMISH | DAVID | 23569 SANDSTONE | Primary | SFR | 1 | 360 | 356 | 55.37 | 990,000.00 | 0 | 5.625 | 20040323 | 20340401 | 0 | 20040701 | 3,155.75 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 548,200.00 | 545,838.22 | C/O Refi | Full | 752 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046897 | GREENFIELD | ROBERT | 2916 AMERICAN SADDLER DR | Primary | SFR | 1 | 360 | 357 | 67.08 | 1,200,000.00 | 0 | 5.75 | 20040416 | 20340501 | 0 | 20040701 | 4,697.76 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 805,000.00 | 802,466.49 | R/T Refi | Full | 758 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046898 | CALDWELL | DANA | 1245 PENINSULA DR | Secondary | SFR | 1 | 360 | 357 | 79.17 | 480,000.00 | 480,000.00 | 0 | 5.5 | 20040323 | 20340401 | 0 | 20040801 | 2,217.58 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 380,000.00 | 378,541.09 | Purchase | Full | 774 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046899 | BOULANGER | BRUCE | 22736 BARLOVENTO | Primary | SFR | 1 | 360 | 356 | 48.91 | 805,000.00 | 0 | 5.5 | 20040323 | 20340401 | 0 | 20040801 | 2,235.39 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 393,700.00 | 391,625.99 | R/T Refi | Full | 723 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046901 | ESAIL | DAMON | 21075 WOOD HOLLOW LN | Primary | SFR | 1 | 360 | 356 | 69.23 | 650,000.00 | 0 | 5.75 | 20040324 | 20340401 | 0 | 20040701 | 2,626.08 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 450,000.00 | 447,095.10 | C/O Refi | Full | 664 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046865 | EVANOFF | FRANK | 13331 LAKESHORE | Primary | SFR | 1 | 360 | 357 | 69.91 | 545,000.00 | 0 | 5.5 | 20040326 | 20340401 | 0 | 20040721 | 2,163.28 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 381,000.00 | 379,141.71 | R/T Refi | Full | 751 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046866 | PANSICK | BOB | 17523 OAK MOUNT PL | Primary | PUD-Detached | 1 | 360 | 357 | 80 | 685,000.00 | 677,000.00 | 0 | 5.375 | 20040412 | 20340501 | 0 | 20040701 | 3,069.61 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 541,800.00 | 537,028.02 | Purchase | Full | 786 | 0.25 | | 0 | 20040601 | NONE | GMACM |
| 359046867 | KRATZKE | TIMOTHY | 6288 OXFORD ROAD SOUTH | Primary | SFR | 1 | 360 | 356 | 80 | 450,000.00 | 0 | 5.375 | 20040401 | 20340401 | 0 | 20040701 | 2,100.86 | FIX | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 360,000.00 | 358,485.72 | R/T Refi | Full | 788 | 0.25 | | 0 | 20040601 | NONE | GMACM |

## ATTACHMENT 2

## PURCHASE AGREEMENT

## ATTACHMENT 3

### SERVICING AGREEMENT

# **APPENDIX II**

Sale and Servicing Agreement

[Attached hereto]

Execution Copy

MASTER FLOW SALE AND SERVICING AGREEMENT
Dated and effective as of August 1, 2003

BANC OF AMERICA MORTGAGE CAPITAL CORPORATION
(Initial Owner)

and

GMAC MORTGAGE CORPORATION
(Company)

Fixed Rate Conventional Mortgage Loans

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ..................................................................................................2

ARTICLE II CONVEYANCE OF MORTGAGE LOANS; POSSESSION OF MORTGAGE
FILES; BOOKS AND RECORDS; DELIVERY OF MORTGAGE LOAN DOCUMENTS ......11
    Section 2.01   Conveyance of Mortgage Loans; Possession of Mortgage Files. ....................11
    Section 2.02   Books and Records..........................................................................................12
    Section 2.03   Delivery of the Collateral File........................................................................12

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE COMPANY;
REPURCHASE AND SUBSTITUTION; REVIEW OF MORTGAGE LOANS ........................14
    Section 3.01   Representations and Warranties of the Company. ...........................................14
    Section 3.02   Representations and Warranties as to Individual Mortgage Loans..................16
    Section 3.03   Repurchase and Substitution. .........................................................................23

ARTICLE IV ADMINISTRATION AND SERVICING OF MORTGAGE LOANS..................24
    Section 4.01   Company to Act as Servicer............................................................................24
    Section 4.02   Liquidation of Mortgage Loans; Servicing Advances and Foreclosure...........25
    Section 4.03   Collection of Mortgage Loan Payments. .........................................................26
    Section 4.04   Establishment of Custodial Account; Deposits in Custodial Account.............26
    Section 4.05   Withdrawals From the Custodial Account........................................................28
    Section 4.06   Establishment of Escrow Account; Deposits in Escrow Account. ...................29
    Section 4.07   Withdrawals From Escrow Account.................................................................29
    Section 4.08   Payment of Taxes, Insurance and Other Charges. ...........................................30
    Section 4.09   Transfer of Accounts......................................................................................30
    Section 4.10   Maintenance of Hazard Insurance...................................................................30
    Section 4.11   Maintenance of Blanket Insurance Policy........................................................31
    Section 4.12   Maintenance of Mortgage Impairment Insurance Policy.................................32
    Section 4.13   Fidelity Bond; Errors and Omissions Insurance. ............................................32
    Section 4.14   Title, Management and Disposition of REO Property. ....................................32
    Section 4.15   Reserved. ........................................................................................................34
    Section 4.16   Inspections......................................................................................................34
    Section 4.17   Restoration of Mortgaged Property..................................................................34
    Section 4.18   Maintenance of Primary Insurance Policy; Claims..........................................35
    Section 4.19   Real Estate Owned Reports.............................................................................35
    Section 4.20   Liquidation Reports.........................................................................................36
    Section 4.21   Reports of Foreclosures and Abandonments of Mortgaged Property. .............36
    Section 4.22   Disaster Recovery/Business Continuity Plan...................................................36

ARTICLE V PAYMENTS TO THE OWNER ........................................................................36
    Section 5.01   Distributions...................................................................................................36
    Section 5.02   Statements to the Owner. ................................................................................37

Section 5.03    P&I Advances by the Company. ..................................................37
Section 5.04    Prepayment Interest Shortfalls. ............................................38


ARTICLE VI GENERAL SERVICING PROCEDURE...............................................38
Section 6.01    Assumption Agreements. ......................................................38
Section 6.02    Release of Mortgage Files; Wrongful Satisfaction of Mortgages. ..................39
Section 6.03    Servicing Compensation. ......................................................39
Section 6.04    Annual Statement as to Compliance. ..........................................39
Section 6.05    Annual Independent Public Accountants' Servicing Report. ........................40
Section 6.06    Owner's Right to Examine the Company Records. ...............................40
Section 6.07    Compliance with REMIC Provisions. ..........................................40
Section 6.08    Fair Credit Reporting Act Compliance. ........................................40

ARTICLE VII REPORTS TO BE PREPARED BY THE COMPANY ......................................40
Section 7.01    The Company Shall Provide Access and Information as Reasonably Required.40
Section 7.02    Financial Statements. ..........................................................41
Section 7.03    Cooperation with Third-Party Service Providers. ..............................41

ARTICLE VIII THE COMPANY ...................................................................41
Section 8.01    Indemnification; Third Party Claims. .........................................41
Section 8.02    Merger or Consolidation of the Company. ......................................42
Section 8.03    Company Not to Resign. .......................................................42

ARTICLE IX DEFAULT .........................................................................42
Section 9.01    Events of Default...............................................................42
Section 9.02    Waiver of Defaults. ...........................................................44

ARTICLE X TERMINATION ......................................................................44
Section 10.01    Termination. .................................................................44
Section 10.02    Termination Without Cause ....................................................44

ARTICLE XI MISCELLANEOUS PROVISIONS .....................................................45
Section 11.01    Successor to the Company. ....................................................45
Section 11.02    Repurchases and Related Assurances. ..........................................46
Section 11.03    Amendment. ..................................................................46
Section 11.04    Reserved. ....................................................................46
Section 11.05    Duration of Agreement. .......................................................46
Section 11.06    Governing Law................................................................46
Section 11.07    Notices.......................................................................47
Section 11.08    Severability of Provisions. ....................................................47
Section 11.09    No Partnership................................................................47
Section 11.10    Counterparts. .................................................................47
Section 11.11    Successors and Assigns. .......................................................47
Section 11.12    Intention of the Parties. ......................................................47
Section 11.13    Solicitation of Mortgagor. .....................................................48
Section 11.14    Further Agreements............................................................48

Section 11.15   Confidential Information...............................................................................48
Section 11.16   Exhibits. ...............................................................................................................49
Section 11.17   General Interpretive Principles. ..............................................................49

ARTICLE XII WHOLE LOAN TRANSFER; PASS-THROUGH TRANSFER ........................49
Section 12.01   Removal of Mortgage Loans from Inclusion under this Agreement upon a
Whole Loan Transfer or a Pass-Through Transfer on One or More Reconstitution Dates .......49

## EXHIBITS

Exhibit A        Contents of Mortgage Files

Exhibit B        Custodial Account Letter Agreement

Exhibit C        Escrow Account Letter Agreement

Exhibit D        Form of Request for Release of Documents

Exhibit E        Form of Monthly Remittance Advice

Exhibit F        Underwriting Standards

Exhibit G        SEC Certification

Exhibit H        Form of Assignment and Conveyance

This is a Master Flow Sale and Servicing Agreement, dated and effective as of August 1, 2003, and is executed between Banc of America Mortgage Capital Corporation, a North Carolina corporation, as purchaser and initial owner (hereinafter, the "Initial Owner"), and GMAC Mortgage Corporation, a Pennsylvania corporation, as seller and servicer (the "Company"). The Initial Owner has agreed to purchase from time to time, from the Company and the Company has agreed to sell, from time to time, to the Initial Owner, certain conventional fixed rate residential mortgage loans (the "Mortgage Loans") as described herein on a servicing retained basis, which shall be delivered in groups of whole loans on various dates as provided herein (each a "Closing Date").

Each Mortgage Loan is secured by first lien mortgages or deeds of trust on residential dwellings located in the jurisdiction indicated on the Mortgage Loan Schedule.

The Initial Owner and the Company wish to prescribe the manner of conveyance, servicing and control of the Mortgage Loans.

In consideration of the premises and the mutual agreements hereinafter set forth, the Initial Owner and the Company agree as follows:

ARTICLE I

DEFINITIONS

Whenever used herein, the following words and phrases, unless the context otherwise requires, shall have the following meanings:

"Agreement": This Master Flow Sale and Servicing Agreement, including all exhibits hereto, and all amendments hereof and supplements hereto.

"ALTA": The American Land Title Association.

"Appraisal": A written appraisal of a Mortgaged Property made by a qualified appraiser satisfying the requirements of Title XI of The Financial Institutions Reform, and Enforcement Act of 1989, as amended, and the regulations promulgated thereunder, which appraisal must be written, in form and substance, to FDIC, Fannie Mae and Freddie Mac standards, and must meet the appraisal standards of the Uniform Standards of Professional Appraisal Practice.

"Appraised Value": The amount set forth in an Appraisal in connection with the origination of each Mortgage Loan as the value of the Mortgaged Property, or, if the Mortgage Loan is a refinanced Mortgage Loan processed and originated under the Company's "express refinance," "streamline refinance," "GM family" or "select processing" program (as described in the Company's underwriting guidelines attached hereto as Exhibit F) the Appraised Value shall equal the amount indicated on the Company's servicing system as the appraised value of the Mortgaged Property; or if the Mortgage Loan is a purchase Mortgage Loan originated under the Company's "select processing" or "GM family" programs (as described in the Company's underwriting guidelines attached hereto as Exhibit F) the Appraised Value shall equal the amount of the purchase price of the Mortgaged Property.

"Assignment and Conveyance": An assignment and conveyance with respect to the Mortgage Loans purchased on a Closing Date in the form annexed hereto as Exhibit H.

"Assignment of Mortgage": An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form (but not recorded) that, when properly completed and recorded, is sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect of record the sale of the Mortgage Loan to the Owner.

"Assumed Principal Balance": As to each Mortgage Loan as of any date of determination, (i) the principal balance of the Mortgage Loan outstanding as of the related Cut-off Date after application of payments due on or before the related Cut-off Date, whether or not received, minus (ii) all amounts previously distributed to the Owner with respect to the Mortgage Loan pursuant to Section 5.01 and representing (a) payments or other recoveries of principal or (b) advances of scheduled principal payments made pursuant to Section 5.03.

"Business Day": Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking or savings and loan institutions in the Commonwealth of Pennsylvania, State of Iowa or State of New York are authorized or obligated by law or executive order to be closed.

2

"Closing Date": The date or dates on which the Initial Owner, from time to time, shall purchase and the Company, from time to time, shall sell to the Initial Owner, the Mortgage Loans listed on the Mortgage Loan Schedule with respect to the related Mortgage Loan Package.

"Code": The Internal Revenue Code of 1986, as it may be amended from time to time or any successor statute thereto, and applicable U.S. Department of the Treasury regulations issued pursuant thereto.

"Collateral File": The documents outlined in Section 2.03 required to be delivered to the Owner under same.

"Company": GMAC Mortgage Corporation, a Pennsylvania corporation, or its successor in interest or any successor to the Company under this Agreement appointed as herein provided.

"Condemnation Proceeds": All awards or settlements in respect of a taking of an entire Mortgaged Property by exercise of the power of eminent domain or condemnation.

"Consumer Information": Information including but not limited to all personal information about any Mortgagor that is supplied to the Company by or on behalf of the Mortgagor.

"Custodial Account": The separate account or accounts created and maintained pursuant to Section 4.04.

"Custodian": The custodian, or its successor in interest or assigns, under a certain custodial agreement governing the retention of the originals of each Mortgage Note, Mortgage, Assignment of Mortgage and other documents upon purchase of the Mortgage Loans by the Initial Owner.

"Curtailment": Any Principal Prepayment made by a Mortgagor that is not a Full Principal Prepayment.

"Customary Servicing Procedures": Procedures (including collection procedures) using the same care that the Company customarily employs and exercises in servicing and administering mortgage loans for its own account giving due consideration to accepted mortgage servicing practices.

"Cut-off Date": The first day of the month in which the respective Closing Date occurs or if the first day of such month is not a Business Day, the first Business Day immediately following.

"Deleted Mortgage Loan": A Mortgage Loan which is repurchased by the Company in accordance with the terms of this Agreement or which is replaced or to be replaced with a Qualified Substitute Mortgage Loan in accordance with the terms of this Agreement.

"Determination Date": The 16th day (or if such 16th day is not a Business Day, the Business Day immediately preceding such 16th day) of the month of the related Remittance Date.

3

"Due Date": The day of the month on which each Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

"Due Period": With respect to each Remittance Date, the period beginning on the second day of the month preceding the month of the Remittance Date, and ending on the first day of the month of the Remittance Date.

"Eligible Depository Institution": An account or accounts maintained with a depository institution which is acceptable to Fannie Mae or Freddie Mac for establishment of custodial accounts.

"Eligible Investments": Any one or more of the following obligations or securities:

(i)    obligations of or guaranteed as to principal and interest by the United States, Freddie Mac, Fannie Mae or any agency or instrumentality of the United States when such obligations are backed by the full faith and credit of the United States; provided, that such obligations of Freddie Mac or Fannie Mae shall be limited to senior debt obligations and mortgage participation certificates except that investments in mortgage-backed or mortgage participation securities with yields evidencing extreme sensitivity to the rate of principal payments on the underlying mortgages shall not constitute Eligible Investments hereunder;

(ii)    repurchase agreements (which must be fully collateralized) on obligations specified in clause (i) maturing not more than one month from the date of acquisition thereof;

(iii)    federal funds, certificates of deposit, demand deposits, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days or a remaining maturity of more than 30 days) denominated in United States dollars of any U.S. depository institution or trust company incorporated under the laws of the United States or any state thereof or of any domestic branch of a foreign depository institution or trust company;

(iv)    commercial paper (having original maturities of not more than 365 days) of any corporation incorporated under the laws of the United States or any state thereof which are rated at least "A-1" or "P-1" by S & P and Moody's, respectively;

(v)    obligations of major foreign commercial banks, limited to Eurodollar deposits, time deposits, certificate of deposits, bankers acceptances, Yankee Bankers acceptances and Yankee certificate of deposits;

(vi)    obligations of major foreign corporations limited to commercial paper, auction rate preferred stock, medium term notes, master notes and loan participations;

(vii)    money market funds comprised of securities described in the aforementioned clauses (i) through (iv) and having a stated policy of maintaining a set net

4

asset value per share (a "Money Market Fund"). All Money Market Funds will conform to Rule 2a-7 of the Investment Company Act of 1940;

provided, however, that no instrument shall be an Eligible Investment if it represents, either (1) the right to receive only interest payments with respect to the underlying debt instrument or (2) the right to receive both principal and interest payments derived from obligations underlying such instrument and the principal and interest with respect to such instrument provide a yield to maturity greater than 120% of the yield to maturity at par of such underlying obligations.

"Escrow Account": The separate account or accounts created and maintained pursuant to Section 4.06.

"Escrow Payments": The amounts constituting taxes, assessments, mortgage insurance premiums, fire and hazard insurance premiums and other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to any Mortgage Loan.

"Event of Default": Any one of the conditions or circumstances enumerated in Section 9.01.

"Fannie Mae": The Federal National Mortgage Association or any successor organization.

"Fidelity Bond": A fidelity bond required to be maintained by the Company pursuant to Section 4.13.

"FDIC": The Federal Deposit Insurance Corporation or any successor organization.

"Freddie Mac": The Federal Home Loan Mortgage Corporation or any successor organization.

"Full Principal Prepayment": A Principal Prepayment made by a Mortgagor of the entire principal balance of a Mortgage Loan.

"HUD": The Department of Housing and Urban Development or any successor organization.

"Initial Owner": Banc of America Mortgage Capital Corporation, a North Carolina corporation.

"Insurance Proceeds": Proceeds of any Primary Insurance Policy, title policy, hazard policy or other insurance policy covering a Mortgage Loan, if any, to the extent such proceeds are not to be applied to the restoration of the related Mortgaged Property or released to the Mortgagor in accordance with Customary Servicing Procedures or in accordance with the terms of the related Mortgage Loan or applicable law.

"Liquidation Proceeds": Cash, other than Insurance Proceeds, Condemnation Proceeds or REO Disposition Proceeds, received in connection with the liquidation of a defaulted

5

Mortgage Loan, whether through the sale or assignment of the Mortgage Loan, trustee's sale, foreclosure sale or otherwise.

"Loan-to-Value Ratio" or "LTV": With respect to any Mortgage Loan, the original principal balance of such Mortgage Loan divided by the Appraised Value of the related Mortgaged Property.

"MERS": Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

"MERS® System": The system of recording transfers of Mortgages electronically maintained by MERS.

"Monthly Payment": The scheduled monthly payment of principal and interest on a Mortgage Loan which is payable by a Mortgagor under the related Mortgage Note.

"Moody's": Moody's Investor Services, Inc. or any successor thereto.

"Mortgage": The mortgage, deed of trust or other instrument creating a first lien on or first priority ownership interest in an estate in fee simple, in real property securing a Mortgage Note, including any rider incorporated by reference therein.

"Mortgage File": The documents, records and other items referred to in Exhibit A annexed hereto pertaining to a particular Mortgage Loan.

"Mortgage Interest Rate": The annual rate at which interest accrues on any Mortgage Loan in accordance with the provisions of the related Mortgage Note.

"Mortgage Loan": An individual mortgage loan that is the subject of this Agreement, each mortgage loan originally sold and subject to this Agreement being identified on the Mortgage Loan Schedule.

"Mortgage Loan Package": A pool or group of Mortgage Loans purchased on a Closing Date, as described in the Mortgage Loan Schedule annexed to the related Assignment and Conveyance.

"Mortgage Loan Remittance Rate": As to each Mortgage Loan, the annual rate of interest required to be remitted hereunder to the Owner, which shall be equal to the related Mortgage Interest Rate minus the related Servicing Fee.

"Mortgage Loan Schedule": With respect to each Mortgage Loan Package, the schedule of Mortgage Loans annexed to the related Assignment and Conveyance, such schedule setting forth the following information as to each Mortgage Loan, as applicable: (a) the Mortgage Loan identifying number, (b) state and zip code of the Mortgaged Property, (c) the Mortgage Interest Rate, (d) the original principal balance of the Mortgage Loan, (e) principal balance of the Mortgage Loan as of the Cut-off Date after deduction of payments of principal due on or before the Cut-off Date, whether or not collected, (f) the first payment date, (g) a code indicating whether the Mortgaged Property is occupied by the owner (and, if so, whether it is occupied as a

primary, secondary or vacation residence), (h) the purpose of the Mortgage Loan, (i) the "MIN" or mortgage identification number indicating loans registered with MERS, (j) a code indicating whether the Mortgaged Property is a single family residence, two-family residence, three-family residence, four-family residence, PUD or Condominium, (k) the Monthly Payment, (l) the original term to maturity, (m) the scheduled maturity date, (n) LTV Ratio, (o) a code indicating the name of the issuer of the Primary Insurance Policy and (p) the Appraised Value.

"Mortgage Note":  The note or other evidence of the indebtedness of a Mortgagor secured by the related Mortgage.

"Mortgaged Property":  The real property and improvements subject to a Mortgage, constituting security for repayment of the debt evidenced by the related Mortgage Note.

"Mortgagor": The obligor on a Mortgage Note.

"Nonrecoverable Advance":  Any advance previously made by the Company pursuant to Section 5.03 or Section 5.04 or any expenses incurred pursuant to Section 4.08 which, in the good faith judgment of the Company, may not be ultimately recoverable by the Company from Liquidation Proceeds. The determination by the Company that it has made a Nonrecoverable Advance, shall be evidenced by an Officer's Certificate of the Company delivered to the Owner and detailing the reasons for such determination.

"Officers' Certificate":  A certificate signed by the President, a Senior Vice President or a Vice President and by the Treasurer or the Secretary or one of the Assistant Secretaries of the Company, or by other duly authorized officers or agents of the Company, and delivered to the Owner as required by this Agreement.

"Opinion of Counsel":  A written opinion of counsel, who may be salaried counsel employed by the Company.

"Owner":  The Initial Owner and any successor or assign to this Agreement of the Initial Owner or an Owner.

"P&I Advance":  As to any Mortgage Loan, any advance made by the Company pursuant to Section 5.03.

"Pass-Through Transfer":  The sale or transfer of some or all of the Mortgage Loans by the Initial Owner to a trust to be formed as part of a publicly issued or privately placed mortgage-backed securities transaction.

"Person":  Any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Prepayment Interest Shortfall":  As to any Remittance Date and any Mortgage Loan, (a) if such Mortgage Loan was the subject of a Full Principal Prepayment during the related Principal Prepayment Period, the excess of one month's interest (adjusted to the Mortgage Loan Remittance Rate) on the Assumed Principal Balance of such Mortgage Loan outstanding

immediately prior to such prepayment, over the amount of interest (adjusted to the Mortgage Loan Remittance Rate) actually paid by the Mortgagor in respect of such Principal Prepayment Period, and (b) if such Mortgage Loan was the subject of a Curtailment during the related Principal Prepayment Period, an amount equal to one month's interest at the Mortgage Loan Remittance Rate on the amount of such Curtailment.

"Primary Insurance Policy": With respect to each Mortgage Loan, the primary policy of mortgage insurance in effect, or any replacement policy therefor obtained by the Company pursuant to Section 4.08.

"Principal Prepayment": Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any prepayment penalty or premium thereon, and is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

"Principal Prepayment Period": As to any Remittance Date, the calendar month preceding the calendar month in which such Remittance Date occurs.

"Purchase Price": The price paid on the related Closing Date by the Initial Owner to the Company for the Mortgage Loans, as calculated as set forth in the Purchase Price and Terms Letter.

"Purchase Price and Terms Letter": With respect to any Mortgage Loan Package purchased and sold on any Closing Date, the letter agreement between the Initial Owner and the Company, setting forth the terms and conditions of such transaction and describing the Mortgage Loans to be purchased by the Initial Owner on such Closing Date.

"Qualified Substitute Mortgage Loan": A mortgage loan substituted by the Company for a Deleted Mortgage Loan which must, on the date of such substitution, (i) have a principal balance at the time of substitution not in excess of the principal balance of the Deleted Mortgage Loan (the amount of any difference being deemed to be a principal payment to be credited to or deposited by the Company in the Custodial Account), (ii) have a Mortgage Interest Rate not less than and not more than 1% greater than that of the Deleted Mortgage Loan, (iii) have a remaining maturity not later than and not more than one year less than the remaining maturity of the Deleted Mortgage Loan and (iv) be, in the reasonable determination of the Company of the same type, quality and character as the Deleted Mortgage Loan as if the breach had not occurred.

"Rating Agency": Each of Fitch, Inc., Moody's, and S & P, or any successor thereto.

"Reconstitution Agreement": The agreement or agreements entered into by the Company and the Owner and certain third parties on any Reconstitution Date or Dates with respect to any or all of the Mortgage Loans serviced hereunder, in connection with a Whole Loan Transfer or a Pass-Through Transfer as provided in Section 12.01.

"Reconstitution Date": The date or dates on which any or all of the Mortgage Loans serviced under this Agreement shall be removed from this Agreement and reconstituted as part of a Whole Loan Transfer or Pass-Through Transfer pursuant to Section 12.01 hereof. On such

8

date, the Mortgage Loans transferred shall cease to be covered by this Agreement and the Company shall cease to service such Mortgage Loans under this Agreement.

"Record Date": The close of business of the last Business Day of the month preceding the month of the related Remittance Date.

"Refinanced Mortgage Loan": A Mortgage Loan that was made to a Mortgagor who owned the Mortgaged Property prior to the origination of such Mortgage Loan.

"REMIC": A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

"REMIC Provisions": Provisions of the federal income tax law relating to a REMIC, which appear at Section 860A through 860G of Subchapter M of Chapter 1, Subtitle A of the Code, and related provisions, and regulations, rulings or pronouncements promulgated thereunder, as the foregoing may be in effect from time to time

"Remittance Date": The 18th day of any month, or if such 18th day is not a Business Day, the first Business Day immediately following.

"REO Disposition": The final sale by the Company of a Mortgaged Property acquired by the Company in foreclosure or by deed in lieu of foreclosure.

"REO Disposition Proceeds": All amounts received with respect to an REO Disposition pursuant to Section 4.14.

"REO Property": A Mortgaged Property acquired by the Company through foreclosure or deed in lieu of foreclosure, as described in Section 4.14.

"Repurchase Price": With respect to any Mortgage Loan to be repurchased by the Company pursuant to Section 3.03, an amount equal to the Assumed Principal Balance of such Mortgage Loan as of the date of such repurchase, plus interest on such Assumed Principal Balance at the Mortgage Loan Remittance Rate from the date to which interest has last been paid to the day prior to the day of the repurchase, plus with regard to any Mortgage Loan subject to a Pass-Through Transfer, any costs and damages incurred by a related trust in connection with any violation by such Mortgage Loan of any predatory or abusive lending law.

"S & P": Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies Inc., or any successor thereto.

"Servicing Advances": All customary, reasonable and necessary "out of pocket" costs and expenses incurred in the performance by the Company of its servicing obligations, including, but not limited to, the cost of (a) the preservation, restoration and protection of the Mortgaged Property, (b) any enforcement or judicial proceedings, including foreclosures, (c) the management and liquidation of REO Property pursuant to Section 4.14 and (d) compliance with the Company's obligations described in Section 4.08.

"Servicing Fee": The amount of the annual fee the Owner shall pay to the Company, equal to .25% of the outstanding principal amount of each Mortgage Loan. Such fee shall be payable monthly and shall be computed on the basis of the same principal amount and for the period respecting which any related interest payment on a Mortgage Loan is computed.

"Servicing Officer": Any officer of the Company involved in, or responsible for, the administration and servicing of the Mortgage Loans whose name appears on a list of servicing officers furnished by the Company to the Owner upon request, as such list may from time to time be amended.

"Whole Loan Transfer": Any sale or transfer of all of the Mortgage Loans by the Initial Owner to a third party.

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS; POSSESSION OF MORTGAGE FILES; BOOKS
AND RECORDS; DELIVERY OF MORTGAGE LOAN DOCUMENTS

Section 2.01    Conveyance of Mortgage Loans; Possession of Mortgage Files.

(a)    The Company, in exchange for the payment of the applicable Purchase Price by
the Initial Owner on the related Closing Date, shall sell, transfer, assign, set over and convey to
the Initial Owner, without recourse, but subject to the terms of this Agreement, all of its rights,
title and interest in and to the Mortgage Loans in that Mortgage Loan Package having an
aggregate principal balance on the related Cut-off Date in an amount as set forth in the related
Purchase Price and Terms Letter, or in such other amount as agreed to by the Initial Owner and
the Company as evidenced by the actual aggregate principal balance of such Mortgage Loan
Package accepted by the Initial Owner on the related Closing Date, together with the related
Mortgage Files and all rights and obligations arising under the documents contained therein.

(b)    On each Closing Date, the Initial Owner shall be entitled to receive all interest
and principal received by the Company on or with respect to the Mortgage Loans in the related
Mortgage Loan Packages after the related Cut-off Date (other than payments of principal and
interest due on the Mortgage Loans on or before such Cut-off Date).  The Company shall deliver
to the Initial Owner the Mortgage Loan Schedule at least two (2) Business Days prior to the
related Closing Date.  Pursuant to Section 2.03 hereof, the Company shall deliver a portion of
each Mortgage File to the Owner.  The contents of each Mortgage File not delivered to the
Owner shall be held in trust by the Company for the benefit of the Owner as the owner thereof
and the Company's possession of the portion of each Mortgage File so retained shall be at the
will of the Owner for the sole purpose of servicing the related Mortgage Loan, and such retention
and possession by the Company shall be in a custodial capacity only.  On the related Closing
Date, the ownership of each Mortgage Note, Mortgage and each related Mortgage File shall be
vested in the Owner and the ownership of all records and documents with respect to each related
Mortgage Loan prepared by or which come into the possession of the Company shall
immediately vest in the Owner and shall be retained and maintained, in trust, by the Company at
the will of the Owner in such custodial capacity only.  The Mortgage File may be retained in
microfilm, microfiche, optical storage or magnetic media in lieu of hard copy.  The Company
shall maintain records (i) confirming the sale of the related Mortgage Loan to the Owner and (ii)
confirming the Owner's ownership interest in the Mortgage File.  The Company shall release
from its custody the contents of any Mortgage File only in accordance with written instructions
from the Owner, unless such release is required as incidental to the Company's servicing of the
Mortgage Loans or is in connection with a repurchase of any Mortgage Loan or the removal of
any Mortgage Loan or related REO Property from the terms of this Agreement pursuant to
Section 3.03 in which case such written instructions shall not be required.

(c)    The Purchase Price for the Mortgage Loans in each Mortgage Loan Package shall
be the percentage of par as stated in or as otherwise calculated pursuant to the related Purchase
Price and Terms Letter (subject to adjustment as provided therein), plus accrued interest on the
aggregate scheduled principal balance of such Mortgage Loans at the weighted average
Mortgage Loan Remittance Rate from the related Cut-off Date through the day prior to the

11

related Closing Date inclusive. The initial principal amount of such Mortgage Loans shall be the aggregate principal balance of such Mortgage Loans, so computed as of the related Cut-off Date, after application of scheduled payments of principal due on or before the related Cut-off Date, whether or not collected. Such payments shall be made to the account designated by the Company by wire transfer of immediately available funds.

Section 2.02    Books and Records.

(a)    Notwithstanding the sale of the Mortgage Loans to the Owner, record title to each Mortgage and the related Mortgage Note shall continue in the name of the Company and be retained by the Company in trust for the Owner for the sole purpose of facilitating the servicing and the supervision of the servicing of the Mortgage Loans. All rights arising out of the Mortgage Loans including, but not limited to, all funds received on or in connection with a Mortgage Loan shall be held by the Company in trust for the benefit of the Owner as the owner of the Mortgage Loans, subject to subsequent deduction of amounts to which the Company is entitled pursuant to the terms of this Agreement.

(b)    The sale of each Mortgage Loan shall be reflected on the Company's balance sheet and other financial statements as a sale of assets by the Company. The Company shall be responsible for maintaining, and shall maintain, a complete set of books and records for each Mortgage Loan, which shall be clearly marked to reflect the ownership of each Mortgage Loan by the Owner.

Section 2.03    Delivery of the Collateral File.

(a)    The Company shall, on or prior to each Closing Date, deliver to the Initial Owner or its designee each of the following documents for each Mortgage Loan in the related Mortgage Loan Package:

(i)    The original Mortgage Note endorsed, "Pay to the order of _____, without recourse" and signed in the name of the Company by an authorized officer. Such signature may be an original signature or a facsimile signature of such officer. In the event the original Mortgage Note is lost, misplaced or destroyed, the Company shall deliver a lost note affidavit in lieu of the original Mortgage Note. If the Mortgage Loan was acquired by the Company in a merger, the endorsement must be by "GMAC Mortgage Corporation, successor by merger to [name of predecessor]"; and if the Mortgage Loan was acquired or originated by the Company while doing business under another name, the endorsement must be by "GMAC Mortgage Corporation, formerly known as [previous name]". The Mortgage Note shall include all intervening endorsements showing a complete chain of title from the originator to the Company.

(ii)    Unless the Mortgage Loan is registered on the MERS System, the original Assignment of Mortgage, assigned to _____, but otherwise in form and substance acceptable for recording and sent for recording; provided, however, that certain recording information will not be available if, as of the related Closing Date, the Company has not received the related Mortgage from the appropriate recording office. If

12

the Mortgage Loan was acquired by the Company in a merger, the assignment must be by "GMAC Mortgage Corporation, successor by merger to [name of predecessor]"; and if the Mortgage Loan was acquired or originated by the Company while doing business under another name, the assignment must be by "GMAC Mortgage Corporation, formerly known as [previous name]".

Within thirty (30) days of the related Closing Date, the Company shall deliver to the Initial Owner or the Custodian as the Initial Owner's designee, for each Mortgage Loan in the related Mortgage Loan Package, the Collateral File, to the extent not already delivered. The Collateral File shall consist of the documents referred to in Exhibit A as items 1 through 9. The Company shall be responsible for recording the Assignments of Mortgage, if necessary, in accordance with Customary Servicing Procedures and this Agreement. The Owner shall be responsible for the initial and on-going fees and expenses of the Custodian.

Except as otherwise provided in this Section 2.03, upon discovery or receipt of notice of any materially defective document in the Collateral File, or that a document in the Collateral File is missing, the Company shall have sixty (60) days to cure such defect or deliver such missing document to the Custodian. If the Company does not cure such defect or deliver such missing document within such time period, the Company shall either repurchase or substitute for such Mortgage Loan in accordance with Section 3.03.

The Company shall promptly forward to the Custodian original documents evidencing an assumption, modification, consolidation or extension of any Mortgage Loan entered into in accordance with Section 4.01 or 6.01.

If (i) the original Mortgage, or copy thereof with evidence of recording thereon certified by the appropriate recording office to be a true copy of the recorded Mortgage, was not delivered pursuant to the above or (ii) any intervening assignment was not delivered pursuant to the above, the Company shall promptly secure the delivery of such originals and shall use its best efforts to cause such originals to be delivered to the Initial Owner or its designee within 240 days of the related Closing Date; provided, however, that in the event that the Company cannot deliver originals of items (i) or (ii) above within the specified period due to a delay caused by the recording office in the applicable jurisdiction, the Company shall instead deliver a recording receipt of such recording office or, if such recording receipt is not available, an Officer's Certificate of a servicing officer of the Company confirming that item (i) or (ii) has been accepted for recording.

(b)    From time to time and as appropriate for the foreclosure or servicing of any of the Mortgage Loans, the Owner shall release to the Company, upon written request and receipt of the Company in the form annexed hereto as Exhibit D, the original Collateral File. All documents so released to the Company shall be held by it in trust for the benefit of the Owner in accordance with Section 2.01 of this Agreement. The Company shall return to the Owner the original Collateral File, when the Company's need therefor in connection with such foreclosure or servicing no longer exists, unless the Mortgage Loan shall be liquidated, in which case, the Company shall deliver a certification to this effect to Owner in the form annexed hereto as Exhibit D, and shall deposit the Liquidation Proceeds into the Custodial Account.

(c)    Upon the repurchase of any Mortgage Loan pursuant to Section 3.03 of this Agreement or the payment in full of any Mortgage Loan and upon receipt by the Owner from the Company of a request and receipt in the form annexed hereto as Exhibit D (which request and receipt shall include a statement to the effect that all amounts received in connection with such payment or repurchase, including but not limited to the Repurchase Price, have been credited to the Custodial Account as provided in this Agreement), the Owner shall cause the Custodian to promptly release the related Collateral File to the Company.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE COMPANY; REPURCHASE AND SUBSTITUTION; REVIEW OF MORTGAGE LOANS

Section 3.01    <u>Representations and Warranties of the Company</u>.

The Company represents, warrants and covenants to the Owner, as of the related Closing Date or as of such other date specified below, that:

(i)    The Company is a validly existing corporation in good standing under the laws of the Commonwealth of Pennsylvania and is qualified to transact business in, is in good standing under the laws of, and possesses all licenses necessary for the conduct of its business in, each state in which any Mortgaged Property is located or is otherwise exempt or not required under applicable law to effect such qualification or license and no demand for such qualification or license has been made upon the Company by any such state, and in any event the Company is in compliance with the laws of each such State to the extent necessary to ensure the enforceability of each Mortgage Loan;

(ii)    The Company has full power and authority to hold each Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate all transactions contemplated by this Agreement and to conduct its business as presently conducted, has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement and each Assignment of Mortgage (if applicable) to the Owner and this Agreement and each Assignment of Mortgage (if applicable) constitutes a legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms subject to bankruptcy laws and other similar laws of general application affecting rights of creditors and subject to the application of the rules of equity, including those respecting the availability of specific performance;

(iii)    None of the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, or the fulfillment of or compliance with the terms and conditions of this Agreement will conflict with any of the terms, conditions or provisions of the Company's articles of incorporation or by-laws or materially conflict with or result in a material breach of any of the terms, conditions or provisions of any legal restriction or any agreement or instrument to which the Company is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the material violation of any law, rule, regulation, order, judgment or decree to which the Company or its property is subject;

14

(iv)    There is no litigation pending or, to the best of Company's knowledge, threatened, with respect to the Company which is reasonably likely to have a material adverse effect on the sale of the related Mortgage Loans, the execution, delivery or enforceability of this Agreement, or which is reasonably likely to have a material adverse effect on the financial condition of the Company;

(v)    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Company of or compliance by the Company with the terms of this Agreement, the sale of the Mortgage Loans or the consummation of the transactions contemplated by this Agreement except for consents, approvals, authorizations and orders which have been obtained;

(vi)    The consideration received by the Company upon the sale of the Mortgage Loans under this Agreement shall constitute fair consideration and reasonably equivalent value for the Mortgage Loans;

(vii)    The Servicing Fee received by the Company represents reasonable compensation for performing such services.

(viii)    The Company does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement. The Company is solvent and the sale of the Mortgage Loans will not cause the Company to become insolvent. The sale of the Mortgage Loans is not undertaken to hinder, delay or defraud any of the Company's creditors;

(ix)    Neither this Agreement nor any statement, report or other document furnished by or on behalf of the Company or to be furnished by or on behalf of the Company pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading;

(x)    The Company has not dealt with any broker, investment banker, agent or other Person that may be entitled to any commission or compensation in the connection with the sale of the Mortgage Loans;

(xii)    The consummation of the transactions contemplated by this Agreement is in the ordinary course of business of the Company, and the transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Company pursuant to this Agreement are not subject to bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction;

(xiii)    The Mortgage Loans were selected on a random basis from among the outstanding residential mortgage loans contained in the Company's 30-year nonconforming fixed rate portfolio immediately prior to the related Closing Date as to which the representations and warranties set forth in this Section 3.01 and Section 3.02 could be made; and

(xiv)    Company has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); Company has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws.

Section 3.02    Representations and Warranties as to Individual Mortgage Loans.

The Company, hereby represents and warrants to the Owner, as to each Mortgage Loan as of the related Closing Date or such other date as may be specified below, that:

(i)    The information set forth in the Mortgage Loan Schedule and the related electronic data file are true, complete and correct in all material respects as of the related Cut-off Date;

(ii)    The Mortgage creates a first lien or a first priority ownership interest in the related Mortgaged Property, free and clear of all adverse claims, liens and encumbrances having priority over the first lien of the Mortgage subject only to (1) the lien of non-delinquent current real property taxes and assessments not yet due and payable, (2) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording which are acceptable to mortgage lending institutions generally and, with respect to any Mortgage Loan for which an Appraisal was made prior to the related Cut-off Date, either (A) which are referred to or otherwise considered in the Appraisal made for the originator of the Mortgage Loan, or (B) which do not adversely affect the appraised value of the Mortgaged Property as set forth in such Appraisal, and (3) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property. Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates a valid, subsisting and enforceable first lien and first priority security interest on the property described therein;

(iii)    The Mortgage Loan has not been delinquent thirty (30) days or more at any time during the twelve (12) month period prior to the Cut-off Date for such Mortgage Loan. There are no defaults under the terms of the Mortgage Loan; and the Company has not advanced funds, or induced, solicited or knowingly received any advance of funds from a party other than the owner of the Mortgaged Property subject to the Mortgage, directly or indirectly, for the payment of any amount required by the Mortgage Loan;

16

(iv)    There are no delinquent taxes which are due and payable, ground rents, insurance premium, leasehold payments, assessments or other outstanding charges affecting the lien priority on the related Mortgaged Property;

(v)    The terms of the Mortgage Note of the related Mortgagor and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments which have been recorded to the extent any such recordation is required by applicable law or is necessary to protect the interests of the Owner, and which have been approved by the title insurer and the primary mortgage insurer, as applicable, and copies of which written instruments are included in the Mortgage File. No other instrument of waiver, alteration or modification has been executed, and no Mortgagor has been released, in whole or in part, from the terms thereof except in connection with an assumption agreement, which assumption agreement is part of the Mortgage File and the terms of which are reflected on the Mortgage Loan Schedule;

(vi)    The Mortgage Note and the Mortgage are not subject to any right of rescission, set-off, counterclaim or defense, including without limitation the defense of usury, nor will the operation of any of the terms of the Mortgage Note and the Mortgage, or the exercise of any right thereunder, render the Mortgage Note or Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including without limitation the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

(vii)    All buildings upon the Mortgaged Property are insured by a generally acceptable insurer pursuant to standard hazard policies conforming to the requirements of Fannie Mae and Freddie Mac, Customary Servicing Procedures and the requirements of Section 4.10.    All such standard hazard policies are in effect and on the date of origination contained a standard mortgagee clause naming the Company and its successors in interest as loss payee and such clause is still in effect and all premiums due thereon have been paid. If the Mortgaged Property is located in an area identified by the Federal Emergency Management Agency as having special flood hazards under the Flood Disaster Protection Act of 1973, as amended, such Mortgaged Property is covered by flood insurance by a generally acceptable insurer in an amount not less than the requirements of Fannie Mae and Freddie Mac. The Mortgage obligates the Mortgagor thereunder to maintain all such insurance at the Mortgagor's cost and expense, and on the Mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor;

(viii)    Any and all requirements of any federal, state or local law including, without limitation, all applicable predatory or abusive lending, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity or disclosure laws applicable to the origination and servicing of the Mortgage Loan have been complied with in all material respects.    All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property have been made or obtained from the appropriate authorities;

17

(ix)    The Mortgage has not been satisfied, canceled or subordinated, in whole or in part, or rescinded, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part nor has any instrument been executed that would effect any such satisfaction, release, cancellation, subordination or rescission;

(x)    The Mortgage Note and the related Mortgage are original and genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in all respects in accordance with its terms subject to bankruptcy, insolvency and other laws of general application affecting the rights of creditors, and the Company has taken all action necessary to transfer such rights of enforceability to the Owner. All parties to the Mortgage Note and the Mortgage had the legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note and the Mortgage. The Mortgage Note and the Mortgage have been duly and properly executed by such parties. The proceeds of the Mortgage Note have been fully disbursed and there is no requirement for future advances thereunder, and any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage were paid, and the Mortgagor is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(xi)    Any future advances made prior to the related Cut-off Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term reflected on the Mortgage Loan Schedule. The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first lien priority by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to Fannie Mae or Freddie Mac; the consolidated principal amount does not exceed the original principal amount of the Mortgage Loan; the Company shall not make future advances after the related Cut-off Date;

(xii)    The Mortgage Loan is covered by an ALTA lender's title insurance policy acceptable to Fannie Mae or Freddie Mac or other generally acceptable form of policy of insurance, with all necessary endorsements, issued by a title insurer acceptable to Fannie Mae or Freddie Mac and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring (subject to the exceptions contained in clause (ii) (1), (2) and (3) above) the Company, its successors and assigns, as to the first priority lien of the Mortgage in the original principal amount of the Mortgage Loan. Such title insurance policy affirmatively insures ingress and egress and against encroachments by or upon the Mortgaged Property or any interest therein. The Company is the sole insured of such lender's title insurance policy, such title insurance policy has been duly and validly endorsed to the Owner or the assignment to the Owner of the Company's interest therein does not require the consent of or notification to the insurer and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement. No claims have been made under such lender's title insurance policy, and no prior holder of the related

18

Mortgage has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy;

(xiii)   There is no default, breach, violation or event of acceleration existing under the Mortgage or the related Mortgage Note and, to the Company's knowledge, no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event permitting acceleration; and neither the Company nor any prior mortgagee has waived any default, breach, violation or event permitting acceleration;

(xiv)   Except as insured against by the related title insurance referenced in paragraph (xii) above, there are no mechanics, or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such liens) affecting the related Mortgaged Property which are or may be liens prior to or equal to the lien of the related Mortgage;

(xv)   All improvements subject to the Mortgage lie wholly within the boundaries and building restriction lines of the Mortgaged Property (and wholly within the project with respect to a condominium unit) and no improvements on adjoining properties encroach upon the Mortgaged Property except those which are insured against by the title insurance policy referred to in clause (xii) above and all improvements on the property comply with all applicable zoning and subdivision laws and ordinances;

(xvi)   The Mortgage Loan was originated by the Company or by an eligible correspondent of the Company.  The Mortgage Loan complies in all material respects with all the terms, conditions and requirements of the Company's underwriting standards attached here as Exhibit F. The Mortgage Notes and Mortgages are on forms acceptable to Fannie Mae or Freddie Mac;

(xvii)   The Mortgage Loan contains the usual and enforceable provisions of the originator at the time of origination for the acceleration of the payment of the unpaid principal amount if the related Mortgaged Property is sold without the prior consent of the mortgagee thereunder.  Principal payments commenced no more than sixty (60) days after the funds were dispersed to the Mortgagor in connection with the Mortgage Loan. The Mortgage Loan has an original term to maturity of not more than thirty (30) years, with interest payable in arrears on the first day of each month.  The Mortgage and related Mortgage Note contain customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure.  Except as otherwise set forth on the related Mortgage Loan Schedule, the Mortgage Loan does not contain terms or provisions which would result in negative amortization nor contain "graduated payment" features;

(xviii)   The Mortgaged Property at origination of the Mortgage Loan was and, to the Company's knowledge, currently is free of damage and waste and at origination of

19

the Mortgage Loan there was, and, to the Company's knowledge, there currently is, no proceeding pending, for the total or partial condemnation thereof;

(xix)  The related Mortgage contains enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby, including, (1) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (2) otherwise by judicial foreclosure;

(xx)  If the Mortgage constitutes a deed of trust, a trustee, duly qualified if required under applicable law to act as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Owner to the trustee under the deed of trust, except in connection with a trustee's sale or attempted sale after default by the Mortgagor;

(xxi)  If required by the applicable processing style, the Mortgage File contains an Appraisal of the related Mortgaged Property made and signed prior to the final approval of the mortgage loan application by a qualified appraiser satisfying the requirements of Title XI of The Financial Institutions Reform, and Enforcement Act of 1989, as amended, and the regulations promulgated thereunder, that is acceptable to Fannie Mae or Freddie Mac and approved by the Company. The Appraisal, if applicable, is in a form generally acceptable to Fannie Mae or Freddie Mac;

(xxii)  All parties which have had any interest in the Mortgage, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (A) in substantial compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (B) (1) organized under the laws of such state, or (2) qualified to do business in such state, or (3) federal savings and loan associations, national banks, a Federal Home Loan Bank or the Federal Reserve Bank, or (4) not doing business in such state;

(xxiii)  To the best of the Company's knowledge, there does not exist any circumstances or conditions with respect to the Mortgage, the Mortgaged Property, the Mortgagor or the Mortgagor's credit standing that could reasonably be expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, to cause the Mortgage Loan to become delinquent, or to materially adversely affect the value or marketability of the Mortgage Loan;

(xxiv)  Each of the Mortgaged Properties consists of a single parcel of real property with a detached single-family residence erected thereon, or a two- to four-family dwelling, or a townhouse, or an individual condominium unit in a condominium project or an individual unit in a planned unit development. Any condominium unit or planned unit development either conforms with applicable Fannie Mae or Freddie Mac requirements regarding such dwellings or is covered by a waiver confirming that such condominium unit or planned unit development is acceptable to Fannie Mae or Freddie

20

Mac or is otherwise "warrantable" with respect thereto. No such residence is a mobile home or manufactured dwelling;

(xxv) The ratio of the original outstanding principal amount of the Mortgage Loan to the lesser of the appraised value (or stated value if an appraisal was not a requirement of the applicable processing style) of the Mortgaged Property at origination or the purchase price of the Mortgaged Property securing each Mortgage Loan is not in excess of 95.00%. The original Loan-to-Value Ratio of each Mortgage Loan was not more than 95.00%, and the excess LTV over 80.00% is insured as to payment defaults by a Primary Insurance Policy issued by a primary mortgage insurer acceptable to Fannie Mae or Freddie Mac. All provisions of such Primary Insurance Policy have been and are being complied with, such policy is in full force and effect, and all premiums due thereunder have been paid. Any Mortgage Loan subject to a Primary Insurance Policy obligates the Mortgagor thereunder to maintain the Primary Insurance Policy and to pay all premiums and charges in connection therewith. The Mortgage Interest Rate for the Mortgage Loan Schedule is net of any such insurance premium;

(xxvi) The Mortgagor has not notified the Company, and the Company has no knowledge of any relief requested by or provided to the Mortgagor under the Soldiers' and Sailors' Civil Relief Act of 1940, as amended, or any similar state law;

(xxvii) The Company is either, and each Mortgage Loan was originated by, a savings and loan association, savings bank, commercial bank, credit union, insurance company or similar institution which is supervised and examined by a federal or State authority, or by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Section 203 and 211 of the National Housing Act;

(xxviii)The origination, collection and servicing practices with respect to each Mortgage Note and Mortgage have been in accordance with Customary Servicing Procedures and legal in all material respects. With respect to escrow deposits and payments that the Company collects, all such payments are in the possession of, or under the control of, the Company, and there exist no deficiencies in connection therewith, for which customary arrangements for repayment thereof have not been made. All escrow deposits have been collected in full compliance with state and federal law. No escrow deposits or other charges or payments due under the Mortgage Note have been capitalized under any Mortgage or the related Mortgage Note;

(xxix) No fraud or misrepresentation of a material fact with respect to the origination of a Mortgage Loan has taken place on the part of the Company and to the best of the Company's knowledge, no fraud or misrepresentation of a material fact with respect to the origination of a Mortgage Loan has taken place on the part of any third party, including without limitation the Mortgagor, connected with the origination of the Mortgage Loan;

(xxx) As of the date of origination, the Mortgaged Property was lawfully occupied under applicable law, and to the Company's knowledge, the Mortgage Property is lawfully occupied as of the related Closing Date;

21

(xxxi) The Mortgage Note is not and has not been secured by any collateral, pledged account or other security except the lien of the corresponding Mortgage and the security interest of any applicable security agreement or chattel mortgage referred to in Paragraph (ii) above;

(xxxii) No Mortgage Loan was made in connection with (i) the construction or rehabilitation of a Mortgaged Property or (ii) facilitating the trade-in or exchange of a Mortgaged Property other than a construction-to-permanent loan which has converted to a permanent Mortgage Loan;

(xxxiii)No Mortgage Loan is subject to a buydown agreement;

(xxxiv)No Mortgagor was a debtor in any state or federal bankruptcy or insolvency proceeding at the time the Mortgage Loan was originated and, to the best of the Company's knowledge, following the date of origination of the Mortgage Loan, the Mortgagor with respect to the Mortgage Loan was not a debtor in any state or federal bankruptcy or insolvency proceeding, and the Mortgaged Property has not been subject to any bankruptcy or foreclosure proceedings;

(xxxv) To the Company's knowledge, there exist no violation of any local, state or federal environmental law, rule or regulation. There is no pending action or proceeding directly involving any Mortgaged Property of which the Company is aware in which compliance with any environmental law, rule or regulation is an issue;

(xxxvi)Article XVI, Section 50(a)(6) of the Texas Constitution (a "Texas Refinance Loan") is not applicable to the Mortgage Loan.  If the Mortgage Loan was originated in Texas it is not a cash-out refinance loan;

(xxxvii)    The Mortgagor is one or more natural persons and/or trustees for an Illinois land trust or a trustee under a "living trust" and such "living trust" is in compliance with Fannie Mae or Freddie Mac guidelines. In the event the Mortgagor is a trustee, the borrower is a natural person;

(xxxviii)    No Mortgage Loan is subject to the provisions of the Home Ownership and Equity Protection Act of 1994, as amended or any comparable state or local law or regulation;

(xxxix)No Mortgage Loan secured by property located in the Commonwealth of Kentucky and originated on or after June 24, 2003 had an original principal amount of $200,000 or less;

(xl)    Each Mortgage Loan is a "qualified mortgage" within Section 860G(a)(3) of the Code;

(xli)    Each Mortgage Loan is covered by a paid in full, life of loan, tax service contract;

(xlii)   No Mortgage Loan is secured by a leasehold interest, mobile home or manufactured housing unit.

(xliii)   No Mortgage Loan provides for prepayment penalties.

Section 3.03   Repurchase and Substitution.

The representations and warranties set forth in Sections 3.01 and 3.02, shall survive the sale of the Mortgage Loans and shall inure to the benefit of the Owner, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment of Mortgage or the examination of any Mortgage File.  Upon discovery by the Company or an Owner of a breach (including any occurrence, condition, act or omission that would be a breach in the event that the Company were to have knowledge thereof) (a "Repurchase Event") of any of the representations and warranties set forth in Sections 3.01 and 3.02 (notwithstanding the Company's lack of knowledge of such representation and warranty), which Repurchase Event materially and adversely affects the value of the Mortgage Loans or the interest of the Owner (or which materially and adversely affects the interest of the Owner in the related Mortgage Loan in the case of a representation and warranty relating to a particular Mortgage Loan), the party discovering such Repurchase Event shall give prompt written notice to the other.  Within ninety (90) days of the earlier of either discovery by or notice to the Company of any such Repurchase Event, the Company shall use its best efforts to promptly cure such Repurchase Event in all material respects and, if such Repurchase Event cannot be cured during such ninety (90) day period, the Company shall, at the Owner's option, repurchase such Mortgage Loan at the Repurchase Price.  If any such breach shall involve any representation or warranty set forth in Section 3.01, and such breach cannot be cured within ninety (90) days of the earlier of either discovery by or notice to the Company of such breach, all the Mortgage Loans shall, at the Owner's option, be repurchased by the Company at the Repurchase Price; provided, however, that in the event of a breach of representation and warranty set forth in Section 3.01 that relates to less than all of the Mortgage Loans, the Company shall repurchase only the Mortgage Loans to which such breach relates.  However, the Company may, at its option, replace a Mortgage Loan as to which a Repurchase Event has occurred as described in the foregoing sentences of this Section 3.03 and substitute in its place with a Qualified Substitute Mortgage Loan or Loans, provided, however, that any such substitution shall be effected not later than 120 days after the related Closing Date.  If the Company has no Qualified Substitute Mortgage Loan, it shall repurchase the deficient Mortgage Loan within ninety (90) days after the written notice of the Repurchase Event.  Any repurchase of a Mortgage Loan or Loans pursuant to the foregoing provisions of this Section 3.03 shall be accomplished by deposit in the Custodial Account of the amount of the Repurchase Price (after deducting therefrom any amounts received in respect of such repurchased Mortgage Loan or Loans and being held in the Custodial Account for future distribution).

The Company shall effect any substitution of a Qualified Substitute Mortgage Loan by delivering to the Owner the documents as are required to be delivered by Section 2.03, with the Mortgage Note endorsed as required by Section 2.03.  No substitution will be made in any calendar month after the Determination Date occurring in such month.  The Company shall deposit in the Custodial Account the Monthly Payment less the Servicing Fee due on such Qualified Substitute Mortgage Loan or Loans in the month following the date of such

23

substitution. Monthly Payments due with respect to Qualified Substitute Mortgage Loans in the month of substitution will be retained by the Company. For the month of substitution, distributions to the Owner will include the Monthly Payment due on such Deleted Mortgage Loan in the month of substitution, and the Company shall thereafter be entitled to retain all amounts subsequently received by the Company in respect of such Deleted Mortgage Loan. The Company shall give written notice to the Owner that such substitution has taken place and shall amend the Mortgage Loan Schedule to reflect the removal of such Deleted Mortgage Loan from the terms of this Agreement and the substitution of the Qualified Substitute Mortgage Loan. Upon such substitution, such Qualified Substitute Mortgage Loan or Loans shall be subject to the terms of this Agreement in all respects, and the Company shall be deemed to have made with respect to such Qualified Substitute Mortgage Loan or Loans, as of the date of substitution, the covenants, representations and warranties set forth in Sections 3.01 and 3.02, except to the extent a representation contained in Section 3.02 relates to an expressly specified percentage of the Mortgage Loans.

For any month in which the Company substitutes one or more Qualified Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the Company will determine the amount (if any) by which the aggregate principal balance of all such Qualified Substitute Mortgage Loans as of the date of substitution is less than the aggregate Assumed Principal Balance of all such Deleted Mortgage Loans (after application of scheduled principal payments due in the month of substitution). The amount of such shortfall shall be distributed by the Company in the month of substitution pursuant to Section 5.01. Accordingly, on the date of such substitution, the Company will deposit from its own funds into the Custodial Account an amount equal to the amount of such shortfall.

ARTICLE IV

ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

Section 4.01    Company to Act as Servicer.

The Company, as independent contract servicer, shall service and administer the Mortgage Loans for the benefit of the Owner in accordance with the terms of this Agreement and in conformity with Customary Servicing Procedures and applicable federal, state and local laws. In performing its obligations hereunder, the Company shall exercise no less than the same care that it customarily employs and exercises in servicing and administering mortgage loans for its own account, but shall perform such obligations without regard to the Company's obligation to make Servicing Advances or P&I Advances, or to the Company's right to receive compensation for its services hereunder.

Subject to the above-described servicing standards, the specific requirements and prohibitions of this Agreement and the respective Mortgage Loans, and the provisions of any Primary Insurance Policy and applicable law, the Company shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which the Company may deem necessary or desirable. Without limiting the generality of the foregoing, the Company shall, and is hereby authorized and empowered to (i) execute and deliver on behalf of itself and the Owner, any and all instruments of satisfaction or cancellation, or of partial or

24

full release, discharge and all other comparable instruments, with respect to the Mortgage Loan and with respect to the Mortgaged Property and (ii) waive, modify or vary any term of any Mortgage Loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to the related Mortgagor if in the Company's reasonable and prudent determination such waiver, modification, postponement or indulgence is not materially adverse to the interests of the Owner and is not prohibited by a Primary Insurance Policy; provided, however, that the Company may not, unless it has obtained the consent of the Owner, permit any modification with respect to any Mortgage Loan that would vary the Mortgage Interest Rate, defer or forgive the payment of interest or of any principal, reduce the outstanding principal amount (other than as a result of its actual receipt of payment of principal on), extend the final maturity date of such Mortgage Loan, or in the Company's judgment, materially impair the security for such Mortgage Loan or reduce the likelihood of timely payment of amounts due thereon or otherwise constitute a "significant modification" within the meaning of Treasury Regulation 1.860G-2(b). If, with the consent of the Owner, the Company permits the deferral of interest or principal payments on any Mortgage Loan, the Company shall include in each remittance for any month in which any such principal or interest payment has been deferred an amount equal to the amount that the Company would have been required to advance pursuant to Section 5.03 if such deferred amounts had been delinquent, and shall be entitled to reimbursement for such advances only to the same extent as for P&I Advances made pursuant to Section 5.03. If reasonably required by the Company, the Owner shall furnish the Company with any powers of attorney and other documents necessary or appropriate to enable the Company to carry out its servicing and administrative duties under this Agreement.

Section 4.02    Liquidation of Mortgage Loans; Servicing Advances and Foreclosure.

If any payment due under any Mortgage Loan and not postponed pursuant to Section 4.01 is not paid when the same becomes due and payable, or if the Mortgagor fails to perform any other covenant or obligation under the Mortgage Loan and such failure continues beyond any applicable grace period, the Company shall take such action as it shall deem to be in the best interests of the Owner. If any payment due under any Mortgage Loan and not postponed pursuant to Section 4.01 remains delinquent for a period of ninety (90) days or more, the Company shall (a) act in the best interests of the Owner, and such action may include the commencement of foreclosure proceedings, (b) if the Company commences foreclosure proceedings, notify the Owner thereof on the monthly remittance report delivered pursuant to Section 5.02 on the first Remittance Date following such commencement and (c) respond to reasonable inquiries of the Owner with respect to the Mortgage Loan or related REO Property. If the Company has commenced foreclosure proceedings and the Owner wishes to participate in such proceedings or the disposition of an REO Property upon acquisition thereof, the Owner shall notify the Company in writing (addressed to "Department Head of the Foreclosure Department") within fifteen (15) days following the Owner's receipt of the notice of commencement of foreclosure proceedings described in clause (c) of the preceding sentence, and upon receipt thereof, the Company shall thereafter periodically advise the Owner of the status of the foreclosure proceedings and follow the Owner's instructions in connection therewith. The Company shall be entitled to compensation for loss mitigation, as permitted by Fannie Mae or Freddie Mac.

Whether in connection with the foreclosure of a Mortgage Loan or otherwise, the Company shall from its own funds make all necessary and proper Servicing Advances; provided, however, that the Company is not required to make a Servicing Advance unless the Company determines in the exercise of its good faith reasonable judgment that such Servicing Advance would ultimately be recoverable from REO Dispositions, Insurance Proceeds or Condemnation Proceeds (with respect to each of which the Company shall have the priority described in Section 4.05 for purposes of withdrawals from the Custodial Account). In the event that any Servicing Advance or any commitment to pay Servicing Advances in connection with any Mortgage Loan exceeds $5,000 in the aggregate, the Company shall secure the written approval of the Owner.

Notwithstanding anything to the contrary contained herein, in connection with a foreclosure or acceptance of a deed in lieu of foreclosure, in the event the Company has reasonable cause to believe that a Mortgaged Property is contaminated by hazardous or toxic substances or wastes, or if the Owner otherwise requests an environmental inspection or review of such Mortgaged Property, such an inspection or review is to be conducted by a qualified inspector at the Owner's expense. Upon completion of the inspection, the Company shall promptly provide the Owner with a written report of the environmental inspection. In the event (a) the environmental inspection report indicates that the Mortgaged Property is contaminated by hazardous or toxic substances or wastes and (b) the Owner directs the Company to proceed with foreclosure or acceptance of a deed in lieu of foreclosure, the Company shall be reimbursed for all reasonable costs associated with such foreclosure or acceptance of a deed in lieu of foreclosure and any related environmental clean up costs, as applicable, from the related Liquidation Proceeds, or if the Liquidation Proceeds are insufficient to fully reimburse the Company, the Company shall be entitled to be reimbursed from amounts in the Custodial Account pursuant to Section 4.05 hereof. In the event the Owner directs the Company not to proceed with foreclosure or acceptance of a deed in lieu of foreclosure, the Company shall be reimbursed for all Servicing Advances made with respect to the related Mortgaged Property from the Custodial Account pursuant to Section 4.05 hereof.

Section 4.03    Collection of Mortgage Loan Payments.

Continuously from the date hereof until the principal and interest on all Mortgage Loans are paid in full, the Company will proceed diligently, in accordance with this Agreement, to collect all payments due under each of the Mortgage Loans when the same shall become due and payable, and will take special care in ascertaining and estimating annual taxes, assessments, fire and hazard insurance premiums, mortgage insurance premiums, and all other charges that, as provided in any Mortgage, will become due and  payable in order that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.

Section 4.04    Establishment of Custodial Account; Deposits in Custodial Account.

The Company shall segregate and hold all funds collected and received pursuant to each Mortgage Loan and REO Property separate and apart from any of its own funds and general assets and shall establish and maintain one or more Custodial Accounts (collectively, the "Custodial Account"), in the form of non-interest bearing time deposit or demand accounts. The Custodial Account shall be established with an Eligible Depository Institution. The creation of

26

any Custodial Account shall be evidenced by a letter agreement in the form of Exhibit B hereto. A copy of such certification or letter agreement shall be furnished to any Owner upon request.

The Company shall deposit in a mortgage clearing account on a daily basis and in the Custodial Account no later than the second Business Day thereafter and retain therein:

(i)    all scheduled payments due after the Cutoff Date on account of principal, including Principal Prepayments collected after the Cutoff Date, on the Mortgage Loans;

(ii)    all payments on account of interest on the Mortgage Loans (minus the portion of any such payment which is allocable to the period prior to the Cutoff Date) adjusted to the Mortgage Loan Remittance Rate;

(iii)    all Liquidation Proceeds;

(iv)    all Insurance Proceeds, including amounts required to be deposited pursuant to Sections 4.10, 4.11 and 4.18, other than proceeds to be held in the Escrow Account and applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with Customary Servicing Procedures, the Mortgage Loan documents or applicable law;

(v)    all Condemnation Proceeds with respect to any Mortgaged Property which are not released to the Mortgagor in accordance with Customary Servicing Procedures, the Mortgage Loan documents or applicable law;

(vi)    any amounts payable in connection with the repurchase of any Mortgage Loan pursuant to Section 3.03 and all amounts required to be deposited by the Company in connection with shortfalls in principal amount of Qualified Substitute Mortgage Loans pursuant to Section 3.03 or;

(vii)    any amount required to be deposited in the Custodial Account pursuant to Section 5.04; and

(viii)    any amount required to be deposited in the Custodial Account pursuant to Sections 4.01, 4.14, 5.01, 5.03 and 6.02.

The foregoing requirements for deposit in the Custodial Account shall be exclusive. Without limiting the generality of the foregoing, payments in the nature of late payment charges, fees for special services provided to a Mortgagor and assumption fees need not be deposited by the Company in the Custodial Account.

The Company may invest the funds in the Custodial Account in Eligible Investments designated in the name of the Company for the benefit of the Owner, which shall mature not later than the Business Day next preceding the Remittance Date next following the date of such investment (except that (i) any investment in the institution with which the Custodial Account is maintained may mature on such Remittance Date and (ii) any other investment may mature on such Remittance Date if the Company shall advance funds on such Remittance Date, pending receipt thereof to the extent necessary to make distributions to the Owner) and shall not be sold

27

or disposed of prior to maturity.  Notwithstanding anything to the contrary herein and above, all income and gain realized from any such investment shall be for the benefit of the Company and shall be subject to its withdrawal or order from time to time.  The amount of any losses incurred in respect of any such investments shall be deposited in the Custodial Account by the Company out of its own funds immediately as realized.  All funds required to be deposited into the Custodial Account shall be held in trust for the Owner until withdraw in accordance with Section 4.05.

Section 4.05    Withdrawals From the Custodial Account.

The Company shall, from time to time, withdraw funds from the Custodial Account for the following purposes:

(i)    to make payments to the Owner in the amounts and in the manner provided for in Section 5.01;

(ii)    to reimburse itself for P&I Advances, the Company's right to reimburse itself pursuant to this subclause (ii) being limited to amounts received on the related Mortgage Loan that represent payments of principal and/or interest respecting which any such P&I Advance was made;

(iii)    to reimburse itself first for unreimbursed Servicing Advances, second for unreimbursed P&I Advances, and third for any unpaid Servicing Fees, the Company's right to reimburse itself pursuant to this subclause (iii) with respect to any Mortgage Loan being limited to related Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, REO Disposition Proceeds and such other amounts as may be collected by the Company from the Mortgagor or otherwise relating to the Mortgage Loan, it being understood that, in the case of any such reimbursement, the Company's right thereto shall be prior to the rights of the Owner unless the Company is required to repurchase a Mortgage Loan pursuant to Section 3.03 , in which case the Company's right to such reimbursement shall be subsequent to the payment to the Owner of the Repurchase Price pursuant to Sections 3.03 and all other amounts required to be paid to the Owner with respect to such Mortgage Loan;

(iv)    to reimburse itself for unreimbursed Servicing Advances and advances of the Company funds made pursuant to Section 5.03 to the extent that such amounts are nonrecoverable by the Company pursuant to subclause (iii) above, provided that the Mortgage Loan for which such advances were made is not required to be repurchased by the Company pursuant to Section 3.03, in which case the Company's right to such reimbursement shall be subsequent to the payment to the Owner of the Repurchase Price pursuant to Section 3.03 and all other amounts required to be paid to the Owner with respect to such Mortgage Loan, and to reimburse itself for such amounts to the extent that such amounts are nonrecoverable from the disposition of REO Property pursuant to Section 4.14 hereof;

(v)    Reserved.

28

(vi)    to pay itself with respect to each Mortgage Loan repurchased pursuant to Section 3.03 all amounts collected in respect of such Mortgage Loan and remaining on deposit in the Custodial Account as of the date on which the related Repurchase Price is deposited into the Custodial Account (other than the amount of such Repurchase Price and amounts otherwise required to be paid to the Owner pursuant to this Agreement;

(vii)    to pay itself with respect to each Mortgage Loan, servicing compensation pursuant to Section 6.03;

(viii)    to reimburse itself for any Nonrecoverable Advances; and

(ix)    to clear and terminate the Custodial Account upon the termination of this Agreement.

On each Remittance Date, the Company shall withdraw all funds from the Custodial Account except for those amounts which, pursuant to Section 5.01(a)(iv) and (v), the Company is not obligated to remit on such Remittance Date. The Company may use such withdrawn funds only for the purposes described in this Section 4.05.

Section 4.06    Establishment of Escrow Account; Deposits in Escrow Account.

The Company shall segregate and hold all funds collected and received pursuant to each Mortgage Loan which constitute Escrow Payments separate and apart from any of its own funds and general assets and shall establish and maintain one or more Escrow Accounts (collectively, the "Escrow Account"), in the form of non-interest bearing time deposit or demand accounts. The Escrow Account shall be established with an Eligible Depository Institution. The creation of any Escrow Account shall be evidenced by a letter agreement in the form of Exhibit C hereto. Upon request, the Company shall provide the Owner with a copy of a letter agreement evidencing the establishment of each Escrow Account. Notwithstanding the foregoing, the Company may deposit in the Escrow Account amounts constituting escrow payments relating to mortgage loans not subject to this Agreement, provided, however, that all Escrow Payments in the Escrow Account are insured in a manner which shall provide the maximum available insurance by the FDIC thereon.

The Company shall deposit in a mortgage clearing account on a daily basis and no later than the second Business Day thereafter in the Escrow Account and retain therein: (i) all Escrow Payments held or collected on account of the Mortgage Loans, for the purpose of effecting timely payment of any such items as required under the terms of this Agreement, (ii) all Insurance Proceeds or Condemnation Proceeds that are to be applied to the restoration or repair of any Mortgaged Property and (iii) all revenues received with respect to the management, conservation, protection and operation of the REO Properties pursuant to Section 4.14. The Company shall make withdrawals therefrom only to effect such payments as are required under this Agreement, and for such other purposes as shall be set forth in or in accordance with Section 4.07. The Company shall pay to the Mortgagor interest on escrowed funds to the extent required by law notwithstanding that the Escrow Account is non-interest bearing.

Section 4.07    Withdrawals From Escrow Account.

29

Withdrawals from the Escrow Account may be made by the Company only (a) to effect timely payments of taxes, assessments, Primary Insurance Policy premiums, fire and hazard insurance premiums or other items constituting Escrow Payments for the related Mortgage, (b) to reimburse the Company for any Servicing Advance made by the Company pursuant to Section 4.08 hereof with respect to a related Mortgage Loan, but only from amounts received on the related Mortgage Loan which represent late payments or collections of Escrow Payments thereunder, (c) to refund to any Mortgagor any funds found to be in excess of the amounts required under the terms of the related Mortgage Loan, (d) upon default of a Mortgagor or in accordance with the terms of the related Mortgage Loan and if permitted by applicable law, for transfer to the Custodial Account of such amounts as are to be applied to the indebtedness of a Mortgage Loan in accordance with the terms thereof, (e) for application to restoration or repair of the Mortgaged Property, (f) to deposit into the Custodial Account the funds required to be deposited therein pursuant to Section 4.14, (g) to pay to itself amounts to which it is entitled pursuant to Section 4.14, (h) to withdraw any Escrow Payments related to a Mortgage Loan repurchased by the Company pursuant to Section 3.03, or (i) to clear and terminate the Escrow Account upon the termination of this Agreement.

Section 4.08    Payment of Taxes, Insurance and Other Charges.

With respect to each Mortgage Loan, the Company shall maintain accurate records reflecting the status of taxes, assessments, and other charges for which an escrow is maintained and the status of Primary Insurance Policy premiums and fire and hazard insurance coverage and shall obtain, from time to time, all bills for the payment of such charges (including renewal premiums) and shall effect payment thereof employing for such purpose deposits of the Mortgagor in the Escrow Account which shall have been estimated and accumulated by the Company in amounts sufficient for such purposes, as allowed under the terms of the Mortgage or applicable law. To the extent that a Mortgage does not provide for Escrow Payments, or the Company has waived the escrow of Escrow Payments or the Company is prohibited by applicable state law from requiring the escrow of Escrow Payments, the Company shall determine that any such payments are made by the Mortgagor. The Company assumes full responsibility for the timely payment of all such bills and shall effect timely payments of all such bills irrespective of each Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments and shall make advances from its own funds to effect such payments. The costs incurred by the Company, if any, in effecting the timely payments of taxes and assessments on the Mortgaged Properties and related insurance premiums shall not be added to the Assumed Principal Balances of the related Mortgage Loans, notwithstanding that the terms of such Mortgage Loans so permit.

Section 4.09    Transfer of Accounts.

The Company may from time to time transfer the Custodial Account and the Escrow Account to any other Eligible Depository Institution. The Company shall notify the Owner within five (5) Business Days following any such transfer under this Section 4.09.

Section 4.10    Maintenance of Hazard Insurance.

The Company shall cause to be maintained for each Mortgage Loan, fire and hazard insurance by an insurer acceptable to Fannie Mae or Freddie Mac with extended coverage customary in the area where the Mortgaged Property is located, in an amount which is, subject to applicable law, at least equal to the lesser of (i) the maximum insurable value of the improvements securing the related Mortgage Loan and (ii) the greater of (a) the outstanding principal balance of the Mortgage Loan and (b) the minimum amount necessary to prevent the Mortgagor and/or the mortgagee from becoming a co-insurer. If the Mortgaged Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards (and such flood insurance has been made available) the Company will cause to be maintained a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration with an insurance carrier generally acceptable to Fannie Mae or Freddie Mac, in an amount representing coverage not less than the least of (i) the outstanding principal balance of the Mortgage Loan, (ii) the full insurable value of the Mortgaged Property, or (iii) the maximum amount of insurance available under the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, each as amended. The Company shall also maintain on any REO Property, fire and hazard insurance with extended coverage in an amount which is at least equal to the maximum insurable value of the improvements which are a part of such property, liability insurance and, to the extent required and available under the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, each as amended, flood insurance in an amount required above. Any amounts collected by the Company under any such policies (other than amounts to be deposited in the Escrow Account and applied to the restoration or repair of the related Mortgaged Property, REO Property, or released to the Mortgagor in accordance with Customary Servicing Procedures or in accordance with the terms of the Mortgage Loan or applicable law) shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 4.05. It is understood and agreed that no earthquake or other additional insurance need be required by the Company of any Mortgagor or maintained on property acquired in respect of a Mortgage Loan, other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance. All policies required hereunder shall be endorsed with standard mortgagee clauses with loss payable to the Company, its successors and its assigns, or, upon request of the Owner, to the Owner, and shall provide for at least thirty (30) days prior written notice to the Company of any cancellation thereof. The Company shall not accept or obtain any such insurance policy from an insurance company that does not at that time maintain a General Policy Rating of B-III or better in Best's Key Rating Guide, or that is not licensed to do business in the State wherein the related Mortgaged Property is located. In no event shall a Mortgage Loan be without a hazard insurance policy at any time, subject only to Section 4.11 hereof.

Section 4.11    Maintenance of Blanket Insurance Policy.

If the Company shall obtain and maintain a blanket insurance policy that is issued by an insurer generally acceptable to Fannie Mae and Freddie Mac and that insures against hazard losses on all of the Mortgage Loans, then, to the extent such policy provides coverage in an amount equal to the coverage required pursuant to Section 4.10 and otherwise complies with all other requirements of Section 4.10, the Company shall be deemed to have satisfied its obligations as set forth in Section 4.10. Such policy may contain a clause providing for a reasonable deductible, in which case the Company shall, if there shall not have been maintained

on the related Mortgaged Property a policy complying with Section 4.10, and if there shall have been a loss that would have been covered by such policy, deposit in the Custodial Account the amount not otherwise payable under the blanket policy because of such deductible clause. The Company shall prepare and make any claims on the blanket policy as deemed necessary by the Company in accordance with Customary Servicing Procedures. Any amounts collected by the Company under any such policy relating to a Mortgage Loan shall be deposited in the Custodial Account subject to withdrawal pursuant to Section 4.05. Upon request of the Owner, the Company shall cause to be delivered to the Owner a certified true copy of such policy and a statement from the insurer thereunder that such policy shall in no event be terminated or materially modified without ten (10) days' prior written notice.

Section 4.12    Maintenance of Mortgage Impairment Insurance Policy.

The Company may satisfy its obligations under Section 4.10 and 4.11 pertaining to physical storage of insurance policies and general policy rating requirements by maintaining a mortgage impairment or other form of blanket policy that will protect the Company and/or investor in the event of uninsured loss, insolvency of an insurance carrier or any other loss normally to be covered by a mortgage impairment policy. It is agreed that any expense incurred by the Company in maintaining any such insurance shall be borne by the Company. This shall be deemed to include any loss or any expense as a result of a deductible clause in such a policy.

Section 4.13    Fidelity Bond; Errors and Omissions Insurance.

The Company, at its own expense, shall maintain with responsible companies throughout the term of this Agreement a blanket fidelity bond and an errors and omissions insurance policy, with broad coverage on all officers, employees and other individuals acting on behalf of the Company in connection with its activities under this Agreement. The amount of coverage shall be at least equal to the coverage that would be required of the Company by Fannie Mae or Freddie Mac, if the Company were servicing the Mortgage Loans for Fannie Mae or Freddie Mac, and such policy shall be issued by a company that is acceptable to Fannie Mae or Freddie Mac. The Fidelity Bond and errors and omissions insurance shall be in the form of the Mortgage Banker's Blanket Bond and shall protect and insure the Company against losses caused by such individuals, including losses from forgery, theft, embezzlement, fraud, errors and omissions and negligent acts of such individuals. Such Fidelity Bond shall also protect and insure the Company against losses in connection with the failure to maintain any insurance policies required pursuant to this Agreement and the release or satisfaction of a Mortgage Loan without having obtained payment in full of the indebtedness secured thereby. No provision of this Section 4.13 requiring such fidelity bond and errors and omissions insurance shall diminish or relieve the Company from its duties and obligations as set forth in this Agreement. Upon the request of the Owner, the Company shall cause to be delivered to the Owner a certificate of insurance for such Fidelity Bond and errors and omissions insurance policy and a statement from the surety and the insurer that such Fidelity Bond and errors and omissions insurance policy shall in no event be terminated or materially modified without ten (10) days' prior written notice.

Section 4.14    Title, Management and Disposition of REO Property.

If title to a Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be taken in the name of the Company or its nominee, in either case as nominee, for the benefit of the Owner on the date of acquisition of title (the "REO Owner"). In the event the Company is not authorized or permitted to hold title to real property in the state in which the REO Property is located, or would be adversely affected under the "doing business" or tax laws of such state by so holding title, the deed or certificate of sale shall be taken in the name of such Person or Persons as shall be consistent with an opinion of counsel obtained by the Company, at expense of the REO Owner, from an attorney duly licensed to practice law in the state where the REO Property is located. The Person or Persons holding such title other than the REO Owner shall acknowledge in writing that such title is being held as nominee for the REO Owner.

The Company, either itself or through an agent (provided such agent is approved by the Owner) selected by the Company, shall manage, conserve, protect and operate each REO Property for the REO Owner solely for the purpose of its prompt disposition and sale, and in same manner that it would be required to manage, conserve, protect and operate foreclosed property for its own account (subject to the condition described in the second paragraph of Section 4.02). The Company shall attempt to sell the same (and may temporarily rent the same) on such terms and conditions as the Company deems to be in the best interest of the REO Owner. Notwithstanding any provision in this Section 4.14, the Owner shall have the option to manage and operate the REO Property provided the Owner gives written notice of its intention to do so within sixty (60) days after such REO Property is acquired in foreclosure or by deed in lieu of foreclosure. The election by the Owner to manage the REO Property shall not constitute a termination of any rights of the Company pursuant to section 10.02.

The Company shall cause to be deposited in the Escrow Account, on a daily basis upon receipt thereof, all revenues received with respect to the conservation and disposition of the related REO Property and shall withdraw therefrom funds necessary for the proper operation, management and maintenance of the related REO Property, including the cost of maintaining any hazard insurance pursuant to Section 4.10 hereof and the fees of any managing agent acting on behalf of the Company. If the Company (and not an agent of the Company) manages the related REO Property, the Company shall be entitled to receive a management fee in an amount equal to the greater of $1,200 or 1% of the sales price of the related REO Property (the "REO Disposition Fee"). The Company shall be entitled to deduct the REO Disposition Fee directly from the REO Disposition proceeds prior to distribution of the REO Distribution Proceeds to the REO Owner. Any disbursement in excess of $5,000 shall be made only with the written approval of the REO Owner. For purposes of the preceding sentence, any approval give by the Owner shall constitute approval by the REO Owner. If is hereby understood and agreed by the Company that if requested by the Owner in connection with a securitization as contemplated under Article XII, the Company shall waive its right to collect an REO Disposition Fee. On or before each Determination Date, the Company shall withdraw from the Escrow Account and deposit into the Custodial Account the net income from the REO Property on deposit in the Escrow Account less any reserves required to be maintained in the Escrow Account from time to time to satisfy reasonably anticipated expenses. The Company shall furnish to the Owner on each Remittance Date, an operating statement for each REO Property covering the operation of each REO Property for the previous month and the Company's efforts in connection with the sale of that

33

REO Property. Such statement shall be accompanied by such other information, as the Owner shall reasonably request.

Each REO Disposition shall be carried out by the Company at such price, and upon such terms and conditions, as the Company deems to be in the best interests of the REO Owner. If upon the acquisition of title to the Mortgaged Property by foreclosure sale or deed in lieu of foreclosure or otherwise, there remain outstanding unreimbursed P&I Advances pursuant to Section 5.03 with respect to the Mortgage Loan or if, upon liquidation as provided in this Section 4.14, there remain outstanding any unreimbursed Servicing Advances with respect to the Mortgaged Property or the Mortgage Loan, the Company shall be entitled to reimbursement from the proceeds received in connection with the disposition of the Mortgaged Property, and from the Owner if such proceeds are insufficient, for any related unreimbursed Servicing Advances or related unreimbursed P&I Advances pursuant to Section 5.03. On the Remittance Date immediately following the Principal Prepayment Period in which REO Disposition Proceeds are received, the net cash proceeds of such REO Disposition shall be distributed to the REO Owner. In the event that the Company is billed for expenses related to an REO Property subsequent to the date on which the net cash proceeds of such REO Disposition are distributed to the REO Owner, the Company shall pay such expenses and shall thereupon be entitled to reimburse itself therefor by withdrawing the amount of such expenses from the Custodial Account.

Section 4.15    Reserved.

Section 4.16    Inspections.

If any Mortgage Loan is more than sixty (60) days delinquent, the Company immediately shall inspect the Mortgaged Property and shall conduct subsequent inspections in accordance with Customary Servicing Procedures or as may be required by the primary mortgage guaranty insurer. The Company shall keep a written or electronic report of each such inspection.

Section 4.17    Restoration of Mortgaged Property.

The Company need not obtain the approval of the Owner prior to releasing any Insurance Proceeds or Condemnation Proceeds to the Mortgagor to be applied to the restoration or repair of the Mortgaged Property if such release is in accordance with Customary Servicing Procedures. For claims greater than $15,000, at a minimum the Company shall comply with the following conditions in connection with any such release of Insurance Proceeds or Condemnation Proceeds:

(a)    the Company shall receive satisfactory independent verification of completion of repairs and issuance of any required approvals with respect thereto;

the Company shall take all steps necessary to preserve the priority of the lien of the Mortgage, including, but not limited to requiring waivers with respect to mechanics' and materialmen's liens;
the Company shall verify that the Mortgage Loan is not in default; and
pending repairs or restoration, the Company shall place the Insurance Proceeds or Condemnation Proceeds in the Escrow Account.

34

If the Owner is named as an additional loss payee, the Company is hereby empowered to endorse any loss draft issued in respect of such a claim in the name of the Owner.

Section 4.18    Maintenance of Primary Insurance Policy; Claims.

If a Mortgage Loan has an original LTV of 80% or greater, the Company shall, without any cost to the Owner, maintain or cause the Mortgagor to maintain in full force and effect a Primary Insurance Policy insuring the portion over 78% until such Primary Insurance Policy may be terminated pursuant to the Homeowners Protection Act of 1998, 12 USC §4901, et seq. In the event that such Primary Insurance Policy shall be terminated other than as required by law, the Company shall obtain from another insurer generally acceptable to Fannie Mae and Freddie Mac a comparable replacement policy, with a total coverage equal to the remaining coverage of such terminated Primary Insurance Policy. If the insurer shall cease to be generally acceptable to Fannie Mae and Freddie Mac, the Company shall determine whether recoveries under the Primary Insurance Policy are jeopardized for reasons related to the financial condition of such insurer, it being understood that the Company shall in no event have any responsibility or liability for any failure to recover under the Primary Insurance Policy for such reason. If the Company determines that recoveries are so jeopardized, it shall notify the Owner and the Mortgagor, if required, and obtain from another insurer generally acceptable to Fannie Mae and Freddie Mac a replacement insurance policy. The Company shall not take any action which would result in noncoverage under any applicable Primary Insurance Policy of any loss which, but for the actions of the Company would have been covered thereunder. In connection with any assumption or substitution agreement entered into or to be entered into pursuant to Section 6.01, the Company shall promptly notify the insurer under the related Primary Insurance Policy, if any, of such assumption or substitution of liability in accordance with the terms of such Primary Insurance Policy and shall take all actions which may be required by such insurer as a condition to the continuation of coverage under such Primary Insurance Policy. If such Primary Insurance Policy is terminated as a result of such assumption or substitution of liability, the Company shall obtain a replacement Primary Insurance Policy as provided above.

In connection with its activities as servicer, the Company agrees to prepare and present, on behalf of itself and the Owner, claims to the insurer under any Primary Insurance Policy in a timely fashion in accordance with the terms of such Primary Insurance Policy and, in this regard, to take such action as shall be necessary to permit recovery under any Primary Insurance Policy respecting a defaulted Mortgage Loan. Pursuant to Section 4.04, any amounts collected by the Company under any Primary Insurance Policy shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 4.05.

Section 4.19    Real Estate Owned Reports.

Together with the statement furnished pursuant to Section 5.02, the Company shall furnish to the Owner on or before the Remittance Date each month a statement with respect to any REO Property covering the operation of such REO Property for the previous month and the Company's efforts in connection with the sale of such REO Property and any rental of such REO Property incidental to the sale thereof for the previous month. That statement shall be accompanied by such other information, as the Owner shall reasonably request.

Section 4.20    Liquidation Reports.

Upon the foreclosure sale of any Mortgaged Property or the acquisition thereof by the Owner pursuant to a deed in lieu of foreclosure, the Company shall submit to the Owner a liquidation report with respect to such Mortgaged Property.

Section 4.21    Reports of Foreclosures and Abandonments of Mortgaged Property.

Following the foreclosure sale or abandonment of any Mortgaged Property, the Company shall report such foreclosure or abandonment as required pursuant to Section 6050J of the Code. The Company shall file information reports with respect to the receipt of mortgage interest received in a trade or business and information returns relating to cancellation of indebtedness income with respect to any Mortgaged Property as required by the Code. Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by the Code.

Section 4.22    Disaster Recovery/Business Continuity Plan.

The Company shall establish and maintain contingency plans, recovery plans and proper risk controls to ensure the Company's continued performance under this Agreement. Such plans shall be in accordance with Customary Servicing Procedures and in accordance with Fannie Mae requirements. The Company agrees to make copies or summaries of the plans available to one or more of the regulatory authorities supervising the Owner upon the Owner's reasonable request.


ARTICLE V

PAYMENTS TO THE OWNER

Section 5.01    Distributions.

(a)    On each Remittance Date, the Company shall remit to the Owner of record on the preceding Record Date (i) all amounts credited to the Custodial Account as of the close of business on the preceding Determination Date (net of charges against or withdrawals from the Custodial Account pursuant to Section 4.05(ii)-(iv)), plus (ii) the aggregate amount of P&I Advances, if any, and payments pursuant to Section 5.03, if any, that the Company is obligated to make on such Remittance Date, plus (iii) the aggregate amount of any Prepayment Interest Shortfall existing as of such Remittance Date and minus (iv) any amounts that represent early receipts of Monthly Payments due on a Due Date or Due Dates subsequent to the Due Date occurring in the month of such Remittance Date (except to the extent that, pursuant to Section 5.03, any funds described in this clause (iv) are to be remitted to the Owner in lieu of P&I Advances by the Company out of its own funds).

(b)    Each remittance pursuant to this Section 5.01 shall be made by wire transfer of immediately available funds to, or by other means of transmission or transfer that causes funds to be immediately available in, the account which shall have been designated by the Owner.

(c)    With respect to any remittance received by the Owner after the Business Day on which such payment was due, the Company shall pay to the Owner interest on any such late

payment at an annual rate equal to the Prime Rate, adjusted as of the date of each change, plus two (2) percentage points, but in no event greater than the maximum amount permitted by applicable law. Such interest shall be deposited in the Custodial Account by the Company on the date such late payment is made and shall cover the period commencing with the day following such Business Day and ending with the Business Day on which such payment is made, both inclusive. Such interest shall be remitted along with the distribution payable on the next succeeding related Remittance Date. The payment by the Company of any such interest shall not be deemed an extension of time for payment or a waiver of any Event of Default by the Company.

(d)    The Company shall ten (10) days prior to the Remittance Date on which the final distribution of funds to Owner is to be made hereunder, notify each Owner of the pendency of such distribution and such distribution shall be made to each Owner.

Section 5.02    Statements to the Owner.

Not later than the (10th) Business Day of the month of the related Remittance Date, the Company shall deliver to the Owner a monthly remittance statement in the form of, and providing the information described in, Exhibit E hereto and a mutually agreed upon electronic format.

In addition, not more than sixty (60) days after the end of each calendar year, upon receipt of written request by the Owner, the Company will furnish at any time during such calendar year, a listing of the principal balances of the Mortgage Loans outstanding at the end of such calendar year.

The Company shall prepare and file any and all tax returns, information statements or other filings required to be delivered to any governmental taxing authority (other than those required to be filed by the Owner) or to the Owner pursuant to any applicable law with respect to the Mortgage Loans and the transactions contemplated hereby.

Section 5.03    P&I Advances by the Company.

Not later than the close of business on the Business Day preceding each Remittance Date, the Company shall from its own funds deposit in the Custodial Account an amount equal to all Monthly Payments that were due on the related Due Date and that were delinquent at the close of business on the related Determination Date, with the interest adjusted to the respective Mortgage Loan Remittance Rates; provided, however, that to the extent there are funds on deposit in the Custodial Account that are not otherwise required to be distributed to the Owner on such Remittance Date, the Company may remit such funds in lieu of making advances of its own funds; and further provided that any such funds held for future distribution and so used shall be appropriately reflected in the Company's records and replaced by the Company by deposit into the Custodial Account on or before each Remittance Date to the extent that funds on deposit in the Custodial Account for the related Remittance Date (determined without regard to P&I Advances required to be made on such Remittance Date) shall be less than the aggregate amount required to be distributed to the Owner pursuant to Section 5.01 on such related Remittance Date. For purposes of this Section 5.03, any Monthly Payment or portion thereof deferred

pursuant to Section 4.01 shall be considered delinquent until paid. The Company's obligation to make P&I Advances as to any Mortgage Loan shall continue through the earlier to occur of (a) the repurchase of the Mortgage Loan by the Company pursuant to Section 3.03 and (b) the Remittance Date following acquisition or disposition of title to the related Mortgaged Property through foreclosure or by delivery of a deed in lieu of foreclosure; provided, however, that if requested by a Rating Agency in connection with a securitization as contemplated under Article XII, the Company shall be obligated to make such advances through the Remittance Date prior to the date on which cash is received in connection with the liquidation of REO Property.

Notwithstanding the provisions of this Section 5.03, the Company shall not be required to make any advance of principal and interest if, in the good faith judgment of the Company, such advance of principal and interest will not ultimately be recoverable from the related Mortgagor, from Liquidation Proceeds or otherwise. In the event that the Company determines that any such advances are non-recoverable, the Company shall provide the Owner with an Officer's Certificate.

Section 5.04    Prepayment Interest Shortfalls.

Not later than the close of business on the Business Day preceding each Remittance Date, the Company shall from its own funds deposit in the Custodial Account an amount equal to the aggregate Prepayment Interest Shortfall, if any, existing in respect of the related Principal Prepayment Period.


ARTICLE VI

GENERAL SERVICING PROCEDURE

Section 6.01    Assumption Agreements.

The Company shall use its best efforts to enforce any "due-on-sale" provision contained in each Mortgage or Mortgage Note to the extent permitted by law and provided that such enforcement would not impair any recovery under any related Primary Insurance Policy. The Company shall be entitled to retain as additional servicing compensation any assumption fee collected by the Company for entering into an assumption agreement. In connection with any such assumption agreement, none of the Mortgage Interest Rate borne by the related Mortgage Note, the term of the Mortgage Loan, the outstanding principal amount of the Mortgage Loan nor any other material terms shall be changed without the Owner's consent.

To the extent that any Mortgage Loan is assumable, the Company shall inquire diligently into the credit worthiness of the proposed transferee, and shall use the underwriting criteria for approving the credit of the proposed transferee which are used with respect to underwriting mortgage loans of the same type as the Mortgage Loans. If the credit worthiness of the proposed transferee does not meet such underwriting criteria, the Company diligently shall, to the extent permitted by the Mortgage or the Mortgage Note and by applicable law, accelerate the maturity of the Mortgage Loan.

38

Section 6.02   Release of Mortgage Files; Wrongful Satisfaction of Mortgages.

Upon the payment in full of any Mortgage Loan, the Company will obtain the portion of the Mortgage File that is in the possession of the Owner, prepare and process any required satisfaction or release of the Mortgage and notify the Owner as provided in Section 5.02.

If the Company satisfies or releases the lien of a Mortgage without having obtained payment in full of the indebtedness secured by the Mortgage, the Company, upon written demand, shall remit to the Owner the then Assumed Principal Balance of the related Mortgage Loan, plus accrued interest at the Mortgage Loan Remittance Rate through the date of release, by deposit thereof in the Custodial Account. The Company shall maintain the Fidelity Bond as provided for in Section 4.13 insuring the Company against any loss it may sustain with respect to any Mortgage Loan not satisfied in accordance with the procedures set forth herein.

Section 6.03   Servicing Compensation.

As compensation for its services hereunder, the Company shall be entitled to withdraw from the Custodial Account or to retain from interest payments on the Mortgage Loans the amounts provided for as the Company's Servicing Fee. The obligation of the Owner to pay the Servicing Fee is limited to, and payable solely from, the interest portion of the Monthly Payments. Additional servicing compensation in the form of assumption fees, as provided in Section 6.01, and late payment charges or otherwise shall be retained by the Company. The Company shall be entitled to request reimbursement for additional services, including:

(a)     express and other delivery charges and any other reasonable out-of-pocket expenses incurred by the Company with respect to a Mortgage Loan to the extent not ordinary to the servicing function (but not including salaries, rent and other general operating expenses of Servicer normally classified as overhead);

(b)     preparation and delivery of any special reports, magnetic tapes, disks, or transmission outside the normal monthly accounting reports; and

(c)     to the extent not ordinary to the servicing function, any action taken by the Company which the Company reasonably determines to be necessary or appropriate in order to protect the rights of Owner, (including property preservation), with respect to any Mortgage Loan, not to exceed $5,000.00 without the prior approval of the Owner (with the exception of advances for real estate taxes and insurance premiums).

Section 6.04   Annual Statement as to Compliance.

The Company shall deliver to the Owner, on or before February 28 of each year, beginning February 28, 2004, an Officers' Certificate stating that (i) a review of the activities of the Company during the preceding calendar year and of the Company's performance under this Agreement has been made under such officer's supervision, and (ii) to the best of such officer's knowledge, based on such review, the Company has fulfilled all of its obligations under this Agreement throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such Servicing Officer and the nature and status thereof and the action being taken by the Company to cure such default.

Section 6.05    Annual Independent Public Accountants' Servicing Report.

On or before February 28 of each year, beginning February 28, 2004, the Company, at its expense, shall cause a firm of independent public accountants that is a member of the American Institute of Certified Public Accountants to furnish a statement to the Owner to the effect that such firm has examined certain documents and records relating to the servicing of mortgage loans in the Company's portfolio. On the basis of this examination, the CPA firm will disclose any exceptions or errors relating to the servicing of mortgage loans, as required by paragraph four (4) of "The Uniform Single Attestation Program for Mortgage Bankers."

Section 6.06    Owner's Right to Examine the Company Records.

The Owner shall have the right, upon reasonable notice to the Company, to examine and audit any and all of the books, records or other information of the Company whether held by the Company or by another on behalf of the Company, which may be relevant to the performance or observance by the Company of the terms, covenants or conditions of this Agreement, and to discuss such books, records or other information with an officer or employee of the Company who is knowledgeable about the matters contained therein.

Section 6.07    Compliance with REMIC Provisions.

If a REMIC election has been made with respect to the arrangement under which the Mortgage Loans and REO Property are held, the Company shall not take any action, cause the REMIC to take any action or fail to take (or fail to cause to be taken) any action that, under the REMIC Provisions, if taken or not taken, as the case may be, could (i) endanger the status of the REMIC as a REMIC or (ii) result in the imposition of a tax upon the REMIC (including but not limited to the tax on "prohibited transactions" as defined in Section 860(a)(2) of the Code and the tax on "contributions" to a REMIC set forth in Section 860(d) of the Code) unless the Company has received an opinion of counsel (at the expense of the party seeking to take such action) to the effect that the contemplated action will not endanger such REMIC status or result in the imposition of any such tax.

Section 6.08    Fair Credit Reporting Act Compliance.

The Company shall fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on its borrower credit files to Equifax, Experian, and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis.

ARTICLE VII

REPORTS TO BE PREPARED BY THE COMPANY

Section 7.01    The Company Shall Provide Access and Information as Reasonably Required.

The Company shall furnish to the Owner upon written request, during the term of this Agreement, such periodic, special or other reports or information, including but not limited to

40

evidence of origination compliance, whether or not provided for herein, as shall be necessary, reasonable or appropriate with respect to the purposes of this Agreement. The Company may negotiate with the Owner for a reasonable fee for providing such report or information, unless (i) the Company is required to supply such report or information pursuant to any other section of this Agreement, or (ii) the report or information has been requested in connection with Internal Revenue Service requirements or with inquiries from one or more of the regulatory authorities supervising the Owner. The Company agrees to execute and deliver all such instruments as the Owner, from time to time, may reasonably request in order to effectuate the purposes and to carry out the terms of this Agreement.

Section 7.02    Financial Statements.

The Company understands that, in connection with marketing the Mortgage Loans, the Owner may make available to a prospective Owner a consolidated statement of operations of the Company for the most recently completed five fiscal years for which such a statement is available as well as a consolidated statement of condition at the end of the last two fiscal years covered by such consolidated statement of operations. The Company, if it has not already done so, agrees to promptly furnish to Owner copies of the statements specified above.

The Company also agrees to make available upon reasonable notice and during normal business hours to any prospective Owner a knowledgeable financial or accounting officer for the purposes of answering questions respecting recent developments affecting the Company or the financial statements of the Company and to permit upon reasonable notice and during normal business hours any prospective Owner to inspect the Company's servicing facilities for the purpose of satisfying such prospective Owner that the Company has the ability to service the Mortgage Loans in accordance with this Agreement.

Section 7.03    Cooperation with Third-Party Service Providers.

The Company shall cooperate with the Owner in servicing the Mortgage Loans in accordance with the usual and customary requirements of any credit enhancement, risk management and other service providers and shall otherwise cooperate with the Owner in connection with such third-party service providers and the provision of third-party services; *provided, however*, that such requirements are reasonably acceptable to the Company and pose no greater risk, obligation or expense to the Company than otherwise set forth in this Agreement. Any additional costs and/or expenses will be paid by the requesting party.

ARTICLE VIII

THE COMPANY

Section 8.01    Indemnification; Third Party Claims.

The Company agrees to indemnify the Owner and hold them harmless against any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments, and any other costs, fees and expenses that the Owner incurs resulting from the failure of the Company to perform its duties and service the Mortgage Loans in material compliance with the terms of this Agreement. The Company shall immediately notify the Owner if a claim is made

41

by a third party with respect to this Agreement or any of the Mortgage Loans. The Company shall follow any written instructions received from the Owner in connection with such claim and shall pay all expenses in connection therewith, including counsel fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against it or the Owner in respect of such claim. The Company may request reimbursement from the Owner for any expenses incurred by it in connection with the defense of any such third party claim except when the claim is in any way related to a breach of the Company's representations and warranties set forth in the Agreement or the failure of the Company to perform its duties and service the Mortgage Loans in strict compliance with the terms of this Agreement or in accordance with applicable law. Such reimbursement will be made by the Owner within thirty (30) days of notification by the Company.

Section 8.02    Merger or Consolidation of the Company.

The Company shall keep in full effect its existence, rights and franchises as a corporation, and shall preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, or the ability of the Company to perform its duties under this Agreement.

Any Person into which the Company may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Company shall be a party, or any Person succeeding to the business of the Company hereunder, shall be the successor of the Company hereunder without the execution or filing of any paper or any further act on the part of either of the parties hereto, anything herein to the contrary notwithstanding; provided, however, that the successor or surviving Person shall be an institution (i) that is qualified to service mortgage loans on behalf of Fannie Mae or Freddie Mac and (ii) that has a net worth of not less than $15,000,000.

Section 8.03    Company Not to Resign.

The Company shall not assign this Agreement (except to any affiliate or subsidiary of the Company) or resign from the obligations and duties hereby imposed on it except by mutual consent of the Company and the Owner or upon the determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by the Company. Any such determination permitting the resignation of the Company shall be evidenced by an Opinion of Counsel to such effect delivered to the Owner. No such resignation shall become effective until a successor shall have assumed the Company's responsibilities and obligations hereunder in the manner provided in Section 11.01.

ARTICLE IX

DEFAULT

Section 9.01    Events of Default.

Event of Default, whenever used herein, means any one or more of the following events:

(i)    any failure by the Company to remit to the Owner any payment required to be made under the terms of this Agreement that continues unremedied for a period of three (3) Business Days after the date upon which written notice of such failure, requiring the same to be remedied, shall have been received by the Company from the Owner; or

(ii)    any failure on the part of the Company duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Company set forth in this Agreement, including, but not limited to, breach by the Company of any one or more of the representations, warranties and covenants of the Company as set forth in Section 3.01 of this Agreement, that continues unremedied for a period of sixty (60) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been received by the Company from the Owner or party acting on behalf of the Owner; or

(iii)    a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a trustee in bankruptcy, conservator, receiver or liquidator in any bankruptcy, reorganization, insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Company and such decree or order shall have remained in force undischarged or unstayed for a period of sixty (60) days; or

(iv)    the Company ceases to be qualified to transact business in any jurisdiction where it is currently so qualified, but only to the extent such non-qualification materially and adversely affects the Company's ability to perform its obligations hereunder; or

(v)    the Company shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Company or of or relating to all or substantially all of its property; or

(vi)    the Company shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency, bankruptcy or reorganization statute, make an assignment for the benefit of its creditors or voluntarily suspend payment of its obligations or cease its normal business operations for three (3) consecutive Business Days; or

(vii)    the Company attempts to assign its right to servicing compensation hereunder or to assign this Agreement or the servicing responsibilities hereunder or to delegate its duties hereunder or any portion thereof in violation of Section 8.03.

If the Company obtains knowledge of an Event of Default, such party shall promptly notify the Owner. If an Event of Default shall occur, then so long as such Event of Default shall not have been remedied, the Owner may, by notice in writing to the Company, in addition to whatever rights the Owner may have at law or equity to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Company under this Agreement and in and to the Mortgage Loans and the proceeds thereof. On or after the receipt by the Company

43

of such written notice, all authority and power of the Company under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the successor appointed pursuant to Section 11.01. Upon written request from the Owner, the Company shall prepare, execute and deliver, any and all documents and other instruments, place in such successor's possession all Mortgage Files, and do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise, at the Company's sole expense. The Company shall cooperate with the Owner and such successor in effecting the termination of the Company's responsibilities and rights hereunder, including, without limitation, the transfer to such successor for administration by it of all cash amounts (less any amounts due the Company pursuant to the terms of this Agreement) which shall at the time be credited by the Company to the Custodial Account or Escrow Account or thereafter received with respect to the Mortgage Loans.

Section 9.02    Waiver of Defaults.

The Owner may in writing waive any past default by the Company in the performance of its obligations hereunder and the consequences thereof and any default in remitting to Owner any required distribution in accordance with this Agreement, including the Company's obligation to make P&I Advances. Subject to the preceding sentence, upon any waiver of a past default, such default shall be deemed not to exist and any Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement, except as otherwise stated in such waiver; provided, however, that no such waiver shall extend to any subsequent or other default or impair any right consequent thereto, except as otherwise stated in such waiver.

ARTICLE X

TERMINATION

Section 10.01    Termination.

(a)    This Agreement shall terminate upon either: (i) the later of the distribution to the Owner of final payment or liquidation with respect to the last Mortgage Loan (or advances of same by the Company), or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure with respect to the last Mortgage Loan and the remittance of all funds due hereunder or (ii) mutual consent of the Company and the Owner in writing. The representations and warranties and indemnification provisions contained herein shall survive the termination of this Agreement.

Section 10.02    Termination Without Cause

The Owner may, at its sole option, terminate any rights the Company may have hereunder with respect to one or more Mortgage Loan Packages in whole or in part, without cause, upon thirty (30) days prior written notice. In the event of such a termination, the Owner agrees to pay a sum, as liquidated damages, in an amount equal to (i) two percent (2%) of the aggregate Assumed Principal Balance of the Mortgage Loans as to which the Company's services, rights and obligations hereunder are terminated if such written notice is received by the

44

Company on or before the Business Day that is five (5) years from the related Closing Date, or (ii) one percent (1%) of the aggregate Assumed Principal Balance of the Mortgage Loans as to which the Company's services, rights and obligations hereunder are terminated if such written notice is received by the Company after the Business Day that is five (5) years from the related Closing Date (either amount shall be referred to as "Liquidated Damages"). Any such notice of termination shall be in writing and delivered to the Company by registered mail as provided in Section 11.07 of this Agreement.

Termination pursuant to this Section 10.02 shall be effective on the date on which the Company transfers all responsibilities, rights, duties and obligations under this Agreement to the successor appointed pursuant to Section 11.01.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.01  Successor to the Company.

Prior to termination of the Company's responsibilities and duties under this Agreement pursuant to Section 8.03, 9.01, 10.01(a)(ii) or 10.02 the Owner shall (i) succeed to and assume all of the Company's responsibilities, rights, duties and obligations under this Agreement, or (ii) appoint a successor which shall succeed to all rights and assume all of the responsibilities, duties and liabilities of the Company under this Agreement prior to the termination of the Company's responsibilities, duties and liabilities under this Agreement.  In connection with such appointment and assumption, the Owner may make such arrangements for the compensation of such successor out of payments received with respect to the Mortgage Loans as it and such successor shall agree.  The Company shall discharge its duties and responsibilities during the period from the date it acquires knowledge of such termination until the effective date thereof with the same degree of diligence and prudence that it is obligated to exercise under this Agreement.  The resignation or removal of the Company pursuant to the aforementioned Sections shall not become effective until a successor shall be appointed pursuant to this Section and shall not relieve the Company of its obligations under Section 3.03.

Any successor appointed as provided herein shall execute, acknowledge and deliver to the Company and to the Owner an instrument accepting such appointment, whereupon such successor shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the Company, with like effect as if originally named as a party to this Agreement. No termination of the Company or this Agreement shall affect any claims that the Owner may have against the Company arising prior to any such termination or resignation.

The Company shall timely deliver to its successor the funds in the Custodial Account and the Escrow Account (less any amounts to which the Company is entitled pursuant to the terms of this Agreement) and all Mortgage Files and related documents and statements held by it hereunder and the Company shall account for all funds. The Company shall execute and deliver such instruments and do such other things all as may reasonably be required to more fully and definitely vest and confirm in the successor all such rights, powers, duties, responsibilities, obligations and liabilities of the Company.

45

Upon a successor's acceptance of appointment as such, the Company shall notify by mail the Owner of such appointment.

In connection with the termination or resignation of the Company hereunder, either (i) the successor shall represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS, in which case the Company shall cooperate with the successor in causing MERS to revise its records to reflect the transfer of servicing to the successor as necessary under MERS' rules and regulations, or (ii) the Company shall cooperate with the successor in causing MERS to execute and deliver an Assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Owner and shall execute and deliver such other notices, documents and other instruments as may be necessary or desirable to effect a transfer of such Mortgage Loan or servicing of such Mortgage Loan on the MERS® System to the successor. The Company shall file or cause to be filed any such Assignment of Mortgage in the appropriate recording office. The Company shall bear any and all fees of MERS, costs of preparing any Assignments of Mortgage, and fees and costs of filing any assignments of Mortgage that may be required under this subsection (b), except in the event that the Owner terminates the Company under this Agreement in accordance with Section 10.02 hereof. The successor shall cause such Assignment of Mortgage to be delivered to the Owner promptly upon receipt of the original with evidence of recording thereon or a copy certified by the public recording office in which such assignment was recorded.

Section 11.02  Repurchases and Related Assurances.

In the event the Company repurchases a Mortgage Loan pursuant to Section 3.03, the Owner shall, upon any request of the Company subsequent to the Remittance Date on which the Repurchase Price has been remitted to the Owner, take actions reasonably necessary to effect the reconveyance of the Mortgage Loan.

Section 11.03  Amendment.

This Agreement may be amended only by written agreement signed by the Company and Owner hereunder.

Section 11.04  Reserved.

Section 11.05  Duration of Agreement.

This Agreement shall continue in existence and effect until terminated as herein provided. This Agreement shall continue notwithstanding transfers of the Mortgage Loans by the Owner.

Section 11.06  Governing Law.

This Agreement shall be construed in accordance with the laws of the State of New York, except to the extent preempted by federal law but without regard to principles of conflicts of laws, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

46

Section 11.07 <u>Notices</u>.

Any communications provided for or permitted hereunder shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given if (a) personally delivered, (b) mailed by registered mail, postage prepaid, return receipt requested, and received by the addressee, (c) sent by express courier delivery service and received by the addressee, or (d) transmitted by telex, telecopy or telegraph and confirmed by a writing delivered by means of (a), (b) or (c), to: (i) in the case of the Company 100 Witmer Road, Horsham, PA 19044, Attention: Bill Maguire, Senior Vice President, or such other address as may hereafter be furnished to the Owner in writing by the Company and (ii) in the case of the Owner, Banc of America Mortgage Capital Corporation, Hearst Tower, NC1-027-21-04, 214 North Tryon Street, 21st Floor, Charlotte, North Carolina 28255, Attention: Managing Director, Fax: (704) 386-3215, or such other address or fax as may hereafter be furnished to the Company in writing by the Owner.

Section 11.08 <u>Severability of Provisions</u>.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

Section 11.09 <u>No Partnership</u>.

Nothing herein contained shall be deemed or construed to create a co-partnership or joint venture between the parties hereto and the services of the Company shall be rendered as an independent contractor and not as agent for the Owner.

Section 11.10 <u>Counterparts</u>.

This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which shall be deemed to be an original. Such counterparts shall constitute one and the same agreement.

Section 11.11 <u>Successors and Assigns</u>.

Notwithstanding anything to the contrary in this agreement, it is understood and agreed that the Owner may transfer its interest in this Agreement and the Mortgage Loans, in whole or in part, in accordance with Article XII of this Agreement. This Agreement shall inure to the benefit of and be binding upon the Company, the Owner and their respective successors and assigns permitted hereunder.

Section 11.12 <u>Intention of the Parties</u>.

It is the intention of the parties that the Initial Owner is purchasing, and the Seller is selling, the Mortgage Loans and not a debt instrument of the Seller or another security. Accordingly, the parties hereto each intend to treat each of the transactions contemplated

47

hereunder for Federal income tax purposes as a sale by the Company, and a purchase by the Initial Owner, of the Mortgage Loans. The Initial Owner shall have the right to review the Mortgage Loans and the related Mortgage Files to determine the characteristics of the Mortgage Loans which shall affect the Federal income tax consequences of owning the Mortgage Loans and the Company shall cooperate with all reasonable requests made by the Initial Owner in the course of such review.

Section 11.13  Solicitation of Mortgagor.

The Company agrees not to directly solicit the Mortgagor of any Mortgage Loan for refinancing of any Mortgage Loan or in any way induce, or directly attempt to induce, the refinancing of any Mortgage Loan or the substitution of any Mortgage Loan with any other loan. Nothing contained herein shall prohibit the Company from (i) providing all Mortgagors for which the Company services mortgage loans with any general advertising including information brochures, coupon books, monthly statements or other similar documentation which indicates services the Company offers, including refinances or (ii) providing financing of home equity loans to Mortgagors at the Mortgagor's request.

Section 11.14  Further Agreements.

The Owner and the Company each agree to execute and deliver to the other such additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

Section 11.15  Confidential Information.

(a)    The Company shall keep confidential and shall not divulge to any party, without the Owner's prior written consent, the price paid by the Owner for the Mortgage Loans, except to the extent that it is reasonable and necessary for the Company to do so in working with legal counsel, auditors, taxing authorities or other governmental agencies.

(b)    The Owner and the Company agree they (i) shall comply with all applicable laws and regulations regarding the privacy or security of Consumer Information, (ii) shall not collect, create, use, store, access, disclose or otherwise handle Consumer Information in any manner inconsistent with any applicable laws or regulations regarding the privacy or security of Consumer Information, (iii) shall not disclose Consumer Information to any affiliated or non-affiliated third party except to enforce or preserve its rights, as otherwise permitted or required by applicable law (or by regulatory authorities having jurisdiction in the premises) or, in the case of the Company, at the specific written direction of the Owner, (iv) shall maintain appropriate administrative, technical and physical safeguards to protect the security, confidentiality and integrity of Consumer Information, including maintaining security measures designed to meet the Interagency Guidelines Establishing Standards for Safeguarding Consumer Information published in final form on February 1, 2001, 66 Fed. Reg. 8616, and the rules promulgated thereunder and (v) shall promptly notify the other party in writing upon becoming aware of any actual breach and of any suspected breach of this section. The Company shall promptly provide the Owner's regulators information regarding such security measures upon the reasonable request of the Owner, which information shall include, but not be limited to, any SAS 70 or

similar independent audit reports, summaries of test results or equivalent measures taken by the Company with respect to its security measures, as agreed upon by the parties. Each party shall indemnify and defend the other party against, and shall hold the other party harmless from, any cost, expense, loss, claim or other liability that such other party may suffer as a result of or in connection with its failure to comply with or perform the obligations set forth in this section. The restrictions set forth herein shall survive the termination of this Agreement.

Section 11.16 <u>Exhibits</u>.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 11.17 <u>General Interpretive Principles</u>.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)    accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)    references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs, Clauses and other subdivisions of this Agreement;

(d)    a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs, Clauses, and other subdivisions;

(e)    the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)    the term "include" or "including" shall mean without limitation by reason of enumeration.

## ARTICLE XII

## WHOLE LOAN TRANSFER; PASS-THROUGH TRANSFER

Section 12.01 <u>Removal of Mortgage Loans from Inclusion under this Agreement upon a Whole Loan Transfer or a Pass-Through Transfer on One or More Reconstitution Dates</u>

(a)    The Company acknowledges and the Owner agrees that with respect to some or all of the Mortgage Loans, the Owner may effect one or more Whole Loan Transfers or Pass-

Through Transfers; provided, however, that the aggregate number of such transfers by the Owner shall not exceed four (4).

(b)    The Company shall cooperate with the Owner in connection with any Whole Loan Transfer or Pass-Through Transfer contemplated by the Owner pursuant to this Section. In connection therewith, the Owner shall deliver any Reconstitution Agreement or other document related to the Whole Loan Transfer or Pass Through Transfer to the Company at least fifteen (15) days prior to such transfer, and the Company shall execute any Reconstitution Agreement which contains servicing provisions substantially similar to those herein or otherwise reasonably acceptable to the Owner and the Company and which restates the representations and warranties contained in Section 3.01 as of the Reconstitution Date (except to the extent any such representation or warranty is not accurate on such date) and Section 3.02 herein as of the related Closing Date. The Owner hereby agrees to reimburse the Company for reasonable "out of pocket" expenses incurred by the Company related to such Whole Loan Transfer or Pass-Through Transfer, including reimbursement for the amount which reasonably reflects time and effort expended by the Company in connection therewith.

(c)    With respect to any Mortgage Loans that are subject to a Pass-Through Transfer, unless otherwise provided in the related pooling and servicing agreement or similar agreement, the Company shall (1) cause the servicing officer in charge of servicing for the Company to execute and deliver a certification (the "SEC Certification") in the format attached hereto as Exhibit G which at the Owner's option shall be (A) attached to any Form 10-K's filed with the Securities and Exchange Commission ("SEC") in connection with the related securitization trust (or similar transaction) or (B) provided to the Owner and such other Persons as are specified in the pooling and servicing agreement or similar agreement, and (2) indemnify the Owner and such other Persons as are specified in the pooling and servicing agreement or similar agreement for losses in connection with or relating to the inaccuracy of the SEC Certification provided by the Company.

(d)    All Mortgage Loans not sold or transferred pursuant to a Whole Loan Transfer or Pass-Through Transfer shall be subject to this Agreement and shall continue to be serviced in accordance with the terms of this Agreement and with respect thereto this Agreement shall remain in full force and effect.

[Remainder of page intentionally blank - signatures follow.]

IN WITNESS WHEREOF, the Company and the Initial Owner have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

GMAC MORTGAGE CORPORATION, as Company

By: _____

Name: _____
       Patricia C. Taylor
       Vice President

Title: _____


BANC OF AMERICA MORTGAGE CAPITAL CORPORATION, as Initial Owner


By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the Company and the Initial Owner have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

GMAC MORTGAGE CORPORATION,
as Company

By: _____

Name: _____

Title: _____

BANC OF AMERICA MORTGAGE
CAPITAL CORPORATION, as Initial
Owner

By: _____

Name: _____

Title: _____

COMMONWEALTH OF <u>PENNSYLVANIA</u>)

)  SS.

COUNTY OF <u>MONTGOMERY</u>)

On the 28th day of August before me, a Notary Public in and for said Commonwealth, personally appeared Patricia C. Taylor known to me to be Vice President of GMAC Mortgage Corporation, that executed the within instrument and also known to me to be the person who executed it on behalf of said association, and acknowledged to me that such association executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand affixed my official seal the day and year in this certificate first above written.

_Margaret Brossman_

Notary Public

My Commission expires _3-19-06_

```
         NOTARIAL SEAL
MARGARET BROSSMAN, Notary Public
  Horsham Twp., Montgomery County
 My Commission Expires March 19, 2006
```

STATE OF North Carolina )
                        ) SS.
COUNTY OF Mecklenburg )

On the 26th day of August ____ before me, a Notary Public in and for said state, personally
appeared Bruce W. Good ____ known to me to be a Vice President of Bank of America
Mortgage Capital Corporation, the company that executed the within instrument and also known to me to
be the person who executed it on behalf of said company, and acknowledged to me that such
company executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand affixed my official seal the day and year
in this certificate first above written.

_____
Notary Public

My Commission expires 12-15-07

EXHIBIT A

CONTENTS OF MORTGAGE FILES

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items (except the items delivered to the Owner or its designee pursuant to Section 2.03), all of which shall be available for inspection by the Owner and which may be retained in microfilm, microfiche, optical storage or magnetic media in lieu of hard copy:

1.    A copy of the Mortgage Note endorsed, "Pay to the order of _____, without recourse" and signed in the name of the Company by an authorized officer. Such signature may be an original signature or a facsimile signature of such officer. If the Mortgage Loan was acquired by the Company in a merger, the endorsement must be by "GMAC Mortgage Corporation, successor by merger to [name of predecessor]"; and if the Mortgage Loan was acquired or originated by the Company while doing business under another name, the endorsement must be by "GMAC Mortgage Corporation, formerly known as [previous name]". The Mortgage Note shall include all intervening endorsements showing a complete chain of title from the originator to the Company.

2.    The original of any guarantee executed in connection with the Mortgage Note (if any).

3.    The original Mortgage, or a copy of the Mortgage, with evidence of recording thereon certified by the appropriate recording office to be a true copy of the recorded Mortgage, or, if the original Mortgage has not yet been returned from the recording office, a copy of the original Mortgage together with a certificate of a duly authorized representative of the Company (which certificate may consist of stamped text appearing on such copy of the Mortgage), the closing attorney or an officer of the title insurer which issued the related title insurance policy, certifying that the copy is a true copy of the original of the Mortgage which has been transmitted for recording in the appropriate recording office of the jurisdiction in which the Mortgaged Property is located.

4.    Unless the Mortgage Loan is registered on the MERS System, the Assignment of Mortgage, executed in blank, but otherwise in form and substance acceptable for recording; provided, however, that certain recording information will not be available if, as of the related Closing Date, the Company has not received the related Mortgage from the appropriate recording office. If the Mortgage Loan was acquired by the Company in a merger, the assignment must be by "GMAC Mortgage Corporation, successor by merger to [name of predecessor]"; and if the Mortgage Loan was acquired or originated by the Company while doing business under another name, the assignment must be by "GMAC Mortgage Corporation, formerly known as [previous name]".

5.  Originals or certified true copies from the appropriate recording offices of all assumption, modification, consolidation and extension agreements, if any or if the original has not yet been returned from the recording office, a copy of such original certified by the Company.

6.  Originals, or certified true copies from the appropriate recording offices, of any intervening assignments of the Mortgage with evidence of recording thereon, or, if the original intervening assignment has not yet been returned from the recording office, a certified copy of such assignment.

7.  A certified copy of any power of attorney.

8.  Any security agreement, chattel mortgage or equivalent executed in connection with the Mortgage.

9.  For each Mortgage Loan which is secured by a residential long-term lease, if any, a copy of the lease with evidence of recording indicated thereon, or, if the lease is in the process of being recorded, a photocopy of the lease, certified by an officer of the respective prior owner of such Mortgage Loan or by the applicable title insurance company, closing/settlement/escrow agent or company or closing attorney to be a true and correct copy of the lease transmitted for recordation.

10. The original policy of title insurance or, if such insurance is in force but the original policy of title insurance has not been delivered to the Company by the issuing title insurer, the report of title insurance or other evidence of title insurance generally acceptable to Fannie Mae or Freddie Mac or, if the Mortgage Loan is the subject of a Fannie Mae or Freddie Mac approved master title insurance policy, a certified copy of the certificate of title insurance issued thereunder.

11. The original Primary Insurance Policy, if any, or, if the Primary Insurance Policy has been issued but the original thereof has not been delivered to the Company by the issuer thereof, a copy of the Primary Insurance Policy certified by a duly authorized officer of the Company to be a true, complete and correct copy of the original, which certification may be in the form of a blanket certification relating to more than one Mortgage Loan.

12. Original hazard insurance policy or a binder evidencing such coverage and, if required by law, flood insurance policy, with extended coverage of the hazard insurance policy, unless the Mortgage Loan is the subject of a blanket mortgage impairment insurance policy meeting the requirements of Section 4.11 of the Agreement.

13. Mortgage Loan closing statement (Form HUD-1 or HUD-1A).

14. Residential loan application.

15.    Credit report on the Mortgagor.

16.    Residential appraisal report, if applicable.

17.    Photograph of the property, if applicable.

EXHIBIT B

CUSTODIAL ACCOUNT LETTER AGREEMENT

To: _____

_____

_____

(the "Depository")

As servicer under the Master Flow Sale and Servicing Agreement, dated as of August 1, 2003 Mortgage Loans, Group No. _____ (the "Agreement"), GMAC Mortgage Corporation (the "Company") hereby authorizes and requests you to establish an account, as a Custodial Account pursuant to Section 4.04 of the Agreement, to be designated as "GMAC Mortgage Corporation, in trust for the Owner - _____ Mortgage Loans - Group No. _____ and various Mortgagors." All deposits in the account shall be subject to withdrawal therefrom by order signed by the Company. This letter is submitted to you in duplicate. Please execute and return one original to us.

GMAC Mortgage Corporation

By_____

The undersigned, as "Depository", hereby certifies that the above described account has been established under Account Number _____, at the office of the Depository indicated above, and agrees to honor withdrawals on such account as provided above. The amount deposited at any time in the account will be insured by the Federal Deposit Insurance Corporation to the extent available under applicable law.

_____

(name of Depository)

By_____

EXHIBIT C

ESCROW ACCOUNT LETTER AGREEMENT

To:    _____
       _____
       _____
       (the "Depository")

As servicer under the Master Flow Sale and Servicing Agreement, dated as of August 1, 2003 Mortgage Loans, Group No. _____ (the "Agreement"), GMAC Mortgage Corporation (the "Company") hereby authorizes and requests you to certify that an account exists titled "GMAC Mortgage Corporation, in trust for the Owner as indicated on GMAC Mortgage Corporation's records and various mortgagors." All deposits in the account shall be subject to withdrawal therefrom by order signed by the Company. This letter is submitted to you in duplicate. Please execute and return one original to us.

GMAC Mortgage Corporation


By_____


The undersigned, as "Depository", hereby certifies that the above described account has been established under Account Number _____, at the office of the Depository indicated above, and agrees to honor withdrawals on such account as provided above. The amount deposited at any time in the account will be insured by the Federal Deposit Insurance Corporation to the extent available under applicable law.


_____
(name of Depository)


By_____

EXHIBIT D

FORM OF REQUEST FOR RELEASE OF DOCUMENTS

To:

RE:    The Master Flow Sale and Servicing Agreement, Group 2003-NCFX8,
dated as of August 1, 2003.

In connection with the administration of the pool of Mortgage Loans held by you as Owner, we request the release, and acknowledge receipt, of the (Collateral File/[specify documents]) for the Mortgage Loan described below, for the reason indicated.

Mortgagor's Name, Address & Zip Code:

Mortgage Loan Number:

Reason for Requesting Documents (check one)

1.    Mortgage Loan Paid in Full (Company hereby certifies that all amounts received in connection therewith have been credited to the Custodial Account as provided in the Master Flow Sale and Servicing Agreement.)

2.    Mortgage Loan Repurchased Pursuant to Section 3.03 of the Master Flow Sale and Servicing Agreement (the Company hereby certifies that the repurchase price has been credited to the Custodial Account as provided in the Master Flow Sale and Servicing Agreement.)

3.    Mortgage Loan Liquidated By (the Company hereby certifies that all proceeds of foreclosure, insurance or other liquidation have been finally received and credited to the Custodial Account pursuant to the Master Flow Sale and Servicing Agreement.

4.    Mortgage Loan in Foreclosure

5.    Other (explain)_____.

If box 1, 2, 3 or 4 above is checked, and if all or part of the Collateral File was previously released to us, please release to us, any additional documents in your possession relating to the above specified Mortgage Loan.

If box 5 above is checked, upon our return of all of the above documents to you as Owner, please acknowledge your receipt by signing in the space indicated below, and returning this form.

GMAC MORTGAGE CORPORATION

By: _____
Name: _____
Title: _____
Date: _____

Documents returned to Owner:

_____
Owner

By: _____
Date: _____

EXHIBIT E

FORM OF MONTHLY REMITTANCE STATEMENT

# EXHIBIT F

## UNDERWRITING STANDARDS

EXHIBIT G

SEC CERTIFICATION

I, [identify the senior officer in charge of servicing], certify [to [name of depositor] (the "Depositor"), and its officers, directors and affiliates, and with the knowledge and intent that they will rely upon this certification,] that:

(b)    I have reviewed the information required to be delivered to the trustee by the servicer pursuant to the pooling and servicing agreement (the "Servicing Information");

(c)    Based on my knowledge, the Servicing Information, taken as a whole, does not contain erroneous or incomplete information required to be provided to the trustee by the servicer under the pooling and servicing agreement;

(d)    Based on my knowledge, the Servicing Information required to be provided to the trustee by the servicer under the pooling and servicing agreement has been provided to the trustee;

(e)    I am responsible for reviewing the activities performed by the servicer under the pooling and servicing agreement and based upon the review required under the pooling and servicing agreement, and except as disclosed in the report, the servicer has fulfilled its obligations under the pooling and servicing agreement; and

(f)    I have disclosed to [the Depositor's certificate public accountants][the servicer's certified public accountants] all significant deficiencies relating to the servicer's compliance with the minimum servicing standards in accordance with a review conducted in compliance with the Uniform Single Attestation Program for Mortgage Bankers or similar standard as set forth in the pooling and servicing agreement.


Date: _____


_____

[Signature]


_____

[Title]

EXHIBIT H

FORM OF ASSIGNMENT AND CONVEYANCE

On this [___] day of [  ], 2003, GMAC Mortgage Corporation, as the Company, under that certain Master Flow Mortgage Loan Sale and Servicing Agreement, dated as of August 1, 2003 (the "Agreement") does hereby sell, transfer, assign, set over and convey to [  ], as Initial Owner under the Agreement all of the right, title and interest of the Company in and to the Mortgage Loans listed on the Mortgage Loan Schedule attached hereto as Exhibit A, together with the related Mortgage Files and all rights and obligations arising under the documents contained therein. Pursuant to Section 2.03 of the Agreement, the Company has delivered to the Custodian the documents for each Mortgage Loan to be purchased as set forth in the Agreement. The ownership of each Mortgage Note, Mortgage, and the contents of each Mortgage File is vested in the Initial Owner and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or which come into the possession of the Company shall immediately vest in the Initial Owner and shall be retained and maintained, in trust, by the Company at the will of the Initial Owner in such custodial capacity only; and upon request by the Initial Owner shall be delivered promptly by the Company to the Initial Owner.

The Company confirms to the Initial Owner that the representations and warranties set forth in Section 3.02 of the Agreement with respect to the Mortgage Loans listed on the Mortgage Loan Schedule attached hereto, and the representations and warranties in Section 3.01 of the Agreement with respect to the Company are true and correct as of the date hereof.

All other terms and conditions of this transaction shall be governed by the Agreement.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement.

GMAC MORTGAGE CORPORATION

By: _____
Name: _____
Title: _____

# GMAC Mortgage

Capital Markets

As of August 10, 2005

Mr. Bruce Good
Bank of America, National Association
Hearst Tower
NC1-027-21-04
214 North Tryon Street, 21st Floor
Charlotte, NC, 28255

**RE:**    **Purchase Price and Terms Letter**
       **Jumbo 30yr Fixed**

Dear Mr. Good:

GMAC Mortgage Corporation (the "Seller") confirms it agreement to sell and Bank
of America, National Association (the "Purchaser") confirms its agreement to
purchase, on a mandatory delivery basis, approximately $725,000,000.00 (plus or
minus 5%) (the "Commitment Amount") of 30 year non-conforming fixed rate, first
lien, conventional residential mortgage loans (the "Mortgage Loans") in a whole
loan format on the terms and conditions set forth below and further outlined in
Exhibit B. Servicing for the Mortgage Loans shall be retained by the Seller.

Such Mortgage Loans will be sold pursuant to the Master Flow Sale and Servicing
Agreement, dated as of August 1, 2003, by and between the Seller and Banc of
America Mortgage Capital Corporation ("BAMCC"), as amended by the Global
Amendment to Sale and Servicing Agreements, dated as of September 1, 2005, by
and among the Seller, the Purchaser and BAMCC (collectively, the "Agreement"),
which shall set forth further terms and provisions with respect to the Mortgage
Loans and the sale and servicing of the Mortgage Loans

In the event of a conflict between this Purchase Price and Terms Letter and the
Agreement, the terms and characteristics of the Agreement, except with respect to
pricing, will control on and after the Closing Date (as defined below). All
capitalized terms not defined herein shall have the meaning assigned to them in the
Agreement.

1.    **Terms of this Commitment**

       The Mortgage Loans shall be sold on September 15, 2005 or earlier or later
       as mutually agreed (the "Closing Date"), provided, however, that all closing

GMAC Mortgage Corporation
100 Witmer Road
Horsham, PA 19044

www.gmacmortgage.com

documents required pursuant to the Agreement are delivered to the Seller by 12 o'clock noon Eastern Standard Time on the Closing Date.

**2.    Purchase Price**

The purchase price percentage for the Mortgage Loans shall be 99.6166% of the aggregate outstanding scheduled principal balance of the Mortgage Loans as of September 1, 2005 (the "Cut-off Date") plus accrued interest at the net weighted average coupon rate (the "Net WAC") from the first day of the month in which the Closing Date occurs through the day prior to the Closing Date. In the event that on the Closing Date the Net WAC does not equal 5.67% (plus or minus 0.05%), the purchase price percentage shall be recalculated to equal the interpolated 5.5% FNMA 30 year price of 100.046875% and a 6% FNMA 30 year price of 101.906250% and a spread of 1.06250%.

**3.    The Mortgage Loans**

The Mortgage Loans have the characteristics described in the electronic file to be delivered to the Purchaser on or around August 11, 2005, and further described as follows:

a.    **Product Type:** 30 Year Non Conforming Fixed Rate.

b.    **Gross Weighted Average Coupon Rate:** Approximately 5.92%.

c.    **Original Stated Maturity:** Not in excess of 30 years.

d.    **Delinquencies:** None of the Mortgage Loans shall have been 30 days or more delinquent during the twelve months preceding the Closing Date and shall be paid through August 1, 2005, at the Closing Date.

e.    **Documents:** The Mortgage, Mortgage Note, and appraisal, if applicable, are on Fannie Mae/Freddie Mac approved forms.

f.    **Underwriting:** The underwriting of each Mortgage Loan, documentation of each loan file, and appraisal of each mortgaged property will be in compliance with the Seller's underwriting guidelines attached hereto as Exhibit A (the "Underwriting Guidelines"). However, exceptions to such guidelines may be permitted when compensating factors are demonstrated.

4.    **Mortgage Loan Schedule**

The Seller shall deliver to the Purchaser prior to the Closing Date a final
mortgage loan schedule in electronic format.    The final mortgage loan
schedule shall be the preliminary electronic file, with the following
adjustments:

(a) The Seller shall delete such mortgage loans which have been prepaid in
full prior to the Closing Date, or which do not conform with the
requirements of this Purchase Price and Terms Letter as of the Closing
Date, and

(b) The Seller shall add Mortgage Loans, as substitutes, provided such
Mortgage Loan(s) are acceptable to the Purchaser, for loans deleted as
provided in (a) above.

5.    **Servicing**

The Mortgage Loans shall be serviced pursuant to the Agreement.    The
Servicer shall be entitled to receive a servicing fee equal to .25% of the
outstanding principal amount of each Mortgage Loan per annum in
accordance with the terms of the Agreement.

6.    **Delivery of Documents**

With respect to each Mortgage Loan, the Seller shall deliver the Mortgage
Note endorsed to blank and the Assignment of Mortgage to blank (for non-
MERS Mortgage Loans) at least 5 Business Days prior to the Closing Date
to Wachovia Bank, National Association (the "Custodian").    Within 30 days
of the Closing Date, the Seller shall deliver to the Custodian for each
Mortgage Loan, a copy of the unrecorded Mortgage (which has been sent for
recording), copy of any applicable intervening assignments (for non-MERS
Mortgage Loans) (collectively, the "Additional Documents").    The
Additional Documents shall be delivered in either hard copy, or electronic
format as mutually agreed between Purchaser and the Seller.

7.    **Review of Mortgage Loan Files**

The Seller shall make the Mortgage Loan files available at its offices during
normal business hours on August 22, 2005 through August 26, 2005 for
review by the Purchaser or the Purchaser's agent, or other arrangement as
mutually agreed.    The Purchaser shall have the right to reject Mortgage
Loans which do not conform to the terms of this Purchase Price and Terms

Letter and shall notify the Seller with a listing of any such rejected Mortgage Loan(s) (the "Rejected Mortgage Loans") prior to the close of business on September 2, 2005. Any rejected Mortgage Loan or Mortgage Loans may be (i) replaced by substitute Mortgage Loans reasonably acceptable to the Purchaser or (ii) repriced as mutually agreed between Purchaser and the Seller. Such review shall not impair or diminish the rights of the Purchaser with respect to a breach of representations and warranties contained in the Agreement.

8.    **Payment of Fees**

The Purchaser shall pay its fees and expenses, which shall include the cost of any underwriting review and the fees and expenses of its counsel. The Seller shall pay its fees and expenses, the fees and expenses of its counsel, preparation fees for Assignments of Mortgage, (if applicable), Mortgage Note endorsements and file transfer fees.

9.    **Failure to Deliver**

If on the Closing Date, the Seller fails to deliver Mortgage Loans conforming to the requirements of this letter having an aggregate principal balance equal to at least 95% of the Commitment Amount, the Seller shall pay to the Purchaser, within 24 hours of the Closing Date, as liquidated damages, with respect to the amount by which the aggregate principal balance of Mortgage Loans delivered is less than 95% of the Commitment Amount, an amount equal to the difference, if higher, between (i) the price calculated in the manner set forth in Paragraph 2 in effect on the Closing Date and (ii) the price calculated in the manner set forth in Paragraph 2 at the trade date.

10.    **Survival**

This Purchase Price and Terms Letter shall survive the execution and delivery of the Agreement and delivery of the Mortgage Loans on the Closing Date.

All funds required to be paid pursuant to this letter shall be paid in immediately available funds by wire transfer. Kindly acknowledge receipt of this confirmation by signing and promptly returning the enclosed duplicate of this letter on or before August 25, 2005. Your failure to return a countersigned duplicate of this letter to us within the time indicated shall give us the right, at our sole option, to declare this agreement null and void.

Very truly yours,
**GMAC MORTGAGE CORPORATION**

Patricia C. Taylor
Vice President

**ACKNOWLEDGED AND ACCEPTED:**

**BANK OF AMERICA, NATIONAL ASSOCIATION**

**By:** _____

**Name:** _____

**Title:** _____

**Date:** _____

All funds required to be paid pursuant to this letter shall be paid in immediately available funds by wire transfer. Kindly acknowledge receipt of this confirmation by signing and promptly returning the enclosed duplicate of this letter on or before August 25, 2005. Your failure to return a countersigned duplicate of this letter to us within the time indicated shall give us the right, at our sole option, to declare this agreement null and void.

Very truly yours,
**GMAC MORTGAGE CORPORATION**

Patricia C. Taylor
Vice President

**ACKNOWLEDGED AND ACCEPTED:**

**BANK OF AMERICA, NATIONAL ASSOCIATION**

By: _____

Name:   ~~Bruce W. Good~~
            Vice President

Title:   _____

Date:   _____

**EXHIBIT A**

**UNDERWRITING GUIDELINES**

# RETAIL LENDING JUMBO FIXED RATE PRODUCTS

| | JUMBO FIXED RATE |
|---|---|
| **1. PRODUCT DESCRIPTION** | • Conventional Jumbo Fixed Rate<br>• 10 to 30 years in five-year increments<br>• Fully amortizing<br>• Servicing retained<br>   LPMI Option<br>   • 30 year term<br>   • All loans are utilizing the lender paid mortgage insurance option |
| **2. PRODUCT CODES** | • 15Y Big Fixed (002)<br>• 30Y Big Fixed (004)<br>• LPMI Big Fixed (618)<br>• Retail Lending: 15Y Frost Bank (804)<br>• Retail Lending: 30Y Frost Bank (805)<br>• Rotational Relocation Enhancement<br>   • 15Y BigRelo Fixed (583)<br>   • 30Y BigRelo Fixed (586) |
| **3. AMOUNT AVAILABLE** | Open |
| **4. FINAL FUNDING DATE** | Open |
| **5. INDEX** | N/A |
| **6. MARGIN** | N/A |
| **7. ANNUAL/ADJUTMENT CAP** | N/A |
| **8. LIFE CAP** | N/A |
| **9. RATE AT ADJUSTMENT** | N/A |
| **10. CONVERSION OPTION** | N/A |
| **11. CONVERSION FEE** | N/A |
| **12. INITIAL RATE & FEE** | • Set daily under NC BIG |

Product Summaries contain eligibility guidelines only.  Consult the GMACM Conventional Underwriting Manual for full details.
RETAIL LENDING JUMBO FIXED RATE PRODUCTS   [nconformNCFixedRate]

08/15/05 - page 1
CP05-98

# RETAIL LENDING JUMBO FIXED RATE PRODUCTS

## JUMBO FIXED RATE

| | **Jumbo Fixed Rate** | **Jumbo LPMI Fixed Rate** |
|---|---|---|
| **13. DELIVERY** | Standard delivery time frame<br>Fixed Rate Disc - None required<br>Fixed Rate Note - Multistate Fixed Rate Note Laser #0061(FNMA 3200)<br><br>**State Specific Notes**<br>AK .0050 (FNMA 3202)<br>FL .1065 (FNMA 3210)<br>LA .0120 (FNMA 3219)<br>ME .1066 (FNMA 3220)<br>NH .1177 (FNMA 3230)<br>NY .0049 (FNMA 3233)<br>VA .0052 (FNMA 3247)<br>VT .0053 (FNMA 3246)<br>W .1067 (FNMA 3250)<br>W .0047 (FNMA 3249) | Standard delivery time frame<br>Fixed Rate Disc - None required<br>Fixed Rate Note - Multistate Fixed Rate Note. Laser # 0061 (FNMA/FHLMC #3200)<br>LPMI Disclosure – Notice Regarding Private Mortgage Insurance Form 1051 (0508)<br><br>**State Specific Notes**<br>AK .0050 (FNMA 3202)<br>FL .1065 (FNMA 3210)<br>LA .0120 (FNMA 3219)<br>ME .1066 (FNMA 3220)<br>NH .1177 (FNMA 3230)<br>NY .0049 (FNMA 3233)<br>VA .0052 (FNMA 3247)<br>VT .0053 (FNMA 3246)<br>W .1067 (FNMA 3250)<br>W .0047 (FNMA 3249) |
| **14. TEMPORARY BUYDOWNS** | **Annual**<br>• Primary Residence and Second Homes<br>• Purchases and Rate & Term Refinances<br>• Maximum 2% annual<br>• Maximum 3 year term for LTVs up to 90%<br>• Maximum 2 year term for LTVs over 90%<br>• Maximum 3% below note rate<br><br>**Compressed**<br>• Primary Residence and Second Homes<br>• Purchases and Rate & Term Refinances<br>• 6 month increments<br>• Maximum 18 month term<br>• Maximum 1% per adjustment<br>Maximum 3% below note rate | |
| **15. QUALIFYING RATE AND RATIOS** | • Ratos - 36/40<br><br>**With Temporary Buydown**<br>• Ratios – 33/38<br>• Qualify at second year rate<br><br>**Compensating factors are needed when exceeding the stated DTI ratio. When exceeding a DTI ratio of 45%, all of the following compensating factors are needed:**<br>• DU Approve/Eligible required<br>• Max loan amount $500,000<br>• Primary residences and second homes<br>• One unit | |

Product Summaries contain eligibility guidelines only. Consult the GMACM Conventional Underwriting Manual for full details.
RETAIL LENDING JUMBO FIXED RATE PRODUCTS  [nconformNCFixedRate]

08/15/05 - page 2
CP05-98

# RETAIL LENDING JUMBO FIXED RATE PRODUCTS

## JUMBO FIXED RATE

- Purchases and Rate & Term Refinances
- Standard processing
- Minimum credit score 680
- 50% of loan amount in documented reserves
- Max DTI 60%[1] for LTV/CLTV up to 80%
- Max DTI 65%[1] for LTV/CLTV up to 70%

[1] If subordinate financing provided by GMACM, DTI ratio may not exceed home equity limits

### 16. TYPES OF FINANCING

- **Purchase Mortgages**
  - No seasoning of first mortgage
  - Reasonable and customary closing costs, prepaids and seasoned junior liens may be incorporated into the loan amount.
  - Cash out is limited to 1% of the principal amount of the new loan.
  - One year seasoning on junior liens from funding unless documentation is provided to verify it was incurred as part of acquisition or for home improvements. This does not apply to draws of 1% or less of the new loan amount or a maximum of $5,000 within the past 12-month period.
  - Properties listed for sale in the last 6 months are not eligible for refinance transactions
  - Owner occupied properties located in Texas:
    - If the first or second Texas Section 50(a)(6) loan is being paid off, regardless of whether the borrower is getting any cash back, the loan is restricted to the Texas Refinance product.
    - If the first mortgage is not a Texas Section 50(a)(6) loan and the second mortgage is a Texas Section 50(a) (6), the second lien may be subordinated and is considered a rate and term refinance. The second lien must be subordinate to the GMACM first mortgage and a subordination agreement must be executed. Borrower cannot receive any cash back from the first mortgage transaction.
    - If a Texas Section 50(a)(6) second lien is being paid off, the loan is restricted to the Texas Refinance product.
    - The title policy will reference Texas Section 50(a)(6)

- **Equity Refinances**
  - No seasoning on first mortgage or junior liens
  - If owned less than 12 months, LTV must be based on lower of appraised value or purchase price. HUD-1 or Deed must be provided to verify ownership.
  - Properties listed for sale in the last 6 months are not eligible for refinance transactions.
  - Owner occupied properties located in Texas subject to Texas Section 50(a)(6) are NOT eligible.
  - Paying off loans that are not Texas Section 50 (a)(6) but are defined as a cash out refinance based on agency guidelines are eligible for this product. Borrower cannot receive any cash back from the transaction
  - Cashout limitations[2] – Includes payoff of unseasoned second mortgages or HELOCs.

| LTV | >640 | >660 | >700 |
|---|---|---|---|
| <=55% | $200,000 | $300,000 | $400,000 |
| >55% <=60% | $150,000 | $225,000 | $300,000 |
| >60 | $100,000 | $150,000 | $200,000 |

[2] Cash-out limited to a maximum of $100,000 for One Unit Investment Properties

### 17. MAXIMUM LOAN AMOUNT

$2,000,000

Product Summaries contain eligibility guidelines only. Consult the GMACM Conventional Underwriting Manual for full details.
RETAIL LENDING JUMBO FIXED RATE PRODUCTS    [nconformNCFixedRate]

08/15/05 – page 3
CP05-98

# RETAIL LENDING JUMBO FIXED RATE PRODUCTS

## JUMBO FIXED RATE

**18. LOAN AMOUNT AND LTV LIMITATION**

### PURCHASE AND RATE/TERM REFINANCE — PRIMARY RESIDENCE

| Units | STANDARD | | | STATED INCOME | | | Loan Amount |
|---|---|---|---|---|---|---|---|
| | LTV | CLTV | Credit Score³ | CLTV | LTV | Credit Score³ | |
| One Unit | 95% | 95% | 620 | 80% | 80% | 620 | $ 450,000 |
| | 90% | 95% | 660 | N/A | N/A | 660 | $ 750,000 |
| | 70% | 90% | 620 | 90% | 75% | 660 | |
| | 90% | 90% | 720 | N/A | N/A | N/A | $1,000,000 |
| | 75% | 95% | 660 | N/A | N/A | N/A | |
| | 70% | 70% | 640 | 60% | 60% | 660 | $1,500,000 |
| | 70% | 80% | 660 | N/A | N/A | N/A | |
| | 75% | 90% | 700 | N/A | N/A | N/A | |
| | 60% | 60% | 640 | N/A | N/A | N/A | $2,000,000 |
| | 65% | 75% | 660 | N/A | N/A | N/A | |
| 2-4 Units Or Mid/High-Rise Condos³ | 95% | 95% | 620 | 75% | 75% | 620 | $ 450,000 |
| | 90% | 95% | 660 | N/A | N/A | N/A | $ 750,000 |
| | 70% | 90% | 640 | 70% | 70% | 640 | |
| | 90% | 90% | 720 | N/A | N/A | N/A | $1,000,000 |
| | 75% | 95% | 660 | 85% | 75% | 660 | |
| | 70% | 70% | 640 | N/A | N/A | N/A | $1,500,000 |
| | 70% | 80% | 660 | N/A | N/A | N/A | |
| | 75% | 90% | 700 | N/A | N/A | N/A | |
| | 66% | 75% | 660 | N/A | N/A | N/A | $2,000,000 |

### EQUITY REFINANCE

| Units | STANDARD | | | STATED INCOME | | | Loan Amount |
|---|---|---|---|---|---|---|---|
| | LTV | CLTV | Credit Score³ | CLTV | LTV | Credit Score³ | |
| One Unit | 75% | 90% | 660 | 70% | 70% | 660 | $ 550,000 |
| | 75% | 90% | 700 | 70% | 70% | 700 | $ 800,000 |
| | 70% | 75% | 640 | 60% | 60% | 640 | $1,000,000 |
| | 75% | 80% | 660 | N/A | N/A | N/A | |
| | 70% | 70% | 700 | N/A | N/A | N/A | $1,500,000 |
| | 60% | 60% | 660 | N/A | N/A | N/A | $2,000,000 |
| 2-4 Units Or Mid/High Rise Condos¹ | 75% | 90% | 660 | 70% | 70% | 660 | $ 550,000 |
| | 70% | 75% | 700 | 70% | 70% | 700 | $ 800,000 |
| | 75% | 75% | 640 | 60% | 60% | 640 | $1,000,000 |
| | 75% | 80% | 660 | N/A | N/A | N/A | |
| | 70% | 70% | 700 | N/A | N/A | N/A | $1,500,000 |
| | 60% | 60% | 660 | N/A | N/A | N/A | $2,000,000 |

³ Refer to #20 Property Types for additional restrictions for Mid/High-Rise Condos
¹ Minimum 660 credit score required for LPMI Option

Product Summaries contain eligibility guidelines only. Consult the GMACM Conventional Underwriting Manual for full details.
RETAIL LENDING JUMBO FIXED RATE PRODUCTS  [nconformNCFixedRate]

# RETAIL LENDING JUMBO FIXED RATE PRODUCTS

## JUMBO FIXED RATE

### PURCHASE AND RATE/TERM REFINANCE

#### SECOND HOMES

| Units | STANDARD | | | STATED INCOME | | | |
|---|---|---|---|---|---|---|---|
| | LTV | CLTV | Credit Score[1] | LTV | CLTV | Credit Score[2] | Loan Amount |
| One Unit Or Mid/High Rise Condo | 80% | 95% | 640 | 70% | 80% | 640 | $ 500,000 |
| | 90% | 95% | 700 | N/A | N/A | N/A | $ 500,000 |
| | 85% | 90% | 660 | 65% | 75% | 660 | $ 750,000 |
| | 75% | 85% | 680 | 60% | 70% | 680 | $1,000,000 |
| | 85% | 90% | 720 | N/A | N/A | N/A | $1,500,000 |
| | 70% | 70% | 660 | N/A | N/A | N/A | |
| | 70% | 80% | 700 | N/A | N/A | N/A | |

### EQUITY REFINANCE

| Units | STANDARD | | | STATED INCOME | | | |
|---|---|---|---|---|---|---|---|
| | LTV | CLTV | Credit Score | LTV | CLTV | Credit Score | Loan Amount |
| One Unit | 70% | 70% | 640 | 70% | 70% | N/A | $ 500,000 |
| | 70% | 75% | 700 | N/A | N/A | N/A | $ 500,000 |
| | 70% | 70% | 660 | N/A | N/A | N/A | $ 750,000 |
| | 60% | 70% | 680 | N/A | N/A | N/A | $1,000,000 |
| | 60% | 60% | 660 | N/A | N/A | N/A | $1,500,000 |

[1] Refer to #20 Property Types for additional restrictions for Mid/High-Rise Condos
[2] Minimum 660 credit score required for LPMI Option

### PURCHASE AND RATE/TERM REFINANCE

#### INVESTMENT PROPERTIES

| Units | STANDARD | | | STATED INCOME | | | |
|---|---|---|---|---|---|---|---|
| | LTV | CLTV | Credit Score | LTV | CLTV | Credit Score | Loan Amount |
| One Unit | 80% | 90% | 680 | N/A | N/A | N/A | $ 650,000 |
| | 75% | 85% | 680 | N/A | N/A | N/A | $ 750,000 |
| | 70% | 80% | 680 | N/A | N/A | N/A | $1,000,000 |
| Two Unit | 75% | 75% | 680 | N/A | N/A | N/A | $ 400,000 |

### EQUITY REFINANCE

| Units | STANDARD | | | STATED INCOME | | | |
|---|---|---|---|---|---|---|---|
| | LTV | CLTV | Credit Score | LTV | CLTV | Credit Score | Loan Amount |
| One Unit | 65% | 75% | 680 | N/A | N/A | N/A | $ 650,000 |

| 19. | SECONDARY FINANCING | • Permitted - Refer to #18 Loan Amount and LTV Limitations and the Loan Eligibility Analysis Chapter of the GMACM Conventional Underwriting Manual for secondary financing guidelines. |
|---|---|---|
| 20. | PROPERTY TYPES | Eligible Property Types<br>• 1-4 units<br>• PUDs[1]<br>• Condos[1]<br>   • GMACM warrantable projects |

Product Summaries contain eligibility guidelines only. Consult the GMACM Conventional Underwriting Manual for full details.
RETAIL LENDING JUMBO FIXED RATE PRODUCTS  [nconformNCFixedRate]

# RETAIL LENDING JUMBO FIXED RATE PRODUCTS

## JUMBO FIXED RATE

|  |  |  |
|---|---|---|
|  |  | • Mid-rise Condos (5-8 stories): <br> • Primary Residence and Second Homes Only <br> • Refer to #18 Loan Amount and LTV Limitations <br> High-rise Condos (over 8 stories) are subject to the following restrictions: <br> • Primary Residence and Second Homes Only <br> • Refer to #18 Loan Amount and LTV Limitations <br> • Standard Processing in Continental US permitted. <br> • Stated Income Processing: <br> • Must be located in one of the following metropolitan areas: Boston, Chicago, Honolulu, Las Vegas, Los Angeles, New York, Philadelphia, San Diego, San Francisco, Washington D.C., or the Florida counties of Broward, Collier, Dade, Hillsboro, Indian River, Martin, Palm Beach, Pinellas, Sarasota, or St. Lucie. <br> • Must conform to GMACM existing project classification <br> • Two comps from outside subject building <br> • Developer may NOT be in control of HOA <br> • GMACM will finance lesser of 10 units in one project or 20% concentration in the project <br> Modular Pre-Cut/Panelized Housing[1] <br> Leasehold Estates[1] <br><br> [1] Refer to the GMACM Conventional Underwriting Manual for eligibility requirements. <br><br> **Ineligible Property Types** <br> • Manufactured homes <br> • Co-ops |
| 21. | OCCUPANCY | • Primary Residence <br> • Second Homes (one unit) <br> • Investment Properties |
| 22. | GEOGRAPHIC LOCATIONS/ RESTRICTIONS | • Continental US, Alaska and Hawaii <br> • High-Rise Condos are limited to specific metropolitan areas - See # 20 Property Types |
| 23. | ASSUMPTIONS | Not Permitted |
| 24. | ESCROW WAIVERS | Refer to GMACM Retail Lending Operations Manual |
| 25. | PREPAYMENT PENALTY | None |
| 26. | UNDERWRITING | • Engenious Approve recommendations may follow Findings report for all documentation requirements. Loan must be validated by an Underwriting Consultant <br> • Engenious Refer recommendations may not follow Findings report documentation. Loans must underwritten by authorized associate within lending limits as a manual. <br> • Refer to Delegated Underwriting Matrix in the Risk Management Chapter of the GMACM Conventional Underwriting Manual for delegated authority and restrictions. <br> • Delegated MI underwriting |
| 27. | PROCESSING STYLES | • Standard <br> • Stated Income <br> • Relocation <br> • VIP Relocation <br> • National Relocation <br> • International Relocation <br> • Select <br> • Super Select |

Product Summaries contain eligibility guidelines only.  Consult the GMACM Conventional Underwriting Manual for full details.
RETAIL LENDING JUMBO FIXED RATE PRODUCTS   [nconformNCFixedRate]

# RETAIL LENDING JUMBO FIXED RATE PRODUCTS

## JUMBO FIXED RATE

### 28. BORROWER ELIGIBILITY

- Express Refi
- Streamline

**Note: The more conservative LTV limit between the product and processing style must always be applied. Refer to #18 Loan Amount and LTV Limitations and Processing Options Chapter of the GMACM Conventional Underwriting Manual for details.**

**Permanent Resident Aliens**
- Provide Alien Registration Card

**Non-Permanent Resident Alien (Not co-borrowing with a permanent resident alien or US Citizen)**
- Must provide one of the following Visas: H-1B, L-1, E-1, G series (G-1, G-2, G-3, G-4), TN, TC
- Funds held outside the US must be deposited into a US financial institution prior to underwriting. Evidence must be provided that the funds were transferred from a foreign country and that the funds were the borrowers prior to the transfer.
- Stated Income processing is NOT permitted

**Primary Residence**

**Purchase and Rate & Term Refis**

| Property Type | LTV | CLTV |
|---|---|---|
| 1 Unit | 90% | 95% |
| 2-4 Unit | 75% | 75% |
| MidHigh Rise | 75% | 75% |

**Equity Refis**

| Property Type | LTV | CLTV |
|---|---|---|
| 1 Unit | 75% | 75% |

**Second Homes**

**Purchase**

| Property Type | LTV | CLTV |
|---|---|---|
| 1 Unit | 75% | 75% |
| MidHigh Rise | 70% | 70% |

- LTVs > 75%
  - 2 year residency, employment & credit history in US
- LTVs <=75%
  - 2 years satisfactory credit history & stable employment (at least 1 year in US supplemented by credit history & employment history established in country of origin)
  - 2-year history of residency provided on application

**Trust Agreements**
- Refer to GMACM Conventional Underwriting Manual

### 29. CO-BORROWERS

- LTV > 90% – Co-borrower must occupy
- Loan amounts > $1,000,000 – Co-borrower must occupy
- LTV <=90% - Co-borrower does not have to occupy
  - Occupant borrower(s) must qualify for the loan on their own income with debt-to-income ratio not to exceed 50%
  - Minimum 5% down payment must come from occupant borrower's own cash (waived when receipt of gift reduces LTV/CLTV to <=80% and occupant borrower pays their own closing costs & no secondary financing exists)
  - Non-occupant co-borrower must be an immediate family member.
  - All borrowers must take title.
- Stated Income processing is NOT permitted.

### 30. CREDIT

- Minimum 660 credit score required for LPMI Option

Product Summaries contain eligibility guidelines only. Consult the GMACM Conventional Underwriting Manual for full details.
RETAIL LENDING JUMBO FIXED RATE PRODUCTS   [nconformNCFixedRate]

# RETAIL LENDING JUMBO FIXED RATE PRODUCTS

| | | JUMBO FIXED RATE |
|---|---|---|
| 31. | ASSETS | • Refer to #18 Loan Amount and LTV Limitations for requirements<br>• No mortgage/rental lates in last 12 months<br>• GMACM Bankruptcy and Foreclosure guidelines apply – Refer to the Credit Considerations Chapter of the GMACM Conventional Underwriting Manual.<br><br>**Borrower Investment**<br>• Primary residence and second home loans require 5% from borrower's own funds<br>• Investment property loans require 10% from borrower's own funds<br>• Entire down payment must be from borrower's own funds on all loans over $1 million.<br><br>**Seller Contributions**<br>Primary Residences<br>• 3% for LTV > 90%<br>• 6% for LTV <=90%<br><br>Second Homes<br>• 3% for LTV > 80%<br>• 6% for LTV <=80%<br><br>Investment Properties<br>2%<br><br>**Gifts**<br>• Acceptable on loans up to $1 million provided minimum borrower investment requirements are met<br>• For Standard loans, the minimum borrower investment is waived on primary residences and second homes when gift reduces the LTV/CLTV to <=80% and borrower pays own closing costs and no secondary financing exists.<br>• **No gifts acceptable on loans over $1 million.**<br><br>**Reserves**<br>• Primary Residence and Second Homes<br>  • 2 months PITI (exclusive of cash-out received and closing costs)<br>  Investment Properties<br>  • 6 months PITI<br>• Super Jumbo<br>Refer to the Super Jumbo chapter of the GMACM Conventional Underwriting Manual for asset and reserve requirements |
| 32. | LIMITATIONS ON OTHER R. E. OWNED | **Multiple Loans to the Same Borrower**<br>Maximum 20% concentration in any one project or subdivision<br>  Primary Residences<br>  • Up to 10 GMACM financed properties (including the subject property) or $3.5 million whichever is less<br>  Second Homes and Investment Properties<br>  • Up to 4 GMACM financed properties (including the subject property) or $3.5 million whichever is less and a total of 10 financed properties<br>  **The following parameters apply when financing the 5th to 10th GMACM financed property (including current portfolio):**<br>  • Minimum credit score 680<br>  • No bankruptcy or foreclosure<br>  • 6 months PITI reserves required for those properties being financed, exclusive of cash-out<br>  • Borrower must demonstrate a 2 year history of property management experience<br>  • Maximum 15% cumulative cash-out is permitted (based on the loan amount of all loans being financed)<br>  • Non-arms length transactions are not permitted<br>  • Super Jumbo guidelines apply when a new single loan or new multiple loan submissions exceed $850,000 |

Product Summaries contain eligibility guidelines only.  Consult the GMACM Conventional Underwriting Manual for full details.
RETAIL LENDING JUMBO FIXED RATE PRODUCTS  [nconformNCFixedRate]

# RETAIL LENDING JUMBO FIXED RATE PRODUCTS

| | JUMBO FIXED RATE |
|---|---|
| | • New multiple loans must be underwritten simultaneously<br> • Submit only one master file and all 1008s and 1003s for new multiple loan submissions if not underwritten in the CSC.<br>Refer to #29 Underwriting |
| **33. APPRAISER REQUIREMENTS** | GMACM approved appraisers |
| **34. APPRAISAL REQUIREMENTS** | • Loan amounts and combined loan amounts up to $850,000<br> • 2055 Interior/Exterior[1]<br> • One full appraisal<br>• Loan amounts and combined loan amounts $850,001 to $1,000,000<br> • One full appraisal<br>• Loan amounts and combined loan amounts greater than $1,000,000<br> • Two full appraisals by two independent appraisal firms<br><br>[1] 2055 Interior/Exterior Appraisal options acceptable on One Unit Properties ONLY |

Product Summaries contain eligibility guidelines only. Consult the GMACM Conventional Underwriting Manual for full details.
RETAIL LENDING JUMBO FIXED RATE PRODUCTS  [nonformNCFixedRate]

# RETAIL LENDING JUMBO FIXED RATE PRODUCTS

## JUMBO FIXED RATE

**35. MORTGAGE INSURANCE**

- Required on all loans exceeding an 80% LTV except:
- Traditional borrower paid mortgage insurance is NOT required when utilizing the LPMI Option
- This product requires Standard Rates
- Acceptable Companies:
  - For loan amounts up to $650,000:
    - GE
    - UG
    - PMI
    - RMIC
    - Radian
    - MGIC
  - For loan amounts >$650,000:
    - UG
    - PMI
    - GE
    - MGIC
- Allocation among the insurers should be equally divided (usage to be determined by Underwriter).
- MI may be financed on primary residence purchase and rate & term refis.
  - The mortgage amount and LTV, including the financed premium, may not exceed the limitations set forth in the program guidelines.
  - MI coverage is based on LTV including the financed premium.
  - MI may not be financed on Anchorage loans
- NY State – Use the appraised value to determine if mortgage insurance is required. If mortgage insurance is required, use the lesser of the sales price or appraised value to determine the appropriate coverage.

**Primary Residence**

| LTV | Coverage | |
|---|---|---|
| | 30 Year | 15 Year |
| 80.01% - 85% | 12% | 6% |
| 85.01% - 90% | 25% | 12% |
| 90.01% - 95% | 30% | 25% |

**Second Homes**

| LTV | Coverage | |
|---|---|---|
| | 30 Year | 15 Year |
| 80.01% - 85% | 20% | 12% |
| 85.01% - 90% | 30% | 20% |

**36. INVESTOR ELIGIBILITY**

Private Investor

**37. SPECIAL REQUIREMENT/R ESTRICTIONS**

None

Product Summaries contain eligibility guidelines only. Consult the GMACM Conventional Underwriting Manual for full details.
RETAIL LENDING JUMBO FIXED RATE PRODUCTS  [nconformNCFixedRate]

**EXHIBIT B**

**WHOLE LOAN TRADE STIPULATIONS**

# GMAC RESIDENTIAL MORTGAGE CORP.
## 25 TO 30 YEAR FIXED RATE
## JUMBO "A" CREDIT MORTGAGES

| | |
|---|---|
| **BID DATE** | <u>AUGUST 10, 2005</u> |
| **SETTLEMENT DATE** | <u>SEPTEMBER 15, 2005</u> |
| **BID TIME** | <u>4:00 P.M. EASTERN</u> |
| **CONTACT** | SANDY BLITZER  (215) 682-1127 |
| **COLLATERAL SIZE** | $725,000,000  (+/- 5%) |

**SECURITIZATION ASSUMPTIONS:**

| | |
|---|---|
| **AAA SENIOR SIZE** | $696,725,000  (+/- .50%) |
| **PASS-THROUGH** | 5.50% |
| **APPROXIMATE AAA SUBORDINATION LEVEL** | 3.90%  (+/- .50%) |

| **APPROXIMATE CLASS SIZES** | | |
|---|---|---|
| | AA | 1.80% |
| | A | 0.75% |
| | BBB | 0.45% |
| | BB | 0.40% |
| | B | 0.30% |
| | NR | 0.20% |

SUBORDINATION LEVELS ARE NOT FINAL

---

<u>TRANSACTION STIPULATIONS:</u>

SECURITIES WILL BE ISSUED OFF OF Residential Asset Mortgage Products, Inc. SHELF
GMACM TO INCUR ALL STANDARD ISSUER COSTS AND FEES
FINAL DEAL STRUCTURE DATE <u>SEPTEMBER 6, 2005</u>

<u>PLEASE PROVIDE BIDS FOR AAA, IO, AND PO CLASSES.  SUBORDINATE CLASSES TO BE
SOLD AT A LATER DATE.</u>

\*DEALER PURCHASES NON-ECONOMIC RESIDUAL

MAXIMUM RETAIL CLASS SIZE IS 10% OF COLLATERAL BALANCE.
ALL RETAIL CLASSES MUST BE WRAPPED BY A THIRD PARTY SURETY PROVIDER.
SURETY FEE MUST BE PAID FOR BY PURCHASING DEALER.
THE RETAIL CLASS AND THE CLASSES BEING PAID PRIOR TO AND SIMULTANEOUSLY
WITH THE RETAIL CLASS MUST BE SIMPLE AND EASY TO UNDERSTAND.

PURCHASER WILL NOT REMOVE LOANS BASED SOLELY ON BROKER PRICE OPINIONS

# GMAC RESIDENTIAL MORTGAGE CORP.
## 25 TO 30 YEAR FIXED RATE
## JUMBO "A" CREDIT MORTGAGES

| | | |
|---|---|---|
| AGGREGATE PRINCIPAL BALANCE | $660,000,000 | (+/- 5%) |
| MORTGAGE LOAN CUTOFF DATE | 9/01/05 | |
| INTEREST RATE RANGE | 4.875 – 7.75 | |
| GROSS WAC | 5.92% | (+/- 5 Bps) |
| WEIGHTED AVERAGE SERVICING FEE | 25 Bps | |
| ORIGINAL WAM | 359 | |
| CURRENT WAM | 358 | (+/- 2 Months) |
| WALTV % | 70.50 | |
| WAFICO | 735 | |
| CALIFORNIA % | 33 | (MAX 35%) |
| SINGLE LARGEST ZIP CODE % | 0.35 | (MAX 1%) |
| AVERAGE UPB | $447,500 | |
| MAXIMUM UPB | $1,500,000 | |
| INTEREST ONLY % (120 MONTH TERM) | 10.5 | (MAX 12%) |
| CASH-OUT REFINANCE % | 39.00 | (MAX 40%) |
| PRIMARY RESIDENCE % | 95.50 | (MIN 93%) |
| SINGLE FAMILY/PUD % | 93.00 | (MIN 90%) |
| STANDARD DOCUMENTATION % | 82.00 | (MIN 80%) |
| UNINSURED > 80% LTV % | 0 | |
| TEMPORARY BUYDOWNS % | 0.90 | (MAX 1.0%) |

## ANTICIPATED GROSS WAC DISPERSION

| | |
|---|---|
| **4.875** | **< 1%** |
| **5.000** | **< 1%** |
| **5.125** | **< 1%** |
| **5.250** | **< 1%** |
| **5.375** | **1.00%** |
| **5.500** | **3.58%** |
| **5.625** | **5.53%** |
| **5.75** | **22.71%** |
| **5.875** | **23.79%** |
| **6.0** | **20.74%** |
| **6.125** | **10.07%** |
| **6.25** | **5.80%** |
| **6.375** | **3.14%** |
| **6.5** | **1.32%** |
| **6.625** | **< 1%** |
| **6.75** | **< 1%** |
| **6.875** | **< 1%** |
| **7.0** | **< 1%** |
| **7.125** | **< 1%** |
| **7.25** | **< 1%** |
| **7.375** | **< 1%** |
| **7.5** | **< 1%** |
| **7.625** | **< 1%** |
| **7.75** | **< 1%** |

GLOBAL AMENDMENT
TO SALE AND SERVICING AGREEMENTS

**(GMAC Mortgage Corporation)**

This Global Amendment (this "Amendment") dated as of September 1, 2005, by and among BANC OF AMERICA MORTGAGE CAPITAL CORPORATION, a North Carolina corporation (the "Initial Owner"), GMAC MORTGAGE CORPORATION, a Pennsylvania corporation (the "Company"), and BANK OF AMERICA, NATIONAL ASSOCIATION, a national banking association (the "Assignee") amends each of the sale and servicing agreements listed on Schedule I attached hereto (the "Agreements"), each by and between the parties set forth in Schedule I.

W I T N E S S E T H

WHEREAS, pursuant to various Assignment, Assumption and Recognition Agreements executed by the parties hereto from time to time, the Initial Owner has previously assigned its interest in certain of the Agreements as such relate to certain pools of Mortgage Loans to the Assignee; and

WHEREAS, the Company, the Initial Owner and the Assignee have agreed, subject to the terms and conditions of this Amendment, that each of the Agreements be amended to reflect certain agreed upon revisions to the terms thereof.

NOW, THEREFORE, in consideration of the mutual premises and mutual obligations set forth herein and other good and valuable consideration:

1.    The Company, the Initial Owner and the Assignee hereby agree the Agreements are amended to assign, transfer and set over all of the Initial Owner's right, title and interest to and under the Agreements to the Assignee and to remove the Initial Owner as a party thereto and furthermore, that the Agreements are amended by deleting any occurrence of "Banc of America Mortgage Capital Corporation" and replacing it with "Bank of America, National Association."

2.    The Initial Owner hereby assigns, transfers and sets over to the Assignee all of its right, title and interest in, to and under the Agreements (other than the rights of the Initial Owner to indemnification thereunder), and the Assignee hereby assumes all of the Initial Owner's obligations and duties under the Agreements from and after the date hereof, and the Company hereby acknowledges such assignment and assumption and hereby agrees to the release of the Initial Owner from any obligations or duties under the Agreements from and after the date hereof. Notwithstanding the foregoing, it is understood that the Company is not released from liability to the Initial Owner for any breaches of any representations and warranties by the Company made in the Agreements prior to the date hereof regardless of when such breaches are discovered or made known.

Notwithstanding anything to the contrary herein or otherwise, it is understood that the Initial Owner is not released from liability to the Company for any breaches of any representations, warranties and covenants by the Initial Owner made in and pursuant to the Agreements prior to the date hereof regardless of when such breaches are discovered or made known.

3.    The Company, the Initial Owner and the Assignee hereby agree that the definition of "Pass-Through Transfer" in Article I of each of the Agreements is amended by deleting such definition in its entirety and replacing it with the following:

> "Either (i) the sale or transfer of some or all of the Mortgage Loans by the Initial Owner to a trust to be formed as part of a publicly issued or privately placed mortgage-backed securities transaction or (ii) a synthetic securitization in which some or all of the Mortgage Loans are included as part of the reference portfolio relating to such securitization."

4.    The Company, the Initial Owner and the Assignee hereby agree that Section 3.02 of the Flow Agreement (as defined in Schedule I attached hereto) is hereby amended by inserting the following as new subsections therein (to be effective as of September 15, 2005):

> "(xlv)  No Mortgage Loan is a "High Cost Loan" or a "Covered Loan," as applicable (as such terms are defined in the then current Standard & Poor's LEVELS Glossary, which is now Version 5.6c Revised);

> (xlvi)  No Mortgage Loan originated on or after August 1, 2004 requires the related Mortgagor to submit to arbitration to resolve any dispute arising out of or relating in any way to the Mortgage Loan transaction;

> (xlvii)  No Mortgage Loan is a high cost loan under the predatory lending law of any jurisdiction in which the related Mortgaged Property is located; and

> (xlviii) No Mortgage Loan originated on or after October 1, 2002 through and including March 6, 2003 is governed by the Georgia Fair Lending Act;

5.    The Company, the Initial Owner and the Assignee hereby agree that Section 5.02 of each of the Agreements is amended by deleting in their entirety the first two paragraphs thereof and by replacing such paragraphs with the following:

> "Not later than the third (3rd) Business Day of each month, the Company shall furnish to the Owner, with respect to the preceding month, a monthly collection report, a monthly paid in full report that summarizes Mortgage Loans paid in full during the related Due Period and a monthly trial balance report that provides a trial balance as of the last day of the month preceding such Remittance Date in electronic format agreed upon by the Company and the Owner.

Notwithstanding anything to the contrary herein or otherwise, it is understood that the Initial Owner is not released from liability to the Company for any breaches of any representations, warranties and covenants by the Initial Owner made in and pursuant to the Agreements prior to the date hereof regardless of when such breaches are discovered or made known.

3.    The Company, the Initial Owner and the Assignee hereby agree that the definition of "Pass-Through Transfer" in Article I of each of the Agreements is amended by deleting such definition in its entirety and replacing it with the following:

> "Either (i) the sale or transfer of some or all of the Mortgage Loans by the Initial Owner to a trust to be formed as part of a publicly issued or privately placed mortgage-backed securities transaction or (ii) a synthetic securitization in which some or all of the Mortgage Loans are included as part of the reference portfolio relating to such securitization."

4.    The Company, the Initial Owner and the Assignee hereby agree that Section 3.02 of the Flow Agreement (as defined in Schedule I attached hereto) is hereby amended by inserting the following as new subsections therein (to be effective as of September 15, 2005):

> "(xlv)  No Mortgage Loan is a "High Cost Loan" or a "Covered Loan," as applicable (as such terms are defined in the then current Standard & Poor's LEVELS Glossary, which is now Version 5.6c Revised);

> (xlvi)  No Mortgage Loan originated on or after August 1, 2004 requires the related Mortgagor to submit to arbitration to resolve any dispute arising out of or relating in any way to the Mortgage Loan transaction;

> (xlvii)  No Mortgage Loan is a high cost loan under the predatory lending law of any jurisdiction in which the related Mortgaged Property is located; and

> (xlviii) No Mortgage Loan originated on or after October 1, 2002 through and including March 6, 2003 is governed by the Georgia Fair Lending Act;

5.    The Company, the Initial Owner and the Assignee hereby agree that Section 5.02 of each of the Agreements is amended by deleting in their entirety the first two paragraphs thereof and by replacing such paragraphs with the following:

> "Not later than the third (3rd) Business Day of each month, the Company shall furnish to the Owner, with respect to the preceding month, a monthly collection report, a monthly paid in full report that summarizes Mortgage Loans paid in full during the related Due Period and a monthly trial balance report that provides a trial balance as of the last day of the month preceding such Remittance Date in electronic format agreed upon by the Company and the Owner.

2

Not later than the fifth (5th) Business Day of the month of the related Remittance Date, the Company shall deliver to the Owner a delinquency report and a monthly remittance statement in the form of, and providing the information described in, <u>Exhibit I</u> hereto and a mutually agreed upon electronic format."

6.    The Company, the Initial Owner and the Assignee hereby agree that Article V of each of the Agreements is amended by inserting the following as Section 5.05 therein (and the Table of Contents is amended accordingly):

"Section 5.05   <u>Automated Servicing Systems</u>.

The Company shall set up, format, maintain and transmit to the Owner the Company's mortgage servicer file and other electronic data storage and transmission systems related to the Mortgage Loans (collectively, the "Servicing Systems") in accordance with the guidelines and requirements set forth in <u>Exhibit I</u> attached hereto (the "Servicer Requirements"), and the Company shall cooperate with the Owner to receive data from the Owner that is to be incorporated in the Servicing Systems in accordance with the System Requirements."

7.    The Company, the Initial Owner and the Assignee hereby agree that Section 7.01 of each of the Agreements is amended by inserting the following as the new second paragraph therein:

"Upon reasonable request from the Owner, the Company shall deliver no later than thirty (30) days after such request any Mortgage File or document therein, or copies thereof, to the Owner at the direction and expense of the Owner. The Owner shall return any originals of documents delivered pursuant to this Section no later than ten (10) days after receipt thereof.  If the Company fails to furnish copies of any Mortgage File or document therein, and if the related Mortgaged Property becomes REO Property, the Company shall indemnify the Owner for losses incurred by the Owner with respect to such Mortgage Loan to the extent such losses are directly attributable to the Company's failure to provide the related Mortgage File or document copy requested by the Owner."

8.    The Company, the Initial Owner and the Assignee hereby agree that each of the Agreements is amended by inserting at the end thereof new <u>Exhibit I</u>, substantially in the form of <u>Exhibit A</u> hereto (and updating the table of exhibits accordingly).

Upon execution of this Amendment, each Agreement as it relates to Mortgage Loans sold to the Initial Owner by the Company prior to the date hereof and owned by the Assignee as of the date hereof will be read to contain the above amendments, except the amendment set forth in <u>Section 4</u> above, and the Flow Agreement, as it relates to Mortgage Loans sold pursuant to Assignment and Conveyances executed on or after the date hereof, will be read to contain all of the above amendments.   Any future reference to each and any Agreement will mean such Agreement as so modified.  The parties hereto acknowledge that the Agreements have not been modified or amended, except as otherwise expressly described or provided for herein.

Not later than the fifth (5th) Business Day of the month of the related Remittance Date, the Company shall deliver to the Owner a delinquency report and a monthly remittance statement in the form of, and providing the information described in, Exhibit I hereto and a mutually agreed upon electronic format."

6.   The Company, the Initial Owner and the Assignee hereby agree that Article V of each of the Agreements is amended by inserting the following as Section 5.05 therein (and the Table of Contents is amended accordingly):

"Section 5.05  Automated Servicing Systems.

The Company shall set up, format, maintain and transmit to the Owner the Company's mortgage servicer file and other electronic data storage and transmission systems related to the Mortgage Loans (collectively, the "Servicing Systems") in accordance with the guidelines and requirements set forth in Exhibit I attached hereto (the "Servicer Requirements"), and the Company shall cooperate with the Owner to receive data from the Owner that is to be incorporated in the Servicing Systems in accordance with the System Requirements."

7.   The Company, the Initial Owner and the Assignee hereby agree that Section 7.01 of each of the Agreements is amended by inserting the following as the new second paragraph therein:

"Upon reasonable request from the Owner, the Company shall deliver no later than thirty (30) days after such request any Mortgage File or document therein, or copies thereof, to the Owner at the direction and expense of the Owner. The Owner shall return any originals of documents delivered pursuant to this Section no later than ten (10) days after receipt thereof.  If the Company fails to furnish copies of any Mortgage File or document therein, and if the related Mortgaged Property becomes REO Property, the Company shall indemnify the Owner for losses incurred by the Owner with respect to such Mortgage Loan to the extent such losses are directly attributable to the Company's failure to provide the related Mortgage File or document copy requested by the Owner."

8.   The Company, the Initial Owner and the Assignee hereby agree that each of the Agreements is amended by inserting at the end thereof new Exhibit I, substantially in the form of Exhibit A hereto (and updating the table of exhibits accordingly).

Upon execution of this Amendment, each Agreement as it relates to Mortgage Loans sold to the Initial Owner by the Company prior to the date hereof and owned by the Assignee as of the date hereof will be read to contain the above amendments, except the amendment set forth in Section 4 above, and the Flow Agreement, as it relates to Mortgage Loans sold pursuant to Assignment and Conveyances executed on or after the date hereof, will be read to contain all of the above amendments.  Any future reference to each and any Agreement will mean such Agreement as so modified.  The parties hereto acknowledge that the Agreements have not been modified or amended, except as otherwise expressly described or provided for herein.

3

This Amendment shall be construed in accordance with the laws of the State of New York, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

This Amendment may be executed in one or more counterparts and by different parties hereto on separate counterparts, each of which, when so executed, shall constitute one and the same agreement.

With respect to the Agreements, this Amendment shall inure to the benefit of and be binding upon the Initial Owner, the Assignee and the Company under the Agreements, and their respective successors and permitted assigns.

Any capitalized term, not otherwise herein defined, shall have the meaning set forth in the Agreements.

[SIGNATURES COMMENCE ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

**BANC OF AMERICA MORTGAGE CAPITAL CORPORATION**, as Initial Owner

By: _____

Name: Bruce W. Good

Title: Vice President

**BANK OF AMERICA, NATIONAL ASSOCIATION**, as Assignee

By: _____

Name: Bruce W. Good

Title: Vice President

**GMAC MORTGAGE CORPORATION**, as Company

By: _____

Name: _____

Title: _____

*[Signature Page to Global Amendment to Sale and Servicing Agreements]*

IN WITNESS WHEREOF, the parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

**BANC OF AMERICA MORTGAGE CAPITAL CORPORATION**, as Initial Owner

By:_____

Name: Bruce W. Good

Title: Vice President

**BANK OF AMERICA, NATIONAL ASSOCIATION**, as Assignee

By:_____

Name: Bruce W. Good

Title: Vice President

**GMAC MORTGAGE CORPORATION**, as Company

By:_____

Name:_____

Title:_____

*[Signature Page to Global Amendment to Sale and Servicing Agreements]*

# EXHIBIT A

## SERVICER REQUIREMENTS

- Loading/Updating Investor Headers

  1. Assignee will provide investor matrix for input on Servicing Systems, if applicable. Updates/additions will occur monthly, including new investor header detail for each new deal that is settled.
  2. The Company, acting as servicer (the "Servicer"), will load investor information upon receipt or before month end for inclusion on the next month-end file to Assignee.
  3. The Servicer will include the investor information on the monthly servicer file ("MSF") and the monetary file ("MF").

- Loading Account Numbers

  1. Upon receipt of a funding schedule, Assignee will deliver a cross reference of Servicer-to-Assignee account numbers within 24 hours (or same day, if last day of the month). The account numbers will be delivered in an electronic format that is agreed upon.
  2. The Servicer will load account numbers upon receipt or before month end to ensure inclusion with the next month-end files to Assignee.

- Automated Monetary Transaction File

  1. The Servicer will establish a process to feed a MSF to Assignee that contains loan information specified in the MSF layout provided.
  2. The feed will include all new loans purchased in the previous month, as well as a maintenance file for all existing loans in the Assignee portfolio.
  3. The file will cut-off at month-end, including any changes or transactions that occur on the last day of the month.
  4. The file will be transmitted from the Servicer to the specified mailbox at Assignee.
  5. Assignee will receive and process the electronic file on the first business day of the month for the previous month-end file.
  6. The Servicer will provide an email providing file details for balancing.

- MSF — Ongoing Process

  1. The Servicer will establish a process to feed a MSF to Assignee that contains loan information specified in the MSF layout provided.
  2. The feed will include all new loans purchased in the previous month, as well as a maintenance file for all existing loans in the Assignee portfolio.
  3. The file will cut-off at month-end, including any changes or transactions that occur on the last day of the month.
  4. The file will be transmitted from the Servicer to the specified mailbox at Assignee.
  5. Assignee will receive and process the electronic file on the first business day of the month for the previous month-end file.
  6. The Servicer will provide an email providing file details for balancing.

- MSF — Test File

For testing purposes, Assignee requests a sample file that represents the MSF.

  1. The Servicer will load/update investor header information received from Assignee.

2.  Assignee will receive and process the file on the first business day of the month for the previous month-end file.
3.  The Servicer will provide an email providing file details for balancing.

- Reporting Requirements

The Servicer will provide the following reports to Assignee by the 5th business day of the month, unless otherwise specified. Reports will be provided in an electronic format, unless otherwise specified. The reports listed below are required for the Assignee's project; reports in addition to these may also be required.

The description of these reports is as follows:

- **Collection Report** - Report that summarizes the collections made during the reporting period.
- **Paid In Full Report** - Report that summarizes paid in full loans made during the reporting period.
- **Trial Balance Report** - Monthly statement of mortgage accounts or a trial balance as of the cutoff date.
- **Scheduled Remittance Reports** – The Servicer sends on a monthly basis. We would like this report by the 5th business day.
- **Delinquency Report** – Report from the Servicer to be sent by the 5th business day. Assignee would like this report sent via e-mail or fax.

## SCHEDULE I

| | |
|---|---|
| 1. | Sale and Servicing Agreement dated February 1, 2003, by and among Banc of America Mortgage Capital Corporation, Witmer Funding LLC and GMAC Mortgage Corporation, as amended by Amendment No. 1 to Sale and Servicing Agreement, dated April 1, 2003 |
| 2. | Sale and Servicing Agreement dated April 1, 2003, by and among Banc of America Mortgage Capital Corporation, Witmer Funding LLC and GMAC Mortgage Corporation, as amended by Amendment No. 1 to Sale and Servicing Agreement, dated April 1, 2003 |
| 3. | Sale and Servicing Agreement dated May 1, 2003, by and among Banc of America Mortgage Capital Corporation, Witmer Funding LLC and GMAC Mortgage Corporation |
| 4. | Sale and Servicing Agreement dated June 1, 2003, by and between Banc of America Mortgage Capital Corporation and GMAC Mortgage Corporation |
| 5. | Master Flow Sale and Servicing Agreement (the "Flow Agreement") dated August 1, 2003, by and between Banc of America Mortgage Capital Corporation and GMAC Mortgage Corporation |

EXECUTION VERSION

## REGULATION AB COMPLIANCE ADDENDUM
## TO MASTER FLOW SALE AND SERVICING AGREEMENT

This Regulation AB Compliance Addendum (this "Reg AB Addendum"), dated as of January 1, 2006, by and between Bank of America, National Association (the "Purchaser") and GMAC Mortgage Corporation (the "Company"), to that certain Master Flow Sale and Servicing Agreement, dated as of August 1, 2003, by and between the Company and the Purchaser (as amended, modified or supplemented, the "Agreement").

### WITNESSETH

WHEREAS, the Company and the Purchaser have agreed to adopt an addendum to the Agreement to reflect the intention of the parties to comply with Regulation AB.

NOW, THEREFORE, in consideration of the mutual promises and mutual obligations set forth herein, the Company and the Purchaser hereby agree as follows:

### ARTICLE I
### DEFINED TERMS

Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Agreement. The following terms shall have the meanings set forth below, unless the context clearly indicates otherwise:

Commission:  The United States Securities and Exchange Commission.

Company Information:  As defined in Section 2.07(a).

Depositor:  The depositor, as such term is defined in Regulation AB, with respect to any Securitization Transaction.

Exchange Act:  The Securities Exchange Act of 1934, as amended.

Master Servicer:  With respect to any Securitization Transaction, the "master servicer," if any, identified in the related transaction documents.

Qualified Correspondent:  Any Person from which the Company purchased Mortgage Loans, provided that the following conditions are satisfied:  (i) such Mortgage Loans were originated pursuant to an agreement between the Company and such Person that contemplated that such Person would underwrite mortgage loans from time to time, for sale to the Company, in accordance with underwriting guidelines designated by the Company ("Designated Guidelines") or guidelines that do not vary materially from such Designated Guidelines; (ii) such Mortgage Loans were in fact underwritten as described in clause (i) above and were acquired by the Company within 180 days after origination; (iii) either (x) the Designated Guidelines were, at the time such Mortgage Loans were originated, used by the Company in origination of mortgage loans of the same type as the Mortgage Loans for the Company's own account or (y) the Designated Guidelines were, at the time such Mortgage Loans were underwritten, designated by

the Company on a consistent basis for use by lenders in originating mortgage loans to be purchased by the Company; and (iv) the Company employed, at the time such Mortgage Loans were acquired by the Company, pre-purchase or post-purchase quality assurance procedures (which may involve, among other things, review of a sample of mortgage loans purchased during a particular time period or through particular channels) designed to ensure that Persons from which it purchased mortgage loans properly applied the underwriting criteria designated by the Company.

Reconstitution:  Any Securitization Transaction or Whole Loan Transfer.

Regulation AB:  Subpart 229.1100 – Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (Jan. 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

Securities Act:  The Securities Act of 1933, as amended.

Securitization Transaction:  Any transaction involving either (1) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (2) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

Servicer:  As defined in Section 2.03(c).

Servicing Criteria:  The "servicing criteria" set forth in Item 1122(d) of Regulation AB, as such may be amended from time to time.

Static Pool Information:  Static pool information as described in Item 1l05(a)(l)-(3) and 1105(c) of Regulation AB.

Subcontractor:  Any vendor, subcontractor or other Person that is not responsible for the overall servicing (as "servicing" is commonly understood by participants in the mortgage-backed securities market) of Mortgage Loans but performs one or more discrete functions identified in Item 1122( d) of Regulation AB with respect to Mortgage Loans under the direction or authority of the Company or a Subservicer.

Subservicer:  Any Person that services Mortgage Loans on behalf of the Company or any Subservicer and is responsible for the performance (whether directly or through Subservicers or Subcontractors) of a substantial portion of the material servicing functions required to be performed by the Company under this Agreement or any Reconstitution Agreement that are identified in Item 1122(d) of Regulation AB.

Third-Party Originator:  Each Person, other than a Qualified Correspondent, that originated Mortgage Loans acquired by the Company.

2

<u>Whole Loan Transfer</u>:  Any sale or transfer of some or all of the Mortgage Loans, other than a Securitization Transaction.

## ARTICLE II
## COMPLIANCE WITH REGULATION AB

Section 2.01.  <u>Intent of the Parties; Reasonableness</u>.

The Purchaser and the Company acknowledge and agree that the purpose of Article II of this Reg AB Addendum is to facilitate compliance by the Purchaser and any Depositor with the provisions of Regulation AB and related rules and regulations of the Commission and that the provisions of this Reg AB Addendum shall be applicable to all Mortgage Loans included in a Securitization Transaction closing on or after January 1, 2006, regardless whether the Mortgage Loans were purchased by the Purchaser from the Company prior to the date hereof.  Although Regulation AB is applicable by its terms only to offerings of asset-backed securities that are registered under the Securities Act, the Company acknowledges that investors in privately offered securities may require that the Purchaser or any Depositor provide comparable disclosure in unregistered offerings.  References in this Agreement to compliance with Regulation AB include provision of comparable disclosure in private offerings.

Neither the Purchaser nor any Depositor shall exercise its right to request delivery of information or other performance under these provisions other than in good faith, or for purposes other than compliance with the Securities Act, the Exchange Act and the rules and regulations of the Commission thereunder (or the provision in a private offering of disclosure comparable to that required under the Securities Act).  The Company acknowledges that interpretations of the requirements of Regulation AB may change over time, whether due to interpretive guidance provided by the Commission or its staff, consensus among participants in the asset-backed securities markets, advice of counsel, or otherwise, and agrees to comply with requests made by the Purchaser, any Master Servicer or any Depositor in good faith for delivery of information under these provisions on the basis of evolving interpretations of Regulation AB.  In connection with any Securitization Transaction, the Company shall cooperate fully with the Purchaser and any Master Servicer to deliver to the Purchaser (including any of its assignees or designees), any Master Servicer and any Depositor, any and all statements, reports, certifications, records and any other information necessary in the good faith determination of the Purchaser, the Master Servicer or any Depositor to permit the Purchaser, such Master Servicer or such Depositor to comply with the provisions of Regulation AB, together with such disclosures relating to the Company, any Subservicer, any Third-Party Originator and the Mortgage Loans, or the servicing of the Mortgage Loans, reasonably believed by the Purchaser or any Depositor to be necessary in order to effect such compliance.

The Purchaser (including any of its assignees or designees) shall cooperate with the Company by providing timely notice of requests for information under these provisions and by reasonably limiting such requests to information required, in the Purchaser's reasonable judgment, to comply with Regulation AB.

Section 2.02.    <u>Additional Representations and Warranties of the Company</u>.

(a)      The Company hereby represents to the Purchaser, to any Master Servicer and to any Depositor, as of the date on which information is first provided to the Purchaser, any Master Servicer or any Depositor under Section 2.03 that, except as disclosed in writing to the Purchaser, such Master Servicer or such Depositor prior to such date:  (i) the Company is not aware and has not received notice that any default, early amortization or other performance triggering event has occurred as to any other securitization due to any act or failure to act of the Company; (ii) the Company has not been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; (iii) no material noncompliance with the applicable Servicing Criteria with respect to other securitizations of residential mortgage loans involving the Company as servicer has been disclosed or reported by the Company; (iv) no material changes to the Company's policies or procedures with respect to the servicing function it will perform under this Agreement and any Reconstitution Agreement for mortgage loans of a type similar to the Mortgage Loans have occurred during the three-year period immediately preceding the related Securitization Transaction; (v) there are no aspects of the Company's financial condition that could have a material adverse effect on the performance by the Company of its servicing obligations under this Agreement or any Reconstitution Agreement; (vi) there are no material legal or governmental proceedings pending (or known to be contemplated) against the Company, any Subservicer or any Third-Party Originator; and (vii) there are no affiliations, relationships or transactions relating to the Company, any Subservicer or any Third-Party Originator with respect to any Securitization Transaction and any party thereto identified by the related Depositor of a type described in Item 1119 of Regulation AB.

(b)      If so requested by the Purchaser, any Master Servicer or any Depositor on any date following the date on which information is first provided to the Purchaser, any Master Servicer or any Depositor under Section 2.03, the Company shall, within ten Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in paragraph (a) of this Section or, if any such representation and warranty is not accurate as of the date of such request, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting party.

Section 2.03.    <u>Information to Be Provided by the Company</u>.

In connection with any Securitization Transaction, the Company shall (i) within ten Business Days following request by the Purchaser or any Depositor, provide to the Purchaser and such Depositor (or, as applicable, cause each Third-Party Originator and each Subservicer to provide), in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, the information and materials specified in paragraphs (a), (b), (c), (f) and (g) of this Section, and (ii) as promptly as practicable following notice to or discovery by the Company, provide to the Purchaser and any Depositor (in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor) the information specified in paragraph (d) of this Section.

(a)      If so requested by the Purchaser or any Depositor, the Company shall provide such information regarding (i) the Company, as originator of the Mortgage Loans (including as

4

an acquirer of Mortgage Loans from a Qualified Correspondent), or (ii) each Third-Party Originator, and (iii) as applicable, each Subservicer, as is requested for the purpose of compliance with Items 1103(a)(l), 1105, 1110, 1117 and 1119 of Regulation AB. Such information shall include, at a minimum:

      (A)    the originator's form of organization;

      (B)    a description of the originator's origination program and how long the originator has been engaged in originating residential mortgage loans, which description shall include a discussion of the originator's experience in originating mortgage loans of a similar type as the Mortgage Loans; information regarding the size and composition of the originator's origination portfolio; and information that may be material, in the good faith judgment of the Purchaser or any Depositor, to an analysis of the performance of the Mortgage Loans, including the originators' credit-granting or underwriting criteria for mortgage loans of similar type(s) as the Mortgage Loans and such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 1110(b)(2) of Regulation AB;

      (C)    a description of any material legal or governmental proceedings pending (or known to be contemplated) against the Company, each Third-Party Originator and each Subservicer; and

      (D)    a description of any affiliation or relationship between the Company, each Third-Party Originator, each Subservicer and any of the following parties to a Securitization Transaction, as such parties are identified to the Company by the Purchaser or any Depositor in writing in advance of such Securitization Transaction:

          (1)    the sponsor;
          (2)    the depositor;
          (3)    the issuing entity;
          (4)    any servicer;
          (5)    any trustee;
          (6)    any originator;
          (7)    any significant obligor;
          (8)    any enhancement or support provider; and
          (9)    any other material transaction party.

      (b)    If so requested by the Purchaser or any Depositor, the Company shall provide (or, as applicable, cause each Third-Party Originator to provide) Static Pool Information with respect to the mortgage loans (of a similar type as the Mortgage Loans, as reasonably identified by the Purchaser as provided below) originated by (i) the Company, if the Company is an originator of Mortgage Loans (including as an acquirer of Mortgage Loans from a Qualified Correspondent), and/or (ii) each Third-Party Originator. Such Static Pool Information shall be prepared by the Company (or Third-Party Originator) on the basis of its reasonable, good faith interpretation of the requirements of Item 1105(a)(1)-(3) of Regulation AB. To the extent that there is reasonably available to the Company (or Third-Party Originator) Static Pool Information with respect to more than one mortgage loan type, the Purchaser or any Depositor shall be entitled to specify

whether some or all of such information shall be provided pursuant to this paragraph. The content of such Static Pool Information may be in the form customarily provided by the Company, and need not be customized for the Purchaser or any Depositor. Such Information for each vintage origination year or prior securitized pool, as applicable, shall be presented in increments no less frequently than quarterly over the life of the mortgage loans included in the vintage origination year or prior securitized pool. The most recent periodic increment must be as of a date no later than 135 days prior to the date of the prospectus or other offering document in which the Static Pool Information is to be included or incorporated by reference. The Static Pool Information shall be provided in an electronic format that provides a permanent record of the information provided, such as a portable document format (pdf) file, or other such electronic format reasonably required by the Purchaser or the Depositor, as applicable.

Promptly following notice or discovery of a material error in Static Pool Information provided pursuant to the immediately preceding paragraph (including an omission to include therein information required to be provided pursuant to such paragraph), the Company shall provide corrected Static Pool Information to the Purchaser or any Depositor, as applicable, in the same format in which Static Pool Information was previously provided to such party by the Company.

If so requested by the Purchaser or any Depositor, the Company shall provide (or, as applicable, cause each Third-Party Originator to provide), at the expense of the requesting party (to the extent of any additional incremental expense associated with delivery pursuant to this Agreement), such statements and agreed-upon procedures letters of certified public accountants reasonably acceptable to the Purchaser or Depositor, as applicable, pertaining to Static Pool Information relating to prior securitized pools for securitizations closed on or after January 1, 2006 or, in the case of Static Pool Information with respect to the Company's or Third-Party Originator's originations or purchases, to calendar months commencing January 1, 2006, as the Purchaser or such Depositor shall reasonably request. Such statements and letters shall be addressed to and be for the benefit of such parties as the Purchaser or such Depositor shall designate, which may include, by way of example, any Sponsor, any Depositor and any broker dealer acting as underwriter, placement agent or initial purchaser with respect to a Securitization Transaction. Any such statement or letter may take the form of a standard, generally applicable document accompanied by a reliance letter authorizing reliance by the addressees designated by the Purchaser or such Depositor.

(c)    If so requested by the Purchaser or any Depositor, the Company shall provide such information regarding the Company, as servicer of the Mortgage Loans, and each Subservicer (each of the Company and each Subservicer, for purposes of this paragraph, a "Servicer"), as is requested for the purpose of compliance with Items 1108, 1117 and 1119 of Regulation AB. Such information shall include, at a minimum:

(A)    the Servicer's form of organization;

(B)    a description of how long the Servicer has been servicing residential mortgage loans; a general discussion of the Servicer's experience in servicing assets of any type as well as a more detailed discussion of the Servicer's experience in, and procedures for, the servicing function it will perform under the Agreement and any

6

Reconstitution Agreements; information regarding the size, composition and growth of the Servicer's portfolio of residential mortgage loans of a type similar to the Mortgage Loans and information on factors related to the Servicer that may be material, in the good faith judgment of the Purchaser or any Depositor, to any analysis of the servicing of the Mortgage Loans or the related asset-backed securities, as applicable, including, without limitation:

> (1)    whether any prior securitizations of mortgage loans of a type similar to the Mortgage Loans involving the Servicer have defaulted or experienced an early amortization or other performance triggering event because of servicing during the three-year period immediately preceding the related Securitization Transaction;

> (2)    the extent of outsourcing the Servicer utilizes;

> (3)    whether there has been previous disclosure of material noncompliance with the applicable servicing criteria with respect to other securitizations of residential mortgage loans involving the Servicer as a servicer during the three-year period immediately preceding the related Securitization Transaction;

> (4)    whether the Servicer has been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; and

> (5)    such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 1108(b)(2) of Regulation AB;

(C)    a description of any material changes during the three-year period immediately preceding the related Securitization Transaction to the Servicer's policies or procedures with respect to the servicing function it will perform under the Agreement and any Reconstitution Agreements for mortgage loans of a type similar to the Mortgage Loans;

(D)    information regarding the Servicer's financial condition, to the extent that there is a material risk that an adverse financial event or circumstance involving the Servicer could have a material adverse effect on the performance by the Company of its servicing obligations under the Agreement or any Reconstitution Agreement;

(E)    information regarding advances made by the Servicer on the Mortgage Loans and the Servicer's overall servicing portfolio of residential mortgage loans for the three-year period immediately preceding the related Securitization Transaction, which may be limited to a statement by an authorized officer of the Servicer to the effect that the Servicer has made all advances required to be made on residential mortgage loans serviced by it during such period, or, if such statement would not be accurate, information regarding the percentage and type of advances not made as required, and the reasons for such failure to advance;

7

(F)    a description of the Servicer's processes and procedures designed to address any special or unique factors involved in servicing loans of a similar type as the Mortgage Loans;

(G)    a description of the Servicer's processes for handling delinquencies, losses, bankruptcies and recoveries, such as through liquidation of mortgaged properties, sale of defaulted mortgage loans or workouts; and

(H)    information as to how the Servicer defines or determines delinquencies and charge-offs, including the effect of any grace period, re-aging, restructuring, partial payments considered current or other practices with respect to delinquency and loss experience;

(I)    a description of any material legal or governmental proceedings pending (or known to be contemplated) against the Servicer; and

(J)    a description of any affiliation or relationship between the Servicer and any of the following parties to a Securitization Transaction, as such parties are identified to the Servicer by the Purchaser or any Depositor in writing in advance of such Securitization Transaction:

        (1)    the sponsor;
        (2)    the depositor;
        (3)    the issuing entity;
        (4)    any servicer;
        (5)    any trustee;
        (6)    any originator;
        (7)    any significant obligor;
        (8)    any enhancement or support provider; and
        (9)    any other material transaction party.

(d)    For the purpose of satisfying the reporting obligation under the Exchange Act with respect to any class of asset-backed securities, the Company shall (or shall cause each Subservicer and Third-Party Originator to) (i) provide prompt notice to the Purchaser, any Master Servicer and any Depositor in writing of (A) any material litigation or governmental proceedings involving the Company, any Subservicer or any Third-Party Originator, (B) any affiliations or relationships that develop following the closing date of a Securitization Transaction between the Company, any Subservicer or any Third-Party Originator and any of the parties specified in clause (D) of paragraph (a) of this Section (and any other parties identified in writing by the requesting party) with respect to such Securitization Transaction, (C) any Event of Default under the terms of this Agreement or any Reconstitution Agreement, (D) any merger, consolidation or sale of substantially all of the assets of the Company, and (E) the Company's entry into an agreement with a Subservicer to perform or assist in the performance of any of the Company's obligations under this Agreement or any Reconstitution Agreement and (ii) provide to the Purchaser and any Depositor a description of such proceedings, affiliations or relationships.

8

(e)    As a condition to the succession to the Company or any Subservicer as servicer or subservicer under the Agreement or any Reconstitution Agreement by any Person (i) into which the Company or such Subservicer may be merged or consolidated, or (ii) which may be appointed as a successor to the Company or any Subservicer, the Company shall provide to the Purchaser, any Master Servicer, and any Depositor, at least 15 calendar days prior to the effective date of such succession or appointment, (x) written notice to the Purchaser and any Depositor of such succession or appointment and (y) in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, all information reasonably requested by the Purchaser or any Depositor in order to comply with its reporting obligation under Item 6.02 of Form 8-K with respect to any class of asset-backed securities.

(f)    In addition to such information as the Company, as servicer, is obligated to provide pursuant to other provisions of the Agreement, not later than ten days prior to the deadline for the filing of any distribution report on Form 10-D in respect of any Securitization Transaction that includes any of the Mortgage Loans serviced by the Company or any Subservicer, the Company or such Subservicer, as applicable, shall, to the extent the Company or such Subservicer has knowledge, provide to the party responsible for filing such report (including, if applicable, the Master Servicer) notice of the occurrence of any of the following events along with all information, data, and materials related thereto as may be required to be included in the related distribution report on Form 10-D (as specified in the provisions of Regulation AB referenced below):

(i)    any material modifications, extensions or waivers of pool asset terms, fees, penalties or payments during the distribution period or that have cumulatively become material over time (Item 1121(a)(11) of Regulation AB);

(ii)    material breaches of pool asset representations or warranties or transaction covenants (Item 1121(a)(12) of Regulation AB); and

(iii)    information regarding new asset-backed securities issuances backed by the same pool assets, any pool asset changes (such as, additions, substitutions or repurchases), and any material changes in origination, underwriting or other criteria for acquisition or selection of pool assets (Item 1121(a)(14) of Regulation AB).

(g)    The Company shall provide to the Purchaser, any Master Servicer and any Depositor, evidence of the authorization of the person signing any certification or statement, copies or other evidence of Fidelity Bond Insurance and Errors and Omissions Insurance policy, financial information and reports, and such other information related to the Company or any Subservicer or the Company or such Subservicer's performance hereunder.

(h)    In the event that (i) the Company does not reasonably believe that certain information requested under Section 2.03 is required to be disclosed pursuant to Regulation AB and (ii) the Company has not provided such information for any of its own securitizations, the Purchaser shall pay all reasonable documented costs incurred by the Company in connection with the preparation and delivery of such information, and the Company shall promptly deliver such information after expiration of a reasonable period of time for establishing the necessary systems and procedures to produce such information. Further, notwithstanding anything to the

9

contrary herein, when determining if information is required under Regulation AB, all threshold and other requirements shall be determined solely by looking at the Company's mortgage loans and those of its third-party originators. The Company shall have no obligation with respect to disclosure or reporting under Regulation AB in the event that the aggregation of its third-party originated Mortgage Loans with those of the Purchaser's other sellers require additional disclosure; provided, however, the Company shall otherwise cooperate with the Purchaser to provide disclosure or reporting under Regulation AB in the event that such disclosure or reporting is required under Regulation AB and not otherwise available to the Purchaser.

Section 2.04.    Servicer Compliance Statement.

The Company shall use its best efforts to deliver on or before March 5th, but in no event later than March 15th, of each calendar year, commencing in 2007, to the Purchaser, any Master Servicer and any Depositor a statement of compliance addressed to the Purchaser, such Master Servicer and such Depositor and signed by an authorized officer of the Company, to the effect that (i) a review of the Company's activities during the immediately preceding calendar year (or applicable portion thereof) and of its performance under the Agreement and any applicable Reconstitution Agreement during such period has been made under such officer's supervision, and (ii) to the best of such officers' knowledge, based on such review, the Company has fulfilled all of its obligations under the Agreement and any applicable Reconstitution Agreement in all material respects throughout such calendar year (or applicable portion thereof) or, if there has been a failure to fulfill any such obligation in any material respect, specifically identifying each such failure known to such officer and the nature and the status thereof.

Section 2.05.    Report on Assessment of Compliance and Attestation.

(a)    The Company shall use its best efforts to, on or before March 5th, but in no event later than March 15th, of each calendar year, commencing in 2007:

(i)    deliver to the Purchaser, any Master Servicer and any Depositor a report (in form and substance reasonably satisfactory to the Purchaser, such Master Servicer and such Depositor) regarding the Company's assessment of compliance with the Servicing Criteria during the immediately preceding calendar year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB. Such report shall be addressed to the Purchaser, such Master Servicer and such Depositor and signed by an authorized officer of the Company, and shall address each of the "Applicable Servicing Criteria" specified on Exhibit B hereto;

(ii)    deliver to the Purchaser, any Master Servicer and any Depositor a report of a registered public accounting firm reasonably acceptable to the Purchaser, such Master Servicer and such Depositor that attests to, and reports on, the assessment of compliance made by the Company and delivered pursuant to the preceding paragraph. Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act;

(iii)    cause each Subservicer, and each Subcontractor determined by the Company pursuant to Section 2.06(b) to be "participating in the servicing function"

within the meaning of Item 1122 of Regulation AB to deliver to the Purchaser, any Master Servicer and any Depositor an assessment of compliance and accountants' attestation as and when provided in paragraphs (a) and (b) of this Section; and

(iv)    deliver, and cause each Subservicer and Subcontractor described in clause (iii) to provide, to the Purchaser, any Depositor, any Master Servicer and any other Person that will be responsible for signing the certification (a "Sarbanes Certification") required by Rules 13a-14(d) and 15d-14(d) under the Exchange Act (pursuant to Section 302 of the Sarbanes-Oxley Act of 2002) on behalf of an asset-backed issuer with respect to a Securitization Transaction a certification, signed by the appropriate officer of the Company, in the form attached hereto as Exhibit A.

The Company acknowledges that the parties identified in clause (a)(iv) above may rely on the certification provided by the Company pursuant to such clause in signing a Sarbanes Certification and filing such with the Commission. Neither the Purchaser nor any Depositor will request delivery of a certification under clause (a)(iv) above unless a Depositor is required under the Exchange Act to file an annual report on Form 10-K with respect to an issuing entity whose asset pool includes Mortgage Loans.

(b)    Each assessment of compliance provided by a Subservicer pursuant to Section 2.05(a)(iii) shall address each of the Servicing Criteria specified on a certification substantially in the form of Exhibit B hereto delivered to the Purchaser concurrently with the execution of this Reg AB Addendum or, in the case of a Subservicer subsequently appointed as such, on or prior to the date of such appointment. An assessment of compliance provided by a Subcontractor pursuant to Section 2.05(a)(iii) need not address any elements of the Servicing Criteria other than those specified by the Company pursuant to Section 2.06.

Section 2.06.    Use of Subservicers and Subcontractors.

The Company shall not hire or otherwise utilize the services of any Subservicer to fulfill any of the obligations of the Company as servicer under the Agreement or any Reconstitution Agreement unless the Company complies with the provisions of paragraph (a) of this Section. The Company shall not hire or otherwise utilize the services of any Subcontractor, and shall not permit any Subservicer to hire or otherwise utilize the services of any Subcontractor, to fulfill any of the obligations of the Company as servicer under the Agreement or any Reconstitution Agreement unless the Company complies with the provisions of paragraph (b) of this Section.

(a)    It shall not be necessary for the Company to seek the consent of the Purchaser, any Master Servicer or any Depositor to the utilization of any Subservicer. The Company shall cause any Subservicer used by the Company (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of this Section and with Sections 2.02, 2.03( c), (e), (f) and (g), 2.04, 2.05 and 2.07 of this Reg AB Addendum to the same extent as if such Subservicer were the Company, and to provide the information required with respect to such Subservicer under Section 2.03(d) of this Reg AB Addendum. The Company shall be responsible for obtaining from each Subservicer and delivering to the Purchaser and any Depositor any servicer compliance statement required to be delivered by such Subservicer under Section 2.04, any assessment of compliance and attestation required to be delivered by such

11

Subservicer under Section 2.05 and any certification required to be delivered to the Person that will be responsible for signing the Sarbanes Certification under Section 2.05 as and when required to be delivered.

(b)    It shall not be necessary for the Company to seek the consent of the Purchaser, any Master Servicer or any Depositor to the utilization of any Subcontractor. The Company shall promptly upon request provide to the Purchaser, any Master Servicer and any Depositor (or any designee of the Depositor, such as an administrator) a written description (in form and substance satisfactory to the Purchaser, such Depositor and such Master Servicer) of the role and function of each Subcontractor utilized by the Company or any Subservicer, specifying (i) the identity of each such Subcontractor, (ii) which (if any) of such Subcontractors are "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, and (iii) which elements of the Servicing Criteria will be addressed in assessments of compliance provided by each Subcontractor identified pursuant to clause (ii) of this paragraph.

As a condition to the utilization of any Subcontractor determined to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, the Company shall cause any such Subcontractor used by the Company (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of Sections 2.05 and 2.07 of this Reg AB Addendum to the same extent as if such Subcontractor were the Company. The Company shall be responsible for obtaining from each Subcontractor and delivering to the Purchaser and any Depositor any assessment of compliance and attestation and the other certifications required to be delivered by such Subservicer and such Subcontractor under Section 2.05, in each case as and when required to be delivered.

Section 2.07.    Indemnification; Remedies.

(a)    The Company shall indemnify the Purchaser, each affiliate of the Purchaser, and each of the following parties participating in a Securitization Transaction:  each sponsor and issuing entity; each Person (including, but not limited to, any Master Servicer if applicable) responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction; each broker dealer acting as underwriter, placement agent or initial purchaser, each Person who controls any of such parties or the Depositor (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers, employees, agents and affiliates of each of the foregoing and of the Depositor (each, a "Purchaser Indemnified Party"), and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, reasonable legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

(i)    (A) any untrue statement of a material fact contained or alleged to be contained in any information, report, certification, data or other material provided under this Article II by or on behalf of the Company, or provided under this Article II by or on behalf of any Subservicer, any Subcontractor or any Third-Party Originator (collectively, the "Company Information"), or (B) the omission or alleged omission to state in the

Company Information a material fact required to be stated in the Company Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided, by way of clarification,* that clause (B) of this paragraph shall be construed solely by reference to the Company Information and not to any other information communicated in connection with a sale or purchase of securities, without regard to whether the Company Information or any portion thereof is presented together with or separately from such other information;

(ii)    any breach by the Company of its obligations under this Article II, including particularly any failure by the Company, any Subservicer, any Subcontractor or any Third-Party Originator to deliver any information, report, certification, accountants' letter or other material when and as required under this Article II, including any failure by the Company to identify pursuant to Section 2.06(b) any Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB;

(iii)    any breach by the Company of a representation or warranty set forth in Section 2.02(a) or in a writing furnished pursuant to Section 2.02(b) and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by the Company of a representation or warranty in a writing furnished pursuant to Section 2.02(b) to the extent made as of a date subsequent to such closing date; or

(iv)    the gross negligence, bad faith or willful misfeasance in the performance of the Company's duties, or by reason of reckless disregard of obligations and duties, under this Article II;

*provided, however,* that in no event, other than with respect to any indemnification obligations of the Company relating to any Company Information provided by the Company for inclusion in the any prospectus, prospectus supplement, or any private placement memorandum, or in any amendment or supplement thereto, in a Securitization Transaction, will the Company be liable for any consequential or punitive damages pursuant to this Section 2.07, even if advised of the possibility of such damages.

The Purchaser shall indemnify the Company, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the respective present and former directors, officers, employees, agents and affiliates of each of the foregoing (each, a "Company Indemnified Party;" together with the Purchaser Indemnified Parties, the "Indemnified Parties"), and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, reasonable legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon any untrue statement contained or alleged to be contained in any filing with the Commission or the omission or alleged omission to state in any filing with the Commission a material fact required to be stated or necessary to be stated in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in each case to the extent, but only to the extent, that such untrue statement, alleged untrue statement, omission, or alleged omission arose out of or was based upon any information or statement, other than the Company Information, in a filing with the Commission.

13

If the indemnification provided for herein is unavailable or insufficient to hold harmless an Indemnified Party, then the Company agrees that it shall contribute to the amount paid or payable by such Indemnified Party as a result of any claims, losses, damages or liabilities incurred by such Indemnified Party in such proportion as is appropriate to reflect the relative fault of such Indemnified Party on the one hand and the Company on the other.

In the case of any failure of performance described in clause (a)(ii) of this Section, the Company shall promptly reimburse the Purchaser, any Depositor, as applicable, and each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction, for all costs reasonably incurred by each such party in order to obtain the information, report, certification, accountants' letter or other material not delivered as required under Regulation AB by the Company, any Subservicer, any Subcontractor or any Third-Party Originator.

This indemnification shall survive the termination of this Agreement or the termination of any party to this Agreement.

(b)    (i)    Any failure by the Company, any Subservicer, any Subcontractor or any Third-Party Originator to deliver any information, report, certification, accountants' letter or other material when and as required under this Article II, or any breach by the Company of a representation or warranty set forth in Section 2.02(a) or in a writing furnished pursuant to Section 2.02(b) and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by the Company of a representation or warranty in a writing furnished pursuant to Section 2.02(b) to the extent made as of a date subsequent to such closing date, shall, immediately and automatically, without notice or grace period, constitute an Event of Default with respect to the Company under the Agreement and any applicable Reconstitution Agreement, and shall entitle the Purchaser or any Depositor, as applicable, in its sole discretion to terminate the rights and obligations of the Company as servicer under the Agreement and/or any applicable Reconstitution Agreement without payment (notwithstanding anything in this Agreement or any applicable Reconstitution Agreement to the contrary) of any compensation to the Company (and if the Company is servicing any of the Mortgage Loans in a Securitization Transaction, appoint a successor servicer reasonably acceptable to any Master Servicer for such Securitization Transaction); *provided* that to the extent that any provision of the Agreement and/or any applicable Reconstitution Agreement expressly provides for the survival of certain rights or obligations following termination of the Company as servicer, such provision shall be given effect.

(ii)    Notwithstanding subparagraph (b)(i) above, in the event that the Company (or any applicable Subservicer or Subcontractor) delivers any missing information, report, certification or accountants' letter after the date required under this Reg AB Addendum and the Master Servicer or Depositor, as the case may be, despite such late delivery, timely files the related annual report on Form 10-K under the Exchange Act without having to file a Form 12b-25 related to a notification of an inability to make a

timely filing and the Company indemnifies and promptly reimburses the Master Servicer and Depositor pursuant to this Section for all costs and expenses incurred as a result of such delay, any notice given by the Master Servicer declaring an Event of Default shall be automatically revoked and the delay in providing the missing information, report, certification or accountants' letter shall cease to constitute an Event of Default. Notwithstanding subparagraph (b)(i) above, in the event that the Company fails to timely comply with Section 2.04 or 2.05, the Purchaser or the Depositor, in its sole discretion, may elect not to terminate the Company; *provided*, that any costs or expenses incurred by the Purchaser or the Depositor in obtaining written or verbal statements or assurances from the Commission that the related failure of the Master Servicer or Depositor to provide the required assessment of compliance and attestation report on a timely basis will not result in any adverse effect on the Purchaser or the Depositor or their affiliates with respect to any shelf registration on Form S-3 of the Purchaser or the Depositor or any of their affiliates shall be reimbursed to the Purchaser or the Depositor, as applicable, by the Company and that the foregoing shall not affect the right of the Purchaser or the Depositor upon written notice to terminate all rights and obligations of the Company under this Agreement and in and to the Mortgage Loans.

Neither the Purchaser, any Master Servicer nor any Depositor shall be entitled to terminate the rights and obligations of the Company pursuant to this subparagraph (b) if a failure of the Company to identify a Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB was attributable solely to the role or functions of such Subcontractor with respect to mortgage loans other than the Mortgage Loans.

(iii)    The Company shall promptly reimburse the Purchaser (or any designee of the Purchaser, such as a master servicer) and any Depositor, as applicable, for all reasonable expenses incurred by the Purchaser (or such designee) or such Depositor, as such are incurred, in connection with the termination of the Company as servicer and the transfer of servicing of the Mortgage Loans to a successor servicer. The provisions of this paragraph shall not limit whatever rights the Purchaser or any Depositor may have under other provisions of the Agreement and/or any applicable Reconstitution Agreement or otherwise, whether in equity or at law, such as an action for damages, specific performance or injunctive relief.

Section 2.08.    Third-Party Beneficiary.

For purposes of this Article II and any related provisions thereto, each Master Servicer shall be considered a third-party beneficiary of this Agreement, entitled to all the rights and benefits hereof as if it were a direct party to this Agreement.

[SIGNATURES ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the Purchaser and the Company have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

BANK OF AMERICA, NATIONAL
ASSOCIATION,
as Purchaser

By:_____

Name:_____Bruce W. Good_____

Title:_____Vice President_____

GMAC MORTGAGE CORPORATION,
as Company

By:_____

Name:_____

Title: _____

*[Signature Page to Regulation AB Compliance Addendum (servicing-retained)]*

IN WITNESS WHEREOF, the Purchaser and the Company have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

BANK OF AMERICA, NATIONAL ASSOCIATION,
as Purchaser

By:_____

Name:_____

Title:_____


GMAC MORTGAGE CORPORATION,
as Company

By:_____

Name:_____
Patricia C. Taylor
Vice President

Title:_____

*[Signature Page to Regulation AB Compliance Addendum (servicing-retained)]*

EXHIBIT A

FORM OF ANNUAL CERTIFICATION

Re:    The [                ] agreement dated as of [    ], 200[ ] (the "Agreement"), among
       [IDENTIFY PARTIES]

I, _____, the _____ of [NAME OF
COMPANY] (the "Company"), certify to [the Purchaser], [the Depositor], and the [Master
Servicer] [Securities Administrator] [Trustee], and their officers, with the knowledge and intent
that they will rely upon this certification, that:

(1)    I have reviewed the servicer compliance statement of the Company
provided in accordance with Item 1123 of Regulation AB (the "Compliance Statement"),
the report on assessment of the Company's compliance with the servicing criteria set
forth in Item 1122(d) of Regulation AB and identified as the responsibility of the
Company on Exhibit B to the Regulation AB Compliance Addendum to the Agreement
(the "Servicing Criteria"), provided in accordance with Rules 13a-18 and 15d-18 under
Securities Exchange Act of 1934, as amended (the "Exchange Act") and Item 1122 of
Regulation AB (the "Servicing Assessment"), the registered public accounting firm's
attestation report provided in accordance with Rules 13a-18 and 15d-18 under the
Exchange Act and Section 1122(b) of Regulation AB (the "Attestation Report"), and all
servicing reports, officer's certificates and other information relating to the servicing of
the Mortgage Loans by the Company during 200[ ] that were delivered by the Company
to the [Depositor] [Master Servicer] [Securities Administrator] [Trustee] pursuant to the
Agreement (collectively, the "Company Servicing Information");

(2)    Based on my knowledge, the Company Servicing Information, taken as a
whole, does not contain any untrue statement of a material fact or omit to state a material
fact necessary to make the statements made, in the light of the circumstances under which
such statements were made, not misleading with respect to the period of time covered by
the Company Servicing Information;

(3)    Based on my knowledge, all of the Company Servicing Information
required to be provided by the Company under the Agreement has been provided to the
[Depositor] [Master Servicer] [Securities Administrator] [Trustee];

(4)    I am responsible for reviewing the activities performed by the Company as
servicer under the Agreement, and based on my knowledge and the compliance review
conducted in preparing the Compliance Statement and except as disclosed in the
Compliance Statement, the Servicing Assessment or the Attestation Report, the Company
has fulfilled its obligations under the Agreement in all material respects; and

(5)    The Compliance Statement required to be delivered by the Company
pursuant to this Agreement, and the Servicing Assessment and Attestation Report
required to be provided by the Company and by any Subservicer and Subcontractor
pursuant to the Agreement, have been provided to the [Depositor] [Master Servicer].

Any material instances of noncompliance described in such reports have been disclosed to the [Depositor] [Master Servicer].  Any material instance of noncompliance with the Servicing Criteria has been disclosed in such reports.

Date:   _____

By:   _____
      Name:
      Title:

EXHIBIT B

SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

The assessment of compliance to be delivered by [the Company] [Name of Subservicer] shall address, at a minimum, the criteria identified as below as "Applicable Servicing Criteria";

| *Servicing Criteria* | | *Applicable Servicing Criteria* |
|---|---|---|
| **Reference** | **Criteria** | |
| | **General Servicing Considerations** | |
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | X |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | X |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the mortgage loans are maintained. | |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | X |
| | **Cash Collection and Administration** | |
| 1122(d)(2)(i) | Payments on mortgage loans are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | X |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | X |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of overcollateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | X |

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| Reference | Criteria | |
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements.  For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1 (b)(1) of the Securities Exchange Act. | X |
| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access. | X |
| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts.  These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items.  These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | X |
| | **Investor Remittances and Reporting** | |
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements.   Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of mortgage loans serviced by the Servicer. | X |
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | X |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the Servicer's investor records, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | X |

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| **Reference** | **Criteria** | |
| | **Pool Asset Administration** | |
| 1122(d)(4)(i) | Collateral or security on mortgage loans is maintained as required by the transaction agreements or related mortgage loan documents. | X |
| 1122(d)(4)(ii) | Mortgage loan and related documents are safeguarded as required by the transaction agreements | X |
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | X |
| 1122(d)(4)(iv) | Payments on mortgage loans, including any payoffs, made in accordance with the related mortgage loan documents are posted to the Servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related mortgage loan documents. | X |
| 1122(d)(4)(v) | The Servicer's records regarding the mortgage loans agree with the Servicer's records with respect to an obligor's unpaid principal balance. | X |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's mortgage loans (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents. | X |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. | X |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a mortgage loan is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent mortgage loans including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). | X |

| | Servicing Criteria | Applicable Servicing Criteria |
|---|---|---|
| Reference | Criteria | |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for mortgage loans with variable rates are computed based on the related mortgage loan documents. | X |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts):  (A) such funds are analyzed, in accordance with the obligor's mortgage loan documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable mortgage loan documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related mortgage loans, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. | X |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the servicer, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | X |
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the transaction agreements. | X if obligated under transaction documents |

4

[NAME OF COMPANY]
[NAME OF SUBSERVICER]

Date:    _____

By:    _____
            Name:
            Title:

5