UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Case No. 12-12020 (MG) |
| | ) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) Chapter 11 |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |

## DECLARATION OF SUSHEEL KIRPALANI

I, Susheel Kirpalani, state as follows:

1. I am a partner at the law firm of Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), and counsel in the above-captioned cases to AIG Asset Management (U.S.), LLC ("AIG"), Allstate Insurance Company ("Allstate"), Massachusetts Mutual Life Insurance Company ("MassMutual"), and Prudential Insurance Company of America ("Prudential", and together with AIG, Allstate and MassMutual, the "Settling Private Securities Claimants"). The Settling Private Securities Claimants are holders of general unsecured claims against Residential Capital, LLC and its debtor-subsidiaries (the "Debtors") arising from the purchase and sale of residential mortgage-backed securities (the "RMBS Certificates") that were marketed by the Debtors and issued by bankruptcy remote trusts established by the Debtors. The Settling Private Securities Claimants also have asserted claims against Ally Financial, Inc. ("AFI") and Ally Securities, LLC ("Ally Securities") relating to the RMBS Certificates.

2.     I submit this declaration in support of confirmation of the Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al., and the Official Committee of Unsecured Creditors (the "Plan"),[1] so that the Court has factual details concerning (i) the negotiations and discussions that resulted in the settlement of the claims (the "Private Securities Claims") held by the Private Securities Claimants[2] as part of an overall settlement involving most of the major claims in the Debtors' chapter 11 cases, the principal terms of which are embodied in the Plan Support Agreement, dated as of May 13, 2013 (including the exhibits, annexes and other attachments thereto, the "Plan Support Agreement"), and (ii) the establishment of the Private Securities Claims Trust. Nothing herein is intended to be or shall be deemed to constitute a waiver of attorney-client, work product or any other applicable privilege.

3.     The Plan Support Agreement was the product of a lengthy mediation process that commenced in December 2012, when the Debtors filed a motion requesting the appointment of a mediator to assist in plan negotiations. The Bankruptcy Court granted the motion and on December 26, 2012, entered an order appointing the Honorable James Peck as mediator.

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Plan.

[2] The Private Securities Claimants are: (i) AIG, (ii) Allstate, (iii) Asset Management Funds d/b/a AMF Funds, AMF Intermediate Mortgage Fund, AMF Ultra Short Mortgage Fund, (iv) Bank Hapoalim B.M., (v) Cambridge I, (vi) Cambridge II, (vii) Deutsche Zentra-Genossenschaftsbank, New York Branch, d/b/a DZ Bank AG, New York, DH Holding Trust, (viii) Federal Home Loan Bank of Boston, (ix) Federal Home Loan Bank of Chicago, (x) Federal Home Loan Bank of Indianapolis, (xi) HSH Nordbank AG, HSH Nordbank AG Luxembourg Branch, HSH Nordbank AG New York Branch, HSH Nordbank Securities S.A., (xii) Huntington Bancshares Inc., (xiii) IKB Deutsche Industriebank AG, IKB International S.A. in liquidation, (xiv) John Hancock Life Insurance Company (U.S.A.), (xv) MassMutual, (xvi) Principal Life Insurance Company, Principal Funds, Inc., Principal Variable Contracts Funds, Inc., (xvii) Prudential, (xviii) Sealink Funding Limited, (xix) Stiching Pensioenfonds ABP, (xx) The Union Central Life Insurance Company/Ameritas Life Insurance Corp./Acacia Life Insurance Company, (xxi) the Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company, and Fort Washington Investment Advisors, Inc.[3] Based on increases in the projected recovery on estate assets, as of the date of the filing of the Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al., and the Official Committee of Unsecured Creditors, dated August 23, 2013 (the "Disclosure Statement"), the amount of the PSC Fund was increased to $235 million (subject to adjustment).

4.      Prior to the commencement of the mediation, I participated in discussions with representatives of AFI and Ally Securities concerning the claims held by the Private Securities Claimants. AFI and Ally Securities provided me with a list of claimants with claims similar to those asserted by the Settling Private Securities Claimants, including twenty-one that had timely filed or tolled claims against either AFI or Ally Securities, or both. The purpose of those discussions was to try to ascertain the nature, theories, and status of each claim, and the potential (albeit disputed) liability AFI and Ally Securities might face if the Private Securities Claimants were successful. At the same time, at my direction, other attorneys from Quinn Emanuel experienced in RMBS litigation performed diligence on the claims asserted by the Private Securities Claimants, including reviewing public court filings and participating in telephone conversations with their respective counsel, in a further effort to ascertain the amount, theories, and litigation status of each of these claims. In addition, at my direction, the Quinn Emanuel team reviewed information from other cases concerning public settlements of claims arising from the purchase and sale of RMBS Certificates. These diligence efforts, which continued throughout the mediation, enabled me and the other members of my team to develop an understanding of the potential liability of Ally Securities and AFI to each Private Securities Claimant, their potential aggregate liability to the entire group of Private Securities Claimants, and the range within which the claims of the Private Securities Claimants reasonably may settle.

5.      The diligence process described in the foregoing Paragraph 4 was important on a number of levels. First, in the mediation process it was anticipated that the four Settling Private Securities Claimants involved would be asked to negotiate a settlement amount that would be shared by all twenty-one Private Securities Claimants. It was, therefore, essential for the Settling Private Securities Claimants to understand the entire pool of these claims, to ensure that any

settlement payment to this group would be sufficient to permit distributions satisfactory to each of the Private Securities Claimants. Widespread support for a global settlement would avoid costly and time consuming litigation concerning some of the potentially extraordinary terms of the chapter 11 plan the Debtors were formulating, including the broad third-party releases for AFI and its non-Debtor affiliates that were a prerequisite to any proposed settlement with AFI. Second, it was important that any settlement payment to the group of Private Securities Claimants be allocated in a rational and principled manner, to ensure that all parties received fair treatment and to provide a basis, if necessary, for binding any party that unreasonably held out for an excessive payment.

6.      In order for a global settlement to be fully consensual, the pool of funds available for distribution to the Private Securities Claimants had to be sufficient to provide each affected creditor with recoveries that each deemed to be satisfactory consideration, under the circumstances, for settlement of its Private Securities Claims. A determination of what amount would be sufficient had to take into account the possibility that (i) the claims of the seventeen Private Securities Claimants other than the Settling Private Securities Claimants (the "Additional PS Claimants") might turn out to be greater than projected, or otherwise different in character, than as described informally by AFI, Ally Securities, or counsel to the Additional PS Claimants, and (ii) estate assets might be less than projected, as a result of unfavorable asset sales and/or greater than expected administrative expenses, which would have had the effect of diluting the recovery on all Private Securities Claims. The Settling Private Securities Claimants approached the mediation with these challenges in mind.

7.      The mediation concluded successfully in May 2013 with the execution of the Plan Support Agreement by various parties, including the Settling Private Securities Claimants. Under the Plan Support Agreement, AFI and its non-Debtor affiliates agreed to make a contribution to the Debtors' estates of $2.1 billion (consisting of (a) $1.95 billion in cash on the Effective Date of the Plan and (b) $150 million, anticipated to come from a settlement between Ally and its insurers, but in any event to be paid by Ally no later than September 30, 2014 (collectively (a) and (b), the "Ally Contribution")). The Ally Contribution, together with a then-projected estimate of $805 million of estate assets, would be used to fund distributions to creditors under a Plan.

8.      Under the Plan Support Agreement, $225.7 million (subject to adjustment, the "PSC Fund") was allocated to payment of Private Securities Claims.[3] In order to ensure that the Additional PS Claimants were accurately stating the amount of losses underlying their claims, on or about June 14, 2013, the Settling Private Securities Claimants, through Quinn Emanuel, requested that each Additional PS Claimant execute a confidentiality agreement (which each did), submit a proof of loss form listing the dollar amounts of their claims against AFI and Ally Securities, and provide the following information for each claimed certificate purchase:

- A. Name of certificate
- B. CUSIP
- C. Date purchased
- D. Purchasing entity
- E. Domicile of purchasing entity
- F. Face amount purchased
- G. Price of purchase
- H. Date of sale, if applicable

---

[3] Based on increases in the projected recovery on estate assets, as of the date of the filing of the Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al., and the Official Committee of Unsecured Creditors, dated August 23, 2013 (the "Disclosure Statement"), the amount of the PSC Fund was increased to $235 million (subject to adjustment).

    I. Face value of sale, if applicable
    J. Price of sale, if applicable
    K. Whether sale was to arms-length third-party or to affiliate, if applicable
    L. Face value of current holdings, if applicable
    M. Price of current holdings, if applicable
    N. Source of price of current holdings, if applicable
    O. Interest received
    P. Principal received
    Q. Claimed losses

The proof of loss form also requested that each Additional PS Claimant provide copies of any of the following applicable documents to the extent they exist or are relevant: (i) tolling agreements; (ii) complaints; (iii) court decisions regarding the status of the claims; and (iv) any other claimed basis for tolling of statutes of limitations.

    9.    Quinn Emanuel received a host of information in response to these requests, including proof of loss forms submitted on behalf of each of the Additional PS Claimants, together with substantial back-up materials. Upon review of these materials, it became evident that some claimants had calculated their losses in ways that were not entirely consistent with others, including utilizing different dates for measuring mark-to-market losses.

    10.    To address this issue, on June 24, 2013, Quinn Emanuel distributed an updated proof of loss form, requesting that each of the Additional PS Claimants calculate its losses as of the commencement of the Debtors' bankruptcy cases, May 14, 2012, which is the same date used for calculating losses for purposes of filing proofs of claims against the Debtors. The updated proof of loss form also instructed claimants that:

> Losses are to be calculated based on the Adjusted Cost Basis of the RMBS (purchase price less any principal payments received) minus either (i) the price at which the RMBS was sold or (ii) the fair market value of RMBS as of the Record Date of May 14, 2012 (the petition date of the ResCap bankruptcy cases).

In response to this request, each of the Additional PS Claimants either provided new loss information tied to the May 14, 2012 petition date or confirmed that the information previously provided reflected losses as of May 14, 2012.

11.     Quinn Emanuel reviewed the updated loss information provided by the Additional PS Claimants to ensure that losses were calculated in a consistent manner, and analyzed the back-up materials provided by the Additional PS Claimants. This review and analysis revealed only minor discrepancies with the claims asserted by the Additional PS Claimants; there was no basis to conclude that any of the Additional PS Claimants had overstated its losses or misstated the nature or status of its claims.

12.     Following several weeks of intensive discussions and negotiations, the Private Securities Claimants reached an agreement in principle regarding allocation of the PSC Fund. The agreement in principle was subsequently embodied in the Allocation Agreement, dated as of August 16, 2013, to which each of the Private Securities Claimants is a party, and pursuant to which each Private Securities Claimant is allocated a percentage of the PSC Fund. Based on their respective allocations, each of the Private Securities Claimants has agreed to vote in favor of, and not object to, the Plan, including the third-party releases contained therein.

13.     The settlement embodied in the Plan Support Agreement, as complemented by the Allocation Agreement, resolves Private Securities Claims asserted against Ally Securities in the aggregate estimated amount of $1,409,892,416, and aggregate claims asserted against the Debtors and AFI estimated at $2,429,425,521, in consideration for the PSC Fund of $235 million. It is my understanding, based on my review of publicly available information and discussions with representatives of the Additional PS Claimants,

that the recovery rates represented by this settlement are generally consistent with other settlements of claims based on the purchase and sale of RMBS Certificates, although the specific recovery rates for RMBS claims vary based on the particular characteristics of such claims, including, for example, whether the claims have survived a motion to dismiss, or whether the claims are based on statutes with less stringent elements of proof, such as state blue sky claims or claims under the Securities Act of 1933. It is also my understanding, based on my review of publicly available information and discussions with representatives of the Additional PS Claimants, that recovery rates in class action cases, which typically settle at much lower percentages, are not directly comparable.

14. I can say unequivocally, having participated in the initial discussions with representatives of AFI and Ally Securities, having participated in the mediation with other creditors, and having received regular reports on negotiations with Additional PS Claimants from those working at my direction within Quinn Emanuel, that the settlement of Private Securities Claims set forth in the PSA and the Allocation Agreement was conducted at arm's length. The unanimous support among all Private Securities Claims for such settlement reflects a common understanding by all those affected that the terms are fair and reasonable. The consensual resolution of billions of dollars of securities claims avoids the substantial time, expense and risks associated with litigating such claims, in courts all over the country, and permits the expeditious completion of the Debtors' chapter 11 cases. In addition, this settlement resolves uncertain litigation over whether the Private Securities Claims may be subordinated under Bankruptcy Code section 510. Prior to the execution of the Plan Support Agreement, the Settling Private Securities Claimants and the Debtors had fully briefed this dispute, and the matter was set for oral argument on cross motions for

summary judgment. If the litigation had proceeded, achieving a global settlement in these cases would have been immeasurably more difficult, as it would have required unsecured creditors in these cases to significantly realign their expectations regarding recoveries, based on the uncertainty surrounding treatment and priority of more than $20 billion of claims against the Debtors' estates. And appeals would further have delayed any prospect for achieving a global resolution regardless of the outcome at the trial court level.

15. As set forth in the Plan, the Private Securities Claims Trust will be established to distribute the assets of the Private Securities Claims Trust to holders of Private Securities Claims in accordance with the Private Securities Claims Trust Agreement, which is to be executed in a form reasonably acceptable to the Plan Proponents, Ally, and the Settling Private Securities Claimants on or before the Effective Date. A substantially complete version of the Private Securities Claims Trust Agreement was filed with the Bankruptcy Court on October 11, 2013, as part of the Plan Supplement. It is my understanding that this version of the Private Securities Claims Trust Agreement is in a form acceptable to Plan Proponents, Ally, and each of the Settling Private Securities Claimants.

16. In order to implement the distribution to Private Securities Claimants, the Private Securities Claims Trustee will be appointed in the Confirmation Order. The manager of Liquidating Trust will also serve as the Private Securities Claims Trustee, in order to avoid unnecessary costs. The Private Securities Claims Trustee's authority will commence as of the Effective Date, provided that the Private Securities Claims Trustee will be permitted to take certain actions in accordance with the Private Securities Claims Trust Agreement following the Confirmation Date.

17. In consideration of the distribution of their respective allocable shares of the PSC Fund, the Private Securities Claimants agreed to forego any other recovery from the Debtors or the Liquidating Trust in respect of the Private Securities Claims, and neither the Debtors, Ally, nor the Liquidating Trust shall have any further financial or other responsibility or liability therefor. Private Securities Claimants instead are entitled to receive their allocated share of either (a) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution, or (b) the Cash available for distribution from the Private Securities Claims Trust in respect of the Private Securities Claims Trust Assets, in each case in accordance with the Private Securities Claims Trust Agreement and the Allocation Agreement, as their sole source of recovery in respect of the Private Securities Claims. It is currently anticipated that the Private Securities Claims Trust will distribute all of the Units that constitute the Private Securities Claims Trust Unit Distribution on the Initial Distribution Date, shortly after the Effective Date of the Plan. Private Securities Claimants will subsequently receive cash payments in respect of those Units directly from the Liquidating Trust.

18. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed November 12, 2013 at New York, NY

/s/ _____
Susheel Kirpalani