**SEWARD & KISSEL LLP**
Mark D. Kotwick
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, New York  10004
Telephone:  (212) 574-1200
Facsimile:  (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee*
*of Certain Mortgage Backed Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | ) |
| | ) **Chapter 11** |
| **Debtors.** | ) |
| | ) **Jointly Administered** |

**DECLARATION OF MAMTA K. SCOTT,**
**AS OFFICER OF U.S. BANK, AS RMBS TRUSTEE**

I, Mamta K. Scott, hereby declare, pursuant to 28 U.S.C. § 1746, that the

following is true and correct to the best of my knowledge, information, and belief:

1.      I am employed by U.S. Bank National Association ("**U.S. Bank**"), and my

current title is Vice President and my position is a default group account manager.  I have

personal knowledge of the facts set forth herein, except as to certain matters that I believe to be

true based on (i) information provided by Duff & Phelps, LLC ("**Duff & Phelps**");

(ii) information about positions of parties in these Chapter 11 Cases contained in pleadings that I

reviewed or learned during my participation in this case, including the Plan Mediation (defined

below); and (iii) my review of business records of U.S. Bank.

2.      This Declaration is submitted in support of the confirmation of the *Joint*

*Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of*

*Unsecured Creditors* (the "**Plan**").[1]

        3.      On May 13, 2013, the Debtors, Ally Financial Inc. ("**AFI**"), the Official

Committee of Unsecured Creditors (the "**Committee**") and the Consenting Claimants, including

U.S. Bank, as RMBS Trustee, entered into the Plan Support Agreement [ECF No. 3814, Ex. 3]

(the "**Plan Support Agreement**"), pursuant to which they agreed to the terms of a proposed

consensual Chapter 11 plan of reorganization and resolution of all claims and disputes between

them as set forth in the Plan Term Sheet and the Supplemental Term Sheet, attached respectively

as Exhibits A and B to the Plan Support Agreement.

        4.      The Debtors filed their *Motion for an Order Under Bankruptcy Code*

*Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan*

*Support Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting*

*Claimants* (the "**PSA Motion**") [ECF No. 3814] on May 23, 2013.  By Order dated June 26,

2013 [ECF No. 4098], the Court approved the PSA Motion.

**A.**    **U.S. BANK'S ROLE AS TRUSTEE**

        5.      U.S. Bank serves as trustee, indenture trustee, securities administrator, co-

administrator, paying agent, grantor trustee, master servicer, custodian and/or other similar

agencies (in any such capacity, a "**Trustee**") in respect of certain residential mortgage backed

securities ("**RMBS**") trusts, whole loan servicing agreements, net interest margin trusts, other

trusts and similar arrangements listed on Schedule A to the Proofs of Claim (defined below)

---

[1]    On August 23, 2013, the Plan Proponents filed the *Notice of Filing of Corrected Solicitation Version of the Disclosure Statement and Joint Chapter 11 Plan* [Docket 4819] that attached, as Exhibit A, the solicitation version of the *Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors,* which included the Plan as Exhibit 1.  Capitalized terms used herein without definition shall have the meanings ascribed to them in the Plan.  For the convenience of the reader, in some cases the definitions found in the Plan are repeated herein or a citation to the Plan's definition of such term is given.

(collectively, the "**U.S. Bank RMBS Trusts**"). This Declaration is made solely with respect to U.S. Bank's role as Trustee.[2]

6. The U.S. Bank RMBS Trusts are governed by one or more pooling and servicing agreements, highly integrated sets of "servicing agreements," mortgage loan purchase agreements, deposit trust agreements, trust agreements, indentures, asset sale agreements, depositor sale agreements, administration agreements, yield maintenance agreements and other ancillary transaction documents (collectively, the "**Transaction Documents**").[3]

7. Pursuant to the Transaction Documents, one or more of the Debtors has obligations in various capacities, including as originator, seller, sponsor, depositor and similar capacities (collectively, "**Seller**"), and/or as servicer, subservicer, master servicer, back-up servicer, HELOC servicer, administrator, co-administrator and similar capacities (collectively, "**Servicer**").

8. In the appropriate capacity or capacities as provided for in the Transaction Documents, U.S. Bank has the right to enforce claims against the Seller and Servicer in respect of the U.S. Bank RMBS Trusts and to vote such claims in connection with the Plan.

---

[2]   As used herein, unless the context dictates otherwise, the term "**RMBS Trustees**" has the meaning ascribed to it in the Plan, to wit, U.S. Bank; The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A. (together, "**BNY Mellon**"); Wells Fargo Bank, N.A. ("**Wells Fargo**"); Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas (together, "**Deutsche Bank**"); Law Debenture Trust Company of New York ("**Law Debenture**"); and HSBC Bank USA, N.A. ("**HSBC**"), each solely in their respective capacities as trustee, indenture trustee, separate trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or other similar agencies. U.S. Bank, together with Deutsche Bank and BNY Mellon, as RMBS Trustees, are also members of the Committee.

[3]   A sample pooling and servicing agreement that governs one of the U.S. Bank RMBS Trusts (RAMP 2005-EFC7) may be found at **Exhibit PX-1501** for identification and is attached hereto, and is indicative of the pooling and servicing agreements that govern certain of the U.S. Bank RMBS Trusts. A sample indenture that governs one of the U.S. Bank RMBS Trusts (RFMSII-HI1) may be found at **Exhibit PX-1502** for identification and is attached hereto, and is indicative of the indentures that govern certain of the U.S. Bank RMBS Trusts.

B.    **THE PROOFS OF CLAIM AND THE NOTICE OF CURE CLAIMS**

9.    On or about March 1, 2013, U.S. Bank filed proofs of claim (the "**Proofs of Claim**") against each applicable Debtor.  [Proof of Claim Nos. 6655-6705]  The Proofs of Claim asserted claims for all of the U.S. Bank RMBS Trusts.  On April 16, 2013, U.S. Bank filed a *Notice of Cure Claim of U.S. Bank National Association as Trustee and Master Servicer* [ECF No. 3453] (the "**Notice of Cure Claim**"), asserting claims arising from the Debtors' failure to perform its obligations as Servicer under the Transaction Documents.  The Notice of Cure Claim applied to all U.S. Bank RMBS Trusts with cure claims.

C.    **THE RMBS SETTLEMENT AND 9019 MOTION**

10.    Among the claims and disputes resolved in the Plan Support Agreement, and ultimately the Plan, is a settlement (as further defined in the Plan, the "**RMBS Settlement**") that provides for the allowance, priority and allocation of (a) the claims of the RMBS Trusts against the Debtors arising from obligations or liability in respect of the origination and sale of mortgage loans to the RMBS Trusts (the "**RMBS R+W Claims**") and (b) the claims of the RMBS Trusts against the Debtors other than the RMBS R+W Claims (the "**RMBS Cure Claims**," together with the RMBS R+W Claims, as further defined in the Plan, the "**RMBS Trust Claims**").

11.    Shortly after these Chapter 11 Cases were filed, the Debtors filed a motion (as amended, the "**RMBS 9019 Motion**"[4]), seeking approval of the Original RMBS Settlement Agreements with the two groups of Institutional Investors (the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants).  The Original RMBS Settlement

---

[4]    The RMBS 9019 Motion refers to the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 320], as amended and supplemented by the *Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 1176] and the *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreement.* [ECF No. 1887]

Agreements relate to the proposed settlement of the RMBS R+W Claims of the 392 Original

Settling RMBS Trusts.[5]

12.    Under the Original RMBS Settlement Agreements, the Original Settling

RMBS Trusts would have been granted an allowed aggregate claim of up to $8.7 billion against

those Debtors that acted as Sellers, to be allocated in accordance with certain formulas set forth

in Exhibit B to each of the Original RMBS Settlement Agreements.[6]  In support of the RMBS

9019 Motion, the Debtors submitted an expert report that calculated the Original Settling RMBS

Trusts' RMBS R+W Claims at between $6.7 billion and $10.3 billion.[7]

**D.    U.S. BANK'S RETENTION OF
        QUALIFIED PROFESSIONALS AND EXPERTS**

13.    U.S. Bank retained and has been advised throughout these Chapter 11

Cases, including in connection with its consideration of the RMBS Settlement, by Seward &

Kissel, LLP, an experienced and knowledgeable New York firm.

14.    At the outset of these Chapter 11 Cases, and in light of the then-pending

RMBS 9019 Motion, U.S. Bank and three other RMBS Trustees (Deutsche Bank, BNY Mellon

and Wells Fargo) retained Duff & Phelps as their financial advisor to, among other things, assist

them in the identification, quantification, litigation and/or resolution of the RMBS Trust Claims.[8]

---

[5]    Investors in the Original Settling RMBS Trusts were notified of the RMBS 9019 Motion, and all such
       Investors, and all other parties in interest in these Chapter 11 Cases, had the opportunity to object to the RMBS
       9019 Motion.

[6]    The RMBS 9019 Motion provided that "[w]hile the [Original Settlement Agreement] was negotiated by the
       Institutional Investors, the Trustees of each of the [Original Settling RMBS] Trusts will also evaluate the
       reasonableness of the settlement and can accept or reject the proposed compromise on behalf of each Trust."
       *See* ECF No. 320 at ¶ 4.

[7]    *Declaration of Frank Sillman in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval
       of the RMBS Trust Settlement Agreements.  See* ECF No. 320-8, at ¶¶ 68 and 69.

[8]    Law Debenture and HSBC later joined in the retention of Duff.

15.    Duff & Phelps was retained after a rigorous selection process based on (a) the firm's experience in handling similar types of engagements involving the evaluation of mortgage loan servicing agreements and loan origination agreements, bankruptcy litigation, restructuring, asset valuation, complex securitizations and RMBS loan repurchase actions and (b) the depth of resources available to the firm, including advisory services about bankruptcy issues generally.

## E.    OBJECTIONS TO THE RMBS 9019 MOTION

16.    No party in interest filed an objection to the RMBS 9019 Motion claiming that the $8.7 billion allowed claim was too low.  There were, however, several objections that the $8.7 billion number was too high.  For example, the Committee's objection stated that the Debtors' liability for RMBS R+W Claims of the Original Settling RMBS Trusts was approximately $3.8 billion, and if certain legal defenses were considered, might be reduced to a range of $2.7 billion to $3.3 billion.[9]  FGIC objected that the Debtors could not support the reasonableness of an allowed claim exceeding $4 billion, excluding the value of the claims that monoline insurers (each, a "**Monoline**") have against the Debtors, and that "the $8.7 Billion claim amount is excessive and unreasonable" and "grossly overstates the value of the settled claim."[10]  MBIA similarly objected that the RMBS R+W Claims of the Original Settling RMBS Trusts, excluding the claims of the Monolines, were less than $3 billion and that the Original RMBS Settlement Agreements provide a "windfall for certain Settling Trusts at the expense of

---

[9]    *Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* [ECF No. 2825], including the supporting Expert Report of Bradford Cornell, Ph.D [ECF No. 2829, Ex. A] (the "**Committee Objection**").

[10]   *Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreement.* [ECF No. 2819]

both non-settling and settling creditors."[11]

17.    Only two Investors in the Original Settling RMBS Trusts filed objections to the RMBS 9019 Motion.[12] Those objections were limited to the manner in which the allowed claim was to be allocated among the Original Settling RMBS Trusts in the Original RMBS Settlement Agreements. The crux of those two objections was that the allocation methodology in the Original RMBS Settlement Agreements failed to take into account the unique characteristics of the Original Settling RMBS Trusts and inappropriately used net losses as a proxy for viable RMBS R+W Claims.

**F.    THE RMBS TRUSTEES' EVALUATION OF THE ORIGINAL RMBS SETTLEMENT AGREEMENTS**

18.    Duff & Phelps was asked by the RMBS Trustees to evaluate the reasonableness of the Original RMBS Settlement Agreements as they related to the RMBS R+W Claims of the Original Settling RMBS Trusts.

**1.    Modification of the Original Claim Allocation Methodology**

19.    As part of its analysis of the RMBS R+W Claims, Duff & Phelps evaluated the claim allocation methodology in the Original RMBS Settlement Agreements, which would have allocated RMBS R+W Claims among the Original Settling RMBS Trusts *pro rata* on the basis of the sum of the net losses that have been experienced and are estimated to be experienced by each such RMBS Trust through the date of its termination.

20.    Based on Duff & Phelps' suggestion, and after lengthy discussions with the Steering Committee Consenting Claimants, the Debtors and other parties in interest, the

---

[11]    *Objection of MBIA Insurance Corporation to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2810], including the Expert Declaration of C.J. Brown [ECF. No. 2811].

[12]    *See Objection to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2308]; *Limited Objection to Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements.* [ECF. No. 2297]

claim allocation methodology in the Original RMBS Settlement Agreements was modified (the

"**Revised Claim Allocation Methodology**") to provide for RMBS R+W Claims to be allocated

*pro rata* based on differences among the RMBS Trusts' (i) losses *and* (ii) in the incidence of

breaches of representations and warranties, as revealed by loan sampling and statistical work to

be performed by Duff & Phelps. Duff & Phelps advised U.S. Bank and the other RMBS

Trustees that it believed the Revised Claim Allocation Methodology largely addressed the

substance of the objections to the RMBS 9019 Motion related to allocation methodology.

Consistent with Duff & Phelps' recommendations, the Revised Claim Allocation Methodology is

part of the RMBS Settlement that is part of the Plan Support Agreement (at Schedule A to Annex

III) and embodied in Exhibits 9 and 13 to the Plan.

> **2.    Valuation of Original Settling
> RMBS Trusts' RMBS R+W Claims**

21.    To assess the reasonableness of the $8.7 billion settlement consideration in

the Original RMBS Settlement Agreements, Duff & Phelps conducted a sampling review of

more than 6,500 mortgage loan files provided by the Debtors. In its review, Duff & Phelps

sought to identify breaches of representations and warranties made by the Debtors using

statistical methodologies to estimate the incidence of those breaches across the population of

mortgage loans in the RMBS Trusts. Duff & Phelps also used historical information and

financial analysis to calculate the total present and projected future losses of the RMBS Trusts

that were associated with breaches of representations and warranties by the Debtors. As a result

of the significant work done by Duff & Phelps, U.S. Bank and the other RMBS Trustees gained

an understanding that the range of RMBS R+W Claims for the Original Settling RMBS Trusts

was between $6.5 billion and $10.2 billion.

3.    **The RMBS Trustees' Statement**
       **Regarding the RMBS 9019 Motion**

22.    Absent the approval of the RMBS Settlement, the RMBS R+W Claims

would have to be asserted, litigated and liquidated on an individual basis.  It is U.S. Bank's

understanding that the individual RMBS R+W Claims of the Original Settling RMBS Trusts

would be subject to significant litigation risks and factual and legal defenses.  Many of those

risks and defenses are identified in the Committee Objection and in the *Steering Committee*

*Investors' Statement in Support of Settlement and Response to Settlement Objections* [ECF No.

1739] (the "**Steering Committee Statement**").  As described in the Steering Committee

Statement, the litigation of those claims would be an uncertain, expensive and protracted process.

Even if such litigation were successful, it likely would deplete the Debtors' estates and result in

diminished recoveries to all creditor constituencies, including the RMBS Trusts.  *See* Steering

Committee Statement, ¶¶ 8, 28-32.

23.    In light of the conclusion of Duff & Phelps regarding the estimated range

of the RMBS R+W Claims of the Original Settling RMBS Trusts, and considering the substantial

risks and defenses associated with litigating those claims in the absence of a consensual

resolution, on or about February 4, 2013, U.S. Bank, BNY Mellon, Deutsche Bank and Law

Debenture, responding to the Court's request that they advise it of their views concerning the

Original RMBS Settlement Agreements in advance of the hearing on the RMBS 9019 Motion,

filed the *RMBS Trustees' Statement Regarding Debtors' Motion Pursuant To Fed. R. Bankr. P.*

*9019 For Approval Of RMBS Trust Settlement Agreements* [ECF No. 2833] (the "**Trustees'**

**Statement**").

24.    In the Trustees' Statement, the RMBS Trustees explained, among other things, that:

> After careful consideration of relevant factors and analysis, including (a) the results of its review of a statistically significant number of loan files in the [Original] Settling [RMBS] Trusts provided by the Debtors, (b) the estimation of projected total collateral losses and underwriting breach rates in the [Original] Settling [RMBS]Trusts, (c) the estimation of likely agree rates with respect to the [Original] Settling [RMBS] Trusts (which take into account the litigation risk associated with the relative characteristics of the breach), and (d) consideration of causality factors (which take into account the litigation risk associated with a lack of causal relationship between the breach and loss), Duff advised [BNY Mellon, Deutsche Bank, U.S. Bank and Law Debenture] that the amount of [up to $8.7 billion] is within a reasonable range to settle the [Original] Settling [RMBS]Trusts' [RMBS R+W] Claims ...

Trustees' Statement, at ¶ 10.

25.    Those RMBS Trustees further stated that:

> Assuming no changes in the facts and controlling law underlying the [RMBS R+W] Claims, and subject to the RMBS Trustees' determination that all provisions of the [Original] RMBS Trust Settlement[s] are fair, equitable and reasonable to the Settling Trusts, the RMBS Trustees have determined that the Allowed Claim falls within a reasonable range to resolve the [Original] Settling [RMBS] Trusts' [RMBS R+W] Claims and the Debtors' proposed Revised Claim Allocation Methodology for allocating the Allowed Claim among the [Original] Settling [RMBS] Trusts is fair and equitable to those trusts.

*Id.* at ¶ 12.

26.    On May 23, 2013, the day the PSA Motion was filed, the trial dates and other matters related to the RMBS 9019 Motion were adjourned.  [ECF Nos. 3815, 3816]

## G.    PLAN MEDIATION AND MODIFICATION OF THE ORIGINAL RMBS SETTLEMENT AGREEMENTS

27.    On December 6, 2012, the Debtors filed a motion [ECF No. 2537] seeking the entry of an order appointing a mediator to assist certain parties in interest in resolving various

plan issues in furtherance of reaching a consensual Chapter 11 plan.  On December 26, 2012, the

Court appointed U.S. Bankruptcy Judge James M. Peck as Mediator (the "**Mediation Order**").

[ECF No. 2519]

      28.    The Plan Support Agreement,[13] and now the Plan, was the result of an

extensive mediation over the course of some five months (the "**Plan Mediation**") overseen by

Judge Peck.  The communications and analyses relating to negotiations conducted during the

Plan Mediation are confidential pursuant to the Mediation Order and cannot be disclosed in

detail.  In general, however, the RMBS Settlement, as well the FGIC Settlement Agreement

(discussed below), must be understood as part of an integrated, multifaceted Global Settlement

that was the product of a highly contentious, arms-length negotiation conducted by and among

sophisticated parties (including the RMBS Trustees) with differing and conflicting interests,

advised by sophisticated advisors, conducted under the close supervision and guidance of a

sitting bankruptcy judge.

      29.    During the course of the Plan Mediation, the Original RMBS Settlement

Agreements were expanded to include the RMBS Trust Claims for all the RMBS Trusts.[14]

    **1.**    **RMBS R+W Claims of the Additional Settling RMBS Trusts**

      30.    It had been consistently contemplated by the RMBS Trustees that the

resolution of the RMBS Trust Claims would need to include the RMBS R+W Claims of all

---

[13]    My Declaration [ECF No. 3940-5], dated June 10, 2013, submitted in support of the (a) PSA Motion and (b) the *Joinder of Certain RMBS Trustees to Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants* [ECF No. 3940] may be found at **Exhibit PX-1503** for identification and is attached hereto and incorporated herein by reference.

[14]    Art.IV.C.1 of the Plan provides:

*Modification of Original RMBS Settlement Agreements.* The Original RMBS Settlement Agreements are hereby expanded to include all RMBS Trusts holding RMBS Trust Claims and are otherwise modified as set forth herein.

RMBS Trusts for which they acted,[15] and not just the Original Settling RMBS Trusts. In that regard, the RMBS Trustees, working with Duff & Phelps, identified Additional Settling RMBS Trusts and quantified the range of the RMBS R+W Claims for the Additional Settling RMBS Trusts, folding those Additional Settling RMBS Trusts into the RMBS Settlement in the context of the Plan Mediation.

31.     The calculation of the range of RMBS R+W Claims of the Additional Settling RMBS Trusts was completed by Duff & Phelps using the same methodologies it employed to quantify the comparable claims of the Original Settling Trusts. Duff & Phelps presented its analysis of the RMBS R+W Claims of the Additional Settling RMBS Trusts to the RMBS Trustees, including U.S. Bank, both orally and in writing.

32.     As contemplated by the RMBS Trustees, the Plan allows for distributions to the Additional Settling RMBS Trusts. The RMBS R+W Claims of the Additional Settling RMBS Trusts are included in the RMBS Settlement contained in the Plan, and will receive treatment consistent with that being accorded to the RMBS R+W Claims of the Original Settling RMBS Trusts under the terms of the Plan.

**2.     RMBS Cure Claims**

33.     Negotiations in the Plan Mediation also resulted in the RMBS Cure Claims being wrapped into the RMBS Settlement. In order to assist the RMBS Trustees in quantifying the range of potential RMBS Cure Claims, Duff & Phelps analyzed potential liabilities of the applicable Debtor, as servicer, for the RMBS Trusts for which the RMBS

---

[15]    The claims of each RMBS Trusts are based on the applicable Transaction Documents and therefore only certain RMBS Trusts have RMBS R+W Claims.

Trustees act as Trustee or Master Servicer.[16]

34.     Duff & Phelps attempted to quantify the Debtors' liability as servicer as related to: (a) misapplied and miscalculated payments; (b) wrongful foreclosure and improper loss mitigation practices; and (c) extended foreclosure timing issues caused by improper or inefficient servicing behavior such as falsified affidavits, improper documentation, and improper collection practices. Duff & Phelps concluded that the potential liability of the Debtors as servicer for the three bases analyzed could be asserted in amounts up to as much as $1.1 billion, but that the assertion of such claims involved significant risk and uncertainty.[17] Duff presented its analysis relating to the quantification of the RMBS Cure Claims both orally and in writing to the RMBS Trustees.

35.     As compromised and settled, the RMBS Cure Claims are included in the RMBS Settlement contained in the Plan Support Agreement and the Plan. Under the Plan, the RMBS Cure Claims are allowed in an aggregate amount of $96 million and divided between (a) RMBS Trusts where the servicing agreement has been assumed and assigned by the Debtors by the Effective Date ("**Recognized Cure Claims**"), in which case the claims are (or will be) listed on Schedules 1G or 1R to the Plan and (b) RMBS Trusts where the servicing agreement has not been assumed and assigned by the Debtors by the Effective Date ("**Recognized Unsecured Servicing Claims**"), in which case the claims will be listed on Schedules 4G or 4R.

---

[16]    In performing this analysis, Duff used publicly-available data on industry specific litigations and regulatory actions relating to residential mortgage servicing practices; reviewed the files of a large sampling of litigations specific to the Debtors; reviewed rating agency evaluation reports for the Debtors; accessed and reviewed a large sampling of the Debtors' records of servicing complaints for Debtor-serviced loans; and used publicly-available performance data on a sample of the RMBS Trusts.

[17]    The RMBS Trustees were unable to obtain full discovery regarding potential RMBS Cure Claims, in part because the Debtors asserted that some of the information requested was not reasonably available. The amount of information and data that would be needed in order to assert the RMBS Cure Claims in a litigated proceeding is likely very large and the analysis of that information and data would likely be expensive, time-consuming, and may ultimately lack sufficient certainty to establish the validity of such claims in a contested proceeding. Furthermore, the Debtors may have viable defenses to the assertion and quantification of any RMBS Cure Claims, the resolution of which is uncertain.

## H.    THE FGIC SETTLEMENT AGREEMENT

36.    U.S. Bank, BNY Mellon, Wells Fargo and Law Debenture are trustees, indenture trustees or separate trustees in respect of forty-seven RMBS Trusts that were insured by FGIC (the "**FGIC Insured Trusts,**" and U.S. Bank, BNY Mellon, Wells Fargo and Law Debenture in such capacities, the "**FGIC Trustees**"). U.S. Bank serves as the trustee or indenture trustee for eight of the FGIC Insured Trusts (the "**U.S. Bank FGIC Insured Trusts**").

37.    During the Plan Mediation, the FGIC Trustees were asked to consider a settlement proposal with FGIC.[18]  Under that proposal, among other things, FGIC would pay to the FGIC Insured Trusts a lump sum payment (the "**Commutation Payment**") and forgo future premiums, reimbursements or other amounts otherwise payable to FGIC under insurance policies issued by FGIC in connection with the FGIC Insured Trusts (the "**FGIC Policies**").[19]  In exchange, the FGIC Trustees would release and discharge FGIC from all obligations and liabilities under the FGIC Policies.  That proposal formed the basis of the FGIC Settlement Agreement, which is a central piece of Global Settlement which forms the basis of the Plan Support Agreement and ultimately the Plan.

38.    At the request of the FGIC Trustees, Duff & Phelps conducted an analysis

---

[18]    On or about June 2012, the Superintendent of Financial Services of the State of New York filed a rehabilitation petition on behalf of FGIC in New York state court, and was subsequently appointed by the Court as rehabilitator (the "**Rehabilitator**") in a rehabilitation proceeding (the "**FGIC Rehabilitation Proceeding**"). As a result of an injunction entered by the court in that proceeding (and earlier administrative action taken by FGIC's regulator), the FGIC Insured RMBS Trusts were obligated to continue to pay premiums under the FGIC Policies, notwithstanding that FGIC was relieved of its obligations to pay claims made by the those trusts under those policies. In or about June 2013, the Rehabilitator filed a revised First Amended Plan of Rehabilitation for FGIC (the "**Plan of Rehabilitation**") which contemplated, among other things, payments over time to policyholders in partial payment of claims under  FGIC-issued insurance policies, including to the FGIC Insured RMBS Trusts on account of the FGIC Policies.

[19]    A sample FGIC Policy issued by FGIC to one of the U.S. Bank FGIC Insured Trusts (RFMSII-HI1) may be found at **Exhibit PX-1504** for identification and is attached hereto, and is indicative of the Monoline policies issued to certain of the U.S. Bank RMBS Trusts. Also attached hereto as **Exhibit PX-1505** for identification is a sample Insurance and Indemnity Agreement for a U.S. Bank FGIC Insured Trust, which is indicative of the Insurance and Indemnity Agreements for certain of the U.S. Bank RMBS Trusts with Monoline policies.

of the economic terms of the FGIC Settlement Agreement and compared the Commutation

Payment (and the other benefits of the FGIC Settlement Agreement) to the discounted value of

the stream of payments each of the FGIC Insured Trusts would be projected to receive under the

Plan of Rehabilitation if the FGIC Trustees declined to enter into the FGIC Settlement

Agreement.

39.    As described in more detail in my Declaration ("**FGIC 9019**

**Declaration**"), dated July 31, 2013, submitted in support of the FGIC 9019 Motion,[20] a copy of

which may be found at **Exhibit PX-1506** for identification and is attached hereto and

incorporated herein by reference, based on its analysis of the respective benefits to each of the

FGIC Insured Trusts of the FGIC Settlement Agreement and those that such trusts would

otherwise receive under the Plan of Rehabilitation, Duff & Phelps advised the FGIC Trustees

that the FGIC Settlement, including the Commutation Payment, represented a reasonable

resolution of the accrued and unpaid claims and projected future claims against FGIC under the

FGIC Policies.

40.    The facts and circumstances evidencing that (a) U.S. Bank, and the other

FGIC Trustees, acted reasonably and in good faith in agreeing to the FGIC Settlement

Agreement; (b) the FGIC Settlement Agreement is in the best interests of the FGIC Insured

Trusts (including the U.S. Bank FGIC Insured Trusts) and the Investors in those trusts; and

(c) notice to the Investors in the U.S. Bank FGIC Insured Trusts of the FGIC Settlement was

sufficient, are described in detail in my FGIC 9019 Declaration and will not be repeated here.

41.    A limited number of objections, including by some Investors in the FGIC

---

[20]    The FGIC 9019 Motion is the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investor* [ECF No. 3929], to which the FGIC Trustees filed a joinder, the *Joinder of FGIC Trustees to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors.* [ECF No. 3982]

Insured Trusts, were filed in response to the FGIC 9019 Motion.[21]  At the conclusion of a two

day trial before this Court, however, all of the objections filed by investors in the FGIC Insured

Trusts were withdrawn.[22]  On September 13, 2013, this Court granted the FGIC 9019 Motion.[23]

## I.    FACTORS SUPPORTING THE GLOBAL SETTLEMENT

42.    The RMBS Settlement, as well as the FGIC Settlement Agreement, is part

of an integrated, multifaceted Global Settlement among numerous constituencies that was the

product of an extensive and contentious Plan Mediation that resulted in the Plan Support

Agreement, and ultimately, the Plan.  Prior to entering into the Plan Support Agreement, U.S.

Bank considered not only the benefits and risks of the RMBS Settlement and the FGIC

Settlement Agreement, but also the benefits and risks associated with reaching an agreement

regarding an overall consensual Chapter 11 plan, as well as the risks and uncertainties associated

with litigating the RMBS Trust Claims in the absence of such a plan.

### 1.    The AFI Contribution

43.    A significant facet of the Global Settlement contained in the Plan Support

---

[21]    *Objection of the Ad Hoc Group of Junior Secured Noteholders to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [ECF No. 4027]; *Objection of Monarch Alternative Capital, LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [ECF No. 4400]; *Supplemental Objection of the Ad Hoc Group of Junior Secured Noteholders to the Debtors' FGIC Settlement Motion* [ECF No. 4401]; and *Federal Home Loan Mortgage Corporation's Objection to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors.* [ECF No. 4406]

[22]    *Notice of Withdrawal of Objection of Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [ECF No. 5020]; *Notice of Withdrawal of Federal Home Loan Mortgage Corporation's Objection To Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors.* [ECF No. 5021]

[23]    *Memorandum Opinion and Order, and Findings of Fact and Conclusions of Law, Approving the FGIC Settlement Motion.* [ECF No. 5042]  On September 20, 2013, the Court entered its *Order Granting Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among FGIC, the Debtors, the Trustees and the Institutional Investors.* [ECF No. 5125]

Agreement and the Plan is the resolution of claims against AFI and AFI's $2.1 billion

contribution to the Debtors' estates (the "**AFI Contribution**"). Prior to the Plan Mediation, AFI

had been willing to make a contribution of $750 million, however, in the Plan Mediation, AFI

increased that amount to $2.1 billion.

       44.    U.S. Bank believes that unless all parties (including the RMBS Trustees)

consented to an overall settlement that included the allowance and treatment of claims, it is

unlikely that AFI would have agreed to make the AFI Contribution , leading to lengthy and

expensive litigation with uncertain outcomes. U.S. Bank considered the substantial increase in

the amount of the AFI Contribution, the certainty associated with fixing that contribution, the

added value to the Debtors' estates and the impact on the recoveries of the RMBS Trusts

resulting therefrom and the avoidance of the delay, expense and uncertainty associated with

litigating AFI's liability to the Debtors' estates, to collectively be of significant benefit to the

U.S. Bank RMBS Trusts and the other RMBS Trusts.

    **2.**    **Litigation Risks**

       45.    Until the Consenting Claimants agreed to the Plan Support Agreement,

these Chapter 11 Cases were at the precipice of several kinds of lengthy and expensive litigation

that could have adversely affected the recoveries of the RMBS Trusts, including the U.S. Bank

RMBS Trusts. The Plan Support Agreement and the Plan resolve those disputes and eliminate

several significant litigation risks that otherwise would be present in the absence of the Plan.

       46.    The Plan fixes the claims that the RMBS Trustees expect would otherwise

be contested in time-consuming and uncertain proceedings. Objections to the RMBS 9019

Motion, including those of FGIC, MBIA and the Committee will no longer be pressed. Notably,

the RMBS 9019 Motion will be resolved by the Plan, avoiding what would almost certainly have

been lengthy and expensive hearings. Upon the conclusion of such hearings, while the Court

might authorize the Debtors to perform the Original RMBS Settlement Agreements, it is also

possible that the Court might sustain one or more of the objections filed to the RMBS 9019

Motion. If the Court declined to grant the RMBS 9019 Motion, the allowance of RMBS R+W

Claims of the Original Settling RMBS Trusts would be left to the expensive and uncertain

process of claims litigation. The allowance of the RMBS R+W Claims, as contemplated by the

Plan, offers the benefits of allowance consistent with the RMBS 9019 Motion, within the range

of reasonableness for the Original Settling Trusts, without the risks attendant to that contested

matter.

      47.     In addition, the Plan fixes the amount of, and distributions on, the RMBS

R+W Claims of the Additional Settling RMBS Trusts without the expense, delay and uncertainty

associated with analyzing, asserting and litigating those claims.

      48.     The Plan also provides for the allowance of, and distribution on, the

RMBS Cure Claims, including those of the U.S. Bank RMBS Trusts. As set forth above,

although those claims were roughly quantified by Duff & Phelps, their presentation would have

required further discovery and analysis, likely leading to litigation over both the quantification of

the claims and their relative priority. The treatment of the RMBS Cure Claims represents a

meaningful recovery to the RMBS Trusts possessing such claims, without the expense, delay and

uncertainty associated with analyzing, asserting and litigating those claims.

      49.     Furthermore, many of the contentious and complicated inter-creditor

issues in these cases are resolved by the Plan Support Agreement and the Plan, including, among

other things, the priority of certain claims asserted by the Monolines and by certain other

securities claimants. In particular, both the amount of the claims of the Monolines and the

relationship between those claims and the RMBS Trust Claims are the subject of disputes, and

the resolution of all those disputes through litigation presents both a general risk of delay and

expense to all stakeholders as well as a specific risk to the RMBS Trusts of dilution.

50.    Finally, the mounting costs of administration of these Chapter 11 Cases

threatened to erode any distribution to unsecured creditors. Confirmation of the Plan would

effectively end the continued accrual of such costs.

### 3.    Support of Other Constituencies

51.    The Institutional Investors, which hold significant, and for some RMBS

Trusts controlling, investments in certificates issued by the RMBS Trusts have regularly

communicated with the RMBS Trustees and support the RMBS Settlement. The Institutional

Investors actively participated in the Plan Mediation and the negotiations that led to the Global

Settlement in the Plan Support Agreement and are Consenting Claimants under the Plan. The

Institutional Investors were aware of all of the compromises that evolved during the Plan

Mediation and negotiations leading to the Plan Support Agreement and now contained in the

Plan, and they communicated through their counsel that they fully supported the Plan Support

Agreement and now the Plan.

## J.    ALLOWANCE OF, AND DISTRIBUTIONS ON, THE RMBS TRUST CLAIMS UNDER THE PLAN

### 1.    Allowed Amounts and Reasons for the Reallocation of Units

52.    Article IV, Section C of the Plan provides, among other things, that:

(a) Entry of the Confirmation Order shall constitute approval of the Allowed amount of the RMBS Trust Claims as non-subordinated Unsecured Claims, subject only to the Allowed Fee Claim, in the aggregate amounts of (i) $209.8 million against the GMACM Debtors; (ii) $7,091.2 million against the RFC Debtors; and (iii) $0 against the ResCap Debtors.

Plan Art.IV.C.2.

53.    The aforesaid "Allowed amounts" were used by the Consenting Claimants

during the negotiations that took place during the Plan Mediation which resulted in the

distributions to be made to the RMBS Trusts – *in the aggregate* – pursuant to the Plan Support

Agreement, and now the Plan.  However, there were certain significant differences between the

"Allowed amounts" and the RMBS Trust Claims as calculated by Duff & Phelps, particularly

with respect to (i) the aggregate amount of the RMBS R+W claims of the Additional Settling

RMBS Trusts and (ii) the aggregate amount of the Recognized Cure Claims.  In addition, there

were disputes between the Debtors and the RMBS Trustees regarding which Debtor was

responsible for certain of those claims.  Finally, as of the time the Plan Support Agreement was

negotiated, there was substantial remaining due diligence needed to confirm that certain of these

claims were properly asserted under the provisions of the Transaction Documents of certain of

the RMBS Trusts, and if they were, to determine the responsible Debtor under those documents.

       54.     Accordingly, the RMBS Trustees required the Plan to contain provisions

that would allow the RMBS Trustees, after completing due diligence, to use the completed due

diligence and Duff & Phelps' final calculations of the RMBS Trust Claims to re-allocate the

Units that will be distributed based on the "aggregate amounts of (a) $209.8 million against the

GMACM Debtors and (b) $7,091.2 million against the RFC Debtors."[24]  The re-allocation of

Units from the RFC Pool to the GMACM Pool avoids significant distortions in distributions on

account of the RMBS Trust Claims, as finally calculated, that would otherwise occur if

distributions were made based on the above-referenced "aggregate" allowed amounts contained

in the Plan.

    **2.**     **Reason for Calculation of "Weighted" Claims**

       55.     At the time the Plan Support Agreement was agreed to, the RMBS

---

[24]    Art.IV.C.2(a) of the Plan.

Trustees contemplated that RMBS Cure Claims of RMBS Trusts whose Servicing Agreements had been assumed would be paid first, in full, from cash distributed on the Units distributed under the Plan on account of the RMBS Trust Claims.[25]  Thereafter, it was learned that a priority distribution of cash proceeds would adversely affect the REMIC status of the applicable RMBS Trusts.  To avoid such an adverse tax effect while at the same time honoring the priority nature of a RMBS Cure Claim where the Servicing Agreement has been assumed and assigned, Art.IV.C.3(c) and (d) of the Plan implements the concept of a RMBS Trust's total "weighted claim."  In order to calculate the GMACM Weighted Claim of a RMBS Trust, the GMACM Recognized Cure Claim is valued at 100%, and the GMACM Recognized Original R+W Claim, the GMACM Additional R+W Claim and the GMACM Recognized Unsecured Servicing Claim of that trust, if any, are valued at the percentage distribution available from the GMACM Pool after the calculations made by D&P described in the Plan.  After the Weighted Claims are calculated, distributions are made based on a RMBS Trust's *pro rata* share of all of the Weighted Claims in the GMAC Pool.  The same process applies to calculate the RFC Weighted Claim of an RMBS Trust.

### 3. Impact of Monoline Insurance and "Recognized" Claims

56.    Insured RMBS Trusts (other than those insured by FGIC and Ambac) have received, and in the future are assumed to receive, payment of their losses to the extent necessary to pay the principal and interest due to the insured tranches of such trusts directly from the applicable Monoline, which in most cases eliminates the need for any distribution to those RMBS Trusts given the structure of the Plan and the inter-related settlements contained in the

---

[25]    *See, e.g.,* Annex III to the Plan Support Agreement.  [ECF No. 3814]

Plan.[26]  In such cases, the "recognized" claim of the RMBS Trust is set to zero, or is reduced, to

take into account the full or partial payment of claims by the applicable Monoline, unless an

exception applies.[27]  The rights of Insured RMBS Trusts are reserved in the event that the

applicable Monoline does not honor its obligations.[28]

## K.    **NOTICE TO INVESTORS IN THE U.S. BANK RMBS TRUSTS**

57.    U.S. Bank has regularly provided to the Investors in the U.S. Bank RMBS

Trusts notice of matters related to the RMBS 9019 Motion and other significant events in the

Chapter 11 Cases.  For the Investors in U.S. Bank RMBS Trusts, U.S. Bank provided the

following notices during the early stages of the Chapter 11 Cases:

- On or about May 30, 2012, an informational notice to Investors in the U.S. Bank RMBS Trusts in the Original Settling RMBS Trusts which advised of the Chapter 11 Cases, various plan support agreements, a plan term sheet, the Original Settlement Agreements, a RMBS Trust plan support agreement between AFI and certain institutional investors, the AFI settlement, the proposed sale of the Debtors' mortgage origination and servicing businesses and certain deadlines in those pleadings and agreements.  This notice, which may be found at **Exhibit PX-1507** for Identification and is attached hereto, advised Investors how to obtain information in the Chapter 11 Cases, urged them to carefully review the pleadings and to consult with their own advisors (the "**Initial Notice**").

- On or about June 18, 2012, a notice to Investors in the U.S. Bank RMBS Trusts in the Original Settling RMBS Trusts which advised Investors that they may object to (1) the original RMBS 9019 Motion, and (2) the Debtors' motion to assume plan support agreements with certain settling investors.  The notice, which may be found at **Exhibit PX-1508** for identification and is attached hereto, also provided additional information regarding those motions, advised Investors that U.S. Bank was not a party to the Original RMBS Settlement Agreements and the plan support agreements and urged Investors to carefully review the pleadings and consult with their own advisors (the "**Supplemental Notice**").

- On or about June 18, 2012, a notice to Investors for certain Additional Settling RMBS Trusts which included the information provided in the Initial Notice and the

---

[26]    In consideration for these payments, the Monolines are allowed significant claims against the applicable Debtors, on account of which they are anticipated to receive substantial distributions.

[27]    The exceptions are described at Art.IV.C.3.(a)(iv) of the Plan.

[28]    Art.IV.C.4 of the Plan.

Supplemental Notice. A copy of this notice may be found at **Exhibit PX-1509** for identification and is attached hereto.

58.     Following the filing of the initial RMBS 9019 Motion, U.S. Bank, together with the BNY Mellon, Deutsche Bank and Wells Fargo, jointly retained an agent, The Garden City Group, Inc. ("**GCG**") to coordinate and facilitate notice to Investors in the RMBS Trusts regarding the RMBS 9019 Motion, developments with respect to the RMBS 9019 Motion, and other important events in the Chapter 11 Cases.

59.     On behalf of the RMBS Trustees, GCG provided certain administrative services in connection with noticing various Investors, including the coordination and facilitation of the dissemination of notices to the various Investors at the direction and on behalf of the RMBS Trustees, and in connection with the creation and maintenance of a website for Investors that provides, among other things, contact information for the RMBS Trustees, significant relevant developments in the Chapter 11 Cases, links to relevant documents filed in the Chapter 11 Cases, and upcoming Court deadlines and hearing dates (the "**RMBS Trustee Website**").

60.     As described in more detail in the Affidavit of Jose C. Fraga, sworn to November 12, 2013 (the "**Fraga Affidavit**"), and filed contemporaneously herewith, on behalf of the RMBS Trustees, GCG has distributed to various Investors and has published on the RMBS Trustee Website the following notices, copies of which are attached as exhibits to the Fraga Affidavit:

- On August 22, 2012, following the filing of the Chapter 11 Cases and the First Supplemental RMBS 9019 Motion, to the Investors in the Original Settling Trusts, a "Time Sensitive Notice Regarding a Proposed Settlement Between Residential Capital, LLC, et al. and the Settlement Trusts."

- On October 17, 24 and 31, 2012, at or about the time of the Second Supplemental RMBS 9019 Motion, to certain Investors which may have RMBS Trust Claims and for which Wells Fargo is Trustee, a notice titled "Time Sensitive Notice Regarding (a) Order Setting Last Date to File Claims Against Debtors Residential Capital, LLC

and Certain of its Direct and Indirect Subsidiaries, and (b) Updates of Matters Relevant to Certain Certificateholders."

- On January 24, 2013 and February 1, 2013, to certain Investors which may have RMBS Trust Claims and for which Wells Fargo is Trustee, a "Time Sensitive Notice Regarding Sale of Debtors' Servicing Platform to Ocwen Loan Servicing, LLC."

- On April 8, 9 and 12, 2013, to certain Investors which may have RMBS Trust Claims and for which Wells Fargo is Trustee, a "Notice Regarding Closing of Sale of Debtors' Servicing Platform to Ocwen and Update of 9019 Settlement."

- On May 24, 2013, at or about the time of the PSA Motion, a "Time Sensitive Notice Regarding (a) Plan Support Agreement Among ResCap Debtors and the RMBS Trustees, Among Others, and (b) Settlement Agreement Among the Debtors, Financial Guaranty Insurance Company and Certain of the RMBS Trustees."[29]

- On August 30, 2013, a "Time Sensitive Notice Regarding (a) Approval of Disclosure Statement for ResCap Chapter 11 Plan and (b) Hearing on Confirmation of Plan."

- On October 1, 2013, a "Time Sensitive Notice Regarding (A) Hearing on Information of Proposed ResCap Chapter 11 Plan and (B) Court Approvals of the FGIC Settlement Agreement."[30]

61.    U.S. Bank received an instruction from a controlling Monoline under the Transaction Documents for the RMBS Trust Greenpoint Mortgage Funding Trust 2006-HE1 directing U.S. Bank to withdraw its execution of the Plan Support Agreement and not to vote in favor of the Plan on behalf of that trust. Consequently, on or about June 26, 2013, U.S. Bank filed a Notice of Withdrawal of RMBS Trust from Plan Support Agreement (the "**Withdrawal Notice**") [ECF No. 4092] in which U.S. Bank gave notice of its withdrawal of both its execution of the Plan Support Agreement and the agreement to vote in favor of the Plan with respect to the

---

[29]    On or about June 4, 2013, U.S. Bank also sent a "Time Sensitive Notice Regarding Settlement Agreement Among the ResCap Debtors, Financial Guaranty Insurance Company and the FGIC Trustees" to the Investors in the U.S. Bank FGIC Insured Trusts, a copy of which may be found at **Exhibit PX-1510** for identification and is attached hereto. Similarly, on or about August 8, 2013, U.S. Bank sent a "Time Sensitive Notice Regarding Allocation of Certain Settlement Amounts Under the Settlement Agreement Among the ResCap Debtors, Financial Warranty Insurance Company and the FGIC Trustees," a copy of which may be found at **Exhibit PX-1511** for identification and is attached hereto.

[30]    The October 1, 2013 notice urged all recipients of that notice to review all prior notices sent by the RMBS Trustees as certain RMBS Trusts identified in Schedule A to the October 1, 2013 notice had not been listed on the schedules attached to at least some of the Trustees' prior notices.

trust.

      62.    Following the filing of the Withdrawal Notice, U.S. Bank provided the

following notices to Holders in Greenpoint Mortgage Funding Trust 2006-HE1:

- On or about July 25, 2013, a "Time Sensitive Notice Regarding Status of Greenpoint Mortgage Funding Trust 2006-HE1 with Respect to Plan Support Agreement and Proposed Chapter 11 Plan of Reorganization," a copy of which may be found at **Exhibit PX-1512** for identification and is attached hereto.

- On or about September 4, 2013, a "Time Sensitive Notice Regarding Status of Greenpoint Mortgage Funding Trust 2006-HE1 Under Proposed Chapter 11 Plan of Reorganization and Debtors' Motion to Assume and Assign Services Under the Trust," a copy of which may be found at **Exhibit PX-1513** for identification and is attached hereto.

## L.    **CONCLUSION**

      63.    For all of the foregoing reasons, U.S. Bank believes that (a) the Plan

Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement

Agreement and all the transactions contemplated by each of the foregoing, including the releases

given therein, are in the best interests of the Investors in each RMBS Trust, each such RMBS

Trust and the RMBS Trustees; (b) the RMBS Trustees acted reasonably, in good faith and in the

best interests of the Investors in each RMBS Trust and each such RMBS Trust in (i) entering into

the Plan Support Agreement, (ii) performing their obligations under the Plan Support Agreement,

including voting in favor of the Plan, where applicable, and (iii) agreeing to, and performing

under, the Global Settlement and each of the settlements embodied therein, including the RMBS

Settlement and the FGIC Settlement Agreement; and (c) the RMBS Trustees' notice of the Plan

Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement

Agreement and all the transactions contemplated by each of the foregoing, including the releases

given therein, was sufficient and effective in satisfaction of federal and state due process

requirements and other applicable law to put the parties in interest in these Chapter 11 Cases and

others, including the Institutional Investors and the Investors in each RMBS Trust, on notice of

the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC

Settlement Agreement and all the transactions contemplated by each of the foregoing, including

the releases given therein, and, accordingly, consistent with its undertakings in the Plan Support

Agreement and to the extent of its authority to do so, has voted in favor of the Plan, and urges

that the Court enter the proposed Order confirming the Plan.

*[Remainder of page intentionally left blank]*

Dated this 12th day of November, 2013

Mamta K. Scott

SK 03687 0119 1427182