# Trial Exhibit PX-1503

**Exhibit E**

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as*
*Trustee of Certain Mortgage Backed Securities*
*Trusts*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | )   **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC, *et al.*,** | ) |
| | )   **Chapter 11** |
| Debtors. | ) |
| | )   **Jointly Administered** |

## DECLARATION OF MAMTA K. SCOTT,
## <u>AS OFFICER OF U.S. BANK, AS RMBS TRUSTEE</u>

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

      I, Mamta K. Scott, hereby declare, pursuant to 28 U.S.C. § 1746, that the

following is true and correct to the best of my knowledge, information and belief:

      1.    I am employed by U.S. Bank National Association (**"<u>U.S. Bank N.A.</u>"**),

and my current title is Vice President and I am authorized to sign this Declaration on behalf of

U.S. Bank N.A.  I have personal knowledge of the facts set forth herein, except as to certain

matters that I believe to be true based on (a) information provided by Duff & Phelps, LLC

(**"<u>Duff & Phelps</u>"**), (b) information about positions of parties in these Chapter 11 cases

contained in pleadings that I reviewed, were reported to me by counsel, or I learned during my

participation in the Plan Mediation (defined below), and (c) my review of business records of

U.S. Bank N.A.

2.      This Declaration in submitted in support of the (a) *Joinder of Certain
RMBS Trustees to Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and
363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with
Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants,* dated June 10,
2013, and (b) *Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b)
Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally
Financial Inc., the Creditors Committee and Certain Consenting Claimants* [ECF No. 3814] (the
"**Plan Support Agreement Motion**").[1]

3.      On May 13, 2013, the Debtors, Ally Financial Inc. ("**AFI**"), the Official
Committee of Unsecured Creditors (the "**Committee**") and the Consenting Claimants,[2] including

---

[1]     On May 14, 2012, Residential Capital, LLC, and certain of its direct and indirect subsidiaries (collectively,
"**ResCap**" or the "**Debtors**") filed voluntary petitions under Chapter 11 of the United States Bankruptcy
Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy
Court**") (collectively, the "**Chapter 11 Cases**"). The Chapter 11 Cases are being jointly administered
under the caption In re Residential Capital, LLC, Case No. 12-12020 (MG).

[2]     The "**Consenting Claimants**" include AIG Asset Management (U.S.) LLC, as investment advisor for
certain affiliated entities that have filed proofs of claim in the Debtors' chapter 11 cases; Allstate Insurance
Company and its subsidiaries and affiliates; Deutsche Bank National Trust Company and Deutsche Bank
Trust Company Americas, each solely in its capacity as trustee, indenture trustee, securities administrator,
co-administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect of
certain of the RMBS Trusts (together, "**Deutsche Bank**"); Financial Guaranty Insurance Corporation
("**FGIC**"); HSBC Bank USA, N.A., solely in its capacity as trustee in respect of certain of the RMBS
Trusts ("**HSBC**"); the Kessler Class Claimants; Law Debenture Trust Company of New York, solely in its
capacity as separate trustee in respect of certain of the RMBS Trusts ("**Law Debenture**"); Massachusetts
Mutual Life Insurance Company and its subsidiaries and affiliates; MBIA Insurance Corporation and its
subsidiaries and affiliates ("**MBIA**"); certain funds and accounts managed by Paulson & Co. Inc.;
Prudential Insurance Company of America and its subsidiaries and affiliates; the Steering Committee
Consenting Claimants; certain holders of the Senior Unsecured Notes issued by ResCap; The Bank of New
York Mellon and The Bank of New York Mellon Trust Company, N.A., each solely in its capacity as
trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, master

U.S. Bank, entered into the Plan Support Agreement [ECF No. 3814, Ex. 3], pursuant to which

they agreed to the terms of a proposed consensual Chapter 11 plan of reorganization (the

"**Plan**") and resolution of all claims and disputes between them as set forth in the Plan Term

Sheet (the "**Plan Term Sheet**") and the Supplemental Term Sheet (the "**Supplemental Term**

**Sheet**," together with the Plan Term Sheet, the "**Term Sheets**") attached respectively as Exhibits

A and B to the Plan Support Agreement.[3]

       4.     Among the claims and disputes resolved in the proposed Plan is a

settlement (the "**RMBS Settlement**") that provides for the allowance, priority, allocation and

treatment of the claims of mortgage backed securities trusts (the "**RMBS Trusts**"), including

both arising from Origination-Related Provisions[4] (the "**Repurchase Claims**") and unrelated to

Origination-Related Provisions (the "**Servicing Claims**,"[5] together with the Repurchase claims,

the "**RMBS Trust Claims**").

---

       servicer, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts (together, "**BNY Mellon**"); the Talcott Franklin Consenting Claimants; U.S. Bank National Association, solely in its capacity as trustee, indenture trustee, master servicer, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts ("**U.S. Bank**"); Wells Fargo Bank, N.A., solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts ("**Wells Fargo**"); and Wilmington Trust, National Association, not individually, but solely in its capacity as Indenture Trustee for the Senior Unsecured Notes issued by ResCap. The term "RMBS Trustees" has been defined, at different times in this case, in slightly different ways. As used herein, unless the context dictates otherwise, the term "**RMBS Trustees**" shall include U.S. Bank, Deutsche Bank, BNY Mellon, U.S. Bank and Wells Fargo, as well as Law Debenture and HSBC.

[3]     Capitalized terms used herein without definitions have the meanings ascribed to them in the Plan Support Agreement Motion or the Plan Support Agreement, as applicable.

[4]     "**Origination-Related Provisions**" shall have the meaning ascribed in the *Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding (I) Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Agreements, (II) The RMBS Trustees' Limited Objection to the Sale Motion* [ECF No. 945].

[5]     Servicing Claims include claims that arise under the Transaction Documents that are executory contracts that (i) were assumed and assigned in connection with the sale of the Debtors' servicing assets ("**Cure Claims**"), and (ii) were not assumed and assigned during the Chapter 11 Cases and the Debtors' role thereunder was terminated prior to or during the Chapter 11 Cases ("**Other Servicing Claims**").

## A.    RELEVANT BACKGROUND

### 1.    U.S. Bank's Role as Trustee

5.    U.S. Bank serves as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, securities administrator, master servicer, custodian and/or other similar agencies (in any such capacity, the "**Trustee**") in respect of certain residential mortgage backed securities trusts, whole loan servicing agreements, net interest margin trusts, other trusts and similar arrangements listed on Schedule A to the Proofs of Claim (defined below) (collectively, the "**U.S. Bank RMBS Trusts**").[6]  This Declaration is made solely with respect to U.S. Bank's role as Trustee.

6.    The U.S. Bank RMBS Trusts are governed by one or more pooling and servicing agreements, highly integrated sets of "servicing agreements," mortgage loan purchase agreements, deposit trust agreements, trust agreements, indentures, asset sale agreements, depositor sale agreements, administration agreements, yield maintenance agreements and other ancillary transaction documents (collectively, the "**Transaction Documents**").  Pursuant to the Transaction Documents, one or more of the Debtors has obligations in various capacities, including as originator, seller, sponsor, depositor and similar capacities (together, "**Seller**"), and/or as servicer, subservicer, master servicer, back-up servicer, HELOC servicer, administrator, co-administrator and similar capacities (collectively, "**Servicer**").

7.    In the appropriate capacity or capacities as provided for in the Transaction Documents, U.S. Bank has the authority to enforce claims against the Seller and Servicer in respect of the U.S. Bank RMBS Trusts and to vote such claims in connection with a plan of reorganization.

---

[6]    U.S. Bank, together with Deutsche Bank and BNY Mellon, as Trustees, are also members of the Committee.

8.    The claims of the U.S. Bank RMBS Trusts fall into two broad categories: (a) Repurchase Claims, which arise from the conduct of the Debtors as Seller, and which include, but are not limited to, claims arising from the right to demand the repurchase of loans based on breaches of representations and warranties under the Transaction Documents with respect to such loans; and (b) Servicing Claims, which arise from the conduct of the Debtors as Servicer under each pooling and servicing agreement (or similar agreement).

9.    On or about March 1, 2013, U.S. Bank filed proofs of claim (the "**Proofs of Claim**") against each applicable Debtor [Proof of Claim Nos. 6655-6705] asserting, among other things: (a) the Servicing Claims; (b) the Repurchase Claims and other breach of representations and warranties claims; (c) claims for indemnification under the Transaction Documents; and (d) claims for fraud and/or negligent misrepresentation arising from the conduct of the Debtors acting as Seller under the Transaction Documents.  The Proofs of Claim asserted claims for all of the U.S. Bank RMBS Trusts. [7]

10.    On April 16, 2013, U.S. Bank filed a *Notice of Cure Claim of U.S. Bank National Association as Trustee and Master Servicer* [ECF No. 3453] (the "**Notice of Cure Claim**"), asserting claims arising from the Debtors' failure to perform its obligations as Servicer under the Transaction Documents, including, but not limited to: (a) claims arising from failure to give notice of, and enforce, breaches of representations and warranties; (b) claims arising from severance of Origination-Related Provisions; (c) claims arising from origination and sale of mortgages to the U.S. Bank RMBS Trusts; (d) claims for indemnification and payment of expenses; (e) claims arising from borrower complaints; and (f) claims arising from litigation. Claims in (e) and (f) include claims related to, among other things, misapplication of payments,

---

[7]    The RMBS Trust Claims were asserted by U.S. Bank in the appropriate capacity or capacities as provided for in the Transaction Documents.

wrongful foreclosure, improper loss mitigation practices and unreasonably long foreclosure

timing caused by improper servicing practices. The Notice of Cure Claim applied to all U.S.

Bank RMBS Trusts with Cure Claims.

    2.    **The RMBS 9019 Motion**

    11.    On June 11, 2012, the Debtors filed the *Debtors' Motion Pursuant to Fed.

*R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 320] (as

amended and supplemented by the *Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P.*

*9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 1176] and the *Debtors'*

*Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust*

*Settlement Agreements* [ECF No. 1887] (collectively, the "**RMBS 9019 Motion**"). In the RMBS

9019 Motion, the Debtors sought approval of their agreement with two groups of institutional

investors covering the Repurchase Claims of 392 RMBS Trusts (the "**Original Settling**

**Trusts**"), which is documented in the Third Amended and Restated Settlement Agreements filed

with the Bankruptcy Court on March 15, 2013 (the "**Original Settlement Agreement**").[8]

    12.    The Original Settlement Agreement had been negotiated by three law

firms, Gibbs & Bruns, P.C., Ropes & Gray LLP and Talcott Franklin P.C. Those three firms

represented the aforementioned two groups of institutional investors (clients of Gibbs & Bruns

and Ropes & Gray (the "**Steering Committee Consenting Claimants**") and clients of Talcott

Franklin (the "**Talcott Franklin Consenting Claimants**," together with the Steering Committee

Consenting Claimants, the "**Institutional Investors**")) who collectively held, or were authorized

investment managers for holders of, 25% or more of classes (or tranches) of certificates of

---

[8]    The Third Amended and Restated Settlement Agreements can be found at Exhibits 1 and 2 of the
*Declaration of LaShann M. DeArcy in Further Support of Debtors' Motion Pursuant to Fed. R. Bankr. P.*
*9019 for Approval of the RMBS Settlement Agreements* [ECF No. 3222].

various of the Original Settling Trusts.[9]

13.    Under the Original Settlement Agreement, the Original Settling Trusts

would be granted an allowed aggregate claim of up to $8.7 billion (as further described herein,

the "**Allowed Claim**") against those Debtors that acted as Seller, to be allocated in accordance

with certain formulas set forth in Exhibit B to the Original Settlement Agreement.[10]  In support

of the RMBS 9019 Motion, the Debtors submitted an expert report that calculated the Original

Settling Trusts' Repurchase Claims at between $6.7 billion and $10.3 billion.  *See Declaration of*

*Frank Sillman in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of*

*the RMBS Trust Settlement Agreements* [ECF No. 320-8], at ¶¶ 68-69.

### 3.    Objections to the RMBS 9019 Motion

14.    Holders in the 392 Original Settling Trusts and other parties in interest had

the opportunity to object to the RMBS 9019 Motion, and various objections were filed with the

Court.

15.    No party filed an objection to the RMBS 9019 Motion claiming that the

$8.7 billion Allowed Claim was unreasonably low.  The only objection to the top line number

was that $8.7 billion was excessive.  For example, the Committee's objection stated that the

Debtors' liability for Repurchase Claims of the Original Settling Trusts was approximately $3.8

billion, and if certain legal defenses were considered, might be reduced to a range of $2.7 billion

to $3.3 billion or lower.  *See Objection of the Official Committee of Unsecured Creditors to the*

*Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement*

---

[9]    Holders of certificates of the RMBS Trusts are referred to herein as "**Holders**."

[10]    The RMBS 9019 Motion provided that "[w]hile the [Original Settlement Agreement] was negotiated by the
Institutional Investors, the Trustees of each of the [Original Settling Trusts] will also evaluate the
reasonableness of the settlement and can accept or reject the proposed compromise on behalf of each
Trust." *See* RMBS 9019 Motion at ¶4.

*Agreements* [ECF No. 2825] (the "**Committee Objection**"), including the supporting Expert

Report of Bradford Cornell, Ph.D [ECF No. 2829, Ex. A] (the "**Cornell Report**").

      16.    FGIC objected that the Debtors could not support the reasonableness of an

Allowed Claim exceeding $4 billion, excluding the value of the claims that monoline insurers

(each, a "**Monoline**") have against the Debtors, and that "the $8.7 Billion claim amount is

excessive and unreasonable" and "grossly overstates the value of the settled claim." *See*

*Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental*

*Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF

No. 2819]. MBIA similarly objected that the Repurchase Claims of the Original Settling Trusts,

excluding the claims of the Monolines, was less than $3 billion and that the Original Settlement

Agreement provides a "windfall for certain Settling Trusts at the expense of both non-settling

and settling creditors." *See Objection of MBIA Insurance Corporation to Debtors' Motion*

*Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF No.

2810], including the Expert Declaration of C.J. Brown [ECF No. 2811].[11]

      17.    Only two Holders in the Original Settling Trusts filed objections to the

RMBS 9019 Motion, and their objections were limited to objecting to the manner in which the

Allowed Claim was to be allocated among the Original Settling Trusts. *See Objection to the*

*Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of*

*RMBS Settlement Agreements* [ECF No. 2308]; *Limited Objection to Debtors' Second*

*Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement*

*Agreements* [ECF No. 2297]. The crux of those two objections was that the allocation

methodology in the Original Settlement Agreement failed to take into account the unique

---

[11]    Both FGIC and MBIA are now Consenting Claimants.

characteristics of the Original Settling Trusts and inappropriately used net losses of an RMBS

Trust as a proxy for viable Repurchase Claims.

18.    The allocation methodology in the Original Settlement Agreement was

revised in the RMBS Settlement to provide that the aggregate amount of the Repurchase Claims

be allocated based on differences among the Settling Trusts in the incidence of breaches of

representations and warranties.  As described below, the financial advisor to the RMBS Trustees

has advised the RMBS Trustees that it believes that this revised allocation methodology largely

addresses the substance of the objections in the RMBS 9019 Motion related to allocation

methodology. *See infra* at ¶ 30.

### 4.    Retention of Duff & Phelps

19.    In light of the then-pending RMBS 9019 Motion, U.S. Bank and three

other RMBS Trustees (Deutsche Bank, BNY Mellon and Wells Fargo) retained an expert to

assist them in the Chapter 11 Cases, including in the identification, quantification, litigation

and/or resolution of the RMBS Trust Claims.

20.    Those RMBS Trustees engaged in a rigorous selection process that

involved, among other things, interviewing five potential advisory firms in person, selecting two

finalists, and hearing follow up presentations by the two finalists.

21.    At the conclusion of this process, the aforementioned RMBS Trustees

jointly engaged Duff & Phelps to assist them based on (a) the firm's experience in handling

similar types of engagements involving the evaluation of mortgage loan servicing agreements

and loan origination agreements, bankruptcy litigation, restructuring, asset valuation, complex

securitizations and RMBS loan repurchase actions and (b) the depth of resources available to the

9

firm, including advisory services about bankruptcy issues generally. [12]

22.    Duff & Phelps generally was asked to (a) evaluate the reasonableness of

the Original Settlement Agreement as it related to the Repurchase Claims of the Original Settling

Trusts; (b) determine, for any other RMBS Trusts for which any of the RMBS Trustees acted as

Trustee or Separate Trustee (the "**Additional Settling Trusts**," together with the Original

Settling Trusts, the "**Settling Trusts**") the appropriate amount of their Repurchase Claims; (c)

determine, for all of the Settling Trusts, the amount of their Servicing Claims; and (d) advise the

RMBS Trustees regarding any proposed plan of reorganization or liquidation of the Debtors, and

distributions thereunder.[13]

### 5.    Plan Mediation

23.    The Plan Support Agreement, Term Sheets and proposed Plan (including

the RMBS Settlement) were the result of an extensive mediation over the course of some five

months (the "**Plan Mediation**") overseen by sitting Bankruptcy Judge, the Honorable James M.

Peck (the "**Plan Mediator**"). The communications and analyses relating to negotiations

conducted during the Plan Mediation are privileged and confidential by law and pursuant to

agreement, and therefore cannot be disclosed in detail. In general, however, the integrated,

global settlement associated with the Plan Support Agreement must be understood first and

foremost as the product of intense, arms-length negotiations conducted among sophisticated

parties with differing and conflicting interests, under the close supervision and guidance of a

sitting bankruptcy judge.

---

[12]    Law Debenture later joined in the retention of Duff & Phelps.

[13]    The nature of the RMBS Trust Claims varies on a trust by trust basis. For example, certain Settling Trusts
may have Repurchase Claims but not Servicing Claims (or some subset thereof), others may have Servicing
Claims but not Repurchase Claims, and still others may assert claims in each category.

**B.    CLAIMS ALLOWANCE**

   24. The Plan Support Agreement provides for the (a) allowance of the RMBS

Trust Claims and (b) treatment of those claims in accordance with the proposed Plan. As set

forth herein, relying on the advice of its professional advisors, U.S. Bank took steps to assess

whether the allowance of, and distribution on, those claims (which includes the RMBS Trust

Claims of the U.S. Bank RMBS Trusts) under the terms set forth in the Plan Support Agreement

would be reasonable. For the reasons set forth in the following paragraphs, U.S. Bank has

determined in good faith and by relying on its professional advisors, along with taking into

consideration the number and nature of the objections filed to the RMBS 9019 Motion and the

fact that the RMBS settlement was negotiated as part of the Plan Mediation, that the allowance

and treatment of the RMBS Trust Claims as set forth in the Plan Support Agreement and the

proposed Plan are a reasonable compromise of the claims of the U.S. Bank RMBS Trusts.

   **1. Repurchase Claims**

   25. The scope of Duff & Phelps' engagement included, as it relates to the

Repurchase Claims: review of mortgage loan files and origination and servicing documents;

statistical sampling of the mortgage loan pool; and preparation of written and oral reports to U.S.

Bank and the other RMBS Trustees relating to the quantification and allocation of the

Repurchase Claims.

    (a) **Original Settling Trusts**

     (i) **Valuation of Claims**

   26. In the course of its engagement, Duff & Phelps conducted a sampling

review of more than 6,500 mortgage loan files provided by the Debtors in an effort to identify

breaches of representations and warranties, and used statistical methodologies to estimate the

incidence of those breaches across the population of mortgage loans in the RMBS Trusts. Duff & Phelps also used historical information and financial analysis to calculate the total present and projected future losses experienced by the RMBS Trusts. Duff & Phelps concluded that the range of Repurchase Claims for the Original Settling Trusts was between $6.5 billion and $10.2 billion.

27.    It is U.S. Bank's understanding that the Repurchase Claims, if litigated on an individual basis, would be subject to significant litigation risks and factual and legal defenses. Many of those risks and defenses are identified in the Committee Objection and in the *Steering Committee Investors' Statement in Support of Settlement and Response to Settlement Objections* [ECF No. 1739] (the "**Steering Committee Statement**"). The litigation of the Repurchase Claims would be an uncertain, expensive and protracted process, and even if such litigation were successful, it likely would deplete the Debtors' estates, and may result in diminished recoveries to all creditor constituencies, including the RMBS Trusts. *See* Steering Committee Statement, ¶¶ 8, 28-32.

28.    In light of the conclusion of Duff & Phelps regarding the estimated range of the Repurchase Claims, and considering the substantial risks and defenses associated with litigating those claims in the absence of a consensual resolution, on or about February 4, 2013, U.S. Bank, BNY Mellon, Deutsche Bank and Law Debenture, in furtherance of the Court's request that they advise the Court of their views of the Original Settlement Agreement in advance of the hearing on the RMBS 9019 Motion, filed the *RMBS Trustees' Statement Regarding Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of RMBS Trust Settlement Agreements* [ECF No. 2833] (the "**Trustees' Statement**"). The Trustees' Statement stated, among other things, that:

12

> After careful consideration of relevant factors and analysis,
> including (a) the results of its review of a statistically significant
> number of loan files in the [Original] Settling Trusts provided by
> the Debtors, (b) the estimation of projected total collateral losses
> and underwriting breach rates in the [Original] Settling Trusts, (c)
> the estimation of likely agree rates with respect to the [Original]
> Settling Trusts (which take into account the litigation risk
> associated with the relative characteristics of the breach), and (d)
> consideration of causality factors (which take into account the
> litigation risk associated with a lack of causal relationship between
> the breach and loss), Duff [& Phelps] advised [BNY Mellon,
> Deutsche Bank, U.S. Bank and Law Debenture] that the amount of
> [up to 8.7 billion] is within a reasonable range to settle the
> [Original] Settling Trusts' Repurchase Claims ...

Trustees' Statement, at ¶ 10.

29.    Those RMBS Trustees further stated in the Trustees' Statement that:

> Assuming no changes in the facts and controlling law underlying
> the Repurchase Claims, and subject to the RMBS Trustees'
> determination that all provisions of the RMBS Trust Settlement are
> fair, equitable and reasonable to the Settling Trusts, the RMBS
> Trustees have determined that the Allowed Claim falls within a
> reasonable range to resolve the Settling Trusts' Repurchase Claims
> and the Debtors' proposed Revised Claim Allocation Methodology
> for allocating the Allowed Claim among the Settling Trusts is fair
> and equitable to those trusts.

*Id.* at ¶12.

### (ii)    **Allocation of Claims**

30.    Duff & Phelps also evaluated the methodology in the Original Settlement

Agreement regarding allocation to each of the RMBS Trusts of the Allowed Claim. That

proposed methodology allocated the Allowed Claim among the Original Settling Trusts pro rata

on the basis of net expected lifetime losses. In response to suggestions by Duff & Phelps, and

after lengthy discussions with the Steering Committee Consenting Claimants and the Debtors,

the methodology was modified (the "**Revised Claim Allocation Methodology**") to provide for

the Allowed Claim to be allocated pro rata based on differences among the RMBS Trusts in the

incidence of breaches of representations and warranties, as revealed by additional loan sampling
and statistical work to be performed by Duff & Phelps. In light of Duff & Phelps' analysis, U.S.
Bank concluded that the Revised Claim Allocation Methodology was reasonable.

31.    Consistent with Duff & Phelps' recommendations, the Revised Claim
Allocation Methodology is set forth in the Supplemental Term Sheet and is part of the RMBS
Settlement. *See* Supplemental Term Sheet, Schedule A to Annex III.

**(b)    Additional Settling Trusts**

32.    It consistently has been contemplated by the RMBS Trustees that the
resolution of the RMBS Trust Claims would need to include the claims of all RMBS Trusts, not
just the Original Settling Trusts. In that regard, the RMBS Trustees, working together with Duff
& Phelps, identified additional RMBS Trusts with RMBS Trust Claims (the "**Additional
Settling Trusts**," together with the Original Settling Trusts, the "**Settling Trusts**").

33.    The calculation of the Repurchase Claims of the Additional Settling Trusts
was completed by Duff & Phelps using the same methodologies it employed to quantify the
Repurchase Claims of the Original Settling Trusts. Based on those methodologies, as of the date
the Supplemental Term Sheet was agreed to, Duff & Phelps had preliminarily determined that
the aggregate amount of the Repurchase Claims of the Additional Settling Trusts[14] was
approximately $950 million. That amount was known to be subject to further refinement, based
on further information required by Duff & Phelps.

34.    The Additional Settling Trusts are included in the RMBS Settlement and
their claims will receive treatment thereunder that is consistent with the treatment being accorded
to the like claims of the Original Settling Trusts.

---

[14]    The claims of each RMBS Trusts are based on the applicable Transaction Documents and therefore only
certain Additional Settling Trusts have Repurchase Claims.

14

(c)    **Claims Allowance**

35.    The Allowed Claim in the Original Settlement Agreement has been

adjusted under the RMBS Settlement and Plan Support Agreement.  Specifically, pursuant to the

Supplemental Term Sheet:

> ... all RMBS Trust Claims of the Original Settling Trusts and the
> Additional Settling Trusts shall be fully and finally allowed as non-
> subordinated unsecured claims in the aggregate amount of $7.051
> billion for the Original Settling Trusts and in the aggregate amount
> of $250 million for the Additional Settling Trusts (collectively, the
> "Allowed RMBS Trust Claims") and allocated $209.8 million to
> the GMACM Debtors and $7,091.2 million to the RFC Debtors;
> provided, however, the allowance and allocation of such claims
> pursuant to this paragraph shall not affect the distributions to be
> made in accordance with the RMBS Trust Allocation Protocol
> (attached hereto as Annex III).

Supplemental Term Sheet at p. 5, ¶5.

36.    The proviso contained in the quoted portion of the Supplemental Term

Sheet was necessary because, based on Duff & Phelps' work, (i) the Repurchase Claims of both

the Original Settling Trusts and the Additional Settling Trusts are in different amounts than the

amounts stated in the Supplemental Term Sheet, and the allocation of those Repurchase Claims

as between the GMACM Debtors and the RFC Debtors is different than the allocation made by

the Debtors; and (ii) the allocations of claims made by the Debtors did not include a specific

allocation of the Servicing Claims (after an agreed upon allowance at $96 million, as discussed

below) as between the GMACM Debtors and the RFC Debtors.  While these differences did not

diminish the total Distribution Amount for RMBS Trust Claims, they do impact the amount that

will be distributed to Class GS-6 and Class RS-6 and the individual RMBS Trusts therein, which

could impact the ultimate distributions under the Plan contemplated by the Plan Support

Agreement among the RMBS Trusts.  Accordingly, the RMBS Trustees requested, and the other

parties to the Plan Support Agreement agreed, that the distributions for those claims, whether to

the GMACM Debtors or the RFC Debtors, be subject to the RMBS Trust Allocation Protocol,

which will allow Duff & Phelps to ensure that the ultimate distributions to any particular RMBS

Trust will not be impacted by the foregoing factors or other factors that were not addressed in the

Supplemental Term Sheet.[15]

37.    The amounts set forth in the Supplemental Term Sheet reflect the

exclusion from the Allowed Claim of approximately $1.6 billion in claims held by the Insured

RMBS Trusts (as defined in the Supplemental Term Sheet).  The Insured RMBS Trusts (other

than those insured by FGIC) have received, and in the future are assumed to receive, payment of

their losses directly from the applicable Monoline, which largely eliminates the need for an

allowed Repurchase Claim against the Debtors' estates for the Insured RMBS Trusts.  As noted

in the Supplemental Term Sheet, a separate aggregate claim amount of $250 million will be

allowed to account for the expansion of the RMBS Settlement to include the Additional Settling

Trusts.

38.    Based on the analysis of Duff & Phelps, and in light of the concessions

and agreements contained in the RMBS Settlement, because Duff & Phelps' initial allocation

with respect to the Additional Settling Trusts was preliminary and subject to further refinement

and dispute, and because the Additional Settling Trusts will share in the Distribution Amount (as

described in paragraph 46 hereof) together with the Original Settling Trusts based on the same

formula pursuant to the RMBS Trust Allocation Protocol, U.S. Bank believes it is reasonable to

include the Additional Settling Trusts in the RMBS Settlement.

---

[15]    As noted in the RMBS Trust Allocation Protocol, Duff & Phelps' determinations are subject to further
refinement.

### 2.    Servicing Claims

39.    In order to assist the RMBS Trustees in quantifying the Servicing Claims,
Duff & Phelps analyzed potential liabilities arising from Debtors' multiple roles as Servicer in
the securitization process.  In performing this part of the analysis, Duff & Phelps used publicly-
available data on industry specific litigations and regulatory actions relating to residential
mortgage servicing practices, reviewed the files of a large sampling of litigations specific to the
Debtors; reviewed rating agency evaluation reports for the Debtors; accessed and reviewed a
large sampling of the Debtors' records of servicing complaints for Debtor-serviced loans; and
used publicly-available performance data on a sample of the RMBS Trusts.  Duff & Phelps
presented its analysis relating to the quantification of the Servicing Claims both orally and in
writing to the RMBS Trustees.

40.    Based on the analysis of that data, Duff & Phelps attempted to quantify the
Debtors' liability as Servicer as related to: (a) misapplied and miscalculated payments; (b)
wrongful foreclosure and improper loss mitigation practices; and (c) extended foreclosure timing
issues caused by improper or inefficient servicing behavior such as falsified affidavits, improper
documentation and improper collection practices.

41.    Duff & Phelps concluded that the potential liability of the Debtors as
Servicer for just the three bases analyzed (misapplied and miscalculated payments, wrongful
foreclosure and improper loss mitigation practices and extended foreclosure timing issues caused
by improper servicing behavior) could be asserted in amounts up to as much as $1.1 billion, but
that the amount of the claim was subject to uncertainty and material refinement.

42.    Duff & Phelps advised that the assertion of Servicing Claims against the
Debtors involve significant risk and uncertainty.  The RMBS Trustees have been unable to

obtain full discovery regarding potential Servicing Claims, in part because the Debtors assert that

some of the information requested is not reasonably available.  The amount of information and

data that would be needed in order to assert the Servicing Claims in a litigated proceeding is

likely very large and the analysis of that information and data would likely be expensive, time-

consuming and may ultimately lack sufficient certainty to establish the validity of such claims in

a contested proceeding.

   43. Furthermore, the Debtors may have viable defenses to the assertion and

quantification of any Servicing Claims, the resolution of which is uncertain.  For example,

certain of the Transaction Documents provide that the Servicer can be held liable only if it can be

shown to have acted in a negligent or grossly negligent manner.  In addition, certain of the

defenses discussed in the Committee's Objection also would be available to the Debtors as

Servicer. *See supra* at ¶ 27.

   44. Under the Plan Support Agreement, the Servicing Claims are allowed in

the aggregate amount of $96 million.  Based on the analysis performed by Duff & Phelps, and in

recognition of the material uncertainty relating to the quantification and assertion of such claims

in a contested proceeding, U.S. Bank has concluded that this amount represents a reasonable

resolution of the Servicing Claims in the context of the Plan Support Agreement, including the

RMBS Settlement.

## C. CLAIMS TREATMENT UNDER THE PLAN

   45. The Plan Support Agreement provides for the allocation of the estimated

"distributable value" of the Debtors' estates (including the AFI Contribution, as described

below).  The details of that agreed upon allocation are set forth in Annex I to the Supplemental

Term Sheet.

46.    Under the Supplemental Term Sheet, certain RMBS Trust Claims are entitled to receive distributions of cash and liquidating trust interests or such other consideration of equivalent value as will not adversely affect the REMIC status of the RMBS Trusts. Specifically, Annex I to the Supplemental Term Sheet provides that the Distribution Amount (as defined therein) allocated for the RMBS Trust Claims is $672.3 million.

47.    The amount of cash and other consideration allocable to the Repurchase Claims will be the Distribution Amount of $672.3 million, less (i) fees payable to counsel to the Institutional Investors in a total amount estimated to be approximately $38.32 million, and (ii) $96 million paid to the RMBS Trusts on account of their Servicing Claims, or approximately $537.98 million. The proposed RMBS Trust Allocation Protocol allocates the assets available for distribution to Repurchase Claims and Servicing Claims between those RMBS Trusts that have Repurchase Claims against the GMACM Debtors and those that have claims against the RFC Debtors.[16]

48.    Pursuant to the RMBS Trust Allocation Protocol, the Cure Claims will receive payment prior to the payment of the other claims of the RMBS Trusts; such treatment is consistent with the assertion by the RMBS Trustees that such claims are "cure claims" entitled to administrative priority.[17]

49.    The Repurchase Claims of Insured RMBS Trusts that are insured by

---

[16]    The Distribution Amount (less attorneys' fees, described above, and the amount attributable to Servicing Claims) will be shared in accordance with the RMBS Trust Allocation Protocol, which is attached as Annex III to the Supplemental Term Sheet, and the amount to be distributed and allocated will be subject to certain adjustments.

[17]    The total allowed amount of Servicing Claims, including Cure Claims and Other Servicing Claims, is capped at $96 million. Within that capped amount, the RMBS Trustees anticipate that to the extent the Other Servicing Claims are general unsecured claims, they will be treated pari passu with the Repurchase Claims, and to the extent that are entitled to administrative priority, they will be treated pari passu with the Cure Claims.

Monolines other than FGIC generally are not allowed against the Debtors' estates because it is
contemplated that those trusts will receive payments directly from the applicable Monoline on
account of losses associated with those claims. The rights of Insured RMBS Trusts are reserved
in the event that the applicable Monoline does not honor its obligations.

      50.     With regard to FGIC Insured RMBS Trusts, FGIC will pay to the RMBS
Trustees, for distribution to such trusts, a lump sum cash payment of $253.3 million (the "**FGIC
Lump Sum Payment**"). The RMBS Trustees of the FGIC Insured RMBS Trusts (the "**FGIC
RMBS Trustees**") will determine, based off of the analysis done by Duff & Phelps, the portion
of the FGIC Lump Sum Payment that will be allocated to each FGIC Insured RMBS Trust based
on each trust's allocable share of its accrued and unpaid claims and estimated future claims
under its policy or policies with FGIC (the "**FGIC Policies**").

**D.**      **FACTORS SUPPORTING SETTLEMENT**

      51.     The RMBS Settlement is part of an integrated, multifaceted agreement
among numerous constituencies that was born as the result of a lengthy, highly contentious Plan
Mediation. Prior to entering such agreement, U.S. Bank considered the benefits and risks
associated with reaching an overall consensual plan of reorganization, as well as the risks and
uncertainties associated with litigating the RMBS Trust Claims in the absence of a consensual
plan.

      **1.**      **The AFI Contribution**

      52.     One significant facet of the global settlement is the resolution of claims
against AFI and the quantification of the contribution by AFI to the Debtors' estates at $2.1
billion in value (the "**AFI Contribution**"). Pursuant to the Original 9019 Motion, AFI
previously was willing to make a contribution limited to $750 million.

53.    U.S. Bank considered the substantial increase in the amount of the AFI

Contribution; the certainty associated with fixing the AFI Contribution; the added value to the

Debtors' estates by virtue of the AFI Contribution; and the avoidance of the delay and expense

associated with litigation relating to AFI's liability to the Debtors' estates, to collectively be of

significant benefit to the RMBS Trusts.

## 2.    Litigation Risks

54.    The Chapter 11 Cases are at the precipice of several kinds of what would

be anticipated to be lengthy and expensive litigation that could affect the recoveries of the

RMBS Trusts.

55.    *First*, the Plan Support Agreement contemplates the fixing of claims that

the RMBS Trustees expect would otherwise be contested in time-consuming and uncertain

proceedings.  Objections to the RMBS 9019 Motion, including those of FGIC, MBIA and the

Committee will no longer be pressed.  The RMBS 9019 Motion remains outstanding and, in the

absence of the overall settlement associated with the Plan Support Agreement, would likely

require a lengthy and expensive hearing.  Upon the conclusion of such hearing, while the Court

might authorize the Debtors to perform the Original Settlement Agreement, it is also possible

that the Court might sustain one or more of the objections filed to the RMBS 9019 Motion.  If

the Court declined to grant the RMBS 9019 Motion, the allowance of Repurchase Claims of the

Original Settling Trusts would be left to the expensive and uncertain process of claims litigation.

Thus, allowance of the RMBS Trust Claims, as contemplated by the Plan Support Agreement,

offers the benefits of allowance consistent with the RMBS 9019 Motion without the risks

attendant to that contested matter.

56.    In addition, the Plan Support Agreement permits the determination of, and

21

distribution under the proposed Plan on, the Repurchase Claims of the Additional Settling Trusts without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims.

57.    The Plan Support Agreement also provides for the allowance of, and distribution under the proposed Plan on, the Servicing Claims of the RMBS Trusts. As set forth above, those claims were the subject of an analysis by Duff & Phelps and were roughly quantified, but presentation of those claims would have required further discovery and analysis, likely leading to litigation over both the quantification of the claims and their relative priority. The treatment of the Servicing Claims represents a meaningful recovery to the RMBS Trusts possessing such claims, without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims.

58.    *Second*, many of the contentious and complicated inter-creditor issues in these cases are resolved by the Plan Support Agreement, including, among other things, the priority of certain claims asserted by the Monolines and by certain other securities claimants. In particular, both the amount of the claims of the Monolines and the relationship between those claims and the RMBS Trust Claims are the subject of disputes, and the resolution of all those disputes through litigation presents both a general risk of delay and expense to all stakeholders as well as a specific risk to the RMBS Trusts of dilution. Thus, the Plan Support Agreement, which resolves these inter-creditor claims, offers significant benefit to the RMBS Trusts.

59.    *Third,* the ever mounting costs of administration of these Chapter 11 Cases threaten to erode any distribution to unsecured creditors. The Plan Support Agreement and proposed Plan would effectively abate the continued accrual of such costs.

22

3.    **The FGIC Rehabilitation Proceeding and FGIC Settlement**

60.    With regard to the forty seven FGIC Insured RMBS Trusts (including eight U.S. Bank RMBS Trusts), the fact that FGIC is currently in a state rehabilitation proceeding was a significant complicating factor in resolving the claims of the FGIC Insured RMBS Trusts.

61.    In or about June 2012, the Superintendent of Financial Services of the State of New York filed a rehabilitation petition on behalf of FGIC in the Supreme Court of the State of New York, and was subsequently appointed by the Court as rehabilitator (the "**Rehabilitator**") in a rehabilitation proceeding (the "**FGIC Rehabilitation Proceeding**"). As a result of an injunction entered by the court in that proceeding (and earlier administrative action taken by FGIC's regulator), the FGIC Insured RMBS Trusts have been obligated to continue to pay premiums under the FGIC Policies, notwithstanding that FGIC was relieved of its obligations to pay claims made by the those trusts under those same policies.

62.    In or about June 2013, the Rehabilitator filed a revised First Amended Plan of Rehabilitation for FGIC (the "**Plan of Rehabilitation**") which contemplates, among other things, for certain payments over time to policyholders on account of claims under FGIC-issued insurance policies, including to the FGIC Insured RMBS Trusts on account of the FGIC Policies. The contemplated payments to the FGIC Insured RMBS Trusts under the Plan of Rehabilitation, however, represent only a percentage of the accrued and unpaid claims and the projected future claims of the FGIC Insured RMBS Trusts under the FGIC Policies.

63.    In or about early April 2013, the RMBS Trustees were asked to consider a settlement agreement between the Steering Committee Consenting Claimants, FGIC and MBIA (the "**Proposed Monoline Agreement**"). Pursuant to the Proposed Monoline Agreement,

23

among other things, FGIC would pay to the FGIC Insured RMBS Trusts the FGIC Lump Sum

Payment and forgo future premiums with respect to the FGIC Policies (estimated by Duff &

Phelps to be approximately $18.3 million).  In exchange, the FGIC RMBS Trustees would

release and discharge FGIC from all obligations and liabilities under the FGIC Policies.  Those

terms formed the basis of a Settlement Agreement, entered into as of May 23, 2013 by and

among the Debtors, FGIC, the FGIC RMBS Trustees and the Institutional Investors (the "**FGIC**

**Settlement**") which is a central piece of RMBS Settlement and the Plan Support Agreement.

64.    At the request of the FGIC RMBS Trustees, Duff & Phelps conducted an

analysis of the economic terms of the FGIC Settlement, using both publicly-available and non-

public information from Lazard, the financial advisor to the Rehabilitator, as to projected future

claims and anticipated payouts pursuant to the Plan of Rehabilitation.  Duff & Phelps utilized

this information to compare the FGIC Lump Sum Payment under the FGIC Settlement with the

discounted value of the stream of payments the FGIC Insured RMBS Trusts would be projected

to receive under the Plan of Rehabilitation if the FGIC RMBS Trustees declined to enter into the

FGIC Settlement.

65.    Based on its analysis of the respective benefits to the FGIC Insured RMBS

Trusts of the FGIC Settlement and those that such trusts would enjoy under the Plan of

Rehabilitation, Duff & Phelps advised the FGIC RMBS Trustees that the FGIC Settlement,

including the FGIC Lump Sum Payment, represented a reasonable resolution of the accrued and

unpaid claims and projected future claims against FGIC under the FGIC Policies.

66.    Based on the analysis provided by Duff & Phelps, U.S. Bank concluded

that the treatment of the claims of the FGIC Insured RMBS Trusts under the Plan Support

Agreement was reasonable.

4.    **Support of Other Creditor Constituencies**

67.    The Institutional Investors, which hold significant, and for some RMBS

Trusts controlling, investments in certificates issued by the RMBS Trusts were informed,

involved, in regular communication with the RMBS Trustees and supportive of the RMBS

Settlement.  The Institutional Investors were active participants in the Plan Mediation and the

negotiations that led to the overall settlement associated with the Plan Support Agreement.  The

Institutional Investors were aware of all of the compromises that evolved during the Plan

Mediation and negotiations leading to the Plan Support Agreement, and they communicated

through their counsel to the RMBS Trustees that they fully supported the Plan Support

Agreement and the proposed Plan.

E.    **NOTICE TO HOLDERS IN THE U.S. BANK RMBS TRUSTS**

68.    U.S. Bank has regularly provided to the Holders in the U.S. Bank RMBS

Trusts notice of matters related to the RMBS 9019 Motion and other significant events in the

Chapter 11 Cases.  For the Holders in U.S. Bank RMBS Trusts, U.S. Bank provided the

following notices during the early stages of the Chapter 11 Cases:

- On May 30, 2012, an informational notice to Holders in the U.S. Bank RMBS Trusts in the Original Setting Trusts which advised of the Chapter 11 Cases, various plan support agreements, the plan term sheet, the Original Settlement Agreement, an RMBS Trust plan support agreement between AFI and certain institutional investors, the AFI settlement, the proposed sale of the Debtors' mortgage origination and servicing businesses and certain deadlines in those pleadings and agreements.  This notice advised Holders how to obtain information in the Chapter 11 Cases, urged them to carefully review the pleadings and to consult with their own advisors (the "**Initial Notice**").

- On June 18, 2012, a notice to Holders in the U.S. Bank RMBS Trusts in the Original Settling Trusts which advised Holders that they may object to (1) the original RMBS 9019 Motion, and (2) the Debtors' motion to assume plan support agreements with certain settling investors.  The notice also provided additional information regarding those motions, advised Holders that U.S. Bank was not a party to the Original RMBS Settlement Agreement and the

25

plan support agreements and urged Holders to carefully review the pleadings and consult with their own advisors (the "**Supplemental Notice**").

- On June 18, 2012, a notice to Holders for certain Additional Settling Trusts which included the information provided in the Initial Notice and the Supplemental Notice.

69.     Following the filing of the initial RMBS 9019 Motion, U.S. Bank, together with the BNY Mellon, Deutsche Bank and Wells Fargo, jointly retained an agent, The Garden City Group, Inc. ("**GCG**") to coordinate and facilitate notice to Holders in the RMBS Trusts regarding the RMBS 9019 Motion, developments with respect to the RMBS 9019 Motion, and other important events in the Chapter 11 Cases.

70.     On behalf of the RMBS Trustees, GCG provided certain administrative services in connection with noticing various Holders, including the coordination and facilitation of the dissemination of notices to the various Holders at the direction and on behalf of the RMBS Trustees, and in connection with the creation and maintenance of a website (the "**RMBS Trustee Website**") for Holders that provides, among other things, contact information for the RMBS Trustees, significant relevant developments in the Chapter 11 Cases, links to relevant documents filed in the Chapter 11 Cases, and upcoming Court deadlines and hearing dates.

71.     As described in more detail in the Affidavit of Jose C. Fraga, sworn to June 7, 2013, and filed contemporaneously herewith, on behalf of the RMBS Trustees, GCG has distributed, as of the date hereof, the following notices to be published to various Holders and posted on the RMBS Trustee Website:

- On August 22, 2012, following the filing of the Chapter 11 Cases and the First Supplemental RMBS 9019 Motion, a "Time Sensitive Notice Regarding a Proposed Settlement Between Residential Capital, LLC, et al. and the Settlement Trusts."

- On October 17, 24 and 31, 2012, at or about the time of the Second Supplemental RMBS 9019 Motion, a notice entitled "Time Sensitive Notice

> Regarding (a) Order Setting Last Date to File Claims Against Debtors
> Residential Capital, LLC and Certain of its Direct and Indirect Subsidiaries,
> and (b) Updates of Matters Relevant to Certain Certificateholders."

- On January 24, 2013 and February 1, 2013, a "Time Sensitive Notice
  Regarding Sale of Debtors' Servicing Platform to Ocwen Loan Servicing,
  LLC."

- On April 8, 9 and 12, 2013, a "Notice Regarding Closing of Sale of Debtors'
  Servicing Platform to Ocwen and Update of 9019 Settlement."

- On May 24, 2013, at or about the time of the Plan Support Motion, a "Time
  Sensitive Notice Regarding (a) Plan Support Agreement Among ResCap
  Debtors and the RMBS Trustees, Among Others, and (b) Settlement
  Agreement Among the Debtors, Financial Guaranty Insurance Company and
  Certain of the RMBS Trustees."

72.    Finally, on June 4, 2013, U.S. Bank distributed a "Time Sensitive Notice

Regarding Settlement Agreement Among the ResCap Debtors, Financial Guaranty Insurance

Company and the FGIC Trustees" (the "**Holder FGIC Settlement Notice**"), dated June 4, 2013,

a copy of which is attached hereto as Exhibit 1. The Holder FGIC Settlement Notice was

provided by U.S. Bank to the Holders in the eight FGIC Insured U.S. Bank RMBS Trusts. The

Holder FGIC Settlement Notice provided additional information to the Holders in those trusts

regarding the Rehabilitation Proceeding, FGIC Settlement, their rights thereunder, the process

for Holders to object to the FGIC Settlement in the Rehabilitation Proceeding and how to obtain

information on the cash amount FGIC will pay to a particular trust. The Holder FGIC Settlement

Notice and certain pleadings in the FGIC Rehabilitation Proceeding have also been posted on the

RMBS Trustee Website.

Dated this 10th day of June, 2013

Mamta K. Scott

SK 03687 0119 1387052.12

27

# EXHIBIT 1

SK 03687 0119 1385897 v5

**TIME SENSITIVE NOTICE**
**REGARDING SETTLEMENT AGREEMENT AMONG THE RESCAP DEBTORS,**
**FINANCIAL GUARANTY INSURANCE COMPANY AND THE FGIC TRUSTEES**

**NOTICE IS HEREBY GIVEN BY:**

**THE BANK OF NEW YORK MELLON,**
**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,**
**U.S. BANK NATIONAL ASSOCIATION,**
**WELLS FARGO BANK, N.A., AND**
**LAW DEBENTURE TRUST COMPANY OF NEW YORK**

**IN THEIR SEVERAL CAPACITIES AS TRUSTEES, INDENTURE TRUSTEES AND/OR SEPARATE TRUSTEES (COLLECTIVELY, THE "FGIC TRUSTEES" AND EACH, AN "FGIC TRUSTEE"), TO THE HOLDERS (THE "CERTIFICATEHOLDERS") OF CERTIFICATES, NOTES OR OTHER SECURITIES (COLLECTIVELY, THE "CERTIFICATES") UNDER THE RESIDENTIAL MORTGAGE-BACKED SECURITIZATION TRUSTS IDENTIFIED ON SCHEDULE A TO THIS NOTICE (COLLECTIVELY, THE "FGIC TRUSTS" AND EACH A "FGIC TRUST").**

**THIS NOTICE CONTAINS IMPORTANT TIME-SENSITIVE INFORMATION FOR CERTIFICATEHOLDERS AND OTHER PERSONS POTENTIALLY INTERESTED IN THE FGIC TRUSTS. ALL DEPOSITORIES, CUSTODIANS AND OTHER INTERMEDIARIES RECEIVING THIS NOTICE, AS APPLICABLE, ARE REQUESTED TO EXPEDITE ITS RE-TRANSMITTAL TO CERTIFICATEHOLDERS IN A TIMELY MANNER. FAILURE TO ACT PROMPTLY IN COMPLIANCE WITH THIS PARAGRAPH MAY IMPAIR THE ABILITY OF THE CERTIFICATEHOLDERS ON WHOSE BEHALF SUCH INTERMEDIARIES ACT TO CONSIDER THE MATTERS DESCRIBED IN THIS NOTICE IN A TIMELY FASHION.**

Dated: June 4, 2013

This notice (the "Notice") is given to you by the FGIC Trustees under the Pooling and Servicing Agreements (including Series Supplements and Standard Terms of Pooling and Servicing Agreements), and Indentures and related Servicing Agreements (collectively, the "Governing Agreements") governing the FGIC Trusts. This Notice incorporates by reference the notice given by the RMBS Trustees (as defined therein) regarding (A) the Plan Support Agreement, dated May 13, 2013 (the "Plan Support Agreement"), among the ResCap Debtors and the RMBS Trustees (including the FGIC Trustees), among others, and (B) the Settlement Agreement among the Debtors, Financial Guaranty Insurance Company and Certain of the RMBS Trustees(including the FGIC Trustees), dated May 24, 2013 (the "May 24 Notice"). In the event of any inconsistencies between the May 24 Notice and this Notice, this Notice shall govern.

Capitalized terms used but not defined herein shall have the meanings assigned to them in the Governing Agreements or in the FGIC Settlement Agreement, as defined below.

THIS NOTICE CONCERNS A PROPOSED SETTLEMENT OF, AMONG OTHER THINGS, THE PRESENT AND FUTURE CLAIMS OF THE FGIC TRUSTS AGAINST FINANCIAL GUARANTY INSURANCE CORPORATION ("FGIC") UNDER THE INSURANCE POLICIES (THE "POLICIES") ISSUED BY FGIC IN RESPECT OF THE TRUSTS.[1]

IF THE FGIC SETTLEMENT AGREEMENT IS APPROVED BY THE STATE COURT AND THE BANKRUPTCY COURT, IT WILL BIND EACH APPLICABLE FGIC TRUST AND THE RELATED CERTIFICATEHOLDERS. THE PROPOSED FGIC SETTLEMENT AGREEMENT MATERIALLY AFFECTS THE INTERESTS OF THE CERTIFICATEHOLDERS. THE FGIC TRUSTEES THEREFORE RESPECTFULLY REQUEST THAT ALL CERTIFICATEHOLDERS AND OTHER NOTICE RECIPIENTS READ THIS NOTICE AND RELATED MATERIALS CAREFULLY IN CONSULTATION WITH THEIR LEGAL AND FINANCIAL ADVISORS. CERTIFICATEHOLDERS THAT DO NOT WANT THE FGIC SETTLEMENT AGREEMENT TO BECOME EFFECTIVE SHOULD CONSIDER OBJECTING TO ITS APPROVAL IN THE STATE COURT ON OR BEFORE THE DEADLINE OF JULY 16, 2013 AT 3:00 P.M. (PREVAILING EASTERN TIME) AND/OR IN THE BANKRUPTCY COURT ON OR BEFORE THE DEADLINE THAT WILL BE SET ONCE THE NOTICE OF THE MOTION TO APPROVE THE FGIC SETTLEMENT AGREEMENT IS FILED (SUCH NOTICE IS EXPECTED TO BE FILED ON OR BEFORE JUNE 7, 2013).[2]

## I.    Background--ResCap Bankruptcy Filing and FGIC Rehabilitation Proceeding.

On May 14, 2012, Residential Capital, LLC, and certain of its direct and indirect subsidiaries (collectively, "ResCap" or the "Debtors") filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (*In re Residential Capital, LLC*, Case No. 12-12020 (MG) and related cases) (collectively, the "Chapter 11 Cases"). To obtain information regarding the Chapter 11 Cases, please see Section VI, below.

Pursuant to an order dated June 28, 2012, the Supreme Court of the State of New York (the "State Court") appointed Benjamin M. Lawsky, Superintendent of Financial Services of the State of New York, as rehabilitator (the "Rehabilitator") of FGIC in the rehabilitation proceeding styled *In the Matter of the Rehabilitation of Financial Guaranty Insurance Company*, Index No. 401265/2012 (the "Rehabilitation Proceeding").

---

[1] Terms not otherwise defined in these initial summary paragraphs are defined below.

[2] When the notice of the motion seeking Bankruptcy Court approval of the FGIC Settlement Agreement (the "FGIC Motion") is filed with the Bankruptcy Court, it will be available at http://www.rescaprmbssettlement.com, or from The Garden City Group ("GCG") by contacting GCG in the manner described in Section VI, below, and other means as set forth in Section VI. Any Certificateholder of a FGIC Trust may object to the approval of the FGIC Settlement Agreement in the Bankruptcy Court pursuant to the terms of the FGIC Motion.

2

## II.     The FGIC Settlement Agreement.

On May 23, 2013, ResCap, FGIC, and the FGIC Trustees as trustees or separate trustees under the FGIC Trusts, and certain other parties (collectively, the "**FGIC Settlement Parties**") entered into a settlement agreement (the "**FGIC Settlement Agreement**") pursuant to which the FGIC Settlement Parties settled their claims against each other, including the claims of the FGIC Trusts against FGIC for claims under the Policies under which FGIC insured the payment of principal and interest owing on certain of the Certificates.  According to the terms of the FGIC Settlement Agreement, among other things, (a) each FGIC Settlement Party shall release the other FGIC Settlement Parties in respect of the Policies and other Policy Agreements (as defined in the FGIC Settlement Agreement), including the release by the FGIC Trusts of current claims in the amount of at least $789 million, and future claims against FGIC, (b) FGIC will pay to the FGIC Trusts for distribution to Certificateholders holding Certificates insured by the Policies cash in the aggregate amount of $253.3 million in settlement of the FGIC Trusts' claims against FGIC, (c) the FGIC Trustees shall release the Debtors in respect of Origination-Related Provisions (as defined in the FGIC Settlement Agreement), (d) FGIC will not be liable for any further payments under the Policies and other Policy Agreements, and (e) the FGIC Trusts will no longer make premium, reimbursement, or other payments to FGIC.[3]  Copies of the FGIC Settlement may be obtained at http://www.rescaprmbssettlement.com, at www.fgicrehabilitation.com or from GCG by contacting GCG in the manner described in Section VI, below.

In accordance with the allocation methodology set forth in Exhibit F to the FGIC Settlement Agreement, the FGIC Trustees, in consultation with their advisors, will have sole and exclusive authority to determine the share of the $253.3 million payable to each FGIC Trust and the allocation of such share among the CUSIPs issued by each such FGIC Trust that are insured by a Policy.  On or before July 3, 2013, the FGIC Trustees will notify FGIC in writing of the cash amount that FGIC shall pay to each FGIC Trust once the FGIC settlement is effective.

**As of July 3, 2013, the FGIC Trustees will make available to any Certificateholders holding Certificates insured by a Policy information as to the cash amount that FGIC will pay to the FGIC Trust(s) that issued such Certificates, provided that any such Certificateholder submits a proper request for such information to the FGIC Trustee(s) for such FGIC Trust(s), and provides appropriate verification of its holdings.**

---

[3] Pursuant to the FGIC Settlement Agreement, FGIC will receive an allowed claim against certain of the Debtors in the aggregate amount of (i) approximately $934 million, if the chapter 11 plan contemplated by the Plan Support Agreement attached to the FGIC Settlement Agreement as Exhibit C goes effective, or (ii) $596.5 million, if the Plan Support Agreement is terminated in accordance with its terms and the chapter 11 plan contemplated thereby does not go effective, subject to FGIC's right to assert a claim against each of three of the Debtors, in each case up to the amount of $596.5 million.  FGIC has agreed under the Plan Support Agreement to cap its recovery from ResCap under (i), above, to $206.5 million.  For more information on the Plan Support Agreement, please review the May 24 Notice.

3

**CERTIFICATEHOLDERS OF A FGIC TRUST ARE URGED TO REVIEW
CAREFULLY THE FGIC SETTLEMENT AGREEMENT AND TO CONSULT WITH
THEIR ADVISORS.**

### III.    The Rehabilitation Proceeding and Related Deadlines.

On May 29, 2013, an affirmation (the "**Affirmation**") in support of the Rehabilitator's motion
for an order approving the FGIC Settlement Agreement and relevant portions of the Plan Support
Agreement was filed in the State Court. On May 30, 2013, the State Court entered an order to
show cause (the "**Order to Show Cause**") setting forth a schedule of deadlines and the date of a
hearing to consider approval of the FGIC Settlement Agreement and relevant portions of the Plan
Support Agreement (the "**State Court Hearing**"). Copies of the Affirmation and the Order to
Show Cause may be obtained at **www.fgicrehabilitation.com**, at
**http://www.rescaprmbssettlement.com** or from GCG by contacting GCG in the manner
described in Section VI, below. Pursuant to the Order to Show Cause, the State Court Hearing
will take place on August 6, 2013 at 10:00 a.m. at IAS Part 36, Room 428, thereof, at the
Courthouse located at 60 Centre Street, New York, New York.

**Any Certificateholder objecting to any aspect of the FGIC Settlement Agreement must file
an objection with the State Court, and serve a copy of such objection via email upon
gary.holtzer@weil.com and joseph.verdesca@weil.com, attorneys for the Rehabilitator, so
that such objection is received on or before July 16, 2013 at 3:00p.m. (the "State Court
Objection Deadline").**

If no objection is filed on or before the State Court Objection Deadline, pursuant to the Order to
Show Cause, the State Court may approve the FGIC Settlement Agreement without holding the
State Court Hearing.[4]

### IV.    Certificateholders Can Object to the FGIC Settlement Agreement.

*Any Certificateholder objecting to any aspect of the FGIC Settlement Agreement can file an
objection with the Bankruptcy Court as set forth in footnote 2, above, and/or in the State
Court as set forth in Section III, above. If a Certificateholder of a FGIC Trust does not file a
timely objection to the FGIC Settlement Agreement in the Bankruptcy Court or Rehabilitation
Proceeding or if such Certificateholder's timely objection(s) are overruled, so long as the
FGIC Settlement Agreement is approved by the Bankruptcy Court and the State Court, such
Certificateholder will be bound by the terms of the FGIC Settlement Agreement.[5] If approved*

---

[4] As noted in footnote 2, above, Certificateholders of a FGIC Trust may also object to the FGIC Motion in the
Bankruptcy Court.

[5] Note that Bankruptcy Court approval of a plan of reorganization for the Debtors is *not* a condition to the
effectiveness of the FGIC Settlement Agreement. By its terms, the FGIC Settlement Agreement will become
effective if and when both the Bankruptcy Court and the Rehabilitation Court have entered final orders approving it.
The May 24 Notice incorrectly stated that the Bankruptcy Court approval of a plan of reorganization for the Debtors
was a condition to the effectiveness of the FGIC Settlement Agreement.

*by the Bankruptcy Court and the State Court, all Certificateholders holding Certificates insured by FGIC's Policies, and any other persons or entities who received this Notice, will be bound by the FGIC Settlement Agreement and the settlements, releases and discharges contained therein, regardless of whether any Certificateholder or other person or entity appeared before the Bankruptcy Court and/or at the State Court Hearing or submitted an objection.*

*Certificateholders should review with their advisors the relevant Governing Agreements and any applicable orders that have been entered by the State Court, including the Order of Rehabilitation, dated June 28, 2012, to determine what legal position, if any, they intend to assert.*

**V.    This Notice Is a Summary.**

This Notice is not intended as, nor does it provide, a detailed restatement of the FGIC Settlement Agreement, relevant law or relevant legal procedures.  The FGIC Trustees do not intend to send any further notices with respect to the matters addressed herein, and Certificateholders and other potentially interested persons are urged to review carefully the FGIC Settlement Agreement, any related notices, and other related pleadings that have been filed, and that subsequently may be filed, in the Chapter 11 Cases and in the Rehabilitation Proceeding, and to consult with their own legal and financial advisors.

**VI.    Other Sources of Information.**

Information relevant to the FGIC Settlement Agreement, the Plan Support Agreement, and any notices thereof will be available at **http://www.rescaprmbssettlement.com**, which will be updated regularly with related material documents filed or orders entered by the Bankruptcy Court and the State Court.  Certificateholders may also access documents filed in the Rehabilitation Proceeding at **www.fgicrehabilitation.com**.  If a Certificateholder has any questions or would like to request copies of any of the relevant documents, Certificateholders may call GCG at (866) 241-7538 in the United States, +1 (202) 470-4565 outside the United States, or send an email to **questions@ rescaprmbssettlement.com**.

Certificateholders may also obtain any documents filed with the Bankruptcy Court in the Chapter 11 Cases by visiting ResCap's claims agent website at **http://www.kccllc.net/rescap**, or by logging on to PACER at **https://www.uscourts.gov** (a small fee is charged for this service).  Documents filed in the Chapter 11 Cases may also be viewed during normal business hours at the Clerk's Office of the Bankruptcy Court, located at One Bowling Green, New York, New York 10004.

The Committee appointed in the Chapter 11 Cases has established an official website (the "**Committee Website**"), on which basic information concerning the Chapter 11 Cases has been posted, including, but not limited to, relevant contact information, upcoming dates and deadlines, statements and schedules filed by ResCap and a list of answers to frequently asked questions.  The Committee Website can be reached at **http://dm.epiq11.com/RES/Project**.

SK 03687 0119 1385897 v5

Inquiries with respect to any particular FGIC Trust for which The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., U.S. Bank National Association, or Wells Fargo Bank, N.A. serves as FGIC Trustee may be directed to the FGIC Trustee for such FGIC Trust using the "RMBS Trustee Contact Information" for such FGIC Trustee at http://www.rescaprmbssettlement.com. With respect to those FGIC Trusts for which Law Debenture Trust Company of New York serves as separate FGIC Trustee, inquiries may be directed to nytrustco@lawdeb.com. With respect to all other trusts, Certificateholders of those trusts should refer to their respective Governing Agreements for contact information.

**VII.    Other Matters.**

Certificateholders and other persons interested in the FGIC Trusts should not rely on the FGIC Trustees, or on counsel or other advisors retained by the FGIC Trustees, as their sole source of information.

Please note that the foregoing is not intended and should not be construed as investment, accounting, financial, legal or tax advice by or on behalf of the FGIC Trustees, or their directors, officers, affiliates, agents, attorneys or employees. Each person or entity receiving this Notice should seek the advice of its own advisers in respect of the matters set forth herein.

Please be further advised that each of the FGIC Trustees reserves all of the rights, powers, claims and remedies available to it under the Governing Agreements and applicable law. No delay or forbearance by an FGIC Trustee to exercise any right or remedy accruing upon the occurrence of a default, or otherwise under the terms of the Governing Agreements, other documentation relating thereto or under applicable law, shall impair any such right or remedy or constitute a waiver thereof or acquiescence therein.

Each of the FGIC Trustees expressly reserves its rights under each applicable Governing Agreement, including without limitation, its right to recover in full its fees and costs (including, without limitation, fees and costs incurred or to be incurred by such FGIC Trustee in performing its duties, indemnities owing or to become owing to such FGIC Trustee, compensation for such FGIC Trustee's time spent and reimbursement for fees and costs of counsel and other agents it employs in performing its duties or to pursue remedies) and its right, prior to exercising any rights or powers in connection with any applicable Governing Agreement at the request or direction of any Certificateholder, to receive security or indemnity satisfactory to it against all costs, expenses and liabilities which might be incurred in compliance therewith, and all rights that may be available to it under applicable law or otherwise.

6

Please be advised that with respect to any particular inquiry from individual Certificateholders, a FGIC Trustee may conclude that a specific response to such inquiry is not consistent with requirements under applicable law and regulation of equal and full dissemination of information to all Certificateholders.

THE BANK OF NEW YORK MELLON, THE BANK OF NEW
YORK MELLON TRUST COMPANY, N.A., U.S. BANK
NATIONAL ASSOCIATION, WELLS FARGO BANK, N.A.,
AND LAW DEBENTURE TRUST COMPANY OF NEW YORK,
severally, as trustees, and/or indenture trustees or separate trustees
of the FGIC Trusts

7

### Schedule A to June 4, 2013 Notice to Certificateholders in FGIC Trusts

| Trusts Insured by Financial Guaranty Insurance Company ("FGIC") | Trustee | Policy ID |
|---|---|---|
| GMACM 2001-HE2 | The Bank of New York Mellon and The Bank of New York Mellon Trust Company N.A. ("BNYM") | 1010293 |
| GMACM 2002-HE4 | Wells Fargo Bank, N.A. ("WFB")/Law Debenture Trust Company of NY ("LDTC") | 2030026 |
| GMACM 2003-HE2 | WFB/LDTC | 3030009 |
| GMACM 2004-HE5 | WFB/LDTC | 4030047 |
| GMACM 2005-HE2 | WFB/LDTC | 5030041 |
| GMACM 2006-HE2 | BNYM | 6030080 |
| GMACM 2006-HE3 | BNYM | 6030099 |
| GMACM 2006-HE5 | BNYM | 6030127 |
| GMACM 2007-HE2 | BNYM | 7030046 |
| GMACM 2001-HE2 | BNYM | 1010294 |
| GMACM 2001-HE3 | BNYM | 1030013 |
| GMACM 2002-HE1 | WFB/LDTC | 2030009 |
| GMACM 2003-HE1 | WFB/LDTC | 3030008 |
| GMACM 2004-HE1 | WFB/LDTC | 4030006 |
| GMACM 2005-HE1 | WFB/LDTC | 5030011 |
| GMACM 2006-HE1 | BNYM | 6030037 |
| GMACM 2004-HLTV1 | BNYM | 4030036 |
| GMACM 2006-HLTV1 | BNYM | 6030034 |
| RFC, RAMP 2004-RS7 | BNYM | 4030020 |
| RFC, RAMP 2004-RS7 | BNYM | 4030021 |
| RFC, RAMP 2005-EFC7 | U.S. Bank National Association ("USB") | 5030159 |
| RFC, RAMP 2005-NC1 | USB | 5030158 |
| RFC, RAMP 2005-RS9 | BNYM | 5030145 |
| RFC, RASC 2001-KS1 | BNYM | 1010248 |
| RFC, RASC 2001-KS1 | BNYM | 1010249 |
| RFC, RASC 2004-KS7 | BNYM | 4030022 |
| RFC, RASC 2004-KS7 | BNYM | 4030023 |
| RFC, RASC 2004-KS9 | BNYM | 4030032 |
| RFC, RASC 2004-KS9 | BNYM | 4030033 |
| RFC, RASC 2005-EMX5 | USB | 5030153 |
| RFC, RASC 2007-EMX1 | USB | 7030010 |

SK 03687 0119 1386095 v2

| Trusts Insured by Financial Guaranty Insurance Company ("FGIC") | Trustee | Policy ID |
|---|---|---|
| RFC, RFMSI 2005-S2 | USB | 5030006 |
| RFC, RFMSI 2005-S7 | USB | 5030142 |
| RFC, RFMSII 2002-HS3 | BNYM | 2030023 |
| RFC, RFMSII 2003-HS1 | BNYM | 3030004 |
| RFC, RFMSII 2004-HS1 | BNYM | 4030007 |
| RFC, RFMSII 2005-HS1 | BNYM | 5030097 |
| RFC, RFMSII 2005-HS2 | BNYM | 5030143 |
| RFC, RFMSII 2005-HSA1 | BNYM | 5030160 |
| RFC, RFMSII 2006-HSA1 | BNYM | 6030003 |
| RFC, RFMSII 2006-HSA2 | BNYM | 6030022 |
| RFC, RFMSII 2002-HS3 | BNYM | 2030024 |
| RFC, RFMSII 2003-HS1 | BNYM | 3030005 |
| RFC, RFMSII 2003-HS2 | BNYM | 3030017 |
| RFC, RFMSII 2004-HS1 | BNYM | 4030008 |
| RFC, RFMSII 2004-HS3 | BNYM | 4030035 |
| RFC, RFMSII 2005-HS1 | BNYM | 5030098 |
| RFC, RFMSII 2005-HS2 | BNYM | 5030146 |
| RFC, RFMSII 2005-HSA1 | BNYM | 5030161 |
| RFC, RFMSII 2006-HSA2 | BNYM | 6030026 |
| RFC, RAMP 2004-RZ2 | BNYM | 4030012 |
| RFC, RAMP 2004-RZ2 | BNYM | 4030013 |
| RFC, RFMSII 2004-HI2 | BNYM | 4030015 |
| RFC, RFMSII 2004-HI3 | BNYM | 4030034 |
| RFC, RFMSII 2005-HI1 | BNYM | 5030001 |
| RFC, RFMSII 2006-HI2 | BNYM | 6030063 |
| RFC, RFMSII 2006-HI3 | BNYM | 6030087 |
| RFC, RFMSII 2006-HI4 | BNYM | 6030113 |
| RFC, RFMSII 2006-HI5 | USB | 6030135 |
| RFC, RFMSII 2007-HI1 | USB | 7030014 |

SK 03687 0119 1386095 v2

## U.S. Bank FGIC Trusts

| Deal Name | | CUSIP[1] |
|---|---|---|
| RAMP 2005-EFC7 | | 76112BR69,76112BR77,76112BR85, 76112BR93,Class R-I & R-II |
| RAMP 2005-NC1 | | 76112BQ94,76112BR28,76112BR36,76112BT67, Class R-I & R-II |
| RASC 2005-EMX5 | | 76110W7Q3,76110W7R1, 76110W7S9, Class R-I & R-II |
| RASC 2007-EMX1 | | 74924XAB1,74924XAC9,74924XAD7,74924XAE5, 74924XAF2, Class R. |
| RFMSI 2005-S2 | | 76111XTQ6, 76111XTR4, 76111XTS2, 76111XTT0, 76111XTU7, 76111XTV5, 76111XTW3, 76111XTX1, 76111XTY9, 76111XTZ6, 76111XUA9, 76111XUB7, 76111XUC5, 76111XUD3, 76111XUE1, 76111XUF8. |
| RFMSII 2006-HI5 | | 43718VAC8,43718VAD6, Owner Trust Certificate |
| RFMSII 2007-HI1 | | 43718WAC6,43718WAD4, Owner Trust Certificate |
| RFMSI 2005-S7 | | 76111XZR7, 76111XZS5, 76111XZT3, 76111XZU0, 76111XZV8, 76111XZW6, 76111XZX4, 76111XZY2, 76111XZZ9, 76111XA29, 76111XA37, 76111XA45, 76111XA52, 76111XA60, 76111XA78, 76111XA86, 76111XZN6, 76111XZP1, 76111XZQ9 |

---

[1] The CUSIP numbers appearing herein have been included solely for the convenience of the Securityholders. No representation is made as to the correctness of the CUSIP numbers either as printed on the certificates or notes related to the Trusts or as contained in this notice.

A-1