# Trial Exhibit PX-1506

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Brian P. Maloney
Ryan Suser
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee
of Certain Mortgage Backed Securities Trusts*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) |
| | ) Chapter 11 |
| Debtors. | ) |
| | ) Jointly Administered |

**DECLARATION OF MAMTA K. SCOTT,
AS OFFICER OF U.S. BANK, AS RMBS TRUSTEE**

I, Mamta K. Scott, hereby declare, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

1. I am employed by U.S. Bank National Association ("**U.S. Bank**"), and my current title is Vice President and my position is a default group account manager. I have personal knowledge of the facts set forth herein, except as to certain matters that I believe to be true based on (i) information provided by Duff & Phelps, LLC ("**Duff & Phelps**"), (ii) information about positions of parties in these Chapter 11 Cases contained in pleadings that I reviewed, or reported to me by counsel, or learned during my participation in the Plan Mediation (defined below); and (iii) my review of business records of U.S. Bank.

2. This Declaration is submitted in support of the Debtors' Motion Pursuant to Fed.

R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees, and Certain Individual Investors [ECF No. 3929] (the "**FGIC Motion**").[1] The FGIC Trustees[2] filed a Joinder to the FGIC Motion [ECF No. 3982]. The FGIC Motion seeks the entry of an order approving the FGIC Settlement Agreement[3] attached as Exhibit 2 to the FGIC Motion [ECF No. 3929-2]. The FGIC Settlement Agreement, dated May 23, 2013, is among the Debtors, FGIC, the FGIC Trustees and the Institutional Investors.

A.  *Introduction and Overview*

### U.S. Bank's Role as Trustee of Certain FGIC Insured Trusts

3.  The FGIC Trustees serve as trustees or indenture trustees of the FGIC Insured Trusts, all of which were established before 2008. The FGIC Insured Trusts issued residential mortgage backed securities ("**RMBS**") or similar securities. FGIC, a monoline financial guaranty insurance company, issued irrevocable insurance policies (the "**FGIC Policies**") for certain classes of the securities (the "**Securities**") issued by the FGIC Insured Trusts, thereby guaranteeing the payment of principal and interest due on the Securities. At the same time, FGIC entered into an Insurance and Indemnity Agreement with one or more of the Debtors in connection with each of the FGIC Insured Trusts (the "**Insurance Agreements**"). Pursuant to the Insurance Agreements, the Debtor party agreed, among other things, to reimburse FGIC for

---

[1] I have previously submitted a declaration, dated June 10, 2013 (the "Scott PSA Declaration") in support of the (a) Joinder of Certain RMBS Trustees to the Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors' Committee and Certain Consenting Claimants [ECF No. 3940-6] and (b) Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors' Committee and Certain Consenting Claimants [ECF No. 3814].

[2] The FGIC Trustees are The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A. (together, "**BNY Mellon**"), U.S. Bank and Wells Fargo Bank, N.A. ("**Wells Fargo**"), each solely in their respective capacities as trustees or indenture trustees for certain FGIC Insured Trusts.

[3] Capitalized terms used in this declaration but not defined herein have the meanings ascribed to them in the FGIC Motion. For the convenience of the reader, in some cases, definitions found in the FGIC Motion are repeated here.

certain payments FGIC made under the FGIC Policies that resulted from the applicable Debtor's failure to repurchase or substitute mortgage loans that breached one or more representations or warranties contained in the applicable Governing Documents.

4.   U.S. Bank serves as trustee or indenture trustee in respect of eight of the forty-seven FGIC Insured Trusts that are the subject of the FGIC Settlement Agreement (collectively, the "**U.S. Bank FGIC Insured Trusts**").[4]

### The FGIC Rehabilitation Proceeding

5.   In or about June 2012, the Superintendent of Financial Services of the State of New York filed a rehabilitation petition on behalf of FGIC in the Supreme Court of the State of New York, County of New York (the "**Rehabilitation Court**"), and was subsequently appointed by the Rehabilitation Court as rehabilitator (the "**Rehabilitator**") in that proceeding (the "**FGIC Rehabilitation Proceeding**"). As a result of administrative action and a subsequent injunction entered by the Rehabilitation Court, the FGIC Insured Trusts were obligated to continue to pay premiums under the FGIC Policies, but FGIC has been relieved of its obligations to pay claims made under those same policies since late 2009.

6.   On September 27, 2012, the Rehabilitator filed a proposed Plan of Rehabilitation for FGIC (as amended, the "**Rehabilitation Plan**"), which was approved by the Rehabilitation Court on June 11, 2013. The Rehabilitation Plan does not provide for full payment of the claims of policyholders; rather, it contemplates partial distributions to all of FGIC's policyholders, including the FGIC Insured Trusts, on account of present and future claims, over a period of up

---

[4]   A sample Pooling and Servicing Agreement that governs one of the U.S. Bank FGIC Insured Trusts may be found at Exhibit 114 for identification, attached hereto at Tab A. Exhibit 114 is indicative of the Pooling and Servicing Agreements that govern certain of the U.S. Bank FGIC Insured Trusts. A sample Indenture that governs one of the U.S. Bank FGIC Insured Trusts may be found at Exhibit 117 for identification, attached hereto at Tab B. Exhibit 117 is indicative of the Indentures that govern certain of the U.S. Bank FGIC Insured Trusts.

3

to forty years.

### The FGIC Settlement Agreement

7.  During the Plan Mediation in these Chapter 11 Cases, the FGIC Trustees were asked to consider a settlement proposal between the Steering Committee Group,[5] FGIC and MBIA (the "**Settlement Proposal**"). The Settlement Proposal included, among other things, a lump sum payment by FGIC to the FGIC Insured Trusts (the "**Commutation Payment**") in satisfaction of any obligations of FGIC to make payments in the future to the FGIC Insured Trusts under the Rehabilitation Plan (the "**Projected Payments**"). Ultimately, the terms of the Settlement Proposal, including the Commutation Payment, became the basis of the FGIC Settlement Agreement.

8.  The FGIC Trustees requested that their financial advisor in these Chapter 11 Cases, Duff & Phelps, review the financial terms of the Settlement Proposal and, in particular, analyze the value of the Projected Payments under the Rehabilitation Plan with the Commutation Payment and other value to the FGIC Insured Trusts under the FGIC Settlement Agreement. Duff & Phelps did so, and as described in further detail below, in reliance on their analysis and recommendation, U.S. Bank determined in good faith that entering into the FGIC Settlement Agreement was in the best interests of the FGIC Insured Trusts. U.S. Bank understood that the other FGIC Trustees reached the same conclusion.

9.  While the FGIC Trustees considered the merits of the FGIC Settlement

---

[5] The Steering Committee Group was a group of institutional investors in the Settling Trusts, including FGIC Insured Trusts, represented by Gibbs & Bruns LLP. The Talcott Franklin Group was another group of institutional investors in the Settling Trusts, including FGIC Insured Trusts, represented by Talcott Franklin P.C.. The Steering Committee Group, together with the Talcott Franklin Group, are referred to collectively as the "**Institutional Investors**."

4

Agreement on a stand-alone basis, it is also an integral part of a Plan Support Agreement[6] that paves the way for confirmation of a Chapter 11 bankruptcy plan that will produce additional value for investors in the FGIC Insured Trusts.[7] Specifically, under the Plan Support Agreement and the global settlement it embodies, the FGIC Insured Trusts will receive a significant distribution, estimated now to be approximately $92 million, from the Debtors' estates on account of representation and warranty claims against the Debtors. The FGIC Trustees considered this value as well in weighing whether to accept the FGIC Settlement Agreement.

### The RMBS 9019 Motion

10.    Shortly after these Chapter 11 Cases were filed, the Debtors filed a motion (as amended, the "**RMBS 9019 Motion**"), seeking approval of the Debtors' agreements (collectively, as amended, the "**RMBS Settlement Agreement**") with the Institutional Investors. The RMBS Settlement Agreement relates to the Repurchase Claims of 392 RMBS Trusts (the "**Original Settling Trusts**").

11.    Under the RMBS Settlement Agreement, among other things, AFI would contribute $750 million to the Debtors' estates and the Original Settling Trusts would be granted an allowed aggregate claim of up to $8.7 billion (the "**Allowed Claim**").[8] FGIC, among others, opposed the RMBS Settlement Agreement, resulting in substantial litigation and uncertainty, including with respect to the size of the AFI contribution to the Debtors' estates, the size and priority of the Original Settling Trusts' Repurchase Claims, and the validity, priority and

---

[6] "Plan Support Agreement" means, collectively, the Plan Support Agreement and Plan Term Sheet, each dated May 13, 2013, and the Supplemental Plan Term Sheet, dated May 2013.

[7] On July 3, 2013, a plan based on the Plan Support Agreement was filed (the "ResCap Plan") [ECF No. 4153].

[8] The RMBS 9019 Motion provided that "[w]hile the [Original Settlement Agreement] was negotiated by the Institutional Investors, the Trustees of each of the [Original Settling] Trusts will also evaluate the reasonableness of the settlement and can accept or reject the proposed compromise on behalf of each Trust." See ECF No. 320 at ¶4.

5

relationship of those claims to the claims asserted by FGIC and other monoline insurers.

**B.**  ***The FGIC Trustees Acted Reasonably and in Good Faith in Agreeing to the FGIC Settlement Agreement***

12. The process by which the FGIC Trustees, including U.S. Bank, determined to enter the FGIC Settlement Agreement evidences that they acted reasonably and in good faith.

### U.S. Bank's Retention of Qualified Professionals and Experts

13. U.S. Bank retained and has been advised throughout these Chapter 11 Cases, including in connection with its consideration of the FGIC Settlement Agreement, by Seward & Kissel LLP, an experienced and knowledgeable New York law firm.

14. The analysis and comparison of the value of the Projected Payments under the Rehabilitation Plan with the Commutation Payment and other value to the FGIC Insured Trusts under the FGIC Settlement Agreement involved sophisticated financial modeling and required a level of expertise beyond that possessed by U.S. Bank as Trustee. The Governing Documents expressly contemplate in these circumstances that the FGIC Trustees, including U.S. Bank, are entitled to rely on the advice of an expert in evaluating the alternatives.

15. At the outset of these Chapter 11 Cases, U.S. Bank and three other RMBS Trustees (Deutsche Bank,[9] BNY Mellon and Wells Fargo), after a rigorous selection process, had retained Duff & Phelps as their financial advisor. Duff & Phelps was selected over four other qualified candidates based on (a) the firm's experience in handling similar types of engagements involving the evaluation of mortgage loan servicing agreements and loan origination agreements, bankruptcy litigation, restructuring, asset valuation, complex securitizations and RMBS loan

---

[9] "**Deutsche Bank**" means Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas, each solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect of certain of the Settling Trusts.

repurchase actions and (b) the depth of resources available to the firm, including advisory services about bankruptcy issues generally.

16.     Duff & Phelps was uniquely situated to provide the FGIC Trustees with advice concerning the economic terms of the Settlement Proposal and the Projected Payments under the Rehabilitation Plan. Not only is Duff & Phelps a well-respected financial advisor with expertise in financial modeling and cash flow projections, but it had substantial experience in these Chapter 11 Cases through its work on behalf of the RMBS Trustees. Their work has included:

- Conducting a sampling review of more than 6,500 mortgage loan files provided by the Debtors in an effort to identify breaches of representations and warranties, and using statistical methodologies to estimate the incidence of those breaches across the population of mortgage loans in the Original Trusts. Duff & Phelps also used historical information and financial analysis to calculate the total present and projected future losses experienced by the Original Settling Trusts, including thirty-seven of the FGIC Insured Trusts.

- Working together with the RMBS Trustees, identifying RMBS trusts in addition to the Original Settling Trusts with RMBS Trust Claims (the "**Additional Settling Trusts**," together with the Original Settling Trusts, the "**Settling Trusts**"), and quantifying those claims so the Additional Settling Trusts, including ten FGIC Insured Trusts, could receive treatment that is consistent with the treatment being accorded to the like claims of the Original Settling Trusts.

- Analyzing potential liabilities arising from Debtors' multiple roles as servicer in the securitization process in order to assist the RMBS Trustees in quantifying potential Servicing Claims so that the Settling Trusts, including all forty-seven of the FGIC Insured Trusts, could receive an allowed claim on account of those claims.

<u>The Plan Mediation</u>

17.     The FGIC Settlement Agreement was agreed to as part of an extensive mediation with numerous interested parties in these Chapter 11 Cases in an effort to reach a consensual Chapter 11 plan (the "**Plan Mediation**"). The Plan Mediation occurred over the course of some five months beginning in December 2012 and was overseen by a sitting Bankruptcy Judge, the Honorable James M. Peck.

7

18.   The communications and analyses relating to negotiations conducted during the Plan Mediation are confidential by law and pursuant to court order,[10] and therefore cannot be disclosed in detail. In general, however, the integrated global settlement associated with the Plan Support Agreement (including the FGIC Settlement Agreement) and now part of the ResCap Plan, must be understood as the product of intense, arm's-length negotiations conducted among sophisticated parties with differing and conflicting interests, under the close supervision and guidance of a sitting bankruptcy judge. My view of the Settlement Proposal was shaped, in part, by Judge Peck's involvement in the process of negotiating the FGIC Settlement Agreement.

**Participation of the Institutional Investors**

19.   In evaluating the Settlement Proposal, the FGIC Trustees, including U.S. Bank, considered that the Institutional Investors (which included investors in the FGIC Insured Trusts) actively participated in the Plan Mediation and supported the Settlement Proposal, ultimately becoming signatories to the FGIC Settlement Agreement. Because of the confidentiality provisions of the Mediation Order, the FGIC Trustees were unable to raise the Settlement Proposal with investors in the FGIC Insured Trusts who were not participants in the Plan Mediation.

**Notice to Investors in the FGIC Insured Trusts of the FGIC Settlement Agreement**

20.   One of the reasons that the FGIC Settlement Agreement is now before this Court is that none of the FGIC Trustees would agree to the Settlement Proposal unless investors in the FGIC Insured Trusts were provided a full and fair opportunity to voice any objections they may have to such a settlement, including that the FGIC Settlement Agreement is not in the best interest of investors, and to be heard with respect to any such objections. The FGIC Trustees

---

[10] *See December 26, 2012 Order Appointing Mediator* [ECF No. 2519] (the "**Mediation Order**").

8

insisted that the FGIC Settlement Agreement require prompt notice be given with respect to the FGIC Settlement Agreement[11] and require approval of the FGIC Settlement Agreement by the Bankruptcy Court.[12]

21.  From U.S. Bank's perspective, it was essential for the FGIC Settlement Agreement to provide investors with notice and the opportunity to object. Absent such provisions, U.S. Bank would not have agreed to the FGIC Settlement Agreement, and would not have determined that it is in the best interests of the FGIC Insured Trusts and their investors.

**Other Factors Evidencing the Reasonableness of U.S. Bank's Conduct**

22.  U.S. Bank also had the benefit of sitting on the Official Committee of Unsecured Creditors in these Chapter 11 Cases. My role as U.S. Bank's representative on that committee gave me an additional perspective of the overall bankruptcy proceedings, allowing me to better evaluate the Settlement Proposal in the larger picture of the Chapter 11 Cases and understand the relative risks and benefits of proceeding under the FGIC Settlement Agreement or the Rehabilitation Plan.

23.  Finally, U.S. Bank and its counsel had the benefit of the views of the other two

---

[11]  Section 4.02 of the FGIC Settlement Agreement provides:

Within seven (7) Business Days following execution by all Parties of this Agreement, the Debtors shall file the 9019 Motion with the Bankruptcy Court and otherwise use commercially reasonable efforts to promptly obtain the Bankruptcy Court Order. Upon obtaining knowledge of the issuance of the Bankruptcy Court Order, the Debtors shall promptly notify the other Parties.

[12]  Section 6.01 of the FGIC Settlement Agreement provides that a condition precedent to the effectiveness of the FGIC Settlement Agreement is the signing of orders approving the FGIC Settlement Agreement by both the Bankruptcy Court and the Rehabilitation Court and that such orders become final. The FGIC Settlement Agreement must also be approved by the Rehabilitation Court after notice. Section 4.01 of the FGIC Settlement Agreement provides:

Within three (3) Business Days following execution by all Parties of this Agreement, the Rehabilitator, on behalf of FGIC, shall file the Affirmation with the Rehabilitation Court and otherwise use commercially reasonable efforts to obtain the Rehabilitation Court Order. The Rehabilitator shall endeavor to schedule the hearing on the Rehabilitation Court Order for a date that is no less than thirty-seven (37) days after the filing of the Affirmation. Upon obtaining knowledge of the issuance of the Rehabilitation Court Order, the Rehabilitator, on behalf of FGIC, shall promptly notify the other Parties.

9

FGIC Trustees and their counsel in considering the Settlement Proposal. Like U.S. Bank, BNY Mellon and Wells Fargo are two of the largest and most sophisticated financial institutions in the country and were represented by experienced counsel in this matter. The three FGIC Trustees, although similarly situated and assisted by the same financial advisor, independently considered the Settlement Proposal. U.S. Bank took into consideration in forming its views of the Settlement Proposal that BNY Mellon and Wells Fargo and their counsel were coming to similar conclusions regarding the benefits of the FGIC Settlement Agreement as compared to the Projected Payments under the Rehabilitation Plan.

C.  *The FGIC Settlement Agreement is in the Best Interests of the FGIC Insured Trusts and the Investors in Those Trusts*

### Consideration of the FGIC Settlement Agreement and the Duff Report

24.  As mentioned above, in the context of the Plan Mediation, the FGIC Trustees were asked to consider the Settlement Proposal that included, among other things, FGIC making the Commutation Payment in lieu of the Projected Payments under the Rehabilitation Plan.

25.  The FGIC Trustees requested that Duff & Phelps analyze the economic terms of the Settlement Proposal against the Projected Payments under the Rehabilitation Plan and provide a recommendation to the FGIC Trustees. Duff & Phelps was not asked to analyze how the amount of the Commutation Payment was determined, but rather how the Commutation Payment and the broader Settlement Proposal compared to the Projected Payments under the Rehabilitation Plan.

26.  In conducting its analysis, I understand that Duff & Phelps reviewed and analyzed publicly available information and also signed a confidentiality agreement with FGIC pursuant to which I understand they had the opportunity to speak to FGIC's Chief Restructuring Officer and Lazard Freres & Co. LLC ("**Lazard**"), the financial advisors to Weil, Gotshal & Manges, LLP,

10

counsel to the FGIC Rehabilitator and to receive additional information concerning the Rehabilitation Plan.

27. On or about May 10, 2013, I received from my counsel draft discussion materials prepared by Duff & Phelps setting forth its analysis of the Settlement Proposal. *See* Exhibit 120 for identification, attached hereto at Tab C.

28. Subsequently, on or about May 13, 2013, Duff & Phelps made a presentation to the FGIC Trustees and their counsel concerning the Settlement Proposal. The presentation took place in New York and lasted over an hour. I work in Chicago, and had recently returned from maternity leave, so I participated in the presentation telephonically and via a "webex." Accordingly, I was able to view the discussion materials Duff had prepared while participating via a conference call. Although I was not physically present at the presentation, U.S. Bank's attorneys attended.

29. During the presentation, representatives from Duff & Phelps walked the Trustees and their counsel through their analysis, using as a reference its written discussion materials. I do not now recall whether the slides used were the discussion materials I received on May 10, or slides substantially similar. During the presentation, questions were posed to Duff & Phelps, including by U.S. Bank's counsel. To my recollection, Duff & Phelps answered all of the questions asked. I do not recall asking questions myself.

30. At the time of the presentation, I was able to follow and understand Duff & Phelps' analysis at a high level. I had no previous experience in this type of proposal, and my primary focus was on the conclusions concerning how the Commutation Payment, together with the other value to the FGIC Insured Trusts under the Settlement Proposal, compared to the Projected Payments under the Rehabilitation Plan. At the conclusion of the presentation, I recall

11

having confidence that Duff & Phelps appeared to have done a thorough analysis.

31.     On or about May 15, 2013, I received a final version of the Duff & Phelps discussion materials concerning the Settlement Proposal (the "**Duff Report**"). *See* Exhibit 123 for identification, attached hereto at Tab D. The Duff Report was substantially similar to the draft discussion materials I had received on May 10 and the discussion materials used during the May 13 presentation.

32.     The Duff Report, consistent with the May 13 presentation, advises that the Commutation Payment is within the reasonable range of the estimated Projected Payments under the Rehabilitation Plan. It also identifies the value associated with not having to pay premiums on the FGIC Policies going forward, as well as the fact that the FGIC Settlement Agreement, as part of the global settlement embodied in the Plan Support Agreement, would resolve various outstanding issues in the Chapter 11 Cases, including potential litigation and inter-creditor disputes involving the FGIC Trusts.

33.     The Duff Report states that it is Duff & Phelps' recommendation that the Settlement Proposal, and specifically the Commutation Payment, is within the range of reasonableness of the estimated Projected Payments under the Rehabilitation Plan.

### The Merits of the FGIC Settlement Agreement on a Stand-Alone Basis

34.     It was significant to me that the $253.3 million Commutation Payment was a fixed amount, while the estimated $150 million initial Projected Payment to the FGIC Insured Trusts was estimated and subject to change at the discretion of the Rehabilitator following the effective date of the Rehabilitation Plan. In addition, while I understood there was the potential for future Projected Payments in excess of the Commutation Payment, there was no certainty of the amount of any future Projected Payments, or the timing of such payments. In fact, I

understood there was a risk that future Projected Payments may fall short of the amount of the Commutation Payment. My concern over the uncertainty of payments from FGIC was informed by the fact that, although the FGIC Insured Trusts continue to pay premiums under the FGIC Policies, they have received no payment on any claims made under the policies since late 2009. The FGIC Settlement Agreement eliminates the risk and uncertainty associated with the Projected Payments in exchange for a certain recovery.

35.    I also found significant that the Commutation Payment, by itself, was within the reasonable range of the estimated total Projected Payments under the Rehabilitation Plan ($190 million to $340 million). The Duff Report, however, also makes clear that there was value to the FGIC Insured Trusts in the Settlement Proposal in addition to the Commutation Payment. Specifically, as a result of the termination of the FGIC Policies under the FGIC Settlement Agreement, the FGIC Insured Trusts would be relieved from the payment of future premiums, estimated to be some $18 million. I also understood under the Settlement Proposal that FGIC would forego its right to receive certain reimbursement amounts from the FGIC Insured Trusts pursuant to the waterfall provisions under the relevant Governing Documents, which would provide additional, although at the time unquantified, future value to the FGIC Insured Trusts.

36.    Given Duff & Phelps' expertise and extensive experience in the Chapter 11 Cases, their access to FGIC and Lazard in connection with analyzing the Settlement Proposal and their May 13 presentation and the Duff Report, I had no reason to question Duff & Phelps' analysis, and nothing that has transpired since that time has changed my view in that regard.

### The Additional Value to the FGIC Insured Trusts Under the ResCap Plan

37.    In addition to the stand-alone benefits, the FGIC Settlement Agreement is an integral component of the Plan Support Agreement (and now proposed ResCap Plan) which

13

resolves the claims of substantially all of the major constituents in these Chapter 11 Cases and confers many benefits upon the Debtors' creditors, including the FGIC Insured Trusts. If the ResCap Plan is confirmed, these benefits include, among other things, that the FGIC Insured Trusts will receive a distribution from the Debtors' estates, contemplated to be in excess of $90 million, on account of representation and warranty claims against the Debtors.

38. It is an express condition of the Plan Support Agreement that both the Bankruptcy Court and the Rehabilitation Court approve the FGIC Settlement Agreement. Without the FGIC Settlement Agreement, the global settlement embodied in the Plan Support Agreement, including the favorable claim treatment of the FGIC Insured Trusts, would collapse. The FGIC Insured Trusts would not receive the contemplated more than $90 million distribution from the Debtors' estates if the FGIC Settlement Agreement was rejected in favor of proceeding under the Rehabilitation Plan.

39. In the absence of the FGIC Settlement Agreement and the global settlement embodied in the Plan Support Agreement, the value of any future recovery, if any, by the FGIC Insured Trusts in the Chapter 11 Cases is highly uncertain.

- First, the proposed ResCap Plan secures the contribution by AFI to the Debtors' estates of $2.1 billion in value, which is a substantial portion of the assets that will be distributed to the creditors of the Debtors' estates (including the FGIC Insured Trusts).

- Second, at the time of the Plan Mediation, the Chapter 11 Cases were facing several potentially lengthy and expensive litigations that could have significantly diminished the recoveries of the Settling Trusts, including the FGIC Insured Trusts.

    - The proposed ResCap Plan fixes claims that the FGIC Trustees expect would otherwise be contested in time-consuming and uncertain proceedings. In the absence of the global settlement embodied in the Plan Support Agreement, the RMBS 9019 Motion would likely require a lengthy and expensive hearing, the outcome of which is uncertain. If the Court declined to grant the RMBS 9019 Motion, the allowance of Repurchase Claims of the Original Settling Trusts (including thirty-seven FGIC Insured Trusts) would be left to the expensive

14

and uncertain process of claims litigation. Allowance of the RMBS Trust Claims, as contemplated by the proposed ResCap Plan, offers the benefits of allowance consistent with the RMBS 9019 Motion without the risks attendant to that contested matter.

- The proposed ResCap Plan also allows the Repurchase Claims of the Additional Settling Trusts, including ten FGIC Insured Trusts, without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims, which otherwise would occur absent a global settlement.

- Finally, the proposed ResCap Plan allows the Servicing Claims of the Settling Trusts, including all forty-seven of the FGIC Insured Trusts. The presentation of those claims otherwise would have required further discovery and analysis, likely leading to litigation over both the quantification of the claims and their relative priority.

- Third, many of the contentious and complicated inter-creditor issues in these cases are resolved by the proposed ResCap Plan, including disputes over the priority of claims asserted by FGIC and the other Monolines and by certain other securities claimants. In particular, both the amount of FGIC's claims and the relationship between those claims and the claims of the FGIC Insured Trusts are the subject of disputes, and the resolution of all those disputes through litigation presents both a general risk of delay and expense to all stakeholders as well as a specific risk to the FGIC Insured Trusts of dilution.

- Finally, the ever mounting costs of administration of these Chapter 11 Cases threaten to erode any distribution to unsecured creditors (including the FGIC Insured Trusts). The proposed ResCap Plan effectively abates the continued accrual of such costs, thus increasing the amount of ultimate recoveries to all creditors, including the FGIC Insured Trusts.

40.    For the reasons described above, and based on the analysis provided by Duff & Phelps, U.S. Bank concluded that the FGIC Settlement Agreement was reasonable and in the best interests of the FGIC Insured Trusts and their investors and agreed to accept it on behalf of the FGIC Insured Trusts.

**D.    *Notice to Investors in the U.S. Bank FGIC Insured Trusts of the FGIC Settlement Agreement was Sufficient***

41.    Notice of the FGIC Settlement Agreement, including notice of the FGIC Settlement Agreement by the FGIC Trustees, including U.S. Bank, is sufficient and effective to

15

put the parties in interest in these Chapter 11 Cases, including the investors in the FGIC Insured Trusts, on notice of the FGIC Settlement Agreement.

42. U.S. Bank has regularly provided to investors in the U.S. Bank RMBS Trusts, including the U.S. Bank FGIC Insured Trusts, notice of significant events in these Chapter 11 Cases. Following the filing of the RMBS 9019 Motion, U.S. Bank, together with BNY Mellon, Deutsche Bank and Wells Fargo, jointly retained an agent, The Garden City Group, Inc. ("**GCG**"), to coordinate and facilitate notice to investors regarding important events in the Chapter 11 Cases.

43. On behalf of the RMBS Trustees, GCG provided certain administrative services in connection with noticing various investors, including the coordination and facilitation of the dissemination of notices to the various investors at the direction and on behalf of the RMBS Trustees, and in connection with the creation and maintenance of a website for investors that provides, among other things, contact information for the RMBS Trustees significant relevant developments in the Chapter 11 Cases, links to relevant documents filed in the Chapter 11 Cases, and upcoming Court deadlines and hearing dates (the "**RMBS Trustee Website**").

44. GCG distributed to various investors and published on the RMBS Trustee Website various notices. Among those notice was a notice dated May 24, 2013 entitled "Time Sensitive Notice Regarding (a) Plan Support Agreement Among ResCap Debtors and the RMBS Trustees, Among Others, and (b) Settlement Agreement Among the Debtors, Financial Guaranty Insurance Company and Certain of the RMBS Trustees." *See* Exhibit 128 for identification, attached hereto at Tab E. This notice, among other things, described the terms of the Plan Support Agreement and the FGIC Settlement Agreement and the process by which investors could object to them.

45. In addition, on June 4, 2013, U.S. Bank distributed a "Time Sensitive Notice Regarding Settlement Agreement Among the ResCap Debtors, Financial Guaranty Insurance Company and the FGIC Trustees" (the "**Holder FGIC Settlement Notice**"). *See* Exhibit 129 for identification, attached hereto at Tab F. The Holder FGIC Settlement Notice was provided by U.S. Bank to the investors in the eight U.S. Bank FGIC Insured Trusts. The Holder FGIC Settlement Notice provided additional information to those investors regarding the FGIC Rehabilitation Proceeding, the FGIC Settlement Agreement, their rights thereunder, the process for investors to object to the FGIC Settlement Agreement in the FGIC Rehabilitation Proceeding and how to obtain information on the cash amount FGIC will pay to a particular trust. The Holder FGIC Settlement Notice and certain pleadings in the FGIC Rehabilitation Proceeding have also been posted on the RMBS Trustee Website.

46. As part of the notice process, and in order to provide additional information to investors in the FGIC Insured Trusts concerning the FGIC Settlement Agreement, the FGIC Trustees agreed to make available to those investors information concerning the allocable share of the Commutation Payment that each such FGIC Trust would receive under the FGIC Settlement Agreement.

47. Finally, the schedules attached to the Disclosure Statement filed with the ResCap Plan provide information concerning the estimated recoveries of the FGIC Insured Trusts on account of Repurchase Claims and Servicing Claims against the Debtors.

E. *Continued Assessment of the Reasonableness of the FGIC Settlement Agreement*

48. Shortly after the FGIC Settlement Agreement became public, certain investors indicated their intent to object to the FGIC Settlement Agreement. As a result, the FGIC Trustees have continued to assess the reasonableness of the FGIC Settlement Agreement. The

17

Objectors[13] have asserted that the FGIC Settlement Agreement is not in their best interest or in the best interests of the FGIC Insured Trusts because, in their view, the FGIC Insured Trusts would receive greater recoveries under the Rehabilitation Plan.

49.    The FGIC Trustees asked Duff & Phelps to evaluate and consider the assertions of the Objectors. Duff & Phelps has done so and its conclusions are presented in the Expert Report of Allen M. Pfeiffer, dated July 19, 2013. In addition, the FGIC Trustees consulted S.P. Kothari, currently the Gordon Y. Billard Professor in Management at the Sloan School of Management at the Massachusetts Institute of Technology ("**MIT**") as well as Deputy Dean of MIT's Sloan School of Management. Dr. Kothari presented an expert report, also dated July 19, 2013.

50.    The reports of both Mr. Pfeiffer and Dr. Kothari support the conclusions presented by Duff & Phelps during the May 13 presentation and memorialized in the Duff Report.

[signature on following page]

---

[13]    The "Objectors" are CQS ABS Master Fund Limited, CQS ABS Alpha Master Fund Limited, Bayview Fund Management LLC, Monarch Alternative Capital LP, Stonehill Capital Management LLC and Federal Home Loan Mortgage Corporation in conservatorship.

Dated this 31st day of July, 2013

_____
Mamta K. Scott

SK 03687 0119 1402296 v6