RESPONSE DEADLINE: NOVEMBER 12, 2013

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Thomas J. Moloney (TJM-9775)
Sean A. O'Neal (SAO-4067)
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Special Counsel for Wilmington Trust, National
Association, as Indenture Trustee for the Senior
Unsecured Notes Issued by Residential Capital, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------X
:
In re                            :
:                Chapter 11 Case No.
RESIDENTIAL CAPITAL, LLC, et al.,:
:                12-12020 (MG)
        Debtors.                 :
:                (Jointly Administered)
:
---------------------------------X

**STATEMENT OF WILMINGTON TRUST, NATIONAL ASSOCIATION, SOLELY IN
ITS CAPACITY AS INDENTURE TRUSTEE FOR THE SENIOR UNSECURED NOTES
AND AS A CONSENTING CLAIMANT, IN SUPPORT OF CONFIRMATION OF THE
JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC ET AL
AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

TO THE HONORABLE JUDGE GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Wilmington Trust, National Association (the "Trustee"), solely in its capacity as indenture trustee for various series of senior unsecured notes (the "Notes" and the holders thereof, the "Noteholders") in the outstanding aggregate principal amount of approximately $1 billion issued by Residential Capital, LLC ("ResCap," and with its debtor-affiliates, the "Debtors"), under that certain indenture dated as of June 24, 2005, respectfully submits this statement in support of confirmation of the *Joint Chapter 11 Plan Proposed By Residential*

*Capital, LLC et al. And The Official Committee Of Unsecured Creditors* (as amended, the "Plan") (Doc. No. 4819).[1]  In support of confirmation, the Trustee states as follows:

## STATEMENT

1. For the reasons articulated in the *Memorandum Of Law In Support Of Confirmation Of The Joint Chapter 11 Plan Proposed By Residential Capital, LLC, et al., And The Official Committee of Unsecured Creditors* (Doc. No. __), and the *Plan Proponents' Omnibus Response To Objections To Confirmation Of The Joint Chapter 11 Plan Proposed By Residential Capital, LLC, et al., And The Official Committee Of Unsecured Creditors* (Doc. No. __), the Trustee, on behalf of the Consenting Claimant Noteholders, fully supports confirmation.

2. As the Court is aware, the Trustee has been an active and constructive participant in these proceedings over the past 18 months. When the case commenced, the Trustee played a unique role as the only unsecured creditor holding material liquidated claims against any of the Debtors. In that role, the Trustee filed multiple pleadings in these chapter 11 proceedings relating to the RMBS Settlement, extensions of exclusivity, and other matters. In addition, the Trustee, after an extensive independent investigation, identified third-party and estate claims, and filed a proposed complaint against Ally Financial, Inc. ("AFI") and others as part of its motion to obtain standing to pursue such claims. *See Motion of Wilmington Trust, National Association, Solely In Its Capacity As Indenture Trustee For The Senior Unsecured Notes Issued By Residential Capital, LLC For An Order Authorizing It To Prosecute Claims And Other Causes Of Action On Behalf Of The Residential Capital, LLC Estate* (Doc. No. 3475-B) (the "Trustee's Complaint"). The Trustee's Complaint outlined 20 claims the Trustee sought to bring to vindicate rights of the Noteholders, ResCap, and ResCap's creditors. Trustee's Complaint ¶¶ 159-302.

---

[1] Capitalized terms not defined herein shall have the meaning set forth in the Plan.

3.   As the Trustee readied for litigation, it also remained committed to pursuing a possible global compromise. To that end, the Trustee advocated for the appointment of a mediator as well as the termination of the prepetition plan support agreements that did not treat all creditors fairly. The Trustee's efforts were furthered by the involvement of a Noteholder in the negotiations with AFI and the various creditor constituencies. These efforts, of course, helped lead to the Global Settlement.

4.   The Global Settlement is the result of the intense effort and compromise by the Debtors' stakeholders over months of hard work. The mediation was particularly difficult because, other than the Trustee, creditors held unliquidated claims involving extremely complex and novel legal theories and facts that, if litigated to conclusion, would take years and tens of millions of dollars in professional fees and expenses. The complexity was only compounded by the number of constituencies at the table, including the participation of numerous federal and state regulatory entities. The failure to reach a global settlement would have been inherently value destructive, leaving all creditors with materially less than under the Plan.

5.   It is against this backdrop that virtually every major creditor constituency (other than the Junior Secured Noteholders (the "JSNs")) support this Plan. In addition to the dozens of creditors that are parties to the Plan Support Agreement, most creditors in these cases support the Plan or have reached an agreement resolving their objections, including creditors that once voiced strong objections such as the Federal Housing Finance Agency (FHFA) as Conservator for the Federal Home Loan Mortgage Corporation (Freddie Mac), Ambac Assurance Corporation, Assured Guaranty Municipal Corporation, Syncora, the borrower class action plaintiffs, the National Credit Union Administration Board (NCUAB), and various Federal Home Loan Banks.

6. As this Court has noted previously, the JSNs have worked tirelessly to "blow up the PSA and the entire case." Tr. Hearing, July 30, 2013 at 64:18. The JSNs were content to receive in connection with their proposed prepetition settlement with AFI an aspirational treatment essentially equivalent to the treatment they now disparage. That resolution would have left unsecured creditors with minimal, if any, recoveries. Once the other creditors obtained a resolution that provided them with meaningful recoveries, which essentially guaranteed the JSNs the full payment of their allowed claim that AFI had only hopefully promised, the JSNs embarked on a strategy to extort additional payments to which they were not legally entitled.

7. The JSNs did absolutely nothing to contribute to the value associated with the Global Settlement. The JSNs refused to participate meaningfully in global negotiations and instead objected to the appointment of a mediator because, inexplicably, the settlement options were not complex enough. They regularly objected to exclusivity extensions to prevent sacrificing "good optionality" for "bad optionality." In contrast to their present position, they expressed concern about administrative insolvency. And they did all this in pursuit of replacing consensual negotiation with a pitched plan contest. Indeed, when they could not defeat a global consensus, they sought to make its implementation an impossibility by filing a motion to disqualify professionals and appealing the approval of the FGIC Settlement Motion even though the parties with the true economic interest withdrew their objection. The JSNs' motivations are transparently focused on creating hold-up value, including by imposing additional costs on every constituency in this case.

8. The JSNs now seek to reap the rewards of the very global resolution they vociferously attempted to stymie and have objected to confirmation on various grounds, including by alleging that they have not received the fair value of their claims. The Trustee joins in the

4

responses of the Debtors and the Creditors' Committee in these matters. As a party who was directly involved in both analyzing the intercompany claims as part of the Global Settlement and negotiating a resolution with AFI more broadly, both subjects of Phase II and confirmation, the Trustee adds the following brief observations.

9. *First*, the Trustee submits that settling the intercompany claims at zero can only be viewed as an integral and non-severable part of a larger settlement that resolves all inter-debtor disputes. The JSNs seek to distract the Court by focusing on the intercompany claims in isolation, and they do not account for the uncertainty that a failure to achieve a global settlement, including settlement of intercompany claims, would cause. This Court need only to look at the Trustee's Complaint, which identified over $9.5 billion in fraudulent transfer claims that ResCap could assert against the other Debtors, to appreciate the complexity of dissecting competing inter-debtor disputes. Accordingly, the global settlement made perfect legal sense because it resolved multiple kinds of uncertainty related to such disputes, including, but not limited to:

- The significant time and expense of analyzing and litigating thousands or tens of thousands of intercompany transactions, including an analysis of individual defenses for the transactions such as the inclusion of bankruptcy standstill provisions;

- The complex factual determinations as to whether all or some of the intercompany claims were in fact debt for various reasons, including the lack of documentation, the lack of interest paid, the lack of maturity periods, and the lack of scheduled of payments, *see, e.g.*, Trustee's Complaint ¶¶ 298-302 (seeking declaratory relief that certain ResCap payables were not debt because they were the result of cash management sweeps under the Debtors' cash management system);

- Setoff rights that the Debtors may have against and among each other, including in respect of intercompany claims, *see, e.g.*, *In re Westchester Structures, Inc.*, 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995) (recognizing that New York law provides for equitable and statutory setoff rights); *cf. In re U.S. Aeroteam, Inc.*, 327 B.R. 852, 870-71 (Bankr. S.D. Ohio 2005) (holding that setoff rights prime Article 9 liens on accounts receivable); *compare* Trustee's Complaint ¶¶ 232-39 (asserting claims owned by ResCap against RFC in the amount of $7 billion related to debt forgiveness transactions) *with* Bingham Declaration (Doc. No. 5444-A) at 23-24 (noting that the JSNs' second largest intercompany lien is on an intercompany claim owned by RFC against ResCap);

5

- The Debtors' rights, at any time, to release or forgive the intercompany claims and a long history of executing such forgiveness;

- AFI's rights to control the disposition and release of collateral under the relevant intercreditor agreements;

- Subrogation claims between the Debtors on account of any Junior Secured Notes Deficiency Claims; and

- The possibility that the Plan could provide for substantive consolidation, which would eliminate entirely all intercompany claims and disputes, and eliminate recovery on any Junior Secured Notes Deficiency Claim, in addition to imposing substantial cost and delay in resolving claims that would inevitably ensure that any victory would be pyrrhic.

In short, in light of these significant issues (and attendant litigation risks, costs, and delay), settling the intercompany claims at zero is reasonable as part of the Global Settlement, which provides significant value to all creditors, including the JSNs.

10.  *Second*, the Court should give little credence to the argument that the JSNs are entitled to some kind of allocation of the AFI Settlement. The JSNs have the burden to identify specific collateral, show an attachment, and appropriately value it. The Trustee expects that the JSNs will rely principally on the examiner's report, which is inadmissible hearsay based on unsworn interviews, to identify three "breach of contract" claims on which their liens supposedly attached, post-petition, in a hypothetical scenario where such claims might be filed. Critically, the JSNs have no right to control the filing of any such claims. Their argument is entirely speculative.

11.  The first claim is for a breach of contract relating to a 2009 tax allocation agreement (the "Tax Claim"). But the JSNs do not have a lien on the Tax Claim because it relies on a subsequent agreement that superseded the 2009 tax allocation agreement that must be avoided before the Tax Claim can be asserted. In other words, any recovery on the Tax Claim is reliant on, and stems from, an avoidance action that belongs to the ResCap estate. The second claim is in respect of GMAC Mortgage LLC's ("GMACM") role in brokering loans to Ally Bank whereby

6

changes in the economic terms of the transactions were not recognized in the governing documents. But the Creditors' Committee asserted this claim as an avoidance action, not as a contract action, and therefore any recovery properly belongs to the Debtors. Finally, the third claim involves a total return swap contract between GMACM and Ally Bank in respect of MSRs, whereby the economic practice between the parties was allegedly not properly reflected in the agreements. But this claim fares no better, including because, as the examiner notes, it is unlikely to succeed.

12. Even if the JSNs could show that these three claims exist and are subject to their lien, which they cannot, they likely cannot establish a defensible non-speculative value for them. It is not sufficient for the JSNs to proffer the report of Raymond T. Lyons, Esq., a former bankruptcy judge, because it is nothing more than an inadmissible legal opinion by someone who did not conduct an independent review of the claims. At bottom, Lyons's report is merely *ex post facto* speculation based on a subjective reading of the examiner's report that, by definition, played no role in the negotiations because it was sealed until after the Global Settlement was publicly disclosed.

13. Finally, even if the JSNs could somehow show that their claims could ultimately succeed, they would also have to demonstrate that the estates' fiduciaries would prioritize the prosecution of these claims over alter-ego type claims that would benefit all creditors equally, and that a material amount of the billions of dollars of competing claims against AFI by other creditors would not succeed. The JSNs have the burden to show they are somehow injured by being paid in full. It is a burden they cannot possibly meet.

Dated: New York, New York
November 12, 2013

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: ___/s/___Sean A. O'Neal___
Thomas J. Moloney (TJM-9775)
Sean A. O'Neal (SAO-4067)
A Member of the Firm
One Liberty Plaza
New York, NY 10006
*(212) 225-2000*

*Special Counsel for Wilmington Trust, National Association, as Indenture Trustee for the Senior Unsecured Notes Issued by Residential Capital, LLC*