G<span>IBBS</span> & B<span>RUNS</span> LLP
Kathy D. Patrick, Esq. (*pro hac vice*)
Robert J. Madden, Esq. (*pro hac vice*)
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

-AND-

R<span>OPES</span> & G<span>RAY</span> LLP
Keith H. Wofford, Esq. (KW-2225)
D. Ross Martin, Esq. (DM-2947)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Attorneys for the Steering Committee Group of RMBS Holders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>Residential Capital, LLC, *et al.*<br><br>Debtors. | Chapter 11<br><br>Case No. 12-12020 (MG)<br><br>Jointly Administered |

**MEMORANDUM OF THE STEERING COMMITTEE GROUP OF RMBS HOLDERS IN SUPPORT OF PLAN CONFIRMATION AND IN REPLY TO THE OBJECTION OF THE NOTES TRUSTEE AND AD HOC COMMITTEE OF JUNIOR SECURED NOTEHOLDERS TO CONFIRMATION OF PLAN PROPONENTS' CHAPTER 11 PLAN**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ........................................................................................................................ 1

REPLY TO JSN OBJECTION ..................................................................................................... 4

I.     The RMBS Trust Claims Are Not Claims For Damages Arising From The Purchase Or Sale Of Securities ................................................................................ 4

II.    The RMBS Trust Claims Are Not Disguised Securities Law Claims .......................... 5

III.   The JSNs' Argument Seeks To Expand Section 510(b) Beyond Its Text To Any Claim That Could Be Said To "Overlap With" A Securities Claim ............................... 6

IV.   The Intercompany Claims Are Themselves Subject To Subordination ........................... 7

MEMORANDUM IN SUPPORT OF ALLOWED FEE CLAIM ............................................. 8

I.     Background Of The Allowed Fee Claim ........................................................................ 8

II.    The Allowed Fee Claim Is Reasonable Under Bankruptcy Rule 9019 ......................... 10

III.   The Allowed Fee Claim Is Supported By The Common Fund Doctrine ....................... 11

IV.   To The Extent Applicable, The Allowed Fee Claim Is Reasonable Under Section 1129(a)(4). ........................................................................................................................ 12

CONCLUSION ............................................................................................................................ 13

# **TABLE OF AUTHORITIES**

                                                                         **Page(s)**

**CASES**

*Air Line Pilots Ass'n, Int'l v. Am Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*,
    156 B.R. 414 (S.D.N.Y. 1993) ......................................................................................... 10

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ......................................................................................................... 11

*CIT Group Inv. v. Tyco Int'l, Inc.*,
    479 Fed. Appx. 393 (2d Cir. 2012) .................................................................................. 6

*Exchange Nat'l. Bank v. Touche Ross & Co.*
    544 F.2d 1126 (2d Cir. 1976) .......................................................................................... 5

*In re Adelphia Commc'ns Corp.*,
    327 B.R. 143 (Bankr. S.D.N.Y. 2005) ........................................................................... 10

*In re Dewey & LeBoeuf LLP*,
    478 B.R. 627 (Bankr. S.D.N.Y. 2012) ........................................................................... 10

*In re Enron Corp.*,
    341 B.R. 141 (Bankr. S.D.N.Y. 2006) ......................................................................... 5, 6

*In re Journal Register Co.*,
    407 B.R. 520 (Bankr. S.D.N.Y. 2009) ........................................................................... 13

*In re Milton Poulos, Inc.*,
    947 F.2d 1351 (9th Cir. 1991) ........................................................................................ 12

*Kelleran v. Adnrijevic*,
    825 F.2d 692 (2d Cir. 1987) ............................................................................................. 7

*Kopet v. Esquire Realty Co.*,
    523 F.2d 1005 (2d Cir. 1975) ......................................................................................... 11

*Pepper v. Litton*,
    308 U. S. 295 (1939) ......................................................................................................... 7

*Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*
    177 B.R. 791 (S.D.N.Y. 1995) ....................................................................................... 12

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990) ............................................................................................................ 5

**STATUTES**

11 U.S.C. § 510(b) ...........................................................................................................4, 5, 6

11 U.S.C. § 1123(b)(3)(A) ...................................................................................................12

11 U.S.C. § 1129(a)(4) ....................................................................................................12, 13

**OTHER AUTHORITIES**

FED. R. BANKR. P. 9019 ..............................................................................................8, 10, 12

TO THE HONORABLE MARTIN GLENN:

The Steering Committee Group of RMBS Holders (the "Steering Committee Group"),[1] by and through its undersigned counsel, hereby submits this memorandum in support of confirmation of the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 4153] (as amended from time to time, the "Plan")[2] and in reply to the *Objection of the Notes Trustee and Ad Hoc Committee of Junior Secured Noteholders to Confirmation of Plan Proponents' Chapter 11 Plan* [Docket No. 5443] (the "JSN Objection"). In support thereof, the Steering Committee Group respectfully represents as follows:

## INTRODUCTION

1. The Steering Committee Group is the largest group of holders of RMBS issued by the Debtors' securitization trusts. The Steering Committee Group collectively holds more than $12 billion of the Debtors' RMBS (based on unpaid principal balance),[3] and holds 25% or more of such securities in at least one tranche of 304 of the 392 trusts created by the Debtors between 2004 and 2007.[4]

2. The Steering Committee Group, through its counsel Gibbs & Bruns LLP and Ropes & Gray LLP (together, "Steering Committee Counsel"), has taken a lead and active role in

---

[1] The Steering Committee Group consists of AEGON USA Investment Management, LLC; Angelo, Gordon & Co., L.P.; Cascade Investment, LLC; Federal Home Loan Bank of Atlanta; Goldman Sachs Asset Management, L.P.; ING Investment Management Co. LLC; ING Investment Management, LLC; Bayerische Landesbank; BlackRock Financial Management Inc.; Kore Advisors, L.P.; Pacific Investment Management Company LLC; Metropolitan Life Insurance Company ("MetLife"); Neuberger Berman Europe Limited; SNB StabFund; The TCW Group, Inc.; Teachers Insurance and Annuity Association of America; Thrivent Financial for Lutherans; Western Asset Management Company; and certain of their affiliates, either in their own capacities or as advisors or investment managers.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Plan.

[3] *See Verified Statement of Gibbs and Bruns LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 1741] (holdings as of Sept. 26, 2012).

[4] *See Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* [Docket No. 1887] ¶ 3 (holdings as of Sept. 17, 2012).

addressing the RMBS Trusts' claims against the Debtors, including negotiating the original RMBS Settlement that was announced on the first day of these cases and filed shortly thereafter. After nearly a year of thorough (and costly) litigation regarding the original RMBS Settlement, nearly every constituency in these cases, including the RMBS Trustees, the Official Committee of Unsecured Creditors, and the Consenting Claimants, now support the settlement, which is fully incorporated into the Plan.

3. The only unresolved objection concerning the RMBS Settlement is from the Junior Secured Noteholders (the "JSNs") – a constituency that will be paid in full, together with all post-petition interest that the Court may determine it is entitled to. Importantly, the JSNs do not object to the merits of the RMBS Settlement or the allowance of the RMBS Trust Claims.[5] Instead, the JSNs set forth a tenuous argument that the Plan's treatment of the pre-petition Intercompany Balances, which are being waived, somehow deprives the JSNs of the full value of their collateral because, according to the JSNs, the RMBS Trust claims are subject to subordination under section 510(b) of the Bankruptcy Code.

4. The entirety of the JSNs' argument is based on the assertion that the RMBS Trusts' contractual claims "materially overlap with securities fraud claims that have been, or could be, asserted against the Debtors," whatever that may mean or imply. However, the RMBS Trust claims are contract claims, pure and simple. They do not "arise from" the purchase or sale of a security of the debtor. Notably, other than intoning the statute, the JSNs cite not a single case in which anyone even *argued* that an RMBS trust's contract claims were subject to

---

[5] *See* JSN Objection at 6 n.6 ("[T]he JSNs do *not* object to the allowance (but do object to the priority) of the Consenting Claimants' claims as set forth in the Global Settlement . . . . The JSNs do object to . . . the priority of certain claims subject to mandatory subordination to the extent the failure to subordinate such claims affect the entitlements of the JSNs."); *id.* at 35 ("[T]he JSNs through this Objection seek merely to ensure that the Intercompany Claims are value for the purposes of the JSN Liens and entitlement to adequate protection as if they received the value that is being improperly diverted to other creditors because the Securities-Related Claims [defined to include the RMBS Trust claims] are not subject to subordination under section 510(b).").

2

subordination under 510(b), much less any decision from a court to that effect. The JSN's objection should be overruled: the RMBS Trust Claims are not subject to subordination under section 510(b).

5. Lastly, this memorandum addresses the Allowed Fee Claim that is to be provided to Steering Committee Counsel as a component of the RMBS Settlement. The Allowed Fee Claim provides for the payment to counsel for the Institutional Investors, including Steering Committee Counsel, of an aggregate 5.7% of the Allowed RMBS Trust Claims.[6] The RMBS Trusts, who own the RMBS Trust Claims, have agreed to the RMBS Settlement, including the Allowed Fee Claim. The Allowed Fee Claim does not impact the recoveries of any other creditor constituency in these proceedings.

6. The absence of any objection to the Allowed Fee Claim is not surprising.[7] The contingent fee represented by the Allowed Fee Claim permitted Steering Committee Counsel to negotiate and navigate the RMBS Settlement through the bankruptcy process on behalf of the Steering Committee Group, with the benefits thereunder accruing to all investors in the RMBS Trusts, all without any out-of-pocket expenditure for legal fees or expenses by any investor. The existence of a cohesive and large group of RMBS holders was also instrumental to the uncontested sale of the Servicing Platform, the Debtors' largest asset, one they had been unable to sell prior to bankruptcy *because* the RMBS Trust claims had not been resolved. For these reasons, and those stated in the Declarations of Ralph R. Mabey and Nancy Mueller-Handal, the Allowed Fee Claim, as a non-severable component of the RMBS Settlement, is appropriate

---

[6] The plan permits separate claim stipulations concerning the allocation of this fee among counsel. *See* Plan § IV(c)(6).

[7] The JSNs do not raise any objections to the Allowed Fee Claim in particular, but instead object to the overall RMBS Settlement as discussed above.

3

under Bankruptcy Rule 9019, supported by the common fund doctrine, and, to the extent applicable, reasonable under section 1129(a)(4).

## REPLY TO JSN OBJECTION

7. Even in their kitchen-sink approach, the JSNs manage to devote only three paragraphs of their forty-nine page objection to the assertion that over $7 billion of Allowed RMBS Trust Claims are subject to subordination under section 510(b). They cite only one inapposite case. The entire basis for the JSNs' argument is that the RMBS Trust Claims "materially overlap" with securities fraud claims that have been, or could be, asserted against the Debtors. JSN Objection at 38. The assertion that the RMBS Trusts' contractual based claims against the Debtors are subject to mandatory subordination simply because *other parties* "could" assert securities fraud claims would turn section 510(b) on its head.

I.   THE RMBS TRUST CLAIMS ARE NOT CLAIMS FOR DAMAGES ARISING FROM THE PURCHASE OR SALE OF SECURITIES

8. Section 510(b) provides that a claim "for damages arising from the purchase or sale of" a "security of the debtor or an affiliate of the debtor" shall be "subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security." 11 U.S.C. § 510(b). The JSNs assert that the RMBS certificates issued by the RMBS Trusts are securities "of the debtor or an affiliate of the debtor" because, under federal regulations, the depositor for the RMBS is deemed the "issuer" for securities law purposes. *See* JSN Objection at 36 & n.24. Even assuming that designation applied in this context, section 510(b) does not apply to the RMBS Trusts because the RMBS Trusts never purchased the subject securities, which were *issued by the RMBS Trusts themselves* and, accordingly, have no damages "arising from" such a purchase.

4

## II. THE RMBS TRUST CLAIMS ARE NOT DISGUISED SECURITIES LAW CLAIMS

9. The JSNs attempt to side-step this fatal flaw in their argument by asserting that the RMBS Trusts' contractual claims "overlap" with securities fraud claims that "could" be asserted by holders of RMBS certificates issued by the RMBS Trusts.[8] The single case cited in support of this argument is *In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006). The JSNs cite *Enron* for the proposition that "section 510(b) may require subordination of contractual claims, such as the representation and warranty claims at issue here, when they are substantially similar to claims for fraudulent issuance." JSN Objection at 39. The facts and reasoning of *Enron* demonstrate the flaw in the JSNs' argument.

10. In *Enron*, employees sought damages in connection with unexercised stock options they received which, of course, declined in value when the company's true financial condition was revealed. As summarized by former Chief Judge Gonzalez, one *pro se* claimant sought to disguise his securities-based claim as a contract based claim:

> [F]irst, the Debtor was obliged by contract to the Claimants for a certain amount; second, the Debtor attempted to meet this obligation by granting the Claimants stock options, representing those options to have a certain value; third, the stock options either did not or would not have that value; and fourth, the contractual obligation was therefore not satisfied and was breached following the Debtor's attempt to perform.

Judge Gonzalez recognized that a claim for breach of contract can be subordinated under section 510(b) if the breach of contract claim is a disguised securities claim:

> [S]ection 510(b) is intended to prevent shareholders and other securityholders from bootstrapping their equity interests to a level on par with general creditors and thus sharing equally in the distribution of the bankruptcy estate. The same concern is implicated by recharacterized breach of contract claims. In such cases, the claimant is also seeking to elevate his equity interest, but

---

[8] Notably, the JSNs do not even argue that the RMBS Trusts purchased securities. *Accord Exchange Nat'l. Bank v. Touche Ross & Co.* 544 F.2d 1126, 1137-38 (2d Cir. 1976); *Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990).

> has simply relocated the source of the obligation in order to avoid the application of section 510(b). Clearly, if the courts are commanded to rebuff securities claims seeking treatment on par with general creditors, a functional analysis similarly requires the courts to rebuff securityholders asserting breach of contract claims.

*Id.* at 161. Judge Gonzalez concluded that the stock option claimant simply recharacterized his securities fraud claim as a contract claim and determined it was subordinated. *Id.* at 162 ("[T]his breach of contract claim is simply a disguised claim of fraud in the issuance.").

11. Unlike in *Enron*, the RMBS Trusts have no securities claims that are being disguised as contract claims. Instead, the RMBS Trusts have only contractual claims against the Debtors. Self-evidently, the RMBS Trusts cannot assert securities fraud claims based on securities they do not own and section 510(b) does not apply. *See CIT Group Inv. v. Tyco Int'l, Inc.*, 479 Fed. Appx. 393 (2d Cir. 2012) (rejecting the argument that "a causal connection between the claim and a securities transaction is enough to require subordination.").

III. THE JSNs' ARGUMENT SEEKS TO EXPAND SECTION 510(B) BEYOND ITS TEXT TO ANY CLAIM THAT COULD BE SAID TO "OVERLAP WITH" A SECURITIES CLAIM

12. The JSNs would have the Court turn the statute on its head so that, far from subordinating a securities claim, it would subordinate a <u>contract</u> clam simply because other parties have securities claims based on "overlapping" facts. The text of the statute demonstrates the futility of the JSNs' argument. To be subordinated, the claim must "arise from" the purchase or sale of a security. 11 U.S.C. § 510(b). In other words, the statute is one-directional: as *Enron* held, a securities claimant cannot elevate its claim by disguising its securities claim as a contract claim. The JSNs would have the Court make the statute somehow work in the opposite direction: to lower the priority of contract-based claims of the RMBS Trusts simply because they somehow "overlap" with securities claims of others. That is directly contrary to the text of the statute.

6

IV.    THE INTERCOMPANY CLAIMS ARE THEMSELVES SUBJECT TO SUBORDINATION

13.    Even if the JSNs' had a plausible argument that the RMBS Trust Claims are potentially subject to subordination, the JSNs' would not benefit from the Intercompany Balances because the Intercompany Balances would under the JSNs' "overlap" theory be themselves subject to subordination. The vast majority of the Intercompany Balances represent cash flows directly associated with the origination of mortgages, as well as their securitization. These mortgage related cash flows were not limited to loan originations; they included large flows associated with payments to the GSEs to repurchase non-conforming loans, as required by the GSEs' single family program.[9] If anything "overlaps with" the purchase and sale of securities, it is these claims for the actual cash. The Intercompany Balances cannot possibly be <u>senior</u> to the claims of the RMBS Trusts – the creditors that were actually harmed by the Debtors' origination practices – when the RMBS Trust Claims and the purported Intercompany Balance claims all arise from the same bad acts. *See, e.g.*, *Pepper v. Litton*, 308 U. S. 295, 305 (1939) (holding that a bankruptcy court may subordinate any claim in whole or in part according to the equities of the case); *Kelleran v. Adnrijevic*, 825 F.2d 692, 697 (2d Cir. 1987) ("Under the doctrine of equitable subordination . . . a bankruptcy court may subordinate a particular claim if it finds that the creditor's claim, while not lacking a lawful basis nonetheless results from inequitable behavior on the part of that creditor.").

---

[9] *See, e.g.*, Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 6] ¶ 100 ("From January 1, 2008 through March 31, 2012, the Debtors have repurchased mortgage loans or otherwise made payments with respect to representation and warranty claims of approximately $2.8 billion.").

**MEMORANDUM IN SUPPORT OF ALLOWED FEE CLAIM**

14. This memorandum also addresses the appropriateness of the Allowed Fee Claim under Bankruptcy Rule 9019, which is supported by the common-fund doctrine, and, to the extent applicable, is reasonable under section 1129(a)(4). In support of the Allowed Fee Claim, the Steering Committee Group has submitted the expert testimony of former bankruptcy judge Ralph Mabey (the "Mabey Decl.") and the declaration of Nancy Mueller-Handal (the "MetLife Decl."), a managing director of MetLife, a member of the Steering Committee Group. In light of the absence of any objections to the Allowed Fee Claim, the Steering Committee Group will not burden the Court with a detailed recitation of the background of the Steering Committee Group and Steering Committee Counsel's key role in negotiating and prosecuting the RMBS Settlement, which are set forth at length in the declarations.

I.      BACKGROUND OF THE ALLOWED FEE CLAIM

15. In brief summary, Steering Committee Counsel negotiated the RMBS Settlement prior to the bankruptcy filing. A non-severable component of the RMBS Settlement was the payment of the contingency fees of Steering Committee Counsel. This contingent fee arrangement was necessitated by the structure of the RMBS Trusts. RMBS certificateholders do not own any representation and warranty claims; instead, those claims are owned by the RMBS trusts themselves. Any recoveries on those claims would inure to the benefit of the Steering Committee Group only upon recoveries by the RMBS Trusts. Upon such recoveries, all the holders of the RMBS securities in those trusts, not just the members of the Steering Committee Group, would benefit. The Steering Committee Group therefore retained Steering Committee Counsel on a contingent fee arrangement that contemplated overall recoveries to the trusts.

16. This contingent fee arrangement also had a key benefit for the trusts. Absent this arrangement, it would have been difficult to pursue the claims due to a structural free rider

8

problem inherent in the trusts' claims. While a minority of holders, usually 25%, can direct the trustee to act, recoveries for claims pursued at the direction of a minority of holders flow to all holders, including those who have not borne the burdens of pursuing the claims and have paid none of the costs necessary to achieve a recovery. Absent a contingent fee arrangement, which imposes attorneys' fees on the entirety of the trusts' recovery, but imposes no costs if no recovery is achieved, the RMBS Trusts' claims might never have been pursued comprehensively or successfully. Until this innovative contingent fee arrangement was put in place, there had been no comprehensive resolution of RMBS trust claims with respect to an originator. Since this arrangement, the only comprehensive resolutions that have been achieved are those achieved by Gibbs & Bruns, acting pursuant to this contingent fee arrangement. This confirms the clear fairness and benefit of the contingent fee arrangement to the RMBS Trusts: it solves the free-rider problem inherent in compelling a subset of holders to pay hourly lawyers to achieve recoveries that would be shared with those who hadn't contributed to the costs incurred to obtain the recoveries.

17. Importantly, the RMBS Trustees – who own the representation and warranty claims – were not bound to accept the original RMBS Settlement negotiated by the Steering Committee Group. Rather, the settlement, as proposed, preserved the independent right of the RMBS Trustees to assess the merits of the deal for each of the respective RMBS Trusts. In order to make this determination, each of the several RMBS Trustees and their professionals analyzed the proposed settlement, performed their own statistical sampling, and proposed various modifications to the agreement that were accepted by the Steering Committee Group and the Debtors. With such modifications, the RMBS Trustees made the independent and reasoned

9

determination that the settlement, including the payment of the contingent fee, was in the best interests of the trusts and their investors.

## II. THE ALLOWED FEE CLAIM IS REASONABLE UNDER BANKRUPTCY RULE 9019

18. The RMBS Settlement,[10] including the payment of the Allowed Fee Claim, is subject to approval under Bankruptcy Rule 9019. "As a general matter, '[s]ettlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate.'" *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012) (citing *In re MF Global Inc.,* 2012 Bankr. LEXIS 3701 (Bankr. S.D.N.Y. Aug. 10, 2012). Rule 9019 provides for the approval of a settlement where "it is supported by adequate consideration, is 'fair and equitable', and is in the best interest of the estate." *Air Line Pilots Ass'n, Int'l v. Am Nat'l Bank & Trust Co.* (*In re Ionosphere Clubs, Inc.*), 156 B.R. 414, 426 (S.D.N.Y. 1993). In approving a settlement, the Court need not conduct a mini-trial or decide the issues of law and fact raised by the settlement, "but must only 'canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005).

19. As set forth at length in prior briefing and in the plan proponents' memorandum in support of confirmation, the entire RMBS Settlement is reasonable. Even if the Court were to assess the reasonableness of the Allowed Fee Claim for Steering Committee Counsel on a standalone basis, it is objectively reasonable. Judge Mabey's expert testimony details how the negotiated Allowed Fee Claim is at the low-end of comparable contingency fees and is reasonable. *See* Mabey Decl., Annex at 42-46.

---

[10] The reasonableness of the overall RMBS Settlement has been the subject of significant prior briefing and is set forth at length in the plan proponents' memorandum in support of confirmation, and will not be repeated here. The Steering Committee Group incorporates by reference its arguments set forth previously in connection with the approval of the RMBS Settlement under the Debtors' Rule 9019 motion. *See* Docket Nos. 2808, 3011.

20. Perhaps more importantly, the RMBS Trustees, who act for the Trusts and ultimately for the benefit of the certificateholders, have agreed to the RMBS Settlement, including the Allowed Fee Claim. This agreement is not surprising. The efforts of Steering Committee Counsel in negotiating the RMBS Settlement on the eve of bankruptcy provided the RMBS Trusts and their certificateholders with a proverbial stake-in-the-ground at the commencement of these cases, the importance of which cannot be overstated. The negotiation of the RMBS Settlement, including the settlement of potentially billions of dollars of cure claims, facilitated the sale of the Debtors' servicing platform. After nearly a year of litigation, the RMBS Settlement was incorporated into a global settlement agreement that is now set forth in the Plan. These results simply would not have been achieved without the work of Steering Committee Counsel pursuant to their contingency fee arrangement.

III. THE ALLOWED FEE CLAIM IS SUPPORTED BY THE COMMON FUND DOCTRINE

21. Although the Court need not look beyond the reasonableness of the RMBS Settlement and the RMBS Trustees' agreement thereto, the Allowed Fee Claim is also supported by the common fund doctrine. Under the common fund doctrine, if an attorney's efforts result in a fund or benefit for parties in addition to the attorney's client, a court may award fees from that fund to prevent the unjust enrichment of the parties benefiting from the fund. *See, e.g.*, *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.") (citations omitted); *see also Kopet v. Esquire Realty Co.*, 523 F.2d 1005, 1008 (2d Cir. 1975) ("There is no question . . . that federal

11

courts may award counsel fees based on benefits resulting from litigation efforts even where adjudication on the merits is never reached, e.g., after a settlement."). Bankruptcy courts have authorized, under the common fund doctrine, the payment of contingency fees to counsel for creditors from funds created or established as a result of such counsel's efforts. *See, e.g.*, *In re Milton Poulos, Inc.*, 947 F.2d 1351, 1353 (9th Cir. 1991) (reversing denial of award of attorneys' fees from fund, where counsel was "directly responsible for the availability of the funds from the statutorily created trust. Through their efforts, the bankruptcy court declared the trust valid and enforceable, thereby permitting the funds to be dispersed among the trust claimants. As the efforts of these attorneys resulted in a common fund for the group . . . they are entitled to recover their attorneys' fees out of the fund.") (citing *Boeing*, 444 U.S. at 478). Judge Mabey's expert testimony sets forth at length the reasonableness of the Allowed Fee Claim, including an analysis of the factors considered in awarding attorneys' fees in common fund cases. *See* Mabey Decl., Annex at 48-51.

IV.     TO THE EXTENT APPLICABLE, THE ALLOWED FEE CLAIM IS REASONABLE UNDER SECTION 1129(a)(4).

22.     The RMBS Settlement is subject to approval under Bankruptcy Rule 9019. The Allowed Fee Claim is simply a percentage of the RMBS Trust Claims that are to be allowed pursuant to Bankruptcy Rule 9019. The implementation and approval of the RMBS Settlement in the context of a global settlement implemented by the Plan does not change the standard for approval. *Resolution Trust Corp. v. Best Prods. Co.* (*In re Best Prods. Co.*) 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995) ("Irrespective of whether a claim is settled as part of a plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to a separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same.").

23. To the extent the Court determines section 1129(a)(4) may be applicable to the Allowed Fee Claim, the Allowed Fee Claim is nevertheless reasonable under section 1129(a)(4). The determination of whether a payment is reasonable under section 1129(a)(4) requires an analysis based on the facts and circumstances of the payments. As one court has stated, the issue of reasonableness:

> will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate. In the typical case, payments that are not payable from, or reimbursable by, the bankruptcy estate should not engender anything like the judicial scrutiny devoted to those that are payable out of the bankruptcy estate.

*In re Journal Register Co.*, 407 B.R. 520, 537-38 (Bankr. S.D.N.Y. 2009) (citing *Mabey v. Southwestern Elec. Power Co.* (*In re Cajun Elec. Power Coop, Inc.*), 150 F.3d 503, 517 (5th Cir. 1998)). Here, the Allowed Fee Claim is a percentage of the Allowed RMBS Trust Claims. The RMBS Trusts have agreed to the Allowed Fee Claim, and the Allowed Fee Claim does not impact the recoveries of any other creditor. Judge Mabey's expert testimony sets forth at length the reasonableness of the Allowed Fee Claim under section 1129(a)(4). *See* Mabey Decl., Annex at 51-59. Regardless of the level of scrutiny applied, the Allowed Fee Claim is reasonable.

## **CONCLUSION**

WHEREFORE, the Steering Committee Group respectfully requests that the Court overrule the JSN Objection and confirm the Plan.

13

Dated: November 12, 2013
New York, New York

*/s/ D. Ross Martin*

Kathy D. Patrick, Esq. (*pro hac vice*)
Robert J. Madden, Esq. (*pro hac vice*)
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile:  (713) 750-0903

-AND-

ROPES & GRAY LLP
Keith H. Wofford, Esq. (KW-2225)
D. Ross Martin, Esq. (DM-2947)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone:  (212) 596-9000
Facsimile:   (212) 596-9090

*Attorneys for the Steering Committee Group of RMBS Holders*