**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Residential Capital, LLC, *et al.* | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

### DECLARATION OF RALPH R. MABEY

I, Ralph R. Mabey, hereby certify and declare as follows based upon my own personal

information and knowledge:

1.      I respectfully submit this declaration, in lieu of direct testimony, in connection

with confirmation of the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and

the Official Committee of Unsecured Creditors* [Docket No. 4153] (as amended from time to

time, the "Plan").[1]

2.      Annexed hereto is a copy of the "Expert Report of Ralph R. Mabey" (the

"Report") that I, with the assistance of my colleagues, prepared and executed on October 18,

2013.  The Report sets forth my opinions on the issues analyzed therein, and the facts set forth in

the Report are true and correct based upon my knowledge, information and belief as set forth in

the Report, or have been assumed by me to be true and correct also as set forth in the Report.  I

incorporate the contents of my Report into this declaration as if set forth in full herein.

3.      As stated in the Report, Gibbs & Bruns LLP ("Gibbs & Bruns") and Ropes &

Gray LLP ("Ropes & Gray") (together, "Steering Committee Counsel") retained me to give my

opinion as to whether payment of 5.7% of the Allowed RMBS Trust Claims (the "Allowed Fee

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Plan.

Claim") to certain law firms who represented holders of notes, securities and/or certificates of the RMBS Trusts provided for in the Plan is reasonable.

4.    Based on the entirety of the analysis set forth in the Report, it is my opinion that the Allowed Fee Claim is reasonable.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of November, 2013, at Salt Lake City, Utah.

Ralph R. Mabey

2

# ANNEX

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| In re | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | Chapter 11 |
| | ) | |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |


**EXPERT REPORT OF RALPH R. MABEY**

## TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION ........................................................................................1

II.    SUMMARY, CONCLUSIONS AND OPINION ............................................2

III.   BACKGROUND AND QUALIFICATIONS ...................................................6

IV.    DOCUMENTS REVIEWED AND INTERVIEWS CONDUCTED ..............................9

       A.    Documents Reviewed .......................................................9

       B.    Interviews Conducted ....................................................15

V.     FACTUAL BASIS FOR OPINION.................................................................15

       A.    The RMBS Trusts .........................................................16

       B.    The RMBS Trust Claims ................................................17

       C.    Collective Action And Organization Of The RMBS Steering
             Committee ...................................................................19

       D.    The RMBS Steering Committee .....................................23

       E.    Negotiation Of Original Steering Committee RMBS Settlement.....................23

       F.    The Original Plan Support Agreement .............................30

       G.    The Chapter 11 Cases And The 9019 Motion ...................31

       H.    The Platform Sale And Whole-Loan Sale .........................32

       I.    Plan Negotiations and Mediation.....................................35

VI.    LEGAL BASIS FOR OPINION...................................................................40

       A.    The Allowed Fee Claim Is Based Upon A Reasonable Contingency
             Fee..............................................................................40

             1.    The Allowed Fee Claim Is A Reasonable Fee Arrangement
                   Under  State Law. ...............................................40

             2.    Contingency Fees Are Permitted Under The Bankruptcy
                   Code ................................................................46

                   a.    Bankruptcy Code Section 328 ...................46

b.      The Common Fund Doctrine. ......................................................48

B.     The Allowed Fee Claim Has Been Disclosed And Is In My
       Opinion Reasonable Under Bankruptcy Code Section 1129(a)(4)....................51

       1.      Who Makes The Payment?.....................................................................54

       2.      Disclosure and Opportunity To Object...................................................54

       3.      Acceptance By Affected Parties .............................................................57

       4.      Complexity Of Case/Involvement of RMBS Steering
               Committee and RMBS Trustees .............................................................58

       5.      Comparison To Market...........................................................................59

C.     Consideration Of The Substantial Contribution Factors Supports
       The Reasonableness Of The Allowed Fee Claim .................................................59

D.     Bankruptcy Code Section 330 and The *Johnson* Factors. .................................65

E.     Conclusion ...........................................................................................................67

## I.    <u>INTRODUCTION</u>

1.      Gibbs & Bruns LLP ("<u>Gibbs & Bruns</u>") and Ropes & Gray LLP ("<u>Ropes & Gray</u>") ("<u>Steering Committee Counsel</u>") retained me to give my opinion as to whether payment of 5.7% of the Allowed RMBS Trust Claims[1] (the "<u>Allowed Fee Claim</u>") to certain law firms who represented holders of notes, securities and/or certificates of the RMBS Trusts provided for in the Plan is reasonable.

2.      The Allowed Fee Claim is a percentage of the Allowed RMBS Trust Claims based upon the contingency fee agreement negotiated by the RMBS Steering Committee (defined below) and Steering Committee Counsel.  The Allowed Fee Claim will be paid by allocating to certain law firms identified in the Disclosure Statement an aggregate of 5.7% of the Allowed RMBS Trust Claims.  Based upon the projected recoveries set forth in the Disclosure Statement, the Allowed RMBS Trust Claims would yield approximately $700 million in distributions and the Allowed Fee Claim would yield approximately $39 million in distributions. The Debtors' plan supplement, filed with the Court on October 11, 2013 [Docket No. 5342] (the "<u>Plan Supplement</u>"), provides for the allocation of the Allowed Fee Claim among law firms.  I have not been asked to opine on the allocation of the Allowed Fee Claim as set forth in the Plan Supplement, or to opine on the reasonableness of the Allowed Fee Claim with respect to each law firm receiving an allocation thereof.  My engagement solely is focused on providing my opinion on the reasonableness of the aggregate 5.7% Allowed Fee Claim based upon the efforts of the RMBS Steering Committee and Steering Committee Counsel and the facts and circumstances giving rise to the Allowed RMBS Trust Claims.

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Joint Chapter 11 Plan Proposed By Residential Capital, LLC, et al. And The Official Committee of Unsecured Creditors [Docket No. 4819-2] (the "<u>Plan</u>").

3.      In formulating my opinion I have drawn on my lengthy experience as a

Bankruptcy Judge and as a practicing attorney in the restructuring field representing debtors,

committees, and creditors, my academic teaching, speaking and writing activities, and my

specific experience as a Trustee, Mediator, Examiner and Expert on restructuring issues.  A

detailed description of my professional background, the hourly rates charged, and related

matters, is set forth in Section III, below.

4.      To understand the facts relevant to my analysis, my colleagues and I

reviewed numerous pleadings filed in the Chapter 11 Cases, interviewed certain participants in

the Chapter 11 Cases, and relied upon the Statement of Involvement prepared by Steering

Committee Counsel.  The direct facts upon which my analysis is based are set forth in Section V,

below.  A description of the materials reviewed and interviews conducted in establishing these

facts is set forth in Section IV, below.

5.      To anchor the legal meaning of "reasonable" as it applies to my

assessment of the reasonableness of the Allowed Fee Claim, we reviewed non-bankruptcy law

related to contingency fees and bankruptcy law relating to compensation in chapter 11 cases.  A

statement of the legal authorities considered, and the extent to which they bear upon my opinion,

is set forth in Section VI, below.

## II.    SUMMARY, CONCLUSIONS AND OPINION

6.      I was asked by the Steering Committee Counsel to provide my opinion as

to whether the Allowed Fee Claim is reasonable.[2]  The Bankruptcy Code does not define

---

[2]      In formulating my opinion, I have analyzed the Allowed Fee Claim on a stand-alone basis, and not as part of the consideration of the reasonableness of the RMBS Settlement.  I have not been asked to express an opinion as to whether the overall RMBS Settlement is reasonable, or whether the Allowed Fee Claim is reasonable by virtue of the reasonableness of the overall RMBS Settlement.

"reasonable," and the common dictionary meaning of reasonable[3] does not provide meaningful guidance.  As there is no *a priori* set of facts or circumstances that defines that which is reasonable, my opinion relies upon a qualitative and quantitative analysis of the Allowed Fee Claim.  The qualitative analysis requires consideration of the nature, extent, context and quality of the actions giving rise to the Allowed Fee Claim.  The quantitative analysis requires consideration of the amount of the Allowed Fee Claim and the facts and circumstances fixing the amount.

7.    To provide a foundation for my analysis, we reviewed and considered the jurisprudence related to (i) contingency fee arrangements, and (ii) sections 328, 330, 503(b)(3)(D) and (b)(4), and 1129(a)(4) of the Bankruptcy Code.[4]

8.    Based upon my experience and qualifications, the facts as presented, and drawing upon relevant case law, it is my opinion that the Allowed Fee Claim is reasonable.  As discussed in detail below, my opinion is based upon the following conclusions:

- The Allowed Fee Claim is based upon a contingency fee arrangement negotiated by the RMBS Steering Committee and Steering Committee Counsel that was negotiated and agreed to by sophisticated parties.  This fee arrangement took proper account of the factual and legal risks and uncertainties, costs, and time requirements associated with pursuing representation and warranty claims related to RMBS, and is at the lower end of the range of market comparable contingency fee arrangements.

- The Bankruptcy Code permits a contingency fee arrangement.

- Under applicable state law guidelines, the contingency fee negotiated by the RMBS Steering Committee and the Steering Committee Counsel is reasonable and not excessive.

---

[3]    *See* Miriam Webster Dictionary, available at http://www.merriam-webster.com/dictionary/reasonable (last visited October 9, 2013) ("1 a: being in accordance with reason <a *reasonable* theory> b: not extreme or excessive <*reasonable* requests> c: moderate, fair <a *reasonable* chance> <a *reasonable* price> d: inexpensive").

[4]    I have not been asked to, and do not, provide an opinion as to, the applicability of these, or other, statutory sections to approval of the Allowed Fee Claim.  These legal precedents are reference points drawn upon in framing my opinion on the reasonableness of the Allowed Fee Claim.

- The Allowed Fee Claim is part of the RMBS Settlement and the RMBS Trustees agreed to and support the RMBS Settlement.

- The Global Settlement, which includes the RMBS Settlement, is the product of hard work and cooperation among, and is agreed to and supported by, the Debtors, Ally, the Official Committee of Unsecured Creditors, the RMBS Trustees, AIG Asset Management (U.S.), LLC, Allstate Insurance Company, Financial Guaranty Insurance Company, the Kessler Class Claimants, Massachusetts Mutual Life Insurance Company, MBIA Insurance Corporation, Prudential Insurance Company of America, the Supporting Senior Unsecured Noteholders, Wilmington Trust, National Association, and Paulson & Co., Inc.

- The Allowed Fee Claim does not deplete the assets of the Debtors' estates; it is a part of, and allocated from, the Allowed RMBS Trust Claims fixed pursuant to the RMBS Settlement.

- The Allowed Fee Claim was disclosed from the outset of the Chapter 11 Cases with the filing of the Original Steering Committee RMBS Settlement (defined below). Since then, additional notices of the RMBS Settlement have been given.

- The RMBS Steering Committee and Steering Committee Counsel engaged the Debtors to settle the RMBS Trust Claims, maintained their position of seeking a negotiated resolution throughout the relevant time frame (backed by the threat of litigation of the RMBS Trust Claims), and did not engage in aggressive, non-productive, litigation tactics.

- The RMBS Steering Committee and Steering Committee Counsel led the negotiations resulting in the Original Steering Committee RMBS Settlement, its subsequent two modifications in response to initial objections raised, and its final modification and incorporation in the Plan.

- By entering into the Original Steering Committee RMBS Settlement, the RMBS Steering Committee and Steering Committee Counsel helped to set the framework for, and actively worked with the Debtors and other parties-in-interest to facilitate, the Debtors' transition into chapter 11 and the maintenance of the Debtors' going concern franchise. This enabled the sale of the Debtors' servicing platform and whole loan portfolio resulting in $4.1 billion of gross proceeds to the Debtors' estates.

- The RMBS Steering Committee and Steering Committee Counsel identified a structure and mechanism for settling various disputes with the Monoline insurers (MBIA and FGIC), thus helping to move forward the settlement negotiations which at that time had not yet resulted in a comprehensive resolution.

- The RMBS Steering Committee and Steering Committee Counsel actively worked with other parties-in-interest to address the hundreds of trusts not included in the Original Steering Committee RMBS Settlement (the "Orphan Trusts"). They agreed to include the Orphan Trusts as part of the RMBS Trusts sharing in the Allowed

RMBS Trust Claims notwithstanding the dilution of the interests of the RMBS
Steering Committee.

- The RMBS Steering Committee and Steering Committee Counsel were continuously
involved, over the span of almost a year, as active participants in the negotiations that
ultimately resulted in the Global Settlement, both in the context of the formal
mediation process and outside of the formal mediation process.

- The RMBS Steering Committee and Steering Committee Counsel aided the Debtors'
restructuring process by providing relevant background to the RMBS Trust Claims,
identifying and clarifying legal issues, providing position papers on relevant legal
issues, negotiating disputes, and engaging parties-in-interest, educating them as to the
gating issues and soliciting their support for a consensual global resolution.

- The Original Steering Committee RMBS Settlement, standing alone, and as part of
the Global Settlement: (i) resolved complex and uncertain legal issues that would take
years to litigate at considerable cost to the Debtors and the parties-in-interest, with an
outcome that is uncertain; (ii) provided the foundation for the Debtors to realize the
value of their mortgage servicing business and whole loan business in generating
$4.1 billion of gross proceeds; (iii) enabled the Debtors to advance their
reorganization by providing the basis for a plan of reorganization, thereby
accelerating recoveries for creditors; and (iv) is supported by virtually every major
constituent in the Chapter 11 Cases.

- A comparison of the Original Steering Committee RMBS Settlement negotiated by
the RMBS Steering Committee and Steering Committee Counsel and the RMBS
Settlement incorporated in the Plan shows that the essential structure and purpose of
the Original Steering Committee RMBS Settlement remained intact providing the
fulcrum for the Debtors' reorganization: (i) The RMBS Trust Claims of $7.301 billion
(which exclude a claim for the Insured RMBS Trusts) compares to the initial allowed
claim of $8.7 billion that was available to all of the RMBS Trusts as set forth in the
Original Steering Committee RMBS Settlement taking into consideration the
approximate $1.8 billion of claims of the Insured RMBS Trusts now excluded from
the RMBS Trust Claims and separately treated.  (ii) The structure of the RMBS Trust
Claims against the Debtors has generally remained from the initial settlement
structure, with the Allowed amount against the GMACM Debtors and the RFC
Debtors specified, and with no claim allowed against the ResCap Debtors.  (iii) A
process for an inter-creditor allocation of the RMBS Trust Claims among the RMBS
Trusts has remained from the initial settlement structure, with the included trusts
expanded to include the Orphan Trusts, and the allocation process flushed out and
clarified.  (iv) The debtor releases and third party releases have generally remained
from the initial settlement structure.  (v) The exculpations have generally remained
from the initial settlement structure.  (vi) The Ally contribution, now increased, has
remained from the initial settlement structure.

- By working to clarify and expand the coverage of the Original Steering Committee
RMBS Settlement, and working with others to find common ground for a

comprehensive settlement that would avoid protracted and costly bankruptcy
litigation, the direct impact on the RMBS Steering Committee has been a reduction in
the claim size negotiated in the Original Steering Committee RMBS Settlement, but
prevention of further diminution of the estates from which that claim would be paid.
Instead of digging in their heals to preserve the letter of their negotiated agreement,
the RMBS Steering Committee and Steering Committee Counsel committed
themselves in the Chapter 11 Cases to preserving the essential benefit of their
negotiated agreement in a manner that also furthered the comprehensive resolution of
the many complex issues confronting the Debtors, and furthered the conservation of
estate assets, even when doing so resulted in a decrease in the claim size negotiated
by the members of the RMBS Steering Committee.

## III.    BACKGROUND AND QUALIFICATIONS

9.    I received my law degree from Columbia University in 1972 and served
on the Board of Editors of the Columbia Law Review.  I formerly served as a United States
Bankruptcy Judge from 1979 to 1983.

10.    Currently, I am Senior of Counsel to Stutman, Treister & Glatt P.C.
("Stutman"), and Professor of Law at the S.J. Quinney College of Law, University of Utah.  My
law firm specializes in, and limits its practice to, bankruptcy matters.  I am a member of the New
York and Utah Bars.

11.    I have served as the president and chair of the American College of
Bankruptcy and as an appointee of the Chief Justice of the United States to the U.S. Judicial
Conference's Advisory Committee on the Bankruptcy Rules.  I have also served as a managing
editor of the *Norton Bankruptcy Law Adviser*, on the Editorial Advisory Board of the *American
Bankruptcy Law Journal*, and as a contributing author to *Collier on Bankruptcy.* I am a member
of the National Bankruptcy Conference, the American Law Institute, and the International
Insolvency Institute.  I have experience in many chapter 11 cases representing debtors, official
creditor and shareholder committees, bondholders, employees, secured creditors, and unsecured
creditors.  These cases include Baldwin-United, Columbia Gas Systems, Dow Corning, Enron,
Federated Department Stores, MicroAge, TWA, United Airlines, and US Airways.  My firm has

represented debtors, official creditor and shareholder committees, bondholders, employees,

secured creditors, and unsecured creditors in bankruptcy courts throughout the United States.

These cases include Adelphia, American Airlines, Calpine, Carter Hawley Hale, Chrysler, CIT

Group, Daewoo Motors America, Dynegy, Eastman Kodak, Edwards Theatres Circuit, Enron,

Extended Stay Hotels, Falcon Industries, General Growth, General Maritime, Geneva Steel,

Hechinger, Hostess Brands, Jefferson County, Lehman Brothers, Lyondell Chemicals, Mariner

Post Acute Network/Mariner Health Group, Maxicare, MF Global, MGM, Nortel, Overseas

Shipholding, Owens-Corning, Papercraft, Refco, The Resort at Summerlin, Scotia Pacific,

Tribune Companies, TOUSA, UHP Healthcare, U.S. Aggregates, Washington Mutual, Western

Asbestos, and WorldCom.

          12.     Stutman represents a number of existing clients  ("Existing Clients") in

connection with certain matters arising in, or related to, the Chapter 11 Cases, but unrelated to

my opinion on the reasonableness of the Allowed Fee Claim.  The Existing Clients provided a

waiver to allow me, and other members of Stutman who are not currently doing work for

Existing Clients with respect to the Chapter 11 Cases, to provide this report.  Steering Committee

Counsel was advised of the concurrent representation of Existing Clients and waived any

objections to such concurrent representation.  Notwithstanding these concurrent representations,

Stutman strictly preserves all client confidences.  Stutman's representation of Existing Clients

and the provision of this report are subject to an "ethical wall" within Stutman.  Accordingly,

none of the Stutman attorneys presently working for any of Existing Clients, or who are working

with me on this report, are permitted to discuss the substance of their services, or exchange

substantive information regarding their services, with the attorneys at Stutman not working for

the same client.  Kizzy L. Jarashow, an associate at Stutman, worked on a discrete research

project for an Existing Client on a matter unrelated to this report, and was released by the Existing Client to provide assistance to me in connection with my preparation of this report.

13.    I was appointed by the United States Trustee on order of the Court to investigate and supervise the actions of management in the chapter 11 case of A.H. Robbins (Virginia).  The complexities in that case included approximately 300,000 tort claims related to the Dalkon Shield IUD.  In the chapter 11 case of Cajun Electric Power Cooperative (Louisiana), I was appointed as trustee by the United States Trustee on order of the Court to assume the duties of management of the company during bankruptcy, as well as to investigate the conduct of past management.  I was also appointed by the United States Trustee on order of the Court to investigate transactions preceding the chapter 11 case of Extended Stay Hotels (New York).

14.    In addition, courts and parties have appointed me to serve as mediator or arbitrator in cases in Alaska, Arizona, California, Delaware, Michigan, New York, Texas, Utah and Washington, D.C.  By order of the United States Bankruptcy Court for the Southern District of New York, I currently serve as court-appointed mediator in the Lehman Brothers cases (New York).

15.    I have published a number of bankruptcy-related articles and appeared as a faculty member on a number of workout and bankruptcy programs.  These activities, for the last decade only, are set forth in the list attached hereto as **Exhibit A**.

16.    Within the preceding four years, I have been deposed, testified, or reported as an expert in the matters set forth in the list attached hereto as **Exhibit B**.

17.    For my services as an expert witness in the present matter, my firm will be compensated for my time at my rate of $1065 an hour and for the work of shareholders and associates who assist me at their guideline hourly rates for these kinds of engagements.

IV.    **DOCUMENTS REVIEWED AND INTERVIEWS CONDUCTED**

A.    **Documents Reviewed**

18.    In conjunction with my colleagues, we reviewed the following materials in connection with formulating my opinion:

a.    RMBS Trust Settlement Agreement (Steering Committee) [Docket No. 320-2]

b.    RMBS Trust Settlement Agreement (Talcott Franklin) [Docket No. 320-4]

c.    Amended and Restated RMBS Trust Settlement Agreement (Steering Committee) [Docket No. 1176-2]

d.    Declaration of Jeffrey A. Lipps [Docket No. 1712-7]

e.    Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 1887]

Exhibit 1 – Order Granting Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements

Exhibit 2 – Third Amended & Restated RMBS Trust Settlement Agreement (Steering Committee)

Exhibit 3 – Third Amended & Restated RMBS Trust Settlement Agreement (Talcott Franklin)

Exhibit 4 – Supplemental Declaration of Jeffrey A. Lipps

Exhibit 5 – Supplemental Declaration of Frank Sillman In Support of Debtor's Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements

f.    Revised Joint Omnibus Scheduling Order And Provisions For Other Relief Regarding (I) Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of RMBS

Trust Settlement Agreements, And (II) The RMBS Trustees' Limited Objection To The Sale

Motion [Docket No. 945]

g.      Objection of MBIA Insurance Corporation to Debtors' Motion Pursuant to

Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No.

2810]

h.      Objection of Wilmington Trust, National Association to the Debtors'

Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement

Agreements [Docket No. 2814]

i.      Limited Objection to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019

for Approval of the RMBS Trust Settlement Agreements [Docket No. 2297]

j.      Debtors' Reply Brief re *Iridium* Factors in Support of Debtors' Motion for

Approval of the RMBS Trust Settlement Agreements [Docket No. 2803]

k.      Debtors' Reply Brief re Non-*Iridium* Issues in Support of Debtors' Motion

for Approval of the RMBS Trust Settlement Agreements [Docket No. 2804]

l.      The Steering Committee Investors' Consolidated Reply to Objections to

the RMBS Trust Settlement Agreement [Docket No. 2808]

m.      RMBS Trustees' Statement Regarding Debtors' Motion Pursuant to Fed. R.

Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2833]

n.      The Steering Committee Investors' Reply to Objections of Assured

Guaranty and the Junior Secured Noteholders to the RMBS Trust Settlement Agreement [Docket

No. 3011]

o.      Ally Financial, Inc.'s Omnibus Reply to the Objections to the Debtors'

Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS

Trust Settlement Agreements Submitted by the Official Committee of Unsecured Creditors,

Financial Guaranty Insurance Company, MBIA Insurance Corporation, and Wilmington Trust,

National Association [Docket No. 2816]

        p.     Ally Financial, Inc.'s Reply to the Objections of the Ad Hoc Committee of

Junior Secured Noteholders to the Debtors' Second Supplemental Motion Pursuant to Fed. R.

Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 3009]

        q.     Debtors' Motion For The Entry Of An Order Further Extending Their

Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof [Docket No.

2918]

        r.     Examiner's Report, Vol. 1 (Selected Pages: I-33-39 and III-300-35)

        s.     Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and

363(b) Authorizing the Debtors to Enter into and Perform Under a Plan Support Agreement with

Ally Financial, Inc., the Creditors' Committee, and Certain Consenting Claimants [Docket No.

3814]

        t.     Declaration of Lewis Kruger In Support Of Debtors' Motion For An Order

Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter into and

Perform Under a Plan Support Agreement with Ally Financial, Inc., the Creditors' Committee,

and Certain Consenting Claimants [Docket No. 3814-3]

        u.     Joinder of Certain RMBS Trustees to the Debtors' Motion for an Order

Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter into and

Perform Under a Plan Support Agreement with Ally Financial, Inc., the Creditors' Committee,

and Certain Consenting Claimants [Docket No. 3940]

        Exhibit A – Declaration of Robert H. Major

        Exhibit B – Declaration of Brendan Meyer

                  11

Exhibit C – Declaration of Fernando Acebedo

Exhibit D – Declaration of Thomas Musarra

Exhibit E – Declaration of Mamta K. Scott, As Officer Of U.S. Bank, As RMBS Trustee

Exhibit F – Declaration of Mary L. Sohlberg

Exhibit G – Affidavit Regarding Dissemination of Notices And Information To RMBS Trust Certificateholders

v.      Limited Objection to Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter into and Perform Under a Plan Support Agreement with Ally Financial, Inc., the Creditors' Committee, and Certain Consenting Claimants [Docket No. 4008]

w.      Official Committee of Unsecured Creditors' Statement In Support of, And Response to Objections to, Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter into and Perform Under a Plan Support Agreement with Ally Financial, Inc., the Creditors' Committee, and Certain Consenting Claimants [Docket No. 4064]

x.      Order Granting Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter into and Perform Under a Plan Support Agreement with Ally Financial, Inc., the Creditors' Committee, and Certain Consenting Claimants [Docket No. 4098]

y.      Memorandum Opinion Approving The Plan Support Agreement [Docket No. 4102]

z.     Disclosure Statement for the Joint Chapter 11 Plan Proposed by

Residential Capital, LLC et al., and the Official Committee of Unsecured Creditors [Docket No.

4819]

Exhibit 1 — Joint Chapter 11 Plan

Exhibit 2 — List of Debtors

Exhibit 3 — Organizational Chart

Exhibit 4 — Illustrative Unit Issuance Structure

Exhibit 5 — Consenting Claimants

Exhibit 6 — List of Seven Largest Intercompany Balances

Exhibit 7 — Recovery Analysis

Exhibit 8 — Liquidation Analysis

Exhibit 9 — RMBS Trusts: Methodology for Calculation of Recognized

Claims

Exhibit 10 — JSN's Position on Examiner's Report & Ally's Response

Exhibit 11 — List of Payments to be Made Pursuant to the Plan

Exhibit 12 — Schedule of Recoveries to the RMBS Trusts

Exhibit 13 — Explanation of Calculation of Recoveries to the RMBS

Trusts

aa.     Objection of the United States Trustee to Plan Proponents' Disclosure

Statement [Docket No. 4596]

bb.     Limited Objection To Plan Proponents' Motion For An Order (I)

Approving Disclosure Statement, (II) Establishing Procedures For Solicitation and Tabulation of

Votes to Accept or Reject the Plan Proponents' Joint Chapter 11 Plan, (III) Approving the Form

of Ballots, (IV) Scheduling a hearing on Confirmation of the Plan, (V) Approving Procedures for

Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan, and

(VI) Granting Related Relief [Docket No. 4591]

        cc.     Exhibits 2 Through 21 Comprising The Plan Supplement To The Joint

Chapter 11 Plan Proposed By Residential Capital, LLC, et al. And The Official Committee of

Unsecured Creditors (Selected Pages: Exhibit 14) [Docket No. 5342]

        dd.     Witness Statement of John S. Dubel [Docket No. 4436]

        ee.     Memorandum Opinion and Order, and Findings of Fact and Conclusions

of Law, Approving the FGIC Settlement Motion [Docket No. 5042]

        ff.     Direct Testimony of Marc D. Puntus [Adv. Case No. 13-01343, Docket

No. 75]

        gg.     Direct Testimony of Thomas Marano [Adv. Case No. 13-01343, Docket

No. 79]

        hh.     Engagement Agreement Regarding Retention of Gibbs & Bruns LLP For

Representation And Warranty Litigation

        ii.     Engagement Agreement Regarding Retention of Ropes & Gray LLP For

Bankruptcy Aspects Of Representation And Warranty Litigation

        jj.     Verified Statement of Gibbs and Bruns LLP Pursuant to Federal Rule of

Bankruptcy Procedure 2019 [Docket No. 1741]

        kk.     Overview of Contingent Fee Considerations

        ll.     Steering Committee Counsel Statement of Involvement

        mm.     Series Supplement To Standard Terms of Pooling and Servicing

Agreement, between Residential Funding Mortgage Securities I, Inc., Residential Funding

Company, LLC, and U.S. Bank National Association (as Trustee), dated as of November 1, 2007

(Selected Pages: Sections 2.01 and 2.02 and Exhibit A (Standard Terms of Pooling and Servicing

Agreement) at Sections 2.01, 2.02, 7.01 and 8.01)

nn.    White Paper of Ad Hoc RMBS Holder Group Regarding Secured Status of

Representation and Warranty Claims Against GMAC Mortgage LLC and Residential Funding

LLC

oo.    Steering Committee Counsel Biographies

**B.    <u>Interviews Conducted</u>**

a.    Kathy Patrick, Gibbs & Bruns, Counsel to RMBS Steering Committee

b.    D. Ross Martin, Ropes & Gray, Counsel to RMBS Steering Committee

c.    James L. Garrity, Jr., Morgan, Lewis & Bockius LLP, Counsel to

Deutsche Bank Trust Company Americas and Deutsche Bank National Trust Company, as

RMBS Trustee.

d.    John S. Dubel, Chief Executive Officer, FGIC and Co-Chair of Official

Committee of Unsecured Creditors.

e.    Nancy Mueller, MetLife, Member of RMBS Steering Committee and sub-

committee.

f.    Kenneth Eckstein, Kramer Levin Naftalis & Frankel LLP, Counsel to the

Official Committee of Unsecured Creditors.

**V.    <u>FACTUAL BASIS FOR OPINION</u>**

19.    My opinion assumes as true the Steering Committee Counsel's Statement

of Involvement (the "<u>Statement</u>").  I have not independently verified the information set forth in

the Statement.  I have not received or reviewed any information that is contrary to that contained

in the Statement.  In conjunction with my colleagues, we have reviewed the pleadings filed in the

Chapter 11 Cases noted above.  We have conducted interviews (the "Interviews") as noted

above.  The background facts set forth below are based upon the information obtained from the

Statement, the pleadings, and our Interviews.  Specific sources are footnoted.

A.     **The RMBS Trusts**

20.     The Bank of New York Mellon Trust Company, N.A., Deutsche Bank

Trust Company Americas, Deutsche Bank National Trust Company, U.S. Bank National

Association, Wells Fargo Bank, N.A., HSBC Bank USA, N.A., and Law Debenture Trust

Company of New York each serve as trustee or indenture trustee (collectively, the "RMBS

Trustees" or the "Trustees") for certain mortgage-backed securities trusts (each, a "Trust" and,

collectively, the "RMBS Trusts").[5]  The economic stakeholders of the RMBS Trusts are the

current investors who hold the mortgage-backed securities, notes and certificates ("RMBS

Certificates") related to the RMBS Trusts (collectively, the "Investors").[6]

21.     Before their bankruptcy filings, "a principal business of the Debtors was

the origination, acquisition and securitization of residential mortgages."[7]  The Debtors

"underwrote and sold 392 separate securitizations of private label RMBS between 2004 and

2007, with original principal balances totaling $221 billion."[8]  To securitize the mortgage loans,

certain of the Debtors "originated or acquired residential mortgage loans which were then sold to

---

[5]     Joinder of Certain RMBS Trustees To The Debtors' Motion For An Order Under Bankruptcy Code
Sections 105(a) And 363(b) Authorizing The Debtors To Enter Into And Perform Under A Plan Support
Agreement With Ally Financial Inc., The Creditors' Committee, And Certain Consenting Claimants [Docket
No. 3940] ("RMBS Trustees' Joinder"), at 1.

[6]     *Id.* at 2.

[7]     Debtors' Second Supplemental Motion Pursuant to Fed. Bank. P. 9019 for Approval of the RMBS Trust
Settlement Agreements [Docket No. 1887] ("Second Supplemental Motion to Approve RMBS Settlement")
at 7.

[8]     Examiner's Report, Vol. 1 at III-300; Second Supplemental Motion to Approve RMBS Settlement at 7-8.  The
Debtors also underwrote and sold securitizations of private label RMBS before 2004.  The approximately 1,000
trusts holding the pre-2004 RMBS are referred to as the "Orphan Trusts."  RMBS Trustees' Joinder at 2.

a Trust, in some cases through one or more Debtors, acting as a depositor."[9]  The interests in

those Trusts (together with the rights to receive income generated from the underlying loans)

"are evidenced by the RMBS, which were created and sold to the Investors."[10]

    22.    In certain cases, the payments to be made by the RMBS Trusts to the

holders of the RMBS Certificates were "wrapped" by an insurer (the "Monolines").[11]  Under the

governing documents, the Monolines asserted certain rights of subrogation and claims against

the Debtors and others.[12]

### B.    The RMBS Trust Claims

    23.    In connection with securitization and loan sales, the RMBS Trusts were

provided certain representations and warranties relating to the loans sold.[13]  Those

representations and warranties pertained to the "ownership of the loan, the validity of the lien

securing the loan, the loan's compliance with the criteria for inclusion in the transaction, the

ability to deliver required documentation, and compliance with applicable laws."[14]  Also, in

certain circumstances, the documents governing the RMBS Trusts (the "Governing

---

[9]    Second Supplemental Motion to Approve RMBS Settlement at 8.

[10]    *Id.*

[11]    Memorandum Opinion and Order, And Findings Of Fact And Conclusions Of Law, Approving FGIC Settlement Motion [Docket No. 5042] (the "Order Approving FGIC Settlement"), at 7; Declaration of Lewis Kruger In Support Of Debtors' Motion For An Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors To Enter Into And Perform Under A Plan Support Agreement With Ally Financial, Inc., the Creditors' Committee, and Certain Consenting Claimants (the "Kruger Declaration"), at 11.

[12]    Second Supplemental Motion To Approve RMBS Settlement at ¶ 12.

[13]    Second Supplemental Motion to Approve RMBS Settlement at 8; Disclosure Statement at 30.

[14]    Examiner's Report, Vol. 1 at III-300-01; Second Supplemental Motion To Approve RMBS Settlement at 8.

Agreements")[15] require certain of the Debtors to repurchase securitized mortgage loans that breach applicable representations and warranties.[16]

24.    The RMBS Trustees assert claims against the Debtors for breaches of representations and warranties contained in the Governing Agreements and the failure to repurchase non-performing loans (the "RMBS Trust Claims").[17]  Evidence supporting the RMBS Trust Claims included "(1) excess early default and foreclosure rates in the relevant mortgage pools; (2) an FHFA loan-level analysis, which purportedly showed that up to 49% of the mortgage loans in AFI or ResCap breached certain representations and warranties; (3) MBIA's loan-level analysis (as reported in MBIA's lawsuits against AGI), which purportedly showed that high numbers of mortgages in the RMBS pools were ineligible at origination; (4) downgrades in the credit ratings of the certificates issued by the RMBS trusts; and (5) AFI's reserve in the amount of $289 million for repurchase liabilities as of June 30, 2011."[18]

25.    On the Petition Date, the Debtors were the subject of pending litigation related to the RMBS Trust Claims by the Monolines.[19]  The Monolines' litigation raised complex, novel and uncertain legal issues.[20]  In just one of the cases pending against a debtor entity, *MBIA Insurance Corp. v. Residential Funding Company, LLC*, RFC produced more than

---

[15]    The Governing Agreements include Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements, and other documents governing the RMBS Trusts.  *See* Second Supplemental Motion To Approve RMBS Settlement at 3.

[16]    Second Supplemental Motion to Approve RMBS Settlement at 3, 9.

[17]    *Id.* at 2-3; Examiner's Report, Vol. 1 at III-302; Disclosure Statement at 29, 92-105. The Monolines assert similar claims.

[18]    Examiner's Report, Vol. I at III-302-03.  The Second Supplemental Motion To Approve RMBS Settlement details additional evidence presented to support the RMBS Trust Claims.  Second Supplemental Motion To Approve RMBS Settlement at 15-18.

[19]    Disclosure Statement at 29, 92-105.

[20]    Declaration of Jeffrey A. Lipps [Docket No. 1712-7] ("Lipps Declaration"), at 2-8; Supplemental Declaration of Jeffrey A. Lipps [Docket No. 1887-5] ("Supplemental Lipps Declaration"), at 4-42 (describing complexity of RMBS Trust Claim litigation).

1 million pages of documents, including loan files for over 63,000 separate mortgage loans and

nearly one terabyte of data.[21]  In addition, MBIA took over 80 days of depositions of debtor

personnel, and RFC took over 50 days of depositions of MBIA personnel.[22]  The Debtors, in

their Second Supplemental Motion To Approve RMBS Settlement, acknowledge that their

potential liability for all of the Debtors' securitizations could be in excess of $40 billion.[23]

### C. Collective Action And Organization Of The RMBS Steering Committee

26.     Under the Governing Agreements, the RMBS Trust Claims "belong to the

Trusts, which hold them for the benefit of the Holders in the Trusts."[24]  The RMBS Trustee for

each RMBS Trust "is the party ultimately authorized to pursue representation and warranty

claims and to receive the proceeds from any repurchase of loans for which there is a breach of a

representation or warranty."[25]  The Governing Agreements set forth the obligations of the RMBS

Trustees.[26]

27.     Holders of RMBS Certificates are permitted to direct the RMBS Trustees

to act only in limited circumstances, after they assemble the required voting rights (holding at

least 25% of a particular tranche of RMBS Certificates of a particular RMBS Trust) and provide

required contractual indemnities.[27]  Meeting the threshold requirement of having at least 25% of

---

[21]    Lipps Declaration at 11; Second Supplemental Motion to Approve RMBS Settlement at 4.

[22]    Lipps Declaration at 11; Second Supplemental Motion to Approve RMBS Settlement at 4.

[23]    Second Supplemental Motion to Approve RMBS Settlement at 15; Debtors' Reply Brief re *Iridium* Factors In Support Of Motion For Approval Of RMBS Settlement Agreements [Docket No. 2803] ("Debtors' Iridium Reply Brief"), at Section II.A.

[24]    Second Supplemental Motion to Approve RMBS Settlement at 9 (citing Pooling and Servicing Agreement §§ 2.01(a) and 2.02).

[25]    *Id.* at 10 (citing Pooling and Servicing Agreement § 2.04).

[26]    Steering Committee Counsel Statement at 3; Pooling and Servicing Agreement, Exhibit 4 (Standard Terms of Pooling And Servicing Agreement Dated As Of November 1, 2007), at §§ 7.01 and 8.01.

[27]    Steering Committee Counsel Statement at 3; Pooling and Servicing Agreement, Exhibit 4 (Standard Terms of Pooling And Servicing Agreement Dated As Of November 1, 2007), at §§ 7.01 and 8.01.

a particular tranche of RMBS Certificates of a particular RMBS Trust was a necessary predicate

for holders of RMBS Certificates to protect their interests, and for the Debtors to negotiate with

an organized group of holders of RMBS Certificates.[28]

28.    With this in mind, Gibbs & Bruns developed a strategy to bring together

clients with sufficient holdings to direct RMBS trustees across the industry to act on behalf of the

RMBS trusts.[29]  Gibbs & Bruns handled significant litigation regarding securitized assets for

over a decade, and in that time worked with a number of the holders of RMBS certificates.[30]

Based upon its experience, in early 2010, certain of its large bondholder clients approached

Gibbs & Bruns to organize a group of holders of RMBS certificates to take action with respect to

the RMBS trusts.[31]

29.    Gibbs & Bruns reviewed substantial documentation about the market, the

securities and the governing agreements, and developed a plan to assert certain representation

and warranty claims against the originators and servicers of the RMBS trusts on an industry-wide

basis.[32]  Gibbs & Bruns sought to overcome the significant logistical difficulties of loan-by-loan

litigation of mortgage repurchase and servicing claims, which promised uncertain results and

could have involved decades of litigation.[33]  It also sought to address and reform, on a

comprehensive basis, mortgage servicing practices that were not in the best interests of holders

---

[28]    Steering Committee Counsel Statement at 3; Third Amended And Restated RMBS Trust Settlement [Docket No. 1887-3], at Section 3.02 (requiring the Institutional Investors to maintain a minimum aggregate percentage of holdings in not less than 80% of the Covered Trusts (as defined in the Third Amended And Restated Trust Settlement Agreement)); Second Supplemental Motion To Approve RMBS Settlement at ¶¶ 14, 55.

[29]    Steering Committee Counsel Statement at 3.

[30]    Steering Committee Counsel Statement at 1; *see generally* Verified Statement Of Gibbs And Bruns LLP Pursuant To Federal Rule Of Bankruptcy Procedure 2019.

[31]    Steering Committee Counsel Statement at 1.

[32]    *Id.*

[33]    *Id.*

of RMBS certificates and did not properly align the interests of the holders and borrowers whose mortgages were held by RMBS trusts.[34]

30.    Gibbs & Bruns' strategy depended on the firm's clients collectively holding more than the threshold amounts of securities in the multitude of RMBS trusts. The firm's clients put Gibbs & Bruns in touch with numerous other large holders of RMBS certificates.[35]  As a result, Gibbs & Bruns' client group comprised more than 20 holders of RMBS certificates who rank among the world's largest, most sophisticated investment advisors and investors.[36]  Collectively, the client group holds tens of billions of dollars of ResCap RMBS Certificates.[37]  The client group has been active since March 2010, and has been involved in many matters involving mortgage backed securities, including most notably in resolving claims against Bank of America relating to numerous Countrywide trusts.[38]  Because the group has sufficient size in terms of holdings and long-term commitment of its members, the group has been able to pursue both claims and servicing changes in the industry.[39]

31.    The group, once formed (the "RMBS Steering Committee"), elected a sub-committee to direct the litigation in the Chapter 11 Cases, with as-needed updates and approvals from the entire RMBS Steering Committee.

---

[34]    *Id.*

[35]    *Id.*

[36]    *Id.*; Second Supplemental Motion To Approve RMBS Settlement at 4-5, n. 8; *see generally* Verified Statement Of Gibbs And Bruns LLP Pursuant To Federal Rule Of Bankruptcy Procedure 2019.  The client group is currently comprised of eighteen different institutions, including pension fund advisors, insurance companies, government-sponsored enterprises, government agencies, banks, investment advisors, and other investment funds.  Steering Committee Counsel Statement at 1-2.

[37]    Steering Committee Counsel Statement at 1.

[38]    *Id.* at 2-3.

[39]    *Id.* at 1, 3.

32.     Because the RMBS Trusts own the RMBS Trust Claims,[40] any recovery

on those claims would inure to the benefit of all holders of RMBS Trusts, not just those holders

who actively negotiated for, and financed, the pursuit of the claims.[41]  Thus, during the process

of forming the RMBS Steering Committee, the group was concerned about the inherent "free

rider" problem associated with pursuing the RMBS Trust Claims.  In order to litigate, or settle,

the RMBS Trust Claims, the RMBS Steering Committee would have to spend years litigating

and/or negotiating, incurring significant costs in doing so, yet only receive a portion of the

benefits arising from such activities.

33.     As a result, the RMBS Steering Committee retained Gibbs & Bruns and,

later, Ropes & Gray, on a contingent fee arrangement based on recoveries to the trusts.[42]  The

contingency fee arrangement was designed to facilitate the members of the RMBS Steering

Committee pursuing recovery on the RMBS Trust Claims.[43]  The fee was calibrated by the

parties to reflect the risks inherent in the litigation, which was of a type that had never been

undertaken successfully before on a significant scale, was anticipated to be lengthy and ground-

breaking, and was dependent for its success on the ability of the group to remain intact and to

prompt – and maintain – action by both the holders of the RMBS Certificates and the RMBS

---

[40]    The Steering Committee Investors' Reply To The Objections Of Assured Guaranty And The Junior Secured
        Noteholders To The RMBS Trust Settlement Agreement [Docket No. 3011] ("Steering Committee Reply"),
        at 3.

[41]    Steering Committee Counsel Statement at 2-3.

[42]    *See* Engagement Agreement Regarding Retention of Gibbs & Bruns LLP for Representation and Warranty
        Litigation; Engagement Agreement Regarding Retention of Ropes & Gray LLP For Bankruptcy Aspects of
        Representation and Warranty Litigation; *see also* Steering Committee Counsel Statement at 2, 5.

[43]    Steering Committee Counsel Statement at 2-3.  Notably, until this innovative contingent fee arrangement was
        put in place, there had been no comprehensive resolution of RMBS trust claims and, since this arrangement, the
        only comprehensive resolutions that have been achieved are those achieved by Gibbs & Bruns, acting pursuant
        to a contingent fee arrangement that avoids the free-rider problem inherent in compelling a subset of holders to
        pay hourly rates to lawyers to achieve recoveries that would be shared with those who had not contributed to the
        costs incurred to obtain the recoveries.  *Id.*

Trustees.[44]  Given these structural barriers to recovery, the Gibbs & Bruns and the Ropes & Gray

fees provided for different recoveries based upon, among other things, the different stages of the

litigation, the different outcomes that might be obtained, and the length of time before resolution

was reached.[45]

**D.     The RMBS Steering Committee**

34.     In October 2011, the RMBS Steering Committee held approximately 25%

or more of the securities issued by one or more tranches in 242 ResCap originated RMBS Trusts

(and held RMBS Certificates in other RMBS Trusts).[46]  From its formation in March 2010, the

RMBS Steering Committee has been represented by Kathy Patrick, Scott Humphries, Robert

Madden and David Sheeren of Gibbs & Bruns.[47]  In April 2012, when it was evident that a

bankruptcy filing by ResCap was imminent, the RMBS Steering Committee engaged Ropes &

Gray LLP, which has substantial experience in complex chapter 11 cases, to assist as bankruptcy

counsel.[48]  Ross Martin, Keith Wofford and Andrew Devore of Ropes & Gray have been primary

bankruptcy counsel to the RMBS Steering Committee since April 2012.

**E.     Negotiation Of Original Steering Committee RMBS Settlement**

35.     In October 2011, Ms. Patrick sent a letter to William Solomon, General

Counsel of AFI, to begin discussions to attempt to resolve the substantial RMBS Trust Claims

---

[44]    *Id.*

[45]    *Id.* at 2, 5.

[46]    Steering Committee Counsel Statement at 4.  As of October 19, 2012, the RMBS Steering Committee
        represented 25% or more of the holders of RMBS Certificates of one or more classes of certificates in at least
        304 RMBS Trusts, which RMBS Trusts accounted for approximately 77.5% of the total original issue balance
        for the RMBS Trusts issued from and after 2004.  *See* Second Supplemental Motion To Approve RMBS
        Settlement at 4-5. As of February 1, 2013, the RMBS Steering Committee owned at least 25% of the voting
        rights in 300 of the securitizations issued by the Debtors from and after 2004.  Examiner's Report, Vol. 1 at III-
        302, n.1780.

[47]    *See generally* Steering Committee Counsel Statement.

[48]    *Id.* at 5.

that the RMBS Trustees held against AFI and its affiliates.[49]  After the exchange of further

letters, Gibbs & Bruns met with senior management of ResCap to determine whether a business

resolution of the RMBS Trust Claims could be achieved or whether, instead, it would be

necessary to pursue litigation to enforce the RMBS Trusts' remedies.[50]  To facilitate these

discussions, Gibbs & Bruns and ResCap entered into a confidentiality agreement in January 2012

and, thereafter, ResCap began providing Gibbs & Bruns with data relating to ResCap's

repurchase history, including government-sponsored entity demand rates and repurchase rates.[51]

Gibbs & Bruns undertook significant analysis of this data, the legal terms of the Governing

Documents, and other information relevant to an evaluation of the ResCap entities' repurchase

liabilities and servicing practices.[52]

        36.    From October 2011 until May 2012, the Debtors and Ms. Patrick on behalf

of the RMBS Steering Committee "extensively negotiated the terms of [a] proposed

compromise".[53]  Simultaneously, Gibbs & Bruns was preparing to pursue litigation against both

ResCap and Ally in the event that a settlement was not reached.[54]

        37.    Ms. Patrick's extensive involvement in the prepetition formulation of a

comprehensive settlement of the RMBS Trust Claims is well-documented in the record.[55]

Indeed, the Debtors have recognized that Ms. Patrick brought to the negotiating table a wealth of

---

[49]    Steering Committee Counsel Statement at 4; Examiner's Report, Vol. 1 at III-302; Debtors' Iridium Reply Brief at 11.

[50]    Steering Committee Counsel Statement at 4; Examiner's Report, Vol. 1 at III-304-05; Debtors' Iridium Reply Brief at 11-18.

[51]    Steering Committee Counsel Statement at 4; Examiner's Report, Vol. 1 at III-306-07.

[52]    Steering Committee Counsel Statement at 4; Examiner's Report, Vol. 1 at III-322.

[53]    Second Supplemental Motion To Approve RMBS Settlement at 3-4; Steering Committee Counsel Statement at 5-6; Examiner's Report, Vol. 1 at III-302-323.

[54]    Steering Committee Counsel Statement at 5.

[55]    Examiner's Report, Vol. 1 at III-302-31; Disclosure Statement at 28; Debtors' Iridium Reply Brief at 11-18.

knowledge and experience regarding RMBS Trust Claims.[56]  In the two weeks before the

Petition Date, Gibbs & Bruns and Ropes & Gray engaged in essentially daily (including

weekends) extensive discussions and negotiations with Ally and ResCap, including the exchange

of repurchase data, presentations of expected recoveries, legal analyses, and other diligence

materials.[57]  While both firms were intimately involved in all aspects of the settlement, Gibbs &

Bruns took the lead negotiating the amount of the settlement, while Ropes & Gray took the lead

developing the bankruptcy strategy and negotiating the agreements.[58]

      38.    During the end of April and in early May 2012, Gibbs & Bruns engaged in

extensive negotiations with ResCap over the amount of the allowed claim and the potential sale

of the ResCap servicing platform.[59]

      39.    Stability and improvement in mortgage servicing was a central concern of

Gibbs & Bruns' clients because of the benefits to holders of RMBS certificates and borrowers

resulting from efficient mortgage servicing.[60]  A collapse of the ResCap servicers into

bankruptcy was a concern to Gibbs & Bruns' clients because they believed such a collapse could

have created chaos for borrowers and holders of RMBS Certificates.[61]  Gibbs & Bruns' clients

believed that the RMBS Trustees, who are the contractually designated backup servicers, could

not readily step into the role of servicers and early litigation—even in bankruptcy—over how

and whether to maintain mortgage servicing would create massive uncertainties for borrowers

---

[56]    Disclosure Statement at 28 (The Steering Committee "made a substantial contribution to the Debtors' liquidation efforts and played an integral role in working towards an expeditious resolution of these Chapter 11 cases.").

[57]    Steering Committee Counsel Statement at 5; Examiner's Report, Vol. 1 at III-314-29; Debtors' Iridium Reply Brief at 14-18.

[58]    Steering Committee Counsel Statement at 5.

[59]    *Id.*; Examiner's Report, Vol. 1 at III-310-29.

[60]    Steering Committee Counsel Statement at 5-6.

[61]    *Id.* at 6.

and holders of RMBS Certificates.[62]  For its part, ResCap reported to Gibbs & Bruns that it

attempted to sell its servicing assets outside of bankruptcy, but found that it could not do so

because the RMBS Trusts' servicing and repurchase claims were unresolved and uncertain.[63]

ResCap apparently understood that the sale of the servicing platform would be impossible

without a comprehensive and fair settlement of those claims to permit the uncontested sale of the

platform to a third party buyer.[64]

        40.     Gibbs & Bruns' clients believed that the uncertainty surrounding the

continuation of servicing of loans created an environment in which the parties could engage in

constructive negotiations that would resolve the RMBS Trusts' repurchase and servicing claims,

stabilize the servicer, and permit the sale of the servicing platform in an orderly way for the

benefit of all creditors.[65]

        41.     The negotiations resulting in a settlement between the RMBS Steering

Committee and the Debtors were hard fought by both sides, with both sides having significant

experience in repurchase litigation.[66]  On or about May 8, 2012, Ms. Patrick of Gibbs & Bruns

on behalf of her clients, and ResCap, through its counsel, agreed in principal to an allowed claim

in the amount of $8.7 billion for those post-2004 RMBS Trusts that accepted the proposal (the

"Original Steering Committee RMBS Settlement").[67]

---

[62]   *Id.*

[63]   *Id.*; Disclosure Statement at 63-64.

[64]   Steering Committee Counsel Statement at 6; Disclosure Statement at 63; Second Supplemental Motion To
    Approve RMBS Settlement at 6; Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and
    363(b) Authorizing the Debtors to Enter Into and Perform Under A Plan Support Agreement with Ally
    Financial, Inc., the Creditors' Committee, and Certain Consenting Claimants [Docket No. 3814] (the "PSA
    Motion"), at 6-7; Debtors' Iridium Reply Brief at 1.

[65]   Steering Committee Counsel Statement at 6; Disclosure Statement at 63.

[66]   Steering Committee Counsel Statement at 6.

[67]   *Id.*; *see also* Examiner's Report, Vol. 1 at III-320.

42.    In the days leading up to the Petition Date, Steering Committee Counsel

engaged in around-the-clock negotiations and drafting of the settlement and plan support

agreements.[68]  A significant complexity in the settlement was the combination of (i) a history of

RMBS trustees' role in chapter 11 cases, including the existence of significant and unresolved

RMBS trust claims in the Lehman and Washington Mutual cases many years after those entities

collapsed and (ii) the inability of the RMBS Steering Committee – and the holders of RMBS

Certificates generally – to directly settle the RMBS Trust Claims that belonged to the RMBS

Trusts, who held them for the benefit of holders of RMBS Certificates.[69]

43.    In order to resolve the RMBS Trust Claims, Steering Committee Counsel

developed a novel settlement structure whereby ResCap agreed, as a prepetition agreement to be

timed with the commencement of chapter 11, to make a standing offer to all of the RMBS Trusts

created during the period of 2004-2007 of a share of the $8.7 billion allowed claim, in settlement

of each such trust's repurchase claims.[70]  Through this structure, the RMBS Steering Committee

achieved something not done before: obtain a proposed resolution of repurchase claims early in a

chapter 11 case involving a mortgage originator as a result of a pre-bankruptcy agreement.  That

proposed resolution, early in the Chapter 11 Cases, gave these claimants a significant voice in

the overall case, permitted them to protect their recoveries, and enabled them to press all parties

to resolve the cases consensually rather than permitting them to descend into years of

unproductive and costly litigation.[71]  It also allowed the RMBS Steering Committee to

---

[68]    Steering Committee Counsel Statement at 6; Examiner's Report, Vol. 1 at III-316-31; Second Supplemental
Motion To Approve RMBS Settlement at 11.

[69]    Steering Committee Counsel Statement at 6-7.

[70]    *Id.* at 7; Examiner's Report, Vol. 1 at III-323; Second Supplemental Motion To Approve RMBS Settlement at
10-11.

[71]    Steering Committee Counsel Statement at 7, 9-10; Second Supplemental Motion To Approve RMBS Settlement
at 10-11; Debtors' Iridium Reply Brief at 11-18.

immediately engage the RMBS Trustees in reviewing the settlement and focusing them on

making a decision to either: (i) accept the settlement, or (ii) reject the settlement and engage in

protracted and uncertain litigation even though a definitive settlement offer was acceptable to the

largest group of their beneficial holders.[72]

44.    The Debtors stated that the benefits of the Original Steering Committee

RMBS Settlement include "that a reasonable resolution of the Trusts' repurchase claims could be

achieved that would benefit all of the Debtors' creditors, by removing the risks associated with

expensive and uncertain litigation over tens of billions of dollars in potential mortgage

repurchase claims."[73]   The Debtors also stated that the settlement allowed them to "avoid an

inevitable disruption and potential delay to the Debtors' proposed sale of its mortgage origination

and servicing platform."[74]

45.    As summarized by the Examiner, the Original Steering Committee RMBS

Settlement would "resolve, in exchange for an allowed general unsecured claim of up to $8.7

billion, any alleged and potential representation and warranty claims held by up to 392

securitization trusts in connection with approximately 1.6 million mortgage loans and

approximately $221 billion in original issue balance of associated RMBS, comprising all such

securities issued by the Debtors' affiliates from 2004 to 2007. . . ."[75]   The RMBS Steering

---

[72]    Steering Committee Counsel Statement at 7; Declaration of Robert H. Major [Docket No. 3940-1] ("Major Declaration"), at 7, n.11 ("In early May 2012, BNY Mellon was informed that a lawyer claiming to represent a substantial portion of certificateholders in certain residential mortgage backed trusts, Kathy Patrick of Gibbs & Bruns, P.C. . . . wished to meet with BNY Mellon and three other similarly situated RMBS Trustees, Deutsche Bank, U.S. Bank and Wells Fargo.' . . . 'At the meeting Ms. Patrick informed the attendees of the impending Chapter 11 filings of the Debtors and of the contemplated settlements that had been reached between two groups of institutional investors and the Debtors."); Declaration of Brendan Meyer [Docket No. 3940-2] ("Meyer Declaration"), at 7, n.11 (same).

[73]    Second Supplemental Motion to Approve RMBS Settlement at 10.

[74]    Second Supplemental Motion to Approve RMBS Settlement at 10-11.

[75]    Examiner's Report, Vol. 1 at III-301.

Committee also agreed to support the Debtors' plan of reorganization, including a third-party

release in favor of AFI.[76]

46.     Consistent with the contingency fee arrangement negotiated by the RMBS

Steering Committee, the Original Steering Committee RMBS Settlement provided that a portion

of the Allowed RMBS Trust Claims would be allocated to counsel to the RMBS Steering

Committee (the "Allowed Fee Claim").[77]  Specifically, 5.7% of the Allowed RMBS Trust Claims

would be allocated to counsel for the RMBS Steering Committee, subject to reduction to the

extent that additional counsel representing investors with sufficient holdings instruct an RMBS

Trustee to accept the settlement.[78]

47.     The allocation of 5.7% of the Allowed RMBS Trust Claims to counsel

would "reduce the amount of the Allowed Claim that is ultimately provided to the Trusts[,]"[79]

but would not reduce recoveries to any other creditor constituency.[80]

48.     After the Debtors negotiated the final form of the Original Steering

Committee RMBS Settlement with the RMBS Steering Committee, the Debtors presented the

settlement to the Talcott Franklin Group.[81]  As of October 19, 2012, the Talcott Franklin Group

had holdings of 25% or more of the certificates of at least one tranche of certain RMBS Trusts

and added 35 additional RMBS Trusts to the settlement.[82]  The Talcott Franklin Group agreed to

---

[76]  *Id.*

[77]  Second Supplemental Motion To Approve RMBS Settlement at 12.  As noted above, I am not opining on the
reasonableness of the allocation of the Allowed Fee Claim set forth in the Plan Supplement.

[78]  Third Amended and Restated RMBS Trust Settlement Agreement [Docket No. 1887-2], at Exhibit C.

[79]  *Id.*

[80]  Debtors' Reply Brief re Non-*Iridium* Issues In Support Of Motion For Approval Of RMBS Settlement
Agreements [Docket No. 2804] ("Debtors' Non-Iridium Reply Brief"), at 28; The Steering Committee Investors'
Consolidated Reply To The Objections To The RMBS Trust Settlement Agreement [Docket No. 2808]
("Steering Committee Consolidated Reply"), at 24-25.

[81]  Debtors' Iridium Reply Brief at 18.

[82]  Second Supplemental Motion To Approve RMBS Settlement at 30.

the settlement negotiated by the RMBS Steering Committee that was virtually identical to the

Original Steering Committee RMBS Settlement (the "Original Talcott RMBS Settlement," and

together with the Original Steering Committee RMBS Settlement, as amended, the "Original

RMBS Settlement").[83]

### F.    The Original Plan Support Agreement

49.    Simultaneously with the negotiation of the Original Steering Committee

RMBS Settlement, Steering Committee Counsel negotiated a plan support agreement with

ResCap and Ally (the "Original Plan Support Agreement").[84]  The Original Plan Support

Agreement was important to the prospective sale of ResCap's servicing platform, which would

not only increase recoveries to the RMBS Trusts, but also provide for ongoing servicing and

prevent further servicing losses to the RMBS Trusts.[85]

50.    The Original Plan Support Agreement was premised on a $750 million

contribution from Ally.[86]  While Steering Committee Counsel separately analyzed various claims

the Debtors' estates could assert against Ally, Steering Committee Counsel also recognized that

there were numerous constituencies that did not sign similar plan support agreements and that

Ally would likely be the target of further negotiations.[87]  The Original Plan Support Agreement

provided that the RMBS Trusts would share ratably in any additional contribution from Ally (if

---

[83]    TF RMBS Settlement.

[84]    Steering Committee Counsel Statement at 9; Disclosure Statement at 21; Second Supplemental Motion to Approve RMBS Settlement at 26.

[85]    Steering Committee Counsel Statement at 9; Second Supplemental Motion To Approve RMBS Settlement at 6; PSA Motion at 6-7.

[86]    Steering Committee Counsel Statement at 9; Official Committee Of Unsecured Creditors' Statement In Support Of, And Response To Objections To, Debtors' Motion For An Order Under Bankruptcy Code Sections 105(a) And 363(b) Authorizing The Debtors To Enter Into And Perform Under A Plan Support Agreement With Ally Financial Inc., The Creditors' Committee, And Certain Consenting Claimants [Docket No. 4064] ("Committee Statement In Support Of PSA"), at 5; Witness Statement of John S. Dubel [Docket No. 4436] ("Dubel Witness Statement"), at 4-5.

[87]    Steering Committee Counsel Statement at 9.

one was negotiated by a creditors' committee or other constituents) by requiring that the

allocation methodology of any additional Ally contribution comport with the waterfalls

presented to the RMBS Steering Committee to induce it to enter into the Original Plan Support

Agreement.[88]

### G.    The Chapter 11 Cases And The 9019 Motion

51.    On May 14, 2012 (the "Petition Date"), the day after the parties entered

into the Original RMBS Settlement, each of the Debtors filed a voluntary petition for relief under

chapter 11 of the Bankruptcy Code.[89]

52.    The Original RMBS Settlement was announced on the Petition Date.[90]

Immediately following the announcement, Steering Committee Counsel began working with the

RMBS Trustees on their review of the settlement, and to refine the structure of the settlement to

ensure the ability of the RMBS Trustees to accept the settlement.[91]  Given the size of the

proposed settlement, which dwarfed all other claims in the Chapter 11 Cases, the Original RMBS

Settlement became a target of opposition, discussion and negotiation.[92]

53.    In an effort to consensually resolve objections to the Original RMBS

Settlement, the RMBS Steering Committee, through Steering Committee Counsel, engaged in

frequent discussions with the RMBS Trustees and other parties-in-interest to obtain their support

---

[88]    *Id.*

[89]    Disclosure Statement at 1; Memorandum Opinion Approving The Plan Support Agreement [Docket No. 4102] (the "Opinion Approving PSA"), at 4.

[90]    Steering Committee Counsel Statement at 10.

[91]    *Id.*; see *supra* n. 72.

[92]    Steering Committee Counsel Statement at 10; Disclosure Statement at 21-22 ("Following the Petition Date, the Creditors' Committee and certain of the Debtors' creditor constituencies challenged the sufficiency of the proposed contribution, among other things, and ultimately the Debtors and Ally allowed the prepetition plan support agreements to expire and continued to negotiate the terms of a potential settlement that would appeal to a larger group of creditor constituents."); Dubel Witness Statement at 5.

for the Original RMBS Settlement.[93]  This cooperation resulted in several amendments to the

Original RMBS Settlement, including various amendments to the allocation of the claims among

the RMBS Trusts.[94]

54.    Steering Committee Counsel played a significant role in the litigation of

the motion to approve the Original RMBS Settlement.  Given the size of the settlement, and its

relevance to a chapter 11 plan, various other creditors engaged in extensive litigation.  Steering

Committee Counsel participated in numerous depositions and coordinated litigation strategy to

defend the Original RMBS Settlement.  Additionally, Steering Committee Counsel provided

input on the ongoing developments in this emerging area of the law.[95]

### H.    The Platform Sale And Whole-Loan Sale

55.    Before the Petition Date, liquidation of the Debtors was a distinct

possibility "due to, among other things, uncertainty regarding their ability to assume and assign

the valuable portions of numerous pooling and servicing agreements, mortgage loan purchase

agreements, indentures, servicing agreements and/or Trust agreements . . ., while rejecting other

provisions in [those agreements] related to the origination and sale of the mortgage loans. . . ."[96]

Prospective purchasers of ResCap's servicing platform were not willing to purchase the platform

under the cloud of the RMBS Trust Claims.[97]

56.    Absent resolution of the RMBS Trust Claims or another mechanism to sell

the platform without the cloud of the RMBS Trust Claims, the Debtors would have been forced

to prosecute their argument that the origination-related provisions of the pooling and servicing

---

[93]    Steering Committee Counsel Statement at 10; Dubel Witness Statement at 3-9.

[94]    Steering Committee Counsel Statement at 10-11; Major Declaration at 16-17.

[95]    Steering Committee Counsel Statement at 11-12.

[96]    Disclosure Statement at 63.

[97]    Steering Committee Counsel Statement at 11.

agreements could be "severed" from the servicing provisions.[98]  Steering Committee Counsel

asserted that, if bifurcation was not possible, the Debtors repurchase claims would constitute

"cure claims" entitled to a first priority lien on the proceeds of the sale of the servicing

platform,[99] so that the Debtors "would have been required to pay billions of dollars of additional

defaults under origination-related provisions in the [Governing Agreements] prior to assuming

and assigning these agreements to a purchaser."[100]  Ropes & Gray took the position that, under

section 9-404 of the Uniform Commercial Code, such setoff rights would be senior in priority to

any third-party secured creditors (namely Ally and the JSNs) who failed to provide authenticated

notification of their subsequent security interests.[101]  In those circumstances, the RMBS Trusts

would have a first-priority lien on any sale proceeds, even ahead of secured lenders of record.[102]

57.    Because the Original RMBS Settlement had not been approved at the time

of the proposed platform sale, the Debtors and the RMBS Trusts had to resolve issues relating to

the RMBS Trust Claims and the cure claims before the Debtors could sell their mortgage

servicing platform.[103]  While the settlement of repurchase liabilities was a condition to the sale of

the servicing platform, the structure of the sale and the smooth transition to a new servicer was of

importance to the RMBS Steering Committee.[104]  As a result, Steering Committee Counsel spent

---

[98]    *Id.*

[99]    Steering Committee Counsel Statement at 7-9.  Ropes & Gray presented this argument to ResCap and Ally in a
white paper early in the negotiations.  *See* White Paper of Ad Hoc RMBS Holder Group Regarding Secured
Status of Representation and Warranty Claims Against GMAC Mortgage LLC and Residential Funding LLC
(the "White Paper").  Ropes & Gray asserted that the RMBS Trusts would be entitled to setoff all representation
and warranty claims (which were otherwise unsecured) against all servicing and advance reimbursement claims
before the platforms could be sold.  Steering Committee Counsel Statement at 7-9; White Paper.

[100]    Disclosure Statement at 63.

[101]    *Id.*

[102]    *Id.*

[103]    Disclosure Statement at 63; Steering Committee Counsel Statement at 11.

[104]    Steering Committee Counsel Statement at 7-8.

significant time discussing and negotiating aspects of the platform sale, and several issues were agreed upon to facilitate the sale.[105]  Ultimately, Steering Committee Counsel and the RMBS Trustees negotiated, notwithstanding the ongoing litigation related to the Original RMBS Settlement, a $600 million reserve of the sale proceeds to be used to pay the RMBS Trusts' cure claims in the event the Original RMBS Settlement was not approved.[106]

58.    The Original RMBS Settlement and the cure reserve "indisputably provided the Debtors with significant benefits necessary to avoid the fate of every other major mortgage servicer that has filed for bankruptcy in recent years – i.e., liquidation."[107]  It allowed the Debtors to sell their servicing business as a going concern not encumbered by billions of dollars of claims, which provided a substantial benefit to the Debtors' estates and their creditors.[108]

59.    In November 2012, the Court approved the Debtors' sale of their mortgage servicing business (the "Platform Sale") and of a majority of the estates' whole loan portfolio (the "Whole Loan Sale").[109]  The Platform Sale and the Whole Loan Sale generated approximately $4.1 billion of gross proceeds to the Debtors.[110]

---

[105]   *Id.* at 8.

[106]   Steering Committee Counsel Statement at 11; Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding (I) Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements, and (II) The RMBS Trustees' Limited Objection to the Sale Motion [Docket No. 945], at 7-9.

[107]   PSA Motion at 7.

[108]   Disclosure Statement at 64; Kruger Declaration at 4 (noting that the Original RMBS Settlement "permitted the Debtors to (i) proceed with the sales of the estates' assets on a smooth and expeditious basis and (ii) resolve objections regarding the severability of the Debtors' pooling and servicing agreements and the appropriate priority of the RMBS Trusts' alleged origination-based claims to a future date or, potentially, to avoid the dispute altogether.").

[109]   Disclosure Statement at 74; PSA Motion at 7; Order Approving FGIC Settlement at 5.

[110]   Disclosure Statement at 48-49; PSA Motion at 7.

I.    **Plan Negotiations and Mediation**

60.    Following the Platform Sale and the Whole Loan Sale, the Debtors focused their efforts on reaching a consensual resolution of a chapter 11 plan.[111]  On December 26, 2012, on the eve of the scheduled hearing on the motion to approve the Original RMBS Settlement, the Honorable James M. Peck was selected as plan mediator (the "Mediator").[112] The goal of the mediation was to "facilitate a global resolution of pivotal issues" and the treatment of certain claims.[113]

61.    Before the mediation, Steering Committee Counsel had engaged in various discussions with several of the largest parties-in-interest in the bankruptcy case.[114]  These discussions continued into the mediation, and Steering Committee Counsel played an active and extensive role, along with many other parties-in-interest, in negotiating the Global Settlement.[115] As described by the co-chair of the Official Committee of Unsecured Creditors, "there were a large variety of complex issues to understand and attempt to resolve through the mediation process[,]" which "was the most complex and lengthy such process with which I have ever been personally involved, in any capacity."[116]

---

[111]    PSA Motion at 7-8; Order Approving FGIC Settlement at 5.

[112]    Order Approving FGIC Settlement at 5-6; Steering Committee Counsel Statement at 12.

[113]    Disclosure Statement at 22; Kruger Declaration at 4-5.

[114]    Steering Committee Counsel Statement at 12.

[115]    *Id.*; Opinion Approving PSA at 44; RMBS Trustees' Joinder at 17 ("various constituencies, including the RMBS Trustees as well as counsel for the two sets of Institutional Investors, have participated in numerous mediation sessions, both with and without the Court-appointed Mediator."); Major Declaration at 28 ("It was important to BNY Mellon that the Institutional Investors – two large investor groups holding significant, and for some RMBS Trusts controlling, investments in certificates issued by the RMBS Trusts – were informed, involved, and supportive of the RMBS Settlement."; "The Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants were active participants in the negotiations (including the Plan Mediation) that led to the overall settlement associated with the Plan Support Agreement."); Meyer Declaration at 25-26; Kruger Declaration at 4-6.

[116]    Dubel Witness Statement at 6, 8.

62.     According to public information, the initial mediation efforts did not result

in a comprehensive resolution by February 2013 for a number of reasons, including issues

related to the Monolines, MBIA and FGIC.[117]  Steering Committee Counsel engaged in

extensive discussions with MBIA and FGIC, in hopes of jump starting a global settlement

dynamic.[118]  The RMBS Steering Committee and its counsel proposed a settlement of certain

issues related to MBIA and FGIC (the "Tripartite Agreement") that was ultimately agreed to and

then incorporated into an executed settlement agreement (the "FGIC Settlement Agreement")

among the Debtors, FGIC, FGIC Trustees, and the RMBS Steering Committee (on behalf of

Investors holding certificates in the FGIC Trusts), and approved by the Bankruptcy Court and the

FGIC Rehabilitation Court.[119]  The FGIC Settlement Agreement included a commutation of

FGIC's policies with the RMBS Trusts it had insured, which would in turn reduce the Debtors'

claim pool by approximately one billion dollars.[120]  The Tripartite Agreement between MBIA,

FGIC and the RMBS Steering Committee was the basis for the FGIC Settlement Agreement, and

the FGIC Settlement Agreement was a cornerstone of the Global Settlement included in the

Plan.[121]

63.     In connection with the approval of the FGIC Settlement Agreement, Mr.

John S. Dubel, Chief Executive Officer of FGIC, submitted a "witness statement" detailing the

---

[117]   Steering Committee Counsel Statement at 12; Debtors' Motion For The Entry Of An Order Further Extending
Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof [Docket No. 2918]
("Motion To Extend Exclusivity"), at 5, 14-15.

[118]   *Id.*

[119]   *Id.*; Order Approving FGIC Settlement  at 22-23.

[120]   Steering Committee Counsel Statement at 12.

[121]   Order Approving FGIC Settlement at 6, 35; Steering Committee Counsel Statement at 12; RMBS Trustees'
Joinder at 18; Dubel Witness Statement at 10 ("The FGIC Settlement Agreement, as reflected in the Plan
Support Agreement, is a key component of this global plan construct, and is a required condition to
effectiveness of the plan.").

mediation timeline, procedural process, participants and complexity.[122]  The timeline included in

the witness statement refers specifically to numerous meetings with the RMBS Steering

Committee that led to the Tripartite Agreement.[123]  According to Mr. Dubel, the RMBS Steering

Committee "regularly participated in the ResCap chapter 11 cases," and "actively participated in

the mediation and in negotiation of the FGIC Settlement Agreement. . . ."[124]

        64.     Following the FGIC Settlement Agreement, the mediation process

continued.[125]  As described by Lewis Kruger, Chief Restructuring Officer for the Debtors,

numerous meetings took place, a mediation "summit" with the Mediator was held on April 22

and 23, 2013, information and proposals were exchanged, and "hard-fought arm's length

negotiations" took place.[126]  Although the issues were significantly narrowed during the

"summit," the parties were unable to reach a global consensus.[127]  After the mediation summit,

numerous follow-up meetings and conference calls took place and two additional mediation

sessions were held on May 9 and 10, 2013.[128]

        65.     Steering Committee Counsel participated extensively in all aspects of the

mediation, and made various concessions with regards to the Original RMBS Settlement.[129]

---

[122]  *See generally* Dubel Witness Statement.

[123]  *Id.* at Exhibit D.

[124]  *Id.* at 3.

[125]  Steering Committee Counsel Statement at 13.

[126]  Kruger Declaration at 5-6.

[127]  *Id.* at 6; PSA Motion at 8.

[128]  Kruger Declaration at 6; PSA Motion at 8.

[129]  Steering Committee Counsel Statement at 13; Major Declaration at 28 (Steering Committee Counsel "were
active participants in the negotiations (including the Plan Mediation) that led to the overall settlement associated
with the Plan Support Agreement."); Disclosure Statement at 28 (noting that the Steering Committee, among
others, "made a substantial contribution to the Debtors' liquidation efforts and played an integral role in working
towards an expeditious resolution of these Chapter 11 cases."); Kruger Declaration at 7; Dubel Witness
Statement at 3-9.

Notably, the RMBS Trustees and Steering Committee Counsel agreed to fold the so-called "Orphan Trusts" into the existing settlement.[130]

66.    On May 13, 2013, after months of arm's-length mediation negotiations, the Debtors and most of their claimant constituencies reached the Global Settlement, which is embodied in the Plan Support Agreement, the Plan Term Sheet (the "Plan Term Sheet"), and the Supplemental Term Sheet (the "Supplemental Term Sheet"), and incorporated into the Plan.[131]

67.    The Plan Support Agreement was negotiated at arm's length by sophisticated parties and represents a comprehensive agreement among those parties to resolve the most significant disputes in the Chapter 11 Cases.[132]  As in virtually every bankruptcy case, cooperation and hard work among the parties-in-interest was required to achieve a global comprehensive settlement.  Among the settlements contemplated by the Plan Support Agreement is the RMBS Settlement.[133]  The RMBS Settlement is a modification of the Original RMBS Settlement, expanded to include the Orphan Trusts and modified in a number of additional respects.[134]  The RMBS Settlement:

> resolves: (i) alleged and potential claims for breaches of representations and warranties held by all RMBS Trusts and (ii) all alleged and potential claims for damages arising from servicing, in

---

[130]    Steering Committee Counsel Statement at 13; RMBS Trustees' Joinder at 16.

[131]    Steering Committee Counsel Statement at 13; Order Approving FGIC Settlement at 6; Disclosure Statement at 22, 87-88; PSA Motion at 8.

[132]    RMBS Trustees' Joinder at 3. Kruger Declaration at 7-9, 12; Disclosure Statement at 21 (the "Plan reflects a global compromise among the Debtors, the Creditors' Committee, Ally, and the Debtors' major creditor constituencies, pursuant to which, among other things, Ally has agreed to contribute $2.1 billion to the Estates . . . an increase of $1.35 billion over the amount Ally had agreed to contribute in its pre-petition plan support agreement with the Debtors."); PSA Motion at 2-3, 21(the Plan Support Agreement "represents a remarkable achievement given the complexity of the Debtors' capital structure, and the complexity and breadth of the disputed issues poses in these cases, and signals an end to the litigation, infighting, and potential 'nuclear war' in these cases."); Dubel Witness Statement at 7, 9 ("the global mediation successfully resolved the key major issues in the ResCap chapter 11 cases and obviated years of difficult, expensive, protracted and uncertain litigation.").

[133]    RMBS Trustees' Joinder at 3; Disclosure Statement at 28.

[134]    Disclosure Statement at 28.

exchange for Allowed Claims in the aggregate amount of $7.301 billion for the RMBS Trusts, to be allocated as between the GMACM Debtors and the RFC Debtors [(the "Allowed RMBS Trust Claims")].[135]

The distributions received by the RMBS Trustees under the RMBS Settlement will be allocated based on an agreed-upon "RMBS Trust Allocation Protocol" that is set forth in detail in the Plan.[136] The Allowed Fee Claim is incorporated into the RMBS Settlement as a non-severable term.[137] The Allowed Fee Claim is described in the text of the Disclosure Statement[138] and the Supplemental Term Sheet.[139] The Plan also resolves the outstanding disputes regarding claims of the Insured RMBS Trusts.[140] It provides that the Monolines will have claims against the Debtors' estates independent of the claims of the RMBS Trusts, and the Insured RMBS Trusts will not have any Allowed RMBS Trust Claims, but reserve the ability to enforce their rights against any Monoline (other than FGIC) that does not perform in accordance with an insurance policy for the benefit of the applicable Insured RMBS Trust.[141]

68.    The RMBS Trust Claims resolved by the Plan "comprise the single largest set of disputed claims against the Debtors' estate" and their resolution in accordance with the

---

[135]  *Id.* at 28-29, 84.  Specifically, the Joint Plan provides that the RMBS Trusts shall have an allowed, non-subordinated claim in the amount of $209,800,000 against the GMACM Debtors and $7,091,200,000 against the RFC Debtors.

[136]  *Id.* at 29.

[137]  *Id.* at 84; Original Steering Committee RMBS Settlement [Docket No. 320-2], at § 6.02; Steering Committee Amended and Restated RMBS Trust Settlement Agreement [Docket No. 1176-2], at § 6.04; Steering Committee Third Amended and Restated RMBS Trust Settlement [Docket No. 1887-2], at § 6.03.

[138]  Disclosure Statement at 84, n.74.

[139]  PSA Motion at Exhibit 3.B, p. 6 (Supplemental Term Sheet).  The Allowed Fee Claim is also described in the Second Supplemental Motion To Approve RMBS Settlement at 12, 19-20.  In addition to the notices provided by the Debtors of the PSA Motion, the Disclosure Statement and the Plan, the RMBS Trustees have provided broad notice of the RMBS Settlement.  *See infra* at Section VI.B.2.

[140]  Disclosure Statement at 29.

[141]  *Id.*

Plan allows the Debtors to avoid "protracted and costly litigation that would otherwise result."[142]

Indeed, a substantial majority of the parties-in-interest in the Chapter 11 Cases agree that the

Global Settlement, and the RMBS Settlement in particular, are "very much in the interest of the

Debtors' Estates and Creditors."[143]

       69.     The Plan Support Agreement was approved by the Bankruptcy Court on

June 26, 2013.[144]  In connection with approving the Plan Support Agreement, the Bankruptcy

Court found that the RMBS Trustees acted in good faith by entering into the Plan Support

Agreement and the RMBS Settlement and that the RMBS Settlement provides for a reasonable

settlement of the RMBS Trust Claims.[145]  According to the Bankruptcy Court, "[t]he evidence

establishes that the RMBS Trustees participated fully and actively in the mediation process[,]"

"acted prudently" and in "the best interests of the investors."[146]

## VI.    LEGAL BASIS FOR OPINION

### A.    The Allowed Fee Claim Is Based Upon A Reasonable Contingency Fee

#### 1.    The Allowed Fee Claim Is A Reasonable Fee Arrangement Under State Law.

       70.     State law recognizes and permits contingency fee arrangements.  The

Model Rules of Professional Conduct, which in this regard have been adopted in both New

---

[142]  *Id.*; Kruger Declaration at 10-11 ("Absent consensus on the[] matters [resolved in the Global Settlement], the Debtors' estates would likely be involved in costly and time consuming litigation regarding these issues that could last several years.").

[143]  Disclosure Statement at 30; Plan Support Agreement at 10; Committee Statement In Support Of PSA at 8 ("In light of the substantial benefits to be realized under the Plan Support Agreement, it is no surprise that it has garnered almost universal support.").

[144]  Disclosure Statement at 2.

[145]  Opinion Approving PSA at 44; RMBS Trustees' Joinder at 19 ("each of the . . . deal points was the result of hard-fought negotiations, with the RMBS Trustees taking great pains to preserve and protect the Investors' rights and the RMBS Trusts' interests and ensure that the Agreement and the settlements contemplated therein are in the best interests of the RMBS Trusts and the Investors."); Steering Committee Consolidated Reply at 24; Major Declaration at 28-29; Meyer Declaration at 25-26.  *See also infra* n. 209.

[146]  Opinion Approving PSA at 44-45.

York[147] and Texas,[148] permit contingency fees.  In both jurisdictions, contingency fees are

subject to the following rule:  "A lawyer shall not make an agreement for, charge, or collect an

excessive or illegal fee or expense.  A fee is excessive when, after a review of the facts, a

reasonable lawyer would be left with a definite and firm conviction that the fee is excessive."[149]

To determine whether a contingency fee is excessive, a multi-factored test is applied.  The

factors set forth in the governing rule are:

>  (1) the time and labor required, the novelty and difficulty of the
>  questions involved, and the skill requisite to perform the legal
>  service properly;
>
>  (2) the likelihood, if apparent or made known to the client, that the
>  acceptance of the particular employment will preclude other
>  employment by the lawyer;
>
>  (3) the fee customarily charged in the locality for similar legal
>  services;
>
>  (4) the amount involved and the results obtained;
>
>  (5) the time limitations imposed by the client or by circumstances;
>
>  (6) the nature and length of the professional relationship with the
>  client;
>
>  (7) the experience, reputation and ability of the lawyer or lawyers
>  performing the services; and
>
>  (8) whether the fee is fixed or contingent.

---

[147]    Model Rule 1.5, adopted in New York as a part of Part 1200 of the Joint Rules of the Appellate Division
(22 NYCRR Part 1200),

[148]    Tex. Disciplinary R. Prof Conduct 1.04.

[149]    *See supra* n. 147 and 148; *see also Alderman v. Pan Am World Airways*, 169 F.3d 99, 102 (2d Cir. 1999) (courts
have broad authority to refuse to enforce contingent fee arrangements that award fees that exceed a reasonable
amount) (citing *Blanchard v. Bergeron*, 489 U.S. 87, 93, 109 S. Ct. 939 (1989) (analyzing a statutory attorneys
fee award to the prevailing party in certain civil rights litigation)); *Hoffert v. Gen. Motors Corp.*, 656 F.2d 161,
164 (5th Cir. 1981) ("To determine whether the settlement was just, fair, and reasonable, the district court was
required to examine, among other things, the net recovery to the plaintiffs.  Apart from the total settlement
amount, the 33 1/3 % attorneys' fee award was the single most important factor bearing on the amount of that
recovery.").

71.    In the aggregate, applying these factors to the Allowed Fee Claim

indicates that the Allowed Fee Claim is reasonable and not excessive.

**Time and labor, novelty and difficulty of issues, skills required**.  Representing
the RMBS Steering Committee was a massive undertaking given the complexity, size, and
scope of the Debtors' operations, the number of RMBS Trusts involved, and the number of
individual loans covered by the RMBS Trusts.[150] Moreover, the law governing litigating the
RMBS Trust Claims was evolving (and continues to evolve), causing substantial uncertainty
as to the potential outcome of litigating the RMBS Trust Claims.[151] The representation of the
RMBS Steering Committee required experienced, sophisticated, legal counsel.[152]

**Lost opportunity**.  Steering Committee Counsel's representation involved
gathering factual data, researching legal issues, attending face to face meetings, and
appearing in court.[153]  These activities necessarily required a devotion of time and effort that
limited engaging in other representations.

**Market comparables**. Steering Committee Counsel considered market
comparisons in determining the Allowed Fee Claim.[154]  The Allowed Fee Claim, as a
percentage of the Allowed RMBS Trust Claims, is well within, and at the low end of, the
comparables that Steering Committee Counsel considered.

In analyzing whether the Allowed Fee Claim is reasonable, we have reviewed
research regarding contingency fee arrangements.  Specifically, we have reviewed Brian T.
Fitzpatrick's "An Empirical Study of Class Action Settlements and Their Fee Awards."[155]  In
his study, Professor Fitzpatrick analyzed 688 federal class actions settlements from the years
2006 and 2007, which involved an aggregate of nearly $33 billion in cash settlement
payments, comprising mean and median settlements in federal court of $54.7 million and

---

[150]  Kruger Declaration at 10 ("these cases involve complicated legal and factual issues"); *see supra* n. 8, 20, 69, and 132 and accompanying text; Motion to Extend Exclusivity at 6-7, 12-13, 15, 17-18; *see infra* Section VI.B.4.

[151]  Disclosure Statement at 30 ("In the months preceding the Global Settlement, the case law . . . continued to evolve; . . . thus confirming the highly uncertain nature of the law governing RMBS put-back litigation.").

[152]  Steering Committee Counsel Statement at 1-3.

[153]  *See supra* n. 20, 29, 32, 33, 35, 55, 68, 93, 125, 128, 129, and 131 and accompanying text; *see also* Steering Committee Counsel Statement at 4, 5.

[154]  *See* Overview of Contingency Fee Considerations.

[155]  *See* Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical Legal Stud. 811, 811-14 (Dec. 2010) ("*Fitzpatrick*").  Mr. Fitzpatrick is a Professor of Law at Vanderbilt Law School whose research focuses on class action litigation, among other things.  He was invited to present his empirical work on class action settlements and fee awards in a session of the 2009 Conference on Empirical Legal Studies.  The *Fitzpatrick* study and the *Eisenberg* study, discussed *infra*, are highly regarded by courts analyzing class common fund fee awards.  *See, e.g., In re Heartland Payment Sys.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (noting that the *Fitzpatrick* and *Eisenberg* studies allow the court to set a more accurate fee benchmark).

$5.1 million, respectively.[156]  Professor Fitzpatrick found that the average percentage fee award in those settlements was 25.4 percent, and the median percentage fee award was 25 percent.[157]  We also reviewed "Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008," by Theodore Eisenberg and Geoffrey Miller, which analyzed 689 settlements from common fund cases during 1993 to 2008, with mean and median settlement amounts of $116 million and $12.5 million, respectively.[158]  That study found that the mean and median contingency fees awarded were 23 and 24 percent of the settlement, respectively.[159]  The above-described studies indicate that as settlement size increases, fee percentages tend to decrease.  In cases with settlements greater than $1 billion, the average percentage fee ranged from 10.2 percent to 13.7 percent, which are significantly higher percentages than the 5.7 percent fee used to determine the Allowed Fee Claim.[160]  These studies, and other academic work,[161] support my opinion that the Allowed Fee Claim as a percentage of the Allowed RMBS Trust Claim is well within the range of market comparables and is thus reasonable.

---

[156]  *Fitzpatrick* at 813, 827.

[157]  *Id.* at 833.

[158]  Theodore Eisenberg & Geoffrey Miller, 7 J. Empirical Legal Stud. 248, 251-53; 258-59 (June 2010) ("*Eisenberg*").  Professor Eisenberg is a Professor of Law and Adjunct Professor of Statistical Sciences at Cornell University.  His curriculum vitae evidences a career devoted in large part to the application of statistical methodology to practical legal research.  Professor Miller is a Professor of Law and the Director of the Center for Financial Institutions at New York University School of Law.  He is a founder of the Society for Empirical Legal Studies, which is a scholarly organization devoted to promoting statistical and other empirical techniques in the study of legal institutions.  The *Eisenberg* work comprehensively updates a previous 2004 study published by Professors Eisenberg and Miller, which has been used extensively by courts setting common fund fee awards.  *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1080-81 (citing extensive list of cases that relied heavily on the 2004 Eisenberg and Miller study).

[159]  *Eisenberg* at 258-59.

[160]  *Fitzpatrick* at 838-39 (within the smallest 10 percent of settlements, the average percentage fee was 28.8 percent and the median was 29.6 percent while courts awarded average percentage fees of 18.4 percent and median fees of 19.0 percent in the largest 10% of settlements, and for the very largest settlements comprising nine settlements ranging from $1 billion to $6.6 billion, the average percentage fee among that group was 13.7 percent, while the median was 9.5 percent); *Eisenberg* at 264-65 (in the top decile of settlement amounts reviewed, mean and median fee awards were 12.0 and 10.2 percent, respectively).

[161]  *See, e.g.*, Theodore Eisenberg, Geoffrey Miller, and Michael A. Perino, 29 Wash. U. J.L. & Pol'y 5, 18-19 (2009) (analyzing 717 settlements in federal securities class actions filed from 1984 through 2005 and settled from 1991 through 2007 and finding mean fees in the range of 26% to 28%); James L. Tuxbury, Note: A Case For Competitive Bidding For Lead Counsel In Securities Class Actions, 2003 Colum. Bus. L. Rev. 285, 319 (2003) ("The percentage recovery for the 'benchmark' sample ranged from 7% to 33% with a mean of 28.5% and a median recovery of 30%. This range is strongly supported by other empirical studies."); Herbert M. Kritzer, The Wages of Risk: The Returns of Contingency Fee Legal Practice, 47 DePaul L. Rev. 267, 285-90 (1998) (finding, based on survey, prevalence of contingency fees of approximately 33%); James S. Kakalik & Nicholas M. Pace, Costs And Compensation Paid In Tort Litigation, viii & 38-39 (1986) available at <http://www.rand.org/content/dam/rand/pubs/reports/2006/R3391.pdf> (finding that almost all plaintiff's side tort litigation is financed through contingency fees and that average fees in tort suits were approximately 30%); Michael A. Perino, The Milberg Weiss Prosecution: No Harm, No Foul? (St. John's Legal Studies, Research Paper No. 08-0135, 2008), available at <http://ssrn.com/abstract=1133995> (stating that "plaintiffs' attorney fees paid by class members have averaged about 31 percent").

**Fee amount and results obtained.**  The RMBS Steering Committee and Steering Committee Counsel worked to achieve: (i) the realization of value for the Debtors' estates in the form of the Platform Sale; (ii) the allowance of the RMBS Trust Claims within the range of potential outcomes without litigating the RMBS Trust Claims on a loan-by-loan basis; (iii) resolution of numerous inter-creditor disputes; and (iv) a timely and largely consensual Plan.[162]  These results translated to an approximate projected recovery for the RMBS Trusts of $700 million.  And the projected recovery is anticipated to be timely, unlike the outcomes in similarly situated cases.[163]

**Time constraints.**  The RMBS Steering Committee and Steering Committee Counsel were constrained by four critical time factors: (i) the Debtors prepetition funding was provided by Ally and Ally was not prepared to fund the Debtors after May 2012;[164] (ii) once the Debtors filed their chapter 11 cases, unless operations could be maintained pending a sale, the ability to maximize value would be impaired;[165]  (iii) in the absence of a settlement, litigating the various RMBS Trust Claims, and related claims and inter-creditor disputes would consume a substantial amount of time and resources;[166] (iv) the longer the Debtors remained in chapter 11, the higher the administrative costs would be that would dilute recoveries.

**Professional relationship.**  Members of the RMBS Steering Committee had a positive relationship with the Gibbs & Bruns firm, which enabled the RMBS Steering Committee to form, to work effectively and efficiently, and to remain intact throughout the process.[167]

**Qualifications of Steering Committee Counsel.**  Steering Committee Counsel are experienced counsel, with relevant knowledge and skills particular to the issues involved in representing the RMBS Steering Committee.[168]  The results obtained for the RMBS Steering Committee, and the contributions made to achieve the Global Settlement validate the nature, scope and quality of the services provided.  Interviews with parties involved in the Chapter 11 Cases confirm that Steering Committee Counsel was actively involved, knowledgeable and constructive.

---

[162]  *See supra* Sections V.C – V.I.  As previously noted, many parties-in-interest devoted substantial time and resources and made significant contributions to reach the Global Settlement.

[163]  Steering Committee Counsel Statement at 6-7.

[164]  Disclosure Statement at 66.

[165]  Disclosure Statement at 50-51, 63-64.

[166]  Opinion Approving PSA at 11; Kruger Declaration at 11; Disclosure Statement at 29; Second Supplemental Motion To Approve RMBS Settlement at 28.

[167]  Steering Committee Counsel Statement at 1.

[168]  *See* Steering Committee Counsel Biographies, available at http://www.gibbsbruns.com/kpatrick/, http://www.gibbsbruns.com/shumphries/,  http://www.gibbsbruns.com/rmadden/, http://www.gibbsbruns.com/david-sheeren/, http://www.ropesgray.com/keithwofford/, http://www.ropesgray.com/biographies/m/d-ross-martin.aspx, and http://www.ropesgray.com/biographies/d/andrew-g-devore.aspx.

**Contingent Fee.**  The Allowed Fee Claim is based upon a contingency fee agreement that Steering Committee Counsel negotiated with the RMBS Steering Committee. The Allowed Fee Claim is incorporated into the RMBS Settlement that the RMBS Trustees have agreed to and support.  The Allowed Fee Claim is part of the overall Global Settlement agreed to and supported by all of the parties to the Plan Support Agreement.  The Allowed Fee Claim was negotiated by sophisticated parties based upon the relevant facts and circumstances.  These facts support the reasonableness of the Allowed Fee Claim[169] and do not suggest the necessity of intervention to protect a class of persons unable to protect

---

[169]  N.Y. Jud. Law § 474 (2013) ("The compensation of an attorney or counsellor for his services is governed by agreement, express or implied, which is not restrained by law . . . ."); Tex. Civ. Prac. & Rem. Code § 38.003 ("It is presumed that the usual and customary attorney's fees for a claim of the type described in Section 38.001[, which includes contingency fees] are reasonable). *Ward v. Orsini*, 152 N.E. 696, 698 (N.Y. 1926) ("The parties were free to make their own contract as to compensation.  The basic question is whether under all the circumstances of the case Mr. Ward thereby obtained an undue advantage over his client as applied to the settlement made in this case."); *European Crossroads' Shopping Ctr. v. Criswell*, 910 S.W.2d 45, 59 (Tex. App. 1995) (testimony of attorney that 35% contingency fee was customary in Dallas County area was itself sufficient to establish the reasonableness of the fee); *see Alderman*, 169 F.3d at 103-4 (a contingent fee retainer contract "is the freely negotiated expression both of a [client's] willingness to pay more than a particular hourly rate to secure effective representation, and of an attorney's willingness to take the case despite the risk of nonpayment.  [Courts] should seek to enforce the parties' intentions in a contingent fee agreement, as with any contract."); *Mathis v. Exxon Corp.*, 302 F.3d 448, 462 (5th Cir. 2002) (In Texas, "there is a rebuttable presumption of reasonableness for fees that are 'usual' or 'customary.'"); *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 101 (3d Cir. 1985) ("Courts should be reluctant to disturb contingent fee arrangements freely entered into by knowledgeable and competent parties."); *Farmington Dowel Prods. Co. v. Forster Mfg. Co.*, 421 F.2d 61, 90 (1st Cir. 1969) (explaining that exercise of court's supervisory power over the bar is reserved for exceptional circumstances and involves consideration of the outer limit of reasonableness); *In re Merry-Go-Round*, 244 B.R. at 339-40 (applying Model Rule 1.5 and determining that "a fee of 40% of the net recovery is within a range of reasonableness, particularly for complex . . . litigation."); *see also Rosquist v. Soo L. R.R.*, 692 F.2d 1107, 1111 (7th Cir. 1982) ("An agreement between two freely consenting, competent adults will most often be controlling; courts rarely interfere with such contracts. But that restraint is based on the presumption that the parties can identify their own interests, can assess their bargaining position, and are equally able to assert their position.").  I am aware of the proposition set forth in *Strong v. BellSouth Telecomms.*, 137 F.3d 844 (5th Cir. 1998) that the "district court is not bound by the agreement of the parties as to the amount of attorneys' fees" and must instead "scrutinize the agreed-to fees under the standards set forth in *Johnson v. Ga. Highway Express*, 488 F.2d 714 (5th Cir. 1974), and not merely 'ratify a pre-arranged compact." *Id.* at 849.  *Strong* involved a class action settlement that provided residential and small business customers of BellSouth with the option to keep certain phone service, or cancel the service and receive a less than $24 credit, and provided for $6 million of attorneys' fees. The Fifth Circuit rejected the argument that the settlement was a common fund recovery upon which fees should be based and instead affirmed the District Court's decision that followed the class action rules requiring approval of the reasonableness of the fees and applied a lodestar calculation.

Even following *Strong* and not relying on the contingency fee arrangement that was negotiated by the RMBS Steering Committee, it does not alter my view that the Allowed Fee Claim is reasonable. As noted in the text, the factors applied under Texas law to determine if a contingency fee claim is excessive evidence that the Allowed Fee Claim is not excessive.  As noted below, the factors identified in *Johnson* are essentially the same, and thus application of *Johnson* leads to the same conclusion.  In sum, the Allowed Fee Claim was negotiated by sophisticated parties and is supported by sophisticated parties, there are no circumstances incapable of being foreseen that have arisen to make the agreement improvident, the services required to be provided were novel and uncertain and required a high level of experience and skill, the Steering Committee Counsel provided, and demonstrated, a high level of experience and skill, the results obtained were highly successful not only to the RMBS Steering Committee, but to all of the holders of RMBS Certificates, and to other creditors and the Debtors' reorganization, and the Allowed Fee Claim is at the low end of the range of comparable contingency fees.

themselves.[170]  All of the relevant supporting parties are sophisticated, represented by counsel, and participants in a lengthy, complex, and arduous settlement negotiation.  The supporting parties represent virtually all of the major constituents in the Chapter 11 Cases.

## 2.  Contingency Fees Are Permitted Under The Bankruptcy Code

### a.  Bankruptcy Code Section 328

72.    For professionals employed at the expense of a chapter 11 estate, the

Bankruptcy Code permits employment pursuant to a contingency fee arrangement.[171]  The

professionals in question here were not employed at the expense of the Debtors' estates, but I

have considered the standards applied to section 328 in forming my opinion as to whether the

Allowed Fee Claim is reasonable.  In considering a proposed contingent fee arrangement

pursuant to section 328(a), the court is required to decide if the terms are reasonable.[172]

Contingency fee arrangements have been approved in chapter 11 cases.[173]  The Allowed Fee

---

[170]    *See, e.g.*, *Uy v. Bronx Mun. Hosp. Ctr.*, 182 F.3d 152, 155 (2d Cir. 1999) ("Under New York law, a private retainer agreement is viewed as presumptively fair in the absence of fraud, deceit, overreaching, or undue influence.") (citation marks omitted); *Cappel v. Adams*, 434 F.2d 1278, 1280 (5th Cir. 1970) (noting that it is appropriate to scrutinize contingent fee contracts "when the client is a minor, largely because of the obvious possibilities of unfair advantage."); *Rosquist*, 692 F.2d at 1110-11 ("An agreement between two freely consenting, competent adults will most often be controlling; courts rarely interfere with such contracts. But that restraint is based on the presumption that the parties can identify their own interests, can assess their bargaining position, and are equally able to assert their position. . . . Counsel fees have been subjected to such oversight when the client is unable fully to protect his own interests.  For example, seamen, parties to a class action, and children have all enjoyed the protection of federal courts from excessive fees.") (citations omitted); *see generally Goldstein v. St. Luke's-Roosevelt Hosp. Center (In re Goldstein)*, 430 F.3d 106, 110 (2d Cir. 2005) (noting the court's inherent "right to inquire into fee arrangements . . . to protect the client from excessive fees," and, under such authority, a federal court "may order attorneys to return fees the client has paid pursuant to a contract.") (quoting *In re Austrian & German Bank Holocaust Litig.*, 317 F.3d 91, 98-99 (2d Cir. 2003)).

[171]    11 U.S.C. § 328(a) (providing for employment of a professional person under section 327 or 1103 "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis.").

[172]    *Comm. of Equity Sec. Holders of Federal-Mogul Corp. v. Official Comm. of Unsecured Creditors (In re Fed. Mogul-Global Inc.)*, 348 F.3d 390, 397-403 (3d Cir. 2003) (rejecting the argument that the court is not vested to rejected a proposed monthly fee cap and set its own fee monthly fee cap pursuant to section 328(a)).

[173]    *See, e.g., Riker, Danzig, Scherer, Hyland & Perretti v. Official Comm. of Unsecured Creditors (In re Smart World Techs., LLC)*, 552 F.3d 228  (2d Cir. 2009) (affirming district court's award of attorney's fees pursuant to terms of bankruptcy court's prior approval of contingency fee pursuant to section 328(a) calculated as: (i) 33-1/3% of the first $1,500,000; (ii) (a) amounts in excess of $1,500,000 but less than $8 million will be (a) 0% if the litigation lasts less than 6 months, (b) 10% if the litigation lasts from 6 months to 9 months, (c) 20% if the litigation lasts between 9 months and 12 months, (d) 37% if the litigation lasts more than 12 months; and (b) 37% of all funds received in excess of $8 million; and (ii) for any monies received after 18 months shall be 33

Claim is well below the range of contingency fees discussed in Section VI.A.1, *supra*.  The most

notable comparison to the Allowed Fee Claim is the 40% contingency fee approved and upheld

in the chapter 7 case of Merry-Go-Round Enterprises.  In that case, the chapter 7 trustee hired

special counsel to prosecute a malpractice lawsuit against the debtor's accounting firm.  The

lawsuit settled for $185,000,000, and the 40% contingent fee was $71,200,000.  The bankruptcy

court not only upheld the contingency fee over an objection that its approval had been

improvident, but considered applicable state ethical rules, the court's inherent power to regulate

fees, and common fund fee awards and the standards in making fee awards from common funds,

in upholding the 40% contingency fee.[174]  As noted in Section VI.A.1 above, I have similarly

considered the applicable state ethics rules and standards of professional conduct, the court's

inherent power to regulate attorneys' fees, and factors relevant to common fund fee awards.

73.    The Allowed Fee Claim was not approved in advance by any court;

however, it was negotiated prepetition by sophisticated parties, disclosed from the outset of the

Chapter 11 Cases, incorporated into the RMBS Settlement that has been agreed to by the RMBS

Trustees, and is a part of the Global Settlement that is supported by the signatories to the Plan

Support Agreement.

---

1/3%); *In re Reimers*, 972 F.2d 1127, 1128 (9th Cir.1992) (where bankruptcy court had approved a 40%
contingency fee, the Ninth Circuit reversed a reduction of the fee and remanded because there was no finding
that the original fee approval was "improvident in light of developments not capable of being anticipated at the
time of the fixing of such terms and conditions"); *Benassi v First Nat'l Bank of Babbitt (In re Benassi)*, 72 B.R.
44, 49 (D. Minn.1987) (rejecting challenge to one third contingency fee approved pursuant to section 328(a);
"Percentage fee arrangements are expressly condoned by § 328(a) and comport with the Bankruptcy Code's goal
of attracting highly qualified professionals to the bankruptcy arena. Attorneys accept the risk in entering such
arrangements that their efforts will not be rewarded. Contingent fees enable debtors, with their limited means, to
avoid legal fees altogether. Successful representation by the lawyer inures not only to his own benefit, but also
increases the assets of the estate and improves the potential recovery of creditors."); *In re Merry-Go-Round
Enters.*, 244 B.R. at 330-333 (40% contingency fee approved pursuant to section 328(a) and withstood
challenge pursuant to the "improvident" standard); *Solfanelli v. Meridian Bank (In re Solfanelli)*, 230 B.R. 54,
71 (Bankr. M.D. Pa. 1999), *aff'd and remanded on other grounds*, 203 F.3d 197 (affirming Bankruptcy Court's
award of compensation based upon 25% contingency fee approved pursuant to section 328(a) with certain
adjustments for failure by the attorney to make certain disclosures).

[174]    *Merry-Go-Round,* 244 B.R. at 335-45.

74.     In the context of a contingency fee approved pursuant to section 328(a),
advance approval is not a guarantee of payment if the terms and conditions "prove to have been
improvident in light of developments not capable of being anticipated at the time of the fixing of
such terms and conditions."  11 U.S.C. § 328(a).  Accordingly, I have considered whether in
hindsight, the Allowed Fee Claim is "improvident."

75.     The Second Circuit has held that the ability to alter terms and conditions
approved pursuant to section 328(a) is "severely constrained" and challenges are a "high hurdle
to clear."[175]  The improvident standard requires specific identification of factors that were not
capable of being anticipated when the relevant agreement was approved, and not factors that
were simply unanticipated.  The potential order of magnitude of the Allowed Fee Claim, the
potential for settlement of the RMBS Trust Claims, the anticipated time period for, the
complexity of, and risks in litigating, the RMBS Trust Claims, the potential for negotiations and
settlement in a potential chapter 11 case, and the resource commitment of Steering Committee
Counsel, were all capable of being anticipated, both at the time the RMBS Steering Committee
and the Steering Committee Counsel negotiated the contingency fee, and throughout the Chapter
11 Cases while the RMBS Settlement and the Global Settlement were being negotiated.  I
believe the Allowed Fee Claim was not improvident.

### b.     The Common Fund Doctrine.

76.     Under the common fund doctrine, if an attorney's efforts result in a fund or
benefit for parties in addition to the attorney's client, a court may award fees from that fund to
prevent the unjust enrichment of the parties benefiting from the fund and provide restitution to

---

[175]   *Smart World Techs.*, 552 F.3d at 232, 234-35.

the plaintiff and counsel who procured the benefit.[176]  The common fund doctrine is well

established under Texas and New York law.[177]  The rule is not limited to recoveries obtained

after litigation and a party or its attorney may recover when the common fund is the result of a

settlement.[178]  Bankruptcy courts have authorized, under the common fund doctrine, the payment

of contingency fees to counsel for creditors from funds created or established as a result of such

counsel's efforts, as in a class action or other litigation activity that generates a fund benefiting a

class of parties.[179]

---

[176]  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S. Ct. 745 (1980) ("The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.  Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.") (citation omitted); *see also Mulligan Law Firm v. Zyprexa MDL Plaintiffs' Steering Comm. II (In re Zyprexa Prods. Liab. Litig.)*, 594 F.3d 113, 128-129 (2d Cir. 2010) (Common fund doctrine "permits litigants or lawyers who recover a common fund for the benefit of persons other than themselves to obtain reasonable attorney's fees out of the fund, thus spreading the cost of the litigation to its beneficiaries. . . . A court acting in equity therefore may assess attorney's fees proportionally among those benefitted by the suit."); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir. 1989) ("Although the common fund doctrine does not permit the shifting of the burden of the litigation expenses to the losing party, it does permit the burden to be shared among those who are benefited by the litigant's efforts.").  Application of the common fund doctrine is most appropriate when (1) the class of persons benefitted by the lawsuit is small and easily identifiable, (2) the benefits can be traced with some accuracy, and (3) the costs of the litigation can be shifted accurately to those who profit by it.  *Boeing*, 444 U.S. at 479.

[177]  *Knebel v. Capital Nat'l Bank*, 518 S.W.2d 795, 799 (Tex. 1974) ("[A] court of equity will allow reasonable attorney's fees to a complainant who at his own expense has maintained a successful suit or proceeding for the preservation, protection, or increase of a common fund. . . . The rule is founded upon the principle that one who preserves or protects a common fund works for others as well as for himself, and the others so benefited should bear their just share of the expenses, including a reasonable attorney's fee; and that the most equitable way of securing such contribution is to make such expenses a charge on the fund so protected or recovered.") (quoting *Brand v. Denson*, 81 S.W.2d 111 (Tex. Ct. App. 1935); *Woodruff v. New York, L. E. & W. R. Co.*, 129 N.Y. 27, 36-37 (1891) ("[A] trust estate must bear the expenses of its administration. It is also established by sufficient authority that where one of many parties, having a common interest in a trust fund, at his own expense takes proper proceedings to save it from destruction and to restore it to the purposes of the trust, he is entitled to reimbursement, either out of the fund itself or by proportional contribution from those who accept the benefit of his efforts.").

[178]  *Kopet v. Esquire Realty Co.*, 523 F.2d 1005, 1008 (2d Cir. 1975).

[179]  *In re Milton Poulos, Inc.*, 947 F.2d 1351, 1353 (9th Cir. 1991) (reversing B.A.P.'s denial of award of attorneys' fees from fund, where counsel was "directly responsible for the availability of the funds from the statutorily created trust. Through their efforts, the bankruptcy court declared the trust valid and enforceable, thereby permitting the funds to be dispersed among the trust claimants. As the efforts of these attorneys resulted in a common fund for the group, . . . they are entitled to recover their attorneys' fees out of the fund.") (citing *Boeing*, 444 U.S. at 478); *cf. Bergstrom v. Dalkon Shield Claimants Trust (In re A. H. Robins Co.)*, 86 F.3d 364, 370, 376-77 (4th Cir. 1996) (permitting plaintiffs' counsel to recover contingency fees from bankruptcy created fund, and regulating the amount of such fees); *In re Merry-Go-Round*, 244 B.R. at 343-44 (in dicta, analogizing

77.     In a common fund case, the court awards a "reasonable" fee.[180]  The

Supreme Court has suggested that percentage awards are preferred in common fund cases.[181]

Courts in the Second Circuit determine percentage fees in common fund cases on a case by case

basis, "guided" by the following factors: "(1) the time and labor expended by counsel; (2) the

magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of

representation; (5) the requested fee in relation to the settlement; and (6) public policy

considerations."[182]  Further, where sophisticated and independently represented institutional

investors have negotiated a contingent fee agreement that results in a common fund, the private

contract should be accorded some deference in determining a reasonable percentage recovery.[183]

---

payment of fees under section 328(a) to special counsel, who created a large fund for creditors, to common fund case).

[180]   *Boeing*, 444 U.S. at 478.

[181]   *Blum v. Stenson*, 465 U.S. 886, 900 (U.S. 1984) (noting that fee-shifting cases are "[u]nlike the calculation of attorney's fees under the 'common fund doctrine . . . .'").  The Second Circuit allows either a percentage fee approach, or a lodestar approach, with many courts opting to use the percentage approach.  *See generally Goldberger v. Integrated Res.*, 209 F.3d 43, 52 (2d Cir. 2000) ("Lawyers who successfully prosecute [common fund cases] deserve reasonable compensation, and . . . market rates, where available, are the ideal proxy for their compensation."); *In re WorldCom, Inc. ERISA Litig.*, 2005 U.S. Dist. LEXIS 28686, *23-24 (S.D.N.Y. Nov. 21, 2005) ("The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.  This method has been found to be a solution to various problems inherent in the lodestar method, which creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet-eyed review of line-item fee audits.") (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (quotation marks omitted)).  The Fifth Circuit has not explicitly adopted the percentage approach, but appears to allow a combined percentage and lodestar approach.  *See Stong*, 137 F.3d at 852-53 (approving application of lodestar and stating that the percentage approach could be restricted to a percentage of claims actually made by class members rather than the total amount that might be claimed).  Generally, a percentage fee approach is both practical and more probative where, as here, the case is the type of case that would normally be taken on a contingency fee basis, thus allowing a reviewing court to compare the fee to other percentage fees.  *See generally* Court Awarded Attorney Fees: Report of the Third Circuit Task Force, *reprinted in* 108 F.R.D. 237, 255 (Oct. 8, 1985) ("[I]n the traditional common-fund situation and in those statutory fee cases that are likely to result in a settlement fund from which adequate counsel fees can be paid, the district court, on motion or its own initiative and at the earliest practicable moment, should attempt to establish a percentage fee arrangement agreeable to the Bench and to plaintiff's counsel.").

[182]   *Goldberger v. Integrated Res.*, 209 F.3d 43, 49- 50 (2d Cir. 2000) (alterations omitted).

[183]   The Allowed Fee Claim is part of the RMBS Settlement that is approved by the RMBS Trustees, and the RMBS Settlement is part of the Global Settlement that is supported by all of the parties to the Plan Support Agreement. Courts in common fund cases have taken notice of the sophistication of the beneficiaries of the fund and have accorded contingent fee agreements greater deference when the beneficiaries are sophisticated.  *See Dunn v. H. K. Porter Co.*, 602 F.2d 1105, 1110 (3d Cir. 1979) ("[T]he court must consider a number of critical factors,

In contrast, where the circumstances of the private contract suggest court intervention is required to protect the client party, the private contract will have less weight.

78.     Considering the context and the facts giving rise to the Allowed Fee Claim and the factors considered in awarding attorneys' fees in common fund cases, I believe the Allowed Fee Claim is reasonable.  The RMBS Steering Committee and Steering Committee Counsel expended considerable time and effort since organizing,[184] the complexities and risk of litigating the RMBS Trust Claims is well-established,[185] the Allowed Fee Claim is at the low end of comparable contingency fee arrangements,[186] and public policy favors awarding a percentage fee in common fee recovery cases.[187]  Moreover, the benefit in avoiding time consuming and expensive litigation is clear in the record, as is the relationship between the Original RMBS Settlement and maximizing the proceeds from the Platform Sale.  As with the factors governing whether a contingency fee is reasonable and not excessive, the factors applied under the common fund doctrine evidence that the Allowed Fee Claim is reasonable.

## B.     The Allowed Fee Claim Has Been Disclosed And Is In My Opinion Reasonable Under Bankruptcy Code Section 1129(a)(4)

79.     The Allowed Fee Claim is part of the RMBS Settlement and is incorporated into the Plan as a non-severable provision of the RMBS Settlement.[188]  I have not been asked, and do not express an opinion as to, whether approval of the RMBS Settlement

---

including the manner into which the contract was entered, the status and sophistication of the plaintiffs, whether the source of the fee payment is a settlement fund or a tax against the defendants, the size of the proposed award and whether the fee allowed is sufficient to encourage capable counsel to undertake such litigation in the future."); *Philadelphia Elec. Co. v. Anaconda Am. Brass Co.*, 47 F.R.D. 557, 559 (E.D. Pa. 1969) ("The 25 percent fee has already been agreed to by virtually all of the claimants. These are responsible governmental entities and substantial enterprises, for the most part represented by their own counsel; I am reluctant to suppose that they are all incorrect in their assessment of a fair and reasonable arrangement.").

[184]  *See, e.g.*, n. 55, 56, 57, 58, 68, 91, 93, 95,105, 114, 115, 119, 125, 128, and 129, *supra*, and accompanying text.

[185]  *See, e.g.*, n. 132 and 150, *supra*, and accompanying text.

[186]  *See supra* Section VI.A.1.

[187]  *See supra* n. 181 and accompanying text.

[188]  *See supra* n. 132, 133, 134, 135, and 136 and accompanying text.

under Bankruptcy Rule 9019 alone satisfies the disclosure and reasonableness requirements of section 1129(a)(4) with respect to the payment of the Allowed Fee Claim.  I have not been asked, and do not express an opinion as to, whether the Allowed Fee Claim is itself subject to section 1129(a)(4).  Nevertheless, in forming my opinion, I have considered the case law interpreting section 1129(a)(4), which applies a "reasonableness" test to payments made "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, for services or for costs and expenses."[189]

80.    Section 1129(a)(4) requires disclosure and that the payments made are reasonable (or subject to a determination of reasonableness).[190]  The disclosure requirement of section 1129(a)(4) is of particular import, as the judicial antecedents to section 1129(a)(4) were enacted to address a then common practice of non-disclosure of private fee arrangements where fiduciaries were in effect able to fix their own fees.[191]  As noted above, the Allowed Fee Claim was negotiated by sophisticated holders of RMBS Certificates and incorporated into the RMBS Settlement approved by the RMBS Trustees, is supported by the parties to the Plan Support Agreement as part of the Global Settlement, and as discussed below, has been fully disclosed from the outset of the Chapter 11 Cases and on many occasions thereafter. These facts all support my opinion that the Allowed Fee Claim is reasonable.

81.    Section 1129(a)(4) does not define what constitutes a "reasonable" payment, and there has been no clear test for reasonableness articulated by courts in the Second Circuit.  The prevailing case law indicates that when determining whether a payment is reasonable for purposes of section 1129(a)(4) courts consider the totality of the circumstances.

---

[189]    11 U.S.C. § 1129(a)(4).

[190]    *In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009) (quoting 7 *Collier on Bankruptcy* at ¶ 1129.03[4] (15th ed. rev. 1998)).

[191]    *See, e.g., Leiman v. Guttman*, 336 U.S. 1, 6-7,  69 S.Ct. 371, 374 (1949)

As stated by the Fifth Circuit in *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop.)*,

150 F.3d 503, 517 (5th Cir. 1998):

> What constitutes a reasonable payment will clearly vary from case
> to case and, among other things, will hinge to some degree upon
> who makes the payments at issue, who receives those payments,
> and whether the payments are made from assets of the estate.  In
> the typical case, payments that are not payable from, or
> reimbursable by, the bankruptcy estate should not engender
> anything like the judicial scrutiny devoted to those that are not
> payable out of the bankruptcy estate.

Other factors to be considered when determining whether a payment is reasonable under section

1129(a)(4) include whether the payments were fully disclosed to affected parties, whether those

parties had an "opportunity to factor the payments into their decision whether to accept the

[p]lan," whether those parties voted in favor of the plan, whether the plan (including the

provision for payment of the fees) was endorsed by other parties-in-interest in the bankruptcy

cases, what role the party receiving the fee played in the bankruptcy case, the complexity of the

issues in the case, and whether the fee itself is consistent with market rates.[192]

       82.    As a general rule, acting in one's own self-interest is not a *per se*

disqualifier to a fee being found reasonable.[193]  However, where a party seeking a fee under a

plan of reorganization has taken actions that were clearly contrary to public policy or that

harmed the debtor's estate, such as scorched-earth tactics or actions that are clearly abusive,

irresponsible, or destructive to the estate, courts have the discretion to determine that such party's

---

[192]    *See, e.g., Journal Register*, 407 B.R. at 538; *In re Congoleum Corp.*, Civil Action No. 09-4371 (JAP), 2010 WL 1850182, at *6-7 (D. N.J. May 7, 2010) (in assessing the reasonableness of fees, the court considered the difficulties faced by counsel in creating a consensus among the numerous claimants and the amount of the fee claim relative to the other fees and expenses paid by the estate in the case to date); *In re Burlington Motor Holdings, Inc.*, 217 B.R. 711, 716 (Bankr. D. Del. 1997), *vacated on other grounds*, 1998 WL 864827 (D. Del. Nov. 24, 1998) (noting that a critical issue in determining whether a fee is reasonable is that the fee provision was "adequately and timely disclosed, so that, among other things, creditors will have had the opportunity to factor the fee into their decision whether to accept or reject the plan.").

[193]    *See In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 19-20 (Bankr. S.D.N.Y. 2010).

fees are not "reasonable."[194]  Based upon our review of the record (and our Interviews) I am not

aware of any indication that the RMBS Steering Committee engaged in destructive conduct.  In

contrast, the actions of the RMBS Steering Committee and the Steering Committee Counsel were

constructive, helpful, and supportive of a consensual restructuring process.

### 1.    <u>Who Makes The Payment?</u>

83.    In the instant case, the Allowed Fee Claim does not deplete the assets of

the Debtors' estates.  The Allowed Fee Claim is not in addition to the Allowed RMBS Trust

Claims, but rather is an allocation of the Allowed RMBS Trust Claims.[195]  Although the

beneficiaries of the Allowed Fee Claim will hold an "allowed claim" against the estates, and the

distributions on such claims will be made directly to the holders of the Allowed Fee Claim, the

Allowed Fee Claim "does not add to the amount of any claim against the Debtors' estates" and

payment on such claim will not reduce the recoveries to any other estate creditor.[196]

### 2.    <u>Disclosure and Opportunity To Object</u>

84.    The Allowed Fee Claim has been fully disclosed throughout the course of

the Chapter 11 Cases, and all interested parties have had the opportunity to object to the Allowed

Fee Claim.  The Original Steering Committee RMBS Settlement, filed by the Debtors with the

Bankruptcy Court on June 11, 2012, and each amendment, clearly provide that Steering

Committee Counsel will be allocated a percentage of the Allowed RMBS Trust Claims for their

work relating to the Chapter 11 Cases and the RMBS Settlement.[197]  The fee arrangement was

---

[194]   *Id.* at 20-22 (holding that creditors should not have to "subsidize" the fees for parties whose actions create "intolerable consequences for an estate").

[195]   *See supra* n. 77 - 78 and accompanying text.

[196]   *See supra* n. 78 - 79 and accompanying text.

[197]   *See supra* n. 137.

again disclosed when the Debtors' filed their Plan Support Agreement on May 23, 2013.[198]  The

Supplemental Term Sheet For Proposed Chapter 11 Plan, attached as Exhibit B to the Plan

Support Agreement provides, in pertinent part, as follows:

> In accordance with the Original Settlement Agreements as
> modified hereby, the Plan and RMBS Settlement shall provide for
> fees payable to counsel for the Institutional Investors, by direct
> allocation under the Plan and without conveyance to the RMBS
> Trustees, allowed unsecured claims and allowed cure claims in a
> total amount equal to 5.7% of the amounts allowed for the RMBS
> Trusts (the "Allowed Fee Claim"), against the relevant entities for
> each respective Trust pursuant to the Plan and the RMBS Trust
> Allocation Protocol, which amounts shall reduce the total amount
> of allowed unsecured claims and allowed cure claims for the
> RMBS Trusts. The Allowed Fee Claim shall be apportioned among
> counsel for the Steering Committee Consenting Claimants, on the
> one hand, and counsel for the Talcott Franklin Consenting
> Claimants, on the other, in conformity with the Original Settlement
> Agreements. The portion of the Allowed Fee Claim allocated to
> counsel for the Steering Committee Consenting Claimants shall be
> paid 4.75% to Gibbs & Bruns LLP and 0.95% to Ropes & Gray
> LLP. The portion of the Allowed Fee Claim allocated to counsel
> for the Talcott Franklin Consenting Claimants shall be paid 5.7%
> to be shared among Talcott Franklin P.C., Miller, Johnson, Snell &
> Cummiskey, P.L.C., and Carter Ledyard & Milburn LLP based on
> lodestar as calculated per agreement between co-counsel. Each
> share of the Allowed Fee Claim (and distributions thereon,
> including Trust Units) shall be documented in separate claims
> stipulations and shall be independently transferable.[199]

In addition, the Debtors' Disclosure Statement clearly describes the fee arrangement.

85.    Also informing my opinion is the fact that the Investors in the RMBS

Trusts received direct notice of the settlement and the Allowed Fee Claim from the RMBS

Trustees.[200]  The RMBS Trustees hired Garden City Group ("GCG"), a firm specializing in

---

[198]  PSA Motion at Exhibit 3.B, p. 6.

[199]  Id.  The Plan contemplates that 5.7% of the Allowed RMBS Trust Claims will be paid as the Allowed Fee
Claim and shared among Gibbs & Bruns, Ropes & Gray and counsel for the Talcott Franklin Consenting
Claimants.  The allocation of that 5.7% among those law firms is set forth in the Plan Supplement.

[200]  RMBS Trustees' Joinder at 13-14.

large-scale litigation notice programs, to design a notice campaign and build and maintain the

RMBS Trustees' website. Through GCG, the RMBS Trustees distributed notices to all registered

holders of RMBS by mail and to the Depository Trust Company via email. Before filing the

PSA Motion, for example, GCG sent out four notices to various groups of Investors.[201]

86.    On May 24, 2013, the RMBS Trustees, through GCG, provided notice to

the Investors regarding the Global Settlement, the PSA Motion, the RMBS Settlement and the

FGIC settlement.[202] The notice clearly provided Investors with information regarding the

deadline for objecting to the Plan Support Agreement, the process for approving or rejecting the

FGIC Settlement Agreement, and the Investors' option to direct the RMBS Trustees to withdraw

from the RMBS Settlement in respect of the applicable RMBS Trust.[203] Further, the Bankruptcy

Court, in the Order Approving the Plan Support Agreement, held that the notice provided by the

RMBS Trustees was "sufficient and effective in satisfaction of federal and state due process

requirements and other applicable law to put the parties-in-interest in these Chapter 11 cases and

others, including the Institutional Investors and the investors in each RMBS Trust, on notice of

the [Plan Support] Agreement, the RMBS [Plan] Settlement, and the FGIC Settlement

Agreement."[204]

---

[201]    *Id.* at 14.

[202]    *Id.*

[203]    *Id.*

[204]    Order Granting Debtors' Motion For An Order Under Bankruptcy Code Sections 105(A) And 363(B)
Authorizing The Debtors To Enter Into A Plan Support Agreement With Ally Financial Inc., The Creditors'
Committee, and Certain Consenting Claimants (the "Order Approving PSA"), at 3; Opinion Approving PSA at
10-11.

### 3.  <u>Acceptance By Affected Parties</u>

87.    The RMBS Trusts own the claims that are the subject of the RMBS

Settlement and that are being settled in connection with the Plan.[205]  The RMBS Trustees (on

behalf of the RMBS Trusts) are the parties who may assert, settle and vote such claims.[206]  The

RMBS Trustees and their counsel were active participants in the settlement negotiations that led

to the Plan Support Agreement[207] and, with the assistance of Duff & Phelps LLC ("<u>Duff</u>"),

conducted a thorough analysis of the RMBS Settlement.[208]  Based upon that analysis, the RMBS

Trustees determined that the allowance and treatment of the RMBS Trust Claims in accordance

with the proposed Plan, including the Allowed Fee Claim, is reasonable and appropriate.[209]

88.    In addition to having the support of the RMBS Trustees, the RMBS

Settlement, including the Allowed Fee Claim, has been endorsed by all the parties to the Plan

Support Agreement, including the Debtors, the Official Committee of Unsecured Creditors, AIG

Asset Management (U.S.), LLC, Allstate Insurance Company, Financial Guaranty Insurance

Company, the Kessler Class Claimants, Massachusetts Mutual Life Insurance Company, MBIA

Insurance Corporation, Prudential Insurance Company of America, the Supporting Senior

Unsecured Noteholders, Wilmington Trust, National Association, and Paulson & Co., Inc.

(collectively, the "<u>Plan Support Parties</u>").[210]  The nearly universal support for the RMBS

---

[205]   Steering Committee Reply at 3.

[206]   RMBS Trustees' Joinder at 2; Steering Committee Reply at 3 (citing *Redmond v. Commerce Trust Co.*, 144 F.2d 140, 154-55 (8th Cir. 1944)).

[207]   *See supra* n. 129 and accompanying text; *see also* Steering Committee Counsel Statement at 12-13.

[208]   RMBS Trustees' Statement Regarding Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval Of RMBS Trust Settlement Agreements [Docket No. 2833], at 2-3.

[209]   *Id.* at 3; Major Declaration at 12-13; Meyer Declaration at 12-13; Declaration of Fernando Acebedo [Docket No. 3940-3], at 6-7; Declaration of Thomas Musarra [Docket No. 3940-4], at 11; Declaration of Mamta K. Scott, As Officer of U.S. Bank, As RMBS Trustee [Docket No. 3940-5], at 11; Declaration of Mary L. Sohlberg [Docket No. 3940-6], at 10.

[210]   *See supra* n. 143 and accompanying text.

Settlement (including, notably, from the RMBS Trustees), supports my conclusion that the

Allowed Fee Claim is reasonable under Bankruptcy Code section 1129(a)(4).[211]

### 4.    Complexity Of Case/Involvement of RMBS Steering Committee and RMBS Trustees

89.    The record of the Chapter 11 Cases demonstrates the complexity of the

cases.  The Debtors have characterized the cases as follows: "[f]ostering consensus [in these

Chapter 11 Cases] has been no easy task, particularly in light of the numerous complex legal

issues that had to be resolved, including the validity and priority of claims of securities holders

and the monoline insurers, the amount of the claims held by the RMBS Trustees, and the extent

of the estates' claims against Ally."[212]  As described in further detail in Section V.I, *supra*, the

Global Settlement incorporated in the Plan provides significant benefit to the Debtors' estates and

their creditors.[213]  The Global Settlement "resulted from a months-long, Court-supervised

mediation involving numerous parties[,]" settles "billions of dollars of claims" and is "supported

by a substantial majority of the Debtors' major claimant constituencies."[214]  Absent the Global

Settlement, and the RMBS Settlement in particular, the Debtors would face complex, fact-

intensive, lengthy and costly litigation of the RMBS Trust Claims on a loan-by-loan basis.[215]

Discovery in such cases would likely involve millions of pages of documents and months of

---

[211]    *See In re Lehman Bros. Holdings, Inc.*, 487 B.R. 181, 193 (Bankr. S.D.N.Y. 2013) (where a fee arrangement is disclosed and the plan incorporating that fee arrangement is accepted by affirmative votes, a "reasonable conclusion from that vote is that the creditors have spoken . . . and have chosen not to object to the payments. . . ."); *Journal Register*, 407 B.R. at 538 (overruling objection to incentive plan payments where, *inter alia*, disclosure statement and plan "fully disclosed" incentive plan, gave holders of unsecured claims an opportunity to object, and creditors overwhelmingly voted in favor of plan).

[212]    PSA Motion at 2.

[213]    Order Approving PSA at 41, 44.

[214]    *Id.*

[215]    *Id.* at 11; Kruger Declaration at 10-11; Disclosure Statement at 29; Second Supplemental Motion To Approve RMBS Settlement at 28; Major Declaration at 14; Meyer Declaration at 13-14.

deposition testimony from current and former employees.[216]  "Even if such litigation were

successful, it likely would deplete the Debtors' estates, and might nonetheless result in

diminished recoveries to all creditor constituencies, including the [RMBS Trusts]."[217]

90.    Steering Committee Counsel has been actively involved in the Chapter 11

Cases since before their inception, and have played a critical role in achieving critical consensus

among many different creditor constituents with competing interests.[218]  The Examiner, in his

report, spends over thirty (30) pages detailing months of intense, complex prepetition

negotiations between counsel to the RMBS Steering Committee, the Debtors and other key

creditor constituents.[219]

### 5.    Comparison To Market

91.    As described in further detail in Section VI.A.1, *supra*, the Allowed Fee

Claim is at the low end of the range of comparable contingency fees.

### C.    Consideration Of The Substantial Contribution Factors Supports The Reasonableness Of The Allowed Fee Claim

92.    Courts have generally declined to apply Bankruptcy Code section 503(b)'s

substantial contribution test when assessing reasonableness of fees paid in connection with a plan

---

[216]  Second Supplemental Motion to Approve RMBS Settlement at 27-29; Lipps Declaration at 23-29; Supplemental Lipps Declaration at 40-42.

[217]  Major Declaration at 14; Meyer Declaration at 14; Second Supplemental Motion to Approve RMBS Settlement at 30; Supplemental Lipps Declaration at 42.

[218]  *See* generally Steering Committee Counsel Statement; Examiner's Report, Vol. 1 at III-302-35; Kruger Declaration at 4-5; Dubel Witness Statement at 3-9.  *See also* n. 55, 56, 57, and 58, 96 - 110, 115, 117 - 121, 129, 132, 133, *supra*, and accompanying text.

[219]  *See* Examiner's Report, Vol. 1 at III-302-35.  The Examiner notes that the group of Investors represented by Gibbs & Bruns and Ropes & Gray were primarily responsible for the prepetition settlement negotiations: while "Rescap had initial discussions with both the Steering Committee Group and the Talcott Franklin Group, ResCap primarily negotiated the terms of the [Original RMBS Settlement] (and the allowed amount of the Trust R&W Claims) with the Steering Committee Group." *Id.* at III-309; *see also id.* at III-329 ("Rescap primarily negotiated the terms of the RMBS Trust Settlement Agreements with the Steering Committee Group because, unlike the Talcott Franklin Group, the Steering Committee Group 'could kill a sale, full stop.").  *See also* Disclosure Statement at 63 (the Debtors engaged in extensive prepetition negotiations with Steering Committee Counsel).

of reorganization.[220]  I have not been asked to form an opinion as to the applicability of section 503(b)(3)(D).  Nonetheless, I have considered the factors courts apply when considering a substantial contribution claim.

93.    The case law applying section 503(b)(3)(D) provides descriptive guideposts and examples of specific actions that courts have held to meet the criteria for determining if a person made a substantial contribution to a bankruptcy case.  As these guideposts and examples describe actions that "should be" compensated (as distinguished from determining the amount of the compensation), they provide a useful normative benchmark for evaluating the actions of the RMBS Steering Committee and its counsel and thus determining the reasonableness of the Allowed Fee Claim.  The comparison of the actions of the RMBS Steering Committee and its counsel to the substantial contribution guideposts and examples also is informative because a "substantial contribution" requires a qualitative level of conduct that exceeds that required by mere "reasonableness."[221]

---

[220]  The United States District Court for the Southern District of New York in *United States Trustee v. Bethlehem Steel Corp (In re Bethlehem Steel Corp.)*, 2003 WL 21738964 at *6-*12 (S.D.N.Y. 2003), affirmed the Bankruptcy Court's approval, pursuant to section 363(b), of a debtor's reimbursement of its union's due diligence expenses incurred in connection with participating in plan discussions.  In so doing, the District Court rejected the United States Trustee's argument that subsections 503(b)(3)(D) and (b)(4) should control the payment, reasoning: (i) section 363(b) governs actions of the debtor whereas subsections 503(b)(3)(D) and (b)(4) govern actions of non-debtor parties; (ii) the mere fact that a creditor could seek payment pursuant to subsections 503(b)(3)(D) and (b)(4) did not prohibit the debtor from agreeing to make such payments; and (iii) the agreed upon payments would be appropriate provided the requirements of section 363(b) were satisfied.  *See also Lehman Bros.*, 487 B.R. at 192 (noting that "there are basic differences between a claim for reimbursement of professional fees under Section 503(b) and payments that are made pursuant to a plan of reorganization."); *Adelphia Commc'ns Corp.*, 441 at 19 (holding that fees may be paid in connection with a plan under section 1129(a)(4) if they are approved by a court as reasonable, or subject to such a review, without showing that the party receiving such fees has made a substantial contribution to the bankruptcy case).

[221]  The respective common meanings of  "substantial" and "reasonable" reflect that "substantial" implies a higher order of magnitude than "reasonable."  *See* Merriam-Webster Dictionary, available at http://www.merriam-webster.com/dictionary (last visited October 15, 2013) *(*defining substantial as: "*a*: consisting of or relating to substance b: not imaginary or illusory: real, true c: important, essential"; and defining "reasonable" as: "*a*: being in accordance with reason <*a reasonable theory*> b: not extreme or excessive <*reasonable requests*> c: moderate, fair <*a reasonable chance*> <*a reasonable price*> d: inexpensive").  The substantial contribution case law is animated by the view that a "substantial contribution" claim should be the "exception, not the rule" because a substantial contribution award diminishes the estate. *See, e.g., In re S&Y Enters., LLC*, 480 B.R. 452, 459 (Bankr. E.D.N.Y. 2012) (noting that approval of expenses and fees for making a substantial contribution

94.     The case law teaches that to make a substantial contribution there must be
actual demonstrable benefit to the estate as a whole.[222]  To prove[223] that such a benefit has been
made, courts have set forth descriptive guideposts for evaluating what constitutes a substantial
contribution.  The case-law guideposts require meaningful participation in the chapter 11 case
that is neither disruptive nor duplicative, but rather fosters, and advances the administration of
the bankruptcy estate and the reorganization process.[224]

95.     The RMBS Steering Committee and its counsel have by all accounts acted
before and after the commencement of the Chapter 11 Cases to foster the efficient and
consensual resolution of the Chapter 11 Cases.  The constructive role of the RMBS Steering
Committee from the prepetition negotiation of the Original RMBS Settlement Agreement and the
Original Plan Support Agreement to the negotiation of the global Plan Support Agreement has

---

"should be the exception, not the rule" because payment of such fees diminish the estate); *In re Am. Preferred Prescription*, 194 B.R. 721, 727 (Bankr. E.D.N.Y. 1996) ("Compensation under section 503 is reserved for those rare and extraordinary circumstances when the creditor's involvement truly enhances the administration of the estate.").

[222]  *S&Y Enters.*, 480 B.R. at 464 (requiring proof of "services in the bankruptcy process that yielded a direct and significant benefit to the bankruptcy estate or the parties as a whole"); *In re Granite Partners, L.P.*, 213 B.R. 440, 446 (Bankr. S.D.N.Y. 1997) (collecting cases that require proof of "actual and demonstrable benefit"); *In re Best Prods. Co.*, 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994) (stating that a court should "strictly limit[ ] compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtors or estate."); *see also Lebron v. Mechem Fin., Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) (quoting *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988) ("the applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors.")).

[223]  The "substantial contribution" standard of proof is a preponderance of the evidence. *In re U.S. Lines*, 103 B.R. at 429 (Bankr. S.D.N.Y. 1989); *see also Lebron*, 27 F.3d at 946.

[224]  *See, e.g.*, *S&Y Enters.*, 480 B.R. at 464 ("applicant's efforts should advance the entire bankruptcy process, and should move the bankruptcy case toward a successful reorganization"); *In re Bayou Grp., LLC*, 431 B.R. 549, 561 (Bankr. S.D.N.Y. 2010) ("[S]ection 503(b)(3)(D) focuses on process as much as on contribution, on the movant's substantial contribution in *the case* – that is, the entire chapter 11 case."); *In re Randall's Island Family Golf Centers, Inc.*, 300 B.R. 590, 598 (Bankr. S.D.N.Y. 2003) (substantial contribution is limited to "those rare occasions when the creditor's involvement truly fosters and enhances the administration of the estate.") (quoting *Best Prods. Co.*, 173 B.R. at 866); *Granite Partners*, 213 B.R. at 446 (noting that duplicative services are not entitled to compensation); *see also Hall Fin. Group v. DP Partners, Ltd. P'ship (In re DP Partners, Ltd.)*, 106 F.3d 667, 672 (5th Cir.), *cert. denied* 552 U.S. 815, 118 S.Ct. 63 (1997) ("[S]ervices which make a substantial contribution are those which 'foster and enhance, rather than retard or interrupt the progress of reorganization.'") (quoting *In re Consol. Bancshares, Inc.*, 785 F.2d 1249, 1253 (5th Cir. 1986)); *Lebron*, 27 F.3d at 944 (same); *In re Lister*, 846 F.2d at 57 (substantial contribution is based upon benefit to the estate).

been noted by the Examiner,[225] the Debtors,[226] and the major constituents in the Chapter 11

Cases.[227]

96.     Further, the approach of the RMBS Steering Committee has been one of

consensus building, backed by the threat of litigation of the underlying RMBS Trust Claims if

reasonable compromises could not be reached.  The RMBS Steering Committee initially reached

out to the Debtors to attempt to negotiate a settlement as an alternative to litigation.[228]  After the

Original RMBS Settlement with the Debtors was reached, the RMBS Steering Committee and its

counsel reached out to the RMBS Trustees to build support and consensus for the settlement.[229]

In addition, the RMBS Steering Committee and its counsel engaged in a dialogue with other

parties-in-interest, both before and during the mediation, to reach consensus.[230]

97.     The RMBS Steering Committee did not strike a deal with the Debtors and

sit back as the Chapter 11 Cases unfolded.  It was an active, meaningful, participant throughout

the Chapter 11 Cases.[231]  As discussed above,[232] the RMBS Steering Committee engaged in

ongoing dialogue with parties-in-interest in the case to build support for the settlement;

negotiated changes to the Original RMBS Steering Committee Settlement in response to

---

[225]  *See supra* n. 218, and accompanying text.

[226]  Disclosure Statement at 28 (providing that the Steering Committee, among others, had "made a substantial
contribution to the Debtors' liquidation efforts and played an integral role in working towards an expeditious
resolution of these Chapter 11 Cases.").

[227]  Second Supplemental Motion To Approve RMBS Settlement at 4; PSA Motion at 6-8, 17; Committee
Statement In Support Of PSA, at 3-4.  *See also* n. 115, 129, *supra*, and accompanying text.

[228]  Examiner's Report, Vol. 1 at III-302; Steering Committee Counsel Statement at 4.

[229]  *See supra* n. 91 and accompanying text.

[230]  Steering Committee Counsel Statement at 12; *see also supra* n. 49, 53, 55, 57, 58, 59, 68, 84, 91, 93, 105, 114,
115, 118, 119, 125, 128, and 129 and accompanying text.

[231]  Steering Committee Counsel Statement at 4-13; Examiner's Report, Vol. 1 at III-302-29; *see also* n. 115, 129,
*supra*, and accompanying text.

[232]  Steering Committee Counsel Statement at 4-13; *see* n. 115 and 129, *supra*, and accompanying text; *see also*
Section V.B.4, *supra*.

objections made and clarifications requested; participated in court hearings; participated in

discovery; supported the Debtors' Platform Sale and Whole Loan Sale and helped to negotiate

the "cure settlement" with the RMBS Trustees; helped to orchestrate the FGIC Settlement;

provided background on factual and legal issues; participated in the mediation before Judge

Peck; and assisted in drafting the various RMBS trust settlements, the plan support agreements,

and the plan implementation documents.[233]

    98.  To be sure, the RMBS Steering Committee did not act purely for altruistic

purposes.  However, providing a benefit to similarly situated holders of interests in the RMBS

Trusts was a direct by-product of the actions taken by the RMBS Steering Committee and was a

factor why the RMBS Steering Committee negotiated a contingency fee.[234]  In addition, many

parties other than other holders of RMBS Trust interests were the direct beneficiaries of the

actions taken by the RMBS Steering Committee, including the RMBS Trusts, the RMBS

Trustees, the Monolines, the Orphan Trusts, the Debtors, the Committee and Ally.[235]  The

Allowed Fee Claim is not rendered unreasonable because actions taken by the RMBS Steering

Committee benefited its self-interest.[236]  Indeed, the RMBS Trustees support the RMBS

---

[233] Steering Committee Counsel Statement at 12.

[234] *Id.* at 2-3.

[235] *See supra* n. 226.

[236] The Bankruptcy Courts in the Second Circuit have adopted the view that because a creditor is always to some
extent acting in its own self-interest, self-interest alone is not *per se* a disqualifying factor in making a
substantial contribution claim.  *See, e.g., S&Y Enters.*, 480 B.R. at 463 (noting that self-interest is "likely in
nearly every situation," and stating that "the existence of a self-interest cannot in and of itself preclude
reimbursement'" (quoting *In re AmFin Fin. Corp.*, 468 B.R. 827, 833 (Bankr. N.D. Ohio 2012)); *In re AMfesco
Indus., Inc.*, 1988 WL 141524, at *4 (E.D.N.Y. Dec. 21, 1988) ("altruistic motive" is not required); *see also In
re Celotex Corp.*, 227 F.3d 1336, 1339 (11th Cir. 2000) ("The degree of benefit conferred or contribution made
is 'not diminished by selfish or shrewd motivations.' [*In re*] *DP Partners, [Ltd.,]* 106 F.3d [667] at 673 [5th Cir.
1997]"); *DP Partners,* 106 F.3d at 673 (statutory language does not require "a self-deprecating, altruistic intent
as a prerequisite to recovery…").  *Contra Lebron*, 27 F.3d at 941 (stating that substantial contribution requires
"more than an incidental [benefit] arising from activities the applicant has pursued in protecting his or her own
interest"); *In re Lister*, 846 F.2d at 57 ("Efforts undertaken by a creditor solely to further his own self-
interest . . . will not be compensable, notwithstanding any incidental benefit accruing to the bankruptcy
estate.").

Settlement that includes the Allowed Fee Claim because it is in the best interest of the RMBS

Trusts and the beneficiaries thereof.[237]

99.    In addition to the guideposts discussed above, the substantial contribution

case law provides illustrative examples of conduct that warrants compensation.  These examples

include:

> 1)  Participating in the chapter 11 process by participating in negotiations and mediating disputes, attending hearings, communicating with parties and drafting documents;[238]
>
> 2)  Taking actions which increased recoveries for the estate;[239]
>
> 3)  Providing expertise on specific legal issues.[240]

---

[237]  *See supra* n. 208-209 and accompanying text.

[238]  *See, e.g.*, *In re Worldwide Direct, Inc.*, 334 B.R. 112, 122-123 (Bankr. D. Del. 2005) (drafting a plan and disclosure statement was a substantial contribution to the debtor's case); *In re Essential Therapeutics, Inc.*, 308 B.R. 170, 175-76 (Bankr. D. Del. 2004) ("drafting key Plan provisions, participating in hearings, and providing assistance during the reorganization process . . ."; "preparing the necessary corporate documents for the Reorganized Debtor"); *In re Baldwin-United Corp.*, 79 B.R. 321, 340-44 (Bankr. S.D. Ohio 1987) (noting substantial contributions made by: (i) addressing legal issues; (ii) providing a voice of reason in negotiations; (iv) mediating disputes; and (iv) developing a plan for the acquisition of assets which caused a competing bid to emerge).

[239]  *DP Partners*, 106 F.3d at 672 (actions which resulted in identifying assets, changes to the plan, and confirmation of the plan resulting in at least $3 million benefit to creditors); *In re FF Holdings Corp.*, 343 B.R. 84 (D. Del. 2006) (negotiating alternative debtor-in-possession financing and persuading another creditor to withdraw its objection to confirmation); *In re Pow Wow River Campground, Inc.*, 296 B.R. 81, 87-88 (Bankr. D. N.H. 2003) (objections to proposed plan and offers to purchase debtor's asset at a higher price resulting in increased recovery to unsecured creditors and facilitating quick confirmation); *Baldwin-United Corp.*, 79 B.R. at 344 (developing a plan to purchase certain of the debtors' assets resulted in a higher bid); *U.S. Lines*, 103 B.R. at 431-32 (negotiating settlement agreement creating funds for the estate).

[240]  *Granite Partners*, 213 B.R. at 451 ("The Berlack Firm lent its expertise to the goal of resolving many obstacles to confirmation, and thereby facilitated the successful liquidation of the three debtors. . . .  [T]he Berlack Firm's efforts led to the Investor Settlement which paved the way for confirmation and established the postconfirmation administration of the estates . . . [and] worked jointly [with the trustee] on the disclosure statement . . . and also facilitated settlements . . . ."); *see also Celotex Corp.*, 227 F.3d at 1340 (claimant "played a significant role in the successful negotiation of a consensual plan, and that a large portion of credit for achievement of the plan was attributable to Speights because of his credibility and the expertise in asbestos-related bankruptcy that he brought to the process"); *In re SONICblue, Inc.*, 422 B.R. 204, 212-14 (Bankr. N.D.Cal. 2009) (expertise of civil litigation firm aided in trial preparation and the trial and the development of legal theories and evidence warranting substantial contribution claim); *Marcus Montgomery Wolfson & Burten, P.C. v. AM Int'l (In re AM Int'l)*, 203 B.R. 898, 904-05 (Bankr. D. Del. 1996) (shareholders made a substantial contribution by designing warrant structure that benefited debtor and the shareholders).

100.    These examples provide a useful comparison to the activities of the RMBS

Steering Committee and Steering Committee Counsel.  The RMBS Steering Committee and

Steering Committee Counsel were actively engaged in settlement negotiations involving the

RMBS Trusts, the Monolines, the FGIC Settlement, and the Orphan Trusts, and participated in

drafting documents relating to the same.[241]  By participating and fostering these settlements, the

RMBS Steering Committee and Steering Committee Counsel achieved a beneficial result for all

holders of interests in the RMBS Trusts in the form of the agreement on their Allowed RMBS

Trust Claims, as well as the allocation thereof,[242] assisted in the consummation of the Platform

Sale and the Whole Loan Sale, contributed to the overall reorganization process by facilitating

the mediation of disputes, and helped to increase recoveries by avoiding timely and costly

litigation that would have resulted in the absence of such settlements.[243]  Significant is the

substantive expertise that the RMBS Steering Committee and Steering Committee Counsel

brought to the table with respect to the representation and warranty claims, not only in terms of

educating the parties-in-interest as to the issues involved and in sizing the claims, but in terms of

structuring settlements.[244]

### D.    Bankruptcy Code Section 330 and The *Johnson* Factors.

101.    Section 330 of the Bankruptcy Code provides that, after notice and a

hearing, the court may award a professional person employed under section 327 "(A) reasonable

compensation for actual, necessary services rendered by the . . .  professional person. . . ."[245]

---

[241]    *See supra* n. 115, 129 and accompanying text.

[242]    *See supra* n. 209 and accompanying text.

[243]    *See supra* n. 142, 215 and accompanying text.

[244]    Steering Committee Counsel Statement at 1-4.

[245]    11 U.S.C. § 330(a)(1)(A).

102.     Section 330 provides a set of factors to determine the amount of reasonable compensation to be awarded to an estate-employed professional person, including (i) the time spent on such services, (ii) the rates charged for such services, (iii) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a chapter 11 case, (iv) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; (v) whether the professional person has demonstrated skill and experience in the bankruptcy field; and (vi) whether the compensation is reasonable when compared to market.[246]

103.     Courts in the Second Circuit assessing the reasonableness of compensation under section 330 begin with the "lodestar" test – which multiplies the reasonable number of hours expended times a reasonable billing rate – and then determine whether to apply any enhancements to the lodestar amount under *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-20 (5th Cir. 1974)" (the "Johnson Factors").[247]  Courts in the Second Circuit have cautioned against departing from the lodestar, noting that enhancements based on the Johnson Factors are "only appropriate in *exceptional and rare circumstances* and must be supported by detailed evidence and specific findings."[248]

---

[246]    *Id.* at 330(a)(3); *see also In re Northwest Airlines Corp.*, 382 B.R. 632, 644 (Bankr. S.D.N.Y. 2008).

[247]    *Northwest Airlines Corp.*, 382 B.R. at 645 (quoting *In re Erik Stephen Brous*, 370 B.R. 563, 569 (Bankr. S.D.N.Y. 2007)); *In re Kohl*, 421 B.R. 115, 131 (Bankr. S.D.N.Y. 2009).  The Johnson Factors are: (1) the time and labor required for the matter; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the services appropriately; (4) the preclusion of the professional from taking other cases by working on the matter; (5) the customary fee involved in similar instances; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client; (8) the sums involved and the results obtained; (9) the experience and ability of the employed professional; (10) whether the case is desirable or not; (11) the length of the relationship between the professional and the client; and (12) what awards were granted in similar cases.  *In re Kohl*, 421 B.R. at 132 n.2.

[248]    *In re Kohl*, 421 B.R. at 131.

104.    Section 328, not section 330, of the Bankruptcy Code addresses
contingency fees, and Steering Committee Counsel was not retained as a professional person in
the Chapter 11 Cases.  That said, section 330 and the Johnson Factors are informative for
purposes of my analysis.  Section 330 and the Johnson Factors mirror in many respects the
factors that govern the determination of whether a contingency fee is reasonable.[249]
Accordingly, for same reasons discussed in Section VI.A, *supra*, and having generally
considered the factors identified in section 330 and the Johnson Factors, I believe the Allowed
Fee Claim is reasonable.

E.    **Conclusion**

105.    In absolute terms, a $39 million fee is a very large fee.  So too is the $700
million recovery to the RMBS Trusts.  In my opinion, the fee is reasonable.  The RMBS Steering
Committee asked the Steering Committee Counsel to work on a contingency fee basis and they
did.  The negotiated fee accounts for the risks and complexities of  difficult and uncertain RMBS
litigation and the high degree of experience and skill required to see the issues through to
resolution.  The factors that courts typically consider in determining the reasonableness of
professional fees strongly support my conclusion that the Allowed Fee Claim is reasonable.  The
Allowed Fee Claim does not deplete the assets of the Debtors' estates, and does not reduce
recoveries to other creditors.  The percentage of the Allowed Fee Claim is clearly within (and on
the low end of) the range of comparable contingency fee percentages for similar engagements.
The Allowed Fee Claim was disclosed early, and often, throughout the course of the Chapter 11
Cases, providing notice and opportunity to object to all affected parties, and was approved as
part of the RMBS Settlement by the RMBS Trustees (who have the authority to settle the RMBS

---

[249]    *See supra* Section VI.A.

Trust Claims).  It is supported by the parties to the Plan Support Agreement.  The RMBS

Steering Committee, and Steering Committee Counsel, created a novel approach to resolving the

RMBS Trust Claims. They were highly successful in liquidating the amount of the RMBS Trust

Claims without resort to detailed loan-by-loan litigation over representation and warranty claims.

They were active and constructive participants in the Chapter 11 Cases, helping to achieve a sale

of the Debtors' key assets, the FGIC Settlement Agreement, and the Global Settlement resolving,

among other things, inter-creditor priorities and allocations.  They helped to maximize recoveries

in the Chapter 11 Cases and the early recovery for creditors as compared to other similarly

situated chapter 11 cases.  Based upon the entirety of the analysis set forth in this report, it is my

opinion that the Allowed Fee Claim is reasonable.

<div align="center">Executed this 18th day of October, 2013, at Salt Lake City, Utah.</div>

/s/ Ralph R. Mabey
Ralph R. Mabey

## EXHIBIT "A"

### Bankruptcy-Related Publications 2003-2013

The New U.S. Trustee Guidelines for Review of Attorneys' Free and Expense
Applications In Larger Chapter 11 Cases:  Issues and Observations
(with Gregory W. Fox)
American Bankruptcy Institute/New York University School of Law
39th Annual Lawrence P. King and Charles Seligson Workshop on Bankruptcy &
Business Reorganization, 2013

Multinational Enterprise Group Insolvencies:  Emerging Issues and Proposed Guidelines
(with Margreta M. Morgulas)
American Bankruptcy Institute/New York University School of Law
39th Annual Lawrence P. King and Charles Seligson Workshop on Bankruptcy &
Business Reorganization, 2013

Professionals Employed Under Bankruptcy Code Sections 327 and 1103:  Standards for
Employment—The Use of Conflicts Counsel to Cure Otherwise Disqualifying Conflicts
of Interest—The Scope of Rule 2014 Disclosure Obligations
(with Michael S. Neumeister)
American Bankruptcy Institute/New York University School of Law
39th Annual Lawrence P. King and Charles Seligson Workshop on Bankruptcy &
Business Reorganization, 2013

Litigation Trusts:  Assignment of Causes of Action, Treatment of Non-Consenting
Creditors, Feasibility and Funding Issues
(with Audrey J. Noll)
American Bankruptcy Institute/New York University School of Law
38th Annual Lawrence P. King and Charles Seligson Workshop on Bankruptcy &
Business Reorganization, 2012

Issues Affecting Distressed Debt Investment
(with Gabriel I. Glazer)
American Bankruptcy Institute/New York University School of Law
38th Annual Lawrence P. King and Charles Seligson Workshop on Bankruptcy &
Business Reorganization, 2012

The Potential For, and Challenges To, Mediation as a Facilitating Solution
(with Alex Fisch, Katherine Baudistel and Jake Smart)
American Bankruptcy Institute/New York University School of Law
37th Annual Lawrence P. King and Charles Seligson Workshop on Bankruptcy &
Business Reorganization, 2011

Chapter 11 Plan Confirmation:  Cram Up, Feasibility, Cram Down with a Gift,
Reinstatement/Unimpairment
(with Audrey J. Noll)
American Bankruptcy Institute/New York University School of Law 35th Annual
Lawrence P. King and Charles Seligson Workshop on Bankruptcy & Business
Reorganization, 2009

Guidelines for Coordination of Multi-National Enterprise Group Insolvencies (Working
Drafts)
International Insolvency Institute (with selected international distribution) 2008-2012
(As Chair of the International Insolvency Institute's Committee on Jurisdiction and
Coordination; with Susan Johnston, Committee Reporter.)

Coordination Among Insolvency Courts in the Rescue of Multi-National Enterprises
(with Susan Power Johnston)
Annual Review of International Insolvency, 2009

Hon. Ralph R. Mabey on *In re Excel Innovations, Inc., Solidus Networks, Inc. v. Excel
Innovations, Inc. (In re Excel Innovations, Inc.)*, 502 F.3d 1086 (9th Cir. 2007),
LexisNexis Expert Commentaries, February 2008

Hon. Ralph R. Mabey on *In re Brown & Cole Stores, LLC*, Brown & Cole Stores, LLC v.
*Associated Grocers, Inc. (In re Brown & Cole Stores, LLC)*, 375 B.R. 873 (B.A.P. 9th Cir.
2007), LexisNexis Expert Commentaries, December 2007

Hon. Ralph R. Mabey on *In re Seven Fields Development Corp., Geruschat v. Ernst &
Young LLP (In re Seven Fields Development Corp.)*, 505 F.3d 237 (3d Cir. 2007),
LexisNexis Expert Commentaries, December 2007

Hon. Ralph R. Mabey on *In re El Toro Materials Co., Saddleback Valley Community
Church v. El Toro Materials Co., Inc. (In re El Toro Materials Co., Inc.)*, 2007 U.S.
App., Lexis 22991 (9th Cir. Oct. 1, 2007), LexisNexis Expert Commentaries, November
2007

Hon. Ralph R. Mabey on *In re Northwest Airlines Corp., In re Northwest Airlines Corp.*,
366 B.R. 270 (Bankr. S.D.N.Y. 2007), LexisNexis Expert Commentaries, November
2007

Hon. Ralph R. Mabey on *In re Adbox, Metcalf v. Golden (In re Adbox, Inc.)*, 488 F.3d
836 (9th Cir. 2007), LexisNexis Expert Commentary, November 2007

Hon. Ralph R. Mabey on *In re Gencarelli, UPS Capital Business Credit v. Gencarelli (In
re Gencarelli)*, 2007 U.S. App. Lexis 20751 (1st Cir. Aug. 30, 2007), LexisNexis Expert
Commentaries, October 2007

Hon. Ralph R. Mabey on *In re National Energy & Gas Transmission, National Energy & Gas Transmission, Inc. v. Liberty Electric Power, LLC (In re National Energy & Gas Transmission, Inc.),* 492 F.3d 297, 2007 U.S. App., Lexis 16263 (4th Cir. 2007), LexisNexis Expert Commentaries, September 2007

Hon. Ralph R. Mabey on *In re Perrine, In re Perrine, 2007 Bankr. Lexis 1432 (Bankr. C.D. Cal. April 13, 2007)*, LexisNexis Expert Commentaries, September 2007

Hon. Ralph R. Mabey on *In re Dana Corp., In re Dana Corp., 2007 Bankr. Lexis 1466 (Bankr. S.D.N.Y. Apr. 19, 2007)*, Lexis Nexis Expert Commentaries, August 2007

Hon. Ralph R. Mabey on *In re Fortune Natural Resources Corporation, In re Fortune Natural Resources Corp.*, 2007 Bankr. Lexis 1350 (Bankr. E.D. La. Apr. 12, 2007), LexisNexis Expert Commentaries, July 2007

Hon. Ralph R. Mabey on *VFB LLC v. Campbell Soup Co., VFB LLC v. Campbell Soup Co., 482 F.3d 624 (3d Cir. 2007)*, LexisNexis Expert Commentaries, July 2007

The Evolving Bankruptcy Bench:  How Are the 'Units' (28 U.S.C. § 151) Faring?
Boston College Law Review, December 2005

Second Report of the Select Advisory Committee on Business Reorganization (SABRE)
(as a SABRE member)
The Business Lawyer, Volume 60, No.1, November 2004

Transnational Insolvency:  Cooperation Among the NAFTA Countries
(4 vol.) (as an United States Adviser), The American Law Institute (2003)

Chapter 11:  Life After Death
(with Patrick S. Malone)
The Utilities Project, Volume 3, 2003

**Bankruptcy-Related Program Faculties in the Last 10 Years (for some of which I also prepared written materials)**

Panelist, "Current Ethics Issues for Bankruptcy Counsel; U.S. Trustee Fee Guidelines," and "Issues in Multijurisdictional Cases; Venue Issues," American Bankruptcy Institute/New York University School of Law 39th Annual Lawrence P. King and Charles Seligson Workshop on Bankruptcy & Business Reorganization, 2013, New York.

Panelist, "Issues Affecting Stressed Debt Investment," American Bankruptcy Institute/New York University School of Law 38th Annual Lawrence P. King and Charles Seligson Workshop on Bankruptcy & Business Reorganization, 2012, New York

Panelist, "Plan Confirmation Issues:  Part II," American Bankruptcy Institute/New York University School of Law 38th Annual Lawrence P. King and Charles Seligson Workshop on Bankruptcy & Business Reorganization, 2012, New York

Panelist, "Examine This!  Examiners, Examinations and You," 85th Annual National Conference of Bankruptcy Judges, October 2011, Tampa, Florida.

Panelist, "Mediation in Bankruptcy:  A Complement to the Judicial Process," sponsored by the American Bar Association Business Law Section's Business Bankruptcy Committee, 85th Annual National Conference of Bankruptcy Judges, October 2011, Tampa, Florida.

Featured Speaker, INSOL India, Gwalior, India, October 2011

Panel Chair, "Early Challenges in Chapter 11 Cases," Annual American Law Institute-American Bar Association Course of Study, "Fundamentals of Bankruptcy Law," September 2011, Chicago, Illinois.

Panel Chair, "Consensual Resolution Part II:  The 'Solutions' and Whether They Work," ABI Bankruptcy and Business Reorganization Advanced Course 2011, New York University School of Law, September 2011, New York.

Panelist, "Consensual Resolution Part I:  The Obstacles," ABI Bankruptcy and Business Reorganization Advanced Course 2011, New York University School of Law, September 2011, New York.

Panel Chair, "Coordinating Corporate Group Insolvencies Across National Borders," International Insolvency Institute 11th Annual International Insolvency Institute Conference, June 2011, New York.

Panelist, "Ethics and Morality in the Classroom," 3rd Annual J. Reuben Clark Law Society Faculty Section Conference in connection with the American Association of Law Schools, January 2011, San Francisco, California.

"Harvard Law School Roundtable on Distressed Debt Restructuring," Harvard Law School, December 2010, Boston, Massachusetts.

Panelist and Presenter, (1) " Issues Affecting Claims Transfers/Special Purpose Entities in Bankruptcy," and (2) "Chapter 9 Municipal Debt Adjustments," Bankruptcy and Business Reorganization Advanced Course 2010, New York University School of Law, September 2010, New York.

Panel Chair, " Coordination of Multinational Corporate Group Insolvencies:  Solving the COMI Issue," International Insolvency Institute 10th Annual Conference, June 2010, Rome, Italy.

Panel Chair, "Distribution of the Estate," Annual American Law Institute-American Bar Association Course of Study, "Fundamentals of Bankruptcy Law," April 2010, Chicago, Illinois.

Panelist and Presenter, "Navigating Angels Landing at Zion National Park: The Art of Negotiation in Bankruptcy," American Bankruptcy Institute's Rocky Mountain Bankruptcy Conference, January 2010, Denver, Colorado.

Panelist and Presenter, (1) "Fraud Cases;" and (2) "Tight Credit:  DIP Financing and Plan Confirmation;" Bankruptcy and Business Reorganization Advanced Course 2009, New York University School of Law, New York, September 2009.

Panelist, "Insolvencies and Restructurings of Multinational Corporate Enterprises," International Insolvency Institute 9th Annual Conference, June 2009, New York.

Panelist, Annual American Law Institute-American Bar Association Course of Study, "Fundamentals of Bankruptcy Law," Chicago, Illinois, May 2009.

Panelist, 23rd Annual Norton Bankruptcy Litigation Institute, Park City, Utah, February 2009.

Panelist and Presenter, "Wall Street in Crisis," S. J. Quinney College of Law, University of Utah, October 2008.

Panelist and Presenter, (1) "Retailer Chapter 11 Cases;" (2) "Chapter 15 Multinational Cases;" (3) "Advanced Avoidance Issues;" and (4) "Is the Bankruptcy Code Capable of Dealing with the Next Round of Challenges?;" Bankruptcy and Business Reorganization Advanced Course 2008, New York University School of Law, New York, September 2008.

Speaker, "Coordination Among Insolvency Courts in the Rescue of Multi-National Enterprises," The American Law Institute/International Insolvency Institute, Transnational Insolvency:  Principles of Cooperation, Berlin, Germany, June 2008.

Panelist, Annual American Law Institute-American Bar Association Course of Study, "Fundamentals of Bankruptcy Law," Philadelphia, Pennsylvania, March 2008.

Panelist, Annual American Law Institute-American Bar Association Course of Study, "Fundamentals of Bankruptcy Law," Las Vegas, Nevada, March 2008.

Panelist, 22nd Annual Norton Bankruptcy Litigation Institute, Park City, Utah, February 2008.

Panelist, American Bankruptcy Institute, 13th Annual Rocky Mountain Bankruptcy Conference, "Weather Forecast:  The Future of Bankruptcy," Denver, Colorado, February 2008.

Panelist and Presenter, (1) "Bankruptcy Rule Amendments; Ethics," and (2) "What is Reorganizable?  Special Aspects of Bankruptcies of Financial Assets Businesses;" Bankruptcy and Business Reorganization Advanced Course 2007, New York University School of Law, New York, September 2007.

Panelist, Annual American Law Institute-American Bar Association Course of Study, "Fundamentals of Bankruptcy Law," Philadelphia, Pennsylvania, April 2007.

Speaker, 25th Annual State and Local Government Conference, Brigham Young University, "Whither Bankruptcy:  Are Millions of Americans Still Upside Down?" Provo, Utah, March 2007

Panelist, 21st Annual Norton Bankruptcy Litigation Institute, Park City, Utah, February 2007.

Representative of the International Insolvency Institute, United Nations Commission on International Trade Law, Insolvency Working Group Meetings, Group V, Vienna, Austria, December 2006.

Panelist and Presenter, (1) "Chapter 11's New Case Demands:  Management Retention and Incentives," (2) "Legal Issues in Claims Trading; Special Issues in Cases with Second Lien Financing Structures;" and (3) "The Constantly Changing Case - The Effects of Claims Liquidity and Hedge Funds on Reorganizations:  Ethics," Bankruptcy and Business Reorganization Advanced Course 2006, New York University School of Law, New York, September 2006.

Panelist, Annual American Law Institute-American Bar Association Course of Study, "Fundamentals of Bankruptcy Law," Chicago, Illinois, May 2006.

Panelist, "Litigation in Chapter 11," 20th Annual Norton Bankruptcy Litigation Institute, Park City, Utah, March 2006.

Panelist, "Legends of the Law," National Conference of Bankruptcy Judges, San Antonio, Texas, November 2005.

Panelist and Presenter, "Major First Day Issues" and "Employee-Related Issues in Chapter 11 Cases," Bankruptcy and Business Reorganization Advanced Course 2005, New York University School of Law, New York, September 2005.

Panelist, Annual American Law Institute-American Bar Association Course of Study, "Fundamentals of Bankruptcy Law," Santa Fe, New Mexico, May 2005.

Speaker and Discussion Leader, "Moving Mountains: $2 Trillion in Consumer Debt and the Middle Class Bankruptcy Earthquake," American College of Bankruptcy, Washington, DC, March 2005.

Panelist, "Bankruptcy Ethics: Are There Universal Standards, or Do the Ends Define the Rules?" American Bankruptcy Institute, 10th Annual Rocky Mountain Bankruptcy Conference, Denver, Colorado, February 2005.

Panelist, "Major First Day Issues," Bankruptcy and Business Reorganization Advanced Course 2004, New York University School of Law, New York, September 2004.

Panelist, Annual American Law Institute-American Bar Association Course of Study, "Fundamentals of Bankruptcy Law," New Orleans, Louisiana, May 2004.

Group Leader, 20th Annual Weekend Retreat, The Bankruptcy Bar Association of the southern District of Florida, Palm Beach, Florida, May 2004.

Panelist, "Litigation in Chapter 11 Cases, First Day Orders, Operating & Financing, Sale of Assets and Confirmation," Norton Bankruptcy Litigation Institute, Park City, Utah, February 2004.

Panelist, Annual American Law Institute-American Bar Association Course of Study, "Fundamentals of Bankruptcy Law," Seattle, Washington, May 2003.

Panelist, "Bankruptcy Reform: The Second Report of the Select Advisory Committee on Business Reorganization," American Bar Association Spring Meeting, Los Angeles, California, April 2003.

Moderator, "Asbestos Bankruptcies–Mass Torts, Mass Filings, and Mass Controversy!" American College of Bankruptcy Second Annual Salon Meeting, March 2003.

Panelist, "Chapter 11 Cases," Norton Bankruptcy Litigation Institute I, Park City, Utah, February 2003.

## EXHIBIT "B'

## <u>Prior Testimony 2008-2013</u>

For Powell Goldstein, LLP, <u>Darryl S. Laddin, as Trustee for the Liquidating Trust of the Estates of Verilink  Corporation and Larscom, Inc.</u>, Case No. 5:11-MC-03877, United States District Court for the Northern District of Alabama, Northeastern Division, 2012

For KT Group, LLC and Eagle Mountain Partners, LLC, <u>KT Group, LLC and Eagle Mountain Partners, LLC v. Heritage Orcas Partners, LP, et al.</u>, Case No. 2:07cv00790, United States District Court for the District of Utah, 2010

For Regions Bank and Capital Factors, Inc., <u>Siegel v. Royal Bank of Canada</u> (Adv. No. 00-03021), Montreal, Quebec, 2009

For Catalyst Investment Group Limited, <u>Catalyst Investment Group Ltd.; Timothy Roberts; ARM Asset-Backed Securities S.A. v. Max Lewinsohn; Maximillian & Co. (a firm); Mircopower Global Ltd.</u>, Case No. HC08C03158 and HC08C03241, In The High Court of Justice, Chancery Division, Royal Courts of Justice, 2009

For Paul, Hastings, Janofsky & Walker, LLP, <u>CAPCO American Securitization Corporation and Capital Company of America, LLC v. Paul, Hastings, Janofsky & Walker, LLP</u>, Case No. BC 358128, Superior Court of the State of California, County of Los Angeles, Central Division, 2008

For Grupo Mexico/Americas Mining Corporation., <u>ASARCO LLC and Southern Peru Holding, LLC v. Americas Mining Corporation</u>, Case No:  1:07-CV-00018, United States District Court for the Southern District of Texas, Brownsville Division, 2007

For Fulbright & Jaworski, L.L.P., <u>Suez Energy Marketing, NA, Inc., v. Fulbright & Jaworski, L.L.P.</u>, Case No.  2006-06355, District Court of Harris County, Texas, 133rd Judicial District, 2006

For American International Specialty Lines Insurance Company, <u>American International Specialty Lines Insurance Company v. Greenwich Insurance Company</u>, CV-4003-BSJ, United States District Court, Southern District of New York, 2006

For Gerald K. Smith, Plan Trustee for Estate of Boston Chicken, et al., <u>ACE Bermuda Insurance Ltd v. Peer Pedersen, Scott Beck, Saad Nadhir and Gerald K. Smith</u>, 2005 No. 89, Supreme Court of Bermuda, Civil Jurisdiction, 2005

For AT&T Corporation; <u>Richard A. Williamson, on behalf of and as trustee for, The Bondholders' Liquidating Trust of At Home Corporation v. AT&T Corp, et al.</u>, CV-812506, Superior Court of the State of California, County of Santa Clara, 2005

577328v1