UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>Residential Capital, LLC, *et al.*<br><br>Debtors. | Chapter 11<br><br>Case No. 12-12020 (MG)<br><br>Jointly Administered |

**DECLARATION OF NANCY MUELLER-HANDAL
IN SUPPORT OF PLAN CONFIRMATION**

I, Nancy Mueller-Handal, hereby certify and declare as follows based upon my own personal information and knowledge:

1. I am a Managing Director of Metropolitan Life Insurance Company ("MetLife"). I am the Global Head of Structured Finance within the Investments Department at MetLife, responsible for a $70 billion portfolio of Domestic and International ABS, CMBS, RMBS and Residential Mortgage Loans. I oversee a team of Structured Finance professionals, responsible for credit and convexity analysis, trading, risk management, strategy and surveillance. Prior to leading the Structured Finance group, I was the head of the RMBS group at MetLife. I held various roles within Structured Finance including trading and analyzing Agency and Non Agency CMOs and Pass-Throughs and trading, analyzing and monitoring Domestic and International ABS.

2. MetLife is a member of the Steering Committee Group of RMBS Holders (the "Steering Committee Group"),[1] which is represented by Gibbs & Bruns LLP and Ropes & Gray

---

[1] The Steering Committee Group consists of AEGON USA Investment Management, LLC; Angelo, Gordon & Co., L.P.; Cascade Investment, LLC; Federal Home Loan Bank of Atlanta; Goldman Sachs Asset Management, L.P.; ING Investment Management Co. LLC; ING Investment Management, LLC; Bayerische Landesbank; BlackRock Financial Management Inc.; Kore Advisors, L.P.; Pacific Investment Management Company LLC; Metropolitan

LLP (together, "Steering Committee Counsel").  I respectfully submit this declaration, in lieu of direct testimony, in support of confirmation of the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 4153] (the "Plan"),[2] specifically the Allowed Fee Claim that is a provided to Steering Committee Counsel as part of the RMBS Settlement.

**Formation of the Steering Committee Group**

3.    The origins of the Steering Committee Group trace back to early 2010, when several of Gibbs & Bruns' large bondholder clients approached the firm about RMBS representation and warranty claims.  MetLife joined the group soon after it was formed.  At the group's request, Gibbs & Bruns reviewed substantial documentation about the RMBS market, the securities, and the governing agreements at issue.  Gibbs & Bruns developed a plan to assert representation and warranty claims against the originators and servicers of the RMBS trusts on an originator-wide basis.  This plan sought to overcome the significant logistical difficulties of loan-by-loan litigation of mortgage repurchase and servicing claims, which could have involved decades of litigation.  The group, through Gibbs & Bruns, also sought to address and reform, on a comprehensive basis, mortgage servicing practices that were not in the best interests of certificateholders and did not properly align the interests of certificateholders and borrowers whose mortgages were held by RMBS trusts.

4.    Because this strategy depended on the group collectively holding more than certain threshold amounts of securities in the multitude of RMBS trusts, the original bondholder clients put Gibbs & Bruns in touch with numerous other large RMBS certificateholders.  As a

---

Life Insurance Company; Neuberger Berman Europe Limited; SNB StabFund; The TCW Group, Inc.; Teachers Insurance and Annuity Association of America; Thrivent Financial for Lutherans; Western Asset Management Company; and certain of their affiliates, either in their own capacities or as advisors or investment managers.

[2] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Plan.

result, the group increased to more than 20 certificateholders who rank among the world's largest and most sophisticated investment advisers and investors. The Steering Committee Group now includes pension fund advisers, insurance companies, government-sponsored enterprises, government agencies, banks, investment advisers, and other investment funds that collectively hold hundreds of billions of dollars of RMBS.

5. The larger Steering Committee Group formed a smaller steering committee of investor professionals to direct the Group's negotiation and litigation efforts, with as-needed approvals from the larger Steering Committee Group. I, on behalf of MetLife, have served on this investor steering committee since its inception.

**The Contingent Fee Structure**

6. The Steering Committee Group retained Gibbs & Bruns (and later Ropes & Gray) on a contingent fee arrangement based on recoveries to the RMBS trusts. This contingent fee arrangement was necessitated by the structure of the RMBS trusts. RMBS certificateholders do not own any representation and warranty claims; instead, those claims are owned by the RMBS trusts themselves. Any recoveries on those claims would inure to the benefit of the Steering Committee Group only upon recoveries by the RMBS trusts. Upon such recoveries, all the holders of the RMBS securities in those trusts, not just the members of the Steering Committee Group, would benefit. The Steering Committee Group therefore retained Gibbs & Bruns on a contingent fee arrangement that contemplated overall recoveries to the trusts.

7. The fee was structured to reflect the risks inherent in the litigation, which was of a type that had never been undertaken successfully before, was anticipated to be lengthy and ground-breaking, and was dependent for its success on the ability of the group to prompt—and maintain—action by both certificateholders and trustees. Given these risks and structural

barriers to recovery, the Gibbs & Bruns fee provided for different fee recoveries based upon different stages of the litigation and the potentially different outcomes that might be obtained. The Gibbs & Bruns fee agreement was signed in 2010.  Without disclosing our privileged communications with our counsel, the contingent fee was negotiated so that it would compensate Gibbs & Bruns fairly and reasonably in light of the likely litigation risks, the duration and uncertainty of any recovery from the litigation we retained the firm to pursue, the creativity that would be required to develop and implement this unprecedented litigation strategy, and the multi-year, intense level of effort the firm would have to invest—and has continued to invest—to achieve success in this and other cases.  Internal counsel for the investors in the Steering Committee Group considered proposals from a number of firms before we retained Gibbs & Bruns.  Internal investor counsel for the Steering Committee Group then negotiated the proposed contingent fee arrangement with Gibbs & Bruns.  The original fee Gibbs & Bruns proposed was different in structure and amount than the ultimate fee agreement.  It was formulated, in part, by comparing the proposed fee structure to fee structures in other multi-billion dollar cases.  The contingent fee also considered a variety of potential outcomes, and included different fee structures that would govern early settlement, loan-by-loan litigation, and individual loan repurchases.  I am satisfied that the Gibbs & Bruns contingent fee was fair and reasonable at the time we entered into it.  It remains fair today and is demonstrably fair to the RMBS Trusts.  This is particularly true given the results achieved in this case when compared to other bankruptcy cases, such as Washington Mutual and Lehman Brothers, where RMBS holders are still awaiting their recoveries.

8. A contingent fee arrangement also had a key benefit for the trusts.  Absent this arrangement, it would have been difficult to pursue the claims due to a structural free rider

problem inherent in the trusts' claims. While a minority of holders, usually 25%, can direct the trustee to act, recoveries for claims pursued at the direction of a minority of holders flow to all holders, including those who have not borne the burdens of pursuing the claims and have paid none of the costs necessary to achieve a recovery. Absent a contingent fee arrangement, which imposes attorneys' fees on the entirety of the trusts' recovery, but imposes no costs if no recovery is achieved, the RMBS Trusts' claims might never have been pursued comprehensively or successfully. Upon information and belief, until this innovative contingent fee arrangement was put in place, there had been no comprehensive resolution of RMBS trust claims with respect to an originator and, since this arrangement, the only comprehensive resolutions that have been achieved are those achieved by Gibbs & Bruns, acting pursuant to this contingent fee arrangement. This confirms the clear fairness and benefit of the contingent fee arrangement to the RMBS Trusts: it solves the free-rider problem inherent in compelling a subset of holders to pay hourly lawyers to achieve recoveries that would be shared with those who hadn't contributed to the costs incurred to obtain the recoveries.

**The Bank of America / Countrywide Settlement**

9.      The Steering Committee Group, through Gibbs & Bruns, began discussions directly with various originators and servicers. The initial focus of these efforts was on Bank of America and Countrywide. With the active involvement of BNYMellon, a trustee that was willing to step forward and act, the efforts of the Steering Committee Group and Gibbs & Bruns resulted in the announcement in June 2011 of a settlement whereby Bank of America would pay $8.5 billion to numerous Countrywide RMBS trusts, plus market reforming servicing improvements for those trusts valued at approximately $2 billion. Upon information and belief, this was, and remains, the largest private litigation settlement ever achieved.

**Initial Discussions with ResCap**

10.     In October 2011, the Steering Committee Group, through Gibbs & Bruns, contacted Ally Financial to begin discussions to resolve the substantial representation and warranty liabilities of Ally and its affiliates. Gibbs & Bruns, on behalf of the Steering Committee Group, engaged in discussions with senior management of ResCap to determine whether a resolution of the Trusts' repurchase and servicing claims could be achieved or whether, instead, it would be necessary to pursue litigation to enforce the Trusts' repurchase remedies. The smaller steering committee, including me, was provided with regular updates from Gibbs & Bruns on the progress of the negotiations.

**Engagement of Ropes & Gray as Bankruptcy Counsel**

11.     In April 2012, it was evident that a bankruptcy filing by ResCap was imminent. Given the chapter 11 complexities that would be involved, the Steering Committee Group engaged Ropes & Gray, which has substantial experience in complex chapter 11 cases, to assist as bankruptcy counsel pursuant to a separate contingent fee agreement.

12.     Ropes & Gray principally negotiated the amount of its fee with representatives of PIMCO and Blackrock, the two largest holders of RMBS in the Steering Committee Group. The original proposed fee was higher that the ultimate amount, and the holders also specifically negotiated for a tiered arrangement where the fee percentage would increase based on the length of time from the start of a bankruptcy case to the effective date of a plan.

**The ResCap RMBS Settlement**

13.     In the months leading up to the Petition Date, Gibbs & Bruns, on behalf of the Steering Committee Group, continued both to negotiate and to prepare to pursue litigation against both ResCap and Ally. In the approximately two weeks prior to the Petition Date, Gibbs

6

& Bruns and Ropes & Gray were engaged in essentially daily (including weekend) discussions with Ally and ResCap on behalf of the Steering Committee Group, including the exchange of repurchase data, presentations of expected recoveries, legal analyses, and other diligence materials. While both firms were intimately involved in all aspects of the settlement, Gibbs & Bruns took the lead in negotiating the amount of the settlement while Ropes & Gray took the lead on developing the bankruptcy strategy and negotiating the agreements.

14. Steering Committee Counsel provided the group's smaller steering committee, including me, with regular updates on the situation, including convening various conference calls in which I participated in the days (including the weekend) leading up to the bankruptcy filing to discuss the status of whether bankruptcy litigation would occur, a negotiated resolution could be achieved, or a negotiated resolution accompanied by substantial litigation would follow. These efforts culminated in the execution by the Steering Committee Group, including MetLife, of the original RMBS Settlement at the commencement of the cases. The RMBS Settlement included, as a non-severable provision, the payment of the contingency fee claim to Steering Committee Counsel as had been negotiated with the Steering Committee Group.

**The Global Settlement**

15. The Steering Committee Group received updates and conducted discussions, in which I participated, during the bankruptcy case. The larger Steering Committee Group ultimately approved the entry into the Plan Support Agreement and the Global Settlement, which included the RMBS Settlement.

**Conclusion**

16. The extraordinary results that have been achieved by Steering Committee Counsel would not have been obtained absent the contingent fee arrangements that were agreed to by the

Steering Committee Group, including MetLife. Both the Gibbs & Bruns fee agreement and the Ropes & Gray fee agreement fall within the overall Allowed Fee Claim. This contingent fee structure permitted Steering Committee Counsel to negotiate and navigate the RMBS Settlement through the bankruptcy process on behalf of the Steering Committee Group, but all holders benefited very substantially from the efforts of an organized, united group of RMBS certificateholders that insisted that RMBS holders be treated fairly and then worked constructively, with other creditor constituencies, to achieve a fair RMBS Trust settlement and to ensure it was embodied in the overall ResCap plan – a plan that provides fair recoveries to all RMBS certificateholders. These results, importantly, were achieved because of the contingent nature of the fee arrangement: no investors bore an unfair cost burden; indeed, no investors bore any out-of-pocket expenditure for legal fees or expenses. Finally, the Allowed Fee Claim is being paid from solely from proceeds that would otherwise have been distributed to RMBS Trust certificateholders, so the costs of this fee are not being borne by any other creditor constituency. The results achieved here demonstrate the extraordinary level of skill and involvement by Steering Committee Counsel. MetLife fully supports the Allowed Fee Claim for Steering Committee Counsel.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Executed on this 11th day of November, 2013.    _____
Nancy Mueller-Handal