**MORGAN, LEWIS & BOCKIUS LLP**
James L. Garrity, Jr.
John C. Goodchild, III (*pro hac vice*)
101 Park Avenue
New York, New York 10178-0600
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

*Counsel to Deutsche Bank National Trust*
*Company and Deutsche Bank Trust Company*
*Americas, as Trustees of Certain Mortgage*
*Backed Securities Trusts*

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC, *et al.*,** | ) |
| | ) **Chapter 11** |
| Debtors. | ) |
| | ) **Jointly Administered** |

### DECLARATION OF BRENDAN MEYER

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

     I, Brendan Meyer, hereby declare, pursuant to 28 U.S.C. § 1746, that the following is true

and correct to best of my knowledge, information and belief:

     1.      I am employed by DB Services New Jersey, Inc., and am authorized to conduct

certain activities on behalf of its affiliates Deutsche Bank National Trust Company and Deutsche

Bank Trust Company Americas (together, "**Deutsche Bank**"), including the authorization to

make this Declaration.  Unless otherwise indicated, I have personal knowledge of the facts set

forth herein, except as to certain matters that I believe to be true based on (i) information

provided by Duff & Phelps, LLC ("**Duff & Phelps**"); (ii) information about positions of parties

in these Chapter 11 Cases contained in pleadings that I reviewed, or were reported to me by

counsel, or learned during my participation in this case, including the Plan Mediation (defined below); and (iii) my review of business records of Deutsche Bank.

2.      I have been employed by Deutsche Bank in this capacity since April 2002.  My responsibilities as Director include the administration of defaulted and distressed structured finance transactions for which Deutsche Bank serves as trustee, including, among other things, consulting with counsel, declaring events of default, sending notices of default and other significant events, communicating with transaction parties and investors, and, in connection with the foregoing and in consultation with investors, exercising remedies.

3.      I submit this Declaration in support of the confirmation of the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* (the "**Plan**"), filed on August 23, 2013.[1]

4.      On May 13, 2013, the Debtors, Ally Financial Inc. ("**AFI**"), the Official Committee of Unsecured Creditors (the "**Committee**"), and the Consenting Claimants, including Deutsche Bank, as RMBS Trustee, entered into the Plan Support Agreement [ECF No. 3814, Ex. 3] (the "**Plan Support Agreement**"), pursuant to which they agreed to the terms of a proposed consensual Chapter 11 plan of reorganization and resolution of all claims and disputes between them as set forth in the Plan Term Sheet and the Supplemental Term Sheet, attached respectively as Exhibits A and B to the Plan Support Agreement.

5.      The Debtors filed their *Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support*

---

[1]      On August 23, 2013, the Plan Proponents filed the *Notice of Filing of Corrected Solicitation Version of the Disclosure Statement and Joint Chapter 11 Plan* [ECF No. 4819], which attached, as Exhibit A, the solicitation version of the *Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* (the "**Disclosure Statement**"), to which the Plan was in turn attached as Exhibit 1.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Plan.  For the convenience of the reader, in some cases the definitions found in the Plan are repeated herein or a citation to the Plan's definition of such term is included.

*Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants*

(the "**PSA Motion**") [ECF No. 3814] on May 23, 2013.

6.      By Order dated June 26, 2013 [ECF No. 4098], this Court approved the PSA

Motion.

7.      Among the claims and disputes resolved in the Plan Support Agreement and

ultimately the Plan is a settlement (the "**RMBS Settlement**"), which provides for the allowance,

priority and allocation of (a) the claims of certain residential mortgage backed securitization

trusts (collectively, the "**RMBS Trusts**") against the Debtors arising from obligations or liability

in respect of the origination and sale of mortgage loans to the RMBS Trusts (as further defined in

the Plan, the "**RMBS R+W Claims**")[2] and (b) the claims of the RMBS Trusts against the

Debtors other than the RMBS R+W Claims (the "**RMBS Cure Claims**,"[3] and together with the

RMBS R+W Claims, the "**RMBS Trust Claims**").[4]

**I.      Relevant Background**

   **A.      Deutsche Bank's Role as Trustee**

8.      Deutsche Bank serves as trustee, indenture trustee, securities administrator, co-

administrator, paying agent, grantor trustee, custodian and/or other similar agencies (in any such

capacity, the "**Trustee**") in respect of certain RMBS Trusts, whole loan servicing agreements,

net interest margin trusts, other trusts, and similar arrangements listed on <u>Exhibit A</u> to the

Amendment to Declaration of Brendan Meyer (the "**Meyer Amendment**") filed with this Court

on June 14, 2013  [ECF No. 3980] (collectively, the "**Deutsche Bank RMBS Trusts**").  This

Declaration is made solely with respect to Deutsche Bank's role as Trustee.

---

[2]    Defined at Art. I.A.257 of the Plan.

[3]    Defined at Art. I.A.256 of the Plan.

[4]    The RMBS Trust Claims are also defined at Art. I.A. 260 of the Plan.

9.      The Deutsche Bank RMBS Trusts are governed by one or more pooling and servicing agreements, highly integrated sets of "servicing agreements," mortgage loan purchase agreements, deposit trust agreements, trust agreements, indentures, asset sale agreements, depositor sale agreements, administration agreements, yield maintenance agreements and other ancillary transaction documents (collectively, the "**Transaction Documents**").[5]  Pursuant to the Transaction Documents, one or more of the Debtors has obligations in various capacities, including as originator, seller, sponsor, depositor and similar capacities (together, "**Seller**"), and/or as servicer, subservicer, master servicer, back-up servicer, HELOC servicer, administrator, co-administrator and similar capacities (collectively, "**Servicer**").

10.     In the appropriate capacity or capacities as provided for in the Transaction Documents, Deutsche Bank has the right to enforce claims against the Seller and Servicer in respect of the Deutsche Bank RMBS Trusts and to vote such claims in connection with the Plan.

### B.      The Proofs of Claim and the Notice of Cure Claims

11.     On or about March 1, 2013, Deutsche Bank, as Trustee,[6] filed Proofs of Claim nos. 6706 through 6756 (the "**Proofs of Claim**") against each applicable Debtor.[7]

---

[5]   The Transaction Documents have information and details specific to the particular Deutsche Bank RMBS Trust they govern, but in large part, the Transaction Documents have the same or comparable provisions, particularly as they relate to the responsibilities and rights of the Trustee.  Attached hereto as Exhibit  PX 1531 and incorporated herein by reference is a sample indenture that governs one of the Deutsche Bank RMBS Trusts. Exhibit PX 1531 is indicative of the indentures that govern certain of the Deutsche Bank RMBS Trusts. Attached hereto as Exhibit PX 1532 and incorporated herein by reference is a sample pooling and servicing agreement (including standard terms and conditions and a series supplement) that governs one of the Deutsche Bank RMBS Trusts.  Exhibit PX 1532 is indicative of the pooling and servicing agreements that govern certain of the Deutsche Bank RMBS Trusts.

[6]   The RMBS Trust Claims were asserted by the Deutsche Bank in the appropriate capacity or capacities as provided for in the Transaction Documents.

[7]   *See also Stipulation and Order Permitting Certain Parties to File Proofs of Claim After the Bar Date* dated November 6, 2012 [ECF No. 2095].

12.    On April 16, 2013, Deutsche Bank filed a *Notice of Cure Claim of Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas as Trustee* (the "**Notice of Cure Claim**") [ECF No. 3451] asserting claims arising from the Debtors' failure to perform its obligations as Servicer under the Transaction Documents.[8]

### C.    The RMBS 9019 Motion

13.    Shortly after these Chapter 11 Cases were filed, the Debtors filed a motion (the "**Original RMBS 9019 Motion**"),[9] which was later amended (as amended, the "**RMBS 9019 Motion**").[10]    The RMBS 9019 Motion seeks approval of the **Original RMBS Settlement Agreement**s[11] with the two groups of **Institutional Investors**[12] (the **Steering Committee Consenting Claimants**[13] and the **Talcott Franklin Consenting Claimants**[14]).    The Original RMBS Settlement Agreements relate to the RMBS R+W Claims of the 392 Original Settling RMBS Trusts.[15]

---

[8]    *See also Fourth Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements*, ECF No. 2528, at ¶ 15.

[9]    *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 320].

[10]    *Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 1176] and the *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreement* [ECF No. 1887].

[11]    Defined at Art. I.A.194 of the Plan.

[12]    Defined at Art. I.A.131 of the Plan.  The Institutional Investors represented that they collectively held, or were authorized investment managers for holders of, 25% or more of one or more classes (or tranches) of certificates of a significant number of the Original Settling RMBS Trusts.  *See, e.g.,* RMBS 9019 Motion [ECF No. 1887], at ¶ 3; Original RMBS 9019 Motion [ECF No. 320] at ¶ 3.

[13]    Defined at Art. I.A.278 of the Plan.

[14]    Defined at Art. I.A.280 of the Plan.

[15]    Investors in the Original Settling RMBS Trusts were notified of the RMBS 9019 Motion, and all such Investors, and all other parties in interest in these Chapter 11 Cases, had the opportunity to object to the RMBS 9019 Motion.

14.     Under the Original RMBS Settlement Agreements, the Original Settling RMBS Trusts would have been granted an allowed aggregate claim of up to $8.7 billion (assuming full participation by the Original Settling RMBS Trusts) against those Debtors that acted as Sellers to be allocated in accordance with certain formulas set forth in Exhibit B to each of the Original RMBS Settlement Agreements.[16]  In support of the RMBS 9019 Motion, the Debtors submitted an expert report that calculated the Original Settling RMBS Trusts' RMBS R+W Claims at between $6.7 billion and $10.3 billion.[17]

**D.     Objections to the RMBS 9019 Motion**

15.     No party in interest filed an objection to the RMBS 9019 Motion claiming that the $8.7 billion allowed claim was too low.  There were, however, several objections that the $8.7 billion amount was too high.  For example, the Committee's objection stated that the Debtors' liability for RMBS R+W Claims of the Original Settling RMBS Trusts was approximately $3.8 billion, and if certain legal defenses were considered, might be reduced to a range of $2.7 billion to $3.3 billion.[18]

16.     FGIC's objection asserted that the Debtors could not support the reasonableness of an allowed aggregate claim exceeding $4 billion, excluding the value of the claims that monoline insurers (each, a "**Monoline**") have against the Debtors, and that "the $8.7 billion claim amount is excessive and unreasonable" and "grossly overstates the value of the settled

---

[16]     The Original RMBS 9019 Motion provided that "[w]hile the [Original RMBS Settlement Agreements] [were] negotiated by the Institutional Investors, the Trustees of each of the [Original Settling RMBS] Trusts will also evaluate the reasonableness of the settlement and can accept or reject the proposed compromise on behalf of each Trust." *See* ECF No. 320 at ¶4.

[17]     *See Declaration of Frank Sillman in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* [ECF No. 320-8], at ¶¶ 68-69.

[18]     *See Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* [ECF No. 2825], including the supporting Expert Report of Bradford Cornell, Ph.D [ECF No. 2829, Ex. A] (the "**Committee Objection**").

claim."[19]  MBIA similarly objected, stating that the RMBS R+W Claims of the Original Settling

RMBS Trusts, excluding the claims of the Monolines, were less than $3 billion and that the

Original RMBS Settlement Agreements would have provided a "windfall for certain Settling

Trusts at the expense of both non-settling and settling creditors."[20]

17.     Only two Investors in the Original Settling RMBS Trusts filed objections to the

RMBS 9019 Motion, which objections were limited to the manner in which the allowed claim

was to be allocated among the Original Settling RMBS Trusts in the Original RMBS Settlement

Agreements.[21]   The crux of those two objections was that the allocation methodology in the

Original RMBS Settlement Agreements failed to take into account the unique characteristics of

the Original Settling RMBS Trusts and inappropriately used net losses as a proxy for viable

RMBS R+W Claims.

### E.    Deutsche Bank's Retention of Qualified Professionals and Experts

18.     Deutsche Bank retained and has been advised throughout these Chapter 11 Cases,

including in connection with its consideration of the RMBS Settlement, by Morgan Lewis &

Bockius LLP, an experienced and knowledgeable law firm.

19.     Near the outset of these Chapter 11 Cases and in light of the then-pending RMBS

9019 Motion, Deutsche Bank and three other RMBS Trustees (BNY Mellon, U.S. Bank and

---

[19]   *See Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2819].

[20]   *See Objection of MBIA Insurance Corporation to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2810], including the Expert Declaration of C.J. Brown [ECF No. 2811].

[21]   *See Objection of Triaxx Prime CDO 2006-1, LLC, Triaxx Prime CDO 2006-2, LLC, and Triaxx Prime CDO 2007-1, LLC to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF No. 2308]; *Limited Objection of Amherst Advisory & Management, LLC to Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF No. 2297].

Wells Fargo)[22] retained Duff & Phelps as their financial advisor to, among other things, assist them in the identification, quantification, litigation and/or resolution of the issues and claims addressed in the Original RMBS Settlement Agreements, and, more broadly, the resolution of all of the RMBS Trust Claims.[23]

20.    Duff & Phelps was retained after a rigorous selection process based on (a) the firm's experience in handling similar types of engagements involving the evaluation of mortgage loan servicing agreements and loan origination agreements, bankruptcy litigation, restructuring, asset valuation, complex securitizations and RMBS loan repurchase actions and (b) the depth of resources available to the firm, including advisory services about bankruptcy issues generally.

**F.    The RMBS Trustees' Evaluation of the Original RMBS Settlement Agreements**

21.    Duff & Phelps was asked by the RMBS Trustees to evaluate the reasonableness of the Original RMBS Settlement Agreements as they related to the RMBS R+W Claims of the Original Settling RMBS Trusts.

**i.    Modification of the Original Claim Allocation Methodology**

22.    As part of its analysis of the RMBS R+W Claims, Duff & Phelps evaluated the claim allocation methodology in the Original RMBS Settlement Agreements, which would have allocated RMBS R+W Claims among the Original Settling RMBS Trusts *pro rata* on the basis of

---

[22]    As used herein, unless the context dictates otherwise, the term "**RMBS Trustees**" has the meaning ascribed to it in the Plan, to wit, Deutsche Bank; U.S. Bank, National Association ("**U.S. Bank**"); The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A. (together, "**BNY Mellon**"); Wells Fargo Bank, N.A. ("**Wells Fargo**"); Law Debenture Trust Company of New York ("**Law Debenture**"); and HSBC Bank USA, N.A. ("**HSBC**"), each solely in their respective capacities as trustee, indenture trustee, separate trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or other similar agencies. Deutsche Bank Trust Company Americas, together with BNY Mellon and U.S. Bank (each as Trustee), is also a member of the Committee.

[23]    Law Debenture and HSBC later joined in the retention of Duff & Phelps.

the sum of the net losses that have been experienced and are estimated to be experienced by each

such RMBS Trust through the date of its termination.

23.     Based on Duff & Phelps' suggestion, and after lengthy discussions with the

Steering Committee Consenting Claimants, the Debtors and other parties in interest, the claim

allocation methodology in the Original RMBS Settlement Agreements was modified (the

"**Revised Claim Allocation Methodology**") to provide for RMBS R+W Claims to be allocated

*pro rata* to account for differences among the RMBS Trusts with respect to (i) losses *and* (ii) the

incidence of breaches of representations and warranties, as revealed by loan sampling and

statistical work to be performed by Duff & Phelps.  Duff & Phelps advised Deutsche Bank and

the other RMBS Trustees that it believed the Revised Claim Allocation Methodology largely

addressed the substance of the objections to the RMBS 9019 Motion related to allocation

methodology.  Consistent with Duff & Phelps's recommendations, the Revised Claim Allocation

Methodology is part of the RMBS Settlement embodied in the Plan Support Agreement (at

Schedule A to Annex III) and embodied in Exhibits 9 and 13 to the Disclosure Statement.

### ii.     Valuation of Original Settling RMBS Trusts' RMBS R+W Claims

24.     To assess the reasonableness of the $8.7 billion allowed claim in the Original

RMBS Settlement Agreements, Duff & Phelps conducted a sampling review of more than 6,500

mortgage loan files provided by the Debtors.  In its review, Duff & Phelps sought to identify

breaches of representations and warranties made by the Debtors, and used statistical

methodologies to estimate the incidence of those breaches across the population of mortgage

loans in the RMBS Trusts.  Duff & Phelps also used historical information and financial analyses

to calculate the total present and projected future losses of the RMBS Trusts that were associated

with breaches of representations and warranties by the Debtors.  As a result of the significant

work done by Duff & Phelps, Deutsche Bank and the other RMBS Trustees gained an understanding that the range of RMBS R+W Claims for the Original Settling RMBS Trusts was between $6.5 billion and $10.2 billion.

### iii.    The RMBS Trustees' Statement Regarding the RMBS 9019 Motion

25.    Absent the approval of the RMBS Settlement, the RMBS R+W Claims would have to be asserted, litigated and liquidated on an individual basis.  It is Deutsche Bank's understanding that, if so litigated, the individual RMBS R+W Claims of the Original Settling RMBS Trusts would be subject to significant litigation risks and factual and legal defenses. Many of those risks and defenses are identified in the Committee Objection and in the *Steering Committee Investors' Statement in Support of Settlement and Response to Settlement Objections* [ECF No. 1739] (the "**Steering Committee Statement**").  As described in the Steering Committee Statement, the litigation of the RMBS R+W Claims would be an uncertain, expensive and protracted process.  Even if such litigation were successful, it likely would deplete the Debtors' estates, and might result in diminished recoveries to all creditor constituencies, including the RMBS Trusts.  *See* Steering Committee Statement, ¶¶ 8, 28-32.

26.    In light of the conclusion of Duff & Phelps regarding the estimated range of the RMBS R+W Claims of the Original Settling RMBS Trusts, and considering the substantial risks and defenses associated with litigating those claims in the absence of a consensual resolution, on or about February 4, 2013, Deutsche Bank, BNY Mellon, U.S. Bank and Law Debenture, responding to the Court's request that they advise the Court of their views concerning the Original RMBS Settlement Agreements in advance of the hearing on the RMBS 9019 Motion, filed the *RMBS Trustees' Statement Regarding Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of RMBS Trust Settlement Agreements* [ECF No. 2833] (the "**RMBS**

**Trustees' Statement**").  In the RMBS Trustees' Statement, the RMBS Trustees stated, among

other things, that:

> After careful consideration of relevant factors and analysis,
> including (a) the results of its review of a statistically significant
> number of loan files in the [Original] Settling [RMBS] Trusts
> provided by the Debtors, (b) the estimation of projected total
> collateral losses and underwriting breach rates in the [Original]
> Settling [RMBS] Trusts, (c) the estimation of likely agree rates
> with respect to the [Original] Settling [RMBS] Trusts (which take
> into account the litigation risk associated with the relative
> characteristics of the breach), and (d) consideration of causality
> factors (which take into account the litigation risk associated with
> a lack of causal relationship between the breach and loss), Duff [&
> Phelps] advised [BNY Mellon, Deutsche Bank, U.S. Bank and
> Law Debenture] that the amount of [up to $8.7 billion] is within a
> reasonable range to settle the [Original] Settling [RMBS] Trusts'
> [RMBS R+W] Claims  . . . .

RMBS Trustees' Statement, at ¶ 10.

27.    The foregoing RMBS Trustees further stated in the RMBS Trustees' Statement

that:

> Assuming no changes in the facts and controlling law underlying
> the [RMBS R+W] Claims, and subject to the RMBS Trustees'
> determination that all provisions of the [Original] RMBS Trust
> Settlement[s] are fair, equitable and reasonable to the Settling
> Trusts, the RMBS Trustees have determined that the Allowed
> Claim falls within a reasonable range to resolve the [Original]
> Settling [RMBS] Trusts' [RMBS R+W Claims] and the Debtors'
> proposed Revised Claim Allocation Methodology for allocating
> the Allowed Claim among the [Original] Settling [RMBS] Trusts
> is fair and equitable to those trusts.

*Id.* at ¶12.

28.    On May 23, 2013, the day the PSA Motion was filed,[24] the trial dates and other

matters related to the RMBS 9019 Motion were adjourned.[25]

---

[24]    *See* ECF No. 3814.

[25]    *See* ECF Nos. 3815 and 3816.

G. **The Plan Mediation and the Modification of the Original RMBS Settlement Agreements**

29.    On December 6, 2012, the Debtors filed a motion seeking the entry of an order appointing a mediator to assist certain parties in interest in resolving various plan-related issues in furtherance of reaching a consensual Chapter 11 plan.[26]  By Order dated December 26, 2012 (the "**Mediation Order**"), the Court appointed U.S. Bankruptcy Judge James M. Peck as Mediator.[27]

30.    The Plan Support Agreement,[28] the terms of which are now embodied in the Plan, was the result of an extensive mediation over the course of some five months (the "**Plan Mediation**") overseen by Judge Peck.  The communications and analyses relating to negotiations conducted during the Plan Mediation are confidential pursuant to the Mediation Order and cannot be disclosed in detail.  In general, however, the RMBS Settlement must be understood as the product of an integrated, multifaceted Global Settlement[29] that was the product of highly-contentious, arm's-length negotiations conducted by and among sophisticated parties (including the RMBS Trustees) with differing and conflicting interests, that were advised by sophisticated advisors, and conducted under the close supervision and guidance of a sitting bankruptcy judge.

---

[26]    *See* ECF No. 2357.

[27]    *See* ECF No. 2519.  The Court later extended the term of the Mediator.

[28]    *See* Declaration of Brendan Meyer, dated June 10, 2013 [ECF No. 3940-2] (as amended by the Meyer Amendment [ECF No. 3980], the "**Meyer PSA Declaration**"), in support of the (a) *Joinder of Certain RMBS Trustees to Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants* [ECF No. 3940] and (b) *Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants* [ECF No. 3814].  A copy of the Meyer PSA Declaration is attached hereto as Exhibit PX 1533 and  incorporated herein by reference.

[29]    Defined at Art. I.A.113 of  the Plan.

31.    As further described below, during the course of the Plan Mediation, the Original RMBS Settlement Agreements were expanded to include all of the RMBS Trust Claims for all of the RMBS Trusts.

### i.    RMBS R+W Claims of the Additional Settling RMBS Trusts

32.    The RMBS Trustees have consistently contemplated that the resolution of the RMBS Trust Claims would need to include the RMBS R+W Claims of all RMBS Trusts for which they acted,[30] and not just those of the Original Settling RMBS Trusts.  In that regard, the RMBS Trustees, working together with Duff & Phelps, identified the Additional Settling RMBS Trusts (as defined in the Plan), and in the context of the Plan Mediation those Additional Settling RMBS Trusts were folded into the RMBS Settlement.[31]

33.    The calculation of the range of the RMBS R+W Claims of the Additional Settling RMBS Trusts was completed by Duff & Phelps using the same methodologies it employed to quantify the comparable claims of the Original Settling RMBS Trusts.  Duff & Phelps presented its analysis of the RMBS R+W Claims of the Additional Settling RMBS Trusts to the RMBS Trustees, including Deutsche Bank, both orally and in writing.

34.    As contemplated by the RMBS Trustees, the Plan allows for distributions to the Additional Settling RMBS Trusts.  Thus, the RMBS R+W Claims of the Additional Settling RMBS Trusts are included in the RMBS Settlement contained in the Plan, and their claims will

---

[30]    The claims of each RMBS Trusts are based on the applicable Transaction Documents and therefore only certain RMBS Trusts have RMBS R+W Claims.

[31]    Art. IV.C.1 of the Plan provides:

*Modification of Original RMBS Settlement Agreements*. The Original RMBS Settlement Agreements are hereby expanded to include all RMBS Trusts holding RMBS Trust Claims and are otherwise modified as set forth herein.

receive treatment thereunder that is consistent with the treatment being accorded to the RMBS R+W Claims of the Original Settling RMBS Trusts under the terms of the Plan.

### ii.    RMBS Cure Claims

35.    Negotiations in the Plan Mediation also resulted in the RMBS Cure Claims being wrapped into the RMBS Settlement.  In order to assist the RMBS Trustees in quantifying the range of potential RMBS Cure Claims, Duff & Phelps analyzed potential liabilities of each applicable Debtor, as Servicer, for the RMBS Trusts for which the RMBS Trustees act as trustee or as servicer, subservicer, master servicer, back-up servicer, HELOC servicer, administrator, co-administrator and similar capacities.[32]

36.    Duff & Phelps attempted to quantify the Debtors' liability as Servicer as related to: (a) misapplied and miscalculated payments; (b) wrongful foreclosure and improper loss mitigation practices; and (c) extended foreclosure timing issues caused by improper or inefficient servicing behavior such as falsified affidavits, improper documentation, and improper collection practices.  Duff & Phelps concluded that the potential liability of the Debtors as Servicer for the three bases analyzed could be asserted in amounts up to as much as $1.1 billion for all of the RMBS Trusts, but that the assertion of such claims involved significant risk and uncertainty.[33]

---

[32]    In performing this analysis, Duff used publicly-available data on industry specific litigations and regulatory actions relating to residential mortgage servicing practices; reviewed the files of a large sampling of litigations specific to the Debtors; reviewed rating agency evaluation reports for the Debtors; accessed and reviewed a large sampling of the Debtors' records of servicing complaints for Debtor-serviced loans; and used publicly-available performance data on a sample of the RMBS Trusts.  Duff presented its analysis relating to the quantification of the RMBS Cure Claims both orally and in writing to the RMBS Trustees.

[33]    The RMBS Trustees were unable to obtain full discovery regarding potential RMBS Cure Claims, in part because the Debtors asserted that some of the information requested was not reasonably available.  The amount of information and data that would be needed in order to assert the RMBS Cure Claims in a litigated proceeding is likely very large and the analysis of that information and data would likely be expensive, time-consuming, and may ultimately lack sufficient certainty to establish the validity of such claims in a contested proceeding.  Furthermore, the Debtors may have viable defenses to the assertion and quantification of any RMBS Cure Claims, the resolution of which is uncertain.

37.     As compromised and settled, the RMBS Cure Claims are included in the RMBS

Settlement contained in the Plan Support Agreement and the Plan.  Under the Plan, the RMBS

Cure Claims are allowed in the aggregate amount of $96 million, and are divided between (i)

RMBS Trusts where the servicing agreement has been assumed and assigned by the Debtors by

the Effective Date (as defined in the Plan), which claims (the "**Recognized Cure Claims**") are

(or will be) listed on Schedules 1G or 1R to the Plan and (ii) RMBS Trusts where the servicing

agreement has not been assumed and assigned by the Debtors by the Effective Date, which

claims (the "**Recognized Unsecured Servicing Claims**") will be listed on Schedules 4G or 4R.

III.    **Allowance of, and Distributions on, the RMBS Trust Claims Under the Plan**

    A.    **Allowed Amounts and Reasons for the Reallocation of Units**

    38.    Article IV, Section C of the Plan, provides, among other things, that:

> (a) Entry of the Confirmation Order shall constitute approval of the
> Allowed amount of the RMBS Trust Claims as non-subordinated
> Unsecured Claims, subject only to the Allowed Fee Claim, in the
> aggregate amounts of (i) $209.8 million against the GMACM
> Debtors; (ii) $7,091.2 million against the RFC Debtors; and (iii) $0
> against the ResCap Debtors.

Plan Art. IV.C.2.

39.     The aforesaid "Allowed amounts" were used by the Consenting Claimants during

the negotiations that took place during the Plan Mediation, which resulted in the agreed

distributions to be made to the RMBS Trusts – *in the aggregate* – pursuant to the Plan Support

Agreement (and now the Plan).  There were certain significant differences, however, between the

"Allowed amounts" and the RMBS Trust Claims as calculated by Duff & Phelps, particularly

with respect to (i) the aggregate amount of the RMBS R+W claims of the Additional Settling

RMBS Trusts and (ii) the aggregate amount of the Recognized Cure Claims.  In addition, there

were disputes between the Debtors and the RMBS Trustees regarding which Debtor was

responsible for certain of those claims. Finally, as of the time the Plan Support Agreement was negotiated, there was substantial remaining due diligence needed to confirm that certain of the claims of the RMBS Trusts were properly asserted under the provisions of the Transaction Documents of the RMBS Trusts, and (if they were), to determine the responsible Debtor under the Transaction Documents.

40.    Accordingly, the RMBS Trustees required the Plan to contain provisions that would allow the RMBS Trustees, after completing due diligence, to use the completed due diligence and Duff & Phelps' final calculations of the RMBS Trust Claims to re-allocate the Units that will be distributed based on the "aggregate amounts of (i) $209.8 million against the GMACM Debtors; and (ii) $7,091.2 million against the RFC Debtors."[34] The re-allocation of Units from the RFC Pool to the GMACM Pool avoids significant distortions in distributions on account of the RMBS Trust Claims, as finally calculated, that would otherwise occur if distributions were made based on the above-referenced "aggregate" allowed amounts contained in the Plan.

### B.    Reason for Calculation of "Weighted" Claims

41.    At the time the Plan Support Agreement was agreed to, the RMBS Trustees contemplated that the RMBS Cure Claims of RMBS Trusts whose Servicing Agreements had been assumed would be paid first, in full, from cash distributed on the Units distributed under the Plan on account of the RMBS Trust Claims.[35] Thereafter, it was learned that a priority distribution of cash proceeds would adversely affect the REMIC status of the applicable RMBS Trusts. To avoid such an adverse tax effect while at the same time honoring the priority nature of an RMBS Cure Claim where the Servicing Agreement has been assumed and assigned, Art.

---

[34]    *See* Art. IV.C.2(a) of the Plan.

[35]    *See, e.g.*, Annex III to the Plan Support Agreement [ECF No. 3814].

IV.C.3(c) and (d) of the Plan implements the concept of an RMBS Trust's total "weighted claim." In order to calculate the GMACM Weighted Claim of an RMBS Trust, the GMACM Recognized Cure Claim is valued at 100%, and the GMACM Recognized Original R+W Claims, the GMACM Additional R+W Claims and the GMACM Recognized Unsecured Servicing Claims, if any, are valued at percentage distribution available from the GMACM Pool after the calculations made by Duff & Phelps described in the Plan. After the Weighted Claims are calculated, distributions are made based on an RMBS Trust's pro rata share of all of the Weighted Claims in the GMACM Pool. The same process applies to calculate the RFC Weighted Claim of an RMBS Trust.

C.    **Impact of Monoline Insurance and "Recognized" Claims**

42.    Insured RMBS Trusts (other than those insured by FGIC and Ambac) have received, and in the future are assumed to receive, payment of their losses to the extent necessary to pay the principal and interest due to the insured tranches of such trusts directly from the applicable Monoline, which in most cases eliminates the need for any distribution to those RMBS Trusts in respect of their RMBS Trust Claims given the structure of the Plan and the inter-related settlements contained in the Plan.[36] In such cases, the "recognized" claim of the RMBS Trust is set to zero, or is reduced, to take into account the full or partial payment of claims by the applicable Monoline, unless an exception applies.[37] The rights of Insured RMBS Trusts are reserved in the event that the applicable Monoline does not honor its obligations.[38]

---

[36]    In consideration for these payments, the Monolines are allowed significant claims against the applicable Debtors, on account of which they are anticipated to receive substantial distributions from such Debtors' estates.

[37]    The exceptions are described at Art. IV.C.3.(a)(iv) of the Plan.

[38]    *See* Art. IV.C.4 of the Plan.

II.    **Factors Supporting Settlement**

43.    The RMBS Settlement is part of the integrated, multifaceted Global Settlement among numerous constituencies that was the product of the lengthy, highly contentious Plan Mediation, and that resulted in the Plan Support Agreement, and ultimately, the Plan.  Prior to entering into the Plan Support Agreement, Deutsche Bank considered not only the benefits and risks of the RMBS Settlement, but also the benefits and risks associated with reaching an agreement regarding an overall consensual Chapter 11 plan, as well as the risks and uncertainties associated with litigating the RMBS Trust Claims in the absence of such a plan.

A.    **The AFI Contribution**

44.    A significant facet of the Global Settlement contained in the Plan Support Agreement and the Plan is the resolution of claims against AFI and the quantification of the contribution by AFI to the Debtors' estates at $2.1 billion (the "**AFI Contribution**").  Prior to the Plan Mediation, AFI had been willing to make a contribution to the Debtors' estates limited to $750 million.[39]  AFI increased that amount to $2.1 billion during the Plan Mediation.

45.    Deutsche Bank believes that, unless all parties (including the RMBS Trustees) consented to an overall settlement that included the allowance and treatment of claims, it is unlikely that AFI would have agreed to make the AFI Contribution, leading to lengthy and expensive litigation with uncertain outcomes.  Deutsche Bank considered the following factors collectively to be of significant benefit to the Deutsche Bank RMBS Trusts and the other RMBS Trusts: (i) the substantial increase in the amount of the Ally Contribution; (ii) the certainty associated with fixing the AFI Contribution; (iii) the added value to the Debtors' estates by virtue of the AFI Contribution and the effect on the recoveries of the RMBS Trusts resulting

---

[39]    *See Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings*  [ECF No. 6].

therefrom, and (iv) the avoidance of the delay, expense and uncertainty associated with litigation relating to AFI's liability to the Debtors' estates.

      **B.**      <u>**Litigation Risks**</u>

46.     Until the Consenting Claimants agreed to the Plan Support Agreement, the Debtors' Chapter 11 Cases were at the precipice of several kinds of lengthy and expensive litigation that could have affected the recoveries of the RMBS Trusts, including the Deutsche Bank RMBS Trusts. The Plan Support Agreement and the Plan resolve those disputes, and thus present several significant benefits with respect to the litigation risks that would be present absent the Plan.

47.     *First*, the Plan fixes claims that otherwise would be contested in time-consuming and uncertain proceedings. Notably, the Plan resolves objections to the RMBS 9019 Motion, including those of FGIC, MBIA and the Committee, that raise issues that would likely require significant expense and numerous hearings. Upon the conclusion of such hearings, while the Court might authorize the Debtors to perform the Original RMBS Settlement Agreements, it is also possible that the Court might sustain one or more of the objections filed to the RMBS 9019 Motion. If the Court declined to grant the RMBS 9019 Motion, the allowance of the RMBS R+W Claims of the Original Settling RMBS Trusts would be left to the expensive and uncertain process of claims litigation. The allowance of the RMBS R+W Claims, as contemplated by the Plan, offers the benefits of allowance consistent with the RMBS 9019 Motion, within the range of reasonableness for the Original Settling RMBS Trusts, without the attendant litigation risks attendant to that contested matter.

48.    Relatedly, the Plan fixes the amount of, and distributions on, the RMBS R+W Claims of the Additional Settling RMBS Trusts without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims.

49.    The Plan also provides for the allowance of, and distribution on, the RMBS Cure Claims of the RMBS Trusts, including those of the Deutsche Bank RMBS Trusts.  As set forth above, although those claims were roughly quantified by Duff & Phelps, their presentation would have required further discovery and analysis, likely leading to litigation over both the quantification of the claims and their relative priority.  The treatment of the RMBS Cure Claims represents a meaningful recovery to the RMBS Trusts possessing such claims, without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims.

50.    *Second*, the Plan resolves many of the contentious and complicated inter-creditor issues in these cases, including, among other things, the priority of certain claims asserted by the Monolines and by certain other securities claimants.  In particular, both the amount of the Monolines' claims and the relationship between those claims and the RMBS Trust Claims are the subject of disputes, and the resolution of all those disputes through litigation presents both a general risk of delay and expense to all stakeholders as well as a specific risk of dilution to the RMBS Trusts.

51.    *Third,* the ever mounting costs of administration of these Chapter 11 Cases threatened to erode any distribution to unsecured creditors.  Confirmation of the Plan would effectively end the continued accrual of such costs.

D.    **Support of Other Constituencies**

52.    The Institutional Investors, which hold significant, and, for some RMBS Trusts controlling, investments in certificates issued by the RMBS Trusts have regularly communicated

with the RMBS Trustees and the RMBS Settlement contained in the Plan.  The Institutional

Investors actively participated in the Plan Mediation and the negotiations that led to the Global

Settlement contained with the Plan Support Agreement and are Consenting Claimants under the

Plan.[40]  The Institutional Investors were aware of all of the compromises that evolved during the

Plan Mediation and negotiations leading to the Plan Support Agreement and now contained in

the Plan, and they communicated through their counsel that they fully supported the

compromises made by the RMBS Trustees, as reflected in the Plan Support Agreement and the

Plan.

IV.    **Notice to Investors in the Deutsche Bank RMBS Trusts**

53.    Deutsche Bank has regularly provided to the Investors in the Deutsche Bank

RMBS Trusts notice of matters related to the RMBS 9019 Motion and other significant events in

these Chapter 11 Cases.  In the first instance, on May 23, 2012, Deutsche Bank provided an

informational notice to certain Investors which may have RMBS Trust Claims and for which

Deutsche Bank is Trustee, concerning the voluntary bankruptcy of Residential Capital LLC and

certain of its affiliates, events of default and certain other matters to the holders of the

Residential Mortgage Backed Securities Sponsored, Master Serviced and/or Serviced by:

Residential Accredit Loans, Inc.; Residential Funding Mortgage Securities I, Inc.; Residential

Funding Company, LLC; Residential Asset Mortgage Products, Inc.; Residential Asset Securities

Corporation; and GMAC Mortgage LLC, copies of which are attached hereto as Exhibits PX

1534 and 1535, respectively, and incorporated herein by reference.

54.    Following the filing of the initial RMBS 9019 Motion, Deutsche Bank, together

with the BNY Mellon, U.S. Bank and Wells Fargo, jointly retained an agent, The Garden City

Group, Inc. ("**GCG**"), to coordinate and facilitate notice to Investors in the RMBS Trusts

---

[40]    Defined at Art. I.A.256 of the Plan.

regarding the RMBS 9019 Motion, developments with respect to the RMBS 9019 Motion, and

other important events in the Chapter 11 Cases.

55.    On behalf of the RMBS Trustees, GCG provided certain administrative services

in connection with noticing various Investors, including the coordination and facilitation of the

dissemination of notices to the various Investors at the direction and on behalf of the RMBS

Trustees, and in connection with the creation and maintenance of a website for Investors that

provides, among other things, contact information for the RMBS Trustees significant relevant

developments in the Chapter 11 Cases, links to relevant documents filed in the Chapter 11 Cases,

and relevant upcoming Court deadlines and hearing dates (the "**RMBS Trustee Website**").

56.    As described in more detail in the Affidavit of Jose C. Fraga, sworn to November

12, 2013 (the "**Fraga Affidavit**"), and filed contemporaneously herewith, on behalf of the

RMBS Trustees, GCG has distributed to various Investors and has published on the RMBS

Trustee Website the following notices, copies of which are attached as exhibits to the Fraga

Affidavit:

- On August 22, 2012, following the filing of the Chapter 11 Cases and the First
  Supplemental RMBS 9019 Motion, to the Investors in the Original Settling Trusts, a
  "Time Sensitive Notice Regarding a Proposed Settlement Between Residential
  Capital, LLC, et al. and the Settlement Trusts."

- On October 17, 24 and 31, 2012, at or about the time of the Second Supplemental
  RMBS 9019 Motion, to certain Investors which may have RMBS Trust Claims and
  for which Deutsche Bank is Trustee, a notice titled "Time Sensitive Notice Regarding
  (a) Order Setting Last Date to File Claims Against Debtors Residential Capital, LLC
  and Certain of its Direct and Indirect Subsidiaries, and (b) Updates of Matters
  Relevant to Certain Certificateholders."

- On January 24, 2013 and February 1, 2013, to certain Investors which may have
  RMBS Trust Claims and for which Deutsche Bank is Trustee, a "Time Sensitive
  Notice Regarding Sale of Debtors' Servicing Platform to Ocwen Loan Servicing,
  LLC."

- On April 8, 9 and 12, 2013, to certain Investors which may have RMBS Trust Claims and for which Deutsche Bank is Trustee, a "Notice Regarding Closing of Sale of Debtors' Servicing Platform to Ocwen and Update of 9019 Settlement."

- On May 24, 2013, at or about the time of the PSA Motion, a "Time Sensitive Notice Regarding (a) Plan Support Agreement Among ResCap Debtors and the RMBS Trustees, Among Others, and (b) Settlement Agreement Among the Debtors, Financial Guaranty Insurance Company and Certain of the RMBS Trustees."

- On August 30, 2013, a "Time Sensitive Notice Regarding (a) Approval of Disclosure Statement for ResCap Chapter 11 Plan and (b) Hearing on Confirmation of Plan."

- On October 1, 2013, a "Time Sensitive Notice Regarding (A) Hearing on Information of Proposed ResCap Chapter 11 Plan and (B) Court Approvals of the FGIC Settlement."[41]

## V.    Conclusion

57.    For all of the foregoing reasons, Deutsche Bank believes that (a) the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement and all the transactions contemplated by each of the foregoing, including the releases given therein, are in the best interests of the Investors in each RMBS Trust, each such RMBS Trust and the RMBS Trustees; (b) the RMBS Trustees acted reasonably, in good faith and in the best interests of the Investors in each RMBS Trust and each such RMBS Trust in (i) entering into the Plan Support Agreement, (ii) performing their obligations under the Plan Support Agreement, including voting in favor of the Plan, where applicable, and (iii) agreeing to, and performing under, the Global Settlement and each of the settlements embodied therein, including the RMBS Settlement; and (c) the RMBS Trustees' notice of the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement and all the transactions contemplated by each of the foregoing, including the releases given therein, was sufficient and effective in satisfaction of federal and state due process requirements and other applicable law to put the parties in interest in these Chapter 11 Cases and

---

[41]    The October 1, 2013 Notice urged all recipients of that notice to review all prior notices sent by the Trustees as certain trusts identified in Schedule A to the October 1, 2013 Notice had not been listed on Schedule A to at least some of the Trustees' prior notices.

others, including the Institutional Investors and the other Investors in each RMBS Trust, on

notice of the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement

and all the transactions contemplated by each of the foregoing, including the releases given

therein, and, accordingly, consistent with its undertakings in the Plan Support Agreement and to

the extent of its authority to do so, has voted in favor of the Plan, and urges that the Court enter

the proposed Order confirming the Plan.

[*Remainder of page intentionally left blank.*]

Dated this 12th day of November, 2013.

_____
Brendan Meyer

[Signature Page to Meyer Declaration]

DB2/ 24508140