UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                                        )
In re:                                                  )    Case No. 12-12020 (MG)
                                                        )
RESIDENTIAL CAPITAL, LLC, et al.,                       )    Chapter 11
                                                        )
       Debtors.                                         )    Jointly Administered
                                                        )
                                                        )
------------------------------------------------------- x

### DIRECT TESTIMONY OF JOHN S. DUBEL ON BEHALF OF FGIC

I, JOHN S. DUBEL, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am Chief Executive Officer and Chairman of the Board of Financial Guaranty Insurance Company ("FGIC"). I provide these services through my company, Dubel & Associates, LLC ("DA"). DA commenced its engagement with FGIC on January 2, 2008. I have over thirty years of experience restructuring companies. Prior to joining FGIC, I was a Managing Director of Gradient Partners, L.P., a distressed strategy investment fund, from 2006 through 2007. From 2002 to 2006, I was a Principal and Managing Director with AlixPartners, LLC, a firm specializing in turnaround and crisis management. I have served as Chief Executive Officer of Cable & Wireless America, President and Chief Operating Officer at RCN Corporation, Chief Restructuring Officer of Anchor Glass Container Corporation and Acterna Corporation, and CFO at WorldCom, Inc. I received a Bachelor in Business Administration degree from the College of William and Mary.

2. I respectfully submit this witness statement on behalf of FGIC and in support of confirmation of the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the*

*Official Committee of Unsecured Creditors* (the "Plan").[1]  I will make myself available for cross-examination and further testimony at the hearing on confirmation of the Plan.

3. This witness statement summarizes the bases for FGIC's claims in these cases, and supplements my prior testimony in these proceedings in support of *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* (Docket No. 3929) (the "FGIC Settlement").  See Witness Statement of John S. Dubel dated July 31, 2013 (Docket No. 4436); August 16, 2013 Hearing Tr. at 36:12-74:24 (Docket No. 4759); August 19, 2013 Hearing Tr. at 452:8-485:1 (Docket No. 4776).  A full record of my prior testimony is attached,[2] and I intend that the full record of those proceedings related to the FGIC Settlement be fully incorporated herein.[3]

4. I have been extensively involved in these bankruptcy proceedings in my capacity as the Chief Executive Officer of FGIC and co-chair of the Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (the "Debtors").  I represented both FGIC and Committee interests in the global mediation process.

5. FGIC is a monoline insurance company that wrote financial guaranty insurance policies with respect to asset-backed securities, including RMBS.[4]  FGIC's financial guaranty

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

[2] The July 13, 2013 Witness Statement of John Dubel (Docket No. 4436) is attached hereto as Exhibit PX-887. Relevant portions of the August 16 and 19, 2013 hearing transcripts containing my testimony are attached as Exhibit PX-889 and Exhibit PX-890 (excerpts).

[3] Attached hereto as Exhibit PX-892 and Exhibit PX-893 are: (i) the Designation of Record by Appellant the Ad Hoc Group of Junior Secured Noteholders Pursuant to Federal Rule of Bankruptcy Procedure 8006 (Docket No. 5391) and (ii) the Designation of Record by Appellees and Certain Other Parties to the FGIC Order Pursuant to Federal Rule of Bankruptcy Procedure (Docket No. 5596), respectively.

[4] The Debtors originated, sold, and serviced residential mortgage loans (the "Mortgage Loans") and participated in critical aspects of securitization transactions. For instance, a Debtor acts as sponsor of a particular transaction by

2

insurance policies guaranteed the payment of principal and interest due on insured RMBS issuances (the "Policies"). Under the terms of the Policies, FGIC unconditionally and irrevocably guaranteed to the Trustee that, if there were a shortfall in cash available to make required payments on the Securities, FGIC would pay the amount of the shortfall to the Trustee for the ultimate benefit of the investors.

6. In connection with 47 transactions where a Debtor entity served as sponsor (the "Transactions"), FGIC and the applicable Debtor entered into an Insurance and Indemnity Agreement (the "I&I Agreement"). Pursuant thereto, FGIC entered into the Policies with the Trustees.[5] As a result of FGIC's Policies, the credit ratings and marketability of the RMBS that the Trusts issued were significantly enhanced. Notably, the Trustees did not enter into Policies with insurers in connection with all securitization transactions for which a Debtor entity served as sponsor.

7. The Debtors earned substantial fees in connection with their role as sponsor of the Transactions—fees that would continue if one of the Debtor entities became the servicer of the Mortgage Loans. In 2007, ResCap became the servicer for all of the Transactions that were

---

(continued…)

arranging for the securitization of the Mortgage Loans. In that capacity, the Debtor would be responsible for the sale to investors of either certificates or notes in the form of residential mortgage-backed securities, which were collateralized by the Mortgage Loans (the "RMBS"). The RMBS were issued by a trust that was formed for the specific securitization (each a "Trust" and collectively the "Trusts") and administered by a trustee (the "Trustee").

In addition to their role as sponsors, various Debtor entities also acted as the mortgage loan servicer for some—but not all—of the securitization transactions. In its role as a servicer, the Debtor would be responsible for, among other things, collecting borrower payments, performing other loss mitigation tasks such as modifying delinquent Mortgage Loans, preserving the underlying mortgaged properties in the event of borrower defaults on the Mortgage Loans, liquidating defaulted Mortgage Loans, and performing other servicing duties set forth in the applicable securitization agreements.

[5]    Attached hereto are copies of the Policies that were entered into in connection with two sample RFC- and GMACM-sponsored transactions: the GMACM 2006-HE1 Transaction and the RASC 2007-EMX1 Transaction. (Exhibit PX-752 [Tab 13] and Exhibit PX-753 [Tab 6b], respectively).

3

previously serviced by its affiliates or subsidiaries. The fees that the Debtors earned as sponsor and servicer allowed the Debtors and Ally Financial, Inc. ("Ally") to strengthen their balance sheets and grow their mortgage loan origination business through off-balance sheet financing vehicles.

8. Pre-petition, FGIC insured the Transactions and, pending the closing of the FGIC Settlement, is the largest monoline insurer in terms of exposure to the Debtors by balance of securities issued. FGIC has filed proofs of claim against ResCap, Residential Funding Company, LLC ("RFC"), and GMAC Mortgage, LLC ("GMACM") [Proofs of Claim Nos. 4868, 4870, and 4871] (collectively, the "Proofs of Claim").[6] As discussed within the Proofs of Claim, FGIC brought twelve pre-petition civil actions against the Debtors and/or Ally, which are currently pending in the U.S. District Court for the Southern District of New York before the Honorable Paul A. Crotty (the "FGIC RMBS Litigation").[7] FGIC's claims against the Debtors arise directly and solely out of the Policies, which include claims for breaches of the I&I Agreements and, for a majority of the Transactions, fraudulent inducement to enter into the I&I Agreements. The chart attached hereto as Exhibit PX-754 details the allegations set forth in the FGIC RMBS Litigation.

9. FGIC asserts several, distinct claims for breach of contract against the Debtors. FGIC alleges that the Debtors, in their role as sponsor, (i) breached transaction-level and loan-level representations, warranties, and affirmative covenants; (ii) breached their duty to repurchase, cure, or substitute defective Mortgage Loans; and (iii) breached their duty to provide FGIC with access to information regarding the Mortgage Loans. In addition, FGIC asserts a

---

[6] Attached hereto as Exhibit PX-951, Exhibit PX-952, and Exhibit PX-953 are the Proofs of Claim.

[7] Attached hereto as Exhibit PX-725 is a copy of one of the complaints that was filed in the FGIC RMBS Litigation. FGIC v. Ally Financial, et al., Case No. 11-cv-9729 (PAC).

number of claims resulting from multiple events of default under each I&I Agreement, as well as claims for contractual reimbursement and indemnification. These breach of contract claims provide FGIC with rights to recover from the sponsors all losses that FGIC has suffered and will suffer in connection with the Transactions. FGIC also alleges that the Debtors, acting as servicer, have breached their duties to properly service the Mortgage Loans.

10. FGIC's separate fraudulent inducement allegations against the Debtors derive from the material representations and warranties that the Debtors made to FGIC about the manner in which the Mortgage Loans were selected and evaluated for inclusion in the Transactions and the credit characteristics, and thus related risk, of the Mortgage Loans. For example, the Debtors represented that the underwriting standards relating to the Mortgage Loans generally conformed to the published criteria applicable to the particular Mortgage Loans to be included in the Transactions. These material representations and warranties were false when the Debtors made them. The Debtors made these false statements to obtain FGIC's participation in the Transactions and induce FGIC to issue the Policies for the Transactions, which provided credit enhancement for the Transactions.

11. With regard to ResCap in particular, FGIC has alleged that the substantial breaches of contract that GMACM and RFC committed as sponsor were carried out at the direction of ResCap, which acted at the direction of Ally. ResCap was the alter ego of GMACM and RFC, and therefore responsible for their obligations owing to FGIC. Thus, ResCap is also liable to FGIC for, among other things, breach of contract and fraudulent inducement. Similarly, ResCap itself directly managed and directed the servicing operations that the various Debtor

5

entities performed and, in 2007, took over all of the servicing of the Mortgage Loans.[8]  As servicer, ResCap took substantial actions including, but not limiting to, changing the risk classification of mortgage loans sold to insured RMBS Trusts, which caused FGIC direct harm.[9]

12.    FGIC seeks legal, recissory, equitable, consequential, and punitive damages against the Debtors for their material breaches of the Transactions and their fraudulent inducement of FGIC to enter into the I&I Agreements and issue the Policies for the Transactions.  In addition, the I&I Agreements provide that the sponsor must indemnify FGIC for any and all claims, losses, liabilities, demands, damages, costs, or expenses of any nature arising out of or relating to the breach of any representation or warranty arising out of the Transactions.  Further, FGIC is entitled to full reimbursement from the Debtors for any payment that FGIC makes under the Policies due to the sponsor's failure to substitute, repurchase, or cure a defective Mortgage Loan, including any interest accrued on any unreimbursed amount.  The reimbursement obligation includes attorneys' and accountants' fees and expenses that FGIC has paid and will continue to pay in connection with the enforcement, defense, or preservation of any of its rights under the Transactions, including FGIC's participation in any insolvency proceeding concerning the Transactions.

13.    FGIC could not complete discovery before the pre-petition litigation was stayed by the filing of these Chapter 11 cases.  Therefore, FGIC's investigation of the acts, conducts and legal theories of liability that could be asserted against the Debtors is not complete, and FGIC reserved its rights to assert additional claims, legal theories and/or causes of action.

---

[8]  See BusinessWire, Fitch Assigns Resi Servicer Ratings to Residential Capital LLC (Dec. 12, 2007) available at http://www.businesswire.com/news/home/20071212006044/en/Fitch-Assigns-Resi-Servicer-Ratings-Residential-Capital. (Attached hereto as Exhibit PX-751).

[9]  See Edge Mortgage Advisory Corporation, Servicer Review – GMAC Servicing (Mar. 25, 2009).  (Attached hereto as Exhibit PX-750).

See Attachments to Proofs of Claim, ¶¶ 40-44 (Exhibit PX-951, Exhibit PX-952, and Exhibit PX-953).

14. The only benefit FGIC stands to receive under the Policies is the receipt of insurance premiums. The Polices do not provide FGIC with an equity stake in the Debtors or the Trusts, and FGIC sought through the pre-petition litigation and its proofs of claims only to recoup its past, present and future damages incurred by virtue of the Debtors' actions. Moreover, FGIC has now agreed to waive its right to receive payment of insurance premiums as part of the May 23, 2013 settlement between FGIC, the Debtors, the FGIC Trustees, and the Institutional Investors, which settlement this Court approved on September 13, 2103.

Executed on November 12, 2013
New York, New York

_____
John S. Dubel