# Exhibit PX-725

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

FINANCIAL GUARANTY INSURANCE )      No. 11-cv-9729 (PAC)
COMPANY, )
     )
         Plaintiff, )
     )      **AMENDED COMPLAINT**
         -against- )
     )
ALLY FINANCIAL, INC. F/K/A GMAC, )
LLC; RESIDENTIAL CAPITAL, LLC )
F/K/A RESIDENTIAL CAPITAL )
CORPORATION; ALLY BANK F/K/A )
GMAC BANK; GMAC MORTGAGE, )
LLC F/K/A GMAC MORTGAGE )
CORPORATION )
     )
         Defendants. )

------------------------------------------------------- x

Plaintiff Financial Guaranty Insurance Company ("FGIC"), by and through its attorneys,

Jones Day, for its Complaint against defendants. Ally Financial, Inc., formerly known as GMAC.

LLC ("Ally Financial"), Residential Capital, LLC, formerly known as Residential Capital

Corporation ("ResCap"), Ally Bank, formerly known as GMAC Bank ("Ally Bank"), and

GMAC Mortgage, LLC, formerly known as GMAC Mortgage Corporation ("GMACM"),

alleges as follows:

## NATURE OF THE ACTION

1.      This action arises in connection with a financial guaranty insurance policy (the

"2006-HE1 Policy" or the "Policy") issued by FGIC in relation to a GMACM-sponsored

transaction (the "2006-HE1 Transaction" or the "Transaction"), in which GMACM Home Equity

Loan Trust 2006-HE1 (the "2006-HE1 Trust" or the "Trust") issued and sold to investors over

$1.2 billion aggregate principal amount of insured residential mortgage-backed securities (the

PX
725

RC_FGIC9019_00000704

"2006-HEI Notes"). As the sponsor of the 2006-HE1 Transaction, GMACM procured the

Policy from FGIC in order to enhance the ratings and marketability of the 2006-HE1 Notes.

GMACM fraudulently induced FGIC's agreement to provide this insurance through willful and

material misrepresentations and omissions concerning, among other things, the nature of its

business practices and the credit quality and characteristics of the tens of thousands of mortgage

loans (individually the "Mortgage Loans," and collectively the "Loan Pool") that provided the

collateral for the 2006-HE1 Notes. In short, the Mortgage Loans were different—and

demonstrably worse—than GMACM had represented them to be. FGIC's issuance of the Policy

enabled the 2006-HE1 Notes to receive a triple-A rating from the rating agencies, which in turn

made the 2006-HE1 Transaction viable, and enabled GMACM and its affiliates to earn millions

of dollars in transaction fees.

2.      Since the closing of the 2006-HE1 Transaction, GMACM has compounded its

misconduct by repeatedly and materially breaching its contractual obligations to FGIC. From the

very inception of the 2006-HE1 Transaction, GMACM has violated the essential terms of its

agreement with FGIC. GMACM has also breached the essential terms of the other operative

documents incorporated therein.

3.      The wrongdoing committed by GMACM, as detailed more fully below, was

directed by Ally Financial, acting directly or indirectly through its wholly-owned subsidiary,

ResCap. Ally Financial is the ultimate parent of ResCap, which owns GMACM. Ally Financial,

as the ultimate parent of ResCap and GMACM, has the practical ability, which it has repeatedly

exercised, to direct and control the activities of these (and other) subsidiaries. In many

instances—including in this Transaction—Ally Financial's direction and control was effected by

using ResCap as an intermediary instrument to achieve its goals. For example, many of the

- 2 -

RC_FGIC9019_00000705

material contractual breaches committed by GMACM, concerning, primarily, FGIC's right to access information in GMACM's possession and GMACM's failure to repurchase or cure certain of the Mortgage Loans backing the 2006-HE1 Notes that FGIC sought to have repurchased, were carried out by ResCap, at the direction and control of Ally Financial.

    4.    GMACM was also substantially assisted in fraudulently inducing FGIC to issue the Policy by another Ally Financial subsidiary, Ally Bank, then doing business as GMAC Bank. Ally Bank and GMACM were the two principal originators of loans that became the collateral for the 2006-HE1 Transaction, and as such had intimate knowledge of the quality of the Loan Pool. In total, Ally Bank sold over $500 million in loans that it had originated or acquired to GMACM to be securitized in the 2006-HE1 Transaction. Further, Ally Bank agreed to serve as custodian of the 2006-HE1 Transaction—one of the critical parties charged with certain oversight and maintenance duties with respect to the 2006-HE1 Trust—and received certain key operative documents with respect to the Transaction. With knowledge of GMACM's material misrepresentations and omissions regarding the Mortgage Loans that collateralized the Transaction, Ally Bank separately made representations and warranties regarding those loans for the purpose of aiding GMACM's inducement of FGIC to issue the Policy. By assisting GMACM in inducing FGIC to issue the Policy, Ally Bank was able to collect substantial fees as Custodian and perpetuate its lucrative loan origination business.

    5.    Ally Bank has materially breached its own separate contractual agreement regarding its duties as Custodian of the 2006-HE1 Transaction, in particular by failing to ensure that essential documents were included in the loan file and failing to notify FGIC of breaches of representations and warranties by GMACM of which Ally Bank was aware.

- 3 -

**PX 0725 pg. 3 of 100**

RC_FGIC9019_00000706

6.     The 2006-HE1 Transaction is a mortgage loan securitization: a complex
arrangement comprising multiple interdependent agreements among GMACM and several other
parties whereby tens of thousands of home equity loans and home equity revolving lines of credit
were pooled together and transferred to the 2006-HE1 Trust, which then issued to investors
securities (*i.e.*, the 2006-HE1 Notes) collateralized by those loans.

7.     In March 2006, FGIC and several other parties entered into the 2006-HE1
Transaction. The 2006-HE1 Transaction was sponsored by GMACM. To facilitate the
Transaction, GMACM pooled together over twenty-one thousand Mortgage Loans to provide
collateral for the 2006-HE1 Notes. All of the Mortgage Loans were either originated or acquired
by GMACM or Ally Bank.

8.     After pooling the Mortgage Loans originated or acquired by GMACM and Ally
Bank, GMACM transferred the Mortgage Loans directly or indirectly to another Ally Financial
subsidiary, Residential Asset Mortgage Products, Inc. ("RAMP"). RAMP then deposited the
Mortgage Loans it received from GMACM into the 2006-HE1 Trust. The 2006-HE1 Trust, in
turn, issued the 2006-HE1 Notes to investors. The 2006-HE1 Trust was a legal entity created by
GMACM solely for the purposes of the 2006-HE1 Transaction to hold the Mortgage Loans and
to issue the 2006-HE1 Notes to investors in a registered public offering.

9.     The periodic mortgage payments made by the borrowers under the Mortgage
Loans held by the Trust are used to pay, among other things, principal and interest due on the
2006-HE1 Notes, and the fees and expenses of GMACM and other participants in the
Transaction.

10.     GMACM also acts as servicer of the 2006-HE1 Transaction (the "Servicer"). As
Servicer, GMACM supervises the collection of borrower payments and performs other servicing

- 4 -

RC_FGIC9019_00000707

duties related to the Mortgage Loans. As discussed in more detail below, all of GMACM's

servicing operations have since been integrated into ResCap. Yet another Ally Financial

subsidiary, Ally Securities, LLC ("Ally Securities" f/k/a GMAC RFC Securities), was a co-

manager of the 2006-HE1 Transaction. In addition, JPMorgan Chase Bank, N.A ("JPMorgan")

agreed to act as indenture trustee of the Trust (the "Indenture Trustee").

11.     GMACM, directed and controlled by Ally Financial, is, therefore, the hub of the

2006-HE1 Transaction: it is the sponsor of the securitization, the originator and seller of many

of the Mortgage Loans, and the servicer of all the loans that collateralize the 2006-HE1 Notes.

The primary victim of the 2006-HE1 Transaction—which turned out to be backed by inferior

loans that did not meet the underwriting standards or loan characteristics warranted by

GMACM—is FGIC, which has already paid out tens of millions of dollars in losses under the

Policy, with further material losses still to come.

12.     FGIC, a monoline financial guaranty insurance company, was in the business of

writing financial guaranty insurance policies with respect to asset-backed and debt securities,

including residential mortgage-backed notes ("RMBS Notes"). At the time of the 2006-HE1

Transaction, FGIC's financial strength was rated triple-A by Moody's Investors Services, Inc.

("Moody's"), Standard and Poor's Ratings Services (a division of The McGraw-Hill Companies,

Inc.) ("S&P"), and Fitch, Inc., which enabled securities that were insured by FGIC to be rated

triple-A as well. FGIC's financial guaranty insurance policies for RMBS Notes typically

guaranteed the timely payment of the principal and interest due on the insured securities,

including the amount, if any, of principal losses allocated to the RMBS Notes. FGIC's insurance

policies thus enhanced the credit quality, and marketability, of the insured securities.

- 5 -

RC_FGIC9019_00000708

13.     To enhance the ratings and marketability of the 2006-HE1 Notes, and to increase the profit that GMACM would derive from the 2006-HE1 Transaction, GMACM sought to have FGIC issue the Policy to JPMorgan, as Indenture Trustee for the 2006-HE1 Notes for the benefit of the holders of the 2006-HE1 Notes.

14.     To induce FGIC to issue the Policy, GMACM made material representations and warranties to FGIC about the manner in which the Mortgage Loans were selected and evaluated and their characteristics. Those representations and warranties were false when stated. FGIC reasonably relied on such warranties, among others, when deciding to enter into the 2006-HE1 Transaction. Additionally, those representations and warranties were false on the many occasions when they were restated by GMACM (for example, when GMACM added new loans to the Loan Pool). As a result, FGIC was fraudulently induced to enter the Transaction, and the credit risk assumed by FGIC in connection with the Transaction was far greater than it would have been had GMACM's representations and warranties been true, as demonstrated by the overwhelming number of claims that have been subsequently presented to FGIC.

15.     GMACM received substantial assistance from Ally Bank in fraudulently inducing FGIC to issue the Policy. Ally Bank was aware of the material misrepresentations GMACM had made to FGIC, and further represented to FGIC that it would undertake duties to monitor and certify the accuracy and completeness of certain material aspects of the Mortgage Loan files, as well as inform FGIC of certain failures by GMACM to comply with its obligations under the 2006-HE1 Transaction documents. Ally Bank made these representations to FGIC despite its knowledge that GMACM had not complied—and would not comply—with its representations and warranties to FGIC. As such, Ally Bank actively aided and abetted GMACM's fraudulent inducement of FGIC to issue the Policy.

- 6 -

RC_FGIC9019_00000709

16.     Moreover, both GMACM and Ally Bank received substantial assistance from Ally Financial in fraudulently inducing FGIC to issue the Policy. Ally Financial took actions and made statements to boost investor confidence in, and otherwise finance and support, its mortgage securitization business, which was carried out by its subsidiaries. Ally Financial was aware of the material misrepresentations GMACM and Ally Bank had made to FGIC. As a result of its dominance over ResCap, Ally Bank, and GMACM, Ally Financial knew that the representations and warranties GMACM and Ally Bank made to FGIC, prior to and at the closing, upon which FGIC reasonably relied, were false. As such, Ally Financial actively aided and abetted GMACM's and Ally Bank's fraudulent inducement of FGIC to issue the Policy.

17.     The increased credit risk inherent in the Mortgage Loans has resulted in extremely high levels of delinquencies, defaults, and losses on the Mortgage Loans, and the resultant claims presented to FGIC have been far in excess of what FGIC reasonably expected when it decided to issue the Policy in reliance on the (presumed) accuracy and truthfulness of GMACM's representations and warranties and affirmative covenants. In fact, the levels of defaults and losses, and the resulting amount of claims presented to FGIC have been overwhelming. Had FGIC been told the truth about the nature of GMACM's underwriting and business practices and/or the true characteristics of the Mortgage Loans, it would never have agreed to issue the Policy, and would thereby have avoided the significant losses and liabilities it has incurred, and will incur, as a result of GMACM's misconduct.

18.     Further, as explained more fully below, following the closing of the 2006-HE1 Transaction, GMACM failed to properly give effect to a "Managed Amortization Event," as defined by the plain language of the transaction documents. GMACM subsequently improperly added approximately $580 million in additional mortgage loans (the "Subsequent Mortgage

- 7 -

RC_FGIC9019_00000710

Loans") to the 2006-HE1 Trust through subsequent transfers that it was not authorized to make. As a result, FGIC is being asked to pay significant losses incurred on a substantial number of loans that were added to the 2006-HE1 Trust after closing, in circumstances where the express terms of the operative documents for the 2006-HE1 Transaction (the "Operative Documents") precluded those loans from being added to the 2006-HE1 Trust.

19.     In order to evaluate the extent of GMACM's breaches, FGIC has requested copies of the mortgage loan files and servicing notes for the Mortgage Loans. GMACM is obligated, under its agreements with FGIC, to provide those documents to FGIC. GMACM has refused to provide FGIC with the requested documentation, which, on information and belief, will further evidence material breaches by GMACM. This refusal to provide information in itself constitutes a material breach of GMACM's insurance agreement with FGIC.

20.     Certain of the material contractual breaches committed by GMACM and Ally Bank—including, but not limited to, its refusal to honor FGIC's right to access information in GMACM's possession—were directed by Ally Financial, acting directly or indirectly through ResCap.

21.     Through this Amended Complaint, FGIC seeks relief against GMACM, Ally Bank, ResCap, and Ally Financial for GMACM's fraudulent inducement of FGIC, and for GMACM's material breaches of its insurance agreement with, and contractual obligations owed to, FGIC in connection with the 2006-HE1 Transaction.

22.     Further, FGIC seeks relief against Ally Financial and Ally Bank for aiding and abetting GMACM's fraudulent inducement, as well as for Ally Bank's material breaches of its contractual obligations to FGIC.

- 8 -

**PX 0725 pg. 8 of 100**

RC_FGIC9019_00000711

23.     FGIC also seeks a declaration from the Court that Ally Financial, ResCap and
GMACM were and continue to be alter egos of one another.

## THE PARTIES

24.     Plaintiff FGIC is a New York stock insurance corporation with its principal place
of business at 125 Park Avenue, New York, New York 10017.

25.     Defendant Ally Financial is a Delaware corporation with its principal place of
business in Detroit, Michigan. Ally Financial is the parent company of ResCap, GMACM, and
all GMACM-affiliated entities relevant to this action.

26.     Defendant GMACM is a Delaware limited liability company with its principal
place of business in Fort Washington, Pennsylvania. In the period relevant to this action,
GMACM originated, acquired, and serviced residential mortgage loans, and sponsored
securitizations of mortgage loans.

27.     Since 2005, GMACM has been an indirect wholly-owned subsidiary of ResCap;
prior to that time, GMACM was an indirect, wholly-owned subsidiary of Ally Financial.

28.     Defendant ResCap is a Delaware limited liability corporation and an indirect
wholly-owned subsidiary of Ally Financial. ResCap is the indirect corporate parent of GMACM
and its business includes originating, acquiring, selling, and servicing mortgage loans.

29.     In September 2008, ResCap announced that it was closing much of its mortgage
loan acquisition business.

30.     Ally Bank (f/k/a GMAC Bank), an indirect, wholly-owned subsidiary of Ally
Financial, was at all times relevant to this Amended Complaint a loan originator. To facilitate
the 2006-HE1 Transaction, Ally Bank sold to GMACM over $500 million in mortgage loans that
it had originated or acquired to be securitized in the Transaction. These loans comprised more

- 9 -

RC_FGIC9019_00000712

than 55% of the initial Mortgage Loans.  GMAC Bank was renamed Ally Bank in May 2009. Ally Bank is an online bank chartered under Utah law.

## JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has personal jurisdiction over the defendants as the defendants have consented to this jurisdiction by virtue of having removed the New York state court action to this Court. Additionally, in an agreement at issue in this case, at least one of the defendants irrevocably submitted to the jurisdiction of this Court.

32.    Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred within this judicial district, and, in an agreement at issue in this case, at least one of the defendants agreed not to challenge venue in this Court. Further, the defendants have consented to this venue by virtue of having removed the New York state court action to this Court.

## RELEVANT NON-PARTIES

33.    RAMP, a special purpose vehicle, is an indirect, wholly-owned subsidiary of Ally Financial and a Delaware corporation with its principal place of business in Minnesota.  To facilitate the 2006-HE1 Transaction, RAMP purchased mortgage loans from GMACM and another affiliate, Walnut Grove Mortgage Loan Trust 2003-A ("Walnut Grove"), and deposited those loans into the 2006-HE1 Trust.  The trust then issued the 2006-HE1 Notes to the underwriters, including Ally Securities (then doing business as GMAC RFC Securities), to be sold to investors.

- 10 -

PX 0725 pg. 10 of 100

RC_FGIC9019_00000713

34.    Ally Securities, an entity incorporated in Delaware, is an affiliate of GMACM and

RAMP and a registered broker-dealer under the Securities Exchange Act of 1934, and is

registered to do business in New York. Prior to 2007, Ally Securities was known as Residential

Funding Securities Corporation, and was doing business as GMAC RFC Securities. Ally

Securities served as an underwriter of the 2006-HE1 Notes and, on information and belief,

participated in the preparation of certain of the key offering documents for the 2006-HE1

Transaction.

35.    Walnut Grove is a Delaware statutory trust established by an affiliate of GMACM.

Beginning in 2003, GMACM sold to Walnut Grove second-lien mortgage loans that it had

originated or acquired. To facilitate the 2006-HE1 Transaction, Walnut Grove sold certain of the

Mortgage Loans to RAMP.

### FACTUAL ALLEGATIONS

#### A.    Ally Financial and its Subsidiaries

36.    In the period relevant to this action, GMACM originated, acquired, sold, and

serviced residential mortgage loans and, from time to time, arranged for the securitization of

those mortgage loans and the sale of securities collateralized by those mortgage loans to

investors, often in the form of RMBS Notes.

37.    The Mortgage Loans have suffered extremely high rates of delinquencies, defaults

and losses, and it is a matter of public knowledge that the business practices of Ally Financial's

subsidiaries, including in large part GMACM, Ally Bank, and ResCap, led Ally Financial to seek

a bailout by the federal government in 2008.

- 11 -

**PX 0725 pg. 11 of 100**

RC_FGIC9019_00000714

### (1)    GMACM, GMAC-RFC, and RFC

38.    GMACM is a subsidiary of GMAC-RFC Holding Company, LLC ("GMAC-RFC") which in turn is a subsidiary of ResCap, which in turn is a subsidiary of the ultimate parent, Ally Financial.

39.    Residential Funding Corporation, LLC ("RFC") is also a subsidiary of GMAC-RFC and ResCap. Like its affiliate GMACM, RFC engaged in the business of originating, acquiring, servicing, and securitizing mortgage loans during the period relevant to this action.

40.    GMAC-RFC companies issued $42.34 billion of non-agency mortgage-backed securities in 2004, $56.93 billion in 2005, $66.19 billion in 2006, and $32.43 billion in 2007, according to Inside Mortgage Finance Publications, Inc. *See 2011 Mortgage Market Statistical Annual: Volume II* at 38-41. GMAC-RFC was the fifth largest issuer of non-agency mortgage-backed securities in 2005, the fourth largest in 2006, and the eighth largest in 2007. *Id.*

41.    GMAC-RFC was the largest issuer of private mortgage-backed securities in 2002, when it issued $11.5 billion of private mortgage-backed securities, according to the *Financial Crisis Inquiry Report, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (the "FCIC Report"), published in January 2011. *See* FCIC Report at 462. GMAC-RFC was also the fourth largest subprime mortgage lender in 2004, when it loaned $26 billion to subprime borrowers. *See id.* at 504.

42.    The FCIC Report pointedly notes the widespread failure among the mortgage-backed security industry generally to adhere to basic standards in loan origination, selection, and evaluation—a truth FGIC would come to learn specifically in its dealings with GMACM. The FCIC Report concludes that:

> [F]irms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards.    Potential

- 12 -

**PX 0725 pg. 12 of 100**

RC_FGIC9019_00000715

> investors were not fully informed or were misled about the poor
> quality of the mortgages contained in some mortgage-related
> securities. These problems appear to have been significant.

*Id.* at 187.

43.     The FCIC Report further notes that, in light of Ally Financial and its subsidiaries'

systemic failure to ensure the credit quality of the mortgage loans backing its securitizations,

repurchase demands against GMAC/Ally Financial have mounted. From 2007 to 2010, the

Federal National Mortgage Association ("Fannie Mae") has forced Ally Financial to buy back

approximately $838 million worth of mortgage loans. *Id.* at 225. And in 2009 and 2010, the

Federal Home Loan Mortgage Corporation ("Freddie Mac") forced Ally Financial to buy back

approximately $453 million worth of mortgage loans. *Id.*

### (2)     Ally Financial's Securitization Business

44.     Ally Financial's business model depended on securitizations, which were

conducted by its business units, including GMACM. Pooling mortgage loans and selling them

into securitizations enabled GMACM to fund its ongoing mortgage loan originations and

acquisitions, earned it significant fees from the resulting transactions, and reduced the credit risk

it retained with respect to those loans.

45.     In order to gain additional fees for performing certain administrative duties under

the various transaction agreements, including collecting mortgage payments and determining

whether a mortgage loan is in default based on the transaction documents, GMACM generally

acted as servicer of its own securitizations. GMACM thereby earned servicing fees that

normally amounted to 0.50% per annum of the aggregate principal balance of the mortgage loans,

as well as collected fees in the range of 20%-36% of any subsequent recoveries from charged-off

loans.

- 13 -

RC_FGIC9019_00000716

46.     GMACM also enriched Ally Financial and its other subsidiaries through its

sponsorship of securitizations. Ally Financial entities typically participated in each of the key

steps in the securitization process, and recorded gains and earned fees at each of those steps. For

example, in the 2006-HE1 Transaction:

- Ally Bank gained fees for originating nearly 60% of the loans initially comprising the 2006-HE1 Trust, and proceeds from selling those loans to GMACM; Ally Bank also gained fees as custodian of the 2006-HE1 Trust for holding certain documents;

- Walnut Grove received the proceeds from selling certain of the Mortgage Loans to RAMP (after purchasing over 40% of the loans from GMACM);

- RAMP received payments for serving as the depositor of the Mortgage Loans to the 2006-HE1 Trust; and

- Ally Securities received fees for underwriting the 2006-HE1 Notes.

### (3)     Ally Financial, GMACM, and RFC Face Numerous Investigations and Lawsuits Relating to Their RMBS Securitizations

47.     GMACM is currently being investigated by the U.S. Department of Justice (the

"DOJ") for fraud related to the origination and underwriting of mortgage loans. On June 29,

2011, Ally Financial disclosed that the DOJ had served GMACM with a subpoena in June 2011,

which "includes a broad request for documentation and other information in connection with its

investigation of potential fraud related to the origination and/or underwriting of mortgage loans."

Ally Fin. Inc., Amendment No. 3 to Form S-1 Registration Statement under the Securities Act of

1933 (Form S-1/A), at 23 (June 29, 2011).

48.     Additionally, on September 2, 2011, the Federal Housing Finance Authority

("FHFA"), as conservator for Freddie Mac, filed suit in the Supreme Court of the State of New

York, New York County against Ally Financial and several of its subsidiaries for claims arising

in connection with its role in the public filing of offering documents containing false and

misleading statements. These claims arise from Freddie Mac's purchase of over $6 billion in

- 14 -

**PX 0725 pg. 14 of 100**

RC_FGIC9019_00000717

certificates issued through twenty-one transactions similar to the transaction at issue here.
Among other claims, FHFA brought suit for common law fraud against various Ally Financial
subsidiaries and aiding and abetting fraud against Ally Financial for its intentional and
substantial assistance in rendering material misrepresentations to Freddie Mac in connection with
the sale of the subject certificates.

49.    The FHFA also alleges violations of state and federal securities laws by Ally
Financial and several of its subsidiaries stemming from false and misleading statements
contained in publicly filed prospectuses, prospectus supplements, registration statements, and
other offering documents. Additionally, FHFA also alleges aiding and abetting fraud against
Ally Financial and certain of its affiliates for their intentional and substantial assistance in
rendering material misrepresentations to Freddie Mac in connection with the sale of the
certificates. The FHFA action seeks relief in the form of rescission and recovery of the $6
billion purchase price of the certificates, including lost principal and interest, as well as punitive
damages and attorneys' fees and costs.    In October 2011, Ally Financial and its co-defendants
removed the FHFA action to the U.S. District Court for the Southern District of New York.

50.    In addition, GMACM is currently facing a lawsuit brought by MBIA Insurance
Corporation ("MBIA") in New York Supreme Court in which MBIA alleges that in connection
with three transactions similar to the one at issue here, GMACM affirmatively misrepresented
the credit quality of tens of thousands of mortgage loans, with a total original principal balance
of more than $4 billion, as a means of unfairly shifting to investors and MBIA risks that
GMACM should have borne itself. On December 15, 2010, the New York Supreme Court
issued a ruling denying GMACM's motion to dismiss, which allowed both the breach of
representations and warranties and fraud claims, among others, to proceed to trial.

- 15 -

RC_FGIC9019_00000718

51.     GMACM's sister company, RFC, is also currently facing a lawsuit brought by
MBIA in New York Supreme Court for, among other things, fraud and breach of representations
and warranties in connection with RMBS transactions. In December 2009, the New York
Supreme Court rejected RFC's motion to dismiss certain of the claims brought against it,
allowing both the breach of contract and fraud claims, among others, to proceed.

52.     Additionally, according to Ally Financial's quarterly report for the third quarter of
2011, as of November 4, 2011, there were twenty-two pending suits in various jurisdictions
pending against Ally Financial's mortgage-related business units and subsidiaries, arising from
numerous mortgage-backed securities offerings. The plaintiffs in those suits have alleged,
among other things, that Ally Financial's various mortgage subsidiaries made misstatements and
omissions in registration statements, prospectuses, prospectus supplements, and other documents
related to RMBS offerings. The alleged misstatements typically concern underwriting standards.
*See* Ally Fin. Inc., Quarterly Report (Form 10-Q), at 159 (Nov. 4, 2011). Further, in its 2011
annual report, Ally Financial stated that it expects additional similar claims to be brought against
Ally Financial and/or its subsidiaries in the future. *See* Ally Fin. Inc., Annual Report (Form 10-
K), at 20 (Feb. 28, 2011).

53.     Since the filing of its November 2011 quarterly report, moreover, Ally Financial
and its subsidiaries have been sued by additional plaintiffs, including HSH Nordbank AG, which
have alleged, inter alia, material misrepresentations and omissions about the loans backing
RMBS securities issued by Ally Financial's affiliates.

54.     Moreover, Ally Financial has disclosed that it expects additional RMBS lawsuits
from monoline insurers like FGIC given that Ally Financial and its subsidiaries sold $42.7
billion of loans into monoline-wrapped securitizations from 2004 to 2007. During 2011, Ally

- 16 -

RC_FGIC9019_00000719

Financial and its subsidiaries have received repurchase claims from monoline insurers for $265

million worth of mortgages related to securitizations it consummated between 2004 and 2007.

Ally Financial clearly recognizes its exposure because, according to Ally Financial's CEO,

Michael Carpenter, ResCap has already reserved $829 million for representations and warranties

claims and, according to its own U.S. Securities and Exchange Commission ("SEC") filings,

Ally Financial confirms that "litigation with . . . monolines is likely." Ally Fin. Inc., Annual

Report (Form 10-K), at 98 (Feb. 28, 2012).

55.    Indeed, according to Ally Financial's annual report, Ally Financial, GMACM's

parent, also believes that "[t]he total exposure . . . to mortgage representation and warranty

claims is most significant for loans originated and sold between 2004 through 2008, specifically

the 2006 and 2007 vintages that were originated and sold prior to enhanced underwriting

standards and risk-mitigation actions implemented in 2008 and forward." Ally Fin. Inc., Annual

Report (Form 10-K), at 224 (Feb. 28, 2012). The 2006-HE1 Transaction is, as its name implies,

of the 2006 vintage, but also includes Mortgage Loans originated in 2007.

56.    Additionally, Ally Financial also disclosed that the SEC served a subpoena on

Ally Financial in June 2011, requesting documentation regarding certain "bulk settlements"

relating to securitized mortgage loans as well as a request for materials provided to investors and

prospective investors in mortgage securitization transactions. *See* Ally Fin. Inc., Amendment No.

3 to Form S-1 Registration Statement under the Securities Act of 1933 (Form S-1/A), at 23 (June

29, 2011).

### (4)    The Mortgage Loan Servicing Misconduct of Ally Financial and GMACM Has Come Under Scrutiny and Resulted in Severe Sanctions

57.    On February 9, 2012, the Federal Reserve Board announced that Ally Financial,

its subsidiaries, and several other mortgage loan servicers would be required to pay $766.5

- 17 -

**PX 0725 pg. 17 of 100**

RC_FGIC9019_00000720

million in monetary sanctions for "unsafe and unsound processes and practices in residential

mortgage loans servicing and foreclosure processing." Press Release, Fed. Reserve Bd., Federal

Reserve Board Announces Agreement in Principle with Five Banking Organizations Regarding

the Issuance of Monetary Sanctions (Feb. 9, 2012). On February 12, 2012, the Federal Reserve

Board imposed well over $200 million of this fine against Ally Financial, ResCap, and GMACM

pursuant to an assessment order, which requires that the sanctions be paid into various borrower

assistance programs and nonprofit programs established to help victims of improper servicing

and foreclosure practices. *See In re Ally Fin. Inc.*, FRB Docket Nos. 12-006-CMP-HC & 12-

006-CMP-DEO (Feb. 10, 2012) (the "Assessment Order"). According to the Federal Reserve

Board, the sanction "takes into account the maximum amount prescribed for unsafe and unsound

practices under the applicable statutory limits, the comparative severity of the institutions'

misconduct, and the comparative sizes of the institutions' foreclosure activities." *See* Press

Release, Fed. Reserve Bd., Federal Reserve Board Announces Agreement in Principle with Five

Banking Organizations Regarding the Issuance of Monetary Sanctions (Feb. 9, 2012).

     58.    Further, also on February 9, 2012, the U.S. Attorney General announced that Ally

Financial will take part in a $25 billion settlement to resolve claims brought by the government

in response to the "reckless and abusive mortgage practices" of Ally Financial and four similarly

situated bank holding companies. *See* Eric Holder, U.S. Attorney General, Remarks at the

Mortgage Servicers Settlement Press Conference (Feb. 9, 2012). Although the settlement

releases Ally Financial from certain civil claims brought by the DOJ and multiple state attorneys

general, *see id.*; National Mortgage Settlement, Servicing Standard Highlights, *available at*

http://www.nationalmortgagesettlement.com (last visited Mar. 10, 2012), the settlement was not

designed to resolve any other liabilities that Ally Financial has incurred through its improper

- 18 -

PX 0725 pg. 18 of 100

RC_FGIC9019_00000721

origination, securitization, and servicing practices, *see* National Mortgage Settlement, About the Settlement, http://www.nationalmortgagesettlement.com/about (last visited Mar. 10, 2012).

59.    According to the U.S. Attorney General, the $25 billion settlement and $766.5 million sanction are just "the latest step forward" in holding Ally Financial and others accountable for "egregious mortgage loan servicing abuses." *See* Eric Holder, U.S. Attorney General, Remarks at the Mortgage Servicers Settlement Press Conference (Feb. 9, 2012).

60.    Similarly, the New York Attorney General recently announced a $136 million settlement with the nation's five largest mortgage servicers—including GMAC/Ally Financial. *See* Press Release, Office of the New York Attorney General, Schneiderman Secures Major Settlement that Allows Sweeping Mortgage Investigations to Proceed (Feb. 9, 2012). As the New York Attorney General noted, the settlement principally addressed "foreclosure abuses" by GMAC/Ally Financial and other banks, and "[i]n addition to penalties for past abuses, the settlement includes direct relief to victims of wrongful foreclosure conduct" and "imposes strong national standards for mortgage servicing" that had previously been lacking. *Id.* Additionally, the New York Attorney General will lead the new Residential Mortgage-Backed Securities Working Group, a component of the interagency Financial Fraud Enforcement Task Force led by the DOJ, which "brings together the Department of Justice (DOJ), several state law enforcement officials, and other federal agencies to investigate those responsible for misconduct contributing to the financial crisis through the pooling and sale of residential mortgage-backed securities." *Id.*

61.    In addition to these recent settlements and Assessment Order, the Federal Reserve Board and the Federal Deposit Insurance Corporation (the "FDIC") previously ordered Ally Financial, GMACM, and several other Ally Financial subsidiaries to adopt new procedures and

- 19 -

**PX 0725 pg. 19 of 100**

RC_FGIC9019_00000722

practices in relation to mortgage loan servicing. *See In re Ally Fin. Inc.*, FRB Docket Nos. 11020-B-HC & 11020-B-DEO, FDIC-11-123b (April 13, 2011) (the "Consent Order").

62.    The Consent Order notes that Ally Financial's mortgage servicing subsidiaries, including GMACM, have been accused, *inter alia*, of (1) failing to properly increase financial, staffing, and managerial resources in order to meet an increasing number of foreclosures; (2) failing to properly put in place "adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process"; (3) filing false affidavits in foreclosure actions; and (4) litigating foreclosure proceedings without "confirming that the promissory note and mortgage document were properly endorsed or assigned." *Id.* at 3-4.

63.    Furthermore, under the Consent Order, Ally Financial must direct GMACM and its other mortgage servicing subsidiaries to take certain remedial action to ensure that they operate in a "safe and sound manner" in the future. *Id* at 4. Specifically, among other things, the Consent Order requires Ally Financial to take "steps to improve the information and reports that will be regularly reviewed by [Ally Financial's] board of directors. . . [to assess the performance of] residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations . . . ." *Id.* at 8.

64.    In connection with the enforcement of the Consent Order, as of November 2011, the Federal Reserve Board is permitting mortgage borrowers who were financially harmed by the foreclosure processes of GMACM to request an independent review of their files. *See* Press Release, Fed. Reserve Bd., Federal Reserve Board Announces that Borrowers from Four Mortgage Servicers Can Request an Independent Review and Potentially Receive Compensation (Nov. 1, 2011). This independent review will determine whether errors and misrepresentations

- 20 -

RC_FGIC9019_00000723

in GMACM's foreclosure processes indeed caused financial harm to the borrower. *See id.* If the foreclosure process is found to have caused financial injury to the borrower, GMACM will then be required to provide full compensation. *See id.*

65.     As a result of servicing misconduct, Ally Financial and other bank holding companies will now be required to adhere to new, heightened servicing standards. *See* Press Release, Fed. Reserve Bd., Federal Reserve Board Announces Agreement in Principle with Five Banking Organizations Regarding the Issuance of Monetary Sanctions (Feb. 9, 2011). The Federal Reserve Board has ordered Ally Financial to remedy its servicing practices by, *inter alia*, "strengthen[ing] the coordination of communications with borrowers by providing borrowers the name of the person at the service who is their primary point of contact, establish[ing] limits on foreclosures where loan modifications have been approved, establish[ing] robust third party vendor controls, strengthen[ing] compliance programs, and provid[ing] appropriate remediation to borrowers who suffered financial injury as a result of errors by the servicers." *See id.*

66.     Moreover, the servicing and foreclosure improprieties of Ally Financial and its subsidiaries is a matter of public record. According to the sworn testimony of an Ally Financial/GMACM employee, Ally Financial's mortgage servicing subsidiaries have routinely filed false affidavits in thousands of foreclosure actions across the country. *See* Jeffrey Stephan Dep. *Fed. Nat'l Mortgage Ass'n v. Bradbury*, BRI-RE-09-65 (Me. Dist. Ct., Dist. Nine, Div. N. Cumberland) (June 7, 2010). Indeed, according to the FCIC Report:

> [L]enders have relied on "robo-signers" who substituted speed for accuracy
> by signing, and sometimes backdating, hundreds of affidavits claiming
> personal knowledge of facts about mortgages that they did not actually
> know to be true. One such "robosigner," Jeffrey Stephan of GMAC, said
> that he signed 10,000 affidavits in a month—roughly 1 per minute, in a 40-
> hour workweek—making it highly unlikely that he verified payment
> histories in each individual case of foreclosure.

- 21 -

**PX  0725 pg.  21 of 100**

RC_FGIC9019_00000724

FCIC Report at 407.

67.     Stephan also testified that, when executing summary judgment affidavits to be used in judicial foreclosure actions, he was acting in accordance with policies and procedures, and never in fact inspected any of the exhibits to the affidavits or even ensured that the exhibits were attached, despite swearing that he had done so in the affidavits themselves. Stephan Dep. Tr. at 54:12-25. Such exhibits would generally include (or at least should have included), among other things, the mortgage note and documents relating to the assignment of the mortgage. *See id.* at 51:15-23. Stephan further testified that when he signed an affidavit affirming that the foreclosure was proper, all he knew was the borrower's name and whether he had signing authority for the GMAC entity foreclosing on the property. *Id.* at 62:23-25, 63:2-6. Stephan testified that the process he followed in signing summary judgment affidavits was in accordance with the policies and procedures required by GMACM. *Id.* at 64:8-14.

68.     Additionally, in October 2010, the Ohio Attorney General filed suit against GMACM and Ally Financial, alleging, *inter alia,* that employees of GMACM had executed thousands of false affidavits in connection with foreclosures on properties in that state. *See Ohio v. GMAC Mortgage, LLC,* C10201006984, Ct. C.P. Lucas Cnty. Although some of the claims brought by the Ohio Attorney General's suit have been resolved by the $25 billion multi-party settlement, many additional claims not encompassed by the settlement, including those relating to the improper assignment of mortgage notes, have survived. As of February 2012, the action remains pending in Ohio.

69.     Similarly, in December 2011, the Massachusetts Attorney General filed suit against GMACM for, among other things, engaging in unfair and deceptive foreclosure practices. *See Massachusetts v. Bank of Am., N.A.,* 11-4363, Suffolk Cnty. Super. Ct. Days after filing suit,

- 22 -

RC_FGIC9019_00000725

the Massachusetts Attorney General sent a letter to the United States Senate Committee on

Banking, Housing and Urban Affairs, and the United States House Committee on Financial

Services asking that the federal government investigate Ally Financial and GMACM for

allegedly carrying out illegal foreclosures and submitting false documents related to property

seizures. *See* Boston Globe, *Attorney General Martha Coakley Urges Congress to Investigate*

*Ally Financial's GMAC Over Foreclosure Practices*, Dec. 6, 2011. Specifically, the

Massachusetts Attorney General's letter to the Senate and House Committees stated:

> In light of Ally [Financial]'s alleged deceptive and illegal actions
> against homeowners in Massachusetts and across the country, I
> respectfully request that your committees investigate Ally
> [Financial]'s serious misconduct and consider what actions the
> federal government can take to ensure that Ally [Financial] adheres
> to the law.

*Id.*

    70.    While the $25 billion settlement ultimately resolved certain claims brought by the

Massachusetts Attorney General in this action, several claims relating to improper foreclosure

practices and abuse of certain state recordation systems have survived and will continue to be

prosecuted. *See* Press Release, Office of the Attorney General of Massachusetts. *Massachusetts*

*Homeowners to Receive $318 Million in Relief as Part of State-Federal Agreement Over*

*Unlawful Foreclosures and Loan Servicing*, Feb. 9, 2012.

        (5)    **Significant Possibility of Ally Financial Seeking Bankruptcy**
               **Protection for ResCap, GMAC-RFC, and GMACM**

    71.    Since as early as November 2011, Ally Financial has been considering filing for

bankruptcy protection for ResCap, its wholly-owned subsidiary, which has reportedly lost $555

million since 2009, according to multiple published reports. GMACM is a wholly-owned,

indirect subsidiary of ResCap.

- 23 -

**PX 0725 pg. 23 of 100**

RC_FGIC9019_00000726

72.    Around that time, the financial industry was "betting that Ally [Financial] will place its Residential Capital LLC [ResCap] mortgage unit into bankruptcy instead of supporting the business as the bank prepares for an initial public offering." Bloomberg News, *Ally May Put ResCap in Bankruptcy to Ease IPO: Corporate Finance*," Nov. 14, 2011.

73.    As the article notes, Ally Financial has the power to decide whether its "mortgage unit," ResCap, should file for bankruptcy. *See id.*

74.    Indeed, Ally Financial warned in its 2011 annual report that "[t]here is a significant risk that ResCap will not be able to meet its debt service obligations and other funding obligations in the near term." Ally Fin. Inc., Annual Report (Form 10-K), at 19 (Feb. 28, 2012).

75.    That risk ultimately came to pass as Ally Financial recently disclosed that the penalties assessed by the federal government and numerous state attorneys general regarding the foreclosure practices of Ally Financial and its subsidiaries "resulted in our Mortgage operations recording a $230 million charge in the fourth quarter of 2011." *Id.* at 31. As Ally Financial detailed in its previous public filing, the "[t]he majority of [the charge] was recorded at Residential Capital, LLC ('ResCap') . . . [which] resulted in a covenant breach in certain of ResCap's credit facilities." Ally Fin. Inc., Current Report (Form 8-K) (Jan. 31, 2012). Indeed, as Ally Financial more recently explained, "ResCap is required to maintain consolidated net worth . . . of $250 million at the end of each month under the terms of certain of its credit facilities. . . [and] as a result of the fourth quarter charge, ResCap's consolidated net worth was $92 million at December 31, 2011." Ally Fin. Inc., Annual Report (Form 10-K), at 31-32 (Feb. 28, 2012). ResCap's substantial shortfall, however, was "immediately remediated by Ally

- 24 -

RC_FGIC9019_00000727

through a capital contribution of $197 million, which was provided through forgiveness of intercompany debt during January 2012." *Id.*

76.     Moreover, in February 2012, it was reported that Ally Financial had contacted buyout firms such as Fortress Investment Group LLC and Cerberus Capital Management LP regarding a potential sale of ResCap through a pre-packaged bankruptcy to be effectuated by the end of March as ResCap faces financing and liquidity deadlines. *See* Bloomberg News, *Ally's ResCap Said to Seek Buyers for Prearranged Bankruptcy*, Feb. 8, 2012.

77.     According to the report, "[p]otential bidders are being told that a pre-packaged bankruptcy filing would allow the buyer to leave behind liabilities such as [RMBS] securitizations that have been the subject of litigation." *Id.* To that end, Ally Financial's CEO, Michael Carpenter, has stated that he will not pursue the aforementioned initial public offering for Ally Financial "until [these] legacy mortgage issues are resolved." *Id.* Nevertheless, a bondholder group representing holders of approximately $800 million in ResCap debt has expressed its desire to "fight [Ally Financial] tooth and nail" to oppose the bankruptcy, based in part on the belief that "Ally [Financial] can't legally separate itself from ResCap because it has stripped assets from the unit." Bloomberg News, *Paulson, Tepper Said Among Investors Urging Ally to Back ResCap*, Jan. 10, 2012.

78.     Indeed, as Ally Financial has pointedly noted in its most recent annual report: "In light of ResCap's liquidity and capital needs combined with volatile conditions in the marketplace, there is substantial doubt about ResCap's ability to continue as a going concern." Ally Fin. Inc., Annual Report (Form 10-K), at 18 (Feb. 28, 2012).

- 25 -

RC_FGIC9019_00000728

B.   **Ally GMACM's Securitizations and Financial Guaranty Insurance Generally**

    (1)   **Financial Guaranty Insurance Policies**

79.   To improve the marketability and ratings of the RMBS Notes issued as part of its securitizations, GMACM from time to time sought credit enhancement for the RMBS Notes from FGIC, a financial guaranty insurer, in the form of financial guaranty insurance policies. Under the terms of a financial guaranty insurance policy like the one FGIC issued here, the insurer unconditionally and irrevocably guarantees to the trustee for the benefit of the holders of the insured RMBS Notes that, if there is a shortfall in cash available to make required payments on the insured securities, the financial guaranty insurer will pay the amount of the shortfall to the trustee for the benefit of the holders of the insured securities.

80.   For a trust that issues RMBS Notes, the primary source of funds is the remittance of payments on the underlying residential mortgage loans. Delinquencies by borrowers in making their mortgage loan payments will, by definition, reduce cash flows to the trust, which will directly impair the ability of the trust to make required payments on the RMBS Notes. Delinquencies, if not cured, will eventually result in losses on the mortgage loans, which reduce the aggregate principal amount of the Loan Pool held by the trust. In this manner, high levels of mortgage loan delinquencies and defaults can lead to shortfalls in cash available to pay RMBS investors. Such shortfalls result in claims on FGIC's policies.

    (2)   **Securitization Sponsor's Disclosures and Representations and Warranties**

81.   The risk FGIC assumes when it agrees to issue a policy for RMBS Notes depends upon the credit quality of the underlying mortgage loans, which in turn depends on the underwriting practices of the loan originators and the characteristics of the loans. If, for instance, GMACM and other loan originators employ substandard underwriting practices, the underlying

- 26 -

**PX 0725 pg. 26 of 100**

RC_FGIC9019_00000729

mortgage loans would be of inferior credit quality. Consequently, the credit risk—the risk of delinquency or default—of the underlying mortgages, and of the mortgage portfolio as a whole, would be materially increased.

82.    Accordingly, FGIC generally required securitization sponsors, like GMACM, to provide substantial representations and warranties about the underlying mortgage loans, such as the ratio of the borrower's monthly debt payments to monthly income ("DTI ratio"), the ratio of the mortgage loan principal balance to the value of the mortgaged property at origination—plus, in the case of a junior lien mortgage loan, the principal balance of the senior mortgage loan on the related mortgaged property—("CLTV ratio"), and the borrower's credit score ("FICO score"). Even where GMACM did not originate a particular loan, it nonetheless is typically required to make representations about that loan, thereby assuming the risk that those representations might not be accurate. GMACM's representations and warranties, including representations about the standards and procedures used to underwrite the loans, were intended to allow FGIC to assess the credit risk inherent in the mortgage loan pool before deciding to commit to the transaction.

83.    GMACM's representations and warranties in its RMBS transactions regarding the characteristics of the loans included in the mortgage loan portfolios, and the underwriting standards used to evaluate those mortgage loans, are particularly vital because each loan pool comprised thousands of mortgage loans, each of which was in itself a complex legal transaction. Each loan file typically contains (or at least is supposed to contain) a mortgage application, a credit report, income and employment verifications, an appraisal, the lender's internal documentation and a wide variety of other documentation necessary to support proper loan underwriting decisions. Moreover, in seeking financial guaranty insurance from FGIC for the

- 27 -

RC_FGIC9019_00000730

2006-HE1 Transaction, GMACM demanded that FGIC commit to the pricing and other material terms within a very limited time frame. Both GMACM and FGIC understood and intended that FGIC would rely on the information supplied by GMACM as sponsor, as well as GMACM's representations and warranties concerning that information, in assessing the credit risk of the mortgage loan pool.

84.     Further, on information and belief, for each of its securitizations, GMACM as sponsor supplied the same data it provided to FGIC to one or several rating agencies in order for those agencies to create expected loan level default and loss estimates. The loan level default and loss estimates were then used by the rating agencies to create cash flow projections and potential loss estimates for the entire transaction. Finally, the rating agencies delivered to the sponsor and to FGIC a private credit assessment for the transaction (sometimes referred to as a "shadow rating") without considering the effect of FGIC's policy. The shadow rating provided an overall evaluation of the likelihood of default on the securities FGIC would be insuring in the securitization. As sponsor, GMACM arranged for the shadow rating to be provided to FGIC knowing that it was an essential condition to FGIC's willingness to issue a financial guaranty insurance policy.

## C.     The GMACM 2006-HE1 Transaction

85.     On March 30, 2006, GMACM pooled together and deposited many thousands of fixed and adjustable rate Home Equity (Revolving) Lines of Credit ("HELOCs") and Home Equity Loans ("HELs") into the GMACM Home Equity Loan Trust 2006-HE1. The 2006-HE1 Trust served as the Issuer of $1,274,156,000 in aggregate principal amount of 2006-HE1 Notes. Home equity loans are essentially second-lien mortgage loans, which are generally funded entirely at the closing of the loan. Home equity lines of credit are typically revolving credit lines

- 28 -

RC_FGIC9019_00000731

collateralized by second-lien mortgage loans, which can be drawn on at any time during an extended period, and repaid at any time, subject to a maximum repayment period.

86.     The initial conveyance to the 2006-HE1 Trust by RAMP (acting as Depositor) contained over 12,500 HELOCs with an aggregate outstanding principal balance of approximately $593 million, and over 8,800 HELs with an aggregate principal balance of approximately $368 million. In all, the 2006-HE1 Trust contained at closing roughly 21,300 initial Mortgage Loans with an aggregate principal balance of approximately $961 million. Investors in the GMACM-sponsored 2006-HE1 Transaction were issued a single class of securities—the 2006-HE1 Notes (formally termed the GMACM Home Equity Loan-Backed Term Notes, Series 2006-HE1)—which were collateralized by the Mortgage Loans transferred to and held by the 2006-HE1 Trust. In addition, approximately $320 million was deposited into a pre-funding account at the closing, which was used to acquire additional Mortgage Loans in the 90 days following the closing.

87.     To enhance the ratings and marketability of the 2006-HE1 Notes, GMACM sought a financial guaranty insurance policy from FGIC for the purpose of insuring the transaction for the benefit of the certificate holders. On March 30, 2006, GMACM and FGIC executed an Insurance and Indemnity Agreement (the "I&I Agreement"), under which FGIC agreed to and did issue Policy number 06030037 to insure the 2006-HE1 Notes. The I&I Agreement was signed by FGIC (the "Insurer" of the 2006-HE1 Transaction); GMACM (the "Sponsor", "Seller" and "Servicer" for the 2006-HE1 Transaction); RAMP (the "Depositor" for the 2006-HE1 Transaction); Walnut Grove (a "Seller" for the 2006-HE1 Transaction); and JPMorgan (the "Indenture Trustee" for the 2006-HE1 Transaction). The Bank of New York Trust Company, N.A., later became the successor in interest to JPMorgan as Indenture Trustee.

- 29 -

RC_FGIC9019_00000732

88.    Also on March 30, 2006, Ally Bank (using its then-current name, GMAC Bank) entered into a Custodial Agreement whereby it agreed to serve as Custodian of the underlying mortgage loan notes on behalf of the 2006-HE1 Trust. FGIC is an express third party beneficiary of that agreement. *See* Custodial Agreement § 5.6.

89.    The I&I Agreement provides that FGIC (the Insurer) is a third-party beneficiary of, and shall have all of the rights provided for in, the "Operative Documents." I&I Agreement § 2.02(k). "Operative Documents" are defined to include, among other documents: (i) the 2006 HE-1 Notes; (ii) the Mortgage Loan Purchase Agreement dated as of March 30, 2006 among GMACM, RAMP, Walnut Grove and JPMorgan (the "MLPA"); (iii) the Servicing Agreement dated as of March 30, 2006 among GMACM, the 2006-HE1 Trust and JPMorgan; (iv) the Indenture dated as of March 30, 2006 between the 2006-HE1 Trust and JPMorgan; and (v) the Custodial Agreement dated as of March 30, 2006 among GMACM, JPMorgan, and Ally Bank. I&I Agreement § 1.01. FGIC is referred to as the "Enhancer" under certain of the Operative Documents.

90.    Pursuant to the I&I Agreement FGIC insured $1,274,156,000 aggregate principal amount of the 2006-HE1 Notes. The Policy improved the marketability of the 2006-HE1 Notes by mitigating risk for potential investors and making the 2006-HE1 Notes eligible to receive a credit rating of triple-A by the rating agencies at closing.

91.    GMACM and the Depositor offered the 2006-HE1 Notes for sale pursuant to a prospectus, dated February 16, 2006 (the "Prospectus"), and a prospectus supplement, dated March 29, 2006 (the "Prospectus Supplement"), which touted the Policy and the "triple-A" initial rating of the 2006-HE1 Notes, which was made possible by the Policy. The Prospectus and Prospectus Supplement, together with certain preliminary offering documents, each as

- 30 -

RC_FGIC9019_00000733

further supplemented by any subsequent amendment or supplement thereto, and any other offering document that makes reference to the Policy, are referred to collectively as the "Offering Documents."

92.      On March 30, 2006, an Ally Financial subsidiary, Ally Securities, sold the 2006-HE1 Notes to investors, and FGIC issued the Policy in accordance with the terms of the I&I Agreement.

93.      The 2006-HE1 Transaction was structured in such a way as to permit GMACM to add Subsequent Mortgage Loans to the pool during a specifically defined Revolving Period, which enabled GMACM to continue to shift the credit risk of such loans to investors and to FGIC for a defined period after the closing, and to realize immediate gains on the loans it sold to the trust. GMACM represented and warranted to FGIC that the Subsequent Mortgage Loans would conform to the same contractual representations and warranties GMACM made about the loans and the underwriting of the loans that were in the pool at closing. *See* MLPA § 3.1(b). Those representations and warranties were critical to FGIC's acceptance of this feature of the 2006-HE1 Transaction.

94.      As discussed more fully below, Subsequent Mortgage Loans were also expressly not permitted to be added to the pool following the occurrence of a Managed Amortization Event, which, as defined, was deemed to occur whenever the Funding Account carried an average daily balance of greater than $10 million in any three-consecutive-month period.

### D.      GMACM Fraudulently Induces FGIC to Insure the 2006-HE1 Notes with Substantial Assistance from Ally Financial and Ally Bank

#### (1)      GMACM's Fraudulent Inducement of FGIC

95.      FGIC's participation in the 2006-HE1 Transaction was an essential component of the 2006-HE1 Transaction and enhanced GMACM's ability to market the securitization

- 31 -

RC_FGIC9019_00000734

effectively. The Policy allowed GMACM to sell the 2006-HE1 Notes with an initial triple-A
credit rating, making them more attractive to a broader pool of potential investors.

96.    In order to induce FGIC to write financial guaranty insurance for the 2006-HE1
Transaction, GMACM provided to FGIC, directly or indirectly, a variety of information.

97.    *First* and foremost, GMACM provided to FGIC initial and final Prospectus
Supplements summarizing, among other material information, the credit quality and
characteristics of the Mortgage Loans, and GMACM's loan underwriting guidelines and loan
origination criteria.

98.    *Second*, GMACM provided a document (generally referred to as a "loan tape" or
"magnetic tape") detailing material characteristics of individual borrowers and loans expected to
be included in the 2006-HE1 Transaction, together with representations regarding material
statistics about the Loan Pool as a whole.

99.    *Third*, GMACM provided to FGIC credit ratings for the 2006-HE1 Notes
determined without considering the effect of the Policy. These ratings, which GMACM
procured from the credit rating agencies, are known as "shadow ratings."

100.    *Fourth*, as discussed in detail below, GMACM provided to FGIC representations,
warranties, and affirmative covenants in the Operative Documents and the I&I Agreement
regarding the Mortgage Loans specifically and the Loan Pool generally.

101.    ***Prospectus Supplement and Other Operative Documents.*** In determining
whether to insure the 2006-HE1 Notes, FGIC relied in part upon representations and warranties
regarding GMACM's loan underwriting standards made by GMACM in the Prospectus and
Prospectus Supplement. The Prospectus, as supplemented by the Prospectus Supplement, was
filed with the SEC and became effective on March 29, 2006. A Preliminary Prospectus

- 32 -

RC_FGIC9019_00000735

Supplement was transmitted to, among others, Dana Skelton of FGIC, on or about March 28,

2006, in an email sent by Daniel Deaton, on behalf of GMACM. The Final Prospectus

Supplement was transmitted to, among others, Dana Skelton of FGIC, on or about March 29,

2006, in an email sent by Jeffrey Wittenberg on GMACM's behalf.

102.    In the Offering Documents, GMACM represented that, based on the data

provided in the borrower's application and certain other applicable verifications, "a

determination will have been generally made by the original lender that the borrower's monthly

income would be sufficient to enable the borrower to meet its monthly obligations on the loan

and other expenses related to the property." Prospectus at 29. Further, in the Prospectus

Supplement, GMACM also represented to FGIC that:

> The mortgage loans were selected for inclusion in the mortgage
> pool from among mortgage loans originated or purchased in
> connection with [GMACM's] Underwriting Standards . . . based
> on [GMACM's] assessment of investor preferences and rating
> agency criteria.

Prospectus Supplement at S-33.

103.    The Prospectus Supplement expressly states that GMACM's "underwriting

standards with respect to the [Mortgage Loans, including the Home Equity Lines of Credit and

Home Equity Loans] will generally conform to those published in the GMAC Mortgage

Corporation underwriting guidelines, including the provisions of the GMAC Mortgage

Corporation underwriting guidelines applicable to the GMAC Mortgage Home Equity Program."

Prospectus Supplement at S-38, S-42.

104.    GMACM publishes its loan underwriting standards in a document referred to in

the Prospectus Supplement as "the GMAC Mortgage Corporation underwriting guidelines" (and

referred to herein as the "Underwriting Guidelines"). Prospectus Supplement at S-38, S-39, S-42.

In general, the Underwriting Guidelines specify documentation requirements, and substantive

- 33 -

RC_FGIC9019_00000736

criteria for key credit-related characteristics, that borrowers must satisfy in order to qualify for a particular mortgage loan or line of credit. Depending upon the particular type of loan or line of credit, these requirements and criteria may include asset verification, income verification, employment verification, bank statements, payment histories and/or evidence of closing funds, among other things. The substantive criteria for eligibility address material characteristics of the proposed loan, such as DTI ratios, CLTV ratios and occupancy status.

105.    The Prospectus Supplement set forth, among other information, the following important characteristics of the Loan Pool: the ranges of and weighted average FICO scores, the ranges of and weighted average CLTV ratios, the ranges of and weighted average outstanding principal balances of the loans, the DTI ratios of the borrowers, the geographic distribution of the loans, and the occupancy status of the borrowers (*i.e.*, whether the property securing a mortgage is: (i) the borrower's primary residence; (ii) a second home; or (iii) an investment property). *See* Prospectus Supplement at A-I-1 - A-I-14.

106.    In particular, GMACM represented in the Prospectus Supplement that the loans had generally been originated with a maximum DTI ratio of 45% and a maximum CLTV ratio of 100%. *See* Prospectus Supplement at S-40, S-43. GMACM also represented that for each Mortgage Loan it had made a determination based upon all applicable employment, credit and property information regarding whether the prospective borrower had sufficient monthly income available to meet the borrower's monthly obligations. *See* Prospectus Supplement at S-41, S-45.

107.    GMACM also represented in the Offering Documents that, with respect to occupancy status, 97.85% of the Mortgage Loans would be secured by the borrower's primary residence. Prospectus Supplement at A-1-4.

- 34 -

RC_FGIC9019_00000737

108.    **Loan Tapes.** The loan tapes provided by GMACM set forth, for each loan in the Loan Pool, key characteristics such as the borrower's FICO score and DTI ratio and the CLTV ratio for the loan. GMACM also disclosed in the Prospectus Supplement—with respect to the Loan Pool as a whole—aggregate characteristics also relevant to the assessment of the credit risk of the pool, including weighted averages of FICO scores, DTI ratios and CLTV ratios.

109.    **Shadow Rating Letters.** GMACM, on information and belief, provided Moody's and S&P with, at a minimum, the same mortgage loan tape that it also provided to FGIC. Based on the information supplied by GMACM, Moody's assessed the credit quality of the Loan Pool and assigned a shadow rating of Baa2 to the 2006-HE1 Notes, while S&P assigned the 2006-HE1 Notes a shadow rating of BBB. These shadow ratings met FGIC's minimum requirements. FGIC required these shadow ratings as an essential condition to its willingness to insure the 2006-HE1 Transaction.

### (2)    GMACM's Fraudulent Inducement of FGIC is Carried Out with Substantial Assistance from Ally Bank

110.    Ally Bank provided substantial assistance to its affiliate GMACM in fraudulently procuring the Policy from FGIC. As it originated or acquired nearly 60% of the Mortgage Loans, Ally Bank was well aware of the true characteristics of the majority of the Loan Pool. Moreover, as a result of its affiliate status with GMACM, and its role as Custodian for the 2006-HE1 Transaction—for which it received substantial fees—Ally Bank was aware of the representations and warranties GMACM made to FGIC regarding the nature of GMACM's business practices and the characteristics of the Mortgage Loans (including the many thousands of Mortgages Loans that were originated by Ally Bank).

111.    With full knowledge that GMACM had not complied—and would not comply—with the representations and warranties it made to FGIC, and direct knowledge of the many

- 35 -

**PX 0725 pg. 35 of 100**

RC_FGIC9019_00000738

thousands of loans it had originated and sold to GMACM, which formed a substantial part of the collateral for the 2006-HE1 Transaction, Ally Bank represented to FGIC that, as Custodian, it would inform FGIC if it discovered any non-compliant Mortgage Loans or non-compliance with GMACM's obligations under the Operative Documents. By offering FGIC this false comfort, despite knowing that GMACM was fraudulently inducing FGIC to provide financial guaranty insurance for the 2006-HE1 Transaction, Ally Bank provided material assistance to GMACM's fraud.

### (3)    GMACM's Fraudulent Inducement of FGIC is Carried Out with Substantial Assistance from Ally Financial

112.    Ally Financial provided substantial assistance to its subsidiaries GMACM and Ally Bank in fraudulently inducing FGIC to participate in the 2006-HE1 Transaction and, ultimately, issue the Policy. Ally Financial knew that the Mortgage Loans underlying the 2006-HE1 Transaction were of a substantially poorer quality than was represented to FGIC and other participants in the Transaction, including investors. Ally Financial further knew that the Mortgage Loans were not underwritten to the standards represented in the Offering Documents and warranted in the Operative Documents. Moreover, on information and belief, as a result of its dominance over ResCap, Ally Bank, and its other subsidiaries, Ally Financial knew that the representations and warranties GMACM made to FGIC prior to and at the closing, upon which FGIC reasonably relied, were false.

113.    Ally Financial, at the direction of its board of directors, took a number of actions in 2005 to engender investor confidence in, and otherwise finance and support, its mortgage securitization business, which was carried out by its subsidiaries. Ally Financial substantially restructured its subsidiaries in 2005. ResCap, for example, did not conduct any operations whatsoever until GMAC Residential Holding Corp. and GMAC-RFC Holding Corp.—two of

- 36 -

RC_FGIC9019_00000739

Ally Financial's wholly-owned subsidiaries—were transferred to it in March 2005. Those two subsidiaries represented substantially all of Ally Financial's mortgage securitization business.

    114.    Ally Financial, at the direction of its board of directors, also provided ResCap with liquidity and capital.

    115.    Further, in Ally Financial's 8-K, filed on June 9, 2005, it disclosed that ResCap would enter into an operating agreement with Ally Financial, under which Ally Financial would agree to "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries."

    116.    On information and belief, Ally Financial's restructuring and financial support of its subsidiaries was undertaken at the direction of the Ally Financial board of directors in order to improve and maintain the investment grade rating and profitability of Ally Financial's mortgage securitization business. This restructuring then enabled Ally Financial to present itself to its subsidiaries' securitization transaction partners—including FGIC—as a stable corporate parent supporting and overseeing the business of its subsidiaries, which in turn made those subsidiaries more attractive as counterparties to market participants, such as FGIC.

    117.    Ally Financial's corporate restructuring also allowed GMACM to explicitly represent and warrant to FGIC in the I&I Agreement that GMACM "is solvent, and will not be rendered insolvent by the Transaction. . . . [GMACM] shall not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business." I&I Agreement § 2.01(m). This statement—on which FGIC materially relied—could not have been made absent Ally Financial's decision to prop up its subsidiary GMACM.

    118.    Additionally, Ally Financial was aware that the true characteristics of the Mortgage Loans in the 2006-HE1 Transaction—and other securitization transactions—were far

- 37 -

RC_FGIC9019_00000740

worse than was represented to FGIC and were not underwritten to the standards that were represented and warranted to FGIC. This is true in that Ally Financial's subsidiaries were, in many cases, the acquirers, sellers, and servicers of those very loans. Indeed, the driving factor in the separation of Ally Financial from General Motors Corporation ("GM") and the creation, in particular, of ResCap, was to create an entity, the sole focus of which was the home mortgage business.

119.   Moreover, as a result of its domination and control over ResCap, GMACM, and Ally Bank, as well as the shared officers and directors among and between Ally Financial and its subsidiaries, Ally Financial was aware of GMACM's representations and warranties to FGIC— and that they were untrue when stated—as well as the substantial assistance Ally Bank was rendering GMACM in aid of its fraudulent inducement of FGIC. For example, Eric A. Feldstein was Ally Financial's CEO and Chairman of its board of directors and also served as Chairman of ResCap's board of directors. Furthermore, Sanjiv Khattri has served as Executive Vice President and CFO of Ally Financial, while also serving as a director and CFO of ResCap. Numerous other individuals served as Directors and Officers of both Ally Financial and ResCap, with many serving in roles directly related to the mortgage operations of both companies. ResCap and its own subsidiaries, including GMACM, shared numerous directors and senior management as well. Similarly, William F. Muir, Ally Financial's President, has served in that capacity since at least 2004 (first at GMAC and then at Ally Financial) while also serving as President and Chairman of the Board of IB Finance Holding Company, LLC—the direct parent of Ally Bank— and as a director of Ally Bank.

120.   David C. Walker is another example of the many employees who had overlapping responsibilities at Ally Financial and its subsidiaries, including GMACM and RAMP. Walker

- 38 -

**PX 0725 pg. 38 of 100**

RC_FGIC9019_00000741

joined Ally Financial in 1985 and has served as Vice President of GMAC Group and CFO of GMAC Mortgage Group. In September 2005, shortly before the closing of the 2006-HE1 Transaction, Walker was a director at ResCap, GMACM, RFC, and RAMP, among other ResCap subsidiaries. In the 2006-HE1 Transaction, acting as a director of RAMP, Walker was a signatory to RAMP's May 1, 2005 "Unanimous Written Consent of Directors in Lieu of Meeting of Board of Directors," which was included among the closing documents of the 2006-HE1 Transaction.

121.   As a result of the overlapping personnel, intertwined business operations, and the free flow of information among Ally Financial, ResCap, Ally Bank, and GMACM, it is more than reasonable to conclude that information regarding the representations and warranties being made to FGIC by GMACM was shared among and between GMACM and its parent ResCap, ResCap and its parent Ally Financial, and Ally Bank and its parent and affiliates. Indeed, at least one Ally Financial employee who was involved in the 2006-HE1 Transaction appeared on the Transaction's working group list and received all distributions that were sent to the group, including all drafts, final versions, and communications concerning the Operative and Offering Documents.

122.   Ally Financial, by (1) representing that its mortgage loan practices were sound and that its securitization transactions were supported by mortgage loans that met the criteria to which they were purportedly underwritten, (2) providing financial, managerial, and strategic assistance to its subsidiaries, and (3) modifying its corporate structure to control and direct its subsidiaries, provided substantial assistance to GMACM in fraudulently inducing FGIC to participate in the Transaction and issue the Policy. Further, the issuance of the Policy, which

- 39 -

RC_FGIC9019_00000742

made the 2006-HE1 Transaction possible, inured to the significant financial benefit of Ally
Financial and its subsidiaries.

     **E.**     **GMACM's Representations, Warranties and Affirmative Covenants**

     123.    In connection with the 2006-HE1 Transaction, GMACM, at the direction of Ally
Financial, either directly or indirectly through ResCap, gave numerous representations,
warranties and affirmative covenants to FGIC. These representations and warranties were
material and concerned, among other things, the way GMACM conducted its loan origination,
selection, and evaluation process, the characteristics of the Mortgage Loans, and the accuracy
and completeness of the information supplied to FGIC. These and other characteristics of the
Mortgage Loans included in the Loan Pool at closing were detailed in a schedule attached to the
Servicing Agreement, and, as to Subsequent Mortgage Loans, in similar schedules at the time of
their transfer to the 2006-HE1 Trust (such schedules collectively, the "Mortgage Loan
Schedule"). GMACM also promised to provide timely Mortgage Loan file information and to
provide FGIC with a variety of information, including access to GMACM's books and records
and to GMACM's Chief Financial Officer and its independent accountants.

     124.    GMACM's representations and warranties, and particularly GMACM's
representation that the information supplied to FGIC was not materially inaccurate or
misleading, induced FGIC to enter into the 2006-HE1 Transaction and to issue the Policy.
Further, the I&I Agreement's incorporation and restatement of the representations and warranties
in the Operative Documents was intended to allow FGIC to rely upon each and every one of the
representations and warranties that GMACM made in connection with the 2006-HE1
Transaction.

     125.    FGIC, for its part, reasonably relied on the information available to it regarding
the underlying Mortgage Loans and the representations and warranties provided by GMACM,

- 40 -

RC_FGIC9019_00000743

Since FGIC had neither the right under the Operative Documents, nor the practical ability, to review the tens of thousands of underlying Mortgage Loan files in the days available to it prior to the closing of the 2006-HE1 Transaction, GMACM knew that FGIC had no choice but to rely on GMACM's representations regarding the underlying loans in determining whether to issue the Policy. Further, FGIC had no reason to believe that these representations were not true and accurate.

126.    Indeed, GMACM included more than 21,000 individual Mortgage Loans in the 2006-HE1 Transaction at closing. Typically, each Mortgage Loan has its own voluminous file containing, among other items, mortgage applications, credit reports, income and employment verifications, the lender's internal documentation and other forms of documentation necessary to support each underwriting decision. Unlike GMACM, FGIC was under no contractual duty whatsoever to review the more than 21,000 Mortgage Loans. Instead, FGIC, as contemplated by the many representations, warranties, and affirmative covenants by GMACM regarding its loan origination, selection, and evaluation practices, and the credit quality of the Mortgage Loans, reasonably relied on GMACM to conduct its underwriting processes according to the promised standards and FGIC had no basis to conclude that GMACM's representations and warranties were false. Thus, FGIC reasonably believed that truthful and accurate information had been provided and that it would not face additional, hidden risk by virtue of material omissions or positive misrepresentations having been made.

127.    Based on the information received by FGIC and the representations and warranties given by GMACM, FGIC entered into the I&I Agreement and agreed to issue the Policy to the Indenture Trustee for the benefit of the holders of the 2006-HE1 Notes. In return for doing so, FGIC received a modest annual premium, based on a small, fixed percentage of the

- 41 -

RC_FGIC9019_00000744

aggregate principal balance of the 2006-HE1 Notes. Specifically, FGIC received 0.12% per annum of the aggregate balance of the 2006-HE1 Notes for serving as insurer, a figure commensurate with the risk that FGIC believed it was accepting, based on the representations, warranties and affirmative covenants provided by GMACM.

128.    As discussed below, GMACM's information, representations and warranties were materially false when disclosed and/or provided by GMACM. GMACM knew that this information, and its representations and warranties, were materially false when made. GMACM also knew that this information and the representations and warranties were essential to FGIC's decision to issue the Policy. Indeed, GMACM intentionally made these material misrepresentations to induce FGIC to enter into the I&I Agreement and issue the Policy. The issuance by FGIC of the Policy—induced by GMACM's fraudulent misrepresentations and substantial assistance by Ally Financial—made the 2006-HE1 Notes eligible to receive an initial triple-A credit rating, thus greatly improving their marketability to potential investors.

### (1)    Representations, Warranties and Affirmative Covenants Relating to the Operative and Offering Documents

129.    Under Section 2.01 of the I&I Agreement, GMACM made the following representations and warranties, among others (emphasis added in each case):

+ *Accuracy of Information.* **Neither the Operative Documents to which it is a party nor other information relating to the Mortgage Loans,** the operations of GMACM. . . or the financial condition of GMACM . . . furnished to [FGIC] . . . by GMACM . . . including the Offering Documents . . . **contains any statement of a material fact which was untrue or misleading in any material respect when made** . . . GMACM . . . has no knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change with respect to GMACM . . . Since the furnishing of the Documents, there has been no change nor any development or event involving a prospective change known to GMACM . . . that would render any of the Documents untrue or misleading in any material respect.

- 42 -

RC_FGIC9019_00000745

♦ *Compliance with Securities Laws.* The offering and sale of the Securities complies in all material respects with all requirements of law, including the registration requirements of the Securities Act and any other applicable securities laws. **The Offering Documents do not contain any untrue statement of a material fact and do not omit to state material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading** . . . .

♦ *Operative Documents.* **Each of the representations and warranties of GMACM . . . contained in the applicable Operative Documents and the Underwriting Agreement is true and correct in all material respects** [and] GMACM . . . hereby makes each such representation and warranty to, and for the benefit of, [FGIC] as if the same were set forth in full herein.

♦ *Solvency; Fraudulent Conveyance.* GMACM . . . is solvent and will not be rendered insolvent by the Transaction and . . . **GMACM . . . shall not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business**, and . . . GMACM . . . does not intend to incur, or believe that it has incurred, debts beyond its ability to pay as they mature. . . . GMACM . . . is not transferring the Mortgage Loans . . . with any intent to hinder, delay or defraud . . . creditors.

130.    *First*, in the I&I Agreement, GMACM represented and warranted to FGIC that

"[n]either the Operative Documents to which it is a party nor other information relating to the

Mortgage Loans. . . including the Offering Documents . . . contains any statement of a material

fact which was untrue or misleading in any material respect when made." I&I Agreement §

2.01(j). Through these Operative and Offering Documents, GMACM communicated several

material facts about the characteristics of the mortgage loans sold to the 2006-HE1 Trust.

131.    *Second*, in the I&I Agreement, GMACM represented and warranted that "[t]he

Offering Documents do not contain any untrue statement of a material fact and do not omit to

state material fact necessary to make the statements made therein, in light of the circumstances

under which they were made, not misleading." § 2.01(k). As discussed above, in the Prospectus

Supplement, GMACM represented that all of the mortgage loans sold to the 2006-HE1 Trust had

- 43 -

RC_FGIC9019_00000746

been underwritten generally in accordance with GMACM's underwriting standards, including the GMAC Mortgage Home Equity Program. Prospectus Supplement at S-38, S-42.

132.    *Third*, the I&I Agreement incorporated by reference, for the benefit of FGIC, the representations and warranties contained in the "Operative Documents," as that term was defined in the I&I Agreement: "[e]ach of the representations and warranties . . . contained in the applicable Operative Documents . . . is true and correct in all material respects[.]" *See* I&I Agreement §§ 1.01, 2.01(l). The incorporation by reference of the Operative Documents into the I&I Agreement was intended to allow FGIC to rely on any representation and warranty that GMACM made to other entities, such as investors or the Indenture Trustee, in connection with the 2006-HE1 Transaction. Indeed, the I&I Agreement expressly identifies FGIC as a third-party beneficiary with respect to the related Operative Documents. I&I Agreement § 2.02(k).

133.    *Fourth*, GMACM also provided information to FGIC concerning Mortgage Loans in the 2006-HE1 Transaction. *See* I&I Agreement § 2.02(e)(iii). This information included loan tapes that set forth statistics about the Loan Pool. The loan tapes purported to describe key characteristics relevant to the assessment of risk, including DTI ratios, CLTV ratios, occupancy status and FICO scores. *See* MLPA § 2.1(d). On information and belief, the loan tape FGIC received at closing contains the same information as is contained in the Mortgage Loan Schedule referred to in the MLPA.

134.    In turn, in the MLPA, GMACM represented that all the information in that Mortgage Loan Schedule "is true and correct in all material respects as of the date or dates respecting which such information is furnished." MLPA § 3.1(b)(i).

135.    As a result of incorporating into the I&I Agreement the representations and warranties in the related Operative Documents, GMACM incorporated representations and

- 44 -

RC_FGIC9019_00000747

warranties regarding the underwriting of the Mortgage Loans included in the 2006-HE1

Transaction. These representations and warranties set forth the standards governing each

Mortgage Loan, including, significantly, the representation that the Mortgage Loans had been

underwritten in compliance with GMACM's underwriting guidelines. *See* MLPA § 3.1(xxxvii).

136.    In particular, in the MLPA, GMACM represents and warrants, as to each

Mortgage Loan:

♦ The information set forth in the Mortgage Loan Schedule with respect to each
Mortgage Loan or the Mortgage Loans is true and correct in all material respects
as of the date or dates respecting which such information is initially furnished;

♦ As of the Cut-Off Date or related Subsequent Cut-Off Date, no Mortgage
Loan was 30 days or more delinquent in payment of principal or interest;

♦ With respect to the GMACM Initial Mortgage Loans or, as applicable, any
Subsequent Mortgage Loans sold by GMACM, the related Mortgage File contains
or will contain, in accordance with the definition of "Mortgage File" in Appendix
A to the Indenture, each of the documents and instruments specified to be
included therein;

♦ As of the Cut-Off Date or Subsequent Cut-Off Date, the Combined Loan-to-
Value Ratio [("CLTV")] for each Mortgage Loan was not in excess of 100.00%;

♦ GMACM used no selection procedures that identified the Mortgage Loans as
being less desirable or valuable than other comparable mortgage loans originated
or acquired by GMACM under the GMACM Home Equity Program.

137.    Moreover, in the I&I Agreement—which expressly identifies FGIC as a third-

party beneficiary with respect to the related Operative Documents—GMACM specifically

covenants that it will "comply in all material respects with the terms and conditions of and

perform its obligations under the Operative Documents to which it is a party . . . ." I&I

Agreement § 2.02(a).

- 45 -

RC_FGIC9019_00000748

### (2) Representations, Warranties and Affirmative Covenants Regarding Access to Information and Servicing

138.    The I&I Agreement also incorporates the representations and warranties that GMACM made in the Servicing Agreement in its capacity as Servicer. *See* I&I Agreement § 2.01(I). Under the I&I Agreement, GMACM covenanted that "[a]ll Mortgage Loans will be serviced in all material respects in compliance with the [Servicing Agreement]." I&I Agreement § 2.02(I). In the Servicing Agreement, GMACM covenanted, represented, and warranted that it would service the Mortgage Loans in the 2006-HE1 Transaction in a manner consistent with its own servicing guidelines. *See* Servicing Agreement § 3.01(a).

139.    The I&I Agreement requires *inter alia* that GMACM furnish or cause to be furnished to FGIC "promptly upon receipt thereof, copies of all schedules, financial statements or other similar reports delivered to or by GMACM . . . [as well as] promptly on request such other data as [FGIC] may reasonably request." I&I Agreement § 2.02(c)(v),(A),(B).

140.    The I&I Agreement further affords FGIC the express right "to conduct an ongoing review of GMACM's practices as Servicer through reviews of the Mortgage Loans, reappraisals of Mortgaged Properties and reviews of servicing practices." I&I Agreement § 2.02(p). FGIC also has the express right to "inspect the books and records of GMACM . . . [and to] discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM; and with GMACM's consent, which consent shall not be unreasonably withheld or delayed, to discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants." I&I Agreement § 2.02(e)(i)-(iii).

### F.    GMACM's Breaches of Its Representations, Warranties and Affirmative Covenants

141.    As discussed above, FGIC relied on material representations and warranties made by GMACM regarding the manner in which the Mortgage Loans were originated, selected, and

- 46 -

**PX 0725 pg. 46 of 100**

RC_FGIC9019_00000749

evaluated, the characteristics of those loans, and the accuracy and completeness of information GMACM supplied to FGIC. Based on those representations and warranties, FGIC agreed to issue the Policy. In fact, as demonstrated by the extreme levels of delinquencies and losses detailed below, the risk that FGIC assumed when it issued the Policy was many times greater than the risk disclosed by GMACM's representations and warranties. GMACM breached its representations and warranties to FGIC, and FGIC has been damaged as a result of those breaches.

142.    The 2006-HE1 Transaction has performed poorly, and delinquencies and defaults for Mortgage Loans in the 2006-HE1 Transaction have been substantial. As of October 2011, a total of 4,763 mortgage loans, representing nearly 15% of the balance of the entire Loan Pool, had been liquidated or were delinquent. As discussed above, by making these extensive representations and warranties to FGIC, and thereby inducing FGIC to issue the Policy, which covers, *inter alia*, shortfalls in amounts paid to noteholders arising from liquidated Mortgage Loans, GMACM assumed and allocated to itself all risk associated with the Mortgage Loans failing to comply with GMACM's own representations and warranties.

143.    The poor performance of the Mortgage Loans has reduced the cash flow to the 2006-HE1 Trust, which has caused, and will continue to cause, substantial claims to be presented to FGIC under the Policy to cover these shortfalls. As of March 2012, approximately $98 million in claims had been presented to FGIC in connection with the 2006-HE1 Transaction. FGIC expects tens of millions of dollars more in claims to be presented to it under the 2006-HE1 Transaction in the future.

144.    As an increasingly high percentage of the 2006-HE1 Mortgage Loans enter delinquency and default, FGIC has uncovered a wealth of material breaches of GMACM's

- 47 -

RC_FGIC9019_00000750

representations and warranties regarding the characteristics of the loans and the standards to which they were underwritten.

### (1)    Breaches Identified Through Initial Review

145.    When FGIC became concerned about the high delinquencies and default rates in the 2006-HE1 Transaction, FGIC requested that GMACM provide it with certain Mortgage Loan files underlying the 2006-HE1 Transaction.

146.    FGIC selected for review 121 non-performing (*i.e.*, non-current or charged-off) loans that had resulted in a loss to the 2006-HE1 Trust. To perform this review, FGIC hired an independent outside consultant with particular skill, experience, and expertise in the review, evaluation, and re-underwriting of mortgage loans.

147.    That review revealed that GMACM had breached one or more material representations and warranties on 103 of the 121 loans, or approximately 85% of the loans reviewed.

148.    A small sample of these material breaches and underwriting violations are listed below:

- Loan Number 8253418290: due to an undisclosed second mortgage, the loan closed with a CLTV of 148.77%. In order for this mortgage loan to have been eligible for inclusion in the 2006-HE1 pool, the relevant guidelines for the particular type of loan underwritten permit a maximum CLTV ratio of 100%.

- Loan Number 8255068044: due to an income misrepresentation, the loan closed with a DTI of 106.49%. In order for this mortgage loan to have been eligible for inclusion in the 2006-HE1 pool, the relevant guidelines for the particular type of loan underwritten permit a maximum DTI ratio of 50%.

- Loan Number 8259971235: the borrower had a payment history evidencing multiple delinquencies on a prior loan within the prior year and the loan closed with a DTI of 58.83%. In order for this mortgage loan to have been eligible for inclusion in the 2006-HE1 pool, the relevant guidelines for the particular type of loan underwritten require that the borrower have made no late payments on any prior loans within the

- 48 -

PX 0725 pg. 48 of 100

RC_FGIC9019_00000751

twelve month period preceding the date of the mortgage loan. Further, the relevant
guidelines permit a maximum DTI ratio of 50%.

- Loan Number 8601459619: the borrower never made a single payment on the loan
  and it was therefore delinquent at the time it was transferred to the 2006-HE1 Trust.
  GMACM represented and warranted to FGIC that no mortgage loan was 30 days or
  more delinquent in payment of principle or interest at the time of payment.

- Loan Number 8655697712: the loan closed with a DTI of 69.30% and a CLTV of
  88.84%. In order for this mortgage loan to have been eligible for inclusion in the
  2006-HE1 pool, the relevant guidelines for the particular type of loan underwritten
  permit a maximum DTI of 45% and a maximum CLTV of 85%.

149.    These examples of underwriting violations—but a small smattering of the

extensive defects among the Mortgage Loans—evidence significant breaches of the MLPA,

under which GMACM represented and warranted that (i) the information set forth in the

Mortgage Loan Schedule is true and correct in all material respects; (ii) no Mortgage Loan was

30 days or more delinquent as of March 1, 2006; (iii) each Mortgage File contains all required

documents and instruments; (iv) the CLTV of each Mortgage Loan did not exceed 100%; and (v)

GMACM selected the Mortgage Loans in accordance with its underwriting guidelines (*i.e.* the

Home Equity Loan Program). *See* MLPA § 3.1. It is reasonable to conclude—based on what is

now known by FGIC and as a result of what is being wrongly withheld from FGIC—that a

substantial majority of the 27,400 initial and pre-funded Mortgage Loans (amounting to over

$1.2 billion) held by the 2006-HE1 Trust, and the approximately 13,300 Subsequent Mortgage

Loans (amounting to over $600 million), evidence similar breaches of GMACM's

representations and warranties.

150.    Following the discovery of these high defect rates and pursuant to the I&I

Agreement and the MLPA, FGIC demanded that GMACM repurchase the non-compliant

Mortgage Loans discovered during its repurchase review. GMACM has expressly refused to

- 49 -

RC_FGIC9019_00000752

repurchase a substantial number of non-conforming Mortgage Loans. This failure constitutes a material breach of the I&I Agreement and Operative Documents incorporated therein.

151.    Moreover, on information and belief, GMACM is and has been aware that many of the Mortgage Loans, whether acquired at the closing or thereafter, were nonconforming and, thus, in breach of its own representations and warranties. Despite this knowledge, GMACM has failed to repurchase the nonconforming loans with conforming loans, as is required under the Operative Documents.

### (2)    Breaches Identified Through Additional Review

152.    In 2010, as the 2006-HE1 Transaction continued to perform poorly, FGIC again retained a professional mortgage loan review team to identify, review, and evaluate a statistically significant sample of mortgage loans in the 2006-HE1 Transaction.

153.    FGIC's independent loan consultant reviewed the 257 loan files FGIC did receive from GMACM. That review revealed that GMACM had breached one or more material representations with respect to 245, or an astounding 95%, of these loans.

154.    Based on the information gathered from this random sample review, FGIC estimates a Transaction-wide defect rate as high as 88%.

### (3)    GMACM's Pervasive and Material Breaches of Its Representations and Warranties and Affirmative Covenants

155.    As indicated above, FGIC ultimately obtained access to 378 Mortgage Loan files (the 121 files FGIC initially reviewed, as well as the 257 files it belatedly received from GMACM) which FGIC's independent consultant reviewed to evaluate and re-underwrite the Mortgage Loans. These reviews revealed that GMACM breached one or more material representations with respect to 348—approximately 92%—of the Mortgage Loans reviewed.

- 50 -

RC_FGIC9019_00000753

156.    Moreover, despite its express obligations under the MLPA and the I&I Agreement,

GMACM continues to refuse to repurchase or cure over 300 of the 348 non-compliant and

defective loans that FGIC has asked GMACM to repurchase.

157.    The pervasive and overwhelming defects in the Mortgage Loan files reviewed to

date indicate the clear breach of GMACM's contractual representations, warranties and

affirmative covenants relating to, among other things, the characteristics of the Mortgage Loans,

including the guidelines to which the Mortgage Loans were underwritten. Specifically,

GMACM has breached representation and warranties stating, for the 2006-HE1 Transaction, that:

- neither the Operative Documents nor any information related to the Mortgage Loans contain any untrue or misleading statement of material fact;

- the Offering Documents (*i.e.* the Prospectus and Prospectus Supplement) contain no untrue or misleading statement of material fact;

- each representation and warranty of GMACM in the Operative Documents (including each representation and warranty in the MLPA) is true and correct in all material respects;

- the information set forth in the Mortgage Loan Schedule is true and correct in all material respects;

- no Mortgage Loan was 30 days or more delinquent as of March 1, 2006 (or the date the loan was transferred to the 2006-HE1 Trust);

- each Mortgage File contains all required documents and instruments;

- the CLTV of each Mortgage Loan did not exceed 100%; and

- GMACM selected the Mortgage Loans in accordance with its underwriting guidelines (*i.e.* the Home Equity Loan Program).

158.    Moreover, the true scope of the material underwriting failures is unknown given

GMACM's refusal to provide FGIC with pertinent—and contractually required—information.

This refusal in itself constitutes a breach of GMACM's affirmative covenant to comply with

FGIC's reasonable requests regarding access to information concerning the Mortgage Loans.

- 51 -

RC_FGIC9019_00000754

### (4)    GMACM's Denial of Loan File Requests

159.    As the 2006-HE1 Transaction continued to perform poorly, on December 9, 2010, FGIC wrote to Jeff Blashko, a GMACM/ResCap employee GMACM via e-mail demanding that GMACM provide additional Mortgage Loan files to FGIC, including origination files, servicing notes, and custodian files, for a random sample of 431 2006-HE1 loans. Having received no response from GMACM to its earlier requests, FGIC sent a follow-up e-mail on February 3, 2011, regarding the status of its December 9, 2010 request for files. FGIC's demands for information were received by ResCap, which informed FGIC that ResCap could not respond to the requests until the matter was discussed internally at ResCap and a response was authorized by those with decision-making authority. On information and belief, the request required authorization from officers at Ally Financial, and GMACM/ResCap's response was directed by officers at Ally Financial.

160.    On February 14, 2011, and again on April 26, 2011, FGIC sent further follow-up letters requesting loan files.

161.    In finally responding to FGIC's request for information, GMACM refused to provide any loan files or other information relating to current or pre-paid loans ("Performing Loans"). Instead, it only provided FGIC with a small sampling (257 of 431) of the requested loan files, consisting largely of non-performing loans, and chose to conceal the Performing Loan files from FGIC.

162.    Pursuant to the Servicing Agreement and the I&I Agreement, FGIC is entitled to reasonable access to the documentation regarding all of the Mortgage Loans. Section 2.02(p) of the I&I Agreement provides that "FGIC shall have the right, so long as any of the 2006-HE1 Notes remains outstanding, to conduct an ongoing review of GMACM's practices as Servicer through reviews of the Mortgage Loans . . . ." Notably, there is no limitation in the I&I

- 52 -

RC_FGIC9019_00000755

Agreement as to the nature of the Mortgage Loans files that are subject to review. Further, Section 2.02(c)(v) of the I&I Agreement states that "[p]romptly upon request," GMACM must provide to FGIC "such other data as [FGIC] may reasonably request relating to the Mortgage Loans . . . ."

163.    On April 26, 2011, having still received none of the remaining performing 2006-HE1 Mortgage Loan files it requested, FGIC sent a further letter requesting the remaining loan files. To date, GMACM has not responded.

164.    By producing only non-performing Mortgage Loan files, in contravention of the I&I Agreement, GMACM has arbitrarily and unreasonably imposed limitations on FGIC's contractual right to reasonable access to Mortgage Loan files in contravention of the Operative Documents.

> (5)   **GMACM's Denial of Servicing Notes**

165.    On December 9, 2010, FGIC demanded, pursuant to Section 2.02(c)(iv) of the I&I Agreement, that GMACM furnish or cause to furnish the servicing notes for the Mortgage Loans.

166.    GMACM, without justification or explanation, and in breach of its obligations in the I&I Agreement, has failed to respond to requests for servicing notes.

> (6)   **GMACM's Denial of FGIC's Access to Books and Records, Servicing Officer, and GMACM's Independent Accountants**

167.    On November 21, 2011, in accordance with its express rights under Sections 2.02(e)(i),(ii), (iii) of the I&I Agreement, FGIC requested to (i) inspect the books and records of GMACM; (ii) discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM; and (iii) discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants.

- 53 -

PX 0725 pg. 53 of 100

RC_FGIC9019_00000756

168.    To date. GMACM has failed to respond to this request, in violation of the I&I Agreement.

### G.    Ally Bank's Breaches of the Custodial Agreement

169.    Under the Custodial Agreement, to which FGIC is an express third party beneficiary, *see* Custodial Agreement § 5.6, and through which Ally Bank received substantial fees, Ally Bank undertook several obligations to FGIC concerning the manner in which Ally Bank would ensure that the Mortgage Loans contained complete and accurate information and that GMACM was in compliance with its representations and warranties regarding the origination, selection, and characteristics of those loans.

170.    Ally Bank agreed that it would "hold the Mortgage Notes and any Loan Agreement relating to any Subsequent Mortgage Loan," and that it would review the Mortgage Notes and deliver to FGIC a certification of "the completeness of the receipt of the Mortgage Notes." Custodial Agreement §§ 2.1, 2.2.

171.    Ally Bank further agreed to notify FGIC of breaches of the MLPA by GMACM, by providing that: "Upon discovery by the Custodian of a breach of any representation or warranty made by [GMACM] in the Purchase Agreement . . .with respect to a Mortgage Loan . . . the Custodian shall give prompt written notice to [FGIC]." Custodial Agreement § 2.3.

172.    An initial review of a small percentage of defective Mortgage Loans has revealed that in many instances the Mortgage Note was not included in the loan file. The lack of a Mortgage Note within a particular file constitutes a breach of the representations and warranties given by GMACM in the MLPA. Ally Bank should have been aware of the fact that Mortgage Notes were missing from certain Mortgage Loan files, and that this was a breach of the MLPA representations and warranties. Consequently, it should have notified FGIC pursuant to its own obligations under the Custodial Agreement. *See* Custodial Agreement §§ 2.1-2.3.   Ally Bank

- 54 -

RC_FGIC9019_00000757

has, however, failed to provide FGIC with any notices regarding defects in any Mortgage Loan file, and has further provided inaccurate and/or incomplete certifications regarding the Mortgage Loans, thereby breaching the Custodial Agreement to which FGIC is an express third party beneficiary.

173.    Moreover, Ally Bank had an obligation to notify FGIC of any breach by GMACM of the MLPA representations and warranties that it discovered, not just those pertaining to the Mortgage Note. Since Ally Bank originated nearly 60% of the Mortgage Loans in the 2006-HE1 Transaction—which have suffered astounding defect rates—it must have been keenly aware of the breadth and scope of the underwriting failures with respect to those loans. Ally Bank, thus, must have known that GMACM was in breach of the representations and warranties in the MLPA, and its failure to so notify FGIC was a further breach of the Custodial Agreement.

## H.    GMACM's Fraud

174.    The material breaches of GMACM's representations and warranties, including the extensive underwriting failures by GMACM, and the poor credit quality of almost all of the Mortgage Loans, demonstrate the knowing and wanton disregard of the material representations and warranties and affirmative covenants GMACM made to FGIC to induce its participation in the Transaction. The extraordinarily high defect and default rate among the Mortgage Loans demonstrates not merely that GMACM breached its representations and warranties as a contractual matter, but that it did not—and never intended to—comply with them, despite representing to FGIC that, if FGIC issued the Policy, it (GMACM) would make the representations and warranties set forth in the Operative Documents, and that those representations and warranties would be true. Because GMACM refuses to provide all of the

- 55 -

RC_FGIC9019_00000758

requested Mortgage Loan files in violation of its contractual obligation to do so, however, the
full extent and scope of the fraud has yet to be revealed.

175.    All of the Mortgage Loans underlying the 2006-HE1 Transaction were originated
or acquired by GMACM. As such, GMACM had the access and ability to evaluate the Mortgage
Loan files and to determine if the loans were in substantial compliance with the applicable
GMACM underwriting guidelines and if the loans breached other representations and warranties
made by GMACM.

176.    To induce FGIC to enter into the 2006-HE1 Transaction, GMACM provided
FGIC with a loan tape, which contained false and misleading information regarding, among
other things, the CLTV ratios, DTI ratios, occupancy status and FICO scores of the borrowers.

177.    In addition, GMACM made critical misrepresentations to FGIC with respect to
the credit rating agencies' assessment of the loans that were to comprise the 2006-HE1 Trust.
GMACM was well aware that FGIC would not agree to insure the 2006-HE1 Notes unless
GMACM obtained shadow ratings from the rating agencies that satisfied FGIC's minimum
requirements. To this end, upon information and belief, GMACM provided Moody's and S&P
with the same false information regarding the credit quality of the underlying Mortgage Loans
that it also provided to FGIC. Based on this faulty information, Moody's and S&P assigned
shadow ratings regarding the credit quality of the 2006-HE1 Notes that met FGIC's minimum
requirements—Baa2 and BBB, respectively. In this way, GMACM made both direct and
indirect misrepresentations to FGIC—first, by providing faulty information to the rating agencies
to provide a risk assessment that GMACM would pass on to FGIC, and second, by causing
shadow ratings of the 2006-HE1 Notes to be delivered to FGIC without disclosing to FGIC that
those ratings were based on incomplete and inaccurate loan-level data.

- 56 -

RC_FGIC9019_00000759

178.    GMACM was well aware that FGIC would rely on the shadow ratings—prepared with information supplied by GMACM—as the I&I Agreement specifically contemplated as a condition to issuance of the Policy that FGIC "shall have received confirmation that the Notes insured by the Policy are rated" by S&P and Moody's at a specified minimum level "without regard to the Policy." I&I Agreement § 3.01(k).

179.    As noted, the issuance of the Policy enabled the 2006-HE1 Notes to receive triple-A ratings from the rating agencies. Moreover, the receipt of a triple-A rating for the 2006-HE1 Notes, which depended on the issuance of the Policy, which in turn depended on the shadow ratings formulated using (inaccurate) information supplied by GMACM, was a critical component of the Transaction. As GMACM expressly noted in the Prospectus Supplements: "It is a condition to the issuance of the notes that they be rated 'Aaa' by Moody's . . . and 'AAA' by Standard & Poor's[.]" Prospectus Supplement at S-108.

180.    Had the information provided to the ratings agencies by GMACM been accurate and truthful, Moody's and S&P would almost certainly have assigned a very different (and lower) shadow rating to the 2006-HE1 Transaction, and FGIC in turn would not have issued the Policy on the agreed terms, or would have refused to issue the Policy altogether.

181.    GMACM also made material misrepresentations to FGIC, on which FGIC relied, about the characteristics of the Mortgage Loans, including the guidelines under and standards to which the Mortgage Loans were underwritten.

182.    For example, in the Prospectus Supplement (and in the I&I Agreement by incorporation) GMACM assured FGIC that the Mortgage Loans "were originated generally in accordance with the underwriting standards of GMAC Mortgage Corporation." Prospectus

- 57 -

RC_FGIC9019_00000760

**PX 0725 pg. 57 of 100**

Supplement at S-33, S-36. GMACM provided FGIC with GMACM's Underwriting Guidelines themselves, which contained extensive underwriting standards and requirements.

183.    In fact, as confirmed by the overwhelming defect rates in the Loan Pool described above, all of which are due to Mortgage Loans that are inconsistent with GMACM's own underwriting guidelines, GMACM was well aware at the closing of the 2006-HE1 Transaction that those representations were false. In other words, at the time of the closing of the 2006-HE1 Transaction, GMACM either (1) knew or should have known that its representations were materially false because GMACM had not, among other things, determined if the Mortgage Loans were originated "generally in accordance" with its own underwriting guidelines, or (2) had reviewed whether the Mortgage Loans were originated "generally in accordance" with its underwriting guidelines, had determined that they were not, but nonetheless materially misrepresented to FGIC that the Mortgage Loans were originated "generally in accordance" with those guidelines.

184.    Moreover, GMACM represented to FGIC that, in the case of each loan within the Loan Pool, an underwriter had made an assessment that the borrower had the ability to repay his or her loan, after receiving and reviewing all applicable employment, credit, and property information. In fact, GMACM was not verifying the ability of borrowers to repay their loans in compliance with its own underwriting guidelines accurately or at all. As a result, GMACM misrepresented facts that were uniquely within its knowledge.

185.    Moreover, the MLPA (and the I&I Agreement by incorporation) contained other false and misleading representations about the Mortgage Loans. In particular, GMACM misrepresented that, as of the closing: (i) the information set forth in the Mortgage Loan Schedule is true and correct in all material respects; (ii) no Mortgage Loan was 30 days or more

- 58 -

**PX 0725 pg. 58 of 100**

RC_FGIC9019_00000761

delinquent as of March 1, 2006; (iii) each Mortgage File contains all required documents and instruments; (iv) the CLTV of each Mortgage Loan did not exceed 100%; and (v) GMACM selected the Mortgage Loans in accordance with its underwriting guidelines (*i.e.* the Home Equity Loan Program). The true information regarding these loans—as known by GMACM—simply could not substantiate GMACM's assurances. In short, no amount of GMACM promising that the loans met certain standards, despite knowing otherwise, actually made those promises true.

186.    GMACM knew that its representations were materially false and that these false representations were essential to FGIC's decision to issue the Policy. GMACM intentionally made these material misrepresentations to induce FGIC to enter into the I&I Agreement and to issue the Policy.

187.    GMACM knew when making the representations and warranties regarding the Mortgage Loans to FGIC prior to FGIC agreeing to issue the Policy that GMACM never intended to honor those representations and warranties, as is evidenced, *inter alia*, by the extraordinary breadth and depth of the problems FGIC has uncovered with respect to the underwriting and characteristics of those loans, and the poor performance of the 2006-HE1 Trust. In short, in order to induce FGIC to issue the Policy, GMACM represented to FGIC that, if FGIC issued the Policy, GMACM would comply with its contractual representations and warranties, despite knowing that it had not complied—and would not comply—with those very same obligations.

188.    GMACM's repeated fraudulent acts have exposed it to investigations by the DOJ and the SEC, including the receipt of a subpoena served in connection with GMACM's

- 59 -

PX 0725 pg. 59 of 100

RC_FGIC9019_00000762

suspected fraudulent origination and underwriting practices, as well as to a multitude of suits and the potential for more litigation to come.

189.    Consistent with this pattern of behavior, GMACM defrauded FGIC into issuing the Policy, through its knowing misrepresentations.

### I.    Ally Bank Aids and Abets GMACM's Fraud

190.    Ally Bank provided substantial assistance to GMACM in fraudulently inducing FGIC to issue the Policy. In its role as Custodian—for which it received substantial fees—Ally Bank undertook to provide "prompt written notice" to FGIC of any breaches of the representations and warranties in the MLPA that it discovered. The MLPA, *see supra* at ¶ 94, contained several representations and warranties regarding the characteristics of the underlying Mortgage Loans as well as loans subsequently transferred to the 2006-HE1 Trust.

191.    As an originator of nearly 60% of the Mortgage Loans, Ally Bank was well aware of the true nature of the Loan Pool. Moreover, as a result of being a key part of the 2006-HE1 Transaction and its affiliate status with GMACM, Ally Bank must have been aware of the representations and warranties GMACM routinely made to financial guaranty insurers—and did make here to FGIC—regarding the nature of GMACM's business practices and the quality of the mortgage loans that collateralized its many RMBS transactions, including the 2006-HE1 Transaction.

192.    Against this backdrop, Ally Bank represented to FGIC that, if the 2006-HE1 Transaction was consummated, it (Ally Bank) would hold and monitor certain key information and documentation regarding the Mortgage Loans, and would provide notice to FGIC of any breaches by GMACM of which it was aware with respect to GMACM's representations and warranties to FGIC. As must have been known to Ally Bank, these representations and warranties made by GMACM directly concerned the Mortgage Loans, including the 60% of

- 60 -

**PX 0725 pg. 60 of 100**

RC_FGIC9019_00000763

them that Ally Bank itself had originated. Ally Bank made these representations to FGIC with full knowledge that GMACM had not complied—and would not comply—with its relevant representations and warranties, and, accordingly, that they were false. By representing to FGIC that it would (a) hold and certify the accuracy of certain key information and documentation regarding the Mortgage Loans, the majority of which it had originated itself, and (b) inform FGIC of any failure by GMACM to comply with its obligations, Ally Bank materially aided GMACM's fraudulent inducement of FGIC to issue the Policy. The issuance of the Policy, which made the 2006-HE1 Transaction possible, inured to the significant financial benefit of Ally Bank, given that it collected substantial fees as Custodian and also perpetuated the market for its loan origination and sales business.

### J.    Ally Financial Aids and Abets GMACM's Fraud

193.    Ally Financial provided substantial assistance to GMACM in fraudulently inducing FGIC to issue the Policy. As the ultimate parent of an intertwined corporate enterprise, the subsidiaries of which were substantially involved in every aspect of Ally Financial's securitization business, Ally Financial was well aware of the true nature of the Mortgage Loans. Moreover, as discussed above, Ally Financial was aware of the representations and warranties GMACM made regarding the nature of GMACM's business practices and the quality of the Mortgage Loans and that such representations and warranties were false.

### K.    The Managed Amortization Event

194.    As discussed below, under the plain language of the 2006-HE1 Transaction documents, GMACM failed to properly give effect to the existence of a "Managed Amortization Event." Accordingly, GMACM improperly added 12,712 new loans, having an aggregate principal amount of approximately $580 million, to the 2006-HE1 Trust through subsequent transfers.

- 61 -

RC_FGIC9019_00000764

### (1)    The Operative Documents Control the Occurrence of a Managed Amortization Event

195.    Under the Operative Documents, GMACM, as Servicer of the 2006-HE1 Trust, is required to establish a Custodial Account in which it must deposit any payments made by borrowers on the Mortgage Loans (*i.e.*, the principal and interest payments made by mortgagors). *See* Servicing Agreement § 3.02(b).

196.    Additionally, under the Operative Documents, the Indenture Trustee is required to establish a segregated trust account known as the Funding Account. *See* Servicing Agreement § 3.16(a). As Servicer of the 2006-HE1 Trust, GMACM is required, "on each Payment Date during the Revolving Period, . . . to withdraw from the Custodial Account and deposit into the Funding Account the aggregate amount of Principal Collections remaining after the purchase of all Additional Balances or Subsequent Mortgage Loans on or prior to such Payment Date." Servicing Agreement § 3.16(a).

197.    A revolving period, in the context of a securitization, is generally the time during which cash available to the trust may properly be reinvested in new collateral for the pool rather than being used to repay the securities. Under the Operative Documents for the 2006-HE1 Transaction, the Revolving Period was defined as: "the period beginning on the Closing Date and ending on the earliest of (i) the Payment Date occurring in September 2007, (ii) the occurrence of a Managed Amortization Event or (iii) the occurrence of a Rapid Amortization Event." Indenture, Appendix A. As further described below, a "Managed Amortization Event" was defined as a period beginning on the first date when the balance of the particular account from which cash available to the trust may properly be reinvested in new loans for the pool, for any reason, exceeds a specified amount. *See id.*

- 62 -

RC_FGIC9019_00000765

198.    In the 2006-HE1 Transaction. during the Revolving Period. GMACM could use

the funds in the Funding Account. subject to certain conditions, to purchase:

> Subsequent Mortgage Loans that are HELOCs, if any, in an
> amount equal to (1) the aggregate Principal Balance of all such
> Subsequent Mortgage Loans purchased from such Seller during the
> related Collection Period or (2) if the Servicer has applied amounts
> on deposit in the Custodial Account representing Principal
> Collections for such Collection Period toward the purchase of
> Subsequent Mortgage Loans that are HELOCs, the excess if any,
> of the aggregate Principal Balance of all such Subsequent
> Mortgage Loans purchased from such Seller over such Principal
> Collections.

Servicing Agreement § 3.16(c)(i)(B).

199.    In consideration for the payment of funds from the Funding Account. the

Operative Documents require that the seller from whom the new loans are purchased transfer the

new loans into the 2006-HE1 Trust. *See* MLPA § 2.2(a). The MLPA also requires GMACM to

deliver to FGIC. within five days after the transfer, a copy of the Mortgage Loan Schedule

reflecting the Subsequent Mortgage Loans in electronic format. *See* MLPA § 2.2(c). Further, if

a Subsequent Mortgage Loan is outside certain criteria. GMACM is required to seek and obtain

FGIC's agreement to the transfer of the mortgage loan to the 2006-HE1 Trust as a Subsequent

Mortgage Loan. subject to certain conditions. including that GMACM must increase the over-

collateralization amount for 2006-HE1 Trust in order to reduce FGIC's potential exposure. *See*

MLPA § 2.2(d).

200.    Significantly, GMACM may transfer Subsequent Mortgage Loans only if "the

Revolving Period shall not have terminated." MLPA § 2.2(b)(v). The Revolving Period ends,

*inter alia*. upon "the occurrence of a Managed Amortization Event." Indenture, Appendix A.

201.    A Managed Amortization Event, as defined in the current version of the Indenture,

is "deemed to occur if . . . for any three month consecutive period. the average of the daily

- 63 -

RC_FGIC9019_00000766

balances on deposit in the Funding Account for such three consecutive months is greater than $10,000,000." Indenture, Appendix A.

### (2)   The Initial Managed Amortization Event Definition

202.   The currently operative version of the Managed Amortization Event definition was included in the Indenture in or around May 2006—approximately six weeks after the initial closing date of the 2006-HE1 Transaction.

203.   At the closing of the 2006-HE1 Transaction on March 30, 2006, the Prospectus Supplement issued by GMACM in conjunction with the offering of the 2006-HE1 Notes and dated March 29, 2006, defined a Managed Amortization Event as "the event deemed to occur on any date on which the amount on deposit in the Funding Account equals or exceeds $10,000,000." Prospectus Supplement at S-64. As relevant here, then, the Operative Documents strictly limited the transfer of Subsequent Mortgage Loans to the 2006-HE1 Trust by creating an iron-clad requirement: that the Revolving Period shall not have terminated due to a Managed Amortization Event having been triggered by the Funding Account having a balance of greater than $10,000,000.

204.   In April 2006, the Funding Account held an ending balance of nearly $15,000,000. As such, under the then-operative definition, a Managed Amortization Event would have been triggered almost as soon as the 2006-HE1 Transaction closed. FGIC was not aware, and GMACM did not provide notice, of the fact that the Managed Amortization Event had been triggered. Accordingly, GMACM has breached the I&I Agreement sections 2.02(a).

### (3)   GMACM Changes the Managed Amortization Event Definition After a Managed Amortization Event Has Already Occurred

205.   Sometime in or around late April to early May 2006, GMACM approached FGIC in an effort to change the definition of Managed Amortization Event under the Operative

- 64 -

RC_FGIC9019_00000767

Documents. Ultimately, FGIC agreed to GMACM's proposed change, as reflected in Appendix A to the Indenture, such that the Managed Amortization Event was deemed triggered "if, beginning in June 2006, for any three month consecutive period, the average of the daily balances on deposit in the Funding Account for such three consecutive months is greater than $10,000,000." Although GMACM never executed a formal amendment to the Operative Documents, and did not obtain the consent of either the relevant credit rating agencies or the Indenture Trustee, the altered Indenture, together with its Appendix A containing the governing definitions, was filed with the SEC on or about May 17, 2006, and is dated "as of March 30, 2006 [i.e., the closing date]."

206.    Assuming that the revised definition was operative on or about May 17, 2006, the Operative Documents still strictly limit the transfer of Subsequent Mortgage Loans to the 2006-HE1 Trust, although the altered—but still inflexible—requirement is that the Revolving Period shall not have terminated due to a Managed Amortization Event having been triggered by the existence of a three-consecutive-month period in which the Funding Account held an average daily balance of greater than $10,000,000.

### (4)    A Managed Amortization Event Occurs Under GMACM's Modified Definition

207.    In the three-consecutive-month period from May 2006 to July 2006, the Funding Account held an average daily balance of greater than $10,000,000, such that a Managed Amortization Event was deemed to have occurred as of July 2006.

208.    Accordingly, by operation of clear and express provisions in the Operative Documents, the Revolving Period automatically (and without the need for any action by any party) ended at the time that such Managed Amortization Event occurred. Once the Revolving Period ended, GMACM was prohibited from transferring any new loans to the 2006-HE1 Trust.

- 65 -

RC_FGIC9019_00000768

209.    Notwithstanding this fact, GMACM failed to calculate and give effect to the fact
that a Managed Amortization Event had occurred in July 2006, ending the Revolving Period, and
continued to improperly transfer Subsequent Mortgage Loans into the 2006-HE1 Trust. *See*
MLPA § 2.2(b)(v); Indenture, Appendix A.

210.    Notwithstanding the termination of the Revolving Period, GMACM improperly
sold and added to the 2006-HE1 Trust, through fifteen (15) Subsequent Transfers, an aggregate
principal amount of $578,445,325.61 in improper Subsequent Mortgage Loans.

211.    The below table sets forth the amount of principal balance in each of the fifteen
(15) improper Subsequent Transfers that GMACM effected:

| Month | Subsequent Transfer Amount ($) |
|---|---|
| Jul-06 | 32,099,929.96 |
| Aug-06 | 37,199,985.80 |
| Sep-06 | 38,299,997.82 |
| Oct-06 | 42,999,999.71 |
| Nov-06 | 37,499,997.95 |
| Dec-06 | 27,101,022.31 |
| Jan-07 | 53,937,029.04 |
| Mar-07 | 67,749,920.19 |
| Apr-07 | 44,924,807.40 |
| May-07 | 36,359,900.58 |
| Jun-07 | 34,560,875.41 |
| Jul-07 | 36,821,863.64 |
| Aug-07 | 33,499,999.50 |
| Sep-07 | 29,099,337.99 |
| Oct-07 | 26,290,658.11 |
| **Total** | **578,445,325.61** |

212.    Further, the Subsequent Mortgage Loans transferred into the 2006-HE1 Trust
have performed much worse than the initial and pre-funded Mortgage Loans. As of October 1,
2011, approximately 20% of the balance of the over $578 million in improperly transferred
Subsequent Mortgage Loans has been charged-off, defaulted, or was severely delinquent, as

- 66 -

**PX  0725 pg.  66 of 100**

RC_FGIC9019_00000769

compared to approximately 12.7% of the balance of the earlier Mortgage Loans as of the same
time period.

213.    With respect to each Subsequent Transfer for which FGIC received the required
Subsequent Transfer Agreement, GMACM restated therein all applicable representations and
warranties regarding the mortgage loans and that it was complying with the requirements of the
Operative Documents, including that its actions were not in contravention of any of those
agreements. GMACM further certified that it had satisfied each condition precedent to effecting
a Subsequent Transfer even though this was untrue as the occurrence of a Managed Amortization
Event in July 2006 had ended the Revolving Period and precluded any Subsequent Transfers.

214.    In short, Subsequent Mortgage Loans were improperly transferred to the 2006-
HE1 Trust despite the fact that a Managed Amortization Event had already triggered the
termination of the Revolving Period. GMACM had no authority to execute such transfers. As
such, under the express terms of the Operative Documents, the subsequently transferred loans
were not properly transferred to the 2006-HE1 Trust in accordance with the terms of the 2006-
HE1 Transaction, constituting yet another breach of the I&I Agreement. Moreover, the
Subsequent Transfer Agreements, which were executed by GMACM and purported to
permissibly transfer Subsequent Mortgage Loans to the 2006-HE1 Trust, were improper on their
face due to the occurrence of the Managed Amortization Event prohibiting any subsequent
transfers of Mortgage Loans. Consequently, GMACM committed multiple breaches of
representations and warranties made in the MLPA stating that all Subsequent Transfer
Agreements are valid and that their execution does not constitute a material breach of any
agreements to which GMACM is a party. *See* MLPA § 3.1(a)(iv),(vii). Pursuant to the terms of
the I&I Agreement, because GMACM has breached multiple representations and warranties

- 67 -

RC_FGIC9019_00000770

contained in section 3.1 of the MLPA, GMACM is obligated to repurchase all Subsequent

Mortgage Loans improperly transferred to the 2006-HE1 Trust. *See* I&I Agreement § 2.01(I).

**L.  GMACM's Breach of Obligations as Servicer**

215.  GMACM, as Servicer, failed in numerous material respects to properly perform

its duties to service and administer the Mortgage Loans in accordance with the provisions of the

relevant Operative Documents for the 2006-HE1 Transaction, including, but not limited to, its

obligations to follow proper servicing procedures.

216.  GMACM took responsibility for the servicing of the Mortgage Loans and had

certain related contractual obligations under the I&I Agreement and the Servicing Agreement

with respect to the 2006-HE1 Transaction.  Under the I&I Agreement, GMACM covenanted that

"[a]ll Mortgage Loans will be serviced in all material respects in compliance with the [Servicing

Agreement]." I&I Agreement § 2.02(I). Under the Servicing Agreement, GMACM is liable to

FGIC for the servicing and administering of the Mortgage Loans, and in doing so is required to

"follow such collection procedures as shall be normal and usual in its general mortgage servicing

activities and consistent with the procedures the Servicer employs in servicing all other

Mortgage Loans in the servicing portfolio with characteristics similar to those of the Mortgage

Loans." Servicing Agreement §§ 3.02(a), 6.01.

217.  During 2007, the servicing operations of GMACM were integrated into ResCap.

Since the time of the integration, on information and belief, GMACM breached these obligations

by, among other things, being deficient in its borrower contact, collections, and loss mitigation

standards, and by failing to honor FGIC's contractual rights to information.  In particular, an

onsite review of the Ally Financial servicing arm's headquarters, including those of GMACM,

on March 25, 2009 by FGIC and a third party firm, and subsequent analysis, revealed *inter alia*:

(i) inadequate call center staffing—staffing unable to handle increased incoming and outgoing

- 68 -

RC_FGIC9019_00000771

call volumes; (ii) call center staffing turnovers as high as 40% in a single year; (iii) a calling campaign that does not attempt to contact borrowers through other means when GMACM does not have a viable number or the borrower is continuously unresponsive to messages left; (iv) a lack of effort to hire personnel to visit the mortgaged property to discuss loss mitigation strategies with borrowers in default; and (v) severely infrequent use of alternative loss mitigation strategies as compared to the industry GMACM, as servicer, also had an obligation to notify FGIC of any material breaches of representations and warranties, and to cause GMACM, as seller, to repurchase the affected Mortgage Loans.

218.    On information and belief, GMACM has failed to remedy any of its deficient servicing practices.

219.    In addition, GMACM disclosed to FGIC for the first time in March 2009 that it classified loans into one of three categories or "Risk Tiers" under a servicing protocol ("Risk Protocol"). Such an approach was, upon information and belief, part of the further cost-cutting measures implemented under the direction of Ally Financial when all of the servicing operations were integrated.

220.    FGIC was damaged by the use of the Risk Protocol following the Ally-directed integration. Under the Risk Protocol, the timing and frequency of calls made with respect to a loan are determined in accordance with the loan's assigned category or Risk Tier. GMACM disclosed to FGIC that all of the mortgage loans in FGIC-insured, GMACM-serviced transactions (over 90,000 mortgage loans), including all of the Mortgage Loans in the 2006-HE1 Transaction, were placed in the lowest category of risk. For such mortgage loans, regardless whether they were (i) first- or second-lien, (ii) underwritten under less stringent guidelines, or (iii) originated by non-GMAC entities—all of which are factors that require more attentive

- 69 -

RC_FGIC9019_00000772

servicing—delinquent borrowers were called at a later stage of delinquency and less frequently than loans in higher risk categories. As the purchaser of the Mortgage Loans, however, GMACM clearly knew that such Mortgage Loans, by their very nature, required particularized servicing before the implementation of the Risk Protocol. The Mortgage Loans were therefore knowingly miscategorized and neglected, and intentionally received much less care than if they had been properly categorized and appropriately serviced. Consequently, the failure by GMACM to ensure that the Mortgage Loans were serviced and administered in accordance with "procedures as shall be normal and usual in its general mortgage servicing activities" constitutes a breach of the Servicing Agreement and the I&I Agreement. *See* Servicing Agreement §§ 3.02(a), 3.04; I&I Agreement § 2.02(l).

221.    On July 8, 2009, FGIC requested: (1) additional information concerning the various Risk Tiers generally, and (2) documentation in order to assess whether or not FGIC was being harmed as a result of being placed in the lower risk tier. To date, GMACM has failed to provide such information in breach of Section 2.02(c)(v) of the I&I Agreement.

### M.    Ally Financial's Domination and Control of its Subsidiaries Results in an Integrated, Single Corporate Enterprise

222.    As discussed in greater detail below, Ally Financial is the ultimate parent of all of the other Defendants to this action. Ally Financial owns ResCap, which owns GMACM and RFC. Ally Financial—as the ultimate parent of ResCap, GMACM, Ally Bank, and RFC—has the practical ability, which it has repeatedly and admittedly exercised, to direct and control the actions of its subsidiaries, including ResCap, GMACM, Ally Bank, and RFC.

223.    As also discussed below, Ally Financial has exercised such domination and control over its subsidiaries, including ResCap, GMACM, Ally Bank, and RFC. Ally Financial exercised its direction and control in connection with the 2006-HE1 Transaction. At times, Ally

- 70 -

RC_FGIC9019_00000773

Financial performed such direction and control by using ResCap as an instrument to effect its goals.

224. As mentioned above, Ally Financial has recently admitted to the Federal Reserve Board and FDIC that it "indirectly owns and controls . . . numerous direct and indirect nonbank subsidiaries, including Residential Capital, LLC . . . ('ResCap'), and its direct and indirect subsidiaries." *See In re Ally Fin. Inc.*, FRB Docket Nos. 11020-B-HC & 11020-B-DEO, FDIC-11-123b (April 13, 2011) (emphasis added).

225. As further discussed below, Ally Financial's public statements and actions at or around the time of the Transaction's close until present, also demonstrate that Ally Financial: (i) owns a majority of its subsidiaries' stock; (ii) shares resources, management and employees with its subsidiaries; (iii) considers its mortgage businesses to be "units" of its business; and (iv) has a business relationship with its subsidiaries designed to benefit itself at the expense of its subsidiaries.

#### (1) Evidence of Ally Financial's Domination of GMACM Directly and Indirectly Through its Control of ResCap

226. From its inception as the ultimate parent company, Ally Financial focused on controlling the management of its subsidiaries to the point that it treated ResCap as an extension of itself, rather than a subsidiary whose dealings were at arm's length.

227. ResCap, for example, did not conduct any operations whatsoever until GMAC Residential Holding Corp. and GMAC-RFC Holding Corp.—two of Ally Financial's wholly-owned subsidiaries—were transferred to it in March 2005. Those two subsidiaries represented substantially all of Ally Financial's mortgage securitization business.

228. Ally Financial, at the direction of its board of directors, also provided ResCap with liquidity and capital.

- 71 -

PX 0725 pg. 71 of 100

RC_FGIC9019_00000774

229.    Further, in Ally Financial's 8-K, filed on June 9, 2005, it disclosed that ResCap
would enter into an operating agreement with Ally Financial, under which Ally Financial would
agree to "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap]
suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries."
Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005 (hereinafter "2005
Operating Agreement").

230.    On information and belief, Ally Financial's restructuring and financial support of
its subsidiaries was undertaken at the direction of the Ally Financial board of directors in order to
improve and maintain the investment grade rating and profitability of Ally Financial's mortgage
securitization business. This restructuring then enabled Ally Financial to present itself to its
subsidiaries' securitization transaction partners—including FGIC—as a stable corporate parent
supporting and overseeing the business of its subsidiaries, which in turn made those subsidiaries
more attractive as counterparties to market participants, such as FGIC.

231.    On December 1, 2006, Ally Financial had its inaugural conference call with
investors, at which time Rick Buxton, the then head of Ally Financial's Investor Relations,
"welcome[d everyone] to the beginning of a new era [of Ally Financial] as an independent global
financial services company." On the same investor call, Eric Feldstein, Ally Financial's then
CEO, demonstrated how Ally Financial was going to take initial steps to actively control its
subsidiaries. For instance, Feldstein declared that one of Ally Financial's first acts as controlling
parent was "to integrate certain of GMAC mortgage operations . . . with RFC operations . . . to
drive some cost efficiencies." *Id.*

- 72 -

**PX  0725 pg. 72 of 100**

RC_FGIC9019_00000775

232.    At all times since Ally Financial caused ResCap to be incorporated, it has owned 100% of ResCap.[1]  Since incorporation, the ownership of ResCap has not changed—Ally Financial still "owns 100% of ResCap . . . ." Ally Financial Earnings Call dated Nov. 2011, statement by Michael Carpenter, Ally Financial's CEO.

233.    Ally Financial has continued to exert its domination and control over ResCap via shared resources, management and employees.  For example, Ally Financial and ResCap shared at least three common board members, including two individuals who were active participants with respect to the intertwined relationship between Ally Financial and ResCap: (1) ResCap's chairman and Ally Financial's CEO, Eric Feldstein; and (2) Ally Financial's CFO and a director of ResCap, Sanjiv Khattri.  In fact, the proposed 2005 operating agreement, between ResCap and Ally Financial, which Ally Financial filed with the SEC, and which upon information and belief is still currently in effect, "*require[s]* that [ResCap's] board of directors include at least two independent directors, *to be selected by GMAC*."  Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005 (hereinafter "2005 Operating Agreement") (emphasis added).

234.    Moreover, on April 26, 2007, "ResCap Investor Relations" announced the release of Ally Financial's 2007 first quarter financial results to investors in an email bearing the ResCap logo.  That announcement stated that Ally Financial's financial results were found on both Ally Financial's and ResCap's websites.

---

[1] GM had created a shell company, GMAC Mortgage Group Inc., which was the direct parent of ResCap. However, there is no indication that this company conducted any business independent from Ally Financial.  In fact, Ally Financial's first Annual Report as an independent entity, which was filed with the SEC on March 3, 2007, included a corporate hierarchy chart that evidenced Ally Financial's corporate structure.  There was a direct line from Ally Financial to ResCap.  *See* Ally Fin. Form 10-K, at 2 (March 3, 2007).  In addition, there is no indication that Ally Financial ever discusses ResCap as an "indirect subsidiary."  To the contrary, as discussed, below, Ally has publicly stated on numerous occasions that it is the owner of ResCap.

- 73 -

RC_FGIC9019_00000776

235.   Moreover, David C. Walker, as discussed above, has served as Vice President of GMAC Group and CFO of GMAC Mortgage Group, and as of September 29, 2005, was a director at ResCap, GMACM, RFC, and RAMP, among other Ally Financial subsidiaries.

236.   Similarly, as noted above, William F. Muir, Ally Financial's President, has also served as President and Chairman of the Board of IB Finance Holding Company, LLC—the direct parent of Ally Bank—and as a director of Ally Bank.

237.   Ally Financial's domination and control of its subsidiaries, and in particular its use of ResCap to effectuate that control, is further evidenced by John Ruckdaschel, who, according to publicly available information, has served as in-house counsel at Ally Financial since October 2006.   According to an e-mail sent from ResCap to FGIC, Ruckdaschel has served as "internal legal counsel for all [] securitizations" since at least May 2008.  Although purportedly an Ally Financial employee, Ruckdaschel also sent and received e-mail using a ResCap e-mail address.  Further, an employee of ResCap specifically instructed FGIC that all "official letters" regarding several Ally Financial subsidiaries—including GMACM, RAMP and others—should be sent not to the relevant (and supposedly independent) subsidiary, but rather to Ruckdaschel, Ally Financial's internal counsel.  Additionally, Ruckdaschel received correspondence relating to the Operative Documents at issue in this Transaction.

238.   As further evidence of Ally Financial's domination over ResCap, the 2005 Operating Agreement also indicates that Ally Financial has expressly "restrict[ed] ResCap's ability to declare dividends or prepay subordinated indebtedness owed to [Ally Financial] or its other affiliates." *See id.*

239.   Conversely, Ally Financial has also agreed to directly pay the losses or expenses of ResCap.  In the same 2005 Operating Agreement, Ally Financial stated that it would stand

- 74 -

PX 0725 pg. 74 of 100

RC_FGIC9019_00000777

behind ResCap and "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries." *Id.*

240. Ally Financial has continued to make additional public statements that further demonstrate its willingness to support and fund ResCap. For instance, in May 2007, during an investor earnings call, Sanjiv Khattri, the Executive Vice President and Chief Financial Officer of Ally Financial, repeatedly made statements that Ally Financial's board of directors "will take whatever reasonable efforts that need to be done to maintain [ResCap's] earnings." Ally Financial's Q1 2007 Earnings Call at 24 (May 2, 2007). Khattri pointed to the fact that "the [Ally Financial] Board . . . and [Ally Financial] did not hesitate to inject a billion dollars of equity when it was appropriate . . . ." Ally Financial's Q2 2007 Earnings Call at 9 (July 30, 2007). Khattri unequivocally stated that "[a]ll I can assure you [is] that if you look at the strategic plan of [Ally Financial], a strong ResCap with an investment grade rating is a key part of our plan and a key part of our value creation." *Id.* (emphasis added). Thus, Ally Financial's senior management assured the market that Ally Financial was supporting ResCap for the purposes of Ally Financial's own "value creation."

241. The financial support Ally Financial gave to ResCap began as far back as May 2005 and has persisted over many years. Upon information and belief, Ally Financial continued to prop up ResCap, an undercapitalized entity, by channeling capital and liquidity into ResCap even as its condition continued to deteriorate as the housing market crashed. In addition to the direct financial support Ally Financial contributed to ResCap, it was also instrumental in obtaining outside investments that flowed directly to its mortgage subsidiaries. In 2008, Ally Financial announced to the market that it renewed a funding facility with Citibank, which

- 75 -

RC_FGIC9019_00000778

provided "funding of up to $13.8 billion." Ally Fin. Inc., Form 8-K (Sept. 19, 2008). A portion of such funding was specifically earmarked for "mortgage assets across the [Ally Financial] and [ResCap] businesses." *Id.*

242. Indeed, Ally Financial's 2011 annual report states that "ResCap remains heavily dependent on [Ally Financial] and its affiliates for funding and capital support." Ally. Fin. Inc., Annual Report (Form 10-K), at 128 (Feb. 28, 2012).

243. Additionally, Annual Reports prepared by Ally Financial further note its pursuit of strategic alternatives with ResCap, and highlight the extent to which Ally Financial manipulated its control over its subsidiaries to enhance its own financial health. According to Ally Financial: "On December 31, 2009, we announced that due to our ongoing strategic review of how to best deploy GMAC's current and future liquidity, we decided to pursue strategic alternatives with respect to ResCap and committed to a plan . . . related to management's intent to sell certain ResCap related assets and businesses. . . . In order to maximize value, we will consider a variety of options including one or more sales, spin-offs, or other potential transactions . . . [that we believe] should minimize the impact of any significant future losses related to ResCap's legacy mortgage business . . . ." Ally Fin. Inc., Annual Report (Form 10-K), at 3-4 (Feb. 26, 2010).

244. There is also substantial evidence that billions of dollars of TARP funds meant to stabilize Ally Financial were given to ResCap by Ally Financial. *See* TARP Report dated March 10, 2010, at 41, 44 (hereinafter "TARP Report"). Upon information and belief, the TARP funds were commingled among a variety of entities within Ally Financial's mortgage family, including ResCap.

- 76 -

RC_FGIC9019_00000779

245.    Further, Ally Financial has established a "Mortgage Repurchase Reserve" to account for the potentially significant liabilities stemming from repurchase demands made on its mortgage-related subsidiary business units. The balance of the Mortgage Repurchase Reserve was $825 million as of the fourth quarter of 2011. *See* Ally Financial's 4Q 2011 Earnings Presentation at 16. Although these repurchase demands are generally made on Ally Financial's subsidiaries—such as GMACM—in discussing the reserve on an earnings call, Ally Financial CFO Jim Mackey made clear that it was Ally Financial that was recording "repurchase expense[s]" related to mortgages, as he stated that Ally Financial "had lower mortgage repurchase expense of $44 million." Ally Financial's Q4 2011 Earnings Call at 4 (Feb. 2, 2012).

246.    Similarly, in discussing Ally Financial's Mortgage Repurchase Reserve on Ally Financial's third quarter 2011 earnings call, Mackey further described losses attributable to mortgage loan repurchases as belonging to Ally Financial, when he stated: "Our mortgage repurchase reserve is [as it then stood] $829 million . . . . Our loss experience improved during the quarter due to the fact that we had fewer mortgage insurance rescission payments that we experienced last quarter and that did not repeat this quarter." Ally Financial's Q3 2011 Earnings Call at 6 (Nov. 2, 2011) (emphases added). On the same call, Ally Financial CEO Carpenter explained that "we have routinely repurchased problem loans voluntarily and by contract . . . ." *Id.* at 8 (emphasis added).

247.    Additionally, as discussed above, Ally Financial recorded a $230 million charge in the fourth quarter of 2011, $212 million of which was recorded at its controlled subsidiary, ResCap. As a result of the penalties assessed against ResCap by government regulators, and the fact that ResCap failed to maintain sufficient tangible net worth to comply with the requirements of the terms of certain credit facilities, Ally Financial propped up its subsidiary ResCap with a

- 77 -

RC_FGIC9019_00000780

$197 million capital contribution in the form of intercompany debt forgiveness. *See* Ally Fin.

Inc., Form 10-K, at 31-32 (Feb. 28, 2012).

### (2)    Ally Financial Has Disregarded Corporate Formalities and Treated Its Businesses as a Single Enterprise

248.    Ally Financial describes its subsidiaries as its own business units rather than

separate and distinct entities. For example, Ally Financial declares, in a section of its website

specifically intended to inform investors, that GMACM is a "business unit" of Ally Financial,

rather than an indirect subsidiary owned by ResCap. *See* Ally Financial Website, Ally Home >

About Ally > Investor Relations, *available at* http://www.ally.com/about/investor/ (last visited

March 27, 2012).

249.    In line with Ally Financial's current classification of its mortgage businesses as

"units" of Ally Financial, it has consistently been involved in the day-to-day operations of its

subsidiaries. For example, at least one individual, who was identified at various times as being a

GM and/or Ally Financial employee, was on the working group list for transactions involving

ResCap subsidiaries that FGIC insured, including this Transaction. He was included on

communications surrounding the deal document drafting processes from commencement to

close. Such communications sent to him concerned both the negotiation of the various Operative

and Offering Documents, as well as the final executed versions of the Operative and Offering

Documents, including the fraudulent representations, warranties, and affirmative covenants that

are at issue in this action.

250.    The origination and securitization of mortgage loans by ResCap and its

subsidiaries have long been integral parts of Ally Financial's core business. In its 2006 Annual

Report, Ally Financial (then reporting as GMAC LLC) stated that "[w]e are a leading real estate

finance company focused primarily on the residential real estate market. Our business activities

- 78 -

RC_FGIC9019_00000781

include the origination, purchase, servicing, sale and securitization of residential mortgage loans." GMAC LLC, Annual Report (Form 10-K), at 3 (Mar. 13, 2007) (emphasis added). Ally Financial further stated that "we utilize asset and mortgage securitizations and sales as a critical component of our diversified funding strategy." *Id.* at 5 (emphasis added).

251.    Ally Financial continued to publicly report on its own business and that of its subsidiaries in later filings on an integrated basis: "We engage in the origination, purchase, servicing, sale, and securitization of consumer (i.e., residential) mortgage loans and mortgage-related products. Mortgage operations include the Residential Capital, LLC (ResCap) legal entity, [and] the mortgage operations of Ally Bank . . . ." Ally Fin. Inc., Annual Report (Form 10-K), at 3 (Feb. 26, 2010). More recently, continuing to discuss its various mortgage operations as a single enterprise, Ally Financial stated that "[o]ur Origination and Servicing operations is one of the leading originators of conforming and government-insured residential mortgage loans in the United States. We are one of the largest residential mortgage loan servicers in the United States and we provide collateralized lines of credit to other mortgage originators." Ally Fin. Inc., Annual Report (Form 10-K), at 4 (Feb. 28, 2012).

252.    Moreover, as discussed above, Ally Financial—at least in the view of certain of ResCap's bondholders—is believed to have stripped assets from its subsidiary.

253.    In addition to the dominance and control Ally Financial exerted over its mortgage units, ResCap also viewed GMACM and RFC as part of its own business. For example, in its investor presentation from 2007, ResCap declares that GMACM and RFC "are owned and *operated* by GMAC Residential Capital Company, LLC [ResCap]." It further states that ResCap "is part of the [Ally Financial] family of companies." As discussed above, Ally Financial exerted its dominance and control over ResCap. Upon information and belief, when Ally

- 79 -

**PX 0725 pg. 79 of 100**

RC_FGIC9019_00000782

Financial was not directly controlling GMACM and RFC, it was using ResCap as an instrument to do so.

254. Ally Financial is currently using its subsidiaries' resources as its own in order to earn favorable ratings by credit rating agencies. For instance, a report put out by Moody's in November 2011 rated Ally Financial as an "above average" originator of mortgage loans. It is evident from that report that Ally Financial obtained such a rating by providing information related to its mortgage units, including GMACM and Ally Bank. Ally Financial itself is not engaged in the origination business. Instead, it is using its mortgage units as instruments to obtain favorable ratings.

255. Such disregard for the corporate form has persisted over time. For instance, Fitch Ratings in 2007 publicly reported that "operations of [Ally Financial]'s residential mortgage servicing businesses—which include [GMACM, RFC], and HomeComings Financial Network— have been integrated into" ResCap. Moreover, Moody's reported that in 2007, "ResCap combined all servicing operations under one servicing entity . . . under common management [and] common systems . . . ." There is no indication that either RFC or GMACM has ceased operations or been sold to other entities or investors. Thus, upon information and belief, ResCap has conflated various businesses that currently have extensive third-party contractual relationships, such as the one GMACM has with respect to the 2006-HE1 Transaction as Servicer.

256. Even the employees of Ally Financial's subsidiaries think of themselves as employees of Ally Financial rather than separate entities since there appears to be no difference. For example, Thomas F. Marano, served as an officer of Ally Financial as well as Chairman and CEO of ResCap. His responsibilities include overseeing the mortgage lending and servicing in

- 80 -

RC_FGIC9019_00000783

ResCap. In testimony before the House Financial Services Subcommittee on November 18, 2011, Marano stated that "Ally [Financial]'s mortgage business is conducted through GMAC Mortgage." Upon information and belief. Marano—in his dual role as an officer of Ally Financial as well as Chairman and CEO of ResCap—directed and controlled the actions of GMACM and RFC.

257.   In another example, Larry Hipp, a member of ResCap's Risk Analyst/Investor Repurchase Department. communicated with FGIC regarding rescission requests using an Ally Financial email address, but in those very same emails, lists his ResCap contact information, including a ResCap email address. In addition, Ally Financial/ResCap used to send FGIC secure communications bearing a "GMAC ResCap" header, but those secure communications now have an Ally Financial header.

258.   A further example is supplied by Jeffrey Stephan, a loan officer of GMACM who was implicated in the robo-signing issues associated with servicing mortgage loans. He was asked the following questions at his deposition:

> Q:   Could you please state your name for the record.
> A:   My name is Jeffrey Stephan.
> Q:   Okay. And who do you work for?
> A:   GMAC, LLC [Ally Financial].
> Q:   And is there a difference between GMAC, LLC and GMAC Mortgage. LLC?
> A:   GMAC, LLC – I'm trying to think of the word to use – the most recent name.
> Q:   Okay.
> A:   It's GMCA [sic] Mortgage Corporation.
> Q:   Okay.
> A:   I'm not sure how you would word that.
> Q.   Okay. So are they -- does GMAC, LLC -- now has that basically taken over these other entities --
> A.   Yes.
> Q.   -- that formerly existed?
> A.   Yes.
> Q.   So these entities no longer currently exist?

- 81 -

PX 0725 pg. 81 of 100

RC_FGIC9019_00000784

> A.    Right.
> Q.    Okay. And how long then have you been employed by GMAC, LLC?
> A.    Five years.

Jeffrey Stephan Deposition, *GMAC Mortgage. LLC v. Neu*, 4:25-5:22, Dec. 10, 2009, Case No. 50 2008 CA 040805. (15th Cir. Ct., Palm Beach, Fl.).

### N.    FGIC's Contractual Remedies Under The I&I Agreement

259.    The I&I Agreement provides FGIC with broad remedies for GMACM's breaches of its representations and warranties. The breadth of these remedies provided further material inducement for FGIC to issue the Policy. Specifically, Section 5.02(b) of the I&I Agreement provides:

> Unless otherwise expressly provided, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Insurance Agreement, the Indenture or the other Operative Documents, or existing at law or in equity.

260.    Moreover, the I&I Agreement provides that, upon an "Event of Default" – which is defined to include when "[a]ny representation or warranty" by GMACM in the I&I Agreement or the Operative Documents is materially untrue or incomplete – FGIC can "take whatever action at law or in equity as may appear necessary or desirable in its judgment to collect the amounts, if any, then due under [the I&I Agreement] or any other Operative Document or to enforce performance and observance of any obligation, agreement or covenant of [GMACM]." I&I Agreement §§ 5.01(a), 5.02(a).

261.    In addition, GMACM agreed in Section 3.04(a) of the I&I Agreement:

> to pay, and to protect, indemnify and save harmless [FGIC] . . . from and against, any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages costs or expenses (including reasonable fees and expenses of attorneys . . . ) of any nature arising out of or relating to the breach

- 82 -

RC_FGIC9019_00000785

by GMACM of any of the representations or warranties contained
in Section 2.01 [of the I&I Agreement] or arising out of or relating
to the Transaction contemplated by the Operative Documents . . . .

I&I Agreement § 3.04(a).

262.    Moreover, consistent with its obligation to select Mortgage Loans that met its

published criteria, GMACM agreed to repurchase or substitute Mortgage Loans that did not

conform to GMACM's representations and warranties, and to indemnify FGIC for claims and

losses arising from GMACM's breach of any representation or warranty. *See* I&I Agreement §§

3.03(b), 3.04(a).

## FIRST CAUSE OF ACTION

### (As Against Ally Financial, ResCap, GMACM; Declaratory Relief Regarding GMACM's Indemnification Obligations)

263.    FGIC re-alleges and incorporates by reference paragraphs 1 through 262 of this

Amended Complaint.

264.    The I&I Agreement is a valid and binding agreement between the parties.

265.    FGIC has performed its obligations under the I&I Agreement.

266.    GMACM's representations and warranties were material to FGIC's decision to

insure the 2006-HE1 Notes and to issue the 2006-HE1 Policy.

267.    GMACM's pervasive and material breaches of its representations and warranties,

from the very inception of the Transaction and in the years since, constitute a material breach of

the I&I Agreement that has deprived FGIC of the purpose of the parties' bargain.

268.    Pursuant to Section 3.04(a) of the I&I Agreement, GMACM must indemnify

FGIC for any and all claims, losses, liabilities, demands, damages, costs or expenses of any

nature arising out of or relating to the breach by GMACM of any of the representations or

warranties contained in Section 2.01 of the I&I Agreement or arising out of or related to the

- 83 -

RC_FGIC9019_00000786

transactions contemplated by the related Operative Documents by reason of, among other things: (i) the breach by GMACM of any representation, warranty, or covenant under any of the related Operative Documents; or (ii) any untrue statement or alleged untrue statement of a material fact contained in the related Offering Documents or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

269.    As explained above, GMACM has breached numerous representations, warranties, and covenants in the 2006-HE1 Offering and Operative Documents. These breaches have caused FGIC to pay claims and to incur losses, costs, and expenses; and it will continue to do so.

270.    Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

271.    FGIC therefore seeks a declaration that Ally Financial, ResCap, and GMACM must jointly and severally indemnify and reimburse FGIC for all sums arising out of the 2006-HE1 Transaction for which FGIC has or will become liable, and that FGIC is entitled to immediate indemnity: (i) for all sums it has paid to date under the 2006-HE1 Policy and to the payment of all future amounts that may fall due or claims that may be presented for payment by FGIC under the 2006-HE1 Policy as and when such sums fall due or claims are presented; or, alternatively, (ii) for all loss resulting from any breaches of the representations, warranties, and covenants of the I&I Agreement or any of the related Operative Documents; or, alternatively, (iii) in an amount to be determined at trial; and an order giving effect to such indemnification.

272.    In addition, FGIC seeks a declaration that GMACM must indemnify FGIC for all sums arising out of the 2006-HE1 Transaction for which FGIC has or will become liable, and that FGIC is entitled to immediate indemnity: (i) for all sums it has paid to date under the 2006-

- 84 -

RC_FGIC9019_00000787

HE1 Policy and to the payment of all future amounts that may fall due or claims that may be presented for payment by FGIC under the 2006-HE1 Policy as and when such sums fall due or claims are presented; or, alternatively, (ii) for all loss resulting from any breaches of the representations, warranties, and covenants of the I&I Agreement or any of the related Operative Documents; or, alternatively, (iii) in an amount to be determined at trial; and an order giving effect to such indemnification.

## SECOND CAUSE OF ACTION

### (As Against Ally Financial, ResCap, GMACM: Fraudulent Inducement — I&I Agreement)

273.    FGIC re-alleges and incorporates by reference paragraphs 1 through 272 of this Amended Complaint.

274.    GMACM induced FGIC to enter into the I&I Agreement and to issue the Policy by making false representations and warranties about its business practices and the Mortgage Loans, and by agreeing to broad remedies (including indemnification) for any breach of those representations and warranties.

275.    As explained above, GMACM knowingly made materially false statements to FGIC, and/or omitted material facts from its statement to FGIC, with the intent to induce reliance by FGIC.

276.    GMACM intended for FGIC to rely on GMACM's material false statements and/or omissions. FGIC had no reason to believe that GMACM's representations were false, and reasonably and justifiably relied on GMACM's material false statements and/or omissions regarding information uniquely in the possession of GMACM when it decided to enter into the I&I Agreement and to issue the Policy for the 2006-HE1 Notes.

277.    As a result of GMACM's material false statements and material omissions from its statements, FGIC entered into the I&I Agreement, issued the Policy, and thereby agreed to

- 85 -

RC_FGIC9019_00000788

insure Notes backed by a pool of Mortgage Loans that was, in actuality, materially different from
the Loan Pool that GMACM represented would collateralize the 2006-HE1 Transaction.

278.    Ally Financial, acting directly and/or indirectly through ResCap, directed
GMACM's actions as set forth in this cause of action.

279.    As a result of GMACM's material false statements and material omissions from
its statements, FGIC has been damaged and will continue to be damaged in an amount to be
determined at trial.

280.    GMACM, ResCap and Ally Financial are jointly and severally liable for such
damages.

281.    Alternatively, GMACM is liable for such damages.

### THIRD CAUSE OF ACTION

#### (As Against Ally Financial and Ally Bank;
#### Aiding and Abetting Fraudulent Inducement — I&I Agreement)

282.    FGIC re-alleges and incorporates by reference paragraphs 1 through 281 of this
Amended Complaint.

283.    As explained above, Ally Financial provided substantial assistance to its
subsidiary GMACM in fraudulently inducing FGIC to issue the Policy.

284.    GMACM could not have perpetrated its fraudulent scheme against FGIC without
the substantial assistance of Ally Financial.

285.    Ally Financial knew that GMACM fraudulently induced FGIC to issue the Policy
for the 2006-HE1 Transaction.

286.    Ally Financial's statements materially aided GMACM's fraudulent inducement.

287.    As a result of Ally Financial's aiding and abetting GMACM's fraud, FGIC has
been damaged and will continue to be damaged in an amount to be determined at trial.

- 86 -

RC_FGIC9019_00000789

288.    Moreover, as explained above, Ally Bank provided substantial assistance to its affiliate GMACM in fraudulently inducing FGIC to issue the Policy.

289.    Ally Bank originated nearly 60% of the Mortgage Loans (amounting to over $500 million in loans), which form a substantial part of the collateral for the 2006-HE1 Transaction. Ally Bank was therefore aware of the characteristics of the Loan Pool. Ally Bank was also an affiliate of GMACM and served as Custodian of the 2006-HE1 Transaction, for which it received substantial fees. As such, Ally Bank was aware of the material misrepresentations GMACM had made to FGIC to fraudulently induce FGIC to issue the Policy. Ally Bank further represented to FGIC that it would undertake duties to monitor and certify the accuracy and completeness of the Mortgage Loan files, as well as inform FGIC of failures by GMACM to comply with its obligations under the Operative Documents. Ally Bank made these representations to FGIC despite its knowledge that GMACM had not complied—and would not comply—with its representations and warranties.

290.    Ally Bank's representations to FGIC materially aided GMACM's fraudulent inducement of FGIC to issue the Policy.

291.    As a result of Ally Bank's aiding and abetting of GMACM's fraud, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

292.    Ally Bank and Ally Financial are separately liable for their respective damages as set forth in this cause of action.

## FOURTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM: Breach of Contract—Representations, Warranties, and Affirmative Covenants)

293.    FGIC re-alleges and incorporates by reference paragraphs 1 through 292 of this Amended Complaint.

- 87 -

**PX 0725 pg. 87 of 100**

RC_FGIC9019_00000790

294.   The I&I Agreement is a valid and binding agreement between the parties.

295.   FGIC has performed its obligations under the I&I Agreement.

296.   As explained above, GMACM has materially breached its representations and
warranties under Section 2.01 of the I&I Agreement.

297.   Ally Financial, acting directly and/or indirectly through ResCap, directed
GMACM's actions as set forth in this cause of action.

298.   As a result of these breaches of contract, FGIC has been damaged and will
continue to be damaged in an amount to be determined at trial.

299.   GMACM, ResCap and Ally Financial are jointly and severally liable for such
damages.

300.   Alternatively, GMACM is liable for such damages.

### FIFTH CAUSE OF ACTION

#### (As Against Ally Bank: Breach of Custodial Agreement)

301.   FGIC re-alleges and incorporates by reference paragraphs 1 through 300 of this
Amended Complaint.

302.   The Custodial Agreement is a valid and binding agreement between the parties
thereto.

303.   FGIC is an express third party beneficiary of the Custodial Agreement.

304.   As explained above, Ally Bank has materially breached its obligations under
Sections 2.1, 2.2, and 2.3 of the Custodial Agreement.

305.   Ally Financial, acting directly and/or indirectly through ResCap, directed Ally
Bank's actions as set forth in this cause of action.

306.   As a result of these breaches of contract, FGIC has been damaged and will
continue to be damaged in an amount to be determined at trial.

- 88 -

RC_FGIC9019_00000791

## SIXTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM: Breach of Repurchase Obligation)

307.    FGIC re-alleges and incorporates by reference paragraphs 1 through 306 of this Amended Complaint.

308.    The I&I Agreement is a valid and binding agreement between the parties.

309.    FGIC has performed its obligations under the I&I Agreement.

310.    Pursuant to the terms of the I&I Agreement, and the provisions of the MLPA incorporated therein, FGIC has demanded that GMACM repurchase non-complying Mortgage Loans. GMACM has refused to repurchase numerous such Mortgage Loans.

311.    GMACM has breached the I&I Agreement, and the provisions of the MLPA incorporated therein, by failing to repurchase those Mortgage Loans that violated GMACM's representations and warranties that FGIC has noticed to GMACM.

312.    Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

313.    As a result of these breaches of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

314.    GMACM, ResCap and Ally Financial are jointly and severally liable for such damages.

315.    Alternatively, GMACM is liable for such damages.

## SEVENTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, GMACM: Material Breach of the Operative Documents — Indemnification for Improper Subsequent Transfers or, Alternatively, Declaration of Repurchase Obligation)

316.    FGIC re-alleges and incorporates by reference paragraphs 1 through 315 of this Amended Complaint.

- 89 -

PX 0725 pg. 89 of 100

RC_FGIC9019_00000792

317.    The I&I Agreement is a valid and binding agreement between the parties.

318.    FGIC has performed its obligations under the I&I Agreement.

319.    GMACM has breached the I&I Agreement, and the provisions of the MLPA and the Operative Documents incorporated therein, by executing improper Subsequent Transfers to the 2006-HE1 Trust despite the occurrence of a Managed Amortization Event having triggered the termination of the Revolving Period.

320.    Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

321.    FGIC has been damaged in an amount to be proven at trial as a result of the improper transfer of Mortgage Loans to the 2006-HE1 Trust.

322.    FGIC is entitled to indemnification for any claim it has paid or which it may be required to pay arising from a Subsequent Mortgage Loan that was improperly transferred to the 2006-HE1 Trust after the occurrence of a Managed Amortization Event triggered the termination of the Revolving Period.

323.    FGIC therefore seeks a declaration that GMACM must reimburse and indemnify FGIC for all sums arising out of the 2006-HE1 Transaction for which FGIC has or will become liable and that FGIC is entitled to immediate reimbursement of all sums it has paid to date under the Policy and to the payment of all future amounts due or claims that may be presented for payment by FGIC under the Policy as and when such sums fall due or such claims are presented, as a result of the improper transfer of Subsequent Mortgage Loans to the 2006-HE1 Trust.

324.    In the alternative, FGIC has been damaged in an amount to be proven at trial because it has paid or remains liable for certain claims arising from Subsequent Mortgage Loans that GMACM was obligated to repurchase as a result of their improper transfer to the 2006-HE1

- 90 -

RC_FGIC9019_00000793

Trust after the occurrence of a Managed Amortization Event (i) triggered the termination of the

Revolving Period and (ii) invalidated all later Subsequent Transfer Agreements.

325.    GMACM, ResCap and Ally Financial are jointly and severally liable for such

damages.

326.    Alternatively, GMACM is liable for such damages.

## EIGHTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM: Breach of Contract – Declaratory Relief Regarding Access to Information)

327.    FGIC re-alleges and incorporates by reference paragraphs 1 through 326 of this

Amended Complaint.

328.    The I&I Agreement is a valid and binding agreement between the parties.

329.    FGIC has performed its obligations under the I&I Agreement.

330.    Pursuant to Sections 2.02(e)(i)-(iii) of the I&I Agreement, GMACM agreed to

furnish or cause to be furnished to FGIC financial statements, accountants' reports, and other

information. Such other information includes, but is not limited to, data relating to the Mortgage

Loans, the servicing of the Mortgage Loans, and the 2006-HE1 Transaction. FGIC further has

the right to conduct reviews of GMACM's practices as Servicer through reviews of the Mortgage

Loans pursuant to Section 2.02(p) of the I&I Agreement.

331.    As discussed above, pursuant to the I&I Agreement, FGIC made numerous

reasonable written requests that GMACM furnish or cause to be furnished data relating to the

Mortgage Loans, and the servicing of those loans, in order for FGIC to determine the veracity of

representations and warranties made by GMACM, and others, concerning the Mortgage Loans.

332.    GMACM has refused to provide more than a fraction of the data concerning the

Mortgage Loans sought by FGIC.

- 91 -

**PX  0725 pg.  91 of 100**

RC_FGIC9019_00000794

333.    GMACM has failed to comply with its contractual obligations and breached the I&I Agreement by failing to provide data relating to the Mortgage Loans after receiving reasonable requests for such data from FGIC.

334.    Pursuant to Sections 2.02(e)(i)-(iii) of the I&I Agreement, GMACM agreed to permit FGIC, upon its reasonable request, to (i) inspect the books and records of GMACM; (ii) discuss the affairs, finances and accounts of GMACM with GMACM's Chief Financial Officer; and (iii) discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants.

335.    On November 21, 2011, FGIC made a reasonable written request that GMACM permit FGIC or its authorized agent to conduct an inspection of the books and records of GMACM, as well as permit FGIC to (i) discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM, and (ii) with GMACM's consent, which consent shall not be unreasonably withheld or delayed, discuss the affairs, finances, and accounts of GMACM with GMACM's independent accountants.

336.    GMACM has failed to make available such persons or to produce such information.

337.    GMACM has failed to comply with its contractual obligations and breached the I&I Agreement by failing to make available the persons requested or to provide the information requested pursuant to the I&I Agreement, Section 2.02(e)(i)-(iii).

338.    Pursuant to Section 2.02(e)(v) of the I&I Agreement, GMACM agreed to furnish or cause to furnish to FGIC "all reports provided . . . pursuant to the [Servicing Agreement]."

339.    FGIC made a reasonable request for servicing notes on December 9, 2010.

- 92 -

RC_FGIC9019_00000795

340. GMACM has failed to comply with its contractual obligations and breached the
I&I Agreement by failing to cause the Servicing Reports to be delivered to FGIC after receiving
reasonable requests from FGIC.

341. Ally Financial, acting directly and/or indirectly through ResCap, directed
GMACM's actions as set forth in this cause of action.

342. Accordingly, FGIC seeks a declaration that GMACM has failed to comply with
Sections 2.02(c)(v), 2.02(e)(i)-(iii), and 2.02(p) of the I&I Agreement, and an order requiring
GMACM to promptly remedy those breaches and therefore comply with FGIC's requests and
notices to GMACM pursuant to the relevant provisions, as detailed above.

## NINTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM: Breach of Servicer Obligations)

343. FGIC re-alleges and incorporates by reference paragraphs 1 through 342 of this
Complaint.

344. The I&I Agreement is a valid and binding agreement between the parties.

345. FGIC has performed its obligations under the I&I Agreement.

346. Moreover, as explained above, GMACM has breached its affirmative covenant
under the I&I Agreement to service all Mortgage Loans in all material respects in compliance
with the Servicing Agreement.

347. GMACM's breaches of the I&I Agreement has caused substantial harm and
damages to FGIC, in an amount to be proved at trial, but at a minimum including substantially
higher claims on Policies and other losses and expenses.

348. Ally Financial, acting directly and/or indirectly through ResCap, directed
GMACM's actions as set forth in this cause of action.

- 93 -

349.    As a result of this breach of contract, FGIC has been damaged and will continue
to be damaged in an amount to be determined at trial.

350.    GMACM, ResCap and Ally Financial are jointly and severally liable for such
damages.

351.    Alternatively, GMACM is liable for such damages.

## TENTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM: Declaratory Relief)

352.    FGIC re-alleges and incorporates by reference paragraphs 1 through 351 of this
Complaint.

353.    As discussed above, Ally Financial, acting directly and/or indirectly through
ResCap, directed GMACM's actions as set forth in this complaint.

354.    For the reasons set forth in paragraphs 222 through 258, among others, Ally
Financial, ResCap, and GMACM were and continue to be alter egos of each other.

355.    FGIC has been damaged as a result of the actions Ally Financial, ResCap and
GMACM.

356.    FGIC therefore seeks a declaration that Ally Financial, ResCap, and GMACM
were and continue to be alter egos of each other, and therefore are jointly and severally liable for
each other's liabilities.

## ELEVENTH CAUSE OF ACTION

### (As Against GMACM: Attorneys' Fees and Costs)

357.    FGIC re-alleges and incorporates by reference paragraphs 1 through 356 of this
Amended Complaint.

358.    The I&I Agreement is a valid and binding agreement between the parties.

359.    FGIC has performed its obligations under the I&I Agreement.

- 94 -

RC_FGIC9019_00000797

360.   Pursuant to Section 3.03(c) of the I&I Agreement, GMACM agreed to reimburse

FGIC for any and all costs or expenses "including reasonable attorneys' . . . fees and expenses"

in connection with the enforcement, defense or preservation of any rights in respect of any of the

Operative Documents. Further, pursuant to Section 3.04(a) of the I&I Agreement, GMACM

agreed to pay FGIC any and all costs or expenses "including reasonable fees and expenses of

attorneys" arising out of or relating to the breach by GMACM of any of the representations or

warranties contained in Section 2.01 of the I&I Agreement or arising out of or relating to the

2006-HE1 Transaction.

361.   FGIC has incurred and will continue to incur substantial costs and expenses,

including but not limited to attorneys' fees in filing and prosecuting this lawsuit, arising out of

GMACM's failure to provide Mortgage Loan files, Servicing Reports, and financial information

and its breach of the representations and warranties contained in Section 2.01 of the I&I

Agreement and other representations, warranties, and its covenants within the Operative

Documents, such as Section 2.02 of the I&I Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff Financial Guaranty Insurance Company demands judgment in

its favor and against defendant GMAC Mortgage Company, LLC, with respect to (1), (2), (4), (5),

(6), and (8) through (17) below, and in its favor and against Residential Capital, LLC, with

respect to (1), (2), (4), (5), (6), (8) through (14), (16) and (17), below, and in its favor and against

Ally Bank, with respect to (3), (7), (16), and (17) below, and in its favor and against Ally

Financial, Inc., with respect to (1) through (6), (8) through (14), (16) and (17) below and the

following relief:

        (1)   A declaration that, pursuant to GMACM's obligations under the I&I
              Agreement, GMACM must solely and/or Ally Financial, ResCap, and
              GMACM must jointly and severally reimburse and indemnify FGIC for all

- 95 -

RC_FGIC9019_00000798

sums arising out of the 2006-HE1 Transaction for which FGIC has or will become liable, and that FGIC is entitled to immediate reimbursement: (i) for all sums it has paid to date under the Policy and to the payment of all future amounts that may fall due or claims that may be presented for payment by FGIC under the Policy as and when such sums fall due or such claims are presented; or, alternatively, (ii) for all loss resulting from any breaches of the representations, warranties, and covenants of the I&I Agreement or any of the related Operative Documents; or, alternatively, (iii) in an amount to be determined at trial: and (iv) an order giving effect to that declaration;

(2) Further or alternatively, an award of all legal, rescissory, equitable and punitive damages, to be proven at trial, for GMACM's fraudulent inducement of FGIC to enter into the 2006-HE1 Transaction and to issue the Policy;

(3) Further or alternatively, an award of all legal, rescissory, equitable, and punitive damages, to be proven at trial, for Ally Financial's and Ally Bank's aiding and abetting of GMACM's fraudulent inducement of FGIC to enter into the 2006-HE1 Transaction and to issue the Policy;

(4) Further or alternatively, an award of all legal, rescissory, and equitable damages, to be proven at trial for GMACM's material breaches of the 2006-HE1 Transaction;

(5) Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for GMACM's pervasive and material breaches of its representations, warranties, and affirmative covenants, which constitute material breaches of the I&I Agreement and frustration of the parties' bargain;

(6) Further or alternatively, a declaration that GMACM must repurchase all Mortgage Loans that are in breach of GMACM's representations and warranties in the 2006-HE1 Transaction, and an order giving effect to that declaration;

(7) Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for Ally Bank's material breaches of its obligations under the Custodial Agreement;

(8) Further or alternatively, a declaration that GMACM reimburse and indemnify FGIC for all sums arising out of the 2006-HE1 Transaction for which FGIC has or will become liable, and that FGIC is entitled to immediate reimbursement of all sums it has paid to date under the Policy and to the payment of all future amounts due or claims that may be presented for payment by FGIC under the Policy as and when such sums

- 96 -

RC_FGIC9019_00000799

fall due or such claims are presented, as a result of Subsequent Mortgage Loans that were improperly transferred to the 2006-HE1 Trust, and an order giving effect to that declaration;

(9)   Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for GMACM's improper transfer of Subsequent Mortgage Loans to the 2006-HE1 Trust;

(10)  Further or alternatively, a declaration that GMACM must repurchase the Mortgage Loans that were improperly transferred to the 2006-HE1 Trust, and order giving effect to that declaration;

(11)  Further or alternatively, a declaration that GMACM must provide full access to all Mortgage Loan files requested or that will be requested by FGIC in the 2006-HE1 Transaction, and an order giving effect to that declaration;

(12)  Further or alternatively, a declaration that GMACM must allow FGIC to inspect the books and records of GMACM, to discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM, and to discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants, and an order giving effect to that declaration;

(13)  Further or alternatively, a declaration that GMACM must cause to be provided servicing notes for the 2006-HE1 Transaction when requested by FGIC;

(14)  Further or alternatively, a declaration that Ally Financial, ResCap, and GMACM are alter egos of each other;

(15)  An award of FGIC's attorneys' fees, and other costs and expenses incurred in enforcing, defending, or preserving its rights under the I&I Agreement and other Operative Documents, as defined in the I&I Agreement;

(16)  An award of prejudgment interest at the statutory rate; and

(17)  Any other and further relief that the Court deems just and proper.

- 97 -

RC_FGIC9019_00000800

## JURY DEMAND

FGIC demands a trial by jury for all issues so triable as a matter of right.


Dated: March 30, 2012

JONES DAY

Jayant W. Tambe
Stephen J. Pearson
Howard F. Sidman
Patrick J. Smith
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Plaintiff*
*Financial Guaranty Insurance Company*

- 98 -

PX  0725 pg.  98 of 100

RC_FGIC9019_00000801

**STATE OF NEW YORK**   )
                        : SS.:
**COUNTY OF NEW YORK** )

## AFFIRMATION OF SERVICE

I, Michael O. Thayer, being duly sworn, deposes and says:

1. Deponent is not a party to the action, is over 18 years of age, and is employed by the law firm Jones Day, located at 222 East 41st Street, New York, New York 10017.

2. On the 30th day of March, 2012, I served, by overnight mail, a true and correct copy of the Amended Complaint upon the following:

Barry S. Levin
Orrick, Herrington & Sutcliffe LLP (San Francisco)
The Orrick Building
405 Howard Street
San Francisco, CA 94105

Daniel J. Dunne
Orrick, Herrington & Sutcliffe LLP (Seattle)
701 Fifth Avenue, Suite 5600
Seattle, WA 98104

Elyse D. Echtman
Orrick, Herrington & Sutcliffe LLP (NYC)
51 West 52nd Street
New York, NY 10019

Jeffrey A. Lipps
Carpenter Lipps & Leland LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, OH 43215

Jennifer A.L. Battle
Carpenter Lipps & Leland LLP
280 North High Street, Suite 1300
Columbus, OH 43215

Michael Nathaniel Beekhuizen
Carpenter Lipps & Leland LLP
280 North High Street
Suite 1300
Columbus, OH 43215

RC_FGIC9019_00000802

Richard A. Martin
Orrick, Herrington & Sutcliffe LLP (NYC)
51 West 52nd Street
New York, NY 10019

Michael Orth Ware
Mayer Brown LLP
1675 Broadway
New York, NY 10019

Richard A. Spehr
Mayer Brown LLP
1675 Broadway
New York, NY 10019

Jennifer Marie Rosa
Mayer Brown LLP(DC)
1999 "K" Street, N.W.
Washington, DC 20006

Reginald Raybern Goeke
Mayer Brown LLP(DC)
1999 "K" Street, N.W.
Washington, DC 20006

by delivering the same, enclosed in a  properly addressed wrapper, into the custody of the
overnight delivery service Federal Express, prior to the latest time designated by them for
overnight delivery.

Michael O. Thayer

RC_FGIC9019_00000803