# Exhibit PX-752

*Excerpt: Tab 13 of Exhibit*

**Document Produced in Native Format**

PX
752

CONFIDENTIAL

RCPC00065277

FINANCIAL GUARANTY INSURANCE COMPANY,
as Insurer,

GMAC MORTGAGE CORPORATION,
as a Seller and the Servicer,

WALNUT GROVE MORTGAGE LOAN TRUST 2003-A,
as a Seller,

RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.,
as Depositor,

GMACM HOME LOAN TRUST 2006- HE1,
as Issuing Entity

and

JPMORGAN CHASE BANK, N.A.,
as Indenture Trustee

# INSURANCE AND INDEMNITY AGREEMENT

RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.

GMACM HOME LOAN TRUST 2006- HE1

GMACM HOME LOAN-BACKED TERM NOTES, SERIES 2006- HE1

Dated as of March 30, 2006

# TABLE OF CONTENTS

(This Table of Contents is for convenience of reference only and shall not be deemed to be part of this Agreement. All capitalized terms used in this Agreement and not otherwise defined shall have the meanings set forth in Article I of this Agreement.)

Page

ARTICLE I DEFINITIONS ...........................................................................................2
    Section 1.01.   Defined Terms. ............................................................................2
ARTICLE II REPRESENTATIONS, WARRANTIES AND COVENANTS.............................5
    Section 2.01.   Representations and Warranties of GMACM, the WG Trust, the
    Issuing Entity and the Depositor.......................................................................5
    Section 2.02.   Affirmative Covenants of GMACM, the WG Trust, the Issuing
    Entity and the Depositor. ................................................................................10
    Section 2.03.   Negative Covenants of GMACM, the WG Trust, the Issuing
    Entity and the Depositor. ................................................................................16
    Section 2.04.   Representations, Warranties and Covenants of the Insurer. ......17
ARTICLE III THE POLICY; REIMBURSEMENT ........................................................19
    Section 3.01.   Issuance of the Policy. ...............................................................19
    Section 3.02.   Payment of Fees and Premium. ..................................................21
    Section 3.03.   Reimbursement Obligation. .......................................................21
    Section 3.04.   Indemnification. .........................................................................23
    Section 3.05.   Payment Procedure. ...................................................................25
    Section 3.06.   Joint and Several Liability. .........................................................26
ARTICLE IV FURTHER AGREEMENTS ....................................................................26
    Section 4.01.   Effective Date; Term of the Insurance Agreement. ....................26
    Section 4.02.   Further Assurances and Corrective Instruments. ........................26
    Section 4.03.   Obligations Absolute. .................................................................26
    Section 4.04.   Assignments; Reinsurance; Third-Party Rights.........................28
    Section 4.05.   Liability of the Insurer. ...............................................................28
    Section 4.06.   Annual Servicing Audit and Certification. .................................29
ARTICLE V DEFAULTS AND REMEDIES...................................................................29
    Section 5.01.   Defaults. .....................................................................................29
    Section 5.02.   Remedies; No Remedy Exclusive................................................30
    Section 5.03.   Waivers. .....................................................................................31
ARTICLE VI MISCELLANEOUS ...............................................................................31
    Section 6.01.   Amendments, Etc. ......................................................................31
    Section 6.02.   Notices. ......................................................................................32
    Section 6.03.   Severability. ...............................................................................33
    Section 6.04.   Governing Law. ..........................................................................33
    Section 6.05.   Consent to Jurisdiction...............................................................33
    Section 6.06.   Consent of the Insurer.................................................................34
    Section 6.07.   Counterparts. ..............................................................................34
    Section 6.08.   Headings. ....................................................................................34
    Section 6.09.   Trial by Jury Waived. .................................................................34
    Section 6.10.   Limited Liability. ........................................................................35
    Section 6.11.   Entire Agreement. .......................................................................35
    Section 6.12.   No Petition. .................................................................................35

INSURANCE AND INDEMNITY AGREEMENT (as may be amended, modified or supplemented from time to time, this "Insurance Agreement"), dated as of March 30, 2006, by and among FINANCIAL GUARANTY INSURANCE COMPANY, as Insurer, GMAC MORTGAGE CORPORATION, as a Seller and the Servicer, WALNUT GROVE MORTGAGE LOAN TRUST 2003-A ("WG Trust"), a Seller, RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., as Depositor, GMACM HOME LOAN TRUST 2006-HE1, as Issuing Entity, and JPMORGAN CHASE BANK, N.A., as Indenture Trustee.

## W I T N E S S E T H :

WHEREAS, each of GMACM, as a Seller, and the WG Trust, as a Seller, have sold and assigned their entire interest to Residential Asset Mortgage Products, Inc. (the "Depositor"), and the Depositor has accepted from GMACM the sale and assignment of such interest, in the Mortgage Loans pursuant to the Mortgage Loan Purchase Agreement, dated as of March 30, 2006, by and among GMACM, the WG Trust, the Depositor, the Issuing Entity and the Indenture Trustee;

WHEREAS, a Servicing Agreement, dated as of March 30, 2006, by and among GMACM, as Servicer, the Issuing Entity and the Indenture Trustee provides for the administration and servicing of the Mortgage Loans;

WHEREAS, a Trust Agreement, dated as of March 30, 2006, by and between the Depositor and the Owner Trustee (as may be amended, modified or supplemented from time to time as set forth therein, the "Trust Agreement") provides for, among other things the formation of GMACM Home Loan Trust 2006-HE1 (the "Issuing Entity" or the "Trust") and the issuance of GMACM Home Loan-Backed Certificates, Series 2006-HE1 (the "Certificates") representing undivided beneficial ownership interests in the Trust;

WHEREAS, an Indenture, dated as of March 30, 2006, by and between the Trust and the Indenture Trustee (as may be amended, modified or supplemented from time to time as set forth therein, the "Indenture") provides for, among other things, the issuance of GMACM Home Loan-Backed Term Notes, Series 2006-HE1 (the "Notes") representing indebtedness of the Trust;

WHEREAS, the Notes will be secured by all of the Issuing Entity's right, title and interest in the Mortgage Loans and certain other accounts and funds;

WHEREAS, the Insurer has agreed to issue the Policy, pursuant to which it will agree to pay in favor of the Indenture Trustee on behalf of the Issuing Entity and for the benefit of the Holders of the Notes, certain amounts relating to interest and principal on the Notes;

WHEREAS, the Insurer shall be paid a Premium for the Policy as set forth herein; and

WHEREAS, each of GMACM, the WG Trust, the Issuing Entity and the Depositor has undertaken certain obligations in consideration for the Insurer's issuance of its Policy.

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01.  Defined Terms.

Unless the context clearly requires otherwise, all capitalized terms used but not defined herein shall have the respective meanings assigned to them in the Indenture (including Appendix A thereto) or the Policy described below.  For purposes of this Insurance Agreement, the following terms shall have the following meanings:

"Certificates" means the GMACM Home Loan-Backed Certificates, Series 2006-HE1 issued pursuant to the Trust Agreement.

"Closing Date" means March 30, 2006.

"Commission" means the Securities and Exchange Commission.

"Confidentiality Agreement" means the confidentiality agreement dated June 28, 2001 between GMACM and the Insurer, as such agreement may be amended or superceded from time to time.

"Custodial Agreement" means that certain Custodial Agreement, dated as of March 30, 2006, among the Servicer, the Indenture Trustee and GMAC Bank, as custodian.

"Default" means any Event of Default or any event or circumstance that, with the giving of notice or the lapse of time or both, would result, in an Event of Default.

"Depositor" means Residential Asset Mortgage Products, Inc.

"Documents" has the meaning given such term in Section 2.01(j) herein.

"Event of Default" means any event of default specified in Section 5.01 of this Insurance Agreement.

"Final Offering Document" means the Prospectus, dated February 16, 2006, as supplemented by the final prospectus supplement (the "Prospectus Supplement"), dated March 29, 2006, in respect of the Notes.

"Financial Statements" means, with respect to GMACM, its (i) consolidated statements of financial condition as of December 31, 2004 and December 31, 2003 and the statements of operations, stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2004 and the notes thereto and (ii) unaudited, nine month consolidated statements of financial condition as of September 30, 2005 and September 30, 2004.

"GMACM" means GMAC Mortgage Corporation, as Seller under the Mortgage Loan Purchase Agreement and as Servicer under the Servicing Agreement, and any successor thereto under either such agreement.

"Holder" means the holder of any Note.

"Indenture" has the meaning given such term in the recitals.

"Indenture Trustee" means JPMorgan Chase Bank, N.A., as indenture trustee under the Indenture, and any successor thereto under the Indenture.

"Insurance Agreement" has the meaning given such term in the preamble hereof.

"Insurer" means Financial Guaranty Insurance Company, or any successor thereto, as issuer of the Policy.

"Insurer Financial Statements" has the meaning given such term in Section 2.04(j) hereof.

"Insurer Information" means the information in the Preliminary Offering Document and the Final Offering Document regarding the Insurer and the Policy, which consists solely of the information set forth under the captions "The Credit Enhancer" and "Description of the Policy" in each such Offering Document and the financial statements of the Insurer as of December 31, 2005 and December 31, 2004 and for each of the years in the three-year period ended December 31, 2005 as provided to the Depositor for inclusion in the Offering Documents.

"Investment Company Act" means the Investment Company Act of 1940, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Issuing Entity" has the meaning given such term in the recitals.

"Late Payment Rate" means the lesser of (a) the greater of (i) the per annum rate of interest publicly announced from time to time by Citibank, N.A. as its prime or base lending rate (any change in such rate of interest to be effective on the date such change is announced by Citibank, N.A.), and (ii) the then applicable highest rate of interest on any of the Notes and (b) the maximum rate permissible under applicable usury or similar laws limiting interest rates. The Late Payment Rate shall be computed on the basis of the actual number of days elapsed over a year of 360 days.

"Material Adverse Change" means, in respect of any Person, a material adverse change in the ability of such Person to perform its obligations under any of the Operative Documents, including any material adverse change in the business, financial condition, results of operations or properties of such Person on a consolidated basis with its subsidiaries that might have such effect. References herein to a Material Adverse Change that do not refer to a particular Person mean a Material Adverse Change with respect to either of GMACM or the Depositor.

"Moody's" means Moody's Investors Service, Inc., and any successor thereto.

"Notes" has the meaning given such term in the recitals.

"Offering Documents" means any of the Preliminary Offering Document, the Final Offering Document (each as further supplemented by any subsequent amendment or supplement

thereto), and any other offering document in respect of the Notes that makes reference to the Policy.

"Operative Documents" means this Insurance Agreement, the Securities, the Servicing Agreement, the Mortgage Loan Purchase Agreement, any Subsequent Transfer Agreement, the Custodial Agreement, the Trust Agreement and the Indenture.

"Owner Trustee" means Wilmington Trust Company, as owner trustee under the Trust Agreement, and any successor thereto under the Trust Agreement.

"Person" means an individual, joint stock company, trust, unincorporated association, joint venture, corporation, business, real estate investment trust, or owner trust, partnership, limited liability company or other organization or entity (whether governmental or private).

"Policy" means the Financial Guaranty Insurance Policy, No. 06030037, together with all endorsements thereto, issued by the Insurer in favor of the Indenture Trustee, for the benefit of the Holders of the Notes.

"Preliminary Offering Document" means the Prospectus, dated February 16, 2006, as supplemented by the preliminary prospectus supplement (the "Preliminary Prospectus Supplement"), dated March 27, 2006, in respect of the Notes.

"Premium" means the premium payable in accordance with the Policy and this Insurance Agreement.

"Premium Percentage" means 0.12% per annum.

"Registration Statement" means the registration statement on Form S-3 No. 333-125485 including the prospectus and prospectus supplement, relating to the Notes, at the time it became effective.

"Securities" means the Notes and the Certificates.

"Securities Act" means the Securities Act of 1933, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Securities Exchange Act" means the Securities Exchange Act of 1934, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"Shortfall Event" means on any Payment Date after the first Payment Date on which the related Overcollateralization Amount is equal to or greater than the related Required Overcollateralization Amount, the failure of the Overcollateralization Amount to be equal to or greater than 85% of the related Required Overcollateralization Amount.

"Transaction" means the transactions contemplated by the Operative Documents, including the transactions described in the Offering Documents.

"Trust" means the GMACM Home Loan Trust 2006-HE1 created pursuant to the Trust Agreement.

"Trust Agreement" means the Amended and Restated Trust Agreement, dated as of March 30, 2006, between the Depositor and Wilmington Trust Company, as Owner Trustee.

"Trust Estate" has the meaning given such term in the Indenture.

"Trust Indenture Act" means the Trust Indenture Act of 1939, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Underwriters" means J.P. Morgan Securities Inc., Greenwich Capital Markets, Inc. and Residential Funding Securities Corporation.

"Underwriting Agreement" means the Underwriting Agreement, dated March 27, 2006, among the Underwriters, GMACM and the Depositor with respect to the offer and sale of the Notes, as such may be amended, modified or supplemented from time to time.

"WG Trust" means Walnut Grove Mortgage Loan Trust 2003-A, as a Seller under the Mortgage Loan Purchase Agreement, and any successor thereto under such agreement.

Section 1.02.   Other Definitional Provisions.

The words "hereof," "herein" and "hereunder" and words of similar import when used in this Insurance Agreement shall refer to this Insurance Agreement as a whole and not to any particular provision of this Insurance Agreement, and Section, subsection, Schedule and Exhibit references are to this Insurance Agreement unless otherwise specified.   The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.   The words "include" and "including" shall be deemed to be followed by the phrase "without limitation."

## ARTICLE II
## REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 2.01.   Representations and Warranties of GMACM, the WG Trust, the Issuing Entity and the Depositor.

Each of GMACM, the WG Trust, the Issuing Entity and the Depositor represents and warrants as of the Closing Date as follows:

(a)    *Due Organization and Qualification.*  Each of GMACM and the Depositor is a corporation, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and each of the WG Trust and the Issuing Entity is a statutory trust duly organized, validly existing and in good standing under the laws of Delaware.   Each of GMACM, the WG Trust, the Issuing Entity and the Depositor is,

duly qualified to do business, is in good standing and has obtained all necessary licenses, permits, charters, registrations and approvals (together, "approvals") necessary for the conduct of its business as currently conducted and as described in the Offering Document and the performance of its obligations under the Operative Documents to which it is a party in each jurisdiction in which the failure to be so qualified or to obtain such approvals would render any Operative Document to which it is a party unenforceable in any respect or would have a material adverse effect upon the Transaction.

(b)     *Power and Authority.*  Each of GMACM, the WG Trust, the Issuing Entity and the Depositor has all necessary power and authority to conduct its business as currently conducted and as described in the Offering Document, to execute, deliver and perform its obligations under the Operative Documents to which it is a party and to consummate the Transaction.

(c)     *Due Authorization.*  The execution, delivery and performance of the Operative Documents to which it is a party by each of GMACM, the WG Trust, the Issuing Entity and the Depositor has been duly authorized by all necessary action and does not require any additional approvals or consents, or other action by or any notice to or filing with any Person, including any governmental entity or any of the stockholders or beneficial owners, as applicable, of GMACM, the WG Trust, the Issuing Entity or the Depositor, which have not previously been obtained or given by GMACM, the WG Trust, the Issuing Entity or the Depositor.

(d)     *No contravention.*  The execution and delivery by each of GMACM, the WG Trust, the Issuing Entity or the Depositor of the Operative Documents to which it is a party, the consummation of the Transaction and the satisfaction of the terms and conditions of the Operative Documents to which it is a party do not and will not:

(i)     conflict with or result in any breach or violation of any provision of the applicable organizational documents of GMACM, the WG Trust, the Issuing Entity or the Depositor or any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award currently in effect having applicability to GMACM, the WG Trust, the Issuing Entity or the Depositor or any of their respective material properties, including regulations issued by any administrative agency or other governmental authority having supervisory powers over GMACM, the WG Trust, the Issuing Entity or the Depositor, which conflict, breach or violation reasonably could be expected to result in a Material Adverse Change;

(ii)     constitute a default by GMACM, the WG Trust, the Issuing Entity or the Depositor under, result in the acceleration of any obligation under, or breach any provision of any loan agreement, mortgage, indenture or other agreement or instrument to which GMACM, the WG Trust, the Issuing Entity or the Depositor is a party or by which any of their respective properties is or may be bound or affected, which default, acceleration or breach reasonably could result in a Material Adverse Change; or

(iii)    result in or require the creation of any lien upon or in respect of any assets of GMACM, the WG Trust, the Issuing Entity or the Depositor, which lien reasonably could be expected to result in a Material Adverse Change, except as otherwise contemplated by the Operative Documents.

(e)    *Legal Proceedings*. There is no action, proceeding or investigation by or before any court, governmental or administrative agency or arbitrator against or affecting GMACM, the WG Trust, the Issuing Entity or the Depositor or any of their respective subsidiaries, any properties or rights of GMACM, the WG Trust, the Issuing Entity or the Depositor or any of their respective subsidiaries or any of the Mortgage Loans pending or, to GMACM's, the WG Trust's, the Issuing Entity's or the Depositor's knowledge after reasonable inquiry, threatened, that could, if decided adversely to GMACM, the WG Trust, the Issuing Entity or the Depositor or any such subsidiary could result in a Material Adverse Change with respect to GMACM, the WG Trust, the Issuing Entity or the Depositor.

(f)    *Valid and Binding Obligations*. The Operative Documents (other than the Securities) to which it is a party, when executed and delivered by GMACM, the WG Trust, the Issuing Entity or the Depositor, will constitute the legal, valid and binding obligations of each of GMACM, the WG Trust, the Issuing Entity and the Depositor, enforceable in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equitable principles and public policy considerations as to rights of indemnification for violations of federal securities laws. The Notes, when executed, authenticated and delivered in accordance with the Indenture, will be validly issued and outstanding and entitled to the benefits of the Indenture, and the Certificates when executed, authenticated and delivered in accordance with the Trust Agreement, will be validly issued and outstanding and entitled to the benefits of the Trust Agreement.

(g)    *Financial Statements*. The Financial Statements of GMACM, copies of which have been furnished to the Insurer, (i) are, as of the dates and for the periods referred to therein, complete and correct in all material respects, (ii) present fairly the financial condition and results of operations of GMACM as of the dates and for the periods indicated and (iii) have been prepared in accordance with generally accepted accounting principles consistently applied, except as noted therein (subject as to interim statements to normal year-end adjustments). Since the date of the most recent Financial Statements, there has been no Material Adverse Change in respect of GMACM, the WG Trust, the Issuing Entity or the Depositor. Except as disclosed in the Financial Statements, GMACM is not subject to any contingent liabilities or commitments that, individually or in the aggregate, have a material possibility of causing a Material Adverse Change in respect of GMACM, the WG Trust, the Issuing Entity or the Depositor.

(h)    *Compliance with Law, Etc.* No practice, procedure or policy employed, or proposed to be employed, by GMACM, the WG Trust, the Issuing Entity or the Depositor in the conduct of its business violates any law, regulation, judgment, agreement, order or decree applicable to GMACM, the WG Trust, the Issuing Entity or

the Depositor that, if enforced, could result in a Material Adverse Change with respect to GMACM, the WG Trust, the Issuing Entity or the Depositor.

(i)    *Taxes*.  Each of GMACM, the WG Trust, the Issuing Entity and the Depositor has filed prior to the date hereof all federal and state tax returns that are required to be filed and has paid all taxes, including any assessments received by it that are not being contested in good faith, to the extent that such taxes have become due.  Any taxes, fees and other governmental charges payable by GMACM, the WG Trust, the Issuing Entity or the Depositor in connection with the Transaction, the execution and delivery of the Operative Documents to which it is a party and the issuance of the Securities have been paid or shall have been paid at or prior to the Closing Date if such taxes, fees or other governmental changes were due on or prior to the Closing Date.

(j)    *Accuracy of Information*.  Neither the Operative Documents to which it is a party nor other information relating to the Mortgage Loans, the operations of GMACM, the WG Trust, the Issuing Entity or the Depositor or the financial condition of GMACM, the WG Trust, the Issuing Entity or the Depositor (collectively, the "Documents"), as amended, supplemented or superseded, furnished to the Insurer in writing or in electronic form by GMACM, the WG Trust, the Issuing Entity or the Depositor, including the Offering Documents (other than the Insurer Information) contains any statement of a material fact which was untrue or misleading in any material respect when made.  Each of GMACM, the WG Trust, the Issuing Entity and the Depositor has no knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change with respect to GMACM, the WG Trust, the Issuing Entity or the Depositor.  Since the furnishing of the Documents, there has been no change nor any development or event involving a prospective change known to GMACM, the WG Trust, the Issuing Entity or the Depositor that would render any of the Documents untrue or misleading in any material respect.

(k)    *Compliance with Securities Laws*.  The offering and sale of the Securities complies in all material respects with all requirements of law, including the registration requirements of the Securities Act and any other applicable securities laws.  The Offering Documents do not contain any untrue statement of a material fact and do not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading as of the Closing Date and as of any amendment or supplement to the Offering Document; *provided, however,* that no representation is made with respect to the Insurer Information.  The offering of the Notes has not been and will not be in violation of the Securities Act or any other federal or state securities laws.  Based upon advice of legal counsel, the Trust Agreement is not required to be qualified under the Trust Indenture Act and each of the Issuing Entity and the Trust Estate is not required to be registered as an "investment company" under the Investment Company Act.  GMACM will satisfy in all material respects any of the information reporting requirements of the Securities Exchange Act arising out of the Transaction to which it or the Issuing Entity or the Depositor are subject.

(l)    *Operative Documents*.  Each of the representations and warranties of GMACM, the WG Trust, the Issuing Entity and the Depositor contained in the applicable

Operative Documents and the Underwriting Agreement is true and correct in all material respects as of the date reflected therein and each of GMACM, the WG Trust, the Issuing Entity and the Depositor hereby makes each such representation and warranty to, and for the benefit of, the Insurer as if the same were set forth in full herein; *provided, however,* that the remedy for any breach of a representation and warranty of GMACM or the WG Trust in Section 3.1 of the Mortgage Loan Purchase Agreement and the remedy with respect to any defective Mortgage Loans under Section 3.1 of the Mortgage Loan Purchase Agreement shall be limited to the remedies specified in the Mortgage Loan Purchase Agreement.

(m)     *Solvency; Fraudulent Conveyance.* Each of GMACM, the WG Trust, the Issuing Entity and the Depositor is solvent and will not be rendered insolvent by the Transaction and, after giving effect to the Transaction, GMACM, the WG Trust, the Issuing Entity and the Depositor shall not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business, and each of GMACM, the WG Trust, the Issuing Entity and the Depositor does not intend to incur, or believe that it has incurred, debts beyond its ability to pay as they mature. Each of GMACM, the WG Trust, the Issuing Entity and the Depositor does not contemplate the commencement of insolvency, liquidation or consolidation proceedings or the appointment of a receiver, liquidator, conservator, trustee or similar official in respect of GMACM, the WG Trust, the Issuing Entity and the Depositor or any of their respective assets. The amount of consideration being received by GMACM and the WG Trust, as applicable, upon the sale of the Mortgage Loans to the Depositor constitutes reasonably equivalent value and fair consideration. The amount of consideration being received by the Depositor upon the transfer of the Mortgage Loans to the Trust constitutes reasonably equivalent value and fair consideration for ownership interest evidenced by the Mortgage Loans. The amount of consideration being received by the Issuing Entity upon the sale of the Securities constitutes reasonably equivalent value and fair consideration for the ownership and/or debt interest evidenced by the Securities. GMACM and the WG Trust, as applicable, is not transferring the Mortgage Loans to the Depositor nor is the Issuing Entity selling the Securities, as provided in the Operative Documents, with any intent to hinder, delay or defraud any of GMACM's, the WG Trust's, the Issuing Entity's or the Depositor's creditors.

(n)     *Jurisdiction of Organization.* GMACM is a Pennsylvania corporation. The Depositor is a Delaware corporation. The WG Trust and the Issuing Entity are organized under Delaware law.

(o)     *Qualified Special Purpose Entity.* The Issuing Entity is a qualified special purpose entity as the term is defined in Statement of Financial Accounting Standards No. 140 ("FAS 140") issued by the Financial Accounting Standards Board ("FASB").

Section 2.02.    Affirmative Covenants of GMACM, the WG Trust, the Issuing Entity and the Depositor.

Each of GMACM, the WG Trust, the Issuing Entity and the Depositor hereby agrees that during the term of this Insurance Agreement, it will comply with the following covenants, unless the Insurer shall otherwise expressly consent in writing:

(a)    *Compliance With Agreements and Applicable Laws.*  Each of GMACM, the WG Trust, the Issuing Entity, and the Depositor shall comply in all material respects with the terms and conditions of and perform its obligations under the Operative Documents to which it is a party in all cases in which failure to so comply or perform would result in a default thereunder and shall comply with all requirements of any law, rule or regulation applicable to it in all circumstances where non-compliance reasonably could be expected to result in a Material Adverse Change.  Each of GMACM, the WG Trust, the Issuing Entity and the Depositor will not at any time in the future deny that the Operative Documents to which it is a party constitute the legal, valid and binding obligations of GMACM, the WG Trust, the Issuing Entity and the Depositor, as applicable.

(b)    *Corporate Existence.*  Each of GMACM, the WG Trust, the Issuing Entity and the Depositor and their respective successors and permitted assigns shall maintain its corporate or trust existence, as applicable, and shall at all times continue to be duly organized under the laws of their formation and duly qualified and duly authorized (as described in subsections 2.01(a), (b) and (c) hereof) and shall conduct its business in accordance with the terms of its applicable organizational documents.

(c)    *Financial Statements; Accountants' Reports; Other Information.*  Each of GMACM, the WG Trust, the Issuing Entity and the Depositor shall keep or cause to be kept in reasonable detail books and records of account of its assets and business relating to the Transaction, and shall, as applicable, clearly reflect therein the sale of the Mortgage Loans to the Depositor, the transfer of the Mortgage Loans by the Depositor to the Trust and the sale of the Certificates, respectively, as a sale of the Mortgage Loans by GMACM and the WG Trust, as applicable, to the Depositor, a sale of the Mortgage Loans by the Depositor to the Trust and a sale of the equity interest in the Trust to the Holders of the Certificates.  GMACM shall furnish or cause to be furnished to the Insurer:

(i)    *Annual Financial Statements.*  As soon as available, and in any event within 120 days after the close of each fiscal year of GMACM, the audited consolidated statements of financial condition of GMACM and its subsidiaries as of the end of such fiscal year and the related audited consolidated statements of operations, stockholders' equity and cash flows for such fiscal year, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the preceding fiscal year, prepared in accordance with generally accepted accounting principles, consistently applied, and accompanied by the audit opinion of GMACM's independent accountants (which

shall be a nationally recognized independent public accounting firm or otherwise acceptable to the Insurer) and by the certificate specified in Section 2.02(d).

(ii)     *Quarterly Financial Statements.*  Upon the reasonable request of the Insurer, the unaudited consolidated statement of financial condition of GMACM and its subsidiaries as of the end of the first three quarters of each fiscal year of GMACM and the related unaudited consolidated statements of operations, stockholders' equity and cash flows for the portion of the fiscal year then ended, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the preceding fiscal year, prepared in accordance with generally accepted accounting principles consistently applied (subject to normal year-end adjustments); each delivery of quarterly financial statements shall be accompanied by a certificate of one (or more) corporate officers stating that the quarterly financial statements are correct in all material respects and present fairly the financial condition and results of operations of GMACM and its subsidiaries as of the dates and for the periods indicated, in accordance with generally accepted accounting principles consistently applied (subject to normal year-end adjustments).

(iii)    *Mortgage Loan Data.*  On or before the Closing Date, a magnetic tape containing information setting forth, as to each Mortgage Loan, the information required under the definition of "Mortgage Loan Schedule" in Appendix A to the Indenture.  At its option, GMACM may make updated Mortgage Loan data available to the Insurer on GMACM's or the Depositor's internet website, on a monthly basis.

(iv)    *Certain Information.*  Upon the reasonable request of the Insurer, copies of any requested proxy statements, financial statements, reports and registration statements that GMACM, the WG Trust, the Issuing Entity or the Depositor files with, or delivers to, the Commission or any national securities exchange.

(v)     *Other Information.*  (A) Promptly upon receipt thereof, copies of all schedules, financial statements or other similar reports delivered to or by GMACM, the WG Trust, the Issuing Entity, the Depositor, the Owner Trustee or the Indenture Trustee pursuant to the terms of any of the Operative Documents, including all reports provided to either the Indenture Trustee or any Securityholder pursuant to the Servicing Agreement, (B) promptly upon request, such other data as the Insurer may reasonably request and (C) all information required to be furnished to the Owner Trustee, the Indenture Trustee, the Noteholders or the Certificateholders simultaneously with the furnishing thereof to the Owner Trustee, the Indenture Trustee, the Noteholders or the Certificateholders, as the case may be.

All financial statements specified in clauses (i) and (ii) of this subsection (c) shall be furnished in consolidated form for GMACM and all its subsidiaries in the event that GMACM shall consolidate its financial statements with its

subsidiaries. To the extent available, the information supplied pursuant to this Section 2.02(c) will be in Excel or Word format or another form of an electronic data file accessible by the Insurer by means of standard application software.

(d)     *Compliance Certificate.* Each of GMACM (in its capacity as Servicer), the WG Trust, the Issuing Entity and the Depositor shall deliver to the Insurer, on or before July 1 of each year beginning with 2006, certificates of one (or more) of its officers stating that:

(i)     a review of the performance of GMACM, the WG Trust, the Issuing Entity or the Depositor, as applicable, under the Operative Documents to which it is a party during the prior year has been made under such officer's supervision;

(ii)     to the best of such officer's knowledge following reasonable inquiry, no Default or Event of Default has occurred, or if a Default or Event of Default has occurred, specifying the nature thereof and, if GMACM, the WG Trust, the Issuing Entity or the Depositor has a right to cure pursuant to Section 5.01, stating in reasonable detail (including, if applicable, any supporting calculations) the steps, if any, being taken by GMACM, the WG Trust, the Issuing Entity or the Depositor to cure such Default or Event of Default or to otherwise comply with the terms of the agreement to which such Default or Event of Default relates; and

(iii)     GMACM, as Servicer, has in full force and effect a fidelity bond (or direct surety bond) and an errors and omissions policy in accordance with the terms and requirements of Section 3.13 of the Servicing Agreement.

So long as GMACM shall continue to act as Servicer, the annual Officer's Certificate prepared by GMACM as Servicer pursuant to Section 3.10 of the Servicing Agreement shall be deemed to satisfy GMACM's obligations as imposed by clauses (i) and (ii) of this Section 2.02(d). The certificate required by this Section 2.02(d) may be delivered via electronic means if it constitutes an electronic record authenticated as the executed document of GMACM in accordance with applicable electronic signature laws.

(e)     *Access to Records; Discussions with Officers and Accountants.* On an annual basis, or upon the occurrence of a Material Adverse Change, GMACM, the WG Trust, the Issuing Entity and the Depositor shall, upon the reasonable request of the Insurer, permit the Insurer or its authorized agents:

(i)     to inspect the books and records of GMACM, the WG Trust, the Issuing Entity and the Depositor as they may relate to the Securities, the obligations of GMACM, the WG Trust, the Issuing Entity and the Depositor under the Operative Documents to which it is a party and the Transaction (including, without limitation, but only if, after the Closing Date, there has been a change to FAS 140, FASB Financial Interpretation No. 46 ("FIN 46") or the interpretive guidance issued by FASB or, to any interpretation thereof by the

Insurer's certified public accountants relating thereto, in any case that is applicable to the Insurer and the Truansaction, access to information reasonably required for purposes of complying with FASB Financial Interpretation No. 46; provided that the Insurer will maintain confidentiality with respect to such information in accordance with its internal policies and in accordance with the confidentiality provisions set forth in the Confidentiality Agreement);

(ii)    to discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM; and

(iii)    with GMACM's consent, which consent shall not be unreasonably withheld or delayed, to discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants; *provided, however,* that an officer of GMACM shall have the right to be present during such discussions.

In addition, when a Shortfall Event shall have occurred, GMACM, the WG Trust, the Issuing Entity and the Depositor shall, upon the reasonable request of the Insurer, permit the Insurer or its authorized agents to conduct an inspection of the type described in clause (i) above.

Such inspections and discussions shall be conducted during normal business hours and shall not unreasonably disrupt the business of GMACM, the WG Trust, the Issuing Entity or the Depositor.  The books and records of GMACM, the WG Trust and the Issuing Entity shall be maintained at the address of GMACM designated herein for receipt of notices, unless GMACM shall otherwise advise the parties hereto in writing.  The books and records of the Depositor shall be maintained at the Depositor's principal place of business, unless the Depositor shall otherwise advise the parties hereto in writing.

(f)    *Notice of Material Events*.  GMACM, the WG Trust, the Issuing Entity and the Depositor shall be obligated (which obligation shall be satisfied as to each if performed by GMACM, the WG Trust, the Issuing Entity or the Depositor) promptly to inform the Insurer in writing of the occurrence of any of the following:

(i)    the submission of any claim or the initiation or threat of any legal process, litigation or administrative or judicial investigation, or rule making or disciplinary proceeding by or against GMACM, the WG Trust, the Issuing Entity or the Depositor that (A) would be required to be disclosed to the Commission or GMACM's shareholders or (B) could result in a Material Adverse Change with respect to GMACM, the WG Trust, the Issuing Entity or the Depositor, or to the best of the knowledge of GMACM, the WG Trust, the Issuing Entity or the Depositor, the promulgation of any proceeding or any proposed or final rule which would likely result in a Material Adverse Change with respect to GMACM, the WG Trust, the Issuing Entity and the Depositor or any of their respective subsidiaries;

(ii)    any change in the location of jurisdiction of organization of GMACM, the WG Trust, the Issuing Entity or the Depositor;

(iii)    the occurrence of any Default or Event of Default or any Material Adverse Change in respect of GMACM, the WG Trust, the Issuing Entity or the Depositor;

(iv)    the commencement of any proceedings by or against GMACM, the WG Trust, the Issuing Entity or the Depositor under any applicable bankruptcy, reorganization, liquidation, rehabilitation, insolvency or other similar law now or hereafter in effect or of any proceeding in which a receiver, liquidator, conservator, trustee or similar official shall have been, or may be, appointed or requested for GMACM, the WG Trust, the Issuing Entity or the Depositor or any of their respective assets; or

(v)    the receipt of notice that (A) GMACM, the WG Trust, the Issuing Entity or the Depositor is being placed under regulatory supervision, (B) any license, permit, charter, registration or approval necessary for the conduct of GMACM's, the WG Trust's, the Issuing Entity's or the Depositor's business is to be, or may be, suspended or revoked or (C) GMACM, the WG Trust, the Issuing Entity or the Depositor is to cease and desist any practice, procedure or policy employed by GMACM, the WG Trust, the Issuing Entity or the Depositor in the conduct of their respective business, and such suspension, revocation or cessation may reasonably be expected to result in a Material Adverse Change with respect to GMACM, the WG Trust, the Issuing Entity or the Depositor.

(g)    *Financing Statements and Further Assurances.*  GMACM shall cause to be filed all necessary financing statements or other instruments, and any amendments or continuation statements relating thereto, necessary to be kept and filed in such manner and in such places as may be required by law to preserve and protect fully the interest of the Indenture Trustee in the Trust Estate.  Each of GMACM, the WG Trust, the Issuing Entity and the Depositor shall, upon the reasonable request of the Insurer, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, within ten days of such request, such amendments hereto and such further instruments and take such further action as may be reasonably necessary to effectuate the intention, performance and provisions of the Operative Documents to which it is a party. In addition, each of GMACM, the WG Trust, the Issuing Entity and the Depositor agrees to cooperate with S&P and Moody's in connection with any review of the Transaction that may be undertaken by S&P and Moody's after the date hereof.

(h)    *Maintenance of Licenses.*  Each of GMACM, the WG Trust, the Issuing Entity and the Depositor, and any successors thereof, shall maintain all licenses, permits, charters and registrations the loss or suspension of which could result in a Material Adverse Change.

(i)    *Retirement of Notes.*  GMACM, the Issuing Entity and the Depositor shall instruct the Indenture Trustee, upon a retirement or other payment of all of the Notes, to surrender the Policy to the Insurer for cancellation.

(j)    [RESERVED.]

-14-

(k)     *Third-Party Beneficiary.* Each of GMACM, the WG Trust, the Issuing Entity and the Depositor agrees that the Insurer shall have all rights provided to the Insurer in the Operative Documents and that the Insurer shall constitute a third-party beneficiary with respect to such rights in respect of the Operative Documents and hereby incorporates and restates its representations, warranties and covenants as set forth therein for the benefit of the Insurer; *provided, however,* that the remedy for any breach of a representation and warranty of GMACM or the WG Trust in Section 3.1 of the Mortgage Loan Purchase Agreement and the remedy with respect to any defective Mortgage Loans under Section 3.1 of the Mortgage Loan Purchase Agreement shall be limited to the remedies specified in the Mortgage Loan Purchase Agreement.

(l)     *Servicing of Mortgage Loans.* All Mortgage Loans will be serviced in all material respects in compliance with the Servicing Agreement and the Indenture, and GMACM, as Servicer, agrees that the Servicing Agreement shall provide that GMACM's obligations under this Insurance Agreement shall be binding on any successor Servicers thereunder but only to the extent of GMACM's obligations as Servicer under the Servicing Agreement and from the effective time of any such succession.

(m)     *Closing Documents.* GMACM, the Issuing Entity and the Depositor shall provide or cause to be provided to the Insurer an executed original copy of each document executed in connection with the Transaction within 60 days after the Closing Date.

(n)     *Custodial Account.* Monies on deposit in the Custodial Account shall be invested in Permitted Investments maturing as provided in the Servicing Agreement, and monies on deposit in the Note Payment Account shall be invested in Permitted Investments maturing as provided in the Indenture.

(o)     *Corporate Formalities.* Each of GMACM, the WG Trust, the Issuing Entity and the Depositor shall observe all the formalities necessary to preserve its corporate or trust existence, as applicable, under the laws of the State of its formation, including, as applicable, (i) the obligation to hold annual meetings of its beneficial owners, shareholders or its board of directors and (ii) the obligation to prepare and file annual income, franchise and other tax returns.

(p)     *Due Diligence.* The Insurer shall have the right, so long as any of the Notes remains outstanding, to conduct an ongoing review of GMACM's practices as Servicer through reviews of the Mortgage Loans, reappraisals of Mortgaged Properties and reviews of servicing practices. Such ongoing due diligence shall be conducted at the expense of the Insurer and in a reasonable manner convenient to both GMACM and the Insurer.

(q)     *Disclosure Document.* Upon the written direction of the Insurer prior to the delivery of such Offering Document, each Offering Document delivered with respect to the Notes shall clearly disclose that the Policy is not covered by the property/casualty insurance security fund specified in Article 76 of the New York Insurance Law

      (r)    *Notice to Insurer.* If the Depositor does not receive any Insurer Financial Statements pursuant to Section 2.04(j) herein at least five days prior to the date that such Insurer Financial Statements are to be filed with the Commission, the Depositor shall provide or shall cause the party responsible for filing the Depositor's Form 10-Ds and 10-Ks to provide written notice to the Insurer via electronic mail at RegAB@fgic.com, stating that it has not received the Insurer Financial Statements and requesting that such Insurer Financial Statements be emailed in accordance with Section 2.04(j) herein. Additionally, in the event that any Insurer Financial Information is to be included in a Form 10-D or Form 10-K filing of the Issuing Entity which occurs prior to the termination of the offering of the Notes, the Depositor shall provide written notice to the Insurer via electronic mail at least ten (10) days prior to such filing, stating that an accountant's consent will be required for such filing. In such event the Depositor shall be responsible for paying the Insurer's costs for obtaining such consent. All such emails shall identify the deal name and the policy number.

GMACM shall use its best efforts to cause the Issuing Entity, the WG Trust and the Depositor to observe the provisions of this Section 2.02.

Section 2.03. Negative Covenants of GMACM, the WG Trust, the Issuing Entity and the Depositor.

Each of GMACM, the WG Trust, the Issuing Entity and the Depositor hereby agrees that during the term of this Insurance Agreement it will comply with the following covenants, unless the Insurer shall otherwise expressly consent in writing:

      (a)    *Impairment of Rights.* Neither GMACM, the WG Trust, the Issuing Entity or the Depositor shall take any action, or fail to take any action, if such action or failure to take action may result in a Material Adverse Change with respect to GMACM, the WG Trust, the Issuing Entity or the Depositor, nor interfere in any material respect with the enforcement of any rights of the Insurer under or with respect to any of the Operative Documents or the Policy. GMACM, the WG Trust, the Issuing Entity and the Depositor shall give the Insurer written notice of any such action or, to the best of the knowledge of any of GMACM, the WG Trust, the Issuing Entity or the Depositor, any such failure to act on the earlier of: (i) the date upon which any publicly available filing or release is made with respect to such action or failure to act and (ii) promptly prior to the date of consummation of such action or failure to act. Each of GMACM, the WG Trust, the Issuing Entity and the Depositor shall furnish to the Insurer all information reasonably requested by the Insurer that is necessary to determine compliance with this paragraph.

      (b)    *Waiver, Amendments, Etc.* Neither GMACM, the WG Trust, the Issuing Entity or the Depositor shall modify, waive or amend, or consent to any modification, waiver or amendment of, any of the terms, provisions or conditions of the Operative Documents to which it is a party (other than any amendment to the Offering Document required by law) without the prior written consent of the Insurer thereto, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    *Limitation on Mergers, Etc*. None of GMACM, the WG Trust, the Issuing Entity and the Depositor shall consolidate with or merge with or into any Person or transfer all or substantially all of its assets to any Person or liquidate or dissolve except as provided in the Operative Documents or as permitted hereby. GMACM, the WG Trust, the Issuing Entity and the Depositor shall furnish to the Insurer all information requested by the Insurer that is reasonably necessary to determine compliance with this paragraph.

(d)    *Successors*. Neither GMACM, the WG Trust, the Issuing Entity or the Depositor shall terminate or designate, or consent to the termination or designation of, any successor Servicer, Paying Agent, Custodian, Indenture Trustee or Owner Trustee without the prior written approval of the Insurer, which approval shall not be unreasonably withheld, conditioned or delayed.

GMACM shall use its best efforts to cause the Issuing Entity, the WG Trust and the Depositor to observe the provisions of this Section 2.03.

Section 2.04.    Representations, Warranties and Covenants of the Insurer.

The Insurer represents, warrants and covenants to the Indenture Trustee, GMACM, the WG Trust, the Issuing Entity and the Depositor as follows:

(a)    *Organization and Licensing*. The Insurer is duly incorporated and validly existing as a New York stock insurance company in good standing and duly qualified to conduct an insurance business in the State of New York and in any other jurisdiction where qualification may be necessary to accomplish the Transaction.

(b)    *Corporate Power*. The Insurer has the corporate power and authority to issue the Policy and execute and deliver this Insurance Agreement and to perform all of its obligations hereunder and thereunder.

(c)    *Authorization; Approvals*. Proceedings legally required for the issuance and execution of the Policy and the execution, delivery and performance of this Insurance Agreement have been taken and licenses, orders, consents or other authorizations or approvals of any governmental boards or bodies legally required for the enforceability of the Policy and the conduct by the Insurer of the business and activities contemplated by the Transaction have been obtained; any proceedings not taken and any licenses, authorizations or approvals not obtained are not material to the enforceability of the Policy.

(d)    *Enforceability*. The Policy, when issued, and this Insurance Agreement will each constitute a legal, valid and binding obligation of the Insurer, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, receivership and other similar laws affecting creditors' rights generally and to general principles of equity and subject to principles of public policy limiting the right to enforce the indemnification provisions contained therein and herein, insofar as such provisions relate to indemnification for liabilities arising under federal securities laws.

(e)     *Financial Information.* The consolidated balance sheets of the Insurer and its subsidiaries as of December 31, 2005 and December 31, 2004, the related consolidated statements of income, stockholder's equity and cashflows for the years ended December 31, 2005 and 2004 and for the periods from December 18, 2003 through December 31, 2003, and from January 1, 2003 through December 17, 2003, and the accompanying footnotes, together with an opinion thereon of Ernst & Young LLP, independent registered public accounting firm, a copy of which has been delivered to the Depositor to be incorporated by reference into the registration statement relating to the Offering Document, present fairly in all material respects the financial condition of the Insurer as of such dates and for the periods covered by such statements in accordance with generally accepted accounting principles consistently applied. Since December 31, 2005, there has been no material change in such financial condition of the Insurer that would materially and adversely affect its ability to perform its obligations under the Policy.

(f)     *Insurer Information.* The Insurer Information in the Preliminary Offering Document as of the date of the Preliminary Offering Document and the Insurer Information in the Final Offering Document as of the date of the Final Offering Document and as of the date hereof, is true and correct in all material respects and does not contain any untrue statement of a material fact.

(g)     *No Litigation.* There are no actions, suits, proceedings or investigations pending or, to the best of the Insurer's knowledge, threatened against it at law or in equity or before or by any court, governmental agency, board or commission or any arbitrator which, if decided adversely, would materially and adversely affect its ability to perform its obligations under the Policy or this Insurance Agreement.

(h)     *Confidential Information.* The Insurer agrees that it shall comply with the terms of that certain Confidentiality Agreement.

(i)     *Compliance with Law, Etc.* No practice, procedure or policy employed, or proposed to be employed, by the Insurer in the conduct of its business violates any law, regulation, judgment, agreement, order or decree applicable to the Insurer that, if enforced, could result in a Material Adverse Change with respect to the Insurer.

(j)     *Delivery of Financial Statements of Insurer.* As soon as reasonably practicable after the release of its unaudited financial statements for each of the March, June and September 2006 fiscal quarters and the release of its audited financial statements for the 2006 fiscal year, the Insurer shall furnish to the Depositor such unaudited or audited financial statements, as appropriate (the "Insurer Financial Statements") for the related period meeting the requirements of Regulation S-X of the Securities Act. The Insurer Financial Statements shall be delivered in electronic form via electronic mail to al_gentile@gmacm.com, or such other address that has been designated by the Depositor and provided in writing to the Insurer. To the extent that the Insurer shall have been notified in writing on or before March 31, 2007 that the Depositor's reporting obligations under the Securities Exchange Act have not been suspended in accordance with the Securities Exchange Act and the related rules and regulations thereto, the Insurer shall continue to furnish such quarterly and annual financial

-18-

statements as set forth above for so long as such financial statements may be required for the Depositor to comply with its reporting requirements under the Securities Exchange Act. All written notices under this section shall be sent to the Insurer via electronic mail at RegAB@fgic.com. The requirement for the delivery of any Insurer Financial Statements pursuant to this Section 2.04(j) shall be satisfied to the extent that the Insurer has delivered the required Insurer Financial Statements pursuant to any similar transaction in which GMACM is acting as "Seller." The Insurer shall use commercially reasonable efforts to identify each transaction to which the delivery relates, provided that the failure to denote such transactions shall not be deemed a failure to deliver such Insurer Financial Statements pursuant to this Section 2.04(j).

## ARTICLE III
## THE POLICY; REIMBURSEMENT

Section 3.01.  Issuance of the Policy.

The Insurer agrees to issue the Policy on the Closing Date subject to satisfaction of the conditions precedent set forth below on or prior to the Closing Date; *provided, however*; that the Insurer, in its sole and absolute discretion, may waive any of the conditions precedent set forth below, by delivering a written waiver relating thereto:

(a)     [RESERVED];

(b)     *Operative Documents.* The Insurer shall have received a copy of each of the Operative Documents, in form and substance reasonably satisfactory to the Insurer, duly authorized, executed and delivered by each party thereto;

(c)     *Certified Documents and Resolutions.* The Insurer shall have received (i) a copy of the applicable organizational documents of GMACM, the WG Trust, the Issuing Entity and the Depositor and (ii) a certificate of the Secretary or Assistant Secretary of GMACM and the Depositor dated the Closing Date stating that attached thereto is a true, complete and correct copy of resolutions duly adopted by the Board of Directors or other governing body, as applicable, of GMACM and the Depositor authorizing the issuance of the Securities, the execution, delivery and performance by GMACM and the Depositor of the Operative Documents to which it is a party and the consummation of the Transaction and that such applicable organizational documents and resolutions are in full force and effect without amendment or modification on the Closing Date;

(d)     *Incumbency Certificate.* The Insurer shall have received a certificate of the Secretary or an Assistant Secretary of each of GMACM and the Depositor certifying the names and signatures of the officers of GMACM and the Depositor authorized to execute and deliver the Operative Documents to which it is a party and that shareholder or beneficial owner consent to the execution and delivery of such documents is not necessary or has been obtained;

(e)     *Representations and Warranties.* The representations and warranties of GMACM, the WG Trust, the Issuing Entity and the Depositor dated the Closing Date set

forth or incorporated by reference in this Insurance Agreement shall be true and correct on and as of the Closing Date as if made on the Closing Date;

(f)     *Opinions of Counsel*.  The Insurer shall have received all opinions of counsel addressed to any of Moody's and S&P, the Indenture Trustee, the Owner Trustee, GMACM, the WG Trust, the Issuing Entity, the Depositor and the Underwriter, in respect of GMACM, the WG Trust, the Issuing Entity and the Depositor or any other parties to the Operative Documents and the Transaction dated the Closing Date in form and substance reasonably satisfactory to the Insurer, addressed to the Insurer and addressing such matters as the Insurer may reasonably request, and the counsel providing each such opinion shall have been instructed by its client to deliver such opinion to the addressees thereof;

(g)     *Approvals, Etc.*  The Insurer shall have received true and correct copies of all approvals, licenses and consents, if any, including any required approval of the shareholders or beneficial owners, as applicable, of GMACM, the WG Trust, the Issuing Entity and the Depositor, required in connection with the Transaction;

(h)     *No Litigation, Etc.*  No suit, action or other proceeding, investigation or injunction, or final judgment relating thereto, shall be pending or threatened before any court, governmental or administrative agency or arbitrator in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with any of the Operative Documents or the consummation of the Transaction;

(i)     *Legality*.  No statute, rule, regulation or order shall have been enacted, entered or deemed applicable by any government or governmental or administrative agency or court that would make the Transaction illegal or otherwise prevent the consummation thereof;

(j)     *Satisfaction of Conditions of the Underwriting Agreement*.  All conditions in the Underwriting Agreement relating to the Underwriter's obligation, if any, to purchase the Notes shall have been satisfied, without taking into account any waiver by the Underwriter of any condition unless such waiver has been approved by the Insurer. The Insurer shall have received copies of each of the documents, and shall be entitled to rely on each of the documents, required to be delivered to the Underwriter pursuant to the Underwriting Agreement;

(k)     *Issuance of Ratings*.  The Insurer shall have received confirmation that the Notes insured by the Policy are rated at least "BBB" by S&P and at least "Baa2" by Moody's without regard to the Policy, and that the Notes, when issued, will be rated "AAA" by S&P and "Aaa" by Moody's.

(l)     *No Default*.  No Default or Event of Default shall have occurred;

(m)     [RESERVED];

(n)     *Satisfactory Documentation*.   The Insurer and its counsel shall have reasonably determined that all documents, certificates and opinions to be delivered in

-20-

connection with the Securities conform to the terms of the Indenture, the Trust Agreement, the Registration Statement, the Offering Document and this Insurance Agreement; and

(o)    *Indemnification Letter.*    The Insurer shall have received from the Underwriter an indemnification letter or agreement with respect to securities law matters in form and substance reasonably satisfactory to the Insurer.

Section 3.02.    Payment of Fees and Premium.

(a)    *Legal and Accounting Fees; Fees for Loan File Review.*    GMACM shall pay or cause to be paid to the Insurer, at the Closing Date, legal fees, due diligence expenses and accounting fees in the aggregate amount not to exceed $34,000.

(b)    *Rating Agency Fees.*    GMACM shall promptly pay the initial fees of S&P and Moody's with respect to the Notes and the Transaction following receipt of a statement with respect thereto. All periodic and subsequent fees of S&P and Moody's with respect to, and directly allocable to, the Notes shall be for the account of, and shall be billed to, GMACM. The fees for any other rating agency shall be paid by the party requesting such other agency's rating unless such other agency is a substitute for S&P and Moody's in the event that S&P or Moody's is no longer rating the Notes, in which case the fees for such agency shall be paid by GMACM.

(c)    [Reserved].

(d)    *Premium.*

(i)    In consideration of the issuance by the Insurer of the Policy, the Insurer shall be entitled to receive the Premium for the Policy, as and when due on each Payment Date in accordance with and from the funds in respect of the Mortgage Loans. The Premium due on each Payment Date in respect of the Policy shall be an amount equal to 1/12th of the product of (i) the Premium Percentage and (ii) the aggregate Note Balance of the Notes on the prior Payment Date (after giving effect to any distributions to be made on such Payment Date); provided that on the First Payment Date, the Premium will be equal the product of the (i) Premium Percentage converted to a daily rate and (ii) the aggregate Note Balance of the Notes as of the Closing Date and (iii) the number of days from and including the Closing Date to and including the first Payment Date.

(ii)    The Premiums paid under the Indenture in respect of the Policy shall be nonrefundable without regard to whether the Insurer makes any payment under the Policy or any other circumstances relating to any Notes or provision being made for payment of any Notes prior to maturity.

Section 3.03.    Reimbursement Obligation.

(a)    As and when due in accordance with and from the funds specified in Section 3.05(a) of the Indenture, the Insurer shall be entitled to reimbursement for any

-21-

payment made by the Insurer under the Policy, which reimbursement shall be due and payable on the date that any amount is paid thereunder, in an amount equal to the amount to be so paid and all amounts previously paid that remain unreimbursed, together with interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate.

(b)    GMACM agrees to pay to the Insurer as follows:  anything in Sections 2.01(l), 2.02(k) and 3.03(a) or in any Operative Document to the contrary notwithstanding, the Insurer shall be entitled to reimbursement from GMACM and shall have full recourse against GMACM for (i) any payment made under the Policy arising as a result of GMACM's or the WG Trust's failure to substitute for or deposit an amount in respect of any defective Mortgage Loan as required pursuant to Section 3.1 of the Mortgage Loan Purchase Agreement, together with interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any such unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate, and (ii) any payment made under the Policy arising as a result of (A) GMACM's or the WG Trust's failure to pay or deposit any amount required to be paid or deposited pursuant to the Operative Documents or (B) GMACM's or the WG Trust's failure to honor any demand made by the Indenture Trustee under Section 3.12 of the Indenture in accordance with the terms thereof, together with interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect to any such unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate.

(c)    GMACM agrees to pay to the Insurer any and all charges, fees, costs and expenses that the Insurer may reasonably pay or incur, including reasonable attorneys' and accountants' fees and expenses, in connection with (i) the enforcement, defense or preservation of any rights in respect of any of the Operative Documents, including defending, monitoring or participating in any litigation or proceeding (including any insolvency proceeding in respect of any Transaction participant or any affiliate thereof) relating to any of the Operative Documents, any party to any of the Operative Documents (in its capacity as such a party) or the Transaction or (ii) any amendment, waiver or other action with respect to, or related to, any Operative Document, whether or not executed or completed.  Provided that three Business Days written notice of the intended payment or incurrence shall have been given to GMACM by the Insurer, such reimbursement shall be due on the dates on which such charges, fees, costs or expenses are paid or incurred by the Insurer.

(d)    GMACM agrees to pay to the Insurer interest on any and all amounts described in subsections 3.03(b), 3.03(c) and 3.03(e) and Sections 3.02 and 3.04 from the date such amounts become due or, in the case of subsections 3.02(b) or 3.03(c) or Section 3.04, are incurred or paid by the Insurer until payment thereof in full (after as well as before judgment), at the Late Payment Rate.

(e)    GMACM agrees to reimburse the Insurer for any payments made by the Insurer under the Policy that were made in connection with a failure by GMACM or the WG Trust to make any required payments or distributions under any Operative Documents. Any such reimbursement shall be payable by GMACM on the date any such payment is made by the Insurer.

Section 3.04. Indemnification.

(a)    In addition to any and all of the Insurer's rights of reimbursement, indemnification, subrogation and to any other rights of the Insurer pursuant hereto or under law or in equity, GMACM, the WG Trust, the Issuing Entity and the Depositor agree, jointly and severally, to pay, and to protect, indemnify and save harmless, the Insurer and its officers, directors, shareholders, employees, agents and each Person, if any, who controls the Insurer within the meaning of either Section 15 of the Securities Act or Section 20 of the Securities Exchange Act from and against, any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of any nature arising out of or relating to the breach by GMACM, the WG Trust, the Issuing Entity or the Depositor of any of the representations or warranties contained in Section 2.01 or arising out of or relating to the transactions contemplated by the Operative Documents by reason of:

(i)    any omission or action (other than of or by the Insurer) in connection with the offering, issuance or delivery of the Securities by GMACM, the WG Trust, the Depositor, the Owner Trustee or the Indenture Trustee;

(ii)    the negligence, bad faith, willful misconduct, misfeasance, malfeasance or theft committed by any director, officer, employee or agent of GMACM, the WG Trust, the Depositor, the Owner Trustee or the Indenture Trustee in connection with any Transaction arising from or relating to the Operative Documents;

(iii)    the violation by GMACM, the WG Trust, the Issuing Entity or the Depositor of any domestic or foreign law, rule or regulation, or any judgment, order or decree applicable to it, which violation reasonably could result in a Material Adverse Change;

(iv)    the breach by GMACM, the WG Trust, the Issuing Entity or the Depositor of any representation, warranty (other than a representation or warranty in respect of the Mortgage Loans under Section 3.1 of the Mortgage Loan Purchase Agreement) or covenant under any of the Operative Documents to which it is a party or the occurrence, in respect of GMACM, the WG Trust, the Issuing Entity or the Depositor, under any of the Operative Documents of any "event of default" or any event which, with the giving of notice or the lapse of time or both, would constitute any "event of default"; or

-23-

(v)    any untrue statement or alleged untrue statement of a material fact contained in the Offering Documents or the Registration Statement or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, except insofar as such claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact or omission or alleged omission of a material fact in information included in the Insurer Information.

(b)    The Insurer agrees to pay, and to protect, indemnify and save harmless, GMACM, WG, the Issuing Entity and the Depositor and their respective officers, directors, shareholders, employees, agents and each Person, if any, who controls GMACM, the WG Trust, the Issuing Entity and the Depositor within the meaning of either Section 15 of the Securities Act or Section 20 of the Securities Exchange Act from and against, any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of any nature arising out of or by reason of (i) any untrue statement or alleged untrue statement of a material fact contained in the Insurer Information or any omission or alleged omission to state in the Insurer Information a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, (ii) any failure of the Insurer to make a payment required to be made under the Policy or (iii) a breach of any of the representations and warranties of the Insurer contained in Section 2.04.

(c)    If any action or proceeding (including any governmental investigation) shall be brought or asserted against any Person (individually, an "Indemnified Party" and, collectively, the "Indemnified Parties") in respect of which the indemnity provided in Section 3.04(a) or (b) may be sought from GMACM, the WG Trust, the Issuing Entity or the Depositor, on the one hand, or the Insurer, on the other (each, an "Indemnifying Party") hereunder, each such Indemnified Party shall promptly notify the Indemnifying Party in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all expenses. The omission so to notify the Indemnifying Party will not relieve it from any liability which it may have to any Indemnified Party except to the extent the Indemnifying Party is prejudiced by such failure. The Indemnified Party shall have the right to employ separate counsel in any such action and to participate in the defense thereof at the expense of the Indemnified Party; provided, however, that the fees and expenses of such separate counsel shall be at the expense of the Indemnifying Party if (i) the Indemnifying Party has agreed to pay such fees and expenses, (ii) the Indemnifying Party shall have failed within a reasonable period of time to assume the defense of such action or proceeding and employ counsel reasonably satisfactory to the Indemnified Party in any such action or proceeding or (iii) the named parties to any such action or proceeding (including any impleaded parties) include both the Indemnified

Party and the Indemnifying Party, and the Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the Indemnifying Party (in which case, if the Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such action or proceeding on behalf of such Indemnified Party, it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for the Indemnified Parties, which firm shall be designated in writing by the Indemnified Party and shall be reasonably satisfactory to the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such action or proceeding effected without its written consent, which consent shall not be unreasonably withheld, conditioned or delayed, but, if settled with its written consent, or if there is a final judgment for the plaintiff in any such action or proceeding with respect to which the Indemnifying Party shall have received notice in accordance with this subsection (c), the Indemnifying Party agrees to indemnify and hold the Indemnified Parties harmless from and against any loss or liability by reason of such settlement or judgment.

(d)    To provide for just and equitable contribution if the indemnification provided by the Indemnifying Party is determined to be unavailable or insufficient to hold harmless any Indemnified Party (other than due to application of this Section), each Indemnifying Party shall contribute to the losses incurred by the Indemnified Party on the basis of the relative fault of the Indemnifying Party, on the one hand, and the Indemnified Party, on the other hand.

No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

Section 3.05.  Payment Procedure.

In the event of any payment by the Insurer, the Indenture Trustee, GMACM, the WG Trust, the Issuing Entity and the Depositor agree to accept the voucher or other evidence of payment as prima facie evidence of the propriety thereof and the liability, if any, described in Section 3.03 therefor to the Insurer. All payments to be made to the Insurer under this Insurance Agreement shall be made to the Insurer in lawful currency of the United States of America in immediately available funds at the notice address for the Insurer as specified in the Indenture on the date when due or as the Insurer shall otherwise direct by written notice to the other parties hereto. In the event that the date of any payment to the Insurer or the expiration of any time period hereunder occurs on a day that is not a Business Day, then such payment or expiration of time period shall be made or occur on the next succeeding Business Day with the same force and effect as if such payment was made or time period expired on the scheduled date of payment or expiration date.

Section 3.06.    Joint and Several Liability.

GMACM, the WG Trust, the Issuing Entity and the Depositor shall be jointly and severally liable for all amounts due and payable to the Insurer hereunder by any such parties.

## ARTICLE IV
## FURTHER AGREEMENTS

Section 4.01.    Effective Date; Term of the Insurance Agreement.

This Insurance Agreement shall take effect on the Closing Date and shall remain in effect until the later of (a) such time as the Insurer is no longer subject to a claim under the Policy and the Policy shall have been surrendered to the Insurer for cancellation and (b) all amounts payable to the Insurer by GMACM, the WG Trust, the Issuing Entity or the Depositor hereunder or from any other source hereunder or under the Operative Documents or the Policy and all amounts payable under the Notes have been paid in full; provided, however, that the provisions of Sections 3.02, 3.03, 3.04 and 3.06 hereof shall survive any termination of this Insurance Agreement.

Section 4.02.    Further Assurances and Corrective Instruments.

(a)    Except at such times as a default in payment under the Policy shall exist or shall have occurred, none of GMACM, the WG Trust, the Issuing Entity or the Depositor nor the Owner Trustee shall grant any waiver of rights under any of the Operative Documents to which any of them is a party without the prior written consent of the Insurer, which shall not be unreasonably withheld, conditioned or delayed and any such waiver without prior written consent of the Insurer shall be null and void and of no force or effect.

(b)    To the extent permitted by law, each of GMACM, the WG Trust, the Issuing Entity and the Depositor agrees that it will, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such supplements hereto and such further instruments as the Insurer may reasonably request and as may be required in the Insurer's reasonable judgment to effectuate the intention of or facilitate the performance of this Insurance Agreement.

Section 4.03.    Obligations Absolute.

(a)    So long as no Credit Enhancer Default shall have occurred and shall have continued beyond any period of cure applicable thereto, the obligations of GMACM, the WG Trust, the Issuing Entity and the Depositor hereunder shall be absolute and unconditional and shall be paid or performed strictly in accordance with this Insurance Agreement under all circumstances irrespective of:

(i)    any lack of validity or enforceability of, or any amendment or other modifications of, or waiver, with respect to any of the Operative Documents or the Securities that have not been approved by the Insurer;

(ii)     any exchange or release of any other obligations hereunder;

(iii)    the existence of any claim, setoff, defense, reduction, abatement or other right that GMACM, the WG Trust, the Issuing Entity or the Depositor may have at any time against the Insurer or any other Person;

(iv)    any document presented in connection with the Policy proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(v)     any payment by the Insurer under the Policy against presentation of a certificate or other document that does not strictly comply with terms of the Policy;

(vi)    any failure of GMACM, the WG Trust, the Issuing Entity or the Depositor to receive the proceeds from the sale of the Securities; and

(vii)   any other circumstances, other than payment in full, that might otherwise constitute a defense available to, or discharge of, GMACM, the WG Trust, the Issuing Entity or the Depositor in respect of any Operative Document.

(b)     So long as no Credit Enhancer Default shall have occurred and shall have continued beyond any period of cure applicable thereto, GMACM, the WG Trust, the Issuing Entity and the Depositor and any and all others who are now or may become liable for all or part of the obligations of GMACM, the WG Trust, the Issuing Entity or the Depositor under this Insurance Agreement renounce the right to assert as a defense to the performance of their respective obligations each of the following:  (i) to the extent permitted by law, any and all redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness and obligations evidenced by any Operative Document or by any extension or renewal thereof; (ii) presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor and notice of protest; (iii) all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default or enforcement of any payment hereunder, except as required by the Operative Documents; and (iv) all rights of abatement, diminution, postponement or deduction, or to any defense other than payment, or to any right of setoff or recoupment arising out of any breach under any of the Operative Documents, by any party thereto or any beneficiary thereof, or out of any obligation at any time owing to GMACM, the WG Trust, the Issuing Entity or the Depositor.

(c)     GMACM, the WG Trust, the Issuing Entity and the Depositor and any and all others who are now or may become liable for all or part of the obligations of GMACM, the WG Trust, the Issuing Entity or the Depositor under this Insurance Agreement agree to be bound by this Insurance Agreement and (i) agree that any consent, waiver or forbearance hereunder with respect to an event shall operate only for such event and not for any subsequent event; (ii) consent to any and all extensions of time that may be granted by the Insurer with respect to any payment hereunder or other provisions

hereof and to the release of any security at any time given for any payment hereunder, or any part thereof, with or without substitution, and to the release of any Person or entity liable for any such payment; and (iii) consent to the addition of any and all other makers, endorsers, guarantors and other obligors for any payment hereunder, and to the acceptance of any and all other security for any payment hereunder, and agree that the addition of any such obligors or security shall not affect the liability of the parties hereto for any payment hereunder.

(d)     Nothing herein shall be construed as prohibiting GMACM, the WG Trust, the Issuing Entity or the Depositor from pursuing any rights or remedies it may have against any Person in a separate legal proceeding.

Section 4.04.   Assignments; Reinsurance; Third-Party Rights.

(a)     This Insurance Agreement shall be a continuing obligation of the parties hereto and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Each of GMACM, the WG Trust, the Issuing Entity and the Depositor may not assign its rights under this Insurance Agreement or the Policy, or delegate any of its duties hereunder, without the prior written consent of the Insurer. Any assignments made in violation of this Insurance Agreement shall be null and void.

(b)     The Insurer shall have the right to give participations in its rights under this Insurance Agreement and to enter into contracts of reinsurance with respect to the Policy upon such terms and conditions as the Insurer may in its discretion determine; *provided, however*, that no such participation or reinsurance agreement or arrangement shall relieve the Insurer of any of its obligations hereunder or under the Policy.

(c)     Except as provided herein with respect to participants and reinsurers, nothing in this Insurance Agreement shall confer any right, remedy or claim, express or implied, upon any Person, including, particularly, any Holder, other than the Insurer against GMACM, the WG Trust, the Issuing Entity or the Depositor, or GMACM, the WG Trust, the Issuing Entity or the Depositor against the Insurer and all the terms, covenants, conditions, promises and agreements contained herein shall be for the sole and exclusive benefit of the parties hereto and their successors and permitted assigns. Neither the Indenture Trustee nor any Holder shall have any right to payment from any Premiums paid or payable hereunder or under the Indenture or from any amounts paid by GMACM pursuant to Sections 3.02 or 3.03.

Section 4.05.   Liability of the Insurer.

Neither the Insurer nor any of its officers, directors or employees shall be liable or responsible for: (a) the use that may be made of the Policy by the Indenture Trustee or for any acts or omissions of the Indenture Trustee in connection therewith; or (b) the validity, sufficiency, accuracy or genuineness of documents delivered to the Insurer in connection with any claim under the Policy, or of any signatures thereon, even if such documents or signatures should in fact prove to be in any or all respects invalid, insufficient, fraudulent or forged (unless

the Insurer shall have actual knowledge thereof).   In furtherance and not in limitation of the foregoing, the Insurer may accept documents that appear on their face to be in order, without responsibility for further investigation.

Section 4.06.   Annual Servicing Audit and Certification.

The annual servicing audit required pursuant to Section 3.11 of the Servicing Agreement shall be performed by an independent third party reasonably acceptable to the Insurer.  Any one of the four major nationally recognized firms of independent public accountants is deemed to be acceptable.

## ARTICLE V
## DEFAULTS AND REMEDIES

Section 5.01.   Defaults.

The occurrence of any of the following shall constitute an Event of Default hereunder:

(a)   Any representation or warranty made by GMACM, the WG Trust, the Issuing Entity or the Depositor hereunder or under the Operative Documents, or in any certificate furnished hereunder or under the Operative Documents, shall prove to be untrue or incomplete in any material respect;

(b)   (i)   GMACM, the WG Trust, the Issuing Entity or the Depositor shall fail to pay when due any amount payable by GMACM, the WG Trust, the Issuing Entity or the Depositor hereunder or (ii) a legislative body has enacted any law that declares or a court of competent jurisdiction shall find or rule that this Insurance Agreement or any other Operative Document is not valid and binding on GMACM, the WG Trust, the Issuing Entity or the Depositor, provided that, with respect to any law or judicial action within the scope of this clause (ii), GMACM, the WG Trust, the Issuing Entity and the Depositor shall have 30 days to reinstate the binding effect of this Insurance Agreement or any other Operative Document; the Insurer agrees to take such actions as may be reasonably requested of it to facilitate the reinstatement of such binding effect;

(c)   The occurrence and continuance of an "event of default", or any event which given the lapse of time or notice would constitute an "event of default", under any Operative Document;

(d)   Any failure on the part of GMACM, the WG Trust, the Issuing Entity or the Depositor duly to observe or perform in any material respect any other of the covenants or agreements on the part of GMACM, the WG Trust, the Issuing Entity or the Depositor contained in this Insurance Agreement (other than the covenants or agreements contained in Sections 2.02(a), 2.02(l) and 2.02(n)) which continues unremedied for a period of 30 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to GMACM by the Insurer (with a copy to the Indenture Trustee) or by the Indenture Trustee (with a copy to the Insurer);

(e)    A decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or the appointment of a conservator or receiver or liquidator or other similar official in any bankruptcy, insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against GMACM, the WG Trust, or the Depositor and such decree or order shall have remained in force undischarged or unstayed for a period of 90 consecutive days;

(f)    GMACM, the WG Trust, or the Depositor shall consent to the appointment of a conservator or receiver or liquidator or other similar official in any bankruptcy, insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to GMACM, the WG Trust, or the Depositor or of or relating to all or substantially all of their respective property;

(g)    GMACM, the WG Trust, or the Depositor shall become insolvent or admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of or otherwise voluntarily commence a case or proceeding under any applicable bankruptcy, insolvency, reorganization or other similar statute, make an assignment for the benefit of its creditors or voluntarily suspend payment of its obligations; or

(h)    The Issuing Entity shall become subject to an entity level tax or to registration as an investment company under the Investment Company Act.

Section 5.02.    Remedies; No Remedy Exclusive.

(a)    Upon the occurrence of an Event of Default, the Insurer may exercise any one or more of the rights and remedies set forth below:

(i)    declare all indebtedness of every type or description then owed by GMACM, the WG Trust, the Issuing Entity or the Depositor to the Insurer with respect to this Residential Asset Mortgage Products, Inc. GMACM Home Loan-Backed Term Notes, Series 2006-HE1 transaction to be immediately due and payable, and the same shall thereupon be immediately due and payable;

(ii)    exercise any rights and remedies under the Trust Agreement in accordance with the terms thereof or direct the Owner Trustee to exercise such remedies in accordance with the terms of the Trust Agreement;

(iii)    exercise any rights and remedies under the Indenture in accordance with the terms thereof or direct the Indenture Trustee to exercise such remedies in accordance with the terms of the Indenture;

(iv)    exercise any rights and remedies under the Servicing Agreement in accordance with the terms thereof or direct the Servicer to exercise such remedies in accordance with the terms of the Servicing Agreement;

(v)    exercise any rights and remedies under the Mortgage Loan Purchase Agreement in accordance with the terms thereof or direct the appropriate party to exercise such remedies in accordance with the terms thereof; or

(vi)    take whatever action at law or in equity as may appear necessary or desirable in its judgment to collect the amounts, if any, then due under this Insurance Agreement or any other Operative Document or to enforce performance and observance of any obligation, agreement or covenant of GMACM, the WG Trust, the Issuing Entity or the Depositor under this Insurance Agreement or any other Operative Documents.

(b)    Unless otherwise expressly provided, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Insurance Agreement, the Indenture or existing at law or in equity.   No delay or omission to exercise any right or power accruing under this Insurance Agreement or the Indenture upon the happening of any event set forth in Section 5.01 shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient.  In order to entitle the Insurer to exercise any remedy reserved to the Insurer in this Article, it shall not be necessary to give any notice, other than such notice as may be required by this Article.

Section 5.03.   Waivers.

(a)    No failure by the Insurer to exercise, and no delay by the Insurer in exercising, any right hereunder shall operate as a waiver thereof.  The exercise by the Insurer of any right hereunder shall not preclude the exercise of any other right, and the remedies provided herein to the Insurer are declared in every case to be cumulative and not exclusive of any remedies provided by law or equity.

(b)    The Insurer shall have the right, to be exercised in its complete discretion, to waive any Event of Default hereunder, by a writing setting forth the terms, conditions and extent of such waiver signed by the Insurer and delivered to GMACM.  Unless such writing expressly provides to the contrary, any waiver so granted shall extend only to the specific event or occurrence which gave rise to the Event of Default so waived and not to any other similar event or occurrence which occurs subsequent to the date of such waiver.

## ARTICLE VI
## MISCELLANEOUS

Section 6.01.   Amendments, Etc.

This Insurance Agreement may be amended, modified, supplemented or terminated only by written instrument or written instruments signed by the parties hereto.  GMACM agrees to provide a copy of any amendment to this Insurance Agreement promptly to the Indenture Trustee and each Rating Agency.   No act or course of dealing shall be deemed to constitute an amendment, modification, supplement or termination hereof.

Section 6.02.   Notices.

All demands, notices and other communications to be given hereunder shall be in writing (except as otherwise specifically provided herein) and shall be mailed by registered mail or personally delivered and telecopied to the recipient as follows:

(a)   To the Insurer:

Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017
Attention:  Structured Finance Surveillance GMACM 2006-HE1
Facsimile:  212-312-3220
Confirmation:  (800) 352-0001
E-mail:  SFSurveillance@fgic.com

(in each case in which notice or other communication to the Insurer refers to an Event of Default, a claim on the Policy, or with respect to which failure on the part of the Insurer to respond shall be deemed to constitute consent or acceptance, then a copy of such notice or other communication should also be sent to the attention of the general counsel of each of the Insurer, GMACM, the WG Trust, the Depositor and the Indenture Trustee and in all cases, both any original and all copies shall be marked to indicate "URGENT MATERIAL ENCLOSED.")  Any notice regarding delivery or non-delivery of the Insurer Financial Information shall be sent via electronic mail to the Insurer at RegAB@fgic.com and shall reference the deal name and policy number.

(b)   To GMACM:

GMAC Mortgage Corporation
100 Witmer Road
Horsham, Pennsylvania  19044
Attention:  Chief Financial Officer
Facsimile:  (215) 682-1515
Confirmation:  (215) 682-1000

Notice to GMACM shall also constitute notice to the WG Trust, the Issuing Entity and the Depositor to the extent the party providing such notice is required to provide notice to all such parties (in each case in which notice or other communication to GMACM refers to an Event of Default, a claim against GMACM, the WG Trust, the Issuing Entity or the Depositor or with respect to which failure on the part of GMACM, the WG Trust, the Issuing Entity or the Depositor to respond shall be deemed to constitute consent or acceptance, then a copy of such notice or other communication should also be sent to the attention of the general counsel of each of the Insurer, GMACM and the Indenture Trustee and, in all cases, both any original and all copies shall be marked to indicate "URGENT MATERIAL ENCLOSED.").

-32-

(c)    To the Indenture Trustee, at its Corporate Trust Office, with a copy to:

JPMorgan Chase Bank, N.A.
4 New York Plaza, 6th Floor
New York, New York 10004
Facsimile: (212) 623-5858
Phone No.: (212) 623-5600

A party may specify an additional or different address or addresses by writing mailed or delivered to the other parties as aforesaid. All such notices and other communications shall be effective upon receipt.

Section 6.03. Severability.

In the event that any provision of this Insurance Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, the parties hereto agree that such holding shall not invalidate or render unenforceable any other provision hereof. The parties hereto further agree that the holding by any court of competent jurisdiction that any remedy pursued by any party hereto is unavailable or unenforceable shall not affect in any way the ability of such party to pursue any other remedy available to it.

Section 6.04. Governing Law.

This Insurance Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to the conflict of laws provisions thereof other than Sections 5-1401 and 5-1402 of the General Obligations Law, which the Parties hereto expressly rely upon as the governing law hereunder).

Section 6.05. Consent to Jurisdiction.

(a)    The parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York and any court in the State of New York located in the City and County of New York, and any appellate court from any thereof, in any action, suit or proceeding brought against it and to or in connection with any of the Operative Documents, the Policy or the Transaction or for recognition or enforcement of any judgment, and the parties hereto hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding may be heard or determined in such New York state court or, to the extent permitted by law, in such federal court. The parties hereto agree that a final unappealable judgment in any such action, suit or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. To the extent permitted by applicable law, the parties hereto hereby waive and agree not to assert by way of motion, as a defense or otherwise in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such courts, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that the related documents or the subject matter thereof may not be litigated in or by such courts.

(b)     To the extent permitted by applicable law, the parties hereto shall not seek and hereby waive the right to any review of the judgment of any such court by any court of any other nation or jurisdiction which may be called upon to grant an enforcement of such judgment.

(c)     Service on GMACM, the WG Trust, the Issuing Entity or the Depositor may be made by mailing or delivering copies of the summons and complaint and other process which may be served in any suit, action or proceeding to the Servicer addressed as follows:  GMAC Mortgage Corporation, 100 Witmer Road, Horsham, Pennsylvania 19044, Attention:  General Counsel.  Such address may be changed by the applicable party or parties by written notice to the other parties hereto.  The provision of notice to change the address set forth in Section 6.02 shall constitute notice for purposes of the preceding sentence, unless such notice shall expressly state to the contrary.

(d)     Nothing contained in this Insurance Agreement shall limit or affect any party's right to serve process in any other manner permitted by law or to start legal proceedings relating to any of the Operative Documents or the Policy against any other party or its properties in the courts of any jurisdiction.

Section 6.06.   Consent of the Insurer.

In the event that the consent of the Insurer is required under any of the Operative Documents, the determination whether to grant or withhold such consent shall be made by the Insurer in its sole discretion without any implied duty towards any other Person, except as otherwise expressly provided therein, and such consent is only effective when and if given by the Insurer in writing.

Section 6.07.   Counterparts.

This Insurance Agreement may be executed in counterparts by the parties hereto, and all such counterparts shall constitute one and the same instrument.

Section 6.08.   Headings.

The headings of Articles and Sections and the Table of Contents contained in this Insurance Agreement are provided for convenience only.  They form no part of this Insurance Agreement and shall not affect its construction or interpretation.

Section 6.09.   Trial by Jury Waived.

Each party hereby waives, to the fullest extent permitted by law, any right to a trial by jury in respect of any litigation arising directly or indirectly out of, under or in connection with any of the Operative Documents or a Policy or any of the transactions contemplated thereunder. Each party hereto (A) certifies that no representative, agent or attorney of any party hereto has represented, expressly or otherwise, that it would not, in the event of litigation, seek to enforce the foregoing waiver and (B) acknowledges that it has been induced to enter into the Operative Documents to which it is a party (or, in the case of a Policy, the Insurer so acknowledges) by, among other things, this waiver.

Section 6.10.  <u>Limited Liability</u>.

No recourse under any Operative Document or the Underwriting Agreement shall be had against, and no personal liability shall attach to, any officer, employee, director, affiliate or shareholder of any party hereto, as such, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute or otherwise in respect of any of the Operative Documents or the Underwriting Agreement, the Notes or the or the Policy, it being expressly agreed and understood that each Operative Document or the Underwriting Agreement is solely a corporate obligation of each party hereto, and that any and all personal liability, either at common law or in equity, or by statute or constitution, of every such officer, employee, director, affiliate or shareholder for breaches of any party hereto of any obligations under any Operative Document or the Underwriting Agreement is hereby expressly waived as a condition of and in consideration for the execution and delivery of this Insurance Agreement.

Section 6.11.  <u>Entire Agreement</u>.

This Insurance Agreement and the Policy set forth the entire agreement between the parties with respect to the subject matter hereof and thereof, and this Insurance Agreement supersedes and replaces any agreement or understanding that may have existed between the parties prior to the date hereof in respect of such subject matter.

Section 6.12.  <u>No Petition</u>.

The Insurer hereby covenants and agrees that it will not at any time institute against the Depositor or the WG Trust, or join in any institution against the Depositor or the WG Trust of, any bankruptcy proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations under this Agreement or any of the other Operative Documents.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, all as of the day and year first above mentioned.

FINANCIAL GUARANTY INSURANCE COMPANY, as Insurer

By: _____

Name: *Benjamin Perlman*

Title: *Vice President*

RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., as Depositor

By: _____

Name: _____

Title: _____

GMAC MORTGAGE CORPORATION, as a Seller and the Servicer

By: _____

Name: _____

Title: _____

GMACM HOME EQUITY LOAN TRUST 2006-HE1, as Issuing Entity
   By: Wilmington Trust Company, not in its individual
         capacity but solely as Owner Trustee

By: _____

Name: _____

Title: _____

WALNUT GROVE MORTGAGE LOAN TRUST 2003-A, as a Seller
By: Wilmington Trust Company, not in its
      individual capacity but solely as Owner
      Trustee

By: _____

Name: _____

Title: _____

JPMORGAN CHASE BANK, N.A. as Indenture Trustee

By: _____

Name: _____

Title: _____

[Signature Page to Insurance and Indemnity Agreement for GMACM Home Equity Loan-Backed Term Notes, Series 2006-HE1]

50887.000141 RICHMOND 1713526v3

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, all as of the day and year first above mentioned.

FINANCIAL GUARANTY INSURANCE COMPANY, as Insurer

By:_____

Name: _____

Title: _____

GMAC MORTGAGE CORPORATION, as a Seller and the Servicer

By:_____

Name: ~~Sandy Bitzer~~

Title: ~~Vice President~~

WALNUT GROVE MORTGAGE LOAN TRUST 2003-A, as a Seller
By:  Wilmington Trust Company, not in its individual capacity but solely as Owner Trustee

By:_____

Name: _____

Title: _____

RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., as Depositor

By:_____

Name: ~~Patricia C. Taylor~~

Title: ~~Vice President~~

GMACM HOME LOAN TRUST 2006-HE1, as Issuing Entity
By: Wilmington Trust Company, not in its individual capacity but solely as Owner Trustee

By:_____

Name: _____

Title: _____

JPMORGAN CHASE BANK, N.A. as Indenture Trustee

By:_____

Name:_____

Title:_____

[Signature Page to Insurance and Indemnity Agreement for GMACM Home Loan-Backed Term Notes, Series 2006-HE1]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, all as of the day and year first above mentioned.

FINANCIAL GUARANTY INSURANCE
COMPANY, as Insurer

By:_____
Name: _____
Title: _____

GMAC MORTGAGE CORPORATION,
as a Seller and the Servicer

By:_____
Name: _____
Title: _____

RESIDENTIAL ASSET MORTGAGE PRODUCTS,
INC., as Depositor

By:_____
Name: _____
Title: _____

GMACM HOME EQUITY LOAN TRUST 2006-HE1,
as Issuing Entity
   By: Wilmington Trust Company, not in its individual
       capacity but solely as Owner Trustee

By:_____
Name: ____Patricia A. Evans_____
Title: ____Vice President_____

WALNUT GROVE MORTGAGE LOAN
TRUST 2003-A, as a Seller
By: Wilmington Trust Company, not in its
    individual capacity but solely as Owner
    Trustee

By:_____
Name: ____Patricia A. Evans_____
Title: ____Vice President_____

JPMORGAN CHASE BANK, N.A.
as Indenture Trustee

By:_____
Name:_____
Title:_____

[Signature Page to Insurance and Indemnity Agreement for GMACM Home Equity Loan-Backed Term Notes, Series 2006-HE1]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, all as of the day and year first above mentioned.

FINANCIAL GUARANTY INSURANCE
COMPANY, as Insurer

By:_____

Name: _____

Title: _____


GMAC MORTGAGE CORPORATION,
as a Seller and the Servicer

By:_____

Name: _____

Title: _____


WALNUT GROVE MORTGAGE LOAN
TRUST 2003-A, as a Seller
By: Wilmington Trust Company, not in its
    individual capacity but solely as Owner
    Trustee

By:_____

Name: _____

Title: _____


RESIDENTIAL ASSET MORTGAGE PRODUCTS,
INC., as Depositor

By:_____

Name: _____

Title: _____


GMACM HOME LOAN TRUST 2006-HE1, as Issuing
Entity
  By: Wilmington Trust Company, not in its individual
      capacity but solely as Owner Trustee

By:_____

Name: _____

Title: _____


JPMORGAN CHASE BANK, N.A.
as Indenture Trustee

By:_____Keith Richardson_____

Name:_____Attorney-In-Fact_____

Title:_____

[Signature Page to Insurance and Indemnity Agreement for GMACM Home Loan-Backed Term Notes, Series 2006-HE1]

# Exhibit PX-753

*Excerpt: Tab 6b of Exhibit*

Document Produced in Native Format



CONFIDENTIAL                                      RCPC00065278

FINANCIAL GUARANTY INSURANCE COMPANY,
as Insurer,


RESIDENTIAL FUNDING COMPANY, LLC
as Sponsor and Master Servicer,


RESIDENTIAL ASSET SECURITIES CORPORATION,
as Depositor


and


U.S. BANK NATIONAL ASSOCIATION
as Trustee


INSURANCE AND INDEMNITY AGREEMENT


HOME EQUITY MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES,
SERIES 2007-EMX1


Dated as of March 12, 2007

TABLE OF CONTENTS

*(This Table of Contents is for convenience of reference only and shall not be deemed to be part
of this Insurance Agreement. All capitalized terms used in this Insurance Agreement and not
otherwise defined shall have the meanings set forth in Article I of this Insurance Agreement.)*

Page

ARTICLE I DEFINITIONS ........................................................................................................1
    Section 1.01.   Defined Terms. ........................................................................................1
    Section 1.02.   Other Definitional Provisions. ...............................................................5
ARTICLE II REPRESENTATIONS, WARRANTIES AND COVENANTS................................5
    Section 2.01.   Representations and Warranties.............................................................5
    Section 2.02.   Affirmative Covenants of RFC and the Depositor. ................................8
    Section 2.03.   Negative Covenants of RFC and the Depositor.....................................13
    Section 2.04.   Representations, Warranties and Covenants of the Insurer. ....................14
ARTICLE III THE POLICY; REIMBURSEMENT ...................................................................16
    Section 3.01.   Issuance of the Policy. ..........................................................................16
    Section 3.02.   Payment of Fees and Premium. .............................................................17
    Section 3.03.   Reimbursement Obligation. ...................................................................18
    Section 3.04.   Indemnification. ...................................................................................19
    Section 3.05.   Payment Procedure. ..............................................................................21
    Section 3.06.   Liability of RFC......................................................................................22
ARTICLE IV FURTHER AGREEMENTS.................................................................................22
    Section 4.01.   Effective Date; Term of the Insurance Agreement. ..............................22
    Section 4.02.   Further Assurances and Corrective Instruments. ...................................22
    Section 4.03.   Obligations Absolute. ...........................................................................22
    Section 4.04.   Assignments; Reinsurance; Third-Party Rights.....................................24
    Section 4.05.   Liability of the Insurer. .........................................................................24
ARTICLE V DEFAULTS AND REMEDIES..............................................................................25
    Section 5.01.   Defaults. ................................................................................................25
    Section 5.02.   Remedies; No Remedy Exclusive...........................................................26
    Section 5.03.   Waivers. .................................................................................................26
ARTICLE VI MISCELLANEOUS .............................................................................................27
    Section 6.01.   Amendments, Etc...................................................................................27
    Section 6.02.   Notices. ..................................................................................................27
    Section 6.03.   Severability. ...........................................................................................28
    Section 6.04.   Governing Law. .....................................................................................29
    Section 6.05.   Consent to Jurisdiction...........................................................................29
    Section 6.06.   Consent of the Insurer............................................................................29
    Section 6.07.   Counterparts...........................................................................................29
    Section 6.08.   Headings. ...............................................................................................30
    Section 6.09.   Trial by Jury Waived. ............................................................................30
    Section 6.10.   Limited Liability. ...................................................................................30
    Section 6.11.   Entire Agreement. ..................................................................................30

INSURANCE AND INDEMNITY AGREEMENT (as amended, modified or supplemented from time to time, this "Insurance Agreement"), dated as of March 12, 2007, by and among FINANCIAL GUARANTY INSURANCE COMPANY, as Insurer, RESIDENTIAL FUNDING COMPANY, LLC, as Sponsor and as Master Servicer, RESIDENTIAL ASSET SECURITIES CORPORATION, as Depositor, and U.S. BANK NATIONAL ASSOCIATION, as Trustee with respect to the Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1 (the "Certificates").

## W I T N E S S E T H :

WHEREAS, the Depositor has transferred and assigned its entire interest to the Trustee pursuant to that certain Pooling and Servicing Agreement dated as of February 1, 2007 (as may be amended, modified or supplemented from time to time as set forth therein, the "Pooling and Servicing Agreement") by and among the Depositor, the Master Servicer and the Trustee, for the benefit of the holders of the Certificates (as defined herein), in certain first and junior lien, residential Mortgage Loans (as defined herein). The Pooling and Servicing Agreement also provides for, among other things, the issuance of the Certificates and the servicing of the Mortgage Loans by the Master Servicer;

WHEREAS, the Insurer has agreed to issue the Policy, as provided in Article III of this Insurance Agreement, pursuant to which it will agree to pay in favor of the Trustee for the benefit of the Holders of the Class A Certificates (as defined herein), certain payments in respect of the Class A Certificates;

WHEREAS, the Insurer shall be paid a Premium for the Policy as set forth herein; and

WHEREAS, each of RFC and the Depositor has undertaken certain obligations in consideration for the Insurer's issuance of the Policy;

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

### Section 1.01.  Defined Terms.

Unless the context clearly requires otherwise, all capitalized terms used but not defined herein shall have the respective meanings assigned to them in the Policy or, if not defined therein, in the Pooling and Servicing Agreement. For purposes of this Insurance Agreement, the following terms shall have the following meanings:

"Assignment Agreement" means the Assignment and Assumption Agreement, dated as of March 12, 2007, between RFC and the Depositor.

"Certificates" means the Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1, Class A Certificates, Class SB Certificates and Class R Certificates.

"Class A Certificates" means collectively, the Class A-I-1, Class A-I-2, Class A-I-3, Class A-I-4 and Class A-II Certificates.

"Closing Date" means March 12, 2007.

"Commission" means the Securities and Exchange Commission.

"Custodial Agreement" means that certain Custodial Agreement, dated as of February 1, 2007, among the Master Servicer, the Trustee, the Depositor, and Wells Fargo Bank, National Association, as custodian.

"Default" means any Event of Default or any event or circumstance that, with the giving of notice or the lapse of time or both, would result in an Event of Default.

"Depositor" means Residential Asset Securities Corporation, a Delaware corporation, or any successor thereto.

"Documents" has the meaning given such term in Section 2.01(a)(x) herein.

"Event of Default" means any event of default specified in Section 5.01 of this Insurance Agreement.

"Final Offering Document" means the Prospectus, dated December 6, 2006, as supplemented by the final prospectus supplement (the "Prospectus Supplement"), dated March 8, 2007, in respect of the Class A Certificates.

"Financial Statements" means, with respect to RFC, the consolidated statements of financial condition as of December 31, 2005 and December 31, 2006 and the statements of operations, stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2006 and the notes thereto.

"Holder" has the meanings given such term in the Policy.

"Insurance Agreement" has the meaning given such term in the preamble hereof.

"Insurer" means Financial Guaranty Insurance Company, or any successor thereto, as issuer of the Policy.

"Insurer Financial Statements" has the meaning given such term in Section 2.04(j) hereof.

"Insurer Information" means the information in the Preliminary Prospectus Supplement and the Prospectus Supplement which consists solely of the information set forth under the captions "The Certificate Insurer" and "Description of the Certificates — Description of the Financial Guaranty Insurance Policy" and the audited consolidated balance sheets of the Insurer and subsidiaries as of December 31, 2006 and December 31, 2005 and the related statements of income, stockholder's equity and cash flows, and the accompanying notes thereto, for each of the years in the three year period ended December 31, 2006, in each case as provided to the

Depositor for inclusion in the Preliminary Prospectus Supplement and the Prospectus Supplement.

"Investment Company Act" means the Investment Company Act of 1940, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Issuing Entity" means RASC Series 2007-EMX1 Trust.

"Late Payment Rate" means the lesser of (a) the greater of (i) the per annum rate of interest publicly announced from time to time by Citibank, N.A. as its prime or base lending rate (any change in such rate of interest to be effective on the date such change is announced by Citibank, N.A.), and (ii) the then applicable highest rate of interest on any of the Class A Certificates and (b) the maximum rate permissible under applicable usury or similar laws limiting interest rates as determined by the Insurer. The Late Payment Rate shall be computed on the basis of the actual number of days elapsed over a year of 360 days.

"Material Adverse Change" means, in respect of any Person, a material adverse change as determined by the Insurer in the ability of such Person to perform its obligations under any of the Operative Documents, including any material adverse change in the business, financial condition, results of operations or properties of such Person on a consolidated basis with its subsidiaries that might have such effect. References herein to a Material Adverse Change that do not refer to a particular Person mean a Material Adverse Change with respect to either of RFC or the Depositor.

"Moody's" means Moody's Investors Service, Inc., and any successor thereto.

"Mortgage Loans" means the mortgage loans included in the Trust Fund.

"Offering Document" means any of the Preliminary Offering Document, the Final Offering Document (each as further supplemented by any subsequent amendment or supplement thereto), and any other offering document in respect of the Certificates that makes reference to the Policy.

"Operative Documents" means this Insurance Agreement, the Certificates, the Assignment Agreement, the Custodial Agreement, the Interest Rate Swap Agreement and the Pooling and Servicing Agreement.

"Person" means an individual, joint stock company, limited liability company, trust, unincorporated association, joint venture, corporation, business or owner trust, real estate investment trust, partnership or other organization or entity (whether governmental or private).

"Policy" means the Financial Guaranty Insurance Policy, No. 07030010, together with all endorsements thereto, issued by the Insurer in favor of the Trustee, for the benefit of the Holders of the Class A Certificates.

"Pooling and Servicing Agreement" has the meaning set forth in the recitals to this Insurance Agreement.

- 3 -

"Preliminary Offering Document" means the Prospectus, dated December 6, 2006, as supplemented by the preliminary prospectus supplement (the "Preliminary Prospectus Supplement"), dated March 7, 2007, in respect of the Class A Certificates.

"Premium" means the premium payable in accordance with the Policy and this Insurance Agreement, which shall be payable on each Distribution Date in arrears in an amount equal to 1/12th of the product of (i) the Premium Percentage and (ii) the aggregate Certificate Principal Balance of the Class A Certificates on the prior Distribution Date (after giving effect to any distributions to be made on such Distribution Date); provided that on the first Distribution Date, the Premium will be equal the product of the (i) Premium Percentage converted to a daily rate and (ii) the aggregate Certificate Principal Balance of the Class A Certificates as of the Closing Date and (iii) the number of days from and including the Closing Date to and including the first Distribution Date.

"Premium Percentage" shall mean 0.22% per annum.

"Registration Statement" means the registration statement on Form S-3 No. 333-131209 including the prospectus and prospectus supplement, relating to the Certificates, at the time it became effective.

"RFC" means Residential Funding Company, LLC, a Delaware limited liability company, in its individual capacity and as Sponsor and Master Servicer under the Pooling and Servicing Agreement, and includes any successor Master Servicer.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"Securities Act" means the Securities Act of 1933, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Securities Exchange Act" means the Securities Exchange Act of 1934, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Transaction" means the transactions contemplated by the Operative Documents, including the transactions described in the Offering Documents.

"Trust" means the RASC Series 2007-EMX1 Trust created pursuant to the terms of the Pooling and Servicing Agreement.

"Trust Fund" has the meaning given such term in the Pooling and Servicing Agreement.

"Underwriter" means Residential Funding Securities, LLC and Credit Suisse Securities (USA) LLC.

"Underwriting Agreement" means the Underwriting Agreement, dated March [7], 2007 between the Underwriters and the Depositor with respect to the Class A Certificates, as amended, modified or supplemented from time to time.

- 4 -

**Section 1.02.  Other Definitional Provisions**.

The words "hereof," "herein" and "hereunder" and words of similar import when used in this Insurance Agreement shall refer to this Insurance Agreement as a whole and not to any particular provision of this Insurance Agreement and Section, subsection, Schedule and Exhibit references are to this Insurance Agreement unless otherwise specified.  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.  The words "include" and "including" shall be deemed to be followed by the phrase "without limitation."

**ARTICLE II**
**REPRESENTATIONS, WARRANTIES AND COVENANTS**

**Section 2.01.  Representations and Warranties**.

(a)      *Representations and Warranties of RFC and the Depositor*.  Each of RFC and the Depositor represents and warrants as of the Closing Date, as follows:

(i)      *Due Organization and Qualification*.  RFC is a limited liability company and the Depositor is a corporation and each of RFC and the Depositor is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Each of RFC and the Depositor is duly qualified to do business, is in good standing and has obtained all necessary licenses, permits, charters, registrations and approvals (together, "approvals") necessary for the conduct of its business as currently conducted and as described in the Offering Documents and the performance of its obligations under the Operative Documents to which it is a party in each jurisdiction in which the failure to be so qualified or to obtain such approvals would render any Operative Document to which it is a party unenforceable in any material respect or would have a material adverse effect on the Transaction.

(ii)      *Power and Authority*.  Each of RFC and the Depositor has all necessary power and authority to conduct its business as currently conducted and as described in the Offering Documents, to execute, deliver and to perform its obligations under, the Operative Documents to which it is a party and to consummate the Transaction.

(iii)      *Due Authorization*.  The execution, delivery and performance of the Operative Documents to which it is a party by each of RFC and the Depositor have been duly authorized by all necessary actions and does not require any additional approvals or consents, or other action by or any notice to or filing with any Person, including any governmental entity or any of its stockholders or beneficial owners, as applicable, which it has not previously obtained or given.

(iv)      *Noncontravention*.  The execution and delivery by each of RFC and the Depositor of the Operative Documents to which it is a party, the consummation of the Transaction and the satisfaction of the terms and conditions of the Operative Documents to which it is a party do not and will not:

- 5 -

        (1)     conflict with or result in any breach or violation of any provision of the applicable organizational documents of RFC or the Depositor or any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award currently in effect having applicability to RFC or the Depositor or any of their respective material properties, including regulations issued by any administrative agency or other governmental authority having supervisory powers over RFC or the Depositor, which conflict, breach or violation reasonably could be expected to result in a Material Adverse Change;

        (2)     constitute a default by RFC or the Depositor under, result in the acceleration of any obligation under, or breach any provision of, any loan agreement, mortgage, indenture or other agreement or instrument to which RFC or the Depositor is a party or by which any of their respective properties is or may be bound or affected, which default, acceleration or breach reasonably could be expected to result in a Material Adverse Change; or

        (3)     result in or require the creation of any lien upon or in respect of any assets of RFC or the Depositor, which lien reasonably could be expected to result in a Material Adverse Change, except as otherwise contemplated by the Operative Documents.

        (v)    *Legal Proceedings.* There is no action, proceeding or investigation by or before any court, governmental or administrative agency or arbitrator against or affecting RFC or the Depositor or any of their respective subsidiaries, any properties or rights of RFC or the Depositor or any of their respective subsidiaries, or any of the Mortgage Loans, either pending or, to RFC's or the Depositor's knowledge after reasonable inquiry, threatened, that, if decided adversely to RFC or the Depositor or any such subsidiary could result in a Material Adverse Change with respect to RFC or the Depositor.

        (vi)    *Valid and Binding Obligations.* The Operative Documents to which each of RFC and/or the Depositor is a party, when executed and delivered by RFC and/or the Depositor and the other parties thereto, will constitute legal, valid and binding obligations of each of RFC and the Depositor, enforceable in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equitable principles and public policy considerations as to rights of indemnification for violations of federal securities laws. The Class A Certificates, when executed, authenticated and delivered in accordance with the Pooling and Servicing Agreement, will be validly issued and outstanding and entitled to the benefits of the Pooling and Servicing Agreement. So long as no Insurer Default shall have occurred and continued beyond any grace period applicable thereto, it will not at any time in the future deny that the Operative Documents to which it is a party constitute its legal, valid and binding obligations.

        (vii)    *Financial Statements.* RFC has furnished copies of its Financial Statements to the Insurer, (1) those Financial Statements: (i) are, as of the dates and for

the periods referred to therein, complete and correct in all material respects, (ii) present fairly its financial condition and results of operations as of the dates and for the periods indicated and (iii) have been prepared in accordance with generally accepted accounting principles consistently applied, except as noted therein (subject as to interim statements to normal year-end adjustments) and (2) since the date of the most recent of those Financial Statements, there has been no Material Adverse Change in respect of RFC.

(viii)    [RESERVED].

(ix)    *Taxes*.  RFC has filed prior to the date hereof all federal and state tax returns that are required to be filed, and has paid all taxes, including any assessments received by it that are not being contested in good faith, to the extent that such taxes have become due, except with respect to any failures to file or pay that, individually or in the aggregate, will not result in a Material Adverse Change.

(x)    *Accuracy of Information*.  None of the Operative Documents nor any other material information relating to the Mortgage Loans, the operations of RFC or the Depositor or the financial condition of RFC or the Depositor (collectively, the "Documents"), as amended, supplemented or superseded, furnished to the Insurer in writing or in electronic form by RFC or the Depositor, including the Offering Documents (other than the Insurer Information) contains any statement of a material fact which was untrue or misleading in any material respect when made.  Each of RFC and the Depositor has no knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change with respect to RFC or the Depositor.  Since the furnishing of the Documents, there has been no change nor any development or event involving a prospective change known to RFC or the Depositor that would render any of the Documents untrue or misleading in any material respect.

(xi)    *Compliance with Securities Laws*.  The offering and sale of the Class A Certificates complies in all material respects with all requirements of law, including the registration requirements of the Securities Act and any other applicable securities laws. The Offering Documents do not contain any untrue statement of a material fact and do not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; *provided, however*, that no representation is made with respect to the Insurer Information.  The offering of the Class A Certificates has not been and will not be in violation of the Securities Act or any other federal or state securities laws.  Based upon advice of legal counsel, the Trust Fund is not required to be registered as an "investment company" under the Investment Company Act.

(xii)    *Operative Documents*.  Each of the representations and warranties of RFC and the Depositor contained in the applicable Operative Documents and the Underwriting Agreement is true and correct in all material respects; *provided, however*, that the remedy for any breach of a representation and warranty of RFC in Section 4 of the Assignment Agreement and the remedy with respect to any defective Mortgage Loan or any Mortgage Loan as to which there has been a breach of a representation or warranty under Section 4

- 7 -

or Section 5 of the Assignment Agreement shall be limited to the remedies specified in the Assignment Agreement.

(xiii)   *Solvency; Fraudulent Conveyance.* Each of RFC and the Depositor is solvent, and will not be rendered insolvent by the Transaction and after giving effect to the Transaction, neither RFC nor the Depositor shall not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business. Each of RFC and the Depositor does not intend to incur, and does not believe that it has incurred, debts beyond its ability to pay as they mature. Each of RFC and the Depositor does not contemplate the commencement of insolvency, liquidation or consolidation proceedings or the appointment of a receiver, liquidator, conservator, trustee or similar official in respect of RFC or the Depositor or any of their respective assets. The amount of consideration it will receive upon the sale of the Mortgage Loans or the Class A Certificates, as applicable, pursuant to the terms and conditions of the related Operative Documents constitutes reasonably equivalent value and fair consideration for the Mortgage Loans or the Class A Certificates, as the case may be. It is not entering into the Operative Documents, or transferring any of its assets in connection with the Transaction, with any intent to hinder, delay or defraud any of its creditors.

(xiv)   [RESERVED];

(xv)   *Qualified Special Purpose Entity.* The Issuing Entity is a qualified special purpose entity as the term is defined in Statement of Financial Accounting Standards No. 140 ("FAS 140") issued by the Financial Accounting Standards Board ("FASB").

(b)   *Representations and Warranties of the Trustee.* The Trustee represents and warrants as of the Closing Date, as follows and covenants with the other parties hereto as follows:

(i)   *Due Organization and Qualification.* The Trustee is duly organized, existing and authorized to engage in the business of banking as a national banking association.

(ii)   *Due Authorization.* The Trustee has full power, authority and right to execute, deliver and perform the Operative Documents to which it is a party, and has taken all necessary steps to authorize the execution, delivery and performance by it of the Operative Documents to which it is a party.

(iii)   *Due Execution.* The Operative Documents to which the Trustee is a party have been duly executed and delivered by the Trustee.

**Section 2.02.  Affirmative Covenants of RFC and the Depositor.**

Each of RFC and the Depositor hereby agrees that during the term of this Insurance Agreement, it will comply with the following covenants, unless the Insurer shall otherwise expressly consent in writing:

- 8 -

(a)    *Compliance With Agreements and Applicable Laws.*  Each of RFC and the Depositor shall comply in all material respects with the terms and conditions of and perform its obligations under the Operative Documents to which it is a party and shall comply with all requirements of any law, rule or regulation applicable to it in all circumstances where non-compliance reasonably could be expected to result in a Material Adverse Change.

(b)    *Existence.*  Except in the case of a merger or other business combination that is consummated in compliance with the Operative Documents, each of RFC and the Depositor will at all times (i) maintain its existence as a limited liability company or corporation, as applicable (ii) be duly organized under the laws of its jurisdiction of incorporation or organization and duly qualified and duly authorized (as described in subsections 2.01(a), (b) and (c) hereof) and (iii) conduct its business in accordance with the terms of its organizational documents.

(c)    *Financial Statements; Accountants' Reports; Other Information.*  Each of RFC and the Depositor shall keep or cause to be kept, in reasonable detail, books and records of account of its assets and business relating to the Transaction.  RFC will furnish or cause to be furnished to the Insurer:

(i)    *Annual Financial Statements.*  As soon as available, and in any event within 120 days after the close of each fiscal year of RFC, the audited consolidated statements of financial condition for RFC and its subsidiaries as of the end of such fiscal year of RFC and the related audited consolidated statements of operations, stockholders' equity and cash flows for such fiscal year, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the preceding fiscal year, prepared in accordance with generally accepted accounting principles, consistently applied, and accompanied by the audit opinion of RFC's independent accountants (which shall be a nationally recognized independent public accounting firm or otherwise acceptable to the Insurer) and by a certificate relating to such statements equivalent to the certificate required by Section 2.02(a)(ii).

(ii)    *Quarterly Financial Statements.*  Upon the reasonable request of the Insurer, and as soon as reasonably practicable, the unaudited consolidated statement of financial condition of RFC and its subsidiaries as of the end of the first three quarters of each fiscal year of RFC and the related unaudited consolidated statements of operations, stockholders' equity and cash flows for the portion of the fiscal year then ended, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the preceding fiscal year, prepared in accordance with generally accepted accounting principles consistently applied (subject to normal year-end adjustments); each delivery of quarterly financial statements shall be accompanied by a certificate of one (or more) corporate officers stating that the quarterly financial statements are correct in all material respects and present fairly the financial condition and results of operations of RFC and its subsidiaries as of the dates and for the periods indicated, in accordance with generally accepted accounting principles consistently applied (subject to normal year-end adjustments).

(iii)    *Initial Report.*  On or before the Closing Date, a copy of the magnetic tape or Mortgage Loan Schedule in the form of an electronic database or spreadsheet file,

using database or spreadsheet software that is readily available to the Insurer, to be delivered to the Trustee on the Closing Date setting forth, as to each Mortgage Loan, the information required under the definition of "Mortgage Loan Schedule" in the Pooling and Servicing Agreement, and on each Distribution Date, RFC will ensure that updated Mortgage Loan data is available to the Insurer on RFC's or the Depositor's internet website, including changes to information discovered to have been incorrect.

(iv)    *Servicing Reports.* Promptly upon receipt thereof, copies of all schedules, financial statements or other similar reports delivered to or by RFC, the Depositor or the Trustee pursuant to the terms of any of the Operative Documents, including all reports provided to either the Trustee or any Holder pursuant to the Pooling and Servicing Agreement.

(v)    *Other Information.* (A) Promptly upon request, such other data as the Insurer may reasonably request relating to the Mortgage Loans, the servicing of the Mortgage Loans (including, without limitation, a detailed accounting on a loan-by-loan basis as to amounts advanced by, sold, pledged or assigned to, and reimbursed to any advancing Person), the Transaction or the ability of any of RFC or the Depositor to perform its obligations under the Operative Documents, and (B) all information required to be furnished to the Trustee or the Holders, as the case may be.

All financial statements specified in clauses (i) and (ii) of this subsection (c) will be furnished in consolidated form for RFC and all its subsidiaries in the event that RFC consolidates its financial statements with its subsidiaries. To the extent available, the information supplied pursuant to clauses (iii), (iv) or (v) will be in Excel or Word format or another form of an electronic data file accessible by the Insurer by means of standard application software.

(d)    [RESERVED].

(e)    *Access to Records; Discussions with Officers and Accountants.* On an annual basis, or at any time when a Material Adverse Change shall have occurred and be continuing, upon the reasonable request of the Insurer, it will permit the Insurer or its authorized agents, or cause the Insurer or its authorized agents to be permitted:

(i)    to inspect the books and records of RFC or the Depositor as they may relate to the Class A Certificates, their respective obligations under the Operative Documents to which it is a party and the Transaction (including, without limitation, access to information reasonably required for purposes of complying with FASB Financial Interpretation No. 46; provided that the Insurer will maintain confidentiality with respect to such information in accordance with its internal policies);

(ii)    to discuss the affairs, finances and accounts of RFC or the Depositor as they relate to the Mortgage Loans, the Transaction or the ability to perform their respective obligations under the Operative Documents with a Servicing Officer, in the case of RFC, or its responsible officers and employees, in the case of the Depositor; and

(iii)    if the Insurer reasonably believes that a Material Adverse Change may have occurred and with RFC's consent, which consent shall not be unreasonably withheld

or delayed, to discuss the affairs, finances and accounts of RFC or the Depositor with the independent accountants of such Person; *provided, however,* that officers of RFC shall have the right to be present during such discussions.

In addition, if requested by the Insurer, on an annual basis, or otherwise when reasonably requested by the Insurer, RFC will (x) cause the Custodian to deliver to the Insurer an updated certification, in the form of the "Interim Certification" required under the Custody Agreement, with an exceptions list attached thereto, to enable the Insurer to track the progress of recording of Mortgages and Assignments with respect to the Mortgage Loans, and (y) use its reasonable best efforts to cause the Insurer or its authorized agents to be permitted to inspect the books and records of any Subservicer as they may relate to the Mortgage Loans or its servicing operation relating thereto and to discuss the affairs, finances and accounts of such Subservicer as they relate to the Mortgage Loans or its ability to perform its respective obligations under the related subservicing agreement with its responsible officers and employees.

Such inspections and discussions shall be conducted during normal business hours and shall not unreasonably disrupt the business of RFC or the Depositor, and no such inspections or discussions shall be commenced more frequently than three times in any twelve month period and each shall be concluded within a reasonable period of time after commencement. The books and records of RFC or the Depositor shall be maintained at the address of RFC designated herein for receipt of notices, except to the extent that RFC shall otherwise advise the parties hereto in writing.

(f)     *Notice of Material Events.* Each of RFC and the Depositor will promptly inform the Insurer in writing of the occurrence of any of the following:

(i)     the submission of any claim or the initiation or threat of any legal process, litigation or administrative or judicial investigation, or the initiation of any proceeding or disciplinary proceeding by or against it that (A) it is required to disclose to the Commission (or that it would be required to disclose to the Commission if the Certificates were registered under the Securities Exchange Act and its reporting obligations under the Securities Exchange Act were not suspended) or to its shareholders, members or beneficial owners that relates to the Mortgage Loans, the Transaction or RFC's or the Depositor's ability to perform its obligations under any Operative Documents or (B) could result in a Material Adverse Change;

(ii)     the promulgation by any governmental agency of any proposed or final rule (but only if it has actual knowledge thereof) which would likely result in a Material Adverse Change;

(iii)     any change in its legal name or jurisdiction of organization;

(iv)     the occurrence of any Default or Event of Default or any Material Adverse Change in respect of RFC or the Depositor;

(v)     the commencement of any proceedings with respect to RFC or the Depositor under any applicable bankruptcy, reorganization, liquidation, rehabilitation, insolvency or other similar law now or hereafter in effect or of any proceeding in which a

- 11 -

receiver, liquidator, conservator, trustee or similar official shall have been, or may be, appointed or requested for RFC or the Depositor or any of their respective assets; or

(vi)    the receipt of notice that (A) RFC or the Depositor is being placed under regulatory supervision, (B) any license, permit, charter, registration or approval materially necessary for the conduct of RFC's or the Depositor's business is to be, or may be, suspended or revoked or (C) RFC or the Depositor is to cease and desist any practice, procedure or policy it employs in the conduct of its business, and such suspension, revocation or cessation may reasonably be expected to result in a Material Adverse Change with respect to RFC or the Depositor.

(g)    *Financing Statements and Further Assurances.* RFC shall file or cause to be filed all necessary financing statements or other instruments, and any amendments or continuation statements relating thereto, necessary to be kept and filed in such manner and in such places as may be required by law to preserve and protect fully the interest of the Trustee in the Trust Fund. Upon the reasonable request of the Insurer, from time to time, each of RFC and the Depositor will execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, within ten days of such request, such amendments hereto and such further instruments, and will take or cause to be taken such further action, as may be reasonably necessary to effectuate the intention, performance and provisions of the Operative Documents.

(h)    *Maintenance of Licenses.* Each of RFC and the Depositor and any successors thereof, has and shall maintain all licenses, permits, charters and registrations the loss or suspension of which, or the failure to hold which, could reasonably be expected to result in a Material Adverse Change.

(i)    *Retirement of Class A Certificates.* RFC and the Depositor shall instruct the Trustee upon a retirement or other payment of all of the Class A Certificates, to surrender the Policy to the Insurer for cancellation.

(j)    *Rating Agencies.* RFC and the Depositor and any of their respective successors will cooperate with S&P and Moody's in connection with any review of the Transaction that may be undertaken by S&P and Moody's after the date hereof.

(k)    *Third-Party Beneficiary.* Each of RFC and the Depositor agrees that the Insurer shall have all rights provided to the Certificate Insurer in the Operative Documents and that the Insurer will constitute a third-party beneficiary with respect to such rights in respect of the Operative Documents and hereby incorporates and restates its representations, warranties and covenants as set forth therein for the benefit of the Insurer; *provided, however,* that the remedy for any breach of a representation and warranty of RFC in Section 4 of the Assignment Agreement and the remedy with respect to any defective Mortgage Loan or any Mortgage Loan as to which there has been a breach of a representation or warranty under Section 4 or 5 of the Assignment Agreement shall be limited to the remedies specified in the Assignment Agreement.

(l)    *Servicing of Mortgage Loans.* All Mortgage Loans will be serviced in all material respects in compliance with the Pooling and Servicing Agreement.

(m)    *Due Diligence.* If in the Insurer's reasonable judgment circumstances so warrant, based on the performance of the Transaction, the Insurer shall have the right, so long as the Class A Certificates remain outstanding, to conduct reviews of RFC's practices as Master Servicer through reviews of the Mortgage Loans, reappraisals of Mortgaged Properties and reviews of servicing practices, at the Insurer's expense and in a reasonable manner convenient to both RFC and the Insurer. This due diligence right is in addition to the access provided and the other rights provided for in Section 2.02(e) of this Insurance Agreement.

(n)    *Closing Documents; Post Closing Matters.* The Depositor shall cause to be delivered as soon as possible (but in no event later than 60 days of the Closing Date) two closing sets to the Insurer and one closing set to its counsel, which closing sets may be delivered in electronic form and shall include execution copies of each of the Operative Documents other than the Certificates.

(o)    *Disclosure Document.* Upon the written direction of the Insurer prior to the delivery of any Offering Document, each Offering Document delivered with respect to the Class A Certificates shall clearly disclose that the Policy is not covered by the property/casualty insurance security fund specified in Article 76 of the New York Insurance Law.

(p)    *Notice to Insurer.* If the Depositor does not receive any Insurer Financial Statements pursuant to Section 2.04(j) herein at least five days prior to the date that such Insurer Financial Statements are to be filed with the Commission, the Depositor shall provide or shall cause the party responsible for filing the Depositor's Form 10-Ds and Form 10-Ks to provide written notice to the Insurer via electronic mail at RegAB@fgic.com, stating that it has not received the Insurer Financial Statements and requesting that such Insurer Financial Statements be emailed in accordance with Section 2.04(j) herein. Additionally, in the event that any Insurer Financial Information is to be included in a Form 10-D or Form 10-K filing of the Issuing Entity which occurs prior to the termination of the offering of the Certificates, the Depositor shall provide written notice to the Insurer via electronic mail at least ten (10) days prior to such filing, stating that an accountant's consent will be required for such filing. In such event the Depositor shall be responsible for paying the Insurer's costs for obtaining such consent. All such emails shall identify the deal name and the policy number. No failure by the Depositor or any other party to notify the Insurer pursuant to this Section 2.02(p) that any financial statements that are required to be delivered by the Insurer have not been received or to request delivery thereof, shall affect the Insurer's obligations with respect thereto, including without limitation, its obligation to deliver such financial statements hereunder and its obligation hereunder to indemnify the Depositor and the other parties specified in Section 3.04(b) for any failure to deliver.

### Section 2.03. Negative Covenants of RFC and the Depositor.

Each of RFC and the Depositor hereby agrees that during the term of this Insurance Agreement it will comply with the following covenants, unless the Insurer shall otherwise expressly consent in writing:

(a)    *Impairment of Rights.* Neither RFC or the Depositor will take any action, or fail to take any action, if such action or failure to take action may result in a material adverse change

in its ability to perform its obligations under any of the Operative Documents, or interfere in any material respect with the enforcement of any rights of the Insurer under or with respect to any of the Operative Documents. RFC and the Depositor will give the Insurer written notice when any event, action or, to its knowledge, omission to act, may result in a material adverse change as described in the definition of Material Adverse Change, on the earlier of: (i) the date upon which any publicly available filing or release is made with respect to such event, action or omission to act and (ii) promptly prior to the date of occurrence of such event, action or failure to act or, if such notice cannot be given at or before such time, as soon as possible thereafter. RFC and the Depositor will furnish to the Insurer all information reasonably requested by the Insurer that is necessary to demonstrate compliance with this paragraph.

(b)    *Waiver, Amendments, Etc*. Except as provided in and in accordance with the Operative Documents, neither RFC or the Depositor will modify, waive or amend, or consent to any modification, waiver or amendment of, any of the terms, provisions or conditions of the Operative Documents to which it is a party (other than any amendment to an Offering Document required by law) without the prior written consent of the Insurer thereto, which consent shall not be unreasonably withheld, conditioned or delayed.

### Section 2.04.  Representations, Warranties and Covenants of the Insurer.

The Insurer represents, warrants and covenants to each of RFC, the Depositor and the Trustee as follows:

(a)    *Organization and Licensing*. The Insurer is duly incorporated and validly existing as a New York stock insurance company in good standing and duly qualified to conduct an insurance business in the State of New York and in any other jurisdiction where qualification may be necessary to accomplish the Transaction.

(b)    *Corporate Power*. The Insurer has the corporate power and authority to issue the Policy and execute and deliver this Insurance Agreement and to perform all of its obligations hereunder and thereunder.

(c)    *Authorization; Approvals*. Proceedings legally required for the issuance and execution of the Policy and the execution, delivery and performance of this Insurance Agreement have been taken and licenses, orders, consents or other authorizations or approvals of any governmental boards or bodies legally required for the enforceability of the Policy and the conduct by the Insurer of the business and activities contemplated by the Transaction have been obtained; any proceedings not taken and any licenses, authorizations or approvals not obtained are not material to the enforceability of the Policy.

(d)    *Enforceability*. The Policy, when issued, and this Insurance Agreement, will each constitute a legal, valid and binding obligation of the Insurer, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, receivership and other similar laws affecting creditors' rights generally and to general principles of equity and subject to principles of public policy limiting the right to enforce the indemnification provisions contained therein and herein, insofar as such provisions relate to indemnification for liabilities arising under federal securities laws.

(e)     *Financial Information.*  The audited consolidated balance sheets of the Insurer and subsidiaries as of December 31, 2006 and December 31, 2005, and the related statements of income, stockholder's equity and cash flows, and the accompanying notes there, for each of the years in the three-year period ended December 31, 2006, together with an opinion thereon of Ernst & Young LLP, independent registered public accounting firm, a copy of which is incorporated by reference into the registration statement relating to the Offering Documents, present fairly in all material respects the financial condition of the Insurer as of such dates and for the periods covered by such statements in accordance with generally accepted accounting principles consistently applied.  Since December 31, 2006, there has been no material change in such financial condition of the Insurer that would materially and adversely affect its ability to perform its obligations under the Policy.

(f)     *Insurer Information.*  The Insurer Information in the Preliminary Offering Document as of the date of the Preliminary Offering Document and the Insurer Information in the Final Offering Document as of the date of the Final Offering Document and as of the date hereof is true and correct in all material respects and does not contain any untrue statement of a material fact.

(g)     *No Litigation.*  There are no actions, suits, proceedings or investigations pending or, to the best of the Insurer's knowledge, threatened against it at law or in equity or before or by any court, governmental agency, board or commission or any arbitrator which, if decided adversely, would materially and adversely affect its ability to perform its obligations under the Policy or this Insurance Agreement.

(h)     *Confidential Information.*  The Insurer agrees that it shall comply with the terms of the Confidentiality Agreement dated September 4, 2000, between RFC and the Insurer.

(i)     *Compliance with Law, Etc.*  No practice, procedure or policy employed, or proposed to be employed, by the Insurer in the conduct of its business violates any law, regulation, judgment, agreement, order or decree applicable to the Insurer that, if enforced, could result in a Material Adverse Change with respect to the Insurer.

(j)     *Delivery of Financial Statements of Insurer.*  As soon as reasonably practicable after the release of its unaudited financial statements for each of March, June and September 2007 fiscal quarters and the release of its audited financial statements for the 2007 fiscal year, the Insurer shall furnish to the Depositor such unaudited or audited financial statements, as appropriate (the "Insurer Financial Statements") for the related period meeting the requirements of Regulation S-X of the Securities Act.  The Insurer Financial Statements shall be delivered in electronic form via electronic mail to SFRegABCoordinator@gmacrfc.com, or such other address that has been designated by the Depositor and provided in writing to the Insurer.  To the extent that the Insurer shall have been notified in writing on or before February 15, 2008 that the Depositor's reporting obligations under the Securities Exchange Act have not been suspended in accordance with the Securities Exchange Act and the related rules and regulations thereto, the Insurer shall continue to furnish such quarterly and annual financial statements as set forth above for so long as such financial statements may be required for the Depositor to comply with its reporting requirements under the Securities Exchange Act.  All written notices under this section shall be sent to the Insurer via electronic mail at RegAB@fgic.com.  The requirement for the

- 15 -

delivery of any Insurer Financial Statements pursuant to this Section 2.04(j) shall be satisfied to the extent that the Insurer has delivered the required Insurer Financial Statements pursuant to any similar transaction in which RFC is acting as "Sponsor" or "Seller." The Insurer shall use commercially reasonable efforts to identify each transaction to which the delivery relates, provided that the failure to denote such transactions shall not be deemed a failure to deliver such Insurer Financial Statements pursuant to this Section 2.04(j).

(k)    *Delivery of Information Regarding Affiliates and Relationships.* If the Depositor is required to include information required by Item 1119 of Regulation AB in the Depositor's Report on Form 10-K and the Depositor provides written notice to the Insurer via electronic mail at RegAB@fgic.com, referencing "Reg AB Item 1119 Reporting" (i) identifying the relevant parties to the transaction as required under paragraph (a) of Item 1119 of Regulation AB (such parties the "Transaction Parties") and (ii) requesting that the Insurer identify whether the Insurer is an affiliate of any of the Transaction Parties then the Insurer shall provide the following information to the Depositor in electronic form via electronic mail to SFRegABCoordinator@gmacrfc.com, or such other address that has been designated by the Depositor, not later than 30 days after such request by the Depositor: (x) any Transaction Party which directly controls, or is directly controlled by, either the Insurer or FGIC Corporation and (y) any Transaction Party which, to the knowledge of senior management of the Insurer, indirectly controls, is indirectly controlled by, or is under common control with, either the Insurer or FGIC Corporation.

## ARTICLE III
## THE POLICY; REIMBURSEMENT

**Section 3.01.  Issuance of the Policy.**

The Insurer agrees to issue the Policy on the Closing Date subject to satisfaction of the conditions precedent set forth below on or prior to the Closing Date:

(a)    [RESERVED];

(b)    *Operative Documents.*  The Insurer shall have received a copy of each of the Operative Documents, in form and substance reasonably satisfactory to the Insurer, duly authorized, executed and delivered by each party thereto;

(c)    [RESERVED];

(d)    *Representations and Warranties.*  The representations and warranties of RFC and the Depositor made as of the Closing Date and set forth or incorporated by reference in this Insurance Agreement shall be true and correct on and as of the Closing Date as if made on the Closing Date;

(e)    *Opinions of Counsel.*  The law firm of Orrick, Herrington & Sutcliffe LLP shall have delivered its opinion or opinions of counsel substantially in the form previously reviewed by and found acceptable by the Insurer's counsel; the Insurer shall have received such other opinions of counsel, addressed to the Insurer and in form and substance acceptable to the Insurer, addressing such other matters as the Insurer may reasonably request;

- 16 -

(f)    [RESERVED];

(g)    *No Litigation, Etc.*    No suit, action or other proceeding, investigation or injunction, or final judgment relating thereto, shall be pending or threatened before any court, governmental or administrative agency or arbitrator in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with any of the Operative Documents or the consummation of the Transaction;

(h)    *Legality.*    No statute, rule, regulation or order shall have been enacted, entered or deemed applicable by any government or governmental or administrative agency or court that would make the Transaction illegal or otherwise prevent the consummation thereof;

(i)    *Satisfaction of Conditions of the Underwriting Agreement.*    All conditions in the Underwriting Agreement relating to the Underwriters' obligation to purchase the Offered Certificates shall have been satisfied, unless waived by the Underwriters and approved by the Insurer;

(j)    *Issuance of Ratings.*    The Insurer shall have received confirmation that (i) the Class A Certificates are rated at least "BBB" by S&P and at least "A2" by Moody's, without regard to the Policy, and (ii) the Class A Certificates, when issued, will be rated "AAA" by S&P and "Aaa" by Moody's;

(k)    *No Default.*    No Default or Event of Default shall have occurred;

(l)    *Satisfactory Documentation.*    The Insurer and its counsel shall have reasonably determined that all documents, certificates and opinions to be delivered in connection with the Class A Certificates conform to the terms of the Pooling and Servicing Agreement and this Insurance Agreement and the descriptions thereof in the Offering Documents.

### Section 3.02. Payment of Fees and Premium.

(a)    *Legal, Accounting and Due Diligence Fees.*    RFC shall pay or cause to be paid to the Insurer, at the Closing Date, legal fees, due diligence expenses and accounting fees incurred by the Insurer in connection with the issuance of the Policy in an amount equal to $34,000.

(b)    *Premium.*

(i)    In consideration of the issuance by the Insurer of the Policy, the Insurer shall be entitled to receive the Premium with respect to that Policy, in the amount set forth herein, as and when due and from the funds specified by Section 4.02 of the Pooling and Servicing Agreement. In addition, the Insurer will be paid on the Closing Date from the proceeds of the issuance of the Class A Certificates, an upfront premium in an amount equal to $2,043,913.

(ii)    The Premiums paid under the Pooling and Servicing Agreement shall be nonrefundable without regard to whether the Insurer makes any payment under any Policy or any other circumstances relating to the Class A Certificates or provision being made for payment of the Class A Certificates prior to maturity.

(c)    *Rating Agency Fees.* RFC shall promptly pay the initial fees of S&P and Moody's with respect to the Class A Certificates and the transaction following receipt of a statement with respect thereto. All periodic and subsequent fees of S&P or Moody's with respect to, and directly allocable to, the Class A Certificates shall be for the account of, and shall be billed to, RFC. The fees for any other rating agency shall be paid by the party requesting such other agency's rating unless such other agency is a substitute for S&P or Moody's in the event that S&P or Moody's is no longer rating the Class A Certificates, in which case the fees for such agency shall be paid by RFC.

(d)    *Account.* All payments made to the Insurer pursuant to this Section 3.02 shall be made by wire transfer of immediately available funds to the following account:

|   |   |
|---|---|
| Account Name: | FGIC Premium Account |
| Account Number: | 904951812 |
| Bank: | JPMorgan Chase |
| ABA Number: | 021000021 |
| Reference: | RASC 2007-EMX1 |
| FGIC Policy Number: | 07030010 |

### Section 3.03. Reimbursement Obligation.

(a)    As and when due in accordance with and from the funds specified in Section 4.02 of the Pooling and Servicing Agreement, the Insurer shall be entitled to reimbursement for any payment made by the Insurer under the Policy, which reimbursement shall be due and payable on the date that any amount is paid under the Policy, in an amount equal to the amount to be so paid and all amounts previously paid that remain unreimbursed, together with interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate.

(b)    Anything in Sections 2.01(a)(xii) and 3.03(a) hereof or in any Operative Document to the contrary notwithstanding, the Insurer shall be entitled to full reimbursement from RFC for (i) any payment made under the Policy arising as a result of RFC's failure to substitute for or deposit an amount in respect of any defective Mortgage Loan as required pursuant to Section 4 and Section 5 of the Assignment Agreement, together with interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any such unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate, and (ii) any payment made under the Policy arising as a result of RFC's or the Depositor's failure to pay or deposit any amount required to be paid or deposited pursuant to the Operative Documents, together with interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any such unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate.

(c)    RFC agrees to pay to the Insurer any and all reasonable charges, fees, costs and expenses that the Insurer may reasonably pay or incur, including reasonable attorneys' and

accountants' fees and expenses, in connection with (i) the enforcement, defense or preservation of any rights in respect of any of the Operative Documents, including defending, monitoring or participating in any litigation or proceeding (including any insolvency proceeding in respect of any Transaction participant or any affiliate thereof) relating to any of the Operative Documents, any party to any of the Operative Documents (in its capacity as such a party) or the Transaction or (ii) any amendment, waiver or other action with respect to, or related to, any Operative Document, whether or not executed or completed. Provided that three Business Days written notice of the intended payment or incurrence shall have been given to RFC by the Insurer, such reimbursement shall be due on the dates on which such charges, fees, costs or expenses are paid or incurred by the Insurer.

(d)    RFC agrees to pay to the Insurer interest (without duplication) on any and all amounts described in subsections 3.03(b), 3.03(c) and 3.03(e) and Sections 3.02 and 3.04 from the date such amounts become due or, in the case of subsection 3.03(c) or Section 3.04, are incurred or paid by the Insurer until payment thereof in full (after as well as before judgment), at the Late Payment Rate.

(e)    RFC agrees to pay to the Insurer as follows: any payments made by the Insurer on behalf of, or advanced to, RFC or the Depositor including any amounts payable by RFC or the Depositor pursuant to any of the Operative Documents on the date any such payment is made or advanced by the Insurer. Notwithstanding the foregoing, in no event shall the Insurer have any recourse under this subsection against RFC or the Depositor with respect to any payments the Insurer has made in respect of principal or interest distributions on the Class A Certificates (except pursuant to Section 3.03(b) above).

(f)    The Insurer shall have no right to set-off payments to be made under the Policy against payments to be made to the Insurer by RFC or the Depositor (or any person or organization acting on their behalf), the Trustee or any Holder or any affiliate, officer or director of any of them.

**Section 3.04.  Indemnification.**

(a)    In addition to any and all of the Insurer's rights of reimbursement, indemnification, subrogation and to any other rights of the Insurer pursuant hereto or under law or in equity, RFC and the Depositor agree to pay, and to protect, indemnify and save harmless, the Insurer and its officers, directors, shareholders, employees, agents and each Person, if any, who controls the Insurer within the meaning of either Section 15 of the Securities Act or Section 20 of the Securities Exchange Act from and against, any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of any nature arising out of or relating to the breach by RFC or the Depositor of any of the representations or warranties contained in Section 2.01 or arising out of or relating to the transactions contemplated by the Operative Documents by reason of:

(i)    any omission or action (other than of or by the Insurer) in connection with the offering, issuance or delivery of the Class A Certificates by RFC, the Depositor or the Trustee, other than those covered by subparagraph (v) below;

- 19 -

(ii)    (ii)    the misfeasance or malfeasance of, or gross negligence or theft committed by, any director, officer, employee or agent of RFC, the Depositor or the Trustee in connection with any Transaction arising from or relating to the Operative Documents;

(iii)    the violation by RFC or the Depositor of any federal or state law, rule or regulation, or any judgment, order or decree applicable to it, which violation reasonably could result in a material adverse change as described in the definition of Material Adverse Change;

(iv)    the breach by RFC or the Depositor of any representation, warranty (other than a representation or warranty in respect of the Mortgage Loans contained in Section 4 of the Assignment Agreement, or covenant under any of the Operative Documents or the occurrence, in respect of RFC or the Depositor, under any of the Operative Documents of any "event of default"; or

(v)    any untrue statement or alleged untrue statement of a material fact contained in the Offering Documents or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; provided, however, that this Section 3.04(a)(v) does not cover the Insurer Information.

(b)    The Insurer agrees to pay, and to protect, indemnify and save harmless, RFC and the Depositor and their respective officers, directors, shareholders, employees, agents and each Person, if any, who controls RFC and the Depositor within the meaning of either Section 15 of the Securities Act or Section 20 of the Securities Exchange Act from and against, any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of any nature arising out of or by reason of (i) any untrue statement or alleged untrue statement of a material fact contained in the Insurer Information or the Insurer Financial Statements or any omission or alleged omission to state in the Insurer Information or Insurer Financial Statements a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; (ii) any failure of the Insurer to make a payment required to be made under the Policy; or (iii) a breach of any of the representations and warranties of the Insurer contained in Section 2.04 and a breach of covenant in 2.04(j) or (k)..

(c)    If any action or proceeding (including any governmental investigation) shall be brought or asserted against any Person (individually, an "Indemnified Party" and, collectively, the "Indemnified Parties") in respect of which the indemnity provided in Section 3.04(a) or (b) may be sought from RFC or the Depositor, on the one hand, or the Insurer, on the other (each, an "Indemnifying Party") hereunder, each such Indemnified Party shall promptly notify the Indemnifying Party in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all expenses. The omission so to notify the Indemnifying Party will not relieve it from any liability which it may have to any Indemnified Party except to the extent the Indemnifying Party is prejudiced thereby. The Indemnified Party shall have the right to employ

separate counsel in any such action and to participate in the defense thereof at the expense of the Indemnified Party; *provided, however,* that the fees and expenses of such separate counsel shall be at the expense of the Indemnifying Party if (i) the Indemnifying Party has agreed in writing to pay such fees and expenses, (ii) the Indemnifying Party shall have failed within a reasonable period of time to assume the defense of such action or proceeding and employ counsel reasonably satisfactory to the Indemnified Party in any such action or proceeding or (iii) the named parties to any such action or proceeding (including any impleaded parties) include both the Indemnified Party and the Indemnifying Party, and the Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the Indemnifying Party (in which case, if the Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such action or proceeding on behalf of such Indemnified Party, it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for the Indemnified Parties, which firm shall be designated in writing by the Indemnified Party and shall be reasonably satisfactory to the Indemnifying Party).  The Indemnifying Party shall not be liable for any settlement of any such action or proceeding effected without its written consent, which consent shall not be unreasonably withheld, conditioned or delayed, but, if settled with its written consent, or if there is a final judgment for the plaintiff in any such action or proceeding with respect to which the Indemnifying Party shall have received notice in accordance with this subsection (c), the Indemnifying Party agrees to indemnify and hold the Indemnified Parties harmless from and against any loss or liability by reason of such settlement or judgment. Notwithstanding anything in this paragraph to the contrary, the consent of such Indemnified Party shall not be required if such settlement fully discharges, with prejudice against the plaintiff, the claim or action against such Indemnified Party.

(d)     To provide for just and equitable contribution if the indemnification provided by the Indemnifying Party is determined to be unavailable or insufficient to hold harmless any Indemnified Party (other than due to application of this Section), each Indemnifying Party shall contribute to the losses incurred by the Indemnified Party on the basis of the relative fault of the Indemnifying Party, on the one hand, and the Indemnified Party, on the other hand.

No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

### Section 3.05.  Payment Procedure.

In the event of any payment by the Insurer, RFC and the Depositor agree to accept the voucher or other evidence of payment as prima facie evidence of the propriety thereof and the liability, if any, described in Section 3.03 therefor to the Insurer.  All payments to be made to the Insurer under this Insurance Agreement shall be made to the Insurer in lawful currency of the United States of America in immediately available funds at the notice address for the Insurer as specified in the Servicing Agreement on the date when due or as the Insurer shall otherwise

direct by written notice to the other parties hereto.  In the event that the date of any payment to the Insurer or the expiration of any time period hereunder occurs on a day that is not a Business Day, then such payment or expiration of time period shall be made or occur on the next succeeding Business Day with the same force and effect as if such payment was made or time period expired on the scheduled date of payment or expiration date.

### Section 3.06.  Liability of RFC.

RFC shall be liable for all amounts due and payable by the Depositor to the Insurer hereunder.

## ARTICLE IV
## FURTHER AGREEMENTS

### Section 4.01.  Effective Date; Term of the Insurance Agreement.

This Insurance Agreement shall take effect on the Closing Date and shall remain in effect until the later of (a) such time as the Insurer is no longer subject to a claim under the Policy and the Policy shall have been surrendered to the Insurer for cancellation and (b) all amounts payable to the Insurer by RFC or the Depositor hereunder or from any other source hereunder or under the Operative Documents and all amounts payable under the Class A Certificates have been paid in full; *provided, however*, that the provisions of Sections 3.02, 3.03, 3.04 and 3.06 hereof shall survive any termination of this Insurance Agreement.

### Section 4.02.  Further Assurances and Corrective Instruments.

(a)     Except at such times as a default in payment under the Policy shall exist or shall have occurred, none of RFC, the Depositor or the Trustee shall grant any waiver of rights under any of the Operative Documents to which any of them is a party without the prior written consent of the Insurer, which shall not be unreasonably withheld, conditioned or delayed and any such waiver without prior written consent of the Insurer shall be null and void and of no force or effect.

(b)     To the extent permitted by law, each of RFC and the Depositor agrees that it will, from time to time, following good faith negotiations in connection therewith, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such supplements hereto and such further instruments as the Insurer may reasonably request and as may be required in the Insurer's reasonable judgment to effectuate the intention of or facilitate the performance of this Insurance Agreement.

### Section 4.03.  Obligations Absolute.

(a)     So long as no Insurer Default shall have occurred and shall have continued beyond any period of cure applicable thereto, the obligations of RFC and the Depositor hereunder shall be absolute and unconditional and shall be paid or performed strictly in accordance with this Insurance Agreement under all circumstances irrespective of:

(i)     any lack of validity or enforceability of any of the Operative Documents or the Certificates, or any amendment or other modifications of, or waiver, with respect to any of the Operative Documents or the Certificates, that have not been approved by the Insurer;

(ii)    any exchange or release of any other obligations hereunder;

(iii)   the existence of any claim, setoff, defense, reduction, abatement or other right that RFC or the Depositor may have at any time against the Insurer or any other Person;

(iv)    any document presented in connection with the Policy proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(v)     any payment by the Insurer under the Policy against presentation of a certificate or other document that does not strictly comply with terms of that Policy;

(vi)    any failure of RFC or the Depositor to receive the proceeds from the sale of the Class A Certificates; and

(vii)   any other circumstances, other than payment in full, that might otherwise constitute a defense available to, or discharge of, RFC or the Depositor in respect of any Operative Document.

(b)     So long as no Insurer Default shall have occurred and shall have continued beyond any period of cure applicable thereto, RFC and the Depositor and any and all others who are now or may become liable for all or part of the obligations of RFC or the Depositor under this Insurance Agreement, to the extent permitted by law, irrevocably renounce the right to assert as a defense to the performance of their respective obligations each of the following: (i) any and all redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness and obligations evidenced by any Operative Document or by any extension or renewal thereof; (ii) presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor and notice of protest; (iii) all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default or enforcement of any payment hereunder, except as required by the Operative Documents; and (iv) all rights of abatement, diminution, postponement or deduction, or to any defense other than payment, or to any right of setoff or recoupment arising out of any breach under any of the Operative Documents, by any party thereto or any beneficiary thereof, or out of any obligation at any time owing to RFC or the Depositor.

(c)     RFC and the Depositor and any and all others who are now or may become liable for all or part of the obligations of RFC or the Depositor under this Insurance Agreement, to the extent permitted by law, agree to be bound by this Insurance Agreement and (i) agree that any consent, waiver or forbearance hereunder with respect to an event shall operate only for such event and not for any subsequent event; (ii) consent to any and all extensions of time that may be granted by the Insurer with respect to any payment hereunder or other provisions hereof and to the release of any security at any time given for any payment hereunder, or any part thereof, with

- 23 -

or without substitution, and to the release of any Person or entity liable for any such payment; and (iii) consent to the addition of any and all other makers, endorsers, guarantors and other obligors for any payment hereunder, and to the acceptance of any and all other security for any payment hereunder, and agree that the addition of any such obligors or security shall not affect the liability of the parties hereto for any payment hereunder.

(d)     Nothing herein shall be construed as prohibiting RFC or the Depositor from pursuing any rights or remedies it may have against any Person in a separate legal proceeding.

### Section 4.04.  Assignments; Reinsurance; Third-Party Rights.

(a)     This Insurance Agreement shall be a continuing obligation of the parties hereto and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Neither RFC nor the Depositor may not assign any of its rights under this Insurance Agreement or the Policy, or delegate any of its duties hereunder or thereunder, without the prior written consent of the Insurer.  Any assignments made in violation of this Insurance Agreement shall be null and void.

(b)     The Insurer shall have the right to give participations in its rights under this Insurance Agreement and to enter into contracts of reinsurance with respect to the Policy upon such terms and conditions as the Insurer may in its discretion determine; *provided, however*, that no such participation or reinsurance agreement or arrangement shall relieve the Insurer of any of its obligations hereunder or under the Policy, nor shall RFC or the Depositor be required to deal directly with any such parties.

(c)     Except as provided herein with respect to participants and reinsurers, nothing in this Insurance Agreement shall confer any right, remedy or claim, express or implied, upon any Person, including, particularly, any Holder, other than the Insurer against RFC or the Depositor, or RFC or the Depositor against the Insurer, and all the terms, covenants, conditions, promises and agreements contained herein shall be for the sole and exclusive benefit of the parties hereto and their successors and permitted assigns.  Neither the Trustee nor any Holder shall have any right to payment from any Premiums paid or payable hereunder or under the Pooling and Servicing Agreement or from any amounts paid by RFC pursuant to Sections 3.02, 3.03 or 3.04.

### Section 4.05.  Liability of the Insurer.

Neither the Insurer nor any of its officers, directors or employees shall be liable or responsible for:  (a) the use that may be made of the Policy by the Trustee or for any acts or omissions of the Trustee in connection therewith; or (b) the validity, sufficiency, accuracy or genuineness of documents delivered to the Insurer in connection with any claim under the Policy, or of any signatures thereon, even if such documents or signatures should in fact prove to be in any or all respects invalid, insufficient, fraudulent or forged (unless the Insurer shall have actual knowledge thereof).  In furtherance and not in limitation of the foregoing, the Insurer may accept documents that appear on their face to be in order, without responsibility for further investigation.

## ARTICLE V
## DEFAULTS AND REMEDIES

**Section 5.01. Defaults.**

The occurrence of any of the following shall constitute an Event of Default hereunder:

(a)     Any representation or warranty made by RFC or the Depositor hereunder or under the Operative Documents, or in any certificate furnished hereunder or under the Operative Documents, shall prove to be untrue or incorrect in any material respect unless remedied within the cure period, if any, provided under the applicable Operative Document; *provided, however,* that a breach of a representation or warranty by RFC or the Depositor under Section 4 of the Assignment Agreement shall not constitute an Event of Default under this Section 5.01(a); *provided, further, however,* that the preceding proviso shall not affect the Insurer's rights as a third party beneficiary under the Pooling and Servicing Agreement or the existence of an Event of Default under Section 5.01(c) or (d) of this Insurance Agreement;

(b)     (i) RFC or the Depositor shall fail to pay when due any amount payable by it hereunder or (ii) a legislative body has enacted any law that declares or a court of competent jurisdiction shall find or rule that this Insurance Agreement or any other Operative Document is not valid and binding on RFC or the Depositor; *provided* that, with respect to any law or judicial action within the scope of this clause (ii), RFC and the Depositor shall have 30 days to reinstate the binding effect of this Insurance Agreement or any other Operative Document, and the Insurer agrees to take such actions as may be reasonably requested of it to facilitate the reinstatement of such binding effect;

(c)     The occurrence and continuance of an "event of default" or "Event of Default," under any Operative Document;

(d)     Any failure on the part of RFC or the Depositor duly to observe or perform in any material respect any other of the covenants or agreements on the part of RFC or the Depositor contained in this Insurance Agreement which continues unremedied for a period of 30 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to RFC by the Insurer (with a copy to the Trustee) or by the Trustee (with a copy to the Insurer);

(e)     A decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or the appointment of a conservator or receiver or liquidator or other similar official in any bankruptcy, insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against RFC or the Depositor and such decree or order shall have remained in force undischarged or unstayed for a period of 90 consecutive days;

(f)     RFC or the Depositor shall consent to the appointment of a conservator or receiver or liquidator or other similar official in any bankruptcy, insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to RFC or the Depositor or of or relating to all or substantially all of their respective property;

- 25 -

(g)    RFC or the Depositor shall become insolvent or admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of or otherwise voluntarily commence a case or proceeding under any applicable bankruptcy, insolvency, reorganization or other similar statute, make an assignment for the benefit of its creditors or voluntarily suspend payment of its obligations; or

(h)    the Trust Fund shall become subject to an entity level tax or to registration as an investment company under the Investment Company Act.

### Section 5.02. Remedies; No Remedy Exclusive.

(a)    Upon the occurrence of an Event of Default, the Insurer may exercise any one or more of the rights and remedies set forth below:

(i)    declare all indebtedness with respect to the Transaction of every type or description then owed by RFC or the Depositor to the Insurer with respect to the Transaction to be immediately due and payable, and the same shall thereupon be immediately due and payable;

(ii)    exercise any of its rights and remedies under the Pooling and Servicing Agreement in accordance with the terms thereof or direct the Trustee, RFC and/or the Depositor to exercise their respective rights and remedies under the Operative Documents in accordance with the terms thereof; or

(iii)    take whatever action at law or in equity may appear necessary or desirable in its judgment to collect the amounts, if any, then due under this Insurance Agreement or any other Operative Document or to enforce performance and observance of any obligation, agreement or covenant of RFC or the Depositor under this Insurance Agreement or any other Operative Documents.

(b)    Unless otherwise expressly provided, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Insurance Agreement, the Pooling and Servicing Agreement or the other Operative Documents, or existing at law or in equity. No delay or omission to exercise any right or power accruing under this Insurance Agreement, the Pooling and Servicing Agreement or any other Operative Document, or otherwise, upon the happening of any event set forth in Section 5.01 shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. In order to entitle the Insurer to exercise any remedy reserved to the Insurer in this Article, it shall not be necessary to give any notice, other than such notice as may be required by this Article.

### Section 5.03. Waivers.

(a)    No failure by the Insurer to exercise, and no delay by the Insurer in exercising, any right hereunder shall operate as a waiver thereof. The exercise by the Insurer of any right hereunder shall not preclude the exercise of any other right, and the remedies provided herein to

the Insurer are declared in every case to be cumulative and not exclusive of any remedies provided by law or equity.

(b)     The Insurer shall have the right, to be exercised in its complete discretion, to waive any Event of Default hereunder, by a writing setting forth the terms, conditions and extent of such waiver signed by the Insurer and delivered to RFC. Unless such writing expressly provides to the contrary, any waiver so granted shall extend only to the specific event or occurrence which gave rise to the Event of Default so waived and not to any other similar event or occurrence which occurs subsequent to the date of such waiver.

## ARTICLE VI
## MISCELLANEOUS

### Section 6.01.  Amendments, Etc.

This Insurance Agreement may be amended, modified, supplemented or terminated only by written instrument or written instruments signed by the parties hereto.  RFC agrees to provide a copy of any amendment to this Insurance Agreement promptly to the Trustee and the rating agencies maintaining a rating on the Class A Certificates.  No act or course of dealing shall be deemed to constitute an amendment, modification, supplement or termination hereof.

### Section 6.02.  Notices.

All demands, notices and other communications to be given hereunder shall be in writing (except as otherwise specifically provided herein) and shall be mailed by registered mail or personally delivered and telecopied to the recipient as follows:

(a)     To the Insurer:

> Financial Guaranty Insurance Company
> 125 Park Avenue
> New York, New York  10017
> Attention:  Structured Finance Surveillance - RASC 2007-EMX1
> Facsimile:  (212) 312-3231
> Confirmation:  (800) 352-0001
> Email: SFSurveillance@fgic.com

> (in each case in which notice or other communication to the Insurer refers to an Event of Default, a claim on the Policy or with respect to which failure on the part of the Insurer to respond shall be deemed to constitute consent or acceptance, then a copy of such notice or other communication should also be sent to the attention of the general counsel of each of RFC, the Depositor, the Insurer and the Trustee and, in all cases, both any original and all copies shall be marked to indicate "URGENT MATERIAL ENCLOSED.")  Any notice regarding delivery or non-delivery of the Insurer Financial Information or information relating to Item 1119 of Regulation AB shall be sent via electronic mail to the Insurer

at RegAB@fgic.com and shall reference the deal name and policy number.

(b)    To RFC:

Residential Funding Company, LLC
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, MN 55437
Attention: Managing Director Structured Finance
Facsimile: (952) 857-7442
Confirmation: (952) 857-7000

Notice to RFC shall also constitute notice to the Depositor to the extent the party providing such notice is required to provide notice to both parties (in each case in which notice or other communication to RFC refers to an Event of Default, a claim against RFC or the Depositor or with respect to which failure on the part of RFC or the Depositor to respond shall be deemed to constitute consent or acceptance, then a copy of such notice or other communication should also be sent to the attention of the general counsel of each of RFC, the Insurer and the Trustee and, in all cases, both any original and all copies shall be marked to indicate "URGENT MATERIAL ENCLOSED.").

(c)    To the Trustee, at its Corporate Trust Office; and

(d)    To the Depositor:

Residential Asset Securities Corporation
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota 55437
Attention: President (RASC)
Facsimile: (952) 857-7442
Confirmation: (952) 857-7048

A party may specify an additional or different address or addresses by writing mailed or delivered to the other parties as aforesaid. All such notices and other communications shall be effective upon receipt.

**Section 6.03. Severability.**

In the event that any provision of this Insurance Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, the parties hereto agree that such holding shall not invalidate or render unenforceable any other provision hereof. The parties hereto further agree that the holding by any court of competent jurisdiction that any remedy pursued by any party hereto is unavailable or unenforceable shall not affect in any way the ability of such party to pursue any other remedy available to it.

**Section 6.04.  Governing Law.**

This Insurance Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to the conflict of laws provisions thereof other than Sections 5-1401 and 5-1402 of the General Obligations Law, which the parties hereto expressly rely upon as the governing law hereunder).

**Section 6.05.  Consent to Jurisdiction.**

(a)     The parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York and any court in the State of New York located in the City and County of New York, and any appellate court from any thereof, in any action, suit or proceeding brought against it and to or in connection with any of the Operative Documents, the Policy or the Transaction or for recognition or enforcement of any judgment, and the parties hereto hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding may be heard or determined in such New York state court or, to the extent permitted by law, in such federal court.  The parties hereto agree that a final unappealable judgment in any such action, suit or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  To the extent permitted by applicable law, the parties hereto hereby waive and agree not to assert by way of motion, as a defense or otherwise in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such courts, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that the related documents or the subject matter thereof may not be litigated in or by such courts.

(b)     To the extent permitted by applicable law, the parties hereto shall not seek and hereby waive the right to any review of the judgment of any such court by any court of any other nation or jurisdiction which may be called upon to grant an enforcement of such judgment.

(c)     Nothing contained in this Insurance Agreement shall limit or affect any party's right to serve process in any other manner permitted by law or to start legal proceedings relating to any of the Operative Documents or the Policy against any other party or its properties in the courts of any jurisdiction.

**Section 6.06.  Consent of the Insurer.**

In the event that the consent of the Insurer is required under any of the Operative Documents, the determination whether to grant or withhold such consent shall be made by the Insurer in its sole discretion without any implied duty towards any other Person, except as otherwise expressly provided therein, and such consent is only effective when and if given by the Insurer in writing.

**Section 6.07.  Counterparts.**

This Insurance Agreement may be executed in counterparts by the parties hereto, and all such counterparts shall constitute one and the same instrument.

**Section 6.08. Headings.**

The headings of Articles and Sections and the Table of Contents contained in this Insurance Agreement are provided for convenience only. They form no part of this Insurance Agreement and shall not affect its construction or interpretation.

**Section 6.09. Trial by Jury Waived.**

Each party hereby waives, to the fullest extent permitted by law, any right to a trial by jury in respect of any litigation arising directly or indirectly out of, under or in connection with any of the Operative Documents or any of the Transactions contemplated thereunder. Each party hereto (a) certifies that no representative, agent or attorney of any party hereto has represented, expressly or otherwise, that it would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it has been induced to enter into the Operative Documents to which it is a party by, among other things, this waiver.

**Section 6.10. Limited Liability.**

No recourse under any Operative Document or the Underwriting Agreement shall be had against, and no personal liability shall attach to, any officer, employee, director, affiliate or shareholder of any party hereto, as such, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute or otherwise in respect of any of the Operative Documents or the Underwriting Agreement, the Certificates or the Policy, it being expressly agreed and understood that each Operative Document or the Underwriting Agreement is solely a corporate obligation of each party thereto, and that any and all personal liability, either at common law or in equity, or by statute or constitution, of every such officer, employee, director, affiliate or shareholder for breaches of any party thereto of any obligations under any Operative Document or the Underwriting Agreement is hereby expressly waived as a condition of and in consideration for the execution and delivery of this Insurance Agreement.

**Section 6.11. Entire Agreement.**

This Insurance Agreement and the Policy set forth the entire agreement between the parties with respect to the subject matter hereof and thereof, and this Insurance Agreement and the Policy, supersede and replace any agreement or understanding that may have existed between the parties prior to the date hereof in respect of such subject matter.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, all as of the day and year first above mentioned.

FINANCIAL GUARANTY INSURANCE
COMPANY,
    as Insurer

By:_____
    Name: DANA SKELTON
    Title: DIRECTOR

RESIDENTIAL FUNDING COMPANY, LLC, as
Sponsor and as Master Servicer

By:_____
    Name:
    Title:

RESIDENTIAL ASSET SECURITIES
CORPORATION,
    as Depositor

By:_____
    Name:
    Title:

U.S. BANK NATIONAL ASSOCIATION,
    as Trustee

By:_____
    Name:
    Title:

- 31 -

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, all as of the day and year first above mentioned.

FINANCIAL GUARANTY INSURANCE COMPANY,
   as Insurer

By:_____
   Name:
   Title:

RESIDENTIAL FUNDING COMPANY, LLC, as Sponsor and as Master Servicer

By:_____
   Name: Joseph Orning
   Title:  Associate

RESIDENTIAL ASSET SECURITIES CORPORATION,
   as Depositor

By:_____
   Name: Tim Jacobson
   Title:  Vice President

U.S. BANK NATIONAL ASSOCIATION,
   as Trustee

By:_____
   Name:
   Title:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, all as of the day and year first above mentioned.

FINANCIAL GUARANTY INSURANCE
COMPANY,
   as Insurer

By:_____
   Name:
   Title:

RESIDENTIAL FUNDING COMPANY, LLC, as
Sponsor and as Master Servicer

By:_____
   Name:
   Title:

RESIDENTIAL ASSET SECURITIES
CORPORATION,
   as Depositor

By:_____
   Name:
   Title:

U.S. BANK NATIONAL ASSOCIATION,
   as Trustee

By:_____
   Name:
   Title:   Michelle Moeller
       Assistant Vice President

- 31 -

# Exhibit PX-754

| Docket No. | Transaction | Offering Amount ($) | Closing Date | Fraud | Breach of R&W | Breach of Repurchase Obligations | Breach of Access Rights | Breach of Servicing Obligations | Indemnification | Attorneys' Fees | Alter Ego | Aiding & Abetting | Custodial Breach | Unique Claims | Service Dates |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11-cv-9737 | RAMP 2005-RS9 | 1,179,000,000 | Nov. 29, 2005 | | RFC | | RFC | | RFC | RFC | | | | | 12/2/2011 12/5/2011 |
| 11-cv-9736 | RFMSII 2005-HS1 | 853,750,000 | Sept. 23, 2005 | | RFC | RFC | RFC | | RFC | RFC | | | | | 12/2/2011 12/6/2011 |
| | RFMSII 2005-HS2 | 577,462,500 | Nov. 29, 2005 | | | | | | | | | | | | |
| 12-cv-0341 | RASC 2005-EMX5 | 380,000,000 | Dec. 16, 2005 | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | | RFC Ally ResCap | RFC | RFC Ally ResCap | Ally | | | 12/19/2011 |
| 12-cv-0339 | RAMP 2005-NC1 | 870,750,000 | Dec. 28, 2005 | RFC Ally ResCap | RFC Ally ResCap | | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC | RFC Ally ResCap | Ally | | | 12/29/2011 |
| 12-cv-0338 | RAMP 2005-EFC7 | 696,175,000 | Dec. 28, 2005 | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC | RFC Ally ResCap | Ally | | | 12/29/2011 |
| 12-cv-0340 | RFMSII 2006-HSA1 | 461,444,000 | Jan. 27, 2006 | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC | RFC Ally ResCap | Ally | | | 12/29/2011 |
| | RFMSII 2005-HSA1 | 278,847,000 | Dec. 29, 2005 | | | | | | | | | | | | |
| | RFMSII 2006-HSA2 | 447,900,000 | Feb. 24, 2006 | | | | | | | | | | | | |
| 12-cv-1601 | RASC 2007-EMX1 | 692,852,000 | March 12, 2007 | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC | RFC Ally ResCap | Ally | | | 3/8/2012 3/9/2012 |

PX 0754 pg. 1 of 2

RCPC00065279


PX 754

PX 0754 pg. 2 of 2

RCPC00065280

| Docket No. | Transaction | Offering Amount ($) | Closing Date | Fraud | Breach of R&W | Breach of Repurchase Obligations | Breach of Access Rights | Breach of Servicing Obligations | Indemnification | Attorneys' Fees | Alter Ego | Aiding & Abetting | Custodial Breach | Unique Claims | Service Dates |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12-cv-1860 | RFMSII 2006-HI2 | 237,391,000 | May 25, 2006 | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC Ally ResCap | RFC | RFC Ally ResCap | Ally | | | 3/13/2012 3/15/2012 |
| | RFMSII 2006-HI3 | 223,158,000 | July 21, 2006 | | | | | | | | | | | | |
| | RFMSII 2006-HI4 | 272,693,000 | Sept. 28, 2006 | | | | | | | | | | | | |
| | RFMSII 2006-HI5 | 247,469,000 | Dec. 28, 2006 | | | | | | | | | | | | |
| | RFMSII 2007-HI1 | 254,956,000 | Mar. 30, 2007 | | | | | | | | | | | | |
| 11-cv-06729 | GMACM 2006-HE1 (As Amended) | 1,274,156,000 | Mar. 30, 2006 | GMACM Ally ResCap | GMACM Ally ResCap | GMACM Ally ResCap | GMACM Ally ResCap | GMACM Ally ResCap | GMACM Ally ResCap | GMACM | GMACM Ally ResCap | Ally Ally Bank | Ally Bank | Improper Subsequent Transfer | 12/2/2011 12/3/2011 12/5/2011 |
| 12-cv-00780 | GMACM 2005-HE1 | 962,325,000 | Mar. 29, 2005 | | | GMACM Ally ResCap | GMACM Ally ResCap | GMACM Ally ResCap | GMACM Ally ResCap | GMACM | GMACM Ally ResCap | | Ally Bank | Improper Subsequent Transfer | 2/7/2012 2/9/2012 |
| 12-cv-1658 | GMACM 2006-HE3 | 1,142,334,000 | Aug. 30, 2006 | GMACM Ally ResCap | GMACM Ally ResCap | GMACM Ally ResCap | GMACM Ally ResCap | GMACM Ally ResCap | GMACM Ally ResCap | GMACM | GMACM Ally ResCap | Ally Ally Bank | Ally Bank | Improper Inclusion of Balloon Loans | 3/8/2012 3/9/2012 |
| 12-cv-1818 | GMACM 2006-HE2 | 626,240,000 | June 29, 2006 | GMACM Ally ResCap | GMACM Ally ResCap | GMACM Ally ResCap | GMACM Ally ResCap | GMACM Ally ResCap | GMACM Ally ResCap | GMACM | GMACM Ally ResCap | Ally Ally Bank | Ally Bank | | 3/13/2012 3/15/2012 |
| | GMACM 2007-HE2 | 1,240,884,000 | July 28, 2007 | | | | | | | | | | | | |

# Exhibit PX-887

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------ x
                                    )
In re:                              )   Case No. 12-12020 (MG)
                                    )
RESIDENTIAL CAPITAL, LLC, et al.,   )   Chapter 11
                                    )
        Debtors.                    )   Jointly Administered
                                    )
                                    )
------------------------------------------------------ x

```
┌──────────────┐
│          PX  │
│              │
│          887 │
└──────────────┘
```

### WITNESS STATEMENT OF JOHN S. DUBEL

I, JOHN S. DUBEL, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that

the following is true and correct:

1.      I am Chief Executive Officer of Financial Guaranty Insurance Company

("FGIC"). I provide these services through my company, Dubel & Associates ("DA"). DA

commenced its engagement with FGIC on January 2, 2008. I have over thirty years of

experience restructuring companies. Prior to joining FGIC, I was a Managing Director of

Gradient Partners, L.P., a single strategy distressed hedge fund, from 2006 through 2007. From

2002 to 2006, I was a Principal and Managing Director with AlixPartners, LLC, a firm

specializing in turnaround and crisis management. While at AlixPartners, I served as Chief

Executive Officer of Cable & Wireless America, President and Chief Operating Officer at RCN

Corporation, Chief Restructuring Officer of Anchor Glass Container Corporation and Acterna

Corporation, and CFO at WorldCom, Inc. I received a Bachelor in Business Administration

degree from the College of William and Mary.

2.      I respectfully submit this witness statement, in lieu of direct testimony, on behalf

of FGIC and in support of the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval*

*of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain*

1



1212020130731000000000020

*Institutional Investors* (Docket No. 3929). I will make myself available for cross-examination
and further testimony at the hearing on the Debtors' motion.

3.     FGIC was appointed to the Official Committee of Unsecured Creditors (the
"OCC") in the ResCap chapter 11 cases by the United States Trustee, and I represented FGIC on
the OCC. I was the principal negotiator for FGIC with respect to the global mediation in the
Residential Capital ("ResCap" and together with its subsidiaries, the "Debtors") bankruptcy case.
The ResCap bankruptcy case is very large in size, and the estimated claims of administrative,
secured and unsecured creditors is almost $18 billion. *See* Disclosure Statement for the Joint
Chapter 11 Plan Proposed by Residential Capital, LLC, *et al.* and the Official Committee of
Unsecured Creditors (July 4, 2013) (Docket No. 4157) ("Debtors' Disclosure Statement")
(excerpt attached hereto as Exhibit A), Ex. 6 (ResCap Recovery Analysis).

### The Mediation Process

4.     The mediation was conducted pursuant to an order of the Bankruptcy Court
beginning in December 2012. I was personally involved in all mediation sessions and
negotiations on behalf of FGIC. I personally participated in the negotiation of the Plan Support
Agreement,[1] signed on or about May 13, 2013, and the related term sheets and agreements
negotiated and signed then and on May 23, 2013, as part of the overall global bankruptcy plan
settlement. An integral part of the global bankruptcy plan negotiations, and a condition
precedent to the ResCap bankruptcy plan proceeding to confirmation by the Bankruptcy Court,
was negotiation and development of the settlement agreement (the "FGIC Settlement
Agreement"), signed on May 23, 2013, among FGIC, the Debtors, the Trustees (defined below),
the Steering Committee Group (defined below), and the Talcott Franklin Group (defined below).

---

[1] When I use terms not otherwise defined herein, I intend those terms to have the same meanings as in
*Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors,
FGIC, the FGIC Trustees and Certain Institutional Investors* (Docket No. 3929).

2

Even though the signature pages of the FGIC Settlement Agreement are dated May 23, 2013, minor changes to the language of the agreement were made through May 29, 2013.

5.      The First Amended Plan of Rehabilitation for FGIC, dated June 4, 2013 (the "Plan"), is not in effect yet. The authority to settle policy claims is currently and expressly permitted by the FGIC Order of Rehabilitation, entered more than a year ago, which grants the Rehabilitator broad powers throughout the duration of the rehabilitation proceeding, including the power to operate and conduct FGIC's business. If the Plan were in effect, however, the terms of the Plan allow FGIC to enter into settlements of potential claims. In particular, section 4.8 of the Plan provides that FGIC may resolve claims "without further Court approval" through negotiation, settlement, or "any similar transaction that results in the extinguishment or reduction of FGIC's liability, in respect of [] all or part of any Policy . . . .". Section 4.8 (even if applicable here, which it is not) does not require FGIC to obtain the consent of investors holding securities of policyholders whose policies are being settled.

6.      The Steering Committee Group and the Talcott Franklin Group were the only two groups of holders of RMBS securities that both regularly participated in the ResCap chapter 11 cases, and signed confidentiality agreements in order to participate fully in the mediation process, restricting their ability to trade in ResCap securities during the negotiation period. They actively participated in the mediation and in negotiation of the FGIC Settlement Agreement, along with the Trustees.

7.      The Steering Committee Group[2] includes 18 sophisticated banks and financial institutions, such as Goldman Sachs, ING, BlackRock, Teachers Insurance and Annuity

---

[2] The investors in the "Steering Committee Group" consist of AEGON USA Investment Management, LLC, Angelo Gordon, Bayerische Landesbank, BlackRock Financial Management Inc., Cascade Investment, LLC, Federal Home Loan Bank of Atlanta, Goldman Sachs Asset Management, L.P., ING Investment Management Co. LLC, ING Investment Management LLC, Kore Advisors, L.P., Pacific Investment Management Company LLC, Maiden Lane LLC and Maiden Lane III LLC (by the Federal Reserve Bank of New York as managing member), Metropolitan Life Insurance Company, Neuberger Berman Europe Limited, SNB StabFund, The TCW Group, Inc.,

3

Association, TCW, Metropolitan Life, PIMCO, and Western Asset Management. They hold

approximately $12.1 billion in current amount, and $29.8 billion in original face amount, of

RMBS securities issued by various ResCap related trusts. Attached hereto as Exhibit B is the

latest Bankruptcy Rule 2019 filing (Docket No. 1741), indicating the holdings of the Steering

Committee Group. The Talcott Franklin Group[3] is a similar group of 57 banks, financial

institutions and funds, which includes objectors CQS ABS Master Fund Limited and CQS ABS

Alpha Master Fund Limited and holds $17 billion in original face amount, of RMBS securities

issued by various ResCap related trusts. *Debtors' Second Supplemental Motion Pursuant to Fed.*

*R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* at 30 (Docket No.

1887).

    8.    At the commencement of the ResCap bankruptcy, the Steering Committee Group,

the Talcott Franklin Group, and the Junior Secured Noteholders had negotiated and signed a pre-

bankruptcy agreement with the Debtors and the Debtors' parent company, Ally Financial Inc.

---

(continued…)

Teachers Insurance and Annuity Association of America, Thrivent Financial for Lutherans, Western Asset Management Company, and certain of their affiliates, either in their own capacities or as advisors or investment managers. *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* at 4 n.8 (Docket No. 1887).

[3] The investors in the "Talcott Franklin Group" consist of: Anchor Bank, fsb, Bankwest, Inc., Blue Heron Funding V, Caterpillar Life Insurance Company, Caterpillar Insurance Co. Ltd., Caterpillar Product Services Corporation, Cedar Hill Mortgage Opportunity Master Fund, L.P., Citizens Bank & Trust Co., Commerce Bancshares, Inc., Commonwealth Advisors, Inc., CQS ABS Master Fund Limited, CQS Select ABS Master Fund Limited, CQS ABS Alpha Master Fund Limited, Citizens Bank and Trust Company, DNB National Bank, Doubleline Capital LP, Ellington Management Group, LLC., Everest Reinsurance (Bermuda) Ltd., Everest International Re, Ltd., Farallon Capital Management, L.L.C., Farmers and Merchants Trust Company of Chambersburg, First National Bank and Trust Company of Rochelle, First National Banking Company, First National Bank of Wynne, First Farmers State Bank, First Bank, Gemstone CDO I, Gemstone CDO II, Gemstone CDO V, Gemstone CDO VII, HBK Master Fund L.P., Heartland Bank, Kerndt Brothers Savings Bank, Kleros Preferred Funding V plc, Knights of Columbus, LL Funds LLC, Lea County State Bank, Manichaean Capital, LLC, Mutual Savings Association FSA, Northwestern Bank N.A., Pinnacle Bank of South Carolina, Peoples Independent Bank, Perkins State Bank, Phoenix Light SF Limited, Radian Asset Assurance Inc., Randolph Bank and Trust, Rocky Mountain Bank & Trust, Royal Park Investments SA/NV, SBLI USA Mutual Life Insurance Company, Silver Elms CDO II Limited, Silver Elms CDO plc, South Carolina Medical Malpractice Liability JUA, Summit Credit Union, Thomaston Savings Bank, Union Investment Luxembourg S.A., United Educators Insurance - Reciprocal Risk Retention Group, Wells River Savings Bank, Vertical Capital, LLC, and certain of their affiliates, either in their own capacities or as advisors or investment managers. *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* at 4 n.8 (Docket No. 1887).

4

("AFI"), whereby AFI would contribute $750 million to the Debtors in exchange for general releases of all claims, including third party claims, and certain claims held by the Trustees against the Debtors would be compromised for $8.7 billion. That proposed pre-bankruptcy settlement agreement was opposed by many other parties in the bankruptcy case, including FGIC and the OCC, resulting in substantial litigation and uncertainty. Among the major issues in controversy were (1) the scope and size of the AFI contribution, (2) whether $750 million sufficed to settle and resolve all of the estate and third party claims against AFI, (3) the size and priority of claims asserted with respect to the RMBS trusts, (4) the validity, priority and interrelationship of those claims with respect to claims asserted by the monoline insurers, (5) the amount, priority or possible subordination of security law claims asserted against the Debtors in class actions and other lawsuits, and (6) the claims of various government entities and borrower class actions asserted against the Debtors.

9. To move the bankruptcy case forward, and forestall potentially years of burdensome and extremely expensive litigation between and among the Debtors, their parent AFI, and all of the competing creditors and creditor groups, the Bankruptcy Court, by order entered on December 26, 2012, appointed the Honorable James M. Peck, a sitting bankruptcy judge with significant experience in complex, multi-party cases (such as the Lehman bankruptcy case) to act as global plan mediator. *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ¶¶ 34-44 (Docket No. 3929). As part of the Bankruptcy Court's order, the Bankruptcy Court placed strict confidentiality protections in place, which preclude me from describing the substance of any of the negotiations, or the various proposals or counter-proposals. Attached as Exhibit C is a copy of the Mediation Order (Docket No. 2519), which

5

provides that all documents or discussions made or provided in connection with the mediation by

parties participating in the mediation must be kept confidential. The Mediation Order states:

> [N]o person or party participating in the mediation . . . shall in any
> way *disclose to any non-party* or to any court, including, without
> limitation, in any pleading or other submission to any court, any
> such discussion, mediation statement, other *document or
> information*, correspondence, resolution, offer or counteroffer that
> may be made or provided in connection with the mediation, unless
> otherwise available and not subject to a separate confidentiality
> agreement that would prevent its disclosure *or as authorized by
> this Court.*

¶ 4 (emphasis added).

10.     Without revealing the substance of the negotiations, however, I can describe in

general terms the process of the mediation, the participants, and the good faith, arm's-length

nature of the negotiations. The mediation in this case was the most complex and lengthy such

process with which I have ever been personally involved, in any capacity. Judge Peck began by

holding individual meetings with each of the main participants, and the process was very time

intensive for all parties, particularly for Judge Peck. His initial meeting with FGIC and our

counsel lasted approximately five hours. There were regular meetings among and between

various parties including FGIC, to discuss the relevant issues, and Judge Peck regularly met with

and communicated with the Debtors, the OCC, and other individual creditors and groups.

11.     In addition to the above parties, the Trustees of the various ResCap related trusts

that issued RMBS securities also actively participated in the mediation. The Trustees include

The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A, Law

Debenture Trust Company of New York, U.S. Bank National Association, and Wells Fargo

Bank, N.A., who are the Trustees of the trusts that issued RMBS insured by FGIC (the "FGIC

Insured Trusts"). Attorneys from law firms such as Dechert, Seward & Kissel, and Alston &

Bird represented the Trustees during the mediations. The Trustees also received advice from

6

Duff & Phelps, a financial advisory firm serving as the Trustees' expert. Various other significant creditor groups, such as the Steering Committee Group and the Talcott Franklin Group, participated both in discussions and meetings with the Trustees and others.

12. The ResCap bankruptcy involves numerous parties and claims, and there are many complex interdebtor and intercreditor issues that would affect plan distributions. Accordingly, the mediation was necessary to address these complex issues. Specifically, the mediation process was designed by the Debtors and approved by the Court to encompass two major areas, (i) the claims asserted by the Debtors' estates and the third party claims held by individual creditors against AFI, as well as (ii) how the value of any recovery on those claims and the other assets of the Debtors' estates would be allocated among the many competing creditor groups. *See* Debtors' Disclosure Statement at 72. As reflected in the Debtors' Disclosure Statement, some 6,850 proofs of claim were filed, totaling $99.7 billion, although the Debtors estimate that they will end up with approximately $13.4 billion in allowed unsecured claims. *See id.*, Ex. 4 at 1.

13. The ultimate success of the global mediation was far from a certainty. In fact, on February 21, 2013, a group of Junior Secured Noteholders, who claim to have secured claims of approximately $2 billion, and who were participating in the global plan mediation, objected to the Debtors' motion to extend their exclusive time period to file a bankruptcy plan (where the Debtors in part relied upon the mediation process as cause for the extension) stating:

> For the past two months, the Ad Hoc Group has patiently participated in a plan mediation process that has, to date, not resulted in the global compromise envisioned by the Court at its inception. Perversely, these well-intentioned efforts to achieve consensus through mediation have seemingly emboldened certain parties to harden their negotiating positions, secure in the knowledge that the Debtors' present plan construct – with its non-consensual third party release provisions with Ally – remains the only show in town. Even the best efforts of a sitting bankruptcy

7

**PX 0887 pg. 7 of 50**

judge and experienced and respected mediator have been unable to
break this impasse.

*Objection of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of
an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit
Acceptances Thereof* at 2-3 (Docket No. 2997).

14.     From January through the end of May, 2013, I personally participated in dozens

of meetings and innumerable conference calls with various parties to the mediation process, as

well as significant internal work with FGIC's counsel as part of the mediation and negotiation

process. A partial list of the dates of significant meetings and multi-party external conference

calls is attached hereto on the "Timeline" labeled Exhibit D.[4]

15.     There were a large variety of complex issues to understand and attempt to resolve

through the mediation process. As reflected in the Timeline, Judge Peck participated in meetings

with the OCC and other significant creditors from January through March, 2013, when he

determined that it was appropriate to convene a series of large group mediation sessions, all of

which I personally attended.

16.     The first global group mediation session occurred on or about April 22, 2013, and

lasted ten hours, and was followed by another session on April 23, 2013, which lasted

approximately nine hours. I have reviewed the attendance list for the first day's session, and not

including Judge Peck and his two law clerks, there were 140 participants. There were

representatives from approximately 23 different creditors and creditor groups (groups such as the

Steering Committee Group and the Talcott Franklin Group I count as only one group, even

though they include many institutions). There were a total of 29 creditors or creditor group

---

[4] The Timeline does not include individual calls between FGIC, the Debtors or other single mediation
participants.

8

business representatives in attendance, along with 75 attorneys and 36 financial advisors to the various parties.

17.    The mediation was far from a secret or clandestine process. There were literally dozens of pleadings filed in the Bankruptcy Court and served on the Objectors' counsel that mentioned the mediation, along with extensive discussion at public court hearings, as well as substantial press coverage. Significantly, attending the mediation were attorneys for the Federal Housing Finance Agency, Freddie Mac's conservator and the federal agency currently exercising legal control over Freddie Mac, and attorneys for the Talcott Franklin Group, of which CQS was a member. Freddie Mac served special notice requests in the Bankruptcy Court and participated therein through its counsel, the same counsel that recently filed objections in this Court.

18.    Over the next month, in late April and throughout much of May 2013, there were approximately five more large group mediation sessions, as well as many conference calls and smaller group meetings. The last set of large group negotiations started in the morning of May 22, 2013, and went through the following night, only ending with the signing of documents at approximately 9 a.m. on May 23, 2013.

**The Global Settlement and the FGIC Settlement Agreement**

19.    As reflected in the documents signed on May 23, 2013, and the related and supplemental term sheets and agreements, the global mediation successfully resolved the key major issues in the ResCap chapter 11 cases and obviated years of difficult, expensive, protracted and uncertain litigation. AFI agreed to contribute $2.1 billion to the ResCap bankruptcy estate, nearly tripling its prior agreement, and all of the significant participating creditor groups agreed to provide releases to AFI for all claims asserted against AFI in dozens of state and federal lawsuits. The parties participating in the Plan Support Agreement also agreed to allocation of the

9

total cash available for distribution to unsecured creditors, estimated at \$2.62 billion. *See* Debtors' Disclosure Statement at 38.

20. The FGIC Settlement Agreement, as reflected in the Plan Support Agreement, is a key component of this global plan construct, and is a required condition to effectiveness of the plan. Although the FGIC Settlement Agreement is a stand-alone settlement agreement, the global plan construct cannot move forward—and the \$2.1 billion AFI settlement contribution cannot be realized—absent approval by this Court and the State Court overseeing the FGIC rehabilitation proceeding.

21. The FGIC Insured Trusts will receive value under the settlement in a number of different ways.

22. First, the FGIC Insured Trusts will receive an immediate, lump sum settlement payment of \$253.3 million in lieu of partial cash payments over decades to come on account of potentially \$1.1 billion in policy claims. FGIC will make this settlement payment in cash immediately after both court approvals are obtained and the FGIC Settlement Agreement becomes effective. The FGIC Insured Trusts and investors therein will not have to wait for confirmation of the ResCap Chapter 11 plans, which could take many months.

23. Second, if the FGIC Settlement Agreement becomes effective, FGIC will forgo its right to collect a gross amount of approximately \$40 million in future installment policy premium payments, which when discounted at a 15% rate, results in approximately \$18.3 million in future policy premiums that FGIC estimates the FGIC Insured Trusts would otherwise be obligated to pay to FGIC over the life of FGIC's insurance policies. These amounts will instead be retained by the FGIC Insured Trusts and likely paid to the investors in the FGIC Insured Trusts.

10

24. Third, if the plan of reorganization contemplated by the Plan Support Agreement is confirmed, and AFI's $2.1 billion settlement payment is realized, the FGIC Insured Trusts will be entitled to a distribution in excess of $90 million from the Trustees. *See generally* Debtors' Disclosure Statement; *see also* Expert Report of Allen M. Pfeiffer, ¶ 59 (July 19, 2013). Specifically, if the Bankruptcy Court confirms the proposed plan of reorganization, the Trustees collectively will receive an allowed general unsecured claim in the bankruptcy cases of $7.301 billion. *See* Debtors' Disclosure Statement at 27. This $7.301 billion allowed general unsecured claim will net the Trustees a distribution under the proposed reorganization plan of approximately $698.7 million (the "RMBS Proceeds"). *See* Debtors' Disclosure Statement, Ex. 6 (ResCap Recovery Analysis). The Plan Support Agreement (and the reorganization plan) provides that the RMBS Proceeds will be distributed to RMBS trusts in accordance with the RMBS Trust Protocol attached as Annex III to the supplemental term sheet. The RMBS Trust Protocol provides that insured RMBS trusts that both (i) have made policy claims against a monoline insurer and (ii) have not received full payment on their claims by the plan of reorganization's effective date, will be entitled to receive a distribution of the RMBS Proceeds on the terms provided therein. The FGIC Insured Trusts—which have made policy claims against FGIC that will not be paid in full at the time of the plan's effective date—will thus, if the reorganization plan is confirmed, be entitled to receive a distribution of RMBS Proceeds on the terms provided in the RMBS Trust Protocol. I am informed that the Trustees have calculated the amount of RMBS Proceeds to which the FGIC Insured Trusts will be entitled, and I have also reviewed the Disclosure Statement filed in the bankruptcy cases. I understand the amount of RMBS Proceeds to which the FGIC Insured Trusts will be entitled exceeds $90 million.

25. Finally, and significantly, if the FGIC Settlement Agreement becomes effective, FGIC will forgo its right to receive any and all reimbursements from the FGIC Insured Trusts

11

pursuant to the waterfall provisions under the governing documents of the various trusts (as such reimbursement rights may be modified pursuant to the FGIC Rehabilitation Plan). These amounts will instead be retained by the FGIC Insured Trusts and likely paid to the investors in the FGIC Insured Trusts.

26. The Expert Witness Report of Charles R. Goldstein (the "Goldstein Report") submitted by Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited, and CQS ABS Alpha Master Fund Limited does not acknowledge this very significant financial benefit to the FGIC Insured Trusts (and their respective investors), among other errors. These other errors include, for example, the failure to account for any possibility for downside risk, including the risks presented by FGIC's substantial exposure to municipal bonds issuances, which account for one third of FGIC's portfolio. The analyses prepared by the objectors' experts ignore the possibility of future negative adjustments to the cash payment percentage ("CPP") resulting from the poor performance of certain FGIC-wrapped municipal bonds, including bonds issued by the City of Detroit and other distressed municipalities.

27. The Goldstein Report (¶¶ 12, 29) refers to FGIC's March 31, 2013 quarterly statements as projecting more than $1 billion in gross recoveries from loss mitigation activities. This statement mischaracterizes the nature of these projected gross recoveries. FGIC did not include in its March 31, 2013 quarterly statements any estimate of recoveries from loss mitigation activities, including litigation claims, as FGIC has not determined them to be probable and estimable. The approximately $1.06 billion projected recovery amount in FGIC's March 31, 2013 quarterly statements comprises recoveries that FGIC estimated it would receive through the waterfall provisions under the governing documents of the various trusts insured by FGIC from funds available from projected collateral cash flows and projected payments from other providers

12

of credit enhancement in the subject transactions. These projected recoveries were based on assumptions used by FGIC for statutory accounting purposes to estimate, among other things, collateral performance, which assumptions are subject to change; and it is uncertain whether and to what extent any projected recoveries will be realized.

28. Also, these projected recoveries did not account for the terms of the FGIC Rehabilitation Plan, which limit FGIC's right to receive recoveries that otherwise would have been payable to FGIC pursuant to the waterfall provisions under the governing documents of the various trusts insured by FGIC. If such $1.06 billion projected gross recovery is realized, FGIC would be entitled to receive only approximately $300 million (utilizing the base case present value payout percentage of 28.5%) and the remainder would be retained by the trusts for application in accordance with such waterfall provisions, likely for payment to the trusts' investors.

29. However, since approximately half of that $1.06 billion projected gross recovery amount represents FGIC's estimate of the reimbursements that will be due to FGIC in connection with ResCap-related transactions pursuant to the various trust waterfall provisions under the governing documents for the FGIC Insured Trusts, approximately half of that projected $300 million recovery will be forgiven by FGIC pursuant to the FGIC Settlement Agreement (§2.01(b)), which will allow the FGIC Insured Trusts to retain for themselves (and their investors) the portion of those estimated reimbursements that would otherwise be paid to FGIC. This is a significant benefit and improvement over the terms of the FGIC Rehabilitation Plan for the FGIC Insured Trusts (and their investors). If FGIC's projected gross recovery for the FGIC Insured Trusts is realized, the FGIC Insured Trusts would be entitled to retain (and pay to their investors) an additional $140 million (utilizing the base case present value payout percentage of

13

28.5%) that they would otherwise be required to pay to FGIC in the absence of the FGIC

Settlement Agreement.

PX 0887 pg. 14 of 50

Executed on July 31, 2013
New York, New York

_____

John S. Dubel

# Exhibit A

*THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE CHAPTER 11 PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT ARE NOT INTENDED TO BE, AND SHOULD NOT IN ANY WAY BE CONSTRUED AS, A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT BE RELIED ON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION. THE PLAN PROPONENTS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER THIS DISCLOSURE STATEMENT.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN**
**PROPOSED BY RESIDENTIAL CAPITAL, LLC, et al. AND THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS**

MORRISON & FOERSTER LLP
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
Samantha Martin
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000

Alexandra Steinberg Barrage
2000 Pennsylvania Avenue, NW
Washington, DC 20006-1888
Telephone: (202) 887-1500

*Counsel to the Debtors and*
*Debtors in Possession*
Dated: July [3], 2013
New York, New York

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Rachael L. Ringer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Counsel for the Official Committee of*
*Unsecured Creditors*

ny-1097924

of the Debtors and these Chapter 11 Cases. Upon the Effective Date, Ally shall be fully released from the Continuing Obligations and shall have no monetary obligations in respect of the Continuing Obligations under the Consent Order, DOJ/AG Settlement, and the Order of Assessment.

As described above, the consideration provided by the Debtors' current and former officers and directors in exchange for the release discussed in this section includes their forbearance regarding any claims for coverage they may have under any directors & officers or errors & omissions insurance policies covering the Debtors or their Representatives between November 2006 and the Effective Date, and their forbearance regarding any contractual claims for indemnification that they may have against Ally or the Debtors. In addition, the Plan's release provisions seek to release the Debtors' current and former officers and directors from any post-Effective Date liability, thereby preventing certain of these individuals, as a practical matter, from performing the Continuing Obligations described in this section post-Effective Date.

Notwithstanding anything to the contrary herein, nothing in the Plan shall release, enjoin, or preclude any Representative of the Debtors from pursuing any rights a Representative of the Debtors may have (i) to indemnification or advancement from Ally solely for any claims that are not released by the Plan and the Confirmation Order; or (ii) as an "insured" under any insurance coverage purchased by Ally or covering Representatives of the Debtors, or against any party (other than the Debtors) arising out of such policies of insurance, solely for any claims that are not released by the Plan and the Confirmation Order. For the avoidance of doubt, nothing in the Plan expands or reduces any existing indemnification rights or rights as an "insured" for any Representative of the Debtors for claims that are not released by the Plan. No rights of the Consenting Claimants are released under the Plan in their capacity as liability insurance or reinsurance carriers for Ally or the Debtors.

## B.     The Plan Includes a Settlement of RMBS Trust Claims

One element of the overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and Section 1123 of the Bankruptcy Code, the Plan contemplates approval of a settlement that provides for the allowance, priority, and allocation of claims of residential mortgage backed securities Trusts (the "RMBS Settlement"). The Plan's treatment of those claims is a modification of the Debtors' prior settlement agreement with certain Investors in certain RMBS Trusts (the "Original RMBS Settlement Agreement"), expanded to include the Additional Settling Trusts and modified in a number of additional respects. The RMBS Settlement embodied in the Plan resolves: (i) alleged and Potential Claims for breaches of representations and warranties held by all RMBS Trusts and (ii) all alleged and Potential Claims for damages arising from servicing, in exchange for Allowed Claims in the aggregate amount of $7.301 billion for the RMBS Trusts, to be allocated as between the GMACM Debtors and the RFC Debtors. The allocation of distributions received on account of the RMBS Trust Claims is subject to the RMBS Trust Allocation Protocol, as set forth in more detail in Article [●] of the Plan. A copy of the RMBS Trust Allocation Protocol is attached as Exhibit 8 hereto.

-27-

ny-1097924

Upon confirmation of the Plan, no RMBS Trust can opt out of the RMBS Settlement embodied in the Plan. Consistent with the order approving the Plan Support Agreement, any RMBS Trust that has withdrawn from the Plan Support Agreement preserves its right to object to the Disclosure Statement and Plan. Upon confirmation of the Plan, distributions to the RMBS Trusts on account of the RMBS Trust Claims will be in accordance with the RMBS Trust Allocation Protocol.

Importantly, the Plan resolves outstanding disputes regarding the claims of the RMBS Trusts that are insured by monoline insurers (the "Insured RMBS Trusts"). The Plan provides that certain monoline insurers will have allowed claims against the Debtors' Estates independent of the claims of the RMBS Trusts, and the Insured RMBS Trusts will have no allowed RMBS Trust Claims but will reserve the ability to enforce their rights against any monoline insurer (other than FGIC) that does not, in the future, perform in accordance with an insurance policy for the benefit of the applicable RMBS Trust. In addition, those Insured RMBS Trusts that have made policy claims against an applicable monoline insurer but have not received full payment on account of such claims as of the Effective Date shall receive an allocated distribution that takes into account such partial payment on account of the RMBS Trust Claims, reduced by any partial payments from such monolines, in accordance with the RMBS Trust Allocation Protocol.

The Plan treatment covers all of the RMBS Trusts that have Claims against the Debtors, whether the RMBS Trust was sponsored by the Debtors and their affiliates or was sponsored by a third party. These claims comprise the single largest set of disputed claims against the Debtors' Estates. The Plan resolves such claims without the need for protracted and costly litigation that would otherwise result. By way of example, litigation over the claims asserted by the RMBS Trustees could require a Trust-by-Trust analysis of the claims and could last several years, presenting a significant burden on the Debtors' Estates. As discussed below, the Plan also avoids the cost of going forward with the trial on the Debtors' motion seeking approval of the Original RMBS Settlement Agreement pursuant to Bankruptcy Rule 9019, as well as likely follow-up litigation regarding the subordination of the RMBS Trust Claims pursuant to Section 510 of the Bankruptcy Code, each of which would have posed a significant burden on the Estates and required a massive amount of time, effort, and expense.

## C.    The Plan Settles the Claims of FGIC and MBIA

The Plan also resolves the allowance, priority and allocation of the Claims of Monoline insurers, arising generally from alleged breaches by the Debtors and their affiliates of representations, warranties, and/or covenants in various governing documents and offering documents related to RMBS and insurance agreements associated with the relevant RMBS transactions. Specifically, certain monoline insurers, including MBIA Insurance Corporation ("MBIA") and Financial Guaranty Insurance Company ("FGIC"), filed lawsuits against the Debtors and Ally asserting billions of dollars of Claims, and the continued litigation of such Claims would have been costly and could have taken years to resolve.

*MBIA.* The Plan resolves the allowed amount and allocation of MBIA's claims and avoids the need for further litigation between the Debtors and MBIA. MBIA has asserted claims against the Debtors for alleged breaches of representations and warranties and fraud in

-28-

PX 0887 pg. 19 of 50

Setting aside the cost of reviewing, analyzing, and taking discovery with respect to tens of thousands of transactions, litigation of these and similar claims would be extremely time-consuming and expensive. Fraudulent conveyance, substantive consolidation, recharacterization, and similar issues are highly complex and factually intensive, requiring extensive discovery and expert testimony addressing solvency, valuation, contemporaneous exchange of value, arms'-length terms, accounting practices, allocation issues, and so forth. Experience in similar cases demonstrates that, absent consensual resolution, fully litigating these issues would cost the Estates tens of millions of dollars, and substantially delay the ability to confirm any Chapter 11 plan.

Given the numerous inter-related litigations that would arise from any attempt to enforce the Intercompany Balances and any objections thereto, it was clear that the uncertainty and costs associated with litigating the intercompany issues would impact all creditor recoveries. As part of the Global Settlement, each Debtor, with the support of the Creditors' Committee and the Consenting Claimants, has agreed to compromise the Intercompany Balances. For purposes of the Plan, Intercompany Balances, as well as any subrogation claims and fraudulent conveyance claims related to the forgiveness of intercompany debt, will be compromised as part of the Global Settlement, and waived, cancelled, and discharged on the Effective Date, and holders of Intercompany Balances will receive no recovery on account of such claims.

The Debtors and the Creditors' Committee have concluded that the compromise of Intercompany Balances is reasonable in consideration of all of the factors discussed above, including (i) the Debtors' and Creditors' Committee's analysis and conclusion that the Intercompany Balances reflected on the Schedules lack indicia of true debt and are not enforceable claims; (ii) the costly and time-consuming litigation that would result from any effort to enforce the putative Intercompany Balances; (iii) the inability to reach consensual agreement with numerous creditor constituencies absent consensual resolution of the Intercompany Balances and inextricably related issues; and (iv) the substantial benefits to all creditor constituencies from the Global Settlement. For these reasons, the Plan Proponents and the Consenting Claimants agree that it is in the best interest of the Debtors' Estates and their creditors to compromise the Intercompany Balances.

## L.    The Plan Allocates the Estate Assets and Administrative Expenses among Debtor Groups and Creditor Constituencies

The cornerstone of the Global Settlement is the $2.1 billion contribution by Ally to the Estate assets in exchange for the Debtor Release and Third Party Releases. Through the negotiation process, the parties determined to allocate the Ally Contribution as follows (which remains subject to adjustment based on amounts reserved for Disputed Claims):

-36-

PX 0887 pg. 20 of 50

| Entity | Allocation |
|--------|-----------|
| ResCap Debtors | $782.7 million |
| GMACM Debtors | $462.3 million |
| RFC Debtors | $462.3 million |
| Private Securities Claims Trust | $235.0 million |
| Borrower Claims Trust | $57.6 million |
| NJ Carpenters Claims Distribution | $100.0 million |

The agreed upon allocation of the Ally Contribution was a central focus of the mediation sessions, and reflects a thorough analysis of a number of variables.[31] First, the parties analyzed the assets available for unsecured Creditors at each of the Debtor Groups, and determined that the GMACM and RFC Debtors held significant unencumbered assets, whereas the ResCap Debtors had little to no unencumbered assets available for distribution to unsecured Creditors at those entities. Second, the parties then analyzed the secured and unsecured Claims asserted against each of the Debtors, the allocation of Allowed Claims against each Debtor Group, as well as the potential post-petition intercompany claims held by each of the Debtor Groups. Third, the parties considered the rights and Causes of Action that each of the Debtor Groups could pursue against Ally, as identified by the Debtors and the Committee through their investigations. After conducting each of these analyses, the parties determined that the proposed allocation of the Estate assets is reasonable and appropriate, and is in the best interest of the Estates and the creditors of each of the Debtor Groups.

The Global Settlement also embodies an allocation of accrued and projected administrative expenses among the Debtor Groups. The Debtors project that, after April 30, 2013, there will be approximately $1.086 billion in administrative costs. In light of the fact that the GMACM Debtors and the RFC Debtors were the operating companies and have the greatest amount of unencumbered assets available for unsecured Creditors, in contrast to the ResCap Debtors with limited operations and assets, and as part of the global compromise and settlement, the settling parties agreed to allocate the accrued and projected administrative costs to the GMACM Debtors and the RFC Debtors, with no administrative expenses allocated to the ResCap Debtors, as appropriate under the circumstances. Specifically, the parties determined that of the projected $1.086 billion in administrative costs, $836.3 million shall be allocated to the GMACM Debtors, and $249.8 million shall be allocated to the RFC Debtors.

After payment of all Allowed secured claims and projected Allowed administrative and priority Claims, the Debtors project that, based upon the allocation of the Ally Contribution and projected Estate assets (including Cash and non-Cash assets) available for distribution to unsecured creditors at each of the Debtors' Estates, the following amounts will be available for distribution to unsecured creditors (subject to adjustment based on amounts reserved for Disputed Claims):

---

[31] Thus, the Global Settlement does not include an allocation of any portion of the Ally Contribution on account of specific claims or causes of action that could be pursued by the Debtors or third parties.

-37-

PX 0887 pg. 21 of 50

| Entity | Allocation |
|--------|-----------|
| ResCap Debtors | $780.2 million |
| GMACM Debtors | $626.0 million |
| RFC Debtors | $820.8 million |
| Private Securities Claims Trust | $235.0 million |
| Borrower Claims Trust | $57.6 million |
| NJ Carpenters Claims Distribution | $100.0 million |

In light of the fact that the amount of Allowed Administrative Expense Claims remains uncertain and the value of certain non-Cash assets held by the Estates will vary as they are liquidated over time, the parties to the Plan Support Agreement determined that any increase or decrease in administrative expenses and/or the value of all of the Debtor Estates from current projections, would be shared among the GMACM Debtors, the RFC Debtors, and the Private Securities Claims Trust, pro rata, regardless of the Debtor Group against which their claims are asserted.

## ARTICLE III.
## BACKGROUND

### A.    The Debtors' Businesses and Operations

#### 1.    Overview

As a result of the commencement of the Chapter 11 Cases and the sale of the Debtors' mortgage loan servicing and origination platform (the "Origination and Servicing Business") to Ocwen and Walter and the Debtors' "whole loan" portfolio (the "Whole Loan Portfolio") to Berkshire Hathaway, Inc. ("Berkshire") for a combined total of approximately $4.1 billion in gross sale proceeds (prior to reduction for payment of assumed liabilities, core costs, and other associated liabilities) (together, the "Asset Sales"). Following the transfer of the majority of the Debtors' business pursuant to the Asset Sales, the Debtors' operations have significantly changed. A general description of the Debtors' organization and business prior to the Petition Date is set forth below.

Prior to the Petition Date, the Debtors were a leading residential real estate finance company indirectly owned by non-Debtor AFI. The Debtors, together with their non-debtor subsidiaries, managed their mortgage-related businesses in two business lines:    (i) the Origination and Servicing Business, and (ii) the Whole Loan Portfolio and other business, which the Debtors started to wind down prior to the Petition Date. As discussed herein, following the Petition Date, the Debtors sold substantially all of the assets associated with the Origination and Servicing Business to Ocwen and Walter and sold the Whole Loan Portfolio to Berkshire.

-38-

ny-1097924

PX 0887 pg. 22 of 50

## 11. Motions Seeking Standing to Pursue Claims Against Ally

*Committee Standing Motion.* Following its investigation (as described above), the Creditors' Committee believed it identified viable and valuable Claims and Causes of Action against Ally, and that it was best suited to prosecute and settle claims against AFI and certain of AFI's non-debtor affiliates (the "AFI Defendants") arising from those transactions. On April 11, 2013, the Creditors' Committee filed a motion seeking entry of an order authorizing it to prosecute and settle veil-piercing, fraudulent transfer, indemnification, pre-petition preference, and equitable subordination claims on behalf of the Debtors' Estates against the AFI Defendants [Docket No. 3412]. Prior to the filing of this motion, the Debtors consented to the Creditors' Committee's standing to investigate these claims after determining that the Creditors' Committee was best positioned to pursue the claims and causes of action against the AFI Defendants in light of the Pre-Petition AFI-ResCap Settlement Agreement. The motion was heard by the Bankruptcy Court on May 7, 2013, but the Bankruptcy Court reserved decision. The Creditors' Committee's motion is stayed during the term of the Plan Support Agreement.

*Wilmington Trust Standing Motion.* On April 19, 2013, Wilmington Trust, National Association, solely in its capacity as Indenture Trustee for the Senior Unsecured Notes ("Wilmington Trust") filed a motion (the "Wilmington Trust Standing Motion") seeking authority to prosecute claims and other causes of action on behalf of the ResCap Estate [Docket No. 3475]. In particular, Wilmington Trust sought permission to file a complaint to pursue certain Estate claims and claims that Wilmington Trust alleged were third party claims, including constructive and actual fraudulent transfers, in coordination with the Creditors' Committee's efforts to prosecute Estate claims. On May 6, 2013, the Debtors filed a limited objection to the Wilmington Trust Standing Motion [Docket No. 3598]. The Wilmington Trust Standing Motion has not yet been heard by the Bankruptcy Court.

As a result of the Plan Support Agreement, the Wilmington Trust Standing Motion and other motions seeking standing to pursue claims or Causes of Action against AFI or its affiliates on behalf of the Debtors' Estates are stayed during the term of the Plan Support Agreement, and will be rendered moot once the Plan is confirmed.

## 12. Appointment of a Mediator

Recognizing the numerous, divergent interests held by the Debtors' key stakeholders, on December 6, 2012, the Debtors requested the appointment of a Mediator to assist with the plan negotiations process [Docket No. 2357]. Such request was supported by the Creditors' Committee. On December 26, 2012, the Bankruptcy Court entered an order appointing the Honorable James M. Peck as Mediator in these Chapter 11 Cases to assist in plan negotiations, foster a dialogue with key stakeholders, and reach resolution on significant plan issues [Docket No. 2519]. Initially, the Mediator was appointed for a limited period ending February 28, 2013, but as a result of subsequent negotiations amongst parties involved in the mediation, the Court further extended the term of the Mediator's appointment through October 31, 2013, or such earlier date as the Mediator declares that the mediation is at an impasse and should be terminated [Docket Nos. 2519, 3101, 3877] (collectively, the "Mediation Order").

-71-

PX 0887 pg. 23 of 50

The Mediator has offered constructive and independent guidance to the Mediation parties (as defined below) on the complex interdebtor and intercreditor issues that necessarily impact plan distributions. In particular, the focus of the mediation to date has been twofold: (1) to settle certain potential Estate and third party claims and causes of action identified against Ally in exchange for a contribution from Ally to the Debtors' Estates, in the form of the Debtor Release and the Third Party Releases, and (2) to address intercreditor issues related to the allocation of the Debtors' assets. Tremendous progress was made under the Mediator's guidance, ultimately culminating in the Plan Support Agreement.

### 13. Mediation Process

As discussed above, commencing shortly after the Mediator's appointment through the date of the filing of this Disclosure Statement, the Mediator attended numerous mediation sessions with the following parties, both on an individual basis and jointly with different combinations of representative parties: the Debtors, the Creditors' Committee (as well as its individual members), the Ad Hoc Group, Ally, FHFA, the Institutional Investors, Paulson, and certain of the Debtors' other key constituencies (collectively, the "Mediation parties"). In an effort to facilitate these discussions and to guide the Mediation parties in their negotiations, the Debtors and their advisors prepared and provided the Mediator and the Mediation parties with comprehensive business and financial information, including multiple "waterfall" analyses that helped set forth hypothetical returns to creditors based on shifting recovery scenarios. In addition, certain parties provided to each other, as well as to the Mediator, presentations and draft pleadings outlining the strengths and weaknesses of their own, and other parties' claims. Subject to the Mediation Order, materials provided by any party as part of the mediation remain confidential in order to promote progress and protect commercially sensitive information. Ultimately, a global resolution was reached on a consensual plan and embodied in the Plan Support Agreement.

### 14. The Termination of the Pre-Petition AFI-ResCap Settlement Agreement

Following the Asset Sales, the Debtors engaged in numerous discussions with various parties in interest, including Lewis Kruger, the Debtors' CRO, the Mediator, and the Creditors' Committee, regarding the framework of the Plan and the Potential Claims. Because the Asset Sales successfully closed thus accomplishing the primary objective of the Pre-Petition AFI-ResCap Settlement Agreement, the Debtors, with the support of the Creditors' Committee, allowed the AFI-ResCap Settlement Agreement to expire by its terms. However, the Creditors' Committee determined that negotiations with Ally regarding the resolution of the Potential Claims should continue. As discussed below, after substantial investigation and examination of claims and causes of action against Ally by the Creditors' Committee and the Examiner, the negotiations among the Debtors, Ally, the Creditors' Committee and the Consenting Claimants culminated in the Ally Contribution and the Global Settlement embodied in the Plan.

### 15. Adjournment of the RMBS Trial

On June 11, 2012, the Debtors filed a motion pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "9019 Motion") for approval of the Original RMBS Settlement Agreements, [see Docket Nos. 320, 1176 and 1887]. When it became clear that the sale of the Debtors'

-72-

PX 0887 pg. 24 of 50