# Exhibit 6

## RECOVERY ANALYSIS

## RESIDENTIAL CAPITAL, LLC

1.    The Recovery Analysis[1] is based on the planned orderly wind-down of the assets remaining in the Estates as of April 30, 2013. The recovery from these assets, along with cash on hand as of April 30, 2013 and the proceeds from the settlement with Ally Financial, Inc. (the "Ally Contribution"), are then distributed to; i) holders of secured claims, ii) administrative and priority expenses, and iii) general unsecured claims.

2.    Estimates were made of the cash proceeds which might be realized from the orderly liquidation of the Debtors' assets. The liquidation is based on asset balances as of April 30, 2013 with certain proforma adjustments[2] used to estimate recoveries. Recoveries to creditors are presented on an undiscounted basis and are assumed to occur over the course of 7 years with over 85% of recoveries occurring over the first 3 years. There can be no assurance that the recoveries assigned to the assets will in fact be realized.

### *Estimate of Costs*

3.    The Recovery Analysis assumes the wind-down of the Estates lasts for a period of approximately 3 years for the settlement of claims, although certain asset realization costs will continue through 7 years. During this time the Debtors will incur administrative expenses for operating expenses, restructuring professional fees, foreclosure file review costs, and other items. There can be no assurance that the administrative expenses will not exceed the estimates included in this analysis.

4.    THE DEBTORS' RECOVERY ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF THE ORDERLY LIQUIDATION OF THE ASSETS OF THE DEBTORS. Underlying the Recovery Analysis are a number of estimates and material assumptions that are inherently subject to significant economic, competitive, and operational uncertainties and contingencies beyond the control of the Debtors. In addition, various decisions upon which certain assumptions are based are subject to change. Therefore, there can be no assurance that the assumptions and estimates employed in determining the

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan and Disclosure Statement.

[2] The pro-forma adjustments were made to exclude certain assets that are either non-economic or securitized (i.e. assets with offsetting liabilities recorded on the balance sheet). The asset balances also exclude certain accounting adjustments related to pre-paid expenses and accounts receivable, as well as entries recorded to estimate true-up payments for the asset sale transactions with Ocwen and Walter.

recovery values of the assets will result in an accurate estimate of the proceeds that will be realized. In addition, amounts of Claims against the Estates could vary significantly from the estimate set forth herein. Therefore, the actual recovery received by creditors of the Debtors could vary materially from the estimates provided herein.

5.      THE RECOVERY ANALYSIS SET FORTH HEREIN WAS BASED ON THE VALUES OF THE DEBTORS' ASSETS AS OF APRIL 30, 2013 WITH CERTAIN PROFORMA ADJUSTMENTS. TO THE EXTENT THAT OPERATIONS THROUGH SUCH DATE WERE DIFFERENT THAN ESTIMATED, THE ASSET VALUES MAY CHANGE. DELOITTE TOUCHE TOHMATSU LLP, THE INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR RESCAP, HAS NOT EXAMINED, COMPILED OR OTHERWISE APPLIED PROCEDURES TO THESE VALUES AND, CONSEQUENTLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE VALUES IN THE RECOVERY ANALYSIS.

## ASSET RECOVERY ASSUMPTIONS

### *Cash and Cash Equivalents*

6.      Cash and cash equivalents include cash in the Debtors' domestic bank accounts and other cash equivalents. The estimated recovery for this category of assets is 100%.

### *Restricted Cash*

7.      Restricted cash primarily consists of cash held at Ally Bank, escrow funds for GNMA pooling agreements and other amounts held in escrow related to the Ocwen APA and Walter Assignment, and other parties. Outstanding amounts are estimated to be fully recovered in the Recovery Analysis scenarios.

### *FHA/VA Mortgage Assets*

8.      Federal Housing Administration and Department of Veterans Affairs ("FHA/VA") mortgage assets consist of mortgage loans, servicer advances, and accrued interest. These assets constitute the bulk of the Estates' remaining assets. The FHA/VA recovery calculation assumes two primary resolution strategies, including: 1) recoveries through delivery of modified loans into GNMA securitizations, and 2) recovery of loan principal, interest and advances through FHA/VA insurance claims. The timing of claim recoveries is driven by the individual loan status and is dependent on foreclosure status, presence of documentation deficiencies and geography. Geography has become particularly important, as some judicial foreclosure states have an average foreclosure timeline of 4 years.

9.      FHA/VA loans are assumed to have a blended net recovery rate of approximately 93% of book value in the Recovery Analysis.

### *Non FHA/VA Mortgage Assets*

10.     The Estates' Non FHA/VA mortgage assets consist primarily of mortgage loans, servicer advances and accrued interest on loans removed from Fannie Mae ("FNMA") and Freddie Mac ("FHLMC") securitizations, loans rejected from the Berkshire Hathaway asset purchase

agreement and other loans deemed to be non-marketable. These assets are not guaranteed by any government agency.

11.     The Recovery Analysis assumes approximately 15% of the loan portfolio will be resolved through foreclosure or real estate owned ("REO") sales. The analysis further assumes a bulk sale of the remaining portfolio by the end of 2013. The Estates are currently preparing to market this portfolio. The blended recovery rate is assumed to be approximately 73% in the Recovery Analysis.

### *MSRs and Associated Servicer Advances*

12.     Mortgage servicing rights ("MSRs") and the associated servicer advances consist of assets excluded from the asset purchase agreements with Ocwen and Walter, due to various counterparty objections. The Estates are currently negotiating with the counterparties to resolve the objections and intends to sell these MSRs and servicer advances once settlements have been achieved. The blended recovery rate is assumed to be 103% of book value in the Recovery Analysis.

### *Other Debtors' Assets*

13.     Other Debtors' Assets consist primarily of securitized Home Equity Lines of Credit ("HELOCs"), REO properties, trading securities and derivative assets.

14.     The securitized HELOCs are comprised of current paying home equity lines which are projected to run off over the next 15 months.

15.     REO properties are assumed to be sold in the ordinary course.

16.     The GMAC 2010-01 securitization asset is assumed to continue paying off at historical rates over the first 2 years of the Estates. After the first 2 years, the securitization will be unwound through a cleanup call and the resulting whole loans will be sold at prices consistent with on-balance sheet FHA/VA loans.

17.     Derivative collateral is expected to be collected upon the completion of the delivery of modified loans into GNMA securitizations.

18.     The Other Debtors' Assets are expected to recover at a blended average rate of approximately 61% of book value in the Recovery Analysis.

### *Non-Debtors' Assets*

19.     Non-Debtors' Assets are comprised primarily of equity interests in the Debtors' foreign affiliates. These affiliates are working to liquidate assets and to resolve claims and litigation. The Debtors assume in the Recovery Analysis that they will be able to recover $24 million from non-Debtor affiliates.

*Other Recoveries*

20. Additional incremental recoveries are expected to materialize from client recoveries and broker fees from the wind-down of the originations pipeline, however, these fees are expected to be offset by incremental costs for the Berkshire loan repurchase true-up[3]. In total, incremental recoveries are estimated to generate approximately $0 net recovery.

*Ally Contribution*

21. The Ally Contribution is assumed to result in an additional contribution to the Estates of $2.1 billion in the Recovery Analysis. The Ally Contribution is comprised of $1.95 billion in cash to be paid on the Effective Date and $150 million on account of certain insurance claims. The Recovery Analysis assumes that $783 million of the AFI Contribution will be allocated to ResCap Debtors, $462 million will be allocated to GMACM Debtors, $462 million will be allocated to RFC Debtors and $393 million will be allocated to the Private Securities Claims Trust, Borrowers Claims Trust, and NJ Carpenters Claims Trust based on the plan term sheet.

## ADMINISTRATIVE EXPENSES

22. Administrative expenses include payments for operating expenses, asset management costs, interest expense, professional fees, foreclosure file review related expenses, and post-petition accounts payable and accrued expenses. Post-petition intercompany claims, which are subject to administrative priority status, are reflected in the April 30, 2013 cash balances by legal entity. The assumed total administrative expenses in the Recovery Analysis are $1.086 billion.

*Operating Expenses and Compensation and Benefits*

23. Operating expenses consist of a number of costs necessary to administer the Estates after April 30, 13. These costs are primarily related to compensation and benefits, document storage and destruction costs, transition service agreement expenses, ordinary course professional fees and other operating expenses and are assumed to be $379 million in the Recovery Analysis.

24. The estimation for compensation and benefits assumes an initial headcount of 257 as of April 30, 2013 which winds down over the forecast period. By the expected Confirmation Date of October 31, 2013, headcount is anticipated to decline to approximately 135. Compensation and benefits includes severance, retention, and incentive payments.

25. Document storage and destruction costs include expenses relating to the physical retention and destruction of documents. The Recovery Analysis assumes that all document destruction occurs at the end of the three years.

26. Transition service agreement ("TSA") costs reflect the current TSA agreements between the Estates and Ocwen, AFI, and Walter. The Recovery Analysis reflects all extensions, modifications, and terminations as currently known and the most recent pricing available.

---

[3] Excludes any adjustments related to Walter and Ocwen sale true-ups.

27.    Ordinary course (non-reorganization) professional fees are projected based on the analysis of historical costs of closed cases, discounted for a reduction in litigation costs due to the AFI Contribution.

28.    Other operating expenses consist primarily of overhead costs necessary to run the Estates. This category includes costs related to facilities, insurance, information technology, and taxes[4], as well as other miscellaneous expenses.

### Direct Asset Management Costs

29.    Direct asset management costs primarily consist of servicing and subservicing fees to Ocwen and custodial fees.

30.    Servicing and subservicing costs are a function of the delinquency status of the individual loans being serviced. Servicing and subservicing costs reflect fees for the full asset disposition period (i.e. 7 years). The Recovery Analysis includes $47 million of direct asset management costs.

### Interest Expense

31.    Interest expense consists of post-petition interest payments made on the senior secured AFI Revolver and AFI LOC facilities. As of the date of the Disclosure Statement, both the AFI Revolver and the AFI LOC have been paid in full and no additional interest expense is assumed in the forecast. Total interest included in the Recovery Analysis is $8 million.

### Foreclosure File Review and Remediation Expenses

32.    Foreclosure file review and remediation costs consist of (i) expenses related to the Debtors' pending final settlement with the Board of Governors of the Federal Reserve of the independent foreclosure review ("IFR") under the Consent Order, as well as (ii) expenses related to ongoing compliance with the DOJ/AG Settlement entered into by the Debtors with the Department of Justice and 49 state attorneys general. These include costs related to the pending IFR settlement, third party professional fee expenses, costs and related to the SCRA file review component of the DOJ/AG Settlement, and a pro-rata share of the ongoing fees and expenses of the Office of Mortgage Settlement Oversight during the DOJ/AG Settlement enforcement period. The $230 million IFR settlement was agreed in June 2013 and bankruptcy court approval will be sought during July 2013. Total foreclosure review and remediation costs are assumed to be $328 million in the Recovery Analysis.

### Restructuring Professional Fee Expenses

33.    Restructuring Professional Fee Expenses include those fees paid to professionals engaged by the Debtors, the Unsecured Creditors Committee ("UCC"), the Junior Secured Noteholders, the Residential Mortgage Backed Securities ("RMBS") trustees, the Examiner, the US Trustee,

---

[4] The Estates have retained advisors for tax matters. The tax estimate is presented based upon preliminary guidance the Estates have received from their tax advisors. It should be noted that the tax analysis has not been completed, and accordingly the guidance may change and those changes may be material.

PX 0887 pg. 30 of 50

and the Chief Restructuring Office ("CRO"). Where applicable, forecasted fees are based on third party vendor forecast submissions. Restructuring professional expenses are assumed to be approximately $310 million in the Recovery Analysis.

### Claims

#### *Ally Secured Claims*

34. Secured claims are given priority under the Bankruptcy Code and are entitled to payment prior to any payment on unsecured claims. Secured claims from secured facilities include the claims related to the Ally Revolver and the Ally LOC facilities.

#### *Junior Secured Notes*

35. The JSNs' claim of $2.223 billion ($2.121 billion of principal plus $102 million of pre-petition interest) is assumed to be satisfied in full in the Recovery Analysis by the residual value of AFI Revolver collateral and pledged equity after the satisfaction of the AFI Revolver.

36. The allocation of the JSN recoveries among the Debtors is listed below. The Plan also contemplates that the JSN claims will be paid in full on the Effective Date.

| ResCap Debtors | 8% |
|---|---|
| GMACM Debtors | 62% |
| RFC Debtors | 30% |

#### *General Unsecured Claims*

37. General Unsecured Claims include:

    (1)    RMBS Trust Claims;

    (2)    Monoline Claims;

    (3)    Other General Unsecured Claims;

    (4)    Borrower Claims; and

    (5)    Senior Unsecured Notes

38. The treatment of many of these claims in the Recovery Analysis is assumed to be subject to the settlement terms agreed upon by the Consenting Claimants.

39. Per the terms of the settlement, the Monoline Claims held by MBIA Inc. ("MBIA") are assumed to be fully and finally allowed as non-subordinated unsecured claims of $719 million against the ResCap Debtors, $1.450 billion against the GMACM Debtors, and $1.450 billion against the RFC Debtors. Pursuant to the FGIC Settlement Agreement, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed Claims and issues embodied in the Plan, as of the Effective Date, the Allowed amounts of the General Unsecured

Claims held by FGIC shall be; $337.5 million against the ResCap Debtors, $181.5 million against the GMACM Debtors, and $415.0 million against the RFC Debtors. On account of such Allowed General Unsecured Claims, FGIC shall receive its Pro Rata Share of the GMACM Debtors Unit Distribution, RFC Debtors Unit Distribution and ResCap Debtors Unit Distribution, as applicable. The Monoline Claims held by all other Monolines are assumed to be treated under the Plan as unsecured claims of the ResCap Debtors, the RFC Debtors or the GMACM Debtors, as applicable, or as otherwise approved by the Plan Proponents and the Consenting Claimants.

40.     Per the terms of the settlement, the plan incorporates a settlement that provides for the allowance, priority, and allocation of the RMBS Trust Claims through approval of the Debtors' prior agreement with the Institutional Investors, which covered 392 RMBS Trusts. The RMBS Settlement shall provide that all RMBS Trust Claims of the Original Settling Trusts and the Additional Settling Trusts shall be fully and finally allowed as non-subordinated unsecured claims in the aggregate amount of $7.051 billion for the Original Settling Trusts and in the aggregate amount of $250 million for the Additional Settling Trusts. The $7.301 billion of claims is allocated $210 million to the GMACM Debtors and $7.091 billion to the RFC Debtors; provided, however, the allowance and allocation of such claims shall not affect the distributions to be made in accordance with the RMBS Trust Allocation Protocol.

41.     Senior Unsecured Claims of $1.003 billion is assumed to be asserted against Residential Capital LLC and is assumed to recover pari passu with the general unsecured creditors at Residential Capital LLC.

42.     Other General Unsecured Claims are comprised of trade claims, lease rejections, and other unsecured claims and are assumed to be $92 million.

43.     Borrower Claims will be addressed through the establishment of a Borrower Claims Trust for the benefit of the holders of Borrower Claims at each of the Debtors and shall be funded in an amount of $57.6 million, subject to the Adjustments as defined in the Supplemental Term Sheet.

### *Additional Securities Claims*

44.     Per the terms of the settlement, the recoveries for Securities Claims have been fixed. These include the NJ Carpenters Claims totaling $100 million and Private Securities Claims totaling $226 million, plus a pro-rata share of incremental recoveries beyond amounts contemplated in the Term Sheet.

<table>
<tr><td colspan="6"><strong>Residential Capital, LLC and Subsidiaries</strong><br><strong>Recovery Analysis</strong><br>($ Millions)</td></tr>
</table>

| | | Book Value | | | |
|---|---|---|---|---|---|
| | | ResCap Debtors | GMACM Debtors | RFC Debtors | Total |
| 1 | Restricted Cash | $ 27.9 | $ 39.2 | $ - | $ 67.1 |
| 2 | FHA/VA Mortgage Assets | - | 945.3 | - | 945.3 |
| 3 | Non FHA/VA Mortgage Assets | - | 39.4 | 7.3 | 46.7 |
| 4 | MSRs and Associated Servicer Advances | - | 189.2 | 21.8 | 211.0 |
| 5 | Other Debtors' Assets | 0.1 | 85.3 | 9.7 | 95.1 |
| 6 | Non-Debtor Assets (5) | - | - | - | - |
| 7 | Other Recoveries | - | - | - | - |
| 8 | **Total** | **$ 28.0** | **$ 1,298.3** | **$ 38.9** | **$ 1,365.2** |

| | | Recoveries ($) | | | |
|---|---|---|---|---|---|
| | | ResCap Debtors | GMACM Debtors | RFC Debtors | Total |
| 9 | Restricted Cash | $ 27.9 | $ 39.2 | $ - | $ 67.1 |
| 10 | FHA/VA Mortgage Assets | - | 878.3 | - | 878.3 |
| 11 | Non FHA/VA Mortgage Assets | - | 27.6 | 6.4 | 34.0 |
| 12 | MSRs and Associated Servicer Advances | - | 189.5 | 28.4 | 217.9 |
| 13 | Other Debtors' Assets | - | 50.9 | 6.6 | 57.5 |
| 14 | Non-Debtor Assets | - | - | 24.2 | 24.2 |
| 15 | Other Recoveries | - | 5.5 | (6.8) | (1.3) |
| 16 | **Total** | **$ 27.9** | **$ 1,191.0** | **$ 58.8** | **$ 1,277.6** |

| | | Recoveries (%) | | | |
|---|---|---|---|---|---|
| | | ResCap Debtors | GMACM Debtors | RFC Debtors | Total |
| 17 | Restricted Cash | 100.0% | 100.0% | n/a | 100.0% |
| 18 | FHA/VA Mortgage Assets | n/a | 92.9% | n/a | 92.9% |
| 19 | Non FHA/VA Mortgage Assets | n/a | 70.1% | 87.1% | 72.8% |
| 20 | MSRs and Associated Servicer Advances | n/a | 100.2% | 130.3% | 103.3% |
| 21 | Other Debtors' Assets | 0.0% | 59.7% | 67.9% | 60.4% |
| 22 | Non-Debtor Assets | n/a | n/a | n/a | n/a |
| 23 | Other Recoveries | n/a | n/a | n/a | n/a |

---

[5] Book values for the recoveries of the non-debtor assets are not shown as these assets for Debtors' represent equity claims.

**Residential Capital, GMACM and RFC**
**Recovery Analysis**
**($ Millions)**

| | ResCap Debtors | GMACM Debtors | RFC Debtors | Settlement Payment | Total |
|---|---|---|---|---|---|
| **Distributable Value** | | | | | |
| 1 Cash | $143.5 | $2,037.8 | $1,496.9 | $ - | $3,678.3 |
| 2 Remaining Assets | 27.9 | 1,191.0 | 58.8 | - | 1,277.6 |
| 3 AFI Contribution | 782.7 | 462.3 | 462.3 | - | 1,707.4 |
| 4 Trust Contribution | - | - | - | 392.6 | 392.6 |
| 5 **Total Distributable Value** | $954.1 | $3,691.1 | $2,018.0 | $392.6 | $7,055.9 |
| **Paydown of Sec. Debt and JSN** | | | | | |
| 6 Ally Revolver and Ally Line of Credit | $ - | $(854.4) | $(272.7) | $ - | $(1,127.1) |
| 7 Total JSN Paydown | (173.9) | (1,374.4) | (674.7) | - | (2,223.0) |
| 8 **Total Paydown** | $(173.9) | $(2,228.8) | $(947.4) | $ - | $(3,350.1) |
| **Priority/Wind-Down** | | | | | |
| 9 Priority/Wind-Down | $ - | $(836.3) | $(249.8) | $ - | $(1,086.2) |
| **Value Available to GUC** | | | | | |
| 10 Total Value Available to GUC | $780.2 | $626.0 | $820.8 | $392.6 | $2,619.6 |
| **GUC Claims** | | | | | |
| 11 Monolines | $1,143.0 | $1,806.5 | $2,040.0 | $ - | $4,989.5 |
| 12 RMBS Trusts | - | 209.8 | 7,091.2 | - | 7,301.0 |
| 13 Senior Unsecured Notes | 1,003.3 | - | - | - | 1,003.3 |
| 14 Other GUCs | 0.9 | 63.7 | 27.5 | - | 92.1 |
| 15 Securities Claimants | - | - | - | - | - |
| 16 Borrower Claimants | - | - | - | - | - |
| 17 **Total GUC Claims** | $2,147.2 | $2,080.0 | $9,158.7 | $ - | $13,386.0 |
| **GUC Recoveries ($)** | | | | | |
| 18 Monolines | $415.3 | $543.7 | $182.8 | $ - | $1,141.8 |
| 19 RMBS Trusts | - | 63.1 | 635.5 | - | 698.7 |
| 20 Senior Unsecured Notes | 364.6 | - | - | - | 364.6 |
| 21 Other GUCs | 0.3 | 19.2 | 2.5 | - | 22.0 |
| 22 Securities Claimants | - | - | - | 335.0 | 335.0 |
| 23 Borrower Claimants | - | - | - | 57.6 | 57.6 |
| 24 **Total GUC Recoveries ($)** | $780.2 | $626.0 | $820.8 | $392.6 | $2,619.6 |
| **GUC Recoveries (%)** | | | | | |
| 25 Monolines | 36.3% | 30.1% | 9.0% | n/a | 22.9% |
| 26 RMBS Trusts | n/a | 30.1% | 9.0% | n/a | 9.6% |
| 27 Senior Unsecured Notes | 36.3% | n/a | n/a | n/a | 36.3% |
| 28 Other GUCs | 36.3% | 30.1% | 9.0% | n/a | 23.8% |
| 29 Securities Claimants | n/a | n/a | n/a | n/a | n/a |
| 30 Borrower Claimants | n/a | n/a | n/a | n/a | n/a |
| 31 **Total GUC Recoveries (%)** | 36.3% | 30.1% | 9.0% | n/a | 19.6% |

# Exhibit B

GIBBS & BRUNS LLP
Kathy D. Patrick, Esq. *(pro hac vice)*
Robert J. Madden, Esq. *(pro hac vice)*
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

-AND-

ROPES & GRAY LLP
Keith H. Wofford, Esq. (KW-2225)
D. Ross Martin, Esq. (DM-2947)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Attorneys for the Steering Committee Group of RMBS Holders*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re | Chapter 11 |
| Residential Capital, LLC, *et al.* | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

## VERIFIED STATEMENT OF GIBBS AND BRUNS LLP PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2019

In connection with the above-captioned chapter 11 cases (the "Chapter 11 Cases")

commenced by the debtors on May 14, 2012, Gibbs & Bruns LLP ("Gibbs & Bruns") hereby

submits this verified statement (the "Statement") pursuant to Rule 2019 of the Federal Rules of

Bankruptcy Procedure ("Bankruptcy Rule 2019") in connection with Gibbs & Bruns'

representation of the Steering Committee Group of RMBS Holders (the "Steering Committee"),

which hold, or manage accounts that hold, Residential Mortgage Backed Securities issued by


121202012100500000000000028

various Debtors and included in the RMBS Trust Settlement Agreement, as amended from time to time ("RMBS"). Gibbs & Bruns respectfully states as follows:

1.    As of the date of this Statement, Gibbs & Bruns represents the Steering Committee, which is comprised of each of the entities identified in Exhibit A attached hereto (each a "Member") in connection with the Chapter 11 Cases. As of the date of this Statement, each Member holds, or manages accounts that hold, the RMBS.

2.    In or around September 2011, certain Members engaged Gibbs & Bruns to represent them to pursue mortgage repurchase and servicing claims against the Debtors and/or Ally Financial Inc. In or around late April and early May 2012, certain Members engaged Ropes & Gray LLP ("Ropes and Gray") as co-counsel to represent them to pursue mortgage repurchase and servicing claims against the Debtors and/or Ally Financial Inc. After the RMBS Trust Settlement was reached, and after the commencement of the Chapter 11 Cases, certain other Members joined the Steering Committee. Gibbs & Bruns and Ropes & Gray's legal fees shall be paid in accordance with Section 6.03 of the RMBS Trust Settlement Agreement and Exhibit C thereto.

3.    As of the date of this statement, Gibbs & Bruns and Ropes & Gray represent only the Steering Committee and do not represent or purport to represent any entities other than the Steering Committee in connection with the Chapter 11 Cases. In addition, the Steering Committee represents only the interests of its Members and does not represent or purport to represent any other entities in connection with the Chapter 11 Cases.

4.    The Steering Committee holds, or manages accounts that hold, approximately $12.1 billion in aggregate current face amount of the RMBS, or approximately $29.8 billion in

2

aggregate original face amount of the RMBS.[1]  In accordance with Bankruptcy Rule 2019, the address and nature and amount of all disclosable economic interests for each Member is set forth on Exhibit A.  The information contained in Exhibit A is based upon information provided by the Members to Gibbs & Bruns and is subject to change.

5.       Nothing in this Statement (or Exhibit A hereto) should be construed as a limitation upon, or waiver of, any Member's rights to assert, file and/or amend its claims in accordance with applicable law and any orders entered in these cases.

6.       The undersigned, who is a partner at Gibbs & Bruns, verifies that the foregoing is true and correct to the best of her knowledge.

Dated:    October 5, 2012
          New York, New York

                                     /s/ Kathy D. Patrick

                                     Kathy D. Patrick, Esq. (*pro hac vice*)
                                     Robert J. Madden, Esq. (*pro hac vice*)
                                     GIBBS & BRUNS LLP
                                     1100 Louisiana, Suite 5300
                                     Houston, TX 77002
                                     Telephone: (713) 650-8805
                                     Facsimile:  (713) 750-0903

                                     -AND-

                                     ROPES & GRAY LLP
                                     Keith H. Wofford, Esq. (KW-2225)
                                     D. Ross Martin, Esq. (DM-2947)
                                     1211 Avenue of the Americas
                                     New York, NY 10036-8704
                                     Telephone:  (212) 596-9000
                                     Facsimile:  (212) 596-9090

                                     *Attorneys for the Steering Committee Group of RMBS Holders*

---

[1]       As Exhibit A and footnotes 2 through 9 thereto indicate, this figure excludes "Interest-Only" or "IO" holdings.

3

PX 0887 pg. 38 of 50

EXHIBIT A

Nature and Amount of Disclosable Economic Interest [1]

| | | RMBS Included in RMBS Trust Settlement Agreement | | | |
| | | Holdings as of Sept. 30, 2011 | | Holdings as of Sept. 26, 2012 [9] | |
| Name | Address | Original Face | Current Face | Original Face | Current Face |
|---|---|---|---|---|---|
| AEGON USA Investment Management, LLC | 4333 Edgewood Road NE Cedar Rapids, IO 52499-5110 Attn: Renee Montz | $623,897,000 | $366,942,487 | $603,897,000 | $330,397,514 |
| Angelo, Gordon & Co., L.P. [2] | 245 Park Avenue, 42nd Floor New York, NY 10167 Attn: Allan N. Krinsman | $316,795,819 | $120,264,216 | $822,174,736 | $323,085,820 |
| Bayerische Landesbank | 560 Lexington Ave New York, NY 10022 Attn: Lorraine Briganti | $931,462,000 | $423,278,308 | $931,462,000 | $360,161,278 |
| BlackRock Financial Management Inc. [3] | 40 East 52nd Street New York, NY 10022 Attn: Stephen Ahrens | $6,616,820,542 | $2,473,186,738 | $2,929,494,781 | $1,074,063,893 |
| Cascade Investment, LLC | 2365 Carillon Point Kirkland, WA 98033 Attn: Laurie Smiley | $513,018,600 | $199,332,370 | $513,018,600 | $175,288,407 |
| Federal Home Loan Bank of Atlanta | 1475 Peachtree Street NE Atlanta, GA 30309 Attn: Branden Baltich | $32,000,000 | $6,053,463 | $32,000,000 | $5,386,527 |
| Goldman Sachs Asset Management, L.P. | 200 West Street New York, NY 10282 Attn: Caroline Straus | $2,132,989,063 | $1,059,963,595 | $2,156,195,283 | $979,369,120 |
| ING Investment Management Co. LLC [4] | 5780 Powers Ferry Road, NW Atlanta, GA 30327 Attn: Kate Ippen | $2,230,369,890 | $946,259,036 | $2,230,369,890 | $813,905,690 |
| ING Investment Management, LLC [5] | 5780 Powers Ferry Road, NW Atlanta, GA 30327 Attn: Kate Ippen | $926,184,517 | $406,315,843 | $926,184,517 | $344,937,763 |
| Kore Advisors, L.P. | 1501 Corporate Dr., Ste 230 Boynton Beach, FL 33426 Attn: Cory Nass | $155,725,598 | $100,247,215 | $210,128,583 | $131,306,131 |
| Metropolitan Life Insurance Company | 1095 Avenue of the Americas New York, NY 10036 Attn: Kevin Finnegan | $2,322,117,860 | $1,025,326,497 | $2,759,428,360 | $1,128,036,448 |
| Neuberger Berman Europe Limited | Lansdowne House 57 Berkeley Square London W1J 6ER United Kingdom Attn: Paul de Francisci | $558,615,000 | $403,705,776 | $558,615,000 | $363,426,470 |
| Pacific Investment Management Company LLC | 840 Newport Center Drive Newport Beach, CA 92660 Attn: Rick LeBrun | $4,853,503,231 | $2,022,960,894 | $6,432,565,824 | $2,828,164,723 |
| SNB StabFund [6] | 1285 Avenue of the America 3rd Floor New York, NY 10019 Attn: Jeffrey Lavine | $2,402,868,378 | $612,104,393 | $2,392,868,378 | $464,098,342 |
| Teachers Insurance and Annuity Association of America | 8500 Andrew Carnegie Blvd. C2-08-04 Charlotte, NC 28262 Attn: John D. McCally | $1,791,426,859 | $1,410,181,631 | $2,116,407,442 | $1,346,349,486 |
| The TCW Group, Inc. [7] | 865 S Figueroa Street Los Angeles, CA 90017 Attn: Sean Plater | $1,665,339,720 | $864,830,483 | $2,281,512,675 | $845,705,800 |

Page 1 of 2

PX 0887 pg. 39 of 50

**EXHIBIT A**

**Nature and Amount of Disclosable Economic Interest** [1]

| | | RMBS Included in RMBS Trust Settlement Agreement | | | |
| | | Holdings as of Sept. 30, 2011 | | Holdings as of Sept. 26, 2012 [9] | |
| Name | Address | Original Face | Current Face | Original Face | Current Face |
|---|---|---|---|---|---|
| Thrivent Financial for Lutherans | 625 Fourth Ave. S. Minneapolis, MN 55415-1665 Attn: David Royal | $192,592,000 | $77,880,077 | $198,010,000 | $64,038,917 |
| Western Asset Management Company [8] | 385 E. Colorado Blvd. Pasadena, CA 91101 Attn: Stephen Venable | $2,984,143,449 | $1,120,202,439 | $1,682,632,412 | $549,218,291 |
| **TOTAL** | | **$31,249,869,526** | **$13,639,035,462** | **$29,776,965,481** | **$12,126,940,619** |

**Notes**

[1] Holdings for the Steering Committee investors do not include holdings of other securities issued by the Debtor(s) that are not "represented by" the Steering Committee group.

[2] Excludes interest-only holdings as of September 30, 2011 ($549mm in original face, $286mm in current face) and September 26, 2012 ($929mm in original face, $414mm in current face).

[3] Excludes interest-only holdings as of September 30, 2011 ($3.569bb in original face, $999mm in current face) and September 26, 2012 ($1.785bb in original face, $433mm in current face).

[4] In February 2012, beneficial ownership of the RMBS currently managed by ING Investment Management Co. LLC was transferred from ING Bank, fsb to ING Bank, NV.

[5] Excludes interest-only holdings as of September 30, 2011 ($145mm in original face, $49mm in current face) and September 26, 2012 ($145mm in original face, $40mm in current face).

[6] Excludes interest-only holdings as of September 30, 2011 ($10.572bb in original face, $4.689bb in current face) and September 26, 2012 ($10.572bb in original face, $3.990bb in current face).

[7] Excludes interest-only holdings as of September 30, 2011 ($585mm in original face, $257mm in current face) and September 26, 2012 ($10.435bb in original face, $4.403bb in current face).

[8] Excludes interest-only holdings as of September 30, 2011 ($10mm in original face, $3mm in current face) and September 26, 2012 ($10mm in original face, $3mm in current face).

[9] Holdings for ING Investment Management Co. LLC and ING Investment Management LLC are as of September 30, 2012.

PX 0887 pg. 40 of 50

# Exhibit C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                    )      Case No. 12-12020 (MG)
                                          )
RESIDENTIAL CAPITAL, LLC, et al.,         )      Chapter 11
                                          )
                          Debtors.        )      Jointly Administered
                                          )

## ORDER APPOINTING MEDIATOR

Upon the motion (the "Motion")[1] of the above-captioned debtors and debtors in

possession in these Chapter 11 cases (collectively, the "Debtors") requesting the appointment of

a mediator (a "Mediator") to assist the parties in resolving certain issues relating to the

formulation and confirmation of a Plan [Docket No. 2357]; and it appearing that this Court has

jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that

venue of these Chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§

1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. §

157(b); and this Court having determined that the relief requested in the Motion is in the best

interests of the Debtors, their estates, their creditors and other parties in interest; and this Court

having found that proper and adequate notice of the Motion and the relief requested therein has

been provided in accordance with the Bankruptcy Rules, the Local Rules, and the Case

Management Procedures Order [Docket No. 141] for these Chapter 11 cases, and that, except as

otherwise ordered herein, no other or further notice is necessary; and any objections (if any) to

the Motion having been withdrawn or overruled on the merits; and after due deliberation thereon;

and good and sufficient cause appearing therefor;

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.



1212020121226000000000006

IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED as set forth herein.

2.     Upon entry of this Order, Judge James M. Peck shall be appointed as Mediator for an initial period through February 28, 2013. The Debtors may, in consultation with the relevant parties involved in the mediation discussions (the "Mediation Parties"), seek to extend such period.

3.     To the extent it is determined that mediation is appropriate, the Mediation Parties may (or at the direction of the Court shall) meet and confer with the Mediator to establish procedures and timing of the mediation.

4.     Without limiting the applicability of Local Rule 9019-1 or General Order M-390, all (a) discussions among any of the Mediation Parties, including discussions with or in the presence of the Mediator, (b) any mediation statements and any other documents or information provided to the Mediator or the Mediation Parties in the course of the mediation, and (c) correspondence, draft resolutions, offers, and counteroffers produced for or as a result of the mediation shall be strictly confidential and shall not be admissible for any purpose in any judicial or administrative proceeding, and no person or party participating in the mediation, whether a direct participant or member of a committee or group, including counsel for any Mediation Party or any other party, shall in any way disclose to any non-party or to any court, including, without limitation, in any pleading or other submission to any court, any such discussion, mediation statement, other document or information, correspondence, resolution, offer or counteroffer that may be made or provided in connection with the mediation, unless otherwise available and not subject to a separate confidentiality agreement that would prevent its disclosure or as authorized by this Court.

5.     To the extent that any Mediation Party is in possession of privileged or
confidential information provided to such Mediation Party pursuant to the terms and conditions
of a confidentiality agreement executed or order of this Court entered in connection with these
Chapter 11 cases, such information may be disclosed to the Mediator, but shall otherwise
remain privileged and confidential and shall not be disclosed to any other Mediation Party.

6.     For the avoidance of doubt, to the extent any part of this Order shall conflict with
Local Rule 9019-1 or General Order M-390, the terms and provisions of this Order shall govern.

7.     Notwithstanding the possible applicability of Fed. R. Bankr. P. 6004(h), 7062,
9014, or otherwise, this Order shall be in full force and effect upon its entry.

8.     This Court shall retain jurisdiction with respect to all matters arising from or
related to the enforcement of this Order.

New York, New York
Date: December 26, 2012

                              /s/Martin Glenn
                              MARTIN GLENN
                         United States Bankruptcy Judge

# Exhibit D

# Timeline of FGIC Settlement Discussions During the Mediation Process



* Defined terms herein shall have the same meanings as they do in the Witness Statement of John S. Dubel.

1

# Timeline of FGIC Settlement Discussions During the Mediation Process



2



12-12020-mg Doc 4436 Filed 07/31/13 Entered 07/31/13 18:49:27 Main Document
Pg 48 of 50

# Timeline of FGIC Settlement Discussions During the Mediation Process

3

# Timeline of FGIC Settlement Discussions During the Mediation Process



12-12020-mg Doc 4436 Filed 07/31/13 Entered 07/31/13 16:49:01 Main Document
Pg 50 of 58

# Timeline of FGIC Settlement Discussions During the Mediation Process

** The Plan Support Agreement is Exhibit 3 of Docket No. 3814 , and the Plan Term Sheet is attached to the Plan Support Agreement.

# Exhibit PX-889

*Excerpt of Exhibit*

**In Re:**

*RESIDENTIAL CAPITAL, LLC, et al.*

*Case No. 12-12020-mg*

*August 16, 2013*

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us.*



Min-U-Script® with Word Index

PX
889

1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 12-12020-mg

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              August 16, 2013

19              8:59 AM

20

21   B E F O R E:

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

2

1

2   (Doc no. 4539) Hearing RE: Monarch Alternative Capital LP,

3   Stonehill Capital Management LLC, CQS ABS Alpha Master Fund

4   Limited, CQS ABS Master Fund Limited, and Bayview Fund

5   Management LLC's Motion In Limine to Preclude the Testimony of

6   Jeffrey A. Lipps Regarding the Debtors' 9019 Motion (In Limine

7   Motion One) [Docket No. 4539]

8

9   (Doc no. 4545) Hearing RE: Monarch Alternative Capital LP,

10  Stonehill Capital Management LLC, CQS ABS Alpha Master Fund

11  Limited, CQS ABS Master Fund Limited, and Bayview Fund

12  Management LLC's Motion In Limine to Preclude Evidence on the

13  Debtors' 9019 Motion Concerning the Negotiations Leading Up to

14  the FGIC Settlement Agreement and the Conclusory Statements

15  Offered by the FGIC Trustees and Others About the Nature of

16  Those Negotiations (In Limine Motion Five) [Docket No. 4545].

17

18  (Doc no. 4541) Hearing RE: Monarch Alternative Capital LP,

19  Stonehill Capital Management LLC, CQS ABS Alpha Master Fund

20  Limited, CQS ABS Master Fund Limited, and Bayview Fund

21  Management LLC's Motion In Limine to Preclude the Testimony of

22  S.P. Kothari Regarding the Debtors' 9019 Motion (In Limine

23  Motion Two) [Docket No. 4541]

24

25

3

1  (Doc no. 4549) Hearing RE: Omnibus Motion In Limine of the Ad

2  Hoc Group of Junior Secured Noteholders to Preclude Certain

3  Aspects of the Testimony of Lewis Kruger and John Dubel and the

4  Expert Testimony of Ron D'Vari and Jeffrey Lipps Proffered In

5  Connection with the FGIC Settlement [Docket No. 4549]

6

7  (Doc no. 4554) Hearing RE: Motion In Limine of Federal Home

8  Loan Mortgage Corporation to Preclude certain Expert Testimony

9  of Dr. Ron D'Vari in Connection with the Debtors' Motion

10 Pursuant to Fed R. Bankr. P. 9019 for Approval of the

11 Settlement Agreement Among the Debtors, FGIC, The FGIC Trustees

12 and Certain Institutional Investors [Docket No. 4554]

13

14 (Doc no. 4548) Hearing RE: Monarch Alternative Capital LP,

15 Stonehill Capital Management LLC, CQS ABS Alpha Master Fund

16 Limited, CQS ABS Master Fund Limited, and Bayview Fund

17 Management LLC's Motion In Limine to Preclude the Trustees from

18 Offering Any Evidence of Their Reliance on Counsel in Support

19 of Debtors' 9019 Motion (In Limine Motion Four) [Docket No.

20 4548]

21

22

23

24

25

4

1

2   (Doc no. 4546) Hearing RE: Monarch Alternative Capital LP,

3   Stonehill Capital Management LLC, CQS ABS Alpha Master Fund

4   Limited, CQS ABS Master Fund Limited, and Bayview Fund

5   Management LLC's Motion In Limine to Preclude the Testimony of

6   Allen M. Pfeiffer Regarding the Debtors' 9019 Motion (Motion In

7   Limine Three) [Docket No. 4546]

8

9   Trial RE: FGIC Settlement

10

11   (Doc no. 4550) Hearing RE: Financial Guaranty Insurance

12   Company's Motion In Limine [Docket No. 4550]

13

14

15

16

17

18

19

20   Transcribed by:  David Rutt

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973) 406-2250

25   operations@escribers.net

5

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8   BY:   CHARLES L. KERR, ESQ.

9        JOSEPH ALEXANDER LAWRENCE, ESQ.

10        GARY S. LEE, ESQ.

11

12

13   WHITE & CASE LLP

14        Attorneys for Ad Hoc Group of Junior Secured Noteholders

15        1155 Avenue of the Americas

16        New York, NY 10036

17

18   BY:   J. CHRISTOPHER SHORE, ESQ.

19        VANESSA D. SODERBERG, ESQ.

20        HARRISON DENMAN, ESQ.

21

22

23

24

25

6

1

2  KIRKLAND & ELLIS LLP

3         Attorneys for Ally Bank and Ally Financial, Inc.

4         153 East 53rd Street

5         New York, NY 10022

6

7  BY:   PETER TSAO, ESQ.

8

9

10  CLEARY GOTTLIEB STEEN & HAMILTON LLP

11         Attorneys for Wilmington Trust

12         One Liberty Plaza

13         New York, NY 10006

14

15  BY:   MARK A. LIGHTNER, ESQ.

16

17

18  JONES DAY

19         Attorneys for FGIC

20         222 East 41st Street

21         New York, NY 10017

22

23  BY:   HOWARD F. SIDMAN, ESQ.

24         RICHARD L. WYNNE, ESQ.

25         STEVEN C. BENNETT, ESQ.

7

```
 1
 2   SEWARD & KISSEL LLP
 3        Attorneys for US Bank as RMBS Trustee
 4        One Battery Park Plaza
 5        New York, NY 10004
 6
 7   BY:   MARK D. KOTWICK, ESQ.
 8         THOMAS ROSS HOOPER, ESQ.
 9         ARLENE R. ALVES, ESQ.
10         BRIAN MALONEY, ESQ.
11
12
13   DECHERT LLP
14        Attorneys for Bank of New York Mellon
15        1095 Avenue of the Americas
16        New York, NY 10036
17
18   BY:   GLENN E. SIEGEL, ESQ.
19         REBECCA S. KAHAN, ESQ.
20         MAURICIO A. ESPANA, ESQ.
21         HECTOR GONZALEZ, ESQ.
22
23
24
25
```

8

```
 1   ALSTON & BIRD LLP

 2         Attorneys for Wells Fargo Bank

 3         1201 West Peachtree Street

 4         Atlanta, GA 30309

 5

 6   BY:   JOHN C. WEITNAUER, ESQ.

 7

 8

 9   MCKOOL SMITH, P.C.

10         Attorneys for Freddie Mac

11         One Bryant Park

12         47th Floor

13         New York, NY 10036

14

15   BY:   ANN SCHOFIELD BAKER, ESQ.

16         MICHAEL R. CARNEY, ESQ.

17         PETER S. GOODMAN, ESQ.

18

19

20   MOSS & KALISH, PLLC

21         Attorneys for Freddie Mac

22         125 East 42nd Street

23         New York, NY 10168

24

25   BY:   DAVID B. GELFARB, ESQ.
```

**PX 0889 pg. 9 of 274**

9

1
2    WILLKIE FARR & GALLAGHER LLP
3          Attorneys for Monarch, Stonehill, CQS, Bayview
4          787 Seventh Avenue
5          New York, NY 10019
6
7    BY:   JOSEPH T. BAIO, ESQ.
8          MARY EATON, ESQ.
9          EMMA J. JAMES, ESQ.
10
11
12   ROPES & GRAY
13          Attorneys for Steering Committee of RMBS Investors
14          800 Boylston Street
15          Boston, MA 02199
16
17   BY:   D. ROSS MARTIN, ESQ.
18          ANDREW G. DEVORE, ESQ.
19
20
21   KELLEY DRYE & WARREN, LLP
22          Attorneys for UMB Bank
23          101 Park Avenue
24          New York, NY 10178
25

```
 1   BY:   CATHERINE L. THOMPSON, ESQ.

 2

 3   GIBBS & BRUNS, LP

 4        Attorneys for Steering Committee of RMBS Investors

 5        1100 Louisiana

 6        Suite 5300

 7        Houston, TX 77002

 8

 9   BY:   KATHY PATRICK, ESQ.

10

11

12   MUNGER, TOLLES & OLSON LLP

13        Attorneys for Berkshire Hathaway, Inc.

14        355 South Grand Avenue

15        35th Floor

16        Los Angeles, CA 90071

17

18   BY:   THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

19

20

21   BAYVIEW ASSET MANAGEMENT

22        4425 Ponce de Leon Boulevard

23        5th Floor

24        Coral Gables, FL 33146

25
```

1  BY:   MICHAEL B. GUSS, ESQ.

2

3  ALSO PRESENT: (TELEPHONICALLY)

4        KENT COLLIER, Reo Research

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**RESIDENTIAL CAPITAL, LLC, ET AL.**

36

1   fill through the cross-examination and just really focus on the

2   issue of whether if a plan isn't confirmed does the deal in

3   which they get 596 guaranteed, an opportunity for another 596,

4   and then the possibility of Ally getting involved in it, does

5   that make sense under the evidence that's presented to the

6   Court.

7          THE COURT:  Thank you, Mr. Shore.

8          All right.  Are we ready to begin the evidence?  No?

9   I'm sorry.

10         MR. KERR:  I think we are, Your Honor.

11         THE COURT:  We are.  Okay.  Who is the first witness?

12         MR. SIDMAN:  Good morning, Your Honor, Howard Sidman

13  from Jones Day for FGIC.  We're calling as our first witness

14  John Dubel, chief executive officer of FGIC.

15         THE COURT:  If you would come up to the witness stand

16  and raise your right hand, Mr. Dubel.

17     (Witness sworn)

18         THE COURT:  Please have a seat.  There's water in the

19  pitcher if you wish to have some.

20         THE WITNESS:  Thank you, Your Honor.

21         THE COURT:  Mr. Sidman, go ahead.

22         MR. SIDMAN:  Because this is the first witness and I'm

23  not sure how Your Honor wants to proceed with the

24  declarations --

25         THE COURT:  Well, I think you should offer the

12-12020-mg   Doc 5692-4   Filed 11/12/13   Entered 11/12/13 21:05:16   Part 4 of 5
Pg 41 of 78
RESIDENTIAL CAPITAL, LLC, ET AL.

37

1   declaration into evidence.

2        MR. SIDMAN:  Okay.  That's what I'm going to do, Your

3   Honor.

4        THE COURT:  Okay.  And so if you would identify it for

5   the record.

6        MR. SIDMAN:  Right.  I'm going to -- what I have in my

7   hand is a witness statement of John Dubel dated July 31st of

8   2013 along with the exhibits thereto.

9        THE COURT:  Okay.

10        MR. SIDMAN:  And at this time I'd like to offer it

11   into the record and into evidence.

12        THE COURT:  All right.  Any objections?

13        MR. BAIO:  Yes, Your Honor.  Joseph Baio for the

14   individual investors.  A couple of things.  Your Honor, we

15   obviously have an ongoing objection to references to the

16   mediation and attorneys --

17        THE COURT:  Look, I've already ruled, Mr. Baio.  don't

18   revisit what's been ruled on.  You tried that in the motion in

19   limine.  I've ruled.

20        MR. BAIO:  I understand, Your Honor.  I'm not going to

21   repeat any such objections.  I do object though to paragraphs

22   23 to the end of this declaration.

23        THE COURT:  Mr. Sidman, do you have another copy of

24   it?

25        MR. SIDMAN:  Yes.  Let me do that.  Let me --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

38

1          May I approach?

2          THE COURT:  Please.  If you want, why don't you hand

3    up the rest of it.

4          All right, what's your objection, Mr. Baio?

5          MR. BAIO:  23 to the end constitutes expert testimony,

6    Your Honor.  This witness was not identified as an expert.

7    There are assumptions that are not included, information wasn't

8    provided underlying these statements, including particularly,

9    paragraphs 27 to 29, so that it should not be accepted because

10   we did not have an opportunity to examine this witness as an

11   expert or on these subjects.  In addition --

12         THE COURT:  Did you have the declaration --

13         MR. BAIO:  No, Your Honor.

14         THE COURT:  -- when you deposed him?

15         MR. BAIO:  No, the declaration occurred afterwards,

16   Your Honor.  The deposition was I believe July 25th. The

17   declaration is --

18         THE COURT:  All right.  Go ahead with your objection.

19   Anything else?

20         MR. BAIO:  Yes, and there's no foundation independent

21   from anything else as to 27 to the end, the discussion

22   including series of calculations about which we have nothing.

23         THE COURT:  Mr. Goodman, you have an objection too?

24         MR. GOODMAN:  Your Honor, all I want to say is I

25   support Mr. Baio's objection particularly with respect to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

                                                                                        39

1    paragraphs 28 through the end of the affidavit for the reasons

2    he so stated.

3              THE COURT:  Mr. Sidman, do you want to respond?

4              MR. SIDMAN:  Your Honor, may I respond?

5              THE COURT:  Please.

6              MR. SIDMAN:  Look, this objection is surprising, but I

7    will tell you the information here is based on Mr. Dubel's

8    personal knowledge.  We're not offering him as an expert

9    witness.  Indeed, he's here as a fact witness.

10             THE COURT:  The objection is overruled.

11   (Declaration of Mr. Dubel was hereby received into evidence as

12   FGIC's Exhibit, as of this date.)

13             MR. SIDMAN:  Thank you, Your Honor.  With that --

14             THE COURT:  Cross-examination.

15             MR. SIDMAN:  Your Honor, we have some witness binders.

16             THE COURT:  Why don't you get them circulated and let

17   me have a copy.

18        (Pause)

19             MR. GOODMAN:  Your Honor, may I proceed?

20             THE COURT:  Please, yes, go ahead.

21             MR. GOODMAN:  Thank you.

22   CROSS-EXAMINATION

23   BY MR. GOODMAN:

24   Q.   Mr. Dubel, I'm Peter Goodman again, from McKool Smith.

25   We've met before, correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

40

1   A.   Yes, we have.

2   Q.   Okay.  And, Mr. Dubel, you're experienced in representing

3   troubled companies in reorganization; is that correct?

4   A.   I am.

5   Q.   And you are currently the chief executive officer of FGIC;

6   is that right?

7   A.   That is correct.

8   Q.   Okay.  Now, you have, as I understand, significant

9   experience working on plans and disclosure statements; is that

10  right?

11  A.   I do.

12  Q.   And you agree that a disclosure statement needs to provide

13  accurate information concerning the plan of reorganization; is

14  that true?

15  A.   I believe that's the -- that's what it's supposed to do,

16  yes.

17  Q.   Okay.  Now, I'm correct that the rehabilitator filed a

18  disclosure statement in the state court rehabilitation

19  proceeding; is that right?

20  A.   That is correct.

21  Q.   And you worked extensively with the agent to the

22  rehabilitator, Mr. Giacone in developing the disclosure

23  statement; is that right?

24  A.   Mr. Giacone, yes.

25  Q.   Um-hum.  And who is Mr. Giacone again?

PX 0889 pg. 41 of 274

12-12020-mg   Doc 5692-4   Filed 11/12/13   Entered 11/12/13 21:05:16   Part 4 of 5
Pg 45 of 78
RESIDENTIAL CAPITAL, LLC, ET AL.

41

1   A.   Mr. Giacone is the chief financial officer of the New York

2   Liquidation Bureau and was appointed by the rehabilitator,

3   superintendent of the Department of Financial Services, Mr.

4   Lawsky, as his agent to act on his behalf in the FGIC

5   rehabilitation proceedings.

6   Q.   And in the disclosure statement, the rehabilitator

7   provided detailed information concerning the policies which he

8   intended to commute; am I right?

9   A.   I don't believe it was detailed information on  -- there

10  was general information about the policies, but also the fact

11  that we would have the ability to commute any and all policies.

12  Q.   Okay.  Now --

13       Mr. Dubel, in tab -- it's at tab 2 of your deposition, if

14  you could pull that out for a moment in your witness binder.

15  A.   Sorry.

16  Q.   The tab is called transcript, I apologize, and it's tab 2.

17           THE COURT:  You're looking at what's been marked for

18  identification as Objectors' Trial Exhibit AS; is that correct?

19           MR. GOODMAN:  Yes, Your Honor.

20           THE COURT:  Okay.  We have to --

21           MR. GOODMAN:  I apologize.

22           THE COURT:  -- be sure, so that we have a clear trial

23  record.

24           MR. GOODMAN:  Yes.

25           THE COURT:  You've got the binders; that's helpful,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

42

1    but you need to identify exhibits by their trial designation.

2    All right.  So we're looking at for identification Objectors'

3    Trial Exhibit AS.

4    Q.    And I'd draw your attention to page 3.  Are you there?

5    A.    Yes.  I'm sorry; yes.

6    Q.    And do you recall during your deposition we reviewed the

7    paragraph beginning "Third, in an effort to mitigate FGIC'S

8    liabilities and increase recoveries for policyholders as part

9    of the plan the rehabilitator is seeking approval of certain

10   settlements with counterparties to FGIC contracts"?  Do you see

11   that paragraph?

12            THE COURT:  I don't.

13   A.    I'm sorry, I don't either.  I apologize.  On page 3 you're

14   referring to.

15            THE COURT:  There are page numbers at the bottom of

16   the page.  Are you referring to one of those page numbers?

17   Q.    Page 23, I apologize.

18   A.    Is it the page 23 of 73, is that what you're referring to?

19            MR. GOODMAN:  One moment.  And I apologize, Your

20   Honor.  I think we gave out all the witness binders, so we're

21   just looking.  Well, I can circle back to that, Your Honor.

22   All right.

23   Q.    Now, isn't it true that the disclosure statement does not

24   include any discussion of the commutation of the RMBS policies?

25   A.    I don't believe that's true.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

43

1   Q.   Okay.  It doesn't include specific -- does it include

2   specific reference to commutations of RMBS policies?

3   A.   There are no specific references, as I recall to any

4   particular deals other than the fact that there were deals that

5   were actually in front of the court or were going to be put in

6   front of the court at that time.  But it does reference back to

7   the plan which incorporates language that says FGIC has the

8   ability to commute and/or settle any and all policies it has,

9   which would obviously include RMBS policies.

10   Q.   Okay.  Now, you recall having your deposition taken in

11   this case?

12   A.   I do.  That's correct.

13   Q.   And do you recall when I asked you on page 76, line 17

14   through 25 of your deposition, do you know whether the

15   disclosure statement contains disclosure concerning commuting

16   specific RMBS policies issued to the trusts?

17          THE COURT:  Are you referring to a specific document,

18   Mr. Goodman?

19          MR. GOODMAN:  This is his transcript, Your Honor.

20          THE COURT:  What page?  When you're going to refer to

21   deposition transcript you need to give me page and line

22   numbers.

23          MR. GOODMAN:  Yeah.  It's that same exhibit.

24          THE COURT:  I have the same exhibit, tell me the page

25   and line numbers.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

44

1          THE WITNESS:  It's Exhibit F --

2          MR. GOODMAN:  Yeah, page 76, lines 17 --

3          THE COURT:  I'm sorry, say it again?

4          MR. GOODMAN:  76 line 17 through 25

5          THE WITNESS:  Is this Exhibit FG, you're referring to?

6          THE COURT:  Okay.  The transcript is marked as Exhibit

7    FG for identification?

8          MR. GOODMAN:  FG.

9          THE COURT:  And page 76, lines 17 to 25.

10          MR. GOODMAN:  Um-hum.

11   Q.   Now, do you recall I asked you, "Do you know whether this

12   disclosure statement contains disclosure concerning commuting

13   specific RMBS policies issued to the trusts?"  Your counsel

14   objected to the form, "Are you asking him to review the entire

15   disclosure statement?"

16          THE COURT:  Let's not read the objections.  If you've

17   got an answer let's get to the --

18   Q.   "Do you know?"  And your answer is on page 77, lines 2

19   through 5, "To my knowledge, there were no specific references

20   to commutations of policies that were issued to the trustees of

21   the RMBS securitization."  Is that correct?

22   A.   That's what I stated at the time, yes.

23   Q.   Now, going back to the disclosure statement, do you have

24   the disclosure statement that's annexed to the transcript in

25   front of you --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   A.   Which tab?

2   Q.   -- as part of your witness package?  Exhibit AS tab 2.

3   A.   I'm sorry, is it in this book?

4   Q.   Yes, the witness binder.

5   A.   I'm sorry.  I see it, yes.

6        THE COURT:  There are multiple page numberings on

7   exhibits.  On Exhibit AS on the lower left there's a Supreme

8   Court records online library page something of 73.  Use those

9   and tell me where you are.  Maybe you can share, Mr. Sidman,

10  so --

11       MR. KERR:  Your Honor, I'm going to move so he can --

12       THE COURT:  Okay.  All right.

13       THE WITENSS:  I'm Sorry, Mr. Goodman, am I supposed to

14  be looking --

15       THE COURT:  Hold on, Mr. Dubel.  It's in the binder.

16  He's going to tell us where.  Okay?

17       THE WITNESS:  Thank you.

18       MR. GOODMAN:  It's Exhibit AR.

19       THE COURT:  That's behind tab 1?

20       MR. GOODMAN:  And it's FGIC 0000050.  There's page

21  numbers in the middle of the disclosure statement I believe on

22  Exhibit AR.

23       THE COURT:  Page 3 of the document?

24       MR. GOODMAN:  Yes, Your Honor.

25       THE COURT:  Go ahead.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

46

1           MR. GOODMAN:  And again, I apologize for the

2    confusion.  We just handed out more binders than we

3    anticipated.

4    BY MR. GOODMAN:

5    Q.    Now, do you see the paragraph that states "Third, in an

6    effort to mitigate FGIC'S liabilities and increase recovery for

7    policyholders," on that page?

8    A.    I do.

9    Q.    Okay.  Is there any reference in there to RMBS policies?

10   A.    Not on this line, no.

11   Q.    Um-hum.  And then turn to page 23 of that same document

12   for a moment.

13   A.    Is that 23 --

14   Q.    It's Bates number 000070 --

15   A.    70.

16   Q.    -- page 23, the bottom paragraph.  Do you see the bottom

17   paragraph there starting with "The rehabilitator will set the

18   initial CPP"?

19   A.    I do.

20   Q.    Okay.  And the gist of that paragraph is that the

21   contemplated commutations would affect the CPP payments; isn't

22   that correct?

23   A.    Yes, it is.

24   Q.    And do you see --

25   A.    Among other things, yes.

PX  0889 pg.  47 of 274

**RESIDENTIAL CAPITAL, LLC, ET AL.**

47

1    Q.    Among other things, fair enough.  And do you see any

2    reference in that paragraph to RMBS policy commutations?

3    A.    There's no reference in this paragraph.

4    Q.    Now, am I correct that you participated in negotiations

5    with an ad hoc steering committee concerning a rehabilitation

6    plan for FGIC?

7    A.    Yes.

8    Q.    And my client, Freddie Mac, and the ad hoc steering

9    committee worked with FGIC to negotiate a plan?

10   A.    Of rehabilitation?  Yes.

11   Q.    Yes.  And in the time period towards the end of 2010 and

12   the beginning of 2011, the steering committee, the ad hoc

13   steering committee and FGIC negotiated a term sheet that was

14   submitted to the New York State Department -- excuse me, to the

15   New York Insurance Department, which is now I believe the New

16   York State Department of Financial Services; is that right?

17   A.    Yes, there was a negotiated term sheet and yes the name

18   did change.  I'm not sure what you were asking, but yes.

19   Q.    And that term sheet was submitted to the New York State

20   Insurance Department?

21   A.    Yes, it was a very high level term sheet that was

22   submitted.

23   Q.    Um-hum.  And during these negotiations that went into the

24   term sheet that was submitted to the New York State Insurance

25   Department, you never had any discussions with Freddie Mac or

**RESIDENTIAL CAPITAL, LLC, ET AL.**

48

1    the steering committee regarding the possibility that their

2    RMBS policies would be commuted, correct?

3    A.    No, we did not have specific discussions of that point.

4    Q.    Now let's move forward a little bit in terms of timing.

5    In September of 2012, FGIC filed its plan of rehabilitation and

6    disclosure statement with the New York State Supreme Court,

7    correct?

8    A.    That is correct.

9    Q.    And you understand that the entry into a settlement with

10   ResCap was not a condition to the effective date of the plan of

11   reorganization; is that right?

12   A.    I don't believe it is.

13          THE COURT:   You don't believe it's right or you don't

14   believe it's a condition?

15          THE WITNESS:   Sorry, Your Honor.

16   A.    I don't believe it's a condition.

17   Q.    But I am correct that FGIC did delay the effective date of

18   the plan of rehabilitation in order to complete the

19   implementation of the ResCap/FGIC settlement; is that right?

20   A.    Among other matters, yes.   That was one of the things.

21   But there were many other things that needed to be accomplished

22   before we could go effective.

23   Q.    Were you in court on June 11th when the rehabilitation

24   court approved the plan of rehabilitation?

25   A.    I was.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

49

1  Q.    Um-hum.  Do you recall your counsel, Mr. Holtzer stating

2  "Right now, Your Honor, we don't anticipate going effective

3  before the 6th.  Currently, Your Honor is aware that there are

4  hearings before Your Honor that may occur on August 6th

5  depending on whether there's an objection to two stipulations

6  and settlements that we've submitted to Your Honor"?  Do you

7  recall that?

8              MR. SIDMAN:  Objection; hearsay.

9              THE COURT:  Overruled.

10  A.    I don't recall exactly what he said, but something along

11  that lines.  I just don't recall exact words.

12  Q.    And the two stipulations, one stipulation had to deal with

13  settlement with JeffCo; is that correct?

14  A.    I don't believe it was with JeffCo.  It was with certain

15  holders of certificates in JeffCo.

16  Q.    In JeffCo?

17  A.    In relation to JeffCo.

18  Q.    And the other stipulation was the FGIC/ResCap settlement;

19  is that correct?

20  A.    I believe that's the case, yes.

21  Q.    Now, Mr. Dubel, you were involved in the negotiations of

22  the FGIC/ResCap settlement that is before the court today,

23  correct?

24  A.    That is correct.

25  Q.    And you never discussed the commutation of the ResCap RMBS

**RESIDENTIAL CAPITAL, LLC, ET AL.**

50

1    policies with anyone from Freddie Mac; is that right?

2    A.    I was precluded from doing that.

3    Q.    And you were precluded because there was an order entered

4    in the mediation precluding you from discussing the

5    negotiations at that mediation?

6    A.    That's correct.

7    Q.    And in fact, are you aware that your counsel -- well,

8    counsel to the rehabilitator stated "The substance of the

9    negotiations among the settlement parties was not disclosed to

10   the objectors for a very simple reason.  The negotiations were

11   covered by a court order mediation privilege to prevent such

12   disclosure."  Do you agree with that?

13   A.    I would have to look at the wording, but I think that's

14   generally what he said.  I don't remember the exact words that

15   he said.

16   Q.    And you know who FHFA is?

17   A.    I do, yes.

18   Q.    Um-hum.  And you know that the FHFA is the conservator of

19   Freddie Mac, correct?

20   A.    That's what I understand, yes.

21   Q.    And I believe in your declaration to this Court you noted

22   that the FHFA through its counsel was present at the mediation;

23   is that right?

24   A.    That's correct.

25   Q.    And you're aware that Chris Johnson from the Kasowitz firm

**RESIDENTIAL CAPITAL, LLC, ET AL.**

51

1  was asked to participate in the ResCap mediation for issues

2  involving Ally Bank; is that right?

3  A.    I don't know what he was asked to do.

4  Q.    Do you know that Mr. Johnson was there?

5  A.    I don't recall meeting Mr. Johnson --

6  Q.    Um-hum.

7  A.    -- at the mediation.

8  Q.    So you never met him?

9  A.    I have never met him.

10  Q.    Okay.  And did you seek to determine why the FHFA attended

11  the mediation sessions?

12  A.    We understood they were there to work on behalf of the

13  claims that they had in the ResCap proceeding.

14  Q.    And those claims are separate from Freddie Mac's claims in

15  the ResCap -- with respect to ResCap; is that correct?

16  A.    I don't know that.

17  Q.    Okay.

18  A.    I thought that they were part of Freddie Mac.  I thought

19  they were doing it on behalf --

20  Q.    Okay.

21  A.    -- of Freddie Mac.

22  Q.    And did you seek to determine why he attended the meeting?

23  A.    I didn't know that he was attending the meeting, so I

24  wouldn't have sought to determine.

25  Q.    Oh, you didn't know he was attended.  You learned

**RESIDENTIAL CAPITAL, LLC, ET AL.**

52

1  afterwards that he attended the meeting?

2  A.    Mr. Johnson?

3  Q.    Yes.

4  A.    Yes, that's true.

5  Q.    Um-hum.  So you weren't able to tell Mr. Johnson at the

6  time that there was a proposal on the table to commute the FGIC

7  wrap --

8          THE COURT:  Sustained.

9          MR. GOODMAN:  Fair enough.

10          THE COURT:  Let's move along, Mr. Goodman.

11          MR. GOODMAN:  Yes, I'm moving, Your Honor, I

12  appreciate that.

13  Q.    Now, am I correct that according to your witness statement

14  that's attached -- excuse me, am I correct that the timeline

15  which is attached to your witness statement states that the

16  commutation issue arose as early as January 14th, 2013?

17  A.    Yes.

18  Q.    Um-hum.  Now, am I correct that Freddie Mac had entered

19  into a nondisclosure agreement with FGIC?

20  A.    Not related to ResCap, but yes.

21  Q.    But related to the negotiations that were going on with

22  respect to the ResCap plan of rehabilitation; isn't that right?

23  A.    I'm sorry, the FGIC plan of rehabilitation?  Yes.

24  Q.    I'm sorry, I did that during your deposition.

25          THE COURT:  He clarified.

**PX  0889 pg.  53 of 274**

**RESIDENTIAL CAPITAL, LLC, ET AL.**

53

1        MR. GOODMAN:  Thank you.

2        THE COURT:  Just so that the record is clear, why

3   don't you ask your question again --

4        MR. GOODMAN:  Fair enough, Your Honor.

5        THE COURT:  -- and let's get it clear.

6   Q.   The note -- so --

7        THE COURT:  FGIC entered into an NDA --

8   Q.   FGIC --

9        THE COURT:  -- with --

10  Q.   -- Freddie Mac in connection with the rehabilitation plan;

11  isn't that right?

12  A.   With the FGIC rehabilitation plan.  Yes, Your Honor.  Yes.

13       THE COURT:  Go ahead, next question.

14  Q.   Mr. Dubel, am I correct that recovery for the commuted

15  ResCap trusts' interest holders is all premised on both the

16  finalization of claims that are received and the future claims

17  that come in with respect -- come into the trusts, and the

18  value to the trustees as policyholders of receiving back the

19  rights that FGIC has?

20       MR. SIDMAN:  Objection to the question, vague.  If he

21  can break it down?

22  A.   I'm sorry, I'm not sure I understand it.

23       THE COURT:  I'm going to sustain the objection.

24       MR. GOODMAN:  That's fine, Your Honor.

25       THE COURT:  You're clearly entitled to go into this,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

54

1   but --

2           MR. GOODMAN:  I understand.  Your Hon --

3           THE COURT:  Go ahead.

4   Q.   Can you turn to your deposition page 134 at lines 18

5   through 25.

6   A.   I'm sorry, you said page 134 lines?

7   Q.   Lines 18 through 25.  And in that I asked you whether you

8   had the occasion to estimate the average recovery for these

9   RMBS trusts as a result of the settlements; do you see that?

10  A.   I do.

11  Q.   And a few lines down in response to my question, "And do

12  you agree that the recovery is about twenty-one cents on the

13  dollar" and you responded "I have no reason to believe" --

14          THE COURT:  Where are you reading?

15          MR. GOODMAN:  I'm sorry, page --

16          THE COURT:  135--

17          MR. GOODMAN:  134 lines 18 through 25 over to 135

18  lines 2 through 19.

19          THE COURT:  All right.  What's your question?

20  Q.   Okay.  And Mr. Dubel, on page 135, lines 2 through 19 I

21  state "And do you agree that the recovery is about twenty-one

22  cents on the dollar?"  Do you see that?

23  A.   I see that, yes.

24  Q.   And you responded "I have no reason to believe that the

25  number -- that that's the number because it is all premised on

**RESIDENTIAL CAPITAL, LLC, ET AL.**

55

1    the finalization -- on both the finalization of the claims that

2    are received and the future claims that come in and the value

3    to the trustees as policyholders of receiving back the rights

4    that FGIC has."  Do you recall that statement?

5    A.    I do.

6    Q.    Okay.  So am I correct that with respect to the recovery

7    that ResCap investors will receive under the FGIC settlement,

8    am I correct that if future claims are higher for a particular

9    trust the recovery to the certificate holders would be lower

10   all else being equal?

11              MR. SIDMAN:  Objection to form.

12              THE COURT:  Sustained.  I don't understand your

13   question, Mr. Goodman.

14              MR. GOODMAN:  I will rephrase it.

15              THE COURT:  You know --

16   Q.    So am I correct that future claims affect the recovery to

17   certificate holders of the ResCap trust?

18   A.    Among other things, yes.  There's many other contributing

19   factors, though.

20   Q.    Um-hum.  But that's one of them, right?

21   A.    That is one.

22   Q.    And am I right that as a result of the ResCap

23   certificate --

24              MR. GOODMAN:  Strike that.

25   Q.    And am I correct that as a result of the ResCap/FGIC

**RESIDENTIAL CAPITAL, LLC, ET AL.**

56

1    settlement, certificate holders for the trusts would no longer

2    be able to recover from FGIC'S assets that are made available

3    under the plan of rehabilitation?

4    A.    It is a settlement that would basically not pay anything

5    further to those trusts.  From FGIC that is.

6    Q.    And am I correct that you had occasion to value how much

7    more the non-ResCap trusts will receive as a result of the

8    ResCap settlement?

9    A.    I'm sorry, could you repeat that, please?

10    Q.    Sure.  Am I correct that you have had occasion to value

11    how much more the non-ResCap trust certificate holders will

12    receive as a result of the ResCap settlement?

13           MR. SIDMAN:  Objection to the form.  More than what?

14           THE COURT:  Overruled.  Do you under -- if you

15    understand the --

16    A.    I'm not sure I understand the question.  I apologize.

17           THE COURT:  If you don't understand, ask another

18    question. I'm more concerned that the witness understands.

19    Let's try and get this moving along.

20    Q.    Turn to page, please, Mr. Dubel, 138, lines 3 through 25

21    of your deposition.  And do you see where I ask you the

22    question, "Have you had occasion to value how much more the

23    non-ResCap trusts will receive as a result of the ResCap

24    settlement"?

25    A.    Yes, I do.

12-12020-mg   Doc 5692-4   Filed 11/12/13   Entered 11/12/13 21:05:16   Part 4 of 5
Pg 61 of 78
RESIDENTIAL CAPITAL, LLC, ET AL.

57

1   Q.   Um-hum.  And your answer is "I've looked at that, yes"?

2   A.   That's correct.

3   Q.   Um-hum.  But am I correct that you could not give us that

4   information at your deposition?

5   A.   Yes, that's correct.

6   Q.   Um-hum.  In fact, your counsel interposed an objection due

7   to the mediation --

8           THE COURT:  Okay.  That's improper examination.

9           MR. GOODMAN:  Fair enough, Your Honor.

10          THE COURT:  If you want to ask the witnesses -- look,

11  if you're going to use a deposition, use it correctly.  If you

12  want to ask the witness a question, ask him a question.  If

13  you're going to use the deposition to refresh his recollection

14  use it to refresh his recollection.  If you're using it for

15  impeachment, use it for impeachment.  You haven't done any of

16  that.

17          MR. GOODMAN:  I'm trying, Your Honor, and I apologize.

18          THE COURT:  Ask direct questions.

19          MR. GOODMAN:  I will.

20          THE COURT:  When I say direct, you're entitled to ask

21  him leading questions, okay, but make it, it's got to have some

22  content to it.

23          MR. GOODMAN:  Understood, Your Honor.

24  Q.   Can you turn to tab 1, Mr. Dubel.

25  A.   Yes, sir.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

58

1  Q.   Is that your witness statement?

2  A.   Tab 1 is the disclosure statement, I'm sorry.

3  Q.   It's a tab that says Dubel at the very front of the

4  binder.

5  A.   I'm sorry, the other book, is it?  You're talking about

6  this one?  It's the tab behind, or it's the section behind the

7  tab that says Dubel, is that what you're referring to?

8  Q.   Exactly.  And is that your witness declaration, Mr. Dubel?

9  A.   Without the exhibits, yes, it is.

10  Q.   Okay.  And I'd turn your attention to paragraphs 28 and 29

11  of your declaration.  Do you see that?

12  A.   I do.

13  Q.   Um-hum.  Now, in it you analyze, as I understand it,

14  certain reimbursement rights that are due FGIC from the ResCap

15  trusts?

16  A.   Sorry.

17  Q.   In paragraphs 28 through 29 you discuss reimbursement

18  claims that FGIC has against the ResCap trusts; is that

19  correct?

20  A.   I'm discussing a line item in our financial statements

21  that was pointed out in Mr. Goldstein's, I think it was his

22  expert report, and I'm just discussing those particular -- that

23  particular line.

24  Q.   Okay.  And if you look at the bottom of the page, you

25  appear to conclude that as part of the consideration for the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

59

1   settlement, FGIC is giving up a claim of --a reimbursement

2   claim of approximately 140 million dollars due from the trusts;

3   is that right?

4   A.   Again, I'm parsing out the line that's in the financial

5   statements --

6   Q.   Um-hum.

7   A.   -- which is based upon some statutory accounting and I'm

8   breaking it down to better explain how much of it would be

9   related to the ResCap-related trusts.

10  Q.   And your analysis is that 140 million dollars would be due

11  from the trusts; is that right?

12  A.   Of the billion, roughly billion dollars, approximately 140

13  of that is related to the ResCap-related trusts, yes.

14  Q.   Um-hum.  Do you know whether any documents or analysis

15  underlying that calculation, whether that's been provided to

16  the objectors?

17  A.   I do not know.

18        MR. GOODMAN:   Thank you, Your Honor, no further

19  questions.

20        THE COURT:   Redirect?  Oh, we have more cross.   Sorry,

21  Mr. Baio.

22        MR. BAIO:   Thank you, Your Honor.

23        THE COURT:   Go ahead.

24  CROSS-EXAMINATION

25  BY MR. BAIO:

**RESIDENTIAL CAPITAL, LLC, ET AL.**

60

1  Q.    Good morning, Mr. Dubel.  I'm Joe Baio.  I think we met at

2  your deposition.  Good morning.  And let me ask you to draw

3  your attention to your witness statement again.  And I'd like

4  you to look at paragraph 27.

5  A.    Yes, sir.

6  Q.    And the third sentence which appears in the third line

7  states, "FGIC did not include in its March 31, 2013 quarterly

8  statements any estimate of recoveries from loss mitigation

9  activities, including litigation claims as FGIC has not

10 determined them to be probable and estimable."  Do you see

11 that?

12 A.    I do.

13 Q.    And that's an accurate statement, correct?

14 A.    That is.

15 Q.    And when you referred to litigation claims in that

16 sentence, what litigation claims are you referring to?

17 A.    We have a variety of active litigations some of which are

18 on hold in the ResCap bankruptcy, obviously, also against

19 Countrywide and against Credit Suisse.

20 Q.    And are -- there may be as many as fourteen cases against

21 those parties that are outstanding?

22 A.    Roughly that's the number, yes.

23 Q.    Okay.  And the amount at least being claimed by FGIC is in

24 the billions of dollars, correct?

25 A.    That is correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

61

1  Q.   And to the extent that FGIC collects or settles any of

2  those claims, it will have additional funds beyond what's

3  identified in the rehabilitation plan, correct?

4  A.   That's correct.

5  Q.   Fresh money that can then be used to pay policyholders; is

6  that correct?

7  A.   That's correct.

8  Q.   Okay.  And but that's not included -- none of that, those

9  recoveries are included in the evaluation of how much

10  policyholders or trusts can receive from FGIC under the FGIC

11  rehabilitation plan, correct?

12  A.   That's correct.

13  Q.   Okay.  You say that it excludes any estimate of recoveries

14  from loss mitigation activities.  What do you mean by loss

15  mitigation activities?  Is it more than just litigation claims?

16  A.   Yes.  It would include working with servicers to improve

17  the performance of the -- of the underlying trust deals.

18  Q.   And no benefit that will redound as a result of those

19  efforts are included in the estimates of how much money FGIC

20  will have under the rehabilitation plan to pay policyholders,

21  correct?  Those are excluded?

22  A.   No, that's not correct.

23  Q.   Okay.  So I thought it says that you did not include any

24  estimate of recoveries from loss mitigation activities.  So I'm

25  trying to find out what other factors besides the billions of

12-12020-mg    Doc 5692-4    Filed 11/12/13    Entered 11/12/13 21:05:16    Part 4 of 5
Pg 66 of 78
RESIDENTIAL CAPITAL, LLC, ET AL.

62

1  dollars of claims are included in loss mitigation factors that

2  do not appear in the quarterly statements?  Is that clear?

3  A.    I'm sorry, could you repeat the question again?

4  Q.    Sure.  This sentence refers to items that are not included

5  in the quarterly statements that you refer to, the quarterly

6  statements of FGIC, correct?

7  A.    This sentence is referring to one line item in the

8  quarterly statement, yes.

9  Q.    Okay.  And it's saying that certain things are excluded

10  from that line item, correct?

11  A.    Yes.

12  Q.    And you've already established that the billions of

13  dollars of claims that you've identified that are outstanding

14  and are being litigated and potentially settled are excluded

15  from the financial statements, correct?

16          MR. SIDMAN:  Objection to form; assumes facts not in

17  evidence.

18          THE COURT:  Overruled.

19  Q.    Is that correct?

20  A.    We do not include them in the financial statements --

21  Q.    Okay.

22  A.    -- or in that particular line item.

23  Q.    And my only question then is, you're referring not just to

24  litigation claims, but loss mitigation activities that are not

25  included in that line.  What are those things?

12-12020-mg   Doc 5692-4   Filed 11/12/13   Entered 11/12/13 21:05:16   Part 4 of 5
Pg 67 of 78
RESIDENTIAL CAPITAL, LLC, ET AL.

63

1   A.   As I stated, the vast majority of our loss mitigation

2   efforts right now are seeking put-back recoveries from parties

3   through, most situations through -- unfortunately through

4   expensive litigation.

5   Q.   Do you know what percentage of the billion dollars is

6   included in that?

7   A.   I'm sorry, what percent --

8        MR. BAIO:   Strike that, strike that.

9   Q.   And the reason they're not included is because FGIC has

10  determined that the claims are not probable or estimable; is

11  that correct?

12  A.   That's correct.

13  Q.   Okay.  You then refer to what is included in the 1.06-

14  billion-dollar projected recoveries in the next sentence.  Do

15  you see that?  You'll have to read it.  You can read it to

16  yourself, but I'm going to ask you about certain provisions

17  that are included in there.

18       So it starts "The approximately 1.06 billion of projected

19  recovery amount in FGIC'S March 31, 2013 quarterly statements

20  comprises" -- and then I believe there are two components, at

21  least as you've described it there.  The first, I'm picking up

22  from where I left off, is "recoveries that FGIC estimated it

23  would receive through the waterfall provisions under the

24  governing documents of the various trusts insured by FGIC from

25  funds available from projected collateral cash flows."  That's

**RESIDENTIAL CAPITAL, LLC, ET AL.**

64

1   one group; is that fair?

2   A.    That is fair.

3   Q.    Okay.  And then the other element of the 1.06 billion

4   dollars is projected payments from other providers of credit

5   enhancement in the subject transactions.  Do you see that?

6   A.    I do.

7   Q.    Okay.  Let's take that second component.  What does that

8   include, that is projected payments from other providers of

9   credit enhancement in the subject transactions?  What did you

10  mean by subject transactions first?

11  A.    Specific policies that we have where there are separate

12  abilities to get recoveries on.

13  Q.    Does that include reinsurance or there are other things?

14  A.    That would not include reinsurance.  That would include

15  other things such as credit enhancements, such as mortgage

16  insurance, or other first-to-pay type policies that would stand

17  in front.

18  Q.    Okay.  And what percentage of the 1.06 billion dollars is

19  the projected payments from other providers of credit

20  enhancement in the subject transactions?

21  A.    I don't recall it off the top of my head right now.

22  Q.    Well, is there a document that reflects how much of it is

23  in one category and how much is in another category?  We don't

24  have it.  But do you know if there is one?

25  A.    It would be reflected in our accounting records.

PX  0889 pg.  65 of 274

**RESIDENTIAL CAPITAL, LLC, ET AL.**

65

1  Q.   And did you refer to your accounting records when you

2  prepared this statement?

3  A.   Yes.

4  Q.   Okay.  But we don't -- did you produce them to us?

5  A.   I did not.

6  Q.   Okay.  The first part of that -- the first component of

7  the 1.06 billion dollars is recoveries that FGIC estimated it

8  would receive through the waterfall provisions under the

9  governing documents; and then it goes on.  Do you see that?

10 A.   I do.

11 Q.   Now, and I want to be sure I have this right, when you

12 read the end of that paragraph, as I understand it, you are

13 saying it is uncertain whether and to what extent any projected

14 recoveries will be realized.  That means on both components it

15 is uncertain whether and to what extent any projected

16 recoveries will be realized; is that correct?

17 A.   That is correct.

18 Q.   Now that means certainly that the recoveries are not

19 probable, right?  I mean, they're uncertain, so they're not

20 probable?

21 A.   This is an accounting estimate based upon our financial

22 records, but it's not certain that they would be -- that we

23 would receive them, no.

24 Q.   And it's certainly not probable in your view, experience?

25 A.   Some of them are probable.  We do have some that flow

**RESIDENTIAL CAPITAL, LLC, ET AL.**

66

1    through, but I haven't looked at every single one of them at

2    this point.

3    Q.    Certainly not the reimbursements; is that correct?   The

4    reimbursements are not certain?

5    A.    That's correct.

6    Q.    They're not probable?

7    A.    You're asking what I think is an accounting question and

8    I'm not -- as I sit here today, I can't answer that

9    specifically on each one of those.

10    Q.    Sorry, I'm not asking an accounting issue.

11          THE COURT:   You are.   Probable and estimable are

12    specific accounting terms.   Ask your next question, Mr. Baio.

13          MR. BAIO:   Okay.

14    Q.    Well, you state that the amount -- the first component

15    includes amounts FGIC estimated it would receive through the

16    waterfall provisions under the governing documents.   Do you see

17    that?

18    A.    I do.

19    Q.    Now, do you understand that under the typical trust

20    indenture that FGIC generally is not entitled to reimbursement

21    until the policyholders are paid principal and interest in

22    full?

23    A.    It depends upon the specific deals.

24    Q.    Right.

25    A.    It may or may not be the case.

12-12020-mg   Doc 5692-4   Filed 11/12/13   Entered 11/12/13 21:05:16   Part 4 of 5
Pg 71 of 78
**RESIDENTIAL CAPITAL, LLC, ET AL.**

67

1  Q.   Well, do you have an understanding, given your position,

2  that at least a majority of them include those provisions, that

3  is, under the waterfall FGIC doesn't get its reimbursement

4  until the trusts are paid their principal and interest in full?

5  A.   I don't have that understanding.

6  Q.   And the chances that that's going to happen, given the

7  rehabilitation plan evaluation are very slim; isn't that

8  correct, that is, that the trusts are going to be paid

9  principal and interest in full?

10  A.   That's correct.

11  Q.   So really on the reimbursement side, you don't really have

12  an idea of whether FGIC is going to get a dime from anyone

13  under the waterfall provision, correct?  Certainly not certain?

14  A.   That's correct.

15  Q.   And not probable?  I mean probable in the probability

16  sense, sorry, not in an accounting sense?

17  A.   I guess the best way to say it is what it says right here.

18  It's uncertain whether we will.  I think you're asking me what

19  I view as an accounting question so I don't want to answer

20  that --

21  Q.   Okay.

22  A.   -- in that sense, but it's uncertain, yes.

23  Q.   And the extent is uncertain, meaning it could be not a

24  dime?

25  A.   That's correct.

12-12020-mg    Doc 5692-4    Filed 11/12/13    Entered 11/12/13 21:05:16    Part 4 of 5
Pg 72 of 78
**RESIDENTIAL CAPITAL, LLC, ET AL.**

68

1  Q.    Okay.  So then in paragraph 28 you refer to some potential

2  benefits under the FGIC rehabilitation plan that the people who

3  may not pay a dime get as a result of the terms of the plan.

4  This paragraph 28 does not, does not refer to anything under

5  the settlement; is that correct?  This is what happens under

6  the rehabilitation plan?

7            MR. SIDMAN:  I'll object to the question.

8            THE COURT:  What's the question?

9  Q.    The question is paragraph 28 includes an evaluation of

10  potential recoveries and benefits independent from the

11  settlement agreement.

12            THE COURT:  Do you agree?

13  Q.    This is under the rehabilitation plan?

14            THE COURT:  Do you agree with that?

15  A.    Independent of this agreement, yes.

16            THE COURT:  Okay.  Next question.

17  Q.    You project that of the one -- and let's read that second

18  sentence, "If the 1.06 billion projected recovery is realized,

19  FGIC would be entitled to receive only approximately 300

20  million dollars." And that 300 million is also the potential

21  zero, not a dime, correct?

22  A.    That's correct.

23  Q.    Okay.  "And the remainder would be retained by the trusts

24  for application in accordance with such waterfall provisions

25  likely for payment to the trusts' investors," correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

69

1   A.    That's correct.

2   Q.    And that's a benefit, to the extent it is at all, that an

3   investor gets not as a result of the settlement plan, of the

4   settlement agreement, but as a result of the FGIC

5   rehabilitation plan, correct?

6   A.    That's correct.

7   Q.    Paragraph 29, the first sentence says, "However, since

8   approximately half of that 1.06 billion projected gross

9   recovery amount represents FGIC'S estimate of the

10  reimbursements that will be due to FGIC in connection with

11  ResCap-related transactions pursuant to the various waterfall

12  provisions," do you see that?

13  A.    I do.

14  Q.    Is that suggesting that the reimbursements that may never

15  come through nevertheless lead to an estimate of 500 million

16  dollars of payments that are due?

17          MR. SIDMAN:  Objection.

18          THE COURT:  Sustained.

19  Q.    Half of the billion is 500 million, correct?

20  A.    Half of a billion is 500, yes.

21  Q.    Okay.  And what you're saying here is 500 million dollars

22  of that 1 billion dollars is based on an estimate of recovery

23  of reimbursements on the ResCap-related trusts, right?

24          THE COURT:  No, it says -- it doesn't say that.  So

25  read it correctly.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

70

1    MR. BAIO:  Okay.  I'm sorry, Your Honor.

2  Q.    "Since approximately half of that 1.06-billion-dollar

3  projected gross recovery amount represents FGIC's estimate of

4  the reimbursements that will be due to FGIC in connection with

5  the ResCap-related transactions pursuant to the various trust

6  waterfall provisions," do you see that?

7  A.    I do.

8  Q.    And is that saying that FGIC has estimated that the

9  reimbursements that will be due to FGIC in connection with

10 ResCap-related transactions pursuant to the various trust

11 waterfall provisions, will be approximately half of the 1.06

12 billion dollars?

13 A.    For that one particular line item in the financial

14 statements and the footnotes, yes, that's what I'm referring

15 to.

16 Q.    And those are the reimbursements that may actually be

17 zero, correct?

18 A.    That's correct.

19 Q.    And then as you go through and you say half of the

20 projected 300 million will be forgiven and you get to the 140

21 million at the bottom, those numbers in fact all could be zero?

22 A.    That is correct.

23 Q.    In paragraph 24 you have a calculation of some ninety

24 million dollars.  Do you see that?

25 A.    I do.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

71

1   Q.   And that ninety million dollars represents a payment for

2   what claims, if you know?

3   A.   The claims that have been put forward by the various FGIC

4   insured trusts.

5   Q.   Against?

6   A.   Against, I don't recall exactly the specifics of the

7   proofs of claims that were filed, but the trusts filed claims

8   against the various ResCap debtors.

9   Q.   And so far as you understand, in the absence of the

10  settlement, those claims survive fully, correct, at least in

11  your understanding?

12  A.   I don't --

13  Q.   They don't go away?

14  A.   I don't believe that the proof of claim has been approved

15  or denied at this point in time.

16          MR. BAIO:  Your Honor, I pass the witness.

17          THE COURT:  All right.  Anybody else wish wishes to

18  cross-examine?

19          Redirect.

20          MR. SIDMAN:  Your Honor, can I have one minute to

21  confer with my colleague?

22          THE COURT:  Sure, go ahead.

23      (Pause)

24          THE COURT:  Mr. Sidman?

25  REDIRECT EXAMINATION

PX  0889 pg.  72 of 274

**RESIDENTIAL CAPITAL, LLC, ET AL.**

72

1   BY MR. SIDMAN:

2   Q.    Mr. Dubel, just a couple of questions on redirect.

3   Earlier counsel for Freddie Mac was discussing with you or

4   asking you about additional possible recoveries that were --

5   would be included in the rehabilitation plan that would

6   increase recoveries under the rehabilitation plan.  Do you

7   recall those questions?

8   A.    I do.

9   Q.    Okay.  Are there other items that -- not included in the

10  rehabilitation plan that would -- may lead to increases in

11  claims that would decrease the rehab -- the payments due to --

12  the payments received under the rehabilitation plan for those

13  people who receive will rehabilitation plan payments?

14          MR. BAIO:  Object to the form.

15          THE COURT:  Sustained.  Just ask it again.  Okay, Mr.

16  Sidman.

17          MR. SIDMAN:  Sure.

18  Q.    Are there --

19          THE COURT:  Are there other claims that may be

20  received that will reduce payments under the rehabilitation

21  plan?

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  Could you explain that?

24          THE WITNESS:  We have a book of about thirty-one

25  billion dollars of exposure.  About a third of that is related

**RESIDENTIAL CAPITAL, LLC, ET AL.**

73

1    to the public finance space, and we've seen a tremendous

2    deterioration in the public finance space over the last several

3    years, something that's unprecedented.

4          THE COURT:  How much exposure do you have in Detroit?

5          THE WITNESS:  We have -- well, it's a billion-seven of

6    par but we insure the interest, too, so it could be well over

7    two billion dollars depending on what happens.  And we have

8    tremendous exposure in other areas, Puerto Rico which has more

9    recently experienced some severe downturns.  So there are other

10   areas that could happen or other structured finance problems

11   that could occur.

12         THE COURT:  Go ahead, Mr. Sidman.

13         MR. SIDMAN:  I have no further questions.

14         THE COURT:  Any further cross?

15         MR. BAIO:  Just to follow up on that, Your Honor.

16         THE COURT:  Go ahead, Mr. Baio.

17   RECROSS-EXAMINATION

18   BY MR. BAIO:

19   Q.   Mr. Dubel, FGIC has set up very significant reserves for

20   those exposures, correct?

21   A.   I'm sorry, for which exposures are you talking --

22   Q.   The ones you were just referring to?

23         THE COURT:  Public finance?

24   Q.   Public finance?

25   A.   We have put in reserves, most recently, yes, we have.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

74

1    Q.    And they're in your financial statements?

2    A.    They are.

3          MR. BAIO:  Correct.  No further questions.

4          THE COURT:  Thank you, Mr. Baio.

5          Mr. Sidman?

6          MR. SIDMAN:  Yes.

7          THE COURT:  Quickly.

8          MR. SIDMAN:  Yes, sure.

9    FURTHER REDIRECT EXAMINATION

10   BY MR. SIDMAN:

11   Q.    Speaking of reserves in your financial statements, has

12   FGIC recently issued new financial statements for the second

13   quarter ending June 30th, 2013?

14   A.    We did, in accordance with the deadlines that we have with

15   the Insurance Department, we filed our second quarter

16   yesterday.

17   Q.    Have there been any changes with respect to those

18   reserves?

19   A.    Yes, there has.

20   Q.    What were those changes?

21   A.    We've increased our reserves for the quarter by

22   approximately a little over 800 million dollars.

23          THE COURT:  Anything else?

24          MR. SIDMAN:  No, Your Honor.  At this time I just want

25   to make sure for the record we would like to introduce the