Hearing Date and Time: November 19, 2013, at 10:00 a.m.

Richard L. Wynne
Erin N. Brady (*admitted pro hac vice*)
Lance E. Miller
**JONES DAY**
222 East 41st Street
New York, New York  10017.6702
Phone: (212) 326-3418
Fax: (212) 755-7306

Attorneys for Creditor
*Financial Guaranty Insurance Company*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x
In the matter of:                                         )
                                                          )   Case No. 12-12020 (MG)
RESIDENTIAL CAPITAL, LLC,                                 )
                                                          )   Chapter 11
         Debtors.                                         )
                                                          )
                                                          )
                                                          )
                                                          )
--------------------------------------------------------- x

**FINANCIAL GUARANTY INSURANCE CORPORATION'S
REPLY TO PLAN OBJECTIONS MADE BY THE JUNIOR
SECURED NOTEHOLDERS**

LAI-3203328v1

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .................................................................................................................................. 5

    I.  FGIC's Rescap Claim Should Be Approved ...................................................... 5

    II.  The Global Settlement Does Not Violate The Absolute Priority Rule. ............................. 7

        A.  The JSNs are Collaterally Estopped from Arguing that the Absolute Priority Rule Bars Approval of the Global Settlement. .......................................................... 7

        B.  The Monoline Insurers' Claims Are Not Subject to Subordination Under Section 510(b) of the Bankruptcy Code ....................................................................... 11

            (i)  FGIC's Claims do Not "Arise" from the Purchase or Sale of a Security of the Debtors or their Affiliates ............................................................... 12

            (ii) Monoline Insurance was not Inextricably Intertwined with the Sale of the Debtors' Securities ........................................................................................ 15

CONCLUSION ............................................................................................................................ 15

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Bank of New York v. First Millennium, Inc.*,
    607 F.3d 905 (2d Cir. 2010)..................................................................................................8

*Chevron Corp. v. Donziger*,
    886 F.Supp.2d 235 (S.D.N.Y. 2012).......................................................................................9

*Corestates Bank, N.A. v. United Chem. Techs., Inc.*,
    202 B.R. 33 (E.D. Pa. 1996)....................................................................................................3

*DiSorbo v. Hoy*,
    343 F.3d 172 (2d Cir. 2003)....................................................................................................8

*In re Adelphia Communications Corp.*,
    327 B.R. 143 (Bankr. S.D.N.Y. 2005)..................................................................................11

*In re Adelphia Communications Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007)....................................................................................4

*In re Betacom of Phoenix, Inc.*,
    240 F.3d 823 (9th Cir. 2001) ................................................................................................11

*In re Calpine Corp.*,
    Case No. 05-60200, 2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007).......................................12

*In re CIT Group Inc.*,
    460 B.R. 633 (Bankr. S.D.N.Y. 2011)..................................................................................12

*In re DBSD N. Am., Inc.*,
    419 B.R. 179 (Bankr. S.D.N.Y. 2009), *rev'd, in part, on other grounds*, 627 F.3d 496
    (2d Cir. 2010) .........................................................................................................................4

*In re Dewey & LeBoeuf LLP*,
    478 B.R. 627 (Bankr. S.D.N.Y. 2012) (Glenn, J.)................................................................11

*In re Iridium Op. LLC*,
    478 F.3d 452 (2d Cir. 2007)..................................................................................................11

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986)......................................................................................3

*In re Kelly*,
    155 B.R. 75 (Bankr. S.D.N.Y. 1993)......................................................................................8

*In re Marketxt Holdings Corp.*,
  361 B.R. 369 (Bankr. S.D.N.Y. 2007) ................................................................................12

*In re Med Diversified, Inc.*,
  461 F.3d 251 (2d Cir. 2006) ........................................................................................11, 12

*In re NationsRent, Inc.*,
  381 B.R. 83 (Bankr. D. Del. 2008) .....................................................................................12

*In re PT-1 Communications, Inc.*,
  304 B.R. 601 (Bankr. E.D.N.Y. 2004) ................................................................................12

*In re Telegroup, Inc.*,
  281 F.3d 133 (3d Cir. 2002) ..............................................................................11, 12, 13

*Proctor v. LeClaire*,
  715 F.3d 402 (2d Cir. 2013) ................................................................................................8

**STATUTES AND FEDERAL RULES**

11 U.S.C. § 510(b) ................................................................................................... passim

Fed. R. Bankr. P. 9019 ...............................................................................................7, 9

iii

Financial Guaranty Insurance Corporation ("FGIC") hereby replies to arguments made by UMB Bank, N.A., as successor Notes Trustee for those certain 9.625% Junior Secured Guaranteed Notes due 2015 (the "Junior Secured Notes") and by the Ad Hoc Committee of Junior Secured Noteholders (collectively, the "JSNs") in their joint Objection to confirmation of the Plan [Dkt. No. 5443] (the "JSN Objection").[1]

**PRELIMINARY STATEMENT**

1. In their Objection the JSNs raise two contentions specifically relating to FGIC. First, they assert that the FGIC (and MBIA) claims against RFC and GMACM are being allowed at ResCap with "no apparent legal or factual basis." *See* JSN Obj. ¶ 6.[2] Second, they assert that the Global Settlement and Plan violate the absolute priority rule because claims held by the Monoline Insurers, among others, will not be subordinated under section 510(b) of the Bankruptcy Code. *See* JSN Obj. ¶¶ 84-88. The Court should overrule both objections. There is a substantial legal and factual basis for the allowance of FGIC's claims against ResCap. And the JSNs' subordination argument is not only legally and factually incorrect, but has also already been considered—and rejected—by this Court.

2. Just three months ago, this Court presided over—and the JSNs participated in—a two day trial to consider the merits of the FGIC Settlement. The trial followed extensive discovery involving all parties, including the JSNs. At the conclusion of that trial, the Court approved the FGIC Settlement,[3] describing the FGIC Settlement as an "essential, inextricable

---

[1] Capitalized terms not specifically defined herein have the meaning assigned to them in the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Dkt. No. 4819] (as amended, the "Plan").

[2] The JSNs' complaint about allowance of the ResCap Claim contradicts the statement made later in their Objection that the JSNs "do not object to the allowance (but do object to the priority) of the Consenting Claimants' claims as set forth in the Global Settlement. . . ." JSN Obj., at n.6.

[3] All terms of the settlement were approved except for allowance of FGIC's claim against ResCap, which, pursuant to the terms of the FGIC Settlement, was reserved pending approval of the Global Settlement and confirmation of the Plan.

and critical cornerstone of the Global Settlement" and finding that the FGIC Settlement was in the best interests of the Debtors' estates. *See Memorandum Decision and Order, and Findings of Fact and Conclusions of Law, Approving the FGIC Settlement Motion* [Docket No. 5042] (the "FGIC Settlement Approval Decision"), at *35, 49 (The FGIC Settlement is "clearly in the best interest of the creditors of the estates—it will resolve significant claims against the estates for far less than the amounts asserted and it imposes a cap on FGIC's claims in case the contemplated plan is not confirmed."). The Court also overruled the JSNs' objection that section 510(b) of the Bankruptcy Code foreclosed the Court from approving a settlement of FGIC's claims, recognizing that "courts in this District have approved settlements where the claims could be subject to subordination." *Id*. at 50. These issues cannot be re-litigated in these confirmation proceedings.

3. The only aspect of the FGIC Settlement that remains to be decided is allowance of FGIC's claim against ResCap (the "ResCap Claim"). The Debtors, the Creditors' Committee, and substantially all of the Debtors' primary constituencies—including the Senior Unsecured Noteholders, who hold substantial liquidated claims solely at the ResCap entity level—agreed to support allowance of the ResCap Claim under the FGIC Settlement and the Global Settlement. Allowance of the claim serves the best interests of the Debtors' estates and should be approved.

4. The JSNs wrongly contend that there is no legal or factual basis to allow the ResCap Claim. Indeed, the legal and factual bases for the ResCap Claim are found in (i) FGIC's twelve prepetition lawsuits against, among others, the ResCap Debtors, (ii) FGIC's proof of claim against ResCap, and (iii) the extensive factual record developed in the almost twelve months of discovery and extensive briefing submitted in preparation for two separate settlement hearings involving RMBS and monoline claims against the Debtors. Fundamentally, FGIC's

claims against ResCap arise from (a) its actions in directing and managing GMACM and RFC, (b) its role in the Debtors' servicing operations, and (c) its status as an as the alter ego of GMACM and RFC. To the extent that the JSNs wished to dispute the legitimacy of the ResCap Claim as part of this or any other proceeding, they had ample opportunity to do so. They did not. The record fully supports allowance of the ResCap claim as part of the Global Settlement.

5. Finally, the JSNs argue that the Global Settlement cannot be approved because "[Monoline Claims], all of which are subject to mandatory subordination under section 510(b) of the Bankruptcy Code, will receive substantial distributions on account of their claims, while the [Intercompany Balances] are not being paid in full, thus violating the absolute priority rule."[4] JSN. Obj. ¶ 75. Critically, Intercompany Balances are not being paid in full—or at all—because the Debtors consensually released them as part of the Global Settlement. This release was valid and permissible under the underlying contracts and applicable law. *See Plan Proponents' Omnibus Response to Objections to Confirmation of the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors*, at § I.A.2 (the Debtors' Intercompany Balances are unenforceable debt obligations as evidenced by, among other things, the facts that (i) they did not have fixed maturities and generally carried no interest rate, (ii) there was no general practice of repayment or cash settlement of Intercompany Balances, (iii) the waiver of Intercompany Balances was routinely done (149 times for $16.6 billion) and consistently recorded as an adjustment to equity, and (iv) the JSNs' loan agreement provides the Debtors with unfettered discretion to release Intercompany Balances);

---

[4] The JSNs do not own any of the intercompany claims that they believe will be improperly "crammed down"; instead, the JSNs claim that they hold valid liens on some of those claims. There is significant doubt as to whether this indirect interest suffices to provide the JSNs with standing to question the Debtors' compliance with section 1129(b) with respect to intercompany claims. *See, e.g., Corestates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 47-48 (E.D. Pa. 1996) (secured creditor lacked standing to object to plan on grounds that it unfairly discriminated against another class of creditors because "[t]he only creditor who can argue unfair discrimination is a dissident claimant who has been the direct object of unfair treatment"); *see also In re Johns-Manville Corp.*, 68 B.R. 618, 624 (Bankr. S.D.N.Y. 1986) ("no party may successfully prevent the confirmation of a plan by raising the rights of third parties who do not object to confirmation").

3

*see also In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009), *rev'd, in part, on other grounds*, 627 F.3d 496 (2d Cir. 2010) (a plan may waive estate claims if it is "a valid exercise of the Debtors' business judgment, and [is] fair, reasonable, and in the best interests of the estate"); *In re Adelphia Communications Corp.*, 368 B.R. 140, 263 (Bankr. S.D.N.Y. 2007) ("The Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own."). Because released claims are not entitled to distributions—as they no longer have any legal consequence—the JSNs invocation of the absolute priority rule with respect to the Monoline Insurers' claims is misplaced.

6.  Assuming *arguendo* that the absolute priority rule were relevant, the JSNs' contention that a debtor cannot settle claims that could be subject to subordination is still without merit. Indeed, the Court already considered and rejected similar subordination arguments in approving the FGIC Settlement—a ruling to which collateral estoppel plainly applies. *See* FGIC Appr. Dec., at *51 ("The JSNs have failed to provide any authority holding that a court cannot approve a settlement where the claims could potentially be subordinated."). Moreover, the Monoline Insurers' claims—based largely on the Debtors' acts and omissions in procuring monoline insurance—are not subject to section 510(b) even under the broadest reading.

7.  These have been intense and complicated cases. Ultimately, as a result of hard fought negotiations and significant concessions by all parties involved, the Debtors have arrived at a plan that has near-unanimous support from the Debtors' primary constituencies—something that seemed improbable, if not impossible, at the outset. The alternative to confirmation of the Plan will almost certainly be chaos and years of complex litigation over an ever shrinking sum of value. The Global Settlement (including the FGIC Settlement and the allowance of the ResCap

Claim) serves the best interests of the Debtors' estates and all creditors, including the JSNs, and should be approved.

## ARGUMENT

### I. FGIC'S RESCAP CLAIM SHOULD BE APPROVED

8. FGIC is a monoline insurance company that wrote financial guaranty insurance policies with respect to asset-backed securities, including RMBS.[5] *Direct Testimony of John S. Dubel on Behalf of FGIC* (the "Dubel Testimony"), at ¶ 5. FGIC's insurance policies guaranteed the payment of principal and interest due on the insured RMBS (the "Policies"). *Id*. Under the terms of the Policies, FGIC unconditionally and irrevocably guaranteed to the Trustee that, if a shortfall arose in cash available to make required payments to the insured RMBS Trusts, FGIC would pay the amount of the shortfall to the applicable trustee. *Id*.

9. FGIC insured 47 transactions where a Debtor entity served as a sponsor. *Id*. at ¶ 6. As such, pending the closing of the FGIC Settlement, FGIC is the largest monoline insurer in terms of exposure to the Debtors by balance of securities issued. *Id*. at ¶ 8. FGIC has filed proofs of claim numbers 4868, 4870 and 4871 against ResCap, RFC, and GMACM (collectively, the "Proofs of Claim"). *Id*. As discussed in those claims, before the Petition Date, FGIC brought twelve pre-petition civil actions against the Debtors (including ResCap) and/or Ally, seeking damages for various misrepresentations and breaches of duty and breaches of contract (the "FGIC RMBS Litigation"). The FGIC RMBS Litigation is currently pending in the U.S.

---

[5] To avoid unnecessary duplication, FGIC joins in the *Memorandum of Points and Authorities in Support of Confirmation of the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, and the Official Committee of Unsecured Creditors* [Dkt. No. 5669] (the "MBIA Brief").

District Court for the Southern District of New York before the Honorable Paul A. Crotty. *Id*. at ¶ 8.[6]

10.  FGIC's claims against ResCap arise from FGIC's allegations that, at ResCap's specific direction, GMACM and RFC, as sponsors, (i) breached transaction-level and loan-level representations, warranties, and affirmative covenants; (ii) breached their duty to repurchase, cure, or substitute defective Mortgage Loans; (iii) breached their duty to provide FGIC with access to information regarding the Mortgage Loans, and (iv) fraudulently induced FGIC into entering into certain insurance agreements. *Id*. at ¶¶ 9, 10. Furthermore, FGIC believes and has alleged that ResCap was the alter ego of GMACM and RFC, and is therefore responsible for their obligations owing to FGIC. *Id*. at ¶ 11. Finally, ResCap itself directly managed and directed the servicing operations that the various Debtor entities performed, which led to direct claims against ResCap for its actions. *Id*.

11.  In 2007, ResCap took over all of the servicing of the Mortgage Loans. *Id*. at ¶ 7. As servicer, ResCap took substantial actions including, but not limited to, changing the risk classification of mortgage loans sold to insured RMBS Trusts, which caused FGIC direct harm. *Id*. at ¶ 12.

12.  These facts all point to one conclusion—the FGIC ResCap Claim is legitimate, and FGIC has pursued it aggressively and consistently since long before the Petition Date.

13.  An additional significant indication of the ResCap Claim's legitimacy is the fact that the Senior Unsecured Notes *agreed* to a Global Settlement that includes the ResCap Claim. The Senior Unsecured Notes hold claims against one estate only—ResCap. At the time the parties negotiated the Global Settlement, moreover, they were the only unsecured creditor

---

[6] Copies of the complaints filed in the FGIC RMBS Litigation are marked as Exhibit Nos. PX-719 through PX-730, and a copy of one of the complaints is attached to the Dubel Testimony. Copies of the Proofs of Claim are marked as Exhibit Nos. PX-951 through PX-953, and are attached to the Dubel Testimony.

constituency with liquidated claims against ResCap. They, above all other significant constituencies in these cases, are the most incentivized to object to allowance of claims against ResCap. The JSNs, by contrast, hold secured claims against ResCap and assert the same claims against many other Debtors in these cases.

14. FGIC has consistently asserted and pursued claims against ResCap, through both pre-petition litigation and post-petition litigation and negotiations. FGIC will not summarize here the significant pleadings filed with respect to the original RMBS settlement litigation that discussed issues relating to RMBS and monoline claims. It suffices to say, however, that the law in this area, much of it based on New York insurance law, is quite favorable to the Monoline Insurers' claims, and that law continues to develop in favor of the Monoline Insurers. The Debtors' settlement of those claims as part of the Global Settlement was, therefore, a reasonable exercise of their business judgment. *See Direct Testimony of Lewis Kruger* ¶¶ 65-87. The JSNs' suggestion to the contrary lacks any basis in law or fact.

## II. THE GLOBAL SETTLEMENT DOES NOT VIOLATE THE ABSOLUTE PRIORITY RULE.

### A. The JSNs are Collaterally Estopped from Arguing that the Absolute Priority Rule Bars Approval of the Global Settlement.

15. The JSNs wrongly contend that the Plan violates the absolute priority rule (and thus is not fair and equitable) because it does not subordinate the Monoline Insurers' claims under section 510(b) of the Bankruptcy Code. JSN Obj. ¶¶ 51-52 (quoting *In re Iridium Op. LLC*, 478 F.3d 452, 464 (2d Cir. 2007)). As an initial matter, the JSNs fail to acknowledge that the Plan's allowance of the monoline claims derives from settlements that form part of the Global Settlement, and thus must be evaluated under the deferential standards provided under Bankruptcy Rule 9019. Moreover, the Court already considered and expressly rejected this

7

argument when ruling on the FGIC Settlement. It is therefore barred under the doctrine of collateral estoppel.

16.  Collateral estoppel ("issue preclusion") applies where: (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits. *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 918 (2d Cir. 2010) (quoting *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006)). Where these elements appear, a party is barred as a matter of law from attempting to re-litigate or contest the issue previously decided. *Id.*; *see also Proctor v. LeClaire*, 715 F.3d 402 (2d Cir. 2013) ("If all four of the above conditions are met, issue preclusion is applicable even if the two suits are not based on the same cause of action.").

17.  Collateral estoppel applies even where the issue in the prior proceeding is on appeal. *See, e.g., DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) ("Under New York law, mere pendency of an appeal does not prevent the use of the challenged judgment as the basis of collaterally estopping a party to that judgment in a second proceeding." *quoting Amica Mut. Ins. Co. v. Jones*, 85 A.D.2d 727 (2d Dept. 1981)); *In re Kelly*, 155 B.R. 75, 78 (Bankr. S.D.N.Y. 1993) ("Collateral estoppel may be applied when the prior judgment is on appeal. For purposes of issue preclusion, a 'final judgment includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.'" *quoting, in part*, Restatement (Second) of Judgments, § 13 (1980)). As Judge Kaplan recently summarized:

> "As to the need for finality of decision," the Second Circuit has remarked, "collateral estoppel . . . does not require a judgment which ends the litigation . . . and leaves nothing for the court to do but execute the judgement." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 366 (2d Cir.

8

>1992). As Judge Friendly wrote, "to borrow Mr. Justice Brandeis' famous phrase, 'final' . . . is 'a word of many meanings []'; the law of judgments does not use it in relation to conclusiveness . . . to mean only a judgment 'which ends the litigation . . . and leaves nothing for the court to do but execute the judgment.'" *Lummus v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961) (citation omitted). Rather, the concept of finality for collateral estoppel purposes includes many dispositions which, though not final in that sense, have nevertheless been fully litigated.
>
>. . . The better view, and that applied in New York and in the federal courts, is that a judgment otherwise final remains so despite the taking of an appeal. This is so even—as particularly relevant here—if a statute or rule of court provides that the judgment cannot be executed upon or otherwise enforced during the period allowed for making such a motion and the further period until the motion if made is decided.

*Chevron Corp. v. Donziger*, 886 F.Supp.2d 235, 270 (S.D.N.Y. 2012) (internal quotations and citations omitted); *see also Schuh v. Druckman & Sinel, LLP*, 602 F.Supp.2d 454, 468 (S.D.N.Y. 2009) (Kaplan, J.) ("New York requires only that the issue have been properly raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding. Additionally, collateral estoppel can be invoked, either offensively or defensively by a non-party to the litigation." (internal quotations omitted)).

18. The JSNs assert incorrectly that the Plan cannot be approved because it allows holders of claims that may be subject to subordination under section 510(b) of the Bankruptcy Code to recover *pari passu* with other unsecured creditors. JSN Obj. ¶ 75 ("The Plan provides that the holders of [monoline claims], all of which are subject to mandatory subordination under section 510(b) of the Bankruptcy Code, will receive substantial distributions on account of their claims, while the Intercompany Balance Claimants are not being paid in full, thus violating the absolute priority rule."). The JSNs similarly objected to the FGIC Settlement, arguing "it is inappropriate to allow a claim that is otherwise subject to section 510(b) subordination to recover *pari passu* with general unsecured creditors, even if such status is required by a settlement agreement." *Objection of the Ad Hoc Group of Junior Secured Noteholders to the Debtors'*

9

*Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among The Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [Dkt. No. 4027], at ¶ 32; *see also* FGIC Settlement Approval Dec., at *49 ("[T]he JSNs assert that the Settlement is unreasonable because it settles claims that could otherwise be subordinated under section 510(b) of the Bankruptcy Code.").

19.    This Court expressly considered and rejected the JSNs' contention in approving the FGIC Settlement, first recognizing "it is far from clear that [the Monoline Insurers'] Claims would be subordinated," and also finding:

> In any event, ***courts in this District have approved settlements where the claims could be subject to subordination.*** See *In re WorldCom, Inc.*, No. 02-13533 (Bankr. S.D.N.Y. Aug. 6, 2003) (ECF Doc. # 8125) (approving a settlement that involved claims that may be subject to subordination); *In re Adelphia Communications Corp.*, 327 B.R. 143,168-70 (Bankr. S.D.N.Y. 2005), *aff'd sub. nom. Ad Hoc Adelphia Trade Claims Committee v. Adelphia Communications Corp.*, 337 B.R. 475, 478 (S.D.N.Y. 2006) (same); *In re Drexel Lambert Grp., Inc.*, 138 B.R. 717, 719 (Bankr. S.D.N.Y. 1992) (approving settlement resolving various employee ERISA and compensation claims "related principally to the purchase or acquisition of stock by employees or the divesture of stock by employees" over objections that those claims should be subordinated under section 510(b) where it was unclear whether ERISA overrode the mandates of section 510(b)), *aff'd sub. nom. Lambert Brussels Assocs. L.P. v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 140 B.R. 347 (S.D.N.Y. 1992).
>
> The court in *Adelphia* explained:
>
>> The real issue before me . . . is whether the Government and the Debtors could settle a controversy as to which that close and difficult issue [of subordination under Section 510(b)] is an element, and the answer to that plainly is 'yes.' It is no different than the multitude of other difficult issues that are settled in litigation all the time.
>
> 327 B.R. at 168-70. ***The JSNs have failed to provide any authority holding that a court cannot approve a settlement where the claims could potentially be subordinated.*** Rather, in all of the cases cited by the JSNs, the claims at issue were clearly subject to subordination, and only one case involved a Rule 9019 motion. *See In re Cincinnati Microwave, Inc.*, 210

10

> B.R. at 133-34. There, the court denied the motion because the settlement was not in the best interest of creditors; it did not determine that claims subject to subordination cannot be settled.

*Id*. at *50-51 (emphasis added).

20. Collateral estoppel applies to the Court's holding that a settlement—like the Monoline Settlement and Global Settlement here—may be approved regardless of whether the underlying claims may be subject to subordination under section 510(b) of the Bankruptcy Code. The JSNs raised the same issue in connection with their objection to the FGIC Settlement; the issue was actually litigated and decided by the Court; the JSNs had a full and fair opportunity to litigate the issue; and resolution of the JSNs' legal theory was necessary to support the Court's decision to approve the FGIC Settlement. The JSNs' objection that the Global Settlement and Plan will not be fair and equitable because it fails to subordinate the Monoline Claims is thus barred.[7]

### B. The Monoline Insurers' Claims Are Not Subject to Subordination Under Section 510(b) of the Bankruptcy Code

21. The JSNs' argument that the Monoline Insurers' claims are subject to mandatory subordination under section 510(b) of the Bankruptcy Code, is wrong on the law and the facts.

---

[7] The JSNs cite a single case—*In re Iridium Op., LLC*, 478 F.3d 452 (2d Cir. 2007)—for the notion that "a settlement cannot be approved if its terms would violate . . . the absolute priority rule." JSN Obj., at ¶ 51. *Iridium*, however, does not support that proposition. In fact, the Second Circuit in *Iridium* specifically *rejected* a *per se* rule that a settlement can never be approved if junior creditors' claims are satisfied before those of more senior creditors, because requiring a court to find that a settlement complies with the absolute priority rule makes little sense given that the dispute at issue often relates to relative priorities of claims. *Iridium Op. LLC*, 478 F.3d at 464 ("It is difficult to employ the rule of priorities in the approval of a settlement in a case such as this when the nature and extent of the Estate and the claims against it are not yet fully resolved. In our view, a rigid *per se* rule cannot accommodate the dynamic status of some pre-plan bankruptcy settlements."). Following the *Iridium* decision, courts in the Second Circuit have rejected repeatedly the proposition that a settlement must comply with the absolute priority rule. *See, e.g., In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 642 (Bankr. S.D.N.Y. 2012) (Glenn, J.) ("While the Court does not believe that the releases violate the absolute priority rule, a court in its discretion can approve a settlement that does not comply strictly with the absolute priority rule, as long as the settling parties can justify the divergence, and the court can 'clearly articulate the reasons for approving . . . a settlement that deviates from the priority rule.' (quoting *Iridium*, 478 F.3d at 465)); *In re Adelphia Communications Corp.*, 327 B.R. 143 (Bankr. S.D.N.Y. 2005) (when addressing a settlement of claims arguably subject to subordination under section 510(b), there is "no need or occasion to decide the underlying question").

LAI-3203328v1

        (i)      FGIC's Claims do Not "Arise" from the Purchase or Sale of a Security of the Debtors or their Affiliates

22.      In order for section 510(b) to apply, a claim must "arise" from the purchase or sale of a security of the debtor or its affiliates. *See* 11 U.S.C. § 510(b). A claim "arises" from the purchase or sale of a security only if: (1) the creditor "took on the risk and return expectations of a shareholder, rather than a creditor," or (2) the creditor "seeks to recover a contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor." *In re Med Diversified, Inc.*, 461 F.3d 251, 256 (2d Cir. 2006). This standard is generally satisfied where the claim at issue relates to the creditor's possession or acquisition of stock in the debtor. *See, e.g., In re Telegroup, Inc.*, 281 F.3d 133, 142 (3d Cir. 2002) (creditor sought damages for debtor's breach of obligation to register stock); *In re Betacom of Phoenix, Inc.*, 240 F.3d 823 (9th Cir. 2001) (claim related to debtor's failure to issue stock as required by merger agreement); *In re PT-1 Communications, Inc.*, 304 B.R. 601 (Bankr. E.D.N.Y. 2004) (claim for breach of an obligation to issue stock); *Med Diversified*, 461 F.3d at 256 (claim related to debtor's failure to complete stock exchange); *In re Calpine Corp.*, Case No. 05-60200, 2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007) (claim for breach of conversion right provided in a bond issuance).

23.      In contrast, a claim does not "arise" from purchase or sale of a security where it is based in contract or is in the nature of a debt, even if the underlying transactions in some respects involves a security. *See, e.g., In re Marketxt Holdings Corp.*, 361 B.R. 369, 383 (Bankr. S.D.N.Y. 2007) (claims for repayment of notes provided to extinguish the creditor's preferred stock not subordinated); *In re NationsRent, Inc.*, 381 B.R. 83 (Bankr. D. Del. 2008) (claims for certain make-whole payments arising from debtor's purchase of the creditor's former subsidiary not subordinated); *In re CIT Group Inc.*, 460 B.R. 633 (Bankr. S.D.N.Y. 2011) (claims relating

to independent contract where creditor did not bargain for risks and rewards of a shareholder not subordinated); *see also Med Diversified,* 461 F.3d at 258 (noting an "equal concern for guarding against attempts by a bankruptcy debtor to clothe a general creditor in the garb of a shareholder").[8]

24. In approving the FGIC Settlement, this Court appropriately cited the decision in *CIT Group. See* FGIC Settlement Appr. Dec., at *49 (citing *CIT Group* and stating: "[I]t is far from clear that [FGIC's] Claims would be subordinated."). In that case, Tyco International Ltd. spun-off CIT through a pre-petition IPO. In connection with the IPO, Tyco and CIT entered into a tax agreement whereby CIT agreed to pay Tyco for any tax benefits it realized as a result of pre-IPO net operating losses. When CIT filed for bankruptcy relief, it sought to subordinate Tyco's claim under the tax agreement, arguing that it "arises directly from the sale of CIT's shares through the IPO." *Id*. at 639. The court rejected that argument and refused to subordinate Tyco's claims because Tyco did not "bargain[] for the risks and rewards of a holder of equity rather than a holder of debt." *Id*. Notably, the court also rejected arguments that section 510(b) should apply because the tax agreement with Tyco was "an integral part of the IPO." *Id.* ("The Tax Agreement here was arguably an integral part of the IPO, but it was not . . . merely a supplement to a share purchase agreement."). As the court stated:

> There is no question that the Tax Agreement has a nexus to the issuance of the stock in the IPO in that both were agreed to in connection with the spinoff of CIT from Tyco. As

---

[8] The JSNs—without analysis or explanation—cite *Telegroup, Inc.*, 281 F.3d at 133, contending that a claim may be subject to section 510(b) if it "arise[s] out of events that occur after the purchase of the security and relate to obligations that go beyond the actual purchase or sale of the security." *See* JSN Obj. ¶ 87. The *Telegroup* decision actually helps prove FGIC's point. The *Telegroup* court counseled that in applying section 510(b), a court must compare a challenged creditor to a traditional equityholder:

> Nothing in our rationale would require the subordination of a claim simply because the identity of the claimant happens to be a shareholder, where the claim lacks any causal relationship to the purchase or sale of stock and when subordinating the claims would not further the policies underlying § 510(b), which was intended to prevent shareholders from recovering their equity investment in parity with general unsecured creditors.

*Id*. at 144, n.2.

13

the foregoing cases demonstrate, however, ***the existence of a mere "connection" between the claim and the purchase or sale of a security is not enough to support a finding that the claim "arises from" the purchase or sale*** and should be subordinated unless the purposes of the statute would be served thereby.

*Id*. at 639 (emphasis added).

25. FGIC, like Tyco, did not "bargain[] for the risks and rewards of a holder of equity rather than a holder of debt." *Id.* Indeed, the claims of a monoline insurer like FGIC bear no resemblance to those that may be subject to subordination under section 510(b). Among other things, none of FGIC's claims against the Debtors are based on state or federal securities law. None of FGIC's claims relate to the securities sold to the RMBS note holders by the Debtors or any of the Debtors' activities thereto. None of the damages FGIC seeks are intended to compensate FGIC for a loss relating to the Debtors' equity or otherwise depend on the Debtors' securities pricing. None of FGIC's claims relate to a "contribution to the equity pool" of the Debtors. And none of FGIC's claims are based on subrogation to the rights of RMBS note holders. *See also* MBIA Brief, at *6. Rather, FGIC's claims arise under the terms of its agreement to insure the Trusts against principal and interest losses.[9] FGIC's only potential benefit under these agreements was the payment of policy premiums. *See* Dubel Test. ¶ 14 ("The only benefit FGIC stands to receive under the Policies is the receipt of insurance premiums. The Policies do not provide FGIC with an equity stake in the Debtors or the Trusts."). And the damages FGIC seeks are intended to compensate FGIC for the Debtors' actions—actions which caused FGIC substantial losses. Simply put, there is no scenario in

---

[9] In approving the FGIC Settlement, this Court took note of the Debtors' argument that "claims asserted by the investors [of RMBS trusts] do not arise out of the purchase or sale of securities because they arise out of a sale of mortgage loans, not securities." FGIC Settlement Appr. Dec., at *50. The Monoline Insurers' claims are even further removed from the securitization process than claims by investors in the RMBS Trusts. The investors were at least involved in purchasing *someone's* securities (here, the Certificates issued by the RMBS Trusts), and thus accepted certain market-related risks in exchange for potential upside. The Monoline Insurers, on the other hand, simply wrote insurance policies; they did not purchase any securities and had no direct exposure to market-related risk or reward. If the claims held by investors in the RMBS Trusts do not "arise" from purchase or sale of a security of the debtors, the same must be true for the Monoline Insurers.

14

which FGIC's interests—or for that matter any of the Monoline Insurers' interests—could be viewed as those of equity. *See also* MBIA Brief, at *7-8 (distinguishing cases cited by JSNs as relating to claims asserted by purchaser or prospective purchaser of a debtor's securities).

        (ii)    <u>Monoline Insurance was not Inextricably Intertwined with the Sale of the Debtors' Securities</u>

26.    The Policies that FGIC and the other Monoline Insurers issued were not inextricably linked with the purchase or sale of those securities. While monoline insurance policies can be issued at the same time as a securitization, the insurance policies are not a required component of securitizations. Indeed, whereas a relative handful of the Debtors' securitization transactions involved monoline insurance policies, the vast majority were not insured at all. As with the tax agreement in *CIT Group*, monoline insurance is "arguably an integral part of the [Debtors' securitizations], but it was not . . . merely a supplement to a share purchase agreement." *CIT Group* recognizes that a claim will not fall within section 510(b) merely because it was somehow related to a security issuance.

27.    The Monoline Insurers—whose sole benefit under the insurance policies are their receipt of insurance premiums—share no common traits with an investor in the Debtors' stock. The JSNs' attempts to extend section 510(b) to the Insurers' claims should thus be rejected.

## CONCLUSION

The JSN Objection should be overruled and the Plan should be confirmed.

Dated: November 12, 2013　　　　　　　　　　JONES DAY
New York, New York

                                                    */s/ Richard L. Wynne*
                                                    Richard L. Wynne
                                                    Erin N. Brady
                                                    Lance E. Miller
                                                    222 East 41st Street
                                                    New York, New York 10017