| | |
|---|---|
| Richard M. Cieri | Jeffrey S. Powell |
| Ray C. Schrock | Daniel T. Donovan |
| Noah J. Ornstein | Judson D. Brown |
| KIRKLAND & ELLIS LLP | KIRKLAND & ELLIS LLP |
| 601 Lexington Avenue | 655 15th Street, N.W., Ste. 1200 |
| New York, New York 10022 | Washington, D.C. 20005 |
| Telephone: (212) 446-4800 | Telephone: (202) 879-5000 |
| Facsimile: (212) 446-4900 | Facsimile: (202) 879-5200 |

*Counsel for Ally Financial Inc. and Ally Bank*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

-------------------------------------------------------------

**ALLY FINANCIAL INC.'S AND**
**ALLY BANK'S REPLY IN SUPPORT OF CONFIRMATION**
**OF THE JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL**
**CAPITAL, LLC AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND.....................................................................................................3

Ally's Pre-Petition Support of the Debtors..............................................................................3

The Debtors' Pre-Petition Analysis of Claims Against Ally and Pre-Petition Settlement.............3

Ally's Support of the Debtors During the Chapter 11 Cases.....................................................4

Mediation and Global Settlement ..........................................................................................5

The Ally Settlement and Third Party Release..........................................................................5

Additional Settlements and Voting on the Plan.......................................................................7

ARGUMENT ........................................................................................................................7

I.       The Debtor Release Is Appropriate And Justified. ........................................................7

II.      The Third Party Release Is Appropriate And Justified...................................................8

         A.       The Third Party Release Is Largely Consensual...........................................8

         B.       To The Extent The Third Party Release Is Non-Consensual, It Is
                  Appropriate And Justified.........................................................................9

                  1.       The Court Has Subject Matter Jurisdiction To Grant The Third
                           Party Release...............................................................................10

                           a.       Ally has indemnification and contribution claims against
                                    the Debtors for the claims subject to the Third Party
                                    Release. ............................................................................10

                           b.       An asset of the Estates—insurance policies and proceeds
                                    that the Debtors share with Ally—will be depleted if the
                                    Third Party Release is not granted. ....................................13

                  2.       The Third Party Release Is Appropriate Because Ally Has
                           Provided Unique and Substantial Consideration That Is Important
                           And Essential To The Debtors' Plan. ..............................................16

                           a.       Ally has provided and will provide unique and substantial
                                    consideration to the Debtors' Estates under the Plan..................16

i

b.      The Debtors and Ally also share an identity of interest with respect to the claims subject to the Third Party Release...............20

C.      The Objectors' Challenges To The Third Party Release Lack Merit. ...................21

1.      The JSNs Lack Standing To Challenge The Third Party Release. ............21

2.      The JSNs Challenge To Ally's Contribution Is Factually And Legally Incorrect. .......................................................................................22

a.      The MSR swap claim is meritless..................................................23

b.      The revenue allocation claim is meritless.....................................25

c.      The tax allocation agreement claim is meritless. ..........................28

3.      The Third Party Release binds unimpaired creditors................................29

4.      The Plan satisfies the "best interests of creditors" test. ...........................30

III.    The JSN Objection Ignores Key Provisions Of The Intercreditor Agreement That Should Be Enforced By This Court. ......................................................................31

CONCLUSION.......................................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 1031 Tax Grp., LLC,*
397 B.R. 670 (Bankr. S.D.N.Y. 2008) .................................................................. 13

*In re Adelphia Commc'ns Corp.,*
368 B.R. 140 (Bankr. S.D.N.Y. 2007) .......................................................... passim

*In re Amanat,*
338 B.R. 574 (Bankr. S.D.N.Y. 2005) .................................................................. 11

*In re Charter Commc'ns,*
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ................................................. 7, 16, 20, 21

*In re Chemtura Corp.,*
439 B.R. 561 (Bankr. S.D.N.Y. 2010) .................................................................. 19

*In re Coudert Bros.,*
487 B.R. 375 (S.D.N.Y. 2013) .............................................................................. 33

*In re Cuyahoga Equip. Corp.,*
980 F.2d 110 (2d Cir. 1992) ................................................................................. 10

*In re DBSD N. Am., Inc.,*
419 B.R. 179 (Bankr. S.D.N.Y. 2009) .................................................................... 7

*In re Dreier LLP,*
429 B.R. 112(Bankr. S.D.N.Y. 2010) ................................................................... 10

*In re Drexel Burnham Lambert Grp., Inc.,*
960 F.2d 285 (2d Cir. 1992) ................................................................................. 16

*In re FairPoint Commc'ns, Inc.,*
452 B.R. 21 (S.D.N.Y. 2011) ............................................................................... 11

*In re Granite Broad. Corp.,*
369 B.R. 120 (Bankr. S.D.N.Y. 2007) .................................................................. 23

*In re Indianapolis Downs, LLC,*
486 B.R. 286 (Bankr. D. Del. 2013) ..................................................................... 30

*In re Ion Media Networks, Inc.,*
419 B.R. 585 (Bankr. S.D.N.Y. 2009) .................................................................. 32

iii

*In re Johns-Manville Corp. (Manville III)*,
  517 F.3d 52 (2d Cir. 2008) ........................................................................... 10

*In re Johns-Manville Corp. (Manville IV)*,
  600 F.3d 135 (2d Cir. 2010) ......................................................................... 13

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986),
  *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
  *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) .......................... 22

*In re Karta Corp.*,
  342 B.R. 45 (S.D.N.Y. 2006) .................................................................. 16, 17

*In re Margulies*,
  476 B.R. 393 (Bankr. S.D.N.Y. 2012) .............................................................. 14

*In re Masterwear Corp.*,
  241 B.R. 511 (Bankr. S.D.N.Y. 1999) .............................................................. 11

*In re Metro. 885 Third Ave. Leasehold, LLC*,
  2010 WL 6982778 (Bankr. S.D.N.Y. Dec. 22, 2010) ............................................ 17, 20

*In re Metromedia Fiber Network, Inc.*,
  416 F.3d 136 (2d Cir. 2005) ................................................................. 16, 20

*In re Musicland Holding Corp.*,
  374 B.R. 113 (Bankr. S.D.N.Y. 2007)
  *aff'd*, 386 B.R. 428 (S.D.N.Y. 2008)
  *aff'd*, 318 F. App'x 36 (2d Cir. 2009) ........................................................... 32

*In re Oldco M. Corp.*,
  2010 WL 2910136 (Bankr. S.D.N.Y. Feb. 23, 2010) ............................................... 9

*In re Plant Insulation Co.*,
  469 B.R. 843 (Bankr. N.D. Cal. 2012) ............................................................. 30

*In re Quigley Co.*,
  676 F.3d 45 (2d Cir. 2012) ............................................................ 13, 14, 15

*In re Quigley Co., Inc.*,
  391 B.R. 695 (Bankr. S.D.N.Y. 2008) .............................................................. 22

*In re Residential Capital, LLC*,
  497 B.R. 720 (Bankr. S.D.N.Y. 2013) .............................................................. 11

*In re Rickel & Assocs., Inc.*,
  272 B.R. 74 (Bankr. S.D.N.Y. 2002) .............................................................. 23

*In re Spansion, Inc.*,
  426 B.R. 114 (Bankr. D. Del. 2010) ...................................................................... 30

*In re Trinsum Grp., Inc.*,
  2013 WL 1821592 (Bankr. S.D.N.Y. Apr. 30, 2013) ............................................. 15

*In re Wedtech Corp.*,
  87 B.R. 279 (Bankr. S.D.N.Y. 1988) ...................................................................... 12

*In re WorldCom, Inc. Sec. Litig.*,
  293 B.R. 308 (S.D.N.Y. 2003) ................................................................................ 12

*In re XO Commc'ns, Inc.*,
  330 B.R. 394 (Bankr. S.D.N.Y. 2005) ............................................ 16, 17, 20, 21

*MacArthur Co. v. Johns-Manville Corp. (Manville I)*,
  837 F.2d 89 (2d Cir. 1988) ..................................................................................... 13

*Wiegand v. Tringali*,
  177 N.W.2d 435 (Mich. Ct. App. 1970) ................................................................. 28

**Statutes**

11 U.S.C. § 105 ......................................................................................................... 33

11 U.S.C. § 1123(b)(3)(A) ......................................................................................... 7

11 U.S.C. § 1129 ................................................................................................. 30, 34

11 U.S.C. § 1129(a)(7) .............................................................................................. 30

11 U.S.C. § 368 ......................................................................................................... 33

11 U.S.C. § 510(a) .................................................................................................... 32

12 U.S.C. § 4617(f) ................................................................................................... 20

Fed. R. Bankr. P. 9019 ............................................................................................... 7

N.Y. C.P.L.R. § 1401 ................................................................................................ 12

N.Y. C.P.L.R. § 1402 ................................................................................................ 12

## PRELIMINARY STATEMENT

The Plan before the Court is the culmination of months of intense, arm's-length negotiations between the Debtors, Ally, and the Debtors' key stakeholders and supervised by Judge James Peck. Those efforts resulted in a Global Settlement in which Ally agreed to provide $2.1 billion in exchange for a Debtor Release and a Third Party Release. The Plan, and the Global Settlement on which it is based, have received the support of an overwhelming majority of the Debtors' creditors. More than 95% of non-insider creditors eligible to vote have accepted the Plan and consented to the Releases. Only 64 creditors voted against the Plan. Only five creditors have asserted unresolved objections to the Third Party Release.

In fact, the only major creditor constituency that does not support the Plan—and the Releases it contains—is the Ad Hoc Group of Junior Secured Noteholders. Although a group of junior secured noteholders agreed to an original settlement in which Ally contributed $750 million of financial support, the JSNs now object to the Plan that provides them an even better recovery. The JSNs seek to hold up confirmation of this Plan—and its Releases—in pursuit of post-petition interest which they will receive if entitled. The JSNs' objections to the Third Party Release, and the objections of the four other individual creditors, are meritless.

This is the quintessential case in which a Third Party Release is appropriate and justified. As a threshold matter, the lion's share of creditors whose claims are subject to the Third Party Release have consented to such a release. As to those creditors who have not provided consent, the Third Party Release is fully warranted in light of the substantial contributions that Ally has made to the Debtors over the course of these bankruptcy proceedings—contributions that no other party could or would provide.

Ally's contribution of $2.1 billion in cash is unprecedented. It is the first instance in which a parent entity is providing such a substantial amount of cash to a bankruptcy estate. This

payment alone will materially improve recoveries for the Debtors' creditors. The Debtors' general unsecured creditors will recover more than 30% of their claims under the Plan—as compared to a nominal recovery, at best, under a liquidation scenario. Ally's cash contribution is the source of more than 80% of the estimated funds available for those recoveries.

To be sure, Ally has provided far more than just $2.1 billion in cash. Ally has provided substantial operational support that allowed the Debtors to continue their businesses during these bankruptcy proceedings. Ally enabled the Debtors to continue originating mortgages—by funding those loans through a broker agreement with the Bank—and allowed the Debtors to continue servicing the loans and MSRs that the Bank owned. As a direct result of that support— which no other entity would provide—the Debtors were able to preserve their origination and mortgage service operations, making the Debtors the first mortgage originator and servicer to continue operations during bankruptcy. Ally provided still more operational support, including providing more than $200 million in DIP financing so the Debtors could meet their obligations to Ginnie Mae; serving as the stalking horse bidder for the Debtors' portfolio of held for sale loans; and providing shared services and shared insurance for the Debtors to run their businesses. Those businesses ultimately were sold in these proceedings for $4.5 billion—sales which would not have been possible but for Ally's support.

Ally was only willing to provide this tremendous financial and operational support in exchange for the Debtor Release and the Third Party Release. Ally's substantial contribution, which it was uniquely situated to provide, warrants the Third Party Release—even as to the few creditors who have not provided consent and the handful of creditors who have objected to it.

## FACTUAL BACKGROUND

### Ally's Pre-Petition Support of the Debtors

Beginning in 2007, the global financial markets experienced an extreme economic decline. The value of mortgage-backed assets plummeted, and ResCap (together with its affiliated debtors and debtors in possession, the "Debtors") became unable to access the capital markets to restructure its debt or to obtain a sufficient level of working capital.[1] Ally stepped in to assist: between January 1, 2007 and the Petition Date, Ally supplied the Debtors with more than $8 billion of capital relief in the form of debt forgiveness and infusions of cash and securities. Ally's support allowed the Debtors to meet their tangible net worth covenants and avoid significant defaults under their funding facilities.

### The Debtors' Pre-Petition Analysis of Claims Against Ally and Pre-Petition Settlement

As the Debtors began to prepare for a potential Chapter 11 filing, they and their advisors conducted a comprehensive review of claims that the Debtors and third parties might have against Ally. As part of this review, the Debtors' counsel, in conjunction with counsel for the Debtors' independent directors and financial advisors at FTI Consulting, conducted an in-depth review of related-party transactions between the Debtors and Ally, the Debtors' capitalization and enterprise value, and the legal and factual bases for potential claims against Ally. This investigation formed the basis of the Debtors' pre-petition settlement agreement with Ally (the "Original Settlement"). Under the Original Settlement, Ally agreed to contribute $750 million to the Estates and to provide considerable support during the course of the bankruptcy as set forth below. This Original Settlement had the support of certain junior secured noteholders and certain RMBS investors that comprise the Debtors' largest creditor constituency by claim

---

[1] Capitalized terms used herein without definition have the meanings given to such terms in the Plan.

value—and it ensured the Debtors would have a "soft landing" upon the bankruptcy filing.  On May 14, 2012, the Debtors filed these cases.

### Ally's Support of the Debtors During the Chapter 11 Cases

Ally also agreed to provide substantial operational support to the Debtors throughout the course of these cases.  Ally's support preserved the Debtors' assets and operations, and is directly responsible for the value now available for the Debtors' creditors.  (*See, e.g.*, Debtors' Mot. for Order Authorizing Entry Into Plan Supp. Agreement ("PSA Mot.") ¶ 9, May 23, 2013, ECF No. 3814.)  This support, which Ally was uniquely situated to provide, included:

- Continuing to support the Debtors' origination of mortgages by funding mortgages on market terms pursuant to a broker agreement between Ally Bank and the Debtors, which preserved the Debtors' mortgage servicing platform that ultimately sold for $3 billion;

- Allowing the Debtors to continue servicing Ally Bank's loans and MSRs, rather than having a third-party servicer perform those tasks, which further enhanced the value of the Debtors' servicing platform;

- Providing debtor-in-possession financing of more than $200 million in order to, among other things, facilitate the Debtors' ability to repurchase, or buy-back, the delinquent loans in certain securitization pools as required to preserve the Debtors' ability to continue selling loans to Ginnie Mae;

- Serving as the stalking horse bidder for the Debtors' portfolio of held-for-sale loans, at a bid that was $200 million greater than the bid submitted by Fortress Investment Group;

- Allowing the Debtors to use Ally Bank's portfolio of loans in order to satisfy the Debtors' loan modification obligations to the Department of Justice;

- Continuing to provide shared insurance coverage for the Debtors to allow them to meet their legal and regulatory obligations during bankruptcy without having to obtain their own insurance at cost-prohibitive prices;

- Agreeing to provide shared services to the Debtors prior to the sale of their assets and to prospective purchasers of those assets following such sale; and

- Supporting certain pension obligations of the Debtors to allow them to retain hundreds of employees.

Ally's substantial operational support allowed the Debtors to continue their businesses. Those assets were sold in these proceedings for $4.5 billion, providing a direct and material benefit to the Debtors' creditors. Without Ally's operational support, those asset sales—at those prices—would not have been possible.[2]

### Mediation and Global Settlement

Nonetheless, certain creditor constituencies—including, most notably, the Creditors' Committee—continued to object to the Original Settlement in pursuit of even higher recoveries. On December 26, 2012, the Court appointed the Honorable James M. Peck to serve as a mediator to assist the Debtors, Ally, the Creditors' Committee, and other claimants, in resolving certain issues relating to the formulation and confirmation of a Plan of Reorganization. Beginning in early 2013 and continuing for several months, the parties participated in a good faith, arm's-length mediation process featuring several formal all-day, intensive negotiating sessions and many informal conferences. These discussions involved legal and financial advisors and/or business leaders representing the Debtors and nearly all of their major claimant constituencies.

As a result of these negotiations, on May 13, 2013, Ally, along with the Debtors, the Creditors' Committee, and eighteen of the Debtors' key, and largest, creditor constituencies entered into a Plan Support Agreement ("PSA") to pave the way for the Debtors' exit from bankruptcy. Each party to the PSA agreed to support a proposed Chapter 11 Plan that was ultimately filed with the Court on August 23, 2013.

### The Ally Settlement and Third Party Release

The Plan incorporates a settlement with Ally pursuant to which Ally has agreed to increase the monetary contribution offered in the Original Settlement in exchange for the Debtor Release and the Third Party Release. Ally has committed to contribute $2.1 billion in cash—a

---

[2] The factual statements herein are supported by direct testimony that will be proffered at the Confirmation Hearing.

contribution that it would not have agreed to make absent the Releases. This contribution consists of (i) $1.95 billion in cash and (ii) the first $150 million Ally receives under its directors-and-officers and/or errors-and-omissions insurance coverage or, in any case, an equivalent amount on or before September 30, 2014.

This contribution, which the Plan refers to as the "Ally Contribution," is the primary source of creditor recoveries under the Plan. For example, the Ad Hoc Group of Junior Secured Noteholders ("the "Ad Hoc JSN Group" or, by its members, the "JSNs") will collect the full amount of their claims under the Plan, while under a Chapter 7 liquidation scenario they likely would have recovered less than 80% of their claim value. (*See* Disclosure Statement, Exs. 7 and 8, ECF No. 4819.) Similarly, the Debtors' general unsecured creditors will recover more than 30% of their claims under the Plan, whereas they would have recovered, at most, a nominal amount under Chapter 7 liquidation scenarios. (*Id.*) In fact, the Ally Contribution constitutes more than 80% of the estimated funds available for distribution to unsecured creditors. (*Id.*)

In exchange for Ally's financial and operational support throughout the bankruptcy, the Plan includes a Third Party Release of any and all causes of action against Ally and its officers for conduct arising from or related in any way to the Debtors, these Chapter 11 cases, or the Plan. (*See id.* at Ex. 1 ("Plan") art. IX.D.) Specifically, the Third Party Release provides that:

> On and as of the Effective Date of the Plan, the holders of Claims and Equity Interests, shall be deemed to provide a full and complete discharge and release to the Ally Released Parties and their respective property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan, and any obligations under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment.

(*Id.*)  The Third Party Release is an essential component of the Global Settlement and is critical to Ally's support for the Plan.  Indeed, Ally would not have entered into the Global Settlement—and would not have agreed to contribute $2.1 billion in cash—without the Third Party Release.

### Additional Settlements and Voting on the Plan

Even after entering into the Global Settlement and Plan Support Agreement, the Debtors, the Creditors' Committee, and Ally have continued working to resolve additional claims held by the Debtors' creditors.  In light of those efforts and the support for the Plan garnered via the Plan Support Agreement and Global Settlement, voting on the Plan resulted in nearly unanimous class support at each Debtor.  Indeed, there are very few votes against the Plan, and every key creditor constituency except the JSNs supports the Global Settlement and Plan.

### ARGUMENT

**I.    The Debtor Release Is Appropriate And Justified.**

The Plan's proposed Debtor Release is appropriate and should be approved.  Section 1123(b)(3)(A) of the Bankruptcy Code makes clear that a Chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).  Here, the Debtors propose to release and discharge Ally, the Creditors' Committee, and other consenting claimants from any and all causes of action arising from or related in any way to the Debtors.  Such release is squarely within the Debtors' business judgment and governed by the same Bankruptcy Rule 9019 standard applied to compromises reached by debtors in bankruptcy.  *See, e.g.*, *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289 (Bankr. S.D.N.Y. 2007); *In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009).

Even if a heightened "entire fairness" standard were to apply, the Debtor Release still meets that standard.  The Debtor Release is unquestionably the product of good faith, arm's-

length negotiations among sophisticated parties and facilitated by the Mediator. It resolves a myriad of complex disputes regarding the nature, scope, and validity of potential claims the Estates may have against the released parties, obviating the need for protracted litigation with its attendant expense, inconvenience, and risk. And it is supported by valuable consideration from Ally. In fact, not a single objection to the proposed Plan challenges the Debtor Release. The reason is simple: it is an appropriate exercise of the Debtors' business judgment and satisfies the entire fairness standard.

## II.    **The Third Party Release Is Appropriate And Justified.**

The Debtors' Plan—and the Third Party Release it contains—is largely consensual. Nearly all of the Debtors' creditors have agreed to support the Plan, and have consented to the release of their claims against Ally. There are relatively few creditors who have not expressly agreed to support the Plan—and even fewer who have affirmatively objected to the Third Party Release. Those objections distort the law and ignore the critical facts of these bankruptcy proceedings. This case presents the "truly unusual circumstances" in which a Third Party Release is appropriate and justified.

### A.    **The Third Party Release Is Largely Consensual.**

As a result of the mediation process and the Plan Proponents' efforts to resolve creditor claims, the overwhelming majority of claims subject to the Third Party Release of Article IX.D are being released on a consensual basis. Following months of intensive arm's-length negotiations under the supervision of a court-appointed mediator, the Debtors, the Creditors' Committee, Ally, and a substantial majority of the Debtors' largest claimant constituencies, achieved a Global Settlement. The Creditors' Committee and the Consenting Claimants— including some of the Debtors' largest creditors, such as MBIA, FGIC, a host of securities claimants and others—all agreed to release their claims against Ally.

8

After entering into this settlement, the Debtors, the Creditors' Committee, and Ally have continued working to reach consensus with other creditors to resolve outstanding claims and objections. Those efforts have resulted in numerous additional creditors providing their consent to the Plan and Third Party Release as a result of settlement.

Moreover, all creditors who voted to accept the Plan and those who failed to vote are deemed to have consented to the Third Party Release. The Disclosure Statement and Ballot both make clear that a vote to accept the plan, and a failure to vote, constitute consent to the Third Party Release. (*See* Disclosure Statement; Approved Solicitation Materials at Ex. A-5 ("General Ballot A") at 2, Aug. 23, 2013, ECF No. 4814); *see also Adelphia*, 368 B.R. at 260; *In re Oldco M. Corp.*, 2010 WL 2910136, at *11 (Bankr. S.D.N.Y. Feb. 23, 2010) (Glenn, J.).

The votes have now been cast. More than 95% of non-insider creditors eligible to vote have expressly supported the Plan and consented to the Releases it provides. Only 64 creditors voted against the Plan. Only five creditors have asserted unresolved objections to the Third Party Release: the JSNs, the Collateral Agent for the JSNs, Impac, WFBNA, and Wendy Allison Nora. None of those creditors even have claims against Ally, much less claims that they have asserted. Against this backdrop of overwhelming support, the Third Party Release should be considered substantially consensual.

### B. To The Extent The Third Party Release Is Non-Consensual, It Is Appropriate And Justified.

The Third Party Release is appropriate and warranted even as to the few creditors who have not provided consent—and as to the even fewer creditors who expressly objected to the release. As a threshold matter, this Court has subject matter jurisdiction to grant the Third Party Release. And on its merits, the Third Party Release is justified under the law in light of the truly

unusual circumstances of these cases and the substantial consideration that Ally has provided throughout these cases and has agreed to provide in conjunction with the Plan.

**1.    The Court Has Subject Matter Jurisdiction To Grant The Third Party Release.**

This Court has jurisdiction to release the third party claims against Ally because those claims "directly affect the *res* of the bankruptcy estate." *In re Johns-Manville Corp. (Manville III)*, 517 F.3d 52, 66 (2d Cir. 2008); *accord In re Dreier LLP*, 429 B.R. 112, 131 (Bankr. S.D.N.Y. 2010); *see also In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) ("The test for determining whether litigation has a significant connection with a pending bankruptcy proceeding [sufficient to confer bankruptcy jurisdiction] is whether its outcome might have any 'conceivable effect' on the bankrupt estate."). The third party claims to be released pursuant to the Plan directly affect the *res* of the Estates in two primary ways. *First*, Ally has indemnification and contribution claims against the Debtors for any fees, expenses, losses, and damages that Ally may incur on account of the third party claims—and it has filed proofs of claim pursuant to the Debtors' indemnification and contribution obligations. *Second*, as this Court has previously noted, Ally and the Debtors share certain insurance policies which provide coverage for the claims subject to the Third Party Release. The proceeds from these policies are an asset of the Estates, and allowing the third party claims to continue against Ally would diminish that asset. This Court, therefore, has jurisdiction to grant the Third Party Release.

**a.    Ally has indemnification and contribution claims against the Debtors for the claims subject to the Third Party Release.**

The Court has jurisdiction to grant the Third Party Release because the Debtors are contractually obligated to indemnify Ally—and may be liable to Ally on the basis of contribution—for any losses Ally incurs in defending against the third party claims. Indeed, Ally has filed numerous proofs of claim in these cases on account of the Debtors' indemnification and

10

contribution obligations.  Courts in this district have consistently held that "a bankruptcy court has 'related to' jurisdiction over non-debtor litigation if the estate is obligated to indemnify or contribute to the losing party."  *In re Amanat*, 338 B.R. 574, 579 (Bankr. S.D.N.Y. 2005); *accord In re Residential Capital, LLC*, 497 B.R. 720, 745 (Bankr. S.D.N.Y. 2013) ("In the Second Circuit, 'related to' bankruptcy jurisdiction exists in any civil action where the outcome might have any conceivable effect on [a bankruptcy] estate."); *In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 29 (S.D.N.Y. 2011); *In re Masterwear Corp.*, 241 B.R. 511, 516 (Bankr. S.D.N.Y. 1999) ("In litigation involving non-debtors, 'relatedness' often turns on the estate's obligation to indemnify the losing party.  Where the obligation to indemnify is contractual and absolute, the third party litigation is 'related to' the bankruptcy case.").

Here, the Debtors' are contractually obligated to indemnify Ally for any losses from claims subject to the Third Party Release.  ResCap's Operating Agreement obligates it to indemnify Ally for losses associated with the Debtors' business and operations.  Section 3(c) of the Operating Agreement provides that "ResCap will, to the fullest extent permitted by law, indemnify, defend and hold harmless" the non-debtor Ally entities "from and against any losses related to ResCap Indemnifiable Liabilities."  (Operating Agreement § 3(c).)  The Operating Agreement defines "ResCap Indemnifiable Liabilities" as "Liabilities [that] (a) relate to, (b) arise out of or (c) result principally from" the "businesses and operations ... of ResCap or its Subsidiaries."  (*Id.* § 1.)  Pursuant to the language of the Plan, the claims subject to the Third Party Release are those "arising from or related in any way to the Debtors, including those in any way related to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan."  (*See* Plan art. IX.D.)  In other words, the claims subject to the Third Party Release, including MBS lawsuits and the foreclosure-related actions, "(a) relate to, (b) arise out

11

of or (c) result principally from" the Debtors' "businesses and operations"—and therefore, the

Debtors are contractually obligated to indemnify Ally for any losses related to those claims.

Ally also has a right to seek contribution from the Debtors for any losses associated with

the claims subject to the Third Party Release because it is the Debtors' conduct that gave rise to

such claims.  *See, e.g.*, *In re Wedtech Corp.*, 87 B.R. 279, 288 (Bankr. S.D.N.Y. 1988)

(recognizing that "contribution is permitted for violations of the [federal] securities laws"); N.Y.

C.P.L.R. § 1401 ("[T]wo or more persons who are subject to liability for damages for the same

personal injury, injury to property or wrongful death, may claim contribution among them

whether or not an action has been brought or a judgment has been rendered against the person

from whom contribution is sought."); *see also* N.Y. C.P.L.R. § 1402 ("The amount of

contribution to which a person is entitled shall be the excess paid by him over and above his

equitable share of the judgment recovered by the injured party ….").  The "effect of [these]

contribution claims on the bankruptcy estate is at the very least 'conceivable,'" therefore, the

claims against Ally are "related to the bankruptcy and subject to the jurisdiction of this Court."

*In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 321 (S.D.N.Y. 2003).

Only one objector—WFBNA—challenges this Court's jurisdiction based on the Debtors'

indemnification obligations, but its argument is flawed.  WFBNA's claim against Ally—which

Ally disputes—seeks payment of the fees and expenses its counsel, Winston & Strawn, has

incurred exclusively in these proceedings.  That claim relates to the Debtors' business and

therefore falls within ResCap's contractual indemnification obligation to Ally.[3]  WFBNA

---

[3] The Debtors and Ally had funds in deposit accounts with WFBNA pre-petition.  In anticipation of the Debtors' bankruptcy filing, WFBNA sent a letter to the Debtors and Ally purporting to unilaterally amend the deposit agreement to, among other things, require Ally to pay for all of WFBNA's costs relating to the Debtors' accounts, including attorneys' fees, if Ally did not close its deposit account and cease use of all WFBNA services by April 25, 2012 (*i.e.*, within 38 days).  Ally objected and, in conjunction with the Debtors, began the process of closing the deposit accounts.  WFBNA has asserted no claim on account of the bank accounts—so it is entirely unclear why WFBNA's counsel participated in these proceedings at all.

nonetheless contends that the indemnity obligations under Ally's and the Debtors' deposit agreement with WFBNA—the validity of which is itself in dispute—do not provide this Court with jurisdiction.  This Court's jurisdiction, however, is based on the contractual obligations under ResCap's Operating Agreement—not the terms of the deposit agreement with WFBNA.

>    **b.**    **An asset of the Estates—insurance policies and proceeds that the Debtors share with Ally—will be depleted if the Third Party Release is not granted.**

Ally has certain insurance policies that also provide shared coverage to the Debtors.  As this Court has already noted, those shared policies, and the proceeds from them, are assets of the Estates.  (*See* Hr'g Tr. 125:19-21, July 10, 2012.)  Those policies provide coverage for losses and fees incurred in defending against certain third-party claims that are the subject of the Third Party Release, namely the claims stemming from the Debtors' mortgage-backed securitizations. If those claims were to go forward against the non-debtor Ally entities, the shared insurance policies and proceeds would be depleted, in turn reducing an asset of the Estates.  Accordingly, this Court has jurisdiction to grant the Third Party Release.

It is well settled that insurance policies and proceeds that cover both debtors and their non-debtor parents or affiliates are joint property of the debtors' estate and the non-debtor entities.  *See In re Quigley Co.*, 676 F.3d 45, 53-54, 58 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2849 (2013); *In re Johns-Manville Corp. (Manville IV)*, 600 F.3d 135, 152 (2d Cir. 2010) (per curiam) ("[T]he insurance policies that Travelers issued to Manville are the estate's most valuable asset."); *MacArthur Co. v. Johns-Manville Corp. (Manville I)*, 837 F.2d 89, 92 (2d Cir. 1988) (agreeing with the "[n]umerous courts [that] have determined that a debtor's insurance policies are property of the estate"); *In re The 1031 Tax Grp., LLC*, 397 B.R. 670, 677-78 (Bankr. S.D.N.Y. 2008) (Glenn, J.) (recognizing that shared E&O policy was property of bankruptcy estate).

The Second Circuit addressed a nearly identical factual scenario in *Quigley*, 676 F.3d 45 (2d Cir. 2012)—that court's most recent discussion of bankruptcy court jurisdiction over third-party claims against non-debtors.   *Quigley* stems from lawsuits brought against Quigley regarding asbestos-contaminated products it manufactured, and against Pfizer (which had acquired Quigley) on a theory of derivative liability based on Pfizer permitting its name to appear on the Quigley products.   *Id.* at 47.   On appeal, the Second Circuit held that the bankruptcy court had jurisdiction over the asbestos claims against Pfizer.   The court reasoned that insurance policies shared between Pfizer and Quigley were "the joint property of Pfizer and Quigley's estate"—and, if the asbestos-related actions against Pfizer were allowed to continue, "Pfizer may submit a claim to be paid out of insurance that is this joint property," thus "drawing down [the shared] insurance policies" and depleting an asset of the bankruptcy estate.   *Id.* at 53, 58.

So too here.   As this Court has already stated, the Debtors and Ally share insurance policies and proceeds that are assets of the Estates.   (*See* Hr'g Tr. 125:19-21, July 10, 2012.) Ally and the Debtors are entitled to use the insurance proceeds to satisfy defense costs, settlements, and judgments for claims covered by the Third Party Release.   As this Court further noted, the shared insurance "is a wasting policy, meaning that every dollar spent of policy proceeds reduces the amount available for claims by the debtors." (*Id.* at 138:7-10.)  If the third-party claims against Ally are not released, the shared insurance proceeds will be depleted to pay for Ally's defense costs and any settlements or judgments, thus reducing the proceeds available to the Debtors and depleting an asset of the Estates.   *See Quigley*, 676 F.3d at 47-48, 58; *In re Margulies*, 476 B.R. 393, 400 (Bankr. S.D.N.Y. 2012) ("The bankruptcy court ... has jurisdiction over third-party non-debtor claims that affect the estate's rights in its insurance policies."); *In re*

14

*Trinsum Grp., Inc.*, 2013 WL 1821592, at *5 (Bankr. S.D.N.Y. Apr. 30, 2013) (Glenn, J.) ("*Quigley* makes clear that any suit that ultimately will be paid out of an insurance policy affects the *res* of the estate, if such a policy is property of the estate.").

The objectors do not address *Quigley* or its application here. Instead, they contend that this Court lacks jurisdiction because their claims against Ally are direct—not derivative—claims. (*See, e.g.*, Impac Obj. at 10-12, Oct. 21, 2013, ECF No. 5401; Wells Fargo Obj. at 16-18, Oct. 21, 2013, ECF No. 5410; U.S. Tr. Obj. at 9, Oct. 21, 2013, ECF No. 5412; JSN Obj. at 44, Oct. 22, 2013, ECF No. 5443.) That assertion is premised on an incorrect statement of the law. None of the Second Circuit's decisions addressing bankruptcy court jurisdiction over third-party claims against non-debtors has held that the action must be derivative of a claim against the debtor in order for the bankruptcy court to have jurisdiction—not *Manville III*, *Manville IV*, or any other decision. Indeed, in *Quigley*, the Second Circuit expressly rejected such an argument, stating: "[*Manville III*] did not impose a requirement that an action must … be derivative of the debtor's rights and liabilities for bankruptcy jurisdiction over the action to exist. Our more recent decision in *Manville IV* made more explicit the fact that in *Manville III* derivative liability was discussed not as an independent jurisdictional requirement …." *Quigley*, 676 F.3d at 57. The *Quigley* court further stated that a "suit against a third party alleging liability not derivative of the debtor's conduct but that nevertheless poses the specter of direct impact on the *res* of the bankrupt estate may just as surely impair the bankruptcy court's ability to make a fair distribution of the bankrupt's assets as a third-party suit alleging derivative liability." *Id.* at 58. Because the claims here would directly impact the *res* of the Estates—through the indemnification obligations and the depletion of shared insurance policies and proceeds—the Court has jurisdiction to grant the Third Party Release.

2.      ***The Third Party Release Is Appropriate Because Ally Has Provided Unique and Substantial Consideration That Is Important And Essential To The Debtors' Plan.***

The Third Party Release is appropriate in light of the "truly unusual circumstances" of this case and the substantial consideration Ally has provided during these cases and will provide under the Plan, which "render[s] the release terms important to success of the plan." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142-43 (2d Cir. 2005); *accord In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992) ("In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan."). In *Metromedia*, the Second Circuit articulated various circumstances in which non-consensual third-party releases have been approved, including when the non-debtor provides the estate with substantial consideration, when the released claims would indirectly impact the debtor's reorganization "by way of indemnity or contribution," when the released claims are "channeled" to a settlement fund rather than extinguished, and when the plan otherwise provides for the full payment of the released claims. 416 F.3d at 142. Although the analysis "is not a matter of factors and prongs," third party releases are justified in those "unusual circumstances" where the release is "important to success of the plan." *Id.* at 142-43; *accord In re Charter Commc'ns*, 419 B.R. 221, 258-59 (Bankr. S.D.N.Y. 2009); *In re Karta Corp.*, 342 B.R. 45, 55-57 (S.D.N.Y. 2006); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007); *In re XO Commc'ns, Inc.*, 330 B.R. 394, 437-40 (Bankr. S.D.N.Y. 2005). This case presents the "truly unusual circumstances" that justify the Third Party Release.

a.      **Ally has provided and will provide unique and substantial consideration to the Debtors' Estates under the Plan.**

Over the course of these bankruptcy proceedings, Ally has provided—and will continue to provide—significant consideration to the Estates in the form of both financial and operational

support.  First and foremost, Ally has agreed to pay $2.1 billion in cash to the Estates, including

$150 million from proceeds of any settlement that Ally reaches with its insurance carriers (an

amount Ally has guaranteed).  This case is the first time that a parent entity will provide more

than $2 billion in cash to a bankruptcy estate—and that substantial cash infusion has materially

increased creditor recoveries.  For example, the JSNs will collect the full amount of their claims

under the Plan as a result of Ally's contribution, and unsecured creditors will receive more than

30% of their claims under the Plan, multiple times what they would receive, if anything, without

Ally's cash contribution.   (*See* Disclosure Statement, Exs. 7 and 8.)   In fact, the Ally

Contribution constitutes more than 80% of the estimated funds available for distribution to

unsecured creditors.  (*Id.*)  That substantial cash contribution alone warrants the Third Party

Release.  *See In re Metro. 885 Third Ave. Leasehold, LLC*, 2010 WL 6982778 (Bankr. S.D.N.Y.

Dec. 22, 2010) (approving third-party releases where non-debtor beneficiary waived claims

worth more than $160 million); *XO Commc'ns*, 330 B.R. at 437-40.

Ally's contributions to the Estates go far beyond a "mere ... financial contribution."

*Karta*, 342 B.R. at 55.  Ally also has provided significant operational support that was essential

to the success of the Debtors' bankruptcy.  The Debtors' filing was the first time that a subsidiary

of a bank holding company has filed for bankruptcy as a going concern, and it is the first time

that a mortgage originator and servicer has been able to continue operations during bankruptcy

and ultimately sell its assets as a going concern—all directly because of Ally's support.  Ally

Bank entered into a broker agreement with the Debtors that called for Ally Bank to fund the

mortgages on market terms—a step that no other party was willing to take—and pay the Debtors

a market-based broker fee in the process.  Ally Bank also entered into direct relationships with

Fannie Mae and Freddie Mac on the eve of the Debtors' bankruptcy to further facilitate the

Debtors' continued mortgage sales. And Ally Bank allowed the Debtors to continue servicing the loans and MSRs that the Bank owned.

Ally Bank's support enabled the Debtors to continue their origination business and to continue servicing loans that the Debtors had sold to the Government-Sponsored Enterprises (Fannie, Freddie, and Ginnie).  Indeed, the GSEs indicated that they would revoke the Debtors' authorization to service loans sold to those GSEs if the Debtors did not have the ability to originate mortgages throughout their bankruptcy proceedings.  In other words, without Ally's support throughout the bankruptcy, the Debtors would have had neither the ability to originate mortgages nor the ability to service them.  Originating and servicing loans were the lifeblood of the Debtors' operations—and without Ally's support, the Debtors' businesses would not have survived, and they certainly would not have been sold at auction for $4.5 billion.

Continuing to originate mortgage loans throughout the bankruptcy was also essential to the Debtors' ability to comply with the DOJ/AG consent judgment resolving claims related to the Debtors' foreclosure practices.  That settlement requires the Debtors to provide their borrowers with $200 million in mortgage-related relief, primarily by refinancing their loans.  The Debtors could not have refinanced those loans—and thus, could not comply with the terms of the consent judgment—if they had been unable to originate new mortgages.  That failure, in turn, could have led to stiff financial penalties for the Debtors or, potentially, a cease and desist order from the Government.  The former would have been bad enough for the Debtors, but the latter would have effectively ended their ability to continue originating and servicing mortgage loans.

Ally provided still more support that was crucial to the Debtors' ongoing business operations.  The Debtors' ability to sell loans to Ginnie Mae was conditioned on the Debtors' agreement to repurchase, or buy-back, the delinquent loans in a given securitization pool if the

delinquency rate exceeds a specified threshold.  On the eve of their bankruptcy filing, the Debtors anticipated that those repurchase obligations would require additional funding that the Debtors did not have.  Their primary DIP lender, Barclays, would not provide that funding, and the Debtors could not find it elsewhere in the market.  Ally stepped in and gave the Debtors more than $200 million in DIP financing so that the Debtors could satisfy their obligations with Ginnie Mae—allowing the Debtors to preserve their ability to continue selling loans to Ginnie Mae.

Ally provided still more operational support, including: permitting the Debtors to use Ally Bank's portfolio of loans so that the Debtors could satisfy their obligations under the DOJ/AG consent judgment, something no other mortgage originator was willing or able to do; providing insurance coverage for the Debtors following the Petition Date as part of a shared insurance policy with Ally so the Debtors could satisfy their legal and regulatory obligations; providing certain shared services during the bankruptcy proceedings and on a transition basis to the buyer of the Debtors' assets; supporting pension obligations of the Debtors; and serving as the stalking horse bidder for the Debtors' portfolio of HFS loans at a bid that was $200 million more than Fortress submitted.[4]

Both individually and in aggregate, Ally's consideration to the Estates is plainly unique and substantial.  Far from the type of routine concessions that "creditors have to [make] in every chapter 11 case," *In re Chemtura Corp.*, 439 B.R. 561, 611 (Bankr. S.D.N.Y. 2010), Ally's contributions significantly exceed the efforts of typical Chapter 11 creditors.   And those contributions—which Ally was uniquely situated to provide—have proven to be essential to the

---

[4] The fact that Ally provided some of this consideration over the course of the Debtors' bankruptcy proceeding is no basis for rejecting its importance to the success of the Debtors' Plan.  Indeed, courts do not predicate such a finding on the timing of the consideration. *See, e.g.*, *Adelphia*, 368 B.R. at 268 (finding that both financial and non-financial consideration given in the past was substantial, noting that the non-debtors had already "put in $17.5 billion into th[e] estate, and agreed to rework their agreements to take the Debtors' assets in a section 363 sale").

success of the Debtors' restructuring efforts.[5]   Ally's contributions to the Debtors warrant the

Third Party Release and makes this case one of those "truly unusual circumstances" where a

non-debtor release is appropriate.  *See, e.g.*, *Metromedia*, 416 F.3d at 142-43; *Metro*. 885, 2010

WL 6982778 (granting third-party release where non-debtors' consideration facilitated the

debtors' business objectives and was "essential to the success of the Plan"); *Charter*, 419 B.R. at

259 (granting third-party releases to non-debtors who provided "very substantial consideration in

a rare restructuring context"); *XO Commc'ns*, 330 B.R. at 439-40 (non-debtor's voluntary

consent to resolve certain litigation necessary for success of plan was "unique circumstance[]"

warranting third-party release).[6]

> ### b.    The Debtors and Ally also share an identity of interest with respect to the claims subject to the Third Party Release.

The identity of interest between Ally and the Debtors with respect to the claims subject to

the Third Party Release is yet another factor that justifies the Third Party Release.   In

*Metromedia*, the Second Circuit specifically noted that a third party release may be appropriate

when "the enjoined claims would indirectly impact the debtor's reorganization 'by way of

indemnity or contribution.'" 416 F.3d at 142.   Following *Metromedia*'s guidance, courts have

often recognized an identity of interest between the debtor and non-debtor as a basis for granting

a third-party release.  *See, e.g.*, *Charter*, 419 B.R. at 258-59 (granting release based in part on the

"identity of interest between the debtors and the non-debtor releasees by indemnification

---

[5] The JSNs assert that the Third Party Release cannot be deemed "necessary" to the Plan because the Plan previously carved out one entity—the FHFA—from the release.  That ignores the special statutory protections afforded to the FHFA, including the anti-injunction provision of the Housing and Economic Recovery Act of 2008 ("HERA"), 12 U.S.C. § 4617(f), which prevents courts from taking any action to restrain the exercise of powers or functions of the FHFA as a conservator or receiver.   And in any event, Ally has since reached a settlement of the FHFA's claims against it and such claims are no longer carved out of the Third Party Release.

[6] The truly unique circumstances of this case include the fact that Ally is 74% owned by the United States Treasury—and thus the American taxpayers—by virtue of its $17 billion infusion into Ally in recognition of Ally's importance to the future success of the automobile industry.  Granting the Third Party Release will allow Ally to dedicate its effort and resources to repaying the U.S. Treasury and the American taxpayers.  The beneficial impact that will result from that fact alone distinguishes this case from others seeking third-party releases.

agreements"); *XO Commc'ns*, 330 B.R. at 440 (approving third-party release based partly on the "identity of interest present as a result of indemnification/contribution exposure of the Debtor").

The Debtors and Ally have an identity of interest because, as set forth above, the Debtors have contractual indemnification obligations to Ally for any losses arising from the claims subject to the Third Party Release. Because "the third party releases are congruent with the [Debtors'] indemnification obligations, and the Debtors would be liable for any liability imposed on [the non-debtor Ally entities], third-party releases are acceptable." *Adelphia*, 368 B.R. at 268; *accord Charter*, 419 B.R. at 258-59.

## C.    The Objectors' Challenges To The Third Party Release Lack Merit.

Several objectors—including the JSNs, WFBNA, Impac, and the U.S. Trustee—nonetheless contend that the Third Party Release is inappropriate.[7]  Their assertions lack merit.

### 1.    The JSNs Lack Standing To Challenge The Third Party Release.

As a threshold matter, the JSNs have no standing to challenge the Third Party Release. Pursuant to the terms of the Plan, the JSNs are being paid in full with accrued pre-petition interest and any post-petition interest to which they may be entitled—treatment that is better than the JSNs agreed to prior to the petition date, and better than they could have possibly achieved absent the Global Settlement. Accordingly, the Plan already provides for the JSNs to receive everything they are entitled to receive regardless of whether the Court approves or disapproves of the Third Party Release. Nor have the JSNs articulated any valid claim against Ally that would be subject to the Third Party Release. The sole claim that the JSNs identify—the

---

[7] Impac has not asserted or identified any claims against Ally. Ally has litigation against Impac unrelated to the Debtors, and has proposed that Impac preserve its rights relating to that litigation. Impac has denied the offer. Instead, Impac asks that Ally release it from Ally's claims unrelated to the Debtors in exchange for Impac withdrawing its objection to the Third Party Release. Despite Impac's position, at Ally's request, the Plan Proponents will include in the confirmation order a preservation of rights for Impac regarding the litigation. The Court therefore should deny Impac's objection as meritless.

"potential damage claims" that the JSNs "can potentially pursue" against Ally pursuant to the

Intercreditor Agreement, (JSN Obj. at 7, 45)—are meritless, as set forth below.[8]

Against that backdrop, the JSNs' challenge to the Third Party Release should be seen for

what it is: a transparent attempt to derail the Plan by attacking a provision that will not impact

them. This is improper. Courts in this district have held that parties do not have standing to

object to aspects of a plan—including a third-party release—that do not affect their rights. *See,*

*e.g.*, *In re Quigley Co.*, 391 B.R. 695, 705-06 (Bankr. S.D.N.Y. 2008) (objectors were "limited to

challenging the Plan provisions and raising the confirmation objections that directly affect their

contractual rights and interests" because "a 'party in interest' cannot assert third party rights

defensively to defeat confirmation even if confirmation would directly and adversely affect its

own rights"); *In re Johns-Manville Corp.*, 68 B.R. 618, 623 (Bankr. S.D.N.Y. 1986) ("[N]o party

may successfully prevent the confirmation of a plan by raising the rights of third parties who do

not object to confirmation."), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-*

*Manville Corp.*, 843 F.2d 636 (2d Cir. 1988). The JSNs lack standing to object to the Third

Party Release.

### 2. The JSNs Challenge To Ally's Contribution Is Factually And Legally Incorrect.

The JSNs question the amount of Ally's monetary contribution to the Estates, implying

that the $2.1 billion in cash is too low to justify both the Third Party Release and the Debtor

Release. (JSN Obj. at 46.) As support, the JSNs point to the Examiner's Report for assertions

regarding the potential value of claims that the Estates could potentially bring against Ally. As

an initial matter, any findings and conclusions in the Examiner's Report are not evidence—they

---

[8] The JSNs' assertion that they should be excluded from the Third Party Release because Ally cannot identify claims the JSNs have against Ally has it entirely backwards. Rather, because the *JSNs* cannot identify any claims they have against Ally as an initial matter, the JSNs lack standing to challenge the entry of that release.

are inadmissible hearsay. *See, e.g.*, *In re Granite Broad. Corp.*, 369 B.R. 120, 128 n.10 (Bankr. S.D.N.Y. 2007); *In re Rickel & Assocs., Inc.*, 272 B.R. 74, 87-88 (Bankr. S.D.N.Y. 2002). Further, as a matter of law, when evaluating the appropriateness of a proposed third party release courts do not weigh the value of financial consideration provided against the potential damages from claims subject to the release. That makes sense: such a balancing act would require either an assumption on the merits of the claims or a resolution of them—and that is not required. In all events, the potential claims on which the JSNs rely have little, if any, value to the Estates.

### a.    The MSR swap claim is meritless.

The JSNs' claim that Ally Bank should have been paying GMAC Mortgage the initial capitalized value of MSRs from loans purchased from correspondents, in addition to the initial capitalized value of MSRs for Bank-originated loans, is meritless. The claim has no basis in the terms of the MSR Swap's governing documents, contradicts the parties' intent and conduct, and makes no economic sense.

The MSR Swap was a great deal for GMAC Mortgage: the swap enabled it to receive all of the economics of MSRs without having to own the asset. In that way, the MSR Swap functioned as a total return swap. In exchange, GMAC Mortgage paid Ally Bank a LIBOR-based rate of return. The parties' intent was for the MSR Swap to provide all of the economics to GMAC Mortgage while having no impact on the Bank's income statement except the LIBOR-based return.

Upon entering into the MSR Swap, Ally Bank would acquire MSRs through two primary method: first, it could originate a loan with its own funds and sell that loan to GMAC Mortgage while retaining the MSR; second, it could purchase a loan and its MSR from a third-party correspondent and then sell the loan to GMAC Mortgage while retaining the MSR. The economics of those MSRs were swapped between the parties pursuant to an ISDA Master

Agreement and two separate schedules—a Fair Market Value (FMV) Schedule and a Net Funding Schedule. Once MSRs were capitalized onto the Bank's books, the daily mark-to-market changes in the MSRs' value would transfer between the parties pursuant to the FMV Schedule—if the value of the Bank's MSR asset increased, the Bank would pay the increase to GMAC Mortgage; GMAC Mortgage would pay any decrease to the Bank. The Net Funding Schedule shifted all of the economics of servicing—the servicing-related income and fees—to GMAC Mortgage in exchange for the LIBOR-based return to the Bank.

The JSNs assert that Ally Bank was obligated to pay GMAC Mortgage the initial capitalized value of MSRs from loans purchased from correspondents—but the swap documents do not require that. The FMV Schedule governed the parties' payments concerning value changes in the Bank's MSR asset. It calls for the parties to make payments to one another based on changes in the Bank's MSR value from "FAS 156 mark-to-market" entries. Assets are marked to market once they are on the Bank's book—in other words, after an asset has been capitalized onto the Bank's balance sheet. The initial capitalization of a purchased asset—such as MSRs that the Bank purchases from correspondents—is not a mark-to-market entry. Therefore, the FMV Schedule does not obligate the Bank to pay GMAC Mortgage the initial capitalized value of MSRs from loans purchased from correspondents.

Nor did the parties intend for the FMV Schedule to require Ally Bank to pay GMAC Mortgage the initial capitalized value of MSRs from loans purchased from correspondents. The purpose of the MSR Swap was for the Bank to hedge its MSRs by passing all of their economics to GMAC Mortgage, leaving the Bank with no impact on its income statement except for the LIBOR-based return. The way to achieve that objective was for the Bank to pass along the capitalized value of MSRs from Bank-originated loans, but not for MSRs from loans purchased

from correspondents. That different treatment is due to the difference in the cost of those assets from the Bank's perspective:

- When the Bank originates a loan, the MSR is embedded within that loan: the Bank pays to fund the loan, but there is no cost for the MSR. When the Bank sells the loan to GMAC Mortgage but retains the MSR, value is created; there is a new, stand-alone asset. Retaining that MSR asset results in a gain on the Bank's income statement. For the Bank to remain income-statement neutral, the value of that gain must be passed to GMAC Mortgage under the FMV Schedule.

- In contrast, when the Bank purchases loans and their corresponding MSRs from a third-party correspondent, it pays the seller a purchase price that includes premium for the servicing rights. When the Bank capitalizes this MSR on its books, there is no gain on its income statement; it paid to purchase the MSR and capitalized that asset at the same value. In order for the Bank to remain income-statement neutral, the initial capitalized value of this MSR does not pass to GMAC Mortgage.

If the Bank were obligated to pay GMAC Mortgage the initial value of MSRs from loans purchased from correspondents, it would be paying twice for that asset—once to the correspondent, and once to GMAC Mortgage. That would make no economic sense, would have a negative impact on the Bank's income statement, and likely would have raised regulatory scrutiny. Neither party intended for the MSR Swap to work that way. Nor did they implement its terms in such a manner. The JSNs' claim is meritless and should be rejected.

### b.      The revenue allocation claim is meritless.

The JSNs' claim that the Bank misallocated revenues on loans brokered to the Bank by GMAC Mortgage is similarly meritless. The claim, essentially, is that the Bank overcharged GMAC Mortgage for brokered loans it sold back to GMAC Mortgage, resulting in a misallocation of revenues. The JSNs are incorrect. The July 1, 2008 Master Mortgage Loan Purchase and Sale Agreement ("MMLPSA") defined the price that GMAC Mortgage paid the Bank for loans, including loans brokered into the Bank after January 1, 2009. The Bank charged GMAC Mortgage the price set forth in the MMLPSA.

The MMLPSA defined the purchase price of a loan as the "Cost Basis plus reserves associated with such First Lien Mortgage Loan." (MMLPSA art. 1.24.)  In turn, "Cost Basis" is defined as "net carrying value, as defined by accounting principles generally accepted in the United States of America (as amended) to include without limitation the unpaid principal balance of such Mortgage Loan, plus or minus any premium or discount paid, net deferral fees or costs, accrued interest and basis adjustments from derivative loan commitments, hedge accounting or lower of cost or market adjustments."  (*See id.* art. 1.9.)

Under the terms of the MMLPSA, the price that GMAC Mortgage paid for first lien mortgage loans was the Bank's "net carrying value, as defined by" GAAP.  On August 1, 2009, the Bank elected fair value accounting.  As a result, loans that the Bank originated were recorded on the Bank's books at the loan's fair value at the time of origination.  And when the Bank sold the loans to GMAC Mortgage pursuant to the MMLPSA, the price it charged was the "net carrying value" of the loans as defined by GAAP—*i.e.*, the loan's fair value—even if that was different from the Bank's cost basis in the loan.  The Bank therefore would be left with the difference—whether positive or negative—between the loan's fair value and the Bank's cost basis in the loan.

Over the course of 2009 and 2010, the mortgage market changed to a "premium pricing" market: consumers would pay a higher interest rate than downstream investors demanded in exchange for low/no closing costs such as points or rate buydowns.  As a result of that shift, a loan's fair value would often exceed a lender's cost basis in the loan.  The combination of that market shift and the MMLPSA's definition of the cost that GMAC Mortgage paid for loans left the Bank retaining so-called "day one" gains—the gains that resulted from a consumer paying a higher coupon than the investor market required.  A now-former employee questioned whether

the Bank's retention of these gains was appropriate, and the Bank and ResCap investigated the issue in early 2012. Both the Bank and ResCap agreed that GMAC Mortgage had paid the appropriate price required under the MMLPSA—and Ally's Internal Audit and Global Security and KPMG (who AFI had retained to investigate the issue) both concurred.

For the period from January 1 to July 31, 2009—the time frame from the broker arrangement's inception until the Bank shifted to fair value accounting—the Bank had elected to use hedge accounting for its Held-for-Sale ("HFS") portfolio and therefore accounted for HFS loans at fair value. The "net carrying value" for HFS loans was thus fair value during this period. Here too, the proper purchase price pursuant to the MMLPSA was the loan's fair value. The Bank, however, had undercharged GMAC Mortgage for loans sold during that time— effectively charging GMAC Mortgage its cost basis in the loan. The Bank and ResCap discovered this error in early 2012—when investigating the former employee's claims—and determined that the difference between what GMAC Mortgage paid and what it should have paid was approximately $47 million. In order to correct this issue, GMAC Mortgage paid the Bank $47 million plus interest, as required by regulation, in early 2012.

In short, the plain language of the MMLPSA is clear: GMAC Mortgage is contractually obligated to pay the "net carrying value" of the loan, as defined by GAAP. At all times after the broker arrangement was implemented—from January 1, 2009 through the Petition Date—the Bank's net carrying value for loans sold to GMAC Mortgage was the fair value of the loan— first, as a result of the Bank's hedge accounting election for its HFS portfolio, and then pursuant to the Bank's change to fair value accounting. That is the price that GMAC Mortgage has paid for loans it purchased from the Bank. Therefore, any breach of contract claim concerning a misallocation of revenues between the Bank and GMAC Mortgage is meritless.

c.      **The tax allocation agreement claim is meritless.**

The JSNs' claim regarding a draft 2009 tax allocation agreement is similarly meritless for multiple reasons. *First*, the Draft Tax Allocation Agreement is not—and never was—an enforceable contract. Although it was partially executed, the parties did not intend to be bound until the document was fully executed—and ResCap never signed it. Whether a binding contract exists turns on the intent of the parties. If the parties intend that the contract will not be enforceable until all parties have signed a formal written agreement, that intent controls. *See Wiegand v. Tringali*, 177 N.W.2d 435, 437 (Mich. Ct. App. 1970) ("In cases where a writing which purports to evidence a contract between several named persons has been signed by less than all those named, it is often found that the signers did not intend to become contractually bound until all the apparent parties sign and deliver the writing. This is not, however, immutable doctrine. ... Their intention governs."). ResCap's Board authorized senior management to execute the agreement—but that authorization was not sufficient to bind ResCap. ResCap still had to execute the agreement—and neither party intended to be bound until the document was fully executed by both sides.

*Second*, Ally's Chief Accounting Officer, who signed the Draft Tax Allocation Agreement, did not have authority to do so. The Draft Tax Allocation Agreement would have required Ally to make payments to ResCap well in excess of $50 million; under GAAP, those payments would have been accounted for as capital contributions. Pursuant to an October 2009 express reservation of authority, only Ally's Board could approve capital contributions of $50 million or more—a fact of which ResCap was well aware. (*See* Oct. 5, 2009 Minutes of Special Meeting of Ally Board (ALLY_0115241-43 at ALLY_0115243); Dec. 30, 2009 Unanimous Consent to Action and accompanying memorandum (ALLY_PEO_0075648-57 at ALLY_PEO_0075657) (showing ResCap's express knowledge of $50 million threshold for Ally

28

Board approval).) Ally's Board did not review or approve the Draft Tax Allocation Agreement, and therefore the Chief Accounting Officer's signature could not bind the company.

*Third*, ResCap's decision not to sign the Draft Tax Allocation Agreement was entirely reasonable. Ally and ResCap were in thoughtful, deep discussions about Ally providing permanent capital to ResCap at the time of the tax allocation agreement negotiations, and those discussions were extremely important to ResCap. As a result, when Ally alerted ResCap that the Draft Tax Allocation Agreement had not been appropriately vetted with senior management and that the terms potentially—and unintentionally—compelled Ally to make large cash payments to ResCap that would be accounted for as capital contributions, ResCap decided not to sign the agreement and risk upsetting Ally. ResCap's decision made sense, particularly in the context of maintaining a strong relationship with the lender of last resort to ResCap at that time.

For these reasons, any claim on account of the Draft Tax Allocation Agreement is meritless.[9]

### 3.    *The Third Party Release binds unimpaired creditors.*

The JSNs' assertion that the Third Party Release cannot apply to them because "the Plan Proponents have chosen to treat the JSN Claims as 'unimpaired' at certain Debtors," (JSN Obj. ¶ 99), fails as a matter of law. The basis of the JSNs' objection is that the imposition of the Third Party Release would impermissibly alter their rights. But in light of the Plan's guarantee that the JSNs will be paid the full value of their claims, the effect of the Third Party Release is irrelevant as a matter of law. Indeed, courts have frequently held that a debtor's payment in full

---

[9] Even if the Draft Tax Allocation Agreement was enforceable, the JSNs' damages projection is flawed and overstated. The JSNs' damages of $2.24 billion contains a material error: the calculation is circular because it includes the amount paid for the settlement of damages in the calculation of those damages. The JSNs' own expert acknowledges as much, conceding that "if part of the payment was for a comprehensive release, then it shouldn't be included in the calculation of the damages for the tax claim." (Nov. 11, 2013 Dep. of R. Lyons at 380:10-20; *see id.* at 379:2-380:24.) Correcting for this error but still applying the JSNs' methodology reduces potential damages by over $700 million.

of unimpaired creditors' claims is sufficient consideration for third party releases. *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) (holding that "these creditors are being paid in full and have therefore received consideration for the [third party] releases"); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (overruling "the objection to the extent that the [U.S. Trustee] opposes applying the third party release to those parties who are 'deemed' to have accepted the Plan," because such parties were unimpaired).

### 4.    The Plan satisfies the "best interests of creditors" test.

Finally, the Third Party Release will not cause the Plan to violate Bankruptcy Code § 1129(a)(7)'s "best interests of creditors" test, as asserted by the JSNs and WFBNA. (*See* JSN Obj. ¶ 108; WFBNA Obj. ¶ 9, Oct. 21, 2013, ECF No. 5411.) Rather, all creditors would receive far less in a hypothetical Chapter 7 liquidation than they do under the Plan. For their part, the JSNs are being paid in full. They are in the "best" position possible, and there is no scenario in which the Plan would fail the "best interests" test as to the JSNs' claims. Moreover, the "best interests of creditors" test does not apply to the potential release of WFBNA's alleged claims against Ally under the Plan. The "best interests" test addresses only the amount a dissenting creditor would receive or retain on account of its claims *against the debtor* in a hypothetical Chapter 7 liquidation—not on account of claims the creditor may have against non-debtor third parties. *See In re Plant Insulation Co.*, 469 B.R. 843, 886-88 (Bankr. N.D. Cal. 2012) (construing the term "claim" in section 1129 to refer only to a liability of the debtor), *rev'd on other grounds*, 2013 WL 5779568, at *13 (9th Cir. Oct. 28, 2013).

In any event, WFBNA's assertion that it "would receive full recovery on its claims from [Ally] in a Chapter 7 ResCap bankruptcy" is wholly unsupported. (*See* WFBNA Obj. ¶ 2.) As noted above, Ally vigorously disputes WFBNA's claims, which are based on the unnecessary

accrual of attorneys' fees related to these cases.  WFBNA's meritless claim should not entitle it

to hold up this Court's imposition of the Third Party Release.

III.    **The JSN Objection Ignores Key Provisions Of The Intercreditor Agreement That Should Be Enforced By This Court.**

In addition to overruling the JSNs' various objections to the Third Party Release, the

Court should overrule the remainder of the JSNs' objections, raised in their capacity as secured

noteholders.  Those objections depend in large part on the JSNs' argument that the Plan does not

adequately account for the JSNs' liens on certain collateral—namely, certain intercompany

claims (such as accounts receivable), certain litigation claims against Ally, and certain equity

pledges in entities—and that the JSNs have been impaired by the treatment of certain of this

collateral.  Although Ally takes no position on the validity of these liens, *see* Intercreditor

Agreement § 2.2 (EXAM00114100-82 at EXAM00114112), even assuming for the sake of

argument that the liens are valid, the JSNs' ability to recover on their direct liens is severely

curtailed—if not outright eliminated—because the JSNs are not entitled to the proceeds from this

collateral in the first instance.  Rather, under the plain terms of the Intercreditor Agreement the

JSNs signed and do not contest, any proceeds flowing to the ResCap grantors must first go to pay

off the first-priority lienholder—Ally—before any such proceeds flow to the third-priority

lienholders—the JSNs.  As such, the JSNs' objection that they are not impaired by the treatment

of the collateral does not tell the entire story.  The JSNs fail to address this straightforward

contractual point.

It bears noting at the outset that the JSNs have never contended that the Intercreditor

Agreement is not valid and binding as to them.  To the contrary, the JSNs concede that they are

"in contractual privity with Ally under an intercreditor agreement."  (JSN Obj. ¶ 13.)  And that

agreement is binding on the JSNs, as they raise objections based on their capacity as secured

noteholders.    Indeed, there is no question that intercreditor agreements are binding and enforceable in bankruptcy cases. *See* 11 U.S.C. § 510(a) (providing that "[a] subordination agreement is enforceable in a case under [the Bankruptcy Code] to the same extent that such agreement is enforceable under applicable nonbankruptcy law"); *In re Ion Media Networks, Inc.*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009) (holding that an intercreditor agreement was "strictly enforceable in accordance with its terms"); *In re Musicland Holding Corp.*, 374 B.R. 113, 121 (Bankr. S.D.N.Y. 2007) (enforcing the "unambiguous provisions" of an intercreditor agreement), *aff'd*, 386 B.R. 428 (S.D.N.Y. 2008), *aff'd*, 318 F. App'x 36 (2d Cir. 2009).

Likewise, there is no question that the terms of the Intercreditor Agreement plainly and unambiguously provide that any proceeds received by the grantors—including with respect to the collateral at issue here—must first go to pay Ally.  Specifically, section 3.1 of the Intercreditor Agreement states that "[u]ntil the Discharge of First Priority Claims has occurred … the [JSNs] agree[] that [they] will not … take or receive any Collateral or any proceeds of Collateral unless and until the Discharge of First Priority Claims has occurred."   (Intercreditor Agreement § 3.1(b)(1) (EXAM00114116).)  Similarly, the JSNs agreed in section 3.2 that "unless and until the Discharge of First Priority Claims has occurred, [they] will not, and shall be deemed to have waived any right to, commence, or join with any Person in commencing any enforcement, collection, execution, levy or foreclosure action or proceeding with respect to any Lien held by it."   (*Id.* § 3.2(a) (EXAM00114118).)   If proceeds of collateral are received by the third-lien holders (the JSNs) before the first-lien holder (Ally) is paid off, the Intercreditor Agreement expressly provides that the proceeds will "be segregated and held in trust and ***forthwith paid over to the First Priority Collateral Agent for the benefit of the First Priority Secured Parties*** in the same form as received."  (*Id.* § 4.2(a) (EXAM00114120) (emphasis added).)

It is undisputed that Ally's first-priority liens have not been discharged.  Among other things, Ally's "First Priority Claims" include "interest accrued or accruing (or which would, absent the commencement of an Insolvency Proceeding, accrue) after the commencement of an Insolvency Proceeding … whether or not the claim for such interest is allowed as a claim in such Insolvency Proceeding."  (*Id.* § 1.1 (EXAM00114104).)  The "First Priority Claims" also include "fees, expenses, disbursements and indemnities."  (*Id.*)  Additionally, "Discharge of First Priority Claims" means payment in full in cash, including pre- and post-petition interest, fees, and expenses.  (*See id.* (EXAM00114103).)  As made clear in the June 13, 2013 Order Granting Debtors' Amended Motion for Entry Under 11 U.S.C. §§ 105 and 363 Authorizing the Debtors to Satisfy Certain Secured Claims ("Paydown Order"), ECF No. 3967, "all reasonable, documented fees and expenses incurred or accrued by AFI as lender under the AFI LOC and AFI Senior Secured Credit Facility, including all reasonable fees and expenses of counsel, shall continue to accrue during the Debtors' Chapter 11 cases."  (Paydown Order ¶ 5.)  Accordingly, Ally's First Priority Claims have not been discharged and Ally retains its status as a First Priority Secured Party.

Under the plain and unambiguous language of the Intercreditor Agreement, then, even were proceeds to be collected on the collateral identified by the JSNs—and Ally disputes whether this could occur—such money would flow *to Ally*, not the JSNs.  And if the JSNs receive any payments prior to repayment in full in cash of all the outstanding obligations under the Revolving Credit Facility, then the JSNs must hand over such proceeds *to Ally*.  The plain language of the Intercreditor Agreement is the beginning and the end of this point.  *See, e.g.*, *In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013) ("It is the primary rule of construction of contracts that when the terms of a written contract are clear and unambiguous, the intent of the

parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations."). Because the JSNs are not entitled to the proceeds of this collateral in the first instance—Ally is—the JSNs cannot argue that they have been impaired by the treatment of this collateral, including any release of this collateral.[10]

## CONCLUSION

For all the foregoing reasons, Ally respectfully submits that the Plan should be confirmed under section 1129 of the Bankruptcy Code and all objections should be overruled.

---

[10] Nor do the JSNs have any claim that Ally acted improperly by releasing collateral. Section 3.1 of the Intercreditor Agreement provides Ally, as the first-lien holder, with the "exclusive right to enforce rights, exercise remedies …, refrain from enforcing or exercising remedies, and ***make determinations regarding release or disposition of the Collateral*** without the consent of or any consultation with [the other lien holders, including the JSNs]." (Intercreditor Agreement § 3.1(a)(ii)(A) (EXAM00114114) (emphasis added).)

Dated:  November 12, 2013
        New York, New York

__/s/ *Jeffrey S. Powell* _____

Richard M. Cieri
Ray C. Schrock
Noah J. Ornstein
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel to Ally Financial Inc. and Ally Bank*