**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) ) ) | Chapter 11 |
| Debtors. | ) ) | Jointly Administered |

# DIRECT TESTIMONY OF MICHAEL A. CARPENTER

I, Michael Carpenter, under penalty of perjury, testify as follows:

1.  I am Ally Financial Inc.'s Chief Executive Officer and a member of its Board of Directors. I have been Ally's Chief Executive Officer since November 2009. I have served on the Ally Board of Directors since May 2009.[1]

2.  Prior to assuming my role as Chief Executive Officer of Ally, I was the Chairman of Southgate Alternative Investments, which I founded in 2006. From 2002 to 2006, I was the Chairman and Chief Executive Officer of Citigroup Alternative Investments. In that role, I oversaw $60 billion of proprietary capital and customer funds in various alternative investment vehicles. I was the Chairman and Chief Executive Officer of Citigroup's Global Corporate & Investment Bank from 1998 to 2002, with responsibility for Salomon Smith Barney Inc. and Citibank's corporate banking activities globally. Prior to that time, I served as the Chairman and Chief Executive Officer of Travelers Life & Annuity and Vice Chairman of Travelers Group Inc., Chairman of the Board, President and Chief Executive Officer of Kidder Peabody Group Inc. (a wholly owned subsidiary of General Electric Company), and Executive Vice President of GE Capital Corporation. Earlier in my career, I spent nine years as Vice President and Director of the Boston Consulting Group.

3.  In addition to my roles at Ally, I serve on the boards of U.S. Retirement Partners, Autobytel Inc., and the New York City Investment Fund. I have previously served as a board member of the New York Stock Exchange, General Signal, Loews Cineplex, and other private and public companies.

4.  I have personal knowledge of the matters set forth herein. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.[2]

---

[1]  Ally Financial Inc., along with its non-debtor affiliates and subsidiaries, is referred to as "Ally".

1

## **Ally**

5.    Ally is an independent, diversified, financial services firm providing a broad array of financial products and services.

6.    On December 24, 2008, Ally became a United States Bank Holding Company. Ally's banking subsidiary, Ally Bank, is an indirect wholly owned subsidiary of Ally and a commercial state non-member bank chartered under the laws of the State of Utah. Ally Bank is a leading franchise in the direct (internet, telephone, mobile, and mail) banking market.

7.    As a bank holding company, Ally is subject to supervision, examination and regulation by the Board of Governors of the Federal Reserve System ("FRB"), among others. Ally must also comply with regulatory risk-based capital and leverage requirements, as well as various safety and soundness standards imposed by the FRB, and is subject to certain statutory restrictions concerning the types of assets or securities it may own and the activities in which it may engage.

8.    Ally Bank is subject to supervision, examination, and regulation by the Federal Deposit Insurance Corporation (FDIC) and the Utah Department of Financial Institutions (UDFI). Ally Bank's deposits are insured by the FDIC, and Ally Bank is required to file periodic reports with the FDIC concerning its financial condition.

9.    Ally's and Ally Bank's regulators have closely monitored these Chapter 11 cases in numerous respects.

10.    As part of the Automotive Industry Financing Program created under the Troubled Asset Relief Program ("TARP") established by the U.S. Department of the Treasury

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and The Official Committee of Unsecured Creditors [ECF No. 4819-2].

2

("Treasury") under the Emergency Economic Stabilization Act of 2008, Ally has entered into agreements pursuant to which Treasury has made investments in Ally in excess of $17 billion. As of February 28, 2013, Treasury held 981,971 shares of Ally's common stock, which represents approximately 74% of the voting power of the holders of common stock outstanding.

11. Each of Residential Capital, LLC ("ResCap") and its affiliated debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors") is an indirect subsidiary of Ally. The Debtors, as subsidiaries of Ally, continue to be subject to regulations applicable to bank holding companies.

### Ally's Pre-Petition Assistance of ResCap

12. Prior to its bankruptcy filing, Ally provided ResCap more than $8 billion in capital contributions. These capital contributions were provided in the form of cash and securities and debt forgiveness.

13. Ally's decisions to support ResCap, including decisions regarding capital contributions, were made by the Ally Board of Directors. In October 2009, the Ally Board expressly reserved to itself the authority to make any capital contributions of $50 million or more to Ally subsidiaries, including ResCap. In 2012, Ally decided to no longer continue its financial support of ResCap outside Chapter 11.

14. My objective has always been to protect the value of the Ally auto finance franchise (which is a critical part of the automobile industry and the reason the United States government supported Ally in 2008), as well as to support Ally Bank. My goal has also been to allow Ally to be better positioned to repay the United States taxpayers for the TARP funds Ally received.

**Ally's Support of ResCap During Bankruptcy**

15. On May 14, 2012, the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Although Ally supported the Debtors' decision to file for bankruptcy, the decision to file was made by ResCap's Board of Directors alone.

16. Prior to the Debtors' filing, I understand that the Debtors conducted a review of potential claims that the Debtors may have had against Ally. Although Ally disputed, and continues to dispute, the validity of those potential claims, Ally agreed to negotiate with the Debtors' independent directors and advisors to resolve those potential claims in advance of a bankruptcy filing.

17. From the beginning of those negotiations, Ally required any resolution to include a release of claims relating to the Debtors' business (including any claims the Debtors believed they could assert against Ally, as well as any potential third-party claims against Ally relating to the Debtors' business). These negotiations resulted in a pre-petition settlement with the Debtors by which Ally agreed to contribute $750 million to the Debtors' Estates and to provide substantial and unique support during the course of the bankruptcy, in exchange for debtor and third-party releases and an injunction against such released claims. That substantial support is described below.

18. Ally agreed to and has provided, among other things, the following support to the Debtors since their bankruptcy filing:

   a. **Support for Continued Origination of Mortgages.** Ally Bank agreed to fund mortgages originated by the Debtors, which enabled the Debtors to continue to originate loans during their bankruptcy cases. No other third party was willing to enter into such an agreement with the Debtors. Ally Bank's support in this regard benefitted the Debtors in two materials respects. First, the fees paid by Ally Bank to the Debtors for loans originated

4

following the bankruptcy filing were paid at market rates and totaled approximately $160 million to $180 million. Without this support, the Debtors would have been unable to continue to originate loans. Entirely because of this support, the Debtors were able to continue to originate loans during the bankruptcy proceedings. Second, Ally Bank's support also enabled the Debtors to preserve their ability to service loans that they had sold to the Government-Sponsored Enterprises (Fannie Mae, Freddie Mac, and Ginnie Mae). The GSEs had indicated that they would revoke the Debtors' authorization to service those loans if the Debtors did not have the ability to originate mortgages throughout their bankruptcy proceedings.

        b.     **Support to Preserve ResCap's Servicing Platform.** Ally Bank agreed to continue to have Mortgage Servicing Rights ("MSRs") owned by Ally Bank serviced by ResCap, rather than moving the MSRs to a backup servicer. This arrangement helped preserve and enhance ResCap's ongoing business as a servicer, and was critical to the GSEs.

        c.     **Debtor-in-Possession Financing.** Ally provided the Debtors with debtor-in-possession financing of more than $200 million in order to, among other things, facilitate the Debtors' ability to repurchase, or buy-back, delinquent loans in certain securitization pools, as required by Ginnie Mae. On the eve of their bankruptcy filing, the Debtors anticipated that those repurchase obligations would require additional funding that the Debtors did not have. The Debtors were unable to obtain this funding from their primary DIP lender (Barclays) or from any other third party. As a result, Ally agreed to provide the Debtors more than $200 million in DIP financing on favorable terms so that the Debtors could satisfy any buy-back obligations that might arise and to enable the Debtors to preserve their ability to continue selling loans to Ginnie Mae.

d. **Stalking Horse Bidder.** Ally agreed to serve as the stalking horse bidder for the Debtors' portfolio of held-for-sale (HFS) loans at a price of $1.6 billion. The assets in the HFS portfolio were "non-standard" and few entities were willing to bid for those assets. Ally's bid was $200 million greater than the bid submitted by Fortress Investment Group for the same portfolio of assets, and included minimal representation, warranty, and due diligence "outs." Ally's bid set the floor for the bidding to continue at auction, which was critical to the Debtors given the relatively few interested bidders. The winning bidder (Berkshire Hathaway) ultimately agreed to pay approximately $225 million more than Ally's bid for the same assets in a § 363 sale (after adjusting for the change in unpaid principal balance between the Ally bid date and Berkshire Hathaway bid date). Berkshire Hathaway agreed to pay that amount without doing any significant due diligence of its own, instead relying on Ally's own diligence and familiarity with the loan portfolio.

e. **Subservicing of Mortgage Loans.** Ally permitted the Debtors to use Ally Bank's portfolio of loans for the purposes of satisfying the Debtors' loan modification obligations to the Department of Justice. Ally Bank was the only mortgage originator willing or able to allow the Debtors to use its loans for this purpose. Ally also allowed the loans subserviced by the Debtors to remain with the Debtors throughout these cases and ultimately to be sold as part of the servicing platform.

f. **Shared Services and Pension Obligations.** Ally continued to provide the Debtors with the use of Ally's shared services, such as centralized payroll and risk management services, and cooperated to permit the smooth transition of the Debtors' businesses to purchasers of the Debtors' assets, which generated substantial value for their Estates. Additionally, Ally assumed the Debtors' pension obligations, which helped the Debtors retain hundreds of

6

employees including its management team, and eliminated substantial claims by the Pension Benefit Guaranty Corporation in these cases. Without these services and employees, I believe the Debtors' operating platform would likely have collapsed.

## Ally Was Uniquely Situated To Provide Substantial Support to ResCap During Bankruptcy

19. Ally was uniquely situated to provide these benefits during the course of these proceedings; no other entity could have or would have provided these benefits. But for Ally's contributions, the Debtors would have been unable to operate as a going concern in Chapter 11, would not have been able to sell their key assets for the amounts they have realized during these cases, and would have risked a "free fall" in Chapter 11. These measures have enabled the Debtors to preserve and maximize the value of their assets during the course of these cases and, in turn, substantially enhanced creditor recoveries.

## Mediation And The Plan

20. On December 26, 2012, at the request of the Debtors, the Court appointed the Honorable James M. Peck to serve as a mediator to assist the Debtors, the Official Committee of Unsecured Creditors (the *"Committee"*), Ally, and other claimants, in resolving certain issues relating to the formulation and confirmation of a Plan of Reorganization. Ally supported the Debtors' request.

21. Beginning in January 2013 and continuing over the course of a number of months, Ally participated in good faith in the arm's-length mediation process. Working in conjunction with legal and financial advisors, I represented Ally throughout this process, which included numerous mediation meetings and conference calls as well as multiple round-the-clock negotiating sessions and "summits." The discussions involved advisors and/or business leaders representing the Debtors and nearly all of their major creditor constituencies.

22. On May 13, 2013, with Judge Peck's invaluable assistance, Ally, along with the Debtors, the Committee, and certain other consenting claimants entered into a Plan Support Agreement ("PSA") and Plan Term Sheet to pave the way for the Debtors' exit from bankruptcy ("Global Settlement"). Each of the parties to the PSA agreed to support a proposed Chapter 11 Plan that was filed with the Court on August 23, 2013.

23. Together with the extraordinary support that Ally provided to ResCap during its bankruptcy (which was significantly responsible for the successful sale of ResCap's assets for $4.5 billion), the Plan incorporates a settlement with Ally pursuant to which Ally has agreed to contribute $2.1 billion consisting of (i) $1.95 billion in cash, and (ii) the first $150 million received by Ally for any claims it pursues pursuant to its directors-and-officers and/or errors-and-omissions insurance coverage. Under the settlement, the Debtors will receive $150 million on account of such insurance claims no later than September 30, 2014.

24. The $2.1 billion in cash and insurance proceeds, which is collectively referred to in the Plan as the "Ally Contribution," will materially enhance creditor recoveries under the Plan, including allowing the Debtors' junior secured noteholders to be paid in full and unsecured creditors to receive at least three times (and in many cases more) than they would have received absent Ally's cash contribution. In exchange for the Ally Contribution, as well as the other contributions made during the course of the Debtors' bankruptcy cases, the Plan provides debtor and third-party releases of causes of action against Ally and its directors and officers arising from or related in any way to the Debtors and/or these Chapter 11 cases or the Plan, as well as an injunction against the prosecution of any claims released pursuant to those releases.

**Ally Requires Global Resolution**

25.     Ally's objective, and a requirement for Ally's extraordinary support during ResCap's bankruptcy, as well as the Ally Contribution, is to reach a global resolution.  Ally strongly believes it would defeat any claims asserted by the Debtors or other parties-in-interest.  However, Ally believes it would take an extended period of time to litigate those claims.  Given Ally's status as a regulated entity in the financial services industry (which itself is recovering from severe distress) and participant in the capital markets, protracted litigation would potentially increase Ally's cost of capital and raise regulatory issues, especially in light of the increased regulatory scrutiny in the financial services industry.  Furthermore, extended litigation and uncertainty would jeopardize Ally's goal of returning the American taxpayers' TARP investment as soon as possible.  As a result, Ally agreed to enter into the Global Settlement, which provides a superior outcome for ResCap's creditors and helps Ally achieve finality so it can focus on its core business activities.

26.     A comprehensive set of releases for Ally was the foundation for the negotiations that led to the initial settlement with ResCap and that principle has been a constant in the subsequent negotiations as well.  Ally would not have entered into the Global Settlement and would not have agreed to contribute $2.1 billion without the inclusion of the debtor and third-party releases in the Plan.  If the Ally Contribution were in exchange only for releases from the Debtors, Ally would not have agreed to the Ally Contribution and would not support the Plan because it would not have provided a global resolution of potential claims regarding the Debtors' businesses.  Rather, a comprehensive settlement, including full debtor and third-party releases and an injunction against such claims, is the basis for Ally's agreement to enter into the

mediation and is the cornerstone of the Global Settlement. Such a comprehensive settlement was part of Ally's pre-petition agreement with the Debtors and never changed throughout these cases.

27. Ally believes the third-party release and injunction are necessary to resolving the mortgage-related contingent liabilities affecting both the Debtors' and Ally's business, particularly given the regulatory climate within which Ally operates. If the third-party release as part of the Plan is not approved, Ally will be forced to withdraw its support for the Global Settlement, including its $2.1 billion contribution. Absent the debtor and third-party releases, the Global Settlement will no longer be in the best interest of Ally.

Executed this 12th day of November, 2013 at New York, New York.

/s/ *Michael A. Carpenter*
Michael A. Carpenter