**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------------------
                                                    )
    In re:                                    )    Case No. 12-12020 (MG)
                                                    )
    RESIDENTIAL CAPITAL, LLC, et al.,    )    Chapter 11
                                                    )
                            Debtors.         )    Jointly Administered
---------------------------------------------------------------------------------)

# DIRECT TESTIMONY OF JAMES N. YOUNG

I, James N. Young, under penalty of perjury, testify as follows:

**Summary of Testimony**

1.  My testimony addresses the facts concerning three separate issues: first, the MSR (Mortgage Servicing Rights) Swap agreement between Ally Bank and GMAC Mortgage LLC; second, the revenue that Ally Bank received for loans it sold to GMAC Mortgage LLC under the Master Mortgage Loan Purchase and Sale Agreement (MMLPSA) between those two entities; and finally, a draft 2009 tax allocation agreement between Ally Financial Inc. (AFI) and ResCap. I understand the Ad Hoc Group of Junior Secured Noteholders have identified potential claims that the Debtors' Estates may have against Ally based on these issues and assert that they hold liens against those potential claims.[1]

2.  I have personal knowledge of the matters set forth herein. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.[2]

**Background**

3.  I am the Chief Financial Officer of Ally Bank. I have held the same position since joining Ally Bank in May 2011, though for a period my title was Chief Financial Executive. In my role as CFO of Ally Bank, I am responsible for all finance and treasury activities of the Bank.

4.  Before joining Ally Bank, I was an employee of ResCap for six years. I joined ResCap in March 2005 as Chief Accounting Officer and Controller and became its Chief Financial Officer in March 2008. In those roles, I was responsible for financial oversight, analysis, control, reporting, accounting and business planning for ResCap.

---

[1] AFI, along with its non-debtor affiliates and subsidiaries, is referred to as Ally.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and The Official Committee of Unsecured Creditors [ECF No. 4819-2].

2

5. Prior to my tenure with ResCap, I spent more than 20 years at KPMG. I started as an accountant and worked my way up through the ranks, serving as a partner for 12 years. During that time, I worked with many publicly-held financial institutions and worked in several key roles within KPMG, including leader of the Chicago banking practice, the Midwest area banking practice development leader, and SEC reviewing partner.

6. I hold a bachelor's degree in accounting from Luther College and am a certified public accountant.

## MSR Swap Agreement

7. In 2007, Ally Bank and GMAC Mortgage entered into a swap arrangement related to mortgage servicing rights—the MSR Swap. The MSR Swap was designed to function as a total return swap. It transferred all of the economics of the MSRs owned by the Bank to GMAC Mortgage in exchange for GMAC Mortgage paying a LIBOR-based rate of return to the Bank. The intent of the MSR Swap was for Ally Bank to hedge the volatility associated with owning MSRs while ResCap was able to continue with its core mortgage operations.

8. The parties originally entered into an ISDA Master Agreement and two separate schedules—a Fair Market Value schedule (the FMV Schedule), which is attached as Exhibit 1, and a Net Funding Schedule, which is attached is Exhibit 2. The FMV Schedule, which I signed on behalf of GMAC Mortgage, was designed to shift the daily mark-to-market changes in MSR values to GMAC Mortgage. Thus, if the mark-to-market value of the Bank's MSR asset increased, the Bank would pay the increase to GMAC Mortgage; if that value decreased, GMAC Mortgage would pay the decrease to the Bank. The Net Funding Schedule, which I also signed on behalf of GMAC Mortgage, provided all of the economics of servicing—the servicing-related income and fees—to GMAC Mortgage in exchange for the LIBOR-based return to the Bank.

3

9. Ally Bank would acquire MSRs through two primary methods: first, by originating a loan with its own funds and then selling that loan to GMAC Mortgage while retaining the MSR; second, by purchasing a loan and its embedded MSR from a third-party correspondent and then selling the loan to GMAC Mortgage while retaining the MSR. Once those MSRs were capitalized onto the Bank's books, the daily mark-to-market changes in the MSRs' value would transfer between the parties pursuant to the FMV Schedule, and the servicing-related income and fees would be transferred to GMAC Mortgage in exchange for the LIBOR-based return pursuant to the Net Funding Schedule.

10. I understand that the potential claim that the JSNs focus on does not concern the value changes in the MSRs after they were capitalized onto the Bank's books, the servicing-related income and fees, or the LIBOR-based payment to the Bank. Instead, the potential claim is focused on the initial capitalized value of the MSRs—and whether the Bank should have been paying GMAC Mortgage the initial capitalized value of MSRs from loans purchased from correspondents, in addition to the initial capitalized value of MSRs for Bank-originated loans. That potential claim does not comport with the terms of the MSR total return swap documents as I understand them, the parties' intent when entering into the MSR Swap arrangement, or their conduct in implementing the MSR Swap since 2007.

11. The FMV Schedule governed the parties' payments concerning value changes in the Bank's MSR asset. That schedule does not articulate whether the Bank is to pay GMAC Mortgage for the initial capitalized value of any MSRs, whether from Bank-originated loans or loans purchased from correspondents. Instead, the FMV Schedule calls for Ally Bank and GMAC Mortgage to make payments to one another based on changes in the value of MSRs owned by the Bank measured according to "FAS 156 mark-to-market" accounting. (*See* Exhibit

4

1, Part 6(a)(iii).) It is my understanding that mark-to-market accounting is performed for assets that are on a business's books—in other words, after an asset has been capitalized onto the balance sheet, it is then marked to market at subsequent periods. The initial capitalization of a purchased asset—such as a purchased MSR—is not a mark-to-market accounting entry. Thus, as I understand the FMV Schedule, the initial recognition of MSRs from loans purchased from correspondents would not result in a payment to GMAC Mortgage.

12. That was the parties' intent as well. The goal was for the Bank to hedge its owned MSRs by passing all of the economics of them to GMAC Mortgage, leaving the Bank with no impact on its income statement from the MSRs except for the LIBOR-based return. The only way to achieve that objective was for the Bank to pass along the capitalized value of MSRs from Bank-originated loans, but not do so for MSRs from loans purchased for correspondents. The reason for that is the inherent difference in the cost of those assets from the Bank's perspective.

13. When the Bank originates a loan, the MSR is an embedded asset within that loan. The Bank will pay to fund the loan—assume, for illustrative purposes, $100—but there is no cost for the MSR—it is simply an asset embedded within the loan upon origination. When the Bank sells the loan to GMAC Mortgage but retains the MSR asset, value is created; there is a new, stand-alone asset, with a value of $1 to continue the illustration. Retaining that MSR asset has created value for the Bank; it has resulted in a $1 gain to the Bank on its income statement upon the sale of the related loan. In order to execute effectively a total return swap—leaving the Bank income-statement neutral—that value needs to be passed to GMAC Mortgage.

14. MSRs from loans purchased from correspondents have a different financial impact on the Bank. When the Bank purchases loans and their corresponding MSR from a third-

5

party correspondent, it pays the seller a purchase price that includes a premium (sometimes referred to as a servicing-released premium (SRP)) for the servicing rights. For example, to continue the illustration above, the Bank pays a hypothetical price of $101—$100 for the loan and $1 for the MSR. When the Bank capitalizes this MSR on its books, there is no gain on its income statement; it paid $1 to purchase the MSR and capitalized the MSR at the same value. In order to execute effectively a total return swap, the initial capitalized value of this MSR should not be passed on to GMAC Mortgage as there is no income statement return associated with the capitalization of that MSR. Additionally, if the Bank were to be required to pay the value of a purchased MSR to GMAC Mortgage, the Bank would be paying twice for that asset—once to the correspondent, and once to GMAC Mortgage. That would make no economic sense, it would have a negative impact on the Bank's income statement, and it would run counter to the parties' intent when entering into the MSR Swap.

15.    A ResCap presentation from February 2011, which I received in my role as ResCap CFO, confirms this intent and understanding. That presentation, attached as Exhibit 3, included an overview of the MSR Swap and its components. One of the overview slides discusses the FMV Schedule, and notes that it "shifts all the economics of the MSR asset from the Bank to GMACM, thus effectively transferring all risk and reward of the MSR out of the Bank." (*See* Exhibit 3 at EXAM 11190201.) The presentation goes on to indicate that the FMV Schedule "covers the gain from the capitalization of the MSR as well as the change in valuation (positive or negative) driven by the regular mark-to-market of the existing MSR asset." (*Id.*) The "gain from the capitalization of the MSR" is a reference to the capitalization of MSRs that have an impact on the Bank's income statement—MSRs from Bank-originated loans.

6

16. Not only is that what the parties intended, but it is also how Ally Bank and GMAC Mortgage implemented the MSR Swap since it was created. The Bank passed the capitalized value of MSRs from Bank-originated loans to GMAC Mortgage but would not do so for loans purchased from correspondents. GMAC Mortgage understood and never questioned that course of conduct.

### Revenue Allocation

17. Ally Bank sold loans to GMAC Mortgage pursuant to the MMLPSA between the parties that was operative at the time. The price that GMAC Mortgage paid to the Bank for loans after January 1, 2009 was governed by the Amended and Restated MMLPSA dated July 1, 2008. That MMLPSA, attached as Exhibit 4, defines the purchase price for first lien loans to be the "Cost Basis plus reserves associated with such First Lien Mortgage Loan." (*See* Exhibit 4 at ¶ 1.24.) In turn, "Cost Basis" is defined as "net carrying value, as defined by accounting principles generally accepted in the United States of America (as amended) to include without limitation the unpaid principal balance of such Mortgage Loan, plus or minus any premium or discount paid, net deferral fees or costs, accrued interest and basis adjustments from derivative loan commitments, hedge accounting or lower of cost or market adjustments." (*See id.* at ¶ 1.9.)

18. The "net carrying value, as defined by" generally accepted accounting principles (GAAP) has a particular meaning in finance and accounting. The Bank's Board had to review and approve this MMLPSA, and the materials provided in conjunction with that approval confirm this pricing. Those materials, attached as Exhibit 5, indicate that the definition of "Cost Basis" was "clarified … to reflect net carrying value under GAAP." (*See* Exhibit 5 at Ally_0260254.)

19. In late 2011—when I was the Chief Financial Executive of the Bank—a now-former employee, Adam Glassner, questioned whether the Bank was retaining too much revenue

7

when selling loans to GMAC Mortgage. Upon learning of the matter, I had my finance and accounting team investigate Mr. Glassner's concern, ResCap's finance and accounting team looked into the issue as well, and AFI investigated the issue too.

20. By March 2012, my team and I had determined that the Bank had charged GMAC Mortgage the appropriate price, in accordance with the agreement, for loans sold on and after August 1, 2009. On that date, the Bank switched to a fair value accounting methodology for the mortgage loans held for sale. Under fair value accounting, the Bank's "net carrying value" of mortgage loans, as defined by GAAP, was the fair value of the loans. From August 1, 2009 forward, the Bank had appropriately charged GMAC Mortgage the fair value of the loans at the time of sale. ResCap, Ally's Internal Audit and Global Security, and KPMG (who AFI had retained to investigate the issue) all agreed that the Bank charged GMAC Mortgage the appropriate price, in accordance with the agreement, for loans sold on and after August 1, 2009.

21. My team and I also investigated the price that the Bank charged GMAC Mortgage from January 1, 2009 until July 31, 2009. We concluded that the Bank had undercharged GMAC Mortgage during that period. From January 1 to July 31, 2009, the Bank had elected to use hedge accounting for its portfolio of loans held for sale to GMAC Mortgage (the HFS portfolio). Pursuant to the use of hedge accounting under GAAP, the Bank's HFS loans were recorded at fair value. The "net carrying value" as defined by GAAP was therefore the fair value of the Bank's HFS loans. From January 1 to July 31, 2009, the Bank should have been charging GMAC Mortgage the loan's fair value—pursuant to this hedge accounting election. Instead, the Bank was effectively charging GMAC Mortgage its cost for the loan, as if under a lower-of-cost-or-market (LOCOM) accounting methodology.

22. My team and I concluded that, according to the terms of the agreement, the Bank had undercharged GMAC Mortgage for loans sold from January 1 to July 31, 2009. ResCap's finance and accounting team similarly concluded that GMAC Mortgage had underpaid the Bank for loans it purchased during that period. Our respective teams determined that the difference between the price GMAC Mortgage should have paid under the MMLPSA and the price it effectively paid was approximately $47.2 million. In order to correct this error, GMAC Mortgage paid the Bank $47.2 million plus interest, as necessary under banking regulation.

### Tax Allocation Agreement

23. As ResCap's CFO, I was involved in negotiating a tax allocation agreement between ResCap and AFI in 2009 and 2010. The primary purpose of a tax allocation agreement is to allocate the tax attributes, for financial reporting purposes, of a subsidiary that is part of a consolidated group in which an ultimate parent company is the taxpayer. By appropriately allocating tax attributes to those subsidiaries and recording the allocations in the subsidiaries financial statements, the users of those financial statements can more clearly understand the financial results and compare such to other taxable entities. While I was at ResCap, the ResCap management team focused on adopting tax allocation agreements for that very purpose. Tax allocation agreements are not designed or intended to be a vehicle or means for generating capital for the Company. Instead, when ResCap required capital, ResCap's management engaged AFI in separate, deliberate and thoughtful processes that involved formal requests to the AFI Board and resulted in transactions that provided ResCap with permanent capital.

24. The first draft of the 2009 tax allocation agreement (the "Draft Tax Allocation Agreement") was drafted by AFI's tax team, which is attached as Exhibit 6. That version deviated from a traditional standalone tax allocation and the operative 2006 Tax Allocation Agreement between ResCap and AFI. It provided that ResCap would be paid for certain tax

9

attributes owned by AFI, but allocated to ResCap, when AFI utilized them on its tax return, even if they could not be recorded by ResCap using the standalone concept. Under a traditional standalone allocation, tax attributes are recorded in the financial statements as if the subsidiary were in fact the taxable legal entity (even though it is not). Accordingly, two-way payments to reflect the allocations are only made when the subsidiaries, on a standalone basis, can record the effects of those tax attributes.

25. I did not object to the Draft Tax Allocation Agreement when presented for my review. At that time, while I was aware of the non-traditional term set forth in the draft agreement, I was focused on adopting a tax allocation agreement that was fair to ResCap for that purpose. I viewed the Draft Tax Allocation Agreement as more than fair. My objective, however, was not to adopt a tax sharing agreement which may generate capital in an unintended manner, particularly capital that is subject to the two-way payment structure of a tax sharing agreement which may require the return of such capital dependent upon future unknown events. Accordingly, I was not focused on the potential size of any such two-way payment for that unintended purpose. Separately, I was focused on ensuring ResCap had access to capital through other unrelated discussions with AFI.

26. ResCap's General Counsel Tammy Hamzehpour presented the Draft Tax Allocation Agreement to the ResCap Board on August 6, 2010, the minutes of which are attached as Exhibit 7. Following a discussion and consideration of the terms of the agreement, the ResCap Board authorized and empowered ResCap's officers to execute the Draft Tax Allocation Agreement and to take all such steps as they deem necessary or desirable in connection with the Board's resolution. (*See* Exhibit 7 at RC40018822.) However, it was my

understanding that ResCap did not intend the Draft Tax Allocation Agreement to be binding until executed by all parties.

27. To the best of my recollection, near the time I received the Draft Tax Allocation Agreement to sign, AFI alerted me that the Draft Tax Allocation Agreement had not been vetted with AFI's senior management or Board, and the agreement's terms created a potential obligation that AFI make tax-driven cash payments to ResCap that would be accounted for as capital contributions. I do not believe either party had previously contemplated the size or ramifications of such capital contributions with that two-way agreement. Given the existing process used for negotiating capital contributions from AFI to ResCap, I did not think it would be reasonable to sign an agreement and attempt to bind AFI without proper management review and approval by AFI: ResCap continued to rely on AFI for substantial financial support through capital contributions. The long-term benefit to ResCap of a strong relationship with AFI—to continue to work through thoughtful solutions to capital and liquidity problems—outweighed any potential for an unintended, short-term, potentially temporary cash payment driven by tax attributes under the Draft Tax Allocation Agreement.

28. AFI and ResCap revised that draft agreement to remove the provision calling for the non-traditional allocation of tax attributes and returned to pure standalone treatment (the "Final Tax Allocation Agreement"), which is reflected in the Final Tax Allocation Agreement attached as Exhibit 8. The 2006 Tax Allocation Agreement between AFI and ResCap, which is attached as Exhibit 9, had provided for pure standalone treatment. The pure standalone approach is also the GAAP-preferred default for how tax attributes are recorded on subsidiaries' books and records.

29. I presented the Final Tax Allocation Agreement to the ResCap Board, which is reflected in the December 22, 2010 ResCap Board Minutes attached as Exhibit 10. Following a discussion and consideration of the terms of the revised agreement, the independent directors reviewed and discussed the Final Tax Allocation Agreement with their counsel. Following a discussion and consideration of the revised agreement and subject to inclusion of edits provided by counsel for the independent directors, the ResCap Board agreed that the Final Tax Allocation Agreement was fair and authorized ResCap's officers to take all such steps as they deem necessary or desirable in connection with the Board's resolution. (*See* Exhibit 10 at RC40018862.) As a condition for approval, the independent directors' outside counsel requested a clarification in the language of the Final Tax Allocation Agreement; AFI agreed, which resolved an outstanding issue between the parties. The Final Tax Allocation Agreement was fully executed on January 26, 2011. (*See* Exhibit 8 at RC00028801).

Executed this 12th day of November, 2013 at Minneapolis, Minnesota.

/s/ *James N. Young*
James N. Young