(Multicurrency - Cross Border)
ISDA 1992 Master Agreement

SCHEDULE
to the
ISDA Master Agreement (FMV)
dated as of August 31, 2007

between

**GMAC Mortgage, LLC,**             and            **GMAC Bank**
a Delaware limited liability company                a Utah industrial bank

(referred to herein as "Party A")                   (referred to herein as "Party B")


This Agreement shall apply to and govern: (i) with effect on the Commencement Date and continuing until the Termination Date, each Subject Transaction (as defined in Part 6 hereof) without regard to the execution of a Confirmation in respect of such Subject Transaction and (ii) any other Transaction between the parties the terms of which are set out in a Confirmation the provisions of which expressly reference and incorporate by reference the provisions of this Master Agreement.

**Part 1. Termination Provisions.**

(a)     "*Specified Entity*" means in relation to Party A for the purpose of:

        Section 5(a)(v):    Not Applicable
        Section 5(a)(vi):   Not Applicable
        Section 5(a)(vii):  Not Applicable
        Section 5(b)(iv):   Not Applicable

and in relation to Party B for the purpose of:

        Section 5(a)(v):    Not Applicable
        Section 5(a)(vi):   Not Applicable
        Section 5(a)(vii):  Not Applicable
        Section 5(b)(iv):   Not Applicable

(b)     "*Specified Transaction*" will have the meaning specified in Section 14 of this Agreement.

(c)     The "*Cross Default*" provisions of Section 5(a)(vi):   will not apply to Party A and
                                                                   will not apply to Party B

(d)     The "*Credit Event Upon Merger*" provisions of Section 5(b)(iv):   will not apply to Party A and
                                                             will not apply to Party B.

(e)     The "*Automatic Early Termination*" provision of Section 6(a):   will not apply to Party A and
                                                          will not apply to Party B.

(f)     *Payments on Early Termination.* For the purpose of Section 6(e) of this Agreement and subject to the provisions of Part 5 of this Schedule:

        (i)     Market Quotation will apply.
        (ii)    The Second Method will apply.

(g)     "*Termination Currency*" means United States Dollars.

CONFIDENTIAL                                                                                                                    RC00027822

(h)    *Additional Termination Event*" shall mean termination of that certain ISDA Master Agreement (Net Funding), dated as of August 31, 2007.

## Part 2.    Tax Representations.

(a)    *Payer Representations*.  For the purpose of Section 3(e) of this Agreement, Party A and Party B each make the following representation:

> It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement, and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, *provided* that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    *Payee Representations*.

(1)    For the purpose of Section 3(f) of this Agreement, Party A represents that it is a limited liability company organized and existing under the laws of the State of Delaware.

(2)    For the purpose of Section 3(f) of this Agreement, Party B represents that it is an industrial bank organized and existing under the laws of the State of Utah.

## Part 3.    Agreement to Deliver Documents.

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, respectively, each party agrees to deliver (i) such tax forms, certificates and other documents as the other party may reasonably request and (ii) such documents as the other party may reasonably request to evidence the power and authority of such party to enter into this Agreement and the Transactions hereunder and the incumbency of the individuals executing this Agreement and each Confirmation on its behalf.

## Part 4.    Miscellaneous.

(a)    *Address for Notices*.  Section 12(a) is hereby amended to delete the phrase "facsimile transmission or" from the third line thereof.  For the purpose of Section 12(a) of this Agreement:

(i)    Address for notices or communications to Party A:    GMAC Mortgage, LLC
4 Walnut Grove Drive
Horsham, PA 19044
Attention:  Chief Financial Officer
Facsimile No: (215) 682-1151

(ii)   Address for notices or communications to Party B:    GMAC Bank
4 Walnut Grove Drive
Horsham, PA 19044
Attention: EVP – Mortgage Operations
Facsimile No.: (215) 682-1770
Telephone No.: (215) 682-3225

2

CONFIDENTIAL

With a copy to:

GMAC Bank
6985 Union Park Center, Suite 435
Midvale, UT 84047
Attention: Chief Financial Officer
Facsimile No.: (801) 790-5002
Telephone No.: (801) 790-5062

(b) *Process Agent.* With respect to Party A: Not Applicable.
    With respect to Party B: Not Applicable.

(c) *Offices.* The provisions of Section 10(a) will apply to this Agreement.

(d) *Multibranch Party.* For purposes of Section 10(c) of this Agreement:

   (i)  Party A is not a Multibranch Party.
   (ii) Party B is not a Multibranch Party.

(e) *Calculation Agent.* The Calculation Agent is Party A or such other entity designated from time to time by Party B and reasonably acceptable to Party B.

(f) *Credit Support Document.*    With respect to Party A: Not Applicable.
                                   With respect to Party B: Not Applicable.

(g) *Credit Support Provider.*     With respect to Party A: Not Applicable.
                                   With respect to Party B: Not Applicable.

(h) *Governing Law.* This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to its choice of law doctrine).

(i) *Netting of Payments.* Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any Transactions.

(j) *Consent to Telephone Recording.* Each party hereby agrees that the other party or its agents may electronically record all telephone conversations between officers or employees of the consenting party and the officers or employees of the other party who quote on, agree to, or otherwise discuss terms of foreign exchange agreements, interest exchange agreements, currency exchange agreements, commodity swap agreements, caps, collars, floors, and other rate or price protection transactions on behalf of the party. Any such recordings will be used only in connection with any misunderstanding or question arising with respect to any transaction discussed over the telephone by or on behalf of the parties. Each party further agrees to notify its officers and employees that telephone conversations with such persons acting on behalf of the other party will be recorded.

**Part 5. Other Provisions.**

(a) *Set Off.* Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without setoff or counterclaim, except that each party to this Agreement (such party, "Party X") agrees that, upon an Early Termination Date resulting from an Event of Default with respect to Party X the other party hereto (such other party, a "Non-Defaulting Party") may, without prior notice, reduce any amounts due and owing to Party X under this Agreement or any other transactions between Party X and the Non-Defaulting Party by setting off against such amounts any amounts due and owing to the Non-Defaulting Party by Party X hereunder or under any other transactions between Party X and the Non-defaulting Party. For this purpose, any amount which is denominated in a currency other than U.S. Dollars may be converted by the Non-defaulting Party into U.S. Dollars at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase such amount. The rights provided by this paragraph are in addition to and not in limitation of any other right or remedy (including any right to setoff, counterclaim, or otherwise withhold payment) to which a party may be entitled (whether by operation of law, contract or otherwise). Nothing in this Section shall be effective to create a charge or other security interest.

3

CONFIDENTIAL                                                                                                                    RC00027824

(b) *Definitions*. The definitions and provisions contained in the 2000 ISDA Definitions (as published by the International Swaps and Derivatives Association, Inc.), without regard to any amendment or supplement thereof subsequent to the date of this Agreement (the "ISDA Definitions"), are hereby incorporated in this Agreement. If a conflict exists (1) between the provisions of the ISDA Definitions and this Agreement, this Agreement will prevail, (2) between the provisions of a Confirmation and the ISDA Definitions, the Confirmation will prevail and (3) between the provisions of a Confirmation and this Agreement, the Confirmation will prevail.

(c) *Conditions Precedent*. The condition precedent in Section 2(a)(iii)(1) of this Agreement shall not apply with respect to a payment or delivery owing by a party in respect of a Transaction if the other party shall have satisfied in full all of its payment or delivery obligations under 2(a)(i) of this Agreement in respect of such Transaction and shall at the relevant time have no future payment or delivery obligations, whether absolute or contingent, under Section 2(a)(i) in respect of such Transaction.

(d) *Default Under Specified Transactions*. The provisions of Section 5(a)(v) of this Agreement are modified by adding, immediately prior to the semicolon at the end thereof, the following:

"provided, however, that it shall not constitute an Event of Default under Section 5(a)(v) if (A) such event of default or failure to pay arises in the ordinary course of business by mistake, oversight, or transfer difficulties and (B) such event of default or failure to pay is remedied on or before the fifth Business Day after the occurrence or existence of such event of default or failure to pay."

(e) *Termination Payments by Non-Defaulting Party*. Notwithstanding the provisions of Sections 6(e) and 6(d) of this Agreement, if there is a Defaulting Party, the obligations of the other party (the "Non-Defaulting Party") to pay to the Defaulting Party any amount under Section 6(e) shall not arise until, and shall be subject to the conditions precedent that the Non-Defaulting Party shall have received confirmation satisfactory to it in its sole discretion that (1) all Transactions are terminated in accordance with Section 6(c), (2) each Specified Transaction shall have terminated pursuant to its specified termination date or has been terminated through the exercise by a party of a right to terminate, and all amounts due under each Specified Transaction shall have been fully and finally paid, and (3) all obligations (contingent or absolute, matured or unmatured) of the Defaulting Party to make any payment to the Non-Defaulting Party shall have been fully and finally performed; provided that, if under the foregoing provisions it is determined that the Non-Defaulting Party is to make a payment to the Defaulting Party, there shall be deducted from the amount of such payment all amounts which the Defaulting Party may be obligated to pay under Section 11. With respect to the foregoing clause (2), it is expressly agreed that the Non-Defaulting Party shall have no obligation to exercise any right it may have to terminate a Specified Transaction prior to its specified termination date.

(f) *All Confirmations*. With respect to each Transaction other than a Subject Transaction, Party B will, on or promptly after the Trade Date thereof, send Party A a Confirmation of the terms and conditions of the Transaction in substantially the form set out as Exhibit I to the Definitions (or such other form as may be agreed by the parties). Party B will promptly thereafter (1) confirm the accuracy of such Confirmation or (2) request correction of the Confirmation, indicating how the terms of such Confirmation should be correctly stated and such other terms as should be added or deleted from such Confirmation to make it correct. The parties hereby agree that any exchange of telexes or facsimile transmissions or exchange of electronic messages on an electronic messaging system shall constitute a Confirmation for all purposes hereunder, even where not so specified therein. Each Subject Transaction and each other Transaction (whether now existing or hereafter entered into) between the parties to this Agreement, in respect of which the Confirmation fails by its terms expressly to subject such transaction to the provisions of any other master agreement between the parties, shall be deemed to incorporate the terms of, and shall be governed by and subject to, this Agreement and for purposes hereof shall be deemed to be a "Transaction."

(g) *Transfer*. The consent referred to in Section 7 shall not (after consideration of any tax or other consequences to a party of consenting to such assignment) be unreasonably withheld.

(h) *Definitions*. The definition of "Default Rate" in Section 14 is hereby amended by deleting such definition and substituting in lieu thereof the following:

"*Default Rate*" means, for each day that such rate is relevant, the rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it

4

CONFIDENTIAL                                                                                                                                      RC00027825

were to fund or of funding the relevant amount for such day plus 1% per annum provided, however, that in respect of any overdue amount denominated in United States Dollars the Default Rate for each such day shall be the per annum rate which equals the overnight USD Federal Funds - H.15 rate for such day plus 2%.

(i) *No Reliance.* Without limiting the representations explicitly set out herein, each party has entered into this Agreement and each Transaction in reliance only upon its judgment, in order to accomplish legitimate business needs. Neither party holds itself out as advising, or any of its employees or agents as having any authority to advise, the other party as to whether or not it should enter into this Agreement or any Transaction. Neither party is receiving any compensation from the other party for providing advice in respect of this Agreement or any Transaction, and any such advice provided to such other party will not form the primary basis for an investment decision by such other party.

(j) *Impossibility.* The occurrence of an Impossibility shall also be a Termination Event, as to which the Affected Party shall be subject to an Impossibility. For purposes of this Agreement, "Impossibility" shall mean the occurrence of a natural or man-made disaster, armed conflict, act of terrorism, riot, labor disruption or any other circumstances beyond its control after the date on which a Transaction is entered into which continues for a period of more than twenty (20) days and which makes it impossible (other than as a result of its own misconduct) for such a party:

(1) to perform any absolute or contingent obligation, to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such transaction; or

(2) to perform, or for any Credit Support Provider of such Party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction.

All terms and conditions of this Agreement applicable to an Illegality shall be equally applicable to an Impossibility and the definition of Termination Event shall be amended to include Impossibility.

(k) *Additional Representations.* Section 3(a) is amended by adding the following paragraphs (vi) and (vii):

"(vi) *No Agency.* It is entering into this Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(vi) *Eligible Contract Participant.* It is an "eligible contract participant" as that term is defined in the Commodities Exchange Act, 7 U.S.C. § 1(a)(12).

(l) *FIRREA Provisions.*

(i) **Maintenance of Records.** Party B agrees to maintain in its official books and records: (i) a copy of the Confirmation for each Transaction, for so long as such Transaction remains outstanding; and (ii) a copy of the Agreement and the Authorizing Resolution, for so long as any Transaction under the Agreement remains outstanding.

(ii) **Authorizing Resolution Representation.** Party B makes the following representation to Party A, which representation will be deemed repeated at the times set forth in Section 3 of the Agreement: An Authorizing Resolution, as defined in Part 3 of this Schedule, is in full force and effect.

(iii) **Qualified Financial Contract.** Each of Party A and Party B intends that each Transaction and the Agreement be categorized as a "swap agreement" and a "qualified financial contract" and that the Agreement be categorized as a "master agreement," for purposes of Section 11(e)(8) of the Federal Deposit Insurance Act or any successor provisions.

(iv) **Authorized Officer.** Party B agrees that this Agreement, any Credit Support Document to which it is a party, each Confirmation, and any other documentation relating to this Agreement

5

CONFIDENTIAL                                                                                                    RC00027826

to which it is a party or that it is required to deliver will be executed and delivered by a duly appointed or elected and authorized officer of Party B of the level of vice-president or higher.

(v) **Regulatory Compliance.** Under Federal Reserve System Regulation W (12 CFR 223.1 et. seq.), Party A and Party B are affiliates of each other. Party A and Party B intend that this Agreement comply with requirements of Sections 23A and 23B of the Federal Reserve Act (12 USC 221 et. seq.) and the implementing federal regulations.

**Part 6. Subject Transactions.**

The provisions of this Part 6 shall apply to each Subject Transaction (as defined below). In the event of any inconsistency in respect of a Subject Transaction between the provisions of this Part 6 and any other provision of this Agreement, the provisions of this Part 6 will apply in the case of such Subject Transaction.

(a) *Definitions.*

(i) *"Business Day"* means any day other than a Saturday or Sunday on which commercial banks are not required or authorized to close in New York, New York.

(ii) *"Commencement Date"* means August 31, 2007.

(iii) *"FMV Change"*, in respect of a Subject Transaction, means the FAS 156 mark to market for the Valuation Period as recorded by Party B against the mortgage servicing right asset.

(iv) *"Interest Rate"* means the average Thirty Day London InterBank Offered Rate (L1mo), as published in the Wall Street Journal on the first business day of each month, plus 1.00 percent.

(v) *"Subject Transaction"* means the dollar amount of mortgage servicing rights owned by Party B as reported on the accounting general ledger of Party B.

(vi) *"Termination Date"*, unless earlier terminated in accordance with the provisions of this Agreement, means August 31, 2008; provided that, as long as no Event of Default in respect of Party B is then continuing, with effect on the day prior to the Termination Date, the Termination Date will automatically be extended by successive periods of one year unless no less than 120 days prior to the then Termination Date Party B notifies Party A that the Termination Date shall not be so extended.

(vii) *"Valuation Date"* means each Business Day which shall also be the payment date.

(b) *Reporting.* No later than each Business Day of each month, Party A will provide to Party B the calculation of FMV Change for the most recent Valuation Date together with such detail as Party B may reasonable require in support of such calculation.

(c) *Disputed Calculation.* In the event that Party B disagrees with the calculation of FMV Change for any Valuation Date it shall notify Party A of such disagreement and the basis thereof within one (1) Business Day of receipt of the calculation for such Valuation Date set out in paragraph (b) above. In the event that Party A and Party B after good faith discussions are unable to agree on the FMV Change for such Valuation Date, the parties shall engage, on a shared expense basis, a third party reasonably acceptable to both to determine such FMV Change.

(d) *Payments.* On each Valuation Date (i) if the FMV Change for the most recent Valuation Date is an increase in the market value of recorded mortgage servicing assets in the general ledger of Party B, Party B will pay to Party A an amount equal to the FMV Change or (ii) if such FMV Change is a decline in the market value of recorded mortgage servicing assets in the general ledger, Party A will pay to Party B an amount equal to the FMV Change. In the event of any disputed FMV Change, the relevant party shall pay the undisputed portion of such valuation as required by the preceeding sentence and within two Business Days of resolution of the disputed FMV Change the relevant party shall pay the remaining portion together with interest on the unpaid amount at the Interest Rate for each day from the Valuation Date to the date of payment of such amount in full.

6

CONFIDENTIAL                                                                                                       RC00027827

INTENDING TO BE LEGALLY BOUND HEREBY, the parties have caused this Schedule to be executed by their duly authorized officers as of the date first above written.

GMAC Mortgage, LLC

By: _____
Name: James N. Young
Title: CFO

GMAC Bank

By: _____
Name: Robert E. Grady
Title: Chief Mortgage Accountant

7

CONFIDENTIAL    RC00027828