

| | |
|---|---|
| D. F. Geer | M. E. Newman |
| R. J. Hall | B. J. Stokel |
| W. E. Manning | D. P. Stum |
| W. F. Muir | F. H. Suitter |
| S. Nelson | F. B. Winckler, Jr. |

**GMAC Bank Board of Directors Meeting**
**Tuesday, July 22, 2008, 1:00 p.m. (Eastern)**
Dial-in No.:  866-297-2139 / International No.:   801-828-9913
Access Code:   136-9470

The telephonic GMAC Bank Board of Directors meeting will be held Tuesday, July 22, 2008, at 1:00 p.m. (Eastern).  The agenda and supporting materials are attached.

Please advise the Office of the Secretary (Barbara Taylor, 313-656-6304) if you are unable to participate in the meeting.

C. L. Quenneville
Secretary
7/18/08

Attachments

| cc: | | |
|---|---|---|
| | J. P. Andrews | C. N. Pedersen |
| | A. J. Celini | M. A. Rizzo |
| | M. P. DiComo | P. A. Simon |
| | L. R. Gerner | W. B. Solomon, Jr. |
| | R. E. Groody | M. H. Weintraub |
| | M. B. Hales | J. J. Wright |
| | G. K. Merryman | L. K. Zukauckas |

Confidential

ALLY_0260216

July 22, 2008
1:00 p.m. (Eastern)

**Board of Directors**

| | |
|---|---|
| D. F. Geer | M. E. Newman |
| R. J. Hall | B. J. Stokel |
| W. E. Manning | D. P. Stum |
| W. F. Muir | F. H. Suitter |
| S. Nelson | F. B. Winckler, Jr. |

## GMAC BANK

## BOARD OF DIRECTORS

## AGENDA

Call to Order and Introduction
*Ralph J. Hall, Chair*

I.  **Action Items**

    1.  Approval of minutes of meeting held June 2, 2008

    2.  Proposal to Approve the Information Security Policy and Program

    3.  Proposal to Approve the US Bank Mortgage Servicing Agreement

    4.  Proposal to Approve and Adopt Revisions to Affiliate Agreements

II.  **Business Review**

    5.  Consolidated Financial and Liquidity Update – June 2008
        *Lisa R. Gerner, Chief Financial Officer*
        *Peter Simon, Assistant Treasurer, Mortgage Portfolio Management & ALM*

    6.  Automotive Operation Credit Review – June 2008; Quarterly Portfolio Review
        *John J. Wright, Chief Credit Officer, Automotive Division*

    7.  CRA Update
        *Cliff N. Pedersen, Chief Compliance Officer*

    8.  Fair Lending Update
        *Donald James, Fair Lending Officer*

    9.  Litigation Report and Bank Charter Update
        *Gregory K. Merryman, General Counsel*
        *Jonathan P. Andrews, Assistant General Counsel and Assistant Secretary*

III.  **Other Business**

    10.  Supplemental Reports

      •  Next Meeting – August 20, 2008 – Salt Lake City – 8:00 am (Mountain)

*DRAFT*

MINUTES of a Regular Meeting of the Board of Directors of GMAC Bank (the "Bank" or the "Corporation"), held on due notice in the Lodge Dining Room of the Sun Valley Resort, Sun Valley, Idaho, on July 2, 2008, at 8:15 a.m. (Mountain).

PRESENT:    Dennis F. Geer
Ralph J. Hall
William E. Manning (by telephone)
William F. Muir
Scott Nelson
Mark E. Newman
Barbara J. Stokel
Daryl P. Stum
Francis H. Suitter
Fred B. Winckler, Jr.

who are all the members of the Board.

Jonathan P. Andrews (by telephone), Albert J. Celini (by telephone), Michael P. DiComo (by telephone), Lisa R. Gerner, Robert E. Groody, Mark B. Hales, Clifford N. Pedersen (by telephone), Cathy L. Quenneville, Michael A. Rizzo (by telephone), Peter A. Simon (by telephone), John J. Wright (by telephone), and Linda K. Zukauckas were also in attendance.

The Chairman, Mr. Hall, presided and the Secretary, Ms. Quenneville, recorded.

## ACTION ITEMS

### Minutes

The minutes of the Meeting held May 21, 2008, which had been previously submitted for review by members of the Board, were presented for approval. Following discussion, the minutes were approved upon motion made by Mr. Stum and seconded by Mr. Muir.

### Proposed to Approve and Adopt Revisions to the Investment Policy

Ms. Gerner presented proposed revisions to the GMAC Bank Investment Policy. She presented the proposal overview that had been previously distributed to the Board. Ms. Gerner explained that the proposed change to Section 7.0 of the Investment Policy would add Money Market Funds as an approved investment instrument. She said that as with other Money Market instruments, counterparties are required to have a high rating (Moody's short term debt rating of P-2 or higher, and Standard & Poor's short term debt rating of A-2 or higher). She stated that the proposed change provides for a Money Market Fund portfolio limit of 2% of total outstandings per fund and that counterparties would be approved in accordance with the Counterparty Approval and Monitoring policy addendum to GMAC Bank's credit polices.

Discussion by the Board ensued. In response to a question asked by Mr. Geer, Ms. Gerner commented on the process through which funds would be selected. Responding to a question asked by Mr. Nelson, Ms. Gerner said that investment in Money Market Funds would provide the Bank with a higher rate of return than is available in the federal funds market. Mr. Groody and Mr. Hales

1

participated in the discussion. Following discussion, upon motion made by Mr. Muir and seconded by Mr. Nelson, it was unanimously

RESOLVED, that the Board of Directors of GMAC Bank approves and adopts changes to the Investment Policy as presented at this meeting.

Proposal to Authorize Investment in Merrill Lynch Money Market Fund

Ms. Gerner presented the proposal to adopt the resolutions that had been previously distributed to the Board authorizing investment in the Merrill Lynch Money Market Fund. Ms. Gerner said that investments will comply with stated ALCO Policy requirements and GMAC counterparty risk requirements. She said that the investments would be the lower of $500 million or 2% of fund assets. Following discussion, upon motion made by Mr. Nelson and seconded by Mr. Newman, it was unanimously

RESOLVED, that the Corporation is authorized to establish an account in the Merrill Lynch Funds For Institutions Series (the "Account") with Merrill Lynch Funds Distributors, Inc. for the purchase and sale of any and all types of securities in the name of and on behalf of the Corporation; and it was further

RESOLVED, that the Chairman of the Board, the President, any Executive Vice President or the Chief Financial Officer or any duly authorized agent of the Corporation (the "Corporate Representative"), is hereby authorized to (a) execute and deliver on its behalf the Merrill Lynch Funds For Institutions Account Application and all documents and agreements reasonable requested by the Merrill Lunch Funds Distributor, Inc., as administrator and distributor, to establish the Account and to provide financial services to the Corporation, (b) empower any person or persons that he or she deems proper at any time or times to do any and all things that he or she is so authorized to do, and (c) that the Secretary or any Assistant Secretary of the Corporation is authorized to affix to such documents and agreements the corporate seal, if one exists, of the Corporation and to attest thereto; and it was further

RESOLVED, that each of the following named individuals are designated as "Authorized Representatives" and are hereby authorized individually, without counter signature or co-signature, to give written or oral instructions on behalf of the Corporation for transactions in the Account and to instruct the transfer of funds, including, but not limited to the entire Account balance, by wire, check or otherwise from the Account of the Corporation to any other person.

| Name | Title |
|------|-------|
| John G. Papas | Assistant Treasurer |
| Rick S. Tadokoro | Assistant Treasurer |
| Scott L. Sandberg | Treasurer |

and it was further

RESOLVED, that upon receiving a copy of these Resolutions, the Merrill Lynch Funds Distributor, Inc. is entitled to rely upon the authority granted herein, that no statutory or other impediments exist which would invalidate the effectiveness of this resolution, and that this authorization and indemnity is a continuing one and shall remain in effect until revoked by the

2

Corporation through written notice to Merrill Lynch Funds For Institutions at their place of business located at One Financial Center, 23rd Floor, Boston, Massachusetts 02111.

### Proposal to Approve Changes to the Mortgage Loans Held for Investment Allowance Methodology

Mr. Simon presented materials that had been previously distributed to the Board that summarized proposed changes to the Bank's mortgage loans held for investment ("HFI") allowance methodology. Mr. Simon said that as a result of the deteriorating mortgage market, Bank management believes that the current HFI allowance for loan and lease loss ("ALLL") methodology is no longer sufficient to adequately cover likely future mortgage related losses. Mr. Simon reviewed key factors of the revised methodology.

A full discussion ensued. In response to a question raised by Mr. Sturn, Mr. Groody informed the Board that following the recent visitation the Bank had received a memo from the Federal Deposit Insurance Corporation ("FDIC") expressing an opinion similar to management's in respect of the adequacy of the ALLL. The proposed reserve methodology will require a larger HFI ALLL.

Mr. Simon reviewed and discussed the impact of the revised reserve methodology on the balance sheet and income statement. He said the forecast assumes continued market deterioration. Mr. Groody addressed Mr. Muir's question regarding how the reserve compares to actual loss experience. Ms. Zukauckas and Mr. Rizzo participated in the discussion of the proposal. After full discussion, upon motion made by Mr. Nelson and seconded by Mr. Muir, it was unanimously

RESOLVED, that the Board of Directors of GMAC Bank approves changes to the Mortgage Loans Held for Investment Allowance Methodology as presented at this meeting.

### Proposal to Approve and Adopt the Compliance Management Policy

Mr. Pedersen presented the proposed GMAC Bank Compliance Management Policy that had been previously distributed to the Board. He said that the proposed policy defines the components of the Bank's compliance management program and establishes responsibility for the administration of the program. He said that management has been practicing and the Bank adhering to the policies and procedures described in the Compliance Management Policy. Mr. Pedersen solicited the Board's questions.

Following discussion, upon motion made by Ms. Stokel and seconded by Mr. Geer, it was unanimously

RESOLVED, that the Board of Directors of GMAC Bank approve and adopt the Compliance Management Policy presented at this meeting.

### Proposal to Approve and Adopt Revisions to the Automotive Retail and Lease Credit and Collection Policy

Mr. Wright presented proposed modifications to the Automotive Retail and Lease Credit and Collection Policy. He discussed the major points of proposed changes to automated credit approval criteria, and lease contracts and balloon contracts. Mr. Wright responded to the Board's questions

3

regarding the proposed modifications. Following discussion, upon motion made by Mr. Muir and seconded by Ms. Stokel, it was unanimously

RESOLVED, that the modifications to the GMAC Bank Automotive Retail and Lease Credit and Collection Policy are herby approved as presented at this meeting.

Proposal to Approve the Nomination of Mark B. Hales as a Member of the Board of the Utah Bankers Association and Election as a Member of the Board and an Officer of the Utah Association of Financial Services

Mr. Hall recommended that the Board approve the nomination of Mr. Hales as a member of the Board of the Utah Bankers Association and as a member of the Board and as an officer of the Utah Association of Financial Services. Following discussion, upon motion made by Mr. Muir and seconded by Mr. Geer, it was unanimously

RESOLVED, that the nomination of Mark B. Hales, GMAC Bank President and Chief Executive Officer, for election to the Board of Directors of the Utah Bankers Association and as an Officer and Board Member of the Utah Association of Financial Services is hereby authorized and approved.

BUSINESS REVIEW

Consolidated Bank Financial Review – May 2008

The consolidated Bank financial review as of May 31, 2008 was presented by Ms. Gerner. She began with a presentation of a series of dashboard charts that displayed the consolidated asset mix, key yield information, year-to-date performance and capital ratios. Ms. Gerner then presented a chart that displayed selected financial data for the Bank's Automotive Division. She discussed asset volume and economic returns. She commented on key factors driving lower earnings in the reporting period.

Ms. Gerner presented an overview of selected financial information for the Bank's Mortgage Division and she discussed selected net income data and related statistics set forth in the charts. Ms. Gerner responded to questions raised regarding the information presented.

The Board reviewed the consolidated credit risk report as of May 31, 2008. Ms. Gerner remarked on noteworthy entries. She discussed and responded to questions regarding the data reported. Ms. Gerner next presented tables that illustrated asset/liability policy limits. She discussed key themes and critical risk measures. Ms. Gerner discussed the Bank's current liquidity position in the discussion of the duration of equity measures. Mr. Groody and Mr. Hall joined in the discussion. The Board's discussion focused on the Bank's primary sources of liquidity.

Mr. Hall updated the Board on the status of the pending request for a waiver of the disposition requirement filed with the Federal Deposit Insurance Corporation ("FDIC") in connection with the ownership of GMAC Bank.

Considerable discussion was given to strategic options and potential alternative strategies in the event the request for a waiver of the disposition requirement is not approved by the FDIC. Mr.

4

*DRAFT*

Nelson complimented the management team on their efforts in respect of the initiative and in responding to business challenges that are a result of the current credit and economic environment.

Ms. Gerner and Ms. Zukauckas discussed with the Board an overview of the impact of the current economic environment on the value of lease residuals. Historically, leased vehicles at the end of the term have yielded a small gain or loss when sold at auction. Over the last few months consumer purchase trends have shifted away from larger vehicles and the amount realized on those residuals has been reduced. The recent record $4/gallon fuel prices may have a more lasting impact on the purchase behaviors of the consumer than in the past, resulting in a lack of demand for SUV's. GMAC and the Bank are in the midst of performing a lease impairment analysis to determine if a write-down of lease value is appropriate. The analysis will segment the portfolio into SUV's, trucks and cars. To date the SUV's appear to be most affected, which could result in a charge to the June 2008 results. Ms. Zukauckas noted that the analysis is not complete. Full discussion by the Board and Management ensued.

A summary of affiliate transactions for the Automotive Division and the Mortgage Division was included in the chart set previously distributed to and reviewed with the Board. Ms. Gerner solicited the Board's questions in respect of the information presented.

### Review of Automotive Division Allowance Model Validation Report

Ms. Gerner presented materials that had been previously distributed to the Board that provided an overview of the validation model of the allowance for credit loss metrics. She said that the Allowance for Credit Loss ("ACL") metric model is used by the Bank to compute the ACL rate for its retail and SmartBuy portfolios. The model generates a loss reserve allowance range that is presented to the Allowance for Credit Loss Committee and the Board. Ms. Gerner explained the following four methodologies that are used to compute the ACL rates: roll rate, vintage, customer and trigger based.

Ms. Gerner reviewed the scope of the validation process, conclusions and recommendations. She said that based on the model validation team's review, assessment and testing, the model is considered reliable and the control environment in which it functions effective. Ms. Gerner then reviewed certain non-critical weaknesses in the model design and control environment that were noted by the model validation team and that were summarized in the report along with management responses to, and remediation of, identified items.

Ms. Gerner next presented the results of a review of the allowance for loan and lease losses function of the Automotive Division of the Bank that had been conducted by Burton, Roberts, and Meredith ("BRM") in March 2008. She commented on the scope and objectives of the review. The Board discussed BRM's findings and observations. Ms. Gerner, Mr. Hales, and Mr. Hall responded to Mr. Nelson's and Mr. Suitter's questions regarding the additional methodologies recommended for implementation by BRM.

### Contingency Planning Overview

Mr. Groody reported that changes in Residential Capital, LLC's ("ResCap's") financial condition caused management to evaluate risks to GMAC Bank in the event that critical services provided by ResCap were no longer available. He said the primary services provided by ResCap are administrative, loan servicing, and capital markets activities. He discussed the formation of a

5

ALLY_0260222

*DRAFT*

contingency planning team and current and planned actions to accomplish the goals of the contingency plan. In response to a question asked by Mr. Nelson, Mr. Groody said that the contingency plan has no impact on the Bank's Automotive Division. He added that agreements and services provided by GMAC will be reviewed as part of the overall contingency planning process.

### Proposal to Approve and Adopt Changes to Affiliate Agreements

Mr. Groody presented the proposal for approval of amendments to affiliate agreements. He said the revisions to the Master Mortgage Loan Purchase and Sale Agreement and the Schedule to ISDA Master (Swap) Agreement that were summarized in the proposal previously distributed to the Board will be presented at a future Board meeting.

Mr. Groody then discussed the major points of the proposed revisions to the Client Contract between GMAC Bank and GMAC Mortgage, LLC and the Administrative Services Agreement between GMAC Wholesale Mortgage Corp. and National Motors Bank FSB. Following discussion, upon made by Mr. Muir and seconded by Mr. Sturn, it was unanimously

RESOLVED, that the Board of Directors of GMAC Bank approves the revisions to affiliate agreements of GMAC Bank as discussed at this meeting.

### Review of GMAC Counterparty Exposure Analysis

Mr. Wright presented materials that had been previously distributed to the Board that provided an overview of credit and operational exposure to GMAC. He reviewed GMAC's current credit ratings and five-year credit default swap spreads. Mr. Wright presented a schedule that ranked and summarized the level of importance to the Bank of service agreements in place with GMAC. Responding to questions raised, Mr. Wright commented on credit exposure on dealer loans and wholesale outstandings. Mr. Wright pointed out that GMAC currently has sufficient liquidity to handle the Bank's Automotive Division counterparty exposure.

### Litigation Report

Mr. Andrews discussed the terms of a settlement achieved with the New York Attorney General's office with respect to litigation regarding marketing of student loans. He pointed out that GMAC Bank does not currently offer student loans and said that should market conditions change, the Bank is prepared to re-enter that business segment.

## OTHER BUSINESS

### Supplemental Reports

Mr. Hall noted that the Bank Secrecy Act Status Report and Report of Suspicious Activity were contained in the Supplemental Report section of the meeting package. He solicited the Board's questions and comments on the information presented.

### Next Meeting

Mr. Hall reported that the next meeting of the Board will be held by teleconference on Tuesday, July 22, 2008, at 1:00 p.m. (Eastern).

6

*DRAFT*

ADJOURNMENT

There being no further business to come before the Board, the Meeting was adjourned at 11:00 a.m. (Mountain).  The reports and charts presented at this meeting are on file with the Secretary.

DATED July 2, 2008.

Secretary

7

ALLY_0260224

# SUMMARY

<u>**Approval of Information Security Policy Program**</u>

## Purpose

Approve revisions to the GMAC Information Security Policy to align it with the newly developed Information Security Program.

Approve and adopt the GMAC Bank Information Security Program (ISP), which establishes the minimum administrative, technical, and physical safeguards necessary to protect Bank Information.

## Major Points

Changes to the Information Security Policy have been made to ensure it reflects the requirements of the ISP. Primary changes include:

- The addition of language to recognize the Bank's leveraging of information technology and security services and resources of GMAC and GMAC ResCap in the fulfillment of its ISP objectives.

Prior to the development of the attached ISP, the Bank's information security activities operated under two separate programs -- one for the automotive divisions of the Bank; the other for the mortgage division of the Bank.

The ISP is based on guidance provided in the Federal Financial Institutions Examination Council's *IT Examination Handbook for Information Security* and the *Interagency Guidelines Establishing Standards for Safeguarding Bank Information* set forth in 12 CFR 364, and issued pursuant to section 39 of the Federal Deposit Insurance Act [12 USC 1831-p1] and sections 501 and 505(b) [15 USC 6801 and 6805(b)] of the Gramm-Leach-Bliley Act. The ISP also addresses standards with respect to the proper disposal of consumer information pursuant to Federal Trade Commission regulation 16 CFR 682.

The ISP establishes and defines the responsibilities of the following groups and individuals for the management of the Compliance Management Program"

- Board of Directors
- Bank Management
- General Counsel
- Employees and Users of Bank Information
- Service Providers

The primary components of the ISP include the following;

- Information Security Risk Assessment
- Security Controls
- Security Monitoring and Response

## Requested Action

Approval of the attached program and information security risk assessment.

1

ALLY_0260225

## GMAC Bank
### (A Utah Corporation)

### Proposed Resolution of the Board of Directors on July 22, 2007

<u>Approval of Information Security Policy and Program</u>

**RESOLVED,** that the Board of Directors of GMAC Bank approves and adopts the
Information Security Policy and Program, substantially as presented at this meeting.

2

ALLY_0260226

# GMAC Bank

| POLICY: | | PAGES |
|---|---|---|
| Information Security Policy | | 5 |
| **DIVISION:** | **DISTRIBUTION:** | |
| All Divisions | All Bank Personnel | |
| **SUPERSEDES DATE:** | **EFFECTIVE DATE:** | |
| September 20, 2007 | July 22, 2008 | |
| **AUTHORED & ISSUED BY:** | **APPROVED BY:** | |
| Chief Compliance Officer | Board of Directors | |

Deleted: August
Deleted: 2
Deleted: September
Deleted: 0
Deleted: 7

## 1.0   POLICY STATEMENT

It is the policy of GMAC Bank ("the Bank") to protect the security, confidentiality, and
integrity of its customers' and business information (collectively "Bank Information").
This protection is necessary to establish and maintain trust between the Bank and its
customers, maintain compliance with the law, and protect the reputation of the Bank and
its parent company, GMAC LLC.

To administer this policy, the Bank has developed and implemented an Information
Security Program (ISP) that establishes the administrative, technical, and physical
safeguards necessary to protect Bank Information. The key components of the ISP are
outlined in this policy.

This policy is based on guidelines set forth in the Federal Financial Institutions
Examination Council's Examination Handbook on Information Security, as well as the
Interagency Guidelines Establishing Standards for Safeguarding Bank Information set
forth in 12 CFR 364, and issued pursuant to section 39 of the Federal Deposit Insurance
Act [12 USC 1831-p1] and sections 501 and 505(b) [15 USC 6801 and 6805(b)] of the
Gramm-Leach-Bliley Act. This policy also addresses standards with respect to the
proper disposal of consumer information pursuant to Federal Trade Commission
regulation 16 CFR 682.

Recognizing the Bank is a business unit within GMAC LLC and GMAC ResCap
(collectively, the "Parent") and most of its Bank Information resides within systems
managed by the Parent, the Bank will leverage the information security resources,
systems, and processes of the Parent to carry out the objectives of the ISP. This includes
the resources, systems, and processes necessary to conduct information security risk
assessments, implement and manage security controls, and monitor system activity and
conditions to detect control failures and intrusions and ensure an effective and timely
response.

1

ALLY_0260227

2.0    OBJECTIVES

The objectives of this policy and associated ISP are to:

- Ensure the security and confidentiality of Bank Information;
- Protect against any anticipated threats or hazards to the security or integrity of such information;
- Protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer;
- Ensure the proper disposal of Bank Information and consumer information; and
- Ensure appropriate response and notification in instances of unauthorized access to consumer information in information systems.

3.0    ROLES AND RESPONSIBILITIES

### A. Board of Directors

The Bank's board of directors ("the Board") is responsible for overseeing the Bank's ISP. Oversight requires the Board to supervise management's administration of the ISP, approve information security policies and programs, and review reports of the effectiveness of the ISP. The Board will approve the written ISP and written reports of the effectiveness of the ISP at least annually.

### B. Management & Chief Compliance Officer

The Bank's Board has assigned responsibility for the overall administration of the ISP to Bank Management ("Management"), who has directed the Bank's Chief Compliance Officer to administer the day-to-day components of the ISP, including the risk assessment process, development of policies, standards, and procedures, testing, and security reporting. In this role, the Chief Compliance Officer will work and coordinate efforts with the information security officers of entities that maintain, process, or otherwise are permitted to access the Bank's Bank Information as service providers to the Bank. The Chief Compliance Officer may delegate one or more aspects of ISP administration to his or her staff.

At least annually, the Chief Compliance Officer will report to the Board the overall status of the ISP.

### C. General Counsel

The Bank's General Counsel will be responsible to provide advisement regarding contracts, licenses, and agreements that cover Bank Information and that the Bank enters into with, and any affiliate or third-party service provider to ensure contractual assurances regarding security responsibilities, controls, and reporting.

4.0    REQUIREMENTS

**Deleted:** which

**Deleted:** ensure
**Deleted:** d
**Deleted:** by the Bank
**Deleted:** s
**Deleted:** include

2

ALLY_0260228

*A. Assessing Risk*

The Chief Compliance Officer, in conjunction with appropriate Management, will conduct and prepare, at least annually, a written information security risk assessment. At a minimum, the risk assessment will:

- Identify the information and technology assets of the Bank, including information systems used to access, store, transmit, protect, and dispose of information;
- Identify reasonably foreseeable internal and external threats and vulnerabilities to those assets and the probability and impact thereof; and
- Assess the likelihood and exposure of identified threats and vulnerabilities to determine the appropriate level of training, controls, and assurance necessary for effective mitigation.

*B. Managing and Controlling Risk*

Based on the outcome of the risk assessment, the ISP will be designed or modified to control those risks, commensurate with the sensitivity of the information, as well as the complexity and scope of the Bank's activities. At a minimum, the following security measures will be considered and adopted, as appropriate, to best accomplish risk mitigation and control:

- Access controls on Bank Information systems, including controls to authenticate and permit access only to authorized individuals, and controls to prevent employees from providing Bank Information to unauthorized individuals who may seek to obtain this information through fraudulent means;
- Access restrictions at physical locations containing Bank Information, such as buildings, computer facilities, and records storage facilities to permit access only to authorized individuals;
- Encryption of electronic Bank Information, including while in transit or in storage on networks or systems to which unauthorized individuals may have access;
- Procedures designed to ensure Bank Information system modifications are consistent with the Bank's information security program;
- Dual control procedures, segregation of duties, and employee background checks for employees with responsibilities for or access to Bank Information;
- Monitoring systems and procedures to detect actual and attempted attacks on or intrusions into Bank Information systems;
- Response programs that specify actions to be taken when the bank suspects or detects that unauthorized individuals have gained access to Bank Information systems, including appropriate reports to regulatory and law enforcement agencies; and
- Measures to protect against destruction, loss, or damage of Bank Information due to potential environmental hazards, such as fire and water damage or technological failures.

*C. Overseeing Service Provider Arrangements*

3

Confidential

ALLY_0260229

As a Bank that outsources many aspects of its operations, the Board and Management recognize the need that service providers implement and maintain adequate security controls to safeguard Bank Information. Accordingly, Management will exercise appropriate due diligence in selecting both affiliate and third-party service providers for the Bank. Contracts or agreements with service providers will require the implementation of appropriate security controls to comply with the ISP guidelines. Where indicated by the Bank's risk assessment, contracts or agreements will provide the Bank with a means to monitor or otherwise independently review service provider performance in meeting information security obligations. This may include a review of service provider audit reports, SAS 70 reports, regulatory Technology Service Provider examination reports, or other relevant internal and external evaluations. The Bank's contracts with service providers will require the service provider to take appropriate steps to address incidents of unauthorized access to Bank Information, including providing notice to the Bank as soon as possible. By agreement, the Bank may authorize the service provider to provide notice on its behalf.

### D. Training

Management will ensure all bank employees receive training at least annually regarding the Bank's policies and procedures for safeguarding the privacy of Bank Information. Documentation of this training, including attendance, will be maintained for review by auditors and examiners.

### E. Testing

Management will ensure independent third parties, or staff independent of those that develop or maintain the ISP (e.g., Internal Audit) conduct testing of key controls, systems and procedures of the ISP. The frequency and nature of such tests should be determined by the Bank's risk assessment.

### F. Disposing of customer and consumer information

Management will ensure appropriate measures are in place to properly dispose of Bank Information. Any Bank Information that is also considered "consumer information" as defined in Federal Trade Commission regulation 16 CFR 682 will be disposed of in accordance with the requirements of that regulation.

### G. Business Continuity Management

Management will maintain a process for business continuity that addresses the information security requirements needed for the Bank's business continuity. This process will identify the critical business processes and integrate the information security management requirements of business continuity with other continuity requirements relating to such aspects as operations, staffing, materials, transport, and facilities.

### H. Incident Response and Notice

4

Confidential

ALLY_0260230

Upon learning of any incident that may involve unauthorized access to customers'
information, Management will take steps to ensure a reasonable investigation is
completed of the incident and appropriate controls are put in place to prevent further
unauthorized access. Additionally, Management will notify the FDIC, appropriate law
enforcement officials, and affected customers when warranted.

### I. Adjusting the Program

Management will monitor, evaluate, and adjust, as appropriate, the ISP in light of any
relevant changes in technology, the sensitivity of its Bank Information, internal or
external threats to information, and the Bank's own changing business arrangements.

### J. Reporting to the Board

At least annually, the Chief Compliance Officer will report to the Board the overall status
of the ISP and the Bank's compliance with the guidelines set forth in this policy. The
report will discuss material matters related to the program and include, as applicable, a
discussion of risk assessment(s); risk management and control; service provider
arrangements; results of any testing, audits or other evaluations; security breaches or
violations, and management's response; and recommendations for changes in the ISP.

Deleted: ¶
The Board of Directors approved and
adopted this policy on September 20,
2007.¶

5

# GMAC Bank

# INFORMATION SECURITY PROGRAM

Confidential

ALLY_0260232

# TABLE OF CONTENTS

INTRODUCTION................................................................... 1
Overview............................................................................ 1
Bank Information Defined................................................. 1
Information Security Defined............................................ 1
Responsibility.................................................................... 2
      Board of Directors....................................................... 2
      Management................................................................ 2
      General Counsel......................................................... 3
      Employees & Users of Bank Information.................... 3
      Service Providers........................................................ 4

INFORMATION SECURITY RISK ASSESSMENT.................. 4
Overview............................................................................ 4
Methodology....................................................................... 5
      Identification and Classification of Assets.................. 5
      Threat and Vulnerability Assessment........................ 6
      Residual Risk.............................................................. 7
      Controls...................................................................... 7

SECURITY CONTROLS......................................................... 8
Access Controls................................................................ 8
      Access Control Administration.................................... 9
      Network Access Control.............................................. 9
      Operating System Access Control.............................. 9
      Application Access Control......................................... 10
      Remote Access Control.............................................. 10
Physical & Environment Protection................................. 11
      Building Security......................................................... 11
      Data Center Security.................................................. 11
      Distributed IT Environments....................................... 11
Encryption......................................................................... 12
Malicious Code Prevention............................................... 13
Systems Development, Acquisition, and Maintenance.... 13
Personal Security.............................................................. 13
Customer Information Security......................................... 15
      Paper Media................................................................ 15
      Electronic Media......................................................... 16
      Verbal Media............................................................... 16
      Disposal...................................................................... 16
Service Provider Oversight............................................... 17
Business Continuity Considerations................................ 17

SECURITY MONITORING & RESPONSE............................. 18

# INTRODUCTION

## OVERVIEW

It is the policy of GMAC Bank (the "Bank") to protect the security, confidentiality, and integrity of its customers' and business information (collectively, "Bank Information"). This protection is necessary to establish and maintain trust between the Bank and its customers, ensure compliance with the law, and protect the reputation of the Bank and its parent company, GMAC LLC.

To administer this policy, the Bank has developed the GMAC Bank Information Security Program ("ISP"), which establishes the minimum administrative, technical, and physical safeguards necessary to protect Bank Information. The ISP has been adopted by the Bank's Board of Directors, who has assigned responsibility for the overall administration of the program to Bank Management.

The ISP is based on guidance provided in the Federal Financial Institutions Examination Council's *IT Examination Handbook for Information Security* and the *Interagency Guidelines Establishing Standards for Safeguarding Bank Information* set forth in 12 CFR 364, and issued pursuant to section 39 of the Federal Deposit Insurance Act [12 USC 1831-p1] and sections 501 and 505(b) [15 USC 6801 and 6805(b)] of the Gramm-Leach-Bliley Act. The ISP also addresses standards with respect to the proper disposal of consumer information pursuant to Federal Trade Commission regulation 16 CFR 682.

Recognizing the Bank is a business unit within GMAC LLC and GMAC ResCap (collectively, the "Parent") and most of its Bank Information resides within systems managed by the Parent, the Bank leverages the information security resources, systems, and processes of the Parent, as defined in Service Agreements, to carry out the objectives of the ISP. This includes the resources, systems, and processes necessary to conduct information security risk assessments, implement and manage security controls, and monitor system activity and conditions to detect control failures and intrusions and ensure an effective and timely response.

## BANK INFORMATION DEFINED

Bank Information includes all non-public information in any form, including personal information, which is related to the business of the Bank and is created, acquired, or managed during the normal course of business by or on behalf of the Bank. Bank Information may exist in many forms including, but not limited to, paper, microfilm, electronic storage media, photograph, video and voice. Bank Information is owned by the Bank, wherever it exists, regardless of location or storage medium.

## INFORMATION SECURITY DEFINED

Confidential                                                                          ALLY_0260234

Information Security is the protection of information from a wide range of threats to ensure its confidentiality, integrity, and availability; to minimize business disruption and maximize information-based business opportunities. The Bank strives to protect its information by adhering to the following key security principals:

- **Confidentiality** – Protecting Bank Information from unauthorized access, use, or disclosure. Confidentiality is based on the premise of least privilege, or "need-to-know," which states a user of Bank Information must only be given enough access to complete the required job function.
- **Integrity** – Protecting Bank Information from unauthorized modification that can compromise its accuracy, completeness, or reliability.
- **Availability** – Ensuring Bank Information and the systems that house that information are accessible to authorized users when required.
- **Accountability** – Maintaining processes and controls necessary to trace actions to their source. Accountability supports the concepts of non-repudiation, deterrence, security monitoring, recovery, and legal admissibility of records.
- **Assurance** – Ensuring technical and operational security measures work as intended. Assurance highlights the notion that secure systems provide the intended function while preventing undesired actions.

## RESPONSIBILITY

All Bank employees, contractors, agents, and Bank service providers are individually and collectively responsible for protecting Bank Information in the manner described in the ISP. Custodians of Bank Information must be able to demonstrate due diligence in protecting that information and the computing environments in which it resides. In this way the Bank can successfully protect its rights to Bank Information and the computing environments by, among other actions, taking appropriate legal action. Illegal, unauthorized, or unethical disclosure, modification, misuse, or destruction of Bank Information is strictly prohibited.

### *Board of Directors*
The Bank's Board of Directors (the "Board") is responsible for overseeing the development, implementation, and maintenance of the ISP. The Board provides Bank Management with guidance on information security matters, approves information security policies and programs, and reviews reports on the effectiveness of the ISP.

### *Bank Management*
The Board has assigned responsibility for the overall administration of the ISP to Bank Management ("Management"), who has directed the Bank's Chief Compliance Officer to administer the day-to-day components of the ISP,

Confidential

ALLY_0260235

including the risk assessment process, development of policies and procedures, testing, and security reporting. In this role, the Chief Compliance Officer works and coordinates efforts with the information security officers or managers of entities that maintain, process, or otherwise access Bank Information as service providers to the Bank. The Chief Compliance Officer may delegate one or more aspects of ISP administration to Bank staff.

At least annually, the Chief Compliance Officer reports to the Board on the overall status of the ISP and the Bank's compliance with applicable regulatory requirements. The report includes, as applicable, a discussion of risk assessment(s), risk management and control, service provider arrangements, results of audits and testing, security breaches or violations and Management's response, and recommendations for changes in the ISP.

### General Counsel
The Bank's General Counsel is responsible to provide advisement regarding contracts, licenses, and agreements that cover Bank Information and that the Bank enters into with any affiliate or third-party service provider to ensure contractual assurances regarding security responsibilities, controls, and reporting.

### Employees & Users of Bank Information
Employees are staff directly hired and paid by the Bank and subject to the Bank's terms of employment. Users of Bank Information are employees, contractors, and other agents supporting the Bank who are authorized to access and use Bank Information.

All Bank employees and users of Bank Information have the following individual responsibilities:
- Safeguard all Bank Information created, used, or acquired during and after employment or contractual agreements with the Bank, including protecting it from unauthorized disclosure, modification, compromise, or destruction.
- Abide by applicable Bank policies, standards, and requirements for employee conduct in all transactions involving or related to Bank Information or the information assets of third parties, and conduct business in an ethical manner.
- Abide by all applicable laws and regulations pertaining to Bank Information created, used, or acquired in connection with employment or contractual agreements, (e.g., copyright, software licensing, privacy, etc.).
- Use Bank computing and communication resources only as authorized and in support of business needs.
- Refrain from illegal, unethical, unauthorized, or disruptive use of Bank computing and communication resources on which Bank Information resides (e.g., computer games, unauthorized software, peer-to-peer

Confidential                                                                    ALLY_0260236

connections, etc.) This includes, but is not limited to, accessing, transmitting, or storing inappropriate material (e.g. pornography, lewd or violent materials, sexually-oriented jokes or cartoons, and/or other offensive or demeaning material related to age, race, color, sex, religion, national origin, disability or sexual orientation).

- Use approved information security mechanisms and tools to protect Bank Information residing within the Bank's computing and communication environments.
- Report all information security concerns as appropriate to one or more of the following:
  - Direct Leader
  - Local Management
  - GMAC or GMAC ResCap Information Security as appropriate
  - General Counsel
  - General Auditor
  - The Ethics Hotline

Consequences for failure to perform these responsibilities may include employee discharge, termination of contract, prosecution, or other measures appropriate to the circumstances.

### Service Providers

Service providers are GMAC affiliate entities or outside third-party entities that provide services to the Bank. Service providers entrusted with Bank Information are responsible to safeguard that information from unauthorized disclosure, misuse, alteration, or destruction, and must agree to do so pursuant to a written contract or service agreement with the Bank. At a minimum, service providers entrusted with Bank Information must:

- Maintain a secured and controlled physical environment for any entrusted Bank Information.
- Grant access to Bank Information only as authorized by appropriate service provider management, and limit levels of access to only that necessary to perform job functions.
- Comply with all policies and procedures established for the protection of Bank Information.
- Notify Bank Management of any known or suspected security breaches or problems related to the control of Bank Information in a timely manner.
- Provide appropriate recovery capabilities for all stored Bank Information.
- Comply with all laws and regulations applicable to the services provided.

## INFORMATION SECURITY RISK ASSESSMENT

Confidential                                                                        ALLY_0260237

## OVERVIEW

Information security risk assessment is the process used to identify and understand risks to the confidentiality, integrity, and availability of Bank Information and Bank Information systems. The risk assessment process consists of the identification and valuation of assets and an analysis of those assets in relation to potential threats and vulnerabilities, resulting in a risk rating and ranking of risks. Risk management aims to reduce, but not necessarily eliminate, the frequency of a threat and its impact if it occurs. Risks can be accepted, transferred, or reduced.

The Bank's risk assessment process is comprised of the following activities:

- **Information Inventory** – A detailed inventory of all Bank Information and Bank Information systems to be protected, including electronic systems and physical components used to access, store, transmit, protect, and eventually dispose of information. Bank Information can be both paper-based and electronic-based.
- **Information Classification** – A classification system to identify and rank Bank Information in order of importance and sensitivity. The classification of Bank Information allows the Bank to focus its controls and efforts in an efficient and structured manner.
- **Threats and Vulnerabilities Assessment** – An assessment of the potential threats and vulnerabilities to Bank Information and the impact to the Bank if those threats and vulnerabilities are realized. This assessment helps determine which threats or vulnerabilities deserve priority attention relative to the value of Bank Information being protected.
- **Residual Risk** – The measure of risk determined after assessing the classification with the levels of potential threats and vulnerabilities.
- **Control Evaluation** – An inventory of the controls in place to mitigate the likelihood or impact of identified threats and vulnerabilities and an assessment of the effectiveness of those controls. The evaluation addresses preventive controls as well as detective and corrective controls. Measures of control effectiveness are obtained from security monitoring, self-assessments, metrics, or independent testing.

## METHODOLOGY

### Identification and Classification of Assets

The first step in the risk assessment process is to identify all Bank Information within a given physical location or facility. This is best accomplished by conducting the risk assessment process at a departmental level, or other logical business unit level within the physical location or facility.

The individual(s) conducting the risk assessment meet with each department manager or other appropriate personnel to conduct a comprehensive inventory of

Confidential    ALLY_0260238

all Bank Information. After all Bank Information is inventoried, a sensitivity classification is assigned to the information using one of the following:

- **Secret** – Unauthorized access to this asset is critical to the Bank and can cause a substantial competitive disadvantage or financial loss to the Bank. The number of people with access to this data is very limited. This information is highly secured with very strict rules regarding its use.
- **Confidential** – Unauthorized access to this asset would likely cause a competitive disadvantage and some financial loss. This information is protected and limited to individuals who need it to perform their job functions. Consumer information as defined by GLBA is considered confidential information.
- **Personal** – Any information relating to an identifiable individual. It may include, but is not limited to, name, address, date of birth, email, telephone number, SSN, drivers license, internet protocol address, etc.

Some information assets, such as computer systems, may present a broad range of information across the classification range above. In this case, the classification assigned is at the highest level.

The next step is to identify which of the information assets contain personally identifiable information of consumers. A consumer is an individual who obtains or has obtained a financial product or service from the Bank that is to be used primarily for personal, family, or household purposes. Personally identifiable information is any information:

- A consumer provides to obtain a financial product or service.
- About a consumer resulting from any transaction involving a financial product or service.
- Otherwise obtained about a consumer in connection with providing a financial product or service.

### Threat and Vulnerability Assessment
Threats are events that can compromise the confidentiality, integrity, or availability of Bank Information. They are characterized as potential agents that can exploit a vulnerability to cause harm through the unauthorized disclosure, misuse, alteration, or destruction of Bank Information.

Vulnerabilities are characterized as weaknesses or control gaps that, if exploited, can result in the unauthorized disclosure, misuse, alteration, or destruction of information. Vulnerabilities are grouped into two types: known and expected.

Known vulnerabilities are discovered by testing of the environment, or through knowledge of policy weaknesses, inadequate implementations, or personnel issues. Examples of known deficiencies are those identified through quality control, audits, and examinations.

Confidential

ALLY_0260239

Expected vulnerabilities are those that can reasonably be anticipated to arise in the future. Examples include personnel turnover that may result in less experienced and less knowledgeable staff, new technology, business growth and expansion, and increasing complexity in software systems.

Although some known or expected vulnerabilities may only exist for a short time, until they are corrected, the risk assessment considers the risk posed for the time period the vulnerability might exist. For example, having temporary employees on-site for three months may only pose additional risk to Bank Information for a short duration; however, this limited risk must not be overlooked when performing the risk assessment.

To assess the potential damage, or impact, of threat agents being exploited by vulnerabilities, the Bank employs analytical methods to quantify the risk. The outcome of this analysis is used to determine a risk rating, or "residual risk," for each information asset that can be used to organize and prioritize Bank Information within a logical risk-rated framework.

### Residual Risk

Based on the analysis of Bank Information assets in regard to threat impact and vulnerability, a residual risk rating is determined that represents the overall security risk of the assets. Risks are prioritized and segregated into those the Bank is willing to accept and those that should be mitigated.

### Controls

Controls mitigate the impact or likelihood of identified threats exploiting vulnerabilities. The evaluation of control effectiveness addresses controls that prevent harm as well of those that detect harm and correct damage that occurs. Preventive controls act to limit the likelihood of a threat agent succeeding. Detective and corrective controls are essential to identify harmful actions as they occur, to facilitate their termination and reduce damage.

An evaluation of controls is performed to identify existing controls, assess their effectiveness, and determine if existing controls need strengthening or additional controls are needed to mitigate risks. Measures of control effectiveness may be obtained from various means, including security monitoring, self-assessments, metrics, and independent testing. The evaluation of controls also includes a review of relevant physical access controls – including access to records, equipment, Bank premises, and data center facilities.

## SECURITY CONTROLS

### ACCESS CONTROLS

The goal of access control is to control access to Bank Information by authorized users and devices and to disallow access to all others.

Confidential

ALLY_0260240

Authorized users may be employees, service provider or vendor employees, contractors, or customers. Access is authorized and provided only to individuals whose identity is established, and their activities are limited to the minimum required for business purposes.

Authorized devices are those whose placement on the networks is approved in accordance with GMAC Bank policy.

### Access Control Administration

The Bank employs the following standards to administer access rights:

- Users and devices are only given the access needed to perform their required functions.
- Access rights are updated based on personnel or system changes.
- Authentication controls are put into place in accordance with the level of risk of the application or system.
- Access privileges are authorized by application owners.
- Access rights are reviewed at appropriate intervals based on the risk to the application or system.
- The use of passwords is controlled through a formal management process.
- Users are required to follow good security practices in the selection and use of passwords.
- Password controls include the following:
  o Passwords must be masked, never displayed in clear text on any GMAC Bank computing and communication device.
  o Passwords must be stored in encrypted form, and where technically possible, transmitted using encryption.
  o Password file access is not allowed. Passwords can only be reset, not viewed.
  o Passwords are to be changed at an interval not to exceed 30 days. The 30-day password expiration policy applies to User Accounts and does not apply to System Administration Accounts, Application-to-Application Accounts, or External Facing Accounts (e.g., external consumer websites).
  o Password length must be a minimum of 8 characters
  o Application passwords must be minimum of 8 characters unless waived by Information security
  o Password configurations must be upper/lower case alpha, special characters and numeric combinations, where possible.
  o Password reuse must be restricted in accordance with standards defined in the GMAC Information Security Policy and Standard and GMAC ResCap Information Security Program.

Confidential

ALLY_0260241

- o  Failed access attempts must be logged and monitored to identify and address unauthorized access attempt activity.
- o  User access must be suspended after a maximum of 6 failed sign-on attempts, or after a 30 day period of inactivity

### Network Access Control

Network access control is the process of determining which network systems or users have access to GMAC Bank's data communications networks and which services are allowed to traverse various segments of the network. Network access control requirements include the following:

- Users are only provided with access to the services they have been specifically authorized to use.
- Physical and logical access to diagnostic and configuration ports is controlled.
- All external networks connected to GMAC Bank are restricted via a firewall.
- The firewall blocks all unauthorized service requests originating from external sources.
- The firewall blocks all external packets that appear to originate from an internal location.
- Applications or hosts that offer remote connectivity do not provide access to other systems.
- Approved authentication methods are used to control access by remote users.
- Network devices have appropriate session timeout values assigned.
- The activity of developers, testers, and others with privileged access to restricted datasets or files are logged and monitored.
- Penetration testing is performed on a regular basis or upon request by authorized management.
- Monitored Intrusion Detection/Protection is in place to monitor critical systems

### Operating System Access Control

Operating system access control is the process of securing and restricting access to GMAC Bank's system software within network clients and servers as well as stand-alone systems. System software includes the operating system and system utilities. Operating system access control requirements include the following:

- Access to operating systems is controlled by a secure log-on procedure.
- All users have a unique identifier (user ID) for their personal use only, and a suitable authentication technique is used to substantiate the claimed identity of a user.
- Systems for managing passwords meet the Bank's defined password standard.

Confidential

- The use of utility programs that might be capable of overriding system and application controls is restricted and tightly controlled.
- Inactive sessions are shut down after a defined period of inactivity not to exceed 30 minutes unless an approved Information Security waiver is approved for business reasons.
- Policies and standards are in place for updating operating systems with security patches.
- Devices that can access the operating system through physical and logical means are secured.
- Terminals and workstations are protected by time-out facilities which are activated after a predetermined period of inactivity has elapsed.
- The activity of developers, testers, and others with privileged access to restricted datasets or files is logged and monitored.
- Access to source code and executable programs is configured to restrict the ability to execute, modify, delete or create to appropriate individuals.

### Application Access Control

Application access control is the process of securing and restricting access to GMAC Bank's sensitive or mission-critical applications that support the information processing needs of the Bank's business lines. Effective application control are designed to enforce both segregation of duties and dual control, and ensure authorized users and applications have the minimum level of access needed to perform their business functions. Application access control requirements include the following:

- User access to information and application system functions is controlled in accordance with defined access control standards and based on the risk of the application. Access is granted based on least privilege.
- Access rights are monitored to ensure they are the minimum required for the user's current business needs.
- Time-of-day limitations on access are implemented where appropriate.
- Logging all access and security events to the application alongside the use of software to enable rapid analysis of user activities.

### Remote Access Control

Remote access control is the process of managing outside access to the Bank's network and computing resources by employees, vendors, and others. Remote access is necessary to support the Bank's operations for authorized users who for various reasons, cannot access the Bank's systems directly. Remote access to the Bank's systems provides an attacker with the opportunity to subvert those systems from outside the physical security perimeter and, therefore, must be aggressively controlled. Remote access control standards include the following:

- Remote access is granted to only those individuals who have a business justification for the access.

Confidential                                                                              ALLY_0260243

- Remote access devices are appropriately configured in accordance with GMAC or GMAC ResCap baseline standards.
- Appropriate authentication and encryption systems are employed to secure communications.
- Audit trails of all dial-up computing and communication activity between the host and user are maintained to help uncover intrusion attempts and/or success during sign-on and sign-off.
- Appropriate and timely patches, updates, and software maintenance are made to remote access devices.
- Periodic audits of access device configurations and patch levels are performed.

The use of Personal Digital Assistants (PDAs) that access the network must comply with GMAC PDA security baseline standards.

## PHYSICAL & ENVIRONMENTAL PROTECTION

### Building Security

The confidentiality, integrity, and availability of Bank Information can be impaired through physical access and damage or destruction to that information.  To ensure the ongoing security of Bank Information, the Bank has developed and adopted a Security Policy and Program in accordance with Section 3 of the Bank Protection Act, 12 USC 1882, as implemented by FDIC regulation 12 CFR 326, Subpart A, Minimum Security Procedures.

The objective of the Security Policy and Program is to discourage any activity that would jeopardize the physical security of the Bank, its employees, and assets at all times.  This includes Bank Information assets.

### Data Center Security

Additional security measures are required to protect Bank Information that resides in data centers, where unauthorized access leading to the disclosure, alteration, or destruction of that information can cause the Bank significant harm.

An overriding objective when selecting sites to house the Bank's most important information assets and systems is to limit the risk of exposure from internal and external sources.  This selection process includes a review of the surrounding area to determine if it is relatively safe from exposure to fire, flood, explosion, or similar environmental hazards.  Outside intruders can be deterred through the use of guards, fences, barriers, surveillance equipment, or other similar devices. Since access to key information system hardware and software should be limited, doors and windows must be secure.  Additionally, the location should not be identified or advertised by signage or other indicators. Detection devices, where applicable, should be used to prevent theft and safeguard equipment and should be configured to provide continuous coverage.

Confidential

ALLY_0260244

**Distributed IT Environments**

The level of security necessary to protect Bank Information in distributed hardware and software environments (e.g., local area networks or LANs) depends on the sensitivity of the data that can be accessed, the significance of applications processed, the cost of the equipment, and the availability of backup equipment.

Because of their portability and location in distributed environments, personal computers (PCs) can be prime targets for theft and misuse. The location of PCs within the Bank and the sensitivity of the data and systems they access is considered in determining the type and extent of physical security required.

At a minimum, physical protection for PCs includes physical locks or secure work areas enforced by appropriate authentication technologies, such as magnetic badge readers or electronic keyed entry. Additionally, PCs are password protected.

Physical access to the network components (i.e., files, applications, communications, etc.) is limited to those who require access to perform their jobs. Network workstations are password protected.

## ENCRYPTION

The goal of encryption is to secure communications and data storage, particularly authentication credentials and the transmission of sensitive information. It is used throughout the Bank's technological environment, including, where applicable, operating systems, middleware, applications, file systems, and communications protocols.

The Bank employs appropriate cryptographic controls to mitigate the risk of disclosure or alteration of Bank Information in storage and transit. At a minimum, the Bank's encryption standards adhere to the following requirements:

- Where encryption is implemented, only GMAC or GMAC ResCap-approved methods are used. All encryption methods are be publicly available algorithms. The algorithms used are approved by Information Security to ensure that the method meets current industry standards, including key recovery and other GMAC/ResCap security baseline requirements.
- The use of proprietary encryption techniques or file formats is prohibited.
- Minimum encryption key strengths are the greater of either 128 bit for symmetric, 2048 bit asymmetric for existing systems, and 3072 bit asymmetric for new systems, or as otherwise specified in the GMAC security baseline on cryptographic controls.

Confidential

ALLY_0260245

- Controls are in place to ensure the protection of encrypted communications endpoints.
- Encryption is used in the transmission and storage of authenticators – PINs, digital certificates, passwords, biometric templates.
- Effective key management is in place to establish standards and procedures for managing the use of encryption techniques.

## MALICIOUS CODE PREVENTION

Malicious code is any program that acts in unexpected and potentially damaging ways. Common types of malicious code are viruses, worms, Trojan horses, monitoring programs such as spyware, and cross-site scripts. The functions of malicious code can also act in combination to create more powerful malicious code.

The Bank employs appropriate controls to protect against malicious code. Controls include the use of technology, policies and procedures, and training, all applied in a layered manner from perimeters inward to hosts and data. Controls are applied at the host, network, and user levels and will include:

- Host hardening through the use of patches, upgrades, and fixes for installed software.
- Strict change control and configuration management.
- Monitoring of incoming and outgoing network traffic, including the use of anti-virus, anti-spyware and other monitors of malicious code.
- Prohibiting the use of unauthorized software
- User education in awareness, safe computing practices, indicators of malicious code, and response actions.

## SYSTEMS DEVELOPMENT, ACQUISITION, AND MAINTENANCE

Because information security is a critical part of internally and externally developed or acquired information systems, the Bank considers and incorporates appropriate automated controls into internally developed systems, or ensures the controls are incorporated into acquired systems, before the systems are deployed. To accomplish this, the Bank:

- Ensures systems are developed and implemented with appropriate security features enabled.
- Ensures software is trustworthy by implementing appropriate controls in the development process, reviewing source code, reviewing the history and reputation of vendors and third party developers, and implementing appropriate controls outside of the software to mitigate unacceptable risks from any deficiencies.
- Maintains appropriately robust configuration management and change control processes.
- Maintains effective patch management processes.

Confidential

ALLY_0260246

## PERSONNEL SECURITY

Because of their internal access levels and intimate knowledge of the Bank's systems and processes, employees, contractors, and third-party users of Bank Information pose a potential threat to the Bank's systems and data. These internal users can exploit their legitimate computer access for malicious, fraudulent, or economic reasons. Risk exposures from internal users can include:

- Altering data.
- Deleting production and back-up data.
- Disrupting systems.
- Destroying systems.
- Misusing systems for personal gain or to damage the Bank.
- Holding data hostage.
- Stealing strategic or customer data for corporate espionage or fraud schemes.

To mitigate the risks posed by internal users, the Bank applies appropriate controls when hiring employees and contractors and ensures they are properly trained in security awareness and agree to abide by the Bank's standards for authorized use, confidentiality, and nondisclosure. At a minimum, the Bank ensures employees and contractors are:

- Adequately screened prior to employment to:
  - Verify identity and employment eligibility.
  - Confirm employment experience and academic record.
  - Confirm they have no convictions for any criminal offenses involving dishonesty, a breach of trust, money laundering, or agreements to enter into a pretrial diversion or similar program in connection with a prosecution (FDIA Section 19 prohibitions).
  - Confirm they are not on any federal banking agency's listing of individuals who are or were assessed civil monetary penalties, are the subject of any strictures, prohibitions or limitations as part of Cease and Desist Orders issued against a financial institution, or have been permanently removed and/or prohibited from banking.
- Trained in security awareness and information protection upon hiring with yearly refresher training
- Provided with a copy of GMAC's Code of Conduct and Ethics and GMAC Bank's Code of Conduct and Ethics (collectively, the "Code") and required to affirm their compliance with the Code, which includes provisions relating to authorized use, confidentiality, and nondisclosure of company information.

Upon termination of employment, the supervising manager of the person leaving GMAC Bank contacts the Human Resources function at GMAC to initiate the removal of all access rights of that person to assets associated with the Bank's

Confidential                                                                   ALLY_0260247

information systems and services. Additionally, the supervising manager ensures the return of all issued software, Information, and equipment, including mobile computing devices, credit cards, access cards, software, manuals, and information stored on electronic media.

In the case of a contractor, the termination process may be handled by the agency responsible for the contractor.

## CUSTOMER INFORMATION SECURITY

Because of the heightened sensitivity of customer information and the Bank's obligation to comply with certain privacy laws and regulations, the Bank has established internal standards for its employees to follow to help safeguard the privacy, confidentiality, and security of customer information, whether in paper, electronic, verbal, or other form. The following general rules apply to customer information in any form.

Bank employees must:
- Access customer information only as needed to perform their specific job duties.
- Not disclose customer information to any unauthorized person or entity.
- Not share customer information with other employees, unless necessary to perform specific job duties.
- Properly dispose of customer information when no longer needed.

Bank employees will adhere to additional standards when dealing with the customer information in paper form, electronic form, and verbal form, including its disposal.

### Paper Media
Employees must make reasonable efforts to minimize access to customer information in paper files and documents being used at employees' desks, fax machines, photocopy machines, and in common areas. Minimum standards for employees to follow to protect paper files and documents include the following:
- When away from desks or work areas, make reasonable efforts to reduce access to customer information. This can be accomplished by placing customer files and documents in a place were they are not readily visible or accessible to others.
- When leaving work, secure all customer files and documents in lockable desks, cabinets, or other secure storage areas.
- Place all customer files and documents no longer needed for work purposes in waste/shred bins that are locked and appropriately labeled. Alert a member of the compliance staff or other responsible staff if waste/shred bins are full or not properly locked.

Confidential

ALLY_0260248

- Ensure all central cabinets and storage rooms that contain customer information are locked after business hours or when authorized staff are not present.

### Electronic Media

Employees must make reasonable efforts to prevent unauthorized access of customer information displayed on computer screens and stored on electronic media (e.g., computers, diskettes, CDs, tapes, etc.). This includes measures to shield observable customer information from unauthorized use on computer monitors, and safeguarding and limiting access to computers and detachable electronic media that contain customer information. Minimum standards for employees to follow to protect electronic media containing customer information include the following:

- To the extent practicable, ensure computers monitors are positioned in the work area to be out of the visual range of others.
- When leaving the work area during work hours, engage the computer's screen lock.
- After work hours, log off and shut the computer down.
- To the extent practicable, do not store customer information on a computer's hard drive. If it is necessary, the information must be encrypted.
- Ensure detachable media, including laptops, that contain customer data are properly secured when not in use.
- Password-protect documents containing customer information saved on detachable media. All information saved on detachable media must be encrypted though WinZip or other means.
- Delete all customer information on detachable media before discarding the media (see Disposal).

### Verbal Media

Employees must make reasonable efforts to protect the privacy of customer information in verbal exchanges with others. Employees must be aware of the potential for verbal disclosure of confidential customer information wherever a discussion occurs, including cubicles, employee common areas, or by telephone. Customer information must only be shared with other employees when there is a legitimate business need to do so. Employees must not discuss or disclose information about customers to family members, friends, or others outside the Company who do not otherwise have a business relationship with the Company and who do not have a legitimate business need to know the information.

### Disposal

Employees must make reasonable efforts to dispose of media containing customer information that is no longer needed for business purposes and is not required to be retained in accordance with the Bank's Record Retention Schedule or as directed by Legal Counsel. Minimum standards for employees to follow to properly dispose of customer information include the following:

Confidential                                                                        ALLY_0260249

Paper Media
- Place media in locked bins designated for document destruction (e.g. shred bins).
- If locked bins are not available or not usable (full), shred, burn, or pulverize paper media before discarding it so that the information cannot be read or reconstructed.

Electronic Media
- Erase or overwrite information on portable devices (e.g., CDs, DVDs, USB drives) that can be reused.
- Destroy portable devices before discarding them.  CDs and DVDs can be shred or cut (with scissors); USB drives can be burned, crushed, sanded, or chemically treated to render them inoperable (destruction of USB drives and similar flash media must only be done by appropriate IT staff).
- When disposing of old computers, use software overwrite ("wipe") utility programs (disposal and wiping of computers must only be done by appropriate IT staff).

## SERVICE PROVIDER OVERSIGHT

Because the Bank outsources many aspects of its operations, a significant amount of Bank Information, including the systems that house that information, resides outside the walls of the Bank.  Nevertheless, because the ultimate responsibility for the protection of Bank Information rests with the Bank, it must ensure its service providers have implemented adequate security controls to safeguard that information.  Accordingly, the Bank:
- Exercises appropriate due diligence in selecting service providers.
- Requires service providers by contract or agreement to implement appropriate security controls to comply with the requirements of the Bank's ISP.
- Independently reviews service providers, where appropriate, to confirm they maintain adequate security controls.
- Ensures arrangements are in place to notify the Bank of security breaches involving Bank Information.

## BUSINESS CONTINUITY CONSIDERATIONS

Because events that trigger the implementation of the Bank's Business Continuity Plan (BCP) may impact the security of Bank Information, the Bank ensures information security matters are adequately considered within its business continuity and disaster recovery processes.  This includes:

Confidential

ALLY_0260250

- Identifying personnel with key security roles during a continuity plan implementation, and ensuring those individuals are appropriately trained in their roles.
- Determining security needs for back-up sites and alternate communication networks.

## SECURITY MONITORING & RESPONSE

The goal of security monitoring is to identify control failures before a security incident occurs, detect an intrusion or other security incident in sufficient time to enable an effective and timely response, and support post-event forensics activities.

The Bank assures the adequacy of its information security control strategy as outlined within the ISP by:

- Monitoring network and host activity to identify policy violations and anomalous behavior.
- Monitoring host and network conditions to identify unauthorized configuration and other conditions that increase the risk of intrusion or other security events.
- Analyzing the results of monitoring to accurately and quickly identify, classify, escalate, report, and guide responses to security events.
- Responding to intrusions and other security events and weaknesses to appropriately mitigate the risk to the Bank and its customers, and to restore the Bank's systems.

The Bank may elect to outsource security monitoring and response, but maintains appropriate oversight of the process to remain informed of security incidents and assure timely response and corrective action.

Confidential

ALLY_0260251

# GMAC Bank

## (A Utah Corporation)

### Proposed Resolution of the Board of Directors on July 22, 2008

#### Approval of GMAC Bank Affiliate Agreement

**RESOLVED**, that the Board of Directors of GMAC Bank hereby approves the Standby Servicer Agreement among GMAC Bank, GMAC Mortgage, LLC, and U.S. Bank Home Mortgage, a division of U.S. Bank National Association, as presented to the Board, effective as of July 22, 2008, subject to obtaining any required regulatory approvals.

**RESOLVED FURTHER**, that the Executive Vice President – Chief Operating Officer or the Chief Financial Officer of GMAC Bank is hereby authorized in the name and on behalf of the Bank, to execute and deliver any and all such documents and to take any and all such other actions to carry out the purposes of the foregoing resolution as they in their discretion may deem necessary and proper.

Confidential

ALLY_0260252

# SUMMARY

## Approval of Standby Servicer Agreement

### Background

In connection with GMAC Bank's contingency planning efforts, Bank management has negotiated a Standby Servicer Agreement (the "Agreement") with U.S. Bank Home Mortgage, a division of U.S. Bank National Association ("U.S. Bank") and GMAC Mortgage, LLC ("GMAC Mortgage). Under the Agreement, U.S. Bank would agree to accept transfer of servicing of Bank loans from GMAC Mortgage, if and as required by the Bank.

The Agreement is primarily an arrangement with a third party, but the Agreement also requires that GMAC Mortgage provide certain services for the benefit of GMAC Bank. Accordingly, we have subjected the Agreement to the provisions of the Bank's Affiliate Transaction Policy. In accordance with the Bank's Affiliate Transaction Policy, the Bank's senior management, Chief Compliance Officer, Chief Operating Officer and the Office of the General Counsel reviewed the agreements proposed for adoption or amendment. They concluded that the agreements comply with Federal Reserve Act Sections 23A and 23B and Regulation W, which, among other things, require terms that are substantially the same, or at least as favorable to the Bank, as those prevailing or available at the time for comparable transactions with nonaffiliated companies.

### Major Points:

- GMAC Mortgage, LLC (GMACM) will provide certain information pertaining to loans serviced on behalf of the Bank to U.S. Bank, reporting on a weekly or daily basis as determined in GMAC Bank's discretion
- Upon sixty (60) days prior written notice, U.S. Bank shall accept transfer of servicing for GMAC Bank's loans from GMACM
- Reduces the Bank's risk in the event of insolvency/bankruptcy by GMACM

### Requested Action

- Approval of the attached resolution

Confidential

# SUMMARY

## Approval of Revisions to GMAC Bank Affiliate Agreements

### Background

In accordance with the Bank's Affiliate Transaction Policy, the Bank's senior
management, Chief Compliance Officer, Chief Operating Officer and the Office of the
General Counsel reviewed the agreements proposed for adoption or amendment. They
concluded that the agreements comply with Federal Reserve Act Sections 23A and 23B
and Regulation W, which, among other things, require terms that are substantially the
same, or at least as favorable to the Bank, as those prevailing or available at the time for
comparable transactions with nonaffiliated companies.

### Major Points:

**Amended and Restated Master Mortgage Loan Purchase and Sale Agreement
between GMAC Bank and GMAC Mortgage, LLC (GMACM)**
- Clarifies calculation of Purchase Price for 1st mortgages (cost basis) to reflect net
  carrying value under GAAP, clarifying forward sale commitment take-out price and
  market risk to Bank
  - Change responds to FDIC comment requesting clarification
- Provides terms and conditions for sale of Construction and Lot Loan assets, including
  ability to "put" delinquent assets to GMACM

**Fifth Addendum to Servicing Agreement between GMAC Bank and GMAC
Mortgage, LLC (GMACM)**
- Reduces requirement of prior written notice for termination without cause by the
  Bank from 120 days to 60 days
- Deletes termination fees payable by the Bank upon early termination of the
  Agreement

### Requested Action

- Approval of the attached resolution

Confidential

ALLY_0260254

**GMAC Bank**
(A Utah Corporation)

**Proposed Resolution of the Board of Directors on July 22, 2007**

**Approval and Adoption of Revisions to GMAC Bank Affiliate Agreements**

> **RESOLVED,** that the Board of Directors of GMAC Bank approves the revisions to the affiliate agreements of GMAC Bank as presented at this meeting, subject to obtaining any required regulatory approvals.

ALLY_0260255

# GMAC Bank

# Board of Directors Meeting

# Consolidated Financial Update

July 22, 2008

Confidential

# GMAC Bank

## Financial Summary Update as of June 30, 2008
## $(000)'s - PRELIMINARY

| Change in Allowance for Loan Losses | MTD | QTD | YTD | Current Balance |
|---|---|---|---|---|
| Mortgage Division | ($28,404) | ($57,313) | ($77,034) | ($142,518) |
| Automotive Division | (310) | (1,048) | (2,342) | (36,937) |
| Total | ($28,714) | ($58,361) | ($79,376) | ($179,455) |

| Loss Detail | MTD | QTD | YTD |
|---|---|---|---|
| Mortgage Net Losses | $34,374 | $58,929 | $82,482 |
| Automotive Retail Net Losses | 1,319 | 2,949 | 4,398 |
| Automotive Loss on Lease Terminations | 4,314 | 7,864 | 8,223 |
| Automotive Lease Impairment - Preliminary | 102,700 | 102,700 | 102,700 |
| Total Consolidated Losses | $142,707 | $172,442 | $197,803 |

| | Acutals | Business Plan | Variance |
|---|---|---|---|
| Total Assets | $31,765,526 | $31,504,109 | $261,417 |

| | | | | YTD | |
| Preliminary | MTD | QTD | YTD | Busines Plan | Over/(Under) |
|---|---|---|---|---|---|
| Net Income/(loss) | ($68,041) | ($44,147) | $19,332 | $143,473 | ($124,141) |

Confidential

# GMAC Bank Runoff Analysis

## GMAC Bank Board Meeting
### July 22, 2008

*GMAC Bank Confidential*

**GMAC Bank**

# GMAC Bank

## Runoff Analysis Summary

A 5 year cash flow forecast was created under the assumption that no new business would be added and no additional liquidity created. The analysis demonstrates the following:

- Additional liquidity would have to be created to replace liquidity taken by the Federal Home Loan Bank in order to pay off brokered CDs which mature in Q3 and Q4 of 2008

- Additional liquidity would have to be created to replace brokered money market deposits maturing in 2010

If no new liquidity was attained then the Bank could remain comfortably liquid over a 5 year time horizon by eliminating the HFS business and the warehouse business. This is true even in worst case scenarios when asset cash flows diminish due to mortgage extension or increases in non-accruing assets

*GMAC Bank Confidential*

2

ALLY_0260259

# GMAC Bank

The illustrations in the following slides represent the net cash position of the Bank in monthly increments out over a 5 year horizon under two scenarios (targeted asset liquidation and broad asset liquidation). If in either scenario the net cash position becomes negative (below the horizontal) the Bank would need to secure additional funding to remain solvent. Critical assumptions made to produce these views are as follows:

- No new asset acquisitions by the Bank
- No new liability issuances by the Bank (term liabilities are retired at their maturity dates), though MMDA and escrow deposits are held constant at current levels.
- All callable debt called if economically "in the money"
- Other (non-loan) assets stay flat at current levels

Using the assumptions, the following cash flow scenarios were created:

1. Scenario 1 - current cash position and immediate wind down of HFS and Warehouse

2. Scenario 2 - 50% of mortgage assets are liquidated at distressed prices

*GMAC Bank Confidential*

3

ALLY_0260260

# GMAC Bank

## Scenario 1 – current cash position and immediate wind down of HFS and Warehouse

- Monetizing the HFS and Warehouse businesses provides sufficient liquidity for the Bank to remain liquid over the course of the planning horizon



ALLY_0260261

# GMAC Bank

**Scenario 2 – 50% of mortgage assets are liquidated at distressed prices (80% for firsts, 50% for seconds)**

- The loss generated by such a sale would take the Bank's equity position to well below regulatory requirements (and possibly even negative)

- After the initial loss is recorded, the Bank remains liquid but much less profitable over the remaining horizon



# GMAC Bank

## Automotive Division
### (Period Ending June 30, 2008)

## Board of Directors Meeting
### July 22, 2008

Confidential

ALLY_0260263

# GMAC Bank

## Agenda

**Agenda Items:**

| | Page |
|---|---|
| --Automotive Division Portfolio Outstandings | 3 |
| --Retail & Lease Portfolio Performance Dashboard-Origination Volume & Outstandings by Source | 4 |
| --Retail & Lease Portfolio Performance Dashboard-Delinquency & Net Losses | 5 |
| --Commercial Portfolio-Dealer Loans | 6 |
| --Commercial Portfolio-Dealer Real Estate Loan Concentrations | 7 |
| --Commercial Portfolio-Credit Exceptions | 8 |
| --Commercial Portfolio-Wholesale Outstandings by Manufacturer | 9 |
| --Commercial Portfolio-Outstandings of Top 15 Dealerships | 10 |
| --Commercial (Credit Analysis Risk/Return System Ratings -Borrower & Facility) | 11-15 |
| --Retail & Lease Application & Booking Volume | 16 |
| --Retail & Lease Origination Volume | 17 |
| --Retail & Lease Credit Tier Distribution Dollars (Current Year vs Previous Year) | 18 |
| --Retail & Lease Credit Bureau Score Distribution Dollars (Current Year vs Previous Year) | 19 |
| --Retail & Lease Customer State Concentration | 20 |
| --Retail & Lease Delinquency by Customer State (Top 10) | 21 |
| --Retail & Lease Average EDC/AWV & MSRP | 22 |
| --Retail & Lease Delinquency | 23-27 |
| --Retail & Lease Payment Extensions | 28 |
| --Retail & Lease Bankruptcies | 29 |
| --Retail & Lease Repossessions/Early Terminations by Default | 30 |
| --Retail & Lease Monthly Losses | 31 |
| --Retail & Lease Booked Credit Exceptions | 32 |
| --Retail & Lease Credit Exceptions in Delinquency Status | 33 |
| --Retail & Lease Dealer Ranking Report | 34 |

Confidential

2

# GMAC Bank

## Automotive Division Outstandings



| | # | $ (bil) | $ % of Portfolio |
|---|---|---|---|
| GMAC Retail - New | 136,297 | $2,648.1 | 29.03% |
| GMAC Retail - Used | 36,977 | $538.7 | 5.91% |
| National - New | 5,290 | $113.0 | 1.24% |
| National - Used | 3,658 | $58.9 | 0.65% |
| SmartBuy | 8,345 | $216.8 | 2.38% |
| SmartLease | 113,429 | $3,081.0 | 33.78% |
| Real Estate Loans | 410 | $1,259.4 | 13.81% |
| Working Capital Loans | 107 | $85.6 | 0.94% |
| Borrowing Base LOC | 1 | $42.6 | 0.47% |
| Equipment Loans | 15 | $1.1 | 0.01% |
| Wholesale | 44,007 | $1,076.7 | 11.80% |
| Total | 348,536 | $9,122.0 | 100.00% |

Confidential

3

Confidential                                                                ALLY_0260265

# GMAC Bank

## Retail & Lease Portfolio

## Dashboard-Origination Volume & Outstandings by Source





Current Month Outstanding by Source

| | Jun-07 | | Jun-08 | | Variance | |
|---|---|---|---|---|---|---|
| | Units | $ (000) | Units | $ (000) | Units | $ (000) |
| Retail - New | 121,586 | $2,471,235 | 136,297 | $2,648,123 | 14,709 | $176,888 |
| Retail - Used | 22,372 | $353,706 | 36,977 | $538,721 | 14,605 | $185,015 |
| National - New | 650 | $0 | 5,290 | $112,957 | 4,640 | $112,956 |
| National - Used | 395 | $0 | 3,658 | $58,938 | 3,263 | $58,938 |
| SmartLease | 101,446 | $2,763,025 | 113,429 | $3,081,006 | 11,983 | $327,981 |
| SmartBuy | 7,310 | $199,499 | 8,345 | $216,801 | 1,035 | $17,303 |
| Total | 253,761 | $5,777,463 | 303,996 | $6,656,545 | 50,235 | $879,080 |

Origination Volume

| | | Jun-07 | | Jun-08 | | Variance | |
|---|---|---|---|---|---|---|---|
| | | Units | $ (000) | Units | $ (000) | Units | $ (000) |
| Retail | New | 3,195 | $98,111 | 2,101 | $58,980 | (1,094) | ($39,132) |
| | Used | 1,543 | $30,557 | 2,483 | $50,404 | 940 | $19,847 |
| National | New | 0 | $0 | 506 | $13,574 | 506 | $13,574 |
| | Used | 0 | $0 | 228 | $4,852 | 228 | $4,852 |
| SmartLease | New | 3,949 | $136,848 | 2,204 | $81,177 | (1,745) | ($57,770) |
| SmartBuy | New | 593 | $18,289 | 226 | $7,177 | (367) | ($11,113) |
| Total | | 9,280 | $285,905 | 7,748 | $216,163 | (1,532) | ($69,742) |

Confidential

# GMAC Bank

## Retail & Lease Portfolio

## Dashboard-Delinquency & Net Losses



Monthly Net Losses

Total Delinquency

| | Jun-07 | | Jun-08 | | Variance | |
|---|---|---|---|---|---|---|
| | $ (000) | % | $ (000) | % | $ (000) | % |
| 30-59 DPD | $21,265 | 0.38% | $30,422 | 0.49% | $9,157 | 0.11% |
| 60-88 DPD | $2,236 | 0.04% | $3,876 | 0.06% | $1,639 | 0.02% |
| 90 + DPD | $41 | 0.00% | $820 | 0.02% | $779 | 0.02% |
| Total | $23,542 | 0.43% | $35,118 | 0.57% | $11,575 | 0.14% |

| | Jun-07 | | Jun-08 | | Variance | |
|---|---|---|---|---|---|---|
| | Net C/O | % | Net C/O | % | Net C/O | % |
| Retail | $242,270 | 0.009% | $390,678 | 0.012% | $148,409 | 0.004% |
| National | $0 | 0.000% | $0 | 0.000% | $199,352 | 0.000% |
| SmartLease | $117,823 | 0.04% | $615,180 | 0.02% | $497,357 | 0.016% |
| SmartBuy | 55,096 | 0.03% | $120,507 | 0.056% | $115,411 | 0.053% |
| Total | $365,189 | 0.006% | $1,325,718 | 0.020% | $960,529 | 0.014% |

**ABA Consumer Credit Delinquency Bulletin**, as of the 1st Qtr 2008 (As of March 31, 2008)-30+ delinquency for indirect auto loans was 2.57% as a percent of dollars outstanding and 3.09% as a percent of accounts outstanding. Industry net charge-offs as a % of avg outstandings was 1.87%.

**GMAC 30+ Delinquency**, as of May 31, 2008 was 2.22% and gross losses were 1.33% for managed assets.

Confidential

# GMAC Bank

## Commercial Portfolio

### Dealer Loans

| # | UPB | # | Exposure | # | Exposure | # | Exposure | # | Exposure | # | Exposure |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $1,103.4 | $1,146.6 | 6 | 57.9 | $1,167.0 | | $1,222.0 | 44 | $1,289.8 | 504 | $1,388.7 | $1,523.9 |
| 416 | 436 | | | 445 | | 477 | | 27.5% | | 533 | 683 |

| # | UPB |
|---|---|
| 533 | $1,388.7 |

| LTV % | # | # | Exposure | $ | |
|---|---|---|---|---|---|
| <50% | 178 | 43.4% | | $ 346.89 | 27.5% |
| 51% - 65% | 77 | 18.8% | | $ 276.15 | 21.9% |
| 66% - 75% | 63 | 15.4% | | $ 270.12 | 21.4% |
| 76% - 90% | 38 | 9.3% | | $ 140.61 | 11.2% |
| 91% - 95% | 53 | 12.9% | | $ 221.82 | 17.6% |
| > 95% *** | 1 | 0% | | $ 3.85 | 0.3% |

Commercial portfolio currently has no delinquencies.
* Represents closed loans that have not been booked by Capmark.
*** A $3.9M RE loan was approved for the Serra Group (Team Automotive L.L.C.) with an 88% LTV as a deviation based on satisfactory credit factors.

Confidential

# GMAC Bank

## Commercial Portfolio

## Dealer Real Estate Concentrations

| Rank | State | ($ mil) | (% of Total) |
|------|-------|---------|--------------|
| 1 | Texas | 190.4 | 15.1% |
| 2 | California | 175.2 | 13.9% |
| 3 | Michigan | 144.9 | 11.5% |
| 4 | Rhode Island | 84.0 | 6.7% |
| 5 | Pennsylvania | 70.7 | 5.6% |
| 6 | Florida | 63.7 | 5.1% |
| 7 | Colorado | 52.6 | 4.2% |
| 8 | Wisconsin | 49.5 | 3.9% |
| 9 | New York | 42.6 | 3.4% |
| 10 | Georgia | 32.9 | 2.6% |
| | Others | 352.9 | 28.0% |
| | Total of Top 10 | 906.5 | 72.0% |
| | Total | 1,259.4 | |

Confidential

# GMAC Bank

## Commercial Portfolio

## *Credit Exceptions of Funded Loans

| | | | | | | Total |
|---|---|---|---|---|---|---|
| Inadequate Debt Service Coverage Ratio ** | 3 | 6 | 3 | 2 | 8 | 22 |
| Excessive Rent Factor PNUR | 1 | 0 | 0 | 0 | 0 | 77 |
| Excessive Rent Factor as % of Net Sales | 0 | 6 | 3 | 0 | 1 | 48 |
| Appraisal > 12 months | 0 | 1 | 0 | 0 | 0 | 8 |
| Non-Standard Insurance | 0 | 1 | 0 | 0 | 0 | 14 |
| Excessive LTV | 1 | 0 | 1 | 0 | 1 | 3 |
| Excessive Term | 1 | 2 | 1 | 8 | 4 | 29 |
| Excessive Amortization | 1 | 0 | 2 | 0 | 2 | 15 |
| Excessive Exposure to Obligor | 0 | 0 | 0 | 0 | 0 | 0 |
| ESA > 6 Months | 0 | 1 | 1 | 5 | 2 | 23 |
| BRR < 6+ | 1 | 0 | 0 | 2 | 1 | 9 |
| UCFP 100% AWV Advance | 0 | 0 | 0 | 0 | 0 | 2 |
| Other | 1 | 0 | 0 | 3 | 0 | 4 |
| Total | 9 | 17 | 10 | 21 | 19 | 254 |

*Represents GMAC Bank Utah funded loans
** Incorporated into the commercial lending policy in November 2007

Confidential

# GMAC Bank

## Commercial Portfolio

### Commercial Portfolio- Wholesale OS by Manufacturer

| Make | Outstandings ($MM) | % of Wholesale Portfolio |
|------|--------------------|--------------------------|
| Honda | $202,669.9 | 20.2% |
| Nissan | $170,681.7 | 17.0% |
| Toyota | $161,911.2 | 16.1% |
| Hyundai | $122,640.4 | 12.2% |
| Ford | $121,554.2 | 12.1% |
| Subaru | $46,207.4 | 4.6% |
| Kia | $38,764.6 | 3.9% |
| Mercedes | $38,722.5 | 3.9% |
| BMW | $22,200.5 | 2.2% |
| Volkswagen | $18,239.0 | 1.8% |
| Mitsubishi | $16,311.7 | 1.6% |
| Tata | $14,716.9 | 1.5% |
| All Others | $30,211.9 | 2.9% |

Confidential

# GMAC Bank

## Commercial Portfolio

## Outstandings – Top 15 Dealerships

| # | Dealer Name | State | | | | | % |
|---|---|---|---|---|---|---|---|
| 1 | CAR WAR LLC | RI | 5+ | $0.0 | $84.0 | $84.0 | 2.40% |
| 2 | STEVENSON CHEVROLET WEST INC | CO | 4 | $39.1 | $31.7 | $70.8 | 2.03% |
| 3 | VAN TUYL GROUP | AZ | 4 | $66.1 | $0.0 | $66.1 | 1.89% |
| 4 | BERGSTROM GROUP | WI | 5+ | $7.1 | $43.4 | $50.4 | 1.44% |
| 5 | TOM DURANT DEALER GROUP | TX | 4 | $3.6 | $42.4 | $46.0 | 1.32% |
| 6 | AUTONATION | FL | 4 | $0.0 | $42.6 | $42.6 | 1.22% |
| 7 | HENDRICK AUTOMOTIVE GROUP | NC | 4 | $41.0 | $0.0 | $41.0 | 1.17% |
| 8 | ANCIRA GROUP | TX | 5 | $14.6 | $19.2 | $33.9 | 0.97% |
| 9 | SEWELL DEALER GROUP | TX | 4 | $0.0 | $33.3 | $33.3 | 0.95% |
| 10 | GAIL FAULKNER DEALER GROUP | PA | 4 | $28.7 | $0.0 | $28.7 | 0.82% |
| 11 | SERRA GROUP | MI | 4 | $3.0 | $24.4 | $27.3 | 0.78% |
| 12 | BOWSER GROUP | PA | 4 | $15.5 | $11.4 | $26.9 | 0.77% |
| 13 | RUDDY GROUP | TX | 4 | $25.1 | $0.0 | $25.1 | 0.72% |
| 14 | BENSCO INC. | LA | 4 | $22.7 | $0.0 | $22.7 | 0.65% |
| 15 | FIVE STAR GROUP | WA | 5+ | $22.4 | $0.0 | $22.4 | 0.64% |

10

Confidential

# GMAC Bank

## Commercial Portfolio

## CARRS Ratings Trend - Loans & Wholesale Combined

| BRR | Aug-07 | | Mar-08 | | Apr-08 | | May-08 | | Jun-08 | | 08/07-06/08 Variance | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Satisfactory | 252 | 50.91% | 327 | 49.32% | 334 | 48.20% | 355 | 47.72% | 351 | 46.51% | 99 | 4.30% |
| Limited | 220 | 44.44% | 302 | 45.55% | 318 | 45.89% | 340 | 45.70% | 348 | 46.22% | 128 | 1.77% |
| Programmed | 23 | 4.65% | 34 | 5.13% | 41 | 5.92% | 49 | 6.59% | 54 | 7.17% | 31 | 2.52% |
| Total | 495 | 100.00% | 663 | 100.00% | 693 | 100.00% | 744 | 100.00% | 753 | 100.00% | 258 | 0.00% |

| FRR | Aug-07 | | Mar-08 | | Apr-08 | | May-08 | | Jun-08 | | 08/07-06/08 Variance | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Strong | 99 | 20.00% | 139 | 21.19% | 139 | 20.29% | 155 | 21.03% | 154 | 20.53% | 55 | 0.53% |
| Satisfactory | 308 | 62.22% | 409 | 62.35% | 426 | 62.19% | 456 | 61.87% | 462 | 61.60% | 154 | -0.62% |
| Acceptable | 87 | 17.58% | 107 | 16.31% | 120 | 17.52% | 126 | 17.10% | 131 | 17.47% | 44 | -0.11% |
| Special Mention** | 1 | 0.20% | 1 | 0.15% | - | - | 1 | 0.13% | 1 | 0.13% | 0 | -0.07% |
| Sub-Standard** | 0 | 0.00% | 0 | 0.00% | - | - | - | - | 2 | 0.27% | 2 | 0.27% |
| Total | 495 | 100.00% | 656 | 100.00% | 685 | 100.00% | 737 | 100.00% | 750 | 100.00% | 255 | 0.00% |

** We are in the process of validating assets and/or obtaining additional security. If the FRR can not be improved to an acceptable loan rating, the put option will be exercised.

Confidential

# GMAC Bank

## Retail & Lease Portfolio

### CARRS RATINGS LOANS & WHOLESALE COMBINED



**BRR Rating Chart**

| BRR | Dealerships Classification | % |
|---|---|---|
| 4 | | |
| 4+ | Satisfactory | 46.61 |
| 5+ | | |
| 5 | Limited | 46.22 |
| 5- | | |
| 6+ | | |
| 6 | Programmed | 7.17 |
| 6- | | |
| 7+ | | |
| Total | | 100.00 |

Total Ratings: 753

Confidential

12



**GMAC Bank**

**Commercial Portfolio**

BRR Ratings-Loans & Wholesale Combined

| BRR | Dealerships | | | Current Exposure | |
|---|---|---|---|---|---|
| | Classification | % | | $ | % |
| 4- | Satisfactory | 46.61 | | 316,322,021 | 9.32 |
| 4- | | | | 1,055,371,150 | 31.10 |
| 5+ | | | | 476,996,908 | 14.06 |
| 5 | Limited | 46.22 | | 471,163,593 | 13.95 |
| 5- | | | | 482,678,273 | 14.22 |
| 6+ | | | | 420,509,617 | 12.39 |
| 6 | Programmed | 7.17 | | 95,923,499 | 2.82 |
| 6- | | | | 70,511,992 | 2.08 |
| 7+ | | | | 3,979,909 | 0.12 |
| Total | | 100.00 | | 3,393,456,962 | 100.00 |

Confidential                                                                 ALLY_0260275

# GMAC Bank

## Commercial Portfolio

### CARRS RATINGS LOANS & WHOLESALE COMBINED



**FRR Rating Chart**

| FRR | Dealerships Classification | % |
|---|---|---|
| 2- | Strong | 20.53 |
| 3+<br>3<br>3- | Satisfactory | 61.60 |
| 4+<br>4 | Acceptable | 17.47 |
| *4- | Special Mention | 0.13 |
| *5+ | Sub-Standard | 0.27 |
| Total | | 100.00 |

Total Ratings: 750

* We are in the process of validating assets and/or obtaining additional security. If the FRR can not be improved to an acceptable loan rating, the put option will be exercised

Confidential

ALLY_0260276

## GMAC Bank

## Commercial Portfolio

15



**FRR Ratings-Loans & Wholesale Combined**

| FRR | Dealerships | | Current Exposure | |
|---|---|---|---|---|
| | Classification | % | $ | % |
| 2 | Strong | 20.53 | 21,955,994 | 0.65 |
| 2- | | | 1,011,022,179 | 29.79 |
| 3+ | | | 458,121,541 | 13.50 |
| 3 | Satisfactory | 61.60 | 798,239,991 | 23.52 |
| 3- | | | 517,541,569 | 16.02 |
| 4+ | | | 324,004,404 | 9.55 |
| 4 | Acceptable | 17.47 | 158,192,484 | 4.66 |
| *4- | Special Mention | 0.13 | 3,049,000 | 0.09 |
| *5+ | Sub-Standard | 0.27 | 7,427,000 | 0.22 |
| Total | | 100.00 | 3,393,456,962 | 100.00 |

* We are in the process of validating assets and/or obtaining additional security. If the FRR can not be improved to an acceptable loan rating the put option will be exercised.

Confidential

**GMAC Bank**

**Retail & Lease Portfolio**

## Application & Booking Volume

| GMAC | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | YTD 2007 | YTD 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Applications | 14,873 | 13,250 | 11,460 | 11,408 | 10,864 | 13,686 | 10,156 | 9,653 | 17,392 | 11,415 | 10,707 | 16,462 | 90,961 | 75,785 |
| Approved/Qualified | 12,796 | 11,003 | 9,379 | 8,921 | 8,860 | 11,535 | 8,469 | 7,805 | 15,072 | 9,263 | 8,549 | 14,029 | 70,284 | 63,187 |
| % A/Q to Apply | 86.04% | 83.04% | 81.84% | 78.20% | 81.55% | 88.15% | 83.39% | 80.86% | 86.66% | 81.15% | 79.84% | 85.22% | 77.27% | 83.38% |
| Booked | 11,312 | 11,690 | 8,229 | 8,105 | 6,660 | 7,899 | 9,338 | 5,917 | 9,921 | 9,545 | 6,166 | 7,014 | 56,112 | 47,901 |
| Booked to Look % | 76.1% | 88.2% | 71.8% | 71.0% | 61.3% | 60.4% | 91.9% | 61.3% | 57.0% | 83.6% | 57.6% | 42.6% | 61.7% | 63.2% |
| Capture Ratio | 88.4% | 106.2% | 87.7% | 90.9% | 75.2% | 68.5% | 110.3% | 75.8% | 65.8% | 103.0% | 72.1% | 50.0% | 79.8% | 75.8% |

| National | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | YTD 2007 | YTD 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Applications | 9,777 | 9,971 | 9,457 | 9,801 | 8,838 | 8,695 | 9,155 | 8,588 | 9,404 | 8,961 | 9,471 | 9,102 | | 54,681 |
| Approved/Qualified | 4,245 | 4,271 | 3,815 | 3,476 | 2,938 | 3,334 | 2,693 | 2,376 | 2,968 | 2,644 | 2,927 | 2,885 | | 16,493 |
| % A/Q to Apply | 43.42% | 42.83% | 40.34% | 35.47% | 33.24% | 38.34% | 29.42% | 27.67% | 31.56% | 29.51% | 30.90% | 31.70% | | 30.16% |
| Booked | 1,134 | 1,209 | 1,004 | 933 | 747 | 684 | 796 | 470 | 606 | 690 | 607 | 734 | | 3,897 |
| Booked to Look % | 11.6% | 12.1% | 10.6% | 9.5% | 8.5% | 7.9% | 8.6% | 5.5% | 6.4% | 7.7% | 6.4% | 8.1% | | 7.1% |
| Capture Ratio | 26.7% | 28.3% | 26.3% | 26.8% | 25.4% | 20.5% | 29.3% | 19.8% | 20.4% | 26.1% | 20.7% | 23.4% | | 23.6% |

| Combined | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | YTD 2007 | YTD 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Applications | 24,650 | 23,221 | 20,917 | 21,209 | 19,702 | 21,781 | 19,311 | 18,241 | 26,796 | 20,376 | 20,178 | 25,564 | 90,961 | 130,466 |
| Approved/Qualified | 17,041 | 15,274 | 13,194 | 12,397 | 11,798 | 14,869 | 11,162 | 10,181 | 18,040 | 11,907 | 11,476 | 16,914 | 70,284 | 79,680 |
| % A/Q to Apply | 69.13% | 65.78% | 63.08% | 58.45% | 59.88% | 68.27% | 57.80% | 55.81% | 67.32% | 58.44% | 56.87% | 66.16% | 77.27% | 61.07% |
| Booked | 12,446 | 12,899 | 9,233 | 9,038 | 7,407 | 8,583 | 10,128 | 6,387 | 10,527 | 10,235 | 6,773 | 7,748 | 56,112 | 51,798 |
| Booked to Look % | 50.5% | 55.5% | 44.1% | 42.6% | 37.6% | 39.4% | 52.4% | 35.0% | 39.3% | 50.2% | 33.6% | 30.3% | 61.7% | 39.7% |
| Capture Ratio | 73.0% | 84.5% | 70.0% | 72.9% | 62.8% | 57.7% | 90.7% | 62.7% | 58.4% | 86.0% | 59.0% | 45.8% | 79.8% | 65.0% |

Confidential

16

Confidential

# GMAC Bank

## Retail & Lease Portfolio

### Origination Volume



| | | Jan-08 | | Feb-08 | | Mar-08 | | Apr-08 | | May-08 | | Jun-08 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Units | $ (000) | Units | $ (000) | Units | $ (000) | Units | $ (000) | Units | $ (000) | Units | $ (000) |
| Retail | New | 3,647 | $119,129 | 1,474 | $48,863 | 4,419 | $139,023 | 3,910 | $130,962 | 1,288 | $45,483 | 2,101 | $58,980 |
| | Used | 1,314 | $31,790 | 1,608 | $32,727 | 1,672 | $34,774 | 2,220 | $47,426 | 2,313 | $48,635 | 2,483 | $50,404 |
| National | New | 427 | $12,336 | 276 | $8,171 | 370 | $11,287 | 439 | $12,702 | 415 | $11,798 | 506 | $13,574 |
| | Used | 363 | $7,881 | 194 | $4,439 | 236 | $5,184 | 251 | $5,721 | 192 | $4,155 | 228 | $4,852 |
| SmartLease | New | 3,676 | $130,361 | 2,557 | $92,010 | 3,530 | $126,064 | 3,181 | $113,479 | 2,376 | $84,942 | 2,204 | $81,177 |
| SmartBuy | New | 501 | $15,858 | 278 | $8,665 | 300 | $10,594 | 234 | $7,050 | 189 | $5,770 | 226 | $7,177 |
| Total | | 10,128 | $317,354 | 6,387 | $194,875 | 10,527 | $326,926 | 10,235 | $317,340 | 6,773 | $200,783 | 7,748 | $216,163 |
| O(U) previous month | | 2,530 | $69,576 | (3,741) | ($122,479) | 4,140 | $132,051 | (292) | ($9,586) | (3,462) | ($116,557) | 975 | $15,380 |

Confidential

17

# GMAC Bank

# Retail & Lease Portfolio

## Credit Tier Distribution – Current Year vs. Previous Year

| | | Jun-07 | | Jun-08 | | Variance | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | $ (000) | % of Portfolio | $ (000) | % of Portfolio | $ (000) | % of Portfolio |
| Retail | S | $982,703 | 34.8% | $1,193,550 | 37.5% | $210,847 | 2.7% |
| | A | $1,253,116 | 44.4% | $1,417,253 | 44.5% | $164,137 | 0.1% |
| | B | $512,174 | 18.1% | $519,390 | 16.3% | $7,215 | -1.8% |
| | C | $576,809 | 2.7% | $556,544 | 1.5% | ($20,265) | -0.9% |
| | Other | $139 | 0.0% | $108 | 0.0% | ($31) | 0.0% |
| | Total | $2,524,941 | | $3,186,844 | | $361,903 | |
| Nd-Retail | S | $0 | 0.0% | $67,167 | 39.1% | $67,167 | 39.1% |
| | A | $0 | 0.0% | $71,879 | 41.8% | $71,879 | 41.8% |
| | B | $0 | 0.0% | $29,936 | 17.4% | $29,936 | 17.4% |
| | C | $0 | 0.0% | $2,913 | 1.7% | $2,913 | 1.7% |
| | Other | $0 | 0.0% | $0 | 0.0% | $0 | 0.0% |
| | Total | $0 | | $171,895 | | $171,895 | |
| SmartLease | S | $1,708,335 | 62.1% | $1,840,563 | 59.7% | $132,228 | -2.3% |
| | A | $778,463 | 28.3% | $936,903 | 30.4% | $158,440 | 2.1% |
| | B | $242,190 | 8.8% | $280,507 | 9.1% | $38,317 | 0.3% |
| | C | $23,884 | 0.9% | $22,904 | 0.7% | ($980) | -0.1% |
| | Other | $152 | 0.0% | $128 | 0.0% | ($24) | 0.0% |
| | Total | $2,753,025 | | $3,081,005 | | $327,980 | |
| SmartBuy | S | $60,009 | 30.1% | $71,923 | 33.2% | $11,914 | 3.1% |
| | A | $67,441 | 33.8% | $73,489 | 33.9% | $6,049 | 0.1% |
| | B | $61,012 | 30.6% | $62,586 | 28.9% | $1,574 | -1.7% |
| | C | $11,037 | 5.5% | $8,803 | 4.1% | ($2,234) | -1.5% |
| | Other | $0 | 0.0% | $0 | 0.0% | $0 | 0.0% |
| | Total | $199,499 | | $216,801 | | $17,303 | |
| Total | S | $2,751,047 | 47.6% | $3,173,203 | 47.7% | $422,155 | 0.1% |
| | A | $2,099,020 | 36.3% | $2,499,524 | 37.5% | $400,504 | 1.2% |
| | B | $815,377 | 14.1% | $892,419 | 13.4% | $77,042 | -0.7% |
| | C | $611,729 | 1.5% | $591,164 | 1.4% | ($20,565) | -0.6% |
| | Other | $291 | 0.0% | $237 | 0.0% | ($55) | 0.0% |
| | Total | $5,777,465 | | $6,656,546 | | $879,081 | |

| % of Tier 1 Capital | Tier 1 Capital Guideline | Credit Tier Guideline |
| --- | --- | --- |
| 162.3% | Unlimited | Unlimited |
| 25.5% | <= 250% | <= 30% |
| 2.6% | <= 100% | <= 8% |
| 190.4% | | |

Confidential

18

# GMAC Bank

## Retail & Lease Portfolio

## Combined Dollars by FICO – Current Year vs. Previous Year

| | Jun-07 | | Jun-08 | | Variance | |
|---|---|---|---|---|---|---|
| | $ (000) | % of Portfolio | $ (000) | % of Portfolio | $ (000) | % of Portfolio |
| < 661 | $7,636 | 0.1% | $7,760 | 0.1% | $124 | 0.0% |
| 661 - 679 | $463,895 | 8.0% | $526,465 | 8.1% | $62,569 | 0.1% |
| 680 - 699 | $564,703 | 9.8% | $632,998 | 9.8% | $68,295 | 0.0% |
| 700 - 719 | $644,385 | 11.2% | $717,412 | 11.1% | $73,027 | -0.1% |
| 720 - 739 | $653,952 | 11.3% | $727,006 | 11.2% | $73,055 | -0.1% |
| 740 - 759 | $621,137 | 10.8% | $687,450 | 10.6% | $66,313 | -0.1% |
| 760 - 779 | $590,944 | 10.2% | $646,689 | 9.9% | $55,745 | -0.3% |
| 780 - 799 | $658,149 | 11.4% | $732,865 | 11.3% | $74,716 | -0.1% |
| > 800 | $1,572,665 | 27.2% | $1,806,007 | 27.9% | $233,341 | 0.7% |
| Total | $5,777,465 | | $6,484,651 | | $707,186 | |

Confidential

19

# GMAC Bank

## Retail & Lease Portfolio

## Dollars & Accounts Outstandings by Customer State

| Customer State | Rank* | Retail | | National | | SmartLease | | SmartBuy | | Total | | % of Total | | % of Tier 1 Capital |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | # | $ | # | $ | # | $ | # | $ | # | $ | # | $ | |
| Ohio | 1 | 13,295 | $225,995,882 | 281 | $5,237,655 | 20,543 | $484,660,301 | 28 | $602,772 | 34,147 | $716,496,610 | 11.23% | 10.76% | 20.49% |
| California | 2 | 17,031 | $366,706,837 | 823 | $14,311,943 | 8,644 | $293,612,484 | 6 | $134,818 | 26,504 | $674,766,084 | 8.72% | 10.14% | 19.30% |
| Pennsylvania | 3 | 10,434 | $163,688,371 | 181 | $2,854,083 | 10,054 | $259,197,184 | 1,204 | $24,042,278 | 21,873 | $449,781,916 | 7.20% | 6.76% | 12.87% |
| Michigan | 4 | 4,618 | $71,385,753 | 227 | $3,757,282 | 14,172 | $325,556,038 | 12 | $233,102 | 19,029 | $400,932,176 | 6.26% | 6.02% | 11.47% |
| Texas | 5 | 11,352 | $218,084,183 | 2,304 | $49,119,816 | 263 | $8,204,759 | 2,884 | $94,276,250 | 16,803 | $369,685,007 | 5.53% | 5.55% | 10.57% |
| Florida | 6 | 7,113 | $135,080,332 | 534 | $10,522,336 | 6,940 | $210,527,282 | 29 | $698,587 | 14,616 | $356,828,537 | 4.81% | 5.36% | 10.21% |
| New York | 7 | 4,754 | $79,070,939 | 296 | $5,463,397 | 9,372 | $248,080,534 | 800 | $15,249,625 | 15,222 | $347,864,494 | 5.01% | 5.23% | 9.95% |
| Arizona | 8 | 6,541 | $153,740,472 | 165 | $3,205,764 | 3,635 | $127,514,155 | 12 | $290,480 | 10,353 | $284,750,891 | 3.41% | 4.28% | 8.15% |
| Illinois | 9 | 8,068 | $137,365,989 | 108 | $2,116,394 | 2,628 | $82,158,955 | 780 | $14,750,874 | 11,584 | $236,392,212 | 3.81% | 3.55% | 6.76% |
| Indiana | 10 | 5,645 | $93,028,793 | 51 | $895,720 | 5,265 | $129,576,047 | 165 | $2,745,139 | 11,126 | $226,245,699 | 3.66% | 3.40% | 6.47% |
| All Other | | 84,423 | $1,542,696,605 | 3,978 | $74,410,739 | 31,913 | $911,897,845 | 2,426 | $63,877,279 | 122,739 | $2,552,882,557 | 40.38% | 38.95% | |
| Total of Top 10 | | 88,851 | $1,644,147,552 | 4,970 | $97,484,411 | 81,516 | $2,169,107,739 | 5,920 | $152,923,926 | 181,257 | $4,063,663,627 | 59.62% | 61.04% | |
| Total | | 173,274 | $3,186,844,356 | 8,948 | $171,895,149 | 113,429 | $3,081,005,583 | 8,345 | $216,801,205 | 303,996 | $6,656,546,293 | | | |

*Ranking based on percentage of total dollars
Outstandings exclude bankrupt accounts

Confidential

20

ALLY_0260282

# GMAC Bank

## Retail & Lease Portfolio

## Delinquency & Losses by State

| Customer State | Rank | % 30-59 DPD | % 60-89 DPD | % 90+ DPD | % Repossession | Losses |
|---|---|---|---|---|---|---|
| Ohio | 1 | 0.41% | 0.04% | 0.00% | 0.05% | 0.001% |
| California | 2 | 0.69% | 0.14% | 0.03% | 0.12% | 0.002% |
| Pennsylvania | 3 | 0.38% | 0.03% | 0.02% | 0.04% | 0.001% |
| Michigan | 4 | 0.45% | 0.06% | 0.00% | 0.07% | 0.002% |
| Texas | 5 | 0.56% | 0.09% | 0.08% | 0.07% | 0.003% |
| Florida | 6 | 0.57% | 0.08% | 0.01% | 0.16% | 0.002% |
| New York | 7 | 0.30% | 0.03% | 0.00% | 0.02% | 0.001% |
| Arizona | 8 | 0.79% | 0.10% | 0.04% | 0.09% | 0.001% |
| Illinois | 9 | 0.23% | 0.09% | 0.03% | 0.06% | 0.000% |
| Indiana | 10 | 0.53% | 0.08% | 0.03% | 0.05% | 0.001% |
| All Other | | 0.45% | 0.05% | 0.02% | 0.05% | 0.007% |

| Total of Top 10 | 0.30% | 0.04% | 0.01% | 0.04% | 0.014% |
|---|---|---|---|---|---|

| Total | 0.49% | 0.06% | 0.01% | 0.06% | 0.020% |
|---|---|---|---|---|---|

21

Confidential

# GMAC Bank

## Retail & Lease Portfolio

### Average EDC/AWV and % of MSRP

| Booking Date | Portfolio | Units Booked | | Average Term | | Average EDC/ AWV or % of MSRP | |
|---|---|---|---|---|---|---|---|
| | | New | Used | New | Used | New | Used |
| Jan 2008 MTD | Retail | 3,647 | 1,514 | 63.3 | 56.6 | 100% | 99% |
| | Nationals | 427 | 363 | 71.2 | 67.2 | 99% | 112% |
| | SmartLease | 3,677 | 0 | 37.0 | 0.0 | 99% | 0% |
| | SmartBuy | 501 | 0 | 41.3 | 0.0 | 85% | 0% |
| Feb 2008 MTD | Retail | 1,474 | 1,608 | 61.8 | 57.3 | 97% | 101% |
| | National | 276 | 194 | 71.2 | 68.8 | 103% | 114% |
| | SmartLease | 2,557 | 0 | 37.0 | 0.0 | 100% | 0% |
| | SmartBuy | 278 | 0 | 41.3 | 0.0 | 87% | 0% |
| Mar 2008 MTD | Retail | 4,419 | 1,672 | 60.3 | 58.4 | 96% | 105% |
| | National | 370 | 236 | 72.9 | 68.1 | 106% | 119% |
| | SmartLease | 3,530 | 0 | 37.0 | 0.0 | 99% | 0% |
| | SmartBuy | 300 | 0 | 41.7 | 0.0 | 91% | 0% |
| Apr 2008 MTD | Retail | 3,910 | 2,220 | 61.9 | 57.9 | 97% | 105% |
| | National | 439 | 251 | 72.6 | 67.6 | 106% | 117% |
| | SmartLease | 3,181 | 0 | 36.0 | 0.0 | 99% | 0% |
| | SmartBuy | 234 | 0 | 40.6 | 0.0 | 86% | 0% |
| May 2008 MTD | Retail | 1,288 | 2,313 | 65.0 | 58.0 | 98% | 104% |
| | National | 415 | 192 | 72.0 | 67.4 | 105% | 115% |
| | SmartLease | 2,376 | 0 | 36.0 | 0.0 | 98% | 0% |
| | SmartBuy | 189 | 0 | 40.8 | 0.0 | 86% | 0% |
| Jun 2008 MTD | Retail | 2,101 | 2,483 | 63.1 | 57.7 | 102% | 104% |
| | National | 506 | 226 | 71.7 | 68.2 | 103% | 113% |
| | SmartLease | 2,204 | 0 | 36.0 | 0.0 | 98% | 0% |
| | SmartBuy | 226 | 0 | 39.9 | 0.0 | 89% | 0% |
| 2006 YTD | Retail | 62,690 | 10,907 | 62.7 | 54.6 | 95% | 95% |
| | SmartLease | 48,065 | 0 | 35.0 | 0.0 | 98% | 0% |
| | SmartBuy | 7,033 | 0 | 43.4 | 0.0 | 88% | 0% |
| 2007 YTD | Retail | 42,853 | 16,667 | 57.2 | 57.1 | 94% | 107% |
| | National | 3,874 | 2,910 | 69.7 | 66.7 | 94% | 111% |
| | SmartLease | 40,488 | 0 | 36.0 | 0.0 | 98% | 0% |
| | SmartBuy | 5,581 | 0 | 42.7 | 0.0 | 96% | 0% |
| 2008 YTD | Retail | 16,839 | 11,810 | 62.2 | 57.7 | 98% | 103% |
| | National | 2,433 | 1,464 | 72.0 | 67.8 | 103% | 115% |
| | SmartLease | 17,525 | 0 | 37.0 | 0.0 | 99% | 0% |
| | SmartBuy | 1,728 | 0 | 41.1 | 0.0 | 97% | 0% |

Confidential

22

# GMAC Bank

# Retail & Lease Portfolio

## Retail Delinquency



### Units | % of Retail Portfolio

| | Jul-07 | | Aug-07 | | Sep-07 | | Oct-07 | | Nov-07 | | Dec-07 | | Jan-08 | | Feb-08 | | Mar-08 | | Apr-08 | | May-08 | | Jun-08 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| 30-59 DPD | 514 | 0.35% | 535 | 0.35% | 586 | 0.38% | 635 | 0.41% | 547 | 0.35% | 718 | 0.45% | 574 | 0.35% | 488 | 0.34% | 499 | 0.30% | 477 | 0.28% | 576 | 0.34% | 602 | 0.35% |
| 60-89 DPD | 51 | 0.03% | 50 | 0.03% | 45 | 0.03% | 52 | 0.03% | 50 | 0.03% | 60 | 0.04% | 43 | 0.03% | 36 | 0.02% | 31 | 0.02% | 28 | 0.02% | 44 | 0.03% | 69 | 0.04% |
| 90 + DPD | 1 | 0.00% | 3 | 0.00% | 4 | 0.00% | 10 | 0.01% | 11 | 0.01% | 7 | 0.00% | 8 | 0.00% | 6 | 0.00% | 14 | 0.01% | 12 | 0.01% | 7 | 0.00% | 8 | 0.00% |
| Total | 566 | 0.39% | 588 | 0.39% | 635 | 0.41% | 697 | 0.45% | 608 | 0.39% | 785 | 0.49% | 625 | 0.38% | 530 | 0.32% | 544 | 0.33% | 517 | 0.31% | 627 | 0.37% | 679 | 0.39% |

### Dollars (000) | % of Retail Portfolio

| | Jul-07 | | Aug-07 | | Sep-07 | | Oct-07 | | Nov-07 | | Dec-07 | | Jan-08 | | Feb-08 | | Mar-08 | | Apr-08 | | May-08 | | Jun-08 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $ | % | $ | % | $ | % | $ | % | $ | % | $ | % | $ | % | $ | % | $ | % | $ | % | $ | % | $ | % |
| 30-59 DPD | $10,886 | 0.38% | $11,052 | 0.39% | $12,660 | 0.43% | $13,539 | 0.43% | $11,669 | 0.38% | $14,575 | 0.47% | $11,341 | 0.38% | $10,084 | 0.32% | $10,707 | 0.34% | $9,904 | 0.31% | $11,850 | 0.37% | $12,814 | 0.40% |
| 60-89 DPD | $1,144 | 0.04% | $1,042 | 0.04% | $821 | 0.03% | $1,104 | 0.04% | $1,203 | 0.04% | $1,429 | 0.05% | $862 | 0.03% | $826 | 0.03% | $760 | 0.02% | $602 | 0.02% | $1,044 | 0.03% | $1,478 | 0.05% |
| 90 + DPD | $50 | 0.00% | $91 | 0.00% | $55 | 0.00% | $170 | 0.01% | $195 | 0.01% | $200 | 0.01% | $173 | 0.01% | $55 | 0.00% | $235 | 0.01% | $145 | 0.00% | $31 | 0.00% | $153 | 0.00% |
| Total | $12,030 | 0.42% | $12,185 | 0.42% | $13,536 | 0.46% | $14,913 | 0.50% | $13,067 | 0.43% | $16,204 | 0.53% | $12,075 | 0.42% | $10,966 | 0.35% | $11,702 | 0.37% | $10,651 | 0.33% | $12,925 | 0.40% | $14,445 | 0.45% |

Confidential

23

# GMAC Bank

## Retail & Lease Portfolio

## SmartLease Delinquency



Delinquency Dollars — % of total portfolio — Total Delinquency — Dollars (000)



Delinquency Units — % of total portfolio — Total Delinquency — Units

### Units / % of SmartLease Portfolio

|  | Jul-07 | | Aug-07 | | Sep-07 | | Oct-07 | | Nov-07 | | Dec-07 | | Jan-08 | | Feb-08 | | Mar-08 | | Apr-08 | | May-08 | | Jun-08 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| 30-59 DPD | 382 | 0.36% | 410 | 0.38% | 463 | 0.42% | 489 | 0.44% | 386 | 0.35% | 542 | 0.48% | 398 | 0.35% | 426 | 0.37% | 441 | 0.38% | 462 | 0.40% | 494 | 0.43% | 549 | 0.48% |
| 60-89 DPD | 26 | 0.02% | 45 | 0.04% | 49 | 0.04% | 47 | 0.04% | 50 | 0.05% | 51 | 0.05% | 42 | 0.04% | 37 | 0.03% | 45 | 0.04% | 53 | 0.05% | 52 | 0.05% | 61 | 0.05% |
| 90+ DPD | 6 | 0.01% | 2 | 0.00% | 2 | 0.00% | 9 | 0.01% | 8 | 0.01% | 2 | 0.00% | 2 | 0.00% | 4 | 0.00% | 7 | 0.01% | 14 | 0.01% | 16 | 0.01% | 18 | 0.02% |
| Total | 414 | 0.39% | 457 | 0.42% | 514 | 0.47% | 545 | 0.49% | 444 | 0.40% | 595 | 0.53% | 442 | 0.39% | 467 | 0.40% | 493 | 0.43% | 529 | 0.45% | 562 | 0.49% | 628 | 0.55% |

### Dollars (000) / % of SmartLease Portfolio

|  | Jul-07 | | Aug-07 | | Sep-07 | | Oct-07 | | Nov-07 | | Dec-07 | | Jan-08 | | Feb-08 | | Mar-08 | | Apr-08 | | May-08 | | Jun-08 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| 30-59 DPD | $11,257 | 0.37% | $11,767 | 0.38% | $13,729 | 0.43% | $14,752 | 0.46% | $11,663 | 0.40% | $15,650 | 0.49% | $11,910 | 0.40% | $12,561 | 0.40% | $13,360 | 0.43% | $13,864 | 0.37% | $15,635 | 0.40% | $16,633 | 0.44% |
| 60-89 DPD | $979 | 0.04% | $1,333 | 0.03% | $1,708 | 0.03% | $1,525 | 0.04% | $1,684 | 0.04% | $1,752 | 0.04% | $1,412 | 0.03% | $1,180 | 0.03% | $1,354 | 0.03% | $1,725 | 0.03% | $1,567 | 0.04% | $2,297 | 0.04% |
| 90+ DPD | $165 | 0.01% | $51 | 0.00% | $68 | 0.00% | $562 | 0.01% | $370 | 0.01% | $27 | 0.00% | $80 | 0.00% | $144 | 0.00% | $186 | 0.01% | $400 | 0.01% | $444 | 0.01% | $632 | 0.02% |
| Total | $12,401 | 0.42% | $13,151 | 0.41% | $15,505 | 0.45% | $16,875 | 0.51% | $13,717 | 0.45% | $17,229 | 0.52% | $13,402 | 0.43% | $13,885 | 0.43% | $14,820 | 0.47% | $15,989 | 0.47% | $17,655 | 0.45% | $19,592 | 0.51% |

Confidential

# GMAC Bank

# Retail & Lease Portfolio

## SmartBuy Delinquency



### Units / % of SmartBuy Portfolio

| | Jul-07 | | Aug-07 | | Sep-07 | | Oct-07 | | Nov-07 | | Dec-07 | | Jan-08 | | Feb-08 | | Mar-08 | | Apr-08 | | May-08 | | Jun-08 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| 30-59 DPD | 27 | 0.36% | 30 | 0.39% | 43 | 0.55% | 41 | 0.52% | 39 | 0.49% | 50 | 0.62% | 41 | 0.50% | 28 | 0.34% | 23 | 0.28% | 30 | 0.36% | 41 | 0.49% | 54 | 0.65% |
| 60-89 DPD | 6 | 0.08% | 1 | 0.01% | 6 | 0.08% | 13 | 0.16% | 8 | 0.10% | 11 | 0.14% | 6 | 0.07% | 3 | 0.04% | 0 | 0.00% | 1 | 0.01% | 18 | 0.22% | 3 | 0.04% |
| 90 + DPD | 0 | 0.00% | 1 | 0.01% | 0 | 0.00% | 1 | 0.01% | 4 | 0.05% | 7 | 0.09% | 11 | 0.13% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 6 | 0.07% | 2 | 0.02% |
| Total | 33 | 0.44% | 32 | 0.41% | 49 | 0.62% | 55 | 0.69% | 51 | 0.64% | 68 | 0.85% | 58 | 0.70% | 31 | 0.38% | 23 | 0.28% | 31 | 0.37% | 65 | 0.78% | 59 | 0.71% |

### Dollars (000) / % of SmartBuy Portfolio

| | Jul-07 | | Aug-07 | | Sep-07 | | Oct-07 | | Nov-07 | | Dec-07 | | Jan-08 | | Feb-08 | | Mar-08 | | Apr-08 | | May-08 | | Jun-08 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| 30-59 DPD | $649 | 0.32% | $320 | 0.39% | $1,203 | 0.57% | $1,049 | 0.49% | $1,052 | 0.50% | $1,427 | 0.66% | $1,067 | 0.48% | $747 | 0.34% | $691 | 0.31% | $742 | 0.34% | $780 | 0.36% | $954 | 0.44% |
| 60-89 DPD | $144 | 0.07% | $47 | 0.07% | $151 | 0.07% | $307 | 0.14% | $265 | 0.12% | $319 | 0.15% | $149 | 0.07% | $113 | 0.05% | $0 | 0.00% | $39 | 0.02% | $85 | 0.04% | $100 | 0.05% |
| 90 + DPD | $0 | 0.00% | $27 | 0.03% | $0 | 0.00% | $21 | 0.01% | $73 | 0.03% | $184 | 0.09% | $293 | 0.13% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $34 | 0.02% |
| Total | $793 | 0.39% | $394 | 0.42% | $1,366 | 0.64% | $1,377 | 0.64% | $1,400 | 0.65% | $1,930 | 0.90% | $1,509 | 0.68% | $860 | 0.39% | $691 | 0.31% | $781 | 0.36% | $865 | 0.40% | $1,088 | 0.51% |

Confidential

25

ALLY_0260287

# GMAC Bank

## Retail & Lease Portfolio

### Retail/SmartLease/SmartBuy Combined Delinquency



| | Jul-07 | | Aug-07 | | Sep-07 | | Oct-07 | | Nov-07 | | Dec-07 | | Jan-08 | | Feb-08 | | Mar-08 | | Apr-08 | | May-08 | | Jun-08 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Units / % of Total Portfolios** | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| 30-59 DPD | 923 | 0.35% | 981 | 0.36% | 1101 | 0.40% | 1185 | 0.43% | 995 | 0.35% | 1347 | 0.47% | 1054 | 0.35% | 974 | 0.33% | 1017 | 0.34% | 1021 | 0.34% | 1184 | 0.39% | 1273 | 0.42% |
| 60-89 DPD | 83 | 0.03% | 92 | 0.03% | 100 | 0.04% | 112 | 0.04% | 109 | 0.04% | 127 | 0.04% | 96 | 0.03% | 80 | 0.03% | 76 | 0.03% | 93 | 0.03% | 129 | 0.04% | 146 | 0.05% |
| 90 + DPD | 7 | 0.00% | 4 | 0.00% | 6 | 0.00% | 20 | 0.01% | 23 | 0.01% | 16 | 0.01% | 21 | 0.01% | 10 | 0.00% | 21 | 0.01% | 26 | 0.01% | 30 | 0.01% | 29 | 0.01% |
| Total | 1013 | 0.39% | 1077 | 0.39% | 1207 | 0.43% | 1317 | 0.47% | 1127 | 0.40% | 1490 | 0.52% | 1171 | 0.40% | 1064 | 0.36% | 1114 | 0.38% | 1140 | 0.38% | 1343 | 0.44% | 1448 | 0.48% |
| **Dollars ('000) / % of Total Portfolios** | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| 30-59 DPD | $22,792 | 0.39% | $23,638 | 0.39% | $27,584 | 0.45% | $29,480 | 0.48% | $24,394 | 0.40% | $31,652 | 0.51% | $24,818 | 0.40% | $23,392 | 0.37% | $24,699 | 0.40% | $24,809 | 0.39% | $28,265 | 0.46% | $30,422 | 0.49% |
| 60-89 DPD | $2,267 | 0.04% | $2,422 | 0.04% | $2,680 | 0.04% | $2,937 | 0.05% | $3,152 | 0.05% | $3,499 | 0.06% | $2,423 | 0.04% | $2,119 | 0.03% | $2,154 | 0.03% | $2,366 | 0.04% | $2,686 | 0.05% | $3,876 | 0.06% |
| 90 + DPD | $165 | 0.01% | $170 | 0.01% | $133 | 0.00% | $552 | 0.01% | $638 | 0.02% | $512 | 0.01% | $547 | 0.01% | $200 | 0.01% | $422 | 0.01% | $545 | 0.01% | $475 | 0.01% | $820 | 0.02% |
| Total | $25,224 | 0.44% | $26,230 | 0.44% | $30,397 | 0.50% | $32,969 | 0.54% | $28,184 | 0.47% | $35,663 | 0.58% | $27,788 | 0.45% | $25,711 | 0.41% | $27,275 | 0.44% | $27,420 | 0.44% | $31,425 | 0.52% | $35,116 | 0.57% |

Confidential

25

Confidential

ALLY_0260288

# GMAC Bank

## Retail & Lease Portfolio

## National Delinquency



| | Jul-07 | | Aug-07 | | Sep-07 | | Oct-07 | | Nov-07 | | Dec-07 | | Jan-08 | | Feb-08 | | Mar-08 | | Apr-08 | | May-08 | | Jun-08 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| **Units (% of National Portfolio)** | | | | | | | | | | | | | | | | | | | | | | | | |
| 30-59 DPD | 0 | 0.00% | 6 | 0.19% | 9 | 0.22% | 20 | 0.41% | 23 | 0.42% | 37 | 0.61% | 41 | 0.61% | 32 | 0.46% | 54 | 0.73% | 52 | 0.63% | 73 | 0.87% | 68 | 0.785% |
| 60-89 DPD | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 1 | 0.02% | 5 | 0.08% | 5 | 0.07% | 4 | 0.06% | 0 | 0.00% | 11 | 0.14% | 15 | 0.18% | 13 | 0.15% |
| 90 + DPD | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 1 | 0.01% | 1 | 0.01% |
| **Total** | 0 | 0.00% | 6 | 0.19% | 9 | 0.22% | 20 | 0.41% | 24 | 0.44% | 42 | 0.69% | 46 | 0.68% | 36 | 0.52% | 54 | 0.73% | 63 | 0.79% | 89 | 1.06% | 82 | 0.92% |
| **Dollars (000) (% of National Portfolio)** | | | | | | | | | | | | | | | | | | | | | | | | |
| 30-59 DPD | $84 | 0.00% | $171 | 0.00% | $218 | 0.27% | $464 | 0.50% | $538 | 0.57% | $905 | 0.51% | $996 | 0.76% | $765 | 0.56% | $1,322 | 0.92% | $1,372 | 0.89% | $1,741 | 1.07% | $1,801 | 1.05% |
| 60-89 DPD | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $25 | 0.02% | $204 | 0.17% | $105 | 0.08% | $130 | 0.10% | $0 | 0.00% | $301 | 0.19% | $378 | 0.23% | $331 | 0.19% |
| 90 + DPD | $0 | | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% | $8 | 0.01% | $25 | 0.01% |
| **Total** | $85 | 0.00% | $171 | | $218 | | $464 | | $563 | | $1,109 | 0.93% | $1,101 | 0.84% | $895 | | $1,322 | 0.92% | $1,673 | 1.07% | $2,127 | 1.31% | $2,157 | 1.25% |

Confidential

27

# GMAC Bank

## Retail & Lease Portfolio

### Payment Extensions



| GMAC Bank | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 day | 111 | 125 | 131 | 134 | 158 | 205 | 288 | 146 | 147 | 157 | 138 | 166 |
| 60 day | 124 | 138 | 129 | 152 | 177 | 199 | 236 | 184 | 165 | 156 | 127 | 168 |
| 90 day | 1 | 3 | 2 | 5 | 2 | 1 | 6 | 2 | 5 | 5 | 2 | 3 |
| National | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 |
| 30 day | 0 | 0 | 1 | 0 | 3 | 2 | 8 | 4 | 10 | 10 | 9 | 12 |
| 60 day | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 7 | 9 | 11 | 14 | 15 |
| 90 day | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 236 | 266 | 263 | 291 | 340 | 407 | 542 | 343 | 336 | 339 | 290 | 368 |
| % of Outstanding | 0.090% | 0.099% | 0.096% | 0.104% | 0.121% | 0.142% | 0.185% | 0.117% | 0.113% | 0.112% | 0.096% | 0.121% |

Legend: □ 30 day   ◙ 60 day   ■ 90 day

Confidential

ALLY_0260290

# GMAC Bank

## Retail & Lease Portfolio

## Bankruptcies

| Category | Metric | | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Retail | New Bankruptcies | Units | 21 | 38 | 29 | 39 | 34 | 27 | 53 | 44 | 53 | 67 | 70 | 56 |
| | | Dollars | $467,931 | $764,163 | $622,112 | $616,495 | $740,917 | $515,831 | $689,133 | $851,570 | $625,065 | $1,314,865 | $1,320,191 | $984,785 |
| | Outstanding Bankruptcies | Units | 231 | 231 | 251 | 253 | 263 | 281 | 282 | 316 | 337 | 366 | 411 | 448 |
| | | Dollars | $3,891,852 | $3,876,822 | $4,239,310 | $4,205,627 | $4,184,243 | $4,855,577 | $4,403,095 | $4,861,813 | $5,223,945 | $5,693,656 | $6,483,047 | $7,075,712 |
| National SmartLease | New Bankruptcies | Units | 1 | 0 | 3 | 1 | 0 | 0 | 1 | 1 | 4 | 2 | 7 | 5 |
| | | Dollars | $18,754 | $0 | $63,439 | $12,737 | $0 | $0 | $16,620 | $20,235 | $91,242 | $539,335 | $141,751 | $533,670 |
| | Outstanding Bankruptcies | Units | 0 | 1 | 3 | 4 | 4 | 2 | 3 | 4 | 5 | 9 | 11 | 16 |
| | | Dollars | $0 | $18,499 | $18,239 | $80,694 | $74,519 | $49,214 | $60,789 | $76,469 | $95,536 | $185,942 | $222,197 | $323,475 |
| SmartBuy | New Bankruptcies | Units | 26 | 42 | 27 | 36 | 33 | 27 | 32 | 34 | 29 | 51 | 45 | 36 |
| | | Dollars | $612,954 | $1,030,900 | $644,650 | $988,871 | $789,276 | $673,609 | $760,431 | $808,700 | $761,257 | $1,343,565 | $1,192,022 | $901,177 |
| | Outstanding Bankruptcies | Units | 175 | 185 | 207 | 210 | 216 | 232 | 227 | 240 | 249 | 238 | 254 | 271 |
| | | Dollars | $3,983,222 | $4,195,434 | $4,730,572 | $4,815,635 | $4,992,637 | $5,322,525 | $5,248,833 | $5,547,408 | $5,669,083 | $5,493,593 | $5,974,064 | $6,383,919 |
| SmartBuy | New Bankruptcies | Units | 3 | 2 | 2 | 3 | 6 | 2 | 2 | 3 | 3 | 2 | 7 | 1 |
| | | Dollars | $75,954 | $46,689 | $39,980 | $87,863 | $134,027 | $46,494 | $45,211 | $58,033 | $80,514 | $41,690 | $157,084 | $13,708 |
| | Outstanding Bankruptcies | Units | 13 | 13 | 14 | 14 | 14 | 18 | 14 | 11 | 12 | 15 | 16 | 22 |
| | | Dollars | $353,385 | $349,985 | $331,679 | $366,566 | $377,529 | $147,407 | $549,129 | $274,827 | $270,532 | $337,080 | $354,645 | $491,286 |
| Total | | Units | 470 | 512 | 534 | 560 | 570 | 589 | 614 | 653 | 692 | 750 | 821 | 855 |
| | | Dollars | $9,403,951 | $10,275,298 | $10,739,981 | $11,174,488 | $11,293,149 | $11,610,659 | $11,773,273 | $12,499,054 | $13,121,194 | $14,446,776 | $15,817,000 | $16,265,732 |

Confidential

29

ALLY_0260291

# GMAC Bank

## Retail & Lease Portfolio

## Repossessions/Early Terminations by Default

| | | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Retail - New** | | | | | | | | | | | | | |
| New Repossessions | Units | 30 | 43 | 41 | 31 | 46 | 33 | 54 | 36 | 37 | 42 | 32 | 48 |
| | Dollars | $853,347 | $1,063,946 | $854,141 | $767,860 | $1,177,448 | $851,226 | $1,413,882 | $835,720 | $914,261 | $1,187,698 | $825,656 | $1,352,601 |
| Outstanding Repossessions | Units | 12 | 16 | 26 | 21 | 20 | 32 | 22 | 22 | 24 | 28 | 29 | 22 |
| | Dollars | $298,703 | $462,625 | $598,062 | $446,679 | $556,754 | $923,858 | $1,152,756 | $469,191 | $581,407 | $788,736 | $759,636 | $705,976 |
| **Retail - Used** | | | | | | | | | | | | | |
| New Repossessions | Units | 5 | 8 | 7 | 6 | 8 | 5 | 9 | 11 | 7 | 17 | 7 | 9 |
| | Dollars | $115,806 | $138,026 | $192,089 | $117,145 | $111,212 | $160,672 | $182,908 | $213,191 | $276,347 | $294,195 | $137,981 | $201,569 |
| Outstanding Repossessions | Units | 3 | 2 | 8 | 6 | 8 | 5 | 5 | 3 | 7 | 7 | 9 | 10 |
| | Dollars | $45,442 | $58,972 | $155,552 | $214,716 | $194,968 | $111,233 | $145,162 | $57,579 | $122,391 | $174,249 | $140,397 | $350,547 |
| **National - New** | | | | | | | | | | | | | |
| New Repossessions | Units | 0 | 1 | 1 | 2 | 5 | 4 | 6 | 6 | 3 | 3 | 10 | 10 |
| | Dollars | $0 | $30,520 | $53,341 | $50,601 | $105,453 | $121,924 | $233,439 | $90,343 | $66,076 | $246,697 | $277,584 | $287,907 |
| Outstanding Repossessions | Units | 0 | 0 | 0 | 1 | 3 | 4 | 5 | 5 | 4 | 3 | 5 | 6 |
| | Dollars | $0 | $0 | $0 | $38,341 | $42,906 | $130,079 | $269,752 | $162,041 | $128,778 | $66,679 | $146,542 | $169,587 |
| **National - Used** | | | | | | | | | | | | | |
| New Repossessions | Units | 0 | 2 | 1 | 4 | 5 | 5 | 5 | 10 | 6 | 7 | 7 | 8 |
| | Dollars | $0 | $50,334 | $24,720 | $98,425 | $92,522 | $133,109 | $127,083 | $243,710 | $126,638 | $53,477 | $186,827 | $195,404 |
| Outstanding Repossessions | Units | 0 | 0 | 1 | 1 | 3 | 5 | 5 | 5 | 6 | 3 | 6 | 7 |
| | Dollars | $0 | $0 | $27,013 | $24,720 | $58,755 | $130,109 | $12,084 | $125,511 | $174,626 | $187,352 | $132,957 | $208,359 |
| **SmartLease** | | | | | | | | | | | | | |
| New Early Terminations by Default | Units | 23 | 22 | 33 | 40 | 27 | 54 | 42 | 36 | 41 | 36 | 32 | 31 |
| | Dollars | $644,871 | $725,908 | $1,013,177 | $1,122,921 | $983,798 | $1,556,447 | $1,240,264 | $1,125,393 | $1,286,585 | $1,196,700 | $1,126,585 | $910,264 |
| Outstanding ETD | Units | 5 | 14 | 19 | 19 | 21 | 22 | 28 | 22 | 23 | 32 | 22 | 19 |
| | Dollars | $140,081 | $349,130 | $518,838 | $659,846 | $608,210 | $651,536 | $792,059 | $795,021 | $789,357 | $1,044,029 | $815,561 | $737,066 |
| **SmartBuy** | | | | | | | | | | | | | |
| New Repossessions | Units | 2 | 4 | 1 | 1 | 1 | 2 | 6 | 3 | 7 | 2 | 2 | 3 |
| | Dollars | $79,658 | $55,376 | $114,098 | $32,543 | $54,740 | $327,692 | $181,345 | $54,667 | $251,560 | $66,694 | $53,385 | $75,919 |
| Outstanding Repossessions | Units | 1 | 1 | 2 | 2 | 3 | 2 | 2 | 3 | 0 | 2 | 2 | 3 |
| | Dollars | $24,964 | $37,000 | $28,339 | $57,351 | $119,629 | $61,093 | $42,301 | $93,869 | $0 | $11,656 | $35,330 | $33,385 |
| **Summary Total** | | | | | | | | | | | | | |
| Total | Units | 81 | 113 | 141 | 136 | 149 | 174 | 188 | 157 | 166 | 187 | 161 | 168 |
| | Dollars | $2,207,871 | $3,012,138 | $3,644,480 | $3,631,149 | $4,106,395 | $4,803,776 | $5,193,036 | $4,266,226 | $4,718,426 | $5,361,162 | $4,618,221 | $4,968,363 |
| **G-3 Installment Details** | | | | | | | | | | | | | |
| Retail | Units | 0 | 2 | 1 | 1 | 6 | 6 | 6 | 0 | 1 | 4 | 3 | 3 |
| National | Units | 0 | 3 | 2 | 4 | 5 | 4 | 3 | 4 | 3 | 1 | 2 | 1 |
| SmartLease | Units | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 |
| SmartBuy | Units | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

*Report by type highlights the name of contact*

Confidential

# GMAC Bank

## Retail & Lease Portfolio

## Monthly Losses

| | | | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Retail | Gross Charge Offs | Units | 53 | 46 | 49 | 64 | 55 | 65 | 66 | 86 | 57 | 60 | 63 | 71 |
| | | Dollars | $605,227 | $382,328 | $488,013 | $599,647 | $531,855 | $665,632 | $883,682 | $1,058,516 | $626,075 | $760,129 | $695,412 | $668,039 |
| | Recoveries | Dollars | ($96,777) | ($156,610) | ($129,260) | ($137,718) | ($98,202) | ($83,483) | ($76,867) | ($102,148) | ($106,130) | ($253,754) | ($54,939) | ($277,361) |
| National | Gross Charge Offs | Units | 0 | 0 | 1 | 0 | 1 | 6 | 7 | 13 | 15 | 11 | 12 | 20 |
| | | Dollars | $0 | $0 | $14,249 | $0 | $43,582 | $37,963 | $79,073 | $194,807 | $222,010 | $195,954 | $135,614 | $243,609 |
| | Recoveries | Dollars | $0 | $0 | $0 | $0 | $0 | $11,020 | ($184) | ($225) | ($10,800) | ($37,527) | ($51,688) | ($43,657) |
| Smart Lease | Charge Offs | Units | 179 | 250 | 178 | 292 | 269 | 266 | 379 | 300 | 520 | 568 | 633 | 703 |
| | | Dollars | $160,008 | $208,007 | $142,223 | $247,797 | $255,837 | $258,323 | $370,551 | $314,435 | $487,903 | $478,066 | $522,768 | $615,180 |
| Smart Buy News | Gross Charge Offs | Units | 3 | 4 | 3 | 4 | 4 | 10 | 8 | 12 | 12 | 15 | 16 | 24 |
| | | Dollars | $34,053 | $32,803 | $32,061 | $44,253 | $28,636 | $62,819 | $51,560 | $58,686 | $49,661 | $76,523 | $43,642 | $128,138 |
| | Recoveries | Dollars | ($713) | $0 | $0 | ($550) | ($1,398) | ($335) | ($599) | $260 | ($2,454) | ($11,555) | ($4,121) | ($7,631) |
| | Net Charge Offs | Dollars | $701,799 | $466,528 | $547,286 | $753,928 | $760,310 | $951,940 | $1,306,819 | $1,524,351 | $1,266,254 | $1,208,796 | $1,336,687 | $1,325,718 |
| | % of Outstanding | Dollars | 0.012% | 0.008% | 0.009% | 0.012% | 0.012% | 0.015% | 0.020% | 0.023% | 0.019% | 0.018% | 0.020% | 0.020% |
| | Annualized** | Dollars | 0.113% | 0.114% | 0.117% | 0.122% | 0.127% | 0.132% | 0.249% | 0.280% | 0.269% | 0.271% | 0.265% | 0.272% |

*Monthly losses include credit related losses and non-credit related losses such as total collisions with insurance proceeds death/disability, or excess mileage/wear and tear.

**Annualized calculation: Total YTD losses / YTD days x total days in the year / average receivables

Confidential

31

Confidential

# GMAC Bank

## Retail & Lease Portfolio

## Booked Credit Exceptions



Booked Credit Exceptions

| | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | LTD Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1st CB <661 | 2 | 3 | 2 | 2 | 2 | 2 | 4 | 2 | 1 | 4 | 0 | 1 | 130 |
| DTI | 1 | 1 | 2 | 2 | 2 | 3 | 3 | 0 | 0 | 3 | 3 | 0 | 251 |
| EDC | 4 | 8 | 10 | 3 | 3 | 2 | 4 | 0 | 3 | 3 | 5 | 7 | 2984 |
| PTI | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 1 | 1 | 1 | 0 | 65 |
| Term | 3 | 0 | 4 | 20 | 13 | 21 | 24 | 15 | 25 | 28 | 24 | 23 | 626 |
| Tier | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
| Amt Financed | 0 | 1 | 0 | 1 | 3 | 1 | 1 | 2 | 3 | 2 | 1 | 0 | 122 |
| MSRP | 2 | 0 | 2 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 564 |
| Mileage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 |
| Odds <3.0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 28 |
| Total Booked | 12 | 15 | 20 | 28 | 23 | 35 | 41 | 19 | 33 | 47 | 35 | 31 | 4,801 |

Legend: 1st CB <661, DTI, EDC, PTI, Term, Tier, Amt Financed, MSRP, Mileage, Odds <3.0

Credit exceptions over the last 12 months with CB between 650-660 represents 89,429,069.11 as a percent of the GMAC Banks Tier 1 Capital is 0.27%

Confidential

# GMAC Bank

## Retail & Lease Portfolio

## Credit Exceptions in Delinquent Status





| | 30-59 Days Past Due | | 60-89 Days Past Due | | 90 Plus Days Past Due | |
|---|---|---|---|---|---|---|
| | Units | Dollars | Units | Dollars | Units | Dollars |
| 1st CB <661 | 7 | $ 204,603 | 2 | $ 87,332 | 2 | $ 44,504 |
| DTI | 5 | $ 122,489 | - | - | - | - |
| EDC | 30 | $ 718,327 | 3 | $ 55,197 | - | - |
| PTI | 1 | $ 10,568 | - | - | - | - |
| Term | - | - | - | - | - | - |
| Tier | - | - | - | - | - | - |
| Amt Financed | 7 | $ 100,560 | 1 | $ 19,605 | 1 | $ 17,183 |
| MSRP > 110% | 2 | $ 53,828 | - | - | - | - |
| MSRP > 120% | - | - | - | $ | - | - |
| Mileage | - | - | - | - | - | - |

Confidential

33

# GMAC Bank

## Retail & Lease Portfolio

### Dealer Ranking Report

| Rank | Dealer Group | Primary Dealer # | Dealer | City | State | Total Applications | Approved / Qualified # | % of Total | Booked # | % of Total | $ |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 1 | N/A | 32590 | Wally Edgar Chevrolet-Buick | Lake Orion | MI | 131 | 125 | 95.42% | 67 | 51.15% | $1,634,721 |
| 2 | 104393 | 55663 | Cochran Pontiac | Monroeville | PA | 118 | 106 | 89.83% | 63 | 53.39% | $1,842,731 |
| 3 | N/A | 25295 | Martin Cadillac Company | Los Angeles | CA | 74 | 69 | 93.24% | 62 | 83.78% | $2,663,841 |
| 4 | N/A | 61723 | Columbiana Buick-Oldsmobile-Cadillac, Co | Columbiana | OH | 100 | 85 | 85.00% | 56 | 56.00% | $1,826,778 |
| 5 | #N/A | 94236 | The Merrick Chevrolet Company | Strongsville | OH | 120 | 98 | 81.67% | 55 | 45.83% | $1,220,673 |
| 6 | #N/A | 96053 | Patrick O'Brien Jr Chevrolet | Westlake | OH | 118 | 99 | 83.90% | 53 | 44.92% | $1,111,935 |
| 7 | #N/A | 54167 | Queen City Acquisition | Spearfish | SD | 65 | 59 | 87.69% | 50 | 75.76% | $1,042,865 |
| 8 | N/A | 61001 | J.M.K. Auto Sales | Springfield | NJ | 88 | 83 | 95.51% | 49 | 55.68% | $1,453,048 |
| 9 | N/A | 28725 | Runde Chevrolet | East Dubuque | IL | 85 | 82 | 95.38% | 46 | 70.77% | $855,555 |
| 10 | #N/A | 31665 | Lemay Buick-Pontiac-Gmc-Cadillac | Kenosha | WI | 59 | 57 | 96.61% | 37 | 62.71% | $885,902 |
| 11 | #N/A | 54223 | Baierl Chevrolet | Wexford | PA | 72 | 57 | 79.17% | 37 | 51.39% | $721,178 |
| 12 | N/A | 55676 | Saturn West | Columbus | OH | 56 | 52 | 89.29% | 37 | 66.07% | $993,253 |
| 13 | #N/A | 13662 | East Hills Chevrolet Oldsmobile | Roslyn | NY | 62 | 52 | 83.87% | 35 | 66.06% | $1,130,631 |
| 14 | #N/A | 55347 | Gillogly Chevrolet Central | West Seneca | NY | 54 | 53 | 98.44% | 35 | 54.69% | $930,976 |
| 15 | #N/A | 53792 | Village Chevrolet | Wayzata | MN | 59 | 53 | 94.92% | 34 | 57.63% | $874,531 |
| | | | All Others | | | 29,314 | 15,734 | 54.92% | 7,031 | 26.92% | $197,287,931 |
| | | | Total | | | 23,564 | 16,914 | 66.16% | 7,748 | 20.31% | $216,183,377 |

Confidential

34



# GMAC Bank

## Automotive Division

## Quarterly Portfolio Review

## Retail & Lease and Commercial Lending Portfolio

Three months ending June 30, 2008

1

Confidential

ALLY_0260297

## Quarterly Portfolio Review

### Purpose

The purpose of the Automotive Division Quarterly Review of the Retail & Lease and Commercial Lending Portfolio is to provide a written evaluation of GMAC Bank's ("Bank") automotive portfolio to the Board of Directors ("Board"). This summary will allow the Board to monitor the quality of the automotive loan and lease assets, monitor the level of automotive loan losses and oversee automotive lending administration.

### Executive Summary

The Automotive Division acquires retail installment and lease contracts on an indirect basis from participating automotive dealerships and provides commercial lending financing (real estate, working capital, equipment loans and wholesale inventory financing) to automotive dealers. The Bank's target market for retail, lease financing and commercial lending products is automotive dealerships located throughout the United States. As of June 30, 2008 the Bank had a total of $9.1 billion in retail, lease and commercial receivables outstanding.

## Retail & Lease Portfolio

### Portfolio Update

#### Accounts Outstanding

| Portfolio | Dec 2007 | Jun 2008 | Variance |
|-----------|----------|----------|----------|
| Retail-GMAC | 160,704 | 173,274 | 12,570 |
| Retail-National | 6,093 | 8,948 | 2,855 |
| SmartBuy | 8,053 | 8,345 | 292 |
| SmartLease | 111,940 | 113,429 | 1,489 |
| | | | |
| **Totals** | **286,790** | **303,996** | **17,206  +5.99%** |

#### Dollars Outstanding ($MM)

| Portfolio | Dec 2007 | Jun 2008 | Variance |
|-----------|----------|----------|----------|
| Retail-GMAC | $3,105.2 | $3,186.8 | $81.6 |
| Retail-National | $120.3 | $171.9 | $51.6 |
| SmartBuy | $215.8 | $216.8 | $1.0 |
| SmartLease | $3,036.4 | $3,081.0 | $44.6 |
| | | | |
| **Totals** | **$6,477.7** | **$6,656.5** | **$178.8 +2.76%** |

*Note: Includes GMAC and National active and repossessed accounts. Excludes GMAC and National charged-off, bankrupt and special accounts.

2

Confidential

ALLY_0260298

- **Volumes (Application, Approval/Qualified, Booking)**

The Bank reviewed 66,118 applications, approved/qualified 40,297 (60.9%) and booked 24,756 (61.4%) contracts for the second quarter 2008.

| Period | App Volume | Approval | # Booked | Capture % |
|---|---|---|---|---|
| Qtr 1-2007 | 38,778 | 33,142 (85.4%) | 27,296 | 82.3% |
| Qtr 2-2007 | 52,183 | 37,142 (71.1%) | 29,889 | 80.5% |
| Qtr 3-2007 | 68,788 | 45,509 (66.1%) | 34,578 | 76.0% |
| Qtr 4-2007 | 62,692 | 39,064 (62.3%) | 25,028 | 64.0% |
| Qtr 1-2008 | 64,348 | 39,383 (61.2%) | 27,042 | 68.7% |
| Qtr 2-2008 | 66,118 | 40,297 (60.9%) | 24,756 | 61.4% |

- **Credit Quality (Asset Quality)**

The Bank's portfolio reflects high credit quality. The average credit bureau score is 760 and 82.0% of the portfolio has a credit bureau score of 700 or greater. In addition, 98.6% of the portfolio is in the S, A or B credit tier and the overall odds are 48.0

The following is a comparison of the credit quality of the Bank's portfolio with GMAC's portfolio:

GMAC Bank Portfolio Outstandings - Credit Tier, Overall Odds and Average Credit Bureau Score

| Tier | Units OS | % of Total | Dollars OS | % of Total | Overall Odds | Avg CB Score |
|---|---|---|---|---|---|---|
| S | 145,430 | 49.1% | $3,108,777,848.77 | 47.8% | 192.2 | 791 |
| A | 109,173 | 36.9% | $2,435,549,408.31 | 37.4% | 47.5 | 742 |
| B | 37,217 | 12.6% | $870,158,442.21 | 13.4% | 14.2 | 698 |
| C | 4,323 | 1.5% | $89,275,310.31 | 1.4% | 6.2 | 692 |
| Other | 9 | 0.0% | $236,706.20 | 0.0% | 4.8 | 702 |
| TOTALS | 296,153 | | $6,504,012,112.80 | | 48.0 | 760 |

Note: Includes accounts that are active, repossessed, charged-off, bankrupt and special accounts. Excludes National accounts that are active, repossessed, charged-off, bankrupt and special accounts.

GMAC Portfolio Outstandings - Credit Tier, Overall Odds and Average Credit Bureau Score

| Tier | Units OS | % of Total | Dollars OS | % of Total | Overall Odds | Avg CB Score |
|---|---|---|---|---|---|---|
| S | 1,190,720 | 46.5% | $21,576,317,094 | 47.3% | 176.69 | 788.36 |
| A | 859,129 | 33.6% | $15,034,711,709 | 32.9% | 42.84 | 735.18 |
| B | 406,885 | 15.9% | $7,215,694,985 | 15.8% | 13.86 | 697.72 |
| C | 101,174 | 4.0% | $1,802,707,260 | 3.9% | 5.95 | 684.59 |
| Other | 0 | 0.0% | $0 | 0.0% | 0.00 | 0.00 |
| Totals | 2,558,502 | | $45,644,912,348 | | 36.43 | 751.96 |

3

- **Delinquency & Net Credit Loss Trends**

The Bank's delinquency and net credit loss trends are satisfactory when compared with other indirect auto lenders. According to the ABA Consumer Credit Delinquency Bulletin, 1st qtr 2008 (as of March 31, 2008), the over 30 day delinquency for indirect auto loans was 2.57% as a percent of dollars outstanding and 3.09% as a percent of accounts outstanding (seasonally adjusted). Industry net charge-offs as a % of average outstandings were 1.87%. GMAC's delinquency trend for the same period was 1.76% of dollars outstanding and 2.01% of accounts outstandings of the managed portfolio. GMAC Bank's delinquency trend for the same period was 0.38% of dollars outstanding and 0.48% of accounts outstanding. GMAC Bank losses were 0.27%.

### GMAC Bank delinquency and losses as of June 30, 2008

| Delinquency or Loss Category | % of Dollars Delinquent | % of Accounts Delinquent |
|---|---|---|
| 30-59 DPD | 0.49% | 0.42% |
| 60-89 DPD | 0.06% | 0.05% |
| 90+ DPD | 0.02% | 0.01% |
| Losses | 0.20% | NA |
| Annualized | 0.27% | NA |

### GMAC Bank Delinquency by Credit Tier (Accounts)
(As of June 30, 2008)

|  | S Tier | A Tier | B Tier | C Tier | Other | Total |
|---|---|---|---|---|---|---|
| Total OS | 145,415 | 109,113 | 37,173 | 4,307 | 9 | 296,017 |
| Current - 10 DPD | 99.2% | 97.6% | 93.3% | 90.4% | 88.9% | 97.7% |
| 11 - 29 DPD | 0.5% | 1.6% | 4.0% | 5.7% | 11.1% | 1.4% |
| 30 - 59 DPD | 0.1% | 0.4% | 1.3% | 2.0% | 0.0% | 0.4% |
| 60 - 89 DPD | 0.0% | 0.0% | 0.2% | 0.3% | 0.0% | 0.0% |
| 90 - 119 DPD | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Charge Off | 0.0% | 0.1% | 0.1% | 0.4% | 0.0% | 0.0% |
| Repo/ETD | 0.0% | 0.0% | 0.2% | 0.3% | 0.0% | 0.0% |
| Bankruptcy | 0.1% | 0.3% | 0.8% | 1.0% | 0.0% | 0.3% |
| Special | 0.0% | 0.1% | 0.2% | 0.2% | 0.0% | 0.0% |

Note: Excludes charged-off accounts.

### GMAC Delinquency by Credit Tier (Accounts)
(As of June 30, 2008)

|  | S Tier | A Tier | B Tier | C Tier | Other | Total |
|---|---|---|---|---|---|---|
| Total O/S | 1,182,293 | 854,561 | 404,462 | 100,478 | NA | 2,541,794 |
| Current-10 DPD | 97.7% | 95.1% | 88.9% | 82.7% | NA | 94.8% |
| 11-29 DPD | 1.0% | 2.5% | 5.5% | 8.3% | NA | 2.5% |
| 30-59 DPD | 0.6% | 1.1% | 2.7% | 4.6% | NA | 1.3% |
| 60-89 DPD | 0.3% | 0.2% | 0.5% | 0.7% | NA | 0.3% |
| 90-119 DPD | 0.2% | 0.2% | 0.3% | 0.4% | NA | 0.2% |
| Charge Off | ---- | ---- | ---- | ---- | ---- | ---- |
| Repossession/ETD | 0.0% | 0.1% | 0.2% | 0.4% | NA | 0.1% |
| Bankruptcy | 0.2% | 0.7% | 1.6% | 2.4% | NA | 0.7% |
| Special | 0.0% | 0.1% | 0.2% | 0.5% | NA | 0.1% |

Note: Charge-offs are excluded from O/S. Special O/S includes accounts marked as bankruptcy, SSCRA, contested insurance, litigation, confiscations, and special situations.

4

Confidential                                                                                                    ALLY_0260300

## Contract Extensions & Renewals

During 2nd Qtr 2008, the Bank extended payments on 997 accounts or 0.03% of the accounts outstandings as of June 30, 2008.

| Quarter | 30 Day Ext | 60 Day Ext | 90 Day Ext |
|---------|-----------|-----------|-----------|
| Q1 2007 | 284 | 294 | 1 |
| Q2 2007 | 260 | 276 | 6 |
| Q3 2007 | 368 | 391 | 6 |
| Q4 2007 | 502 | 528 | 8 |
| Q1 2008 | 603 | 605 | 13 |
| Q2 2008 | 492 | 495 | 10 |

## Geographic Dispersion

The Bank currently has broad geographic representation.   The Bank has outstandings in 50 states plus the District of Columbia. As of June 30, 2008 the Bank's portfolio (by dollar amount) in the top ten states represented 61.05% of the total.

### Dollar & Accounts Outstandings - Top 10 States (Ranking Based on $ Outstanding)

|  | Customer State | $ (000) | % of Total Dollars | # of Units | % of Total Units |
|---|---------|---------|-----------|-------|-----------|
| 1 | Ohio | $716,416 | 10.76% | 34,147 | 11.23% |
| 2 | California | $674,766 | 10.14% | 26,504 | 8.72% |
| 3 | Pennsylvania | $449,781 | 6.76% | 21,873 | 7.20% |
| 4 | Michigan | $400,932 | 6.02% | 19,029 | 6.26% |
| 5 | Texas | $369,685 | 5.55% | 16,803 | 5.53% |
| 6 | Florida | $356,828 | 5.36% | 14,616 | 4.81% |
| 7 | New York | $347,864 | 5.23% | 15,222 | 5.01% |
| 8 | Arizona | $284,750 | 4.28% | 10,353 | 3.41% |
| 9 | Illinois | $236,392 | 3.55% | 11,584 | 3.81% |
| 10 | Indiana | $226,245 | 3.40% | 11,126 | 3.66% |

## Loans with Affiliates

Section 23A of the Federal Reserve Act limits lending transactions with affiliates of the Bank. A system solution has been established to ensure the Bank only receives applications from eligible dealers. When a dealer is set up in the On Line Scoring and Credit Review System (OSCAR), a Bank eligible code is assigned that allows only applications from eligible dealers to come to the Bank.  In addition to the systematic safeguard, several reports have been created to compare GMAC Bank eligible dealers with the GMAC wholesale outstandings database to ensure that no contracts are booked with dealers that have wholesale outstandings.   During the 2nd Qtr 2008, 8 accounts were booked from dealers that have wholesale financing with GMAC. These accounts have been or are in the process of being sold back to GMAC.

Confidential

ALLY_0260301

## Quality Loan Administration

- ### Summary of Exceptions to Policy

The Credit Committee reviews exceptions to policy each month and the exceptions are provided in monthly Board reports.

| EXCEPTIONS | 2Q 07 | 3Q 07 | 4Q 07 | 1Q 08 | 2Q 08 |
|---|---|---|---|---|---|
| Contracts Booked | 29,889 | 34,578 | 25,028 | 27,042 | 24,756 |
| Contracts Booked w/ Exceptions | 41 | 45 | 86 | 93 | 113 |
| % Of Contracts Booked w/ Exceptions | 0.001% | 0.001% | 0.003% | .003% | .004% |

There were credit exceptions on $9.4 million in outstanding retail and lease contracts during the past twelve months which represented 0.27% of automotive tier one capital.

- ### Loan Administration - Quality Assurance Program - QA

The Bank has developed and implemented a Quality Assurance Program (QA) for Retail and Lease accounts. The purpose of the QA Program is to provide a consistent monitoring and evaluation of various processes, services and policies. For the months of March, April and May 2008 the Bank performed quality assurance on 1,150 booked contracts.

QA is performed in the following areas:

- Credit Quality
- Documentation
- Lien Perfection

The QA process involves a physical review of copies of original installment or lease contracts, copies of certificates of title and selected screens from the Customer Accounts Receivables System (CARS) and On Line Scoring and Credit Review System (OSCAR).

Management is satisfied that the Bank is applying credit underwriting in accordance with policy and the service provider organizations are consistently applying the Bank's policies related to contract processing and lien perfection.

- Credit Quality Review: 97.8% accuracy rate
- Documentation Review: 95.6% accuracy rate
- Lien Perfection Review: 99.3% accuracy rate

In the second quarter 2008, the Bank performed QA on 1,150 booked contracts. Service Provider (GMAC/National) had an overall accuracy rate of 94.9%. The Bank is satisfied that Service Providers (GMAC/National) are adhering to the Bank's policies and procedures.

6

Confidential

- **National Auto Finance (National) Portfolio Credit Quality**

During the second quarter 2008, the Bank reviewed 27,534 applications, approved/qualified 8,456 (30.7%) and booked 2,031 (24.0%) from the National. Bank Management continues to monitor the portfolio closely.

<u>National Portfolio Outstandings - Credit Tier, Overall Odds and Average Credit Bureau Score</u>

Retail New-National

| Tier | Units OS | % of Total | Dollars OS | % of Total | Overall Odds | Avg CB Score |
|------|----------|------------|------------|------------|--------------|--------------|
| S | 2,441 | 0.8% | $41,770,430.17 | 0.6% | 173.7 | 785 |
| A | 2,028 | 0.7% | $49,745,853.67 | 0.8% | 30.0 | 707 |
| B | 800 | 0.3% | $20,758,250.51 | 0.3% | 13.2 | 684 |
| C | 43 | 0.0% | $1,057,733.94 | 0.0% | 7.0 | 683 |
| Other | 0 | 0.0% | $0.00 | 0.0% | 0.0 | 0.0 |
| TOTALS | 5,312 | | $113,332,268.29 | | 37.0 | 739 |

Retail Used-National

| Tier | Units OS | % of Total | Dollars OS | % of Total | Overall Odds | Avg CB Score |
|------|----------|------------|------------|------------|--------------|--------------|
| S | 1,808 | 0.6% | $25,521,210.79 | 0.4% | 70.3 | 769 |
| A | 1,253 | 0.4% | $22,436,182.57 | 0.3% | 20.9 | 722 |
| B | 516 | 0.2% | $9,426,829.98 | 0.1% | 11.1 | 695 |
| C | 102 | 0.0% | $1,855,496.88 | 0.0% | 6.3 | 689 |
| Other | 0 | 0.0% | $0.00 | 0.0% | 0.0 | 0.0 |
| TOTALS | 3,679 | | $59,239,720.22 | | 25.5 | 741 |

Note: Includes accounts that are active, repossessed, charged-off, bankrupt and special accounts

<u>National Delinquency as of June 30, 2008</u>

| Delinquency or Loss Category | % of Dollars Delinquent | % of Accounts Delinquent |
|------------------------------|-------------------------|--------------------------|
| 30-59 DPD | 1.05% | 0.76% |
| 60-89 DPD | 0.19% | 0.15% |
| 90+ DPD | 0.01% | 0.01% |

7

## Retail & Lease Portfolio

## Risk Management Reports

1.   Performance Odds Report

| Booking Period | Booked Units | Booked Odds | Q3 2006 | Q4 2006 | Q1 2007 | Q2 2007 | Q3 2007 | Q4 2007 | Q1 2008 | Q2 2008 |
|---|---|---|---|---|---|---|---|---|---|---|
| Q3 2004 | 12,341 | 107.2 | 128.7 | 112.1 | 105.3 | 96.9 | 92.2 | 71.2 | 54.3 | 52.3 |
| Q4 2004 | 34,430 | 97.3 | 149.2 | 131.2 | 118.4 | 108.5 | 99.9 | 74.7 | 51.81 | 47.9 |
| Q1 2005 | 25,201 | 95.4 | 140.4 | 126.7 | 109.4 | 98.8 | 84.6 | 61.1 | 42.6 | 39.6 |
| Q2 2005 | 21,760 | 82.8 | 131.5 | 113.3 | 93.8 | 82.5 | 70.4 | 49.6 | 34.7 | 32.6 |
| Q3 2005 | 15,472 | 53.7 | 178.6 | 143.4 | 119.7 | 103.3 | 87.4 | 59.6 | 40.0 | 36.0 |
| Q4 2005 | 14,184 | 43.5 | 442.0 | 362.1 | 231.3 | 190.3 | 143.1 | 88.2 | 56.2 | 47.3 |
| Q1 2006 | 27,121 | 48.1 | 967.1 | 676.5 | 450.6 | 317.7 | 232.1 | 143.3 | 86.8 | 74.0 |
| Q2 2006 | 28,805 | 44.5 | 487.6 | 798.4 | 470.9 | 363.0 | 236.3 | 137.3 | 75.6 | 64.7 |
| Q3 2006 | 52,883 | 36.5 | | 852.1 | 1035.0 | 561.2 | 408.0 | 210.5 | 112.9 | 91.8 |
| Q4 2006 | 19,618 | 46.8 | | | 593.9 | 1030.1 | 434.4 | 282.4 | 150.7 | 113.4 |
| Q1 2007 | 27,276 | 48.9 | | | | 1048.0 | 972.6 | 662.8 | 274.1 | 197.7 |
| Q2 2007 | 27,749 | 47.4 | | | | | 615.5 | 541.6 | 215.6 | 183.6 |
| Q3 2007 | 27,925 | 50.3 | | | | | | 392.2 | 292.6 | 205.3 |
| Q4 2007 | 22,662 | 52.2 | | | | | | | 353.8 | 684.4 |
| Q1 2008 | 25,155 | 51.9 | | | | | | | | 717.0 |
| Q2 2008 | 22,751 | 43.9 | | | | | | | | |

*Note: Reviews account odds performance after a minimum of 9 months on the books.

2.   SmartLease & SmartBuy Maturities in the next 12 Months

| | Jul-08 | Aug-08 | Sep-08 | Oct-08 | Nov-08 | Dec-08 |
|---|---|---|---|---|---|---|
| Cars | 1,104 | 1,142 | 1,233 | 1,382 | 1,405 | 1,256 |
| Trucks | 74 | 94 | 92 | 108 | 96 | 121 |
| SUVs | 713 | 803 | 865 | 1,033 | 973 | 1,134 |
| Totals | 1,891 | 2,039 | 2,190 | 2,523 | 2,474 | 2,511 |

| | Jan-09 | Feb-09 | Mar-09 | Apr-09 | May-09 | Jun-09 |
|---|---|---|---|---|---|---|
| Cars | 1,151 | 1,670 | 2,052 | 1,700 | 1,849 | 2,132 |
| Trucks | 147 | 178 | 285 | 246 | 279 | 330 |
| SUVs | 997 | 1,347 | 1,827 | 1,153 | 1,366 | 1,665 |
| Totals | 2,295 | 3,195 | 4,164 | 3,099 | 3,494 | 4,127 |

8

3.    SmartLease Book Gain/Loss – Cars and Light Duty Trucks/SUV's

### Residual Book Gain/Loss Performance

#### Cars

|  | YTD | Apr-08 | May-08 | Jun-08 |
|---|---|---|---|---|
| Terminations | 7,660 | 1,485 | 1,494 | 1,643 |
| | | | | |
| Asset 20-3, less booked depreciation | 17,411 | 17,349 | 17,304 | 17,407 |
| Sales Proceeds/Insur Settlement | 14,700 | 14,922 | 14,478 | 14,366 |
| Excess/(Shortage) | (2,711) | (2,428) | (2,826) | (3,041) |
| Support Paid: | | | | |
| Divisional Support | 2,128 | 1,955 | 2,173 | 2,227 |
| Risk Sharing | 435 | 353 | 426 | 516 |
| Book Gain/(Loss) per unit | (148) | (119) | (227) | (298) |
| Total Book Gain/(Loss) | (1,132,342) | (177,006) | (338,500) | (490,198) |

#### Light Duty Trucks

|  | YTD | Apr-08 | May-08 | Jun-08 |
|---|---|---|---|---|
| Terminations | 8,326 | 1,568 | 1,511 | 1,789 |
| | | | | |
| Asset 20-3, less booked depreciation | 22,781 | 22,359 | 20,889 | 21,986 |
| Sales Proceeds/Insur Settlement | 18,346 | 18,802 | 16,260 | 15,381 |
| Excess/(Shortage) | (4,435) | (3,557) | (4,629) | (6,604) |
| Support Paid: | | | | |
| Divisional Support | 3,055 | 2,673 | 2,621 | 3,252 |
| Risk Sharing | 727 | 516 | 791 | 1,323 |
| Book Gain/(Loss) per unit | (653) | (369) | (1,216) | (2,029) |
| Total Book Gain/(Loss) | (5,433,624) | (577,872) | (1,837,981) | (3,630,380) |

Previous Quarterly Portfolio Reviews reflected the booked gain/loss on normal maturities of the entire portfolio. The above chart reflects all terminations (early terminations as well as normal maturities and the book gain/loss by cars and light duty trucks - including SUV's).

### Retail & Lease Portfolio
9

## Risk Management Reports

### GMAC Bank Booked Custom Score Odds vs Performance Odds

|  | <7/31/2005* | >8/1/2005 & <=7/10/2007** | =>7/11/2007*** |
|---|---|---|---|
| 1. GMAC Overall | | | |
| • Booked Odds | 93.2 | 43.5 | 49.4 |
| • Performance Odds | 37.5 | 69.0 | 279.0 |
| 2. GMAC Retail New | | | |
| • Booked Odds | 89.3 | 38.9 | 48.7 |
| • Performance Odds | 42.8 | 71.7 | 265.9 |
| 3. GMAC Retail Used | | | |
| • Booked Odds | 28.7 | 21.8 | 30.9 |
| • Performance Odds | 22.6 | 75.2 | 196.7 |
| 4. GMAC SmartLease | | | |
| • Booked Odds | 140.5 | 86.7 | 81.2 |
| • Performance Odds | 31.0 | 67.2 | 367.5 |
| 5. GMAC SmartBuy | | | |
| • Booked Odds | | 24.0 | 33.6 |
| • Performance Odds | | 52.9 | 507.7 |
| 6. National New | | | |
| • Booked Odds | | 36.1 | 39.7 |
| • Performance Odds | | 21.9 | 93.1 |
| 7. National Used | | | |
| • Booked Odds | | 18.6 | 27.8 |
| • Performance Odds | | 10.2 | 72.4 |
| 8. GMAC & National Overall | | | |
| • Booked Odds | | 43.4 | 47.5 |
| • Performance Odds | | 67.7 | 231.6 |

*Represents booked performance odds from custom scorecards prior to August 1, 2005
**Represents booked performance odds from custom scorecards after August 1, 2005
***Represents booked performance odds from custom scorecards after July 10, 2007

Performance Bad Definition:

- Loss
- Repossession
- Redeemed Repossession
- Bankruptcy
- Any account that has been 1 or more times 90 days past due
- Any Account that has been 4 or more times 60 days past due
- Any account that has greater than 40% of the payments received more than 30 days past due

## Retail & Lease Portfolio

10

## Risk Management Reports

### GMAC Booked Custom Score Odds vs Actual Performance Odds

|  | <7/31/2005* | >8/1/2005** |
|---|---|---|
| 1. Overall | | |
| • Booked Odds | 44.4 | 29.0 |
| • Actual Performance Odds | 34.1 | 84.8 |
| 2. Retail New | | |
| • Booked Odds | 52.8 | 30.7 |
| • Actual Performance Odds | 42.3 | 95.6 |
| 3. Retail Used | | |
| • Booked Odds | 22.3 | 17.7 |
| • Actual Performance Odds | 15.5 | 69.5 |
| 4. SmartLease | | |
| • Booked Odds | 73.9 | 68.9 |
| • Actual Performance Odds | 61.4 | 75.1 |
| 5. SmartBuy | | |
| • Booked Odds | 28.4 | 20.4 |
| • Actual Performance Odds | 20.9 | 94.6 |

*Represents booked performance odds from custom scorecards prior to August 1, 2005
**Represents booked performance odds from custom scorecards after August 1, 2005 (new scorecards)

Performance Bad Definition:

- Loss
- Repossession
- Redeemed Repossession
- Bankruptcy
- Any account that has been 1 or more times 90 days past due
- Any Account that has been 4 or more times 60 days past due
- Any account that has greater than 40% of the payments received more than 30 days past due

## Retail & Lease Portfolio

11

## Service Level Standards-2008 2nd Quarter Results

### Acquisitions

- GMAC Bank to have the capability to review credit applications in OSCAR within 3 hours of receipt by GMAC.
- Result: 12.2 minutes

### Contract Purchasing

- 98% of all contracts funded are booked within 30 days.
- Result: 99.9%

### Customer Service
- Average Speed to Answer (ASA) for inbound calls is 80% within 20 seconds
- Result: 50.9%

  Note: Semperian call center in Eugene closed. They continue to ramp up offshore operations to support call center operations for the GMAC organization. Service Provider continues to hire and train agents to improve process. Results are trending positively in July.

- Abandoned rate for inbound calls not to exceed 5%
- Result: 10.2%

  Note: Semperian call center in Eugene closed. They continue to ramp up offshore operations to support call center operations for the GMAC organization. Service Provider continues to hire and train agents to improve process. Results are trending positively in July.

- 90% average quality score for customer service agents.
- Result: 92.2%

### Collections/Charge-Offs/Repossessions

- 30-59 Days Past Due not to exceed 1.85%
- Result: 0.42%

- 60-89 Days Past Due not to exceed 0.20%
- Result: 0.05%

- 90+ Days Past Due not to exceed 0.02%
- Result: 0.01%

- Net charge-offs not to exceed 0.72%
- Result: 0.021%

- Retail repossessions not to exceed 1.75% of the portfolio outstandings.
- Result: 0.36%

- Early termination by defaults not to exceed 1.35% of the portfolio outstandings
- Result: 0.27%

### Lease Returns

- Average time to get returned leased vehicle to disposition not to exceed 38 days.
- Result: 30 days

12

ALLY_0260308

## Commercial Portfolio

- **Portfolio Update**

Commercial Portfolio Outstandings ($MM)

| Portfolio | Dec 2007 | Jun 2008 | Variance |
|---|---|---|---|
| Dealer Real Estate Loans | $1,032.1 | $1,259.4 | $227.3 |
| Working Capital Loans | $46.4 | $85.6 | $39.2 |
| Equipment Loans | $1.0 | $1.1 | $0.1 |
| Borrowing Base LOC | $0.0 | $42.6 | $42.6 |
| Wholesale | $792.5 | $1,076.7 | $284.2 |
| | | | |
| Totals | $1,872.0 | $2,465.4 | $593.4 + 31.6% |

*Dealer loans (real estate, working capital, equipment loans): As of June 30, there were 6 loans in process (closed loans that have not been booked by Capmark) totaling $7.9 million and 44 loans approved not closed totaling $127.3 million. Total exposure $1,523.9 billion.

- **Dealer Real Estate Concentration-Top 10 States**

| Rank | State | Unpaid Balance ($MM) | % of Total Unpaid Balances |
|---|---|---|---|
| 1 | Texas | $190.4 | 15.1% |
| 2 | California | $175.2 | 13.9% |
| 3 | Michigan | $144.9 | 11.5% |
| 4 | Rhode Island | $84.0 | 6.7% |
| 5 | Pennsylvania | $70.7 | 5.6% |
| 6 | Florida | $63.7 | 5.1% |
| 7 | Colorado | $52.6 | 4.2% |
| 8 | Wisconsin | $49.5 | 3.9% |
| 9 | New York | $42.6 | 3.4% |
| 10 | Georgia | $32.9 | 2.6% |
| | All Others | $352.9 | 28.0% |
| | | | |
| | Total Top 10 | $906.5 | 72.0% |
| | Grand Total | $1,259.4 | 100.0% |

- **Dealer Real Estate Loans – Loan-to-Value**

| Loan-to-Value % | # | % of Portfolio |
|---|---|---|
| <50% | 178 | 27.5% |
| 51%-65% | 77 | 21.9% |
| 66%-75% | 63 | 21.4% |
| 76%-80% | 38 | 11.2% |
| 81%-85% | 53 | 17.6% |
| >85%* | 1 | 0.3% |

*A $3.9 million real estate loan was approved for the Serra Group an 88.0% loan-to-value as a deviation based on satisfactory credit factors.

13

## Commercial Portfolio

- **Stress Test of the Real Estate Loan Portfolio**

The following is the result of a stress test of the Bank's real estate loan portfolio to estimate the Bank's exposure if overall real estate values decline. The stress test is based on the existing value of the Bank's real estate collateral should real estate values decline by 10% and 20% as compared to current loan balances:

- Potential deficit resulting from a 10% decline in real estate collateral value: Nil as of 06/30/08.
- Potential deficit resulting from a 20% decline in real estate collateral value: $9.9M as of 06/30/08. The total estimated deficit includes potential deficits in 21 states with the largest ($2.3M) in Michigan.

| State | Exposure |
|-------|----------|
| AL | $243,874 |
| CA | $1,084,016 |
| CO | $18,458 |
| CT | $186,207 |
| GA | $462,397 |
| IN | $209,757 |
| LA | $19,707 |
| MI | $2,380,891 |
| MT | $209,592 |
| NJ | $440,172 |
| NM | $2,363 |
| NY | $392,008 |
| OH | $84,150 |
| OR | $640,481 |
| PA | $134,452 |
| TN | $7,412 |
| TX | $833,627 |
| UT | $472,311 |
| WA | $110,542 |
| WI | $1,946,171 |
| WY | $83,025 |
| **TOTAL** | $9,961,613 |

14

ALLY_0260310

## Commercial Portfolio

- **Wholesale Accounts Outstanding by Manufacturer**

New Vehicle Wholesale Outstandings by Manufacturer (As of June 30, 2008)

| Make | Outstandings ($MM) | % of Wholesale Portfolio |
|------|--------------------|--------------------------|
| Honda | $202,669.9 | 20.2% |
| Nissan | $170,681.7 | 17.0% |
| Toyota | $161,911.2 | 16.1% |
| Hyundai | $122,640.4 | 12.2% |
| Ford | $121,554.2 | 12.1% |
| Subaru | $46,207.4 | 4.6% |
| Kia | $38,764.6 | 3.9% |
| Mercedes | $38,722.5 | 3.9% |
| BMW | $22,200.5 | 2.2% |
| Volkswagen | $18,239.0 | 1.8% |
| Mitsubishi | $16,311.7 | 1.6% |
| Tata | $14,716.9 | 1.5% |
| All Others | $30,211.9 | 2.9% |

- **Loans with Affiliates**

Procedures are in place to ensure used vehicles owned or financed by any affiliates are not on floorplan. The Bank has developed an electronic filtering process to exclude the following vehicles from eligibility:

- Used vehicles financed by GMAC and on GMAC floorplan within the last three business days;
- Used vehicles that were General Motors or GMAC company vehicles within the last three business days;
- Used vehicles financed or leased from GMAC that were outstanding on GMAC's retail financing or leasing portfolio within the last three business days;
- Any vehicles with a make code in the vehicle identification number which would identify the vehicle as a Chrysler, Dodge or Jeep

If ineligible units are presented to the Bank, the system will divert the units to GMAC floorplan financing.

15

ALLY_0260311

## Commercial Portfolio

- **Credit Quality (Asset Quality)**

The Bank's commercial portfolio reflects a high credit quality. The portfolio delinquency is 0.00%.

### Borrower Risk Rating (CARRS Rating for Dealer Loans & Wholesale Combined)

| BRR | # of Accounts | | % of Portfolio |
|---|---|---|---|
| 4, 4-, 5+ | 351 | Satisfactory | 46.6% |
| 5, 5-, 6+ | 348 | Limited | 46.2% |
| 6, 6-, 7+ | 54 | Programmed | 7.2% |

### Facility Risk Rating (CARRS Rating for Dealer Loans & Wholesale Combined)

| FRR | # of Accounts | | % of Portfolio |
|---|---|---|---|
| 2, 2- | 154 | Strong | 20.5% |
| 3+, 3, 3- | 462 | Satisfactory | 61.6% |
| 4+, 4 | 131 | Acceptable | 17.5% |
| *4- | 1 | Special Mention | 0.1% |
| *5+ | 2 | Substandard | 0.3% |

*The Bank is in the process of validating assets and/or obtaining additional security. If FRR can not be improved to an acceptable loan rating, the Bank's put option will be exercised.

- **Summary of Exceptions to Policy**

The Credit Committee reviews exceptions to policy each month and the exceptions are provided in monthly Board reports.

| Exception | Apr 08 | May 08 | Jun 08 | LTD |
|---|---|---|---|---|
| Inadequate Debt Service Coverage Ratio* | 3 | 2 | 8 | 22 |
| Excessive Rent factor PNUR | 0 | 0 | 0 | 77 |
| Excessive Rent factor as a % of net sales | 3 | 0 | 1 | 48 |
| Appraisal >12 months | 0 | 0 | 0 | 8 |
| Insurance | 0 | 0 | 0 | 14 |
| LTV | 0 | 0 | 1 | 3 |
| Term | 1 | 8 | 4 | 29 |
| Amortization | 2 | 1 | 2 | 15 |
| Maximum exposure to obligor | 0 | 0 | 0 | 0 |
| ESA > 6 Months | 1 | 5 | 2 | 23 |
| BRR < 6+ | 0 | 2 | 1 | 9 |
| 100% advance of AWV on UCFP | 0 | 0 | 0 | 2 |
| Other | 0 | 3 | 0 | 4 |
| **Total** | 10 | 21 | 19 | 254 |

* Incorporated into the Commercial Lending Policy in November 2007.

16

ALLY_0260312

## Adequacy of Allowance for Credit Losses (ACL) – Retail, Lease and Commercial Portfolio

An Allowance for Credit Losses ("ACL") is maintained at a level adequate to absorb the estimated credit losses associated with the retail and commercial portfolios. As of June 30, 2008, the ACL is $35,128,171 or 1.07% of the net retail portfolio outstanding of $3,284,866,980. For the commercial portfolio, the ACL is $1,808,776 or .07% of the commercial outstandings of $2,463,564,034. Based on current loss trends and historical losses in the GMAC portfolio, Bank Management believes that the Bank has an adequate Allowance for Credit Losses.

### Conclusion

Based on Management's review of the portfolio, it is our conclusion that the portfolio has been originated according to the criteria established by the Board of Directors and risk is being adequately identified, measured, controlled and monitored. Management also believes the portfolio is adequately reserved.

17

Confidential

ALLY_0260313

# GMAC BANK

# COMMUNITY REINVESTMENT ACT
## Lending Performance
## &
## Community Development

## Board of Directors Meeting
### July 22, 2008

Confidential

ALLY_0260314

# GMAC BANK

## CRA COMMUNITY DEVELOPMENT LOANS, INVESTMENTS, AND SERVICE SUMMARY
### as of May 31, 2008

### LOANS

| Loan Summary | Volume Originated during Performance Period | 2006 Originated Volume | 2007 Originated Volume | 2008 Originated Volume |
|---|---|---|---|---|
| Residential Mortgage Loan Volume and LMI Distribution in AA*N | $ 161,700,000 | NA | $ 126,900,000 | $ 34,800,000 |
| Small Business Loans in AA*(#53 2 mean organization summary) | $ - | $ - | $ 195,000 | $ 1,000,000 |
| Total | $ 161,700,000 | $ 1,700,000 | $ 126,900,000 | $ 34,800,000 |

### COMMUNITY DEVELOPMENT

#### LOANS

| Loan Summary | Volume Originated during Performance Period | 2006 Originated Volume | 2007 Originated Volume | 2008 Originated Volume YTD |
|---|---|---|---|---|
| Community Development Loans in AA | $ 2,895,000 | $ 1,700,000 | $ 195,000 | $ 1,000,000 |
| Total | $ 2,895,000 | $ 1,700,000 | $ 195,000 | $ 1,000,000 |

#### INVESTMENTS

#### COMMUNITY DEVELOPMENT INVESTMENTS

| Mortgage Backed Securities (MBS) | Purchase Volume during Performance Period | 2006 Purchase Volume | 2007 Purchase Volume | 2008 Purchase Volume YTD |
|---|---|---|---|---|
| Federal National Mortgage Association (Fannie Mae) Pools | $ 72,390,000 | $ 29,039,000 | $ 42,869,000 | $ 1,492,000 |
| Federal Home Loan Mortgage Corporation (Freddie Mac) Pools | $ 27,707,000 | $ 2,362,000 | $ 13,039,000 | $ 12,306,000 |
| Access Capital Strategies Community Investment Fund | $ - | $ - | $ - | $ - |
| Total | $ 100,097,000 | $ 31,401,000 | $ 55,907,000 | $ 13,798,000 |

| Municipal Bonds | Purchase Volume during Performance Period | 2006 Purchase Volume | 2007 Purchase Volume | 2008 Purchase Volume YTD |
|---|---|---|---|---|
| Utah Housing Corporation | $ 5,895,000 | $ 3,700,000 | $ 595,000 | $ 2,500,000 |
| Small Business Administration Loan Pool (SBA) | $ 2,024,000 | $ - | $ 995,000 | $ 1,029,000 |
| Delaware Housing Authority | $ 13,025,000 | $ 6,065,000 | $ 7,900,000 | $ - |
| Total | $ 20,944,000 | $ 9,765,000 | $ 8,490,000 | $ 3,529,000 |

Confidential

ALLY_0260315

# GMAC BANK

## CRA COMMUNITY DEVELOPMENT LOANS, INVESTMENTS, AND SERVICE SUMMARY
### as of May 31, 2008

### GRANTS

| Grant Summary | Donated Volume during Performance Period | 2006 Donation Volume | 2007 Donation Volume | 2008 Donation Volume YTD |
|---|---|---|---|---|
| Housing | $ 701,375 | $ 282,500 | $ 263,875 | $135,000 |
| Counseling | 287,800 | 57,500 | 147,500 | $62,800 |
| Financial Literacy | 218,642 | 118,000 | 95,642 | $35,000 |
| Community Outreach/Service | 531,387 | 232,011 | 128,856 | $172,700 |
| **Total** | **$1,739,193** | **$687,011** | **$525,972** | **$395,200** |

### SERVICE

| Service Hours | Total Service Hours during Performance Period | 2006 Service Hours | 2007 Service Hours | 2008 Service Hours YTD |
|---|---|---|---|---|
| **Total** | 1274.33 | 144.25 | 540.5 | 631.83 |

NOTE: Performance Period is February 26, 2006 to date.

1 Assessment Area

2 Residential Mortgage Loan Volume and LMI Distribution is from the HMDA LAR as of March 31, 2008

Confidential

ALLY_0260316

# GMAC BANK

## MORTGAGE LOAN VOLUME & LMI DISTRIBUTION UPDATE
### as of March 31, 2008

### UT Assessment Area (Utah County, Salt Lake County, Tooele County, Weber County)
YTD Loan Volume - $21.5 Million

**LMI Household Distribution**

**Non-Appended (purchased loans included)**

| | Quarter | | | Year to Date | | |
|---|---|---|---|---|---|---|
| | Total | # LMI | % LMI | Total | # LMI | % LMI |
| 1st Qtr. 08 | 656 | 69 | 10.5% | 656 | 69 | 10.5% |
| 2nd Qtr. 08 | | | | | | |
| 3rd Qtr. 08 | | | | | | |
| 4th Qtr. 08 | | | | | | |

**Non-Appended (purchased loans NOT included)**

| | Quarter | | | Year to Date | | |
|---|---|---|---|---|---|---|
| | Total | # LMI | % LMI | Total | # LMI | % LMI |
| 1st Qtr. 08 | 304 | 69 | 22.7% | 304 | 69 | 22.7% |
| 2nd Qtr. 08 | | | | | | |
| 3rd Qtr. 08 | | | | | | |
| 4th Qtr. 08 | | | | | | |

**Appended (with income)**

| | Quarter | | | Year to Date | | |
|---|---|---|---|---|---|---|
| | Total | # LMI | % LMI | Total | # LMI | % LMI |
| 1st Qtr. 08 | 646 | 143 | 22.1% | 646 | 143 | 22.1% |
| 2nd Qtr. 08 | | | | | | |
| 3rd Qtr. 08 | | | | | | |
| 4th Qtr. 08 | | | | | | |

LMI Target: 20.58%

**LMI Census Tract Distribution**    LMI Target: 14.92%

| | Quarter | | Year to Date | |
|---|---|---|---|---|
| | # LMI | % LMI | # LMI | % LMI |
| 1st Qtr. 08 | 76 | 11.7% | 76 | 11.9% |
| 2nd Qtr. 08 | | | | |
| 3rd Qtr. 08 | | | | |
| 4th Qtr. 08 | | | | |

### PA/DE Assessment Area (Montgomery County, New Castle County)
YTD Loan Volume - $13.3 Million

**LMI Household Distribution**

**Non-Appended (purchased loans included)**

| | Quarter | | | Year to Date | | |
|---|---|---|---|---|---|---|
| | Total | # LMI | % LMI | Total | # LMI | % LMI |
| 1st Qtr. 08 | 304 | 48 | 11.7% | 304 | 48 | 11.7% |
| 2nd Qtr. 08 | | | | | | |
| 3rd Qtr. 08 | | | | | | |
| 4th Qtr. 08 | | | | | | |

**Non-Appended (purchased loans NOT included)**

| | Quarter | | | Year to Date | | |
|---|---|---|---|---|---|---|
| | Total | # LMI | % LMI | Total | # LMI | % LMI |
| 1st Qtr. 08 | 146 | 46 | 31.5% | 146 | 46 | 31.5% |
| 2nd Qtr. 08 | | | | | | |
| 3rd Qtr. 08 | | | | | | |
| 4th Qtr. 08 | | | | | | |

**Appended (with income)**

| | Quarter | | | Year to Date | | |
|---|---|---|---|---|---|---|
| | Total | # LMI | % LMI | Total | # LMI | % LMI |
| 1st Qtr. 08 | 391 | 103 | 26.3% | 391 | 103 | 26.3% |
| 2nd Qtr. 08 | | | | | | |
| 3rd Qtr. 08 | | | | | | |
| 4th Qtr. 08 | | | | | | |

LMI Target: 22.11%

**LMI Census Tract Distribution**    LMI Target: 31.97%

| | Quarter | | Year to Date | |
|---|---|---|---|---|
| | # LMI | % LMI | # LMI | % LMI |
| 1st Qtr. 08 | 48 | 12.4% | 48 | 12.4% |
| 2nd Qtr. 08 | | | | |
| 3rd Qtr. 08 | | | | |
| 4th Qtr. 08 | | | | |

Confidential

# GMAC BANK

## MORTGAGE LOAN VOLUME & LMI DISTRIBUTION UPDATE
### as of March 31, 2008

**National Assessment**
YTD Loan Volume - $1.7 Billion

**LMI Household Distribution**     LMI Target: 17.92%

Non-Appended (purchased loans included)

|              | Quarter | | | Year to Date | | |
|--------------|---------|-------|-------|-------|-------|-------|
|              | Total   | # LMI | % LMI | Total | # LMI | % LMI |
| 1st Qtr. 08  | 47332   | 4620  | 9.8%  | 47332 | 4620  | 9.8%  |
| 2nd Qtr. 08  |         |       |       |       |       |       |
| 3rd Qtr. 08  |         |       |       |       |       |       |
| 4th Qtr. 08  |         |       |       |       |       |       |

Non-Appended (purchased loans NOT included)

|              | Quarter | | | Year to Date | | |
|--------------|---------|-------|-------|-------|-------|-------|
|              | Total   | # LMI | % LMI | Total | # LMI | % LMI |
| 1st Qtr. 08  | 16710   | 4620  | 27.6% | 16710 | 4620  | 27.6% |
| 2nd Qtr. 08  |         |       |       |       |       |       |
| 3rd Qtr. 08  |         |       |       |       |       |       |
| 4th Qtr. 08  |         |       |       |       |       |       |

**LMI Census Tract Distribution**     LMI Target: 17.96%

|              | Quarter | | | Year to Date | | |
|--------------|---------|-------|-------|-------|-------|-------|
|              | Total   | # LMI | % LMI | Total | # LMI | % LMI |
| 1st Qtr. 08  | 47332   | 6826  | 14.4% | 47332 | 6826  | 14.4% |
| 2nd Qtr. 08  |         |       |       |       |       |       |
| 3rd Qtr. 08  |         |       |       |       |       |       |
| 4th Qtr. 08  |         |       |       |       |       |       |

NOTE: LMI Targets are based on 2006 National Aggregate data derived from HMDA LARs from all home lenders within the Bank's Assessment Area.

Confidential

5

## FAIR LENDING UPDATE
### July 2008

## OTS Fair Lending Examination Completed

- The exit interview for the OTS fair lending examination, which began in January 2007 and ended in November 2007, occurred on April 14, 2008. The examination consisted of a review of the bank's 2004 and 2005 Home Mortgage Disclosure Act (HMDA) data. Comparative file reviews were conducted in June and November 2007. In the November review, the examiners identified 20 "packets" to be reviewed; in each packet there was one "target" denied application from a minority applicant and four "comparator" loans with similar characteristics to the denied application but made to White, non-Hispanic borrowers. The examiners reviewed each packet to determine if the denied applicant(s) was more qualified to receive a loan than were the three White, non-Hispanic borrowers. In the exit interview, the examiner in charge and his supervisor reported that there were no findings and that no report would be issued.

## FDIC HMDA Validation/Fair Lending Examination

- In early November 2007, the bank received a letter from the FDIC that said a review of the bank's 2006 HMDA data had raised questions about the pricing of our conventional, first-lien home purchase loans and conventional, first-lien refinance loans. With the letter was an extensive information request, which the bank completed and returned in late November. In April 2008, an FDIC fair lending specialist contacted the bank and said that he would probably do some HMDA data validation before beginning regression analyses of the bank's data. That HMDA data validation took place in June 2008. The examiner reviewed roughly 40 loans in each of three lending channels – broker, correspondent, and retail – and has communicated apparent discrepancies between the actual file and the data in the bank's loan application register ("LAR"). The HMDA group is in the process of researching these apparent discrepancies. Following the HMDA validation, we anticipate receiving a fair lending examination similar to the OTS examination.

## Fair Lending Training

- In response to a recommendation made by the OTS examiner who conducted the bank's last fair lending examination, in October 2006, fair lending training was created for the bank's correspondent clients to download and use to train their employees. For those clients whose names had appeared on the bank's Q1-Q3 2007 and Q1 2008 non-delegated pricing disparity lists, this training, or training substantially similar, was made a requirement.

Attorney-Client Privileged
Attorney Work Product

CONFIDENTIAL
NOT FOR DISTRIBUTION

Fair Lending Analytics
C. Richardson

ALLY_0260319

# 2008-Q1 Fair Lending Dashboard Executive Summary

<u>Notes:</u>

According to RFG's external legal counsel, adjusted APR disparities of 10 basis points or larger, or adjusted trigger rate or application denial rate odds ratios of 1.50 or larger, indicate higher fair lending risk. Adjusted disparities shown in this summary are based on models that adjust APRs, trigger rates, or denial rates for broad product categories such as conforming, jumbo, Alt-A, government (FHA/VA) loans, and closed-end home equity loans.

GMAC Bank analyses include all loans appearing in the GMAC Bank Loan Application Register ("LAR"), which include Broker Fulfillment, Non-Delegated correspondents, certain loans from delegated correspondents that were underwritten by GMAC Bank or contract underwriters, and loans purchased from Ditech, Homecomings (HFW), Direct, and Retail through the 250.250 program. HFW analyses <u>include</u> 250.250 loans sold to the Bank, in addition to applications appearing in the HFW LAR because of the low volume of HFW loans that are not purchased by the Bank. The GMAC Mortgage Retail/Direct analyses <u>exclude</u> 250.250 loans sold to the Bank, and <u>exclude</u> Ditech loans appearing in the Mortgage LAR. The 2007 column within the GMAC Mortgage/Retail/Direct group represents only Retail loans; Direct loans are included only in the Direct 2008-Q1 column. The Ditech analyses <u>include</u> Ditech loans appearing in the Bank and Mortgage LARs, in addition to loans appearing in the Ditech LAR (Hawaii, Wyoming, and Massachusetts). Given the construction of the analyses, 250.250 Ditech loans, 250.250 HFW loans, and non-delegated correspondent loans appear in two analyses: the separate Ditech/HFW/non-delegated correspondent analysis and the GMAC Bank analysis. GMAC Bank Non-Delegated loans include correspondent, table funded, and brokered non-delegated loans.

<u>Definitions:</u>

- The "Unadjusted Disparity" is the difference between the average APR for protected class borrowers and the average APR for White, Non-Hispanic borrowers (shown in basis points).
- The "Adjusted Disparity" estimates the difference between the average APR for protected class borrowers and White Non-Hispanic Borrowers after controlling for private data pricing factors (FICO score, loan-to-value, loan amount, loan type, amortization type, loan purpose, property type, loan term, etc...). According to RFG's outside counsel, an Adjusted Disparity of less than 10 bps presents lower risk.
- The Trigger Rate is the percentage of loans with APRs at or above the HMDA reportable APR (which is 3% above comparable Treasury yields for first liens.
- The trigger rate "Unadjusted Odds Ratio" represents the likelihood of receiving an APR above the HMDA reportable trigger for a protected class applicant relative to a White Non-Hispanic applicant without consideration of credit factors that might account for differences in trigger rates.
- The trigger rate "Adjusted Odds Ratio" represents the likelihood of receiving an APR above the HMDA reportable trigger for a protected class applicant relative to a White Non Hispanic applicant after controlling for credit factors (FICO score, loan-to-value, debt-to-income, loan term, loan type, loan purpose, property type, etc...). According to RFG's outside counsel, an Adjusted Odds ratio of 1.5 or less presents lower risk.
- The denial rate "Unadjusted Odds Ratio" represents the likelihood of decline for a protected class applicant relative to a White Non-Hispanic applicant.
- The denial rate "Adjusted Odds Ratio" represents the likelihood of decline for a protected class applicant relative to a White Non Hispanic applicant after controlling for credit factors (FICO score, loan to-value, debt-to-income, loan term, loan type, loan purpose, property type, etc...). According to RFG's outside counsel, an Adjusted Odds ratio of 1.5 or less presents lower risk.
- The "Denial Rate" is the percent of loans that were denied.
- Ditech loans include: (1) all loans in the Ditech.com LAR, and (2) Ditech loans extracted from the GMAC Mortgage and GMAC Bank LARs.

12-12020-mg   Doc 5696-5   Filed 11/12/13   Entered 11/12/13 21:47:04   Exhibit 5:
2008-Q1 Fair Lending Dashboard Executive Summary
July 2008 Bank Board Materials   Pg 106 of 203

3

| Pricing (APR) Analysis | HFW | | GMAC Bank (All) | | GMAC Bank (Non-Delegated) | | GMAC Mortgage Retail | | Direct | Ditech | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008-Q1 | 2007 | 2008-Q1 | 2007 | 2008-Q1 | 2007 | 2008-Q1 | 2008-Q1 | 2007 | 2008-Q1 |
| African American (# loans) | 10928 | 1054 | 5271 | 747 | 864 | 234 | 2907 | 568 | 70 | 1383 | 191 |
| Unadjusted Disparity | 0.71 | 0.97 | 0.64 | 0.79 | 0.51 | 0.71 | 0.37 | 0.36 | 0.23 | 0.19 | 0.24 |
| Adjusted Disparity | 0.16 | 0.11 | 0.14 | 0.12 | 0.12 | 0.14 | 0.05 | 0.05 | 0.08 | 0.02 | 0.07 |
| Average APR (%) | 8.62 | 7.43 | 7.83 | 6.96 | 7.49 | 6.71 | 7.23 | 6.58 | 6.34 | 7.41 | 6.46 |
| Hispanic (# loans) | 15276 | 1396 | 5461 | 777 | 831 | 247 | 2374 | 477 | 85 | 1330 | 215 |
| Unadjusted Disparity | 0.46 | 0.59 | 0.38 | 0.58 | 0.40 | 0.71 | 0.28 | 0.17 | 0.03 | -0.16 | -0.15 |
| Adjusted Disparity | 0.12 | 0.15 | 0.12 | 0.12 | 0.07 | 0.14 | 0.04 | 0.01 | 0.05 | -0.01 | -0.06 |
| Average APR (%) | 8.38 | 7.05 | 7.57 | 6.76 | 7.38 | 6.72 | 7.13 | 6.39 | 6.14 | 7.06 | 6.06 |
| Asian (# loans) | 3136 | 396 | 1855 | 468 | 593 | 237 | 1205 | 275 | 17 | 334 | 67 |
| Unadjusted Disparity | 0.08 | -0.12 | -0.21 | -0.11 | -0.14 | -0.13 | -0.22 | -0.40 | -0.26 | -0.33 | -0.15 |
| Adjusted Disparity | 0.03 | 0.08 | -0.04 | 0.02 | -0.04 | 0.02 | -0.05 | -0.07 | 0.01 | 0.04 | 0.01 |
| Average APR (%) | 7.99 | 6.34 | 6.98 | 6.06 | 6.84 | 5.87 | 6.64 | 5.81 | 5.65 | 6.89 | 6.06 |
| White Non-Hispanic (# loans) | 59178 | 8122 | 47602 | 11346 | 14113 | 5906 | 29453 | 7628 | 1145 | 13624 | 2292 |
| Average APR (%) | 7.91 | 6.46 | 7.79 | 6.41 | 7.68 | 6.00 | 6.86 | 6.00 | 6.36 | 7.22 | 6.21 |

Notes: HFW Hispanic disparity of 15 bps appears to be driven by shift to higher proportion of Fannie EA loans for Hispanics. Bank non-delegated disparities are driven partially by differences in pricing among individual non-delegated correspondents that are not accounted for in current models.

| Trigger Rate Analysis | 2007 | 2008-Q1 | 2007 | 2008-Q1 | 2007 | 2008-Q1 | 2007 | 2008-Q1 | 2008-Q1 | 2007 | 2008-Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| African American (# loans) | 10928 | 1054 | 5271 | 747 | 864 | 234 | 2907 | 568 | 70 | 1383 | 191 |
| Unadjusted Odds Ratio | 2.87 | 5.76 | 3.88 | 4.81 | 3.69 | 3.87 | 2.96 | 2.40 | 2.82 | 1.68 | 1.50 |
| Adjusted Odds Ratio | 1.65 | 1.28 | 1.42 | 1.03 | 1.63 | 0.60 | 1.25 | 1.10 | 1.57 | 1.01 | 0.40 |
| Trigger Rate (%) | 57.66 | 46.96 | 37.64 | 24.23 | 21.06 | 13.25 | 16.75 | 9.33 | 12.86 | 19.45 | 8.38 |
| Hispanic (# loans) | 15276 | 1396 | 5461 | 777 | 831 | 247 | 2374 | 477 | 85 | 1330 | 215 |
| Unadjusted Odds Ratio | 1.65 | 2.88 | 2.68 | 3.93 | 3.22 | 6.44 | 2.02 | 1.56 | 1.71 | 0.82 | 0.88 |
| Adjusted Odds Ratio | 1.48 | 1.57 | 1.51 | 1.63 | 1.68 | 3.28 | 1.12 | 1.20 | 1.74 | 0.99 | 1.00 |
| Trigger Rate (%) | 43.91 | 32.52 | 29.43 | 20.72 | 18.89 | 20.24 | 12.09 | 6.29 | 8.24 | 10.60 | 5.12 |
| Asian (# loans) | 3136 | 396 | 1855 | 468 | 593 | 237 | 1205 | 275 | 17 | 334 | 67 |
| Unadjusted Odds Ratio | 0.89 | 0.51 | 0.52 | 0.78 | 0.64 | 0.66 | 0.41 | 0.43 | 0.00 | 0.44 | 1.32 |
| Adjusted Odds Ratio | 1.02 | 0.78 | 0.82 | 1.04 | 0.82 | 2.57 | 0.67 | 0.90 | 0.00 | 1.22 | 3.87 |
| Trigger Rate (%) | 29.72 | 8.08 | 7.44 | 4.91 | 3.37 | 2.53 | 2.74 | 1.82 | 0.00 | 5.99 | 7.46 |
| White Non-Hispanic (# loans) | 59178 | 8122 | 47602 | 11346 | 14113 | 5906 | 29453 | 7628 | 1145 | 13624 | 2292 |
| Trigger Rate (%) | 32.21 | 14.55 | 13.47 | 6.43 | 6.75 | 3.79 | 8.36 | 4.12 | 4.98 | 12.60 | 5.76 |

Notes: Increased unadjusted trigger rate odds ratios for HFW indicate substantial shifts in risk profiles among demographics: African American and Hispanic borrower pools became riskier relative to White non-Hispanics. Disparity in trigger rates is largely accounted for by increase in relative risk. Bank non-delegated Hispanic trigger rate reflects shift to higher proportion of Fannie EA loans for Hispanics. Asian adjusted disparity is due to outliers in the small number of Asian trigger loans (10).

| Denial Rate Analysis | 2007 | 2008-Q1 | 2007 | 2008-Q1 | 2007 | 2008-Q1 | 2007 | 2008-Q1 | 2008-Q1 | 2007 | 2008-Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| African American (# loans) | 20771 | 3887 | 7909 | 2335 | 1289 | 377 | 3987 | 854 | 389 | 6029 | 945 |
| Unadjusted Odds Ratio | 1.92 | 1.92 | 2.52 | 3.07 | 3.04 | 5.12 | 2.59 | 2.60 | 3.42 | 1.63 | 1.52 |
| Adjusted Odds Ratio | 1.40 | 1.20 | 1.52 | 1.27 | 1.43 | 1.75 | 1.33 | 1.25 | 1.76 | 1.10 | 0.85 |
| Denial Rate (%) | 19.85 | 34.29 | 16.18 | 34.13 | 18.85 | 28.21 | 13.17 | 15.81 | 76.86 | 74.95 | 78.84 |
| Hispanic (# loans) | 28197 | 5019 | 8684 | 2731 | 1354 | 377 | 3310 | 690 | 265 | 4092 | 818 |
| Unadjusted Odds Ratio | 1.27 | 1.36 | 2.10 | 2.44 | 2.84 | 4.79 | 2.28 | 2.65 | 1.87 | 1.00 | 1.08 |
| Adjusted Odds Ratio | 1.3 | 1.12 | 1.46 | 1.18 | 1.69 | 2.08 | 1.56 | 1.33 | 1.61 | 1.07 | 1.29 |
| Denial Rate (%) | 14.03 | 26.94 | 13.86 | 29.22 | 17.80 | 26.79 | 11.78 | 16.09 | 64.53 | 64.59 | 72.49 |
| Asian (# loans) | 5423 | 1124 | 2522 | 905 | 775 | 286 | 1511 | 356 | 71 | 993 | 239 |
| Unadjusted Odds Ratio | 0.98 | 0.96 | 1.16 | 1.17 | 1.12 | 1.20 | 0.90 | 0.87 | 2.15 | 0.98 | 0.95 |
| Adjusted Odds Ratio | 1.11 | 1.07 | 1.38 | 1.01 | 1.84 | 1.74 | 1.14 | 0.75 | 3.15 | 1.35 | 1.48 |
| Denial Rate (%) | 11.19 | 20.73 | 8.17 | 16.46 | 7.88 | 8.39 | 5.03 | 5.90 | 67.61 | 64.25 | 69.87 |
| White Non-Hispanic (# loans) | 90678 | 17316 | 59113 | 17477 | 17395 | 6704 | 36063 | 9361 | 2463 | 41121 | 8256 |
| Denial Rate (%) | 11.42 | 21.38 | 7.12 | 14.45 | 7.09 | 7.10 | 5.54 | 6.74 | 49.25 | 64.25 | 71.00 |

Notes: Bank non-delegated disparities are driven by differences in underwriting and product offerings among individual non-delegated correspondents that are not accounted for in current models.

Attorney-Client Privileged
Attorney Work Product

CONFIDENTIAL
NOT FOR DISTRIBUTION

Fair Lending Analytics
C. Richardson

# Litigation Report and Bank Charter Update

*Gregory K. Merryman, General Counsel*
*Jonathan P. Andrews, Assistant General Counsel and*
*Assistant Secretary*

Confidential

**GMAC Bank**

## SUPPLEMENTAL REPORTS INDEX:

- BSA Status Report

- Information Security Program Status Report

- Committee Meeting Minutes
  - ALCO
  - Community Reinvestment Act
  - Credit – Automotive Division
    - Allowance Sub-Committee
  - Credit – Mortgage Division
    - Allowance Sub-Committee
  - Fair Lending
  - Operational Risk

- Counterparty Review

- Glossary of Acronyms

Confidential

# GMAC Bank

# Bank Secrecy Act
# Status Report

## Board of Directors Meeting
## July 22, 2008

Confidential

# GMAC Bank

## Report of BSA/AML activity

BSA information as of June 30, 2008 was presented to the Board at the July 2, 2008 meeting. The next BSA update to the Board will be on August 20, 2008.

Confidential

2

ALLY_0260325

# GMAC Bank

# Information Security Program
# Status Report

## Board of Directors Meeting
## July 22, 2008

Confidential

1

# GMAC Bank

As required by FDIC regulation at 12 CFR Part 364, Appendix B, each bank must report to its board or an appropriate committee of the board at least annually on the overall status of the information security program and the bank's compliance with the Interagency Guidelines Establishing Information Security Standards.

The following page provides a summary of the state of the Bank's Information Security Program as of July 2008.

Confidential

ALLY_0260327

# GMAC Bank

## INFORMATION SECURITY PROGRAM STATUS REPORT
### 2008

| | |
|---|---|
| **Overall Status** | The Bank's Information Security Program is functioning as designed and the overall control environment within the Bank supports the continued security, confidentiality, and integrity of Bank Information |
| **Information Security Risk Assessment** | The Bank has developed and implemented a risk assessment methodology that focuses on the following key activities: information inventory; information classification; threat and vulnerability assessment; risk measurement; and control evaluation.<br><br>The outcome of the Bank's information security risk assessment indicates a low to moderate risk profile. Risks are well controlled and there are no identified material gaps. |
| **Risk Management and Control** | The Bank has developed and implemented information security measures designed to protect the security, confidentiality, and integrity of its customers' and business information. Bank leadership oversees the management of information security risk and ensures appropriate controls are in place to prevent the unauthorized access, disclosure, alteration, or destruction of Bank Information. |
| **Service Provider Arrangements** | The Bank oversees its service provider relationships and requires by contract or agreement the implementation of appropriate security controls to protect Bank Information. |
| **Testing** | The Bank relies upon GMAC Internal Audit for the testing of key controls, systems, and procedures related to information security.<br><br>Audits of GMAC Bank and GMAC in its service provider capacity to the Bank identified one R1 issue pertaining to excessive and unnecessary access to the ResCap payroll application system, potentially resulting in unauthorized and undetectable changes to employees' payroll records. The issue has been reported to the Bank's Audit Committee and is being addressed by management. |
| **Security Breaches & Management Response** | There have been no security breaches at GMAC Bank or GMAC involving the unauthorized access, disclosure, alteration, or destruction of Bank Information. |
| **Program Changes** | The Bank has revised its Information Security Program to align it with GMAC's Information Security Policy and Standards and GMAC ResCap's Information Security Program to ensure a consolidated program and approach across the Bank's automotive and wholesale mortgage divisions. |

Confidential

3

ALLY_0260328

# GMAC Bank

## Information Security Risk Assessment

The automotive and mortgage divisions of the Bank conducted an information security risk assessment using similar risk assessment methodologies. The risk assessments analyzed the impacts associated with the threats and vulnerabilities to the Bank's information assets and the effectiveness of controls to mitigate risks.

Based on the analysis performed, the overall weighted average* information security risk rating for the Bank is 1.7**, representing low-medium risk.

\* Weighted average takes into account the asset size of both divisions

\*\* Risk rating scale is 1-5 from low to high

Confidential

# SUMMARY

## Asset Liability Committee Minutes

### Purpose

Provide the Board with an overview of the activities of the Asset Liability Committee

### Major Points

- The minutes are in summary format and cover the key compliance, liquidity, funds management and interest rate risk reviews from the April, May and June, 2008 meetings of the GMAC Bank Asset Liability Committee.

### Requested Action

- Review of the minutes of the Asset Liability Committee.

Confidential

# GMAC Bank

**Asset/Liability Management Committee**

Chairman: Lisa Gerner
Secretary: Linda Heigh

Meeting Held:  April 8, 2008

**Committee Members:**

| | |
|---|---|
| Lisa Gerner, Chief Financial Officer | Mike Rizzo, Chief Credit Officer/Mortgage Operations |
| Robert Groody, Chief Operating Officer | Scott Sandberg, Treasurer |
| Mark Hales, President | Peter Simon, Assistant Treasurer/Portfolio Management |
| John Papas, Assistant Treasurer/Mortgage Funding | John Wright, Chief Credit Officer/Automotive Operations |

**Attendees:**  Lisa Gerner, Mark Hales, John Papas, Mike Rizzo, Scott Sandberg, Peter Simon, John Wright

The special ALCO meeting was called to order at 12:00 p.m. MDT by Lisa Gerner

## Reclassification of HELOC Loans and Student Loans from HFS to HFI

➢ The committee discussed the proposal to reclassify HELOC Loans and Student Loans currently held in HFS to HFI. Mr. Hales inquired as to why the loans were not being sold back to GMAC Mortgage under a repurchase agreement. Mr. Simon noted that there is not a required purchase agreement for HELOC Loans and the Student Loans were originated the Bank itself. The HELOCs traditionally have carried large gains if sold and were easily placed into securitizations so the agreement allowed for the sale of these loans to an affiliate (at a presumably higher price) but didn't require repurchase. Due to the current economic environment the loans are no longer easily securitized so the Bank will be holding rather than selling to the affiliate. The affiliate has agreed to indemnify the Bank for any loan losses for loans that do not meet current underwriting criteria.

➢ Mr. Simon motioned for approval of the reclassification of HELOC Loans and Student Loans from HFS to HFI (see attached)
   – Recommend reclassifying the following loans owned by the Bank with a Held for Sale designation to a Held for Investment designation:
     • $211M in HELOC loans, priced as of March 31, 2008, and reclassified as of April 1, 2008
     • $90 M in student loans, reclassified as of February 29, 2008
   – Affiliate has agreed to indemnify all loans which do not meet current underwriting guides
   – The ALCO approved the motion

## Approvals

➢ Reclassification of HELOC loans and student loans from HFS to HFI

The meeting adjourned at 12:40 p.m. MST

2

# GMAC Bank

**Asset/Liability Management Committee**

Chairman: Lisa Gerner                                    Meeting Held: April 29, 2008
Secretary: Linda Heigh

**Committee Members:**

| | |
|---|---|
| Lisa Gerner, Chief Financial Officer | Mike Rizzo, Chief Credit Officer/Mortgage Operations |
| Robert Groody, Chief Operating Officer | Scott Sandberg, Treasurer |
| Mark Hales, President | Peter Simon, Assistant Treasurer/Portfolio Management |
| John Papas, Assistant Treasurer/Mortgage Funding | John Wright, Chief Credit Officer/Automotive Operations |

**Attendees:**  Lisa Gerner, Bob Groody, Mark Hales, John Papas, Mike Rizzo, Scott Sandberg, Peter Simon, John Wright

**Present at the Invitation of the ALCO:**  Al Celini, Kofi Essiam, Ralph Hall, Andrei Magasiner, Brian Maguire

The ALCO meeting was called to order at 1:10 p.m. MST by Ms. Gerner

The materials for the April 29, 2008 ALCO meeting were reviewed and approved for distribution to the ALCO members and invited guests at a pre-ALCO meeting held on Thursday, April 24th. The following individuals participated in the meeting:  Mark Hales, Lisa Gerner, Bob Groody, Peter Simon, John Papas and Brian Maguire.

## Minutes Approval

➢ Minutes from the GMAC Bank ALCO meetings held March 31, 2008 and April 8, 2008 were presented and approved

## Net Interest Income Limit Test

➢ Mr. Simon reviewed with the ALCO the new Balance Sheet Guidance, Net Interest Income section which was added to the ALM Policy Limits page of the core ALCO package (see page 11 of the attached package)
   - This new balance sheet guidance analysis provides additional details on the Bank's risk position, primarily focusing on the impact of changes in interest rates to the Bank's net interest income. The Bank consequently decided to permanently add this section going forward to get additional insight on the Bank's income exposure. However, at this time, there are no policy limits associated with the additional scenarios.
   - ResCap and RFG ALCO are also working on risk limits related to net income.
   - The Bank has a 12 month net interest income limit (#4 of ALM Policy limit). Mr. Simon and Mr. Maguire felt we should supplement our current policy limit with additional tests to ensure ALCO has a view into all the dimensions of the Bank's risk exposure.
   - Six scenarios have been constructed. If we impose these shocks on the balance sheet and net interest income stays within 10% change versus base, we consider that a well-hedged balance sheet. If we exceed the 10% threshold, we should examine what is causing the variance.
   - Mr. Magasiner asked if we could do a combination of multiple scenarios at once to gauge the impact of truly stressful situations.

3

Confidential                                    ALLY_0260332

**Callable Advance Refinancing Strategy Update**

➢ Mr. Papas updated the ALCO on the Bank's callable advance refinancing activity
- In February 2008, it was decided to repay callable advances that were economically in-the-money as they came due and to refinance them with lower cost, short-duration non-callable liabilities until such time as the market breached certain trigger levels.
- Mr. Papas reported that the agreed upon trigger levels had not yet been breached.
- Mr. Papas reviewed a summary of refinancing activity since February, providing a call pipeline report (see attached). He explained how new callable liabilities would be identified and issued if the agreed upon triggers were breached.
- Will report back to ALCO at future meetings

**Balance Sheet Restructuring Contingencies**

➢ A discussion ensued regarding the Bank's asset/liability strategy should critical liability sources disappear in the next few months
- Escrow deposits – currently $1.5 - 2 Billion
  - Beginning conversations with agencies on whose behalf we're holding the escrows
- Brokered CD's
  - Access to this market affected in the short-term by concerns around the Bank charter and the potential impact on FDIC insurance

➢ Liabilities
- Mr. Papas discussed the Bank's liquidity position from a liability standpoint, including recent events that the Bank was responding to:
  - Effective May 1st, FHLB haircuts on collateral are going up by 10%, affecting our borrowing capacity by over $1 Billion
  - FHLB is increasing reporting requirements – Master Borrowing Capacity Forms to be submitted weekly
  - WSJ article could limit Bank access to brokered deposit market
  - Intraday overdraft protection for the Enterprise, including GMAC Bank accounts, had been eliminated by the lenders. The Bank was pre-funding its business accounts in response. This results in an additional drain on liquidity.

- Operational Liquidity
  - $5.5 Billion at the end of April ($2.5 Billion in cash; $3.0 Billion in FHLB borrowing capacity)
  - May/June – the minimum amount on any given day is forecasted at about $2.9 Billion in liquidity (maximum is a little over $4 Billion). Taking into account all envisioned changes, we have sufficient liquidity through June month-end.
  - Ms. Walsh is negotiating with the FHLB to re-categorize certain loan types in the weekly FHLB collateral filing which could add additional borrowing capacity going forward

- Contingency Liquidity
  - $3 Billion committed line with GMAC that we can draw on
  - Automotive division in the process of submitting an application to the Fed to borrow at the fed discount window or term auction facility. Securing auto loans at the Fed provides an additional source of contingency liquidity.
  - Treasury Group performs an analysis in which we run out six months to see if we have sufficient liquidity to cover a progression of severe liquidity events. The analysis indicated that available operational liquidity sources were sufficient to cover the event simulated.

4

Confidential                                                                                    ALLY_0260333

> Assets
>> … Mr. Maguire discussed the Bank's liquidity from an asset standpoint
>>> • At quarter end, $2 Billion of cash
>>> • HFS Mortgage portfolio - $2.25 Billion (measured in days to exit those assets); redeemed near par
>>> • Warehouse - $1.5 Billion (estimate 90 day window of time to exit those assets)
>>> • HFI Mortgage portfolio - $15 Billion (would be difficult to liquidate without absorbing value impairment)
>>> • Auto loans, approximately $5.5 Billion - $3 Billion in retail loans, $2.5 Billion in leases (exit at levels in the vicinity of par)

## Market Summary/Risk Overview

> With regard to the ALM Policies:
>> – IRR – NPV Ratio, NPV Sensitivity and Duration Gap – No violations
>> – Investment Risk Policy Violation – No violations
>> – Liquidity – Operational and Contingency Liquidity – No violations
>> – Funding – Capital Ratio – No violations
>> – Capital Adequacy – No violations
>> – Modeling & Analytics – No violations

> With regard to the Mortgage Portfolio Management Trigger Limits:
>> – Key Rate Duration
>>> • Not published due to problems with QRM – will run 3/31/08 calculations
>> – Duration of Equity – approaching 5% trigger

> Critical Risk Measures (as attached) were presented and reviewed by Mr. Maguire and the ALCO
>> – Duration of Equity measures: consolidated 4%, Auto division 2.5%, Mortgage division 5.4%
>>> • The duration of consolidated assets is rising due to Mortgage HFI extension; we expect this measure to approach 5% at our next month-end analysis due to the 75 bps increase in rates through April
>> – Base Case NPV ratio is 9.7%
>> – Duration Gap of the balance sheet is currently 4.9 months

> Balance Sheet (as attached) was presented and reviewed by Mr. Maguire and the ALCO
>> – The consolidated balance sheet assets at the end of March were $30.4 billion, with book equity of $3.4 billion
>> – The consolidated balance sheet size rose 6% month over month, increasing by $1.6 Billion
>> – The mortgage HFI portfolio represents 51% of total assets, or $15.4 Billion book balance
>> – The automotive portfolio represents 26% of total assets, about $7.9 Billion book balance

> QRM Procedures & Assumptions Update (as attached) was presented and reviewed by Mr. Maguire and the ALCO
>> … FHLB Curve Construction
>>> • Within QRM, the FHLB curve is built by defining levels as a spread to the LIBOR curve. On a quarterly basis, ALM consults with Treasury on what levels FHLB advances are executed, expressed as a spread to LIBOR. Though these assumptions infrequently require change, the abnormal funding conditions of the last 3 months have warranted a change in assumptions.
>>> • Update: setting current coupon mortgage spreads:
>>>> – Spreads between Jumbo and Conforming product remained historically wide through March 31; conditions appear to have tightened through April

5

ALLY_0260334

## Q1 2008 QRM Assumptions Summary

➢ Mr. Maguire noted that the quarterly QRM model assumptions summary could not be prepared due to system issues. He will make sure the summary is produced and filed into the record with the remaining ALCO content.

## Action Items

➢ Net interest income limit test – combinations of multiple scenarios
➢ Key rate duration – results of 3/31/08 calculations

The meeting adjourned at 2:10 p.m. MST

6

ALLY_0260335

# GMAC Bank

### Asset/Liability Management Committee

Chairman: Lisa Gerner
Secretary: Linda Heigh

Meeting Held: May 27, 2008

**Committee Members:**

| | |
|---|---|
| Lisa Gerner, Chief Financial Officer | Mike Rizzo, Chief Credit Officer/Mortgage Operations |
| Robert Groody, Chief Operating Officer | Scott Sandberg, Treasurer |
| Mark Hales, President | Peter Simon, Assistant Treasurer/Portfolio Management |
| John Papas, Assistant Treasurer/Mortgage Funding | John Wright, Chief Credit Officer/Automotive Operations |

**Attendees:** Lisa Gerner, Bob Groody, Mark Hales, John Papas, Mike Rizzo, Scott Sandberg, Peter Simon, John Wright

**Present at the Invitation of the ALCO:** Kofi Essiam, Ralph Hall, Andrei Magasiner, Brian Maguire, Linda Zukauckas

The ALCO meeting was called to order at 1:10 p.m. MST by Ms. Gerner

The materials for the May 27, 2008 ALCO meeting were reviewed and approved for distribution to the ALCO members and invited guests at a pre-ALCO meeting held on Thursday, May 22nd. The following individuals participated in the meeting: Mark Hales, Lisa Gerner, Bob Groody, Peter Simon, John Papas, Scott Sandberg and Brian Maguire.

## Minutes Approval

➤ Minutes from the GMAC Bank ALCO meeting held April 29, 2008 were presented and approved.

## Contingency Liquidity Update

➤ GMAC Bank's Liquidity Policy requires that the Bank have adequate total liquidity, a combination of operational and contingency liquidity, to protect against the loss of certain sources of liquidity. Mr. Papas proposed altering contingency liquidity events assumed in the contingency liquidity model to better reflect the Bank's potential response to a given liquidity shock or to increase the severity of the event (see attached). The proposed changes are:
  - Tier 2 event: New auto business set to zero
  - Tier 3 event: Promontory balances decline by 25%; tighter haircut levels on FHLB; repurchase agreements and swaps are increased by 10%; escrows and warehouse lending receivables are set to zero
➤ Mr. Papas reviewed the effect on net liquidity surplus with the ALCO

## Proposal to Add Money Market Institutional Mutual Funds to List of Eligible Investments

➤ Mr. Papas motioned for approval to add investments in money market funds as an eligible investment under the ALCO Investment Policy (see attached example)
  - Limit investments in any single fund; not to exceed 2% of fund assets

7

Confidential

- Mr. Rizzo questioned if the Fed Funds balance is considered a loan on the call report and becomes a source of lending limit violations
- Review counterparty approval process for individuals funds
  - $500M ceiling per counterparty
  - Update Counterparty Policy, if necessary
- Mr. Simon will update the Investment Policy and forward to Ms. Gerner for presentation to the Bank Board
- Mr. Rizzo will update the ALCO on any required credit restriction and on whether a fund investment constitutes a loan
- ➢ The ALCO approved the motion

### Proposal to Tune AFT Prepayment Models

- ➢ Mr. Simon noted that the CPR variance (actual vs. forecast) for the conforming ARM, Alt-A fixed rate and CMG - HELOC prepayment models exceeded 5% for three consecutive months. Mr. Simon motioned for approval of tuning the model for conforming ARM product.
  - New section was added to slide 13 of the core ALCO package noting action steps and risk mitigants
    - Conforming ARM – tested the conforming Alt-A ARM model as a substitute for the conforming ARM model since many of the conforming loan samples no longer fit conforming guidelines
    - Alt-A Fixed Rate – examine the spread set up on the Alt-A fixed rate portfolio
    - HELOC – CMG
      - Does not currently pose a risk to the portfolio due to its low duration (< 1 month)
      - Run the model on the whole portfolio with and without the home ownership accelerator calculator and monitor results
- ➢ The ALCO approved the motion

### Follow Up Items

- ➢ Mr. Maguire updated the ALCO on two action items from the April meeting
  - Net interest income simulation (slide 12 of core package)
    - For this exercise, we maintain the balance sheet to its original size in order to isolate the exposures due to asset and liability repricing; in addition to the standard shocks and curve rotations, credit spread widening and tightening was added
    - Key takeaways:
      - Projected 12 month consolidated Bank net interest income at 4/30/08 is $710 million
      - Under all rate scenarios, the Bank's NII change versus Base is well within our tolerance of +/- 10%
  - Key Rate Duration Calculation
    - Mr. Maguire reviewed the QRM procedures and assumptions update in detail with the ALCO (slide 15 of core package)
    - Slide 10 of the core package illustrates the metrics which result from this change
      - Note: March 31 and April 30 metrics as published are using these new calculation methods

### GMAC Bank Funding Summary

- ➢ Mr. Papas provided the ALCO with a GMAC Bank Funding Summary as of April 30, 2008 (see attached). The report is a detailed breakdown by maturity and product of the consolidated Bank's liability position.
  - To be included in core package going forward

8

Confidential

## Market Summary/Risk Overview

- With regard to the ALM Policies:
  - IRR – NPV Ratio, NPV Sensitivity and Duration Gap – No violations
  - Investment Risk Policy Violation – No violations
  - Liquidity – Operational and Contingency Liquidity – No violations
  - Funding – Capital Ratio – No violations
  - Capital Adequacy – No violations
  - Modeling & Analytics – Conforming ARM, Alt-A Fixed, HELOC – CMG
    - Action steps approved

- With regard to the Mortgage Portfolio Management Trigger Limits:
  - Key Rate Duration – No Violation
  - Duration of Equity – No Violation

- Critical Risk Measures (as attached) were presented by Mr. Maguire
  - Duration of Equity measures: consolidated 3.3%, Auto division 2.4%, Mortgage division 3.9%
  - Base Case NPV ratio is 9.6%
  - Duration Gap of the balance sheet is currently 4.0 months

- Balance Sheet (as attached) was presented by Mr. Maguire
  - The consolidated balance sheet assets at the end of April were $31.3 billion, with book equity of $3.45 billion
  - The consolidated balance sheet size rose 3% month over month, increasing by $900 Million
  - The mortgage HFI portfolio represents 50% of total assets, or $15.8 Billion book balance
  - The automotive portfolio represents 26% of total assets, about $8.1 Billion book balance

## Action Items

- Update Investment Policy and forward to Ms. Gerner to be presented at July Board meeting
- Review/update Counterparty Policy as required
- Update the ALCO on any required credit restriction and on whether a fund investment constitutes a loan

## Approvals

- Tune AFT Prepayment Model for conforming ARM product
- Add investment in money market funds to Investment Policy

The meeting adjourned at 2:10 p.m. MST

9

ALLY_0260338

# GMAC Bank

*Draft*

### Asset/Liability Management Committee

Chairman: Lisa Gerner
Secretary: Eileen Rhodes

Meeting Held: June 26, 2008

**Committee Members:**

| | |
|---|---|
| Lisa Gerner, Chief Financial Officer | Mike Rizzo, Chief Credit Officer/Mortgage Operations |
| Robert Groody, Chief Operating Officer | Scott Sandberg, Treasurer |
| Mark Hales, President | Peter Simon, Assistant Treasurer/Portfolio Management |
| John Papas, Assistant Treasurer/Mortgage Funding | John Wright, Chief Credit Officer/Automotive Operations |

**Attendees:** Lisa Gerner, Mark Hales, John Papas, Peter Simon, and Bob Groody

**Present at the Invitation of the ALCO:** Al Celini, Brian Maguire, Kofi Essiam and Ralph Hall

---

The ALCO meeting was called to order at 1:08 p.m. MST by Ms. Gerner

The materials for the June 26, 2008 ALCO meeting were reviewed and approved for distribution to the ALCO members and invited guests at a pre-ALCO meeting held on Wednesday, June 25th. The following individuals participated in the meeting: Mark Hales, Lisa Gerner, Peter Simon, John Papas and Brian Maguire.

## Minutes Approval

➢ Minutes from the GMAC Bank ALCO meeting held May 27, 2008 and the Special GMAC Bank ALCO meeting held on June 6, 2008 were presented and approved.

## Liability Strategy Update

➢ Mr. Papas asked the Committee to look at the supplemental one page document titled Callable Reissuance Strategy included in the meeting materials.
  – Mr. Papas directed the Committee to Section A, which showed that between February and June of this year liability maturities exceeded asset run-off by $764million, due primarily to the redemption of callable advances. Approximately $650 million of new callable advances were issued in that time frame at an average coupon of 5.20%. Projected asset run-off between $200-$250 million in July and August will be roughly equal to the liability terminations.

## Key Themes/May 2008, Slide 4:

➢ Mr. Maguire stated duration of equity closed May within .1% of policy target, at 4.9%; Mr. Papas' execution of $730 million of advances for settlement in June will be reflected in the next balance sheet capture; Mr. Maguire did note that this activity is worth a 1% reduction in the duration of equity measure. Mr. Maguire noted that interest rates on a June month-to-date basis are up just slightly, suggesting the market effect on the June 30 balance sheet metrics should be minimal.

10

ALLY_0260339

## Market Summary/IRR Trends as of May 2008, Slide 5:

➤ Mr. Maguire stated the importance of noting exactly which parts of the curve have risen in this recent 90-day bear market in bonds. Slide 5 illustrates a clear steepening in the LIBOR curve; 1 month LIBOR has actually *fallen* 10 basis points since mid-March. The chart to the right on slide 5 indicates projected forward rates, a flatter curve with short rates rising with anticipated Fed tightening. Mr. Maguire noted over the last 12 months, the Bank has maintained a liability-sensitive position; rates have fallen 150bps over that time. A positive duration of equity suggests the Market Value of Equity will rise in falling rate environments.

## Market Summary, Slide 6:

➤ Mr. Maguire reviewed the forecasted liability maturity schedule through year-end 2008. Notably, although rates have risen sharply over the last 3 months, borrowings are expected to roll-off at rates higher than where those dollars can be replaced in the forecasted rate environment.

➤ Mr. Simon noted on slide 4, 2nd bullet it was added that we do not have the same access to term funding as we did before. In the event a policy limit is breached, it is being made clear the liquidity needs of the Bank come first.

## Balance Sheet Guidance, Slide 13:

➤ Mr. Maguire updated the Committee on net interest income simulation.

➤ Mr. Maguire noted that Mr. Papas' monthly Mortgage Division Funding Summary will be included going forward in Slide 17 titled Mortgage Division Funding Summary. Also, the July package will have a significant update on the closure of the action items from the February model validation exercise as most of the action items were due June 30th.

## Market Summary/Risk Overview

➤ With regard to the ALM Policies:
  – IRR – NPV Ratio, NPV Sensitivity and Duration Gap – No violations
  – Investment Risk Policy Violation – No violations
  – Liquidity – Operational and Contingency Liquidity – No violations
  – Funding – Capital Ratio – No violations
  – Capital Adequacy – No violations
  – Modeling & Analytics – No violations

➤ With regard to the Mortgage Portfolio Management Trigger Limits:
  – Key Rate Duration – No Violation
  – Duration of Equity – No Violation

➤ Critical Risk Measures (as attached) were presented by Mr. Maguire
  – Duration of Equity measures: consolidated 4.9%, Auto division 2.1%, Mortgage division 6.4%
  – Base Case NPV ratio is 9.7%
  – Duration Gap of the balance sheet is currently 5.9 months

➤ Balance Sheet (as attached) was presented by Mr. Maguire
  – The consolidated balance sheet assets at the end of May were $32.1 billion, with book equity of $3.5 billion
  – The consolidated balance sheet size rose 3% month over month, increasing by $800 Million
  – The mortgage HFI portfolio represents 50% of total assets, or $15.9 Billion book balance
  – The automotive portfolio represents 26% of total assets, about $8.2 Billion book balance

Mr. Maguire asked if there were any questions and none were raised.
The meeting adjourned at 1:41 p.m. MST

11

Confidential                                                        ALLY_0260340

# SUMMARY

## CRA Committee Minutes

**Purpose**

Provide the Board with an overview of the activities of the CRA Committee

**Major Points**

- The minutes are in summary format and cover discussion of the primary CRA loans, contributions and service hours and CRA proposals from the April, 2008 meeting of the GMAC Bank CRA Committee.

**Requested Action**

- Review of the minutes of the CRA Committee.

GMAC BANK
CRA COMMITTEE MEETING MINUTES

April 10, 2008

A meeting of the GMAC Bank ("Bank") Community Reinvestment Act ("CRA") Committee ("Committee") was held at the office of the Bank at 6985 Union Park Center, Suite 435, Midvale, Utah, on April 10, 2008, at 9:06 a.m., Mountain Daylight Time.

Present were Committee members:
Frank Suitter
Cliff Pedersen
Mark Hales (by phone)
Donald James (by phone)
Bob Groody (by phone)

Also present was Jenny Johnson.

As Chairman, Mr. Pedersen presided. Ms. Johnson recorded the minutes.

## Approval of Minutes

The minutes of the Committee meeting held on February 14, 2008, which had been previously submitted for review by members of the Committee, were presented for approval. Mr. Pedersen noted the CRA Grant Proposals section in the minutes had changed to provide only a summary of the grant requests and action taken, instead of providing a detailed restatement of each organization's history and request. The minutes were unanimously approved upon motion by Mr. Suitter and seconded by Mr. Hales.

## CRA Community Development Loans, Investments, and Service Summary

Mr. Pedersen referred the members of the Committee to the CRA Community Development Loans, Investments, and Service Summary page. He explained the format of the summary had changed from that used in prior meetings. The new format shows loans, investments, and service hours for the performance period and year-over-year from 2006 through YTD 2008. Mr. Pedersen explained that this presentation of CRA data better represents how the examiners will evaluate the Bank's CRA performance.

Mr. Pedersen noted that residential mortgage loan volume within the Bank's assessment area totaled almost $127 million in 2007. He stated YTD 2008 mortgage loan volume was not yet available, but would be provided at the next Committee meeting. Mr. Pedersen indicated the Bank had originated almost $2.9 million in community development loans during the performance period and had also invested approximately $95.7 million and $20.1 million in mortgage-backed securities and housing bonds, respectively. He noted the Bank had donated more than $928 thousand to organizations that provide services to the community and that Bank employees had contributed 1,110 hours in various community development services.

ALLY_0260342

## Mortgage Loan Volume and LMI Distribution Update

Mr. Pedersen referred the members of the Committee to the Mortgage Loan Volume & LMI
Distribution Update page. Mr. Pedersen explained the Bank's 2007 volume of mortgage loans
for the Utah (UT) assessment was $79.5 million and that the distribution of those loans to LMI
households was 25.4%, which compared favorably to the Bank's target of 20.58%. He further
noted the distribution of loans to LMI census tracts in the UT assessment area was 14.1%, which
was slightly below the Bank's target of 14.92%.

Mr. Pedersen continued by explaining the Bank's 2007 volume of mortgage loans for the
Pennsylvania/Delaware (PA/DE) assessment area was $47.4 million and that the distribution of
those loans to LMI households was 26.3%, which compared favorably to the Bank's target of
22.11%. He stated the distribution of loans to LMI census tracts in the PA/DE assessment area
was 11.2%, which was slightly below the Bank's target of 11.97%.

## Community Development Loans

Mr. Pedersen referred the Committee to the Community Development Loans page. He indicated
the Bank has community development loan commitments totaling $5.4 million, of which $2.3
million is currently drawn.

Mr. Pedersen informed the Committee that the NeighborWorks Capital loan of $5 million was
communicated to the organization and should be drawn once the loan agreement is final. He also
updated the Committee that Lehman Brothers Commercial Bank had agreed to a $5 million loan
to NeighborWorks Capital, as well.

## Community Development Investments

Mr. Pedersen referred the Committee to the Community Development Investments page. He
discussed the format of the page and indicated additional detail had been added to provide an
enhanced perspective of the Bank's CRA investment performance, showing volume year-over-
year and for the performance period by original principal purchase value and current principal
value. Additionally, he pointed out that Area Median Income (AMI) percentages were added
for each investment pool/fund, where known. Mr. Pedersen noted the average AMI for the
Fannie Mae pools is 62% and the average AMI for the Freddie Mac pools is 66%. He also stated
that 78% and 76% of mortgage loans in the Fannie Mae and Freddie Mac pools, respectively, are
in the Bank's assessment area.

## CRA Service Hours

Mr. Pedersen referred the Committee to the Community Development 2008 Service Hours page.
He discussed with the Committee the service hour goal for 2008, the total hours that have been
completed, and the hours that still need to be completed. Mr. Pedersen noted the Automotive
Division has already exceeded its 2008 goal for service hours primarily due to the involvement

ALLY_0260343

of six Bank employees in United Way's Volunteer Income Tax Assistance (VITA) program during the months of February through April. He also indicated the Automotive Division has completed 99 services hours that may be eligible for some CRA credit based on the FDIC's review during the next CRA examination.

## Examples of Qualified Investments

Mr. Pedersen referred the Committee to the Federal Register, Federal Financial Institutions Examination Council Community Reinvestment Act Interagency Questions and Answers page. From the Q&A, He provided the Committee with examples of qualified community development investments and grants.

## CRA Proposals

Mr. Pedersen and Mr. James discussed several grant proposals for qualifying organizations serving low- and moderate-income households and individuals within the Bank's assessment areas. Mr. Pedersen and Mr. James provided the Committee members with background information on the requesting organizations and explained the proposed use of the grant funds. The chart below summarizes the grant proposals discussed and the Committee's decision regarding each.

| Organization | Amount Approved | Moved Motion | 2nd the Motion | Unanimous Decision Y/N |
|---|---|---|---|---|
| Utah Alcoholism Foundation | $10,000 | D. James | F. Suitter | Y |
| Catholic Community Services | $5,000 | C. Pedersen | M. Hales | Y |
| Salt Lake City Corporation | $5,000 | D. James | F. Suitter | Y |
| Family Support Center of Ogden | $2,500 | C. Pedersen | D. James | Y |
| The Heart to Home Foundation | $2,500 | F. Suitter | D. James | Y |
| Delaware Housing Coalition | $0 | C. Pedersen | F. Suitter | Y |
| First State Community Action Agency | $20,000 | C. Pedersen | F. Suitter | Y |
| Nehemiah Gateway | $30,000 | C. Pedersen | F. Suitter | Y |

## Adjournment

There being no further business to come before the Committee, the meeting was adjourned at 9:56 a.m., Mountain Daylight Time.

_____ Jenny Johnson

Confidential

ALLY_0260344

SUMMARY

## Automotive Credit Committee Meeting Minutes

### Purpose

Provide the Board with an overview of the activities of the Automotive Credit Committee

### Major Points

- The minutes are in summary format and cover a review of the activities of the Automotive Credit Committee from the April, May and June 2008 Credit Committee meetings.

### Requested Action

- Review of the minutes of the Automotive Credit Committee meetings.

Confidential

ALLY_0260345

GMAC Bank
Credit Committee Meeting Minutes
Meeting Date: June 27, 2008

Minutes of a Regular Meeting of the Credit Committee of GMAC Bank Automotive
Division, held at 6985 Union Park Center, Suite 435, Midvale, Utah on Friday, June 27, 2008.

Voting Members Present:          Mr. Mark Newman (by phone)
                                 Mr. Mark Hales
                                 Mr. John Wright

Also in attendance were Ms. Linda Zukauckas (by phone), Mr. Michael Nestor and Mr. Anthony
(Tony) Zimmer. The Chairman, Mr. Wright, presided and Mr. Nestor acted as Secretary recording
the minutes of the meeting.

## Approval of Minutes

Mr. Wright made a motion to approve the minutes from the May 15, 2008 Automotive
Division Credit Committee Meeting. Mr. Hales seconded the motion and the minutes were
approved unanimously by the Committee.

## Operating Results

Mr. Wright reviewed the portfolio related statistics as of May 31, 2008 starting with the
Automotive Division's Portfolio outstandings which include consumer business (retail, Smartbuy,
Smartlease) and commercial business (real estate, equipment loans, working capital loans and
wholesale financing).

### Automotive Division Outstandings

Mr. Wright reviewed the chart reflecting the Automotive Division outstanding portfolio by
product line accounts and dollars. He noted that the total portfolio was at $9.1 billion outstanding as
of May 31, 2009 which is an increase of $77.3 million for the month. He noted that the commercial
portfolio (dealer loans and wholesale) is just over $2.4 billion.

### Retail & Lease Portfolio

Mr. Wright then reviewed the Retail & Lease Portfolio Dashboards with the Committee.
The retail and lease portfolio delinquency (30+ DPD) was 0. 52% and losses of .020% remain far
below industry statistics. According to the American Bankers Association Consumer Delinquency
Bulletin as of December 31, 2007, delinquency (accounts 30 days or more past due) for indirect
automobile loans was 2.57% as a percentage of dollars outstandings. Mr. Wright also noted that
GMAC's delinquency was at 2.22% as of May 31, 2008. Mr. Hales stated that the Bank is in
excellent shape with regard to the loss reserve, when you consider the monthly losses of $1.3
million for May and multiplying by 12. He pointed out that the total for the year would be $15.6
million which is well under the loss reserve of $32 million.

Confidential

ALLY_0260346

Mr. Wright also reviewed the Application and Booking Volume Report. The Bank reviewed 20,178 applications for the month, approving 56.9%. The book-to-look ratio was 33.6% and the capture ratio was 59.0%. The origination volume was reviewed and it was noted that there were 6773 contracts booked during May 2008. Mr. Wright reviewed the chart relating to the accounts outstanding concentration by customer state. The top five states and percentage of Tier I Capital are as follows: Ohio –20.6%; California –19.4%; Pennsylvania –12.9%; Michigan –12.0%; Texas – 10.6%.

Mr. Wright next reviewed the delinquency and repossession results for the top ten states with the highest concentration of accounts outstanding. All delinquency and repossession trends are satisfactory. The chart titled Average EDC/AWV and % of MSRP was reviewed. Mr. Wright noted that the average EDC/AWV percentages on volume from the National channel were down when compared to April and May. He pointed out that the proposed credit policy revision reducing the maximum EDC/AWV percentages for automatic approval criteria should result in a further reduction in the average EDC/AWV percentage.

Mr. Wright then reviewed the Delinquency charts by line of business and the National channel. Mr. Hales pointed out that while the overall SmartBuy delinquency is satisfactory, however the sharp increase in May compared with April is concerning. Mr. Wright advised that he did not have an explanation for it, but he would look into it and get back with the Committee. Ms. Zukakis stated that it is GMAC's intention to discontinue the SmartBuy product in the near future. She advised that the product is almost identical to the SmartLease product and the volume has been on the decline. Mr. Wright then discussed the delinquency chart for the National channel. He stated that the over 30 day delinquency is much higher than the GMAC channel at 1.31%. He pointed out that the National volume represents just 1.8% of the total Bank portfolio. He stated that the Bank started booking volume from National in mid-May 2007. It was also pointed out that the volume through the National channel is different from the rest of the Bank portfolio in that the credit quality is not as good as the rest of the portfolio and there is not a lot of dealer loyalty. Mr. Wright said that several measures had been taken since November of last year to improve the book of business. For example, approximately 30 dealers where Bank experience has been adverse have been made ineligible for Bank financing and the Acquisition Analysts have been really watching for "straw purchases". Mr. Wright advised that he feels that the Bank now has a good handle on the National business, however due to it being a small percentage of the total portfolio the delinquency trends will be higher on a percentage basis than the other part of the portfolio.

The chart reflecting the percentage of extensions was discussed. The percentage was 0.096% in May 2008. Mr. Wright then directed the Committee's attention to the chart of Repossessions/Early Terminations by Default (ETD's). He reviewed the repossessions and EDT's that occurred within 0-3 months of booking. There were a total of 5 during May (3 from the GMAC channel and 2 from the National channel). He noted that there were 4 "A" tier and 1 "S" tier. In reviewing the accounts, it was noted that one was a deal where an elderly person had signed the contract on behalf of her grandson. In that situation, the dealer had made a settlement and the contact was reassigned to the dealer. There wasn't anything unusual about the other accounts. Mr. Wright stated that the increase in 0-3 installment default repossessions/ETD's appears to be the result of the downturn in the general economy. He advised that the trends will continue to be monitored.

The Committee reviewed the Booked Credit Exception Report. Credit exceptions made over the last 12 months represented 0.27% of the Bank's Tier 1 Capital.

Confidential

Mr. Wright updated the Committee on the progress of the contract assignment monitoring. For contracts purchased in the month of March, the error percentage was at 4.00%. This is somewhat higher than previous months and will be monitored closely.

## Commercial Lending Portfolio

### Dealer Loans

Mr. Wright updated the Committee on the Dealer Loan Portfolio. As of April 2008, the Bank had 504 dealer loans (real estate, working capital, equipment) with unpaid balances of $1,290 million. The total dealer real estate loan commitments totaled $1,431.8 million. This includes loans outstanding, loans in process and loans that have been approved but not closed. He also reviewed the loan to value (LTV) percentages of the real estate loan portfolio. He pointed out that 70.6% of the loans in the portfolio have LTV's of 75% or less. He updated the Committee with real estate loan concentrations by state. It included Texas 14.4%, California 14.3%, Michigan 11.7%, Rhode Island 7.1%, and Pennsylvania 5.7%. These concentrations are within the policy of not exceeding 25.0% in any one state. Mr. Newman expressed some concern about the high percentage of LTV's in Michigan. Mr. Wright pointed out that as part of the Bank's loan monitoring process updated appraisals are being obtained where warranted in certain states where there has been the highest negative home price appreciation. He stated that Michigan is one of the states where updated appraisals are being obtained. Next, the chart reflecting the credit exceptions of funded loans was reviewed by the Committee.

### Wholesale

Mr. Wright updated the Committee on the Wholesale Portfolio. At the end of April 2008, the Bank had $1,069.3 million in outstandings. As of month end, the Bank's wholesale outstandings included the following manufacturers Honda 20.9%, Toyota 16.1%, Nissan 15.4%, Ford 12.8%, Hyundai 11.8%, Subaru 4.5%, Kia 4.0%, Mercedes 4.0%, Volkswagen 2.3%, BMW 2.1%, Mitsubishi 1.6%, Tata (Landrover and Jaguar) 1.4% and all others 3.1%.

Mr. Wright indicated that the Automotive Division's portfolio performance was satisfactory with no notable adverse trends or concerns. The Committee agreed with the assessment of the portfolio.

## New Business Items/Discussions

Mr. Wright informed the Committee that $18,599 of retail finance charge shortages had been absorbed in April 2008. Retail finance charge shortages are primarily due to adjustments made when the contracts are discounted due to dealer errors. The potential SmartBuy shortages were $51,077 for the month. Potential SmartBuy Shortages are due to mandatory state laws that require the Bank to refinance the residual balance for the customer at the original payment and rate. The Committee agreed that this is a modest volume of adjustments and potential SmartBuy shortages.

Mr. Wright also reviewed the operating metrics provided by Semperian, the service provider that handles the Bank collection activity. The operating metrics included the average daily numbers for the prime GMAC/GMAC Bank portfolio. The metrics measures the intensity and effectiveness of the collection activity in the early stage and the high risk stage in 2006, 2007 and 2008 and comparing 2008 with 2007. It is noted that the number of collection assignments had decreased but the number of full time employees and call activity had increased in 2008 compared to 2007. Mr. Wright pointed out that the chart reflects that Semperian is responding to the decline in the general economy and controlling delinquency by added to staff and increasing collection activity.

## Adjournment

There being no further business to come before the Credit Committee, the Meeting was adjourned.

_____

M. F. Nestor, Acting Secretary

Confidential

ALLY_0260349

GMAC Bank
Credit Committee Meeting Minutes
Meeting Date: May 15, 2008

Minutes of a Regular Meeting of the Credit Committee of GMAC Bank Automotive
Division, held at 6985 Union Park Center, Suite 435, Midvale, Utah on Thursday, May 15, 2008.

Voting Members Present:          Mr. Mark Newman (not present)
                                 Mr. Mark Hales
                                 Mr. John Wright

Also in attendance were Ms. Linda Zukauckas, Mr. Jeff Mortenson, and Mr. Anthony (Tony)
Zimmer. The Chairman, Mr. Wright, presided and Mr. Jeff Mortenson acted as Secretary recording
the minutes of the meeting.

## Approval of Minutes

Mr. Wright made a motion to approve the minutes from the April 16, 2008 Automotive
Division Credit Committee Meeting. Mr. Hales seconded the motion and the minutes were
approved unanimously by the Committee.

## Operating Results

Mr. Wright reviewed the portfolio related statistics as of April 30, 2008 starting with the
Automotive Division's Portfolio outstandings which include consumer business (retail, Smartbuy,
Smartlease) and commercial business (real estate, equipment loans, working capital loans and
wholesale financing).

### Retail & Lease Portfolio

Mr. Wright reviewed the Retail & Lease Portfolio Dashboards with the Committee.   The
retail and lease portfolio delinquency (30+ DPD) was 0. 44% and losses of .018% remain far below
industry statistics.  According to the American Bankers Association Consumer Delinquency
Bulletin as of December 31, 2007, delinquency (accounts 30 days or more past due) for indirect
automobile loans was 2.57% as a percentage of dollars outstandings. Mr. Wright also noted that
GMAC's delinquency was at 2.08% as of March 31, 2008.

Mr. Wright also reviewed the Application and Booking Volume Report. The Bank reviewed
20,376 applications for the month, approving 58.4% with a book-to-look ratio of 50.2% and a
capture ratio of 86.0%. The origination volume was reviewed and it was noted that there were
10,235 contracts booked during April 2008.  Mr. Wright reviewed the chart relating to the
accounts outstanding concentration by customer state. The top five states and percentage of Tier I
Capital are as follows: Ohio –21.0%; California –19.7%; Michigan –13.1%; Pennsylvania –12.5%;
Texas – 10.7%.

Mr. Wright next reviewed the delinquency and repossession results for the top ten states
with the highest concentration of accounts outstanding. All delinquency and repossession trends are
satisfactory. The percentage of extensions was 0.112% in April 2008. The Committee reviewed the
Booked Credit Exception Report. Credit exceptions made over the last 12 months represented
0.28% of the Bank's Tier 1 Capital.

Confidential                                                    ALLY_0260350

Mr. Wright updated the Committee on the progress of the contract assignment monitoring. For contracts purchased in the month of March, the error percentage was at 2.75%. This is lower in comparison to February when the error percentage was at 3.43%.

## Commercial Lending Portfolio

### Dealer Loans

Mr. Wright updated the Committee on the Dealer Loan Portfolio. As of April 2008, the Bank had 477 dealer loans (real estate, working capital, equipment) with unpaid balances of $1,222 million. The total dealer real estate loan commitments totaled $1,459.0 million. This includes loans outstanding, loans in process and loans that have been approved but not closed. He updated the Committee with real estate loan concentrations by state. It included Texas-15.1%, California-14.5%, Michigan-10.9%, Rhode Island 7.4%, and Pennsylvania-6.2%. These concentrations are within the policy of not exceeding 25.0% in any one state. Next, the chart reflecting the number of credit exceptions of funded loans was reviewed by the Committee.

### Wholesale

Mr. Wright updated the Committee on the Wholesale Portfolio. At the end of April 2008, the Bank had $1,016.2 million in outstandings. As of month end, the Bank's wholesale outstandings included the following manufacturers Honda 24.1%, Toyota 17.4%, Nissan 14.7%, Ford 12.7%, Hyundai 10.1%, Subaru 4.5%, and Kia 3.9%, Mercedes 3.1%, Volkswagen 2.3%, BMW 2.0%, Suzuki 1.9%, Mitsubishi 1.2%, and all others 1.6%.

Mr. Wright indicated that the Automotive Division's portfolio performance was satisfactory with no notable adverse trends or concerns. The Committee agreed with the assessment of the portfolio.

## New Business Items/Discussions

Mr. Wright informed the Committee that $21,073 of retail finance charge shortages had been absorbed in April 2008. Retail finance charge shortages are primarily due to adjustments made when the contracts are discounted due to dealer errors. The potential SmartBuy shortages were $48,415 for the month. Potential SmartBuy Shortages are due to mandatory state laws that require the Bank to refinance the residual balance for the customer at the original payment and rate. The Committee agreed that this is a modest volume of adjustments and potential SmartBuy shortages.

### Adjournment

There being no further business to come before the Credit Committee, the Meeting was adjourned.

Jeff Mortenson, Acting Secretary

Confidential

GMAC Bank
Credit Committee Meeting Minutes
Meeting Date: April 16, 2008

Minutes of a Regular Meeting of the Credit Committee of GMAC Bank Automotive
Division, held at 6985 Union Park Center, Suite 435, Midvale, Utah on Wednesday, April 16, 2008.

Voting Members Present:                 Mr. Mark Newman (via telephone)
                                        Mr. Mark Hales
                                        Mr. John Wright

Also in attendance were Mr. Jeff Mortenson, and Mr. Anthony (Tony) Zimmer. The Chairman, Mr.
Wright, presided and Mr. Jeff Mortenson acted as Secretary recording minutes of the meeting.

## Approval of Minutes

Mr. Wright made a motion to approve the minutes from the March 19, 2008 Automotive
Division Credit Committee Meeting. Mr. Hales seconded the motion and the minutes were
approved unanimously by the Committee.

## Operating Results

Mr. Wright reviewed the portfolio related statistics as of March 31, 2008 starting with the
Automotive Division's Portfolio outstandings which include consumer business (retail, Smartbuy,
Smartlease) and commercial business (real estate, equipment loans, working capital loans and
wholesale financing).

### Retail & Lease Portfolio

Mr. Wright reviewed the Retail & Lease Portfolio Dashboards with the Committee.   The
retail and lease portfolio delinquency (30+ DPD) was 0. 44% and losses of .019% remain far below
industry statistics. According to the American Bankers Association Consumer Delinquency
Bulletin as of December 31, 2007, delinquency (accounts 30 days or more past due) for indirect
automobile loans was 2.57% as a percentage of dollars outstandings. Mr. Wright also noted that
GMAC's delinquency was at 2.08% as of March 31, 2008.

Mr. Wright also reviewed the Application and Booking Volume Report. The Bank reviewed
26,796 applications for the month, approving 67.3% with a book-to-look ratio of 39.3% and a
capture ratio of 58.4%. The origination volume was reviewed and it was noted that there were
10,527 contracts booked during March 2008.   Mr. Wright reviewed the chart relating to the
accounts outstanding concentration by customer state. The top five states and percentage of Tier I
Capital are as follows: Ohio –21.0%; California –19.7%; Michigan –13.0%; Pennsylvania –13.0%;
Texas – 10.6%.

Confidential

Mr. Wright next reviewed the delinquency and repossession results for the top ten states with the highest concentration of accounts outstanding. All delinquency and repossession trends are satisfactory. The percentage of extensions was 0.113% in March 2008. The Committee reviewed the Booked Credit Exception Report. Credit exceptions made over the last 12 months represented 0.28% of the Bank's Tier 1 Capital.

Mr. Hales commented on the excellent performance of the portfolio. He said it is unusual for growth to be flat and have the delinquency rate decline.

Mr. Wright updated the Committee on the progress of the contract assignment monitoring. For contracts purchased in the month of February, the error percentage was at 3.43%. This is slightly higher from January when the error percentage was at 2.65%.

## Commercial Lending Portfolio

### Dealer Loans

Mr. Wright updated the Committee on the Dealer Loan Portfolio. As of March 2008, the Bank had 445 dealer loans (real estate, working capital, equipment) with unpaid balances of $1,167.0 million. The total dealer real estate loan commitments totaled $1,523.3 million. This includes loans outstanding, loans in process and loans that have been approved but not closed. He updated the Committee with real estate loan concentrations by state. It included California-14.6%, Texas-13.9%, Michigan-11.1%, Virginia 7.8%, and Pennsylvania-6.3%. These concentrations are within the policy of not exceeding 25.0% in any one state. Next, the chart reflecting the number of credit exceptions of funded loans was reviewed by the Committee.

### Wholesale

Mr. Wright updated the Committee on the Wholesale Portfolio. At the end of March 2008, the Bank had $1,016.2 million in outstandings. As of month end, the Bank's wholesale outstandings included the following manufacturers Honda 24.1%, Toyota 17.4%, Nissan 14.7%, Ford 12.7%, Hyundai 10.1%, Subaru 4.5%, and Kia 3.9%, Mercedes 3.1%, Volkswagen 2.3%, BMW 2.0%, Suzuki 1.9%, Mitsubishi 1.2%, and all others 1.6%.

Mr. Wright and Mr. Zimmer reviewed the Commercial Lending Monitor List with the Committee. Dealers reviewed included Art Moran (MI), Findlay Automotive Group (NV), Carl Black Automotive Group (GA), Joseph Auto Group (MI), Michael Holley Dealer Group (FL), Trenary Group (CA), Golling Group (MI), Rainbow Group (LA), Randy Wise (MI), Kevin Whitaker (SC), Cookeville Automotive (TN), Daugherty & Daugherty (CA), East Syracuse Sales, Co. (NY), Hoak Motors (IA), Lakeshore Chevrolet (OH), McGraw Webb Chevrolet (AL), Mike Schmitz Automotive (AL) and Randy Hosler PBG (MI). Mr. Wright and Mr. Zimmer indicated that all dealers discussed are performing satisfactorily, however will continue to be monitored.

Mr. Wright indicated that the Automotive Division's portfolio performance was satisfactory with no notable adverse trends or concerns. The Committee agreed with the assessment of the portfolio.

Confidential

## New Business Items/Discussions

Mr. Wright informed the Committee that $12,633 of retail finance charge shortages had been absorbed in March 2008. Retail finance charge shortages are primarily due to adjustments made when the contracts are discounted due to dealer errors. The potential SmartBuy shortages were $59,443 for the month. Potential SmartBuy Shortages are due to mandatory state laws that require the Bank to refinance the residual balance for the customer at the original payment and rate. The Committee agreed that this is a modest volume of adjustments and potential SmartBuy shortages.

### Adjournment

There being no further business to come before the Credit Committee, the Meeting was adjourned.

Jeff Mortenson, Acting Secretary

Confidential

# SUMMARY

## Automotive Division Allowance Committee Minutes

### Purpose

Provide the Board with an overview of the activities of the Automotive Division Allowance Committee.

### Major Points

- The GMAC Bank Automotive Division Allowance Committee is a sub-committee of the Automotive Credit Committee. Allowance Committee meeting minutes are included regularly in the Automotive meeting materials as an addendum for the Automotive Credit Committee members to review.
- The minutes are in summary format and cover the key allowance policy reviews and adequacy of allowance to cover future loan losses based the Committee's interpretation of credit risk associated with lending exposures on the Bank's balance sheet from the April, May and June, 2008 meetings of the GMAC Bank Automotive Division Allowance Committee.

### Requested Action

- Review of the minutes of the Automotive Division Allowance Committee.

1

Confidential

ALLY_0260355

# GMAC BANK
## AUTOMOTIVE DIVISION
## ALLOWANCE FOR LOAN AND LEASE LOSS
## COMMITTEE MEETING MINUTES

**Meeting Held:** April 29, 2008

**Chairman:**
John Wright

**Committee Members Present:**
John Wright, GMAC Bank, Chief Credit Officer -- Automotive Division
Lisa Gerner, GMAC Bank, Chief Financial Officer
Mark Hales, GMAC Bank, President

**Present By Invitation:**
Lance Evenson, GMAC Bank, Controller
Kyle Rands, GMAC Bank, Senior Financial Analyst
Mike Nestor, GMAC Bank, Operations Manager Commercial Lending
Jeff Mortenson, GMAC Bank, Operations Manager Retail & Leasing
Tony Zimmer, GMAC Bank, Operations Manager Commercial Lending

**Meeting Summary:**
The  Automotive Division Allowance for Loan and Lease Loss Committee ("ALLL Committee"
or "Allowance Committee") of GMAC Bank ("the Bank"), a Utah Corporation, was held in Salt
Lake City, Utah, on Tuesday April 29th at 10 AM Mountain Daylight Time.

---

Mr. Wright welcomed everyone to the meeting of the Automotive Division Allowance
Committee, a sub-committee of the GMAC Bank Automotive Division Credit Committee.

1.  ## Minutes Approval
    Minutes from the GMAC Bank Automotive Division ALLL Committee meeting held
    March 25, 2008 were presented and approved.

1.  ## Burton, Roberts & Meredith Review
    Ms. Gerner began a discussion about the Burton, Roberts & Meredith ('BRM')
    Allowance for Loan and Lease Loss Review from March 2008. Ms. Gerner brought
    to the committee's attention BRM's suggestion to separately track and reserve non-
    accrual loans. Non-accrual loans are currently included in the Bank's normal
    calculations since they are very small. The committee discussed whether it made
    sense for the Bank to take the time to separate the non-accruals and agreed that this
    would not make sense as the number of non-accruals is currently very small. Mr.
    Hales stated adding a page showing the number of vehicles in non-accrual would be
    sufficient, and that these non-accruals should continue to be part of the general
    reserve. If the volume of non-accrual loans becomes significant they should be
    segregated appropriately.

2

Ms. Gerner also brought to the committee's attention BRM's suggestion to include eight qualitative factors in the Bank's detailed reserve methodology. The committee discussed this suggestion and did not think creating a narrative page for each factor would be necessary. It was decided these factors would be listed in each meeting packet and addressed separately at each meeting. Ms. Gerner will distribute copies of the Interagency Policy Statement to the committee members for review.

## 3.    Allowance Committee Meeting Package

Ms. Gerner began a discussion about the contents of the Allowance Committee meeting package. The Reserve Allowance Summary showed that the Bank still maintained a 1% loss Reserve on Retail. The Reserve Allowance Assumptions confirmed the non-accruals insignificance showing YTD non-performing >89 days past due of 0.02%. Ms. Gerner noted that the Vintage, Bad Performance and Trigger Based reserve analyses are beginning to ramp up as the accounts are ageing. Ms. Gerner stated that the Consumer Credit Loss Reserve Details shows the Bank is well over reserved. Ms. Gerner brought the Committee's attention to the Loss Rate as a % of Allowance on the Consumer Credit Losses page stating she would research this prior to the next meeting and provide the committee with more detailed information.

The methodology used to calculate the allowance for retail based on the custom score odds was discussed. Mr. Mortenson reviewed the concern regarding performance odds not coming in as originally projected and the affect it has on the allowance based on the Custom Scorecard Analysis methodology. Currently, the scorecards are performing worse than predicted, hence reliance upon the score cards for predicting the reserve may impacted. The Committee engaged in a discussion regarding the issue and determined the Custom Scorecard Analysis should be maintained, however less weighting should be given to this method when determining the allowance for the retail portfolio. The Retail & Lease Department will continue to monitor the scorecard performance through the quarterly scorecard meetings and report material updates to the Committee. Mr. Rands indicated the Custom Scorecard Analysis is based contracts that reach maturity and not an annualized number. In the future, Custom Scorecard Analysis will also reflect an annual figure based on the average loan life.

The Committee reviewed the Commercial allowance with no recommendations for changes to the assumptions or methodology.

Based on the various allowance for loss methodologies and portfolio performance, the Committee agreed the portfolio is adequately reserved.

## 4.    Adjournment

There being no further business to come before the Committee, the Meeting was adjourned.

Dated: April 29, 2008

3

ALLY_0260357

# GMAC BANK
## AUTOMOTIVE DIVISION
## ALLOWANCE FOR LOAN AND LEASE LOSS
## COMMITTEE MEETING MINUTES

**Meeting Held:** May 27, 2008

**Chairman:**
John Wright

**Committee Members Present:**
John Wright, GMAC Bank, Chief Credit Officer – Automotive Division
Lisa Gerner, GMAC Bank, Chief Financial Officer
Mark Hales, GMAC Bank, President

**Present By Invitation:**
Lance Evenson, GMAC Bank, Controller
Kyle Rands, GMAC Bank, Senior Financial Analyst
Mike Nestor, GMAC Bank, Operations Manager Commercial Lending
Jeff Mortenson, GMAC Bank, Operations Manager Retail & Leasing
Tony Zimmer, GMAC Bank, Operations Manager Commercial Lending

**Meeting Summary:**
The Automotive Division Allowance for Loan and Lease Loss Committee ("ALLL Committee"
or "Allowance Committee") of GMAC Bank ("the Bank"), a Utah Corporation, was held in Salt
Lake City, Utah, on Tuesday May 27th at 10 AM Mountain Daylight Time.

---

Mr. Wright welcomed everyone to the meeting of the Automotive Division Allowance
Committee, a sub-committee of the GMAC Bank Automotive Division Credit Committee.

## 2.    Minutes Approval
Minutes from the GMAC Bank Automotive Division ALLL Committee meeting held
April 29, 2008 were presented and approved.

## 1.    GMAC Model Validation
Ms. Gerner began a discussion about the GMAC Model Validation of Allowance for
Credit Loss Metrics. The validation was completed by GMAC Enterprise Risk
Services. Ms. Gerner stated the Bank is required to perform the model validation
annually, and the executive summary pages of this validation will be presented to the
Board. Ms. Gerner noted that the Bank will not need to engage a Burton, Roberts &
Meredith Review in the future. The Committee was in agreement that this Model
Validation was complete with satisfactory results.

4

5.  **Allowance Committee Meeting Package**

Ms. Gerner began a discussion about the contents of the Allowance Committee
meeting package. The Reserve Allowance Summary showed that the Bank continues
to maintain a 1% loss Reserve for the retail portfolio, 0.07% reserve for the
commercial portfolio and 0.07% for the SmartBuy residual loss reserve. Ms. Gerner
stated that it was recently learned that the SmartBuy product will be phased out
between now and the end of the year and any remaining residual reserve will be
maintained throughout the life of the SmartBuy portfolio with no new additions. She
pointed out that a roll rate analysis based on a 12 month average was added to the
reserve allowance assumptions as part of the reserve analysis range calculated for
April and will be included each month going forward.

Ms. Gerner discussed the reserve analysis based on the various methodologies and the
Consumer Credit Loss Reserve details chart. She then reviewed the chart of
Consumer Credit Losses as of April 30, 2008. She pointed out that the losses remain
very small relative to the industry but are in line with the high quality portfolio the
Bank maintains.

Ms. Gerner then introduced  a chart of the Consumer Outstanding Non Accruals,
which is a new page showing the trend of non accruals, 90+ days delinquency that
have not yet been repossessed. This will be included in the package going forward.
The committee agreed to monitor the trend of the non-accruals and will determine if a
specific reserve is required in the future as they become material to the overall credit
quality of the Bank.

Ms. Gerner reviewed the Consumer Top 10 Delinquency Performances by State. .She
then reviewed the Vintage Analysis and the Custom Scorecard Analysis. Mr.
Mortenson inquired as to whether the loss severity had increased from previous
months. Mr. Wright stated that the average loss per account of $9,109 had increased
from $8,886 last month. He pointed out that the severity has been on the increase due
to the weak used vehicle market.

Mr. Rands discussed the Roll Rate Analysis in detail for the committee. He stated that
the analysis is used to predict losses based on delinquency roll rates.  Over time, the
roll rate analysis will provide average roll rates between the delinquency buckets
eventually ending in charge-off, with the charge-off data representing skip trace
losses.  The roll rate analysis results are based on 3 and 12 month average roll rates
with annualized and average term life loss rates to allow for comparative
measurements against other ALLL metrics.

Ms. Gerner reviewed the Commercial Loss Reserve Details noting the breakout of
commercial receivables and their corresponding allowance was steady.

Mr. Wright reviewed the Dealer Loans, noting from a LTV perspective the portfolio
is quite strong. Mr. Wright discussed the breakdown of Commercial Portfolio --
Wholesale OS by Manufacturer, noting Honda, Toyota, Nissan, Ford and Hyundai as
being the bulk of the portfolio. Mr. Wright discussed the Dealer Real Estate
Concentrations, noting a guideline in the Credit Policy prohibits the Bank from
having more than 25% in any one state, and that the Bank was well within these

5

limits. He pointed out that Texas, California and Michigan were the states with the highest concentration of 15.1%, 14.5% and 10.9%, respectively

Mr. Wright then reviewed the CARRS ratings for the Commercial portfolio. He noted that based on the Facility Risk Ratings (FRR), 82.5% of the portfolio was considered Strong or Satisfactory. The Industry Data comparisons with the American bankers Association and GMAC were reviewed. It was pointed out that the Bank's portfolio delinquency and loss trends were very favorable compared to the industry. Mr. Wright discussed the updated profitability for GM dealers, noting 66.1% of the GM dealers are profitable this year compared to 68.8% last year.

Mr. Wright next reviewed the Factors Influencing Historical Loss Rates page, which was added to the package this month. This page lists several factors which were outlined in the 1998 Interagency Policy Statement. These factors influence historical loss rates which need to be considered by the Allowance Committee.

Based on the various allowance for loss methodologies and portfolio performance, the Committee agreed the portfolio is adequately reserved.

6.    **Adjournment**
There being no further business to come before the Committee, the Meeting was adjourned.

Dated: May 27, 2008

6

Confidential

# GMAC BANK
## AUTOMOTIVE DIVISION
## ALLOWANCE FOR LOAN AND LEASE LOSS
## COMMITTEE MEETING MINUTES

**Meeting Held:** June 24, 2008

**Chairman:**
John Wright

**Committee Members Present:**
John Wright, GMAC Bank, Chief Credit Officer – Automotive Division
Lisa Gerner, GMAC Bank, Chief Financial Officer

**Present By Invitation:**
Lance Evenson, GMAC Bank, Controller
Kyle Rands, GMAC Bank, Senior Financial Analyst
Mike Nestor, GMAC Bank, Operations Manager Commercial Lending
Tony Zimmer, GMAC Bank, Operations Manager Commercial Lending

**Invited, Absent**
Mark Hales, GMAC Bank, President
Jeff Mortenson, GMAC Bank, Operations Manager Retail & Leasing

**Meeting Summary:**
The Automotive Division Allowance for Loan and Lease Loss Committee ("ALLL Committee"
or "Allowance Committee") of GMAC Bank ("the Bank"), a Utah Corporation, was held in Salt
Lake City, Utah, on Tuesday June 24th at 10 AM Mountain Daylight Time.

---

Mr. Wright welcomed everyone to the meeting of the Automotive Division Allowance
Committee, a sub-committee of the GMAC Bank Automotive Division Credit Committee.

### 3.   Minutes Approval
Minutes from the GMAC Bank Automotive Division ALLL Committee meeting held
May 27, 2008 were presented and approved.

### 1.   GMAC Model Validation Remedy Item
Ms. Gerner began a discussion about the GMAC Model Validation of Allowance for
Credit Loss Metrics. Ms. Gerner noted that included in the meeting package was a
table showing ALLL Metric Performance trending and thresholds that are being
implemented to remedy the one control weakness from the model validation. Ms.
Gerner will present the model validation results to the Board of Directors at next
weeks meeting, and once approved will complete the model validation for the year.

7

7.    **Allowance Committee Meeting Package**

Ms. Gerner began a discussion about the contents of the Allowance Committee meeting package. The Reserve Allowance Summary showed that the Bank continues to maintain a 1% loss Reserve for the retail portfolio, 0.07% reserve for the commercial portfolio and 0.07% for the SmartBuy residual loss reserve.

Ms. Gerner discussed the reserve allowance summary noting there was not much difference from last month except that under the non-performing section the >89 days category was changed to "non-accrual" to provide further clarity to the tracking of the non-accrual accounts. Ms. Gerner noted that this historically has remained small and would stand reason for continuing to not hold a reserve for it.

Ms. Gerner then introduced the Reserve Allowance Severity Trends. Ms. Gerner noted that severity is changing and thought having a trend here would be helpful in order to see variables more informatively. Mr. Wright suggested focusing on the mix and segregating light duty trucks/SUV's from cars, showing losses to get to severity. Mr. Rands stated that he could put together a report that breaks down the severity of re-sale losses by light duty trucks/SUV and cars. Mr. Rands noted that in the aggregate the report will tie back to the custom scorecard, but should provide management a more detailed view of the loss severity. Mr. Wright stated this would be helpful to ensure a higher reserve is not required. Mr. Wright then stated that this month he added a bullet point to the Factors Influencing Historical Loss Rates page, which states "Due to the spike in fuel costs, the resale values of SUV's and pick-up trucks are depressed which is resulting in an increase in the severity of losses on the sale of repossessions".

Ms. Gerner discussed the Consumer Outstanding Non Accruals, stating it includes anything >89 days delinquent. Ms. Gerner clarified that this only includes active accounts and not bankruptcies or repossessions.

Ms. Gerner reviewed the Custom Scorecard Analysis noting that the ACL% is 1.02%. Mr. Wright stated that there is some concern about the accuracy of the scorecards due to the current general economic situations and that an independent third party is being engaged to validate the scorecards.

Ms. Gerner reviewed the Commercial Loss Reserve Details noting the breakout of commercial receivables and their corresponding allowance was steady and that the Bank has $2.4B outstanding and $1.6M reserve to cover losses.

Mr. Wright reviewed the Dealer Loans, noting from a LTV perspective that 77.3% of the loans in the portfolio have LTV's of 75% or less. Mr. Wright discussed the breakdown of Commercial Portfolio – Wholesale OS by Manufacturer, noting Honda, Toyota, Nissan, and Ford as being the bulk of the portfolio and noting that Tata represents Land Rover and Jaguar (Tata Motors is a company from India that purchased Land Rover and Jaguar from Ford Motor Company). Mr. Wright discussed the Dealer Real Estate Concentrations, noting a guideline in the Credit Policy prohibits the Bank from having more than 25% in any one state, and that the Bank was well within these limits. He pointed out that Texas, California and Michigan

8

ALLY_0260362

were the states with the highest concentration of 14.4%, 14.3% and 11.7%, respectively

Mr. Wright then reviewed the CARRS ratings for the Commercial portfolio noting there were not any significant changes from last month. Mr. Wright next discussed the Dealer Profitability for Large Channels noting that profitability and return on assets were down. Mr. Wright requested that this page be divided into 2 separate pages for next months meeting so it would be easier to review.

Mr. Wright next reviewed the Factors Influencing Historical Loss Rates page. Mr. Wright noted that the Bank chose 4-5 states in which there has been negative home price appreciation and ordered updated appraisals. Mr. Nestor stated that the completed appraisals should all be received next month and the results of the appraisals would be discussed during the next meeting. Mr. Zimmer stated that the updated appraisal amounts have been satisfactory on the ones received so far.

Based on the various allowance for loss methodologies and portfolio performance, the Committee agreed the portfolio is adequately reserved for retail and commercial.

8.    **Adjournment**
There being no further business to come before the Committee, the Meeting was adjourned.

Dated: June 24, 2008

9

Confidential

# SUMMARY

## Mortgage Credit Policy Committee Minutes

**Purpose**

Provide the Board with an overview of the activities of the Mortgage Credit Policy Committee

**Major Points**

- The minutes are in summary format and cover the key mortgage credit policy and portfolio reviews from the March, April and May, 2008 meetings of the GMAC Bank Mortgage Credit Policy Committee.

**Requested Action**

- Review of the minutes of the Mortgage Credit Policy Committee.

1

## *GMAC Bank*                              *Final*

### Mortgage Credit Policy Committee Meeting Minutes

Chairman: Mike Rizzo                          Meeting Held:  March 26, 2008

**Committee Members Present:**

Matthew Detwiler, GMAC Wholesale Mortgage Corp., MD Correspondent Lending (via teleconference)
John Gray, Residential Finance Group, EVP, U.S. Lending
Bob Groody, GMAC Bank, Chief Operating Officer
Mark Hales, GMAC Bank, President & CEO (via teleconference)
Deanna Keith, GMAC Wholesale Mortgage Corp., Correspondent Client Risk Management
Joseph Meehan, GMAC Wholesale Mortgage Corp., Warehouse Lending Risk Management
Mike Rizzo, GMAC Bank, Chief Credit Officer – Mortgage Division
Suzanne Sabia, GMAC Wholesale Mortgage Corp., Construction Lending
Peter Simon, SVP, GMAC Wholesale Mortgage Corp., Portfolio Management and ALM

**Committee Members Not Present:**

Al Celini, GMAC Wholesale Mortgage Corp., SVP, Lending & Product Development
Marianne Mainardi, GMAC Wholesale Mortgage Corp., MD Correspondent Lending
Mitchell Nomura, GMAC Wholesale Mortgage Corp., Correspondent Client Risk Management (via teleconference)
Mike Rizzo, GMAC Bank, Chief Credit Officer – Mortgage Division
Martin Schroeter, GMAC Wholesale Mortgage Corp., SVP Warehouse Lending (via teleconference)
Rich Smith, GMAC Wholesale Mortgage Corp., Construction Lending Executive (via teleconference)

**By Invitation:**    Jack Cole, GMAC Wholesale Mortgage Corp., Director of Mortgage Portfolio Surveillance
Colleen Fletcher, GMAC Wholesale Mortgage Corp., Senior Credit Officer
Molly Hapgood, Residential Finance Group, Legal (via teleconference)
Don James, GMAC Wholesale Mortgage Corp., Chief Compliance and CRA Officer (via teleconference)
Richard Kennedy, GMAC Wholesale Mortgage Corp., Manger, Credit Reporting & Administration
Mark MacCauley, GMAC Wholesale Mortgage Corp., Senior Credit Officer (via teleconference)
James Redmond, ResCap, Chief Risk Officer (via teleconference)
Arash Sotoodehnia, Residential Finance Group, Credit Policy (via teleconference)

---

The meeting was called to order at 3:02 PM.

The February 27, 2008 meeting minutes were included in the meeting package for convenience, having been distributed to the Committee and approved via e-mail on 3/24/2008.

**Credit Policy:**

| Policy Approval | Meeting Package Reference: | Summary | Motion to Approve Made By: | Motion Seconded By: |
|---|---|---|---|---|

2

Confidential                                                                    ALLY_0260365

| Policy Approval | Meeting Package Reference: | Summary | Motion to Approve Made By: | Motion Seconded By: |
|---|---|---|---|---|
| Warehouse Lending Approval Authorities | Page 12 | • Changes to Approval Authority:<br>  • Increase SCO authority from $25MM to $35MM<br>  • Increased Division CCO authority from $35MM to $75MM<br>  • Bank CCO or Bank Chairman involvement at > $75 MM, down from $100MM.<br>• Other Changes:<br>  • Removes the requirement for one-up for policy exceptions<br>  • Removes limitation requiring higher authority for multiple extensions<br>  • Provides for limited temporary increase authority at SCO level<br>  • No longer requires SCO for Loan level exceptions.<br>• Unanimously approved by the Committee. | Mr. Groody | Mr. Simon |

Mr. Rizzo advised the Committee regarding a Regulation W covered transaction where the Correspondent Channel acquired loans from clients that have warehouse financing from our RFC affiliate due to confusion with how a bank account was labeled. He advised that the maximum average daily exposure was approximately $70MM and was well within the 10% equity limit established in Regulation W. He also advised that actions have been taken to fix controls to ensure that no further loan acquisitions from clients that have used an RFC warehouse line for financing. Mr. Sotoodehnia inquired about the amount available for covered transactions. Mr. Rizzo responded that the capacity is there to cover an unforeseen breakdown in controls. Mr. Gray inquired if other naming conventions were being checked. Mr. Rizzo advised that there was only one affiliated vehicle and assets left in RFC are distressed and unlikely to come into GMAC Bank.

Mr. Meehan presented a proposal to update Warehouse Lending approval authorities. Proposed changes in approval authorities apply to facilities rated minimally acceptable or better, and Warehouse Express (WEX). Approval authority increases for commitments from $25MM to $35MM for Senior Credit Officers (SCO), from $35MM to $75MM for the Division Chief Credit Officer, and lowers requirement for either the Bank Chief Credit Officer or Bank Chairman from $100MM to commitments greater than $75MM. Mr. Meehan advised the changes also removes the requirement for one-up for policy exceptions, removes limitation requiring higher authority for multiple extensions, provides for limited temporary increase authority at SCO level, and no longer requires SCO for Loan level exceptions. He also explained the rationale for these changes, including the backgrounds and experience levels of the Division CCO and SCOs. Mr. Hales spoke to recent fraud and suggested that a tighter review might be warranted. Mr. Meehan responded stating that the level of credit authority would not have prevented the fraud as it was a breakdown in operational controls that did not catch the fraud. After additional discussion, the Committee Unanimously approved the proposed changes in Warehouse approval authorities.

Ms. Fletcher provided an update on HFI Flow exceptions to Credit Policy for February, 2008. She reported that HELOC made up the majority of products and noted an increase in Jumbo products in the February flow. Committee discussion focused on CLTV numbers due to HELOC originations and that there should be a gradual reduction in these numbers. Mr. Rizzo advised that it was discovered that CMG had not implemented debt to income requirements for nontraditional mortgage products when requested; once advised, CMG implemented the requirements right away. Ms. Fletcher confirmed that loans are being reviewed based on current guidelines, even though some older loans may have been underwritten under older guidelines.

3

ALLY_0260366

Ms. Fletcher reminded the Committee that Caution exceptions are noted for exceptions that would not have been made up front, and Accept exceptions for those that would have been made up front. All 18 Caution exceptions are referred to the business channels for response. She advised that one Wholesale Lending loan with an exception for an excessive debt to income ratio has been referred to Quality Control for review. Five Consumer Lending loans with insufficient explanations for exceeding guidelines were also referred to Quality Control for review. Ms. Fletcher also advised that all 134 Accept exceptions were due to program changes to home equity during February. Mr. Hales inquired if the review was performed on the entire population or just a sample. Ms. Fletcher advised that credit characteristics of all flow for February were reviewed on a spreadsheet. Mr. Groody requested that future reports to the Committee specifically note loans are reviewed to current guidelines and not necessarily the guidelines in place when originally underwritten.

Mr. Cole updated the Committee regarding Quality Control (QC) reviews of defaulted loans from Quicken Loan. 65% of the loans reviewed were stated income. Of the loans reviewed, 39 have been served up to Quicken Loan for repurchase with a settlement for $1.25MM on a total estimated loss value of $2.6MM. Quicken has yet to sign the settlement agreement. Only the most severe cases were served up to Quicken. Mr. Cole also advised that Quicken has subsequently received another repurchase request on approximately 10 loans through the normal QC process. Committee discussion focused on the Quicken Loan's status as a platinum client. Mr. Detwiler advised loans could be 3-D (2nd tier repurchase liability from FNMA only if Quicken were to become insolvent) and not platinum; however, Mr. Simon advised the loans in the Bank settlement were portfolio and not 3-D. Mr. Groody, Mr. Simon, and Mr. Gray were in favor of pulling platinum status and require more than a review of data in purchasing loans. Mr. Rizzo advised we were getting to that point, but wants to work with the production team to see how Quicken responds to the repurchase requests. Mr. Simon inquired about the aging of the repurchase requests. Mr. Rizzo spoke to the new aged repurchase exposure policy approved by the Committee at the February 27, 2008 MCPC meeting to expire a client's master commitment when they have more than $1 Million in outstanding principle balance repurchase exposure that is aged over 60 days from the date of the demand letter, unless Repurchase Management is having effective interaction with the client. Ms. Keith advised aged repurchases are addressed on the Correspondent Key Risk Metrics (KRM) report, and she will insure Mr. Simon is included on the distribution.

Mr. Simon advised the Committee regarding a request from CMG for additional capacity to current limit at $100MM per month. The Committee had approved a 10% sub-limit of HFI UPB for CMG's Home Ownership Accelerator (HOA) product at the February 27, 2008 MCPC meeting. Mr. Simon reported that CMG has approximately $160MM capacity under the limit. Discussion focused on CMG's search for additional investors with none added, and the potential for a couple of loans to be put back to CMG for repurchase. The Committee was not prepared to act on the request without additional investors in place and denied the request. The Committee also thought it appropriate that there now be only a single point of contact for CMG within GMAC Bank.

## Roundtable Discussion

Mr. Simon advised the Committee that the Quicken Loan and CMG updates covered the HFI portfolio update.

4

Confidential

Mr. Detwiler led a discussion on Correspondent Lending. He advised that Correspondent Lending was working on implementing policies to weed out poor pull through clients (loans locked but not funded). He also advised Correspondent Lending was going through an inactivation process on approximately 250 inactive clients. Ms Keith reported on the process to qualify prospective new clients to ensure they meet standards. Those qualifying for broker approval are referred to Homecomings. Mr. Rizzo advised that a Correspondent approval and policy manual will be presented for approval at an upcoming MCPC meeting.

Mr. Meehan led a discussion on Warehouse Lending. He advised that the new risk rating methodology, approved by the Committee on at the December 19, 2007 MCPC meeting, will be implemented for 3/31/2008. He also advised that a contractor will begin an Internal Loan Review (ILR) on 3/31/2008. Mr. Groody inquired if all operating controls have been put in place Bethesda. Mr. Meehan replied that they have, but will have Internal Audit perform a targeted review to test their implementation. Mr. Meehan also spoke to a recent Internal Audit rating of Needs Improvement. Issues identified in the audit include the need for more "know your customer" documentation, curtailments, and operational process for fraud not fully in place with shift to a new system. He advised five action plans have been identified to address these issues. Mr. Rizzo advised that implementation of the revised Warehouse reserve methodology, scheduled for 3/31/2008, will be pushed back to allow new risk ratings to be fully implemented, as well as finalize the change management process.

Ms. Sabia led a discussion on Construction Lending (CTP). She advised that 15 loans, with total outstanding balances of $2MM to $3MM, had been identified as potential builder fraud and referred to Paul Sullivan in Fraud Management to investigate. She advised there could be a 30% hit on these balances. Some of the potential fraud loans are part of the SWAT book and Mitchell Nomura is aware. Ms. Sabia advised that Rick Smith is continuing through a re-organization and the operational team should be in place in April. She also advised an audit was scheduled for April.

Mr. Rizzo advised that Mr. Celini is working on internal projects in HFS.

Mr. Rizzo thanked the Committee and adjourned the meeting at 4:25PM.

Respectfully submitted,

Richard P. Kennedy
Secretary

5

Confidential

# GMAC Bank                                    *Final*

### Mortgage Credit Policy Committee Meeting Minutes

Chairman: Mike Rizzo                          Meeting Held:  April 30, 2008

**Committee Members Present:**
Al Celini, GMAC Wholesale Mortgage Corp., SVP, Lending & Product Development
Matthew Detwiler, GMAC Wholesale Mortgage Corp., MD Correspondent Lending (via teleconference)
John Gray, Residential Finance Group, EVP, U.S. Lending
Bob Groody, GMAC Bank, Chief Operating Officer
Mark Hales, GMAC Bank, President & CEO (via teleconference)
Deanna Keith, GMAC Wholesale Mortgage Corp., Correspondent Client Risk Management
Marianne Mainardi, GMAC Wholesale Mortgage Corp., MD Correspondent Lending
Joseph Meehan, GMAC Wholesale Mortgage Corp., Warehouse Lending Risk Management
Mike Rizzo, GMAC Bank, Chief Credit Officer – Mortgage Division
Martin Schroeter, GMAC Wholesale Mortgage Corp., SVP Warehouse Lending (via teleconference)
Peter Simon, SVP, GMAC Wholesale Mortgage Corp., Portfolio Management and ALM
Rich Smith, GMAC Wholesale Mortgage Corp., Construction Lending Executive

**Committee Members Not Present:**
Mitchell Nomura, GMAC Wholesale Mortgage Corp., Correspondent Client Risk Management (via teleconference)
Suzanne Sabia, GMAC Wholesale Mortgage Corp., Construction Lending

**By Invitation:**    Jon Andrews, GMAC Wholesale Mortgage Corp., General Counsel
Jack Cole, GMAC Wholesale Mortgage Corp., Director of Mortgage Portfolio Surveillance
Colleen Fletcher, GMAC Wholesale Mortgage Corp., Senior Credit Officer
Lisa Gess, Residential Finance Group, SVP Operations Risk Management (via teleconference)
Ralph Hall, GMAC Bank, Chairman of the Board (via teleconference)
Richard Kennedy, GMAC Wholesale Mortgage Corp., Manger, Credit Reporting & Administration
Mark MacCauley, GMAC Wholesale Mortgage Corp., Senior Credit Officer (via teleconference)
Denise Rinear, GMAC Wholesale Mortgage Corp., VP, Senior Risk Director
Arash Sotoodehnia, Residential Finance Group, Credit Policy (via teleconference)
Lauren Zonies, GMAC Wholesale Mortgage Corp., Business Lending Risk

---

The meeting was called to order at 3:02 PM.

The March 26, 2008 meeting minutes were included in the meeting package for convenience, having been distributed to the Committee and approved via e-mail on 4/28/2008.

Mr. Rizzo advised the Committee that Mitchell Nomura has resigned from the company.

**Credit Policy:**

6

Confidential

| Policy Approval | Meeting Package Reference: | Summary | Motion to Approve Made By: | Motion Seconded By: |
|---|---|---|---|---|
| GMAC Bank Internal Loan Review Policy | Pages 7 - 12 | • Update to existing Internal Loan Review Policy<br>• Revises one line in the policy referring to the quarterly sample:<br>  "A representative sample of credits across the entire GMAC Bank commercial loan portfolio will be reviewed on at least a quarterly basis."<br>• Unanimously approved by the Committee. | Mr. Celini | Mr. Groody |
| GMAC Bank FHA Approval Changes | Page 14 | • Changes to FHA Approval Qualification:<br>  • FHA delegated threshold changes from 250 loans to 100 loans.<br>  • FHA non-delegated threshold changed from 20 loans to zero, but clients are still required to complete training. Client/prospect will no longer be required to submit QC reports or management's response to findings. QC reports and management responses to findings will be requested during recertification.<br>  • Clients attempting to graduate from non-delegated to delegated will need to provide QC plans, reports and management responses to findings.<br>  • Identify delegated clients in underwriting review who can graduate out of this status.<br>• Unanimously approved by the Committee. | Mr. Groody | Mr. Celini |

Mr. Rizzo presented an updated GMAC Bank Internal Loan Review Policy to the Committee. The policy was initially approved by the GMAC Bank Board of Directors on October 17, 2007. The update revises language in the policy as noted in the policy approval matrix above. The updated policy was unanimously approved by the Committee.

Ms. Keith presented proposed GMAC Bank FHA approval changes as noted in the policy approval matrix above. Committee discussion focused on non-delegated clients and requesting QC reports during the recertification process. Ms. Keith advised that requesting QC reports/responses validates that a client has a QC process in place. Additional discussion focused on the underwriting review status, with Ms. Keith advising that some clients are new to government lending. She advised the goal is to graduate clients out of underwriting review if they have low significant findings rates. The GMAC Bank FHA approval changes were unanimously approved by the Committee.

### Portfolio / Channel Reviews

Mr. Simon led the Committee in a review of the HFI Investment Portfolio. He noted the HFI portfolio consisted of over 106,000 loans at a UPB of $15.3 Billion as of March 31, 2008. He also advised that all non-conforming residential assets originated by ResCap continue to flow into Bank HFI, and noted $220MM of HELOC loans were reclassified into HFI at the end of the 1st Quarter with indemnifications on $175MM. While speaking to March 2008 funded loan activity, Mr. Simon noted improvement in loan characteristics. Mr. Simon noted that the mortgage credit environment was still extremely stressed with no liquidity for non-conforming mortgage assets; delinquencies in all buckets having increased significantly from the end of the 2nd Quarter; the housing market expected to be adverse into 2009; large mortgage players, including banks, continue to report significant losses related to mortgages, and hundreds of small and medium players have exited the business. Mr. Simon also added that home equity charge offs continue to be high with the trend starting during the 4th Quarter of 2007. REO inventories

7

are also approaching 200 units, with Mr. Cole confirming growth of approximately 15 units per month.

The Bank was in compliance with all but one Portfolio limit in Q1 2008. At 10.4% on 3/31/08, the percentage of 2nd lien loans with FICOs less than or equal to 660 exceeded the 10% guideline. Other Portfolio Risk Management activities include the Bank is now in full control of rate sheet pricing for portfolio products; Portfolio Surveillance is active in several critical areas of Servicing; seriously delinquent loans, loans in foreclosure, and loans moved to REO are receiving QC reviews, regardless of seasoning. Given the current market environment, Mr. Simon recommended focusing activities on managing the risk of the seasoned Alt-A portfolio, Portfolio Surveillance activities, mortgage QC activities, indemnification tracking, as well as EPO and EPD management across all origination channels. He advised the Committee that QC is being requested to review delinquent loans at 30 days past due instead of waiting for them to become seriously delinquent.

Committee discussion focused on home price growth. Mr. Simon advised that home price growth on an HFI portfolio weighted basis was a negative 1% in the 4th Quarter of 2007, compared to a negative 0.86% in the 3rd Quarter. He used both recent historical data from the 3rd Quarter of 2007, as well as current data to demonstrate that more than one half of the Bank's delinquency performance can be explained by local market home price growth. He also advised that the Portfolio Management Group was looking at trends in the top 10 Metropolitan Statistical Areas (MSA), noting that Michigan appeared to be getting to the end of a cycle and both California and Arizona were at the beginning of cycles.

Mr. Cole presented the HFI Portfolio Surveillance review. March Portfolio Surveillance highlights include; completed QC credit file reviews on 1,194 loans through month end resulting the repurchase of $22.6MM in loans that were at risk as it related to performance and misrepresentation; executed final settlement on 37 loans with Quicken for $1.25MM on a total estimated loss value of $2.6MM; Collections outbound calling productivity continues to exceed current SLA as it relates to primetime calling periods; Bank loss mitigation strategies resulted in a combined $3.4MM loan loss saves for charge off and delinquent accounts; the blended loss mitigation population grew by 4% to 37 units; and through March, 143 Home Equity accounts have been approved for the trial mod program with 52 loans actively participating in the repay plan to mod program. As noted earlier in the meeting, REO inventory grew approximately 15% to 183 properties during the 1st Quarter. Ten properties were sold during March for 93% of fair market value. Mr. Cole also noted that, in March, the Bank partnered with HFN in a 1st Quarter Note Sale that funding on 4/2/08. The Bank sold 44 charged-off 2nd mortgage lien units with a $2.16MM UPB for 4.5%. Net proceeds for the deal were $92,000. Committee discussion focused on repurchase demands to Quicken. Mr. Cole advised Quicken is now holding repurchase demands on 10 additional HFI loans and we are waiting on Quicken's written response on up to 10 loans they do not want to repurchase. Additional discussion focused on a 19.8% Unacceptable rate from the QC HFI defaulted loan review. Mr. Simon advised that the loans were already seriously delinquent and that the adverse sample drives the high finding rate. Mr. Sotoodehnia confirmed that a 20% finding rate is consistent with RFG results for similar adverse samples.

Ms. Fletcher presented a CMG HOA review, updating the Committee on significant program changes in the HOA program as noted on pages 40 and 41 of the meeting deck; including an established HOA UPB limit at 10% of HFI UPB and the elimination of future line increases.

8

Other changes to maximum LTV/CLTV, maximum debt ratio, and restrictions to stated income processing styles are consistent with other enterprise programs. She also advised that CMG's delegated approval authority for HOA has been withdrawn as of 4/28/08. Mr. Celini advised he was working with the client through the changes. Ms. Fletcher also updated the Committee on a review of 22 loans where prior exception requests were not granted, with 18 of the 22 loans noted with eligibility concerns. She also advised the Committee that a targeted post-funding review of loans submitted for purchase on 3/31/2008 was in process with 13 of 16 loan reviews completed to date with eligibility concerns, including stated income. QC is presently reviewing the findings to insure consistency with similar reviews and findings. Committee discussion focused on the eligibility concerns from the two special reviews reported above, specifically those involving stated income.

Mr. Celini led a discussion on the HFS account. He advised 1st mortgage assets are performing in accordance with the affiliate agreement, with delinquency at modest levels and aged 1st mortgage loans will be put back to the affiliate in June 2008. HFS 2nd mortgage assets have delinquency levels in line with the HFI portfolio. Mr. Celini advised that HELOC aging levels have presented concerns. Referring to Mr. Simon's HFI update, he reported that on April 8, 2008, GMAC Bank management recommended and received approval from ALCO to reclassify $211MM in HFS HELOC loans to an HFI designation. $166MM of the $211MM were transferred with a 4 year indemnification agreement back to the affiliate. Committee discussion focused on the driving factors behind the transfer as outlined on pages 114 and 115 of the meeting deck.

Mr. Meehan presented a review of Warehouse Lending. He advised the Committee that all qualifying warehouse relationships have been moved into the Bank, with only three relationships remaining outside the Bank due to Reg. W concerns and financing needs outside the Bank's charter. Loans aged greater than 60 days have been reduced to $3.1MM, or 0.2% of the portfolio. Subprime collateral has been virtually eliminated. He advised that a unified risk rating methodology has been implemented as of March 31, 2008, as well as the implementation of a new credit policy. Mr. Meehan spoke to an Internal Audit rating of "Needs Improvement", to which corrective action plans have been agreed to and are on schedule. He also reported that BRM had conducted a review of the grading and monitoring systems with the report in draft, but findings are not significant. He also reported a $144MM loss was incurred related to a fraud scheme, to which new funding controls have been identified and are being implemented. Mr. Meehan also updated the Committee on a new Warehouse legal document based on "lessons learned" that is being rolled out as clients renew. He also updated the Committee on the ongoing development of a new purchase facility program that provides the Bank better protection in bankruptcy, as well as access to FHLB funding. While speaking to portfolio characteristics, Mr. Meehan advised that page 48 of the meeting deck summaries Warehouse for GMAC Bank only, with all other pages of the Warehouse presentation referring to all Warehouse clients. Mr. Rizzo requested that risk ratings be included when clients are ranked in future portfolio review presentations.

Mr. Rizzo presented a summary review of Treasury Counterparty Risk referring the Committee to pages 63 to 67 of the meeting deck. He advised the current focus is on high quality Fed funds sales.

Ms. Keith presented a review of Correspondent Lending Key Risk Metrics (KRM) as of March 2007. She advised the Committee that 60 day plus delinquency (including foreclosure) has

9

Confidential

increased from 3.65% in February 2008 to 3.75% in March of 2008, with loans funded in 2005 and 2006 driving a high percentage of the delinquency. Overall repurchase exposure to both GMAC Bank and GMAC RFC increased from $142MM in February 2008 to $144MM in March of 2008, with $78MM of this exposure either under Legal review or has an existing recovery plan in place. She also reported that the Credit Risk Group (CRG) has experienced a 36% increase in new applications from February 2008 to March 2008. 32 new applications decisions were rendered with a 28% approval rate. The primary reason for a rejected packages is incomplete applications. Ms. Keith also advised a large portion of production is obtained from a small portion of the client base. While reviewing top producers, Mr. Groody inquired as to the number of clients with multiple client IDs and if they could have multiple risk ratings. Ms. Zonies advised that a client could have multiple client IDs for various programs, but only one client risk rating. Mr. Rizzo inquired if ratings were over a 12-month period, to which Ms. Zonies replied yes, but production is as of the current month. Committee discussion focused on correspondent clients subject to the Aged Repurchase Policy. Responding to questions concerning repurchase demands to Quicken, Mr. Detwiler advised that Quicken was aware of the Aged Repurchase Policy. Ms. Zonies added that Quicken would probably enter into a repayment plan. Both Mr. Hall and Mr. Groody inquired about the 3D program and the Bank's exposure to repurchase demands, to which Ms. Zonies replied that the investor would go first to the client and then to RFG, noting no such requests have been received to date.

Mr. Smith presented a review of the Construction Lending (CTP) portfolio, reporting that the Bank CTP portfolio as of March 31, 2008 is 657 loans with total commitments of $250.4MM and $171.9MM in outstanding balances. Mr. Smith advised CTP was actively implementing process improvements to correct operational issues, including inefficient use of the TCP servicing system. He also advised the Committee that loans currently being originated are of better quality than the portfolio inherited by the current management team. Mr. Groody inquired if the was a limit in place for CTP and if one was necessary. Mr. Celini advise that there was a limit on Lot loans, but not on CTP in general. Mr. Rizzo added that there have been recent changes to underwriting guidelines. Mr. Smith updated the Committee on progress in developing a One-Time-Close (OTC) product with FNMA, advising that they are making progress but that FNMA is not ready to roll out the product. Mr. Groody commented that an CTP limit may need to be considered if FNMA does not roll out the OTC product. Mr. Smith advised the Committee on efforts regarding loans in the portfolio with no GMAC end loan option, noting that the focus has been on higher LTVs in declining markets. The CTP presentation also included state specific portfolio profiles. Mr. Smith also updated the Committee on an ongoing fraud investigation in Florida where the Fraud Risk Group has identified issues regarding appraised values and stated income. He advised CTP is currently pursuing repurchase with correspondents. He also advised that a reserve has been added for loans involved in the fraud scheme.

Mr. Rizzo advised the Committee that sub-committee minutes for the GMAC Bank Mortgage Division Allowance Committee are provided as an addendum to the MCPC meeting deck.

Mr. Rizzo thanked the Committee and adjourned the meeting at 5:40 PM.

Respectfully submitted,

Richard P. Kennedy
Secretary

10

Confidential

## GMAC Bank                              *Final*

### Mortgage Credit Policy Committee Meeting Minutes

Chairman: Mike Rizzo                              Meeting Held:  May 28, 2008

**Committee Members Present:**
Al Celini, GMAC Wholesale Mortgage Corp., SVP, Lending & Product Development
Matthew Detwiler, GMAC Wholesale Mortgage Corp., MD Correspondent Lending (via teleconference)
John Gray, Residential Finance Group, EVP, U.S. Lending (via teleconference)
Bob Groody, GMAC Bank, Chief Operating Officer
Mark Hales, GMAC Bank, President & CEO (via teleconference)
Deanna Keith, GMAC Wholesale Mortgage Corp., Correspondent Client Risk Management
Marianne Mainardi, GMAC Wholesale Mortgage Corp., MD Correspondent Lending
Joseph Meehan, GMAC Wholesale Mortgage Corp., Warehouse Lending Risk Management (via teleconference)
Mike Rizzo, GMAC Bank, Chief Credit Officer – Mortgage Division
Suzanne Sabia, GMAC Wholesale Mortgage Corp., Construction Lending (via teleconference)
Martin Schroeter, GMAC Wholesale Mortgage Corp., SVP Warehouse Lending (via teleconference)
Peter Simon, SVP, GMAC Wholesale Mortgage Corp., Portfolio Management and ALM
Rich Smith, GMAC Wholesale Mortgage Corp., Construction Lending Executive (via teleconference)

**Committee Members Not Present:**
None, all committee members were present

**By Invitation:**     Jack Cole, GMAC Wholesale Mortgage Corp., Director of Mortgage Portfolio Surveillance
Marcy DeCerbo, GMAC Wholesale Mortgage Corp., Business Lending Risk
Colleen Fletcher, GMAC Wholesale Mortgage Corp., Senior Credit Officer
Ralph Hall, GMAC Bank, Chairman of the Board (via teleconference)
Molly Hapgood, Residential Finance Group, Legal (via teleconference)
Mike Iversen, Residential Finance Group, Credit Policy (via teleconference)
Richard Kennedy, GMAC Wholesale Mortgage Corp., Manger, Credit Reporting & Administration
Mark MacCauley, GMAC Wholesale Mortgage Corp., Senior Credit Officer (via teleconference)
Grant Paulson, GMAC Wholesale Mortgage Corp., Treasury Counterparty Risk (via teleconference)
James Redmond, ResCap, Chief Risk Officer (via teleconference)
Arash Sotoodehnia, Residential Finance Group, Credit Policy (via teleconference)
Lauren Zonies, GMAC Wholesale Mortgage Corp., Business Lending Risk

The meeting was called to order at 3:03 PM.

The April 30, 2008 meeting minutes were included in the meeting package for convenience, having been distributed to the Committee and approved via e-mail on 5/27/2008.

11

Confidential

**Credit Policy:**

| Policy Approval | Meeting Package Reference: | Summary | Motion to Approve Made By: | Motion Seconded By: |
|---|---|---|---|---|
| Underwriting Approval Authorities | Pages 7 - 10 | • Updated lending authority matrix blends RFG authority matrix with Bank authorities in the Bank Mortgage Credit Policy.<br>• Committee modified footnote #1 to state loans greater than $3.5MM up to $6MM and added a prerequisite of Bank Chief Credit Officer approval.<br>• Unanimously approved by the Committee with the inclusion of the modified footnote #1 and footnote #2 as noted in the meeting deck. | Mr. Groody | Mr. Celini |
| Correspondent CRM Contract Requirements / Certificate of Good Standing | Page 15 | • No longer requires certificate of good standing from a 3rd party service provider in favor of obtaining corporate documentation directly from the client and verifying its accuracy internally.<br>• Clients will be required to certify accuracy of documentation.<br>• Unanimously approved by the Committee. | Mr. Simon | Mr. Celini |
| Correspondent CRM TPO Requirements | Page 16 | • Requires policies and procedures for all clients or prospects requesting TPO approval.<br>• Waivers for P&Ps no longer acceptable, even if the client is FNMA or FHLMC approved.<br>• Unanimously approved by the Committee. | Mr. Celini | Mr. Groody |
| Correspondent CRM Exception Approval Authority | Page 17 | • Sets limits to the number and level of exceptions per client file, as well as authority levels required to grant exceptions.<br>• Unanimously approved by the Committee subject to modification of the FHA Compare Ratio thresholds to lower levels as requested by the Committee. | Mr. Celini | Mr. Groody |
| Correspondent CRM Platinum Electronic Delivery Criteria | Page 19 | • Proposed changes in Platinum Electronic Delivery Criteria as noted in two matrices on pages 18 & 19 of the meeting deck.<br>• The Committee agreed Platinum status should not be granted to any client that has had past issues.<br>• Unanimously approved by the Committee on the condition that the Committee be advised of any clients receiving an exception for Platinum status. | Mr. Groody | Mr. Simon |
| Correspondent CRM Red Flag Reporting and Monitoring Policy | Page 20 | • Includes existing procedures in a specific Red Flag Reporting and Monitoring Policy.<br>• Unanimously approved by the Committee with the addition of non-compliance with Platinum Electronic Delivery Criteria and Fair Lending issues as red flag issues. | Ms. Mainardi | Mr. Simon |

## Underwriting Approval Authorities

Mr. Rizzo presented updated lending/underwriting authorities to the committee for approval. He advised the Committee that the revised authority matrix is a blending of the RFG authority matrix and the Bank authorities in the Bank's Mortgage Credit Policy. After discussion, the Committee requested that footnote #1 from the meeting deck be modified to state loans greater than $3.5MM up to $6MM and added a prerequisite of Bank Chief Credit Officer approval. The Committee also requested inclusion of footnote #2 stating that the Chief Credit Officers underwriting approval authority can be delegated to select Senior Credit Officers up to $3MM for GMAC Bank. The Committee inquired who the select Chief Credit Officers would be, and Mr. Rizzo advised only Nora Pio at this time. The revised Underwriting Approval Authorities

12

Confidential

ALLY_0260375

were unanimously approved by the Committee with the inclusion of the modified footnote #1 and footnote #2.

## Correspondent Client Risk Management Policy Manual

Ms. Keith presented changes to the Correspondent Client Risk Management Policy Manual to the Committee for approval. A draft copy of the updated policy manual was provided to the Committee for convenience. She advised that sections of the policy manual with smaller fonts are part of the correspondent channel guide and will be omitted from the final policy.

Ms. DeCerbo led the Committee in a review of changes to contract requirements. Committee discussion focused on discontinuing use of a third party service company to collected documentation and certify a client in good standing in favor of obtaining documentation directly from the client and verifying through public websites and other methods. Responding to a question from the Committee, Ms. Hapgood noted while third party certification will no longer be required, the ·clients will need to certify accuracy and our internal staff will verify information. Mr. Simon inquired if the 3rd party service provider provided contractual assurance of the work it performed. Ms. Keith responded yes, but also that a claim has never been filed. After additional discussion, the policy change was unanimously approved by the Committee.

Ms. DeCerbo led the Committee in a review of changes to Third Party Origination (TPO) requirements. The current policy waives the requirement for TPO policies and procedures if the client is Fannie Mae or Freddie Mac approved. The proposed change requires policies and procedures for all clients or prospects requesting TPO approval. Ms. DeCerbo advised more requests are being received for TPO approval and the change tightens credit requirements. Clients already approved will be grandfathered. Mr. Groody inquired if a QC program is already imbedded in the policy, to which Ms. Keith responded, yes. Mr. Celini inquired how the QC program is validated. Ms. Keith advised if an issue or concern comes up, the Correspondent Credit Risk Group will go through a validation process with the client. Mr. Rizzo made a suggestion to have a credit score floor and threshold to update documentation. Ms. Hapgood and Ms. Keith advised an authorization would most likely be required, but agreed to look into implementing the suggestion. The policy change was unanimously approved by the Committee.

Ms. Keith led the Committee in a review of changes to Exception Approval Authority. The proposed changes set specific authority levels, the number of exceptions, as well as the types of exceptions that could be granted at each level. Level I exceptions can be granted by a senior analyst, Level II exceptions can be granted by a credit manager, and Level III exceptions require approval of the VP of Correspondent Credit Risk Management. Discussion focused on FHA Compare Ratio thresholds for exceptions. The Committee unanimously approved the revised exception approval authorities subject to modification of the FHA Compare Ratio thresholds to lower levels.

Ms. Keith led the Committee in a review of changes to Platinum Electronic Delivery Criteria. Ms. Keith presented two matrices that compared existing Platinum requirements to the proposed requirements. Discussion focused Platinum status in general. Ms. Keith advised that no client has been approved for Platinum in the past nine months. The Committee advised Ms. Keith that Platinum status should not be granted to any client that has had past issues. The Committee unanimously approved changes to Platinum Electronic Delivery Criteria on the condition that the Committee be advised of any clients receiving an exception for Platinum status.

13

ALLY_0260376

Ms. Zonies presented the Correspondent Red Flag Reporting and Monitoring Policy to the Committee. She advised that all components are in place, but are now in a specific monitoring policy. Committee discussion focused on the red flag process and the handling of clients on monitor. The Committee unanimously approved the Correspondent Red Flag Reporting and Monitoring Policy with the addition of non-compliance with Platinum Electronic Delivery Criteria and Fair Lending issues as red flag issues.

## GMAC Bank HFI Mortgage Insurance Company Exposure

Mr. Rizzo led the Committee in a review of MI company exposure in the Bank's HFI portfolio on page 22 of the meeting deck. He advised that the report is presented regularly to the Bank's Mortgage Division Allowance Committee. He also advised that an Enterprise MI policy is presently being circulated for review. Triad has been removed as an approved provider, but will be presenting their case for re-instatement. Committee discussion focused on other monitors that could be used to identify issues regarding the MI companies, including any laws impacting MI company capital, other regulatory issues, bond ratings, and eligibility with the Government Sponsored Entities (GSE's).

## Roundtable Discussions

Mr. Smith led a discussion regarding Construction Lending (CTP). He updated the Committee on the status of a fraud case in Florida, stating that repurchase letters are being issued. The loans are classified in three groups; projects that will be completed and marketable, projects with declining values with LTV less than 100%, and projects with declining values with LTV greater than 100%. The interest rates have been cut in some cases to make it easier for borrowers to make payments. Mr. Simon suggested looking into a potential non-secured note program from FNMA to address lower market values. Mr. Smith also updated the Committee on improved reporting of stale draws. Issues causing higher stale draw reporting have been corrected in CTP's servicing system (TCL). Mr. Smith reported that the one-close product is not moving as fast as he would like, because this is not a high priority for FNMA. He also reported that the staff restructure has gone well; the pipeline is growing with full doc loans; and reporting capabilities are improving, but there is still more work to do. Mr. Groody requested increased reporting on stale draws, as well as reports on origination sources of new business.

Mr. Meehan led a discussion on Warehouse Lending. He advised that outstandings are down slightly; the risk profile is flat to somewhat improving; and the inflow of criticized assets has slowed. He also reported the first new deal in a year has been approved with Sierra Pacific. Mr. Meehan reported that Carol Macelree is the new credit risk officer replacing Tom Kelly. He also reported that work on the new purchase facility is moving slowly, but moving. Responding to questions on Internal Audit action plans, Mr. Meehan advised that addressing Internal Audit findings has been part of a larger change process with newly restructured portfolio management teams. Mr. Meehan also reported that Warehouse Lending was looking into FDIC examiner comments regarding low levels of reserves. Speaking to Reg. W, Mr. Rizzo advised both Warehouse Lending and Correspondent Lending to be aware on how Construction Lending loans were funding to insure if they were funding in the Bank to insure that they close under a different warehouse line.

14

Confidential

ALLY_0260377

Mr. Simon updated the Committee on the Bank's HFI portfolio. He reported flow is diminishing in May with less home equity loans. Overall fundings in May will be less than in March and April. Mr. Simon also reported the Bank was looking to add more jumbo hybrid loans to the portfolio. He reported increased delinquency for loans from certain deals with Nat City and his group is working with the servicer. Nat City, Wachovia, and HSBC are the main third party serviced clients. He also reported that a repurchase settlement offer from Quicken Loans was not acceptable due to being too low and included a condition of no further repurchase requests. Outstanding repurchase requests to Quicken may be approaching the Aged Repurchase Policy threshold, with 5 to 10 new repurchase requests each month. Mr. Cole reported that May has been a good month for workout activity and modifications. Mr. Simon and Mr. Rizzo both spoke to efforts of restructuring certain loans so to put borrowers in a better position to pay.

Mr. Celini advised the Committee regarding strong HFS volume in conforming loans from Correspondent Lending. He also reported growing 250.250 volumes with a request to fund more, but managing that volume so not to exceed the Reg. W limit. Mr. Celini advised the Committee on progress in working with the affiliate channels regarding a repurchase agreement/policy for loans with Quality Control defects. He also reported that June 15th was the date for the annual put back to the mortgage company for aged 1st mortgage loans, adding that the liquidity of the mortgage company was being monitored. Mr. Rizzo spoke to making sure there is enough cushion in the covered transaction limit.

Mr. Detwiler updated the Committee on Correspondent Lending activity. He advised the Committee regarding an increase in plan for Correspondent Lending, including increased business with USAA, continuing 3D and Assignment of Trade (AOT) business, and continuing FHA originations. Mr. Detwiler reported that intermediate players were doing well in the current environment. He also reported the top 100 clients account for 64% of current business. Discussion focused on 29 delegated clients with TPO relationships originating FHA loans that are being assessed and moved to a non-delegated status. Ms. Keith advised that clients with delegated status turned off for TPO FHA origination have delegated status turned off for all TPO origination due to how the systems are set up.

Mr. Rizzo advised the Committee that sub-committee minutes for the GMAC Bank Mortgage Division Allowance Committee are provided as an addendum to the MCPC meeting deck.

Mr. Rizzo thanked the Committee and adjourned the meeting at 4:53 PM.

Respectfully submitted,

Richard P. Kennedy
Secretary

15

Confidential

# SUMMARY

## Mortgage Division Allowance Committee Minutes

### Purpose

Provide the Board with an overview of the activities of the Mortgage Division Allowance
Committee.

### Major Points

- The GMAC Bank Mortgage Division Allowance Committee (AC) is a sub-committee of the
  Mortgage Credit Policy Committee (MCPC). AC minutes are included regularly in MCPC
  meeting materials as an addendum for the MCPC to review.
- The minutes are in summary format and cover the key allowance policy reviews and
  adequacy of allowance to cover future loan losses based the Committee's interpretation of
  credit risk associated with lending exposures on the Bank's balance sheet from the March,
  April and May, 2008 meetings of the GMAC Bank Mortgage Division Allowance
  Committee.

### Requested Action

- Review of the minutes of the Mortgage Division Allowance Committee.

1

ALLY_0260379

## GMAC Bank                                                      *Final*

### Allowance Committee Meeting Minutes

Chairman: Mike Rizzo                                Meeting Held:  March 26, 2008

**Committee Members Present:**
Lisa Gerner, GMAC Bank, Chief Financial Officer
Bob Groody, GMAC Bank, Chief Operating Officer
Mark Hales, GMAC Bank, President & CEO (via teleconference)
Mike Rizzo, GMAC Bank, Chief Credit Officer – Mortgage Division
Peter Simon, GMAC Wholesale Mortgage Corp., SVP, Portfolio Management
Kim Walsh, GMAC Wholesale Mortgage Corp., Chief Accounting Officer

**By Invitation:**
Richard Kennedy, GMAC Wholesale Mortgage Corp., Manager, Credit Reporting &
Administration
Arash Sotoodehnia, Residential Finance Group, Credit Policy (via teleconference)
Cheng-Yu Tai, GMAC Wholesale Mortgage Corp., Finance Director, Portfolio Management

---

The meeting was called to order at 1:02 PM.

The February 27, 2008 meeting minutes were included in the meeting package for convenience,
having been distributed to the Committee and approved via e-mail on 3/24/2008.

Mr. Rizzo advised the Committee that Arash Sotoodehnia will be a standing invited guest to the
Allowance Committee, representing Residential Finance Group - Credit Policy.

Mr. Rizzo also advised the Committee that the e-mail voting results for the 4Q07 GMAC Bank
Loss Reserve Adequacy Memo was provided in the meeting deck for documentation purposes.
The Committee had unanimously approved the memo via e-mail.

Mr. Simon presented the Q1 update of the loss severity component of GMAC Bank's Allowance
for Loan Loss (ALL) model.  The current ALL methodology requires that the ultimate loss
severity (loss given default) be estimated for every loan expected to be liquidated or charged off.
The current estimation process uses a discount factor, computed by measuring the difference
between a broker price opinion (BPO) as the loan approaches foreclosure and the ultimate sales
price of the property.  Each quarter, the discount factor is updated by including all REO
transactions that occurred over the previous three months.  In adding the additional sales
transactions results the first lien discount factor changes from 27.76% to 27.92%, and the second
lien discount factor changes from 93.95% to 94.30%.  Mr. Simon also proposed, given an
increasing number of first lien loans are liquidated via a short payoff (SPO), that it is now
appropriate to include short payoff loans in the discount factor calculation.  The first lien
discount factor with the new methodology (REO+SPO) changes from 27.92% to 25.15%.
Committee discussion included the BPO process and short payoffs leading to lower ultimate loss
severity since short payoffs do not incur the REO carrying costs of vacant properties.  Ms. Walsh

2

inquired why the discount factor was greater for second liens. Mr. Simon responded that that
note sales of first liens typically net the second, and the borrower is usually less motivated
toward the second lien. Mr. Sotoodehnia inquired how stable was the 25% discount factor from
the REO+SPO methodology. Mr. Simon advised that there were not enough short sales last
quarter due to only a limited number of liquidations last quarter, and that this would be the first
quarter to be tested. Mr. Simon also advised that the assumptions could be adjusted each quarter
with experience.    After additional discussion, the Committee approved the proposals as
presented. The increase in severity based on the disposition of REO properties is offset by a
reduction including short payoffs, resulting in no impact to the $10MM unallocated reserve.

Mr. Simon presented a proposal to change the historical roll rate horizon in the Allowance and
Loan Loss model from a "life of bank" approach to a "12 month rolling average" approach. Mr.
Simon referred to an executive summary on page 18 of the meeting deck describing the current
HFI loss allowance calculation. At present, the GMAC Bank uses a "life of bank" approach to
calculate the foreclosure probability assumption. The difference in required allowance between
the 12 month rolling average method and "life of bank" approach was minimal when the Bank
first took over the allowance calculation from GMAC Mortgage.    The difference in recent
months has increased to approximately $3MM with the 12 month rolling average being higher.
Committee discussion focused on reserving the portfolio for expected life time losses.    Mr.
Sotoodehnia advised that the Residential Finance Group (RFG) reserves for lifetime loss on
loans that have had a delinquency event. Mr. Simon also advised that the Bank reserves for
expected lifetime loss. Committee discussion focused on the relative impact of the two methods
under current conditions, with the 12 month rolling average method resulting in a need for
additional allowance. The 12 month rolling average would also reduce provisions for loss faster
if conditions improve. After additional discussion, the Committee unanimously approved the use
of the 12 month rolling average method.

**Summary of Allowance:**

Mr. Rizzo led the Committee in a review of the Allowance Summary beginning on page 23 of
the meeting deck, speaking to the total allowance of $76.9MM, of which $68.9MM is HFI
including the $10MM unallocated reserve. Mr. Rizzo led a discussion of support for the
unallocated allowance on pages 24 and 25 of the meeting deck.    Referring to the mortgage
division allowance history on page 31, he recommended that the unallocated reserve be used to
offset losses in home equity. Following discussion, the Committee agreed to maintain the
unallocated reserve as recommended.    Mr. Rizzo also addressed state concentrations, but
recommended addressing other concentrations, using interest only as an example. Ms. Walsh
inquired, due to decreasing in property values in California, Michigan, and Florida, if there was a
need to calculate the reserve by state. Mr. Tai responded that state and performance are included
in the roll rates. Mr. Tai also noted that the model looks at history and does not look to future
trends.

Mr. Tai led a review of HFI Reserve Support for February 2008, based on "life of bank", on
pages 28 to 30.

The Committee reviewed the HFI Net Charge Off (NCO) History, the Mortgage Division HFI
Allowance History, and Industry Performance Peer Group Comparisons.    Mr. Rizzo spoke to
selecting a peer group of 10 banks to consistently compare GMAC Bank to that peer group.

3

Confidential

ALLY_0260381

Mr. Rizzo led a review of the February 2008 Warehouse Lending Reserve Support beginning on page 38 of the meeting deck. Mr. Rizzo advised the Committee of the first Warehouse Bank charge off and noted more could follow.

The Committee reviewed other credit exposures beginning on page 40 of the meeting deck. While reviewing Available for Sale (AFS), Mr. Rizzo advised the Committee that support for the Construction Lending reserve was included on page 43. Committee discussion focused on education loans. Mr. Rizzo suggested that a one-page summary reporting loan exposure, the specific reserve balance and the LOCOM reserve to support the Allowance adequacy be added to the meeting deck.

Mr. Rizzo opened the floor for discussion regarding the current month. The Committee recapped discussions earlier in the meeting regarding changes to the HFI severity model and "life of bank" vs. 12 month rolling average for the historical roll rate horizon. Mr. Rizzo also raised the need to reserve for warehouse fraud.

Discussion continued regarding Mortgage Insurance (MI) company exposure presented on page 46 of the meeting deck. Mr. Rizzo advised MI exposure will continue to be updated.

Mr. Rizzo directed the Committee to the RFG Housing & Economic Outlook provided for convenience beginning on page 48 of the meeting deck.

Mr. Rizzo advised the Committee that future meetings will be extended 30 minutes to allow adequate time for discussion.

### Adequacy:

As of February 29, 2008, the Committee determined Reserves to be adequate, and unanimously agreed to carry forward the $10MM Unallocated Reserve.

The meeting was adjourned at 2:25 PM.

Respectfully submitted,
Richard P. Kennedy
Secretary

4

Confidential

## GMAC Bank                                             _Final_

### Allowance Committee Meeting Minutes

Chairman: Mike Rizzo                          Meeting Held:  April 30, 2008

**Committee Members Present:**
Lisa Gerner, GMAC Bank, Chief Financial Officer (via teleconference)
Mark Hales, GMAC Bank, President & CEO (via teleconference)
Mike Rizzo, GMAC Bank, Chief Credit Officer – Mortgage Division
Peter Simon, GMAC Wholesale Mortgage Corp., SVP, Portfolio Management
Kim Walsh, GMAC Wholesale Mortgage Corp., Chief Accounting Officer

**Committee Members Not Present:**
Bob Groody, GMAC Bank, Chief Operating Officer

**By Invitation:**
Al Celini, GMAC Wholesale Mortgage Corp., SVP, Lending & Product Development
Ralph Hall, GMAC Bank, Chairman of the Board (via teleconference)
Richard Kennedy, GMAC Wholesale Mortgage Corp., Manager, Credit Reporting & Administration
Debra Scott, GMAC Wholesale Mortgage Corp., VP
Arash Sotoodehnia, Residential Finance Group, Credit Policy (via teleconference)
Cheng-Yu Tai, GMAC Wholesale Mortgage Corp., Finance Director, Portfolio Management

The meeting was called to order at 1:12 PM.

The March 26, 2008 meeting minutes were included in the meeting package for convenience, having been distributed to the Committee and approved via e-mail on 4/28/2008.

Mr. Simon spoke to the model validation process, presented the GMAC Bank ALL Model Validation results to the Committee, and requested that the report be entered into the Committee record.  Mr. Simon led the Committee in a discussion of action plans resulting from the model validation review; two of which required Committee approval.

| Policy Approval | Meeting Package Reference: | Summary | Motion to Approve Made By: | Motion Seconded By: |
|---|---|---|---|---|
| #3 Model Inputs Delinquency Status and Investor Identification Numbers | Page 8 | • Provide documentation of changes to delinquency status and investor identification numbers for approval by management.<br>• Portfolio Analytics Group has made the following assumptions:<br>  ◦ All loans with investor numbers 70630, 78630, and 79630 are treated as charge-off.<br>  ◦ All loans with an investor number of 50251 are treated as REO.<br>• Unanimously approved by the Committee. | Mr. Simon | Ms. Walsh |

5

| Policy Approval | Meeting Package Reference: | Summary | Motion to Approve Made By: | Motion Seconded By: |
|---|---|---|---|---|
| #4 Model Inputs Documentation of Vintage Loan Range | Page 9 | • Provide documentation and approval supporting the vintage range of 2001 and 2006.<br>• Automate the process to update vintage range with similar to the input assumptions.<br>• Bank Portfolio Analytics group will:<br>   ▪ Modify the SAS program to address the vintage range<br>   ▪ Change 2006 vintage code to select loans with age > 12 months<br>   ▪ Submit this model assumption to the ALL Committee for approval.<br>• Unanimously approved by the Committee. | Mr. Simon | Mr. Hales |

Mr. Tai led the discussion for the two action plans. While speaking to the action plan regarding documenting changes to delinquency status and investor numbers, he advised that once an REO property or charged off loan is sold, the servicing system changes the loan status to Paid off (PO). He advised that the investor number assumptions for charge-off and REO are necessary in order to truly reflect the correct loan status in the model. While speaking to the action plan regarding, Mr. Tai advised that the Portfolio Analytics group has changed the 2006 vintage code to a code that will select loans aged greater than 12 months, stating that loans defaulting earlier than 12 months are considered Early Payment Defaults (EPD) or fraudulent loans and not considered representative of future performance. He also advised that the condition requiring loans to have been originated after 2001 still applies since the Enterprise Data Repository (EDR) only has servicing data available from 2002 forward. Mr. Hales requested confirmation that EPD loans were included in the reserve. Mr. Simon advised EPD loans are included in the reserve, and that the change only impacts how the roll rate is calculated.

Ms. Walsh advised the Committee that she was in the process of preparing the SAB 102 Allowance Adequacy memo for 1Q08 and requested moving the AC meeting earlier during the month to facilitate completing the Allowance Adequacy memo. Mr. Simon suggested, and the Committee agreed, to convene at quarter ends for the purpose of providing Ms. Walsh with required information for the Allowance Adequacy memo.

**Summary of Allowance:**

Mr. Rizzo led the Committee in a review of the Allowance Summary beginning on page 15 of the meeting deck, speaking to the total allowance of $82.4MM, of which $76.4MM is HFI including the $10MM supplemental allowance. Mr. Rizzo led a discussion of support for the supplemental allowance on pages 16 and 17 of the meeting deck. He noted that HFI delinquency continues to increase, but remains favorable when compared to the industry peer group. The Committee agreed that the term supplemental allowance was more appropriate than the term unallocated allowance used previously.

Ms. Walsh inquired if an increase in the supplemental allowance was needed in the provision to support the year-end forecast of $190MM in chare-offs. Discussion focused on increasing the supplemental allowance. Mr. Rizzo suggested an increase to the supplemental allowance of $10MM. Mr. Simon suggested staggering the increase in increments of $3MM, $3MM and $4MM over the 2nd Quarter rather than $10MM in April. Mr. Simon also advised the Committee that an evaluation was in process to consider moving from a triangular approach to a rectangular approach in order to reserve more for loans with a status of current. The Committee agreed to

6

an additional $10MM supplemental reserve, noting an adjustment can be made when the evaluation process is completed.

Continuing with the Allowance Summary, Mr. Rizzo led the Committee in a review of the GMAC Bank Credit Report Executive Summary on pages 18 – 22 of the meeting deck. On page 20, he noted improvement in HFI credit characteristics over the last three months, including no Alt-A, an increase in weighted average FICO, improved loan-to-value and debt-to-income ratios, and a greater percentage of full doc processing styles. Page 21 provides information on property state and interest only concentrations. Mr. Rizzo advised a summary of interest only reset risk was presently under development, but noted the majority of amortization resets were still more than 24 – 25 months out.

Mr. Tai led a review of HFI Reserve Support for March 2008 on pages 24 to 26, noting that the change in foreclosure frequencies approved at the March AC meeting were reflected in the Loss Allowance Variance Analysis.

The Committee reviewed the HFI Net Charge Off (NCO) History, the Mortgage Division HFI Allowance History, and Industry Performance Peer Group Comparisons. Mr. Rizzo spoke to $8MM in HELOC charge offs over the past 12 months. Ms. Walsh advised that the recent $1.2MM in Rep & Warrant recoveries will be processed as recoveries. Mr. Rizzo spoke to 2-times reserve coverage on conforming and non-conforming 1st mortgage loans and the need for additional coverage for closed-end seconds and HELOC. Committee discussion continued focusing on the existing $10MM supplemental allowance and the additional $10MM supplemental allowance approved by the Committee during this meeting.

While speaking to industry performance peer group comparisons, Mr. Rizzo advised that GMAC Bank compared well in serious delinquency; however, the GMAC Bank's second lien distribution of only 20% was not typical to the peer group. He also advised that Allowance to Total Loans was low in comparison to the peer group. Mr. Simon suggested using the entire Bank to measure allowance to compare to total portfolio.

Mr. Rizzo led a review of the March 2008 Warehouse Lending Reserve Support beginning on page 34 of the meeting deck. Mr. Rizzo advised, do to timing, the $20MM reserve on page 35 does not reflect a $14.3MM charge off, which reduces the reserve as of 3/31/08 to $5,958,037. Ms. Walsh added that the specific reserve and charge off occurred in the same month.

The Committee reviewed other credit exposures beginning on page 36 of the meeting deck. While reviewing Held for Sale (HFS), Ms. Walsh advised the Committee that she will work with Mr. Celini to itemize RFG counterparty exposure. Mr. Hales suggested, and the Committee agreed, involving Jon Andrews (Legal) in the process. Additional Committee discussion included reserving for HFS loans that are re-classed as HFI.

While reviewing Available for Sale (AFS), Mr. Rizzo advised the Committee that the $2.8MM reserve due in part to confirmed misrepresentation in Florida with repurchase, as well as other remedies being pursued. Mr. Rizzo advised that the misrepresentation appears to involve the appraiser and realtor. Mr. Hall inquired if the borrowers have been contacted, to which Mr. Rizzo responded yes, and that they appear not to be involved in the misrepresentation.

7

Confidential
ALLY_0260385

Ms. Scott led the Committee in a review of education loan exposure beginning on page 39 of the meeting deck. She advised loans are one-time distribution and that borrowers typically take out one loan for each year. Loan payments are usually deferred for four years and have a twenty year term; the average repayment is nine years. Discussion focused on The Education Resources Institute (TERI). There is a $5.8MM specific reserve maintained by TERI in the name of GMAC Bank. There is also a $5,987,306 LOCOM adjustment taken prior to moving the portfolio to HFI. Ms. Scott also advised that we have petitioned Massachusetts courts to allow Mr. Celini to sit on the Creditors Committee for TERI's bankruptcy. After additional discussion, the Committee agreed to monitor the $11.8 in reserves and LOCOM and to adjust as necessary with continued experience. Ms. Scott agreed to provide claims data on a monthly basis with a quarterly update to the Committee in the month of quarter-end.

Mr. Rizzo opened the floor for discussion regarding the current month. Mr. Rizzo spoke to both FDIC and PWC comments regarding reserves and suggestions to include additional reporting around FICO scores, geography, and other risk characteristics to assist in the Allowance for Loan Loss process. Mr. Rizzo also advised that Warehouse should implement the new reserve methodology by either month-end April or May. Additional Committee discussion focused on classification of Construction Lending loans and whether there should be a reserve or LOCOM adjustment.

Mr. Rizzo led a discussion on Mortgage Insurance (MI) company exposure presented on page 46 of the meeting deck. He advised that Residential Finance Group's (RFG) 3P Committee has removed Triad as a MI provider, focusing on RMIC and Old Republic for new business. Ms. Walsh inquired if there has been any push-back from the MI companies. Mr. Sotoodehnia advised than Genworth (GE) has been tougher on details than they had in the past. The Committee agreed to continue to monitor MI company exposure and to adjust the allowance as necessary and appropriate.

Mr. Rizzo directed the Committee to the RFG Housing & Economic Outlook provided for convenience beginning on page 48 of the meeting deck.

**Adequacy**:

As of March 31, 2008, the Committee determined Reserves to be adequate, unanimously agreed to carry forward the $10MM Supplemental Reserve, and unanimously agreed to an additional $10MM Supplemental Reserve.

The meeting was adjourned at 2:35 PM.

Respectfully submitted,
Richard P. Kennedy
Secretary

Confidential

ALLY_0260386

## GMAC Bank                                                   *Final*

### Allowance Committee Meeting Minutes
Chairman: Mike Rizzo                              Meeting Held: May 28, 2008

**Committee Members Present:**
Lisa Gerner, GMAC Bank, Chief Financial Officer (via teleconference)
Bob Groody, GMAC Bank, Chief Operating Officer
Mark Hales, GMAC Bank, President & CEO (via teleconference)
Mike Rizzo, GMAC Bank, Chief Credit Officer – Mortgage Division
Peter Simon, GMAC Wholesale Mortgage Corp., SVP, Portfolio Management
Kim Walsh, GMAC Wholesale Mortgage Corp., Chief Accounting Officer

**Committee Members Not Present:**
None, all committee members were present

**By Invitation:**
Ralph Hall, GMAC Bank, Chairman of the Board (via teleconference)
Richard Kennedy, GMAC Wholesale Mortgage Corp., Manager, Credit Reporting &
Administration
Arash Sotoodehnia, Residential Finance Group, Credit Policy (via teleconference)
Cheng-Yu Tai, GMAC Wholesale Mortgage Corp., Finance Director, Portfolio Management

---

The meeting was called to order at 1:04 PM.

The April 30, 2008 meeting minutes were included in the meeting package for convenience,
having been distributed to the Committee and approved via e-mail on 5/27/2008.

Mr. Rizzo advised the Committee that the GMAC Bank Loss Reserve Adequacy memo for the
1st Quarter 2008 was distributed to voting members on May 19, 2008 via e-mail for review and
unanimously approved by an e-mail vote.

**Summary of Allowance:**

Mr. Rizzo led the Committee in a review of the Allowance Summary beginning on page 8 of the
meeting deck, speaking to the total allowance of $104.6MM, of which $91.5MM is HFI
including the $20MM supplemental allowance. Mr. Rizzo noted that the increase in allowance is
driven by HFI. Ms. Walsh noted that the $5,987,306 reserve noted for Education loans is not
actually a reserve and should be either reported as zero, or noted as a LOCOM adjustment below
the total reserves. Mr. Rizzo led a discussion on support for the supplemental allowance on page
9 of the meeting deck. The Committee requested adding additional commentary regarding other
concentrations.

Continuing with the Allowance Summary, Mr. Rizzo led the Committee in a review of the
GMAC Bank Credit Report Executive Summary on pages 10 – 14 of the meeting deck. On page
12, he noted HFI credit characteristics over the last three months are improved over the HFI

9

portfolio in general. Mr. Rizzo also spoke to property state and interest only concentrations on page 13 of the meeting deck. He also spoke to interest only reset risk, noting that 20% of interest only loans have already paid off and a majority of active interest only loans have amortization resets still more than 24 – 25 months out, with the exception of the 2004 vintage which is a relatively small population. On page 14, Mr. Rizzo noted that HFI delinquency had started to plateau in February and March, but increased April.

Mr. Tai led a review of HFI Reserve Support for April 2008 on pages 16 to 18, noting that increasing delinquency was the main driver for the increasing allowance. Mr. Rizzo spoke to the HELOC charge off rate and recommended that HELOC may need to be addressed differently in the new model presently under consideration.

The Committee reviewed the HFI Net Charge Off (NCO) History, the Mortgage Division HFI Allowance History, and Industry Performance Peer Group Comparisons. Mr. Rizzo spoke to page 19 of the meeting deck and a subjective allocation of the 20MM supplemental reserve to cover closed-end seconds and HELOC. On page 20, he noted a decreasing trend in allowance coverage to last 12 months net charge offs. While reviewing industry performance peer group comparisons, Mr. Simon suggested adding a non-accrual to allowance ratio to the peer group comparisons.

Mr. Rizzo led a review of the April 2008 Warehouse Lending Reserve Support beginning on page 26 of the meeting deck. He informed the Committee that the $1,534,064 charge off in April was for clean-up of clients. He also advised the Committee that Warehouse Lending is waiting on Model Validation to switch to the new reserve model approved by the Committee. Additional discussion focused on examiner comments regarding the general reserve and possibly increasing from 15% to 20% or 25%.

The Committee reviewed other credit exposures beginning on page 28 of the meeting deck. While reviewing Available for Sale (AFS), Mr. Rizzo advised the Committee that most of the $2.3MM specific reserve for Construction Lending was due to a fraud and Construction Lending was working on repurchases where possible.

Mr. Rizzo opened the floor for discussion regarding the current month. Ms. Walsh inquired if another increase in the supplemental allowance was needed in the provision to support the year-end forecast of $190MM in charge-offs. Discussion focused on increasing delinquency and loan losses, as well as the additional $10MM supplemental allowance added in April. Based on an ongoing analysis for model change, the $20MM supplemental allowance could be used as an allocated reserve. Adding an additional $10MM now would increase the supplemental reserve to $30MM. The Committee agreed to an additional $10MM supplemental reserve pending further discussion on model change.

The Committee also discussed ResCap counterparty risk and a potential collateral deposit. Mr. Groody requested that Ms. Walsh track HFS swaps.

Mr. Rizzo directed the Committee to Mortgage Insurance (MI) company exposure presented on page 38 of the meeting deck.

10

Confidential

ALLY_0260388

Mr. Rizzo opened the floor for management discussion on whether any changes to assumptions in the HFI model were necessary. After discussion, the Committee agreed no changes were needed this month.

Mr. Rizzo directed the Committee to the RFG Housing & Economic Outlook provided for convenience beginning on page 40 of the meeting deck.

**Adequacy:**

As of April 30, 2008, the Committee determined Reserves to be adequate, unanimously agreed to carry forward the $20MM Supplemental Reserve, and unanimously agreed to an additional $10MM Supplemental Reserve.

The meeting was adjourned at 1:55 PM.

Respectfully submitted,
Richard P. Kennedy
Secretary

11

Confidential

ALLY_0260389

SUMMARY

## GMAC Bank Fair Lending Management Committee (FLMC) minutes

### Purpose

Provide the Board with an overview of the activities of the Bank FLMC

### Major Points

- The meeting minutes are in summary format and review the key fair lending issues reviewed and discussed at the April 1, 2008 Bank Fair Lending Management Committee.

### Requested Action

- Review of the minutes of the Bank FLMC

Confidential

# GMAC BANK Fair Lending Management Committee

## April 1, 2008

The Fair Lending Management Committee ("FLMC") of GMAC Bank met on Tuesday, April 1, 2008 at 9:00 a.m. in FTW Conference Room 4L03.

| | |
|---|---|
| *Members Present:* | Don James\*, Chair; Mike Rizzo\*, Ralph Hall\*; Marianne Mainardi |
| *Telephone:* Pedersen\*; | Greg Merryman; Christopher Richardson; Jane Miller; Cliff |
| | Robert Groody\*; Al Celini\*; Lisa Gess |
| *Absent:* \*voting member | Sonya McCumber; Jon Andrews |

The meeting was called to order at 9:00 a.m. by Don James, Chair.  The committee last met on February 5, 2008 and was chaired by Don James.

I.   **Minutes of January 10, 2008 and February 5, 2008**

James said that the minutes of January 10 and February 5 had been reviewed and edited by Jon Andrews and asked if there were any comments.  There being no discussion, a motion was made, seconded, and unanimously carried for each set of minutes to approve as presented.

II.   **Documents**
   A. **GMAC Bank's Fair Lending Policy and Practices and Fair Lending Program for the Broker Fulfillment Group.**

James reported that he had sent the document, entitled "GMAC Bank's Fair Lending Policy and Practices and Fair Lending Program for the Broker Fulfillment Group" to each voting member for approval. Since six of the seven voting members approved it via e-mail, with the seventh member not voting, James said that he considered it passed.

James reported to the committee that he had telephone conversations with the two lenders that had pricing disparities, based on 2007 Q1-Q3 data, that could not be explained by further testing that was done by Mike Smale of Correspondent Funding. He said that the conversations were cordial and that both lenders said that they would look into the matter.  One of the lenders asked for loan numbers and the other said that he would convene a meeting of his entire staff and review what had been discussed.  James added that Chris Richardson had run the same report for 2007 Q4, and neither lender was on it.

   B. **Broker/Correspondent Fair Lending Training**
James reminded the committee that one of the recommendations made by the OTS examiner during the 2006 fair lending examination was that GMAC Bank provide fair lending training to its correspondents.  He referred to the document provided in

Confidential

the committee packet, "Broker/Correspondent Fair Lending Training," and stated that
Mike McElfish was going to put a pdf version of this document on Correspondent
Funding's correspondent Web site. James added that he was going to conduct the
training on April 10 for all sales directors and follow up with Marianne Mainardi
with regard to how to keep track of which correspondents download the training and
whether we ask for some form of acknowledgement that they conduct the training in
their companies.

**III.    Analytics**

James turned the committee's attention to the "Fair Lending Dashboard 2004-2007
Summary" and informed the committee that there was a new row and a new column
added to this report. The new row, "Adj. Disp w/prod categories," takes into account
various product categories, e.g., conforming, ALT-A, government, home equity,
expressway, and jumbo loans. Richardson said that he added this category because of
differences in underwriting for the various products. The new column, "GMAC Bank
(Non-Delegated Only)" was added, he continued, because of the pricing information
from the 2007 Q1-Q3 dashboard.

James and Richardson let the committee through a detailed review of the Dashboard
Summary, primarily focusing on the APR (pricing) analysis and the trigger rate (rate
spread) analysis. Discussion ensued, particularly about Homecoming Financials' impact
on bank data in light of the increased Homecoming production starting in the 3rd quarter
of 2007 purchased by the bank through the Regulation W pricing exemption. From the
discussion, three deliverables were identified:

1. Create a report that shows an All-Bank drill down to understand the distribution of
loans to the
     bank from the other lending channels.
2. After the drill down, provide information on product detail to identify where the issues
are.
     We should choose Homecomings as a channel to determine if there are a handful of
brokers
     that are driving the disparities or the bank's pricing relative to high-risk products and
not
     specific to a broker.
3. Richardson to produce a summary that shows how pricing adjustments are being
made.


**Other Business**

**A.  Board Training and Updates**

After discussion on the frequency of fair lending updates to the GMAC Bank board
of directors, it was determined that annually would be sufficient and that James
should give an overview of the dashboard as far as the trends and potential problem
areas from the previous four quarters. It was also suggested that board training take
place since some of the newer board members may not be as familiar with the topics
and measurement points, and it was decided to bring that suggestion to the bank
president.

Confidential

B. **Retail Overages Report**

James stated that this report shows the number of loans on a prefund basis that exceeded 200 basis points policy limit of overage in the Retail channel and the number of loans on a postfund basis that exceeded the policy. In January, there was one loan prefund and one loan post fund. In February, it was zero for both.

There being no further business, the meeting adjourned at 10:40 a.m.

Respectfully submitted,

Isobel Wastak/Donald James

ALLY_0260393

## SUMMARY

### Residential Finance Group and GMAC Bank Operations Risk Committee Meeting Minutes

### Purpose

Provide the Board with an overview of the activities of the Residential Finance Group ("RFG") and the GMAC Bank Operations Risk Committee ("ORC")

### Major Points

- The meeting minutes are in summary format and review the key operational risk topics reviewed and discussed at the April, May and June, 2008 RFG/GMAC Bank ORC.
- The Automotive Division held two meetings during the second quarter. The meeting minutes are in summary format for the April and May, 2008 Automotive Division ORC meetings.

### Requested Action

- Review of the minutes of the Bank Operations Risk Committees

Confidential

## Minutes
### GMAC Bank and RFG Operations Risk Committee
### Meeting Date: April 24, 2008

Members/Invitees

\* = in attendance

\*\* = in attendance (via telephone)

| Members | | Non-Voting Members | | Invitees | |
|---|---|---|---|---|---|
| Lisa Gess | * | Don James | ** | Bridget Berg | ** |
| Ralph Flees | | Dave Baily | * | Paul Sullivan | * |
| Tim King | | Dan Began | ** | Jeff Kearney | ** |
| Joe Pensabene | | Deanna Keith | ** | Patrick Glemser | * |
| Marianne Mainardi | * | Marc MacCauley | ** | Stephanie Marjoram | * |
| Dan Bettenburg | | Frank Madden | * | John Sweeney | * |
| Bill Maguire | * | Ed Muscovitch | | Aldo Walker | * |
| Mark Hales | * | Denise Rinear | * | Joe Kochuba | * |
| Bob Groody | | Cathy Williams | * | | |
| Mike Rizzo | | Peter Hasselmo | | | |
| Lisa Gerner | ** | Wayne Tull | * | | |
| Anthony Harney | * | Will Thompson | ** | | |
| Preston Lyvers | ** | Sonya McCumber | | | |

Lisa Gess called the meeting to order at 10:00 am.

### Follow up Items

- Mr. Kochuba noted that the Risk & Controls Team is working on a draft of the Ops Risk Scorecard for the May meeting.
- Mr. Kochuba noted that the Risk & Controls Team added a column "Business Unit Risk Manager" (BURM) to the Open Control Matters Tracking spreadsheet. The additional column will improve communication by informing the "coordinator" assigned to close the action plan (e.g. Marcy Jackson- Privacy) to include the BURM (e.g. Cathy Williams) in correspondence with the Responsible Party when following up on the monthly status. Ms. Gess commented that the action item will be considered closed unless additional communication issues surface during the next few months.
- Ms. Gess complimented the committee members on their timely response in providing feedback and suggestions to Joe Kochuba & Peter Hasselmo for the Key Risk Metric document. Ms. Gess noted that the only outstanding response to this request is Finance (Ralph Flees).

### Fraud Presentation

- Ms. Berg presented Exhibit A- GMAC Global Anti-Fraud Policy.

- Ms. Berg presented Exhibit B- ResCap Fraud and Ethics Policy. Ms. Gess inquired upon the need for a fraud policy at both the ResCap and GMAC level and suggested that this be a follow-up item.

ALLY_0260395

Additionally, Ms. Rinear questioned the need for a GMAC Bank Fraud Policy. Ms. Gess questioned what parallels would exist between the ResCap Fraud and Ethics Policy and a GMAC Bank Fraud Policy. Ms. Gess suggested this be a follow-up item for Ms. Rinear. Ms. Gess explained to the ORC that the GMAC Global Anti-Fraud Policy is for informational purposes. However, Ms. Gess requested adding a follow-up item for feedback from the Committee on the ResCap Fraud and Ethics Policy within the next two weeks before sending the policy for approval.

- Ms. Berg presented her section (Fraud Policy and Analytics) of Exhibit C- Fraud Roles and Responsibilities. Ms. Gess asked for an example of a fraud prevention technique. Ms. Berg responded by describing that she is working with each business unit/channel to determine the most appropriate model.

Ms. Gess asked how Ms. Berg identifies the data (e.g. dollar impact) around fraud losses. Ms. Berg responded that final loss data takes time to be realized and available for reporting. Ms. Berg noted that RFG had experienced $75 million in realized losses on properties since January 2007; losses were $160 million if properties in a delinquent status were included. Ms. Rinear inquired whether any metrics can be defined. Ms. Gess recommended that Fraud metrics be a follow-up item for the Risk and Controls Team and Ms. Berg.

- Mr. Sullivan presented his section (Mortgage Fraud Loan Operations) of Exhibit C- Fraud Roles and Responsibilities. Mr. Sullivan noted that his focus is mainly on systemic fraud in the business channels. Mr. Sullivan also noted that he works closely with Ms. Berg and Mr. Kearney on fraud investigations and reporting.

- Mr. Kearney presented his section (Fraud Investigation and Reporting (GMAC Global Security) of Exhibit C- Fraud Roles and Responsibilities. Mr. Kearney explained how the reporting structure had been consolidated at the GMAC level into GMAC Global Security, Fraud, and Investigation. Additionally, Mr. Kearney highlighted that the team is in the process of developing a global fraud incident tool that will include Ms. Berg's and Mr. Sullivan's data.

- Ms. Berg presented Exhibit D- Loan Level Fraud Report (1st Quarter Fraud Summary.) Ms. Gess asked whether Servicing was involved in the investigations described during Ms. Berg's presentation. Ms. Berg responded "yes", they are meeting with Servicing twice a week on investigations.

Discussion ensued with Ms. Berg mentioning that she was concerned about "Short Sales". Mr. Sullivan noted that "Short Sales" are the new "scam". Mr. Madden inquired whether a member of Javid Jaberi's team was included in the Short Sale investigations. Ms. Berg responded "no." Mr. Madden noted that he would circle back with Ms. Berg and Mr. Jaberi offline.

Ms. Gess asked whether remediation plans exist to decrease the fraud numbers. Ms. Berg explained that she is compiling a report to determine which frauds may have been preventable. Ms. Gess asked that Ms. Berg come back to the ORC to report on the channel remediation plans.

Mr. Harney asked whether any comparative data existed for trending purposes. Mr. Sullivan responded that his group is working on a new system that would allow them to trend the data over time.

- Mr. Kearney presented Exhibit E- Fraud Report (GMAC Security).

Confidential                                                                        ALLY_0260396

## Business Resiliency Management Presentation

- Mr. Glemser presented Exhibit F- Business Continuity and Disaster Recovery Update. Mr. Glemser noted that Ms. Marjoram will be moving to a new role at GMAC Enterprise Risk Services (ERS) and Mr. Sweeney will be responsible for Business Impact Analysis, Training, and Recovery Exercises.

- Ms. Marjoram presented the GMAC ERS BCP Policy section of Exhibit E. Ms. Marjoram highlighted the main BCP components.

- Mr. Sweeney presented the 2008 Accomplishments, highlighting the renegotiation of the SunGard contract. Mr. Sweeney described the Paragon software tool and noted the expected implementation date of EOY 2008. Mr. Sweeney also highlighted the Business Impact Analysis (BIA) results. Mr. Sweeney noted he is working with Mr. Hasselmo and Mr. Moran to define consistent metrics across the RFG.

- Mr. Walker presented the Key Program Elements of ITG-Disaster Recovery (DR). Mr. Walker highlighted that a major project for ITG- DR includes the Data Center Consolidation Project in 2008.

Ms. Gess provided closing remarks and highlighted BRM's accomplishment in getting the BCP plans updated despite significant resource constraints. Ms. Gess also highlighted the fact that the organization is continuing to undergo substantial changes, and BCP and DR weaknesses will exist if we update plans without testing appropriately. Ms. Gess then stressed the importance of testing the BCP plans so that people know how to react during a significant business disruption.

Ms. Gess thanked everyone for attending and adjourned the meeting at 11:00am

| Follow up items | Responsible Party | Completion Date |
|---|---|---|
| Draft Scorecard for review by committee | Peter Hasselmo | May 2008 |
| Review whether two Anti-Fraud Policies (GMAC and ResCap) are necessary | Lisa Gess and Bridget Berg | May 2008 |
| Determine whether a separate GMAC Bank Fraud Policy is needed and determine how it should relate to the ResCap Fraud and Ethics Policy | Denise Rinear | May 2008 |
| Provide feedback on the draft ResCap Fraud and Ethics Policy before it is sent out for formal approval | Committee Members | Mid May 2008 |
| Report on the channel fraud remediation plans | Bridget Berg | TBD |
| Develop fraud key risk metrics to be used as part of the Ops Risk Scorecard process | Peter Hasselmo and Bridget Berg | June 2008 |

Confidential

**Minutes**
**GMAC Bank and RFG Operations Risk Committee**
**Meeting Date: May 22, 2008**

Members/Invitees
\* = in attendance
\*\* = in attendance (via telephone)

| Members | | Non-Voting Members | | Invitees | |
|---|---|---|---|---|---|
| Mike Rizzo- Chairperson | * | Don James | | Bridget Berg | ** |
| Lisa Gess- alt. Chair | * | Dave Baily | * | Paul Sullivan | * |
| Jim Whitlinger | ** | Dan Began | ** | Joe Kochuba | * |
| Cathy Dondzila | ** | Deanna Keith | | | |
| Tim King | * | Marc MacCauley | ** | | |
| Joe Pensabene | ** | Frank Madden | | | |
| Marianne Mainardi | ** | Ed Muscovitch | ** | | |
| Bill Maguire | | Denise Rinear | ** | | |
| Mark Hales | ** | Cathy Williams | * | | |
| Bob Groody | * | Peter Hasselmo | * | | |
| Lisa Gerner | ** | Wayne Tull | * | | |
| Anthony Harney | * | Will Thompson | ** | | |
| Preston Lyvers | ** | Sonya McCumber | | | |

Mike Rizzo called the meeting to order at 10:05 am.

**<u>Fraud Policy Approval</u>**

- Ms. Berg presented Exhibit A - ResCap Fraud and Ethics Policy and Exhibit B -- Fraud Policy summary of substantive changes.

Mr. Rizzo asked whether we have a Cost of Fraud estimate. Ms. Berg responded that this information is being worked on. She noted the challenges associated with the delay in realizing losses on fraud and misrepresentation loans. Using the actual loss data to calculate severity, she needs to determine the probability of the loss occurring. Mr. Rizzo explained the differences between a fraud loss (actual) versus fraud exposure (potential) and how these two components should be reconciled over time. Ms. Gess requested that a Cost of Fraud estimate be a follow up item for next month's meeting.

Ms. Gess asked Ms. Rinear about the status of the Bank Fraud Policy. Ms. Rinear responded that a Bank Fraud Policy did not exist but that one has been drafted and will be discussed at the Bank Ops Risk Committee -- Automotive Division meeting.

Discussion ensued regarding the Bank Fraud Policy. Mr. Rizzo noted the importance of clear terminology when it comes to the bank fraud policy. He explained that banks must write down all loans identified with fraud within 90 days and noted that fraud has been defined by GMAC Bank as: the property does not exist or the borrower does not exist. Other incidents are characterized as misrepresentations. Ms. Gess requested that Ms. Rinear provide an update on the Bank Fraud Policy at the next Ops Risk Committee meeting.

Confidential

*Ms. Gess motioned for approval of the ResCap Fraud and Ethics Policy. The motion was second by Mr. Groody and approved unanimously by the RFG & GMAC Bank Ops Risk Committee (ORC).*

*Note: Per discussion at the 4/24/08 ORC meeting, the ResCap Fraud and Ethics Policy will be recommended for approval to the ResCap Chief Risk Officer – Jim Redmond.*

- Mr. Sullivan presented Exhibit C – Zero Tolerance Policy (from HR Handbook) and Exhibit D – Draft Zero Tolerance Policy process document. Mr. Sullivan highlighted issues with the unauthorized brokering in and out of loans. He also highlighted the specific language he is going to add to address the problem of allowing employees to resign when they are under investigation instead of completing the investigation and terminating the employee (if necessary).

Discussion ensued regarding the brokering in and out of loans. Mr. Sullivan noted that the company has formal procedures for properly brokering in or out a loan. Ms. Gess commented that we have seen a spike in the level of issues with brokering in and out. She also noted that the company has focused on remediation efforts. Mr. Rizzo questioned if there was any way to identify loans "Brokered in"? Mr. Sullivan replied that identifying brokered in loans is difficult and relies heavily on vigilant processors and underwriters to identify flags in the loan. Ms. Williams noted that controls over brokering in and out will be enhanced by the consolidation of processing locations and the move to the Eclipse system in June.

Additional discussion ensued regarding the communication of fraud policies. Ms. Gess suggested that this discussion be taken off-line and that a group including Ms. Berg, Mr. Sullivan, and Ms. Gess address fraud policy coordination and communication issues.

- Mr. Rizzo asked if a central location existed for all of the Operations Risk Policies.

Discussion ensued regarding the various locations of policy documentation. Mr. King offered to provide an update on the status of the Intranet / Sharepoint / GMAC Exchange conversion plan at the next ORC meeting.

## Presentation- GMAC Bank Investor Repurchase Policy

- Ms. Rinear presented the GMAC Bank Investor Repurchase Policy for approval. She noted that this new policy is intended to clarify the processes that are currently being used for auditing loans and the determination as to whether the loan should be referred back to the originator for repurchase. She also noted that a log of Rep & Warrant violations is maintained by GMAC Bank.

Discussion ensued regarding the policy. Mr. Groody noted that he had comments regarding the policy that he would like to address prior to the committee reviewing the policy. Mr. Hales inquired as to whether a policy was required or whether the documentation of the process could be embedded into procedure documents. Mr. Groody suggested that the need for the policy, and other details, be discussed and reviewed off-line and that the policy be brought back to the Committee at a later date.

Confidential

## Presentation- ORM Executive Risk Scorecard (Objective/Subjective Approach)

- Mr. Kochuba presented Exhibit F - ORM Executive Risk Scorecard and Exhibit G - ORM Business Unit Risk Sample Scorecard.

- Mr. Kochuba provided the purpose and brief history of the original ORM Executive Risk Scorecard (aka "the Ops Risk Scorecard) and presented the concept of adding an objective component (e.g. Key Risk Metric section.) According to Mr. Kochuba, the Ops Risk Scorecard will include key business segments within GMAC Bank and RFG. Initially, ten Key Operations Risk Categories will be scored for each business unit. Each Key Operations Risk Category will have associated Key Risk Metrics (KRMs) developed by the business unit. Mr. Kochuba noted that as Business Unit Risk Managers (BURMs) perform risk assessments and identify new KRMs; these KRMs would be added to the appropriate Operations Risk Category of the ORM Executive Risk Scorecard.

Discussion ensued with Mr. Rizzo expressing the need for KRMs around Scratch and Dent defects. Mr. Harney noted that Project Aqueduct is impacting key resources needed to report upon and address the scratch and dent/unsaleable loan process. Ms. Mainardi made note of the concurrent project Scott Permar and Jill Horner are working on relative to aged inventory and unsaleable loans. Mr. Harney responded that the Permar/Horner project was focused on channel notification and fair and equitable charge backs to the origination channels. This is a slightly different agenda from the capital markets aged inventory remediation and reporting process he is focused on.

Additional discussion ensured regarding GMAC Bank's role in the inventory process. Mr. Harney noted that he would like to have a meeting with the appropriate bank personnel to better understand the bank's process relative to aged inventory. Mr. Groody suggested meeting with Al Celini. Ms. Gess asked to be included in this meeting.

- Mr. Kochuba continued the presentation by explaining the importance of setting thresholds for KRMs based on the RFG's Operations risk appetite. Mr. Kochuba explained the KRM weighting and scoring process to determine the Key Risk Category Score (Objective Score).

- Mr. Kochuba pointed out that a key feature of the Executive Scorecard is the ability to compare the Key Risk Category "Objective" Score to the BURM (Subjective) score. The BURM (Subjective) Score is based on a five-point range and derived through risk assessments and/or the prior Ops Risk Scorecard criteria. Mr. Kochuba also noted the comments section will allow the BURM to express supporting details for their subjective score.

- Mr. Kochuba presented a sample ORM Executive Scorecard Summary which provides a high-level summary of each individual business unit's Ops Risk Scorecard. The proposed scorecard process would include having the ORM Executive Summary presented to the Ops Risk Committee on a quarterly basis. Mr. Kochuba finished the presentation by explaining the next steps to complete the Executive Scorecard.

Confidential

Ms. Gess noted that for the People risk category, possible metrics include retention of key performers. In addition, Ms. Gess noted for the Third Party and Vendor Risk section that business units should reflect any key Service Level Agreements that are in place. Mr. Rizzo suggested that the Risk & Controls Team obtain copies of the "monthly package" used for the "Executive Committee Review." He commented that good key risk metrics are included in this reporting. Additionally, Mr. Rizzo noted that we should consider combining all of the Lending Channels to represent a complete picture for John Gray.

Mike Rizzo/Lisa Gess adjourned the meeting at 11:05 am.

| Follow up items | Responsible Party | Completion Date |
| --- | --- | --- |
| Determine whether a separate GMAC Bank Fraud Policy is needed and determine how it should relate to the ResCap Fraud and Ethics Policy | Denise Rinear | June 2008 |
| Report on the channel fraud remediation plans | Bridget Berg | TBD |
| Develop fraud key risk metrics to be used as part of the Ops Risk Scorecard process | Peter Hasselmo and Bridget Berg | June 2008 |
| Prepare and present a Cost of Fraud estimate | Bridget Berg | June 2008 |
| Update on the status and plans for converting/migrating from the current intranet environment to a new environment (possibly GMAC Exchange) | Tim King | June 2008 |
| Re-visit the need for and content of the GMAC Bank Investor Repurchase Policy – if required present to Ops Risk Committee for confirmation vote | Denise Rinear | June 2008 |
| Set up meeting with GMAC Bank HFS team to understand process/impact on capital markets inventory | Tony Harney / Peter Hasselmo | June 2008 |

### Minutes
### GMAC Bank and RFG Operations Risk Committee
### Meeting Date: June 26, 2008

Members/Invitees

* = in attendance

** = in attendance (via telephone)

| Members | | Non-Voting Members | | Invitees | |
|---|---|---|---|---|---|
| Mike Rizzo- Chairperson | * | Don James | ** | Bridget Berg | ** |
| Lisa Gess- alt. Chair | * | Dave Baily | * | | |
| Jim Whitlinger | | Dan Began | ** | | |
| Cathy Dondzila | | Deanna Keith | | | |
| Tim King | ** | Marc MacCauley | ** | | |
| Joe Pensabene | | Frank Madden | ** | | |
| Marianne Mainardi | ** | Ed Muscovitch | | | |
| Bill Maguire | ** | Denise Rinear | * | | |
| Mark Hales | * | Cathy Williams | * | | |
| Bob Groody | | Peter Hasselmo | * | | |
| Lisa Gerner | | Wayne Tull | | | |
| Anthony Harney | * | Will Thompson | * | | |
| Preston Lyvers | | Sonya McCumber | ** | | |
| | | Joe Kochuba | | | |
| | | Suzanne Sabia | * | | |
| | | Chuck Scalzott | * | | |
| | | Ed Muckerman | ** | | |

Mike Rizzo called the meeting to order at 10:05 am.

### Misrepresentation Exposure Report

Ms. Berg presented Exhibit A – June 2008 Misrepresentation Exposure Report and highlighted the following items:

- Pg. 2 – details the agreed upon definition of misrepresentation
- Pg. 3 – Bridget covered the sources of findings and the process used to determine whether potential misrepresentation occurred. Bridget highlighted the 4506 form findings and noted that 53% of recent 4506 findings from QC (with greater than 25% deviation) were determined to meet the misrepresentation definition.

Discussion ensued regarding the 4506 process and frequency. In response to a question, Will Thompson estimated that approx. 15% of the go fast loans were found with misrepresentation through the 4506 process. Mike Rizzo asked whether research is done to determine if there is a story behind the difference between the 4506 and application data. Bridget responded that QC does provide comments regarding special circumstances. Bridget also commented that the data is clustered at the extremes. Many of the deviations are substantial. A borrower might show a couple of thousand dollars on their tax return and substantial income (six figures) on their loan application.

- Pg. 4 – Bridget covered the scope of the reporting and the process used. The data includes: 5,233 records from 2005 and forward, Legacy RFC and Resi data is segregated, DQ 90 includes – REO, foreclosure, other workout, and the realized loss category reflects actual loss at disposition.

As a follow up item, Mike Rizzo requested that we identify the portion of the misrepresentation loans which are currently on our balance sheet (segregate reporting based on ownership of the loans).

Confidential

- Pg. 5 – Bridget described the calculations used for arriving at the misrepresentation cost estimate. Bridget noted that the probability number based on the relationship with the random QC findings is a challenge but she anticipates it will get better as more data becomes available. She highlighted the analysis for 1% misrepresentation that arrived at a 6 bps loss rate based on 15% probability and 40% severity rate.

Discussion ensued regarding Pg. 5. In response to questions on the Go Fast product, Cathy Williams estimated that Go Fast product might represent 15% of Consumer's production. Mike Rizzo commented that could mean 1 in 10 Go Fast Loans might include misrepresentation (using 1.79% of 17% of production). Cathy Williams noted that the new version of DU (version 7.0) included tighter criteria for Go Fast processing which should reduce volumes. Mike Rizzo asked what is our exposure to the Go Fast product. Additional discussion ensued. Will Thompson noted that if a FNMA Go Fast loan goes 90 days within 36 months it is a buyback. He also noted that we cannot confirm income misrepresentation using the 4506 if delinquency occurs after the 4506 has expired. The question was raised regarding how we rank against our competitors. The response, based on feedback from FNMA, is that we are either consistent with our competitors or slightly better (fewer buybacks). Mike Rizzo requested that Cathy Williams set up a meeting with Joe Pensabene to further discuss Go Fast lending. Mike Rizzo also commented that given the data for Broker, as much as 12% of their margin could be eaten up by misrepresentation (80bp margin – 10bp approx. cost of income misrep.). Dan Began responded that Go Fast product was a problem (broker has discontinued the product) but that their current pre-funding control practices do identify a great deal of misrepresentation.

## Presentation - Bank Operations Risk Assessment

Denise Rinear introduced the Bank Operations Risk Assessment and Scorecard concept. She highlighted that this is the Risk Manager's assessment of risk. She then turned over the presentation to the subject matter expert on the detailed scorecard process - Suzanne Sabia

- Suzanne Sabia presented the Bank Operations Risk Assessment overview document. She highlighted that the detailed scorecards would be refreshed and published quarterly. The scorecard is prepared from the Risk Manager's perspective. This is a self evaluation of the business based on conversations between the business unit's management and risk manager. Suzanne also highlighted the escalation process on pg. 2. The executive summary of the scorecard would be presented quarterly to executive management.

Mike Rizzo noted that ORM does not act as an independent party when preparing the detailed scorecard risk assessment. This is a partnership. The process is accomplished by working with the business unit (Marianne Mainardi in this case) and the result should be a tool that the business unit finds valuable. Marianne Mainardi commented that she did find the process valuable.

Chuck Scalzott presented the detailed scorecard for Correspondent Lending. Chuck walked through the individual risk categories highlighting certain key items. Topics included:

- Compliance – risk score of 3.0 – In response to the item on Reg. W, Mike Rizzo commented that the risk team should be aware of the First Savings transaction and the issue of accepting "covered transactions."
- 3rd Party / Vendor – risk score of 2.0 – Chuck highlighted the Automated Decisioning (AD) issues and noted that a large forum meeting was recently held to discuss the issues. The resulting 6 or fewer (based on consolidation) action plans will address the gaps.

Denise Rinear highlighted the following concept on the risk ratings. Ratings are not adjusted based on the creation of the action plan but are adjusted as quantifiable impact is realized. When

ALLY_0260403

the work is completed and the results reflect the expected outcome, the risk ratings will be reduced.

- Operations -- risk score of 3.0 -- Staffing for underwriting of Government loans has been a challenge but Correspondent has been successful in implementing a number of solutions to address the issue.
- Systems -- risk score of 2.0 -- Chuck highlighted the issues with the product development, the pricing engine, and testing issues. He also noted partial solutions that are coming on line including the total effective dating solution due to be implemented in October.

Discussion ensued regarding the testing process and environment used for the pricing engine (CEPI) and the Walt system. Chuck noted that a portion of the action plans discussed above will tackle these issues. Denise Rinear commented that an important feature of the scorecard process is to capture issues that spill over between groups. She noted that the testing issue is an example of one of these issues. In response to concerns regarding the Capital Markets Rate Sheet upload process, Mike Rizzo asked Tony Harney to assist with the review of potential controls to ensure the upload occurred correctly.

- Key Risk Indicators -- Chuck presented the final page of the deck and noted that they are still working on the details of the triggers for about half of the metrics.

Mike Rizzo adjourned the meeting at 11:10 am.

| Follow up items | Responsible Party | Completion Date |
|---|---|---|
| Determine whether a separate GMAC Bank Fraud Policy is needed and determine how it should relate to the ResCap Fraud and Ethics Policy | Denise Rinear | TBD |
| Report on the channel fraud remediation plans | Bridget Berg | TBD |
| Develop fraud key risk metrics to be used as part of the Ops Risk Scorecard process | Peter Hasselmo and Bridget Berg | July 2008 |
| Prepare and present a Cost of Fraud estimate | Bridget Berg | Completed |
| Update on the status and plans for converting/migrating from the current intranet environment to a new environment (possibly GMAC Exchange) | Tim King | Completed |
| Re-visit the need for and content of the GMAC Bank Investor Repurchase Policy | Denise Rinear | TBD |
| Set up meeting with GMAC Bank HFS team to understand process/impact on capital markets inventory | Tony Harney / Peter Hasselmo | Completed |
| Mike Rizzo requested that the portion of the misrepresentation loans which are currently on our balance sheet be identified. | Bridget Berg | July 2008 |
| Set up meeting with Mike Rizzo, Cathy Williams, Will Thompson, and Joe Pensabene to discuss the Go Fast product | Cathy Williams | July 2008 |
| Mike Rizzo asked Tony Harney to assist with a review of controls to ensure the Capital Markets Rate Sheet upload occurs correctly | Tony Harney | July 2008 |

Confidential

# GMAC Bank

## Auto Division Operations Risk Committee

**Members/Invitees**
\* = in attendance

| Members | | Non-Voting Members | Invitees | |
|---|---|---|---|---|
| Denise Rinear (Chair) | | Marc MacCauley | | |
| Mark Hales | | Jeff Mortensen | | |
| Bob Groody | | Tony Zimmer | | |
| Lisa Gerner | | Mike Nestor | | |
| Cliff Pedersen | | Jill Tashro | | |
| John J. Wright | | Peter Hasselmo | | |
| Mike Rizzo | | Joe Kochuba | | |

Minutes from Auto Division Ops Risk Meeting

April 29, 2008

Denise Rinear opened the meeting stating she would like to speak to 3 things in every
AORM:

- Open Control Matters
- Risk Scorecard
- Key Risk Metrics

Meeting Agenda Item 1 – Approval of last AROM minutes

> Final Version of the Bank Ops Risk Committee Charter was approved by all.
> Lisa Gerner requested a copy of the final version.

Meeting Agenda Item 2 – Fraud and Ethics Discussion

- Marc MacCauley gave a Summation on the commonalities/differences between
ResCap's and GMAC Bank Auto Division Fraud and Ethics Policies
> The Auto Division has adopted the GMAC Code of Conduct with the
> following supplemental additions:
>> **Roles and Responsibilities** – Banks Board of Directors
>> responsible for the oversight of the Code.  Management and the

Bank's Chief Compliance Officer are responsible for employee
training and adherence.

**Golden Parachutes**
**Prohibited Indemnification Payments**
**Convicted Individuals Policies**
**Management Official Interlocks**
**Bank Officers and Directors not eligible to direct Public
utilities**
**Extensions of Credit to Officers, Directors and Principal
Shareholders**
**Employee Background Screening**

- Lisa Gerner informed the group the FDIC requires a separate Bank Code of
Conduct Policy (driven by federal regulations)
- Cliff Peterson stated we are covered under the BSA with our Suspicious Activity
Reporting
    This is coordinated with the GMAC Security Group (Tom Peterson)
-The question was posed if the GMAC Code replaces the ResCap Code of
Conduct
    GMAC has separate Fraud and Code of Ethics Policies
    ResCap has one combined Policy
GMAC Global Anti-Fraud Policy
    Business Units are responsible for conducting a fraud risk assessment on
    an annual basis. Risk assessments conducted by the Controller's Office
    will consist of minimum compliance with this requirement.
        - Cliff confirmed this should be done by the GMAC Chief
        Compliance Officer (Greg Merriman) but it is not happening.
        - Peter Hasselmo stated they are still building the specific
        databases but they are not ready to go.
    Mike Rizzo stated the Bank should have our own Fraud Policy
        -It should follow the GMAC Policy with an addendum that
        addresses Bank additions.
        -Compliance to Policy should be reported annually
        -Should be linked to the quarterly scorecard review
**Takeaway:  Denise R and Marc M to prepare a draft**
            **Consult with Mark Hales, Lisa Gerner, and Cliff Pedersen**

Meeting Agenda Item 3 – Scorecard Review, Suzanne Sabia

Scorecard is a tool to communicate/escalate Operations Risks within an area
        -Executive Summary Page – Identifies overview of Category Risk, Top 5
        Concerns of the Ops Risk Mgr and Leadership, Commentary from both.
        -Scorecard – Suzanne presented a column by column review including
        opportunity to weigh each risk factor importance within the category.
        -Methodology – Describes consistent rating levels to be used by all areas
        of the Bank

Confidential

Key Risk Metrics — Should be set by the business leader to assist in managing the
business
> Must be quantifiable

Mike Rizzo suggested using color to draw the eye quickly to areas of concern (red
for negative)

Cliff Peterson added that he felt the Scorecard was good — the examiners looking
for qualitative information and the Summary Page will be good for Mgmt

**Takeaway — Marc MacCauley will make sure the Auto Div Scorecard draft is
ready for the Mid-May review of all Bank scorecards**

Mr Rizzo stated the Bank ORM is part of the RFG approach. There will be differences
b/n Auto and Mtg products, but overall should have a vertical level of risk structure.

**Takeaway — Denise R and Peter H to contact John Andrews to inquire about
integration of GMAC and Bank ORM governance and communication. Bank to
leverage what GMAC does (avoiding redundancy).**

All AORM Members and Non-Voting Members were in attendance with the exception of
Bob Groody and Joe Kochuba. Suzanne Sabia was an Invitee.

Confidential

# GMAC Bank

## Auto Division Operations Risk Committee

Minutes from Auto Division Ops Risk Meeting

May 22, 2008

Denise Rinear opened the meeting with a discussion on the draft of the Bank Fraud Policy.

- Mike Rizzo stated write-offs have to be done w/n 90 days, but he felt that was appropriately documented in the minutes of the Mtg Credit Policy Committee and would not need to be re-addressed in the Bank Fraud Policy.
- Cliff Pedersen felt there was definite overlap GMAC Code of Conduct and Ethics Policy and the GMAC Global Anti-Fraud Policy. He believed the reason for this could be attributed to the two Policy's being owned by two different groups.
    o Code of Conduct is owned by Legal while the Fraud Policy is owned by Global Security.
- Lisa Gerner felt the additions to the Bank Fraud Policy of creating a reporting layer of the Bank Chief Compliance Officer prior to GMAC Global Security, and a paragraph on SAR's were appropriate.
- Bob Groody expressed concern that the mortgage division was not covered as they adhere to ResCap's Fraud and Ethics Policy. He asked Cliff what information he would provide to auditors if asked.
    o Cliff answered he would provide the Bank Fraud Policy, then the GMAC Global Anti-Fraud Policy, then the GMAC Code of Ethics
- Mark Hales found a paragraph in the ResCap Fraud Policy that states it's intent is to comply with the GMAC Policy, but agreed we should look into the Bank Fraud Policy covering both sides. (Mtg and Auto)
- Mike Rizzo suggested the division ops risk scorecards should include items from the Fraud Policy (background checks, tracking, etc)
    o He also stated that each business segment should report fraud compliance on an annual basis.

**TAKEAWAY – Cliff was asked to build the Policy so the logic follows for both divisions.**

Denise reported on her communication with John Andrews and felt that legal was satisfied with everything.
- Mike Rizzo added both Ops Risk Charters had been approved by the Bank Board of Directors.

Discussion on Scorecards, KRM's, and Open Control matters

- Denise reported there were no new open control matters
  - o  Bob Groody said the items from the most recent FDIC visitation should be added. There were 5 that came up in the last 3 weeks.
  - o  Mike Rizzo added management should be ready to respond to any past due open control matters.
- Marc MacCauley asked to speak more in-depth on the KRM's so everyone on the call could hear where we are taking this hoping to make sure we are all on the same page.
  - o  Mike Rizzo stated we should be focused on the Risk Categories defined in the scorecard.
    - ※  The Metrics should be measurable
    - ※  Identify key risks
      - ●  Should help the leader understand the control environment is effective and compliant
    - ※  Metrics are a derivative of risk and control assessments
  - o  Denise stated it should be a measure to help us know if the threshold of a particular metric is not being exceeded.
    - ※  After tracking the metric we may see holes that would require new controls and/or metrics
    - ※  Metrics should be revisited on a monthly basis
  - o  Mark Hales expressed concern that there could be duplication of effort between FDICIA frameworks, SOX and KRM's.
    - ※  The key will be separating credit risk and ops risk.

**TAKEAWAY – Denise to research if the Bank risk categories should match those of RFG.**

Confidential

**GMAC Bank**
**Fed Fund Sales Counterparties**

| Bank Name | Bank Location |
|---|---|
| JPMorgan Chase Bank, National Association | Columbus, OH |
| Bank of America, National Association | Charlotte, NC |
| Wells Fargo Bank, N.A. | Sioux Falls, SD |
| U.S. Bank National Association | Cincinnati, OH |
| National City Bank | Cleveland, OH |
| State Street Bank and Trust Company | Boston, MA |
| Regions Bank | Birmingham, AL |
| Wachovia Bank, National Association | Charlotte, NC |
| HSBC Bank USA, National Association | Wilmington, DE |
| SunTrust Bank | Atlanta, GA |
| Fifth Third Bank and Trust Company | Lenexa, KS |
| State Street Bank and Trust Company | Boston, MA |
| Manufacturers and Traders Trust Company | Buffalo, NY |
| The Northern Trust Company | Chicago, IL |
| Comerica Bank | Detroit, MI |
| M&I Marshall and Ilsley Bank | Milwaukee, WI |
| PNC Bank, National Association | Pittsburgh, PA |
| KeyBank National Association | Cleveland, OH |
| LaSalle Bank National Association | Chicago, IL |
| Harris National Association | Chicago, IL |
| Compass Bank | Birmingham, AL |
| UnionBanCal Corporation | San Francisco, CA |
| American Express Centurion Bank | Salt Lake City, UT |
| Citizens Bank of Pennsylvania | Providence, RI |
| TD Bank USA, National Association | Portland, ME |
| Zions First National Bank | Salt Lake City, UT |

Confidential

ALLY_0260410

## REMOVED COUNTERPARTIES

ALLY_0260411

## GMAC Bank
## Securities Counterparty Review

Source: Bloomberg 07/17/08

| Counterparty | Limit (*) | S-T Issuer (Comm'l Paper) | | | TK | Parent Company | Outlook | Sr Unsec | ST/CP |
|---|---|---|---|---|---|---|---|---|---|
| | | Moody's | S&P | Fitch | | | | S&P | |
| Banc of America Securities LLC | negotiated | P-1 | A-1+ | F1+ | BAC | Bank of America Corp | Negative | AA | A-1+ |
| Barclays Capital Inc. | negotiated | nr | nr | nr | BCBEY | Barclays Bank PLC | Negative | AA | A-1+ |
| Bear Stearns Securities Corp | negotiated | P-1 | A-1+ | F1+ | BSC | Bear Stearns Companies Inc, The | Negative | AA- | A-1+ |
| Citigroup Global Markets Inc. | negotiated | P-1 | A-1+ | F1+ | C | Citigroup Inc. | Negative | AA- | A-1+ |
| Credit Suisse Securities (USA) LLC | negotiated | nr | nr | nr | DLJ | Credit Suisse Holding USA Inc | Negative | AA- | A-1+ |
| Goldman Sachs & Co. | negotiated | P-1 | A-1+ | nr | GS | Goldman Sachs Group Inc | Negative | AA- | A-1+ |
| Greenwich Capital Markets, Inc. | negotiated | nr | nr | nr | RBS | Royal Bank of Scotland Group PLC | Negative | AA- | A-1+ |
| J. P. Morgan Securities Inc. | negotiated | nr | nr | nr | JPM | JPMorgan Chase & Co. | Negative | AA- | A-1+ |
| Lehman Brothers Inc. | negotiated | P-1 | A-1 | F1 | LEH | Lehman Brothers Holdings Inc | Negative | A | A-1 |
| Merrill Lynch Government Securities Inc. | negotiated | nr | nr | nr | MER | Merrill Lynch & Co. Inc. | Negative | A | A-1 |
| Morgan Stanley & Co. Incorporated | negotiated | nr | nr | nr | MS | Morgan Stanley | Negative | A | A-1 |
| UBS Securities LLC | negotiated | nr | A-1+ | nr | UBBSY | UBS AG | Negative | AA- | A-1+ |

Rating Changes since last portfolio review    [ Upgrade ]    [ Downgrade ]

(*) Limits provided as needed. CPs originally established to support acquired securities to
support the transition of the FSB charter to National Motors Bank.

FFS CP 033198 Resi-Auto 7_30_08 IBC LACE Bank Sr Unsec_LT Issuer-V2.xls

Confidential

**IDC Camel Rating Information**

IDC's analysis is based on a series of financial ratios. Each ratio, in turn, tells us something important about how well-managed your institution is and about how well you're positioned to deal with potentially adverse economic conditions…or to profit from good times.

IDC's unique method of evaluating financial institutions is based on the acronym CAMEL-Capital adequacy, Asset quality, Margins, Earnings returns, and Leverage/Liquidity. Many analysts ignore the "M" in CAMEL while IDC determines management's performance based on margins. One number summary ranks reflect each institution's overall quality.

In addition to performing a CAMEL ratio analysis, IDC calculates the Net Operating Profit After-tax Return on Equity (NOPAT ROE). The NOPAT ROE equation differs from the traditional ROE equation by not subtracting the cost of funding so early in the analysis. The NOPAT ROE equation allows managers to truly compare operating and financial returns with their peers.

Every quarter, we calculate a one-number quality rank for each institution along with over 35 key financial ratios. Our quality ranks range from 1 (the lowest) to 300 (the highest) and fall into one of six categories:

| | |
|---|---|
| | Superior (200-300) |
| | Excellent (165-199) |
| Average (125-164) | |
| Below Average (75-124) | |
| Lowest Ratios (2-74) and Rank of One | |

Our analysis is strictly based on the financial information reported by each institution to the fed

## Key Financial Indicators Used in Deriving Credit Ratings

LACE Financial assesses from main criteria of financial soundness (Liquidity, Asset Quality, Capital Adequacy, and Earnings) to determine the creditworthiness of an institution. LACE also considers other factors, such as: management and control, country risk, and principal lines of business.

LACE Financial Credit Ratings are a measure of the overall financial condition of an institution and its ability to meet its credit obligations. In the past, LACE Financial Corporation has issued more than a million financial soundness ratings.

A+ and A An institution that has an exceptional financial condition, little or no nonperforming assets, and is highly capitalized with strong earnings. These grades are the highest level of financial soundness.

B+ An institution with an overall strong financial condition, but not as strong as A+ and A rated companies. The company is most likely to meet its credit obligations under severe economic, financial and business conditions.

B An institution with an adequate financial condition that is likely to meet its credit obligations under severe economic, financial and business conditions.

B- and C+ An institution with an adequate financial condition but is more susceptible to adverse changes in economic conditions that could affect its ability to meet its credit obligations. Lowest investment grade rating.

C and C- An institution whose financial condition is judged to be relatively weak and its ability to meet financial obligations could be affected by adverse economic, financial or business conditions. Non-investment grade.

D and E Institutions are likely to have financial problems (poor LACE Financial ratios) and careful consideration should be made about investments in these institutions. These institutions are likely to have a higher probability of failure than institutions with higher ratings. LACE Financial recommends that all credits on D and E rated institutions be secured. Non-investment grade.

New banks, less than three years old with total assets less than $30 million, are not rated. However, financial data is listed for the banks and a "NB" is shown in their rating space. New savings & loans, which are less than three years old, are also not rated and an "N" will be shown in its rating space. Atypical banks, bank holding companies, S&Ls, and those missing key financial data necessary to derive a rating, are not rated and an "NR" is shown in their rating space. It should be noted that fraudulent financial reporting by institutions might result in incorrect LACE Financial Credit Ratings.

| CAMEL SYSTEM | LACE RATING | | |
|---|---|---|---|
| 1 | A+ | A | B+ |
| 2 | B | B- | C+ |
| 3 | C | C- | |
| 4 | D | | |
| 5 | E | | |

Confidential

ALLY_0260413

# GMAC Bank
## Glossary of Acronyms

| Acronym | Description | Relationship |
|---------|-------------|--------------|
| ACH | Automated Clearing House | |
| ALCO | Asset Liability Committee | |
| ALLL | Allowances for Loan and Lease Losses | |
| ARM | Adjustable Rate Mortgage | |
| AST | Administrative Support Team | |
| AU | Automated Underwriting | |
| BAMCO | GMAC Bank Asset Management Corporation | |
| BCP | Business Continuity Plan (or: Business Continuity Planning) | |
| BIA | Business Impact Analysis | |
| BLT | Business Lending Technology | |
| BSA | Bank Secrecy Act | |
| CAMELS | Capital adequacy; Asset quality; Management/administration; Earnings; Liquidity; Sensitivity to market risk | FDIC Bank Rating Matrix (1 is excellent, 5 poor) |
| CBA | Cost Benefit Analysis | |
| CCL | Consumer Construction Lending Division | |
| CCP | Corporate Contingency Planning | |
| CD | Control Deficiency | FDICIA/SARBOX |
| CDC | Community Development Corporation | |
| CDU | Custom Desktop Underwriter | |
| CIP | Customer Identification Program | |
| CIT | Customer Identification Task Force | |
| CLC | Correspondent Lending Channel | |
| CLTV | Combined Loan To Value | |
| CMSA | Consolidated Metropolitan Statistical Areas | |
| COF | Cost of Funds | |
| CORE | Capital adequacy, Organizational structure, Relationship and Earnings | OTS oversight of thrift holding companies |
| COSO | Committee of Sponsoring Organizations of the Treadway Commission | |
| CPL | Cost Per Loan | |
| CPP | Construction to Permanent Program | |
| CPR | Conditional Prepayment Rate | |
| CRA | Community Reinvestment Act | |
| CSA | Control Self Assessment | |

Confidential

ALLY_0260414

| Acronym | Description | Relationship |
|---|---|---|
| DAT | Damage Assessment Team | Disaster Recovery Plan |
| DCD | Document Custody Division | |
| DRT | Disaster Recovery Team | |
| DTI | Debt To Income | |
| EBUSA | Escrow Bank USA | |
| ELF | GMACCM Education Loan Funding | |
| EMT | Emergency Management Team | Disaster Recovery Plan |
| EUIC | Executive User Involvement Committee | GMACM's IT project approval process |
| FICO | Fair Isaac Corporation | |
| FASB | Financial Accounting Standards Board | |
| FDICIA | Federal Deposit Insurance Corporation Improvement Act of 1991 | |
| FFIEC | Federal Financial Institutions Examination Council | Organization of FDIC/OTS/OCC and Federal Reserve |
| FHLB | Federal Home Loan Bank of Pittsburgh | |
| FHLMC | Federal Home Loan Mortgage Corporation | "Freddie Mac" |
| FinCEN | Financial Crimes Enforcement Network | |
| FMC | First Marblehead Corporation | Student loan securitizer |
| FNMA | Federal National Mortgage Association | "Fannie Mae" |
| FRM | Fixed Rate Mortgage | |
| FYF | Full Year Forecast | |
| GAAP | Generally Accepted Accounting Principles | |
| GAAS | Generally Accepted Auditing Standards | |
| GCLG | (GMAC) Commercial Lending Group | Dealer loan group |
| GLBA | Gramm-Leach-Bliley Act | |
| GMAC | GMAC LLC | |
| GMACCM | GMAC Commercial Mortgage Corporation | |
| GMACM | GMAC Mortgage, LLC | |
| GMACMG | GMAC Mortgage Group, LLC | |
| GMACR | GMAC Residential Holding Company, LLC | |
| GMAC IA | GMAC Internal Audit | |
| GNMA | Government National Mortgage Association | "Ginnie Mae" |
| GSE | Government Sponsored Enterprises | "Fannie Mae" "Freddie Mac" |
| GWMC | GMAC Wholesale Mortgage Corp. | |
| HAT | Hardware Acquisition Team | Disaster Recovery Plan |
| HEL/ HELOC | Home Equity Loan/Line of Credit | |
| HF | Homecomings Financial, LLC | |
| HFI | Held for Investment | |

Glossary          Page 2 of 5

Confidential                                                                 ALLY_0260415

| Acronym | Description | Relationship |
|---|---|---|
| HIDS | Host Intrusion Detection System | IT Security |
| HMDA | Home Mortgage Disclosure Act | |
| HUD | Department of Housing and Urban Development | |
| ICT | Incident Command Team | Disaster Recovery Plan |
| IDA | Individual Development Accounts | CRA Financial Fitness Training Program |
| ILR | Internal Loan Review | |
| LAR | Loan Application Register | CRA/Fair Lending, i.e., HMDA LAR |
| LIBOR | London Interbank Offering Rate | |
| LMI | Low or Moderate Income | |
| LMI HH | Low or Moderate Income Household | |
| LMI CT | Low or Moderate Income Census Tract | |
| LTV | Loan to Value | |
| MAST | Mortgage Asset Securitization Trust | Bankruptcy remote facility which facilitates pledging of collateral to MINT |
| MBA | Mortgage Bankers Association | |
| MDO | Mortgage Debt Outstanding | |
| MINT | Mortgage Interest Trust | Off-balance sheet QSPE utilized by GMAC entities |
| MIP | Mastercard Interface Processor | Allows access into Mastercard system |
| MIP | Mortgage Investment Pool | |
| MPF | Mortgage Partnership Finance | |
| MSA | Metropolitan Statistical Areas | |
| MSR | Mortgage Servicing Rights | |
| NAO | North American Operations | GMAC's Automotive Division |
| NCRC | National Community Reinvestment Coalition | |
| NECAD | Northeast Corporate Activities Department | |
| NEV | Net Economic Value | |
| NFT | New Facilities Team | Disaster Recovery Plan |
| NII | Net Interest Income | |
| NIDS | Network Intrusion Detection System | IT Security |
| NIM | Net Interest Margin | |
| NLA | National Loan Administration | |
| OCC | Office of the Comptroller of the Currency | |
| OFAC | Office of Foreign Assets Control | |
| OST | Offsite Storage Team | Disaster Recovery Plan |
| OTS | Office of Thrift Supervision | |
| PCAOB | Public Company Accounting Oversight Board | |

Confidential

| Acronym | Description | Relationship |
|---|---|---|
| PERK | Preliminary Exam Request Kit | OTS pre-exam work |
| PMI | Private Mortgage Insurance | |
| PST | Physical Security Team | |
| PwC | PricewaterhouseCoopers, LLP | |
| QRM | Quantitative Risk Management | |
| QSPE | Qualified Special Purpose Entity | Limited purpose legal entity set up under FASB 140 to allow non-consolidation within financial statements, i.e., Walnut Grove |
| QTL | Qualified Thrift Lender | |
| RAA | Risk Assessment and Assurance | |
| Reg O | Regulation O Loans to Executive Officers, Directors, and Principal Shareholders Policy | |
| ResCap | Residential Capital, LLC | |
| RFC | Residential Funding Company, LLC | |
| RFG | Residential Funding Group | |
| ROA | Return on Assets | |
| ROAA | Return on Average Assets | |
| ROE | Return on Equity; Also: Report of Examination (OTS) | |
| SAD | Summary of Aggregated Deficiencies | FDICIA/SARBOX |
| SAR | Suspicious Activity Report | |
| SARBOX | Sarbanes-Oxley Act of 2002 | |
| SAS | Statement on Auditing Standards | |
| SD | Significant Control Deficiency | FDICIA/SARBOX |
| SEC | Securities and Exchange Commission | |
| SFAS | Statement of Financial Accounting Standards | |
| SMAART | | (OTS Presentation 02 01 06) |
| SPE | Special Purpose Entity | i.e., Witmer Funding |
| SOW | Statement of Work | |
| SPO | Service Provider Organization | |
| TCO | Total Cost of Ownership | |
| TF | Table Funding | |
| TPO | Third Party Originator | |
| TERI | The Education Resources Institute, Inc. | Student loan insurer; credit enhancement |
| TFR | Thrift Financial Report | |
| VAP | VISA Authorized Processor | Allows access to VISA system |

Confidential    ALLY_0260417

# INTEREST RATE RISK DEFINITIONS

**Formula**

[(Market Value of Assets * Duration of Assets) - (Market Value of Liabilities * Duration of Liabilities)] / (Market Value of Equity)

**Units**

The measure is quoted as %, consistent with how modified duration is quoted

**Interpretation:**

Intended to predict the expected price (value) change in the Bank's equity for a given
change in interest rates
Positive numbers mean the Bank's assets bear longer duration than the liabilities; equity value would
be expected to rise when rates fall, and vice-versa.
Negative numbers mean the Bank's assets bear shorter duration than the liabilities; equity value would
be expected to fall when rates fall, and vice-versa.
Duration of equity is a function of both duration and leverage

**Current Reading:**

3.7%; within policy but near trigger levels
Given a 100bps shock in interest rates, we would expect the market value of the Bank's equity
to change by about 3.7%, or $100 million

**Formula**

(MV of Equity / MV of Assets)

**Units:**

The measure is quoted as %, the ratio of equity to assets

**Interpretation:**

Intended to measure the impact of interest rates on the value of the Bank.
A stable or rising ratio means that interest rate changes are enhancing the Bank's value.
A declining ratio means that changes in interest rates are destroying equity value.

**Current Reading:**

11.1%; comfortably above policy limit

**Formula:**

Duration of Assets - [(Book Value of Liabilities / Book Value of Assets) * Duration of Liabilities]

**Units**

The measure is quoted in months

**Interpretation:**

Indicates the relative difference between asset and liability duration. 0 would be perfect interest rate risk neutrality
Large, positive numbers mean the Bank's assets are longer, and thus reprice less frequently
Large, negative numbers mean the Bank's liabilities are longer, and thus reprice less frequently.
A positive gap position should benefit when rates fall, since assets are locked into their respective yields longer.

**Current Reading:**

5 months
The Bank intends to manage gap between +/- 6 months

**Definitions:**
Market Value ("MV") = proxy for liquidation value; the present value of projected cash flows for a given product (assets, liabilities, equity)

NPV = Net Present Value; the 'Net' here refers to the net difference between assets and liabilities, which is equity

Modified Duration of Assets = approximate percentage change in asset value for a 100 basis point change in interest rates

Modified Duration of Liabilities = approximate percentage change in liability value for a 100 basis point change in interest rates

Glossary        Page 5 of 5

Confidential