**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------- x
                                          )
In re:                                    )     Case No. 12-12020 (MG)
                                          )
RESIDENTIAL CAPITAL, LLC, et al.,         )     Chapter 11
                                          )
          Debtors.                        )     Jointly Administered
                                          )
                                          )
------------------------------------------------------- x
```

<u>**DIRECT TESTIMONY OF JOHN S. DUBEL**</u>

I, JOHN S. DUBEL, under penalty of perjury, testify as follows:

**I.        Introduction**

1.        I am Chief Executive Officer and Chairman of the Board of Financial Guaranty Insurance Company ("<u>FGIC</u>").  I provide these services through my company, Dubel & Associates, LLC, which commenced its engagement with FGIC on January 2, 2008.  I am also co-chair of the Official Committee of Unsecured Creditors (the "<u>Committee</u>") of the above-captioned debtors and debtors-in-possession (the "<u>Debtors</u>").  I have over thirty years of experience restructuring companies and have dealt with some of the largest, most complex restructurings in the market.

2.        Prior to joining FGIC, I was a Managing Director of Gradient Partners, L.P., a single strategy distressed hedge fund, from 2006 through 2007.  From 2002 to 2006, I was a Principal and Managing Director with AlixPartners, LLC, a firm specializing in turnaround and crisis management.  I have served as Chief Executive Officer of Cable & Wireless America, President and Chief Operating Officer at RCN Corporation, Chief Restructuring Officer of Anchor Glass Container Corporation and Acterna Corporation, CFO at WorldCom, Inc., and

EVP in charge of Restructuring and CFO of the Leslie Fay Cos.  While I was at the Leslie Fay Cos., the company sat on the creditors' committee in the Macy's chapter 11 case, and I directly supervised our representative on the committee.  I have also served as an advisor to multiple creditors' committees, as well as debtors, and sat on multiple ad hoc committees of creditors.  I received a Bachelor's degree in Business Administration from the College of William and Mary.

3.      FGIC was appointed to the Committee by the United States Trustee for the Southern District of New York, and I represented FGIC on the Committee.  I was elected as co-chair by the other members of the Committee, along with representatives from Wilmington Trust.  Throughout the case, I balanced my fiduciary obligations as co-chair of the Committee and my role as FGIC's principal negotiator in all aspects of the matter.

4.      My involvement in these cases has been extensive.  I and my counsel have attended each weekly meeting of the full Committee.  I have also attended near-weekly co-chair meetings at which the Committee co-chairs meet with the Committee advisers to discuss and formulate the agenda for upcoming Committee meetings.  And I have had countless meetings and conferences with the Committee Professionals and individual Committee members in addition to those regularly scheduled meetings.  As co-chair, my goal was to ensure that the Committee operated as smoothly and effectively as possible.  In particular, I have acted as a facilitator, seeking to ensure that the appropriate information is assembled, developed, and presented to the relevant stakeholders so as to permit organized and efficient deliberation and decision-making.  I have also been actively involved on behalf of FGIC at every stage in the case in a non-fiduciary capacity, including countless meetings and conferences with Committee Professionals, the Debtors and their advisers, FGIC's advisors, and others regarding FGIC's

claims and its role as an individual creditor.  In the nearly eighteen months since my appointment as co-chair, these tasks have required my daily attention.

5.      I respectfully submit this witness statement, in lieu of direct testimony, on behalf of the Committee and in support of confirmation of the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* (the "Plan").[1] I will make myself available for cross-examination and further testimony at the hearing on confirmation of the Plan.[2]

## II.      The Committee

6.      The Debtors filed their chapter 11 cases on May 14, 2012 (the "Petition Date"). Two days later, the United States Trustee appointed the following creditors to the Committee: (i) Allstate Life Insurance Company; (ii) AIG Asset Management (U.S.), LLC; (iii) The Bank of New York Mellon Trust Company, N.A., as RMBS Trustee; (iv) Deutsche Bank Trust Company Americas, as RMBS Trustee; (v) FGIC; (vi) MBIA Insurance Corporation; (vii) Rowena L. Drennen; (viii) U.S. Bank National Association, as RMBS Trustee; and (ix) Wilmington Trust, N.A.

7.      The Committee retained Kramer Levin Naftalis & Frankel, LLP ("Kramer Levin") as counsel; Moelis & Company LLC as investment banker; AlixPartners, LLP as financial adviser; Pachulski Stang Ziehl & Jones LLP as co-counsel; SilvermanAcampora LLP as special counsel for borrower-related matters; and Wilmer Cutler Pickering Hale and Dorr LLP as special counsel for regulatory matters (collectively, the "Committee Professionals").

---

[1]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

[2]   Simultaneous with the filing of this testimony, FGIC's counsel is filing my testimony submitted on FGIC's behalf.

8.      Each member of the Committee also retained individual counsel, and some have engaged financial advisers: (i) Allstate is represented by Quinn Emanuel Urquhart & Sullivan, LLP; (ii) AIG is represented by Quinn Emanuel Urquhart & Sullivan, LLP; (iii) Bank of New York is represented by Dechert LLP, Morgan, Lewis & Bockius LLP, and Duff & Phelps; (iv) Deutsche Bank is represented by Morgan, Lewis & Bockius LLP and Duff & Phelps; (v) FGIC is represented by Jones Day; (vi) MBIA is represented by Cadwalader, Wickersham & Taft LLP and The Blackstone Group L.P.; (vii) Rowena Drennen is represented by Polsinelli Shugart and Walters Bender Strohbehn & Vaughan, P.C.; (viii) U.S. Bank is represented by Seward & Kissel LLP and Duff & Phelps; and (ix) Wilmington Trust is represented by Loeb & Loeb LLP, Cleary Gottlieb Steen & Hamilton LLP, and Alvarez and Marsal North America, LLC (such representatives, collectively, the "Committee Member Professionals").

9.      In the first months of the case, the Committee, the Committee Professionals, and the Committee Member Professionals met several times a week, either in person or by phone.  At all stages of the case, such meetings have occurred on a weekly basis, with daily written updates sent to the Committee from the Committee Professionals.  In addition, the Committee has at various times established sub-committees to consider discrete issues in the case, such as the executive compensation sub-committee (on which I served).  These sub-committees have held meetings as necessary to fulfill their functions.

## III.       The Initial Landscape of the Case

10.     The Debtors entered bankruptcy having pre-negotiated the terms of a chapter 11 plan with their parent entity, Ally Financial Inc. ("AFI"), certain holders of Junior Secured

Notes,[3] and certain holders of RMBS.[4]  Pursuant to several interrelated plan support agreements entered with these parties, the Debtors had agreed to pursue the expedited confirmation of a plan premised on AFI's payment of $750 million in exchange for broad releases by the Debtors and, on a non-consensual basis, third parties of claims against AFI and its non-debtor subsidiaries and affiliates (collectively, "Ally") (the "Original Ally Settlement").  The Debtors also intended to resolve potential contractual liability relating to 392 RMBS trusts (but not others) by providing the trusts with allowed general unsecured claims in the aggregate amount of $8.7 billion (the "Original RMBS Settlement").  In addition, the Debtors and AFI had agreed to provide the Junior Secured Noteholders with payment of their prepetition claims over time (the "Original JSN Settlement" and, together with the Original Ally Settlement and the Original RMBS Settlement, the "Original Settlements").

11.    In addition to these settlements, the Debtors had the ambitious goal of selling their servicing and origination assets in less than six months while continuing to operate in chapter 11 – something that I understand no similar business had been able to do.  I understand that the Debtors had conducted a targeted marketing process for their servicing and mortgage assets and certain loan portfolios prior to the Petition Date.  These efforts culminated in the execution of stalking horse asset purchase agreements with Nationstar Mortgage LLC and Ally (the "Proposed Asset Sales").  Specifically, Nationstar agreed to bid $2.3 billion for the Debtors' mortgage servicing rights and related servicer advances, and Ally agreed to bid for held-for-sale mortgage loans.

---

[3]    The group of noteholders constituted at that time approximately 37% of the Junior Secured Noteholders, acting through their representatives White & Case LLP, Milbank, Tweed, Hadley & McCloy LLP, and Houlihan Lokey Capital Inc. (the "Ad-Hoc Group").

[4]    The relevant RMBS investor groups were led by Kathy Patrick of Gibbs & Bruns LLP and Talcott Franklin of Talcott Franklin, P.C. (the "Institutional Investors")

12.     The circumstances of these cases were also defined, from the outset, by the composition of the Committee, which was notable for several reasons. *First*, the Committee was composed entirely of creditors from each major creditor constituency that were not party to the Debtors' prepetition settlements and pre-negotiated plan (described below) – including Senior Unsecured Noteholders, RMBS Trustees representing the vast majority of outstanding RMBS, Monolines, Borrowers, and Private Securities Claimants – and their respective claims spanned the Debtors' capital structure. Accordingly, the Committee was well designed to represent the full spectrum of creditor interests.

13.     *Second*, because its members were not parties to the prepetition agreements, the Committee was the party in the case best able to evaluate the prepetition agreements from an independent fiduciary perspective. When the case began, there was no trustee, no CRO, and no examiner, and the Debtors were contractually bound to pursue the plan and settlements that they had agreed to with their parent and a discrete minority of stakeholders.

14.     *Third*, each member of the Committee held or relied upon contingent, unliquidated litigation claims – most of which had already been the subject of years of complex and costly disputes with the Debtors and Ally. As a result, the risk of value-destroying litigation on an epic scale – a risk that cannot be overstated – was already evident, and the likely "victors" among the Committee members and creditor constituency at large could not be reliably predicted. The central importance of litigation claims meant that it would take extensive diligence for Committee members to understand each other's position in the case – in stark contrast to a case in which the creditors' committee primarily comprises financial and trade creditors with clearly measurable rights to payment. Furthermore, each member of the

Committee (FGIC included) faced substantial contested issues regarding its own claims that would have to be addressed in concert with its fiduciary obligations.

15.    In this environment, the Committee and its members could easily have been disabled by internecine conflict, and there was no clear path to avoid a negative outcome in the case.  At the same time, however, the Committee had the potential to be a vital forum for creditors and the primary catalyst of a successful resolution for all stakeholders.  The fact that each Committee Member retained separate, highly sophisticated advisers – which is, in my view, highly unusual for a creditors' committee – is a testament to these extraordinary obstacles (including the fact that each member was asserting unliquidated and disputed litigation claims).  These circumstances, among others, distinguished this case from all others that I have been involved in or observed over three decades of experience.  While every case involves unique challenges, I am not aware of any other creditors' committee that was compelled for various reasons to do so much, yet confronted by so many factors that could have challenged its effectiveness.

16.    Even on the first days of the case, many of the short-, medium- and long-term issues that would require the Committee's most rigorous attention were already manifest.  The most pressing concern related to the "first day" motions filed by the Debtors on the Petition Date, including complex motions to approve bid procedures for both sales, two debtor-in-possession financing facilities, use of cash collateral under a third facility, continued use of the existing cash management system, continued servicing of government and non-governmental association loans, a shared services agreement, and employee wage and benefit programs.  The Committee had to work with speed and intensity to navigate these issues, contest the relevant

motions where appropriate, and negotiate proper modifications that would inure to the benefit of creditors.

17.    In the following weeks and months, the Proposed Sales were a major focus.  The Committee recognized that the Debtors did not have a viable stand-alone business, and that their mortgage assets would not retain their value long-term in chapter 11.  Crucially, the Committee succeeded in bifurcating the Proposed Sales from the pre-negotiated plan, so that the transactions would not be delayed as the Committee assessed the Original Settlements and the value to be achieved from these sales could be maximized.  The Committee subsequently negotiated improvements to the proposed bid procedures, including the stalking horse bidder asset purchase agreements, and helped facilitate an increased stalking horse purchase price.  The Committee also succeeded in negotiating improvements to the sales following the auctions, including to the asset purchase agreements, transition services agreements, other closing documents, and related proposed orders.

18.    At the same time, the Committee had serious concerns about the Original Settlements and contemplated plan, which did not have the support of the RMBS Trustees, any of the Monolines, any securities claimants, the holders of the Senior Unsecured Notes, or any Borrowers.  I understand that the settlements were informed by an investigation conducted prepetition by the Debtors regarding the potential assets and liabilities they would hold in a chapter 11 case – including claims that could be asserted against Ally, claims that could be asserted by third parties against Ally and others, and RMBS-based claims that could be filed against the estates.  But the settlements did not reflect input or agreement with the members of the Committee or the constituencies that they represent.  Among other things, these creditors observed that the Original Settlements and the pre-negotiated plan:

8

- did not resolve $4 billion in Monoline claims;

- did not resolve securities claims, including over $2.4 billion in private securities claims, more than $13 billion of class action securities claims, and securities claims held by the FHFA on behalf of Freddie Mac;

- did not have support of the holders of more than $1 billion in Senior Unsecured Notes;

- did not address hundreds of millions of dollars in individual and class action Borrower claims; and

- did not address RMBS deals other than those sponsored by the Debtors between 2004 and 2007.

Equally importantly, that plan would have left a *de minimis* recovery for unsecured creditors that would have been obtained only after massive litigation, expense, and delay over the size and treatment of most categories of allowed claims.

19.     The Committee understood that the outcome of these cases would largely be driven by the handling of claims against Ally, on the one hand, and the resolution of the myriad inter-creditor disputes, on the other.  The Committee also recognized that the picture of the Debtors' assets and liabilities was clouded by two factors: many Debtors had no distributable assets other than nascent litigation claims; and nearly all of the Debtors' unsecured liabilities were contingent and unliquidated.

20.     Rather than confront these issues in isolation, the Committee favored a holistic approach.  The Committee concluded that the likelihood of a settlement with Ally that maximized recoveries for all stakeholders would be greatest if inter-debtor and inter-creditor disputes could be settled or set aside.  It was clear that the alternative scenario, in which all inter-debtor and inter-creditor conflicts were resolved through litigation, would destroy significant value for all stakeholders and significantly delay the conclusion of these cases.  Accordingly, the

Committee resolved to pursue a global settlement with Ally and among creditors that reflected broad creditor engagement and support.

21.    The most urgent task in this regard was to ascertain the extent, if at all, that the Debtors' prepetition settlements could provide the foundation for a global settlement. Therefore, the Committee directed the Committee Professionals to perform three separate investigations and assessments: (i) of the Original RMBS Settlement; (ii) of the claims held by each creditor constituency against the estates and Ally; and (iii) of the Original Ally Settlement. These work streams demanded months of effort, ultimately providing the Committee and its members with a vital understanding of the full legal and factual landscape. This knowledge was a prerequisite for any chance of a consensual outcome in the case; it meant that the Committee, its members, and other key stakeholders were well prepared to pursue not only a settlement with Ally, but also consensus among creditor constituencies, without needing to further litigate.

## IV.    The RMBS Investigation

22.    From almost the first day of the case, the Debtors pursued approval of the Original RMBS Settlement. *See* [Docket Nos. 320, 1176, 1887] (as supplemented, the "<u>9019 Motion</u>"). As a result, the Committee's investigation and analysis of the Original RMBS Settlement (the "<u>RMBS Investigation</u>") was framed by active litigation regarding the 9019 Motion.

23.    The RMBS Investigation touched many of the key inter-creditor and inter-debtor disputes in the case. Specific topics assessed by the Committee Professionals, assisted by an additional team of RMBS experts, included the following: (1) the basis for the Debtors' agreement to the Original Ally Settlement; (2) Ally's influence over the negotiation of the Original RMBS Settlements; (3) whether the settlement negotiations were conducted at arm's-length; (4) the validity, size, and priority of the RMBS trusts' put-back claims and the related

claims asserted by the Monolines; (5) the methodologies that could be used to estimate the Debtors' put-back liability; and (6) potential legal defenses available to the Debtors in put-back litigation.

24.      In August 2012, intensive discovery efforts began, including multiple rounds of document requests and interrogatories.  In total, I understand that the Committee Professionals reviewed over 72,000 documents from dozens of custodians relevant to the Original RMBS Settlements and RMBS claims.

25.      The Committee also obtained extensive input and analysis from its own experts. For example, a team led by Professor Bradford Cornell, a professor of financial economics at the California Institute of Technology, independently assessed the portion of the RMBS Trusts' losses attributable to material underwriting defects, using the results of another Committee expert's re-underwriting of a pool of 1,089 randomly selected loans.

26.      At the same time, the Committee conducted extensive legal research to develop its understanding of the potential legal defenses to RMBS claims, including loss causation, statutes of limitation, and the election of remedies.

27.      The hearing on the 9019 Motion was originally scheduled for November 2012. On February 1, 2013, the Committee filed an extensive objection to the 9019 Motion [Docket No. 2825].  Wilmington Trust, MBIA, FGIC, Assured Guaranty Municipal Corp., and the Ad Hoc Group of Junior Secured Noteholders also filed objections.  After several adjournments, the hearing on the 9019 Motion was most recently scheduled to take place on May 28, 2013.  The Committee vigorously prepared for the hearing.  Ultimately, the Global Settlement obviated the need to proceed with this litigation.

V.        **Analysis of Creditor Claims and Creditor Dialogue**

28.    In the Fall of 2012, the Committee began to focus in earnest on strategies that might avoid prolonged conflict and destructive litigation.

29.    The RMBS Investigation and the related litigation demonstrated to the Committee that attempting piecemeal settlements (like the Original RMBS Settlement) could cause as much conflict as they purported to resolve.  The Committee determined that only a global settlement would avoid dramatic delays, waste, and discord and achieve a positive outcome for all stakeholders.  But such an outcome would require consensus among creditors, whose interests were otherwise naturally at odds.  The Committee faced a chicken-and-egg challenge: a settlement with Ally that earned broad creditor support provided the best hope of consensual resolution; yet the best way to maximize Ally's contribution was for the Committee to present a united front, by which it could credibly offer Ally a resolution of *all* estate *and* third party claims.

30.    To avoid a logjam, the Committee sought to inform itself and its members regarding each category of claims against the estates and Ally, and to facilitate discourse among creditors that might lead to consensus.  The Committee believed that creditors might be willing to forego pursuit of their claims through litigation (and forego efforts to challenge competing claims) only in an environment in which each constituency's rights were broadly understood.  Mutual understanding was also a precondition to any meaningful discussion of how estate assets could be fairly allocated through a chapter 11 plan.

31.    The Committee's consideration of creditor claims included the following, among others:

- <u>RMBS Trust Claims</u>.  RMBS Trust Claims were exhaustively assessed as part of the RMBS Investigation, as described above.

- <u>Monoline Claims</u>.    The Committee also investigated claims asserted by the Monolines[5] based on financial guaranty insurance issued in respect of the Debtors' RMBS (the "<u>Monoline Claims</u>").    The Committee was apprised of the sparse but evolving law on these issues.    Among other things, the Committee considered that Monoline Claims were based on different agreements than the RMBS Trust Claims, relied on insurance law, and potentially faced a different burden to show loss causation.    The Committee also considered various potential defenses to the Monoline Claims, including arguments based on contractual limitations and sections 502(e)(1)(B), 509, and 510(b) of the Bankruptcy Code.    These issues were discussed by the Committee as a whole, among certain Committee Members, and with relevant stakeholders outside of the Committee.

- <u>Senior Unsecured Notes Claims</u>.    The Senior Unsecured Noteholders were among the few creditors in the case to hold material liquidated and undisputed claims; they were also unique in that their only claims were against ResCap, rather than operating subsidiaries, making them significant stakeholders of the holding company.    The Committee's understanding of issues affecting this constituency's potential recovery was developed through the Ally Investigation – which encompassed an investigation of the litigation claims that constituted ResCap's most meaningful asset – and the Senior Unsecured Notes Indenture Trustee's own investigation and report to the Examiner.    Ultimately, the Senior Unsecured Notes Indenture Trustee sought standing to assert claims on behalf of the ResCap estate against AFI and certain subsidiary Debtors, in addition to direct third party claims against AFI [Docket No. 3475].

- <u>Junior Secured Notes Claims</u>.    Shortly after its appointment, the Committee undertook an investigation of the validity and enforceability of the Junior Secured Notes Claims and purported liens.    On December 26, 2012, the Committee was granted standing to prosecute and settle certain claims on behalf of the estates against U.S. Bank, as the Junior Secured Noteholders' indenture trustee (succeeded by UMB Bank, N.A.), and Wells Fargo Bank, N.A., as the Junior Secured Noteholders's collateral agent [Docket No. 2518].    On the basis of that standing, on February 28, 2013, the Committee commenced an adversary proceeding seeking declaratory judgment, avoidance of liens, and disallowance of claims.    The Committee undertook a dialogue with the advisers to the Junior Secured Noteholders to understand the elements of their claims in the case.

- <u>Securities Claims</u>.    This category includes a range of claimants with securities law claims based on the Debtors' RMBS: the "Private Securities Claimants," who asserted that the Debtors *and* Ally were liable for over $2.4 billion of investment losses, pursuant to ongoing litigation or a tolling agreement with Ally that preserved litigation rights; class members in the NJ Carpenters Action, a certified class action lawsuit against certain Debtors and Ally based on an alleged $13 billion in investment losses; the FHFA, which had commenced litigation against certain Debtors and Ally

---

[5]    The Monolines include MBIA Insurance Corporation ("<u>MBIA</u>"), Financial Guaranty Insurance Company ("<u>FGIC</u>"), Assured Guaranty Municipal Corp. ("<u>Assured</u>"), and Ambac Financial Group, Inc. ("<u>Ambac</u>").

based on Freddie Mac's $6 billion RMBS holdings; and other discrete claims. The Committee devoted particular attention to whether this category of claims against the Debtors would be subordinated pursuant to section 510 of the Bankruptcy Code. The issue was extensively briefed, culminating in an adversary proceeding commenced against certain Private Securities Claimants (Adv. Case No. 13-01262 (MG)). Summary judgment hearings were scheduled for May 2013. The Committee stayed abreast of this litigation, and informed on the issues, particularly as Committee Members participated on both sides. The Committee was also mindful that there were substantial third party securities claims against AFI and Ally Securities and their potential significance for a third party release.

- <u>Borrower Claims</u>. The Committee received extensive advice regarding Borrower Claims from its special counsel for borrower issues, including with respect to borrowers' proofs of claims, letters, and pleadings (in the plenary case, separate adversary proceedings, and litigation commenced in other courts). Among other things, the Committee received legal advice regarding TILA, RESPA, HOEPA, and RICO.

- <u>Intercompany Balances</u>. Because of their potential to shift value among the Debtors' estates, the Committee Professionals undertook an investigation of potential intercompany balances based on the balances that were recorded on the Debtors' books and records as of the Petition Date. This investigation was based on a factual review begun by the Debtors and considered whether the intercompany balances should be treated as enforceable claims, subordinated claims, subject to set-off, or characterized as equity, capital contributions, or dividends.

32.    These legal and factual issues, and others, were discussed at numerous meetings of the Committee that I personally attended. The Committee Professionals also had extended discussions with members of the Committee and their advisers regarding their claims and the claims of other constituencies. Furthermore, late in 2012, Committee members began to hold discussions among themselves concerning these matters. These efforts served to educate the principal creditor constituencies and lay the foundation for the fruitful negotiations that would follow.

## VI.    The Ally Investigation

33.    Upon its formation, the Committee had quickly ascertained that formal discovery would be required to properly assess the Original Ally Settlement and whether or not the proposed $750 million payment was appropriate for the broad releases to be provided to Ally.

On June 5, 2012, the Bankruptcy Court granted the Committee's request for authority to serve a subpoena, pursuant to Bankruptcy Rule 2004, seeking discovery from the Debtors, AFI, and AFI's parent, Cerberus Capital Management LP [Docket No. 217] (the "Ally Investigation"). The Committee intended to independently examine pre- and post-petition transactions between and among the Debtors and Ally, dating back to ResCap's formation in 2004, up to and including the Original Ally Settlement and related agreements.    The Committee also directed the Committee Professionals to analyze Ally's financial ability to support a larger settlement of the estates' and third parties' claims.

34.    While the Ally Investigation was underway, the Bankruptcy Court appointed the Honorable Arthur J. Gonzalez as examiner (the "Examiner") and authorized him to conduct a separate investigation [Docket Nos. 454, 536].  The respective investigations by the Examiner and the Committee, as authorized by the Bankruptcy Court, were co-extensive.  However, the Committee immediately surmised that reaching a global settlement *before* the Examiner promulgated his report would have significant value to Ally and could provide a useful deadline in negotiations.[6]

35.    The Committee was heavily engaged in the discovery and investigation of claims against Ally from June 2012 through the first half of 2013.  During this period, the Committee Professionals reviewed more than ten million pages of documents and applied extensive accounting, financial, economic, tax, and valuation expertise.  Over time, as described in the Disclosure Statement and various pleadings filed by the Committee, these efforts crystallized into a primary focus on the following inquiries:

---

[6]    The Examiner filed his report  under seal on May 13, 2013 [Docket No. 3698].  The Court unsealed the report on June 26, 2013 [Docket No. 4099].

1.    Whether Ally had dominated, controlled, and mistreated the Debtors so as to give rise to colorable veil-piercing or alter ego claims.

2.    Whether the transfer of Ally Bank (f/k/a GMAC Bank) was for adequate consideration or gave rise to other claims against Ally.

3.    Whether a Master Mortgage Loan Purchase and Sale Agreement and several swap agreements relating to mortgage servicing rights between GMACM and Ally Bank gave rise to a fraudulent conveyance claim; whether these agreements improperly shifted risks and liabilities from Ally Bank to GMACM; and whether the Debtors' directors had not adequately vetted these transactions.

4.    Whether profitable and valuable businesses were transferred away from the Debtors at less than fair market value; and whether these transfers occurred in compressed timeframes, and without adequate valuations, fairness opinions, and third-party marketing.

5.    Whether the Debtors bore an inequitable burden, vis-à-vis Ally, in connection with settlements reached in 2010 with Freddie Mac and Fannie Mae.

6.    Whether the Debtors improperly assumed Ally's financial liabilities and obligations in connection with the April 13, 2011 Consent Order with the Federal Reserve Board, and the February 9, 2012 settlement agreement with the U.S. Department of Justice and certain state attorneys general.

7.    Whether the Debtors made fraudulent and preferential transfers to or for the benefit of Ally.

(*See* Disclosure Statement, Art. V.8.)

36.    Based on its analysis of these and other issues, the Committee determined that the Debtors had very substantial claims against Ally based on alter ego/veil piercing, fraudulent conveyance, preferential transfer, recharacterization, equitable subordination, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. Notably, the alter ego/veil piercing claims had the potential to ascribe Ally with responsibility for *all* liabilities of the estates.

37.    By January 2013, the Ally Investigation was substantially advanced (as was the RMBS Investigation), and the claims of each creditor constituency were well understood by the Committee and its members. The Committee therefore mobilized for active negotiations with

16

Ally.  On January 9, 2013, at an in-person meeting, the Committee Professionals presented to

both Ally's outside counsel and senior members of Ally's legal team (i) the results, to that date,

of the Ally Investigation, (ii) the Committee's view of numerous potential claims against Ally,

and (iii) its assessment of $750 million as consideration for a global release of all direct and third

party claims.  The Committee's conclusion, based on months of diligence and analysis, was that

$750 million would provide an insufficient, inequitable recovery for creditors that did not justify

the proposed releases.

38.     Several weeks later, Ally's advisers made a responsive in-person presentation to

the Committee Professionals, setting forth potential defenses, otherwise attacking the merits of

estate and third party claims, and supporting the Original Ally Settlement.  The Committee

Professionals also met with Ally's advisers on numerous occasions to air these issues.  At each

stage, the Committee Professionals provided full reports to the Committee.

39.     On March 7, 2013, the Committee provided the Examiner with an extensive

report, over 100 pages long, on potentially viable claims against Ally and other results of the

Ally Investigation.[7]  Ally likewise made extensive submissions to the Examiner.

40.     During the same period, because the Debtor had bound itself to support the

prepetition settlement with Ally, the Committee concluded that it was the estate fiduciary best

suited to pursue the claims identified through the Ally Investigation.  On April 11, 2013, the

Committee filed a motion (with the Debtors' consent) seeking standing to prosecute and settle

veil-piercing, fraudulent transfer, indemnification, prepetition preference, and equitable

subordination claims against Ally on the estates' behalf [Docket No. 3412].  In anticipation of

being granted standing, the Committee also prepared a draft complaint – though the Committee

---

[7]   The Committee submitted additional briefing to the Examiner on May 2, 2013 and May 6, 2013.

committed to await the Examiner's report before filing it in the interests of a potential settlement.

While the standing motion was heard by the Bankruptcy Court on May 7, 2013, a decision was

reserved and the matter adjourned in the face of ongoing settlement negotiations.

### VII.    The Mediation

41.    In late 2012, the Committee determined that formal mediation (the "Mediation")

could accelerate negotiations with Ally, forestall years of burdensome and costly litigation, and

push the cases towards resolution. With the support of the Committee, the Honorable James M.

Peck was appointed on December 26, 2012 to act as global plan mediator.  Judge Peck came up

to speed – including through presentations from the Committee Professionals – just as the

Committee approached its own negotiations with Ally.  At the same time, the Debtors moved

forward with the selection and retention of Lewis Kruger as Chief Restructuring Officer.  The

Committee supported the appointment as part of a multi-faceted agreement whereby the Debtors

consented to the Committee's standing to pursue and settle claims against Ally, and the

imminent RMBS trial was further adjourned.  The Committee also agreed to an extension of the

Debtors' exclusivity period, during which the Debtors committed not to file a non-consensual

plan.   The deal thus removed potential distractions that would have impeded productive

settlement discussions, helping to create momentum toward earnest negotiations under the

guidance of Judge Peck.

42.    As part of the order commencing the Mediation [Docket No. 2519], the

Bankruptcy Court imposed strict confidentiality protections that preclude me from describing the

substance of any negotiations, proposals, or counter-proposals.   Among other things, all

documents or discussions made or provided in connection with the Mediation by the participants

must be kept confidential:

> [N]o person or party participating in the mediation . . . shall in any way *disclose to any non-party* or to any court, including, without limitation, in any pleading or other submission to any court, any such discussion, mediation statement, other *document or information*, correspondence, resolution, offer or counteroffer that may be made or provided in connection with the mediation, unless otherwise available and not subject to a separate confidentiality agreement that would prevent its disclosure *or as authorized by this Court.*

¶ 4 (emphasis added).

43.     Without revealing the substance of the negotiations, I can describe in general terms the process of the Mediation, the participants, and the good faith, arm's-length nature of the negotiations. From January 2013 through the end of May, I personally participated in dozens of meetings and innumerable conference calls with various parties to the mediation process, as well as significant internal work with FGIC's counsel as part of the mediation and negotiation process.

44.     A list that reflects, to the best of my knowledge, the key meetings attended by myself, FGIC's counsel, and/or the Committee Professionals is attached as <u>Exhibit A</u>.  These meetings involved an overlapping array of bilateral and multilateral discussions between and among various parties.  The Committee also met regularly during this time, devoting specific attention to its joint fiduciary responsibilities owed to all creditors.  The Committee chose not to elect a negotiation sub-committee for purposes of the Mediation; each member instead nominated a senior person to act on its behalf at every stage.  I was the principal negotiator for FGIC.

45.     All told, the Mediation was the most complex and lengthy negotiation process in which I have ever been personally involved, in any capacity.  Judge Peck began the mediation process by holding individual meetings with each of the main participants, and the process was highly time-intensive for all parties, particularly for Judge Peck.  For example, Judge Peck's

initial meeting with FGIC and our counsel lasted approximately five hours.  Judge Peck met with
Committee Professionals on numerous occasions, attended a Committee meeting in person, and
presented his views to the Committee.  There were regular meetings among and between various
parties to discuss the relevant issues, and Judge Peck regularly met with and communicated with
the Debtors, the Committee, and other individual creditors and groups of creditors.

46.    The participants to the Mediation were numerous and sophisticated.  Each of the
Committee Members was actively involved, supported by both the Committee Professionals and
the Committee Member Professionals.  Other participants included: (i) the Debtors, their CRO,
and their advisers Morrison & Foerster LLP, Centerview Partners, and FTI Consulting; (ii) the
Federal Housing Finance Agency, represented by Kasowitz Benson LLP; (iii) Ally and its
advisers Kirkland & Ellis LLP and Evercore; (iv) Cerberus Capital Management; (v) Paulson &
Co. Inc., as a Senior Unsecured Noteholder, and its advisor Brown Rudnick LLP; (vi) RMBS
trustees that were not members of the Committee, including Law Debenture Trust Company of
New York, Wells Fargo Bank, N.A., and HSBC Bank USA, N.A., along with their advisers,
including Seward & Kissel LLP, Alston & Bird LLP, and Allen & Overy LLP; (vii) the Steering
Committee Group, represented by Gibbs & Bruns LLP and Ropes & Gray LLP; (viii) the Talcott
Franklin Group, and their advisers Miller Johnson and Carter, Ledyard & Milburn; (ix) the
advisers to the Ad Hoc Committee of Junior Secured Noteholders, Milbank, Tweed, Hadley &
McCloy LLP, White & Case LLP, and Houlihan Lokey; and (x) Junior Secured Noteholder
Berkshire Hathaway, represented by Munger, Tolles & Olson LLP.  Given the experience and
sophistication of the participants, discussions and negotiations in the Mediation were vigorous
and hard-nosed.  Each party came well-armed with a detailed understanding of its own legal

position *and* competing legal positions and interests of others, including the strengths and weaknesses of the various competing claims.

47. The goals of the Mediation were ambitious. As noted herein, this case involves multiple complex inter-debtor and inter-creditor issues that affect plan distributions to the numerous and diverse creditors. The mediation process was designed to encompass two major areas: (i) resolution of the claims held by the Debtors' estates and individual creditors against Ally; and (ii) resolution of the estates' inter-creditor and inter-debtor disputes. The Committee recognized that while it would be exceedingly difficult to reach resolution simultaneously on all of the issues necessary to resolve both categories of disputes, it would be impossible to resolve either one in isolation from the other.

48. The success of the mediation demanded a firm grasp of a sweeping range of complex issues, relationships, and claims, as well as the experience and creativity to develop potentially acceptable resolutions. After holding a lengthy series of meetings, teleconferences, and discussions from January 2013 through March with the Committee, the Debtors, each significant creditor constituency, and Ally, the Mediator convened a series of large group mediation sessions, all of which I personally attended. These large group mediation sessions were held at Kramer Levin's offices in New York.

49. The first of these global group mediation sessions was held on April 22, 2013 and lasted approximately twelve hours. It was followed by another session the next day, which lasted approximately nine hours. The attendance list for the first session included over 140 participants, consisting of approximately 29 creditors or creditor group business representatives, accompanied by approximately 75 attorneys and 36 financial advisers.[8]

---

[8]  Advisers and/or principals of each of the Debtors' major creditor constituencies attended the large group mediation sessions, including (but not limited to): AIG, Allstate, Ally, the Committee, FGIC, FHFA, the Kessler

50.     Over the next month, approximately five more large group mediation sessions were held, as well as numerous conference calls and smaller group meetings.  The large group mediation sessions involved negotiations among the mediation parties and drafting of the Plan Support Agreement and related Term Sheets, upon which the Plan is premised.

## VIII.    The Global Settlement and Plan

51.     Following months of intensive, arms-length negotiations, the Mediation ultimately yielded a global compromise (the "Global Settlement").  On or about May 13, 2013, the Debtors, the Committee, a majority of the Debtors' creditor constituencies, and Ally executed a plan support agreement and term sheet (the "Plan Support Agreement" and "Plan Term Sheet," respectively).  These documents outlined the main terms of the Plan and the resolution of many complex legal issues involving the Debtors' largest claimant constituencies, and provided a framework for the Debtors' emergence from bankruptcy.[9]  The key subject of the Plan Term Sheet was Ally's agreement to provide $2.1 billion in plan funding in exchange for Ally's firm requirement of a global release and the attendant agreements with Ally.  It was, however, a condition subsequent to the effectiveness of the Plan Term Sheet that the parties agree upon the allowance and treatment of the claims of the various creditor groups.

52.     After entry into the Plan Support Agreement, therefore, the parties to the agreement resumed large group mediation sessions to continue negotiations over the terms of a supplemental plan term sheet (the "Supplemental Plan Term Sheet" and together with the Plan

_____

(continued…)

Class Claimants, representatives of the Junior Secured Noteholders, MassMutual, MBIA, counsel to the NJ Carpenters Class Members, Prudential, the RMBS Trustees, the Steering Committee Group, counsel to certain holders of the Senior Unsecured Notes, the Talcott Franklin Group, and Wilmington Trust in its capacity as indenture trustee for the Senior Unsecured Notes.

[9]    The Consenting Claimants that executed the Plan Support Agreement are listed in Exhibit 5 to the Disclosure Statement.

Term Sheet, the "Term Sheets") that would address the Plan agreements and compromises in substantial detail. The key subject of the Supplement Plan Term Sheet was the resolution of inter-creditor and inter-debtor disputes made possible by Ally's commitment to contribute $2.1 billion.

53.     The last set of large group negotiations on the Supplemental Term Sheet started in the morning of May 22, 2013 and continued without interruption through the night, culminating at approximately 9:00 a.m. on May 23, 2013 when the Debtors filed a motion seeking authority to enter into and perform under the Plan Support Agreement and Term Sheets [Docket No. 3814].

54.     On June 26, 2013, the Bankruptcy Court authorized the Debtors to enter into and perform under the Plan Support Agreement and Term Sheets [Docket No. 4098]. In accordance with this agreement, the Debtors and the Committee proposed the Plan. The Plan implements and embodies the Global Settlement.

55.     A fundamental characteristic of the Global Settlement is that each component of the deal is inextricable from the settlement as a whole, relying on and relating to the others. The Global Settlement and Plan thus embody a mosaic of interrelated settlements that cannot be fairly evaluated in isolation. Nevertheless, each element of the Global Settlement and Plan reflects careful consideration by the Committee and its members and embodies an outcome that is amply justified from the creditor perspective.

A.     The Ally Contribution and Debtor and Third Party Releases

56.     In exchange for releases of claims that the Debtors and third parties have brought or may bring against the Ally Released Parties in connection with the Debtors' businesses, Ally has agreed to contribute $2.1 billion to the Debtors' estates for distribution to creditors (the "Ally Contribution"). The Committee understood that any deal with Ally would have to include

23

comprehensive releases from estate and third party claims – as the Original Ally Settlement reflected.  The Committee agreed that such releases might eventually be appropriate, because of the complex web of interrelated claims involving the Debtors and the Ally Released Parties, including third party litigation that could have impact on the estates through indemnification and insurance claims.  The Committee also recognized that any deal that offered Ally a legally proper release of all direct and third party claims would be dramatically more valuable to Ally – and therefore lead to greater recoveries for all creditors.  Similarly, the Committee believed that such releases would be appropriate only as part of a comprehensive settlement that resolved substantially all related litigation, provided adequate consent, and provided enhanced recoveries to all constituencies.  The Committee thus opposed the releases in the context of the inadequate $750 million settlement because it was not part of such a global resolution and would, in fact, have improperly released large categories of hotly contested claims.

57.    In contrast to the Original Ally Settlement, the $2.1 billion contribution reflects extensive negotiations between Ally and a broad, representative body of the creditors themselves.  The Committee, each of its members, and other stakeholders carefully balanced the probability of prevailing against the Ally Released Parties and the benefits of settling for $2.1 billion.  Among other things, the parties considered the likelihood of costly and protracted litigation – and its deleterious effect on the estates and creditor recoveries – before concluding that settlement on the agreed terms was an appropriate outcome.

58.    During its deliberations, the Committee was mindful of the claims that had been the focus of the Ally Investigation.  The Committee recognized that proving alter ego/veil piercing claims is a difficult, fact-intensive task, and that certain facts were more favorable to Ally.  In the Committee's assessment, fraudulent transfer claims also faced several factual and

legal challenges, including defenses based on statutory safe harbors and statutes of limitation. The litigation of these claims would be complex, costly, and time-consuming. The Committee also considered the defenses available to a claim against Ally for indemnification, and the challenges associated with seeking to equitably subordinate the Ally Released Parties' claims against the estates.

59.    Based on all of these considerations, the Committee ultimately determined to support the Global Settlement, and since virtually all of the Debtors' constituencies signed on to that settlement, the Committee also determined that it was appropriate to support releases for the benefit of the Ally Released Parties, to provide all parties and the estates with closure from intertwined litigation. Significantly, the only major constituency not signing on to the Global Settlement, the Junior Secured Noteholders, are being paid in full under the Plan and thus not affected by the Third Party Releases.

B.    The Creditor Settlements

1.    *RMBS Trust Claims*

60.    In accordance with the Global Settlement, the Plan resolves all alleged potential claims for breaches of representations and warranties held by all RMBS Trusts (not just the 392 trusts that were covered by the Original RMBS Settlements), and all alleged and potential claims for damages arising from servicing, in exchange for allowed general unsecured claims in the aggregate amount of $7.301 billion. This amounts to a substantial discount relative to the maximum estimated liability of more than $45 billion.

61.    This settlement obviates the need for the five-day trial that had been scheduled for late May regarding the Original RMBS Settlement. Unlike that deal, however, the Global Settlement eliminates lingering uncertainty regarding the effects of allocation on other creditors'

recoveries, the treatment of cure claims, arguments regarding the potential subordination of the RMBS claims, and the treatment of RMBS Trusts that might opt out of the settlement.

62.      In considering this element of the Global Settlement, the Committee recognized that the outcome of potential litigation regarding the RMBS Trust Claims was uncertain.  These contract-based claims require a showing that specific representations and warranties were breached, with material adverse effect for investors.  In the Committee's view, litigating those issues – including the available defenses – would involve numerous complex and novel issues of law and fact.  At a minimum, their litigation in the absence of a settlement would be extremely burdensome for the estates and cause significant delay.

### 2. *Monoline Claims*

63.      In accordance with the Global Settlement, the Plan resolves the claims asserted by MBIA, FGIC, Assured, and Ambac.  This settlement includes a resolution of disputes regarding the allowance, priority, and allocation of the Monoline Claims.

64.      In considering this component of the Global Settlement, the Committee appreciated that litigation of the Monoline Claims would involve similar factual and legal complexity as would the RMBS Trust Claims.  The Committee was also cognizant of recent rulings that may strengthen the Monolines' position.  The Committee determined that the proposed settlement of the Monoline Claims reflected a valuable discount relative to expert assessments of the estates' potential liability.  The Committee was also aware of related litigation commenced against Ally by certain Monolines.  The Committee viewed the settling Monolines' consent to the release of those claims pursuant to the Third Party Release as an important feature of the settlement.

3. *Securities claims*

a) *Private Securities Claims*

65.    In accordance with the Global Settlement, the Plan resolves the Private Securities Claims through the creation of the Private Securities Claims Trust and the allocation of Units (or cash available for distribution) with a projected value of $235 million.  This settlement reflects a substantial discount relative to the $2.4 billion of statutory losses asserted by the Private Securities Claimants.  It also resolves numerous lawsuits or potential lawsuits against Ally and ensures support for the Third Party Release from an important constituency.  I understand that each of the Private Securities Claimants has consented to the Third Party Release.

66.    The Global Settlement contemplated that a methodology for allocating that distribution among the Private Securities Claimant would be established subsequently.  Indeed, the Private Securities Claimants have unanimously agreed how to allocate their recovery among themselves, which agreement will be administered by the Private Securities Claims Trustee as needed.

67.    The Committee recognized that this settlement avoids the substantial time, expense, and risk associated with litigating the Private Securities Claims in courts around the country.  It also resolves litigation over whether the claims against the estate (as opposed to the Private Securities Claimants' third party claims against Ally) are subject to subordination under section 510 of the Bankruptcy Code.  Among other things, the settlement avoids the risk and uncertainty that creditor recoveries could be diluted by securities claims being allowed in their full amount as general unsecured claims.

b) *NJ Carpenters Claims*

68.    In accordance with the Global Settlement, the Plan resolves claims by the NJ Carpenters that assert approximately $13 billion of statutory losses for a distribution of $100

million.  The Committee appreciated that this settlement avoided costly securities litigation with a certified class that posed a far greater downside risk, and also avoided litigation over whether the NJ Carpenters Claims should be subordinated under section 510 of the Bankruptcy Code.  As with the Private Securities Claimants, this resolution also ensured support for the Third Party Release from an important constituency with substantial and concrete claims against Ally.

### 4.  *Senior Unsecured Notes Claims*

69.    In accordance with the Global Settlement, the Plan resolves and settles claims that the Senior Unsecured Notes Indenture Trustee, on behalf of the Senior Unsecured Noteholders, has against the Ally Released Parties and the Debtors, relating to, among other things, an alleged breach of the Senior Unsecured Notes Indenture.   The settlement also resolves potentially competing claims held by ResCap's estate that the Senior Unsecured Notes Indenture Trustee had sought standing to pursue against Ally, and complicated issues regarding subrogation, substantive consolidation, and the allocation of administrative expenses that are associated with these claims.  The Committee understood that these claims and the associated disputed issues are highly complex and fact-specific, and it determined that the benefits of settlement outweighed the likely outcome of litigation.

### 5.  *Borrower Claims*

70.    In accordance with the Global Settlement, the Plan provides substantial benefits to Borrowers through multiple avenues:

71.    *First*, $57.6 million in cash will be allocated to the Borrower Claims Trust as soon as practicable after the Effective Date.  The Committee worked with the Debtors to estimate the Borrower Claims at RFC and GMACM, then ensured that the Borrower Claims Trust would be sufficiently funded so as to provide Borrowers with cash recoveries comparable to those of general unsecured creditors at the applicable Debtor.  Importantly, the Borrower Trust will

enable the prompt and streamlined adjudication of Borrower Claims by authorizing the Borrower

Trustee to provide individual borrowers incentive payments to settle their claims against the

trust.

72.    *Second*, the Debtors' will continue to perform under a prepetition consent

judgment entered with state attorneys general and the Department of Justice, eliminating a

dispute over whether those obligations were prepetition claims.  In performing under the

judgment, the Debtors will have paid $109 million in fines (with certain amounts allocated for

distribution to Borrowers) and provided $185 million of financial relief for eligible

Borrowers.  In addition, the Plan provides for the Liquidating Trust to establish a $55 million

cash reserve to fund ongoing obligations under the consent judgment, including remediation to

active duty service members with respect to foreclosure actions and loan modifications under the

Servicemembers Civil Relief Act and ongoing monitoring costs.

73.    *Third*, as part of the Global Settlement, the Plan Proponents agreed to allow the

Debtors to enter into an amendment to the consent order with the Federal Reserve Board and

agreed to settle their liabilities thereunder for $230 million, which will ultimately be distributed

to Borrowers in accordance with the order.  By enabling the amendment to the consent order, the

Global Settlement resolved disputes as to the treatment and priority of the Debtors' obligations

under the consent order, as well as whether such obligations should be paid by Ally.

C.    The Junior Secured Notes Claims

74.    The Juniors Secured Noteholders were invited to participate in the Mediation, and

their representatives appeared at the initial global negotiating sessions.  Ultimately, the Junior

Secured Noteholders chose not to sign on to the Global Settlement.  Nevertheless, in order to

achieve the confirmation of a consensual plan and to minimize objections from the Junior

Secured Noteholders, the Committee agreed that the Plan would substantially improve on the

treatment of the Junior Secured Notes Claims relative to what was contemplated in the Original

JSN Settlement.  The Plan therefore provides the Junior Secured Noteholders with full cash

payment on their allowed claims (including accrued prepetition interest).  In considering this

treatment, the Committee took advice regarding the value of the Junior Secured Noteholders'

collateral, the treatment of their deficiency claim at each of the Debtor grantors and obligors, and

the fact that original issue discount can reduce the principal amount of the Junior Secured Notes

Claims.

>   D.    Intercompany Balances

75.    A key component of the Global Settlement is that each Debtor, with the support

of Ally, the Committee, and the Consenting Claimants, will waive its Intercompany Balances.

Under the Plan, Intercompany Balances, as well as any subrogation claims and fraudulent

conveyance claims related to the Debtors' forgiveness of more than $16 billion of intercompany

debt prior to the Petition Date, will be waived, cancelled, and discharged on the Effective Date.

76.    This treatment is consistent with the conclusion of the Debtors and the Committee

that the Intercompany Balances lack many of the indicia of true debt and enforceable claims.

This conclusion resulted from an extensive analysis of the Intercompany Balances that the

Debtors and the Committee Professionals conducted after the Debtors filed their Schedules of

assets and liabilities on June 30, 2012 [Docket Nos. 548-649].  I understand that the analysis

considered whether the Intercompany Balances should be treated as Allowed Claims,

subordinated to other Claims, subject to set-off, or recharacterized as equity contributions or

dividends.  The Committee also determined that any litigation over the enforcement of the

Intercompany Balances would be enormously costly and time-consuming.

77.    Given these facts, the Debtors, Ally, the Committee, and the Consenting

Claimants agreed, consistent with the Debtors' past practice, to waive the Intercompany

30

Balances as part of the overall Global Settlement resolving a broad range of disputed inter-creditor and inter-debtor issues.  The parties agreed that the costs and delays caused by litigating the enforceability of the Intercompany Balances would exceed whatever value they had, if any. Further, the parties determined that all constituents, including the Junior Secured Noteholders, would receive a higher recovery under the Global Settlement, with Intercompany Balances waived, than in the alternative scenario where the estates are plunged into extensive litigation over numerous inter-creditor and inter-debtor issues.  The Committee concluded that no separate value should be ascribed to the Intercompany Balances as part of the Global Settlement.

E.      The distribution of assets and expenses

78.      In accordance with the Global Settlement, the Plan provides for the distribution of the Ally Contribution among the estates and settlement trusts as follows: (1) $782.74 million to the ResCap Debtors; (2) $462.32 million to the GMACM Debtors; (3) $462.32 million to the RFC Debtors; (4) $235 million to the Private Securities Claims Trust; (5) $57.62 million to the Borrower Claims Trust; and (6) $100 million on account of the NJ Carpenters Claims.   In addition, projected Administrative Claims shall be allocated as follows: $836.3 million to the GMACM Debtors, $249.8 million to the RFC Debtors, and any variation above or below to be borne by the Liquidating Trust.

79.      This allocation of the Ally Contribution was the subject of significant and often contentious negotiation and debate within the Committee, as the interests of Committee Members differed.  The Committee determined that the proposed settlement is consistent with the respective assets and liabilities at the respective estates, is fair, avoids unnecessary disputes, and facilitates the implementation of the Global Settlement for the benefit of all creditors.

## IX.        No Further Allocation of the Ally Contribution

80.        I understand that the Junior Secured Noteholders have asked the Court to allocate the Ally Contribution to particular claims based upon certain conclusions in the Examiner's report.  While I understand that the Examiner conducted a thorough investigation and prepared an extensive report, his conclusions had no influence on the Committee's approach to the Mediations and did not affect terms of the Global Settlement.  In fact, the Examiner's report remained under seal in the Bankruptcy Court until after the Plan Support Agreement had been signed and submitted to the Court for approval.  Indeed, the Plan Support Agreement expressly denied the parties an opportunity to renegotiate following release of the Examiner's report, consistent with the Committee's view that the Examiner's analysis was not necessary information in the circumstances and that his conclusions would have unforeseeable implications that could jeopardize all progress achieved in the Mediation.

81.        As importantly, an attempt to allocate the Ally Contribution would have prevented the Global Settlement from being achieved.  The Global Settlement *had* to reflect an aggregation of estate and third party claims against Ally.  At a minimum, this was important for the creditors to maintain sufficient leverage and credibility to negotiate an improvement of the Original Ally Settlement that was adequate to gain creditor support.  I also do not believe that Ally would have entertained a negotiation unless such negotiation was premised on a global aggregation and release of claims.  Ally was clear that they would not settle claims on an individual or claim-by-claim basis.

82.        No individual component of the Global Settlement can be fairly considered in isolation, because the goal was a holistic and comprehensive settlement; a claim-by-claim or issue-by-issue approach would have been counterproductive for multiple reasons.

83.    *First*, an allocation among the potential causes of action was not and is not feasible.  While the legal and factual theories underlying these claims had been articulated, factual complexities and the frequent absence of definitive or controlling precedent made the amount of these claims extraordinarily difficult to quantify with precision.  *Second*, even if the amount of creditors' damage claims could have been quantified, the magnitude of the assets of each of the estates against which these claims were asserted were themselves unclear.  Each estate held complex and uncertain litigation claims against Ally where the potential recoveries were not easily estimated.  *Finally*, potential inter-debtor issues – such as substantive consolidation, the enforcement of intercompany balances, prior debt forgiveness, and cost allocation – created the possibility that any estate's litigation recoveries might be reallocated in part to other Debtors.

84.    In this context, the Committee concluded that it was likely impossible and certainly not sensible to attempt a precise bottom-up valuation of all creditor and estate claims as a basis for reaching or implementing the Global Settlement.  The extraordinary number and amounts of the competing creditor and estate claims made it impractical to resolve any specific claims on a consensual basis.  Litigation regarding the Original RMBS Settlement, moreover, demonstrated that non-consensual resolution of even one category of these claims would result in massive, time-consuming, and expensive litigation that was not assured to yield a definitive resolution of claims.  To avoid this result throughout the case, the Committee continuously sought a global compromise by seeking to increase the amount of the Ally Contribution, while at the same time inducing the various creditor constituencies to focus on their recoveries from the settlement (based on all of the parties' competing legal claims and rights), rather than establishing the details of competing creditor or estate claims.

85.      Months of hard-fought, arms'-length negotiations validated this approach.   The Committee and the Debtors succeeded in negotiating a $1.35 billion increase in the amount of the Ally Contribution.    This increase in turn catalyzed a series of delicately balanced compromises of inter-creditor and inter-debtor disputes and resulted in the Global Settlement.

Executed on November 12, 2013
New York, New York

_____
John S. Dubel

## **EXHIBIT A**

*List of Key Meetings*

(1)    On July 19, 2012, a presentation to the Examiner.

(2)    On September 24, 2012, a presentation to the Examiner.

(3)    On October 18, 2012, a meeting of the Committee with the Examiner.

(4)    On January 8, 2013, a presentation to the Mediator.

(5)    On January 9, 2013, a presentation to Ally.

(6)    On January 10, 2013, a Committee meeting convened following the Committee's presentation to Ally the day before.

(7)    On January 15, 2013, a Committee meeting convened to discuss the status of the case, Mediation, and settlement negotiations.

(8)    On January 17, 2013, a presentation to the Debtors.

(9)    On January 23, 2013, a presentation to the Examiner.

(10)   On January 22, 2013, a presentation by Ally, responding to the Committee's January 9, 2013 presentation.

(11)   On January 23, 2013, a meeting of the Committee with the Examiner.

(12)   On January 24, 2013, a Committee meeting convened to discuss the status of the case, Mediation, and settlement negotiations.

(13)   On January 24, 2013, a Committee meeting with Judge Peck as part of the Mediation process.

(14)   On January 30, 2013, a settlement meeting held at Moelis' offices and attended by Richard Cieri and Ray Schrock (counsel to AFI), David Ying (advisor to Debtors), and Jared Dermont, Ken Eckstein, and Doug Mannal (adviser and counsel to the Committee).

(15)   On February 4, 2013, a conference call among counsel to the parties to discuss the status of the case, Mediation, and settlement negotiations.

(16)   On February 6, 2013, a Committee meeting convened to discuss the status of the case, Mediation, and settlement negotiations.

(17)   On February 6, 2013, a Committee meeting with Judge Peck as part of the Mediation process.

(18)    On February 21, 2013, a Committee meeting convened to discuss the status of the case, Mediation, and settlement negotiations.

(19)    On March 8, 2013, a meeting of the Committee with the Examiner.

(20)    On March 20, 2013, a Committee meeting convened to discuss the status of the case, Mediation, and settlement negotiations.

(21)    On April 22, 2013, a twelve-hour, all-party Mediation session convened by Judge Peck.

(22)    On April 23, 2013, a nine-hour, all-party Mediation session convened by Judge Peck.

(23)    On May 2, 2013, a seven-hour, all-party Mediation session convened by Judge Peck.

(24)    On May 6, 2013, a Committee conference call convened to discuss the status of the case, Mediation, and settlement negotiations.

(25)    On May 8, 2013, a conference call convened with the Committee and consenting creditors to discuss the status of the case, Mediation, and settlement negotiations.

(26)    On May 9, 2013, a conference call convened with the Committee and consenting creditors to discuss the status of the case, Mediation, and settlement negotiations.

(27)    On May 9, 2013, a twelve-hour, all-party Mediation session convened by Judge Peck.

(28)    On May 10, 2013, a six-and-a-half-hour, all-party Mediation session convened by Judge Peck.

(29)    On May 12, 2013, two conference calls convened with the Committee and consenting creditors to discuss the status of the case, Mediation, and settlement negotiations.

(30)    On May 13, 2013, two conference calls convened with the Committee and consenting creditors regarding approval and execution of the PSA and Plan Term Sheet.

(31)    On May 22-23, 2013, a 24 hour all-party negotiation session,  culminating in execution of the Supplemental Term Sheet.