**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DIRECT TESTIMONY OF MARTIN BLUMENTRITT**

I, Martin Blumentritt, under penalty of perjury, testify as follows:

1. I submit this testimony in this confirmation hearing on behalf of Ally Financial Inc. (along with its non-Debtor affiliates and subsidiaries, "*Ally*")[1] based on my personal knowledge as a risk officer in the Corporate Insurance and Business Continuity department of Ally. Except as otherwise noted, I have personal knowledge of the matters set forth herein.

2. My testimony will address the directors and officers ("D&O") insurance and errors and omissions ("E&O") insurance purchased by Ally on behalf of itself, its affiliates and subsidiaries (including the Debtors), and their respective officers, directors, and employees.

### Qualifications

3. I am a risk officer in the Corporate Insurance and Business Continuity department of Ally. I have served in my current capacity within Corporate Insurance since June 1, 2006.

4. I hold a Bachelor of Arts degree from Kalamazoo College and a Masters of Business Administration from Michigan State University. Prior to my joining Ally in June 2006, I was a Risk Manager at General Motors.

5. In my position as risk officer for Ally, it is my job to purchase insurance coverage for Ally and the Debtors, as well as their respective officers and directors. I am responsible for the negotiation and administration of the policies comprising this insurance coverage, as well as the placement and payment of those policies. In my role, I have regular contact with the insurance companies with whom Ally and the Debtors maintain policies. In particular, it is the responsibility of my department to assist in providing notice of claims to the insurance companies on behalf of all Insureds.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and The Official Committee of Unsecured Creditors [ECF No. 4819-2].

1

6.      I was directly involved in communicating with the insurance companies with respect to noticing settlements of claims asserted against Ally and the Debtors.

**Background on the Debtors' and Ally's Insurance Policies**

7.      Each year beginning in 2006-2007, and continuing to the present, Ally has obtained E&O and D&O insurance policies on behalf of itself, its subsidiaries and affiliate (including the Debtors), and their respective officers, directors, and employees. These policies extend insurance coverage to both "Organizations" (also sometimes called the "Insureds") and "Insured Persons."

8.      For example, Ally's primary E&O insurance policy for the 2007-2008 policy year[2] extends coverage to both "the Organization," which is defined to include the "Parent Organization and any Subsidiary," and "the Insured Person," which includes any director, officer, or employee of the Organization "while acting in his or her capacity as such." Exhibit 1 to this Direct Testimony is a true and accurate copy of this policy, Federal Insurance Company Policy Number 82077768, which is Ally's primary E&O insurance policy for the period December 31, 2007 to December 31, 2008.

9.      Similarly, Ally's primary D&O insurance policy for the 2007-2008 policy year covers both the "Organization," defined to include Ally (f/k/a GMAC, LLC) and "any Subsidiary," and "Insured Persons," defined to "any past, present or future duly elected director or duly elected or appointed officer of the Organization." Exhibit 2 is a true and accurate copy of this policy, Federal Insurance Company Policy Number 8207-6455, which is Ally's primary D&O insurance policy for the period November 30, 2007 to November 30, 2008.

---

[2] The 2007-2008 policy year is relevant because some of Ally's insurers have taken the position that Ally's "claims" arose in that year, and that all subsequent claims are "related claims" that must be consolidated with the original claim and covered by the policies in effect in that year.

2

10.  Ally entered into similar E&O and D&O policies for each subsequent year, and each year's policies extended coverage to Ally, its subsidiaries, and its insured persons, including the directors, officers, and employees of Ally and all its subsidiaries (including the Debtors and their officers, directors, and employees).

11.  Ally's E&O policies provided broad coverage for all sorts of wrongful acts. Its primary policy from 2007-2008, for example, provided coverage for "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, before or during the Policy Period by any Insured or any person for whose acts the Insured is legally liable" for any provision of "professional services." (Ex. 1 at 6, further amended by endorsement #13.) Policies in subsequent years provided essentially identical coverage.

12.  Similarly, Ally's D&O policies provided broad coverage for "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by an Insured Person, individually or otherwise, in his Insured Capacity, or any matter claimed against him solely by reason of his serving in such Insured Capacity." (Ex. 2 at 10.) Subsequent years' policies contained similar provisions.

13.  For the 2007-2008 policy year, Ally obtained a total of $100 million of E&O insurance coverage from a group of primary and excess insurers, subject to a $25 million retention. For the same year, Ally purchased $300 million in D&O insurance coverage, subject to a $10 million retention. While the policy limits for subsequent years changed from year to year, Ally always maintained at least $100 million of insurance coverage (either E&O or D&O independent of as part of a blended D&O/E&O policy).

14.  The policy limits for Ally's E&O and D&O insurance were aggregate annual

3

limits. This means that each claim, against any insured, during the policy year reduced the remaining available insurance. Moreover, all defense costs and expenses count against policy limits. Thus, the policies are "wasting asset" policies, meaning that each payment for liability or defense costs serves to reduce the level of insurance coverage available for other claims or insureds.

15. When Ally is aware a claim is made (or is reasonably likely to be made) against Ally, the Debtors, or Ally's non-Debtor affiliates, Ally notifies the insurance companies of the existence of such claim and begins exhausting the retention associated with the policies. After the retention is exhausted, the shared insurance proceeds (whether incurred in satisfaction of defense costs, settlements, or judgments) are typically paid on a first-billed, first-paid basis.

### The Plan Support Agreement and Ally Settlement

16. I understand that the Plan incorporates a settlement with Ally pursuant to which Ally will agree to contribute (a) $1,950,000,000 in cash, and (b) the first $150,000,000 received by Ally for any D&O or E&O claims it pursues against its insurance carriers related to the claims released in connection with the Plan. I understand that Ally has agreed to guarantee that the Debtors will receive $150,000,000 on account of such insurance claims no later than September 30, 2014. I understand the $2,100,000,000 in cash and insurance proceeds is collectively referred to in the Plan as the "Ally Contribution."

17. I understand that, in exchange for the Ally Contribution as well as the other contributions made by Ally before and during the course of the Debtors' bankruptcy cases, the Plan contemplates a third-party release of any and all causes of action against Ally and its officers and non-Debtor affiliates for conduct arising from or related in any way to the Debtors. I understand that the release covers, among other things, any claims related to residential mortgage backed securities issued and/or sold by the Debtors or their affiliates.

4

### Coverage Under the Policies

18. To the best of my knowledge, the E&O and D&O Policies described above cover the asserted third-party claims that I understand to be subject to the third-party release. This includes claims stemming from the Debtors' mortgage-backed securitizations (the so-called Private Label Securitization and Rep & Warranty lawsuits). As a result, any costs of defense incurred or payments made as a result of a settlement or judgment of those claims by the non-debtor Ally entities would trigger insurance obligations under the shared policies.

19. For instance, I am aware of at least the following lawsuits that have been noticed to Ally's insurers, the claims of which would be released pursuant to the Plan:

- *Allstate Ins. Co., et al. v. GMAC Mortgage LLC, et al.*, No. 27-CV-11-3480 (Minn. Dist. Ct., Hennepin Cnty., filed Feb. 18, 2011)

- *Assured Guar. Mun. Corp. v. GMAC Mortgage, LLC et al.*, No. 12-cv-3776 (S.D.N.Y. May 11, 2012)

- *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co. et al.*, No. 10-2741-BLS2 (Mass. Super Ct., Suffolk Cnty. filed July 9, 2010)

- *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co. et al.*, No. 11-0555-BLS2 (Mass. Super. Ct., Suffolk Cnty. filed Feb. 11, 2011)

- *FGIC v. GMAC Mortgage, LLC et al.*, No. 1:11-cv-09729-PAC (S.D.N.Y.)

- *FGIC v. Ally Financial Inc. et al.*, 1:12-cv-00338-PAC (S.D.N.Y.)

- *FGIC v. Ally Financial Inc. et al.*, No. 1:12-cv-00339-PAC (S.D.N.Y.)

- *FGIC v. Ally Financial Inc. et al.*, No. 1:12-cv-00340-PAC (S.D.N.Y.)

- *FGIC v. Ally Financial Inc. et al.*, 1:12-cv-00341-PAC (S.D.N.Y.)

- *FGIC v. Ally Financial Inc. et al.*, No. 12-cv-780 (S.D.N.Y. filed Jan. 31, 2012)

- *FGIC v. Ally Financial Inc. et al.*, 12-cv-1601 (S.D.N.Y. Mar. 5, 2012)

- *FGIC v. Ally Financial Inc. et al.*, No. 12-cv-1658 (S.D.N.Y. filed Mar. 6, 2012)

5

- *FGIC v. Ally Financial Inc. et al.*, No. 12-cv-1818 (S.D.N.Y. filed Mar. 12, 2012)

- *FGIC v. Ally Financial Inc. et al.*, No. 12-cv-1860 (S.D.N.Y. filed Mar. 13, 2012)

- *Federal Home Loan Bank of Chicago v. Banc of Am. Funding Corp. et al.*, No. 10 CH 45033 (Ill. Cir. Ct., Cook Cnty., filed Oct. 15, 2010)

- *Federal Home Loan Bank of Boston v. Ally Financial, Inc. et al.*, No. 1:11-cv-10952-GAO (D. Mass)

- *Federal Home Loan Bank of Indianapolis v. Banc of Am. Mortgage Sec., Inc. et al.*, No. 49D05 10 10 PL 45071 (Ind. Super. Ct., Marion Cnty., filed Oct. 15, 2010)

- *John Hancock Life Ins. Co. (U.S.A.) et al. v. Ally Financial Inc. et al.*, No. 12-cv-1841-ADM-TNL (D. Minn., filed July 27, 2012)

- *Mass. Mutual Life Ins. Co. v. Residential Funding Co., LLC et al.*, No. 11-cv-30035-MAP (D. Mass. filed Feb. 9, 2011)

- *MBIA Ins. Corp. v. Ally Financial Inc. et al.*, No. 27-cv-12-18886 (Minn. Dist. Ct., Hennepin Cnty., filed Sept. 17, 2012)

- *MBIA Ins. Corp. v. GMAC Mortg., LLC*, No. 600837/2010 (N.Y. Sup. Ct., N.Y. Cnty. filed Apr. 1, 2010)

- *MBIA Ins. Corp. v. Residential Funding Co., LLC*, No. 603552/2008 (N.Y. Sup. Ct., N.Y. Cnty. filed Dec. 4, 2008)

- *Mitchell, et al. v. Residential Funding Corp., et al.*, No. 03-CV-220489 (Mo. Cir., Jackson Cnty., filed July 29, 2003)

- *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc. et al.*, No. 11-cv-2340 RDR/KGS (D. Kan. filed June 20, 2011)

- *N.J. Carpenters Health Fund, et al. v. Residential Capital, LLC et al.*, No. 08-cv-8781-HB-RLE (S.D.N.Y.)

- *Stichting Pensioenfonds ABP v. Ally Financial Inc. et al.*, No. 12-cv-01381-ADM-TNL (D. Minn.)

- *Thrivent Fin. for Lutherans et al. v. Countrywide Fin. Corp. et al.*, No. 27-CV-11-5830 (Minn. Dist. Ct., Hennepin Cnty. filed Mar, 24, 2011)

- *Union Cent. Life Ins. Co. et al. v. Ally Fin., Inc. et al.*, No. 11-cv-2890-GBD (S.D.N.Y. filed Apr. 28, 2011)

- *W. Va. Inv. Mgmt. Bd. v. Residential Accredited Loans, Inc. et al.*, No. 10-C-412 (W. Va. Cir. Ct., Kanawha Cnty. filed Mar. 4, 2010)

- *Western & Southern Life Ins. Co. v. Residential Funding Co., LLC et al.*, No. A1105042 (Ohio Ct. Comm. Pl., Hamilton Cnty. filed June 29, 2011)

20. If those claims (and other potential claims against Ally arising from or relating to the Debtors' business) were to go forward against the non-debtor Ally entities and were not released pursuant to the proposed Plan, the insurance policies and proceeds shared between Ally and the Debtors would be depleted, in turn reducing an asset of the Debtors' estate.

**Provision of Insurance Following the Petition Date**

21. Ally has continued to assist the Debtors in acquiring E&O and D&O insurance coverage following the Debtors' filing for Chapter 11 protection. The Debtors required such insurance coverage to satisfy their legal and regulatory requirements to allow them to continue originating and servicing loans during bankruptcy, and eventually to be sold as a going concern.

22. Given the Debtors' bankruptcy status, it would have likely cost the Debtors at least $40-60 million to acquire E&O and D&O insurance coverage independent of its relationship with Ally, if it could have secured coverage at all. Ally agreed to assist the Debtors in acquiring such insurance, which continues to be shared among Ally and the Debtors. As a result, the Debtors remain part of shared insurance providing $275 million in D&O coverage and $100 million in E&O coverage to Ally and the Debtors.

Executed this 12th day of November, 2013 at Detroit, Michigan.

/s/  *Martin Blumentritt*
Martin Blumentritt