Hearing Date: December 17, 2013 at 10:00 a.m. (EST)
Objection Deadline:  November 29, 2013 at 4:00 p.m. (EST)

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Norman S. Rosenbaum
Jordan A. Wishnew

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors | Jointly Administered |

**NOTICE OF HEARING ON DEBTORS' MOTION PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 (A) GRANTING CLAIMANTS LIMITED RELIEF FROM AUTOMATIC STAY AND (B) APPROVING THE DEBTORS' ENTRY INTO THE SETTLEMENT AGREEMENT REGARDING THE PENDING STATE COURT CLASS ACTION LITIGATION, AUTHORIZING THE DEBTORS TO PERFORM THE OBLIGATIONS THEREUNDER AND FIXING THE AMOUNT OF AN ALLOWED GENERAL UNSECURED CLAIM FOR THE CLASS ACTION PLAINTIFFS**

**PLEASE TAKE NOTICE** that, on November 12, 2013, the above-captioned debtors

and debtors in possession (collectively, the "**Debtors**") filed the Debtors' Motion Pursuant to

Section 362 of the Bankruptcy Code and Bankruptcy Rule 9019 (a) Granting Claimants Limited

Relief from the Automatic Stay and (b) Approving the Debtors' Entry into the Settlement

Agreement Regarding the Pending State Court Class Action Litigation, Authorizing the Debtors

to Perform the Obligations Thereunder And Fixing The Amount Of An Allowed General Unsecured Claim For The Class Action Plaintiffs (the "**Motion**").

PLEASE TAKE FURTHER NOTICE that a hearing will be held on the Motion before the Honorable Martin Glenn, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 501, One Bowling Green, New York, New York 10004 (the "**Bankruptcy Court**") on **December 17, 2013 at 10:00 a.m. (prevailing Eastern time)**, or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any objection to the Motion must be in writing, conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-399 (General Order M-399 and the User's manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court) by registered users of the Bankruptcy Court's case filing system, and by all other parties-in-interest, on a 3.5 inch disk or CD-ROM, preferably in Portable Document Format, WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers) and served in accordance with General Order M-399 and in accordance with this Court's order, dated May 23, 2012, implementing certain notice and case management procedures [Docket No. 141], so as to be received no later than **November 29, 2013 at 4:00 p.m. (prevailing Eastern Time)**.

2

**PLEASE TAKE FURTHER NOTICE** that if no objection to a Motion is timely filed

and served, the Bankruptcy Court may enter an order granting the relief requested in a Motion

without further notice or opportunity to be heard afforded to any party.

Dated: November 12, 2013
       New York, New York

                              /s/ Norman S. Rosenbaum
                              Gary S. Lee
                              Norman S. Rosenbaum
                              Jordan A. Wishnew
                              MORRISON & FOERSTER LLP
                              1290 Avenue of the Americas
                              New York, New York 10104
                              Telephone: (212) 468-8000
                              Facsimile: (212) 468-7900

                              *Counsel for the Debtors and*
                              *Debtors in Possession*

**Hearing Date: December 17, 2013 at 10:00 a.m. (EST)**
**Objection Deadline:  November 29, 2013 at 4:00 p.m. (EST)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Norman S. Rosenbaum
Jordan A. Wishnew

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors | ) | Jointly Administered |
| | ) | |

**DEBTORS' MOTION PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE**
**AND BANKRUPTCY RULE 9019 (A) GRANTING CLAIMANTS LIMITED RELIEF**
**FROM AUTOMATIC STAY AND (B) APPROVING THE DEBTORS' ENTRY INTO**
**THE SETTLEMENT AGREEMENT REGARDING THE PENDING STATE COURT**
**CLASS ACTION LITIGATION, AUTHORIZING THE DEBTORS TO PERFORM THE**
**OBLIGATIONS THEREUNDER AND FIXING THE AMOUNT OF AN ALLOWED**
**GENERAL UNSECURED CLAIM FOR THE CLASS ACTION PLAINTIFFS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................2

JURISDICTION AND VENUE .............................................................................................6

BACKGROUND .....................................................................................................................6

      A.       The Chapter 11 Cases ...............................................................................6

      B.       The Class Action ......................................................................................7

      C.       The Settlement Agreement ......................................................................14

RELIEF REQUESTED ..........................................................................................................18

BASIS FOR RELIEF REQUESTED .....................................................................................19

      A.       The Court Should Grant Relief From the Automatic Stay ....................19

      B.       The Court Should Approve the Debtors' Entry Into the Settlement Pursuant to Bankruptcy Rule 9019 ........................................................20

CONCLUSION .......................................................................................................................28

NOTICE ..................................................................................................................................28

NO PRIOR REQUEST...........................................................................................................29

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
  699 F.2d 599 (2d Cir. 1983) ..................................................................................21, 28

*Fischer v. Pereira (In re 47-49 Charles St., Inc.)*,
  209 B.R. 618 (S.D.N.Y. 1997) ...................................................................................20

*In re Hibbard Brown & Co., Inc.*,
  217 B.R. 41 (Bankr. S.D.N.Y. 1998) .........................................................................21

*In re Ionosphere Clubs, Inc.*,
  156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1999)..................................21

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986) ..........................................................................24

*In re Purofied Down Prods. Corp.*,
  150 B.R. 519 (S.D.N.Y. 1993) ...................................................................................21

*In re Sonnax Indus., Inc.*,
  907 F.2d 1280 (2d Cir. 1990) ....................................................................................19

*In re Spielfogel*,
  211 B.R. 133 (Bankr. E.D.N.Y. 1997) ......................................................................21

*In re WorldCom, Inc.*,
  347 B.R. 123 (Bankr. S.D.N.Y. 2006) .......................................................................20

*Int'l Bus. Machs. v. Fernstrom Storage & Van Co.(In re Fernstrom Storage & Van Co.)*,
  938 F.2d 731 (7th Cir. 1991) .....................................................................................20

*Loudon v. Amogio Foods, Inc.(In re Loudon)*,
  284 B.R. 106 (B.A.P. 8th Cir. 2002) .........................................................................20

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
  478 F.3d 452 (2d Cir. 2007) ......................................................................................22

*Nellis v. Shugrue*,
  165 B.R. 115 (S.D.N.Y. 1994) ...................................................................................21

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972) ......................................................................................21

ii

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968) ................................................................................20

*Schneiderman v. Bogdanovich (In re Bogdanovich)*,
    292 F.3d 104 (2d Cir. 2002) .....................................................................20

*Wiley v. Hartzler, (In re Wiley)*,
    288 B.R. 818 (B.A.P. 8th Cir. 2003) ..........................................................20

**STATUTES**

11 U.S.C. § 362(d)(1) ........................................................................................19

Fed. R. Bankr. P. 9019(a) ...................................................................................20


EXHIBIT 1 – Proposed Order

EXHIBIT 2 – Declaration of William R. Thompson

EXHIBIT 3 – Settlement Agreement

EXHIBIT 4 – Modified Order

EXHIBIT 5 – Appellate Sanctions Motion

EXHIBIT 6 – Trial Sanctions Motion

EXHIBIT 7 – Attorneys' Fees Motion

EXHIBIT 8 – Insurance Policies

ny-1053977

**TO THE HONORABLE JUDGE GLENN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Residential Capital, LLC ("**ResCap**") and each of its debtor affiliates, as debtors and

debtors in possession (collectively, the "**Debtors**"),[1] by and through their undersigned counsel,

hereby submit this motion (the "**Motion**")[2] seeking entry of an order, substantially in the form

annexed hereto as **Exhibit 1** (the "**Order**"), pursuant to section 362 of title 11 of the United

States Code, 11 U.S.C. §§ 101-1330, as amended (the "**Bankruptcy Code**") and Rule 9019 of

the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") (a) modifying the

automatic stay to allow the claimant to proceed in the class action case captioned *Steven and*

*Ruth Mitchell v. Residential Funding Company, LLC, et al.* (Case No. 03-CV-220489-01),

currently pending in the Circuit Court of Jackson County, Missouri, Division 4 (the "**State**

**Court**"), so as to participate in a settlement hearing seeking final approval of a proposed

settlement between the Plaintiffs (defined below) and Residential Funding Company, LLC

("**RFC**"), and (b) approving RFC's entry in the settlement, authorizing it to perform its

obligations thereunder and, in connection therewith, fixing the amount of an allowed general

unsecured claim for the benefit of the class action Plaintiffs.  In support of the Motion, the

Debtors rely on the Declaration of William R. Thompson, dated November 12, 2013 (the

"**Thompson Declaration**"), annexed hereto as **Exhibit 2**.  In further support thereof, the Debtors

respectfully state as follows:

---

[1] The names of the Debtors in these cases and their respective tax identification numbers are identified on **Exhibit 1** to the Whitlinger Affidavit (defined below).

[2] Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

**INTRODUCTION**

1.      By this Motion, the Debtors request the Court's approval of a settlement agreement with a class of plaintiffs that brings finality to a long-standing litigation by fixing a claim that is both reasonable and beneficial to the Debtors' estate.

2.      For the past nine (9) years, the Debtors have been engaged in class action litigation (the "**Litigation**") pertaining to allegedly improper fees and interest received by RFC and Homecomings Financial Network, Inc. (now Homecomings Financial, LLC ("**Homecomings**")), among other parties, following the Debtors' purchase and/or during the course of the Debtors' servicing of two hundred forty eight (248) second-mortgage loans (the "**Mitchell Loans**").  In July 2003, Steven L. and Ruth E. Mitchell (the "**Plaintiffs**"), in their capacities as putative class action claimants, filed an action against, among other entities, certain of the Debtors—namely, RFC and Homecomings—in the State Court (the "**Mitchell Class Action**").  Through the Mitchell Class Action, the Plaintiffs sought to recover damages, fees and interest that Plaintiffs allege were charged in violation of Missouri law, and punitive damages in connection with the origination and servicing of second mortgage loans procured by the Plaintiffs.  The claims at issue in the class action were litigated before the State Court, which resulted in a total award of $99,651,115.09 against RFC and Homecomings.

3.      Portions of the Plaintiffs' claims against RFC and all of the Plaintiffs' claims against Homecomings were resolved by the State Court after appeal.  After an unsuccessful appeal of the State Court award, RFC and Homecomings paid the class action claimants $12,868,502.74 in satisfaction of certain of the amounts awarded by the State Court that were affirmed by the Missouri Court of Appeals (the "**Court of Appeals**").  Nevertheless, RFC's liability for punitive damages, which were awarded in the amount of $92,000,000.00 by the State

2

Pg 10 of 36

Court, but remanded for a new trial by the Court of Appeals, remained in question and the

Plaintiffs sought to impose punitive damages on RFC over and above those originally awarded

by the State Court. However, the Court of Appeals did not provide an opinion regarding the

proper range of punitive damages, and the State Court's original award of $92,000,000.00 was

vacated when the State Court's judgment with respect to punitive damages was remanded for a

new trial. In addition, as described in greater detail herein, the Plaintiffs sought to impose

sanctions against RFC of up to $20 million as well as attorneys' fees.

4.     As described in greater detail herein, before the remand trial on the issues of

punitive damages and following lengthy negotiations, RFC[3] reached a settlement with respect to

its liability for the 248 RFC loans involved in the class action, which were held by approximately

365 class members (the "**Settlement Agreement**").[4]

5.     Under the terms of the Settlement Agreement, the Debtors fully resolved all of the

outstanding issues against them by fixing RFC's liability to the Mitchell Settlement Class

(defined below) in the amount of $14.5 million (the "**Mitchell Settlement Amount**") as well as

paying an additional $2,780,365.38 for attorneys' fees awarded on appeal (the latter of which

was paid before the Petition Date). Notwithstanding that the Settlement Agreement was entered

into before the Petition Date, the parties have agreed to move forward with the settlement,

provided that upon final approval of the Settlement Agreement, Plaintiffs' claims for the

Mitchell Settlement Amount, as representatives of the Mitchell Settlement Class, shall be

---

[3] RFC is the only party obligated to make a payment under the Settlement Agreement because the Settlement
Agreement resolves, among other things, the Plaintiffs' claims for punitive damages. Any claims against
Homecomings involved compensatory damages, and were not at issue amongst the Parties and therefore are outside
of the scope of the Settlement Agreement. Thus, Homecomings has no liability to the Mitchell Settlement Class
under the Settlement Agreement.

[4] A copy of the Settlement Agreement is annexed hereto as **Exhibit 3**.

3

governed by the following terms and conditions, to which Plaintiffs and the Debtors hereby

stipulate and agree (hereinafter, the "**Settlement Agreement Stipulation**"):

a.  The Plaintiffs will only receive a general allowed unsecured claim against RFC for the Mitchell Settlement Amount (the "**Allowed Mitchell Claim**");

b.  Except as provided in subsection c, below, the Allowed Mitchell Claim shall not be subordinated to the payment of any other claims pursuant to 11 U.S.C. § 510 or the terms of the chapter 11 plan to be jointly proposed by the Debtors and the Official Committee of Unsecured Creditors appointed in these Chapter 11 cases (the "**Plan**");

c.  The Plaintiffs and Mitchell Settlement Class shall receive an assignment of insurance rights with respect to its claim that is substantially the same as the assignment of insurance rights to the Kessler Settlement Class and shall look only to the distributions from the Borrower Claims Trust (as such term is defined in the Plan) and from a recovery (if any) under any insurance policies issued under the General Motors Combined Specialty Insurance Program 12/15/00-12/15/03 identified in the attached **Exhibit 8** (hereinafter defined as the "**Policies**"); provided, however, that the right to collect on the Allowed Mitchell Claim from the proceeds of the Policies shall be subordinated with respect to any valid claim to those proceeds of the Policies made by: (a) the claims of the Liquidating Trust as defined in the Plan (hereinafter the "**Liquidating Trust**") described in Section 5b of the Kessler Settlement Agreement, which Agreement is currently scheduled to be presented to the Court for final approval on November 19, 2013 ("**Kessler Settlement Agreement**"); and (b) the claims of the Kessler Settlement Class described in Section 5b of the Kessler Settlement Agreement;

d.  The Mitchell Settlement Class shall be included as a party in the Cooperation Agreement described in Section 5g of the Kessler Settlement Agreement;

e.  The Plaintiffs, the Mitchell Settlement Class and their Class Counsel (as such term is defined in the Mitchell Settlement Agreement) shall convey, transfer, and assign their rights under that certain Substitute Supersedeas Bond described in subsection Section 4(m) of the Mitchell Settlement Agreement (the "**Bond Rights**") to the Debtors and their respective successors and assigns; and the Debtors, in turn, agree that the Plan shall provide that the Debtors and their successors and assigns, including the Liquidating Trust, shall look solely and exclusively to those Bond Rights and/or their respective Insurance Rights (as provided in Section 5 of the Kessler Settlement Agreement) to avoid, collect, recover, or be reimbursed for the $2,780,365.38 payment made to Class Counsel in resolution of the

4

Attorneys' Fee Motion (as such term in defined in the Mitchell Settlement Agreement"). In consideration for the conveyance of the Bond Rights by the Plaintiffs, the Mitchell Settlement Class and their Class Counsel, the Debtors shall release the Plaintiffs, the Mitchell Settlement Class and Class Counsel from any demands, actions, causes of action, rights, offsets, setoffs, suits, damages, lawsuits, liens, costs, surcharges, losses, attorneys' fees, expenses or liabilities of any kind whatsoever, in law or in equity, whether under 11 U.S.C. § 544 or otherwise, that in any way concerns, relates to, or arise out of RFC's payment of the additional $2,780,365.38 for attorneys' fees awarded on appeal in the Mitchell Class Action.

6.    A condition precedent to the effectiveness of the Settlement Agreement is that it must receive final approval from the State Court presiding over the Class Action (defined below). Accordingly, the Debtors, by this Motion, seek to modify the automatic stay for the limited purpose of allowing the Plaintiffs to participate in proceedings in the State Court to obtain final approval of the Settlement Agreement as modified by the Settlement Agreement Stipulation.

7.    The Debtors believe the proposed settlement to be fair, equitable and in the best interest of the Debtors' estates and their creditors. The terms and conditions of the settlement were reached after extensive arm's-length negotiations between adequately represented parties, and the settlement will resolve all of the remaining claims of the Plaintiffs and the Mitchell Settlement Class against RFC and certain other Released Persons (as defined below and in section 2.22 of the Settlement Agreement) (i) for significantly less than what otherwise may be awarded during the remand trial or a contested matter before this Court, and (ii) without the need for complex, time consuming and expensive litigation, the outcome of which would be uncertain. Moreover, the Mitchell Settlement Amount is fair and reasonable in light of: (a) the allegations made; (b) the fact that litigation of the claims addressed by the settlement could ultimately result in a greater recovery for the Mitchell Settlement Class than what has been agreed upon under the

5

Settlement Agreement; and (c) the necessary incurrence of significant costs and expenses on the part of the estates attendant to the continued litigation of the matter.

8.     Accordingly, as discussed in greater detail herein, granting the relief requested herein is in the best interest of the Debtors, their creditors and the estate.

**JURISDICTION AND VENUE**

9.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28. U.S.C. § 157(b)(2).

10.     Venue before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

**A.    The Chapter 11 Cases**

11.     On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  No trustee has been appointed in these Chapter 11 cases.

12.     On May 16, 2012, the United States Trustee for the Southern District of New York appointed a nine (9) member official committee of unsecured creditors (the "**Creditors' Committee**").

13.     On June 20, 2012, the Court directed that an examiner be appointed [Docket No. 454], and on July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner [Docket No. 674].

14.     On July 3, 2013, the Debtors and the Creditors' Committee filed the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 4153] (the "Plan") and the *Disclosure Statement for the Joint*

6

ny-1053977

*Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of*

*Unsecured Creditors* [Docket No. 4157] (the "Disclosure Statement").  The Court approved the

Disclosure Statement on August 23, 2013 [Docket No. 4809].  The hearing on confirmation of

the Plan is scheduled to commence on November 19, 2013.

  15. The Debtors were formerly a leading residential real estate finance company

indirectly owned by Ally Financial Inc. ("**AFI**"), which is not a Debtor.  Prior to the date of their

Servicing Platform, the Debtors and their non-debtor affiliates operated the fifth largest mortgage

servicing business and the tenth largest mortgage origination business in the United States.  A

more detailed description of the Debtors, including their business operations, their capital and

debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in the

Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of

Chapter 11 Petitions and First Day Pleadings (the "**Whitlinger Affidavit**") [Docket No. 6].

**B.** **The Class Action**

  16. In July 2003, the Plaintiffs commenced a putative class action entitled *Steven and*

*Ruth Mitchell v. Residential Funding Corp., et al.* (Case No. 03-CV-220489) (this case and Case

No. 03-CV-220489-01 are referred to as the "**Class Action**") in the State Court.  *See* Thompson

Declaration at ¶¶ 1, 3.  The Plaintiffs appeared individually and as proposed representatives of

certain similarly-situated borrowers who, on or after July 29, 1997, each are alleged to have

obtained a Second Mortgage Loan (as defined by section 408.231 of the Missouri Second

Mortgage Loan Act ("**MSMLA**")) from Mortgage Capital Resource Corporation ("**MCR**") on

real property located in Missouri (collectively, the "**Litigation Class**").  *See* Thompson

Declaration at ¶ 3; see also Missouri's Second Mortgage Loan Act, §§ 408.231-242.  The Class

Action names RFC and Homecomings as defendants as well as certain non-debtor entities that

are not affiliates of the Debtors, including Household Finance Corporation III ("**Household**")

7

and Wachovia Equity Servicing, LLC ("**Wachovia**") (now Wells Fargo Bank, N.A. ("**Wells**

**Fargo**")).  *See* Thompson Declaration at ¶¶ 5, 6.

17.     On December 8, 2006, the State Court certified the Litigation Class.  *See*

Thompson Declaration at ¶ 3.

18.     The Class Action Plaintiffs alleged (a) that MCR,[5] a California corporation,

charged fees prohibited by the MSMLA when originating their Second Mortgage Loans and

(b) that all interest on those loans was, as a result, illegal.  *See* Thompson Declaration at ¶ 4.

More specifically, the Plaintiffs, among other things, challenged the following fees that were

alleged to have been charged, contracted for, or received by MCR: loan discount; credit report

fee; custodial fee; underwriting fee; processing fee; Federal Express fee; document preparation

fee; attorney's fees; flood certification fee; wire transfer fee; administration fee; no prepay fee;

and two-point reduction fee.  *See id.*  The Plaintiffs asserted that the challenged fees charged by

MCR either: (a) were not authorized by section 408.233.1 of the MSMLA because they were not

enumerated therein; (b) were not bona fide closing costs paid to third parties as allowed by

section 408.233.1(3) of the MSMLA; or (c) were not amounts paid by someone other than the

borrower as permitted under section 408.233.1(6) of the MSMLA.  *See id.*; *see also* MSMLA, §

408.233.

19.     RFC and Homecomings were among the investor defendants named in the Class

Action (the "**Investor Defendants**").  *See* Thompson Declaration at ¶ 5.  The Plaintiffs alleged

that the Investor Defendants purchased, were assigned, serviced, or master serviced the

---

[5] MCR commenced a bankruptcy case before the Petition Date and was not named as a defendant in the Class
Action.  *See* Thompson Declaration at ¶ 4, n. 2.

8

ny-1053977

Plaintiffs' second mortgage loans.[6]  *See id.*  As a result, the Plaintiffs further alleged that the

Investor Defendants, including RFC and Homecomings, were liable for (a) all prohibited fees,

(b) all interest collected or to be collected on the loans, (c) prejudgment interest on the fees and

the interest paid on the loans and (d) punitive damages.  *See id.*

### (i)    The Initial State Court Trial

20.    On December 3, 2007, the Plaintiffs' case proceeded to trial before a jury (the

"**Initial State Court Trial**") against RFC, Homecomings, Household and Wachovia.  *See*

Thompson Declaration at ¶ 6.  At trial, the Plaintiffs argued, among other things, that: (a) RFC

should have double-checked MCR's state law compliance when purchasing the loans at issue;

(b) RFC's failure to double-check MCR's compliance warranted an award of punitive damages

against RFC; and (c) that such damages against RFC needed to be large enough to capture the

attention of the entire industry because double-checking was not industry practice.  *See id.*  In

particular, the Plaintiffs urged the jury to award punitive damages approximating 9.29% of

RFC's net worth as stated on RFC's balance sheet (then showing approximately $5.7 billion)

because the prohibited fees charged to the named Plaintiffs by MCR were approximately 9.29%

of the Plaintiffs' net worth as stated on their loan application.  *See id.*

21.    The State Court ruled in favor of the Plaintiffs on liability.  *See* Thompson

Declaration at ¶ 7.  In addition, following a month-long trial, the jury awarded the Plaintiffs

compensatory damages, interest penalties, and $92 million in punitive damages against RFC

alone.  *See id.*

---

[6] More specifically, RFC purchased 248 of the loans held by the Plaintiffs, and Homecomings serviced some of those loans.  *See* Thompson Declaration at ¶ 5, n. 3.  It is these 248 loans that are the subject of the Settlement Agreement.

22.     The State Court entered judgment on June 24, 2008, and after post-trial motions, entered a modified Nunc Pro Tunc Judgment and Order on October 6, 2008 (the "**Modified Order**")[7] that awarded a total of $99,651,115.09 against RFC in relation to the 248 loans that are the subject of the Settlement Agreement.  *See* Thompson Declaration at ¶ 8.  The award of $99,651,115.09 included: (a) $798,832.00 in unauthorized settlement charges or fees; (b) $3,414,962.00 in interest paid by the Class members; (c) $115,254.00 in future interest payable;[8] (d) $92,000,000.00 in punitive damages; (e) $642,066.00 in prejudgment interest on the unauthorized settlement charges or fees; and (f) $2,680,001.09 in statutory attorneys' fees. *See id.*  Only Plaintiffs' claim for punitive damages is the subject of the Settlement Agreement. *See id.*  The original award of $92,000,000.00 in punitive damages was awarded against only RFC.  *See id.* at ¶¶ 7, 8.  Thus, RFC is the sole responsible party under the Settlement Agreement, and any claim filed with respect to the Settlement Agreement would be allowed only as to the estate of RFC.[9]

23.     The Modified Order also awarded a total of $706,042.00 in compensatory damages against Homecomings, which was comprised of $682,992.00 in interest paid by the Class members and $23,050.00 in future interest payable; however, the amount awarded with respect to Homecomings was later determined to be included within, and not in addition to, the amounts awarded against RFC.  *See* Thompson Declaration at ¶ 9.

---

[7] A copy of the Modified Order is attached hereto as **Exhibit 4**.

[8] Certain of the 248 loans purchased by RFC were still being serviced.  *See* Thompson Declaration at ¶ 8, n. 5.  The award of "future interest payable" pertains to the loans that were still being serviced and was designed to reimburse the holders of such loans for interest that had not yet been paid by the claimant, but would be paid on the loan in the course of the servicing of such loan.  *See id.*

[9] Any compensatory damages awarded with regard to RFC and Homecomings previously were resolved outside of the context of the Settlement Agreement.  *See* ¶ 28, n. 11 *infra*.

### (ii)    *The Appeal*

24.    RFC and Homecomings, along with Wachovia and Household, filed an appeal in the Court of Appeals with respect to the Modified Order, and the Plaintiffs cross-appealed the denial of prejudgment interest on the award of past interest paid, among other issues (the "**Appeal**"). *See* Thompson Declaration at ¶ 10.

25.    While the Appeal was pending, the Plaintiffs filed a motion for sanctions in the Court of Appeals based on allegations that RFC, Wachovia, and each of their counsel in the Initial State Court Trial perpetrated a fraud on the court (the "**Appellate Sanctions Motion**").[10] *See* Thompson Declaration at ¶ 11.  In particular, the Plaintiffs alleged (a) that RFC's counsel failed to produce documents that Wachovia and its counsel had discovered before the Initial State Court Trial, and that RFC's counsel had obtained before such Trial in the course of representing Wachovia in another case and (b) that RFC's counsel made improper arguments or permitted Wachovia's counsel to make improper arguments during the Initial State Court Trial despite the existence of those documents.  *See id.*  Consequently, the Plaintiffs asked the Court of Appeals to dismiss RFC's appeal and to award the Plaintiffs an additional $8 to $20 million in monetary sanctions.  *See id.*

26.    Ultimately, on November 23, 2010, the Court of Appeals:

(a)    affirmed the award of $7,651,115.09 in compensatory damages and related interest and fees, which included $798,832.00 in unauthorized settlement charges or fees, $3,414,962.00 in past interest paid, $115,254.00 in future interest payable, 642,066.00 in prejudgment interest on unauthorized settlement charges or fees and $2,680,001.09 in statutory attorneys fees;

(b)    reversed and remanded the denial of prejudgment interest on the award of $3,414,962.00 in past interest paid and remanded to the State Court to award additional interest;

---

[10] A copy of the Appellate Sanctions Motion is attached hereto as **Exhibit 5**.

11

(c)    reversed the $92,000,000.00 punitive damages award because the jury instructions improperly permitted the jury to punish RFC for MCR's conduct in originating the loans at issue, as opposed to punishing RFC for its own conduct in purchasing or collecting payments on the loans;

(d)    remanded for a new trial on punitive damages;

(e)    granted the Plaintiffs' request for attorneys' fees on appeal and remanded the matter to the State Court to determine a reasonable fee; and

(f)    denied the Appellate Sanctions Motion without explanation.

*See* Thompson Declaration at ¶ 12.

27.    Applications to transfer the case to the Missouri Supreme Court were denied, and on April 28, 2011, the Court of Appeals issued its mandate remanding the punitive damages case to the State Court for retrial against RFC, Household, and Wachovia.  *See* Thompson Declaration at ¶ 13.

### (iii)    *The Remand Trial*

28.    The State Court trial regarding the Court of Appeals' remand (the "**Remand Trial**") was to begin on March 12, 2012.  *See* Thompson Declaration at ¶ 14.  The Remand Trial was expected to last three (3) to five (5) weeks.  *See id.*

29.    In the months following the Court of Appeals' remand, RFC paid the Plaintiffs a total of $12,868,502.74,[11] which included all amounts affirmed by the Court of Appeals, plus the amounts awarded by the State Court after remand for prejudgment interest on the award of past interest paid and for postjudgment interest on the amounts affirmed by the Court of Appeals.[12] *See* Thompson Declaration at ¶ 15.

---

[11] The $12,868,502.74 was paid to the Plaintiffs in two payments, the first of which was on September 7, 2011 and the second of which was on October 5, 2011.  *See* Thompson Declaration at ¶ 15, n. 6.

[12] On August 29, 2011 and September 16, 2011, the State Court issued the Partial Judgment & Order and the Nunc Pro Tunc Order, respectively.  *See* Thompson Declaration at ¶ 15, n. 7.  The Partial Judgment & Order awarded the Plaintiffs $1,423,100.55 in postjudgment interest on the compensatory damages against RFC, $1,121,604.51 in

12

30.     Moreover, the Plaintiffs began comprehensive discovery into the conduct they alleged as the basis for the Appellate Sanctions Motion, including the depositions of several of RFC's and Wachovia's former attorneys.  *See* Thompson Declaration at ¶ 16.  On February 8, 2012, the Plaintiffs filed, in the State Court, a motion for sanctions against RFC and Wachovia based on the same alleged conduct underlying the Appellate Sanctions Motion (the "**Trial Sanctions Motion**").[13]  *See id.*  The Trial Sanctions Motion sought, among other things, (a) entry of default judgment, (b) an order striking RFC's defenses to punitive damages, (c) an instruction informing the jury that RFC had committed fraud on the court, had hidden and destroyed documents and had done so in order to avoid discovery of evidence that was damaging to RFC's case and (d) monetary sanctions of up to $20 million against RFC and Wachovia.  *See id.*

31.     The State Court denied RFC's requests to continue the Remand Trial or to postpone decision on the Trial Sanctions Motion until after the Remand Trial.  *See* Thompson Declaration at ¶ 17.  Instead, the Trial Sanctions Motion was set for a week-long evidentiary hearing beginning March 5, 2012, with the Remand Trial beginning on March 12, 2012.  *See id.*

32.     Furthermore, around the same time that the Trial Sanctions Motion was filed, the Plaintiffs filed a motion requesting attorneys' fees (the "**Attorneys' Fees Motion**").[14]  *See* Thompson Declaration at ¶ 18.  The Plaintiffs, pursuant to the Court of Appeals' award,

---

prejudgment interest on the award of past interest paid against RFC, and $767,214.34 in postjudgment interest on the award of statutory attorneys' fees against RFC.  *See id.*  The Nunc Pro Tunc Order awarded the Plaintiffs an additional $1,868,949 in prejudgment interest on the award of past interest paid against RFC to correct for the State Court's miscalculation in the Partial Judgment & Order.  *See id.*  Additionally, postjudgment interest continued to accrue at a rate of 9% per year between the time that the Partial Judgment & Order and the Nunc Pro Tunc Order were entered and the time that RFC made the payments to the Plaintiffs (the "**Accrued Interest**").  *See id.*  RFC paid the following amounts in Accrued Interest: $11,031.75 in additional postjudgment interest on the compensatory damages against RFC; $2,489.04 in postjudgment interest on the award of prejudgment interest on past interest paid against RFC; $5,947.38 in additional postjudgment interest on the award of statutory attorneys' fees against RFC; and $17,051.08 in postjudgment interest.  *See id.*

[13] A copy of the Trial Sanctions Motion is attached hereto as **Exhibit 6**.

[14] A copy of the Attorneys' Fees Motion is attached hereto as **Exhibit 7**.

13

requested a total award of $6,708,456.50 (twice the amount of actual fees incurred by the

Plaintiffs over the three-year period between the end of the Initial State Court Trial and the

Remand Trial), of which $2,780,365.38 was attributed to RFC.  *See id.*  The Attorneys' Fees

Motion was set for further briefing and decision after the Remand Trial.  *See id.*

### C.    The Settlement Agreement[15]

33.    Rather than proceed with the hearing on the Trial Sanctions Motion and the

Remand Trial, the Plaintiffs and RFC engaged in settlement negotiations and on February 27,

2012 (the "**Settlement Date**") entered into the Settlement Agreement.  *See* Thompson

Declaration at ¶ 19.  The parties to the Settlement Agreement include RFC and various affiliated

entities and individuals, on the one hand, and the Plaintiffs and certain members of the Litigation

Class (the "**Mitchell Settlement Class**"),[16] on the other hand.  *See id.*  The Settlement

Agreement resolves all remaining claims between the Parties, including, but not limited to, the

Plaintiffs' remaining punitive damages claims against RFC with respect to the 248 loans held by

the approximately 365 members of the Mitchell Settlement Class[17] as well as any purported

liability stemming from the Trial Sanctions Motion, thereby eliminating the risk of an allowed

---

[15] This motion and its supporting papers summarize several aspects of the Settlement Agreement for the convenience of the Court, and for the purpose of providing context for the relief sought in this Motion.  Except as set forth in ¶5 of this Motion, nothing in these summaries is intended to or should be considered to alter, amend, limit, expand or otherwise interpret the terms of the Settlement Agreement, a true and correct copy of which is attached as **Exhibit 3** to this Motion.

[16] Specifically, the Mitchell Settlement Class includes all members of the Litigation Class that did not timely exclude themselves from the Litigation Class (as certified by the State Court on December 8, 2006), and includes approximately 365 persons who obtained an MCR loan that was purchased by, assigned to, serviced by and/or master serviced by RFC (collectively, the "**MCR-RFC Loans**").  *See* Thompson Declaration at ¶ 19, n. 9.  It should be noted that only one potential claimant opted out of the Litigation Class prior to its certification on December 8, 2006 and none of the Mitchell Settlement Class claimants have opted out.  Consequently, the Debtors will not need to address a population of claimants outside of the scope of the Mitchell Settlement Class with respect to the claims being released under the Settlement Agreement.

[17] The difference in the number of loans and the number of potential claimants is due to certain loans involving multiple borrowers and certain borrowers filing for bankruptcy protection, resulting in the substitution of a bankruptcy trustee as the claimant.  *See* Thompson Declaration at ¶ 19, n. 10.

punitive damage claim that could exceed the original $92 million award and an additional award of potentially $8 to $20 million in monetary sanctions against RFC. *See id.* On April 16, 2012, the Mitchell Settlement Class received preliminary certification from the State Court. *See id.*

34.    Under the terms of the Settlement Agreement, RFC agreed to pay $14.5 million to the Mitchell Settlement Class and an additional $2,780,365.38 million in attorneys' fees[18] (collectively, the "**Mitchell Settlement Amount**"). *See* Thompson Declaration at ¶ 20. RFC believed this to be a favorable agreement, particularly in light of the result from the Initial State Court Trial. *See id.*

35.    In exchange for the remittance of the Mitchell Settlement Amount, the Mitchell Settlement Class agreed to provide the Released Persons[19] with releases of the Released Claims[20] including, without limitation, the following:

---

[18] The approximately $2.78 million in statutory attorneys' fees was paid in full by RFC to Plaintiffs' counsel on March 2, 2012 in resolution of the Attorneys' Fees Motion. *See* Thompson Declaration at ¶ 20, n. 11.

[19] The "Released Persons" include RFC, individually and together with the affiliates, parent companies and subsidiaries listed on **Exhibit F** to the Settlement Agreement, and each of their joint or respective past and present officers, directors, shareholders, employees, attorneys, accountants, insurers, and the heirs, executors, predecessors, successors, and assigns of each; provided, however, that notwithstanding anything in the Settlement Agreement to the contrary, and regardless of any prior or current relationship or affiliation with RFC, "Released Persons" does not include Household or Wells Fargo, or the respective past and present officers, directors, shareholders, employees, attorneys, accountants, insurers, heirs, executors, and administrators, predecessors, successors, and assigns of each.

[20] The "Released Claims" include any and all of the remaining claims for punitive damages, sanctions, statutory attorneys' fees and any other relief available to the Releasors (as defined in section 2.21 of the Settlement Agreement) under the applicable Missouri revised statutes in connection with the MCR-RFC Loans or the Class Action or the Sanction Motions, not previously satisfied by RFC, and any and all other unsatisfied and/or unadjudicated claims, demands, actions, causes of action, rights, offsets, setoffs, suits, damages, lawsuits, liens, costs, surcharges, losses, attorneys' fees, expenses or liabilities of any kind whatsoever, in law or in equity, for any relief whatsoever, including monetary, injunctive or declaratory relief, rescission, general, compensatory, special, liquidated, indirect, incidental, consequential or punitive damages, as well as any and all claims for treble damages, penalties, sanctions, attorneys' fees, costs or expenses, whether known or unknown, alleged or not alleged in the Class Action, suspected or unsuspected, contingent or vested, accrued or not accrued, liquidated or unliquidated, matured or unmatured, that in any way concern, relate to, or arise out of the MCR-RFC Loans or the Class Action or the Sanctions Motions and which any of the Releasors currently have, from the beginning of time up through and including the effective date of the Settlement Agreement, against the Released Persons.

(a)    any allegations that were or could have been asserted against the Released Persons in the Class Action in any way relating to the MCR-RFC Loans of the Mitchell Settlement Class;

(b)    any activities of the Released Persons with respect to the MCR-RFC Loans including, without limitation, any alleged representations, misrepresentations, disclosures, incorrect disclosures, failures to disclose, acts (legal or illegal), omissions, failures to act, deceptions, acts of unconscionability, unfair business practices, breaches of contract, usury, unfulfilled promises, breaches of warranty or fiduciary duty, conspiracy, excessive fees collected, or violations of any consumer protection statute, any state unfair trade practice statute, or any other body of case, statutory or common law or regulation, federal or state; and/or

(c)    any conduct undertaken by any of the Released Persons to defend the Class Action, including but not limited to, any alleged improper discovery conduct and/or any request for sanctions in the Class Action.

36.    Moreover, the terms of the Settlement Agreement provide that the Mitchell Settlement Amount will be paid to the members of the Mitchell Settlement Class in proportion to each member's share of the Net Distributable Settlement Fund, which is the Mitchell Settlement Amount less: (a) the amount of any awards for attorneys' fees or attorney compensation approved by the State Court and awarded to Plaintiffs' counsel and (b) any interest earned and attributable to the amount of such awards while in escrow.  *See* Thompson Declaration at ¶ 21. Specifically, the Plaintiffs are seeking payment of $25,000.00 of the Mitchell Settlement Amount as an incentive award, counsel to the Mitchell Settlement Class is seeking payment of $6,487,749.32 of the Mitchell Settlement Amount as attorneys' fees and $57,779.28 of the Mitchell Settlement Amount as reimbursement for a share of litigation costs and expenses since the remand, and the remaining portion of the Mitchell Settlement Amount is to be paid to the members of the Mitchell Settlement Class. *See id.*

37.    In light of the fact that the Mitchell Settlement Class, the Plaintiffs and counsel to the Plaintiffs will each receive a portion of the Allowed Mitchell Claim (upon the Motion being granted), it is the movants' understanding that the Plaintiffs and their counsel agree that the

16

proceeds of the Allowed Mitchell Claim will be allocated in the following manner: (a) Plaintiffs'

counsel will have a claim for the amount that the State Court approves, provided that such award

does not exceed $6,487,749.32 in attorneys' fees and $57,779.28 in litigation costs and expenses,

(b) the Plaintiffs will have a claim for an incentive award for the amount that the State Court

approves, provided that such amount does not exceed $25,000 and (iii) the Mitchell Settlement

Class will have a claim for the sum of $14.5 million less the approved amounts of the allowed

general unsecured claims for the Plaintiffs and Plaintiffs' counsel set forth in items (i) and (ii)

above. *See id* at ¶22.

38.    Several factors influenced RFC's decision to enter into the Settlement Agreement,

including, among other things, that:

(a)    at the time of the Settlement Date, the State Court had either sustained,
sustained by agreement, or withheld ruling on all of the Plaintiffs' motions
in limine, which included precluding RFC from (i) arguing that it had been
adequately punished by the awards of compensatory damages,
prejudgment and postjudgment interest, and attorneys' fees that far
exceeded the prohibited fees at issue and (ii) presenting evidence of any
economic benefits that the Plaintiffs received from their loans, each of
which are defenses that RFC would have raised in response to the
Plaintiffs' request for punitive damages during the Remand Trial;

(b)    research indicated that the jury pool in Jackson County, Missouri had
become significantly less favorable to financial institutions since the
Initial State Court Trial due to the economic crisis;

(c)    recent Missouri decisions concerning the punitive damages multiplier
suggest the potential for greater liability; and

(d)    the above factors raised concerns over the potential scope of the punitive
damages that may be awarded.[21]

---

[21] Although the Court of Appeals had reversed the previous punitive damages award, that reversal was based on
instructional error and provided no guidance regarding the due process standards at issue before the State Court.
Additionally, recent Missouri decisions regarding due process limitations on punitive damages awards suggested
that higher ratios of punitive damages were reasonable.  An additional factor that weighed in favor of settlement at
that time was that  RFC may have been required to post a bond in order to stay execution of any judgment pending

17

*See* Thompson Declaration at ¶ 23.

39.    The Settlement Agreement was executed on February 27, 2012 and preliminary approval of the Settlement Agreement by the State Court was obtained on April 16, 2012.  *See* Thompson Declaration at ¶ 24.  After notice of the Settlement Agreement was given to the Mitchell Settlement Class (none of whom opted out), but before final approval of the Settlement Agreement was obtained from the State Court and the $14.5 million was paid to the Mitchell Settlement Class, the Debtors commenced these Chapter 11 cases.  *See id.*

40.    Pursuant to the Settlement Agreement Stipulation, the Debtors are only agreeing to provide the representative of the Mitchell Settlement Class with an allowed, general unsecured claim for $14.5 million and the Class Representatives have agreed to this limitation.  Thompson Declaration at ¶ 25.  However, a condition precedent to effectiveness of the Settlement Agreement is that it must be approved by the State Court.  *See* Thompson Declaration at ¶ 26. Therefore, the Debtors believe it is appropriate to provide the Mitchell Settlement Class with limited stay relief so that Plaintiffs' counsel can seek to have the Settlement Agreement approved and finalized so that a liquidated class claim may be made in these Chapter 11 cases.

## RELIEF REQUESTED

41.    By this Motion, the Debtors seek entry of an order, substantially in the form of the Order, pursuant to section 362 of the Bankruptcy Code and Bankruptcy Rule 9019 (a) modifying the automatic stay to allow the Debtors to proceed with the settlement of the Class Action, including allowing the Plaintiffs to participate in the final settlement hearing before the State Court, and (b) approving the Debtors' entry into the Settlement Agreement and authorizing them

---

appeal.  For example, following the Initial State Court Trial, RFC was required to post a cash bond in the amount of $126,556,917.00.  *See* Thompson Declaration at ¶ 23.

ny-1053977

to perform their obligations thereunder, including the allowance of a claim for the Mitchell

Settlement Amount.

## BASIS FOR RELIEF REQUESTED

42.    Prior to the Petition Date, the Plaintiffs and RFC engaged in extensive settlement

discussions in an attempt to resolve the Class Action, and reached an agreement in principle on

the terms of a settlement.  Specifically, the parties agreed that RFC's payment of the Mitchell

Settlement Amount would resolve all of the Released Claims (as defined in section 2.23 of the

Settlement Agreement) by the Plaintiffs and the Mitchell Settlement Class against RFC and any

other of the Released Persons (as defined in section 2.22 of the Settlement Agreement).  *See*

Thompson Declaration at ¶ 28.  The Settlement Agreement was negotiated, drafted, and signed.

In addition, it received preliminary approval from the State Court and has been approved by the

Mitchell Settlement Class, none of whom opted out of the settlement.  *See* Thompson

Declaration at ¶ 24.  Thus, to take effect, the Settlement Agreement only requires final approval

by the State Court.

43.    However, as a result of the imposition of the automatic stay, a final hearing on the

Settlement Agreement (the "**Final Settlement Hearing**") cannot proceed absent relief from this

Court.  In light of the Debtors' determination, in their business judgment, that the proposed

resolution is in the best interests of the Debtors' estates and their creditors, the Debtors seek

modification of the automatic stay to participate in the Final Settlement Hearing in order to move

forward with the approval of the Settlement Agreement as modified by the Settlement

Agreement Stipulation.

## A.    The Court Should Grant Relief From the Automatic Stay

44.    Under section 362(d)(1) of the Bankruptcy Code, "[o]n request of a party in

interest . . . the court shall grant relief from the stay . . . for cause."  11 U.S.C. § 362(d)(1).  The

Bankruptcy Code does not define "cause." *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d
Cir. 1990). Nevertheless, to determine "cause" courts typically balance the hardships to the
parties. *Int'l Bus. Machs. v. Fernstrom Storage & Van Co.(In re Fernstrom Storage & Van Co.)*,
938 F.2d 731, 735 (7th Cir. 1991); *Loudon v. Amogio Foods, Inc.(In re Loudon)*, 284 B.R. 106,
108 (B.A.P. 8th Cir. 2002); *Wiley v. Hartzler, (in re Wiley)*, 288 B.R. 818, 822 (B.A.P. 8th Cir.
2003). In addition, a stay may be lifted to permit litigation involving the debtor to continue in
another court. *Schneiderman v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 110 (2d Cir.
2002).

45.        In this case, for the reasons set forth above and discussed in further detail below,
the Debtors will benefit by allowing the State Court to proceed with the final approval and
implementation of the Settlement Agreement because, among other reasons, (a) the Plaintiffs'
claims are being fully resolved without the need for further time consuming, costly and
distracting litigation and (b) the resolution of the Class Action through the Settlement Agreement
alleviates the risk of a significantly higher judgment against the Debtors that could enlarge the
claims pool and dilute the creditors' recoveries. *See* Thompson Declaration at ¶¶ 27, 28.

**B.      The Court Should Approve the Debtors' Entry Into the Settlement Pursuant to
Bankruptcy Rule 9019**

46.        Bankruptcy Rule 9019 provides, in part, that "[o]n motion by the [debtor-in-
possession] and after notice and a hearing, the court may approve a compromise or settlement."
Fed. R. Bankr. P. 9019(a); *see In re WorldCom, Inc.*, 347 B.R. 123, 136-37 (Bankr. S.D.N.Y.
2006) ("The decision whether to approve a compromise is within the discretion of the
bankruptcy court and can only be reversed for abuse of such discretion"). In granting a motion
pursuant to Rule 9019(a), a court must find that the proposed settlement is fair and equitable and
is in the best interests of the estate. *Protective Comm. for Indep. Stockholders of TMT Trailer*

*Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Fischer v. Pereira (In re 47-49 Charles St., Inc.)*, 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd,* 17 F.3d 600 (2d Cir. 1994).

47.    The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court.  *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994); *In re Ionosphere Clubs, Inc.*, 156 B.R. at 426-27.  It is the responsibility of the court to examine a settlement and determine whether it "'fall[s] below the lowest point in the range of reasonableness.'"  *Cosoff v. Rodman, (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (internal citation omitted); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).  However, it should be noted that the Court's analysis is not a mechanical process, but rather contemplates a "range of reasonableness . . . which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion . . . ."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).  Additionally, discretion should be exercised by the Bankruptcy Court "in light of the general public policy favoring settlements."  *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *Shugrue*, 165 B.R. at 123 ("[T]he general rule [is] that settlements are favored and, in fact, encouraged . . . .").

48.    To approve a proposed settlement, the Court need not definitively decide the numerous issues of law and fact raised by the settlement.  Rather, the Court should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"  *In re W.T. Grant Co.*, 699 F.2d at 608 (citing *Newman v. Stein*, 464 F.2d at 693); *see also In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying [dispute].").

21

49.      In deciding whether a particular settlement falls within the "range of
reasonableness," courts consider the following "*Iridium*" factors: (a) "the balance between the
litigation's possibility of success and the settlement's future benefits"; (b) "the likelihood of
complex and protracted litigation, 'with its attendant expense, inconvenience, and delay'";
(c) "'the paramount interests of the creditors'"; (d) "whether other parties in interest support the
settlement"; (e) "'the nature and breadth of releases to be obtained by officers and directors'";
(f) "the 'competency and experience of counsel' supporting, and '[t]he experience and
knowledge of the bankruptcy court judge' reviewing, the settlement"; and (g) "'the extent to
which the settlement is the product of arm's length bargaining.'"  *Motorola, Inc. v. Official
Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007)
(internal citations omitted).

50.      The Debtors respectfully submit that the *Iridium* factors weigh in favor of this
Court's approval of the Debtors' entry into the Settlement Agreement.  Under the Settlement
Agreement, the Debtors will resolve the claims of the Mitchell Settlement Class for considerably
less than what otherwise may be awarded to the Plaintiffs by the State Court or in this Court
following a determination of the Class claimants' claims.  Moreover, the terms and conditions of
the Settlement Agreement were reached after arm's length negotiations between the parties, and
the Settlement Agreement resolves actual disputes and controversies that, if permitted to
continue, would involve protracted and expensive litigation proceedings as well as consume the
valuable time and efforts of the Debtors' management and professionals.

*(i)      The Balance Between the Litigation's Possibility of Success and the
        Settlement's Future Benefits*

51.      The Settlement Agreement is the result of arm's-length negotiations between
sophisticated parties.  As part of these negotiations, and prior to the Petition Date, the Debtors

22

concluded that the Mitchell Settlement Amount of approximately $17.28 million (which includes

the $14.5 million dollar settlement of the punitive damage claims and the payment of

approximately $2.78 million in attorneys' fees), was reasonable based on their assessment of the

possibility of success of the litigation and the benefits of the settlement. *See* Thompson

Declaration at ¶ 28.  For example, the State Court, in the Initial State Court Trial, awarded the

Plaintiffs a judgment of, among other things, $92,000,000.00 in punitive damages against RFC.

If the Settlement Agreement is not effectuated and the Debtors were to proceed objecting to the

claims related to the matters at issue in the Remand Trial and the Trial Sanctions Motion, then

the Debtors would risk the allowance of a claim similar to or higher than the amount of the

original punitive damages judgment as well as a further award of potentially $8 to $20 million in

monetary sanctions against RFC in relation to the alleged misconduct of RFC's counsel during

the Initial State Court Trial.  *See id.* at ¶ 27.  Therefore, the Debtors believe that the Mitchell

Settlement Amount reflects the Debtors' reasonable assessment of the risk, as well as the

substantial expense of litigation and the related impact on the Debtors' restructuring efforts,

balanced against the benefits to all parties of a consensual resolution of the Class Action.

      52.     Although the resolution of disputes through litigation always involves some

measure of uncertainty, that is particularly true in the context of the Class Action due to the fact

that: (a) research indicated that the jury pool in Jackson County, Missouri was becoming

increasingly less favorable to financial institutions; (b) punitive damage awards in Jackson

County, Missouri were increasing; and (c) RFC was precluded by the State Court from

(i) arguing that it had been adequately punished by the awards of compensatory damages,

prejudgment and postjudgment interest, and attorneys' fees, (ii) presenting evidence of any

23

economic benefits that the Plaintiffs received from their loans, and (iii) submitting evidence of

RFC's current financial condition.  *See* Thompson Declaration at ¶ 23.

53.    The Mitchell Settlement Class involves 248 loans and approximately 365

potential claimants as well as a multitude of issues and arguments.  *See* Thompson Declaration at

¶ 19.  The Debtors submit that the complexity of the Class Action, the difficulty inherent in

predicting the success of either party with respect to any particular disputed issue, and the risks

and unnecessary distractions associated with complex and protracted litigation of potentially

more than 300 individual claims renders the Settlement Agreement particularly reasonable and

appropriate.  Indeed, as an initial matter, this Court would have to determine whether to permit

Plaintiffs to file and prosecute a proof of claim on behalf of the Litigation Class under

Bankruptcy Rules 9014 and 7023.

54.    The Settlement Agreement provides certainty to the Debtors and their creditors

with respect to the Released Claims.  If, however, the Settlement Agreement is not approved and

the Plaintiffs achieve a greater recovery through their continued litigation in this Court of the

underlying issues in the State Court (or in the State Court), then recovery by the Debtors' other

creditors will be diluted.

55.    The Debtors acknowledge that this Court retains the authority under sections

105(a) and 510(c) of the Bankruptcy Code to subordinate claims for punitive damages.[22]

However, the Court is not necessarily bound to do so.  Here, the Debtors are settling that portion

of the Plaintiffs' claims for approximately 16% of the $92 million amount originally awarded by

the State Court in punitive damages.  On remand, the award could be substantially greater.  In

---

[22] *See In re Johns-Manville Corp.*, 68 B.R. 618, 627-28 (Bankr. S.D.N.Y. 1986) (observing "that arguably under §
510 of the Code, bankruptcy courts have the statutory power to subordinate claims for punitive damages" and noting
that "it is well within the equitable power granted by § 105 of the Code to preclude . . . recovery of punitive
damages in this reorganization").

24

addition, the Settlement Agreement is not limited to the Plaintiffs' punitive damages claims. The

Settlement Agreement also resolves all potential liability with respect to the Sanctions Motion

(which could potentially amount to several millions of dollars) and all other claims of any nature

associated with the Class Action.

56.    In short, although the potential outcome of the Class Action after a lengthy

litigation and claims resolution process could be more or less than the Mitchell Settlement

Amount, the costs and uncertainty of such litigation make settlement a more efficient and

reasonable way to resolve these claims that is in the best interest of all parties, including the

Debtors' estates and creditors.  The compromise of offering an allowed, general unsecured claim

of $14.5 million to the Mitchell Settlement Class will, if approved by the State Court, fully

resolve the Released Claims.

### (ii)    *Likelihood of Complex and Protracted Litigation*

57.    If the Settlement Agreement is not approved and the Debtors have to litigate the

issues involved in the Remand Trial, the Trial Sanctions Motion and the Attorneys' Fees Motion,

then the time and resources to be expended litigating the substance of those claims would be

substantial.  Based on the duration and complexity of the Initial State Court Trial and the

addition of the Trial Sanctions Motion, the Debtors estimate that if RFC litigated the issues

involved with the Remand Trial, it would expend approximately $1-2 million in fees and

expenses.  *See* Thompson Declaration at ¶ 27.  Thus, the Settlement Agreement will allow RFC

to avoid expending between $1-2 million in legal fees and expenses.

58.    Moreover, as with any litigation, the Debtors risk facing substantially greater

damages than what is being agreed to in the Settlement Agreement.  For instance, as discussed

above, if the Settlement Agreement is not effectuated and the Plaintiffs were to succeed in their

prosecution of claims related to the Remand Trial and the Trial Sanctions Motion, then RFC

25

could face allowed claims in excess of $100 million, as opposed to a claim of $14.5 million as is provided for in the Settlement Agreement. *See* Thompson Declaration at ¶ 27.

### *(iii)    The Paramount Interests of Creditors*

59.    Approval of the proposed Settlement Agreement is in the best interests of the Debtors and their creditors because it resolves the Plaintiffs' claims in the Class Action in the most cost effective manner reasonably available, on terms that the Debtors submit are reasonable.  In fact, the bulk of the Debtors' efforts in evaluating and documenting the Settlement Agreement were expended prior to the Petition Date.  If the Settlement Agreement is not approved, the Debtors do not believe that the Mitchell Settlement Class would agree to a resolution on better terms than what is presently before the Court. *See* Thompson Declaration at ¶ 20.  Moreover, in addition to the risk of substantially larger exposure, the Debtors will incur significant litigation costs, and face the risk of a claim, or a multitude of claims, substantially in excess of the Mitchell Settlement Amount.

### *(iv)    Support for the Settlement by the Parties in Interest*

60.    The Settlement Agreement is supported by the Mitchell Settlement Class.  In fact, none of the members of the Mitchell Settlement Class elected to opt of the Settlement Agreement. *See* Thompson Declaration at ¶ 24.  Accordingly, under the Settlement Agreement, the Debtors expect to resolve 100% of the Released Claims held by the appropriate parties who make up the Mitchell Settlement Class.

**(v)    *The Nature of the Release to be Obtained by the Debtors' Officers and Directors***

61.    According to the terms of the Settlement Agreement, the Released Persons with respect to the Released Claims, include, among other parties, RFC and certain of its affiliates,[23] parent companies and subsidiaries, including Ally Financial Inc., Residential Capital LLC and GMAC Mortgage, LLC, as well as numerous other Debtor and non-debtor entities,  in addition to the past and present officers and directors of such entities.  The inclusion of non-debtor parties, including, without limitation, the parents and certain affiliates of the Debtors was a business decision and good practice to ensure related entities are protected from incurring liabilities relating to the Mitchell Settlement Class claims against RFC.

**(vi)    *The Competency of Counsel and the Extent to Which the Settlement Is the Result of Arm's-Length Bargaining***

62.    For the reasons stated above, the Debtors believe that the paramount interests of all parties are best served by approval of the Settlement Agreement.  *See* Thompson Declaration at ¶ 28.  Moreover, the Settlement Agreement also satisfies two additional *Iridium* factors because (a) the Settlement Agreement was negotiated separately between RFC and the Plaintiffs, without collusion, in good faith, and from arm's-length bargaining positions and (b) all parties were represented by experienced and sophisticated counsel.

63.    Finally, as part of approving the settlement and fixing an allowed claim, the order should permit the Mitchell Settlement Class to have a single claim against RFC for the agreed-

---

[23]  A complete list of the RFC affiliates, parent companies and subsidiaries covered by the releases under the Settlement Agreement can be found under **Exhibit F** to the Settlement Agreement.

27

upon Mitchell Settlement Amount in full satisfaction of their claims, and to be allocated pursuant

to the terms of the Settlement Agreement.[24]

## CONCLUSION

64.     In sum, the Debtors have determined, exercising their sound business judgment,

that the Settlement Agreement is fair, equitable, and eminently reasonable to the Debtors' estates

and creditors, thereby satisfying the standards of Bankruptcy Rule 9019.  The timely resolution

of the Class Action is in the best interests of the Debtors and their creditors.  The Debtors

therefore submit that the Settlement Agreement is fair and well within the range of

reasonableness—and certainly not "'below the lowest point in the range of reasonableness.'"  *In*

*re W.T. Grant Co.*, 699 F.2d at 608 (internal citation omitted).  Accordingly, the Debtors

respectfully request that the Court approve the Settlement Agreement pursuant to Bankruptcy

Rule 9019 and modify the automatic stay to allow the parties to proceed with a final hearing on

the Settlement Agreement in the State Court.

## NOTICE

65.     Notice of this Motion will be given to the following parties, or in lieu thereof, to

their counsel:  (a) the Office of the United States Trustee for the Southern District of New York;

(b) the Office of the United States Attorney General; (c) the Office of the New York Attorney

General; (d) the Office of the United States Attorney for the Southern District of New York;

(e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of the

---

[24] If the Settlement Agreement is ultimately approved by the Court,  the Mitchell Settlement Class, through the Plaintiffs Steven and Ruth Mitchell as the representatives of the Mitchell Settlement Class (the "Class Representatives"), will have an allowed general unsecured claim against the estate of Residential Funding Company, LLC in the amount of fourteen million five hundred thousand dollars ("14,500,000.00") which will be reflected on the Claims Register for the estate of Residential Funding Company, LLC.  The Mitchell Settlement Class is a subset of the Litigation Class, which was previously certified by the State Court.  The Mitchell Settlement Class has received preliminary certification as a class in the State Court, and the Mitchell Settlement Class has operated in unison throughout the underlying proceedings to represent their common interests.

28

Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees for

the Debtors' outstanding notes issuances; (i) Ally Financial Inc.; (j) Barclays Bank PLC, as

administrative agent for the lenders under the debtor in possession financing facility; (k) Ocwen

Loan Servicing, LLC and its counsel; (l) the Creditors' Committee; (m) the Mitchell Settlement

Class and their counsel; and (n) all parties requesting notice pursuant to Bankruptcy Rule 2002.

The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no

other or further notice need be provided.

## NO PRIOR REQUEST

66.    Except as otherwise noted herein, no prior motion for the relief requested herein

has been made to this Court or any other court.

**WHEREFORE**, the Debtors respectfully request the entry of the Order granting the

relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        November 12, 2013

                                    Respectfully submitted,


                                    /s/ Norman S. Rosenbaum
                                    Gary S. Lee
                                    Norman S. Rosenbaum
                                    Jordan A. Wishnew


                                    MORRISON & FOERSTER LLP
                                    1290 Avenue of the Americas
                                    New York, New York 10104
                                    Telephone: (212) 468-8000
                                    Facsimile: (212) 468-7900

                                    *Counsel to the Debtors and*
                                    *Debtors in Possession*

29