## EXHIBIT 6

## Trial Sanctions Motion

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY

STEVEN AND RUTH MITCHELL,

                Plaintiffs,

vs.

RESIDENTIAL FUNDING CORPORATION,
et al.,

                Defendants.

Case No. 03-CV-220489

Division 4

**PLAINTIFFS' MOTION FOR SANCTIONS AGAINST
WELLS FARGO BANK, N.A. AND RESIDENTIAL FUNDING COMPANY, LLC
FOR FRAUD ON THE COURT, FOR VIOLATIONS OF THIS COURT'S ORDERS
ENFORCING DISCOVERY, AND FOR CONCEALMENT
AND SPOLIATION OF MATERIAL EVIDENCE**

Plaintiffs, on behalf of themselves and the Class, respectfully move the Court to sanction Defendants Wells Fargo Bank, N.A. ("Wells Fargo") and Residential Funding Company, LLC ("RFC") (hereinafter collectively the "Defendants") for their fraud on the Court, for their violations of this Court's orders enforcing discovery, and for their concealment and spoliation of material evidence that this Court specifically ordered be produced to the Plaintiffs. The Defendants were and are engaged in an unconscionable and intolerable effort to corrupt the judicial process and to prejudice Plaintiffs so as to avoid a substantial punitive damages award.

Specifically, Plaintiffs move the Court to sanction Defendants Wells Fargo Bank, N.A. and Residential Funding Company, LLC as follows:

(1)     The Court should strike Wells Fargo's and RFC's pleadings for failure to comply with the Court's prior orders and for fraud on the Court and render a judgment by default as against Wells Fargo and RFC on Plaintiffs' claims for punitive damages;

(2)    As an alternative to the sanction requested in (1) above, the Court should enter an

order prohibiting Wells Fargo and RFC from opposing Plaintiffs' claims for punitive damages

and/or prohibiting Wells Fargo and RFC from offering any evidence in defense of or in

opposition to the Plaintiffs' punitive damages claims and to instruct the jury that Wells Fargo

and RFC have been prohibited from defending the punitive damages claim as a result of its fraud

on the Court and concealment of material evidence;

(3)    In addition, the Court should enter an order that instructs the jury to make and

draw an adverse inference from Wells Fargo's and RFC's fraud on the Court and concealment of

material evidence; and

(4)    In addition, the Court should enter an order treating as a contempt of court Wells

Fargo's and RFC's failure to obey the Court's earlier discovery orders; and

(5)    In addition, the Court should impose a joint monetary sanction of $10-20 million

but no less than $10 million against Wells Fargo and RFC.

The requested sanctions are necessary, appropriate and warranted given the severity and

long history of the Defendants' conduct. As explained below, and in detail in the accompanying

*Suggestions*, Plaintiffs' continuing investigation irrefutably demonstrates that these Defendants

acted together to "coordinate" and conceal the existence of material evidence that the Court

specifically ordered be produced to the Plaintiffs in its Order granting Plaintiffs' Sixth Motion to

Enforce Discovery on October 3, 2007.

The Court's Order compelled Wells Fargo "to fully and completely answer, without

objections, those interrogatories, requests for production and requests for admission which relate

to its internal policies and procedures to determine legal compliance and to produce responsive

documents, including the matrix, guidelines and its policies and procedures"[1] as Plaintiffs had requested." **Ex. 6**; **Ex. 4**, at p. 10.

Plaintiffs' subsequent investigation has revealed that the Defendants acted together to not only conceal the documents that were responsive to the Court's Order, but they also destroyed the original of a Missouri state fee matrix that was prepared by Wells Fargo for use in its correspondent lending operations in the hope it would never be found. The concealment and destruction of records was part of a joint effort to present a false and contrived "industry standards" defense. This defense hinged on the concealment of material evidence, including the Missouri fee matrix, and then an ensuing "cover up" to prevent the discovery of the concealment and underlying fraud.  To further aid their false and contrived defense, Defendants presented false interrogatory answers, or by their silence ratified such false answers, and pleadings to the Court in violation of Rule 55.03.

Although the final judgment in this case was entered in June 2008, it was not until November 2008 that Plaintiffs first discovered the fraud and concealment of records. To clarify, the fraud and concealment was initially uncovered by the undersigned Plaintiffs' counsel, who were representing the plaintiffs in a different case involving violations of the MSMLA, *Schwartz v. Bann-Cor Mortgage, et al*.  The same attorneys who represented RFC in this matter also represented defendant Wells Fargo in the *Schwartz* case. The Husch & Eppenberger law firm represented Wells Fargo in this case.  The following chart identifies the parties and their primary attorneys in both cases:

| *Defendant* | *Attorneys in Mitchell* | *Attorneys in Schwartz* |
|---|---|---|
| Wells Fargo f/k/a Wachovia Equity Servicing f/k/a HomeEq Servicing Corp. f/k/a | Husch & Eppenberger n/k/a Husch Blackwell Sanders | Reed Smith, LLP<br><br>*Prior to October 2008:* |

---

[1]  The Court granted Plaintiffs' Motion in the Order and the relief sought in the Motion.  The quote is the relief sought in the Motion which the Defendants were Ordered to perform.

| The Money Store | • Scott Martin<br>• Michael Hargens<br>• Kara Benboom | • Roy Arnold<br>• Tom Allen<br>• Lyle Washowich<br>• Dustin Pickens<br><br>*After October 2008:*<br>• Mary Hackett<br>• Jeremy Feinstein |
| Residential Funding Company | Reed Smith<br><br>• Roy Arnold<br>• Tom Allen<br>• Lyle Washowich<br>• Dustin Pickens | N/A |

In October 2008, the *Schwartz* Plaintiffs filed a First Motion for Sanctions related to Wells Fargo's contempt of the *Schwartz* Court's July 2008 Order enforcing discovery. That order in *Schwartz* also compelled Wells Fargo to produce the same fee matrices and documents in the *Schwartz* action, as had been previously ordered to be produced in this case. In connection with the *Schwartz* Plaintiffs' First Motion for Sanctions, a deposition was taken in early November 2008 of a Wells Fargo employee. During that deposition the Wells Fargo employee inadvertently revealed that Wells Fargo had in its possession a previously unproduced index that listed the contents of boxes of documents it continued to maintain in an Iron Mountain storage facility in Sacramento, California. As it turned out, the Wells Fargo's employee's simple but inadvertent revelation "broke the dam" that lead to Plaintiffs' counsel's discovery of Wells Fargo's fraud on the court and concealment of materially important records that ***this Court*** had ordered be produced to Plaintiffs.[2]

Importantly, Plaintiffs later learned through their investigation (1) that the index was dated October 4, 2007, which was the day following this Court's October 3, 2007 Order granting

---

[2] After the Wells Fargo employee revealed the existence of the index, Wells Fargo still refused to produce it. On November 19, 2008, the *Schwartz* Plaintiffs filed a supplement to their Motion for Sanctions which notified the Court of their discovery of the yet-unproduced index. Left with no choice, Wells Fargo produced the index of documents on November 21, 2008.

Plaintiffs' Sixth Motion to Enforce Discovery in *Mitchell*; (2) that the index had been provided to the Husch & Eppenberger law firm on or about that same date; and (3) that Husch & Eppenberger emailed a copy of the index to the Reed Smith law firm (attorneys for RFC in *Mitchell* and Wells Fargo in *Schwartz*) for the purpose of coordinating the defenses of their respective clients in Missouri Second Mortgage Loans Act class action litigation. The index and its contents began the unraveling of the fraud and concealment perpetrated by the Defendants. It very specifically and unambiguously listed that there was a box of records in Wells Fargo's possession containing the description "**Fee Matrices – State**":



**Ex. 54** (highlight added).

Therefore, the index revealed that Wells Fargo's repeated representations to this Court and to the jury that fee matrices did not exist and could not exist were false. Because that index was provided to and in the possession of RFC prior to the trial, it evidences that RFC was aware of the falsity of Wells Fargo's representations but kept silent in its effort to benefit the joint defense the Defendants crafted for the defense of this lawsuit. To be clear, leading up to the trial, Wells Fargo repeatedly and falsely denied that any such fee matrices existed and adamantly maintained its position that it did not check for state law compliance because, according to Wells Fargo, it would have been next to, if not, impossible to do so.

For example, in opposition to *Plaintiffs' Renewed Motion for Sanctions* in *Mitchell*,

Wells Fargo (with the knowledge and consent of RFC) continued to falsely represent to the Court and to the Plaintiffs that "…such a rate fee matrix does not and never did exist." **Ex. 7.** Immediately before trial, Wells Fargo again repeated the fraud in its own *Motion in Limine No. 5* (and again with the knowledge and consent of RFC) and continued to intentionally misrepresent to the Court and to the Plaintiffs that "no such document has ever existed or was ever used." **Ex. 8**. Not content to mislead the Court and Plaintiffs through the filing of false pleadings, Wells Fargo on December 3, 2007 (which RFC ratified through its silence) argued and misrepresented to Plaintiffs and the Court that "there is no such document..." and "there is no witness to say there is a Money Store matrix." **Ex. 1**, at p. 317, 321. Wells Fargo and RFC knew these representations were false, as they were in possession of the allegedly "non-existent" matrices, and yet they continued to make these false representations to Plaintiffs and the Court, because it benefited their collective defense.

Indeed, once the index of boxes and documents was first produced for the first time on November 21, 2008, Wells Fargo and RFC knew they could no longer repeat those same lies. Accordingly, on November 25, 2008, Wells Fargo produced to the *Schwartz* Plaintiffs a Missouri state fee matrix that had been in its and RFC's possession prior to and during the entire *Mitchell* trial. *See* **Ex. 55.** This intentional and unabashed corruption of the judicial system should not be tolerated. It deserves the harshest of sanctions.

One of the many concealed documents that was contained in a file referenced in the index is a "Missouri State Fees" matrix. An image of the first page of the previously concealed matrix, which was produced for the first time on November 25, 2008 in *Schwartz* but not in *Mitchell*, is set forth below:

6



Missouri State Fees

Page 1 of 2

EXHIB
55

## The Money Store Mortgage Division

*Missouri State Fees-Revised 2/20/98*

THIS INFORMATION IS PRODUCT-SPECIFIC. IT APPLIES ONLY TO RETAIL DIRECT, CLOSED-END, REAL-ESTATE-SECURED FIRST AND JUNIOR LIEN LOANS MADE BY THE MONEY STORE THROUGH BRANCHES AND NCRP. IT DOES NOT APPLY TO PURCHASE-MONEY, HOME IMPROVEMENT RETAIL INSTALLMENT CONTRACTS, TITLE I, CORRESPONDENT (WHOLESALE OR NATIONAL), MULTI-FAMILY, HELOCS OR ANY OTHER LOAN PROGRAMS. This information is intended to be used only as guidance and a summary, and should not be relied upon as legal advice or corporate policy, and may not be shared with any person or entity not employed by TMS.

- Jump to Missouri Document Requirements Matrix
- Page down to Servicing Fees
- Jump to Missouri State Record Retention Requirements
- Jump to Missouri Trustee Requirements

| FEES AND CHARGES | FIRST LIEN LOANS | | SECOND LIEN LOANS | |
|---|---|---|---|---|
| | TMS CHARGE | COMMENTS | TMS CHARGE | COMMENTS |
| 1. Appraisal | Actual cost | Amount may vary | Actual cost | Amount may vary |
| 2. Attorney | Actual cost | Amount may vary | Actual cost | Amount may vary |
| 3. Signing Fee | Actual cost | To Title Co. or Signing Service | Actual cost | To Title Co. or Signing Service** |
| 4. Credit Report | $15.00 | To TMS | None | Not permitted |
| 5. Discount Points | TBD | -- | None | -- |
| 6. Document Preparation | $75.00 | To TMS | None | Not charged |
| 7. Escrow | N/A | -- | N/A | -- |
| 8. Flood determination* | $19.00 | Includes life-of loan monitoring | $19.00 | Includes life-of loan monitoring |
| 9. Odd Days Interest* | Up to 21 days | -- | 6 days optimal | Maximum 14 days per statute |
| 10. Points | Up to 7.75% | Must pass High Cost Mortgage test | 5% of loan amount | Must pass High Cost Mortgage test |
| 11. Processing Fee | None | Not Charged | None | Not charged |
| 12. Recording Fee | Actual cost | Amount may vary | Actual cost | Amount may vary |
| 13. State Mortgage Tax | N/A | -- | N/A | -- |
| 14. Tax Service | $31.00 or $62.00 | Thru First American ($31.00 if refi of a loan with Tax Service thru First American) | None | TMS pays as loan expense (if required) |
| **Cannot be charged by an attorney or TMS employee | | | | |
| 15. Title Insurance | Actual cost | Amount may vary | Actual cost | Amount may vary |
| 16. Title Report | Actual cost | In lieu of Title Insurance on some loans | Actual cost | In lieu of Title Insurance on some loans |
| 17. Usury Limit | None | See High Cost Mortgage test | None | See High Cost Mortgage test |

| SERVICING FEES | FIRST LIEN LOANS | | SECOND LIEN LOANS | |
|---|---|---|---|---|
| | TMS CHARGE | COMMENTS | TMS CHARGE | COMMENTS |
| 18. Late Fee | 5%/15 days | Method A | 5%/15 | Method B - |

http://home/mortgage/rnd_general/state_fee_matrix/missouri_state_fee.htm

9/10/98

EXHIBIT
915
12-1-

CONFIDENTIAL
HOMEQ-MO-SCHWARTZ-0022445

Ex. 55.

As the Court can see, the Missouri state fee matrix very clearly identifies whether certain fees charged on second mortgage loans are permitted by Missouri law. In fact, one of the illegal fees is the credit report fee, which was the subject of Plaintiffs' *Sixth Motion to Enforce* in

*Mitchell.* As the Court will recall, the credit report fee was the very fee discussed at length in the *Sixth Motion to Enforce* and, also in Wells Fargo's *Motion in Limine No. 4,* which disputed that the illegal credit report fee was refunded to borrowers Todd and Lori Elton Loan, and that the Court overruled. Although the Missouri fee matrix contains a "Notice" that states that it is not to be used in Wells Fargo's correspondent lending operations, that "Notice" did not and could not serve as a reason to conceal the document from the Court and Plaintiffs for several reasons.

First, it is beyond dispute that the Missouri fee matrix is specifically responsive to requests propounded by Plaintiffs in 2004, even if it was only used in Wells Fargo's "direct lending" operations, because Plaintiffs' discovery also sought fee matrices that were used by Wells Fargo in its direct lending operations:

> 19.    Please produce all policies, procedures and guidelines that you or your Affiliated Parties had in place to comply with Missouri's Second Mortgage Loan Act or state consumer protection laws.

**Ex. 4-6**, at No. 19. Plaintiffs requested "all policies, procedures, and guidelines" and that request was by its clear terms not limited to matrices used in correspondent lending. Indeed, Missouri's Second Mortgage Loans Act's fee prohibitions are the same whether Wells Fargo (or RFC or Household) "directly" or "indirectly" originated the loans and thus Wells Fargo's "direct lending" practices are entirely relevant to its "indirect lending" practices.

Second, the Court's Order granting Plaintiffs' *Sixth Motion to Enforce Discovery* ordered Wells Fargo to produce any an all fee matrices to Plaintiffs:

> "to fully and completely answer, without objections, those interrogatories, requests for production and requests for admission which relate to its internal policies and procedures to determine legal compliance and to produce responsive documents, **including the matrix**, guidelines and its policies and procedures"

*See* **Ex. 6** (Order) and **Ex. 4** (Relief Requested").

8

The Court's Order likewise required production of the documents requested by Request No. 19 and clearly ordered production of any matrix, whether the matrix was used in direct or correspondent lending.

Third, that "Notice" is not accurate, as Plaintiffs later learned, because Wells Fargo and RFC acted together to **conceal** numerous other documents that indicated that Wells Fargo had on occasion reviewed Missouri fee matrices and had used the same in its "correspondent lending" operations. Obviously, the Defendants concealed these documents so that they could continue to falsely argue that fee matrices were not used in correspondent lending.

Fourth, as the Court will recall, in Wells Fargo's *Motion in Limine No. 5*, Wells Fargo argued that a matrix referenced in Wells Fargo's High Cost Mortgage Training Manual was only used in its direct lending operations and therefore was not relevant to or admissible at trial in this case, which involved correspondent lending. The Court denied Wells Fargo's motion in limine and rejected Wells Fargo's arguments. The Court's order made clear that any fee matrices used by Wells Fargo in its operations, whether direct or indirect or correspondent, were relevant and admissible in this case. Consequently, there was no basis to withhold the Missouri fee matrix based on Wells Fargo's false assertion that the matrix only applied to direct lending.

### *The Concealed Documents*

Importantly, as the Court will also recall, Wells Fargo falsely represented in its discovery responses, testimony, and its statements to the Court, fee matrices did not and could not exist and were never used. The concealed documents described below proved otherwise.

Notwithstanding its earlier representation, Wells Fargo had in its possession the very same documents that it falsely claimed did not and could not exist. In response to the Court's October 3, 2007 Order, Wells Fargo's lawyers for the first time on October 10, 2007 reviewed 54

boxes of documents out of the more than 300 boxes identified on the index that were maintained in storage facilities in Roseville and Sacramento, California. Unknown to Plaintiffs' counsel, Wells Fargo's lawyers, Husch & Eppenberger, selected and copied approximately 1,040 pages of documents from the 54 boxes that were responsive to Plaintiffs' discovery requests during that October 10, 2007 review. Thereafter, pursuant to the parties' joint defense agreement and at the request of RFC's counsel (the Reed Smith law firm), those selected and copied documents were emailed to RFC's counsel so that they could "closely coordinate." Unknown to Plaintiffs, on October 12, 2007, a Husch & Eppenberger lawyer sent via 6 separate emails those 1,040 pages of documents to Reed Smith. *See* **Ex. 97.** Astoundingly, of the 1,040 pages of documents that the Husch & Eppenberger and Reed Smith law firms exchanged, only 72 pages were produced to Plaintiffs prior to trial. **Ex. 106** (Documents Produced), **Ex. 107** (Documents Concealed).

Contained in the selected and copied 1,040 pages of documents that were exchanged between Wells Fargo and RFC ***but intentionally concealed from Plaintiffs*** were the following documents and types of "Concealed Documents": (1) a Missouri fee matrix, as referenced above; (2) Wells Fargo's business records indicating that fee matrices could be used or consulted in Wells Fargo's correspondent lending operations; (3) records of policies and procedures that indicated that Wells Fargo made a decision to not require a review of all correspondent loans for economic reasons – because that process created a "bottleneck" in its operations; and (4) records of Wells Fargo's internal audits that indicated its management believed it could not reasonably rely upon its loan correspondent's representations and warranties concerning compliance. ***None of these records were, however, among the 72 pages of documents produced to Plaintiffs.*** The fraud was now in place.

10

For example, one of the concealed documents (which was first produced *in this case in June 2011*) was a "Correspondent Lending" checklist that refers to a review of the HUD-1 Settlement Statement for "the amount restrictions defined by state law:"

**HUD - 1 or HUD 1A Uniform Settlement Statement:**

1.  Is the HUD-1 / HUD - 1A in file?
2.  Is the HUD-1 / HUD - 1A signed (in original) by the borrowers?
3.  Was the HUD-1 / HUD - 1A completed by the closing / settlement agent?
4.  Are all charges conspicuously and clearly itemized on the HUD - 1 / HUD - 1A?
5.  If charges have been paid outside of the closing are the indicated as (POC)?
6   If a fee is to be paid to one other than the lender is the recipients name given next to the item on the HUD - 1 / HUD - 1A?
7.  Are invoices in file to support the costs of all third party charges itemized on the HUD - 1 / HUD - 1A?
8.  Were fees collected within the amount restrictions defined by state law?
9.  If an escrow holdback was indicated on the HUD - 1 / HUD - 1A is there evidence in file that the reason for the holdback (e.g. repair work) has been resolved / completed and the funds have been released?
10. If the customer requested impounds, was the appropriate amount of impounds collected at the time of closing?

**Ex. 102** (highlight added).

Another concealed document used in a "Correspondent Loan File Review" also instructs employees to use the "State fee Matrix" for "guidance" and to "assume that the correspondent is required to use the same:"

**Correspondent Lenders Licensing, Corporate and Loan File Review:**

\*\*\*

3.    Use the Document Matrix and State Fee Matrix on The River *for guidance* as to state-required loan documents and limitations on fees. The River reflects what TMS is restricted by. You should assume that the correspondent is required to use the same. If there are any questions in this regard, refer it to Legal.

**Ex. 64** (highlight added).

Therefore, contrary to Defendants' representations, a Missouri fee matrix that was or could be used in correspondent lending by Wells Fargo, one of the largest companies in the industry, did exist and had always existed. RFC knew, just as Wells Fargo did, that these representations were false because it had the Concealed Documents in its possession, yet it remained silent. These Defendants did so because their "industry standards" defense required

that these documents be concealed from Plaintiffs. In order to maintain their defense, RFC and Wells Fargo had to ensure that these documents never saw the light of day.

And, as noted, other Concealed Documents also evidence why RFC and Wachovia and other members of the industry recklessly chose to ignore their obligations to scrutinize mortgage loans for state law fee restrictions, even though they knew how to.  The Concealed Documents show that the Defendants purposely chose not to review loans for state law fee restrictions because to do so created a "bottleneck" in their loan acquisition processes:

Subject:   Re: Review-State Fee Matrix Policy

I still struggle with the wording.  As I read this, in order to comply, an employee will need to check The River before they prepare documents, purchase or fund EVERY loan that they work on.  This will cause a tremendous bottleneck in our processes along with seriously effecting the quality and level of Service.  Can't we just change the statement to indicate the employees need to be aware of current State Fee Matrix requirements.  If they are unsure of these requirements they should consult the State Fee Matrix on The River prior to preparing documents, funding or purchasing.

**Ex. 69** (highlight added).[3]

The fact that Defendants concealed documents that showed that their true motive or reason for refusing to scrutinize mortgage loans was an economic one and not one based upon the pretext of reliance on a representation and warranty is an enormously important fact.  The concealment of the documents that showed this fact indisputably illustrates the reprehensibility, motives, ill-will and outrageous conduct of the defendants.

The act of concealment of documents, in and of itself, is of paramount importance  That is so because the Concealed Documents reflect (1) knowledge of the illegality of the fees charged on the loans at the time of purchase and (2) the industry's ability to and need to review purchased loans for state law fee restrictions at the time of purchase, as expressed by Wells Fargo (one of the largest secondary market purchasers of mortgage loans in the industry) and (3) RFC and Wells Fargo's knowledge that their continued collection of interest was illegal.  The

---

[3] The "River" is the name used be Wells Fargo for its internal computer network or "Intranet".

concealment and cover-up reflects the Defendants' motives and their willingness to corrupt the judicial process.  That motive and willingness justifies the severest of sanctions.

### *Defendants' Fraud On The Court, Jury, and Plaintiffs and Defendants' Violations Of This Court's Orders Enforcing Discovery*

The accompanying *Suggestions in Support* ("*Suggestions*"), detail the fraud and concealment, its long history, the circumstances of its discovery by Plaintiffs and the great lengths that Wells Fargo and the RFC Defendants pursued to maintain the secrecy of the concealed documents. To provide the Court with sufficient context for this Motion, Plaintiffs briefly set forth specific examples of Defendants' fraud on the Court, their violations of this Court's orders enforcing discovery, and their concealment and spoliation of material evidence that this Court specifically ordered be produced to the Plaintiffs.  The concealment encompassed 22,000-plus documents in all.  Plaintiffs have only recently learned in discovery after remand that the Defendants acted together to destroy the original of the Missouri State Fee Matrix.

As this Court knows, this case is all about illegal second mortgage loan fees and resulting illegal interest charged to the Plaintiffs and the Class and, for punitive damage purposes, the conduct of the Defendants regarding such illegal fees and interest. Wells Fargo and the RFC Defendants vigorously jointly defended this action by asserting that it was the "industry standard or practice" for indirect lender/purchasers to ***not*** review the loans for state law fee restrictions and to instead solely rely on the originating lender for state law compliance.

Defendants' fraud, intentional concealment and cover-up irrefutably began in October 2007 (if not sooner) almost immediately after the Court granted Plaintiffs' *Sixth Motion to Enforce Discovery* on October 3, 2007.  That Order required Wells Fargo to produce any state fee matrices and other records used in its lending operations, including any fee matrices reflecting its efforts to scrutinize the mortgage loans that they acquired from correspondent

13

lenders for compliance with state law fee restrictions. *See* **Ex. 4, 6,** *see also* Order denying **Ex. 18.**

In response to Plaintiffs' *Sixth Motion to Enforce Discovery*, and in its efforts to avoid sanctions for its non-compliance with the Court's Order, Wells Fargo repeatedly represented to the Court that there were no fee matrices or records in existence, that it had not maintained any electronic records of those matrices on its intranet (which it called "The River"), and, in any event, no fee matrices could exist or did exist because fee matrices were not used by Wells Fargo in its correspondent lending operations. *See* **Ex. 5, 18.**

As the Court may recall, on the eve of trial Plaintiffs moved the Court to require production and impose sanctions for Wells Fargo's refusal to produce such records. Again Wells Fargo denied the existence of such records.

This Court pointedly resolved the matter (which included RFC's counsel's contentions that ***Plaintiffs*** were concealing documents) as follows:

> THE COURT:  You know what, there is a lot of that [allegations of holding back documents] going on here.  Plaintiffs are accusing you guys of doing the same thing with respect to the matrix and other documents.  I don't know how to flush that out.  ***The problem with this kind of paper litigation is it's just too convenient for the parties to say, I don't know where the document is.***  It's just too convenient and I don't know how to address that issue.
>
> ***And entering an order demanding them [the defendants] to produce documents when you [the attorneys] are all officers of court representing to me that you've produced everything and anything and I've got to live with that***.

**Ex. 1**, (TR-347:10-24) (bracketed material and emphasis added).

What the Court and Plaintiffs did not know at the time of this Court's prescient ruling and warning was that such documents actually existed and Wells Fargo and RFC had already intentionally concealed such documents and would continue to cover up that concealment throughout the trial and post-trial proceedings in order to advantage themselves.  To further their

defense, the Defendants made numerous misrepresentations to the Court and Plaintiffs.

For example, whether Wells Fargo had or used "fee matrices" to review loans it purchased for compliance with state law fee restrictions was a critical fact issue in the case. Wells Fargo, in its response to *Plaintiffs' Renewed Motion for Sanctions* filed before the trial represented that:

> "…***such a rate fee matrix does not and never did exist.***"[4]

Not content to just defend with an untruth, Wells Fargo repeated the lie in its *Motion in Limine No.5* to prohibit any discussion of a fee matrix by the Plaintiffs. Wells Fargo again represented:

> "…***no such document has ever existed or was ever used***."[5]

Those statements were absolutely false when made and both Wells Fargo and RFC knew they were false at the time they were made. Those representations were untrue because both Wells Fargo and RFC had in their possession in October 2007, at the time the representations were made, state fee matrices that had been maintained in hard copy format.  RFC knew these representations to the Court were false because RFC, through its agents and attorneys, had been furnished the very fee matrices.

Wells Fargo also had copies of related "policies and procedures" records that indicated that the fee matrices (*i.e.*, **Ex. 55, 70**) were in fact also used or consulted in Wells Fargo's "correspondent lending" operations. *See* **Ex. 55, 64, 102, 103.** Wells Fargo also had documents which indicated that it had an economic incentive to not review loans for state fee restrictions because that process created a "bottleneck" in the acquisition of loans from correspondent lenders. *See* **Ex. 64, 69, 100.** Wells Fargo also possessed copies of internal audits and reports

---

[4]  *See* **Ex. 16**, *Opposition to Plaintiffs' Renewed Motion for Sanctions*, dated November 28, 2007.
[5]  *See* **Ex. 18**, *Motion in Limine No.5 to Exclude Evidence Regarding the Alleged Existence of a State Fee Matrix Created by the Money Store,* dated November 29, 2007.

which evidenced that its efforts at legal compliance were unsatisfactory and that it could not rely upon the efforts of its correspondent lenders to scrutinize mortgage loans for compliance with state law fee restrictions. *See* **Ex. 65, 66, 104.**

Not only did Wells Fargo, with the participation, knowledge and concurrence of RFC, conceal documents, it and RFC furthered the fraud and repeatedly used the concealment with an improper motive to further their advantage in the litigation.  In stark contrast to the content of the concealed documents, Wells Fargo consistently through its examination, cross examination and argument asserted that fee matrices "could not" and "did not exist" and that it did not review fees on purchased loans for compliance with state law fee restrictions.

As but two examples of this knowingly false argument, Wells Fargo in its closing argument, stated:

> *"Because of the magnitude and complexity of applying all these separate laws and regulations of 50 different states, The Money Store [Wells Fargo] could not practically determine whether each loan met all these state requirements*."[6]
>
> ***
>
> *"Now, nobody ever produced or had ever seen any kind of spread sheet or matrix that any correspondent lending department ever used."*[7]

*See* **Ex. 1**, at p.3972.

At the time Wells Fargo made these statements and representations, its lawyers had ***in their files*** copies of the concealed documents which revealed Wells Fargo "could" not only "practically" determine whether the fees charged on a loan violated state fee requirements but had, in fact, done so by the creation and use of such fee matrices.

The records intentionally concealed by Wells Fargo and RFC from the Court, the Plaintiffs and the jury, unequivocally show that, in direct contravention of evidence the

---

[6]  *See* **Ex. 1**, TR 3971:15-19
[7]  *See* **Ex. 1**, TR 3972:14-16.

Defendants jointly presented at trial, Wells Fargo **could have and knew how** to review second mortgage loans for compliance with Missouri law at the time of purchase, using fee charts or "matrices." The records also show that Wells Fargo made a decision to not review mortgage loans obtained from correspondent lenders for compliance with state law fee restrictions because it was economically advantageous for them to do so. The concealed documents demonstrated that the practices of Wells Fargo, one of the largest, if not the largest purchaser of loans in the secondary market, directly contradicted the alleged "industry standards and practices" evidence and defense presented jointly by the Defendants in the trial of this case. The claimed "industry practices" defense was premised on the assertion that the purchasers could not and did not review purchased loans for state law fee restrictions but rather solely relied on the loan originator's representations and warranties that the loans complied with state law. That defense was used by the Defendants as part of their defense to not only the actual damages, but most importantly to the punitive damage phase of the trial. That defense was even argued on appeal. RFC's active participation in, knowledge of and intentional silence about Wells Fargo's concealment of the documents allowed RFC and Wells Fargo to make their "industry standards and practices" defense. The concealed documents would have laid bare the defense by unequivocally establishing that it **was not** industry practice to merely rely on loan originators to ensure that loans complied with applicable state law. Those concealed facts would have been additional persuasive evidence that RFC and Wells Fargo, by using an intentional "blind eye" approach was, at a minimum, recklessly indifferent as to whether loans it purchased were illegal.

Particularly reprehensible is the closing argument that "**nobody ever produced or had ever seen any kind of spread sheet or matrix….**" Ironically, that was true only because Wells Fargo and RFC had fraudulently concealed the documents and later acted together to destroy the

original Missouri fee matrix.  In fact, Wells Fargo and RFC had, indeed, seen and received such fee matrix documents. Just these two examples among many make undeniably clear Defendants' motive and malicious intent.

RFC intentionally and unacceptably chose to remain silent while Wells Fargo presented its false arguments throughout the case. Such silence was intentional, improper, and corrupted the judicial process because the Reed Smith lawyers, as officers of the Court, had a duty to disclose Wells Fargo's fraud and misrepresentations to the Court. Because RFC acted through its lawyers and is imputed with the knowledge of its lawyers, RFC clearly participated in the concealment.  Further, RFC profited from the concealment, because its "industry standards and practices" defense would have been wholly contradicted by the Concealed Documents.  RFC intentionally withheld the truth from the Court so that it could benefit from the false "industry standards" defense.

In fact, RFC spent a great deal of effort through examination, cross-examination, expert testimony and argument espousing the position that the "industry practice" was not to review loans for compliance with state law fee restrictions and that RFC acted consistently with this claimed "industry practice." The Concealed Documents would have revealed the truth about Wells Fargo's practices - that Wells Fargo did in fact have the ability to review loans for compliance with state law fee restrictions and that it chose not to do so for economic reasons. Those facts which were known to RFC made their "industry practice" position difficult if not impossible to present with any credibility.  Thus, because RFC was so heavily invested in the assertion of this sham position, they had obvious reasons and motives to participate, as they did, in the fraud and its continuation.

Three examples from RFC's opening statement, elicited testimony and RFC's closing

argument, among many, illustrate RFC's persistent assertion and use of the sham "industry

standard" position that the concealment by both Wells Fargo and RFC made possible.

*Opening Statement Excerpt*:

"But RFC did not check to see if they – each and every loan complied with each
and every state law that could apply to the loan. Now, you are going to hear
evidence in this case from two of our expert witnesses that RFC's actions were
completely consistent with the industry practice."[8]

*Elicited Testimony Excerpt*:

"Q.      What is that opinion?
A.      It is my opinion that RFC's practices were absolutely consistent with the
rest of the industry."[9]

*Closing Argument Excerpt*:

"And there was a number of – a few different witnesses testified about how
RFC's methods and the checking that RFC was doing was consistent with what
others in the industry were doing."[10]

The Concealed Documents revealed that RFC's practices were ***not*** "completely" or

"absolutely" consistent with either the "rest" of the industry or what "others" in the industry

were doing because Wells Fargo, who was not only one of the "rest" or "others" in the

"industry," but, perhaps, the largest in the "industry," could and did review loans for illegal state

fees via use of the state fee matrices. Because RFC made the "industry standard" argument the

centerpiece of its defense, it deliberately did not come clean and disclose the fraud that it and

Wells Fargo had continuously perpetrated on the Court, the Plaintiffs and the jury.  Instead, RFC

intentionally made arguments and presented evidence it knew to be false and misleading in order

to bolster the defenses of RFC and Wells Fargo.

The fraud perpetrated on the Court, the concealment of thousands of documents, and the

---

[8]   *See* **Ex. 1**, TR- 930:2-8 - RFC Defendants' opening statement.
[9]   *See* **Ex. 1**, TR- 3417:24-2418:2 - Mr. David Lykken's testimony.
[10]   *See* **Ex. 1**, TR- 3926:10-14 - RFC Defendants' closing argument.

subsequent cover-up, merit the harshest of sanctions.  As Wells Fargo's own expert notes, "A fraud remains a fraud even when the perpetrator is not caught." **Ex. 79**, at p. 363-64.  Here, the perpetrators, Wells Fargo and RFC, were caught despite their orchestrated efforts to conceal their deception.

### *Discovery of the Fraud and Defendants' Efforts to Conceal their Misconduct*

After the entry of final judgment in *Mitchell*, and through an investigation by the Plaintiffs' Counsel in this matter and in *Schwartz*, the undersigned counsel for the Plaintiffs discovered that Wells Fargo, with the knowledge and consent of RFC, had intentionally concealed thousands of documents.

Plaintiffs' investigation also revealed that Wells Fargo's fraud and concealment was clearly deliberate and intentional.  It is irrefutable that Wells Fargo and RFC were determined to conceal the records from the Plaintiffs and prevent their use at trial through a fraud perpetrated on the Court, the jury and the Plaintiffs. The fraud involved Wells Fargo's intentional preparation of false responses to discovery, false deposition and trial testimony, false argument and misrepresentations in filed pleadings and RFC's silence and ratification of that conduct. Further, Reed Smith participated in the cover-up through its intentional preparation of false responses to discovery, false deposition testimony, false argument and misrepresentations in filed pleadings in the *Schwartz* matter. All were undertaken in order to benefit the joint defense and trial strategy of the Defendants in this action as well as serve the defense interests of Wells Fargo in the related *Schwartz* matter and RFC in other MSMLA litigation.

To clarify, during the time that Wells Fargo was defending the class action claims in the *Mitchell* matter, it was also defending the *Schwartz* matter, which was pending in another division of the Circuit Court of Jackson County, Missouri. In this matter, *Mitchell*, Wells Fargo

was represented by lawyers at the Husch & Eppenberger law firm (n/k/a Husch Blackwell Sanders LLP).  In the *Schwartz* matter, however, Wells Fargo was represented by the Reed Smith and Rasmussen, Willis, Dickey & Moore, law firms – the same lawyers that represented the RFC Defendants in *Mitchell*.[11]  The joint defense of Wells Fargo in the separate *Mitchell* and *Schwartz* actions by both sets of lawyers as well as the joint defense agreement that governed their defense of Wells Fargo and the RFC Defendants in *Mitchell* further provided Wells Fargo and the RFC Defendants with motive and opportunity to collude and participate in Wells Fargo's fraud on the court in *Mitchell*.  That motive and opportunity resulted in the initial concealment and its continued cover up until the persistence of Plaintiffs' Counsel, and the inadvertence of Defendants' new, substitute counsel at Reed Smith, finally discovered an index of documents in November 2008 that "outed" the fraud and made its continued concealment impossible. *See* **Ex. 54.**

That *index* unquestionably revealed the existence of concealed records and state fee matrices contained in boxes of records maintained in an Iron Mountain storage facility in Sacramento, California.  Once Plaintiffs discovered the existence of the index of documents maintained in storage at the Iron Mountain facility and requested the production of the index, Wells Fargo knew that its fraud would be discovered upon the production of the index.  Knowing that the longstanding fraud and concealment was at an end, Wells Fargo reluctantly produced the index.  Within four days thereafter, Wells Fargo produced copies of the allegedly "non-existent," "never used," state fee matrices that no one had supposedly "ever seen" that it had always held and maintained in storage.[12] *See* **Ex. 45, 55.**

---

[11] The Plaintiffs note that the firm of Bryan Cave LLP has since entered their appearance as counsel for RFC.

[12] However, at that time, Wells Fargo intentionally refused to tell Plaintiffs that the original Missouri fee matrix had been removed from the original box in which it was maintained, and that the original had been ***destroyed*** by its counsel at the Husch & Eppenberger and/or Reed Smith law firms, and what was being produced to Plaintiffs was

Unable to maintain its fraud, between November 2008 and April 2009, Wells Fargo in *Schwartz* was forced to produce for the first time over 22,000 pages of documents that were pulled from the boxes identified on the index. These documents were also admittedly responsive to Plaintiffs' discovery and within the scope of the Court's Order granting Plaintiffs' Sixth Motion to Enforce Discovery in *Mitchell*. Although they were produced in *Schwartz*, Wells Fargo still refused to produce the documents in this case until ordered to do so yet a second time by this Court in May 2011. **Ex. 101**.

At a hearing on the *Schwartz* Plaintiffs' First Motion for Sanctions, Plaintiffs further learned for the first time in April 2009 that RFC's attorneys at the Reed Smith law firm also possessed the document index as of October 9, 2007. At the same hearing, Plaintiffs also learned for the first time that Reed Smith, RFC's attorneys, had received via six emails, which contained 1,040 pages of which in excess of 900 pages of documents had been concealed from the Court and Plaintiffs. Included within those concealed documents was the allegedly "non-existent" Missouri State Fee Matrix. Reed Smith requested those concealed documents for the express purpose of "coordinating" their joint defense of this lawsuit and others:

---

electronic copy of the fee matrix that had been retrieved from an email dated October 12, 2007 transmitting the matrix from the Husch & Eppenberger law firm to the Reed Smith law firm. **Ex. 97.** Plaintiffs discovered this only through deposition testimony in January 2012.



**Ex. 8** (emphasis added).

Consistent with Reed Smith's directions, the Husch & Eppenberger lawyers emailed the

documents to Reed Smith for their review:

```
----- Original Message -----
From: Hargens, Michael <Michael.Hargens@Husch.com>
To: Arnold, Roy W.
Cc: Martin, Scott <Scott.Martin@Husch.com>; Bemboom, Kara <Kara.Bemboom@Husch.com>
Sent: Fri Oct 12 18:01:53 2007
Subject: FW: Mitchell Docs Pt. 1

<<SFX36A4.pdf>> Ro <<SFX36B2.pdf>> y, <<SFX36D8.pdf>>  <<SFX36E6.pdf>>  <<SFX367D.pdf>> Ho
<<SFX3686.pdf>> mE <<SFX3694.pdf>> q <<SFX369D.pdf>> wa <<SFX369F.pdf>> s able to locate some
potentially responsive documents in their offsite storage.  We have not finished reviewing
them all yet, but we wanted to send you a copy of them as soon as possible out of an
abundance of caution.  This is the first of 6 emails containing the aforementioned documents.
```

**Ex. 97** (highlight added).

Through their investigation in *this* matter, including the recent review of attorney time

records and internal emails that this Court ordered be produced, and through depositions of

Defendants' former lawyers, as well as the inspection of original boxes of records in January

2012, Plaintiffs have only very recently learned that Defendants' counsel destroyed the original

*Missouri* fee matrix that the Court ordered be produced.  *See* **Ex. 90, 95, 96.**

Moreover, Plaintiffs discovered contemporaneous time records in January 2012 which

evidence that, despite their repeated contentions to the contrary, Defendants' attorneys, in fact,

discussed with each other the concealed documents and their significance, the fact that the

concealed documents were "critical" to the underlying claims, and reviewed the concealed

documents in October 2007 when they were sent to the Reed Smith law firm:

| 10/11/07 Washowich | Correspondence with co-defense counsel re: coordination of corporate representative deposition, scheduled for 10/15, in Mitchell action and documents being reviewed for same at Iron Mountain facility -- relevant to this action and potentially critical to claims in this case. |
| 10/12/07 Washowich | Begin due diligence review and analysis of voluminous series of documents produced/provided by M. Hargens/S. Martin in review for Mitchell matter -- for potential relevance, materiality, and/or responsiveness in this litigation. |

**Ex. 90**, atWES-MITCHELL-001877 (highlight added).

| 10/15/07  Washowich | Complete due diligence review, analysis, preparation of materials and correspondence with co-defense counsel re: defense of and participation in 10/15 Wachovia corporate representative/designee deposition -- in particular, on issues potentially (or directly) relating to punitive damages affecting assignee defendants; correspondence |

**Ex. 96**, at RFC-MITCHELL2-001734 (highlight added).

Emails produced in January 2012 also reveal that in February 2008 the lawyers at Reed

Smith and at Wells Fargo were trying to concoct "a story" concerning the concealed documents

in the event that Plaintiffs' counsel's persistence in propounding written discovery in *Schwartz* in

January 2008 (shortly after the trial concluded in *this* matter) caused or led to the discovery of

the concealed documents:

| From: | Arnold, Roy W. |
|---|---|
| Sent: | Tuesday, February 12, 2008 2:31 PM |
| To: | 'kobi.brinson@wachovia.com'; Washowich, Lyle D. |
| Cc: | amy.davis@homeq.com; jacki.cartmill@homeq.com; pam.mcculler@wachovia.com |
| Subject: | RE: Schwartz Document Production -- ATTORNEY WORK PRODUCT |

Thanks Kobi. It is very important that someone from HomEq be able to confirm that they have searched for the boxes in the inventory and confirm either that they don't exist because they were not retained, or any responsive documents have been provided to us. We have been coordinating with Husch and I believe Lyle got the impression from Kara at Husch that they had not reviewed these particular boxes or files. For example, Husch would have no reason to look at the Bann-Cor Mortgage specific files, although such files may have been previously gathered in other litigation. Consistent with our professional obligations and my directives to him, Lyle is being thorough in an effort to comply with the discovery requests and to head off any motion for sanctions, which as you know from the Mitchell case will be the plaintiffs' next filing. We will need to have a good story to tell in response to such a motion and support it by an affidavit recounting our efforts to locate responsive documents. We appreciate all of your hard work and that of Amy, Jacki and Pam. Like you, we are working to defend Wachovia Equity Servicing and the Money Store LLC against the unfair accusations. The best way to do that is to make sure we don't stub our toe on our search efforts by overlooking a repository, a file cabinet or a stone. Thanks again for everyone's hard work, diligence and care.
Roy

**Ex. 108** (highlights added).

During this same timeframe, Ms. Kobi Brinson, one of Wells Fargo's in-house attorneys,

acknowledged the stunning fact that they had previously presented false testimony to this Court

and that they needed to "do whatever we can do" to avoid getting "hit with a multi-million dollar

verdict" and to avoid sanctions for its fraud in *Mitchell*:

```
To

amy.davis@homeq.com


cc

Pam McCuller/Legal/WACH@WACHOVIA, Mark Buechner/Legal/WACH@Wachovia


Subject

Re: Fw: Schwartz -- Answers to Second Interrogatories -- ATTORNEY WORK PRODUCTMark Buechner
<Notes://Mesg26.Notes.Wachovia.Net/85256A8600589732/38D46BF5E8F088348525
64B500129B2C/26FECE5639F64B45852573F300143A72>

Amy - I had to send out the request when I got it. We asked for the information when we first
received the request a couple of weeks ago - couldn't ask you for it before we had the
request obviously. I sent the reminder because we had a looming deadline, but I understood
that Jacki and Pam were communicating about this so it wasn't intended to be a last minute
pre-holiday request - just a reminder that the deadline was on the 18th which was a federal
holiday, of course - but not a state holiday so the court wasn't closed and that was the date
that was given to us. We did not have a great deal of lead time, unfortunately - these
requests were triggered by the Mitchell verdict. I just pass on the requests as I get them
because we cannot access any TMS information - all we can do is request it from HomEq.

As for this case, this is the companion to Mitchell so we started with Scott Martin and
outside counsel in prior Bann-Cor related cases. Kara (Scotts's associate) told us that they
were aware of certain information (the boxes at Iron Mountain) being available at HomEq, but
they were not sent to the firm, so we had to ask for it again. Once Roy and Lyle went through
those boxes, information that we were told did not exist - and that we informed the court
under oath did not exist, was found in some of those boxes from Iron Mountain. These are very
```
1

dangerous cases as you know - we could very easily get hit with a multi-million dollar verdict since there are twice as many loans in the Schwartz pool - we have to do whatever we can to avoid that. In fact, we may be facing sanctions for the failure to produce those documents (specifically matrix related in the Mitchell case), in the Mitchell case which is not over.

We would appreciate your cooperation going forward, but if it is not forthcoming, then we will have to revisit that with Mark and perhaps the court.

Kobi Kennedy Brinson
Senior Vice President and Assistant General Counsel Wachovia Corporation
301 S. College St., NC-0630
Charlotte, North Carolina 28288-0630
Telephone (704) 715-2337
Facsimile (704) 383-2732
Inactive hide details for amy.davis@homeq.comamy.davis@homeq.com

**Ex. 89** (highlight added).

In her email, Ms. Brinson, who sat through most, if not all, of the *Mitchell* trial, reveals that "Roy [Arnold] and Lyle [Washowich]," each attorneys at Reed Smith, also knew of the fraud. What is now obvious is that the "whatever we can do" to avoid getting "hit with a multi-million dollar verdict" referenced in the email included the continuation of the fraud, concealment, and cover-up perpetrated by the Defendants. Therefore, RFC, Wells Fargo, Reed Smith, and Husch & Eppenberger continued to stonewall the Court and Plaintiffs in the hope that their fraud would go undiscovered. Even worse, if that is possible, this email was transmitted upstream to the highest echelons of Wells Fargo's in-house counsel. Even so, Wells Fargo was undeterred. Wells Fargo continued its fraud on the Court and Plaintiffs without regard to its unlawfulness for the purpose of avoiding clear liability and sanctions in this case. It is difficult to conceive of circumstances that would more readily warrant the imposition of the harshest of sanctions than those that exist here. Not only did they continue their concealment, Wells Fargo knowingly, maliciously, and actively further misrepresented in *Schwartz* by false affidavits, pleadings, and arguments, that it had produced "all responsive, non-privileged documents within its possession, custody and control."

With respect to yet another element of their fraud on the Court, Plaintiffs' investigation has only recently revealed through an inspection of the original boxes of concealed records in January 2012 that Defendants acted together to **destroy** the original ***Missouri*** fee matrix that the Court first ordered be produced on October 3, 2007.







**Ex. 95.**

The foregoing pictures reveal that in January 2012 the original Missouri State Fee Matrix

was missing from "Fee Matrices – State" folder in the box labeled "MTG-189" in which all of

the other state fee matrices were contained.    This box was in Reed Smith's possession on

February 19, 2008, at the point in time that Ms. Brinson acknowledged that the documents

previously sworn under oath not to exist – the Missouri matrix – "was found in some of those

boxes."    Box MTG-189 was still in Reed Smith's possession in November 2008.    Since the

Missouri Fee Matrix was missing from the "Fee Matrices – State" folder in Box "MTG-189" as

of November 2008 when the box was still in Reed Smith's possession, Reed Smith had to have

intentionally removed the Missouri State Fee Matrix from the box.

Now that the fraud has been discovered, Wells Fargo now wants to change its whole

defense strategy and assert that there was a fee matrix used in its correspondent lending but that

the fee matrix cannot be located.    Now, rather than acknowledge their fraud, late in the evening

on January 30, 2012, just two weeks before the close of discovery, and on the eve of the retrial,

Wells Fargo sent to Plaintiffs unverified "supplemental" discovery responses.    That supplemental

response attempts to alter by expressly controverting in its entirety its prior sworn testimony that

it could not and did not review purchased loans for state law fee restrictions.    *See* **Ex. 83-86.**

For example, in a supplemental response to Plaintiffs' Third Requests for Admission,

Wells Fargo now states:

> Subject to and without waiving this objection, Wells Fargo admits that TMS's
> inhouse legal counsel and outside counsel collaborated to develop, maintain, and
> implement a state law guideline or matrix for underwriting second mortgage loans
> in Missouri (among other loan types and jurisdictions). Underwriters in the
> correspondent lending branch of the Home Improvement Division consulted such
> a matrix or guideline of state specific limitations that was housed on TMS's
> intranet, "The River." These underwriters reviewed the fees charged to the
> borrower by MCR to determine whether they exceeded the state specific fee

limitations set out in the matrix or guideline. Due to the significant passage of
time, the particular matrix or guideline used in the underwriting of these 23 loans
has not been located.

**Ex.85,** at No. 143.

As long as the concealment was intact and ongoing, Wells Fargo's position was
calculated to take advantage of the concealment.  Now that the fraud and concealment has been
uncovered, Wells Fargo wants to change its position to take advantage of the facts that it now
perceives them to be after the fraud was "outed."  This contrived response, and the timing with
which it was made, illustrates Wells Fargo's lack of respect for the Court and the judicial
process.  Wells Fargo clearly has no shame or remorse for its fraudulent conduct.  This conduct
also illustrates why the sanctions in this case should be severe.

### *The Relief Requested*

This Court has the authority to supervise the litigants and attorneys who appear before it.
These Defendants, acting through their lawyers, perpetrated egregious misconduct that corrupted
the judicial process and that cannot be tolerated. The Defendants perpetrated a fraud on the
Court, concealed material evidence, and violated Rules 55.03 and 61.01 by signing pleadings and
discovery responses that they knew to be false and in an effort to contumaciously defy this
Court's Order enforcing discovery. The *Suggestions* accompanying this *Motion* provide
evidentiary and chronological detail to Wells Fargo's and RFC's fraud on the court, jury and
Plaintiffs, and provide this Court with the factual, evidentiary and legal basis for the requested
sanctions.  Indeed, the evidence upon which Plaintiffs rely to support this *Motion* and requested
sanctions is clear, convincing and irrefutable. Defendants' fraud, deliberate concealment and
destruction of records is proven not only by the Plaintiffs' discovery of the concealed records
themselves in the *Schwartz* matter, but also by the attorney time records, emails, and the

deposition testimony of Wells Fargo's and RFC's own lawyers given in this case and in the *Schwartz* case.

For the reasons set forth above and in detail in the accompanying *Suggestions*, Plaintiffs request the Court to sanction Defendants with the most severe sanctions possible under Missouri law. Specifically, Plaintiffs move the Court pursuant to Rule 61.01 and 55.03 and the Court's authority to sanction Defendants as follows:

(1)    The Court should strike Wells Fargo's and RFC's pleadings for failure to comply with the Court's prior orders and for fraud on the Court and render a judgment by default as against Wells Fargo and RFC on Plaintiffs' claims for punitive damages;

(2)     As an alternative to the sanction requested in (1) above, the Court should enter an order prohibiting Wells Fargo and RFC from opposing Plaintiffs' claims for punitive damages and/or prohibiting Wells Fargo and RFC from offering any evidence in defense of or in opposition to the Plaintiffs' punitive damages claims and to instruct the jury that Wells Fargo and RFC have been prohibited from defending the punitive damages claim as a result of its fraud on the Court and concealment of material evidence;

(3)    In addition, the Court should enter an order that instructs the jury to make and draw an adverse inference from Wells Fargo's and RFC's fraud on the Court and concealment of material evidence; and

(4)    In addition, the Court should enter an order treating as a contempt of court Wells Fargo's and RFC's failure to obey the Court's earlier discovery orders; and

(5)    In addition, the Court should impose a joint monetary sanction of $10-20 million but no less than $10 million against Wells Fargo and RFC.

These sanctions are reasonable, appropriate, and warranted, because the Defendants have

repeatedly perpetrated and continue to perpetrate the most serious of frauds on the court, jury and Plaintiffs.  Wells Fargo and RFC have perpetrated a fraud on this Court and engaged in intolerable discovery misconduct including the presentation of false trial testimony and the destruction of evidence.  Defendants' concealment and destruction of evidence is intolerable, and their fraud on the Court was enormous, longstanding, and contemptuous and warrants the most severe punishment possible.

Ours is a judicial system founded upon the discovery and presentation of the truth and this type of fraud shakes the very foundations of our judicial system and betrays century's old trust that the citizenry should and must have in the integrity of the judicial system. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238, 246 (1944). The fraud of Wells Fargo and RFC is intolerable, improper, and can in no way be excused or condoned. It must be countered with the harshest of sanctions. Severe sanctions are necessary to punish and deter Wells Fargo, RFC and other similarly motivated or situated litigants from attempting and/or perpetuating the same type of fraud.  The Court should enter an order that effectively punishes Wells Fargo and RFC and that serves to deter similar misconduct in the future by these Defendants or similarly situated defendants.

Dated: February 8, 2012                    Respectfully submitted,

                                           By _____
                                           R. Frederick Walters - Mo. Bar 25069
                                           Kip D. Richards - Mo. Bar 39743
                                           David M. Skeens -Mo. Bar 35728
                                           J. Michael Vaughan - Mo. Bar 24989
                                           Garrett M. Hodes - Mo. Bar 50221
                                           2500 City Center Square
                                           1100 Main Street
                                           Kansas City, Missouri 64105
                                           (816) 421-6620
                                           (816) 421-4747 (Facsimile)

                                           ATTORNEYS FOR PLAINTIFFS AND CLASS
                                           COUNSEL

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the above and foregoing document was served via electronic mail and hand-delivery this 8th day of February 2012 to:

Craig S. O'Dear
Robert M. Thompson
Emma L. Dill
**BRYAN CAVE LLP**
One Kansas City Place
1200 Main Street, Suite 3500
Kansas City, Mo 64105-2100
Tel: (816) 374-3200
Fax: (816) 374-3300
csodear@bryancave.com
rmthompson@bryancave.com
emma.dill@bryancave.com

K. Lee Marshall
**BRYAN CAVE LLP**
Two Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 675-3400
Fax: (415) 675-3434
klmarshall@bryancave.com

Attorneys for Defendants/Appellants Residential Funding Company, LLC and Homecomings Financial, LLC

Todd W. Ruskamp
**Shook, Hardy & Bacon LLP**
2555 Grand Blvd.
Kansas City, Missouri  64108-2613
Tel:  (816) 474-6550
Fax:  (816) 421-5547
truskamp@shb.com
Attorneys for Defendant Household Finance Corporation III

Michael J. Abrams
R. Kent Sellers
Jehan Kamil Moore
**Lathrop & Gage LLP**
2345 Grand Boulevard, Suite 2800
Kansas City, MO  64108
(816) 292-2000
(816) 292-2001 (fax)
mabrams@lathropgage.com
ksellers@lathropgage.com
**jmoore@lathropgage.com**

T. Thomas Cottingham, III
Nash E. Long, III
Stacie C. Knight
**Winston & Strawn, LLP**
214 North Tryon Street, Suite 2200
Charlotte, NC 28202-0178
(704) 350-7700
(704) 350-7800 (fax)
tcottingham@winston.com
nlong@winston.com
sknight@winston.com

Attorneys for Defendant Wells Fargo Bank, NA