<u>**EXHIBIT 7**</u>

<u>**Attorneys' Fees Motion**</u>

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT KANSAS CITY**

| | |
|---|---|
| STEVEN AND RUTH MITCHELL, | |
| Plaintiffs, | Case No. 03-CV-220489-01 |
| vs. | |
| | Division 4 |
| RESIDENTIAL FUNDING CORPORATION, et al., | |
| Defendants. | |

**PLAINTIFFS' SECOND APPLICATION FOR AWARD OF ATTORNEYS' FEES**

Plaintiffs, individually and on behalf of plaintiffs' class, and the undersigned counsel, Walters, Bender, Strohbehn & Vaughan, P.C. ("Class Counsel" or "WBSV"), jointly move the Court for an Order determining the amount of Class Counsel's additional attorneys' fees incurred by Class Counsel from April 1, 2008 through April 26, 2011, pursuant to the Opinion and Mandate of the Missouri Court of Appeals, Western District, ("Mitchell Opinion") and § 408.562 RSMo. The Mitchell Opinion determined that Plaintiffs were the prevailing parties and were therefore entitled to attorneys' fees. As part of the remand, the Mitchell Opinion directed the trial court to determine the amount of such fees. Plaintiffs seek approval of a reasonable fee award in the amount of $6,708,456.50. This amount reflects an enhancement by use a reasonable 2.0 multiplier of the lodestar amount, as set forth herein, on the grounds that such an award is both reasonable and fair in this action, all as is more fully set forth below.

**SUGGESTIONS IN SUPPORT**

**I.    INTRODUCTION**

Plaintiffs and Class Counsel (collectively, "Plaintiffs") seek an award of attorneys' fees in the amount of $6,708,456.50, which represents a 2.0 enhancement of the attorneys' fees

1

incurred by Class Counsel for the time period from April 1, 2008, through April 26, 2011. The requested award is for work performed by Class Counsel for which they have yet to be compensated.[1]

While this case was pending before the Court of Appeals, Plaintiffs filed a motion seeking the attorneys' fees that they now seek, i.e., attorneys' fees incurred for work performed on and after April 1, 2008. The Court of Appeals granted Plaintiffs' motion, specifically finding that Plaintiffs were the prevailing party, and remanded to this Court to determine the appropriate amount to award as attorneys' fees for the work performed on and after April 1, 2008. *Mitchell v. Residential Funding, et al.*, 334 S.W.3d 477, 514 (Mo. App. 2010). Because the Court of Appeals has specifically determined that Plaintiffs are entitled to attorneys' fees pursuant to § 408.562[2] as a prevailing party, this Court need only determine the amount of such attorneys' fees to be awarded. Again, no part of the attorneys' fees that Plaintiffs now seek is duplicative of the fee award that this Court previously made. The Court's initial award was solely based upon the work performed by Class Counsel up through March 31, 2008.

The attorneys' fees that Plaintiffs now seek are for the work performed by Class Counsel on and after April 1, 2008 before this Court, before the Court of Appeals, and before the Supreme Court of Missouri. From April 1, 2008, through April 26, 2011, Class Counsel has expended more than 8,159.05 hours in attorney and paraprofessional time in, *inter alia*, seeking and obtaining attorneys' fees, filing and opposing post-trial motions, litigating issues related to the appropriate amount of the supersedeas bond, briefing and arguing the issues on appeal,

---

[1] On June 24, 2008, the Court entered an Order, which was subsequently amended on October 6, 2008, awarding Class Counsel attorneys' fees upon Plaintiffs previously-filed *Plaintiffs Application for Award of Attorneys' Fees and Expenses*. The Court's award of attorneys' fees was limited to such fees up through March 31, 2008. The instant request is not duplicative of the prior request in that the attorneys' fees now sought are related to work after March 31, 2008, the last date through which Class Counsel was awarded fees.

[2] Section 408.562 permits the Court to award Plaintiffs' attorneys' fees as a "prevailing party." The statute provides that a court "in its discretion, may award ... to the prevailing party in [an action under the SMLA] attorney's fees, based on the amount of time reasonably expended."

2

moving for sanctions and the dismissal of RFC's and Wells Fargo's appeals for their deliberate concealment of relevant documents, and other miscellaneous matters, including but not limited to dealing with class members' bankruptcies and their bankruptcy trustees, dealing with deceased class members estates, communicating with class members, and responding to inquiries about the lawsuit.

All of the work was reasonable and absolutely necessary to protect the judgment obtained for Plaintiffs and the Class. Having been specifically found to be the prevailing party by the Court of Appeals, Plaintiffs are entitled to the attorneys' fees that they now seek.

## II.    THE WORK PERFORMED BY CLASS COUNSEL ON AND AFTER APRIL 1, 2008 FOR WHICH ATTORNEYS' FEES ARE NOW SOUGHT

As this Court is aware, the Court granted Plaintiffs' initial fee application. Pursuant to this Court's June 24, 2008 Order, as amended on October 6, 2008, Plaintiffs were awarded their attorneys' fees through March 31, 2008. In their initial fee application, Plaintiffs also sought additional attorneys' fees for the work they reasonably anticipated would be incurred on and after April 1, 2008, relating to continued work on the matter post-judgment and on appeal. The Court recognized that such work would be required but decided that it would not "grant additional attorney's fees at [that] time" and indicated that the issue would "best be addressed on appeal." As mentioned above, the Court of Appeals addressed the issue of attorneys' fees and specifically found that 1) Plaintiffs were a prevailing party under § 408.562, and 2) Plaintiffs were entitled to attorneys' fees pursuant to § 408.562. *Mitchell*, 334 S.W.3d at 514 ("we find Plaintiffs are the prevailing party on appeal. In our discretion, we grant Plaintiffs' motion for attorney fees on appeal..."). The Court of Appeals remanded the issue back to this Court to determine the appropriate fee award for Plaintiffs' work.

From April 1, 2008, through April 26, 2011, Class Counsel expended 8,159.05 total

3

hours, of which 6,345.40 is attorney hours and 1,813.65 of which is paralegal, legal assistant and other billable hours in connection with this matter. All the work Class Counsel has performed in this matter, including without limitation, the additional work performed on and after April 1, 2008, through April 26, 2011 was necessary, reasonable, and performed in a timely and efficient manner on behalf of and for the benefit of the Plaintiff Class.

Based upon the number of hours expended by Class Counsel and the reasonable and current[3] hourly rate of each individual working on this matter, the total amount of attorneys' fees incurred in the prosecution of this matter from April 1, 2008, through April 26, 2011, totals $3,354,228.25. Under the circumstances of this case as set forth herein and in the attached Affidavit (Ex. A), a 2.0 enhancement of this lodestar amount is reasonable and appropriate. Applying the 2.0 enhancement results in a fee award in the amount of $6,708,456.50, which is a fair and reasonable amount for the work performed on and after April 1, 2008 through April 26, 2011, in connection with this matter.

These attorneys' fee should be allocated between the defendants in a fair and equitable manner based upon the time Class Counsel had to spend on work specifically relating to each defendant. Plaintiffs' proposed allocation for each defendant is as follows:

| Defendant | Amount |
|-----------|--------|
| RFC | $2,780,365.38 |
| Wells Fargo | $2,322,341.16 |
| Household | $1,605,749.96 |

(Aff. ¶159).

In support of this Application, Plaintiffs submit the Affidavit of Roy Frederick Walters as

---

[3] The United States Supreme Court directs lower courts to use the current hourly rates of the attorneys and paralegals involved in the case in order to make "an appropriate adjustment for delay in payment." *Missouri v. Jenkins*, 491 U.S. 274, 284 (1989).

Ex. A.  Plaintiffs have also attached a detailed and itemized description of the particular work performed from April 1, 2008 through April 26, 2011 (Ex. A-1), a spreadsheet that allocates the time entries to the defendants (Ex. A-2), and a chart listing the current hourly billing rates of individuals working on this case for Class Counsel. (Ex. A-3).

The hourly rates charged by the attorneys and legal assistants working on behalf of Plaintiffs are reasonable given the respective education, experience and skill of the lawyers and non-lawyers, the risk involved, the results obtained, and all the other factors to be considered in determining a reasonable statutory fee award.  In further support of this point, Plaintiffs have evidence in the form of summaries of multiple affidavits in similar matters from several reputable area attorneys who practice in the community, which indicate that Class Counsel's current hourly rates are not only reasonable but are actually at the low end of the rates typically charged and/or earned by attorneys in the Kansas City area for similar cases.  (Ex. A ¶95-96). Additionally, Plaintiffs have provided the Court with survey results of hourly rates as reported by several area defense firms, including most if not all of the defense counsel appearing in the instant case, which also confirm that Class Counsel's rates are reasonable . (Ex. A ¶100-104).

The work performed, both in terms of the complexity and the sheer amount, along with the success of and results obtained by Class Counsel, speak to the reasonableness of the attorneys' fees now sought.

**III.    MAJOR AREAS OF WORK PERFORMED BY CLASS COUNSEL ON AND AFTER APRIL 1, 2008**

The following is a brief description of the major areas of work performed by Class Counsel on and after April 1, 2008 through April 26, 2011.

**A.    Class Counsel's Work On and After April 1, 2008 That Related to Their First Application for Attorneys' Fees**

The work performed by Class Counsel in preparing and pursuing a statutory fee award is in and of itself a compensable element of the fee award. *See Davis v. Angoff*, 957 S.W.2d 340, 342-43 (Mo. App. 1998); *Hernandez v. State Board of Registration for the Healing Arts*, 936 S.W.2d 894, 901-02 (Mo. App. 1997). As the court is aware, a portion of the work performed by Class Counsel relating to their first fee application was performed after March 31, 2008. As such, Class Counsel has never been compensated for any of its work relating to the first fee application that occurred on and after April 1, 2008. (Ex. A, ¶12).

As the Court is aware, Defendants opposed Plaintiffs first Application for Award of Attorneys' Fees and Expenses. In response to Defendants' opposition, and on April 30, 2008, Plaintiffs filed their *Reply to Defendants' Opposition to Plaintiffs' Application for Award of Attorneys' Fees and Expenses*. Plaintiffs' reply addressed Defendants' opposition to the first fee application and attached additional documentary evidence in support of the fee application, including redacted time entries through March 31, 2008, in response to Defendants' request for such records. (Ex. A, ¶13).

On May 21, 2008, Plaintiffs participated in a hearing conducted by the Court in connection with Plaintiffs' fee application. Plaintiffs presented arguments in support of their fee application and responded to Defendants' arguments in opposition. Based upon the briefing and counsels' arguments, the Court entered an Order on June 24, 2008 regarding the award of attorneys' fees. In pertinent part, the Order granted Plaintiffs' fee application and awarded attorneys' fees through March 31, 2008. (Ex. A, ¶14).

**B.    Class Counsel's Work with respect to Defendants' Post-Trial Motions**

Faced with a substantial jury verdict against them, the Defendants each filed post-trial motions on July 24, 2008, in an effort to avoid or limit their liability to the Class. Defendants

raised every possible argument in their respective post-trial motions, which is demonstrated by

the sheer size of the briefing involved:

1)    RFC filed two separate post-trial motions – one motion for JNOV, new trial, and

remittitur and a second motion seeking decertification of the class.   The two

motions and the suggestions in support thereof totaled 159 pages, consisting of

seventy-three (73) separate points and subpoints. RFC's briefing included

numerous exhibits, jury instructions, excerpts of the trial transcript, all of which

totaled an additional 2,142 pages and filling six (6) bound volumes. (Ex. A, ¶ 15-

16).

2)    Wells Fargo also sought judgment notwithstanding the verdict, a new trial,

remittitur.  Its post-trial motion and the suggestions in support thereof totaled

forty-seven (47) pages and included ten (10) separate exhibits, totaling an

additional sixty-five (65) pages.   Wells Fargo's post-trial motion and its

suggestions in support thereof consisted of forty-one (41) separate points and

subpoints.   In addition to the points, Wells Fargo incorporated by reference

fourteen (14) separate points from RFC's post-trial motion.  (Ex. A, ¶18-19).

3)    Household also sought judgment notwithstanding the verdict, a new trial,

remittitur. Household's post-trial motion and its suggestions in support thereof

totaled forty-five (45) pages.  Household's post-trial motion and its suggestions in

support thereof consisted of twenty-three (23) separate points and subpoints.  In

addition to the foregoing, Household incorporated by reference nine (9) separate

points from RFC's and Wells Fargo's respective post-trial motions. (Ex. A, ¶21-

22).

If the Defendants' post-trial motions were granted, the jury verdict would have been erased (or substantially reduced if the damages were remitted). Every point raised by Defendants was a point that could have potentially wiped out the judgment for the Class. Accordingly, it was absolutely necessary for Plaintiffs to prepare and file comprehensive briefing in opposition to Defendants' respective post-trial motions and to address each and every point raised by Defendants.

It was needless to say a massive undertaking for Class Counsel to read and analyze the Defendants' respective post-trial briefs, along with the thousands of pages of attached exhibits. Additionally, Class Counsel needed to also read and analyze the hundreds of authorities cited by Defendants in their briefing. An omission or error by Class Counsel on any one issue could have been fatal to the verdict. There was no room for a mistake – thoroughness and an attention to detail were necessary to protect the verdict for the Class. (Ex. A, ¶24).

Plaintiffs were up to the difficult task of responding to the post-trial motions. On August 19, 2008, Plaintiffs' filed their opposition to RFC's motion to decertify. The opposition totaled twenty-one (21) pages and included one (1) exhibit, totaling an additional nineteen (19) pages. (Ex. A, ¶17). Subsequently, Plaintiffs separately filed their oppositions to Defendants' three respective post-trial motions for JNOV, new trial, and remittitur: 1) Plaintiffs' opposition to RFC's motion totaled 127 pages. (Ex. A, ¶ 17). 2) The opposition to Wells Fargo's motion totaled thirty-seven (37) pages and included three (3) unsealed exhibits, totaling an additional thirty-nine (39) pages, specific to the response to Wells Fargo's post-trial motion. (Ex. A, ¶20). 3) Finally, Plaintiffs' opposition to Household's motion totaled fifty-seven (57) pages. (Ex. A, ¶22). Additionally, Plaintiffs attached 38 joint exhibits, totaling an additional 1,825 pages to the opposition to RFC's motion that were incorporated by reference to other two oppositions. (Ex.

A, ¶22). Out of necessity, Plaintiffs oppositions and the exhibits attached thereto were lengthy and voluminous. They had to be in order to adequately address each of Defendants' arguments in the four separate motions.

Based on Class Counsel's thorough and comprehensive briefing, the Court denied all of the defendants' respective motions on October 6, 2008. Accordingly, the judgment was preserved.

### C.    **Class Counsel's Work in relation to the Inadequate Supersedeas Bond**

As the Court is aware, there was significant litigation over the proper amount of the supersedeas bond that the Defendants, particularly RFC, had to file to stay execution of the judgment pending the appeal of this matter. Rule 81.09 requires Defendants to post an amount equal to the "judgment in full" and "the whole amount of the judgment" together with "costs on the appeal, interest, and damages for delay." This is necessary to provide adequate security for the Plaintiffs on appeal. However, the Defendants' proposed bond amounts were insufficient to provide adequate security or to satisfy the requirements of Rule 81.09. Specifically, RFC proposed a bond in the amount of $9,046,979, a mere 9% of the judgment against it. (Ex. A, ¶28).

The insufficient amount of RFC's proposed bond was reason enough for Plaintiffs to object to the proposed bond. However, additional factors made it imperative that Plaintiffs object and make sure that RFC posted a bond for the entire judgment. During the time that RFC and Class Counsel litigated over the proper bond amount, RFC was experiencing financial instability. Had RFC been permitted to file a supersedeas bond in an amount less than the judgment entered against it, there would have been no way to guarantee that Class Counsel would be able to collect the judgment it obtained on behalf of the Class if RFC filed for

9

bankruptcy or became insolvent. If that happened, there was every possibility that Plaintiffs and

the Class would recover nothing. Therefore, it was absolutely necessary for Class Counsel to

vigorously oppose RFC's proposals regarding the proper amount of the bond. (Ex. A, ¶ 29).

After Plaintiffs filed their suggestions in opposition to RFC's bond application, the Court

heard arguments on the bond issue. On October 6, 2008, the Court entered its Order setting the

bond amounts for each defendant, including an Order setting the bond amount for RFC in an

amount of $99,651,115.09 plus an additional amount for post-judgment interest over an

anticipated three-year appeal period. If posted by Defendants, the bonds would provide security

for payment of the judgment.. (Ex. A, ¶30). While Wells Fargo and Household complied with

this Court's Order by posting the required bond, RFC refused to do so and forced Plaintiffs to

continue further litigation on the bond issue before the Court of Appeals for the Western District

of Missouri and before the Missouri Supreme Court.

Rather than comply with the clear mandate of Rule 81.09 and with this Court's Order,

RFC subsequently filed a writ with the Court of Appeals for the Western District of Missouri. In

its writ application, RFC requested that the bond amount should be set at $50 million collectively

for all defendants pursuant to § 512.099 RSMo (which is on its face applicable to tort claims, not

statutory violations), including a bond amount of $39,393,406.88 for itself. RFC's new proposed

bond amount was still wholly insufficient to provide adequate security on appeal in that it was in

an amount less than half the judgment against it. (Ex. A, ¶ 31-33). Class Counsel opposed

RFC's writ application and the Court of Appeals remanded the issue back to this Court to

consider the applicability of § 512.099 RSMo. (Ex. A, ¶ 34-35). Again, Class Counsel briefed

and opposed RFC's proposed bond and further argued that the Court's prior Order setting the

bond amount was appropriate and that § 512.099 was inapplicable, in part because that statute is

applicable to torts, and not statutory violations.    (Ex. A, ¶36).    After considering the comprehensive briefing, the Court addressed and rejected RFC's argument concerning the applicability of § 512.099 RSMo in its Amended Order.  The Court did not substantively alter its prior Order. (Ex. A, ¶ 37).

Undeterred, RFC renewed its efforts to avoid posting an adequate bond by filing writs before the Court of Appeals and before the Missouri Supreme Court.  Plaintiffs opposed RFC's efforts at every level – before this Court, before the Court of Appeals, and before the Missouri Supreme Court. (Ex. A, ¶ 27-47).  Plaintiffs hard work and diligence was rewarded.  On November 3, 2008, the Missouri Supreme Court denied RFC's *Petition for Writ of Prohibition*. (Ex. A, ¶44).  That same day, RFC finally relented and filed a supersedeas bond in the amount of $126,556,917.00. (Ex. A, ¶45).

All of Plaintiffs' work and attorneys' fees incurred in connection with the supersedeas bond issue was necessitated solely by RFC's failure to file a bond in the amount ordered by this Court in the first instance.[4]  Plaintiffs' work and attorneys' fees could have been avoided had RFC complied with this Court's Order, rather than taking numerous steps before the Court of Appeals and the Missouri Supreme Court to circumvent clear legal authority and this Court's Order.  As a result of Class Counsel's success on this issue, RFC were required to post a bond in excess of $100 million, an amount that would provide Plaintiffs adequate security to protect their judgment during the pendency of the appeal.

### D.    Class Counsel's Work on Appeal

---

[4] In anticipation that RFC would not post the required bond amount, Plaintiffs noticed for deposition James N. Young, RFC's CFO and Principal Accounting Officer, in aid of execution of the judgment.  In further aid of execution on the judgment, on October 27, 2008, Plaintiffs filed forty-six (46) separate Writ of Garnishments directed to entities related to RFC and/or whom Plaintiffs believed held money or assets belonging to RFC.  Because RFC finally satisfied the conditions necessary to stay execution by filing the bond in the amount originally ordered by the Court, Plaintiffs then had to halt all efforts already taken to execute upon the judgment against RFC. Therefore, Plaintiffs prepared and filed 46 separate *Release of Garnishment* as to the 46 separate *Writ of Garnishments* previously filed by Plaintiffs on October 27, 2008. (Ex. A, ¶ 38, 46).

Defendants' next attempt to escape and/or limit its liability to Plaintiffs and the Class was to appeal from the judgment. After entry of the Court's final judgment, each of the defendants filed their respective Notices of Appeal. Plaintiffs also filed a cross-appeal, which in part appealed from the Court's denial of prejudgment interest for past interest paid. (Ex. A, ¶48)

To say the least, Class Counsel's appellate work was crucial. It was possible that the entire judgment in favor of Plaintiffs and the Class could have been overturned and possible that no damages would have been recovered. Accordingly, it was absolutely necessary for Plaintiffs' appellate work to be thorough and detail-oriented. Anything less could have been disastrous for the Class.

Even administrative tasks were exhaustive and time consuming. During the initial stage of the appeal, the parties had to compile, prepare, and file the Record on Appeal with the Court of Appeals. The Record on Appeal consisted of 26,000 plus pages that filled 127 bound volumes. (Ex. A, ¶49). Also, Plaintiffs were required to deposit with the Court of Appeals 109 separate exhibits. The exhibits totaled approximately 45,000 pages and filled an estimated 26 bankers boxes. Due to the voluminous nature of the exhibits to be deposited, rather than provide physical copies of the actual exhibits to the Court of Appeals, Plaintiffs deposited the exhibits as files on CDs. In order to do this, Plaintiffs had to scan all of the exhibits, save them as .pdf files, and burn them onto 15 separate CDs. (Ex. A, ¶60). As the Court realizes, the sheer size and volume of the Record on Appeal and the exhibits are indicative of the enormous time and effort required and expended during the appellate process to review, to locate, and accurately cite to the record. Credibility to the reader of the appellate briefs can be negatively affected by inaccurate or incorrect citation to the record. Accordingly, a significant amount of time was spent to ensure that the citation to the record was completely accurate. (Ex. A, ¶50)

12

Of course, the main work on appeal was the actual briefing involved. Given the magnitude of the judgment and importance of the issues on appeal, the size of the appellate briefs filed in this matter is unsurprising:

    a.    RFC's initial appellant's brief totaled 106 pages, raised sixteen (16) separate points relied on, and cited 199 separate legal authorities. Their reply/response brief totaled 105 pages and cited to 154 separate legal authorities. (Ex. A, ¶¶ 51, 57).

    b.    Wells Fargo's initial appellant's brief totaled 108 pages, raised nineteen (19) separate points relied on, and cited 145 separate legal authorities. Their reply/response brief totaled 59 pages and cited to 87 separate legal authorities. (Ex. A, ¶¶ 51, 57).

    c.    Household's initial appellant's brief totaled 114 pages, raised eighteen (18) separate points relied on, and cited 127 separate legal authorities. Their reply/response brief totaled 37 pages and cited to 66 separate legal authorities. (Ex. A, ¶¶ 51, 57).

In all, the six appellate briefs filed by Defendants' totaled 529 pages, collectively raised 53 points relied on, and cited to literally hundreds of legal authorities. The size of Defendants' briefs bears mentioning, because it was Class Counsel's task to address each and every argument raised therein. This was an enormous task. Class Counsel had to read and analyze the Defendants' six appellate briefs, along with reviewing their citations to the Record on Appeal. Additionally, Class Counsel also needed to read and analyze the literally hundreds of authorities cited by Defendants in their briefs. Any neglect, omission or error by Class Counsel on any one issue could have resulted in the complete reversal of this Court's judgment. There was no room

for any mistakes – thoroughness and an attention to detail were absolutely necessary to protect the judgment for the Class. (Ex. A, ¶52).

In preparing their initial appellate brief and their final reply brief, Plaintiffs 1) reviewed each of the defendant's respective briefs in detail; 2) analyzed the arguments contained therein; 3) thoroughly read the hundreds of cases and authorities cited by defendants; 4) outlined and discussed Plaintiffs' arguments in response; 5) conducted independent research in connection with the parties' arguments; 6) read hundreds of cases, statutes, regulations, legislative histories, secondary sources, and treatises in formulating Plaintiffs' own arguments; 7) reviewed the 26,000 plus pages that comprised the record on appeal, the legal file, and the trial transcript, which was necessary for insertion of the citations thereto in the briefs; and 8) undertook the arduous task of the actual drafting of the Plaintiffs' initial appellate brief and their final reply brief. (Ex. A, ¶53, 58).

Given the voluminous and lengthy briefs filed by each of the defendants (which collectively totaled 529 pages), the 53 separate points relied on, the numerous arguments related to the points, and the numerous citations to legal authority, it is not at all surprising that Plaintiffs' own briefs were incredibly lengthy as well. The Respondent-Cross Appellant Brief filed by Plaintiffs totaled 92,984 words and consisted of 345 pages. It included an Appendix that totaled an additional 250 pages. The brief contained seventy-one (71) points and subpoints and cited to and discussed 338 separate cases, 35 statutes, rules, and/or regulations, and six (6) secondary sources. (Ex. A, ¶55). Plaintiffs' Joint Final Reply Brief totaled an additional 14 pages, consisted of 3,629 words, and cited to 12 separate cases and 3 statutes. (Ex. A, ¶59).

The sheer size of Class Counsel's briefing demonstrates the substantial time and effort that Class Counsel had to expend to complete the briefing. In part, the hours spent by Class Counsel on the

appeal was a byproduct of the voluminous nature of Defendants' briefing and the number of

arguments they pursued in an effort to completely overturn the Court's judgment in favor of

Plaintiffs and the Class.    Plaintiffs' extensive and comprehensive briefing was absolutely

necessary to adequately address, oppose, and refute Defendants' appellate arguments. (Ex. A,

¶56).

> As would be expected from the description of the briefing above, Class Counsel spent

significant time preparing for oral argument, which included but was not limited to re-reviewing

each of the defendant's respective briefs in detail, re-analyzing the arguments contained therein,

re-reading the cases and authorities cited by defendants, outlining and discussing Plaintiffs'

arguments for presentation at oral argument. (Ex. A, ¶66).

> Further, additional research was done in an effort to update the cases cited in the briefs

and to determine if there were any new developments since briefing had been completed.    The

additional research included reviewing all cases nationwide at both the state and federal level

involving discussion of the *Gore* factors in connection with punitive damages.    Plaintiffs'

exhaustive and comprehensive research enabled Plaintiffs to direct the Court of Appeals'

attention, via letter, to an additional four cases that had not been cited in the parties' briefs.

Those cases were important to Plaintiffs' arguments concerning the propriety of the punitive

damage award. (Ex. A, ¶67).

> Given the complexity of the case and the size of the briefs submitted by the parties, the

Court of Appeals took the very unusual step of expanding oral argument to an entire hour.  (Ex.

A, ¶65).  On July 8, 2010, oral argument occurred. (Ex. A, ¶70).

> On November 23, 2010, the Court of Appeals issued its opinion in this case.  The opinion

was a tremendous result for the Class and reaffirmed its positions on a multitude of long and

hotly contested issues. The appeal settled various important aspects of Missouri law, e.g., 1)

whether a borrower has standing to assert claims on behalf of a class of borrowers who obtained

loans from a common lender but whose loans were transferred to different defendant entities, 2)

the interpretation and construction of the statutory language of the SMLA, 3) a determination of

what fees violate the SMLA, 4) whether past interest paid on loans are recoverable as damages

under the SMLA, 5) the applicability of HOEPA,  6) assignee liability under HOEPA, 7) the

interplay of HOEPA with the SMLA, and 8) the availability of prejudgment interest on past

interest paid under the SMLA, to name a few. (Ex. A, ¶71).

The opinion, *inter alia*, affirmed the Court's judgment with regard to liability and

compensatory damages, reversed the Court's Order denying prejudgment interest on the award

for past interest paid, held that Plaintiffs had made a submissible case for punitive damages but

that the award of punitive damages had to be reversed on the basis of a technical instructional

error and remanded the case for trial on the punitive damages, granted Plaintiffs' motion for

attorney's fees, specifically found Plaintiffs to be prevailing parties under § 408.562 and

remanded the case back to the Court for further proceedings. (Ex. A, ¶71).

Special mention should be made about Plaintiffs' cross-appeal. As part of their cross-

appeal, Plaintiffs argued that the Court should have granted Plaintiffs' application for an award

of prejudgment interest on the past interest paid. (Ex. A, ¶61-62). The Court of Appeals agreed

with Plaintiffs, holding that prejudgment interest should have been awarded in connection with

the damage award for past interest paid. (Ex. A, ¶63).

Class Counsel's efforts conferred a substantial benefit to the Class in that it resulted in

the recovery of prejudgment interest on the past interest paid on behalf of the Class. The amount

of such prejudgment interest solely for the past interest paid totaled $3,529,804.76 when the

defendants finally paid this component of the Class Members' damages. (Ex. A, ¶ 64). Needless to say, the Court of Appeals' opinion represented a major victory for Plaintiffs and the Class, and was made possible by the diligence, thoroughness, and the exhausting work performed by Class Counsel.

E.    **Motion for Dismissal of RFC's and Wells Fargo's Appeals as a Sanction for Discovery Misconduct**

In addition to typical appellate matters, Class Counsel were also forced to file with the Court of Appeals their *Motion to Dismiss Appeals Nos. WD70244 and WD 70210 and Award of Monetary Sanctions Based Upon Plaintiffs' Post Trial Discovery of Fraud Perpetrated on the Court, Jury and Plaintiffs* ("Motion to Dismiss Appeals"). The Motion to Dismiss Appeals was necessitated after Class Counsel uncovered a scheme to conceal numerous and critical documents and records perpetrated by RFC and Wells Fargo. The Motion to Dismiss Appeals and the suggestions in support thereof totaled 154 pages and cited to 71 separate cases, 16 statutes and/or rules, and 4 secondary authorities. Additionally, Plaintiffs' Motion to Dismiss Appeals included 78 separate exhibits, which totaled an additional 3,223 pages contained in nine (9) bound volumes. (Ex. A, ¶ 74).

The briefing was the end result of Class Counsel's investigation of the deliberate concealment, subsequent cover-up of that concealment, and fraud on the Court, Plaintiffs, and jury, by RFC and Wells Fargo in this case and in a separate second mortgage class action case that spanned two years. The investigation was made difficult and caused by the extent and depth of the pernicious cover-up by the involved defendants, RFC and Wells Fargo. That difficulty was magnified by Plaintiffs' inability to conduct discovery on the matter because the case was on appeal when the fraud was first discovered. (Ex. A, ¶75).

Plaintiffs' Motion to Dismiss Appeals was directed against RFC and Wells Fargo for the intentional concealment of over 20,000 pages of critical documents during discovery in this case. The documents, had they been produced, would have wholly contradicted the "industry standards defense" that Wells Fargo and RFC presented as their main defense at trial. As part of that defense, the defendants asserted that it was a standard, industry-wide practice to simply rely upon the representations and warranties of the seller of a loan, rather than to conduct an independent inquiry as to whether the loan complied with state law fee restrictions. Evidence of a fee matrix, which would have been used to check the loans for compliance with state law fee restrictions, was deliberately concealed from the Court, Plaintiffs, and the jury. Even though they had the very documents in their possession, these defendants nevertheless argued there was no "fee matrix" in existence, it was impossible to create such a "fee matrix," and no such "fee matrix" was used to check for compliance. While these defendants made these arguments to the Court and jury or stood silent while others made these arguments, the defendants' lawyers literally had these allegedly non-existent documents in their files. They knew those arguments were untrue. (Ex. A, ¶76).

All of this was unknown to Class Counsel until an index of boxes that listed concealed documents was unearthed by Class Counsel in late-November 2008 in the matter styled, *Schwartz v. Bann-Cor, et al.*, case no. 00 CV 226639. At that point in time, this case was already on appeal. Because the case was on appeal, the deliberate concealment was never revealed to this Court until this case was remanded back to this Court and then very briefly mentioned at a hearing before the Court on May 18, 2011. Confronted with information about the deliberate concealment perpetrated by RFC and Wells Fargo, Class Counsel had to thoroughly investigate and determine what remedies were available and how they could be sought. Since the

defendants involved in the deliberate concealment were RFC and Wells Fargo, Class Counsel determined that it was in the best interest of the Class to seek the dismissal of the appeals as a sanction for defendants' egregious conduct. (Ex. A, ¶77).

A great deal of work was required before Plaintiffs could even begin drafting the motion itself. Before beginning work on the motion itself, Plaintiffs had to review the discovery responses and the thousands of documents previously produced in this case, correspondence between the parties, in addition to the various motions to compel discovery and the Court's Orders regarding discovery and document production. This initial review was necessary to ensure that Plaintiffs had a factual basis for asserting that Wells Fargo and RFC had disregarded their discovery obligations and failed to identify and produce documents that this Court had in fact ordered be produced. After determining that Wells Fargo and RFC failed to comply with their discovery obligations based upon their review of the discovery and the Court's various orders, Plaintiffs undertook extensive research regarding topics such as the discovery obligations and ethical obligations of parties and of their counsel, availability of sanctions on appeal for discovery misconduct at the trial level, obligations of co-defendants generally and under a joint defense, and obligations to prevent any fraud from being perpetrated on the Court. (Ex. A, ¶78).

Moreover, although Plaintiffs' Motion to Dismiss Appeals cited to 71 separate cases, 16 statutes and/or rules, and 4 secondary authorities, the authorities actually cited in the Motion to Dismiss Appeals are a fraction of the authorities consulted and read by Plaintiffs. Plaintiffs literally read hundreds of cases, statutes, regulations, rules, secondary sources and treatises as part of their comprehensive research. Plaintiffs were able to extract the most useful and relevant authorities only after a detailed reading and analysis of the hundreds of authorities and cases consulted. The circumstances of the intentional concealment and subsequent cover-up presented

a unique situation, because 1) Plaintiffs succeeded at trial despite being deprived of thousands of critical documents; and 2) the deliberate concealment was not discovered until after Defendants appealed the matter. (Ex. A, ¶79).

The arduous task of the actual drafting of the Motion to Dismiss Appeals and the suggestions in support, in addition to setting forth the background to the dispute and presenting legal argument, required the painstaking effort to provide factual support for the Motion through reference and citation to numerous exhibits and the record. Class Counsel spent in excess of a thousand hours investigating, researching, drafting, and annotating the Motion to Dismiss Appeals. The Motion to Dismiss Appeals was reviewed and revised multiple times because of its significance, the seriousness of the allegations, and the stakes involved. It was a motion that absolutely required excruciating detail and annotation, all of which required a large amount of time. (Ex. A, ¶80).

Had Plaintiffs succeeded, RFC's and Wells Fargo's appeals would have been dismissed. The Court of Appeals, however, opted to decide the merits of the appeals, because the case presented numerous issues. The Court of Appeals' decision to decide the appeal on the substantive merits necessarily required it to deny the Motion to Dismiss Appeals. The non-substantive nature of the denial is borne out of the recent denial of the writs sought by RFC and Wells Fargo as to discovery relating to their fraud in concealing thousands of documents and the subsequent cover-up. (Ex. A, ¶82). Although the Motion to Dismiss Appeals was denied on grounds now known to be non-substantive, the Court of Appeals still found Plaintiffs to be prevailing parties and entitled to attorneys' fees under § 408.562. (Ex. A, ¶83)..

F.    **Miscellaneous matters**

Class Counsel's representation of the Class and each of its members also occupied a significant amount of Class Counsel's time. These efforts are certainly not as apparent as the motion practice or work product which is put before the Court, but it is nonetheless vital as it was necessary in order to ensure that each Class member – or the appropriate person(s) with standing to maintain the Class members' claims – recovers their fair share of the recovery in this lawsuit. (Ex. A, ¶84). Further, in some instances, this work was required by Class Counsel's ethical obligations. See Mo. Rule 4-1.4 ("A lawyer shall … keep the client reasonably informed about the status of the matter [and] promptly comply with reasonable requests for information.")

At the time Plaintiffs' filed their initial *Application for Award of Attorneys' Fees and Expenses* on March 14, 2008, Class Counsel had filed three separate motions to add and/or substitute bankruptcy trustees for each class member known to have filed Chapter 7 bankruptcy after obtaining their MCR loans. On April 4, 2008, Class Counsel filed their reply suggestions in support of the motion. On May 15, 2008, the Court denied Plaintiffs' request that the bankruptcy trustees be added, but granted their alternative request to substitute the bankruptcy trustees in place of the class members who had filed Chapter 7 bankruptcy. Since that time, Class Counsel has maintained contact with the various bankruptcy trustees to provide updates on the status of this matter. (Ex. A, ¶85).

Class Counsel also notes their work with respect to the claims for those class members who have died since obtaining their MCR loans. Such work includes communicating with the family members of such class members to obtain information in connection with heirship determinations, traveling to and attending hearings on the respective Petition(s) for Heirship Determination filed in various circuit courts throughout Missouri, and filing annual accountings in connection with the estates for the various class members. (Ex. A, ¶86).

21

Class Counsel also notes that it regularly receives and responds to inquiries from class members regarding the status of this case, and provides updates in connection with significant developments in this case via individualized letters to class members and their bankruptcy trustees, if any, and via updates to Class Counsel's website. (Ex. A, ¶87).

As the foregoing demonstrates, the additional work performed by Class Counsel on and after April 1, 2008, through April 26, 2011, was reasonable, and absolutely necessary to protect the judgment entered on behalf of Plaintiffs and the Plaintiff Class. The sheer amount of work performed by Class Counsel during that time, post-judgment and on appeal, justifies the attorneys' fees requested herein.

## IV. ALLOCATION OF THE "STATUTORY" FEE AWARD BETWEEN DEFENDANTS

The most fair and equitable method of allocating the attorneys' fees and expenses to each defendant is to do so based upon the amount of work that was performed in connection with each defendant and the arguments and/or issued raised by each respective defendant. Certain work performed by Class Counsel related solely to arguments or issues related to an individual defendant or defendants, but not the other defendants; while other work related equally to all the defendants. The work performed that was associated with certain defendants should be wholly allocated to those certain defendants. The work performed that related to all of the defendants should be equally borne by all defendants.

The Affidavit of Roy Frederick Walters discusses at length the rationale behind and the basis for the allocation of attorneys' fees as to each of the defendant. (Ex. A, ¶135-159). Based upon the information contained therein, Class Counsel believes that the most fair and equitable allocation of the entire $6,708,456.50 requested award for attorneys' fee should be allocated as follows:

| Defendant | Amount |
|---|---|
| RFC | $2,780,365.38 |
| Wells Fargo | $2,322,341.16 |
| Household | $1,605,749.96 |

## V.    REASONABLENESS OF THE ATTORNEYS' FEES SOUGHT BY CLASS COUNSEL

The award of attorneys' fees that Plaintiffs are requesting is fair to all parties, reasonable, and appropriate under the law and the facts of this case.  Class Counsel prevailed at trial and secured a substantial judgment against the defendants.  Based upon its work through March 31, 2008, this Court awarded attorneys' fees to Plaintiffs.  Although Plaintiffs also sought attorneys' fees that it reasonably anticipated would be incurred for continued work in this matter post-judgment and on appeal, the Court declined to award the anticipated attorneys' fees at that time; instead, the Court deferred consideration of the issue and indicated that the issue would "best be addressed on appeal."  As discussed above, the Court of Appeals specifically found that Plaintiffs were the prevailing party, determined that Plaintiffs were entitled to attorneys' fee pursuant to § 408.562, and remanded to this Court to determine the appropriate amount to award as attorneys' fees.

From April 1, 2008 through April 26, 2011, Class Counsel performed an additional 8,159.05 hours of work in connection with this case in an effort to protect the judgment it secured on behalf of the Class.  This work performed by Class Counsel was necessary and conferred a substantial benefit to the Class – not only did Class Counsel protect the compensatory damage award and conclusively established that the issue of punitive damages was submissible to a jury, Class Counsel also recovered additional damages not originally awarded by this Court, i.e., prejudgment interest on past interest paid.  Such work warrants the award of

23

attorneys' fees pursuant to the direction of the Court of Appeals.

Ultimately, the Court's decision as to whether the amount of the fee requested is fair and reasonable is a discretionary one. *In re Alcolac Litigation*, 945 SW 2d 459, 461 (Mo. Ct. App. WD 1997). The court will be guided by its knowledge and experience, familiarity with the case and the work and efforts of Class Counsel, the results obtained at trial, post-trial, and on appeal, and other factors. Plaintiffs submit that the Court should approve the award of fees they seek given the additional work performed on and after April 1, 2008, through April 26, 2011, the results obtained by Class Counsel and all the other relevant factors.

A.    **The Court Must Award Fees to Class Counsel/Plaintiffs**

As discussed above, the Court of Appeals specifically found that Plaintiffs were prevailing parties and entitled to attorneys' fees under § 408.562. The award of attorneys' fee are clearly warranted. "Refusing to compensate an attorney for the time reasonably spent on appellate work defending the judgment below would be inconsistent with the intent of the legislature." *Building Owners & Managers Ass'n of Greater Kansas City*, 231 S.W.3d at 214. The Court of Appeals, however, did not address the reasonable amount of attorneys' fees and remanded to this Court to determine the appropriate amount to award for attorneys' fees.

Although § 408.562 provides that a court may in its discretion award attorney's fees "based on the amount of time reasonably expended," the statute does not preclude the Court from considering all the other factors that Missouri courts consider in determining the propriety of a fee award, including, without limitation, the risk of non-payment and lost money, the results achieved and benefit conferred, etc. *See, e.g., Hutchings v. Hutchings*, 193 S.W.3d 334, 351-52 (Mo. App. 2006) (listing factors); *Union Center Redevelopment Corp. v. Leslie,* 733 S.W.2d 6, 9-10 (Mo. App. 1987) (listing factors); Mo. Rule 4.15(a); *Schefke v. Reliable Collection Agency,*

*Ltd.,* 32 P.3d 52, 96-98 (Hawaii 2001) ("contingency enhancement may at times be necessary to ensure enforcement of statutes with fee-shifting provisions").

Attorney's fees are a matter within the trial court's sound discretion. *In re Alcolac Litigation,* 945 S.W.2d at 461. The trial court is an expert on the question of attorney's fees and is "presumed to know the character of their services rendered in duration, zeal and ability, and to know the value of them according to custom, place, and circumstance." *Williams,* 78 S.W.3d at 184.

In determining the reasonable value of legal services, Missouri courts consider the following: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill needed to conduct the case properly; (4) the experience, reputation and ability of the lawyers involved; (5) the contingency or certainty of the compensation; (6) the customary charges for similar work; (7) whether the acceptance of employment will involve the loss of other employment; (8) the time limitations and the character of the employment, whether casual or for an established and constant client; and (9) the amount involved in the controversy and the benefits resulting to the client. *See, e.g., German Evangelical St. Marcus Congregation of St. Louis v. Archambault,* 404 S.W.2d 705, 711 (Mo. 1966); *In re Alcolac,* 945 S.W.2d at 461 ("[i]n determining the reasonable value of legal services, the circuit court should consider the time spent, nature and character of services rendered, nature and importance of the subject matter, degree of responsibility imposed on the attorney, value of property or money involved, degree of professional ability required and the result"); *Union Center Redevelopment Corp. v. Leslie,* 733 S.W.2d 6, 9 (Mo. Ct. App. ED 1987) (same); *Scott v. Home Mutual Telephone Co.,* 510 S.W.2d 793, 795 (Mo. Ct. App. KC 1974) (same); Mo. Rule 4-1.5(a) (itemizing relevant factors to be used by a court in determining the reasonableness or appropriateness of an

25

attorney's fees).[5]   Each and all of the relevant factors support the propriety of Plaintiffs'

requested award for the work performed by Class Counsel on and after April 1, 2008, through

April 26, 2011, especially considering the amount of work performed and the results obtained.

**B.    Application of a 2.0 Enhancement is Reasonable and Appropriate**

Plaintiffs seek approval of a reasonable fee award in the amount of $6,708,456.50.  This

amount reflects a reasonable 2.0 enhancement of the lodestar amount.    The requested 2.0

enhancement is reasonable under the circumstances in this case.

A "lodestar" calculation involves multiplying the number of hours expended by a

reasonable hourly rate for each timekeeper's time and then multiplying the lodestar amount by a

risk premium factor or "multiplier" based on the risk of recovery and other considerations, to

arrive at a reasonable fee. *See, e.g., Cohn v. Nelson*, 375 F.Supp.2d 844, 862 (E.D. Mo.2005)

(citing *Blum v. Stenson,* 465 U.S. 886 (1984)).  Multipliers of 3 to 5 are typical and considered

---

[5]    The factors enumerated in the *Alcolac, Union Center,* and *Scott* cases are essentially the same factors
listed in Mo. Rule 4-1.5, which provides:

"A lawyer's fee shall be reasonable. The factors to be considered in determining the
reasonableness of a fee include the following:

"1. the time and labor required, the novelty and difficulty of the questions involved, and
the skill requisite to perform the legal service properly;

"2. the likelihood, if apparent to the client, that the acceptance of the particular
employment will preclude other employment by the lawyer;

"3. the fee customarily charged in the locality for similar legal services;

"4. the amount involved and the results obtained;

"5. the time limitations imposed by the client or by the circumstances;

"6. the nature and length of the professional relationship with the client;

"7. the experience, reputation, and ability of the lawyer or lawyers performing the
services; and

"8. whether the fee is fixed or contingent."

reasonable to compensate counsel for the risk of contingent representation. *See, e.g., Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1052-54 (9th Cir. 2002) (listing 23 settlements and multipliers for each, in which the average multiplier is 3.28); *Behrens v. Wometco Enters., Inc.,* 118 F.R.D. 534, 549 (S.D. Fla. 1988), *aff'd,* 899 F.2d 21 (11th Cir. 1990) ("Most lodestar multiples awarded in cases like this are between 3 and 4."); *In re Xcel Energy, Inc.,* 364 F. Supp. 2d 980, 999 (D. Minn. 2005) (4.7 multiplier, and cases cited therein).    When determining whether to award a multiplier to a lodestar calculation of attorney's fees, "[t]he contingency factor is based on elementary considerations of fairness and justice."    *Cohn,* 375 F.Supp.2d at 862 (awarding multiplier of 2.9).    As the above cases demonstrate, a 2.0 enhancement is within the range of acceptable multipliers and is actually lower than what most courts would award.    Here, the 2.0 enhancement is reasonable in light of the many factors discussed in detail below (See Section V.C, *infra.*) and in the attached Affidavit.

Moreover, other divisions of this Court have expressly recognized that lodestar amounts can and should be enhanced under fee shifting statutes, such as the one in this case.    For example, in *Berry v. Volkswagen of America, Inc.,* No. 0516-CV-01171-01 (May 3, 2011), the Honorable Michael Manners of this Court awarded attorneys' fees in the amount of $6,174,640.00 to plaintiffs in the prosecution of an action pursuant to the Missouri Merchandising Practices Act (MMPA) and the fee-shifting statute thereunder,§407.025.2 RSMo. *See* May 3, 2011 Order (attached hereto as **Ex. E**).    Judge Manners awarded plaintiffs their lodestar amount with a multiplier of 2.0, the same enhancement requested here.    As part of the court's order, the same factors discussed below were cited by Judge Manners as part of the rationale for applying a 2.0 multiplier. (Ex. E, at p. 1-2).    In fact, consideration of those same factors in this case demonstrates that enhancement of the lodestar is even more appropriate in

this case than it was in *Berry*. *See* Section V.C, *infra*.

Further, Judge Manners made this award despite the fact that the result was the outcome of a settlement and the anticipated payout by Volkswagen was "unlikely to exceed $150,000.00." (*See* Ex. E, at p. 3). In contrast, this case resulted in substantial payments of $5,974,069.16, net of all fees and expenses, that were actually paid in connection with 302 class loans compared to the $150,000 that Judge Manners believed would ultimately be paid in *Berry*. Further, the payments to class members in this case were obtained by Class Counsel for and on behalf of the Class despite the defendants waging more than just a "vigorous" defense as was the case in *Berry*. Here, while this case has been similarly made difficult by the tactics of defense counsel, this case has been more difficult given that the *Berry* case was ultimately resolved through settlement whereas this case required trial, significant post-trial and appellate work. Moreover, the *Berry* case had only been pending for five years when the settlement was reached, whereas the instant case has been pending since 2003, a period stretching nearly nine years.

Additionally, as Judge Manners recognized in *Berry*, "an enhancement is especially congruent with fee awards under [consumer protection statutes], which the Supreme Court has described as having been enacted by the Missouri General Assemby as 'paternalistic legislation designed to protect those that could not otherwise protect themselves.'" (Ex. E, at p. 2). As the Court of Appeals recognized in the appeal of this case, the MSMLA "is a consumer-protection measure designed to regulate the business of making high interest second mortgage loans on residential real estate." *Mitchell*, 334 S.W.3d at 486. Therefore, like the MMPA in *Berry*, the MSMLA, as a consumer protection measure, is designed to protect those that cannot protect themselves. Enhancement here, just as in *Berry*, is congruent with the statutory purposes of the MSMLA. These factors, along with the other factors discussed below, justify a fee award

enhanced by a multiplier of 2.0.

Yet another division of this Court has also recognized that enhancement is appropriate under a fee-shifting statute like the one that exists in the instant case. *See* December 2, 2011 Order in *Doe v. Johnson County Park & Recreation, et al.,* Consolidate No. 0516-CV-23636, 07-EXEC-39290, 0716-CV-24114-01, attached hereto as **Ex. C.** In awarding an enhanced fee in *Doe,* Judge Atwell considered "the duration of [the] litigation, the difficulty of the litigation, as well as the at times unreasonable positions taken and tactics used by defendants." (Ex. C, at p. 21-22). All of those considerations are present in spades in this case.

Moreover, the number of hours expended by Class Counsel compared with the number of hours expended by the law firms representing the defendants demonstrate that Class Counsel has been very efficient with their time. Based upon a sample of the time and billing records provided by RFC and Wells Fargo, Class Counsel estimates that the defendants' attorneys have expended approximately 2.13 times as many hours as did Class Counsel. (Ex. A, ¶105-110). This is an additional factor that justifies the application of a 2.0 multiplier. Plaintiffs should be rewarded, not punished, for their efficiency in this litigation.

In summary, all of the factors discussed herein and in the Affidavit justify the award of attorneys' fees enhanced by a multiplier of 2.0. That amount is $6,708,456.50 and is more than reasonable and appropriate.

C.    **The Factors Support Class Counsel's Request**

(i)    *Time and labor required.*

The time and labor expended by Class Counsel in its continued prosecution of this case on and after April 1, 2008, through April 26, 2011, in an effort to maximize and protect the recovery for Class Members was truly enormous. It required substantial work before this Court,

the Court of Appeals, and the Supreme Court of Missouri. From April 1, 2008, through April 26, 2011, Class Counsel has expended more than 8,159.05 hours in connection with this matter. (Ex. A, ¶89). This figure is comprised of no less than 6,345.40 hours of attorney time and 1,813.65 hours of time expended by legal assistants. In addition, a substantial number of unrecorded hours were expended by non-timekeepers - i.e., administrative personnel employed by Class Counsel. The time and labor that Class Counsel has expended on and after April 1, 2008, through April 26, 2011, supports the propriety of the requested award. (Ex. A, ¶89).

In determining the reasonable value of the legal services performed in a given case, the court should consider factors in addition to time. *German Evangelical, supra,* 404 S.W.2d at 711; *Scott,* 510 S.W.2d at 795 ("time taken to perform [legal] services is only one element to consider and is ordinarily of minor importance"); Mo. Rule 4-1.5(a)(1). However, this initial "time and labor" factor unquestionably supports the propriety of the requested fee awards.

*(ii)    Novelty and difficulty of questions involved.*

The factual and legal issues presented by this case were complex and required the knowledge, skill, and dedication of Class Counsel. Apart from the fact that this class action was tried and appealed, instead of settled, which itself renders the case unique, the case presents numerous complex issues of fact and law, the following among them:

- The acquisition, review, analysis, and presentation of loan records from MCR, a defunct and "uncooperative" mortgage lender.
- The review and analysis of three detailed loan origination/purchase programs through which the assignee defendants facilitated and acquired the second mortgage loans at issue.
- The certification of a consumer class for violations of the SMLA.
- The analysis, organization and presentation of the loan files, loan fees and loan payments for more than 314 second mortgage loans.
- Data management and proof of aggregate damages, a process that required tens of thousand of data entries to be made and verified.

- The acquisition, review and analysis of the trusts and/or securitization/investment programs through which the assignee defendants exploited the second mortgage loans.
- Management of a voluminous pretrial and trial record involving an extraordinary number of discovery disputes, evidentiary issues and motions.
- The standing of the named plaintiffs to sue all defendants on behalf of the unnamed class members.
- The right to recover past interest paid under the SMLA and § 408.562 RSMo.
- The effects of class member bankruptcy and/or death.
- HOEPA or "Section 32" triggers and their application to the class .
- The effect of HOEPA on the defendants' liability as assignees of the illegal loans.
- The applicability and effect of the HOEPA damages "cap."
- The holder in due course and various other defenses that defendants sought to raise in the context of this action.
- Jury instructions in a class action case involving SMLA, HOEPA, and assignee liability issues and/or claims.
- Juror non-disclosure issues.
- Application of the *Gore* factors to the punitive damage award.
- Supersedeas bonding issues and the potential application of §512.099.
- Availability of post-trial sanctions for discovery misconduct.

(Ex. A, ¶¶112).

The foregoing, although not all inclusive, certainly illustrates the novelty and difficulty of some of the proof and legal issues in this matter.   Further, Class Counsel believes this is the first case ever tried under the liability provisions of the SMLA.  (Ex. A, ¶¶113).

Moreover, Class Counsel believes that this is also the first case upon which any Missouri appellate court was required to address the clear-cut provisions of the SMLA.  The appeal reinforced various important aspects of Missouri law, e.g., 1) whether a borrower has standing to assert claims on behalf of a class of borrowers who obtained loans from a common lender but whose loans were transferred to different defendant entities, 2) the interpretation and construction of the statutory language of the SMLA, 3) a determination of what fees violate the SMLA, 4) whether past interest paid on loans are recoverable as damages under the SMLA, 5) the applicability of HOEPA,  6) assignee liability under HOEPA, 7) the interplay of HOEPA with the SMLA, and 8) the availability of prejudgment interest on past interest paid under the

SMLA, to name a few. (Ex. A, ¶114).

The nature and importance of the subject matter also supports the plaintiffs' requested award of fees. The legal rights that plaintiffs enforced though the instant litigation are important ones, affecting the public interest and conferring a significant benefit on a large class of persons (approximately 480). This lawsuit should forever change the way in which mortgage lenders and the secondary mortgage market make, buy and securitize second mortgage loans secured by Missouri homes. No more should the consumers of this state be burdened with a host of unnecessary or bogus fees when using their homes as security for much needed financing. Defendants, mortgage lenders, and the other participants in the secondary mortgage market can no longer ignore the SMLA with impunity, as defendants and others have done for so long. (Ex. A, ¶¶115).

### (iii)    *Skill needed to perform the legal service properly.*

This lawsuit is by no means an ordinary consumer or loan dispute. As stated, there were a plethora of factual and legal issues in this case and defendants elected to challenge nearly every one of them, which is in part demonstrated by the sheer size of the post-trial motions before this Court and the appellate briefing before the Court of Appeals. As stated above, Defendants collectively raised 53 separate points on appeal in their respective appellate briefs, challenging nearly everything and raising every argument imaginable in an effort to have the substantial verdicts against them overturned. The issues required the briefing, explanation, and presentation of both procedural and substantive issues in the context of both state and federal law. In addition, this case is a class action, involving the claims of more than 480 individuals with respect to no fewer than 314 second mortgage loans. The skill and experience needed to adequately prepare and present this case was unusually high. (Ex. A, ¶117).

Moreover, the standing of Class Counsel is also important in assessing the challenges faced and the skill required to meet the same. As the Court is aware and as the foregoing demonstrates, the case has been hotly contested at all stages of litigation – from pre-trial, trial, post-trial, and on appeal. This resulted in voluminous briefing on virtually every issue imagineable. Moreover, Defendants were all represented by firms and attorneys that were nationally known and of the highest caliber. Even so, Defendants retained additional law firms and attorneys, all of whom were also of national renown and reputation, to assist in their defense and appeal of this case. For example, RFC retained Mayer Brown LLP; Wells Fargo retained Winston & Strawn LLP; and Household retained William Cutler Pickering Hale and Dorr LLP. The fact that Class Counsel's attorneys and staff performed all legal work in this case for Plaintiffs, while Defendants hired and employed multiple firms and attorneys, speaks volumes as to the quality and amount of work that Class Counsel had to perform. (Ex. A, ¶118).

### (iv)    *Experience, reputation, and ability of the lawyers.*

As the attached Firm Biography and Class Action Resume and other materials submitted with this affidavit demonstrate, the attorneys at Walters, Bender, Strohbehn & Vaughan, P.C. have extensive experience in complex and class action litigation. See Ex. A-4. Each of the partners working on this matter (viz., Walters, Richards, Skeens, and Vaughan) is an experienced, AV-rated attorney. In addition, the lawyers for defendants are among the best in the country. The caliber and experience of defense counsel shows what Defendants thought of Class Counsel's abilities and should be considered. (Ex. A, ¶119).

The experience, reputation and ability of Class Counsel were substantial factors in obtaining and protecting the verdicts. Less experienced or able counsel would not likely have

taken the case, let alone achieved the results Class Counsel did. The outcome in this case was in large part due to the experience and ability of Class Counsel and substantiates the propriety of the requested awards. (Ex. A, ¶120).

### (v)    Whether the fee is fixed or contingent.

The fee agreements between Class Counsel and the named plaintiffs were contingent. Class Counsel would have received no compensation at all if they had not been successful at trial and in defending the verdicts obtained from Defendants' post-trial motions and appeal. In fact, Class Counsel would have lost the value of their more than 8,159.05 hours of work in this case from April 1, 2008, through April 26, 2011, in addition to the 11,600 hours of work before that time. In addition to the time value of Class Counsel's work, Class Counsel would have lost in excess of $363,000 in expenses incurred through June 30, 2011. Class Counsel faced significant risks from the outset of this litigation, including the risks inherent with seeking to certify a plaintiffs' class. Another risk was that plaintiffs would lose on any one or more of the multiple dispositive motions that defendants' filed, or would lose at trial. Such risks continued after the jury verdict. Defendants filed motions for new trial and appealed from the judgment, thereby perpetuating the risks that plaintiffs faced, as well as delaying the day on which Class Counsel could be paid for all of the work they have performed to effectuate and enforce the SMLA. (Ex. A, ¶121).

Courts have uniformly held that a trial court must recognize the risk of nonpayment and compensate reasonably for it. *See, e.g., Pinto v. Princess Cruise Lines, Ltd.,* 513 F.Supp. 2d 1334, 1340 ("financial risks borne by class counsel fully support the appropriateness of the fee requested"); *In re Continental Illinois Sec. Lit.,* 962 F.2d 566, 569 (7th Cir. 1992) ("failure to make any provision for risk of loss may result in systematic under compensation of plaintiffs' counsel");

34

*Maley v. Del Global Technologies Corp.*, 186 F.Supp.2d 358, 374 (S.D.N.Y. 2002) (it is
"imperative that the filing of ... contingent [class action] lawsuits not be chilled by the
imposition of fee awards which fail to adequately compensate counsel for the risks of pursuing
such litigation and the benefits that would not otherwise have been achieved but for their
persistent and diligent efforts"). Professor Newberg also acknowledges the propriety of risk
compensation:

> [C]ourts have been careful to award a fully compensable reasonable fee based
> on the underlying economic inducement for class action lawyers to pursue
> potentially expensive or complex common fund class litigation. These lawyers
> assume the risk of no compensation unless they successfully confer common
> fund benefits on the class, based on their reasonable expectation that they will
> share in the recovery in a fair proportion, in contrast to receiving a fee based
> initially on time expended criteria that failed to give the results obtained factor
> primary consideration.

H. Newberg, *Attorney Fee Awards*, § 1.09 (1986) (footnote omitted). The risks of litigation must
be judged at the outset of the case, rather than with hindsight. Mo. Rule 4-1.5(a). Without a
doubt, this matter was undertaken at a significant risk of loss to plaintiffs and Class Counsel.
The results are unprecedented. (Ex. A, ¶122).

Although Class Counsel is seeking a 2.0 enhancement based upon their current hourly
rates for the work performed on and after April 1, 2008, through April 26, 2011, the nature of the
attorneys' fees in still contingent. If Defendants had prevailed on their post-trial motions or
successfully appealed this matter, Plaintiffs and the Class would have recovered no damages, and
Class Counsel would have received no attorneys fees. That did not happen however. The Court
denied Defendants' post-trial motions; and the Court of Appeals affirmed the majority of this
Court's judgment. The Court of Appeals also specifically found that Plaintiffs were prevailing
parties under § 408.562, and determined that they were entitled to attorneys' fees. (Ex. A, ¶123).

A court should reward counsel who is successful in class action litigation, especially in consumer class actions like this. Consumer-plaintiffs rarely have the financial resources to pay a fixed hourly rate for legal services. Contingency fees and class action litigation make it feasible for individual consumers to have access to the courts and to counsel who possess the experience and ability necessary to take on complex and novel cases at a substantial risk of loss. Class counsel should be rewarded when they succeed in such cases, especially through trial and through an appeal of a favorable judgment for the Class. (Ex. A, ¶124).

In undertaking this difficult case on a wholly contingent basis, Class Counsel assumed a substantial risk of non-payment (or under-payment if the ultimate recovery is insufficient to support an adequate fee). Class Counsel assumed a significant risk that they would not be compensated at all for the more than 19,759 hours of time in prosecuting this action, including the 8,159.05 hours of time expended from April 1, 2008, through April 26, 2011, the period of time for which Class Counsel now seeks an award of attorneys' fees. Unlike counsel for defendants (who presumably were paid substantial hourly rates and reimbursed for their out-of-pocket expenses on a regular basis), Class Counsel has only recently received compensation for the work it performed through March 31, 2008. Class Counsel has yet to receive any compensation for the work it performed on and after April 1, 2008. This is true even though this suit was filed more than eight years ago, and even though Plaintiffs obtained a judgment against Defendants more than three years ago. The Court should conclude that the award plaintiffs seek for the work it performed from April 1, 2008 through April 26, 2011, is reasonable in this case. (Ex. A, ¶125).

### (vi) Customary fee.

Class Counsel has addressed in detail in the Walters Affidavit at ¶¶89-111 the hourly

36

rates and reasonableness thereof in matters of this type. In matters of this type, the hourly rates

and the requested fee award pursuant to a fee-shifting statute, such as § 408.562, are reasonable.

Further, the award of a fee enhanced by a multiplier of 2.0 is fair and appropriate. *See* Section

V.B, *supra*.

### (vii)    *Preclusion of other employment due to acceptance of the case.*

Class Counsel was forced to turn away other cases given the unusually large amount of

time they were required to spend on this case from April 1, 2008 through April 26, 2011.

Walters, Bender, Strohbehn & Vaughan, PC is currently comprised of 21 lawyers and, at any

given time since April 1, 2008, four to six of those lawyers had to devote a substantial portion

of their time to this case. Other personnel, such as paralegals, legal assistants, data entry and

administrative personnel were also needed. Given the time and personnel required to work on

this matter on and after April 1, 2008, it is obvious that this was time and personnel unavailable

to work on other matters. Had Class Counsel not been actively engaged in the prosecution of

this case at the trial level before this Court, before the Court of Appeals for the Western District

of Missouri, and before the Missouri Supreme Court, Class Counsel would have been able to

accept employment in other matters. (Ex. A, ¶127). This factor, too, weighs heavily in favor of

the requested awards.

It is also notable to look at the size of the firms representing the defendants. Those firms

had enormous resources and manpower that could be employed in litigating this case, while

undertaking other cases. Class Counsel did not have the same range of resources. There is no

question that due to the substantial engagement of time in the investigation, development,

prosecution and negotiation of this case, Class Counsel was effectively precluded from actively

engaging in other matters. Accordingly, this factor, too, weighs heavily in favor of the

requested awards.  (Ex. A, ¶ 128).

### (viii)   *Character of Employment.*

This factor includes both the time limitations imposed by client or the circumstances, Mo. Rule 4-1.5(a)(5), and the nature and length of the professional relationship with the client, Mo. Rule 4-1.5(a)(6).  This lawsuit began in July 2003.  The jury trial concluded on January 4, 2008. However, litigation in this case has continued to this day, more than four years after the jury verdict, as Defendants continued their efforts to avoid liability through their post-trial motions and through a complicated, extensive and burdensome appeal.  The post-trial demands of this litigation forced Class Counsel to dedicate a large amount of their resources to post-trial issues and the appeal of this matter over the last 4 years.    Given the length of time Class Counsel has and will continue to represent Plaintiffs and the Class, and the considerable work yet ahead, the fee award that plaintiffs are requesting is appropriate.  (Ex. A, ¶ 129)

In addition, priority work that delay a lawyer's other legal work is entitled to a premium. Mo. Rule 4-1.5(a)(5).  As stated above, four to six of those lawyers had to devote a substantial portion of their time to this case at various times since April 1, 2008.  Other personnel, such as paralegals, legal assistants, data entry and administrative personnel were also needed.  Given the time and personnel required to work on this matter on and after April 1, 2008, it is obvious that this was time and personnel unavailable to work on other matters.  (Ex. A, ¶ 130).

### (ix)   *The Results Achieved for the Class.*

As the Court is aware, Class Counsel obtained a tremendous result on behalf of the Class through trial of this matter.  However, that was not the end of this case.  Defendants have continued their efforts to escape their legal obligations and avoid liability through post-trial motions for judgment notwithstanding the verdict, new trial, remititur and even moving to

decertify the class, years after the class had been certified. Defendants then sought to have the judgment against them overturned on appeal. Had Defendants succeeded on their post-trial motions or on their appeal, Plaintiffs would have recovered nothing. This did not happen, however. Class Counsel successfully opposed the post-trial motions, and thus protected the judgment for the Class. And through its substantial and comprehensive briefing, Class Counsel prevailed on virtually all issues on appeal, including the propriety of the compensatory damages and the submissibility of punitive damages. In addition to successfully opposing Defendants' effort to completely overturn the judgment in favor of the Class, Class Counsel obtained additional damages on behalf of the Class by successfully appealing the denial of prejudgment interest on past interest paid. This represented an additional recovery for the benefit of Plaintiffs and the Class in the amount of $3,529,804.76 when the defendants finally paid this component of the Class Members' damages. (Ex. A, ¶131).

Plaintiffs have obtained a remarkable benefit for the class. As the court is aware, the verdicts in this case were achieved through painstaking work, at extraordinary risk, after years of hard-fought litigation. This is not the typical "coupon" class action, involving a *de minimus* recovery for the members of the class via a settlement agreement that provides class counsel with an exorbitant fee. Nor was this a class action that was settled early on for a few cents on the dollar. Here, approximately 480 Missouri consumer-borrowers will have received a substantial monetary benefit and still have the opportunity through retrial to recover a substantial punitive damage award. Moreover, Class Counsel, in large part, have been successful in protecting the verdict. The Court denied Defendants' post-trial motions; the Court of Appeals affirmed liability and the award of compensatory damages, in addition to determining that punitive damages were submissible to a jury. In fact, it cannot be disputed that Plaintiffs were successful – the Court of

Appeals itself determined that Plaintiffs were prevailing parties in this case. The requested award of attorney's fees that plaintiffs seek is entirely reasonable and fair and has been earned. (Ex. A, ¶ 132).

### (x). *Public policy favors the fee request*.

The Court should also consider public policy. Persons who are allegedly wronged by the violation of consumer protection laws should have reasonable access to qualified and experienced counsel, who possess the specific skills needed to analyze and litigate such claims. The time and expense involved in complex class action litigation such as this frequently outweigh the economic interests that any individual consumer might have in challenging the violation of a law like the SMLA. The role of class actions in the public interest has long been noted. As the Supreme Court has recognized, without a class action, small claimants individually lack the economic resources to vigorously litigate their rights. *See Amchem Products, Inc. v. Windser*, 521 U.S. 591, 617 (1997). Private attorneys with skill and experience should be encouraged to take the risks required to represent those who would not otherwise be protected from acts of predatory lending. Awarding the requested fees would be fully consistent with important public policy considerations and would encourage lawyers and law firms to continue to advance funding for similar contingent litigation in the future. (Ex. A, ¶133).

In short, considering all the factors Missouri courts can and should evaluate, the requested attorneys' fees in the amount of $6,708,456.50, based upon a 2.0 enhancement for the 8,159.05 hours spent working on this case from April 1, 2008, through April 26, 2011, is equitable and reasonable. (Ex. A, ¶ 134)

## VI.    CONCLUSION

For the reasons above, Plaintiffs and Class Counsel (collectively, "Plaintiffs") seek an

additional award of attorneys' fees in the amount of $6,708,456.50, based upon a 2.0

enhancement for the 8,159.05 hours of work performed by Class Counsel from April 1, 2008,

through April 26, 2011 – Class Counsel have yet to be compensated for this work. Further,

Plaintiffs respectfully suggests that the requested fee award be allocated between Defendants as

follows:.

| Defendant | Amount |
|-----------|--------|
| RFC | $2,780,365.38 |
| Wells Fargo | $2,322,341.16 |
| Household | $1,605,749.96 |

As the foregoing demonstrates, the requested attorneys' fees are reasonable given the

tremendous amount of work performed by Class Counsel from April 1, 2008, through April 26,

2011, and the results of that work. Accordingly, Class Counsel respectfully requests an award of

attorneys' fees per the direction of the Court of Appeals in the amount of $6,708,456.50 and for

any other relief the Court deems just and proper.

Dated: February 6, 2012                    Respectfully submitted,

By _R. Frederick Walters_

R. Frederick Walters - Mo. Bar 25069
Kip D. Richards - Mo. Bar 39743
David M. Skeens -Mo. Bar 35728
J. Michael Vaughan - Mo. Bar 24989
Garrett M. Hodes - Mo. Bar 50221
2500 City Center Square
1100 Main Street
Kansas City, Missouri 64105
(816) 421-6620
(816) 421-4747 (Facsimile)
fwalters@wbsvlaw.com
krichards@wbsvlaw.com
dskeens@wbsvlaw.com

mvaughan@wbsvlaw.com
ghodes@wbsvlaw.com

ATTORNEYS FOR PLAINTIFFS AND CLASS
COUNSEL

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the above and foregoing document was served this 6th day of February 2012 to:

Via hand delivery and electronic mail to:
Craig S. O'Dear
Robert M. Thompson
Emma L. Dill
**BRYAN CAVE LLP**
One Kansas City Place
1200 Main Street, Suite 3500
Kansas City, Mo 64105-2100
Tel: (816) 374-3200
Fax: (816) 374-3300
csodear@bryancave.com
rmthompson@bryancave.com
emma.dill@bryancave.com

Via electronic mail to:
K. Lee Marshall
**BRYAN CAVE LLP**
Two Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 675-3400
Fax: (415) 675-3434
klmarshall@bryancave.com

Attorneys for Defendants/Appellants Residential Funding Company, LLC and Homecomings Financial, LLC

Via hand delivery and electronic mail to:
Todd W. Ruskamp
Catherine C. Whittaker
Elizabeth C. Burke
Benjamin M. Johnston
**Shook, Hardy & Bacon LLP**
2555 Grand Blvd.
Kansas City, Missouri  64108-2613

42

Tel:  (816) 474-6550
Fax:  (816) 421-5547
truskamp@shb.com
cwhittaker@shb.com
eburke@shb.com
bjohnston@shb.com
Attorneys for Defendant Household Finance Corporation III

Via hand delivery and electronic mail to:
Michael J. Abrams
R. Kent Sellers
Jehan Kamil Moore
**LATHROP & GAGE LLP**
2345 Grand Boulevard, Suite 2800
Kansas City, MO  64108
(816) 292-2000
(816) 292-2001 (fax)
mabrams@lathropgage.com
ksellers@lathropgage.com
**jmoore@lathropgage.com**

Via electronic mail to:
T. Thomas Cottingham, III
Nash E. Long, III
Stacie C. Knight
Allen Stevens
WINSTON & STRAWN, LLP
214 North Tryon Street, Suite 2200
Charlotte, NC 28202-0178
(704) 350-7700
(704) 350-7800 (fax)
tcottingham@winston.com
nlong@winston.com
sknight@winston.com
astevens@winston.com
Attorneys for Defendant Wells Fargo Bank, N.A.

*Roy Frederick Walters*