MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Charles L. Kerr
Darryl P. Rains
J. Alexander Lawrence

*Counsel for the Debtors and*
*Debtors in Possession*


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------
|  |  )  |  |
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
-------------------------------------------------------------------


**DIRECT TESTIMONY OF MARK A. RENZI**

I, Mark A. Renzi, under penalty of perjury, testify as follows:

## SUMMARY OF TESTIMONY

1.        I was retained by Residential Capital, LLC ("ResCap"), and its affiliated debtors (together with ResCap, the "Debtors") to provide, among other things, expert testimony in support of confirmation of the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors*, as may be amended (the "Plan"),[1] filed in connection with the above-captioned chapter 11 cases (the "Chapter 11 Cases").[2]  Specifically, it is my opinion that:  (a) the Plan satisfies the "best interest of creditors" requirements of Section 1129(a)(7)(A)(ii) of the Bankruptcy Code, and (b) the limited partial consolidation of the Debtors' estates (for description and distribution purposes only) under the Plan is reasonable and appropriate and does not harm creditors.

2.        I was also asked by the Debtors to review the report submitted by Michael Fazio on October 18, 2013 (the "Opening Fazio Report") and to respond to Mr. Fazio's opinions as stated in that report.  I have also reviewed the rebuttal report Mr. Fazio submitted on November 1, 2013 (the "Rebuttal Fazio Report"), and am prepared to respond to Mr. Fazio's opinions as stated in that rebuttal report as well.

3.        Except as otherwise noted, my analysis is based upon my personal knowledge, my review of various documents and information, my discussions with the Debtors and their other advisors, information prepared and provided by the Debtors, my familiarity with the Debtors' business, operations and financial condition, and my experience, which I describe below.  In addition, I have read and am familiar with the terms and provisions of the Plan and the

---

[1] See The Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors [Dkt. No. 4819-2], a true and correct copy of which is Exhibit PX-868.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

2

Disclosure Statement, as amended.  In preparing my analysis, I was assisted by other

professionals working at my direction and under my supervision.  In those instances where tasks

were performed by my colleagues, I reviewed their work and determined that it was appropriate

to rely upon that work.

4.      Based on the results of the material and data I have reviewed and analyzed,

combined with my specific experience in providing restructuring advice, I have formed the

following opinions:

- *"Best Interest of Creditors" Test:*  The hypothetical liquidation analysis attached as Exhibit 8 to the Disclosure Statement ("Liquidation Analysis") contains reasonable assumptions regarding: (a) the proceeds that could be obtained from a liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code, (b) the costs associated with a wind-down of the Debtors' Estates under Chapter 7, and (c) the claims that have been or may be asserted against the Debtors, including the complexity of certain of those claims.  Based upon the assumptions set forth in the Liquidation Analysis, as of the Effective Date of the Plan, each holder of a claim or interest of each impaired class of claims or interests will likely receive or retain under the Plan a recovery that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7. Therefore, the Plan satisfies the "best interest of creditors" test in Section 1129(a)(7)(A)(ii) of the Bankruptcy Code with respect to each Debtor.

- *Limited Partial Consolidation of the Debtors' Estates*:  No creditors are harmed by the limited partial consolidation of the Debtors' Estates for distribution purposes only.

5.      In addition, based upon my review of the Opening Fazio Report, it is my opinion

that the various scenarios Mr. Fazio ran through his model (the "Fazio Model") as "sensitivity

outputs" in that report are premised on unreasonable assumptions in light of the Global

Settlement that is part of the Plan.  In particular, the Opening Fazio Report posits scenarios in

which the Intercompany Balances are deemed to be "valid", AFI contributes $2.1 billion into the

Debtors' estates and the holders of the 9.625% Junior Secured Guaranteed Notes due 2015 (the

"Junior Secured Noteholders") have liens on certain portions of that AFI contribution, and

specifically that the amounts of the Allowed Claims for all other claimants do not change.  The

3

Opening Fazio Report also posits scenarios in which the Intercompany Balances are deemed to

be "valid", AFI contributes $2.1 billion into the Debtors' estates, the Junior Secured Noteholders

have liens on certain portions of that AFI contribution, and billions of dollars of RMBS,

monoline, and securities claims are subordinated effectively making the JSNs the largest

creditor.  In my opinion and as I describe below, it is not reasonable to assume that these specific

inputs into the Waterfall Model can be changed while the remaining assumptions used by the

Debtors to determine recoveries under the Plan would remain static.  Mr. Fazio also incorrectly

assumes that the Junior Secured Noteholders would benefit from the reinstatement of previously

forgiven Intercompany Balances.  It is my understanding that because such balances would be

reinstated through the prosecution of avoidance actions, and because the Court has already ruled

that the Junior Secured Noteholders do not have a lien on avoidance actions, the Junior Secured

Noteholders are not entitled to claim a security interest in those reinstated balances.  Finally, Mr.

Fazio's scenario that aggregates the Junior Secured Noteholders' deficiency claims is

unreasonable in that it would allow the Junior Secured Noteholders, while undersecured, to

recover more from their deficiency claims than is required to satisfy their allowed claim.

6.      In addition, I disagree with the criticisms of the Debtors' Liquidation Analysis

outlined in the Opening Fazio Report, and believe that the alternative scenarios Mr. Fazio runs in

the Rebuttal Fazio Report with respect to that Liquidation Analysis are not reasonable.  Mr.

Fazio posits that, even in a Liquidation Scenario, the Intercompany balances would be treated as

"valid" and that AFI would be willing to make a contribution in the absence of releases that

parallels the contribution it has agreed to make under the Plan and for which it receives global

third-party releases.  While I do not dispute Mr. Fazio's mathematical calculations in the

Rebuttal Fazio Report based on the assumptions he has been provided (and for which he

4

provides no opinions as to their reasonableness), I continue to believe that the assumptions used

by the Debtors when preparing their Liquidation Analysis attached to the Disclosure Statement

are reasonable and appropriate.

## SUMMARY OF QUALIFICATIONS

### Background

7.    I am a Senior Managing Director in the Corporate Finance/Restructuring practice

at FTI Consulting, Inc. ("FTI").  FTI is one of the financial advisors to the Debtors.  From and

after April 2007, the Debtors periodically engaged FTI to provide financial advisory services.  In

the summer of 2011, the Debtors retained FTI to perform financial advisory services as it

prepared to seek Chapter 11 bankruptcy protection.  On July 25, 2012, this Court approved the

initial retention of FTI as a financial advisor to the Debtors in these Chapter 11 Cases.[3]  This

retention has since been amended or supplemented from time to time pursuant to further orders

of the Court.[4]

8.    During the course of this retention, the Debtors asked FTI to assist with, among

other things, the preparation of financial related disclosures, claims management and claims

resolution, advising the Debtors on accounting matters related to the bankruptcy filing, the

preparation of financial information for distribution to creditors and others, and with the

preparation of information and analysis necessary for confirmation of a plan of reorganization.

---

[3] See Order Under Sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Rule 2014-1 Authorizing the Employment and Retention of FTI Consulting, Inc. as Financial Advisor Nunc Pro Tunc to May 14, 2012, [Dkt. No. 902], a copy of which is Exhibit PX-881.

[4] See Order Under Bankruptcy Code Sections 327(a), 328(a), and 363 Approving Second Addendum to Engagement Agreement with FTI Consulting, Inc., Nunc Pro Tunc to December 5, 2012, and Granting Related Relief [Dkt. No. 3104], a copy of which is Exhibit PX-882; Order Under Bankruptcy Code Sections 327(a), 328(a) and 363 Approving Third Addendum to Engagement Agreement with FTI Consulting, Inc., as Financial Advisor to the Debtors [Dkt. No. 3308], a copy of which is Exhibit PX-883; Order Approving Fourth Addendum to Engagement Agreement with FTI Consulting., as Financial Advisor to the Debtors, Authorizing Provision of Litigation Support Services Nunc Pro Tunc to March 1, 2013 [Dkt. No. 3971], a copy of which is Exhibit PX-885; and First Supplemental Declaration of William J. Nolan Pursuant to Fourth Addendum to Engagement Agreement with FTI Consulting, Inc., as Financial Advisor to the Debtors [Dkt. No. 4417], a copy of which is Exhibit PX-886.

FTI has also provided and continues to provide additional support and analysis to the Debtors as part of these cases.

9.      I have led a team of FTI professionals that performed a variety of financial analyses for the Debtors during the course of FTI's retention.  Specifically, my team and I worked with the Debtors and their investment bankers and legal advisors in connection with the preparation of the Plan, the recovery analysis (the "Recovery Analysis") and the Liquidation Analysis.

## Experience

10.      I received my Bachelor of Arts degree in economics from Washington College and a Master's degree in finance from Boston College.  I also attended the Scuola di Administrazione Aziendale at the University of Turin, School of Business.  Before joining PricewaterhouseCoopers (the predecessor firm to FTI) in 2001, I worked at a boutique money management firm in New York evaluating and trading derivative portfolios.

11.      I am currently employed as a senior managing director in the FTI Consulting Corporate Finance/Restructuring practice, and I am a member of FTI's Financial Institutions industry group.  During my nearly twenty years of business experience and more than twelve years of financial consulting experience, I have practiced in a broad range of industries, including, among others, financial services, retail, manufacturing, distribution, derivative portfolio management, healthcare,  consumer credit, and telecommunications.

12.      I have provided restructuring services on more than twenty-five engagements in both out-of-court workout situations and in Chapter 11 proceedings, including many large and high profile national and international engagements, such as (but not limited to): CIT, Inc., Credit-Based Asset Servicing and Securitization (C-BASS), The Education Resources Institute, American Business Financial Services, Thaxton Financial, Oakwood Homes Corporation, a $4

6

billion international chemical company, and a $2 billion international recreational products company.

13.     My experience includes a wide range of assignments, including liquidity and capital structure assessment, debt and equity restructuring advice, identification of reorganization alternatives, and day-to-day management activities, including the development of pro forma financials, cash flow management, and the identification of liquidity enhancing activities. In addition, I have assisted companies in Chapter 11 cases in the preparation of complex recovery and liquidation analyses, examining compliance with the "best interest" test, and in evaluating distributions and recoveries among creditors.  Among the clients for whom I have provided these analyses are Oakwood Homes Corporation, CIT, Inc., and The Education Resources Institute.  In addition, I have prepared complicated recovery and liquidation analyses in non-bankruptcy matters in cases including C-BASS as well as other cases which are confidential in nature.

14.     I am a member of several professional organizations, including the Association of Insolvency and Restructuring Advisors and the Turnaround Management Association.  I have provided testimony in The Education Resources Institute bankruptcy matter and expert testimony in these Chapter 11 Cases in connection with the JSN Adversary Proceeding.

## THE PLAN SATISFIES THE "BEST INTEREST OF CREDITORS" TEST

### A.  Liquidation Analysis Generally

15.     The Liquidation Analysis contained in the Disclosure Statement provides an estimation of recoveries that would be generated from the liquidation of the Debtors' assets and properties in the context of a proceeding under Chapter 7 of the Bankruptcy Code, as well as a projection of costs associated with Chapter 7 liquidation.  (PX-863, Liquidation Analysis ¶ 1.) In both cases, the Liquidation Analysis assumes a conversion to Chapter 7 utilizing a commencement date of April 30, 2013.  (PX-863, Liquidation Analysis ¶ 2.)  The Liquidation

Analysis also examines how a hypothetical Chapter 7 scenario might impact the recoveries of holders of Claims and Equity Interests in the Debtors.

16.    I have supervised FTI's work to assist the Debtors in the preparation of the Liquidation Analysis. The analysis sets forth, with respect to each Debtor that has creditors, the estimated recoveries that holders of Claims and Equity Interests would receive if each such Debtor were liquidated under Chapter 7.[5]  I, along with other FTI professionals under my supervision, reviewed various financial analyses prepared by employees and management of the Debtors and participated in numerous discussions with management of the Debtors and other Debtor professionals to prepare the Liquidation Analysis.

17.    In preparing the Liquidation Analysis, my team and I worked with the Debtors' employees and management, investment bankers, and the Debtors' counsel to make certain assumptions[6] regarding the estimated proceeds expected to be received from the accelerated disposition of the Debtors' assets.  Those assumptions are set forth in the Liquidation Analysis attached to the Disclosure Statement.  I believe that such assumptions are reasonable.  Given the complexity of the Debtors' assets, if the Debtors' cases were converted to Chapter 7, it is reasonable to estimate that it would take a Chapter 7 trustee approximately twelve months following the appointment to assess and monetize the Debtors' assets.  (PX-863, Liquidation Analysis ¶ 2.)  Many of the Debtors' assets are complex mortgage assets, including FHA/VA loans, whole loans, claims from various governmental agencies, MSRs and associated servicer

---

[5] The Liquidation Analysis only analyzes potential recoveries for creditors at Debtors that have assets available for distribution.  Debtors that do not have assets are listed on the "Summary of Unscheduled Entities." (PX-863, Liquidation Analysis at 24.)

[6] The Liquidation Analysis and the assumptions upon which it relies are inherently subject to significant economic, competitive, and operational uncertainties beyond the control of the Debtors.  For example, the Liquidation Analysis may not include all liabilities that could arise as a result of additional litigation, potential tax assessments, or other unanticipated liabilities.  Further, the actual amount of Claims against the Debtors' Estates could vary significantly.

advances, other securitized HELOCs, REO properties, trading securities, and derivative assets
that would take substantial time and expertise to review and value accurately.  (*Id.* ¶¶ 18-26.)

19. The Liquidation Analysis also assumes that it would likely take a Chapter 7
trustee a significant amount of time to investigate, reconcile, negotiate and/or begin to litigate the
approximately 4,700 Claims remaining on the Debtors' claims register.  (*Id.* ¶ 35.)  As set forth
in the Liquidation Analysis, stakeholders have filed many extremely large, complex, and
competing claims.  Final resolution of these claims will demand the resolution of such complex
issues as the extent and validity of the Junior Secured Noteholders' liens and claims; the nature
and extent of the Claims filed by the RMBS Trustees; whether the RMBS Trustees' claims
should be subordinated to the claims of other general unsecured creditors; issues relating to the
subordination, validity, and amount of the Claims filed by various monoline insurers; issues
relating to subordination, validity, and amount of the Claims filed by securities claimants; the
validity and amount of the Borrower Claims asserted against the Debtors; complex issues
regarding Intercompany Balances; fraudulent conveyance claims arising out of approximately
$16.6 billion in pre-petition intercompany balance forgiveness; and the potential substantive
consolidation of the Debtors.  (See generally Disclosure Statement, PX-256 at 15-17.)  In light of
the time it would take a Chapter 7 trustee to review, resolve, or litigate these claims, it is
reasonable to assume that winding down the Debtors' estates in a Chapter 7 scenario would last
for a period of three years and possibly significantly longer.  (PX-863, Liquidation Analysis ¶ 3.)

19. In light of the complexities of these Chapter 11 Cases and the inherently
conflicting claims that have been or could have been asserted against the Debtors absent the
Global Settlement contained in the Plan, the Liquidation Analysis reasonably assumes that costs
and expenses under the Chapter 7 scenario will be higher than expenses under the Plan.  (*Id.*

¶ 34.)  This is assumed because (a) payments must be made to a Chapter 7 Trustee, and

(b) restructuring professional fees and ordinary course professional fees are estimated to be

higher due primarily to (i) potentially extensive third party litigation in which a Chapter 7 trustee

would most likely need to participate and (ii) the cost of litigating the allowance of claims that

have otherwise been settled under the Plan.

20.    The Liquidation Analysis does not attempt to estimate Estate recoveries arising

from affirmative damage claims against third parties (including avoidance actions and potential

claims against Ally Financial Inc. ("AFI") and its non-Debtor affiliates) and does not assume any

additional expenses associated with pursuing such claims.  The Liquidation Analysis does not

include any such potential recoveries because, as with other litigation claims, the outcome of

such actions would be highly speculative and dependent on numerous uncertain variables

including: (i) the probability of successful judgments; (ii) the cost and time required to litigate

the affirmative claims; and (iii) any offsetting claims third parties and/or AFI may have against

the Debtors.

21.    The Liquidation Analysis assumes the $2.1 billion Ally Contribution provided for

under the Plan would not be available in a liquidation scenario.  The Ally Contribution is

specifically conditioned on AFI obtaining broad third-party releases, *i.e.*, "global peace" among

AFI, the Debtors and their competing claimants and creditors.  Because third-party releases are

not available in a Chapter 7 liquidation, the Liquidation Analysis assumes the Ally Contribution

would not be made and the Global Settlement would not be consummated.  In the absence of the

Global Settlement, it is reasonable to assume that third parties would continue to pursue

significant claims and causes of action against AFI and its affiliates.  It is my understanding that

litigation by third parties against AFI could trigger indemnity claims from AFI against the

10

Debtors' Estates.  In addition to the costs that could be associated with participating in the

litigation of such claims, if those third-party claims were successful and were not disallowed as

contingent or equitably subordinated, they could further dilute any potential recoveries to

creditors.  Finally, it is not clear that the Debtors would be able to pursue these third party claims

for the purposes of obtaining some theoretical recovery without facing the risk of becoming

administratively insolvent.

22.        Additionally, for purposes of the Liquidation Analysis, it is assumed that the

Junior Secured Noteholders are significantly undersecured.  Currently, the Debtors and the

Committee are engaged in extensive litigation with the Junior Secured Noteholders regarding the

scope of the Junior Secured Noteholders' liens and the amount and validity of the Junior Secured

Notes Claims.  It is my understanding that the Junior Secured Noteholders assert that they are

significantly oversecured and have valid liens on substantially more of the Debtors' assets than

was assumed in this Liquidation Analysis.  The Liquidation Analysis assumes that the Debtors

and the Committee prevail on each of their arguments with respect to the scope of the Junior

Secured Noteholders' liens in the JSN Adversary Proceeding, and the Bankruptcy Court finds

that, among other things, the Junior Secured Noteholders are undersecured.  To the extent the

Junior Secured Noteholders are ultimately successful in the JSN Adversary Proceeding, the

assets available for distribution to unsecured creditors (and the unsecured creditors'

corresponding recoveries) in the Liquidation Analysis would decrease.

23.        Based upon the assumptions set forth in the Liquidation Analysis, each holder of a

claim or interest of each impaired class of claims or interests will likely receive or retain under

the Plan a recovery of a value, as of the Effective Date of the Plan, that is not less than the

amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7.

ny-1116221

Because of the $2.1 billion contribution that AFI is making to fund creditor recoveries and the

settlements embodied in the Plan, confirmation of the Plan will result in meaningfully higher

recoveries for creditors than such creditors would likely receive in a hypothetical Chapter 7

scenario.[7]  Accordingly, the Plan meets the requirements of Section 1129(a)(7)(A)(ii) of the

Bankruptcy Code and, on that basis, it is in the best interest of all holders of Claims and Equity

Interests in all classes of the Plan with respect to each of the Debtors.

### B.  Plan Treatment of Creditors of ETS

24.    With respect to those Unsecured Claims asserted against ETS (a subsidiary of

GMACM that would have otherwise been a member of the GMACM Debtors), the Plan provides

that holders of Allowed ETS Unsecured Claims will receive their pro rata share of cash equal to

the value of assets available at the ETS Estate after payment of all allowed claims senior in

priority.  As a result of a review and analysis by FTI and the Debtors' management of each

Debtor's assets and the estimated Allowed Claims against each Debtor's estate, it became

apparent that the unencumbered assets available at ETS would give holders of ETS Unsecured

Claims a greater recovery in a Chapter 7 liquidation than they would receive as a holder of a

General Unsecured Claim against the GMACM Debtor Group under the Plan.  Accordingly, the

Plan properly provides for separate classification and treatment of the ETS Unsecured Claims,

and ensures that holders of Allowed ETS Unsecured Claims will receive the same recovery in

---

[7] As discussed below, because the Recovery Analysis and the Liquidation Analysis show that there are estimated to be more assets than claims at Debtor Executive Trustee Services, LLC ("ETS"), holders of General Unsecured Claims at ETS will be entitled to receive the same recovery under the Plan as they would be entitled to receive under a hypothetical Chapter 7 liquidation scenario.  ETS is a direct subsidiary of GMAC Mortgage LLC ("GMACM") and, therefore falls within the GMACM Debtor Group, as defined in the Plan.

both a hypothetical Chapter 7 scenario and under the Plan.  Section 1129(a)(7)(A)(ii) of the

Bankruptcy Code is therefore satisfied as to holders of ETS Unsecured Claims.[8]

### THE LIMITED PARTIAL CONSOLIDATION OF THE DEBTORS

25.      The Plan provides for partial consolidation of the Debtors into three (3) Debtor

Groups, as described in the Disclosure Statement, for the limited purposes of describing their

treatment under the Plan, confirmation of the Plan, and making distributions under the Plan.  It is

my opinion that no creditors are harmed by the proposed grouping of the Debtors.  The vast

majority of the assets of the Debtors' estates reside at ResCap, GMACM, and Residential

Funding Company ("RFC"), with the Debtor subsidiaries within each Debtor Group having little

or no assets available for distribution to creditors.  In addition, the majority of Claims asserted

against the Debtors are asserted against ResCap, GMACM, and RFC, with, in limited

circumstances, de minimis Claims asserted against the other Debtor subsidiaries within a Debtor

Group.  Therefore, in light of the location of the Claims and assets, the limited partial

consolidation proposed in the Plan confers the benefits of convenience and expedience without

compromising creditor recoveries at any Debtor.[9]

26.      Further, the Junior Secured Noteholders, in my opinion, are not harmed by the

limited partial consolidation.  Intercompany Balances are being compromised and waived as part

---

[8] The Debtors and FTI have not yet completed the claims reconciliation process at ditech, LLC ("ditech").  To the extent that holders of General Unsecured Claims at Debtor ditech vote to reject the Plan and the pre-confirmation claims reconciliation process reveals that there are Allowed General Unsecured Claims at ditech that would receive less under the Plan than under a liquidation scenario, it is my understanding that the Plan Proponents would have to amend the Plan to provide creditors with payment in full of such Allowed Claims.  (See Disclosure Statement, PX-256 at 53 ("To the extent the Plan of a particular Debtor does not meet the 'best interest of creditors' test, distributions under the Plan may be modified, as needed, to satisfy this test, with the consent of the Consenting Claimants, which consent shall not be unreasonably withheld.").)

[9] As described above, there are two entities that posed a potential issue when partially consolidating the Debtors' Estates for description and distribution purposes, ETS and ditech.  With respect to ETS, the treatment of ETS Unsecured Claims has been isolated in the Plan, and creditors of ETS will receive what they would be entitled to in a liquidation scenario.  With respect to ditech, the Debtors and FTI are continuing to conduct the claims resolution process and, to the extent necessary, the Plan would have to be modified to provide creditors of ditech the recoveries they would be entitled to in a liquidation scenario.

of the Global Settlement and not as a result of the limited partial consolidation.  It is my understanding that if the Court determines that the Junior Secured Noteholders are entitled to post-petition interest, they will receive payment on account of that interest under the Plan, regardless of whether or not the Debtor Groups are consolidated.  Therefore, it is my opinion that the Junior Secured Noteholders are not harmed by the limited partial consolidation that is contemplated by the Plan.

27.     Finally, the Plan satisfies the "best interest of creditors" test at each individual Debtor entity (including as to ETS, as described above) and the proposed structure of the partial consolidation proposed in the Plan will not give a class of creditors a higher potential recovery in a hypothetical Chapter 7 scenario than under the Plan.  Accordingly, it is my opinion that the limited partial consolidation is appropriate under the circumstances.

## REBUTTAL TO OPENING FAZIO REPORT

### A.  Summary of Mr. Fazio's Assumptions

28.     I have reviewed the Opening Fazio Report and believe it contains flawed assumptions.  While it appears that the underlying model used by Mr. Fazio and FTI are largely in agreement with one another (other than with respect to the allocation of projected administrative claims to the Junior Secured Noteholders' collateral, which I discuss below), Mr. Fazio runs his model to reflect certain assumptions that I believe are unreasonable on a combined basis.

29.     First, Mr. Fazio incorrectly assumes that all prepetition Intercompany Balances are valid as scheduled on the Debtors' SOALs.  In doing so, Mr. Fazio adopts the conclusion made by the Junior Secured Noteholders' expert witness, Mr. Robert Bingham, that the Intercompany Balances are valid and collectable arm's-length debt, in the full face amount recorded on the Debtors' schedules.  However, as reflected in the report of my colleague Gina

14

Gutzeit (the "Gutzeit Report"), there are numerous reasons to treat the Intercompany Balances as otherwise uncollectable obligations. Mr. Fazio does not account for this possibility when he inputs the Intercompany Balances into the scenarios in his reports.

30.     Second, Mr. Fazio incorrectly assumes that the Junior Secured Noteholders have a lien on Intercompany Balances that would arise from the reinstatement of previously eliminated balances as a result of avoidance actions related to the Debtors' historical forgiveness of such Intercompany Balances. As reflected in the Gutzeit Report, the Debtors forgave approximately $16.6 billion of Intercompany Balances from January 2008 through the Petition Date. They did so when the existence of an intercompany payable on a Debtor's balance sheet threatened certain solvency and net worth thresholds under external financing agreements and/or federal or state regulations.[10] Mr. Fazio incorrectly assumes that, to the extent the reinstatement of forgiven balances would increase the amount of an intercompany balance or create a balance where none existed as of the Petition Date, the Junior Secured Noteholders would be entitled to obtain value on account of the increased or newly created balance through their security interest. However, the Court has already determined in Phase 1 that the Junior Secured Noteholders do not have liens on avoidance actions or the proceeds of avoidance actions.

31.     Third, Mr. Fazio incorrectly assumes that a $2.1 billion settlement contribution from AFI would be available in circumstances where the Intercompany Balances are allowed in their full face amount as of the Petition Date, and no other assumptions change, including, for example, claim amounts and the allocation of expenses. Treating the Intercompany Balances at their full face value as of the Petition Date, however, would likely negatively impact other creditors and, therefore assuming that the amount of claims that other creditors would assert

---

[10] Additionally, Intercompany Balances were forgiven among the Debtors and certain non-Debtor subsidiaries in connection with the Debtors' international transactions and the dissolution of entities.

ny-1116221

would remain the same is not reasonable.  Mr. Fazio compounds the unreasonableness of this

scenario by then assuming that RMBS and Monoline claims are fully subordinated.  In my

opinion, in any scenario in which RMBS and Monoline claims are subordinated, and thus receive

no recovery, the holders of such claims would not agree to release their claims against AFI.  It is

my understanding that AFI only agreed to contribute $2.1 billion to the Debtors' estates in order

to obtain closure and broad releases.  Thus, I believe that Mr. Fazio's assumptions underlying

this scenario are unrealistic.

32.    Finally, Mr. Fazio incorrectly assumes that the Junior Secured Noteholders'

deficiency recoveries at each of the Debtors can be aggregated in a way that would allow the

Junior Secured Noteholders to recover more than the allowed amount of their claim

notwithstanding the fact that they are undersecured.  In my professional experience, I have never

encountered a situation where an undersecured creditor is entitled to collect more than the face

value of its claim based on recoveries from deficiency claims, and I am advised by Counsel that

this is not legally possible.

**B.  Summary of my Rebuttal Report**

33.    In response to the Opening Fazio Report, I was asked by the Debtors' counsel to

run certain analyses to explain how, under certain hypothetical scenarios, the allowance of

Intercompany Balances reflected on the Debtors' books and records as of the Petition Date

impacts the secured recovery of the Junior Secured Noteholders.  In doing so, I relied on the

recovery model that was developed by FTI (the "Waterfall Model") to determine the

distributable value of Intercompany Balances and resulting total recovery for the Junior Secured

Noteholders based on certain scenarios.[11]  The Waterfall Model was developed by me and other

---

[11] The Waterfall Model calculates the recovery for Junior Secured Noteholders at each legal entity and factors in the
impact of allowance/disallowance of certain Intercompany Balances, equity pledges and deficiency claims.

ny-1116221

FTI professionals at my direction during the prepetition period and has since been maintained

and refined as additional information becomes available and additional or different assumptions

become relevant.

*Assumptions*

34.    For the purpose of my analysis, I made the following assumptions:

- I did not opine on whether the Junior Secured Noteholders have valid and perfected liens on the Intercompany Balances and did not take into consideration the potential impact of the UCC's lien challenge on the Junior Secured Noteholders' collateral.  For the purpose of this analysis, I assumed the Intercompany Balances are either directly or indirectly part of the Junior Secured Noteholders' collateral.

- Recoveries from certain international entities and CapRe are excluded, as any recoveries from these entities that might flow into the estate are speculative due to potential and ongoing litigation.

- The Debtors' tracking and allocation of the Revolver/Junior Secured Noteholders collateral is reliable and accurate. Ally Revolver (including blanket lien) collateral and equity in the DIP are used to pay the Junior Secured Noteholders' secured claim before the General Unsecured Creditors.

- The Junior Secured Noteholders' deficiency claims are asserted against the borrower and guarantor entities, including ResCap, and are pari passu with the General Unsecured Creditors and that the Junior Secured Noteholders could not recover more than par and accrued pre-petition interest if they are undersecured.

- The Debtors' assumptions as to the recoverability of assets remaining in the estate, which were included in the Disclosure Statement approved on August 23, 2013, are reasonable.

- The Debtors' assumptions as to the wind-down costs of the estate and the allocation of expenses on a debtor-by-debtor basis are reasonable and consistent with the Global Settlement.  Approximately $169.8 million of projected administrative expenses will be paid from the Junior Secured Noteholders' cash collateral after April 30, 2013.

- Intercompany receivables between two Debtor entities can be offset with intercompany payables between those same two entities, and vice versa. Thus, the Intercompany Balances in this Report are presented on a net basis.

35.    For the purpose of the analysis, I also made the following global assumptions which I applied in each of the hypothetical scenarios:

| Assumption | Comments |
|---|---|
| Waterfall Model Mechanics | ■ Illustrative waterfall analysis based on the Debtors' trial balances as of 4/30/13 adjusted to reflect the Ocwen true-up and claims consistent with the provisions of the Plan<br>■ Obligations are satisfied at each subsidiary by the assets at the subsidiary. Remaining equity, if any, would flow up to the next ownership level<br>■ Key considerations include co-borrowing relationships, guarantees, and equity ownership structure<br>■ With the exception of the Base Case scenario, pre-petition intercompany balances are allowed and then adjusted for various hypothetical scenarios that could occur in light of the intercompany balances being asserted; hypothetical scenarios are discussed below<br>■ Consistent with the cash management order, post-petition intercompany balances are unwound and reflected in the 4/30/13 balances<br>■ Any value attributable to certain international entities and CapRe is excluded as any recoveries from these entities that might flow into the estate are speculative due to potential and ongoing litigation |
| Asset Recovery | ■ The asset recovery estimates are as of April 30, 2013, with certain limited adjustments based on:<br>   • Cash proceeds that might be realized from the orderly liquidation of the Debtors' remaining assets<br>   • Presented on an undiscounted basis<br>   • Assumed to occur over the course of up to seven years, with approximately 85% of the recoveries occurring over the first three years<br>   • Assumed to include $68M in additional proceeds from the Ocwen true-up; $51M is attributed to the JSN collateral |
| AFI Contribution | ■ Sensitivity scenarios outlined in this Report assume no AFI contribution. I have also been instructed by counsel not to include any value for purported liens by the JSN on alleged causes of action on alleged causes of action by the estates against Ally or its affiliates. |
| Wind-down Costs | ■ $826M allocated to the GMACM and approximately $10M allocated to ETS<br>■ $250M allocated to RFC |
| GUC | ■ Amount and allocation of the GUC is consistent with the Disclosure Statement and includes Monoline Claims, RMBS Claims, Senior Unsecured Claims, Other GUC, and the JSN Deficiency Claims<br>■ The JSN Deficiency Claims are asserted against the borrower and guarantor entities, including ResCap, and are pari passu with GUC |

*Reconciliation of FTI Model and Fazio Model*

36.    As an initial matter, and as reflected in the chart below, I believe that the Waterfall Model and the Fazio Model are largely in agreement with one another. The schedule below reflects $1.745 billion[12] in secured recovery for the Junior Secured Noteholders calculated based on the recovery value of the Junior Secured Noteholders' collateral and equity pledges. The analysis also reflects $169.8 million for projected administrative expenses to be applied against the Junior Secured Noteholders collateral after April 30, 2013.[13] Based on the Ocwen

---

[12] I understand that, based on recent developments, management anticipates approximately $10 million to be recovered from CapRe by the end of 2016 and approximately $10 million to be recovered from CapRe by the end of 2019. These amounts were not included in the Liquidation Analysis in the Disclosure Statement and are therefore not included in this number.

[13] Of the $169 million, approximately $27 million was actually paid from the Junior Secured Noteholders' cash collateral under the terms of various stipulations for use of cash collateral between May 1, 2013 and August 13, 2013. The remainder is related to the estimate of accrued and unpaid professional fees as of July 11, 2013 plus $25 million.

ny-1116221

sale true-up analysis, a favorable purchase price adjustment resulted in an additional $51 million

in recoveries allocated to the Junior Secured Noteholders' collateral.

| ($ millions) | JSN Secured Recovery | | | | | |
|---|---|---|---|---|---|---|
| | Fazio Model | | FTI Model | | Variance | |
| 1 Cash and Remaining Assets | $ | 2,512 | $ | 2,513 | $ | (1) |
| 2 Equity Pledges | | 100 | | 99 | | 1 |
| 3 Pledged Intercompany Claims | | - | | - | | - |
| 4 Impact of Ocwen True-Up | | 51 | | 51 | | - |
| 5 Revolver Pay-Down | | (747) | | (747) | | - |
| 6 Additional Expense Allocation | | (27) | | (170) | | 143 |
| 7 **Total Secured Recovery** | $ | **1,888** | $ | **1,745** | $ | **143** |
| 8 *Additional Expenses* | | *(143)* | | *n/a* | | *(143)* |
| 9 **Total Secured Recovery** | $ | **1,745** | $ | **1,745** | $ | **(0)** |

*Summary of Assumptions and Results*

37.    In response to the Opening Fazio Report, I was asked by the Debtors' counsel to

provide sensitivity outputs for the following scenarios:

**Base Case**

38.    <u>Assumptions</u>: In the Base Case Scenario, the projected and allowed claims and expense allocations are consistent with the Plan's Waterfall Model, but the distributions to the Junior Secured Noteholders are not supplemented by the Ally Contribution.  The Base Case Scenario also reflects, consistent with the Waterfall Model, that the Intercompany Balances are receiving no distribution, that the Junior Secured Noteholders do not have enforceable liens on the Intercompany Balances, that to the extent the Junior Secured Noteholders do have liens on the Intercompany Balances such liens have no value, and that the Junior Secured Noteholders will be unable to demonstrate an entitlement to adequate protection on account of the Plan's treatment of Intercompany Balances.

39.    <u>Results</u>: In the Base Case Scenario, the Junior Secured Noteholders will be undersecured and not be paid in full.  Specifically, the Junior Secured Noteholders recover approximately $1.745 billion in secured recovery, calculated based on the recovery value of the Junior Secured Noteholders' collateral and equity pledges (79% of the total Junior Secured Noteholders' asserted claim of $2.223 billion).

**Scenario 1A – Intercompany Balances Identified for Forgiveness**

40.    <u>Assumptions</u>:  Scenario 1A utilizes assumptions from the Base Case scenario.  In addition, it is assumed for purposes of this sensitivity analysis that the Intercompany Balances are allowed and adjusted to reflect the impact of reducing the total Intercompany Balances on the Debtors' books and records as of the Petition Date by the amount of those balances that were identified to be forgiven as of the Petition Date.  Specifically, approximately $2.6 billion of Intercompany Balances that were on the Debtors' books and records as of the Petition Date (and on which the Junior Secured Noteholders allege they have a lien) were identified for forgiveness

ny-1116221

in the first half of 2012. But for the bankruptcy filing, it is appropriate to assume these balances would have been forgiven in the ordinary course of business.

41. <u>Results</u>: In Scenario 1A, the impact of adjusting the total Intercompany Balances by the amount of those balances that were identified to be forgiven as of the Petition Date reduces the intercompany balances by approximately $2.6 billion (from $8.2 billion to $5.6 billion). As a result of allowing these adjusted Intercompany Balances, the Junior Secured Noteholders' secured recovery in Scenario 1A is $1.757 billion (79% of the total Junior Secured Noteholders' asserted claim of $2.223 billion).

42. <u>Schedule</u>: The schedule below reflects the impact of this scenario to the net Intercompany Balances.

| | | Impact of Intercompany Balances Identified for Forgiveness | | | | |
|---|---|---|---|---|---|---|
| ($ millions) | | Top Intercompany Balances | | Net Interco Balance as of May 14, 2012* | Anticipated Intercompany Balance Forgiveness | Adjusted Net Interco Balances |
| | | Paying Entity | Receiving Entity | | | |
| Impact of Intercompany Balances Identified for Forgiveness | 1 | GMAC Residential Holding Co., LLC | Residential Capital, LLC | $ 3,334 | $ - | $ 3,334 |
| | 2 | Residential Capital, LLC | Residential Funding Co., LLC | 1,955 | - | 1,955 |
| | 3 | Residential Funding Co., LLC | Homecomings Financial, LLC | 1,252 | (1,249) | 3 |
| | 4 | GMAC Mortgage, LLC | Passive Asset Transactions, LLC | 697 | (652) | 45 |
| | 5 | GMAC Mortgage, LLC | Executive Trustee Services, LLC | 265 | (265) | 0 |
| | 6 | RFC Asset Holdings II, LLC | Residential Funding Co., LLC | 232 | (214) | 18 |
| | 7 | GMAC Mortgage, LLC | Residential Funding Co., LLC | 140 | - | 140 |
| | 8 | GMAC Residential Holding Co., LLC | Home Connects Lending Serv., LLC | 55 | (55) | - |
| | 9 | GMAC Mortgage, LLC | GMAC Residential Holding Co., LLC | 51 | - | 51 |
| | 10 | Home Connects Lending Serv., LLC | GMACRH Settlement Services, LLC | 50 | (50) | - |
| | 11 | Residential Funding Co., LLC | RFC Asset Management, LLC | 46 | (46) | - |
| | 12 | RFC Asset Management, LLC | RFC SFJV-2002, LLC Pre | 36 | (36) | - |
| | 13 | Residential Funding Co., LLC | RCSFJV2004, LLC | 17 | (17) | 0 |
| | 14 | RFC Asset Holdings II, LLC | Homecomings Financial, LLC | 12 | (12) | - |
| | 15 | GMACRH Settlement Services, LLC | GMAC Mortgage, LLC | 10 | (10) | - |
| | 16 | Other | Other | 41 | (17) | 24 |
| | 17 | **Total** | | $ 8,192 | $ (2,623) | $ 5,569 |

* Total balance of intercompany transactions as of 5/14/12 excludes an intercompany balance between GMAC Res Fund of Canada (Non-debtor) and Residential Funding Co., LLC.

## <u>Scenario 1B – Reinstatement of Balances through Avoidance Actions</u>

43. <u>Assumptions</u>: Scenario 1B utilizes assumptions from the Base Case scenario. In addition, it is assumed that certain balances reflected on the Debtors' books and records as of the Petition Date could be reduced if actions were brought to avoid certain instances of the historical forgiveness of Intercompany Balances. That is because creditors of a Debtor entity that forgave

a balance would likely argue that the Debtor entity did not receive reasonably equivalent value for the extinguishment of the receivable. As discussed above, the Court has determined that avoidance actions and the proceeds thereof are not subject to the Junior Secured Noteholders' liens, so any creation or increase in an intercompany balance would not benefit the Junior Secured Noteholders' secured recovery. Accordingly, for purposes of this scenario, those changes were not included in the schedule below.

44.    Results: In Scenario 1B, the impact of reinstating certain balances on account of the avoidance of fraudulent conveyances reduces the total intercompany balance by approximately $2.0 billion (from $8.2 billion to $6.2 billion). As a result of allowing these adjusted Intercompany Balances, the Junior Secured Noteholders' secured recovery in scenario 1B is $1.870 billion (84% of the total Junior Secured Noteholders' asserted claim of $2.223 billion).

45.    Schedule: The schedule below reflects the impact of this scenario to the net Intercompany Balances.

| | | Top Intercompany Balances | | Net Interco Balance as of May 14, 2012** | Avoidance of Fraudulent Conveyances | Adjusted Net Interco Balances |
|---|---|---|---|---|---|---|
| ($ millions) | | Paying Entity | Receiving Entity | | | |
| Impact of Reinstatement of Balances on Account of Avoidance of Fraudulent Conveyances | 1 | GMAC Residential Holding Co., LLC | Residential Capital, LLC | $ 3,334 | $ - | $ 3,334 |
| | 2 | Residential Capital, LLC | Residential Funding Co., LLC | 1,955 | (1,955) | - |
| | 3 | Residential Funding Co., LLC | Homecomings Financial, LLC | 1,252 | - | 1,252 |
| | 4 | GMAC Mortgage, LLC | Passive Asset Transactions, LLC | 697 | (44) | 653 |
| | 5 | GMAC Mortgage, LLC | Executive Trustee Services, LLC | 265 | - | 265 |
| | 6 | RFC Asset Holdings II, LLC | Residential Funding Co., LLC | 232 | - | 232 |
| | 7 | GMAC Mortgage, LLC | Residential Funding Co., LLC | 140 | - | 140 |
| | 8 | GMAC Residential Holding Co., LLC | Home Connects Lending Serv., LLC | 55 | - | 55 |
| | 9 | GMAC Mortgage, LLC | GMAC Residential Holding Co. LLC | 51 | - | 51 |
| | 10 | Home Connects Lending Serv., LLC | GMACRH Settlement Services, LLC | 50 | - | 50 |
| | 11 | Residential Funding Co., LLC | RFC Asset Management, LLC | 46 | - | 46 |
| | 12 | RFC Asset Management, LLC | RFC SFJV-2002, LLC Pre | 36 | - | 36 |
| | 13 | Residential Funding Co., LLC | RCSFJV2004, LLC | 17 | - | 17 |
| | 14 | RFC Asset Holdings II, LLC | Homecomings Financial, LLC | 12 | - | 12 |
| | 15 | GMACRH Settlement Services, LLC | GMAC Mortgage, LLC | 10 | - | 10 |
| | 16 | Other | Other | 41 | - | 41 |
| | 17 | Total | | $ 8,192 | $ (1,999) | $ 6,193 |

*   For illustrative purposes, the impact of avoidance of fraudulent conveyance has been applied to intercompany balances higher than $10M
**  Total balance of intercompany transactions as of 5/14/12 excludes an intercompany balance between GMAC Res Fund of Canada (Non-debtor) and Residential Funding Co., LLC.

## Scenario 1C - Subordination of Certain Intercompany Balances

46.     Assumptions: Scenario 1C utilizes assumptions from the Base Case scenario. In addition, it is assumed that certain Intercompany Balances could be subordinated as a result of bankruptcy standstill provisions contained in intercompany agreements that require intercompany obligations to be subordinated to General Unsecured Creditors (see Homecomings Intercompany Advance Agreement, PATI Intercompany Advance Agreement, and RAHI Intercompany Advance Agreement).  The Debtors do not believe that the Intercompany Balances on the Debtors' books and records as of the Petition Date accrued pursuant to these agreements; however, to the extent the holders of Junior Secured Noteholders seek to argue that these agreements govern the Intercompany Balances, the bankruptcy standstill provisions contained in these agreements would similarly apply.

47.     Results: In Scenario 1C, the impact of subordinating certain Intercompany Balances to General Unsecured Creditors reduces the total intercompany balance by approximately $2.2 billion (from $8.2 billion to $6.0 billion).  As a result of allowing these adjusted Intercompany Balances, the Junior Secured Noteholders' secured recovery in scenario 1C is $1.768 billion (80% of the total Junior Secured Noteholders' asserted claim of $2.223 billion).

23

48.  <u>Schedule</u>: The schedule below reflects the impact of this scenario to the net Intercompany Balances.

| Impact of Subordination of Certain Intercompany Balances | | | | | |
|---|---|---|---|---|---|
| ($ millions) | Top Intercompany Balances | | Net Interco Balance as of May 14, 2012* | Subordinated Intercompany Balances | Adjusted Net Interco Balances |
| | Paying Entity | Receiving Entity | | | |
| 1 | GMAC Residential Holding Co., LLC | Residential Capital, LLC | $ 3,334 | $ - | $ 3,334 |
| 2 | Residential Capital, LLC | Residential Funding Co., LLC | 1,955 | | 1,955 |
| 3 | Residential Funding Co., LLC | Homecomings Financial, LLC | 1,252 | (1,252) | - |
| 4 | GMAC Mortgage, LLC | Passive Asset Transactions, LLC | 697 | (697) | - |
| 5 | GMAC Mortgage, LLC | Executive Trustee Services, LLC | 265 | - | 265 |
| 6 | RFC Asset Holdings II, LLC | Residential Funding Co., LLC | 232 | (232) | - |
| 7 | GMAC Mortgage, LLC | Residential Funding Co., LLC | 140 | - | 140 |
| 8 | GMAC Residential Holding Co., LLC | Home Connects Lending Serv., LLC | 55 | - | 55 |
| 9 | GMAC Mortgage, LLC | GMAC Residential Holding Co., LLC | 51 | - | 51 |
| 10 | Home Connects Lending Serv., LLC | GMACRH Settlement Services, LLC | 50 | - | 50 |
| 11 | Residential Funding Co., LLC | RFC Asset Management, LLC | 46 | - | 46 |
| 12 | RFC Asset Management, LLC | RFC SFJV-2002, LLC Pre | 36 | - | 36 |
| 13 | Residential Funding Co., LLC | RCSFJV2004, LLC | 17 | - | 17 |
| 14 | RFC Asset Holdings II, LLC | Homecomings Financial, LLC | 12 | - | 12 |
| 15 | GMACRH Settlement Services, LLC | GMAC Mortgage, LLC | 10 | - | 10 |
| 16 | Other | Other | 41 | - | 41 |
| 17 | **Total** | | $ 8,192 | $ (2,180) | $ 6,012 |

* Total balance of intercompany transactions as of 5/14/12 excludes a relationship between GMAC Res Fund of Canada (Non-debtor) and Residential Funding Co., LLC.

## <u>Scenario 1D – Aggregation of 1A, 1B, and 1C</u>

49.  <u>Assumptions</u>: Scenario 1D aggregates the results of Scenario 1A, Scenario 1B and Scenario 1C.

50.  <u>Results</u>: Aggregating Scenarios 1A, 1B, and 1C results in a decrease to the total amount of Intercompany Balances of $4.6 billion. In Scenario 1D, the Junior Secured Noteholders' secured recovery is $1.751 billion (79% of the total Junior Secured Noteholders' asserted claim of $2.223 billion).

ny-1116221

51.  <u>Schedule</u>: The schedule below reflects the impact of this scenario to the net Intercompany Balances.

| Impact of Adjustments to the Intercompany Balances | | | | | | |
|---|---|---|---|---|---|---|
| ($ millions) | Top Intercompany Balances | | Net Interco Balance as of May 14, 2012* | Aggregate Adjustments | Adjusted Net Interco Balances | Adjustments |
| | Paying Entity | Receiving Entity | | | | |
| 1 | GMAC Residential Holding Co., LLC | Residential Capital, LLC | $ 3,334 | $ - | $ 3,334 | |
| 2 | Residential Capital, LLC | Residential Funding Co., LLC | 1,955 | (1,955) | - | B |
| 3 | Residential Funding Co., LLC | Homecomings Financial, LLC | 1,252 | (1,252) | - | A  B  C |
| 4 | GMAC Mortgage, LLC | Passive Asset Transactions, LLC | 697 | (697) | - | A  B  C |
| 5 | GMAC Mortgage, LLC | Executive Trustee Services, LLC | 265 | (265) | 0 | A  B  C |
| 6 | RFC Asset Holdings II, LLC | Residential Funding Co., LLC | 232 | (232) | - | A  C |
| 7 | GMAC Mortgage, LLC | Residential Funding Co., LLC | 140 | - | 140 | |
| 8 | GMAC Residential Holding Co., LLC | Home Connects Lending Serv., LLC | 55 | (55) | - | A |
| 9 | GMAC Mortgage, LLC | GMAC Residential Holding Co., LLC | 51 | - | 51 | |
| 10 | Home Connects Lending Serv., LLC | GMACRH Settlement Services, LLC | 50 | (50) | - | A |
| 11 | Residential Funding Co., LLC | RFC Asset Management, LLC | 46 | (46) | - | A |
| 12 | RFC Asset Management, LLC | RFC SFJV-2002, LLC Pre | 36 | (36) | - | A |
| 13 | Residential Funding Co., LLC | RCSFJV2004, LLC | 17 | (17) | 0 | A |
| 14 | RFC Asset Holdings II, LLC | Homecomings Financial, LLC | 12 | (12) | - | A |
| 15 | GMACRH Settlement Services, LLC | GMAC Mortgage, LLC | 10 | (10) | - | A |
| 16 | Other | Other | 41 | (17) | 24 | A |
| 17 | Total | | $ 8,192 | $ (4,643) | $ 3,549 | |

\* Total balance of intercompany transactions as of 5/14/12 excludes a relationship between GMAC Res Fund of Canada (Non-debtor) and RFC.

## <u>Scenario 2 – Base Case Plus Intercompany Balances in Face Value</u>

52.  <u>Assumptions</u>: Scenario 2 utilizes assumptions from the Base Case scenario.  In addition, it is assumed that the Intercompany Balances on the Debtors' books and records as of the Petition Date are allowed at their face value.  This scenario also uses various assumptions from the Plan recovery analysis that are highly unlikely to occur in the absence of the Global Settlement.  For example, multiple claims that have been resolved under the Global Settlement in the Plan would likely be asserted at much higher amounts if the claimants were litigating the Intercompany Balances under a Liquidation Scenario, thus further reducing the Junior Secured Noteholders' recovery.  Therefore, Scenario 2 is presented purely for illustrative purposes and does not reflect a likely outcome.

53.  <u>Results</u>: In Scenario 2, the Junior Secured Noteholders' secured recovery would increase by approximately $130 million over the Base Case scenario.  The Junior Secured Noteholders' secured recovery in Scenario 2 is $1.876 billion (84% of the total Junior Secured Noteholders' asserted claim of $2.223 billion).

*Impact to Junior Secured Noteholders Secured and Unsecured Recovery*

54.    The following tables demonstrate the recovery available to the Junior Secured Noteholders under the scenarios discussed above.

## Summary of Scenarios

| ($ millions) | Base Case | Scenario 1 | | | | Scenario 2 |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| 1  JSN Secured Recovery | $ 1,745 | $ 1,745 | $ 1,745 | $ 1,745 | $ 1,745 | $ 1,745 |
| 2  Total Improvement in JSN Recovery | - | 12 | 125 | 22 | 6 | 130 |
| 3  Total Secured Recovery | 1,745 | 1,757 | 1,870 | 1,768 | 1,751 | 1,876 |
| 4  % of Total Claim ($2,223M) | 79% | 79% | 84% | 80% | 79% | 84% |
| 5  Unsecured Recovery | 217 | 211 | 189 | 210 | 216 | 186 |
| 6  Total Recovery | $ 1,963 | $ 1,969 | $ 2,060 | $ 1,977 | $ 1,967 | $ 2,062 |
| 7  % of Total Claim ($2,223M) | 88% | 89% | 93% | 89% | 88% | 93% |

## Summaries of Recoveries by Intercompany Balance

| ($ millions) | | Interco Relationships | | Net Interco Balance | Base Case | Scenario 1 | | | | Scenario 2 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Receiving Entity | Paying Entity | | | A | B | C | D | |
| Impact of Intercompany Balances | 1  ResCap | GMAC Resi Holdings | $ 3,334 | $ - | $ - | $ - | $ - | $ - | $ 5 |
| | 2  RFC | ResCap | 1,955 | - | - | - | 5 | - | 5 |
| | 3  Homecomings | RFC | 1,252 | - | 0 | 95 | - | - | 95 |
| | 4  PATI | GMACM | 697 | - | 1 | 14 | - | - | 15 |
| | 5  ETS | GMACM | 265 | - | 0 | 6 | 7 | 0 | 6 |
| | 6  RFC (1) | RAHI (1) | 232 | - | - | - | - | - | - |
| | 7  RFC | GMACM | 140 | - | 4 | 3 | 4 | 4 | 3 |
| | 8  Other | Other | 318 | - | 2 | 7 | 7 | 2 | 7 |
| | 9  Subtotal | | $ 8,192 | $ - | $ 12 | $ 125 | $ 22 | $ 6 | $ 130 |
| JSN Recovery | 10  JSN Secured Recovery - Base Case (2) | | | 1,745 | 1,745 | 1,745 | 1,745 | 1,745 | 1,745 |
| | 11  Total Secured Recovery | | | $ 1,745 | $ 1,757 | $ 1,870 | $ 1,768 | $ 1,751 | $ 1,876 |
| | 12  % of Total Claim ($2,223M) | | | 79% | 79% | 84% | 80% | 79% | 84% |
| | 13  Unsecured Recovery | | | 217 | 211 | 189 | 210 | 216 | 186 |
| | 14  Total Recovery | | | $ 1,963 | $ 1,969 | $ 2,060 | $ 1,977 | $ 1,967 | $ 2,062 |
| | 15  % of Total Claim ($2,223M) | | | 88% | 89% | 93% | 89% | 88% | 93% |



A  Intercompany balances identified for forgiveness
B  Reinstatement of balances on account of avoidance of fraudulent conveyances
C  Subordination of certain intercompany balances
D  The aggregation of 1A, 1B, and 1C

I declare under penalty of perjury that the foregoing is true and correct.

Executed the 12th day of November, 2013, at New York, New York.

          /s/ Mark A. Renzi
          Mark A. Renzi

27