MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Charles L. Kerr
Darryl P. Rains
J. Alexander Lawrence

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------------ ) | | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et</u> <u>al</u>., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------------------------------ ) | | |

**<u>DIRECT TESTIMONY OF BARBARA WESTMAN</u>**

I, Barbara Westman, under penalty of perjury, testify as follows:

## I.    SUMMARY OF TESTIMONY

1.     In the ordinary course of business, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") entered into various transactions with their Debtor and non-Debtor affiliates,[1] including foreign affiliates, which resulted in the creation of intercompany receivables and payables on the Debtors' books and records.  The intercompany receivables and payables accumulated over a number of years, often as a result of tens of thousands of separate, individual transactions that were recorded on the general ledger for a number of reasons, including (a) the movement of cash within the capital structure of the various Debtors, (b) the movement of assets among the Debtors without cash settlement, and (c) the allocation or payment of expenses by one Debtor on behalf of another.

2.     The Debtors accounted for and recorded intercompany payables and receivables in a manner consistent with Ally Financial Inc.'s ("AFI") policies and standards, which required that the books and records of the companies be maintained consistent with Generally Accepted Accounting Principles ("GAAP").  As required by those policies, the Debtors would record and track all intercompany transactions in their accounting system and in the general ledgers for ResCap and its subsidiaries in the ordinary course of business.  Because general ledger entries would generally not identify the reason why a specific transaction occurred and because there is no central repository for intercompany balance backup documentation, trying to determine the reason why an intercompany balance exists is difficult.  Any investigation of intercompany balances on a transaction-by-transaction basis necessarily involves an exhaustive, time-

---

[1] When I refer to "non-Debtor affiliates" I am referring to the non-Debtor subsidiaries of ResCap.

1

consuming, and expensive process and would often require significant guesswork in trying to

identify or recreate the reason for a specific transaction or series of transactions.

3.       Prior to the Petition Date, the Debtors were parties to various lending facilities,

including lending facilities with AFI.  In addition, while at times individual Debtors also entered

into loan agreements and/or intercompany advance agreements with other Debtors and/or with

other non-Debtor affiliates, almost all of the intercompany balances reflected on the Debtors'

books and records did not correspond to any specific agreement.  In addition, for most of the

intercompany balances, there was no formal settlement process and the balances were not

generally repaid.

4.       Between January 2008 and the Petition Date, approximately $16.6 billion in

intercompany balances were forgiven by the Debtors and their non-Debtor affiliates.  The

forgiveness of intercompany balances among the Debtors was almost always treated as a capital

transaction.

5.       Both during 2011 and during the period running up to the Petition Date, the

Debtors' Accounting Operations and Compliance Group monitored and reviewed the

intercompany balances.  As part of the effort, they would identify intercompany balances that

should be forgiven and treated as capital transactions, either to meet ongoing net worth

requirements or because the intercompany balance no longer reflected any business purpose.

6.       Leading up to the Petition Date, the Debtors investigated the intercompany

balances on their books and the historical practice of treating the forgiveness of intercompany

balances as infusions of equity.  In the Disclosure Statement filed in this case, the Debtors listed

seven of the largest intercompany balances as of the Petition Date.  Because the general ledger

does not reflect and our research could not confirm why specific transfers were made, we could

2

not always determine why a specific intercompany balance existed.  We determined, however, that, in general, the intercompany balances had been created over a lengthy period and were the result of tens of thousands of individual journal entries.  For most of these intercompany balances, there was no agreement reflecting this intercompany relationship, no fixed maturity date and no specified interest rate or repayment terms.  Any transfer of funds reflected in these intercompany balances was not done on a secured basis.  In addition, prior to the Petition Date, at least four of these seven intercompany balances had been identified by the Debtors' Accounting Operations and Compliance Group as having no business purpose.  Those intercompany balances, along with many others, were listed as balances identified for forgiveness and for treatments as capital transactions.

## II.    EXPERIENCE AND BACKGROUND

7.    I am a Senior Director and the Controller of Residential Capital, LLC ("ResCap"). I first began working at ResCap in March of 2008 as a consultant employed by Hudson Financial, a private consulting company.  In April 2010, I became a full time ResCap employee with the title of Senior Director – Accounting Operations and Compliance.  I became the Controller for ResCap in February 2013.

8.    Prior to my employment as a consultant by Hudson Financial, I worked for twenty years in various financial manager roles and then as Divisional Controller and/or Divisional CFO at Allianz Life Insurance Company of North America (formerly known as North American Life and Casualty) ("Allianz").  Before working at Allianz, I worked at Sentry Insurance in an internal audit role for approximately five years.  I graduated from the University of Wisconsin Oshkosh in 1981 with a Bachelor Degree in Business Administration – Accounting.  I am a Certified Public Accountant, licensed in the State of Wisconsin.

3

9.      When I began working at ResCap in March of 2008, I was responsible for special

projects within the Financial Control Team, Sarbanes-Oxley compliance and providing project

and process management for liquidity facilities for ResCap and its affiliates.  In June of 2008, I

became responsible for creating certain of the monitoring and reporting processes required by the

Loan Agreement by and among ResCap, Residential Funding Company, LLC ("RFC"), GMAC

Mortgage, LLC ("GMACM"), and GMAC LLC (n/k/a Ally Financial Inc.) (previously defined

as "AFI"), dated June 4, 2008 (the "Original AFI Revolver Agreement").[2]  In November 2008, I

took on similar responsibilities with respect to a separate Line of Credit Agreement (the

"Original AFI Line of Credit Agreement") that ResCap entered into with AFI.[3]

10.      When I became Senior Director working at ResCap in April 2010, my

responsibilities expanded to include: (i) development and maintenance of processes and

procedures with respect to accounting compliance and reporting for liquidity and funding

facilities for ResCap, (ii) development and management of the general ledger operations and

consolidations, (iii) overseeing the AFI Sarbanes Oxley compliance program with respect to

ResCap; (iv) leading the ResCap "Change Management" program and account reconciliation

processes and (v) supporting the quarterly financial filings for ResCap and its affiliates.  In this

role, the accounting team running the general ledger reported to me, and I became directly

involved in overseeing the monthly closing of the general ledger and the preparation of trial

balances.  I also worked with the team monitoring the general ledger with respect to net worth

requirements and reporting on the need for debt forgiveness to manage the Debtors' net worth

and capital requirements.

---

[2] The Original AFI Revolver Agreement is Exhibit PX-5.

[3] The Original AFI Revolver Agreement and the Original AFI Line of Credit Agreement, which is Exhibit PX-9, were both amended and restated at the end of December 2009.  I will refer to these agreements generally as the "AFI Revolver Agreement" and the "AFI Line of Credit Agreement", respectively.

4

11.     When I became Senior Director/Controller in February 2013, my responsibilities further expanded to include, among other things, leading all accounting operations to ensure that transactions are being properly recorded and reported.

## III.    INTERCOMPANY BALANCES

12.     In the ordinary course of business, the Debtors entered into various transactions with their Debtor and non-Debtor affiliates, including foreign affiliates, which resulted in the creation of intercompany receivables and payables on the Debtors' books and records.  These intercompany receivables and payables were reflected in various journal entries and/or ledger accounts on the ResCap general ledgers.  A wide range of individuals in the Debtors' various operating groups had responsibility for making the individual journal entries relating to and reflecting these intercompany transactions.  The intercompany receivables and payables accumulated over a number of years, often as a result of tens of thousands of separate, individual transactions that were recorded on the general ledger for a number of reasons, including (a) the movement of cash within the capital structure of the various Debtors, (b) the movement of assets among the Debtors without cash settlement, and (c) the allocation or payment of expenses by one Debtor on behalf of another.

13.     *Cash Movement*.  Cash was routed daily throughout the Debtors' capital structure as a result of the upstreaming/downstreaming of cash generated from business operations, financing arrangements, and/or money raised in the capital markets.  For example, ResCap's operating subsidiaries would generate cash through different types of operations (including, for example, servicing, subservicing, performing as foreclosure trustee or selling mortgage loans to third-parties).  Some of that cash would stay at the operating level and some of that cash would be swept up to ResCap.  Starting in November 2008, the AFI Line of Credit Agreement established limits on the aggregate amount of cash that could be held at any one time by ResCap

5

companies and also required that any excess cash over those amounts would have to be repaid to

AFI if there were outstanding borrowings under the AFI Line of Credit Agreement.  Any such

cash repayments under the AFI Line of Credit Agreement were usually done by ResCap to AFI

on behalf of the borrowers.[4]  From time to time cash held at ResCap, or separate funds received

under ResCap's financing facilities, would be pushed back down the corporate chain, sometimes

directly to a subsidiary end-user of cash and sometimes through intermediary entities, to meet

general operating needs and/or to pay for significant business transactions such as the purchase

of assets.  At times, this would not involve the actual movement of cash through the intermediate

Debtors and, instead, would be recorded only as book entries within the general ledger.

14.     In connection with these types of movement of cash, journal entries would be

entered into the general ledger but, for the most part, those entries would not reflect the basis of

or the reason for the transfer of funds (*e.g.*, the upstreaming or downstreaming of operational

cash vs. other types of cash movement).  As a general matter, individual account entries in the

general ledger were not coded to reflect the reason for a specific entry.  Thus, it is difficult, if not

impossible, to determine from the general ledger the reason why certain journal entries are made

and/or why there are intercompany payables or receivables that have accumulated between

individual Debtors over time.  This is especially true because individual intercompany balances

may be the result of individual journal entries made over the span of a decade.  In addition,

because these journal entries are often made by separate and distinct operating groups within the

Debtors, each with their own record keeping processes, it is extremely difficult, if not

impossible, to trace back why an individual intercompany balance was created, why it did or did

not change over time or why it continues to exist.

---

[4] RFC Asset Holdings II, LLC ("RAHI") and Passive Asset Transactions, LLC ("PATI") were the designated
"Borrowers" under AFI Original Line of Credit Agreement.  When that Agreement was amended and restated in
December 2009, RFC and GMACM became the designated Borrowers under the AFI Line of Credit Agreement.

15.    *Asset Movement*. As part of the Debtors' ordinary course of business, assets (such as mortgage loans) would move between Debtor entities and/or between Debtor and non-Debtor affiliates, including foreign affiliates, creating intercompany balances.  I am aware of instances where these balances were settled by book entry rather than by an actual transfer of cash, creating an intercompany receivable and payable on the applicable entity's books and records. For example, as part of the ordinary course of business, Homecomings originated and then transferred loans to RFC so that RFC could pool and securitize those loans.  This was done at times without an actual transfer of cash, creating an intercompany receivable and a corresponding intercompany payable on the general ledger for Homecoming and RFC, respectively.

16.    *Expense Allocation*. In the ordinary course of business, the Debtors, their non-Debtor affiliates, and AFI provided financial, operational, and administrative services to each other under formal and informal shared services agreements, including: (a) information technology services; (b) employee benefits administration and other human resources functions; (c) accounting, tax and internal audit services; (d) treasury and collateral management; (e) risk management functions; (f) supply chain management, including procurement of goods and services from third parties; (g) government and regulatory relations and compliance services; (h) facilities management services; (i) marketing services; and (j) capital markets services relating to managing the value of certain of the Debtors' loan servicing rights.  Certain Debtors would pay AFI for expenses accrued for these services and then allocate those expenses to other, appropriate Debtor and non-Debtor affiliates, creating intercompany receivables and payables. In certain instances, the intercompany balance may be cash settled but, in other instances, the

7

balance may remain outstanding.  In addition, from time to time, intercompany balances were

created to reflect the payment of taxes and fees by one Debtor on behalf of another.

## IV.    THE DEBTORS' BOOKS AND RECORDS REFLECT INTERCOMPANY BALANCES

17.    The Debtors accounted for and recorded intercompany payables and receivables

in a manner consistent with AFI's policies and standards, which required that the books and

records of the companies be maintained consistent with GAAP.[5]  The purpose of AFI's

intercompany accounting policies was to ensure consistency with respect to intercompany

transactions so that all subsidiaries recorded intercompany balances in a manner that facilitated

the elimination of those balances when preparing consolidated financial statements.  (Ex. PX-621

§§ 2.0, 6.0, 6.2, 6.3; see also Ex. PX-638 § 3.0.)  AFI's policies regarding intercompany

accounting make clear that the primary purpose of the recording of intercompany transactions as

payables and receivables was to "ensure efficiencies in consolidation and proper elimination of

intercompany transactions."  (Ex. PX-621 § 6.3; see also Ex. PX-638 § 3.0.)  These policies

further state that "[d]irect loans between the parent and its subsidiary (or between subsidiaries)

result in reciprocal intercompany receivables and payables which are eliminated in

consolidation."  (Ex. PX-621 § 6.4.3.)

18.    AFI's accounting policy regarding Related Parties also states that there is a

general presumption that transactions between related parties are not carried out on an arm's-

length basis and that transactions between a parent and its subsidiaries that are under common

control are exempted from any requirement to impute or recognize interest.  (Ex. PX-694 §§

6.3.1, 6.4.3.)  It also provides that, in situations when a parent company forgives a receivable

---

[5] Exhibit PX-621 is a true and correct copy of AFI Accounting Policy 1040 Intercompany Accounting (Dec. 29, 2010).  Exhibit PX-694 is a true and correct copy of AFI Accounting Policy 1075 Related Policy (Jan. 1, 2012).  Exhibit PX-638 is a true and correct copy of AFI General Intercompany Accounting Policy (Nov. 28, 2011).

from a subsidiary, the company should record a change to equity.  "[W]hen a parent company

forgives a receivable from a subsidiary, the company should record a change to equity.

Generally speaking, intra-group debt forgiveness (for example, sister-sister activity) should

generally be recorded as a capital contribution unless there is commercial substance that

indicates that [it] should be treated akin to a third party transaction and recorded through the

income statement."  (Ex. PX-694 § 6.5.2.)  It is my understanding that these policies are

consistent with the GAAP literature on Related Parties Disclosures.[6]

19.    As required by these AFI Accounting Policies, the Debtors would record and

track all intercompany transactions in their accounting system and in the general ledgers for

ResCap and its subsidiaries in the ordinary course of business.  (See Ex. PX-638 § 6.1.)  Some of

these entries are entered manually and some are entered automatically.  The entries, however,

while reflecting the amount of an intercompany transaction, often do not specifically include a

code reflecting the basis of or reason for the transaction.  In other words, the general ledger entry

will generally not identify a transaction as arising from a transfer of cash, an allocation of

expenses, a funding/repayment of an intercompany receivable or payable, or from the sale of an

asset without a transfer of cash.  In addition, there were instances in which a transaction was not

correctly recorded with an appropriate affiliate code.  As a result, in attempting to trace through

the reasons or basis for long-standing individual intercompany balances, we would need to make

assumptions about which entities the intercompany balances related to and what the balances

reflected.

20.    In addition, historically different systems were used to operate the general ledgers

used by GMACM and its subsidiaries on one hand and by ResCap and RFC on the other hand.

---

[6] See FASB ASC 850-10-50-5. "Transactions involving related parties cannot be presumed to be carried out on an
arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist."

GMACM and is subsidiaries used the SmartStream System, and ResCap and RFC used the

PeopleSoft System.  Through April of 2009, the Debtors used a separate system called Hyperion

Enterprise to consolidate the entries from the two general ledger systems and to prepare

consolidated financial statements.  Journal entries were made directly into the different,

underlying systems and were not combined in one system.  Beginning in May of 2009, monthly

summarized data was fed from the SmartStream System into the PeopleSoft System and then all

consolidations were performed in PeopleSoft.  Beginning in November 2010, this feed became

daily, but still only reflected summarized activity entered in the separate systems.  In other

words, GMACM journal entries were still performed in the SmartStream System and were not

reported separately in the PeopleSoft System and were only fed into the PeopleSoft System in

summarized form.  As of November 2011, the SmartStream System was retired and all journal

entries for all entities were performed directly in the PeopleSoft System.  As a result of this

history, tracking historical transactions across company lines is more difficult.

21.    The method for recording intercompany transactions, including intercompany

payables and receivables differed between the SmartStream System and the PeopleSoft System.

With respect to journal entries for intercompany transactions in either system, the journal entry

would reflect a code for a specific entity, but the method for identifying the counterparty varied.

On the PeopleSoft System, there would be a journal entry to record an intercompany receivable

from another entity.  The counterparty entity was reflected in another field called an affiliate

code.  Therefore, each journal entry would always have the entity number in it, but there were

instances where the affiliate code was not populated or was populated incorrectly.  As a result,

when we tried to trace the history of certain intercompany balances, we would need to make

assumptions about who the counterparty was on individual journal entries.  In contrast, on the

SmartStream System, there were generally separate ledger accounts used to reflect the counterparties.

22.    In addition, the Debtors do not have a central repository for backup documentation that reflects why individual journal entries tied to intercompany balances were made. Because the journal entries that make up the intercompany balances were made over many years and by different departments and business units, in different physical locations, and were overseen by different supervisors with different recordkeeping practices, there was no set practice of retaining backup documentation for intercompany journal entries across all of the ResCap companies. As a result, any investigation of intercompany balances on a transaction-by-transaction basis necessarily involves an exhaustive, time-consuming, and expensive process and would often require significant guesswork in trying to identify or recreate the reason for a specific transaction or series of transactions.

23.    As of the Petition Date, approximately $8.2 billion in aggregate net intercompany balances existed among the Debtors or between Debtors and non-Debtor affiliates. This figure represents a snapshot of those intercompany balances on the day of filing, but could have been materially more or less if the Debtors' bankruptcy occurred earlier or later, based on cash movement, expense allocation, and/or the occurrence of additional debt forgiveness.

## V.    AGREEMENTS BETWEEN AFFILIATES

24.    Prior to the Petition Date, the Debtors were parties to various lending facilities, including the AFI Revolver Agreement and the AFI Line of Credit Agreement.[7] Under these loan facilities, certain of the Debtors borrowed cash from AFI for working capital purposes.

---

[7] Exhibit PX-5 is a true and correct copy of the Original AFI Revolver Agreement. Exhibit PX-6 is a true and accurate copy of the Amended and Restated Revolving Credit Facility Agreement. Exhibit PX-9 is a true and correct copy of the Amended and Restated Line of Credit Agreement.

11

Depending upon the period in question, either RFC, GMACM, RAHI and/or PATI were the

designated borrowers under those agreements with AFI.

25.      For a number of years leading up to the Petition Date, AFI would honor funding

requests made by the Debtors under the AFI Line of Credit by depositing cash into a centralized

account held by ResCap.  This was true even when the "borrowers" under these agreements

were, for example, RFC and GMACM—and not ResCap.  Because RFC and GMACM were the

actual borrowers under both the Revolver Agreement and/or the Line of Credit Agreement (*see*

footnote 4 *supra*), but it was ResCap that received the actual funds, intercompany receivables

owing from ResCap were placed on RFC's and GMACM's books, and those entities had

corresponding intercompany payables to AFI in the same amounts.  To further complicate these

transactions, the payables allocated to RFC and GMACM could not be calculated based on their

respective, actual use of cash because those entities had not yet received any cash and might not

ultimately receive any cash due to the lack of any need for funding.  Instead, the intercompany

payables and receivables were calculated based on asset value at those entities.  Stated

differently, if GMACM's collateral securing its obligations under the AFI Line of Credit

Agreement was twice as valuable as RFC's collateral, then the respective ledgers of GMACM

and RFC would reflect an intercompany payable and/or receivable in that same ratio—regardless

of which entity ultimately received or utilized the cash.

26.      As draws were requested to fund the operations of an operating entity, the funds

provided by AFI would be transferred from the central ResCap account to that entity based on its

capital requirements—not based on the value of its assets.  Accordingly, the amount of cash

transferred could be inconsistent with that entity's payable to AFI.  Meanwhile, other Debtor

subsidiaries that never in fact used AFI funds would still have payables to AFI on their books and a receivable from the actual recipient of the cash.

27.     From time to time, individual Debtors also entered into loan agreements and/or intercompany advance agreements with other Debtors and with non-Debtors.  In connection with researching the intercompany balances maintained by the various Debtors in preparation for and following the filing of the Petitions in these cases, the Accounting Operations and Compliance Group undertook a comprehensive search to locate any such agreements, working with the Legal Department, the Treasury Department and various operating and accounting groups throughout the companies.  For the period from 2006 to the Petition Date, we were only able to locate four such agreements between domestic Debtor entities.[8]

28.     As part of our investigation into the intercompany balances shown on the general ledger, we tried to determine whether any of those intercompany balances corresponded to transactions conducted pursuant to these agreements or to something else.  In connection with this effort, we spoke to the Legal Department, the Treasury Department (who generally maintained these types of agreements), and to the accounting groups responsible for specific intercompany balances.  The accounting group responsible for monitoring the intercompany balances between ResCap and ResHolding generally assumed that some or all of those balances were subject to the terms of a ResCap Restated Loan Agreement, but that could not be confirmed based on our research.  With respect to the three Intercompany Advance Agreements, however,

---

[8] Exhibit PX-577 is a true and correct copy of a ResCap Restated Loan Agreement, dated January 1, 2006, among ResCap, as lender, and GMAC Residential Holding Corp. ("ResHolding"), GMACM, and RFC, as borrowers (the "ResCap Restated Loan Agreement").  Exhibit PX-576 is a true and correct copy of an Amended and Restated Intercompany Advance Agreement (HomeComings Financial Network, Inc.), dated June 30, 2006, between HomeComings, as borrower, and RFC, as lender.  Exhibit PX-578 is a true and correct copy of an Intercompany Advance Agreement (Passive Asset Transactions, LLC), dated June 1, 2009, between ResCap, as borrower, and PATI, as lender.  Exhibit PX-575 is a true and correct copy of an Intercompany Advance Agreement (RFC Asset Holdings II, LLC), dated June1, 2009, between ResCap, as borrower, and RAHI, as lender.  In our search, we also located an unexecuted draft of a proposed Intercompany Advance Agreement between RFC and ResCap, but could not locate an executed version or determine whether this was ever executed.

13

we could not determine the reason why those agreements were entered into or whether any of the intercompany balances on the general ledger as of the Petition Date reflected transactions that, in fact, had been made pursuant to any one of these agreements.

29.    Moreover, any transfers that would have been made under any of these Agreements would be done on an unsecured basis and, in each instance, the same individuals, entities, or affiliates controlled both the "lender" and the net receiver upon the commencement of the "lending" relationship.  Finally, three of the four Intercompany Advance Agreements we located contain a "Bankruptcy Standstill" provision, which provides that the "lender" entity will not commence bankruptcy against the "borrower" entity or seek to foreclose on any property, and that obligations under the agreement will not constitute a claim against the "borrower" entity if such entity's assets are insufficient to pay those obligations in full, effectively subordinating the obligations under these agreements to the claims of outside creditors.[9]

### A.    Request By AFI To Review Intercompany Balances

30.    In 2011, AFI initiated a process for all of its business segments to review intercompany balances for the purpose of determining whether those balances were being properly cash settled in compliance with AFI's Accounting Policies.  As part of this review, ResCap's Accounting Operations and Compliance Group investigated the intercompany balances shown on the ResCap general ledger to determine the history of and the reasons for a particular intercompany balance and to confirm which of these balances, if any, were being cash settled on a regular basis.  I was directly involved with this process, which stretched over a number of months.  The review involved preparing an inventory list of all intercompany relationships using information from the general ledger systems, researching the transaction

---

[9] See Homecomings Intercompany Advance Agreement, Ex. PX-576 at 2; PATI Intercompany Advance Agreement, Ex. PX-578 at 2; RAHI Intercompany Advance Agreement, Ex. PX-575 at 2.

14

balances, discussing the purpose of the entries with the responsible accounting areas, and

attempting to determine whether interest was charged, whether the outstanding balances were

settled on a cash basis or on some other basis, and whether there were underlying agreements

relating to or supporting the balances.

31.     In early February 2012, I sent to Cathy Dondzila, who was at the time ResCap's

Controller, a copy of a final list of intercompany balances that we had prepared for certification

purposes on this project.[10]  In the attachment to this email, I included a list of intercompany

balances that we were able to categorize under the AFI Accounting Policies.  We determined

that certain of the intercompany account relationships were in compliance with AFI's

Accounting Policies because they were being regularly settled on a cash basis and/or that

interest was being charged and cash settled on a regular basis.  (PX-604 at 3.)  We identified

another group of intercompany balances that regularly fluctuated, and for which there was no

formal settlement process.  (Id. at 5.)  We determined that these balances generally reflected the

movement of cash within ResCap and its subsidiaries as needed for operational purposes;

however we confirmed that these balances are never fully repaid and there was no formal

settlement process:

> The cash management practice at ResCap results in the creation of
> various intercompany balances within ResCap and it's subsidiaries.
> While these balances fluctuate regularly, there is no formal
> "settlement" practice.  Under the ResCap's Line of Credit
> Agreement (LOC) with Ally, ResCap must maintain a certain
> liquidity position.  If ResCap falls below that liquidity position, it
> may borrow from the LOC, and if it falls above that position, it
> must pay back certain outstanding balances on the LOC.

---

[10] Exhibit PX-604 is a true and correct copy of an email that I sent to Cathy Dondzila, dated February 7, 2012, with
an attachment showing a list of intercompany balances organized into different categories.  I sent this email on or
about February 7, 2012, and it is in the same condition as when I sent it.  I am qualified to explain how the email and
attachment were prepared and maintained.  The document is a record of an act or event, and it was made at or near
the time of the act or event based on my own personal knowledge.  Making the record was a regular part of
ResCap's business, and it was kept in the course of one of ResCap's regularly conducted business activities.

ny-1113706

To facilitate this process and the most efficient use of cash within the entity, all available cash balances of ResCap's subsidiaries are transferred to ResCap on a regular basis, through intercompany accounts. ResCap then reallocates this cash as needed down to any subsidiaries needing cash, or returns the cash to Ally as required under the LOC. This results in continuous changes to these various intercompany balances. However, the balances are never fully "repaid".

Per discussions with Ally, these balances are considered compliant with company settlement practices.

Per Accounting Policy 1075 Related Party, Interest is generally imputed for receivables or payables that represent contractual rights to receive money or contractual obligations to pay money on fixed or determinable dates, when the interest rate stated in a note is unreasonable or there is no stated interest rate.

However, transactions between a parent and its subsidiaries which are under common control are exempted from this requirement. Accordingly, interest is not required to be imputed. Interest still must be imputed to transactions between other related parties.

(Id.)

32.    Finally, we also identified a number of dormant intercompany account relationships that do not settle and that were related to entities having no current or future significant business activities. (Id. at 6.) Thus, those entities would either have no ability to generate the cash needed to repay the payable or did not need cash on account of the receivable. We concluded that "[t]hese intercompany balances are dormant and no longer serve a business purpose. These balances do not meet [AFI's] Policy requirements as no settlement occurs . . . We will seek debt forgiveness on the balances in the next quarter." (Id.)

**B.    The Investigation of Intercompany Balances in Advance of the Petition**

33.    In March of 2012, I was asked by FTI to assist in conducting a comprehensive review of the intercompany balances that were reflected on ResCap's general ledger. Over the course of the next several months and continuing after the Petition Date, the Accounting

16

Operations and Compliance Group conducted a further investigation of the intercompany balances reflected on the ResCap general ledger. We again reviewed the general ledger entries for those balances and worked with the accounting teams in the applicable business units to try to trace the history and current amount of those balances and the reason or reasons why the intercompany balances were created. We again searched for any existing intercompany loan agreements or advance agreements and tried to locate any and all information and documentation we could about the creation of the balances and how and why they were maintained. We re-confirmed that, in many instances, the intercompany balances reflected the culmination of thousands of individual journal entries that had accumulated over the course of many years. For most of the intercompany balances, however, we were unable to determine why they had been created, whether they were based upon any agreement, formal or informal, or the business purpose for continuing to maintain these intercompany balances.

34.    After an extensive review of company records, speaking to company personnel and review of the general ledger, our group, working with FTI, prepared a comprehensive list of the intercompany balances as reflected on the Debtors' books and records as of the Petition Date. Seven of the intercompany balances we identified are summarized in Exhibit 6 to the Disclosure Statement.[11] These seven intercompany balances comprise approximately 96% of all ResCap intercompany balances as of the Petition Date.

    a.    **Disclosure Statement Exhibit 6 - Intercompany Net Balance No. 1**: This intercompany balance reflects a balance of $3.334 billion shown on the general ledger to be an intercompany payable by ResHolding to ResCap. ResHolding is a holding company between ResCap and GMACM. Based on our research, we determined that this balance generally arose

---

[11] See Exhibit 6 to the Disclosure Statement For The Joint Chapter 11 Plan Proposed By Residential Capital, LLC, et al., And The Official Committee Of Unsecured Creditors, dated August 23, 2013 [Dkt. No. 4819-3], a true and correct copy of which is Exhibit PX-869.

17

over time from a series of transactions under which ResHolding received funds from ResCap and

then distributed funds to GMACM and/or other subsidiaries for general operating purposes.

While the general ledger entries do not reflect why specific transfers were done, the accounting

group responsible for monitoring this balance assumed that these transfers were being made, in

part, pursuant to the ResCap Restated Loan Agreement, dated January 1, 2006 or a predecessor

agreement.  (See Ex. PX-577.)  That Agreement provided for no fixed maturity date, interest rate

or repayment terms, and funds were transferred solely on an unsecured basis.  While there was

no fixed interest rate in the Agreement, our review of the general ledger showed that interest was

being cash settled on this intercompany balance on a regular basis until the Petition Date.  Our

research also showed that, in May and June of 2009, $2.52 billion of intercompany payables

from GMACM to ResHolding was forgiven so that GMACM could meet certain net worth debt

covenants.[12]  Because ResHolding was not at risk of defaulting on its net worth requirements,

however, there was no corresponding forgiveness of this intercompany balance by ResCap on

behalf of ResHolding.

       b.      **Disclosure Statement Exhibit 6 - Intercompany Net Balance No. 2**:  This

intercompany balance reflects a balance of $1.955 billion shown on the general ledger to be an

intercompany payable by ResCap to RFC.  While the general ledger does not reflect and our

research could not confirm why specific transfers were made, we determined that this balance

arose, in part, out of the operation of the Debtors' centralized cash management system and was

the result of multiple, individual journal entries over time.  This was consistent with the findings

we reached in late 2011 as part of our Group's efforts to certify compliance with AFI's

Accounting Policies with respect to intercompany balances.  (Ex. PX-604 at 5.)  There was no

---

[12] See PX-687, Memorandum from J. Young, dated June 3, 2009; PX-605, Memorandum from J. Young, dated June 25, 2009; PX-690, Written Consent of the Executive Committee of the Board of Directors of Residential Capital, LLC, dated January 28, 2010.

agreement reflecting this intercompany relationship, no fixed maturity date, no specified interest rate or repayment terms and no settlement practice, and funds were transferred solely on an unsecured basis.  No interest was being accrued or paid on this intercompany balance.  Our research also showed that, in 2008, a $2 billion payable by RFC to ResCap was forgiven so that RFC could meet certain tangible net worth covenants.[13]  In 2009, an additional $151 million payable by RFC was similarly forgiven.[14]

      c.    **Disclosure Statement Exhibit 6 - Intercompany Net Balance No. 3**:  This intercompany balance reflects a balance of $1.252 billion shown on the general ledger to be an intercompany payable by RFC to Homecomings.  While the general ledger does not reflect and our research could not confirm why specific transfers were made, we determined that this balance arose, in part, out of the operation of the Debtors' centralized cash management system.  This was consistent with the findings we reached in late 2011 as part of our Group's efforts to certify compliance with AFI's Accounting Policies with respect to intercompany balances.  (Ex. PX-604 at 6.)  Homecomings sold loans to RFC for securitization as part of normal business operations and subserviced loans and generated other cash through operations that was swept up to RFC.  The intercompany receivable balance largely reflects these past transactions, less intercompany payables from Homecoming to RFC for general overhead expenses.  This intercompany balance changed frequently until 2008.  At that point Homecoming became largely dormant, but continued to have wind down activity that generated some cash that was swept up to RFC.  Interest was accrued, but not paid, on this intercompany balance.  There was no agreement reflecting this intercompany relationship, no fixed maturity date, no repayment terms

---

[13] See PX-685 Residential Capital, LLC - Certificate of Assistant Secretary.

[14] See PX-689, Written Consent of the Executive Committee of Residential Capital, LLC; PX-691, Unanimous Consent to Action.

ny-1113706

and no settlement practice, and funds were transferred solely on an unsecured basis.  As I will

describe below, in February and March 2012, the Accounting Operations and Compliance Group

identified this intercompany balance as recommended for forgiveness by the end of the Second

Quarter of 2012,[15] but the filing of the Bankruptcy Petition prevented that from occurring.

        d.     **Disclosure Statement Exhibit 6 - Intercompany Net Balance No. 4**:  This

intercompany balance reflects a balance of $697 million shown on the general ledger to be an

intercompany payable by GMACM to PATI.  While the general ledger does not reflect and our

research could not confirm why specific transfers were made, we determined that this balance

arose, in part, out of the operation of the Debtors' centralized cash management system.  This

was consistent with the findings we reached in late 2011 as part of our Group's efforts to certify

compliance with AFI's Accounting Policies with respect to intercompany balances.  (Ex. PX-604

at 5.)  We determined that a portion of this balance likely reflects, in part, cash collected by

PATI from non-Debtor entities such as Flume and GXII that was then swept up to GMACM.  No

interest was being accrued or paid on this intercompany balance.  Although we located an

Intercompany Advance Agreement reflecting a lending relationship between PATI and ResCap,

we located no similar agreement between PATI and GMACM.  There was no fixed maturity date

with respect to this intercompany balance and no specified interest rate, no repayment terms and

no settlement practice, and funds were transferred solely on an unsecured basis.  Our research

also showed that, in 2008, a $44 million payable by PATI to GMACM was forgiven so that

---

[15] See Exhibit PX-632 is a true and correct copy of an Excel workbook entitled "Copy of Intercompany Relationships 02-29-12 V2", which was prepared and maintained by Gary Sonnenburg, who worked under my supervision in Accounting Operations and Compliance.  Our Group created and maintained this workbook in the ordinary course of business and it was the ordinary course of business to create workbooks such as this to record and track this type of information.  Mr, Sonnenburg prepared this version of the workbook at the end of February 2012, reflecting the intercompany balances on the general ledger as of that time that were identified by the Accounting Operations and Compliance Group for forgiveness by the end of the following quarter.  With respect to this specific intercompany balance as between RFC (Entity 10010) and Homecoming (Entity 10011), see Ex. PX-632 at 36 ("This tab [of the workbook] shows the current recommendations for debt forgiveness that should be completed").

PATI could meet certain tangible net worth covenants.[16]  As I will describe below, in February

and March 2012, the Accounting Operations and Compliance Group identified this intercompany

balance as recommended for forgiveness by the end of the Second Quarter of 2012,[17] but the

filing of the Bankruptcy Petition prevented that from occurring.

      e.      **Disclosure Statement Exhibit 6 - Intercompany Net Balance No. 5**:  This

intercompany balance reflects a balance of $265 million shown on the general ledger to be an

intercompany payable by GMACM to Executive Trustee Services, LLC ("ETS").  While the

general ledger does not reflect and our research could not confirm why specific transfers were

made, we determined that this balance arose, in part, out of the operation of the Debtors'

centralized cash management system.  This was consistent with the findings we reached in late

2011 as part of our Group's efforts to certify compliance with AFI Accounting Policies with

respect to intercompany balances.  (Ex. PX-604 at 5.)  We determined that this balance likely

reflects revenue received and fees collected by ETS as a foreclosure trustee that was swept up to

GMACM.  GMACM would then satisfy ETS's cash needs on an on-going basis.  Some of these

intercompany balances were created to record this impact on ETS, but no cash settlement

occurred.  Interest was accrued but not paid on this intercompany balance.  There was no

agreement reflecting this intercompany relationship, no fixed maturity date, no repayment terms

and no settlement practice, and funds were transferred solely on an unsecured basis.  As I will

describe below, in February and March 2012, the Accounting Operations and Compliance Group

---

[16] See PX-635, GMAC Mortgage, LLC - Written Consent In Lieu of Meeting of Board of Directors.

[17] With respect to this specific intercompany balance as between GMACM (Entity SS001) and PATI (Entity SS095), see Ex. PX-632 at 36 ("This tab [of the workbook] shows the current recommendations for debt forgiveness that should be completed").

ny-1113706

identified this intercompany balance as recommended for forgiveness by the end of the Second

Quarter of 2012,[18] but the filing of the Bankruptcy Petition prevented that from occurring.

   f.  **Disclosure Statement Exhibit 6 - Intercompany Net Balance No. 6**: This

intercompany balance reflects a balance of $232 million shown on the general ledger to be an

intercompany payable by RAHI to RFC.  While the general ledger does not reflect and our

research could not confirm why specific transfers were made, we determined that this balance

arose, in part, out of the operation of the Debtors' centralized cash management system.  This

was consistent with the findings we reached in late 2011 as part of our Group's efforts to certify

compliance with AFI Accounting Policies with respect to intercompany balances.  (Ex. PX-604

at 5.)  Our research showed that RAHI owned a portfolio of non-economic residuals that resulted

in current taxes being payable to RAHI's parent.  This intercompany balance is primarily

attributable to the settlement of taxes under a tax sharing agreement.  Interest was accrued, but

not paid on this intercompany balance.  There was no agreement reflecting this intercompany

relationship, no fixed maturity date, no repayment terms and no settlement practice, and funds

were transferred solely on an unsecured basis.  Our research also showed that, as of June 2008, a

$1.2 billion payable by RAHI to RFC was forgiven so that RAHI could meet certain tangible net

worth covenants.[19]  As I will describe below, in February and March 2012, the Accounting

Operations and Compliance Group identified this intercompany balance as recommended for

---

[18] With respect to this specific intercompany balance as between GMACM (Entity SS001) and ETS (Entity SS002), see Ex. PX-632 at 36 ("This tab [of the workbook] shows the current recommendations for debt forgiveness that should be completed")**.**

[19] See PX-695, Residential Funding Company, LLC - Written Consent In Lieu of Meeting of Board of Directors. The forgiveness of this intercompany balance was approved retroactively by the RFC Board of Directors in November 2009.

additional forgiveness by the end of the Second Quarter of 2012,[20] but the filing of the

Bankruptcy Petition prevented that from occurring.

       g.    **Disclosure Statement Exhibit 6 - Intercompany Net Balance No. 7**:  This

intercompany balance reflects a balance of $140 million shown on the general ledger to be an

intercompany payable by GMACM to RFC.  Our research showed that the majority of this

balance consists of amounts recorded in connection with AFI billings for shared services, such as

payroll and outside counsel costs.  RFC routinely remitted payment to AFI for services and RFC

then charged GMACM for its portion.  This balance also reflected service fee income received

by GMACM as subservicer relating to RFC's mortgage servicing rights.  Prior to the Petition

Date, cash settlements occurred on these balances.  No interest was being accrued or paid on this

intercompany balance and, consistent with the AFI Policies, this intercompany balance was

settled on a monthly basis.  There was no agreement reflecting this intercompany relationship, no

fixed maturity date and no specified interest rate, and funds were transferred solely on an

unsecured basis.

       35.    I understand that, in a Report prepared by Robert Bingham, the Junior Secured

Noteholders have addressed two additional intercompany balances that were reflected on the

Debtors' books and records as of the Petition Date.  The first transaction is an intercompany

balance of $54.6 million shown on the general ledger as a payable from ResHolding to Home

Connects Lending Services, LLC ("Home Connects").  Home Connects was a subsidiary that

sold insurance and other lending services (credit insurance, title service, life insurance products).

The business ceased operations in 2008, but borrowers continued to make premium payments on

old policies, which resulted in continued cash flows.  As part of the certification process we

---

[20] With respect to this specific intercompany balance as between RAHI (Entity 10015) and RFC (Entity 10010), see Ex. PX-632 at 36 ("This tab [of the workbook] shows the current recommendations for debt forgiveness that should be completed").

conducted in late 2011, this intercompany balance was identified by the Accounting Operations

and Compliance Group as a "dormant [balance that] no longer serve[s] a business purpose." (Ex.

PX-604 at 6.) There was no agreement reflecting this intercompany relationship, no fixed

maturity date and no specified interest rate or repayment terms, and funds were transferred solely

on an unsecured basis. No interest was being accrued or paid on this intercompany balance. At

that time, we investigated this balance and determined that it had been originally recorded in

2008 and that it had shown no activity during 2011. Accordingly, Accounting Operations and

Compliance Group had designated this intercompany balance for forgiveness by the end of the

Second Quarter of 2012,[21] but the filing of the Bankruptcy Petition prevented that from

occurring.

36.     The second, additional balance addressed by the Junior Secured Noteholders is an

intercompany balance of $51.4 million shown on the general ledger as a net payable from

GMACM to ResHolding. This intercompany balance reflected the transfers of funds between

ResHolding and GMACM as part of ongoing operations. Portions of this intercompany balance

would reflect funds received by GMACM under the AFI Line of Credit and/or for operational

needs netted against funds that would be transferred by GMACM up to ResHolding as needed.

Interest was accrued but not paid on this intercompany balance. There was no agreement

reflecting this intercompany relationship, no fixed maturity date and no repayment terms, and

funds were transferred solely on an unsecured basis. As I described previously, because of

---

[21] See Ex. PX-604 at 6 ("We will seek debt forgiveness of these balances in the next quarter"). This intercompany
balance as between Home Connects (Entity SS067) and ResHolding (Entity SS033) was also identified on
Accounting Operations and Compliance's workbook of intercompany balances to be forgiven in early 2012. See
also Ex. PX-632 at 36("This tab [of the workbook] shows the current recommendations for debt forgiveness that
should be completed").

ny-1113706

GMACM's need to meet various net worth requirements, in May and June of 2009, a $2.52

billion payable from GMACM to ResHolding was forgiven.[22]

38.    No sinking fund existed in connection with any of the foregoing intercompany

balances.

## VI.    SCHEDULES OF ASSETS AND LIABILITIES

38.    I understand that, during the course of the Chapter 11 cases, each of the Debtors

was required to prepare and file a Schedule of Assets and Liabilities.  I was involved in

providing information about intercompany balances, if any, that were included in those

Schedules of Assets and Liabilities.  That information was based upon, in part, the investigation

we conducted with FTI regarding intercompany balances that were reflected on ResCap's

general ledger as of the Petition Date.  The information provided was an accurate reflection of

those intercompany balances as shown on the general ledger, but as I have described, for most of

the intercompany balances, we were unable to determine why they had been created, whether

they were based upon any agreement, formal or informal, or the business purpose for continuing

to maintain these intercompany balances.  In addition, our research had shown that, since

January of 2008, a substantial amount of intercompany payables and receivables reflected in the

ResCap general ledger had been routinely forgiven and treated as capital infusions.  Moreover, a

large amount of the intercompany balances that existed on the general ledger as of the Petition

Date had been identified for future forgiveness, but the filing for the Bankruptcy Petition

prevented that from happening.

---

[22] See PX-687, Memorandum from J. Young; PX-605, Memorandum from J. Young; PX-690, Written Consent of
the Executive Committee of the Board of Directors of Residential Capital, LLC.

ny-1113706

39.    I understand that, in the Schedules of Assets and Liabilities that were filed by the

Debtors,[23] these intercompany transactions reflected by the intercompany balances were

described as follows:

> **The Schedules and Statements and these Global Notes should
> not be relied upon by any persons for information relating to
> current or future financial conditions, events or performance
> of any of the Debtors.**
>
> **Reservation of Rights**. . . . Because the Schedules and Statements
> contain unaudited information, which is subject to further review,
> verification, and potential adjustment, there can be no assurance
> that these Schedules and Statements are accurate and/or complete. .
> . . Failure to designate a claim on a given Debtors' Schedule as
> "dispute," "contingent," or "unliquidated" does not constitute an
> admission by the Debtors that such amount is not "disputed,"
> "contingent" or "unliquidated" or that such claim is not subject to
> objection.  The Debtors reserve their respective rights to dispute, or
> assert offsets, setoffs or defenses to any claims reflected on the
> Schedules as to the nature, amount, liability, or status or to
> otherwise subsequently designate any claim as disputed, contingent
> or unliqudiated.
>
> <div align="center">•   •   •</div>
>
> **Intercompany Transactions**.  Prior to the Petition Date (and
> subsequent to the Petition Date but only pursuant to Bankruptcy
> Court approval), the Debtors routinely engaged (and continue to
> engage) in intercompany transactions with both Debtor and non-
> Debtor subsidiaries and affiliates, including Ally Financial Inc.
> ("AFI").  With respect to prepetition transactions between Debtors,
> such intercompany accounts payable and receivable, if any, are
> reflected in the respective Debtor's Schedules and Statements and
> are not necessarily indicative of the ultimate recovery on any inter-
> Debtor receivables or the impairment or claim status of any
> intercompany payable.  The Debtors have made every attempt to
> properly characterize, prioritize and classify all intercompany
> transaction.  Each Debtor reserves the right to re-characterize, re-
> prioritize and re-classify claims against and debts owed to other
> Debtors and non-Debtor affiliates.

(Ex. PX-815 at 3, 5.)

---

[23] See, et al., Schedules of Assets and Liabilities for RFC Asset Holdings, II, LLC (Case No. 12-12065), dated June
30, 2012 [Dkt. No. 586], a true and correct copy of which is Exhibit PX-815.

## VII.    PUBLIC DISCLOSURE OF INTERCOMPANY BALANCES

40.    Information regarding the intercompany balances between the Debtor entities was generally not made publicly available.  ResCap was the only Debtor entity that was required to file financial disclosures with the SEC, and did so only through the Second Quarter of 2009. ResCap's publicly filed financial statements were prepared on a consolidated basis and were intended to reflect the company as a whole.  It is my understanding that, for the purpose of preparing ResCap's consolidated financials, intercompany balances between all ResCap entities were eliminated consistent with AFI's Accounting Policies and GAAP.  Therefore, it was not possible to determine intercompany balances that may have existed among the Debtors based solely upon these publicly filed financial statements.

41.    However, certain of ResCap's public filings prior to 2009, including its 2007 and 2008 annual reports, contain a note to the financials entitled "Supplemental Financial Information."[24]  This note contains information regarding the relationship between ResCap and its subsidiaries, including an asset line item in the Condensed Consolidating Balance Sheet for December 31, 2007, called "Investments in and loans to subsidiaries."  It is my understanding that this line item refers to both the value of ResCap's equity in its subsidiaries and the receivables held by ResCap from its subsidiaries.  (This asset line item was changed to be just "Investments in subsidiaries" in the Condensed Consolidating Balance Sheet for December 31, 2008.)[25]  However, the ResCap financial statements do not provide any information on, or the breakdown of, this item.  No information with respect to balances between or among the subsidiary entities was provided in these financials.

---

[24] Exhibit PX-588 is a true and correct copy of ResCap's 10-K/A for the period ending December 21, 2008, filed with the S.E.C. on August 25, 2009.  (See PX-588 at 215, Note 29 "Supplemental Financial Information")

[25] See id. at 217; cf. id. at 216.

42.    Certain of the Debtor subsidiaries, such as RFC and GMACM, prepared audited financial statements on an annual basis.  These statements netted all intercompany balances within the GMACM and RFC silos, respectively.[26]  Thus, while RFC's financials may have shown an intercompany balance owing to or from ResCap or GMACM, it would net the intercompany balances within the RFC family.  The same would be true with respect to GMACM's financials.

43.    RFC's and GMACM's audited financial statements were not publicly filed with the SEC given that RFC and GMACM were not reporting companies.  I understand, however, that RFC's and GMACM's consolidated financial statements, were made available to certain of the Debtors' lenders, including AFI, through a password protected internet site called Intralinks. In addition, RFC's and GMACM's audited financial statements were provided to the U.S. Department of Housing and Urban Development ("HUD") and to certain state agencies for the purpose of complying with certain licensing and net worth requirements.  HUD, for example, requires that lenders and servicers continuously meet minimum, adjusted net worth requirements and, to ensure compliance, it required compliance reports from RFC and GMACM, along with their audited financials.  HUD's reporting requirements, however, provide that any intercompany receivables listed on a reporting company's books and records are deemed to be an "unacceptable asset" and, thus, are disregarded for purposes of meeting a regulatory net worth

---

[26] For example, Exhibit PX-586 is a true and correct copy of GMAC Mortgage, LLC's Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008.  And, Exhibit PX-585 is a true and correct copy of Residential Funding Company, LLC's Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009.

ny-1113706

requirement.  I understand that certain states took the same approach and disregarded

intercompany receivables when determining compliance with net worth requirements.[27]

## VIII.  THE FORGIVENESS OF INTERCOMPANY BALANCES

44.    In the ordinary course of business, the Debtors regularly forgave intercompany

balances that were recorded on their books and records.  From January 2008 through the Petition

Date, approximately $16.6 billion in intercompany balances was forgiven by the Debtors and

their non-Debtor affiliates.[28]  These balances were forgiven for several reasons, including (a)

compliance with regulatory and licensing requirements, (b) compliance with financing

covenants, and/or (c) as part of a sale of assets or dissolution of an entity.  The forgiveness of

intercompany balances among Debtors was virtually always treated as capital transactions.[29]

45.    As a general matter, different groups within the Debtors' accounting staff would

monitor the books and records of different subsidiaries to track whether an entity would be able

to show that it is in compliance with its various net worth covenants and governmental

---

[27] Exhibit PX-634 is an example of a spreadsheet that would be used to reflect these adjusted net worth determinations for HUD, Fannie Mae and specific states that required adjustments be made to the net worth statement, such as excluding from net worth receivables from affiliates.

[28] Exhibit PX-633 is a true and correct copy of an email that I sent to Filip Szymik of FTI Consulting on April 2, 2013 attaching a spreadsheet entitled "Debt Forgiveness Summary_2008-May 13 2012 with filters.xls", incorporating internal company data concerning historical debt forgiveness.  I sent this email on April 2, 2013, and it is in the same condition as when I sent it.  I am qualified to explain how the email and attachment were prepared and maintained.  The document is a record of an act or event, and it was made at or near the time of the act or event based on my own personal knowledge.  Making the record was a regular part of ResCap's business, and it was kept in the course of one of ResCap's regularly conducted business activities.

[29] See, e.g., Ex. PX-686, Email Chain re: Requesting EC approval for CE debt for equity, dated August 6, 2008; Ex. PX-689, ResCap Written Consent, dated September 21, 2009; Ex. PX-599, ResCap Written Consent, dated October 10, 2009; Ex. PX-602, Email from J. Young to J. Bazella re: RFC Debt Forgiveness, dated November 6, 2009; Ex. PX-695, RFC Written Consent, dated November 12, 2009; Ex. PX-635, GMAC Mortgage, LLC Written Consent, dated November 12, 2009; Ex. PX-692, Email from J. Bazella to B. Westman re: FWD: RFC debt forgiveness, dated December 11, 2009; Ex. PX-691, GMACM Unanimous Consents, dated December 30, 2009; Ex. PX-628, GMACM Written Consent, dated January 13, 2010; Ex. PX-690, ResCap Written Consent, dated December 31, 2009; Ex. PX-683, ResCap Written Consent, dated October 29, 2010; Ex. PX-693, Memo from J. Whitlinger re: Request for Action by Executive Committee of ResCap, dated November 2, 2011; Ex. PX-685, ResCap Certificate of Assistant Secretary re: Capital Contributions, dated December 10, 2012.

ny-1113706

requirements during future months.  When a net worth covenant or requirement would

potentially be triggered, the Accounting Operations and Compliance Group or other accounting

groups within the Debtors would notify senior management of ResCap, who would then

determine whether and to what extent intercompany payables or receivables should be forgiven

to maintain compliance with those net worth requirements.  Typically the matter would be

brought to the CFO and/or the Executive Committee of the Board of Directors, which would then

review and approve, as appropriate, the transaction.

46.     As a general matter, the Board of Directors of ResCap, RFC and/or GMACM

delegated to individual corporate officers or an executive committee the authority to allocate the

capital of the company and/or to effect debt forgiveness for an affiliate or subsidiary company in

order to replenish their respective capital.[30]  When I took over responsibility for the general

ledger teams, I prepared and distributed a procedure document outlining the process followed to

monitor solvency/net worth requirements for the various ResCap subsidiaries.[31]

47.     Working with FTI both pre-petition and post-petition, the Accounting Operations

and Compliance Group undertook a comprehensive review of debt forgiveness generally and of

the forgiveness of intercompany receivables and payables within the ResCap companies.  Based

on our review of the general ledger and other documentation, we identified instances of

forgiveness and tried to confirm the extent of the forgiveness and reasons why specific

transactions were performed.

---

[30] See Ex. PX-592, ResCap Delegation of Authority; see, e.g., Ex. PX-595, GMAC Written Consent in Lieu of Meeting of Board at 1;Ex. PX-594, RFC Written Consent in Lieu of Meeting of Board at 1.

[31] Exhibit PX-593 is a true and accurate copy of an email that I sent to Tammy Hamzehpour attaching this written procedure.  I sent this email on or about March 26, 2010, and it is in the same condition as when I sent it.  I am qualified to explain how the email and attachments were prepared and maintained.  The document is a record of an act or event, and it was made at or near the time of the act or event based on my own personal knowledge.  Making the record was a regular part of ResCap's business, and it was kept in the course of one of ResCap's regularly conducted business activities.


48.     *State and Regulatory Covenant Compliance.*  Intercompany balances were

historically forgiven to ensure that the Debtors remained in compliance with state regulatory and

licensing requirements and with certain federal regulatory requirements.[32]  For example, HUD

required the Debtors to maintain certain adjusted net worth and liquidity levels in order to

maintain FHA approval.[33]  As I have described, however, the calculation of adjusted net worth

used by HUD requires that certain "unacceptable assets" be subtracted from a company's net

worth, including intercompany receivables.  In addition to these federal requirements, a number

of states license mortgage brokers, mortgage servicers and/or mortgage companies require that

those licensees meet certain net worth requirements.  I understand that some states follow the

HUD procedure of subtracting out intercompany receivables as part of an adjusted net worth

calculation.  I also understand that Fannie Mae, Freddie Mac, and Ginnie Mae all have similar

net worth requirements.[34]

49.     As I have described, the accounting teams maintained a net worth workbook and

would calculate the net worth requirements for individual Debtors each month.[35]  The net worth

calculations were typically performed at month-end before closing.  If the general ledger team

projected that an entity could fall below the required net worth, the accounting teams would have

---

[32] See, e.g., PX-687, Memorandum from J. Young, dated June 3, 2009; PX-605, Memorandum from J. Young, dated June 25, 2009; PX-690, Written Consent of the Executive Committee of the Board of Directors of Residential Capital, LLC, dated January 28, 2010; see also Ex PX-691, AFI Unanimous Consent to Action at 1.  Exhibit PX-629, RFC Covenants Spreadsheet and Exhibit PX-627, GMAC Mortgage Covenant Spreadsheet, are true and correct copies of internal company spreadsheets outlining covenants applicable to RFC and GMACM, respectively.

[33] See, e.g., Ex. PX-601, Memo from B. Westman and C. Dondzila re: Regulatory Net Worth Compliance, dated July 28, 2010.

[34] See, e.g., Ex. PX-688, Memo from J. Young re: Request for Action by the ResCap Executive Committee, dated June 25, 2009.

[35] See Ex. PX-632 at 36 ("This tab [of the workbook] shows the current recommendations for debt forgiveness that should be completed").

31

notified the Controller about seeking the appropriate level of intercompany forgiveness in order

to restore the entity to its required net worth threshold.[36]

50.    *Financing Covenant Compliance.*  Intercompany balances were also monitored

and historically forgiven to ensure that the Debtors remained in compliance with the tangible net

worth covenants contained in their loan agreements.  The Debtors' lending agreements with AFI

contained the most stringent net worth covenants.[37]  Prior to December 31, 2009, these financing

agreements required solvency at all Debtor entities that were obligors under those agreements.

Post-2009, the agreements were amended to require that only ResCap maintain a minimum net

worth.  The Debtors' other financing agreements, including the Original JSN Indenture

Agreement, contained similar net worth covenants, as well as cross defaults to the AFI financing

agreements.[38]

51.    *Sale of Assets/Dissolution of Entity.*  Intercompany balances were historically

forgiven as a part of an asset sale or the dissolution of an entity.  For example, certain sale

agreements might contain language requiring the seller to ensure solvency.[39]  Alternatively,

intercompany balances were at times forgiven in connection with dissolving a ResCap affiliated

entity.

---

[36] Exhibit PX-690 is a Written Consent of the Executive Committee of the Board of Directors of ResCap, dated January 28, 2010, authorizing the injection of $20 million of capital into GMACM in the form of forgiveness of affiliate debt (through its direct parent ResHoldingl) and other, similar future injections of capital in order to maintain its state mortgage licenses and GSE approvals.  See also Ex PX-691 AFI Unanimous Consent to Action at 1, which attaches a Memo from James Young, ResCap CFO, to AFI Board of Directors, dated December 28, 2009, requesting debt forgiveness of RFC by ResCap to allow RFC to meet net worth requirements imposed by various regulatory bodies.  Id. at 10.

[37] See Ex. PX-5, the Original AFI Revolver Agreement; Ex. PX-6, the Amended and Restated Revolving Credit Facility Agreement; and Exhibit PX-9, the Amended and Restated Line of Credit Agreement.

[38] Exhibit PX-1 is a true and accurate copy of the Indenture dated June 6, 2008 among ResCap, the Guarantors, and U.S. Bank National Association as Trustee (the "Original JSN Indenture Agreement").

[39] See Ex PX-631, Share Sale Agreement §7.7 (Completion Cash) and at 6 (definition of Seller Liabilities).

52.      The way in which intercompany balances were forgiven might not be reflective of the way in which the original intercompany balances were created.  For example, an intercompany balance that was being forgiven would sometimes result from back to back cash management entries where, as described above, intercompany receivables and intercompany payables were created between multiple Debtor entities due to cash being sent down or up the corporate chain.  Said another way, the Debtors' books and records would reflect an intercompany payable and intercompany receivable from A to B and then from B to C—all in the same amount—reflecting a movement in cash from A to C.  However, at a later time, the particular intercompany balance forgiven could be the intercompany payable from C to B, if C was an entity that was the subject of a particular financial covenant or was risk of triggering a net worth requirement. Depending upon the circumstances, however, the intercompany payables and intercompany receivables as between A and B would remain on the books, as the forgiveness of the intercompany balances would not necessarily be rolled up through the entire corporate chain.

53.      AFI's Accounting Policies regarding debt forgiveness state that debt forgiveness by a parent to a subsidiary or between affiliates "should generally be recorded as a capital contribution unless there is commercial substance that indicates that it should be treated akin to a third party transaction and recorded through the income statement."[40]  In fact, forgiveness of intercompany balances was almost always recorded as a capital contribution rather than as a loss on the income statement.

54.      As I have also described, as part of the investigation that Accounting Operations and Compliance did in late 2011 and early 2012 to certify compliance with AFI's Accounting Policies, we noted that there were intercompany balances on the general ledger that were related to entities that had no current or future significant business activities.  (Ex. PX-604 at 6.)  Those

---

[40] See Ex. PX-694, AFI Accounting Policy 1075 at 10.

entities would either have no ability to generate the cash needed to repay the payable or did not

need cash on account of the receivable.  We concluded that "These intercompany balances are

dormant and no longer serve a business purpose.  These balances do not meet [AFI's] Policy

requirements as no settlement occurs . . . We will seek debt forgiveness on the balances in the

next quarter."  (Id.)  I have no reason to believe that those intercompany balances would not have

been forgiven by the end of the Second Quarter of 2012, but for the intervening filing of the

Petition in these cases.

55.      In addition, in early 2012 and as part of our regular review of intercompany

balances, our team identified several, additional intercompany balances on the general ledger that

had no remaining business purposes and, therefore, we determined that those balances should be

forgiven.  Gary Sonnenburg, who was a member of my accounting team, maintained an Excel

workbook listing the intercompany balances identified by the Accounting Operations and

Compliance Group for forgiveness by the end of the following quarter.  (Ex. PX-632 at 36).[41]

The third tab or worksheet in that workbook, entitled "Debt forgiveness entries", listed a number

of intercompany balances by "Entity" numbers, which corresponds to different individual

Debtors.  "This tab shows the current recommendations for debt forgiveness that should be

completed.  On the left side of the worksheet are the [entries] that can be completed through the

normal course of debt forgiveness."  (Id. at 36.)

56.      As set forth in Exhibit PX-632, four of the seven intercompany balances later

listed in Exhibit 6 to the Disclosure Statement were designated by the Accounting Operations

and Compliance group for forgiveness by the end of the Second Quarter, 2012, including (1) the

$1.252 billion intercompany balance between Homecomings and RFC; (2) the $697 million

---

[41] Exhibit PX-632 is the Excel workbook entitled "Copy of Intercompany Relationships 02-29-12 V2" maintained
by the Accounting Operations and Compliance group that reported to me.

34

intercompany balance between PATI and GMACM; (3) the $265 million intercompany balance between ETS and GMACM; and (4) the $232 million intercompany balance between RFC and RAHI.[42]  In addition, this workbook also listed for forgiveness the $54.6 million intercompany balance between ResHolding and Home Connects.  I have no reason to believe that those intercompany balances would not have been forgiven by the end of the Second Quarter of 2012, but for the intervening filing of the Petition in these cases.

57.    It is my understanding that the forgiveness of intercompany balances is permissible under the Debtors' financing documents.  For example, while the Original JSN Indenture prohibits certain affiliate transactions, it expressly excludes "transactions between or among the Company and/or its Subsidiaries" from the list of prohibited affiliate transactions.[43] To my knowledge, the Junior Secured Noteholders have never objected to, or in any other way disputed, the Debtors forgiveness of intercompany balances.

I declare under penalty of perjury that the foregoing is true and correct.  Executed the 12th day of November, 2013, at Minneapolis, Minnesota.



    /s/ Barbara Westman
    Barbara Westman

---

[42] Exhibit PX-632 reflected the amount of these intercompany balances as of the end of February and not the amounts as of the Petition Date shown on Exhibit 6 to the Disclosure Statement.

[43] See Ex. PX-1, Original JSN Indenture §§ 4.11(a), (b).

35