MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Charles L. Kerr
Darryl P. Rains
J. Alexander Lawrence

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**<u>DIRECT TESTIMONY OF THOMAS MARANO</u>**

I, Thomas Marano, under penalty of perjury, testify as follows:

## Summary of Testimony

1.      I currently serve as Chairman of the Board of Residential Capital, LLC

("ResCap", and, together with its debtor subsidiaries, the "Debtors"), having previously served

as its Chief Executive Officer until May 3, 2013.  As a result, I am familiar with the Debtors'

operations, financial condition, the process that culminated in the sale of ResCap's assets, and

these bankruptcy proceedings.  I submit this testimony on behalf of the Debtors in support of

confirmation of the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the*

*Official Committee of Unsecured Creditors*, as may be amended (the "Plan"),[1] filed in

connection with the above-captioned chapter 11 cases (the "Chapter 11 Cases").

2.      Extensive work prior to and during this bankruptcy made it possible to

accomplish the sale of a majority of the Debtors' assets, including in particular the Debtors'

mortgage servicing rights ("MSRs") and associated advances, for their ultimate value of

$4.5 billion.  This result would not have been possible without the Debtors' many months of

strategic planning and preparation for their eventual bankruptcy filing, which had to take into

account both the size and complexity of the Debtors' operations.  The Debtors, along with their

non-Debtor affiliates, were one of the largest mortgage servicers in the United States, with

approximately two million servicing accounts; in addition, the Debtors' operations were subject

to heightened government scrutiny and regulation because the Debtors were wholly owned by a

highly regulated entity.  The Debtors' extensive planning and preparation thus included, among

other things, obtaining debtor-in-possession ("DIP") financing, engaging in lengthy settlement

---

[1] See The Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of
Unsecured Creditors [Dkt. No. 4819-2], a true and correct copy of which is Exhibit PX-868.

1

discussions with a wide range of governmental agencies and constituencies, identifying viable

stalking horse bidders, procuring related and necessary concessions from Ally Financial Inc.

("AFI"), and reaching a settlement with two groups of institutional RMBS investors asserting

tens of billions of dollars of claims arising out of alleged representation and warranty breaches

related to the issuance and servicing of private-label residential mortgage backed securities

("RMBS"), to resolve the significant liability overhang associated with the assets.

3.     I believe that, without the continued operation of the Debtors' business and the

prosecution of these Chapter 11 Cases, the Debtors would have been substantially impaired in

their ability to, among other things:

a.   sell assets "free and clear" pursuant to Bankruptcy Code section 363;

b.   market assets as a whole or in combinations necessary to maximize value
     (e.g., servicing advances sold together with mortgage servicing rights);

c.   achieve consents and settlements required to close asset sales (with Fannie
     Mae, Freddie Mac, the Federal Housing Finance Agency ("FHFA" and,
     collectively, the "GSEs"), the Department of Justice ("DOJ") and state
     attorneys general, the Federal Reserve Board and others);

d.   continue to originate mortgage loans;

e.   perform under the DOJ/AG Settlement and Consent Order;[2]

f.   amend Pooling and Servicing Agreements;

g.   clear whole loan exceptions;

h.   avoid legal challenges to allocation of proceeds from RMBS trustees and
     government agencies, including approximately $1.4 billion in servicing
     advances that the RMBS trustees threatened to withhold; and

i.   obtain other benefits achieved by the Debtors, as discussed herein.

---

[2] The "DOJ/AG Settlement" refers to the settlement with the Department of Justice, the Department of Housing and Urban Development ("HUD"), and the attorneys general of 49 states, effective as of February 9, 2012.  Exhibit PX-669 is a true and correct copy of the DOJ/AG Settlement.  The "Consent Order" means the consent order settling the investigation by the Federal Reserve Board, which arose from the same general facts as the DOJ/AG Settlement.  Exhibit PX-603 is a true and correct copy of the Consent Order.

2

4.      The results described above were made possible by the pre- and post-petition support provided by AFI and the settling RMBS investors in accordance with the pre-petition Plan Sponsor Agreement (defined below), which in turn paved the way for the Plan.  As part of our bankruptcy strategy to maximize the value of the Debtors' assets by continuing our operations through a sale, the ResCap board sought to determine and resolve any claims ResCap and third parties may have against AFI in the context of a bankruptcy proceeding, and by doing so to obtain AFI's cooperation during the bankruptcy process.  Negotiations between ResCap's independent directors and representatives from AFI resulted in a settlement, under which AFI agreed to—and did—provide substantial monetary and non-monetary contributions to the Debtors.  Among other things, AFI (i) agreed to pay the Debtors $750 million, which was eventually increased to $2.1 billion as part of the Global Settlement in the Plan, (ii) provided the Debtors $200 million in additional DIP financing, (iii) provided the Debtors with a stalking horse bid (with no bid protections) for the held-for-sale loan portfolio, and (iv) continued to support the Debtors' business in bankruptcy and to provide the shared services the Debtors needed to run their business in a regulatory compliant manner.  I believe that entering into bankruptcy with AFI's support facilitated the Debtors' efforts to increase the value of their assets for sale and imparted significant benefits that inured to the benefit of the Debtors' estates.

5.      At the same time that we were negotiating with AFI, we were also working to resolve tens of billions of dollars of potential liability for representation and warranty and servicing claims arising out of our private-label RMBS.  The overhang of this litigation exposure had impeded the Debtors' sale efforts in the years before the Chapter 11 filing and, in my view, absent resolution, would have diminished the value the Debtors could have obtained in a Chapter 11 sale.  After extensive negotiations, the Debtors and two groups of RMBS investors, one

3

represented by, among others, Kathy Patrick of Gibbs & Bruns LLP, and the other represented

by, among others, Talcott Franklin of Talcott Franklin, P.C., reached a settlement resolving tens

of billions of dollars of claims that could have otherwise attached to, and decreased the value of,

the MSRs and associated advances (the "Mortgage Servicing Assets") for sale.  I believe that

resolving these RMBS claims, which allowed the Debtors to sell their assets free and clear of this

enormous potential liability and objection, would have been impossible without the extensive

efforts of the RMBS investors' representatives, and was crucial to maximizing the purchase price

of those assets.

6.      To facilitate the sale process, we also worked with a wide range of governmental

constituencies including the GSEs, Department of Housing and Urban Development, Federal

Reserve, DOJ, and attorneys general of 49 states.  I believe that obtaining government support

for continuing to originate the Home Affordable Refinance Program ("HARP") loans in

conjunction with AFI, who agreed to allow the Debtors to solicit all borrowers in the owned loan

portfolios of AFI and its affiliates for potential borrower relief including refinancing of those

loans under HARP, collecting HUD insurance, maintaining Ginnie Mae approved seller servicer

status and implementing both the DOJ/AG and Federal Reserve consumer relief was extremely

important in consummating a value-maximizing sale of the Debtors' assets, particularly as a loss

in confidence from the GSEs or the regulators could have meant a termination by them of

servicing or a cease and desist, either of which would have been a death knell to our business.

The GSEs made clear that they would take prompt action if we experienced either a moderate

uptick in delinquencies or a significant change in management.  We therefore maintained

hundreds of employees to ensure that delinquencies would not increase and thus diminish the

value of, and jeopardize the sale of, our MSRs and associated advances.

4

7.      Finally, we primed the auction process by generating interest to purchase the assets in the form of a stalking horse bid.  Prior to filing for bankruptcy, the Debtors' financial advisors contacted several potential stalking horse bidders and provided them with substantial due diligence across multiple states.  This effort led to competing, increased bids by the potential stalking horse bidders, and culminated with stalking horse bids from:  (i) Nationstar Mortgage ("Nationstar"), which was the proposed bidder for the Debtors' Mortgage Servicing Assets, including the mortgage servicing rights and associated advances belonging to Ginnie Mae; and (ii) AFI, which was the proposed bidder for the Debtors' held-for-sale loan portfolio.  In particular, AFI's agreement to serve as stalking horse bidder with minimal bid protections enabled the Debtors to target marketing of their assets to two distinct pools of potential bidders, thereby increasing interest in those assets while setting a baseline bid on favorable terms.

8.      Ultimately, Ocwen Loan Servicing, LLC ("Ocwen") and Walter Investment Management Corporation ("Walter") submitted a joint bid constituting the highest and best offer to separately purchase the Debtors' Mortgage Servicing Assets and two unique MSR portfolios for approximately $3 billion.  Berkshire Hathaway won the auction of the Debtors' held-for-sale loan portfolio with the highest and best offer of $1.5 billion.  Through our efforts to, among other things, maintain the support of AFI, the GSEs, and other governmental entities; continue to operate the businesses; and remove the overhang of billions of dollars of potential litigation exposure, we obtained value for all our creditors, including the junior secured noteholders ("JSNs"), that far exceeded what could have been realized as of the Petition Date, and outside of this bankruptcy process.

9.      Without the ability to achieve the results described above, the creditors would not have been able to realize the values achieved by the Debtors in either the stalking horse bids or

5

the ultimate sales.  Those sales, coupled with the post-petition support provided by AFI in

accordance with the pre-petition Plan Sponsor Agreement (defined below), in turn paved the way

for the Plan.

### Education and Experience

10.     I currently serve as Chairman of the Board of ResCap, having previously served

as its Chief Executive Officer until May 3, 2013.  As a result, I am familiar with the Debtors'

operations, financial condition, the process that culminated in the sale of ResCap's assets, and

these bankruptcy proceedings.

11.     I graduated from Columbia College in 1983, with a Bachelor of Arts degree in

history.  After graduation, I joined Bear Stearns, where I worked for twenty-five years.

12.     I held a number of positions at Bear Stearns.  Early in my career, I worked in the

equity syndicate area and the money market desk, where I traded what were known as "bankers

acceptances," worked with Bear Stearns' sales force, and assisted in brokering certificates of

deposits for savings and loans.  In 1985, I moved to the mortgage-backed security area.  As a

trader on the mortgage-backed security desk, I traded Fannie Mae, Ginnie Mae, and Freddie Mac

securities and focused on the creation and distribution of collateralized mortgage obligations

known as real estate mortgage investment conduits ("REMICs").

13.     In 1987, I primarily traded government-guaranteed mortgages and priced the first

Fannie Mae REMIC.  In the early 1990s, I began trading non-government guaranteed mortgages,

such as whole loans and asset-backed securities.  Starting in 1995, I managed a group of traders

who traded these types of products.  In the early 2000s, I began focusing less on the Fannie Mae

and Freddie Mac business and more on the non-agency business—commercial mortgages and

private-label securities.

6

14.     Over time, my role at Bear Stearns became increasingly managerial in nature, and I had a number of traders working under my supervision.  By 2006, I had supervisory authority over the trading desks for unsecuritized loans, private-label securities, commercial mortgages, commercial loans, and Fannie Mae, Freddie Mac, and Ginnie Mae trading.  I was also the Global Head of Mortgage and Asset-Backed Securities, responsible for the entire international mortgage-backed securities operation.

15.     I left Bear Stearns in April 2008 to work for Cerberus Capital Management ("Cerberus") as a Managing Director.  At Cerberus, I was responsible for all RMBS and commercial mortgage backed securities capital markets activity, and for advising on an equity investment in GMAC.  When several key directors and employees of GMAC resigned in the mortgage area, I was asked to become a non-executive chairman of GMAC.  I served in that role for approximately three to four months.

16.     In the summer of 2008, I was seconded by Cerberus to serve as the non-executive chairman of ResCap.  I continued in that capacity until the spring of 2009, when I left Cerberus altogether and became Chief Capital Markets Officer of AFI.

17.     In August 2009, I became the Chief Executive Officer of ResCap.  I served in this position until May 3, 2013.  In my role as ResCap's Chief Executive Officer, I was responsible for the overall leadership and management of the Debtors and their non-debtor subsidiaries.

18.     Today, I continue to serve on ResCap's board as an independent director.  I first became a member of ResCap's board in 2008, and served as its non-executive chairman until August 2009.  At that time, I became the Chairman of the board, a position that I continue to hold.  In my role as Chief Executive Officer and board member, I have been integrally involved in these bankruptcy proceedings.

7

### ResCap's Principal Assets and the Prepetition Operation of ResCap's Business

19.     The Debtors' principal assets on the Petition Date consisted of its MSRs and

associated advances, held-for-sale ("HFS") mortgage loans, held-for-investment ("HFI")

mortgage loans, claims with respect to government-insured loans (included within the Debtors'

accounts receivable), and derivative assets.  The principal activities of the Debtors' mortgage

loan origination and servicing business included:  (i) brokering, originating, purchasing, selling,

and securitizing residential mortgage loans throughout the United States for ResCap and its

affiliate, Ally Bank; and (ii) servicing residential mortgage loans throughout the United States

for ResCap, Ally Bank, and other investors in residential mortgage loans and in RMBS.  By the

Petition Date, the Debtors originated loans only for Ally Bank, and acted primarily as broker

with Ally Bank actually funding the loans.

20.     Since 2008, the Debtors' primary source of ongoing revenue had been mortgage

loan servicing, including the ability to refinance certain of the loans they serviced.  The Debtors

held MSRs that consisted of primary or master servicing rights.  In addition, the Debtors sub-

serviced loans for a fee.  As a primary servicer, the Debtors, among other things, collected and

remitted mortgage loan payments, responded to inquiries from borrowers, accounted for and

applied principal and interest, held custodial and escrow funds for payment of property taxes and

insurance premiums, provided ancillary products, counseled or otherwise worked with

delinquent borrowers, supervised foreclosures and property dispositions, made advances of

required principal, interest, and certain "property protection" costs with respect to delinquent and

defaulted mortgage loans and the real estate that the trust or owner acquired as a result of a

foreclosure of the loan (the "Advances"), and generally administered the loans consistent with

their contractual undertakings and business practices.  In addition, with respect to certain of the

ny-1112584

loans they serviced, the Debtors were able to offer refinancing and then sell the newly originated loans into the market at a profit.

21.     When a Debtor acted as a master servicer, it collected mortgage payments from primary servicers or sub-servicers and distributed those funds to investors and to other transaction parties in RMBS and whole-loan packages.  As a sub-servicer (where another party owned the MSR), a Debtor performed functions similar to the primary servicing functions described above pursuant to contractual arrangements, receiving a fee based on the unpaid principal balance of the mortgage pool, or in some cases, for each loan serviced.  In addition, the Debtors received other remuneration for loan servicing, including interest earned on custodial accounts where mortgage payments are held pending remittance to investors, as well as borrower-contracted fees, such as late charge fees, assignment transfer fees, and other incidental fees and charges.

### ResCap Faced Increasing Liquidity Issues and Potential Liabilities, Ultimately Resulting in a Decision by the Board to File for Chapter 11 Bankruptcy

22.     Throughout my tenure at ResCap, the company faced frequent capital issues due in part to capital markets volatility, challenges in the residential mortgage markets, and changes in the overall economy, most particularly in the mortgage industry.  The company's capital and liquidity issues were of great concern and were the regular subject of board discussion.

23.     In 2010, with the help of Goldman Sachs and Citibank, the Debtors attempted to sell their servicing and origination assets.  Unfortunately, this effort was unsuccessful because bidders were unwilling to assume the Debtors' contingent liabilities—significant RMBS related litigation risks—or contribute the required capital into the company.  Cerberus also looked into a spin-off which floundered for similar reasons.

9

24.     On August 12, 2011, at the direction of the board, I wrote to Michael Carpenter,

AFI's Chief Executive Officer, to apprise him of the current situation surrounding ResCap's net

worth and liquidity.[3]  In that letter, I reminded Mr. Carpenter that ResCap was experiencing

unprecedented volatility in the markets, as well as unprecedented lows in interest rates.

I explained that ResCap's funding facilities contain covenants requiring the company to maintain

a tangible net worth of not less than $250 million, as compared to the company's then-current net

worth of $436 million.  I noted that, if there was no relief from the volatility and if other

contingencies occurred, there was a real likelihood that ResCap would breach its net worth

covenant and incur an event of default under its funding facilities.  Those defaults would have a

domino effect over ResCap's contracts with the GSEs and other investors and trading

counterparties, and could trigger cross-default provisions on ResCap's outstanding public bonds.

The ResCap board agreed that, if that were to happen, ResCap would likely be forced to file for

bankruptcy protection to preserve what little asset value might remain for ResCap's creditors.

Against this backdrop, I requested that AFI promptly consider providing an assurance of

sufficient equity to ResCap so it would not violate its net worth covenants.

25.     After receiving this letter, AFI agreed to provide the necessary capital to avoid a

breach of any net worth covenant.  The ResCap board became increasingly concerned, however,

that AFI support would not continue and that a potential bankruptcy was looming.

---

[3] Exhibit PX-163 is a true and accurate copy of an email from Mr. Whitlinger to James Mackey on August 15, 2011, attaching, Exhibit PX-164, my August 12, 2011 letter to Michael Carpenter.  I sent this letter on or about August 12, 2011, and it is in the same condition as when I sent it.  I am qualified to explain how the letter was prepared and maintained.  The letter is a record of an act or event, and it was made at or near the time of the act or event based on my own personal knowledge.  Making the letter was a regular part of ResCap's business, and the letter was kept in the course of one of ResCap's regularly conducted business activities.

ny-1112584

### ResCap's Efforts to Restructure Its Business

26.     In the fall and early winter of 2011, ResCap's management put together a team, which included outside legal counsel, investment bankers, and other advisors, to explore various strategic alternatives for restructuring the company.  ResCap referred to this effort as "Project Bounce."  Over the course of several months, this team considered four principal options for the company:  (i) a sale of the company's assets in a Chapter 11 proceeding supported by DIP financing; (ii) maintaining the status quo; (iii) a renewed sale process outside of bankruptcy; or (iv) an out-of-court transaction or spin-off.

27.     Upon review, the company determined that the status quo, a renewed sales process outside of bankruptcy, and an out-of-court transaction or spin-off were unfavorable or unachievable options.  First, maintaining the status quo would have required a significant capital infusion into ResCap, which we did not believe we could obtain given market and ResCap financial conditions.  Moreover, a "do-nothing" approach would have allowed the multi-billion dollar litigation overhang and cost of capital to continue to place pressure on ResCap's mortgage loan origination and servicing business.  Second, an out-of-bankruptcy sales process did not present a viable option as demonstrated by recent marketing efforts which had failed to generate acceptable bids—in large part because of the contingent liabilities hanging over ResCap's business.  Third, an out-of-court transaction involving a new money investment, consummated through a "spin-off" of certain assets into a "NewCo," would have entailed significant execution risk.  In addition, this option would have required a third party to make a large capital infusion into ResCap and assume ResCap's billions of dollars of debt obligations and contingent liabilities.  In sum, it became clear that the best and only strategic alternative for the benefit of our creditors would be a sale of the company's assets in a chapter 11 proceeding supported by DIP financing and removal of litigation overhangs.

11

### ResCap Decides to Pursue an Asset Sale through Chapter 11

28.     The decision to proceed with an orderly sale of assets in the context of a
bankruptcy proceeding placed ResCap in the unique position of attempting to market, auction,
and ultimately consummate the sale of the Debtors' principal assets through Chapter 11 while at
the same time preserving the Debtors' business while in bankruptcy.  The board determined that,
by doing this, it would be able to maximize the value of the assets to the benefit of ResCap and
its creditors.

29.     I was not aware of any other company that had successfully placed itself into a
Chapter 11 proceeding while being able to operate its mortgage servicing or origination business,
particularly not in the context of an asset sale, the value of which hinged upon many months of
successful day-to-day operations both pre- and post-sale.  ResCap needed a sufficient time after
the auction date to complete the contractual obligations that would permit ResCap to transfer the
assets at their enhanced value.  To achieve this, ResCap needed sufficient financial and
operational support from AFI to be able to continue operations for at least a year.

30.     I therefore understood that the keys to any successful assets sale for ResCap
would be:  (i) obtaining DIP financing, which could get us the working capital we needed to
preserve the value of our assets; (ii) getting a stalking horse bid, which would give the company
some certainty as to whether someone would potentially buy the company's principal assets;
(iii) continuing to work with the GSEs and regulators to maintain our valuable GSE MSRs and
pave the way for the sale; (iv) reaching a settlement of potential claims against AFI to obtain
AFI's continuing support for the business, including DIP financing as well as origination and
shared services support; and (v) resolving tens of billions of dollars of RMBS representation and
warranty and servicing claims that had been, or may be, asserted against the business, and had
previously made marketing the business impossible.  A successful sale would require us to

12

assure bidders that the legacy representation and warranty claims would not "attach" to the assets being sold and that the RMBS Trustees and institutional investors would not impose legal challenges to the sale.

31.      I believed that these efforts would preserve and enhance the value of the assets and avoid a "free fall" Chapter 11—which would have seriously degraded the business and would have limited, if not eradicated, the value of our assets for sale.

### ResCap Obtains DIP Financing and Agreement from the JSNs and AFI Regarding the Use of Cash Collateral

32.      To maximize the Debtors' estates, the Debtors needed cash to preserve the value of the business pending the assets sales.  Importantly, the Debtors needed post-petition financing and authorization to use the cash collateral securing the existing debt facilities to continue operating the Debtors' business and maintain the value of the Debtors' assets.

33.      Specifically, the Debtors needed cash to continue funding day-to-day business operations such as, for example:  (i) continuing to issue loans and offer loan modifications to thousands of borrowers; (ii) continuing to service mortgages and make advances associated with such servicing obligations; (iii) complying with the Federal Reserve and FDIC consent order; (iv) complying with the settlement agreement between Debtors and the DOJ, the HUD, and attorneys general of 49 states; (v) complying with the agreements that had been entered into with the GSEs mandating the care with which their loans should be serviced and refinanced, and repurchasing loans from the GSEs; and (vi) maintaining hundreds of employees through retentions so that delinquencies would not increase and thus diminish the value of, and jeopardize the sale of, our MSRs and other assets.

34.      Most significantly, the Debtors needed to continue funding the Debtors' servicing advance obligations for the private label, RMBS and GSE loans.  The GSEs or RMBS Trustees

13

could otherwise pull their MSRs, thereby destroying the value of the MSRs and significantly

compromising the collectability of the related advances.  It is important to understand that the

Debtors' servicing rights with respect to GSE loans were actually owned by the GSEs.  Thus, if

the Debtors failed to make the requisite advances, the GSEs could have revoked the Debtors'

servicing rights, and re-assigned those rights to another company—as part of which the GSEs

would have assigned a below-market value to the servicing rights—negatively impacting the

MSRs by hundreds of millions if not a billion dollars, and causing a significant loss to the

estates.  The GSEs made clear that they would take prompt action if the Debtors experienced

either a moderate uptick in delinquencies or a significant change in management.  In particular,

the GSE repeatedly reminded ResCap that the GSEs owned the MSRs, assigned additional GSE

staff to monitor ResCap, and claimed to have created "mirror" copies of the Debtors' tapes, so

that immediate action could be taken if the GSEs deemed it necessary.

35.    I relied on both Jim Whitlinger, Chief Financial Officer of ResCap, and our

Treasury group to develop a plan based on our experience running the business that had a large

enough DIP financing along with authorization to use cash collateral sufficient to fund the entire

business through the sale.  I also directed Mr. Whitlinger and our financial advisors at

Centerview Partners LLC ("Centerview") and FTI Consulting, Inc. ("FTI") to help the Debtors

obtain both financing from a third party and use of cash collateral from our existing lenders.

36.    The Debtors were ultimately able to obtain a DIP facility from Barclays and AFI,

and consensual use of cash collateral from their lenders, including the JSNs.  The bulk of the DIP

financing was provided by Barclays under a facility comprised of revolving and term loans with

a total commitment of $1.45 billion.  The need for the AFI DIP facility arose as the Petition Date

approached and the Debtors determined that the Barclays DIP facility would be insufficient to

cover the Debtors' second largest expense—repurchases of certain whole loans that were sold

into securitization trusts guaranteed by Ginnie Mae ("Ginnie Buybacks").  These repurchases

were funded prior to the Petition Date under the AFI LOC.[4]  Because the Ginnie Buybacks and

the receivables they created were collateral under the AFI LOC, they could not be pledged to a

third party lender on a first lien basis, and the Debtors did not believe that a third party lender

would be willing to provide replacement financing for those obligations on a second lien basis.

Furthermore, the documentation supporting the Ginnie Mae loans was generally viewed as

deficient, such that previous attempts to use those loans as collateral had been rejected by third

party lenders.  As a result, AFI's continued funding of the Ginnie Buybacks postpetition was

critical.  Without the AFI DIP facility, the Debtors would have been unable to effectuate

buybacks required by Ginnie Mae, which would have impaired the value of the Ginnie Mae

assets (MSR and advances), and potentially led to Ginnie Mae sweeping $94 million of restricted

cash the Debtors were required to post to compensate for any losses resulting from the Debtors'

actions.

37.    Accordingly, on May 14, 2012, the Debtors filed motions seeking authorization to

(i) enter the Barclays DIP Facility; (ii) make post-petition draws under the AFI LOC in an

amount up to $200 million; and (iii) use cash collateral under the AFI LOC, Revolver, and Junior

Secured Notes.[5]  The motions were approved on an interim basis on May 15, 2012,[6] and were

---

[4] The "AFI LOC" means that certain $1.1 billion amended and restated secured loan agreement, dated as of December 30, 2009, as amended, by and among Debtors RFC and GMAC Mortgage, LLC ("GMACM") and certain of the other Debtors, as borrowers, ResCap, and certain other Debtors, as a guarantor, and AFI, as agent and lender. Exhibit PX-9 is a true and correct copy of the AFI LOC.

[5] See Motion to Approve Debtor in Possession Financing / Debtors Motion For Interim And Final Orders Pursuant To 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e) And Bankruptcy Rules 4001 And 6004 (I) Authorizing The Debtors To (A) Enter Into And Perform Under Receivables Purchase Agreements And Mortgage Loan Purchase And Contribution Agreements Relating To Initial Receivables And Mortgage Loans And Receivables Pooling Agreements Relating To Additional Receivables, And (B) Obtaining Postpetition Financing On A Secured, Superpriority Basis, (II) Scheduling A Final Hearing Pursuant To Bankruptcy

approved on June 25, 2012.[7]

### The First AFI Settlement as One Key to a Successful Auction

38.        As I mentioned above, from August 2011 through the spring of 2012, the ResCap

board sought to determine and resolve any claims ResCap and third parties may have against

AFI in the context of a bankruptcy proceeding, to bring money into the estate and obtain AFI's

cooperation with origination and other support.  Accordingly, the board added two additional

independent directors, John Mack and Jonathan Ilany, who did not have any prior association

with any earlier AFI-ResCap transaction, to spearhead such negotiations.  Mr. Mack and

Mr. Ilany formed the Special Review Committee, whose charge was to investigate potential

claims arising from ResCap's historic course of dealing and interrelationships with AFI and its

affiliates.

39.        After extensive review and analysis by our legal advisors, and negotiations

between the advisors, the Special Review Committee, and AFI representatives, ResCap was able

to reach a settlement with AFI in the spring of 2012 (the "First AFI Settlement").  We

memorialized the First AFI Settlement in a Plan Sponsor Agreement that the ResCap board

---

Rules 4001(b) and 4001(c), And (III) Granting Related Relief filed by Lorenzo Marinuzzi on behalf of Residential Capital, LLC [Dkt. No. 13], a true and correct copy of which is Exhibit PX-88.

[6] See May 15, 2012 Amended Interim Order Under Bankruptcy Code Sections 105(a), 345, 363, 364, and 503(b)(1) and Bankruptcy Rules 6003 and 6004 Authorizing (I) Continued Use of Existing Cash Management Services and Practices, (II) Continued Use of Existing Bank Accounts, Checks, and Business Forms, (IV) Interim Waiver of the Investment and Deposit Requirements of Bankruptcy Code Section 345, (V) Debtors to Honor Specified Outstanding Prepetition Payment Obligations, (VI) Continuation of Intercompany Transactions, Including Intercompany Transactions with Future Debtors, Granting Administrative Expense Status To Intercompany Claims, and Scheduling a Final Hearing on the Relief Requested [Dkt. No. 82], a true and correct copy of which is Exhibit PX-364.

[7] See Final Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral, and (III) Granting Adequate Protection to Adequate Protection Parties. [Dkt. No. 491], a true and correct copy of which is Exhibit PX-76.

approved on May 13, 2012,[8] which was subsequently executed and filed with the Court on the

Petition Date.[9]

40.      Under the terms of the First AFI Settlement, AFI agreed to make substantial

monetary and non-monetary contributions to support the Debtors leading up to and during their

Chapter 11 Cases.  Those contributions included the following:  (i) making a cash contribution to

the Debtors of $750 million, which was eventually increased to $2.1 billion as part of the Global

Settlement in the Plan; (ii) providing $200 million in additional DIP financing, which was

necessary to fund the Debtors' second biggest category of expenses and was unavailable from

third parties; (iii) agreeing to allow the Debtors to use AFI's cash collateral; (iv) providing a

stalking horse bid (with no bid protections) for the held-for-sale loan portfolio, which set a high

floor for bidding with favorable terms, provided regulators with reassurance that the asset sales

would be completed quickly and efficiently, and enabled the Debtors to conduct separate

auctions their held-for-sale portfolio and servicing and origination platform, thereby allowing the

Debtors to target their marketing efforts to corresponding, and strategically different, interested

bidders; (v) entering into a shared services agreement that provided the Debtors with operational

support they needed to run their business in a regulatory compliant manner; (vi) agreeing to

negotiate (and, ultimately entering into) a transition services agreement with the purchaser of the

Debtors' assets, which further enhanced the sale process and provided the Debtors with

operational support and cooperation needed to efficiently close the asset sales; (vii) honoring in

---

[8] Exhibit PX-65 is a true and accurate copy of the May 13, 2012 ResCap board of directors meeting minutes.  The exhibit is in the same condition as when I received it.  I am qualified to explain how the exhibit was prepared and maintained.  The exhibit is a record of an act or event of which I have personal knowledge, and it was made at or near the time of that act or event.  Making the exhibit was a regular part of ResCap's business, and the exhibit was kept in the course of one of ResCap's regularly conducted business activities.

[9] See Exhibit 8 to the May 14, 2012 Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings [Dkt. No. 6], a true and correct copy of which is Exhibit PX-137, at 123-434.

the ordinary course of business obligations under the employee retirement plan for employees of

the Debtors; (viii) supporting the Debtors' origination operations through the closing of the asset

sales by allowing the Debtors to continue originating loans on AFI's books post-petition, thereby

generating additional MSRs (and related servicing fees) that were retained by the Debtors. See

First AFI Settlement at §§ 2.1(a)-(h) (Ex. PX-137 at 129-130). AFI also agreed to allow the

Debtors to continue servicing Ally Bank's loan portfolio, which represented approximately 30%

of the loans serviced by the Debtors and accounted for approximately 10% of all the Debtors'

servicing related income.

41.    The First AFI Settlement and Plan Sponsor Agreement also provided for the

automatic termination of the agreement if the Bankruptcy Court did not approve a chapter 11

plan on or before October 31, 2012. See id, at Ex. A, ¶ 12 (Ex. PX-137 at 146). AFI and the

Debtors agreed to monthly temporary waivers of this automatic termination through February 28,

2013. This allowed the Debtors to immediately reap the benefits of origination, shared services

and other support, while allowing for additional settlement negotiations, ultimately resulting in

the Debtors' higher $2.1 billion settlement with AFI.

42.    The First AFI Settlement was thus key to the Debtors' Chapter 11 sale strategy.

In addition to the infusion of cash that the Debtors could use to negotiate settlements with other

creditors, as I will discuss below, the origination and shared services support allowed the Debtors

to continue to originate and service loans in bankruptcy, and maximized the value of the assets

the Debtors were trying to sell.

**The RMBS Trust Settlement as Another Key to a Successful Auction**

43.    At the same time that we were negotiating with AFI, we were also working to

resolve approximately $44 billion of potential liability for representation and warranty and

servicing claims arising out of our private-label RMBS. I believed that resolving these private-

18

label securities claims was crucial to enhancing the value of the Debtors' business for a potential

sale.  The overhang of this litigation exposure had impeded our sale efforts in the years before

the bankruptcy filing and, in my view, would have greatly diminished the value we could have

obtained in a bankruptcy sale.  I believed that the only way to maximize the purchase price of the

assets was to sell the business unencumbered by billions of dollars of claims, and without the

RMBS Trustees asserting during the auction process that the assets could not be sold free and

clear of their interests.

44.     Furthermore, we understood that the RMBS Trustees would likely assert the right

to withhold servicing advances owed to the Debtors as an offset against origination and servicing

liabilities allegedly owed to them.  The Debtors estimated that the RMBS Trustees could

withhold approximately $1.4 billion in servicing advances.  Losing that source of capital would

have undermined ResCap's efforts to maximize the value of its assets for sale.

45.     ResCap reached a settlement in May 2012 with institutional investors holding a

substantial stake in the RMBS trusts following extensive negotiations with representatives of

those investors, who were led by Kathy Patrick and Talcott Franklin.  ResCap's board approved

the agreement at its May 13, 2012, board meeting, and the agreement remained subject to

bankruptcy court approval.  At this meeting, I explained that seeking relief under the provisions

of Chapter 11 of the Bankruptcy Code presented the best opportunity for preserving and

maximizing the value of the Debtors' assets for the benefit of ResCap, its subsidiaries, creditors,

employees, and stakeholders.[10]

46.     Under the terms of the RMBS settlement, the Debtors negotiated a settlement of

the $44 billion of potential representation and warranty and servicing claims that clouded the

---

[10] Exhibit PX-65 is a true and correct copy of the May 13, 2012 ResCap board of directors meeting minutes.

ny-1112584

estates. This critically enhanced the value of the assets that were sold as part of the Debtors'

chapter 11 proceeding. Importantly, it created the likelihood that the institutional investors and

RMBS Trustees would not assert a legal challenge to the sale.

47.     Another benefit of the RMBS settlement to the estate and to the Debtors' creditors

was the limitation on cure claims. The original RMBS settlement provided for releases of certain

claims by trusts that opted to participate in the settlement. The released claims extended to

claims (including cure claims) relating to the origination, sale, and servicing of mortgage loans

held by the trusts.

48.     When it became clear that the sale of the Debtors' servicing assets would occur

before final approval of the RMBS settlement, the Debtors negotiated with the Creditors'

Committee, the investors, and the RMBS trustees and reached an agreement that generally

deferred cure claims and allowed for a clean sale of the Mortgage Servicing Assets even though

the release contemplated by the RMBS settlement was not yet in effect. The crucial agreement

was included, by stipulation, in the Revised Scheduling Order entered by the Court on July 31,

2012.[11]

49.     The considerable work the Debtors did up to and in bankruptcy surrounding the

RMBS settlement facilitated the successful sale of the Debtors' servicing assets and advances to

Ocwen. In my view, the purchase price paid by Ocwen was far higher than anyone would have

paid if faced with the prospect of a contested hearing, objections from the RMBS trustees, and

the possibility of contested origination-related and servicing-related liabilities.

---

[11] See Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding (I) Debtor's Motion
Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements and (II) the RMBS
Trustees' Limited Objection to the Sale Motion [Dkt. No. 945], a true and correct copy of which is Exhibit PX-43.

**The Auction Process**

50.     Between October 2011 and January 2012, ResCap and its advisors, led by

Centerview, began extensive preparations for a potential auction of the Debtors' assets.

**A.      ResCap Engages in Communications with Governmental Constituencies**

51.     As part of the auction process, the Debtors and their advisors spent substantial

time with the government agencies with which the Debtors conduct business, including but not

limited to the GSEs, concerning the proposed sale transaction and plans for maintaining the

Debtors' origination and servicing operations as a going concern until closing of the final sale to

the successful bidder to preserve the value of the MSRs and associated advances.  To garner the

support of such organizations and convince them that the Debtors could sell the assets without

damaging the MSRs and associated advances, the Debtors and their advisors engaged in constant

communications, consisting of multiple weekly update strategy calls with certain GSEs and

frequent update calls with other government related organizations, in-person management

presentations and substantive discussions.

52.     Through these regular contacts, the Debtors convinced the GSEs that the Debtors

could sell the assets without damaging the MSRs and associated advances.  If the GSEs had

concluded that ResCap could not operate or credibly pursue an orderly sale of the Mortgage

Servicing Assets, and that the GSE-related assets might therefore be subject to liquidation, the

GSEs would raise the cost of doing business and seize their assets.  Indeed, in virtually all other

cases where a mortgage servicer had filed for bankruptcy without continuing to operate or

conducting an orderly sale process, the GSEs had tried to seize their collateral after filing.  Thus,

by obtaining financing, use of cash, continuity of management through the end of sale, and a

stalking horse bidder, the Debtors reassured the GSEs that a process was in place, and that the

Debtors' business would continue to function as usual pending an orderly sale of their assets.

Also, by showing the market that ResCap was working with the GSEs and continuing to operate in bankruptcy, we encouraged the bidding process and motivated our staff to work diligently to prevent an increase in delinquencies.

53.     The Debtors also conducted extensive discussions with regulators and other governmental authorities, including the DOJ, the attorneys general of 49 states, and the Federal Reserve Board, concerning their continued compliance with both settlements and a consent order arising out of the foreclosure investigations.  Support of these governmental entities was also essential to consummate a value-maximizing sale of Debtors' assets.  Obtaining that support required the Debtors to conduct constant communications with each of these governmental constituencies, to convince them that a sale could be consummated without disrupting compliance with both the settlement and the consent order.  AFI further facilitated these conversations with governmental authorities by, among other things, permitting the Debtors to solicit borrowers in the owned loan portfolios of AFI and its affiliates for potential borrower relief including refinancing of those loans under HARP, which allowed the Debtors to remain in compliance with the DOJ settlement requirements.

**B.      ResCap Obtains Stalking Horse Bids**

54.     In addition to working with the numerous governmental constituencies, the Debtors and their professionals also sought to generate interest to purchase the assets in the form of a stalking horse bidder.  This was, in essence, the beginning of the auction process because obtaining a stalking horse was critical to facilitating a competitive bidding process and enhancing the value of the Debtors' assets.  Moreover, a DIP on terms as favorable as the ones we were able to achieve would not have been possible without a stalking horse bid because any DIP lender would have wanted the debtors to have an exit strategy in place to ensure repayment in a timely manner.

55.     As part of this process, the Debtors and their professionals contacted Nationstar, Ocwen, and other potentially interested parties.

56.     As a result of the stalking horse process, on the Petition Date, the Debtors filed two stalking horse bids with the Bankruptcy Court.[12]  The first was with Nationstar, which proposed a $2.3 billion stalking horse bid for the Debtors' mortgage servicing rights and related advances.  The second was with AFI, which was the proposed bidder for the Debtors' held-for-sale loan portfolio.

57.     Furthermore, as a result of the stalking horse process, the Debtors were able to improve Nationstar's initial indication of interest from a bid of approximately $2.6 billion to aggregate bids totaling close to $4 billion through both an increase in the purchase price for specific assets and an expansion of the assets being purchased.  The Debtors' stalking horse process also enhanced the ultimate sale process in other ways as well.  The Debtors' development of the AFI stalking horse bid increased the flexibility of the marketing process and expanded the range of potential bidders for estate assets.  Without AFI's bid, the Debtors would have been required to include their held-for-sale loan portfolio in the Nationstar stalking horse bid.  And without Nationstar's consent to any kind of alternative bidding structure, competing bidders would have been required to purchase both the mortgage loan origination and servicing business as well as the held-for-sale loan portfolio in a single transaction.  As a result, AFI's stalking horse bid allowed the Debtors to market two very different pools of assets with

---

[12] See Exhibit 3 to Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 for Orders:  (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief [Dkt. No. 61], a true and correct copy of which is Exhibit PX-61.

ny-1112584

corresponding, different interested bidders.  This separation enabled competing bidders, like

Ocwen, to bid without having to partner with other bidding groups in order to put forth a

qualified bid.  The AFI stalking horse bid provided a platform on which the Debtors could—and

did—obtain a $1.5 billion purchase price for the held-for-sale loan portfolio with minimal due

diligence outs, which was unheard of.  The Debtors wisely recognized that, because the loans

had been held-for-investment loans on AFI's books prior to having been contributed to ResCap

as capital, AFI would submit a strong bid with minimal representation and warranty and due

diligence outs.  By isolating these assets with a strong stalking horse bid, we were able to entice

Berkshire to bid on these assets.

58.    With respect to an acquisition of the Debtors' mortgage loan origination and

servicing platform, the bids made clear that bidders were primarily interested in acquiring the

Debtors' MSRs and the associated advances.  These parties' interest in the MSRs and associated

advances was driven by the fact that substantially all of the value associated with the Debtors'

platforms was determined by the cash flows generated by the MSRs.  Essentially, the way the

Debtors' business was operated, the MSRs generated all of the value.

## C.    ResCap's Efforts Result in a Successful Auction

59.    In accordance with the Court's order approving the Debtors' asset sale

procedures,[13] the Debtors conducted the auctions from October 23 through October 25, 2012.

The auction for the Mortgage Servicing Assets was held from October 23 through October 24,

2012.  Two bidders, Nationstar and Ocwen, submitted offers for these assets.  Although Ocwen

---

[13] See Order Under 11 U.S.C. §§ 105, 363(b) and 365 (I) Authorizing and Approving Sale Procedures, Including
Payment of Break-Up Fees; (II) Scheduling Bid Deadline, Auction (if Necessary) and Sale Hearing;
(III) Establishing Assumption and Assignment Procedures, Including Procedures for Fixing Cure Amounts; and
(IV) Establishing Notice Procedures and Approving Forms of Notice [Dkt. No. 538], a true and correct copy of
which is Exhibit PX-44.

was a bidder of record, the Ocwen APA provided for the assignment of the Debtors' Fannie Mae

MSR assets to Walter, with which Ocwen had a Joint Bidding Agreement.

60.    During the bid process, Ocwen, the eventual winner, focused its efforts on

purchasing ResCap's non-Fannie Mae MSRs and associated servicing advances, and its co-

bidder Walter focused its efforts on purchasing ResCap's Fannie Mae MSRs and associated

servicing advances.[14]  Although the Debtors included their servicing and originations platforms

in the pool of marketed and auctioned assets, Ocwen expressed no interest in acquiring them.

Ocwen already had its own servicing platform.  Thus, acquiring ResCap's platform would

require the assumption of significant liabilities associated with the platform's staff, IT contracts,

real property leases, and other items without providing Ocwen any material benefit.  In fact, the

Debtors had sought to sell these platforms in part to divest these liabilities—estimated at

approximately $100 million—from the estates, and provide continued employment for our

staff.[15]  Similarly, Walter primarily expressed interest in purchasing ResCap's Fannie Mae MSRs

and associated servicing advances.  Like Ocwen, Walter already had its own servicing and

originations platforms and by acquiring the platforms, would incur similar overhead costs.

---

[14] Exhibit PX-48 is a true and accurate of an email I received from Karn Chopra to me on October 20, 2012, attaching the October 19, 2012 Ocwen Bid Proposal.  The exhibit was sent to me, John Mack, Jonathan Ilany, Pamela West, Steve Abreu, Ted Smith, and Jim Whitlinger.  I received the exhibit on or about October 20, 2012, and it is in the same condition as when I received it.  I have personal knowledge of the exhibit and am qualified to explain how it was maintained.  The exhibit is a record of an act or event, and it was made at or near the time of the act or event based on my own personal knowledge.  Making the exhibit was a regular part of ResCap's business, and the proposal was kept in the course of one of ResCap's regularly conducted business activities.

[15] Exhibit PX-66 is a true and accurate copy of the October 22, 2012 ResCap board of directors meeting minutes.  The exhibit is in the same condition as when I received it.  I am qualified to explain how the exhibit was prepared and maintained.  The exhibit is a record of an act or event of which I have personal knowledge, and it was made at or near the time of that act or event.  Making the exhibit was a regular part of ResCap's business, and the exhibit was kept in the course of one of ResCap's regularly conducted business activities.

Exhibit PX-49 is a true and accurate copy of the October 22, 2012 ResCap board of directors meeting agenda and corresponding materials.  The exhibit is in the same condition as when I received it.  I am qualified to explain how the exhibit was prepared and maintained.  The exhibit is a record of an act or event of which I have personal knowledge, and it was made at or near the time of that act or event.  Making the exhibit was a regular part of ResCap's business, and the exhibit was kept in the course of one of ResCap's regularly conducted business activities.

Ocwen and Walter's initial bid, like Nationstar's bid, did not contractually obligate them to acquire the employees and contracts necessary to operate the platforms, which was critical to preserving the value of the MSRs and complying with regulatory requirements before the close of the sales.  And even Berkshire, which expressed initial interest in the platforms because it did not have its own platforms, eventually chose not to bid.

61.     After 28 rounds of bidding, Ocwen made the highest and best offer to purchase the Mortgage Servicing Assets, for itself and Walter, with a winning purchase price of approximately $3 billion.  Walter coordinated with the Debtors and Ocwen to enter into an ancillary agreement whereby Ocwen assigned to Walter the Fannie Mae MSR assets, while Owcen retained the Freddie Mac, Ginnie Mae and private MSR assets.  These assets primarily consisted of MSRs and the associated advances.  The Ocwen and Walter Bill of Sale were executed on January 31, 2013.[16]

62.     Ocwen ultimately agreed to assume most, but not all, of the contracts and employees that comprise the servicing and originations platform as part of its acquisition of assets because it needed to top Nationstar, which had agreed to assume such obligations over the course of the auction.  Nationstar and Ocwen, however, did not provide additional consideration for the platform.  Rather, each agreed to the assumption of these obligations only after we offered a credit of over $100 million at the auction to assume the liabilities.  Accordingly, it is my view that Ocwen viewed the platform as simply a "cost" that was necessary for it to assume and maintain the value of the MSRs.  Indeed, I understand that, notwithstanding its purchase, Ocwen began training staff to use its proprietary servicing system within weeks of the closing, and has been moving loans off of ResCap's servicing system for several months now.

---

[16] Exhibit PX-53 is a true and correct copy of the January 31, 2013 Walter Bill.  Additionally, Exhibit PX-54 is a true and correct copy of the June 27, 2013 Ocwen Bill.

26

63.     On October 25, 2012, ResCap held an auction for its held-for-sale loan portfolio. After 11 rounds of bidding, Berkshire won the auction with the highest and best offer of $1.5 billion.  The Bankruptcy Court approved the Debtors' asset sales on November 19, 2012,[17] and entered an order approving the asset sales on November 21, 2012.[18]

### The JSNs' Support for the Restructuring Plan

64.     Shortly before the Chapter 11 filing, the Debtors prepared a restructuring plan premised upon the proposed asset sales.  This restructuring plan was supported by JSNs holding approximately 37% of the outstanding Junior Secured Notes, including certain members of an ad hoc committee of unaffiliated JSNs holding at least 50% of all Junior Secured Notes (the "Ad Hoc Group").  The JSNs' support was reflected in a plan support agreement (the "JSN PSA").[19]

65.     Pursuant to the JSN PSA, the Ad Hoc Group agreed to waive any and all rights to any post-petition interest under the Junior Secured Notes through December 31, 2012, so long as (i) no unsecured creditor received post-petition interest, (ii) the JSN PSA did not terminate, and (iii) (x) the effective date of the plan contemplated by the JSN PSA occurred by December 31, 2012, or (y) the closing of the Asset Sales occurred by December 31, 2012 and the effective date of the contemplated plan occurred by March 31, 2013.

---

[17] See Order Under 11 U.S.C. §§ 105, 363, and 365 and Fed. Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief [Dkt. No. 2246], a true and correct copy of which is Exhibit PX-45.

[18] See Order Under 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Berkshire Hathaway, Inc.; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; and (C) Related Agreements; and (II) Granting Related Relief [Dkt. No. 2247], a true and correct copy of which is Exhibit PX-46.

[19] Exhibit PX-252 is a true and correct copy of the JSN PSA.

66.     In addition, Ally agreed to augment the JSNs' secured recovery through Ally's subordination of a portion of its first priority lien under the Ally Revolver.[20]  Specifically, Ally and the JSNs agreed that: (i) the first $400 million of Collateral proceeds under the Ally Revolver would go to Ally; (ii) the next $1 billion of Collateral proceeds under the Ally Revolver would go to the JSNs; and (iii) the balance of the Collateral proceeds would be split 19% (Ally) / 81% (JSNs).

67.     Following the Petition Date, the JSN PSA was terminated on September 26, 2012.[21]

### The Chapter 11 Proceedings

**A.     The Debtors' Post-Petition Efforts to Maintain Business Operations**

68.     On May 14, 2012, the Debtors commenced these Chapter 11 Cases to preserve their assets and maximize value for the benefit of all of their economic stakeholders.  On or shortly after the Petition Date, the Debtors filed certain "first day" and "second day" pleadings with the Bankruptcy Court to facilitate the Debtors' seamless transition into Chapter 11, minimize disruption to the Debtors' operations, and aid in the preservation of the Debtors' going-concern value.  On the Petition Date, the Bankruptcy Court considered and approved the Debtors' motions to: (i) continue using their cash management system; (ii) gain interim access to

---

[20] The "Ally Revolver" means that certain loan agreement, dated as of December 30, 2009, as amended, by and among Debtors Residential Funding Company, LLC ("**RFC**") and GMACM, as borrowers, and various Debtor affiliates, as guarantors, entered into a loan agreement with AFI, as agent and lender.  Exhibit PX-8 is a true and correct copy of the Ally Revolver.

[21] Berkshire Hathaway Inc. ("**Berkshire**"), directly and indirectly, which held in excess of 40% of the remaining Junior Secured Notes (as well as more than 50% of ResCap's outstanding senior unsecured bonds, which it subsequently sold), was not a party to the JSN PSA.  Notwithstanding their failure to sign on to the JSN PSA, Berkshire has been actively involved in these Chapter 11 cases, seeking to become the stalking horse bidder for both the Whole Loan Portfolio and the Servicing and Origination Assets, and ultimately submitting the winning bid for the Debtors' Whole Loan Portfolio.

the Barclays DIP and AFI DIP facilities; and (iii) use certain of their pre-petition lenders' cash

collateral.

69.     The remaining first day "operational" motions were heard shortly after the

Petition Date, and the Bankruptcy Court entered orders that, collectively, authorized the Debtors

to, among other things: (i) continue their operations with respect to the servicing and origination

business in the ordinary course; (ii) honor pre-petition obligations to customers; and

(iii) continue the Debtors' shared services arrangements with non-debtor affiliates, including

AFI.

**B.     Appointment of the Mediator**

70.     Upon the conclusion of the Asset Sales in November 2012, the Debtors focused

their efforts on developing a Chapter 11 plan supported by the majority of their claimant

constituencies.  Recognizing the numerous, divergent interests held by the Debtors' key

stakeholders, on December 6, 2012, the Debtors requested the appointment of a mediator (the

"Mediator") to assist with the plan negotiations process.[22]

71.     On December 26, 2012, the Bankruptcy Court entered an order appointing the

Honorable James M. Peck as Mediator in these Chapter 11 Cases to assist in plan negotiations,

foster a dialogue with key stakeholders, and reach resolution on significant plan issues.[23]

Initially, the Mediator was appointed for a limited period ending February 28, 2013, but as a

result of subsequent negotiations amongst parties involved in the mediation, the Bankruptcy

Court further extended the term of the Mediator's appointment through October 31, 2013, or

---

[22] See Debtors' Motion for Appointment of a Mediator [Dkt. No. 2357], a true and correct copy of which is Exhibit PX-832.

[23] See Order Appointing Mediator [Dkt. No. 2519], a true and correct copy of which is Exhibit PX-835.

ny-1112584

such earlier date as the Mediator declares that the mediation is at an impasse and should be terminated.[24]

## C.    Appointment of the CRO

72.    Following the Asset Sales, in addition to administering and monetizing the remaining assets and winding down the estates, the Debtors' primary focus shifted to reaching and obtaining confirmation of a consensual plan.  Because the Asset Sales successfully closed thus accomplishing the primary objective of the First AFI Settlement, the Debtors, with the support of the Creditors' Committee, allowed the First AFI Settlement to expire by its terms. However, the Creditors' Committee determined that negotiations with AFI regarding the resolution of the Debtors' potential claims against AFI should continue.

73.    In furtherance of their goal of developing a consensual plan, on February 11, 2013, the Debtors sought the appointment of Lewis Kruger to act as the Debtors' chief restructuring officer ("CRO").  After consultation with the Creditors' Committee regarding the appropriate scope of the CRO's appointment, on March 5, 2013, the Bankruptcy Court appointed Mr. Kruger as CRO.[25]

74.    Mr. Kruger represented the Debtors' interests in the plan mediation by addressing and seeking resolution of key disputes among the Debtors' major stakeholders, brokering a consensual settlement of the estates' and others' claims against AFI, and determining the appropriate allocation of estate assets among the Debtors' creditors throughout the negotiation and mediation process.

---

[24] See Order Extending Appointment of Hon. James M. Peck as Mediator [Dkt. No. 3101], a true and correct copy of which is Exhibit PX-848; see also Order Further Extending Appointment of Honorable James M. Peck as Mediator [Dkt. No. 3877], a true and correct copy of which is Exhibit PX-856.

[25] See Order Granting Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer [Dkt. No. 3103], a true and correct copy of which is Exhibit PX-849.

**D.      Post-Petition Efforts to Obtain Approval of the RMBS Trust Settlement**

75.      On June 11, 2012, the Debtors filed a motion pursuant to Federal Rule of

Bankruptcy Procedure 9019 (the "9019 Motion") for approval of the RMBS Trust Settlement.[26]

When it became clear that the sale of the Debtors' servicing assets would occur before the

RMBS Trust Settlement would be heard by the Bankruptcy Court, the RMBS Trustees later

agreed (in July 2012) (i) not to object to the assignment of pooling and servicing agreements free

and clear of representation and warranty claims and (ii) to defer, and cap the amount of, their

cure claims.

76.      A hearing on the 9019 Motion was originally scheduled for November 2012, but

was adjourned on several occasions.  A number of parties, including the Creditors' Committee,

Wilmington Trust, FGIC and MBIA, among others, filed objections to the 9019 Motion.

77.      The parties ultimately determined that it was in their collective best interests to

avoid protracted and costly litigation with respect to the RMBS Trust Settlement, and instead to

resolve the RMBS Trusts' claims in the context of, and as provided by, the Plan Support

Agreement.[27]  Following extensive discussions in connection with the overall global settlement

embodied in the Plan, the parties agreed that the Plan should expand the scope of the Original

RMBS Settlement Agreements to cover all RMBS Trusts holding RMBS Trust Claims.

---

[26] See Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Settlement Agreements [Dkt. No. 320], a true and correct copy of which is Exhibit PX-810; see also Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Dkt. No. 1176], a true and correct copy of which is Exhibit PX-820; and Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Dkt. No. 1887], a true and correct copy of which is Exhibit PX-822.

[27] "Plan Support Agreement" refers to that certain agreement among the Debtors, the Creditors' Committee, certain of the Debtors' creditors, and AFI, dated May 13, 2013 [Dkt. No. 3814-4], a true and correct copy of which is Exhibit PX-855.

## The Mediation

78.     The focus of the plan mediation was twofold: (1) to settle certain potential estate and third party claims and causes of action identified against AFI in exchange for a contribution from AFI to the Debtors' estates, in exchange for releases of AFI provided by the Debtors and third parties, and (2) to address intercreditor issues related to the allocation of the Debtors' assets.

79.     In addition to AFI, the RMBS Trustees, and the Creditors' Committee, the Debtors worked to identify additional parties with a particular interest in the issues being addressed in the mediation.  Among the parties identified were monoline insurers, the Junior Secured Noteholders, and parties to securities litigation asserting pre-petition claims against the Debtors.

80.     On June 26, 2013, the Bankruptcy Court entered an order authorizing the Debtors to enter into the Plan Support Agreement.[28]  On July 3, 2013, the Debtors filed the Plan, which was consistent with, and contemplated by, the Plan Support Agreement.

## Conclusion

81.     As a result of the work done by Debtors and their professionals prior to and during the bankruptcy process, the estates have been able to maximize value for the benefit of stakeholders.  For example, the better-than-expected DIP financing obtained from AFI and Barclays and the use of cash collateral that was agreed to by the JSNs and AFI, allowed the Debtors to continue funding their day-to-day business operations.  Without that financing the GSEs would have terminated the MSRs related to their loans, and the RMBS trustees would have

---

[28] See Order Granting Debtors' Motion Authorizing the Debtors to Enter Into a Plan Support Agreement with Ally Financial Inc., The Creditors' Committee, and Certain Consenting Claimants [Dkt. No. 4098], a true and correct copy of which is Exhibit PX-857.

ny-1112584

sought to do the same. Furthermore, without the AFI settlement, the Debtors would have not

have had the operational support they needed to continue to run their business post-petition,

again putting at grave risk the value of the MSRs and associated advances, nor would potential

purchasers have had assurances that AFI would support and facilitate a smooth transition

following the asset sales, which might have inhibited bidding. AFI also enhanced the sale

process by agreeing to serve as a stalking horse bidder with minimal bid protections, and by

enabling the Debtors to separately market and sell their held-for sale loan portfolio and

origination and servicing business, which increased the potential pool of bidders. Additionally,

if the overhang of billions in potential liability for representation and warranty and servicing

claims arising out of our private-label RMBS had not been resolved, our sale efforts would

hampered or derailed altogether, as had occurred in the Debtors' two prepetition efforts to sell

their business.

82.    With regard to the auction process, without the Debtors' open line of

communication with the GSEs, the GSEs could have both raised the cost of doing business and

seized their collateral. Similarly, the Debtors' open line of communication with DOJ and the

attorneys general of 49 states, as well as the Federal Reserve Board, assured these governmental

constituencies that a sale could be consummated without disrupting compliance of an earlier

settlement and consent order. Without these lines of communications, the Debtors would not

have consummated a value-maximizing sale of their assets.

83.    Finally, without the Debtors' work in obtaining initial stalking horse bids, the

Debtors would not have generated the substantial interest that led to a mini-auction for potential

purchasers to serve as stalking horse bidders, and the ultimate auction that yielded the

phenomenal sale prices for the Debtors' assets.

33

84.    Fundamentally, the Debtors' orderly asset sale in conjunction with a planned reorganization paved the way for a soft landing in bankruptcy which:  (i) maximized the value of the Debtors' assets for the benefit of creditors; (ii) preserved the Debtors' servicing business for sale, thus preserving jobs, and providing the best possible outcome for more than 2.4 million homeowners whose loans were serviced by the Debtors and for the investors in securitization pools that own loans serviced by the Debtors; (iii) avoided disruption in the fragile housing market recovery; and (iv) yielded the Debtors' stakeholders $4.5 billion in sale proceeds.  Had the Debtors not operated in bankruptcy as they did—which would have been impossible without the substantial support of and contributions by AFI—I do not believe the assets could have been sold for anywhere near this price.

85.    The estates were also directly benefitted by the flexibility provided by the uncoupling of those sales from the First AFI Settlement.  The separation of the First AFI Settlement from asset sales allowed the settlement negotiations to continue after the sales had closed and ultimately culminated in the Plan and the global settlement embodied therein.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this 12th day of November, 2013 at New York, New York.


_____/s/ Thomas Marano_____
Thomas Marano