MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Charles L. Kerr
Darryl P. Rains
J. Alexander Lawrence

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------
|  | ) |  |
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
----------------------------------------------------------------------

**<u>DIRECT TESTIMONY OF GINA GUTZEIT</u>**

I, Gina Gutzeit, under penalty of perjury, testify as follows:

## SCOPE OF TESTIMONY

1.          Counsel for Residential Capital, LLC ("ResCap"), and its affiliated debtors (together with ResCap, the "Debtors") requested that I review the October 18, 2013 report submitted by Robert S. Bingham (the "Bingham Report") regarding the intercompany balances on the Debtors' books and records as of the May 14, 2012 commencement of the Debtors' chapter 11 cases (the "Petition Date") and to respond to Mr. Bingham's opinions contained in his report.  As set forth more fully below I am a senior managing director in FTI Consulting Inc's ("FTI") Corporate Finance practice group.  No portion of FTI's or my compensation is dependent upon the nature of my opinions or on the outcome of this proceeding.

2.          In furtherance of my review and response, I considered various accounting rules, principles and standards, as well as FTI's review of the Debtors' general ledgers, financial statements, agreements and other documents.  I also considered information and documents provided to FTI by the Debtors reflecting the historical practices that gave rise to the tens of thousands of journal entries making up the intercompany balances.  In addition to information and documents provided by the Debtors, my comments and conclusions are also based on information and knowledge that I have acquired, or that FTI professionals under my supervision have acquired, over the five years that FTI has been engaged by the Debtors as their financial advisors.  Finally, I considered certain documents produced in the litigation with the Ad Hoc Group of Junior Secured Noteholders ("Ad Hoc Group") of the 9.625% Junior Secured Guaranteed Notes due 201 ("JSNs") and UMB Bank, N.A. as Trustee for the JSNs ("Notes Trustee"), testimony from depositions taken in this case, conversations with management, other expert reports produced in this matter, and publicly available information.

3.      I understand that the analysis of whether the intercompany balances could be valid and collectible obligations focuses on the intent associated with each balance, including but not limited to consideration of the following factors: (i) the names given to the instruments, if any, evidencing the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a rate of interest and interest payments; (iv) the source of repayments of the purported indebtedness; (v) the adequacy or inadequacy of the capitalization of the net receiver; (vi) the identity of interest between net receiver and the "lender"; (vii) the security, if any, for the putative debt; (viii) the ability of the net receiver to obtain financing from outside lenders; (ix) the extent to which the payments were subordinated to the claims of outside creditors; (x) the extent to which the advances were used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide repayments.  The intercompany balances should be assessed based upon a complete set of factors, including the foregoing and the fact that they were "related party" transactions that should not be presumed to be the culmination of arm's-length transactions under GAAP.[1]  I have considered the foregoing factors in my testimony below.

4.      In responding to the Bingham Report, I address two points.  First, I review and discuss information, documents and facts that Mr. Bingham does not address in his report.  These facts, when considered, undermine Mr. Bingham's conclusions that the intercompany balances reflect true "debt".  In addressing this point, I describe the historical process through which the intercompany balances were created and recorded over many years, the historical practice of forgiving these intercompany balances, and the manner in which the Debtors historically accounted for such forgiveness.  I also review and describe the Debtors' financial records that

---

[1] See ASC 850-10-50-5, a copy of which is Exhibit PX-747.

were available to third-parties, as well as the Debtors' internal accounting records.  In addition, I discuss various provisions of the Ally Financial, Inc. ("AFI") accounting policies, as well as aspects of Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Accounting Standards ("GAAS").

5.      Second, I respond to Mr. Bingham's analysis of the top nine intercompany balances reflected on the Debtors' books and records as of the Petition Date.  In addressing this point, I describe the application of the relevant accounting standards and AFI accounting policies to each intercompany balance, as well as the process and practices by which these balances were recorded.  Based on FTI's analysis of each of the top nine intercompany balances, in light of the manner in which they were recorded on the Debtors' general ledgers and within the Debtors' financial statements, and the manner in which intercompany balances were forgiven, it is my opinion that the intercompany balances were not akin to third-party, arm's-length debt expected to be repaid; rather, the creation and the forgiveness of the intercompany balances on the Debtors' general ledgers was indicative of the allocation of capital and transfers of equity[2] between related parties as management saw fit to satisfy the needs of the business.

## SUMMARY OF TESTIMONY

6.      Based upon my review and analysis, when considering the circumstances related to the historical creation and extinguishment of the intercompany balances, these balances are not indicative of "valid liabilities" or "valid and collectible obligations."  The intercompany balances were comprised of many individual journal entries, and were created and extinguished over time.  Contrary to Mr. Bingham's suggestion otherwise, the manner in which these balances were created is not merely the result of cash being transferred through the corporate

---

[2] Equity transactions are also referred to as capital transactions in GAAP (ASC 470-50-40-2) which are inclusive of capital contributions.  A copy of ASC 470-50-40-2 is Exhibit PX-749.

structure for purposes of cash needs as is typical of a "cash management system."  Rather,

balances arose as a result of a variety of business and operational reasons, including asset

transfers, allocation and/or payment of expenses by one Debtor for another, or other journal

entries representing book entry movements of cash down the corporate structure.

7.      In addition, capital was allocated throughout the ResCap corporate structure by a

common management team based on cash needs, licensing requirements, financial covenants,

and cross default provisions.  The presence of common management indicates that

intercompany transfers were not bona fide "valid and collectible obligations," but rather were an

efficient way to allocate liquidity and capital as management saw fit to meet the needs of the

business.

8.      Moreover, the top nine intercompany balances were generally not supported by

written agreements.  In certain instances, where existing documentation between individual

entities does exist, such documentation is inconsistent with the actual payable/receivable

relationship between the entities, and/or contains no fixed maturity date, stated interest rate, or

repayment schedule, or contains terms that would be inconsistent with an arm's-length

lender/borrower relationship.

9.      Contrary to Mr. Bingham's suggestion, the Debtors' intent to repay, or to demand

repayment of, the intercompany balances cannot be inferred merely from the Debtors' reporting

and accounting of intercompany transactions as "intercompany receivables" and "intercompany

payables" on their internal records and external financial reports.  As an initial matter and as I

describe more fully in section "B" below, Mr. Bingham does not address the fact that the

Debtors' accounting of intercompany transactions on their books and records was done in

accordance with the accounting policies of its parent company, AFI, which accounting policies

were, in turn, consistent with GAAP. Mr. Bingham also mischaracterizes how the Debtors

reported intercompany transactions on their filings with the United States Securities and

Exchange Commission ("SEC"). ResCap, the only Debtor entity that publicly filed financial

statements with the SEC, prepared its reports on a consolidated basis at the ResCap legal entity

level, meaning that intercompany balances with and among ResCap and its subsidiaries were

eliminated in accordance with GAAP. Under GAAP and the AFI accounting policies followed

by the Debtors, intercompany balances were eliminated regardless of the intent or ability to

repay such balances. Mr. Bingham further overlooks the fact that for the purpose of calculating

net worth in order to comply with certain regulatory and licensing requirements, intercompany

receivables were often excluded. For example, the calculation of adjusted net worth used by the

United States Department of Housing and Urban Development ("HUD") requires that

intercompany receivables be subtracted from a company's net worth calculation as they are

deemed to be an "Unacceptable Asset."

10.    In his report, Mr. Bingham suggests that GAAP's requirement that an

intercompany balance must be "collectible" in order to be included in a company's financial

statement evidences a presumption that such intercompany balance would be repaid and/or there

is an expectation of an intent to demand repayment of such balance.[3] In doing so, Mr. Bingham

points to testimony provided by Barbara Westman regarding a Residential Funding Company,

LLC ("RFC") receivable, with respect to which Ms. Westman stated that the receivable was

eligible to remain on RFC's financials because there was "an ability for that to be collected, if

necessary" through ResCap selling assets, or collecting intercompany receivables owed to it.[4]

However, hypothetical collectability does not mean that the balance could practically be "repaid"

---

[3] Bingham Report ¶ 30.

[4] Westman Tr. at 188:9-11.; Westman Dep. Ex. 32, a copy of which is Exhibit PX-608.

from within the Debtors' corporate structure without incurring significant additional indebtedness that ultimately could not be repaid.[5]

11.     Finally, the process by which the Debtors and non-Debtors forgave intercompany balances (*i.e.,* officer approval or approval by some or all of the Debtors' or its parent's Board of Directors) does not indicate that the intercompany balances being forgiven constituted true "debt." When intercompany balances were forgiven, the Debtors typically recorded the forgiveness as a capital contribution rather than as an impact to the profit and loss of either the obligor or the obligee.[6] The fact that approval was required, however, does not prove that the intercompany balances constituted true "debt." As subsidiaries of AFI, the Debtors were required to follow the corporate policies that were implemented by AFI.

## SUMMARY OF QUALIFICATIONS

12.     I am a senior managing director in FTI's Corporate Finance practice based in New York. I have over 30 years of experience in operational and financial restructuring, interim management, bankruptcy proceedings, process improvement and litigation services in a variety of industries. Before joining FTI in 2002, I was a partner in PricewaterhouseCoopers ("PwC") within the Financial Advisory Services practice. I joined PwC's predecessor firm, Coopers & Lybrand in 1990 and for an intermediate two years (1994 to 1996) had joined Peterson

---

[5] Since as early as ResCap's December 31, 2008 Form 10-K/A, a copy of which is Exhibit PX-588, the Debtors have raised substantial doubt about its ability to continue as a going concern stating that "[t]he occurrence of recent adverse developments in the mortgage finance and credit markets has adversely affected our business, our liquidity and our capital position and has raised substantial doubt about our ability to continue as a going concern." This was the first risk factor listed in its "Risk Factors" section of the Form 10-K/A. See PX-588 at 32. Further disclosure about its ability to continue as a going concern was also emphasized in the audit opinion, (id. at 118), as well as the footnotes to the financial statements (id. at 128). Other subsidiaries of ResCap including, but not limited to, GMAC Mortgage, LLC ("GMACM") and RFC also disclosed substantial doubt about their ability to continue as a going concern as early as December 31, 2008. See GMACM December 31, 2008 financial statements, (id. at 7), a copy of which is Exhibit PX-712, and RFC December 31, 2008 financial statements, (id. at 9), a copy of which is Exhibit PX-600.

[6] Dondzila Tr. at 81:4-86:16. Except for an instance where a collateralized affiliate balance was impaired through the profit and loss statements, I am not aware of any other forgiveness that was not recorded as an adjustment to equity.

Consulting.  Prior to that, I was a manager at Ernst & Young, having joined a predecessor firm,

Arthur Young in 1988.  Prior to that, I worked at Jerry B. Klein, CPA, a boutique accounting

firm providing auditing, tax, bankruptcy and litigation services.

13.    I hold a B.A.A. in Public Accounting from Pace University. I hold many

certifications including as a Certified Public Accountant licensed in the state of New York, a

Certified Fraud Examiner, and a Certified Insolvency and Restructuring Advisor.  I am a

member of many professional organizations including the American Institute of Certified Public

Accountants ("AICPA"), the New York State Society of Certified Public Accountants

("NYSSCPA"), and the International Women's Insolvency & Restructuring Confederation

("IWIRC").  In addition, I am a Board Member and Vice President of the Association of

Insolvency & Restructuring Advisors ("AIRA").

14.    I have served as financial advisor to numerous companies experiencing financial

and operational distress and have advised on all aspects of financial restructurings, cash flow

management as well as have provided assistance in preparing financial projections, negotiations

with lenders and creditors, assessing divestiture and consolidation scenarios and related

financial impact.  I have assisted numerous debtors in Chapter 11 proceedings.  Some of my

clients include CIT, WorkFlow Management, Stock Building Supply, and US Airways (both

filings).  In addition, I have represented senior lenders in out-of-court and in-court matters such

as the senior lenders of St. Vincent's Catholic Medical Center.

15.    I have provided expert accounting assistance in several litigation matters

including reconstruction and analysis of cash receipts, cash disbursements, and other financial

and non-financial information to determine losses and damages, preparation for discovery

hearings and depositions.  In the last four years, I have served as an expert witness and have

been deposed for Workflow Management, Inc.  In addition, I was appointed as an Examiner by the U.S. Bankruptcy Court for the Southern District of New York and have worked with the Federal Bureau of Investigation on special investigations of companies suspected of embezzling and defrauding lenders.

16.    I have served in several interim management roles with responsibilities including: day-to-day responsibility for accounting, treasury, tax, and SOX compliance; SEC reporting including restatements of previously issued financial statements; resolving SEC inquiries and delisting by NASDAQ; evaluation and enhancement of global cash management and forecasting systems to balance global cash needs; and improvement of monthly financial reporting and forecasting tools.  Through these processes, I was critical to the communication among board members, the audit committee, senior management, outside legal counsel and independent auditors.  I have served as interim officer of several companies including:

- Chief Restructuring Officer of a payroll processing and staffing company.

- Chief Financial Officer of a home health care provider.

- Chief Restructuring Officer of a privately-held, $600 million real estate development and investment company.

- Chief Financial Officer of Savient Pharmaceuticals, Inc., a publicly traded pharmaceutical development company.

- Chief Operating Officer for American Nursing Services, Inc., a national medical staffing company.

- Chief Financial Officer for aaiPharma, Inc., a publicly traded science based pharmaceutical company.

17.     I am a contributing editor for the American Bankruptcy Institute Journal for which I have written and co-written numerous articles about bankruptcy, distressed debt, and the financial crisis, including: What's New with Chapter 22? (2013); One Final Look at Post-Emergence Performance (2013); One Last Look at Post Emergence Performance (2012); Revisiting Post-Emergence Performance (2011); Z-Score Performance Amid Great Recession (2011); Distress Debt Exchanges – You Can Run But You Can't Hide (2010); Distress Signals or Background Noise? (2009); Jittery Credit Markets Pose Multi-front Threat to Turnarounds and Reorganizations (2008) ; Don't Overlook Source Documents in This Age of Instantaneous Information (2007); Turning In to Market Signals Even for Private Companies (2007); A Debtor's Reorganization Plan is Confirmed – Now, the Real Work Begins (2006); Benchmarking Works! (2005); Amendments to Debt not Always Relief for the Borrower (2005); Are We Safe from Financial Reporting Frauds? (2004).  I have also authored the article Private Equity's New Challenges Amid the Credit Crunch for the AIRA Journal (2008).  In addition, I authored a chapter on benchmarking in The Professional Services Firm Bible by John Baschab and Jon Piot.  I have also taught several CIRA classes including CIRA course Part I Managing Turnaround and Bankruptcy Cases, CIRA course Part II Bankruptcy Plan development, CIRA course Part III Bankruptcy Accounting, and Financial Reporting and Taxes.

## THE DEBTORS' INTERCOMPANY BALANCES

**A.     The History Behind the Creation of the Intercompany Balances Evidences that They Were Not Intended to Be Repaid.**

18.     Mr. Bingham's review of the general ledger and financial statements ignores the historical elements of the intercompany balance build-up and forgiveness and leads to the incorrect conclusion that the intercompany balances represent valid debt intended to be repaid.

19.    In order to evaluate the collectability and the Debtors' intent in generating these intercompany balances, it is important to understand the history and manner in which the balances were created.  However, Mr. Bingham does not address the historical intercompany activity that led to the buildup of the balances, which significantly impacts his assessment of whether the balances should be characterized as equity or debt.

20.    I understand that, in the ordinary course of business, the Debtors entered into certain transactions with their Debtor and non-Debtor affiliates, including foreign affiliates, which resulted in intercompany receivables and payables that were recorded on the books and records of the respective entities.  With respect to the Debtors, these intercompany receivables and payables accumulated over time as a result of tens of thousands of separate, individual journal entries that were recorded on the Debtors' general ledgers for a variety of business and operational reasons, including asset transfers, allocation and/or payment of expenses by a Debtor for another, or other journal entries representing book entry movements of cash up and down the corporate structure.

21.    I understand that the Debtors recorded intercompany receivables and payables through journal entries in various ledger accounts in a manner consistent with AFI's accounting policies, which required that the books and records of the companies be maintained consistent with GAAP.[7]  The stated objective of AFI's accounting policies, which were applicable to all of AFI's subsidiaries, was to ensure that the books and records of the AFI subsidiaries be maintained in a consistent manner that would allow AFI to file its consolidated financial statements in accordance with GAAP—that is, that all intercompany receivables and payables of

---

[7] AFI Accounting Policy 1040 Intercompany Accounting (Dec. 29, 2010), a copy of which is Exhibit PX-621.

AFI's subsidiaries be accurately and consistently recorded so that the balances could be properly eliminated in AFI's consolidated financial statements filed with the SEC.

22.     ResCap itself filed consolidated financial statements with the SEC through the second quarter of 2009, which statements eliminated intercompany balances among all ResCap subsidiaries.  Certain ResCap subsidiaries, including RFC, GMACM, and Homecomings Financial, LLC ("Homecomings"), provided audited financial statements to certain interested parties, including lenders, the Nationwide Mortgage Licensing System ("NMLS"), and HUD.  In accordance with GAAP, any intercompany balances with and among the reporting entity and its subsidiaries were eliminated in consolidation.[8]

23.     The AFI accounting policies required that the Debtors record and track all intercompany transactions on their general ledgers.[9]  I understand that the recording of journal entries was performed either automatically through accounting programs or manually by a wide range of individuals in different departments and business units, in different physical locations, that were overseen by different supervisors with different recordkeeping practices.  The tens of thousands of entries underlying the intercompany balances largely do not specify the basis of, or reason for, a balance.  It would be extremely time-consuming, and likely impossible, to link each of the individual ledger entries to a specific type of intercompany balance, or to decipher whether each individual entry resulted from asset transfers, allocation and/or payment of expenses by a Debtor for another, or other journal entries representing book entry movements of cash down the corporate structure.

---

[8] See ASC 810-10-45-1, a copy of which is Exhibit PX-745.

[9] AFI General Intercompany Accounting Policy (Nov. 28, 2011), a copy of which is Exhibit PX-638; AFI Accounting Policy 1040 Intercompany Accounting (Dec. 29, 2010), a copy of which is Exhibit PX-621.

24.     In most instances, the top nine intercompany balances do not correspond to a specific intercompany agreement.  The Debtors have identified four intercompany agreements between and among the domestic Debtor entities from 2006 to the Petition Date.[10]  The parties to the agreements were controlled by the same management team, entities, or affiliates.  It is difficult to determine whether an intercompany transaction can be tied to these agreements because the Debtors did not designate intercompany entries in the general ledger as having resulted from, or being made under, any particular intercompany advance or funding agreement.  Furthermore, at least two of the four intercompany agreements contemplate a "lending" relationship that is the reverse of the intercompany balance that existed on the Debtors' books and records as of the Petition Date and at least two of them are between entities that do not have an existing balance among the top nine intercompany balances.

25.     None of the four identified agreements between domestic Debtor entities contains a stated interest rate.  In fact, interest was accrued and cash settled in connection with only one intercompany balance, the balance from ResHolding to ResCap.  Of the remaining top eight intercompany balances, only four reflected that interest was being accrued but not paid, and none of the remaining intercompany balances reflected any interest accrual.

26.     Finally, three of the four agreements contain a "bankruptcy standstill" provision, which provides that the "lender" entity will not commence bankruptcy against the "borrower" entity or seek to foreclose on any property of the borrowing entity, and that obligations under the

---

[10] ResCap Restated Loan Agreement, dated January 1, 2006, among ResCap, as lender, and GMAC Residential Holding Corp. ("ResHolding"), GMAC Mortgage, and RFC, as borrowers, a copy of which is Exhibit PX-577; Amended and Restated Intercompany Advance Agreement (HomeComings Financial Network, Inc.), dated June 30, 2006, between HomeComings Financial Network, Inc. (n/k/a Homecomings Financial, LLC), as borrower, and RFC, as lender, a copy of which is Exhibit PX-576; Intercompany Advance Agreement (Passive Asset Transactions, LLC), dated June 1, 2009, between ResCap, as borrower, and Passive Asset Transactions, LLC, as lender, a copy of which is Exhibit PX-578; Intercompany Advance Agreement (RFC Asset Holdings II, LLC), dated June 1, 2009, between ResCap, as borrower, and RFC Asset Holdings II, LLC, as lender, a copy of which is Exhibit PX-575.

agreement will not constitute a claim against the "borrower" entity if such entity's assets are insufficient to pay those obligations in full.  I understand that these provisions at the very least effectively subordinated the obligations, if any, under these agreements to the claims of outside creditors and arguably even eliminated these obligations under such circumstances.  I understand that the Debtors do not believe that of these agreements correspond to any of the intercompany balances.  To the extent that Mr. Bingham points to these agreements to suggest that they relate or correspond to a particular intercompany balance, however, any claim based on that intercompany balance would be subject to these subordination provisions.

27.    Whether or not the top nine intercompany balances arose under or were related to a documented agreement, I understand that, with the exception of the intercompany balance between RFC and GMACM, there was no consistent practice of repayment or cash settlement of the intercompany balances.  Periodically, significant forgiveness of these balances occurred from 2008 through the Petition Date.  During that period, there were 149 individual instances of forgiveness by Debtor entities that were identified totaling approximately $16.6 billion, which I understand were largely to meet certain net worth compliance provisions under the Debtors' financing arrangements and licensing requirements.  For example, the Debtors monitored and historically forgave intercompany balances to comply with the net worth covenants in financing agreements with AFI.[11]  Also, I understand that the Debtors were required to maintain compliance with thresholds of net worth imposed by certain state and federal licensing authorities, including HUD.  As discussed below, HUD requires that intercompany receivables be subtracted from a company's net worth calculation as they are deemed to be an "Unacceptable Asset."

---

[11] Westman Tr. at 21:8-22:15.; 218:16-25.

28.    Based upon FTI's review of the Debtors' books and records and discussions with Debtors' management, in all but one instance that I am aware of, the forgiveness recorded by the Debtors was recorded as an adjustment to equity rather than a loss on the profit and loss statement.  This is consistent with AFI's accounting policies and GAAP, which require that forgiveness between a parent and its subsidiary (or between two affiliates) be recorded as an adjustment to equity unless there is commercial substance that indicates it should be treated akin to a third-party transaction, in which case it should be recorded as a loss on the income statement.[12]  In my opinion, recording the forgiveness is this manner supports the evidence that these transactions should be treated as equity transactions.

29.    I understand that, in early 2012, approximately $3.1 billion in intercompany balances had been identified to be forgiven some time in 2012.  These balances included entities that had no current or future significant business activities.  In fact, as of February 2012, four of the seven largest intercompany balances listed in Exhibit 6 to the Disclosure Statement were identified for forgiveness.  Consistent with historical practices, those balances would likely have been forgiven and treated as adjustments to equity.

30.    A review and understanding of (i) the historical buildup of the balances, (ii) the manner in which and reasons for the Debtors recording intercompany payables and receivables, (iii) the applicability of accounting policies implemented by AFI consistent with GAAP, and (iv) a review of the agreements, all support the conclusion that the intercompany balances as of the Petition Date are not representative of arm's-length transactions, and do not represent "valid and collectable obligations."

---

[12] See Ex. PX-624 AFI Accounting Policy 1075 Related Party (Jan. 1, 2012) ("In situations when a parent company forgives a receivable from a subsidiary, the company should record a change to equity.  Generally speaking, intra-group debt forgiveness (for example sister-sister activity) should generally be recorded as a capital contribution unless there is commercial substance that indicates that is [sic] should be treated akin to a third party transaction and recorded through the income statement."); see ASC 470-50-40-2, a copy of which is Exhibit PX-749.

**B.**    **The Manner in Which the Debtors Recorded Intercompany Balances under GAAP and AFI Accounting Policies Does Not Establish They Were Intended to Be Repaid.**

31.    The Debtors' intent to repay, or to demand repayment of, the intercompany balances cannot be inferred from the Debtors' reporting and accounting of intercompany balances as "intercompany receivables" and "intercompany payables" on their internal books and records and external financial reports.

32.    It is incorrect to suggest that the recording of an intercompany receivable or payable on the Debtors' books and records validates or legitimizes the balance as true "debt." The Debtors recorded intercompany balances consistent with the accounting policies of AFI, which applied to all of AFI's subsidiaries.[13]  Specifically, one of AFI's accounting policies stated as follows: "In preparing consolidated financial statements, all intercompany (parent-subsidiary) transactions are eliminated.  If intercompany transactions are not eliminated, the result is improper reporting of gross balances in the financial statements."[14]  This policy required that the Debtors' books and records be maintained so that AFI could accurately and efficiently eliminate all of its subsidiaries' intercompany balances and eliminate them for purposes of preparing and filing its consolidated financial statements consistent with GAAP and AFI's policies.[15]  The Debtors' compliance with AFI's policy regarding how to account for intercompany balances so that AFI could have an efficient elimination process is not an indication that the Debtors, individually or collectively, intended for these balances to be treated as "valid and collectible

---

[13] AFI Accounting Policy 1040 Intercompany Accounting (Dec. 29, 2010), a copy of which is Exhibit PX-621.

[14] AFI Accounting Policy 1040 Intercompany Accounting (Dec. 29, 2010), a copy of which is Exhibit PX-621.

[15] ASC 810-10-45-1, a copy of which is Exhibit PX-745, provides as follows: "In the preparation of consolidated financial statements, intra-entity balances and transactions shall be eliminated.  This includes intra-entity open account balances, security holdings, sales and purchases, interest, dividends, and so forth.  As consolidated financial statements are based on the assumption that they represent the financial position and operating results of a single economic entity, such statements shall not include gain or loss on transactions among the entities in the consolidated group."

obligations". This conclusion is further supported by the presumption in GAAP and AFI's policy that transactions between related parties are not carried out of an arm's-length basis.[16]

33.  In his report, Mr. Bingham suggests that the accurate recording of balances results in them being equivalent to commercial, third-party transactions. Mr. Bingham uses words such as "valid," "bona fide," "legitimate," and "collectible" when referring to the intercompany balances. However, Mr. Bingham does not address that these balances are "related-party transactions" within the meaning of GAAP and that GAAP differentiates related-party transactions from other third-party transactions. For example, GAAP provides that "[t]ransactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist."[17] Mr. Bingham similarly fails to address that these transactions are "related party" transactions as defined within the AFI related party policy which mirrors the language in the GAAP literature.[18]

34.  Contrary to Mr. Bingham's assertions, however, the Debtors' publicly filed financial reports did not include intercompany balances with and among its subsidiaries. ResCap was the only Debtor entity that was required to file financial statements with the SEC, and it did so only through the second quarter of 2009. ResCap's publicly filed financial statements were prepared on a consolidated basis and were intended to reflect the company as a whole. Consistent with the AFI accounting policies and GAAP, ResCap eliminated all intercompany balances that existed with and among ResCap and its subsidiaries.[19] Thus, while a balance with

---

[16] See AFI Accounting Policy 1075 Related Party (Jan. 1, 2012), a copy of which is Exhibit PX-694; ASC 850-10-50-5, a copy of which is Exhibit PX-747.

[17] See ASC 850-10-50-5, a copy of which is Exhibit PX-747.

[18] See AFI Accounting Policy 1075 Related Party (Jan. 1, 2012), a copy of which is Exhibit PX-694.

[19] See Ex. PX-621, AFI Accounting Policy 1040 Intercompany Accounting (Dec. 29, 2010) ("In preparing consolidated financial statements, all intercompany (parent-subsidiary) transactions are eliminated."). For example, consistent with this policy and GAAP, the ResCap 2009 audited financial statements provide the following disclosure relating to the elimination of intercompany activity: "The consolidated financial statements include the

AFI would exist on ResCap's financial statements, balances with and among ResCap and its subsidiaries would not.

35.     Certain of the Debtor subsidiaries, including RFC, GMACM, and Homecomings, prepared audited financial statements on an annual basis that were not publicly filed with the SEC.  These financial statements eliminated all intercompany balances with and among the reporting entity and its subsidiaries.  For example, while RFC's financials would have shown intercompany balances between an RFC entity and ResCap, or between an RFC entity and GMACM or a GMACM subsidiary, RFC's financials would have eliminated any intercompany balances within the RFC family.

36.     As I noted above, the Debtor subsidiaries that sit below ResCap on the corporate structure did not file audited financial statements with the SEC.  It is my understanding that certain audited financial statements for some subsidiaries were made available to HUD and certain state agencies for purposes of demonstrating compliance with licensing and net worth requirements.  Contrary to Mr. Bingham's suggestion that reporting intercompany balances as either intercompany receivables, payables or borrowings in their external financial reports, including reports to HUD, is an indication that the ResCap entities expected these intercompany balances to be repaid, HUD required its filers to adjust their net worth calculations to exclude certain "Unacceptable Assets," including any "asset due . . . from a related entity. . . ."[20]  If HUD considered these intercompany receivables to be unacceptable and excluded from the calculation of net worth, it is reasonable to conclude that these receivables are not akin to third-party transactions reflecting valid arm's-length liabilities and obligations.

---

accounts of the Company and its subsidiaries after eliminating all significant intercompany balances and transactions." 2009 ResCap Financial Statements, at 12, a copy of which is Exhibit PX-587.

[20] See Consolidated Audit Guide for Audits of HUD Programs, at 138, a copy of which is Exhibit PX-672.

37.     Mr. Bingham suggests that simply placing an intercompany balance on a financial statement in accordance with GAAP is evidence of the Debtors' expectation that such intercompany balance would be repaid and/or presumptive of the Debtors' intent to demand repayment of such balance.  However, it is not appropriate to conclude that repayment of intercompany balances was expected simply because such balances exist on the Debtors' internal books and records and external financial statements.  The intercompany balances should be assessed based upon a complete set of factors, including the fact that they were "related party" transactions that were not presumed to be the culmination of arm's-length transactions under GAAP.[21]

38.     In support of his conclusion that the intercompany payables and receivables are akin to debt owed to independent third parties, Mr. Bingham also refers to an accounting memorandum prepared for RFC's auditors by Barbara Westman, who testified in her deposition that the $1.8 billion intercompany balance due from ResCap to RFC was "a valid receivable as there was an ability for that to be collected, if necessary."[22]  But the fact that a receivable could potentially be satisfied does not mean that the Debtors intended the balance to be paid.  In fact, the memorandum prepared by Ms. Westman to RFC's auditors provides that, "should it be deemed in the future that ResCap does not have the ability to support its intercompany obligations with RFC, it would be more appropriate to settle the receivable as an equity transaction, in this case as a dividend from the subsidiary to the parent, rather than impair the receivable."[23]  This supports that the balance is reflective of equity and not debt.

---

[21] ASC 850-10-50-5, a copy of which is Exhibit PX-747.

[22] Westman Tr. at 188:9-11.

[23] Westman Dep. Ex. 32, a copy of which is Exhibit PX-608; Consistent with GAAP (ASC 470-50-40-2) and AFI's policy (Accounting Policy 1075 – Related Party, (PX-694 at 10), related party forgiveness should be recorded as an equity adjustment which, given Ms. Westman's statement that the balance would be an equity adjustment if not

39.     The history of not settling or collecting intercompany balances is evidenced by a schedule prepared at Ms. Westman's direction by ResCap employees to determine whether the Debtors' intercompany balances complied with AFI's intercompany accounting policy, which required the settlement of balances.  This schedule contains a list of intercompany balances, including the $1.8 billion intercompany balance due from ResCap to RFC, and states that "there is no formal 'settlement' practice" for the listed intercompany balances and "the balances are never fully 'repaid.'"[24]

### C.     The Debtors' History of Forgiveness of Intercompany Balances Evidences a Lack of Intent to Repay Outstanding Balances.

40.     The Debtors' practice of forgiving intercompany balances and recording the forgiveness as a capital contribution is inconsistent with the notion that the intercompany balances were valid or collectible "debts."

41.     In his report, Mr. Bingham concludes that the intercompany balances were "valid" or "collectible" as a result of the policies and procedures put into place by the Debtors with respect to forgiveness of intercompany balances.  However, this conclusion is contradicted by the fact that there was a significant forgiveness of intercompany balances recorded by the Debtors as equity, which Mr. Bingham acknowledges in his report.[25]

42.     The Debtors' treatment of the forgiveness of intercompany balances as equity transactions is consistent with GAAP requirements.  For example, ASC 470-50-40-2 states that "extinguishment transactions between related entities may be in essence capital transactions."[26]

---

collected coupled with the lack of intent to pay, is evidence that this intercompany balance would likely be settled as an adjustment to equity and thus was not akin to an independent third party receivable.

[24] See Email from B. Westman to C. Dondzila with attachment, a copy of which is Exhibit PX-604.

[25] Bingham Report ¶ 17 ("These debt forgiveness transactions were generally effectuated by way of capital contributions.").

[26] See ASC 470-50-40-2, a copy of which is Exhibit PX-749.

Further, the Ally "related party" policy also stated that intercompany balances that are forgiven should be recorded as equity transactions:

> In situations when a parent forgives a receivable from a subsidiary, the company should record a change to equity. Generally speaking, intra-group debt forgiveness (for example sister-sister activity) should generally be recorded as a capital contribution unless there is commercial substance that indicates that is [sic] should be treated akin to a third party transaction and recorded through the income statement.[27]

In all but one instance that I am aware of, the forgiveness recorded by the Debtors was recorded as an adjustment to equity rather than a loss on the profit and loss statement.

43.    I disagree with Mr. Bingham's suggestion that the intercompany balances were akin to "debt" because the Debtors were required to comply with corporate formalities relating to the forgiveness of such balances. As discussed above, the Debtors were subject to various policies and procedures implemented by their parent, AFI, relating to any capital contribution, including the forgiveness of intercompany balances. I do not believe that the existence of these policies alone makes these balances "valid and collectible obligations." To the contrary, the Debtors considered balance forgiveness to be a capital contribution. As such, the Debtors sought approval from AFI because AFI's corporate policies required approval for capital contributions above a threshold.[28]

## THE TOP NINE INTERCOMPANY BALANCES

44.    Mr. Bingham's analysis of the top nine intercompany balances fails to properly consider the historical basis for the buildup of the receivable, the operations and status of the particular entities, and the facts that the receivables were recorded as required by GAAP and the AFI accounting policy regardless of the intent or ability for repayment of the obligation. Based

---

[27] See AFI Accounting Policy 1075 Related Party (Jan. 1, 2012), a copy of which is Exhibit PX-694.

[28] See Hamzehpour Dep. Ex. 1 at 2, a copy of which is Exhibit PX-593.

on my review of the facts and circumstances as they relate to the top nine intercompany balances

below, it is reasonable to conclude that these balances were not intended to be repaid.

### 1.   Intercompany #1 - Residential Capital, LLC intercompany receivable from GMAC Residential Holding Company, LLC

45.     The largest intercompany balance as of the Petition Date is the receivable held by

ResCap, the ultimate parent, due from ResHolding, a direct subsidiary of ResCap which acted as

a holding company for certain operating companies.  As of the Petition Date, the Debtors' books

and records reflected an intercompany balance of approximately $3.33 billion. This

intercompany balance generally arose from transactions where ResHolding received funds from

ResCap and then distributed funds to GMACM for general operating purposes.  The result was

an intercompany receivable on the books of ResHolding from GMACM and an intercompany

payable to ResCap.  ResHolding was not an operating entity and as such was reliant upon its

subsidiaries to meet its obligations.  As of the Petition Date, other than equity in subsidiaries,

ResHolding had de minimis assets.  Interest was accrued on this intercompany balance and cash

settled.  This is the only intercompany balance of the top nine for which interest was cash settled.

46.     In 2009, ResHolding forgave an intercompany payable from GMACM in the

amount of $2.52 billion.  A similar forgiveness of intercompany balances payable by ResHolding

to ResCap was not effectuated even though the main source of repayment for that intercompany

(*i.e.*, the balance to ResHolding from GMACM) had been extinguished.  Between 2009 and the

Petition Date, ResHolding's equity declined from approximately $420 million to approximately

negative $385 million.

47.     ResHolding's ability to repay the intercompany balance to ResCap was impacted

by the forgiveness of the GMACM receivable.  The inconsistency in the forgiveness of

ResHolding's receivable from GMACM but not ResHolding's payable to ResCap can be

explained by the fact that ResHolding did not produce stand-alone financial statements after

2007.  As a result, the intercompany balance payable from ResHolding to ResCap did not appear

on any external balance sheet other than internal trial balances as it was consolidated at the

ResCap level for financial reporting purposes.  Since this intercompany forgiveness did not

occur, ResHolding was left with an intercompany payable to its parent, ResCap, without a

corresponding receivable from its operating subsidiary, GMACM.  If this were a "valid and

collectible obligation" entered into in an arm's-length transaction with ResCap as a true "lender,"

ResCap would not have permitted its "borrower" (*i.e.* ResHolding) to forgive and write off such

a large asset, the recovery from which would have been instrumental in repaying the obligation

to ResCap had repayment been intended.

48.    While there is an agreement possibly relating to portions of the intercompany

balance, that agreement is very limited in nature and omits several important provisions that

would typically be included in an agreement intended to be enforced and collected upon.  The

agreement does not specify a defined interest rate, a maturity date, or repayment terms.  A

typical loan agreement would identify (i) a maturity date upon which repayment must occur, and

(ii) a calculation of interest to be charged specifically identifying the rate and calculation basis of

interest, and frequency of interest payments or accrual.

49.    In a typical third-party lending relationship, it would be common, given the size

of the transaction, to consider ResHolding's capitalization.  In the intercompany relationship

between ResCap and ResHolding, the "borrower" was undercapitalized, to the point where it had

negative equity by the end of 2011.  This undercapitalization was the result of years of losses in

almost all of its downstream operating companies.  In an arm's-length transaction, a lender

would typically seek to protect its loan from an undercapitalized borrower through various

default triggers.  Should equity decrease below a certain threshold, a lender would typically have

the ability to declare a default on a loan or, at the very least, demand a pay down to bring the

loan balance in line with an acceptable level of leverage.  Without such terms identified in a

properly executed and signed loan agreement, a lender does not have the same protections.  It

would be considered highly unlikely for a "valid and collectable obligation" to be made on an

unsecured basis to a company that was undercapitalized and had limited means of repayment.

> ### 2.    Intercompany #2 - Residential Funding Company, LLC intercompany receivable from Residential Capital, LLC

50.    The second largest intercompany balance is the intercompany receivable of RFC

due from ResCap.  RFC is an indirect subsidiary of ResCap.  As of the Petition Date, ResCap

had no unencumbered assets.  The Debtors' books and records reflected an intercompany balance

of approximately $1.96 billion.  Similar to subsidiaries in the ResCap parent-sub relationship, as

cash was generated, it would at times be centralized and swept upward to the parent company as

part of the cash management system and the requirements of the amended and restated secured

loan agreement among certain Debtors and AFI, as amended from time to time, (the "Ally

LOC").  This particular intercompany balance arose out of many journal entries and changed

frequently.

51.    Following the mortgage crisis which started in 2007, RFC experienced significant

losses due to increased loan delinquencies and defaults, which impaired the profitability of the

mortgage servicing business, drove up cash requirements for funding of servicer advances, and

resulted in write-downs of asset values.  RFC was also facing large losses from its international

businesses.  Between 2007 and 2011, RFC consolidated income statements reflected net losses of

approximately $14.75 billion.

52.     In 2010, most of RFC's international business was sold to affiliates of certain funds managed by affiliates of Fortress Investment Group LLC.  Once its international business was sold and its operations were reduced, RFC no longer required allocation of capital and liquidity reinvestment from its parent.  In fact, RFC started to send funds generated from the wind-down process upstream to ResCap through intercompany transactions.  Transfers were at times required under the terms of the Ally LOC facility.  Per the cash management policies under the Ally LOC, cash was swept from the subsidiaries to ResCap so that any funds in excess of the $300 million system wide threshold could be used to pay down any outstanding amounts owed under the Ally LOC.  This transfer of cash from RFC to ResCap led to an increasing intercompany receivable from ResCap.  At the end of 2009, the intercompany balance was approximately $260 million.  By the Petition Date, the intercompany balance had grown to almost $2.0 billion.

53.     The transfers to ResCap were not a "valid and collectible obligation" intended to be repaid.  In fact, the RFC balance sheet was rapidly shrinking as operations were wound down. In 2007, the RFC consolidated balance sheet reflected total assets of approximately $48 billion. By 2011, as the business was wound down, total assets had declined to approximately $4.7 billion.

54.     It is my understanding based upon discussions with management that, during this period, management wanted to close the RFC entity, but could not identify a workable solution to do so because of legal and regulatory restrictions.  Unable to remain profitable on its own, management made the decision to wind down the operations of RFC over time.  In 2008, $2.0 billion of intercompany payables from RFC to ResCap were forgiven so that RFC could meet certain tangible net worth debt covenants.  In 2009, an additional $151 million of payables from

RFC to ResCap were forgiven.  In the aggregate, over $7 billion of intercompany payables from

RFC and its subsidiaries to ResCap were forgiven from 2008 through 2012.

55.    Because RFC was in the process of closing, there would have been no reason to

downstream funds to this entity other than to address temporary liquidity and capital needs.

Further, it is important when examining the intercompany payable to RFC to consider the

forgiveness of over $2.15 billion of RFC intercompany balances held by ResCap in 2008 and

2009.  But for the $2.15 billion forgiveness of balance in 2008 and 2009, RFC would have an

intercompany payable to ResCap in excess of $196 million as of the Petition Date.

56.    There are other indications that this balance was not intended to represent a "valid

and collectible obligation."  The Debtors' books and records show that interest on the

intercompany balance was neither accrued nor paid.  There is no agreement reflecting this

intercompany relationship, but rather only an agreement reflecting a reverse "lender / borrower"

relationship, with ResCap as the "lender" and RFC as the 'borrower".  Without a loan agreement

addressing the actual flow of funds from RFC to ResCap, basic terms of a lending relationship

were not stated—no defined interest rate, defined maturity date, or defined repayment schedule.

Given the magnitude of the intercompany relationship, if this balance had been intended to be

treated as debt, one would have expected a formal lending agreement to have been put into place.

The fact that there was not such an agreement suggests that the Debtors did not consider this

intercompany balance to be a "valid and collectible obligation," but instead a result of

management's efforts to allocate liquidity and capital amongst its subsidiaries.

### 3.    Intercompany #3 - Homecomings Financial, LLC intercompany receivable from Residential Funding Company, LLC

57.    The third largest intercompany balance is the receivable in favor of

Homecomings, due from RFC.  Homecomings is a direct subsidiary of RFC.  As of the Petition

Date, the Debtors' books and records reflected an intercompany balance of approximately $1.25 billion. There is no agreement reflecting this intercompany payable.

58.      As part of normal business operations, Homecomings sold loans to RFC for securitization, subserviced loans, and generated other cash through operations that was swept up to RFC. The receivable balance, which apparently arose, in part, out of operation of the Debtors' centralized cash management system, consists largely of these activities, less payables to RFC for general overhead expenses. The intercompany balance changed frequently until 2008 and included the accrual of interest. However, interest on the intercompany balance was not paid.

59.      In 2008, Homecomings began to wind down its operations following large losses. By the end of 2008, almost all of Homecomings' assets had become largely inactive, but it continued to have wind down activity that generated cash that was swept to RFC.

60.      Homecomings did not need to meet tangible net worth requirements and did not prepare stand-alone financials after 2008. In early 2012, as part of the normal course of business, accounting personnel identified various intercompany balances to be forgiven, including the entire outstanding balance of $1.25 billion from RFC to Homecomings. Due to the impending Chapter 11 bankruptcy, however, actual forgiveness was not implemented. Had forgiveness been completed, this balance would have been reduced to zero.

61.      The intercompany payable from RFC to Homecomings does not have the attributes of a "valid and collectable obligation" expected in a normal arm's-length "lender / borrower" relationship. There is no agreement reflecting this intercompany relationship and no defined interest rate, maturity date, or repayment schedule. If the intercompany balance from RFC to Homecomings had been intended to be treated as debt, some form of a lending agreement would have ordinarily been put into place, with Homecomings as the 'lender" and

RFC as the "borrower".  While there is an agreement reflecting a reverse "lender /borrower" relationship listing RFC as the "lender" and Homecomings as the "borrower", that agreement does not support the direction of the intercompany balance from RFC to Homecomings. Furthermore, the reverse lending agreement itself lacks key attributes of a "valid and collectible obligation" such as a defined interest rate, maturity date, and repayment schedule.  It includes a bankruptcy standstill provision, which provision states that in the event of a bankruptcy, RFC will not look to property or assets of the "borrower" in respect to advances made under the agreement.  It also states that any such obligations will not constitute a claim against the "borrower" in bankruptcy.  In the case of a "valid and collectible obligation," a "lender" would typically have a means to collect should a default occur.  Inclusion of a clause that eliminates the right to enforce a contract in bankruptcy is contrary to what a typical "lender" would require.

### 4.    Intercompany #4 - Passive Asset Transactions, LLC intercompany receivable from GMAC Mortgage, LLC

62.    The fourth largest intercompany balance is the receivable by Passive Asset Transactions, LLC ("PATI") due from GMACM.  PATI is a subsidiary of GMACM.  As of the Petition Date, the Debtors' books and records reflected an intercompany balance of $697 million. According to management, PATI was formed as a passive holding company to hold certain notes from international non-Debtor entities (*i.e.* Flume and GX II).  AFI sought to have the notes secure the Ally LOC facility in a separate legal entity.  Under the Ally LOC facility, the Debtors were required to use any excess cash over $300 million to pay down the debt balance.

63.    The majority of the intercompany balance reflects cash collected by PATI from the non-Debtor entities that was swept to GMACM and then eventually to ResCap.  The assets underlying the notes pledged to PATI were amortizing mortgages which were designed to run off over time.  PATI's asset balances decreased from $335 million in 2008, to $34 million in 2010,

and to $8 million as of the Petition Date.  As with other entities moving cash upstream to a

parent company, recording a receivable is consistent with AFI's accounting policy and GAAP.

Moreover, while AFI's accounting policy and GAAP required the formation of an intercompany

receivable, this was not intended to be a loan transaction, but rather a distribution to the parent

from a subsidiary winding down its assets.

64.     It should also be noted that, in 2008, $44 million of the intercompany balance

payable by PATI to GMACM was forgiven so that PATI could meet certain tangible net worth

debt covenants.  Further, prior to the Petition Date, the entire outstanding balance had been

identified for forgiveness by PATI; this forgiveness was not completed because of the Chapter

11 filing.

65.     If one looks for other attributes of a "valid and collectible obligation," it should be

noted that interest on this intercompany balance was neither accrued nor paid.  While there is no

formal agreement between PATI and GMACM reflecting this arrangement, an agreement does

exist that reflects a relationship from PATI to ResCap but not to GMACM.  That agreement was

titled, Intercompany Advance Agreement, dated June 9, 2009, between ResCap, as "borrower,"

and PATI, as "lender."  Even if that agreement were applicable (and I understand that the

Debtors do not believe that it is), it lacks a fixed maturity date, interest rate, and repayment

terms.

66.     Moreover, the agreement between PATI and ResCap contains a bankruptcy

standstill provision, which provision states that in the event of a bankruptcy, PATI will not look

to property or assets of the "borrower" in respect to advances made under the agreement.  It also

states that any such obligations will not constitute a claim against the "borrower" in bankruptcy.

In the case of a "valid and collectible obligation," a "lender" would typically have a means to

collect should a default occur.  Inclusion of a clause that eliminates the right to enforce a contract

in bankruptcy is contrary to what a typical third-party lender would require.

### 5.    Intercompany #5 - Executive Trustee Services, LLC intercompany receivable from GMAC Mortgage, LLC

67.    The fifth largest intercompany balance is the receivable by Executive Trustee

Services, LLC ("ETS") due from GMACM.  ETS is a direct subsidiary of its parent company

GMACM.  As of the Petition Date, the Debtors' books and records reflected an intercompany

balance of approximately $265 million.  Interest was accrued but not paid on the intercompany

balance and is included within the intercompany balance.

68.    ETS performed foreclosure related services for defaulted loans.  ETS also

collected fees from the sale of charged off loans.  While the general ledger does not reflect why

specific transactions were made, this balance apparently arose, in part, out of operation of the

Debtors' centralized cash management system.  Revenue received by ETS (as foreclosure

trustee) was swept up to GMACM and GMACM, in turn, satisfied ETS's cash needs.

69.    The ETS business was profitable, and as a result, ETS was in a position to

consistently upstream funds to GMACM.  In fact, GMACM was the largest client of ETS,

representing substantially all of its revenue.  ETS had minimal liabilities, and its unsecured

creditors are projected to recover 100% on their claims under the Plan.  Excess funds generated

by ETS were up-streamed to GMACM.  Since ETS was consolidated at the GMACM level for

financial reporting purposes, the intercompany balance was eliminated in GMACM's financial

statements as per the AFI accounting policy and GAAP requirements.

70.    The $265 million balance as of the Petition Date, including any interest which had

been accrued, was identified for forgiveness in 2012, but the process was not completed due to

the Chapter 11 filing.  The process of determining if an intercompany balance should be written

off indicates that these balances were not intended to be repaid but instead were a result of the

management team allocating capital among ResCap and its subsidiaries based on cash needs,

licensing requirements, financial covenants, and cross default provisions.

71.    Management indicated that there was no expectation that ETS would be repaid for

the cash transfers to GMACM, as the entity was profitable and did not require cash or

reinvestment of capital.  In addition, there is no agreement reflecting this intercompany

relationship, and the intercompany balance from GMACM to ETS represented nearly the entirety

of ETS's asset base.

72.    The intercompany payable from GMACM to ETS does not have the attributes of

a "valid and collectable obligation" expected in a typical arm's-length "lender / borrower"

relationship.  If the intercompany balance from GMACM to ETS had been intended to be treated

as debt, one would expect a formal lending agreement to be put into place.  Because there is no

lending agreement, the intercompany relationship lacks key attributes of a "valid and collectible

obligation" such as a defined interest rate, maturity date, or repayment schedule.

### 6.    Intercompany #6 - Residential Funding Company, LLC intercompany receivable from RFC Asset Holdings II, LLC

73.    The sixth largest intercompany balance is the receivable by RFC due from RFC

Asset Holdings II, LLC ("RAHI").  RAHI is a subsidiary of RFC and has very few

unencumbered assets.  As of the Petition Date, the Debtors' books and records reflected an

intercompany balance of approximately $232 million.  There is no agreement reflecting this

intercompany relationship.  Interest was accrued but not paid on the intercompany balance and

has been included within the intercompany balance.  While the general ledger does not reflect

why specific transactions were made, this balance apparently arose, in part, out of operation of

the Debtors' centralized cash management system.

74.    RAHI had significant losses during the period from 2007 through 2011, over $2.4 billion in total.  RFC would account for RAHI's tax liabilities and create an intercompany balance reflecting these liabilities.

75.    The recording of the intercompany balance from RAHI to RFC was required by AFI accounting policies and under GAAP.  As of the Petition Date, RAHI had assets of $204 million and negative equity of in excess of $640 million.  In 2008, $1.2 billion of intercompany balance was forgiven by RFC in favor of RAHI so that RAHI could meet certain tangible net worth debt covenants.  The payable increased after that forgiveness.  This balance was identified by accounting personnel as one to be forgiven if not for the bankruptcy filing.  Identifying this balance for forgiveness indicates that this payable was not intended to be repaid prior to the Petition Date.

76.    The only agreement that identified the intercompany relationship with RAHI as a party, is an agreement between RAHI, as "lender" (not "borrower"), and ResCap (not RFC), as "borrower."  That agreement thus appears to be irrelevant when considering the intercompany balance from RAHI to RFC.  But even if it were relevant, it lacks key attributes of a "valid and collectible obligation."  First, although the agreement does require interest to accrue to RAHI at the "lender's" cost of funds, it does not define this rate.  Second, although the agreement requires payments monthly, it does not specify a fixed maturity date nor does it define a repayment schedule.  Third, it includes a bankruptcy standstill provision, which provision states that in the event of a bankruptcy, RAHI will not look to property or assets of the "borrower" in respect to advances made under the agreement.  It also states that any such obligations will not constitute a claim against the "borrower" in bankruptcy.  In the case of a "valid and collectible obligation," a "lender" would typically have a means to collect should a default occur.  Inclusion of a clause

31

that eliminates the right to enforce a contract in bankruptcy is contrary to what a typical "lender" would require.

77.    The intercompany payable from RAHI to RFC does not have the characteristics of a "valid and collectable obligation" expected in a normal arm's-length "lender / borrower" relationship.  Without an agreement documenting the relationship, the attributes of a "valid and collectable obligation" such as a defined interest rate, maturity date, or repayment schedule are not present.  Book interest was accrued, but it was not paid.  Moreover, as noted above, the entire balance was identified for forgiveness in 2012, but, because of the Chapter 11 filing, was not actually forgiven.

### 7.    Intercompany #7 - Residential Funding Company, LLC intercompany receivable from GMAC Mortgage, LLC

78.    The seventh largest intercompany balance is the receivable by RFC due from GMACM.  Of the top nine intercompany relationships, this balance represents the only intercompany relationship that does not involve a parent-subsidiary structure.  RFC and GMACM were sister organizations, each reporting up to a common parent, ResCap.  As of the Petition Date, the Debtors' books and records reflected an intercompany balance of approximately $140 million.

79.    The majority of the balance consists of amounts recorded in connection with AFI billings for shared services (*e.g.* payroll, outside counsel) and service fee income received by GMACM as subservicer relating to RFC master servicing rights.  As part of the normal course of operations, RFC routinely remitted payment to AFI for services, and RFC then charged GMACM for its portion.  Interest on the outstanding balance did not accrue and was not paid. Unlike the other top receivables which represented intercompany relationships between a parent company and a subsidiary, the receivable to RFC from GMACM was between two sister

companies and was cash settled on a monthly basis per AFI accounting policies as it would not have been eliminated during financial statement consolidation at RFC and GMACM.

80.     The intercompany payable from GMACM to RFC lacks many of the key terms of a "valid and collectable obligation" expected in a normal arm's-length "lender / borrower" relationship.  There is no agreement reflecting the intercompany relationship.  If the intercompany balance from GMACM to RFC had been intended to be treated as debt, one would expect a formal lending agreement to have been put into place.  As there is no lending agreement, there is no defined interest rate and in fact, interest was neither accrued nor charged. Nor is there a defined maturity date or repayment schedule.

### 8.     Intercompany #8 - Home Connect Lending Services, LLC intercompany receivable from GMAC Residential Holding Company, LLC

81.     The eighth largest intercompany balance is the receivable by Home Connect Lending Services, LLC ("HomeConnect") due from ResHolding.  HomeConnect is a subsidiary of ResHolding.  In the organizational structure, there is an intermediary entity, GMACRH Settlement Services, LLC, between HomeConnect and ResHolding.  As of the Petition Date, the Debtors' books and records reflected an intercompany balance of approximately $55 million to HomeConnect from ResHolding.  HomeConnect was a subsidiary that sold insurance and other lending services (credit insurance, title service, life insurance products).  HomeConnect earned fees and passed these fees to GMACRH Settlement Services, LLC, then to ResHolding, and ultimately to ResCap.  I understand that HomeConnect ceased operations in 2008 because there were concerns that the operations may not have been consistent with certain regulatory requirements.

82.     HomeConnect was a relatively small entity, with few assets on its balance sheet. Even though the business ceased operations in 2008, borrowers continued to make premium

payments on old policies, which resulted in cash flows continuing through the Petition Date.

These cash flows were swept upstream as the business had been operationally closed.  While AFI

accounting policies and GAAP required the creation of an intercompany receivable,

HomeConnect did not prepare stand-alone financials, and the intercompany receivable was

eliminated during consolidation.  As in the case of other entities whose operations were shut

down or in the process of being wound down, the entire outstanding intercompany balance from

ResHolding to HomeConnect was identified for forgiveness but was not actually forgiven due to

the bankruptcy filing.  Identifying this balance for forgiveness indicates that this payable was not

intended to be repaid prior to the Petition Date.

83.     The intercompany payable from ResHolding to HomeConnect lacks any of the

attributes of a "valid and collectable obligation" expected in a normal arm's-length

"lender/borrower" relationship.  There is no agreement reflecting this intercompany relationship.

If the intercompany balance from ResHolding to HomeConnect had been intended to be treated

as debt, one would expect a formal lending agreement to have been put into place.  As there is no

lending agreement, there is no defined interest rate, maturity date, and repayment schedule.

Interest between the parties was neither accrued nor paid.  ResHolding had negative equity

beginning in 2011.

### 9.     Intercompany #9 - GMAC Residential Holding Company, LLC intercompany receivable from GMAC Mortgage, LLC

84.     The ninth largest intercompany balance is the receivable by ResHolding, due from

GMACM, a subsidiary of ResHolding.  As of the Petition Date, the Debtors' books and records

reflected a net intercompany balance of approximately $51 million.  This balance is related to the

intercompany receivable from ResHolding to ResCap (Intercompany #1).  As discussed above,

ResHolding served as a holding company, with funding for operations from ResCap to GMACM advanced through ResHolding.

85.     GMACM was one of the two main operating subsidiaries of ResCap. Between 2007 and 2011, GMACM's consolidated income statements reflected net losses of approximately $3.5 billion.  Due to the losses, GMACM was in danger of failing to meet regulatory requirements for net worth.  As a consequence, in 2009, approximately $2.52 billion of intercompany balances payable by GMACM to ResHolding was forgiven so that GMACM could meet certain tangible net worth covenants.  Following this forgiveness, GMACM continued to be a money-losing subsidiary that would continue to incur losses and require additional funding.

86.     The intercompany payable from GMACM to ResHolding does not have the attributes of a "valid and collectable obligation" expected in a normal arm's-length "lender / borrower" relationship.  There is no agreement reflecting this intercompany relationship.  If the balance from GMACM to ResHolding had been intended to be treated as debt, one would expect a formal lending agreement to have been to be put into place.  As there is no lending agreement, there is no defined interest rate, maturity date, and repayment schedule. Interest on the intercompany balance was accrued but not paid.  If interest had been charged, any accrued interest would likely need to have been forgiven as well in order to meet the tangible net worth requirement.  Without such forgiveness, GMACM would have had negative equity and would have been unable to continue operating.  Based on the relationship between ResHolding and GMACM, the intercompany balance does not appear to be a "valid" or "collectable" obligation that was expected to be repaid but rather appears to be an investment in the operations of a subsidiary that was not expected to be repaid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed the 12th day of November, 2013, at New York, New York.

                                    /s/ Gina Gutzeit
                                    Gina Gutzeit