MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Charles L. Kerr
Darryl P. Rains
J. Alexander Lawrence

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------ | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------------------------ | ) | |

**<u>DIRECT TESTIMONY OF TAMMY HAMZEHPOUR</u>**

I, Tammy Hamzehpour, under penalty of perjury, testify as follows:

1.      I am the Chief Business Officer of Residential Capital, LLC ("ResCap"), a debtor
and debtor-in-possession in the above-captioned Chapter 11 cases.  ResCap is the ultimate
parent of the other debtors and debtors-in-possession (collectively with ResCap, the "Debtors").
I have held my current title of Chief Business Officer since February 2013.  From October 2007
until that date, I was the General Counsel for ResCap.  Since joining ResCap in 1998, I have
held various legal positions covering both Mergers & Acquisitions and ResCap's International
Business Group.

2.      In my roles as Chief Business Officer and General Counsel, I am familiar with the
Debtors' business and day-to-day affairs leading up to and during the course of these
bankruptcy cases.

## Summary of Testimony

3.      As set out in the Plan, claims that have been or could be asserted by holders of
Claims and Equity Interests against the Ally Released Parties will be released.  If the Claims
against the Ally Released Parties were allowed to proceed, they would implicate the Debtors'
indemnity and contribution obligations to the Ally Released Parties.  Similarly, if Claims against
the Debtors' current and former officers and directors are not released as provided in the Plan,
they would implicate the Debtors' indemnity obligations to those officers and directors under
the ResCap LLC Agreement and, potentially, the Debtors' alleged indemnity obligations to AFI.

4.      I understand that, in exchange for a release of Claims that have been brought or
could have been brought against the Debtors' current and former officers and directors
regarding their pre- and post-petition actions, the current and former officers and directors who
are currently being defended by Debtors in respect of claims arising out of their officer, director

or other employment positions with Debtors, which defense costs are eligible for coverage under various insurance policies will have agreed to forego any claims for coverage under those insurance policies.   By giving up their insurance, the Debtors' officers and directors will have provided substantial consideration to the Debtors' Estates, which is important to the success of the Plan.

5.    ResCap, GMACM and the Federal Reserve Board have agreed to an Amendment to an April 2011 Consent Order entered into by ResCap, GMACM, AFI, the Federal Reserve and the FDIC.   Under this Amendment, the Debtors have settled the Independent Foreclosure Review and are working with the Federal Reserve Board to expedite settlement payments to Borrowers.

6.    From January of 2008 through the Petition Date, approximately $16.6 billion in intercompany balances was forgiven by the Debtor entities.  I describe the Debtors' and AFI's regular business practice of forgiving intercompany balances and my role in that process.

**Third Party Releases**

7.    Pursuant to the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors*, as may be amended from time to time (the "Plan")[1], Claims that have been asserted or could be asserted by holders of Claims and Equity Interests against the Ally Released Parties[2] will be released (the "Third Party Release"),

---

[1] See The Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors [Dkt. No. 4819-2], a true and correct copy of which is Exhibit PX-868.

[2] The Ally Released Parties are defined in Article I(A)(20) of the Plan.  The Ally Released Parties include, but are not limited to, Ally Financial Inc. (f/k/a GMAC LLC) ("AFI") and its direct and indirect subsidiaries and affiliates (excluding the Debtors and their direct and indirect subsidiaries), and each of AFI's and the Debtors' respective members, shareholders, partners, non-Debtor affiliates and "Representatives."  (See PX-868, Plan Article I(A)7), (14), (20), (71) and (238).)  "Representatives" include AFI's and the Debtors' former and current officers, directors and principals and their employees, agents, financial advisors, attorneys and other professionals.  (*Id*. Article I(A)(238).)

subject to certain, specific carve outs that are specified in the Plan.  (Plan Art. IX(D) & (E).)[3]

Any such Claims that have been or could be brought by third parties, if not released as provided

for by the Plan, might have an effect on the Debtors' Estates.  For example, the Claims against

the Ally Released Parties, if allowed to proceed, would implicate the various indemnification and

contribution obligations between the Debtors and the Ally Released Parties.  Similarly, to the

extent that Claims asserted against Debtors' officers and directors—many of which have filed

proofs of claim in these proceedings[4]—are not released and allowed to proceed, those Claims

would trigger the Debtors' obligations to indemnify those officers and directors under certain

agreements.

8.    *First*, the Debtors have certain indemnification obligations to AFI and its

Affiliates pursuant to an Amended and Restated Operating Agreement, dated as of November 27,

2006, by and between General Motors Corporation, GMAC LLC (n/k/a as AFI) and ResCap (the

"Operating Agreement").[5]  Section 3(c) of the Operating Agreement provides that "ResCap will,

to the fullest extent permitted by law, indemnify, defend and hold harmless" AFI and its

Affiliates "from and against any losses related to ResCap Indemnifiable Liabilities."  (Ex. PX-

589 § 3(c).)  Pursuant to this provision, the Debtors have agreed to indemnify AFI and its

Affiliates for "Liabilities [that] (a) relate to, (b) arise out of or (c) result principally from" the

"businesses and operations . . . of ResCap or its Subsidiaries."  (*Id*. § 1 at 4-5.)  Thus, AFI and/or

---

[3] Note that many of the claims that could be asserted against the Ally Released Parties are in fact claims of the Estates that properly could only be brought by the Debtors.  These claims are subject to the separate Releases by the Debtors, which release a broader group than just the Ally Released Parties.  (Plan Art. IX(C).)

[4] Exhibits PX-1330 through PX-1375 are true and correct copies of the proofs of claims filed by directors and officers in these proceedings.

[5] Exhibit PX-589 is a true and accurate copy of the Operating Agreement.  Under the Operating Agreement, "Affiliates" is defined very broadly and means with respect to AFI, any other Person – defined to be any "individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity and any Governmental Authority – "directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such Person."  (Ex. PX-589 § 1.)

an Affiliate may seek indemnification from the Debtors if it incurs losses, damages and/or costs

of defense costs resulting in or from actions where claims and allegations "relate to, arise out of

or result principally from" the "businesses and operations . . . of ResCap or its Subsidiaries"—

*i.e.*, the origination, acquisition, securitization, and servicing of mortgage loans.  (*Id*. § 1 at 4-5 &

§ 3(c).)  These indemnification obligations are parallel in scope to the Plan's release of Ally

Released Parties for liability "arising from or related in any way to the Debtors."  (Plan Art.

IX(D).)

9.    *Second*, the Debtors' current and former directors and officers are entitled to

indemnification from ResCap for a broad variety of claims pursuant to the Amended and

Restated Limited Liability Company Agreement of Residential Capital, LLC, dated and

effective March 31, 2008 (the "ResCap LLC Agreement").[6]  The ResCap LLC Agreement

provides for indemnification for any loss or damage incurred by any employee, officer, or

director who is "a party or is threatened to be made a party to any threatened, pending or

completed action, suit or proceeding, whether civil, criminal, administrative or investigative"

and provides indemnification for "expenses (including attorneys' fees), judgments, fines and

amounts paid in settlement actually and reasonably incurred by the [officer, director, or

employee or on that person's behalf] in connection with such action, suit or proceeding and any

appeal therefrom."  (Ex. PX-590 § 18(a)(i)-(ii).)  Those indemnification obligations cover losses

and defense costs associated with claims arising out of an act or omission committed in good

faith while acting as an officer, director, or employee.  (*Id*.)  Fees must be advanced, regardless

of whether the officer or director is alleged to have acted in bad faith, and only if it is ultimately

---

[6] Exhibit PX-590 is a true and accurate copy of the ResCap LLC Agreement.

determined that the director or officer is not entitled to indemnity must the director or officer

repay the advanced fees.  (*Id.* at § 18(d)(i).)

10.      *Third*, the Debtors have certain indemnification obligations to Ally Securities,

LLC ("Ally Securities") pursuant to various underwriting agreements the Debtors entered into in

connection with the sale of certificates for different securitized trusts (the "Underwriting

Agreements").  A representative example of one of these Underwriting Agreements is the

Residential Funding Mortgage Securities II, Inc. Home Equity Loan Pass-Through Certificates,

Series 2007-HSA2 Underwriting Agreement, dated April 23, 2007. [7]  Section 7 of this

Underwriting Agreement provides that RFMSII and RFC, jointly and severally, agree to

indemnify the underwriters, and each person who controls any underwriter, named in the various

Underwriting Agreements (including Ally Securities) for claims related to the offering materials.

To the extent that Ally Securities incurs liability in connection with the Underwriting

Agreements, it will have direct claims against the Debtors' Estates based on these

indemnification provisions in these Underwriting Agreements.  I understand that most of the

Underwriting Agreements entered into by the Debtors in connection with other securitization

trusts contain similar indemnification obligations.

11.      *Fourth*, Ally Bank has indemnity rights against GMAC Mortgage, LLC (f/k/a

GMAC Mortgage Corporation) ("GMACM") under certain custodial agreements entered into

between, among others, Ally Bank and GMACM in connection with numerous private label,

Ginnie Mae, and GSE securitization transactions (the "Custodial Agreements").  A

representative example of one of these agreements is the Custodial Agreement, dated June 29,

---

[7] Exhibit PX-620 is a true and accurate copy of this Underwriting Agreement, dated April 23, 2007, which is an
agreement between Residential Funding Mortgage Securities II, Inc. ("RFMSII") and Residential Funding
Corporation ("RFC") incidental to the Pooling and Servicing Agreement dated as of April 1, 2007 among RFMSII
and LaSalle Bank National Association.

2006, by and between JPMorgan Chase Bank, National Association, GMACM and Ally Bank.[8]

Under this Custodial Agreement, Ally Bank agreed to serve as a custodian of the underlying

mortgage loan files on behalf of the respective RMBS Trust.  Section 3.2 of this Custodial

Agreement provides that GMACM, as the servicer of the underlying mortgage loans, "agrees to

indemnify and hold the Custodian [Ally Bank] harmless from and against all claims and

liabilities, *including payment of the Custodian's legal fees and expenses*."  (See Ex. PX-614 §

3.2 (emphasis added).)

12.     *Fifth*, the Debtors' current and former directors and officers are entitled to

indemnification from AFI under Article VIII(D) of AFI's Amended and Restated Certificate of

Incorporation, as Amended.[9]  Under this Certificate of Incorporation, AFI "shall indemnify and

hold harmless each person who was or is made a party or is threatened to be made a party to or is

involved in or participates as a witness with respect to any action, suit or proceeding, whether

civil, criminal, administrative or investigative (each a "Proceeding"), by reason of the fact that he

or she, or a person of whom he or she is the legal representative, is or was a director or an

officer, or is or was serving at the request of the Corporation as a manager, director, officer,

employee, fiduciary or agent of another entity (collectively, the "Indemnified Persons") from and

against any and all loss, cost, damage . . . (including reasonable attorney's fee and expenses of

attorneys and other advisors and any court costs incurred by any Indemnified Person) or liability

actually and reasonably incurred by the person in connection with the Proceeding . . ." (Ex. PX-

636, Art. VIII(D).)  AFI is also responsible for paying in advance any reasonable expenses,

---

[8] Exhibit PX-614 is a true and correct copy of the Custodial Agreement for the Mortgage Loans of GMAC Mortgage Home Equity Loan Trust 2006-HE2.

[9] Exhibit PX-636 is a true and correct copy of AFI's Amended and Restated Certificate of Incorporation, as amended dated as of March 25, 2011; see also Exhibit PX-637 which is a true and correct copy of AFI's Amended and Restated Certificate of Incorporation, dated as of December 30 2009.

including the reasonable costs of defense) incurred by an Indemnified Person.  (*Id.* Art. VIII(E).)
To the extent that AFI incurs any such costs with respect to liabilities that arise out of or result
principally from the business and operation of ResCap and its Subsidiaries, AFI may seek
indemnification from the Debtors under the Operating Agreement.

13.     Finally, I understand that the Debtors and the Debtors' officers and directors share
insurance coverage with AFI and other non-debtor affiliates under insurance policies procured by
AFI.  Any policy proceeds spent on indemnifying or defending AFI or the other non-debtor
affiliates in connection with Claims arising out of the Debtors' business reduces the amount of
insurance coverage available to Debtors under those policies and, thus, could have a conceivable
effect on the Debtors' Estates.

**Release by Officers and Directors of**
**Their Rights Under Various Insurance Policies**

14.     In addition to the foregoing, the Plan provides for a release of Claims that have
been brought or could have been brought against the Debtors' current and former officers and
directors regarding their pre- and post-petition actions.  (See PX-868, Plan Art. I(A)(20)
(definition of "Ally Released Parties"); id. Art. I(A)(70) (definition of "Debtor Released
Parties"); id. Art. I(A)(236) (definition of "Released Party"); id. Art. I(A)(238) (definition of
"Representative") and id. Art. IX(C) & (D) (setting forth releases).)  In exchange for these
releases, I understand that the Debtors' current and former officers and directors will forego any
claims for coverage they may have, with respect to those Claims that are released under the Plan,
under various insurance policies covering the Debtors or their current and former officers and
directors for the period between November 2006 and the Effective Date.  (See id. Art. I(A)(275)
(definition of "Settlement Insurance Policies"); id. Art. IV(B)(c) (setting forth the settlement of
the Debtors' Rights to and under Settlement Insurance Policies).)  Additionally, I understand that

the Debtors' current and former officers and directors will waive contractual claims, if any, for

indemnification under the ResCap LLC Agreement, with respect to those claims released under

the Plan, that the current and former officers and directors of the Debtors may have against the

Debtors.  (See id. Art. IV(B)(c).)  By giving up their insurance and contractual indemnity claims,

the Debtors' officers and directors will have provided substantial consideration to the Debtors'

Estates, which is important to the success of the Plan.

### Amendment to the Consent Order with the Federal Reserve Board and the Federal Deposit Insurance Corporation

15.    In June 2013, ResCap, GMACM and the Federal Reserve Board (the "FRB")

agreed in principle to the terms of an amendment to a previous Consent Order, dated April 11,

2011, entered into by ResCap, GMACM, AFI and the FRB and the FDIC (the "Consent Order").

This amendment to the original Consent Order was signed by ResCap, GMACM and the FRB on

or about July 26, 2013 (the "Amendment to Consent Order," and the contents thereof, the "FRB

Settlement") in order to satisfy certain obligations contained in the Consent Order, including the

independent foreclosure review ("IFR") obligations set forth in paragraphs 3 and 4 of the

Consent Order.[10]  Under the FRB Settlement, approximately $230 million previously escrowed

by GMACM was released into a Qualified Settlement Fund.  It is my understanding that funds

from the Qualified Settlement Fund will ultimately be paid directly to all Borrowers who were in

the review population for the IFR.  By entering into the FRB Settlement, which was approved by

the Bankruptcy Court on July 26, 2013,[11] the Debtors ensured expedited payment to a vastly

larger number of Borrowers than would have potentially received remediation payments had the

IFR continued to its conclusion.  Further, the FRB Settlement avoids the hundreds of millions of

---

[10] Exhibit PX-666 is a true and accurate copy of the Amendment to Consent Order.

[11] See Order Granting Debtors' Motion Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 363(b)(1) Authorizing the Debtors to Enter Into and Perform Under Amendment to Consent Order [Dkt. No. 4365], a true and correct copy of which is PX-860.

dollars of costs the Debtors would have incurred by continuing to conduct the IFR under the

Consent Order, resulting in a decrease in the distributions to Borrowers and other holders of

General Unsecured Claims.

16.     The Plan provides that, to the extent a holder of a Borrower Claim receives

payments pursuant to the Debtors' obligations under the Consent Order, the amount of such

Borrower Claim shall be reduced in an amount equal to the amount received.  (See PX-868, Plan

Art. IV(F)(6).)  Based on a review of the Debtors' claims register by the Debtors' employees and

management working under my supervision and by FTI, and assuming certain pending

objections to claims are sustained by the Bankruptcy Court, the Debtors estimate that

approximately 170 holders of Borrower Claims, to the extent their claims are allowed, may have

their Claims reduced by amounts equal to the amounts such holders receive under the FRB

Settlement.  The exact number of reductions on account of distributions made under the FRB

Settlement remains subject to change based upon the ongoing claims reconciliation process.

**Forgiveness of Intercompany Balances**

17.     From January 2008 through the Petition Date, approximately $16.6 billion in

intercompany balances was forgiven by the Debtor entities.[12]  In connection with the forgiveness

of intercompany balances, the Debtors' accounting department monitored and reviewed, among

other things, the Debtors' quarterly financials and their trial balances to determine whether those

entities were in compliance with certain capital or net worth covenants under debt arrangements,

including the Revolving Credit Agreement, certain state and federal agency capital or net worth

requirements, and similar requirements of government-sponsored entities Fannie and Freddie

Mac ("GSE's.  The purpose of this monitoring and review was, in part, to identify in advance

---

[12] Exhibit PX-633 is a true and correct copy of an email from Barbara Westman with an attached spreadsheet
entitled "Debt Forgiveness Summary_2008-May 13 2012 with filters.xls", incorporating internal company data
concerning historical debt forgiveness.

when it might be appropriate and/or necessary to allocate capital to those entities in order to

maintain the required net worth or capital levels.  If the accounting department determined that

an entity was at risk of breaching a covenant under some credit agreement or would potentially

not be in compliance with any applicable state, federal agency or GSE capital or net worth

requirements, they would develop a recommendation as to the amount of capital contribution

and/or what amount of intercompany balances could be forgiven in order to ensure that the

specific Debtor would remain in compliance.  At this point, the need to forgive a company

balance or make a capital contribution would be presented to the ResCap CFO, and in certain

instances, the ResCap Executive Committee, for approval.[13]

18.     Under a General Delegation of Authority, dated August 27, 2008, the Board of

Directors of ResCap delegated to the Chairman and Chief Executive Officer and the Chief

Financial Officer of the Company, acting together, the authority to allocate the capital of ResCap

to its subsidiaries, provided that if that allocation is required in order to replenish any equity

capital of a subsidiary that had eroded due to operating losses within the preceding twelve

months, they had to obtain the approval of the Executive Committee of the ResCap Board.[14]

This procedure was implemented, in part, to make sure that the CEO, CFO and the Executive

Committee would be informed if a reallocation of capital or other infusion of equity was required

because of recent operating losses at a ResCap subsidiary.  While this Delegation of Authority

did not expressly refer to the forgiveness of intercompany balances, any such forgiveness of an

existing balance would operate as a reallocation of a portion of Debtors' overall capital to the

relevant subsidiary and avoid the need to make a capital infusion in the form of cash.

---

[13] Exhibit PX-593 is a true and accurate copy of an email that I received from Barb Westman attaching this written procedure.  I received this email on or about March 26, 2010, and it is in the same condition as when I received it.

[14] Exhibit PX-592 is a true and accurate copy of a Residential Capital, LLC Delegation of Authority, dated August 27, 2008.

19.    Consistent with this policy and procedure, the Boards of Directors for ResCap,

RFC and GMACM approved, from time to time, Board resolutions authorizing allocation of

capital to their respective subsidiaries in the form of "forgiveness of the debt of each [of] the

Affiliates in order to replenish each of their respective capital, in each case in an amount

necessary to enable the respective Subsidiary to be solvent and carry positive capital at the end of

each calendar month."[15]

20.    Separately, in November 2011, the Board of Directors of AFI voted to reserve

certain corporate authority to itself (the "AFI Board Authority Policy").[16]  My understanding is

that the AFI Board took this step because it wanted greater clarity over the scope and limitations

of authority granted to AFI's then-current CEO and its subsidiaries.  Under this AFI Board

Authority Policy, Board approval was required for "[a]n injection of equity into any company or

joint venture where, as a result of such capital injection, [AFI] invests $50 million or more."[17]

While forgiveness of intercompany balances was not a transaction that was specifically

delineated in this AFI Board Authority Policy, the finance departments of both AFI and the

Debtors took a conservative view of the Policy and, because the forgiveness of intercompany

balances was generally treated for accounting purposes as an infusion of equity, Debtors

regularly sought approval from AFI for any forgiveness of intercompany balances over $50

million.

21.    In my role as General Counsel, I regularly assisted in liaising with the CFO and

the Executive Committee of ResCap and/or with the AFI legal staff in charge of Board and

---

[15] Exhibit PX-594 is a true and accurate copy of Written Consent in Lieu of Meeting of Board of Directors of RFC, dated Nov. 12, 2009.  Exhibit PX-595 is a true and accurate copy of a Written Consent in Lieu of Meeting of Board of Directors of GMACM, dated December 10, 2009.

[16] Exhibit PX-682 is a true and correct copy of the AFI Board Authority Policy, attached to a cover email.

[17] See Ex. PX-682 at 3.

governance matters with respect to preparing any necessary consents required for forgiveness of

intercompany balances.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 12th day of November, 2013 at Minneapolis, Minnesota.


_____/s/  Tammy Hamzehpour_____
Tammy Hamzehpour