MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Charles L. Kerr
Darryl P. Rains
J. Alexander Lawrence

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

------------------------------------------------------------------

**<u>DIRECT TESTIMONY OF LEWIS KRUGER</u>**

I, Lewis Kruger, under penalty of perjury, testify as follows:

## SUMMARY OF TESTIMONY

1.    I am the Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors in possession (collectively, the "Debtors").[1]

2.    I offer this testimony in support of the Joint Chapter 11 Plan (the "Plan") proposed by the Debtors and the Official Committee of Unsecured Creditors (the "Committee").[2]

3.    The Plan is a proper exercise of the Debtors' business judgment and complies with Section 1129(a) of the Bankruptcy Code.  The Plan also enjoys overwhelming support from the Estates' creditors, including the Estates' largest claimant constituencies, asserting tens of billions in claims.  The supporting creditors include, but are not limited to, the Committee, the Consenting Claimants, the RMBS Trustees, the Supporting Senior Unsecured Noteholders (including Paulson, and Wilmington Trust, as indenture trustee), the Kessler Class Claimants, the Federal Housing Finance Agency ("FHFA"), Financial Guaranty Insurance Company ("FGIC"), MBIA Insurance Corporation ("MBIA"), Ambac Assurance Corporation ("Ambac"), and Assured Guaranty, Ltd ("Assured").  The Plan has also received overwhelming support from those creditors that voted on the Plan.  As set forth in the voting certification of Kurtzman Carson Consultants LLC ("KCC"), 95% of the creditors in number and tens of billions of value voted to accept the Plan.

4.    The Plan is the culmination of extensive, good faith negotiations guided by the Honorable James M. Peck, a United States Bankruptcy Judge for the Southern District of New York, as mediator (the "Mediator"), among the Debtors, the Committee, Ally Financial, Inc.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or Disclosure Statement.

[2] See The Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors [Dkt. No. 4819-2], a true and correct copy of which is Exhibit PX-868.

1

("AFI"), and the Consenting Claimants.  The terms of the Plan are premised upon AFI's

agreement to provide, in addition to the substantial financial and operational support already

provided to the Estates throughout the Chapter 11 Cases, an additional contribution of $2.1

billion in plan funding (the "Ally Contribution"), in exchange for the Debtors Release and Third

Party Releases.  In addition, the Plan settles a variety of highly complex disputes that have been

a source of contention throughout the Chapter 11 Cases and which, if left unresolved, would

have led to years of costly litigation and resulted in significant uncertainty and delays in

distributions to creditors.  Each of the settlements embodied in the Plan are dependent upon all

others and, thus, constitute a global settlement (the "Global Settlement") of the numerous issues

resolved under the Plan.

5.      In my role as CRO for the Debtors, I evaluated the various settlements that are

part of the Global Settlement and the Plan (the "Plan Settlements") and the releases provided

therein and concluded that the Plan Settlements constitute a fair, equitable and reasonable

compromise in connection with their respective claims.

6.      Based on my review of the complex issues presented by the underlying claims,

the positions taken by parties with respect to these claims, and the risks associated with litigating

the claims, I believe that the Plan Settlements benefit the Debtors and their creditors by

compromising, resolving and eliminating substantial claims against the Debtors' Estates.

7.      The Plan Settlements will provide substantial benefits to all of the Debtors, the

Debtors' Estates and to their creditors.  The Plan Settlements eliminate the enormous costs and

complexities associated with potential future litigation of claims, enable the Debtors and their

Estates to receive a considerable financial contribution from AFI, and move the Debtors closer to

accomplishing a successful Chapter 11 plan of liquidation.  Absent the Plan Settlements, the

2

Debtors' Estates would be diminished significantly and there is little likelihood that the creditors would see a distribution, if any, for years to come.

8.      The parties to the mediation (the "Mediation") had highly divergent interests. This was evident from the contentious disputes and issues that were being litigated in connection with (i) the motion seeking approval of the Original RMBS Settlement under Bankruptcy Rule 9019 (the "RMBS 9019 Motion"), (ii) the adversary proceedings commenced to subordinate claims, (iii) various claims objections, (iii) the motions seeking standing to pursue claims and causes of action against AFI and its affiliates, and (iv) third party litigation against Ally outside of the Bankruptcy Court (each of which were ultimately resolved as part of the Global Settlement).  The Debtors and each of the other parties who negotiated and ultimately agreed to the Global Settlement were represented by competent and experienced counsel and advisors.  I personally met numerous times with each of these parties and their counsel after my appointment as CRO to work on resolving all of these issues.  In making my business judgment that it was in the Debtors' best interests to enter into the Global Settlement, I was able to draw on that firsthand experience, my work with the Debtors' counsel and financial advisors, my interaction with the Committee and their counsel and advisors, other creditors and their advisors, and my lengthy experience as a bankruptcy and restructuring lawyer.  From my perspective, I believe that discussions and negotiations over the issues that ultimately led to the Plan and Plan Settlements were conducted professionally and at arm's-length.

## EXPERIENCE AND ROLE

9.      Prior to my engagement as CRO, I was a partner and Co-Chair of the Financial Restructuring Group at Stroock & Stroock & Lavan LLP, a law firm that has extensive experience in all aspects of restructuring and insolvency matters.  I have over fifty years of

3

restructuring experience and have played a role in many significant reorganization proceedings
in the United States, representing debtors, official and ad hoc committees, financial institutions
and acquirers of assets.

10.    I have also previously represented a number of debtors as they sought
confirmation of a Chapter 11 plan, including Columbia Gas Systems, Seatrain Lines, Anchor
Glass Container Corporation, Tiphook Finance Corporation, Neisner Brothers, Planet
Hollywood, The Icing and Victor Technologies.

11.    On February 11, 2013, I was appointed by the Debtors to serve as their CRO
pursuant to a February 11, 2013 engagement letter, as amended (the "Engagement Letter").[3]  On
March 5, 2013, the Court approved my appointment as CRO for the Debtors and the terms of my
Engagement Letter (the "Retention Order").[4]

12.    My Engagement Letter sets out my responsibilities and authority to act on behalf
of the Debtors.  Under the Scope of Services, the Engagement Letter provides that "Mr. Kruger
shall serve as the Chief Restructuring Officer (the "CRO") of the Debtors [and] shall report
directly to the Board Directors of Residential Capital, LLC (the "Board")".[5]  It further provides
that:

> [T]he CRO shall be vested with the Debtors' powers to oversee,
> manage, and direct the acts, conduct, assets, liabilities and
> financial conditions of the Debtors, the operation of the Debtors'
> business [in] any matters relevant to the case, including without
> limitation, the authority to:

---

[3] Exhibit PX-846 is a true and accurate copy of the Engagement Letter, dated February 11, 2013, as amended [Dkt. Nos. 2887-5 & 3074-1].

[4] See Order Granting Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer, dated March 5, 2013 [Dkt. No. 3103], a true and correct copy of which is Exhibit PX-849.

[5] See Ex. PX-846 at 7.

4

    i.    direct Debtors' respective management teams and professionals in connection with the Debtors' efforts to negotiate and settle the Claims against the Debtors, and propose a schedule and process for the litigation of disputed claims, including, but not limited to, those held by the monolines, junior secured bonds, the RMBS Trustees, and securities claimants;

    ii.    direct the Debtors' executive management teams and professionals in developing and implementing an efficient liquidation of the Debtors' assets for the benefits of the Debtors' unsecured creditors;

    iii.    direct the litigation strategy of the Debtors including the investigation, prosecution, settlement and compromise of claims filed against the Debtors and of estate causes of action;

    iv.    direct the Debtors' executive management team and professionals in formulating a chapter 11 plan;

    v.    communicate and negotiate with the Debtors' creditors and key stakeholders, including the official committee of unsecured creditors (the "Creditors Committee"), and assist such parties in working towards a consensual chapter 11 plan;

    vi.    make decisions on behalf of each Debtor with respect to chapter 11 plan negotiations and formulation, in such a manner as is consistent with the business judgment rule, the provision of applicable law, taking into account the respective fiduciary duties of the CRO to each Debtor's respective estate;

    vii.    cooperate with the Creditors' Committee in negotiations with Ally Financial Inc. ("AFI") to attempt to pursue a global settlement of the Debtors' claims against AFI that is acceptable to all major stakeholders;

    viii.    represent the Debtors' interests through counsel before this Court; . ..

*Id.* My Engagement Letter also makes clear that "[e]ach of the Debtors acknowledges and agrees that the Services being provided hereunder are being provided on behalf of them, and the

5

Company, on behalf of each Debtor, hereby waives any and all conflicts of interest that may

arise on account of the Services being provided on behalf of any other entity." *Id.* at 4.

## MY INITIAL WORK AS CRO

13.    Immediately after being retained as CRO, I worked closely with the Debtors'

employees, the Debtors' counsel and the Debtors' financial advisors to learn about the Debtors,

their businesses and their current condition.  I also spent substantial time familiarizing myself

with the prior proceedings in the Chapter 11 Cases and became directly involved in the ongoing

mediation process that was being overseen by Judge Peck.  I had meetings with AFI and the

Committee and began meeting with the Debtors' various creditors so that I could better

understand the nature of their claims and the defenses and responses to those claims.

14.    I also read materials and attended presentations about the Debtors' historical

business, the nature of the Debtors' relationships to its affiliates, the Debtors' prepetition

transactions, governmental regulatory issues and prepetition governmental agreements, the

RMBS Trusts and Trustees, the monoline insurers (such as FGIC and MBIA) that insured certain

securities in certain of the Trusts, the securities claimants, the intercompany transactions, and

various other creditors for the Debtors.  For example, on or about April 4, 2013, I met with

Debtors' advisors and received a presentation on intercompany transactions.[6]

15.    Further, I read and reviewed proofs of claims submitted by the monolines and

other parties in these Chapter 11 Cases, such as the proofs of claim filed by MBIA,[7] and one of

the proofs of claim filed by FGIC.[8]

---

[6] Exhibit PX-591 is a true and accurate copy of a presentation I received on April 4, 2013, entitled "ResCap – Intercompany Transactions." I recall receiving the presentation on or about April 4, 2013.

[7] Exhibits PX-1211 through PX-1216 are true and accurate copies of Claim Nos. 5846, 5847, 5848, 5849, 5850, and 5851 filed by MBIA, dated November 16, 2012.

6

16.     In addition, I read various pleadings and motions filed by, and against, the

Debtors, that highlighted the key legal issues I needed to consider as part of the Mediation and

negotiation process.  For example, I reviewed the Debtors' complaint and motion for summary

judgment in the adversary proceeding against certain securities claimants, which highlighted the

contentious legal issue of possible subordination of claims.[9]  I also reviewed the Committee's

Standing Motion,[10] which outlined the claims the Debtors could attempt to assert against AFI

absent the Global Settlement.  Further, I reviewed the Debtors' submissions in connection with

their adversary proceeding to extend the automatic stay to certain non-Debtor affiliates in private

label securitization suits,[11] all of the Debtors', AFI's and the Committee's pleadings in

connection with AFI's Motion to Extend the Stay relating to the *Rothstein* putative class action,[12]

---

[8] Exhibits PX-951 through PX-953 are true and accurate copies of Claim Nos. 4868, 4870 and 4871 filed by FGIC, dated November 16, 2012.

[9] See Memorandum of Law in Support of Debtors' Motion for Summary Judgment in *Residential Capital LLC v. Allstate Insurance Co.*, Adv. Case No. 13-01262 (MG) [Dkt. No. 26], a true and correct copy of which is Exhibit PX-808; see also Complaint in *Residential Capital LLC v. Allstate Insurance Co.*, Adv. Case No. 13-01262 (MG) [Dkt. No. 1], a true and correct copy of which is Exhibit PX-801.

[10] See Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates [Dkt. No. 3412], a true and correct copy of which is Exhibit PX-852.

[11] See Complaint, Case No. 12-ap-01671 (MG) [Dkt. No. 1], a true and correct copy of which is Exhibit PX-802; Debtors' Motion to Extend the Automatic Stay or, in the Alternative, for Injunctive Relief Enjoining the Prosecution of Certain Litigation Against Debtors' Directors and Officers and Non-Debtor Corporate Affiliates, Case No. 12-ap-01671 (MG) [Dkt. No. 4], a true and correct copy of which is Exhibit PX-803; Debtors' Omnibus Reply in Support of Their Motion to Extend the Automatic Stay or, in the Alternative, for Injunctive Relief Enjoining the Prosecution of Certain Litigation Against Debtors' Directors and Officers and Non-Debtor Corporate Affiliates, Case No. 12-ap-01671 (MG) [Dkt. No.57], a true and correct copy of which is Exhibit PX-894; see also Debtors' Objection to Motion of the Federal Housing Finance Agency for Relief from the Automatic Stay [Dkt. No. 1023], a true and correct copy of which is Exhibit PX-819; Debtors' Supplemental Brief in Support of its Objection to the Motion of Federal Housing Finance Agency for Relief from the Automatic Stay [Dkt. No. 1295], a true and correct copy of which is Exhibit PX-821.

[12] See Joint Motion for an Order Extending the Automatic Stay Pursuant to 11 §§362(A) and 105(A) to Enjoin Prosecution of Claims Against Debtors' Non-Debtor Affiliates in the Putative Class Action Entitled *Rothstein, et al. v. GMAC Mortgage, LLC, et al.* [Dkt. No. 4871], a true and correct copy of which is Exhibit PX-870; Motion By Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. § 362 (a)(3) By (1) Enjoining Prosecution of Alter Ego and Veil Piercing Claims in the Class Action Entitled Landon Rothstein, et al. v GMAC Mortgage, LLC et al., and (2) Declaring Such Claims Void Ab Initio [Dkt. No. 2511], a true and correct copy of which is Exhibit PX-834.

7

and the Debtors', AFI's and the Committee's pleadings relating to the classification of the

Debtors' obligations under the FRB Consent Order.[13]

17.    In connection with the RMBS 9019 Motion, I reviewed pleadings filed by the

various parties regarding the claims of the RMBS Trusts against the Debtors,[14] including the

objections submitted by opposing parties, such as the Junior Secured Noteholders.[15]  In

particular, I read and reviewed declarations submitted by Jeffrey Lipps[16] and Frank Sillman,[17] as

well as the Debtors' other fact and expert witnesses, which provided me with a detailed overview

of the types of claims that had been or could be asserted by claimants such as the Trustees and

---

[13] See Debtors Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination That (I) GMAC Mortgages FRB Foreclosure Review Obligation Is a General Unsecured Claim and (II) The Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Dkt. No. 3055] , a true and correct copy of which is Exhibit PX-847.

[14] See, e.g., Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Settlement Agreements [Dkt. No. 320], a true and correct copy of which is Exhibit PX-810; Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Dkt. No. 1176], a true and correct copy of which is Exhibit PX-820; and Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Dkt. No. 1887], a true and correct copy of which is Exhibit PX-822; Debtors' Reply Brief re: Objection of Junior Secured Noteholders to Motion for Approval of RMBS Settlement Agreements, dated March 15, 2013 [Dkt. No. 3221], a true and correct copy of which is Exhibit PX-850.

[15] See, e.g., Objection of The Ad Hoc Group of Junior Secured Noteholders (JSNs) to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of The RMBS Trust Settlement Agreements [Dkt. No. 2824], a true and correct copy of which is Exhibit PX-844; Objection of The Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Dkt. No. 2825], a true and correct copy of which is Exhibit PX-845; Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Dkt. No. 2819], a true and correct copy of which is Exhibit PX-843; Objection of Wilmington Trust, National Association to the Debtors' Second Supplemental Motion Pursuant to Fed, R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Dkt. No. 2814], a true and correct copy of which is Exhibit PX-842; Objection of MBIA Insurance Corporation to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Dkt. No. 2810], a true and correct copy of which is Exhibit PX-841; Objection of Assured Guaranty Municipal Corp. and Certain Affiliates to Debtors' Motion Pursuant to Bankruptcy Rule 9019 for Order Approving RMBS Trust Settlement Agreements [Dkt. No. 2791], a true and correct copy of which is Exhibit PX-836.

[16] See, e.g., the Declaration of Jeffrey A. Lipps, sworn to May 24, 2012 [Dkt. No. 320-9], a true and correct copy of its Exhibit PX-812; the Supplemental Declaration of Jeffrey A. Lipps, dated September 28, 2012 [Dkt. No. 1887-4 & 1887-5] , a true and correct copy of which is Exhibit PX-823; and the Reply Declaration of Jeffrey A. Lipps, sworn to January 15, 2013 [Dkt. No. 2805], a true and correct copy of its Exhibit PX-838.

[17] See Declaration of Frank Sillman [Dkt. No. 320-8], a true and correct copy of which is Exhibit PX-811; Supplemental Declaration of Frank Sillman [Dkt. No. 1887-6], a true and correct copy of which is Exhibit PX-824; Reply Declaration of Frank Sillman in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of The RMBS Trust Settlement Agreements [Dkt. No. 2807], a true and correct copy of which is Exhibit PX-839.

monolines against the Debtors and the complexities presented by the various litigations addressing those issues.

18.    Based on those efforts, my years of experience, and my role as CRO for the Debtors, I became familiar with the parties' respective positions regarding potential estate claims and causes of action, as well as the priority and nature of the various claims asserted against the Debtors in these Chapter 11 Cases.

19.    This familiarity enabled me to be actively involved in developing and evaluating strategy in the Chapter 11 Cases and to work with the Debtors' counsel and financial advisors on contested matters before the Court.

20.    For instance, because the monoline insurers represent one of the largest creditor groups in the Debtors' bankruptcy cases, I participated in analyzing the validity, priority and amount of the claims asserted by the monoline insurers as well as the implications of the Bankruptcy Code on the treatment of monoline insurers' claims.  I was also involved in the process of (i) preparing objections to the claims filed by certain monoline insurers and (ii) planning for anticipated litigation regarding the monolines' claims, including considering various defenses to those claims such as subordination.

21.    In evaluating settlements of the private securities litigation related to the Debtors' RMBS business, including establishing a Private Securities Claims Trust, I drew on my understanding of the Debtors' efforts to subordinate certain of the Claims held by the Private Securities Claimants.  As noted above, I reviewed the Debtors' complaint and the cross motions for summary judgment in the adversary proceeding to subordinate certain securities claimants. From the Debtors' efforts in that adversary proceeding, I understood the great difficulty and

9

substantial risks the Debtors faced in litigating the priority of those securities claims.[18]  I also

considered that the private securities claimants claimed that they suffered losses totaling $2.1

billion and understood that the Debtors' potential liability could amount to a significant portion

of those asserted losses.  Moreover, from the Debtors' efforts to extend the automatic stay to

certain private securities-related litigation against non-debtor affiliates, I was aware of the vast

scope and expense of discovery the Debtors would face in litigating the private securities claims

to final resolution.[19]

### INVOLVEMENT IN THE MEDIATION PROCESS

22.    A key part of my role and goal as the Debtors' CRO was to negotiate a consensual

chapter 11 plan that would have the support of substantially all the Debtors' creditors and key

stakeholders.  To do this, I expended substantial efforts to gain a comprehensive understanding

of the claims and interests of all the parties involved in these cases, to identify the risks faced by

the Debtors in these cases, and to consider the potential compromises that could be achieved

among the various and competing constituencies.  My responsibility in this area dovetailed with

the ongoing mediation effort being directed by Judge Peck.

23.    This Court appointed Judge Peck, a sitting bankruptcy judge with significant

experience in complex, multi-party cases, to act as global plan mediator to facilitate a global

resolution of the numerous disputes in these Chapter 11 Cases and help forestall potentially years

of burdensome and expensive litigation.  Further, the Mediation was designed by the Debtors and

---

[18] See Memorandum of Law in Support of Motion for Summary Judgment in *Residential Capital LLC v. Allstate Insurance Co.*, Adv. Case No. 13-01262 (MG) [Dkt. No. 26], a true and correct copy of which is Exhibit PX-808; see also Complaint in *Residential Capital LLC v. Allstate Insurance Co.*, Adv. Case No. 13-01262 (MG) [Dkt. No. 1], a true and correct copy of which is Exhibit PX-801.

[19] See Declaration of Jeffrey A. Lipps in *Residential Capital, LLC v. Allstate Ins. Co.*, Case No. 12-ap-1671 (MG) [Dkt. No. 6], a true and correct copy of which is Exhibit PX-804; see also Supplemental Declaration of Jeffrey A. Lipps in *Residential Capital, LLC v. Allstate Ins. Co.*, Case No. 12-ap-1671 (MG) [Dkt. No. 59], a true and correct copy of which is Exhibit PX-809.

the Committee and approved by this Court to encompass two major areas: (i) the claims asserted

by the Debtors' Estates and the third party claims held by individual creditors against AFI, and

(ii) the intercreditor and interdebtor issues, including, but not limited to, those related to (a) the

allocation of proceeds from the sale of the Debtors' assets, (b) the validity of certain security

interests, and entitlement, if any, to post-petition interest and fees, (c) the allocation of

administrative claims among the Debtor entities, (d) the extent, validity and priority of various

creditors' claims, and (e) the treatment of intercompany claims under a plan.

24.    As part of the Mediation, the Court put strict confidentiality protections in place,

which precluded the parties from describing the substance of any of the negotiations.[20]

25.    The Mediation involved intense, good faith, arm's-length negotiations conducted

among sophisticated parties with differing and conflicting interests.  It allowed these parties to

meet in a confidential forum, and to articulate and present their respective positions and interests.

26.    I attended and took an active role in the Mediation, which involved the Debtors'

major creditor constituents—including AFI and the Creditor's Committee—immediately after

being appointed as CRO.

27.    The negotiations spanned five months, commencing in January 2013, although I

joined them in February.  The creditors as a whole, including their lawyers and other advisors,

were heavily involved in countless intense negotiation sessions, calls and meetings, both in small

and large groups, and both with Judge Peck present and without.

28.    For example, on April 22 and 23, 2013, I, along with the Debtors' advisors,

participated in a "mediation summit" at the offices of Kramer Levin Naftalis and Frankel with

Judge Peck, the Committee and its advisors, and the advisors and/or business level leads of each

---

[20] See Order Appointing Mediator, dated December 26, 2012 [Dkt. No. 2519], a true and correct copy of which is
Exhibit PX-835, and General Order M-390, at 7-8.

11

of the Debtors' major creditor constituencies.  Over one hundred people attended, including

representatives from over twenty different creditors or creditor groups, seventy attorneys and

thirty financial advisors to the various parties.  These creditor constituencies included, but were

not limited, to the following parties:

- AIG;

- Allstate;

- AFI;

- the Committee;

- FGIC;

- FHFA;

- the Kessler Class Claimants;

- representatives of the Junior Secured Noteholders;

- representatives of the NJ Carpenters Class;

- MassMutual;

- MBIA;

- Paulson;

- Prudential;

- Deutsche Bank;

- BNY Mellon;

- US Bank;

- Wells Fargo;

- LawDebenture;

- HSBC;

- the Steering Committee Consenting Claimants;

12

- counsel to certain holders of the Senior Unsecured Notes;

- the Talcott Franklin Consenting Claimants; and

- Wilmington Trust[21]

29.     Following the "mediation summit," I attended numerous additional large group mediation sessions in an effort to continue negotiations among the parties, and Judge Peck held additional conference calls and smaller group meetings with certain parties-in-interest.

30.     I was present when the final terms of the Global Settlement set forth in the Plan Support Agreement were hammered out and actively involved in multiple hard-fought arm's-length negotiations in May.  There were numerous in-person meetings and conference calls, and two additional marathon mediation sessions on May 9 and May 10, 2013, between the Debtors, the Committee, AFI and other creditors.  Ultimately, on May 13, 2013, the parties agreed to the terms of the Plan Support Agreement and its accompanying Plan Term Sheet.

31.     Following the execution of the Plan Support Agreement, the Debtors, the Committee, AFI and the Consenting Claimants continued negotiations regarding the more detailed terms of the settlements contemplated by the Plan Support Agreement.  Following additional large group negotiations—including, in particular, the session beginning the morning of May 22, 2013, which lasted through the night and ended with the execution and filing of the Supplemental Term Sheet (along with the Plan Support Agreement and Plan Term Sheet) at approximately 9:00 a.m. on May 23, 2013.

32.     Thereafter, the Plan Proponents, in consultation with various parties in interest, drafted the Plan, which implemented and was consistent with the terms of the Plan Support Agreement and Term Sheets, as well as the related Disclosure Statement and motion seeking

---

[21] Wilmington Trust, National Association, in its capacity as indenture trustee for the Senior Unsecured Notes issued by ResCap.

approval of the Disclosure Statement and solicitation procedures (the "Disclosure Statement Motion").

33.    After further arm's-length negotiations among the parties to the Plan Support Agreement, on July 3, 2013, the Debtors filed the Plan, Disclosure Statement, and Disclosure Statement Motion.[22]  In response to both formal and informal objections from certain parties in interest, the Plan Proponents amended the Plan and Disclosure Statement on August 16, 2013[23] and August 20, 2013.[24]  On August 23, 2013, the Court entered an order approving the Disclosure Statement, as amended, and authorizing the Plan Proponents to solicit votes on the Plan.[25]  Thereafter, the Plan Proponents commenced solicitation of votes on the Plan.[26]

34.    Throughout this successful Mediation, I was also able to meet separately with my counsel, my financial advisors and with individual parties, such as the Committee and its counsel and advisors, and various creditors and their counsel, to receive presentations about their respective positions and to help me understand the issues at stake.  As I have noted previously, most, if not all, of those parties are extremely sophisticated and were represented by experienced counsel and financial advisors who could advocate on their behalf.

---

[22] See [Proposed] Disclosure Statement for the Joint Chapter 11 Plan of Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors [Dkt. No. 4157], a true and correct copy of which is Exhibit PX-859.

[23] See Notice of Filing of Revised Disclosure Statement for Debtors Revised Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 4733], a true and correct copy of which is Exhibit PX-862.

[24] See Notice of Filing of Revised Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors [Dkt. No. 4770], a true and correct copy of which is Exhibit PX-863.

[25] See Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan Proponents' Joint Chapter 11 Plan, (III) Approving the Form of Ballots, (IV) Scheduling a Hearing on Confirmation of the Plan, (V) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of Plan, and (VI) Granting Related Relief [Dkt. No. 4809], a true and correct copy of which is Exhibit PX-865.

[26] See Notice of Filing of the Solicitation Version of the Disclosure Statement and Joint Chapter 11 Plan [Dkt. No. 4811], a true and correct copy of which is Exhibit PX-866.

ny-1111372

35.      As required by my Engagement Letter, since my appointment as CRO and throughout the Mediation and Plan process, I regularly met with the Board of Directors of Residential Capital, LLC ("ResCap") to update them about the current status of negotiations, the mediation before Judge Peck and the positions taken by the various parties in the Chapter 11 Cases.  In those meetings, I was able to answer the Board's questions and outline our efforts to reach a consensual global settlement with as many creditor groups as possible.  Although Board approval was not required, the Board in fact reviewed and approved the Plan Support Agreement and Term Sheet on May 13, 2013,[27] and the Supplemental Term Sheet on June 14, 2013.[28]

## THE GLOBAL SETTLEMENT: APPROVAL OF THE PLAN SUPPORT AGREEMENT, PLAN TERM SHEET AND SUPPLEMENTAL TERM SHEET

36.      Pursuant to the authority given to me by the Board as approved by the Court in the Retention Order, I was responsible for negotiating with the Debtors' creditors and key stakeholders as part of working toward a consensual Chapter 11 plan and to make decisions on behalf of the Debtors, and to negotiate and settle claims against the Debtors when appropriate pursuant to and consistent with my business judgment.  I took that responsibility seriously and actively engaged with my counsel and financial advisors, as well as with the representatives, counsel and advisors of the Debtors' creditors and key stakeholders for months to work toward a resolution of these cases.  I am proud of the work we did, and I believe that the result of those efforts represents a unique accomplishment.

---

[27] Exhibit PX-65 is a true and accurate copy of the draft board minutes of a May 13, 2013, meeting of the ResCap Board of Directors.  It was a regular part of ResCap's business to prepare board minutes subsequent to each board meeting.

[28] Exhibit PX-615 is a true and accurate copy of the draft board minutes of a June 14, 2013, meeting of the ResCap Board of Directors.  It was a regular part of ResCap's business to prepare board minutes subsequent to each board meeting.

ny-1111372

**The Plan Support Agreement, Plan Term Sheet and Supplemental Term Sheet**

37.     The Plan Support Agreement, as approved by the Court in its June 26, 2013 Order,[29] sets forth the Parties' commitments and obligations with respect to the Plan Term Sheet and Supplemental Term Sheet, attached as exhibits to the Plan Support Agreement.  The Plan Support Agreement includes customary conditions for such documents, such as an agreement to support a Plan that is consistent with the terms of the Agreement, to negotiate in good faith to reach definitive documentation and to not take any action that will delay or impede consummation of the Plan.  The Plan Term Sheet contemplates the incorporation of a settlement with AFI, pursuant to which AFI has agreed to contribute value to the Debtors' Estates in exchange for releases from the Debtors, the Committee and the Supporting Parties.

38.     The Ally Contribution facilitated the resolution of numerous inter-Debtor, Debtor-creditor and inter-creditor disputes, and provided recoveries to all constituencies of the Debtors' Estates, which were substantially enhanced over those contemplated by the Debtors' original prepetition settlement with AFI.  Among other things, the Plan resolves disputes relating to: (i) the RMBS Trust Claims; (ii) the claims asserted by certain of the Monolines (i.e., MBIA, FGIC, Ambac, and Assured); (iii) the Private Securities Claims; (iv) the claims held by Wilmington Trust, as indenture trustee for the Senior Unsecured Notes; (v) the NJ Carpenters Claims; (vi) the division of assets (including the Ally Contribution) among the Debtors' Estates; (vii) the division of expenses among the Debtors; (viii) the settlement of intercompany balances and subrogation claims; and (ix) potential substantive consolidation litigation.  In addition, under the Plan, the Junior Secured Noteholders will receive payment in full on account of their Allowed Claims.

---

[29] See Order Granting Debtors' Motion for an Order Under Bankruptcy Code Sections 105(A) and 363(B) Authorizing the Debtors to Enter into a Plan Support Agreement with Ally Financial Inc., the Committee, and Certain Consenting Claimants, dated June 26, 2013 [Dkt. No. 4098], a true and correct copy of which is Exhibit PX-857.

39.    Importantly, as the Plan embodies a Global Settlement of these issues, each of the

Plan Settlements is inextricably intertwined with all others, and the failure of any one settlement

would jeopardize the ability to consummate the Plan as a whole.  None of the Settling Parties

would have reached agreement on a resolution of their claims against the Debtors or the Ally

Released Parties absent the other settlements embodied in the Plan.  For example, the monolines

would not have agreed to settle the amount or allocation of the monoline claims against the

Debtors and agreed to the Third Party Release absent agreement among the parties as to, among

other things, (i) the amount of the Ally Contribution, (ii) the settlement of the division of the

Ally Contribution and administrative expenses among the Debtor Groups, (iii) a settlement of

issues relating to the substantive consolidation of the Debtor estates, and (iv) the treatment of

Intercompany Balances.  Likewise, none of the other Consenting Claimants would have agreed

to settle the amount and allocation of their Claims against the Debtors and the Ally Released

Parties, absent an appropriate settlement of all other Consenting Claimants' Claims against such

parties and consensus regarding the treatment for any other Claims in the Plan.  And AFI would

not have agreed to fund the $2.1 billion Ally Contribution absent consent by the Plan Proponents

and each of the Consenting Claimants to the Debtor and Third Party Releases embodied in the

Plan.

40.    After the Plan Support Agreement was executed, the Debtors and the Committee

continued to work to resolve significant contested litigation claims against the Estates.  As a

result of these efforts, the Plan Proponents were able to resolve a substantial number of contested

claims, as well as the vast majority of formal and informal objections to the Plan.  The result of

those efforts is overwhelming support for the Plan from almost all of the Debtors' creditor

constituencies and other parties in interest. Specifically, subsequent to the entry into the Plan

17

Support Agreement, the Plan Proponents resolved the following claims of Ambac, Assured,

Syncora Guarantee, Inc., the Rothstein Plaintiffs, the RESPA Plaintiffs, the NCUAB, FHFA,

Freddie Mac, Amherst, the PBGC and Ocwen.

41.    I believe that the Global Settlement and each of the settlements contemplated

therein provide a significant benefit to the Estate.  In my experience, litigation is inherently

uncertain, time-consuming and expensive.  By reaching these settlements, the Debtors have

eliminated such risk and uncertainty and quantified for the creditors the exact exposure.

Moreover, these settlements will allow for numerous parties to recover from the Estates soon

after the Effective Date, and because these litigations are resolved, will benefit creditors at large

because it will allow for a greater percentage of funds to be distributed initially to the creditors

rather than held back in a disputed claims reserve until such time that these litigations were to be

avoided.  In the context of a plan such as the one before the Court, I believe there is significant

value in such certainty and timeliness.

### The Negotiation of the Ally Contribution

42.    As part of the global comprise among the Debtors, the Committee, AFI, and the

Debtors' major creditor constituencies, AFI agreed to contribute $2.1 billion to the Debtors'

Estates.  This figure resulted from a year of intense arm's-length negotiations, beginning in early

2012.

43.    Although I was not present for the pre-petition negotiations and compromise, I

understand that the Debtors entered into plan support agreements with AFI and certain other

parties in interest whereby AFI agreed to contribute $750 million to the Debtors' Estates.  I

further understand that in connection with this initial contribution, AFI agreed to (i) provide

debtor in possession financing; (ii) permit the Debtors to continue subservicing mortgage loans;

18

(iii) support the Debtors' continued origination of mortgages; (iv) continue providing the Debtors with use of their back-office shared services, such as centralized payroll and risk management services, among others; (v) cooperate with the Debtors to separate the shared services resources and permit the smooth transitions of the Debtors' business to a purchaser; and (vi) serve as a stalking horse bidder for the Debtors' Whole Loan Sale. AFI provided, or performed, all of these actions during these Chapter 11 Cases which appear to me to have added significant value.

44.    Facing objections by the Committee and other creditor constituencies to the sufficiency of the proposed contribution, among other things, the Debtors and AFI continued to negotiate the terms of a potential settlement.

45.    A year after the Petition Date, and after five months of negotiation during the Mediation, AFI agreed to increase its contribution to the Estates to $2.1 billion. The $2.1 billion Ally Contribution is comprised of $1.95 billion in cash and an additional $150 million contingent on certain insurance claims. This contribution is in addition to the substantial operational support AFI provided, as described above.

46.    The $2.1 billion Ally Contribution is the hallmark of the Plan and the Global Settlement, without which a consensual resolution of these Chapter 11 Cases would be impossible. Without the Ally Contribution, the Consenting Claimants would not have agreed to the resolutions of their own Claims or the other Claims settled pursuant to the Plan.

**The Compromise of Intercompany Balances**

47.    One part of the Global Settlement incorporated into the Plan is the compromise of intercompany payables and receivables among various Debtor entities (the "Intercompany Balances").

19

48.    These Intercompany Balances arose from transactions entered into in the ordinary course of business among the Debtors and their non-Debtor affiliates, accumulated over time through tens of thousands of separate transactions related to (a) the movement of cash within the capital structure, (b) the movement of assets without cash settlement, and (c) expense allocation.

49.    From January 2008 through the Petition Date, approximately $16.6 billion in Intercompany Balances was forgiven by the Debtor entities.  Intercompany Balances were forgiven for several reasons, including (a) compliance with financing covenants, (b) compliance with regulatory and licensing requirements, and (c) as part of a sale.

50.    As of the Petition Date, approximately $8.2 billion in aggregate net Intercompany Balances existed on the Debtors' books.

51.    The Debtors performed an extensive analysis of these Intercompany Balances. This analysis was shared with advisors for the Committee, who independently reviewed the supporting materials and analyses.

52.    Both the Debtors and the Committee concluded that the Intercompany Balances lack many of the indicia of true debt and likely would not be enforceable claims.  At minimum, attempts to enforce such claims would result in complex and expensive litigation that would substantially impair the ability to confirm any Chapter 11 plan.

53.    After conferring with the Debtors' advisors and employees, I concluded it was reasonable to settle these Intercompany Balances.  I reached this decision after considering (i) the Debtors' analysis and conclusion that the Intercompany Balances lack many indicia of true debt and are not likely enforceable claims; (ii) the costly and time-consuming litigation that would result from any effort to enforce the putative Intercompany Balances; (iii) the inability to reach consensual agreement with numerous creditor constituencies absent consensual resolution

20

of the Intercompany Balances and inextricably related issues relating to the forgiveness of

Intercompany Balances, fraudulent conveyance arising out of the forgiveness of Intercompany

Balances, and substantive consolidation; and (iv) the substantial benefits to all creditor

constituencies, including the Junior Secured Noteholders, from the Global Settlement.  I also

determined, after discussing the Intercompany Balances with the Debtors' employees and

advisors, that none of the Intercompany Balances were conclusive.  In addition, I was concerned

that by litigating certain of the Intercompany Balances, we would open the door to litigation

surrounding other Intercompany Balances, and the approximately $16.6 billion of Intercompany

Balances previously forgiven.  Ultimately, I believe the decision to settle the Intercompany

Balances as set forth in the Plan is in the best interest of the Debtors' Estates and their Creditors.

Without the settlement of the Intercompany Balances as provided in the Plan, the Global

Settlement would not have been possible.

     54.     Further, the Debtors made their best efforts to provide potential Plan opponents

ample opportunity to review any applicable company books and records and take testimony from

those responsible for overseeing the pertinent transactions.

### The Plan Settlements

     55.     Each of the settlements described below is supported by each member of the

Committee and several of the Consenting Claimants.  In fact, they are supported by the

overwhelming majority of creditors.

### The RMBS Settlement

     56.     Another part of the Global Settlement, incorporated into the Plan, is the

allowance, priority and allocation of claims of approximately 1,100 residential mortgage backed

securities trusts (the "RMBS Settlement"). The RMBS Settlement embodied in the Plan resolves:

21

(i) alleged and potential claims for breaches of representations and warranties held by all RMBS

Trusts, (ii) all alleged and potential claims for damages arising from servicing, and (iii) any cure

claims (which if allowed would be treated as administrative expense claims), in exchange for

Allowed Claims in the aggregate amount of $7.301 billion for the RMBS Trusts, to be allocated

as between the GMACM Debtors and the RFC Debtors.  As part of this agreement, the Plan

provides for the formation of an RMBS Claims Trust to facilitate distribution to the RMBS

Trusts.  The method for allocating this total allowed claim amount among the RMBS Trusts with

allowed claims is more fully described in Exhibit 9 to the Plan.

57.     Prior to my engagement as CRO, the Debtors negotiated the Original RMBS

Settlement.  I understand that the Debtors' management, in consultation with their advisors and

Board of Directors, entered into a settlement that it believed was in the best interests of the

Debtors and important to the success of these cases.  The Original RMBS Settlement ultimately

permitted the Debtors to (i) proceed with the sales of the Estates' assets in an orderly manner and

(ii) resolve objections regarding the severability of the Debtors' pooling and servicing

agreements and the appropriate priority of the RMBS Trusts' alleged origination-based claims to

a future date or, potentially, to avoid the dispute altogether.

58.     The initial RMBS Settlement proposed to settle claims of 392 RMBS Trusts

sponsored by the Debtors between 2004 and 2007 for an allowed unsecured claim amount of

$8.7 billion, with the potential for Trusts to opt out, in which case the allowed amount would be

reduced accordingly.

59.     As with the initial proposed contribution from AFI, the Original RMBS

Settlement faced objections by the Committee and a number of creditor constituencies, including

MBIA, FGIC, Wilmington Trust, Assured, and the Junior Secured Noteholders.  Faced with

22

those objections, the Debtors determined that further negotiations were necessary.  Subsequent

negotiations proved successful, as they ultimately resulted in the Global Settlement contained

within the Plan, which includes the modified RMBS Settlement.

60.    The RMBS Settlement contemplated by the Plan expands the scope of the

released claims, clarifies the treatment of RMBS Trusts with bond insurance that otherwise were

likely to have opted out of the original RMBS Settlement, and reduces the total allowed claim

amount for the RMBS Trusts.  Altogether, the RMBS Settlement in the Plan now provides for

the release of claims by approximately 1,100 RMBS Trusts, including all of the RMBS Trusts

that were the subject of the initial RMBS Settlement.  The primary improvements to the RMBS

Settlement are as follows:

> (a)    The RMBS Settlement releases the claims of RMBS Trusts sponsored by
> the Debtors from 1999 to 2004, in addition to those sponsored between
> 2004 and 2007;

> (b)    The RMBS Settlement releases the claims of RMBS Trusts that were not
> sponsored by the Debtors, but that include loans sold by the Debtors as to
> which the Debtors made representations and warranties;

> (c)    The RMBS Settlement releases all servicing and case claims of all
> participating RMBS Trusts; and

> (d)    The RMBS Settlement now releases all cure claims of the RMBS which, if
> allowed, would be treated as administrative expense clams; and

> (e)    The total allowed claim amount has been reduced from $8.7 billion in the
> initial RMBS settlement to $7.3 billion.

61.    For RMBS Trusts with bond insurance from a monoline insurer, the RMBS

Settlement is best understood in the context of the separate monoline settlements discussed

below.  For its part, however, the RMBS Settlement contemplates a release of the insured Trusts'

claims against the Debtors, while preserving those Trusts' rights to seek payment from their

respective monoline insurer, whose separate claims against the Debtors are addressed in the

monoline settlements. Generally speaking, the RMBS Settlement allocates no payment from the RMBS Settlement Trust to insured Trusts with respect to insured bonds for which the monoline has made payments.

62.    I believe the RMBS Settlement to be in the best interests of the Debtors' Estates and their creditors in light of, among other things, the litigation risks with respect to defenses, including subordination under Section 510(b) of the Bankruptcy Code, and the risk that substantial cure claims could be allowed as administrative expenses. This belief is supported by the analysis conducted by Mr. Frank Sillman, one of the experts who will testify at the hearing on Plan Confirmation. Mr. Sillman was asked to update his analysis of the likely amount of recoverable damages for the representation and warranty claims resolved by the RMBS Settlement. Mr. Sillman determined that the likely amount of recoverable damages for the representation and warranty claims, after consideration of legal defenses and litigation costs, ranged from $7.38 billion to $8.6 billion.

63.    I did not have and, therefore, did not consider Mr. Sillman's updated analysis at the time I made my determination that the RMBS Settlement was reasonable. However, I was fully informed of the litigation when I approved the RMBS Settlement regarding the original RMBS Settlement and Mr. Sillman's analysis in connection therewith and, in any event, his updated analysis and opinions support my view that the RMBS settlement is fair and equitable and in the best interests of the Debtors' Estates and their creditors.

64.    In addition, as part of the Global Settlement, the RMBS Trustees consented to the Third Party Releases, which was a principal inducement to AFI in agreeing to the $2.1 billion contribution to the Debtors' Estates.

24

**The Monoline Settlements**

65.      The Plan also resolves claims of monoline insurers FGIC, MBIA, Assured and

Ambac (the "Monoline Settlements").  The settlement of these claims eliminates the need for

complex and uncertain litigation concerning the scope and nature of these claims, as well as their

potential subordination.  Moreover, as part of the Plan Settlements, the monolines have agreed to

the Third Party Releases which release their individual claims against AFI.  In fact, I understand

that MBIA, FGIC and Assured had already commenced litigation against AFI that has been

stayed pending the outcome of Plan confirmation.  Release of those claims against AFI was a

critical component of the Global Settlement and a principal inducement to the $2.1 billion Ally

Contribution.

66.      In determining that the Monoline Settlements are all in the best interest of the

Debtors' Estates and their Creditors, I considered the potential drawbacks to entering into each

Monoline Settlement, such as settling the potential litigation regarding the subordination of these

claims.

**The FGIC Settlement**

67.      The resolution of FGIC's Claims through a separate FGIC settlement agreement

entered into as of May 23, 2013 (the "FGIC Settlement"), which has already been approved by

the Court, consists of three principal parts:  (i) allowance of the FGIC Claims against certain of

the Debtors' Estates in the minimum aggregate amount of $596.5 million and a maximum

potential aggregate amount of $1.79 billion comprised of a claim of $596.5 million against each

of three Debtor entities; (ii) the settlement, discharge and release by the FGIC Trustees of

FGIC's obligations under its Policies in exchange for, among other consideration, a bulk cash

payment of $253.3 million from FGIC to the FGIC Trustees; and (iii) the release against the

25

Debtors' Estates of the remainder of the FGIC Claims and the vast majority of the FGIC

Trustees' Claims, as well as a release of the FGIC Trustees' Claims against AFI.  The remainder

of the FGIC Trustees' Claims is released pursuant to the RMBS Settlement.

68.    The effective date of the FGIC Settlement was not conditioned on the Plan being

approved or becoming effective.  The outstanding issues in the FGIC Settlement for Plan

confirmation are (i) finalizing the Allowed amount of the FGIC Claims, within the minimum and

maximum aggregate amounts established by the previously approved FGIC Settlement, and (ii)

the release of AFI from the FGIC Claims pursuant to the terms of the Plan.

69.    The Plan provides that FGIC's claims will be allowed in the following amounts:

(i) $415 million against the RFC Debtors, (ii) $181.5 million against the GMACM Debtors and

(iii) $337.5 million against ResCap.  The aggregate allowed amount of $934 million falls in the

lower half of the range established by the minimum and maximum allowed claims established in

the FGIC Settlement.  Upon the Plan Effective Date, AFI will also be released from the FGIC

Claims, with FGIC's support, pursuant to the Third Party Releases (as defined below).

70.    Consistent with my authority as CRO, I reviewed, approved and executed the

FGIC Settlement.  I also reviewed and approved the amount of the allowed FGIC Claims.  While

the FGIC Settlement was presented to the Board in advance of the May 23, 2013 Board meeting,

ultimately it was my responsibility as CRO to decide whether the FGIC Settlement was

reasonable, fair and equitable and in the best interests of the Debtors and their Estates.  After

careful consideration, I concluded that the FGIC Settlement more than met that test.  My

conclusion was based on my careful review of the financial and other terms of the FGIC

Settlement, one of the proofs of claims submitted by FGIC, my understanding of the claims

asserted by FGIC and the FGIC Trustees, my assessment of the strengths and weaknesses of

those claims and any defenses to those claims, the risk and costs of having to litigate those

claims, and the consequences of not settling.  My views were also informed by discussions with

my counsel and financial advisors and with the other parties and constituencies involved in the

effort to reach a global settlement.  The FGIC Settlement is part and parcel of the overall effort

to reach a global settlement in the plan.  Although I consulted with counsel and the Debtors'

advisors, participated in the long mediation process, and was aware that the Committee approved

of the FGIC Settlement, I relied on and exercised my own independent business judgment in

ultimately determining that entry into the FGIC Settlement was appropriate and in the best

interests of the Debtors' Estates and their creditors.

71.    My belief that the FGIC Settlement and the final FGIC allowed claim under the

Plan are appropriate and in the best interests of the Debtors and their creditors is supported by

the analysis conducted by Dr. Ron D'Vari, an expert retained by the Debtors in connection with

the FGIC 9019 Motion, and the analysis conducted by Mr. Sillman.  Dr. D'Vari analyzed the

potential collateral losses to the FGIC Insured Trusts that formed the basis of the FGIC Trustees'

claim being released in the settlement.  Dr. D'Vari determined the released portion of the FGIC

Trustees' Claim to be approximately $5 billion.  Analysis of the bond losses insured by FGIC

was not part of Dr. D'Vari's analysis in connection with the FGIC 9019 Motion, which instead

focused on the release by the FGIC Insured Trustees.

72.    Mr. Sillman was asked to independently estimate FGIC's potential lifetime

exposure to covered bond losses for the FGIC Insured Trusts, assuming there had been no FGIC

Settlement.  Mr. Sillman estimated the potential covered bond losses (absent settlement) could

have ranged from $1.64 billion to $1.71 billion.  That amount does not include any amount for

interest or indemnification of fees, costs, and expenses.  Mr. Sillman also reviewed recent

27

monoline settlements, and concluded that FGIC's likely amount of recoverable damages could

have ranged from $1.31 billion to $1.7 billon.

73.     I did not have and, therefore, did not consider Dr. D'Vari's or Mr. Sillman's

analysis at the time I made my determinations that the FGIC Settlement and the amounts of the

FGIC allowed claim under the Plan were reasonable, but their analyses support my opinions that

the FGIC Settlement and the final FGIC allowed claim under the Plan are appropriate and in the

best interests of the Debtors' Estates and their creditors.

### The MBIA Settlement

74.     MBIA filed six proofs of claim against the Debtors for a total of approximately

$13.2 billion, of which $2.2 billion was asserted against ResCap, $2.2 billion was asserted

against GMACM and $2.2 billion was asserted against each of four RFC Debtors.  As with

FGIC, these claims generally alleged fraud and breaches of representations and warranties in

connection with the Policies written by MBIA to insure principal and interest payments to

bondholders in certain RMBS Trusts (the "MBIA Insured Trusts").  MBIA sought to recover all

payments it has made under its Policies net of premiums received, as well as interest and

indemnification for fees, costs and expenses.  It alleged that RFC and GMACM aided and

abetted each other's fraud and that ResCap was also liable for the same damages under alter ego

and aiding and abetting theories.

75.     Prepetition, MBIA brought two cases against Debtors RFC and GMACM in New

York State Supreme Court for New York County.  *MBIA Insurance Corp. v. Residential Funding

Company, LLC*, which was the first filed of those actions, illustrates the true enormity and

difficulty of litigation with the monoline claims. In the litigation, I understand that RFC

produced more than a million pages of documents, including loan files for more than 63,000

28

mortgage loans. Further, I understand that MBIA took over 80 days of depositions of ResCap personnel over the course of more than a year and RFC took 50 days of depositions of MBIA personnel.

76.     The Plan resolves the allowed amount and allocation of MBIA's claims and avoids the need for further litigation between the Debtors and MBIA.  Specifically, the Plan approves MBIA's claims in the amount of $719 million against ResCap, $1.45 billion against GMACM, and $1.45 billion against RFC.  Under the RMBS Trust Allocation Protocol, the MBIA Insured Trusts will not share in the distribution to the RMBS Trusts, except where certain Insured Exceptions apply.

77.     Prior to entering into this settlement with MBIA (the "MBIA Settlement"), the Debtors performed an analysis of MBIA's estimated potential lifetime losses, and determined that a settlement of these claims represents a reasonable resolution of the novel and fact-intensive issues that have already been the subject of several years of litigations and is in the best interest of the Estates and their creditors.

78.     The settlement with MBIA is supported by the expert report of Mr. Sillman.  Mr. Sillman was asked to independently assess MBIA's estimated potential lifetime exposure to covered bond losses for the MBIA Insured Trusts, and he concluded that MBIA's potential past and future exposure to cover bond losses ranged from $2.26 billion to $2.29 billion.  That amount does not include any amount for interest or indemnification of fees, costs, and expenses, which I expect would be significant in light of the extensive pre-petition litigation. Mr. Sillman also reviewed recent monoline settlements and concluded that the likely amount of recoverable damages with respect to the Debtor-sponsored trusts ranges from $1.81 billion to $2.29 billion.

29

79.     I did not have and, therefore, did not consider Mr. Sillman's analysis at the time I made my determination that the MBIA settlement was reasonable, but his analysis and opinions are consistent with my understanding of the potential exposure on these claims from the information that was available to me when I considered the MBIA Settlement.

**The Assured Settlement**

80.     Following the filing of the Plan, the Plan Proponents were also able to settle the claims of Assured (the "Assured Settlement").  The Assured Settlement was then incorporated into the Plan and Disclosure Statement that was sent with the Solicitation of votes on the Plan. Assured filed proofs of claim asserting $185.8 million in claims against the GMACM Debtors and approximately $82.1 million in claims against the RFC Debtors.  Of the $185.8 million in claims against the GMACM Debtor, approximately $104 million relates to servicing claims.  The other $81.8 million asserted against GMACM and substantially all the claims against RFC relate to alleged breaches of representations and warranties and/or fraud, and are similar to the claims asserted by FGIC and Ambac.  Assured sought recovery of insured bond losses as well as interest, fees, and expenses with respect to Debtor-sponsored Trusts wrapped by Assured (the "Assured Insured Trusts"), on the basis of breach of representation and warranty and aiding and abetting theories.

81.     The settlement with Assured provides Assured with an allowed unsecured claim in the amount of $88,868,346 against GMACM and $57,950,560 against RFC.  As with the other settling monoline insurers, Assured (and/or the Assured Insured Trusts) will not share in the distribution to the RMBS Trusts, except where certain Insured Exceptions apply.

82.     I believe the Assured Settlement to be in the best interests of the Debtors' Estates and their creditors.  This belief is supported by the expert report of Mr. Sillman.  Mr. Sillman

30

was asked to independently assess Assured's estimated potential lifetime exposure to covered

bond losses for the Debtor-sponsored Assured Insured Trusts, and he concluded that Assured's

potential past and future exposure to cover bond losses ranged from $73.6 million to $77.6

million, without including interest or indemnification of fees, costs, and expenses.  Based on his

review of recent monoline settlements, Mr. Sillman concluded that the likely amount of

recoverable damages with respect to the Debtor-sponsored trusts ranges from $58.9 million to

$77.6 million.  The amount of damages projected by Mr. Sillman is in addition to the $104

million in servicing claims that Assured asserted against GMACM.

### The Ambac Settlement

83.     Ambac's proofs of claim assert liquidated claims of $119.7 million against the

RFC Debtors and $85.6 million against the GMACM Debtors for Ambac's current obligations

on Ambac-insured bond losses.  Ambac also asserts claims for unliquidated amounts

representing future bond losses and indemnification for costs and expenses, which Ambac

estimates exceeds $223 million in the aggregate.

84.     In addition, in connection with the Ocwen sale, Ambac objected to the assignment

of servicing rights with respect to Ambac-insured transactions and alleged that its cure claims

could range from $15.5 million to $26.2 million or more.  Ambac had already taken the position

that it had terminated or asserted an existing right to terminate servicing for thirteen Trusts, and

Ambac had further objected to the assignment of the servicing for approximately fifty-six

additional Ambac-insured transactions under the terms of the Ocwen sale order.  As a result,

absent a negotiated or successfully litigated resolution, the Debtors could not assign the servicing

rights, or receive the payment from Ocwen for outstanding advances and MSR that would

otherwise be received in connection with the assignment and assumption of the servicing for

ny-1111372

these transactions to Ocwen.  The precise amount of the payment the Debtors would receive for

advances and MSR varies monthly for each Trust, and was estimated to be over $61 million for

these Trusts as of September 30, 2013.

85.    Ultimately, the Debtors and Ambac were able to reach a resolution of all of

Ambac's claims and its objection to the assignment and assumption of the servicing of the

Ambac insured transactions, pursuant to a Stipulation and Order approved by the Bankruptcy

Court on October 18, 2013 (the "Ambac Settlement").[30]  The Ambac Settlement provides Ambac

with Allowed General Unsecured Claim amounts of $207,315,815 against GMACM, and

$22,800,000 against RFC subject to confirmation of the Plan and the occurrence of the Effective

Date.  Ambac insured trusts will not share in the distribution to the RMBS Trusts, except where

certain Insured Exceptions apply.

86.    The Ambac Settlement contemplates: (i) a transfer of a sub-set of the Ambac

insured transaction to a third-party servicer in exchange for the reimbursement to the Debtors of

the outstanding advances at an agreed upon percentage; (ii) the transfer of the balance of the

transactions to Ocwen for the purchase price provided for under the Ocwen Asset Purchase

Agreement; and (iii) the payment to Ambac of $750,000 as a cure claim.  The settlement further

provides for the assignment of all the transactions to Ocwen if certain deadlines are not met, but

that is not expected to occur.  Based on estimates as of September 2013, the Debtors will receive

more than $61 million net of the cure payment to Ambac under the stipulated settlement.  As

with the above settlements, the Debtors entered into this settlement only after determining that it

---

[30] See Stipulation and Order: (I) Resolving the Objection of Ambac Assurance Corporation and the Segregated
Account of Ambac Assurance Corporation to Debtors' Proposed Assumption and Assignment of Certain Executory
Contracts, (II) Approving Sale, Assumption and Assignment of Certain Servicing Rights to Owen Loan Servicing,
LLC, and (III) Granting Related Relief [Dkt. No. 5389], a true and correct copy of which is Exhibit PX-877.

32

was in the best interest of the Debtors' Estates and their creditors, and that it was supported by the Committee.

87.      I believe this determination was correct.  This belief is supported by the analysis conducted by Mr. Sillman in connection with Plan Confirmation.  Mr. Sillman was asked to independently assess Ambac's estimated potential lifetime exposure to covered bond losses for the Debtor-sponsored Ambac Insured Trusts, and he concluded that Ambac's potential past and future exposure to cover bond losses ranged from $201.5 million to $212.3 million, without including interest or indemnification of fees, costs, and expenses.  Based on his review of recent monoline settlements, Mr. Sillman concluded that the likely amount of recoverable damages with respect to the Debtor-sponsored trusts ranges from $161.2 million to $212.3 million. Mr. Sillman's analysis did not consider additional consideration the Debtors received from Ambac, including the substantial reduction of Ambac's Cure Amount or the direct benefits to the Debtors' Estates from resolving Ambac's objection to the Ocwen sale that will enable the Debtors to transfer their mortgage servicing rights with respect to certain Ambac-wrapped trusts which, based on estimates as of September 2013, is estimated to generate more than $61 million in value for the Debtors' estates (net of cure costs).

### The Syncora Settlement

88.      Syncora Guaranty Inc.'s ("Syncora") most recent Second Amended Proof of Claim asserts claims totaling at least $83.4 million against the RFC Debtors and $216.6 million against the GMACM Debtors.  The claims against RFC relate to alleged breaches of representations and warranties and breach of servicing obligations with respect to one trust sponsored and serviced by the Debtors.  The claims against GMACM allege breach of servicing obligations with respect to two non-Debtor-sponsored trusts for which GMACM is a loan

33

servicer.  Syncora seeks recovery of insured bond losses as well as interest, fees, and expenses,

including remediation expenses, with respect to the trusts wrapped by Syncora (the "Syncora

Insured Trusts").  In addition, Syncora filed two objections to the sale to Ocwen of servicing

agreements related to the Syncora Insured Trusts serviced by GMACM.

89.    The settlement with Syncora (the "Syncora Settlement") provides that the Debtors

will pay to Syncora a cure amount of $4.5 million in connection with the assumption and

assignment of servicing agreements to Ocwen.  In addition, the Syncora Settlement provides that

Syncora's claims against GMACM and RFC will be reduced and allowed as General Unsecured

Claims of approximately $7.8 million against GMACM and approximately $7.1 million against

RFC.  As with the other settling monoline insurers, Syncora (and/or the Syncora Insured Trusts)

will not share in the distribution to the RMBS Trusts, except where certain Insured Exceptions

apply.  Instead, Syncora will receive pro rata shares of the GMACM Debtors Unit Distribution

and the RFC Debtors Unit Distribution.

90.    The Debtors entered into this settlement only after determining that the settlement

was in the best interest of the Debtors' Estates and their creditors, and was supported by the

Committee.

91.    I believe this determination was correct.  In reaching my opinion, I considered the

fact that Syncora's proof of claim was the subject of a pending objection at the time of

settlement, and Syncora's objection to the sale of servicing rights to Ocwen was also still

pending.  Syncora's relatively lower recovery on its claims, as compared to the other monoline

insurers, reflects the strength of the Debtors' objection to Syncora's claims.  Among other things,

the Debtors asserted that Syncora's claims were time-barred and also disputed that Syncora

could recover the full extent of bond losses based on the alleged breaches of GMACM's

34

servicing obligations.  The Syncora Settlement reflects the uncertainty as to the final outcome of the Debtors' objection to Syncora's proof of claim, as well as Syncora's objection to the transfer of servicing rights.

### Private Securities Litigation Settlements

92.    One part of the Global Settlement incorporated in the Plan is the resolution of ongoing private securities litigation related to the Debtors' RMBS business.  Specifically, the Plan provides for the settlement of federal and state securities law claims asserted by twenty large institutional investors in RMBS certificates who either filed suits against AFI and the Debtors or entered into tolling agreements with them (the "Private Securities Claims Settlement") and the settlement of a federal class action brought on behalf of purchasers of fifty-nine Debtor RMBS offerings (the "*NJ Carpenters* Settlement").  After reviewing the complaints and tolling agreements underlying those claims, I understand that the underlying claims raise novel and difficult legal issues.  I also understand that similar litigations have taken several years, only to result in substantial settlements.  I understand that the Debtors' potential exposure in these cases is significantly larger than the settlement amounts that would be paid under the Plan, and that continued litigation would be extremely expensive.

### The Private Securities Claims Settlement

93.    The Private Securities Claims Settlement resolves certain private securities claims against the Debtors and AFI arising from the purchase or sale of RMBS, asserted by parties who either filed pre-petition lawsuits against the Debtors and AFI (including Ally Securities, LLC ("Ally Securities")) within the relevant limitations period or who entered into pre-petition tolling agreements with AFI and the Debtors.  The Private Securities Claimants include only twenty entities, or groups of affiliated entities.

35

94.    The Private Securities Claimants are (i) AIG; (ii) Allstate; (iii) Asset Management Funds d/b/a AMF Funds, AMF Intermediate Mortgage Fund, AMF Ultra Short Mortgage Fund; (iv) Bank Hapoalim B.M.; (v) Cambridge Place Investment Management, Inc., in two capacities based on separate actions; (vi) Deutsche Zentra-Genossenschaftsbank, New York Branch, d/b/a DZ Bank AG, New York, DH Holding Trust; (vii) Federal Home Loan Bank of Boston; (viii) Federal Home Loan Bank of Chicago; (ix) Federal Home Loan Bank of Indianapolis; (x) HSH Nordbank AG, HSH Nordbank AG Luxembourg Branch, HSH Nordbank AG New York Branch, HSH Nordbank Securities S.A.; (xi) Huntington Bancshares Inc.; (xii) IKB Deutsche Industriebank AG, IKB International S.A. in liquidation; (xiii) John Hancock Life Insurance Company (U.S.A.); (xiv) MassMutual; (xv) Principal Life Insurance Company, Principal Funds, Inc., Principal Variable Contracts Funds, Inc.; (xvi) Prudential; (xvii) Sealink Funding Limited; (xviii) Stiching Pensioenfonds ABP; (xix) The Union Central Life Insurance Company/Ameritas Life Insurance Corp./Acacia Life Insurance Company; and (xx) the Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company, and Fort Washington Investment Advisors, Inc.

95.    The Private Securities Claims Settlement resolves approximately $2.429 billion of securities law claims against the Debtors and AFI, including approximately $1.409 billion in aggregate asserted securities law claims against Ally Securities, arising from the Debtors' loan origination activities and the structuring, sponsoring, underwriting, and sale of RMBS. Furthermore, the Private Securities Claim Settlement provides for the release of claims against AFI and its affiliates by the Private Securities Claimants.  The Ally Contribution would not have been possible without this release, among others.

36

96.      The Private Securities Claims Settlement avoids significant litigation regarding some of the largest claims asserted against the Debtors, including litigation over the validity and value of the Private Securities Claims and whether such claims should be subordinated pursuant to Section 510 of the Bankruptcy Code.

97.      The Private Securities Claims will be settled and resolved through the Private Securities Claims Trust.  On the Effective Date, the Private Securities Claims Trust will receive units from the Liquidating Trust with estimated value of $235.0 million in aggregate. Distributions from the Private Securities Claims Trust will be allocated among the Private Securities Claimants as they have agreed among themselves.  The Private Securities Claimants will forego any other recovery from the Debtors or the Liquidating Trust in respect of their Private Securities Claims.

98.      I believe the settlement of these private securities claims to be in the best interests of the Debtors' Estates and their creditors because the settlement provides a global resolution for twenty different large and uncertain claims against the Debtors.  Continued litigation over those claims would be burdensome and time-consuming, and the result would be uncertain.  My belief is confirmed by the opinion of Lucy P. Allen, one of the Debtors' experts for Plan Confirmation. Ms. Allen found that the proposed settlement amount of $235 million for these claims is consistent with, and within the range of, other recent settlements in comparable RMBS-related litigation.  While I did not have, and therefore did not consider, Ms. Allen's calculations at the time I made my determination that the settlement of these claims was reasonable, her analysis and opinions are consistent with the results of my consultations with the Debtors' advisors and my review of materials in the Chapter 11 Cases since my appointment as CRO.  Moreover, the treatment of the Private Securities Claims under the Plan was a key component of the Global

37

Settlement without which the Ally Contribution and other benefits under the Global Settlement would not be realized.

### The NJ Carpenters Settlement

99.     The Plan also resolves an ongoing securities class action filed against AFI, certain Debtors and their former officers and directors, *N.J. Carpenters Health Fund v. Residential Capital LLC*, No. 08 Civ. 8781 (HB) (S.D.N.Y.).  The *NJ Carpenters* Settlement would resolve a federal securities class action based on alleged misstatements and omissions in the offering materials for fifty-nine different RMBS offerings with original face value of approximately $38 billion.  Although the Debtors dispute these claims, they are a source of significant potential liability.  The Plan resolves these claims for a distribution of $100 million.

100.     The District Court approved the settlement on October 7, 2013.  Reasonable costs of class notice and administration (estimated to be $450,000) will be advanced by the Debtors pursuant to authorization by the Bankruptcy Court, and these amounts will be deducted from the NJ Carpenters Claims Distribution.  If members of the class opt out of the settlement class, they will be ineligible to share in the settlement distribution.  To the extent such opt-outs have allowed claims against the Estates, or if the settlement is not approved and any class members have allowed claims against the Estates, such claims will be treated as General Unsecured Claims, provided that they may be subject to contractual, legal, or equitable subordination.

101.     I believe the *NJ Carpenters* Settlement is in the best interests of the Debtors' Estates and their creditors.  Like the Private Securities Claims Settlement, the *NJ Carpenters* Settlement resolves highly uncertain and potentially burdensome litigation.  Ms. Allen, a Debtor expert, found that the $100 million proposed settlement amount for these claims is consistent with, and within the range of, other recent settlements in comparable RMBS cases.  As with the

38

Private Securities Claims Settlement described above, while I did not have, and therefore did not

consider, Ms. Allen's calculations at the time I made my determination that the settlement of

these claims was reasonable, her analysis and opinions are consistent with my determination.

### The SUN Settlement

102.    The Plan also provides for a settlement of claims that the Senior Unsecured Notes

Indenture Trustee, on behalf of the Senior Unsecured Noteholders (the "SUNs"), has against AFI

and certain Debtors at face value.  The claims related to, among other things, a breach of the

Senior Unsecured Notes Indenture as well as claims held by the ResCap Estate against AFI

relating to, among other things, the transfer of Ally Bank from ResCap to or for the benefit of

AFI.

103.    The Plan provides the SUNs with an allowed claim of $1.003 billion against

ResCap.  I believe this allowed claim to be fair and reasonable and in the best interests of the

Debtors' Estates and their creditors.

### The Kessler Settlement

104.    The Plan also contemplates a resolution of claims asserted against the Debtors in

*In re: Community Bank of Northern Virginia Second Mortgage Lending Practice Litigation*, a

multidistrict proceeding filed in the United States District Court for the Western District of

Pennsylvania, MDL No. 1674, Case Nos. 03-0425, 02-01201, 05-0688, 051386 (the "Kessler

Class Action").  The multidistrict proceeding involves several putative class actions related

primarily to some 44,535 second mortgage loans originated to borrowers nationwide and

acquired by RFC and alleges violations of various consumer protection statutes.  The named

plaintiffs in the Kessler Class Action filed proofs of claim on behalf of the putative class against

Debtors RFC, ResCap, GMACM and GMAC-RFC Holdings Company, LLC.  The Kessler Class

39

Action has been pending against the Debtors for over ten years, and is one of the largest putative

Borrower class actions pending against the Debtors.  In the Kessler Class Action and in the class

proofs of claims, the claimants allege in excess of $1.87 billion of damages.

105.    In connection with the Plan mediation process and the continuation thereof

following the execution of the Plan Support Agreement, and through intensive good faith and

hard fought negotiation, on or about June 27, 2013, certain of the Debtors and representatives of

the named plaintiffs in the Kessler Class Action entered into a settlement agreement (the

"Kessler Settlement") resolving the Claims asserted against the Debtors in connection with the

Kessler Class Action.  The settlement provides for the reduction and allowance of the class

proofs of Claims in the amount of a $300 million claim against RFC only.  On July 31, 2013, the

Debtors and representatives of the named plaintiffs filed a joint motion for preliminary and final

approval of the Kessler Settlement Agreement, which among other things seeks to certify the

class under Bankruptcy Rule 7023 for settlement purposes only and related relief.[31]  On August

23, 2013, the Court granted preliminary approval of the settlement.[32]

106.    Based on my familiarity with the proceedings, the Kessler Class Action plaintiffs'

claims, and the uncertainty of any litigated outcome, I believe this settlement to be fair and

reasonable, and in the best interests of the Debtors' Estates and creditors.

---

[31] See Joint Motion Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 7023 and 9019 for an Order (1) Granting Class Certification for Purposes of Settlement Only, (2) Appointing Class Representative and Class Counsel for Purposes of Settlement Only, (3) Preliminarily Approving the Settlement Agreement Between Plaintiffs, on their Own Behalf and on Behalf of the Class of Similarly Situated Persons, and the Debtors, (4) Approving the Form and Manner of Notice to the Class, (5) Scheduling a Fairness Hearing to Consider Approval of the Settlement Agreement on a Final Basis and Related Relief and (6) Approving the Settlement Agreement on a Final Basis and Granting Related Relief [Dkt. No. 4451], a true and correct copy of which is Exhibit PX-861.

[32] See Order Pursuant to Rules 7023 and 9019 of the Federal Rules of Bankruptcy Procedure (1) Preliminarily Approving Settlement Agreement Between Named Plaintiffs, Individually and as Representatives of the Kessler Settlement Class, and the Settling Defendants, (2) Granting Class Certification for Purposes of Settlement Only, (3) Approving the Form and Manner of Notice of Kessler Settlement Class Members of the Settlement Agreement, (4) Scheduling a Fairness Hearing to Consider Final Approval of the Settlement Agreement, and (5) Granting Related Relief [Dkt. No. 4808], a true and correct copy of which is Exhibit PX-864.

### Treatment of the Borrower Claims

107.      The Plan provides for the treatment of claims asserted by Borrowers through the establishment of the Borrower Claims Trust, which will be funded with cash.  The Plan further provides that the Borrower Claims Trust will be funded with $57.6 million less any amounts paid by the Debtors to or on behalf of holders of Borrower Claims prior to, or in connection with, the Effective Date pursuant to orders of the Bankruptcy Court.

108.      The establishment of the Borrower Claims Trust provides a number of benefits for Borrowers.  The Borrowers Trust will be overseen by a Borrower Claims Trustee and Trust Committee.  As contemplated by the Borrower Claims Trust Agreement, the Borrower Claims Trustee may expedite the reconciliation of disputed claims by adopting alternative dispute resolution procedures for contested Borrower Claims, whether pending at the time of confirmation and thereafter, that will be designed to address the particularized nature of Borrower Claims.  In addition, by funding the Borrower Claims Trust with cash (rather than Units such as those funding the Liquidating Trust), holders of Allowed Borrower Claims will be able to receive immediate cash payments on account of such Claims (as compared to units being utilized in the Liquidating Trust).  Moreover, the recoveries will be unaffected by any variation in the projected distributable value for unsecured creditors as a result of the wind down of the Debtors' Estates, because the Borrower Trust will not have to liquidate non-cash assets before making distributions to Borrowers.  Therefore, by having a fixed sum of cash available to distribute upon a claim being allowed, together with the flexibility to adopt alternative means for fixing allowed claim amounts, the structure of the Borrower Trust has the potential to resolve and expedite the distribution of trust assets to claimholders as compared to other creditors in the Debtors' Estates.

41

109.     Under the Plan, holders of Allowed Borrower Claims are to receive a recovery
from the Borrower Claims Trust comparable to recoveries to be received by holders of allowed
unsecured claims against the applicable Debtor Group against which the Borrower Claims would
otherwise have been asserted.  The Plan contemplates that a calculation will be conducted to
determine whether $57.6 million would be sufficient to comply with the Plan by providing
comparable recoveries to holders of Allowed Borrower Claims and a "Borrower Trust True-up"
payment to increase the funding if the initial amount was determined to be insufficient.

110.     The Debtors and their advisors performed the Borrower Trust True-up
calculation.  The Debtors and their advisors currently project that, based on estimated Allowed
Borrower Claims at each of the Debtor Groups, an amount of $57.6 million will be sufficient to
provide holders of Allowed Borrower Claims with a comparable recovery from the Borrower
Claims Trust to that of general unsecured creditors at the respective Debtor Groups against
which the Borrower Claims are properly asserted.  Therefore, as set forth in the Plan Supplement
filed with the Bankruptcy Court on October 11, 2013, the Plan Proponents stated that the
Borrower Trust True-up is not required.[33]

111.     Certain Borrower Claims may also be covered by insurance policies.  The Plan
provides that, except as set forth in the Kessler Settlement Agreement or other orders of the
Court, to the extent a Borrower recovers insurance proceeds on account of all or a portion of a
Borrower Claim, the Allowed Borrower Claim amount shall be reduced to the extent paid by
insurance proceeds.  If a covered Borrower Claim has already been paid from the Borrower
Claims Trust, the direct recipient of insurance proceeds will be required to return a proportionate

---

[33] See Exhibit 10 to the Plan Supplement to the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al.
and the Official Committee of Unsecured Creditors [Dkt. No. 5342], a true and correct copy of which is Exhibit PX-876.

amount of any prior distributions from the Borrower Claims Trust Assets made on account of
such Borrower Claim to the Borrower Claims Trust, and will then be entitled to its proportionate
share of any future distribution from the Borrower Claims Trust.

### Borrower Class Action Settlements

112.     Following the entry into the Plan Support Agreement, the Plan Proponents
negotiated and reached resolutions of claims filed by approximately thirteen (13) putative class
action plaintiffs asserting claims (all but one of which are Borrower Claims) against the Debtors
certain of which class actions named AFI, Ally Bank or other non-Debtor affiliates as
defendants.  Before the Petition Date, the Debtors and certain of their non-Debtor affiliates were
subject to a variety of litigation throughout the country that sought redress for the Debtors'
allegedly improper origination and servicing practices.  None of the putative classes were
certified under the Federal Rules of Civil Procedure before the Petition Date; however, the
named plaintiffs who filed the claims collectively purported to represent hundreds of thousands
of claimants, and the alleged damages asserted against the Debtors amounted to several billion
dollars.  For those matters that have been or are subject to a proposed settlement, the Debtors and
the Committee engaged with each of the named plaintiffs in an effort to reach amicable
resolutions of the claims and avoid the time and expense of litigating claims that would only
serve to delay distributions to creditors and create greater uncertainty for each of the Estates.  As
a result of these efforts, the Plan Proponents have reached settlements with the named plaintiffs,
which they are currently in the process of documenting and bringing to both this Court and
where applicable, either the state or federal court in which the action is pending, for the requisite
approvals.

43

**Amendment to Consent Order and Impact on Borrowers**

113.    As one component of the Global Settlement, the Debtors, the Committee, and AFI

agreed to support a settlement with the Board of Governors of the Federal Reserve System (the

"FRB") regarding the Debtors' and AFI's obligations under the Consent Order.  Though it

occurred prior to my appointment as CRO, I understand that in the Fall of 2012, the Debtors

originally sought approval of the retention of PricewaterhouseCoopers LLP and certain law firms

to provide services in connection with a foreclosure review to be conducted by the Debtors, as

mandated by the terms of the Consent Order.  I also understand that this retention was contested

by the Committee, who argued that the costs of the foreclosure review should not be borne by the

Debtors' Estates, and that these issues were adjourned and preserved in interim orders

authorizing the retention of professionals in connection with the foreclosure review process.

114.    Upon further review of the Debtors' and AFI's obligations under the Consent

Order, and in light of the escalating cost of the foreclosure review process, shortly after my

appointment the Debtors filed a motion seeking a determination that the foreclosure review

obligations should be classified as general unsecured claims and that the automatic stay barred

the enforcement of such claims.  The result of such a determination would have required AFI to

pay for any ongoing foreclosure review obligations, and attempt to pursue a claim for

contribution against the Debtors in the bankruptcy cases.  The Debtors' motion was contested by

AFI and the FRB.

115.    Given the hotly contested nature of the classification of the Debtors' obligations

under the Consent Order, the parties negotiated a resolution of such obligations through the

Mediation as one component of the Global Settlement.  In furtherance of such settlement, the

FRB and the Debtors entered to an amendment to the Consent Order, which was approved by the

44

Bankruptcy Court on July 26, 2013,[34] pursuant to which approximately $230 million previously

placed into an escrow account by GMACM was released into a Qualified Settlement Fund, from

which the Borrowers would be paid directly, in full satisfaction of the Debtors' foreclosure

review requirements under the Consent Order.  The Borrowers who will be entitled to some

payment under the FRB settlement include any Borrower who was in some stage of active

foreclosure proceedings during 2009 and 2010.[35]

116.    By entering into the amendment to the Consent Order, the Debtors eliminated

nearly all of the costly professionals' fees associated with the foreclosure review, resolved the

outstanding litigation with AFI regarding the allocation of liabilities for the foreclosure review

obligations, and ensured expedited payment of remediation payments to Borrowers.  To the

extent a holder of a Borrower Claim receives payment pursuant to the settlement of the Debtors'

obligations under the Consent Order, the amount of such Borrower Claim shall be reduced in an

amount equal to the amount received.

**FHFA Settlement**

117.    On November 30, 2012, FHFA filed proofs of claim against certain of the Debtors

(the "FHFA Claims").[36]  These claims are based on the FHFA's pre-petition complaint against

Ally Financial and the Debtors in *Federal Housing Finance Agency v. Ally Financial, Inc.*, 11

Civ. 7010 (S.D.N.Y.) (the "FHFA Litigation").  The FHFA asserts claims based on Freddie

Mac's purchase of over $6 billion of Debtor-issued RMBS.  FHFA has asserted that the FHFA

---

[34] See Order Granting Debtors' Motion Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 363(b)(1) Authorizing the Debtors to Enter into and Perform Under Amendment to Consent Order [Dkt. No. 4365], a true and correct copy of which is Exhibit PX-860.

[35] In addition, certain Borrowers will receive remediation payments as a consequence of a separate review related to Borrowers who were eligible to receive benefits under the Service Members' Civil Relief Act from January 1, 2006 through March 12, 2012 undertaken as part of the DOJ/AG Settlement.

[36] See Proof of Claim Nos. 6296, 6297, 6298, 6299, 6300, and 6301, true and correct copies of which are Exhibit PX-1218.

Claims or some portion thereof are entitled to be treated as priority claims under the Housing and

Economic Recovery Act of 2008 ("HERA"), as codified in 12 U.S.C. §§ 4617(b)(15).

118.     The Plan Proponents have reached an agreement in principle with the FHFA that

would settle the FHFA Claims and related issues.  Pursuant to this settlement, the Plan will grant

the FHFA an "FHFA Allowed Claim" of $1.2 billion, entitling it to a cash payment of

approximately $24 million (the "FHFA Settlement").  The FHFA Settlement will secure the

FHFA's support for the Plan.  The FHFA has also reached a separate settlement with Ally

Financial resolves the claims against Ally Financial and affiliated nondebtor defendants in the

FHFA Litigation, which claims are not subject to the Plan's third party release.  That settlement

is not contingent on plan confirmation.

119.     I consider the FHFA Settlement to be a favorable resolution of these claims for

the Debtors.  The claims presented a substantial potential liability and uncertainty for the

Debtors.  In particular, while the Debtors do not believe that HERA entitles the FHFA Claims to

priority, uncertainty over litigation of that issue presented a substantial risk to the successful

resolution of the Debtors' bankruptcy cases.  The FHFA Settlement would also avoid

complicated litigation over the subordination of the FHFA Claims pursuant to Section 510 of the

Bankruptcy Code.

### Substantive Consolidation

120.     The Plan embodies a settlement and compromise of potential disputes over

whether the Debtors should be substantively consolidated and their assets and liabilities pooled

for purposes of efficiency in distributions under the Plan.

121.     After considering the claims of creditors arguing that the Debtors should be

substantively consolidated, and those arguing that they should not be, the Plan Proponents

46

ultimately determined that substantive consolidation would be inappropriate in these Chapter 11

Cases, and would result in uncertainty, costs, and delays related to additional litigation.

Substantive consolidation is not in the best interests of the Debtors' Estates and their creditors.

### Partial Consolidation

122.    Instead, Plan provides for a partial consolidation purely for administrative

convenience.  Specifically, it groups the Debtors into three Debtor Groups – the ResCap Debtors,

the GMACM Debtors, and the RFC Debtors – solely for purposes of describing their treatment

under the Plan, confirmation of the Plan, and making distributions under the Plan.  No Debtor

will be consolidated with a Debtor in another Debtor Group for any purpose.  In fact, as set forth

in the Voting Certification, creditors voted at each Debtor against which their claims were

asserted, rather than at the Debtor Groups.

123.    This partial consolidation has one exception: holders of General Unsecured

Claims against Debtor ETS.  The Debtors, and other Plan Proponents, determined that holders of

Allowed claims against ETS may be entitled to a greater recovery in a Chapter 7 liquidation than

other unsecured claims against the GMACM Debtors.  Therefore, to ensure that the Plan meets

the "best interest of creditors" test, the Plan provides that holders of ETS Unsecured Claims will

receive Cash, to be distributed pro rata, in an amount equal to the value of assets remaining in the

ETS estate after the payment of Allowed Claims with a senior priority.

124.    The Plan Proponents, with the support of the Consenting Claimants, determined

that this grouping of the Debtors into the Debtor Groups solely for description and distribution

purposes, with the one exception described above, would be in the best interests of creditors and

the Debtors' Estates.  The proposed grouping also has the support of each of the parties to the

Plan Support Agreement.

47

ny-1111372

125.     Moreover, I believe the proposed grouping to be reasonable as (i) it provides for a more efficient distribution, (ii) no creditors are prejudiced by the partial consolidation proposed in the Plan, (iii) the benefits of grouping the Debtors in such a manner far outweigh the cost and risk of lengthy and contentious litigation of these issues, and (iv) the proposed settlement, as a component of the Global Settlement, maximizes distributions to unsecured creditors and is in the best interest of the Debtors' Estates.

### **Division of Ally Contribution and Administrative Expenses Among Debtor Groups**

126.     The Global Settlement allocates both the Ally Contribution and the Administrative Expenses.  Both were the subject of hard fought and, at times, contentious negotiations.

127.     <u>First</u>, the Global Settlement allocates the Ally Contribution as follows: $782.74 million to the ResCap Debtors, $462.32 million to the GMACM Debtors, $462.32 million to the RFC Debtors, $235 million to the Private Securities Claims Trust, $57.62 million to the Borrower Claims Trust, and $100 million for the NJ Carpenters Claims Distribution.

128.     Because the Ally Contribution resolves both estate and third party claims against the Ally Released Parties, and because certain claims and causes of action against the Ally Released Parties may be asserted by more than one Debtor entity, it would be extremely difficult—if not impossible—to allocate the Ally Contribution to the Debtor Groups on account of specific causes of action.  Reallocation of the Ally Contribution on account of any number of variables would not only threaten the Global Settlement as a whole, but also would be time consuming, costly, and subject to challenge by all parties to the Global Settlement. Thus, I, and the other Plan Proponents, believe that settling the allocation of the Ally Contribution through the Global Settlement was far superior to litigating these issues.

48

129.    <u>Second</u>, the Global Settlement embodies the allocation of accrued and projected

administrative expenses among the Debtor Groups.  The parties determined to allocate the

accrued and projected administrative costs as follows:  $836.3 million to the GMACM Debtors,

$249.8 to the RFC Debtors, and no administrative costs allocated to ResCap.

130.    Further, because the costs to wind down the Debtors' estates remain uncertain and

the value of certain non-cash assets held by the estates will vary as they are liquidated over time,

the Plan provides that any increase or decrease in administrative expenses and/or the value of all

of the Debtors' estates from current projections would be shared among the ResCap Debtors, the

GMACM Debtors, the RFC Debtors, and the Private Securities Claims Trust, pro rata, in

accordance with the Plan.  In the circumstances of these Chapter 11 Cases, I, along with the Plan

Proponents and all parties to the Plan Support Agreement, believe the agreed-upon allocation

embodied in the Plan is reasonable and appropriate.

131.    Absent agreement over the proper allocation of administrative expenses among

the Debtor Groups, the Debtors would be forced to wade through each and every administrative

expense and determine to which Debtor such expense should be allocated.  This task

unquestionably would be arduous, costly, and the subject of substantial disputes among the

parties.  Moreover, because substantial expenses are shared among two or more Debtors, the

Debtors would still need to make a determination as to how to allocate such shared expense

among Debtor entities.  Settling the allocation of administrative expenses in the manner set forth

above is fair, avoids unnecessary disputes, and facilitates the implementation of the Global

Settlement for the benefit of all creditors.

**Treatment of the Junior Secured Noteholders**

132.    The Junior Secured Noteholders' counsel and advisors attended the Mediation,

but the principals of the Junior Secured Noteholders made a strategic decision not to participate

in the Mediation, which resulted in the Plan Support Agreement, and thus did not enter into the

Plan Support Agreement.  Their advisors attended two initial group Mediation sessions and

thereafter did not appear.

133.    While the Junior Secured Noteholders are not a party to the Plan Support

Agreement and have opposed the Plan, the Plan provides that the Junior Secured Noteholders

will receive payment in full on account of their Allowed Claims (e.g., the secured claims for

outstanding principal, accrued pre-petition interest, and any applicable post-petition interest).

The amount will be determined pursuant to pending adversary proceedings challenging the

extent and validity of the Junior Secured Noteholders' claims and security interests.

134.    The Debtors and the Committee believe that the Junior Secured Noteholders are

significantly undersecured and therefore not entitled to post-petition interest.  Accordingly, the

Debtors and the Committee each filed a complaint seeking to determine the extent and validity of

the liens and claims of the Junior Secured Noteholders.  Such litigation has been consolidated

(the "JSN Adversary Proceeding") and the causes of action bifurcated for trial in two phases.

The first phase ("Phase I"), which relates to issues with the Junior Secured Noteholders' only,

was tried in October 2013.  The second phase ("Phase II"), which relates to issues that implicate

creditors more broadly, including issues proposed to be resolved through the Plan and the Global

Settlement, is to be adjudicated at the Confirmation Hearing.

135.    If this Court ultimately determines in Phase I of the JSN Adversary Proceeding or

at the Confirmation Hearing that the Junior Secured Noteholders are oversecured, then, to the

50

extent they are oversecured, the Junior Secured Noteholders will receive payment on or around, the Effective Date, of the allowed post-petition interest, which will reduce the value of Units distributable under the Plan. I believe the Plan treats the Junior Secured Noteholders fairly by providing them with payment in full of their allowed claim, which includes secured claims for outstanding principal, accrued pre-petition interest and any applicable post-petition interest.

## SUBMISSION, AND APPROVAL, OF THE DISCLOSURE STATEMENT AND PLAN

136.    The Plan complies with Section 1129(a) of the Bankruptcy Code.

137.    <u>First</u>, the Plan complies with provisions relating to classification of claims and the mandatory contents of a plan as dictated by Section 1129(a)(1).  Article III of the Plan properly designates the classification of claims and identifies the classes.

138.    <u>Second</u>, the Plan complies with provisions relating to disclosure and solicitation as required by Section 1129(a)(2).

139.    <u>Third</u>, the Plan is proposed in good faith as required by Section 1129(a)(3). Indeed, the Plan is intended to, and I believe will, achieve a result consistent with the objectives and purposes of the Bankruptcy Code because the Plan and the Global Settlement upon which the Plan is premised were developed through a fair process, and provide for creditor treatment that is substantively fair.

140.    In particular, and as discussed in more detail above, the settlement negotiations through which the Plan was developed were conducted openly and at arm's-length.  They were overseen by Judge Peck, a neutral experienced mediator.  I led the negotiations on behalf of the Debtors, and was actively involved throughout the process.  Throughout the negotiations, I kept the Board, which was also actively engaged, informed of all material developments.  Further,

51

each of the other parties to the mediation was represented by sophisticated and knowledgeable advisors.

141.    In connection with my representation of the Debtors during the mediation, I considered, among other things, analyses prepared by the Debtors and the Committee of actual and potential claims and counterclaims (including their value, strengths, and available defenses) raised by parties to the negotiation.  I believe the Plan is fair in its terms with respect to all creditors, as evidenced by the wide-ranging consensus among vastly disparate creditor constituencies.

142.    <u>Fourth</u>, Articles II(B)(1), (2), (3), and (4) of the Plan outline payments for services or costs made, or to be made, by the plan proponent, the Debtor or by a person issuing securities or receiving property under the plan that have been approved by, or are subject to approval of, the court as required by Section 1129(a)(4).

143.    <u>Fifth</u>, the Plan Supplement, dated October 11, 2013,[37] discloses the identity of proposed officers, directors and voting trustees who will serve the Liquidating Trust after confirmation of the plan, as well as the identity and compensation of any insiders who will be employed or retained by the Liquidating Trust as required by Section 1129(a)(5).

144.    <u>Sixth</u>, the Plan satisfies the "best interests of creditors" test outlined by Section 1129(a)(7).  One of the Debtors' advisors, Mark Renzi of FTI Consulting ("<u>FTI</u>"), will testify regarding the best interest test in greater detail, but I understand that FTI conducted an analysis to determine whether the creditors received greater value under the Plan than they would from a Chapter 7 liquidation.  FTI came to the conclusion that all creditor classes were treated better by

---

[37] <u>See</u> Exhibits 2 through 21 Comprising the Plan Supplement to the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors [Dkt. No. 5342], a true and correct copy of which is Exhibit PX-875.

the Plan as compared to what they would get in liquidation.  I reviewed the analysis and came to the same conclusion.

145.    FTI's analysis did not attribute value to money coming from AFI or from the Intercompany Balances.  These assumptions were reasonable in my view, as I did not consider what may occur after several years of multiple litigations to be capable of inclusion in a liquidation analysis.  In addition, the Debtors spent a substantial amount of time trying to discern the history and bases for the Intercompany Balances, but, as explained above, could not successfully do so.

146.    Seventh, Articles II(A) and (C) of the Plan provide for the payment of certain priority claims, including (a) administrative expensive claims; (b) claims for wage, salaries or commissions and claims for contributions to an employee benefit plan; (c) certain prepetition tax claims as required by Section 1129(a)(9).

147.    Eighth, the Debtors have the ability to make the payments dictated by the Plan, as required by Section 1129(a)(11).  Specifically, these payments include Cash payments that the Debtors or the Liquidating Trust must make on, or immediately following, the Effective Date and Cash payments to fund (i) certain reserves (including reserves for (x) administrative expenses of the Liquidating Trust, (y) current or future Allowed Administrative, Secured, Priority and Convenience Claims, and (z) certain Claims related to the Debtors' obligations under the DOJ/AG Settlement), (ii) the Borrower Claims Trust, (iii) the NJ Carpenters Settlement, and (iv) Cash distributions on account of the FHFA Claims.

148.    Ninth, Article II(D) of the Plan outlines certain bankruptcy fees payable to the United States Trustee that have been paid, or provides for payment of these fees on the Effective Date as required by Section 1129(a)(12).

149.    <u>Tenth</u>, Article VI(C) of the Plan provides for transfers of property consistent with applicable non-bankruptcy law, as required by Section 1129(a)(16).

<b><u>EXERCISE OF BUSINESS JUDGMENT<br>WITH RESPECT TO THE GLOBAL SETTLEMENT</u></b>

### The Plan

150.    I believe that implementation of the Plan is a reasonable exercise of the Debtors' business judgment.  As described above, the Plan provides, and has already provided, substantial benefits to the Debtors' Estates, especially through the Plan Settlements contemplated therein.

151.    These Plan Settlements enable the Debtors to reduce the potentially significant litigation costs that would otherwise have been incurred if the Debtors had continued to pursue confirmation of a nonconsensual plan, as well as the attendant litigation risk of that plan.

152.    Ultimately, the Plan provides for enhanced recoveries for the Debtors' creditors far in excess of what such creditors would otherwise obtain from the Debtors' Estates.

### The Plan Settlements

153.    The Plan Settlements embedded in the Plan meet the *Iridium* Factors outlined below and were a reasonable exercise of the Debtors' business judgment.

154.    As described in more detail elsewhere, I took into account the delay and enormous expense expected to result from litigating the otherwise settled claims.  The Plan Settlements resolve actual disputes, described above, as well as complex potential disputes with AFI, the Committee, the RMBS Trustees, the securities litigants and other investors, the Kessler Class Claimants, FGIC, and MBIA as insurers in connection with certain Debtor-sponsored RMBS Trusts, and certain holders of the Senior Unsecured Notes issued by ResCap, including Paulson, as well as their indenture trustee, Wilmington Trust.

54

155.    Based on the divergent interests of the parties to the Plan Settlements, as well as

the complex issues pervading these cases, I believe that it was in the best interests of the

Debtors' Estates to find common ground and have nearly all major parties coalesce around the

Plan and the Plan Settlements contained within.

156.    The Plan Settlements enable the Debtors to progress and preserve value rather

than spend an inordinate amount of time and money immersed in litigation.

### THE *IRIDIUM* FACTORS

**The Balance Between the Litigation's Possibility
of Success and the Plan Settlements' Future Benefits**

157.    With respect to the claims settled within the Plan Settlements, there is significant,

approaching near total, uncertainty regarding the outcome of any litigation addressing the

validity, priority, and amount of such claims through the claims resolution process.  Due to this

uncertainty, I, along with the Debtors, believe that the Plan Settlements provide substantial

benefits to the Debtors, the Debtors' Estates and their creditors.

158.    After reviewing the claims, some of the filings in related suits, pertinent

agreements, and past adverse rulings in related suits, the Debtors believe that they have strong

defenses to the various claims.  If forced to litigate, the Debtors would mount a vigorous defense.

Nonetheless, the issues that would be involved in litigating these claims are likely to be fact-

intensive in nature and the legal issues involved are relatively novel.  I am also aware of various

settlement trends in residential mortgage backed securities-related cases.  Accordingly, I, along

with the Debtors, understand that litigation involving these types of claims would involve

substantial litigation risk.  In fact, I understand that the results of litigation in similar suits,

generally, have resulted in unfavorable outcomes for RMBS sponsors.  As a result, the Debtors

and I believe that they would face substantial litigation uncertainty and risk in connection with litigating these issues.

159.    On the other hand, I, along with the Debtors believe that the Plan Settlements provide substantial benefits to their Estates and their creditors.  In particular, the Plan Settlements provide benefits in the form of (i) a substantial reduction of claims asserted against each of the Debtors' Estates as described above; (ii) increased certainty regarding the validity, priority and amount of the claims; and (iii) substantial cost savings when compared with the likely costs of professional fees and experts that would be needed if litigation proceeded.  I believe that the alternative of not entering into the Plan Settlements is not in the best interests of the Debtors, the Debtors' Estates and/or the Debtors' creditors.

### The Likelihood of Complex and Protracted Litigation

160.    Prior to the stay imposed by the Debtors' Chapter 11 filing, the Debtors faced a significant number of lawsuits related to their securitization practices.  These lawsuits were brought by three similarly situated entities: 1) the Monolines; 2) private securities investors; and 3) institutional investors.  I understand that litigation against each entity was expected to be complex, protracted and expensive.

### Monolines

161.    The ongoing disputes in recent years among mortgage originators on the one hand, and monoline insurers and securitization trustees on the other, are well publicized.  A number of the lawsuits and other proceedings involving RMBS breach of representation and warranty and fraudulent inducement allegations against mortgage originators have been ongoing for years, in many cases without resolution.  Absent a settlement, the Debtors are almost certain

to become embroiled in additional, complex litigation with the monolines over the validity, amount and possible subordination of their asserted claims.

162.    Given the highly fact intensive nature of RMBS litigation, any monoline litigation is also almost certain to be complex and protracted.  As described further in Mr. Lipps' direct testimony, the Debtors have experienced such litigation first-hand with MBIA, which spanned three and a half years leading up to the Petition Date.  The discovery necessary to resolve the monoline claims—along with the various pleadings and hearings necessary for the Court to decide the allowed amount of the monoline claims—would be massive.

163.    In sum, litigation regarding the validity, amount and priority of the monoline claims would almost certainly be exceedingly complex and could drag on for years, much like other lawsuits of a similar nature that are currently pending in other state and federal courts. Finally, as with any other complex litigation that extends for years, the expenses associated with any litigation of the monoline claims would almost certainly be immense, inconvenient and, given the asserted size of those claims, could result in a delay of distributions to other creditors even in the event of a confirmed Plan.

### **Private Securities Investors**

164.    Prior to the Chapter 11 filing, the Debtors also faced at least 17 lawsuits premised on the allegation that the registration statements and the prospectuses for the securities contained material misstatements.  None of them had progressed beyond the early stages of discovery.

165.    Although certain causes of action vary from the monoline suits, the underlying factual allegations are substantially similar.  Accordingly, the Debtors anticipate that the likely scope of discovery and burden to the Debtors will be the same or similar.  As with the monolines, each case over each claims will involve extensive document and deposition discovery

of the Debtors relating to the particular securitizations at issue in that particular case, including

the origination, acquisition, underwriting and pooling of the loans for each securitization, the

preparation of the transaction documents for each securitization, the diligence performed on

loans contained within the collateral pools for each securitization, and the performance of the

loans underlying each securitization.

### Institutional Investors

166.    The Debtors also faced a potential lawsuit from two groups of institutional

investors, one represented by Kathy Patrick of Gibbs & Bruns LLP, the other by Talcott Franklin

of Talcott Franklin P.C., pertaining to various Pooling and Servicing Agreements, Assignment

and Assumption Agreements, or other sale agreements.  Like with the monoline suits and private

securities lawsuits, the anticipated scope of discovery and burden to the Debtors would likely

have been immense.

### Other Litigation

167.    Absent the Global Settlement, the Debtors would also be faced with years of

lengthy and costly litigation involving borrowers, governmental agencies like FHFA, and class

action securities claimants, as well as their claims against AFI, the enforceability of the

Intercompany Balances, and substantive consolidation.  In fact, I understand that prior to the

Global Settlement, Wilmington Trust, on behalf of the Senior Unsecured Noteholders, was

seeking standing to pursue allegations that forgiveness of intercompany debt constituted

constructive and actual fraudulent transfer.

168.    The Global Settlement, and its resolution of a host of contentious issues, has

helped the Debtors avoid years of costly litigation.

**The Paramount Interests of Creditors**

169.    In my role as CRO for the Debtors, I take seriously my role to try to reach a fair and equitable resolution of claims brought against the Debtor and, if possible, to enter into a consensual Chapter 11 plan that has the support of Debtors' creditors.  I believe that entering into the Plan Settlements is consistent with those goals.  As described above, the Plan Settlements resolve substantial claims against the Debtors' Estates.  Obtaining the releases in the Plan Settlements insures that the Debtors will not have to litigate and face the risk of being responsible for the full amount of claims asserted by the settling parties.  Indeed, as I discuss further above, I believe that it was in the best interests of not only the Debtors' Estates, but also the Estates' creditors, to find common ground and have nearly all major parties coalesce around the Plan and the Plan Settlements contained within.

170.    Moreover, as described above, the Plan Settlements are part of the Plan that, if ultimately approved, will bring substantial, additional benefits to the Debtors' creditors.  Approval of the Plan Settlements is a necessary and required step.

171.    That the Plan, and the Plan Settlements contained within, are in the paramount interests of the creditors is evidenced by their overwhelming, near-unanimous, support for the Plan.  Indeed, the Plan has enjoyed overwhelming support from those creditors that voted on the Plan.  As set forth in the KCC's voting certification 95% of the creditors in number and tens of billions of value voted to accept the Plan.

**Support of Other Parties-in-Interest for the Plan Settlements**

172.    The Plan, and its contemplated Plan Settlements, also has the support of other parties-in-interest, such as:

- AFI;

59

- Allstate Insurance Company and its subsidiaries and affiliates;

- American International Group, as investment advisor for certain affiliated entities that have filed proofs of claim in these Chapter 11 Cases;

- the Bank of New York Mellon, and the Bank of New York Mellon Trust Company, N.A. solely in their capacities as trustees, indenture trustees, or separate trustees;

- the Committee;

- Deutsche Bank, N.A.;

- FGIC and its subsidiaries and affiliates;

- FHFA;

- the Kessler Class Claimants (as defined in the Plan Support Agreement);

- Law Debenture Trust Company of New York solely in its capacity as trustee, indenture trustee, or separate trustee;

- Massachusetts Mutual Life Insurance Company and its subsidiaries and affiliates;

- MBIA and its subsidiaries and affiliates;

- The National Credit Union Administration Board;

- certain funds and accounts managed by Paulson & Co. Inc., holders of Senior Unsecured Notes issued by ResCap;

- each of the Private Securities Claimants;

- Prudential Insurance Company of America and its subsidiaries and affiliates;

- the RMBS Trusts (as defined in the Plan Support Agreement);

- the Steering Committee Consenting Claimants (as defined in the Plan Support Agreement);

- each of the Supporting Senior Unsecured Noteholders (as defined in the Plan Support Agreement) that executed a joinder to the Plan Support Agreement;

- the Talcott Franklin Consenting Claimants (as defined in the Plan Support Agreement);

60

- U.S. Bank National Association solely in its capacity as trustee, indenture trustee, or separate trustee;

- Wells Fargo Bank, N.A. solely in its capacity as trustee, indenture trustee, or separate trustee; and

- Wilmington Trust, National Association, not individually, but solely in its capacity as Indenture Trustee for the Senior Unsecured Notes issued by ResCap.

**Nature and Breadth of Releases To Be Obtained by Officers and Directors**

173.    The releases of the Debtors' officers and directors in the Plan are reasonable and provided in exchange for fair value.

174.    In exchange for these Releases, as discussed in greater detail below, the Debtors' officers and directors have agreed to forego any claims for coverage they may have under any officers & directors or errors & omissions insurance policies covering the Debtors or their officers and directors for the period between November 2006 and the Effective Date, with respect to those Claims that are released under the Plan.  Their willingness to do so resulted in an increased AFI Contribution by $150 million.

**Competency and Experience of Counsel**

175.    All of the parties to the Plan Settlements were represented by competent and experienced counsel throughout the negotiation each Settlement Agreement.  I personally have over fifty years of experience as a practicing attorney in restructuring matters.  The Debtors were represented by competent and experienced counsel, including Morrison & Foerster LLP, Carpenter, Lipps, & Leland LLP, and Curtis, Mallet-Prevost, Colt & Mosle LLP.

176.    Based on my involvement and interactions, I believe that all parties were represented by competent and experienced counsel, including a number of well-regarded law firms.  For example, the Committee was represented by Kramer Levin, Naftalis & Frankel LLP, AFI by Kirkland & Ellis LLP, the RMBS Trustees by Alston & Bird LLP, Dechert LLP, Seward

61

& Kissel LLP, Morgan, Lewis & Bockius LLP, and Allen & Overy LLP, the Private Securities

Claimants by Quinn Emanuel, Urquhart & Sullivan LLP, the Senior Unsecured Notes Indenture

Trustee by Loeb & Loeb LLP, and Cleary, Gottlieb, Stein & Hamilton LLP, NJ Carpenters by

Lowenstein Sandler LLP, FGIC by Jones Day LLP, the National Credit Union Administrative

Board by Zuckerman Spaeder LLP, MBIA by Cadwalader, Wickersham & Taft LLP, Ambac by

Patterson, Belknap, Webb & Tyler LLP, Syncora by Wollmuth, Maher & Deutsch LLP, and

Assured by Proskauer Rose LLP.

177.    In addition, I understand that the Court has already found that the parties to the

Mediation that negotiated the various Plan Settlements were represented by sophisticated

counsel.[38]

### Arm's-Length Negotiations

178.    From my perspective, I believe that the Plan Settlements and the compromises

reflected in the Global Settlement are the result of arm's-length negotiations.

179.    As I described previously, the Plan Settlements arose out of the Mediation

directed by Judge Peck, which was a robust process that went on for months.  A substantial

number of different parties engaged in that process, many of which had divergent and competing

interests and agendas.  That process allowed the various parties to meet in a confidential forum

and, under Judge Peck's guidance, to present their respective positions and interests.  As I note

above, most, if not all, of those parties are highly sophisticated and represented by experienced

counsel and financial advisors who could and did advocate on their behalf.

---

[38] See Memorandum Opinion and Order, and Findings of Fact and Conclusions of Law, Approving the FGIC
Settlement Motion [Dkt. No. 5042], dated Sept. 13, 2013, at 13, 21-22, 33, 35, 49, a true and correct copy of which
is Exhibit PX-872.

180.    Based on the claims asserted by the various parties in these Chapter 11 Cases and the positions they have taken in the various matters before the Court, it is evident that many interests were divergent.  Moreover, as the Court is aware from overseeing the pretrial proceedings in the RMBS 9019 Motion, many of these groups were not hesitant to advocate for their positions and were willing to aggressively pursue their own agendas.  For instance, the Debtors had commenced litigation seeking to subordinate the claims of Private Securities Claimants and had been preparing to prosecute claims objections to many of the other significant claims filed in these cases.  FGIC and MBIA, meanwhile, were pursuing litigation directly against Ally outside of the Bankruptcy Court.

181.    Indeed, I understand that the Court has already found that certain negotiations in the Mediation were at arm's-length and in good faith.  For example, the Court found that negotiation of the FGIC Settlement during the Mediation to have been conducted at arm's-length.[39]

182.    Accordingly, I, along with the Debtors, believe that the Plan Settlements were the result of arm's-length bargaining.

## THE TRUSTEE FINDINGS

183.    While I cannot speak on behalf of the Trustees and/or the investors of the Trusts, I am able to give my views of how the Plan and settlements contained within impact those entities.

184.    With respect to the RMBS Settlement, I note that one of the signatory groups is the "Institutional Investors."  These groups of investors in the Trusts, which were represented by Kathy Patrick at Gibbs & Bruns LLP, Talcott Franklin of Talcott Franklin P.C., and Ropes & Gray are themselves signatories and supporters of the RMBS Settlement, demonstrating that, in

---

[39] See PX-872.

63

their judgment, the RMBS Settlement is in the best interests of the Investors in the implicated

Trusts.

185.    Similarly, based on my dealings with counsel for the Trustees, I believe the

Trustees acted professionally and in good faith.  The Trustees are some of the largest and most

sophisticated financial institutions in the country.  They were all represented by sophisticated

counsel and engaged with and were assisted by extremely competent and professional financial

advisors.

## RELEASES

### Estate Claims Against the Ally Released Parties

186.    The Plan also includes the Debtor Release, pursuant to which all Estate claims

against the Ally Released Parties are released.  For the following reasons, which are also

enumerated within the Disclosure Statement, I believe that the Debtor Release is fair, equitable

and in the best interests of the Estates.

187.    First, the settlement of the Estate claims against the Ally Released Parties is the

product of extensive arm's-length bargaining among the Committee, the Consenting Claimants,

the Debtors and AFI, overseen by the Mediator, as discussed in more detail above.  Following

the Petition Date, the Committee investigated the Potential Claims against AFI arising out of pre-

petition transactions among the Debtors and AFI.  During the course of these Chapter 11 Cases,

the Committee considered the merits and defenses to potential claims and causes of action

against AFI.  As a result of this investigation of the claims and the vigorous and arm's-length

negotiations overseen by the Mediator, the Plan Proponents, with the support of the Consenting

Claimants, reasonably, in good faith, and in the best interests of their respective constituencies,

concluded that the AFI Contribution of $2.1 billion, in addition to AFI's contributions to the

64

Estates throughout these Chapter 11 Cases, described in greater detail above, represents a

substantial contribution without which these Chapter 11 Cases likely would not come to a

successful conclusion.

188.    Second, the Debtor Release is broadly supported by nearly all of the Debtors' key

constituencies, including, in addition to the Committee: all six RMBS Trustees; the Institutional

Investors; the largest securities fraud claimants; MBIA, FGIC, Ambac and Assured, as the

largest monoline claimants; Wilmington Trust; the Supporting Senior Unsecured Noteholders,

including Paulson & Co., Inc.; and the representatives of the Borrowers on the Committee.  Each

of these parties was represented by competent and experienced counsel in the negotiations

leading to agreement on the terms of the Debtor Release.

189.    Third, the settlement reflects a reasonable balance between the litigation's

possibility of success and the settlement's future benefits.  Each party to the negotiations that led

to the settlement had access to a wealth of information gathered over the course of months' long

investigations conducted by the Committee and the voluminous materials made available from

the Examiner's investigation.  To facilitate settlement negotiations, the parties reviewed

extensive document discovery, briefed the merits of the claims, and exchanged written and oral

presentations regarding their legal positions.  With the knowledge accumulated in this process,

each party independently determined that the settlement of the Estate claims against the Ally

Released Parties reflected a reasonable resolution of the claims.

190.    Fourth, the Debtor Release resolves myriad complex disputes among the parties

regarding the nature, scope and validity of the Estate claims against AFI, obviating the need for

protracted litigation with its attendant expense, inconvenience and delay.  The settlement spares

65

all parties, including the Debtors, costly and uncertain litigation that would inevitably delay

consummation of a plan and recoveries to holders of Claims.

191.    It is my understanding that the Junior Secured Noteholders have asserted that they

have liens on the following three potential claims that would be covered by the Debtor Release:

(i) a Tax Allocation Agreement between AFI and ResCap; (ii) the allocation of certain revenues

generated through the "Brokering Consumer Loans to Bank" or "Broker to Bank" project

between Ally Bank and GMACM; and (iii) the value of mortgage-servicing rights ("MSRs")

Ally Bank purchased from GMACM.  The Tax Allocation claims purportedly arise from an

unsigned tax allocation agreement which offered more favorable terms to ResCap than the final,

fully-executed agreement.  Claims related to the Brokering to Bank project arise from the

allocation of revenue between Ally Bank and GMACM when, beginning in 2009 and through

2012, Ally Bank originated loans brokered by GMACM and then sold those loans to GMACM

for securitization and sale into the secondary market.  These claims, among other potential

claims, were investigated by the Debtors internally before the parties entered the Plan Support

Agreement, and independently by the Examiner—although I did not have access to the

Examiner's views regarding these claims until after the parties reached the Global Settlement.

While the Debtors were aware that these were potential claims when they entered into the Plan

Support Agreement, they believed there were serious hurdles to any successful claims against

AFI.  Moreover, the Debtors believed that these claims were best characterized as tort or

avoidance claims, on which the Junior Secured Noteholders do not have a lien, belonging to the

Estates rather than being viable contract claims.  I understand that the Committee also concluded

66

that these were tort or avoidance claims, rather than contract claims, as the Committee noted in its Standing Motion.[40]

192.    In addition, the holders of the Junior Secured Notes did not participate in the Debtors' or the Committees' investigation of AFI or the formulation of potential claims.  I am not aware that they conducted an investigation of such claims independently.

193.    For the foregoing reasons, I believe that the settlement of the Estate claims against the Ally Released Parties falls well within the range of reasonableness and satisfies the applicable standards for approval of settlements in bankruptcy cases.

**Third Party Releases**

194.    The Plan also provides for the release of claims that the Debtors and third parties have brought or may bring against AFI in connection with the Debtors' businesses (the "Third Party Releases").

195.    I believe that these Third Party Releases, pursuant to which claims relating to the Debtors' business that claimants have asserted or could assert against the Ally Released Parties are released and within the Bankruptcy Court's subject matter jurisdiction, since the claims, if not released, would have a direct impact on the Debtors' Estates, and that the unique circumstances of these Chapter 11 Cases render the Third Party Releases crucial to the success of the Plan.

196.    Based on my discussions with the Debtors' advisors, it is my belief that AFI has unquestionably provided sufficient value to the Estate to receive these releases, as demonstrated by claimants' agreement to support the Plan.  AFI's contribution to the Debtors' estate

---

[40] *See* Ex PX-852, at 39, 43 n.7.

ny-1111372

throughout this process, both financially and otherwise, as described in further detail above, has been invaluable.

197.    Indeed, without the Third Party Releases, the AFI Contribution could not have been obtained and there would be no Global Settlement.  The success of the Plan, and the prospects for any meaningful distribution to many of the Debtors' creditors, hinges on the very substantial financial contribution provided by Ally.  For instance, the execution and approval by the Consenting Claimants of the Plan Support Agreement would not have been possible without the Ally Contribution.  Ally's substantial contributions have enabled and will continue to allow the Debtors to maximize stakeholder recovery.

### Releases Related to Continuing Obligations

198.    The Plan dictates that Debtors shall perform any of their remaining obligations under the DOJ/AG Settlement (other than certain obligations assumed by Ocwen Loan Servicing, LLC, and Walter Investment Management Corporation), and the Consent Order.  The Liquidating Trust shall assume any and all rights and remaining obligations of only the Debtors under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment.

199.    On the Effective Date, upon the appointment of the Liquidating Trust Board, the persons acting as directors, managers, and officers of the Debtors prior to the Effective Date as the case may be, will be released from all further authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors or the Chapter 11 Cases.  Upon such release and discharge, the Liquidating Trust Board will be charged with the authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors and these Chapter 11 Cases, except to the extent such authority, duties, responsibilities, and obligations are to be undertaken by the Private Securities Claims Trustee, the RMBS Claims

68

Trust Trustees, the Borrower Claims Trustee, or, with respect to the NJ Carpenters Claims

Distribution, in each case as provided in the Plan.

200.    As described below, the consideration provided by the Debtors' current and

former officers and directors in exchange for the release discussed in this section includes their

forbearance regarding any claims for coverage they may have under any officers & directors or

errors & omissions insurance policies covering the Debtors or their officers and directors

between November 2006 and the Effective Date, and their forbearance regarding any contractual

claims for indemnification that they may have against Ally or the Debtors.  In addition, the

Plan's release provisions seek to release the Debtors' current and former officers and directors

from any post-Effective Date liability, thereby preventing certain of these individuals, as a

practical matter, from performing the Continuing Obligations described in this section post-

Effective Date.

201.    Notwithstanding anything to the contrary herein, nothing in the Plan shall release,

enjoin, or preclude Debtors' officers and directors from pursuing any rights they may have (i) to

indemnification or advancement from Ally solely for any claims that are not released by the Plan

and the Confirmation Order; or (ii) as an "insured" under any insurance coverage purchased by

Ally or covering officers and directors of the Debtors, or against any party (other than the

Debtors) arising out of such policies of insurance, solely for any claims that are not released by

the Plan and the Confirmation Order.  Indeed, nothing in the Plan expands or reduces any

existing indemnification rights or rights as an "insured" for any officer or director of the Debtors

for claims that are not released by the Plan.  No rights of the Consenting Claimants are released

under the Plan in their capacity as liability insurance or reinsurance carriers for Ally or the

Debtors.

**Director and Officers' Releases**

202.     The Plan also provides that, in exchange for valuable consideration, the Debtor

Release and Third Party Release shall release all Claims that have been or could have been

brought against the Debtors' current and former officers and directors, including myself.[41]

203.     The Claims to be released under the Plan against such individuals include, but are

not limited to, claims relating to the Pre-petition Ally Settlement Agreement, the RMBS

Settlement, the DOJ/AG Settlement, the Consent Order, and the pre-petition sales of certain of

the Debtors' assets to AFI and affiliates of Cerberus Capital Management.

204.     In exchange for these Releases, as mentioned previously, I understand the

Debtors' officers and directors will forego any claims for coverage they may have under any

officers and directors or errors and omissions insurance policies covering the Debtors or their

officers and directors for the period between November 2006 and the Effective Date, with

respect to those Claims that are released under the Plan.  This forbearance increased the amount

that AFI was willing to contribute to the Plan through the AFI Contribution because it will

facilitate AFI in reaching a settlement with certain of AFI's insurers regarding coverage issues.

Additionally, I understand the Debtors' officers and directors will waive contractual claims, if

any, for indemnification that the Debtors' officers and directors may have against the Debtors

and AFI with respect to those Claims released under the Plan.  As a result, AFI was willing to

make a greater contribution to the Plan and the Debtors and AFI were relieved of these

contractual indemnification claims.

205.     Moreover, although the Creditors' Committee and other creditors investigated

potential claims against the Debtors' officers and directors, and the Bankruptcy Examiner

---

[41] See Exhibit PX-256 at 39.

devoted substantial effort and resources to investigating these potential claims, no one has

suggested or demonstrated that the Debtors have any significant or valuable claims against their

officers, directors, employees, or advisors.  For these, and the other foregoing reasons, I believe

these releases are reasonable.

## EXCULPATION

206.    The Plan provides that the Debtors, the Consenting Claimants, AFI, the

Committee and its members, and each of the foregoing entities' successors, assigns, members,

subsidiaries, officers, directors, partners, principals, employees and representatives, including

myself (the "Exculpated Parties"), will be exculpated from liability in connection with the

negotiation and documentation for any prepetition plan support agreements, the Plan Support

Agreement, the Plan, Disclosure Statement, FGIC Settlement, RMBS Settlement and any other

documents entered into in connection with the Plan, other than for gross negligence or willful

misconduct.

207.    The exculpation provision in the Plan covers the Exculpated Parties' conduct both

prior to and subsequent to the filing of these Chapter 11 Cases.  Moreover, the Exculpated

Parties covered by the exculpation provision includes both estate fiduciaries, such as the Debtors,

the Creditors' Committee, and the Debtors' officers and directors, as well as non-estate

fiduciaries, including the Consenting Claimants and Ally.

208.    Each of the Exculpated Parties played a meaningful role both prior to the Petition

Date through the negotiation and entry into various plan support agreements, and after the

Petition Date, in the mediation process, and through the negotiation and implementation of the

Global Settlement and Plan.  Each made a substantial contribution to the Debtors' liquidation

efforts and played an integral role in working towards an expeditious resolution of this

71

bankruptcy.  In addition, I led the negotiations on behalf of the Debtors with the officers and directors (including the independent directors who are represented and advised by separate counsel) regarding the exculpation provisions specific to Debtor officers and directors, and understood that the directors' and officers' agreement to waive their right to insurance coverage and contractual indemnification under the plan was expressly conditioned on their receipt of exculpations for both pre- and post-confirmation conduct.

209.    Thus, the proposed exculpation, which carves out gross negligence and willful misconduct, is, based on my understanding, reasonable and appropriate.

## **RMBS ATTORNEYS' FEES**

210.    The Plan also provides for attorneys' fees in connection with the RMBS Settlement, known as the "Allowed Fee Claim."  The Allowed Fee Claim is 5.7% of the Allowed RMBS Trust Claims, which shall be distributed to counsel to the Institutional Investors as fees via direct allocation to counsel for the Institutional Investors and without conveyance to the RMBS Claims Trust, the RMBS Trustees, or the RMBS Trusts.

211.    As set forth in the Plan, the amount of the Allowed Fee Claim shall reduce the total Units distributed (and Cash distributed thereon) by the Liquidating Trust on account of RMBS Trust Claims to the RMBS Claims Trust, and shall have no impact on any other party entitled to a distribution under this Plan.

212.    I believe this attorneys' fees provision to be reasonable.

## **CONCLUSION**

213.    Based on all of the factors described above, I believe that the Plan is in the best interests of the Debtors, the Debtors' Estates and the Debtors' creditors and should be confirmed.

ny-1111372

I declare under penalty of perjury that the foregoing is true and correct.

Executed the 12th day of November, 2013, at New York, New York.

_____/s/ Lewis Kruger_____
Lewis Kruger