**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |
| RESIDENTIAL CAPITAL, LLC; et al., | |
| Plaintiffs, | |
| v. | Adv. Case No. 13-01343 (MG) |
| UMB BANK, N.A., IN ITS CAPACITY AS INDENTURE TRUSTEE FOR THE 9.625% JUNIOR SECURED GUARANTEED NOTES, et al., | |
| Defendants. | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the estate of the Debtors, | |
| Plaintiffs, | Adversary Proceeding No. 13-01277 (MG) |
| v. | |
| UMB BANK, N.A., AS SUCCESSOR INDENTURE TRUSTEE UNDER THAT CERTAIN INDENTURE, dated as of June 6, 2008, et al., | |
| Defendants. | |

# DIRECT TESTIMONY OF MICHAEL FAZIO

1. I, Michael Fazio, testify under penalty of perjury as follows:

**I.    PROFESSIONAL BACKGROUND**

2. I am a Managing Director in the Financial Restructuring Group of Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), and Co-Head of the firm's European Financial Institutions Group. I previously lead the firm's Global Portfolio Valuation Practice and its New York office Financial Advisory Services Practice. I have approximately thirty years of experience in advisory services in connection with acquisitions, divestitures, corporate strategy, operational oversight, and restructurings for financial institutions. I am based in the firm's London office, and I am a member of the firm's management committee.

3. I advised the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. in connection with that company's bankruptcy. As part of that engagement, I valued and restructured the significant derivatives and special purpose vehicle portfolios of Lehman Brothers and was involved in oversight of the Lehman Banks. I also advised the Official Committee of Unsecured Creditors of Refco, Inc., in connection with its bankruptcy and advised in the restructurings of the structured investment vehicles Cheyne and Mainsail II. I also advised a committee of bondholders of CIT Group in their $3 billion financing.

4. Before joining Houlihan Lokey, I served as President and Chief Operating Officer of Comdisco, Inc., an $8 billion equipment-leasing and technology services company, which I led through the bankruptcy process. Earlier, I served as Executive Vice President/Managing Director and COO-Americas of Deutsche Bank AG, managing the integration of Deutsche Bank NA and Bankers Trust Corp., as well as directing all non-

2

front office functions in the Americas (Legal, Controlling, Risk Management, Real Estate, and Operations). I chaired the bank's regional operating committee and was a member of the executive committee.

5.  The rest of my background and experience is set forth in my expert reports. I am amply qualified to offer the opinions and findings expressed therein and below.

II. **SCOPE OF EXPERT ANALYSIS**

6.  At the request of counsel for the Ad Hoc Group of Junior Secured Noteholders and the JSNs' Trustee, my team at Houlihan Lokey and I performed a recovery analysis, providing sensitivity outputs on the Debtors' Collateral Scenario recoveries to estimate the impact of certain issues subject to Phase II of the Adversary Proceeding, including the value of intercompany claims to the JSNs and the impact of the JSNs' lien attaching to a portion of the AFI contribution. We also assessed the impact to the JSNs assuming that the allowed RMBS Trust and Monoline Claims contemplated by the Debtors' Plan are subordinated to general unsecured creditors. In addition, we assessed the potential impact on intercompany claim value from the reinstatement of approximately $16.6 billion in previously forgiven intercompany claims. Lastly, we calculated the aggregate value recoverable from individual deficiency claims asserted by the JSNs in two scenarios. Our analysis and conclusions are set forth in my expert report (my "Opening Report"), the slide presentation attached hereto as Exhibit A.

7.  I have also been asked to consider and respond to the opinions contained in the report of the Debtors' expert Mark Renzi, dated October 18, 2013. My related analysis and

conclusions are set forth in my expert rebuttal report (my "Rebuttal Report"), attached hereto as Exhibit B.

8. I have not had the opportunity to respond to the new opinions and three new hypothetical scenarios that Mr. Renzi added in his rebuttal report because they appeared for the first time in a rebuttal report served on the same day as my rebuttal report. Thus, the fact that I have not specifically rebutted the new opinions and scenarios in Mr. Renzi's rebuttal report should not be interpreted as indicating that I agree with Mr. Renzi's new opinions (which I do not).

9. The attached reports, along with the statements in this Witness Statement (which summarizes certain key points from my reports, but does not attempt to restate my reports in their entirety), constitute my direct testimony in this matter.

### III. THE WATERFALL MODEL AND ITS APPLICATION

10. To perform my analysis, I developed a waterfall model with the assistance of my team at Houlihan Lokey. The waterfall model calculates the potential recovery for creditors at individual legal entities, including the impact of intercompany claims, Equity Pledges (as defined herein) and deficiency claims (if any) in a hypothetical recovery or liquidation scenario. The model includes functionality to change or modify various assumptions in order to calculate creditors' ultimate recoveries under certain scenarios that are being reviewed.

11. The waterfall model generally incorporates the Debtors' asset and claim assumptions as provided in the Debtors' Disclosure Statement (as amended), as well as the recovery

model designed by Mr. Renzi's team for the Debtors. Distributable value for general unsecured creditors by legal entity is calculated using the Debtors' estimated recovery rates for unsold assets applied to the Debtors' April 30, 2013 trial balances, which contain the book value of assets at individual legal entities, less amounts for secured and administrative claims as allocated in the Debtors' Disclosure Statement.

12. As a general mater, the assumptions utilized in the Debtors' Collateral Scenario are intended to be consistent with those utilized by the Debtors in their Disclosure Statement, and updates thereto and are for illustrative purposes only. It is not my intent to opine on contested issues that are addressed in Phase I of the Adversary Proceeding. The Debtors assumptions are being utilized solely to isolate and quantify the impact of certain individual assumptions on the Collateral Scenario's projected recoveries.

13. The architecture of the waterfall model is explained further in slides 6 through 8 of my Opening Report.

14. Prior to and subsequent to the petition date, Houlihan Lokey professionals and the Debtors' advisors have run scenarios through their respective models and agreed that both the Debtors' and Houlihan Lokey's models produce substantially similar results when using the same assumptions. This indicates that methodologically the two models and their outputs are comparable, even though they were independently developed. Slide 10 of my Opening Report illustrates the "baseline" scenario, calculated using Houlihan's waterfall model (but using the Debtors' recovery assumptions), and shows that the JSNs' anticipated recovery from collateral, when calculated in this way, is the same as calculated by Mr. Renzi using the Debtors' model. Aside from rounding differences, the

5

only difference in the individual line-items is the "add-back of additional expenses," which reflects counsel's instruction to exclude the Debtors' proposed allocation of additional expenses to the JSNs' collateral, as indicated in Mr. Renzi's report. Accordingly, the secured recovery indicated by the Houlihan model in this baseline scenario (the "Debtors' Collateral Scenario") should be compared to (and matches) the "Adjusted Secured Recovery" indicated by the Debtors' model.

15. As explained in the remainder of my Opening Report and my Rebuttal Report, at the direction of counsel, I then used the waterfall model to test several scenarios by changing one or more of the Debtors' assumptions in isolation, in order to determine the impact (by comparison to the baseline scenario) that those assumptions have on the JSNs' collateral value.

16. The analysis showed certain of Debtors' assumptions each had the effect of dramatically reducing the JSNs' collateral value and anticipated secured recovery.

17. While I offer no opinion on the validity of those assumptions (which I understand to be at issue in Phase II of this proceeding), the analysis shows that <u>if any of the Debtors' assumptions are determined not to be valid</u>, the JSNs' collateral value and secured recovery will increase substantially, making it clear that the estimated value of the JSNs' collateral as of the assumed effective date is greater than the value of the JSNs' assumed allowed claim of $2.223 billion.

**IV.    ADJUSTED INTERCOMPANY CLAIMS AND AFI CONTRIBUTION**

18. Slide 11 of my Opening Report sets forth the three scenarios I was asked by counsel to evaluate in that report:

   A. Intercompany Claims: Utilizes the Debtors' Collateral Scenario assumptions, but include all pre-petition intercompany claims as valid and as scheduled in the Debtors' Statements of Assets and Liabilities ("SOALs") (rather than assuming that they are invalid, waived or otherwise have no value, as Debtors' analysis assumes).

   B. AFI Contribution: Utilizes the Debtors' Collateral Scenario assumptions, but assume the JSNs have a direct lien on certain components of the contemplated $2.1 billion AFI contribution, which includes the following assumptions (based on the values set forth in Judge Lyons' expert opinion):

   - $624.5 million recovered from Residential Capital, LLC ("HoldCo") on account of breach of contract claims related to the first 2009 tax allocation agreement;

   - $338.8 million recovered from GMACM on account of breach of contract claims related to failure to pay value of purchased mortgage servicing rights;

   - $234.6 million recovered from GMACM on account of breach of contract claims related to the misallocation of net revenues on loans brokered by GMACM;

7

- The remaining $902.1 million is allocated pro-rata to claimants / legal entities in the same manner as the $2.1 billion allocation contemplated by the Disclosure Statement.

C. **Both Intercompany Claims & AFI Contribution:** Utilizes the Debtors' Collateral Scenario assumptions, but assumes both intercompany claims and the JSNs' lien on a portion of the AFI contribution are valid.

19. Slide 12 of my Opening Report summarizes the outcome of my analysis of the three scenarios.

### JSNs' Maximum Secured Recovery ($ in millions)

|  | Debtors' Collateral Scenario | | A W/ InterCo. | B W/ AFI Contr. | C W/ Both |
|---|---|---|---|---|---|
|  | Renzi Report | Houlihan Model | Houlihan Model | Houlihan Model | Houlihan Model |
| Cash & Remaining Assets | $ 2,513 | $ 2,512 | $ 2,512 | $ 2,512 | $ 2,512 |
| Equity Pledges | 99 | 100 | 238 | 100 | 158 |
| Pledged Intercompany Claims | - | - | 602 | - | 342 |
| Pledged AFI Contribution | - | - | - | 1,198 | 1,198 |
| Impact of Ocwen True-Up | 51 | 51 | 51 | 51 | 51 |
| Revolver Pay-Down | (747) | (747) | (747) | (747) | (747) |
| Additional Expense Allocation | (180) | (27) | (27) | (27) | (27) |
| Total Secured Recovery | 1,735 | 1,888 | 2,628 | 3,086 | 3,486 |
| Plus: Add-Back of Addt'l. Exp. | 153 | NA | NA | NA | NA |
| Adj. Secured Recovery | $ 1,888 | $ 1,888 | $ 2,628 | $ 3,086 | $ 3,486 |
| Memo: Incremental Collateral |  |  | $ 740 | $ 1,198 | $ 1,598 |

20. In Scenario A, if the intercompany balances among the Debtors are assumed valid as scheduled, that would have a net impact of increasing the JSN collateral value to approximately $2.628 billion. Specifically, the amount of the JSNs' recovery increases by $602 million on account of the intercompany claims on which the JSNs (are assumed to) have direct liens, and by an additional $138 million ($238 million, versus $100

8

million in the baseline scenario) from increased value of Equity Pledges to the JSNs from Debtor entities.

21. In Scenario B, if the JSNs are assumed to have a direct lien on certain components of the AFI contribution (consistent with Judge Lyons' opinion), the JSNs' collateral value would increase to approximately $3.086 billion.

22. In Scenario C, if both of the above assumptions are used, the JSNs' adjusted secured recovery would total approximately $3.486 billion. Please note that this scenario does not simply combine the amounts from the previous two scenarios, but represents a separate analysis performed using the assumptions from Scenarios A and B. For example, the calculated value of the "Equity Pledges" and "Pledged Intercompany Claims" is lower in Scenario C than in Scenario A because the JSNs' lien attaching to a portion of the AFI contribution reduces the amount of the contribution that is available to satisfy unsecured claims, including the intercompany claims.

23. The bottom row of the chart in Slide 11 of my Opening Report shows the incremental increase in the JSNs' collateral in Scenarios A, B, and C against the Debtors' Collateral Scenario (which is based on using the Debtors' assumptions). As shown in the first two (unlettered) columns of this slide, the output of the baseline scenario, as modeled in Houlihan's waterfall model, is essentially the same as the output of the Debtors' model, used in Mr. Renzi's report.

24. In each of Scenario A, B, and C, the JSNs' secured recovery exceeds $2.223 billion, which I understand to be the amount of the JSNs' allowed claim under the Plan (subject to the resolution of certain Phase I issues and prior to the addition of post-petition interest

9

and unpaid fees and expenses, and other charges, to which I understand that the JSNs contend that they are entitled).

25. Slide 13 of my Opening Report illustrates the effect that subordination of the allowed RMBS Trust and Monoline Claims proposed in the Debtors' Disclosure Statement would have on the above Scenarios A, B, and C. In Scenario A, the JSNs' secured recovery increases to $4.215 billion, based on an increase in the recovery value of intercompany claims. There is no effect on Scenario B, because Scenario B derives increased value only from a portion of the AFI contribution and not the intercompany claims (which are general unsecured claims that would recover pari passu with the RMBS Trust and Monoline Claims absent subordination of those claims). In Scenario C, the increased recovery value of intercompany claims increases the JSNs' total secured recovery to $4.609 billion. The effect that the subordination of the Private Securities Claims would have on Scenarios A, B, and C is not addressed because the Debtors' Collateral Scenario assumes that the Private Securities Claims have no recourse to the Debtors and instead, are paid directly and solely out of the Private Securities Claims Trust and NJ Carpenters Claims Distribution, which are funded with a portion of the AFI contribution. The Private Securities Claimants do not have claims against the Estates under the Plan.

26. At the request of counsel, Slides 14-16 explain the potential impact from the assumed reinstatement of intercompany claims forgiven by the Debtors between January 2008 and the petition date. Accounting for the fact that certain of the reinstated claims could potentially offset or reduce existing intercompany balances (Slide 15), or dilute JSNs' recovery from outstanding intercompany recoveries (if the JSNs do not have guarantees or equity pledges from certain of the entities asserting the reinstated claims) (Slide 16),

10

the JSNs' collateral value under Scenario A would still significantly exceed $2.223 billion.

27. As noted on Slide 16, there was also approximately $6.3 billion of previously forgiven intercompany loans owed to entities in the waterfall model by entities outside the waterfall model, which would generally increase the value of the JSN's collateral if those forgivenesses were avoided and the intercompany claims were reinstated. I was not, however, able to calculate the amount of that increase, because my team did not have access to financial information associated with all of the entities outside the waterfall model that owed those forgiven debts. While the reinstatement of this $6.3 billion in intercompany receivables for the Debtors could benefit the JSNs, I did not have sufficient data to quantify this benefit.

28. As explained in Slides 17-19 of my Opening Report, aggregation of the JSNs' deficiency claims against individual Debtor entities ensures that, under the scenarios I reviewed (including where the JSNs receive no benefit from intercompany claims, receive no secured recovery from the AFI contribution, and the Committee fully prevails on its challenges to the scope and amount of the JSNs' collateral), the JSNs will recover no less than their allowed claim and would, if permitted, enable the JSNs to recover more than their total allowed claim under the Plan. The excess liquidity would be available to pay the JSNs the post-petition interest (or at least a portion thereof) to which they contend that they are entitled.

## V. SELECT ISSUES WITH DEBTORS' HYPOTHETICAL LIQUIDATION ANALYSIS

29. As summarized in Slide 20 of my Opening Report, the Debtors' Liquidation Analysis, which provides low and high liquidation recovery scenarios under which the JSNs are shown to not recover their full $2.223 billion assumed allowed claim, is misleading for several reasons, including, for example, the following.

30. The Debtors' liquidation analysis ascribes zero value to claims against AFI, despite the $2.1 billion settlement between ResCap and AFI contemplated under the Debtors' Plan of Reorganization and the claims identified by the Examiner, which include approximately $3.1 billion of ResCap causes of action deemed "Likely to Prevail" or "Close Questions, But More Likely to Prevail" and in excess of $5.4 billion of total causes of action. Counsel has informed me that claims against AFI would survive in a liquidation. While I do not opine on the specific value that should be assigned to claims against AFI, I believe that it is incorrect to assume that these claims have *zero* value, particularly in light of the fact that AFI is willing to pay $2.1 billion in order to extinguish the claims that the Debtors assume to be worth $0.

31. Similarly, the Debtors' liquidation analysis ascribes zero value to intercompany claims, assuming that they are invalid (which I understand to be in dispute). If the intercompany claims are found to be valid, my analysis (as explained above and in my expert reports) shows that the intercompany claims have value to the JSNs far in excess of $0.

32. The Debtors' liquidation analysis also makes certain disputed assumptions about the size and priority of unsecured claims, including, for example, whether the RMBS Trust and

Monoline claimants have a claim for the approximately $11 billion to $15 billion assumed in the Debtors' Liquidation Analysis, and the priority of those claims, such as whether or not they should be subordinated.

## VI.   IMPACT OF SIZE OF AFI CONTRIBUTION ON DEBTORS' LIQUIDATION ANALYSIS

33. In this section, I explain that even if the Debtors' claims against AFI were valued at less than $2.1 billion in a liquidation of the Debtors, the JSNs could still fare better in a liquidation than they do under the Plan.

34. I analyze three scenarios ("Rebuttal Scenarios" A, B and C, as distinguished from Scenarios A, B and C in my Opening Report) in order to test my hypothesis that a value of less than $2.1 billion for the Debtors' claims against AFI would result in a better outcome for the JSNs.

35. These scenarios are described in Slide 5 of my Rebuttal Report:

**A** Ally Contribution: Utilize the Debtors' Liquidation Analysis assumptions, but include a range of net Ally contribution / settlement value, assuming such value is allocated pro-rata to direct claimants and legal entities in the same manner as the $2.1 billion allocation included in the Debtors' Disclosure Statement
  ➢ The Debtors' Liquidation Analysis ascribes no value (or cost) associated with claims against Ally

**B** Intercompany Claims: Utilize the Debtors' Liquidation Analysis assumptions, but include a range of net Ally contribution / settlement value and assume the Debtors' intercompany claims existing on the petition date are valid as scheduled
  ➢ The Debtors' Liquidation Analysis does not include or account for existing intercompany claims

**C** Claim Subordination: Utilize the Debtors' Liquidation Analysis assumptions, but include a range of net Ally contribution / settlement value, assume the Debtors' intercompany claims are valid as scheduled, and assume all RMBS, monoline and securities claims included in the Debtors' scenarios are subordinated to general unsecured creditors
  ➢ The Debtors subordinate securities claims, but not RMBS or monoline claims, in their "High" recovery Liquidation Analysis scenario

13

(Unlike the Debtors' Collateral Scenario, the Debtors' Liquidation Analysis assumed that Private Securities Claims *did* have recourse to the Debtors, and showed those claims as having been subordinated for purposes of the "High" recovery analysis.)

36. I explained in my testimony and expert reports in Phase I of this proceeding that the Debtors' "Low" and "High" estimates of the JSNs' recovery are inaccurate and misleading. For purposes of my analysis in Phase II, my Rebuttal Report uses the Debtors' estimates, not because I think they are reliable, but in order to isolate the impact of the size of any AFI contribution (provided in consideration for a release of Debtors' claims against AFI) on the JSNs' anticipated recovery in a liquidation situation (as compared to the JSNs' anticipated recovery under the Plan).[1]

37. Slides 6-8 of my Rebuttal Report summarize my analysis and findings. Testing hypothetical AFI contributions of different sizes using the waterfall model shows that, even assuming (for sake of analysis) the truth of the disputed assumptions used by the Debtors, and even assuming a smaller hypothetical AFI contribution, well below $2.1 billion, the JSNs' total recovery, net of costs, would still reach or exceed $2.223 billion in the high liquidation situation included as part of the Debtors' Disclosure Statement.

---

[1] Although I indicated in my Opening Report on slides 17-19 that it is possible for the JSNs to recover more from their deficiency claims than is required to satisfy their allowed claim, for the purposes of addressing Mr. Renzi's liquidation analysis, I have shown the total JSNs' recovery in the event the JSNs are undersecured, consistent with the Debtors' assumptions. Any recovery from deficiency claim aggregation (as set forth on slides 17-19 of my Opening Report), if permitted, would increase the JSNs' recovery from the amounts shown in my Rebuttal Report and in the paragraphs that follow herein.

38. In Rebuttal Scenario A (Slide 6 of my Rebuttal Report), a $1.5 billion AFI contribution would be sufficient to cause the JSNs' liquidation recovery to reach or exceed $2.223 billion in the Debtors' "High" recovery scenario.

| ($ in millions) | | Secured Recovery | | Deficiency Recovery | | Total Recovery | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| | Amount of Net Ally Contribution[3][4] | | | | | | |
| | - | 1,505 | 1,603 | 111 | 162 | 1,617 | 1,765 |
| | 250 | 1,505 | 1,603 | 154 | 250 | 1,659 | 1,853 |
| | 500 | 1,505 | 1,603 | 196 | 339 | 1,701 | 1,942 |
| | 750 | 1,505 | 1,603 | 238 | 427 | 1,743 | 2,031 |
| Ally Contribution Impact On Deficiency Claim Recovery | 1,000 | 1,505 | 1,603 | 280 | 516 | 1,786 | 2,119 |
| | 1,250 | 1,505 | 1,603 | 323 | 604 | 1,828 | 2,208 |
| | 1,500 | 1,505 | 1,603 | 365 | 619 | 1,870 | 2,223 |
| | 1,750 | 1,505 | 1,603 | 407 | 619 | 1,912 | 2,223 |
| | 2,000 | 1,505 | 1,603 | 449 | 619 | 1,955 | 2,223 |
| | 2,100 | 1,505 | 1,603 | 466 | 619 | 1,971 | 2,223 |
| | 2,250 | 1,505 | 1,603 | 492 | 619 | 1,997 | 2,223 |
| | 2,500 | 1,505 | 1,603 | 534 | 619 | 2,039 | 2,223 |
| | 2,750 | 1,505 | 1,603 | 576 | 619 | 2,081 | 2,223 |
| | 3,000 | 1,505 | 1,603 | 618 | 619 | 2,124 | 2,223 |

39. In Rebuttal Scenario B (Slide 7 of my Rebuttal Report), which assumed the intercompany claims are valid as scheduled, a $1.0 billion AFI contribution would be sufficient to cause the JSNs' liquidation recovery to reach or exceed $2.223 billion in the Debtors' "High" recovery scenario.

| ($ in millions) | | Secured Recovery | | Deficiency Recovery | | Total Recovery | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| | Amount of Net Ally Contribution[4][5] | | | | | | |
| | - | 1,590 | 1,724 | 89 | 127 | 1,679 | 1,851 |
| | 250 | 1,624 | 1,781 | 122 | 184 | 1,746 | 1,965 |
| | 500 | 1,657 | 1,838 | 155 | 240 | 1,812 | 2,078 |
| | 750 | 1,691 | 1,896 | 187 | 295 | 1,878 | 2,190 |
| Ally Contribution Impact On InterCompany Claim Recovery & Deficiency Claim Recovery | 1,000 | 1,725 | 2,010 | 219 | 212 | 1,944 | 2,223 |
| | 1,250 | 1,759 | 2,158 | 251 | 65 | 2,010 | 2,223 |
| | 1,500 | 1,793 | 2,273 | 282 | 0 | 2,075 | 2,273 |
| | 1,750 | 1,827 | 2,360 | 313 | 0 | 2,140 | 2,360 |
| | 2,000 | 1,861 | 2,446 | 344 | 0 | 2,205 | 2,446 |
| | 2,100 | 1,877 | 2,481 | 345 | 0 | 2,223 | 2,481 |
| | 2,250 | 1,909 | 2,533 | 314 | 0 | 2,223 | 2,533 |
| | 2,500 | 1,962 | 2,620 | 261 | 0 | 2,223 | 2,620 |
| | 2,750 | 2,014 | 2,707 | 208 | 0 | 2,223 | 2,707 |
| | 3,000 | 2,067 | 2,793 | 156 | 0 | 2,223 | 2,793 |

40. In Rebuttal Scenario C (Slide 8 of my Rebuttal Report), which ascribes value to the intercompany balances *and* subordinates the RMBS Trust, Monoline, and securities

15

claims, the JSNs' liquidation recovery is $2.222 billion without any AFI contribution. Thus, even a minimal contribution from AFI would cause the JSNs' liquidation recovery to reach or exceed $2.223 billion in both the Debtors' "Low" and "High" scenario.

| ($ in millions) | Amount of Net Ally Contribution[6][7] | Secured Recovery Low | Secured Recovery High | Deficiency Recovery Low | Deficiency Recovery High | Total Recovery Low | Total Recovery High |
|---|---|---|---|---|---|---|---|
| Ally Contribution Impact On InterCompany Claim Recovery & Deficiency Claim Recovery | - | 1,761 | 2,022 | 315 | 201 | 2,076 | 2,222 |
| | 250 | 1,943 | 2,340 | 280 | 0 | 2,223 | 2,340 |
| | 500 | 2,312 | 2,494 | 0 | 0 | 2,312 | 2,494 |
| | 750 | 2,461 | 2,648 | 0 | 0 | 2,461 | 2,648 |
| | 1,000 | 2,611 | 2,802 | 0 | 0 | 2,611 | 2,802 |
| | 1,250 | 2,761 | 2,956 | 0 | 0 | 2,761 | 2,956 |
| | 1,500 | 2,911 | 3,110 | 0 | 0 | 2,911 | 3,110 |
| | 1,750 | 3,061 | 3,264 | 0 | 0 | 3,061 | 3,264 |
| | 2,000 | 3,211 | 3,418 | 0 | 0 | 3,211 | 3,418 |
| | 2,100 | 3,271 | 3,480 | 0 | 0 | 3,271 | 3,480 |
| | 2,250 | 3,361 | 3,572 | 0 | 0 | 3,361 | 3,572 |
| | 2,500 | 3,511 | 3,726 | 0 | 0 | 3,511 | 3,726 |
| | 2,750 | 3,661 | 3,880 | 0 | 0 | 3,661 | 3,880 |
| | 3,000 | 3,811 | 4,034 | 0 | 0 | 3,811 | 4,034 |

41. Counsel has instructed me to assume in Rebuttal Scenarios A, B and C, that any AFI contribution to the Debtors' Estates is made in consideration of a release of the Debtors' claims against AFI, but that <u>third-party claims</u>, including the JSNs' claims against AFI, would not be released in a liquidation. Counsel has informed me that the JSNs contend that they are in privity with AFI under the Intercreditor Agreement and possess potential damage claims against AFI in discrete and quantifiable amounts.

42. Accordingly, with even a minimal recovery from AFI, the JSNs' recovery will be greater than $2.223 billion and would recover more in a liquidation than under the Plan. Counsel has informed me that the Plan cannot be confirmed under applicable law if the JSNs would recover more in a liquidation than under the Plan.

43. Further, the analysis set forth in my Rebuttal Report on Slides 6 through 8 shows that if it is assumed that AFI makes a contribution of $2.1 billion in a liquidation, the JSNs should

16

recover at least $2.223 billion (and, in some scenarios, much more) in all of the hypothetical liquidation scenarios reviewed, except the Debtors' "Low" recovery scenario and assuming no benefit to the JSNs from intercompany claims or the subordination of RMBS, Monoline and Securities Claims (Scenario A). Thus, if a $2.1 billion AFI contribution is assumed, and the JSNs' unreleased claims against AFI are assumed to have any non-zero value, the JSNs would be expected to recover more in liquidation than under the Plan.

## VII. IMPACT OF "PARTIAL CONSOLIDATION" ON JSN COLLATERAL

44. As explained in Slide 10 of my Rebuttal Report, if some or all of the intercompany claims are determined to be valid as scheduled, then, contrary to Mr. Renzi's assertions, the JSNs would be harmed by the proposed "limited partial consolidation" because most of the value of intercompany claims would be eliminated, thereby negatively impacting the JSNs' recoveries. In addition, the JSNs' collateral includes subsidiary equity pledges whose value would be eliminated by "limited partial consolidation," further reducing the JSNs' recoveries.

**Michael Fazio**

**November 12, 2013**

17