# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et. al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |

_____)

**EXPERT REPORT OF RAYMOND T. LYONS, ESQUIRE**

**Dated:  October 18, 2013**

**Page**

I.    THE OPINION OF RAYMOND T. LYONS, ESQUIRE.................................. 1

    A.    THE EXPERT.................................................................................... 1

        1.    Retention ............................................................................ 1

        2.    Qualifications .................................................................... 1

        3.    Limitations ......................................................................... 2

    B.    ORGANIZATION OF THE OPINION .................................................. 2

    C.    THE INVESTIGATION ....................................................................... 2

    D.    METHODOLOGY OF EXPERT AND SUMMARY OF CONCLUSIONS ......... 3

        1.    Legal Conclusions ............................................................. 3

        2.    Citations to Examiner's Report ........................................ 3

        3.    Summary of Conclusions .................................................. 4

    E.    DETAILED REVIEW OF EXPERT OPINION REGARDING
        SETTLEMENT VALUES OF POTENTIAL ESTATE CLAIMS ...................... 6

        1.    Claims of GMAC Mortgage and ResCap Relating To The MMLPSA,
            Pipeline Swap, MSR Swap, and Broker Agreement ................................. 8

            a.    Misallocation of Net Revenues on Loans Brokered by GMAC
                Mortgage ........................................................................ 8

            b.    Failure to Pay Value of Purchased MSRs and Correspondent
                Loan MSRs to GMAC Mortgage under the MSR Swap .............. 15

            c.    Representation and Warranty Liabilities Under the 2001 and
                2006 MMLPSAs .......................................................... 22

            d.    Application of the Pipeline Swap To The "Funding To Sale"
                Period And To Ally Bank-Originated Loans ................................. 24

            e.    Failure To Obtain Independent Director Approval...................... 27

        2.    Government Settlements....................................................... 28

        3.    Causes of Action Relating To Use And Allocation Of ResCap's Tax
            Attributes.............................................................................. 34

i

4.    Minnesota Insider Preference Claims ........................................................ 41

5.    Ally Bank Transactions................................................................... 45

      a.    2006 Bank Restructuring ................................................... 45

      b.    2008 Bank Transaction and 2009 Bank Transaction ................... 49

6.    ResCap's Directors And Officers ............................................... 51

7.    Single Entity Theories Of Liability............................................... 54

      a.    Piercing The Corporate Veil ............................................. 54

      b.    Substantive Consolidation ............................................... 56

8.    Debt Re-characterization ....................................................... 58

9.    Equitable Subordination And Equitable Disallowance........................... 59

10.   Constructive Trust Claim ....................................................... 61

11.   Prepetition Asset Sales......................................................... 62

12.   Financing Affiliate Transactions............................................... 66

F.    VALUE OF SETTLED ESTATE CAUSES OF ACTION ................................ 70

G.    OPINION REGARDING PROPOSED POST-PETITION
      TRANSACTIONS AND AGREEMENTS............................................ 72

H.    OPINION REGARDING SETTLEMENT VALUES OF POTENTIAL
      THIRD PARTY CLAIMS ...................................................... 72

1.    Third Party Claims Against AFI............................................... 73

      a.    RMBS Claims ........................................................ 73

      b.    Fraudulent Transfer Claim............................................ 79

2.    Third Party Claims Against Ally Securities................................... 81

3.    Third Party Claims Against Ally Bank......................................... 84

4.    Unsecured Noteholder Causes Of Action ..................................... 86

      a.    Tortious Interference Under 2005 Indenture .......................... 86

b.      Claims Related To The 2006 Bank Restructuring ........................ 88

5.      Junior Secured Noteholder Causes Of Action ........................................... 92

I.      OPINION REGARDING CONSIDERATION FOR RELEASES AND
CONCLUSION REGARDING ALLOCATION OF SETTLEMENT FUND..... 93

II.      EXHIBIT A...................................................................................................................... 1

## I.    THE OPINION OF RAYMOND T. LYONS, ESQUIRE

### A.    THE EXPERT

#### 1.    Retention

I prepared, with the assistance of Fox Rothschild LLP ("Fox Rothschild"), this opinion (the "Opinion") at the request of (a) White & Case LLP and Milbank, Tweed, Hadley & McCloy LLP, co-counsel to (i) the Ad Hoc Group of Junior Secured Noteholders ("Ad Hoc Group") of the 9.625% Junior Secured Guaranteed Notes due 2015 ("JSNs") and (ii) UMB Bank, N.A. as Trustee for the JSNs ("Notes Trustee"), and (b) Akin Gump Strauss Hauer Feld LLP, as special litigation counsel to the Trustee relating to the Chapter 11 proceedings of Residential Capital, LLC ("ResCap", the "Company" or the "Debtors") in the United States Bankruptcy Court for the Southern District of New York, Case No. 12-12020. I was asked to provide my opinion as to the reasonable settlement value of each of the claims identified in the Report of Arthur J. Gonzalez, Esquire, As Examiner, released June 26, 2013 ("Examiner's Report"). I have also been asked to give my opinion as to the reasonable allocation of the $2.1 billion dollar settlement fund provided by AFI among the various settled claims. I and Fox Rothschild are being compensated at Fox Rothschild's usual and customary hourly billing rates.

#### 2.    Qualifications

Prior to joining Fox Rothschild on July 1, 2013, I served as a United States Bankruptcy Judge for the District of New Jersey for over 14 years. I conducted settlement conferences in cases assigned to me and for my colleagues in the District of New Jersey. While on the bench I was authorized by the Court of Appeals for the Third Circuit to serve as mediator in the U.S. Bankruptcy Court for the District of Delaware. Among the matters I mediated in Delaware was the plan of reorganization for Washington Mutual, Inc. involving twenty-two classes of claims and interests and $7 billion in distributions.

I completed the forty-hour Bankruptcy Mediation Training program in the first class conducted by the American Bankruptcy Institute and St. John's University School of Law. I am a member of the Dispute Resolution Section of the New Jersey State Bar Association and the Justice Marie L. Garibaldi ADR Inn of Court. I am on the Roster of Mediators for the American Arbitration Association (AAA), the CPR Panel of Distinguished Neutrals for the International Institute For Conflict Prevention and Resolution (CPR), and the Panel of Arbitrators and Mediators for Federal Arbitration, Inc. (FedArb). I am also on the court-annexed Panel of Mediators in the U.S. Bankruptcy Courts for the Southern District of New York, the Eastern District of New York, the District of Delaware and the Western District of Pennsylvania.

Before taking the bench, I was in private practice for more than 25 years as a commercial lawyer with a concentration in chapter 11 bankruptcy. I taught banking law as an adjunct professor at Seton Hall University School of Law. I received my J.D. from Seton Hall University School of Law and my LL.M. in tax law from New York University School of Law.

Other than the opinions that I have written in my position as a United States Bankruptcy Judge, I have not authored any publications in the last 10 years. I have not testified as an expert either at trial or by deposition in the last four years.

### 3.    Limitations

The opinions expressed herein represent my reasonable professional judgment as to the matters expressed herein, based upon the facts presented in the Examiner's Report and are not guarantees that a court would reach any particular result. In fact, the opinion of settlement amount for each claim is not intended to predict the legal outcome of the claim but rather to estimate the settlement value based on the possibility of various alternative legal outcomes.

My Opinion is limited to the matters stated herein. No opinion is implied or may be inferred beyond the matters expressly stated. The Opinion is given as of the date hereof, and I expressly disclaim any obligation to update or supplement my opinions contained herein to reflect any facts or circumstances that may hereafter come to my attention or any changes in laws which may hereafter occur.

### B.    ORGANIZATION OF THE OPINION

For ease of reference I have organized the Opinion using, for the most part, the same sections as Section I of the Examiner's Report. Section A sets out the background relating to my employment as the expert, my qualifications, the scope of my retention and opinion, and the limitations of the Opinion. Section B discusses the Organization of the Opinion. Section C explains the Examiner's investigation. Section D explains the methodology employed in arriving at my Opinion regarding the settlement values of the potential claims of the estate and the potential claims of third parties and a summary of my Opinion. Section E follows the outline of potential Estate Causes of Action as set forth in Summary Section I.E of the Examiner's Report, and sets forth my opinion regarding the likely settlement amount of each claim. Section F contains a chart of all Estate Causes of Action identified by the Examiner with my opinion on the reasonable settlement value of each claim. Section G relates to the proposed post-petition transactions and agreements. Section H follows the outline of potential third party claims as set forth in Summary Section I.H of the Examiner's Report and contains my opinion concerning the reasonable settlement value of each of those claims. Section I contains my opinion regarding the reasonable allocation of the $2.1 billion dollar settlement fund provided by AFI among the various settled claims.

### C.    THE INVESTIGATION

The Examiner did an evaluation of the facts, including review and examination of almost nine million pages of documents produced by twenty-three different parties, ninety-nine formal interviews of eighty-three witnesses, sixty-six meetings with interested parties, and review of multiple written submissions from a dozen parties. Unless specifically noted, I have relied on the factual findings of the Examiner in reaching my opinion regarding the settlement values of the claims identified by the Examiner.

To the extent that a potential claim identified by the Examiner in his report referenced a pertinent contract or order, such contract or order was reviewed to confirm the Examiner's interpretation of the terms and effect of that contract or order. A list of the documents that were reviewed in order to render my Opinion is attached hereto as Exhibit A.

### D.    METHODOLOGY OF EXPERT AND SUMMARY OF CONCLUSIONS

To render my Opinion, the Examiner's Report has been carefully reviewed in full to assign a settlement value to each of the potential causes of action identified in the Examiner's Report and to allocate the $2.1 billion settlement fund to those settled claims. Importantly, as noted by the Examiner, given the expansive evidence and data reviewed and the nature of sometimes unsettled legal issues raised by many of the claims, the Examiner's assessment of the likelihood of success of each cause of action is inherently imprecise. The Examiner's Report contains nuanced conclusions and therefore, the Examiner cautions against applying probabilities or mathematical models to the results contained in his report.

I have heeded this caution and have applied a non-formulaic, nuanced approach to determining the reasonable settlement value of each claim and the allocation of the $2.1 billion settlement fund provided by AFI among the various settled claims. Although under the absolute priority rule, I could have allocated the settlement first to secured claims such as the JSNs, and second to unsecured claims, instead I made allocations pro rata based on the reasonable value of each of the claims. I did so based on my 25 years of experience as a practitioner, my 14 years of experience as a U.S. Bankruptcy Judge for the District of New Jersey, as well as my experience as a mediator. When appropriate, I have provided more than one method in arriving at my opinion regarding the reasonable settlement amount of a claim. For example, I applied a discounting method focused on the likely outcome or merits of a particular issue and my perception of the motivation of the parties to arrive at a reasonable settlement value of the cause of action. I also applied a likely settlement negotiation scenario to arrive at a settlement value from a second approach. If the settlement value of a particular claim was less than or equal to 1% of the gross value of the $2.1 billion dollar settlement fund provided by AFI (approximately $21 million), I deemed that claim to be not material for purposes of allocating the $2.1 billion settlement fund to the claims.

### 1.    Legal Conclusions

I reviewed each of the legal conclusions of the Examiner and I generally reviewed the statutory and case law cited by the Examiner in support of each potential claim discussed in the Examiner's Report. Unless specifically noted, I agree with and rely on the legal conclusions reached by the Examiner as set forth in his Examiner's Report in rendering my Opinion.

### 2.    Citations to Examiner's Report

For each claim, I have listed the references to relevant information in the Examiner's Report. However, for ease of reading, for the most part I have not pin cited the reference to the Examiner's Report. Unless specifically noted, I agree with the Examiner and rely on the factual conclusions reached by the Examiner as set forth in his Examiner's Report in rendering my Opinion. In addition,

the capitalized terms not defined in this Opinion shall have the meaning as defined in the Examiner's Report and the Appendix thereto.

### 3.    Summary of Conclusions

After reviewing each of the causes of action identified in the Examiner's Report, in my opinion the reasonable settlement value of the Estate Causes of Action is $1,920.0 million and the reasonable settlement value of the Third Party Claims is $480 million for a total reasonable settlement value of all claims and causes of action of $2,400.0 million.  In my opinion the settlement fund of $2.1 billion to be paid by AFI should be allocated to the reasonable settlement value of each claim *pro rata*.

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*)[1] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| ***ESTATE CAUSES OF ACTION*** | | | | | |
| Breach of Contract for Misallocation of Net Revenues on Loans brokered by GMAC | $520.5 | **$268.2** | **51.5%** | **$234.6** | **45.1%** |
| Breach of Contract for Failure To Pay Value of Purchased MSRs | $1,725.0 | **$387.2** | **22.4%** | **$338.8** | **19.6%** |
| Preferential Transfer relating to DOJ/AG Consent Order | $109.6 | **$60.0** | **54.7%** | **$52.5** | **47.9%** |
| Preferential Transfer relating to 2012 Letter Agreement and A&R Servicing Agreement | $48.4 | **$32.0** | **66.1%** | **$28.0** | **57.9%** |

---

[1] Zeros are omitted for any settlement value that does not meet my threshold for materiality ($21 million).

| Claims | Potential Damages (in millions) | Reasonable Settlement Amount (in millions)[1] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (in millions) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| Breach of contract regarding the First 2009 Tax Allocation Agreement | $1,770.0 | $713.7 | 40.3% | $624.5 | 35.3% |
| Minnesota Insider Preference Claims | $566.0 | $328.9 | 58.1% | $287.8 | 50.8% |
| Fraud related to 2006 Bank Restructuring | $569.0 | $130.0 | 22.8% | $113.8 | 20.0% |
| **TOTAL** | | $1,920.0 | | $1,680.0 | |
| ***THIRD PARTY CAUSES OF ACTION*** | | | | | |
| Third Party Claims against AFI | | | | | |
| a. RMBS Claims, including veil-piercing, control person liability, aiding and abetting fraud | $20,000.0[2] | $480.0 | 2.4% | $420.0 | 2.1% |
| ***GRAND TOTAL*** | | $2,400.0 | | $2,100.0 | |

---

[2] The Examiner did not quantify the potential damages for the Third-Party RMBS Claims against AFI.

E.    **DETAILED REVIEW OF EXPERT OPINION REGARDING SETTLEMENT VALUES OF POTENTIAL ESTATE CLAIMS**

In reaching an opinion concerning the likely settlement value of each of the Estate Causes of Action, I have considered a number of factors, including the factors relevant in determining whether the settlement is fair and equitable, the *Iridium* factors.[3]

Bankruptcy Rule 9019 provides that after notice and a hearing, "the court may approve a compromise or settlement." In determining whether to approve a settlement, the court must determine whether the settlement is "fair, equitable and in the best interests of the estate."[4] To determine whether a proposed compromise is fair and equitable, the court must review all facts necessary to (i) determine the probabilities of success should the claim be litigated, (ii) estimate the complexity, expenses and duration of litigating the claims, (iii) evaluate the possible difficulties of collecting on a judgment and all other factors relevant to an assessment of the settlement.[5]

In *Iridium*, the Second Circuit enumerated seven factors that should be evaluated in determining whether a settlement is fair and equitable and should be approved under Bankruptcy Rule 9019. Those factors are:

- The balance between the litigation's possibility of success and the settlement's future benefits;
- The likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment;
- The paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement;
- Whether other parties in interest support the settlement;
- The competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement;
- The nature and breadth of releases to be obtained by officers and directors; and
- The extent to which the settlement is the product of arm's length bargaining.[6]

I have considered each of these factors, as relevant, in determining the likely settlement amount of each claim identified by the Examiner. For all of the Estate Causes of action I assumed that collection is not a significant factor.

---

[3] *Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007)(citing *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006); *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992).

[4] *TMT Trailer Ferry,* 390 U.S. at 424-25.

[5] *Id.*

[6] *Iridium*, 478 F.3d at 462.

In arriving at the likely settlement amount for each of the potential claims identified by the Examiner, I have also considered the likely motivation of the particular litigants regarding the decision to settle the claims. Estate causes of action are likely to be pursued by a fiduciary such as a liquidating trustee or a committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to reduce litigation costs and expedite distributions to creditors.

In assessing the likely settlement value of a potential claim identified by the Examiner, I have also considered the state of the law post-*Stern v. Marshall*.[7] There are many procedural hurdles that attend bankruptcy litigation, including the constitutional authority of a bankruptcy judge to render a final judgment in a state law contract dispute or a tort claim, federal statutory claims such as securities law claims, or an avoidance action under the Bankruptcy Code or state law such as a preference or a fraudulent transfer action. In addition, litigation of estate claims raises procedural issues of withdrawal of the reference and demands for a jury trial (the "Procedural Factors"). The Supreme Court has granted certiorari in the *Bellingham* case,[8] a Ninth Circuit case holding that fraudulent conveyance claims against non-creditors cannot be adjudicated by non-Article III judges. Thus, the Supreme Court may finally resolve these issues and offer both lower Article III courts and bankruptcy courts further guidance on the scope of a bankruptcy judge's authority.

Although *Stern v. Marshall* initially resulted in litigants requesting the withdrawal of the reference resulting in delay of the proceedings, the District Court for the Southern District of New York attempted to ameliorate these procedural roadblocks by entry of its Amended Standing Order of Reference on January 31, 2012. The Standing Order provides that if a bankruptcy judge or district judge determines that the entry of a final order or judgment by the bankruptcy judge would not be consistent with Article III of the United States Constitution in a particular proceeding referred under the standing order and determined to be a core matter, the bankruptcy judge shall hear the proceeding and submit proposed findings of fact and conclusions of law to the district court unless otherwise ordered by the district court. This procedure is the same procedure currently prescribed by 28 U.S.C. § 157(c) relating to non-core matters. Nevertheless, parties must still evaluate which is their preferred forum and take steps they deem in their best interest.

Also, the parties will have the right to a jury trial in many of the estate claims identified by the Examiner such as contract disputes and securities law claims. It is anticipated that some parties may request a jury trial. Many of the procedural issues pertaining to bankruptcy litigation will be present in the estate claims identified by the Examiner. They add complexity, risk, uncertainty, delay and expense to the litigation which must be factored into the evaluation of a reasonable settlement amount.

---

[7] 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011).
[8] *Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 702 F. 3d 553 (9th Cir. 2012).

1.    **Claims of GMAC Mortgage and ResCap Relating To The MMLPSA, Pipeline Swap, MSR Swap, and Broker Agreement**

a.    *Misallocation of Net Revenues on Loans Brokered by GMAC Mortgage*

**Examiner's Report References:**

Section I.E pages I-8 to I-9

Section V.B.6 pages V-123 to V-154

Section VII.L pages VII.L-64 to VII.L-66

**Description:**

The implementation of the agreements between GMAC Mortgage and Ally Bank concerning the allocation of revenues on loans GMAC Mortgage brokered to Ally Bank between January 1, 2009 and April 30, 2012.

**Background:**

In 2008, ResCap was facing severe liquidity issues, while Ally Bank maintained excess liquidity and was searching for ways to grow its business.  As a solution to those issues, in  March 2008, ResCap and Ally Bank personnel began work on the "Brokering Consumer Loans to Bank" project.  Prior to the project, the Bank's ability to purchase loans originated by GMAC Mortgage were subject to the "250.250 exception" limit which capped it at 50% of GMAC Mortgage's preceding twelve-month rolling production.  Loans brokered to Ally Bank by GMAC Mortgage and then originated by Ally Bank would not be subject to this limit.  Under the parties' then-existing agreement, Ally Bank recognized as revenue only the "net interest carry" for the period the loan was on Ally Bank's books.  GMAC Mortgage realized the benefit of any points or other origination fees charged.

Contemporaneous e-mails among Albert Celini (an Ally Bank official and its "Sponsor" of the Brokering Consumer Loans to Bank Project), his subordinate Debra Scott (Bank Project Leader), and Matthew Whitehead (a ResCap representative) reflect a mutual understanding that the parties intended to maintain the same economics that had been in place for loans sold under the 250.250 program.  The parties' agreement is further reflected in a slide presentation dated November 19, 2008, entitled "Brokering Consumer Loans 2 Bank Project (BCL2B), Legal Entity Revenue, Expense, and Broker Fee Proposal" (the "BCL2B Presentation").  The BCL2B Presentation states, among other things, that Ally Bank would "recognize" origination income, overage/shortage or pricing subsidies, broker fees, and underwriting expense, these items would be deferred and capitalized, and, upon the sale of the loan, their resulting economic effects would be transferred to GMAC Mortgage through the Master Mortgage Loan Purchase and Sale Agreement ("MMLPSA") and Pipeline Swap.  Ally Bank would retain net interest carry, and would retain the mortgage servicing rights ("MSRs") upon sale of the loan.  From an accounting standpoint, the deferred loan

origination fees and expenses, including broker fees, was governed by Statement of Financial Accounting Standards No. 91 ("FAS 91").

To achieve this goal on the loans brokered to Ally Bank by GMAC Mortgage, origination fees (*e.g.*, discount points) would be paid by the borrower to Ally Bank, and Ally Bank would then defer and capitalize that income. This would reduce the cost basis of the loan, which, under the Pipeline Swap and MMLPSA, would in turn reduce the price charged to GMAC Mortgage when it purchased the loan from GMAC Bank. Similarly, any brokerage fee paid by GMAC Bank to GMAC Mortgage would also be deferred and capitalized, which, under the Pipeline Swap and MMLPSA, would increase GMAC Mortgage's purchase price of the loan. In this way, Ally Bank was able to recoup the brokerage fees.

On November 20, 2008, GMAC Mortgage and its subsidiary, Ditech, LLC, as brokers and GMAC Bank, predecessor to Ally Bank, entered into the Broker Agreement, which is the only new written agreement into which the parties entered in connection with BCL2B. The Broker Agreement does not specify the fee that is to be paid to GMAC Mortgage for acting as a broker. However, Celini stated that any change in the pre-Broker Agreement economics (or any change in the accounting that required such a change) would have required "a change in affiliate agreements" then in place.

GMAC Bank and GMAC Mortgage initially allocated revenue and expense as agreed when they implemented the Broker Agreement. That is, from January 1, 2009 to July 31, 2009 (when Ally Bank elected an accounting change discussed below), Ally Bank realized only the net interest carry on the loans, while also retaining the MSRs on the increased volume of loans passing through Ally Bank by virtue of avoiding the 250.250 limits. GMAC Mortgage, through the impact of FAS 91 deferrals, continued to reap the benefit of points and other origination-related revenues, as well as the impact of capitalized expenses. The accounting for sample loans from this period produced by the Debtors confirms the above-described treatment, and matched the sample loan-level accounting provided by the BCL2B Presentation. For the period January 1, 2009 through July 31, 2009, the net benefit to GMAC Mortgage from adjusting the purchase price of the brokered loans by the FAS 91 deferrals was $47.2 million. In other words, GMAC Mortgage received net revenue of $47.2 million on the loans that it brokered to GMAC Bank under the Broker Agreement during this period.

Effective August 1, 2009, Ally Bank implemented an accounting change to convert to fair-value accounting. As a consequence of this accounting change, beginning August 1, 2009, rather than realizing the benefit of points and the gain on sale as the parties had agreed (and as it had received under the 250.250 program and for third-party brokered loans), GMAC Mortgage instead received the cost-based, below market broker fee (which, since it was no longer capitalized, GMAC Mortgage did not have to repay to Ally Bank when it purchased the loan). However, GMAC Mortgage had agreed to such a fee with the understanding that, whatever the fee charged, the fee would be a "wash" because of the FAS 91 deferrals, and with the expectation that it would continue to receive the benefit of the FAS 91 deferrals. The Examiner illustrated the changed allocation of revenues resulting from Ally Bank's August 1, 2009 change to fair-value accounting as follows:



**EXHIBIT V.B.6.d**
**Accounting for Loans Brokered by GMAC Mortgage to the Bank**
**Pre and Post Fair Value Election**

■ GMAC Mortgage   ■ Ally Bank

|  | Pre-Fair Value Election | Post-Fair Value Election |
|---|---|---|
| Points collected | GMACM | BANK |
| Lender paid closing costs | GMACM | BANK |
| "Day one" gain | GMACM | BANK |
| Net interest carry | BANK | BANK |
| Gain on sale to third party | GMACM | GMACM |
| Broker fee (at cost) | N/A | GMACM |

*Source: Broker to Bank Contract Accounting Review, at 2 [EXAM12253506] (attached to e-mail from J. Cortese to C. Dondzila, J. Young, J. Whitlinger, and J. Andrews (Feb. 27, 2012) [EXAM12253505].*

There appears to be no evidence that this change in the underlying economics was understood and agreed to by GMAC Mortgage, or that the parties even recognized at the time that the fair-value election would have the effect described above, which was to allow Ally Bank to keep a significant portion of the gain on sale while still assuming no representation and warranty exposure or hedge exposure, and while paying a below-market broker fee in the bargain. Instead, the matter appears to have come to light in December 2011 when Adam Glassner, Ally Bank Senior Managing Director, noticed "the revenue recognition by legal entity was more in the bank and less in ResCap," which he thought erroneous in light of his understanding that GMAC Mortgage was supposed to receive the entire gain on sale.

Upon this discovery, Glassner reached out to James Whitlinger, then Chief Financial Officer, Mortgage Operations, ResCap, and James Young, Chief Financial Executive, Ally Bank. Ally Bank and AFI began a review into the appropriate allocation of revenue under the Broker Agreement, MMLPSA, and Pipeline Swap. Ally Bank personnel initially concluded that the intent of the Brokering Consumer Loans to Bank Project was that Ally Bank was not to receive gain on sale revenue, yet Ally Bank was currently recording a piece of gain on sale.

Despite the initial reactions which favored GMAC Mortgage retaining the entire gain on sale, KPMG (retained by AFI General Counsel William Solomon on AFI's behalf) and an Ally Bank investigation both concluded that the accounting methods employed by Ally Bank after August 1, 2009 were consistent with the agreements between the parties. However, KPMG's report does not acknowledge the BCL2B Presentation's explicit references to FAS 91 deferrals of fees and expenses and does not address the sample accounting provided with the BCL2B Presentation or the fact that it aligns with the accounting treatment implemented from January 1, 2009 to July 1, 2009 by those who had just negotiated the broker arrangement, but not with the accounting treatment implemented after Ally Bank's fair-value election.

Joe Cortese (for Ally Bank) and Cathy Dondzila (for ResCap) also prepared virtually identical, internal accounting memos concluding that the revenue recognition for January 1, 2009 to July 31, 2009, "was done in error." Interestingly, the memos state that there were "conflicting

corporate evidential documents" and recognize that there was some support in the documents that Ally Bank was not to receive any gain on sale revenue. Importantly, the accounting method employed during January 1, 2009 through July 31, 2009 was in accordance with GAAP, and neither memo claimed otherwise.

Subsequently, in March 2012 and at the insistence of Ally Bank, GMAC Mortgage paid Ally Bank $51.4 million, representing the $47.2 million received for the January 1, 2009 to July 31, 2009 time period, plus interest. From the August 1, 2009, fair value election through April 2012, Ally Bank retained additional revenues that would have been allocated to GMAC Mortgage under the revenue allocation implemented from January 1, 2009 through July 31, 2009, illustrated by the Examiner as follows:

EXHIBIT V.B.6.g

**Amounts Retained by Ally Bank But Owed to GMAC Mortgage Under the Revenue Allocation Implemented Between January 1, 2009, and July 31, 2009**

August 2009 – April 2012

*($ in Thousands)*

|  | 2009 | 2010 | 2011 | YTD April 2012 | Total |
|---|---|---|---|---|---|
| Loan discount (net, borrower and lender paid) | $ 144,503 | $ 40,461 | $ 10,540 | $ 513 | $ 196,017 |
| Loan discount (Capital Markets Required Price) | 209 | 113,920 | 158,852 | 137,775 | 410,756 |
| Non-broker activity | 853 | 178 | 635 | - | 1,667 |
| Loan discount income | 145,566 | 154,559 | 170,028 | 138,288 | 608,440 |
| Loan processing fee income | 44,268 | 47,419 | 46,709 | 12,267 | 150,663 |
| Pricing adjustments | (7,551) | (9,064) | (9,831) | (3,816) | (30,262) |
| Overage/shortage | 17 | - | - | - | 17 |
| Origination fee | 16,801 | (666) | (13) | (17) | 16,104 |
| Broker fee expense | (78,089) | (64,543) | (55,622) | (30,416) | (228,670) |
| Total FAS 91 deferral at origination for the period January 1, 2009 to YTD April 2012 | $ 121,010 | $ 127,704 | $ 151,270 | $ 116,306 | $ 516,291 |
| FAS 91 deferral at origination for the period January 1, 2009 to July 31, 2009 | (47,180) | - | - | - | (47,180) |
| Total amount retained by Ally Bank but owed to GMAC Mortgage under the revenue allocation implemented from Jan. 1, 2009 – July 31, 2009 [1] | $ 73,830 | $ 127,704 | $ 151,270 | $ 116,306 | $ 469,111 |

[1] Under this allocation, Ally Bank receives interest carry only and GMAC Mortgage receives the effect of income and expense items that would have been deferred under FAS 91 before the fair value election consistent with the original accounting allocation for the period January 1, 2009 through July 31, 2009.

Source: Exam Requested Loan Origination Revenue [ALLY_0402447]; Broker to Bank Contract Accounting Review, at 2 [EXAM12253506] (attached to e-mail from J. Cortese to C. Dondzila, J. Young, J. Whitlinger, and J. Andrews (Feb. 27, 2012) [EXAM12253505].

As illustrated above, from August 2009 to April 2012, Ally Bank retained a further $469.1 million that would have been paid to GMAC Mortgage had the revenue allocation originally agreed to remain in place. This amount is in addition to the $51.4 million paid by GMAC Mortgage to Ally Bank in March 2012 for amounts received by GMAC Mortgage for the period January 1, 2009 through July 31, 2009.

**Examiner's Analysis and Conclusions:**

1.      The Examiner concluded that it is likely that Ally Bank's August 1, 2009 conversion to fair-value accounting resulted in a breach by Ally Bank of the parties' agreement, documented in the MMLPSA and Pipeline Swap and in the parties' communications and documentation concerning the Brokering Consumer Loans to Bank Project and in their subsequent conduct from January 1, 2009 to July 31, 2009.

2.      The Examiner concluded that it is likely that GMAC Mortgage would prevail on a contractual claim that the allocation of revenues from January 1, 2009 to July 31, 2009 was proper, and that it is therefore entitled to payment of the revenues misallocated to Ally Bank from and after August 1, 2009.

3.      The Examiner concluded that GMAC Mortgage's contract claim under the MMLPSA, Pipeline Swap, and the parties' agreement about the combined effect of those contracts is estimated at $520.5 million, consisting of: (i) $51.4 million, representing return of GMAC Mortgage's March 2012 payment to Ally Bank for amounts received by GMAC Mortgage between January 1, 2009 and July 31, 2009; and (ii) $469.1 million in additional revenues (net of expenses including the below-market broker fee) that GMAC Mortgage would have received had the parties' agreed-upon revenue allocation been respected from August 1, 2009 to April 30, 2012.

4.      The Examiner concluded that although it is unclear which interest rate would apply to these circumstances, the pertinent rate (possibly 9% per annum under New York law or 5% above the Federal Reserve discount rate under Delaware law) would be applied to the $51.4 million component repaid to Ally Bank from the repayment date, and to the $469.1 million in revenues retained by Ally Bank for the period August 1, 2009 through April 30, 2012, from the date on which each of the constituent portions of those revenues was due to GMAC Mortgage (*i.e.*, the sale date of the pertinent loan).

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a bankruptcy fiduciary such as a trustee or committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to expedite distributions to creditors. All of the procedural hurdles that attend bankruptcy litigation would be present in this case including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law contract dispute, (ii) withdrawal of the reference, and (iii) demand for a jury trial. In addition, all litigation carries risk uncertainty and expense. As a result, it is highly likely that any settlement would reflect a discount of 20% from the face value of the claim.

The Examiner concludes that GMAC Mortgage's claim would be predicated on the MMPLSA (governed by Delaware law), and the Pipeline Swap (governed by New York law), and

the parties' agreements reflected in the documentation of the BCL2B. The possible application of the law of two different states would increase the complexity of this litigation and likely allow either side to argue for the application of the law most beneficial to it on a particular issue. In addition, the MMPLSA contains a choice of venue provision calling for resolution of related disputes in the United States District Court for the District of Delaware, which would allow for even more preliminary jurisdictional and venue related disputes than ordinarily present in bankruptcy litigation.

Although the Examiner concludes that GMAC Mortgage would likely prevail on a claim for breach of the parties' agreement, he concedes it is possible that the contemplated allocation of revenues was not mandated by the terms of the 2008 MMLPSA and Pipeline Swap. If so, GMAC Mortgage would need to prove that the contemporaneous Brokering Consumer Loans to Bank Project documentation and the parties' ensuing implementation of the arrangement constituted a written modification of those agreements to provide for the contemplated revenue allocation. Because the 2008 MMLPSA requires that any modification include a signed writing, GMAC Mortgage would need to rely upon the case law that permits modifications to agreements even if such modifications do not comply with the terms set forth for modifications in the original agreement. Although permissible, pursuing a claim based upon an alleged modification to an agreement that does not comply with that agreement's requirements for modifications is substantially more difficult than pursuing a claim based upon a straightforward breach of the agreement's terms. For example, in *Continental Insurance Company v. Rutledge & Company, Inc.,*[9] which the Examiner cites for the general proposition that contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision, the court refused to enforce an alleged non-written contractual modification based on the parties' prior course of dealing because the parties' prior course of conduct demonstrated that they did, in fact, amend the agreement in writing.[10] Here, the parties similarly amended and restated the MMLPSA, in writing, on at least June 1, 2007 and July 1, 2008. Thus, even though the Examiner concludes that GMAC Mortgage would likely prevail on such a claim, the claim is not without risk. Nonetheless, the parties' conduct before and after the implementation of the BCL2B and the limited scope of the KPMG Report (which does not cover the accounting for the transaction prior to the fair value election), would likely overcome AFI's arguments in this regard. I estimate that the existence of disputed facts, associated risk, and likely need for substantial discovery to develop and resolve those disputed facts, would further reduce the settlement value of the claim by 30%.

Even though AFI would likely dispute the claim, the magnitude of the claims (at $520.5 million) would likely be a strong motivating factor for AFI to settle. In addition, the likelihood of success identified by the Examiner would also incline AFI toward a substantial settlement. Legal fees and expenses in prosecuting and defending the claim would run into the tens of millions of

---

[9] 750 A.2d 1219 (Del. Ch. 2000).

[10] To the extent the Pipeline Swap, which is governed by New York law, needs to be amended or modified, New York law similarly permits oral modifications to written contracts that purport to prohibit oral modifications, albeit under a slightly different standard. *See O'Reilly v. NYNEX Corp.*, 693 N.Y.S.2d 13 (N.Y. App. Div. 1999); *Rose v. Spa Realty Assoc.*, 366 N.E. 2d 1279 (N.Y. 1977)); *Honeywell Int'l. Inc. v. Air Prods & Chems, Inc.*, 872 A.2d 944 (Del. 2005) (applying New York law).

dollars, but pale in comparison to the magnitude of the claims. However, the MMPLSA contains a fee-shifting provision in § 8.13, which adds additional litigation risk.

The Examiner noted that there is "ample fodder" for an argument that the initial reaction of those reviewing the revenue allocation issue in 2011 was squelched, and that the resulting reports in 2012 labeling the initial allocation in GMAC Mortgage's favor from January 1, 2009 to July 31, 2009 an accounting error, was the product of a desire to avoid restating Ally Bank's financials and the regulatory scrutiny that would have ensued, rather than a fair and objective attempt to resolve the matter. I agree with that conclusion, and if developed through discovery, this argument would provide GMAC Mortgage with a compelling story of cover-up and wrongdoing that could significantly impact the fact finder's decision and further incentivize AFI to settle.[11]

As the Examiner notes, under either New York or Delaware law, GMAC Mortgage would be entitled to prejudgment interest if successful on its contractual claim for misallocation of net revenues on loans it brokered to Ally Bank. The potentially applicable interest rates are not insignificant (9% under New York Law, and 5% above the Federal Reserve discount rate under Delaware law), and would amount to tens of millions of dollars per year when applied to the total $520.5 million claim. Interest would run on the $51.4 million payment from GMAC Mortgage from the date of that payment in March 2012. Interest on the $469.1 component of the claim for amounts that GMAC Mortgage should have received between August 1, 2009 and April 30, 2012 would ordinarily run from the date on which each of the constituent portions of those revenues was due to GMAC Mortgage. Given the significant amounts involved, the parties would likely submit expert calculations of the interest due on the $469.1 million component of the claim, but it is also possible that a court, applying New York law, would select a single reasonable intermediate date or, if it could not determine a single reasonable intermediate date, to fix interest from the date of commencement of the action.[12] However, cases rarely settle for full value of the claim and less frequently settle for full value of the claim, plus interest. I estimate that the likelihood of interest at a rate of between 5.5% and 9% per annum for a period of, as to some portions of the claim, up to four years, adds 15% to the settlement value of the claim.

Under these circumstances, I would expect plaintiff's initial settlement demand to be at $540 million, approximately 90% of the gross amount of the claim (of approximately $600 million, including interest and attorneys' fees), and defendant's initial offer at $90 million, approximately 15% of the claim. Taking into account the discounts and enhancements identified above, as well as the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate the fair and likely settlement of the misallocation of net revenues on loans brokered by GMAC Mortgage claim at $268.2 million.

---

[11] The Examiner also notes that it may be possible to fashion a breach of fiduciary duty claim against ResCap officials who apparently succumbed to AFI's and Ally Bank's desires, but that such a claim faces a variety of substantial obstacles and would appear to be wholly redundant of the recoveries the Examiner concludes are already available to Debtors under contract law. Accordingly, the analysis of the claim for Misallocation of Net Revenues on Loans Brokered by GMAC Mortgage does not include any value for such a claim of breach of fiduciary duty.

[12] *See, e.g.*, *Gelco Builders & Burjay Constr. Corp. v. Simpson Factors Corp.*, 60 Misc. 2d 492 (N.Y. Sup. Ct. 1969).

| | |
|---|---|
| Potential Damages: | $520.5 million |
| Reduced by: | |
| 20% inherent risk= | $416.4 million |
| 30% risk for possible pursuit of claim under modification theory= | $291.5 million |
| 20% risk based on disputed facts & GMAC Mortgage approval of allocation to be challenged= | $233.2 million |
| Increased By: | |
| 15%  for interest= | $268.2 million |

> **b.** *Failure to Pay Value of Purchased MSRs and Correspondent Loan MSRs to GMAC Mortgage under the MSR Swap*

**Examiner's Report References:**

Section I.E.b pages I-10

 Section III.F.3.c pages III-93

Section V.B.9 pages V-157 to V-184

Section V.B.12 pages V-199 to V-209

Section VII.L.2 pages VII.L-29

Section VII.L-66 to VII.L-73

**Description:**

The implementation, between September 2007 and April 2012, of the agreement between GMAC Mortgage and the federal savings bank now known as National Motors Bank FSB ("Old GMAC Bank")/Ally Bank concerning the application of the MSR Swap,[13] the 2010 Net Funding Schedule,[14] and the April 2011 MSR Swap Confirmation[15] to mortgage servicing rights (MSRs) (i)

---

[13] The "MSR Swap" means the ISDA Master Agreement between GMAC Mortgage and GMAC Bank, dated June 12, 2007, including the FMV Schedule thereto, dated August 31, 2007 and the Net Funding Schedule thereto, dated August 31, 2007.

[14] The "2010 Net Funding Schedule" means the Schedule to the ISDA Master Agreement (Net Funding) between GMAC Mortgage and GMAC Bank, dated July 1, 2010.

arising from loans Ally Bank purchased from correspondents and (ii) to MSRs that Ally Bank purchased from third parties.

**Background:**

When ResCap was formed, its subsidiaries GMAC Mortgage and RFC owned substantial portfolios of MSRs, which are contractual rights to service loans and receive the related fees and certain ancillary income. Since at least 2005, ResCap and Ally Bank had considered entering into an arrangement whereby Ally Bank would hold MSRs in order to, among other things, realize savings associated with no longer financing MSRs through regular lending channels. The Examiner observed that, "[f]rom early on, the personnel involved contemplated that the movement of the MSRs to Ally Bank would be accompanied by a 'total return swap,' transferring the MSRs' economics (positive and negative) back to ResCap in exchange for providing Ally Bank a fixed rate of return." Examiner's Report, at V-159.

The FDIC eventually approved Ally Bank's retention of MSRs on loans sold by Ally Bank to GMAC Mortgage, but repeatedly refused to approve Ally Bank's acquisition of existing MSRs from ResCap entities. In addition, the regulators opposed Ally Bank's retention of the MSRs without the protection of the MSR Swap, which went into effect on August 31, 2007. The original MSR Swap is documented on an ISDA Master Agreement and two Schedules – the FMV Schedule and the Net Funding Schedule, each dated August 31, 2007.

First, under the FMV Schedule, changes in the "FMV Change," defined as "FAS 156 mark to market for the Valuation Period as recorded by [Ally Bank] against the mortgage servicing right asset," were measured each business day. If the FMV Change was positive, then Ally Bank owed GMAC Mortgage the amount of the increase. Conversely, if the FMV Change was negative, GMAC Mortgage owed Ally Bank the amount of the decrease.[16]

Simultaneously, under the Net Funding Schedule, Ally Bank was required to pay GMAC Mortgage all the servicing income it received on its portfolio of MSRs, net of expenses incurred, which included the fees paid to GMAC Mortgage under the Original Servicing Agreement for Bank-owned MSRs. In return, the Net Funding Schedule required GMAC Mortgage to pay Ally Bank a "Funding Fee," which was a LIBOR-based fixed rate payment calculated on the value of the MSRs and servicing revenues. In essence, the combined effect was to transfer the MSRs' economics (positive and negative) to GMAC Mortgage under the FMV Schedule in exchange for a LIBOR-based fixed rate payment to Ally Bank under the Net Funding Schedule.

On its face, the FMV Schedule required that _all_ increases in the value of Ally Bank's mortgage servicing right assets flow to GMAC Mortgage, without distinguishing among MSRs arising from Bank-originated loans, purchased MSRs, and MSRs arising from purchased loans. In practice, however, Ally Bank paid to GMAC Mortgage only for increases related to Bank-originated

---

[15] The "April 2011 MSR Swap Confirmation" means the Confirmation of the Total Return Swap Relating to Mortgage Servicing Rights of Ally Bank, dated April 1, 2011.

[16] 2007 FMV Schedule, parts 6(a)(vii), 6(d) [RC00027822].

loans; it did not include increases related to MSRs arising from correspondent loans Ally Bank had purchased or to MSRs purchased separately. Instead, for correspondent loans, Ally Bank paid the capitalized value of excess servicing rights to GMAC Mortgage, but not the capitalized value of the MSRs themselves. The capitalization and purchase of new MSRs was always handled in this fashion from the August 2007 inception of the MSR Swap, despite the plain language of the FMV Schedule. In contrast, when GMAC Mortgage paid the LIBOR-based Funding Fee, the value of the newly recognized MSRs (including both MSRs on loans Ally Bank sold to GMAC Mortgage and MSRs that Ally Bank periodically purchased from third parties) was included in the amounts used to calculate the Funding Fee.

Although, individuals who had subsequent involvement with the MSR Swap, including Joe Cortese (for Ally Bank) and James Young (for ResCap), offered conflicting explanations for the parties' differing treatment of MSR capitalization under the MSR Swap, the Examiner concluded that none of these explanations perfectly explains the parties' actions.

In April 2011, the parties entered into the MSR Swap Confirmation, which covered the previously separately-documented FMV Swap and Net Funding Swap. After reviewing these changes, the Examiner concluded that the April 2011 MSR Swap Confirmation is, if anything, even clearer than the original MSR Swap and FMV Schedule that it applies not just to MSRs on bank-originated loans, but to all MSRs, including purchased MSRs and correspondent-loan MSRs.

ResCap's records indicate that Ally Bank paid GMAC Mortgage a total of $699.7 million over the duration of the MSR Swap from September 2007 through termination in April 2012. The Examiner illustrated the key financial elements of the MSR Swap, on an annual basis, as follows:

EXHIBIT V.B.12.b(1)—5
**MSR Swap – Key Financial Elements**
September 2007 – April 2012
*($ in Millions)*

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Total |
|---|---|---|---|---|---|---|---|
| FMV change - interest rate [1] | $ (0.0) | $ (296.4) | $ 257.8 | $ 171.7 | $ (430.0) | $ (0.2) | $ (297.3) |
| FMV change - amortization [1] | - | – | (117.9) | (318.2) | (364.1) | (127.2) | (927.4) |
| Funding fees (LIBOR +) | (0.4) | (14.0) | (9.1) | (23.5) | (59.6) | (16.1) | (122.6) |
| Gain on new cap - MSR | 8.6 | 53.4 | 77.6 | 136.1 | 61.6 | 27.0 | 364.2 |
| Gain on new cap - excess servicing | 14.6 | 219.5 | 95.9 | 209.9 | 69.4 | 10.9 | 620.2 |
| Net servicing fees | 3.9 | 102.2 | 177.3 | 294.0 | 362.8 | 122.2 | 1,062.5 |
| Total cash settlement paid to GMAC Mortgage | $ 26.6 | $ 64.7 | $ 481.6 | $ 469.9 | $ (360.0) | $ 16.7 | $ 699.7 |

*[1] For 2007 to 2008, economic amortization was not calculated separately from changes to interest rate assumptions.*
*Source: ResCap - MSR Cash Summary [EXAM00231039]; OMSR Values [EXAM00339036].*

The value of Ally Bank's MSR asset attributable to correspondent loans and purchased MSRs, which were not paid to GMAC Mortgage under the MSR Swap despite the plain language of the MSR Swap and the MSR Swap Confirmation, and thus the value of GMAC Mortgage's potential contract claim under those agreements, totals $1.725 billion, illustrated by the Examiner as follows:

EXHIBIT V.B.10.b(2)

**Additions to the Value of Ally Bank's MSR Asset Attributable to Correspondent Loan MSRs and Purchased MSRs**

*($ in Thousands)*

| | Sep. 2007 - Dec. 2008[1] | Jan.2009 - Mar. 2011 | Apr. 2011 - Mar. 2012 | Total |
|---|---|---|---|---|
| New capitalizations - purchased MSRs | $ 421,860 | $ 256,239 | $ 28,986 | $ 707,085 |
| New capitalizations - originated and correspondent loan MSRs | 19,035 | 923,463 | 404,805 | 1,347,303 |
| Sub-total new capitalization | 440,895 | 1,179,702 | 433,790 | 2,054,387 |
| New capitalizations - excess servicing (originated and correspondent) | 271,602 | 325,647 | 62,153 | 659,402 |
| Gain paid to GMAC Mortgage on new capitalizations | (310,934) | (578,364) | (99,152) | (988,450) |
| Additions attributable to correspondent loan MSRs and purchased MSRs | $ 401,563 | $ 926,985 | $ 396,791 | $1,725,340 |

[1] *Period before the 2009 Bank Transaction; monthly data not available for January 2009.*

*Source:  MSR Swap Review, dated May 2012 [ALLY_0368244]; MSR Rollforward YTD 2009, dated Dec. 31, 2009 [EXAM00232590]; MSR Rollforward YTD 2010, dated Dec. 31, 2010 [EXAM00232591]; MSR Rollforward YTD 2011, dated Dec. 31, 2011 [EXAM00232592].*

## Examiner's Analysis and Conclusions:

1.      The Examiner concluded that GMAC Mortgage has a potential claim that Ally Bank breached the MSR Swap's requirements by failing to pay to GMAC Mortgage the value of MSRs arising from loans Ally Bank purchased from correspondents or for purchased MSRs.  The value of the MSRs, and thus the base value of GMAC Mortgage's potential claim, is approximately $1.725 billion, including $1.329 billion for the period before the April 2011 revision of the MSR Swap.

2.      The Examiner concluded that James Young's attempt to reconcile the parties' practices with the terms of the MSR Swap (by asserting that increases in the value of Ally Bank's MSR portfolio due to newly recognizes MSRs were not required to be paid under the MSR Swap's FMV Schedule) is not likely to prevail.

3.      The Examiner concluded that the parties consistently applied the MSR Swap in a way that is at odds with its language.

4.      The Examiner concluded that the MSR Swap is governed by New York law.

5.      The Examiner concluded that the doctrine of modification is not the proper rubric for analysis, at least before the April 2011 revisions, because there is no suggestion of an agreement after the MSR Swap was adopted to alter its terms.  In addition, it does not appear that a modification in which GMAC Mortgage simply gave up the right to receive the newly recognized value of correspondent-loan MSRs and purchased MSRs would be supported by mutual consideration.

6.    The Examiner concluded that Ally Bank may have substantial arguments that the MSR Swap would not have withstood regulatory scrutiny had it been applied to require payment of the value of purchased and correspondent-loan MSRs upon recognition.

7.    The Examiner concluded that based on the available evidence and the exacting standard which governs the application of the doctrine of mistake, although a close question, a court more likely than not would reform the pre-April 2011 MSR Swap to require payment of the value of newly recognized MSRs only for those MSRs on which Ally Bank recognized a gain (*i.e.*, not for the $1.329 billion attributable to purchased MSRs and purchased-loan MSRs).

8.    The Examiner concluded that while a close question, a court more likely than not would reform the April 2011 MSR Swap Confirmation under the doctrine of mistake to require payment of the value of newly recognized MSRs only for those MSRs on which Ally Bank recognized a gain (*i.e.*, not for the $396 million attributable to purchased MSRs and purchased-loan MSRs).

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a bankruptcy fiduciary such as a trustee or committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to save cost and expedite distributions to creditors. All of the procedural hurdles that attend bankruptcy litigation would be present in this case including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law contract dispute, (ii) withdrawal of the reference, and (iii) demand for a jury trial. In addition, all litigation carries risk uncertainty and expense. As a result, it is highly likely that any settlement would reflect a substantial discount ( of  30%) from the face value of the claim.

GMAC Mortgage would base its claim on the straightforward terms of the MSR Swap, both before and after the April 2011 revisions. As the Examiner notes, by their terms, the relevant provisions turn on the value of the MSRs on Ally Bank's balance sheet, not on whether Ally Bank has recognized a gain on the asset in its income statement, and therefore facially apply to all of Ally Bank's MSR assets. Due to the relative ease with which GMAC Mortgage could meet its initial burden, it would likely initiate settlement discussions with an aggressive opening demand of  60% of the total claim amount, approximately $1 billion.

At that point, the burden would be on AFI to prove its affirmative defenses under either of the theories primarily highlighted by the Examiner: mistake and modification. The Examiner concludes that AFI would likely succeed on the close question of a defense under the doctrine of mistake, despite the exacting standard which governs that doctrine. However, that same "exacting standard" would likely have a significant impact on the parties' settlement positions and the ultimate settlement value of this claim. Under New York law, AFI would need to establish mutual mistake

by clear and convincing evidence in order to overcome a "heavy presumption that a deliberately prepared and executed [agreement] manifest[s] the true intention[s] of the parties, . . . especially between counseled businessmen."[17]  This would require AFI to show that both Ally Bank and GMAC Mortgage shared the same erroneous belief that the MSR Swap would not require Ally Bank to pay GMAC Mortgage the value of MSRs Ally Bank purchased separately or of MSRs arising from correspondent loans Ally Bank purchased.[18]

AFI may face evidentiary difficulties proving mutual mistake because, as the Examiner noted, the recollection of the participants to the negotiation of the MSR Swap, particularly with respect to the issue of the treatment of newly recognized MSRs, was limited.  However, the Examiner concluded that the documentary evidence (other than the MSR Swap itself) supports application of the doctrine of mistake, as does the parties' conduct and the disparate economic effect of transferring the newly recognized value of purchased MSRs and correspondent-loan MSRs to GMAC Mortgage.  Indeed, the parties' mutual and uniform performance under the MSR Swap, throughout its entire term, in a manner inconsistent with its terms but consistent with what AFI would argue was their true understanding, would weigh heavily in favor of AFI's efforts to reform the MSR Swap under the doctrine of mistake.  The regulatory scrutiny and concerns raised by Ally Bank's regulators concerning the MSR Swap, as applied, also supports a claim of mutual mistake.[19]  Nonetheless, AFI would likely attach significant settlement value to this claim in recognition of the decidedly demanding burden it would need to overcome to reform the MSR Swap.  In addition, both parties would likely recognize that AFI would most likely succeed, if at all, only after a trial, because mistake turns on the parties' intent and "[q]uestions of intent . . . are usually inappropriate for disposition on summary judgment."[20]  Thus, AFI would need to factor the substantial costs and risk associated with trial into its settlement analysis.  The magnitude of the claims (at $1.725 billion), combined with the high likelihood that AFI would need to take the claim to trial to prevail, would likely be a strong motivating factor for AFI to settle.  In view of the foregoing procedural and evidentiary hurdles, but accepting the Examiner's conclusion that, although a close question, AFI would more likely than not succeed in reforming the MSR Swap based on the doctrine of mistake to apply to only Bank-originated MSRs, I estimate that the settlement value of this claim would be reduced by 55%.

The Examiner concludes that the doctrine of modification is inapplicable to the parties' dealings with respect to this claim for several reasons, including, among others, the lack of any suggestion of an agreement after the MSR Swap was adopted to alter its terms and the likely lack of mutual consideration for a modification in which GMAC Mortgage simply gave up the right to

---

[17]  *See Healy v. Rich Products Corp.*, 981 F.2d 68, 73 (2d Cir. 1992) (citations and internal quotations omitted).

[18]  *Id.* (mutual mistake occurs when both parties "[s]hare the same erroneous belief and their actions do not in fact accomplish their mutual intent.") (citations omitted); *K.I.D.E. Assocs., Ltd. v. Garage Estates Co.*, 720 N.Y.S.2d 114, 116 (N.Y. App. Div. 2001) (proponent of reformation must show not only that mistake exists, but exactly what was really agreed upon between the parties, particularly where negotiations were conducted by sophisticated, counseled parties).

[19]  As discussed by the Examiner and in more detail below, these same regulatory concerns may provide AFI with arguments in support of a defense that the MSR Swap would not have withstood regulatory scrutiny if applied to correspondent loan MSRs and purchased MSRs.

[20]  *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., v. Turtur*, 892 F.2d 199, 205 (2d Cir. 1989).

receive the newly recognized value of correspondent-loan MSRs and purchased MSRs.[21]   AFI would also likely face difficulties proving a modification of the MSR Swap where the parties subsequently confirmed the MSR Swap through the April 2011 MSR Swap Confirmation, but did not at that time revise the agreement in a manner consistent with the purported modification.  AFI would likely nonetheless pursue a modification defense as an alternative to a mistake defense.  The mere availability of a second plausible theory under which AFI could achieve the same successful result, even if it was unlikely to ultimately succeed under the doctrine of modification, would reduce the settlement value of the claim by approximately 5%.

The settlement value of the claim would be further reduced by the possibility of AFI successfully defending the claim on the grounds that the MSR Swap, if applied to correspondent loan MSRs and purchased MSRs, would not have withstood regulatory scrutiny.  The MSR Swap was implemented and subsequently revised with the involvement and approval of Ally Bank's regulators, who, at its inception, refused to approve Ally Bank's acquisition of existing MSRs from ResCap entities and apparently insisted on the protection of the MSR Swap as a condition of Ally Bank retaining MSRs.  Later, the parties agreed to increase the interest rate applicable to the Funding Fee paid by GMAC Mortgage to Ally Bank pursuant to the 2010 Net Funding Schedule in what the Examiner describes as a partially successful effort to appease the regulators.  In light of these facts, the Examiner notes that Ally Bank would have substantial arguments that the arrangement would not have withstood regulatory scrutiny had it been applied to require payment of the value of purchased and correspondent-loan MSRs upon recognition.  This possible defense would reduce the settlement value of the claim by approximately 20-30%.

Under these circumstances, I would expect plaintiff's initial settlement demand to be at approximately 60% of the gross amount of the claim (approximately $1.725 billion), *i.e.*, $1 billion, and defendant's initial offer at approximately 10% of the claim, *i.e.*, $175 million.  Taking into account the discounts and enhancements identified above, as well as the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate the fair and likely settlement of the failure to pay value of purchased MSRs under MSR Swap claim at $387.2 million.

| | |
|---|---|
| Potential Damages: | $1,725.0 million |
| Reduced By: | |
| 30% inherent risk= | $1,207.5 million |
| 55% risk associated with mutual mistake defense= | $543.4 million |
| 5% risk associated with modification defense= | $516.2 million |
| 25% risk associated with regulatory-based defense= | $387.2 million |

---

[21] *See Estate of Anglin v. Estate of Kelley*, 705 N.Y.S.2d 769 (N.Y. App. Div. 2000) (any change in an existing contract must have a new consideration to support it) (citations omitted).

       *c.*      ***Representation and Warranty Liabilities Under the 2001 and 2006
MMLPSAs***

**Examiner's Report References:**

Section I.E.c pages I-10

V.B.3.a, b pages V-96 to V-109

VII.L.2.a pages VII.L-29 to VII.L-55

**Description:**

The potential liability of AFI or Ally Bank for representations and warranties provided by
Old GMAC Bank in the 2001 MMLPSA and by Ally Bank in the 2006 MMLPSA.

**Background:**

Under the terms of the 2001 MMLPSA, Old GMAC Bank provided representations and
warranties for all mortgage loans sold pursuant to its terms, while under the 2006 MMLPSA, Ally
Bank provided representations and warranties only for second lien loans sold to GMAC Mortgage.
ResCap/GMAC Mortgage later assumed financial responsibility for repurchase and representation
and warranty liabilities on loans purchased from Old GMAC Bank and Ally Bank under the
MMLPSA.  The Examiner analyzed whether ResCap/GMAC Mortgage have claims against AFI
and/or Ally Bank with respect to such liabilities based upon the representations and warranties
provided by Old GMAC Bank under the 2001 MMLPSA and by Ally Bank under the 2006
MMLPSA.

As to loans purchased from Old GMAC Bank under the 2001 MMLPSA, the liabilities
assumed by ResCap/GMAC Mortgage include: (i) charge-offs incurred as a result of loans
repurchased from investors; (ii) a portion of the settlements with Fannie Mae and Freddie Mac in
2010; and (iii) a portion of the related 2013 "cure" settlements with Fannie Mae and Freddie Mac.
The potential claims against AFI/Ally Bank for representations and warranties provided by Old
GMAC Bank in the 2001 MMLPSA and by Ally Bank in the 2006 MMLPSA would also include a
portion of the Trust R&W Claims covered by the $8.7 billion proposed RMBS Trust Settlement
Agreement.

Based upon an analysis of available records, the Examiner's Professionals estimate that the
total dollar amount of representation and warranty and settlement liabilities incurred by GMAC
Mortgage that would comprise the potential representation and warranty claims against AFI/Ally
Bank under the 2001 and 2006 MMLPSAs total approximately: (i)  $278.2 million in charge-offs as
a result of repurchases, and the 2010 settlements and 2013 "cure" settlements with Freddie Mac and
Fannie Mae, relating to First Lien Loans sold by Old GMAC Bank under the 2001 MMLPSA; (ii)
$5.1 million for charge-offs as a result of repurchases of Second Lien Loans sold by Old GMAC
Bank under the 2001 MMLPSA; (iii) no more than $400 million relating to First and Second Lien
Loans sold by GMAC Bank under the 2001 MMLPSA that are included in the securitizations that

22

comprise the Trust R&W Claims; and (iv) less than $86.1 million relating to Second Lien Loans sold by Ally Bank under the 2006 MMLPSA that are included in the securitizations that comprise the Trust R&W Claims. For a variety of reasons detailed in the Examiner's report, including limitations in the available data, the estimated values of these potential liabilities are likely overstated.

**Examiner's Analysis and Conclusions:**

1.      Ally Bank was not a party to, and did not assume, the 2001 MMLPSA, and is unlikely to be held liable on successor liability or indemnification theories.

2.      It is likely that representation and warranty claims would be time-barred under the 2001 MMLPSA's two-year "survival" provision.

3.      For first lien loans (but not second lien loans), the evidence supports the proposition that the 2001 MMLPSA was modified to eliminate representation and warranty liability.

4.      The Examiner concluded that it is unlikely that any claim against AFI or Ally Bank for loan representations and warranties under the 2001 MMLPSA would prevail.

5.      The Examiner concluded that while Ally Bank likely would be held to have provided representations and warranties for second lien loans under the 2006 MMLPSA, representation and warranty (or indemnification) claims against Ally Bank for second lien loans sold under the 2006 MMLPSA are unlikely to prevail because they would be time-barred under the two-year "survival" provision in the 2006 MMLPSA.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Because Ally Bank is not a party to the 2001 MMLPSA and did not assume that agreement in the 2006 Bank Restructuring, ResCap would face many obstacles pursuing a claim against Ally Bank or AFI based on representations and warranties in the 2001 MMLPSA. The Examiner's well-reasoned analysis concludes that ResCap is unlikely to prevail on contractual claims under the 2001 MMLPSA, which would require ResCap to show either that (1) Ally Bank is responsible for the liabilities of Old GMAC Bank under a theory of successor liability; or (2) AFI is responsible for Old GMAC Bank's liabilities under (a) the indemnification provided in connection with the OTS approval of the 2006 Bank Restructuring or (b) the indemnification provisions of the 2005 Operating Agreement or the 2006 Amended Operating Agreement. Because ResCap would likely be unable to meet the elements of any of the recognized exceptions to the general rule of no successor liability, those claims do not add materially to the settlement value of the claims for representation and warranty liabilities under the 2001 MMLPSA. The potential claims based upon indemnification provided in connection with the OTS approval of the 2006 Bank Restructuring similarly add minimal, if any, settlement value to these claims based upon the OTS's non-objection letter with

23

respect to the indemnification proposed by AFI, which was narrower than that initially requested by OTS and would not subject AFI to liability under the 2001 MMLPSA. The potential claims based upon the indemnification provisions of the 2005 Operating Agreement or the 2006 Amended Operating Agreement are similarly weak and add only minimal settlement value based upon the plain language of those agreements as applied to the relevant facts.

More fundamentally, any claims against AFI or Ally Bank based upon the 2001 and 2006 MMLPSAs are unlikely to succeed because they are likely time-barred under the two-year "survival" provisions in those agreements, which the Examiner found would have resulted in the expiration of representations and warranties in those agreements, at latest, in November 2008 and June 1, 2009, respectively. In the face of such strong defenses based upon the "survival" clauses, which could likely be presented to a court as a motion to dismiss, AFI/Ally Bank would be unlikely to place significant settlement value on claims against them based upon representations and warranties in the 2001 and 2006 MMLPSAs.

The Examiner also concludes that it is more likely than not that AFI/Ally Bank would prevail on a claim that the 2001 MMLPSA had been modified to eliminate representations and warranties with respect to First Lien Loans, which would significantly reduce the potential total value of the claims based upon representations and warranties in the 2001 MMLPSA. Contractual modification is a fact-sensitive issue. Thus, if it was the only defense available to AFI/Ally Bank, they would likely place substantial settlement value on the claims under the 2001 MMLPSA, recognizing that even a nuisance value settlement should account for the anticipated expense of substantial discovery needed to develop that defense. Here, however, and as set forth above, AFI/Ally Bank have other strong defenses to potential claims based upon representations and warranties in the 2001 and 2006 MMLPSAs, particularly the "survival" clause defenses, which could likely be presented to the court without undertaking the type of costly discovery that would be involved in a contractual modification defense.

Under these circumstances, I would expect the defendants' initial settlement offer to be based largely on the anticipated cost of defense in preparing a motion to dismiss the claims as time-barred, and therefore not material for purposes of this Opinion.

> ### d. Application of the Pipeline Swap To The "Funding To Sale" Period And To Ally Bank-Originated Loans

**Examiner's Report References:**

Section I.E.1.d pages I-10-11

Section V.B.4, 5, and 10 pages V-114 to V-123 and V-178 to V-188

Section VII.L.2.c pages VII.L-58 to VII.L-64

**Description:**

Potentially there is a claim against AFI for applying the Pipeline Swap to the time period between the funding and the sale of loans and to loans originated by Ally Bank, notwithstanding contract language to the contrary.

**Background:**

GMAC Mortgage purchased and originated conforming loans with the intent to sell them to government-sponsored entities (GSE) while retaining the associated mortgage servicing rights (MSRs). Over time, GMAC's production came increasingly from Ally Bank. By 2009, almost all the loan production was being channeled through Ally Bank, which retained the MSRs on loans sold to Fannie Mae and Freddie Mac (but not to Ginnie Mae).

GMAC Mortgage and Ally Bank entered into a number of agreements related to this business. One of these Agreements was the Pipeline Swap, a derivative transaction in which GMAC Mortgage assumed certain risks and rewards related to changes in the market value of certain Ally Bank loans. Until 2008, the Pipeline Swap covered only Ally Bank's HFI portfolio. The swap was designed to insulate Ally Bank from changes in the market value of loans (typically due to interest rate changes) between rate lock and the funding of the loan. The Examiner noted that considering the original Pipeline Swap on its own, GMAC Mortgage would realize neither profit nor suffer loss assuming that its hedges were effective, although it presumably incurred some incremental hedging expense.

In 2005, the Pipeline Swap was amended to eliminate loans originated by Ally Bank, thereby limiting it to loans purchased by Ally Bank. The Pipeline Swap was not effective from April 2006 to April 2007, but was renewed effective May 1, 2007.

In July 2008, GMAC Mortgage and Ally Bank amended the Pipeline Swap because the FDIC was urging Ally Bank to document its hedges more thoroughly. Ally Bank's HFS loans were added to the Pipeline Swap, although it remained limited to purchased loans, and was not applicable to originated loans.

In addition, the Pipeline Swap continued to apply only to the period from rate lock until funding. In order for the loans to be fully hedged by the Pipeline Swap, however, the Swap would have needed to cover the period not just from rate lock to funding, but from rate lock to sale. Despite the fact that no change was made to the Pipeline Swap to extend the time period covered, many of the people involved believed that it did cover the entire period from rate lock to sale.

At the same time, the 2008 MMLPSA revised the pricing of first mortgage loans to a cost basis. Despite this, and based on the apparently mistaken understanding that the Pipeline Swap applied for the entire period from rate lock to sale, the loans were accounted for on a hedge-accounting basis, "marked to market," and sold to GMAC mortgage at market value, rather than at Ally Bank's cost. The combined effect was to preserve the same economics that had prevailed under prior version of the MMLPSA.

25

If, however, the July 2008 Pipeline Swap Schedule had been applied as written and covered only the period from rate lock to funding, rather than sale, then (1) application of hedge fund accounting would be improper under GAAP, so that the MMLPSA pricing would not be a marked to market price, and (2) the risks and rewards of changes in fair market value of the loans between funding and sale of the loans would reside with Ally Bank, not GMAC Mortgage.  Further, the Pipeline Swap did not include brokered loans originated by Ally Bank, but it was applied to such loans.

In 2011, in response to FDIC pressure, the parties again amended the Pipeline Swap and related agreements.  The 2011 Amendment extended the time period of the swaps to cover the time from funding to sale.  It did not address the omission of loans originated by Ally Bank, however.

**Examiner's Analysis and Conclusions:**

1.      With respect to extending the time period from funding to sale, although it is a close question, the Examiner found it more likely than not that the court would reform the Pipeline Swap under the doctrine of mutual mistake to include that time period.  Therefore, while it is a close question, a claim for breach based on the extension of the Pipeline Swap is unlikely to prevail.

2.      With respect to both extending the time period of the Pipeline Swap from funding to sale and extending it to loans originated by Ally Bank, it is likely that the court would find that the Pipeline Swap was modified to include both.  Therefore, a claim for breach is unlikely to succeed.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  The Examiner does not quantify any harm to GMAC Mortgage from the alleged breaches of the Pipeline Swap, and the Examiner further notes that, except for un-quantified incremental hedging costs, the economic effect on GMAC Mortgage was neutral, assuming that GMAC Mortgage's hedging was effective.

**Settlement Considerations:**

As the Examiner notes, the extension of the Pipeline Swap to include the period between funding and sale and to include loans originated by Ally Bank does not comply with the plain language of the relevant agreements.  On their face, therefore, these appear to be strong breach of contract claims.  However, as the Examiner found, they are unlikely to succeed due to strong affirmative defenses.

First, as to the extension of the Pipeline Swap to the time period from funding to sale, the Examiner found that the claim would not succeed because the contract would be reformed under the doctrine of mutual mistake.  As noted by the Examiner, the parties drafting the Pipeline Swap agreements appeared not to have understood the effect of the language they chose.  More importantly, ending the Pipeline Swap at the time of funding made little business sense.  As a practical matter, GMAC Mortgage hedged the risk in the market as though it had assumed the risk for the entire time, further indicating the intent of the parties.

As acknowledged by the Examiner and discussed elsewhere in this report, however, the burden for establishing mutual mistake is high and would be on AFI. This creates risk that a reformation argument would not succeed and a breach would be found. Therefore, if no other affirmative defenses existed and damages from the breach could be shown, this claim would still have settlement value.

Second, as to both the extension of the Pipeline Swap to the time period from funding to sale and to loans originated by Ally Bank, there is substantial evidence that the parties modified the contract to include these. Specifically, as noted by the Examiner, the written record of the Brokering Customer Loans to Bank Project supports the view that the parties intended the Pipeline Swap to apply to brokered loans and to the "funding to sale" period. This strong written evidence, including e-mails, makes it likely that a court would find that the parties modified the Pipeline Swap, so there is no breach. Crucially, while AFI would bear the burden of proof on a claim of modification, it would not be a heightened burden. Therefore, given the high likelihood of establishing this defense as to both potential breaches, this claim has little settlement value.

Buttressing this analysis, the Pipeline Swaps appear to have been economically-neutral for GMAC Mortgage. Therefore, even if the claims had merit, the damages, if any, would be less than $21 million the threshold for materiality I have used for the purposes of my report. Accordingly, these claims are not assigned any material settlement value.

### e.    Failure To Obtain Independent Director Approval

**Examiner's Report References:**

Section I.E.1.e page I-11

Section VII.L.2.b  pages VII.L-56 to VII.L-58

**Description:**

Whether there is a viable claim for failure to obtain independent director approval of various agreements and amendments to agreements that occurred between the inception of the 2005 Operating Agreement and November 2010.

**Background:**

The 2005 Operating Agreement and the 2006 Amended Operating Agreement barred any transactions between ResCap and GMAC affiliates that were not consistent with what parties would agree to at arm's length and for fair value unless waived by the independent directors. The MMLPSA, Pipeline Swap, and MSR Swap were not entered into on terms that were available in the market and to which parties at arm's length would have agreed. Yet there was no independent director approval of these transactions.

**Examiner's Analysis and Conclusions:**

1.      The agreements at issue did not appear to result in losses for GMAC Mortgage, were not economically unfair to ResCap, and did not materially and adversely affect ResCap's creditors.

2.      Neither AFI nor Ally Bank was involved in the decision whether to seek independent director approval.

3.      The rights of third-party beneficiary creditors are limited to specific enforcement of the requirement of independent director approval, and money damages are specifically foreclosed.

4.      Claims resulting from the lack of independent director approval of these transactions are unlikely to succeed.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions sets forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

The issues identified by the Examiner make it highly unlikely that claims regarding the failure to obtain independent director approval will succeed.  Because the agreements at issue were not unfair to ResCap or the creditors, there are no damages and no likelihood of recovery.  Even if there were, such damages would be barred by the contractual provisions barring monetary damages and limiting the remedy to specific performance.  Accordingly, these claims are not material and do not add any settlement value.

## 2.      Government Settlements

### *$109.6 Million Preference Claim*

**Examiner's Report References:**

Section I.E.2 pages I-12 to I-13

Section V.C pages V-210 to V-299

Section VII.F.5 pages VII.F-1 to VII.F-154

**Description:**

Whether the obligations of the Debtors and AFI were appropriately allocated with respect to two settlements between governmental entities on the one hand, and AFI, ResCap and certain of their subsidiaries on the other hand.  This claim analysis reviews the potentially preferential payment of approximately $109.6 Million made by GMAC Mortgage on March 14, 2012 pursuant to the DOJ/AG Consent Judgment.

**Background:**

Pursuant to the DOJ/AG Consent Judgment (the "Judgment") memorializing the DOJ/AG Settlement between the Department of Justice and various state Attorneys General on the one hand, and AFI, ResCap and GMAC Mortgage, on the other, GMAC Mortgage paid approximately $109.6 million to the government on March 14, 2012 (within 90 days of the Petition Date of May 14, 2012). The Judgment provides that the Defendant (defined, collectively, as AFI, ResCap and GMAC Mortgage) shall pay the "$109.6 million hard dollar payment". ResCap, through GMAC Mortgage, paid the entire $109.6 million on March 14, 2012. The Examiner evaluated whether the approximately $109.6 million payment may be avoidable as a preference under Code section 547 and recoverable from AFI "as an entity for whose benefit such transfer was made . . .."

**Examiner's Analysis and Conclusions:**

1. AFI is liable, together with ResCap, GMAC Mortgage and RFC, for payment of the full amount of the $109.6 million Judgment.

2. AFI received a direct, ascertainable and quantifiable benefit of $109.6 million by being relieved of the obligation to make that payment if ResCap did not.

3. It is likely that an action against AFI to recover the March 14, 2013 payment of $109.6 million as a preferential transfer under Bankruptcy Code section 547 and 550 would prevail.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee. This type of plaintiff is typically motivated to reach an early resolution of disputes in order to save costs and expedite distributions to creditors.

The Examiner reviewed the potential defenses which could be raised. In reviewing potential defenses, the Examiner addressed, *inter alia*, whether AFI was liable for the $109.6 million payment in light of Exhibit I attached to the Judgment which provides that ResCap, GMAC Mortgage and RFC shall pay the $109.6 million payment but is silent as to AFI's payment obligation. Because of the debt forgiveness under the credit facilities provided by AFI, the Examiner also considered whether the "Earmarking Doctrine" would protect AFI from liability under Bankruptcy Code section 550, as well as other issues and potential defenses. The Examiner concluded, after his review and analysis of the interaction, relationship and effect of the relevant judgments, orders and agreements, that AFI was liable for the entire approximately $109.6 million obligation and that, accordingly, the payment thereof by GMAC Mortgage is avoidable as a preference under Bankruptcy Code section 547 and recoverable from AFI as the entity for whose benefit the payment was made.

AFI would most likely vigorously defend the claim and raise all of the issues and potential defenses addressed by the Examiner.  Although the Examiner concludes that the preference claim is likely to be successful, all litigation carries risk, uncertainty and expense.  Similarly, AFI would also incur significant legal cost and expense to defend this claim.

Given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand at $98.6 million, approximately 90% of the total amount of the claim, and defendant's initial offer at $16.4 million, approximately 15% of the total claim.  Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate a fair settlement of this preference claim at approximately $60 million.

### *$48.4 Million Preference Claim*

**Examiner's Report References:**

Section I.E.2 pages I-12 to I-13

Section V.C pages V-210 to V-299

Section VII.F.5 pages VII.F-1 to VII.F-154

**Description:**

Whether the obligations of the Debtors and AFI were appropriately allocated with respect to two settlements between governmental entities on the one hand and AFI, ResCap and certain of their subsidiaries on the other hand.  This claim analysis reviews the payments totaling approximately $48.4 million made by GMAC Mortgage on May 10 and 11, 2012 pursuant to the terms of the various agreements under which GMAC Mortgage was required to indemnify Ally Bank for losses incurred as a result of certain loan modifications in connection with the government settlements.

**Background:**

Pursuant to the terms of the January 30 Letter Agreement and the A&R Servicing Agreement, GMAC Mortgage was permitted to modify certain Ally Bank loans to a greater extent than permitted under the Original Servicing Agreement, but GMAC Mortgage was required to indemnify Ally Bank for losses incurred resulting from such loan modifications to the extent they exceeded the modifications permitted under the Original Servicing Agreement.  The A&R Servicing Agreement, however, was not actually executed until after the May 10 and 11, 2012 payments were made.

**Examiner's Analysis and Conclusions:**

1.      It is likely that an action on behalf of GMAC Mortgage against Ally Bank to avoid and recover the May 10 and 11, 2012 payments as preferential transfers under Bankruptcy Code sections 547 and 550 would prevail.

2.      Even though the A&R Servicing Agreement was not executed until after the subject payments were made, GMAC Mortgage was required to make those payments pursuant to the terms of the January 30 Letter Agreement.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee.  This type of plaintiff is typically motivated to reach an early resolution of disputes in order to save costs and expedite distributions to creditors.

In determining that a preference action to avoid and recover the payments made to Ally Bank would likely prevail, the Examiner concluded that the evidence supports the proposition that Ally Bank, for whose benefits the payments were made, was a creditor of GMAC Mortgage and that the payments were made on account of an antecedent debt within 90 days prior to the Petition Date.  The Examiner also analyzed the potential defenses which could be raised and primarily focused on whether GMAC Mortgage was obligated to pay Ally Bank since the A&R Servicing Agreement was not executed prior to the payments made on May 10 and 11, 2012.  However, the Examiner also concluded that pursuant to the January 30 Letter Agreement, GMAC Mortgage was obligated to indemnify Ally Bank.

Ally Bank would most likely defend the claim and raise the foregoing issue (as well as requiring the trustee to meet its evidentiary burden on all other elements of a preference action).  Although the Examiner concludes that the preference claim is likely to be successful, all litigation carries risk, uncertainty and expense.  Similarly, Ally Bank would also incur significant legal cost and expense to defend this claim.

Given the likelihood of success identified by the Examiner with a claim of $48.4 million, I would expect the plaintiff's initial settlement demand at $43.6 million, approximately 90% of the total amount of the claim and defendant's initial offer at $7.3 million, approximately 15% of the total claim.  Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate a fair settlement of this preference claim at approximately $32 million.

### *$12.9 Million Post-petition Transfer*

**Examiner's Report References:**

Section I.E.2 pages I-13

Section V.C pages V-210 to V-291

Section VII.F.7 pages VII.F-148 to VII.F-151

**Description:**

Whether the obligations of the Debtors and AFI were appropriately allocated with respect to two settlements between governmental entities on the one hand and AFI and ResCap and certain of their subsidiaries on the other hand. This claim analysis reviews the approximate post-petition payment of $12.9 million made by Debtors to Ally Bank on June 13, 2012 pursuant to the terms of the various agreements under which GMAC Mortgage was required to indemnify Ally Bank for losses incurred as a result of certain loan modifications in connection with the government settlements. The post-petition payment, however, was for indemnification obligations for loan modifications which were performed prepetition.

**Background:**

Pursuant to the terms of the January 30 Letter Agreement and the A&R Servicing Agreement, GMAC Mortgage was permitted to modify certain Ally Bank loans to a greater extent than permitted under the Original Servicing Agreement, but GMAC Mortgage was required to indemnify Ally Bank for losses incurred resulting from such loan modifications to the extent they exceeded the modifications permitted under the Original Servicing Agreement. On May 12, 2012, that certain Interim Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreements in the Ordinary Course of Business [Dkt. No. 90] ("Interim Order") was entered.

**Examiner's Analysis and Conclusions:**

1.      The approximately $12.9 million payment was not made in the ordinary course of Debtors' business and, therefore, could only be made by the Debtor if the Bankruptcy Court authorized the Debtor to make such post-petition payments after notice and a hearing pursuant to Bankruptcy Code Section 363.

2.      While a close question, it appears more likely than not that the Interim Order did not authorize the Debtors to make payments to satisfy obligations incurred prepetition.

3.      While a close question, it is more likely than not that the approximately $12.9 million post-petition payment relating to obligations incurred prepetition may be avoided under Bankruptcy Code section 549(a).

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee. This type of plaintiff is typically motivated to reach an early resolution of disputes in order to save costs and expedite distributions to creditors.

In determining that an action to avoid the post-petition payment made to Ally Bank would more likely than not prevail, the Examiner concluded that the obligation to make a post-petition indemnification payment, which stemmed from GMAC Mortgage's responsibilities under a one-time settlement agreement with the government, would not be considered an ordinary course payment and, therefore, could only be made if authorized by the Bankruptcy Court.

The Examiner reviewed the Interim Order which authorized the Debtors' "to continue to perform under the terms of the [A&R] Servicing Agreement…" and considered the argument that such broad language could cover the $12.9 million payment on account of a prepetition obligation. However, the motion seeking entry of the Interim Order did not specifically mention these obligations and stated that the Debtors "were not seeking to pay any prepetition claims through or pursuant to the [A&R] Servicing Agreement." The Examiner concluded that this representation clarifies any ambiguity found in the Interim Order regarding whether payments with respect to prepetition obligations were authorized. The Examiner considered other arguments, including, without limitation, the fact that the agreement which contained the indemnity provisions was attached to the motion, but concluded that the indemnification obligation was not conspicuously disclosed in the motion or exhibits thereto, and there was no mention of the amount of payments to be made. Therefore, the Examiner concluded that, while it is a close question, based on the Debtors' express representations in the motion and lack of disclosure it appears more likely than not that the Interim Order did not authorize the Debtors to make payments to satisfy obligations incurred prepetition.

Ally Bank would most likely defend the claim and raise the foregoing issue (as well as other issues noted and considered by the Examiner). The Examiner concludes that, although a close question, a claim to recover the post-petition payment is more likely than not to prevail, all litigation carries risk, uncertainty and expense. Similarly, Ally Bank would also incur significant legal cost and expense to defend this claim.

Given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand at $10.3 million, approximately 80% of the total amount of the claim and defendant's initial offer at $1.9 million, approximately 15% of the total claim. Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate a fair settlement of this post-petition transfer claim at $7.1 million. Accordingly, this claim is not assigned any material settlement value and will not be included in the allocation of the $2.1 billion settlement fund.

3.      **Causes of Action Relating To Use And Allocation Of ResCap's Tax Attributes**

*First and Second 2009 Tax Allocation Agreements*

**Examiner's Report References:**

Section I.E pages I-13 to I-14

Section V.D pages V-300 to V-344

Section VII.K pages VII.K-1 to VII.K-49

**Description:**

The historical and prospective use and allocation, between ResCap and AFI, of ResCap's tax attributes.

**Background:**

As required by the November 2006 sale of 51% of AFI to Cerberus Capital Management, LP ("Cerberus"), ResCap was converted into a limited liability company and with AFI's consent, became a disregarded entity for federal income tax purposes in the fall of 2006. ResCap remained a disregarded entity, treated as a division of AFI from December 1, 2006 through June 30, 2009.

The 2006 Amended Operating Agreement required that "ResCap and GMAC shall maintain in effect an income tax allocation agreement that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap."[22]

Between July 1, 2009 and November 2, 2009, ResCap became a partnership for federal income tax purposes. It reverted to disregarded entity status on November 2, 2009 to preserve substantial tax losses that would be generated by Ally Bank and its wholly-owned subsidiary, GMACB Asset Management Corporation.

In connection with this reversion, AFI suggested and drafted the First 2009 Tax Allocation Agreement. In December 2009, William Marx, Executive Director Tax Operations and Analysis at AFI, notified both AFI and ResCap that under the proposed tax allocation agreement, any deviation from strict stand-alone accounting would "in all cases be either neutral or more beneficial to ResCap." Consistent with that statement, AFI drafted the First 2009 Tax Allocation Agreement to treat ResCap generally as if it were a stand-alone taxpayer, except that it treated ResCap more favorably in that it entitled ResCap to be paid for its tax benefits that AFI could currently use even if ResCap could not currently use the benefits on a stand-alone basis. The proposed agreement provided that ResCap would be compensated based on AFI's use of ResCap's tax benefits, not hypothetical use by GMAC Mortgage Group LLC, a disregarded entity. The proposed agreement

---

[22] 2006 Amended Operating Agreement, at § 2(b)(iii), [ALLY_0041818].

further provided that AFI would reimburse GMAC Mortgage Group LLC to the extent the Group would have to compensate ResCap for AFI's use of ResCap's tax benefits.

ResCap's legal staff advised the board that it believed that First 2009 Tax Allocation Agreement was "on terms consistent with those that parties at arms' length would agree to and for fair value." The ResCap Board unanimously approved the First 2009 Tax Allocation Agreement at its regularly-scheduled board meeting on August 6, 2010.

On September 9, 2010, Marx prepared a memorandum with instructions for executing the First 2009 Tax Allocation Agreement (and similar agreements) to among others, David DeBrunner, Chief Accounting Officer and Corporate Controller of AFI, and James Young, the CFO of ResCap. The memorandum and agreements were delivered promptly to DeBrunner, who executed the First 2009 Tax Allocation Agreement on behalf of AFI on or about September 13, 2010. Debrunner believed he was acting pursuant to "delegated authority". The First 2009 Tax Allocation Agreement was not approved by the board of directors of AFI, but that practice was consistent with "Ally Accounting Policy 3330" which provided that "[a]ll tax sharing agreements must be approved by the respective boards of directors *or appropriate management designee.*" [23] The memorandum and accompanying agreements were apparently not delivered to Young until approximately October 15, 2010.

In the meantime, AFI began calculating the amounts due to ResCap for 2009 under the First 2009 Tax Allocation Agreement and realized the amounts due to ResCap would be substantial, *i.e.*, approximately $250 million for 2009 and $400 million for 2010. Starting on October 13, 2010, Marx raised his concerns and the possibility of proposing a less-favorable tax allocation agreement to ResCap with James Mackey, the CFO of AFI. The Examiner noted that Marx, on his own initiative, attempted to hold up the completion of the execution of the First 2009 Tax Allocation Agreement, collecting and destroying the partially-executed versions. In addition, it appears that Marx or Mackey (or both) spoke to Young and told him that the agreement had not been fully discussed or vetted within AFI. As a result, Young never signed the First 2009 Tax Allocation Agreement

AFI provided ResCap with proposed revisions to the First 2009 Tax Allocation Agreement (the "Second 2009 Tax Allocation Agreement"). The proposed Second 2009 Tax Allocation Agreement removed ResCap's right to receive compensation from AFI for AFI's use of ResCap's tax benefits. In addition, ResCap became liable to pay AFI for tax on excess inclusion income, which totaled approximately $50 million from 2009 to 2012.

The ResCap Board and Independent Directors reviewed the Second 2009 Tax Allocation Agreement. Counsel for the Independent Directors advised that the Second 2009 Tax Allocation Agreement seemed "very unfair" to ResCap. Nevertheless, after certain revisions were made, the Independent Directors believed that the fairness concerns had been resolved and the ResCap board approved the transaction, which was executed by all parties in 2011.

---

[23] Ally Accounting Policy 3330, Issued by Director of Accounting Policy, Effective June 1, 2011 (emphasis added), [EXAM12354093].

Although the Second 2009 Tax Allocation Agreement appears to be a pure stand-alone agreement in that ResCap is obligated to pay to AFI its hypothetical separate tax liability each year, the Examiner found that a closer look reveals that it is significantly worse for ResCap in that there is nothing in the agreement that would require AFI to pay ResCap any refund ResCap might be entitled to on a stand-alone basis. In addition, the Second 2009 Tax Allocation Agreement does not meet the requirement of the 2006 Amended Operating Agreement that it "shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap." Nor does it meet the standard set by the ResCap board when it approved the First 2009 Tax Allocation Agreement, *i.e.*, that the agreement be "on terms not more disadvantageous in any material respect to the holders of [ResCap's] notes than those existing tax allocation agreement(s) [it is] intended to replace[.]"

**Examiner's Analysis and Conclusions:**

1.      While a close case, it is more likely than not that the First 2009 Tax Allocation Agreement was a valid, binding, and enforceable contract against AFI.

2.      While a close question, it is more likely than not that ResCap's CFO did not breach his fiduciary duties by failing to execute the First 2009 Tax Allocation Agreement.

3.      It is likely that the Second 2009 Tax Allocation Agreement constituted a fraudulent transfer of the contract benefits belonging to ResCap under the First 2009 Tax Allocation Agreement.

4.      While a close question, it is more likely than not that the Second 2009 Tax Allocation Agreement would not be set aside on equitable theories related to overreaching.

5.      While a close question, it is more likely than not that ResCap's Board of Directors did not breach its fiduciary duties by approving the Second 2009 Tax Allocation Agreement.

6.      The benefits that ResCap would have received under the First 2009 Tax Allocation Agreement but for the Second 2009 Tax Allocation Agreement are estimated at $1.77 billion.[24]

7.      Even if the First 2009 Tax Allocation Agreement is not enforceable, it is likely that ResCap could recover the payments made to AFI under the Second 2009 Tax Allocation Agreement in the approximate amount of $50 million as a constructively fraudulent conveyance.

8.      It is likely that the Second 2009 Tax Allocation Agreement would be found to be in violation of the 2006 Amended Operating Agreement.

---

[24] It should be noted that the Examiner's estimate was based on the assumption that AFI would be making a $750 million contribution contemplated by the terminated AFI Settlement and Plan Sponsor Agreement. If a $2.1 billion dollar contribution was assumed, the benefits that ResCap would have received under the First 2009 Tax Allocation Agreement but for the Second 2009 Tax Allocation Agreement would have been greater.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This contract claim would likely be pursued by a bankruptcy fiduciary such as a trustee or committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to expedite distributions to creditors. All of the procedural hurdles that attend bankruptcy litigation would be present in this case, including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law contract dispute and a fraudulent transfer action, (ii) withdrawal of the reference, and (iii) demand for a jury trial. In addition, all litigation carries risk, uncertainty, and expense. As a result, it is highly likely that any settlement would reflect a discount of 20% from the face value of the claim.

The plaintiff would have to establish that the First 2009 Tax Allocation Agreement was binding on AFI, which the Examiner evaluates as a close case. Among the evidentiary and substantive issues highlighted by the Examiner are: (a) the lack of approval by AFI's board or senior management; (b) the testimony of participants that neither side considered the First 2009 Tax Allocation Agreement binding; (c) fading memories and unavailability of witness to events that occurred in 2009 and 2010; (d) lack of signature by ResCap; and (e) the destruction of partially signed copies. Because this is a close question, the risk involved in this threshold determination substantially lowers the maximum settlement value of the claim by 40%, even before the inherent risks of litigation are considered.

If the First 2009 Tax Allocation Agreement were deemed to be binding on AFI, then the failure of ResCap's CFO to execute the First 2009 Tax Allocation Agreement is of no moment. The failure to sign only matters if the First 2009 Tax Allocation Agreement is not binding. In that case, there is a possibility of a claim for breach of fiduciary duty against ResCap's CFO, who is one of the released parties. Based on the Examiner's finding that it is more likely than not that ResCap's CFO did not breach his fiduciary duties, with which I concur, this claim adds only minimal settlement value.

Even if the First 2009 Tax Allocation Agreement were deemed to be binding on AFI, that agreement was superseded by the Second 2009 Tax Allocation Agreement. Thus, to prevail on a claim for breach of contract damages related to the First 2009 Tax Allocation Agreement, the plaintiff would also have to convince the court to set aside the Second 2009 Tax Allocation Agreement. Although the Examiner concludes that the Second 2009 Tax Allocation Agreement is likely to be set aside as a fraudulent transfer, there are still significant risks associated with that claim. As the Examiner noted, AFI would likely argue that ResCap received substantial capital contributions and other assistance from AFI around the time of the Second 2009 Tax Allocation Agreement which could represent reasonably equivalent value for the transaction. Notwithstanding the Examiner's conclusion that he was unable to connect these contributions to the Second 2009 Tax Allocation Agreement, this issue creates further risk for the plaintiff. In addition, as noted above, the First 2009 Tax Allocation Agreement was overly favorable to ResCap. Undoubtedly, AFI would

vigorously defend the claim and raise the issues highlighted by the Examiner. Therefore, the value of the claim would be further reduced by 20%.

If the First 2009 Tax Allocation Agreement were to be found non-binding on AFI, the plaintiff could, nevertheless, seek to set aside the Second 2009 Tax Allocation Agreement as a fraudulent transfer. The Examiner concludes that ResCap did not receive reasonably equivalent value because there was no possibility for ResCap to ever receive a payment thereunder. However, the payments of approximately $50 million are not material in this context because the value of the settlement amount of such payments would be less than $21 million and therefore does not merit separate valuation for settlement purposes. The payments made are included in the total recovery if the First 2009 Tax Allocation Agreement is upheld.

The Examiner also considered whether the Second 2009 Tax Allocation Agreement could be set aside on an overreaching theory. As part of his analysis, the Examiner found that the violation of the 2006 Amended Operating Agreement was further evidence that the Second 2009 Tax Allocation Agreement was unfair and evidenced overreaching. This theory is an alternative argument which only matters if the Second 2009 Tax Allocation Agreement is not set aside as a fraudulent transfer. Because the Examiner concluded that the Second 2009 Tax Allocation Agreement is likely to be set aside as a fraudulent transfer, this theory is unlikely to come into play. Moreover, even if it did come into play, the Examiner concluded that this claim was more likely than not to fail. Accordingly, this claim adds minimal settlement value.

Likewise, the Examiner considered whether ResCap's board breached its fiduciary duties by approving the Second 2009 Tax Allocation Agreement. Again, this is an alternative theory which only applies if the Second 2009 Tax Allocation Agreement is not set aside as a fraudulent transfer. Because the Examiner concluded that the Second 2009 Tax Allocation Agreement is likely to be set aside as a fraudulent transfer, this theory is unlikely to come into play. As above, even if this claim did come into play, the Examiner concluded that it was more likely than not to fail. As a result, this claim also adds minimal settlement value. I estimate that, together, the three alternative theories add 5% to the settlement value of the claim.

On the other side, even assuming that AFI would dispute the Examiner's calculation, the magnitude of the claims ($1,770 million) would likely be a strong motivating factor for AFI to settle. In addition, the likelihood of success identified by the Examiner would also incline AFI toward a substantial settlement. Legal fees and expenses in prosecuting and defending the claim would run into the tens of millions of dollars, but pale in comparison to the magnitude of the claims. Accordingly, I conclude that AFI would make a substantial offer to resolve these claims.

Under these circumstances, I would expect plaintiff's initial settlement demand to be $1,500 million, approximately 85% of the gross amount of the claim, and defendant's initial offer to be $265 million, approximately 15% of the claim. The back and forth of the negotiation process would ensue taking into account the discounts and enhancements identified above, as well as the relative bargaining power of the parties. The anticipated settlement range would be between $750 million, 50% of the plaintiff's initial demand, and $530 million, twice the defendant's initial offer, with a likely value of $713.7 million, calculated as follows:

| | |
|---|---|
| Potential Damages: | $1,770.0 million |
| Reduced By: | |
| 20% inherent risk = | $1,416.0 million |
| 40% on enforceability = | $849.6 million |
| 20% on fraudulent transfer = | $679.7 million |
| Increased By: | |
| 5% for alternative theories = | **$713.7 million** |

### *Claim re 2005 Tax Allocation Agreement*

**Examiner's Report References:**

Section VII.K pages VII.K-1 to VII.K-17

Section V.D pages V-300 to V-345

**Description:**

Whether ResCap has a contractual claim against AFI under the Implemented 2005 Tax Allocation Agreement.

**Background:**

From March 2005 through November 30, 2006 ResCap was included in the GM consolidated federal income tax return. During this period, AFI and ResCap were parties to the Implemented 2005 Tax Allocation Agreement, pursuant to which ResCap was entitled to be compensated by AFI to the extent that ResCap's NOLs and other tax benefits were used by both GM and AFI to reduce each of their separate group tax liabilities. In the case of AFI, this was a hypothetical computation. ResCap received a payment from AFI of $85.9 million for GM's and AFI's use of ResCap tax benefits for the tax year ending November 30, 2006. It was later determined that ResCap generated potential tax savings for GM of $101 million for that tax year so that ResCap still had a contingent right to the remaining $15.1 million in potential tax savings, which would become fixed if and when GM used the tax benefits. During the Examiner's investigation, GM confirmed that it used all of ResCap's tax benefits that were originally unused by GM in 2006; however, the Implemented 2005 Tax Allocation Agreement was terminated prior to GM's use of ResCap's tax attributes.

**Examiner's Analysis and Conclusions:**

It is likely that a contract claim in the approximate amount of $15.1 million against AFI arising under the Implemented 2005 Tax allocation Agreement would prevail.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This cause of action would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee. This type of plaintiff is typically motivated to reach an early resolution in order to save cost and expedite distributions to creditors.

As part of his extensive analysis of estate causes of action arising out of ResCap's tax sharing arrangements, the Examiner considered whether ResCap has a contract claim against AFI based on the tax benefits that were generated by ResCap and passed to, but unused by, GM in 2006. The Implemented 2005 Tax Allocation Agreement required that both GM and AFI be able to use ResCap tax benefits before ResCap would be entitled to compensation for use of its tax benefits (as opposed to the more standard construction which would require that only AFI use ResCap's tax benefits for ResCap to receive compensation). The Examiner also considered whether the claim would be time barred under applicable law. The Examiner concluded that ResCap's right to payment on account of its 2006 tax benefits was unaffected by the subsequent termination of the Implemented 2005 Tax Allocation Agreement as the agreement itself provided that even if it terminated, it would "continue to apply" to determine the parties' respective rights and obligations for the 2006 tax year and that ResCap's right to payment against AFI, albeit contingent and conditional, arose when it performed under the Implemented 2005 Tax Allocation Agreement (*i.e.*, when it generated tax benefits through November 30, 2006 that passed to GM).

Although the Examiner concludes that a claim to recover the $15.1 million contract claim is likely to prevail, all litigation carries risk, uncertainty and expense. AFI would incur legal cost and expense to defend this claim which it is likely to lose.

Given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand at approximately 85% of the total amount of the claim (approx. $12.8 million) and defendant's initial offer at approximately 15% (approx. $2.3 million). Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate a fair settlement of this contract claim at approximately $7 million. Accordingly, this claim is not material and will not be accorded any proposed allocation of the settlement fund.

### 4.    Minnesota Insider Preference Claims

**Examiner's Report References:**

Section I.E.4 pages I-14 to I-16

Section VII.F.4 pages VII.F-26 to VII.F-95

Section VII.F.6 pages VII.F-122 to VII.F-148

**Description:**

Application of Minnesota's substantive fraudulent transfer law to transfers made by ResCap and RFC to AFI and its affiliates, including GMAC Commercial Finance LLC ("GMAC CF").

**Background:**

The Examiner reviewed seven transactions or loan facilities between ResCap as the borrower and AFI or AFI's affiliates, including GMAC CF : (1) the Secured Revolver Facility; (2) the A&R Line of Credit Facility; (3) the Secured MSR Facility; (4) the Servicing Advance Factoring Facility; (5) the Resort Finance Facility; (6) the 2008 Bank Transaction; and (7) the 2009 Bank Transaction (collectively, the "Transactions") to determine whether they implicate potential claims under Minnesota's Insider Preference Statute.

**Examiner's Legal Analysis and Conclusions:**

1.    The Bankruptcy Court would likely apply Minnesota's Insider Preference statute to transfers made by ResCap and RFC to AFI in the six years prior to ResCap's bankruptcy filing.

2.    Minnesota's version of the UFTA has an Insider Preference cause of action. A transfer is fraudulent under Minnesota's Insider Preference statute if: (1) there exists a creditor of the transferor-debtor whose claim arose before the transfer, (2) the transfer was made to an insider of the debtor, (3) the transfer was made for an antecedent debt, (4) the debtor was insolvent at the time of the transfer, and (5) the insider had reasonable cause to believe the debtor was insolvent.

3.    Although a close call, the Minnesota Insider Preference statute allows a "substantially contemporaneous" limitation to the antecedent debt requirement despite the express wording of the statute.

4.    The Minnesota Insider Preference statute has four defenses: good faith transferee; new value; ordinary course; and, good faith effort to rehabilitate the Debtor.

5.    All of AFI's potential insider preference liability stems from the A&R Line of Credit Facility either because payments under the other loan facilities do not meet all the elements of a preference or are offset by new value contributions.

6.      The Subsequent New Value Defense is available to AFI and, although a close call, it likely will be applied as a netting out of all value given against all transfers made during the subject transfer period.  The value of non-cash contributions would be an issue.

7.      Under Minnesota's Insider Preference statute, only the parties' history of dealings is to be considered in determining ordinary course of dealings.  All of the transfers between the Debtors and AFI occurred post-insolvency, and thus the Examiner concluded that AFI would be unlikely to prevail on an ordinary course defense.

8.      It is likely that AFI would not be able to establish the good faith effort to rehabilitate defense.

9.      While Minnesota's Insider Preference statute allows for a six-year reach-back period from the Petition Date, the Examiner concluded that prior to December 30, 2009, AFI provided new value to ResCap and RFC which, taken as a whole as against extensions of credit, exceeded the value of the transfers made by ResCap and RFC to AFI during that same period.

10.      From December 30, 2009 to the Petition Date, RFC made transfers to AFI under the A&R Line Of Credit Facility totaling approximately $650 million, and AFI extended new value to RFC totaling approximately $116 million. GMAC Mortgage and certain of the other Debtors entered into the A&R Line of Credit Facility as well.  The estimated Insider Preference liability for AFI to RFC is $534 million.

11.      GMAC CF, a wholly-owned subsidiary of AFI, has approximately $32 million in potential Insider Preference liability with a potential offset of $1.5 million for new value.  However, the Debtors' records are unclear as to whether the transfers were made by RFC or GMAC Mortgage. To the extent the transfers were made by GMAC Mortgage the Minnesota Insider Preference statute would not apply because Pennsylvania law applies to the GMAC Mortgage.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  I believe it noteworthy that the Examiner was unable to find Minnesota state law directly interpreting Minnesota's ordinary course defense.  The Examiner predicts that, in the absence of a baseline course of dealings predating the financial turmoil, AFI would be unable to look to Minnesota's ordinary course of dealings defense. I believe that application of this narrow reading of the statute overlooks the policy underlying preference defenses to protect creditors who continue to transact business with companies in financial distress. Moreover, under Bankruptcy Code section 547(c)(2)(A), some bankruptcy courts have deemed transfers to be in the ordinary course which occurred only during the preference period.  Although looking to industry practices is not available under Minnesota's UFTA, AFI may nonetheless argue that its dealings with ResCap and RFC during the look-back period should be treated as ordinary course even though ResCap and RFC were in dire financial straits throughout the period.

**Settlement Considerations:**

### *Claims Against AFI*

This cause of action likely would be pursued by a bankruptcy fiduciary such as a committee or a post-confirmation trustee. Although the Examiner concludes that Bankruptcy Code section 546(e)'s safe harbor likely does not apply to these transactions, if the court were to deem the safe harbor applicable, then an estate fiduciary might not be able to pursue these claims; these claims may then be pursued by a non-estate fiduciary, such as a creditor (pursuant to the *Tribune* work-around). The dynamics of settlement may change in the event a creditor seeking its own recovery were substituted for a fiduciary looking to maximize recovery for a broader group of creditors.

Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to expedite distributions to creditors. All of the procedural hurdles that attend bankruptcy litigation would be present in this case, including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law fraudulent transfer action, (ii) withdrawal of the reference, and (iii) demand for a jury trial. AFI would most likely vigorously defend the claim and raise all of the issues and potential defenses addressed by the Examiner. Although the Examiner concludes that the preference claim is likely to be successful, all litigation carries risk, uncertainty and expense. Similarly, AFI would also incur significant legal cost and expense to defend this claim. As a result, given the foregoing factors and the initial face-amount of the claim, I believe that it is highly likely that any settlement would reflect a substantial discount of 30% on the face value of the claim, reducing the claim to $373.8 million.

Further, the Examiner's report details several issues in litigating these Insider Preference Claim that would reduce the settlement value of the claim. First, the Examiner's choice-of-law analysis, which determined Minnesota law to be applicable, is certainly well-reasoned but not an absolute. In the event that the court does not apply the Minnesota Insider Preference statute, AFI will have a stronger ordinary course defense to a preference claim. Likewise, the Bankruptcy Code section 546(e) safe-harbor may arguably remain available to AFI, though a creditor work-around may nonetheless allow for the later prosecution of this claim against AFI by a non-estate fiduciary, thus reducing the strength of the preference claim. Based on these additional issues, I believe that an additional discount of 20% of the claim is warranted, further reducing the claim to $299.0 million.

On the other hand, the Examiner's claim value of $534 million is conservative and there is the possibility, although likely remote, that the court would not net out all transfers between ResCap and AFI, thereby potentially increasing AFI's Insider Preference exposure. Also, there are numerous transfers that the Examiner concludes do not meet all the elements of a preference or are offset by new value contributions; however, the plaintiff would argue otherwise. This is a potential risk of additional exposure to AFI, and thus I have ascribed a 10% increase in value of the settlement amount, bringing the overall likely settlement value of the AFI claims to $328.9 million.

Potential Damages:                                        $534.0 million

Reduced By:

43

| | |
|---|---|
| 30% inherent risk= | $373.8 million |
| 20% for choice of law= | $299.0 million |
| Increased By: | |
| 10% for no netting of transfers= | $328.9 million |

As an alternative method of determining settlement value, given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand at $480.6 million, approximately 90% of the total amount of the claim, and defendant's initial offer at $80.1 million, approximately 15% of the total claim. Taking into account the relative bargaining power of the parties, the back and forth to be expected in the negotiating process, the strong merits of this insider preference claim, and the risk of additional exposure, I expect a reasonable settlement at the upper end of the range at approximately $300 million.

### *Claims against GMAC CF*

With respect to the Insider Preference claims of approximately $32 million against GMAC CF, I believe that the sole defense raised by the Examiner was the new value offset of $1.5 million, reducing the claim to $30.5 million. As with the AFI Insider Preference claims, applying the same discounts and enhancements as above, likely settlement value of the GMAC CF claim is reduced to $18.8 million.

| | |
|---|---|
| Potential Damages: | $30.5 million |
| Reduced By: | |
| 30% inherent risk= | $21.4 million |
| 20% for choice of law= | $17.1 million |
| Increased By: | |
| 10% for no netting of transfers= | $18.8 million |

As an alternate method of determining settlement value, given the likelihood of success identified by the Examiner, I would expect the plaintiff's initial settlement demand to be $28.4 million, approximately 90% of the total amount of the claim, and defendant's initial offer at $4.7 million, approximately 15% of the total amount of the claim. Taking into account the relative bargaining power of the parties and the back and forth to be expected in the negotiating process, I estimate that a fair settlement of this preference claim at approximately $18 million. This is below the materiality threshold of $21 million. In addition, the Examiner was unable to determine from the Debtors' records whether the transfers were made by RFC or GMAC Mortgage. To the extent the transfers were made by GMAC Mortgage Pennsylvania law would apply, not the Minnesota Insider Preference statute with the longer reach back period. Accordingly, these claims are not assigned any material settlement value.

5.        **Ally Bank Transactions**

a.        *2006 Bank Restructuring*

**Examiner's Report References:**

Section I.E.5.a pages I-16 to I-19

Section V.A.1.a pages V-1 to V24

Section V.A.2.a and b pages V-44 to V-70

Section VII.F.6.d pages VII.F-134 to VII.F-142

Section VII.E.2 pages VII.E-28 to VII.E-40

Section VII.L.1 pages VII.L-1 to VII.L-28

**Description:**

ResCap exchanged 100% ownership of Old GMAC Bank, a valuable asset, for non-voting shares in IB Financial, the holding company of Ally Bank, which were much less valuable, in a transaction where ResCap's Independent Directors were not informed of, and perhaps misled about, viable alternate structures that would have preserved the full value of Old GMAC Bank for ResCap.

**Background:**

In 2005 AFI and ResCap sought to separate from GM to reduce their high cost of funds due to GM's poor credit rating. Cerberus agreed to acquire 51% of AFI, which would accomplish the desired separation from GM. One glitch was that ResCap owned a federal savings bank, *i.e.*, Old GMAC Bank. If Cerberus acquired indirect ownership of a federal savings bank, it would become subject to the Bank Holding Company Act (BHCA), an undesirable consequence for Cerberus. Fortunately, AFI owned a Utah industrial bank, GMAC Automotive Bank. Indirect ownership of that industrial bank would not implicate the BHCA. A plan was devised to transfer the assets and liabilities from the federal savings bank to the industrial bank and avoid Cerberus becoming subject to the BHCA. Various structures for ownership of the industrial bank were discussed to account for the value and earnings contributed by ResCap. A structure was developed whereby ResCap was given non-voting shares in IB Financial, a new holding company for the industrial bank. However, AFI retained 100% of the voting shares in IB Financial. AFI wanted to retain 100% of the voting rights to accommodate GM's request for a call option on the automotive finance business. ResCap's Independent Directors were told that this arrangement was necessary to consummate the desired deal with Cerberus, but were not told that Cerberus' agreement placed no restriction on ResCap receiving voting shares and that AFI devised the structure to appease GM. The Independent Directors were also not shown a memo from ResCap's General Counsel suggesting that the proposed structure would violate a 2005 Operating Agreement for the benefit of ResCap's creditors that required Independent Director approval of transactions not at arm's length and at fair value. Nor were they

told that alternate structures were possible, or that ResCap's CEO had proposed giving ResCap voting control of the industrial bank. Nevertheless, ResCap's board, including the Independent Directors, unanimously approved the transaction. The Examiner estimates that the loss of equity value of the non-voting shares versus the equity in the federal savings bank was between $533 million and $608 million. Giving credit for the benefit to ResCap of lower borrowing costs after the Cerberus deal, the Examiner estimated that the net difference in value to ResCap was a loss of between $390 million and $465 million. The Examiner included $360 million of cash and mortgages contributed by ResCap to the industrial bank, for which it received no stock or other consideration, in his calculations of net difference in value.

**Examiner's Analysis and Conclusions:**

1.    While a close question, it is more likely than not that a fraud claim by ResCap against AFI related to the 2006 Bank Restructuring would not prevail in light of the *in pari delicto* defense and the *Wagoner* Rule.

2.    While a close question, it is more likely than not that a breach of contract claim under the 2005 Operating Agreement by ResCap against AFI related to the 2006 Bank Restructuring would not prevail in light of the *in pari delicto* defense and the *Wagoner* Rule.

3.    It is unlikely that a claim for tortious interference with the 2005 Operating Agreement would prevail against AFI related to the 2006 Bank Restructure because only a non-party may be liable for interfering with a contract.

4.    A fraudulent transfer claim against AFI based upon actual intent is unlikely to prevail with respect to the 2006 Bank Restructure because the evidence does not support actual intent to hinder, delay or defraud creditors.

5.    It is unlikely that a constructive fraudulent conveyance action against AFI would prevail with regard to the 2006 Bank Restructure because ResCap was not financially distressed.

6.    While a close question, it is more likely than not that a claim for breach of fiduciary duties against dual-affiliated ResCap insiders would not prevail.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  Moreover, since the date of the Examiner's Report, the Second Circuit has reaffirmed the *in pari delicto* doctrine and the *Wagoner* rule in *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Investment Securities, LLC).*[25]  I further note that the Examiner did not consider the possibility or likelihood of punitive damages on the fraud claim.

---

[25]   721 F.3d 54 (2d Cir. 2013).

**Settlement Considerations:**

The Examiner posited two different sets of possible values for these claims.  First, the Examiner estimated the loss of equity value to ResCap at between $530 million and $608 million. Giving credit for the benefit to ResCap of the reduction in the cost of the lower borrowing costs, the net difference in value was between $390 million and $465 million. However, the core of the Examiner's conclusion was that alternative structures for completing the Cerberus transaction and reducing ResCap's borrowing costs were available.  If these structures had been utilized, ResCap would still have received the lower borrowing costs without the loss of equity value.  The measure of damages for both fraud and breach of contract claims is to put the injured party in the same position it would have been in but for the fraud or breach.  Accordingly, for purposes of valuing settlement, I used the midpoint of the higher range of values, which was $569 million.

This claim would likely be pursued by a bankruptcy fiduciary such as a trustee or committee. Fiduciary plaintiffs are typically motivated to reach an early resolution of disputes in order to save cost and expedite distributions to creditors.  All of the procedural hurdles that attend bankruptcy litigation would be present in this case, including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law contract dispute and a fraudulent transfer action, (ii) withdrawal of the reference, and (iii) demand for a jury trial.  In addition, all litigation carries risk, uncertainty, and expense.  As a result, it is highly likely that any settlement would reflect a substantial discount (30%) from the face value of the claim.

The Examiner concluded that, while a close question, both the fraud and contract claims were likely to be barred by the *in pari delicto* doctrine and the *Wagoner* rule.  The Examiner's conclusion is supported by the evidence and case law.  As a result, any settlement would reflect a discount of over half the settlement value for these defenses, and I estimate settlement value using a 60% discount.

In addition, the Examiner correctly noted other problems with the claims even if the plaintiffs could get past the *in pari delicto* doctrine and the *Wagoner* rule.  On the contract claim, the Examiner acknowledged that AFI could use the "sole obligation" language in Section 7 of the 2005 Operating Agreement to bar a claim under that Agreement.  Although the Examiner concluded that the plaintiffs could defeat this defense by reliance on the implied duty of good faith and fair dealing, this issue creates further risk for plaintiffs.  In addition, claims based on the implied duty of good faith and fair dealing are inherently risky, as they depend not on specific contract language, but on the finder of fact's subjective view of the conduct.  Likewise, the Examiner also noted that if Minnesota law applies to the fraud claim, the *per curiam* decision of the Minnesota Supreme Court in the case of *Blenda Life Corp. v. Blenda Life, Inc.,*[26] appears to establish a blanket bar to a claim by a subsidiary against a parent.  Although the Examiner was unsure whether a court would follow this decision, which has not been cited for this proposition since, and although this case would not apply to the contract claim which is governed by New York law, this issue creates further risk for the plaintiffs.  Accordingly, any settlement would likely reflect a discount of an additional 25% due to risks on the merits.

---

[26] 196 N.W.2d 925, 927 (Minn. 1972) (per curiam).

The Examiner next concluded that a claim of tortious interference against AFI was not likely to succeed, based on the fact that a party cannot be liable for tortiously interfering with its own contract. I did not attribute any settlement value to this claim.

The Examiner also considered the possibility of breach of fiduciary duty claims against ResCap insiders (who also had dual affiliations with AFI) for concealing information from the independent directors.[27] In favor of the claim, the Examiner identified substantial evidence that material information regarding alternative structures was withheld. However, the Examiner also noted that because ResCap was not insolvent at the time, it is unclear that these insiders had a fiduciary duty to disclose this information. Moreover, there is a substantial risk that any such fiduciary duty claims are time-barred. Even if plaintiffs could surmount these hurdles, the harm from the alleged breaches is unclear, as the independent directors may have approved the transaction even if the information was not withheld. These arguments make a breach of fiduciary duty claim unlikely to succeed. Nevertheless, the Examiner found it to be a close question and I thus estimate that the existence of this alternative theory of recovery adds 10% to the settlement value of the claim.

On the other hand, even assuming that AFI would dispute the Examiner's calculation, the magnitude of the claims ($569 million) would likely be a strong motivating factor for AFI to settle. In addition, the fact that these are close issues would also incline AFI toward a substantial settlement. Legal fees and expenses in prosecuting and defending the claim would run into the tens of millions of dollars. Accordingly, I conclude that AFI would make a substantial offer to resolve these claims.

Under these circumstances, I would expect plaintiff's initial settlement demand to be $320 million, approximately 55% of the gross amount of the claim, and defendant's initial offer at $60 million, approximately 10% of the claim. The back and forth of the negotiation process would ensue, taking into account the discounts and enhancements identified above, as well as the relative bargaining power of the parties. The anticipated settlement range would be between $156 million, 50% of the plaintiff's initial demand, and $120 million, twice the defendant's initial offer, with a likely settlement value of $130.0 million, calculated as follows:

| | |
|---|---|
| Potential Damages: | $569 million |
| Reduced By: | |
| 30% inherent risk = | $398.3 million |
| 60% on in *pari delicto*/merits = | $159.3 million |

---

[27] The Examiner also considered a claim for breach of fiduciary duty against the independent directors, but concluded that it was unlikely to succeed because the independent directors did conduct some due diligence, reasonably relied on the advice of outside counsel, and would likely be exculpated under ResCap's charter. In view of the minimal likelihood of success, this claim does not add any settlement value.

25% merits=                                                    $119.5 million

Increased By:

10% for breach of fiduciary theory alternative=               $130.0 million*

* As noted above we have rounded down from $131.4 million to $130 million

### b.      2008 Bank Transaction and 2009 Bank Transaction

**Examiner's Report References:**

Section I.E.5.b pages I-19 to I-20

Section V.A.1.b and c pages V-24 to V-44

Section V.A.2.c and d pages V-70 to V-89

Section VII.F.6.d pages VII.F-134 to VII.F-148

**Description:**

*2008 Bank Transaction*.  At a time when it was insolvent, ResCap issued new ResCap Preferred Interests, convertible into Preferred Interests in IB Finance (the holding company for Ally Bank), in exchange for ResCap bonds that AFI had purchased on the open market.  ResCap retained the right to redeem the IB Finance Preferred Interests.

*2009 Bank Transaction*. At a time when it was insolvent, ResCap sold its remaining non-voting Class M stock in IB Finance (the holding company for Ally Bank) to AFI and surrendered its right to redeem the IB Finance Preferred Interests.  In exchange, AFI contributed to ResCap Senior Secured Notes of ResCap.

**Background:**

In March 2008, ResCap was experiencing liquidity problems and projected that it would be in breach of a Tangible Net Worth ("TNW") covenant as of March 31, 2008.  AFI devised a plan to contribute ResCap bonds that AFI had acquired at a discount on the open market in exchange for newly issued Preferred Interests in ResCap that would be convertible into Preferred Interests in IB Finance, the holding company for Ally Bank.  If AFI exercised its conversion rights, ResCap's nonvoting Class M tracking shares in IB Finance would be reduced *pro tanto*; however, ResCap retained the right to redeem the IB Finance Preferred Interests. ResCap's outside counsel reviewed and recommended the transaction and its outside financial advisors opined that the deal was at arm's length and for fair value. A similar exchange occurred in June 2008. The Examiner's advisors value the debt contributed to ResCap at $841 million and the value of the Preferred Interest with conversion rights transferred by ResCap at between $571 million and $714 million.

49

In 2009, ResCap continued to experience liquidity pressure and teetered on the brink of breaching its TNW covenant.  AFI again contributed ResCap bonds it had acquired on the open market and extended the maturity of the Initial Line of Credit Facility.  In exchange, ResCap transferred its remaining IB Finance non-voting Class M tracking stock and its right to redeem the IB Finance Preferred Interests. The Examiners valued the debt received by ResCap at $600 million and the stock and rights given up by ResCap at between $106.5 million and $217.5 million.

After the 2009 Bank Transaction, equity of the Mortgage Bank which the Class M shares tracked became negative and remained so up until April 30, 2013. Even in hindsight, the 2008 and 2009 Bank Transactions were favorable to ResCap.

**Examiner's Analysis and Conclusions:**

1.      Although the transfer was to an insider at a time when ResCap was in financial distress, the weight of the evidence does not support a finding of actual intent to hinder, delay or defraud ResCap's creditors in connection with the 2008 Bank Transaction.  An action to set aside the transfer as an actual fraudulent transfer is not likely to prevail.

2.      ResCap received more than reasonably equivalent value in the 2008 Bank Transaction, making it unlikely that a constructive fraudulent transfer action would be successful.

3.      Although the transfer was to an insider at a time when ResCap was in financial distress, the weight of the evidence does not support a finding of actual intent to hinder, delay or defraud ResCap's creditors in connection with the 2009 Bank Transaction.  An action to set aside the transfer as an actual fraudulent transfer is not likely to prevail.

4.      ResCap received more than reasonably equivalent value in the 2009 Bank Transaction, making it unlikely that a constructive fraudulent transfer action would be successful.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Actions to set aside the 2008 and 2009 Bank Transactions as fraudulent transactions are outside the two-year look-back period of Bankruptcy Code section 548.  The Examiner determined that these claims would be brought, if at all, under the Minnesota UFTA by a bankruptcy fiduciary using the strong arm provisions of Bankruptcy Code section 544.  In light of the Examiner's conclusion that ResCap received reasonably equivalent value in each transaction, I believe that these claims would probably not be pursued.  Therefore I ascribe no settlement value to the potential fraudulent transfer actions relating to the 2008 Bank Transaction or the 2009 Bank Transaction.

### 6.    ResCap's Directors And Officers

**Examiner's Report References:**

Section I.E.6 pages I-20 to I-23

Section IV pages IV-1 to IV-69

Section VII.E pages VII.E-1 to VII.E-43

Section VII.K.2.b pages VII.K-31 to VII.K-37

Section VII.K.2.f  pages. VII.K-45 to VII.K-50

**Description:**

Whether any of ResCap's directors or officers are liable for breaches of fiduciary duty. Relatedly, whether AFI is liable for aiding and abetting any such breach of fiduciary duty.

**Background:**

The Examiner considered whether ResCap's directors or officers might be liable for breaches of fiduciary duty regarding several transactions and events, including: (a) the 2006 Bank Restructure; (b) the Second 2009 Tax Allocation Agreement; (c) James Young's failure to sign the First 2009 Tax Allocation Agreement; (d) the prepetition asset sales; (e) the January 30 Letter Agreement, and the A&R Servicing Agreement and the $48 million indemnity payment thereunder; (f) the work of the Special Review Committee, the AFI Settlement and  Plan Sponsor Agreement; and (g) the RMBS Trust Settlement Agreements.  The Examiner also considered whether AFI could be liable for aiding and abetting any such breaches of fiduciary duties.

**Examiner's Analysis and Conclusions:**

1.     Although troubling facts exist, no claims for breach of fiduciary duty by ResCap's directors and officers are likely to prevail.

(a)    *2006 Bank Restructure*

2.     Potential breach of fiduciary claims with regard to the 2006 Bank Restructure exist because fiduciaries with dual affiliations to AFI and ResCap may have purposefully concealed material information from ResCap's Independent Directors. However, the Examiner is dubious that the dual-affiliated fiduciaries had a duty to disclose to the Independent Directors because their primary duty was to the parent, AFI, so long as ResCap was solvent, which it was in 2006, and there was no apparent self-dealing.  In addition,  it is likely that the applicable statute of limitations expired before ResCap's bankruptcy filing.  Although the actions of the fiduciaries are troubling, breach of fiduciary claims related to the 2006 Bank Restructure, while a close question, are more likely than not to fail because of an absence of a duty to disclose and because the claims are untimely.

51

3.      The Independent Directors potentially breached their fiduciary duty with regard to the 2006 Bank Restructure by failing to adequately investigate the option for ResCap to receive voting stock in the industrial bank and by not seeking a fairness opinion.  However, it is unlikely that a claim against the Independent Directors for breach of fiduciary duty would prevail because they relied on the advice of counsel and the candor of their co-fiduciaries.

(b)      *Second 2009 Tax Allocation Agreement*

4.      Although the Second 2009 Tax Allocation Agreement was very unfair to ResCap, there was a thorough review process with the assistance of able advisors and there is no evidence to suggest a breach of the duty of loyalty or an intention to act against ResCap's best interests.  The Examiner therefore concluded that, while a close question, a potential breach of fiduciary claim relating to the Second 2009 Tax Allocation Agreement would more likely than not be unsuccessful.

(c) *Young's Failure to Sign First 2009 Tax Allocation Agreement*

5.      The evidence does not establish that Mr. Young intentionally (a) refrained from signing the First 2009 Tax Allocation Agreement with a purpose other than to advance the best interests of ResCap, or (b) acted in dereliction of his duties.  The Examiner accordingly concluded that a claim of breach of fiduciary duty against him, while a close question, would more likely than not be unsuccessful.

(d)      *Prepetition Asset Sales*

6.      Breach of fiduciary claims related to the prepetition asset sales are unlikely to prevail. Although the transactions occurred in a hurried manner, there is no evidence that the fiduciaries lacked adequate information on which to base their decisions.  In addition, ResCap may have benefited from the time pressure of the transactions and it received fair value in each case.

(e)      *January 30, Letter Agreement and the A&R Servicing Agreement and the $48 million Indemnity Payment Thereunder*

7.      The January 30 Letter Agreement was the result of extensive arm's length negotiations and informed decisions.  It provided fair value to ResCap and allowed it to continue operating despite liquidity challenges. A breach of fiduciary claim related to the January 30 Letter Agreement is therefore unlikely to be successful.

8.      While a close question, the Examiner concludes it is more likely than not that a breach of fiduciary claim related to the $48.4 million payment from ResCap to AFI for indemnification obligations without board authorization would not prevail because it was a reasonable exercise of business judgment by ResCap's executive.

9.      The Examiner also concluded that potential breach of fiduciary claims relating to the A&R Servicing Agreement would not be likely to prevail.  The A&R Servicing Agreement was the product of extensive negotiations with both sides represented, and was at arm's length and for fair value.

       (f)     *The Work of the Special Review Committee, the AFI Settlement and Plan Sponsor Agreement*

10.     The Examiner concluded that although the work of the Special Review Committee was flawed and tainted by conflict of interest, a breach of fiduciary duty claim will more likely than not fail, although it is a close question. The Independent Directors on the Special Review Committee were disinterested and they relied heavily on counsel. The business judgment rule will likely preclude a breach of fiduciary duty claim.

11.     Likewise, the Examiner concluded that the AFI Settlement and Plan Sponsor Agreement, although flawed, do not support claims for breach of fiduciary duty. Relying on the advice of counsel, ResCap's board concluded that the AFI Settlement was reasonable in light of the challenging and complex legal issues. The business judgment rule will likely preclude a breach of fiduciary claim.

       (g)     *The RMBS Trust Settlement Agreements*

12.     The Examiner also found that the RMBS Trust Settlement Agreements were hurriedly approved with possibly flawed advice. However, the negotiations were conducted at arm's length by counsel upon whom the board reasonably relied. While a close question, it is more likely than not that a breach of fiduciary claim related to the RMBS Trust Settlement Agreements would not prevail.

13.     Since none of the predicate breach of fiduciary claims is likely to prevail, the Examiner did not believe there is a viable claim of aiding and abetting a breach of fiduciary duty.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Many of the events and transactions that may give rise to potential breach of fiduciary claims are analyzed separately for reasonable settlement value elsewhere in this report. Specifically, the claims for breaches of fiduciary duty claims relating to the 2006 Bank Restructure, the 2009 Tax Allocation Agreements, the pre-petition asset sales, the $48.4 million payment, and the RMBS Trust Settlement Agreements are addressed in those sections. The existence and settlement value of breach of fiduciary duty claims related to those events or transactions are considered in those sections. Because duplicative damages are not available for such claims, these claims do not have additional settlement value above and beyond what is considered in the underlying transactions.

As for the remaining claims, claims for breach of fiduciary duty are expensive to litigate and are susceptible to threshold issues and strong defenses. Specifically, as the Examiner noted, claims for breach of fiduciary duty will have to overcome standing obstacles under Delaware law, and likely will have to be brought derivatively. In addition, the Examiner observed that the defendants

will likely rely on the business judgment rule, experts, and exculpatory clauses to defend against such claims.  As a result, the settlement value of any claim for breach of fiduciary duty is subject to a significant discount of 40%, from its face value.

Turning to specific claims, the Examiner found that breach of fiduciary duty claims based on the January 30 Letter Agreement were not likely to succeed, as it was subject to extensive arm's length negotiation and ResCap received fair value.  Given the cost of bringing such a claim, as well as the availability of the defenses noted above, such a claim is unlikely to be brought and does not add any settlement value.

Similarly, the Examiner found that claims regarding the A&R Servicing Agreement were not likely to prevail.  The Examiner observed that the A&R Servicing Agreement was entered into at arm's length and for fair value, and it was critical to GMAC Mortgage's valuable servicing platform, so that the lack of approval by the GMAC Mortgage Board is not likely to be significant.  Given the cost of bringing such a claim, as well as the availability of the defenses noted above, such a claim is unlikely to be made and does not add any settlement value.

Finally, the Examiner found that fiduciary duty claims related to the AFI Settlement and Plan Sponsor Agreement were not likely to succeed.  The Examiner noted that the performance of the board was incomplete and tainted by conflicts of counsel.  At the same time, the Examiner found that the board and the independent directors reasonably relied on the advice of outside counsel and that they were entitled to defer to that expertise.  Accordingly, such a claim is not likely to be brought and does not add any settlement value.

Because these claims are subject to significant defenses, not likely to prevail, and not likely to be brought, they are not material and do not add any settlement value.

### 7.     Single Entity Theories Of Liability

#### a.     *Piercing The Corporate Veil*

**Examiner's Report References:**

Section I.E.7.a pages I-23 to I-25

Section VII.A pages VII.A-1 to VII.A-64

**Description:**

Whether ResCap and AFI operated as a single economic entity in an unjust or unfair manner such that a claim could be successfully asserted on behalf of ResCap to pierce its corporate veil, thereby making AFI liable for all of ResCap's debts.

**Background:**

ResCap was a wholly owned subsidiary of AFI.  The Examiner's Investigation uncovered evidence of certain indicia that ResCap and AFI operated as a single economic entity.  ResCap's

54

conduct in connection with a number of Affiliate Transactions (*e.g.*, the 2006 Bank Restructuring, the MSR Swap, the Pipeline Swap, the First 2009 Tax Allocation Agreement, the Second 2009 Tax Allocation Agreement, and the allocation of liability in connection with the FRB/FDIC Settlement and the DOJ/AG Settlement) departed in some important respects from appropriate corporate formalities, including the requirements of ResCap's own operating agreements.

**Examiner's Analysis and Conclusions:**

1.      The application of Delaware law to the assessment of potential veil-piercing claims is consistent with the weight of authority in the Second Circuit.

2.      Delaware law recognizes the existence of a claim on behalf of a debtor to pierce its own corporate veil.

3.      An "alter ego" claim constitutes property of the debtor corporation, and the debtor-in-possession or bankruptcy trustee has exclusive standing to assert the claim.

4.      A debtor that succeeds in piercing its own corporate veil may hold its parent liable for all of its debts.

5.      In order to pierce the corporate veil and establish alter ego liability under Delaware law, a plaintiff must show (1) that the parent and subsidiary operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present. The fact that the subsidiary is a limited liability company does not change the analysis.

6.      Factors considered by courts applying Delaware law to determine whether a parent and its subsidiary should be deemed a "single economic entity" include: (1) undercapitalization, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of the debtor corporation at the time, (5) siphoning off of the corporation's funds by the dominant parent, (6) absence of corporate records, and (7) the fact that the corporation is merely a façade for the operations of the dominant parent.

7.      The evidence does not support the proposition that ResCap was inadequately capitalized or insolvent at or around its formation.

8.      The evidence does not support the proposition that AFI siphoned assets from ResCap.

9.      The Examiner did not afford any weight to ResCap's nonpayment of dividends.

10.      The Examiner concluded that the evidence supported the proposition that ResCap failed to follow or followed inconsistently, certain appropriate corporate formalities.

11.      The Examiner concluded that a court would likely find that the operations of ResCap and AFI would be consistent with the operations of a subsidiary and its parent.

12.      The Examiner does not consider any theory of injustice or unfairness likely to succeed.

13.     Any veil-piercing claims asserted on behalf of ResCap against AFI are unlikely to prevail.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Based upon the Examiner's factual and legal conclusions, it would initially seem that if this claim were pursued by a bankruptcy fiduciary, such as a trustee or a committee, it would likely be pursued on a contingent fee basis in view of the uphill battle evidenced by the Examiner's conclusions. However, there are third party contingent claims against AFI for RMBS litigation in the tens of billions of dollars. Thus, I believe that a creditors' committee and third party plaintiffs would work together to overcome any "standing" issues to receive authority from a court to pursue the single entity claim theories, including veil-piercing and alter ego, on behalf of the estate. Despite the fact that the Examiner concludes, and I agree, that veil-piercing and alter ego claims are unlikely to succeed, I conclude there is significant settlement value not to exceed $480 million as discussed in the Third Party RMBS litigation analysis below.

### b.     *Substantive Consolidation*

**Examiner's Report References:**

Section I.E.7.b  page I-25

Section VII.A.2  pages VII.A-65 to VII.A-85

**Description:**

Whether there is evidence to support the consolidation of AFI into the estate of ResCap or any other subsidiary.

**Background:**

Substantive consolidation is an equitable doctrine pursuant to which the assets and liabilities of affiliated entities are treated as one for purposes of a bankruptcy case. Intercompany claims of the consolidated debtors are eliminated, the assets of the consolidated debtors are treated as common assets, and the claims of outside creditors against any of the debtors are treated as claims against the consolidated entity. The only finding of the Examiner in support of substantive consolidation is the absence of certain corporate formalities. However, the Examiner uncovered no credible evidence that creditors dealt with ResCap and AFI as a single entity. Trading activity in ResCap bonds, CDS pricing and credit ratings, consolidated financial statements, and lack of guarantees (although guarantees might negate single entity status) were considered by the Examiner.

56

**Examiner's Analysis and Conclusions:**

1.      Controlling Second Circuit law regarding substantive consolidation is set forth in the *Augie/Restivo*[28] case and requires that either (i) creditors dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit, or (ii) the entities' affairs are so entangled that substantive consolidation would benefit all creditors.

2.      While a close question, it is more likely than not that a court would find that ResCap and AFI operated as a single economic entity.

3.      However, there is no evidence that creditors relied upon ResCap and AFI being a single economic entity.

4.      The evidence does not support the proposition that AFI and ResCap's affairs were hopelessly entangled.

5.      It is unlikely that a motion for substantive consolidation on either theory would prevail.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  Both tests for substantive consolidation are fact specific.

**Settlement Considerations:**

If a claim for substantive consolidation were successful, creditors of ResCap would share in the assets of AFI *pari passu* with AFI's creditors (and vice versa) thereby significantly enhancing their recovery.  Because of the fact intensive nature of substantive consolidation, it may be possible for a trustee or other estate representative to withstand a motion to dismiss, although based on the facts found by the Examiner, the likelihood of such success is minimal.

However, there is always the chance that litigation with a low probability of success will prevail and so the risk to AFI and its creditors increases.  There are third party contingent claims against AFI for RMBS litigation in the tens of billions of dollars.  Despite the fact that the Examiner concludes, and I agree, that a substantive consolidation claim is unlikely to succeed, I conclude there is significant settlement value not to exceed $480 million as discussed in the Third Party RMBS litigation analysis below.

---

[28] *Union Savings Bank v. Augie/Restivo Baking Company, Ltd. (In re Augie/Restivo Baking Company, Ltd.)*, 860 F.2d 515 (2d Cir. 1988).

## 8.    Debt Re-characterization

**Examiner's Report References:**

Section I.E.8 pages I-25 to I-26

Section VII.B pages VII.B-1 to VII.B-27

Section V.E.3, 5, and 8 pages V-357 to V-362, V-368 to V-372 and V-377 to V-379

Section VI.B.2 and 3 pages VII.B-1 to VII.B-13

**Description:**

Whether any of the claims held by AFI are subject to re-characterization as equity.

**Background:**

AFI holds two categories of claims: (1) claims under the A&R Secured Revolver Loan Agreement (approximately $747 million) and under the A&R Line of Credit Agreement (approximately $380 million); and (2) claims with respect to Unsecured Notes and Senior Secured Notes (aggregating $2.4 billion in face principal amount) that were exchanged by AFI for, among other things, ResCap Preferred Interests in the 2008 Bank Transaction and ResCap's remaining IB Finance Class M Shares in the 2009 Bank Transaction.

**Examiner's Analysis and Conclusions:**

1.    It is unlikely that an effort to re-characterize the AFI Secured Revolver Facility claims as equity would prevail.

2.    It is unlikely that an effort to re-characterize the AFI Line of Credit Agreement claims as equity would prevail.

3.    It is unlikely that an effort to retroactively re-characterize the Unsecured Notes and the Senior Secured Notes used by AFI as consideration in connection with the 2008 Bank Transaction and the 2009 Bank Transaction would prevail.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This cause of action would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee. This type of plaintiff is typically motivated to reach an early resolution in order to save cost and expedite distributions to creditors.

58

The Examiner evaluated each of the AFI Secured Revolver Facility, the AFI Line of Credit Agreement, the Unsecured Notes and the Senior Secured Notes used by AFI as consideration in connection with the 2008 Bank Transaction and the 2009 Bank Transaction  (i) in light of the evidence related to the material of issue whether the parties intended them to be debt or equity, (ii) application of the factors courts generally consider in determining whether to re-characterize claims as equity (the "*Autostyle* Factors"), and (iii) possible defenses.  The facts and the application of the *Autostyle* Factors (as well as some other factors) support a determination that the all of the claims and notes constitute debt that cannot be re-characterized as equity.[29]  Significantly, the Examiner's investigation did not reveal any evidence that the parties ever intended, considered or treated the loans as anything other than loans.

The Examiner also considered possible defenses including, *inter alia*, the statute of limitations.

AFI would most likely vigorously defend any re-characterization action because, as set forth above, the facts and the law are almost exclusively in its favor.

Although it appears that AFI would successfully defend such actions, all litigation carries some risk, uncertainty and expense regardless of how strong a case may be.  Thus, AFI may be willing to offer a small settlement ("nuisance settlement") to prevent the limited possibility of losing the litigation, which settlement would be less than $10 million and therefore not material to the allocation of the $2.1 billion settlement fund.  Alternatively, the fiduciary is unlikely to be willing to incur significant legal cost and expense to pursue these complex actions which are unlikely to prevail.

Given the Examiner's factual and legal conclusions, I believe there is no material settlement value to these claims.

## 9.      Equitable Subordination And Equitable Disallowance

**Examiner's Report References:**

Section I.E.9 pages I-26 to I-28

Section VII.C  pages VII.C-1 to VII.C-18

Section VII.D  pages VII.D-1 to VII.D-3

---

[29] I note that the Court of Appeals for the Tenth Circuit in *Sender v. Bronze Group, Ltd.* (*In re Hedged-Investment Assocs., Inc.*), 380 F.3d 1292 (10th Cir. 2004) discussed many of the *Autostyle* Factors plus some additional factors such as the right to enforce payment, the intent of the parties, failure of debtor to repay on due date, and  participation in management, and did not include some of the *Autostyle* Factors such as sinking fund for interest, or security for payment.  However, the Examiner separately considered some of *Sender's* additional factors such as the intent of the parties and right to enforce payment.  Also, in support of his statement that "courts would likely undertake an analysis of the *Autostyle* factors", the Examiner cited *In Re BH S&B Holdings LLC*, 420 B.R. 112 (2009), a Bankruptcy Court case from the Southern District of New York.

**Description:**

Creditors assert that AFI's claims against ResCap, including $747 million under the A&R Secured Revolver and $380 million under the A&R Line of Credit, should be subordinated or disallowed to the claims of all other creditors under Bankruptcy Code section 510(c).

**Background:**

The Examiner investigated the following matters for evidence of inequitable conduct by AFI, harm to other creditors, or unfair advantage to AFI: (1) the 2006 Bank Restructuring, (2) the Second 2009 Tax Allocation Agreement, (3) the misallocation of revenues on brokered loans, (4) ResCap's forgiveness of subsidiary indebtedness and the 2009 Bank Transaction, (5) the Line of Credit Facilities, and (6) alter ego, asset stripping and aiding and abetting breach of fiduciary claims.

**Examiner's Analysis and Conclusions:**

1.      ResCap and its creditors were harmed by AFI's inequitable and unfair conduct in connection with the 2006 Bank Restructuring in an amount of between $390 million and $608 million.

2.      ResCap and its creditors were harmed by AFI's inequitable and unfair conduct in connection with the Second 2009 Tax Allocation Agreement in the approximate amount of $50 million.

3.      It is more likely than not that ResCap and its creditors were harmed by AFI and Ally Bank in the amount of approximately $520.5 million with respect to the misallocation of revenues on the brokered loans.

4.      AFI, however, provided ResCap with substantial capital support totaling in excess of $8 billion in the form of cash contributions, debt forgiveness, and contributions of other assets.

5.      While a close case, it is more likely than not that equitable subordination of AFI's claims would not prevail.

6.      Equitable disallowance requires a showing of more serious conduct than that necessary for equitable subordination.

7.      It is unlikely that equitable disallowance of AFI's claims would prevail.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Each of the claims in which inequitable conduct was found by the Examiner is also ascribed value separately by the Examiner, therefore, each of those claims is evaluated separately for settlement purposes in this report and ascribed significant settlement value. However, I believe that the prospect that AFI's claims might be equitably subordinated or equitably disallowed adds little to the evaluation of those claims and has no independent settlement value on its own.

## 10.   Constructive Trust Claim

**Examiner's Report References:**

Section I.E.10 page I-28

Section VII.I  pages VII.I-1 to VII.I-17

**Description:**

Whether a constructive trust should be imposed on ResCap's interest in the mortgage division of Ally Bank or on proceeds of TARP funds that AFI received by virtue of its relationship with ResCap.

**Background:**

The Examiner considered whether AFI orchestrated the "Ally Bank Transactions," which consist of the 2006 Bank Restructuring, the 2008 Bank Transaction, and the 2009 Bank Transaction, to strip ResCap of its assets, resulting in AFI being unjustly enriched. The details of these transactions are discussed elsewhere in this report.

The Examiner also considered whether the Troubled Asset Relief Program ("TARP") funds received by AFI were received, at least in part, as a result of ResCap's financial difficulties, such that ResCap was an intended beneficiary of these funds and AFI was unjustly enriched by the retention of these funds. AFI received a total of $17.2 billion under TARP, but the Examiner's focus was on the first $5.7 billion received.

**Examiner's Analysis and Conclusions:**

1.     A constructive trust claim is unlikely to prevail with regard to the Ally Bank Transactions. First, claims regarding the 2006 Bank Restructuring are governed by the 2005 Operating Agreement and the indenture governing the Unsecured Notes, and claims for unjust enrichment and a resulting constructive trust do not apply where the relationship is governed by an express contract. Second, the Examiner found that ResCap received reasonably equivalent values in the 2008 Bank Transaction and the 2009 Bank Transaction, negating any claim against AFI for unjust enrichment.

2.    A constructive trust claim is unlikely to prevail for the TARP funds. The evidence shows that the funds went to AFI because of AFI's involvement in the automotive business, not because of ResCap.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Regarding the 2006 Bank Restructuring, it is black-letter law that there can be no unjust enrichment when the claims at issue are governed by a written contract. Accordingly, constructive trust or unjust enrichment claims are highly unlikely to succeed. Moreover, as discussed elsewhere in the report, ResCap has much stronger claims regarding the 2006 Bank Restructuring. Therefore, the unjust enrichment/constructive trust theory does not add materially to the settlement value of those claims.

Similarly, based on the Examiner's well-supported finding that ResCap received fair value in the 2008 Bank Transaction and the 2009 Bank Transaction, a constructive trust claim regarding those transactions is highly unlikely to succeed. I discuss elsewhere that fraudulent transfer claims regarding the 2008 Bank Transaction and the 2009 Bank Transaction would not likely be pursued in light of the Examiner's determination that ResCap received reasonably equivalent value. For the same reason I do not believe that a constructive trust claim would be pursued.

Regarding the TARP funds, the Examiner found significant evidence that the TARP funds were given to AFI not because of ResCap but because of the government's interest in preserving the automotive industry. As a result, the claim is highly unlikely to succeed and AFI would likely be successful in having any claim dismissed on summary judgment. The only countervailing consideration is the sheer size of the claim - $5.7 billion. To avoid the risk of liability as to this large number and the cost of litigating the claim, AFI would likely be willing to settle this for nuisance value, which I believe would be less than $21 million and therefore not material for purposes of the allocation of the $2.1 billion settlement fund.

## 11.    Prepetition Asset Sales

**Examiner's Report References:**

Section I.E.11 page I-29

Section V.F pages V-383 to V-468

Section VII.F.6  pages VII.F-122 to VII.F-147

**Description:**

Whether any of seven prepetition asset sale transactions constitute constructive fraudulent transfers.

**Background:**

The Examiner reviewed the following sales of assets to affiliates of ResCap ("Prepetition Asset Sales"):

> (a)    *Health Capital Sale by RFC to GMAC CF in August 2007*

> *The sale of substantially all assets and operations of Health Capital for $900.5 million;*

> (b)    *June 2008 Model Home Sale by GMAC MHF to Cerberus*

The sale of 1,614 model homes and 127 lots for $230 million plus Class B Junior Preferred Shares in CMH;

> (c)    *Resort Finance Sale by RFC and GMAC Canada to GMAC CF in July 2008*

Sale of substantially all of Resort Finance for cash consideration of $96.1 million (later increased to $111.1 million) plus the assumption of $1,125 billion of debt;

> (d)    *Excess Servicing Rights Sales by GMAC Mortgage to Cerberus in July 2008*

Following two auctions, the sale to Cerberus, as highest bidder, of certain excess servicing rights on (i) Freddie Mac Loans with $13.8 billion unpaid principal balance, and (ii) Fannie Mae loans with $24.8 billion unpaid principal balance, capturing, respectively, $591.2 and $981.9 million notional interest-only securities;

> (e)    *September 2008 Model Home Sale by DOA Holding Properties, LLC to Cerberus*

Following an auction, the sale of two pools of model home assets for net cash proceeds of $59.2 million;

> (f)    *ResMor Sale by GMAC Canada to AFI in January 2009*

Sale of all outstanding shares in ResMor for C$82 million (approximately $67 million as of December 31, 2008); and

> (g)    *US/UK Broker-Dealer Sale by RFC to AFI in May 2009*

Sale of RFC's interests in Ally Securities and RFCIL for $42.3 million and $18.1 million, respectively, plus payment to RFC of an amount equal to the entire outstanding principal due and payable under an existing $50 million subordinated loan between RFC and Ally Securities.

**Examiner's Analysis and Conclusions:**

1.      The evidence supports the proposition that RFC, GMAC Canada, GMAC Mortgage and their affiliate sellers received reasonably equivalent value in each of the Prepetition Asset Sales, with the possible exception of the June 2008 Model Home Sale by GMAC MHF to Cerberus.

2.      While a close question with respect to the June 2008 Model Home Sale, it is more likely than not that a constructive fraudulent transfer claim against Cerberus would not succeed under existing law.

3.      It is more likely than not that a court would find that the value received by RFC as the equity owner of GMAC MHF, as well as by GMAC MHF, would constitute reasonably equivalent value.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

These causes of action would likely be pursued by a fiduciary such as a bankruptcy trustee, committee or post-plan confirmation trustee. This type of plaintiff is typically motivated to reach an early resolution of disputes in order to save costs and expedite distributions to creditors.

The Examiner evaluated each of the Prepetition Asset Sales to determine if any would constitute a constructive fraudulent transfer under applicable law, focusing on whether or not the selling Debtor(s) received "reasonably equivalent value" for the transfer. In that regard the Examiner addressed three fundamental questions: (i) what was the form and value of the property transferred by the Debtor(s); (ii) did the Debtor(s) receive value in exchange for the property transferred, and, if so, in what form and amount; and (iii) was the value received by Debtor(s) a reasonably equivalent in exchange for the property transferred.

With respect to each of the following Prepetition Asset Sales, the Examiner concluded as follows:

(a)      *Health Capital Sale by RFC to GMAC CF in August 2007*

Based on his analysis and the totality of the circumstances, including, without limitation, the valuation prepared by Houlihan Lokey and other market indicators, the evidence supports the proposition that RFC received reasonably equivalent value in this sale.

(b)      *June 2008 Model Home Sale by GMAC MHF to Cerberus*

Although RFC received at least $30 million less than the Fair Market Value, based on the totality of the circumstances, it is more likely than not that a court would find that the value received by RFC would constitute reasonably equivalent value in this sale.

(c)    *Resort Finance Sale by RFC and GMAC Canada to GMAC CF in July 2008*

Based the totality of the circumstances, including, without limitation, the Houlihan Lokey valuation, the Morgan Stanley Fairness opinion, prior sales attempts by Bear Stearns, Morgan Stanley's orderly liquidation analysis, and various adjustments to the calculation of the purchase price, the evidence supports the proposition that RFC and GMAC Canada received reasonably equivalent value in this sale.

(d)    *Excess Servicing Rights Sales by GMAC Mortgage to Cerberus in July 2008*

Based on the totality of the circumstances, including, without limitation, the nature of the auctions, Pentalpha's memorandum, and market conditions at the time of the auctions, the evidence supports the proposition that GMAC Mortgage received reasonably equivalent value in this sale.

(e)    *September 2008 Model Home Sale by DOA Holding Properties, LLC to Cerberus*

Based on the totality of the circumstances, including, without limitation, an auction process including non-affiliated bidders conducted by a nationally recognized broker in an arm's length manner, the degree of differential between the bids received and the temporal and contingent factors surrounding such bids, the evidence supports the proposition that RFC (as the owner of GMAC Canada), and GMAC Canada received reasonably equivalent value in this sale.

(f)    *ResMor Sale by GMAC Canada to AFI in January 2009*

Based on the totality of the circumstances, including, without limitation, the fairness opinions by Goldin Associates and Sandler O'Neill, the GMAC Canada investment in ResMor in the prior year and other market indicators, the evidence supports the proposition that RFC as the owner of GMAC Canada, and GMAC Canada, received reasonably equivalent value in this sale.

(g)    *US/UK Broker-Dealer Sale by RFC to AFI in May 2009*

Based on the totality of the circumstances, including, without limitation, the Goldin Associates valuation analyses and fairness opinion, and prevailing market indicators, the evidence supports the proposition that RFC received reasonably equivalent value in this sale.

The purchasers (AFI and Cerberus) would most likely vigorously defend any fraudulent transfer actions because, as set forth above, the facts and the law are almost exclusively in their favor as to all of the above transactions, with the possible exception of the June 2008 Model Home Sale transaction, and with respect to that sale the Examiner has concluded it is unlikely to prevail.

Although it appears that the purchasers would successfully defend such actions, all litigation carries some risk, uncertainty and expense regardless of how strong a case may be. Alternatively, the fiduciary is unlikely to incur significant legal cost and expense to pursue what would be complex actions which are unlikely to prevail.

Thus, Cerberus may be willing to offer a small settlement ("nuisance settlement") with respect to the June 2008 Model Home Sale transaction to prevent the small possibility of losing the litigation. However, considering that the upside to the fiduciary in that transaction is likely to be no more than $30 million, the fiduciary must also consider the cost and benefit in pursuing same.

Given the Examiner's factual and legal conclusions, I believe there is no material settlement value to these claims.

### 12.    Financing Affiliate Transactions

**Examiner's Report References:**

Section I.E.12  page I-29

Section V.E pages V-350 to V-383

Section VII.F pages VII.F-1 to VII.F-154

**Description:**

Whether the terms of material prepetition financing Affiliate Transactions were entered into at arm's length and on balance were more favorable to ResCap than would have been obtained in third party financings of comparable size and nature.

**Background:**

The Examiner reviewed the following prepetition financing Affiliate Transactions ("Financing Affiliate Transactions"):

    (a)     Resort Finance Facility;

    (b)     Secured MSR Facility;

    (c)     Secured Revolver Facility;

    (d)     Servicing Advance Factoring Facility;

    (e)     Initial Line of Credit Facility;

    (f)     ResMor Loan Facility;

    (g)     Second Line of Credit Facility;

    (h)     Amended and Restated Credit Facilities; and

    (i)     BMMZ Repo Facility.

66

**Examiner's Analysis and Conclusions:**

All of the these Financing Affiliate Transactions were entered into at arm's length and on balance were more favorable to ResCap than would have been obtained in the third-party financings of comparable size and nature.[30]

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

The Examiner evaluated the Financing Affiliate Transactions to determine if each was entered at arm's length or were less favorable to ResCap than would have been obtained in the third-party financings of comparable size and nature.

With respect to each of the following Financing Affiliate Transactions, the Examiner found as follows:

>        (a)        *Resort Finance Facility*

This facility entered by RFC, as borrower, with AFI, as lender, was intended to be bridge financing while ResCap searched for a third party to purchase its Resort Finance business (at the time there were already discussions with third parties for such sale). Bear Stearns issued a fairness opinion concluding that the financial terms and conditions were no less favorable to RFC than the financial terms and conditions that would be expected to be obtained in a comparable financing with an unaffiliated third party at arm's length.

>        (b)        *Secured MSR Facility*

This facility, entered by RFC and GMAC Mortgage as borrowers, and ResCap as guarantor, with AFI, as lender, was to provide additional liquidity. At the time, Barclays contemplated providing RFC with a secured facility and sent a term sheet. However, ResCap's liquidity needs were imminent and several months of negotiations could have been required to complete and syndicate a facility with Barclays. This led to a proposal for AFI to provide the Secured MSR Facility as a bridge to the Barclays facility. Morgan Stanley viewed the terms favorably, concluding, among other things, that the facility provided materially better economic terms than the proposed Barclays facility and existing facilities and was more attractive than facilities available in the then current marketplace. The search for a lender to refinance this facility proved to be futile. AFI ultimately forgave all indebtedness under this facility.

---

[30] The Examiner noted that notwithstanding this conclusion, certain of Financing Affiliate Transactions implicate potential Estate Causes of Action as discussed in Section VII.F (each of which are discussed in other sections of this report).

(c)    *Secured Revolver Facility*

This facility, entered by RFC and GMAC Mortgage as borrowers, ResCap and various ResCap Subsidiaries as guarantors, and AFI as lender, was required to provide more liquidity due to looming credit maturities and capital needs. Two of the maturing credit facilities were (i) the unsecured JP Morgan 364 Day Facility of $875 million and (ii) the JP Morgan 2005 Term Loan Facility in the amount of $1.75 billion. On the closing date of this facility, AFI converted approximately $1.3 billion of term loans under the JPMorgan 2005 Term Loan Facility (that AFI obtained through assignment) into the equivalent amount of the Secured Revolver Facility and $450 million was borrowed thereunder to repay the principal of the JPMorgan 2005 Term Loan Facility. Also, this facility was used to pay the $1.75 billion cash portion of the ResCap tender and bond exchange (pursuant to which $8.6 million in unsecured ResCap notes were exchanged for approximately $5.6 million of the Senior Secured Notes and Junior Secured Notes). As a result, the Secured Revolver Facility was fully drawn in the amount of $3.5 billion with the proceeds used to exchange direct unsecured ResCap obligations owed to unaffiliated parties. The Secured Revolver Loan Agreement was amended and restated by the A&R Secured Revolver Loan Agreement.

(d)    *Servicing Advance Factoring Facility*

ResCap, seeking to monetize certain non-GSE Servicing Advances, entered this facility with GMAC CF which was structured as a "true sale" of receivables and not financing. GMAC CF was reluctant to enter into this facility, but after intensive negotiations, agreed to an 85% advance rate which provided RFC and GMAC Mortgage with greater liquidity than they would have if they borrowed against the same assets under the Secured Revolver Facility. AFI entered into a collateral release agreement with respect to the Servicing Advances. Morgan Stanley delivered a fairness opinion with respect to this facility which concluded that the purchase price for the initial and contemplated subsequent purchase of receivables were fair to RFC. This facility contained provisions commonly found in receivables factoring transactions and other representations, warranties, termination events and indemnification provisions standard for receivables factoring transactions between unaffiliated parties.

(e)    *Initial Line of Credit Facility*

Despite a first lien secured credit facility and second and third lien secured bonds, due to the favorable permitted lien and collateral release provisions in the Secured Revolver Loan Agreement, Senior Secured Notes Indenture and Junior Secured Notes Indenture, PATI and RATI, as borrowers, were able to enter this facility, guaranteed by ResCap, with AFI as lender, in the amount of $430 million. Failing to find unaffiliated lenders, AFI became the lender of last resort for this facility. This facility exemplified an affiliate transaction more favorable to the borrowers than would have been obtained in a syndicated credit facility with unaffiliated lenders, and it would be extremely unlikely for a single lender to provide this facility. This facility was amended and restated by the A&R Line of Credit Facility.

(f)    *ResMor Loan Facility*

GMAC Canada entered into this facility with AFI in the amount of CDN $82 million. At the same time, AFI as purchaser, entered into a purchase agreement to purchase from GMAC Canada, as seller, the stock of 1020491 Alberta Ltd. and ResMor. The principal amount of this loan was intended to be repaid at the closing on the sale by setting it off against the purchase price. The sale closed and the loan was repaid as contemplated. Goldin Associates rendered a fairness opinion stating that the ResMor Sale was fair, from a financial point of view, to ResCap and its creditors (other than AFI). This facility contained very basic representations, warranties and covenants and the events of default were standard for facilities of comparable size and nature.

(g)    *Second Line of Credit Facility*

Instead of increasing the Line of Credit commitment amount, AFI, as lender, provided PATI and RAHI, as borrowers, with this facility in the initial amount of $370 million on substantially similar terms to the Initial Line of Credit Facility (and together with the Second Line of Credit Facility, the "Line of Credit Facilities"). This facility was later increased to $470 million. On December 30, 2009 this facility and the Initial Line of Credit Facility were combined into the A&R Line of Credit Facility. Goldin Associates provided a fairness opinion concluding the terms of the documents were fair to ResCap and its creditors (other than AFI) and provided a further fairness opinion for the amendment of this facility to increase it. The provisions of this facility exemplified an affiliate transaction more favorable to the borrowers than would have been obtained in a third party financing. Goldin Associates delivered a favorable fairness opinion in connection with the increase of the cumulative commitment under the Line of Credit Facilities up to an additional $500 million. Just before the consolidation of the Line of Credit Facilities, this facility was increased from $470 million to $670 million.

(h)    *Amended and Restated Credit Facilities*

The Line of Credit Facilities were combined into one agreement and the Secured Revolver Loan Agreement was amended and restated to convert $1.55 billion of Secured Revolver Facility Revolver Loans into Secured Revolver Facility Term Loans. After assignments of obligations, the new borrowers under the A&R Line of Credit were GMAC Mortgage and RFC, and they were required to provide a solvency representation which was similar to the solvency representation for the A&R Secured Revolver Loan Agreement. The A&R Line of Credit Agreement contained representations, warranties, covenants, events of default and indemnification provisions that were standard for facilities of comparable size and nature (and would be typical for a syndicated credit facility with unaffiliated lenders). Provisions exemplifying an affiliate transaction that were more favorable to the borrowers, were the same as those under the Line of Credit Facilities.

(i)    *BMMZ Repo Facility*

GMAC Mortgage and RFC had each entered separate financing agreements with Citibank and Goldman Sachs in the form of mortgage loan repurchase facilities with an aggregate commitment of $300 million. ResCap guaranteed these obligations. AFI proposed to ResCap a

new mortgage loan repo facility to be provided by one of its Subsidiaries, BMMZ, on substantially the same terms as proposed by Citibank, but with some advantages to ResCap including no commitment fee, more favorable advance rates, and no aggressive amortization schedule. Goldin Associates was engaged to provide an analysis of the terms of the Citibank proposal and of the AFI proposal, and to provide a fairness opinion. Goldin Associates concluded that this facility contained terms that were at least as favorable to ResCap and its creditors (other than AFI) as those that could reasonably be obtained by ResCap from an unaffiliated third party lender. This facility contained closing conditions, representations, warranties, events of default and indemnification provisions that were generally customary for a repo facility. This facility terminated in connection with the transactions consummated under the Barclays DIP Financing Agreement.

The Examiner determined, and I concur, that each of these Financing Affiliate Transactions were entered into at arm's length and on balance were at least as favorable to ResCap than would have been obtained in the third-party financings of comparable size and nature. The Examiner does not discuss any potential causes of action in this section of his Examiner's Report. However, he does note that certain of the Financing Affiliate Transactions are implicated in potential fraudulent transfer Estate Causes of Action, for example, but not by way of limitation, the Minnesota Insider Preference claims, however, the settlement value of those potential Estate Causes of Action are addressed elsewhere in this Opinion.

## F.    VALUE OF SETTLED ESTATE CAUSES OF ACTION

| Claims | Potential Damages (in millions) | Reasonable Settlement Amount (in millions) | Percentage of Potential Damages |
|---|---|---|---|
| **ESTATE CAUSES OF ACTION** | | | |
| Breach of Contract for Misallocation of Net Revenues on Loans brokered by GMAC | $520.5 | **$268.2** | **51.5%** |
| Breach of Contract for Failure To Pay Value of Purchased MSRs | $1,725.0 | **$387.2** | **22.4%** |
| Breach of Representations and Warranties under 2001 and 2006 MMLPSAs | No Amount Given | | |
| Breach of Contract Claims relating to Pipeline Swap | No Amount Given | | |
| Breach of 2005 Operating Agreement or 2006 Amended Operating Agreement in connection with MMLPSA, Pipeline Swap or MSR Swap | No Amount Given | | |

70

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|
| Preferential Transfer relating to DOJ/AG Consent Order | $109.6 | **$60.0** | **54.7%** |
| Preferential Transfer relating to 2012 Letter Agreement and A&R Servicing Agreement | $48.4 | **$32.0** | **66.1%** |
| Unauthorized Post-petition Transfer relating to  Indemnification Obligations under A&R Servicing Agreement | $12.9 | | |
| Breach of contract regarding the First 2009 Tax Allocation Agreement | $1,770.0 | **$713.7** | **40.3%** |
| Constructive Fraudulent Transfer relating to 2nd 2009 Tax Allocation Agreement | $50.0 | | |
| Contract Claim re 2005 Tax Allocation Agreement | $15.1 | | |
| Minnesota Insider Preference Claims | $566.0 | **$328.9** | **58.1%** |
| Fraud related to 2006 Bank Restructuring | $569.0 | **$130.0** | **22.8%** |
| Tortious Interference with Contract relating to 2006 Bank Restructuring | No Amount Given | | |
| Fraudulent Transfer in connection with Ally Bank Transactions | No Amount Given | | |
| Miscellaneous Breach of Fiduciary Duty Claims against ResCap's D&Os | No Amount Given | | |
| Aiding and Abetting Breach of Fiduciary Duty against AFI (other than re 2006 Restructuring) | No Amount Given | | |
| Single Entity theories of liability regarding AFI and ResCap and/or affiliates, including Piercing Corp Veil and Substantive Consolidation | No Amount Given | | |

71

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|
| Debt Re-characterization | No Amount Given | | |
| Equitable Subordination and Disallowance | No Amount Given | | |
| Constructive Trust | No Amount Given | | |
| Constructive Fraudulent Transfer Against Cerberus relating to 2008 Model Home Sale | $30.0 | | |
| Fraudulent Transfer relating to Prepetition Asset Sales (other than 2008 Model Home Sale) | No Amount Given | | |
| Financing Affiliate Transactions | | | |
| **TOTAL** | | **$1,920.0** | |

## G.   OPINION REGARDING PROPOSED POST-PETITION TRANSACTIONS AND AGREEMENTS

This section of the Examiner's Report did not address any potential claims.

## H.   OPINION REGARDING SETTLEMENT VALUES OF POTENTIAL THIRD PARTY CLAIMS

In reaching an opinion concerning the likely settlement value of each claim, I have considered a number of factors, including the factors identified by the Supreme Court in *Protective Committee For Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*[31] applicable to settlement negotiations outside of bankruptcy. Parties will consider: (i) the probabilities of success should the claim be litigated, (ii) the complexity, expenses and duration of litigating the claims, (iii) the possible difficulties of collecting on a judgment and all other factors relevant to an assessment of the settlement as well as factors relevant in determining the motivations of the particular parties to the litigation regarding settlement posture.

---

[31] 390 U.S. 414, 424-25 (1968).

## 1.      Third Party Claims Against AFI

### a.      *RMBS Claims*[32]

**Examiner's Report References:**

Section I.H pages I-36 to I-39

Section VIII.C pages VIII-27 to VIII-109

Section VIII.D pages VIII-201 to VIII-202

Appendix VIII.D.1 page 1

**Description:**

The third-party liability claims ("RMBS Claims") against AFI, whether by investors or financial guaranty insurers (collectively, "Third-Party Claimants"), arising out of the issuance of residential mortgage-backed securities ("RMBS") by ResCap.

**Background:**

The RMBS Claims, estimated in the tens of billions of dollars, are the largest potential liability against AFI as the parent of ResCap.  Between approximately 2004 and 2007, ResCap issued 392 private label RMBS securitizations with an original deal balance of $221 billion.  (Ally Securities was an underwriter on 105 of those securitizations; Ally Bank acted as loan custodian on approximately 34 of them.)  A total of 38 separate suits have been brought by investors such as public pension funds, insurance companies, and others in federal and state courts throughout the country naming AFI as a defendant.  Primarily, those suits allege false or misleading statements or omissions of material fact by ResCap in connection with the issuance of the RMBS securitizations in violation of the Securities Act of 1933, the Securities Exchange Act of 1934, various state securities acts and common law.  The monoline insurers also have overlapping contract claims for breach of representations and warranties.  The Examiner did not consider claims by the RMBS Trusts asserting breach of contract for failure to repurchase defective loans because the Debtors proposed to treat those claims in a separate settlement.

The Third-Party Claimants seek to impose liability on AFI under one or more of the following theories: (i) piercing of the corporate veil or alter ego; (ii) "control person" liability for ResCap's primary violation of federal or state securities laws; and (iii) common-law aiding and abetting fraud by ResCap.  Total damages reported by Third-Party Claimants to the Examiner for the RMBS Claims are approximately $6.3 billion, although the number is likely much higher in light of the fact that, as of March/April 2012, the outstanding principal balance of the RMBS issued by

---

[32] The Examiner's Report discusses non-RMBS claims related to mortgage origination, servicing, foreclosure, insurance and other consumer type claims.  He concludes that most would not survive a motion to dismiss.  Accordingly, no settlement value has been ascribed to the non-RMBS third party claims against AFI.

ResCap was $62.4 billion, with estimated lifetime losses of $43.8 billion. The RMBS Claims are at various stages of the litigation process, with most at or just beyond the motion-to-dismiss stage and none having reached trial.

**Examiner's Analysis and Conclusions:**

1.      It is unlikely that any pending or potential claims seeking to hold AFI liable for RMBS Claims asserted against ResCap under a veil-piercing or alter ego theory will prevail.

2.      Even if the requisites for veil-piercing against AFI could be established, the Third-Party Claimants may lack standing because the veil-piercing claim belongs to the bankruptcy estate under applicable Delaware law.

3.      While a close question, it is more likely than not that the Third-Party Claimants will not be able to establish "control person" liability against AFI under various federal and state securities laws for primary violations of those laws by ResCap.

4.      Even if the requisites for "control person" liability against AFI could be established, certain of those claims could be time-barred by applicable statutes of limitations or repose.

5.      It is unlikely that the Third-Party Claimants will be able to establish liability against AFI under common law claims of aiding and abetting fraud by ResCap in connection with the issuance of RMBS.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions. With respect to AFI's potential control person liability, the inquiry in each case asserting such claims is fact-intensive. Therefore, it is not possible at this point to conclude definitively whether control person liability will be found in any particular case.

**Settlement Considerations:**

The RMBS Claims are being pursued primarily by large institutional investors – insurance companies and pension funds – as well as monoline financial guaranty insurers. As such, they have the motivation and the means to prosecute full-scale, no-holds-barred litigation against AFI that could take many years and hundreds of millions of dollars to reach conclusion. Considering the size of the claims, the time and expense to conduct this complex litigation, the inherent risk warrants a discount of 50%.

The Examiner concludes, and I agree, that under applicable Delaware law efforts to impose liability on AFI on a veil-piercing or alter ego theory are unlikely to succeed. Delaware law is highly protective of the corporate form, which can be pierced only by a showing that ResCap and AFI operated as a single economic entity *and* by the presence of an overall element of injustice or unfairness. Delaware law requires consideration of multiple factors in determining whether to pierce

74

a corporate veil: "(1) undercapitalization, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of the debtor corporation at the time, (5) siphoning off of the corporation's funds by the dominant parent, (6) absence of corporate records, and (7) the fact that the corporation is a mere façade for the operations of the dominant parent." The Examiner's extensive consideration of the evidence strongly militates against piercing the corporate veil here. This warrants a 70% discount in the value of the claims.

Furthermore, even if ResCap and AFI could be deemed to be a single economic entity, Third-Party Claimants would still need to show "injustice or unfairness" in the use of the corporate form. While the Examiner concludes that ResCap was left with unreasonably small capital and became balance sheet insolvent in 2007, this was due to sizeable operating losses beginning in the last quarter of 2006, not misconduct by AFI such as initial undercapitalization or siphoning of funds. In short, the Third-Party Claimants are unlikely to be able to show that AFI used ResCap as part of a corporate "shell game."

The value of the veil-piercing theory is lessened more by the likelihood that, even assuming veil-piercing is warranted, the Third-Party Claimants lack standing to assert it. I agree with the Examiner that, under Delaware law, a veil-piercing claim generally belongs to the estate of the debtor, and not to creditors, at least where the harm suffered is "generalized" to all creditors. However, as discussed above, I anticipate that the standing issue can be finessed by the Third-Party Claimants cooperating with an estate fiduciary to pursue the veil-piercing theory. Nevertheless, in light of the discount already applied to the veil-piercing theory, I do not make any additional discount for the plaintiffs' standing issue since I anticipate an easy resolution.

With respect to "control person" liability, the Examiner concludes that while it is a close question, it is more likely than not that the Third-Party Claimants will not be able to establish "control person" liability against AFI for the primary violations of ResCap in connection with the RMBS securitizations. "Control person" liability can arise under Section 15 of the Securities Act, Section 20 of the Securities Exchange Act or their state analogues and impose liability for material misstatements, omissions or fraud committed by a primary violator. After extensively analyzing the available evidence, the Examiner concludes that the Third-Party Claimants are unlikely to be able to establish that AFI exercised the requisite control over ResCap *with respect to the RMBS securitizations* during the relevant 2004-2007 period. While I agree with the Examiner's analysis, "control person" issues are particularly fact-intensive, discovery in the various cases is incomplete, and different fact-finders are likely to weigh competing evidence differently. Accordingly, although these claims are more likely than not to fail, I discount the settlement value of the claims by only 60%.

Likewise, there appear to be strong arguments, especially in RMBS claims brought by investors, that some of their claims are barred by applicable statutes of limitations or repose. These also are fact-intensive questions, however, and not subject to definitive analysis at this point. The closeness of these questions leads us to discount the value of the RMBS Claims by 60% based on the statute of limitations.

The Examiner also concludes that the Third-Party Claimants are unlikely to prevail against AFI on the RMBS Claims on the common-law theory that AFI aided and abetted fraud by ResCap.

Such claims have been asserted in 14 of the 38 cases, 10 in RMBS Insurer Actions, four in RMBS Investor Actions. These claims are subject to higher burdens of proof and the heightened pleading requirements of Fed. R. Civ. P. 9. They require a showing of (1) the existence of fraud by ResCap, (2) actual knowledge of the fraud by AFI, and (3) AFI's substantial assistance in the commission of that fraud. While the existence of actual fraud by ResCap was beyond the Examiner's scope of investigation, the Examiner was presented with no evidence of AFI's actual knowledge of fraudulent conduct by ResCap. Nor was there any evidence that AFI provided substantial assistance to ResCap in committing the fraud as opposed to providing capital support and general corporate functions and services, which cannot be deemed to be the proximate cause of ResCap's fraud. Therefore, I do not attribute any settlement value to this theory.

While it was not possible for the Examiner to establish with precision the value of the RMBS Claims, at least $6.3 billion in alleged damages has been asserted by Third-Party Claimants. The Examiner states that as of March/April 2012, the outstanding principal balance of RMBS was $62.4 billion and the estimated lifetime losses were $43.8 billion.[33] This data appears in the Declaration of Frank Sillman in support of the Debtors' motion to approve the RMBS Trust Settlement Agreements. Mr. Sillman also calculated the Debtors' potential repurchase requirements to RMBS Trusts for defective mortgages at $6.7 billion to $10.3 billion. Of course, he assumed that the Trusts could prove that the Debtors breached the representations and warranties in the governing agreements. Also, he was focused on the Debtors' potential exposure, not the parent company AFI which was not a party to the governing agreements.

In the Appendix, the Examiner lists the RMBS Claims Damages to the extent he could obtain information. I note that of the eighteen Parties/Actions listed, only three asserted damages greater than $1 billion: (i) AIG, Allstate, Mass Mutual and Prudential - $1.5 billion, (ii) FGIC - $1.85 billion, and (iii) MBIA Insurance Company - $2 billion. Nine of the other listed Parties/Actions with damage amounts shown are less than $100 million. Only three others are over $100 million with the highest of those being $293 million. Given the magnitude of the expected lifetime losses of $43.8 billion, and the magnitude of claims that could be asserted by investors, purchasers, and insurers, it is reasonable and conservative to estimate for settlement purposes that the total of the RMBS claims is in the range of $20 billion.

Since the Examiner Scope Approval Order directs him not to attempt to independently quantify the Third-Party RMBS damages, I have looked for publicly available information on settlements in similar or analogous cases.

Cornerstone Research publishes an annual review of Securities Class Action Settlements. Their data is focused on suits brought by securities purchasers alleging fraudulent inflation in the price of a corporation's common stock. I have reviewed the 2012 Review and Analysis.[34] The year

---

[33] "RMBS Claims" is defined by the Examiner as "claims against the Debtors and the AFI Defendants on account of residential mortgage-backed securities." Examiner's Report, VIII-2.

[34] Ellen M. Ryan & Laura E. Simmons, *Sec. Class Action Settlements, 2012 Review and Analysis* (Cornerstone Research, Inc., Boston, MA), 2013.

2012 saw an extraordinary number of settlements in excess of $100 million that Cornerstone Research classifies as "mega-settlements," a significant portion of which were related to the credit crisis. Many of the larger cases take three to five years to settle indicating that they commenced in 2007 to 2009 when the stock price of financial corporations was impacted by their ownership or issuance of RMBS during the financial crisis. Approximately one-third of settlements in 2012 were for issuers in the financial industry and they rank highest in median settlement value.

Cornerstone Research posits that "estimated damages" is the most important factor in determining settlement amounts. Mega-settlements traditionally settle for a smaller proportion of estimated damages. Settlements as a percentage of estimate damages typically decrease as estimated damages increase. Larger cases tend to settle for smaller proportions of losses. For cases with estimated damages in excess of $5 billion, the median settlement amount was 1.3% of the estimated damages. Institutional investors as lead plaintiffs, particularly public pension funds, tend to be associated with significantly higher settlement amounts according to Cornerstone Research. Also, the later the stage at which the litigation settles, the higher the settlement values. Cases that survive motions to dismiss or summary judgment motions tend to settle for higher amounts.

NERA Economic Consulting published *Recent Trends in Securities Class Action Litigation: 2012 Full-Year Review.*[35] Among the highlights is that financial institutions are no longer the focus of new filings, indicating that the wave of credit-crisis related litigation ended in 2012. The stage of the litigation, *i.e.* whether it has survived a motion to dismiss, summary judgment, or class certification, is important in settlement of securities class action litigation. Most cases are resolved before a class certification motion has been filed or decided. Investor losses are a powerful predictor of settlement size. There are only a handful of cases each year with investor losses greater than $10 billion. As of the end of 2012, only ten securities class action cases ever have settled for over $1 billion. Larger cases settle for a smaller percentage of investor losses. The median ratio of settlement to investor losses decreases as investor losses increase. The median settlement for cases with investor losses over $1 billion has been 0.7% of the investor losses. Where the lead plaintiff is an institutional investor, especially a public pension fund, settlements tend to be larger.

The D&O Diary[36] publishes a list titled *Subprime and Credit Crises-Related Lawsuits, Settlements, Dismissals and Denials.* Of the sixty settlements listed, only one exceeded $1 billion. That settlement was the Bank of America/Merrill Lynch Merger Case for $2.43 billion, which is an outlier. Five cases settled for between $500 million and $730 million: Citigroup Bondholders Action - $730 million, Wachovia Preferred Securities and Bond/Notes Litigation - $627 million, Countrywide Financial - $624 million; Citigroup - $590 million; and Countrywide Mortgage Backed Securities Action - $500 million. Both Citigroup cases and the Wachovia case were brought by purchasers of common stock or bonds issued by the defendant/parent corporation, not mortgage backed securities ("MBS"). Although the price of the stock or bonds were allegedly overstated by

---

[35] Dr. Renzo Comolli, *et al.*, *Recent Trends in Securities Class Action Litigation: 2012 Full-Year Review* (NERA Economic Consulting, New York, NY), Jan., 2013.

[36] Kevin M. LaCroix, *The D&O Diary Subprime and Credit Crisis-Related Lawsuits Settlements, Dismissals and Denials* (RT ProExec, Beachwood, OH) April, 2013.

the defendants' inaccurate statements regarding subprime and other mortgage products, the plaintiffs were not purchasers of MBS as are those pursuing ResCap and AFI.

In valuing ResCap as part of the solvency analysis, the Examiner's Financial Advisors identified Countrywide, Washington Mutual (WaMu) and Indybank as similar institutions to ResCap. Indybank is not listed as a party to a settlement in the D&O Diary, but Countrywide and WaMu are. The Countrywide Financial settlement for $624 million was a class action by purchasers of common stock and notes issued by Countrywide, not MBS. Although plaintiffs allege that Countrywide did not accurately disclose problems with its mortgage business and portfolio that lead to an overstatement of stock value, that litigation is not exactly similar to the Third-Party RMBS claims against AFI.

The Countrywide Mortgaged Back Securities Action in the U.S. District Court for the Central District of California (2:10-CV-00302) that settled for $500 million is analogous to the Third-Party RMBS claims against ResCap and AFI. The Countrywide MBS settlement involved 429 MBS with an original issue principal of $351 billion. The Examiner's Report states that ResCap issued 392 RMBS with an original deal balance of $221 billion. A settlement of ResCap's RMBS Claims on a proportional basis would be approximately $315 million.

The Washington Mutual Securities Multi-District Litigation settled for $208.5 million. Once again the plaintiffs were purchasers of securities issued by the parent company, Washington Mutual, Inc. (WMI) and not MBS. Because Washington Mutual Bank had been seized and sold by the FDIC, and the parent company, WMI, was in bankruptcy, the settlement fund consisted of contributions by the Directors and Officers insurance carriers ($105 million), the underwriters ($85 million) and the auditors ($18.5 million). This is not indicative of reasonable settlement value of the secondary liability of AFI for RMBS issued by ResCap.

I mediated an objection in the bankruptcy case of WMI to the claim of the MBS plaintiffs who sued WaMu's securities subsidiary that was not a debtor in bankruptcy. That securities subsidiary had been acquired by JPMorgan Chase but had limited resources of its own. That underlying action involving hundreds of millions of dollars in alleged damages, settled for $26 million.

Under these circumstances, even assuming that the gross value of the RMBS Claims is $20 billion, the unlikelihood of the Third-Party Claimants prevailing on two of their three major theories (veil-piercing/alter ego and aiding and abetting fraud), the questionable likelihood of prevailing on their third major theory ("control person" liability), the statute of limitations defenses, and the significant cost, time and uncertainty of pursuing 38 separate cases, militate in favor of a deeply discounted settlement value. Securities litigation is like a game of *Survivor*. If plaintiff can survive a motion to dismiss, class certification or summary judgment, it is likely to reach a settlement with the amount increasing at each stage. Some of the pending cases against AFI have survived motions to dismiss and thus are prime candidates for settlement. Moreover, similar claims against other RMBS issuers such as Countrywide (whose liability is primary, not secondary like AFI's) have settled recently in the range of 0.14% of the original deal balance. Analysis of settlements of securities class actions by Cornerstone Research and NERA Economic Consulting consistently find that settlements in securities class actions seeking in excess of $10 billion in damages average less

than 0.5% of claimed damages, and those are against the issuer, not a parent company.  If AFI had the time and inclination to litigate its contingent exposure to ResCap's RMBS Claims, it could end up with a total cost less than the $500 million paid by Countrywide.

On the other hand, AFI has some unique motivations that may influence its willingness to make a substantial payment to obtain the solid gold release it seeks in a confirmed plan of reorganization.  AFI professes a great desire to repay the American taxpayers for the assistance provided in the TARP program and elsewhere.  The looming specter of huge, unliquidated, contingent liabilities associated with ResCap preclude AFI from an initial public offering (IPO) or other alternatives to allow the U.S. government to monetize its stake in AFI and permit AFI to return to private ownership.  Considering the massive size of the claims, the not-inconsequential risk that plaintiffs will prevail at least on the issue of control person liability, the time and cost required to defend the 38 cases, and the prospect of additional actions being filed, the RMBS Claims are not devoid of substantial settlement value.  Taking into account the factors discussed above, especially the Countrywide settlement of larger, primary claims at $500 million, I ascribe a settlement value of no more than $480 million to the RMBS Claims, calculated as follows:

| | |
|---|---|
| Potential Damages: | $20,000 million |
| Reduced By: | |
| 50% inherent risk = | $10,000 million |
| 70% veil-piercing alter ego risk = | $3,000 million |
| 60% risk on control person theory = | $1,200 million |
| 60% statute of limitations risk = | $480 million |
| Total Settlement Value = | **$480 million** |

### b.    Fraudulent Transfer Claim

**Examiner's Report References:**

Section I.H.1.b page I-39

Section VIII.D.5 pages VIII-207 to VIII-215

**Description:**

Whether transfers of funds from Ally Securities to AFI can be recovered as fraudulent transfers.

**Background:**

On April 16, 2012, Ally Securities transferred $200 million to AFI.  On August 20, 2012 Ally Securities transferred $25.5 million to AFI.  Ally Securities characterized the two transfers to AFI as "distributions of excess capital"; thus, these transfers were payments of dividends to Ally's sole member.

**Examiner's Analysis and Conclusions:**

1.    The Examiner's Financial Advisers determined that Ally Securities' total capital following the transfers was $49.5 million and $16.3 million, respectively.  Since Ally Securities was then a defendant in ten RMBS-related lawsuits involving billions of dollars, the Examiner concluded that a reasonable quantification of these contingent liabilities would likely overwhelm Ally Securities' equity on the transfer dates and that Ally Securities was insolvent on the transfer dates.

2.    The transfers were not made for reasonably equivalent value.

3.    It is likely that the transfers could be avoided as constructively fraudulent transfers.

4.    While a close question, it is more likely than not that these transfers were actual fraudulent transfers.

5.    It unlikely that a court would determine that these transfers constituted unlawful dividends.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  The determinations of the amount of the contingent liability and of actual fraud are fact intensive.

**Settlement Considerations:**

Consideration of the avoidance of these transfers is only relevant to the evaluation of the reasonable settlement value of RMBS actions against Ally Securities, which are evaluated elsewhere in this report.  The Examiner notes that Ally Securities has an equity value that is dwarfed by the potential third party RMBS claims.  However, those third party creditors would seek to augment the funds available to Ally Securities by avoiding the transfers from Ally Securities to AFI discussed in this section. If any one of the three recovery theories discussed by the Examiner is successful, Ally Securities, or its representative, would be able to recover $225.5 million from AFI.  Although the actual fraud theory is fact intensive and the unlawful dividend theory is unlikely to prevail, the constructive fraudulent theory appears strong.

I would expect the plaintiff to open with a settlement demand of $191.7 million, approximately 85% of the amount in controversy.  AFI would likely initially offer to settle the litigation for $33.8 million, 15% of the amount in controversy.  Due to the strength of the law and

the facts, I would expect an ultimate settlement of approximately $157.9 million, 60% of the amount in controversy. This fraudulent transfer claim is only relevant to the potential liability of Ally Securities for third party claims which would be considered in all of the third party claims against AFI. Thus, this fraudulent transfer claim has no independent settlement value.

## 2.    Third Party Claims Against Ally Securities

**Examiner's Report References:**

Section I.H pages I-39 to I-41

Section VIII.C pages VIII-109 to VIII-129

Section VIII.D pages VIII-201 to VIII-203

**Description:**

Evaluation of the RMBS Claims against Ally Securities by Third-Party Claimants arising out of Ally Securities' role as an underwriter of RMBS issued by ResCap.

**Background:**

Between approximately 2004 and 2007, ResCap issued 392 RMBS securitizations with an original deal balance of $221 billion. Ally Securities acted as lead or co-lead underwriter on 105 of them with a principal balance of $57.2 billion, and also served as co-underwriter on an additional 131 of them. Suits by Third-Party Claimants against Ally Securities primarily allege claims for violations of Sections 11 and 12(a)(2) of the Securities Act of 1933 and analogous state statutes, fraud and fraudulent inducement, aiding and abetting fraud, and negligent misrepresentation. The RMBS Claims are at various stages of the litigation process, with most at or just beyond the motion-to-dismiss stage and none having reached trial.

**Examiner's Analysis and Conclusions:**

1.    Neither ResCap nor AFI challenges that the Third-Party Claimants have standing to bring their securities law claims against Ally Securities or that Ally Securities' participation in the securitizations suffices to give rise to potential liability.

2.    The claims of fraud and fraudulent inducement are similar to the securities claims because they are based on misrepresentations and omissions in the RMBS Offering Documents, but more difficult to prove because they require proof of Ally Securities' knowledge of the fraud and intent to defraud, along with justifiable reliance and damages causation.

3.    No evidence supports the assertions that Ally Securities knowingly made untrue or misleading material statements, but such claim requires further factual development.

4.    The claims of aiding and abetting fraud require proof of an underlying fraud, knowledge of the fraud by Ally Securities and substantial assistance to ResCap in perpetrating the

fraud.  If the Third-Party Claimants can show a fraud, they are likely to prevail against Ally Securities on a claim of aiding and abetting.

5.      A claim of negligent misrepresentation turns on the issue of whether a plaintiff can establish a special relationship between itself and Ally Securities, an inquiry beyond the scope of the Examiner's Investigation.   Nevertheless, in most transactions between sophisticated corporate parties, no duty of care is required.

6.      While Ally Securities participated as lead or co-lead underwriter on 105 RMBS deals with an original principal balance of $57.2 billion and acted as co-underwriter on 131 more securitizations, its limited net equity ($11.7 million as of December 31, 2012) may make it difficult for Third-Party Claimants to collect.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  The ultimate issue of whether the RMBS Offering Materials contained misstatements or omissions of material fact was beyond the scope of the Examiner's Investigation.  AFI likely received two avoidable fraudulent transfers totaling $225.5 million in 2012.  The reasonable settlement value of those claims should be added to Ally Securities' net equity in evaluating collectability.

**Settlement Considerations:**

Despite the overall enormity of the Third-Party RMBS Claims (billions of dollars), I believe that the settlement value of the claims against Ally Securities for its role as underwriter is ultimately affected more by its relative lack of resources to satisfy a judgment than the  actual merits of the claims themselves and, therefore, the settlement value is small.

Each of the RMBS Claims against Ally Securities requires a factually-intensive inquiry with respect to each deal in which it was involved as an underwriter to determine whether the RMBS Offering Documents contained untrue misstatements or omissions of material fact.

Claims for violations under Section 11 of the Securities Act do not require a plaintiff to allege or prove scienter, reliance or loss causation; a plaintiff need only show purchase of a registered security from the issuer or in the aftermarket following an offering, participation by the defendant in the offering sufficient to give rise to liability (almost always the case for an underwriter), and that the registration statement contained an untrue statement of material fact or omitted a material fact required to be stated therein or necessary to make the registration statement not misleading.

Section 12(a)(2) of the Securities Act requires a showing that the defendant is a "statutory seller," the sale was effectuated by prospectus or oral communication, and the prospectus or oral communication contained an untrue statement of material fact or omitted to state a material fact necessary to make the statements not misleading.

A plaintiff's burden of proof under section 11 and 12(a)(2) of the Securities Act is a preponderance of the evidence, while a defendant such as Ally Securities bears the burden of proving affirmative defenses such as due diligence (*e.g.*, after reasonable investigation, the defendant believed the statements in the registration statement were true and there was no omission to make the statements not misleading) or loss causation (*e.g.*, a plaintiff's losses are not attributable to the misrepresentations, but rather to a general market decline).

Of all of the Third-Party RMBS Claims against Ally Securities, the Examiner concludes that the securities law claims have some viability.

The essentially identical common-law claims of fraud and fraudulent inducement place a much higher burden on a plaintiff. They require a showing by clear and convincing evidence of (1) a misrepresentation or omission of material fact which was false and known by the defendant to be false, (2) made with an intention to induce reliance, (3) justifiable reliance thereon, and (4) damages caused by the misrepresentation. It is likely that Ally Securities will argue that the sophistication of the Third-Party Claimants will make it difficult for them to establish justifiable reliance. The lack of proof at this stage of Ally Securities' actual knowledge of the statements' falsity, combined with the difficulty in establishing justifiable reliance, causes us to discount the settlement value of these claims significantly.

Aiding and abetting fraud requires (1) existence of a fraud, (2) knowledge of the fraud by the defendant, and (3) substantial assistance to the one committing the fraud. Although only one Third-Party Claimant (MBIA) has asserted such a claim against Ally Securities so far, I agree with the Examiner that if the existence of a fraud by ResCap is proved, a claim of aiding and abetting is likely to prevail.

Claims of negligent misrepresentation, however, are likely not to succeed. The key element to a negligent misrepresentation claim is demonstrating a duty of care owed by the defendant to the plaintiff. Most courts that have considered the question have found that sophisticated parties engaged in RMBS transactions do not owe one another a duty of care and have dismissed negligent misrepresentation claims at the pleadings stage. I do not attribute any settlement value to such claims.

Ordinarily, the sheer size of the Third-Party RMBS Claims, and the relative ease of prevailing at least on a securities law claim if an untrue statement or omission of material fact is established, would be cause for attributing a high settlement value to the Third-Party RMBS Claims against Ally Securities. That would be offset by ordinary litigation uncertainty and costs, although in this instance, Ally Securities' small equity ($11.7 million as of December 31, 2012), not to mention the probability that most if not all of that could be consumed by defense costs, dictates a very low settlement value. Ally Securities equity could be augmented by avoiding transfers to AFI in the amount of $225.5 million made in 2012, the reasonable settlement value of which I have estimated at $157.9 million.

The claims have a face value of $1 billion, which is reduced by 50% for inherent risk, and 20% for the difficulty of prevailing on the securities claims, for a merits value of $400 million.

I anticipate that settlement discussions would quickly switch focus away from the merits of the claim to collectability. If the maximum fund available is Ally Security's net equity of $11.7 million plus $157.9 million, the reasonable settlement value of the fraudulent transfer claim against AFI, the reasonable settlement value at 10% of the funds available, approximately $16 million, is appropriate in light of the dubious merits and risk of litigation.

Because the settlement value of these claims is less than $21 million, it is not material in light of the magnitude of the $2.1 billion settlement fund, and because I believe these claims are duplicative of claims made against ResCap and AFI, I ascribe no value to Third Party Claims against Ally Securities for purpose of allocating the settlement fund.

### 3.    Third Party Claims Against Ally Bank

**Examiner's Report References:**

Section I.H pages I-41 to I-42

Section VIII.C pages VIII-129 to VIII-150

Section VIII.D pages VIII-201 to VIII-203

**Description:**

Evaluation of the RMBS Claims against Ally Bank by Third-Party Claimants arising out of Ally Bank's role as a loan originator and custodian of mortgage loan notes in connection with RMBS issued by ResCap.

**Background:**

Between approximately 2004 and 2007, ResCap issued 392 RMBS securitizations with an original deal balance of $221 billion. Ally Bank and its predecessor, Old GMAC Bank, acted as loan custodian for approximately 34 of those deals representing a principal balance of a $21.7 billion. Ally Bank was original loan custodian on six of the deals; Old GMAC was original custodian on 28. Ally Bank also acted as a loan originator in some 124 instances, in the approximate amount of $16 billion. As a custodian, Ally Bank entered into contracts to hold and review the mortgage notes underlying the securitizations and to give various notices to the loan servicer, trustee and monoline insurer. The principal direct claims asserted against Ally Bank are (1) breach of contract for failing to provide proper notice or certifications under the custodial agreements and (2) aiding and abetting fraud by ResCap.

**Examiner's Analysis and Conclusions:**

1.    There is no evidence that Ally Bank breached its obligations under the custodial agreements to gather, review and certify mortgage notes, although the Examiner did not audit individual mortgage notes. There is also no evidence that Ally Bank breached obligations to the

trustees and monoline insurers to alert them to breaches of representations and warranties related to the securitizations.

2.      The Examiner reaches no conclusion with respect to the existence of an underlying fraud by ResCap, but notes that the Third-Party Claimants proffered no evidence of Ally Bank's actual knowledge of the alleged fraud.  The Examiner also notes, however, that discovery has been limited and that evidence exists showing Ally Bank was "intricately involved" in the operations of ResCap.  Likewise, if ResCap engaged in fraud, there is evidence that Ally Bank's financing activities constituted "substantial assistance" to that fraud.

3.      Under applicable Utah law, it is unlikely that Ally Bank will be found to be a successor in liability of Old GMAC Bank and, therefore, the RMBS Claims against it would be limited to securitizations containing loans sold by Ally Bank after the 2006 Bank Restructuring.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

Under Pennsylvania law, which governs the custodial agreements, a claim for breach of contract requires three elements:  (1) existence of a contract; (2) breach of its terms; and (3) damages.  Although the mortgage notes themselves were not audited by the Examiner, there is no evidence that Ally Bank breached its contractual obligations to obtain, review and certify the mortgage notes underlying the securitizations.  While the Third-Party Claimants allege that Ally Bank also breached its obligation to notify them of breaches of representations and warranties in the loan purchase agreements, Ally Bank was not required to look for breaches, only report them if it learned of them.  There is no evidence that Ally Bank had actual knowledge of any breaches of representations and warranties by ResCap.  Accordingly, I ascribe no settlement value to this claim.

With respect to the aiding and abetting claims, controlling New York law requires (1) the existence of an underlying fraud, (2) actual knowledge of the fraud, and (3) substantial assistance in committing the fraud.  Even assuming a fraud by ResCap (which the Examiner does not), the Third-Party Claimants have not identified any evidence showing actual knowledge of the fraud by Ally Bank, although discovery has been limited and Ally Bank and ResCap were closely connected, with overlapping leadership and working cooperation between personnel.  There is evidence that Ally Bank's financing activities provided "substantial assistance" to ResCap since Ally Bank was created to serve as a funding conduit for ResCap's securitization activity by providing loan originations.  Given the lack of evidence of actual knowledge of the underlying fraud, albeit with limited discovery, this claim has minimal settlement value.

Moreover, it is unlikely that Ally Bank will be deemed to be a successor to the liability of Old GMAC Bank, so even if Ally Bank it is found liable, that liability would be limited to securitizations containing loans sold by Ally Bank after the 2006 Bank Restructuring, further reducing the already tenuous settlement value of the claims.

Under these circumstances, I conclude that these claims are not material and have only nominal settlement value.

### 4.    Unsecured Noteholder Causes Of Action

#### a.    Tortious Interference Under 2005 Indenture

**Examiner's Report References:**

Section I.H.4.a pages I-42 to I-43

Section VIII.C.5.a pages VIII-163 to VIII-190

**Description:**

Whether AFI tortiously interfered with the 2005 Indenture by causing ResCap to transfer all or substantially all of its assets in violation of the 2005 Indenture.

**Background:**

In the 2005 Indenture, ResCap covenanted not to transfer "all or substantially all" of its assets, with certain exceptions. The Unsecured Noteholders allege that AFI induced ResCap to breach this covenant by entering into a series of transactions in furtherance of a pre-arranged plan which resulted in the transfer of substantially all of ResCap's assets. Those transactions include ResCap's forgiveness of indirect and direct debts owed by certain subsidiaries, including GMAC Mortgage and RFC, and the 2009 Bank Transaction. Although none of the transactions would trigger the covenant when considered individually, the Unsecured Noteholders contend that the transactions should be aggregated for purposes of determining whether ResCap transferred substantially all of its assets.

**Examiner's Analysis and Conclusions:**

1.    The Unsecured Noteholders would likely have standing to pursue this claim.

2.    Although it is a close question, it is more likely than not that the transactions would not be aggregated.

3.    Even if the transactions were aggregated, although it is a close question, a court would more likely find that the transactions did not result in a breach of the covenant.

4.    Even if a court found a breach of the covenant, it is unlikely that a claim for tortious interference would prevail because the Examiner did not uncover any evidence that AFI intended to cause a breach and because AFI has an economic justification defense, as it acted to protect its own interests.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

This claim would be pursued by the Unsecured Noteholders at their own expense. Given the high hurdles found by the Examiner, the Unsecured Noteholders would likely be motivated to reach an early resolution of disputes in order to expedite distributions. All of the procedural hurdles that attend bankruptcy litigation would be present in this case including (i) the constitutional authority of a bankruptcy court to render a final judgment in a state law action, (ii) withdrawal of the reference, and (iii) demand for a jury trial. In addition, all litigation carries risk, uncertainty, and expense. As a result, it is highly likely that any settlement would reflect a substantial discount (30%) from the face value of the claim.

Before reaching the merits of their claim, the Unsecured Noteholders would first need standing to bring this claim. Although the Examiner concluded that the Unsecured Noteholders would have standing, he recognized standing as a serious threshold issue, which could be resolved against the Unsecured Noteholders, thereby creating additional risk and reducing the settlement value of the claim by 10%.

Once the merits are reached, the Examiner identified three hurdles that the Unsecured Noteholders would have to overcome to establish a claim of tortious interference: (1) whether to aggregate the challenged transactions; (2) whether the transactions, if aggregated, resulted in a transfer of substantially all of the assets in breach of the covenant; and (3) whether, if a breach were found, AFI intentionally procured the breach. The Unsecured Noteholders would have to win each of these issues to prevail on this claim.

First, under the leading *Sharon Steel*[37] case, whether to aggregate the challenged transactions is a fact-intensive inquiry dependent on whether the challenged liquidation was piecemeal or part of a preconceived plan. The Examiner found substantial facts indicating that the challenged transactions were not part of a preconceived plan. Accordingly, the Examiner concluded that it was more likely than not that the transactions would not be aggregated. The Examiner also concluded that the court would not apply the step-transaction doctrine advocated by the Unsecured Noteholders. AFI would no doubt litigate these issues thoroughly, raising the arguments and facts identified by the Examiner. Accordingly, the more-likely-than-not risk of not prevailing on this issue lowers the settlement value of the claim by 60%.

Second, even if the transactions were aggregated, the Unsecured Noteholders would have to show that the aggregated transactions resulted in the transfer of substantially all of ResCap's assets, resulting in a breach of the covenant. On a quantitative basis, the Examiner found that the transfers

---

[37] *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982).

were approximately 50% of the book value of the operating assets and the total assets, which is most likely not sufficient to constitute a transfer of substantially all of ResCap's assets. On the other hand, on a fair market value basis, the transfers amounted to 34% of the total assets, but 100% of the operating assets. Because the quantitative analysis was unclear, the Examiner also conducted a qualitative analysis, and concluded it did not support the Unsecured Noteholders' claim. Therefore, while it is a close question, the Examiner concluded that it is more likely than not that the Unsecured Noteholders would not be able to establish this element. Again, AFI would litigate these issues thoroughly, using the points made by the Examiner. As a result, the substantial risk of not prevailing on this issue lowers the settlement value of the claim by another 60%.

Third, even if the aggregated transactions breached the covenant, the Unsecured Noteholders would have to show that AFI intentionally procured the breach without justification. However, the Examiner's Investigation did not uncover any evidence that AFI intended to cause such a breach. Moreover, the evidence reviewed by the Examiner showed that AFI's alleged interference was to protect its own economic interest in ResCap. As the Examiner notes, absent evidence of malice, fraud, or illegality, acting to protect an economic interest is a complete defense to the tortious interference claim. The Examiner found no evidence of malice, fraud, or illegality. The minimal likelihood that the Unsecured Noteholders would prevail on these issues reduces the settlement value of the claim by an additional 90%.

Because the likelihood of success is so low, any settlement offer from AFI would likely be a nuisance or cost of litigation settlement and therefore, not material.

### b.    *Claims Related To The 2006 Bank Restructuring*

**Examiner's Report References:**

Section I.H.4.b page I-43

Section VIII.C.5.b pages VIII-190 to VIII-201

**Description:**

Whether the Unsecured Noteholders have viable claims against AFI arising out of the 2006 Bank Restructuring.

**Background:**

The 2006 Bank Restructuring and potential estate claims against AFI are discussed in detail at Section E.5. The Examiner observed that the Unsecured Noteholders, as third-party beneficiaries, could have claims for breach of the 2005 Operating Agreement by AFI. The Examiner also considered whether misrepresentations or omissions by AFI to ResCap and its directors could give rise to fraud claims by the Unsecured Noteholders on the ground that the Unsecured Noteholders were harmed by ResCap's detrimental reliance. However, there is no claim here that misrepresentations or omissions were made directly to the Unsecured Noteholders, or that they relied on any such misrepresentations or omissions.

**Examiner's Analysis and Conclusions:**

1.     The Unsecured Noteholders would have standing to assert these claims.

2.     A breach of contract claim would likely be barred by the statute of limitations.

3.     While a close question, it is more likely than not that a fraud claim against AFI would not be barred by the statute of limitations.

4.     A fraud claim by the Unsecured Noteholders against AFI related to the 2006 Bank Restructuring would not prevail under Minnesota law because Minnesota law does not recognize claims based on reliance by third parties.

5.     Although it is a close question, it is more likely than not that a fraud claim by the Unsecured Noteholders against AFI related to the 2006 Bank Restructuring would not succeed under New York law because it is not clear if New York would recognize a claim based on third-party reliance and it is not clear that the Unsecured Noteholders could make out such a claim.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I largely agree with the Examiner's analysis and conclusions, subject to two qualifications.

First, the Examiner concluded that the Unsecured Noteholders would have standing for two reasons: (1) they suffered a particularized injury under the 2005 Operating Agreement; (2) because *Wagoner* and the *in pari delicto* defense would bar the estate from bringing these claims (see Section E.5), the Unsecured Noteholders would have standing. I find only the second of these persuasive as to the fraud claim, which is the only possibly viable claim.

The case law cited by the Examiner makes clear that for a creditor to have standing to bring a claim against third parties outside of the bankruptcy proceeding, it must be suing for separate and distinct injuries it suffered directly, not for injuries to the debtor or the estate that harmed all creditors.[38] Where, however, the injury alleged is not particularized to the plaintiff, but rather is a generalized injury to the debtor that affects all creditors, then the creditor does not have standing.[39] The Examiner stated that a court would more likely than not find that the Unsecured Noteholders could allege a particularized injury here because of the Unsecured Noteholders' rights under the 2005 Operating Agreement, *i.e.*, because they are third-party beneficiaries of that agreement.[40]

---

[38] *See Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1101 (2d Cir. 1988); *Fisher v. Apostolou*, 155 F.3d 876, 881 (7th Cir. 1998).

[39] *See St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.*, 884 F.2d 688, 701 & 705-06 (2d Cir. 1989); *Securities Investor Protection Corp. v. Bernanrd L. Madoff Investment Securities, LLC (In re Madoff)*, 429 B.R. 423, 431 (Bankr. S.D.N.Y. 2010).

[40] Examiner's Report, VIII-191, fn. 1034.

While that may create a particularized injury as to the breach of contract claim,[41] the Unsecured Noteholders' contract claims are barred by the statute of limitations and do not add value, as discussed below.

The key question, therefore, is whether there is any particularized injury with regard to the fraud claim which would confer standing on the Unsecured Noteholders. The alleged fraud claim is not based on an allegation that AFI made a misrepresentation or a material omission to the Unsecured Noteholders. Nor is there any allegation that the Unsecured Noteholders relied in any way on any such misrepresentation or omission. Rather, this fraud claim is based on reliance by ResCap. The injury allegedly resulting from ResCap's reliance is the loss in value to ResCap, because ResCap did not receive fair value in exchange for the 2006 Bank Restructuring, thereby reducing the fund from which ResCap's debts could be paid. Therefore, the injury is not a direct and particularized injury to the Unsecured Noteholders, but rather an injury to ResCap and a generalized injury to all the creditors, so that the Unsecured Noteholders would likely not have standing.[42]

I find the alternative ground for standing to bring a fraud claim more persuasive. As discussed in Section E.5, the Examiner found that, although it is a close question, it is more likely than not that the estate could not bring a fraud claim because of the *Wagoner* rule and the *in pari delicto* defense. If those defenses applied, then the estate could not bring the claim, but the Unsecured Noteholders could.[43] Thus, the Unsecured Noteholders would have standing only to the extent that the estate were barred from bringing the claim.

Second, the Examiner did not expressly consider who would benefit from a recovery on these claims. As discussed above, the alleged fraud claim is not based on an allegation that AFI made a misrepresentation or a material omission to the Unsecured Noteholders, or that there was any reliance by the Unsecured Noteholders. Again, the harm was that ResCap did not receive fair value in the 2006 Bank Restructuring. This is an injury to all creditors, not a particularized injury to the Unsecured Noteholders. Moreover, the only reason I believe that the Unsecured Noteholders are likely to have standing to pursue this claim is because, although it is a close question, the estate is likely barred from bringing it under *Wagoner*. Therefore, if there were a recovery on the fraud claim, I believe that the recovery would inure to the benefit of the estate and all its creditors, not just the Unsecured Noteholders. As a result, the claims of the Unsecured Noteholders are duplicative of the estate's claims regarding the 2006 Bank Restructuring, which I consider at length in Section 5.E, above. Because these claims are duplicative of the estate's claims, and because the benefit would inure to the estate regardless of whether it is brought by the estate or the Unsecured Noteholders, I only analyze here whether the alternative claims of the Unsecured Noteholders would add any value to the estate's claims.

---

[41] Even as to the breach of contract claim, it is worth noting that the Unsecured Noteholders' remedies as third-party beneficiaries are limited to specific enforcement of the provisions of the 2005 Operating Agreement. Examiner's Report, III-21-22.

[42] *See St. Paul*, *supra*, 884 F.2d at 705-06 (holding that challenge to actions that allegedly reduced the fund from which debtor's debts would be paid was not a particularized harm allowing a claim to be brought outside of bankruptcy).

[43] *See In re The Bennett Funding Group, Inc.*, 336 F.3d 94, 102 (2d Cir. 2003).

**Settlement Considerations:**

As to the breach of contract claim, the Examiner concluded that the Unsecured Noteholders' breach of contract claims would be barred by the statutes of limitation. Because this would be a complete bar to the claim and easily established by AFI, the breach of contract claims by the Unsecured Noteholders do not add any settlement value to the estate's claims.

The third-party fraud claim faces a number of difficult hurdles. As a threshold matter, the Examiner considered whether such a claim was viable under both Minnesota law and New York law. The Examiner first concluded that it was not viable under Minnesota law because Minnesota does not recognize a fraud claim based on reliance by a third party. He also concluded that if the claim were brought in New York, the court would apply Minnesota law, which would bar the claim. Thus, if the fraud claim were brought in New York, it would fail and does not add any settlement value to the estate's claims.

The Examiner considered the possibility that New York law would apply if the Unsecured Noteholders could bring the fraud claim in Minnesota. For the reasons discussed above and in *St. Paul*,[44] I believe that it is unlikely that the court would allow the claim to be brought in Minnesota outside of the bankruptcy. This severely limits any settlement value to the claim. But even if the Unsecured Noteholders were allowed to bring this claim in Minnesota, the Examiner found that, although it is a close question, the fraud claim would more likely than not fail. The Examiner concluded that if the fraud claim were brought in Minnesota, New York law would apply. The Examiner found that it was unclear whether New York law would recognize a fraud claim based on reliance by a third party; the law supporting that theory had a "somewhat checkered" history and has been rejected by the Second Circuit. Moreover, even if the Unsecured Noteholders could get over that hurdle, they would still have to establish the remaining elements of a fraud claim. Together these factors render the third-party fraud claim of minimal settlement value, even if it were allowed to be brought outside the bankruptcy.

The Examiner also considered whether the statute of limitations would bar a fraud claim. Although the Examiner found it a close question, he concluded it was more likely than not that the statute of limitations would not bar the claim. Nonetheless, because this is a significant risk, and would completely bar the claim if AFI prevailed, it further detracts from the settlement value.

To gain a recovery on their third-party fraud claim, the Unsecured Noteholders would have to establish standing, obtain permission to bring the claim outside the bankruptcy, have New York law apply, have the court apply a questionable interpretation of New York law, establish the elements of a fraud claim, and defeat a statute of limitations argument. In light of these substantial hurdles, I do not believe that the third-party fraud claim by the Unsecured Noteholders adds materially to the settlement value of the estate's claims regarding the 2006 Bank Restructuring.

---

[44] 884 F.2d 688, 705-06 (2d Cir. 1989).

### 5.    Junior Secured Noteholder Causes Of Action

**Examiner's Report References:**

Section I.H.5 pages I-43 to I-44

Section V.E pages V-350 to V-383

**Description:**

Whether ResCap and AFI breached the Secured Revolver Loan Agreement, the Junior Secured Notes Indenture, the Senior Secured Notes Indenture, or the Intercreditor Agreement by either: (1) entering into the Line of Credit Facilities; or (2) releasing the liens on certain assets securing the Secured Revolver Facility, the Junior Secured Notes, and the Senior Secured Notes, and having such assets secure the Line of Credit Facilities.

**Background:**

Due to persistent liquidity shortages, ResCap entered into a series of financing transactions between 2007 and 2010. In particular, in late 2008, facing liquidity shortfalls, two ResCap affiliates (PATI and RAHI) entered into the Initial Line of Credit Facility, with AFI as lender in the amount of $430 million. ResCap guaranteed the Initial Line of Credit Facility on a full recourse basis. Although ResCap had attempted to find unaffiliated lenders for this transaction, it was unable to do so and AFI was the lender of last resort. In order to have collateral available to secure the Initial Line of Credit Facility, collateral had to be released from other credit facilities, *i.e.*, the Secured Revolver Facility, the Senior Secured Notes, and the Junior Secured Notes. In a typical case, this would have been an impediment to a new line of credit.

In June 2009, PATI and RAHI entered into a Second Line of Credit Facility with AFI for an additional $370 million on substantially similar terms to the Initial Line of Credit Facility. Goldin Associates rendered a fairness opinion in connection with the Second Line of Credit Facility, finding it fair to ResCap and its creditors (other than AFI). In late 2009, the amount available under the Line of Credit Facilities was increased, and Goldin Associates again issued a favorable fairness opinion. Finally, in late 2009, the Line of Credit Facilities were combined into one agreement and the Secured Revolver Loan Agreement was amended and restated. Under the Amended and Restated Line of Credit Facility, RFC and GMAC Mortgage replaced PATI and RAHI as the borrowers.

**Examiner's Analysis and Conclusions:**

The Examiner concluded that the evidence does not support the allegations made by the Ad Hoc Group of Junior Secured Noteholders that either: (1) entering into the Line of Credit Facilities; or (2) releasing the liens on certain assets securing the Secured Revolver Facility, the Junior Secured Notes, and the Senior Secured Notes, and having such assets secure the Line of Credit Facilities, violated the terms of the Secured Revolver Loan Agreement, the Junior Secured Notes Indenture, the Senior Secured Notes Indenture, or the Intercreditor Agreement.

**Review of Examiner's Analysis and Conclusion:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.

**Settlement Considerations:**

The Examiner found that the evidence does not support the allegations of breach of the Secured Revolver Loan Agreement, the Junior Secured Notes Indenture, the Senior Secured Notes Indenture, or the Intercreditor Agreement. Accordingly, this claim is not assigned any settlement value.

## I.    OPINION REGARDING CONSIDERATION FOR RELEASES AND CONCLUSION REGARDING ALLOCATION OF SETTLEMENT FUND

**Examiner's Report:**

Section I.I pages I-44

Section IX pages IX-1 to IX-28

**Description:**

In order to provide guidance to the parties, the Examiner reviewed the terminated AFI Settlement and Plan Sponsor Agreement to determine whether the Debtor Release and Third-Party Release would have been warranted based upon AFI's contributions.

A new settlement has been reached that is embodied in a Plan Support Agreement dated May 13, 2013 and provides for AFI to contribute $2.1 billion in exchange for a broad release in a confirmed plan of reorganization. I opine on the reasonable allocation of that fund among the causes of action that have material settlement value.

**Background:**

The terminated AFI Settlement and Plan Sponsor Agreement proposed to settle all Estate Causes of Action and Third Party Claims against the AFI Released Parties in exchange for a cash contribution from AFI to the Debtor of $750 million plus other non-cash contributions. No party in interest or creditor group, other than the RMBS Institutional Investors, supported the terminated AFI Settlement and Plan Support Agreement. Ultimately, the Debtor withdrew from the AFI Settlement and Plan Sponsor Agreement.

The Bankruptcy Court directed the parties to mediation before the Hon. James M. Peck, U.S. Bankruptcy Judge. When the Examiner was ready to release his report, the parties asked that it be delayed to afford them the opportunity to complete mediation. Following extensive marathon mediation sessions, on May 13, 2013 a Plan Support Agreement was reached among the Debtors, AFI, the Creditors Committee and certain Consenting Claimants. Under the Plan Support Agreement, AFI is to contribute $2.1 billion to the Debtors in exchange for a broad release of the

AFI Released Parties upon confirmation of a plan of reorganization.  On June 26, 2013, the Bankruptcy Court granted the Debtors' motion for approval to enter into the Plan Support Agreement.

**Examiner's Analysis and Conclusions:**

1.      A court would consider the *Iridium* factors in deciding whether to approve the terminated AFI Settlement and Plan Sponsor Agreement.

2.      Creditor support, a major consideration in the approval of settlements, was lacking.

3.      It is extremely difficult to confirm a plan with a third-party release absent consent of substantially all of the third party claimants.

4.      The evidence does not support ascribing significant value to AFI's non-cash contributions under the terminated AFI Settlement and Plan Sponsor Agreement.

5.      The cash contribution of $750 million and the non-cash contributions from AFI were inadequate to support a release of the Estate Causes of Action, let alone the Third Party Claims.

6.      It is unlikely that a court would have approved the terminated AFI Settlement and Plan Sponsor Agreement.

**Review of Examiner's Analysis and Conclusions:**

After reviewing the facts and legal conclusions set forth in the Examiner's Report, I agree with the Examiner's analysis and conclusions.  My opinion on the reasonable settlement value of each of the Estate Causes of Action, when added together, totals $1,920.0 million and is consistent with the Examiner's conclusion that $750 million was insufficient consideration to support releases of the Estate Causes of Action, let alone the Third Party Claims.

**Conclusion:**

In the following chart, I have compiled my assessment of the reasonable settlement value of each of the Estate Causes of Action and the Third Party Claims.  In my opinion, the reasonable settlement value of Estate Causes of Action is $1,920.0 million and the reasonable settlement value of the Third Party Claims is $480 million. Although under the absolute priority rule, I could have allocated the settlement first to secured claims such as the JSNs, and second to unsecured claims, instead I made allocations pro rata based on the reasonable value of each of the claims.  Because in determining the reasonable settlement amount of each claim I have taken into account the merits of the claim, the motivations of the parties to settle, the time and expenses associated with litigation and all of the other relevant factors relative to a reasonable settlement value, there is no reason to apply these factors again, and therefore, I have allocated the settlement fund of $2.1 billion among the reasonable settlement values for each claim on a *pro rata* basis.

The $2.1 billion settlement fund is smaller than my estimate of the reasonable settlement value of the claims done on a claim-by-claim basis, and it may be that in this instance the sum of the parts is greater than the whole.  Also, the magnitude of the settlement fund that AFI has agreed to contribute, *i.e.*, $2.1 billion, and the opportunity to resolve numerous claims at one time in the context of a bankruptcy, may warrant a discount. Overall I feel that my assessment of the reasonable settlement value of each individual claim, when combined and compared with the settlement fund of $2.1 billion, is appropriate.  I have allocated the settlement fund of $2.1 billion among the reasonable settlement values.

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*)[45] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| ***ESTATE CAUSES OF ACTION*** | | | | | |
| Breach of Contract for Misallocation of Net Revenues on Loans brokered by GMAC | $520.5 | **$268.2** | **51.5%** | **$234.6** | **45.1%** |
| Breach of Contract for Failure To Pay Value of Purchased MSRs | $1,725.0 | **$387.2** | **22.4%** | **$338.8** | **19.6%** |
| Breach of Representations and Warranties under 2001 and 2006 MMLPSAs | No Amount Given | | | | |
| Breach of Contract Claims relating to Pipeline Swap | No Amount Given | | | | |

---

[45] Zeros are omitted for any settlement value that does not meet my threshold for materiality ($21 million).

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*)[45] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| Breach of 2005 Operating Agreement or 2006 Amended Operating Agreement in connection with MMLPSA, Pipeline Swap or MSR Swap | No Amount Given | | | | |
| Preferential Transfer relating to DOJ/AG Consent Order | $109.6 | **$60.0** | **54.7%** | **$52.5** | **47.9%** |
| Preferential Transfer relating to 2012 Letter Agreement and A&R Servicing Agreement | $48.4 | **$32.0** | **66.1%** | **$28.0** | **57.9%** |
| Unauthorized Post-petition Transfer relating to Indemnification Obligations under A&R Servicing Agreement | $12.9 | | | | |
| Breach of contract regarding the First 2009 Tax Allocation Agreement | $1,770.0 | **$713.7** | **40.3%** | **$624.5** | **35.3%** |
| Constructive Fraudulent Transfer relating to 2nd 2009 Tax Allocation Agreement | $50.0 | | | | |
| Contract Claim re 2005 Tax Allocation Agreement | $15.1 | | | | |

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*)[45] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| Minnesota Insider Preference Claims | $566.0 | $328.9 | 58.1% | $287.8 | 50.8% |
| Fraud related to 2006 Bank Restructuring | $569.0 | $130.0 | 22.8% | $113.8 | 20.0% |
| Tortious Interference with Contract relating to 2006 Bank Restructuring | No Amount Given | | | | |
| Fraudulent Transfer in connection with Ally Bank Transactions | No Amount Given | | | | |
| Miscellaneous Breach of Fiduciary Duty Claims against ResCap's D&Os | No Amount Given | | | | |
| Aiding and Abetting Breach of Fiduciary Duty against AFI (other than re 2006 Restructuring) | No Amount Given | | | | |
| Single Entity theories of liability regarding AFI and ResCap and/or affiliates, including Piercing Corp Veil and Substantive Consolidation | No Amount Given | | | | |
| Debt Re-characterization | No Amount Given | | | | |
| Equitable Subordination and Disallowance | No Amount Given | | | | |

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*)[45] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| Constructive Trust | No Amount Given | | | | |
| Constructive Fraudulent Transfer Against Cerberus relating to 2008 Model Home Sale | $30.0 | | | | |
| Fraudulent Transfer relating to Prepetition Asset Sales (other than 2008 Model Home Sale) | No Amount Given | | | | |
| Financing Affiliate Transactions | | | | | |
| **TOTAL** | | **$1,920.0** | | **$1,680.0** | |
| ***THIRD PARTY CAUSES OF ACTION*** | | | | | |
| Third Party Claims against AFI | | | | | |
| a. RMBS Claims, including veil-piercing, control person liability and aiding and abetting fraud | $20,000.0 | **$480.0** | **2.4%** | **$420.0** | **2.1%** |

| Claims | Potential Damages (*in millions*) | Reasonable Settlement Amount (*in millions*)[45] | Percentage of Potential Damages | Allocation from $2.1 billion AFI Settlement Fund (*in millions*) | Percentage of Potential Damages |
|---|---|---|---|---|---|
| b. Fraudulent Transfer Claims for Payments of $200 M and 25.5 M | | | | | |
| Third Party Claims against Ally Securities, including Fed and State Securities law, common law fraud, aiding and abetting fraud, and negligent misrepresentation | | | | | |
| Third Party Claims against Ally Bank | | | | | |
| Unsecured Noteholder Causes of Action, including tortious interference under 2005 Indenture and claims relating to the 2006 Bank Restructuring | | | | | |
| Junior Noteholder Causes of Action | | | | | |
| ***Total  Third Party Claims*** | **$480.0** | | | **$420.0** | |
| ***GRAND TOTAL*** | **$2,400.0** | | | **$2,100.0** | |

After reviewing each of the causes of action identified in the Examiner's Report, in my opinion the reasonable settlement value of the Estate Causes of Action is $1,920.0 million and the reasonable settlement value of the Third Party Claims is $480 million for a total reasonable settlement value of all claims and causes of action of $2,400.0 million. In my opinion the settlement fund of $2.1 billion to be paid by AFI should be allocated to the reasonable settlement value of each claim *pro rata*.

October 18, 2013

Raymond T. Lyons

**EXHIBIT A**

**Documents Reviewed**

1.    *Report of Arthur J. Gonzales, as Examiner, released June 26, 2013*

2.    <u>*Documents*</u>[1]

    (a)      Implemented 2005 Tax Allocation Agreement
    (b)      Other 2005 Tax Allocation Agreement
    (c)      2006 Tax Allocation Agreement
    (d)      First 2009 Tax Allocation Agreement
    (e)      Second 2009 Tax Allocation Agreement
    (f)      2001 MMLPSA
    (g)      March 2008 Pipeline Swap Schedule
    (h)      July 2008 Pipeline Swap Schedule
    (i)      Amended and Restated Schedule to the 2002 ISDA Master Agreement dated April 1, 2011
    (j)      2006 MMPLSA
    (k)      2007 MMPLSA
    (l)      2005 Operating Agreement
    (m)      2008 MMPLSA
    (n)      2010 Net Funding Schedule
    (o)      April 2011 MSR Swap Confirmation
    (p)      MSR Swap
    (q)      2006 Amended Operating Agreement
    (r)      November 20, 2008 Broker Agreement
    (s)      First Priority Security Agreement
    (t)      Junior Notes Indenture
    (u)      Senior Secured Notes Indenture
    (v)      Intercreditor Agreement
    (w)      Initial Line of Credit Agreement
    (x)      Second Line of Credit Agreement
    (y)      A&R Line of Credit Agreement
    (z)      Ally Accounting Policy 3330 – Accounting for Income Taxes, effecrtive October 1, 2010
    (aa)    FMV Schedule
    (bb)    Secured Revolver Loan Agreement

---

[1]  Unless otherwise noted with an asterisk, the documents listed in this Exhibit are defined in the Appendix to the Examiner's Report.

3.      *Reports Regarding Securities Settlements*

     a.    ***The D&O Diary*** – Subprime and Credit Crisis-Related Lawsuits, Settlements, Dismissals and Denials – April 30, 2013 (Kevin LaCroix)

     b.    ***NERA Economic Consulting*** – Recent Trends in Securities Class Action Litigation: 2012 Full-Year Review – January 29, 2013 (Dr. Renzo Comoli, Sukaina Klein, Dr. Roald I. Miller and Svetlana Starykh)

     c.    ***Cornerstone Research (Economic and financial Consulting and Expert Testimony)*** – Securities Class Action Settlements - 2011 Review and Analysis

4.      *Related Mortgage Backed Securities Settlements*

     a.    ***In re Residential Capital, LLC, et al.*** (U.S. Bankruptcy Court, Southern District of New York, Case No. 12-12020 MG)

         (1)    Reply Declaration of Jeffrey A. Lipps (Docket No. 2805)

         (2)    Direct Testimony of Jeffrey A. Lipps (Docket No. 4433)

     b.    ***In re Citigroup Inc. Securities Litigation.*** (U.S. District Court, Southern District of New York, Case No. 07:cv-09901)

         (1)    Order Preliminarily Approving Proposed Settlement and Providing for Notice dated August 29, 2012 (Docket No. 156)

         (2)    Final Judgment and Order of Dismissal With Prejudice dated August 1, 2013 (Docket No. 276); *also see b(1) below*

     c.    ***In re Citigroup Inc. Securities Litigation.*** (U.S. District Court, Southern District of New York, Case No. 09 MD 2070)

         (1)    Opinion dated August 1, 2013 (Docket No. 275)

     d.    ***In re Citigroup Inc. Bond Litigation***. (U.S. District Court, Southern District of New York, Case No. 08-Civ. 9522)

         (1)    Final Opinion and Order dated August 20, 2013 (Docket No. 180)

     e.    ***Maine State Retirement System, et al. v. Countrywide Financial Corporation.*** (U.S. District Court, Central District of California, Case No. 10-cv-00302); ***David H. Luther, et al. v. Countrywide Financial Corporation.*** (U.S. District Court, Central District of California, Case No. 12-cv-05125); ***Western Conference of Teamsters Pension Trust Fund, et al. v. Countrywide Financial***

*Corporation, et al.* (U.S. District Court, Central District of California, Case No. 12-cv-05122)

    (1)    Order Granting Preliminary Approval to Settlement and Directing Dissemination of Notice to the Class

    (2)    Notice of Pendency and Proposed Settlement of Class Actions, Fairness Hearing and Motion for an Award of Attorneys' Fees and Litigation Expenses

f.    ***George Pappas, et al. and Countrywide Financial Corp., et al. v. The Bank of America 401(k) Plan for Legacy Companies as a Successor to the Countrywide Financial Corporation 401(k) Savings and Investment Plan.***  (United States Court of Appeals for the Ninth Circuit, Case No. 11-55570)

    (1)    Mandate dated June 20, 2013 (Docket No. 1104)

g.    ***Countrywide Financial Corporation Securities Litigation*** (U.S. District Court, Central District of California, Western Division Lead, Case No. CV 07-05295)

    (1)    Notice of Pendency and Proposed Settlement of Class Action and Fairness Hearing

h.    ***In re Washington Mutual Mortgage Backed Securities Litigation.*** (U.S. District Court, Western District of Washington, Case No. 09-cv-00037)

i.    ***In re Washington Mutual, Inc. Securities Litigation.*** (US District Court for the Western District of Washington at Seattle, Case No. 2:08-md-1919 MJP, Lead Case No. C08-387-MJP)

    (1)    Stipulation and Agreement of Settlement with Individual Officer and Director Defendants and with Washington Mutual, Inc. (Exhibit 1 to Docket No. 308)

    (2)    Stipulation and Agreement of Settlement with the Underwriter Defendants (Exhibit 2 to Docket No. 308)

    (3)    Stipulation and Agreement of Settlement with Defendant Deloitte & Touche LLP (Exhibit 3 to Docket No. 308)

    (4)    [Proposed] Order Preliminarily Approving Proposed Settlements and Providing for Notice (Exhibit 3 to Docket No. 308)

j.    ***United States of America, et al. v. Bank of America Corp., et al.*** (United States District Court for the District of Columbia, Case No. 12-0361)

    (1)    Consent Judgment

3

(2)     Earmark and Indemnification Agreement

k.   ***Ally Financial Inc., Residential Capital, LLC and GMAC Mortgage LLC***
(United States of America before the Board of Governors of the Federal Reserve
System, Washington, D.C., Docket No. 12-006 CMP-HC & 12-006 CMP DEO)

   (1)     Order of Assessment of a Civil Money Penalty Issued Upon Consent
Pursuant to the Federal Deposit Insurance Act, as Amended

   (2)     January 30, 2012 letter re: Terms of Support Relating to Possible
DOJ/State Attorneys' General Settlement

l.   ***Ally Financial Bank Inc., Ally Bank, Residential Capital, LLC and GMAC
Mortgage, LLC*** (United States of America before the Board of Governors of the
Federal Reserve System, Washington, D.C. and Federal Deposit Insurance
Corporation, Washington, D.C., Docket No. 11-020-B-HC and 11-020-B-DEO)

   (1)     Consent Order

4