MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Charles L. Kerr
Darryl P. Rains
J. Alexander Lawrence

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------
|  | ) |  |
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
------------------------------------------------------------------------

## <u>DIRECT TESTIMONY OF WILLIAM R. THOMPSON</u>

I, William R. Thompson, under penalty of perjury, testify as follows:

1.      I am the General Counsel for Residential Capital, LLC ("ResCap") and its

subsidiaries (collectively, the "Debtors").  I am familiar with claims asserted against the Debtors

by borrowers and with the treatment of borrower claims under the Plan.

## SUMMARY OF TESTIMONY

2.      Approximately 3,000 Borrowers whose mortgage loans were originated, owned

and/or serviced by one of the Debtors (the "Borrowers") filed proofs of claims (collectively, the

"Borrower Claims") against various Debtors.

3.      To address the Borrower Claims, the Plan[1] provides for:

(a) The Debtors' continued performance under two nationwide settlements with
the Federal Government—one with the Department of Justice and 49 state
attorneys general (the "DOJ/AG Settlement") and the other with the Board of
Governors of the Federal Reserve and the FDIC (the "FRB Consent Order")—
that have provided, directly and indirectly, more than $579 million to
Borrowers; and

(b) A trust to be established upon the Effective Date for the benefit of holders of
Allowed Borrower Claims (the "Borrower Claims Trust") to be funded with
$57.6 million in cash (net of cash settlements paid to Borrowers on their
claims in accordance with Bankruptcy Court orders).

4.      Under the Plan, the Liquidating Trust shall reserve $55 million to satisfy the

ongoing obligations under the DOJ/AG Settlement.  The Plan also provides that continuing

regulatory obligations under the FRB Consent Order will be transferred to the Liquidating Trust

on the Effective Date.  In addition, the Debtors agreed to a Bankruptcy Court approved

amendment of the FRB Consent Order pursuant to which GMACM paid approximately $230

million, which will ultimately be paid directly to Borrowers.

---

[1] See The Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of
Unsecured Creditors [Dkt. No. 4819-2], as may be amended from time to time (the "Plan"), a true and correct copy
of which is Exhibit PX-868.

5.      The Borrower Claims Trust is intended to streamline and expedite the process of making distributions to Borrowers by, among other things, allowing holders of Allowed Borrower Claims to receive distributions in cash, rather than Units, while providing those holders with a percentage recovery that is comparable to that expected to be received by holders of Allowed General Unsecured Claims at the same Debtor Group.

6.      In advance of filing the Plan Supplement,[2] the Plan Proponents undertook a process to review, analyze, and estimate the Borrower Claims filed against the Debtors' respective Estates to assess the need for a Borrower Trust True-Up.  Based on those analyses, the Plan Proponents believe that the $57.6 million funding of the Borrower Claims Trust under the Plan is more than sufficient to ensure that Borrowers with Allowed Borrower Claims will receive their target recoveries under the Plan and that no Borrower Trust True-Up would be necessary.

## EXPERIENCE AND BACKGROUND

7.      I am the General Counsel of the Debtors, and I have held that position since February 2013.  I have been employed by the company since April 2005, serving as Chief Litigation Counsel for GMAC Mortgage, LLC ("GMACM") and later for its parent, ResCap.  In those capacities, I had supervisory responsibility over all of the mortgage litigation portfolio, including core mortgage cases involving all origination and servicing issues, and personally handled or supervised all commercial, complex, and class action cases for the mortgage entities. I assumed the role of General Counsel for ResCap and its subsidiaries in February 2013.

8.      Prior to my employment by GMACM and ResCap, I served as Senior Vice President and Associate General Counsel in charge of litigation for American Business Financial

---

[2] See Notice Of Filing Of Exhibits 2 Through 21 Comprising the Plan Supplement to the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors, dated October 11, 2013 [Dkt. No. 5342] (the "Plan Supplement"), a true and correct copy of which is Exhibit PX-875.

Services ("ABFS"), a residential home mortgage lender, securitizer, and servicer.  At ABFS, I

personally oversaw all of ABFS' mortgage origination and servicing cases as well as its

commercial disputes, securities litigation, class actions, complex litigation, employment

litigation, and government investigations.  I also helped support its operations after it filed for

bankruptcy in or about December 2004.  Before working for ABFS, I was the Chair of the

Litigation Group for the City of Philadelphia Law Department.  I also served as Acting City

Solicitor for the City of Philadelphia.  Prior to joining the Philadelphia Law Department, I was a

partner at Klehr, Harrison, Harvey, Branzburg LLP in Philadelphia, Pennsylvania, and

maintained a sophisticated commercial litigation practice there for over twelve years.  I began

my career as an Assistant District Attorney in the Philadelphia District Attorney's Office.  All

told, I have over thirty-three years of litigation experience.

9.      My duties include, among other things, oversight of the Debtors' Claims

Management and Reconciliation ("CM&R") and Legal teams.  The CM&R team is responsible

for the review, analysis and reconciliation of the Proofs of Claim filed against the Debtors'

Estates.  The CM&R team is comprised of twenty-two associates with an average of sixteen

years in the mortgage industry and ten years at the ResCap companies (including time at Ally

Bank).  Collectively, the team has experience in all aspects of the mortgage business, with a

large concentration in mortgage operations, servicing, loss mitigation, default, origination,

quality control, risk management, regulatory compliance, secondary marketing, financial

reporting and repurchase management.  In the claims review and analysis process, the CM&R

team works closely with the Legal group, which assigned to the CM&R team, among others, two

attorneys and two legal assistants who were responsible for managing class action, mass action,

securities, commercial, contract, employment, and individual mortgage-related litigation for

GMACM, ResCap and related entities prior to the Petition Date, and who continued to perform those duties following the Petition Date.

## TREATMENT OF BORROWERS UNDER PLAN

10. In addition to the creation of the Borrower Claims Trust (described below) established under the Plan to fund recoveries to Borrowers on account of Allowed Borrower Claims (defined below), the Plan provides for the Debtors' continued performance under two nationwide settlements with the Federal Government that have provided, directly and indirectly, more than $579 million to Borrowers.

11. The first settlement, the DOJ/AG Settlement, was with 49 State attorneys' general and the Department of Justice regarding the Debtors' mortgage loan servicing and origination operations. Under the DOJ/AG Settlement, prior to the Petition Date, the Debtors paid approximately $109 million in settlement of civil claims of various federal and state governmental entities with respect to their mortgage origination and servicing operations, the proceeds of which were to be used, in part, for disbursement to eligible Borrowers who assert they were harmed by the Debtors' alleged deficiencies in its mortgage servicing operations.[3]  In addition, under the DOJ/AG Settlement, both before and after the Petition Date, the Debtors provided more than $185 million of financial relief—including, loan modifications, such as principal reductions, rate modifications and refinancing—to eligible Borrowers who were either delinquent or at imminent risk of default and owed more on their mortgages than their homes were estimated to be worth.  Moreover, under the Plan, the Debtors and the Liquidating Trust have committed to fund the costs incurred by Joseph A. Smith Jr., appointed to serve as the

---

[3]  Under the proposed Plan, the Plan Proponents are agreeing to waive the right to seek avoidance of the pre-petition payments made under the DOJ/AG Settlement pursuant to Sections 547 and 548 of the Bankruptcy Code.

Monitor to insure that Ocwen and Walter comply with certain servicing standards following the

Effective Date, as well as to fund the Debtors' obligations under the Servicemembers Civil

Relief Act, which provides certain protections for active duty service members with respect to

foreclosure actions and modifications to mortgage loan interest rates.  Under the Plan, the

Liquidating Trust shall reserve $55 million to satisfy these ongoing obligations.

12.     The second nationwide settlement for the benefit of Borrowers, the FRB Consent

Order, was entered into by the Debtors, Ally Financial, Inc. ("AFI"), the Board of Governors of

the Federal Reserve System and the FDIC.  During the pendency of the Chapter 11 Cases, the

Plan Proponents took the position that the Debtors' obligations under the FRB Consent Order

were pre-petition obligations and should not be awarded administrative priority.  In addition, the

Plan Proponents asserted that such obligations should be paid by the Debtors' solvent parent

company, AFI, who was also obligated under the Consent Order.  However, as part of the global

settlement contained in the Plan, the Plan Proponents agreed to cause the Debtors to perform

under the FRB Consent Order.  To that end, on June 26, 2013 the Debtors agreed to amend the

terms of the FRB Consent Order (the "FRB Consent Order Amendment"), pursuant to which

GMACM  paid approximately $230 million, which will then be paid directly to Borrowers in

accordance with the terms of the FRB Consent Order.[4]  In addition, the Plan provides that any

continuing regulatory obligations under the FRB Consent Order will be transferred to the

Liquidating Trust on the Effective Date.

---

[4] On June 26, 2013, the Bankruptcy Court entered an order [Dkt. No. 4091], a true and correct copy of which is
Exhibit PX-926, authorizing ResCap and GMACM to transfer $230 million into an escrow account as part of the
FRB Consent Order Amendment.   On July 12, 2013, the Debtors filed a motion seeking approval from the
Bankruptcy Court to enter into and perform under the FRB Consent Order Amendment.  On July 26, 2013, the
Bankruptcy Court granted the Debtors' motion [Dkt. No. 4365], a true and correct copy of which is Exhibit PX-860,
and the settlement amount was released into a qualified settlement fund in accordance with the terms of the FRB
Consent Order Amendment.

13.     In addition to enabling the Debtors and the Liquidating Trust to adhere to their obligations under the above-referenced settlements, the Plan establishes the Borrower Claims Trust for the benefit of Borrowers who filed Borrower Claims to the extent such claims are ultimately allowed either through settlement by the Borrower Claims Trustee or pursuant to an Order of the Bankruptcy Court.

14.     The Plan provides for the creation of a Borrower Claims Trust in recognition of the distinct nature of the Borrower Claims.  The decision to provide a Borrower Claims Trust was made by the Plan Proponents, in consultation with their advisors, and counsel for Ms. Rowena Drennen, the Borrower representative sitting on the Creditors' Committee.  The Borrower Claims Trust will be separate and distinct from the Liquidating Trust, such that Borrower Claims will not be included along with the other claims being resolved by the Liquidating Trust.  The Plan calls for holders of Allowed Borrower Claims to receive a percentage recovery comparable to the projected recoveries to be received by holders of Allowed General Unsecured Claims at their respective Debtor Groups.

15.     The purpose of the Borrower Claims Trust is to streamline and expedite the process of making distributions to Borrowers.  First, holders of Allowed Borrower Claims will receive distributions in cash, rather than Units.  This will prevent the Borrowers from having to receive distributions over time, unlike other General Unsecured Claim holders whose distributions will be paid as claims are resolved and assets are liquidated by the Liquidating Trust.  Second, the Borrower Claims Trust includes a feature that will authorize the Borrower Claims Trustee to pay an incremental $500 to those Borrowers agreeing to reduce their Borrower Claim to $8,500 or less, if against GMACM, and $28,000 or less, if against RFC, which may avoid the need for many Borrowers to incur the expense of counsel to resolve their claims.

16.     The Borrower Claims Trust will be funded by the Liquidating Trust with $57.6 million in cash (net of cash settlements paid to Borrowers on their claims in accordance with Bankruptcy Court orders), which will be allocated pro rata among holders of Allowed Borrower Claims in accordance with the Plan and the Borrower Claims Trust Agreement.[5]  The Debtors currently project that the $57.6 million will be reduced by approximately $1.3 on account of cash settlements paid or anticipated to be paid to Borrowers.  Under the Plan, upon the Effective Date, Borrower-Related Causes of Action will be transferred to the Borrower Claims Trust.  In addition, the Plan mandates that Borrowers who recover insurance proceeds contribute a portion of those recoveries to the Borrower Claims Trust.  Thus, there is the potential for the Borrower Claims Trust to realize additional cash that will be distributed to Borrowers with Allowed Borrower Claims.  Taken together, those assets will be the sole source of recovery for holders of Allowed Borrower Claims under the Plan

## ADEQUACY OF FUNDING FOR BORROWER CLAIMS TRUST

17.     According to the claims estimation performed by the Plan Proponents, with the assistance of SilvermanAcampora, special counsel to the Committee for Borrowers' issues ("Special Borrowers' Counsel") and in consultation with counsel for Rowena Drennen, the $57.6 million funding of the Borrower Claims Trust under the Plan is more than sufficient to ensure that Borrowers with Allowed Borrower Claims shall receive their target recoveries under the Plan, and no "Borrower Trust True-Up" (as defined in the Plan) is required.  To reach this conclusion, the Debtors, in consultation with the Creditors' Committee's advisors, including Special Borrowers' Counsel, have conducted a thorough analysis of the Borrower Claims,

---

[5] The administrative expenses of the Borrower Claims Trust shall be separately funded by a one-time payment to be made pursuant to an agreement between the Liquidating Trust and the Borrower Claims Trust.

including a review of each claim.  The Plan Proponents have provided notice of their

determination that no Borrower Trust True-Up is necessary in the Plan Supplement.

18.     The Borrower Trust True-Up analysis involved categorizing Borrower Claims

based on, among other things, (a) whether the Claims were filed on behalf of individual

Borrowers or putative classes in connection with pending class action litigation, (b) the nature,

and the amount asserted in such claims, (c) the status (*i.e.*, whether the claim was subject to a

pending objection, identified for objection, or still under review) and level of diligence that had

been conducted with respect to the Claim, (d) the Debtor entity at which such Claims were

asserted or should be asserted (assuming such Claims were to become Allowed Claims), and

(e) whether the Claims related to loans that are still being actively serviced.  The Debtors then

assessed their potential exposure with respect to the various categories of Borrower Claims,

applying conservative estimates and assumptions to each group of Borrower Claims.

19.     The Debtors' estimates and assumptions were informed by their review and

assessment of the Borrower Claims and the bases therefore, their experience and results to date

in objecting to Borrower Claims, and the Debtors' extensive historical experience litigating

similar claims or categories of claims prior to the Petition Date.

20.     The Borrower Trust True-Up was calculated based on claims data as of October 2,

2013.  This testimony reflects updated claims data, including updates to claims' objection status,

as of November 4, 2013.

21.     The following chart summarizes the results of the Borrower Trust True-Up

analysis:

| Debtor Group | (A) Estimated Recovery (Disclosure Statement) | (B) Estimated Borrower Claims | Estimated Recovery Amount (A x B) |
|---|---|---|---|
| GMACM Debtors | 30.1% | $55.1 million | $16.6 million |
| RFC Debtors | 9% | $323.1 million | $29.1 million |
| ETS | 100% | $2.2 million | $2.2 million |
| ResCap Debtors | 36.3% | $0.00 | $0.00 |
| | | Total Estimated Recoveries | $47.9 million |
| | | Borrower Trust Assets | $57.6 million |
| | | Less Cash Settlement Payments | ($1.3 million) |
| | | Total Available Borrower Trust Assets | $56.3 million |
| | | Required (Excess) Borrower Trust Funding | ($8.4 million) |
| | | Borrower Trust True-Up | $0.00 |

## II.    THE BORROWER CLAIMS TRUST TRUE-UP ANALYSIS

### A.    Overview of the Process for Estimating Borrower Claims

22.    In advance of filing the notice in the Plan Supplement that no Borrower Trust True-Up is necessary, the Debtors and their professional advisors, in consultation with the Creditors' Committee's advisors, including Special Borrowers' Counsel, undertook a process to review, analyze, and estimate each of the Borrower Claims filed against the Debtors' respective Estates to determine the need for a Borrower Trust True-Up. The estimated exposure to Borrower Claims continues to diminish as new objections are identified, filed, and ruled upon; however, in accordance with the terms of the Plan,[6] the amount to be funded into the Borrower Claims Trust shall not be reduced.

23.    I am familiar with and participated in the process employed in making the Borrower Trust True-Up determination, and continue to participate in the ongoing monitoring of the claims. This process is based, in part, on the Debtors' historical experience with Borrower Claims, with which I am personally familiar based on my approximately eight years of

---

[6] See PX-868, Plan Art. IV.F.6.

employment history with the Debtors, including my current role as General Counsel. This process included a review of the Debtors' experience objecting to Borrower Claims as well as performing the following analyses. Each step will be discussed in detail below, but generally speaking, the steps were:

(a)  Class Action vs. Non-Class Action:  The Debtors identified Claims purportedly filed on behalf of putative Borrower classes (the "Borrower Class Action Claims") and those filed by Borrowers solely in their individual capacities (the "Individual Borrower Claims"). The Debtors evaluated the Borrower Class Action Claims separately from the Individual Borrower Claims. The majority of the Borrower Class Action Claims have been resolved.

(b)  Categorization of Claims:  The Debtors conducted a thorough review and reconciliation of the approximately 3,000 Borrower Claims that have been filed against the Estates. This process involved assigning and allocating the Borrower Claims, where possible, to specific categories, including certain categories of Claims that were deemed to be facially invalid.

(c)  Re-designation of Claims:  The Debtors identified certain Individual Borrower Claims, which, as filed, asserted claims against the wrong Debtor entity, determined the Debtor entity against which the Claims were most properly asserted, assuming such Claims were to be Allowed, and then re-designated the claims to that proper entity.

(d)  Identification for and Prioritization of Objection:  After Claims were preliminarily categorized and, if applicable, re-designated, the Debtors undertook a Claim assessment process. The process considered numerous sources of information regarding each claim, including the allegations set forth in the Proofs of Claim and accompanying documentation, the Debtors' books and records, additional documentation, if any, supplied by the claimant in accordance with Bankruptcy Court-approved procedures, relevant litigation history, and the Debtors' experience in evaluating and litigating similar claims prior to the Petition Date. Based on that assessment, the Debtors began the process of filing claim objections (which were either omnibus or individual objections, as appropriate) with respect to those Borrower Claims determined by the Debtors to be invalid.

(e)  Estimation of Remaining Borrower Claims:  The Debtors have obtained orders from the Bankruptcy Court disallowing and expunging approximately 1,281 Individual Borrower Claims and an additional 33 Individual Borrower Claims have been withdrawn with prejudice largely through the Debtors' effort. The Debtors evaluated the remaining

population of Individual Borrower Claims, and account for such Individual Borrower Claims as follows:

(1)     Approximately 1,058 Claims are either the subject of a pending objection or identified for a future objection; and

(2)     The remaining approximately 633 Claims were further categorized utilizing various criteria based on the nature of the Claim, the dollar amount asserted in the Proof of Claim, and whether the underlying mortgage loan is currently being serviced by Ocwen Financial Corporation ("Ocwen") or Green Tree Servicing LLC ("Green Tree"), or is not currently being serviced.[7]

Each of these analyses is described in greater detail below.

### 2.     Borrower Class Action Claims

24.     For purposes of analyzing and estimating potential Allowed Borrower Claims, the Debtors segregated the Borrowers Claims into Borrower Class Action Claims and Individual Borrower Claims.

25.     The Borrower Class Action Claims represented the largest potential exposure for the Debtors from among Borrower Claims.  The claims register includes approximately twenty-three Borrower Class Action Claims filed in connection with approximately sixteen pending or proposed putative class actions.  In certain instances, the representatives for the putative class filed claims at two or more of the Debtors.  Three of those Borrower Class Action Claims are expected to be expunged by Bankruptcy Court orders.[8]  The Debtors, working with the Creditors' Committee, have resolved approximately nineteen Borrower Class Action Claims,

---

[7] In connection with Borrower Claims reconciliation process, it became apparent that many Borrower Claims were filed in grossly overstated amounts.

[8] See Debtors' Objection to Proofs of Claim Filed Against Residential Capital, LLC by (I) Ruth Assorgi (Claim No. 2580); (II) John R. Foster and Elizabeth Foster (Claim No 2581) and (III) Mark Moody and Sherrill Moody (Claim No. 2583) Pursuant to Section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007 [Dkt. No. 5163] (seeking to disallow and expunge Claim Nos. 2580, 2581, and 2583, each purportedly filed in connection with putative borrower class actions), a true and correct copy of which is Exhibit PX-924.

involving approximately twelve putative class actions, on a final or preliminary basis.  To date,

the primary Borrower Class Action Claims settlements are:

(a)     Kessler Class Action, which consisted of four wholly unliquidated claims
        filed against multiple legal entities, for which a single claim against RFC
        will be an Allowed Claim for approximately $300 million;[9]

(b)     Rothstein Class Action, for which a settlement has been agreed to in
        principle as an Allowed Claim against GMACM in the amount of $13.0
        million.[10]

(c)     Mitchell Class Action, for which a settlement has been agreed to providing
        for an Allowed Claim against RFC in the amount of $14.5 million;[11] and

(d)     Moore Class Action, which settlement is being funded by non-Debtor Cap
        Re of Vermont, Inc. (a non-Debtor entity), and therefore does not factor
        into the Borrower Claims Trust True-Up.[12]

The Debtors also expect to complete the documentation and approval process for an additional

approximately six putative class actions in the near term.  If the Plan goes effective, each of these

settlements will result in Allowed Borrower Class Action Claims or direct cash payments.

Pursuant to the Plan, the direct cash payments will reduce the base amount to be funded into the

---

[9] See Order Pursuant to Rules 7023 and 9019 of the Federal Rules of Bankruptcy Procedure (1) Preliminarily
Approving Settlement Agreement Between Named Plaintiffs, Individually and as Representatives of the Kessler
Settlement Class, and the Settling Defendants; (2) Granting Class Certification for Purposes of Settlement Only;
(3) Approving the Form and Manner of Notice to Kessler Settlement Class Members of the Settlement Agreement;
(4) Scheduling a Fairness Hearing to Consider Final Approval of the Settlement Agreement; and (5) Granting
Related Relief [Dkt. No. 4808], a true and correct copy of which is Exhibit PX-864.  Exhibits PX-962 through PX-
964 are true and correct copies of the proofs of claims filed by Rowena Drennen, Flora Gaskin, Roger Turner,
Christie Turner, John Picard, and Rebecca Picard on behalf of themselves and the putative class.

[10] This settlement is subject to final documentation. Exhibits PX-649 through PX-651 are true and correct copies of
the initial complaint, first amended complaint, and second amended complaint filed in *Landon Rothstein,
individually and on behalf of all others similarly situated v. GMAC Mortgage, LLC, et al.*, No. 12-cv-3412
(S.D.N.Y. Apr. 30, 2012).  PX-972 is a true and correct copy of the proof of claim filed by Landon Rothstein,
Jennifer Davidson, Robert Davidson, and Ihor Kobryn, individually and on behalf of a putative class.

[11] See Debtors' Motion Pursuant To Section 362 Of The Bankruptcy Code And Bankruptcy Rule 9019 (A) Granting
Claimants Limited Relief From Automatic Stay And (B) Approving The Debtors' Entry Into The Settlement
Agreement Regarding The Pending State Court Class Action Litigation, Authorizing The Debtors To Perform The
Obligations Thereunder And Fixing The Amount Of An Allowed General Unsecured Claim For The Class Action
Plaintiffs [Dkt. No. 5700], a true and correct copy of which is Exhibit PX-925.

[12] This settlement is subject to final documentation. Exhibit PX-967 is a true and correct copy of the proof of claim
filed by Donna Moore, Frenchola Holden, Keith McMillon and a class of similarly situated borrowers

Borrower Claims Trust. The Borrower Class Action Claims' estimated Allowed amounts are based on the preliminary settlement amounts plus estimates for the remaining matters where a preliminary settlement has not been reached. To date, these settlements will consume approximately $33.7 million of the Estates' contribution to the Borrower Clams Trust.

26.     In addition, approximately six Borrower Class Action Claims have been or will be settled for direct cash payments totaling approximately $1.3 million. These claims will therefore not result in an Allowed Borrower Class Action Claim, but for purposes of the Borrower Trust True-Up the direct cash payments have been deducted from the total available funds, as reflected by the entry for "Cash Settlement Payments" in the Table on page 9, above.

### 3.     Categorization of Individual Borrower Claims by Claim Type

27.     After Individual Borrower Claims were separated from the putative class action claims, the Debtors' CM&R team, working under my supervision, then undertook a further review of Individual Borrower Claims to identify the nature of the Claims asserted and to classify such Claims by claim type into one or more of the following categories:

| Category[13] | Description |
|---|---|
| Insurance Claims | Borrowers allege that a Debtor mishandled property insurance proceeds, or improperly force-placed property insurance. |
| Loan Modification Claims | Borrowers allege that (A) a Debtor improperly denied claimant a loan modification, (B) the terms of their loan modification were misrepresented to them or not as favorable as claimant asserts they deserved, or (C) they want a loan modification. |

---

[13] True and correct copies of example proofs of claim falling into each category identified here are provided at Exhibit PX-1226 (Claim No. 2051 (Insurance Claim)); Exhibit PX-1224 (Claim No. 1210 (Loan Modification Claim)); Exhibit PX-1229 (Claim No. 3502 (Origination Claim)); Exhibit PX-1225 (Claim No. 205 (Servicing Claim)); Exhibit PX-1227 (Claim No. 2374 (Standing Claim)); Exhibit PX-1328 (Claim No. 4167 (Wrongful Foreclosure Claim)); Exhibit PX-1228 (Claim No. 332 (Other/Indiscernible Claim))).

| Category[13] | Description |
|---|---|
| Origination Claims | Borrowers allege issues regarding origination of their loan, such as disputes regarding loan terms, rights of rescission, defective title exams, predatory lending, excessive origination fees, violation of lender-related laws (RESPA, TILA, etc.), and misrepresented loan documents. |
| Servicing Claims | Borrowers allege a Debtor improperly serviced and/or committed errors in servicing claimant's loan that led to damages, including allegations regarding improper handling of escrows, incorrect credit reporting, charging improper servicing-related fees, and/or "fair debt collection act" violations. |
| Standing Claims | Borrowers challenge a Debtor's standing to service and/or foreclose on claimant's loan based on allegations that may include improper note endorsement, improper assignment, improper MERS transfers, robo-signing, and/or failure to have possession of the note. |
| Wrongful Foreclosure Claims | Borrowers allege that a Debtor wrongfully foreclosed, wrongfully attempted foreclosure, and/or committed errors in the foreclosure process with respect to claimant's loan.  Most Borrower Claims asserting wrongful foreclosure claims also assert claims in one or more of the other categories of claim types. |
| All Other Claims | Borrowers assert a wide variety of allegations that are either unique or fall into several different category types (excluding wrongful foreclosure). Included in this population are claims with no asserted or discernible basis. |

28.    This categorization process involved a thorough review of the Proofs of Claim

forms and the documentation appended thereto, if any, and the Debtors' books and records to

determine the extent and scope, if any, of the current or historical relationship with the Debtors,

including prior or existing litigation.  In addition, in compliance with the Bankruptcy Court-

approved claims objection procedures (the "Borrower Claims Objection Procedures"),[14] in many

instances, the Debtors sent a letter to the Borrower requesting additional information from the

claimant regarding the basis for their Claim.  As required by the Borrower Claims Objection

---

[14] See Order Pursuant to Sections 105(a) of the Bankruptcy Code and Bankruptcy Rules 1009, 3007 and 9019(b) Approving (I) Claim Objection Procedures, (II) Borrower Claim Procedures, (III) Settlement Procedures, and (IV) Schedule Amendment Procedures  [Dkt. No. 3294], a true and correct copy of which is Exhibit PX-851.

Procedures, the Debtors coordinated the effort with Special Borrowers' Counsel who reviewed and approved the lists of Borrowers to whom such correspondence was sent as well as the form of such correspondence.  Over the past several months, the Debtors sent approximately 1,800 such letters.[15]  To the extent the Claimants' responses identified with sufficient clarity the nature of the Claims, this information was taken into consideration as part of the categorization process. Categorizing Individual Borrower Claims allowed the Debtors to simplify and streamline their analysis of the potential bases for such Claims as well as potential defenses to those Claims, and to conduct a more thorough review of their books and records based on the nature of the liabilities claimed.

### 4.    Re-designation and Reclassification of Individual Borrower Claims

29.    To ensure the accuracy of the estimated Individual Borrower Claims applicable to each Debtor Group, the Debtors' CM&R team, working under my supervision, reviewed all of the Individual Borrower Claims and, to the extent necessary, re-designated the Claims to the proper Debtor entity if such claims were filed against the wrong Debtor.  This process involved reviewing each Claim and confirming whether the Debtors' books and records reflected a potential nexus between the Borrower and a specific Debtor entity.  This review and re-designation of Claims was necessary because, for example, many Borrowers filed Claims against ResCap—the named Debtor for the Chapter 11 Cases—instead of the Debtor-entity with which they have some type of nexus (such as the Debtor entity actually responsible for servicing the Borrower's mortgage loan).  In these instances, Borrowers did not appear to file their Claims against ResCap based on any particular theory of liability; rather, they seem to have mistakenly failed to designate the Debtor entity against which their Claims actually lie on the face of the

---

[15] Exhibit PX-678 is a true and correct copy of an example Borrower Request Letter.

Proof of Claim form.[16]  The Borrower Trust True-Up analysis reflects this re-designation of

Borrower Claims.

30.     To ensure that the Borrower Claims were properly classified in terms of their

claims class, the Debtors' CM&R team, working under my supervision, reviewed those

Borrower Claims that asserted a Claims class other than General Unsecured Claims.  This review

indicated that none of the Borrower Claims (assuming such Claim is an Allowed Borrower

Claim) were entitled to any Claim status other than as a General Unsecured Claim and that such

claimants did not have a valid basis for self-selecting a secured, administrative and/or priority

status.  For example, many claimants included the value of their home or the amount of their

mortgage in the secured section of the Proof of Claim form.  Two omnibus objections were filed

seeking to reclassify approximately 155 Borrower Claims.  Based on the analysis conducted, the

Debtors will be filing an additional omnibus objection to reclassify Borrower Claims.

31.     The processes of categorizing and redesignating Borrower Claims was not a linear

one, but instead involved multiple analyses occurring simultaneously.  Accordingly, as new

information was gathered through the claims reconciliation process, the Debtors continuously

updated and refined their understanding and estimation of the Borrower Claims to the best of

their ability.

**5.      Identification and Prioritization of Individual Borrower Claims for
Objections**

32.     After conducting these steps of categorizing and re-designating Individual

Borrower Claims, the Debtors CM&R team engaged in a secondary review to identify which

Borrower Claims should be included in objections, whether on an omnibus or individual basis.

---

[16] See, e.g., Proof of Claim No. 4167, a true and correct copy of which is Exhibit PX-1328.

The Debtors prioritized potential objections based on a number of factors, including (i) whether the Borrower Claim could be the subject of an objection based on purely procedural grounds (*e.g*., the Proof of Claim was filed after the Bar Date or was amended and superseded by a subsequently filed Proof of Claim), (ii) the amount asserted in the Borrower's Proof of Claim, (iii) whether the Borrower Claim was the subject of prior or pending litigation, and (iv) the scope of the Debtors' defenses to such Claims.

33.    For all claims linked to litigation, the Legal team searched its matter management system to identify any claims linked to litigation that were (i) settled, (ii) dismissed with prejudice, (iii) subject to a pending dispositive motion, or (iv) finally dismissed and currently the subject of a pending appeal.  These claims were identified for objection on procedural and/or substantive legal grounds.

34.    For claims not initially identified for objection on procedural or substantive legal grounds, the CM&R team, in consultation with the Legal group, performed an extensive review of the Debtors' books and records, including their loan files, escrow analyses, payment histories, servicing notes, communications with Borrowers, loan modification applications, approval or denial letters, short sale applications, investor guidelines, breach letters and foreclosure records, information provided in the Proofs of Claim, additional information provided by the claimants at the Debtors' request, and the Debtors' own diligence.  The goal was to determine, prior to objecting to any claim or identifying a claim for objection, whether the Debtors' books and records reflect any potential liability to a claimant.  In the overwhelming majority of cases, the

Debtors' books and records reflect no such liability or potential liability and, as a result, the Debtors believed it appropriate to object to the allowance of such Claims.[17]

35.    As part of conducting this review of each Borrower Claim, the Debtors and their advisors worked with Kramer Levin Naftalis & Frankel LLP, counsel to the Creditors' Committee, and Special Borrowers' Counsel, to analyze individual Borrower Claims, request additional information pursuant to the process set forth in the Borrower Claims Procedures, and object to Borrower Claims where warranted.

36.    Based on the multi-step review process, the Debtors, with the assistance of their advisors, identified Borrower Claims for objections and undertook to file and prosecute such objections, both through omnibus and individual claim objections.  To date, the Debtors have filed approximately forty-five omnibus and individual Claim objections, relating to 2,109 Individual Borrower Claims (including 191 unliquidated claims).  Of the approximately 3,000 Borrower Claims filed, the Court has sustained objections to 1,281 Individual Borrower Claims, and, as a result, those Claims have been expunged from the claims register.  An additional thirty-three Individual Borrower Claims have been withdrawn with prejudice by the individual claimant.

**6.    Estimation of Remaining Individual Borrower Claims**

37.    The Debtors have continued to evaluate their potential exposure for the remaining population of Individual Borrower Claims.

---

[17] For instance, the Debtors reviewed the numerous sources of information listed above to analyze Borrower Claims involving the alleged wrongful refusal of a loan modification.  In most instances, the CM&R team found that the Debtor was servicing the Borrower's loan properly and rightfully refused the Borrower's request for a loan modification because documents and records demonstrate that, at that time, the Borrower did not qualify for such loan modification.

**B.      Analysis and Assumptions Applied to Remaining Borrower Claims**

**1.      Categories of Remaining Individual Borrower Claims**

38.      The Debtors have used a number of general assumptions to evaluate potential exposure to the remaining Individual Borrower Claims for purposes of the Borrower Claims True-Up calculation.  In addition to their review of the pending Individual Borrower Claims themselves, the assumptions were generally based on the Debtors' experience in reviewing and objecting to Borrower Claims, as well as the Debtors' historical experience litigating with Borrowers pre-petition, as set forth in greater detail below.  The starting point for the analysis was to categorize the claims based on the amount of the claim and their objection status.

39.      As of November 4, 2013:

(a)      approximately, 828 Individual Borrower Claims (including thirty-five unliquidated Claims) are subject to a pending objection scheduled to be heard prior to the contemplated Effective Date;

(b)      approximately 230 Borrower Claims have been identified for an objection to be filed in the near term;

(c)      approximately 248 Borrower Claims (including seventy-one unliquidated Claims) filed in face amounts in excess of $100,000 each, are reflected in the Debtors' claims register for which no objection had yet been conclusively identified (the "Non-De Minimis Borrower Claims"), although the Debtors believe there are likely significant bases on which to object to such Claims; and

(d)      approximately 385 Borrower Claims each filed in face amounts of $100,000 or less are reflected in the Debtors' claims register for which no objection had yet been conclusively identified (the "De Minimis Borrower Claims"), although the Debtors believe there are likely significant bases on which to object to such Claims.

40.      The Claims identified in (a) through (d) above are collectively referred to herein as the "Remaining Borrower Claims."

**2.      The Debtors' Historical Experience with Borrower Litigation**

41.      In the ordinary course of business prior to the Petition Date, the Debtors

maintained a database that was regularly updated to manage and track the resolution of

borrower-related litigation.  To estimate the Debtors' potential exposure to Remaining Borrower

Claims, the Debtors compiled a list from that database of their Borrower-related litigation

resolved between January 1, 2011 and the Petition Date, which included claims initiated from

2007 through 2012.  Matters that were class action in nature were removed to ensure the

population was comparable to the Individual Borrower Claims that were subject to estimation.

In addition, the population of claims reviewed did not include the several hundred thousand

foreclosures conducted by the Debtors' network of outside counsel during that same period,

which were processed in the ordinary course of the Debtors' servicing businesses and either were

uncontested, or otherwise did not rise to the level where direct oversight was deemed necessary.

42.      Instead, for determining the Borrower Trust True-Up, the Debtors focused their

review of pre-Petition Date litigation on the approximately 3,600 closed litigation cases that had

prompted active oversight and management on the part of the Debtors' in-house counsel in the

ordinary course of business from 2007 through 2012.  These cases tended to be those where

Borrowers asserted a vigorous defense and/or asserted direct claims or counter-claims against a

Debtor.  The Debtors' in-house counsel tracked such cases using an internal case management

database that recorded information including the disposition of each case and whether any

settlement payment had been made.

43.      Approximately 10% of the 3,600 closed litigation cases between January 1, 2011,

and the Petition Date resulted in a cash payment to a Borrower.  In the 376 cases where a cash

payment was made, the median payment amount was approximately $5,000.  In 314 out of those

376 cases, the payments were under $15,000.  In the other approximately 90% of the 3,600

closed litigation cases, the matter was either dismissed, a judgment was granted in favor of the Debtor, or the case was settled without a cash payment.

### 3.    Overview of Assumptions Applied to Remaining Borrower Claims

44.    Although the Debtors' expect that the vast majority of the Remaining Borrower Claims will, in all likelihood, be subject to a valid objection, for purposes of the Borrower Trust True-Up analysis the goal was to apply a conservative approach to test whether the Borrower Claims Trust's funded amount of $57.6 million was sufficient.

45.    To that end, at my direction, the Debtors applied certain general assumptions, provided below, to the Remaining Borrower Claims, which take into account the Debtors' historical experience with Borrower litigation and their experience in objecting to Borrower Claims.  None of these assumptions affect how the Borrower Claims Trust will allocate distributions to Borrowers with Allowed Borrower Claims.  Nor do these assumptions represent the Debtors' view of the actual value of these Claims.

(a)    *First*, the Debtors assumed that all Non-De Minimis Borrower Claims (*i.e.*, those claiming more than $100,000 and including unliquidated Claims) would become Allowed Borrower Claims at a multiple of the Debtors' historical settlement amount.  While the claims review process is ongoing and the Debtors fully anticipate that additional objections will be interposed to a large majority of the Remaining Borrower Claims, to ensure a conservative calculation, the expected identification of additional objections was not factored into the analysis.

(b)    *Second,* the Debtors assumed that all Non-De Minimis Borrower Claims that are currently being serviced would be allowed at an average of approximately three times the historical settlement amount.  This assumption is based on the Debtors' historical experience that Borrowers whose loans are actively being serviced can benefit from non-cash remediation (loan modifications and the like), and thus the claim resolution tends to involve lower cash payments.

(c)    *Third,* the Debtors assumed that all Non-De Minimis Borrower Claims that involve loans <u>not</u> currently being serviced by Ocwen or Green Tree (typically because they have already been foreclosed on), would be

allowed at an average of approximately four times the Debtors' historical settlement amount.

(d)     *Fourth*, the Debtors assumed that where objections to Borrower Claims have been filed but not yet ruled upon and the Borrower filed a timely response to the objection or the objection deadline has not yet passed, 50% of the Claims would survive and become Allowed Borrower Claims at an average of approximately four times the Debtors' historical settlement amount.

(e)     *Fifth,* the Debtors assumed that where objections to Borrower Claims had been identified but not yet filed, 50% of the Claims would survive an objection and become Allowed Borrower Claims at an average of approximately four times the Debtors' historical settlement amount.

(f)     *Sixth,* the Debtors assumed that 100% of the De Minimis Borrower Claims would become Allowed Claims at the lesser of the asserted amount or approximately four times the Debtors' historical settlement amount.

46.     The number of Claims in each category of Remaining Borrower Claims, and the assumptions applied to that category, are set forth below.

### 4.     Remaining Borrower Claims Subject to Pending Objections

47.     Objections to approximately 828 Individual Borrower Claims (including thirty-five unliquidated claims) have been filed and remain pending.  To date, approximately 6% of Borrowers whose Claims are subject to claim objections have filed responses.  For purposes of the Borrower Trust True-Up calculation, the Debtors have assumed that where the deadline to respond has passed and no response was received such Claims will be expunged.  In addition, where the deadline to respond has not passed or a response has been filed, the Debtors have assumed that 50% of these Claims will be Allowed in an amount which is approximately four times the average historical settlement amount for Borrower-related matters.

### 5.     Remaining Borrower Claims Subject to Future Objections

48.     In addition, at present, approximately 230 Individual Borrower Claims have been identified for future objection.  For purposes of the Borrower Claims Trust True-Up, the Debtors

have also assumed that 50% of these Claims will be Allowed in an amount which is approximately four times the average historical settlement amount for Borrower-related matters.

### 6.    Non-De Minimis Borrower Claims Not Yet Identified for Objection

49.    The Non-De Minimis Borrower Claims consist of approximately 248 Claims asserting amounts in excess of $100,000, including seventy-one wholly unliquidated Claims.

### (a)    *Loans Currently Being Serviced*

50.    Eighty-six of these Non-De Minimis Borrower Claims, relate to loans that are currently being serviced.  The current servicer has the potential to offer non-monetary relief such as loan modifications, debt forgiveness, and credit report adjustments, which may result in the resolution or waiver of the Borrower Claim.  For purposes of the Borrower Trust True-Up calculation, the Debtors have assumed that 100% of these Non-De Minimis Claims will be Allowed in an amount which represents approximately three times the average historical settlement amount for Borrower-related matters.

### (b)    *Loans Not Currently Being Serviced*

51.    The remaining 162 Non-De Minimis Borrower Claims in this category relate to loans that are not being actively serviced.  Accordingly, the ability to offer certain settlement incentives, such as loan modifications, does not exist for those loans.  For purposes of calculating the potential need for the Borrower Claims Trust True-Up, the Debtors have assumed that 100% of these Non-De Minimis Claims will be Allowed in an amount which represents approximately four times the average historical settlement amount for Borrower-related matters.

### 7.    De Minimis Borrower Claims

52.    As of today, there are approximately 385 De Minimis Borrower Claims with asserted amounts equal to or less than $100,000.  These Borrower Claims include those claims the Debtors have sought to re-designate but not expunge.  While the Debtors' historical

experience suggests that valid objections will be identified for the vast majority of these Claims, for purposes of the Borrower Trust True-Up analysis, the Debtors have assumed that 100% of these De Minimis Claims will be Allowed at the lesser of (a) the face amount of the Claim, or (b) approximately four times the average historical settlement amount.

## **CONCLUSION**

53.    Based on the Debtors' estimation methodology adopted and applied as described above, the proposed funding of the Borrower Claims Trust in the amount of $57.6 million is more than sufficient to align Allowed Borrower Claim recoveries with those of General Unsecured Creditors within each Debtor Group.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this 12th day of November, 2013 at Ft. Washington, Pennsylvania.

_____/s/  William R. Thompson_____
William R. Thompson