# **<u>Exhibit G</u>**

# RE: Bounce - Intercompany Follow Up

From:
"Dondzila, Cathy - PA" <cathy.dondzila@ally.com>
To:
"Renzi, Mark" <mark.renzi@fticonsulting.com>, "Westman, Barbara - MN" <bwestman@gmacm.com>
Cc:
"Nolan, William" <william.nolan@fticonsulting.com>, "Park, Liz" <liz.park@fticonsulting.com>, "Szymik, Filip" <filip.szymik@fticonsulting.com>
Date:
Sun, 22 Apr 2012 18:07:35 +0000
Attachments:
Intercompany Questions v2.xls (24.58 kB)

This is a very complicated situation and likely cannot be answered at the level of detail everyone would like (as evidenced by the detailed questions noted below).

The first step is a bit of a walk down memory lane. In the beginning (and neither Barb nor I were here), ResCap issued public debt and generated cash. Some of the agreements provided were likely created during that time, and were intended to push this cash into the primary operating companies (GMAC Mortgage, RFC and probably Homecomings). This would have created a receivable on the books of the ResCap holding company and a payable on the operating company books. These were likely interest bearing agreements.

Fast forward to the credit crisis and market implosion and the situation changes dramatically. ResCap holding company is now a consumer of cash and the operating companies are generators of cash. Liquidity providers want to be as close as possible to the collateral securing their facilities. As a result, borrowings are now recorded on the books of the operating companies. This changes the relationship, and cash is now moving in a different direction, from the operating companies to the Parent. This creates payables on the Parent and receivables on the subs.

The Company also uses daily sweep process to consolidate all of its available liquidity at the Parent. As the operating companies generate cash, through asset sales, borrowings, asset liquidations etc., this cash moves upstream to ResCap. This again creates the payable on the Parent and the receivable at the operating company.

Finally, in order to maintain sufficient regulatory net worth to satisfy requirements, and to clean up balance sheets as part of entity minimization or sale activities, intercompany balances have been forgiven. In many cases, with the approval of the Ally Board of Directors. In most cases, but not all, the forgiveness has been treated as equity. In limited cases, where the forgiveness occurred with respect to collateralized borrowings, it may have been treated as income/expense. Barb and I will see if we can put together a comprehensive list of all debt forgiveness since 2007 by entity. Not sure what that effort will entail or how long it will take. Will let you know what we conclude.

I've included some thoughts with respect to the specific questions below. In many cases, the information being requested is not possible to provide or would require a significant amount of research to be able to even partially respond.

Barb and I will confer on a couple of potential additions to the list, if you guys could review what has been provided and give us some insight into next steps?

**From:** Renzi, Mark [mailto:mark.renzi@FTIConsulting.com]
**Sent:** Friday, April 20, 2012 3:58 PM
**To:** Dondzila, Cathy - PA; Westman, Barbara - MN
**Cc:** Nolan, William; Park, Liz; Szymik, Filip
**Subject:** Bounce - Intercompany Follow Up

Cathy and Barb,

After we provided MoFo with interco files we received from you (zipped folder), MoFo, K&E, Evercore and Ally had follow up questions on the top 10 intercompany relationships which we have consolidated. Please see below:

1) For each intercompany balance:

a) Explain intent for each balance - loan or equity? Was there an expectation of repayment? This is not a question accounting can answer. To the extent we have deemed a collateralized

affiliate balance impaired we have impaired it through earnings. Otherwise we have concluded for GAAP financial statement purposes the balances were expected to be repaid.

b) Describe how and when the balance was incurred. See above and the attached email which provided much better descriptions about some of the drivers of the balances (not sure who summarized what was provided on the FTI list).

c) To what extent has the balance arisen from the operation of the company's cash management system? Does the company intend to continue to operate the same way post-petition? For example, is the balance in entry #7 a result of the intercompany cash management system? How did it arise? How old is the balance? Yes, the Company expects to continue to follow its cash management practices post-petition.

d) What were the funds used for (capital improvements or operating expenses)? Yes, among other things including running its servicing business activities and funding the purchase of new assets.

e) Was interest accrued or paid for any intercompany balance? Will see if Barb can have someone add this to the spreadsheet.

i) Was interest paid regularly or sporadically?

ii) At a fixed or variable rate?

iii) When was the last interest payment due, and when was it paid?

f) Have principal payments been made? If so, since when, how often and how much? My guess is that certain of these balances have 'principal' repayments and 'draws' regularly as cash activity flows in and out but I'll see if Barb can have someone evaluate.

g) Where the source document does not support the intercompany balance (e.g., #2, #3), what is the explanation for the reversed balance? Does the balance track to a different agreement (or no agreement)? See descriptions above. No new agreements.

h) Where the source document is not between the same entities as the intercompany balance (e.g., #4, #8), what is the explanation? Does the balance track to a different agreement (or no agreement)? No agreement.


2) Were any intercompany balances reported in any public or regulatory filings as debt or equity? All intercompany balances eliminate in consolidation. In standalone financial statements of the operating companies they are reported as affiliate receivables/payables/debt.

Confidential                                                                                          RCUCCJSN30023151

3) What is the explanation for the different "Intercompany Types" noted on the FTI Summary Chart? Appears to correspond to the operational account description in the general ledger.

4) For #2, what does "cash movement related to revolver" mean? Does this reflect a onetime book entry? Has this balance remained static over time? How were other revolver-related entries treated? As described above, to the extent an operating company records a direct borrowing secured by its assets (includes the Ally Senior Secured Credit (Revolver) and LOC facilities, among others), the cash generated by that agreement is repatriated up to the Parent through the cash management sweep. The description is not 100% complete and does not describe the entire balance. On a monthly basis, the outstanding balances on the Revolver and LOC are recorded to the operating companies in proportion to their pledged collateral. As such, each month there will be changes in the balance of the intercompany generated. This particular balance has also been impacted by earlier forgiveness of liabilities to ResCap as we have had to shore up the RFC net worth to comply with state and other regulatory requirements.

5) For transactions #4 and #8:

a) Do we have fully executed notes for transactions #4 and #8? No. With respect to #4, this is part of regular cash management activities. The source of the cash into PATI was cash received from the Flume and GXII notes that were contributed to PATI by ResCap. Flume and GXII were securitization facilities for international (UK and CE) assets. As cash was received by PATI, it was swept to GMACM and from there up to the Parent. I'm not sure what drove RAHI balance with RFC but wouldn't be surprised if it didn't relate to gains/ losses on sales of securitizations/retained interests as RAHI was the transferor and holder of retained interests historically for RFC securitizations. The cash sweep process would have taken that all up the chain.

b) Are these balances specific to any transaction or facility?

i) Why do balances exist between these entities? Note: the corresponding agreement for #4 only names ResCap as Borrower, not GMAC Mortgage. There appears to be no evidence of a direct relationship between GMACM and PATI. For #8, the corresponding agreement only names RAHI II and ResCap, not RFC. There appears to be no direct agreement between RFC and RAHI II.

ii) Do PATI and RAHI II earn income from any source other than as holders of the GSAP-related preference shares? PATI and RAHI do not hold the GSAP preference shares, PATI-A and RAHI-A do. PATI holds the remaining Flume notes and certain retained interests, including the FHA/VA securitization bon, and RAHI has mortgage loans and retained interests. RAHI also is required, under to GAAP, to recognize certain on-balance sheet securitizations due to either failed sale or consolidation or both.

iii) For Intercompany Advance Agreements (PAT and RAHI) (#4 and #8), PATI and RAHI II are listed as Lenders and ResCap is listed as the Borrower. Why do notes accompanying #4 and #8 state the source document supports ResCap as lender?

Confidential                                                                                          RCUCCJSN30023152

6)   For transactions #5 and #6:

a)   Explain existing balances between GMACM, PATI, and the GSAP Issuer (which is an offshore SPE). Are these entities directly related? See b) for explanation.

b)   Supporting emails state that GMACM sold balances to the GSAP Trust, but it was GMACR Mortgage Products, LLC, not GMACM. Emails also state that PATI purchased assets from the GSAP Trust – what are these assets and are they supported by documents? GMACM was the initial seller (through the transferor GMACR Products) to GSAP. In 2008, the GSAP facility was amended and RFC also became a seller (through the transferor RFC-GSAP). In connection with the amendment, the Class A-1 preference shares were transferred by GMACM to PATI and Class A-2 preference shares were issued to RAHI. While the transfers of financial assets achieved legal true sale, the initial sale by the sellers (GMACM and RFC) did not meet the criteria for sale accounting under GAAP. As a result, intercompany balances were created between the sellers and the GSAP SPE. The GSAP entity was also evaluated, in accordance with GAAP, to determine whether it was required to be consolidated under predecessor GAAP (FIN46R) and current GAAP (FAS167). In both cases, it was determined GSAP should be consolidated under GAAP to the primary beneficiary, which was determined to be GMACM. There are a variety of GSAP documents, including facility agreements, asset sale agreements between the seller and transferor and the transferor and GSAP etc.

7)   Was the Rescap Restated Loan Agreement dated as of January 1, 2006 amended or extended beyond its termination date?

8)   Why is transaction #9 reflected as an intercompany balance if Borrower is not a ResCap sub? What is the current amount owing on the Note and when is it due? The general ledger is prepared on a basis consistent with GAAP. With respect to certain transactions (Viaduct, Flume, GSAP), we failed sale (meaning the transfers of financial assets did not meet the criteria to be recorded as sales) and we also tripped consolidation accounting rules. As a result, the Viaduct and Flume bankruptcy-remote SPEs are consolidated to ResCap and the transferred financial assets remain on the books of GPF (one of our wholly-owned international subsidiaries). The failed sale accounting creates intercompany balances between the entities.

9)   Were any guidelines in place regarding the determination of whether an acquisition of assets (e.g., purchased assets from the GSAP facility) would be accounted for through equity or intercompany accounts? Also, to what extent were there any guidelines with respect to allocating expenses and overhead among companies by means of intercompany accounts? With respect to GSAP, the transfers of the financial assets between the sellers (GMACM and RFC), the transferors (GMACR Products and RFC-GSAP) and GSAP did not qualify for sale. There are a variety of memorandum supporting the GAAP accounting treatment for these transfers. In addition, the GSAP entity is required to be consolidated by GMACM, as the primary beneficiary. In the situation of failed sales, the accounting is recorded through the use of intercompany accounts. The GSAP transaction is particularly complex due to having two sellers and by having other subsidiaries within the group owning the preferences shares of GSAP (PATI-A and RAHI-A). These create additional intercompany accounting that had the transfers met the criteria for true sale would not have otherwise existed. In the waterfall we eliminated all of the

Confidential                                                                                                                  RCUCCJSN30023153

GSAP balances EXCEPT the intercompany balances. Should probably think through whether those intercompany balances shouldn't also be removed. In the end, GMACM and RFC sold assets for cash and an indirect investment in the preference shares held by the PATI-A and RAHI-A entities, who dividend any cash they receive back to GMACM and RFC, respectively.

10) Need to address intercompany balance spreadsheet sent by Evercore and obtain documentation in relation to those balances. ("Project Rodeo – Intercompany Comparisonv2" excel file attached)

a) Are there any documents or information supporting a $254 mm balance between Executive Trustee Services, LLC and GMAC Mortgage, LLC ("Project Rodeo – Intercompany Comparisonv2" excel file attached)? This results from the cash management activities whereby cash generated by an entity is swept through the organization up to the Parent. Cash is actually deposited into a GMACM bank account directly in connection with the services ETS provides (you'll note the intercompany is awfully close to the retained earnings). GMACM books the intercompany payable to ETS and ETS books the intercompany receivable vs. income. Not sure why this didn't make the FTI list of top ten. Balance was $253.5 million at 12/31/11 (Corp SS002 vs. SS001).

Please let us know when you would like to review the list and how we can help pull together this information. The intercompany notes have become a critical item for the Junior Secured Bonds and the respective recovery. We are available at your convenience.

Best regards,

**Mark A. RENZI**
Managing Director | Corporate Finance

F T I Consulting
617.897.1528 direct
617.785.0177 mobile
617.897.1510 fax
Mark.Renzi@FTIConsulting.com

200 State Street, 8th Floor

Boston, MA 02109

www.fticonsulting.com

Confidentiality Notice
This email and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this e-mail or any attachment is prohibited. If you have received this email in error, please notify us immediately by returning it to the sender and deleting this copy and the reply from your system. Thank you for your cooperation.

Confidential                                                                                    RCUCCJSN30023154

Confidential                                                                                                                                                    RCUCCJSN30023155

**Intercompany Balances**  in millions

| Receiving Entity | Paying Entity | Balance | Description |
|---|---|---|---|
| Residential Capital | GMAC Residential Holdings | $3,186 | This is the ResHoldings note with ResCap. This balance acts as an LOC where GMACM can borrow funds, or contribute funds, to ResCap as needed. This borrowing is funneled through its parent, Resi Holdings.<br><br>Note there is no similar large balance between Resi Holdings and GMACM, as $2.6 billion of GMACM debt was forgiven by Resi Holdings in 2009. |
| Residential Funding Company | Residential Capital | $1,847 | This relationship is similar to the Residential Holdings relationship above, and in the past was in a similar position where RFC owed ResCap. However, in 2008, $2 billion of debt was forgiven. Activity since 2008 activity makes sense as RFC is generally generating cash through pledging its assets for direct borrowings (Ally Revolver, LOC, BMMZ repo etc.) or generating cash from asset sales. Cash generated by the operating companies is swept up to the holding company (ResCap) for centralized treasury management. |
| Homecomings Financial | Residential Funding Company | $1,231 | The majority of this balance was created in 2008 when loans were sold from Homecomings to its parent. No cash was exchanged. |
| Passive Asset Transactions | GMAC Mortgage | $647 | The majority of the balance represents the cash collections transferred from the IBG entities for the Flume and GXII note receivables. The cash was transferred from IBG to PATI and then from PATI to GMACM and up to ResCap (through that same treasury sweep function described above). |
| Executive Trustee Services | GMAC Mortgage | $254 | Cash needs for the ETS entity are handled through GMACM accounts, and intercompany transactions are created to record the impact to ETS, however, no cash settlement occurs. |

RCUCCJSN30023156