# Exhibit M

# GMAC MORTGAGE, LLC

**Consolidated Financial Statements for the Years Ended
December 31, 2011 and 2010**

CONFIDENTIAL

EXAM00234281

GMAC Mortgage, LLC

|  | **Page** |
|---|---|
| Table of Contents | 2 |
| Independent Auditors' Report | 3 |
| Consolidated Balance Sheet | 4 |
| Consolidated Statement of Income | 5 |
| Consolidated Statement of Comprehensive Income | 6 |
| Consolidated Statement of Changes in Equity | 7 |
| Consolidated Statement of Cash Flows | 8 |
| Supplemental Statement of Cash Flows | 9 |
| Notes to Consolidated Financial Statements | |
| 1. Description of Business and Significant Accounting Policies | 10 |
| 2. Mortgage Loans Held–for–sale | 20 |
| 3. Finance Receivables and Loans, Net | 20 |
| 4. Securitizations and Variable Interest Entities | 22 |
| 5. Servicing Activities | 28 |
| 6. Accounts Receivable, Net | 31 |
| 7. Other Assets | 31 |
| 8. Borrowings | 32 |
| 9. Other Liabilities | 36 |
| 10. Other Revenue, Net | 36 |
| 11. Other Noninterest Expense | 36 |
| 12. Other Comprehensive Income | 37 |
| 13. Income Taxes | 37 |
| 14. Employee Benefit Plans | 38 |
| 15. Fair Value | 39 |
| 16. Derivative Instruments and Hedging Activities | 49 |
| 17. Higher Risk Mortgage Loans and Credit Quality | 52 |
| 18. Guarantees, Commitments and Contingencies | 53 |
| 19. Reinsurance Arrangements | 63 |
| 20. Related Party Transactions | 65 |
| 21. Regulatory Matters | 69 |
| 22. Subsequent Events | 69 |

CONFIDENTIAL                                                                EXAM00234282

To the Board of Directors and Member of GMAC Mortgage, LLC:

We have audited the accompanying Consolidated Balance Sheets of GMAC Mortgage, LLC (the "Company") (a wholly-owned subsidiary of Residential Capital, LLC, whose ultimate parent is Ally Financial, Inc.) as of December 31, 2011 and 2010, and the related Consolidated Statements of Income, Comprehensive Income, Changes in Equity, and Cash Flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards as established by the Auditing Standards Board (United States) and in accordance with the auditing standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 20 to the financial statements, the Company has entered into a number of agreements and transactions with its affiliates.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2011 and 2010, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company's liquidity and capital needs, combined with conditions in the marketplace, raise substantial doubt about its ability to continue as a going concern. Management's plans concerning these matters are also discussed in Note 1 to the financial statements. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

Deloitte & Touche LLP
March 28, 2012
Detroit, Michigan

3

CONFIDENTIAL                                                                                                                    EXAM00234283

GMAC Mortgage, LLC

| December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $117,303 | $194,340 |
| Mortgage loans held–for–sale ($27,253 and $17,744 fair value elected) | 3,105,352 | 3,384,115 |
| Finance receivables and loans, net | | |
|   Consumer ($42,600 and $43,383 fair value elected) | 205,917 | 241,730 |
|   Allowance for loan losses | (10,126) | (16,676) |
|   Total finance receivables and loans, net | 195,791 | 225,054 |
| Mortgage servicing rights | 1,131,518 | 1,827,529 |
| Accounts receivable, net | 2,850,059 | 2,466,377 |
| Other assets | 6,579,084 | 5,172,331 |
| Total assets | $13,979,107 | $13,269,746 |
| **Liabilities** | | |
| Borrowings | | |
|   Borrowings from Ally Inc. and subsidiaries | $749,163 | $1,047,009 |
|   Borrowings from Parent | 17,614 | 515,891 |
|   Collateralized borrowings in securitization trusts ($38,823 and $37,154 fair value elected) | 39,201 | 112,342 |
|   Other borrowings | 1,243,055 | 1,405,020 |
|   Total borrowings | 2,049,033 | 3,080,262 |
| Other liabilities | 9,337,828 | 7,123,490 |
| Total liabilities | 11,386,861 | 10,203,752 |
| **Equity** | | |
| Member's interest | 5,444,219 | 5,378,291 |
| Accumulated deficit | (2,793,089) | (2,265,559) |
| Accumulated other comprehensive loss | (58,884) | (46,738) |
| Total equity | 2,592,246 | 3,065,994 |
| Total liabilities and equity | $13,979,107 | $13,269,746 |

The assets of consolidated variable interest entities that can be used only to settle obligations of the consolidated variable interest entities and the liabilities of these entities for which creditors (or beneficial interest holders) did not have recourse to our general credit at December 31, 2011 and 2010, were as follows.

| December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| **Assets** | | |
| Mortgage loans held–for–sale | $8,658 | $21,482 |
| Finance receivables and loans, net | | |
|   Consumer ($42,600 and $43,383 fair value elected) | 205,917 | 241,730 |
|   Allowance for loan losses | (10,126) | (16,676) |
|   Total finance receivables and loans, net | 195,791 | 225,054 |
| Accounts receivable, net | 873,839 | 1,071,983 |
| Other assets | 98,664 | 2,345 |
| Total assets | $1,176,952 | $1,320,864 |
| **Liabilities** | | |
| Borrowings | | |
|   Collateralized borrowings in securitization trusts ($38,823 and $37,154 fair value elected) | $39,201 | $112,674 |
|   Other borrowings | 855,630 | 846,284 |
|   Total borrowings | 894,831 | 958,958 |
| Other liabilities | 227 | 519 |
| Total liabilities | $895,058 | $959,477 |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

CONFIDENTIAL

EXAM00234284

| Year ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---:|---:|
| **Revenue** | | |
| Interest income | $72,248 | $220,647 |
| Interest expense | 115,548 | 173,307 |
| Net financing revenue | (43,300) | 47,340 |
| **Other revenue** | | |
| Servicing fees | 730,876 | 848,755 |
| Servicing asset valuation and hedge activities, net | (293,416) | 340,249 |
| Total servicing income, net | 437,460 | 1,189,004 |
| Gain on mortgage loans, net | 163,330 | 298,672 |
| Loss on foreclosed real estate | (8,282) | (5,502) |
| Other revenue, net | 91,071 | 102,793 |
| Total other revenue | 683,579 | 1,584,967 |
| **Total net revenue** | 640,279 | 1,632,307 |
| **Provision for loan losses** | (2,697) | 5,586 |
| **Noninterest expense** | | |
| Compensation and benefits | 304,516 | 238,109 |
| Mortgage fines and penalties | 204,000 | — |
| Representation and warranty expense, net | 98,614 | 703,719 |
| Professional fees | 94,136 | 54,542 |
| Data processing and telecommunications | 77,955 | 111,030 |
| Occupancy | 26,461 | 22,228 |
| Advertising | 18,160 | 360 |
| Other noninterest expense, net | 341,198 | 410,438 |
| Total noninterest expense | 1,165,040 | 1,540,426 |
| **(Loss) income before income taxes** | (522,064) | 86,295 |
| Income tax expense | 5,466 | 9,346 |
| **Net (loss) income** | $ (527,530) $ | 76,949 |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

5

**CONFIDENTIAL**

**EXAM00234285**

GMAC Mortgage, LLC

| Year ended December 31, *($ in thousands)* | **2011** | 2010 |
|---|---|---|
| **Net (loss) income** | **($527,530)** | $76,949 |
| **Other comprehensive (loss) income , net of tax** | | |
| Unrealized gains (losses) on investment securities | | |
| Net unrealized (losses) gains arising during the period | **(666)** | 1,606 |
| Net realized (losses) gains reclassified to net (loss) income | **(676)** | — |
| Net change | **(1,342)** | 1,606 |
| Defined benefit pension plans | | |
| Net (losses) and prior service costs arising during the period | **(10,804)** | (15,050) |
| Net gain (loss) and prior service costs reclassified to net (loss) income | **—** | — |
| Net change | **(10,804)** | (15,050) |
| **Other comprehensive income** | **(12,146)** | (13,444) |
| **Comprehensive (loss) income** | **($539,676)** | $63,505 |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

6

EXAM00234286

| ($ in thousands) | Member's interest | Accumulated deficit | Accumulated other comprehensive loss | Total equity |
|---|---|---|---|---|
| **Balance at January 1, 2010** | $5,378,291 | ($2,338,239) | ($33,294) | $3,006,758 |
| Cumulative effect of change in accounting principles as of January 1, 2010, net of tax | | | | |
| Adoption of ASU 2009-17 | — | (4,269) | — | (4,269) |
| Net income | — | 76,949 | — | 76,949 |
| Other comprehensive income, net of tax | — | — | (13,444) | (13,444) |
| **Balance at December 31, 2010** | $5,378,291 | ($2,265,559) | ($46,738) | $3,065,994 |
| **Balance at January 1, 2011** | **$5,378,291** | **($2,265,559)** | **($46,738)** | **$3,065,994** |
| Net loss | — | **(527,530)** | — | **(527,530)** |
| Capital contribution | **65,928** | — | — | **65,928** |
| Other comprehensive income, net of tax | — | — | **(12,146)** | **(12,146)** |
| **Balance at December 31, 2011** | **$5,444,219** | **($2,793,089)** | **($58,884)** | **$2,592,246** |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

7

EXAM00234287

| Year ended December 31, *($ in thousands)* | **2011** | 2010 |
|---|---|---|
| **Operating activities** | | |
| Net (loss) income | **($527,530)** | $76,949 |
| Reconciliation of net (loss) income to net cash provided by (used in) operating activities | | |
| Depreciation and amortization | **17,062** | 6,378 |
| Provision for loan losses | **(2,697)** | 5,586 |
| Gain on mortgage loans, net | **(163,329)** | (298,672) |
| Net loss on other assets | **13,568** | 3,031 |
| Change in fair value of mortgage servicing rights | **750,136** | 606,073 |
| Originations and purchases of mortgage loans held–for–sale | **(60,562,503)** | (70,106,524) |
| Proceeds from sales and repayments of mortgage loans held–for–sale | **59,499,770** | 69,307,147 |
| Net change in | | |
| Accounts receivable | **779,769** | 562,934 |
| Other assets | **(1,225,671)** | (2,697,605) |
| Other liabilities | **2,354,055** | 2,235,537 |
| Net cash provided by (used in) operating activities | **932,630** | (299,166) |
| **Investing activities** | | |
| Net decrease in consumer mortgage finance receivables and loans | **93,699** | 272,832 |
| Proceeds from sales of foreclosed and owned real estate | **34,014** | 44,343 |
| Other, net | **63,383** | 263,334 |
| Net cash provided by investing activities | **191,096** | 580,509 |
| **Financing activities** | | |
| Net decrease in borrowings from Ally Inc. and affiliates | **(231,919)** | (190) |
| Net (decrease) increase in borrowings from Parent | **(498,277)** | 157,182 |
| Proceeds from issuance of collateralized borrowings in securitization trusts | **—** | 165,936 |
| Repayments of collateralized borrowings in securitization trusts | **(105,258)** | (267,348) |
| Proceeds from other long–term borrowings | **662,932** | 508,000 |
| Repayments of other long–term borrowings | **(840,502)** | (47,072) |
| Net decrease in other short–term borrowings | **(187,739)** | (728,641) |
| Net cash used in financing activities | **(1,200,763)** | (212,133) |
| Net (decrease) increase in cash and cash equivalents | **(77,037)** | 69,210 |
| Cash and cash equivalents at beginning of year | **194,340** | 125,130 |
| Cash and cash equivalents at end of year | **$117,303** | $194,340 |

8

EXAM00234288

GMAC Mortgage, LLC

| Year ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| **Supplemental disclosures** | | |
| Cash paid for | | |
| Interest | $104,088 | $236,585 |
| Income taxes | 17,354 | 16 |
| Non cash items | | |
| Mortgage loans held–for–sale transferred to other assets | 21,231 | 52,599 |
| Mortgage loans held–for–sale transferred to accounts receivable | 1,169,108 | 655,836 |
| Mortgage servicing rights recognized upon the transfer of financial assets | 54,426 | 184,494 |
| Capital contributions through forgiveness of borrowings from Ally Inc. | 65,928 | — |
| Change upon initial adoption of new accounting standard (ASU 2009-17): | | |
| Increase in consumer finance receivables and loans | — | 252,064 |
| Increase in collateralized borrowings in securitization trusts | — | 228,586 |
| Decrease in consumer finance receivables and loans upon deconsolidation | — | 216,930 |
| Decrease in collateralized borrowings upon deconsolidation | — | 208,839 |
| Other disclosures | | |
| Proceeds from sales and repayments of consumer finance receivables and loans originally designated as mortgage loans held–for–sale | $66,200 | $206,910 |
| **Reconciliation of mortgage loans held–for–sale** | | |
| Mortgage loans held–for–sale at beginning of year | $3,384,115 | $2,729,973 |
| Originations and purchases of mortgage loans | 60,562,503 | 70,106,524 |
| Gain on sale of mortgage loans | 163,329 | 298,672 |
| Proceeds from sales and repayments of mortgage loans | (59,499,770) | (69,307,147) |
| Proceeds from sales and repayments of loans transferred from consumer finance receivables and loans | (34,648) | (77,156) |
| Originations of mortgage servicing rights | (54,426) | (184,494) |
| Transfers to consumer finance receivables and loans | — | 1,161 |
| Transfers to accounts receivable | (1,169,108) | (655,836) |
| Transfers to other assets | (21,231) | (52,599) |
| Net change in delinquent loans subject to repurchase option | (64,523) | 571,090 |
| Other, net | (160,889) | (46,073) |
| Mortgage loans held–for–sale at end of year | $3,105,352 | $3,384,115 |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

9

CONFIDENTIAL                                   EXAM00234289

# 1. Description of Business and Significant Accounting Policies

GMAC Mortgage, LLC (GMAC Mortgage, we, our, or us) is a wholly owned subsidiary of GMAC Residential Holding Company, LLC (RHC or Parent) which is a wholly owned subsidiary of Residential Capital, LLC (ResCap) which is a wholly owned subsidiary of Ally Financial Inc. (Ally Inc.). References throughout these financial statements to Ally Inc. and subsidiaries corresponds to Ally Inc. and its consolidating subsidiaries excluding ResCap and its consolidating subsidiaries. References to ResCap and affiliates corresponds to ResCap and its consolidating subsidiaries.

We purchase, sell, securitize, and service residential mortgage loans in the United States. We broker virtually all of the loan production from our origination channels to our affiliate, Ally Bank. Virtually all of our loan purchases are executed with Ally Bank, and consist primarily of agency eligible or government insured loans. Prime credit quality loans originated in conformity with the underwriting guidelines of the Federal National Mortgage Association (Fannie Mae) and Federal Home Loan Mortgage Corporation (Freddie Mac) are generally sold to one of these government-sponsored entities in the form of agency-sponsored securitizations. Prime credit quality loans originated in conformity with the underwriting guidelines of the Federal Housing Administration (FHA) and Department of Veterans Affairs (VA) are generally sold into securitizations guaranteed by the Government National Mortgage Association (Ginnie Mae and with Fannie Mae and Freddie Mac collectively, the GSEs).

On November 2, 2011, Ally Inc. announced that in order to proactively address changes in the mortgage industry as a whole, Ally Bank would be taking immediate action to reduce its focus on its correspondent mortgage lending channel. The correspondent lending channel represents approximately 84% of Ally Bank's 2011 mortgage loan originations. For the year ended December 31, 2011, we purchased $56.7 billion of mortgage loans from Ally Bank, which represents 93.6% of our total originations and purchases of consumer mortgage loans of $60.6 billion. We do not expect this action to have a material adverse impact on our financial condition, results of operations or cash flows. We do, however, expect the level of mortgage loan purchases from Ally Bank to decline in future periods, potentially significantly.

We, ResCap, and our affiliates have been negatively impacted by the events and conditions in the mortgage banking industry and the broader economy, both domestically and internationally. The market deterioration led to fewer sources and significantly reduced levels of liquidity to finance our operations. We are highly leveraged relative to our cash flow and previously recognized credit and valuation losses that resulted in a significant deterioration in capital. We have been, and may continue to be, negatively impacted by exposure to representation and warranty obligations, adverse outcomes with respect to current or future litigation, fines, penalties or settlements related to our business activities and additional expenses to address regulatory requirements. Our ability to continue to purchase, sell, securitize and service residential mortgage loans could be negatively impacted by any change in our access to programs available to us under our agreements with the GSEs.

All of ResCap's credit facilities and certain of our agreements contain covenants that require ResCap to maintain consolidated tangible net worth of $250.0 million as of each month end. We have joint and several liability, along with our affiliate Residential Funding Company, LLC (RFC), under facilities with Ally Inc. and its subsidiaries. There are cross default provisions included within and among the credit facilities and ResCap's senior unsecured and junior secured debt and certain other agreements. A default under any one of these agreements can, through cross default provisions, create defaults in all of the other agreements. Failure to meet this covenant represents an event of default and may result in, among other things, an acceleration of the facility's maturity and/or may trigger an early amortization event. See Note 8 - Borrowings for additional information related to financial covenants and counterparties' remedies in an event of default. Furthermore, we and other of our affiliates, including RHC and RFC, are guarantors of the obligations of ResCap with respect to its 9.625% Junior Secured Guaranteed Notes due 2015 and certain medium-term unsecured notes issued by GMAC Financiera S.A. de C.V., SOFOM, ENR, a wholly-owned subsidiary of RFC. See Note 18 - Guarantees, Commitments and Contingencies for additional information relating to these guarantees.

ResCap's consolidated tangible net worth, as defined, as of December 31, 2011 was $92.4 million, which constitutes an event of default under its credit facilities and certain of our other agreements. ResCap obtained waivers or acknowledgment letters from each of the liquidity providers in connection with the credit facilities and counterparties to agreements with financial covenants under which they agreed not to pursue their contractual remedies with respect to the default. These waivers were predicated, in part, on a January 30, 2012 capital contribution received from Ally Inc. ResCap is in compliance with any conditions with respect to these waivers and acknowledgment letters. ResCap is in compliance with all of its financial covenants as of March 28, 2012 the date of issuance of these Consolidated Financial Statements.

10

CONFIDENTIAL

ResCap received capital support in the form of debt forgiveness from Ally Inc. of $109.4 million during the year ended December 31, 2011. We recognized a capital contribution from our Parent of $65.9 million, and a corresponding reduction of our borrowings under the Ally Inc. Line of Credit (Ally Inc. LOC), during the year ended December 31, 2011 in connection with Ally Inc.'s capital support to ResCap. In December 2011, GMAC Mortgage and RFC entered into a $250.0 million secured financing agreement with BMMZ Holdings, LLC (BMMZ), a wholly owned subsidiary of Ally Inc., which replaced secured financing agreements with unaffiliated third-party liquidity providers. We remain heavily dependent on Ally Inc. and its subsidiaries for funding, and except as noted in these financial statements, Ally Inc. and its subsidiaries are under no obligation to provide such support and there can be no assurance that they will continue such actions. Consequently, there remains substantial doubt about our ability to continue as a going concern. Should Ally Inc. or ResCap no longer continue to support our capital or liquidity needs or should we, and ResCap, be unable to successfully execute other initiatives, it would have a material adverse effect on our business, financial condition and results of operations.

On February 9, 2012, Ally Inc., ResCap and GMAC Mortgage entered into agreements with the Federal Government, State Attorneys General and state banking departments (the Settlement) in connection with investigations into procedures followed by mortgage servicing companies and banks in connection with mortgage foreclosure home sales and evictions. On March 12, 2012, the Settlement was filed as a consent judgment in the U.S. District Court for the District of Columbia. ResCap and GMAC Mortgage separately reached an independent settlement with Oklahoma, which did not participate in the broader settlement and entered into agreements with two other states for other releases. The Settlement requires cash payments of $110.0 million and borrower relief of $200.0 million, subject to an upward adjustment, over a three year period. We are also required to make cash payments of approximately $2.5 million in connection with separate state agreements. Borrower relief will include loan modifications, including principal reductions, rate modifications and refinancing for borrowers that meet certain criteria, and participation in certain other programs. The Settlement does not prevent state and federal authorities from pursuing criminal enforcement actions, securities-related claims (including actions related to securitization activities and Mortgage Electronic Registration Systems, or MERS), loan origination claims, certain claims brought by the Federal Deposit Insurance Corporation (FDIC) and the GSEs, and certain other matters. The Settlement also does not prevent claims that may be brought by individual borrowers.

On February 9, 2012, Ally Inc., ResCap and GMAC Mortgage also agreed in principle with the Board of Governors of the Federal Reserve on a civil monetary penalty (CMP) of $207.0 million related to the same activities that were the subject of the Settlement. This amount will be reduced dollar-for-dollar in connection with certain aspects of our satisfaction of the required monetary payment and borrower relief obligations included within the Settlement. For the year ended December 31, 2011, we recognized $211.5 million of expense related to the Settlement and separate state agreements. See Note 18 - Guarantees, Commitments and Contingencies for additional information.

On January 30, 2012, ResCap and GMAC Mortgage received $196.5 million in capital support from Ally Inc. in connection with the settlement agreements and CMP in the form of debt forgiveness. We recognized a capital contribution from our Parent of $124.2 million, and a corresponding reduction in borrowings under the Ally Inc. LOC, as of January 30, 2012 in connection with Ally Inc.'s capital support to ResCap. See Note 20 - Related Party Transactions for additional information.

On January 30, 2012, we and ResCap entered into an agreement with Ally Inc. (the Letter Agreement) in connection with the $196.5 million in capital support. In consideration of this Letter Agreement, ResCap agreed to certain terms and conditions, including but not limited to, agreeing to meet its obligations to regulatory bodies or governmental agencies in connection with certain settlements and penalties (including the required payment under the Settlement described above), to negotiate in good faith an amendment to our subservicing agreement with Ally Bank and to negotiate in good faith such documents as are necessary to terminate certain swap agreements with Ally Bank and to enter into new agreements with Ally Investment Management Inc. (Ally IM), a wholly owned subsidiary of Ally Inc. See Note 20 - Related Party Transactions for additional information.

In concert with ResCap, we seek to manage our liquidity and capital positions and explore initiatives to address ongoing debt covenant compliance and liquidity needs, including debt maturing in the next twelve months and other risks and uncertainties. We have $1.1 billion in debt maturing in 2012, including $323.0 million in mortgage servicing rights secured funding facility borrowings maturing in March 2012 and $749.2 million in secured borrowings from Ally Inc. and its subsidiaries maturing in April 2012. These initiatives could include, but are not limited to, the following: continuing to work with key credit providers to optimize all available liquidity options; continued exploration of funding and capital support from Ally Inc. and subsidiaries; and further reductions in assets or other restructuring activities, which could include a restructuring achieved through a Chapter 11 bankruptcy filing.

The outcomes of certain of these initiatives are, to a great extent, outside of our control, resulting in increased uncertainty as to their successful execution. There continues to be a risk that we or ResCap may not be able to meet our or its debt service obligations, may default on our or its financial debt covenants due to insufficient capital, and/or may be in a negative liquidity position in future periods.

11

CONFIDENTIAL

EXAM00234291

## Consolidation and Basis of Presentation

The accompanying Consolidated Financial Statements were prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The Consolidated Financial Statements include our accounts and accounts of our majority–owned subsidiaries after eliminating all significant intercompany balances and transactions and include all variable interest entities (VIEs) in which we are the primary beneficiary. See Note 4 — Securitization and Variable Interest Entities for additional information. Our accounting and reporting policies conform to accounting principles generally accepted in the United States of America.

Certain amounts in prior periods have been reclassified to conform to the current period presentation. During 2011, interest paid to investors of $57.2 million in connection with consumer mortgage loans that were paid off prior to their stated maturity and interest paid to borrowers of $5.4 million in connection with escrow deposits, both of which were included in interest expense in prior periods, have been reclassified to servicing fees in the Consolidated Statement of Income. Additionally, interest paid on loans of $57.9 million that we repurchased out of Ginnie Mae securitizations, which was included in interest expense, has been reclassified to interest income in the Consolidated Statement of Income. These reclassifications have no impact to our consolidated financial position or results of operations.

During 2011, we identified errors in periods prior to 2011 which were not material to those prior periods. As a result, we corrected those errors in 2011 resulting in additional expense of $42.1 million, an increase in payables to affiliates of $47.4 million, and an increase in cash of $5.3 million. The misstatement had no impact on our consolidated financial condition at December 31, 2011.

## Use of Assumptions and Critical Accounting Estimates

The preparation of financial statements in conformity with (Generally Accepted Accounting Principles) GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and income and expenses during the reporting period and critical accounting estimates. In developing these estimates and assumptions, management uses available evidence at the time of the financial statements. Because of uncertainties associated with estimating the amounts, timing and likelihood of possible outcomes, actual results could differ from our estimates. An accounting estimate is considered critical if the estimate requires management to make assumptions about matters that were highly uncertain at the time the accounting estimate was made, and if different estimates reasonably could have been used or changes in the accounting estimate are reasonably likely to occur from period to period that would have a material impact on our financial condition, results of operations or cash flows. If actual results differ from our assumptions, it may have an adverse impact on the results of operations and cash flows.

### Valuation of Mortgage Loans Held–for–Sale

Mortgage loans held–for–sale are typically pooled together and sold into certain exit markets depending on the underlying attributes of the loan, product type, interest rate, and credit quality. To the extent observable market prices are not available, we will determine the fair value of mortgage loans held–for–sale using internally developed valuation models. These loans are valued on a discounted cash flow basis utilizing cash flow projections from internally developed models that require prepayment, default and discount rate assumptions. To the extent available, we will utilize market observable inputs such as interest rates and market spreads. If market observable inputs are not available, we are required to utilize internal inputs, such as prepayment speeds, credit losses, and discount rates. While numerous controls exist to calibrate, corroborate and validate the internal inputs, they require the use of judgment by us and can have a significant impact on the determination of the loan's estimated fair value.

### Valuation of Mortgage Servicing Rights

Mortgage servicing rights (MSRs) represent the capitalized value of the right to receive future cash flows from the servicing of mortgage loans for others. MSRs are a significant source of value derived from originating or acquiring mortgage loans. Because residential mortgage loans typically contain a prepayment option, borrowers often elect to prepay their mortgage loans by refinancing at lower rates during declining interest rate environments. The borrower's ability to prepay is at times impacted by other factors in the current environment that may limit their eligibility to access a refinance (e.g. a high loan to value ratio). When this occurs, the stream of cash flows generated from servicing the original mortgage loan is terminated. As such, the market value of MSRs has historically been very sensitive to changes in interest rates and tends to decline as market interest rates decline and increase as interest rates rise. We capitalize MSRs on residential mortgage loans that we have originated and purchased based upon the fair value of the servicing rights associated with the underlying mortgage loans at the time the loans were sold or securitized. GAAP requires that the value of MSRs be determined based on market transactions for comparable servicing assets, if available. In the absence of representative market trade information, valuations should be based on other available market evidence and modeled market expectations of the present value of future estimated net cash flows that market participants would expect from servicing. When observable prices are not available, management uses internally developed discounted cash flow models to estimate the fair value. These internal valuation models estimate net cash flows based on internal operating assumptions that we believe would be used by

12

CONFIDENTIAL

EXAM00234292

market participants combined with market–based assumptions for loan prepayment rates, interest rates, default rates, and discount rates that management believes approximate yields required by investors for these assets. Servicing cash flows primarily include servicing fees, ancillary income, and late fees less operating costs to service the loans. The estimated cash flows are discounted using an option-adjusted spread-derived discount rate. Management considers the best available information and exercises significant judgment in estimating and assuming values for key variables in the modeling and discounting process. All of our MSRs are carried at estimated fair value.

We use the following key assumptions in our valuation approach:

- *Prepayment* — The most significant drivers of MSR value are actual and forecasted portfolio prepayment behavior. Prepayment speeds represent the rate at which borrowers repay their mortgage loans prior to scheduled maturity. The most significant factor influencing prepayment speeds is the interest rate environment. However, prepayment speeds are influenced by a number of factors such as the value of the collateral, government programs, and other market factors. As interest rates rise, prepayment speeds generally slow, and as interest rates decline, prepayment speeds generally accelerate. When mortgage loans are paid or expected to be paid earlier than originally estimated, the expected future cash flows associated with servicing such loans are reduced. We primarily use third–party models to project residential mortgage loan payoffs. In other cases, we estimate prepayment speeds based on historical and expected future prepayment rates. We measure model performance by comparing prepayment predictions against actual results at both the portfolio and product level.

- *Discount rate* — The cash flows of our MSRs are discounted utilizing appropriate risk-adjusted yield assumptions that, when applied to projected cash flows, produce benchmarked fair value

- *Base mortgage rate* — The base mortgage rate represents the current market interest rate for newly originated mortgage loans. This rate is a key component in estimating prepayment speeds of our portfolio because the difference between the current base mortgage rate and the interest rates on existing loans in our portfolio is an indication of the borrower's likelihood to refinance.

- *Cost to service* — In general, servicing cost assumptions are based on actual expenses directly related to servicing. These servicing cost assumptions are compared to market-servicing costs when market information is available. Our servicing cost assumptions include expenses associated with our activities related to loans in default.

- *Volatility* — Volatility represents the expected rate of change of interest rates. The volatility assumption used in our valuation methodology is intended to estimate the range of expected outcomes for future interest rates. We use implied volatility assumptions in connection with the valuation of our MSRs. Implied volatility is defined as the expected rate of change in interest rates derived from the prices at which options on interest rate swaps or swaptions are trading.

We also periodically perform a series of reasonableness tests as we deem appropriate, including the following:

- *Review and compare data provided by an independent third–party broker.* We evaluate and compare our fair value price, multiples, and underlying assumptions to data, including prepayment speeds, discount rates, and cost to service provided by an independent third–party broker.

- *Review and compare pricing of publicly traded interest-only securities.* We evaluate and compare our fair value to publicly traded interest-only stripped mortgage-backed securities (MBS) by age and coupon for reasonableness.

- *Review and compare fair value price and multiples.* We evaluate and compare our fair value price and multiples to market fair value price and multiples in external surveys produced by third–parties.

- *Compare actual monthly cash flows to projections.* We compare actual monthly cash flows to those projected in the MSR valuation. Based upon the results of this comparison, we assess the need to modify the individual assumptions used in the valuation. This process calibrates the model to actual servicing cash flow results.

- *Review and compare recent bulk mortgage servicing right acquisition activity.* We evaluate market trades for reliability and relevancy and then consider, as appropriate, our estimate of fair value of each significant transaction to the traded price. Currently, there is a lack of comparable transactions between willing buyers and sellers in the bulk acquisition market, which are the best indicators of fair value. However, we continue to monitor and track market activity on an ongoing basis.

We generally expect our valuation to be within a reasonable range of these comparisons. Changes in these assumptions could have a significant impact on the determination of fair value. In order to develop our best estimate of fair value, management reviews

13

CONFIDENTIAL

and analyzes the output from the models and makes adjustments to the valuation to take into consideration other factors that may not be captured. If we determine our valuation has exceeded the reasonable range, we may adjust it accordingly.

The assumptions used in modeling expected future cash flows of MSRs have a significant impact on the fair value of MSRs and potentially a corresponding impact to earnings. See Note 5 — Servicing Activities for sensitivity analysis. At December 31, 2011, based on the market information obtained, we determined that our MSR valuations and assumptions used to value those servicing rights were reasonable and consistent with what an independent market participant would use to value the assets.

### Legal and Regulatory Reserves

Our legal and regulatory reserves reflect management's best estimate of probable losses in connection with legal and regulatory matters. As a legal or regulatory matter develops, management, in conjunction with internal and external counsel handling the matter, evaluates on an ongoing basis whether such matter presents a loss contingency that is both probable and estimable. If, at the time of evaluation, the loss contingency related to a legal or regulatory matter is not both probable and estimable, the matter will continue to be monitored for further developments that would make such loss contingency both probable and estimable. When the loss contingency related to a legal or regulatory matter is deemed to be both probable and estimable, we will establish a liability with respect to such loss contingency and record a corresponding amount to other noninterest expense, net. To estimate the probable loss, we evaluate the individual facts and circumstances of the case including information learned through the discovery process, rulings on dispositive motions, settlement discussions, our prior history with similar matters and other rulings by courts, arbitrators or others. The reserves are continuously monitored and updated to reflect the most recent information related to each matter.

Additionally, in matters for which a loss contingency is not deemed probable, but rather reasonably possible to occur, we would attempt to estimate a loss or range of loss related to that event, if possible. For these matters, we do not record a liability. However, if we are able to estimate a loss or range of loss, we would disclose this loss, if it is material to our consolidated financial statements. To estimate a range of probable or reasonably possible loss, we evaluate each individual case in the manner described above. We do not accrue for matters for which a loss event is deemed remote.

For details regarding the nature of all material contingencies, refer to Note 18 — Guarantees, Commitments and Contingencies.

### Liability for Representation and Warranty Obligations

The liability for representation and warranty obligations reflects management's best estimate of probable lifetime loss. We consider historical and recent demand trends in establishing the reserve. The methodology used to estimate the reserve considers a variety of assumptions including borrower performance (both actual and estimated future defaults), repurchase demand behavior, historical loan defect experience, historical and estimated future loss experience, which includes projections of future home price changes as well as other qualitative factors including investor behavior. In cases where we have limited or no current or historical demand experience with an investor, because of the inherent difficulty in predicting the level and timing of future demands, if any, losses cannot be reasonably estimated, and a liability is not recognized. Management monitors the adequacy of the overall reserve and makes adjustments to the level of reserve, as necessary, after consideration of other qualitative factors including ongoing dialogue with counterparties.

## Significant Accounting Policies

### Cash and Cash Equivalents

Cash and cash equivalents include cash on hand and certain highly liquid investment securities with maturities of three months or less from the date of purchase. Cash and cash equivalents that have restrictions as to our ability to withdraw the funds are included in other assets. The fair value of cash equivalents approximates book value because of the short maturities of these instruments.

### Securitizations and Variable Interest Entities

We securitize, sell, and service consumer mortgage loans. Securitization transactions typically involve the use of variable interest entities and are accounted for either as sales or secured financings. Economic interests in the securitized and sold assets are generally retained in the form of senior or subordinated interests, interest– or principal–only strips, cash reserve accounts, residual interests, and servicing rights.

In order to conclude whether or not a variable interest entity is required to be consolidated, careful consideration and judgment must be given to our continuing involvement with the variable interest entity. In circumstances where we have both the power to direct the activities of the entity that most significantly impact the entity's performance and the obligation to absorb losses or the right to receive benefits of the entity that could be significant, we consolidate the entity, which would also preclude us from recording an accounting sale on the transaction. In the case of a consolidated variable interest entity, the accounting is consistent with a secured financing, that is, we continue to carry the loans and we record the securitized debt on our balance sheet. Further, there is no specific accounting record of our economic interests; rather, they are captured as the difference between the recognized assets and liabilities.

14

CONFIDENTIAL

EXAM00234294

In transactions where either one or both of the power or economic criteria mentioned above are not met, we determine whether or not we achieve a sale for accounting purposes. In order to achieve sale for accounting purposes, the assets being transferred must be legally isolated, not be constrained by restrictions from further transfer, and be deemed to be beyond our control. If we were to fail any of the three criteria for sale accounting, the accounting would be consistent with the preceding paragraph (i.e., a secured borrowing). However, if we meet the criteria, the transaction would be recorded as a sale, and the variable interest entity would not be consolidated. See Note 4 — Securitizations and Variable Interest Entities for discussion on variable interest entities.

Gains or losses on off–balance sheet securitizations take into consideration the fair value of the retained interests including the value of certain servicing assets or liabilities, which are initially recorded at fair value at the date of sale. The estimate of the fair value of the retained interests and servicing requires us to exercise significant judgment about the timing and amount of future cash flows from the interests. See Note 15 — Fair Value for a discussion of fair value estimates.

Gains or losses on off–balance sheet securitizations are reported in gain on mortgage loans, net. Changes in the fair value of retained interests are reflected in other revenue, net. Retained interests, as well as any purchased securities, are included in other assets. Securities that are noncertificated and cash reserve accounts related to securitizations are included in other assets.

Our affiliate, RFC generally retains master servicing for our non-agency consumer mortgage loan securitizations. We may receive servicing fees based on the securitized loan balances and certain ancillary fees, all of which are reported in servicing fees. We also retain the right to service the consumer mortgage loans sold in securitization transactions involving Ginnie Mae, Fannie Mae, Freddie Mac, and private investors.

Whether on or off balance sheet, the investors in the securitization trusts generally have no recourse to our assets outside of customary market representation and warranty provisions.

**Mortgage Loans Held–for–sale**

Mortgage loans held-for-sale are carried at lower of cost or fair value or at estimated fair value. The majority of held-for-sale loans are pooled together for purposes of determining the lower of cost or fair value based on loan characteristics. Fair value is determined by type of loan and is generally based on contractually established commitments from investors, current investor yield requirements, current secondary market pricing, or cash flow models using market–based yield requirements. Our fair value option election loans primarily consist of conforming and government-insured mortgage loans. See Note 15 — Fair Value for details on fair value measurement.

We hold conditional repurchase options in off-balance sheet securitizations that allow us to repurchase a loan at par if it exceeds a certain pre-specified delinquency level (e.g. 90 days). We have discretion regarding when or if we will exercise these options, but generally we will do so only when it is in our best interest. We recognize those assets that can be repurchased under the conditional repurchase option (and any related liability to pay the trust) once the condition has been satisfied, but only in those situations where we have determined that we would have a more than trivial benefit. The assets are recorded in mortgage loans held-for-sale with a corresponding liability in other liabilities. We do not record the asset (and related liability to pay the trust) when delinquent loan repurchase options are both quantitatively and qualitatively deep out of the money, because we would not have a more than trivial benefit from the options.

**Finance Receivables and Loans**

We classify finance receivables and loans either as held-for-sale or held-for-investment based on management's assessment of its intent and ability to hold for the foreseeable future or until maturity. Management's intent and ability may change from time to time depending on a number of factors including economic, liquidity, and capital conditions. Management's view of the foreseeable future is generally a twelve–month period based on the longest reasonably reliable net income, liquidity, and capital forecast period.

We elected the fair value option for consumer mortgage finance receivables and loans related to certain of our on–balance sheet securitizations that were consolidated upon the adoption of ASU 2009–17. These securitized mortgage loans are legally isolated from us and are beyond the reach of our creditors. They are measured at fair value using a portfolio approach, or an in-use premise. The values for loans held on an in-use basis may differ considerably from loans held–for–sale that can be sold in the whole-loan market. This difference arises primarily due to the liquidity of the asset-backed (ABS) or MBS securities market and is evident in the fact that spreads applied to lower rated ABS/MBS are considerably wider than spreads observed on senior bond classes and in the whole-loan market. The objective in linking the fair value of these loans to the fair value of the related securitization debt is to properly account for our retained economic interest in the securitizations. See Note 15 — Fair Value for details on fair value measurement.

The balance of our consumer finance receivables and loans are reported at the principal amount outstanding, net of unearned income, premiums and discounts, and allowances. Unearned income, which includes deferred origination fees reduced by origination costs, is amortized over the contractual life of the related finance receivable or loan using the interest method. Loan commitment fees are deferred and amortized over the commitment period.

15

EXAM00234295

GMAC Mortgage, LLC

Our classes of consumer finance receivables are based on several factors including the method for monitoring and assessing credit risk, the method of measuring carrying value, and the risk characteristics of the finance receivable.

Our classes of finance receivables are:

- *1st Mortgage* — Consists of residential mortgage loans that are secured in a first–lien position and have priority over all other liens or claims on the respective collateral.

- *Home equity* — Consists of residential home equity loans or mortgages with a subordinate–lien position.

## Nonaccrual Loans

Generally, we recognize all classes of loans as past due when they are 30 days delinquent. Revenue recognition is suspended when loans are placed on nonaccrual status. Generally, all classes of consumer loans are placed on nonaccrual status when delinquent for more than 60 days or when determined not to be probable of full collection. Revenue accrued, but not collected, at the date loans are placed on nonaccrual status is reversed and subsequently recognized only to the extent it is received in cash or until the loan qualifies for return to accrual status. Where there is doubt regarding the ultimate collectability of loan principal, all cash received is applied to reduce the carrying value of the loan. Loans are restored to accrual status only when contractually current and the collection of future payments is reasonably assured. Typically, this requires a sustained period of repayment performance of at least six consecutive months by the borrower.

## Charge–offs

Consumer first–lien mortgage loans, which consist of our entire 1st mortgage class and a subset of our home equity class that are secured by real estate, are written down to the estimated fair value of the collateral, less costs to sell, once a mortgage loan becomes 180 days past due. Second-lien consumer mortgage loans within our consumer home equity class are charged off at 180 days past due. First and second–lien consumer mortgage loans in bankruptcy that are 60 days past due are written down to the estimated fair value of the collateral, less costs to sell, within 60 days of receipt of notification of filing from the bankruptcy court. Loans are considered collateral dependent at the time foreclosure proceedings begin and are charged off to the estimated fair value of the collateral, less costs to sell.

## Allowance for Loan Losses

The allowance for loan losses (the allowance) is management's estimate of incurred losses with respect to our consumer loan portfolio. Additions to the allowance are charged to current period earnings through the provision for loan losses; amounts determined to be uncollectible are charged directly against the allowance, net of amounts recovered on previously charged–off accounts.

The allowance is comprised of two components: reserves established for specific loans evaluated as impaired and portfolio-level reserves established for large groups of typically smaller balance homogenous loans that are collectively evaluated for impairment. We evaluate the adequacy of the allowance based on the combined total of these two components. Determining the appropriateness of the allowance is complex and requires judgment by management about the effect of matters that are inherently uncertain. It is possible that others, given the same information, may at any point in time reach different reasonable conclusions.

Measurement of impairment for specific reserves is generally determined on a loan–by–loan basis. Loans determined to be specifically impaired are measured based on the present value of expected future cash flows discounted at the loan's effective interest rate, an observable market price, or the estimated fair value of the collateral less costs to sell, whichever is determined to be the most appropriate. When these measurement values are lower than the carrying value of that loan, impairment is recognized. Loans that are deemed not to be individually impaired are pooled with other loans with similar risk characteristics for evaluation of impairment for the portfolio-level allowance.

The allowance consists of the combination of a quantitative assessment component based on statistical models, a retrospective evaluation of actual loss information to loss forecasts, and may include a qualitative component based on management judgment. Management takes into consideration relevant qualitative factors, including external and internal trends such as the impacts of changes in underwriting standards, collections and account management effectiveness, geographic concentrations, and economic events, among other factors, that have occurred but are not yet reflected in the quantitative assessment component. All qualitative adjustments are adequately documented, reviewed, and approved through our established risk governance processes.

## Mortgage Servicing Rights

Primary servicing rights represent our right to service consumer residential mortgage loans. Primary servicing involves the collection of payments from individual borrowers and the distribution of these payments to the master servicer. Master servicing rights represent our right to service mortgage–and asset–backed securities and whole–loan packages issued for investors. Master servicing involves the collection of borrower payments from primary servicers and the distribution of those funds to investors. We

16

EXAM00234296

GMAC Mortgage, LLC

may at times purchase and sell primary and master servicing rights through transactions with other market participants.

We capitalize the value expected to be realized from performing specified mortgage servicing activities for others as MSRs when the expected future cash flows from servicing are projected to be more than adequate compensation for such activities. These capitalized servicing rights are purchased or retained upon sale or securitization of mortgage loans. MSRs are not recorded on securitizations accounted for as secured financings.

We measure all mortgage servicing assets at fair value. We define our servicing rights based on the availability of market inputs and the manner in which we manage the risks of our servicing assets. We leverage available relevant market data to determine the fair value of our recognized servicing assets.

### Accounts Receivable

Accounts receivable are recorded at net realizable value and include servicer advances and receivables. Servicer advances arise in the ordinary course of business as we make advances to investors in mortgage loans serviced by us. Such advances are generally made to maintain scheduled investor cash flows in the event of borrower default or delinquency and may reflect payments of property taxes and insurance premiums in advance of collection from borrowers; principal and interest payments to investors prior to their collection from borrowers; and amounts advanced for mortgages in foreclosure. Servicer advances receive priority cash flows, including contractual interest, in the event of foreclosure or liquidation. As a result, the collection of the advances is reasonably assured. We establish a reserve for any servicing advances where collectability is in doubt.

### Derivative Instruments and Hedging Activities

We use derivative instruments for risk management purposes. We have not elected to designate any of our derivative instruments in a qualifying hedging relationship. All derivative financial instruments are recorded as other assets or other liabilities and are measured at fair value and reported in current period earnings. Additionally, we report derivative financial instruments on a gross basis.

### Foreclosed Assets

Assets are classified as foreclosed and included in other assets when physical possession of the collateral is taken regardless of whether foreclosure proceedings have taken place. Foreclosed assets are carried at the lower of the outstanding balance at the time of foreclosure or the fair value of the asset less estimated costs to sell. Losses on the revaluation of foreclosed assets are charged to gain on mortgage loans, net at the time of foreclosure. Declines in value after foreclosure are charged to loss on foreclosed real estate.

### Property and Equipment

Property and equipment, stated at cost, net of accumulated depreciation and amortization, are reported in other assets. Included in property and equipment are certain buildings, furniture and fixtures, leasehold improvements, IT hardware and software, and capitalized software costs. Depreciation is computed on the straight–line basis over the estimated useful lives of the assets, which generally ranges from 3 to 30 years. Capitalized software is generally amortized on a straight–line basis over its useful life, which generally ranges from three to five years. Capitalized software that is not expected to provide substantive service potential or for which development costs significantly exceed the amount originally expected is considered impaired and written down to fair value. Software expenditures that are considered general, administrative, or of a maintenance nature are expensed as incurred.

### Legal and Regulatory Reserves

Reserves for legal and regulatory matters are established when those matters present loss contingencies that are both probable and estimable, with a corresponding amount recorded to noninterest expense. In cases where we have an accrual for losses, it is our policy to include within that estimate an estimate for probable and estimable legal expenses related to the case. If, at the time of evaluation, the loss contingency related to a litigation or regulatory matter is not both probable and estimable, we do not establish an accrued liability. We continue to monitor legal and regulatory matters for further developments that could affect the requirement to establish a liability or that may impact the amount of a previously established liability. There may be exposure to loss in excess of any amounts recognized. For certain other matters where the risk of loss is determined to be reasonably possible, estimable, and material to the financial statements, disclosure regarding details of the matter and an estimated range of loss is required. The estimated range of possible loss does not represent our maximum loss exposure. Financial statement disclosure is also required for matters that are deemed probable or reasonably possible, material to the financial statements, but for which an estimated range of loss is not possible to determine. While we believe our reserves are adequate, the outcome of legal and regulatory proceedings is extremely difficult to predict and we may settle claims or be subject to judgments for amounts that differ from our estimates. For details regarding the nature of all material contingencies, see Note 18 — Guarantees, Commitments and Contingencies.

### Liability for Representation and Warranty Obligations

We sell loans that take the form of securitizations guaranteed by the GSEs and to whole–loan purchasers. In addition, we

17

EXAM00234297

infrequently sell securities to investors through private-label securitizations. In prior years, our volume of private label securitization issuance was considerably larger and included securitized loans where monolines insured the related bonds. In connection with these activities we provide to the GSEs, investors, monolines, and whole–loan purchasers various representations and warranties related to the loans sold. These representations and warranties generally relate to, among other things, the ownership of the loan; the validity of the lien securing the loan; the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer; ability to deliver required documentation; and compliance with applicable laws. Generally, these representations and warranties may be enforced at any time over the life of the loan. We also assume all of the customary representation and warranty obligations for loans we purchase from Ally Bank and subsequently sell into the secondary market.

Upon a breach of a representation, we correct the breach in a manner conforming to the provisions of the sale agreement. This may require us either to repurchase the loan, to indemnify (make–whole) a party for incurred losses, or provide other recourse to a GSE, monoline, or investor. Repurchase demands and claims for indemnification payments are generally reviewed on a loan–by–loan basis to validate if there has been a breach requiring repurchase or a make–whole payment. We actively contest claims to the extent we do not consider them valid. In cases where we repurchase loans, we bear the subsequent credit loss on the loans. Repurchased loans are classified as held–for–sale and initially recorded at fair value. Any initial impairment is charged to the liability for representation and warranty obligations. We seek to manage the risk of repurchase and associated credit exposure through our underwriting and quality assurance practices and by servicing mortgage loans to meet investor standards.

At the time a loan is sold, an estimate of the fair value of the liability is recorded and classified in other liabilities and recorded as a component of gain on mortgage loans, net. We recognize changes in the liability throughout the life of the sold loans, as necessary, when additional relevant information becomes available. Changes in the liability are recorded as representation and warranty expense.

**Reinsurance Arrangements**

We have entered into excess layer reinsurance agreements with non-affiliated private mortgage insurance (PMI) companies that provide PMI for certain of our mortgage loan servicing portfolio. We assume the risk of loss over a specified first loss percentage for covered loans and in return earn a portion of the PMI premium associated with those mortgage loans. We reserve for loss and loss adjustment expenses when notices of default on insured mortgage loans are received and the specified first loss percentage covered by the ceding company is exhausted.

**Income Taxes**

We, through ResCap, are a division of Ally Inc., a corporation, for income tax purposes. We are subject to corporate U.S. Federal, state, and local taxes and are included in the consolidated Ally Inc. U.S. Federal and unitary and/or consolidated state income tax returns. We provide for our U.S. Federal and state taxes on a stand alone basis which is consistent with the applicable tax sharing agreement between us and our Parent. The tax sharing agreement requires taxes to be based on the income tax liability determined as if we were a separate affiliated group of corporations filing consolidated U.S. Federal and state income tax returns.

Income taxes are accounted for using the asset and liability method. Under this method, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. Deferred tax assets are recognized subject to management's judgment that realization is more likely than not.

## Recently Adopted Accounting Standards

**Comprehensive Income - Presentation of Comprehensive Income (ASU 2011-05)**

As of December 31, 2011, we early adopted Accounting Standards Update (ASU) 2011-05, which amended Accounting Standards Codification (ASC) 220, Comprehensive Income. The amendments increased the prominence of items reported in other comprehensive income and facilitated convergence between GAAP and International Financial Reporting Standards (IFRS). This ASU required that nonowner changes in stockholders' equity be presented either in a single continuous statement of comprehensive income or in two separate but consecutive statements. We elected to early adopt ASU 2011-05, including the deferral permitted under ASU 2011-12 (*Comprehensive Income - Deferral of the Effective Date for Amendments to the Presentation of Reclassifications of Items Out of Accumulated Other Comprehensive Income in Accounting Standards Update No. 2011-05*), by retrospective application for the two years ended December 31, 2011, and 2010. Because this ASU impacts only presentation, there was not a material impact to our financial condition or results of operations.

18

CONFIDENTIAL
EXAM00234298

13-12020-mg Doc 5374-13 Filed 11/12/13 Entered 11/12/13 23:27:50 Exhibit M
Pg 20 of 70

**Receivables - A Creditor's Determination of Whether a Restructuring Is a Troubled Debt Restructuring (ASU 2011-02)**

As of July 1, 2011, we adopted ASU 2011-02, which amends ASC 310, Receivables. ASU 2011-02 clarifies which loan modifications constitute a TDR. It is intended to assist creditors in determining whether a modification of the terms of a receivable meets the criteria to be considered a troubled debt restructuring, both for purposes of recording an impairment loss and for disclosure of TDRs. The ASU must be applied retrospectively to modifications made to the beginning of the annual period of adoption, which for us is January 1, 2011.

Effective September 30, 2011, ASU 2011-02 also required us to disclose, if material, the total amount of receivables and the allowance for credit losses related to those receivables that are newly considered impaired for which impairment was previously measured under ASC 450-20, Contingencies - Loss Contingencies.

The adoption did not have a material impact to our consolidated financial condition or results of operations.

**Receivables - Disclosures about the Credit Quality of Financing Receivables and the Allowance for Credit Losses (ASU 2010-20)**

ASU 2010-20 was implemented in three distinct components as required by the ASU. Beginning with the three months ended September 30, 2011 and in conjunction with the requirements of ASU 2011-02, the deferral of TDR related disclosures within ASU 2010-20 prescribed by ASU 2011-01, *Deferral of the Effective Date of Disclosures about Troubled Debt Restructurings in Update No. 2010-20*, was ended, which required us to expand our TDR disclosures to include more information on modifications that are classified as TDRs. Beginning with the three months ended March 31, 2011, ASU 2010-20 required us to disclose a rollforward of the allowance for loan losses and additional activity-based disclosures for both financing receivables, and the allowance for each reporting period.

We early adopted the rollforward requirement during the December 31, 2010, reporting period along with the initial expansion of disclosures related to the credit quality of finance receivables and loans. Since the guidance relates only to disclosures, adoption of each of the phases did not have a material impact on our consolidated financial condition or results of operations.

## Recently Issued Accounting Standards

**Fair Value Measurement - Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRS (ASU 2011-04)**

In May 2011, the FASB issued ASU 2011-04, which amends ASC 820, Fair Value Measurements. The amendments in this ASU clarify how to measure fair value. It is intended to improve the comparability of fair value measurements presented and disclosed in financial statements prepared in accordance with GAAP and IFRS. The ASU will be effective for us on January 1, 2012, and must be applied prospectively. Early adoption is not permitted. We do not expect the adoption to have a material impact to our consolidated financial condition or results of operations.

**Balance Sheet - Disclosures about Offsetting Assets and Liabilities (ASU 2011-11)**

In December 2011, the FASB issued ASU 2011-11, which contains new disclosure requirements regarding the nature of an entity's rights of setoff and related arrangements associated with its financial instruments and derivative instruments. The new disclosures will give financial statement users information about both gross and net exposures. ASU 2011-11 is effective for us on January 1, 2013, and retrospective application is required. Since the guidance relates only to disclosures, adoption is not expected to have a material impact on our consolidated financial condition or results of operations.

CONFIDENTIAL

EXAM00234299

## 2. Mortgage Loans Held–for–sale

The composition of residential mortgage loans held–for–sale reported at carrying value, were as follows.

| December 31, *($ in thousands)* | 2011(a) (b) | 2010(a) (b) |
|---|---|---|
| 1st Mortgage | $2,674,407 | $2,895,293 |
| Home equity | 430,945 | 488,822 |
| Total mortgage loans held–for–sale (c) | $3,105,352 | $3,384,115 |

(a)   Includes mortgage loans subject to conditional repurchase options of $2.3 billion and $2.3 billion sold to Ginnie Mae guaranteed securitizations and $5.1 million and $3.9 million sold to off-balance sheet private-label securitization trusts at December 31, 2011 and 2010, respectively. The corresponding liability is recorded in other liabilities. See Note 4 — Securitizations and Variable Interest Entities for additional information.

(b)   Includes mortgage loans for which we have elected the fair value option of $27.3 million and $17.7 million at December 31, 2011 and December 31, 2010, respectively. See Note 15 — Fair Value for additional information.

(c)   The carrying values are net of discounts of $53.2 million and $(145.2) million, fair value adjustments of ($1.3) million and $0.1 million, lower of cost or fair value adjustments of $13.3 million and $31.3 million, and UPB write-downs of $318.2 million and $427.7 million at December 31, 2011 and 2010, respectively.

## 3. Finance Receivables and Loans, Net

The composition of finance receivables and loans, net reported at carrying value before allowance for loan losses, were as follows.

| December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Consumer | | |
| 1st Mortgage | $726 | $1,095 |
| Home equity | 205,191 | 240,635 |
| Total consumer finance receivables and loans (a) (b) | $205,917 | $241,730 |

(a)   Consumer mortgages include $42.6 million and $43.4 million at fair value as a result of fair value option elections as of December 31, 2011 and 2010, respectively. See Note 15 — Fair Value for additional information.

(b)   The carrying values are net of fair value adjustments of $87.0 million and $116.5 million, at December 31, 2011 and 2010, respectively.

The following table presents an analysis of the activity in the allowance for loan losses on consumer finance receivables and loans, net.

| *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Allowance at January 1, | $16,676 | $13,481 |
| Provision for loan losses | (2,697) | 5,586 |
| Charge-offs | (6,374) | (4,370) |
| Recoveries | 2,521 | 1,979 |
| Net charge-offs | (3,853) | (2,391) |
| Allowance at December 31, | $10,126 | $16,676 |
| Allowance for loan losses | | |
| Individually evaluated for impairment | $3,035 | $3,626 |
| Collectively evaluated for impairment | 7,091 | 13,049 |
| Finance receivables and loans | | |
| Individually evaluated for impairment | 8,055 | 7,233 |
| Collectively evaluated for impairment | 155,261 | 191,154 |

20

CONFIDENTIAL

EXAM00234300

The following table presents an analysis of our past due finance receivables and loans at gross carrying value.

| (S in thousands) | 30-59 days past due | 60-89 days past due | 90 days or more past due | Total past due | Current | Total |
|---|---|---|---|---|---|---|
| **December 31, 2011** | | | | | | |
| Consumer mortgage | | | | | | |
| 1st Mortgage | **$70** | **$—** | **$63** | **$133** | **$593** | **$726** |
| Home equity | **3,156** | **1,885** | **2,309** | **7,350** | **197,841** | **205,191** |
| Total consumer mortgage | **$3,226** | **$1,885** | **$2,372** | **$7,483** | **$198,434** | **$205,917** |
| December 31, 2010 | | | | | | |
| Consumer mortgage | | | | | | |
| 1st Mortgage | $106 | $— | $— | $106 | $989 | $1,095 |
| Home equity | 3,066 | 1,364 | 2,044 | 6,474 | 234,161 | 240,635 |
| Total consumer mortgage | $3,172 | $1,364 | $2,044 | $6,580 | $235,150 | $241,730 |

The following table presents the carrying amount of our finance receivables and loans in nonaccrual status.

| December 31, (S in thousands) | 2011 | 2010 |
|---|---|---|
| Consumer mortgage (a) | | |
| 1st Mortgage | **$133** | $296 |
| Home equity | **7,023** | 8,320 |
| Total consumer | **$7,156** | $8,616 |

(a)   Interest revenue that would have been accrued on total nonaccrual consumer mortgage finance receivables and loans at original contractual rates was $0.4 million and $0.4 million during the years ended December 31, 2011 and 2010, respectively.  Interest income recorded for these nonaccrual loans was $0.5 million and $0.6 million during the years ended December 31, 2011 and 2010, respectively.

Management performs a quarterly analysis of its consumer finance receivable and loan portfolio using a range of credit quality indicators to assess the adequacy of the allowance based on historical and current trends.  Based on our allowance methodology, our credit quality indicators are performing and nonperforming.

The following table presents the credit quality indicators for our consumer mortgage loan portfolio at gross carrying value.

| December 31, (S in thousands) | 2011 | | | 2010 | | |
|---|---|---|---|---|---|---|
| | Performing | Nonperforming | Total | Performing | Nonperforming | Total |
| Consumer mortgage | | | | | | |
| 1st Mortgage | **$593** | **$133** | **$726** | $799 | $296 | $1,095 |
| Home equity | **198,168** | **7,023** | **205,191** | 232,315 | 8,320 | 240,635 |
| Total consumer mortgage | **$198,761** | **$7,156** | **$205,917** | $233,114 | $8,616 | $241,730 |

As of December 31, 2011, the five largest state concentrations based on carrying value for our finance receivables and loans, net were as follows.

| December 31, 2011 | |
|---|---|
| California | **24.8%** |
| Michigan | **10.0** |
| New York | **5.6** |
| New Jersey | **5.0** |
| Massachusetts | **4.6** |
| All other | **50.0** |
| Total | **100.0%** |

21

EXAM00234301

## 4.  Securitizations and Variable Interest Entities

### Overview

We are involved in several types of securitization and financing transactions that utilize special–purpose entities (SPEs).  A SPE is an entity that is designed to fulfill a specified limited need of the sponsor.  Our principal use of SPEs is to obtain liquidity by securitizing certain of our financial assets.

The SPEs involved in securitization and other financing transactions are generally considered variable interest entities (VIEs). VIEs are entities that have either a total equity investment that is insufficient to permit the entity to finance its activities without additional subordinated financial support or whose equity investors lack the ability to control the entity's activities.

### Securitizations

We provided a wide range of consumer mortgage loan products to a diverse customer base.  We often securitize these loans through the use of securitization entities, which may or may not be consolidated on our Consolidated Balance Sheet.  We securitize consumer mortgage loans through either the GSEs or private-label (nonagency) securitizations.  For the periods presented our consumer mortgage loan activity is primarily securitized through the GSEs.

Our current securitization activity is executed primarily with the GSEs.  In the case of Fannie Mae and Freddie Mac, the securitization entity is not owned by us.  Typically, we sell pools of financial assets to a transaction-specific securitization entity owned by Fannie Mae or Freddie Mac in exchange for the beneficial interests of the securitization entity, which are subsequently sold by us to Ally IM or third party investors.  These beneficial interests are collateralized by the transferred loans and entitle the investors to specified cash flows generated from the securitized loans.  In the aggregate, these beneficial interests have the same average life as the transferred financial assets.  Payments of interest and principal to the beneficial interest holders are guaranteed by the GSEs.  We typically retain primary servicing rights associated with these GSE securitizations.  Because our servicing activities are governed by the GSE servicing guide(s), we are not deemed to have power over the securitization entity's most crucial activities and therefore these securitizations are not consolidated.

Historically we sold pools of financial assets to a wholly owned, bankruptcy-remote SPE, which transferred the financial assets to a separate, transaction-specific securitization entity for cash, servicing rights, and in some transactions, other retained interests (private-label securitization).  The securitization entity was funded through the issuance of beneficial interests in the securitized financial assets.  The beneficial interests took the form of either notes or trust certificates that were sold to investors and/or retained by us.  These beneficial interests are collateralized by the transferred loans and entitle the investors to specified cash flows generated from the securitized loans.  In the aggregate, these beneficial interests have the same average life as the transferred financial assets. In addition to providing a source of liquidity and cost-efficient funding, securitizing these financial assets also reduced our credit exposure to the borrowers beyond any economic interest we retained.

Each securitization, whether private-label or GSE, is governed by various legal documents that limit and specify the activities of the securitization entity.  The securitization entity is generally allowed to acquire the loans, to issue beneficial interests to investors to fund the acquisition of the loans, and, in the case of private-label securitizations, to enter into derivatives or other yield maintenance contracts (e.g., coverage by monoline bond insurers) to hedge or mitigate certain risks related to the financial assets or beneficial interests of the entity.  A servicer, who is generally us, is appointed pursuant to the underlying legal documents to service the assets the securitization entity holds and, in the case of private-label securitizations, the beneficial interests it issues.  Servicing functions include, but are not limited to, making certain payments of property taxes and insurance premiums, default and property maintenance payments, as well as advancing principal and interest payments before collecting them from individual borrowers.  To the extent we are the servicer, our responsibilities, which constitute continued involvement in the transferred financial assets, consist of primary servicing (i.e., servicing the underlying transferred financial assets) and/or master servicing (i.e., servicing the beneficial interests that result from the securitization transactions).  Certain securitization entities also require the servicer to advance scheduled principal and interest payments due on the beneficial interests issued by the entity regardless of whether cash payments are received on the underlying transferred financial assets.  Accordingly, we are required to provide these servicing advances when applicable.  See Note 5 - Servicing Activities for additional information regarding our servicing rights.

In private-label securitizations, cash flows from the assets initially transferred into the securitization entity represent the sole source for payment of distributions on the beneficial interests issued by the securitization entity and for payments to the parties that perform services for the securitization entity, such as the servicer or the trustee.  In certain private-label securitization transactions, a liquidity facility may exist to provide temporary liquidity to the entity.  The liquidity provider generally is reimbursed prior to other parties in subsequent distribution periods.  Monoline insurance may also exist to cover certain shortfalls to certain investors in the beneficial interests issued by the securitization entity.  As noted above, in certain private-label securitizations, the servicer is required to advance scheduled principal and interest payments due on the beneficial interests regardless of whether cash payments

22

EXAM00234302

are received on the underlying transferred financial assets. The servicer is allowed to reimburse itself for these servicing advances. Additionally, certain private-label securitization transactions may allow for the acquisition of additional loans subsequent to the initial loan transfer. Principal collections on other loans and/or the issuance of new beneficial interests, such as variable funding notes, generally fund these loans; we are often contractually required to invest in these new interests.

We may retain beneficial interests in our private-label securitizations, which may represent a form of significant continuing economic interest. These retained interests include, but are not limited to, senior or subordinate mortgage- or asset-backed securities, interest-only strips, principal-only strips, and residuals. Certain of these retained interests provide credit enhancement to the trust as they may absorb credit losses or other cash shortfalls. Additionally, the securitization agreements may require cash flows to be directed away from certain of our retained interests due to specific over-collateralization requirements, which may or may not be performance-driven.

We generally hold certain conditional repurchase options that allow us to repurchase assets from the securitization entity. The majority of our private-label securitizations provide us, as servicer, with a call option that allows us to repurchase the remaining transferred financial assets or outstanding beneficial interests at our discretion once the asset pool reaches a predefined level, which represents the point where servicing becomes burdensome (a clean-up call option). The repurchase price is typically the par amount of the loans plus accrued interest. Additionally, we may hold other conditional repurchase options that allow us to repurchase a transferred financial asset if certain events outside our control are met. The typical conditional repurchase option is a delinquent loan repurchase option that gives us the option to purchase the loan if it exceeds a prespecified delinquency level. We have discretion regarding when or if we will exercise these options, but generally, we would do so only when it is in our best interest.

Other than our customary representation and warranty obligations, these securitizations are nonrecourse to us, thereby transferring the risk of future credit losses to the extent the beneficial interests in the securitization entities are held by third parties. Representation and warranty provisions generally require us to repurchase loans or indemnify the investor or other party for incurred losses to the extent it is determined that the loans were ineligible or were otherwise defective at the time of sale. See Note 18 - Guarantees, Commitments and Contingencies for detail on representation and warranty provisions. We did not provide any noncontractual financial support to any of these entities during the years ended December 31, 2011 and 2010.

## Other Variable Interest Entities

*Servicer Advance Funding Entity* — To assist in the financing of our servicer advance receivables, we formed a SPE that issues term notes and variable funding notes to third–party investors that are collateralized by servicer advance receivables. These servicer advance receivables are transferred to the SPE and consist of delinquent principal and interest advances we made as servicer to various investors; property taxes and insurance premiums advanced to taxing authorities and insurance companies on behalf of borrowers; and amounts advanced for mortgages in foreclosure. This SPE funds the purchase of the receivables through financing obtained from the third–party investors and subordinated loans or an equity contribution from us. This SPE is consolidated on our balance sheet at December 31, 2011 and 2010. The beneficial interest holder of this SPE does not have legal recourse to our general credit. We do not have a contractual obligation to provide any type of financial support in the future, nor have we provided noncontractual financial support to the entity during the years ended December 31, 2011 and 2010.

*Home Equity Funding Entity* — To assist in the financing of certain of our home equity mortgage loans, we formed a SPE that issued variable funding notes to third–party investors that are collateralized by home equity loans and revolving lines of credit. This SPE is consolidated on our balance sheet at December 31, 2011 and 2010. The beneficial interest holder of this VIE does not have legal recourse to our general credit. We do not have a contractual obligation to provide any type of financial support in the future, nor have we provided noncontractual financial support to the entity during the years ended December 31, 2011 and 2010.

## Involvement with Variable Interest Entities

The determination of whether financial assets transferred by us to VIEs (and related liabilities) are consolidated on our balance sheet (also referred to as on–balance sheet) or not consolidated on our balance sheet (also referred to as off–balance sheet) depends on the terms of the related transaction and our continuing involvement (if any) with the SPE. We are deemed the primary beneficiary and, therefore, consolidate VIEs for which we have both (a) the power through voting rights or similar rights to direct the activities that most significantly impact the VIE's economic performance, and (b) a variable interest (or variable interests) that (i) obligates us to absorb losses that could potentially be significant to the VIE and/or (ii) provides us the right to receive residual returns of the VIE that could potentially be significant to the VIE. We determine whether we hold a significant variable interest in a VIE based on a consideration of both qualitative and quantitative factors regarding the nature, size, and form of our involvement with the VIE. We assess whether we are the primary beneficiary of a VIE on an ongoing basis.

CONFIDENTIAL                                                                          EXAM00234303

Our involvement with consolidated and nonconsolidated VIEs in which we hold a variable interest as of December 31, 2011 and 2010, is presented below.

| ($ in thousands) | Consolidated involvement with VIEs | Assets of nonconsolidated VIEs, net (a) | Maximum exposure to loss in nonconsolidated VIEs (b) |
|---|---|---|---|
| **December 31, 2011** | | | |
| On–balance sheet variable interest entities | | | |
| Private-label securitizations | $99,938 | $— | $— |
| Servicer Advance Funding (c) | 920,592 | — | — |
| Home Equity Funding | 156,423 | — | — |
| Off–balance sheet variable interest entities | | | |
| Ginnie Mae securitizations | 2,651,939 (d) | 44,126,607 | 44,126,607 |
| Private-label securitizations | 27,289 (e) | 1,538,817 | 1,538,817 |
| Total | $3,856,181 | $45,665,424 | $45,665,424 |
| December 31, 2010 | | | |
| On–balance sheet variable interest entities | | | |
| Private-label securitizations | $180,145 | $— | $— |
| Servicer Advance Funding | 954,351 | — | — |
| Home Equity Funding | 186,368 | — | — |
| Off–balance sheet variable interest entities | | | |
| Ginnie Mae securitizations | 2,908,823 (d) | 43,594,804 | 43,594,804 |
| Private-label securitizations | 31,644 (e) | 2,039,215 | 2,039,215 |
| Total | $4,261,331 | $45,634,019 | $45,634,019 |

(a) Asset values represent the current UPB of outstanding consumer mortgage loans within the VIEs.

(b) Maximum exposure to loss represents the current UPB of outstanding consumer mortgage loans based on our customary representation and warranty provisions. This measure is based on the unlikely event that all of the loans have underwriting defects or other defects that trigger a representation and warranty provision and the collateral supporting the loans is worthless. This required disclosure is not an indication of our expected loss.

(c) Represents current outstanding balance of mortgage servicer advances in the amount of $823.1 million and current outstanding balance of a receivable due from our affiliate RFC in the amount of $97.5 million that we are required to consolidate as we are deemed to be the primary beneficiary of the VIE. The affiliate receivable reflects RFC's ability to participate in the facility.

(d) Includes $377.8 million and $569.0 million classified as MSRs and $2.3 billion and $2.3 billion of mortgage loans held–for–sale that are subject to conditional repurchase options at December 31, 2011 and 2010, respectively. The corresponding liability related to conditional repurchase option loans is recorded in other liabilities.

(e) Includes $17.9 million and $3.9 million classified as other assets, $4.4 million and $0.0 million classified as mortgage servicing rights and $5.1 million and $3.9 million of mortgage loans held–for–sale that are subject to conditional repurchase options at December 31, 2011 and 2010, respectively. The corresponding liability related to conditional repurchase option loans is recorded in other liabilities.

## On–balance Sheet Variable Interest Entities

We engage in securitization and other financing transactions that do not qualify for off–balance sheet treatment. In these situations, we hold beneficial interests or other interests in the VIE, which represents a form of significant continuing economic interest. The interests held include, but are not limited to, senior or subordinate mortgage– or asset–backed securities, interest–only strips, principal–only strips, residuals, and servicing rights. Certain of these retained interests provide credit enhancement to the securitization entity as they may absorb credit losses or other cash shortfalls. Additionally, the securitization documents may require cash flows to be directed away from certain of our retained interests due to specific over–collateralization requirements, which may or may not be performance–driven. Because these securitization entities are consolidated, these retained interests and servicing rights are not recognized as separate assets on our Consolidated Balance Sheet.

We consolidate certain of these entities because we have a controlling financial interest in the VIE, primarily due to our servicing activities, and because we hold a significant variable interest in the VIE. We are the primary beneficiary of certain private-label securitization entities for which we perform servicing activities and have retained a significant variable interest in the form of a beneficial interest. In cases where we did not meet sale accounting under previous guidance, unless we have made modifications to the overall transaction, we do not meet sale accounting under current guidance as we are not permitted to revisit sale accounting

24

EXAM00234304

guidelines under the current guidance. In cases where substantive modifications are made, we then reassess the transaction under the amended guidance based on the new circumstances.

Consolidated VIEs represent separate entities with which we are involved. The third–party investors in the obligations of consolidated VIEs have legal recourse only to the assets of the VIEs and do not have recourse to us, except for customary representation and warranty provisions or situations where we are the counterparty to certain derivative transactions involving the VIE. Cash flows from the assets are restricted only to pay such liabilities. Thus, our economic exposure to loss from outstanding third–party financing related to consolidated VIEs is significantly less than the carrying value of the consolidated VIE assets. All assets are restricted for the benefit of the beneficial interest holders. See Note 15 — Fair Value for discussion of the assets and liabilities for which the fair value option has been elected.

### Off-balance Sheet Variable Interest Entities

The nature, purpose, and activities of nonconsolidated securitization entities are similar to those of our consolidated securitization entities with the primary difference being the nature and extent of our continuing involvement. The cash flows from the assets of nonconsolidated securitization entities generally are the sole source of payment on the securitization entities' liabilities. The creditors of these securitization entities have no recourse to us with the exception of market customary representation and warranty provisions as described in Note 18 — Guarantees, Commitments and Contingencies.

Nonconsolidated VIEs include entities for which we either do not hold significant variable interests or do not provide servicing or asset management functions for the financial assets held by the securitization entity. Additionally, to qualify for off–balance sheet treatment, transfers of financial assets must meet sale accounting conditions in ASC 860. Our residential mortgage loan securitizations consist of GSE and private-label securitizations. We are not the primary beneficiary of any GSE loan securitization transaction because we do not have the power to direct the significant activities of such entities. Additionally, we do not consolidate certain private-label securitizations because we do not have a variable interest that could potentially be significant or we do not have power to direct the activities that most significantly impact the performance of the VIE.

For nonconsolidated securitization entities, the transferred financial assets are removed from our balance sheet provided the conditions for sale accounting are met. The financial assets obtained from the securitization are primarily reported as cash, servicing rights, or retained interests (if applicable). As an accounting policy election, we elected fair value treatment for our MSR portfolio. Liabilities incurred as part of these securitization transactions, such as representation and warranty provisions, are recorded at fair value at the time of sale and are reported as other liabilities on our Consolidated Balance Sheet. Upon the sale of the loans, we recognize a gain or loss on sale for the difference between the assets recognized, the assets derecognized, and the liabilities recognized as part of the transaction.

The following summarizes the pretax gains and losses recognized on financial assets sold into nonconsolidated securitization and similar asset-backed financing entities.

| Year ended December 31,    *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Total pretax gain (loss) for Consumer mortgage — GSEs | $686,833 | $718,622 |

CONFIDENTIAL

EXAM00234305

Notes to Consolidated Financial Statements
GMAC Mortgage, LLC

The following table summarizes cash flows received from and paid to securitization entities that are accounted for as a sale and in which we have a continuing involvement with the transferred assets (e.g., servicing) that were outstanding during 2011 and 2010. This table contains information regarding cash flows received from and paid to nonconsolidated securitization entities that existed during each period.

| | Consumer mortgage | |
|---|---|---|
| Year ended December 31, *($ in thousands)* | GSEs | Nonagency |
| **2011** | | |
| Cash proceeds from transfers completed during the year | $59,814,651 | $— |
| Cash flows received on retained interests in securitization entities | — | 11,985 |
| Servicing fees | 518,069 | 50,713 |
| Purchases of previously transferred financial assets | | |
|   Representation and warranty obligations | (143,340) | (179) |
|   Other repurchases | (2,537,257) | (49,252) (a) |
| Other cash flows | (6,302) | 120,220 |
| Total net cash flows | $57,645,821 | $133,487 |
| **2010** | | |
| Cash proceeds from transfers completed during the year | $68,821,918 | $— |
| Cash flows received on retained interests in securitization entities | — | 17,038 |
| Servicing fees (b) | 476,897 | 31,692 |
| Purchases of previously transferred financial assets | | |
|   Representation and warranty obligations | (388,873) | (160) |
|   Other repurchases | (1,865,408) | (102,016) (a) |
| Other cash flows | (25,200) | 21,829 |
| Total net cash flows | $67,019,334 | ($31,617) |

(a) Includes repurchases in connection with clean up call options.
(b) We determined the amounts previously disclosed related to servicing fees for the year ended December 31, 2010, were misstated. Previously disclosed servicing fees were $733.1 million for GSEs and $30.8 million for nonagency. These amounts were corrected in the presentation above. The misstatement had no impact on our consolidated financial condition or results of operations.

CONFIDENTIAL

EXAM00234306

The following table represents on–balance sheet mortgage loans held–for–sale and consumer finance receivable and loans, off–balance sheet securitizations, and whole–loan sales where we have continuing involvement. The table presents information about delinquencies and net credit losses. See Note 5 — Servicing Activities for further detail on total serviced assets.

| December 31, *($ in thousands)* | Total UPB | | Amount 60 days or more past due | | Net credit losses | |
|---|---|---|---|---|---|---|
| | **2011** | 2010 | **2011** | 2010 | **2011** | 2010 |
| On–balance sheet loans | | | | | | |
| Consumer mortgage held–for–sale | **$3,173,195 (a)** | $3,560,520 (a) | **$2,450,651 (a)** | $2,552,194 (a) | **$6,773** $ | (34,456) (b) |
| Consumer mortgage finance receivables and loans | **292,891** | 358,204 | **7,288** | 6,433 | **6,534** | 6,447 |
| Total on–balance sheet loans | **3,466,086** | 3,918,724 | **2,457,939** | 2,558,627 | **13,307** | (28,009) |
| Off–balance sheet securitization entities | | | | | | |
| Consumer mortgage — GSEs (c) | **131,635,288** | 152,373,232 | **7,666,285** | 11,947,733 | **n/m** | n/m |
| Consumer mortgage — nonagency | **8,209,555** | 9,870,875 | **424,054** | 511,017 | **393,987** | 516,589 |
| Total off–balance sheet securitization entities | **139,844,843** | 162,244,107 | **8,090,339** | 12,458,750 | **393,987** | 516,589 |
| Whole-loan transactions (d) | **14,775,204** | 15,473,103 | **2,075,535** | 2,694,912 | **642,336** | 968,985(b) |
| Total | **$158,086,133** | $181,635,934 | **$12,623,813** | $17,712,289 | **$1,049,630** | $1,457,565 |

n/m = not meaningful

(a) Includes loans subject to conditional repurchase options of $2.3 billion and $2.3 billion guaranteed by Ginnie Mae, and $5.1 million and $3.9 million sold to certain nonagency mortgage securitization entities at December 31, 2011 and 2010, respectively. The corresponding liability is recorded in other liabilities.

(b) We determined the amounts previously disclosed related to net credit losses for the year ended December 31, 2010, were misstated. Previously disclosed net credit losses were $119.3 million for on–balance sheet mortgage loans held-for-sale and whole loan net credit losses were reported as zero. These amounts were corrected in the presentation above. The misstatement had no impact on our consolidated financial condition or results of operations.

(c) Anticipated credit losses are not meaningful due to the GSEs guarantees.

(d) Whole-loan transactions are not part of a securitization transaction, but represent pools of consumer mortgage loans sold to investors.

## Changes in Accounting for Variable Interest Entities

ASU 2009–17 became effective on January 1, 2010, and upon adoption, we consolidated certain securitization entities that were previously held off–balance sheet. On January 1, 2010, we recognized a net increase of $258.6 million to assets and liabilities on our Consolidated Balance Sheet.

During 2010, we completed the sale of our significant retained residuals and subordinate bonds related to certain on-balance sheet securitization entities. Since we disposed of our variable interests in these securitization entities to unrelated third parties, a reassessment was required to determine whether we continued to hold a controlling financial interest. All subordinate retained economic interests in these entities were sold and therefore we no longer held a controlling financial interest. All assets and liabilities associated with the trust were derecognized and all retained interests in the entities, including insignificant retained senior interests and mortgage servicing rights, were recorded at their fair values at the date of deconsolidation. Consolidated assets and consolidated liabilities of $212.6 million and $211.3 million, respectively, associated with this transaction were derecognized and a gain of $0.8 million was recorded. We continue to hold servicing rights associated with these transactions; however retained servicing does

27

CONFIDENTIAL

EXAM00234307

not preclude deconsolidation because the retained servicing we hold does not absorb a potentially significant level of variability in the securitization entities. Upon deconsolidation we recorded $7.8 million of servicing rights.

## 5. Servicing Activities

### Mortgage Servicing Rights

The following table summarizes our activity related to MSRs. Although there are no market transactions that are directly observable, management estimates fair value based on the price it believes would be received to sell the MSR asset in an orderly transaction under current market conditions.

| ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Estimated fair value at January 1, | $1,827,529 | $2,254,269 |
| Additions recognized on sale of mortgage loans | 54,357 | 184,494 |
| Subtractions from sales of servicing assets | (302) | (245) |
| Changes in fair value | | |
| Due to changes in valuation inputs or assumptions used in the valuation model | (530,149) | (89,630) |
| Other changes in fair value | (219,987) | (516,443) |
| Other changes that affect the balance (a) (b) | 70 | (4,916) |
| Estimated fair value at December 31, | $1,131,518 | $1,827,529 |

(a)  In 2010 we derecognized $12.7 million of MSRs upon initial adoption of ASU 2009–17.

(b)  In 2010 we deconsolidated certain VIEs resulting in the recognition of $7.8 million of MSRs. See Note 4 — Securitizations and Variable Interest Entities for additional information.

Changes in fair value due to changes in valuation inputs or assumptions used in the valuation models include all changes due to a revaluation by a model or by a benchmarking exercise. Other changes in fair value primarily include the accretion of the present value of the discount related to forecasted cash flows and the economic run-off of the portfolio.

The key economic assumptions and the sensitivity of the fair value of MSRs to immediate 10% and 20% adverse changes in those assumptions were as follows.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Weighted average life (in years) | 4.2 | 5.9 |
| Weighted average prepayment speed | 18.5% | 11.7% |
| Impact on fair value of 10% adverse change | ($67,419) | ($85,539) |
| Impact on fair value of 20% adverse change | (127,845) | (161,647) |
| Weighted average discount rate | 6.3% | 11.7% |
| Impact on fair value of 10% adverse change | ($18,043) | ($36,930) |
| Impact on fair value of 20% adverse change | (35,111) | (72,102) |

These sensitivities are hypothetical and should be considered with caution. Changes in fair value based on a 10% and 20% variation in assumptions generally cannot be extrapolated because the relationship of the change in assumptions to the change in fair value may not be linear. Also, the effect of a variation in a particular assumption on the fair value is calculated without changing any other assumption. In reality, changes in one factor may result in changes in another (e.g., increased market interest rates may result in lower prepayments and increased credit losses) that could magnify or counteract the sensitivities. Further, these sensitivities show only the change in the asset balances and do not show any expected change in the fair value of the instruments used to manage the interest rate and prepayment risks associated with these assets.

### Risk Mitigation Activities

The primary economic risk related to our MSR is interest rate risk and the resulting impact on prepayment speeds. A significant decline in interest rates could lead to higher than expected prepayments that could reduce the value of the MSRs. We economically hedge the impact of this risk with both derivative and nonderivative financial instruments. These instruments include interest rate swaps, caps and floors, options to purchase these items, futures and forward contracts, constant monthly maturity (index trades), synthetic interest only and principal only securities and/or to–be–announced (TBAs) securities. The net fair value of derivative financial instruments used to mitigate this risk amounted to $(199.8) million and $(207.6) million at December 31, 2011 and 2010, respectively. See Note 16 — Derivative Instruments and Hedging Activities for additional information.

The components of servicing asset valuation and hedge activities, net, were as follows.

28

CONFIDENTIAL

EXAM00234308

| Year ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Change in estimated fair value of mortgage servicing rights | ($750,136) | ($606,073) |
| Change in fair value of derivative financial instruments | 456,720 | 946,322 |
| Servicing asset valuation and hedge activities, net | ($293,416) | $340,249 |

**Mortgage Servicing Fees**

The components of servicing fees were as follows.

| Year ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Contractual servicing fees (net of guarantee fees and including sub servicing) | $529,473 | $604,275 |
| Late fees | 55,822 | 69,822 |
| Ancillary fees | 145,581 | 174,658 |
| Total | $730,876 | $848,755 |

**Mortgage Servicer Advances**

In connection with our primary servicing activities (i.e., servicing of mortgage loans), we make certain payments for property taxes and insurance premiums, default and property maintenance payments, as well as advances of principal and interest payments before collecting them from individual borrowers. Servicer advances, including contractual interest are priority cash flows in the event of a loan principal reduction or foreclosure and ultimate liquidation of the real estate–owned property, thus making their collection reasonably assured. These servicer advances are included in accounts receivable and totaled $1.8 billion and $1.8 billion at December 31, 2011 and 2010, respectively. We maintain an allowance for uncollectible primary servicer advances, which totaled $42.5 million and $25.0 million at December 31, 2011 and 2010, respectively. Our potential advance obligation is influenced by a borrower's performance and credit quality. Additionally, we have fiduciary responsibility for mortgage escrow and custodial funds of approximately $4.4 billion and $4.2 billion at December 31, 2011 and 2010, respectively. These amounts are segregated in custodial bank accounts, which are not included on our Consolidated Balance Sheet.

We advance funds for various activities related to the foreclosure process principally related to attorney fees and costs, appraisals, escrow, insurance and property preservation, in the event we, or the investor, determine foreclosure is the most appropriate loss mitigation strategy. In the current environment, many states and local jurisdictions are requiring us to alter our processes in connection with foreclosures and in some circumstances this can result in us restarting the foreclosure process entirely or repeating certain of the required steps (foreclosure restarts). To the extent we restart the process, in whole or in part, we will not be reimbursed for advances in connection with the original activities. The circumstances and extent of any foreclosure restart are specific and unique to each state and/or local jurisdiction. During the year ended December 31, 2011, we recognized losses of $22.1 million in connection with foreclosure restarts. These losses are recorded in other noninterest expense, net. At December 31, 2011, we had a reserve for uncollectible advances in connection with estimated foreclosure restarts of $9.9 million.

At December 31, 2011, we had an allowance for uncollectible primary servicer advances of $7.5 million related to expected loan modification activities in connection with our February 9, 2012 settlement agreement. See Note — 18 Guarantees, Commitments and Contingencies for additional information. To the extent amounts had been advanced for loans that are expected to be modified in connection with the settlement, these amounts will not be collected. The amount of this allowance is management's best estimate given the anticipated modification activity.

When we act as a subservicer of mortgage loans, we perform the responsibilities of a primary servicer but do not own the corresponding primary servicing rights. We receive a fee from the primary servicer for such services. As the subservicer, we would have the same responsibilities of a primary servicer in that we would make certain payments of property taxes and insurance premiums, default and property maintenance, as well as advances of principal and interest payments before collecting them from individual borrowers. As of December 31, 2011 and 2010, outstanding servicer advances related to subserviced loans were $124.9 million and $140.0 million and we had a reserve for uncollectible subservicer advances of $1.1 million and $0.5 million, respectively.

**Serviced Mortgage Assets**

In many cases we act as the primary servicer. However, in certain cases, we also service loans that have been purchased and subsequently sold through a securitization trust or whole–loan sale whereby the originator retained the primary servicing rights.

29

EXAM00234309

The unpaid principal balance of total serviced mortgage assets was as follows.

| December 31, ($ in millions) | 2011 | 2010 (d) |
|---|---|---|
| On–balance sheet mortgage loans (a) | | |
| Held–for–sale and investment | $4,155 | $5,363 |
| Off–balance sheet mortgage loans | | |
| Loans held by third–party investors | | |
| Consumer mortgage private-label | 8,841 | 10,581 |
| Consumer mortgage agency | 131,635 | 152,373 |
| Consumer mortgage whole-loan portfolios | 13,054 | 15,470 |
| Purchased servicing rights (b) | 3,247 | 3,946 |
| Total primary serviced mortgage loans | 160,932 | 187,733 |
| Subserviced mortgage loans (c) | 212,925 | 187,953 |
| Total serviced mortgage loans | $373,857 | $375,686 |

(a)    Includes on–balance sheet securitization consumer finance receivables and loans.  See Note 3 — Finance Receivables and Loans, net, for additional information.

(b)    There is no recourse to us outside of customary contractual provisions relating to the execution of the services we provide.

(c)    Includes loans where we act as a subservicer under contractual agreements with the primary servicer, including Ally Bank and RFC.  As subservicer, there is no recourse to us outside of customary contractual provisions relating to the execution of the services we provide, except for loans subserviced on behalf of Ally Bank. See Note 20 — Related Party Transactions for additional information.

(d)    We have reclassified conditional repurchase option loans of $2.3 billion from off–balance sheet mortgage loans to on–balance sheet mortgage loans.  The reclassification had no impact on the total serviced mortgage loans.

The following table sets forth information concerning the delinquency experience in our domestic consumer mortgage loan primary servicing portfolio, including pending foreclosures.

| December 31, ($ in millions) | 2011 | | 2010 | |
|---|---|---|---|---|
| | Number of loans | Unpaid principal balance | Number of loans (a) | Unpaid principal balance (a) |
| Total U.S. mortgage loans primary serviced | 1,236,880 | $160,932 | 1,406,017 | $187,734 |
| Period of delinquency | | | | |
| 30 to 59 days | 44,203 | $6,255 | 48,596 | $ 6,972 |
| 60 to 89 days | 15,420 | 2,323 | 17,426 | 2,644 |
| 90 days or more | 14,717 | 2,450 | 12,580 | 2,034 |
| Foreclosures pending | 41,684 | 7,403 | 45,218 | 8,196 |
| Bankruptcies | 20,564 | 2,961 | 20,429 | 2,894 |
| Total delinquent loans | 136,588 | $21,392 | 144,249 | $22,740 |
| Percent of U.S. mortgage loans primary serviced | 11.0% | 13.3% | 10.3% | 12.1% |

(a)    We have reclassified resolved bankruptcies, previously reported in Bankruptcies, to their corresponding delinquency status at December 31, 2010. This classification is consistent with the December 31, 2011 presentation.

We are required to maintain certain servicer ratings in accordance with our master agreements with a GSE.  At December 31, 2011, we are in compliance with the servicer rating requirements of the master agreements.

In addition, ResCap is required to maintain consolidated tangible net worth, as defined, of $250.0 million, under our agreements with a GSE. In the event of default by ResCap, the GSE could require posting collateral in an amount based on repurchase demands outstanding plus recourse obligations; termination or suspension of our selling and servicing contract; require additional or more frequent financial and operational reporting; limit early funding programs or trading desk transactions; accelerate rebuttal time periods for outstanding repurchase demands; or take other actions permitted by law. Should our mortgage selling and servicing contract be terminated, cross default provisions within certain credit and bilateral facilities could be triggered. ResCap's consolidated tangible net worth at December 31, 2011 was $92.4 million, in breach of this contractual covenant. We received a letter of acknowledgment from the GSE indicating they would take no immediate action in connection with the breach. ResCap is in compliance with this covenant as of March 28, 2012, the date of issuance of these Consolidated Financial Statements.

We are required to maintain minimum net worth, as defined, under our master agreements with the GSEs. The requirements vary by GSE, with the most restrictive requiring minimum consolidated adjusted net worth, as defined, of $500.0 million. In the event we failed to meet these requirements the GSEs could require posting collateral in an amount based on repurchase demands outstanding plus recourse obligations; termination or suspension of our selling and servicing contract; require additional or more frequent financial and operations reporting; limit early funding programs or trading desk transactions; accelerate rebuttal time periods for outstanding repurchase demands; or take other actions permitted by law. We had consolidated net worth of $2.6 billion at December

CONFIDENTIAL

EXAM00234310

31, 2011, which, after adjustment for unacceptable assets as defined in the master agreements, was in excess of our minimum consolidated adjusted net worth requirements. Our excess consolidated adjusted net worth under our GSE master agreements ranged from $1.9 billion to $2.6 billion at December 31, 2011.

At December 31, 2011, domestic insured private-label securitizations with an unpaid principal balance of $2.4 billion contain provisions entitling the monoline or other provider of contractual credit support (surety providers) to declare a servicer default and terminate the servicer upon the failure of the loans to meet certain portfolio delinquency and/or cumulative loss thresholds. Securitizations with an unpaid principal balance of $2.0 billion had breached a delinquency and/or cumulative loss threshold. While we continue to service these loans and receive service fee income with respect to these securitizations, the value of the related MSR is zero at December 31, 2011. Securitizations with an unpaid principal balance of $409.0 million have not yet breached a delinquency or cumulative loss threshold. The value of the related MSR is $1.8 million at December 31, 2011.

## 6. Accounts Receivable, Net

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Servicer advances, net (a) | $1,892,609 | $1,927,083 |
| Loan insurance guarantee receivable, net (b) | 745,396 | 392,384 |
| Due from brokers for derivative trades | 94,024 | 9,749 |
| Servicing fees receivable | 72,618 | 92,358 |
| Accrued interest receivable | 8,916 | 8,032 |
| Other | 36,496 | 36,771 |
| Total accounts receivable, net | $2,850,059 | $2,466,377 |

(a) The allowance for uncollectible servicer advances was $43.7 million and $25.5 million at December 31, 2011 and 2010, respectively.
(b) Represents mortgage loans in foreclosure for which a guarantee from Ginnie Mae exists, net of a reserve for uncollectible guaranteed receivables of $21.8 million and $15.1 million at December 31, 2011 and 2010, respectively.

## 7. Other Assets

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Property and equipment at cost | $111,163 | $211,163 |
| Accumulated depreciation and amortization | (78,339) | (185,276) |
| Net property and equipment | 32,824 | 25,887 |
| Fair value of derivative contracts in a receivable position | 4,855,612 | 3,270,328 |
| Collateral placed with derivative counterparties | 1,089,379 | 1,238,288 |
| Restricted cash (a) | 441,807 | 467,819 |
| Receivables from Ally Bank | 1,364 | 11,656 |
| Trading securities | 18,019 | 29,223 |
| Receivables from affiliates | 113,974 | 39,882 |
| Foreclosed assets | 9,922 | 25,307 |
| Available for sale securities | — | 27,670 |
| Income taxes receivable | 8,259 | 2,014 |
| Other | 7,924 | 34,257 |
| Total other assets | $6,579,084 | $5,172,331 |

(a) At December 31, 2011, restricted cash included $63.5 million for late day check issuance with Ally Bank, $93.8 million for a GSE collateral account, $126.1 million related to a cash reserve account for our reinsurance business, $48.5 million related to collateral posted with Ally Bank, and $109.9 million related to funds collected, but not yet distributed to a third–party. At December 31, 2010, restricted cash included $91.7 million for a GSE collateral account, $177.8 million related to a cash reserve account for our reinsurance business, $110.9 million related to collateral posted with Ally Bank, and $72.7 million related to funds collected, but not yet distributed to a third–party.

CONFIDENTIAL

EXAM00234311

## 8. Borrowings

Borrowings were as follows.

| ($ in thousands) | Weighted average end of period interest rates December 31, 2011 | 2010 | December 31, 2011 Unsecured | Secured | Total | December 31, 2010 Unsecured | Secured | Total |
|---|---|---|---|---|---|---|---|---|
| Short-term borrowings | | | | | | | | |
| Borrowings from Ally Inc. and subsidiaries (a) | 3.0% | 3.0% | $— | $124,014 | $124,014 | $— | $382,109 | $382,109 |
| Borrowings from affiliates | 3.8% | 0.9% | 17,614 | — | 17,614 | 515,891 | — | 515,891 |
| Other short-term borrowings | 6.3% | 4.8% | — | 323,000 | 323,000 | — | 713,911 | 713,911 |
| Total short-term borrowings | 5.2% | 3.1% | 17,614 | 447,014 | 464,628 | 515,891 | 1,096,020 | 1,611,911 |
| Long-term borrowings | | | | | | | | |
| Borrowings from Ally Inc. and subsidiaries (a) | 3.0% | 3.0% | — | 625,149 | 625,149 | — | 664,900 | 664,900 |
| Collateralized borrowings in securitization trusts (b) | 2.7% | 3.8% | — | 39,201 | 39,201 | — | 112,342 | 112,342 |
| Other long-term borrowings | 3.1% | 3.4% | — | 920,055 | 920,055 | — | 691,109 | 691,109 |
| Total long-term borrowings | 3.0% | 3.3% | — | 1,584,405 | 1,584,405 | — | 1,468,351 | 1,468,351 |
| Total borrowings | 3.6% | 3.2% | $17,614 | $2,031,419 | $2,049,033 | $515,891 | $2,564,371 | $3,080,262 |

(a) GMAC Mortgage and RFC, as borrowers, have joint and several liability under these facilities.

(b) Collateralized borrowings with an outstanding balance of $118.8 million and $146.1 million were recorded at fair value of $38.8 million and $37.2 million as of December 31, 2011 and 2010, respectively. See Note 15 — Fair Value for additional information.

The following table summarizes the maturity profile of our borrowings by type. Amounts represent the scheduled maturity of debt, assuming no early redemptions occur. For sources of borrowings without a stated maturity date (as is the case with uncommitted agreements), the maturities are assumed to occur within 2012.

| Year ended December 31, ($ in millions) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 and thereafter | Total |
|---|---|---|---|---|---|---|---|
| Secured borrowings | | | | | | | |
| Borrowings from Ally Inc. and subsidiaries | $749.2 | $— | $— | $— | $— | $— | $749.2 |
| Collateralized borrowings in securitization trusts (a) | — | — | — | — | — | 39.2 | 39.2 |
| Other secured borrowings | 323.0 | 64.4 | — | — | — | 855.6 | 1,243.0 |
| Total secured borrowings | 1,072.2 | 64.4 | — | — | — | 894.8 | 2,031.4 |
| Unsecured borrowings | 17.6 | — | — | — | — | — | 17.6 |
| Total borrowings | $1,089.8 | $64.4 | $— | $— | $— | $894.8 | $2,049.0 |

(a) The principal on the debt securities is paid using cash flows from underlying collateral (mortgage loans). Accordingly, the timing of the principal payments on these debt securities is dependent on the payments received, and as such, we elected to represent the full term of the securities in the 2017 and thereafter time frame.

The most restrictive financial covenants in our credit facilities require ResCap to maintain consolidated tangible net worth of $250.0 million as of the end of each month, consolidated liquidity of $250.0 million daily, and unrestricted liquidity of $250.0 million daily. For these purposes, consolidated tangible net worth is defined as ResCap's consolidated equity excluding intangible assets. Unrestricted liquidity is defined as certain unrestricted and unencumbered cash balances in U.S. dollars and cash equivalents on a consolidated basis. ResCap views unrestricted liquidity as cash readily available to cover operating demands across our business operations. These financial covenants are included in certain of our bilateral facilities. Should ResCap fail to remain in compliance with these requirements, remedies include but are not limited to, at the option of the facility provider, termination of further funding,

32

CONFIDENTIAL

EXAM00234312

acceleration of outstanding obligations, rights to realize against the assets securing or otherwise supporting the facility, and other legal remedies. Liquidity providers can waive their contractual rights in the event of a default.

In addition, ResCap is required to maintain consolidated tangible net worth, as defined, of $250.0 million, under our agreements with a GSE. In the event of default by ResCap, the GSE could require posting collateral in an amount based on repurchase demands outstanding plus recourse obligations; termination or suspension of our selling and servicing contract; require additional or more frequent financial and operational reporting; limit early funding programs or trading desk transactions; accelerate rebuttal time periods for outstanding repurchase demands; or take other actions permitted by law. Should our mortgage selling and servicing contract be terminated, cross default provisions within certain credit and bilateral facilities could be triggered.

As of December 31, 2011, ResCap was in compliance with its consolidated and unrestricted liquidity requirements.

ResCap's consolidated tangible net worth at December 31, 2011 was $92.4 million, in breach of its contractual covenants. ResCap received waivers in connection with this breach from each of its credit providers, including Ally Inc. and BMMZ (see Note 20 - Related Party Transactions). ResCap is in compliance with its covenants as of March 28, 2012 the date of issuance of these Consolidated Financial Statements. We received an acknowledgement letter from the GSE indicating they would take no immediate action in connection with the ResCap consolidated tangible net worth breach as of December 31, 2011.

The following table summarizes the outstanding, unused, and total capacity of our funding facilities at December 31, 2011. We use both committed and uncommitted credit facilities. The financial institutions providing the uncommitted facilities are not legally obligated to advance funds under them.

| December 31, 2011   *(\$ in thousands)* | Outstanding | Unused capacity | Total capacity |
|---|---|---|---|
| Facilities with Ally Inc and subsidiaries and Parent | | | |
| Ally Inc. Senior Secured Credit Facility | $625,149 | $— | $625,149 |
| Ally Inc. LOC | 110,635 | 1,021,240 | 1,131,875 |
| Secured financing agreement with BMMZ | 13,379 | — | 13,379 |
| Borrowings from affiliates | 17,614 | 6,982,386 | 7,000,000 |
| Total facilities with Ally Inc. and subsidiaries and affiliates | 766,777 | 8,003,626 | 8,770,403 |
| Secured funding facilities — committed | | | |
| Secured financing agreement | — | 250,000 | 250,000 |
| Mortgage servicing rights facility | 323,000 | 177,000 | 500,000 |
| Servicer advance funding facilities | 780,385 | 144,615 | 925,000 |
| Home equity funding facility | 139,670 | — | 139,670 |
| Other funding facilities | — | 1,000 | 1,000 |
| Total committed | 1,243,055 | 572,615 | 1,815,670 |
| Secured funding facilities — uncommitted | | | |
| Mortgage servicing rights facility | — | 50,000 | 50,000 |
| Total uncommitted | — | 50,000 | 50,000 |
| Total secured funding facilities | 1,243,055 | 622,615 | 1,865,670 |
| Total funding facilities | $2,009,832 | $8,626,241 | $10,636,073 |

## Facilities with Ally Inc. and Subsidiaries and Parent

### Ally Inc. Senior Secured Credit Facility

The Ally Inc. Senior Secured Credit Facility matures on April 13, 2012. GMAC Mortgage and RFC (collectively, the Borrowers), which are jointly and severally liable under this facility no longer have the ability to request revolving loans under the facility. The facility is secured by certain domestic whole loans, accounts receivable, notes receivable, securities, and equity investments of the Borrowers. The facility contains limitations on the use of proceeds from sales of pledged collateral with any such proceeds required to be paid to Ally Inc. to reduce the balance outstanding. Advances under the Facility were allocated to the Borrowers consistent with the borrowing base attributable to each of the individual Borrowers.

### Ally Inc. LOC

The Ally Inc. Line of Credit (LOC) matures on April 13, 2012. The Borrowers are jointly and severally liable under this facility. The maximum capacity of the LOC is $1.6 billion, comprised of $1.1 billion of secured capacity and $500.0 million of unsecured capacity. Certain domestic whole loans, accounts receivable, notes receivable, mortgage servicing rights, securities, and equity investments of the Borrowers secure draws under the secured portion of the LOC, which are available to the extent there is sufficient

CONFIDENTIAL

EXAM00234313

collateral securing the draw. Draws on the unsecured portion of the LOC are available only after the secured portion has been fully utilized. Draws by the Borrowers under the LOC are available only if certain unrestricted and unencumbered balances in U.S. dollars and cash equivalents of ResCap and its subsidiaries are less than $300.0 million. Advances under the LOC are allocated to the Borrowers consistent with the borrowing base attributable to each of the individual Borrowers. The available amount and the borrowing base of the Ally Inc. LOC will both be reduced by the amount of any collateral posted or delivered by Ally IM to the Borrowers pursuant to certain derivative transaction agreements with Ally IM. The obligations under the Ally Inc. LOC and the Ally IM Derivative Agreements are cross-collateralized for the benefit of Ally Inc. On December 30, 2011, Ally Inc forgave $65.9 million of GMAC Mortgage's outstanding balance of this facility. In addition on January 30, 2012, Ally Inc. forgave $124.2 million of GMAC Mortgage's outstanding balance of this facility.

### BMMZ Holdings, LLC Secured Financing Agreement

On December 21, 2011, the Borrowers entered into a secured financing agreement with BMMZ Holdings LLC (BMMZ) a wholly-owned subsidiary of Ally Inc. The Borrowers are jointly and severally liable under this facility. The initial facility amount is $250.0 million. The secured financing agreement is collateralized by domestic mortgage loan assets. Advances under the Facility were allocated to the Borrowers consistent with the borrowing base attributable to each of the individual Borrowers. The maturity date is the earlier of the maturity date of the Ally Inc. LOC or December 19, 2012.

### Borrowings from Parent

We have a $7.0 billion unsecured credit facility with our Parent. The facility is payable upon demand.

## Secured Funding Facilities

### Secured Financing Agreement

Our secured financing agreement had a maximum facility amount of $250.0 million and was to mature on May 30, 2013. The secured financing agreement was collateralized by domestic mortgage loan assets. This facility was terminated on January 27, 2012.

### Mortgage Servicing Rights Facility

As of December 31, 2011, we have $500.0 million of committed funding capacity and $50.0 million of uncommitted capacity through which eligible mortgage servicing rights are funded. The facility matures on March 30, 2012. On February 1, 2012, this facility was amended and the committed amount was reduced to $300.0 million and the uncommitted amount was increased to $250.0 million.

### Servicer Advance Funding Facilities

As of December 31, 2011, a secured facility to fund mortgage servicer advances had total capacity of $800.0 million, consisting of term notes in the amount of $450.0 million and a variable funding note of $350.0 million. On March 13, 2012, a new variable funding note was issued with a total capacity of $800 million with the proceeds used to pay down the existing variable funding note and term notes on March 13 and March 15, 2012, respectively. The variable funding note will begin amortizing on March 12, 2013. The servicer advance facility utilizes a multi-seller structure of which a portion supports advances originated and sold by our affiliate, RFC. We are deemed to be the primary beneficiary and therefore consolidate the assets and obligations of the issuing entity.

A second secured facility to fund mortgage servicer advances has capacity of $125.0 million. On August 1, 2012, the scheduled revolving period will end, after which date no new advances will be funded and the 18 month repayment period will begin. Termination will occur upon the earlier of the end of the repayment period or the date the outstanding loan amount is paid in full.

### Home Equity Funding Facility

As of December 31, 2011, the secured facility to fund home equity mortgage loans consisted of $139.7 million in variable funding notes due to mature on February 25, 2031.

## Collateralized Borrowings in Securitization Trusts

We previously sold pools of consumer mortgage loans through private-label securitization transactions. The purpose of these securitizations was to provide permanent funding and exit for these assets. Certain of these securitizations were accounted for as secured borrowings, and therefore, the debt is reflected on our Consolidated Balance Sheet.

34

CONFIDENTIAL

EXAM00234314

## Collateral for Secured Debt

The following table summarizes the carrying value of assets that are restricted, pledged, or for which a security interest has been granted as collateral for the payment of certain debt obligations.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Mortgage loans held–for–sale | $668,156 | $845,141 |
| Consumer finance receivables and loans, net | 195,792 | 225,054 |
| Mortgage servicing rights | 753,755 | 1,258,241 |
| Accounts receivable, net | 2,248,351 | 2,115,758 |
| Other assets | 118,664 | 36,030 |
| Total assets restricted as collateral | $3,984,718 | $4,480,224 |
| Related secured debt | $2,031,419 | $2,564,371 |

We have also provided a lien on certain of our consolidated assets, as specified in the Ally Inc. Senior Secured Credit Facility agreements, for the benefit of the Ally Inc. Senior Secured Credit Facility and ResCap's 9.625% Junior Secured Guaranteed Notes due 2015. Included in the table above is $1.0 billion and $1.1 billion at December 31, 2011 and 2010, respectively of collateral pledged that can be re–hypothecated or re–pledged by the secured party.

The following table summarizes the carrying value of assets pledged and the amount of related debt outstanding by our secured borrowing types.

| December 31, ($ in thousands) | 2011 | | 2010 | |
| | Total assets restricted as collateral | Related secured debt | Total assets restricted as collateral | Related secured debt |
|---|---|---|---|---|
| Borrowings from Ally Inc. and its subsidiaries | | | | |
| Ally Inc. Senior Secured Credit Facility (a) | $1,044,667 | $625,149 | $1,072,343 | $664,900 |
| Ally Inc. LOC | 981,430 | 110,635 | 894,000 | 382,109 |
| Secured financing agreement with BMMZ | 26,710 | 13,379 | — | — |
| Collateralized borrowings in securitization trusts | 92,578 | 39,201 | 169,373 | 112,342 |
| Other secured borrowings | | | | |
| Secured financing agreements | — | — | 58,082 | 10,739 |
| Mortgage servicing rights facility | 634,345 | 323,000 | 1,054,796 | 500,000 |
| Servicer advance funding facilities | 1,050,779 | 780,385 | 1,049,959 | 711,171 |
| Home equity funding facility | 153,191 | 139,670 | 181,671 | 183,110 |
| Other secured facility | 1,018 | — | — | — |
| Total | $3,984,718 | $2,031,419 | $4,480,224 | $2,564,371 |

(a)  The collateral securing the Ally Inc. Senior Secured Credit Facility is the same collateral that secures the ResCap 9.625% Junior Secured Guaranteed Notes due 2015.

CONFIDENTIAL

EXAM00234315

## 9. Other Liabilities

| December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Fair value of derivative contracts in a liability position | $5,107,639 | $3,254,902 |
| Liability for option to repurchase assets (a) | 2,279,225 | 2,343,748 |
| Collateral received from derivative counterparties | 647,890 | 573,920 |
| Liability for representation and warranty obligations | 493,198 | 496,216 |
| Accounts payable | 294,908 | 173,708 |
| Mortgage foreclosure settlement | 204,000 | — |
| Payable to RFC (b) | 69,785 | — |
| Reserve for insurance losses | 91,615 | 162,565 |
| Employee compensation and benefits | 72,026 | 45,994 |
| Net payable to Ally Bank | 22,429 | — |
| Liability for assets sold with recourse | 31,801 | 36,873 |
| Payable to Ally Inc. | 2,144 | — |
| Other | 21,168 | 35,564 |
| Total other liabilities | $9,337,828 | $7,123,490 |

(a) We recognize a liability for the conditional repurchase option on certain assets held by off-balance sheet securitization trusts. The corresponding asset is recorded in mortgage loans held for sale. See Note 2— Mortgage Loans Held–for–Sale and Note 4 — Securitizations and Variable Interest Entities for additional information.

(b) Includes costs for personnel, information technology, communications, corporate marketing, procurement, and services related to facilities incurred by Ally Inc. and allocated to RFC, who in turn allocated a portion of the cost to us. See Note 20 — Related Party Transactions for additional information.

## 10. Other Revenue, net

| Year ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Change due to fair value option elections | | |
| Consumer mortgage finance receivables and loans, net | $26,818 | $169,208 |
| Collateralized borrowings | (28,996) | (193,314) |
| Loan broker fee from Ally Bank | 55,622 | 64,543 |
| Insurance income | 21,541 | 35,462 |
| Other | 16,086 | 26,894 |
| Total other revenue, net | $91,071 | $102,793 |

## 11. Other Noninterest Expense, Net

| Year ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Legal fees | $76,925 | $103,473 |
| Management fees - Ally Inc. and subsidiaries (a) | 72,365 | 82,149 |
| Loan administration fees | 67,583 | 59,978 |
| Insurance losses | 31,388 | 36,113 |
| Equipment and supplies | 27,794 | 28,513 |
| Restructuring expense | 1,422 | 14,085 |
| Other | 63,720 | 86,127 |
| Total other noninterest expense, Net | $341,197 | $410,438 |

(a) Includes allocated costs for personnel, information technology, communication, corporate marketing, procurement, and services related to facilities incurred by Ally Inc. and allocated to RFC, who in turn allocated a portion of the cost to us. See Note 20 — Related Party Transactions for additional information.

CONFIDENTIAL

EXAM00234316

## 12. Accumulated Other Comprehensive Income (Loss)

The following table summarizes our activity related to the components accumulated of other comprehensive income.

| ($ in thousands) | Unrealized gain (loss) on available for sale securities (a) | Defined benefit pension plans over (under) funded (c) | Accumulated other comprehensive (loss) |
|---|---|---|---|
| Balance at January 1, 2010 | ($264) | ($33,030) | ($33,294) |
| 2010 net change | 1,606 | (15,050) | (13,444) |
| Balance at December 31, 2010 | 1,342 | (48,080) | (46,738) |
| **2011 net change** | **(1,342)** | **(10,804)** | **(12,146)** |
| **Balance at December 31, 2011** | **$—** | **($58,884)** | **($58,884)** |

(a)  Represents the after-tax difference between the fair value and amortized cost of available for sale securities.
(b)  Includes after-tax gains and losses on foreign currency translation from operations for which the functional currency is other than the U.S. dollar.  There was zero tax impact to the net change amounts for the years ended December 31, 2011 and 2010, respectively.
(c)  Includes after-tax impact of the over/(under)-funded status of our defined benefit plans. See Note 14 — Employee Benefit Plans for additional information.

## 13. Income Taxes

The significant components of income tax expense were as follows.

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Current income tax expense | | |
| U.S. Federal | **$3,048** | $8,062 |
| State and local | **2,418** | 1,282 |
| Foreign | **—** | 2 |
| Total current expense | 5,466 | 9,346 |
| Total income tax expense | **$5,466** | $9,346 |

A reconciliation of the statutory U.S. Federal income tax rate to the effective income tax rate is shown in the following table.

| Year ended December 31, | 2011 | 2010 |
|---|---|---|
| Statutory U.S. Federal rate | **35.0%** | 35.0% |
| Change in tax rate resulting from | | |
| State and local income taxes, net of federal income tax benefit | **5.5** | 11.9 |
| Effect of valuation allowance change | **(41.0)** | (33.9) |
| Other | **(0.5)** | — |
| Effective tax rate | **(1.0)%** | 13.0% |

All losses are derived from U.S. sources.  Tax expense does not naturally correspond with pretax income because we apply a valuation allowance to our net deferred tax assets.  Tax expense for the year ended December 31, 2011 was $5.5 million, largely driven by certain taxes that are not eligible for offset by net operating losses.

At December 31, 2011, we had U.S. federal and state net operating loss carryforwards and capital loss carryforwards of $605.9 million and $667.7 million, respectively.  The federal net operating loss carryforwards expire in the years 2029-2031.  The capital loss carryforwards expire in the years 2014-2016.  The corresponding expiration periods for the state operating and capital loss carryforwards are 2014-2031 and 2014-2015, respectively.  Pursuant to the tax sharing agreement with our Parent, the benefits of our tax attributes will be payable to us only when we would be able to utilize them on a standalone basis as if we were a corporation filing tax returns separately from our Parent.

CONFIDENTIAL

EXAM00234317

At December 31, 2011 and 2010, a valuation allowance has been established against the deferred tax asset to the extent it exceeds the deferred tax liability. A valuation allowance has been established because we have determined that it is more likely than not that all such tax assets will not be realized. The change in the valuation allowance is primarily the result of pretax net operating losses.

At December 31, 2011 and 2010, we had no uncertain tax positions as defined by ASC 740-10, *Accounting for Uncertainty in Income Taxes*.

The significant components of deferred tax assets and liabilities were as follows.

| December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Deferred tax assets | | |
| Tax loss carryforwards | $458,784 | $213,417 |
| Provision for loan losses | 253,490 | 227,762 |
| Mark-to-market on finance receivables and loans | 83,709 | 109,820 |
| State and local taxes | 85,908 | 75,337 |
| MSRs | 35,815 | — |
| Accruals not currently deductible | 20,613 | 2,716 |
| Pension | 20,609 | 16,828 |
| Sales of finance receivables and loans | 2,237 | 10,339 |
| Other | 12,131 | 10,434 |
| Gross deferred tax assets | 973,296 | 666,653 |
| Valuation allowance | (973,296) | (559,550) |
| Net deferred tax assets | — | 107,103 |
| Deferred tax liabilities | | |
| MSRs | — | 106,834 |
| Unrealized gains on securities | — | 269 |
| Gross deferred tax liabilities | — | 107,103 |
| Net deferred tax assets (liabilities) | $— | $— |

## 14. Employee Benefit Plans

We participate in the defined benefit retirement plan of GMAC Mortgage Group, LLC (GMAC Mortgage Group), the immediate parent of ResCap. Effective December 31, 2006, benefit accrual of the defined benefit retirement plan was frozen. No further benefits accrued for participants subsequent to that date and no new entrants have been permitted to enter the plan. Based on the December 31, 2011 actuarial assessment, there is no contribution expected during 2012.

We participate in Ally Inc.'s defined contribution savings plan for domestic employees meeting certain eligibility requirements. Employees may contribute a percentage of eligible compensation to the plan, not to exceed annual IRS limits. Based on certain employee eligibility and vesting requirements and eligible compensation as defined by the plan, we contribute toward employees post-retirement benefits in three ways. We contribute a 2% retirement contribution every pay period, a dollar for dollar matching contribution up to 6% each year, and an additional discretionary contribution of up to 2% based upon Ally Inc.'s performance. Funds contributed to, and earned by, the defined contribution savings plans can be withdrawn by participants only under specific conditions.

The following table summarizes information related to employee benefit plan expense from continuing operations.

| Year ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Defined benefit retirement plan | ($2,642) | ($3,855) |
| Defined contribution savings plan | 16,132 | 11,938 |
| (Revenue) Expense total | $13,490 | $8,083 |

CONFIDENTIAL

EXAM00234318

## 15. Fair Value

## Fair Value Measurements

Fair value is defined as the exchange price that would be received to sell an asset or paid to transfer a liability (exit price) in the principal or most advantageous market in an orderly transaction between market participants at the measurement date. Fair value is based on the assumptions market participants would use when pricing an asset or liability. Additionally, entities are required to consider all aspects of nonperformance risk, including the entity's own credit standing, when measuring the fair value of a liability.

A three-level hierarchy is used when measuring and disclosing fair value. The fair value hierarchy gives the highest priority to quoted prices available in active markets (i.e., observable inputs) and the lowest priority to data lacking transparency (i.e., unobservable inputs). An instrument's categorization within the fair value hierarchy is based on the lowest level of significant input to its valuation. The following is a description of the three hierarchy levels.

| | |
|---|---|
| Level 1 | Inputs are quoted prices in active markets for identical assets or liabilities at the measurement date. Additionally, we must have the ability to access the active market, and the quoted prices cannot be adjusted by us. |
| Level 2 | Inputs are other than quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly. Level 2 inputs include quoted prices in active markets for similar assets or liabilities; quoted prices in inactive markets for identical or similar assets or liabilities; or inputs that are observable or can be corroborated by observable market data by correlation or other means for substantially the full term of the assets or liabilities. |
| Level 3 | Unobservable inputs are supported by little or no market activity. The unobservable inputs represent management's best assumptions of how market participants would price the assets or liabilities. Generally, Level 3 assets and liabilities are valued using pricing models, discounted cash flow methodologies, or similar techniques that require significant judgment or estimation. |
| Transfers | Transfers into or out of any hierarchy level are recognized at the end of the reporting period in which the transfer occurred. There were no significant transfers between any levels during the year ended December 31, 2011. |

Following are descriptions of the valuation methodologies used to measure material assets and liabilities at fair value and details of the valuation models, key inputs to those models and significant assumptions utilized.

- *Mortgage loans held–for–sale* – We originate and purchase residential mortgage loans that we intend to sell to the GSEs. We also own nonagency eligible residential mortgage loans that were originated or purchased in prior years. Consumer mortgage loans we intend to sell to the GSEs are carried at fair value as a result of a fair value election. Our nonagency eligible residential mortgage loans are accounted for at the lower of cost or fair value. Only those non-fair value elected loans that are currently being carried at fair value are included within our nonrecurring fair value measurement tables. Mortgage loans held–for–sale account for 6.0% of all recurring and nonrecurring assets reported at fair value at December 31, 2011.

   Mortgage loans held–for–sale are typically pooled together and sold into certain exit markets, depending upon underlying attributes of the loan, such as agency eligibility, product type, interest rate, and credit quality. Two valuation methodologies are used to determine the fair value of mortgage loans held–for–sale. The methodology used depends on the exit market as described below.

   *Loans valued using observable market prices for identical or similar assets (a Level 2 fair value)* - Includes all agency–eligible mortgage loans carried at fair value due to fair value option election, which are valued predominantly using published forward agency prices. Also includes any domestic loans and foreign loans where recently negotiated market prices for the loan pool exist with a counterparty (which approximates fair value) or quoted market prices for similar loans are available. As of December 31, 2011, we classified 100.0% of our mortgage loans held–for–sale that are being carried at fair value on a recurring basis as Level 2.

   *Loans valued using internal models (a Level 3 fair value)* - All nonagency eligible residential mortgage loans that are accounted for at the lower of cost or fair value. The fair value of these residential mortgage loans are determined using internally developed valuation models because observable market prices were not available. The loans are priced on a discounted cash flow basis utilizing cash flow projections from internally developed models that utilize prepayment, default, and discount rate assumptions. To the extent available, we will utilize market observable inputs such as interest rates and market spreads. If market observable inputs are not available, we are required to utilize internal inputs, such as prepayment speeds, credit losses, and discount rates. While numerous

39

CONFIDENTIAL

EXAM00234319

controls exist to calibrate, corroborate, and validate the internal inputs, they require the use of judgment by us and can have a significant impact on the determination of the loan's fair value. As of December 31, 2011, 100.0% of our mortgage loans held–for–sale that are currently being carried at fair value on a nonrecurring basis and less than 1% of our mortgage loans held-for-sale that are carried at fair value on a recurring basis are classified as Level 3.

- *Consumer Finance receivables and loans, net* — We elected the fair value option for consumer mortgage finance receivables and loans related to certain of our on–balance sheet securitizations including those securitization trusts that were consolidated upon the adoption of ASU 2009–17. A complete description of these securitizations is provided in the *On-balance sheet securitization debt* section later in this Note. The remaining balance of our consumer finance receivables and loans are reported on the balance sheet at their principal amount outstanding, net of charge-offs, allowance for loan losses, and net premiums/discounts.

  The securitization trusts for which we elected fair value option, the loans are measured at fair value using a portfolio approach or an in-use premise. The values for loans held on an in-use basis may differ considerably from loans held–for–sale that can be sold in the whole-loan market. This difference arises primarily due to the liquidity of the ABS/MBS market and is evident in the fact that spreads applied to lower rated ABS or MBS securities are considerably wider than spreads observed on senior bond classes and in the whole-loan market. The objective in linking the fair value of these loans to the fair value of the related securitization debt is to properly account for our retained economic interest in the securitizations. As a result of reduced liquidity in the capital and secondary markets for securitized bonds, values of these consumer mortgage finance receivables and loans and the related securitized bonds are expected to be volatile. As of December 31, 2011, we classified 100.0% of our fair value elected consumer mortgage finance receivables and loans as Level 3. These loans account for less than 1% of all recurring and nonrecurring assets reported at fair value at December 31, 2011.

- *Mortgage servicing rights* — MSRs currently do not trade in an active market with observable prices, therefore we use internally developed discounted cash flow models to estimate the fair value of MSRs. These internal valuation models estimate net cash flows based on internal operating assumptions that we believe would be used by market participants combined with market-based assumptions for loan prepayment rates, interest rates, and discount rates that management believes approximate yields required by investors in this asset. Cash flows primarily include servicing fees, float income, and late fees, in each case less estimated operating costs to service the loans. The estimated cash flows are discounted using an option-adjusted spread derived discount rate. At December 31, 2011, 100.0% of our MSRs are classified as Level 3 and account for 17.6% of all recurring and nonrecurring assets reported at fair value.

- *Derivative instruments* — We enter into a variety of derivative financial instruments as part of our risk management strategies. Derivative assets account for 75.4% of all recurring and nonrecurring assets and derivative liabilities account for 99.3% of all recurring and nonrecurring liabilities reported at fair value at December 31, 2011.

  Certain of these derivatives are exchange traded, such as Eurodollar futures. To determine the fair value of these instruments, we utilize the exchange prices for the particular derivative contract; therefore, we classified these contracts as Level 1. We classified 1.3% of the derivative assets and less than 1% of the derivative liabilities reported at fair value as Level 1 at December 31, 2011.

  We also execute over–the–counter derivative contracts, such as interest rate swaps, swaptions, forwards, caps, floors and agency-to-be-announced (TBAs) securities. We utilize third–party–developed valuation models that are widely accepted in the market to value our over–the–counter derivative contracts. The specific terms of the contract and market observable inputs (such as interest rate forward curves and interpolated volatility assumptions) are used in the model. We classified 98.0% of the derivative assets and 99.6% of the derivative liabilities reported at fair value as Level 2 at December 31, 2011.

  We also hold certain derivative contracts that are structured specifically to meet a particular hedging objective. These derivative contracts often are utilized to hedge risks inherent within certain on–balance sheet securitizations. To hedge risks on particular bond classes or securitization collateral, the derivative's notional amount is often indexed to the hedged item. As a result, we typically are required to use internally developed prepayment assumptions as an input into the model to forecast future notional amounts on these structured derivative contracts. Accordingly, we classified these derivative contracts as Level 3. These derivative contracts accounted for less than 1% of the derivative assets and less than 1% of the derivative liabilities reported at fair value at December 31, 2011.

  We are counterparty to a forward flow agreement with Ally Bank, which effectively transfers the exposure to changes in fair value of specified pools of Ally Bank's mortgage loans held–for–sale and interest rate lock commitments to us. In addition, we are counterparty to a total return swap agreement with Ally Bank that effectively transfers the total economic

40

EXAM00234320

return of a specified portfolio of mortgage servicing rights owned by Ally Bank to us in exchange for a variable payment based on a fixed spread to LIBOR. The underlying reference assets that support the value of the swap agreements are valued using internally developed valuation assumptions; therefore the swaps are classified as Level 3. These agreements accounted for less than 1% of the derivative assets and less than 1% of the derivative liabilities reported at fair value at December 31, 2011. See Note 20 — Related Party Transactions for additional information.

We are required to consider all aspects of nonperformance risk, including our own credit standing, when measuring fair value of a liability. We reduce credit risk on the majority of our derivatives by entering into legally enforceable agreements that enable the posting and receiving of collateral associated with the fair value of our derivative positions on an ongoing basis. In the event that we do not enter into legally enforceable agreements that enable the posting and receiving of collateral, we will consider our credit risk and the credit risk of our counterparties in the valuation of derivative instruments through a credit valuation adjustment (CVA), if warranted.

- *Trading securities* —Trading securities are recorded at fair value within other assets. The securities may be mortgage-backed or mortgage-related asset–backed securities (including senior and subordinated interests), interest-only, principal-only, or residual interests and may be investment grade, non-investment grade, or unrated securities. We base valuations on internally developed discounted cash flow models that use a market-based discount rate. In order to estimate cash flows, we utilize various significant assumptions, including market observable inputs such as forward interest rates, as well as internally developed inputs such as prepayment speeds, delinquency levels, and credit losses. As of December 31, 2011, we classified 99.3% of our trading securities as Level 3. Trading securities account for less than 1% of all recurring and nonrecurring assets reported at fair value at December 31, 2011.

- *Foreclosed assets* — Through the normal course of business, we may foreclose upon real estate assets to the extent borrowers default under the terms of their agreements with us. Foreclosed properties are carried at the lower of cost or fair value less costs to sell within other assets. Only those assets that are being carried at fair value less costs to sell are included in the non-recurring fair value disclosures.

  Foreclosed assets that are valued based upon independent third-party appraisals less costs to sell are classified as Level 2. When third–party appraisals are not obtained, valuations are typically obtained from a third-party broker price opinion; however, depending upon the circumstances, the property list price or other sales price information may be used in lieu of a broker price opinion. We typically adjust a broker price opinion or other price source, as appropriate, in order to take into account damage and other factors that typically cause the actual liquidation value of foreclosed assets to be less than the broker price opinion or other price source. This valuation adjustment is based upon our historical experience and is necessary to ensure the valuation ascribed to these assets takes into account the unique factors and circumstances surrounding a foreclosed asset. Because we apply an internally developed adjustment to the third-party provided valuation of the foreclosed asset, these assets are classified as Level 3. As of December 31, 2011, less than 1% and nearly 100.0% of our foreclosed assets that are being carried at fair value less costs to sell are classified as Level 2 and Level 3, respectively. Foreclosed assets account for less than 1% of all recurring and nonrecurring assets reported at fair value at December 31, 2011.

- *On-balance sheet securitizations* – We elected the fair value option for certain consumer mortgage finance receivables and loans, and securitization debt for certain of our on-balance sheet securitizations. The objective in measuring these loans and related securitization debt at fair value is to approximate our economic exposure to the collateral securing the securitization debt. The remaining on-balance sheet securitization debt that was not fair value option–elected is reported on the balance sheet at cost, net of premiums or discounts and all issuance costs.

  We value securitization debt that was fair value option–elected, as well as any trading securities using market observable prices whenever possible. The securitization debt is principally in the form of asset-backed and mortgage-backed securities collateralized by the underlying consumer mortgage finance receivables and loans. Due to the attributes of the underlying collateral and current capital market conditions, observable prices for these instruments are typically not available in active markets. We base valuations on internally developed discounted cash flow models that use a market-based discount rate. In order to estimate cash flows, we utilize various significant assumptions, including market observable inputs such as forward interest rates, as well as internally developed inputs such as prepayment speeds, delinquency levels, and credit losses. As a result of the reliance on significant assumptions and estimates for model inputs, at December 31, 2011, 100.0% of fair value option–elected securitization debt is classified as Level 3. On-balance sheet securitization debt accounts for less than 1% of all recurring and nonrecurring liabilities reported at fair value at December 31, 2011.

41

CONFIDENTIAL

EXAM00234321

**Recurring Fair Value**

The following tables display the assets and liabilities measured at fair value on a recurring basis, including financial instruments for which we elected the fair value option. In certain cases we economically hedge the fair value change of our assets or liabilities with derivatives and other financial instruments. The table below displays the hedges separately from the hedged items and, therefore, does not directly display the impact of our risk management activities.

| December 31, 2011 ($ in thousands) | Recurring fair value measurements | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Mortgage loans held–for–sale (a) | $— | $27,253 | $— | $27,253 |
| Consumer mortgage finance receivables and loans, net (a) | — | — | 42,600 | 42,600 |
| Mortgage servicing rights | — | — | 1,131,518 | 1,131,518 |
| Other assets | | | | |
| Fair value of derivative contracts in receivable position | | | | |
| Interest rate contracts | 61,025 | 4,759,549 | 35,038 | 4,855,612 |
| Trading securities | | | | |
| Mortgage and asset backed residential | — | 136 | 17,883 | 18,019 |
| Total assets | $61,025 | $4,786,938 | $1,227,039 | $6,075,002 |
| **Liabilities** | | | | |
| Collateralized borrowings | | | | |
| On-balance sheet securitization debt (a) | $— | $— | ($38,823) | ($38,823) |
| Other liabilities | | | | |
| Fair value of derivative contracts in liability position | | | | |
| Interest rate contracts | (18,445) | (5,089,189) | (5) | (5,107,639) |
| Total liabilities | ($18,445) | ($5,089,189) | ($38,828) | ($5,146,462) |

(a) Carried at fair value due to fair value option election, see Note 4 – Securitizations and Variable Interest Entities for additional information.

| December 31, 2010 ($ in thousands) | Recurring fair value measurements | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Mortgage loans held–for–sale (a) | $— | $17,744 | $— | $17,744 |
| Consumer mortgage finance receivables and loans, net (a) | — | — | 43,383 | 43,383 |
| Mortgage servicing rights | — | — | 1,827,529 | 1,827,529 |
| Other assets | | | | |
| Fair value of derivative contracts in receivable position | | | | |
| Interest rate contracts | 237,173 | 2,854,705 | 178,450 | 3,270,328 |
| Available for sale securities | | | | |
| Debt securities | | | | |
| U.S. Treasury and federal agencies | — | 2,028 | — | 2,028 |
| Mortgage-backed residential | — | 24,653 | 989 | 25,642 |
| Trading securities | | | | |
| U.S. Treasury | 2,304 | — | — | 2,304 |
| Mortgage and asset-backed residential | 150 | — | 26,769 | 26,919 |
| Total assets | $239,627 | $2,899,130 | $2,077,120 | $5,215,877 |
| **Liabilities** | | | | |
| Collateralized borrowings | | | | |
| On-balance sheet securitization debt (a) | $— | $— | ($37,154) | ($37,154) |
| Other liabilities | | | | |
| Fair value of derivative contracts in liability position | | | | |
| Interest rate contracts | (187,136) | (2,958,792) | (108,974) | (3,254,902) |
| Total liabilities | ($187,136) | ($2,958,792) | ($146,128) | ($3,292,056) |

(a) Carried at fair value due to fair value option elections, see Note 4 – Securitizations and Variable Interest Entities for additional information.

CONFIDENTIAL

EXAM00234322

The following tables present the reconciliation for all Level 3 assets and liabilities measured at fair value on a recurring basis. Transfers into or out of Level 3 were recognized as of the end of the reporting period in which the transfer occurred. In certain cases we economically hedge the fair value change of our assets or liabilities with derivatives and other financial instruments. The Level 3 items presented below may be hedged by derivatives and other financial instruments that are classified as Level 1 or Level 2. Thus, the following tables do not fully reflect the impact of our risk management activities.

| ($ in thousands) | January 1, 2011 Level 3 fair value | Net gains/(losses) included in earnings | | Other comprehensive income (loss) | Purchases | Sales | Issuances | Settlements | December 31, 2011 Level 3 fair value |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | realized gains (losses) | unrealized gains (losses) | | | | | | |
| **Assets** | | | | | | | | | |
| Mortgage loans held–for–sale | $— | $— | $— | $— | $— | $— | $— | $— | $— |
| Consumer mortgage finance receivables and loans, net | 43,383 | 23,355 (a) | 12,883 (a) | — | — | — | — | (37,021) | 42,600 |
| Mortgage servicing rights | 1,827,529 | (9) (b) | (750,136) (b) | — | — | (300) | 54,356 | 78 | 1,131,518 |
| Other assets | | | | | | | | | |
| Fair value of derivative contracts in receivable | | | | | | | | | |
| Interest rate contracts | 69,476 | (377,204) (c) | 255,706 (c) | — | — | — | — | 87,055 | 35,033 |
| Trading securities | | | | | | | | | |
| Mortgage– and asset–backed residential | 26,769 | (12,179) (d) | 10,110 (d) | — | — | — | — | (6,817) | 17,883 |
| Available for sale securities | | | | | | | | | |
| Debt securities | | | | | | | | | |
| Mortgage–backed residential | 989 | (150) | — | 491 | — | (1,007) | — | (323) | — |
| Total assets | $1,968,146 | ($366,187) | ($471,437) | $491 | $— | ($1,307) | $54,356 | $42,972 | $1,227,034 |
| **Liabilities** | | | | | | | | | |
| Collateralized borrowings | | | | | | | | | |
| On–balance sheet securitization debt | (37,154) | (4,892) (a) | (28,995) (a) | $— | $— | $— | $— | $32,218 | (38,823) |
| Total liabilities | ($37,154) | ($4,892) | ($28,995) | $— | $— | $— | $— | $32,218 | ($38,823) |

(a) Fair value adjustment reported in other revenue, net, and related interest on loans and debt are reported in interest income and interest expense, respectively.
(b) Fair value adjustment reported in servicing asset valuation and hedge activities, net.
(c) See Note 16 — Derivative Instruments and Hedging Activities for location of fair value adjustments in our Consolidated Statement of Income.
(d) Fair value adjustment reported in other revenue, net. Interest accretion on these assets is reported in interest income.

43

CONFIDENTIAL

| ($ in thousands) | January 1, 2010 Level 3 fair value | Net gains/(losses) included in earnings | | Other comprehensive income (loss) | Purchases, sales, issuances, and settlements, net (e) | December 31, 2010 Level 3 fair value |
| --- | --- | --- | --- | --- | --- | --- |
| | | realized gains (losses) | unrealized gains (losses) | | | |
| **Assets** | | | | | | |
| Consumer mortgage finance receivables and loans, net | $— | $129,300 (b) | $92,393 (b) | $— | ($178,310) | $43,383 |
| Mortgage servicing rights | 2,254,269 | (517) (c) | (606,073) (c) | — | 179,850 | 1,827,529 |
| Other assets | | | | | | |
| Fair value of derivative contracts in receivable (liability) position, net | | | | | | |
| Interest rate contracts | 1,024 | 455,343 (d) | (50,873) (d) | — | (336,018) | 69,476 |
| Trading securities | | | | | | |
| Mortgage and asset backed residential | 74,732 | (20,354) | 17,506 | — | (45,115) | 26,769 |
| Available for sale securities | | | | | | |
| Debt securities | | | | | | |
| Mortgage-backed residential | 5,585 | 6 | — | (1,820) | (2,782) | 989 |
| Total assets | $2,335,610 | $563,778 | ($547,047) | ($1,820) | ($382,375) | $1,968,146 |
| **Liabilities** | | | | | | |
| Collateralized borrowings | | | | | | |
| On-balance sheet securitization debt | $—  $ | (30,641) (b)  $ | (193,314) (b) | $— | $186,801 | ($37,154) |
| Total liabilities | $— | ($30,641) | ($193,314) | $— | $186,801 | ($37,154) |

Level 3 recurring fair value measurements

(a)  Fair value adjustment reported in other revenue, net. Interest accretion on these assets is reported in interest income.
(b)  Fair value adjustment reported in other revenue, net, and related interest on loans and debt are reported in interest income and interest expense, respectively.
(c)  Fair value adjustment reported in servicing asset valuation and hedge activities, net.
(d)  See Note 16 — Derivative Instruments and Hedging Activities for location of fair value adjustments in our Consolidated Statement of Income.
(e)  These amounts include the removal of $11.5 million of trading securities and $12.7 million of MSRs, as well as the additions of $252.1 million of consumer mortgage finance receivables and loans, and $228.6 million of collateralized borrowings upon the adoption of ASU 2009-17
(f)  These amounts include the removal of $209.2 million of consumer mortgage finance receivables and loans, $209.1 million of collateralized borrowings, and addition of $7.8 million of MSRs in connection with deconsolidation activity.  See Note 4 — Securitizations and Variable Interest Entities for additional information.

44

CONFIDENTIAL

EXAM00234324

## Nonrecurring Fair Value

We may be required to measure certain assets or liabilities at fair value from time-to-time. These periodic fair value measures typically result from application of lower of cost or fair value or certain impairment measures. These items would constitute nonrecurring fair value measures. The table below presents those items which we measured at fair value on a nonrecurring basis.

| December 31, ($ in thousands) | Nonrecurring fair value measures | | | Total estimated fair value | Lower of cost or fair value or valuation allowance | Total gains included in income from continuing operations for the year ended |
|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | | | |
| **2011** | | | | | | |
| Mortgage loans held–for–sale (a) | $— | $— | $360,996 | $360,996 | ($13,305) | n/m (c) |
| Other assets | | | | | | |
| Foreclosed assets (b) | — | — | 4,673 | 4,673 | (1,931) | n/m (c) |
| Total | $— | $— | $365,669 | $365,669 | ($15,236) | n/m |
| **2010** | | | | | | |
| Mortgage loans held–for–sale (a) | $— | $— | $820,556 | $820,556 | ($31,324) | n/m (c) |
| Other assets | | | | | | |
| Foreclosed assets (b) | — | — | 9,817 | 9,817 | (5,053) | n/m (c) |
| Total | $— | $— | $830,373 | $830,373 | ($36,377) | n/m |

n/m = not meaningful

(a)   Represents loans or pools of loans held–for–sale that are required to be measured at lower of cost or fair value. Only loans or pools of loans with fair value below cost are included in the table above. The related valuation allowance represents the cumulative adjustment to fair value of those loans and pool of loans.

(b)   The allowance provided for foreclosed assets represents any cumulative valuation adjustments recognized to adjust the assets to fair value less costs to sell.

(c)   We consider the applicable valuation to be the most relevant indicator of the impact on earnings caused by the fair value measurement. Accordingly, the table above excludes total gains and losses included in earnings for these items. The carrying values are inclusive of the respective valuation.

## Fair Value Option for Financial Assets and Financial Liabilities

We have elected to value certain financial assets and liabilities at fair value consistent with our intent to mitigate a divergence between our accounting results and our retained economic exposure related to these assets and liabilities.

Financial assets and liabilities elected to be measured at fair value are as follows.

- *On-balance sheet securitizations* – We elected the fair value option for certain domestic on-balance sheet securitization trusts in which we estimated that the credit reserves pertaining to securitized assets could have exceeded or already had exceeded our economic exposure. The fair value option election was made at a securitization level and thus the election was made for both the consumer mortgage finance receivable and loans and the related securitization debt. We elected the fair value option for all securitization trusts that were required to be consolidated upon the adoption of ASU 2009-17.

   The fair value elected loan balances are recorded within consumer finance receivables and loans, net, unless they are repurchased from a securitization trust in which case they are recorded in mortgage loans held–for–sale. Our policy is to separately record interest income on these fair value elected loans. The fair value adjustment recorded for consumer finance receivables and loans is classified as other revenue, net, and the fair value adjustment for mortgage loans held–for–sale is classified as gain or loss on mortgage loans.

   The fair value elected securitization debt balances are recorded within collateralized borrowings in securitization trusts. Our policy is to separately record interest expense on the fair value elected securitization debt, which is classified as interest expense in our Consolidated Statement of Income. The fair value adjustment recorded for this debt is classified as other revenue, net.

- *Government–and agency–eligible loans* – We elected the fair value option for government–and agency–eligible consumer mortgage loans held–for–sale. This election includes government–and agency–eligible loans we fund directly to borrowers and government–and agency–eligible loans we purchase from Ally Bank. The fair value option was elected to mitigate earnings volatility by better matching the accounting for the assets with the related hedges and to maintain consistency with the fair value option election by Ally Bank given the level of affiliate loan purchase and sale activity between the entities. See Note 20 — Related Party Transactions for additional information.

45

CONFIDENTIAL

EXAM00234325

The fair value option was not elected for certain government– and agency–eligible loans held–for–sale, as described below:

- *Government– and agency–eligible loans funded on or before July 31, 2009* — the fair value option election must be made at the time of funding. As such, these loans could not be fair value option–elected at a subsequent date.

- *Repurchased / Rerecognized government– and agency–eligible loans* — Loans are repurchased or rerecognized due to representation and warranty or conditional repurchase options. We typically will be unable to resell these repurchased/rerecognized loans through regular channels due to characteristics of the loans. The fair value of these loans will be influenced by factors that cannot be effectively hedged by us; accordingly, we do not intend to elect the fair value option for any repurchased or rerecognized loans.

We carry fair value option–elected government– and agency–eligible loans within mortgage loans held–for–sale. Our policy is to separately record interest income on these fair value elected loans. Upfront fees and costs related to the fair value elected loans are not deferred or capitalized. The fair value adjustment recorded for these fair value option–elected loans is reported in gain or loss on mortgage loans, net. The fair value option election is irrevocable once the loan is funded even if it is subsequently determined that a particular loan cannot be sold.

CONFIDENTIAL

EXAM00234326

The following table summarizes the fair value option elections and information regarding the amounts recognized in earnings for each fair value option–elected item.

| Year ended December 31, *($ in thousands)* | Interest income (expense) (f) | Gain on mortgage loans, net | Other revenue, net | Total included in net income | Change in fair value due to credit risk (a) | |
|---|---|---|---|---|---|---|
| **2011** | | | | | | |
| **Assets** | | | | | | |
| Mortgage loans held–for–sale (b) | $544 | $761,611 | $— | $762,155 | $— | (c) |
| Consumer mortgage finance receivables and loans, net | 9,420 | — | 26,818 | 36,238 | (2,817) | (d) |
| **Liabilities** | | | | | | |
| Collateralized borrowings | | | | | | |
| On-balance sheet securitizations | (4,892) | — | (28,996) | (33,888) | (143) | (e) |
| Total | | | | $764,505 | ($2,960) | |
| **2010** | | | | | | |
| **Assets** | | | | | | |
| Mortgage loans held–for–sale (b) | $992 | $905,940 | $— | $906,932 | $— | (c) |
| Consumer mortgage finance receivables and loans, net | 52,484 | — | 169,208 | 221,692 | (1,457) | (d) |
| **Liabilities** | | | | | | |
| Collateralized borrowings | | | | | | |
| On-balance sheet securitizations | (30,642) | — | (193,314) | (223,956) | 8 | (e) |
| Total | | | | $904,668 | ($1,449) | |

*Changes included in our Consolidated Statement of Income*

(a)  Factors other than credit quality that impact the fair value include changes in market interest rates and the liquidity or marketability in the current marketplace.  Lower levels of observable data points in illiquid markets generally result in wide bid/offer spreads.

(b)  Includes the gain/loss recognized on fair value option–elected government– and agency–eligible assets purchased from Ally Bank.

(c)  The credit impact for mortgage loans held–for–sale that are currently GSE eligible is currently zero because the fair value option–elected GSE loans are salable, and any unsalable assets are currently covered by a government guarantee.  The credit impact for non-agency eligible loans and related liability was quantified by applying internal credit loss assumptions to cash flow models.

(d)  The credit impact for consumer mortgage finance receivables and loans was quantified by applying internal credit loss assumptions to cash flow models.

(e)  The credit impact for on-balance sheet securitization debt is assumed to be zero until our economic interests in a particular securitization is reduced to zero, at which point the losses in the underlying collateral will be expected to be passed through to third-party bondholders.  Losses allocated to third-party bondholders, including changes in the amount of losses allocated, will result in fair value changes due to credit.  We also monitor credit ratings and may make credit adjustments to the extent any bond classes are downgraded by rating agencies.

(f)  Interest income on consumer mortgage finance receivables and loans and mortgage loans held–for–sale is measured by multiplying the unpaid principal balance on the loans by the coupon rate and the number of days of interest due.  Interest expense on the on-balance sheet securitizations is measured by multiplying the bond principal by the coupon rate and days interest due to the investor.

CONFIDENTIAL  EXAM00234327

The table below provides the fair value and the unpaid principal balance for our fair value option–elected loans and related collateralized borrowings.

| December 31, ($ in thousands) | 2011 | | 2010 | |
| --- | --- | --- | --- | --- |
| | Unpaid principal balance | Fair value (a) | Unpaid principal balance | Fair value (a) |
| **Assets** | | | | |
| Mortgage loans held–for–sale | | | | |
| Total loans | **$27,747** | **$27,253** | $17,293 | $17,744 |
| Nonaccrual loans | — | — | — | — |
| Loans 90+ days past due (b) | — | — | — | — |
| Consumer mortgage finance receivables and loans, net | | | | |
| Total loans | **129,574** | **42,600** | 159,857 | 43,383 |
| Nonaccrual loans | **8,663** | **2,937 (c)** | 9,666 | 2,748 (c) |
| Loans 90+ days past due (b) | **3,721** | **1,293 (c)** | 3,310 | 983 (c) |
| **Liabilities** | | | | |
| Collateralized borrowings | | | | |
| On-balance sheet securitizations | **($118,820)** | **($38,823)** | ($146,147) | ($37,154) |

(a) Excludes accrued interest receivable.

(b) Loans 90+ days past due are also presented within the nonaccrual loans and total loans except those that are government insured and still accruing.

(c) The fair value of consumer mortgage finance receivables and loans is calculated on a pooled basis; therefore, we allocated the fair value of nonaccrual loans and 90+ days past due to individual loans based on the unpaid principal balances.

## Fair Value of Financial Instruments

The following table presents the carrying and estimated fair value of assets and liabilities that are considered financial instruments. Accordingly, items that do not meet the definition of a financial instrument are excluded from the table. When possible, we use quoted market prices to determine fair value. Where quoted market prices are not available, the fair value is internally derived based on appropriate valuation methodologies with respect to the amount and timing of future cash flows and estimated discount rates. However, considerable judgment is required in interpreting market data to develop estimates of fair value, so the estimates are not necessarily indicative of the amounts that could be realized or would be paid in a current market exchange. The effect of using different market assumptions or estimation methodologies could be material to the estimated fair values. Fair value information presented herein was based on information available at December 31, 2011 and 2010.

| December 31, ($ in thousands) | 2011 | | 2010 | |
| --- | --- | --- | --- | --- |
| | Carrying value | Fair value | Carrying value | Fair value |
| **Financial Assets** | | | | |
| Mortgage loans held–for–sale (a) | **$3,105,352** | **$3,133,085** | $3,384,115 | $3,388,307 |
| Finance receivables and loans, net (a) | **195,792** | **142,848** | 225,054 | 158,540 |
| **Financial Liabilities** | | | | |
| Borrowings from Ally Inc. and subsidiaries | **$749,163** | **$749,163** | $1,047,009 | $1,047,009 |
| Other borrowings | **1,243,055** | **1,214,165** | 1,405,020 | 1,383,288 |

(a) Includes financial instruments carried at fair value due to fair value option elections. Refer to the previous section of this note titled *Fair Value Option for Financial Assets and Liabilities* for further information about the fair value elections.

The following describes the methodologies and assumptions used to determine fair value for the respective classes of financial instruments. In addition to the valuation methods discussed below, we also followed guidelines for determining whether a market was not active and a transaction was not distressed. As such, we assumed the price that would be received in an orderly transaction (including a market–based return) and not in forced liquidation or distressed sale.

- *Mortgage loans held–for–sale* — Carrying value differs from fair value as certain loans may be required to be carried at cost under lower of cost or fair value measurements (i.e. fair value is greater than cost). See discussion of valuation methods and assumptions used for mortgage loans held for sale within the *Fair Value Measurement* section of this Note.

- *Consumer mortgage finance receivables and loans, net* — Consumer mortgage finance receivables and loans that are not securitized and fair value elected use valuation methods and assumptions similar to those used for mortgage loans held–for–sale. These valuations take into account the unique attributes of the respective mortgage loans, such as geography,

CONFIDENTIAL

EXAM00234328

delinquency status, product type, and other factors.

- ***Ally Inc. and subsidiaries borrowings*** — Ally Inc. and subsidiaries borrowings have been executed to approximate arms-length terms. These borrowing arrangements generally charge floating interest rates based on an index plus a market-based spread. There are frequent negotiations and restructuring activities around these borrowing arrangements. Accordingly, the interest rates on these borrowings would be equivalent to those demanded in the market and thus carrying value approximates fair value.

- ***Other borrowings*** — Includes our third-party funding facilities. Our third-party funding facilities have floating rates based on an index plus a spread. These borrowings have recently been negotiated or amended and the credit spread would be consistent with those demanded in the market. Accordingly, the interest rates on these borrowings would be at market and thus carrying value would approximate fair value.

## 16. Derivative Instruments and Hedging Activities

We transact interest rate and foreign currency swaps, futures, forwards, options, swaptions, and TBAs in connection with our risk management activities. Our primary objective for executing these financial instruments is to mitigate our economic exposure to future events that are outside our control. These financial instruments are utilized principally to manage market risk and cash flow volatility associated with mortgage loans held–for–sale and MSRs, including our total return and forward flow agreements with Ally Bank. See Note 20 — Related Party Transactions for additional information. We do not transact derivative instruments for reasons beyond risk management.

In addition to derivatives transacted as part of our risk management activities, we create derivative contracts as part of our ongoing operations. In particular, we frequently execute forward mortgage loan purchase and sale commitments with Ally Bank and financial institutions, respectively, principally to provide a future source of mortgage volume and dedicated exit channels. Additionally, we enter into commitments with mortgage borrowers that require us to originate a mortgage at a stated amount and rate; these are derivative contracts if our intent is ultimately to hold the originated loan for sale. We refer to commitments to purchase mortgage loans from Ally Bank and commitments to originate mortgage loans held–for–sale, collectively, as interest rate lock commitments (IRLCs).

The following summarizes our significant asset and liability classes, the risk exposures for these classes, and our risk management activities utilized to mitigate certain of these risks. The discussion includes both derivative and nonderivative financial instruments utilized as part of these risk management activities.

### Interest Rate Sensitive Assets/Liabilities

- ***Mortgage loan commitments and loans held–for–sale*** — We are exposed to interest rate risk from the time an IRLC is made, either directly or indirectly through the forward flow agreement with Ally Bank, until the time the mortgage loan is sold. Changes in interest rates impact the market price for the mortgage loan; as market interest rates decline, the value of existing IRLCs and mortgage loans held–for–sale increase and vice versa. The primary objective of our risk management activities related to IRLCs and mortgage loans held–for–sale is to eliminate or reduce any interest rate risk associated with these assets.

  We enter into forward sale contracts of mortgage-backed securities, primarily agency TBAs, as our primary strategy to mitigate this risk. These contracts are typically entered into at the time the interest rate lock commitment is made. The value of the forward sales contracts moves in the opposite direction of the value of our IRLCs and mortgage loans held–for–sale. We may also use other derivatives, such as options, and futures, to economically hedge certain portions of the portfolio. Nonderivative instruments, such as short positions on U.S. Treasuries, may also be used to economically hedge the portfolio. We monitor and actively manage our risk on a daily basis; therefore trading volume can be significant.

  We do not apply hedge accounting to our derivative portfolio held to economically hedge our IRLCs and mortgage loans held–for–sale. Included in the derivatives on IRLCs and mortgage loans held–for–sale is the forward flow agreement with Ally Bank having a fair value of $16.4 million and an outstanding notional of $9.8 billion at December 31, 2011. Under the terms of the forward flow agreement, Ally Bank transfers the exposure to changes in fair value of specified pools of assets, in this case IRLCs and mortgage loans held–for–sale, to us. See Note 20 — Related Party Transactions for additional information.

49

CONFIDENTIAL

EXAM00234329

- *Mortgage servicing rights* — Our MSRs and retained interests are generally subject to loss in value when mortgage rates decline. Declining mortgage rates generally result in an increase in refinancing activity, which increases prepayments and results in a decline in the value of MSRs and other retained interests. To mitigate the impact of this risk, we maintain a portfolio of financial instruments, primarily derivatives, which increase in value when interest rates decline. The primary objective is to minimize the overall risk of loss in the value of MSRs and other retained interests due to the change in fair value caused by interest rate changes and their interrelated impact to prepayments.

We use a variety of derivative instruments to manage the interest rate risk related to MSRs and other retained interests. These include, but are not limited to, interest rate futures, call or put options on U.S. Treasuries, swaptions, mortgage-backed securities (MBS) futures, U.S. Treasury futures, interest rate swaps, interest rate floors and caps. While we do not currently utilize nonderivative instruments (i.e., U.S. Treasuries) to hedge this portfolio, we have utilized them in the past and may utilize them again in the future. We monitor and actively manage our risk on a daily basis, and therefore trading volume can be significant.

Included in the derivatives hedging MSRs and retained interests is a total return swap with Ally Bank having a fair value of $17.7 million at December 31, 2011. Under the terms of the total return swap, Ally Bank transfers the total economic return of a specified portfolio of mortgage servicing rights owned by Ally Bank to us in exchange for a variable payment based on a fixed spread to LIBOR. See Note 20 — Related Party Transactions for additional information.

## Credit Risk and Collateral Arrangements

Derivative financial instruments contain an element of credit risk if counterparties, including affiliates, are unable to meet the terms of their agreements. Credit risk associated with derivative financial instruments is measured as the net replacement cost should the counterparties that owe us under the contracts completely fail to perform under the terms of those contracts, assuming there are no recoveries of underlying collateral, as measured by the fair value of the derivative financial instruments. At December 31, 2011 and December 31, 2010, the fair value of derivative financial instruments in an asset, or receivable position, were $4.9 billion and $3.3 billion, including $3.2 billion and $2.2 billion with affiliates, respectively. See Note 20 — Related Party Transactions for additional information.

We minimize the credit risk exposure by limiting our counterparties to those major banks and financial institutions that meet established credit guidelines and transacting with and through affiliates. Additionally, we reduce credit risk on the majority of our derivative financial instruments by entering into legally enforceable agreements that permit the closeout and netting of transactions with the same counterparty upon occurrence of certain events. To further mitigate the risk of counterparty default, we execute collateral agreements with counterparties. The agreements require both parties to maintain cash deposits in the event the fair values of the derivative financial instruments meet established thresholds. We have received cash deposits from counterparties totaling $647.9 million and $574.0 million at December 31, 2011 and, 2010, respectively, for derivative positions in an asset position to us. We have placed cash deposits totaling $1.1 billion and $1.2 billion at December 31, 2011 and 2010, respectively, in accounts maintained by counterparties for derivative positions in a liability position to us. The cash deposits placed and received are included in accounts receivable, other assets, and other liabilities.

We are not exposed to credit risk related contingent features in any of our derivative contracts that could be triggered and potentially could expose us to future loss.

CONFIDENTIAL

EXAM00234330

## Consolidated Balance Sheet Presentation

The following table summarizes the location and fair value amounts of derivative instruments reported on our Consolidated Balance Sheet. The fair value amounts are presented on a gross basis and further segregated by type of contract.

| December 31, ($ in thousands) | 2011 | | | 2010 | | |
| | Fair value of derivative contracts in | | | Fair value of derivative contracts in | | |
| | receivable position (a) | payable position (b) | Notional amount | receivable position (a) | payable position (b) | Notional amount |
|---|---|---|---|---|---|---|
| Economic hedges | | | | | | |
| Interest rate risk | | | | | | |
| MSRs and retained interests | $4,811,804 | ($5,011,557) | $523,036,528 | $2,965,238 | ($3,187,461) | $325,749,110 |
| Mortgage loans held–for–sale | 8,770 | (96,077) | 17,323,000 | 235,600 | (67,426) | 30,476,696 |
| Total interest rate risk | 4,820,574 | (5,107,634) | 540,359,528 | 3,200,838 | (3,254,887) | 356,225,806 |
| Non-risk management derivatives | | | | | | |
| Bank MSR swap | 17,681 | — | 1,384,835 | 14,603 | — | 3,477,747 |
| Bank forward flow agreement | 16,424 | — | 9,825,783 | 54,669 | — | 13,413,484 |
| Mortgage loan commitments | 933 | (5) | 77,633 | 218 | (15) | 20,169 |
| Total non-risk management | 35,038 | (5) | 11,288,251 | 69,490 | (15) | 16,911,400 |
| Total derivatives | $4,855,612 | ($5,107,639) | $551,647,779 | $3,270,328 | ($3,254,902) | $373,137,206 |

(a)   Presented in other assets.
(b)   Presented in other liabilities.

## Consolidated Statement of Income Presentation

The following table summarizes the location and amount of gains and losses reported in our Consolidated Statement of Income related to derivative instruments.

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Economic hedges | | |
| Risk management derivatives | | |
| Gain (loss) recognized in earnings on derivatives | | |
| Interest rate contracts | | |
| Gain on mortgage loans, net | ($721,939) | ($336,417) |
| Servicing asset valuation and hedge activities, net | 816,243 | 476,378 |
| Other revenue, net | — | — |
| Total interest rate contracts | 94,304 | 139,961 |
| Non-risk management derivatives | | |
| Gain on mortgage loans, net | 238,024 | (65,474) |
| Servicing asset valuation and hedge activities, net | (359,523) | 469,945 |
| Total non-risk management derivatives | (121,499) | 404,471 |
| Total derivatives | ($27,195) | $544,432 |

Our derivative portfolios generally are reflected in the operating activities section of our Consolidated Statement of Cash Flows. Derivative fair value adjustments are captured in our Consolidated Statement of Income line items described in the table above and, accordingly, are generally reflected within the respective line items within the reconciliation of net income (loss) to net cash provided by operating activities section of our Consolidated Statement of Cash Flows. The remaining changes in derivative portfolio values are generally reflected within the "net change in other assets" or "net change in other liabilities" line items on our Consolidated Statement of Cash Flows.

51

CONFIDENTIAL

EXAM00234331

## 17. Higher Risk Mortgage Loans and Credit Quality

Historically, we originated and purchased mortgage loans that had contractual features that may increase our exposure to credit risk and thereby result in a concentration of credit risk. These mortgage loans include loans that may subject borrowers to significant payment increases in the future, have negative amortization of the principal balance or have high loan–to–value ratios.

The following table summarizes the gross carrying value of our higher-risk mortgage loans classified as held–for–sale and finance receivables and loans.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| High loan-to-value (greater than 100%) mortgage loans | $153,451 | $170,427 |
| Interest-only mortgage loans | 3,820 | 17,777 |
| Below market initial rate mortgage loans | 213,404 | 201,549 |
| Total carrying value of higher-risk mortgages | $370,675 | $389,753 |

Included in the table above are $42.6 million and $78.9 million of high-risk mortgage loans held in on-balance sheet securitizations at December 31, 2011 and 2010, respectively. Our exposure on these loans is limited to the value of our retained interest.

As part of our loss mitigation efforts and participation in certain governmental programs (e.g., the Making Home Affordable program), we may offer loan restructurings to borrowers. Due to the nature of restructurings, these loans are generally considered higher risk. Loan modifications can include any or all of the following; principal forgiveness, maturity extensions, delinquent interest capitalization and changes to contractual interest rates. Modifications can be either temporary or permanent. Temporary loan modifications are generally used to monitor the borrower's ability to perform under the revised terms over a specified trial period; if the borrower performs, it may become a permanent loan modification. We have historically performed loan modifications under our private modification program; however, more recently the majority of loan modifications are completed under government programs. The carrying value of our on-balance sheet modified mortgage loans was $760.7 million and $559.6 million as of December 31, 2011 and 2010, respectively. These modified mortgage loans are included within mortgage loans held–for–sale and consumer finance receivables and loans.

## Nonperforming Assets

Nonperforming assets include nonaccrual loans and foreclosed assets. The classification of a loan as nonperforming does not necessarily indicate that the principal amount of the loan is ultimately uncollectible in whole or in part. In certain cases, borrowers make payments to bring their loans contractually current and, in all cases, our mortgage loans are collateralized by residential real estate. As a result, our experience has been that any amount of ultimate loss for mortgage loans other than home equity loans is substantially less than the unpaid principal balance of a nonperforming loan.

Delinquent loans expose us to higher levels of credit losses and therefore are considered higher risk loans. The determination as to whether a loan falls into a particular delinquency category is made as of the close of business on the balance sheet date. The following table sets forth information concerning the delinquency experience in our mortgage loans held–for–sale and consumer finance receivable and loans at carrying value.

| December 31, ($ in thousands) | 2011 Amount | 2011 % of total | 2010 Amount | 2010 % of total |
|---|---|---|---|---|
| Current | $805,329 | 24.3% | $837,239 | 23.1% |
| Past due | | | | |
| 30 to 89 days | 84,766 | 2.6 | 65,271 | 1.8 |
| 90 days or more and still accruing interest (a) | 73,661 | 2.2 | 24,451 | 0.7 |
| 90 days or more conditional repurchase option loans (b) | 2,279,225 | 68.8 | 2,343,748 | 64.6 |
| Nonaccrual | 68,288 | 2.1 | 355,136 | 9.8 |
| Total | 3,311,269 | 100.0% | 3,625,845 | 100.0% |
| Allowance for loan losses | (10,126) | | (16,676) | |
| Total, net | $3,301,143 | | $3,609,169 | |

(a) Loans that are 90 days or more delinquent and still accruing interest are government insured.

(b) We do not record interest income on conditional repurchase option loans. If these options were exercised and we acquired the loans, $2.3 billion and $2.3 billion would be classified as 90 days or more and still accruing due to government guarantees at December 31, 2011 and 2010, respectively. The private-label conditional repurchase option loans of $5.1 million and $3.9 million would be classified as nonaccrual at December 31, 2011 and 2010, respectively.

CONFIDENTIAL

EXAM00234332

The following table presents the net carrying value of nonperforming assets.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Nonaccrual consumer | | |
| 1st Mortgage | **$47,172** | $124,222 |
| Home equity | **21,116** | 230,914 |
| Total nonaccrual consumer (a) | **68,288** | 355,136 |
| Foreclosed assets | **9,922** | 25,307 |
| Total nonperforming assets | **$78,210** | $380,443 |

(a) Excludes loans subject to conditional repurchase options of $2.3 billion and $2.3 billion sold to Ginnie Mae guaranteed securitizations and $5.1 million and $3.9 million sold to off-balance sheet private-label securitization trusts at December 31, 2011 and 2010, respectively. The corresponding liability is recorded in other liabilities. See Note 4 — Securitizations and Variable Interest Entities for additional information.

## 18. Guarantees, Commitments and Contingencies

### Guarantees

Guarantees are defined as contracts or indemnification agreements that contingently require us to make payments to others based on changes in an underlying agreement that is related to a guaranteed party. The following summarizes our outstanding guarantees.

| | 2011 | | 2010 | |
|---|---|---|---|---|
| December 31, ($ in thousands) | **Maximum liability** | **Carrying value of liability** | Maximum liability | Carrying value of liability |
| Off-balance sheet guarantees | | | | |
| HLTV securitizations | **$4,381** | **$—** | $5,417 | $— |
| Guarantor of ResCap and affiliate debt | **2,249,295** | **—** | 2,266,108 | — |
| Credit enhancement guarantees | **1,467** | **20** | 1,522 | 20 |

### HLTV securitizations

We have entered into agreements to provide credit loss protection for certain HLTV securitization transactions. The maximum potential obligation under these agreements is equal to the lesser of a specified percentage of the original loan pool balance or a specified percentage of the current loan pool balance. We are required to perform on our guaranty obligation when losses exceed cash available in each period.

For certain other HLTV securitizations, the maximum potential obligation is equivalent to the pledged collateral amount. There were no pledged collateral amounts related to these HLTV securitizations at December 31, 2011 and 2010, respectively. Our guaranty obligation is triggered when the security credit enhancements are exhausted and losses are passed through to over-the-counter dealers. The guaranty obligations terminate the first calendar month during which the security aggregate note amount is reduced to zero.

### Guarantor of ResCap and Affiliate Debt

We, along with certain other subsidiaries of ResCap, are guarantors of ResCap's obligations under its 9.625% Junior Secured Guaranteed Notes due 2015 (the Junior Secured Notes). The Junior Secured Notes are secured by second priority liens on the same collateral that secures the Ally Inc. Senior Secured Credit Facility and are repayable in three equal annual tranches of $707.0 million from May 2013 through 2015. We, along with certain other subsidiaries of ResCap, are also guarantors of peso denominated medium-term notes issued by GMAC Financiera S.A. de C.V., SOFOM, ENR, a wholly owned subsidiary of RFC.

### Credit enhancement

We have sold certain mortgage loans to investors which contain a guarantee for the payment of the third-party debt in the event of default or loss.

53

CONFIDENTIAL
EXAM00234333

## Financing Commitments

The contractual amounts of financing commitments were as follows.

| | Contract amount | |
|---|---|---|
| December 31, ($ in thousands) | **2011** | 2010 |
| Commitments to | | |
| Originate/purchase mortgage loans or securities | **$9,903,415** | $13,484,045 |
| Sell mortgage loans or securities (a) | **12,632,000** | 14,348,696 |
| Home equity lines of credit | **1,551,734** | 2,162,976 |

(a) Includes $6.3 billion and $1.7 billion as of December 31, 2011 and 2010, respectively, of commitments to sell securities to Ally IM under outstanding TBA transactions. See Note 16 - Derivative Instruments and Hedging Activities for additional information.

### Commitments to originate/purchase mortgage loans or securities

Prior to mortgage funding we commit to originate loans under interest rate lock commitments with borrowers whereby we commit to fund loans at a set interest rate, provided the borrower elects to close the loan. We also commit to purchase loans from Ally Bank. The estimated fair value for these commitments is the current estimated fair value of the underlying mortgage loan less the par value of committed loan amount, adjusted for anticipated net origination costs and fees and any loans that are not expected to be funded based on our historical experience. The determination of the underlying mortgage loan fair value is estimated using published market information associated with commitments to sell similar instruments. All of these commitments were accounted for as derivatives at December 31, 2011 and 2010.

### Commitments to sell mortgage loans or securities

We enter into forward delivery commitments to sell mortgages and MBS to third party investors. The forward sale commitments obligate us to sell a certain amount of loans or securities within a certain range of interest rates in a specified time period. Due to the nature of the commitment, we are exposed to interest rate and market rate risk during the commitment period. All of these commitments were accounted for as derivatives at December 31, 2011 and 2010.

### Home equity lines of credit

We have commitments to fund the remaining undrawn balances on home equity lines of credit. The unused lines of credit reset at prevailing market rates and, as such, approximate market value. Included in the home equity lines of credit are both lines of credit on our Consolidated Balance Sheet, and those within certain of our off-balance sheet securitizations. As provided by the securitization structure, we become obligated to fund any incremental draws, subject to customary borrower requirements, on home equity lines of credit by borrowers if certain triggers are met. These draws are referred to as excluded amounts and are funded directly to the borrower by us. In return, our lending balances are collected from our percentage of the remitted funds for specific borrowers within the securitization trust. We actively manage the available lines of credit within these securitization trusts to reduce potential funding risk. At December 31, 2011 and 2010, the cumulative funds drawn were $367.9 million and $377.8 million, respectively, which we classified within mortgage loans held–for–sale. At December 31, 2011 and 2010, the commitments to fund home equity lines of credit in off-balance sheet securitizations represented $645.9 million and $986.7 million, respectively, of our total unfunded commitments of $1.6 billion and $2.2 billion, respectively. We estimate and record a liability for the incurred credit losses on our unfunded home equity line of credit commitments. These anticipated credit losses are classified within other liabilities. At December 31, 2011 and 2010, we had a liability of $1.4 million and $3.9 million, respectively, recorded for incurred credit losses on our unfunded home equity line of credit commitments.

## Other Commitments and Contingencies

We believe it is reasonably possible that losses beyond amounts currently recorded for the litigation matters and representation and warranty obligations and related claims described below could occur, and such losses could have a material adverse impact on our results of operations, financial condition or cash flows. However, based on currently available information, we are unable to estimate a range of reasonably possible losses above amounts that have been recorded at December 31, 2011.

### Loan Repurchases and Obligations Related to Loan Sales

*Overview*

We sell loans that take the form of securitizations guaranteed by the GSEs, securitizations sold to private investors, and to whole–loan investors. In connection with a portion of our private-label securitizations, the monolines insured all or some of the related bonds and guaranteed timely repayment of bond principal and interest when the issuer defaults. In connection with securitizations and loan sales, the trustee for the benefit of the related security holders and, if applicable, the related monoline insurers are provided various representations and warranties related to the loans sold. The specific representations and warranties vary among

CONFIDENTIAL

different transactions and investors but typically relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, the ability to deliver required documentation and compliance with applicable laws. In general, the representations and warranties described above may be enforced at any time unless a sunset provision is in place. Upon discovery of a breach of a representation or warranty, the breach is corrected in a manner conforming to the provisions of the sale agreement. This may require us to repurchase the loan, indemnify the investor for incurred losses, or otherwise make the investor whole. We have entered into settlement agreements with both Fannie Mae and Freddie Mac that, subject to certain exclusions, limit our remaining exposure with the GSEs. See *Government-sponsored Enterprises* below. We assume all of the customary representation and warranty obligations for loans purchased from Ally Bank and subsequently sold into the secondary market, generally through securitizations guaranteed by the GSEs.

### Originations

The total exposure to mortgage representation and warranty claims is most significant for loans originated and sold between 2004 through 2008, specifically the 2006 and 2007 vintages that were originated and sold prior to enhanced underwriting standards and risk-mitigation actions implemented in 2008 and forward. Since 2009, we have focused primarily on purchasing prime conforming and government-insured mortgages. In addition, we ceased offering interest-only jumbo mortgages in 2010. Representation and warranty risk mitigation strategies include, but are not limited to, pursuing settlements with investors where economically beneficial in order to resolve a pipeline of demands in lieu of loan-by-loan assessments that could result in repurchasing loans, aggressively contesting claims we do not consider valid (rescinding claims), and seeking recourse against correspondent lenders from whom we purchased loans wherever appropriate.

### Demand/Claim Process

After receiving a claim under representation and warranty obligations, we review the claim to determine the appropriate response (e.g. appeal, and provide or request additional information) and take appropriate action (rescind, repurchase the loan, or remit indemnification payment). Historically, repurchase demands were generally related to loans that became delinquent within the first few years following origination. As a result of market developments over the past several years, investor repurchase demand behavior has changed significantly. GSEs and investors are more likely to submit claims for loans at any point in their life cycle. Investors are more likely to submit claims for loans that become delinquent when a loss is incurred. Representation and warranty claims are generally reviewed on a loan-by-loan basis to validate if there has been a breach requiring a potential repurchase or indemnification payment. We actively contest claims to the extent they are not considered valid. We are not required to repurchase a loan or provide an indemnification payment where claims are not valid.

The risk of repurchase or indemnification, and the associated credit exposure, is managed through our underwriting and quality assurance practices and by servicing mortgage loans to meet investor standards. We believe that, in general, the longer a loan performs prior to default, the less likely it is that an alleged breach of representation and warranty will be found to have a material and adverse impact on the loan's performance. When loans are repurchased, we bear the related credit loss on the loans. Repurchased loans are classified as held-for-sale and initially recorded at fair value.

The following table includes amounts paid to investors and monolines with respect to representation and warranty obligations.

| December 31, *($ in thousands)* | **2011** | 2010 |
|---|---|---|
| Loan repurchases (UPB) | | |
| GSEs | **$143,340** | $388,873 |
| Private-label securitizations insured (monolines) | **179** | 160 |
| Private-label securitizations uninsured | **—** | — |
| Whole-loan investors | **1,426** | 66,201 |
| Total | **$144,945** | $455,234 |
| Indemnifications (make wholes) by investor | | |
| GSEs | **$59,269** | $227,994 |
| Private-label securitizations insured (monolines) | **5,449** | 12,149 |
| Private-label securitizations uninsured | **—** | — |
| Whole-loan investors | **869** | — |
| Total | **$65,587** | $240,143 |

CONFIDENTIAL

EXAM00234335

The following table presents the total number and original unpaid principal balance of loans related to unresolved representation and warranty demands (indemnification claims and/or repurchase demands). The table includes demands that we have requested be rescinded but which have not yet been agreed to by the investor. The table excludes certain demands in situations where investors have requested additional documentation as part of individual loan file reviews.

| | 2011 | | 2010 | |
|---|---|---|---|---|
| December 31, ($ in millions) | Number of loans | Dollar amount of loans | Number of loans | Dollar amount of loans |
| Unresolved repurchase demands previously received | | | | |
| GSEs | 357 | $71 | 833 (a) | $170 (a) |
| Monolines | | | | |
| MBIA Insurance Corporation | 3,494 | 229 | 3,576 | 243 |
| Financial Guaranty Insurance Company | 3,579 | 199 | 295 | 23 |
| Other | 286 | 22 | 93 | 8 |
| Other investors | 98 | 27 | 196 | 41 |
| Total unpaid principal balance | 7,814 | $548 | 4,993 | $485 |

(a) This amount is gross of any demands that would be removed due to the Fannie Mae settlement. At December 31, 2010, $48.0 million of outstanding claims were covered under the Fannie Mae settlement agreement.

We are currently in litigation with MBIA Insurance Corporation (MBIA) and Financial Guaranty Insurance Company (FGIC) with respect to certain representation and warranty matters related to certain of our private-label securitizations. Historically we have requested that most of the demands be rescinded, consistent with the claim/demand process described above. As the litigation process proceeds, additional loan reviews are expected and will likely result in additional repurchase demands.

### Liability for Representation and Warranty Obligations

The liability for representation and warranty obligations reflects management's best estimate of probable lifetime loss. We consider historical and recent demand trends in establishing the reserve. The methodology used to estimate the reserve considers a variety of assumptions including borrower performance (both actual and estimated future defaults), repurchase demand behavior, historical loan defect experience, historical mortgage insurance rescission experience, and historical and estimated future loss experience, which includes projections of future home price changes as well as other qualitative factors including investor behavior. In cases where we do not have or have limited current or historical demand experience with an investor, it is difficult to predict and estimate the level and timing of any potential future demands. In such cases, we may not be able to reasonably estimate losses, and a liability is not recognized. Management monitors the adequacy of the overall reserve and makes adjustments to the level of reserve, as necessary, after consideration of other qualitative factors including ongoing dialogue and experience with counterparties.

At the time a loan is sold, an estimate of the fair value of the liability is recorded and classified in other liabilities and recorded as a component of gain on mortgage loans, net. We recognize changes in the liability when additional relevant information becomes available. Changes in the liability are recorded as representation and warranty expense, net. At December 31, 2011, the liability relates primarily to non–GSE exposure. The following table summarizes the changes in our liability for representation and warranty obligations.

| ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Balance at January 1, | $496,216 | $874,990 |
| Provision for representation and warranty obligations | | |
| Loan sales | 20,578 | 23,038 |
| Change in estimate | 98,614 | 703,719 |
| Total additions | 119,192 | 726,757 |
| Realized losses (a) | (133,068) | (1,113,989) |
| Recoveries | 10,858 | 8,458 |
| Balance at December 31, | $493,198 | $496,216 |

(a) Includes principal losses and accrued interest on repurchased loans, indemnification payments, and settlements with investors.

### Government–sponsored Entities

Between 2004 and 2011, we sold $430.8 billion of loans to the GSEs. Each GSE has specific guidelines and criteria for sellers and servicers of loans underlying their securities. In addition, the risk of credit loss of the loans sold was generally transferred to investors upon sale of the securities into the secondary market. Conventional conforming loans were sold to either Freddie Mac or Fannie Mae, and government–insured loans were securitized with Ginnie Mae. Our representation and warranty obligation liability

56

EXAM00234336

with respect to the GSEs considers the existing unresolved claims and the best estimate of future claims that could be received. We consider our experiences with the GSEs in evaluating our liability. During 2010, we were party to agreements with Freddie Mac and Fannie Mae that subject to certain exclusions, limits our remaining exposure to each counterparty.

The following table summarizes the changes in the original unpaid principal balance related to unresolved repurchase demands with respect our GSE exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor. The table excludes certain demands in situations where investors have requested additional documentation as part of individual loan file reviews. If we subsequently determine that we cannot deliver the requested documentation, and we repurchase the loan or make an indemnification payment, the demand will be reported in resolved claims.

| ($ in millions) | 2011 | 2010 |
|---|---|---|
| Balance at January 1, | $170 | $296 |
| New claims | 441 | 842 |
| Resolved claims (a) | (349) | (756) |
| Rescinded claims/other | (191) | (212) |
| Balance at December 31, | $71 | $170 |

(a)  Includes settlements, repurchased loans and claims under which indemnification payments are made.

In March 2010, we entered into an agreement with Freddie Mac under which we made a one-time payment to Freddie Mac for the release of repurchase obligations relating to most of the mortgage loans sold to Freddie Mac prior to January 1, 2009. This agreement does not release any of our obligations with respect to exposure for private-label MBS in which Freddie Mac had previously invested, loans where our affiliate, Ally Bank, is the owner of the servicing, as well as defects in certain other specified categories of loans. Further, we continue to be responsible for other contractual obligations we have with Freddie Mac, including all indemnification obligations that may arise in connection with the servicing of the mortgages. These other specified categories include (i) loans subject to certain state predatory lending and similar laws; (ii) groups of 25 or more mortgage loans purchased, originated, or serviced by one of our subsidiaries, the purchase, origination, or sale of which all involve a common actor who committed fraud; (iii) "non-loan-level" representations and warranties which refer to representations and warranties that do not relate to specific mortgage loans (examples of such non-loan-level representations and warranties include the requirement that our subsidiaries meet certain standards to be eligible to sell or service loans for Freddie Mac or our subsidiaries sold or serviced loans for market participants that were not acceptable to Freddie Mac); and (iv) mortgage loans that are ineligible for purchase by Freddie Mac under its charter and other applicable documents. If, however, a mortgage loan was ineligible under Freddie Mac's charter solely because mortgage insurance was rescinded (rather than for example, because the mortgage loan is secured by a commercial property), and Freddie Mac required us or our subsidiary to repurchase that loan because of the ineligibility, Freddie Mac would pay any net loss we suffered on any later liquidation of that mortgage loan.

We have received subpoenas in July 2010 from the Federal Housing Finance Agency (FHFA), which is the conservator of Fannie Mae and Freddie Mac. The subpoenas relating to Fannie Mae investments have been withdrawn with prejudice. The FHFA indicated that documents provided in response to the remaining subpoenas will enable the FHFA to determine whether they believe issuers of private-label MBS are potentially liable to Freddie Mac for losses they might have incurred. The FHFA has commenced securities and related common law fraud litigation against certain of our affiliates with respect to certain of Freddie Mac's private-label securities investments. It is possible that FHFA could bring legal claims against us in the future.

In December 2010, we entered into an agreement with Fannie Mae under which we made a one-time payment to Fannie Mae for the release of repurchase obligations related to most of the mortgage loans we sold to Fannie Mae prior to June 30, 2010. The agreement also covers potential exposure for private-label MBS in which Fannie Mae had previously invested. This agreement does not release any of our obligations with respect to loans where our affiliate, Ally Bank, is the owner of the servicing, as well as for defects in certain other specified categories of loans. Further, we continue to be responsible for other contractual obligations we have with Fannie Mae, including all indemnification obligations that may arise in connection with the servicing of the mortgages, and we continue to be obligated to indemnify Fannie Mae for litigation or third party claims (including by borrowers) for matters that may amount to breaches of selling representations and warranties. These other specified categories include, among others, (i) those that violate anti-predatory laws or statutes or related regulations or that otherwise violate other applicable laws and regulations; (ii) those that have non-curable defects in title to the secured property, or that have curable title defects, to the extent our subsidiaries do not cure such defects at our subsidiary's expense; (iii) any mortgage loan in which title or ownership of the mortgage loan was defective; (iv) groups of 13 or more mortgage loans, the purchase, origination, sale or servicing of which all involve a common actor who committed fraud; and (v) mortgage loans not in compliance with Fannie Mae Charter Act requirements (e.g., mortgage loans on commercial properties or mortgage loans without required mortgage insurance coverage). If a mortgage loan falls out of compliance with Fannie Mae Charter Act requirements because mortgage insurance coverage has been rescinded and not reinstated or replaced, upon the borrower's default our subsidiaries would have to pay to Fannie Mae the amount of insurance proceeds that would have been paid by the mortgage insurer with respect to such mortgage loan. If the amount of the loss exceeded the amount

57

CONFIDENTIAL

EXAM00234337

of insurance proceeds, Fannie Mae would be responsible for such excess.

### Monoline Insurers

Historically, we have securitized loans where the monolines insured all or some of the related bonds and guaranteed the timely repayment of bond principal and interest when the issuer defaults. Typically, any alleged breach requires the insurer to have both the ability to assert a claim as well as evidence that a defect has had a material and adverse effect on the interest of the security holders or the insurer. For the period 2004 through 2007, we sold $18.5 billion of loans into these monoline–wrapped securitizations.

We are currently in litigation with MBIA and FGIC in connection with our representation and warranty obligations, and additional litigation with other monolines is likely.

The following table summarizes the changes in the original unpaid principal balance related to unresolved repurchase demands with respect to our Monoline exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor. The table excludes certain demands in situations where investors have requested additional documentation as part of individual loan file reviews. If we subsequently determine that we cannot deliver the requested documentation, and we repurchase the loan or make an indemnification payment, the demand will be reported in resolved claims.

| ($ in millions) | 2011 | 2010 |
|---|---|---|
| Balance at January 1, | $274 | $231 |
| New claims (a) | 211 | 49 |
| Resolved claims (b) | (2) | (4) |
| Rescinded claims/other | (33) | (2) |
| Balance at December 31, | $450 | $274 |

(a)  Substantially all relate to claims associated with the 2004 through 2007 vintages.
(b)  Includes settlements, repurchased loans and claims under which indemnification payments are made.

### Private–label Securitization

In general, representations and warranties provided as part of our private–label securitization activities are less rigorous than those provided to the GSEs and generally impose higher burdens on investors seeking repurchase. In order to successfully assert a claim, it is our position that a claimant must prove a breach of the representations and warranties that materially and adversely affects the interest of the investor in the allegedly defective loan. Securitization documents typically provide the investors with a right to request that the trustee investigate and initiate a repurchase claim. However, a class of investors generally are required to coordinate with other investors in that class comprising no less than 25% and in some cases 50% of the percentage interest constituting a class of securities of that class issued by the trust to pursue claims for breach of representations and warranties. In addition, our private-label securitizations generally require that the servicer or trustee give notice to the other parties whenever it becomes aware of facts or circumstances that reveal a breach of representation that materially and adversely affects the interest of the certificate holders.

Regarding our securitization activities, we have exposure to potential losses primarily through two avenues. First, investors, through trustees to the extent required by the applicable agreements (or monoline insurers in certain transactions), may request pursuant to applicable agreements that we repurchase loans or make the investor whole for losses incurred if it is determined that we violated representations and warranties made at the time of the sale, provided that such violations materially and adversely impacted the interest of the investor. Contractual representations and warranties are different based on the specific deal structure and investor. It is our position that litigation of these matters must proceed on a loan by loan basis. This issue is being disputed throughout the industry in various pending litigation matters. Similarly in dispute as a matter of law is the degree to which claimants will have to prove that the alleged breaches of representations and warranties actually caused the losses they claim to have suffered. Ultimate resolution by courts of these and other legal issues will impact litigation and treatment of non-litigated claims pursuant to similar contractual provisions. Second, investors in securitizations may attempt to achieve rescission of their investments or damages through litigation by claiming that the applicable offering documents were materially deficient. If an investor properly made and proved its allegations, the investor might attempt to claim that damages could include loss of market value on the investment even if there were little or no credit loss in the underlying loans.

CONFIDENTIAL

EXAM00234338

### Whole–loan Sales

The following table summarized the changes in the original unpaid principal balance related to unresolved repurchase demands with respect to our whole-loan exposure. The table includes demands that we have requested be made but which have not been agreed to by the investor. The table excludes certain demands in situations where investors have requested additional documentation as part of individual loan file reviews. If we subsequently determine that we cannot deliver the requested documentation, and we repurchase the loan or make an indemnification payment, the demand will be reported in resolved claims.

| ($ in millions) | 2011 | 2010 |
|---|---|---|
| Balance at January 1, | $41 | $29 |
| New claims (a) | 20 | 52 |
| Resolved claims (b) | (8) | (17) |
| Rescinded claims/other | (26) | (23) |
| Balance at December 31, | $27 | $41 |

(a) Includes $18.9 million and $51.8 million new claims associated with the 2004 through 2007 vintages in 2011 and 2010, respectively.

(b) Includes settlements, repurchased loans and claims under which indemnification payments are made.

### Private Mortgage Insurance

Mortgage insurance is required for certain consumer mortgage loans sold to the GSEs and certain securitization trusts and may have been in place for consumer mortgage loans sold to whole-loan investors. Mortgage insurance is typically required for first-lien consumer mortgage loans having a loan-to-value ratio at origination of greater than 80 percent. Mortgage insurers are, in certain circumstances, permitted to rescind existing mortgage insurance that covers consumer loans if they demonstrate certain loan underwriting requirements have not been met. Upon receipt of a rescission notice, we assess the notice and if appropriate we refute the notice, or if the notice cannot be refuted we attempt to remedy the defect. In the event the mortgage insurance cannot be reinstated, we may be obligated to repurchase the loan or provide an indemnification payment in the event of a loss, subject to contractual limitations. While we make every effort to reinstate the mortgage insurance, we have had limited success and as a result, most of these requests result in rescission of the mortgage insurance. At December 31, 2011, we have approximately $130.2 million in original unpaid principal balance of outstanding mortgage insurance rescission notices where we have not received a repurchase demand. However, this unpaid principal amount is not representative of expected future losses.

### Private–label Securitizations – Other Potential Repurchase Obligations

When we sell mortgage loans through whole-loan sales or securitizations, we are required to make customary representations and warranties about the loans to the purchaser and/or securitization trust. These representations and warranties relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, ability to deliver required documentation, and compliance with applicable laws. Generally, the representations and warranties described above may be enforced at any time over the life of the loan. Breaches of these representations and warranties have resulted in a requirement that we repurchase mortgage loans. As the mortgage industry continues to experience higher repurchase requirements and additional investors begin to attempt to put back loans, a significant increase in activity beyond that experienced today could occur, resulting in additional future losses.

### Mortgage Foreclosure Matters

On February 9, 2012, Ally Inc., ResCap, and GMAC Mortgage reached an agreement in principle with the federal government, 49 state attorneys general, and 45 state banking departments with respect to investigations into procedures followed by mortgage servicing companies and banks in connection with mortgage origination and servicing activities and foreclosure home sales and evictions (the Settlement). On March 12, 2012, the Settlement was filed as a consent judgment in the U.S. District Court for the District of Columbia). In addition, we separately reached an independent settlement with Oklahoma, which did not participate in the broader settlement described below, and agreements with two other states for other releases.

CONFIDENTIAL

EXAM00234339

The Settlement requires us to pay approximately $110.0 million to a trustee, who will then distribute these funds to federal and state governments. In addition, we are obligated to provide $200.0 million towards borrower relief, subject to possible upward adjustment as described below. This obligation for borrower relief will include loan modifications, including principal reductions, rate modifications, and refinancing for borrowers that meet certain requirements, and participation in certain other programs. Generally, if certain basic criteria are met, borrowers that are either delinquent or at imminent risk of default and owe more on their mortgages than their homes are worth could be eligible for principal reductions, and borrowers that are current on their mortgages but who owe more on their mortgage than their homes are worth could be eligible for refinancing opportunities. Further, we have agreed to solicit all borrowers that are eligible for rate and principal modifications as of March 1, 2012. We are committed to provide loan modifications to all borrowers who accept a modification offer within three months of the solicitation. We have also agreed to provide loan modifications to borrowers who accept a modification offer within six months of the solicitation, unless and until total borrower relief provided exceeds $250.0 million.

We currently expect that loans totaling approximately $550.0 million in outstanding unpaid principal balance will be modified in connection with these programs. This estimate was determined by identifying loans that appear to meet the program eligibility requirements, and applying various assumptions with respect to anticipated modifications. Given that we have limited historical experience upon which to base our assumptions, the actual unpaid principal balance of loans ultimately modified could be significantly different.

The Settlement provides incentives for borrower relief that is provided within the first twelve months, and all obligations must be met within three years from the date the consent judgment is filed. In addition to the foregoing, we will be required to implement new servicing standards relating to matters such as foreclosure and bankruptcy information and documentation, oversight, loss mitigation, limitations on fees, and related procedural matters. Compliance with these obligations will be overseen by an independent monitor, who will have authority to impose additional penalties and fines if we fail to meet established timelines or fail to implement required servicing standards.

The Settlement generally resolves potential claims arising out of origination and servicing activities and foreclosure matters, subject to certain exceptions. The Settlement does not prevent state and federal authorities from pursuing criminal enforcement actions, securities-related claims (including actions related to securitization activities and Mortgage Electronic Registration Systems, or MERS), loan origination claims, claims brought by the FDIC, and certain other matters. The Settlement also does not prevent claims that may be brought by individual borrowers.

The Settlement is subject to ongoing discussions among the parties and the completion of definitive documentation as well as required regulatory and court approvals.

On February 9, 2012, Ally Inc., ResCap, and GMAC Mortgage also agreed with the Federal Reserve Board (FRB) on a civil money penalty (CMP) of $207.0 million related to the same activities that were the subject of the Settlement. This amount will be reduced dollar-for-dollar in connection with certain aspects of our satisfaction of the required monetary payment and borrower relief obligations included within the Settlement, as well as our participation in other similar programs that may be approved by the FRB. While additional future cash payments related to the CMP are possible if we are unable to satisfy the borrower relief requirements of the Settlement within two years, we currently expect that the full amount of the CMP will be satisfied through our commitments in connection with the Settlement.

For the year ended December 31, 2011, we recognized losses of $211.5 million related to the matters described above. While we may forgo future interest payments received related to modified loans that we may not have otherwise agreed without the Settlement, we do not expect the borrower relief modifications required by the Settlement to have a significant impact on future interest. Further, we do not expect our borrower relief commitments overall will have a material adverse effect on our consolidated financial condition, results of operations, or cash flows.

In connection with our Settlement obligations we expect to solicit qualifying borrowers from the Ally Bank and RFC consumer mortgage loan portfolios. To the extent activities under the borrower relief programs are consistent with activities currently permitted under our servicing agreements with Ally Bank and RFC, we do not expect to reimburse, or indemnify, either affiliate for any losses it incurs in connection with these borrower relief activities

**Other Mortgage Foreclosure Matters**

*Consent Order*

As a result of an examination conducted by the FRB and Federal Deposit Insurance Corporation (FDIC), on April 13, 2011, we entered into a Consent Order (the Consent Order) with the FRB and the FDIC. The Consent Order requires that we make improvements to various aspects of our residential mortgage loan servicing business, including compliance programs, internal audit,

CONFIDENTIAL

EXAM00234340

communications with borrowers, vendor management, management information systems, employee training, and oversight by the board of directors of ResCap.

The Consent Order further requires us to retain independent consultants to conduct a risk assessment related to mortgage servicing activities and, separately, to conduct a review of certain past residential mortgage foreclosure actions. We cannot estimate the ultimate impact of any deficiencies that have been or may be identified in our historical foreclosure procedures. There are potential risks related to these matters that extend beyond potential liability on individual foreclosure actions. Specific risks could include, for example, claims and litigation related to foreclosure remediation and resubmission; claims from investors that hold securities that become adversely impacted by continued delays in the foreclosure process; the reduction in foreclosure proceeds due to delay, or by challenges to completed foreclosure sales to the extent, if any, not covered by title insurance obtained in connection with such sales; actions by courts, state attorneys general, or regulators to delay further the foreclosure process after submission of corrected affidavits, or to facilitate claims by borrowers alleging that they were harmed by our foreclosure practices (by, for example, foreclosing without offering an appropriate range of alternative home preservation options); additional regulatory fines, sanctions, and other additional costs; and reputational risks. To date we have borne all out-of-pocket costs associated with the remediation rather than passing any such costs through to investors for whom we service the related mortgages, and we expect that we will continue to do so.

## Legal Proceedings

We are subject to potential liability under various governmental proceedings, claims, and legal actions that are pending or otherwise asserted against us. We are named as defendants in a number of legal actions, and we are occasionally involved in governmental proceedings arising in connection with our respective businesses. Some of the pending actions purport to be class actions, and certain legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. We establish reserves for legal claims when payments associated with the claims become probable and the costs can be reasonably estimated. Given the inherent difficulty of predicting the outcome of litigation and regulatory matters, it is generally very difficult to predict what the eventual outcome will be, and when the matter will be resolved. The actual costs of resolving legal claims may be higher or lower than any amounts reserved for the claims. We recorded a liability for probable legal claims of $6.9 million at December 31, 2011, and $7.8 million at December 31, 2010.

## Mortgage-backed Securities Litigation

### Private-label Securities Litigation

We and certain of our affiliates have been named as defendants in several cases relating to our various roles in MBS offerings. The plaintiffs generally allege that the defendants made misstatements and omissions in registration statements, prospectuses, prospectus supplements, and other documents related to the MBS offerings. The alleged misstatements and omissions typically concern underwriting standards. Plaintiffs generally claim that such misstatements and omissions constitute violations of state and/ or federal securities law and common law including negligent misrepresentation and fraud. Plaintiffs seek monetary damages and rescission. Set forth below are descriptions of the most significant of these legal proceedings.

### Allstate Litigation

On February 14, 2011, the Allstate Insurance Company and various of its subsidiaries and affiliates (collectively, Allstate) filed a complaint in Hennepin County District Court, Minnesota, against GMAC Mortgage; RFC; Residential Funding Securities LLC (RFS); Residential Accredit Loans Inc. (RALI); Residential Asset Mortgage Products, Inc (RAMP); Residential Funding Mortgage Securities I Inc. (RFMSI); Residential Funding Mortgage Securities II Inc. (RFMSII); and Residential Asset Securities Corporation (RASC) (collectively, the defendants). The complaint alleges that the defendants misrepresented in the offering materials the riskiness and credit quality of, and omitted material information related to, residential MBS Allstate purchased. The complaint asserts claims for fraud and negligent misrepresentation and seeks money damages and costs, including attorneys' fees. Discovery in this case is underway.

### Huntington Bancshares Litigation

On October 11, 2011, Huntington Bancshares, Inc. commenced a lawsuit against GMAC Mortgage; RALI; ResCap; GMAC-RFC Holding Company LLC (RFC Holding); RFC; and several individuals (collectively, the defendants). The complaint alleges that the defendants made misrepresentations and omissions of material facts related to the originator's loan underwriting guidelines in the offering materials for five residential mortgaged-backed securities. The complaint asserts claims for fraud, aiding and abetting fraud, negligent misrepresentation, and violation of the Minnesota Securities Act and seeks rescission, money damages, and costs. The defendants' motion to dismiss is pending.

61

EXAM00234341

***Private-label Monoline Bond Insurer Litigation***

*MBIA Litigation*

On April 1, 2010 MBIA Insurance Corporation v. GMAC Mortgage was filed. The complaint alleges that we breached our contractual representations and warranties relating to the characteristics of mortgage loans contained in certain insured MBS offerings. The complaint further alleges that we failed to follow specific remedy procedures set forth in the contracts and improperly serviced the mortgage loans. Along with claims for breach of contract, MBIA also alleges fraud. MBIA seeks, among other remedies, repurchase of certain loans, payments on current and future claims under the relevant policies, indemnification for attorneys' fees and costs, and punitive damages. The case is in discovery.

*FGIC Litigation*

On November 29, 2011, FGIC filed a complaint entitled Financial Guaranty Insurance Company v. GMAC Mortgage LLC, et al. FGIC alleges that we breached our contractual representations and warranties relating to the characteristics of the mortgage loans contained in certain insured MBS offerings as well as a claim for fraudulent inducement. In addition, FGIC alleges aiding and abetting fraudulent inducement against Ally Bank, which originated a large portion of the loans in the disputed pool, and breach of the custodial agreement for failing to notify FGIC of the claimed breaches of representations and warranties. In each of these cases, FGIC seeks, among other relief, reimbursement of all sums it paid under the various policies and an award of legal, rescissory, equitable, and punitive damages. There are currently twelve FGIC lawsuits pending against us and our affiliates in the U.S. District Court for the Southern District of New York.

**Other Litigation**

*Commonwealth of Massachusetts*

On December 1, 2011, the Commonwealth of Massachusetts filed an enforcement action in the Suffolk County Superior Court against us and several other lender/servicers. The Commonwealth claims that certain aspects of defendants' foreclosure processes are unlawful, that defendants do not always process loan modifications accurately, and that defendants' use of the Mortgage Electronic Registration Systems (MERS) has damaged the integrity of the Commonwealth's Torrens recording system. The Commonwealth seeks civil penalties, injunctive relief, costs, and attorneys' fees. In connection with the settlement with the federal government and state attorneys general announced on February 9, 2012, the Commonwealth of Massachusetts agreed to settle all servicing-related claims asserted in this action and to certain limits on monetary damages, if any. However, the Commonwealth of Massachusetts continues to pursue claims related to MERS and certain foreclosure-related matters.

**Regulatory**

Our origination, purchase, sale, securitization and servicing business activities expose us to risks of noncompliance with extensive federal, state, and local laws, rules and regulations. Our business activities are also governed by, among other contracts, primary servicing agreements that contain covenants and restrictions regarding the performance of our servicing activities. Our failure to comply with these laws, rules, regulations and contracts can lead to, among other things, loss of licenses and approvals, an inability to sell or securitize loans, demands for indemnification or loan repurchases from purchasers of loans, demands for indemnification or other compensation from investors in our securitizations, fines, penalties, litigation, including class action lawsuits, and governmental investigations and enforcement actions, including, in the case of some violations of law, possible criminal liability.

CONFIDENTIAL

**Operating Leases**

As of December 31, 2011, we were obligated under non-cancelable operating leases for office space and equipment. Future minimum rental payments, including escalation clauses, under leases with terms of one year or more at December 31, 2011, were as follows.

| Year Ended December 31, (*$ in thousands*) | Leases as part of ongoing operation |
|---|---|
| 2012 | $13,081 |
| 2013 | 11,813 |
| 2014 | 11,821 |
| 2015 | 12,001 |
| 2016 | 12,181 |
| 2017 and thereafter | 33,657 |
| | $94,554 |

The above table includes all rental payments we are obligated to pay under non-cancelable operating leases for office space. These payments exclude amounts we expect to collect through subleases or contract terminations as a result of our restructuring efforts.

Rental expense for the years ended December 31, 2011 and 2010, was $12.1 million and $13.5 million, respectively. These amounts exclude any leases included in restructuring activities.

**Other Commitments**

We have a commitment with a third-party information technology provider for use of their integrated loan servicing platform and data warehouse product. This agreement is for $5.1 million per year and expires on May 31, 2012.

**Other Contingencies**

We are subject to potential liability under various other exposures including tax, nonrecourse loans, self-insurance, and other miscellaneous contingencies. We establish reserves for these contingencies when the item becomes probable and the costs can be reasonably estimated. The actual costs of resolving these items may be substantially higher or lower than the amounts reserved for any one item. Based on information currently available, it is the opinion of management that the eventual outcome of these items will not have a material adverse effect on our consolidated financial condition, results of operations, or cash flows.

## 19. Reinsurance Arrangements

Cap Re of Vermont, LLC (Cap Re), our wholly-owned subsidiary, has excess layer reinsurance agreements with five non-affiliated private mortgage insurance (PMI) companies (the ceding companies) that provide PMI for certain of our mortgage loan servicing portfolio. Cap Re assumes the risk of loss over a specified first loss percentage for covered loans and in return earns a portion of the PMI premium associated with those mortgage loans. The first loss layer is equal to the risk in force multiplied by the weighted average of the first loss percentages based on the percentage of the original loan principal in each book.

We earned premiums of $17.3 million and $29.4 million during the years ended December 31, 2011 and 2010, respectively, which are included within other revenue, net.

We establish a liability for insured events, which includes estimates of future payments of loss and related loss adjustment expenses. We reserve for loss and loss adjustment expenses when notices of default on insured mortgage loans are received and the specified first loss percentage covered by the ceding company is exhausted.

CONFIDENTIAL

EXAM00234343

The following is a summary of the activity in the reserve for insurance losses

| ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Balance at January 1, | $162,565 | $230,487 |
| Provision | 31,388 | 36,508 |
| Claims paid | (102,338) | (104,430) |
| Balance at December 31, | $91,615 | $162,565 |

64

CONFIDENTIAL

EXAM00234344

## 20. Related Party Transactions

### Balance Sheet

A summary of the balance sheet effect of our affiliate transactions were as follows.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| **Assets** | | |
| Mortgage loans held–for–sale — purchased from Ally Bank | $13,518 | $16,951 |
| Other Assets | | |
|   Restricted cash deposits — Ally Bank | 112,458 | 111,354 |
|   Derivative collateral placed with Ally IM | 1,002,472 | 914,698 |
|   Fair value of derivative instruments | | |
|     Forward flow agreement — Ally Bank | 16,423 | 54,669 |
|     MSR swap — Ally Bank | 17,681 | 14,603 |
|   Receivable from ResCap, net - Passive Asset Transactions, LLC (PATI) Notes (a) | 1,778 | 25,681 |
|   Receivable from other affiliates (b) | 112,195 | 14,201 |
| | | |
| Borrowings - Ally Inc. Senior Secured Credit Facility (c) | $626,778 | $664,900 |
| Borrowings - Ally Inc. LOC (c) | 111,520 | 382,109 |
| Borrowings - Secured Financing Agreement BMMZ (c) | 13,398 | — |
| Borrowings from RHC (c) | 17,614 | 515,891 |
| Other Liabilities | | |
|   Liability for loans sold with recourse — Ally Bank (d) | 6,773 | 6,668 |
|   Fair value of derivative instruments, net | | |
|     Ally IM (e) | 1,043,929 | 552,332 |
|   Payable to RFC (f) | 69,785 | — |
|   Payable (receivable), net Ally Bank | 22,429 | (11,656) |
|   Payable to Ally Inc. | 2,144 | (662) |
| **Other activity** | | |
| Loans purchased (UPB) from RFC | $8,539 | $— |
| Loans sold (UPB) to RFC | 292,243 | |
| Loans purchased (UPB) under the MMLPSA - Ally Bank (g) | 56,680,164 | 66,310,743 |
| Loans sold (UPB) under the MMLPSA - Ally Bank | 27,041 | 94,811 |
| Loans  (UPB) sub-serviced - Ally Bank | 143,172,634 | 113,904,266 |
| Loans  (UPB) sub-serviced - RFC | 43,393,746 | 50,253,899 |
| Servicing escrow / deposits for off balance sheet loans - Ally Bank | 2,003,745 | 2,069,527 |
| Home Equity Loans (UPB) subject to indemnifications - Ally Bank | 58,512 | 68,017 |
| Income tax settled with Ally Inc. (h) | 17,353 | — |

(a)   Amount is net of impairment of $52.4 million  and $52.6 million  at December 31, 2011 and 2010, respectively.

(b)   Includes $97.8 million receivable due from our affiliate RFC.  The receivable represents RFC's involvement with the mortgage servicer advance facility which we consolidate as we are deemed to be the primary beneficiary of the VIE.

(c)   Includes principal balance of debt outstanding plus accrued interest.

(d)   Relates to an indemnification agreement with respect to a portfolio of second lien home equity loans with an original UPB of $166.0 million.

(e)   Includes the fair value of forwards, TBAs and swaptions executed in connection with hedging of our mortgage loans held–for–sale, retained interests and MSRs.  See Note 16 — Derivative Instruments and Hedging Activities for additional information.

(f)   Includes costs for personnel, information technology, communications, corporate marketing, procurement, and services related to facilities incurred by Ally Inc. and allocated to RFC, who in turn allocated a portion of the cost to us.

(g)   Includes repurchased loans of $11.7 million and  $19.8 million as of December 31, 2011 and 2010, respectively.

(h)   See Note 13 - Income taxes for additional information.

CONFIDENTIAL

EXAM00234345

## Statement of Income

A summary of the income statement effect of our affiliate transactions were as follows.

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| **Net financing revenue** | | |
| Interest income – ResCap | $3,877 | $54,287 |
| Interest income – cash deposits at Ally Bank | 1,104 | 1,267 |
| Interest expense – Ally Inc. Senior Secured Credit Facility | 19,340 | 24,879 |
| Interest expense – Ally Inc. LOC | 8,778 | 3,201 |
| Interest expense – Secured Financing Agreement BMMZ | 19 | — |
| Interest expense – Ally Bank | 4,022 | — |
| Interest expense – Borrowings from RHC | 4,781 | 15,542 |
| Amortization expense of deferred issuance costs – Ally Inc. | — | 1,905 |
| **Other revenue** | | |
| Gain on mortgage loans, net - Ally Bank | $189,902 | ($70,058) |
| Gain on mortgage loans, net - derivative instruments with Ally IM | (56,336) | 10,278 |
| Gain on mortgage loans, net – Ally Securities, LLC (a) | 174,968 | 79,101 |
| Servicing fees - Ally Bank | 34,824 | 23,954 |
| Servicing fees - RFC | 38,920 | 45,774 |
| Servicing asset valuation and hedge activities, net - derivative instruments with Ally IM | 172,819 | 97,260 |
| Servicing asset valuation and hedge activities, net - derivative instruments with Ally Bank | (359,523) | 469,945 |
| Loan brokerage fees - Ally Bank (b) | 55,622 | 64,543 |
| **Provision expense — Ally Bank** | $2,868 | $7,657 |
| **Noninterest expense** | | |
| Management fees – Ally Inc. | $72,365 | $82,149 |
| Other provision expense – PATI Notes Receivable - ResCap (c) | 4,225 | 51,959 |
| Custodial fees - Ally Bank | 7,732 | 7,519 |
| Allocated expenses - Ally Bank | 134 | 291 |

(a)    Relates to mortgage and asset–backed securities brokered to Ally Securities, LLC for underwriting, distribution and capital markets liquidity services.

(b)    Under the terms of a broker agreement with Ally Bank, we provide loan processing services to support Ally's loan origination and purchase activities as well as loan closing services.

(c)    See the *Borrowing* section of this note for discussion of impairment expense recognized in connection with the PATI Note.

## Statement of Changes in Equity

ResCap received capital support in the form of debt forgiveness from Ally Inc. of $109.4 million during the year ended December 31, 2011. We recognized a capital contribution from our Parent of $65.9 million, and a corresponding reduction of borrowings under the Ally Inc. LOC, during the year ended December 31, 2011 in connection with Ally Inc.'s capital support to ResCap.

On January 30, 2012, ResCap received capital support in the form of debt forgiveness from Ally Inc. of $196.5 million. We recognized a capital contribution from our Parent of $124.2 million, and a corresponding reduction of borrowings under the Ally Inc. LOC in connection with Ally Inc.'s capital support to ResCap.

## Borrowings

The Ally Inc. LOC is a U.S. dollar denominated agreement that is collateralized by domestic whole loans, accounts receivable, MSRs, securities, certain equity investments, and PATI notes receivable. PATI is our wholly–owned consolidated subsidiary. The U.S. dollar denominated PATI notes receivable are collateralized by international commercial finance receivables (the Pledged Assets) that are owned by affiliates. The Pledged Assets were legally sold by these affiliates to special purpose entities that issued notes (the SPE Notes) which were sold to ResCap and contributed through RHC to PATI, who then pledged the SPE Notes to the Ally Inc. LOC. The sales of the Pledged Assets from the affiliates to the SPEs were recorded as on–balance sheet securitizations, with the SPE Notes recorded as receivable from affiliates in other assets on our Consolidated Balance Sheet. Because ResCap is the primary beneficiary of these special purpose entities, they are deemed to be our affiliates. The original SPE Notes were established based on the fair value of the underlying Pledged Assets at the date the Pledged Assets were sold and the SPE Notes issued. The SPE Notes do not automatically adjust as the fair value of the Pledged Assets change. At December 31, 2011 and 2010, we had impairment recorded of $52.4 million and $52.6 million, respectively, to reduce the receivable from affiliates to the fair value of the

66

CONFIDENTIAL

EXAM00234346

Pledged Assets. The initial impairment, as well as subsequent changes in the impairment, were recognized in other noninterest expense, net. PATI and ResCap have the ability to forgive portions of the SPE Notes to adjust the carrying value to the fair value of the Pledged Assets in connection with third party sales of Pledged Assets. This debt forgiveness requires the approval of Ally Inc., ResCap and the special purpose entities. To the extent PATI and ResCap forgive portions of the SPE Notes, this will result in the realization of the recorded impairment. $4.6 million and $663.9 million in SPE Notes were forgiven during the year ended December 31, 2011 and 2010, respectively.

## Other Significant Affiliate Agreements

We are party to an ISDA 2002 Master Agreement with Ally IM whereby we enter into interest rate hedging transactions (the ISDA Agreements and a Master Securities Forward Transaction Agreement (the Forward Agreement) (together with the ISDA Agreement, the Derivative Agreements)) whereby we agree to sell certain mortgage–backed securities to Ally IM from time to time on a forward basis. We also entered into a Guarantee and Master Netting Agreement with Ally IM whereby the parties agreed to aggregate, net, and set off the Derivative Agreement, and the Ally Inc. LOC. In connection with these agreements, we cross-collateralize the respective obligations and granted a security interest to Ally IM in any cash or other property posted, or required to be posted, as collateral by us.

On December 5, 2011, ResCap and GMAC Mortgage entered into an agreement with Ally Inc. and GMAC Mortgage Group (the Agreement), whereby we agreed to certain terms and conditions in respect of ongoing loan sales by Ally Bank to us under the terms of our Master Mortgage Loan Purchase and Sale Agreement (MMLPSA) with Ally Bank. In accordance with the Agreement, we have instructed the GSEs to deliver, free and clear of all liens and encumbrances, mortgage-backed securities received from the GSEs in connection with our loan sales to them (New MBS) directly upon issuance into an account of Ally IM for the benefit of Ally Bank and GMAC Mortgage Group. We grant Ally Bank and GMAC Mortgage Group security interests in loans purchased from Ally Bank and all proceeds from the sale of the New MBS. All proceeds from the sale of the New MBS are paid without setoff, recoupment or other reduction by Ally IM directly to Ally Bank. Ally Bank remits to us proceeds, if any, in excess of the purchase price of loans sold to us under the MMLPSA, and we remit to Ally Bank the amount of any shortfall in such proceeds necessary to pay the purchase price of the loans. In connection with these conditions, we are negotiating a Pledge and Security Agreement among ResCap, GMAC Mortgage, Ally Inc., GMAC Mortgage Group, Ally Bank and Ally IM (the Pipeline Security Agreement).

In accordance with the terms of the Agreement, and to assist ResCap and GMAC Mortgage with our hedging activities and liquidity needs, Ally Inc. provided us and RFC as Borrower's, with $250 million of new financing through a secured financing agreement with its subsidiary BMMZ and a commitment to ResCap for capital support at November 30, 2011, ResCap did not require any capital support from Ally Inc. as of November 30, 2011. In accordance with the terms, of the Agreement and to assist us with our hedging activities, existing counterparty derivative transactions were novated to Ally IM, to the extent possible, and new derivative transactions were executed between us and Ally IM on terms substantially the same as the novated trades. New derivative transactions will be executed with Ally IM. We expect to transact virtually all of our hedging transactions with Ally IM in the future.

On January 30, 2012, ResCap and GMAC Mortgage entered into an agreement (the Letter Agreement) with Ally Inc. pursuant to which Ally Inc. agreed to provide capital support to ResCap in connection with potential obligations in connection with mortgage foreclosure fines and penalties. Under the terms of the Letter Agreement, Ally Inc. agreed to provide ResCap with immediate capital support of $196.5 million through forgiveness of debt, and to provide, and cause BMMZ to provide, waivers of any breach of or default under the Ally Inc. Senior Secured and LOC and BMMZ Secured Financing Agreement credit facilities, where the breach or default results from amounts recorded with respect to such potential obligations. Ally Inc. also agreed, in accordance with, and subject to, the approval of the Ally Inc. Board of Directors, to contribute capital to ResCap in the form of debt forgiveness in an amount necessary for ResCap to exceed its consolidated tangible net worth covenants by $25 million as of January 31, 2012, provided that such capital contribution is a result of net operating losses in the ordinary course of business and does not exceed $100 million.

In connection with the Letter Agreement, we and ResCap agreed to promptly perform all obligations that might be required in connection with mortgage foreclosure fines and penalties, including the timely remittance of any cash payments that might be owed to the applicable government authorities and any borrower relief that might be agreed in connection with any mortgage foreclosure settlement with the federal government, state attorneys general and state banking departments and in connection with any civil monetary penalty issued by the FRB. We also agreed to amend our subservicing agreement with Ally Bank to permit us to implement modifications and other loss mitigation activities in connection with any borrower relief obligations that might be required. Under the pending amendment, any uncured breach of our obligations with respect to the terms of any settlement or penalty would constitute an event of default and entitle Ally Bank to immediately terminate the subservicing agreement upon written notice. We have also agreed to renegotiate the terms of our forward flow and MSR Swap agreements with Ally Bank, whereby Ally Bank may novate the agreements with us to Ally IM or Ally Bank may terminate the agreements. In the event Ally Bank terminates the agreements, we may enter into new agreements with Ally IM.

67

CONFIDENTIAL

EXAM00234347

## Transactions with Ally Bank

Following are descriptions of our substantive affiliate agreements with Ally Bank. Certain of these agreements are expected to be renegotiated, novated or otherwise terminated in connection with agreements we have entered into with Ally Inc. See Other Significant Affiliate Agreements for additional information.

Under the terms of the Broker Agreement, we act in a broker capacity and provide loan processing services to Ally Bank to support its origination and purchase of loans as well as loan closing services. The Broker Agreement has no mandatory expiration date and can be terminated by either party with 30–days notice. Under the terms of the Broker Agreement, loans meeting the underwriting standards of Ally Bank are originated (funded) by Ally Bank, while loans not meeting those standards may be originated by us and sold directly into the secondary market. We also provide certain representations and warranties and indemnifications to Ally Bank with respect to brokered loans.

Under the terms of the MMLPSA with Ally Bank, we purchase first- and second-lien mortgage loans held-for-sale from Ally Bank. We sell and deliver such mortgage loans into the secondary market primarily through agency securitizations and whole-loan sales. The MMLPSA has no mandatory expiration date and can be terminated on 30 days notice by Ally Bank or immediately if agreed by both parties. Under the MMLPSA, we purchase loans from Ally Bank and recognize gains or losses on the sale of mortgage loans as they are sold by us into the secondary market. Loans purchased by us pursuant to the MMLPSA include mortgage loans originated by third parties and purchased by Ally Bank (correspondent lending); loans originated directly by Ally Bank; and mortgage loans originated by us and sold to Ally Bank pursuant to a loan sale agreement (the Client Agreement).

Under the terms of the Pipeline Security Agreement, Ally Bank is granted security interests in loans sold to us under the MMLPSA and all proceeds from the sale of New MBS in connection with the sale of such loans to the GSEs. All proceeds from the sale of New MBS are paid without setoff, recoupment or other reduction directly to Ally Bank. Ally Bank remits to us proceeds, if any, in excess of the purchase price of the loans sold to us under the MMLPSA, and we remit to Ally Bank the amount of any shortfall in such proceeds necessary to pay the purchase price of the loans. At December 31, 2011, there were no amounts due to or from Ally Bank in connection with this agreement.

We purchase loans from Ally Bank under the MMLPSA on a nonrecourse basis, either servicing released or servicing retained. If servicing is retained, Ally Bank retains the mortgage servicing rights and designates us as subservicer, pursuant to a servicing agreement between Ally Bank and us.

We are counterparty to a forward flow agreement for mortgage loans held-for-sale and interest rate lock commitments held by Ally Bank that ultimately will be sold to us under the MMLPSA. The forward flow agreement transfers the exposure to changes in fair value of Ally Bank's mortgage loans held-for-sale and interest rate lock commitments to us. We hedge our exposure to the forward flow agreement consistent with the hedging of our own mortgage loans held-for-sale and interest rate lock commitments. The forward flow agreement has no mandatory expiration date and can be terminated with 30 days notice from Ally Bank or immediately if agreed by both parties. In connection with our Letter Agreement with Ally Inc., we expect the forward flow agreement will be novated to Ally IM or terminated.

We are counterparty to a MSR Total Return Swap (the MSR Swap) which transfers the total economic return of MSRs owned by Ally Bank to us in exchange for a variable payment based upon a fixed spread to LIBOR. The fixed spread to LIBOR is periodically evaluated against available market data. Effective July 1, 2010, the fixed spread was increased to 325 basis points. We hedge our exposure to the MSR Swap consistent with the hedging of our own MSRs. The MSR Swap has no mandatory expiration date and can be terminated with 30 days notice from Ally Bank or immediately if agreed by both parties. In connection with our Letter Agreement with Ally Inc., we expect the MSR Swap will be novated to Ally IM or terminated.

We are party to an ISDA 2002 Master Agreement with Ally Bank governing the forward flow agreement and MSR Swap. We have also entered into an Agreement to Set Off Obligations (the Netting Agreement) which provides Ally Bank the right, but not the obligation, to set off any obligation that we have to Ally Bank against any obligation of Ally Bank to us. The Netting Agreement can be terminated by either party with 30 days notice. To the extent the forward flow agreement and MSR swap are novated or terminated, the ISDA 2002 Master Agreement and Netting Agreement may be terminated.

CONFIDENTIAL    EXAM00234348

Under the GSE servicer guides, the seller and servicer of mortgage loans equally share in customary representation and warranty obligations. We assume all of the representation and warranty obligations for loans we purchased from Ally Bank that we subsequently sell through Agency securitization or otherwise sell into the secondary market. To the extent these loans were originated by third-parties and purchased by Ally Bank and subsequently sold to us under the MMLPSA, we pursue recovery of losses from the third-parties under breach of customary representation and warranties. Pursuant to the Client Agreement, we also provide certain representations and warranties and indemnifications to Ally Bank with respect to those loan transactions. For loans that are not eligible to be sold to the GSEs that reach certain delinquency thresholds or which are otherwise in breach of sale representations and warranties contained in the client agreement, we repurchase loans from Ally Bank at their carrying cost.

In the first quarter of 2008, Ally Bank purchased a portfolio of second-lien home equity loans from us. We provided an indemnification to Ally Bank whereby we reimburse Ally Bank at such time as any of the loans covered by this agreement are charged off, typically when the loan becomes 180 days delinquent. This indemnification is limited to loans with an original unpaid principal balance of $166.0 million. In December 2009, Ally Bank sold approximately $3.5 billion of loans to Ally Inc. of which $52.6 million were covered under the indemnification. The indemnification associated with these loans did not transfer to Ally Inc. and was effectively retired.

In connection with our Settlement obligations (See Note 18 – Guarantees, Commitments, and Contingencies for additional information related to the Settlement), and as part of the Letter Agreement, Ally Bank has agreed to participate in borrower relief programs and activities with respect to their loan portfolios. We recognized a liability of $83.5 million at December 31, 2011, in connection with losses Ally Bank is expected to incur in connection with the programs. To the extent activities under the borrower relief programs are consistent with activities currently permitted under our servicing agreement. Ally Bank will not seek to be reimbursed, or indemnified, for any losses it incurs in connection with these borrower relief activities.

We have short-term receivables due from Ally Bank that primarily consist of amounts due from Ally Bank related to miscellaneous mortgage loan funding transactions and accounts payable transactions, and are generally settled on a monthly basis.

We have cash collateral on deposit with Ally Bank, primarily related to certain of our transactions that are deemed to be covered under Section 23A of Reg. W, which governs affiliate transactions for banks.

We deposit certain escrow funds for taxes and insurance collected from borrowers as part of our servicing activities in noninterest bearing accounts with Ally Bank.

We provide office facilities and a wide range of administrative services, including legal, risk, capital markets, finance and accounting, and information technology support to Ally Bank under an administrative services agreement. No fees were collected during the years ended December 31, 2011 and 2010, for these facilities and services. We also contract with Ally Bank to provide document custody services including, certifications, releases, reinstatements and file maintenance.

## 21. Regulatory Matters

We and certain subsidiaries associated with our mortgage and real estate operations are required to maintain regulatory net worth requirements. See Note 5 — Servicing for additional information. Failure to meet minimum capital requirements can initiate certain mandatory actions by federal, and state agencies that could have a material effect on our results of operations and financial condition. These entities were in compliance with these requirements as of December 31, 2011.

## 22. Subsequent Events

Events subsequent to December 31, 2011, were evaluated through March 28, 2012, the date on which these Consolidated Financial Statements were issued.

On February 9, 2012 we entered into an agreement in principal with federal agencies, 49 state attorneys general and 45 state banking departments with respect to investigations into procedures followed by mortgage servicing companies and banks in connection with mortgage foreclosure homes sales and evictions. On March 12, 2012, the Settlement was filed as a consent judgment in the U.S. District Court for the District of Columbia. On February 9, 2012, we also agreed in principle with the FRB on a civil monetary penalty related to these same activities. At December 31, 2011, we recorded a liability of $204 million related to these agreements. See Note –18 Guarantees, Commitments and Contingencies for additional information.

On January 30, 2012, ResCap received $196.5 million in capital support from Ally Inc. through the forgiveness of debt. We received a capital contribution of $124.2 million from our Parent, and a corresponding forgiveness of our borrowings under the Ally Inc. LOC, in connection with the Ally Inc. capital support to ResCap.

69

CONFIDENTIAL

EXAM00234349