# <u>Exhibit N</u>

DX ASI

# RESIDENTIAL FUNDING COMPANY, LLC

**Consolidated Financial Statements for the Years Ended
December 31, 2011 and 2010**

|  | Page |
|---|---|
| Table of Contents | 2 |
| Independent Auditors' Report | 3 |
| Consolidated Balance Sheet | 4 |
| Consolidated Statement of Income | 5 |
| Consolidated Statement of Comprehensive Income | 6 |
| Consolidated Statement of Changes in Equity | 7 |
| Consolidated Statement of Cash Flows | 8 |
| Supplemental Statement of Cash Flows | 9 |
| Notes to Consolidated Financial Statements |  |
| 1. Description of Business and Significant Accounting Policies | 10 |
| 2. Discontinued Operations | 19 |
| 3. Mortgage Loans Held–for–sale | 19 |
| 4. Finance Receivables and Loans, Net | 20 |
| 5. Securitizations and Variable Interest Entities | 23 |
| 6. Servicing Activities | 29 |
| 7. Accounts Receivable, Net | 31 |
| 8. Other Assets | 31 |
| 9. Borrowings | 32 |
| 10. Other Liabilities | 35 |
| 11. Other Revenue, Net | 35 |
| 12. Other Noninterest Expense | 36 |
| 13. Other Comprehensive Income | 36 |
| 14. Income Taxes | 36 |
| 15. Employee Benefit Plans | 39 |
| 16. Fair Value | 39 |
| 17. Higher Risk Mortgage Loans and Credit Quality | 49 |
| 18. Guarantees, Commitments and Contingencies | 51 |
| 19. Related Party Transactions | 60 |
| 20. Regulatory Matters | 61 |
| 21. Subsequent Events | 61 |

CONFIDENTIAL                                                    RCUCCJSN00007240

To the Board of Directors and Member of
Residential Funding Company, LLC:

We have audited the accompanying Consolidated Balance Sheets of Residential Funding Company, LLC (the "Company") (a wholly-owned subsidiary of Residential Capital, LLC, whose ultimate parent is Ally Financial Inc.) as of December 31, 2011 and 2010, and the related Consolidated Statements of Income, Comprehensive Income, Changes in Equity, and Cash Flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards as established by the Auditing Standards Board (United States) and in accordance with the auditing standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 19 to the financial statements, the Company has entered into a number of agreements and transactions with its affiliates.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2011 and 2010, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company's liquidity and capital needs, combined with conditions in the marketplace, raise substantial doubt about its ability to continue as a going concern. Management's plans concerning these matters are also discussed in Note 1 to the financial statements. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.


Deloitte & Touche LLP
March 28, 2012
Detroit, Michigan

3

CONFIDENTIAL

RCUCCJSN00007241

Consolidated Balance Sheet
Residential Funding Company, LLC

| December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $391,884 | $253,146 |
| Mortgage loans held–for–sale ($29,723 and $4,084 fair value elected) | 1,144,273 | 1,269,203 |
| Finance receivables and loans, net | | |
| Consumer ($792,592 and $971,320 fair value elected) | 816,812 | 1,071,972 |
| Commercial | 38,017 | 117,316 |
| Allowance for loan losses | (18,490) | (26,135) |
| Total finance receivables and loans, net | 836,339 | 1,163,153 |
| Mortgage servicing rights | 101,589 | 164,057 |
| Accounts receivable, net | 206,664 | 184,477 |
| Receivable from Parent | 1,844,929 | 2,302,250 |
| Other assets | 195,798 | 196,547 |
| Total assets | $4,721,476 | $5,532,833 |
| **Liabilities** | | |
| Borrowings | | |
| Borrowings from Ally, Inc. and subsidiaries | $440,230 | $479,766 |
| Borrowings from Affiliates | 281,590 | 211,151 |
| Collateralized borrowings in securitization trusts ($791,117 and $934,914 fair value elected) | 791,117 | 944,945 |
| Other borrowings | 131,674 | 400,920 |
| Total borrowings | 1,644,611 | 2,036,782 |
| Other liabilities | 797,400 | 1,152,075 |
| Total liabilities | 2,442,011 | 3,188,857 |
| **Equity** | | |
| Member's interest | 14,752,930 | 14,704,121 |
| Accumulated deficit | (12,475,790) | (12,366,095) |
| Accumulated other comprehensive loss | 2,325 | 5,950 |
| Total equity | 2,279,465 | 2,343,976 |
| Total liabilities and equity | $4,721,476 | $5,532,833 |

The assets of consolidated variable interest entities that can be used only to settle obligations of the consolidated variable interest entities and the liabilities of these entities for which creditors (or beneficial interest holders) did not have recourse to our general credit were as follows.

| December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| **Assets** | | |
| Finance receivables and loans, net | | |
| Consumer ($792,592 and $971,320 fair value elected) | $792,591 | $971,320 |
| Allowance for loan losses | — | — |
| Total finance receivables and loans, net | 792,591 | 971,320 |
| Accounts receivable, net | 20,828 | 25,874 |
| Other assets | 28,342 | 45,233 |
| Total assets | $841,761 | $1,042,427 |
| **Liabilities** | | |
| Collateralized borrowings in securitization trusts ($791,117 and $934,914 fair value elected) | $791,117 | $934,914 |
| Other liabilities | 28,871 | 28,752 |
| Total liabilities | $819,988 | $963,666 |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

4

RCUCCJSN00007242

Residential Funding Company, LLC

| Year ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---:|---:|
| **Revenue** | | |
| Interest income | $322,664 | $695,588 |
| Interest expense | 167,113 | 348,515 |
| Net financing revenue | 155,551 | 347,073 |
| **Other revenue** | | |
| Servicing fees | 108,912 | 123,929 |
| Servicing asset valuation | (62,299) | (117,679) |
| Total servicing income, net | 46,613 | 6,250 |
| Gain on mortgage loans, net | 60,419 | 353,864 |
| Real estate related revenues, net | 15,254 | 8,832 |
| (Loss) gain on foreclosed real estate | (7,521) | 39,017 |
| Gain on extinguishment of debt | 4,594 | 663,897 |
| Other revenue, net | (107,889) | (170,350) |
| Total other revenue | 11,470 | 901,510 |
| **Total net revenue** | 167,021 | 1,248,583 |
| **Provision for loan losses** | 26,718 | (12,875) |
| **Noninterest expense** | | |
| Representation and warranty expense, net | 218,303 | (132,785) |
| Compensation and benefits | 14,966 | 24,142 |
| Professional fees | 19,762 | 16,009 |
| Other noninterest expense, net | 12,103 | 32,770 |
| Total noninterest expense | 265,134 | (59,864) |
| **(Loss) income before income taxes** | (124,831) | 1,321,322 |
| Income tax (benefit) expense | (15,136) | 188,160 |
| **Net (loss) income from continuing operations** | (109,695) | 1,133,162 |
| Loss from discontinued operations, net of tax | — | (2,772) |
| **Net (loss) income** | ($109,695) | $1,130,390 |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

5

RCUCCJSN00007243

Residential Funding Company, LLC

| Year ended December 31, *($ in thousands)* | **2011** | 2010 |
|---|---|---|
| **Net (loss) income** | **($109,695)** | $1,130,390 |
| **Other comprehensive income, net of tax** | | |
| Translation adjustments | | |
| Foreign currency translation | **56** | 23,332 |
| Net change | **56** | 23,332 |
| Defined benefit pension plans | | |
| Net (losses) and prior service costs arising during the period | **(3,681)** | (4,992) |
| Net gain (loss) and prior service costs reclassified to net (loss) income | **—** | — |
| Net change | **(3,681)** | (4,992) |
| **Other comprehensive income** | **(3,625)** | 18,340 |
| **Comprehensive income** | $ **(113,320)** | $ 1,148,730 |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

6

CONFIDENTIAL

RCUCCJSN00007244

Residential Funding Company, LLC

| (S in thousands) | Member's interest | Accumulated deficit | Accumulated other comprehensive income (loss) | Total equity |
|---|---|---|---|---|
| Balance at January 1, 2010 | $14,089,278 | ($13,496,485) | ($12,390) | $580,403 |
| Net income | — | 1,130,390 | — | 1,130,390 |
| Capital contributions | 614,843 | — | — | 614,843 |
| Other comprehensive income, net of tax | — | — | 18,340 | 18,340 |
| Balance at December 31, 2010 | $14,704,121 | ($12,366,095) | $5,950 | $2,343,976 |
| **Balance at January 1, 2011** | **$14,704,121** | **($12,366,095)** | **$5,950** | **$2,343,976** |
| Net loss | — | **(109,695)** | — | **(109,695)** |
| Capital contribution | **48,809** | — | — | **48,809** |
| Other comprehensive income, net of tax | — | — | **(3,625)** | **(3,625)** |
| **Balance at December 31, 2011** | **$14,752,930** | **($12,475,790)** | **$2,325** | **$2,279,465** |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

CONFIDENTIAL

RCUCCJSN00007245

Residential Funding Company, LLC

| Year ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| **Operating activities** | | |
| Net (loss) income | **($109,695)** | $1,130,390 |
| Reconciliation of net income (loss) to net cash provided by (used in) operating activities | | |
| Depreciation and amortization | **4,044** | 18,965 |
| Provision for loan losses | **26,718** | 9,032 |
| Gain on mortgage loans, net | **(60,419)** | (185,561) |
| Net loss (gain) on other assets | **2,566** | (39,417) |
| Gain on extinguishment of debt | **(4,594)** | (663,897) |
| Recovery of held-for-sale platforms | **—** | (54,649) |
| Equity in earnings of investees in excess of cash received | **—** | (973) |
| Change in fair value of mortgage servicing rights | **62,299** | 119,278 |
| Purchases of mortgage loans held–for–sale | **(289,713)** | (189,297) |
| Proceeds from sales and repayments of mortgage loans held–for–sale | **290,070** | 1,035,269 |
| Net change in | | |
| Deferred income taxes | **(68,987)** | 53,620 |
| Accounts receivable | **(21,363)** | (169,472) |
| Receivable from Parent | **457,321** | (1,778,889) |
| Other assets | **(183,815)** | (450,723) |
| Other liabilities | **(12,144)** | 799,842 |
| Net cash provided by (used in) operating activities | **92,288** | (366,482) |
| **Investing activities** | | |
| Net decrease in commercial finance receivables and loans | **46,432** | 214,989 |
| Net decrease in consumer mortgage finance receivables and loans | **452,436** | 2,218,622 |
| Net decrease in investments in real estate and other | **4,543** | 107,187 |
| Proceeds from sales of foreclosed and owned real estate | **74,335** | 359,676 |
| Proceeds from sale of business units, net (a) | **—** | (122,741) |
| Other, net | **14,436** | 571,717 |
| Net cash provided by investing activities | **592,182** | 3,349,450 |
| **Financing activities** | | |
| Net decrease in borrowings from Ally Inc. and subsidiaries | **3,941** | (361,836) |
| Net decrease in borrowings from Parent | **70,439** | (1,603,551) |
| Net decrease in other borrowings | **(197,946)** | (48,545) |
| Proceeds from issuance of collateralized borrowings in securitization trusts | **—** | 66,818 |
| Repayments of collateralized borrowings in securitization trusts | **(361,378)** | (1,911,035) |
| Proceeds from other long–term borrowings | **1,909** | (13,441) |
| Repayments of other long–term borrowings | **(53,534)** | 655,513 |
| Net cash used in financing activities | **(536,569)** | (3,216,077) |
| Effect of changes in foreign exchange rates on cash and cash equivalents | **(9,163)** | 112,957 |
| Net decrease in cash and cash equivalents | **138,738** | (120,152) |
| Change in cash and cash equivalents of operations held–for–sale | **—** | 155,473 |
| Cash and cash equivalents at beginning of year | **253,146** | 217,825 |
| Cash and cash equivalents at end of year | **$391,884** | $253,146 |

(a)  The amount for the year ended December 31, 2010 is net of cash and cash equivalents of $452.1 million, of business units at the time of disposition.

8

CONFIDENTIAL

RCUCCJSN00007246

Residential Funding Company, LLC

| Year ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| **Supplemental disclosures** | | |
| Cash paid for | | |
| Interest | **$159,192** | $327,349 |
| Income taxes | **246,725** | 3,634 |
| Non cash items | | |
| Mortgage loans held–for–sale transferred to consumer finance receivables and loans | **4,756** | 30,535 |
| Consumer finance receivables and loans transferred to mortgage loans held–for–sale | **72,876** | 325,778 |
| Consumer finance receivables and loans transferred to other assets | **16,031** | 197,911 |
| Mortgage loans held–for–sale transferred to other assets | **25,842** | 54,941 |
| Capital contributions through forgiveness of borrowings | **48,809** | 614,843 |
| Change upon initial adoption of new accounting standard (ASU 2009-17): | | |
| Increase in assets of operations held–for–sale | — | 10,242,675 |
| Increase in liabilities of operations held–for–sale | — | 10,079,011 |
| Increase in consumer finance receivables and loans | — | 958,705 |
| Increase in collateralized borrowings in securitization trusts | — | 915,178 |
| Decrease in consumer finance receivables and loans upon deconsolidation | — | 1,751,929 |
| Decrease in collateralized borrowings upon deconsolidation | — | 1,336,570 |
| Other disclosures | | |
| Proceeds from sales and repayments of consumer finance receivables and loans originally designated as mortgage loans held–for–sale | **91,027** | 1,040,844 |
| **Reconciliation of mortgage loans held–for–sale** | | |
| Mortgage loans held–for–sale at beginning of year | $ **1,269,203** | $ 2,575,921 |
| Purchases of mortgage loans | **289,713** | 189,297 |
| Gain on sale of mortgage loans | **60,419** | 152,095 |
| Proceeds from sales and repayments of mortgage loans | **(290,070)** | (1,035,269) |
| Proceeds from sales and repayments of loans transferred from consumer finance receivables and loans | **(190,772)** | (829,082) |
| Transfers to consumer finance receivables and loans | **(4,756)** | (30,535) |
| Transfers from consumer finance receivables and loans | **72,876** | 325,778 |
| Transfers to other assets | **(25,842)** | (54,941) |
| Net change in delinquent loans subject to repurchase option | **(37,724)** | (30,156) |
| Other, net | **1,226** | 6,095 |
| Mortgage loans held–for–sale at end of year | **$1,144,273** | $1,269,203 |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

9

RCUCCJSN00007247

# 1. Description of Business and Significant Accounting Policies

Residential Funding Company, LLC (RFC, we, our, or us) is a wholly owned subsidiary of GMAC-RFC Holding Company, LLC (RFC Holding) which is a wholly owned subsidiary of Residential Capital, LLC (ResCap or Parent) which is a wholly owned subsidiary of Ally Financial Inc. (Ally Inc.). References throughout these financial statements to Ally Inc. and subsidiaries refers to Ally Inc. and its consolidated subsidiaries excluding ResCap and its consolidated subsidiaries. References to ResCap or Parent and affiliates refers to ResCap and its consolidated subsidiaries.

Historically our business included non-conforming domestic and international residential mortgage loan originations, purchases, sales and securitization activities, and domestic and international commercial lending activities. We are managing our business to maximize our return, which may include periodic asset sales, workouts or other strategic disposition transactions. In addition, we continue to provide primary and master servicing for our own and other investor pools of mortgage loans. We have entered into sub-servicing agreements with our affiliate, GMAC Mortgage, LLC (GMAC Mortgage), and other servicers to perform primary servicing activities on our behalf.

We, ResCap and our affiliates have been negatively impacted by the events and conditions in the mortgage banking industry and the broader economy, both domestically and internationally. The market deterioration led to fewer sources and significantly reduced levels of liquidity to finance our operations. We are highly leveraged relative to our cash flow and previously recognized credit and valuation losses that resulted in a significant deterioration in capital. We have been, and may continue to be, negatively impacted by exposure to representation and warranty obligations, adverse outcomes with respect to current or future litigation, fines, penalties or settlements related to our business activities and additional expenses to address regulatory requirements.

ResCap and its affiliates credit facilities and certain other agreements contain covenants that require ResCap to maintain consolidated tangible net worth of $250.0 million as of each month end. We have joint and several liability, along with our affiliate GMAC Mortgage, under credit facilities with Ally Inc. and its subsidiaries. There are cross default provisions included within and among the credit facilities and ResCap's senior unsecured and junior secured debt and certain other agreements. A default under any one of these agreements can, through cross default provisions, create defaults in all of the other agreements. Failure to meet this covenant represents an event of default and may result in, among other things, an acceleration of the facility's maturity and/or may trigger an early amortization event. See Note 9 - Borrowings for additional information related to financial covenants and counterparties remedies in an event of default. Furthermore, we and other ResCap subsidiaries, including RFC Holding and GMAC Mortgage, are guarantors of the obligations of ResCap with respect to its 9.625% Junior Secured Guaranteed Notes due 2015 and certain medium-term unsecured notes issued by GMAC Financiera S.A. de C.V., SOFOM, ENR, our wholly-owned subsidiary. See Note 18 - Guarantees, Commitments and Contingencies for additional information relating to these guarantees.

ResCap's consolidated tangible net worth, as defined, as of December 31, 2011 was $92.4 million, which constitutes an event of default under its credit facilities and certain other agreements. ResCap obtained waivers or acknowledgment letters from each of the liquidity providers in connection with the credit facilities and counterparties to agreements with financial covenants under which they agreed not to pursue their contractual remedies with respect to the default. These waivers were predicated, in part, on a January 30, 2012 capital contribution ResCap received from Ally Inc. ResCap is in compliance with any conditions with respect to these waivers and acknowledgment letters. ResCap is in compliance with all of its financial covenants as of March 16, 2012, the date of issuance of these Consolidated Financial Statements.

ResCap received capital support in the form of debt forgiveness from Ally Inc. of $109.4 million during the year ended December 31, 2011. We recognized a capital contribution from RFC Holding of $48.8 million, and a corresponding reduction of our borrowings under the Ally Inc. Line of Credit (Ally Inc. LOC), during the year ended December 31, 2011, in connection with Ally Inc.'s capital support to ResCap. In December 2011, RFC and GMAC Mortgage entered into a $250.0 million secured financing agreement with BMMZ Holdings, LLC (BMMZ), a wholly owned subsidiary of Ally Inc., which replaced secured financing agreements with unaffiliated third-party liquidity providers. We remain heavily dependent on Ally Inc. and its subsidiaries for funding, and except as noted in these financial statements, Ally Inc. its subsidiaries are under no obligation to provide such support and there can be no assurance that they will continue such actions. Consequently, there remains substantial doubt about our ability to continue as a going concern. Should Ally Inc. or ResCap no longer continue to support our capital or liquidity needs or should we, and ResCap, be unable to successfully execute other initiatives, it would have a material adverse effect on our business, financial condition and results of operations.

On February 9, 2012, Ally Inc., ResCap, and GMAC Mortgage entered into agreements with the Federal Government, State Attorneys General and state banking departments (the Settlement) in connection with investigations into procedures followed by mortgage servicing companies and banks in connection with mortgage foreclosure home sales and evictions. On March 12, 2012,

10

CONFIDENTIAL    RCUCCJSN00007248

the Settlement was filed as a consent judgment in the U.S. District Court for the District of Columbia. ResCap and GMAC Mortgage separately reached an independent settlement with Oklahoma, which did not participate in the broader settlement and agreements with two other states for other releases. The Settlement requires cash payments of $110.0 million and borrower relief up to $200.0 million, subject to an upward adjustment, over a three-year period. ResCap and GMAC Mortgage are also required to make cash payments of approximately $2.5 million in connection with the separate state agreements.  Borrower relief will include loan modifications, including principal reductions, rate modifications and refinancing for borrowers that meet certain criteria, and participation in certain other programs.  The Settlement does not prevent state and federal authorities from pursuing criminal enforcement actions, securities-related claims (including actions related to securitization activities and Mortgage Electronic Registration Systems, or MERS), loan origination claims, certain claims brought by the Federal Deposit Insurance Corporation (FDIC) and the GSEs, and certain other matters. The Settlement also does not prevent claims that may be brought by individual borrowers.

On February 9, 2012, Ally Inc., ResCap and GMAC Mortgage also agreed in principle with the Board of Governors of the Federal Reserve on a civil monetary penalty (CMP) of $207.0 million related to the same activities that were the subject of the Settlement.  This amount will be reduced dollar-for-dollar in connection with certain aspects of ResCap and GMAC Mortgage's satisfaction of the required monetary payment and borrower relief obligations included within the Settlement.  For the year ended December 31, 2011, GMAC Mortgage recognized $211.5 million of expense related to the Settlement and separate state agreements. See Note 18 - Guarantees, Commitments and Contingencies for additional information.

On January 30, 2012, ResCap received $196.5 million in capital support from Ally Inc. in connection with the settlement agreements and CMP in the form of debt forgiveness.  We recognized a capital contribution from RFC Holding of $72.3 million, and a corresponding reduction in our borrowings under the Ally Inc. LOC, as of January 30, 2012 in connection with Ally Inc.'s capital support to ResCap.  See Note 19 - Related Party Transactions for additional information.

In concert with ResCap, we seek to manage our liquidity and capital positions and explore initiatives to address ongoing debt covenant compliance and liquidity needs, including debt maturing in the next twelve months and other risks and uncertainties.  We have $755.9 million in debt maturing in 2012, including $440.2 million in secured borrowings from Ally Inc. and subsidiaries maturing in April 2012.  These initiatives could include, but are not limited to, the following: continuing to work with key credit providers to optimize all available liquidity options; continued exploration of funding and capital support from Ally Inc. and subsidiaries; and further reductions in assets or other restructuring activities, which could include a restructuring achieved through a Chapter 11 bankruptcy filing.

The outcomes of certain of these initiatives are, to a great extent, outside of our control, resulting in increased uncertainty as to their successful execution. There continues to be a risk that we may not be able to meet our debt service obligations, may default on our financial debt covenants due to insufficient capital, and/or may be in a negative liquidity position in future periods.

## Consolidation and Basis of Presentation

The accompanying Consolidated Financial Statements were prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business.  The Consolidated Financial Statements include our accounts and accounts of our majority–owned subsidiaries after eliminating all significant intercompany balances and transactions and include all variable interest entities (VIEs) in which we are the primary beneficiary.  See Note 5 — Securitization and Variable Interest Entities for additional information.  Our accounting and reporting policies conform to accounting principles generally accepted in the United States of America.

We operate our international subsidiaries in a similar manner as we operate in the United States of America (U.S. or United States), subject to local laws or other circumstances that may cause us to modify our procedures accordingly. The financial statements of subsidiaries that operate outside of the United States are measured using the local currency as the functional currency. All assets and liabilities of foreign subsidiaries are translated into U.S. dollars at year–end exchange rates.  The resulting translation adjustments are recorded in accumulated other comprehensive income, a component of equity. Income and expense items are translated at average exchange rates prevailing during the reporting period.

During 2011, we identified an error in periods prior to 2011 which were not material to those prior periods. As a result, we corrected the error in 2011 resulting in additional expense of $30.8 million and made cash payments of $30.8 million. The misstatement had no impact on our consolidated financial condition at December 31, 2011.

11

RCUCCJSN00007249

## Use of Assumptions and Critical Accounting Estimates

The preparation of financial statements in conformity with Generally Accepted Accounting Principles (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and income and expenses during the reporting period and related disclosures and critical accounting estimates. In developing these estimates and assumptions, management uses available evidence at the time of the financial statements. Because of uncertainties associated with estimating the amounts, timing and likelihood of possible outcomes, actual results could differ from our estimates. An accounting estimate is considered critical if the estimate requires management to make assumptions about matters that were highly uncertain at the time the accounting estimate was made, and if different estimates reasonably could have been used or changes in the accounting estimate are reasonably likely to occur from period to period that would have a material impact on our financial condition, results of operations or cash flows. If actual results differ from our assumptions, it may have an adverse impact on the results of operations and cash flows.

### Valuation of Mortgage Loans Held–for–Sale

Mortgage loans held–for–sale are typically pooled together and sold into certain exit markets depending on the underlying attributes of the loan, product type, interest rate, and credit quality. To the extent observable market prices are not available, we will determine the fair value of mortgage loans held–for–sale using internally developed valuation models. These loans are valued on a discounted cash flow basis utilizing cash flow projections from internally developed models that require prepayment, default and discount rate assumptions. To the extent available, we will utilize market observable inputs such as interest rates and market spreads. If market observable inputs are not available, we are required to utilize internal inputs, such as prepayment speeds, credit losses, and discount rates. While numerous controls exist to calibrate, corroborate and validate the internal inputs, they require the use of judgment by us and can have a significant impact on the determination of the loan's estimated fair value.

### Valuation of Mortgage Servicing Rights

Mortgage servicing rights (MSRs) represent the capitalized value of the right to receive future cash flows from the servicing of mortgage loans for others. MSRs are a significant source of value derived from originating or acquiring mortgage loans. Because residential mortgage loans typically contain a prepayment option, borrowers often elect to prepay their mortgage loans by refinancing at lower rates during declining interest rate environments. The borrower's ability to prepay is at times impacted by other factors in the current environment that may limit their eligibility to access a refinance (e.g. a high loan to value ratio). When this occurs, the stream of cash flows generated from servicing the original mortgage loan is terminated. As such, the market value of MSRs has historically been very sensitive to changes in interest rates and tends to decline as market interest rates decline and increase as interest rates rise. We capitalize MSRs on residential mortgage loans that we have originated and purchased based upon the fair value of the servicing rights associated with the underlying mortgage loans at the time the loans are sold or securitized. GAAP requires that the value of MSRs be determined based on market transactions for comparable servicing assets, if available. In the absence of representative market trade information, valuations should be based on other available market evidence and modeled market expectations of the present value of future estimated net cash flows that market participants would expect from servicing. When observable prices are not available, management uses internally developed discounted cash flow models to estimate the fair value. These internal valuation models estimate net cash flows based on internal operating assumptions that we believe would be used by market participants combined with market-based assumptions for loan prepayment rates, interest rates, default rates, and discount rates that management believes approximate yields required by investors for these assets. Servicing cash flows primarily include servicing fees, ancillary income, and late fees less operating costs to service the loans. The estimated cash flows are discounted using an option-adjusted spread-derived discount rate. Management considers the best available information and exercises significant judgment in estimating and assuming values for key variables in the modeling and discounting process. All of our MSRs are carried at estimated fair value.

We use the following key assumptions in our valuation approach:

- *Prepayment*—A significant driver of MSR value is voluntary and involuntary (default) prepayment behavior. Our MSR portfolio is primarily comprised of servicing related to pre-2009 vintage loans in relatively illiquid product types (e.g. Subprime, Alt-A and 2nd Lien). For Non-Prime products, default and voluntary prepayment behavior is projected based on an internal model, and is tracked by comparing prepayment predictions against actual results at both the portfolio and product level.

- *Discount rate*—The cash flows of our MSRs are discounted utilizing appropriate risk-adjusted yield assumptions that, when applied to projected cash flows, produce our best estimate of fair value.

- *Cost to service*—In general, servicing cost assumptions are based on actual expenses directly related to servicing. These servicing cost assumptions are compared to market-servicing costs when market information is available. Our servicing cost assumptions include expenses associated with our activities related to loans in default.

12

We also periodically perform a series of reasonableness tests as we deem appropriate, including the following:

- *Review and compare data provided by an independent third-party broker.* We evaluate and compare our fair value price, multiples, and significant assumptions to those provided by an independent third-party broker.

- *Compare actual monthly cash flows to projections.* We compare actual monthly cash flows to those projected in the MSR valuation. Based upon the results of this comparison, we assess the need to modify the individual assumptions used in the valuation.

We generally expect our valuation to be within a reasonable range of these comparisons. Changes in these assumptions could have a significant impact on the determination of fair value. In order to develop our best estimate of fair value, management reviews and analyzes the output from the models and makes adjustments to the valuation to take into consideration other factors that may not be captured. If we determine our valuation has exceeded the reasonable range, we may adjust it accordingly.

The assumptions used in modeling expected future cash flows of MSRs have a significant impact on the fair value of MSRs and potentially a corresponding impact to earnings. See Note 6 — Servicing Activities for sensitivity analysis. At December 31, 2011, based on the market information obtained, we determined that our MSR valuations and the assumptions used to value those servicing rights were reasonable and consistent with what an independent market participant would use to value the assets.

## Legal and Regulatory Reserves

Our legal and regulatory reserves reflect management's best estimate of probable losses in connection with legal and regulatory matters. As a legal or regulatory matter develops, management, in conjunction with internal and external counsel handling the matter, evaluates on an ongoing basis whether such matter presents a loss contingency that is both probable and estimable. If, at the time of evaluation, the loss contingency related to a legal or regulatory matter is not both probable and estimable, the matter will continue to be monitored for further developments that would make such loss contingency both probable and estimable. When the loss contingency related to a legal or regulatory matter is deemed to be both probable and estimable, we will establish a liability with respect to such loss contingency and record a corresponding amount to other noninterest expense, net. To estimate the probable loss, we evaluate the individual facts and circumstances of the case including information learned through the discovery process, rulings on dispositive motions, settlement discussions, our prior history with similar matters and other rulings by courts, arbitrators or others. The reserves are continuously monitored and updated to reflect the most recent information related to each matter.

Additionally, in matters for which a loss contingency is not deemed probable, but rather reasonably possible to occur, we would attempt to estimate a loss or range of loss related to that event, if possible. For these matters, we do not record a liability. However, if we are able to estimate a loss or range of loss, we would disclose this loss, if it is material to our consolidated financial statements. To estimate a range of probable or reasonably possible loss, we evaluate each individual case in the manner described above. We do not accrue for matters for which a loss event is deemed remote.

For details regarding the nature of all material contingencies, refer to Note 18 — Guarantees, Commitments and Contingencies.

## Liability for Representation and Warranty Obligations

The liability for representation and warranty obligations reflects management's best estimate of probable lifetime loss. We consider historical and recent demand trends in establishing the reserve. The methodology used to estimate the reserve considers a variety of assumptions including borrower performance (both actual and estimated future defaults), repurchase demand behavior, historical loan defect experience, historical and estimated future loss experience, which includes projections of future home price changes as well as other qualitative factors including investor behavior. In cases where we have limited or no current or historical demand experience with an investor, because of the inherent difficulty in predicting the level and timing of future demands, if any, losses cannot be reasonably estimated, and a liability is not recognized. Management monitors the adequacy of the overall reserve and makes adjustments to the level of reserve, as necessary, after consideration of other qualitative factors including ongoing dialogue with counterparties.


## Significant Accounting Policies

### Cash and Cash Equivalents

Cash and cash equivalents include cash on hand and certain highly liquid investment securities with maturities of three months or less from the date of purchase. Cash and cash equivalents that have restrictions as to our ability to withdraw the funds are included in other assets. The fair value of cash equivalents approximates book value because of the short maturities of these instruments.

### Securitizations and Variable Interest Entities

13

RCUCCJSN00007251

We securitize, sell, and service consumer mortgage loans. Securitization transactions typically involve the use of variable interest entities and are accounted for either as sales or secured financings. Economic interests in the securitized and sold assets are generally retained in the form of senior or subordinated interests, interest– or principal–only strips, cash reserve accounts, residual interests, and servicing rights.

In order to conclude whether or not a variable interest entity is required to be consolidated, careful consideration and judgment must be given to our continuing involvement with the variable interest entity. In circumstances where we have both the power to direct the activities of the entity that most significantly impact the entity's performance and the obligation to absorb losses or the right to receive benefits of the entity that could be significant, we consolidate the entity, which would also preclude us from recording an accounting sale on the transaction. In the case of a consolidated variable interest entity, the accounting is consistent with a secured financing, that is, we continue to carry the loans and we record the securitized debt on our balance sheet. Further, there is no specific accounting record of our economic interests, rather, they are captured as the difference between the recognized assets and liabilities.

In transactions where either one or both of the power or economic criteria mentioned above are not met, we determine whether or not we achieve a sale for accounting purposes. In order to achieve sale for accounting purposes, the assets being transferred must be legally isolated, not be constrained by restrictions from further transfer, and be deemed to be beyond our control. If we were to fail any of the three criteria for sale accounting , the accounting would be consistent with the preceding paragraph (i.e., a secured borrowing). However, if we meet the criteria, the transaction would be recorded as a sale, and the variable interest entity would not be consolidated. See Note 5 — Securitizations and Variable Interest Entities for discussion on variable interest entities.

Gains or losses on off–balance sheet securitizations take into consideration the fair value of the retained interests including the value of certain servicing assets or liabilities, which are initially recorded at fair value at the date of sale. The estimate of the fair value of the retained interests and servicing requires us to exercise significant judgment about the timing and amount of future cash flows from the interests. See Note 16 — Fair Value for a discussion of fair value estimates.

Gains or losses on off–balance sheet securitizations are reported in gain on mortgage loans, net. Changes in the fair value of retained interests are reflected in other revenue, net. Retained interests, as well as any purchased securities, are included in other assets. Securities that are noncertificated and cash reserve accounts related to securitizations are included in other assets.

We generally retain master servicing for our non-agency consumer mortgage loan securitizations. We receive servicing fees based on the securitized loan balances and certain ancillary fees, all of which are reported in servicing fees. We also retain the right to service the consumer mortgage loans sold in securitization transactions involving Freddie Mac and private investors.

Whether on or off balance sheet, the investors in the securitization trusts generally have no recourse to our assets outside of customary market representation and warranty provisions.

**Mortgage Loans Held–for–sale**

Loans held-for-sale are carried at lower of cost or fair value or at estimated fair value. The majority of held-for-sale loans are pooled together for purposes of determining the lower of cost or fair value based on loan characteristics. Loan origination fees, as well as discount points and incremental direct origination costs, are initially recorded as an adjustment of the cost of the loan and are reflected in the gain or loss on sale of loans when sold. Fair value is determined by type of loan and is generally based on current investor yield requirements, current secondary market pricing, or cash flow models using market–based yield requirements.

We hold conditional repurchase options in off–balance sheet securitizations that allow us to repurchase a loan at par if it exceeds a certain pre-specified delinquency level (e.g. 90 days). We have discretion regarding when or if we will exercise these options, but generally we will do so only when it is in our best interest. We recognize those assets that can be repurchased under the conditional repurchase option (and any related liability to pay the trust) once the condition has been satisfied, but only in those situations where we have determined that we would have a more than trivial benefit. The assets are recorded in mortgage loans held-for-sale with a corresponding liability in other liabilities. We do not record the asset (and related liability to pay the trust) when delinquent loan repurchase options are both quantitatively and qualitatively deep out of the money, because we would not have a more than trivial benefit from the options. We have fair value elected both the asset and the liability related to loans subject to a conditional repurchase option. See Note 16 — Fair Value for details on fair value measurement.

**Finance Receivables and Loans**

We classify finance receivables and loans either as held-for-sale or held-for-investment based on management's assessment of its intent and ability to hold for the foreseeable future or until maturity. Management's intent and ability may change from time to time depending on a number of factors including economic, liquidity, and capital conditions. Management's view of the foreseeable future is generally a twelve–month period based on the longest reasonably reliable net income, liquidity, and capital forecast period.

We elected the fair value option for consumer mortgage finance receivables and loans related to certain of our on–balance

14

CONFIDENTIAL

RCUCCJSN00007252

sheet securitizations, including those securitization trusts that were consolidated upon the adoption of ASU 2009–17. These securitized mortgage loans are legally isolated from us and are beyond the reach of our creditors. They are measured at fair value using a portfolio approach, or an in-use premise. The values for loans held on an in-use basis may differ considerably from loans held–for–sale that can be sold in the whole-loan market. This difference arises primarily due to the liquidity of the asset-backed (ABS) or mortgage-backed (MBS) securities market and is evident in the fact that spreads applied to lower rated ABS/MBS are considerably wider than spreads observed on senior bond classes and in the whole-loan market. The objective in linking the fair value of these loans to the fair value of the related securitization debt is to properly account for our retained economic interest in the securitizations. See Note 16 — Fair Value for details on fair value measurement.

The balance of our consumer finance receivables and loans are reported at the principal amount outstanding, net of unearned income, premiums and discounts, and allowances. Unearned income, which includes deferred origination fees reduced by origination costs, is amortized over the contractual life of the related finance receivable or loan using the interest method. Loan commitment fees are deferred and amortized over the commitment period.

Our portfolio segments are based on the level at which we develop and document our methodology for determining the allowance for loan losses. Additionally, the classes of finance receivables are based on several factors including the method for monitoring and assessing credit risk, the method of measuring carrying value, and the risk characteristics of the finance receivable. Based on an evaluation of our process for developing the allowance for loan losses including the nature and extent of exposure to credit risk arising from our finance receivables, we have determined our portfolio segments to be consumer and commercial.

- *Consumer mortgage* — Consists of the following classes of finance receivables.

    - *1st Mortgage* — Consists of residential mortgage loans that are secured in a first–lien position and have priority over all other liens or claims on the respective collateral.

    - *Home equity* — Consists of residential home equity loans or mortgages with a subordinate–lien position.

- *Commercial* — Consists of the following classes of finance receivables.

    - *Commercial and Industrial Mortgage* — Consists primarily of warehouse lending.

    - *Commercial Real Estate Mortgage* — Related primarily to activities within our international operations, which provided financing to residential land developers and homebuilders.

## Impaired Loans

For all classes of consumer loans, impaired loans are loans that have been modified in troubled debt restructurings. All classes of commercial loans are considered impaired on an individual basis and reported when we determine it is probable that we will be unable to collect all amounts due according to the terms of the loan agreement, including troubled debt restructuring (TDR). Income recognition is consistent with that of nonaccrual loans.

## Nonaccrual Loans

Generally, we recognize all classes of loans as past due when they are 30 days delinquent. Revenue recognition is suspended when loans are placed on nonaccrual status. Generally, all classes of consumer loans are placed on nonaccrual status when delinquent for more than 60 days or when determined not to be probable of full collection. All commercial loans are placed on nonaccrual status when delinquent for more than 90 days. Revenue accrued, but not collected, at the date loans are placed on nonaccrual status is reversed and subsequently recognized only to the extent it is received in cash or until the loan qualifies for return to accrual status. Where there is doubt regarding the ultimate collectability of loan principal, all cash received is applied to reduce the carrying value of the loan. Loans are restored to accrual status only when contractually current and the collection of future payments is reasonably assured. Typically, this requires a sustained period of repayment performance of at least six consecutive months by the borrower.

## Charge–offs

Consumer first–lien mortgage loans, which consist of our entire 1st mortgage class and a subset of our home equity class that are secured by real estate, are written down to the estimated fair value of the collateral, less costs to sell, once a mortgage loan becomes 180 days past due. Second-lien consumer mortgage loans within our consumer home equity class are charged off at 180 days past due. First and second–lien consumer mortgage loans in bankruptcy that are 60 days past due are written down to the estimated fair value of the collateral, less costs to sell, within 60 days of receipt of notification of filing from the bankruptcy court. Loans are considered collateral dependent at the time foreclosure proceedings begin and are charged off to the estimated fair value of the collateral, less costs to sell.

Commercial loans are individually evaluated and where collectability of the recorded balance is in doubt are written down to

15

estimated fair value of the collateral, less costs to sell. Generally, all commercial loans, both collateral and noncollateral dependent, are charged off when they are 360 days or more past due.

## Allowance for Loan Losses

The allowance for loan losses (the allowance) is management's estimate of incurred losses on the consumer and commercial finance receivable and loan portfolios. We determine the amount of the allowance required for each of our portfolio segments based on its relative risk characteristics. The evaluation of these factors for both consumer and commercial finance receivables and loans involves complex, subjective judgments. Additions to the allowance are charged to current period earnings through the provision for loan losses; amounts determined to be uncollectible are charged directly against the allowance, net of amounts recovered on previously charged–off accounts.

The allowance is comprised of two components: reserves established for specific loans evaluated as impaired and portfolio-level reserves established for large groups of typically smaller balance homogenous loans that are collectively evaluated for impairment. We evaluate the adequacy of the allowance based on the combined total of these two components. Determining the appropriateness of the allowance is complex and requires judgment by management about the effect of matters that are inherently uncertain. It is possible that others, given the same information, may at any point in time reach different reasonable conclusions.

Measurement of impairment for specific reserves is generally determined on a loan–by–loan basis. An individual loan is considered impaired when, based on current information and events, it is probable that we will be unable to collect all amounts due (both principal and interest) according to the contractual terms of the agreement. Loans determined to be specifically impaired are measured based on the present value of expected future cash flows discounted at the loan's effective interest rate, an observable market price, or the estimated fair value of the collateral less estimated costs to sell, whichever is determined to be the most appropriate. When these measurement values are lower than the carrying value of that loan, impairment is recognized. Loans that are deemed not to be individually impaired are pooled with other loans with similar risk characteristics for evaluation of impairment for the portfolio-level allowance.

For the purpose of calculating portfolio-level reserves, we have determined logical grouping of loans into two portfolio segments: consumer mortgage and commercial. The allowance consists of the combination of a quantitative assessment component based on statistical models, a retrospective evaluation of actual loss information to loss forecasts, and may include a qualitative component based on management judgment. Management takes into consideration relevant qualitative factors, including external and internal trends such as the impacts of changes in underwriting standards, collections and account management effectiveness, geographic concentrations, and economic events, among other factors, that have occurred but are not yet reflected in the quantitative assessment component. All qualitative adjustments are adequately documented, reviewed, and approved through our established risk governance processes.

## Mortgage Servicing Rights

Our mortgage servicing rights consist of primary and master servicing rights. Primary servicing rights represent our right to service consumer residential mortgage loans. Primary servicing involves the collection of payments from individual borrowers and the distribution of these payments to the master servicer. Master servicing rights represent our right to service mortgage–and asset–backed securities and whole–loan packages issued for investors. Master servicing involves the collection of borrower payments from primary servicers and the distribution of those funds to investors. We may at times sell primary and master servicing rights through transactions with other market participants.

We capitalize the value expected to be realized from performing specified mortgage servicing activities for others as MSRs when the expected future cash flows from servicing are projected to be more than adequate compensation for such activities. These capitalized servicing rights are purchased or retained upon sale or securitization of mortgage loans. MSRs are not recorded on securitizations accounted for as secured financings.

We measure all mortgage servicing assets at fair value. We define our servicing rights based on the availability of market inputs and the manner in which we manage the risks of our servicing assets. We leverage available relevant market data to determine the fair value of our recognized servicing assets.

## Accounts Receivable

Accounts receivable are recorded at net realizable value and include servicer advances and receivables. Master servicing advances arise in the ordinary course of business as we make advances for principal and interest payments to investors when the primary servicer has not advanced delinquent borrower payments or for real estate owned. Servicer advance repayments receive priority cash flows under the terms of the servicing agreements. As a result, the collection of the advances is reasonably assured. We establish a reserve for any servicing advances where collectability is in doubt.

16

CONFIDENTIAL

**Foreclosed Assets**

Assets are classified as foreclosed and included in other assets when physical possession of the collateral is taken regardless of whether foreclosure proceedings have taken place. Foreclosed assets are carried at the lower of the outstanding balance at the time of foreclosure or the fair value of the asset less estimated costs to sell. Losses on the revaluation of foreclosed assets are charged to gain on mortgage loans, net at the time of foreclosure. Declines in value after foreclosure are charged to (loss) gain on foreclosed real estate.

**Property and Equipment**

Property and equipment, stated at cost, net of accumulated depreciation and amortization, are reported in other assets. Included in property and equipment are certain buildings, furniture and fixtures, leasehold improvements, IT hardware and software, and capitalized software costs. Depreciation is computed on the straight–line basis over the estimated useful lives of the assets, which generally ranges from 3 to 30 years. Capitalized software is generally amortized on a straight–line basis over its useful life, which generally ranges from three to five years. Capitalized software that is not expected to provide substantive service potential or for which development costs significantly exceed the amount originally expected is considered impaired and written down to fair value. Software expenditures that are considered general, administrative, or of a maintenance nature are expensed as incurred.

**Legal and Regulatory Reserves**

Reserves for legal and regulatory matters are established when those matters present loss contingencies that are both probable and estimable, with a corresponding amount recorded to noninterest expense. In cases where we have an accrual for losses, it is our policy to include within that estimate, an estimate for probable and estimable legal expenses related to the case. If, at the time of evaluation, the loss contingency related to a litigation or regulatory matter is not both probable and estimable, we do not establish an accrued liability. We continue to monitor legal and regulatory matters for further developments that could affect the requirement to establish a liability or that may impact the amount of a previously established liability. There may be exposure to loss in excess of any amounts recognized. For certain other matters where the risk of loss is determined to be reasonably possible, estimable, and material to the financial statements, disclosure regarding details of the matter and an estimated range of loss is required. The estimated range of possible loss does not represent our maximum loss exposure. Financial statement disclosure is also required for matters that are deemed probable or reasonably possible, material to the financial statements, but for which an estimated range of loss is not possible to determine. While we believe our reserves are adequate, the outcome of legal and regulatory proceedings is extremely difficult to predict and we may settle claims or be subject to judgments for amounts that differ from our estimates. For details regarding the nature of all material contingencies, see Note 18 — Guarantees, Commitments and Contingencies.

**Liability for Representation and Warranty Obligations**

We sell loans to whole–loan purchasers. In addition, we infrequently sell securities to investors through private-label securitizations. In prior years, our volume of private label securitization issuance was considerably larger and included securitized loans where monolines insured the related bonds. In connection with these activities we provide to investors, monolines, and whole–loan purchasers various representations and warranties related to the loans sold. These representations and warranties generally relate to, among other things, the ownership of the loan; the validity of the lien securing the loan; the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer; ability to deliver required documentation; and compliance with applicable laws. Generally, these representations and warranties may be enforced at any time over the life of the loan.

Upon a breach of a representation, we correct the breach in a manner conforming to the provisions of the sale agreement. This may require us either to repurchase the loan, to indemnify (make–whole) a party for incurred losses, or provide other recourse to the monoline or investor. Repurchase demands and claims for indemnification payments are generally reviewed on a loan–by–loan basis to validate if there has been a breach requiring repurchase or a make–whole payment. We actively contest claims to the extent we do not consider them valid. In cases where we repurchase loans, we bear the subsequent credit loss on the loans. Repurchased loans are classified as held–for–sale and initially recorded at fair value. Any initial impairment is charged to the liability for representation and warranty obligations. We seek to manage the risk of repurchase and associated credit exposure through our underwriting and quality assurance practices and by servicing mortgage loans to meet investor standards.

At the time a loan is sold, an estimate of the fair value of the liability is recorded and classified in other liabilities and recorded as a component of gain on mortgage loans, net. We recognize changes in the liability throughout the life of the sold loans, as necessary, when additional relevant information becomes available. Changes in the liability are recorded as representation and warranty expense.

**Income Taxes**

We, through ResCap, are a division of Ally Inc., a corporation, for income tax purposes. We are subject to corporate U.S. Federal, state, and local taxes and are included in the consolidated Ally Inc. U.S. Federal and unitary and/or consolidated state income tax returns. We provide for our U.S. Federal and state taxes on a stand-alone basis, which is consistent with the applicable tax

17

RCUCCJSN00007255

sharing agreement between us and RFC Holdings. The tax sharing agreement requires taxes to be based on the income tax liability determined as if we were a separate affiliated group of corporations filing consolidated U.S. Federal and state income tax returns. Our foreign businesses have been and continue to operate as corporations and are subject to, and provide for, U.S. Federal, state, and/or foreign income tax.

Income taxes are accounted for using the asset and liability method. Under this method, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. Deferred tax assets are recognized subject to management's judgment that realization is more likely than not.

## Recently Adopted Accounting Standards

### Comprehensive Income - Presentation of Comprehensive Income (ASU 2011-05)

As of December 31, 2011, we early adopted Accounting Standards Update (ASU) 2011-05, which amended Accounting Standards Codification (ASC) 220, Comprehensive Income. The amendments increased the prominence of items reported in other comprehensive income and facilitated convergence between GAAP and International Financial Reporting Standards (IFRS). This ASU required that nonowner changes in stockholders' equity be presented either in a single continuous statement of comprehensive income or in two separate but consecutive statements. We elected to early adopt ASU 2011-05, including the deferral permitted under ASU 2011-12 (*Comprehensive Income - Deferral of the Effective Date for Amendments to the Presentation of Reclassifications of Items Out of Accumulated Other Comprehensive Income in Accounting Standards Update No. 2011-05*), by retrospective application for the two years ended December 31, 2011, and 2010. Because this ASU impacts only presentation, there was not a material impact to our financial condition or results of operations.

### Receivables - A Creditor's Determination of Whether a Restructuring Is a Troubled Debt Restructuring (ASU 2011-02)

As of July 1, 2011, we adopted ASU 2011-02, which amends ASC 310, Receivables. ASU 2011-02 clarifies which loan modifications constitute a TDR. It is intended to assist creditors in determining whether a modification of the terms of a receivable meets the criteria to be considered a troubled debt restructuring, both for purposes of recording an impairment loss and for disclosure of TDR's. The ASU must be applied retrospectively to modifications made to the beginning of the annual period of adoption, which for us is January 1, 2011.

Effective September 30, 2011, ASU 2011-02 also required us to disclose the total amount of receivables and the allowance for credit losses related to those receivables that are newly considered impaired for which impairment was previously measured under ASC 450-20, Contingencies - Loss Contingencies. Refer to Note 4 — Finance Receivables and Loans, Net for additional information regarding TDRs.

The adoption did not have a material impact to our consolidated financial condition or results of operations.

### Receivables - Disclosures about the Credit Quality of Financing Receivables and the Allowance for Credit Losses (ASU 2010-20)

ASU 2010-20 was implemented in three distinct components as required by the ASU. Beginning with the three months ended September 30, 2011 and in conjunction with the requirements of ASU 2011-02, the deferral of TDR related disclosures within ASU 2010-20 prescribed by ASU 2011-01, *Deferral of the Effective Date of Disclosures about Troubled Debt Restructurings in Update No. 2010-20*, was ended, which required us to expand our TDR disclosures to include more information on modifications that are classified as TDRs. Beginning with the three months ended March 31, 2011, ASU 2010-20 required us to disclose a rollforward of the allowance for loan losses and additional activity-based disclosures for both financing receivables, and the allowance for each reporting period. We early adopted the rollforward requirement during the December 31, 2010, reporting period along with the initial expansion of disclosures related to the credit quality of finance receivables and loans. Since the guidance relates only to disclosures, adoption of each of the phases did not have a material impact on our consolidated financial condition or results of operations.

## Recently Issued Accounting Standards

### Fair Value Measurement - Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRS (ASU 2011-04)

In May 2011, the FASB issued ASU 2011-04, which amends ASC 820, Fair Value Measurements. The amendments in this ASU clarify how to measure fair value. It is intended to improve the comparability of fair value measurements presented and disclosed

18

CONFIDENTIAL

RCUCCJSN00007256

Residential Funding Company, LLC

in financial statements prepared in accordance with GAAP and IFRS. The ASU will be effective for us on January 1, 2012, and must be applied prospectively. Early adoption is not permitted. We do not expect the adoption to have a material impact to our consolidated financial condition or results of operations.

**Balance Sheet - Disclosures about Offsetting Assets and Liabilities (ASU 2011-11)**

In December 2011, the FASB issued ASU 2011-11, which contains new disclosure requirements regarding the nature of an entity's rights of setoff and related arrangements associated with its financial instruments and derivative instruments. The new disclosures will give financial statement users information about both gross and net exposures. ASU 2011-11 is effective for us on January 1, 2013, and retrospective application is required. Since the guidance relates only to disclosures, adoption is not expected to have a material impact on our consolidated financial condition or results of operations.

## 2. Discontinued Operations

On October 1, 2010, we completed the sale of our United Kingdom (U.K.) and continental Europe (CE) platforms. These platforms included residential mortgage loan origination, acquisition, servicing, asset management, sale, and securitizations in the United Kingdom and continental Europe (the Netherlands and Germany).

The associated operations and cash flows have been eliminated from our operations, and we do not have any significant continuing involvement in these platforms. For all periods presented, all of the operating results were removed from continuing operations and are presented separately as discontinued operations, net of tax. The Notes to our Consolidated Financial Statements were adjusted to exclude discontinued operations unless otherwise noted.

Selected financial information for these discontinued operations are summarized below.

| Year ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Total net revenue | $— | $60,206 |
| Provision for loan losses | — | 21,907 |
| Noninterest expense, net | — | (8,768) |
| Income before income taxes including direct costs to transact a sale | — | 47,067 |
| Income tax expense | — | 49,839 |
| Net loss from discontinued operations | $— | ($2,772) |

## 3. Mortgage Loans Held–for–sale

The composition of residential mortgage loans held–for–sale reported at carrying value, were as follows.

| December 31, *($ in thousands)* | 2011 | | | 2010 | | |
|---|---|---|---|---|---|---|
| | Domestic (a) (b) | Foreign | Total | Domestic (a) (b) | Foreign | Total |
| 1st Mortgage | $822,986 | $12,011 | $834,997 | $891,866 | $10,461 | $902,327 |
| Home equity | 309,276 | — | 309,276 | 366,744 | 132 | 366,876 |
| Total loans held–for–sale (c) | $1,132,262 | $12,011 | $1,144,273 | $1,258,610 | $10,593 | $1,269,203 |

(a)  Includes mortgage loans subject to conditional repurchase options of $100.7 million and $141.8 million sold to off-balance sheet private-label securitization trusts at December 31, 2011 and 2010, respectively. The corresponding liability is recorded in other liabilities. See Note 5 — Securitizations and Variable Interest Entities for additional information.

(b)  Includes mortgage loans for which we have elected the fair value option of $29.7 million and $4.1 million at December 31, 2011 and December 31, 2010, respectively. See Note 16 — Fair Value for additional information.

(c)  The carrying values are net of discounts of $259.9 million and $151.5 million, fair value adjustments of ($26.6) million and ($1.0) million, lower of cost or fair value adjustments of $46.9 million and $17.1 million, and UPB write-downs of $1.2 billion and $1.4 billion at December 31, 2011 and 2010, respectively.

CONFIDENTIAL

RCUCCJSN00007257

## 4. Finance Receivables and Loans, Net

The composition of finance receivables and loans, net reported at carrying value before allowance for loan losses, were as follows.

| December 31, ($ in thousands) | 2011 Domestic | Foreign | Total | 2010 Domestic | Foreign | Total |
|---|---|---|---|---|---|---|
| Consumer | | | | | | |
| 1st Mortgage | $129,297 | $256,494 | $385,791 | $139,902 | $452,435 | $592,337 |
| Home equity | 431,021 | — | 431,021 | 479,635 | — | 479,635 |
| Total consumer (a) (b) | 560,318 | 256,494 | 816,812 | 619,537 | 452,435 | 1,071,972 |
| Commercial | | | — | | | |
| Commercial and industrial | — | 23,860 | 23,860 | — | 40,771 | 40,771 |
| Commercial real estate | — | 14,157 | 14,157 | 554 | 75,991 | 76,545 |
| Total commercial | — | 38,017 | 38,017 | 554 | 116,762 | 117,316 |
| Total finance receivables and loans | $560,318 | $294,511 | $854,829 | $620,091 | $569,197 | $1,189,288 |

(a)   Consumer mortgages include $792.6 million and $971.3 million at fair value as a result of fair value option elections as of December 31, 2011 and 2010, respectively. See Note 16 — Fair Value for additional information.

(b)   The gross carrying value is net of fair value adjustments of $1.5 billion and $1.8 billion and UPB write-downs of $8.0 million and $10.5 million at December 31, 2011 and 2010, respectively.

The following table presents an analysis of the activity in the allowance for loan losses on finance receivables and loans, net.

| ($ in thousands) | 2011 Consumer | Commercial | Total | 2010 Consumer | Commercial | Total |
|---|---|---|---|---|---|---|
| Allowance at January 1, | $1,006 | $25,129 | $26,135 | $25,121 | $133,779 | $158,900 |
| Provision for loan losses | 3,377 | 23,341 | 26,718 | 4,771 | (17,646) | (12,875) |
| Charge-offs | | | | | | |
| Domestic | (80) | — | (80) | (14,801) | (49,741) | (64,542) |
| Foreign | (3,410) | (42,018) | (45,428) | (2,347) | (50,369) | (52,716) |
| Total charge-offs | (3,490) | (42,018) | (45,508) | (17,148) | (100,110) | (117,258) |
| Recoveries | | | | | | |
| Domestic | 2,619 | 1,716 | 4,335 | 4,242 | 9,053 | 13,295 |
| Foreign | — | 6,810 | 6,810 | — | 53 | 53 |
| Total recoveries | 2,619 | 8,526 | 11,145 | 4,242 | 9,106 | 13,348 |
| Net charge-offs | (871) | (33,492) | (34,363) | (12,906) | (91,004) | (103,910) |
| Deconsolidations (a) | — | — | — | (15,980) | — | (15,980) |
| Allowance at December 31, | $3,512 | $14,978 | $18,490 | $1,006 | $25,129 | $26,135 |
| Allowance for loan losses | | | | | | |
| Individually evaluated for impairment | $— | $14,978 | $14,978 | $— | $23,799 | $23,799 |
| Collectively evaluated for impairment | $3,512 | $— | $3,512 | $1,006 | $1,330 | $2,336 |
| Finance receivables and loans | | | | | | |
| Individually evaluated for impairment | $— | $38,017 | $38,017 | $— | $109,171 | $109,171 |
| Collectively evaluated for impairment | $24,221 | $— | $24,221 | $100,611 | $8,145 | $108,756 |

(a)   In the fourth quarter of 2010, we deconsolidated various securitization trusts. See Note 5 — Securitizations and Variable Interest Entities for additional information.

CONFIDENTIAL

RCUCCJSN00007258

The following table presents an analysis of our past due finance receivables and loans at gross carrying value.

| ($ in thousands) | 30-59 days past due | 60-89 days past due | 90 days or more past due | Total past due | Current | Total |
|---|---|---|---|---|---|---|
| **December 31, 2011** | | | | | | |
| Consumer mortgage | | | | | | |
| 1st Mortgage | $29,660 | $14,665 | $158,192 | $202,517 | $183,274 | $385,791 |
| Home equity | 9,908 | 4,602 | 9,541 | 24,051 | 406,970 | 431,021 |
| Total consumer | 39,568 | 19,267 | 167,733 | 226,568 | 590,244 | 816,812 |
| Commercial | | | | | | |
| Commercial and industrial | — | — | 322 | 322 | 23,538 | 23,860 |
| Commercial real estate | — | 1,736 | 12,212 | 13,948 | 209 | 14,157 |
| Total commercial | — | 1,736 | 12,534 | 14,270 | 23,747 | 38,017 |
| Total | $39,568 | $21,003 | $180,267 | $240,838 | $613,991 | $854,829 |
| December 31, 2010 | | | | | | |
| Consumer mortgage | | | | | | |
| 1st Mortgage | $40,733 | $27,166 | $178,909 | $246,808 | $345,529 | $592,337 |
| Home equity | 13,466 | 5,980 | 10,614 | 30,060 | 449,575 | 479,635 |
| Total consumer | 54,199 | 33,146 | 189,523 | 276,868 | 795,104 | 1,071,972 |
| Commercial | | | | | | |
| Commercial and industrial | — | 35,671 | 3,970 | 39,641 | 1,130 | 40,771 |
| Commercial real estate | — | — | 69,529 | 69,529 | 7,016 | 76,545 |
| Total commercial | — | 35,671 | 73,499 | 109,170 | 8,146 | 117,316 |
| Total | $54,199 | $68,817 | $263,022 | $386,038 | $803,250 | $1,189,288 |

The following table presents the gross carrying value of our finance receivables and loans in nonaccrual status.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Consumer mortgage (a) | | |
| 1st Mortgage | $199,568 | $313,159 |
| Home equity | 29,628 | 43,616 |
| Total consumer | 229,196 | 356,775 |
| Commercial (b) | | |
| Commercial and industrial | 322 | 39,641 |
| Commercial real estate | 12,212 | 69,529 |
| Total commercial | 12,534 | 109,170 |
| Total | $241,730 | $465,945 |

(a)  Interest revenue that would have been accrued on total nonaccrual consumer mortgage finance receivables and loans at original contractual rates was $31.2 million and $24.1 million during the year ended December 31, 2011 and 2010, respectively. Interest income recorded for these nonaccrual loans was $8.4 million and $17.8 million during the year ended December 31, 2011 and 2010, respectively.

(b)  Interest revenue that would have been accrued on total nonaccrual commercial mortgage finance receivables and loans at original contractual rates was $4.5 million and $8.3 million during the year ended December 31, 2011 and 2010, respectively. Interest income recorded for these nonaccrual loans was $0.7 million and $7.6 million during the year ended December 31, 2011 and 2010, respectively.

Management performs a quarterly analysis of its consumer and commercial finance receivable and loan portfolios using a range of credit quality indicators to assess the adequacy of the allowance based on historical and current trends. Based on our allowance methodology, our credit quality indicators for consumer mortgage loans are performing and nonperforming and for commercial mortgage finance receivables and loans are pass and criticized.

The following table presents the credit quality indicators for our consumer mortgage loan portfolio at gross carrying value.

| December 31, ($ in thousands) | 2011 | | | 2010 | | |
|---|---|---|---|---|---|---|
| | Performing | Nonperforming | Total | Performing | Nonperforming | Total |
| Consumer mortgage | | | | | | |
| 1st Mortgage | $186,223 | $199,568 | $385,791 | $279,178 | $313,159 | $592,337 |
| Home equity | 401,393 | 29,628 | 431,021 | 436,019 | 43,616 | 479,635 |
| Total consumer mortgage | $587,616 | $229,196 | $816,812 | $715,197 | $356,775 | $1,071,972 |

21

The following table presents the credit quality indicators for our commercial finance receivable and loan portfolio at gross carrying value.

| December 31, (*$ in thousands*) | 2011 | | | 2010 | | |
|---|---|---|---|---|---|---|
| | Pass | Criticized (a) | Total | Pass | Criticized (a) | Total |
| Commercial | | | | | | |
| Commercial and industrial | $— | $23,860 | $23,860 | $— | $40,771 | $40,771 |
| Commercial real estate | 209 | 13,948 | 14,157 | 198 | 76,347 | 76,545 |
| Total commercial | $209 | $37,808 | $38,017 | $198 | $117,118 | $117,316 |

(a) Includes loans classified as special mention, substandard, or doubtful. These classifications are based on regulatory definitions and generally represent loans in our portfolio that are of higher default risk.

As of December 31, 2011, the five largest state concentrations based on carrying value for our U.S.–only finance receivables and loans, net were as follows.

| December 31, 2011 | |
|---|---|
| Ohio | 7.8% |
| California | 5.7% |
| Texas | 5.3% |
| Michigan | 5.2% |
| Georgia | 4.8% |
| All other | 71.2% |
| Total | 100.0% |

## Impaired Loans and Troubled Debt Restructurings
### Impaired Loans

Loans are considered impaired when we determine it is probable that we will be unable to collect all amounts due according to the terms of the loan agreement or if the loan has been modified under a troubled debt restructuring.

The following table presents information about our impaired finance receivables and loans recorded at historical cost.

| (*$ in thousands*) | Unpaid principal balance (a) | Carrying value before allowance | Impaired with no allowance | Impaired with an allowance | Allowance for impaired loans |
|---|---|---|---|---|---|
| **December 31, 2011** | | | | | |
| Commercial | | | | | |
| Commercial and industrial | $ 322 | $ 322 | $ — | $ 322 | 202 |
| Commercial real estate | 12,271 | 12,212 | 1,442 | 10,770 | 4,592 |
| Total commercial | $ 12,593 | $ 12,534 | $ 1,442 | $ 11,092 | 4,794 |
| December 31, 2010 | | | | | |
| Commercial | | | | | |
| Commercial and industrial | $ 44,410 | $ 39,641 | $ — | $ 39,641 | 14,043 |
| Commercial real estate | 69,651 | 69,529 | 28,154 | 41,375 | 9,756 |
| Total commercial | $ 114,061 | $ 109,170 | $ 28,154 | $ 81,016 | 23,799 |

(a) Unpaid principal balance represents gross carrying value adjusted for UPB write-downs on transfers or charge offs in accordance with our policy.

22

CONFIDENTIAL

RCUCCJSN00007260

The following table presents information about our impaired finance receivables and loans excluding loans carried at fair value due to fair value option elections.

| Year ended December 31, ($ in thousands) | 2011 | | | 2010 | | |
|---|---|---|---|---|---|---|
| | Consumer | Commercial | Total | Consumer | Commercial | Total |
| Average balance of impaired loans | $— | $58,006 | $58,006 | $28,631 | $189,354 | $217,985 |
| Interest income recognized on impaired loans | $— | $6,364 | $6,364 | $1,324 | $7,627 | $8,951 |

At December 31, 2011 and 2010, there were no commercial commitments to lend additional funds to debtors owing receivables whose terms have been modified in a troubled debt restructuring.

### Troubled Debt Restructurings

The following table presents information related to finance receivables and loans recorded at historical cost modified in connection with a troubled debt restructuring during the period. We did not have any TDRs that redefaulted (180 days or more delinquent) on or before the one year anniversary of being modified.

| Year Ended December 31, 2011   ($ in thousands) | Number of Loans | Pre-modification gross carrying value | Post-modification gross carrying value |
|---|---|---|---|
| Consumer mortgage | | | |
| 1st Mortgage | 3 | $162 | $128 |
| Home equity | 0 | — | — |
| Total consumer mortgage | 3 | 162 | 128 |
| Commercial | | | |
| Commercial and industrial | 1 | 37,550 | 27,789 |
| Commercial real estate | 2 | 3,426 | 3,098 |
| Total commercial | 3 | 40,976 | 30,887 |
| Total | 6 | $41,138 | $31,015 |

## 5. Securitizations and Variable Interest Entities

## Overview

We are involved in several types of securitization and financing transactions that utilize special–purpose entities (SPEs). A SPE is an entity that is designed to fulfill a specified limited need of the sponsor. Our principal use of SPEs is to obtain liquidity by securitizing certain of our financial assets.

The SPEs involved in securitization and other financing transactions are generally considered variable interest entities (VIEs). VIEs are entities that have either a total equity investment that is insufficient to permit the entity to finance its activities without additional subordinated financial support or whose equity investors lack the ability to control the entity's activities.

## Securitizations

We historically provided a wide range of consumer mortgage loan products to a diverse customer base. We securitized those loans through the use of securitization entities, which may or may not be consolidated on our Consolidated Balance Sheet. We securitized consumer mortgage loans primarily through private–label (nonagency) securitizations.

In executing a securitization transaction, we sold pools of financial assets to a wholly owned, bankruptcy–remote SPE, which then transferred the financial assets to a separate, transaction–specific securitization entity for cash, servicing rights, and in some transactions, other retained interests. The securitization entity was funded through the issuance of beneficial interests in the securitized financial assets. The beneficial interests took the form of either notes or trust certificates that were sold to investors and/or retained by us. These beneficial interests are collateralized by the transferred loans and entitle the investors to specified cash flows generated from the securitized loans. In the aggregate, these beneficial interests have the same average life as the transferred financial assets. In addition to providing a source of liquidity and cost–efficient funding, securitizing these financial assets also reduces our credit

23

RCUCCJSN00007261

exposure to the borrowers beyond any economic interest we may retain.

Each securitization is governed by various legal documents that limit and specify the activities of the securitization entity. The securitization entity is generally allowed to acquire the loans, to issue beneficial interests to investors to fund the acquisition of the loans, and to enter into derivatives or other yield maintenance contracts (e.g., coverage by monoline bond insurers) to hedge or mitigate certain risks related to the financial assets or beneficial interests of the entity. A servicer, who is generally us, is appointed pursuant to the underlying legal documents to service the assets the securitization entity holds and the beneficial interests it issues. Servicing functions include, but are not limited to, making certain payments of property taxes and insurance premiums, default and property maintenance payments, as well as advancing principal and interest payments before collecting them from individual borrowers. Our servicing responsibilities, which constitute continued involvement in the transferred financial assets, consist of primary servicing (i.e., servicing the underlying transferred financial assets) and/or master servicing (i.e., servicing the beneficial interests that result from the securitization transactions). Certain securitization entities also require the servicer to advance scheduled principal and interest payments due on the beneficial interests issued by the entity regardless of whether cash payments are received on the underlying transferred financial assets. Accordingly, we are required to provide these servicing advances when applicable. See Note 6 — Servicing Activities for additional information regarding our servicing rights.

In private-label securitizations, cash flows from the assets initially transferred into the securitization entity represent the sole source for payment of distributions on the beneficial interests issued by the securitization entity and for payments to the parties that perform services for the securitization entity, such as the servicer or the trustee. In certain private-label securitization transactions, a liquidity facility may exist to provide temporary liquidity to the entity. The liquidity provider generally is reimbursed prior to other parties in subsequent distribution periods. Monoline insurance may also exist to cover certain shortfalls to certain investors in the beneficial interests issued by the securitization entity. As noted above, in certain private-label securitizations, the servicer is required to advance scheduled principal and interest payments due on the beneficial interests regardless of whether cash payments are received on the underlying transferred financial assets. The servicer is allowed to reimburse itself for these servicing advances. Additionally, certain private-label securitization transactions may allow for the acquisition of additional loans subsequent to the initial loan transfer. Principal collections on other loans and/or the issuance of new beneficial interests, such as variable funding notes, generally fund these loans; we are often contractually required to invest in these new interests.

We may retain beneficial interests in our private-label securitizations, which may represent a form of significant continuing economic interest. These retained interests include, but are not limited to, senior or subordinate mortgage–or asset–backed securities, interest–only strips, principal–only strips, and residuals. Certain of these retained interests provide credit enhancement to the trust as they may absorb credit losses or other cash shortfalls. Additionally, the securitization agreements may require cash flows to be directed away from certain of our retained interests due to specific over–collateralization requirements, which may or may not be performance–driven.

We generally hold certain conditional repurchase options that allow us to repurchase assets from the securitization entity. The majority of the securitizations provide us, as servicer, with a call option that allows us to repurchase the remaining transferred financial assets or outstanding beneficial interests at our discretion once the asset pool reaches a predefined level, which represents the point where servicing becomes burdensome (a clean–up call option). The repurchase price is typically the par amount of the loans plus accrued interest. Additionally, we may hold other conditional repurchase options that allow us to repurchase a transferred financial asset if certain events outside our control are met. The typical conditional repurchase option is a delinquent loan repurchase option that gives us the option to purchase the loan if it exceeds a certain prespecified delinquency level. We have discretion regarding when or if we will exercise these options, but generally, we would do so only when it is in our best interest.

Other than our customary representation and warranty obligations, these securitizations are nonrecourse to us, thereby transferring the risk of future credit losses to the extent the beneficial interests in the securitization entities are held by third parties. Representation and warranty provisions generally require us to repurchase loans or indemnify the investor or other party for incurred losses to the extent it is determined that the loans were ineligible or were otherwise defective at the time of sale. See Note 18 — Guarantees, Commitments and Contingencies for detail on representation and warranty provisions. We did not provide any noncontractual financial support to any of these entities during the years ended December 31, 2011 and 2010.

## Other Variable Interest Entities

*Other* — We have involvement with on and off-balance sheet VIEs. These VIEs are generally used for additional liquidity whereby we sell certain financial assets to the VIE and issue beneficial interests to affiliates third parties for cash.

## Involvement with Variable Interest Entities

The determination of whether financial assets transferred by us to VIEs (and related liabilities) are consolidated on our balance sheet (also referred to as on–balance sheet) or not consolidated on our balance sheet (also referred to as off–balance sheet) depends

24

RCUCCJSN00007262

on the terms of the related transaction and our continuing involvement (if any) with the SPE. We are deemed the primary beneficiary and, therefore, consolidate VIEs for which we have both (a) the power through voting rights or similar rights to direct the activities that most significantly impact the VIE's economic performance, and (b) a variable interest (or variable interests) that (i) obligates us to absorb losses that could potentially be significant to the VIE and/or (ii) provides us the right to receive residual returns of the VIE that could potentially be significant to the VIE. We determine whether we hold a significant variable interest in a VIE based on a consideration of both qualitative and quantitative factors regarding the nature, size, and form of our involvement with the VIE. We assess whether we are the primary beneficiary of a VIE on an ongoing basis.

Our involvement with consolidated and nonconsolidated VIEs in which we hold a variable interest as of December 31, 2011 and 2010, is presented below.

| ($ in thousands) | Consolidated involvement with VIEs | Assets of nonconsolidated VIEs, net (a) | Maximum exposure to loss in nonconsolidated VIEs |
|---|---|---|---|
| **December 31, 2011** | | | |
| On–balance sheet variable interest entities | | | |
| Private-label securitizations | **$839,220** | **$—** | **$—** |
| Other | 2,541 | — | — |
| Off–balance sheet variable interest entities | | | |
| Private-label securitizations | 113,420 (c) | 2,869,389 | 2,869,389 (b) |
| Other | 132,744 | 920,592 (d) | 132,744 (e) |
| Total | $1,087,925 | $3,789,981 | $3,002,133 |
| December 31, 2010 | | | |
| On–balance sheet variable interest entities | | | |
| Private-label securitizations | $1,030,910 | $— | $— |
| Other | 11,517 | — | — |
| Off–balance sheet variable interest entities | | | |
| Private-label securitizations | 151,679 (c) | 3,473,854 | 3,473,854 (b) |
| Other | 68,398 | 1,022,749 | 1,022,749 |
| Total | $1,262,504 | $4,496,603 | $4,496,603 |

(a) Unless denoted otherwise, asset values represent the current UPB of outstanding consumer mortgage loans within the VIEs.

(b) Maximum exposure to loss represents the current UPB of outstanding consumer mortgage loans based on our customary representation and warranty provisions. This measure is based on the unlikely event that all of the loans have underwriting defects or other defects that trigger a representation and warranty provision and the collateral supporting the loans are worthless. This required disclosure is not an indication of our expected loss.

(c) Includes $8.7 million and $9.9 million classified as other assets, $4.1 million and $0.0 million classified as mortgage servicing rights and $100.7 million and $141.8 million of mortgage loans held–for–sale that are subject to conditional repurchase options at December 31, 2011 and 2010, respectively. The corresponding liability related to conditional repurchase option loans is recorded in other liabilities.

(d) Asset value of the VIE represents current outstanding balance of servicer advance receivables of $823.1 million as well as a receivable recognized by the VIE in the amount of $97.5 million representing our participation in the facility.

(e) Maximum exposure to loss represents the current outstanding balance of servicer advances that we have legally sold to the VIE. To the extent that servicer advances become ineligible in the facility, we could be required to deposit an equivalent amount to cure the deficiency. Although the VIE is cross-collateralized with assets transferred by our affiliate, GMAC Mortgage, we are not jointly and severally liable and as such do not retain any exposure related to the servicer advances transferred by GMAC Mortgage.

**On–balance Sheet Variable Interest Entities**

We engage in securitization and other financing transactions that do not qualify for off–balance sheet treatment. In these situations, we hold beneficial interests or other interests in the VIE, which represents a form of significant continuing economic interest. The interests held include, but are not limited to, senior or subordinate mortgage– or asset–backed securities, interest–only strips, principal–only strips, residuals, and servicing rights. Certain of these retained interests provide credit enhancement to the securitization entity as they may absorb credit losses or other cash shortfalls. Additionally, the securitization documents may require cash flows to be directed away from certain of our retained interests due to specific over–collateralization requirements, which may or may not be performance–driven. Because these securitization entities are consolidated, these retained interests and servicing rights are not recognized as separate assets on our Consolidated Balance Sheet.

We consolidate certain of these entities because we have a controlling financial interest in the VIE, primarily due to our servicing activities, and because we hold a significant variable interest in the VIE. We are the primary beneficiary of certain private-label securitization entities for which we perform servicing activities and have retained a significant variable interest in the form of a beneficial interest. In cases where we did not meet sale accounting under previous guidance, unless we have made modifications

25

RCUCCJSN00007263

to the overall transaction, we do not meet sale accounting under current guidance as we are not permitted to revisit sale accounting guidelines under the current guidance. In cases where substantive modifications are made, we then reassess the transaction under the amended guidance based on the new circumstances.

Consolidated VIEs represent separate entities with which we are involved. The third–party investors in the obligations of consolidated VIEs have legal recourse only to the assets of the VIEs and do not have recourse to us, except for customary representation and warranty provisions or situations where we are the counterparty to certain derivative transactions involving the VIE. Cash flows from the assets are restricted only to pay such liabilities. Thus, our economic exposure to loss from outstanding third–party financing related to consolidated VIEs is significantly less than the carrying value of the consolidated VIE assets. All assets are restricted for the benefit of the beneficial interest holders. See Note 16 — Fair Value for discussion of the assets and liabilities for which the fair value option has been elected.

## Off-balance Sheet Variable Interest Entities

The nature, purpose, and activities of nonconsolidated securitization entities are similar to those of our consolidated securitization entities with the primary difference being the nature and extent of our continuing involvement. The cash flows from the assets of nonconsolidated securitization entities generally are the sole source of payment on the securitization entities' liabilities. The creditors of these securitization entities have no recourse to us with the exception of market customary representation and warranty provisions as described in Note 18— Guarantees, Commitments and Contingencies.

Nonconsolidated VIEs include entities for which we either do not hold significant variable interests or do not provide servicing or asset management functions for the financial assets held by the securitization entity. Additionally, to qualify for off–balance sheet treatment, transfers of financial assets must meet sale accounting conditions in ASC 860. We do not consolidate certain private-label securitizations because we do not have a variable interest that could potentially be significant or we do not have power to direct the activities that most significantly impact the performance of the VIE.

For nonconsolidated securitization entities, the transferred financial assets are removed from our balance sheet provided the conditions for sale accounting are met. The financial assets obtained from the securitization are primarily reported as cash, servicing rights, or retained interests (if applicable). As an accounting policy election, we elected fair value treatment for our MSR portfolio. Liabilities incurred as part of these securitization transactions, such as representation and warranty provisions, are recorded at fair value at the time of sale and are reported as other liabilities on our Consolidated Balance Sheet. Upon the sale of the loans, we recognize a gain or loss on sale for the difference between the assets recognized, the assets derecognized, and the liabilities recognized as part of the transaction.

We did not have any new private-label securitizations during the years ended December 31, 2011 and 2010.

CONFIDENTIAL

RCUCCJSN00007264

The following table summarizes cash flows received from and paid to securitization entities that are accounted for as a sale and in which we have a continuing involvement with the transferred assets (e.g., servicing) that were outstanding during 2011 and 2010. This table contains information regarding cash flows received from and paid to nonconsolidated securitization entities that existed during each period.

| Year ended December 31, *($ in thousands)* | Consumer mortgage Private-Label |
|---|---|
| **2011** | |
| Cash proceeds from transfers completed during the year | $— |
| Cash flows received on retained interests in securitization entities | 5,147 |
| Servicing fees | 144,169 |
| Purchases of previously transferred financial assets | |
|   Representation and warranty obligations | (37,207) |
|   Other repurchases (a) | (96,546) |
| Other cash flows | 66,418 |
| Total net cash flows | $81,981 |
| **2010** | |
| Cash proceeds from transfers completed during the year | $— |
| Cash flows received on retained interests in securitization entities | 10,521 |
| Servicing fees (b) | 156,861 |
| Purchases of previously transferred financial assets | |
|   Representation and warranty obligations | (13,183) |
|   Other repurchases (a) | (158,622) |
| Other cash flows | (41,994) |
| Total net cash flows | ($46,417) |

(a)  Includes repurchases in connection with clean up call options.

(b)  We determined the amounts previously disclosed related to servicing fees for the year ended December 31, 2010, were misstated. Previously disclosed servicing fees were $173,005. These amounts were corrected in the presentation above. The misstatement had no impact on our consolidated financial condition or results of operations.

CONFIDENTIAL

RCUCCJSN00007265

The following table represents on–balance sheet mortgage loans held–for–sale and consumer finance receivable and loans, off–balance sheet securitizations, and whole–loan sales where we have continuing involvement. The tables present information about delinquencies and net credit losses. See Note 6 — Servicing Activities for further detail on total serviced assets.

| December 31, *($ in thousands)* | Total UPB | | Amount 60 days or more past due | | Net credit losses | |
|---|---|---|---|---|---|---|
| | **2011** | 2010 | **2011** | 2010 | **2011** | 2010 |
| On–balance sheet loans | | | | | | |
| Consumer mortgage held–for–sale | **$1,477,722 (a)** | $1,438,872 (a) | **$598,584 (a)** | $526,638 (a) $ | **23,807** $ | (8,999) (b) |
| Consumer mortgage finance receivables and loans | **2,330,872** | 2,845,520 | **414,729** | 441,847 | **124,763** | 207,673 |
| Total on–balance sheet loans | **3,808,594** | 4,284,392 | **1,013,313** | 968,485 | **148,570** | 198,674 |
| Off–balance sheet securitization entities | | | | | | |
| Consumer mortgage — GSEs (c) | **116,556** | 143,373 | **9,526** | 8,377 | **n/m** | n/m |
| Consumer mortgage — private-label | **52,559,380** | 59,545,696 | **10,808,072** | 11,634,494 | **3,587,697** | 4,088,192 |
| Total off–balance sheet securitization entities | **52,675,936** | 59,689,069 | **10,817,598** | 11,642,871 | **3,587,697** | 4,088,192 |
| Whole-loan transactions (c) | **2,741,242** | 3,076,774 | **133,553** | 148,730 | **52,731** | 61,128 |
| Total | **$59,225,772** | $67,050,235 | **$11,964,464** | $12,760,086 | **$3,788,998** | $4,347,994 |

n/m = not meaningful

(a) Includes loans subject to conditional repurchase options of $126.8 million and $141.8 million sold to certain private-label securitization entities at December 31, 2011 and 2010, respectively. The corresponding liability is recorded in other liabilities.

(b) We determined the amounts previously disclosed related to net credit losses for the year ended December 31, 2010, were misstated. Previously disclosed net credit losses for on-balance sheet mortgage loans held-for-sale were zero. This amount has been corrected in the presentation above. The misstatement had no impact on our consolidated financial condition or results of operations.

(c) Whole-loan transactions are not part of a securitization transaction, but represent pools of consumer mortgage loans sold to investors.

**Changes in Accounting for Variable Interest Entities**

ASU 2009–17 became effective on January 1, 2010, and upon adoption, we consolidated certain securitization entities that were previously held off–balance sheet. On January 1, 2010, we recognized a net increase of $11.0 billion to assets and liabilities on our Consolidated Balance Sheet ($10.1 billion of the increase relates to operations classified as held–for–sale and ultimately sold).

We previously held on our Consolidated Balance Sheet certain mortgage securitization entities, which were on–balance sheet prior to the adoption of ASU 2009–17 because we did not meet the sale accounting requirements at the inception of the transactions. Specific provisions inherent in these deals, included but were not limited to, the ability of the trust to enter into a derivative contract and the inclusion of a five loan repurchase right. The existence of the ability to enter into a derivative precluded the entities from being deemed a QSPE and the existence of the five loan repurchase right precluded sale accounting treatment. These two provisions, when used in combination, were deemed substantive and precluded sale accounting. We also retained servicing and, in most cases, retained an economic interest in the entities in the form of economic residuals, subordinate bonds, and/or IO strips. During 2010, we completed the sale of 100% of our retained residuals and subordinate bonds related to certain of these on–balance sheet

28

CONFIDENTIAL

RCUCCJSN00007266

securitization entities. In addition, any repurchase rights associated with these structures were removed from these deals through exercise of such right. These collective actions were deemed to be substantial to warrant a recharacterization of the original transactions, and as such, they were reassessed under ASC 860, and it was concluded that the securitization entities satisfied sale accounting requirements. Furthermore, the sale of the 100% economic interests resulted in the loss of a controlling financial interest in the securitization entities and accordingly consolidation was not required. The combination of these actions resulted in the derecognition of assets previously sold to these securitization entities. Consolidated assets and consolidated liabilities of $1.2 billion and $1.2 billion, respectively, associated with this transaction were derecognized, and a gain of $51.3 million was recorded. During 2010, we completed the sale of our significant retained residuals and subordinate bonds related to certain other on-balance sheet securitization entities, which were consolidated upon adoption of ASU 2009–17 (but were not consolidated prior to the adoption of ASU 2009–17). Since we disposed of our variable interests in these securitization entities to unrelated third parties, a reassessment was required to determine whether we continued to hold a controlling financial interest. All subordinate retained economic interests in these entities were sold, and therefore, we no longer held a controlling financial interest. All assets and liabilities associated with the trust were derecognized and all retained interests in the entities, including insignificant retained senior interests and mortgage servicing rights, were recorded at their fair values at the date of deconsolidation. Consolidated assets and consolidated liabilities of $496.6 million and $495.8 million, respectively, associated with this transaction were derecognized and a gain of $0.6 million was recorded.

We continue to hold servicing rights associated with these deconsolidation transactions; however retained servicing does not preclude deconsolidation because the retained servicing we hold does not absorb a potentially significant level of variability in the securitization entities. Upon deconsolidation, $1.1 million of servicing rights and $0.7 million of retained interests associated with these transactions were recorded.

## 6. Servicing Activities

## Mortgage Servicing Rights

The following table summarizes our activity related to MSRs. Although there are no market transactions that are directly observable, management estimates fair value based on the price it believes would be received to sell the MSR asset in an orderly transaction under current market conditions.

| ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Estimated fair value at January 1, | $164,057 | $285,319 |
| Additions recognized on sale of mortgage loans | — | — |
| Subtractions from sales of servicing assets | (100) | (305) |
| Changes in fair value | | |
| Due to changes in valuation inputs or assumptions used in the valuation model | (22,821) | (59,343) |
| Other changes in fair value | (39,478) | (59,935) |
| Other changes that affect the balance (a) (b) | (70) | (1,679) |
| Estimated fair value at December 31, | $101,588 | $164,057 |

(a)   In 2010 we derecognized $6.1 million of MSRs upon initial adoption of ASU 2009–17.
(b)   In 2010 we deconsolidated certain VIEs resulting in the recognition of $4.5 million of MSRs. See Note 5 — Securitizations and Variable Interest Entities for additional information.

Changes in fair value due to changes in valuation inputs or assumptions used in the valuation models include all changes due to a revaluation by a model or by a benchmarking exercise. Other changes in fair value primarily include the accretion of the present value of the discount related to forecasted cash flows and the economic run-off of the portfolio.

The key economic assumptions and the sensitivity of the fair value of MSRs to immediate 10% and 20% adverse changes in those assumptions were as follows.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Weighted average life (in years) | 5.7 | 4.3 |
| Weighted average prepayment speed | 12.3% | 18.1% |
| Impact on fair value of 10% adverse change | $(3,804) | $(5,604) |
| Impact on fair value of 20% adverse change | (7,447) | (10,661) |
| Weighted average discount rate | 45.0% | 29.4% |
| Impact on fair value of 10% adverse change | $(7,354) | $(6,740) |
| Impact on fair value of 20% adverse change | (13,802) | (13,002) |

CONFIDENTIAL

RCUCCJSN00007267

These sensitivities are hypothetical and should be considered with caution. Changes in fair value based on a 10% and 20% variation in assumptions generally cannot be extrapolated because the relationship of the change in assumptions to the change in fair value may not be linear. Also, the effect of a variation in a particular assumption on the fair value is calculated without changing any other assumption. In reality, changes in one factor may result in changes in another (e.g., increased market interest rates may result in lower prepayments and increased credit losses) that could magnify or counteract the sensitivities.

## Mortgage Servicing Fees

The components of servicing fees were as follows.

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Contractual servicing fees (net of guarantee fees and including sub servicing) | $109,081 | $121,741 |
| Ancillary fees | (169) | 2,188 |
| Total | $108,912 | $123,929 |

## Mortgage Servicer Advances

In connection with our master servicing activities, we service mortgage–backed and mortgage–related asset–backed securities and whole–loan packages sold to investors. As the master servicer we collect mortgage loan payments from primary servicers and distribute those funds to investors in mortgage–backed and asset–backed securities and whole–loan packages. As the master servicer we are required to advance scheduled payments to the securitization trust or whole–loan investors. To the extent the primary servicer does not advance the payments, we are responsible for advancing the payment to the trust or whole–loan investors. Master servicer advances, including contractual interest, are priority cash flows in the event of a default, thus making their collection reasonably assured. In most cases, we are required to advance these payments to the point of liquidation of the loan or reimbursement of the trust or whole–loan investors. We had outstanding master servicer advances of $158.4 million and $90.4 million as of December 31, 2011 and 2010, respectively. We had no reserve for uncollectible master servicer advances at December 31, 2011 or 2010.

## Serviced Mortgage Assets

In many cases we act as both the primary and master servicer. However, in certain cases, we also service loans that have been purchased and subsequently sold through a securitization trust or whole–loan sale whereby the originator retained the primary servicing rights and we retained the master servicing rights.

The unpaid principal balance of total serviced mortgage assets were as follows.

| December 31, ($ in millions) | 2011 | 2010 (c) |
|---|---|---|
| On–balance sheet mortgage loans (a) | | |
| Held–for–sale and investment | $2,673 | $2,947 |
| Off–balance sheet mortgage loans (b) | | |
| Loans held by third–party investors | | |
| Consumer mortgage private-label | 42,045 | 49,245 |
| Consumer mortgage whole-loan portfolios | 2,050 | 2,054 |
| Total primary serviced mortgage loans | 46,768 | 54,246 |
| Master servicing only mortgage loans | 8,557 | 10,548 |
| Total serviced mortgage loans | $55,325 | $64,794 |

(a) Includes loans owned by us where we are the primary servicer, including on–balance sheet securitization consumer finance receivables and loans. See Note 3 — Mortgage Loans Held–for–sale and Note 4 — Finance Receivables and Loans, net, for additional information.

(b) Includes loans sold to investors through off–balance sheet securitizations and whole–loan sales. See Note 5 — Securitizations and Variable Interest Entities for additional information.

(c) We have reclassified $364.0 million of foreign mortgage loans from subserviced mortgage loans to primary serviced mortgage loans. These corrections had no impact on the total serviced mortgage loans.

30

CONFIDENTIAL

RCUCCJSN00007268

The following table sets forth information concerning the delinquency experience in our domestic consumer mortgage loan primary servicing portfolio, including pending foreclosures.

| ($ in millions) | December 31, 2011 | | December 31, 2010 | |
| --- | --- | --- | --- | --- |
| | Number of loans | Unpaid principal balance | Number of loans (a) | Unpaid principal balance (a) |
| Total U.S. mortgage loans primary serviced | 350,233 | $46,448 | 396,154 | $53,657 |
| Period of delinquency | | | | |
| 30 to 59 days | 23,036 | $3,034 | 26,727 | 3,516 |
| 60 to 89 days | 9,718 | 1,372 | 11,680 | 1,659 |
| 90 days or more | 12,853 | 2,017 | 15,499 | 2,380 |
| Foreclosures pending | 26,482 | 5,615 | 31,364 | 6,737 |
| Bankruptcies | 14,392 | 1,909 | 15,460 | 1,915 |
| Total delinquent loans | 86,481 | $13,947 | 100,730 | $16,207 |
| Percent of U.S. mortgage loans primary serviced | 24.7% | 30.0% | 25.4% | 30.2% |

(a)   We have reclassified resolved bankruptcies, previously reported in Bankruptcies, to their corresponding delinquency status at December 31, 2010. This classification is consistent with the December 31, 2011 presentation.

In certain of our domestic securitizations, the monoline or other provider of contractual credit support (surety providers) is entitled to declare a servicer default and terminate the servicer upon the failure of the loans to meet certain portfolio delinquency and/or cumulative loss thresholds. At December 31, 2011, domestic insured private-label mortgage securitizations with an unpaid principal balance of $3.5 billion had breached a delinquency and/or cumulative loss threshold. While we continue to service these loans and receive service fee income with respect to these securitizations, the value of the related MSR is zero at December 31, 2011. Securitizations with an unpaid principal balance of $198.3 million have not yet breached a delinquency or cumulative loss threshold. The value of the related MSR is $1.0 million at December 31, 2011.

## 7.  Accounts Receivable, Net

| December 31, ($ in thousands) | 2011 | 2010 |
| --- | --- | --- |
| Servicer advances, net (a) | $158,884 | $111,857 |
| Servicing fees receivable | 14,589 | 17,837 |
| Accrued interest receivable | 29,046 | 40,274 |
| Other | 4,145 | 14,509 |
| Total accounts receivable, net | $206,664 | $184,477 |

(a)   There was no allowance for uncollectible servicer advances at December 31, 2011 and 2010.

## 8.  Other Assets

| December 31, ($ in thousands) | 2011 | 2010 |
| --- | --- | --- |
| Property and equipment at cost | $141,726 | $155,149 |
| Accumulated depreciation and amortization | (129,306) | (140,326) |
| Net property and equipment | 12,420 | 14,823 |
| Receivable from affiliates | 69,720 | — |
| Foreclosed assets | 61,563 | 107,348 |
| Interests retained in financial asset sales | 23,102 | 20,588 |
| Trading securities | 15,284 | 17,691 |
| Restricted cash | 3,143 | 14,322 |
| Other | 10,566 | 21,775 |
| Total other assets | $195,798 | $196,547 |

CONFIDENTIAL

RCUCCJSN00007269

Notes to Consolidated Financial Statements
Residential Funding Company, LLC

## 9. Borrowings

Borrowings were as follows.

| ($ in thousands) | Weighted average end of period interest rates December 31, | | December 31, | | | | | |
| | **2011** | 2010 | **2011** | | | 2010 | | |
| | **2011** | 2010 | **Unsecured** | **Secured** | **Total** | Unsecured | Secured | Total |
|---|---|---|---|---|---|---|---|---|
| Short-term borrowings | | | | | | | | |
| Borrowings from Ally Inc. and subsidiaries (a) | **4.5%** | 3.0% | **$—** | **$309,582** | **$309,582** | $— | $298,891 | $298,891 |
| Borrowings from affiliates | **7.2%** | 6.7% | **184,078** | **—** | **184,078** | 211,151 | — | 211,151 |
| Other short-term borrowings | **—%** | 3.7% | **—** | **—** | **—** | 13,363 | 241,900 | 255,263 |
| Total short-term borrowings | **6.4%** | 4.3% | **184,078** | **309,582** | **493,660** | 224,514 | 540,791 | 765,305 |
| Long-term borrowings | | | | | | | | |
| Borrowings from Ally Inc. | **3.0%** | 3.0% | **—** | **130,648** | **130,648** | — | 180,875 | 180,875 |
| Borrowings from affiliates | **3.8%** | —% | **—** | **97,512** | **97,512** | — | — | — |
| Collateralized borrowings in securitization trusts (b) | **4.8%** | 5.2% | **—** | **791,117** | **791,117** | — | 944,945 | 944,945 |
| Other long-term borrowings | **6.0%** | 7.6% | **128,844** | **2,830** | **131,674** | 145,657 | — | 145,657 |
| Total long-term borrowings | **4.8%** | 5.1% | **128,844** | **1,022,107** | **1,150,951** | 145,657 | 1,125,820 | 1,271,477 |
| Total borrowings | **5.3%** | 4.8% | **$312,922** | **$1,331,689** | **$1,644,611** | $370,171 | $1,666,611 | $2,036,782 |

(a) RFC and GMAC Mortgage, as borrowers, have joint and several liability under these facilities.
(b) Collateralized borrowings with an outstanding balance of $2.4 billion and $2.8 billion were recorded at fair value of $791.1 million and $935.0 million as of December 31, 2011 and 2010, respectively. See Note 16 — Fair Value for additional information.

The following table summarizes the maturity profile of our borrowings by type at December 31, 2011. Amounts represent the scheduled maturity of debt, assuming no early redemptions occur. For sources of borrowings without a stated maturity date (as is the case with uncommitted agreements), the maturities are assumed to occur within 2012.

| ($ in millions) | 2012 | 2013 | 2014 | 2015 | 2016 | **2017 and thereafter** | **Total** |
|---|---|---|---|---|---|---|---|
| Secured borrowings | | | | | | | |
| Borrowings from Ally Inc. and subsidiaries | **$440.2** | $— | $— | $— | $— | $— | **$440.2** |
| Borrowings from affiliates | — | — | — | — | — | 97.5 | 97.5 |
| Collateralized borrowings in securitization trusts (a) | — | — | — | — | — | 791.1 | 791.1 |
| Other secured borrowings | 2.8 | — | — | — | — | — | 2.8 |
| Total secured borrowings | 443.0 | — | — | — | — | 888.6 | 1,331.6 |
| Unsecured borrowings | | | | | | | |
| Borrowing from affiliates | 184.1 | — | — | — | — | — | 184.1 |
| Other unsecured borrowings | 128.8 | — | — | — | — | — | 128.8 |
| Total unsecured borrowings | 312.9 | — | — | — | — | — | 312.9 |
| Total borrowings | $755.9 | $— | $— | $— | $— | $888.6 | $1,644.5 |

(a) The principal on the debt securities is paid using cash flows from underlying collateral (mortgage loans). Accordingly, the timing of the principal payments on these debt securities is dependent on the payments received, and as such, we elected to represent the full term of the securities in the 2017 and thereafter time frame.

The most restrictive financial covenants in our credit facilities require ResCap to maintain consolidated tangible net worth of

32

$250.0 million as of the end of each month, consolidated liquidity of $250.0 million daily, and unrestricted liquidity of $250.0 million daily. For these purposes, consolidated tangible net worth is defined as ResCap's consolidated equity excluding intangible assets. Unrestricted liquidity is defined as certain unrestricted and unencumbered cash balances in U.S. dollars and cash equivalents on a consolidated basis. ResCap views unrestricted liquidity as cash readily available to cover operating demands across our business operations. These financial covenants are included in certain of our bilateral facilities. Should ResCap fail to remain in compliance with these requirements, remedies include but are not limited to, at the option of the facility provider, termination of further funding, acceleration of outstanding obligations, rights to realize against the assets securing or otherwise supporting the facility, and other legal remedies. Liquidity providers can waive their contractual rights in the event of a default.

As of December 31, 2011, ResCap was in compliance with its consolidated and unrestricted liquidity requirements.

ResCap's consolidated tangible net worth at December 31, 2011 was $92.4 million, in breach of its contractual covenants. ResCap received waivers in connection with this breach from each of its credit providers, including Ally Inc. and BMMZ (see Note 19 - Related Party Transactions). ResCap is in compliance with its covenants as of March 28, 2012 the date of issuance of these Consolidated Financial Statements.

The following table summarizes the outstanding, unused, and total capacity of our funding facilities at December 31, 2011. We use both committed and uncommitted credit facilities. The financial institutions providing the uncommitted facilities are not legally obligated to advance funds under them.

| ($ in thousands) | Outstanding | Unused capacity | Total capacity |
|---|---|---|---|
| Facilities with Ally Inc. | | | |
| Ally Inc. Senior Secured Credit Facility | $130,648 | $— | $130,648 |
| Ally Inc. LOC | 72,961 | 364,179 | 437,140 |
| BMMZ secured financing agreement | 236,621 | — | 236,621 |
| Total facilities with Ally Inc. | 440,230 | 364,179 | 804,409 |
| Facilities with affiliates | | | |
| Borrowings from affiliates | 281,590 | — | 281,590 |
| Secured funding facility | | | |
| Other funding facilities | — | 10,000 | 10,000 |
| Total funding facilities | $721,820 | $374,179 | $1,095,999 |

## Facilities with Ally Inc. and Subsidiaries

### Ally Inc. Senior Secured Credit Facility

The Ally Inc. Senior Secured Credit Facility matures on April 13, 2012. RFC and GMAC Mortgage, LLC (GMAC Mortgage) (collectively, the Borrowers), no longer have the ability to request revolving loans under the facility. The facility is secured by certain domestic whole loans, accounts receivable, notes receivable, securities, and equity investments of the Borrowers. The facility contains limitations on the use of proceeds from sales of pledged collateral with any such proceeds required to be paid to Ally Inc. to reduce the balance outstanding. Advances under the facility were allocated to the Borrowers consistent with the borrowing base attributable to each of the individual Borrowers.

### Ally Inc. LOC

The Ally Inc. Line of Credit (LOC) matures on April 13, 2012. The Borrowers are jointly and severally liable under this facility. The maximum capacity of the LOC is $1.1 billion. Certain domestic whole loans, accounts receivable, notes receivable, mortgage servicing rights, securities and equity investments of the Borrowers secure draws under the LOC, which are available to the extent there is sufficient collateral (borrowing base) securing the draw. Draws under the LOC are available only if certain unrestricted and unencumbered balances in U.S. dollars and cash equivalents of ResCap are less than $300.0 million. Advances under the LOC are allocated to the Borrowers consistent with the borrowing base attributable to each of the individual Borrowers. The available amount and the borrowing base of the Ally Inc. LOC will both be reduced by the amount of any collateral posted or delivered by Ally IM to the Borrowers or ResCap pursuant to certain derivative transaction agreements with Ally IM. The obligations under the Ally Inc. LOC and the Ally IM derivative agreements are cross-collateralized for the benefit of Ally Inc. On December 30, 2011, Ally Inc forgave $23.0 million of RFC's outstanding balance of this facility. In addition on January 30, 2012, Ally Inc. forgave $72.3 million of RFC's outstanding balance of this facility.

33

CONFIDENTIAL

RCUCCJSN00007271

### BMMZ Secured Financing Agreement

On December 21, 2011, the Borrowers entered into a secured financing agreement with BMMZ. The aggregate facility amount is $250.0 million. The secured financing agreement is collateralized by domestic mortgage loan assets. The maturity date is the earlier of the maturity date of the Ally Inc. LOC or December 19, 2012.

### Borrowings from Affiliates

Borrowings from affiliates includes liabilities related to transfers of financial assets where we did not achieve sale accounting in accordance with ASC 860. The entities involved in these transfers are consolidated by our Parent or GMAC Mortgage.

## Secured Funding Facilities

### Secured Financing Agreement

Our secured financing agreement had a maximum facility amount of $250.0 million and was to mature on May 30, 2013. The secured financing agreement was collateralized by domestic mortgage loan assets. This facility was terminated on January 27, 2012.

## Collateralized Borrowings in Securitization Trusts

We previously sold pools of consumer mortgage loans through private-label securitization transactions. The purpose of these securitizations was to provide permanent funding and exit for these assets. Certain of these securitizations were accounted for as secured borrowings, and therefore, the debt is reflected on our Consolidated Balance Sheet.

## Other Borrowings

### Medium-term Unsecured Notes

Peso denominated medium-term unsecured notes issued by our wholly owned subsidiary GMAC Financiera, S.A. de C.V.,SOFOM, ENR (GMAC Financiera) mature in June 2012. ResCap, GMAC Mortgage, GMAC Residential Holding Company, LLC (Res Holdings), RFC, RFC Holding, and Homecomings Financial, LLC are guarantors of the medium-term unsecured notes.

### Collateral for Secured Debt

The following table summarizes the carrying value of assets that are restricted, pledged, or for which a security interest has been granted as collateral for the payment of certain debt obligations.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Cash and cash equivalents | $3,033 | $7,547 |
| Mortgage loans held–for–sale | 1,019,881 | 1,095,549 |
| Finance receivables and loans, net | | |
| Consumer | 810,190 | 1,063,502 |
| Commercial | 4,226 | 45,016 |
| Total finance receivables and loans, net | 814,416 | 1,108,518 |
| Mortgage servicing rights | 101,589 | 164,057 |
| Accounts receivable, net | 158,555 | 113,730 |
| Other assets | 60,808 | 106,131 |
| Total assets restricted as collateral | 2,158,282 | 2,595,532 |
| Related secured debt | $1,331,689 | $1,666,611 |

A portion of the assets included in the table above represent assets of subsidiaries whose equity has been pledged to secure the Ally Inc. Senior Secured Credit Facility and the Ally Inc. LOC. At December 31, 2011, there were $3.4 million of equity interests of these subsidiaries pledged to the Ally Inc. Senior Secured Credit Facility.

We have provided a lien on certain of our consolidated assets, as specified in the Ally Inc. Senior Secured Credit Facility agreements, for the benefit of the Ally Inc. Senior Secured Credit Facility and ResCap's 9.625% Junior Secured Guaranteed Notes due 2015. Included in the table above is $1.0 billion and $1.1 billion at December 31, 2011 and 2010, respectively of collateral pledged that can be re–hypothecated or re–pledged by the secured party.

CONFIDENTIAL

RCUCCJSN00007272

The following table summarizes the carrying value of assets pledged and the amount of related debt outstanding by our secured borrowing types.

| December 31, *($ in thousands)* | 2011 | | 2010 | |
| | Total assets restricted as collateral | Related secured debt | Total assets restricted as collateral | Related secured debt |
|---|---|---|---|---|
| Borrowings from Ally Inc. and subsidiaries | | | | |
| Ally Inc. Senior Secured Credit Facility | $216,932 | $130,648 | $354,039 | $180,875 |
| Ally Inc. LOC | 603,278 | 72,961 | 639,020 | 298,891 |
| Secured financing agreement – BMMZ | 374,408 | 236,621 | — | — |
| Borrowings from affiliates | 132,744 | 97,512 | 11,517 | — |
| Collateralized borrowings in securitization trusts | 825,654 | 791,117 | 1,030,828 | 944,945 |
| Other secured borrowings | | | | |
| Secured financing facilities | — | — | 491,730 | 184,583 |
| Other secured facility | 5,266 | 2,830 | 68,398 | 57,317 |
| Total | $2,158,282 | $1,331,689 | $2,595,532 | $1,666,611 |

## 10. Other Liabilities

| December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Liability for representation and warranty obligations | $359,446 | $368,826 |
| Liability for option to repurchase assets (a) | 107,509 | 156,109 |
| Reserve for legal proceedings | 87,610 | 104,978 |
| Accounts payable | 71,139 | 97,694 |
| Ally Inc. management fee (b) | 27,735 | 24,647 |
| Current and deferred tax liability | 20,181 | 348,826 |
| Employee compensation and benefits | 15,516 | 15,830 |
| Interest payable | 9,580 | 18,657 |
| Other | 98,684 | 16,508 |
| Total other liabilities | $797,400 | $1,152,075 |

(a)   We recognize a liability for the conditional repurchase option on certain assets held by off-balance sheet securitization trusts. The corresponding asset is recorded in mortgage loans held for sale. See Note 3 — Mortgage Loans Held–for–Sale and Note 5 — Securitizations and Variable Interest Entities for additional information.

(b)   Includes costs for personnel, information technology, communications, corporate marketing, procurement, and services related to facilities incurred by Ally Inc. and allocated to us. See Note 19 — Related Party Transactions for additional information.

## 11. Other Revenue, net

| Year ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Change due to fair value option elections | | |
| Consumer mortgage finance receivables and loans, net | $116,796 | $1,181,521 |
| Collateralized borrowings | (224,333) | (1,374,194) |
| Trading securities income | 1,947 | — |
| (Loss) gain on interests retained in financial assets sales | (5,182) | 3,811 |
| Other | 2,883 | 18,512 |
| Total other revenue, net | ($107,889) | ($170,350) |

CONFIDENTIAL

RCUCCJSN00007273

## 12. Other Noninterest Expense, Net

| Year ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Real estate owned expense | $4,735 | $28,899 |
| Equipment and supplies | 2,828 | 3,735 |
| Loan administration fees | 2,762 | 3,221 |
| Restructuring expense | 1,627 | 3,324 |
| Subservicing fees | — | 6,184 |
| Other | 151 | (12,593) |
| Total other noninterest expense, net | $12,103 | $32,770 |

## 13. Other Comprehensive Income

The following table summarizes our activity related to the components of other comprehensive income.

| ($ in thousands) | Foreign currency translation adjustment (a) | Defined benefit pension plans over (under) funded (b) | Accumulated other comprehensive income (loss) |
|---|---|---|---|
| Balance at January 1, 2010 | $4,020 | ($16,410) | ($12,390) |
| 2010 net change | 23,332 | (4,992) | 18,340 |
| Balance at December 31, 2010 | $27,352 | ($21,402) | $5,950 |
| 2011 net change | 56 | (3,681) | (3,625) |
| Balance at December 31, 2011 | $27,408 | ($25,083) | $2,325 |

(a)  Includes after-tax gains and losses on foreign currency translation from operations for which the functional currency is other than the U.S. dollar. There was zero tax impact to the net change amounts for the years ended December 31, 2011 and 2010, respectively.

(b)  Includes after-tax impact of the over/(under)-funded status of our defined benefit plans. See Note 15 — Employee Benefit Plans for additional information.

## 14. Income Taxes

The following table summarizes income (loss) from continuing operations before income tax expense.

| Year Ended December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| U.S. income (loss) | ($27,756) | $673,091 |
| Non-U.S. income (loss) | (97,075) | 648,231 |
| Income (loss) from continuing operations before income tax expense | ($124,831) | $1,321,322 |

CONFIDENTIAL                                                                RCUCCJSN00007274

The significant components of income tax expense (benefit) from continuing operations were as follows.

| Year Ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Current income tax expense (benefit) | | |
| U.S. Federal | $44,664 | $123,390 |
| Foreign | 1,475 | (2,621) |
| State and local | 7,712 | 13,771 |
| Total current tax expense | 53,851 | 134,540 |
| Deferred income tax expense (benefit) expense | | |
| U.S. Federal | (58,243) | 49,735 |
| Foreign | (4,636) | — |
| State and local | (6,108) | 3,885 |
| Total deferred tax expense (benefit) | (68,987) | 53,620 |
| Total income tax expense (benefit) from continuing operations | ($15,136) | $188,160 |

A reconciliation of the statutory U.S. Federal income tax rate to the effective income tax rate from continuing operations is shown in the following table.

| Year Ended December 31, | 2011 | 2010 |
|---|---|---|
| Statutory U.S. Federal rate | 35.0% | 35.0% |
| Change in tax rate resulting from | | |
| State and local income taxes, net of federal income tax benefit | 0.7 | 1.4 |
| Foreign capital loss | — | 6.0 |
| Effect of valuation allowance change | (17.1) | (27.2) |
| Other | (6.5) | (1.0) |
| Effective tax rate | 12.1% | 14.2% |

At December 31, 2011 we had U.S. Federal and state capital loss carryforwards of $182.9 million. The U.S. Federal and state capital loss carryforwards expire in the years 2014–2015. Pursuant to the tax sharing agreement with RFC Holdings, the benefits of our tax attributes will be payable to us only when we would be able to utilize them on a standalone basis as if we were a corporation filing tax returns separately from RFC Holdings.

At December 31, 2011, we had foreign net operating loss carryforwards of $143.9 million. The foreign net operating loss carryforwards in the U.K. of $65.2 million have an indefinite carryforward period with the remaining net operating loss carryforwards of $78.7 million expiring in the years 2012–2031.

At December 31, 2011 and 2010, a valuation allowance has been established against any realized and unrealized capital loss carryforwards and foreign deferred tax assets. A valuation allowance has been established because we have determined that it is more likely than not that all such tax assets will not be realized. The change in the valuation allowance is primarily the result of international pretax net operating losses.

37

CONFIDENTIAL

RCUCCJSN00007275

The significant components of deferred tax assets and liabilities were as follows.

| December 31, *($ in thousands)* | **2011** | 2010 |
|---|---|---|
| **Deferred tax assets** | | |
| Provision for loan losses | **$122,260** | $111,114 |
| Tax loss carryforwards | **102,878** | 106,602 |
| MSRs | **58,812** | 53,101 |
| Accruals not currently deductible | **29,038** | 34,153 |
| Pension | **10,673** | 8,551 |
| Other | **1,179** | 3,781 |
| Gross deferred tax assets | **324,840** | 317,302 |
| Valuation allowance | **(136,775)** | (118,136) |
| Net deferred tax assets | **188,065** | 199,166 |
| **Deferred tax liabilities** | | |
| Unrealized gains on securities | **223,235** | 282,560 |
| Sales of finance receivables and loans | **43,331** | 58,884 |
| State and local taxes | **1,213** | 5,969 |
| Other | **4,985** | 3,186 |
| Gross deferred tax liabilities | **272,764** | 350,599 |
| Net deferred tax liabilities | **($84,699)** | ($151,433) |

At December 31, 2011, there were no indefinitely reinvested earnings in foreign subsidiaries.

Tax benefits related to positions considered uncertain are recognized only if, based upon the technical merits of the issue, it is more likely than not that we will sustain the position and then at the largest amount that is greater than 50% likely to be realized upon ultimate settlement.

The following table reconciles the beginning and ending amount of unrecognized tax benefits.

| *($ in thousands)* | **2011** | 2010 |
|---|---|---|
| Balance at January 1, | **$3,936** | $3,482 |
| Additions for tax positions of prior years | **3,304** | 1,889 |
| Reductions for tax positions of prior years | **(1,298)** | — |
| Settlements | **(889)** | (16) |
| Expiration of statute of limitations | **—** | (1,419) |
| Balance at December 31, | **$5,053** | $3,936 |

As of December 31, 2011 and 2010, the balance of unrecognized tax benefits that, if recognized, would affect our effective tax rate, is $5.1 million and $3.9 million, respectively.

We recognize accrued interest and penalties related to uncertain income tax positions in interest expense and other noninterest expense, respectively. For the years ended December 31, 2011 and 2010, $0.7 million and $0.4 million, respectively, were accrued for interest and penalties with the cumulative accrued balances totaling $2.4 million and $2.3 million at December 31, 2011 and 2010, respectively.

We anticipate the examination of various U.S. income tax returns along with the examinations by various foreign, state, and local jurisdictions will be completed within the next twelve months. As such, it is reasonably possible that certain tax positions may be settled and the unrecognized tax benefits would decrease by approximately $1.2 million.

We file tax returns in the U.S. Federal, various states and foreign jurisdictions. For the most significant operations, at December 31, 2011, the following summarizes the oldest tax years that remain subject to examination.

| **Jurisdiction** | **Tax Year** |
|---|---|
| U.S. | 2007 |
| Canada | 2004 |
| United Kingdom | 2008 |
| Mexico | 2005 |
| Netherlands | 2009 |

CONFIDENTIAL
RCUCCJSN00007276

## 15. Employee Benefit Plans

We participate in the GMAC Mortgage Group, LLC, the immediate parent of ResCap (GMAC Mortgage Group) defined benefit retirement plan. Effective December 31, 2006, benefit accrual of the defined benefit retirement plan was frozen. No further benefits accrued for participants subsequent to that date and no new entrants have been permitted to enter the plan. Based on the December 31, 2011 actuarial assessment, there is no contribution expected during 2012.

We participate in the Ally Inc. defined contribution savings plan for domestic employees meeting certain eligibility requirements. Employees may contribute a percentage of eligible compensation to the plan, not to exceed annual IRS limits. Based on certain employee eligibility and vesting requirements and eligible compensation as defined by the plan, we contribute toward employees post-retirement benefits in three ways. We contribute a 2% retirement contribution every pay period, a dollar for dollar matching contribution up to 6% each year, and an additional discretionary contribution of up to 2% based upon Ally Inc. performance. Funds contributed to, and earned by, the defined contribution savings plans can be withdrawn by participants only under specific conditions.

The following table summarizes information related to employee benefit plan expense from continuing operations.

| Year ended December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Defined benefit retirement plan | **($1,522)** | ($2,363) |
| Defined contribution savings plan | **926** | 1,179 |
| (Revenue) Expense total | **($596)** | ($1,184) |

## 16. Fair Value

## Fair Value Measurements

Fair value is defined as the exchange price that would be received to sell an asset or paid to transfer a liability (exit price) in the principal or most advantageous market in an orderly transaction between market participants at the measurement date. Fair value is based on the assumptions market participants would use when pricing an asset or liability. Additionally, entities are required to consider all aspects of nonperformance risk, including the entity's own credit standing, when measuring the fair value of a liability.

A three-level hierarchy is used when measuring and disclosing fair value. The fair value hierarchy gives the highest priority to quoted prices available in active markets (i.e., observable inputs) and the lowest priority to data lacking transparency (i.e., unobservable inputs). An instrument's categorization within the fair value hierarchy is based on the lowest level of significant input to its valuation. The following is a description of the three hierarchy levels.

Level 1      Inputs are quoted prices in active markets for identical assets or liabilities at the measurement date. Additionally, we must have the ability to access the active market, and the quoted prices cannot be adjusted by us.

Level 2      Inputs are other than quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly. Level 2 inputs include quoted prices in active markets for similar assets or liabilities; quoted prices in inactive markets for identical or similar assets or liabilities; or inputs that are observable or can be corroborated by observable market data by correlation or other means for substantially the full term of the assets or liabilities.

Level 3      Unobservable inputs are supported by little or no market activity. The unobservable inputs represent management's best assumptions of how market participants would price the assets or liabilities. Generally, Level 3 assets and liabilities are valued using pricing models, discounted cash flow methodologies, or similar techniques that require significant judgment or estimation.

Transfers      Transfers into or out of any hierarchy level are recognized at the end of the reporting period in which the transfer occurred. There were no significant transfers between any levels during the year ended December 31, 2011.

Following are descriptions of the valuation methodologies used to measure material assets and liabilities at fair value and details of the valuation models, key inputs to those models and significant assumptions utilized.

- *Mortgage loans held–for–sale* – Our mortgage loans held for sale portfolio is accounted for at the lower of cost or fair value or estimated fair value. Only those loans that are non-fair value elected currently being carried at fair value are included within our nonrecurring fair value measurement tables. Certain loans are carried at fair value due to a fair value election if they were previously in an on-balance sheet securitization that was fair value elected or are subject to conditional repurchase options recognized on or after January 1, 2011.

39

CONFIDENTIAL

Mortgage loans held–for–sale are typically pooled together and sold into certain exit markets, depending upon underlying attributes of the loan, such as product type, interest rate, and credit quality.  The fair value of our conditional repurchase option loans carried at fair value due to the fair value options election and all nonagency eligible residential mortgage loans that are accounted for at lower of cost or fair values is determined using internally developed valuation models because observable market prices were not available.  The loans are priced on a discounted cash flow basis utilizing cash flow projections from internally developed models that utilize prepayment, default, and discount rate assumptions.  To the extent available, we will utilize market observable inputs such as interest rates and market spreads.  If market observable inputs are not available, we are required to utilize internal inputs, such as prepayment speeds, credit losses, and discount rates.  While numerous controls exist to calibrate, corroborate, and validate the internal inputs, they require the use of judgment by us and can have a significant impact on the determination of the loan's fair value.  As of December 31, 2011, 100.0% of our mortgage loans held–for–sale that are carried at fair value on a nonrecurring basis and 100.0% of our mortgage loans held-for-sale that are carried at fair value on a recurring basis are classified as Level 3.  Mortgage loans held-for-sale account for 12.9% of all recurring and nonrecurring assets reported at fair value at December 31, 2011.

- *Consumer Finance receivables and loans, net* — We elected the fair value option for consumer mortgage finance receivables and loans related to certain of our on–balance sheet securitizations including those securitization trusts that were consolidated upon the adoption of ASU 2009–17.  A complete description of these securitizations is provided in the *On-balance sheet securitization debt* section later in this Note.  The remaining balance of our consumer finance receivables and loans are reported on the balance sheet at their principal amount outstanding, net of charge-offs, allowance for loan losses, and net premiums/discounts.

  For the securitization trusts for which we elected fair value option, the loans are measured at fair value using a portfolio approach or an in-use premise.  The values for loans held on an in-use basis may differ considerably from loans held–for–sale that can be sold in the whole-loan market.  This difference arises primarily due to the liquidity of the ABS/MBS market and is evidenced in the fact that spreads applied to lower rated ABS/MBS are considerably wider than spreads observed on senior bond classes and in the whole-loan market.  The objective in linking the fair value of these loans to the fair value of the related securitization debt is to properly account for our retained economic interest in the securitizations.  As a result of reduced liquidity in the capital and secondary markets for securitized bonds, values of these consumer mortgage finance receivables and loans and the related securitized bonds are expected to be volatile.  As of December 31, 2011, we classified 100.0% of our fair value elected consumer mortgage finance receivables and loans as Level 3.  These loans account for 69.4% of all recurring and nonrecurring assets reported at fair value at December 31, 2011.

- *Mortgage servicing rights* — MSRs currently do not trade in an active market with observable prices, therefore we use internally developed discounted cash flow models to estimate the fair value of MSRs.  These internal valuation models estimate net cash flows based on internal operating assumptions that we believe would be used by market participants combined with market-based assumptions for loan prepayment rates, interest rates, and discount rates that management believes approximate yields required by investors in this asset.  Cash flows primarily include servicing fees, and late fees, in each case less estimated operating costs to service the loans.  The estimated cash flows are discounted using an option-adjusted spread derived discount rate.  At December 31, 2011, 100.0% of our MSRs are classified as Level 3 and account for 8.9% of all recurring and nonrecurring assets reported at fair value at December 31, 2011.

- *Trading securities and interests retained in financial asset sales* —Trading securities and interests retained in financial asset sales are recorded at fair value within other assets.  The securities may be mortgage-backed or mortgage-related asset–backed securities (including senior and subordinated interests), interest-only, principal-only, or residual interests and may be investment grade, non-investment grade, or unrated securities.  We base valuations on internally developed discounted cash flow models that use a market-based discount rate.  In order to estimate cash flows, we utilize various significant assumptions, including market observable inputs such as forward interest rates, as well as internally developed inputs such as prepayment speeds, delinquency levels, and credit losses.  As of December 31, 2011, we classified 98.1% of our trading securities and 100.0% of our interests retained in financial asset sales as Level 3.  Trading securities and interests retained in financial asset sales account for 3.4% of all recurring and nonrecurring assets reported at fair value at December 31, 2011.

- *Foreclosed assets* — Through the normal course of business, we may foreclose upon real estate assets to the extent borrowers default under the terms of their agreements with us.  Foreclosed properties are carried at the lower of cost or fair value less costs to sell within other assets.  Only those assets that are being carried at fair value less costs to sell are included in the non-recurring fair value disclosures.

  Foreclosed assets that are valued based upon independent third-party appraisals less costs to sell are classified as Level 2.  When third–party appraisals are not obtained, valuations are typically obtained from a third-party broker price opinion; however, depending upon the circumstances, the property list price or other sales price information may be used

40

RCUCCJSN00007278

in lieu of a broker price opinion. We typically adjust a broker price opinion or other price source, as appropriate, in order to take into account damage and other factors that typically cause the actual liquidation value of foreclosed assets to be less than the broker price opinion or other price source. This valuation adjustment is based upon our historical experience and is necessary to ensure the valuation ascribed to these assets takes into account the unique factors and circumstances surrounding a foreclosed asset. Because we apply an internally developed adjustment to the third-party provided valuation of the foreclosed asset, these assets are classified as Level 3. As of December 31, 2011, 69.4% and 30.6% of our foreclosed assets that are being carried at fair value less costs to sell are classified as Level 2 and Level 3, respectively. Foreclosed assets account for 3.5% of all recurring and nonrecurring assets reported at fair value at December 31, 2011.

- *On-balance sheet securitizations* — We elected the fair value option for consumer mortgage finance receivables and loans and securitization debt for our on-balance sheet securitizations. The objective in measuring these loans and related securitization debt at fair value is to approximate our economic exposure to the collateral securing the securitization debt.

  We value securitization debt that was fair value option–elected using market observable prices whenever possible. The securitization debt is principally in the form of asset-backed and mortgage-backed securities collateralized by the underlying consumer mortgage finance receivables and loans. Due to the attributes of the underlying collateral and current capital market conditions, observable prices for these instruments are typically not available in active markets. We base valuations on internally developed discounted cash flow models that use a market-based discount rate. In order to estimate cash flows, we utilize various significant assumptions, including market observable inputs such as forward interest rates, as well as internally developed inputs such as prepayment speeds, delinquency levels, and credit losses. As a result of the reliance on significant assumptions and estimates for model inputs, at December 31, 2011, 100.0% of fair value option– elected securitization debt is classified as Level 3. On-balance sheet securitization debt accounts for 96.5% of all recurring and nonrecurring liabilities reported at fair value at December 31, 2011.

- *Liability for option to repurchase assets* — We elected the fair value option for the liability associated with our mortgage loans held–for–sale subject to the conditional repurchase option recognized on or after January 1, 2011. We use an asset– based in use premise approach to valuing this liability. The fair value of the liability will be equal to the fair value of the assets. The fair value of the assets are determined using internally developed discounted cash flow models as discussed in the *Mortgage loans held–for–sale* section earlier in this Note. As of December 31, 2011, 100.0% of the liability that is being carried at fair value is classified as Level 3. The liability for option to repurchase assets accounts for 3.5% of all recurring and nonrecurring liabilities reported at fair value at December 31, 2011.

**Recurring Fair Value**

   The following tables display the assets and liabilities measured at fair value on a recurring basis, including financial instruments for which we elected the fair value option.

| | Recurring fair value measurements | | | |
|---|---|---|---|---|
| December 31, 2011   ($ in thousands) | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | |
| Mortgage loans held–for–sale (a) | $— | $— | $29,723 | $29,723 |
| Consumer mortgage finance receivables and loans, net (a) | — | — | 792,592 | 792,592 |
| Mortgage servicing rights | — | — | 101,589 | 101,589 |
| Other assets | | | | |
|    Trading securities | | | | |
|       Mortgage and asset backed residential | — | 299 | 14,985 | 15,284 |
|    Interests retained in financial asset sales | — | — | 23,102 | 23,102 |
| Total assets | $— | $299 | $961,991 | $962,290 |
| **Liabilities** | | | | |
| Collateralized borrowings | | | | |
|    On-balance sheet securitization debt (a) | $— | $— | ($791,117) | ($791,117) |
| Other liabilities | | | | |
|    Liability for option to repurchase assets (a) | — | — | (28,504) | (28,504) |
| Total liabilities | $— | $— | ($819,621) | ($819,621) |

(a)  Carried at fair value due to fair value option elections, see Note 5 – Securitization and Variable Interest Entities for additional information.

41

CONFIDENTIAL    RCUCCJSN00007279

| December 31, 2010  *($ in thousands)* | Recurring fair value measurements | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| Assets | | | | |
| Mortgage loans held–for–sale (a) | $— | $— | $4,084 | $4,084 |
| Consumer mortgage finance receivables and loans, net (a) | — | — | 971,320 | 971,320 |
| Mortgage servicing rights | — | — | 164,057 | 164,057 |
| Other assets | | | | |
|   Trading securities | | | | |
|     Mortgage and asset-backed residential | 3 | 330 | 17,358 | 17,691 |
|   Interests retained in financial asset sales | — | — | 20,588 | 20,588 |
| Total assets | $3 | $330 | $1,177,407 | $1,177,740 |
| **Liabilities** | | | | |
| Collateralized borrowings | | | | |
|   On-balance sheet securitization debt (a) | $— | $— | ($934,914) | ($934,914) |
| Total liabilities | $— | $— | ($934,914) | ($934,914) |

(a)   Carried at fair value due to fair value option elections, see Note 5 –  Securitizations and Variable Interest Entities for additional information.

CONFIDENTIAL

RCUCCJSN00007280

Residential Funding Company, LLC

The following tables present the reconciliation for all Level 3 assets and liabilities measured at fair value on a recurring basis. Transfers into or out of Level 3 were recognized as of the end of the reporting period in which the transfer occurred.

| ($ in thousands) | January 1, 2011 Level 3 fair value | Net gains/(losses) included in earnings | | Other comprehensive income (loss) | Purchases | Sales | Issuances | Settlements | December 31, 2011 Level 3 fair value |
| | | realized gains (losses) | unrealized gains (losses) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | |
| Mortgage loans held–for–sale | $4,084 | $271 | ($1,407) | $— | $46,520 (a) | ($1,388) | $— | ($18,357) | $29,723 |
| Consumer mortgage finance receivables and loans, net | 971,320 | 193,938 (b) | 122,320 (b) | — | — | — | — | (494,986) | 792,592 |
| Mortgage servicing rights | 164,057 | (165) (c) | (62,298) (c) | — | — | (100) | — | 95 | 101,589 |
| Other assets | | | | | | | | | |
| Trading securities | | | | | | | | | |
| Mortgage– and asset–backed residential | 17,358 | 3,879 (d) | 3,195 (d) | — | — | — | 678 | (10,125) | 14,985 |
| Interests retained in financial asset sales | 20,588 | (1,963) (e) | (3,270) (e) | — | — | — | — | 7,747 | 23,102 |
| Total assets | $1,177,407 | $195,960 | $58,540 | $— | $46,520 | ($1,488) | $678 | ($515,626) | $961,991 |
| **Liabilities** | | | | | | | | | |
| Collateralized borrowings | | | | | | | | | |
| On-balance sheet securitization debt | ($934,914) | $ (182,503) (b) | $ (155,705) (b) | $— | $— | $— | $— | $482,005 | ($791,117) |
| Other liabilities | | | | | | | | | |
| Liability for option to repurchase assets | — | (99)(b) | 1,890(b) | — | (46,662) (a) | — | — | 16,367 | (28,504) |
| Total liabilities | ($934,914) | ($182,602) | ($153,815) | $— | ($46,662) | $— | $— | $498,372 | ($819,621) |

(a)    Includes newly recognized fair value option elected conditional repurchase option loans and the related liability. See Note 5 — Securitizations and Variable Interest Entities for additional information.

(b)    Fair value adjustment reported in other revenue, net, and related interest on loans and debt are reported in interest income and interest expense, respectively.

(c)    Fair value adjustment reported in servicing asset valuation and hedge activities, net.

(d)    Fair value adjustment reported in other revenue, net. Interest accretion on these assets is reported in interest income.

(e)    Fair value adjustment reported in other revenue, net, and interest accretion on these assets is reported in interest income.

43

CONFIDENTIAL

RCUCCJSN00007281

| ($ in thousands) | January 1, 2010 level 3 fair value | Net gains/(losses) included in earnings | | Other comprehensive income (loss) | Purchases, sales, issuances, and settlements, net (d) (e) | December 31, 2010 Level 3 fair value |
| --- | --- | --- | --- | --- | --- | --- |
| | | realized gains (losses) | unrealized gains (losses) | | | |
| **Assets** | | | | | | |
| Mortgage loans held–for–sale | $— | $76(a) | $2,735(a) | $— | $1,273 | $4,084 |
| Consumer mortgage finance receivables and loans, net | 1,303,187 | 584,189 (a) | 1,096,606 (a) | (758) | (2,011,904) | 971,320 |
| Mortgage servicing rights | 285,319 | (109) (b) | (119,279) (b) | — | (1,874) | 164,057 |
| Other assets | | | | | | |
| Trading securities | | | | | | |
| Mortgage and asset backed residential | 48,130 | 3,684(c) | 5,631(c) | — | (40,087) | 17,358 |
| Interests retained in financial asset sales | 58,793 | — | — | — | (38,205) | 20,588 |
| Total assets | $1,695,429 | $587,840 | $985,693 | ($758) | ($2,090,797) | $1,177,407 |
| **Liabilities** | | | | | | |
| Collateralized borrowings | | | | | | |
| On-balance sheet securitization debt | ($1,294,076) $ | (462,680) (a) $ | (1,194,043) (a) | $— | $2,015,885 | ($934,914) |
| Total liabilities | ($1,294,076) | ($462,680) | ($1,194,043) | $— | $2,015,885 | ($934,914) |

(a) Fair value adjustment reported in other revenue, net, and related interest on loans and debt are reported in interest income and interest expense, respectively.

(b) Fair value adjustment reported in servicing asset valuation and hedge activities, net.

(c) Fair value adjustment reported in other revenue, net. Interest accretion on these assets is reported in interest income.

(d) These amounts include the removal of $22.6 million of trading securities and $6.1 million of MSRs, as well as the additions of $564.5 million of consumer mortgage finance receivables and loans, and $528.4 million of collateralized borrowings upon the adoption of ASU 2009-17.

(e) These amounts include the removal of $1.8 billion of consumer mortgage finance receivables and loans, and $1.7 billion of collateralized borrowings as well as the addition of $4.5 million of MSRs in connection with our deconsolidation activity. See Note 5 — Securitizations and Variable Interest Entities for additional information.

44

CONFIDENTIAL

RCUCCJSN00007282

### Nonrecurring Fair Value

We may be required to measure certain assets or liabilities at fair value from time-to-time. These periodic fair value measures typically result from application of lower of cost or fair value or certain impairment measures. These items would constitute nonrecurring fair value measures.

The table below presents those items which we measured at fair value on a nonrecurring basis.

| December 31, *($ in thousands)* | Nonrecurring fair value measures | | | Total estimated fair value | Lower of cost or fair value or valuation allowance | Total gains included in income from continuing operations for the year ended |
|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | | | |
| **2011** | | | | | | |
| Mortgage loans held–for–sale (a) | $— | $— | $117,76 | $117,764 | ($46,927) | n/m (e) |
| Commercial finance receivables and loans, net (b) | — | 1,442 | 21,597 | 23,039 | (14,978) | n/m (e) |
| Other assets | | | | | | |
| Foreclosed assets (c) | — | 27,591 | 12,150 | 39,741 | (10,650) | n/m (e) |
| Real estate and other investments (d) | — | — | — | — | n/m | $380 (f) |
| Total | $— | $29,033 | $151,51 | $180,544 | ($72,555) | $380 |
| **2010** | | | | | | |
| Mortgage loans held–for–sale (a) | $— | $— | $23,317 | $23,317 | ($17,116) | n/m (e) |
| Commercial finance receivables and loans, net (b) | — | 28,708 | 56,663 | 85,371 | (23,799) | n/m (e) |
| Other assets | | | | | | |
| Foreclosed assets (c) | — | 38,169 | 16,393 | 54,562 | (3,171) | n/m (e) |
| Real estate and other investments (d) | — | 4,501 | 250 | 4,751 | n/m | $209 (f) |
| Total | $— | $71,378 | $96,623 | $168,001 | ($44,086) | $209 |

n/m = not meaningful

(a) Represents loans or pools of loans held–for–sale that are required to be measured at lower of cost or fair value. Only loans or pools of loans with fair values below cost are included in the table above. The related valuation allowance represents the cumulative adjustment to fair value of those loans and pool of loans.

(b) Represents the portion of the commercial portfolio that has been specifically impaired. The related valuation allowance represents the cumulative adjustment to fair value of those specific commercial finance receivables and loans and represents the most relevant indicator of the impact on earnings caused by the fair value measurement. The carrying values are inclusive of the respective loan loss allowance.

(c) The allowance provided for foreclosed assets represents any cumulative valuation adjustments recognized to adjust the assets to fair value less costs to sell.

(d) Certain assets within the home model portfolio have been impaired and are being carried at (a) estimated fair value if the model home is under lease or (b) estimated fair value less costs to sell if the model home is being marketed for sale.

(e) We consider the applicable valuation to be the most relevant indicator of the impact on earnings caused by the fair value measurement. Accordingly, the table above excludes total gains and losses included in earnings for these items. The carrying values are inclusive of the respective valuation.

(f) The total loss included in earnings is the most relevant indicator of the impact on earnings caused by the fair value measurement.

### Fair Value Option for Financial Assets and Financial Liabilities

We have elected to value certain financial assets and liabilities at fair value consistent with our intent to mitigate a divergence between our accounting results and our retained economic exposure related to these assets and liabilities.

Financial assets and liabilities elected to be measured at fair value are as follows.

- *On-balance sheet securitizations*– We elected the fair value option for certain domestic on-balance sheet securitization trusts in which we estimated that the credit reserves pertaining to securitized assets could have exceeded or already had exceeded our economic exposure. The fair value option election was made at a securitization level and thus the election was made for both the consumer mortgage finance receivable and loans and the related securitization debt. We elected the fair value option for all securitization trusts that were required to be consolidated upon the adoption of ASU 2009-17.

    The fair value elected loan balances are recorded within consumer finance receivables and loans, unless they have been repurchased from a securitization trust in which case they are recorded in mortgage loans held–for–sale. Our policy is to separately record interest income on these fair value elected loans. The fair value adjustment recorded for consumer

45

CONFIDENTIAL

RCUCCJSN00007283

finance receivables and loans is classified as other revenue, net, and the fair value adjustment for mortgage loans held-for-sale is classified as gain on mortgage loans, net.

The fair value elected securitization debt balances are recorded within collateralized borrowings in securitization trusts. Our policy is to separately record interest expense on the fair value elected securitization debt, which is classified as interest expense in our Consolidated Statement of Income. The fair value adjustment recorded for this debt is classified as other revenue, net.

- *Conditional repurchase option loans and liabilities* – As of January 1, 2011, we elected the fair value option for both mortgage loans held–for–sale subject to conditional repurchase options and the related liability. The conditional repurchase option allows us to repurchase a transferred financial asset if certain events outside our control are met. The typical conditional repurchase option is a delinquent loan repurchase option that gives us the option to purchase the loan if it exceeds a prespecified delinquency level. We have complete discretion regarding when or if we will exercise these options, but generally, we would do so only when it is in our best interest. We are required to record the asset and the corresponding liability on our balance sheet when the option becomes exercisable. The fair value option election must be made at initial recording. As such, the conditional repurchase option loans and liabilities that were recorded prior to January 1, 2011, were not fair value elected.

The fair value elected conditional repurchase option loans are recorded within mortgage loans held–for–sale. The fair value adjustment is classified as other revenue, net. We do not recognize interest income on conditional repurchase option loans until the option is exercised and the loan is repurchased.

The corresponding fair value elected liability is recorded in other liabilities. The fair value adjustment recorded for this liability is classified as other revenue, net.

CONFIDENTIAL

RCUCCJSN00007284

The following table summarizes the fair value option elections and information regarding the amounts recognized in earnings for each fair value option–elected item.

| Year ended December 31, *(S in thousands)* | Changes included in our Consolidated Statement of Income | | | | | |
|---|---|---|---|---|---|---|
| | Interest income (expense) (d) | Gain on mortgage loans, net | Other revenue, net | Total included in net income | Change in fair value due to credit risk | (a) |
| **2011** | | | | | | |
| **Assets** | | | | | | |
| Mortgage loans held–for–sale | $285 | ($1,904) | $483 | ($1,136) | ($305) | |
| Consumer mortgage finance receivables and loans, net | 190,549 | — | 125,707 | 316,256 | (116,376) | (b) |
| **Liabilities** | | | | | | |
| Collateralized borrowings | | | | | | |
| On-balance sheet securitizations | (110,737) | — | (227,472) | (338,209) | (19,442) | (c) |
| Liability for option to repurchase assets | — | — | 1,792 | 1,792 | 305 | (c) |
| Total | | | | ($21,297) | | |
| **2010** | | | | | | |
| **Assets** | | | | | | |
| Mortgage loans held–for–sale | $33 | $— | $2,778 | $2,811 | $134 | |
| Consumer mortgage finance receivables and loans, net | 502,054 | — | 1,178,741 | 1,680,795 | (6,515) | (b) |
| **Liabilities** | | | | | | |
| Collateralized borrowings | | | | | | |
| On-balance sheet securitizations | (282,528) | — | (1,374,194) | (1,656,722) | 28,873 | (c) |
| Total | | | | $26,884 | | |

(a)  Factors other than credit quality that impact the fair value include changes in market interest rates and the liquidity or marketability in the current marketplace. Lower levels of observable data points in illiquid markets generally result in wide bid/offer spreads.

(b)  The credit impact for consumer mortgage finance receivables and loans was quantified by applying internal credit loss assumptions to cash flow models.

(c)  The credit impact for on-balance sheet securitization debt is assumed to be zero until our economic interests in a particular securitization is reduced to zero, at which point the losses in the underlying collateral will be expected to be passed through to third-party bondholders. Losses allocated to third-party bondholders, including changes in the amount of losses allocated, will result in fair value changes due to credit. We also monitor credit ratings and may make credit adjustments to the extent any bond classes are downgraded by rating agencies.

(d)  Interest income on consumer mortgage finance receivables and loans and mortgage loans held–for–sale is measured by multiplying the unpaid principal balance on the loans by the coupon rate and the number of days of interest due. Interest expense on the on-balance sheet securitizations is measured by multiplying the bond principal by the coupon rate and days interest due to the investor.

CONFIDENTIAL

RCUCCJSN00007285

Notes to Consolidated Financial Statements
Residential Funding Company, LLC

The table below provides the fair value and the unpaid principal balance for our fair value option–elected loans and related collateralized borrowings.

| December 31, *($ in thousands)* | 2011 | | 2010 | |
| --- | --- | --- | --- | --- |
| | Unpaid principal balance | Fair value (a) | Unpaid principal balance | Fair value (a) |
| Mortgage loans held–for–sale | | | | |
| Total loans | $56,352 | $29,723 | $5,105 | $4,084 |
| Nonaccrual loans | 53,502 | 27,297 | 652 | 371 |
| Loans 90+ days past due (b) | 53,312 | 27,179 | 133 | 44 |
| Consumer mortgage finance receivables and loans, net | | | | |
| Total loans | $2,306,644 | $792,592 | $2,744,864 | $971,320 |
| Nonaccrual loans | 497,637 | 206,435 (c) | 575,834 | 258,216 (c) |
| Loans 90+ days past due (b) | 358,281 | 161,255 (c) | 362,259 | 183,385 (c) |
| Collateralized borrowings | | | | |
| On-balance sheet securitizations | ($2,440,274) | ($791,117) | ($2,822,713) | ($934,914) |
| Other liabilities | | | | |
| Liability for option to repurchase assets | ($56,568) | ($28,504) | $— | $— |

(a) Excludes accrued interest receivable.
(b) Loans 90+ days past due are also presented within the nonaccrual loans and total loans except those that are government insured and still accruing.
(c) The fair value of consumer mortgage finance receivables and loans is calculated on a pooled basis; therefore, we allocated the fair value of nonaccrual loans and 90+ days past due to individual loans based on the unpaid principal balances.

## Fair Value of Financial Instruments

The following table presents the carrying and estimated fair value of assets and liabilities that are considered financial instruments. Accordingly, items that do not meet the definition of a financial instrument are excluded from the table. When possible, we use quoted market prices to determine fair value. Where quoted market prices are not available, the fair value is internally derived based on appropriate valuation methodologies with respect to the amount and timing of future cash flows and estimated discount rates. However, considerable judgment is required in interpreting market data to develop estimates of fair value, so the estimates are not necessarily indicative of the amounts that could be realized or would be paid in a current market exchange. The effect of using different market assumptions or estimation methodologies could be material to the estimated fair values. Fair value information presented herein was based on information available at December 31, 2011 and 2010.

| December 31, *($ in thousands)* | 2011 | | 2010 | |
| --- | --- | --- | --- | --- |
| | Carrying value | Fair value | Carrying value | Fair value |
| **Assets** | | | | |
| Mortgage loans held–for–sale | $1,144,273 | $1,232,508 | $1,269,203 | $1,294,744 |
| Finance receivables and loans, net | 836,339 | 836,015 | 1,163,153 | 1,144,479 |
| **Liabilities** | | | | |
| Borrowings from Ally Inc. and subsidiaries | $440,230 | $440,230 | $479,766 | $479,766 |
| Borrowings from affiliates | 281,590 | 99,013 | 211,151 | 28,763 |
| Other borrowings | 131,674 | 131,674 | 400,920 | 400,920 |

The following describes the methodologies and assumptions used to determine fair value for the respective classes of financial instruments. In addition to the valuation methods discussed below, we also followed guidelines for determining whether a market was not active and a transaction was not distressed. As such, we assumed the price that would be received in an orderly transaction (including a market–based return) and not in forced liquidation or distressed sale.

- *Mortgage loans held–for–sale* — Fair value is equal to the market value determined for lower of cost or fair value measurement purposes. Carrying value differs from fair value as certain loans may be required to be carried at cost under lower of cost or fair value measurements (i.e. fair value is greater than cost). See discussion of valuation methods and assumptions used for mortgage loans held for sale within the *Fair Value Measurement* section of this Note.

- *Consumer mortgage finance receivables and loans, net* — Consumer mortgage finance receivables and loans that are not securitized and fair value elected use valuation methods and assumptions similar to those used for mortgage loans held–for–sale. These valuations take into account the unique attributes of the respective mortgage loans, such as geography,

48

delinquency status, product type, and other factors.

- *Commercial mortgage finance receivables and loans* — Performing commercial mortgage finance receivables and loans are generally valued by discounting expected future cash flows using our best estimate of a market-based discount rate. The majority of our performing commercial mortgage finance receivables and loans is held short-term at variable interest rates. For those receivables held short-term, carrying value equals fair value. Non-performing commercial mortgage finance receivables and loans are generally valued using our best estimate of the ultimate recoverable value of the receivable, which is predominantly a function of underlying collateral value, and factoring in an anticipated market-based return.

- *Ally Inc. and subsidiaries borrowings* — Ally Inc. borrowings have been executed to approximate arms-length terms. These borrowing arrangements generally charge floating interest rates based on an index plus a market-based spread. There are frequent negotiations and restructuring activities around these borrowing arrangements. Accordingly, the interest rates on these borrowings would be equivalent to those demanded in the market and thus carrying value approximates fair value.

- *Borrowings from Affiliates* - Affiliate borrowings have been executed to approximate arms-length terms. These borrowing arrangements generally charge floating interest rates based on an index plus a market-based spread. . The estimated fair value of these borrowings is equal to the fair value of the underlying assets collateralizing the borrowings.

- *Other borrowings* — Primarily represents third-party funding facilities and unsecured medium term notes. See Note 9 – Borrowings for additional information. Our unsecured medium term notes are valued based on market observable prices when available. Our third-party funding facilities have floating rates based on an index plus a spread. These borrowings have recently been negotiated or amended and the credit spread would be consistent with those demanded in the market. Accordingly, the interest rates on these borrowings would be at market and thus carrying value would approximate fair value.

## 17. Higher Risk Mortgage Loans and Credit Quality

Historically, we originated and purchased mortgage loans that had contractual features that may increase our exposure to credit risk and thereby result in a concentration of credit risk. These mortgage loans include loans that may subject borrowers to significant payment increases in the future, have negative amortization of the principal balance or have high loan-to-value ratios.

The following table summarizes the gross carrying value of our higher-risk mortgage loans classified as held-for-sale and finance receivables and loans.

| December 31, *($ in thousands)* | **2011** | 2010 |
|---|---|---|
| High loan-to-value (greater than 100%) mortgage loans | **$335,176** | $363,643 |
| Payment option adjustable rate mortgage loans | **12,140** | 16,805 |
| Interest-only mortgage loans | **290,155** | 441,937 |
| Below market initial rate mortgage loans | **45,773** | 42,868 |
| Total carry value of higher-risk mortgages | **$683,244** | $865,253 |

Included in the table above are $319.9 million and $410.2 million of high-risk mortgage loans held in on-balance sheet securitizations at December 31, 2011 and 2010, respectively. Our exposure on these loans is limited to the value of our retained interest.

As part of our loss mitigation efforts and participation in certain governmental programs (e.g., the Making Home Affordable program), we may offer loan restructurings to borrowers. Due to the nature of restructurings, these loans are generally considered higher risk. Loan modifications can include any or all of the following; principal forgiveness, maturity extensions, delinquent interest capitalization and changes to contractual interest rates. Modifications can be either temporary or permanent. Temporary loan modifications are generally used to monitor the borrower's ability to perform under the revised terms over a specified trial period; if the borrower performs, it may become a permanent loan modification. We have historically performed loan modifications under our private modification program; however, more recently the majority of loan modifications are completed under government programs. The carrying value of our on-balance sheet consumer and commercial modified mortgage loans was $486.5 million and $398.7 million as of December 31, 2011 and 2010, respectively. These modified mortgage loans are included within mortgage loans held-for-sale and consumer finance receivables and loans.

49

RCUCCJSN00007287

## Nonperforming Assets

Nonperforming assets include nonaccrual loans and foreclosed assets. The classification of a loan as nonperforming does not necessarily indicate that the principal amount of the loan is ultimately uncollectible in whole or in part. In certain cases, borrowers make payments to bring their loans contractually current and, in all cases, our mortgage loans are collateralized by residential real estate. As a result, our experience has been that any amount of ultimate loss for mortgage loans other than home equity loans is substantially less than the unpaid principal balance of a nonperforming loan.

Delinquent loans expose us to higher levels of credit losses and therefore are considered higher risk loans. The determination as to whether a loan falls into a particular delinquency category is made as of the close of business on the balance sheet date. The following table sets forth information concerning the delinquency experience in our mortgage loans held–for–sale and consumer finance receivable and loans at carrying value.

| December 31, *($ in thousands)* | 2011 | | 2010 | |
|---|---|---|---|---|
| | Amount | % of total | Amount | % of total |
| Current | $1,198,599 | 61.1% | $1,366,820 | 58.4% |
| Past due | | | | |
| 30 to 89 days | 52,824 | 2.7% | 36,300 | 1.6% |
| 90 days or more and still accruing interest | — | —% | 64 | —% |
| 90 days or more conditional repurchase option loans (a) | 100,701 | 5.1% | 141,787 | 6.0% |
| Nonaccrual | 608,961 | 31.1% | 796,204 | 34.0% |
| Total | 1,961,085 | 100% | 2,341,175 | 100% |
| Allowance for loan losses | (3,512) | | (1,006) | |
| Total, net | $1,957,573 | | $2,340,169 | |

(a) We do not record interest income on conditional repurchase option loans. If these options were exercised and we acquired the loans, $100.7 million and $141.8 million would be classified as nonaccrual at December 31, 2011 and 2010, respectively.

The following table presents the net carrying value of nonperforming assets.

| December 31, *($ in thousands)* | 2011 | 2010 |
|---|---|---|
| Nonaccrual consumer | | |
| 1st Mortgage | $415,102 | $458,045 |
| Home equity | 50,671 | 89,701 |
| Foreign | 143,188 | 248,458 |
| Total nonaccrual consumer (a) | 608,961 | 796,204 |
| Nonaccrual commercial | | |
| Domestic | — | 554 |
| Foreign | 12,534 | 108,617 |
| Total nonaccrual commercial | 12,534 | 109,171 |
| Foreclosed assets | 61,563 | 107,348 |
| Total nonperforming assets | $683,058 | $1,012,723 |

(a) Excludes loans subject to conditional repurchase options of $100.7 million and $141.8 million sold to off-balance sheet private-label securitization trusts at December 31, 2011 and 2010, respectively. The corresponding liability is recorded in other liabilities. See Note 5 — Securitizations and Variable Interest Entities for additional information.

CONFIDENTIAL

RCUCCJSN00007288

## 18. Guarantees, Commitments and Contingencies

### Guarantees

Guarantees are defined as contracts or indemnification agreements that contingently require us to make payments to third-parties based on changes in an underlying agreement that is related to a guaranteed party. The following summarizes our outstanding guarantees made to third parties.

| | 2011 | | 2010 | |
| December 31, ($ in thousands) | Maximum liability | Carrying value of liability | Maximum liability | Carrying value of liability |
|---|---|---|---|---|
| Off-balance sheet guarantees | | | | |
| HLTV securitizations | $5,988 | $— | $7,464 | $— |
| Credit enhancement guarantees | 1,661 | 235 | 2,368 | 352 |
| Guarantor of ResCap and affiliate debt | 2,249,295 | 128,844 (a) | 2,246,108 | 145,656 |

(a) Represents the peso denominated medium term notes issued by our wholly-owned consolidated subsidiary GMAC Financiera.

### HLTV securitizations

We have entered into agreements to provide credit loss protection for HLTV securitization transactions. The maximum potential obligation under certain of these agreements is equal to the lesser of a specified percentage of the original loan pool balance or a specified percentage of the current loan pool balance. We are required to perform on our guaranty obligation when losses exceed cash available in each period. We have pledged trading securities of $4.0 million and $5.4 million as collateral for these obligations at December 31, 2011 and 2010, respectively.

For certain other HLTV securitizations, the maximum potential obligation is equivalent to the pledged collateral amount. We have pledged cash deposits of $4.9 million and $4.9 million as of December 31, 2011 and 2010, respectively. Our guaranty obligation is triggered when the security credit enhancements are exhausted and losses are passed through to over-the-counter dealers. The guaranty obligations terminate the first calendar month during which the security aggregate note amount is reduced to zero.

### Credit enhancement

We have sold certain mortgage loans to investors which contain a guarantee for the payment of the third-party debt in the event of default or loss.

### Guarantor of ResCap and Affiliate Debt

We, along with certain other subsidiaries of ResCap, are guarantors of ResCap's obligations under its 9.625% Junior Secured Guaranteed Notes due 2015 (the Junior Secured Notes). The Junior Secured Notes are secured by second priority liens on the same collateral that secures the Ally Inc. Senior Secured Credit Facility and are repayable in three equal annual tranches of $707.0 million from May 2013 through 2015. We, along with certain other subsidiaries of ResCap, are also guarantors of peso denominated medium-term notes issued by GMAC Financiera S.A. de C.V., SOFOM, ENR, our wholly owned subsidiary.

### Financing Commitments

The contract amount of financing commitments were as follows.

| | Contract amount | |
| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Commitments to | | |
| Home equity lines of credit | $96,654 | $133,824 |
| Provide capital to investees | 9,000 | 47,500 |

### Home equity lines of credit

We have commitments to fund the remaining undrawn balances on home equity lines of credit. The unused lines of credit reset at prevailing market rates and, as such, approximate market value. Included in the home equity lines of credit are both lines of credit on our Consolidated Balance Sheet, and those within certain of our off-balance sheet securitizations. As provided by the securitization structure, we become obligated to fund any incremental draws, subject to customary borrower requirements, on home equity lines

51

CONFIDENTIAL

RCUCCJSN00007289

of credit by borrowers if certain triggers are met. These draws are referred to as excluded amounts and are funded directly to the borrower by us. In return, our lending balances are collected from our percentage of the remitted funds for specific borrowers within the securitization trust. We actively manage the available lines of credit within these securitization trusts to reduce potential funding risk. At December 31, 2011 and 2010, the cumulative funds drawn were $23.2 million and $11.6 million, respectively, which we classified within mortgage loans held–for–sale. At December 31, 2011 and 2010, the commitments to fund home equity lines of credit in off-balance sheet securitizations represented $23.7 million and $34.9 million, respectively, of our total unfunded commitments of $96.7 billion and $133.8 billion, respectively. We estimate and record a liability for the incurred credit losses on our unfunded home equity line of credit commitments. These anticipated credit losses are classified within other liabilities. At December 31, 2011 and 2010, we had a liability of $0.1 million and $0.2 million, respectively, recorded for incurred credit losses on our unfunded home equity line of credit commitments.

### Commitments to provide capital to equity method investees

We are committed to provide equity capital to certain private equity funds; however, our ability to do so may be limited due to certain equity investments being identified as inadmissible activities under bank holding company regulations.

## Other Commitments and Contingencies.

We believe it is reasonably possible that losses beyond amounts currently recorded for litigation matters and potential representation and warranty obligations and related claims described below could occur, and such losses could have a material adverse impact on our results of operations, financial condition or cash flows. However, based on currently available information, we are unable to estimate a range of reasonably possible losses above amounts that have been recorded at December 31, 2011.

### Loan Repurchases and Obligations Related to Loan Sales

*Overview*

We sell loans that take the form of securitizations sold to private investors and to whole–loan investors. In connection with a portion of our private-label securitizations, the monolines insured all or some of the related bonds and guaranteed timely repayment of bond principal and interest when the issuer defaults. In connection with securitizations and loan sales, the trustee for the benefit of the related security holders and, if applicable, the related monoline insurers are provided various representations and warranties related to the loans sold. The specific representations and warranties vary among different transactions and investors but typically relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, the ability to deliver required documentation and compliance with applicable laws. In general, the representations and warranties described above may be enforced at any time unless a sunset provision is in place. Upon discovery of a breach of a representation or warranty, the breach is corrected in a manner conforming to the provisions of the sale agreement. This may require us to repurchase the loan, indemnify the investor for incurred losses, or otherwise make the investor whole.

*Originations*

The total exposure to mortgage representation and warranty claims is most significant for loans originated and sold between 2004 through 2008, specifically the 2006 and 2007 vintages that were originated and sold prior to enhanced underwriting standards and risk–mitigation actions implemented in 2008 and forward, including curtailment of nonconforming domestic and international loan originations and purchases. Representation and warranty risk mitigation strategies include, but are not limited to, pursuing settlements with investors where economically beneficial in order to resolve a pipeline of demands in lieu of loan-by-loan assessments that could result in repurchasing loans, aggressively contesting claims we do not consider valid (rescinding claims), and seeking recourse against correspondent lenders from whom we purchased loans wherever appropriate.

*Demand/Claim Process*

After receiving a claim under representation and warranty obligations, we review the claim to determine the appropriate response (e.g. appeal, and provide or request additional information) and take appropriate action (rescind, repurchase the loan, or remit indemnification payment). Historically, repurchase demands were generally related to loans that became delinquent within the first few years following origination. As a result of market developments over the past several years, investor repurchase demand behavior has changed significantly. Investors are more likely to submit claims for loans that become delinquent or when a loss is incurred. Representation and warranty claims are generally reviewed on a loan–by–loan basis to validate if there has been a breach requiring a potential repurchase or indemnification payment. We actively contest claims to the extent they are not considered valid. We are not required to repurchase a loan or provide an indemnification payment where claims are not valid.

The risk of repurchase or indemnification, and the associated credit exposure, is managed by servicing mortgage loans to meet investor standards. We believe that, in general, the longer a loan performs prior to default, the less likely it is that an alleged breach of representation and warranty will be found to have a material and adverse impact on the loan's performance. When loans are repurchased, we bear the related credit loss on the loans. Repurchased loans are classified as held–for–sale and initially recorded at

CONFIDENTIAL

RCUCCJSN00007290

fair value.

The following table includes amounts paid to investors and monolines with respect to representation and warranty obligations.

| December 31, *($ in thousands)* | **2011** | 2010 |
|---|---|---|
| Loan repurchases (UPB) | | |
| Private–label securitizations insured (monolines) | **$650** | $13,183 |
| Private–label securitizations uninsured | **36,557** | — |
| Whole–loan investors | **7,859** | 15,616 |
| Total | **$45,066** | $28,799 |
| Indemnifications (make wholes) by investor | | |
| Private–label securitizations insured (monolines) | **$7,025** | $15,166 |
| Private–label securitizations uninsured | **167,354** | — |
| Whole–loan investors | **24,570** | 11,133 |
| Total | **$198,949** | $26,299 |

The following table presents the total number and original unpaid principal balance of loans related to unresolved representation and warranty demands (indemnification claims and/or repurchase demands). The table includes demands that we have requested be rescinded but which have not yet been agreed to by the investor. The table excludes certain demands in situations where investors have requested additional documentation as part of individual loan file reviews.

| | **2011** | | 2010 | |
|---|---|---|---|---|
| December 31, *($ in millions)* | **Number of loans** | **Dollar amount of loans** | Number of loans | Dollar amount of loans |
| Unresolved repurchase demands previously received | | | | |
| Monolines | | | | |
| MBIA Insurance Corporation | **3,820** | **$262** | 3,243 | $223 |
| Financial Guaranty Insurance Company | **1,029** | **171** | 814 | 141 |
| Other | **444** | **34** | 185 | 23 |
| Other investors | **415** | **54** | 196 | 47 |
| Total unpaid principal balance | **5,708** | **$521** | 4,438 | $434 |

We are currently in litigation with MBIA Insurance Corporation (MBIA) and Financial Guaranty Insurance Company (FGIC) with respect to certain representation and warranty matters related to certain of our private-label securitizations. Historically we have requested that most of the demands be rescinded, consistent with the claim/demand process described above. As the litigation process proceeds, additional loan reviews are expected and will likely result in additional repurchase demands.

### *Liability for Representation and Warranty Obligations*

The liability for representation and warranty obligations reflects management's best estimate of probable lifetime loss. We consider historical and recent demand trends in establishing the reserve. The methodology used to estimate the reserve considers a variety of assumptions including borrower performance (both actual and estimated future defaults), repurchase demand behavior, historical loan defect experience, historical mortgage insurance rescission experience, and historical and estimated future loss experience, which includes projections of future home price changes as well as other qualitative factors including investor behavior. In cases where we do not have or have limited current or historical demand experience with an investor, it is difficult to predict and estimate the level and timing of any potential future demands. In such cases, we may not be able to reasonably estimate losses, and a liability is not recognized. Management monitors the adequacy of the overall reserve and makes adjustments to the level of reserve, as necessary, after consideration of other qualitative factors including ongoing dialogue and experience with counterparties.

At the time a loan is sold, an estimate of the fair value of the liability is recorded and classified in other liabilities and recorded as a component of gain on mortgage loans, net. We recognize changes in the liability when additional relevant information becomes available. Changes in the liability are recorded as representation and warranty expense, net.

CONFIDENTIAL

RCUCCJSN00007291

The following table summarizes the changes in our liability for representation and warranty obligations.

| ($ in thousands) | 2011 | 2010 |
|---|---|---|
| Balance at January 1, | $368,826 | $522,467 |
| Provision for representation and warranty obligations | | |
| Loan sales | — | 47,418 |
| Change in estimate | 216,650 | (132,785) |
| Total additions | 216,650 | (85,367) |
| Realized losses (a) | (226,590) | (71,559) |
| Recoveries | 560 | 3,285 |
| Balance at December 31, | $359,446 | $368,826 |

(a)   Includes principal losses and accrued interest on repurchased loans, indemnification payments, and settlements with investors.

### Monoline Insurers

Historically, we have securitized loans where the monolines insured all or some of the related bonds and guaranteed the timely repayment of bond principal and interest when the issuer defaults. Typically, any alleged breach requires the insurer to have both the ability to assert a claim as well as evidence that a defect has had a material and adverse effect on the interest of the security holders or the insurer. For the period 2004 through 2007, we sold $24.3 billion of loans into these monoline–wrapped securitizations.

We are currently in litigation with MBIA and FGIC in connection with our representation and warranty obligations, and additional litigation with other monolines is likely.

The following table summarizes the changes in the original unpaid principal balance related to unresolved repurchase demands with respect our Monoline exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor. The table excludes certain demands in situations where investors have requested additional documentation as part of individual loan file reviews. If we subsequently determine that we cannot deliver the requested documentation, and we repurchase the loan or make an indemnification payment, the demand will be reported in resolved claims.

| ($ in millions) | 2011 | 2010 |
|---|---|---|
| Balance at January 1, | $387 | $322 |
| New claims (a) | 54 | 102 |
| Resolved claims (b) | (18) | (32) |
| Rescinded claims/other | 44 | (5) |
| Balance at December 31, | $467 | $387 |

(a)   Substantially all relate to claims associated with the 2004 through 2007 vintages.
(b)   Includes settlements, repurchased loans and claims under which indemnification payments are made.

### Private–label Securitization

In general, representations and warranties provided as part of our private–label securitization activities are less rigorous and generally impose higher burdens on investors seeking repurchase. In order to successfully assert a claim, it is our position that a claimant must prove a breach of the representations and warranties that materially and adversely affects the interest of the investor in the allegedly defective loan. Securitization documents typically provide the investors with a right to request that the trustee investigate and initiate a repurchase claim. However, a class of investors generally are required to coordinate with other investors in that class comprising no less than 25% and in some cases 50% of the percentage interest constituting a class of securities of that class issued by the trust to pursue claims for breach of representations and warranties. In addition, our private–label securitizations generally require that the servicer or trustee give notice to the other parties whenever it becomes aware of facts or circumstances that reveal a breach of representation that materially and adversely affects the interest of the certificate holders.

Regarding our securitization activities, we have exposure to potential losses primarily through two avenues. First, investors, through trustees to the extent required by the applicable agreements (or monoline insurers in certain transactions), may request pursuant to applicable agreements that we repurchase loans or make the investor whole for losses incurred if it is determined that we violated representations and warranties made at the time of the sale, provided that such violations materially and adversely impacted the interest of the investor. Contractual representations and warranties are different based on the specific deal structure and investor. It is our position that litigation of these matters must proceed on a loan by loan basis. This issue is being disputed throughout the industry in various pending litigation matters. Similarly in dispute as a matter of law is the degree to which claimants will have to prove that the alleged breaches of representations and warranties actually caused the losses they claim to have suffered. Ultimate resolution by courts of these and other legal issues will impact litigation and treatment of non-litigated claims pursuant to similar contractual provisions. Second, investors in securitizations may attempt to achieve rescission of their investments or damages

54

CONFIDENTIAL

through litigation by claiming that the applicable offering documents were materially deficient. If an investor properly made and proved its allegations, the investor might attempt to claim that damages could include loss of market value on the investment even if there were little or no credit loss in the underlying loans.

### Whole–loan Sales

The following table summarizes the changes in the original unpaid principal balance related to unresolved repurchase demands with respect our whole-loan exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor. The table excludes certain demands in situations where investors have requested additional documentation as part of individual loan file reviews. If we subsequently determine that we cannot deliver the requested documentation, and we repurchase the loan or make an indemnification payment, the demand will be reported in resolved claims.

| ($ in millions) | 2011 | 2010 |
|---|---|---|
| Balance at January 1, | $47 | $41 |
| New claims (a) | 64 | 74 |
| Resolved claims (b) | (26) | (29) |
| Rescinded claims/other | (31) | (39) |
| Balance at December 31, | $54 | $47 |

(a) Includes $63.6 million and $68.0 million in new claims associated with the 2004 through 2007 vintages in 2011 and 2010, respectively.
(b) Includes settlements, repurchased loans and claims under which indemnification payments are made.

### Private Mortgage Insurance

Mortgage insurance is required for certain consumer mortgage loans sold to certain securitization trusts and may have been in place for consumer mortgage loans sold to whole-loan investors. Mortgage insurance is typically required for first-lien consumer mortgage loans having a loan-to-value ratio at origination of greater than 80 percent. Mortgage insurers are, in certain circumstances, permitted to rescind existing mortgage insurance that covers consumer loans if they demonstrate certain loan underwriting requirements have not been met. Upon receipt of a rescission notice, we assess the notice and if appropriate we refute the notice, or if the notice cannot be refuted we attempt to remedy the defect. In the event the mortgage insurance cannot be reinstated, we may be obligated to repurchase the loan or provide an indemnification payment in the event of a loss, subject to contractual limitations. While we make every effort to reinstate the mortgage insurance, we have had limited success and as a result, most of these requests result in rescission of the mortgage insurance. At December 31, 2011, we have approximately $97.2 million in original unpaid principal balance of outstanding mortgage insurance rescission notices where we have not received a repurchase demand. However, this unpaid principal amount is not representative of expected future losses.

### Private–label Securitizations – Other Potential Repurchase Obligations

When we sell mortgage loans through whole-loan sales or securitizations, we are required to make customary representations and warranties about the loans to the purchaser and/or securitization trust. These representations and warranties relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, ability to deliver required documentation, and compliance with applicable laws. Generally, the representations and warranties described above may be enforced at any time over the life of the loan. Breaches of these representations and warranties have resulted in a requirement that we repurchase mortgage loans. As the mortgage industry continues to experience higher repurchase requirements and additional investors begin to attempt to put back loans, a significant increase in activity beyond that experienced today could occur, resulting in additional future losses

## Legal Proceedings

We are subject to potential liability under various governmental proceedings, claims, and legal actions that are pending or otherwise asserted against us. We are named as defendants in a number of legal actions, and we are occasionally involved in governmental proceedings arising in connection with our business activities. Some of the pending actions purport to be class actions, and certain legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. We establish reserves for legal claims when payments associated with the claims become probable and the costs can be reasonably estimated. Given the inherent difficulty of predicting the outcome of litigation and regulatory matters, it is generally very difficult to predict what the eventual outcome will be, and when the matter will be resolved. The actual costs of resolving legal claims may be higher or lower than any amounts reserved for the claims. We recorded a liability for probable legal claims of $87.6 million at December 31, 2011, and $105.0 million at December 31, 2010. At December 31, 2011 and 2010, we had $3.9 million and $127.5 million of appeals bonds related to legal proceedings, respectively.

CONFIDENTIAL

RCUCCJSN00007293

## Mortgage-backed Securities Litigation
### Private-label Securities Litigation

We and certain of our subsidiaries have been named as defendants in several cases relating to our various roles in MBS offerings. The plaintiffs generally allege that the defendants made misstatements and omissions in registration statements, prospectuses, prospectus supplements, and other documents related to the MBS offerings. The alleged misstatements and omissions typically concern underwriting standards. Plaintiffs generally claim that such misstatements and omissions constitute violations of state and/or federal securities law and common law including negligent misrepresentation and fraud. Plaintiffs seek monetary damages and rescission. Set forth below are descriptions of the most significant of these legal proceedings.

### Allstate Litigation

On February 14, 2011, the Allstate Insurance Company and various of its subsidiaries and affiliates (collectively, Allstate) filed a complaint in Hennepin County District Court, Minnesota, against us and certain of our subsidiaries and affiliates, including GMAC Mortgage; Residential Funding Securities LLC (RFS); Residential Accredit Loans, Inc. (RALI); Residential Asset Mortgage Products, Inc. (RAMP); Residential Funding Mortgage Securities I, Inc. (RFMSI); Residential Funding Mortgage Securities II, Inc. (RFMSII); and Residential Asset Securities Corporation (RASC) (collectively, the defendants). The complaint alleges that the defendants misrepresented the riskiness and credit quality of, and omitted material information related to, residential MBS Allstate purchased. The complaint asserts claims for fraud and negligent misrepresentation and seeks money damages and costs, including attorneys' fees. Discovery in this case is underway.

### DZ Bank

On December 13, 2011, DZ Bank and DG Holding Trust filed a Summons with Notice in New York County Supreme Court against numerous defendants including us and certain of our subsidiaries and affiliates, including Ally Inc.; ResCap; RFC Holding; Ally Securities LLC (Ally Securities); RAMP; RASC; and RALI (collectively, the defendants). The Summons alleges that the offering materials issued by the defendants for MBS purchased by DZ Bank and DG Holding Trust contained material misrepresentations and omissions related to the originator's underwriting guidelines and the credit quality and characteristics of the mortgage loans underlying the securities. It also notices the defendants of the plaintiffs' claims for damages. Such claims include common law fraud, fraudulent inducement, negligent misrepresentation, and aiding and abetting fraud. The Summons has not been served.

### FHFA Litigation

On September 2, 2011, FHFA, as conservator for Freddie Mac, filed a complaint against us and certain of our subsidiaries and affiliates, including Ally Inc.; GMAC Mortgage Group, Inc. (GMAC Mortgage Group); ResCap; Res Holdings; Ally Securities; RAMP; RASC; and RALI (collectively, the defendants), in New York County Supreme Court. The complaint alleges that Freddie Mac purchased over $6.0 billion of residential MBS issued in connection with 21 securitizations sponsored and/or underwritten by the defendants. It further alleges that the registration statements, prospectuses, and other offering materials associated with these transactions contained false and misleading statements and omissions of material facts. The complaint asserts claims for negligent misrepresentation, fraud, and violations of state and federal securities laws, and seeks rescission and recovery of the consideration Freddie Mac paid for the securities, as well as other compensatory and punitive damages. Ally Inc. and ResCap removed the case to the United States District Court for the Southern District of New York. The FHFA has moved to remand this case to state court. That motion is still pending.

### FHLB Litigation

On July 14, 2011, FHLB of Indianapolis filed an Amended Complaint in Marion County Superior Court for rescission and damages asserting claims for common law negligence and violations of state and federal securities laws, and names our subsidiary RFMSI and GMAC Mortgage Group, among other defendants (collectively, the defendants). The complaint alleges that the offering documents for the securities underwritten and issued by the defendants contained material misrepresentations of fact, evidenced by high default and foreclosure rates, and seeks unspecified damages and an order voiding the transactions at issue. The defendants' motion to dismiss is pending.

On April 20, 2011, FHLB of Boston filed a complaint in Suffolk County Superior Court, naming numerous defendants including us and certain of our subsidiaries and affiliates, including Ally Inc.; GMAC Mortgage Group; and RALI (collectively, the defendants). The complaint alleges that the defendants collectively packaged, marketed, offered, and sold private-label MBS, and FHLB of Boston purchased such securities in reliance upon misstatements and omissions of material facts in the offering documents. The complaint seeks rescission and damages for negligent misrepresentation and violations of the Massachusetts Uniform Securities Act, among other claims. The defendants removed this case to federal court, and FHLB of Boston's motion to remand is pending.

56

RCUCCJSN00007294

On October 15, 2011, FHLB of Chicago filed a Corrected Amended Complaint for Rescission and Damages in Cook County Circuit Court, which names us and certain of our subsidiaries and affiliates as defendants, including Ally Inc.; GMAC Mortgage Group; RFS; RAMP; RASC; and RFMSI (collectively, the defendants). The complaint alleges that the offering documents for the securities underwritten and issued by defendants contained material misrepresentations of fact and asserts claims for violations of state securities law and negligent misrepresentation. The complaint seeks rescission of the transactions at issue and damages in an amount to be determined at trial. The defendants' motion to dismiss is pending.

*Huntington Bancshares Litigation*

On October 11, 2011, Huntington Bancshares, Inc., commenced a lawsuit against us and certain of our affiliates, including Ally; GMAC Mortgage; RALI; ResCap; RFC Holdings; Ally Securities; and several individuals (collectively, the defendants). The complaint alleges that the defendants made misrepresentations and omissions of material facts related to the originator's loan underwriting guidelines in the offering materials for five residential mortgaged-backed securities. The complaint asserts claims for fraud, aiding and abetting fraud, negligent misrepresentation, and violation of the Minnesota Securities Act and seeks rescission, money damages, and costs. The defendants' motion to dismiss is pending.

*Massachusetts Mutual Life Insurance Company Litigation*

On February 9, 2011, the Massachusetts Mutual Life Insurance Company (MassMutual) filed a complaint in the United States District Court for the District of Massachusetts against us and certain of our subsidiaries and affiliates, including RALI; RAMP; RASC; and RFS (collectively, the defendants). The complaint alleges that the defendants' public filings and offering documents associated with MBS purchased by MassMutual contained false statements and omissions of material facts. MassMutual asserts claims for violations of the Massachusetts Uniform Securities Act and seeks both compensatory and statutory damages. The defendants' motion to dismiss was granted in February 2012, subject to certain additional provisions, which has resulted in certain of the original counts being reinstated against certain entities.

*National Credit Union Administration Board (NCUAB) Litigation*

On August 9, 2011, NCUAB filed a complaint as liquidating agent of U.S. Central Federal Credit Union (U.S. Central) and Western Corporate Federal Credit Union (WesCorp) against Goldman, Sachs & Co. as underwriter and seller, and Fremont Mortgage Securities Corp., GS Mortgage Securities Corp., Long Beach Securities Corp., and RALI, as issuers, with respect to certain residential MBS purchased by U.S. Central and WesCorp. Previously, on June 20, 2011, the NCUAB filed a complaint as liquidating agent of U.S. Central against numerous defendants including RFMSII. The complaints assert claims under the California securities laws and Sections 11 and 12 of the Securities Act of 1933, alleging the offering documents associated with the underlying transactions contained untrue statements and omissions of material facts, and seek money damages and costs. The defendants have moved to dismiss both complaints, and those motions are pending.

*New Jersey Carpenters Litigation*

On January 3, 2011, New Jersey Carpenters Health Fund, New Jersey Carpenters Vacation Fund, and Boilermaker Blacksmith National Pension Trust, on behalf of themselves and a putative class (collectively, New Jersey Carpenters), filed a Consolidated Second Amended Securities Class Action Complaint against numerous defendants including us and certain or our subsidiaries and affiliates, including ResCap; RALI; and RFS (collectively, the defendants). The complaint alleges that the plaintiffs and the class purchased MBS between June 28, 2006, and May 30, 2007, and asserts that the offering documents associated with these transactions contained misrepresentations and omitted material information in violation of Sections 11, 12, and 15 of the Securities Act of 1933. The complaint seeks compensatory damages, rescission or a rescissory measure of damages, and attorneys' fees and costs, among other relief. New Jersey Carpenters moved for class certification. The court denied the plaintiffs' motion, and an appeal of that decision is pending.

**Private-label Monoline Bond Insurer Litigation**

*MBIA Litigation*

On December 4, 2008, MBIA Insurance Corporation (MBIA) filed a complaint in the New York County Supreme Court entitled MBIA Insurance Corporation v. RFC. The complaint alleges the defendants breached its contractual representations and warranties relating to the characteristics of mortgage loans contained in certain insured MBS offerings. The complaint further alleges that the defendant failed to follow specific remedy procedures set forth in the contracts and improperly serviced the mortgage loans. Along with claims for breach of contract, MBIA also alleges fraud. MBIA seeks, among other remedies, repurchase of certain loans, payments on current and future claims under the relevant policies, indemnification for attorneys' fees and costs, and punitive damages. The case is in discovery.

57

RCUCCJSN00007295

*FGIC Litigation*

On November 29, 2011, FGIC filed two complaints against us and several of our subsidiaries and affiliates in New York County Supreme Court. In these cases, both entitled Financial Guaranty Insurance Company v. RFC, et al., FGIC alleges that defendants RFC and ResCap breached their contractual representations and warranties relating to the characteristics of the mortgage loans contained in certain insured MBS offerings. FGIC further alleges that the defendants breached their contractual obligations to permit access to loan files and certain books and records.

In December 15, 2011, FGIC filed a separate complaint in New York County Supreme Court related to insurance policies issued in connection with an RFC-sponsored transaction. This complaint, entitled Financial Guaranty Insurance Company v. Ally, et al., names us, along with certain of our affiliates, including Ally Inc. and ResCap (collectively, the defendants), and seeks various forms of declaratory and monetary relief. The complaint alleges that the defendants are alter egos of one another, fraudulently induced FGIC's agreement to provide insurance by misrepresenting the nature of our business practices and the credit quality and characteristics of the underlying loans, and have now materially breached their agreement with FGIC by refusing its requests for information and documents.

On December 27, 2011, FGIC filed three additional complaints in New York County Supreme Court against us and certain of our affiliates, including Ally Inc. and ResCap (collectively, the defendants). These complaints seek relief nearly identical to that of FGIC's previously filed cases and contain substantially similar allegations. In particular, FGIC alleges that the defendants, acting as alter egos of each other, fraudulently induced FGIC to enter into seven separate insurance and indemnity agreements and breached their contractual obligations under same. There are currently twelve FGIC lawsuits pending against us and our affiliates in the U.S. District Court for the Southern District of New York.

## Other Litigation
*Kessler Litigation*

Several putative class actions filed in 2001-2003, all alleging that originators Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee charged certain interest rates and fees in violation of the applicable Secondary Mortgage Loan Act, were consolidated for settlement purposes in the U.S. District Court for the Western District of Pennsylvania. On September 22, 2010, the Third Circuit Court of Appeals vacated an order approving the settlement and remanded the case to the trial court for further proceedings. On October 10, 2011, plaintiffs filed a joint consolidated amended class action complaint against, among others, RFC alleging violations of the Real Estate Settlement Procedures Act; the Truth in Lending Act, as amended by the Home Ownership and Equity Protection Act; and the Racketeer Influenced and Corrupt Organizations Act. RFC's motion to dismiss is outstanding, and the company intends to vigorously defend against these claims.

*Mitchell Litigation*

In this statewide class action, plaintiffs alleged that Mortgage Capital Resources, Inc. (MCR) violated the Missouri Second Mortgage Loan Act by charging Missouri borrowers fees and interest not permitted by the Act. We, and Homecomings among others, were named as defendants in their role as assignees of certain of the MCR loans. Following a trial concluded in January 2008, the jury returned verdicts against all defendants, including an award against RFC and HFN for $4 million in compensatory damages (plus pre- and post-judgment interest and attorneys' fees) and against RFC for $92 million in punitive damages. In a November 2010 decision, the Missouri Court of Appeals affirmed the compensatory damages but ordered a new trial on punitive damages. Upon remand, we paid $12.8 million in compensatory damages (including interest and attorneys' fees). In February 2012, we entered into an agreement in principle, subject to documentation and court approval, to settle all of plaintiffs' remaining claims, including plaintiffs' already-awarded attorneys' fees on appeal, for a total of $17.3 million.

## Regulatory

Our origination, purchase, sale, securitization and servicing business activities expose us to risks of noncompliance with extensive federal, state, local and foreign laws, rules and regulations. Our business activities are also governed by, among other contracts, primary and master servicing agreements that contain covenants and restrictions regarding the performance of our servicing activities. Our failure to comply with these laws, rules, regulations and contracts can lead to, among other things, loss of licenses and approvals, an inability to sell or securitize loans, demands for indemnification or loan repurchases from purchasers of loans, demands for indemnification or other compensation from investors in our securitizations, fines, penalties, litigation, including class action lawsuits, and governmental investigations and enforcement actions, including, in the case of some violations of law, possible criminal liability.

GMAC Financiera, our wholly-owned subsidiary operating in Mexico, incurred losses during the year which reduced its capital stock and its shareholders equity by more than two-thirds. At December 31, 2011, the amount of the deficiency is $62.0 million.

58

RCUCCJSN00007296

Until this deficiency is cured, GMAC Financiera falls within one of the causes for dissolution under Mexican law.

**Operating leases**

As of December 31, 2011, we were obligated under non-cancelable operating leases for office space and equipment. Future minimum rental payments, including escalation clauses, under leases with terms of one year or more at December 31, 2011, were as follows.

| Year Ended December 31, *($ in thousands)* | Leases as part of on going operation |
|---|---|
| 2012 | $10,264 |
| 2013 | 8,382 |
| 2014 | 6,046 |
| 2015 | 2,181 |
| 2016 | 414 |
| 2017 and thereafter | — |
| | $27,287 |

The above table includes all rental payments we are obligated to pay under non-cancelable operating leases for office space. These payments exclude amounts we expect to collect through subleases or contract terminations as a result of our restructuring efforts.

Rental expense recorded by us for the years ended December 31, 2011 and 2010, was $(0.8) million and $(0.2) million, respectively. These amounts exclude any leases included in the restructuring activities and discontinued operations.

**Other Contingencies**

We are subject to potential liability under various other exposures including tax, nonrecourse loans, self-insurance, and other miscellaneous contingencies. We establish reserves for these contingencies when the item becomes probable and the costs can be reasonably estimated. The actual costs of resolving these items may be substantially higher or lower than the amounts reserved for any one item. Based on information currently available, it is the opinion of management that the eventual outcome of these items will not have a material adverse effect on our consolidated financial condition, results of operations, or cash flows.

CONFIDENTIAL

RCUCCJSN00007297

## 19. Related Party Transactions

### Balance Sheet

A summary of the balance sheet effect of our affiliate transactions were as follows.

| December 31, ($ in thousands) | 2011 | 2010 |
|---|---|---|
| **Assets** | | |
| Mortgage loans held-for-sale — contributions from Ally Inc. (carrying value) (a) | **$645,357** | $812,954 |
| Other assets | | |
| Receivable, net - Parent | **1,844,929** | 2,302,250 |
| Receivable affiliates | **69,666** | 7,967 |
| **Liabilities** | | |
| Borrowings — Ally Inc. Senior Secured Credit Facility (b) | **$130,989** | $180,875 |
| Borrowings — Ally Inc. LOC (b) | **73,545** | 298,891 |
| Borrowings — BMMZ Secured Financing Agreement (b) | **236,953** | — |
| Borrowings — Affiliates (b) | **281,590** | 211,151 |
| Other Liabilities | | |
| Payable to Ally Inc. (c) | **27,682** | 24,647 |
| **Other activity** | | |
| Loans purchased (UPB) – GMAC Mortgage | **$292,243** | $— |
| Loans sold (UPB) – GMAC Mortgage | **8,539** | — |
| Loans (UPB) sub-serviced - GMAC Mortgage (d) | **43,393,746** | 50,253,899 |
| Income tax settled with Ally Inc. (h) | **246,575** | — |

(a) Amount represents the carrying value of the loans contributed from Ally Inc. in 2009. The UPB of these loans is $1.6 billion and $2.0 billion at December 31, 2011 and 2010, respectively.

(b) Represents principal balance of debt outstanding plus accrued interest. Includes $97.5 million of outstanding secured borrowings with our affiliate GMAC Mortgage. The borrowings are secured by servicer advances that we have pledged as a co-participant in a funding facility that GMAC Mortgage is required to consolidate as it is deemed to be the primary beneficiary of the VIE.

(c) Includes costs for personnel, information technology, communications, corporate marketing, procurement and services related to facilities incurred by Ally Inc. and allocated to us.

(d) GMAC Mortgage, acts as sub-servicer for loans where we own the primary servicing rights.

60

CONFIDENTIAL

RCUCCJSN00007298

## Statement of Income

A summary of the income statement effect of our affiliate transactions were as follows.

| Year ended December 31, *(S in thousands)* | | 2011 | 2010 |
|---|---|---|---|
| **Net financing revenue** | | | |
| Interest expense - Ally Inc. Senior Secured Credit Facility | | $4,399 | $10,985 |
| Interest expense - Ally Inc. LOC | | 7,628 | 4,157 |
| Interest expense - BMMZ Secured Financing Agreement | | 332 | — |
| Amortization expense of deferred issuance costs - Ally Inc. | | — | 1,139 |
| Interest expense - affiliates | | 13,885 | 2,424 |
| **Other revenue** | | | |
| Servicing fees — GMAC Mortgage (a) | $ | (38,920) $ | (45,774) |
| **Noninterest expense** | | | |
| Management fees - Ally Inc. | | ($2,473) | $12,868 |
| **Discontinued Operations** | | | |
| Interest Expense - Parent and Affiliates | $ | — $ | 91,152 |

(a)   GMAC Mortgage acts as a sub-servicer for loans where we own the primary servicing rights.

## Statement of Changes in Equity

ResCap received capital support in the form of debt forgiveness from Ally Inc. of $109.4 million during the year ended December 31, 2011. We recognized a capital contribution from RFC Holding of $48.8 million, and a corresponding reduction of borrowings under the Ally Inc. LOC, during the year ended December 31, 2011 in connection with Ally Inc.'s capital support to ResCap.

On January 30, 2012, ResCap received capital support in the form of debt forgiveness from Ally Inc. of $196.5 million. We recognized a capital contribution from RFC Holding of $72.3 million, and a corresponding reduction of borrowings under the Ally Inc. LOC in connection with Ally Inc.'s capital support to ResCap.

## 20.  Regulatory Matters

We are required to maintain regulatory net worth requirements.  See Note 6 - Servicing for additional information.  Failure to meet minimum capital requirements can initiate certain mandatory actions by federal, state, and foreign agencies that could have a material effect on our financial condition and results of operations.  We were in compliance with these requirements as of December 31, 2011.

Certain of our foreign subsidiaries operate in local markets as either banks or regulated finance companies and are subject to regulatory restrictions.  These regulatory restrictions, among other things, require that our subsidiaries meet certain minimum capital requirements and may restrict dividend distributions and ownership of certain assets.  As of December 31, 2011, compliance with these various regulations has not had a material adverse effect on our financial condition, results of operations or cash flows.

## 21.  Subsequent Events

Events subsequent to December 31, 2011, were evaluated through March 28, 2012, the date on which these Consolidated Financial Statements were issued.

On February 9, 2012, Ally Inc., ResCap and GMAC Mortgage entered into an agreement in principle (Settlement) with federal agencies, 49 state attorneys general and 45 state banking departments with respect to investigations into procedures followed by mortgage servicing companies and banks in connection with mortgage foreclosure homes sales and evictions.  On March 12, 2012, the Settlement was filed as a consent judgment in the U.S. District Court for the District of Columbia.  On February 9, 2012, Ally Inc., ResCap and GMAC Mortgage also agreed in principle with the (Federal Reserve Board) FRB on a civil monetary penalty related to these same activities.  We may choose to allow GMAC Mortgage to provide borrower relief in connection with the Settlement to borrowers in our mortgage loan held for sale portfolio.  We do not expect our participation in this respect to have a material impact on our financial condition or results of operations.

On January 30, 2012, ResCap received $196.5 million in capital support from Ally Inc. through the forgiveness of debt.  We received a capital contribution of $72.3 million from RFC Holding, and a corresponding forgiveness of our borrowings under the Ally Inc. LOC, in connection with the Ally Inc. capital support to ResCap.

CONFIDENTIAL

RCUCCJSN00007299