**Hearing Date and Time:  November 19, 2013 at 10:00 a.m. (E.T.)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | : | Case No. 12-12020 (MG) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |

-------------------------------------------------------------- x

### PLAN PROPONENTS' OMNIBUS RESPONSE TO OBJECTIONS TO CONFIRMATION OF THE JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC, *et al.* AND THE <u>OFFICIAL COMMITTEE OF UNSECURED CREDITORS</u>

MORRISON & FOERSTER LLP
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
1290 Avenue of the Americas

New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for Debtors and Debtors-in-Possession*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Rachael L. Ringer
1177 Avenue of the Americas

New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee of Unsecured Creditors*

# TABLE OF CONTENTS

**Page**

Table of Authorities .................................................................................................... iii

Preliminary Statement .................................................................................................. 1

Responses to Certain Objections ................................................................................. 7

I.      The JSN Objection Should Be Overruled ............................................................. 7

      A.      The Plan Does Not Improperly Deprive the JSNs of Any Value on Account of Their Collateral ................................................................ 7

            1.      The JSNs Do Not Have Liens on any Portion of the Ally Contribution ................................................................ 8

                  a.      It is Neither Practicable Nor Possible to "Allocate" the Ally Contribution ................................................. 8

                  b.      Even if Allocable, No Portion of the Ally Contribution Should be Allocated to the JSNs ................................. 12

            2.      The JSNs Are Not Entitled to Any Compensation on Account of the Intercompany Balances ................................. 19

                    a.      The JSNs Do Not Have Liens on Intercompany Balances ........... 21

                  b.      Any JSN Lien on Intercompany Balances Has No Value ............ 22

                    c.      The Intercompany Balances Lack Many of the Indicia of Enforceable Debt Obligations ......................................... 26

      B.      The JSNs Have No Adequate Protection Claim ................................... 30

      C.      The Debtors Have the Authority to Release Claims Against Ally and the Intercompany Balances ................................................... 31

      D.      The Plan Satisfies Section 1129(b) of the Bankruptcy Code ............... 32

            1.      The Plan is Fair and Equitable to the Junior Secured Notes Claims ........ 33

            2.      The Plan Does Not Unfairly Discriminate Against, and is Fair and Equitable With Respect to, the Classes of Intercompany Balances ......... 38

                    a.      The Plan Does Not Unfairly Discriminate against Intercompany Balances ................................................... 39

                    b.      The Plan is "Fair and Equitable" with Respect to Intercompany Balances ................................................... 41

      E.      The Limited Partial Consolidation Contained in the Plan is Permissible ........... 42

      F.      The Plan Satisfies the Best Interests Test with Respect to the JSNs ................... 43

II.     Objections to the Third Party Releases and Related Provisions Should be Overruled ........................................................................................... 45

A.    No Objector Has Identified a Legitimate Third Party Claim That Would Be Affected by the Release Provisions ...............................................................46

B.    The Objectors Have Not and Cannot Show That the Third Party Release Fails Under Existing Law ......................................................................................52

C.    The Exculpation Is Justified in the Circumstances ..............................................58

ANNEX A:  Confirmation Objection Response Chart

## TABLE OF AUTHORITIES

**Page**

<u>CASES</u>

*In re Adelphia Commc'ns Corp.*,
    327 B.R. 143 (Bankr. S.D.N.Y. 2005) .................................................................35 n.19

*In re Adelphia Commnc'ns Corp.*,
    361 B.R. 337 (S.D.N.Y. 2007) .........................................................................42, 42 n.23

*Alberts v. Humana Health Plan, Inc. (In re Greater Se. Cmty. Hosp. Corp.)*,
    327 B.R. 26 (Bankr. D.D.C. 2005) ................................................................ Annex A at 4

*In re AOV Indus., Inc.*,
    792 F.2d 1140 (D.C. Cir. 1986).................................................................................. 54-55

*In re Barbara K Enters., Inc.*,
    No. 08-11474, 2008 WL 2439649 (Bankr. S.D.N.Y. June 16, 2008) ..............................17

*Bayer Corp. v. Masotech, Inc. (In re Autostyle Plastics, Inc.)*,
    269 F.3d 726 (6th Cir. 2001) ...........................................................................................20

*In re Boston Generating, LLC*,
    440 B.R. 302 (Bankr. S.D.N.Y. 2010) ...........................................................................32

*In re Buttonwood Partners, Ltd.*,
    111 B.R. 57 (Bankr. S.D.N.Y. 1990) ..............................................................................40

*Cadle Co. II v. PC Liquidation Corp. (In re PC Liquidation Corp.)*,
    383 B.R. 856 (E.D.N.Y. 2008) .......................................................................................44

*Capital Nat'l Bank of N.Y. v. McDonald's Corp.*,
    625 F. Supp. 874 (S.D.N.Y. 1986) .................................................................................16

*In re Carelinc Nat'l Corp.*,
    No. 95-16574, 1995 WL 750160 (Bankr. E.D. Pa. Dec. 15, 1995)..................................41

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...........................................................................50

*In re Chemtura*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ...........................................................................59

*CIT Grp., Inc. v. Tyco Int'l, Inc.*,
    479 Fed. Appx. 393 (2d Cir. 2012) .......................................................................... 35-36

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
    280 F.3d 648 (6th Cir. 2002) .................................................................................... 57-58

*Corestates Bank, N.A. v. United Chem. Techs., Inc.*,
  202 B.R. 33 (E.D. Pa. 1996) ................................................................. 38-39

*In re DBSD N. Am., Inc.*,
  419 B.R. 179 (Bankr. S.D.N.Y. 2009) ...........................................................33

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*,
  416 F.3d 136 (2d Cir. 2005) ...................................................................52

*DJS Props., L.P. v. Simplot*,
  397 B.R. 493 (D. Idaho 2008) ...................................................... Annex A at 4

*In re Dreier LLP*,
  429 B.R. 112 (Bankr. S.D.N.Y. 2010) ..................................................53 n.34

*In re Drexel Burnham Lambert Grp.*,
  138 B.R. 717 (Bankr. S.D.N.Y. 1992) ..................................................35 n.19

*Gonzalez v. Profile Sanding Equip. Inc.*,
  776 N.E.2d 667 (Ill. App. 2002) ................................................................16

*Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd.*
  *(In re Ion Media Networks, Inc.)*, 419 B.R. 585 (Bankr. S.D.N.Y. 2009) .......................51

*Jankowski v. Signet Comm. Credit Corp. (In re Diamond Mfg. Co.)*,
  No. 85-40555, 1995 WL 17004722 (Bankr. S.D. Ga. Feb. 17, 1995) ....................19 n.10

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986) ............................................................38

*In re Johns-Manville Corp.*,
  517 F.3d 52 (2d Cir. 2008) .....................................................................52

*Kitrosser v. CIT Grp./Factoring, Inc.*,
  177 B.R. 458 (S.D.N.Y. 1995) ............................................................34 n.18

*In re Leslie Fay Cos.*,
  207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..........................................................39

*In re Madoff*,
  848 F. Supp. 2d 469 (S.D.N.Y. 2012) ....................................................53 n.34

*In re Mercedes Homes, Inc.*,
  431 B.R. 869 (Bankr. S.D. Fla. 2009) .........................................................50

*In re Metro. 885 Third Ave. Leasehold, LLC*,
  No. 10-16103, 2010 WL 6982778 (Bankr. S.D.N.Y. Dec. 22, 2010) ....................... 51-52

*Nanuet Nat'l Bank v. Photo Promotion Assocs., Inc. (In re Photo Promotion Assocs., Inc.)*,
    61 B.R. 936 (Bankr. S.D.N.Y. 1986) .......................................................................12, 19

*Nat'l Commc'ns Ass'n v. Nat'l Telecommc'ns Ass'n*,
    No. 93-926, 1995 WL 236731 (S.D.N.Y. Apr. 21, 1995) ......................................... 10-11

*In re PCAA Parent, LLC*,
    No. 10-10250, 2010 WL 2745980 (Bankr. D. Del. May 17, 2010) ................................41

*See In re Plant Insulation Co.*,
    469 B.R. 843 (Bankr. N.D. Cal. 2012) ...................................................................56 n.35

*In re Quigley Co., Inc.*,
    391 B.R. 695 (Bankr. S.D.N.Y. 2008) ....................................................................52 n.32

*In re Quigley Co., Inc.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010) ....................................................................56 n.35

*Quigley Co., Inc. v. Angelos (In re Quigley Co., Inc.)*,
    676 F.3d 45 (2d Cir. 2012) ..................................................................................... 52-53

*RenGen Capital I, Inc. v. UAL Corp. (In re UAL Corp.)*,
    635 F.3d 312 (7th Cir. 2011) ........................................................................ Annex A at 4

*In re Residential Capital, LLC*,
    497 B.R. 403 (Bankr. S.D.N.Y. 2013) ...........................................................................13

*In re Residential Capital, LLC*,
    497 B.R. 720 (S.D.N.Y. 2013) ........................................................................... 35-36, 60

*In re Residential Capital, LLC*,
    No. 12-12020, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013) ......................40 n.22

*In re Riddle*,
    444 B.R. 681 (Bankr. N.D. Ga. 2011) ...........................................................................33

*In re Rubicon U.S. REIT, Inc.*,
    434 B.R. 168 (Bankr. Del. 2010)................................................................... Annex A at 4

*In re Sierra-Cal*,
    210 B.R. 168 (Bankr. E.D. Cal. 1997)...................................................................57 n.36

*Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re Terrestar Networks, Inc.)*,
    457 B.R. 254 (Bankr. S.D.N.Y. 2011) ...................................................................18 n.9

*Strictly Painting, Inc. v. Hardin Constr. Group, Inc.*,
    No. 00-1047, 2002 U.S. Dist. LEXIS 9891 (W.D. Tex. Jan. 14, 2002) ..........................11

*In re South Side House, LLC*,
    474 B.R. 391 (Bankr. E.D.N.Y. 2012) ...................................................34 n.18

*In re Temple Zion*,
    125 B.R. 910 (Bankr. E.D. Pa. 1991) .............................................................33

*In re Tex. Extrusion Corp.*,
    844 F.2d 1142 (5th Cir. Tex. 1988) ....................................................57 n.36

*Toso v. Bank of Stockton (In re Toso)*,
    No. 06-1149, 2007 Bankr. LEXIS 4889 (B.A.P. 9th Cir. Jan. 10, 2007) .................19 n.10

*In re Trinsum Grp., Inc.*,
    No. 08-12547, 2013 WL 1821592 (Bankr. S.D.N.Y. April 30, 2013) ............................53

*In re Ultra Stores, Inc.*,
    No. 09-11854, 2009 Bankr. LEXIS 5215 (Bankr. S.D.N.Y. July 28, 2009) ....................41

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*,
    484 U.S. 365 (1988) ............................................................................34

*Upstream Energy Servs. v. Enron Corp.* (*In re Enron Corp.*),
    326 B.R. 497 (S.D.N.Y. 2005) ....................................................................58

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) .............................................................59

*In re Wash. Mut., Inc.*,
    462 B.R. 137 (Bankr. D. Del. 2011) .............................................................37

*In re Worldcom, Inc.*,
    No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ......... 39-40, 40 n.22

## STATUTES

11 U.S.C. § 363(e) .................................................................................30

11 U.S.C. § 363(f) ............................................................................ 31-32

11 U.S.C. § 365(d) .................................................................. Annex A at 4

11 U.S.C. § 502(b)(2) ..............................................................34, 34 n.18

11 U.S.C. § 506(b) ...............................................................34, 34 n.18

11 U.S.C. § 510(a) .................................................................................25

11 U.S.C. § 510(b) ............................................................34-38, 41-42

11 U.S.C. § 552(a) ................................................................................................ 11-12, 17

11 U.S.C. § 552(b) ........................................................................12, 17, 17 n.8, 18, 18 n.9

11 U.S.C. § 1123(a)(4) ..............................................................................................55

11 U.S.C. § 1125 ................................................................................. Annex A at 12

11 U.S.C. § 1126(g) ..............................................................................................39, 41

11 U.S.C. § 1129(a)(3) ............................................................................. Annex A at 12

11 U.S.C. § 1129(a)(4) ............................................................................. Annex A at 1

11 U.S.C. § 1129(a)(7) ............................................................................. 43-45, 56 n.35

11 U.S.C. § 1129(b) .............................................................................................*passim*

11 U.S.C. § 1129(b)(2)(A)(iii) ................................................................................33

N.Y. U.C.C. § 9-608 ..............................................................................................32

N.Y. U.C.C. § 9-615 ..............................................................................................32

## OTHER AUTHORITIES

Fed. R. Bankr. P. 9019 ....................................................................................31, 40 n.22, 45

U.C.C. § 9-102(a) ..............................................................................................22

Residential Capital, LLC and its affiliated debtors and debtors in possession in the above-captioned cases (each a "<u>Debtor</u>" and collectively the "<u>Debtors</u>") and the Official Committee of Unsecured Creditors (the "<u>Creditors' Committee</u>," and together with the Debtors, the "<u>Plan Proponents</u>") submit this omnibus response (the "<u>Response</u>") to the objections and reservations of rights (the "<u>Objections</u>") with respect to confirmation of their joint chapter 11 plan (the "<u>Plan</u>") pursuant to section 1129 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  In support of confirmation and in response to the Objections, the Plan Proponents respectfully represent as follows:

### PRELIMINARY STATEMENT[1]

From the outset, this has been among the most complex and challenging bankruptcies in history.  The Debtors operated and managed one of the largest mortgage origination, servicing, and securitization businesses in the country and faced an overwhelming array of disputes and litigation involving, *inter alia*, allegations of tens of billions of dollars in RMBS-related losses asserted by trusts, monoline insurers, and investors; competing claims of secured and unsecured bondholders at different levels in the capital structure; allegations of improper lending practices by thousands of borrowers; and liabilities arising from myriad investigations and enforcement actions by government agencies and regulators.  It was, in essence, a perfect storm of a case – the collision of a complex financial bankruptcy and a mass tort.

Within eighteen months, the parties reached a Global Settlement that served as a platform for a Plan as close to universally consensual as may be possible in cases of this size and complexity.  Every major constituency but the JSNs has reached a satisfactory resolution of its

---

[1] Capitalized terms not defined herein have the meanings set forth in the Plan or in the Plan Proponents' memorandum of law in support of confirmation of the Plan (the "<u>Confirmation Brief</u>"), filed contemporaneously herewith.

claims.  The overwhelming majority of creditors have resoundingly voted to accept the Plan.  As

the Plan Proponents will demonstrate at the Confirmation Hearing, and as demonstrated in the

numerous declarations being filed in support of confirmation, the Plan and the Plan Settlements

that it embodies satisfy all requirements of the Bankruptcy Code, the Bankruptcy Rules, and

applicable law.  Upon the Effective Date of the Plan, the Debtors will be prepared to distribute to

creditors billions of dollars that, absent confirmation, would be unavailable or otherwise

consumed by contentious, value-destroying litigation and delay.

      While a number of objections to the Plan have been filed, the Plan Proponents

have been resolving them on a nearly daily basis, thus far disposing of objections filed by the

Federal Housing Finance Agency, Freddie Mac, Syncora, Ocwen, and several others.  A handful

of objections will remain unresolved as the Confirmation Hearing begins; principal among them

is the objection (the "JSN Objection") [Dkt. No. 5443] filed by the JSN Group and the Junior

Secured Notes Trustee (the "JSN Objectors").  The JSN Objection should be viewed in the

appropriate context and not permitted to torpedo the remarkable accomplishments embodied in

the Plan.

      Although the JSN constituency (i) supported the $750 million settlement with

Ally at the outset of these cases, which would have provided them an inferior recovery, and

(ii) declined to participate in key portions of the mediation leading to the Global Settlement, the

JSNs are being treated fairly – even generously – under the Plan.  The JSNs are receiving

*payment in full* of their allowed prepetition claims, including accrued prepetition interest, plus

postpetition interest and expenses to the extent they can demonstrate the right to this relief.  The

JSN Adversary Proceeding and the Confirmation Hearing will determine the allowed amount and

priority of the Junior Secured Notes Claims, and the Plan provides for any such amounts to be

paid in full on the Effective Date.  The Bankruptcy Code and the facts of these cases certainly require nothing further.  Since they will be receiving *at least* their full legal entitlement, if not more, the JSN Objectors cannot identify anything in the Plan that prejudices them or otherwise bars confirmation.

The JSN Objection thus should be viewed as merely the latest scorched earth litigation tactic of a constituency determined to extract *more* than its legal entitlement.  The Phase I trial demonstrated that the JSNs are undersecured and have no adequate protection claim because their aggregate collateral has *increased* in value during these cases.  But the JSNs keep spinning ever more far-fetched theories to expand the scope and value of their purported collateral, the latest two of which form the centerpiece of their Objection and Phase II trial strategy, as addressed in Section I, below.

*First*, the JSN Objectors argue that the $2.1 billion Ally Contribution should largely be "allocated" to "contract" claims on which they assert liens.  This assertion ignores reality on multiple levels.  Ally is paying $2.1 billion to achieve a global resolution of all claims (known or unknown) against it – an objective far different from merely resolving a discrete number of identified claims.  The parties did not purport to "allocate" Ally's contribution among particular causes of action, and any attempt to do so after the fact would be inconsistent with the integrated nature of the settlement.  Moreover, it is apparent that, at the time of the negotiations, while the Creditors' Committee had sought authority to pursue claims based on the same conduct as the contract claims now championed by the JSN Objectors, it viewed such claims as either commercial torts or avoidance actions and thus the Creditors' Committee ascribed no value to any contract claims against Ally.  This is evident from the Creditors' Committee's April 2013

standing motion, which set forth the claims for which the Committee sought leave to sue Ally.[2]

The Committee Standing Motion described in detail the estates' veil-piercing and alter ego

claims, as well as an array of avoidance claims, but did not identify any contract claims.  Finally,

even if the Court were to consider the merits of the "contract" claims despite the lack of value

ascribed to them at the time of the negotiations, those claims (i) are either avoidance claims or

commercial tort claims, to which no lien could attach, (ii) are not otherwise subject to the JSNs'

lien, or (iii) lack merit in any event.

Further, the JSNs could not even *have* a valid lien on "contract claims" that were

inchoate at the time the Notes Security Agreement was entered into, and any asserted lien on the

Ally Contribution should similarly be viewed as unenforceable (i) because the settlement

constitutes after-acquired property under section 552(a) of the Bankruptcy Code and (ii) pursuant

to the "equities of the case" doctrine embodied in section 552(b).  The JSNs are benefitting

handsomely from the enhanced treatment facilitated by the Ally Contribution, which enables

them to have their unsecured deficiency claims paid in full, in cash.  The Court should reject

their attempt to gild the lily by asserting an additional "lien" over a settlement they did nothing

to bring about.

*Second*, the JSN Objectors argue that they are entitled to enforce a lien on

Intercompany Balances that are being resolved and released as part of the Global Settlement.

But the balances in question lack many of the indicia of true debt, are comprised of bookkeeping

entries kept for GAAP purposes, and were routinely forgiven.  After careful study, the Debtors

and the Creditors' Committee reasonably determined that any attempt to enforce the

---

[2] (*See* Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates [Dkt No. 3412] (the "Committee Standing Motion").)

Intercompany Balances as "claims" would face significant challenges under both the well-known *Autostyle* factors and challenges related to the avoidance of fraudulent conveyances, setoff, reallocation of expenses, and substantive consolidation, among other, that, if litigated, would impose significant costs and delays with little, no, or negative benefit.   Therefore, the Debtors and the Creditors' Committee determined that it was reasonable to waive the Intercompany Balances as part of the Global Settlement in which all constituencies, including the JSNs, are receiving a superior recovery.   That decision is reasonable and in the best interests of creditors for purposes of Bankruptcy Rule 9019.

In response to the JSN Objection and supporting expert, the Debtors' rebuttal expert Gina Gutzeit confirms the Plan Proponents' conclusions and explains the deficiencies underlying the JSN Objectors' expert's opinion that Intercompany Balances should be regarded as "valid and collectible" obligations.   In any event, the JSNs do not have any liens on Intercompany Balances, and, if they did, any "lien" the JSNs could assert would not be entitled to compensation because the governing documents gave both the Debtors and the First Priority Secured Parties free rein to dispose of and waive Intercompany Balances without the JSN Objectors' consent.   Therefore, the JSNs have no protectable property interest in the balances. The Court should reject the JSN Objectors' attempt to expand their rights and thereby augment their recovery by glomming on to round-robin bookkeeping entries between and among entities where they are already extensively secured.

Finally, the JSN Objectors' scattershot cramdown and best interest objections miss the mark. The Plan is "fair and equitable" to the JSNs because they are receiving the "indubitable equivalent" of their claims.   There is no absolute priority violation with respect to claims that *might have* been subordinated under section 510(b) of the Bankruptcy Code, because

those claims were hotly contested and are being settled on reasonable, indeed favorable, terms

for the estates.  The JSN Objectors lack standing to allege "discrimination" with respect to the

classes of Intercompany Balances, and in any event those claims have been reasonably settled by

the parties that own them – the Debtors.  And the JSN Objectors' speculative "best interest"

argument, based on the illogical fantasy that they might do better if the Global Settlement were

destroyed and the Debtors plunged back into a litigation maelstrom, warrants little attention.

      The JSN Objectors and certain other parties also have objected to confirmation on

the ground that the Third Party Release and related provisions exceed the Court's subject matter

jurisdiction or are otherwise legally impermissible.  The JSN Objectors' objection in this regard

is purely tactical, since they are being paid in full and articulate no valid claim being affected by

the release.  Certain other objections to the Third Party Release have been resolved.  None of the

remaining objections poses any impediment to confirmation, most notably because none

identifies an actual, non-speculative claim affected by the Third Party Release.  In any event, the

Third Party Release and related provisions are permissible under Second Circuit law because

(i) the affected claims give rise to indemnification or insurance claims that potentially impact the

estates and thus come within the Court's related-to jurisdiction and (ii) these cases involve

"unique circumstances" insofar as the releases are largely consensual and Ally's massive

contributions are crucial to providing enhanced recoveries to all constituencies and facilitating a

global resolution of intricately intertwined claims, which in turn justifies releases to bring full

closure to all involved parties.  For the reasons set forth in the Confirmation Brief and in Section

II below, objections to the Third Party Release and related provisions should be overruled.

      Various other objections were filed raising discrete legal issues that relate

specifically to the particular objectors.  As set forth on Annex A, the overwhelming majority of

those objections have been resolved through non-material, technical modifications to the Plan. While the Plan Proponents will continue to attempt to resolve all unresolved objections prior to the Confirmation Hearing, any they are unable to resolve should be overruled for the reasons set forth on Annex A, and the Plan should be confirmed.

RESPONSES TO CERTAIN OBJECTIONS

## I.    The JSN Objection Should Be Overruled[3]

The JSN Objection offers a meandering grab bag of arguments against Plan confirmation, but does not coherently demonstrate that the Plan actually harms the interests of the JSN Objectors nor provide any other reason why it cannot be confirmed.  Most of these arguments are premised on one fatal misconception: that somehow the Plan improperly deprives the JSNs of the value of what they call the "Subject Collateral": (i) portions of the Ally Contribution that they argue should be allocated to claims on which they purport to have a lien and (ii) the Intercompany Balances.  Both assertions fail.  As discussed below, the JSNs' liens attach to neither category of purported collateral and, in any event, are governed by an Intercreditor Agreement that delegates to the senior creditor the exclusive right to dispose of the alleged "Subject Collateral."  Their remaining objections are without merit and pose no obstacle to confirmation.

### A.    The Plan Does Not Improperly Deprive the JSNs of Any Value on Account of Their Collateral

The JSN Objection fails to establish that the Plan improperly deprives the JSNs of value in connection with either the Ally Contribution or the Intercompany Balances.

---

[3] The JSN Objectors' objections to the Third Party Release are addressed in Section II below.

1.    **The JSNs Do Not Have Liens on any Portion of the Ally Contribution**

The JSN Objectors contend that there are three material contract claims against Ally on which they have liens:  (i) breach of contract for misallocation of revenues on loans brokered by GMAC, (ii) breach of contract for failure to pay the value of purchased MSRs, and (iii) breach of contract in connection with a 2009 tax allocation agreement.  (JSN Obj. ¶ 56; Lyons Report at 4-5.)  The JSN Objectors object to the Plan because it fails to allocate part of the Ally Contribution to the JSNs on account of these claims.  (JSN Obj. ¶¶ 53-59.)  The JSNs are mistaken for multiple reasons.

a.    **It is Neither Practicable Nor Possible to "Allocate" the Ally Contribution**

The JSN Objectors have failed to come to grips with one unmistakable reality:  it is simply not practicable (or even possible) to allocate the Ally Contribution among specific causes of action as the JSNs demand.[4]  The Ally Contribution emerged from a comprehensive settlement of the myriad issues resolved by the Global Settlement – including numerous estate and third party claims against Ally, intercreditor claims, and interdebtor claims – and was not negotiated on a claim-by-claim or issue-by-issue basis.  (Dubel Direct ¶¶ 80-84; Kruger Direct ¶¶ 38-39.)  It is not feasible to attempt to reinvent the settlement as if it was negotiated on a claim-by-claim basis.  Each estate held multiple complex and uncertain litigation claims against Ally as to which potential recoveries were not easily estimated.  (Dubel Direct ¶ 83.)  The same is true for the numerous third party claims against Ally that were pending in courts throughout

---

[4] The JSN Objectors' argument in support of allocation is premised entirely upon the report of their proffered expert, Judge Raymond Lyons.  However, Judge Lyons did nothing more than review the Examiner's report in these cases (which consists entirely of inadmissible hearsay) and adopt certain of its conclusions as his own.  His opinions regarding the potential value of certain causes of action therefore add nothing to this Court's own review of the potential claims.  Moreover, Judge Lyons' expert report violates the well-settled rule barring purported expert opinion on domestic legal issues – again, usurping the Court's role.  For those and other reasons, the Plan Proponents have filed a motion *in limine* to preclude the JSN Objectors from offering Judge Lyons' testimony.

the country (or in some cases, tolled).    In addition, potential interdebtor issues – such as substantive consolidation, the enforcement of Intercompany Balances, prior debt forgiveness, and cost allocation – created the possibility that any estate's litigation recoveries might be reallocated in part to other Debtors.  (*Id*.)

Against this backdrop of unusually complex multi-lateral disputes, the Plan Proponents determined that it would be counterproductive, if not impossible, to attempt to develop and achieve consensus around a precise bottom-up valuation of individual creditor and estate claims.  (Dubel Direct ¶ 84.)  The extraordinary number and amounts of the competing claims made it impractical to resolve any specific claims on a consensual basis.  (*Id*.)  This is particularly true because, as the Court is aware, the primary focus of the Creditors' Committee's investigation that framed the parties' negotiations was alter ego and veil-piercing-type theories under which Ally would have been held generally responsible for all of the Debtors' liabilities.  Of necessity, the parties agreed with Ally to resolve *all* claims comprehensively in return for a single total cash contribution of $2.1 billion.  (*See, e.g.*, Carpenter Direct ¶ 26 (stating that Ally would not have agreed to Ally Contribution without global resolution of all claims relating to Debtors' business).)

In a separate but parallel exercise, the creditor constituencies reached agreement on an intricate web of compromises that provided meaningful recoveries to each group, including the RMBS trust claims, monoline claims, Senior Unsecured Notes Claims, private securities claims, borrower claims, and other claims.  It was those intercreditor settlements that drove the division of the Ally Contribution as currency among the three Debtor groups – *not* any attribution of value to particular *claims* against Ally.  To retroactively impose an allocation of the same money to specific claims – and thereby alter the recoveries of constituencies participating

in the Global Settlement – would be entirely artificial, unfair, and destructive to the Global

Settlement and the remarkable progress that has been achieved to date in these complicated

cases. As this Court recognized in connection with the approval of the Disclosure Statement, it

is simply not possible or practicable to allocate the Ally Contribution. (Aug. 21, 2013 Hr'g Tr.

at 109:2-17 (THE COURT: "I agree you don't have to allocate.").)

Courts have recognized that where, as here, a settlement fund relates to a broad

array of potential claims, a select few of which *might* be subject to a creditor's lien while all

others are not, a court is not required to trace recoveries to specific causes of action. Rather, the

settlement fund, negotiated by an estate fiduciary in the context of an actively mediated chapter

11 case, is better viewed as a "new asset" not subject to preexisting liens. *See, e.g.*, *Nat'l*

*Commc'ns Ass'n v. Nat'l Telecommc'ns Ass'n*, No. 93-926, 1995 WL 236731, at *22 (S.D.N.Y.

Apr. 21, 1995).

In *National Communications*, an interpleader action was commenced concerning

the rightful entitlement to the settlement proceeds of various litigation claims, including claims

for breach of contract, tortious acts, fraud, and racketeering as well as consequential and punitive

damages. *Id*. at *1-7. Numerous creditors asserted competing liens on the proceeds – some

claimed liens on certain accounts receivable; another asserted liens on all general intangibles and

proceeds of the specific litigation; the plaintiff's attorney asserted an attorney's lien against the

settlement proceeds; and the U.S. government asserted a federal tax lien. *Id*. at *8-10. The U.S.

government contended that the settlement "was not designated as a resolution of any single claim

or cause of action" on a particular legal theory, but instead represented a "global resolution of all

disputes between the parties" that resulted in the creation of an entirely new asset not traceable to

any original collateral on which any creditor had a lien.  *Id*. at *10, 18.  The court adopted the

government's position:

> [T]he proceeds of the settlement fund were not specifically earmarked as
> settlements of NTA's claim for accounts receivable, but rather comprised
> a variety of "doubtful and disputed claims" at issue in the multiple
> litigations between the parties, including claims of breach of contract,
> tortious interference with contractual relationships, unfair competition and
> conversion. . . . Although it is a close question, I find, based on these facts,
> that the settlement fund in this case represented a "new asset" that did not
> exist for priority purposes until [the settlement agreement was executed].

*Id*. at *22.

A similar conclusion was reached in *Strictly Painting, Inc. v. Hardin Constr.*

*Group, Inc.*, No. 00-1047, 2002 U.S. Dist. LEXIS 9891 at *50-51 (W.D. Tex. Jan. 14, 2002),

*report and recommendation adopted by* 2002 U.S. Dist. LEXIS 9873 (W.D. Tex. Mar. 1, 2002).

In that case, similar to the situation here, an arbitration award was issued based on several

different causes of action.  *Id.* at *50-51.  A party claiming a security interest in contractual

rights, accounts receivables, and other proceeds argued that she should be entitled to a portion of

the award with priority over U.S. tax liens.  The court disagreed.

> The United States argues that because the arbitration award is based on
> several causes of action between [litigants], such as breach of contract,
> estoppel, fraud, and *quantum meruit*, and because the award does not
> attribute sums to specific causes of action, the District Court cannot
> attribute any portion of the award to [lienholder's] security interest [in
> contractual rights, accounts receivable and proceeds].  Therefore, it cannot
> be determined that [lienholder's] security interest attached to any portion
> of the arbitration award.  The Court agrees.

*Id*. at *50-51.

Precisely the same conclusion should apply here, where the parties similarly

agreed on an overall settlement amount to resolve myriad intertwined and hotly contested third

party and estate claims, and the resulting Global Settlement is a "new asset" created as a result of

the bankruptcy process.  Pursuant to section 552(a) of the Bankruptcy Code, "property that the

estate acquired after the petition is not subject to the prepetition security agreement, even though the agreement expressly provided that it extends to after-acquired property." *Nanuet Nat'l Bank v. Photo Promotion Assocs., Inc. (In re Photo Promotion Assocs., Inc.)*, 61 B.R. 936, 938 (Bankr. S.D.N.Y. 1986); *see* 11 U.S.C. § 552(a). The only exception to this rule is that property that constitutes "proceeds, product, offspring, or profits" of original collateral may be subject to a creditor's lien notwithstanding the intervention of bankruptcy. 11 U.S.C. § 552(b)(1).

Here, the Global Settlement emerged only after a lengthy process of investigation and negotiation augmented by the mediation efforts of a sitting Bankruptcy Judge – utilizing procedural mechanisms available only in bankruptcy. Moreover, the Ally Contribution was conditioned on both full estate and broad third party releases. Prior to the Petition Date, Ally could not have obtained a third party release in connection with its ResCap related liabilities. The third party releases became possible only in connection with a chapter 11 plan that could garner overwhelming support from the Debtors' creditors. Quite simply, the Ally Contribution would not have been possible outside of bankruptcy and without the Plan and Global Settlement. The Ally Contribution is a "new asset" under section 552(a) of the Bankruptcy Code, not subject to prepetition liens. Both as a factual and a legal matter, there is simply no basis, and no obligation, for the Court to arbitrarily allocate the Ally Contribution among specific estate and third party claims.

> **b.    Even if Allocable, No Portion of the Ally Contribution Should be Allocated to the JSNs**

In any event, the JSNs were not prejudiced by the non-allocation of the Ally Contribution because, even if allocation were possible, no value would be attributable to causes of action upon which the JSNs purport to have a lien. The Ally Contribution most accurately represents proceeds of avoidance actions, commercial torts, and third party claims. The Court

has already ruled that the JSNs do not have a lien on the proceeds of avoidance actions or commercial torts. *See In re Residential Capital, LLC*, 497 B.R. 403, 413-16 (Bankr. S.D.N.Y. 2013). And, of course, the JSNs could not have a lien on the proceeds of claims belonging to third parties.

To escape the reality that they have no liens on the types of causes of action that were actually the basis of the Ally settlement, the JSN Objectors (i) assert that the Ally Contribution settled specific claims against Ally, including contract claims, (ii) assert that they have a lien on all contract claims against Ally, and then (iii) glibly point to three purported material contract claims identified in the Examiner Report on which they claim to have liens: (a) breach of contract for misallocation of revenues on loans brokered by GMAC, (b) breach of contract for failure to pay the value of purchased MSRs, and (c) breach of contract in connection with a 2009 tax allocation agreement. (JSN Obj. ¶ 56; Lyons Report at 4-5.) The JSNs attempt to allocate over $1.1 billion of the Ally Contribution to these three contract claims based on an expert report that should not be considered by the Court because it lacks credibility, was based on inadmissible legal opinion and was prepared without any independent review of the claims or attempt to confirm that they actually figured in the parties' negotiations.

However, the record makes clear that, at the time of the negotiations, the Creditors' Committee ascribed no value to the estates' contract claims against Ally. This is apparent from the Committee Standing Motion filed by the Creditors' Committee in April 2013, upon the conclusion of its extensive investigation into the Debtors' potential causes of action against Ally. That motion identified the claims that the Creditors' Committee sought leave to pursue against Ally on the estates' behalf, and described the legal and factual bases for each claim. The principal claims identified in the Committee Standing Motion were veil-piercing and

alter ego claims; a number of avoidance claims were also included.  Not one contract claim was
included among the claims that the Creditors' Committee sought leave to pursue.  The Senior
Unsecured Notes Trustee's motion seeking standing to prosecute claims on behalf of the
Debtors' estates did not assert any claims for breach of contract.[5]

In any event, two of the JSNs' highlighted claims (the tax allocation agreement
claim and the claim for misallocation of revenues) are not contract claims at all.  They are
avoidance actions or commercial tort claims.  For example, the claim based on the 2009 tax
allocation agreement is wholly dependent on the avoidance of the existing tax allocation
agreement as a constructive fraudulent transfer.  Judge Lyons himself acknowledged this.
(Lyons Report at 37.)[6]  Accordingly, any proceeds of such a claim must be considered avoidance
action proceeds upon which the JSNs do not have a lien.  Alternatively, any such theoretical
claim premised on breach of contract would have no value to the JSNs because the predicate act
– i.e., the avoidance of the subsequent tax allocation agreement – will never occur.

With respect to claims relating to the misallocation of revenues on loans brokered
by GMACM, the JSN Objectors do not point to a single contractual provision that was in fact
breached by Ally.  Rather, their own purported expert, Judge Lyons, acknowledged that, to
succeed on such a contract-based claim, a plaintiff would need to rely on alleged oral
modifications to preexisting agreements that did not permit such oral modifications.  (Lyons
Report at 13.)  Indeed, the Creditors' Committee sought standing to pursue those claims *as*

---

[5] (*See* Motion of Wilmington Trust, National Association, Solely in its Capacity as Indenture Trustee for the Senior
Unsecured Notes Issued by Residential Capital, LLC for an Order Authorizing It to Prosecute Claims and Other
Causes of Action on Behalf of the Residential Capital, LLC Estate [Dkt. No. 3475].)

[6] In fact, the Examiner (whose analysis Judge Lyons largely followed) found that a constructive fraudulent transfer
claim was the only means likely available to invalidate the 2009 tax allocation agreement.  (Examiner Report at
VII.K-41-45.)

*avoidance claims* – not as contract claims.[7]  Accordingly, those claims could only be considered as avoidance or commercial tort claims – again, not subject to the JSNs' liens.

As for the third "contract claim" upon which the JSN Objectors purport to have a lien (*i.e.*, a claim for the alleged failure of Ally to pay the value of certain MSRs (the "MSR Swap Claim")), the Examiner concluded that this claim was not likely to prevail, and Judge Lyons agrees.  (*See* Examiner Report, Ex. I.F-3 at p. I-32; Lyons Report at 19.)  The JSN Objectors cannot seriously assert that they should be provided with $338 million out of the $2.1 billion Ally Contribution for claims that their own expert believes are meritless and were not ascribed any value by the Plan Proponents.

In any event, the JSNs do not have a lien on the MSR Swap Claim because, as was proven in Phase I of the JSN Adversary Proceeding, as part of the May 14, 2010 release of Collateral, the JSNs released all "Servicing Rights Collateral," "all agreements, contracts, documents, and instruments if and to the extent evidencing or related to the "Servicing Rights Collateral," and all "General Intangibles (including Payment Intangibles)" related thereto.  (*See* Ex. PX-134 (Partial Release of Collateral) at 6, 8.)  As alleged in the Lyons Report, the MSR Swap Claim arises under a swap arrangement that transferred the economics of Ally Bank's MSRs, including the daily fluctuations in Ally Bank-originated MSR values and the economics of servicing (*i.e.*, the servicing-related income and fees) to GMACM in exchange for GMACM paying a LIBOR-based rate of return to Ally Bank.  (*See* Lyons Report at 16.)  The servicing-related income and fees were derived from a servicing agreement, dated as of August 21, 2001, as amended, between GMACM and Ally Bank (the "Servicing Agreement"), under which Ally Bank's MSRs were serviced by GMACM for a fee.  Thus, the MSR Swap was related to and

---

[7] (*See* Committee Standing Motion at ¶¶ 63-34.)

worked in conjunction with the Servicing Agreement, as GMACM's compensation under the Servicing Agreement directly impacted GMACM's recovery under the MSR Swap.

Because the release includes "all agreements, contracts, documents, and instruments if and to the extent evidencing or related to the Servicing Rights Collateral," and because Servicing Rights Collateral is defined to include, *inter alia*, the "Servicing Rights," "the Servicing Contracts and all rights and claims thereunder," and all income associated with the Debtors' mortgage servicing rights (in each case, other than GSE MSRs), that release unquestionably covers the Servicing Agreement and therefore covers any alleged value that could have been recovered on account of the MSR Swap Claim.

Moreover, the proceeds of these purported contract claims are not JSN collateral because the underlying Security Agreement, as a matter of law, could not have granted the JSNs a lien on claims that were inchoate at the time the agreement was entered into and as to which no claims were asserted prior to the Petition Date. *See, e.g., Capital Nat'l Bank of N.Y. v. McDonald's Corp.*, 625 F. Supp. 874, 879 (S.D.N.Y. 1986) ("[O]ne can only assign a chose in action that is sufficiently choate. . . . A breach of contract claim that existed at the time a security interest was granted, then unbeknownst to the creditor, does not 'partake of the requisite nature of collateral to which a security interest may adhere.'") (citation omitted); *Gonzalez v. Profile Sanding Equip. Inc.*, 776 N.E.2d 667, 680 (Ill. App. 2002) ("chose in action" does not include potential or inchoate claims; putative claim that has neither been asserted nor commenced is a "*potential* chose in action").

Because the alleged contract claims identified by the JSN Objectors were unasserted and inchoate prior to the Petition Date, none of those claims could be subject to the JSNs' liens. To date, none of those claims has been brought against Ally. As a result, even if the

- 16 -

JSNs' lien would otherwise attach to claims of this nature, the JSNs have no lien on any of the potential contract claims they have identified.

It therefore follows that any portion of the Ally Settlement relating to such claims is, at best, property acquired after the Petition Date as to which the JSNs' liens do not attach pursuant to Section 552(a) of the Bankruptcy Code.  This provides yet another ground to reject the JSNs' supposed "lien" on a portion of the settlement proceeds.

Moreover, as discussed in more detail below with respect to Intercompany Balances, as First Priority Secured Party, AFI has the ability under the Intercreditor Agreement to dispose of Collateral or direct the release of liens that the JSNs could otherwise assert.  By entering into the Global Settlement, AFI has done precisely that.

Finally, even if the JSNs clear all these hurdles, the Court should nevertheless exercise its discretion to vitiate the supposed lien on settlement proceeds based on the "equities of the case" under section 552(b) of the Bankruptcy Code.[8]   As this Court has previously observed, "[t]he equities of the case doctrine is intended to ensure that secured creditors do not receive a windfall benefit when a trustee uses assets of the estate, for example, to finish uncompleted inventory, and it is also used to adjust recovery by a secured creditor in situations where there is an improvement or decline in the post-petition collateral, especially in situations where the change in value is brought about by a party in the bankruptcy."  *In re Barbara K Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *11 (Bankr. S.D.N.Y. June 16, 2008).  Here,

---

[8] The JSN Objectors falsely contend that the "equities of the case" exception to section 552(b) has been waived pursuant to paragraph 18(c) of the final cash collateral order (the "Cash Collateral Order") [Dkt. No. 491].  To the contrary, Paragraph 18(c) simply provides that "the Debtors" waive such exception.  Nothing in the Cash Collateral Order or anywhere else purports to waive the Creditors' Committee's rights to enforce Section 552(b) – nor could any such recitation undermine this Court's independent discretion to apply the "equities of the case" doctrine as appropriate.

allowing the JSNs' liens to attach to any portion of the Ally Contribution would be an undeserved windfall and contrary to the equities of these cases.[9]

At the outset of these chapter 11 cases, the Debtors had an agreement with Ally to settle potential causes of action for $750 million – an agreement supported by the then-constituted JSN group represented by its current professionals.    Thereafter, the Creditors' Committee engaged in a thorough investigation of claims against Ally, presented its theories of recovery to Ally, and engaged in extensive negotiations with Ally that ultimately led to a dramatic increase in Ally's contribution and, in turn, facilitated the Global Settlement.    The JSN Objectors played no part in that process.    To the contrary, as the Court has already noted, the JSN Objectors have done everything in their power to delay and derail Plan confirmation through "scorched-earth" litigation.    (*See* Order Granting Motion to Implement Discovery Protocol Related to Plan Confirmation [Dkt. No. 4913] at 3 ("Suffice it to say, based on the conduct of the JSNs in this case, the Court concludes that the JSNs have been engaged in a scorched-earth effort to delay and derail confirmation of the Plan in this case at all costs."); *see also* July 30, 2013 Hr'g Tr. at 65:6-9 ("The timing of the filing of [the JSN Group's disqualification] motion raises substantial questions whether the ad hoc group and its counsel have acted in bad faith in filing the motion.").)

It would be inequitable within the meaning of section 552(b) for the JSN Objectors to agree to a lower initial settlement, sit on the sidelines as the Creditors' Committee worked to increase the size of that settlement for all stakeholders, interfere with the Plan Proponents' efforts to implement the enhanced settlement (even though it provides the JSN

---

[9] The JSN Objectors have suggested that the "equities of the case" exception applies only where unencumbered assets are used to enhance the value of a secured creditor's collateral.    But nothing in section 552(b) is so limiting. *See Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re Terrestar Networks, Inc.)*, 457 B.R. 254, 270-73 (Bankr. S.D.N.Y. 2011) (rejecting argument that "equities of the case" exception applies only where unencumbered estate assets are used).    In any event, significant unencumbered assets were used here to accomplish the Global Settlement.

Objectors with significantly improved treatment), and then receive a windfall from that enhanced settlement at the expense of all other creditors. Accordingly, even if the Court concludes that some part of the Ally Contribution could theoretically be allocated to any claim upon which the JSNs have prepetition liens, the equities of these cases prevent those liens from attaching to the proceeds thereof. *See, e.g.*, *Nanuet Nat'l Bank v. Photo Promotion Assocs., Inc. (In re Photo Promotion Assocs., Inc.)*, 61 B.R. 936, 939-40 (Bankr. S.D.N.Y. 1986) (equities of case did not permit secured creditor's liens to attach to postpetition proceeds where value increased as a result of trustee's efforts).[10]

In sum, the JSNs are already benefitting handsomely from the Ally Contribution. Without the Ally Contribution, the JSNs would not be paid in full in cash on the Effective Date on account of their allowed claims. It would be contrary to law, and fundamentally unfair to unsecured creditors in these cases, to allow the JSNs to achieve a windfall simply by cobbling together a series of dubious legal theories for contract claims against Ally and then assert a "lien" on settlement proceeds that in reality had no nexus to any such claims and that the JSNs made no contribution to attaining.

### 2.     The JSNs Are Not Entitled to Any Compensation on Account of the Intercompany Balances

The JSN Objectors' contention that the Global Settlement deprives them of the value of their liens, if any, on Intercompany Balances ignores certain critical facts. As a threshold matter, the JSNs do not *have* liens on the Intercompany Balances. However, even assuming the Court finds to the contrary, the JSNs are not entitled to compensation on account of

---

[10] *See also, e.g.*, *Toso v. Bank of Stockton (In re Toso)*, No. 06-1149, 2007 Bankr. LEXIS 4889, at *46 (B.A.P. 9th Cir. Jan. 10, 2007) (applying equities of case exception against secured creditor); *Jankowski v. Signet Comm. Credit Corp. (In re Diamond Mfg. Co.)*, No. 85-40555, 1995 WL 17004722, at *2 (Bankr. S.D. Ga. Feb. 17, 1995) (applying equities of case exception to settlement proceeds that otherwise would have been subject to secured lender's lien).

the purported liens because the governing documents, including the Notes Indenture, the Notes Security Agreement, and the Intercreditor Agreement, gave both the Debtors and the First Priority Secured Parties the unfettered ability to dispose of and waive the Intercompany Balances without obtaining the consent of, or even providing notice to, the JSNs.  Indeed, the Debtors have exercised that right by settling the Intercompany Balances as part of the Global Settlement and in accordance with Bankruptcy Rule 9019, which (if this Court approves) moots the question of whether the JSNs might otherwise have a lien on any proceeds of Intercompany Balances that were actually prosecuted.  Moreover, the Intercompany Balances themselves lack many of the indicia of valid and enforceable debt obligations and, if litigated, would face significant challenges under the *Autostyle* factors, as well as challenges related to the avoidance of over $16.6 billion in prior intercompany balance forgiveness, the failure to charge certain Debtor entities with allocable expenses, setoff, and substantive consolidation, among other issues.

As set forth in Section II.D.4.h of the Confirmation Brief and as will be demonstrated at the Confirmation Hearing, the Plan Proponents undertook an extensive investigation of the Intercompany Balances and concluded that those balances lack many of the indicia of true debt and enforceable claims.  The Plan Proponents therefore concluded it was reasonable to waive the Intercompany Balances based on the factors identified in *Bayer Corp. v. Masotech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726 (6th Cir. 2001) and that, in any event, litigation over the enforcement of the Intercompany Balances as "claims" would result in significant, protracted, and costly litigation.

Given these facts, the Debtors, the Creditors' Committee, and the Consenting Claimants agreed to waive the Intercompany Balances as part of the overall Global Settlement resolving a broad range of disputed intercreditor and interdebtor issues.  The parties agreed that

the Intercompany Balances would be waived and any avoidance actions on account of the

prepetition forgiveness would be waived because, in the absence of the Global Settlement, any

attempt to enforce the Intercompany Balances would face strong challenges, that, if litigated,

would impose significant costs and delays with little, no, or negative benefit.  Further, the parties

determined that all constituents, including the JSNs, would receive a higher recovery under the

Global Settlement, with Intercompany Balances waived, than in the alternative scenario where

the parties participate in extensive litigation over numerous intercreditor and interdebtor issues.

Significantly, no party other than the JSN Objectors has objected to the waiver of Intercompany

Balances.

### a.    The JSNs Do Not Have Liens on Intercompany Balances

As a threshold matter, the JSNs do not have liens on Intercompany Balances.  The

JSN Objectors glibly refer to "intercompany claims" as if they are a specific, well-defined

category of asset as to which their liens unquestionably attach under the Notes Security

Agreement and applicable law.  In fact, the Intercompany Balances at issue here are ill-defined

and not capable of generic classification.  As discussed above, they arise from a variety of

transactions and circumstances and, depending on the balance, there may have been no

expectation, intent, or requirement that the balance be repaid.  Indeed, certain of the balances do

not even reflect any actual movement of money between the entities identified in the Debtors'

ledgers.  Thus, there are substantial questions as to whether the Intercompany Balances reflected

underlying obligations to make payments and a corresponding right to receive payment.

The JSN Objectors do not contend that they have a lien on any specific notes or

loans underlying the Intercompany Balances.  Instead, they claim that they have a lien on

"general intangibles," which they insist includes "intercompany claims."  However, simply

labeling certain balances in the Debtors' books and records "intercompany claims" does not

make them general intangibles. Rather, the JSNs must show that each specific Intercompany Balance is more than just an entry on a ledger and is actually a "general intangible" asset subject to their liens.

In relevant part, the Uniform Commercial Code (the "UCC") defines a "general intangible" as "any personal property, including things in action" and "payment intangibles." U.C.C. § 9–102(a)(42).[11] A "payment intangible" is defined as "a general intangible under which the account debtor's principal obligation is a monetary obligation." UCC § 9–102(a)(61). Accordingly, before an Intercompany Balance may be classified as a general intangible, the JSN Objectors must prove that it is a legally enforceable obligation and that the applicable account debtor in fact had a legal obligation to pay the balance.

Moreover, the JSNs do not have a lien on all "general intangibles" in any event. As was demonstrated in Phase I of the JSN Adversary Proceeding, as a result of the May 14, 2010 release, all intangibles associated with the mortgage loans pledged to the AFI LOC and PLS MRS were released. As a result, the JSN Objectors must demonstrate that, even if the Intercompany Balances are "general intangibles," such intangibles were not among those released and fall within the scope of their existing lien. This is something they have not even attempted to do.

**b.      Any JSN Lien on Intercompany Balances Has No Value**

In any event, any "lien" the JSNs could assert over the Intercompany Balances is not entitled to compensation because the Notes Indenture and the Intercreditor Agreement gave both the Debtors and the First Priority Secured Parties free rein to dispose of and waive Intercompany Balances without the JSN Objectors' consent – rights now being exercised in

---

[11] The definition of "General Intangibles" provided by the Notes Security Agreement incorporates the UCC definition.

connection with the Global Settlement.    Therefore, the JSNs have no protectable property

interest in the Intercompany Balances that would entitle them to compensation on any basis.

Mone of the extensive covenants in the Notes Indenture or the Notes Security

Agreement limits the Debtors' rights regarding, or protects the JSNs' interests in, the

Intercompany Balances.    To the contrary, Section 8.04(a) of the Notes Indenture (Release of

Collateral) provides that:

> Collateral may be released from the Lien and security interest created by
> the Security Documents at any time or from time to time in accordance
> with the provisions of the Intercreditor Agreement.  In addition, the Liens
> on any Collateral *shall* be released . . . under any one or more of the
> following circumstances: (i) upon the sale, transfer or other disposition of
> such property or assets (other than to the Company or a Guarantor) to the
> extent not prohibited under Section 4.10 hereof . . . .

(Ex. PX-1 (Notes Indenture) § 8.04(a) (emphasis added).)    Thus, the Debtors have the right to

dispose of any Collateral and, upon such disposition, the JSNs' liens will be released so long as

the disposition of the Collateral is not prohibited under Section 4.10 of the Notes Indenture.  (*Id*.)

Section 4.10 of the Notes Indenture – the asset sale covenant – limits the Debtors'

ability to consummate "Asset Sales," which are defined as dispositions of Collateral.  (*See id*.

§ 4.10(a).)  However, the definition of "Collateral" for purposes of Section 4.10(a) was carefully

crafted to mean only Primary Collateral, which excludes the Intercompany Balances.[12]  Thus, the

asset sale covenant does not apply to dispositions of Intercompany Balances or any other assets

---

[12] None of the Intercompany Balances constitutes Primary Collateral, which the Notes Indenture defines by
reference to the Notes Security Agreement as "Initial Collateral [defined in Schedule VI as certain Mortgage Loans,
Servicing Advances, Securities Accounts, Pledged Interests, Pledged Notes and Construction, Mezzanine and
Working Capital Loans], REO Property acquired as the result of foreclosure on Primary Collateral, Reinvestment
Collateral, any assets acquired as a result of exercising remedies under any Initial Collateral or Reinvestment
Collateral that was designated as such prior to the Amendment Closing Date or Substitute Collateral, and all
proceeds of the foregoing."  (*See* Ex. PX-1 (Notes Indenture) § 1.01; Ex. PX-4 (Amended and Restated Security
Agreement) § 1, Sch. VI.)

that do not constitute Primary Collateral.  (*See* Ex. PX-1 (Notes Indenture) § 8.04(a); Ex. PX-4 (Amended and Restated Security Agreement) § 10.)

Just as the definition of the Collateral in the context of Asset Sales was carefully constructed to permit the disposition of non-Primary Collateral like the Intercompany Balances, the affiliate transaction covenant in the Notes Indenture clearly states that the covenant "shall not apply to . . . transactions between or among [ResCap] and/or its Subsidiaries."  (*See* Ex. PX-1 (Notes Indenture) § 4.11(b)(4).)   Accordingly, the covenant does not restrict in any way the settlement, release, waiver, or disposition of Intercompany Balances.  The Debtors' unfettered right to do so renders the JSNs' purported lien valueless.  At the time of issuance, the JSNs had no expectation that the Intercompany Balances had value because the Offering Memorandum for the JSNs provided only consolidated financials.  (Ex. PX-175 (Offering Memorandum) at 51-52.)

In addition, the First Priority Collateral Agent, on behalf of AFI as the agent lender under the Ally Revolving Credit Facility, has the unfettered right to release its liens on the collateral (including Intercompany Balances, if collateral) in connection with "any sale, lease, exchange, transfer or other disposition of any Collateral," and the JSNs agreed in the Intercreditor Agreement that such release will release their liens as well.  Section 5.1(a) of the Intercreditor Agreement provides that when the First Priority Collateral Agent releases its lien on any collateral, "the Lien of the Third Priority Collateral Agent for the benefit of the Third Priority Secured Parties on such Collateral . . . shall in each case be automatically and unconditionally released with no further consent or action of any Person."  (Ex. PX-2 (Intercreditor Agreement) § 5.1(a).)  Further, the Intercreditor Agreement provides that the First Priority Collateral Agent and the Lender Agent may release and otherwise deal with, in any

manner, collateral to the fullest extent permitted under law without the consent of, or notice to, and without incurring any liabilities to, the Secured Parties.  (*Id*. § 7.3(b)(iii).)

Here, AFI, as Lender Agent under the Revolver Facility, is a party to the Plan Support Agreement, which expressly provides for the release and waiver of Intercompany Balances.  Accordingly, AFI's consent to the release of any liens that may exist on, and waiver of, the Intercompany Balances – which the Debtors are fully empowered to release in any event – is binding on the JSNs.

In addition to being bound by the release of their liens and waiver of the balances, the JSNs expressly waived any right to object to the manner in which the First Priority Collateral Agent enforces – or chooses not to enforce – its liens with respect to collateral.  The Intercreditor Agreement provides that the JSNs waive "any claim against any First Priority Secured Party, arising out of any action which such holders of First Priority Claims may take or permit or omit to take with respect to the foreclosure upon, or sale, liquidation or other disposition of, the Collateral."  (*See* Ex. PX-2 (Intercreditor Agreement) § 7.3(d).)  This waiver remains fully enforceable against the JSNs in bankruptcy pursuant to section 510(a) of the Bankruptcy Code.

The right to waive the Intercompany Balances is not just technical or theoretical – it was the Debtors' standard practice prepetition.  In accordance with the Notes Indenture and Notes Security Agreement, prior to the Petition Date, the Debtors routinely settled their Intercompany Balances in the ordinary course for no value and could have done so on the Petition Date.  In fact, in the years prior to the Petition Date, the Debtors forgave approximately $16.6 billion in Intercompany Balances.  (Westman Direct ¶¶ 5, 44.)  In early 2012, approximately $3.1 billion in Intercompany Balances were identified for forgiveness sometime in 2012 (including four of the seven largest balances); it is reasonable to conclude that, but for

the bankruptcy filing, these amounts would have been forgiven in the ordinary course.  (Gutzeit Direct ¶ 27; *see also* Westman Direct ¶¶ 55-56.)    Separately, pursuant to the Intercreditor Agreement, Ally had the right to consent to the waiver of the Intercompany Balances – and did so in connection with the Global Settlement.

Thus, even if the JSNs had theoretical liens on the Intercompany Balances, such liens always remained subject to the Debtors' unilateral right to waive the balances and Ally's rights to authorize their waiver without the JSNs' consent.    The liens therefore had no independent value, and release of the Intercompany Balances as part of the Global Settlement does not deprive the JSNs of any lien value to which they would otherwise be entitled.    At any rate, under the Intercreditor Agreement (which remains fully enforceable in bankruptcy by the parties), the JSNs are bound by AFI's determination with respect to the Intercompany Balances.

### c.    The Intercompany Balances Lack Many of the Indicia of Enforceable Debt Obligations

The JSN Objectors rely on the report of Robert S. Bingham (the "Bingham Report") to challenge the reasonableness of the Plan Proponents' decision to waive the Intercompany Balances as part of the Global Settlement and in support of their argument that the Intercompany Balances in fact are valuable, enforceable debt claims.    The Bingham Report argues that the Intercompany Balances should be treated as debt because (i) they were reported as receivables/payables in internal accounting records and certain external financial reports and (ii) certain internal memoranda and correspondence suggest that the balances were treated as assets and liabilities.    (JSN Obj. ¶¶ 63-64.)    The Bingham Report presents only a limited and distorted view of the Intercompany Balances that ignores the strong argument that these were merely GAAP-driven bookkeeping entries that were routinely forgiven and not treated as real debt.

A more complete and persuasive assessment of the Intercompany Balances is provided by the Debtors' rebuttal expert Gina Gutzeit in her direct testimony and in the direct testimony of Barbara Westman and Tammy Hamzehpour. Those witnesses tell the full story behind the Intercompany Balances and establish the deficiencies in such balances that demonstrate precisely why the Plan Proponents believe it is reasonable to waive the Intercompany Balances under the Plan. (Gutzeit Direct ¶¶ 18-30; Westman Direct ¶¶ 17-23; Hamzehpour Direct ¶¶ 17-21.) For example, the Intercompany Balances accumulated over time as a result of tens of thousands of separate, individual journal entries that were recorded on the Debtors' general ledgers for a variety of business and operational reasons, including asset transfers, allocation and/or payment of expenses by one Debtor for another, or other journal entries representing book entry movements of cash down the corporate structure. (Gutzeit ¶ 20.) The journal entries were recorded automatically through accounting programs or manually by a wide range of individuals in different departments and business units, in different physical locations, that were overseen by different supervisors with different recordkeeping practices. (*Id.* ¶ 23.) These journal entries generally do not specify the basis of, or reason for, a particular balance. (*Id.*)

Most of the nine largest Intercompany Balances were not supported by intercompany agreements. (Gutzeit Direct. ¶ 8.) While the Debtors have identified four intercompany agreements that could potentially pertain to a particular intercompany balance, in all but one instance the documentation is inconsistent with the actual payable/receivable relationship between the entities, and in every instance the agreement does not contain a fixed maturity date, stated interest rate, or repayment schedule. (*Id.* ¶ 24.) Moreover, it is difficult to determine whether an intercompany transaction can be tied to any of the four agreements

because the Debtors did not designate intercompany entries in the general ledger as having resulted from, or being made under, any particular intercompany advance or funding agreement. (*Id.*)[13]

As the Plan Proponents' investigation of the Intercompany Balances confirmed, when the Debtors intended to create enforceable intercompany obligations, they knew how to do so, as reflected by the Debtors' entry into the Revolving Credit Facility and LOC Facility with Ally, which were thoroughly documented and reflected, among other things, stated maturity dates, interest rates, cash settlement, reporting requirements, and security interests. The Intercompany Balances and the intercompany documentation bear no resemblance to those facilities and for good reason – unlike the formal facilities, the evidence demonstrates that the Intercompany Balances were never required to or expected to be repaid.

In fact, interest was accrued and cash settled in connection with only one intercompany balance (against a shell entity that even the JSNs acknowledge has no assets of value), and of the remaining top eight intercompany balances, only four reflected that interest was being accrued but not paid while the remaining balances did not reflect *any* interest accrual. (Gutzeit Direct ¶ 25.)

Significantly, even if those agreements could somehow apply, three of the four intercompany agreements contain a "bankruptcy standstill" provision, which provides that the "lender" entity will not commence bankruptcy against the "borrower" entity or seek to foreclose on any property of the borrowing entity, and that obligations under the agreement will not constitute a claim against the "borrower" entity if such entity's assets are insufficient to pay its

---

[13] (*See also* Westman Direct ¶¶ 14 (explaining that journal entries would not reflect the basis of or reason for entry and were made over the span of a decade, by separate and distinct operating groups within the Debtors, each with its own record keeping processes).)

other obligations in full – in effect subordinating any obligations under these agreements to the claims of outside creditors. (Gutzeit Direct ¶ 26.)

Whether or not the larger intercompany balances arose under or were related to a documented agreement, there was no uniform practice of repayment or cash settlement of the intercompany balances. (Gutzeit Direct ¶ 27.) In fact, these balances were routinely forgiven from 2008 through the Petition Date, during which time there were 149 individual instances of forgiveness by Debtor entities that were identified totaling approximately $16.6 billion. (*Id.*)[14] Among the domestic Debtors, the forgiven balances were recorded as adjustments to equity, rather than as losses on the profit and loss statement, strong evidence that they were *never* intended to be akin to arm's-length loan transactions. (*Id.*)[15]

Mr. Bingham wrongly suggests that the Debtors' intent may be inferred from the Debtors' reporting or describing the Intercompany Balances as receivables and payables. As Ms. Gutzeit explains, that reporting was done primarily for GAAP accounting purposes, pursuant to AFI's accounting policies, which required that the Debtors' books and records be maintained so that AFI could track its subsidiaries' intercompany balances and eliminate them for purposes of preparing and filing consolidated GAAP-compliant financial statements. (Gutzeit Direct ¶ 32.)[16] The Debtors' compliance with AFI's accounting policies does not prove that the balances were viewed as valid and collectible. In fact, Mr. Bingham ignores that GAAP differentiates related-party transactions from other third-party transactions: "[T]ransactions involving related parties

---

[14] As early as 2012, approximately $3.1 billion in Intercompany Balances, including four of the largest six balances, had been identified to be forgiven some time in 2012. (Gutzeit Direct ¶ 29; *see also* Westman Direct ¶¶ 54-55.)

[15] (*See also* Hamzehpour Direct ¶ 17-21 (explaining that intercompany balances were routinely forgiven and accounted for as capital infusions as means to increase particular entity's equity account); Westman Direct ¶¶ 5, 44-53 (explaining that intercompany balances were forgiven for several reasons, including (a) compliance with regulatory and licensing requirements, (b) compliance with financing covenants, and/or (c) as part of sale of assets, and that forgiveness was treated as capital transactions).)

[16] (*See also* Westman Direct ¶ 17.)

cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist." (*Id*. ¶ 33 (quoting ASC 850-10-50-5).)

Moreover, as explained by Ms. Gutzeit and contrary to Mr. Bingham's assertions, the Debtors' publicly filed financial reports did not include intercompany balances with and among its subsidiaries. (Gutzeit Direct ¶ 34.) Rather, ResCap eliminated all intercompany balances that existed with and among ResCap and its subsidiaries. (*Id*.)[17]

In addition to ignoring the historical practices and processes by which the Intercompany Balances accumulated and were extinguished, Mr. Bingham conveniently disregards the operational and economic facts and circumstances surrounding the corporate entities at the point in time when balances were being created or forgiven.

Accordingly, for the reasons set forth in the Hamzehpour, Westman, and Gutzeit Directs, and as will be demonstrated at the Confirmation Hearing, the Intercompany Balances lack the indicia of true debt. Accordingly, it was entirely reasonable, and in the proper exercise of the Debtors' business judgment to waive the Intercompany Balances in connection with the Global Settlement.

### B.    The JSNs Have No Adequate Protection Claim

The JSN Objectors argue that section 363(e) of the Bankruptcy Code requires the Debtors to "compensate" them in the form of adequate protection for the Debtors' alleged use of the Subject Collateral during the course of the chapter 11 cases. This argument is inconsistent with the language in the Bankruptcy Code. The word "compensate" never appears in section 363(e). The Debtors are only required to provide the JSNs with adequate protection for any potential aggregate diminution in the value of their collateral. And the Debtors did so in

---

[17] (*See also* Westman Direct ¶ 40.)

connection with their request to use cash collateral at the outset of these cases – the Cash Collateral Order specifically finds that the interests of the JSNs are adequately protected. (Cash Collateral Order ¶ 23.) Indeed, the JSNs' existing adequate protection package is worth billions of dollars, particularly due to the infusion of $2.1 billion in cash as a result of the Global Settlement, which can be used to satisfy any alleged adequate protection claim. The JSN Objectors cannot now argue that additional adequate protection is required.

To be entitled to "compensation," the JSNs must demonstrate that there has been an aggregate diminution in the value of their collateral. For the reasons set forth herein and as will be demonstrated in the JSN Adversary Proceeding, the JSNs will be unable to do that.

## C.    The Debtors Have the Authority to Release Claims Against Ally and the Intercompany Balances

The JSN Objectors contend that section 363 of the Bankruptcy Code governs the settlement of claims and that the Debtors cannot compromise claims against Ally and waive Intercompany Balances without the JSN Objectors' consent under section 363(f) of the Bankruptcy Code. The JSN Objectors are mistaken.

Section 363(f), by its terms, applies only to a "sale" of collateral. In contrast, settlements of claims are governed by Bankruptcy Rule 9019, the standards for which are well settled in this Circuit and discussed at length in the Confirmation Brief. The JSN Objectors have not cited a single case from this Circuit holding that section 363(f) is implicated when a debtor seeks approval of a settlement under Bankruptcy Rule 9019.

Nevertheless, the Court need not decide the issue because, even if section 363(f) applied, it would pose no impediment to the Global Settlement. At least four different subsections of section 363(f) relating to the sale of collateral free and clear of liens, claims, and encumbrances would authorize the Global Settlement. First, section 363(f)(2) is satisfied

because under the Intercreditor Agreement, the Plan Proponents have obtained the consent of the only party they are required to obtain consent of – AFI.  (*See* Ex. PX-2 (Intercreditor Agreement) § 5.1(a).)

Second, and most obviously, section 363(f)(4) permits a sale where there is a bona fide dispute as to the secured creditor's interest (here, the JSNs' alleged liens).  As is apparent from the entire course of the JSN Adversary Proceeding, there is obviously a bona fide dispute as to the extent of the JSNs' liens.

Third, section 363(f)(5) permits a sale where the secured lender could be compelled in a legal or equitable proceeding to accept a money satisfaction of its interest.  That is the case here, as the JSNs' only interest in these proceedings is to receive money.  *See In re Boston Generating, LLC*, 440 B.R. 302, 333 n.29 (Bankr. S.D.N.Y. 2010) (noting that, "[u]nder New York law, a junior lienholder (either in a foreclosure of real property or of collateral under the Uniform Commercial Code) is entitled to nothing more than the surplus cash generated in a sale") (citing N.Y. U.C.C. §§ 9-608, 9-615).

Fourth, section 363(f)(1) permits a sale of encumbered property free and clear of liens where nonbankruptcy law permits it.  Here, as discussed above, the applicable agreements permit the Debtors and Ally to release Intercompany Balances and the claims against Ally free and clear of the JSNs' liens without their consent.

Accordingly, section 363(f) not only imposes no impediment to the Plan or the related Plan Settlements – it affirmatively authorizes them.

**D.    The Plan Satisfies Section 1129(b) of the Bankruptcy Code**

The JSN Objectors assert that both the JSN class and Intercompany Balances class are rejecting classes and, therefore, the Plan Proponents must satisfy the cram down provisions of section 1129(b).  The JSN Objectors contend that this cannot be done because

(i) the Plan is not fair and equitable with respect to the JSNs (JSN Obj. ¶¶ 75-91) and (ii) the Plan unfairly discriminates and is not fair and equitable with respect to Intercompany Balances (*id*. ¶¶ 67-74).  The JSN Objectors are wrong on both counts.

### 1.     The Plan is Fair and Equitable to the Junior Secured Notes Claims

The JSN Objectors contend that the Plan is not "fair and equitable" with respect to the JSNs because they are not being provided with the "indubitable equivalent" of their claims. (JSN Obj. ¶ 54.)  The JSN Objectors are, again, mistaken.  The Plan provides that if the Court determines that they are undersecured, the JSNs will receive the full amount of their allowed prepetition claims in cash.  If the Court determines that they are oversecured, they will receive the full amount of their allowed prepetition claims and any allowed postpetition interest.  Either way, they are receiving the full amount of their allowed claims.  As a result, they are being provided with the indubitable equivalent of their secured claim for purposes of section 1129(b)(2)(A)(iii).  *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 208 (Bankr. S.D.N.Y. 2009) (where there is no material risk that creditor will not receive payment in full on account of post-effective date liens, "indubitable equivalent" requirement is satisfied), *aff'd*, No. 09-10156, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd on other grounds sub nom. Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79 (2d Cir. 2011); *see also In re Riddle*, 444 B.R. 681, 685 (Bankr. N.D. Ga. 2011) ("In order for treatment of a secured creditor's claim to qualify as being the 'indubitable equivalent' of the claim the treatment must be completely compensatory. . . . In this regard, an equivalent is 'indubitable' if no reasonable doubt exists that the creditor will be paid in full.") (citation omitted); *In re Temple Zion*, 125 B.R. 910, 911 (Bankr. E.D. Pa. 1991) ("[A] plan which contemplates payment of a secured creditor's claim in full within about five months provides that creditor with 'fair and equitable' treatment because it will allow the creditor to realize the 'indubitable equivalent' of its claim.").

In addition, the JSN Objectors assert that, in the event it is determined that they are undersecured, but they are not paid in full (plus postpetition interest) on account of their deficiency claim, the Plan violates the absolute priority rule because it fails to recognize that "Securities-Related Claims" (*i.e.*, the monoline claims, the RMBS trustee claims, and the private securities litigation claims) are subject to section 510(b) subordination. (JSN Obj. ¶ 91.) This argument is doubly flawed.

*First*, the entire premise is wrong. If the JSNs are determined to be undersecured, they cannot, as a matter of law, recover postpetition interest by aggregating their various deficiency claim recoveries. It is well settled that an undersecured creditor's deficiency claim is nothing more than a general unsecured claim, on account of which any claim for postpetition interest is disallowed under section 502(b)(2) of the Bankruptcy Code. *See* 11 U.S.C. § 502(b)(2); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 372-73 (1988) ("Since [section 506(b)] permits postpetition interest to be paid only out of the "security cushion," the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest.").[18]  Accordingly, if the JSNs are undersecured, they are not entitled to postpetition interest. They can recover on account of their deficiency claims up to payment in full of the face amount of their prepetition claims and nothing more.

*Second*, the payment on account of "Securities-Related Claims" does not violate the absolute priority rule because such claims are not being subordinated. They are being *settled* as part of the Global Settlement and provided with general unsecured claims.  And that settlement resolves any allegation that such claims are subject to mandatory subordination.

---

[18] *See also Kitrosser v. CIT Grp./Factoring, Inc.*, 177 B.R. 458, 467 n.4 (S.D.N.Y. 1995) ("Section 506(b) provides an exception to the rule in Section 502(b)(2) for debt that is oversecured, that is, when the value of the property held as security for the claim exceeds the amount of the claim. For the purposes of Section 502(b)(2), undersecured and unsecured debt are treated the same."); *cf. In re South Side House, LLC*, 474 B.R. 391, 413 (Bankr. E.D.N.Y. 2012) ("[A]n undersecured creditor may not receive payment in excess of its original claim.").

The JSN Objectors' unsupported argument that "Securities-Related Claims" cannot be settled as general unsecured claims has already been specifically rejected by this Court in overruling the JSNs' opposition to the FGIC Settlement. There, the JSN Objectors advanced an identical argument that FGIC's claims must be subordinated pursuant to section 510(b) of the Bankruptcy Code and thus could not, as a matter of law, be settled as unsecured claims. The Court rejected that argument, expressly holding that it is permissible for a debtor to settle claims that could potentially be subject to 510(b) subordination. *In re Residential Capital, LLC*, 497 B.R. 720, 752 (S.D.N.Y. 2013) (the "*FGIC 9019 Opinion*") ("The JSNs have failed to provide any authority holding that a court cannot approve a settlement where the claims could potentially be subordinated."). The Court cited numerous examples of courts approving settlements where section 510(b) subordination issues were in dispute.[19]

Here, any attempt to subordinate the monoline, RMBS, or private securities claims would be met with hard-fought and uncertain litigation that the Plan Proponents are avoiding through the Plan Settlements. In approving the FGIC Settlement, the Court recognized as much in the context of the Monoline claims, noting that the section 510(b) subordination of FGIC's claims "would be hotly contested." *FGIC 9019 Opinion*, 497 B.R. at 751. Specifically, the Court observed that because FGIC's claims arose from separate insurance and indemnity agreements, it was "far from clear that [FGIC's] Claims would be subordinated." *Id.* at (citing *CIT Grp., Inc. v. Tyco Int'l, Inc.*, 479 Fed. Appx. 393, 395 (2d Cir. 2012) (holding that

---

[19] *See, e.g.*, *In re WorldCom, Inc.*, No. 02-13533 (Bankr. S.D.N.Y. Aug. 6, 2003) [Dkt. No. 8125] (approving settlement involving claims that might have been subject to subordination); *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 168-70 (Bankr. S.D.N.Y. 2005) ("The real issue before me . . . is whether the Government and the Debtors could settle a controversy as to which that close and difficult issue [of subordination under section 510(b)] is an element, and the answer to that plainly is 'yes.' It is no different than the multitude of other difficult issues that are settled in litigation all the time."), *aff'd sub nom. Ad Hoc Adelphia Trade Claims Comm. v. Adelphia Commc'ns Corp.*, 337 B.R. 475, 478 (S.D.N.Y. 2006); *In re Drexel Burnham Lambert Grp.*, 138 B.R. 717, 718-19 (Bankr. S.D.N.Y. 1992) (approving settlement of employee claims over objection that such claims are subject to section 510(b) subordination), *aff'd sub nom. Lambert Brussels Assocs. Ltd. P'ship v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 140 B.R. 347, 349-50 (S.D.N.Y. 1992).

connection of contract-based claim to purchase or sale of security is insufficient to support

finding that claim "arises from" the purchase or sale of security for section 510(b) purposes)).

The same is true for all of the monoline claims.

Numerous contested issues would exist in litigating the RMBS trustee claims as

well, as the Court also recognized in the *FGIC 9019 Opinion*.  497 B.R. at 751 (quoting Debtors'

Reply Brief re Objection of Junior Secured Noteholders to Motion for Approval of RMBS

Settlement Agreements [Dkt. No. 3221].)  For example, the RMBS trustees would argue that

(i) their claims do not arise out of the purchase or sale of securities because they arise out of a

sale of mortgage loans, not securities; (ii) their claims do not arise from the issuance of trust

certificates, but rather from contractual representations and warranties made in connection with

the deposit of mortgage loans into the trusts (as no RMBS certificates or bonds were ever

deposited into the trusts); (iii) the transactions pursuant to which mortgage loans were deposited

into trusts were separate and apart from the transactions in which certificates, or securities, were

later sold to investors; and (iv) section 510(b) was not intended to cover claims arising out

ownership of securities, as opposed to the purchase and sale of a security.

And while the Debtors may have stronger arguments with respect to

subordinating private securities claims, there would still be litigation risks associated with those

efforts.  For example, the Court would be required to determine whether the RMBS are securities

"of" the Debtors or of an "affiliate" of the Debtors.  Indeed, while Debtor entities sponsored the

issuance of the RMBS, the bankruptcy-remote RMBS Trusts for each RMBS offering technically

issued the certificates to investors.  If the RMBS are not securities "of" the Debtors (or of an

affiliate of the Debtors), section 510(b) subordination might not be available.  There is no clear

law on this issue in this Circuit, and there is at least one case within the Third Circuit holding

that securities fraud claims arising out of RMBS were not eligible for section 510(b) subordination. *See, e.g.*, *In re Wash. Mut. Inc.*, 462 B.R. 137, 146-47 (Bankr. D. Del. 2011) (holding that section 510(b) subordination not available where court determined that trust issuing RMBS was not debtor or "affiliate" of debtor). Unsettled questions concerning the intent and applicability of section 510(b) to RMBS litigation would also be implicated. Those and other legal issues are hotly contested as evidenced by the competing motions for summary judgment filed in connection with the Debtors' adversary proceeding seeking 510(b) subordination of certain private securities claims (the "Subordination Proceeding"). *Residential Capital, LLC. v. Allstate Ins. Co. (In re Residential Capital, LLC)*, No. 13-01262 (Bankr S.D.N.Y.). The Debtors could expect that, even were they to prevail in this Court, the private securities claimants would exhaust their appellate rights, imposing further costs and delay. The Plan and Plan Settlements appropriately avoid the litigation risks, costs, and delays associated with that proceeding.[20]

To suggest, as the JSN Objectors do, that the Debtors are not permitted to settle those "Securities-Related Claims" is simply reckless and irresponsible. The potential liability to the Debtors on all of those claims, should they choose to litigate, could be upwards of $50 billion. In these circumstances, where the stakes are so high and the law so unsettled, it was entirely reasonable for the Plan Proponents to settle those claims on the terms set forth in Plan. And there is nothing in the law that prevents them from doing that so long as the *Iridium* standards have been met – which is plainly the case here. Moreover, the fact that these claims are being settled as part of a broader settlement with Ally that brings $2.1 billion into the

---

[20] For a more thorough discussion of the arguments that holders of private securities claims asserted in opposition to section 510(b) subordination, the Plan Proponents respectfully refer the Court to the motion filed by certain of the private securities claimants for summary judgment in the Subordination Proceeding, Case No. 13-01262 [Dkt. No. 27].

Debtors' estates and which required a resolution of these claims as a condition to that settlement, cannot be ignored.

Moreover, each of the Settling Private Securities Claimants also had pending or tolled claims against AFI and Ally Securities that are being resolved through the Global Settlement and which certainly are not subject to section 510(b) subordination since they are not claims against a debtor.

In sum, the Plan permissibly resolves claims that, if not resolved consensually, would involve hotly contested issues of section 510(b) subordination. The Plan, therefore, does not provide any distribution to any claims that are actually subordinated under section 510(b). Accordingly, in the event it is determined that the JSNs are undersecured, distributions on account of "Securities-Related Claims" do not cause the Plan to violate the absolute priority rule.[21]

2.    **The Plan Does Not Unfairly Discriminate Against, and is Fair and Equitable With Respect to, the Classes of Intercompany Balances**

As an initial matter, the JSN Objectors do not have standing to raise unfair discrimination and "fair and equitable" objections with respect to the classes of Intercompany Balances. The JSNs are not creditors in those classes; they are creditors of the creditors in those classes. *See In re Johns-Manville Corp.*, 68 B.R. 618, 623 (Bankr. S.D.N.Y. 1986) ("[N]o party may successfully prevent the confirmation of a plan by raising the rights of third parties who do not object to confirmation."), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *Corestates Bank, N.A. v. United Chem. Techs.*,

---

[21] The JSN Objectors have also objected (the "JSN NCUAB Objection") [Dkt. No. 5623] to a separate settlement between the Debtors and the National Credit Union Administration Board (the "NCUAB"). The JSN Objectors contend that the NCUAB's claims are "Securities-Related Claims" and, for the reasons set forth in the JSN Objection to confirmation, failure to recognize mandatory subordination violates the absolute priority rule. (JSN NCUAB Obj. ¶ 1.) For the reasons set forth above, those arguments are without merit and the settlement with the NCUAB, like the settlements with the monolines, RMBS trustees and other private securities claimants, should be approved.

*Inc.*, 202 B.R. 33, 48 (E.D. Pa. 1996) ("[Objector] has no standing to assert discrimination that was allegedly directed to a non-dissident class.  The only creditor who can argue unfair discrimination is a dissident claimant who has been the *direct* object of unfair treatment.") (emphasis added).

Moreover, the classes of Intercompany Balances are deemed rejecting classes only as a technical matter under section 1126(g) because they are not receiving any distribution under the Plan on account of any claims.  The real parties in interest, however, are the Debtors holding Intercompany Balances, and they have all consented to their treatment under the Plan, which they specifically negotiated in connection with signing on to the Global Settlement and becoming Plan Proponents.  Were the Debtors to solicit votes from the classes of Intercompany Balances, those classes would unanimously vote to accept the Plan, rendering moot the JSN Objection on this point.

In any event, solicitation is not necessary because, even if the Classes of Intercompany Balances are deemed rejecting classes, the Plan satisfies the requirements of section 1129(b).

### a.    The Plan Does Not Unfairly Discriminate against Intercompany Balances

As set forth in the Confirmation Brief, section 1129(b)'s "unfair discrimination" standard does not prohibit all types of discrimination among holders of claims in impaired, dissenting classes; instead, it prohibits only *unfair* discrimination.  *See In re Leslie Fay Cos.*, 207 B.R. 764, 791 n.37 (Bankr. S.D.N.Y. 1997).  "[I]f under the facts and circumstances of a particular case, there is a reasonable basis for disparate treatment of two similarly situated classes of claims . . . there is no unfair discrimination."  *In re Worldcom, Inc.*, No. 02-13533 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003) (" To determine whether a plan

discriminates unfairly, courts consider whether (1) there is a reasonable basis for discriminating, (2) the debtor cannot consummate the plan without the discrimination, (3) the discrimination is proposed in good faith, and (4) the degree of discrimination is in direct proportion to its rationale." (the "Discrimination Factors")) (citing *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990)).

Here, there is an entirely reasonable basis for the treatment of Intercompany Balances under the Plan.  As set forth in Section II.D.4.h of the Confirmation Brief, Section I.A.2 above and as will be demonstrated at the Confirmation Hearing, the Plan Proponents undertook an extensive investigation of the Intercompany Balances and concluded that they lack many of the indicia of true debt and enforceable claims and that any effort to litigate them would result in prohibitive costs and delay.  Accordingly, in light of all of the benefits of the Global Settlement (catalogued at length in the Confirmation Brief and in the declarations being submitted in support of confirmation), it is reasonable, and accords with the *Iridium* standards, for the holders of Intercompany Balances to consensually waive those balances as part of the Global Settlement and Plan.  It follows that the Plan's implementation of the Global Settlement cannot be considered unfairly discriminatory for purposes of Section 1129(b).[22]

---

[22] For the same reasons, the Court should overrule the JSN Objectors' contention that the waiver of Intercompany Balances falls below the lowest point in the range of reasonableness and does not satisfy the *Iridium* standards.  (*See* JSN Obj. ¶¶ 60-66.)  The JSN Objection ignores that the waiver of Intercompany Balances was one aspect of a Global Settlement that provided significant value to the Debtors' estates, including the $2.1 billion Ally Contribution and the resolution of every major category of claim against the Debtors' Estates, *e.g.*, the claims of RMBS trustees and investors, monoline insurers, securities claimants, lenders, bondholders, and borrowers. Accordingly, as set forth in the Confirmation Brief and as will be demonstrated at the Confirmation Hearing, the release of Intercompany Balances as part of the Global Settlement is reasonable and in the best interests of the Debtors' estates for purposes of Bankruptcy Rule 9019.

As these facts and circumstances also make clear, the remaining Discrimination Factors cited in *Worldcom* and other cases in this District also support a finding that no unfair discrimination exists with respect to the holders of Intercompany Balances:  (i) the waiver of the Intercompany Balances is an integral aspect to a complex bundle of Plan Settlements, and as such, the Plan cannot be consummated absent such discrimination; (ii) the discrimination, which does not harm any entities and is proposed in accord with the Plan Settlements, is the result of good faith negotiations among multiple constituencies in these cases (*see In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *21 (Bankr. S.D.N.Y. June 27, 2013) ("The findings of fact that each of the parties, including the

The current situation mirrors *In re Ultra Stores, Inc.*, No. 09-11854, 2009 Bankr. LEXIS 5215 (Bankr. S.D.N.Y. July 28, 2009), in which a class consisting of intercompany claims was receiving no distributions and thus was deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code. *Id*. at *14. Nevertheless, the court concluded that no unfair discrimination existed where, like here, the entities holding the claims were plan proponents and acknowledged that the treatment of such claims was not unfairly discriminatory. *Id*. at *18; *see also In re PCAA Parent, LLC,* No. 10-10250, 2010 WL 2745980, at *6 (Bankr. D. Del. May 17, 2010) (finding no unfair discrimination for purposes of cram down where intercompany claims received no property under plan and were deemed to reject it); *cf. In re Carelinc Nat'l Corp.*, No. 95-16574, 1995 WL 750160, at *2 (Bankr. E.D. Pa. Dec. 15, 1995) (claims of insiders may be susceptible to separate classification and inferior treatment on account of claimants' insider status). Here, similarly, the holders of the Intercompany Balances are Plan Proponents that have consented to the waiver of those balances as part of the Global Settlement, and as a result the Plan does not unfairly discriminate against them.

### b. The Plan is "Fair and Equitable" with Respect to Intercompany Balances

The JSN Objectors contend that the Plan violates the absolute priority rule (and hence is not fair and equitable for purposes of section 1129(b) of the Bankruptcy Code) because it provides a distribution on account of Securities-Related Claims before Intercompany Balances are paid in full. (JSN Obj. ¶ 75.) For the same reasons discussed in Section I.D.1 above, because the Plan does not provide any distribution to any claims that are actually subordinated

---

RMBS Trustees, have acted in good faith and in the best interests of its respective constituencies in entering into the PSA are appropriate now and supported by the record.")); and (iii) the "degree of discrimination," which here is minimal given the questionable enforceability of the Intercompany Balances and the acknowledgment and consent of those entities holding such balances, is proportionate to its rationale, which is to permit the Plan and Plan Settlements to go forward. *Worldcom*, 2003 WL 23861928, at *59.

under section 510(b) of the Bankruptcy Code, the Plan does not violate the absolute priority rule with respect to Intercompany Balances.

      **E.**      **The Limited Partial Consolidation Contained in the Plan is Permissible**

The JSN Objectors object to the partial consolidation of the Debtors into the three Debtor Groups for distribution purposes.  (JSN Obj. ¶¶ 92-97.)  In particular, the JSN Objectors argue that they are losing the benefit of certain Intercompany Balances and Equity Pledges as a result of the consolidation in the Plan.  But this is in error, as the Intercompany Balances are being waived as part of the Global Settlement and not as a result of the limited partial consolidation.  If the Court determines that the JSNs are entitled to postpetition interest, they will receive payment on account of that interest under the Plan, regardless of whether or not the Debtor Groups are consolidated.  Similarly, the limited consolidation does not affect the JSNs' interest in their Equity Pledges.

The JSN Objectors' reliance on *In re Adelphia Communications Corp.*, 361 B.R. 337 (S.D.N.Y. 2007), is misplaced.  There, the district court held that objecting creditors appealing from plan confirmation showed a substantial likelihood of success on their claim that the bankruptcy court erroneously approved an improper substantive consolidation.  *Id*. at 359. However, it is critical to note that, unlike here, the objectors there were actually harmed by this plan provision.  *Id*. at 361-62.  Here, the JSN Objectors are having their allowed claims paid in full.  They are not harmed.[23]  Accordingly, the Court should overrule the JSNs' objection to the limited consolidation provided for under the Global Settlement and Plan.

---

[23] Moreover, the *Adelphia* court did not rule on the merits of the appeal and did not have the full appellate record and briefing before it.  Rather, it simply concluded that, for purposes of a stay pending appeal, the appellants showed "a substantial likelihood of reversal" based on the facts of that case.  Notably, in that same opinion, the *Adelphia* court required the appellants to post a $1.3 billion bond in order to obtain a stay, which they did not do.  *Id*. at 368.

For the reasons set forth in the Confirmation Brief, the Plan's partial consolidation is entirely appropriate and in the best interests of creditors for several reasons: (i) no creditors are prejudiced, (ii) the benefits of grouping the Debtors far outweighs the cost and risk of lengthy and contentious litigation of substantive consolidation issues, and (iii) the limited consolidation, as a component of the Global Settlement, maximizes distributions to unsecured creditors.

In short, the limited consolidation contained in the Plan is being done for administrative and convenience purposes and no creditor's recovery is being affected by it. Indeed, no other creditor has objected to this aspect of the Plan. The vast majority of the assets of the Debtors' estates reside at ResCap, GMACM, and RFC, with the Debtor subsidiaries within each Debtor Group having little or no assets available for distribution to creditors. In addition, the majority of claims asserted against the Debtors are asserted against ResCap, GMACM, and RFC, with, in limited circumstances, *de minimis* or duplicative claims asserted against the other Debtor subsidiaries within a Debtor Group.[24] Therefore, in light of the location of the claims and assets, the limited partial consolidation proposed in the Plan confers the benefits of convenience and expedience without compromising creditor recoveries at any Debtor.

F.    **The Plan Satisfies the Best Interests Test with Respect to the JSNs**

The JSN Objectors contend that the Plan does not satisfy the "best interests" of creditors test under Section 1129(a)(7) of the Bankruptcy Code. (JSN Obj. ¶¶ 108-11.) This argument is puzzling to say the least. The JSNs' allowed claims are being paid in full under the Plan. It is impossible for the JSNs to receive a higher distribution in connection with a chapter 7

---

[24] The most significant claims asserted against the subsidiaries are the securities claims against certain of the debtor subsidiaries within the RFC Debtor Group. Because most of these claims are channeled to the Private Securities Trust instead of being satisfied by that group, other creditors of RFC or these subsidiaries are not prejudiced by the limited consolidation of the RFC Debtor Group for administrative and convenience purposes.

liquidation.  To suggest, as they do, that they could somehow fare better in the highly speculative

and likely chaotic fire sale context of a chapter 7 liquidation is illogical and frivolous.  The JSN

Objectors' "best interests" objection should be overruled for that reason alone.

Nevertheless, the JSN Objectors complain that the Debtors' liquidation analysis is

required to, but does not, provide an estimate of recoveries on account of claims against Ally in

the event the Global Settlement is not implemented.   However, courts have recognized that a

hypothetical chapter 7 liquidation valuation exercise is inherently speculative.  *See, e.g.*, *Cadle

Co. II v. PC Liquidation Corp. (In re PC Liquidation Corp.)*, 383 B.R. 856, 868 (E.D.N.Y. 2008)

("[T]he valuation of a hypothetical chapter 7 liquidation is, by nature, inherently speculative and

is often replete with assumptions and judgments.") (citation omitted).  And it is not unusual for a

liquidation analysis to omit a valuation of contested and uncertain litigation claims.[25]

Here, the Plan Proponents will demonstrate at the Confirmation Hearing that it

was entirely appropriate not to assign positive value to the claims against Ally in a hypothetical

chapter 7 liquidation.   The outcome of such litigation is highly speculative and dependent on

numerous uncertain variables, including without limitation the probability of successful

judgments and the cost and time required to litigate the affirmative claims.  This uncertainty is

heightened by the potential of offsetting claims that third parties and/or Ally may have against

the Debtors.   Litigation by third parties against Ally could trigger indemnity claims by Ally

---

[25]  *See, e.g.*, *In re Lehman Bros. Holdings, Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y.), Debtors' Disclosure
Statement for Third Amended Joint Chapter 11 Plan, dated August 31, 2011 [Dkt. No. 19629, Exhibit 5 at 5-8]
("Due to uncertainty and litigation risk, there are no significant amounts reflected in the liquidation analysis for
avoidance actions."); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y.), Disclosure Statement Regarding the
First Amended Joint Plan of Reorganization, dated September 24, 2010 [Dkt. No. 2159, Exhibit E at 2] ("The
Liquidation Analysis does not include recoveries resulting from any potential preference, fraudulent transfer or other
litigation or avoidance actions, including the Anadarko Litigation."); *In re Chemtura Corp.*, Case No. 09-11233
(Bankr. S.D.N.Y.), Notice of Filing of Revised Disclosure Statement, dated August 5, 2010 [Dkt. No. 3503, Exhibit
D at 3] ("No recovery or related litigation cost attributed to any potential avoidance actions under chapter 5 of the
Bankruptcy Code, including potential preference or fraudulent transfer actions, is assumed within this Liquidation
Analysis.")

against the Debtors' Estates that, if not disallowed, could offset any potential recoveries from

Ally.  Moreover, any litigation against Ally would be lengthy and costly and the estates would

run the risk of administrative insolvency with little benefit.  Accordingly, the Plan Proponents

submit that, in these circumstances, it was reasonable and appropriate to ascribe no value to

claims against Ally in a hypothetical chapter 7 liquidation.

## II.    Objections to the Third Party Releases and Related Provisions Should be Overruled

As part of the comprehensive resolution of myriad categories of claims held by

and asserted against the estates – and intertwined claims against third parties that would have an

impact on the estates – the Plan contains the Debtor Release, the Third Party Release, the

Exculpation, and the Injunction (together, the "Release Provisions").  These provisions provide

closure on interrelated claims and disputes that have already resulted in years of burdensome

litigation and would spawn much more without the finality that this Court can provide.  The

merits of these provisions, and their ample justification under existing law, are explained in the

Confirmation Brief.  (*See* Confirmation Brief, Section III.)

In summary, consideration of the Debtor Release is governed by the standards

applicable to settlements under Bankruptcy Rule 9019, which are easily met here, and is thus

part and parcel of the approval of the Global Settlement that will be the centerpiece of the

confirmation process.  The Third Party Release is appropriate under the two-part *Metromedia*

standard applicable in the Second Circuit because (i) this Court has jurisdiction over third party

claims that are closely intertwined with estate claims and could affect the estates through

indemnification and competing claims for shared insurance coverage, and (ii) "unique

circumstances" are present because, *inter alia*, the Third Party Release is almost entirely

consensual and Ally's contributions are critical to the intricately negotiated settlements, under

which every constituency is receiving markedly improved Plan treatment.  (Confirmation Brief,

Section III.A.2.).   And the Exculpation provides narrow (and almost entirely consensually granted) protection for professionals and other parties limited to their activities and efforts in connection with negotiating the settlements that have ultimately created an overwhelmingly consensual outcome that benefits all stakeholders.   In the particular circumstances of these cases, those protections (which do *not* excuse gross negligence or willful misconduct) appropriately extend to the parties that were necessary to bringing about the ultimate global resolution through crucial prepetition efforts and/or in roles as non-estate fiduciaries.   (*Id.*, Section III.B.)

Only a handful of parties filed objections to the Release Provisions, and most of those objections have been or will be resolved prior to the Confirmation Hearing, including through discussions in which Ally has confirmed what was already plain from the face of the Release Provisions: that claims arising solely out of Ally's business, and not the Debtors', are not released or enjoined.   Most critically, and confirming the almost totally consensual nature of the Release Provisions, *no party* has identified *any* actual, concrete, non-hypothetical claim against any of the released parties that is affected by the Release Provisions – rendering any remaining objections academic.

A.      **No Objector Has Identified a Legitimate Third Party Claim That Would Be Affected by the Release Provisions**

Not surprisingly, the primary outstanding objection is interposed by the JSN Objectors.   But their complaints are clearly tactical, since the JSNs are not affected by the Release Provisions in any meaningful way.   The JSNs are being paid in cash, *in full*, on the Effective Date.   The JSN Objectors state, without support, that they have "potential damage claims in discrete and quantifiable amounts" against AFI under the Intercreditor Agreement (JSN Obj. ¶ 103) – claims that, tellingly, the JSNs have never actually asserted in any forum and that they have not even purported to describe or quantify.   In fact, the JSNs repeatedly *waived*

potential claims against AFI in the Intercreditor Agreement.[26]  Their unsupported assertion that

they "would be free" to pursue AFI for "their" post-petition interest (JSN Obj. ¶¶ 13, 106) is

patently false.  In fact, it is the JSNs who are required to turn over postpetition interest to AFI.

(Ex. PX-2 (Intercreditor Agreement) § 4.2.)  The JSN Objectors acknowledge that "Ally has

steadfastly maintained that the JSNs have no claims against it" (JSN Obj. ¶ 103.) and make no

attempt to refute Ally's position with any specificity.  The JSN Objectors' attempt to portray

themselves as aggrieved by the Third Party Release is empty posturing.

Wells Fargo, in its separate capacities as AFI's and the JSNs' collateral agent,

similarly fails to allege any actual, concrete claim that it holds that will be affected by the Third

Party Release.  In fact, Wells Fargo's objection (the "Wells Fargo Objection") [Dkt. No. 5410]

details the many reasons why it will *not* be harmed by the Third Party Release, including the

existing Plan provisions that ensure that *all* of its incurred and "reasonably expected" costs, fees,

and expenses will be paid through the Plan.  (Wells Fargo Obj. ¶¶ 46-48, 51-52; Plan, Art.

VII.G) (distributions to Junior Secured Noteholders to be withheld pending receipt of "sufficient

payments to satisfy *all accrued and reasonably expected* . . . Junior Secured Notes Collateral

Agent Fees and Expenses") (emphasis added).[27]  Wells Fargo also highlights the broad universe

of contractual terms that justify its actions, eliminate the JSNs' right to assert claims against the

senior collateral agent for the release of collateral, and exculpate each of the senior and junior

---

[26] (*See, e.g.*, Ex. PX-2 (Intercreditor Agreement) § 3.1(d)(iii) (junior secured creditors "irrevocably, absolutely and unconditionally waives any and all rights" to object to the manner in which AFI or its *agents* "seek to enforce the Liens granted in any of the Collateral"); § 7.3(b)(iii) (AFI and its agents may, among other things, release collateral "without incurring any liability to any" junior secured party); and § 7.3(d) (junior secured parties agree that AFI and its agents shall have "no…liability to any of them…to the fullest extent permitted under applicable law…arising out of any action which such holders of [senior secured claims] may take or permit or omit to take with respect to the foreclosure upon, or sale, liquidation, or other disposition of, the Collateral").)

[27] Wells Fargo admits that nonconsensual releases are permitted where a plan provides for the full payment of the enjoined *claims* and, rather than deny that it will be fully paid, says only that "this factor is not determinative." (Wells Fargo Obj. ¶ 67.)  Thus, Wells Fargo admits that it anticipates full payment under the existing Plan terms.

collateral agents (in its separate capacities) for its obligations to the respective secured parties for anything other than gross negligence or willful misconduct.  (*See* Wells Fargo Obj. ¶¶ 14-18, 24-33.)  In addition, it is unclear how Wells Fargo's actions in its capacity as collateral agent to the senior secured party, AFI, could create liability for Wells Fargo in its capacity as collateral agent to the junior secured party, the JSNs.

For all of these reasons, it is unsurprising that even the JSNs have *never* said they intend to pursue claims against Wells Fargo,[28] despite many opportunities to do so, and in fact have admitted that Wells Fargo would *not* be liable.  (JSN Obj. ¶ 107) (stating that Wells Fargo was "entitled to rely" on certificates prepared by the Debtors).  The fact that the JSNs evidently have given Wells Fargo no formal assurance that they will not pursue frivolous, waived claims against it is yet another facet of their strategic campaign to disrupt confirmation.

The Wells Fargo Objection references similarly hypothetical and baseless claims against the Debtors' officers, directors and other representatives.  Despite the JSNs' recognition that Wells Fargo is not liable, the JSNs' contractual waiver of any rights against the senior collateral agent for releasing the collateral, and the assurance that even future costs would be provided for under the Plan if reasonably expected, Wells Fargo asserts that *if* it is nevertheless held liable to the JSNs, it *might then* have independent claims for contribution or indemnity against officers who provided certificates, counsel who provided opinions (and AFI to the extent it directed Wells Fargo to release collateral); but Wells Fargo purports to assert these claims despite its admission that *no* such claim currently exists.  (Wells Fargo Obj. ¶ 45) (identifying potential claims that would exist "*to the extent* any action is brought against the Collateral Agent

---

[28] Indeed, even in the *Statement of UMB Bank, N.A. with Respect to Objection of Wells Fargo Bank, N.A. to Confirmation of the Joint Chapter 11 Plan* [Dkt. No. 5636] – a document clearly intended by the JSNs to further disrupt the Plan confirmation – there is no indication that the JSNs intend to pursue any claims against Wells Fargo for which indemnification may be relevant.

challenging the Collateral Agent's release of liens and security interests") (emphasis added). And Wells Fargo provides *no* basis to question the conduct of the directors and officers, nor does it explain how it could have claims against these parties, who owed Wells Fargo no contractual duties and solely signed certificates on behalf of the Debtors, not themselves.[29]

There is no indication that these parties were not acting on behalf of Ally or the Debtors when they provided the certifications, and Wells Fargo does not articulate any theory as to the nature of its imagined claims against these parties in their individual capacities – which is the subject of the Third Party Release.  Indeed, Wells Fargo's imagined claims against released parties would be just as irresponsible and frivolous as the imagined claim against Wells Fargo – and certainly unfair to officers and directors who are giving up their insurance coverage and waiving their own indemnification claims to facilitate the Global Settlement and Plan.  (*See* Confirmation Brief, Section III.A.2.b.(ii).)  Wells Fargo's mere speculation about costs that it might incur and that might not be reimbursed under the Plan depends on a parade of unarticulated, fanciful contingencies.  Wells Fargo thus fails to identify a valid claim that is meaningfully affected by the Third Party Release.

As set forth at length in the Confirmation Brief, in exchange for the Third Party Release, these officers and directors are forgoing their rights to shared insurance that they otherwise could access to defend themselves against potential claims related to their individual conduct, or misdirected claims against them that should have been asserted against the Debtors.

---

[29] The JSN Objectors assert similarly that "the Debtors' directors and officers prepared numerous certificates and documents, and made numerous representations, upon which the Notes Trustee and its predecessors were entitled to rely" and speculate that "[t]o the extent such documents or representations were inappropriate, and the Notes Trustee is subject to any liability as a result of its reliance thereon, the Notes Trustee may have claims against such directors and officers."  (Objection of the Notes Trustee and Ad Hoc Committee of Junior Secured Noteholders, filed 10/22/13 [Dkt. No. 5443], at 47 (emphasis added).)  The JSN Objectors, like Wells Fargo, provide no basis for any actual claim.  Any such claim, like the hypothetical claims raised by Wells Fargo, would be derivative of a claim against the Debtors, on whose behalf any such representations were made, and would directly impact the estates through claims for contractual indemnity and insurance coverage.

(Blumentritt Direct ¶¶ 7-12.)    These parties have also agreed to forego their own claims for indemnity and contribution from the estates and Ally.  (Kruger Direct ¶ 200) .  Both sacrifices are directly related to $150 million of the Ally Contribution, but ultimately inextricable from the full $2.1 billion that Ally will contribute.  (*See* Confirmation Brief, Section III.A.2.b.(ii).)  Such contributions are more than adequate to justify folding the directors and officers into this global resolution and avoiding the indemnity and contribution litigation that would surely flow from the prosecution of such third party claims.  *See In re Mercedes Homes, Inc.*, 431 B.R. 869, 878-84 (Bankr. S.D. Fla. 2009) (third party releases approved for directors and officers based on identity of interest from indemnity obligations and substantial contribution by individuals through waiver of claims); *In re Charter Commc'ns*, 419 B.R. 221, 258-59 (Bankr. S.D.N.Y. 2009) (approving third party release of directors and officers, over objections, based on contributions from Paul Allen).

Wells Fargo, in its capacity as successor to Wachovia Bank and Wachovia Bank of Delaware ("WFBNA"), also objects (the "WFBNA Objection") [Dkt. No. 5411], to application of the Third Party Release to purported claims under a prepetition deposit agreement in which Ally purportedly guaranteed the Debtors' obligations.  (*See* WFBNA Obj. at 2.)[30]  But WFBNA's Objection, despite its fog of minutiae, fails to identify any obligation of the Debtors that would implicate Ally's purported guaranty.  In reality, the Debtors closed their WFBNA accounts within *one month* of the Petition Date, with no known liabilities outstanding.[31]  To the extent WFBNA legitimately has claims against Ally that would not affect the Debtors – which

---

[30] WFBNA also appears to rely on a letter sent by its counsel to the Debtors and Ally prior to the Petition Date that purported to unilaterally and drastically amend the deposit agreement.  The Plan Proponents reserve all rights to contest the effectiveness of the letter amendment.

[31] WFBNA's unliquidated proofs of claim, filed five months after the Debtors' accounts were closed, attach the amended deposit agreement without asserting any liquidated amounts or describing any particular grounds for the Debtors' (or Ally's) liability.

WFBNA does not articulate either – then those claims would not be covered by the Third Party Release.  What appears to have occurred, however, is that WFBNA continued to incur exorbitant legal fees for the monitoring of these cases after the Debtors accounts were closed, for reasons that are obscure and for which the Debtors cannot be liable.  Moreover WFBNA, on information and belief, already unilaterally and without notice deducted more than $470,000 from an Ally account to pay its legal fees for monitoring these cases – which is surely enough to pay in full any liabilities incurred by the Debtors to WFBNA under the deposit agreement.  WFBNA should not be permitted to disrupt approval of the Third Party Release on the basis of its fabricated third party claims.

Finally, Impac Funding Corporation and Impac Mortgage Holdings, Inc. (together, "Impac") objects to the Third Party Release (the "Impac Objection") [Docket No. 5401], asserting that they are in active litigation with Ally Bank.  (*See* Impac Obj. ¶ 2.)  Any concern that Impac has on the effect of the Third Party Release on that litigation is rendered moot as a result of language that the Plan Proponents will insert into the Confirmation Order which will expressly preserve Impac's rights in that litigation.  As a result, Impac will not be prejudiced by the Third Party Release.

The absence of any objector articulating a concrete claim affected by the Third Party Release (together with the overwhelmingly consensual nature of the releases and the obviously tactical nature of the principal objections) provides adequate grounds for the Court to overrule the remaining objections.   *See, e.g.*, *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd. (In re Ion Media Networks, Inc.)*, 419 B.R. 585, 601-02 (Bankr. S.D.N.Y. 2009) (permitting releases of hypothetical claims where all parties consented but for one "potential spoiler" seeking to "gain leverage"); *In re Metro. 885 Third Ave. Leasehold, LLC*,

No. 10-16103, 2010 WL 6982778 at *11 (Bankr. S.D.N.Y. Dec. 22, 2010) (noting, in approving release, that "there are no pending claims or causes of action against the released non-debtor parties").  But even if the Court could identify the semblance of a legitimate third party claim, neither the JSN Objectors nor Wells Fargo (or any other party who objected to the Third Party Release) cite any authority that denies the Court's ability to release such remote and contingent claims based on a finding of "truly unusual circumstances that render the release terms important to success of the plan."  *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d Cir. 2005).

**B.      The Objectors Have Not and Cannot Show That the Third Party Release Fails Under Existing Law**

Even if the Court were to proceed to consider objections interposed by parties that cannot demonstrate any prejudice flowing from the Release Provisions,[32] the remaining objections should be overruled.

The principal legal objection to the Third Party Release, asserted by the JSN Objectors, Wells Fargo, Impac, and the United States Trustee, is that the release supposedly exceeds this Court's jurisdiction because it would apply to all third party claims arising out of the Debtors' business, not just those that are technically "derivative" of claims against the estates. (*See* Objection of the United States Trustee (the "UST Objection") at 9 [Dkt. No. 5412]; Wells Fargo Obj. ¶¶ 57-60; JSN Obj. ¶ 100; Impac Obj. ¶¶ 20-25.)  The objectors base this argument on an overbroad reading of *In re Johns-Manville Corp.*, 517 F.3d 52 (2d Cir. 2008), *rev'd sub nom*, *Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009), that the Second Circuit expressly *rejected* in *Quigley Co., Inc. v. Angelos (In re Quigley Co., Inc.)*, 676 F.3d 45 (2d Cir. 2012).  As

---

[32] Parties not directly affected by provisions of a plan to which they object lack standing to raise such objections. *See In re Quigley Co., Inc.*, 391 B.R. 695, 705-06 (Bankr. S.D.N.Y. 2008) ("[A] 'party in interest' cannot assert third party rights defensively to defeat confirmation even if confirmation would directly and adversely affect its own rights.").

this Court has recently recognized, the "touchstone" for bankruptcy jurisdiction is "whether its

outcome might have any conceivable effect on the bankruptcy estate." *In re Trinsum Grp., Inc.*,

No. 08-12547, 2013 WL 1821592, at *5 (Bankr. S.D.N.Y. April 30, 2013) (citing *Quigley*, 676

F.3d at 57).[33]   Whether a suit seeks to impose derivative liability is merely one "helpful way" to

answer that question.   *Quigley*, 676 F.3d at 57 ("while we have  treated whether a suit seeks to

impose derivative liability as a helpful way to assess whether it has the potential to affect the

bankruptcy res, the touchstone of bankruptcy jurisdiction remains whether its outcome might

have any conceivable effect on the bankruptcy estate").[34]

        The JSN Objectors interpose several other objections to the Third Party Release,

none of which has any merit:

        The JSN Objectors first argue that having been deemed "unimpaired" at a limited

number of Debtors, they cannot be made subject to the Third Party Release.   But they cite no

authority holding that a release imposed on all creditors impairs those with no actual third party

claims – and certainly no authority that the designation of "unimpaired" empowers a creditor to

defeat otherwise lawful features of a plan.   In any event, the JSNs' votes have been tabulated at

each entity at which the JSNs have a claim and it would not matter for purposes of confirmation

of the Plan whether they are impaired because the Plan satisfies the requirements of section

---

[33] Beyond this erroneous legal argument, the United States Trustee objects to the Release Provisions in broad, generic terms, essentially asserting that the Plan Proponents needed to meet the legal requirements for releases and exculpations.  (*See* UST Obj. at 6-9).  Such explanation of the legal grounds for the Release Provisions is amply supplied in Section III.A of the Confirmation Brief.  The explication of these legal grounds and application in the Confirmation Brief to the facts of these cases also constitute complete answers to the vague, sweeping, and sometimes vitriolic objection of Wendy Alison Nora, to the extent it relates to the Release Provisions.  (*See* objection of Wendy Alison Nora ¶ 14 [Dkt. No. 5398]) (calling Third Party Release "unjustified").

[34] The United States Trustee seems to imply that *In re Dreier LLP*, 429 B.R. 112, 132-33 (Bankr. S.D.N.Y. 2010), stands for the proposition that jurisdiction is limited to derivative claims (UST Obj. at 9), and the JSNs cite *In re Madoff*, 848 F. Supp. 2d 469, 489-90 (S.D.N.Y. 2012) for the same purpose (JSN Obj. ¶ 100).  These cases approve the release of derivative claims but do not hold that a broader release would be beyond the bankruptcy jurisdiction. *See Dreier*, 429 B.R. at 131 (jurisdiction exists over disputes that "would have an effect on the estate"); *Madoff*, 848 F. Supp. 2d at 489 (release of direct claims not at issue).  Any such holding would in any event be overruled by *Quigley*.

1129(b) of the Bankruptcy Code with respect to the JSNs.   Thus, the JSNs' Objection with respect to this argument is moot.

The JSN Objectors next offer a variety of arguments to the effect that the Third Party Releases have not been justified as "important" to the Plan within the meaning of *Metromedia* or that the Ally Released Parties have not made a sufficient contribution to justify the release.  (JSN Obj. ¶¶ 101-06).  Wells Fargo similarly argues that the Plan Proponents have not demonstrated that the individual Ally Released Parties' contribution is sufficient or that enjoined claims against them would affect the estates.   (Wells Fargo Obj. ¶¶ 65-66).   These conclusory arguments are fully answered in Section III.A.2.b of the Confirmation Brief, which explains, among other things, the crucial role of the releases in wrapping up all related claims that potentially could affect the estates; the dramatically improved treatment and globally negotiated mosaic of compromises that were both made possible only by the Ally Contribution; and other unique circumstances that make this the rare case in which a third party release is truly critical to the Plan.  As noted therein, the "importance" of the Third Party Release, in contrast to the cautionary example set forth in *Adelphia*, is not improperly manufactured through Ally's conditioning its contribution on the release, but it is inherent in the complex, intertwined morass of litigation entangling the Ally Released Parties with the Debtors that mandated a global resolution of unresolved third party litigation.

The JSN Objectors argue that the Third Party Release cannot be "important" if the JSNs have no claims against Ally, but that if the JSNs are, in fact, forced to give up real claims, the release would constitute unfair discrimination under *In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C. Cir. 1986).  Both sides of this inconsistent dichotomy are flawed.  The Release Provisions are critical to provide overall closure with respect to a vast array of intertwined claims.  Absent

settlement, many parties would have large potential claims against the Ally Released Parties, which could result in significant indemnification liabilities for the Debtors and the swift depletion of shared insurance.   (*See* Confirmation Brief, Section III.A.2.a.)   But all of the substantial third party claims – or at least all that surfaced in the several years of prepetition litigation, followed by the eighteen months of this case, including widespread notice and publicity for the Plan and the Release Provisions – are being voluntarily *settled* under the Plan. The fact that the few objectors do not have substantial third party claims (and indeed appear to have none at all) does not undercut the importance of the largely consensual release.

And the invocation of *AOV* is puzzling.   That court held only that, under section 1123(a)(4) of the Bankruptcy Code, a creditor could not be asked to relinquish a uniquely valuable claim to receive the same treatment as other members of *the same class*, where other members of the class lacked such a claim.   792 F.2d at 1154 ("We do not create a sweeping new rule in this case . . . .   We simply find that on these facts, it is unfair to require a creditor to pay a higher price for the same benefit.").   Of course, the JSNs are separately classified, so section 1123(a)(4) is not at issue.   In any event, it is ironic that the JSN Objectors would make this argument here, where *they* are the creditors effectively exchanging non-existent third party claims for a disproportionate share of the Ally Contribution, given their generous treatment under the Plan.

The JSN Objectors' related argument that the Ally Contribution is too small in light of their view of the value of *estate* claims against Ally (JSN Obj. ¶¶ 105-06) is yet another non sequitur because settlement of the estate claims is governed by a different standard than the Third Party Release.   The JSN Objectors suggest that because the estate claims are so valuable, the Ally Contribution should be viewed as paying only to release such claims; that this recovery

should be deemed "allocated" to the JSNs' prepetition claim; and that Ally should be required to

pay separately for a release of the JSNs' ability to pursue it for postpetition interest. (*Id.*) But

this mishmash of arguments makes no sense. As noted above, the JSNs *have* no ability to pursue

AFI, so they are not giving that up. In any event, AFI is paying one lump sum to release *all*

estate *and* third party claims, and it is only because of that payment that the JSNs will receive

under the Plan payment in full of their prepetition claim with the opportunity for post-petition

interest – vastly more than *they agreed to accept* under their prepetition deal. The JSN

Objectors' argument that they are being forced to give up a non-existent cause of action hardly

proves that they are receiving no consideration for the release and ignores the vastly higher

recovery now being offered to the JSNs as a result of the Ally Contribution.

   In addition, the JSN Objectors offer a wholly speculative argument that the Plan

fails the "best interests" test predicated on the fantasy that loss of the Ally Contribution, collapse

of the Global Settlement and Plan, and plunging of the estates into endless, hotly contested

litigation would somehow yield a better result for the JSNs than the current Plan. The JSNs

predicate this scenario on the opinion of their purported expert – which attempts to bootstrap the

Examiner's Report (which is hearsay) into something admissible through a cursory litigation risk

analysis. But the Examiner's speculation about the potential outcome of complex and likely

protracted litigation can hardly more reliably predict a better result for the estates than what is

actually achieved through the Ally Contribution, much less one that does *more* than guarantee

payment in full for the JSNs.[35]

---

[35] WFBNA also purports to the invoke the "best interests" test, apparently relying on Judge Bernstein's decision in
*In re Quigley Co., Inc.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010), for the notion that third party claims are pertinent
under section 1129(a)(7), although it appears that they actually cite to a prior unrelated decision. (WFBNA Obj.
¶¶ 4-9.) The *Quigley* court, however, found that the third party claims at issue were "property" within the meaning
of section 1129(a)(7) *only* because the claims were "neither speculative nor incapable of estimation. Furthermore,
they presently exist and would exist at the time of any date selected for valuation in a hypothetical *Quigley* chapter 7

Finally, the JSN Objectors argue that the Liquidation Analysis is "fatally flawed" and "contrary to case law" because it assigns contingent claims – which could have *negative* value if a chapter 7 trustee incurred the costs of litigation and lost – no negative or positive value. (JSN Obj. ¶ 110). As demonstrated in Section I.F. above, it is hardly uncommon for a liquidation analysis to assign no specific value to highly contested and uncertain estate litigation, and the JSN Objectors cite no authority requiring a different practice.[36]

In addition to the commonly asserted grounds discussed above, Wells Fargo also argues that the Third Party Release fails the *Metromedia* test because the Plan does not provide for "channeling" of released claims to a post-confirmation trust. (Wells Fargo Obj. ¶ 65). But *Metromedia* does not require such channeling in all cases; it merely cites channeling as one of the various factors that courts have found relevant in approving releases in different circumstances. For example, release of a substantial number of potentially viable tort claims through a plan may only be permissible if they are found to be substantially duplicative of claims being channeled to a litigation trust. *See Class Five Nev. Claimants v. Dow Corning Corp. (In re*

---

case." 437 B.R. at 145. WFBNA does not – and cannot – show that any of these considerations apply to its claims. WFBNA articulates no claims of any kind, speculative or not. As a result, the sole authority on which WFBNA relies actually rejects its argument.

To the extent WFBNA argues that the Plan fails the "best interests" test on account of claims against Ally that are unrelated to the Debtors, such claims are not included in the hypothetical liquidation valuation. *See In re Plant Insulation Co.*, 469 B.R. 843, 887-88 (Bankr. N.D. Cal. 2012) (holding section 1129(a)(7) applies to only to third party claims on which debtor and non-debtor are co-liable), *aff'd* 485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, No. 12-17466, 2013 WL 5779568 (9th Cir. Oct. 28, 2013). Under Ally's purported guaranty, Ally and the Debtors are *not* co-liable (*See* WFBNA Obj. Ex. B.), rendering the guaranty claim not relevant to the "best interests" test.

[36] Neither of the cases they cite contain any such mandate. The first merely describes the same general process that was followed here. *See In re Sierra-Cal*, 210 B.R. 168, 172 (Bankr. E.D. Cal. 1997) (noting that "best interests" test requires "considerable degree of speculation," "estimation of disputed and contingent claims and of chapter 7 administrative expenses," and "application of the chapter 7 distribution scheme"). The second simply describes the value assigned to a particular lawsuit on the facts of that case, without stating or implying that a contingent claim could not be found to have no meaningful value for purposes of projecting a company's liquidation value. *See In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1159 n.23 (5th Cir. 1988) (noting that lawsuit was valued for liquidation analysis).

*Dow Corning Corp.*), 280 F.3d 648, 657-58 (6th Cir. 2002) (dissenting mass tort claimants could

opt out and preserve opportunity to be paid in full for unitary claim for which co-defendant

parent company was being released).  Here, in contrast, all claims of any significance are being

*settled* except those of the JSNs, which are being *paid in full*.  Since no claims of identifiable

value are being released without payment, there is nothing to "channel."

      **C.**    **The Exculpation Is Justified in the Circumstances**

      The United States Trustee states that the Plan Proponents have "failed to explain"

why the Exculpation is justified with respect to non-estate fiduciaries.  (UST Obj. at 9).  As fully

explained in Section III.B of the Confirmation Brief, multiple cases in this District support the

exculpation of *all* parties whose efforts bestow substantial value on the estates, whether or not

these parties are estate fiduciaries.  For example, in *Upstream Energy Servs. v. Enron Corp.* (*In

re Enron Corp.*), 326 B.R. 497 (S.D.N.Y. 2005), the District Court cited a host of reasons why

broad exculpation of fiduciaries, indenture trustees, and "respective directors, officers,

employees, members, attorneys, consultants, advisors and agents" was appropriate, all of which

apply here.  Specifically, the provision was (i) negotiated by all parties; (ii) necessary for the

negotiation of the plan; (iii) expected by the negotiating parties to provide limited protection for

their participation, in good faith, in negotiating and documenting key Plan-related agreements to

advance "one of the largest and most complex" cases; and (iv) parties might have abandoned

their efforts to assist the debtors without protection from liability.  *Id*. at 500, 503.

      Indeed, it was only through the intensive efforts of the Exculpated Parties, both

after the Petition Date and, where applicable, prior to it, that the very real threat of a litigation

meltdown was replaced with overwhelming consensus.  In particular, the Consenting Claimants

(some of whom are fiduciaries themselves) deserve credit for achieving, in a highly scrutinized,

contested environment, a dramatically better outcome for *all* creditors than would have otherwise

occurred. To reach this result, these parties and their representatives had to propose that their institutions make carefully considered compromises in order to reach a resolution, and in so doing, relied on having protection for their good faith efforts to achieve consensus. They will not receive any protection if it turns out they acted with gross negligence or bad faith. But the case for exculpation is unusually strong.

The Plan Proponents acknowledge, and so address in the Confirmation Brief, that some courts in this District have treated exculpation provisions as a species of third party release and performed the analysis contemplated by *Metromedia*. *See In re Chemtura*, 439 B.R. 561, 610-11 (Bankr. S.D.N.Y. 2010) (referring to exculpation clauses as "first cousins" of third party releases and applying *Metromedia*). In any case, the *Metromedia* standard, even if applicable, is satisfied here, where all of the non-estate fiduciaries covered by the Exculpation have provided substantial contributions to these cases, and many, including Ally and various Consenting Claimants, have filed proofs of claim that include claims for indemnification and contribution.

In its objection, the United States Trustee alleges that the Plan Proponents failed to explain why, and with sufficient detail, the non-estate fiduciaries are deserving of the protection afforded by the Exculpation. (UST Obj. at 9). The United States Trustee cites to *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011), in an effort to illustrate that it would be appropriate to limit the Exculpation to estate fiduciaries. As an initial matter, the *Washington Mutual* decision and application of Third Circuit precedent is not binding on the Court. Secondly, the *Washington Mutual* court limited exculpation to fiduciary parties – excluding others *already covered* by the debtor and third party release – and expressed concern that extending the protection to non-estate fiduciaries was "either duplicative of the releases [contained elsewhere in the plan] or is an effort to extend those releases." *Id*. at 350-51. Here, in

contrast, the Exculpation protects certain non-estate fiduciaries who are not covered by the Third

Party Release but nevertheless made important contributions towards the overall resolution of

these cases.[37]

The Exculpation performs a function in the Global Settlement similar to the

findings of fact that the RMBS Trustees for the FGIC-wrapped RMBS Trusts required be

included in the order approving the FGIC Settlement Agreement, stating that those RMBS

Trustees acted in the best interests of investors in the trusts.  *See FGIC 9019 Opinion*, 497 B.R.

at 739-42.  That finding helped provide comfort to those RMBS Trustees that they would not

later be sued for the very act of entering into a settlement with the Debtors.  Here, the

Exculpation likewise helps incentivize parties to agree to the Global Settlement.

The Plan Proponents have provided in the Confirmation Brief a comprehensive

and detailed explanation as to why, among other things, the Exculpation is appropriate in scope

as drafted and should extend to the acts of non-estate fiduciaries in these Chapter 11 Cases.

Accordingly, the Plan Proponents submit that they have presented sufficient evidence to address

any concerns the United States Trustee may have as to the appropriateness of the scope of the

Exculpation.

---

[37] Moreover, the limited prepetition activities covered by the Exculpation – principally, negotiating the Original
RMBS Settlement and Original Ally Settlement eased the Debtors' transition into chapter 11 and permitted the
assets sales to conclude successfully, thereby providing significant value to the Debtors' estates.  (*See* Kruger Direct
¶ 59.)

### CONCLUSION

For the foregoing reasons and the reasons set forth in the Confirmation Brief, the

Plan Proponents respectfully request that the Court overrule all outstanding Objections and enter

an order confirming the Plan and providing such other or further relief as is just and proper.

Dated:  November 12, 2013                    Respectfully submitted,

                                           /s/ Gary S. Lee
                                           Gary S. Lee
                                           Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the Debtors and*
*Debtors in Possession*

-and-

KRAMER LEVIN NAFTALIS & FRANKEL
LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Rachael Ringer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee*
*of Unsecured Creditors*

# ANNEX A

# ANNEX A
## CONFIRMATION OBJECTION RESPONSE CHART

| | OBJECTING PARTY | BASIS FOR OBJECTION | PLAN PROPONENTS' RESPONSE | STATUS |
|---|---|---|---|---|
| 1. | United States Trustee<br><br>[Docket No. 5412] | (a)  The Plan Proponents[1] fail to meet their burden of proof that the Plan satisfies the requirements of section 1129, including section 1129(a)(4). | The Plan satisfies each confirmation requirement of section 1129, and properly provides for Bankruptcy Court approval of all professional fees and expenses to be paid by the Debtors.  *See* Confirmation Brief, Section I. | Unresolved |
| | | (b)  The Plan impermissibly provides for overly broad non-debtor third party release and exculpation provisions. | The Third Party Release and Exculpation satisfy the standards for approval in the Second Circuit and are reasonable and appropriate under the circumstances. *See* Confirmation Brief, Section III; Omnibus Response, Section II. | |
| 2. | UMB Bank, N.A. and the Ad Hoc Committee of Junior Secured Noteholders<br><br>[Docket No. 5443] | *See* Omnibus Response, *supra.* | *See* Omnibus Response, *supra.* | Unresolved |
| 3a. | Certain States and the District of Columbia (the "States")<br><br>[Docket No. 5415] | (a)  The Governmental Plaintiffs that filed proofs of claim should be afforded a minimum of 60 days from the Effective Date to file amended claims without having to obtain approval as contemplated by Article VIII.C. | Payments to the States have already been made under the DOJ/AG Settlement and there is no need for additional time to file an amended proof of claim. | Resolved subject to final documentation |

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the *Plan Proponents' Omnibus Response to Objections to Confirmation of the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors*, filed contemporaneously herewith (the "**Omnibus Response**"), or the Plan, as applicable.

| | OBJECTING PARTY | | BASIS FOR OBJECTION | PLAN PROPONENTS' RESPONSE | STATUS |
|---|---|---|---|---|---|
| | | (b) | The Plan should not restrict the right of setoff, recoupment and subrogation beyond the limits of section 553. | The Proposed Confirmation Order[2] preserves the setoff and recoupment rights of Governmental Units. *See* Proposed Confirmation Order ¶ 38(b). | |
| | | (c) | Article IV.Q of the Plan purports to apply the exception in section 1146(a) to "sales" and "use" taxes, which plainly are not included in the section 1146(a) exception. | Article IV.Q of the Plan has been modified to delete the reference to "sales and use" taxes. | |
| | | (d) | The injunction and release provisions are overly broad in precluding actions by the States relating to the DOJ/AG Settlement. | The Liquidating Trust remains obligated under the DOJ/AG Settlement.<br><br>Article IX.E of the Plan has been revised to exclude (i) the United States and the DOJ/AG Settling States from the Third Party Release with regard to any liability the Ally Released Parties may have under the DOJ/AG Settlement or causes of action preserved under sections of the DOJ/AG Settlement and (ii) the United States and the States from the Third Party Release with regard to AFI's obligations under the Internal Revenue Code, environmental laws, civil fraud laws, or criminal laws. (The States purport to object to the Ally Release, by which the Ally Released Parties provide certain reciprocal releases, but they do not articulate an objection.)<br><br>The Plan Proponents understand that the revised language addresses the States' concerns. Regardless, the Injunction, Third Party Release and Ally Release satisfy the standards for approval in the Second Circuit and are reasonable and appropriate under the circumstances. *See* Confirmation Brief, Section III; Omnibus Response, Section II. | |
| 3b. | **United States Department of Justice (no** | (a) | The United States and, in some instances, Governmental Units, are entitled to certain carve-outs | The Proposed Confirmation Order has been revised to preserve the police and regulatory powers of the United States as to the Debtors, the Liquidating Trust, and non- | **Resolved subject to** |

---

[2] "**Proposed Confirmation Order**" means the *Order Confirming First Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors*, filed contemporaneously herewith.

| | OBJECTING PARTY | | BASIS FOR OBJECTION | PLAN PROPONENTS' RESPONSE | STATUS |
|---|---|---|---|---|---|
| | formal objection filed) | | from the release and exculpation provisions. | debtors. The Plan Proponents have negotiated a governmental carve-out to address other concerns in the Proposed Confirmation Order. *See* Proposed Confirmation Order ¶ 38.<br><br>The Exculpation has been revised to provide certain agencies of the United States represented by the Department of Justice a limited carve-out. | final documentation |
| | | (b) | The United States should not be subject to the Third Party Release. | Article IX.E of the Plan has been revised to exclude (i) the United States and the DOJ/AG Settling States from the Third Party Release with regard to any liability the Ally Released Parties may have under the DOJ/AG Settlement or causes of action preserved under sections of the DOJ/AG Settlement and (ii) the United States and the States from the Third Party Release with regard to AFI's obligations under the Internal Revenue Code, environmental laws, civil fraud laws, or criminal laws. Moreover, the government carve-out provides that nothing in the Plan releases or exculpates any non-debtor other than AFI from liabilities to any DOJ-Represented Agency.<br><br>The Plan Proponents understand that the revised language addresses the DOJ's concerns. Regardless, the Injunction, Third Party Release and Ally Release satisfy the standards for approval in the Second Circuit and are reasonable and appropriate under the circumstances. *See* Confirmation Brief, Section III; Omnibus Response, Section II. | |
| 4. | **Federal Home Loan Mortgage Corporation ("Freddie Mac")**<br><br>**[Docket No. 5405]** | (a) | The Plan would impermissibly release Freddie Mac's claims against Ally. | An agreement in principle has been reached, subject to finalization and documentation. | **Withdrawn.** *See* **Docket No. 5671.** |

| | OBJECTING PARTY | | BASIS FOR OBJECTION | PLAN PROPONENTS' RESPONSE | STATUS |
|---|---|---|---|---|---|
| 5. | Impac Funding Corporation and Impac Mortgage Holdings, Inc. ("Impac") [Docket No. 5401] | (a) | The Plan impermissibly extends the deadline for the Debtors to assume or reject executory contracts beyond confirmation. | The Debtors filed a motion[3] to assume and assign Impac's contracts well in advance of confirmation, with the motion currently scheduled to be heard on November 15, 2013. To the extent the Court approves the motion, Impac's objection to the Plan will be moot.<br><br>In any event, the procedures in the Plan relating to assumption or rejection of contracts are supported by relevant law and consistent with procedures approved by this Court and others.<br><br>Several courts have held that debtors may make a determination to assume or reject executory contracts or unexpired real property leases *after* confirmation of the plan. *See DJS Props., L.P. v. Simplot*, 397 B.R. 493, 498 (D. Idaho 2008) (permitting debtor to determine whether to assume or reject a particular contract post-confirmation); *Alberts v. Humana Health Plan, Inc. (In re Greater Se. Cmty. Hosp. Corp.)*, 327 B.R. 26, 34 (Bankr. D.D.C. 2005) (holding that the "Bankruptcy Code permits questions of assumption or rejection under a plan to be determined after confirmation of a plan calling for such post-confirmation determination"); *In re Rubicon U.S. REIT, Inc.*, 434 B.R. 168, 177 (Bankr. D. Del. 2010) (authorizing the rejection of executory contracts after determination of cure amount); *cf. RenGen Capital I, Inc. v. UAL Corp. (In re UAL Corp.)*, 635 F.3d 312, 320 (7th Cir. 2011) (recognizing that the "permissive language of [section 365(d)] leaves open the possibility that an executory contract not be assumed or rejected prior to plan confirmation"); *see also In re MF Global*, No. 11-15059 [Docket No. 1382] (approving similar provisions); *In re General Maritime Corp.*, No. 11-15285 [Docket No. 794] (same); *In re Charter Commc'ns*, No. 09-11435 [Docket No. 273] (same); *In re The Great Atlantic & Pacific Tea Co., Inc.*, No. 10-24549 [Docket No. 3417] (same).<br><br>Thus, Impac's accusations that the Debtors are seeking to hold | **Unresolved** |

---

[3] *Debtors' Motion Under Section 365 of the Bankruptcy Code to Assume and Assign Servicing Related Agreements with Impac Funding Corporation and Impac Mortgage Holdings, Inc.*, filed on Aug. 19, 2013 [Docket No. 4744].

| | OBJECTING PARTY | BASIS FOR OBJECTION | PLAN PROPONENTS' RESPONSE | STATUS |
|---|---|---|---|---|
| | | | Impac "hostage," or confirm a plan with "coercive" effects on counterparties (Impac Obj. ¶ 16) mischaracterize the procedures set forth in the Plan. Accordingly, Impac's objection should be overruled. | |
| | | (b) The Third Party Release is impermissible. | The Plan Proponents have added the following language to the Proposed Confirmation Order to address Impac's concerns with respect to the effect of the Third Party Release on litigation currently pending between Ally and Impac: | |
| | | | Notwithstanding anything herein or in the Plan to the contrary, all rights of Ally, Impac Funding Corporation and Impac Mortgage Holdings, Inc. regarding the civil action entitled *Ally Bank f/k/a GMAC Bank v. Impac Funding Corporation et al.*, No. 13-Civ-5789 (S.D.N.Y. 2013) are fully preserved. | |
| | | | *See* Proposed Confirmation Order ¶ 39(f). | |
| | | | Regardless, the Third Party Release satisfies the standard for approval in the Second Circuit and is reasonable and appropriate under the circumstances. *See* Confirmation Brief, Section III; Omnibus Response, Section II. | |
| 6. | **Wells Fargo Bank, N.A., as the senior collateral agent and junior collateral agent ("Wells Fargo")** <br><br> **[Docket No. 5410]** | (a) The governing agreements require the Debtors to indemnify Wells Fargo with regard to any challenge by the JSNs of the senior collateral agent's release of security interests. Wells Fargo seeks certainty that funds will be withheld from the JSNs' Plan distribution sufficient to cover all of Wells Fargo's fees, expenses and rights to indemnification that would arise in the event of such a | The Plan already preserves Wells Fargo's rights to receive sums owed to it pursuant to the prepetition documents. <br><br> In any case, Wells Fargo's specific concern about exposure to the JSNs is highly contingent and overblown. *See* Omnibus Response, Section II. Among other things, the JSNs have expressly acknowledged that the senior collateral agent was entitled to rely on certificates provided by the Debtors' directors and officers on the Debtors' behalf, and the JSNs waived any rights against the senior collateral agent in the Intercreditor Agreement. *Id.* | **Unresolved** |

| | OBJECTING PARTY | | BASIS FOR OBJECTION | PLAN PROPONENTS' RESPONSE | STATUS |
|---|---|---|---|---|---|
| | | | challenge by the JSNs. | | |
| | | (b) | Wells Fargo objects to the Third Party Release as applied to directors and officers who provided documents on which the senior collateral agent purportedly relied in releasing security interests, as Wells Fargo would have claims against these parties if the JSNs bring claims against Wells Fargo related to its duties under the relevant prepetition documents. Wells Fargo argues that release of its hypothetical claims against the directors and officers is not appropriate under applicable law. | Subject matter jurisdiction exists over Wells Fargo's hypothetical, contingent, and frivolous third party claims against the directors and officers, as these parties could seek indemnification and contribution from Ally (which would in turn seek reimbursement from the Debtors) or the Debtors stemming from such claims. *See* Confirmation Brief, Section III.A.2.a.

Release of the directors and officers is consistent with *Metromedia* and amply justified by the $2.1 billion that Ally is in part paying on their behalf, in exchange for a waiver of their indemnity claims against Ally and an assignment to Ally of insurance coverage, and other unique circumstances. *See id.*, Section III.A.2.b. This exchange is directly linked to $150 million of the Ally Contribution, but is inextricable from the full $2.1 billion. *See id.*

Nor will Wells Fargo suffer cognizable harm as a result of the release. The directors and officers have no contractual obligations to Wells Fargo, and would only be liable if (i) improbably, Wells Fargo was first found liable to the JSNs and (ii) also improbably, Wells Fargo was then able to prevail against the directors and officers on a non-contractual basis. *See* Omnibus Response, Section II. A scenario in which these contingencies arise is difficult to imagine, and provides no grounds to expose the directors and officers (who will have waived their insurance protection and rights to indemnity and who did not act in their individual capacities) to frivolous claims by Wells Fargo. *Id.* | |
| 7. | Wachovia Bank and Wachovia Bank of Delaware, now succeeded by Wells Fargo Bank, N.A. ("WFBNA") [Docket No. | (a) | Release of WFBNA's claims against AFI would violate the best interests test and unfairly discriminate against WFBNA, because WFBNA would otherwise receive 100% of their claims against their estate from an alleged indemnity of such claims from AFI. | WFBNA has not articulated any claim against the Debtors for which AFI is co-liable for purposes of the best interests test, and none exists. The Debtors closed their WFBNA accounts one month after the Petition Date with no amounts owed. WFBNA is understood to have incurred substantial legal fees – which the Debtors have no obligation to reimburse – for ongoing monitoring of the cases *after* all accounts were closed and sought payment from AFI. WFBNA already collected $472,000 from AFI for those fees, more than discharging any alleged obligation. The additional incurrence of unjustified legal fees is no basis to alter the Third | Unresolved |

| | OBJECTING PARTY | | BASIS FOR OBJECTION | PLAN PROPONENTS' RESPONSE | STATUS |
|---|---|---|---|---|---|
| | 5411] | | | Party Release. | |
| | | (b) | Other provisions of the Plan would impair WFBNA's rights against AFI under the AFI Deposit Agreement. | To the extent WFBNA has direct claims against AFI that would not affect the estates, such claims are not released under the Third Party Release. | |
| 8. | Certain Insurers Under General Motors Combined Specialty Insurance Program 12/15/00 - 12/15/03 (the "GM Insurers") [Docket No. 5413] | (a) | The Plan is not "insurance neutral" because the language preserving insurer defenses lacks a "super-preemptory" provision, and because it does not preserve all of the GM Insurers' defenses to coverage, in particular those based on reasonableness. | The Plan Proponents have fully resolved the GM Insurers' objection, and the objection will be withdrawn.  The Plan has been amended to provide insurance neutrality (Plan, Art. VII.K.2.), and the Bankruptcy Court will have concurrent rather than exclusive jurisdiction to hear and determine disputes regarding certain insurance matters. (Plan, Art. XII.) | Resolved |
| | | (b) | The Plan improperly provides for the retention by the Bankruptcy Court of exclusive jurisdiction over certain insurance-related matters rather than concurrent jurisdiction. | | |
| | | (c) | The Plan assigns the Debtors' interests in Policies issued by the GM Insurers in violation of the anti-assignment provisions contained in those Policies. | | |
| 9. | County of San Bernardino, California [Docket No. 5408] | (a) | The Plan fails to properly provide for secured tax payments. | An agreement in principle has been reached, subject to finalization and documentation. | Resolved subject to final documentation |
| 10. | Los Angeles County | (a) | The Plan impermissibly classifies all secured tax claims | An agreement in principle has been reached, subject to finalization | Resolved subject to |

| | OBJECTING PARTY | | BASIS FOR OBJECTION | PLAN PROPONENTS' RESPONSE | STATUS |
|---|---|---|---|---|---|
| | **Treasurer & Tax Collector** [Docket No. 5400] | | as "Priority Tax Claims" thus authorizing the Debtors to pay these taxes over the course of five years pursuant to section 1129(a)(9)(c); secured tax claims which are not otherwise entitled to priority status must be classified as "Other Secured Claims" and paid in full on the Effective Date, with statutory interest pursuant to section 511. | and documentation. | **final documentation** |
| 11. | **Universal Restoration Services, Inc. ("URS")** [Docket No. 5506] | (a) | Through its adversary proceeding, URS seeks a determination that monies GMACM holds for URS in trust or escrow are not property of the estate. The funds at issue should be excluded from the reach of other creditors and URS objects to the inclusion of its claims in the Plan. | The parties are working to reach an agreement and anticipate that the objection will be withdrawn. | **Unresolved** |
| 12. | **Ocwen Loan Servicing, LLC ("Ocwen")** [Docket No. 5461] | (a) | The Plan cannot conflict with or modify the Sale Order, the Ocwen APA or Ocwen's rights in connection with such documents. | The Plan Proponents have fully resolved Ocwen's objection. The Proposed Confirmation Order provides that the Liquidating Trust shall assume and perform any and all rights, benefits, duties, and obligations of the Debtors under the Ocwen APA and the Ocwen Sale Order in accordance with their terms. *See* Proposed Confirmation Order ¶ 26. The parties also resolved Ocwen's objection to the Third Party Release. | **Resolved** |
| | | (b) | The Plan must provide for the Liquidating Trust's performance of its obligations under the Ocwen APA. | | |

8

| | OBJECTING PARTY | | BASIS FOR OBJECTION | PLAN PROPONENTS' RESPONSE | STATUS |
|---|---|---|---|---|---|
| | | (c) | The Plan fails to provide adequate assurance that post-Effective Date administrative claims related to the Ocwen APA will be satisfied. | | |
| | | (d) | The Third Party Release is impermissibly broad. | | |
| 13. | **Deutsche Alt-A Securities, Inc., DB Structured Products, Inc., Deutsche Bank Securities Inc., Deutsche Mortgage Securities, Inc., MIT Holdings, Inc., MortgageIT, Inc., and MortgageIT Securities Corp. (collectively, "Deutsche Bank")** [Docket No. 5459] | (a) | Deutsche Bank seeks a declaration that Article IX.J (Satisfaction and Release of Claims and Equity Interest) of the Plan does not limit its alleged right to a judgment credit pursuant to its claim for indemnification and contribution from the Debtors. | The Judgment Reduction was provided in Article IX.K of the Plan to compensate co-defendants in securities litigation for the loss of indemnification from Ally caused by the Third Party Release.<br><br>Deutsche Bank acknowledges that it only has claims for indemnification from the Debtors, not Ally, and is therefore not affected by the Third Party Release. *See* Obj. ¶ 10.<br><br>Deutsche Bank's apparent concern is that the Plan fails to clarify whether Article IX.J will give rise to a judgment credit. That provision, however, does not release Deutsche Bank's indemnity claims against the estates; those claims will be handled through the ongoing claims process.<br><br>Setting aside whether this Court should *ever* address what consequences the adjudication of Deutsche Bank's indemnity claims against the estates might have in other cases in which Deutsche Bank has been sued, the Court certainly need not do so in the context of Plan confirmation, which does not involve adjudication of such claims. As such, the additional language sought by Deutsche Bank is not necessary or appropriate. | **Unresolved** |
| 14. | **The Federal Housing Finance Agency (the "FHFA")** [Docket No. | (a) | The Plan fails to recognize the priority of FHFA's claims under the Housing and Economic Recovery Act (claims which FHFA has not actually asserted). | An agreement in principle has been reached, subject to finalization and documentation. | **Withdrawn.** *See* **Docket No. 5672.** |

9

| OBJECTING PARTY | BASIS FOR OBJECTION | | PLAN PROPONENTS' RESPONSE | STATUS |
|---|---|---|---|---|
| 5436] | (b) | The Plan unfairly discriminates against FHFA by providing it a significantly smaller distribution percentage than general unsecured creditors. | | |
| | (c) | The Plan does not satisfy the "best interests" test, in part because the Debtors' Liquidation Analysis assigns no value to the estate's claims against Ally. | | |
| | (d) | The Plan was not proposed in good faith, given its violation of HERA and the best interests test, in addition to the FHFA's exclusion from plan negotiations. | | |
| 15. | Syncora Guarantee Inc. ("Syncora") [Docket No. 5418] | (a) | The Plan's proposed exculpation of the RMBS Trustees without consideration is improper. | An agreement in principle has been reached, subject to finalization and documentation. | **Resolved subject to final documentation** |
| | | (b) | Stripping Syncora of its contractual rights to payment from non-debtor third parties like the RMBS Trusts is an impermissible attempt to modify contracts between non-debtors. | | |
| | | (c) | The payment of the Allowed Fee Claim from assets otherwise due to the RMBS Trusts contravenes the Bankruptcy Code and the applicable Trust documents, and the Plan should not be confirmed without at least a | | |

| | **OBJECTING PARTY** | | **BASIS FOR OBJECTION** | **PLAN PROPONENTS' RESPONSE** | **STATUS** |
|---|---|---|---|---|---|
| | | | modification to require that the Court find the Allowed Fee Claim to be reasonable. | | |
| **16.** | **PNC Mortgage, a Division of PNC Bank, NA ("PNC Mortgage")** **[Docket No. 5406]** | (a) | Under the Ally SBO Servicing Agreement, PNC Mortgage is entitled to full payment of all outstanding advances and related obligations prior to transitions servicing from PNC Mortgage. It is unclear if the Third Party Release might release Ally's obligation to repay and reimburse PNC Mortgage if the servicing transition is not completed prior to confirmation. | This limited objection and reservation of rights was withdrawn. *See* Docket No. 5578. | **Resolved** |
| **17.** | **Philip Roger Flinn, II** **[Docket No. 5422] (late-filed)** | (a) | The Third Party Release and Injunction should be inapplicable to Mr. Flinn, as he is being sued by GMACM, ResCap, and Ally, and should retain his counterclaims. | This objection was withdrawn. *See* Docket No. 5625.[4] | **Resolved** |
| | | (b) | Claimants who were defending claims brought by Ally and the Debtors should have been placed in a separate class. | | |
| | | (c) | The Disclosure Statement and ballot lacked appropriate information. | | |

---

[4] Additionally, the Court denied Mr. Flinn's motion to enlarge time to file objections to confirmation. [Docket No. 5616].

| | OBJECTING PARTY | | BASIS FOR OBJECTION | PLAN PROPONENTS' RESPONSE | STATUS |
|---|---|---|---|---|---|
| *Borrower Objections* | | | | | |
| 18. | Wendy Alison Nora [Docket Nos. 5398, 5520] | (a) | The Plan was not proposed in good faith. | As set forth in further detail in the Confirmation Brief, there is no basis for asserting a lack of good faith pursuant to section 1129(a)(3), as the Plan is the result of significant arms' length negotiations among the Debtors, the Creditors' Committee (which represented all creditors, including Borrowers), Ally, and each of the Consenting Claimants, including the Kessler Settlement Class both in its individual capacity and as a member of the Creditors' Committee. SilvermanAcampora ("**Silverman**"), as special counsel to the Committee for Borrower-related issues, has been involved in negotiations surrounding treatment for holders of Borrower Claims to ensure that the Plan is fair and equitable toward Borrower Claims. The Plan Proponents believe that the treatment for holders of Borrower Claims provided in the Plan is in the best interest of all creditors, including Borrowers. Moreover, the Plan also contemplates a settlement of the Debtors' obligations under the Consent Order, which will fund additional distributions by the FRB to certain holders of Borrower Claims covered by the Consent Order. | **The Plan Proponents are continuing to negotiate a possible resolution of Ms. Nora's objection; however, as of the date of filing of this Response, no resolution has been finalized.** |
| | | (b) | The Plan does not comply with the requirements of section 1125 and there was inadequate notice of these proceedings. | The Court has already ruled that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code. The Disclosure Statement, appropriate ballots, notices, and related solicitation materials were distributed to all parties in accordance with the terms of the Disclosure Statement Order. In addition, the date and time of the Voting Deadline and Confirmation Hearing were published in the *Wall Street Journal* and *USA Today* on September 3, 2013. *See* Affidavit of Publication, [Docket. No. 5025]. | |
| | | (c) | The Borrowers Claims Trust is insufficient, and the Plan is founded on the disparate treatment of homeowners' claims as a separate class of general, unsecured claims. | The Plan establishes a Borrower Trust to be funded in the amount of $57.6 million (less any cash payments made to resolve Borrower Claims outside of the Plan), subject to the Borrower Trust True-Up, if necessary. As set forth in Exhibit 10 to the Plan Supplement, upon a review and analysis of the estimated Allowed Borrower Claims, the Plan Proponents determined that a Borrower Trust True-Up is not required. By establishing the Borrower Claims | |

| | OBJECTING PARTY | BASIS FOR OBJECTION | PLAN PROPONENTS' RESPONSE | STATUS |
|---|---|---|---|---|
| | | | Trust, the Plan provides for Cash recoveries to holders of Allowed Borrower Claims in comparable amounts to those estimated for general unsecured creditors against the applicable Debtor Group against which a Borrower Claim is properly asserted. | |
| | | (d) The Third Party Release is unjustified. | The Third Party Release and Exculpation  satisfy the standards for approval in the Second Circuit and are reasonable and appropriate under the circumstances. *See* Confirmation Brief, Section III; Omnibus Response, Section II. | |
| 19. | **Caren Wilson [Docket No. 5409]** | (a) Joinder to Nora Objection | *See* response to Nora Objection, above. | **Unresolved** |
| 20. | **Richard Rode [Docket No. 5414]** | (a) Joinder to Nora Objection | *See* response to Nora Objection, above. | **Unresolved** |
| 21. | **Paul N. Papas II [Docket No. 5466]** | (a) Joinder to Nora Objection | Mr. Papas is not a Borrower, but has joined in Ms. Nora's confirmation objection.  *See* response to Nora Objection, above. | **Unresolved** |
| 22. | **Kevin C. Kovacs [Docket No. 5264]** | (a) It is unclear whether Mr. Kovacs objects to confirmation; he seeks to be reimbursed for all damages, actions, loss and expenses relating to his property. | Efforts by Silverman to contact Mr. Kovacs by phone and letter have been unsuccessful.  *See* response to Nora Objection, above. | **Unresolved** |
| 23. | **Kent & Dorothy Case [Docket No. 5356]** | (a) Mr. & Mrs. Case request the reissuance of a check for amounts owed by GMAC Mortgage. | The objection was withdrawn pursuant to an email exchange between Mrs. Case and Silverman. | **Resolved** |

13

| | **OBJECTING PARTY** | **BASIS FOR OBJECTION** | | **PLAN PROPONENTS' RESPONSE** | **STATUS** |
|---|---|---|---|---|---|
| **24.** | **Joe Vargas [Docket No. 5357]** | (a) | Mr. Vargas seeks payment of his alleged claim. | Mr. Vargas orally confirmed to Silverman that he did not object to confirmation. | **Resolved** |
| **25.** | **Deborah D. Bennett [Docket No. 5522]** | (a) | General objection to confirmation. | Efforts by Silverman to contact Ms. Bennett by phone and letter have been unsuccessful. *See* response to Nora Objection, above. | **Unresolved** |
| **26.** | **David R. Munger [Docket No. 5273]** | (a) | This is not a confirmation objection; Mr. Munger does not consent to the third party releases. | Efforts by Silverman to contact Mr. Munger by phone and letter have been unsuccessful. *See* response to Nora Objection, above. | **Unresolved** |
| **27.** | **Wesley C. Rippy [Docket No. 5168]** | (a) | Mr. Rippy objects to any release of ResCap and sees no reason why ResCap should be relieved of any financial or other obligations. | Mr. Rippy orally confirmed to Silverman that he withdraws his objection. | **Resolved** |

14

| PARTY | RESERVATION OF RIGHTS | PLAN PROPONENTS' RESPONSE |
|---|---|---|
| **1.** **Oracle America, Inc., successor in interest to Oracle USA, Inc., Oracle Corporation, Peoplesoft USA, Inc., Sun Microsystems, Inc., Hyperion Solutions Corporation and Instantservice.com, Inc., ("Oracle")** **[Docket No. 5404]** | To the extent that any pre-petition Oracle contracts will be on the Assumption Schedule, Oracle reserves its rights to be heard with respect to the attempted assumption and/or assignment. To the extent that any Oracle contracts are to be rejected, the confirmation order should clearly provide that, at or prior to rejection, the Debtors shall cease use of the software or services referenced in any such contract and erase all copies of such software. The Debtors are prohibited from assuming and assigning the postpetition Oracle contracts absent Oracle's consent, and Oracle does not consent to the assumption and assignment of the postpetition Oracle contracts to the Liquidating Trust because Oracle does not have sufficient information regarding the specificity of the contract(s) at issue. | Discussions with Oracle are ongoing to address its concerns by negotiating language to be read into the record at the Confirmation Hearing. Parties are working on a statement providing that the Debtors have endeavored to list all agreements between the Debtors and Oracle that they seek to have transferred to the Liquidating Trust on the Assumption Schedule, as amended. |
| **2.** **Ambac Assurance Corporation and the Segregated Account of Ambac Assurance Corporation ("Ambac")** **[Docket No. 5407]** | Ambac reserves its rights in connection with the Bankruptcy Court's jurisdiction to adjudicate any post-confirmation disputes within the scope of the Monoline Reservation. | The Plan Proponents submit that no response is warranted. |
| **3.** **Donna Moore and Keith McMillon, together with named plaintiff Frenchola Holden (the "RESPA Plaintiffs")** **[Docket No. 5457]** | Reservation of rights in the event a settlement is not timely executed/implemented. | The Plan Proponents submit that no response is warranted. |