**Hearing Date and Time: November 19, 2013 at 10:00 a.m. (E.T.)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| RESIDENTIAL CAPITAL, LLC, et al., | : | Case No. 12-12020 (MG) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |

-------------------------------------------------------------- x

**MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE**
**JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC,**
***et al.* AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

| | |
|---|---|
| MORRISON & FOERSTER LLP | KRAMER LEVIN NAFTALIS & FRANKEL LLP |
| Gary S. Lee | Kenneth H. Eckstein |
| Lorenzo Marinuzzi | Douglas H. Mannal |
| Todd M. Goren | Stephen D. Zide |
| Jennifer L. Marines | Rachael L. Ringer |
| 1290 Avenue of the Americas | 1177 Avenue of the Americas |
| New York, New York 10104 | New York, New York 10036 |
| Telephone: (212) 468-8000 | Telephone: (212) 715-9100 |
| Facsimile: (212) 468-7900 | Facsimile: (212) 715-8000 |
| | |
| *Counsel for Debtors and Debtors-in-Possession* | *Counsel for the Official Committee of Unsecured Creditors* |

T<small>ABLE OF</small> C<small>ONTENTS</small>

**Page**

TABLE OF AUTHORITIES .................................................................................................... V

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 3

ARGUMENT ............................................................................................................................. 5

I.    THE PLAN SATISFIES EACH CONFIRMATION REQUIREMENT  OF SECTION 1129 OF THE BANKRUPTCY CODE ............................................................................. 5

    A.    The Plan Complies with the Applicable Provisions of Title 11 (11 U.S.C. § 1129(a)(1)) ................................................................................................. 5

        1.    The Plan Satisfies the Classification Requirements of the Bankruptcy Code (11 U.S.C. § 1122) ........................................................................ 6

        2.    The Plan Satisfies the Seven Mandatory Plan Requirements of 11 U.S.C. §§ 1123(a)(1)-(a)(7) ........................................................................... 9

    B.    The Plan Proponents Have Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)) ............................................... 12

        1.    The Plan Proponents Complied with all Disclosure and Solicitation Requirements (11 U.S.C. § 1125) ............................................................ 13

        2.    The Plan Acceptance Requirements of 11 U.S.C. § 1126 are Satisfied .... 14

        3.    The Technical Modifications to the Plan are Permissible (11 U.S.C. § 1127) ................................................................................................... 17

    C.    The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (11 U.S.C. § 1129(a)(3)) .................................................................. 20

    D.    The Plan Provides for Required Bankruptcy Court Approval of Certain Administrative Payments (11 U.S.C. § 1129(a)(4)) ............................................ 22

    E.    The Members of the Liquidating Trust Board and Liquidating Trust Management Have Been Disclosed and Their Appointment is Consistent with Public Policy (11 U.S.C. § 1129(a)(5)) ........................................................................... 25

    F.    The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (11 U.S.C. § 1129(a)(6)) ........................................................................... 27

    G.    The Plan is in the Best Interests of Creditors and Interest Holders (11 U.S.C. § 1129(a)(7)) ............................................................................................. 27

    H.    Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(8)) .................................. 30

i

I.      The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims (11 U.S.C. § 1129(a)(9)) ......................................................... 32

J.      At Least One Impaired Class of Claims Has Accepted the Plan (11 U.S.C. § 1129(a)(10)) ................................................................................................. 34

K.      The Plan is Feasible (11 U.S.C. § 1129(a)(11)) ..................................................... 34

L.      The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (11 U.S.C. § 1129(a)(12)) ........................................................................................ 36

M.      The Plan Provides for the Payment of Retiree Benefits (11 U.S.C. § 1129(a)(13)) ................................................................................................................... 36

N.      11 U.S.C. §§ 1129(a)(14) and 1129(a)(15) are Not Applicable ............................ 37

O.      The Plan Does Not Provide for the Transfer of Property by any Non-Profit Entities Not in Accordance with Applicable Nonbankruptcy Law (11 U.S.C. § 1129(a)(16)) ......................................................................................................... 37

P.      The Plan Satisfies the "Cram Down" Requirements of 11 U.S.C. § 1129(b) ....... 37

    1.      The Plan Does Not Discriminate Unfairly ................................................ 38

    2.      The Plan Is Fair and Equitable ................................................................. 41

        a.      The Plan Is Fair and Equitable with respect to the Junior Secured Notes Claims................................................................. 41

        b.      The Plan Is Fair and Equitable with respect to the Claims in the Rejecting Borrower Class and Intercompany Balances ............................... 43

        c.      The Plan Is Fair and Equitable with respect to Equity Interests ................ 43

Q.      The Principal Purpose of the Plan is Not Avoidance of Taxes (11 U.S.C. § 1129(d)) ............................................................................................................... 44

II.     THE SETTLEMENTS CONTAINED IN THE PLAN SHOULD BE APPROVED ....... 45

A.      Introduction ............................................................................................................. 45

B.      Events Leading to the Plan Settlements .................................................................. 46

    1.      The Prepetition Negotiations with Ally and Committee Investigation ..... 46

    2.      The Mediation .......................................................................................... 48

    3.      The Plan Support Agreement and Filing of the Plan and Disclosure Statement .................................................................................................. 49

C.      Brief Summary of the Plan Settlements .................................................................. 50

D.      The Legal Standards for Approval of Plan Settlements .......................................... 53

    1.      The Plan Settlements are in the Interests of Creditors and are Supported by Significant Creditors and Other Parties-In-Interest ................................... 55

2.     The Settling Parties Were Counseled by Experienced and Skilled Counsel and Advisors ..................................................................................58

3.     The Plan Settlements are the Product of Arm's-Length Bargaining .........58

4.     The Balance Between the Litigation's Possibility of Success and the Settlement's Future Benefits. ...................................................................60

    a.     The Ally Settlement ..................................................................60

        (i) Alter ego/veil piercing ...........................................................61

        (ii) Fraudulent Transfer ..............................................................64

        (iii) Indemnification ...................................................................66

        (iv) Equitable Subordination ......................................................67

        (v) Other Estate Claims .............................................................68

        (vi) Third Party Claims ..............................................................69

    b.     The RMBS Trust Claims Settlement .........................................70

    c.     The Monoline Settlements ........................................................78

    d.     The Private Securities Claims, FHFA, NJ Carpenters and Other Securities Claims Settlements ...................................................85

    e.     Borrower Claims Treatment and Related Settlements ...........92

    f.     The Senior Unsecured Notes Settlement ..................................96

    g.     Substantive Consolidation Settlement ....................................98

    h.     The Intercompany Balances Settlement .................................103

    i.     The Division of the Ally Contribution and Administrative Expenses among Debtor Groups ...........................................107

5.     The Likelihood of Protracted Litigation ................................................109

6.     The Nature and Breadth of Releases ......................................................111

III.   THE PLAN'S RELEASE, EXCULPATION, INJUNCTION, AND JUDGMENT REDUCTION PROVISIONS SHOULD BE APPROVED ...........................................112

  A.   The Releases are Appropriate and Should be Approved .....................................113

    1.   The Debtor Release .................................................................................113

    2.   The Third-Party Releases ........................................................................118

      a.     The Court Has Subject Matter Jurisdiction Over the Third Party Claims ........................................................................120

        (i) Jurisdiction Based on Indemnification and Contribution ......121

(ii) Jurisdiction based on shared insurance .................................. 124

b.        The Third Party Release Satisfies the "Unique Circumstances"
Test ...................................................................................... 126

(i)   The Third Party Release is Overwhelmingly Consensual ..... 127

(ii) The Third Party Release is Supported by Massive
Consideration Benefitting All Creditors ............................... 132

(iii)The Third Party Releases Are Consistent With the Other
*Metromedia* Factors ............................................................. 137

B.        The Plan's Exculpation Should Be Approved ................................... 140

1.        The Exculpation Is Part of a Plan Made in Good Faith, Was Necessary for
Plan Negotiations, and Is Integral to the Plan's Success. ........................ 142

2.        The Exculpation Properly Extends to Parties Who Are Not Estate
Fiduciaries ............................................................................. 145

3.        The Exculpation Properly Extends to Claims Arising from Certain
Prepetition Conduct ............................................................... 148

C.        The Injunction Is Necessary and Customary ...................................... 152

D.        The Judgment Reduction Is Reasonable and Appropriate ................... 152

IV.    THE ASSUMPTION AND ASSIGNMENT OR REJECTIONS OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN SHOULD BE
APPROVED ...................................................................................... 154

V.    THE FINDINGS REQUIRED AS PART OF THE RMBS SETTLEMENT ARE
APPROPRIATE AND SUPPORTED BY THE RECORD ......................... 155

A.        The Court has Jurisdiction to Issue the Proposed Findings ................. 157

B.        The Proposed Findings are Supported by the Record ........................ 158

CONCLUSION .................................................................................... 161

### TABLE OF AUTHORITIES

**Page**

<u>CASES</u>

*In re 203 N. LaSalle St. Ltd. P'ship,*
    190 B.R. 567 (Bankr. N.D. Ill. 1995) .......................................................... 38-39

*Abel v. Shugrue (In re Ionosphere Clubs, Inc.),*
    184 B.R. 648 (S.D.N.Y. 1995) ..............................................................54, 151

*ACE Sec. Corp. v. DB Structured Prods., Inc.,*
    965 N.Y.S.2d 844 (N.Y. Sup. Ct. 2013)...............................................73

*In re Adelphia Commc'ns Corp.,*
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...................................................*passim*

*In re Adelphia Commc'ns Corp.,*
    441 B.R. 6 (Bankr. S.D.N.Y. 2010) ...................................................24

*Aetna Cas. and Sur. Co. v. Clerk U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay Corp.),*
    89 F.3d 942 (2d Cir. 1996) ...................................................7

*Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.),*
    156 B.R. 414 (S.D.N.Y. 1993) ...................................................54

*Allstate Ins. Co. v. Credit Suisse Secs. (USA),*
    No. 11-2232, 2011 WL 4965150 (S.D.N.Y. Oct. 19, 2011) ........................................122

*In re Amanat,*
    338 B.R. 574 (Bankr. S.D.N.Y. 2005) ...............................................122, 124

*In re Am. Solar King Corp.,*
    90 B.R. 808 (Bankr. W.D. Tex. 1988) ...........................................19

*In re AMR Corp.,*
    497 B.R. 690 (Bankr. S.D.N.Y. 2013) ...........................................24

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB,*
    892 F. Supp. 2d 596 (S.D.N.Y. 2012) ...........................................81

*In re Bally Total Fitness of Greater N.Y., Inc.,*
    No. 07-12395, 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) ........5, 113, 143, 146

*Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship,*
    526 U.S. 434 (1999) ...................................................27, 38

*In re Baumgarten,*
    No. 93-40188, 1993 Bankr. LEXIS 1933 (Bankr. S.D.N.Y. Dec. 30, 1993)...................42

*Bayer Corp. v. Masotech, Inc. (In re AutoStyle Plastics, Inc.)*,
   269 F.3d 726 (6th Cir. 2001) ........................................................................103

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
   563 F.2d 692 (5th Cir. 1977) ..........................................................................67

*Bond St. Assocs., Ltd. v. Ames Dep't Stores, Inc.*,
   174 B.R. 28 (S.D.N.Y. 1994) .........................................................................120

*Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*,
   21 F.3d 477 (2d Cir. 1994) ................................................................................6

*In re Buttonwood Partners Ltd.*,
   111 B.R. 57 (Bankr. S.D.N.Y. 1990) ..............................................................38

*Cartalemi v. Karta Corp. (In re Karta Corp.)*,
   342 B.R. 45 (S.D.N.Y. 2006) ..............................................................132, 133

*In re Celebrity Resorts, LLC*,
   No. 10-3550, 2010 WL 5392657 (Bankr. M.D. Fla. Dec. 28, 2010) ............102

*In re Cellular Info. Sys., Inc.*,
   171 B.R. 926 (Bankr. S.D.N.Y. 1994) ............................................................20

*Celotex Corp v. Edwards*,
   514 U.S. 300 (1995) ......................................................................................121

*In re Chemtura Corp.*,
   493 B.R. 561 (Bankr. S.D.N.Y. 2010) ...........................................22, 131, 142

*Citicorp Acceptance Co., Inc. v. Ruti-Sweetwater (In re Sweetwater)*,
   57 B.R. 354 (D. Utah 1985) .............................................................................19

*City of Ann Arbor Emps. Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*,
   572 F. Supp. 2d 314 (E.D.N.Y. 2008) ..........................................................120

*In re Cont'l Airlines*,
   203 F.3d 203, 214 (3d Cir. 2000) .................................................................147

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) ........................................................146-47

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
   699 F.2d 599 (2d Cir. 1983) ............................................................................55

*In re Crowthers McCall Pattern, Inc.*,
   120 B.R. 279 (Bankr. S.D.N.Y. 1990) ............................................................28

*In re Cuyahoga Equip. Corp.*,
    980 F.2d 110 (2d Cir. 1992) ........................................................................120

*In re DBSD N. Am., Inc.*,
    419 B.R. 179 (Bankr. S.D.N.Y. 2009) ......................................... 42, 128, 142-43

*DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*,
    15 N.Y.3d 147 (N.Y. Ct. App. 2010) ........................................................ 80-81

*Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Products, Inc.*,
    No. 12-8594, 2013 WL 3863861 (S.D.N.Y. July 24, 2013)............................73

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc.*
    *(In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005).....................*passim*

*In re Dewey & LeBoeuf LLP*,
    478 B.R. 627 (Bankr. S.D.N.Y. 2012) ...................................................... 54-55

*In re Digital Music Antitrust Litig.*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011) ............................................................62

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...........................................................5

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992) ......................................................................144

*Duke Energy Trading & Marketing, L.L.C. v. Enron Corp. (In re Enron Corp.)*,
    No. 01-16034, 2003 Bankr. LEXIS 330 (Bankr. S.D.N.Y. Apr. 17, 2003) ...................131

*In re Eagle-Picher Indus., Inc.*,
    203 B.R. 256 (Bankr. S.D. Ohio 1996) .........................................................20

*In re Enron Corp.*,
    No. 01-16034, 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004)............34, 100

*Enron Corp. v. New Power Co. (In re New Power Co.)*,
    438 F.3d 1113 (11th Cir. 2006) ..................................................................19

*In re F.A. Potts & Co.*,
    23 B.R. 569 (Bankr. E.D. Pa. 1982) ...........................................................102

*In re FairPoint Commc'ns, Inc.*,
    452 B.R. 21 (S.D.N.Y. 2011) ....................................................................121

*In re Finlay Enters., Inc.*,
    No. 09-14873, 2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010)......................41, 137

*First Owners Assoc. of Forty Six Hundred Condo. v. Gordon Props., LLC*
  *(In re Gordon Props., LLC)*, 478 B.R. 750 (E.D. Va. 2012).................................... 101-02

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) .........................................................................38

*Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*,
  10 F.3d 944 (2d Cir. 1993) ...............................................................................................6

*In re Granite Broad. Corp.*,
  369 B.R. 120 (Bankr. S.D.N.Y. 2007) .........................................................................146

*In re Graphics Props. Holdings, Inc.*,
  No. 09-11701, 2009 Bankr. LEXIS 5259 (Bankr. S.D.N.Y. Nov. 10, 2009)...................40

*In re Gyro-Trac (USA), Inc.*,
  441 B.R. 470 (Bankr. D.S.C. 2010)...............................................................................102

*In re Gucci*,
  193 B.R. 411 (S.D.N.Y. 1996) ......................................................................................154

*Hotaling v. A.B. Leach & Co.*,
  247 N.Y. 84 (N.Y. 1928)..................................................................................................80

*Hough v. Margulies (In re Margulies)*,
  476 B.R. 393 (Bankr. S.D.N.Y. 2012) .........................................................................125

*HSBC Bank USA, Nat'l Ass'n v. Fane (In re MF Global Inc.)*,
  466 B.R. 244 (Bankr. S.D.N.Y. 2012) ...........................................................................54

*Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd.*
  *(In re Ion Media Networks, Inc.)*, 419 B.R. 585 (Bankr. S.D.N.Y. 2009) .....................139

*In re Ionosphere Clubs, Inc.*,
  98 B.R. 174 (Bankr. S.D.N.Y. 1989) ...............................................................................6

*Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
  517 F.3d 52 (2d Cir. 2008) ...................................................................................119, 121

*Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
  600 F.3d 135 (2d Cir. 2010) ................................................................................... 124-25

*In re Journal Register Co.*,
  407 B.R. 520 (Bankr. S.D.N.Y. 2009) ..............................................................22, 25, 35

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC*
  *(In re Charter Commc'ns, Inc.)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) .................*passim*

*In re Kaiser Aluminum Corp.*,
    No. 02-10429, 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006) .............................. 100-01

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    843 F.2d 636 (2d Cir. 1988) ...................................................................................... 5, 20

*In re Lehman Bros. Holdings Inc.*,
    487 B.R. 181 (Bankr. S.D.N.Y. 2013) .............................................................................. 24

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) ............................................................................................. 88

*In re Leslie Fay Cos.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997) ....................................................................... 20, 38

*MASTR Asset Backed Sec. Trust 2006-HE3 v. WMC Mortg. Corp.*,
    No. 11-02542, 2012 WL 4511065 (D. Minn. Oct. 1, 2012) .............................................. 74

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    936 N.Y.S.2d 513, (N.Y. Sup. Ct. 2012) .......................................................................... 80

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    No. 602825/08, 2013 N.Y. Misc. LEXIS 1818 (N.Y. Sup. Ct. Apr. 29, 2013) .......... 80, 81

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    963 N.Y.S.2d 21 (N.Y. App. Div. 2013) .................................................................. 80, 81

*In re Mercedes Homes, Inc.*,
    431 B.R. 869 (Bankr. S.D. Fla. 2009) ........................................................................... 137

*In re Mesa Air Grp.*,
    No. 10-10018, 2011 WL 182450 (Bankr. S.D.N.Y. Jan. 20, 2011) ................................. 39

*In re Metro. 885 Third Ave. Leasehold, LLC*,
    No. 10-16103, 2010 WL 6982778 (Bankr. S.D.N.Y. Dec. 22, 2010) .................... 133, 139

*In re MF Global Holdings Ltd.*,
    469 B.R. 177 (Bankr. S.D.N.Y. 2012) ......................................................................... 125

*In re MF Global Inc.*,
    No. 11-2790, 2012 WL 3242533 (Bankr. S.D.N.Y. Aug. 10, 2012) ............................... 54

*Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*,
    930 F.2d 1132 (6th Cir. 1991) ...................................................................................... 122

*In re Mirant Corp.*, No. 03-46590, 2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007) ............ 7

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
    25 F.3d 1132 (2d Cir. 1994) ........................................................................................... 13

*Morgan Stanley Mortg. Loan Trust 2006-14SL v. Morgan Stanley Mortgage Capital Holdings
    LLC*, No. 652763/2012, 2013 WL 4488367 (N.Y. Sup. Ct. Aug. 16, 2013) ...................74

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
    478 F. 3d 452 (2d Cir. 2007) ...................................................................................*passim*

*In re Movie Gallery, Inc.*,
    No. 10-30696, 2010 Bankr. LEXIS 5778 (Bankr. E.D. Va. Oct. 29, 2010)...................128

*Murray v. Miner*,
    876 F. Supp. 512 (S.D.N.Y. 1995) .............................................................................131

*Nellis v. Shugrue*,
    165 B.R. 115 (S.D.N.Y. 1994) ...............................................................................54-55

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972) .........................................................................................54

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013) ........................................................................................87

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (1984) ...................................................................................................153

*Nomura Asset Acceptance Corp. Alt. Loan Trust, Series 2005-S4 v. Nomura Credit & Capital,
    Inc.*, No. 653541/2011, 2013 N.Y. Misc. LEXIS 2001 (N.Y. Sup. Ct. May 10, 2013) ....73

*Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*,
    78 F.3d 18 (2d Cir. 1996) ......................................................................................153-54

*Official Comm. of Unsecured Creditors v. Am. Tower Corp (In re Verestar)*,
    343 B.R. 444 (Bankr. S.D.N.Y. 2006) ...........................................................................67

*Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings
    LLC)*, 420 B.R. 112 (Bankr. S.D.N.Y. 2009) ........................................................ 61-63, 69

*Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Grp.
    (In re Buckhead Am. Corp.)*, 178 B.R. 956 (D. Del. 1994)..............................................61

*Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc.
    (In re Sunbeam Corp.)*, 284 B.R. 355 (Bankr. S.D.N.Y. 2002) .................................62-64

*In re Oneida Ltd.*,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006) ....................................................................148-49

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
    4 F.3d 1095 (2d Cir. 1993) .........................................................................................153

*In re Owens Corning*,
   419 F.3d 195 (3d Cir. 2005) .................................................................100

*In re Pacific Lumber Co.*,
   584 F.3d 229 (5th Cir. 2009) ................................................................147

*In re PCAA Parent, LLC*,
   No. 10-1250, 2010 WL 2745980 (Bankr. D. Del. May 17, 2010) ............................ 39-40

*In re PPI Enters. (U.S.), Inc.*,
   324 F.3d 197 (3d Cir. 2003) ...................................................................15

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000) ...........................................................143, 147

*Quigley Co. v. Law Offices of Peter G. Angelos (In re Quigley Co.)*,
   676 F.3d 45 (2d Cir. 2012) ...........................................................*passim*

*In re Quincy Medical Center, Inc.*,
   No. 11-16394, 2011 WL 5592907 (Bankr. D. Mass. Nov. 16, 2011) ..................... 146-47

*In re Residential Capital, LLC*,
   497 B.R. 720 (Bankr. S.D.N.Y. 2013) ................................................*passim*

*In re Residential Capital*,
   No. 12-12020, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013) .............................59

*Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*,
   177 B.R. 791 (S.D.N.Y. 1995) ........................................................ 53-54

*In re Resorts Int'l, Inc.*,
   145 B.R. 412 (Bankr. D.N.J. 1990) ...........................................................100

*In re River Center Holdings, LLC*,
   288 B.R. 59 (Bankr. S.D.N.Y. 2003) .........................................................122

*Rosenberg v. XO Communications, Inc. (In re XO Communications, Inc.)*,
   330 B.R. 394 (Bankr. S.D.N.Y. 2005) .................................................132, 33

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
   960 F.2d 285 (2d Cir. 1992) ........................................................118, 147

*In re Specialty Equip. Cos.*,
   3 F.3d 1043 (7th Cir. 1993) .................................................................127

*In re Spiegel, Inc.*,
   No. 03-11540, 2005 WL 1278094 (Bankr. S.D.N.Y. May 25, 2005) ...........................113

*Syncora Guar. Inc. v. Countrywide Home Loans, Inc.*,
    935 N.Y.S.2d 858 (N.Y. Sup. Ct. 2012)........................................................80

*Syncora Guar. Inc. v. EMC Mortg. Corp.*,
    874 F. Supp. 2d 328 (S.D.N.Y. 2012) .........................................................81

*In re Texaco, Inc.*,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) ...........................................................20

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ...........................................................12

*In re Trinsum Grp., Inc.*,
    No. 08-12547, 2013 WL 1821592 (Bankr. S.D.N.Y. April. 30, 2013) .........................121

*Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*,
    332 F.3d 188, (3d Cir. 2003) ......................................................................62

*In re Ultra Stores, Inc.*,
    No. 09-11854, 2009 Bankr. LEXIS 5215 (Bankr. S.D.N.Y. July 28, 2009).....................40

*Union Carbide Corp. v. Montell N.V.*,
    944 F. Supp. 1119 (S.D.N.Y. 1996) ...........................................................61

*Union Savs. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*,
    860 F.2d 515 (2d Cir. 1988) .......................................................................99

*Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*,
    326 B.R. 497 (S.D.N.Y. 2005) ...................................................... 143-44, 146

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011)................................................. 88-89, 147

*In re Wash. Mut., Inc.*,
    462 B.R. 137 (Bankr. D. Del. 2011)........................................................ 87-88

*Wells Fargo Bank N.A. v. Bank of Am., N.A.*,
    No. 10-9584, 2013 WL 1285289 (S.D.N.Y. Mar. 28, 2013)...........................................72

*Wells Fargo Bank N.A. v. LaSalle Bank Nat'l Ass'n*,
    No. 08-1448, 2011 WL 6300796 (D. Nev. Dec. 15, 2011) .............................................71

*Westpointe, L.P. v. Franke (In re Westpointe, L.P.)*,
    241 F.3d 1005 (8th Cir. 2001) ..............................................................43-44

*In re Winn-Dixie Stores, Inc.*,
    356 B.R. 239 (Bankr. M.D. Fla. 2006) .......................................................100

*Winstar Holdings, LLC v. Blackstone Grp., L.P.*,
   No. 07-4634, 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007)....................................120-21

*In re Worldcom, Inc.*,
   No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003).....................23, 143

*In re WorldCom, Inc. Sec. Litig.*,
   293 B.R. 308 (S.D.N.Y. 2003) .............................................................................93, 121

*In re Yellowstone Mountain Club, LLC*,
   460 B.R. 254 (Bankr. D. Mont. 2011).........................................................................144

## STATUTES

11 U.S.C. § 101(31)...................................................................................................25

11 U.S.C. § 503(b)....................................................................................................24

11 U.S.C. § 506(a)...............................................................................................34, 42

11 U.S.C. § 506(b)....................................................................................................34

11 U.S.C. § 510(b)....................................................................................................30

11 U.S.C. § 1122.............................................................................................6, 18, 20

11 U.S.C. § 1122(b).....................................................................................................8

11 U.S.C. § 1123.................................................................................................18, 20

11 U.S.C. § 1123(a)................................................................................................9-12

11 U.S.C. § 1123(a)(1).............................................................................................7, 10

11 U.S.C. § 1123(a)(2)...............................................................................................10

11 U.S.C. § 1123(a)(3)...............................................................................................10

11 U.S.C. § 1123(a)(4)...............................................................................................10

11 U.S.C. § 1123(a)(5)...............................................................................................10

11 U.S.C. § 1123(a)(7)...............................................................................................11

11 U.S.C. § 1123(b)........................................................................................53-54, 113

11 U.S.C. § 1125.......................................................................................................12

11 U.S.C. § 1125(b)...................................................................................................13

11 U.S.C. § 1126 .................................................................................................... *passim*

11 U.S.C. § 1127 ....................................................................................... 12, 17-19

11 U.S.C. § 1129 ...................................................................................................... 5

11 U.S.C. § 1129(a) ................................................................................................. 3

11 U.S.C. § 1129(a)(1) ........................................................................................ 5, 6

11 U.S.C. § 1129(a)(2) .......................................................................................... 12

11 U.S.C. § 1129(a)(3) ..................................................................................... 20, 22

11 U.S.C. § 1129(a)(4) ................................................................................. 22-23, 25

11 U.S.C. § 1129(a)(5) ..................................................................................... 25-27

11 U.S.C. § 1129(a)(6) .......................................................................................... 27

11 U.S.C. § 1129(a)(7) ..................................................................................... 27, 30

11 U.S.C. § 1129(a)(8) .................................................................................... *passim*

11 U.S.C. § 1129(a)(9) ..................................................................................... 32-34

11 U.S.C. § 1129(a)(10) ........................................................................................ 34

11 U.S.C. § 1129(a)(11) .................................................................................... 34-45

11 U.S.C. § 1129(a)(12) ........................................................................................ 36

11 U.S.C. § 1129(a)(13) .................................................................................... 36-37

11 U.S.C. § 1129(a)(14) ........................................................................................ 37

11 U.S.C. § 1129(a)(15) ........................................................................................ 37

11 U.S.C. § 1129(a)(16) ........................................................................................ 37

11 U.S.C. § 1129(b) ........................................................................................ *passim*

11 U.S.C. § 1129(b)(1) ...................................................................................... 38-39

11 U.S.C. § 1129(b)(2)(A) ................................................................................. 41-42

11 U.S.C. § 1129(b)(2)(B) ................................................................................. 42-43

11 U.S.C. § 1129(b)(2)(C) ...................................................................................... 44

11 U.S.C. § 1129(d) ............................................................................................44

28 U.S.C. § 1334 ........................................................................................120, 142


**BANKRUPTCY RULES**

Fed. R. Bankr. P. 3017 ........................................................................................12

Fed. R. Bankr. P. 3018 ........................................................................................12

Fed. R. Bankr. P. 3019 ........................................................................................19

Fed. R. Bankr. P. 9019 ...................................................................................*passim*


**OTHER AUTHORITIES**

7 Collier on Bankruptcy (15th ed. Rev. 1998) ..........................................................22

H.R. Rep. No. 95-595 (1977) .........................................................................5, 42

H.R. Rep. No. 109-31 (2005) ...............................................................................37

S. Rep. No. 95-989 (1978) ...............................................................................5, 12

Residential Capital, LLC and its affiliated debtors and debtors-in-possession in the above-captioned cases (each, a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") and the Official Committee of Unsecured Creditors (the "<u>Creditors' Committee</u>," and together with the Debtors, the "<u>Plan Proponents</u>") submit this memorandum of law (the "<u>Memorandum</u>") in support of confirmation of their joint chapter 11 plan (as the same has been or may be amended, modified, supplemented, or restated, the "<u>Plan</u>") pursuant to section 1129 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").   In support of confirmation, the Plan Proponents respectfully represent as follows:

### PRELIMINARY STATEMENT[1]

The Global Settlement and Plan now before the Court resolve billions of dollars of claims and bring these cases to the threshold of a successful resolution that just months ago seemed hopelessly locked away.  Absent the Global Settlement and Plan, these Chapter 11 Cases would devolve into potentially endless litigation, not only against Ally and its affiliates, but also among the creditor constituencies.  Representing the good faith efforts of hundreds of principals and professionals – under the constructive guidance of the Court and Mediator – the Plan embodies an intricate mosaic of interrelated compromises that maximizes creditor recoveries and resolves a seemingly intractable litigation morass.  It represents an optimal use of the bankruptcy process to bring order out of chaos and resolve, under one umbrella, multiple disputes that would otherwise bog down these Debtors in years of wasteful, asset-consuming conflict.

The foundation of the Plan is Ally's agreement to contribute $2.1 billion (nearly triple the amount in the original settlement proposed at the outset of these cases) to settle both estate and third party claims against Ally and its non-Debtor affiliates, officers, and directors.

---

[1] Capitalized terms not defined herein have the meanings set forth in the Plan.

Ally agreed to this contribution only after extensive Creditors' Committee and Examiner investigations and months of intense, arms'-length negotiations with the Debtors, Creditors' Committee, and Consenting Claimants under the direction of the Court-appointed mediator, the Honorable James M. Peck (the "Mediator").  Ally's increased contribution made possible a global settlement of complex and often long-standing litigation claims of RMBS trustees and investors, monoline insurers, securities claimants, lenders, bondholders, and borrowers.  The Plan also insures that the Debtors and Ally will satisfy their remaining obligations to the Department of Justice and other regulatory agencies. In addition, the Plan provides Ally the opportunity to obtain closure with respect to its mortgage exposure – thus paving the way for full repayment of billions of dollars of TARP funding advanced to Ally by the U.S. Treasury.

The Plan has garnered overwhelming creditor consensus for cases of this size and complexity – approaching functional unanimity, leaving aside the scorched earth efforts of the Junior Secured Noteholders to extract more than payment in full from these insolvent estates. The current two-phase trial process will determine the allowed amount of the Junior Secured Notes Claims, but this dispute poses no barrier to Plan confirmation.  Every other major constituency has signed on to the Global Settlement, and lingering disputes with individual creditors are being resolved almost daily, narrowing still further the issues in dispute at confirmation.

As will be demonstrated below and at the upcoming hearing on confirmation (the "Confirmation Hearing"), the Plan, and the settlements it embodies (the "Plan Settlements"), satisfy the requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and other applicable law.  Specifically, Part I of this Memorandum demonstrates how the Plan Proponents have satisfied each of the mandatory requirements for

confirmation pursuant to section 1129(a) of the Bankruptcy Code (other than section 1129(a)(8)) and the requirements for cram down pursuant to section 1129(b) of the Bankruptcy Code. Part II of this Memorandum provides the justification for the Global Settlement and each of the Plan Settlements embodied in the Plan, including how such Plan Settlements satisfy the standards for approval under applicable bankruptcy law. Part III of this Memorandum establishes the legal and factual bases for the Plan's release, exculpation, injunction, and judgment reduction provisions under applicable law in the Second Circuit. Part IV of this Memorandum addresses the assumption and assignment or rejection of certain Executory Contracts and Unexpired Leases under the Plan. Finally, Part V of this Memorandum sets forth the legal bases and support for the affirmative findings sought in connection with the RMBS Settlement.

While a limited number of parties have filed objections to the Plan, as set forth in the Plan Proponents' Omnibus Response to Objections to Confirmation of the Joint Chapter 11 Plan (the "Omnibus Response to Objections"), filed contemporaneously herewith, these objections have either been resolved through Plan modifications or are meritless and in many cases interposed purely as tactical maneuvers to increase an individual creditor's recovery. Accordingly, the Plan Proponents respectfully request that the Court enter an order confirming the Plan and approving the intertwined Plan Settlements.

## FACTUAL BACKGROUND

The relevant facts relating to the Debtors' chapter 11 cases and Plan are set forth in the Disclosure Statement and the Plan and highlighted below only to provide necessary context for the discussion of applicable legal principles. In addition, the following individuals have been or will be submitting written declarations and/or direct testimony in support of confirmation, which are all fully incorporated herein by reference:

- Fernando Acebedo (the "Acebedo Direct");

- Lucy Allen (the "<u>Allen Direct</u>");

- Martin Blumentritt (the "<u>Blumentritt Direct</u>");

- Michael Carpenter (the "<u>Carpenter Direct</u>");

- John Dubel (the "<u>Dubel Direct</u>");

- Jose C. Fraga (the "<u>Fraga Direct</u>")

- Ronald Friedman (the "<u>Friedman Direct</u>");

- Gina Gutzeit (the "<u>Gutzeit Direct</u>");

- Tammy Hamzehpour (the "<u>Hamzehpour Direct</u>");

- Susheel Kirpalani (the "<u>Kirpalani Direct</u>");

- Lewis Kruger (the "<u>Kruger Direct</u>");

- Jeffrey A. Lipps (the "<u>Lipps Direct</u>");

- Ralph Mabey (the "<u>Mabey Direct</u>");

- Robert Major (the "<u>Major Direct</u>");

- Thomas Marano (the "<u>Marano Direct</u>");

- Brendan Meyer (the "<u>Meyer Direct</u>");

- Joe Morrow (the "<u>Morrow Direct</u>" or the "<u>Voting Certification</u>");

- Nancy Mueller-Handal (the "<u>Mueller-Handal Direct</u>");

- Thomas Musarra (the "<u>Musarra Direct</u>");

- Alan Pfeiffer (the "<u>Pfeiffer Direct</u>");

- Mark Renzi (the "<u>Renzi Direct</u>");

- Mamta Scott (the "<u>Scott Direct</u>");

- Frank Sillman (the "<u>Sillman Direct</u>");

- Mary Sohlberg (the "<u>Sohlberg Direct</u>");

- William Thompson (the "<u>Thompson Direct</u>");

- Barbara Westman (the "Westman Direct"); and

- Jim Young (the "Young Direct").

**ARGUMENT**

**I.     THE PLAN SATISFIES EACH CONFIRMATION REQUIREMENT OF SECTION 1129 OF THE BANKRUPTCY CODE**

To confirm the Plan, the Plan Proponents must demonstrate by a preponderance of the evidence that they have satisfied the provisions of section 1129 of the Bankruptcy Code. *See In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395, 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007).   As set forth below, and as will be demonstrated at the Confirmation Hearing, the Plan complies with all relevant sections of the Bankruptcy Code (including sections 1122, 1124, 1125, 1126, 1127, and 1129) as well as the Bankruptcy Rules and applicable non-bankruptcy law.

**A.     The Plan Complies with the Applicable Provisions of Title 11 (11 U.S.C. § 1129(a)(1))**

Section 1129(a)(1) of the Bankruptcy Code requires that a chapter 11 plan "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code including, principally, rules governing classification of claims and interests and the contents of a plan of reorganization.  S. Rep. No. 95-989, at 126 (1978); H.R. Rep. No. 95-595, at 412 (1977); *see also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 648-49 (2d Cir. 1988) ("[T]he legislative history of subsection 1129(a)(1) suggests that Congress intended the phrase 'applicable provisions' in [section 1129(a)(1)] to mean provisions of Chapter 11 . . . such as section 1122"); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("The legislative history of § 1129(a)(1) explains that this provision embodies the

- 5 -

requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan."). As explained below, the Plan complies with sections 1122 and 1123 of the Bankruptcy Code in all respects.

### 1. The Plan Satisfies the Classification Requirements of the Bankruptcy Code (11 U.S.C. § 1122)

The classification requirements of section 1122 of the Bankruptcy Code provide:

(a)    Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b)    A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

The Second Circuit has recognized that, under section 1122, plan proponents have significant flexibility to place similar claims into different classes, provided there is a rational basis for doing so. *See Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477, 483 (2d Cir. 1994) (similar claims may be separately classified unless sole purpose is to engineer assenting impaired class); *Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944, 956-57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had rational basis; separate classification based on bankruptcy court approval of debtors' reimbursement of guarantors for payment of certain claimants' indemnity claims); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177-78 (Bankr. S.D.N.Y. 1989) ("[A] debtor may place claimants of the same rank in different classes and thereby provide different treatment for each respective class."). For example, courts have allowed separate classification: (i) where members of a class possess different legal rights; and (ii) where there are good business reasons for separate classification. *See Aetna Cas. and Sur. Co. v. Clerk U.S. Bankr. Ct., New York, N.Y.*

- 6 -

*(In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (finding that debtor must have legitimate business reason supported by credible proof to justify separate classification of unsecured claims) (citation omitted); *In re Mirant Corp.*, No. 03-46590, 2007 WL 1258932, at *7 (Bankr. N.D. Tex. Apr. 27, 2007) (permitting separate classification because holders of claims had different legal interests in debtor's estate).

The Plan properly classifies Claims and Interests as required under the Bankruptcy Code.[2] *First*, the Classes of Claims and Equity Interests are divided by the Debtor Group against which such Claims and Equity Interests are asserted (*i.e.*, the ResCap Debtors, the GMACM Debtors, or the RFC Debtors). *Second*, the Plan provides for the separate classification of Claims and Equity Interests within each Debtor Group based upon: (i) their security position, if any; (ii) their legal priority against the Debtors' assets; and (iii) other relevant criteria. For voting purposes, the Plan also provides that each Class for a Debtor Group will contain sub-classes for each of the Debtors within that Debtor Group (*i.e.*, there will be three sub-Classes for each Class of the ResCap Debtors, twenty-one sub-Classes for each Class of the GMACM Debtors (in lieu of Class GS-4A, however, the Plan for ETS contains a Class GS-4B, for ETS Unsecured Claims), and twenty-seven sub-Classes for each Class of the RFC Debtors). (Plan, Art. III.C.)[3]

The legal rights under the Bankruptcy Code of each of the holders of Claims or Equity Interests within a particular Class are substantially similar to those of other holders of Claims or Equity Interests within that Class. In addition, the Plan Proponents' classification of

---

[2] In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

[3] As of the Confirmation Hearing, certain of these sub-Classes may not have at least one holder of a Claim or Equity Interest that is Allowed for voting purposes, and therefore would constitute a "vacant" Class. Article III.G of the Plan provides that any Class of Claims or Equity Interests that is vacant will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

Claims and Equity Interests under the Plan (i) is not an attempt to manufacture an impaired class

that will vote in favor of the Plan, and (ii) does not discriminate unfairly between or among

holders of Claims or Equity Interests.

Valid business, factual, and legal reasons exist for the separate classification of

Claims and Equity Interests. The Plan separates Claims from Equity Interests, Priority Claims

from General Unsecured Claims, and Secured Claims from both Priority and General Unsecured

Claims. More particularly, due to their unique and different rights:

- The Junior Secured Notes Claims are separately classified to reflect the legal nature of the Claims as well as the fact that the Claims are subject to the terms and conditions of the Junior Secured Notes Indenture and related agreements.

- Borrower Claims will be channeled to the Borrower Claims Trust under the Plan and have been separately classified as they will receive a separate recovery in Cash from that trust.

- Private Securities Claims have been separately classified as they will receive a separate recovery from the Private Securities Claims Trust under the Plan. In addition, the Private Securities Claims have been the subject of substantial litigation with the Debtors and Ally, and their separate treatment facilitates the settlement of such litigation as part of the Global Settlement.

- The NJ Carpenters Claims, consisting of class action securities litigation claims being settled under the Plan, are also separately classified and treated under the Plan to facilitate a settlement of the underlying litigation.

- General Unsecured Convenience Claims against the Debtors are classified separately from other Unsecured Claims pursuant to section 1122(b) of the Bankruptcy Code.[4]

- The FHFA Claims are separately classified as they are dissimilar from all other Claims due to the fact that the FHFA was not subject to the Third Party Release embodied in the Plan.[5]

---

[4] Section 1122(b) of the Bankruptcy Code provides that "[a] plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b).

[5] As explained in the Omnibus Response to Objections, however, the Plan Proponents and Ally have subsequently reached an agreement in principle to settle the allowed amount and distribution on account of the FHFA Claims in

- The Revolving Credit Facility Claims are classified separately as they are governed by separate underlying documentation (*i.e.*, the Revolving Credit Facility) as compared to all other Claims.

- Intercompany Balances are classified separately as they are dissimilar to all other Claims and are not held by third party creditors.

- Equity Interests are appropriately classified separately from Claims against the Debtors because such interests are not Claims.

Based upon the foregoing, the Plan Proponents submit that the classification of Claims and Equity Interests in the Plan is reasonable, appropriate, and within the Plan Proponents' discretion.  The Plan therefore satisfies the requirements of section 1122 of the Bankruptcy Code.

### 2. The Plan Satisfies the Seven Mandatory Plan Requirements of 11 U.S.C. §§ 1123(a)(1)-(a)(7)

Section 1123(a) of the Bankruptcy Code requires that the contents of a chapter 11 plan:  (i) designate classes of claims and interests; (ii) specify unimpaired classes of claims and interests; (iii) specify treatment of impaired classes of claims and interests; (iv) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest; (v) provide adequate means for the plan's implementation; (vi) provide for the prohibition of non-voting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (vii) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.  11 U.S.C. § 1123(a).

---

exchange for the FHFA's consent to the Third Party Release (subject to a limited carve-out) and the withdrawal of their objection to confirmation of the Plan.

The Plan satisfies the requirements set forth in section 1123(a).  Article III of the Plan satisfies the first three requirements by (i) designating Classes of Claims and Interests, as required by section 1123(a)(1), (ii) specifying the Classes of Claims and Interests that are Unimpaired under the Plan, as required by section 1123(a)(2), and (iii) specifying the treatment of each Class of Claims and Interests that is Impaired, as required by section 1123(a)(3). (Plan, Art. III.)

The Plan also satisfies section 1123(a)(4) of the Bankruptcy Code – the fourth mandatory requirement – because the treatment of each Allowed Claim or Interest within a Class is the same as the treatment of each other Allowed Claim or Interest in that Class, unless the Holder of a Claim or Interest consents to less favorable treatment on account of its Claim or Interest.[6]

The provisions of the Plan provide adequate means for the Plan's implementation, thus satisfying the fifth requirement of section 1123(a) of the Bankruptcy Code.  Section 1123(a)(5) specifies that adequate means for implementation of a plan may include retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancellation or modification of any indenture; curing or waiving of any default; amendment of the debtor's charter; or issuance of securities for cash, for property, for existing securities, in exchange for claims or interests, or for any other appropriate purpose.  11 U.S.C. § 1123(a)(5).

The provisions of Articles IV, VI, VII, and VIII of the Plan satisfy section 1123(a)(5) by addressing, among other things:

---

[6]  The only instance in which a holder is not receiving the same treatment as other holders of Claims in the same Class is with respect to Private Securities Claims in Classes R-6, GS-6, and RS-6.  Each of the holders of the Private Securities Claims has, however, agreed to the allocation of distributions made to the Private Securities Claims Trust, as set forth in further detail in the Private Securities Claims Trust Agreement, and voted in favor of the Plan.

- The approval and implementation of the Global Settlement, including each of the individual settlements comprising it, as well as the general settlement of Claims and Interests and other discrete Plan settlements.

- The distribution of the Ally Contribution among the Debtors.

- The partial consolidation of the Debtors for purposes of describing treatment under the Plan, confirmation of the Plan, and distributions under the Plan.

- The establishment of the Liquidating Trust, the Borrower Trust, the Private Securities Claims Trust, and the RMBS Claims Trust.

- The appointment of the Liquidating Trust Board and Liquidating Trust Management.

- The cancellation of securities, indentures, and other documents evidencing Claims and Equity Interests.

- The transfer of the Debtors' assets to the Liquidating Trust, the issuance of Liquidating Trust Units, and the dissolution or termination of the corporate existence of the Debtors.

- The retention of certain claims and causes of actions by the Liquidating Trust.

- The establishment of a Disputed Claims Reserve for remaining disputed, contingent, or unliquidated claims.

Because the Plan provides for the dissolution of the Debtors, the sixth requirement of section 1123(a) of the Bankruptcy Code, that a plan prohibit the issuance of nonvoting equity securities, does not apply.

Finally, the seventh requirement of section 1123(a) is that the Plan provisions with respect to the manner of selection of any officer, director, or trustee "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. § 1123(a)(7). As discussed in further detail below, pursuant to Article IV.O of the Plan, the Debtors will be dissolved following the Effective Date, and no individuals will serve as officers, directors, or voting trustees of the Debtors after the Effective Date, thereby rendering this provision inapplicable to these cases. Nevertheless, the members of the

Liquidating Trust Board and Liquidating Trust Management were identified in the Plan

Supplement [Dkt. No. 5342] and were selected by certain of the Consenting Claimants on terms

agreed upon pursuant to the Global Settlement among the Debtors, the Creditors' Committee,

Ally, and all Consenting Claimants.   No party in interest has objected to the identity of the

members of the Liquidating Trust Board or Liquidating Trust Management.   Thus, the manner of

the selection of the Liquidating Trust Board and Liquidating Trust Management is consistent

with the interest of holders of Claims and Equity Interests and consistent with public policy.

Accordingly, the Plan satisfies the mandatory plan requirements set forth in

section 1123(a) of the Bankruptcy Code.

### B.    The Plan Proponents Have Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2))

Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a

chapter 11 plan comply with the applicable provisions of the Bankruptcy Code.   The legislative

history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure

and solicitation requirements set forth in section 1125 of the Bankruptcy Code and the plan

acceptance requirements set forth in section 1126.   H.R. Rep. No. 95-595, at 412 (1977); S. Rep.

No. 95-989, at 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the

plan comply with the applicable provisions of chapter 11, such as section 1125 regarding

disclosure."); *see also In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y.

1984) (to comply with section 1129(a)(2), "the proponent must comply with the ban on post-

petition solicitation of the plan unaccompanied by a written disclosure statement approved by the

court in accordance with [Bankruptcy] Code §§ 1125 and 1126").   As set forth below, the Plan

Proponents have complied with these provisions, including sections 1125, 1126, and 1127 of the

Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure

Statement and soliciting acceptances of the Plan pursuant to the order approving the Disclosure

Statement [Dkt. No. 4809] (the "Disclosure Statement Order").

### 1.    The Plan Proponents Complied with all Disclosure and Solicitation Requirements (11 U.S.C. § 1125)

Section 1125(b) of the Bankruptcy Code prohibits the solicitation of acceptances

or rejections of a plan "unless, at the time of or before such solicitation, there is transmitted to

such holder the plan or a summary of the plan, and a written disclosure statement approved, after

notice and a hearing, by the court as containing adequate information."  11 U.S.C. § 1125(b).

The purpose of section 1125 is to ensure that parties-in-interest are fully informed as to the

condition of the debtor, the means for implementation of the plan, and the treatment of all classes

of claims and interests so they may make an informed decision on whether to accept or reject the

plan.  *See Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25

F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of Bankruptcy Code obliges debtor to

engage in full and fair disclosure that would enable hypothetical reasonable investor to make

informed judgment about plan).

The Plan Proponents have satisfied section 1125.  On August 23, 2013, before

votes were solicited on the Plan, the Court entered the Disclosure Statement Order, approving the

Disclosure Statement as containing adequate information and approving the procedures for

soliciting and tabulating the votes on the Plan.  The Disclosure Statement Order specifies the

content of the solicitation packages provided to holders of Claims and Interests and the timing

and method of their delivery.  (*See* Disclosure Statement Order at 12-14.)  The Disclosure

Statement, together with appropriate ballots, notices, and related documents was distributed to all

parties in accordance with the terms of the Disclosure Statement Order.  In addition, the date and

time of the Voting Deadline and Confirmation Hearing were published in the *Wall Street Journal*

and *USA Today* on September 3, 2013. (*See* Affidavit of Publication, [Dkt. No. 5025].)

Along with the solicitation packages, holders of general unsecured claims

received a letter from the Creditors' Committee recommending that creditors vote in favor of the

Plan, and holders of Borrower Claims received a separate letter from the Creditors' Committee

summarizing borrower-related provisions in the Plan and Disclosure Statement and likewise

recommending that Borrowers vote in favor of the Plan. Furthermore, as set forth in further

detail in the Voting Certification, the Plan Proponents complied in all respects with the

solicitation procedures as outlined in the Disclosure Statement Order. (*See generally* Voting

Certification.)

### 2.    The Plan Acceptance Requirements of 11 U.S.C. § 1126 are Satisfied

Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of

a chapter 11 plan. Pursuant to section 1126, only holders of allowed claims in impaired classes

of claims or equity interests that will receive or retain property under a plan on account of such

claims or equity interests may vote to accept or reject such plan. 11 U.S.C. § 1126. Section

1126 provides, in pertinent part, as follows:

(a)    The holder of a claim or interest allowed under section 502 of [the
Bankruptcy Code] may accept or reject a plan.

*            *            *

(f)    Notwithstanding any other provision of this section, a class that is
not impaired under a plan, and each holder of a claim or interest of
such class, are conclusively presumed to have accepted the plan,
and solicitation of acceptances with respect to such class from the
holders of claims or interests of such class is not required.

(g)    Notwithstanding any other provision of this section, a class is
deemed not to have accepted a plan if such plan provides that the

- 14 -

claims or interests of such class do not entitle the holders of such
claims or interests to receive or retain any property under the plan
on account of such claims or interests.

As set forth in the Voting Certification, the Debtors solicited votes on the Plan
from those classes entitled to vote – that is, the holders of all Allowed Claims in each Impaired
Class entitled to receive distributions under the Plan, Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11,
R-12, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-3, RS-4, RS-5, RS-6, RS-7, RS-8,
RS-11, and RS-12.  (Voting Certification ¶ 10.)  The Plan provides that each Class of the Debtor
Groups will contain sub-classes for each of the Debtors within a Debtor Group, and creditors
entitled to vote on the Plan voted at the applicable Debtor sub-Classes.   (Plan, Art. III.C.)
Classes R-1, R-2, GS-1, GS-2, RS-1, and RS-2 are Unimpaired and presumed to accept the Plan.

The Plan Proponents believe that holders of Junior Secured Notes Claims are
Unimpaired against certain of the GMACM Debtors (Class GS-3)[7] and RFC Debtors (Class RS-
3)[8] who did not issue or guaranty the Junior Secured Notes, but rather pledged specific assets as
collateral (*i.e.*, Cash) which the holders of Junior Secured Notes will receive under the Plan.[9]
However, because the Junior Secured Noteholders have argued that they are Impaired at all

---

[7] With respect to the GMACM Debtors, the Plan Proponents believe that the Junior Secured Noteholders are
Unimpaired and presumed to accept the Plan at the following Debtors:  Passive Asset Transactions, LLC;
Residential Mortgage Real Estate Holdings, LLC; Home Connects Lending Services, LLC; GMACR Mortgage
Products, LLC; ditech, LLC; Residential Consumer Services, LLC; and GMAC Mortgage USA Corporation.

[8] With respect to the RFC Debtors, the Plan Proponents believe that the Junior Secured Noteholders are Unimpaired
and presumed to accept the Plan at the following Debtors:  GMAC Model Home Finance I, LLC; DOA Holding
Properties, LLC; RFC Asset Holdings II, LLC; RFC Construction Funding, LLC; Residential Funding Real Estate
Holdings, LLC; Homecomings Financial Real Estate Holdings, LLC; Residential Funding Mortgage Securities, I,
Inc.; RFC Asset Management, LLC; RFC SFJV-2002, LLC; and RCSFJV2004, LLC.

[9] The Plan also provides that, to the extent the Bankruptcy Court makes a finding in the JSN Adversary Proceeding
that the Junior Secured Notes Claims are completely oversecured such that they are entitled to full payment of their
postpetition interest, the Junior Secured Notes Claims will be rendered unimpaired, the holders of the Junior Secured
Notes Claims will be conclusively presumed to accept the Plan, and their votes will not be counted.  *See In re PPI
Enters. (U.S.), Inc.*, 324 F.3d 197, 206 (3d Cir. 2003) (creditor that is paid in full, including postpetition interest, is
unimpaired under section 1124 of the Bankruptcy Code). For the avoidance of doubt, the Plan Proponents continue
to believe that the Junior Secured Notes Claims are significantly undersecured.

Debtors, they were provided with provisional ballots at those sub-Classes and, pursuant to the

Disclosure Statement Order, votes cast in Classes in which holders of Junior Secured Notes

Claims are Unimpaired may not be counted for voting purposes.   While the Plan Proponents

continue to believe that holders of Junior Secured Notes Claims at Debtor entities that merely

pledged specific assets as collateral for the Junior Secured Notes are Unimpaired, this is not an

issue that needs to be decided at Confirmation because the Plan satisfies the requirements of

section 1129(b) of the Bankruptcy Code, as discussed in further detail below, and the Plan may

be confirmed, regardless of whether the Junior Secured Notes Claims are deemed Impaired at all

Debtor entities.

Classes R-9, R-10, GS-8, GS-9, RS-9, and RS-10 are Impaired and are not

entitled to receive or retain any property under the Plan on account of such claims and interests,

and thus are presumed to reject the Plan.

Sections 1126(c) and (d) of the Bankruptcy Code specify the requirements for

acceptance of a plan by a class of claims and interests entitled to vote to accept or reject the plan:

> (c)     A class of claims has accepted a plan if such plan has been
> accepted by creditors, other than any entity designated
> under subsection (e) of [section 1126], that hold at least
> two-thirds in amount and more than one-half in number of
> the allowed claims of such class held by creditors, other
> than any entity designated under subsection (e) of [section
> 1126], that have accepted or rejected such plan.
>
> (d)     A class of interests has accepted a plan if such plan has
> been accepted by holders of such interests, other than any
> entity designated under subsection (e) of [section 1126],
> that hold at least two-thirds in amount of the allowed
> interests of such class held by holders of such interest,
> other than any entity designated under subsection (e) of
> [section 1126], that have accepted or rejected such plan.

As evidenced in the Voting Certification, aside from the Classes of Claims deemed to accept or reject the Plan as discussed above, the Plan has been accepted by holders of Claims in Classes R-4, R-5, R-6, R-7, R-8, R-11, R-12, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-4, RS-5 (at all sub-Classes other than Residential Funding Real Estate Holdings, LLC), RS-6, RS-7, RS-8, RS-11, and RS-12 holding in excess of two-thirds in amount and one-half in number of the Allowed Claims voted in each Class.[10]   (Voting Certification, Exhibit B.)   The Plan was rejected by holders of Claims in Classes R-3, GS-3, RS-3, and RS-5 (at the Residential Funding Real Estate Holdings, LLC sub-Class).

Notwithstanding that Classes R-3, GS-3, RS-3, RS-5 (at the Residential Funding Real Estate Holdings, LLC sub-Class), R-9, R-10, GS-8, GS-9, RS-9 and RS-10 have voted or are otherwise deemed to reject the Plan, as discussed in further detail below, the Plan Proponents have demonstrated that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code to "cram down" such rejecting Classes.   Based on the foregoing, the Plan Proponents' solicitation of votes on the Plan was undertaken in conformity with section 1126 of the Bankruptcy Code and the Disclosure Statement Order.

**3.    The Technical Modifications to the Plan are Permissible (11 U.S.C. § 1127)**

In the interest of clarifying and consensually resolving outstanding issues and formal and informal objections to Confirmation of the Plan, the Plan Proponents have made certain non-material modifications to the Plan (the "Technical Modifications").

---

[10] No votes were submitted in Classes GS-7 (at the ETS of Virginia and Executive Trustee Services, LLC sub-Classes), R-8 (at the GMAC Residential Holding Company, LLC sub-Class), RS-5 (at the RAHI Real Estate Holdings, LLC, Residential Accredit Loans, Inc., Residential Asset Securities Corporation, Residential Funding Mortgage Securities I, Inc., and Residential Funding Mortgage Securities II, Inc. sub-Classes), RS-8 (at the Residential Accredit Loans, Inc., Residential Asset Mortgage Products, Inc., Residential Asset Securities Corporation, Residential Funding Mortgage Securities I, Inc., Residential Funding Mortgage Securities II, Inc., Residential Funding Real Estate Holdings, LLC, RFC REO LLC, and RFC SFJV-2002, LLC sub-Classes) (collectively, the "Non-Voting Sub-Classes").   In accordance with paragraph 45(c) of the Disclosure Statement Order, the Non-Voting Sub-Classes are deemed to have accepted the Plan.

Contemporaneously herewith, the Plan Proponents are filing a revised version of the Plan, along with a blackline to the solicitation version of the Plan filed on August 23, 2013.

The Technical Modifications do not materially and adversely affect the treatment of any Claim or Equity Interest holder under the Plan.  Instead, the modifications are designed to (i) implement a settlement of the Plan objections filed by the FHFA and Freddie Mac as well as the treatment and priority of the FHFA Claims, (ii) provide certain governmental carve-outs to the Third Party Release and Exculpation provisions in the Plan to reflect a resolution of an informal objection of the U.S. Department of Justice and certain state attorneys general, (iii) incorporate certain corporate modifications and conform the terms of the Plan to the terms of the Plan Supplement documents, including, in particular, the Liquidating Trust Agreement, (iv) settle certain other objections raised by parties-in-interest to various terms of the Plan, and (v) incorporate other minor technical and clean-up revisions.

Section 1127 of the Bankruptcy Code provides a plan proponent the right to modify the plan "at any time" before confirmation.  Specifically, section 1127 of the Bankruptcy Code provides:

(a)     The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.  After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

*        *        *

(d)     Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.

Accordingly, bankruptcy courts typically allow plan proponents to make non-material changes to a plan without any special procedures or vote re-solicitation.  *See, e.g.*, *In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) ("[I]f a modification does not 'materially' impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.") (citation omitted); *see also Enron Corp. v. New Power Co. (In re New Power Co.)*, 438 F.3d 1113, 1117-18 (11th Cir. 2006) ("[T]he bankruptcy court may deem a claim or interest holder's vote for or against a plan as a corresponding vote in relation to a modified plan unless the modification materially and adversely changes the way that claim or interest holder is treated.").

In addition, Bankruptcy Rule 3019, designed to implement section 1127(d) of the Bankruptcy Code provides in relevant part:

> In a . . . chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Because all creditors in these Chapter 11 Cases have notice of the Confirmation Hearing, and will have an opportunity to object to the Technical Modifications at that time, the requirements of section 1127(d) of the Bankruptcy Code have been satisfied.  *See Citicorp Acceptance Co., Inc. v. Ruti-Sweetwater (In re Sweetwater)*, 57 B.R. 354, 358 (D. Utah 1985) (creditors who had knowledge of pending confirmation hearing had sufficient opportunity to raise objections to modification of plan).

Accordingly, because the Technical Modifications (and any additional technical modifications that may be made prior to or at the Confirmation Hearing), are non-material and

do not materially or adversely affect the treatment of any creditor that has previously accepted the Plan, and the Plan, as modified, continues to comply with the requirements of sections 1122 and 1123 of the Bankruptcy Code, no further solicitation is required.

C.    **The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (11 U.S.C. § 1129(a)(3))**

Section 1129(a)(3) of the Bankruptcy Code requires a bankruptcy court to deny confirmation of a plan if it is not proposed in "good faith" or contains provisions "forbidden by law."  11 U.S.C. § 1129(a)(3).  The Second Circuit has construed the good faith standard as requiring a showing that "the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected."  *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) (internal quotations omitted); *see also In re Texaco, Inc.*, 84 B.R. 893, 907 (Bankr. S.D.N.Y. 1988) ("[I]n the context of a [Chapter 11] reorganization . . . a plan is considered proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.") (internal quotations omitted).  Additionally, courts generally hold that "good faith" should be evaluated in light of the totality of the circumstances surrounding confirmation.  *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994).

Good faith for purposes of section 1129(a)(3) of the Bankruptcy Code may be found where the plan is supported by key creditor constituencies or was the result of extensive arm's-length negotiations with creditors.  *See In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) ("The fact that the plan is proposed by the committee as well as the debtors is strong evidence that the plan is proposed in good faith."); *In re Eagle-Picher Indus., Inc.*, 203 B.R. 256, 274 (Bankr. S.D. Ohio 1996) (finding that plan of reorganization was proposed in

good faith when, among other things, it was based on extensive arm's-length negotiations among plan proponents and other parties-in-interest).

Consistent with the overriding purposes of the Bankruptcy Code – namely, the expeditious and equitable distribution of estate assets – the Plan is designed to liquidate the Debtors' remaining assets in the most efficient and cost effective manner and thereby maximize distributions to unsecured creditors. Among other things, the Plan proposes to (i) dissolve each of the Debtors on or after the Effective Date, (ii) establish the Liquidating Trust to take possession of the Debtors' remaining assets and liquidate and distribute them to creditors (or to Plan Trusts for distribution to creditors), and (iii) assume and assign or reject executory contracts and unexpired leases not previously assumed and assigned (subject to certain exceptions).

As this Court is well aware, the Plan – jointly proposed by the Debtors and the Creditors' Committee – is the result of substantial good faith, arms'-length, and often contentious negotiations among the Debtors, the Creditors' Committee, Ally, and the majority of the Debtors' creditor constituencies, which were led by the Court-appointed Mediator. As a result, the Plan contains a series of compromises that represent a good faith effort to provide the highest recoveries to all creditor constituencies attainable in the circumstances. These compromises garnered overwhelming support for the Plan by the Debtors' key creditor constituencies – which, in itself, is evidence of good faith and an acknowledgement that the Plan is fair and equitable.

Moreover, the various Plan Settlements embodied in the Plan, as well as the established Plan Trusts and treatment for certain creditor constituencies (including the establishment of the Borrower Claims Trust to fund Cash recoveries to holders of Allowed Borrower Claims in comparable amounts to those estimated for general unsecured creditors), are

indicative of the Plan Proponents' efforts to reach consensual resolutions with all parties in interest. *See In re Chemtura Corp.*, 493 B.R. 561, 608-09 (Bankr. S.D.N.Y. 2010) (good faith established because, among other things, debtor negotiated and reached agreements with several parties in interest to propose chapter 11 plan that "in the aggregate demonstrate[d] a good faith effort on the part of the debtor to consider the needs and concerns of all major constituencies in this case") (internal quotations omitted).

The Plan Proponents firmly believe that the Plan provides the best and most efficient path for liquidating the Debtors' remaining assets, dissolving the Debtors, and maximizing distributions to stakeholders. The Plan has been proposed in compliance with all applicable laws, rules, and regulations. Accordingly, the Plan Proponents submit that the Plan was proposed in good faith and satisfies all of the requirements of section 1129(a)(3).

### D.     The Plan Provides for Required Bankruptcy Court Approval of Certain Administrative Payments (11 U.S.C. § 1129(a)(4))

Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under a plan be subject to court approval as reasonable.   11 U.S.C. § 1129(a)(4).   This requirement is "designed to insure compliance with the policies of the Bankruptcy Code that (1) the bankruptcy court should police the awarding of fees in title 11 cases and (2) holders of claims and interests should have the benefit of such information as might affect the claimants' decision to accept or reject the plan." *In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009) (citation omitted).   Accordingly, the "'requirements under § 1129(a)(4) are two-fold.  First, there must be disclosure.  Second, the court must approve of the reasonableness of payments.'" *Id.* (quoting 7 Collier on Bankruptcy ¶ 1129.03[4] (15th ed. Rev. 1998)).

- 22 -

Here, the Plan mandates that all payments made by the Debtors for services, costs, or expenses in connection with these Chapter 11 Cases before the Effective Date, including all Claims for Accrued Professional Compensation,[11] must be approved by, or are subject to the approval of, the Bankruptcy Court as reasonable.  (Plan, Art. II.B.)  Pursuant to the interim compensation and reimbursement procedures established by section 331 of the Bankruptcy Code, this Court authorized and approved the payment of certain fees and expenses of professionals retained in these Chapter 11 Cases.  All such fees and expenses, as well as all other accrued fees and expenses of professionals through the Effective Date, remain subject to final review for reasonableness by the Court under section 330 of the Bankruptcy Code.[12]  In this regard, the Plan makes clear that no Professional fees and expenses denied by the Bankruptcy Court will constitute Accrued Professional Compensation.  (Plan, Art. I.A.1.)  Thus, the procedures for the Court's review and ultimate determination of the fees and expenses to be paid by the Debtors satisfy the objectives of section 1129(a)(4) of the Bankruptcy Code.  *In re Worldcom, Inc.*, No. 02-13533, 2003 WL 23861928, at *54 (Bankr. S.D.N.Y Oct. 31, 2003) (requirements of section 1129(a)(4) were satisfied where plan provided for payment of only "allowed" administrative expenses) (citation omitted).

---

[11]  The Plan defines Claims for "Accrued Professional Compensation" as:

> at any date, and regardless of whether such amounts are billed or unbilled, all of a Professional's accrued and unpaid fees (including success fees) and reimbursable expenses for services rendered in the Chapter 11 Cases through and including such date, whether or not such Professional has filed a fee application for payment of such fees and expenses, (i) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount) and (ii) after applying any retainer that has been provided by the Debtor to such Professional and not previously applied.

(Plan, Art. I.A.1.)

[12] Pursuant to the Plan, Professionals asserting Professional Fee Claims for services rendered before the Effective Date must file a request for final allowance of such Professional Fee Claim no later than 75 days after the Effective Date.  (Plan, Art. II.B.1.)

In accordance with the Plan Support Agreement, Article IV.C.5 of the Plan also provides for the payment of the reasonable pre and postpetition fees and expenses of all RMBS Trustees (including HSBC), pursuant to the provisions of and subject to the procedures set forth in two Bankruptcy Court orders.[13]    These orders require the RMBS Trustees to provide reasonable and customary detail or invoices in support of their fees, and the Debtors may object to such fees based on a "reasonableness standard" within the time period set forth therein.

Moreover, as part of the RMBS Settlement embodied in the Global Settlement, the Plan provides for the allowance of the Allowed Fee Claim, with Units and distributions on account of such claim made to counsel for the Institutional Investors.  The Plan makes clear that the amount of the Allowed Fee Claim is not being paid by the Debtors' estates but rather will be paid out of distributions on account of the RMBS Trust Claims.  Allowance of the Allowed Fee Claim should be approved in connection with the Global Settlement, is reasonable and appropriate, and the Institutional Investors need not satisfy the "substantial contribution" standards of section 503(b) of the Bankruptcy Code.  *See In re AMR Corp.*, 497 B.R. 690, 694-96 (Bankr. S.D.N.Y. 2013) (fees may be reimbursed pursuant to settlement embodied in plan without satisfying requirements of section 503(b)); *In re Lehman Bros. Holdings Inc.*, 487 B.R. 181, 189-90 (Bankr. S.D.N.Y. 2013) (same); *In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 9 (Bankr. S.D.N.Y. 2010) (same).

---

[13] *See Final Supplemental Order Under Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a), and 1108 and Bankruptcy Rule 9019 (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses [Dkt. No. 774], and the Order under 11 U.S.C. §§ 105, 363, and 365, and Fed Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief* [Dkt. No. 2246].

The Allowed Fee Claim is an integral and non-severable component of the RMBS

Settlement, was disclosed in detail in the Plan and Disclosure Statement, and, as set forth in the

Mabey Direct (Annex ¶¶ 6-8), is reasonable in the circumstances.   The Investors in the RMBS

Trusts received direct notice of the RMBS Settlement and the Allowed Fee Claim from the

RMBS Trustees, and none of the Investors objected to Plan confirmation on the ground that the

fees are unreasonable or unwarranted.[14]    Accordingly, the Plan Proponents submit that the

Allowed Fee Claim should be approved as reasonable in connection with confirmation of the

Plan.  *See Journal Register*, 407 B.R. at 536-37 (approving payments under section 1129(a)(4)

where disclosure statement and plan disclosed payments, creditors' committee endorsed

payments as reasonable, and debtors' chief operating officer testified without contradiction that

payments were reasonable).

Based upon the foregoing, the Plan complies with the requirements of section

1129(a)(4) of the Bankruptcy Code.

E.    **The Members of the Liquidating Trust Board and Liquidating Trust
      Management Have Been Disclosed and Their Appointment is Consistent with
      Public Policy (11 U.S.C. § 1129(a)(5))**

Section 1129(a)(5)(A) of the Bankruptcy Code requires that, before confirmation,

the proponent of a plan must disclose the identities and affiliations of the proposed officers and

directors of the reorganized debtors and that the appointment or continuance of such officers and

directors must be consistent with the interests of creditors and equity security holders and with

public policy.   11 U.S.C. § 1129(a)(5)(A).   In addition, section 1129(a)(5)(B) requires a plan

proponent to disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be

---

[14] No party is prosecuting an objection to the Allowed Fee Claim.

employed or retained by the reorganized debtor and the "nature of any compensation for such insider." *Id.* § 1129(a)(5)(B).

In accordance with section 1129(a)(5)(B), the Plan Supplement discloses the identities and compensation structure for the members of the Liquidating Trust Board and Liquidating Trust Management, as well as the identities of the Borrower Claims Trustee, the Borrower Claims Trust Committee, the Private Securities Claims Trustee, and the RMBS Claims Trustee.  (Plan Supplement, Exs. 6-9, 18 [Dkt. No. 5342].)

As part of the Global Settlement negotiations, the Settling Parties agreed, and the Plan provides, that the Liquidating Trust Board shall consist initially of five (5) Liquidating Trustees, one of whom shall be selected by each of: (i) MBIA; (ii) FGIC; (iii) jointly by the RMBS Trustees that are members of the Creditors' Committee, the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants; (iv) Paulson; and (v) the holders of Private Securities Claims, with such other Liquidating Trustees as agreed to by the Plan Proponents and the Consenting Claimants.  (Plan, Art. VI.E.)

Pursuant to the Plan, the Liquidating Trust Board shall appoint officers or other representative agents of the Liquidating Trust, including a Liquidating Trust manager (the "Liquidating Trust Manager") and a secretary, to serve as the Liquidating Trust Management and carry out the purpose of the Liquidating Trust.   (Plan, Art. VI.E.)   The Liquidating Trust Manager disclosed in the Plan Supplement (as well as the other members of Liquidating Trust Management) was indeed selected by the Debtors' primary creditor constituencies and with the support of the Debtors and the Creditors' Committee.  No party in interest has objected to the identity of the initial members of the Liquidating Trust Board and/or Liquidating Trust Management.

Accordingly, the Plan Proponents have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

**F.    The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (11 U.S.C. § 1129(a)(6))**

Section 1129(a)(6) of the Bankruptcy Code permits confirmation of a chapter 11 plan only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan.  11 U.S.C. § 1129(a)(6). Section 1129(a)(6) is inapplicable here because the Plan does not provide for any rate changes.

**G.    The Plan is in the Best Interests of Creditors and Interest Holders (11 U.S.C. § 1129(a)(7))**

The "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.  11 U.S.C. § 1129(a)(7).  Section 1129(a)(7) focuses on individual dissenting creditors, rather than classes of claims. *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 442 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").

The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries under the debtor's plan. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007) ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").  To

- 27 -

determine whether a plan is in the best interests of creditors, a court need not consider any alternative to the plan other than the recoveries projected in a chapter 7 liquidation of all the debtor's assets.  *See, e.g.*, *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297-98 (Bankr. S.D.N.Y. 1990).

The best interests test is satisfied here because, as discussed below, *all* Classes – impaired and unimpaired, accepting and rejecting the Plan – will receive at least as much under the Plan as they would in a hypothetical chapter 7 liquidation.

To determine the value that holders of Claims and Equity Interests would receive in a hypothetical liquidation, the Debtors and their advisors estimated the dollar amount for each of the Debtors' estates that would be available from a liquidation of its assets under chapter 7 of the Bankruptcy Code (the "Liquidation Analysis").  (Disclosure Statement, Ex. 8.)

The following tables provide a consolidated overview of recoveries to holders of Claims and Interests under the Liquidation Analysis on an aggregate basis:

**ResCap Debtors**

| Class | Estimated Aggregate Claims | Estimated Percentage of Recovery | |
|---|---|---|---|
| | | Plan | Liquidation |
| Class R-1 – Other Priority Claims | $0 | 100% | 100% |
| Class R-2 – Other Secured Claims | $0.1 mm | 100% | 100% |
| Class R-3 – Junior Secured Notes Claims | $1,846 mm – 2,553 mm | 100% | 70.3-77.0% |
| Class R-4 – ResCap Unsecured Claims | $2,060.44 mm | 31.5-41.9% | 0.1-0.2% |
| Class R-5 – Borrower Claims | $0 | 36.3% | N/A |
| Class R-6 – Private Securities Claims | $0 | N/A | 0.0-0.1% |
| Class R-7 – NJ Carpenters Claims | N/A | N/A | 0.0-0.1% |
| Class R-8 General Unsecured Convenience Claims | N/A | 36.3% | 0.1-0.2% |
| Class R-9– Intercompany Balances | N/A | 0% | 0% |
| Class R-10 –Equity Interests | N/A | 0% | 0% |
| Class R-11 – FHFA Claims | N/A | N/A[15] | 0.0-0.1% |
| Class R-12 – Revolving Credit Facility Claims | N/A | N/A | 100% |

**GMACM Debtors**

| Class | Estimated Aggregate Claims | Estimated Percentage of Recovery | |
|---|---|---|---|
| | | Plan | Liquidation |
| Class GS-1 – Other Priority Claims | $0.13 mm | 100% | 100% |
| Class GS-2 – Other Secured Claims | $0.04 mm | 100% | 100% |
| Class GS -3 – Junior Secured Notes Claims | $1,846 mm – 2,553 mm | 100% | 70.3-77.0% |
| Class GS -4A – GMACM Unsecured Claims | $2,205.07 mm | 26.0-34.7% | 6.3-8.1% |
| Class GS -4A – ETS Unsecured Claims | $4.9 million | 100% | 100% |
| Class GS -5 – Borrower Claims | $88.57 mm | 30.1% | 6.3-8.1% |
| Class GS-6 – Private Securities Claims | N/A | N/A | 0.0-6.3% |
| Class GS – 7 General Unsecured Convenience Claims | $2.5 mm | 30.1% | 6.3-8.1% |
| Class GS-8– Intercompany Balances | N/A | 0% | 0% |
| Class GS-9 –Equity Interests | N/A | 0% | 0% |
| Class GS-10 – Revolving Credit Facility Claims | N/A | N/A | 100% |

---

[15] Article III of the Plan provides that the holders of the FHFA Claims in Class R-11 will waive any recovery on account of such Claims.

**RFC Debtors**

| Class | Estimated Aggregate Claims | Estimated Percentage of Recovery | |
|---|---|---|---|
| | | Plan | Liquidation |
| Class RS-1 – Other Priority Claims | $0.1 mm | 100% | 100% |
| Class RS-2 – Other Secured Claims | $0.1 mm | 100% | 100% |
| Class RS-3 – Junior Secured Notes Claims | $1,846 mm – 2,553 mm | 100% | 70.3-77.0% |
| Class RS-4 – RFC Unsecured Claims | $9,063.78 mm | 7.8-10.3% | 1.9-3.6% |
| Class RS-5 – Borrower Claims | $333.09 | 9.0% | 1.9-3.6% |
| Class RS-6 – Private Securities Claims | N/A | N/A | 0.0-1.9% |
| Class RS-7 – NJ Carpenters Claims | N/A | N/A | 0.0-1.9% |
| Class RS – 8 General Unsecured Convenience Claims | $0.70 mm | 9.0% | 1.9-3.6% |
| Class RS-9– Intercompany Balances | N/A | 0% | 0% |
| Class RS-10 –Equity Interests | N/A | 0% | 0% |
| Class RS-11 – FHFA Claims | N/A | 2%[16] | 0.0-1.9% |
| Class RS-12 – Revolving Credit Facility Claims | N/A | N/A | 100% |

Based on the foregoing analysis, no dissenting holder of a Claim or Equity Interest in an impaired Class will receive less under the Plan than it would receive if the Debtors were liquidated under chapter 7. Accordingly, the Plan Proponents submit that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

## H.    Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(8))

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept the plan or be unimpaired. Pursuant to section 1126(c) of the Bankruptcy Code, a class of claims accepts a plan if holders of at least two thirds in amount and more than one half in number of the allowed claims in that class vote to accept the plan. Pursuant to section 1126(d) of the Bankruptcy Code, a class of interests accepts a plan if holders of at least two thirds in amount of the allowed interests in that class vote to accept the plan. A

---

[16] The Plan originally provided that the FHFA Claims may be subject to subordination under section 510(b) of the Bankruptcy Code and therefore not entitled to a recovery on account of such Claims or, if not subordinated under section 510(b), would receive a distribution in Cash equal to 2% of such holder's Allowed FHFA Claim against the RFC Debtors (*i.e.*, the amount such holder would be entitled to receive in a chapter 7 liquidation). Because the Plan Proponents and Ally have reached agreement with the FHFA as to the Allowed amount of the FHFA Claims in exchange for the FHFA's consent to the Third Party Release, holders of FHFA Claims against the RFC Debtors will receive a distribution in Cash equal to 2% of such holders' Allowed FHFA Claims.

Main Document

class that is not impaired under a plan is presumed to have accepted the plan.   11 U.S.C. § 1126(f).   On the other hand, a class is deemed to reject a plan if the plan provides that the holders of claims or interests within that class do not receive or retain any property under the plan on account of such claims or interests.  11 U.S.C. § 1126(g).

All unimpaired Classes of Claims under the Plan (*i.e.*, Classes R-1, R-2, GS-1, GS-2, RS-1, and RS-2) are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  As discussed above and as set forth in the Voting Certification, impaired Classes R-4, R-5, R-6, R-7, R-8, R-11, R-12, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-4, RS-5 (at all sub-Classes other than Residential Funding Real Estate Holdings, LLC), RS-6, RS-7, RS-8, RS-11, and RS-12 have accepted the Plan.  (Voting Certification, Exhibit B.) Accordingly, with respect to these Classes of Claims, the requirements of section 1129(a)(8) have been satisfied.

However, because Classes R-3, GS-3, RS-3, and RS-5 (at the Residential Funding Real Estate Holdings, LLC sub-Class)  (the "Rejecting Borrower Class") have voted to reject the Plan and Classes R-9, R-10, GS-8, GS-9, RS-9, and RS-10 are deemed to reject the Plan as the Plan provides that such Claims and Equity Interests will not receive any distribution on account of those Claims and Equity Interests (collectively, the "Rejecting Classes"), the requirements of section 1129(a)(8) are not met with respect to the Rejecting Classes.

Nevertheless, even though certain impaired classes of claims or interests do not accept a plan, and therefore the requirements of section 1129(a)(8) are not satisfied, the Plan may be confirmed over such nonacceptance pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.[17]   As described in further detail below, the Debtors will

---

[17] The condition precedent to confirmation contained in section 1129(a)(8) is the only condition of section 1129(a) that is not necessary for confirmation of a plan of reorganization.

demonstrate that the Plan satisfies the "cram down" requirements under section 1129(b) of the

Bankruptcy Code.

I.      **The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims (11 U.S.C. § 1129(a)(9))**

Unless the holder of a claim entitled to priority under section 507(a) of the

Bankruptcy Code agrees to a different treatment with respect to such claim, section 1129(a)(9)

requires a plan to provide as follows:

(A)     with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of [the Bankruptcy Code], on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B)     with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of [the Bankruptcy Code], each holder of a claim of such class will receive –

(i)     if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii)    if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(C)     with respect to a claim of a kind specified in section 507(a)(8) of [the Bankruptcy Code], the holder of such claim will receive on account of such claim regular installment payments in cash –

(i)     of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii)    over a period ending not later than five years after the date of the order for relief under section 301, 302, or 303; and

(iii)   in a manner not less favorable than the most favored non-priority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)).

(D)     with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the

- 32 -

holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

The Plan satisfies each of the requirements of section 1129(a)(9).  *First,* the Plan provides that each holder of an Allowed Administrative Claim – except with respect to Professional Fee Claims and to the extent that a holder of an Allowed Administrative Claim agrees to less favorable treatment – shall receive Cash in an amount equal to the amount of such Allowed Administrative Claim: (i) if the Administrative Claim is Allowed before the Effective Date, on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon as practicable thereafter); or (ii) if the Administrative Claim is Allowed on or after the Effective Date, on the date such Administrative Claim is Allowed, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon as practicable thereafter).  (Plan, Art. II.A.1.)  The Plan also imposes an Administrative Claims Bar Date, which provides that all Administrative Claims must be filed and served on the Plan Proponents or the Liquidating Trust, as applicable, no later than 30 days following the Effective Date.  (Plan, Arts. I.A.4, II.A.2.)

*Second,* with respect to Other Priority Claims addressed by section 1129(a)(9)(B), the Plan provides that each holder of an Allowed Other Priority Claim against the Debtors will receive, as determined by the Plan Proponents or the Liquidating Trust, as applicable, either: (i) payment in full in Cash, or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.  (*See, e.g.*, Plan, Art. III.D.1.(a).)

*Third,* the Plan provides that each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive Cash on, or as soon as practicable after, the latest of: (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed; or (iii) in regular payments over a period of time not to exceed five (5) years after the

Petition Date with interest at a rate determined in accordance with section 511 of the Bankruptcy

Code.  (Plan, Art. II.C.)  Secured tax claims arising under sections 506(a) or 506(b) of the

Bankruptcy Code are included as Priority Tax Claims under the Plan.  The Plan also provides

that, to the extent a holder of an Allowed Priority Tax Claim holds a valid lien for outstanding

and unpaid real property taxes against property of the Debtors or the Liquidating Trust, any such

liens shall remain unimpaired until such Allowed Priority Tax Claim is paid in full.  *Id.*

The Plan thus complies with the requirements of section 1129(a)(9) of the

Bankruptcy Code.

### J.    At Least One Impaired Class of Claims Has Accepted the Plan (11 U.S.C. § 1129(a)(10))

Section 1129(a)(10) of the Bankruptcy Code provides that, if a class of claims is

impaired under a plan, at least one impaired class of claims must accept the plan, excluding

acceptance by any insider.  11 U.S.C. § 1129(a)(10).  As set forth in the Voting Certification, the

Plan Proponents have satisfied this requirement because at least one impaired Class of Claims

voted to accept the Plan at each and every Debtor entity, after excluding the votes of any insiders

in each Class.[18]  (Voting Certification, Exhibit B.)

### K.    The Plan is Feasible (11 U.S.C. § 1129(a)(11))

Under section 1129(a)(11) of the Bankruptcy Code, a plan may be confirmed only

if "[c]onfirmation of the plan is not likely to be followed by a liquidation or the need for further

financial reorganization, of the debtor or any successor to the debtor under the plan, unless such

---

[18] Nevertheless, this is a per-plan requirement, not a per-debtor requirement.  *See, e.g.*, *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns, Inc.)*, 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009) ("[I]t is appropriate to test compliance with section 1129(a)(10) on a per-plan basis, not, as [objecting parties] argue, on a per-debtor basis); *In re Enron Corp.*, No. 01-16034, 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004) (order confirming joint chapter 11 plan where each debtor did not have an impaired accepting class); *In re SGPA, Inc.*, No. 01-02609 (Bankr. M.D. Pa. Sept. 28, 2001) [Dkt. No. 445] (joint chapter 11 plan complied with section 1129(a)(10) because at least one class of impaired creditors accepted plan, notwithstanding fact that each debtor entity did not have accepting impaired class).  Because at least one impaired Class of Claims voted in favor of the Plan, the Plan Proponents clearly satisfied this requirement.

liquidation or reorganization is proposed in the Plan." 11 U.S.C. § 1129(a)(11).  In the context

of a liquidating debtor, the feasibility test is more limited, however: it measures whether the

debtors will be able to make the payments required under the plan.  *See In re Journal Register

Co.*, 407 B.R. 520, 539 (Bankr. S.D.N.Y. 2009) (feasibility test asks "whether the things which

are to be done after confirmation can be done as a practical matter under the facts").

      As described in the Kruger Direct (¶ 147), the Plan is feasible within the meaning

of section 1129(a)(11) because the Debtors have the wherewithal to make the payments required

under the Plan.  Specifically, the Plan sets forth certain Cash payments that the Debtors and/or

the Liquidating Trust must make on or immediately following the Effective Date.  Those include,

among others, payments to holders of Allowed Administrative Claims, Allowed Priority Tax

Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed Convenience

Claims, Allowed Junior Secured Notes Claims, and ETS Unsecured Claims.  (Plan, Arts. II and

III.)

      The Plan also provides for Cash payments to fund: (i) certain reserves (including

reserves for (x) administrative expenses of the Liquidating Trust, (y) current or future Allowed

Administrative, Secured, Priority and Convenience Claims, and (z) certain Claims related to the

Debtors' obligations under the DOJ/AG Settlement); (ii) the Borrower Claims Trust; (iii) the NJ

Carpenters Settlement; and (iv) Cash distributions on account of the FHFA Claims.  The other

holders of Allowed Claims will receive Units in the Liquidating Trust (rather than an immediate

Cash payment).  The Units will entitle the holders to a share of the Distributable Cash from the

Liquidating Trust.  As set forth in the recovery analysis attached to the Disclosure Statement as

Exhibit 7 (the "Recovery Analysis"), the Debtors estimate that, based upon projected Estate

assets (including the Ally Contribution), and after payment of all projected Allowed secured,

administrative, priority, and convenience claims, and excluding Cash to be funded to the

Borrower Claims Trust and NJ Carpenters Settlement, approximately $2,461.4 million will be

available for distribution to unsecured creditors receiving Units in the Liquidating Trust.

Accordingly, the Plan is feasible and satisfies the requirements of section

1129(a)(11) of the Bankruptcy Code.

**L.    The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (11 U.S.C. § 1129(a)(12))**

Section 1129(a)(12) of the Bankruptcy Code requires that, as a condition

precedent to the confirmation of a plan, "[a]ll fees payable under section 1930 of title 28, as

determined by the court at the hearing on confirmation of the plan, have been paid or the plan

provides for the payment of all such fees on the effective date of the plan." 11 U.S.C.

§ 1129(a)(12). The Plan complies with section 1129(a)(12) by providing that the Debtors shall

pay in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.

(Plan, Art. II.D.) The Plan further provides that, on and after the Effective Date, notwithstanding

the grouping of the Debtors into the Debtor Groups under the Plan, each of the Debtors shall (i)

pay the applicable U.S. Trustee fees when due in the ordinary course until such time as the

Bankruptcy Court enters a final decree in such Debtors' Chapter 11 Case or until each Chapter

11 Case is converted or dismissed, and (ii) file consolidated post-confirmation quarterly status

reports. (Plan, Art. XIII.C.)

**M.    The Plan Provides for the Payment of Retiree Benefits (11 U.S.C. § 1129(a)(13))**

Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits

continue to be paid post-confirmation at any levels established in accordance with section 1114

of the Bankruptcy Code. 11 U.S.C. § 1129(a)(13). The retirement plan covering the Debtors'

employees is sponsored by AFI, the parent of ResCap and a non-Debtor. The Plan provides that

- 36 -

nothing in the Plan releases AFI (the direct parent of GMAC Mortgage Group, LLC) or any other party from the obligations under the Employees Retirement Plan for GMAC Mortgage Group, LLC and ERISA.    (Plan, Art. IX.E.)    The Debtors have no other retiree benefit obligations.  The Plan thus satisfies the requirements of section 1129(a)(13).

### N.    11 U.S.C. §§ 1129(a)(14) and 1129(a)(15) are Not Applicable

Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations and section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  11 U.S.C. §§ 1129(a)(14), (a)(15).  Neither of these provisions applies to the Debtors.

### O.    The Plan Does Not Provide for the Transfer of Property by any Non-Profit Entities Not in Accordance with Applicable Nonbankruptcy Law (11 U.S.C. § 1129(a)(16))

Section 1129(a)(16) of the Bankruptcy Code provides that applicable non-bankruptcy law will govern all transfers of property under a plan to be made by "a corporation or trust that is not a moneyed, business, or commercial corporation or trust."  11 U.S.C. § 1129(a)(16).  The legislative history of section 1129(a)(16) demonstrates that this section was intended to "restrict the authority of a trustee to use, sell, or lease property by a nonprofit corporation or trust."  H.R. Rep. No. 109-31, at 145 (2005).  Although the Debtors – none of which are nonprofit entities – do not believe that any transfers of property under the Plan will be made by a nonprofit corporation or trust, to the extent that any such transfers are contemplated by the Plan, such transfers will be made in accordance with applicable non-bankruptcy law. Accordingly, the Plan satisfies the requirements of section 1129(a)(16) of the Bankruptcy Code.

### P.    The Plan Satisfies the "Cram Down" Requirements of 11 U.S.C. § 1129(b)

As discussed above, because the Junior Secured Noteholders (Classes R-3, GS-3, and RS-3) and the Rejecting Borrower Class voted to reject the Plan, and holders of

Intercompany Balances (Classes R-9, GS-8, and RS-9) and Equity Interests (R-10, GS-9, and RS-10) are deemed to reject the Plan, the requirements of section 1129(a)(8) of the Bankruptcy Code are not met with respect to those Classes.   Section 1129(b) of the Bankruptcy Code provides a mechanism (referred to as "cram down") for confirmation of a plan despite rejection by a class of claims or equity interests.   11 U.S.C. § 1129(b)(1).   Specifically, if a chapter 11 plan satisfies all applicable requirements of section 1129(a) other than section 1129(a)(8)'s requirement that all impaired classes accept the plan, the plan may be confirmed so long as it (i) does not discriminate unfairly and (ii) is fair and equitable, with respect to each class of claims and interests that is impaired and has not accepted the plan.   *Id.*   For the reasons discussed below, the Plan may be confirmed notwithstanding the rejection of the Plan by the Rejecting Classes because the Plan does not discriminate unfairly and is fair and equitable with respect to each of the Rejecting Classes.

### 1.        The Plan Does Not Discriminate Unfairly

Section 1129(b)(1)'s "unfair discrimination" standard does not prohibit all types of discrimination among holders of impaired, dissenting classes; instead, it prohibits only *unfair* discrimination.   *See In re Leslie Fay Cos.*, 207 B.R. 764, 791 n.37 (Bankr. S.D.N.Y. 1997); *In re Buttonwood Partners Ltd.*, 111 B.R. 57, 62 (Bankr. S.D.N.Y. 1990).   The Bankruptcy Code does not specify what circumstances constitute "unfair discrimination."   *In re 203 N. LaSalle St. Ltd. P'ship,* 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *aff'd,* 126 F.3d 955 (7th Cir. 1997), *rev'd on other grounds sub nom. Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434 (1999).   Instead, courts typically examine the facts and circumstances to determine whether unfair discrimination has occurred in a particular case.   *See, e.g.*, *In re Freymiller Trucking, Inc.,* 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (determination of unfair

discrimination requires court to "consider all aspects of the case and the totality of all the circumstances").

A plan unfairly discriminates for purposes of section 1129(b)(1) only if classes comprising similarly situated claims or interests receive disparate treatment under the plan and there is no reasonable basis for such discrimination. *See, e.g.*, *203 N. LaSalle*, 190 B.R. at 585-86 ("[A]ny discrimination must be supported by a legally acceptable rationale.").

As discussed in detail above, Claims and Equity Interests have been classified under the Plan in accordance with the requirements of the Bankruptcy Code, and the Plan does not "discriminate unfairly" with respect to any of the Rejecting Classes.

*First*, the classification and treatment of holders of Allowed Junior Secured Notes Claims is appropriate, given that these claims arise under the Junior Secured Notes Indenture, and no similar Class of Claims exists. By separately classifying and treating the Junior Secured Notes Claims, the Plan gives effect to the different priorities, sources, and rights of recovery of the holders of Junior Secured Notes Claims under the Junior Secured Notes Indenture. *See, e.g.*, *In re Mesa Air Grp.*, No. 10-10018, 2011 WL 182450, at *10 (Bankr. S.D.N.Y. Jan. 20, 2011) (classifying secured creditors separately from other classes did not constitute unfair discrimination under "cram down" provisions of section 1129(b)). Accordingly, the Plan does not "discriminate unfairly" with respect to Classes R-3, GS-3, or RS-3.

*Second*, the Plan does not "discriminate unfairly" with respect to the Borrower Claims in the Rejecting Borrower Class, as the Borrower Claims have a distinct relationship with the Debtors, and have been classified separately to facilitate the receipt of Cash distributions by holders of Allowed Borrower Claims from the Borrower Trust on or as soon as reasonably practicable after the Effective Date as part of the Global Settlement, rather than receiving Units

with a value that is subject to change based on the value of the Liquidating Trust. Moreover, the amount funded to the Borrower Claims Trust is sufficient to ensure that holders of Allowed Borrower Claims will receive comparable recoveries from the Borrower Claims Trust to those of general unsecured creditors at the applicable Debtor Groups.

*Third*, with respect to the Intercompany Balances in Classes R-10, GS-8, and RS-10, those Claims do not involve third party creditors and, as a result, are different from Claims in all other Classes. Moreover, the elimination of the Intercompany Balances is consensual among the creditors in those classes and is a critical component of the Global Settlement pursuant to which the Debtors are receiving $2.1 billion from Ally. For the reasons discussed in Section II, below, the release of those balances as a component of the Global Settlement is reasonable and is in the best interest of the Debtors' estates. Accordingly, the treatment afforded to Intercompany Balances is not unfairly discriminatory. *See In re PCAA Parent, LLC*, No. 10-1250, 2010 WL 2745980, at *6 (Bankr. D. Del. May 17, 2010) (finding no unfair discrimination for purposes of cram down where intercompany claims received no property under plan and were deemed to reject it); *In re Ultra Stores, Inc.*, No. 09-11854, 2009 Bankr. LEXIS 5215, at *18-19 (Bankr. S.D.N.Y. July 28, 2009) (finding no unfair discrimination with respect to intercompany claims where such claims, to the extent any exist, are general unsecured claims "held by Debtor entities which are proponents of the Plan" and the "Debtors acknowledge that the treatment of [intercompany claims] under the Plan does not unfairly discriminate against [such claims]").

*Finally*, the Equity Interests in Classes R-11, GS-9, and RS-11 consist of Equity Interests in the Debtors and are likewise legally distinct in nature and priority from all Claims in all other Classes. Accordingly, the Plan does not "discriminate unfairly" against classes of Equity Interests. *See PCAA*, 2010 WL 2745980, at *6 (plan where equity received no

distribution under plan not unfairly discriminatory); *see also In re Finlay Enters., Inc.*, No. 09-14873, 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010) (finding plan did not "unfairly discriminate" because sole class of equity interests constitutes a "different legal nature and priority than the other classes"); *In re Graphics Props. Holdings, Inc.*, No. 09-11701, 2009 Bankr. LEXIS 5259, at *16, 20-21 (Bankr. S.D.N.Y. Nov. 10, 2009) (plan did not discriminate unfairly against class of equity interests).

### 2.    The Plan Is Fair and Equitable

The Plan also meets the "fair and equitable" standards of section 1129(b)(2) of the Bankruptcy Code with respect to all Rejecting Classes. Section 1129(b)(2) provides differing standards for "fair and equitable" treatment depending on whether the rejecting class consists of secured claims, unsecured claims, or equity interests.

### a.    The Plan Is Fair and Equitable with respect to the Junior Secured Notes Claims.

First, with respect to the Junior Secured Noteholders, section 1129(b)(2)(A) of the Bankruptcy Code states that a plan is "fair and equitable" with respect to a class of secured claims if the plan provides:

> (i)    (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii)    for the sale, subject to section 363(k) of [the Bankruptcy Code], of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of

- 41 -

such sale, and the treatment of such liens on proceeds under clause
(i) or (iii) of this subparagraph; or

(iii)    for the realization by such holders of the indubitable equivalent of
such claims.

11 U.S.C. § 1129(b)(2)(A)(i)-(iii).[19]

This standard is satisfied with respect to the Junior Secured Noteholders because pursuant to Article III of the Plan, their claims will be paid in full in Cash on or as soon as practicable after the Effective Date, in the Allowed amount of such Claims as determined by the Bankruptcy Court in the JSN Adversary Proceeding.[20]    Therefore, holders of the Junior Secured Notes Claims will realize the indubitable equivalent of their Claims.    *In re DBSD N. Am., Inc.*, 419 B.R. 179, 208 (Bankr. S.D.N.Y. 2009) (secured creditor receives indubitable equivalent value when it is provided under the Plan with current value of its claim); *see also In re Baumgarten*, No. 93-40188, 1993 Bankr. LEXIS 1933, at *18-19 (Bankr. S.D.N.Y. Dec. 30, 1993) (secured claimants must receive the indubitable equivalent of the value of their collateral as of the time of confirmation).    To the extent the Bankruptcy Court determines that the Junior Secured Notes Claims are oversecured, the Plan provides for payment of postpetition interest, thereby rendering such Claims unimpaired and deemed to accept the Plan (and, thus, outside the purview of section 1129(b)).

---

[19] The legislative history to section 1129(b) provides that "the court may confirm a plan over the objection of a class of secured claims if the members of that class are unimpaired or if they are to receive under the plan property of a value equal to the allowed amount of their secured claims, as determined under proposed 11 U.S.C. 506(a)."  H.R. No. 95-595, 413-418 (1977).

[20] The Plan Proponents contend in the JSN Adversary Proceeding, among other things, that the Junior Secured Notes are undersecured and not entitled to postpetition interest on account of their claims.  Even if the Bankruptcy Court finds that the Junior Secured Noteholders are undersecured, the Plan provides for payment in full in Cash of the Allowed Junior Secured Notes Claims.  With respect to any portion of the JSNs' recovery paid as an unsecured deficiency claim, section 1129(b)(2)(B) would be satisfied because no junior classes of claims and interests are receiving any distributions under the Plan.  (*See* Plan, Art. III.D) (providing no recovery on account of Intercompany Balances and Equity Interests).

b.      **The Plan Is Fair and Equitable with respect to the Claims in the Rejecting Borrower Class and Intercompany Balances**

The Plan also satisfies section 1129(b)(2) of the Bankruptcy Code with respect to the Borrower Claims in the Rejecting Borrower Class, and Intercompany Balances.   Section 1129(b)(2)(B) of the Bankruptcy Code states that a plan is "fair and equitable" with respect to a class of unsecured claims if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."   11 U.S.C. § 1129(b)(2)(B)(ii); *see also JP Morgan Chase Bank, N.A. v. Charter Commc'ns (In re Charter Commc'ns, Inc.)*, 419 B.R. 221, 268-69 (Bankr. S.D.N.Y. 2009) (confirming plan as "fair and equitable" under section 1129(b)(2)(B)(ii) of the Bankruptcy Code where no holder of a junior claim or interest to the objecting noteholders received any recovery under the plan).

The Plan is "fair and equitable" with respect to the Claims in the Rejecting Borrower Class and Intercompany Balances, as there are no Classes of Claims or Equity Interests junior to such Classes that are receiving or retaining any property under the Plan on account of such Claims or Equity Interests.   (*See* Plan, Art. III.D (providing for no recovery to Classes of Equity Interests)).

c.      **The Plan Is Fair and Equitable with respect to Equity Interests**

Finally, the Plan satisfies section 1129(b)(2) with respect to Equity Interests. Section 1129(b)(2)(C) provides that a plan is fair and equitable with respect to a class of interests if the plan provides that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property."   11 U.S.C. § 1129(b)(2)(C)(ii).   This standard necessarily is satisfied with respect to any impaired dissenting class of interests to the extent that there is no class of claims junior to such dissenting class.   *See*

- 43 -

*Westpointe, L.P. v. Franke (In re Westpointe, L.P.)*, 241 F.3d 1005, 1007 (8th Cir. 2001) ("[A]

plan is fair and equitable as long as the holder of any interest junior to the dissenting impaired

class does not receive any property under the reorganization plan, and because there are no

interests junior to the [impaired class], the confirmed plan satisfies this requirement.").

The Plan thus clearly satisfies the "fair and equitable" requirements of section

1129(b)(2)(C) with respect to Equity Interests, as there are no Classes of Claims or Equity

Interests junior to such Classes that are receiving or retaining any property under the Plan.  (*See*

Plan, Art. III.D (providing for no recovery to Classes of Intercompany Balances or Equity

Interests).)  Indeed, no such junior class exists.

Accordingly, the Plan satisfies the cramdown requirements of section 1129(b) of

the Bankruptcy Code as to all Rejecting Classes, and the Plan may be confirmed notwithstanding

non-compliance with section 1129(a)(8).

### Q.    The Principal Purpose of the Plan is Not Avoidance of Taxes (11 U.S.C. § 1129(d))

Section 1129(d) of the Bankruptcy Code states that "the court may not confirm a

plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the

application of section 5 of the Securities Act of 1933."  11 U.S.C. § 1129(d).  The purpose of the

Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.

Moreover, no Governmental Unit, or any other entity, has thus far raised any objection to the

Plan on these grounds, and all tax Claims will be paid in full pursuant to the Plan.  The Plan

Proponents therefore submit that the Plan satisfies the requirements of section 1129(d).

## II.    THE SETTLEMENTS CONTAINED IN THE PLAN SHOULD BE APPROVED

### A.    Introduction

The Plan implements the terms of the Global Settlement that was reached after months of negotiations under the direction and supervision of Judge Peck as Mediator.  The Global Settlement and Plan are supported by the Creditors' Committee, the Debtors, Ally, and the Consenting Claimants (consisting of all six RMBS Trustees, the Settling Private Securities Claimants, the Senior Unsecured Notes Indenture Trustee, Paulson, the Supporting Senior Unsecured Noteholders (holding over 60% of the Senior Unsecured Notes), MBIA, FGIC, the Kessler Class Claimants, and the Institutional Investors).  In addition, the Plan Proponents have resolved actual and potential objections to the Plan and obtained support for the Plan from the following creditors: Ambac, Assured, Syncora, putative class action plaintiffs in numerous borrower class actions, the National Credit Union Administration Board ("NCUAB"), each of the Private Securities Claimants, the FHFA, Freddie Mac, Ocwen, among others.  Accordingly, virtually every creditor constituency supports the Global Settlement and Plan, other than the Junior Secured Noteholders, who are being paid in full (including postpetition interest, to the extent the Bankruptcy Court determines that they are oversecured) on account of their Allowed Junior Secured Notes Claims.

The Global Settlement is premised upon an agreement by Ally to provide a contribution (the "Ally Contribution") of approximately $2.1 billion to the Debtors' estates in exchange for a settlement of all estate and third party claims that could be brought against Ally relating to the Debtors (subject to certain exceptions), including, *inter alia*, claims based on alter ego and veil-piercing theories of liability, fraudulent conveyance, recharacterization, and other possible causes of action.

The Ally Contribution facilitated the resolution of numerous interdebtor, debtor-creditor, and intercreditor disputes and provided recoveries to all constituencies of the Debtors' estates substantially enhanced over those contemplated by the Debtors' original prepetition settlement with Ally.  Among other things, the Plan resolves disputes relating to:  (i) the RMBS Trust Claims; (ii) the claims asserted by the Monolines (*i.e.*, MBIA, FGIC, Ambac, Assured, and Syncora); (iii) all holders of securities claims, including the Private Securities Claimants, the NJ Carpenters Class, the NCUAB, and the FHFA; (iv) the claims held by Wilmington Trust, as indenture trustee for the Senior Unsecured Notes; (vi) the distribution of assets (including the Ally Contribution) among the Debtors' estates; (vii) the division of expenses among the Debtors; (viii) the settlement of Intercompany Balances and subrogation claims;  and  (ix) potential substantive consolidation litigation.  Each of the Plan Settlements is inextricably intertwined with all others as part of the overall Global Settlement, and the failure of any one settlement would jeopardize the ability to consummate the Plan as a whole.

## B.    Events Leading to the Plan Settlements

### 1.    The Prepetition Negotiations with Ally and Committee Investigation

As set forth in more detail in the Disclosure Statement, prior to the Petition Date, in or around September 2011, the Debtors and their advisors began a comprehensive review of potential claims that could be asserted by the Debtors against Ally in the context of a bankruptcy proceeding, as well as third party claims that could be brought against Ally, including claims that are derivative of the Debtors' conduct.  As part of that review, the Debtors' legal counsel, Morrison & Foerster LLP ("Morrison & Foerster"), conducted an in-depth review of material related-party transactions between the Debtors and Ally, as well as an investigation of the financial and operational course of dealing between the Debtors and Ally dating back to 2005. Morrison & Foerster also retained FTI Consulting, Inc. ("FTI") to conduct an evaluation of the

Debtors' capitalization, solvency, enterprise value, and damages scenarios. Those efforts culminated in a prepetition settlement agreement between the Debtors and Ally pursuant to which, *inter alia*, Ally would contribute $750 million to the Debtors' estates, in exchange for releases from the Debtors and third parties to be provided under a chapter 11 plan (the "Original Ally Settlement").[21]

The Creditors' Committee, dissatisfied with the terms of the Original Ally Settlement, obtained authority from the Bankruptcy Court under Bankruptcy Rule 2004 to conduct its own investigation and subpoena information from the Debtors, AFI, and AFI's affiliates, including its parent Cerberus Capital Management L.P. Over the course of several months, the Creditors' Committee conducted an extensive investigation of the pre- and postpetition transactions and agreements between and among the Debtors, AFI, and non-Debtor AFI affiliates. The Creditors' Committee analyzed millions of pages of documents and extensively researched the merits of potential claims and causes of action against AFI and its affiliates.

While the Creditors' Committee was performing its investigation, Berkshire Hathaway moved for the appointment of an Examiner. The Court appointed former Bankruptcy

---

[21] An ad hoc group of holders of Junior Secured Notes (the "JSN Group") and two sets of RMBS investors – one led by Kathy Patrick of Gibbs & Bruns LLP and the other led by Talcott Franklin of Talcott Franklin, P.C. (the "Institutional Investors"), were party to negotiations leading up to the development of the Original Ally Settlement. Ultimately, the JSN Group executed a plan support agreement (the "JSN Plan Support Agreement") supporting the plan contemplated thereby, and the Institutional Investors executed separate plan support agreements supporting the plan contemplated by the Original Ally Settlement and a settlement of potential liability arising from contractual claims relating to 392 trusts that had issued approximately $221 billion of Debtor-sponsored mortgage-backed securities from 2004 to 2007 (the "Original RMBS Settlements").

Pursuant to the JSN Plan Support Agreement, the JSN Group agreed, among other things, to waive all rights to postpetition interest through December 31, 2012, so long as (i) no unsecured creditor received postpetition interest, (ii) the JSN Plan Support Agreement did not terminate, and (iii) the effective date of the plan contemplated by the JSN Plan Support Agreement occurred by December 31, 2012, or the closing of the asset sales occurred by December 31, 2012, and the effective date of the plan occurred by March 31, 2013. The JSN Plan Support Agreement was terminated in September 2012. Pursuant to the Original RMBS Settlements, among other things, the relevant trusts included in the Original RMBS Settlements would be provided with allowed general unsecured claims in the aggregate amount of $8.7 billion (subject to adjustment).

Judge Arthur J. Gonzalez as the Court-appointed Examiner (the "Examiner"), who also conducted an investigation into the Debtors' prepetition transactions and activities as well as the Original Ally Settlement.

### 2.    The Mediation

Recognizing the complex web of conflicting claims by key stakeholders that would need to be resolved to accomplish a consensual plan, on December 6, 2012, the Debtors requested the appointment of a mediator to assist with the plan negotiations process.    On December 26, 2012, the Bankruptcy Court entered an order appointing Judge Peck as the Mediator to assist in plan negotiations, foster dialogue among stakeholders, and reach resolution on significant plan issues.    The Mediation focused not only on a resolution of the potential claims and causes of action against Ally and its affiliates identified by the Creditors' Committee and creditors, but also on the resolution of significant intercreditor and interdebtor issues.

Immediately following his appointment, the Mediator attended numerous mediation sessions with the following parties, both on an individual basis and jointly with different combinations of representative parties, including:    the Debtors, the Creditors' Committee (as well as its individual members), the RMBS Trustees, counsel for the JSN Group, Ally, the FHFA, the Institutional Investors, Paulson, and certain of the Debtors' other key constituencies (the "Mediation Parties").    To facilitate these discussions and guide the Mediation Parties in their negotiations, the Debtors and their advisors prepared and provided the Mediator and the Mediation Parties with comprehensive business and financial information, including multiple "waterfall" analyses that helped set forth hypothetical returns to creditors based on shifting recovery scenarios.    Likewise, the other Mediation Parties prepared and provided comprehensive analyses of the potential estate and third party claims against Ally, as well as the

strengths and weaknesses of their respective positions on the major intercreditor and interdebtor issues.

### 3. The Plan Support Agreement and Filing of the Plan and Disclosure Statement

Following a number of ad hoc meetings and presentations, Judge Peck organized a global mediation summit to take place on April 22 and 23, 2013.  These mediation sessions were attended by over 140 principals, professionals, and advisors for the Mediation Parties.  While the initial mediation summit did not achieve consensus, it sparked enough progress to foster a number of additional follow-up mediation sessions in the first two weeks of May, culminating in an agreement among certain of the Mediation Parties to the terms of a chapter 11 plan.  The agreement among the parties was embodied in a plan support agreement (the "Plan Support Agreement") and plan term sheet (the "Original Plan Term Sheet") executed by the Debtors, the Creditors' Committee, Ally, and the Consenting Claimants (the "PSA Settling Parties") on or about May 13, 2013.  The Plan Support Agreement and Original Plan Term Sheet outlined the principal terms of the Plan and the resolution of many complex legal issues involving the Debtors' largest claimant constituencies.  The PSA Settling Parties then negotiated the more detailed terms of the numerous settlements of debtor-creditor, interdebtor, and intercreditor issues embodied in the Plan Support Agreement and the Original Term Sheet, and documented these terms in a supplemental term sheet (the "Supplemental Plan Term Sheet"), which was filed with the Plan Support Agreement and Original Term Sheet on May 23, 2013.

Following entry into the Plan Support Agreement and Term Sheets, the Debtors and the Creditors' Committee, as Plan Proponents, drafted and negotiated the Plan and Disclosure Statement, which embodied the compromises set forth in the Plan Support Agreement, as well as numerous additional compromises and settlements reached with creditors

and other parties-in-interest after execution of the agreement. Those compromises and settlements are summarized below.

### C.    Brief Summary of the Plan Settlements

The material terms of the Plan Settlements include:[22]

- *The Settlement of Claims against Ally.* In exchange for releases of claims that the Debtors and third parties have brought or may bring against Ally in connection with the Debtors' businesses, Ally has agreed to contribute $2.1 billion to the Debtors' estates for distribution to creditors comprised of (i) $1.95 billion in cash to be paid on the Plan's Effective Date and (ii) the first $150 million received by Ally for any directors and officers or errors and omissions claims it pursues against its insurance carriers related to the claims released in connection with the Plan, provided, that Ally guarantees that the Debtors will receive $150 million on account of such insurance claims, which guarantee shall be payable without defense, objection, or setoff on September 30, 2014. (Plan, Art. IV.B.)

- *The Settlement of RMBS Trust Claims.* The Plan resolves (i) all alleged potential claims for breaches of representations and warranties held by all RMBS Trusts (not just those of the 392 trusts that were party to the Original RMBS Settlements), (ii) all alleged and potential claims for damages arising from servicing, and (iii) all cure claims which, if allowed, would be treated as administrative expenses, in exchange for allowed general unsecured claims in the aggregate amount of $7.301 billion for the RMBS Trusts, of which $209.8 million will be allowed against the GMACM Debtors and $7.0912 billion will be allowed against the RFC Debtors (the "Allowed RMBS Trust Claims"), provided that 5.7% of the Allowed RMBS Trust Claims (including any distributions on account thereof) shall be directly allocated to counsel for the Institutional Investors, without conveyance to the RMBS Claims Trust, the RMBS Trustees, or the RMBS Trusts, as the Allowed Fee Claim. (Plan, Art. IV.C.2.) Distributions on account of the RMBS Trust Claims, less the distributions allocated to satisfy the Allowed Fee Claim, shall be distributed to the RMBS Claims Trust. (*Id.*) The RMBS Claims Trust shall make distributions to the RMBS Trusts in accordance with the RMBS Trust Allocation Protocol. (*Id.*, Art. IV.C.3.) Moreover, the Confirmation Order must contain findings that the Plan, including the RMBS Settlement and the FGIC Settlement Agreement, is in the best interests of the Investors and that the RMBS Trustees acted in good faith and in the best interests of the Investors in entering into the Plan Support

---

[22] This description of the Plan Settlements is qualified entirely by the Plan itself. To the extent there is any inconsistency between this description and the Plan itself, the Plan governs.

Agreement and performing their obligations thereunder, including in voting for the Plan.  (Plan, Art. IV.C.7.)

- *The Settlement of the Monoline Claims*.  The Plan resolves the claims asserted by certain of the Monolines as follows:  (i) MBIA shall be provided allowed general unsecured claims in the amount of $719 million against the ResCap Debtors, $1.45 billion against the GMACM Debtors, and $1.45 billion against the RFC Debtors; (ii) FGIC shall be provided allowed general unsecured claims in the amount of $337 million against the ResCap Debtors, $181.5 million against the GMACM Debtors, and $415 million against the RFC Debtors; (iii) Assured shall be provided allowed general unsecured claims in the amount of $88,868,346 against the GMACM Debtors and $57,950,560 against the RFC Debtors; and (iv) Ambac shall be provided allowed general unsecured claims in the amount of $207,315,815 against the GMACM Debtors and $22,800,000 against the RFC Debtors.  (Plan, Art. IV.D.)

- *The Settlement of Private Securities Claims*.  The Plan resolves the claims of the Private Securities Claimants against the Debtors and Ally arising from the purchase or sale of RMBS, through the creation of the Private Securities Claims Trust, which shall be funded with Units for the benefit of the Private Securities Claimants, estimated to be worth approximately $235 million.  (Plan, Art. IV.E.)  The Private Securities Claims Trust Agreement provides for an agreed upon methodology pursuant to which the Units will be distributed among all Private Securities Claimants. (Plan, Art. IV.E.5.)

- *The Settlement of the NJ Carpenters Claims*.  The NJ Carpenters Claims shall be settled for a distribution of $100 million for the benefit of the NJ Carpenters Class Members (excluding those who opt out of the class and any Private Securities Claimants).[23]  (Plan, Art. IV.H.)

- *The Settlement of the FHFA Claims*. The Plan also resolves the claims held by the FHFA against the Debtors and Ally, providing that FHFA will receive a 2% recovery on account of its Allowed FHFA Claims against the RFC Debtors in full satisfaction of its claims, will forego recoveries on account of its claims at all other Debtors, and will consent to the Third Party Release embodied in the Plan.  (Plan, Art. III.D.1.k and D.3.k.)

- *The Settlement of the Kessler Class Claimants Claims*.  Through the Mediation, the claims asserted by the Kessler Class Claimants were resolved and settled.  As part of the settlement, which is subject to a separate Rule 9019 motion but contingent on confirmation of the Plan and the occurrence of the Effective Date, and pursuant to the Plan, the Kessler

---

[23] The NJ Carpenters Settlement received final approval from the District Court on October 7, 2013.

Class Claimants will have an allowed Borrower claim not subject to subordination in the amount of $300,000,000.00 against RFC and the Debtors will transfer and assign the Insurance Rights to the Kessler Class Claimants. (Kessler Class Settlement Agreement [Dkt. No. 4451].)

- *The Settlement of the Senior Unsecured Notes Claims*.  The Plan's allowance of the Senior Unsecured Notes Claims and the distributions contemplated by the Plan on account thereof, resolves and settles claims that the Senior Unsecured Notes Indenture Trustee, on behalf of the Senior Unsecured Noteholders, has against the Ally Released Parties and the Debtors, relating to, among other things, an alleged breach of the Senior Unsecured Notes Indenture as well as claims held by the ResCap Estate against Ally relating to, among other things, the transfer of Ally Bank from ResCap to or for the benefit of Ally.  (Plan, Art. IV.I.)

- *The Settlement of Substantive Consolidation Issues*.  The Plan resolves issues concerning substantive consolidation through the partial consolidation of the Debtors for distribution purposes only into three Debtor Groups:  (i) the ResCap Debtors, (ii) the GMACM Debtors (other than ETS) and (iii) the RFC Debtors.  (Plan, Art. III.C.)

- *The Settlement of Intercompany Balances*.  The Plan provides that all Intercompany Balances shall be waived, cancelled and discharged on the Effective Date.  (Plan, Art. III.D.1.i, D.2.i and D.3.i.)

- *The Division of the Ally Contribution and Administrative Expenses among Debtor Groups*.  The Plan provides for the division of the Ally Contribution as follows:  (i) $782.74 million to the ResCap Debtors; (ii) $462.32 million to the GMACM Debtors; (iii) $462.32 million to the RFC Debtors; (iv) $235 million to the Private Securities Claims Trust; (v) $57.62 million to the Borrower Claims Trust; and (vi) $100 million on account of the NJ Carpenters Claims.  (Plan, Art. IV.A.)  In addition, projected Administrative Claims shall be divided among the Debtor Groups as follows:  $836.3 million to the GMACM Debtors and $249.8 million to the RFC Debtors, with any variation above or below to be borne or realized by the Liquidating Trust.  (*Id.*)

Each settlement embodied in the Plan is a necessary component to the overall Global Settlement, and none of the Settling Parties would have reached agreement on a resolution of their Claims against the Debtors or the Ally Released Parties absent the other settlements embodied in the Plan.  For example, the Monolines would not have agreed to settle the amount or allocation of the Monoline Claims against the Debtors and agree to the Third Party

Release absent agreement among the parties as to, among other things, (i) the amount of the Ally

Contribution, (ii) the agreed-upon division of the Ally Contribution and administrative expenses

among the Debtor Groups, (iii) a settlement of issues relating to the substantive consolidation of

the Debtor estates, and (iv) the treatment of Intercompany Balances.  *See also In re Residential*

*Capital, LLC*, 497 B.R. 720, 743 (Bankr. S.D.N.Y. 2013) (the "*FGIC 9019 Opinion*") ("The

[FGIC] Settlement Agreement is an essential, inextricable and critical cornerstone of the Global

Settlement embodied in the PSA, now part of the Plan . . . .").  Likewise, none of the other

Consenting Claimants would have agreed to settle the amount and allocation of their Claims

against the Debtors and the Ally Released Parties, absent an appropriate settlement of all other

Consenting Claimants' Claims against such parties and consensus regarding the treatment for

any other Claims in the Plan.  And Ally would not have agreed to fund the $2.1 billion Ally

Contribution absent consent by the Plan Proponents and each of the Consenting Claimants to the

Debtor and Third Party Releases embodied in the Plan.  Thus, as discussed below, while each of

the foregoing Plan Settlements satisfies the standards for approval under applicable bankruptcy

law individually, the Plan Settlements must be viewed as a whole, as disapproval of any

individual settlement could upset the entire Global Settlement and, consequently, prevent

consummation of the Plan.

### D.    The Legal Standards for Approval of Plan Settlements

Section 1123 of the Bankruptcy Code states that a chapter 11 plan may (i) provide

for the settlement of any claim belonging to the debtor or to its estate and (ii) include any other

appropriate provision not inconsistent with the Bankruptcy Code.  11 U.S.C. § 1123(b)(3)(A)

and (b)(6).  When evaluating plan settlements under section 1123(b), courts consider the

standards used to evaluate settlements under Bankruptcy Rule 9019.  *See, e.g.*, *Resolution Trust

Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995)

("Irrespective of whether a claim is settled as part of a plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to a separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same.").

Rule 9019 empowers bankruptcy courts to approve a settlement agreement where "it is supported by adequate consideration, is 'fair and equitable,' and is in the best interests of the estate." *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993) (citation omitted); *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012). The court's analysis is not a mechanical process, but rather contemplates a "range of reasonableness . . . which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

"As a general matter, '[s]ettlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate.'" *Dewey*, 478 B.R. at 640 (quoting *In re MF Global Inc.*, No. 11-2790, 2012 WL 3242533, at * 5 (Bankr. S.D.N.Y. Aug. 10, 2012)); *HSBC Bank USA, Nat'l Ass'n v. Fane (In re MF Global Inc.)*, 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012). The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court. *See Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994). Bankruptcy courts, however, should consider and factor in the debtor's exercise of its business judgment when reviewing a proposed settlement and may rely on the opinion of the debtor, parties to the settlement, and professionals. *Dewey*, 478 B.R. at 641; *MF Global*, 466 B.R. at 247.

To approve a proposed settlement, a court "need not conduct a mini-trial" or decide the numerous issues of law and fact raised by the settlement. *Dewey*, 478 B.R. at 640-41

(internal quotations omitted).  Rather, a court should "canvass the issues and see whether the settlements 'fall[] below the lowest point in the range of reasonableness.'"  *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *Dewey*, 478 B.R. at 640 (same).  "Although a judge must consider the fairness of the settlement to the estate and its creditors, the judge is not required to assess the minutia of each and every claim."  *Nellis*, 165 B.R. at 123.

In deciding whether a particular settlement falls within the "range of reasonableness," courts consider the following *Iridium* factors:  (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay"; (c) the paramount interests of creditors; (d) whether other parties in interest support the settlement; (e) the nature and breadth of releases to be obtained by officers and directors; (f) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; and (g) "the extent to which the settlement is the product of arm's-length bargaining."  *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F. 3d 452, 462 (2d Cir. 2007) (internal citations and quotations omitted).

As set forth below, and as will be amply demonstrated at the Confirmation Hearing, each of the *Iridium* factors weighs heavily in favor of approval of the Plan Settlements.

### 1.    The Plan Settlements are in the Interests of Creditors and are Supported by Significant Creditors and Other Parties-In-Interest

It is beyond question that the Plan Settlements are in the interests of creditors. The Plan Settlements collectively resolve virtually every significant claim against the Debtors' estates based on extensive compromises by all constituencies, while generating an additional $2.1 billion of cash to be contributed by Ally.  As a result, the Plan Settlements provide

predictability with respect to both the Debtors' claims pool and the material assets available for distribution to creditors.

Without the Ally Contribution and other benefits of the Plan Settlements, creditor recoveries would be highly uncertain and would depend upon the outcome of complex and hotly contested litigation (discussed in more detail below). Those recoveries would erode significantly as the Debtors' estates are burdened with mounting legal expenses. Moreover, continued litigation would delay distributions for several years at best as the various litigations proceeded through the trial and appellate courts.

Notably, the Plan Settlements represent a significant improvement for the Debtors' estates and their creditors over the outcomes promised by the Original Ally Settlement and the Original RMBS Settlement. Specifically, the Ally Contribution has increased nearly three-fold from $750 million to $2.1 billion. Likewise, the RMBS Settlement embodied in the Plan resolves *all* alleged and potential claims (including cure claims, which, if allowed, would be administrative expenses) of *all* RMBS Trusts (1,100 in total), while the Original RMBS Settlement Agreements resolved the claims of only 392 trusts, leaving the remainder to future, costly litigation. Moreover, the Plan, *inter alia*, (i) resolves the claims of the Monolines, the Private Securities Claimants, the NJ Carpenters' Class Members, and the Senior Unsecured Noteholders, (ii) resolves issues of substantive consolidation and disputes relating to Intercompany Balances, (iii) provides for a resolution of Borrower Claims through the creation and funding of the Borrowers Claims Trust, and (iv) provides for the payment in full of the Junior Secured Notes Claims (plus postpetition interest if they are determined to be oversecured). All of these issues were left unresolved by the Original Ally Settlement and Original RMBS

Settlement and would have only resulted in significant additional litigation, which the current Plan and Plan Settlements efficiently avoid.

If the Plan Settlements are not approved, the entire Plan built on them will collapse, thereby destroying the significant progress and consensus achieved through the Mediation.  The parties would be forced back to the drawing board on a chapter 11 plan and plan process that, without the Plan Settlements and the $2.1 billion contribution from Ally, would be certain to result in significant additional litigation and massive cost and delay before a new plan could even be proposed much less confirmed.

Finally, the Plan Settlements were the product of months of intense negotiations and mediation and have the support of every major constituency (other than the JSNs, which in any event are being paid in full under the Plan).  Notably, creditors (other than the JSNs) in all but one sub-Class voted overwhelmingly to accept the Plan and the Plan Settlements embodied therein.  Of the Classes within which votes were solicited (including the JSNs and excluding the votes by insiders), approximately 82.9% of voting creditors voted to accept the Plan.  Eliminating the JSN votes, approximately 97.5% of voting creditors voted to accept the Plan.  Based on those results, the Court can easily conclude that the Plan Settlements are supported not just by "significant creditors," but by a near-unanimous consensus of the vast and diverse constituencies making up these estates.[24]

---

[24] As of the filing of this Memorandum, only 14 parties (including 7 pro se Borrowers) out of thousands of the Debtors' creditors are pursuing an objection to the Plan.

**2.    The Settling Parties Were Counseled by Experienced and Skilled Counsel and Advisors**

As set forth in the chart below, all of the parties to the various Plan Settlements were represented by highly experienced and skilled counsel and advisors:

| Party | Representative(s) |
| --- | --- |
| Debtors | Morrison Foerster; FTI Consulting; Centerview Partners |
| Creditors' Committee | Kramer Levin; Moelis; AlixPartners |
| Ally | Kirkland & Ellis; Evercore |
| RMBS Trustees | Alston & Bird; Dechert; Seward & Kissel; Morgan Lewis; Allen & Overy; Duff and Phelps |
| Settling Private Securities Claimants | Quinn Emanuel |
| Institutional Investors | Gibbs & Bruns; Ropes & Gray; Talcott Franklin; Carter Ledyard; Miller Johnson |
| Senior Unsecured Notes Indenture Trustee | Loeb & Loeb; Cleary Gottlieb, Alvarez & Marsal |
| NJ Carpenters | Lowenstein Sandler |
| FGIC | Jones Day |
| MBIA | Cadwalader; Blackstone |
| Ambac | Patterson Belknap |
| Assured | Proskauer |
| FHFA | Kasowitz, Benson, Torres & Friedman LLP |
| Syncora | Wollmuth Maher & Deutsch LLP |
| National Credit Union Administration Board | Zuckerman Spaeder |

Indeed, the Court has already found that the parties to the Mediation that negotiated the various Plan Settlements "were represented by sophisticated counsel and they did so under the supervision of Judge Peck and Mr. Kruger." *FGIC 9019 Opinion*, 497 B.R. at 751.

**3.    The Plan Settlements are the Product of Arm's-Length Bargaining**

The Plan Settlements were the product of good faith and arm's-length negotiations. The vast majority of the Plan Settlements were the direct product of the roughly six-month long Mediation under the direction and supervision of Judge Peck as Mediator. The negotiations were active, lengthy, and often contentious. This Court has previously found that

- 58 -

the negotiations in the Mediation were at arm's-length and in good faith. *FGIC 9019 Opinion*,

479 B.R. at 735 (finding that negotiation of FGIC Settlement as part of Mediation was at arm's-

length); *In re Residential Capital*, No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y.

June 27, 2013) (the "*PSA Opinion*") ("Based on the evidence in the record, the Court is satisfied

and finds that the negotiations were conducted in good faith, with the Debtors represented by the

CRO, Lewis Kruger, who is an unconflicted fiduciary who is not beholden to AFI.").

        The events leading up to the Mediation further underscore the high level of

adversity and arm's-length dealings among the parties to the Plan Settlements.  For example, the

Creditors' Committee had sought standing to pursue claims against Ally and (along with other

parties in interest) was preparing to prosecute objections to the Original RMBS Settlement.  The

Debtors had commenced litigation seeking to subordinate the claims of Private Securities

Claimants and had been preparing to prosecute objections to many of the other significant claims

filed in these cases.   Numerous creditors, including FGIC, MBIA, Assured, Allstate, AIG,

MassMutual, and Prudential were pursuing litigation directly against Ally outside of the

Bankruptcy Court.  In addition, Wilmington Trust filed a motion seeking authority to prosecute

claims and causes of action against Ally and its affiliates on behalf of the ResCap Estate, and

identified numerous additional third party claims against Ally it would pursue in connection with

such litigation.  There can be no doubt that the parties to the Mediation were vigorously asserting

their own interests in direct opposition to other parties that were doing the same.

4.    **The Balance Between the Litigation's Possibility of Success and the Settlement's Future Benefits.**

Whether considered individually or globally, an analysis of the possibility of success on the merits versus the benefits of the settlements weighs in favor of this Court's approval of each Plan Settlement.[25]

a.    **The Ally Settlement**

The Ally settlement (the "Ally Settlement") was the product of extensive, multi-party negotiations over many months and resolves contentious and hotly disputed issues in these chapter 11 cases relating to complex transactions and relationships between the Debtors on the one hand and AFI and its non-Debtor affiliates on the other.  The Ally Settlement generates $2.1 billion for the Debtors' estates (of which $1.95 billion would be paid in cash on the Effective Date and the balance no later than September 30, 2014).  Each Debtor constituency participating in the Ally Settlement carefully balanced the probability of its position's success against the benefits to be realized through settlement, and carefully considered the likelihood of costly and protracted litigation, before concluding that settlement on the agreed terms would maximize value for the Debtors' estates and their constituents.

The Ally Settlement resolves many categories of both third party and estate claims – several of which are addressed below – including claims that the Creditors' Committee was prepared to prosecute based on its nearly year-long investigation.[26]  Given the complexity of these claims, such litigation would have spanned many years, at great expense to the Debtors'

---

[25] The Plan Proponents believe that the Plan Settlements should not be viewed in isolation as each is dependent on all others and has the support of all parties affected.  (*See* Kruger Direct ¶ 39-40; Dubel Direct ¶ 55.)

[26] The Creditors' Committee met with Ally in January 2013 to present the results of its investigation and describe the colorable claims and causes of action it believed could be maintained against Ally on behalf of the Debtors' Estates.  (Dubel Direct ¶ 37, Exhibit A.)

estates.    The benefits provided by the Ally Settlement outweigh the potential upside of further

litigation, in view of a number of uncertainties with respect to the merits.

### (i)        Alter ego/veil piercing

The Ally Settlement resolves the prospect of an alter ego/veil piercing claim

premised on the allegation that AFI and the Debtors "operated as a single economic entity" and

"that an overall element of injustice or unfairness [was] present." *Official Comm. of Unsecured*

*Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC) ("Bay Harbour")*, 420 B.R.

112, 133-34 (Bankr. S.D.N.Y. 2009) (quotation omitted).    Alter ego liability can lie where a

parent company uses its "domination and control . . . to cause the subsidiary to make transfers for

the benefit of the controlling parties (to the detriment of the subsidiary)." *Official Comm. of*

*Unsecured Creditors of Buckhead Am. Corp. v. Reliance Grp. (In re Buckhead Am. Corp.)*, 178

B.R. 956, 974-75 (D. Del. 1994).    Proving such a claim could render AFI liable for all of

ResCap's billions of dollars in debt.    However, such a claim would face significant legal hurdles.

The facts relevant to successfully pleading and proving an alter ego claim would

focus on the significant interconnections between the Debtors and AFI management and the

treatment of the Debtors by AFI and its non-Debtor affiliates through a series of significant asset

sales and complex affiliate transactions.    *See, e.g.*, *Union Carbide Corp. v. Montell N.V.*, 944 F.

Supp. 1119, 1145 (S.D.N.Y. 1996) (veil piercing claim credibly pled based on allegations that

several layers of parent and affiliated corporations operated as single economic unit and that

defendants dominated subsidiary and forced it to take actions to its detriment and for benefit of

overall corporate enterprise).    For example, the Creditors' Committee's investigation focused on

how (i) AFI gained control of Ally Bank from ResCap in multiple transactions beginning in

November 2006 and concluding in January 2009 (the "Ally Bank Transfer"),[27] (ii) ResCap transferred valuable interests to AFI and its non-Debtor affiliates, including but not limited to healthcare and resort finance, model home, loan servicing, and brokering and trust company assets, and (iii) Ally Bank significantly grew its portfolio of mortgage servicing rights, while being insulated from representation and warranty costs as well as interest rate and other forms of market volatility on account of a series of mortgage affiliate agreements with the Debtors.

While the Creditors' Committee believes that there is credible evidence supporting an alter ego claim, the nature of this cause of action makes it challenging to prove. Ally would likely point to the extensive authority for the general view that the corporate form is sacrosanct and cite this Court's holding that "disregard[ing] the corporate entity" under Delaware law "is a difficult task" that "may be done only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it." *Bay Harbour*, 420 B.R. at 133 (quotations and citations omitted); *see also Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 197 (3d Cir. 2003) (observing that "piercing the corporate veil is an exception reserved for extreme situations, rather than the rule" because it is not uncommon for companies to become insolvent and enter bankruptcy); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 418 (S.D.N.Y. 2011) (observing that party urging court to "disregard[] a corporation's separate identity bears a heavy burden").

Proving the nature and scope of a parent's alleged domination of its subsidiary is a highly fact-intensive inquiry. *See*, *e.g.*, *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 365-66 (Bankr.

---

[27] The Creditors' Committee, the Debtors, and AFI dispute whether the transactions were part of a single integrated scheme or separate transactions.

S.D.N.Y. 2002) (observing that "[o]rdinarily the determination of the nature and extent of domination is a question of fact" and that "there are instances where courts have granted motions to dismiss as well as motions for summary judgment in favor of defendant parent companies where there has been a lack of sufficient evidence to place the alter ego issue in dispute." (quotation and citations omitted)).  Even where overlaps in corporate ownership and governance exist, some courts have emphasized that "the extent of the domination and control *must preclude the controlled entity from having legal or independent significance of its own*," such that the allegedly controlled subsidiary was but a "sham."  *Bay Harbor*, 420 B.R. at 134 (emphasis added) (quotation omitted).

Here, Ally would have several facts to set forth a robust defense.  Ally would argue that the Debtors were well-capitalized at incorporation.  The Debtors have had thousands of employees who ran a series of diverse operations managing more than $100 billion in assets.  And the Debtors have transacted business with major national players in the banking, finance, and mortgage industries – including Barclays, Citibank, and JPMorgan; Fannie Mae, Freddie Mac, and Ginnie Mae; and numerous private trusts and other investors.  Ally would cite such facts to rebut any allegation that it operated the Debtors' businesses as a mere sham.

Ally also would vigorously dispute allegations that the Ally Bank Transfer and other asset sales, or the complex mortgage affiliate transactions between the Debtors and Ally Bank, constituted either asset stripping or a fraudulent means to unjustly saddle its subsidiary with liabilities.  Specifically, Ally would argue that its capital contributions to the Debtors in excess of $8 billion during the timeframe discussed above kept the Debtors afloat while many other mortgage companies were failing.  Ally also would argue that any benefits to Ally Bank arising from its mortgage transactions with the Debtors were justified by corresponding benefits

- 63 -

for the Debtors, in particular since the Debtors were provided an otherwise unavailable source of funding to operate their business.

Ally also surely would argue that Debtors were undermined not by any fraud or injustice on Ally's part, but rather by the larger mortgage market collapse that affected the entire industry. *See Sunbeam*, 284 B.R. at 366, 368 (observing alter ego liability requires "abuse of the corporate form to effect a fraud or an injustice," and dismissing complaint where creditors' committee failed to show Morgan Stanley abused corporate form "to escape any liability it might have based on its conduct") (quotation and citation omitted). All of these disputed issues, coupled with the heavy burdens associated with prevailing on an alter ego claim, create significant uncertainty for the Debtors' estates with respect to any such claim.

### (ii)    Fraudulent Transfer

The Ally Settlement also resolves any fraudulent transfer claims that might be asserted in connection with the Ally Bank Transfer, the Debtors' mortgage affiliate transactions with Ally Bank, and the Debtors' tax and other agreements with AFI pursuant to sections 544(b) and 548(a) of the Bankruptcy Code. These claims would be based largely on the same issues and transactions described above.

Constructive fraudulent transfer claims could be premised on the allegation that the Debtors, while undercapitalized and insolvent, received less than fair value in connection with the series of transactions conveying various assets and their interests in Ally Bank, the mortgage affiliate agreements with Ally Bank, and/or tax allocation or other administrative agreements between the Debtors and AFI. Additionally, intentional fraudulent transfer claims might be asserted with respect to these same transactions and agreements, alleging as "badges of fraud" that significant assets of the Debtors were lost, and its interests subject to extreme risks,

liability, and costs, even as insiders knew that they were not executed for fair consideration, at arm's length, or on market terms.

These claims, too, would face several factual challenges, and litigating their merits would be complex, costly, and time-consuming. Many of the transactions that might be challenged would be subject to various defenses that themselves would involve complicated choice of law analyses. AFI also presumably would argue that certain transactions – including the early phase of the Ally Bank transfer – are barred by relevant statutes of limitation. Other transactions, it would argue, are not subject to avoidance based on the safe harbors provided in Section 546 of the Bankruptcy Code. Such defenses, if successful, could materially reduce or even eliminate any recovery on these claims.

On the merits, AFI would argue that none of the mortgage affiliate agreements in question – by which Ally Bank's lower-cost funding enabled the Debtors' mortgage business to grow, even as the mortgage market soured – either intentionally or effectively shifted costs or liability to the Debtors for inadequate consideration. Ostensibly inadequate consideration relating to tax and other agreements likewise would have to be assessed against the backdrop of various cost/benefit analyses over time and would entail extremely complex and burdensome discovery and analysis. And assessing whether fair value was received for each challenged transfer and the Debtors' solvency at the time of such transfers – both of which are fact-intensive, disputable, and costly to litigate – would have to focus on a number of factors, including the interplay among several agreements over many years between affiliates with a relationship lacking any obvious market comparison; the fact that key agreements were amended at different points in time by different officers and directors in response to rapidly shifting market dynamics and complex regulatory frameworks; and the fact that, throughout this time

period, AFI was a proven source of ongoing capital and other support to the Debtors.  In view of such hurdles, the Ally Settlement reasonably resolves any estate fraudulent transfer claims that may have been pursued against AFI and its non-Debtor affiliates.

### (iii)    Indemnification

The Ally Settlement resolves any estate claims for indemnification based on ResCap's Operating Agreement, which provides that AFI "will, to the fullest extent permitted by law, indemnify, defend and hold harmless ResCap and its Subsidiaries from and against any Losses related to GMAC Indemnifiable Liabilities."  The Debtors could argue that this provision requires AFI to indemnify them for losses and payments arising from certain representation and warranty obligations, as well as liabilities associated with the various settlements reached in connection with litigation and investigations concerning the Debtors' mortgage operations.

Such a claim, however, would require proof that indemnified losses relate not simply to the Debtors' own operations, businesses, and decision-making, but also to those of *AFI* or its non-debtor affiliates.  AFI, however, has numerous factual bases to argue that the Debtors' losses and liabilities are only their own.  These include: evidence that the Debtors' officers understood the market risks and business implications of agreements they entered into; assessments and approval of key deals and settlement agreements by the board of directors (the "Board"), including where independent directors separately evaluated the merits of requested Board actions; and the fact that the Debtors' losses and liabilities – in the form, *e.g.*, of mortgage loan repurchases, representation and warranty liability, and settlements of various litigations and investigations – all arose from the *Debtors'* bread-and-butter business of securitizing, selling, and servicing mortgage loans.

### (iv)    Equitable Subordination

The Ally Settlement also resolves allegations that conduct by AFI injured the Debtors' creditors such that AFI's $1.1 billion secured claim under the AFI Senior Secured Credit Facility ($750 million) and AFI Letter of Credit ($380 million) should be equitably subordinated under section 510(c) of the Bankruptcy Code.  Prevailing on such a claim would require proof that AFI "engaged in some type of inequitable conduct . . . result[ing] in injury to other creditors or [that] conferred an unfair advantage on the creditor to be subordinated" *Official Comm. of Unsecured Creditors v. Am. Tower Corp (In re Verestar)*, 343 B.R. 444, 460-61 (Bankr. S.D.N.Y. 2006) (citing test set forth in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977)).

For many of the same reasons that alter ego liability would be difficult to prove, establishing that AFI's conduct was inequitable would be challenging.  *See Verestar*, 343 B.R. at 461 (noting that inequitable conduct "includes a secret or open fraud, lack of good faith by a fiduciary, unjust enrichment, or enrichment brought about by unconscionable, unjust or unfair conduct or double-dealing." (citations omitted)).  Among other things, AFI would argue that its substantial capital support of the Debtors over many years, and the fact that many of its most talented personnel were officers of the Debtors' businesses and worked to maintain those business units' health and profitability amidst the "Great Recession," rebuts any allegation of inequitable conduct.  Securing the remedy of equitable subordination would require successfully rebutting such facts by proving a more sinister narrative and accordingly presents significant litigation risk to the Debtors' estates.  The Ally Settlement obviates such risk.

(v)    **Other Estate Claims**

Finally, the Ally Settlement also resolves certain other potential claims, the value of which would be speculative and/or minimal relative to the immediate recovery provided by the settlement as balanced against the cost and uncertainty of litigation.

For example, it could be alleged that Bankruptcy Code or state law provisions governing avoidable preferences and transfers apply to, among other transactions, the Debtors' payments to Ally Bank of approximately $48 million and $12.9 million, respectively, pursuant to indemnification provisions set forth in a January 30, 2012 letter agreement and a subservicing agreement, and payments to settle government investigations (*e.g.*, approximately $109.6 million in March 2012 pursuant to the DOJ/AG Consent Judgment) for which AFI also had faced liability.

However, demonstrating the merit of those state law insider preference claims that would survive a statute of limitations defense would turn, at a minimum, on various transaction documents' choice of law provisions. And such claims under the Bankruptcy Code presumably would give rise to a potential "contemporaneous exchange of value" defense under section 547(c)(1). AFI would argue that the Debtors benefitted from its ongoing support (including leading up to, and beyond, its bankruptcy filing), and benefitted by using Ally Bank's loans to meet obligations arising under the DOJ/AG settlement, together with its low-cost funds to sustain their mortgage operations. In any event, the billions of dollars that the Ally Settlement will contribute to the Debtors' estates vastly exceeds such claims' potential value.

The same may be said for other, arguably even more speculative claims. Claims relating to agreements between the Debtors, AFI, or non-Debtor AFI affiliates (*e.g.*, tax allocation or mortgage affiliate agreements) are a case in point. These agreements involved numerous drafts and amendments, and frequently yielded documentation that was incomplete or

in tension with the parties' evolving practices amidst rapidly changing market dynamics.  Such claims would be subject to difficult choice of law analyses, statute of limitations or other defenses, and fact-intensive disputes over the applicability of often complex legal doctrines governing parol evidence, mutual mistake, contract reformation, and allegations of ultra vires decision-making – in addition to then considering whether any actual damages were incurred, given the interrelationship of multiple agreements.

Likewise, allegations sounding in fraud, or in breach of fiduciary duty (or the aiding and abetting thereof) against Debtor and/or AFI officers and directors, would face hurdles that would not justify litigation in lieu of the recovery provided by the Ally Settlement. Presumably involving factual allegations and defenses similar to those discussed above in connection with alter ego and indemnification claims, such claims essentially would require proving that talented professionals with years of experience across multiple industries, who kept the Debtors afloat through the Great Recession while many of their competitors folded, committed fraud and/or knowingly violated duties of care, loyalty, and good faith.

Such factual hurdles would be augmented by other barriers to recovery, *e.g.*, with respect to fiduciary duty claims, the high standards that apply to gateway issues like standing, to whom duties are owed, and burdens of proof.  *See*, *e.g.*, *Bay Harbour*, 420 B.R. at 143-54 (concluding that, under Delaware law, creditors' committee did not adequately plead breach of fiduciary duty against officers of debtor or parent entities).  As with each of the other claims discussed above, the likelihood of prevailing is outweighed by the benefits of the AFI Settlement and the desirability of avoiding protracted litigation as discussed in more detail bellow.

### (vi)    Third Party Claims

As discussed in further detail below in connection with the Third Party Release embodied in the Plan, the Ally Settlement also resolves numerous potential third party claims

asserted against Ally.  Many creditors, including monolines, securities claimants, investors, unsecured noteholders, and borrowers, among others, asserted claims against Ally and its affiliates arising from or related to the Debtors, including claims relating to RMBS issued and/or sold by the Debtors or their affiliates, claims premised upon alter ego and veil piercing theories of liability, and claims for aiding and abetting, substantive consolidation, and breach of fiduciary duties.  Many of these claims have been asserted in actual complaints filed against Ally and its affiliates and have been the subject of longstanding and ongoing litigation with Ally, while numerous other claims are subject to tolling agreements with Ally.  The settlement of this protracted litigation as one aspect of the Ally Settlement provides substantial value to the Debtors' Estates, even beyond the $2.1 billion Ally Contribution, for the benefit of all creditors.

### b.    The RMBS Trust Claims Settlement

A critical component of the Global Settlement and the Plan is the resolution of all issues relating to the allowance, priority, and allocation of the RMBS Trust Claims, which arise out of the Debtors' origination and sale of mortgage loans to the RMBS Trusts and the Debtors' servicing of mortgage loans for the RMBS Trusts.[28]  The Plan's treatment of those claims expands the prepetition settlement to include *all* RMBS Trusts (1,100 in total) as opposed to the 392 trusts that were the subject of the Original RMBS Settlement Agreements.

The RMBS Settlement embodied in the Plan resolves all alleged and potential claims of the RMBS Trusts – including RMBS Cure Claims as well as prepetition claims – for damages arising from breaches of representations and warranties or from servicing breaches, in exchange for an allowed claim in the aggregate amount of $7.301 billion (the "Allowed RMBS Trust Claim").  The proceeds of the Allowed RMBS Trust Claim (after deduction of the Allowed

---

[28] For a thorough description of the numerous proofs of claim submitted by the RMBS Trustees in these cases, the Plan Proponents respectfully refer the Court to paragraphs 79-90 of the Lipps Direct.

Fee Claim) will be allocated *pro rata* among the RMBS Trusts based on (i) each trust's estimated lifetime losses and (ii) the incidence of breaches of representations and warranties, as determined on the basis of extensive loan sampling and statistical analysis performed by Duff & Phelps. (*See* Pfeiffer Direct ¶ 17.)

If the parties were forced to litigate the RMBS Trust Claims, the outcome would be highly uncertain. The claims are primarily for breach of contract – principally, breaches of the representations and warranties contained in the agreements governing the formation and servicing of the trusts (the "<u>Governing Agreements</u>"), as well as breaches of the associated obligation to repurchase loans that are subject to such breaches. Both categories of claims require a showing that a given loan materially breached one or more of the contractual representations and warranties and that the breach materially and adversely affected the interests of investors. The RMBS Trusts would also need to overcome certain affirmative defenses available to the Debtors, including (i) that the applicable statute of limitations bars a significant number of the RMBS Trusts' claims and (ii) that those RMBS Trusts that have elected to foreclose on loans are precluded from seeking to enforce any obligation of the sponsor to repurchase those loans. Litigating those issues would involve many complex and novel issues of law and fact, including the following:

*Existence of a Breach.* There is significant disagreement over the scope and proper interpretation of many of the representations and warranties contained in the Governing Agreements. This inquiry is complicated by the fact that other transaction documents, such as the RMBS Trusts' prospectuses and prospectus supplements, contain extensive risk disclosures, which may inform how a court will interpret potentially ambiguous representations and warranties. Because the representations, warranties, and risk disclosures vary from trust to trust,

disputes concerning their scope or interpretation might need to be litigated separately for each trust.  In addition, as is true in any document-intensive litigation, there is a risk that, among the Debtors' many millions of records, there are self-critical documents and/or missing documents, which the RMBS Trusts would seek to exploit in litigation.

_Material Adverse Effect._    The courts are split on the question of whether a plaintiff is required to meet a "double materiality" standard – that is, whether a plaintiff must prove both that a breach was material, as required under black-letter breach of contract law, and that the breach had a "material and adverse" effect on investors.  _Compare Wells Fargo Bank N.A. v. LaSalle Bank Nat'l Ass'n_, No. 07-449, Nov. 13, 2009 Hr'g Tr. at 5:11-16 (S.D. Ohio) [Dkt. No. 366], _with Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n_, No. 08-1448, 2011 WL 6300796, at *4 (D. Nev. Dec. 15, 2011).  If a court were to apply a double materiality standard, it might look to events that occurred after the securitization transaction to determine whether the alleged underwriting defect materially affected the interests of investors (_e.g._, whether the defect caused a material loss to investors).  If it did not apply that standard, the court might consider only whether the investors' interests in the underlying mortgages were materially affected as of the closing date of the securitization (_e.g._, whether the defect would have affected their investment decision).

In addition, the Debtors would argue that, even for a loan with material breaches of representations and warranties, they are responsible for only the specific portion of the loan's losses that were actually caused by such breaches.  Causation is generally an element of a breach of contract claim, and courts have held that a damages remedy should not put the plaintiff in a better position than it would have been in but for the defendant's breaches.  However, the RMBS Trusts would be able to rely on substantial case authority, including recent decisions in the

- 72 -

Southern District of New York, holding that an RMBS trust is not required to establish a direct causal relationship between a breach of a representation and warranty and any default on a loan. *See, e.g.*, *Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 10-9584, 2013 WL 1285289, at *9-10 (S.D.N.Y. Mar. 28, 2013) (breach need only cause harm, not necessarily default on loan, to satisfy material adverse effect requirement).

   *Statute of Limitations.*    There is significant disagreement in the case law about when the limitations period on a put-back claim begins to run:  when the participation certificates in a trust are issued or when the sponsor of a trust refuses to repurchase a non-conforming loan. *Compare ACE Sec. Corp. v. DB Structured Prods., Inc.*, 965 N.Y.S.2d 844, 847-50 (N.Y. Sup. Ct. 2013) (limitations period runs from time repurchase demand is improperly denied), *with Nomura Asset Acceptance Corp. Alt. Loan Trust, Series 2005-S4 v. Nomura Credit & Capital, Inc.*, No. 653541/2011, 2013 N.Y. Misc. LEXIS 2001, at *28 (N.Y. Sup. Ct. May 10, 2013) (limitations period runs from the time alleged misrepresentation is made).  If a court were to apply the former rule, the Debtors may not have a viable statute of limitations defense with respect to many of the RMBS Trusts that were formed more than six years before the petition date.   Moreover, the Institutional Investors have argued that, even if the limitations period accrues when participation certificates were issued, the Debtors may be equitably estopped from invoking the statute of limitations because GMACM and RFC, in their capacities as Master Servicers for the RMBS Trusts, arguably are responsible for the RMBS Trusts' failure to enforce their put-back rights until after the limitations period expired.   (*See* Steering Committee Investors' Consolidated Reply to the Objections to the RMBS Trust Settlement Agreement at pp. 11-16) (the "Steering Committee RMBS Reply") [Dkt. No. 2808].)

*Election of Remedies.*    One court has held that repurchase claims cannot be asserted with respect to foreclosed mortgage loans where the governing contracts make that remedy available only with respect to an existing loan.    *See MASTR Asset Backed Sec. Trust 2006-HE3 v. WMC Mortg. Corp.*, No. 11-02542, 2012 WL 4511065, at \*5-6 (D. Minn. Oct. 1, 2012).    However, to the extent the Governing Agreements provide a contractual mechanism for repurchase of loans that have been through the foreclosure process, the Debtors may have difficulty arguing that this election of remedies rule applies to such securitizations.    *Cf. Morgan Stanley Mortg. Loan Trust 2006-14SL v. Morgan Stanley Mortg. Capital Holdings LLC*, No. 652763/2012, 2013 WL 4488367, at \*4-6 (N.Y. Sup. Ct. Aug. 16, 2013) (finding that "Charged Off Loans" were subject to put-back under governing agreement because not excluded from definition of "Mortgage Loan," in contrast to "Released Mortgage Loans," which were excluded).    Moreover, recent decisions have rejected the reasoning of *WMC Mortgage Corp.*, holding that construing transaction documents to preclude repurchase demands for foreclosed loans would defeat the purpose of shifting the risk of non-complying loans onto the sponsor of a securitization trust.    *See Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prods., Inc.*, No. 12-8594, 2013 WL 3863861, at \*13 (S.D.N.Y. July 24, 2013). Finally, the Institutional Investors have argued that the Debtors should be equitably estopped from relying on an election of remedies defense, because it was GMACM and RFC, acting in their capacities as Master Servicers, that caused the RMBS Trusts to foreclose on the loans. (Steering Committee RMBS Reply at pp. 16-19.)

*Cure Claims.*    The risks associated with litigating the RMBS Trust Claims are further exacerbated by the RMBS Trustees' assertion that, absent a settlement, these claims would be payable on an administrative expense basis – as RMBS Cure Claims – instead of as

general unsecured claims. In connection with the Debtors' sale of their origination and servicing assets, the RMBS Trustees argued that the Debtors were required to assume all of their obligations under the Pooling and Servicing Agreements governing the RMBS Trusts and to cure all breaches of those obligations, including all breaches of representations and warranties and all associated servicing breaches. The Debtors responded that their origination-related obligations should be severed from their servicing obligations and that only breaches of the latter obligations were required to be cured. Resolution of this dispute was deferred to facilitate the sale of the Debtors' assets by preserving the RMBS Trustees' rights to seek payment of the RMBS Cure Claims as an administrative expense with the cure claim capped at the amount of proceeds from the sale of the PLS mortgage servicing rights and advances (to the extent the advances can be validly set off).[29] While the Debtors believe the RMBS Cure Claims lack merit and that all RMBS Trust Claims would be payable on a general unsecured claim basis, the risk that up to $600 million of those claims might be payable on an administrative expense basis as RMBS Cure Claims is material and cannot be entirely discounted.

In addition to these challenging legal issues, and as discussed in more detail below, litigation of the RMBS Trust Claims would be lengthy, burdensome, and difficult. Settling the RMBS Trust Claims on the terms set forth in the Plan avoids those costs and risks, while providing the Debtors with (i) certainty with respect to the allowed amounts of the RMBS

---

[29] The origination-related RMBS Cure Claims (if any) were further capped at $600 million. (*See* Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding (I) Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements, and (II) the RMBS Trustees' Limited Objection to the Sale Motion, ¶ 18 [Dkt. No. 945]; Order Under 11 U.S.C. §§ 105, 363, and 365 and Fed Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief, ¶ 22 [Dkt. No. 2246].)

Trust Claims and (ii) substantial savings on the probable costs of professional fees and experts needed to litigate those claims.

Based on the foregoing, the amount of the Allowed RMBS Trust Claim falls within the range of reasonableness.  The Debtors' expert, Frank Sillman of Fortace LLC, has attempted to quantify the Debtors' aggregate potential liability to certain of the RMBS Trusts if their claims were litigated.[30]  He estimates that the likely damages that could be recovered by those RMBS Trusts, after consideration of legal defenses and litigation costs, is between $7.4 billion and $8.7 billion.  (*See* Sillman Direct ¶ 4.)   Mr. Sillman reached that conclusion through a three-step process:

First, Mr. Sillman estimated the aggregate lifetime losses that will potentially be incurred by those RMBS Trusts to be between approximately $42.4 billion and $43.2 billion. (Sillman Direct ¶ 42.)  That range is the approximate sum of (i) actual losses to date of $32.9 billion for the Debtor-sponsored trusts, (ii) aggregate forecasted remaining lifetime losses of between $7.76 billion and $8.4 billion for Debtor-sponsored trusts, (iii) actual losses to date of $1.45 billion for the Debtor-sold loans in the non-Debtor-sponsored trusts, and (iv) aggregate forecasted remaining lifetime losses of between $.3 billion and $.4 billion for the non-Debtor-sponsored trusts.  (Sillman Direct ¶¶ 35, 38, 40, 42.)

*Second*, Mr. Sillman estimated the rate of material defects in the underwriting of the loans contained in the subject trusts, which he determined to be 43.5% for loans issued

---

[30] Mr. Sillman's analysis included both Debtor-sponsored and non-Debtor-sponsored trusts containing loans sold by the Debtors, but excluded the portion of the RMBS Trusts that were insured, or "wrapped," by the settling monoline insurers.  This reflects the fact that the Plan gives no allowed claim to insured trusts or tranches, instead giving allowed claims to the monoline insurers in accordance with the Monoline settlements.  In addition, Mr. Sillman's analysis excluded RMBS Trusts that the Debtors serviced but that did not contain any Debtor-sold loans, because the Debtors' potential liability to such Trusts constitutes a very small fraction of the Debtors' overall RMBS exposure and, accordingly, of the RMBS Trust claims that are allowed under the Plan.  (*Compare* Plan Schedules 4G and 4R (allowed RMBS Trust claims for servicing breaches), *with* Plan Schedules 2G, 2R, 3G and 3R (allowed RMBS Trust claims for R&W breaches).

between 2004 and 2007 and 35.1% for loans issued prior to 2004.  (Sillman Direct ¶ 49-50.)[31]

He arrived at the 2004-2007 defect rate by conducting a forensic re-underwriting of a

representative sample of approximately 1,500 loans issued during that period.  (*Id.* at ¶¶ 44-48.)

He calculated the pre-2004 defect rate by comparing the rates of severely

delinquent loans prior to 2004, as compared to 2004 and after, finding that the pre-2004 rate was

80.6% of the latter rate, and then applying that percentage to the 2004-2007 defect rate, yielding

a 35.1% defect rate for the pre-2004 loans.  (Sillman Direct ¶ 50.)  Applying those defect rates to

the estimated lifetime losses, Mr. Sillman estimated that the amount of losses on defective loans

issued between 2004 and 2007 is between $16.8 billion and $17.2 billion, and losses on defective

loans issued prior to 2004 is between $1.31 billion and $1.32 billion.  (*Id.* ¶ 59.)

Third, Mr. Sillman estimated the likely damages that could be recovered by the

subject RMBS Trusts after consideration of legal defenses and litigation costs.  He did this by

applying a discount, in a range between 41% and 47%, to the amount of losses on loans with

material defects.  (Sillman Direct ¶ 52.)  Mr. Sillman derived the discount rate from, among other

things, the Debtors' own historical repurchase experience, industry repurchase data, his own

experience with loan repurchase demands, and the opinions of other experts regarding legal

defenses and litigation expenses.  (*Id.* ¶ 51.)  Applying that discount to the estimated amount of

losses on defective loans, Mr. Sillman estimates that the likely amount of damages recoverable

by the subject RMBS Trusts is between $7.4 billion and $8.7 billion.  (*Id.* ¶ 59.)  Accordingly,

---

[31] Other parties have asserted a wide range of defect rates for the RMBS Trusts, some higher and others lower than Mr. Sillman's estimates.  For example, a number of complaints filed against the Debtors prior to the Petition Date alleged defect rates between 80% and 100% while an expert retained by the Creditors' Committee determined, based upon a re-underwriting of 1,500 loans, that only 28.74% of those loans were materially defective.  (*See* Debtors' Reply Brief Re *Iridium* Factors in Support of Motion for Approval of RMBS Settlement Agreements, at pp. 38-39 [Dkt. No. 2803].)

allowance of the RMBS Trust Claims at $7.301 billion is certainly reasonable when taking into account the risks, costs, and delays of litigation.

In addition to the substantial reduction of potential claims against the Debtors' estates and the avoidance of the massive delays and costs associated with litigating the merits of these claims, the RMBS Settlement provides an additional significant benefit to the Debtors' estates.  As part of their settlement with the Debtors, the RMBS Trustees agreed to the Third Party Release, which releases their claims against Ally.  Release of the RMBS Trustees' third party claims against Ally was a critical component of the Global Settlement and a principal inducement to the $2.1 billion Ally Contribution, thereby providing significant additional benefits to the Debtors' estates.  Indeed, without the benefits of the Global Settlement (and in particular, the $2.1 billion Ally Contribution), the Debtors' estates would be faced with significant delay and uncertainty in resolving these cases, and the attendant costs would be staggering.  This is an additional, powerful reason why the benefits of the RMBS Settlement outweigh any upside that could be achieved through the protracted litigation that would ensue if the Plan is not confirmed.

### c.      The Monoline Settlements

As discussed above, the Plan implements settlements that resolve the allowance, amount, and priority of claims asserted by all of the Monolines – namely, MBIA, FGIC, Assured, Ambac, and Syncora – that insured the payment of principal and interest for certain residential mortgage-backed securities sponsored by certain of the Debtors.  The claims asserted by the Monolines arise generally from alleged breaches by the Debtors and their affiliates of (i) representations, warranties, and/or covenants in the various insurance agreements, offering materials, and other governing documents associated with the relevant RMBS transactions and (ii) servicing obligations under the relevant documents.   They generally allege fraudulent

- 78 -

inducement, material breach of contract, and similar theories, and seek the recovery of all past and future insured bond losses under theories of rescissory and/or compensatory damages.[32]

In addition, the Monolines have asserted that they are entitled to prepetition interest as well as an indemnity for fees, costs, and expenses incurred in connection with their claims. Assured, FGIC and MBIA have asserted in some manner that GMACM is liable for the obligations of RFC and/or vice versa under theories such as aiding and abetting and alter ego. MBIA and FGIC have also asserted claims against ResCap under similar theories.

While the Debtors believe that they have defenses to the Monoline claims, the ultimate outcome of any such litigation would be highly uncertain and pose significant risk to the Debtors. As discussed above in connection with the RMBS Settlement, claims arising in the RMBS securitization context are complex, fact-intensive, and give rise to a range of hotly disputed legal issues. The potential liability and risks to the Debtors are even greater when litigating with monoline insurers, as this Court has already recognized in approving the FGIC Settlement Agreement. The Court found that the monoline claims are "fact-intensive and would include relatively novel legal issues, making the potential outcome uncertain." *FGIC 9019 Opinion*, 497 B.R. at 734. These risks are heightened here because "the Debtors have experienced tremendous attrition among their employees who worked on the securitizations at issue and this would hinder the Debtors' efforts to offer meaningful live testimony in support of the Debtors' defenses." *Id.* Accordingly, the Debtors have reasonably concluded that they would face substantial uncertainty and risk litigating the Monoline claims.

Indeed, a number of recent court decisions arguably strengthen the Monolines' claims, increasing the risks for the Debtors in proceeding with litigation. For example, recent

---

[32] For a more thorough discussion of the claims asserted by the Monolines in these cases, the Plan Proponents respectfully refer the Court to paragraphs 63-72 of the Lipps Direct.

authorities bearing on the Monolines' fraudulent inducement and material breach of insurance contract claims have held that a monoline can rely on sections 3105 and 3106 of the New York Insurance Law to prove their claims and therefore need not prove a direct causal link between its losses and each particular alleged misrepresentation (as opposed to other market events or causes) to obtain a full recovery. *See, e.g.*, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 963 N.Y.S.2d 21, 21-22 (N.Y. App. Div. 2013); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 936 N.Y.S.2d 513, 521-22 (N.Y. Sup. Ct. 2012). Rather, to the extent the monoline was fraudulently induced to issue the insurance policies (or the insurance agreements were materially breached), some courts have held that the monoline is entitled to recover compensatory damages equal to all insurance claim amounts they paid under the insurance policy (*i.e.*, insured bond losses) less premiums. *See MBIA*, 963 N.Y.S.2d at 21-22; *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/08, 2013 N.Y. Misc. LEXIS 1818, at *28 (N.Y. Sup. Ct. Apr. 29, 2013); *see also Hotaling v. A.B. Leach & Co.*, 247 N.Y. 84 (N.Y. Ct. App. 1928); *cf. Syncora Guar. Inc. v. Countrywide Home Loans, Inc.*, 935 N.Y.S.2d 858, 870 (N.Y. Sup. Ct. 2012) (holding that monoline may be entitled to recover, as rescissory damages, amounts paid under insurance policy, less premiums).

According to recent authority, insurers also need not demonstrate that they *reasonably or justifiably* relied on a particular alleged misrepresentation to establish a fraud claim under the New York Insurance Law. Rather, "under Section 3105 [of the New York Insurance Law], the inquiry is not whether the insurer's reliance on the misrepresented information was justifiable but instead whether the insurer might have refused the application had it been aware of the truth of the misrepresentation." *MBIA*, 2013 N.Y. Misc. LEXIS 1818, at *10-11; *see also DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 154 (N.Y. Ct. App.

2010) ("[W]here a plaintiff has gone to the trouble to insist on a written representation that certain facts are true, it will often be justified in accepting that representation rather than making its own inquiry.").

In addition, there is recent authority holding that, for purposes of so-called "repurchase" or "put-back" claims predicated on evidence of breaches of particular representations and warranties, monolines need not establish that they suffered losses with respect to a particular mortgage loan giving rise to such a claim, much less that there is a direct causal connection between any loss and the breach of the representation and warranty to prove that a material breach occurred that entitles the monoline to a recovery. *See MBIA*, 963 N.Y.S.2d at 22-23 ("[A L]oan need not be in default to trigger defendants' obligation to repurchase it. . . . [H]ad these very sophisticated parties desired to have an event of default or non-performance trigger the repurchase agreement, they certainly could have included such language in the contracts."); *MBIA*, 2013 N.Y. Misc. LEXIS 1818, at *32 n.12; *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 892 F. Supp. 2d 596, 603 (S.D.N.Y. 2012) (insurer need only show that alleged breaches caused plaintiff increased risk of loss; not that alleged breaches actually caused loss); *Syncora Guar. Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 339-40 (S.D.N.Y. 2012) (same).

In addition to these challenging legal issues, and as discussed in more detail below, litigation of the monoline claims would be lengthy, burdensome, and difficult. Settling the Monoline claims on the terms set forth in the Plan avoids those costs and risks, while providing the Debtors with (i) certainty with respect to the allowed amounts of the Monoline claims and (ii) substantial cost savings when compared with the probable costs of professional fees and experts that would be needed were the Debtors forced to litigate the Monoline claims.

- 81 -

*See FGIC 9019 Opinion*, 497 B.R. at 734 (recognizing benefits of certainty and savings in connection with FGIC Settlement Agreement).   These settlements have two other prominent benefits for the estates.

        *First*, the Monoline claims are all being allowed in amounts less than those being asserted against the Debtors.   For example, MBIA is asserting claims in excess of $2.2 billion against each of six Debtors, including all three Debtor Groups.   It alleges that RFC and GMACM each committed fraud, and aided and abetted each other's fraud along with ResCap, which would make each one of the three Debtor Groups jointly and severally liable for the full amount of MBIA's losses.   MBIA further alleges that ResCap is liable to it under theories of alter ego and veil piercing.   Mr. Sillman independently assessed the claims asserted by MBIA for covered bond losses and concluded that MBIA's likely amount of recoverable damages (which MBIA is seeking against each Debtor Group) is within the range of $1.81 billion to $2.29 billion. (Sillman Direct ¶ 8.)   As part of its settlement, MBIA's claims – for which each of the Debtor Groups would be jointly and severally liable under MBIA's fraud and aiding and abetting theories – are to be substantially reduced and allowed in amounts which fall well below what Mr. Sillman estimated would be the likely range of recoverable damages:  (i) $1.45 billion against the RFC Debtors, (ii) $1.45 billion against the GMACM Debtors, and (iii) $719 million against ResCap.

        Assured's proofs of claim assert $82.1 million in claims against the RFC Debtors and $185.8 million in claims against the GMACM Debtors.   Of those amounts, approximately $81.8 million relate to past and future insured bond losses as well as interest and indemnification with respect to three Debtor-sponsored trusts which were wrapped by Assured.   Like MBIA, Assured is asserting that RFC and GMACM aided and abetted each other's fraud and are each

liable for those amounts.[33]  Mr. Sillman also independently assessed the claims for bond losses with respect to the Debtor-sponsored Assured-wrapped trusts and concluded that Assured's likely recoverable damages for those trusts is within the range of $58.9 million and $77.6 million.  (Sillman Direct ¶ 6.)  As part of the Assured settlement, Assured's claims will be substantially reduced and allowed in the following amounts:  (i) $57.95 million against the RFC Debtors and (ii) $88.86 million against the GMACM Debtors.

Ambac's proofs of claim assert liquidated claims of $119.7 million against the RFC Debtors and $85.6 million against the GMACM Debtors for Ambac's current obligations on Ambac-insured bond losses and servicing breaches.  Ambac also asserts claims for unliquidated amounts representing future bond losses and indemnification for costs and expenses.  In addition, in connection with the Ocwen sale, Ambac objected to any assignment of servicing rights with respect to Ambac-insured transactions and has alleged that its cure claims (which, if allowed, are administrative expense claims) could range from $15.5 million to $26.2 million or more.  Mr. Sillman also independently assessed the claims for bond losses with respect to the Ambac-wrapped trusts and estimated that Ambac's likely recoverable damages for those trusts is within the range of $161.2 million and $212.3 million.  (Sillman Direct ¶ 5.)  As part of the Ambac settlement as embodied in the Plan and as set forth in a separate stipulation and order entered by the Court on October 18, 2013 [Dkt. No. 5389] (the "Ambac Stipulation"), Ambac's claims will be substantially reduced and allowed in the following amounts:  (i) $22.8 million against the RFC Debtors and (ii) $207.3 million against the GMACM Debtors.[34]

---

[33] In addition, Assured is asserting $280,000 in claims against the RFC Debtors and $104 million in claims against the GMACM Debtors for breaches of various servicing obligations with respect to non-Debtor-sponsored RMBS trusts for which the Debtors acted as servicer and for Assured provided insurance.

[34] As part of its settlement, Ambac also agreed to make a special policy payment to the Ambac-insured trusts equal to 30% of the amount of each distribution it receives pursuant to the Plan on account of its Unit distribution.

Moreover, the Ambac Stipulation allows the Debtors to assume and assign their mortgage servicing rights ("MSRs") with respect to certain Ambac-wrapped RMBS Trusts and receive payment from Ocwen for outstanding advances and MSRs.  The precise amount of the payment the Debtors would receive for advances and MSRs varies monthly for each Trust and was estimated to be over $61 million for these Trusts as of September 30, 2013. (Kruger Direct ¶ 87.)

FGIC filed three proofs of claim against ResCap, GMACM, and RFC totaling $5.55 billion in the aggregate (*i.e.*, $1.85 billion against each Debtor) for bond losses on FGIC-wrapped bonds.  FGIC asserted, among other things, that GMACM and RFC breached various representations and warranties and that ResCap is liable under both aiding and abetting and veil-piercing theories.   Mr. Sillman also independently assessed the claims for bond losses with respect to the FGIC-wrapped trusts and estimated that the potential shortfall to the bonds previously wrapped by FGIC is within the range of $1.31 billion to $1.71 billion.   (Sillman Direct ¶ 7.)  As part of the FGIC Settlement Agreement, if the Plan is confirmed, FGIC's claims will be substantially reduced and allowed in the following amounts:  (i) $415 million against the RFC Debtors, (ii) $181.5 million against the GMACM Debtors and (iii) $337.5 million against ResCap.  The Court has already approved the FGIC Settlement Agreement and concluded that the FGIC Settlement provides many benefits to the Debtors' estates, including substantial reductions to FGIC's asserted claims.  *See FGIC 9019 Opinion*, 497 B.R. at 734.

*Second*, as part of their settlements with the Debtors, the Monolines (like the RMBS Trustees) have agreed to the Third Party Releases, which release their individual claims against Ally.  In fact, MBIA, FGIC, and Assured have already commenced litigation against Ally that has been stayed pending the outcome of Plan confirmation.  *See, e.g.*, *MBIA Ins. Corp. v. Ally Fin. Inc.*, No. 12-2563 (D. Minn.); *Fin. Guar. Ins. Co. v. Ally Fin. Inc.*, Case No.  12-339

(S.D.N.Y); *Assured Guar. Mun. Corp. v. GMAC Mortgage, LLC*, Case No. 12-3776 (S.D.N.Y.);

(*see also* Lipps Direct ¶¶ 54-62) (describing prepetition monoline litigation).   Release of the

Monolines' third party claims against Ally was a critical component of the Global Settlement and

a principal inducement to the $2.1 billion Ally Contribution, thereby providing significant

benefits to the Debtors' estates.  *See FGIC 9019 Opinion*, 497 B.R. at 734 ("Equally important,

the [FGIC] Settlement Agreement is part of the Global Settlement that, if ultimately approved,

will provide a $2.1 billion contribution to the Debtors' estates from AFI and secure global

resolution.").  Like the RMBS Settlement, this is an additional, powerful reason why the benefits

of the Monoline Settlements outweigh any upside that could be achieved through the protracted

litigation that would ensue if the Plan is not confirmed.

> ### d.    The Private Securities Claims, FHFA, NJ Carpenters and Other Securities Claims Settlements

Through the Global Settlement and subsequent negotiations with creditors not

party to the Mediation, the Plan resolves all federal, blue-sky, and common law securities

litigation claims against the Debtors and Ally – claims that attribute over thirty billion dollars in

investment losses to the Debtors' loan origination activities and the structuring, sponsoring,

underwriting, and sale of RMBS.   These claims allege, among other things, fraud based on

material misrepresentations and omissions in the Debtors' registration statements and

prospectuses.  Many of these claims also allege (i) direct claims against Ally and its affiliates

(including Ally Securities) based on their role as sellers or underwriters of the Debtors'

securities, and/or (ii) claims based on aiding and abetting or theories of joint liability.

In light of the considerations described below, the Plan Proponents determined

that the settlement of securities claims against both the Debtors and the Ally Released Parties –

as an element of the Global Settlement – was in the best interests of the Estates and the Debtors'

creditors.    Not only do these settlements resolve substantial potential liability against the

Debtors, but they secure important support for the Plan and the Third Party Releases from parties

with pending third party claims against Ally.

The creditors asserting securities law claims against the Debtors and/or Ally

generally fall within one of four categories: (i) certain creditors that have commenced securities

law-related litigation against the Debtors and AFI or Ally Securities directly, or have a tolling

agreement with Ally that preserves their right to do so (*i.e.*, the Private Securities Claimants),

(ii) class members in the case captioned *N.J. Carpenters Health Fund v. RALI Series 2006-QO1

Trust*, No. 08-8781 (S.D.N.Y.) (the "NJ Carpenters Class"), which class was certified by the

District Court, (iii) the FHFA, and (iv) claimants that have commenced securities law-related

litigation against the Debtors without involving Ally or its non-debtor subsidiaries.    As the

relevant statutes of limitation have largely lapsed with respect to the Debtors' RMBS, the Plan

Proponents believe this defined universe of claims to be comprehensive.    (*See* Lipps Direct ¶ 52.)

All four categories of securities claims have been consensually resolved under the Plan.[35]

These settlements resolve claims that have been litigated for years, yet were not

close to a final resolution.    A number of securities-related lawsuits against the Debtors and Ally

have already survived pre-answer motions to dismiss in whole or in substantial part (*see* Lipps

Direct ¶ 19.), and litigating any one of those cases to finality on the merits would be lengthy and

---

[35] Settlements with claimants that have commenced securities law-related litigation against the Debtors without involving Ally or its non-debtor subsidiaries have been or will be before the Court by stipulation or by separate motion under Bankruptcy Rule 9019.    A settlement with the FHFA regarding claims based on Freddie Mac's losses on $6 billion of RMBS sponsored and/or underwritten by the defendants in the action has likewise been agreed in principle and will be addressed in full through a separate motion under Bankruptcy Rule 9019.    Pursuant to that agreement, the Plan was modified to provide that the FHFA Claims shall recover a Cash distribution of 2% of a $1.2 billion Allowed FHFA Claim against the RFC Debtors.    The FHFA's claims against Ally, which are carved-out of the Third Party Release, have also been resolved through a separate settlement between both parties.

extraordinarily complex; litigating all of the securities claims asserted against the Debtors and/or Ally would result in exponentially greater cost and delay.

All of these claims are factually complex and raise novel and difficult legal issues, and the outcome of litigation remains highly uncertain. (Kruger Direct ¶ 98.)  While each of the securities law claimants continues to assert that it has strong, valuable claims against the Debtors and Ally, each of the Debtors and Ally assert that it has strong defenses to liability.  To prevail on claims based on material misstatements in offering materials and prospectuses, the securities claimants would have to prove that: (i) the Debtors made misstatements in connection with the sale of the RMBS certificates, (ii) any misstatements were material, (iii) the claimant reasonably relied on any alleged misstatement, (iv) its RMBS losses were caused by any alleged misstatement, and (v) requisite privity exists between the claimant and the Debtors to maintain the claim.  In addition, to prevail on claims based on actual fraud, the securities claimants would have to prove that the Debtors intended to deceive the claimant.

In litigating these issues, those securities law claimants that had not already survived a motion to dismiss could cite numerous decisions denying motions to dismiss claims similar to their own, including, recently, *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109 (2d Cir. 2013), and case law that arguably limits any defense based on disclosures in the RMBS offering documents regarding the originators' deviation from underwriting guidelines.  Recent case law in connection with the adjudication of monoline claims, as discussed above, may likewise support arguments that material underwriting defects occurred.

In contrast, the Debtors and Ally would vigorously defend these claims by arguing, first, that there were no material misstatements in the Debtors' offering materials upon

which the claimants relied, and, second, that the securities claimants' losses were due to a downturn in the mortgage market rather than the Debtors' alleged misstatements. *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by [an alleged misstatement] decreases."). Moreover, the Debtors and Ally have asserted statute of limitations defenses, and litigating tolling issues would also require discovery into the tolling agreements themselves and when and under what circumstances the claimants became aware of their potential claims against the Debtors and/or Ally.

A litigated resolution of the securities claims against the Debtors also would require the adjudication of whether such claims are subject to subordination to general unsecured claims under section 510(b) of the Bankruptcy Code.[36] This issue has already been hotly contested by numerous parties in these cases, including in an adversary proceeding commenced by the Debtors. (Adv. Pro. No. 13-01262). As reflected by the parties' motions for summary judgment, this issue poses numerous unsettled questions of law. *See* Motions for Summary Judgment, *Residential Capital, LLC. v. Allstate Ins. Co. (In re Residential Capital, LLC)*, Adv. No. 13-1262, (Bankr. S.D.N.Y. Apr. 2, 2013) [Dkt. Nos. 25-27, 29, 31, 33-34]. As of yet, there is no case law on this topic in the Second Circuit. A recent opinion from a lower court in the Third Circuit found that similar claims are not subject to mandatory subordination (*see In re Wash. Mut., Inc.*, 462 B.R. 137, 145-47 (Bankr. D. Del. 2011)), but the Debtors dispute its significance and applicability. Accordingly, the outcome of any subordination litigation is

---

[36] Litigation regarding the FHFA Claims would also require a determination as to whether the FHFA Claims are entitled to priority treatment under 12 U.S.C. §§ 4617(b)(15) (section 1367 of the Housing and Economic Recovery Act of 2008), as the FHFA asserts. The Plan Proponents dispute these allegations and FHFA's assertion of priority status.

highly uncertain and poses a potential risk to the Debtors' estates if litigated to finality. In addition, subordination of these claims against the Debtors would not apply to the third party claims against Ally – claims that needed to be addressed as part of any global settlement. Therefore, the issue of subordination was not only a source of legal risk; it also offered limited benefits to any plan that was premised on a deal with Ally.

Based on the substantial legal and factual issues that would need to be determined to adjudicate the validity and priority of these claims, and the challenges posed by the related third party claims, the Plan Proponents determined that resolving the claims through the Plan and Global Settlement was in the best interest of the estates and their creditors.  This comprehensive resolution of securities claims facilitated consensus whereby these parties support the Plan, including the Third Party Release, thereby eliminating a significant hurdle to achieving a fundamental requirement of the Global Settlement and facilitating an expeditious confirmation process.  The settlements also avoid the burdensome legal fees and administrative expenses that would be incurred by continuing to litigate these claims.[37]

Each proposed securities settlement embodied in the Plan fairly compromises the Debtors' potential exposure, and is well within the range of comparable recent settlements.  As noted above, the settlements reached with the FHFA and certain individual securities law claimants in litigation against the Debtors are being documented by stipulation and pursued by separate motion under Bankruptcy Rule 9019.

*First*, the settlement with the Private Securities Claimants—consisting of twenty large insurers, institutional investors, and investment funds—resolves claims against the Debtors

---

[37] *See* Transcript of Oral Argument at 137:11-15, *In re Residential Capital, LLC*, Adv. No. 12-0167 (Bankr. S.D.N.Y. July 10, 2012) [Dkt. No. 75] ("The debtors have provided specific examples of cases that involved a small number of securitizations, but still produced millions of pages in discovery and upwards of eighty days' worth of depositions from the debtors' current and former employees.").

and Ally associated with approximately $8 billion of the Debtors' RMBS securities, all of which are the subject of either ongoing litigation against the Debtors and Ally or a tolling agreement preserving the ability to sue.  In total, the Private Securities Claimants filed approximately 225 proofs of claim asserting statutory losses in excess of $2.4 billion.[38]  Pursuant to Article IV of the Plan, as one aspect of the Global Settlement, a settlement trust will be funded with Units in the Liquidating Trust worth approximately $235 million (subject to adjustments), representing an aggregate recovery of 9-10% of all Private Securities Claimants' asserted losses against both the Debtors' and Ally.[39]  In exchange, the Private Securities Claimants agreed to settle their securities law claims against the Debtors (including the issue of subordination) and the Ally Released Parties (for which subordination is not relevant).

The Debtors' expert in securities damages analysis, Lucy Allen, Senior Vice President of NERA Economic Consulting, independently determined that the Private Securities Claimants' investment losses are likely between $2.14 billion and $3.05 billion. (Allen Direct ¶¶ 20, 22)  Ms. Allen then compared the Private Securities Claims settlement to the full body of public settlements between investors and RMBS issuers and underwriters announced since July 2011, and she confirmed that the treatment contemplated by the Global Settlement fell squarely within the range of past settlements, whether compared by original principal balance, minimum cash losses, or maximum cash losses:

|  | *Range of Recent RMBS Settlements* | *Private Securities Claims Settlement* |
|---|---|---|
| % of Original Principal Balance | 0.03 – 13.8% | 2.9% (of $8 billion) |

---

[38] The proofs of claim filed by the Private Securities Claimants are discussed in further detail at ¶¶ 22-53 of the Lipps Direct.

[39] The share of the $235 million settlement allocated to each Private Securities Claimant has been agreed upon by all Private Securities Claimants and embodied in an Allocation Agreement among the Private Securities Claimants. (Kirpalani Direct ¶ 13.)

|  | *Range of Recent RMBS Settlements* | *Private Securities Claims Settlement* |
|---|---|---|
| % of "Maximum Cash Losses" | 0.05-48.6% | 7.7% (of $3.05 billion) |
| % of "Intermediate Cash Losses" | 0.1 – 65.0% | 9.1% (of $2.59 billion) |
| % of "Minimum Cash Losses" | 0.2% - 119% | 11% (of $2.14 billion) |

(Allen Direct ¶¶ 19-22.)[40]    Thus, these findings confirm that the Debtors were justified in determining that the proposed settlement of the Private Securities Claims was well within the bounds of reasonableness. (Kruger Direct ¶¶ 98.)

      *Second*, the Plan resolves claims asserted by representatives of the NJ Carpenters Class, comprising investors in fifty-nine of the Debtors' RMBS securitizations with a total original principal balance of approximately $38 billion, for approximately $13 billion of statutory losses.  As part of the Global Settlement, the Plan allocates $100 million for the full and final satisfaction of these claims – i.e., approximately 1% of asserted losses.  Notably, this settlement has already been approved by the district court in which the action is pending.  (*See* Order and Final Judgment, *N.J. Carpenters Health Fund v. RALI Series 2006-Q01 Trust*, No. 08-8781 (S.D.N.Y. Oct. 7, 2013) [Dkt. No. 5354].)

      Ms. Allen of NERA calculated that the NJ Carpenters Class' losses are likely between $6.61 billion and $21.23 billion.  (Allen Direct ¶ 20, 22.)  Ms. Allen confirmed that the treatment of the NJ Carpenters Claims contemplated by the Global Settlement fell squarely within the range of settlements utilized for the Private Securities Claims, whether compared by original principal balance, minimum cash losses, or maximum cash losses:

---

[40] The recovery rates to individual Private Securities Claimants vary based upon the characteristics of their claims, as agreed among the Private Securities Claimants. (Kirpalani Direct ¶ 13.)

|  | *Range of Recent RMBS Settlements* | *NJ Carpenters Settlement* |
|---|---|---|
| % of Original Principal Balance | 0.03 – 13.8% | 0.3% (of $38.34 billion) |
| % of "Maximum Cash Losses" | 0.05-48.6% | 0.5% (of $21.23 billion) |
| % of "Intermediate Cash Losses" | 0.1 – 65.0% | 0.7% (of $13.91 billion) |
| % of "Minimum Cash Losses" | 0.2% - 119% | 1.5% (of $6.61 billion) |

(Allen Direct ¶¶ 19-22.)  Notably, class action litigation claims tend to settle at smaller amounts

than individual actions like the Private Securities Claims.  (*See* Allen Direct ¶ 29; Kirpalani

Direct ¶ 13.)

In summary, these settlements (i) resolve years of burdensome litigation

(ii) eliminate billions of dollars of potential exposure for the Debtors and the Ally Released

Parties, (iii) fall well within the range of settlement amounts for other recent settlements of

similar claims, and (iv) are a critical component of the Global Settlement and facilitating Ally's

agreement to fund the Ally Contribution.  The Plan Proponents believe that the benefits of each

of the proposed settlements of securities law claims substantially outweigh any potential benefits

that could be obtained from lengthy and protracted litigation of such claims in the absence of the

Plan and Global Settlement.  (Kruger Direct ¶ 98.)

### e.    Borrower Claims Treatment and Related Settlements

In accordance with the Global Settlement, the Plan calls for the establishment of a

Borrower Claims Trust that will be funded on the Effective Date with $57.6 million, and

facilitate Cash distributions to Borrowers comparable to the projected recoveries to be received

by holders of all general unsecured claims at their respective Debtor Groups.  In addition, the

Global Settlement makes possible the Debtors' continued performance under two important

settlements for the benefit of Borrowers: (i) the settlement with 49 State attorneys-general and

- 92 -

the Department of Justice regarding the Debtors' mortgage loan servicing and origination operations (the "DOJ/AG Settlement"), and (ii) the settlement of the Debtors' liability under the Consent Order entered into by the Debtors, AFI, the Board of Governors of the Federal Reserve System and the FDIC (the "FRB Consent Order").

First, by establishing the Borrower Claims Trust and funding the Borrower Claims Trust with $57.6 million (less cash settlements paid to Borrowers pre-Effective Date) on or as soon as practicable after the Effective Date, the holders of Allowed Borrower Claims will receive distributions in Cash, rather than Units. This will prevent Borrowers from having to receive distributions over time, unlike other General Unsecured Claim holders whose distributions will be paid as claims are resolved and assets are liquidated by the Liquidating Trust. This ensures that individual Borrowers receive cash rather than less liquid Liquidating Trust Units. In addition, the Borrower Claims Trust provides a streamlined mechanism for the Borrower Claims Trustee to work to resolve Borrower Claims without requiring individual Borrowers to retain counsel, and authorizes the Borrower Claims Trustee to settle and make incremental incentive payments to Borrowers where such Borrowers agree to settle the allowed amount of their claim below certain thresholds as against the GMACM Debtors and the RFC Debtors. (Thompson Direct ¶ 15.) Under the Plan, upon the Effective Date, Borrower-Related Causes of Action will be transferred to the Borrower Claims Trust. In addition, the Plan mandates that Borrowers who recover insurance proceeds contribute a portion of those recoveries to the Borrower Claims Trust. Thus the Borrower Claims Trust may realize additional cash that will be distributed to Borrowers on account of their Allowed Borrower Claims.

Through the Mediation and subsequent negotiations with holders of individual Borrower Claims and class action Borrower Claims, the Plan Proponents have settled nearly all of the class action Borrower Claims, including: (i) the Kessler Class Claimants' Claims for a single Allowed Claim of approximately $300 million and the transfer and assignment of the Insurance Rights to the Kessler Class Claimants, (ii) the Rothstein Class Action, for which a settlement has been agreed to in principle as an Allowed Claim against GMACM in the amount of $13.0 million, (iii) the Mitchell Class Action, for which a settlement has been agreed to in principle providing for an Allowed Claim against RFC in the amount of $14.5 million, and (iv) the Moore Class Action, which settlement is being funded by non-Debtor Cap Re of Vermont, Inc., and therefore does not factor into the Borrower Claims Trust True-Up.  (Thompson Direct ¶ 25.)  The remaining class action Borrower Claims have been or will be settled for direct cash payments totaling approximately $1.3 million outside of the Plan (which amounts will be deducted from the amount funded to the Borrower Claims Trust).  (*Id.* ¶ 26.)  In light of these settlements and further analysis of the Borrower Claims asserted against the Debtors, the Plan Proponents determined that the amount funded to the Borrower Claims Trust was reasonable and appropriate, and will allow for distributions to holders of Borrower Claims in amounts comparable to distributions to holders of other general unsecured claims against the applicable Debtor Group.  (*Id.* ¶ 17.)

*Second*, in addition to the $57.6 million being funded to the Borrower Claims Trust, additional assets of the Debtors – totaling over $579 million in direct and indirect payments – have been and will continue to be used to satisfy obligations under the DOJ/AG Settlement and FRB Consent Order for the benefit of Borrowers in accordance with the Plan.  Under the DOJ/AG Settlement, the Debtors paid approximately $109 million in settlement

of civil claims of various federal and state governmental entities with respect to their mortgage origination and servicing operations, the proceeds of which were to be used, in part, for disbursement to eligible Borrowers who assert they were harmed by the Debtors' alleged deficiencies in its mortgage servicing operations.[41]  In addition, under the DOJ/AG Settlement, both before and after the Petition Date, the Debtors provided more than $185 million of financial relief – including loan modifications, such as principal reductions, rate modifications and refinancing – to eligible Borrowers who were either delinquent or at imminent risk of default and owed more on their mortgages than their homes were estimated to be worth.  Moreover, under the Plan, the Debtors and the Liquidating Trust have committed to fund the costs incurred by Joseph A. Smith Jr., appointed to serve as the Monitor, to insure that Ocwen complies with certain servicing standards following the Effective Date, and funds the Debtors' obligations under the Servicemembers Civil Relief Act, which provides certain protections for active duty service members with respect to foreclosure actions and modifications to mortgage loan interest rates.  Under the Plan, the Liquidating Trust shall establish a Cash reserve of $55 million to satisfy these ongoing obligations.[42]

        As an additional component of the Global Settlement, the Debtors' also agreed to enter into an amendment to the terms of the FRB Consent Order dated June 26, 2013 (the "FRB Consent Order Amendment"), pursuant to which the Debtors paid $230 million to the Federal Reserve Board in full satisfaction of their obligations under the FRB Consent Order.  In turn, these amounts are to be paid directly to borrowers in accordance with the terms of the FRB Consent Order.  The settlement embodied in the FRB Consent Order Amendment resolved not

---

[41] Under the proposed Plan, the Plan Proponents are agreeing to waive the right to seek avoidance of the pre-petition payments made under the DOJ/AG Settlement pursuant to Section 547 of the Bankruptcy Code.

[42] The amount of the reserve does not limit the Debtors' obligations under the DOJ/AG Settlement.

only the amount of the Debtors' liability under the FRB Consent Order, but also avoided costly professional fees associated with the foreclosure review and settled the ongoing litigation among the Debtors, Ally, and other parties in interest regarding the classification and priority of claims arising from such obligations.  Throughout these Chapter 11 Cases, the Plan Proponents took the position that the Debtors' obligations under the FRB Consent Order were pre-petition obligations and should not be awarded administrative priority.  In addition, the Plan Proponents asserted that such obligations should be paid by the Debtors' solvent parent company, AFI, which was also obligated under the Consent Order.  The FRB and AFI argued in response that the Debtors should be obligated to perform under the FRB Consent Order and pay all related professional fees in full as administrative expenses.  The legal issues surrounding the classification of these claims and the allocation of payment responsibility are unsettled, and the outcome of such litigation was uncertain.  Thus, in accordance with the Global Settlement, the Plan Proponents determined it was in the best interest of the estates to enter into the FRB Consent Order Amendment and to make the attendant $230 million payment for the benefit of certain Borrowers.

Accordingly, the Plan Proponents submit that the treatment of the Borrower Claims, the establishment and funding of the Borrower Claims Trust, the related settlements of Allowed Borrower Claims, and the provisions regarding the Debtors' ongoing obligations under the FRB Consent Order Amendment and DOJ/AG Settlement are reasonable and appropriate, and in the best interest of all creditors.

### f.    The Senior Unsecured Notes Settlement

The Global Settlement resolves a number of claims asserted by the Senior Unsecured Notes Indenture Trustee, on behalf of the Senior Unsecured Noteholders, as independent third party claims against the Ally Released Parties, as well as litigation the Senior

Unsecured Notes Indenture Trustee sought to pursue against the Ally Released Parties on behalf of the ResCap Estate.  These claims were the subject of significant contention throughout the Chapter 11 Cases, and any litigation of these claims would be costly and time-consuming.

Specifically, the Senior Unsecured Noteholders and the Senior Unsecured Notes Indenture Trustee asserted that they held numerous independent third party claims against the Ally Released Parties, including (i) claims that AFI is liable for the breach of the Senior Unsecured Notes Indenture by ResCap pursuant to alter ego and veil piercing theories of liability; (ii) successor liability claims; (iii) claims that AFI is liable for ResCap's alleged breach of the covenant of good faith and fair dealing under alter ego theories of liability; (iv) tortious interference with contract; and (v) equitable subordination of AFI's claims against ResCap.

In addition, Wilmington Trust, National Association, solely in its capacity as Indenture Trustee for the Senior Unsecured Notes ("Wilmington Trust") filed a motion seeking authority to prosecute additional claims and other causes of action on behalf of the ResCap Estate relating to, among other things, the transfer of Ally Bank from ResCap to or for the benefit of Ally.  Those claims were based on constructive and actual fraudulent transfers, breach of fiduciary duty, and contribution and indemnification.

As discussed above in connection with the claims resolved pursuant to the Ally Settlement, the claims Wilmington Trust sought to pursue on behalf of the ResCap Estate are highly complex and fact-specific, and AFI would argue strenuously against Wilmington Trust's assertions of liability.[43]  Likewise, many of the claims Wilmington Trust sought to pursue against AFI as independent, third party claims were premised on the same transactions and factual

---

[43] Because the standing motion filed by Wilmington Trust was adjourned *sine die* in connection with the Global Settlement, all disputes regarding the proper party to pursue claims against the Ally Released Parties on behalf of the ResCap Estate (*i.e.*, Wilmington Trust or the Creditors' Committee), were likewise resolved through the Global Settlement.

background and grounded in alter ego/veil piercing theories of liability – which, as discussed above in connection with the Ally Settlement, carry a heavy burden of proof that would undoubtedly result in hotly contested, lengthy, and uncertain litigation.

Thus, the benefits of settling these claims through the Global Settlement significantly outweigh any likelihood of prevailing in such litigation.

### g.    Substantive Consolidation Settlement

In accordance with the Global Settlement, the Plan embodies a resolution of potential disputes over whether the Debtors should be substantively consolidated and their assets and liabilities pooled for purposes of distributions under the Plan.  Specifically, the Plan does not call for substantive consolidation but provides for the grouping of the Debtors into three Debtor Groups – the ResCap Debtors, the GMACM Debtors, and the RFC Debtors – solely for purposes of describing their treatment under the Plan, confirmation of the Plan, and making distributions under the Plan.  No Debtor will be consolidated with a Debtor in another Debtor Group for any purpose.  As set forth in the Voting Certification, creditors voted at each Debtor against which their claims were asserted, rather than at the Debtor Groups.  (Voting Certification, Exhibit A.)  This treatment is reasonable, consistent with the economic realities of the Debtors' corporate structure, and has no significant impact on creditor recoveries.  And it has been overwhelmingly accepted by the Debtors' stakeholders.

Over the course of these chapter 11 cases, creditors have taken varying positions regarding the appropriateness or inappropriateness of substantive consolidation.  Absent the Ally Contribution, the majority of the Debtors' assets would reside at GMACM and RFC, and therefore creditors' positions on substantive consolidation were largely driven by where their individual claims resided.  As a result of creditor conflicts over substantive consolidation, the

Plan Proponents analyzed two alternative plan structures that, absent a settlement, would be the subject of litigation: a consolidated plan and a nonconsolidated plan.

Substantive consolidation is an equitable remedy that results in the creation of a common pool of assets in which all holders of allowed claims share based upon their respective legal rights. All of the entities in a substantively consolidated group are merged. Intercompany claims, joint and several liability, guaranty claims, and subsidiary ownership interests are eliminated. The Second Circuit has established a test setting forth two alternate inquiries for determining whether substantive consolidation may be appropriate: (i) did the creditors deal with the entities as a single economic unit and not rely on the separate identity of the debtors in extending credit or (ii) are the affairs of the debtors so hopelessly entangled that consolidation will benefit all creditors. *Union Savs. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988).

Proponents of substantive consolidation would argue that all of the Debtor entities operated as a single enterprise and that no creditor relied on the separate identity of an individual Debtor. Proponents of a nonconsolidated plan, by contrast, would argue that creditors did in fact rely on the separateness of the Debtors based on the separate securitizations created by GMACM and RFC and that the Debtors' affairs are not so hopelessly entangled that untangling the assets would consume the value that could otherwise be distributed to creditors.

Courts have considered numerous factors in determining whether substantive consolidation is appropriate, many of which overlap with those relevant to piercing the corporate veil, *e.g.*, disregard of corporate separateness, commingling of funds, and misleading of creditors. *See In re WorldCom*, No. 02-13533, 2003 WL 23861928, at *6-16 (Bankr. S.D.N.Y. Oct. 31, 2003). Such factors are entirely fact-specific and would undoubtedly require lengthy

discovery and testimony regarding creditor reliance on the separateness or interrelatedness of the Debtors, resulting in expensive, protracted litigation that could jeopardize distributions to unsecured creditors.

With the foregoing in mind, as part of the Global Settlement, the Plan Proponents, with the support of the Consenting Claimants, determined that the Debtors should not be substantively consolidated but that organizing the Debtors into the Debtor Groups solely for description and distribution purposes would be in the best interests of creditors and the Debtors' estates and would avoid the uncertainty, costs, and delays of litigating substantive consolidation. "It is well-established that debtors may properly reach a settlement regarding whether the estates should be substantively consolidated." *In re Enron Corp.*, No. 01-16034, 2004 Bankr. LEXIS 2549, at *195 (Bankr. S.D.N.Y. July 15, 2004); *see also In re Lehman Brothers Holdings, Inc.*, No. 08-13555, [Dkt. No. 23023 at pp. 12-14] (Bankr. S.D.N.Y. Dec. 6, 2011) (confirming plan settlement of substantive consolidation issues); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 250-51 (Bankr. M.D. Fla. 2006) (approving plan compromise of substantive consolidation issues); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 418, 459 (Bankr. D.N.J. 1990) (finding global settlement contained in plan settling potential litigation of substantive consolidation fair and equitable).

Moreover, the proposed grouping has the support of each of the parties to the Plan Support Agreement. This type of temporary consolidation may also be employed as a matter of convenience with creditor consent. *See, e.g.*, *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) (describing standards for consolidation as "what must be proven (absent consent)"); *In re Kaiser Aluminum Corp.*, No. 02-10429, 2006 WL 616243, at *22 (Bankr. D. Del. Feb. 6, 2006) (approving deemed consolidation where (i) it "will promote efficiency and decrease costs in the implementation of the Plan," and (ii) no creditor objected to the proposed deemed consolidation;

stating that "[i]n the absence of any creditor objection to the deemed substantive consolidation, and in light of the overwhelming creditor support for the Plan, the deemed substantive consolidation of the Substantively Consolidated Debtors . . . is consensual").

Here, the Plan has garnered overwhelming support from creditor constituencies. Other than the Classes consisting of the Junior Secured Notes Claims and the one Rejecting Borrower Class, all Classes entitled to vote, voted in favor of the Plan. The only parties that have objected to the proposed resolution of the substantive consolidation issues, the Junior Secured Noteholders, are being paid in full under the Plan and thus they are not affected by the Plan's Debtor groupings. The proposed partial consolidation for distribution purposes should be treated as consensual and approved as part of the Global Settlement.

In addition, in light of the assets available at, and claims asserted against, each of the Debtors, the proposed grouping is entirely reasonable and appropriate. The majority of the assets of the Debtors' estates reside at ResCap, GMACM, and RFC, with the Debtor subsidiaries within each Debtor Group having little to no assets available for distribution to Creditors. In addition, the majority of Claims asserted against the Debtors were filed (or properly redesignated) against either ResCap, GMACM, or RFC, with, in limited circumstances, *de minimis* or duplicative Claims asserted against the other Debtor subsidiaries within a Debtor Group. The partial consolidation of the ResCap Debtors, the GMACM Debtors, and the RFC Debtors for distribution purposes will not have a material impact on the holder of any Allowed Claim as compared to the recovery that theoretically would be provided under a plan that provided for separate distributions for each Debtor. Thus, in light of the location of Claims and assets, the Plan's partial consolidation structure provides convenience without compromising Creditor recoveries at any Debtor. *See First Owners Assoc. of Forty Six Hundred Condo. v.*

*Gordon Props., LLC (In re Gordon Props., LLC)*, 478 B.R. 750, 759 n.14 (E.D. Va. 2012) ("The absence of any harm to or objection by other creditors is significant given that the reason courts grant substantive consolidation 'sparingly' is their fear of subordinating the rights of creditors.").[44]

The single exception to the partial consolidation described above applies to holders of General Unsecured Claims against Debtor ETS. Following a review and analysis of the Claims and assets at each of the Debtors, the Plan Proponents determined that, as a result of the amount of unencumbered assets available at ETS, and the limited Claims asserted against ETS, holders of Allowed claims against ETS may be entitled to a greater recovery in a chapter 7 liquidation than other unsecured claims against the GMACM Debtors. Therefore, to ensure that it meets the "best interest of creditors" test, the Plan provides that holders of ETS Unsecured Claims will receive Cash, to be distributed pro rata, in an amount equal to the value of assets remaining in the ETS estate after the payment of Allowed Claims with a senior priority.

In view of the foregoing, the Plan Proponents believe that (i) no creditors are prejudiced by the partial consolidation proposed in the Plan, (ii) the benefits of grouping the Debtors in such a manner far outweigh the costs and risks of lengthy and contentious litigation of these issues, and (iii) the proposed settlement, as a component of the Global Settlement, maximizes distributions to unsecured creditors and is in the best interest of the Debtors' estates.

---

[44] *See also In re Gyro-Trac (USA), Inc.*, 441 B.R. 470, 488 (Bankr. D.S.C. 2010) (approving consolidation and noting that "[c]reditors will not be harmed by substantive consolidation; in fact, creditors will likely benefit. Substantive consolidation will not affect distributions to creditors but will actually facilitate implementation of Debtor's Plan and will allow creditors to be paid more efficiently."); *In re Celebrity Resorts, LLC*, No. 10-3550, 2010 WL 5392657 at *7 (Bankr. M.D. Fla. Dec. 28, 2010) (substantive consolidation appropriate where "there is no evidence of harm caused by substantive consolidation and ample evidence of benefit related to such consolidation"); *In re F.A. Potts & Co.*, 23 B.R. 569, 574 (Bankr. E.D. Pa. 1982) (approving substantive consolidation where there was no evidence that it would harm the interests of objecting creditors or "any other creditor, person, or entity involved in this case").

h.    **The Intercompany Balances Settlement**

A key component of the Global Settlement is that each Debtor, with the support of the Creditors' Committee and the Consenting Claimants, has agreed to waive the Intercompany Balances.    Under the Plan, Intercompany Balances, as well as any subrogation claims and fraudulent conveyance claims related to the Debtors' forgiveness of more than $16 billion of intercompany debt prior to the Petition Date, will be waived as part of the Global Settlement, and waived, cancelled, and discharged on the Effective Date.    As explained below, the Debtors have concluded that the waiver of Intercompany Balances in this manner is reasonable and in the best interests of the Debtors' estates.

As an initial matter, the Debtors determined, with the support of the Creditors' Committee, that the Intercompany Balances lack many of the indicia of true debt and enforceable claims.    This conclusion resulted from an extensive analysis of the Intercompany Balances that the Debtors conducted after filing their schedules of assets and liabilities and statements of financial affairs on June 30, 2012 [Dkt. Nos. 548 - 649].    This analysis considered whether the Intercompany Balances should be treated as Allowed Claims, subordinated to other Claims, subject to set-off, or recharacterized as equity contributions or dividends.[45]

Consistent with the case law on the enforceability of intercompany claims,[46] the Debtors' analysis focused on the intent associated with each balance, including but not limited to consideration of the following factors: (i) the names given to the instruments, if any, evidencing the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a rate of interest and interest payments; (iv) the source of

---

[45] For a thorough discussion the facts underlying, and the infirmities of, the Intercompany Balances, the Plan Proponents respectfully refer the Court to the Westman Direct, Gutzeit Direct, and Hamzehpour Direct.

[46] *See, e.g., Bayer Corp. v. Masotech, Inc. (In re AutoStyle Plastics, Inc.),* 269 F.3d 726 (6th Cir. 2001).

repayments of the purported indebtedness; (v) the adequacy or inadequacy of the capitalization

of the net receiver; (vi) the identity of interest between net receiver and the "lender"; (vii) the

security, if any, for the putative debt; (viii) the ability of the net receiver to obtain financing from

outside lenders; (ix) the extent to which the payments were subordinated to the claims of outside

creditors; (x) the extent to which the advances were used to acquire capital assets; and (xi) the

presence or absence of a sinking fund to provide repayments. The Debtors also reviewed

historical practices and other evidence as to whether there was any intent that Intercompany

Balances would be enforced or repaid.

As explained in the Disclosure Statement (p. 40-41), and as set forth in the

Westman Direct (¶ 34), the analysis revealed that substantially all Intercompany Balances (96%

in amount) stemmed from seven large Intercompany Balances, which were accumulated through

tens of thousands of separate transactions over a period of years.   While it appears these

transactions had been generally a result of the Debtors' shared cash management system, there is

little evidence to support the transactions other than numerical entries in the accounting records.

In particular, there is virtually no documentation to support the accounting entries, and in the few

instances where documentation exists, it often contemplated a "lending" relationship (A owes B)

that is the reverse of the existing balance (B owes A).

There was also little evidence reflecting repayment or other formal settlement of

the balances, and no indication that this was a consistent practice.   In nearly all instances, interest

on Intercompany Balances did not accrue, accrued but was not paid, or, in one instance, was paid

even though there was no memorialized interest rate.   Further, for each of the balances, the same

individuals, entities, or affiliates controlled both the "lender" and the net receiver upon the

commencement of the "lending" relationship.   Lastly, certain of the balances stemmed from a

course of dealing whereby certain Debtors made payments under prepetition loan agreements for the benefit of other Debtors.  A summary of the Debtors' analysis of the top seven Intercompany Balances was attached as Exhibit 6 to the Disclosure Statement.

Approximately $16.6 billion of intercompany balances was forgiven without consideration from 2008 through the Petition Date.  On most occasions, the balances were forgiven because the existence of the intercompany payable on a Debtor's balance sheet threatened the solvency and net worth thresholds required under external funding agreements or by federal and state regulators.  Additionally, the balances were forgiven among the Debtors and certain non-Debtor subsidiaries in connection with the Debtors' international transactions and the dissolution of entities.  If this extensive pattern of prepetition debt forgiveness were to be reversed, certain of the instant Intercompany Balances would be offset. As a result, even if the Intercompany Balances reflected on the Debtors' ledger were accurate and enforceable debts, any attempt to enforce such claims would inevitably lead to ancillary litigation relating to, among other things, (i) potential avoidance of historical debt forgiveness, (ii) failure to charge Debtor entities with allocable expenses, and (iii) substantive consolidation.[47]

The Debtors shared their analysis and supporting materials with advisors for the Creditors' Committee, who independently reviewed it and performed their own follow-up due diligence on the Intercompany Balances.   After its own review, the Creditors' Committee concurred with the Debtors' view that the Intercompany Balances lack most of the indicia of true debt and enforceable claims and that any effort to enforce them would lead to significant litigation over prior debt forgiveness. (*See* Dubel Direct ¶ 76.)

---

[47] Indeed, prior to the Global Settlement, Wilmington Trust, on behalf of the Senior Unsecured Noteholders, was seeking standing to pursue certain Estate Causes of Action alleging that forgiveness of intercompany debt constituted constructive and actual fraudulent transfer.

The Plan Proponents and the Consenting Claimants determined that the uncertainty and costs associated with litigating the validity of the Intercompany Balances would have a substantial detrimental impact on all creditor recoveries. Beyond the threshold costs of reviewing, analyzing, and taking discovery with respect to tens of thousands of transactions, the ensuing litigation would be extremely time consuming and expensive. Fraudulent conveyance, substantive consolidation, recharacterization, and similar issues are highly complex and fact-intensive, requiring extensive discovery and expert testimony addressing solvency, valuation, contemporaneous exchange of value, arm's-length terms, accounting practices, allocation issues, and other issues. Absent consensual resolution, fully litigating these issues would cost the Debtors' estates tens of millions of dollars and substantially delay the ability to confirm any Chapter 11 plan.

In light of these concerns the Debtors, the Committee, and the Consenting Claimants agreed to waive the Intercompany Balances as part of the overall Global Settlement resolving a broad range of disputed intercreditor and interdebtor issues. The parties agreed that the Intercompany Balances would be waived and the prepetition debt forgiveness would not be revisited because, in the absence of the Global Settlement, the Intercompany Balances have little value, and potentially negative value after taking into account the costs and delay of litigating their enforceability.

Further, the parties determined that all constituents, including the Junior Secured Noteholders, would receive a higher recovery under the Global Settlement, with Intercompany Balances settled, than in the alternative scenario where the estates are plunged into extensive litigation over numerous intercreditor and interdebtor issues.

i.    The Division of the Ally Contribution and Administrative
Expenses among Debtor Groups

As discussed above, a key component of the Global Settlement is Ally's

contribution of $2.1 billion to the Debtors' estates to, among other things, settle estate claims and

third party causes of action against the Ally Released Parties.  However, without the settlement

of interdebtor, debtor-creditor and intercreditor issues, in accordance with the Global Settlement,

Ally would never have agreed to provide the Ally Contribution.  As part of determining that a

$2.1 billion contribution was sufficient to support the Debtor and Third Party Releases in the

Plan, the parties to the Plan Support Agreement agreed to distribute the Ally Contribution among

the Debtor Groups and claims trusts as follows:[48]

| Entity | Portion of Ally Contribution |
|---|---|
| ResCap Debtors | $782.74 million |
| GMACM Debtors | $462.32 million |
| RFC Debtors | $462.32 million |
| Private Securities Claims Trust | $235.00 million |
| Borrower Claims Trust | $57.62 million |
| NJ Carpenters Claims Distribution | $100.00 million |
| **TOTAL** | **$2.10 billion** |

The division of the Ally Contribution was the subject of significant, and often

contentious, negotiations and reflects consideration by the settling parties of a number of

variables, including (i) the assets available for unsecured creditors at each Debtor Group, (ii) the

Secured Claims and Unsecured Claims to be allowed against each Debtor, (iii) the treatment of

intercompany balances, (iv) the division of administrative expenses among the Debtor Groups

(as discussed below), and (v) the rights and Causes of Action that each Debtor Group and third

---

[48] The division of the Ally Contribution described herein does not reflect adjustments for reserves established through the Plan, including the Disputed Claims Reserve.

parties could pursue against Ally, as identified by the Debtors, the Creditors' Committee, and others through their investigations.

Because the Ally Contribution resolves both estate and third party claims against the Ally Released Parties, and because certain claims and causes of action against the Ally Released Parties may be asserted by more than one Debtor entity, it would be extremely difficult – if not impossible – to allocate the Ally Contribution to the Debtor Groups on account of specific causes of action.[49]  Redistributing the Ally Contribution on account of any number of variables would not only threaten the Global Settlement as a whole, but would also be time consuming, costly, and subject to challenge by all parties to the Global Settlement. Thus, the Plan Proponents believe that settling the distribution of the Ally Contribution through the Global Settlement was far superior to litigating these issues.

The Global Settlement also embodies a division of accrued and projected administrative expenses among the Debtor Groups – an issue subject to significant disagreement among the parties and heavily negotiated as part of the Global Settlement.  After a thorough analysis of the projected administrative costs to wind down the Debtors' estates (totaling approximately $1.086 billion), the parties also analyzed the operations of each Debtor Group and the historical means of allocating expenses among Debtors.

As part of the Global Settlement, the parties determined to divide the accrued and projected administrative costs as follows:  $836.3 million to the GMACM Debtors, $249.8 to the RFC Debtors, and no administrative costs attributed to ResCap.  Further, because the costs to wind down the Debtors' estates remain uncertain and the value of certain non-Cash assets held by the estates will vary as they are liquidated over time, the Plan provides that any increase or

---

[49] This Court recognized as much at the hearing for approval of the Disclosure Statement.  (Aug. 21, 2013 Hr'g Tr. at 109.)

decrease in administrative expenses and/or the value of all of the Debtors' estates from current projections would be shared among the ResCap Debtors, the GMACM Debtors, the RFC Debtors, and the Private Securities Claims Trust, pro rata. In the circumstances of these Chapter 11 Cases, the Plan Proponents and all parties to the Plan Support Agreement believe the agreed-upon apportionment of expenses embodied in the Plan is reasonable and appropriate.

Absent agreement over the proper division of administrative expenses among the Debtor Groups, the Debtors would be forced to wade through each and every administrative expense and determine to which Debtor such expense should be attributed. This task unquestionably would be arduous, costly, and the subject of substantial disputes among the parties. Moreover, because substantial expenses are shared among two or more Debtors, the Debtors would still need to make a determination as to how to divide such shared expense among Debtor entities. Settling the division of administrative expenses in the manner set forth above is fair, avoids unnecessary disputes, and facilitates the implementation of the Global Settlement for the benefit of all creditors.

### 5.    The Likelihood of Protracted Litigation

In addition to the legal risks associated with the claims settled through the Plan Settlements, it is without question that if the claims were not resolved under the Plan, the Debtors' estates would incur significant delay and expense engaging in what would certainly be lengthy and protracted litigation.

Most of the claims that are the subject of the Plan Settlements involve hotly disputed legal and factual questions that could take years to litigate, thereby delaying the implementation of a chapter 11 plan, increasing administrative expenses, and tying up significant assets that would otherwise be available for distribution to creditors.

Litigation of those claims would entail, among other things:  review of millions of pages of document discovery aimed at understanding and evaluating complex affiliate and third party transactions, some of which had their origins in agreements made a decade or longer ago; conducting hundreds of depositions of individuals involved in those transactions, many of whom have not worked for the Debtors, AFI, or AFI's non-debtor affiliates in years; retaining platoons of experts and resolving disputes over their credentials and methodologies; evaluating, in hindsight, business decisions made years ago by dozens of directors and officers operating under different market premises and regulatory realities than currently prevail; and reviewing the substance of millions of mortgage loan files, together with documentation of changes in custody of those loans during various stages of underwriting, origination, securitization, and sale.

The Court has already recognized that the claims resolved as part of the FGIC Settlement, which is only a small subset of the Monoline settlement (and an even smaller subset of all Plan Settlements) would result in "costly and protracted" litigation. *FGIC 9019 Opinion*, 497 B.R. at 750.  The Court recognized that "[t]he anticipated scope of discovery alone would likely involve tens of millions of pages of documents and hundreds of days of deposition testimony from current and former employees of the Debtors." *Id*. at 734.  For a thorough discussion of the significant burdens and expenses associated with litigating just the RMBS-related claims, the Plan Proponents respectfully refer the Court to paragraphs 5 and 63 through 90 of the Lipps Direct.  Were the Debtors required to litigate *all* of the claims resolved through the Plan Settlements, the costs and delay would expand dramatically.

Additionally, as the Court also recognized, the "[t]he Debtors have experienced tremendous attrition among their employees who worked on the securitizations at issue and this would hinder the Debtors' efforts to offer meaningful live testimony in support of the Debtors'

defenses." *FGIC 9019 Opinion*, 497 B.R. at 734. This factor could similarly complicate litigation of virtually all of the issues resolved through the Plan Settlements.

After eighteen months in bankruptcy, much of it devoted to investigations in which the estates and other parties invested hundreds of millions of dollars in legal fees and other costs evaluating a broad universe of potential claims, the Plan Settlements will provide the Debtors' estates with timely, decisive relief that resolves the most significant claims by and against the estates while generating $2.1 billion in cash that has permitted a settlement providing materially improved recoveries for all constituencies. On the other hand, litigating and defending such claims – many of which are highly speculative and difficult to value, and all of which would require massive resources to put before a trier of fact – would consume time, and diminish value, to an extent that cannot now be estimated. These are precisely the concerns echoed by Judge Gerber when approving the settlement of interdebtor issues in *Adelphia*. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 241-43 (Bankr. S.D.N.Y. 2007) (approving plan settlement of interdebtor issues where litigation would be "extremely complex and expensive to litigate"). For these reasons, this factor tips decidedly in favor of approving the Plan Settlements.

### 6.    The Nature and Breadth of Releases

The Plan contains various estate and third party releases that were integral parts of the Plan Settlements. As set forth in Section III below and as will be demonstrated at the Confirmation Hearing, those releases are appropriate and consistent with the Second Circuit's standards for approving those types of releases.

\*    \*    \*

For the foregoing reasons, the Plan Proponents submit that an analysis of the *Iridium* factors demonstrates that the Plan Settlements fall well within the range of reasonableness, are fair, equitable, and in the best interests of the estates, and should be approved by the Court.

## III.    THE PLAN'S RELEASE, EXCULPATION, INJUNCTION, AND JUDGMENT REDUCTION PROVISIONS SHOULD BE APPROVED

The Plan contains several release-related provisions negotiated as part of the Global Settlement and necessary to provide closure and protection for all participating parties:

- a release by the Debtors of the Debtor Released Parties (Plan, Art. IX.C) (the "Debtor Release");

- a release by holders of Claims and Interests of the Ally Released Parties (Plan, Art. IX.D) (the "Third Party Release");

- exculpation of the Exculpated Parties (Plan, Art. IX.G) (the "Exculpation");

- an injunction provision that implements the Debtor Release, the Third Party Release, the Exculpation, and the discharge provisions of the Plan (Plan, Art. IX.H) (the "Injunction"); and

- a judgment reduction provision for co-defendants in securities litigation matters whose potential claims for indemnification or contribution would be affected by the Third Party Release (Plan, Art. IX.K) (the "Judgment Reduction").

These provisions are essential components of the Global Settlement on which the entire Plan is premised. They are crucial items for both (i) Ally, which would not have agreed to provide $2.1 billion in plan funding absent the release of estate and third party claims, and (ii) the Consenting Claimants, which would not have agreed to compromise their claims absent a release from the Debtors. And none of these stakeholders (many of whom are fiduciaries) would have participated in the global negotiations or made the compromises that led to the Plan absent the protection of the Exculpation. The Plan's release and exculpation provisions are fair, reasonable, and supported by existing law.

- 112 -

A.      **The Releases are Appropriate and Should be Approved**

1.      **The Debtor Release**

The Debtor Release releases and discharges the Debtor Released Parties from all causes of action "arising from or related in any way to the Debtors." (Plan, Art. IX.C.) The Debtor Released Parties are (a) the Ally Released Parties, (b) the Creditors' Committee, (c) the Consenting Claimants, and (d) their respective successors and assigns, members, partners, non-Debtor affiliates, and Representatives.

The Debtors, of course, may settle or release their claims through a chapter 11 plan. Section 1123(b)(3)(A) of the Bankruptcy Code specifically provides that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289 (Bankr. S.D.N.Y. 2007) ("The Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own.").

Approval of the Debtor Release is governed by the same "best interests of the estate" standard that applies to settlements outside of a plan under Bankruptcy Rule 9019, discussed in detail above in Part II. *See generally In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395, 2007 WL 2779438, at *12 (Bankr. S.D.N.Y. Sept. 17, 2007) ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *In re Spiegel, Inc.*, No. 03-11540, 2005 WL 1278094, at *11 (Bankr. S.D.N.Y. May 25, 2005) (approving releases under section 1123(b)(3) and Bankruptcy Rule 9019(a)). The key inquiry is whether the settlement of estate claims is above the "lowest point in the range of reasonableness." *Adelphia*, 368 B.R. at 225; *see Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007).

The Debtor Release satisfies Bankruptcy Rule 9019's "best interests" test.  Quite simply, the Global Settlement would not exist without it, because none of the many parties who had to cooperate to make it happen – from Ally and its non-debtor affiliates to the Consenting Claimants to the Debtors' own officers and directors – would have made the necessary compromises without the basic assurance of a release from liability to the estates.  Absent the comprehensive Debtor Release, the settlements would unravel, the Plan would be rendered moot, and the cases would be plunged back into complex and protracted litigation.  Such a result would be universally detrimental.

Each element of the Debtor Release is fair, reasonable, and customary, and reflects a rational balancing of risks and benefits for the estates.  The release of Ally and its affiliates reflects a fair compromise of the Debtors' potential claims in return for Ally's contribution of $2.1 billion in plan funding.  This trade-off – the centerpiece of the entire Global Settlement – resulted from the highly contested mediation overseen by Judge Peck, which followed thorough discovery and investigation by the Creditors' Committee.  (Kruger Direct ¶¶ 8, 38.)  In addition to the $2.1 billion contribution, Ally also made substantial additional contributions to these cases, including, among other things, debtor-in-possession financing and cooperation that allowed the unprecedented continuation of the Debtors' origination and servicing business in chapter 11.  (Kruger Direct ¶¶ 43, 45; Carpenter Direct ¶¶ 13-16.)  As additional consideration, Ally will release all its claims against the Debtors under the Plan.  (Plan, Art. IX.E.)

These contributions are fair consideration for the Debtors' release of potential claims against Ally.  The Debtors initially investigated a number of potential claims against Ally and its affiliates, including claims for substantive consolidation, veil-piercing, alter ego,

fraudulent conveyance, subordination, breach of fiduciary duty, and indemnity and contribution. The Creditors' Committee followed with an independent investigation that included formal discovery and the review of millions of pages of documents.  That investigation culminated in presentations to Ally regarding claims against it and an adjourned motion by the Creditors' Committee, supported by the Debtors, for standing to pursue those claims on the estates' behalf. As a result, the Debtors and the Committee were both well-armed for the negotiations with Ally that occurred in the Mediation, and their support for the bargain that emerged is exhaustively informed.

Unsurprisingly, no party has challenged the Ally Contribution as inadequate. Prosecution of the estate claims would face many challenges and meet with determined opposition from Ally.  The likelihood of success on any of the claims was uncertain; the amount of damages that might be recovered highly speculative.  Weighing the strengths and weaknesses of the Debtors' potential claims, each of the Debtors, the Creditors' Committee, and the Consenting Claimants appropriately concluded that the Debtor Release "is fair, equitable and in the best interests" of the estates and their creditors.  (Kruger Direct ¶¶ 160-68, 186.)

The Debtor Release also avoids the prospect of enormous costs and complexities associated with the potential prosecution of those claims.  (Kruger Direct ¶ 7.)  And it eliminates the risk that Ally (which has provided a reciprocal release to the Debtors under the Plan) would assert claims against the Debtors, including claims for contractual indemnification, equitable indemnification, and contribution.  These potential claims would have imposed, at a minimum, substantial uncertainty that would take years to resolve, jeopardizing and delaying creditor recoveries and the resolution of these cases.  (*See* Kruger Direct ¶¶ 190.)  The Debtor Release benefits the estates by avoiding these risks and expenses.

- 115 -

The release in favor of the Consenting Claimants and members of the Creditors'

Committee similarly is a fair concession to induce those creditors to compromise their claims

against the Debtors and agree to the various intercreditor and interdebtor settlements embodied

in the Plan.  This aspect of the release also flows from the mediation before Judge Peck.  (*Id.*

¶ 179.)  These creditors played indispensable roles in the mediation process, the negotiation and

development of the Plan, and the Debtors' liquidation efforts.  (*Id.* ¶ 176.)  No party has raised

any objection to this component of the Plan.

The Debtors' release of these parties recognizes their significant contributions and

is fair in light of the lack of any material claims against them.  The Debtors have not identified

any significant prepetition claims against members of the Creditors' Committee or other

Consenting Claimants.  And their postpetition conduct has contributed significantly to the

success of the Debtors' efforts.  The Debtors reasonably concluded, therefore, that the release of

these claims "falls well within the range of reasonableness."  (Kruger Direct ¶ 193.)

Finally, the Debtor Release discharges all claims against the Debtors' current and

former directors, officers, employees, and advisors (in their capacities as such) "arising from or

related in any way to the Debtors" – a release that covers both pre- and postpetition activities on

behalf of the Debtors   (Plan, Art. IX.C; *see* Plan, Art. I.A.233; Kruger Direct ¶ 174.)   As

discussed in more detail below, the release in favor of these individuals is reasonable in light of

their agreement, under the Plan, to assign their insurance protection to Ally and forego their

rights to indemnification in return for inclusion in the Debtor Release and the Third Party

Release.[50]   Despite significant focus on potential claims against these individuals by the

---

[50] The Debtors' directors, officers, and employees are all insured persons under shared insurance policies obtained by Ally.  (Blumentritt Direct ¶¶ 7-15.)  As part of the Plan, they have agreed to forego any continuing insurance coverage under these policies.  (Plan, Art. IV.B.c.) (Debtors and their representatives "relinquish . . . all coverage that might otherwise belong to" them under the insurance policies); *see also* Kruger Direct ¶ 200; Hamzehpour

Examiner and the Creditors' Committee (*see* Dubel Direct ¶ 57), no one has ever suggested let alone demonstrated that the Debtors have any significant or valuable claims against their officers, directors, employees, or advisors.  And of course, pursuing such claims would lead to corresponding indemnification claims (including for defense costs), which are avoided by folding the officers, directors, and employees into the comprehensive release.  Trading the remote prospect of recovering on any claims against these individuals for their release of indemnification claims and contribution of insurance makes perfect sense for the estates and is a customary part of Debtor releases in consensual reorganization plans.[51]

The Debtor Release strikes a fair balance between the value of the Debtors' potential claims and the value conveyed to the Debtors' estates by the released parties. It falls within the range of reasonableness and is in the best interests of the Estate.  It should therefore be approved.

---

Direct ¶ 14.)   The Debtors' officers and directors are also the beneficiaries of several contractual indemnification provisions, including provisions in the ResCap LLC Agreement and in AFI's Articles of Incorporation.   (*See* Hamzehpour Direct ¶¶ 10, 13.)  They have agreed, as part of the Plan, not to assert any contractual indemnity claims against the Debtors for claims within the scope of the releases.  (Kruger Direct ¶¶ 200.)

[51] No party has objected to the Debtors' release of its directors, officers, employees, and advisors.  Courts in this district have routinely approved releases of this sort in parallel circumstances.  *See, e.g.*, *In re Gen. Maritime Corp.*, No. 11-15285 (Bankr. S.D.N.Y. May 7, 2012) [Dkt. No. 794] (releasing creditors' committee, plan support agreement parties, various lenders and noteholders and related trustees or agents, and subsidiaries, affiliates, members, officers, directors, professionals, and employees of each); *In re Almatis*, No. 10-12308 (Bankr. S.D.N.Y. Sept. 20, 2010) [Dkt. No. 444] (releasing directors, officers, employees, prepetition and postpetition lenders, committee members, and noteholders); *In re Uno Rest. Holdings Corp.*, No. 10-10209 (Bankr. S.D.N.Y. July 6, 2010) [Dkt. No. 559] (same); *In re Ion Media Networks, Inc.*, No. 09-13125 (Bankr. S.D.N.Y. Dec. 3, 2009) [Dkt. No. 453] (releasing directors, officers, and parties to global settlement, including creditors' committee and consenting first lien lenders); *In re DJK Residential LLC*, No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008) [Dkt. No. 497] (releasing directors, officers, employees, prepetition and postpetition lenders, and creditors' committee); *In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007) [Dkt. No. 7256] (releasing directors, officers, employees, prepetition and postpetition lenders, and statutory and ad hoc committees and members thereof in their capacities as such); *In re Tower Auto., Inc.*, Case No. 05-10578 (Bankr. S.D.N.Y. July 12, 2007) [Dkt. No. 2932] (releasing directors, officers, employees, lenders and related trustees or agents, committees, and committees' members and professionals).

## 2.    The Third-Party Releases

The Third Party Release provides that the holders of Claims and Equity Interests

will be deemed to release and discharge the Ally Released Parties from "any and all Causes of

Action . . . arising from or related in any way to the Debtors, including those in any way related

to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases of the

Plan."  (Plan, Art. IX.D.)  The "Ally Released Parties" include Ally and each of Ally's and the

Debtor's    respective    members,    shareholders,    partners,    non-Debtor    affiliates,    and

Representatives.[52]  The Third Party Release does *not* release certain claims against Ally held by

Freddie Mac and Fannie Mae.  Nor does it release claims against the Ally Released Parties held

by the United States and the DOJ/AG Settling States arising under the DOJ/AG Settlement,

preserved under the DOJ/AG Settlement, or claims against AFI held by the United States and the

State for liabilities, if any, under the Internal Revenue Code or based on, environmental, civil

fraud, or criminal laws.  (*Id*. at Art. IX.E.)

The    Second    Circuit    has    held    that    a    bankruptcy    court    may    enjoin    future

prosecution of claims against non-debtors in certain circumstances where the injunction "plays

an important part in the debtor's reorganization plan."  *SEC v. Drexel Burnham Lambert Grp.,*

*Inc.* (*In re Drexel Burnham Lambert Grp., Inc.*), 960 F.2d 285, 293 (2d Cir. 1992).  Two

considerations generally apply:  whether a bankruptcy court has subject matter jurisdiction over

the claims to be released, which turns on whether the claims might have "any conceivable effect"

on the bankruptcy estate;[53] and whether the release is "important" to the success of the chapter

---

[52]  "Representatives" includes an "entity's former and current officers, former and current directors, former and current principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals, each solely in its capacity as such."  (Plan, Art. I.A.211.)

[53]  *Quigley Co. v. Law Offices of Peter G. Angelos (In re Quigley Co.)*, 676 F.3d 45, 57 (2d Cir. 2012) ("[T]he touchstone for bankruptcy jurisdiction remains 'whether [a third party action] might have any 'conceivable effect' on the bankruptcy estate.'") (citations omitted), *cert. denied sub nom. Pfizer, Inc. v. Law Offices of Peter G.*

11 plan due to "unusual circumstances." *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141-43 (2d Cir. 2005). While the requisite circumstances are not defined by a fixed test of "factors and prongs," the Second Circuit has observed that third party releases have been approved where one or more of the following applied:

- the estate received substantial consideration;

- the enjoined claims were channeled to a settlement fund rather than extinguished;

- the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution;

- the plan otherwise provided for the full payment of the enjoined claims; or

- the affected creditors consented.

*See Metromedia*, 416 F.3d at 142-43.

Here, jurisdiction exists because the claims covered by the Third Party Release could affect the bankruptcy estate, if permitted to proceed, through indemnity and/or competing claims to insurance assets shared with the Debtors. The "unusual circumstances" test also is satisfied for two main reasons: First, the releases are overwhelmingly *consensual* – this is a comprehensive global settlement supported by virtually every creditor constituency and most individual creditors. As set forth in the Omnibus Response to Objections, only a handful of creditors have filed objections to the Third Party Release, and none has demonstrated the existence of any real claims against the Ally Released Parties that would be affected by the release, rendering irrelevant any consideration of channeling or paying any such claims if they

---

*Angelos*, 133 S. Ct. 2849 (2013); *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52, 66 (2d Cir. 2008) ("*Manville III*") ("[A] bankruptcy court only has jurisdiction to enjoin third party non-debtor claims that directly affect the *res* of the bankruptcy estate.").

did exist.  Second, the estates have received full and fair consideration for the releases that has

benefitted *all* creditors and would not be available absent the release.  It is that combination –

near unanimous support, and the need to provide closure for parties whose contributions made

possible such a global resolution – that makes this a unique situation warranting a third party

release.

### a.    The Court Has Subject Matter Jurisdiction Over the Third Party Claims

The Court has "related to" jurisdiction over the claims subject to the Third Party

Release on two grounds: (1) the Debtors' obligation to indemnify, provide contribution to, or

defend the Ally Released Parties from the released claims, and (2) the released claims' potential

impact on shared insurance policies that are property of the estates.

The "related to" jurisdiction provided by 28 U.S.C. § 1334(b) is broad.  *See City

of Ann Arbor Emps. Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*, 572 F. Supp. 2d 314, 317

(E.D.N.Y. 2008) ("The scope of 'related to' bankruptcy jurisdiction has been broadly interpreted

by the Second Circuit."); *Bond St. Assocs., Ltd. v. Ames Dep't Stores, Inc.*, 174 B.R. 28, 32-33

(S.D.N.Y. 1994) ("The legislative history makes it clear that section 1334(b), taken as a whole,

constitutes an extraordinarily broad grant of jurisdiction to the Article III District Court.").

In the Second Circuit, there is "related to" bankruptcy jurisdiction over any civil

action where the outcome "might have any 'conceivable effect'" on a bankruptcy estate.  *See

Quigley*, 676 F.3d at 57 ("The touchstone for bankruptcy jurisdiction remains 'whether [a third

party action] might have any 'conceivable effect' on the bankruptcy estate.'"); *In re Cuyahoga

Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992).  To have a "conceivable effect" on a bankruptcy

estate, "certainty, or even likelihood, is not required."  *Winstar Holdings, LLC v. Blackstone

Grp., L.P.*, No. 07-4634, 2007 WL 4323003, at *1 n.1 (S.D.N.Y. Dec. 10, 2007); *see also Johns-*

*Manville,* 517 F.3d at 66-67 (bankruptcy court has jurisdiction over claims that affect the *res* of

the estate); *In re Trinsum Grp., Inc.*, No. 08-12547, 2013 WL 1821592, at *5 (Bankr. S.D.N.Y.

April. 30, 2013) (discussing standard).

A third party claim has a "conceivable effect" if "the outcome could alter the

debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and

which in any way impacts upon the handling and administration of the bankruptcy estate." *In re*

*WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 317 (S.D.N.Y. 2003) (quoting *Celotex Corp v.*

*Edwards*, 514 U.S. 300, 308 n.6 (1995)).

A claim potentially affecting the estate is within the Court's jurisdiction

regardless of whether it is nominally "derivative" of an estate claim or a "direct" claim based on

the third party's own liability. *See Quigley*, 676 F.3d at 57 ("The *Manville III* panel thus quite

properly used the derivative/non-derivative inquiry as a means to assess whether the suits at issue

would affect the bankruptcy estate.  It did not impose a requirement that an action must both

directly affect the estate *and* be derivative of the debtor's rights and liabilities for bankruptcy

jurisdiction over the action to exist."); *accord In re Trinsum Grp.*, 2013 WL 1821592, at *5

(quoting *Quigley*).

### (i)    Jurisdiction Based on Indemnification and Contribution

"Related to" jurisdiction has been found to exist where a claim against a non-

debtor may give rise to an indemnification or contribution obligation by a debtor entity. *See,*

*e.g.*, *In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 29 (S.D.N.Y. 2011) ("[A] bankruptcy court

has 'related to' jurisdiction to enjoin non-debtor litigation if the bankruptcy estate may be

obligated to indemnify or contribute to the losing party."); *WorldCom*, 293 B.R. at 318-19

(collecting cases); *In re Amanat*, 338 B.R. 574, 579 (Bankr. S.D.N.Y. 2005) (jurisdiction over

third party actions may be based on implied indemnity or contribution claim); *In re River Center Holdings, LLC*, 288 B.R. 59, 63-65 (Bankr. S.D.N.Y. 2003) (jurisdiction existed because debtor was contractually obligated to indemnify guarantor who was third party defendant); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1143 (6th Cir. 1991) (indemnification provision supported jurisdiction even though debtor "would not be affected until and unless [the third party] invoked the indemnification").

Here, the Third Party Release mirrors the Debtors' potential indemnification and contribution obligations, supporting jurisdiction over the released claims. Ally filed over 100 proofs of claim against the Debtors, each including claims for various types of contribution or indemnification. For example, Ally filed proofs of claim that generally assert claims for indemnification or contribution for: (i) regulatory obligations and consent order obligations that Ally entities may incur as a result of the Debtors' business; (ii) compensation for costs arising out of RMBS-related lawsuits related to the Debtors' business; (iii) compensation for costs arising out of other lawsuits in which Ally or certain of its officers or directors are named as defendants; and (iv) any other amounts for loss that Ally or any of its non-debtor affiliates or subsidiaries suffer that is related to the Debtors or their businesses. (*See* Hamzehpour Direct ¶¶ 3, 8-12.)[54]

These claims are based on several sources. *First*, since at least 2005, Section 3(c) of ResCap's operating agreement has purported to obligate ResCap to indemnify AFI and its affiliates "to the fullest extent permitted by law" "against any losses related to ResCap" or that relate to or arise out of the "businesses and operations . . . of ResCap or its Subsidiaries." (*See*

---

[54] These claims satisfy the threshold requirement for indemnification claims to have affirmatively been asserted through a proof of claim. *See Allstate Ins. Co. v. Credit Suisse Secs. (USA)*, No. 11-2232, 2011 WL 4965150, *4 (S.D.N.Y. Oct. 19, 2011) ("The only way defendants' indemnification claims against the Bankrupt Originators can actually affect the allocation of property among the estates' creditors is if defendants have asserted their claims against the bankruptcy estates.").

Hamzehpour Direct ¶ 8.)   Thus, based on this longstanding and reciprocal arrangement, the

Debtors may be responsible for any liabilities attributable to their business line that are incurred

by its parents and affiliates (as well as the directors and officers of those entities, who were

themselves indemnified) – a broad, inclusive indemnification.

Second, certain non-debtor affiliates, including Ally Securities, may have

indemnification claims pursuant to the Underwriting Agreements that underlie the Debtors'

RMBS offerings.  (Hamzehphour Direct ¶ 11.) [55]   As another example, Ally Bank entered into a

number of custodial agreements with GMACM in connection with RMBS transactions that

purport to indemnify Ally Bank for "all claims and liabilities, including payment of the

Custodian's legal fees and expenses."  (Id.)

Third, indemnification obligations are owed to the Debtors' current and former

directors, officers, and employees, pursuant to typical provisions in ResCap's LLC agreement.

(Hamzehpour Direct ¶ 9.)   These individuals also have indemnity protections from Ally for

which Ally, if liable thereon, would likely seek reimbursement from the Debtors.  (Id.)   And

while directors, officers, and employees are not entitled to indemnification for willful

misconduct or bad faith, these indemnities include obligations to advance defense costs that

could apply even where the individual is eventually determined to have acted willfully or in bad

faith.  (Id. ¶ 12.)   The Second Circuit has recognized that a claim for defense costs alone can

create bankruptcy court jurisdiction over the relevant third party action.  See Quigley, 676 F.3d at

53 ("If the Angelos suits succeed – or even if they merely require Pfizer to incur defense costs in

---

[55] Specifically, the Debtors undertook to "indemnify and hold harmless" Ally Securities for "any and all losses, claims, damages, and liabilities" caused by any untrue statement, alleged untrue statement, omission, or alleged omission of material fact not attributable to the underwriter in the registration statement, prospectus, and other documentation relating the sale.  (Hamzehpour Direct ¶ 12.)  The securities claims asserted against Ally Securities in respect of RMBS fall precisely into that category.

litigating against them – the record is uncontradicted that Pfizer may submit a claim to be paid out of insurance that is this joint property.").

*Finally*, Ally's proofs of claim assert rights to equitable indemnification and contribution based on its potential liability in connection with litigation concerning the Debtors' RMBS. (Lipps Direct ¶¶ 8.) This provides an additional, independent basis for "related to" jurisdiction. *See, e.g., In re Amanat*, 338 B.R. at 579 (asserting jurisdiction over third party claims based on implied indemnity claims against debtor).

Together, the Debtors' various indemnification and contribution obligations make them broadly responsible for liabilities of Ally and related parties arising out of the Debtors' own business – a scope of liability that matches that of the Third Party Release. But the Debtors' indemnification of Ally is not limitless. Among other things, the Ally Released Parties are *not* entitled to indemnification for liabilities arising from their own business, rather than the Debtors' business. As a result, the Third Party Release merely releases the claims that might conceivably have an effect on the *res* of the estates – mirroring the requirement for subject matter jurisdiction and thus satisfying the threshold requirement for the release of third party claims through a bankruptcy plan.[56]

### (ii)     Jurisdiction based on shared insurance

Subject matter jurisdiction is also present due to shared insurance policies in which the Debtors and the Ally Released Parties have a competing interest. A debtor's insurance policies are estate assets. *See Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 152 (2d Cir. 2010) ("[T]he insurance policies that Travelers

---

[56] The Court has already recognized that these types of indemnification obligations could give rise to unsecured claims that would "increase the debtors' total liabilities and detract from the overall creditor recovery." (*In re Residential Capital, LLC*, No. 12-0167, Hr'g Tr. dated July 10, 2012 at 136:8-11.) That effect is more than enough to provide subject matter jurisdiction over the released claims.

issued to Manville are the estate's most valuable asset."). Where policy proceeds are available to

both a debtor and non-debtor, courts have held that "the proceeds will be property of the estate if

depletion of the proceeds would have an adverse effect on the estate to the extent the policy

actually protects the estate's other assets from diminution." *In re MF Global Holdings Ltd.*, 469

B.R. 177, 191 (Bankr. S.D.N.Y. 2012) (citations omitted). As the *Quigley* court made clear,

third party claims that could deplete wasting insurance coverage in which the estate has an

interest fall squarely within a bankruptcy court's jurisdiction. 676 F.3d at 58 ("[W]here litigation

of the Angelos suits against Pfizer would almost certainly result in the drawing down of

insurance policies that are part of the bankruptcy estate of Quigley, the exercise of bankruptcy

jurisdiction to enjoin these suits was appropriate."); *see also Hough v. Margulies (In re

Margulies)*, 476 B.R. 393, 400 (Bankr. S.D.N.Y. 2012) ("The bankruptcy court also has

jurisdiction over third-party non-debtor claims that affect the estate's rights in its insurance

policies.") (citing *Quigley*, 676 F.3d at 53).

     The current circumstances are fully consistent with *Quigley*. Ally has annually

obtained "errors and omissions" (or "E&O") insurance policies for the benefit of Ally, the

Debtors and other subsidiaries, and all employees, directors, and officers. (*See* Blumentritt

Direct ¶ 7.) These insureds are entitled to coverage for amounts they become obligated to pay

(including defense costs) based on an act or omission that is not subject to an exclusion. (*Id.*

¶ 11-12.) As in *Quigley*, the policy benefits are finite: each dollar paid on behalf of an Ally

Released Party will reduce the coverage available for the Debtors. (*Id.* ¶ 14-15.) And just like

*Quigley*, the conflicting interests in policy proceeds pose far more than a hypothetical concern.

(*Id.* ¶ 18-19 (listing litigation for which coverage has been sought under shared policies)).

Indeed, the Court has already found that extension of the automatic stay to enjoin third party

litigation was warranted to protect the Estates' interests in shared insurance.  (*See* July 10, 2012 Hr. Tr. at 125:19-21 (finding that "property of the debtors' estates, namely shared insurance policies, will be depleted if the Western & Southern action against Ally Securities is allowed to continue.").)

The claims covered by the Third Party Release substantially coincide with the insurance coverage the Debtors share with Ally.  The Third Party Release provides for the release of claims belonging to third parties as against the Ally Released Parties "arising from or related in any way to the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan." (Plan, Art. IX.D.)  Ally's insurance policies similarly cover any act, omission, or misstatement made in the conduct of the Debtors' business.  (Blumentritt Direct ¶¶ 11-12.)  The Third Party Release will thus eliminate the risk of additional claims against the Debtors' shared insurance policies.

Based on all of the foregoing – the sweeping potential indemnification obligations that mirror the language of the Third Party Release, the additional indemnities, and the ongoing competition with the Ally Released Parties for insurance proceeds – it is apparent that each claim covered by the Third Party Release would have at least a "conceivable impact" on the estates. As a result, the Court has jurisdiction over *all* claims covered by the Third Party Release.

### b.    The Third Party Release Satisfies the "Unique Circumstances" Test

The case for *exercising* the jurisdiction described above to approve the Third Party Release is similarly overwhelming, satisfying *Metromedia's* "unique circumstances" test. 416 F.3d at 141-43.  Most importantly, the releases are overwhelmingly *consensual*, because the Consenting Claimants and all creditors voting for the Plan affirmatively support it and only a handful of creditors even allege (but cannot establish) that they are negatively affected by it.

And the Third Party Release is an essential feature of the heavily negotiated bargain that forms the foundation of the Plan and the enhanced recoveries it provides, under which Ally has agreed to provide $2.1 billion in plan funding for the benefit of all creditors. The combination of a near-universal settlement; an undeniably crucial contribution from Ally; and the need to provide closure in connection with complex litigation intertwining claims against the Debtors and third parties is precisely the type of unique circumstances in which a third party release is appropriate.

(i)        **The Third Party Release is Overwhelmingly Consensual**

*Metromedia* affirmed that a creditor's consent is a valid basis for a third party release. 416 F.3d at 142 (citing *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993)). The Third Party Release is overwhelmingly consensual – affirmatively supported by all parties to the Global Settlement and by the vast majority of creditors, all of whom have voted to approve the Plan.

All of the Consenting Claimants agreed to the Third Party Release by signing on to the Plan Support Agreement. (*See* Plan Support Agreement § 4.2 [Dkt. No. 3814].) Since that time, all of the Private Securities Claimants – each of which has asserted claims against Ally – have agreed to their treatment under the Plan, including the Third Party Release. (*See* Disclosure Statement at 123.) And numerous creditors have provided their consent as part of individual or group settlements agreed to since solicitation of the Plan began. (*See* Kruger Direct ¶ 85-86 (regarding Ambac settlement); Lipps Direct ¶ 50-51 (regarding settlements with NCUAB and West Virginia Investment Management Board); Thompson Direct ¶ 25 (describing agreement in principle with Moore and the Rothstein plaintiffs.) Together, the creditors *expressly accepting* the release likely account for approximately 85% of all voting creditors.

Moreover, if a third party release is adequately disclosed, a vote in favor of the plan constitutes consent to the release. *See Adelphia*, 368 B.R. at 268 (applying consensual third

party release to creditors that voted to support plan); *In re Metaldyne Corp.*, No. 09-13412 (MG)

(Bankr. S.D.N.Y. Feb. 23, 2010) [Dkt. No. 1384] (same).

        Courts inferring consent have focused on the highlighting of a release provision in

the disclosure statement, ballot, and plan itself. *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 218-

19 (Bankr. S.D.N.Y. 2009) ("[A]dequate notice [of the third party release] is provided in this

case, as both the Plan and Disclosure Statement have the third party release provision set off in

bold font, and the ballots set forth in both capitalized and bold text the effect of consenting to the

Plan or abstaining without opting out of the release."), *aff'd*, No. 09-13061, 2010 WL 1223109

(S.D.N.Y. Mar. 24, 2010), *rev'd on other grounds*, 627 F.3d 496 (2d Cir. 2010).[57]

        Here, the Third Party Release was extensively disclosed, broadening the universe

of creditors who should be deemed to have consented to it. The following appears on the very

first page of the Disclosure Statement:

> **IF YOU ARE ENTITLED TO VOTE ON THE PLAN AND
> RECEIVE A BALLOT: (1) YOUR VOTE TO ACCEPT THE PLAN,
> OR (2) YOUR FAILURE TO TIMELY AND/OR PROPERLY
> SUBMIT A BALLOT, WILL BE DEEMED YOUR CONSENT TO
> THE THIRD PARTY RELEASE CONTAINED IN ARTICLE IX.D
> OF THE PLAN, THE EXCULPATION PROVISION CONTAINED
> IN ARTICLE IX.G OF THE PLAN, AND THE INJUNCTION
> PROVISION CONTAINED IN ARTICLE IX.H OF THE PLAN,
> EACH AS DESCRIBED IN FURTHER DETAIL IN ARTICLE V.X
> OF THIS DISCLOSURE STATEMENT.**

[Dkt. No. 4819-1]. Similarly, the ballots state the following in bold, capitalized font:

---

[57] Some courts have viewed even non-voting creditors to have consented to third party releases, where the releases were well-publicized (and, in some cases, where an opt-out mechanism was provided). *See, e.g., In re Movie Gallery, Inc.*, No. 10-30696, 2010 Bankr. LEXIS 5778, at *20-22 (Bankr. E.D. Va. Oct. 29, 2010) ("consensual" release approved for claimants that voted in favor of plan, abstained from voting, or otherwise consented); *DBSD*, 419 B.R. at 218-19. The Court need not reach this issue, however, because, as explained below, despite extensive publicity regarding the release, no parties have surfaced and successfully demonstrated that they have appreciable claims affected by the release. Thus, the Third Party Release can be enforced with respect to non-voting creditors whether or not they are deemed to have affirmatively "consented" to it.

**IF YOU: (1) VOTE TO ACCEPT THE PLAN, OR (2) FAIL TO
TIMELY AND/OR PROPERLY SUBMIT A BALLOT, YOU WILL
BE DEEMED TO HAVE CONSENTED TO THE THIRD PARTY
RELEASE CONTAINED IN ARTICLE IX.D OF THE PLAN, THE
EXCULPATION PROVISION CONTAINED IN ARTICLE IX.G OF
THE PLAN, AND THE INJUNCTION PROVISION CONTAINED
IN ARTICLE IX.H OF THE PLAN, EACH COPIED BELOW.**

(*See, e.g.*, General Ballot at 2 [Dkt. No. 4814, Ex. A-5].) The text of the Third Party Release was also included in each ballot. Finally, both the ballots and the Disclosure Statement included the following warning:

**REGARDLESS AS TO HOW OR WHETHER YOU VOTED ON THE
PLAN, IF THE PLAN IS CONFIRMED, THE RELEASE,
EXCULPATION AND INJUNCTION PROVISIONS CONTAINED IN
ARTICLE IX OF THE PLAN WILL BE BINDING UPON YOU. THUS,
YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN
CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED
THEREUNDER.**

(Disclosure Statement, Preamble; General Ballot at 2 [Dkt. No. 4814, Ex. A-5].)

The Plan itself highlights the Third Party Release in bold type. (Plan, Art. IX.D.) The solicitations and disclosure process, therefore, has featured all of the hallmarks of adequate disclosure, and the Court may regard all votes in favor of the Plan as consent to the Third Party Release. Furthermore, creditors were on notice that the only way to refute the inference of consent was to vote against the Plan. In response to this thorough notification, creditors overwhelming voted to support the Plan: 1,368 of 1,432 discrete creditors voting (95.5%) in favor (excluding insiders and ballots submitted by others ineligible to vote). In the circumstances, this constitutes remarkable consent to the Third Party Release.

In fact, only 64 creditors voted against the Plan (some with multiple claims), and none of them is known to hold actual third party claims that would be non-consensually released. These dissenting creditors fall into four categories:

*First,* while several securities underwriters that are co-defendants in RMBS litigation abstained, three such institutions voted against it. Co-defendant underwriters are understood to have claims against Ally for contractual indemnity or common law contribution, but those third party claims will be effectively paid through the Judgment Reduction, which deems the Third Party Release to be a "bar order" in the underlying litigations. As a result, the co-defendants will receive a judgment credit, determined in accordance with applicable law by the trial court or other court competent jurisdiction. This language was agreed to with a consortium of co-defendants, including two of the three the dissenters, through extensive negotiation. These votes against the Plan are therefore understood to relate solely to claims against the estates, not the Third Party Release. None of these highly sophisticated dissenting parties objected to the Plan, despite each having appeared in the case, providing credible evidence that they do not object to the Third Party Release.

*Second*, certain states voted against the Plan, but their objections to the Third Party Release have been resolved by modifying the carve-out for governmental claims. (*See* Omnibus Response, Annex A ¶ 3a.) The Tennessee Department of Revenue also voted against the Plan, but its de minimis tax claim will now be paid in full, and it is not understood to have any claim covered by the Third Party Release.

*Third*, just over two dozen Borrowers voted against the Plan, but the Plan Proponents believe that any potentially colorable claims that these creditors might have against the Ally Released Parties would be in the nature of derivative claims, like veil piercing and alter

ego, that are property of the estate – and thus deemed settled by the Debtor Release. *See, e.g.*, *Murray v. Miner*, 876 F. Supp. 512, 517 (S.D.N.Y. 1995) ("the trustee has sole standing to raise all alter ego claims of a general nature"); *aff'd* 74 F.3d 402 (2d Cir. 1996); *Duke Energy Trading & Mktg., L.L.C. v. Enron Corp.* (*In re Enron Corp.*), No. 01-16034, 2003 Bankr. LEXIS 330, at *11 (Bankr. S.D.N.Y. Apr. 17, 2003) ("the trustee or debtor-in-possession would have exclusive standing to maintain a Delaware corporation's alter ego claim of a general nature"); *In re Chemtura Corp.*, 439 B.R. 561, 612 (Bankr. S.D.N.Y. 2010) (bulk of claim "seemingly belong to the *Debtors*, and not individual creditors, and the *Debtors* indisputably could, and will, release any such claims"). Only one of the dissenting Borrowers, Wendy Alison Nora, filed an objection that made even passing reference to the Third Party Release. (*See* Omnibus Response, Section II.)

*Fourth*, around half a dozen miscellaneous creditors voted against the Plan, only two of which objected to the Third Party Release: (i) Impac Funding Corp. ("<u>Impac</u>") and (ii) Wachovia Bank and Wachovia Bank of Delaware, now succeeded by Wells Fargo Bank, N.A. ("<u>WFBNA</u>"). With respect to Impac, however, language has been included in the Proposed Confirmation Order (¶ 39(f)) to confirm that its rights in pending litigation with Ally are not hindered by the Third Party Release. (*See* Omnibus Response, Annex A ¶ 5(b).) And WFBNA has not – and cannot – identify any actual basis for claims against the Ally Released Parties that would be covered by the Third Party Release. (*See id.*, Section II.) The additional miscellaneous dissenters are not understood to hold claims subject the Third Party Release.

In summary, (i) 95.5% of creditors that returned a ballot directly indicated their consent to the Third Party Release; (ii) of the mere 64 creditors that voted against it, none is believed to hold cognizable claims against the Ally Released Parties that would be non-

consensually discharged by the Third Party Release; and (iii) only five creditors and the U.S.

Trustee have lodged unresolved objections to the Third Party Release.[58]   Based on the foregoing,

the Third Party Release should be considered overwhelmingly consensual.

**(ii)      The Third Party Release is Supported by Massive
Consideration Benefitting All Creditors**

Ally's contributions to the case provide a compelling justification for the Third

Party Release, particularly when coupled with the overwhelming creditor support discussed

above and the absence of any meaningful impact of the release on dissenting creditors.   Courts in

this District have repeatedly approved third party releases in favor of a non-debtor whose

contributions to the case were "important" to its success, as contemplated by *Metromedia*.   For

example, in *JPMorgan Chase Bank, N.A. v Charter Commc'ns Operating, LLC* (*In re Charter

Commc'ns, Inc.*), 419 B.R. 221 (Bankr. S.D.N.Y. 2009), the court approved a release where the

third party had contributed "substantial financial and non-financial consideration" that "no other

party could have done." *Id.* at 258-59.

Likewise, the court in *Cartalemi v. Karta Corp.* (*In re Karta Corp.*), 342 B.R. 45

(S.D.N.Y. 2006), approved a release where the third parties' operational support was necessary

for the debtors to "fund the Plan [and] comply with other Plan obligations." *Id.* at 54-55.   In

*Adelphia*, the court approved a third party release in favor of parties who bought the estates'

assets for $17.5 billion and "agreed to rework their agreements to take the Debtors' assets in a

section 363 sale, when creditor feuding made it impossible to confirm the reorganization plan

that the Buyers originally bargained for." 368 B.R. at 268.   And the court in *Rosenberg v. XO

Communications, Inc.* (*In re XO Communications, Inc.*), 330 B.R. 394 (Bankr. S.D.N.Y. 2005),

---

[58] UMB Bank, N.A. (and the Ad Hoc Committee of Junior Secured Noteholders) [Docket No. 5412] and (ii) Wells
Fargo Bank, N.A., as the senior collateral agent and junior collateral agent [Docket No. 5410] also objected to the
Third Party Release.  These objections are meritless for the reasons set forth in Section II of the Omnibus Reply.

granted a release to third parties whose "contributions will provide for certain distributions that would not have been made available but for these nondebtor parties' contributions." *Id.* at 438.

Ally's contributions here compares favorably to the contributions in *Charter*, *Karta*, *Adelphia*, and *XO*. Most obviously, the contribution of $2.1 billion in plan funding constitutes the vast majority of the $2.6 billion that is estimated to be available for distribution to unsecured creditors. (*See* Recovery Analysis [Dkt. No. 4819-3].) In other words, the unencumbered value available for distribution is *over four times greater* as a result of the Ally Contribution. No reported decision involving the proposed release of a non-debtor defendant (as opposed to a debtor's insurers) describes such a dramatic enhancement of creditor recoveries attributable to the non-debtor. Rather, the cases suggest that the bar for a third party release is far lower. *See, e.g., In re Metro. 885 Third Ave. Leasehold, LLC*, No. 10-16103, 2010 WL 6982778, at *11 (Bankr. S.D.N.Y. Dec. 22, 2010) (waiver of $160 million constituted "substantial consideration"); *XO Commc'ns*, 330 B.R. at 437-40 (release approved based on "certain distributions" that would not have occurred absent third party contributions).

But the $2.1 billion settlement with Ally is not merely an enormous amount of money with a dramatic effect on creditor recoveries. The exchange of $2.1 billion for the Third Party Release (and the Debtor Release) embodies the painstaking resolution of a direct conflict between the interests of Ally and all creditors generally. There can be no question that an acceptable settlement of that conflict would not have been possible absent the Third Party Release. (*See* Carpenter Direct ¶¶ 25-27) (explaining that comprehensive release was required because of regulatory issues, as well as Ally's reasonable need for closure); Kruger Direct ¶ 197 ("[W]ithout the Third Party Releases, the AFI Contribution could not have been obtained and

- 133 -

there would be no Global Settlement."); Dubel Direct ¶ 56 (explaining that Committee believed that Ally would not settle without third party release).)

It was only because a settlement with Ally was achievable – crucially, to the satisfaction of nearly every creditor constituency and their fiduciaries – that the creditors had a meaningful opportunity to negotiate and agree on a resolution of the various intercreditor and interdebtor issues, described in detail above, that would otherwise overwhelm these cases. (*See* Dubel Direct ¶ 30 (explaining that satisfactory resolution with Ally was precondition of further settlement among creditors).)

As a result, the $2.1 billion Ally Contribution and the Third Party Release truly are the *sine qua non* of not just the settlement with Ally, but also the Global Settlement, the Plan, and the successful resolution of these cases. This is not the situation that concerned the *Adelphia* court of plan funders "making a third party release a *sine qua non* of their deal, to establish a foundation for an argument that the injunction is essential to the reorganization." 368 B.R. at 269. To the contrary, the bargain with Ally resolved the single most important category of issues in these cases and, by dramatically increasing the resources available to distribute among creditors through the Plan, created the opportunity to resolve most remaining issues. Accordingly, this case provides a paradigmatic example of a third party release that is "*itself* important to the Plan," just as *Metromedia* contemplates. 416 F.3d at 143.

The contribution of $2.1 billion in plan funding, adequate in itself to constitute "substantial consideration" under *Metromedia*, is not the full extent of Ally's contribution. Ally also provided crucial support for the Debtors throughout these cases, offering benefits that no other party could have supplied. Most importantly, Ally cooperated with the Debtors to enable their operations to continue unabated following the Petition Date and to achieve the sale of their

key assets as a going concern, unlike other bankrupt mortgage companies that have death-spiraled to cheap liquidations. (*See* Marano Direct ¶¶ 4, 32-36.)  Ally permitted the Debtors to continue to originate and subservice loans that were sold to Ally Bank, which helped maintain the value of the Debtors' origination and servicing platform. (*Id.* ¶¶ 3, 20, 42.)  Ally provided a DIP loan when financing through the capital markets was not feasible, which allowed the Debtors to fund servicing advances.  (*Id.*)  And Ally was willing to serve as the stalking horse bidder for the Debtors' legacy loan portfolio.  (*Id.* ¶ 4)  These contributions provided significant incremental value to the Debtors' estates, putting the adequacy of the consideration provided for the Third Party Release beyond good faith dispute.

The individual officers and directors of Ally and its subsidiaries (including the Debtors' directors, officers, and employees) covered by the Third Party Release have also made two significant contributions that have contributed greatly to the Plan's success.  First, the Debtors' directors, officers, and employees are all insured persons under shared insurance policies obtained by Ally.  (Blumentritt Direct ¶¶ 7-12.)  These policies provide E&O and D&O coverage for the Debtors' directors, officers, and employees (as well those of Ally and its affiliates) from 2006 through the Effective Date.  (Plan, Art. I.A.270; *see also* Blumentritt Direct ¶¶ 7-12.)  They are "wasting policies," such that any payment to a director, officer, or employee for defense costs or liability would deplete the coverage available to other insured persons or entities.  (Blumentritt Direct ¶ 14.)

As part of the Plan, the Debtors' directors, officers, and employees have agreed to forego any continuing insurance coverage under these policies and to permit all policy benefits to inure to Ally's benefit.  (Plan, Art. IV.B.c.) (Debtors and their representatives "relinquish . . . all coverage that might otherwise belong to" them under the insurance policies); (*see also* Kruger

Direct ¶ 174; Hamzehpour Direct ¶ 14.)  This sacrifice led most directly to Ally's $150 million payment to the Debtors' estates "on account of such insurance."  (Plan, Art. I.A.18) (Ally commits to pay "the first $150,000,000 received by Ally for any directors and officers or errors and omissions insurance policy claims it pursues against its insurance carriers" no later than September 30, 2014.)  But, ultimately, the Debtors' directors', officers', and employees' consent and willingness to forego their own personal insurance coverage is inextricably linked to the entire $2.1 billion contribution amount.  (*See* Hamzehpour Direct ¶ 14.)

*Second*, the Debtors' officers and directors are the beneficiaries of several contractual indemnification provisions, including provisions in the ResCap LLC Agreement and in AFI's Articles of Incorporation.  (*See* Hamzehpour Direct ¶¶ 10, 13.)  These indemnification provisions entitle the Debtors' directors and officers to broad protection against claims asserted by the Debtors and third parties, and also require the advancement of defense costs in any such proceeding.  (*Id*.)  Consequently, any claim asserted against one or more of the Debtors' current or former officers or directors would have an immediate negative impact on the Debtors' estates – triggering defense costs and potential indemnification obligations.

The Debtors' officers, directors, and employees have agreed, as part of the Plan, not to assert any contractual indemnity claims against the Debtors or Ally for claims within the scope of the releases.  (Kruger Direct ¶¶ 173-74.)  Their willingness to forego their indemnification rights benefits the Debtors' estates by eliminating significant uncertainties and potential expenses.  This also provides Ally a benefit that underlies its willingness to contribute $2.1 billion in plan funding.

More fundamentally, it would not be equitable to ask the Debtors' directors, officers, and employees to give up their insurance protection and indemnity rights while, at the

same time, leaving them exposed to potential lawsuits arising out of the Debtors' business. These individuals cannot reasonably be asked to forego insurance and contractual indemnity protection unless they are given corresponding protection, in the form of releases, against claims that would be covered by that insurance or indemnification.

Such contributions are more than adequate to justify folding the officers, directors, and employees into this global resolution and avoiding the indemnity and contribution litigation that would surely flow from the prosecution of such third party claims.  *See In re Mercedes Homes, Inc*., 431 B.R. 869, 878-84 (Bankr. S.D. Fla. 2009) (third party releases approved for directors and officers based on identity of interest from indemnity obligations and substantial contribution by individuals through waiver of claims); *cf. In re Finlay Enters., Inc.*, No. 09-14873, 2010 WL 6580628, at *9-10 (Bankr. S.D.N.Y. June 29, 2010) (approving third party release in favor of "Debtors' directors, officers, and employees [who] made significant personal sacrifices of time and effort by personally participating in the chapter 11 plan and auction process while simultaneously managing the Debtors' businesses").   Moreover, in recognition of its own potential indemnification obligations to its directors and officers, Ally is paying the full $2.1 billion on behalf of all released parties.  (Kruger Direct ¶¶ 4, 174, 202-05.). *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns, Inc.)*, 419 B.R. 221, 258-59 (Bankr. S.D.N.Y. 2009) (approving third party release of directors and officers, over objections, based on contributions from Paul Allen).

### (iii)    The Third Party Releases Are Consistent With the Other *Metromedia* Factors

The other *Metromedia* factors, to the extent relevant, also favor approval of the Third Party Release.  First, there is no need for "channeling" of claims to a trust because substantially all released claims are being settled and paid.  Ally's contributions indisputably

resulted in enhanced recoveries for every single creditor constituency, and, as noted, virtually all creditors besides the Junior Secured Noteholders have agreed to the Third Party Release by signing the Plan Support Agreement, entering into subsequent settlements, or voting for the Plan. The Plan mechanisms established to distribute these enhanced recoveries to each creditor constituency are thus, in effect, paying consenting creditors a liquidated amount on account of both their claims against the Debtors and the largely duplicative and parallel ones they may have against the Ally Released Parties.

For example, the Plan provides for the Private Securities Claims Trust to be established for the benefit of the holders of Allowed Private Securities Claims, all of which, by definition, hold alleged claims against Ally that would be subject to the Third Party Release. (*See* Plan, Art. IV.E.)  In addition, the Borrower Claims Trust will be established for the benefit of the holders of Allowed Borrower Claims.  (*Id*. at Art. IV.F.)  Finally, all other claimants that hold or are awarded an allowed claim will receive interests in the Liquidating Trust, and all unwrapped securitization trusts will receive settlement funds for ratable distribution to RMBS holders, regardless of whether they filed a proof of claim.  Accordingly, with respect to the overwhelming majority of creditors, the third party claims have been *settled* and thus effectively *paid* through the agreed Plan treatment for each class of claims (a single payment in return for both estate and third party releases).

Moreover, as discussed more fully below, co-defendants with indemnity or contribution claims against Ally or its affiliates in securities cases are protected by a judgment reduction provision.  (Plan, Art. IX.K.)  As a result, while these claimants will have their claims against Ally nominally released, they will receive "a judgment credit in the underlying litigation" as compensation for their released claims.  (*Id*.)  Thus, the *Metromedia* factors dealing with the

payment of extinguished third party claims and the potential channeling of released claims to a trust are irrelevant here.

Only a handful of creditors have objected to and attempted to show that they are negatively affected by the Third Party Release. As demonstrated in detail in the Omnibus Response to Objections, the even smaller handful of these objections that have not yet been resolved concern claims that are speculative, remote, frivolous, or so vaguely characterized as to make clear that the objection is tactically motivated and does not reflect a well-founded concern that claims of any value or importance will actually be affected by the Third Party Release. In addition, while no unasserted claims covered by the Third Party Release are known to exist, there are numerous reasons to conclude that such claims, if they ever emerged, would be immaterial. (*See* Lipps Direct at ¶¶ 10, 52.) (explaining, among other things, that Debtors' RMBS issuance stopped by 2007, outside of nearly all applicable statutes of limitation).

Courts have cited the absence of non-speculative claims allegedly affected by a release and the tactical nature of objections as additional factors supporting approval of releases otherwise justified by the circumstances of a particular case. *See In re Metro. 885 Third Ave. Leasehold LLC*, No. 10-16103, 2010 WL 6982778, at *11 (Bankr. S.D.N.Y. Dec. 22, 2010) (noting that "there are no pending claims or causes of action against the released non-debtor parties"); *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd. (In re Ion Media Networks, Inc.)*, 419 B.R. 585, 601-02 (Bankr. S.D.N.Y. 2009) (permitting releases of hypothetical claims where unusual circumstances were present and only objector was "potential spoiler" seeking to "gain leverage").

Finally, with respect to the final *Metromedia* factor, which simply cross-references the jurisdictional inquiry, the released claims here would have substantial and

extensive effects on the estates, including through claims for indemnity or contribution, as described above.

\*    \*    \*

The importance of the Third Party Release to a successful outcome in these cases should be no surprise given the perhaps unprecedented scope and variety of third party claims that are closely intertwined with estate claims and would threaten to affect the *res* of the estates if separately litigated. The categories of third party claims (securities law claims, monoline claims, contract-based RMBS claims, borrower claims, financial creditor claims, etc.) are remarkably diverse. The nebulous intersection of direct third party claims, derivative third party claims, and claims of the estate make the Bankruptcy Court the indispensable forum for a comprehensive resolution – and make understandable the desire of all parties contributing to the resolution of the cases to receive closure for any potential liability stemming from the Debtors' businesses. These circumstances, therefore, are "unusual" even when compared to other cases in which third party releases have been approved. The Third Party Release is not just important to these cases – it is indispensable, and should be approved in connection with Plan confirmation.

### B.    The Plan's Exculpation Should Be Approved

The Plan provides for the exculpation of negligence-based claims arising in connection with the negotiation and documentation of the Plan, the Plan Support Agreement, the Disclosure Statement, the FGIC Settlement Agreement, the RMBS Settlement, and other documents created or entered into in connection with the Plan. (*See* Plan, Art. IX.G.)[59] The

---

[59] The Exculpation states:

> The Exculpated Parties shall neither have, nor incur, any liability to any entity for any pre-petition or postpetition act or omission taken in connection with, or related to, formulating, negotiating, preparing, disseminating, soliciting, implementing, administering, confirming, or effecting the consummation of any prepetition plan support agreements, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, the Kessler Settlement Agreement, the

- 140 -

Exculpation also extends to claims that may be asserted regarding the prepetition plan support agreements and the prepetition Original RMBS Settlement Agreements. (*Id.*) The Exculpation does not bar any claims arising from gross negligence or willful misconduct. (*Id.*)

The "Exculpated Parties" are the Debtors, the Consenting Claimants,[60] Ally, the Creditors' Committee (and its members), and each of their respective successors and assigns, members, affiliates, subsidiaries, officers, directors, partners, principals, employees, and Representatives. (Plan, Art. I.A.97.)[61]

The Exculpation was necessary to induce the Exculpated Parties to cooperate, fully and unreservedly, with the Debtors' reorganization efforts. It enabled the full and frank expression of views and positions and proved essential to the success of plan negotiations and the mediation held before Judge Peck – averting litigation meltdown and substantially improving the outcome of the cases for all stakeholders, including the hypothetical litigants who might

---

RMBS Settlement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, provided, that the foregoing provisions of this Exculpation shall have no effect on the liability of any entity that results from any such act that is determined in a final, non-appealable order to have constituted gross negligence or willful misconduct; provided, further, that the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors concerning his, her, or its duties pursuant to, or in connection with, any prepetition plan support agreement, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, and the RMBS Settlement.

*See* Plan at Art.IX.G.

[60] The "Consenting Claimants" are: "AIG, Allstate, FGIC, the Kessler Class Claimants, MassMutual, MBIA, Prudential, the RMBS Trustees, the Steering Committee Consenting Claimants, the Talcott Franklin Consenting Claimants, the Supporting Senior Unsecured Noteholders, Wilmington Trust, Paulson, and any other parties (other than Ally) that agree to be bound by the terms of the Plan Support Agreement." (Plan, Art. I.A.62.)

[61] "Representatives" means: "a person's or entity's former and current officers, former and current directors, former and current principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals, each solely in its capacity as such; provided, that in the case of Ally and the Debtors, "Representatives" shall not include an underwriter that is unaffiliated with Ally or the Debtors against which an Investor has a pending or tolled Cause of Action. For the avoidance of doubt, Lewis Kruger shall be deemed to be a Representative of the Debtors." (Plan, Art.I.A.238.)

otherwise harass the Exculpated Parties with frivolous claims.  As set forth below, the

Exculpation meets the standards for exculpation in the Second Circuit and should be approved.[62]

> **1.     The Exculpation Is Part of a Plan Made in Good Faith, Was Necessary for Plan Negotiations, and Is Integral to the Plan's Success.**

In hard-fought chapter 11 negotiations, "stakeholders all too often blame others

for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish

to second guess the decision-makers in the chapter 11 case." *In re DBSD N. Am., Inc.*, 419 B.R.

179, 217 (Bankr. S.D.N.Y. 2009), *aff'd*, *In re DBSD N. Am., Inc.*, No. 09-10156, 2010 WL

1223109 (S.D.N.Y. May 24, 2010), *aff'd in part, rev'd in part*, 634 F.3d 79 (2d Cir. 2011).

Exculpations are the recognized solution to this problem.  They protect persons

and entities that make substantial contributions to a debtor's reorganization from negligence-

based claims related to their participation in a debtor's reorganization process.  *See, e.g.*, *In re*

*Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007) (facts supported

exculpation for parties with indemnity right or that substantially contributed); *In re Chemtura*

*Corp.*, 439 B.R. 561, 610-11 (Bankr. S.D.N.Y. 2010) (exculpation appropriate where important

to a debtor's plan or where released party provided substantial contribution, among other

circumstances).

---

[62] The U.S. Trustee argues that this Court lacks subject matter jurisdiction to approve the Exculpation, but the Court's "related to" jurisdiction is sufficiently broad to cover this provision.  *See* 28 U.S.C. § 1334.  This same argument was rejected by the Court in *In re MF Global Holdings Ltd. See* Transcript of Oral Argument at 61:6-24, *In re MF Global Holdings, Ltd.,* , No. 11-15059 (Feb. 14, 2013) [Dkt. No. 1118] ("First, you argued that the Court doesn't have subject matter jurisdiction to issue, approve exculpation.  You cited no cases in support.  Just so we're clear, exculpation is a form of release, but in the common jargon, third party non-debtor releases usually apply to prepetition claims and exculpation is usually a term that's applied to the release that's given to certain participants in the administration of the case relating specifically to acts, events or occurrences in connection with preparation, negotiation, etc., the administration of the case.  Why doesn't 1334(a) or (b) provide subject matter jurisdiction to the Court to approve any injunction or exculpation with respect to the case itself, the acts in the case.  I understand, you know, very clearly what in the Second Circuit, the [*Manville*] decisions say with respect to subject matter jurisdiction, but that's very different than exculpation. If you use my terminology, third party non-debtor releases versus exculpation, there is jurisdiction.").

Exculpations have the practical effect of raising the *standard* of liability, in any future litigation arising out of exculpated matters, to gross negligence or willful misconduct. *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (exculpation "does not affect the liability of these [exculpated] parties, but rather states the standard of liability under the Code"). In this sense, exculpations are different from estate or third party releases, as they do not excuse plan participants from liability, but simply alter the applicable standard under which it is assessed.

Courts in this Circuit evaluate an exculpation provision using several factors, including whether the plan was proposed in good faith, the exculpation is integral to the plan, and the exculpation was necessary for plan negotiations. *See, e.g.*, *In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395, 2007 WL 2779438, at *8, 12 (Bankr. S.D.N.Y. Sept. 17, 2007) (exculpation necessary to successful reorganization and integral to plan); *Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 500-01, 503-04 (S.D.N.Y. 2005) (exculpation necessary to effectuate plan; rejecting exculpation would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition"); *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (exculpation was "an essential element of the Plan formulation process and negotiations").[63]

The Exculpation Provision is a key component of the Plan, as the protection it affords was essential to the promotion of good faith plan negotiations that might not otherwise have occurred had the negotiating parties faced the risk of future collateral attacks from other

---

[63] Some courts have evaluated exculpation using *Metromedia's* third party release standards. *See, e.g.*, *DBSD*, 419 B.R. at 217-19; *Adelphia*, 368 B.R. at 263-69.  Most courts, however, regularly adopt the less stringent multifactor approach described above.

parties.  *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992) (protection against legal exposure may be key to settlement negotiations involving complex issues and multiple parties); *Enron Corp.*, 326 B.R. at 503 (exculpation necessary to encourage parties to participate in plan negotiation process; lack of exculpation would chill parties' willingness to participate).

Perhaps no chapter 11 negotiations have needed the inducement of exculpation more than these did.  By the time the Debtors filed for bankruptcy, they were embroiled in dozens of litigation matters involving hundreds of billions of dollars in potential exposure. Numerous groups of creditors had staked out contradictory and conflicting litigation positions. The situation seemed ready to devolve into protracted and unending litigation.  (*See* Kruger Decl. ¶¶ 178-80.).  The parties needed to be able to negotiate without fear that their cooperation, or even participation, might expose them to more litigation.

Plan negotiations began long before the Debtors filed their petitions, and continued for more than a year after the petitions were filed.  The degree to which these lengthy negotiations were hard-fought is already established, as is the evidence that the Plan that ultimately resulted was arrived at in good faith – both compelling grounds for exculpation.  *See In re Yellowstone Mountain Club, LLC*, 460 B.R. 254, 277 (Bankr. D. Mont. 2011) (approving, over objections, exculpation that was "temporal in nature and cover[ed] those parties who were closely involved with drafting" settlement term sheet that become "cornerstone" of plan; noting that absent settlement, it conversion to chapter 7 was "very likely").

The expectation of the Exculpation enabled the Debtors to induce various creditor groups, both pre- and postpetition, to engage in settlement negotiations, discuss plan support agreements, and otherwise work toward a successful reorganization, without fear of reprisal.

Having worked with the Debtors in good faith, and having made substantial contributions to the

Debtors' reorganization efforts, these parties should be protected from inappropriate litigation

arising from their actions in the negotiation, drafting, and implementation of the Plan, Plan

Support Agreement, and related settlements and agreements.  (Marano Direct ¶¶ 70-74; Kruger

Direct ¶¶ 169-72.)  Allegations of negligence would be especially inappropriate here, where the

efforts of the Exculpated Parties so clearly averted chaotic and prolonged litigation and

dramatically improved the outcome for all stakeholders.  Potential litigants – who will retain all

rights with respect to gross negligence and willful misconduct – should not be able to reap the

benefits made possible by the Exculpated Parties and also allege that they were negligently

achieved.

> **2.      The Exculpation Properly Extends to Parties Who Are Not Estate Fiduciaries**

The Exculpation largely protects estate fiduciaries – the Debtors, the Debtors'

officers and directors, the Creditors' Committee, etc.  The Exculpation also applies to certain

non-estate fiduciaries, including Ally, the Consenting Claimants, and their respective officers,

directors, and Representatives.  (Plan, Art. IX.G.)  Exculpation for these non-fiduciaries is

limited to claims arising from their participation in negotiating or implementing prepetition plan

support agreements or settlements and postpetition involvement in the negotiation and

implementation of the Plan, the Plan Support Agreement, various settlements with creditors, and

other related activities.  The non-fiduciaries will not obtain exculpation for gross negligence or

willful misconduct.

Non-fiduciaries, of course, may provide substantial contributions to a debtor's

reorganization plan, just like estate fiduciaries, and non-fiduciaries face the same risks of

retaliation and collateral litigation as estate fiduciaries.  For these reasons, non-fiduciaries may

properly be exculpated for conduct relating directly to a debtor's reorganization efforts. *See, e.g.*, *In re Almatis, B.V.*, No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010) [Dkt. No. 444] (approving exculpation of debtors' prepetition lenders and holders of senior secured notes for both pre- and postpetition conduct);[64] *In re Uno Rest. Holdings Corp.*, No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010) [Dkt. No. 559] (exculpation of certain prepetition lenders from liability related to acts taken, among other things, "in connection with the Chapter 11 Cases and the process of creating, administering, and distributing property under the plan);[65] *Adelphia*, 368 B.R. at 265-67 (exculpation of debtors' management and board of directors, non-objecting indenture trustees, buyers, and statutory committees); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (exculpation of controlling shareholder as well as estate fiduciaries); *Bally Total Fitness*, 2007 WL 2779438, at *8 (exculpation of prepetition noteholders and new investors); *Enron*, 326 B.R. at 503-04 (exculpation of "the Creditors' Committee, the Employee Committee, the [Enron North America] Examiner . . . , the Indenture Trustees" and their directors, officers, attorneys and other professionals").

Certain cases outside the Second Circuit, as noted by the Court,[66] have concluded that exculpation should not be provided for non-fiduciaries. The Second Circuit has not weighed in on the issue. *See* Aug. 21 Hr'g Tr. 47:13-14; 48:1-3. Two of these non-controlling cases – *In re Quincy Medical Center, Inc.*, No. 11-16394, 2011 WL 5592907 (Bankr. D. Mass. Nov. 16, 2011), and *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) – are actually

---

[64] There were no objections to the exculpation in Almatis, though the court raised the issue of whether it could approve exculpation for non-estate fiduciaries at the confirmation hearing without resolution.

[65] The pleadings filed in connection with confirmation do not reflect objections to the exculpation in *Uno*.

[66] (*See* Aug. 21 Hr'g Tr. 94:2-96:12.)

- 146 -

consistent with the relief sought by the Plan Proponents or do not reach the issue.[67]   The other

two – *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) and *In re Pacific

Lumber Co.*, 584 F.3d 229 (5th Cir. 2009) – involved facts and procedural circumstances very

different from those presented here.[68]   These cases pose no obstacle to approval of this Plan's

Exculpation.

    Here, the non-fiduciaries' contributions were no less substantial than those

provided by the Debtors, their officers and directors, and the Creditors' Committee.   Indeed,

without the substantial efforts of Ally, the institutional RMBS investors, the various monoline

insurers, and many other Consenting Claimants, plan negotiations would have gone nowhere.

These non-fiduciaries are every bit as deserving of exculpation based on their substantial

contributions to the Debtors' reorganization efforts.   They worked tirelessly to resolve difficult

and factually intensive issues that would have stopped the reorganization dead in its tracks.   The

successful resolution of this matter would not have been possible without the significant

involvement of the non-estate fiduciaries.

---

[67] *Quincy*: The *holding* in *Quincy* is actually consistent with the relief sought by the Plan Proponents.   There, the court overruled the U.S. Trustee's objection to exculpation of the prepetition indenture trustee as well as the prepetition bondholders, noting that the provision was "reasonable and appropriate" with respect to the non-estate fiduciaries because of the consideration they provided to the estate.   *Quincy*, 2011 WL 5592907, at *3.

*Coram*: The *Coram* court was not asked to decide the appropriateness of exculpation, but was instead examining "third party releases . . . [and not] provisions exculpating professionals for actions taken during the chapter 11 case."   *Coram*, 315 B.R. at 336.

[68] *Washington Mutual*: Judge Walrath's decision in *Washington Mutual* was largely based upon, and therefore constrained by, binding Third Circuit precedent relating to third party releases set forth in *In re PWS Holding Corp.*, 228 F.3d 224 (2000).   The Second Circuit, however, takes a more pragmatic approach to third party non-debtor releases.   *Compare In re Cont'l Airlines*, 203 F.3d 203, 214 (3d Cir. 2000), *with SEC v. Drexel Burnham Lambert Grp.*, 960 F.2d 285, 293 (2d Cir. 1992).   Thus, this Court and others in this District are not subject to the same constraints imposed upon Judge Walrath by binding Third Circuit precedent.

*Pacific Lumber*: *Pacific Lumber* is factually distinguishable. The court there denied extension of the exculpation to two prepetition lenders because, among other reasons, "[a]ny costs the released parties might incur defending against suits alleging . . . negligence [were] unlikely to swamp either these parties or the consummated reorganization."   584 F.3d at 252.   Here, however, there is no basis to dismiss the risk that the Exculpated Parties will be subject to actions on account of their pre- and postpetition conduct, and such actions could have the effect of derailing implementation of the Plan.

3.    **The Exculpation Properly Extends to Claims Arising from Certain Prepetition Conduct**

The Exculpation extends to negligence-based claims arising from prepetition acts relating to "formulating, negotiating, preparing, disseminating, soliciting, implementing, administering, confirming, or effecting the consummation of" the prepetition plan support agreements and the Original RMBS Settlement Agreements.  These prepetition activities, which related directly to Debtors' reorganization efforts, are properly included within the Exculpation.

Courts have regularly approved exculpation of negligence-based liability for prepetition conduct when that conduct related to plan negotiations, plan support agreements, and the formulation of a restructuring strategy.[69]  *See, e.g.*, Order Confirming Second Amended Joint Plan of Reorganization, *In re Gen. Mar. Corp.*, No. 11-15285 (Bankr. S.D.N.Y. May 7, 2012) [Dkt. No. 794] (exculpation approved for "any act or omission that occurred during and in connection with the Chapter 11 Cases or in connection with, or arising out of the preparation and filing of the Chapter 11 Cases, the Plan, the Disclosure Statement, the negotiation of the Plan")[70]; Debtors Third Amended Joint Plan, *In re Neff Corp.*, No. 10-12610 (Bankr. S.D.N.Y. Sept. 20, 2010) [Dkt. No. 443] (estate and non-estate fiduciaries "shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating . . . the Plan").[71]

---

[69] The phrases "participation in the *formulation of a plan*" and "determination as to *any plan formulated*," which are found in section 1103(c)(3), in no way limit the qualified immunity concept only to postpetition acts.  11 U.S.C. § 1103(c)(3) (emphasis added).

[70] There were no objections to the exculpation in *General Maritime*.  However the Court noted at the confirmation hearing that "[t]he scope of the exculpation clause is consistent with exculpation provisions approved in other cases in this district by me and other judges."  *See* Tr. of Confirmation Hr'g at 47:9-25, *In re Gen. Mar. Corp.*, No. 12-15285 (Bankr. S.D.N.Y. May 7, 2012).

[71] The Official Committee of Unsecured Creditors in the *Neff* chapter 11 cases filed an objection to the debtors' plan, including the release and exculpation provisions, but the objection was resolved without further litigation.

For example, in *In re Almatis, B.V.*, No. 10-12308 (Bankr. S.D.N.Y. Sept. 20, 2010), a Dutch aluminum products company negotiated with its creditors, before filing its bankruptcy petition, to develop a strategy to reduce its company's debt load.  After months of negotiations, Almatis executed a prepetition term sheet with its equity holders and the holders of its senior secured notes that formed the basis of the company's initial prepackaged plan of reorganization.  Notwithstanding these efforts, certain junior lenders challenged whether the term sheet and related plan support agreement were made in good faith and were in the best interests of the estate.  After several months of negotiations and fast-paced discovery, Almatis entered into a revised plan support agreement that included the junior lenders.  The revised agreement called for exculpation of Almatis's prepetition lenders and senior secured noteholders protecting them from (among other things) liability for "the preparation and filing of the Chapter 11 Cases, the formulation, negotiation, and/or pursuit of confirmation of the Plan."  The Court approved this exculpation.  Findings of Fact and Conclusions of Law, and Order, *In re Almatis, B.V.*, No. 10-12308 (Bankr. S.D.N.Y. Sept. 20, 2010) [Dkt. No. 444].

As another example, in *In re Oneida Ltd.*, 351 B.R. 79, 94 & n.22 (Bankr. S.D.N.Y. 2006), the court considered an exculpation provision covering a number of prepetition actors, including the debtors, their prepetition lenders, a prepetition agent, a DIP agent and all parties to a DIP financing agreement, and all their related directors, officers, employees, agents, and professional advisors.  The provision extended to any

> pre-petition or post-petition act or omission in connection with, or arising out of, the Disclosure Statement, the Plan or any Plan Document, including any Bankruptcy Court orders related thereto, the solicitation of votes for and the pursuit of Confirmation of this Plan, the Effective Date of this Plan, or the administration of this Plan or the property to be distributed under this Plan.

Debtors' First Amended Joint Prenegotiated Plan of Reorganization Under Chapter 11 of the
Bankruptcy Code, *In re Oneida Ltd.*, No. 06-10489 (Bankr. S.D.N.Y. July 7, 2006) [Dkt. No.
329]. The court approved the provision and rejected the argument that it was "too broad,"
explaining it "generally follows the text that has become standard in this district." *Oneida*, 351
B.R. at 94, 94 n.22 (citing *Enron*, 326 B.R. at 504).[72]

The Exculpation here tracks the provisions in *Almatis* and *Oneida*, in that liability
for prepetition negligent conduct is expunged to the extent it related directly to the Debtors'
restructuring efforts. Thus, the Exculpation bars liability for any prepetition "act or omission
taken in connection with, or related to, formulating, negotiating, preparing, disseminating,
soliciting, implementing, administering, confirming, or effecting the consummation of any
prepetition plan support agreements" (other than liability for gross negligence or willful
misconduct). (Plan, Art. IX.G.)

This provision makes sense in light of the Debtors' extensive prepetition planning
for bankruptcy – planning that was intended primarily to preserve the Debtors' operations as an
ongoing business enterprise to maximize value for creditors. Before the Petition Date, the
Debtors and their officers and directors negotiated agreements with Ally for a $750 million cash
payment, $200 million in DIP financing, continued support for the Debtors' loan origination and
servicing businesses, continued shared back office services, and a stalking horse bid for the

---

[72] *See also, e.g.*, Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Chapter 11
Plan of Reorganization, *In re Eastman Kodak Co.*, No. 12-10202 (Bankr. S.D.N.Y. Aug. 23, 2013) [Dkt. No. 4966]
(overruling U.S. Trustee objection to exculpation of both estate fiduciaries and non-fiduciaries from liability for
"any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any
way to, the Chapter 11 Cases"); Transcript of Hearing, *In re Eastman Kodak Co.*, No. 12-10202 (Bankr. S.D.N.Y.
Aug. 22, 2013) [Dkt. No. 5144]; Findings of Fact, Conclusions of Law and Order, *In re Charter Commc'ns, Inc.*,
No. 09-11435 (Bankr. S.D.N.Y. Nov. 17, 2009) [Dkt. No. 921] (approving exculpation of estate fiduciaries and non-
fiduciaries for "any pre-petition or postpetition act taken or omitted to be taken in connection with, or related to . . .
the restructuring of the Company").

Debtors' held-for-sale loan portfolio.  (Marano Direct ¶ 4.)  This is the same sort of conduct that routinely would receive postpetition exculpation.

The Debtors also reached agreements, prepetition, with their single largest creditor group – the institutional RMBS investors.  These agreements provided for a settlement of $44 billion of potential liability and a related plan support agreement.  (Marano Direct ¶ 43.) Again, this is just the sort of conduct that routinely would warrant exculpation if it occurred after a petition was filed.

These activities – even those superseded by the final Plan and Plan Support Agreement – eased the Debtors' transition into chapter 11 and avoided an immediate destruction of value that might have jeopardized the Debtors' asset sales and would have harmed all stakeholders.  As a practical matter, this prepetition conduct involved only a subset of the Exculpated Parties, most of which (such as the Debtors and Ally) are protected by other provisions of the Plan.  The few exceptions – certain institutional RMBS investors and their Representatives – should not face litigation for negligence-based claims solely because their good faith efforts to work with the Debtors occurred before, instead of after, the Debtors' petition filings.

The Exculpated Parties contributed greatly to the Debtors' efforts to preserve and maximize the value of the estates.  They also enabled the successful conclusion of the Plan and Plan Support Agreement.  They should not now be exposed to second-guessing and punitive collateral litigation.  The Exculpation appropriately protects these parties from negligence-based liability, is properly tailored to cover only conduct directly related to the Debtors' reorganization efforts, and falls within the parameters approved in other cases.  For these reasons, the Exculpation should be approved.

- 151 -

C.    **The Injunction Is Necessary and Customary**

The Injunction is narrowly tailored to enforce the Debtor Release, the Third Party

Release, and the Exculpation.  Such a provision is necessary to implement plan releases.  *See In

re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395, 2007 WL 2779438, at *8 (Bankr.

S.D.N.Y. Sept. 17, 2007) (exculpation, release, and injunction provisions appropriate because

they were fair and equitable, necessary to successful reorganization, and integral to the plan);

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960

F.2d 285, 292-93 (2d Cir. 1992) (court may approve release and injunction as important plan

feature); *Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 184 B.R. 648, 655 (S.D.N.Y. 1995)

("[C]ourts may issue injunctions enjoining creditors from suing third parties . . . in order to

resolve finally all claims in connection with the estate and to give finality to a reorganization

plan.") (citation omitted).  Accordingly, such provisions are commonplace.  *See, e.g.*, Order

Confirming Third Amended Chapter 11 Plan, *In re Mesa Air Grp.*, No. 10-10018 (Bankr.

S.D.N.Y. Jan. 20, 2011) [Dkt. No. 1448]; Findings of Fact and Conclusions of Law, and Order

Confirming the First Amended Plan of Reorganization, *In re Almatis, B.V.*, No. 10-12308

(Bankr. S.D.N.Y. Sept. 20, 2010) [Dkt. No. 444]; Order Confirming Second Amended Joint Plan

of Liquidation, *In re Oldco M Corp. (f/k/a Metaldyne Corp.)*, No. 09-13412 (Bankr. S.D.N.Y.

Feb. 23, 2010) [Dkt. No. 1384].  In accordance with these precedents and the necessity of the

Injunction to the Plan, the Injunction should be approved.

D.    **The Judgment Reduction Is Reasonable and Appropriate**

Pursuant to the Judgment Reduction, a defendant in an Investor-related securities

case that might be owed indemnity or contribution from an Ally Released Party but for the Third

Party Release will be entitled to a judgment credit in the underlying litigation in the amount and

on the terms that would be available if the Third Party Releases were treated as a bar order in the

underlying litigation, in accordance with, and to the extent permitted under, applicable statutory or common law.  The specifics of that judgment credit are reserved for future determination by a court of competent jurisdiction.   This approach ensures that imposition of the Third Party Release complies with existing law; it also reflects the fact that Investor-related securities litigation is ongoing in multiple jurisdictions, which may have varying approaches to judgment reduction.[73]

Other courts have included similar judgment reduction provisions in plan confirmation orders, when appropriate, in connection with implementing a third party release. *See, e.g.*, Final Order Confirming Modified Third Amended Plan of Reorganization, *In re Pittsburgh Corning Corp.*, No. 00-22876 (Bankr. W.D. Pa. May 24, 2013) [Dkt. No. 9444]; Order Confirming Fourth Amended Joint Plan of Reorganization, *In re Tribune Co.*, No. 08-13141 (Bankr. D. Del. July 23, 2012) [Dkt. No. 12074]; Order Confirming Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, *In re FairPoint Commc'ns, Inc.*, No. 09-16335 (Bankr. S.D.N.Y. Jan. 13, 2011) [Dkt. No. 2113]; Findings of Fact and Conclusion of Law in Support of Fifth Amended Joint Plan of Reorganization, *In re Thorpe Insulation Co.*, No. 07-19271 (Bankr. C.D. Cal. Feb. 1, 2010) [Dkt. No. 2612].  In this case, the terms of the Judgment Reduction were carefully negotiated by and among a consortium of five institutional defendants in Investor-related securities litigation, on the one hand, and numerous plaintiffs in such cases, on the other.  Accordingly, the Judgment Reduction should be approved as reasonable, necessary, and appropriate.

---

[73] Cases are pending in California, Illinois, Indiana, Kansas, Massachusetts, Minnesota, New York, New Jersey, and Ohio.  In addition, Investors have tolled claims that could potentially be asserted in Florida, Illinois, Iowa, New Jersey, New York, and Israel.  And various foreign laws may apply depending on the application of choice of law principles.

IV.    **THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF EXECUTORY
        CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN SHOULD BE
        APPROVED**

The Plan provides for the assumption of executory contracts and unexpired leases

identified by the Plan Proponents in the Plan Supplement.  (Plan, Art. V.B; *see also Notice of

Filing of the Assumption Schedule Constituting Exhibit 1 of the Plan Supplement* [Dkt. No.

5546].)  The Plan also provides that, to the extent an executory contract or unexpired lease is not

identified in the Plan Supplement or otherwise assumed by the Debtors, such executory contract

or unexpired lease shall be deemed automatically rejected as of the Effective Date.  (Plan, Art.

V.A.)

Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the

court's approval, may assume or reject any executory contract or unexpired lease."  11 U.S.C.

§ 365(a).  Courts routinely approve motions to assume and assign or reject executory contracts or

unexpired leases upon a showing that the debtor's decision to take such action will benefit the

debtor's estate and is an exercise of sound business judgment.  *See Orion Pictures Corp. v.

Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (stating

that section 365 "permits the trustee or debtor-in-possession, subject to the approval of the

bankruptcy court, to go through the inventory of executory contracts of the debtor and decide

which ones it would be beneficial to adhere to and which ones it would be beneficial to reject.");

*see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that traditional standard

applied by courts to authorize rejection of executory contract is "business judgment"); *Nostas

Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996) ("business

judgment" test should be applied to assumption and rejection decisions); *In re Gucci*, 193 B.R.

411, 414-15 (S.D.N.Y. 1996) (same).

The Plan Proponents reviewed and analyzed the Debtors' executory contracts and unexpired leases.  Given that the Debtors will be winding down their operations and dissolving under the Plan, the Plan Proponents have determined that a number of the Debtors' executory contracts and unexpired leases, to the extent not already rejected, should be rejected on or before the Effective Date.  The Plan Proponents have determined, however, that the Debtors should assume a selection of executory contracts and unexpired leases for services critical to the assets being transferred to the Liquidating Trust.  These determinations were made with the goals of (i) preserving agreements that the Plan Proponents have determined are beneficial or otherwise essential to continuing their remaining wind-down activities, the implementation of the Plan or the preservation of rights, claims, or causes of action that the Debtors may have, and (ii) eliminating the agreements that are unduly burdensome or no longer necessary for these purposes.  The Plan and proposed Confirmation Order contain provisions to provide notice of the assumption and assignment and rejection decisions and the opportunity for the contract counterparty to be heard with respect to these issues and, where applicable, file proofs of claim in accordance with the procedures set forth in the Plan.  (*See* Plan, Art. V.)

Accordingly, the proposed assumption or rejection of executory contracts and unexpired leases should be approved in connection with confirmation.

## V.    THE FINDINGS REQUIRED AS PART OF THE RMBS SETTLEMENT ARE APPROPRIATE AND SUPPORTED BY THE RECORD

As part of the RMBS Settlement, the Plan requires that the Court make certain affirmative findings with respect to the RMBS Settlement and FGIC Settlement Agreement:

> The Confirmation Order shall include affirmative findings that the Plan, including the RMBS Settlement and the FGIC Settlement Agreement, is in the best interests of Investors, that the RMBS Trustees acted in good faith and in the best interests of the Investors in entering into the Plan Support Agreement and performing their obligations thereunder, including voting

- 155 -

for the Plan, <u>provided, however</u>, the Confirmation Order shall provide that such findings shall be binding solely in connection with the RMBS Trustees, the RMBS Trusts (including the Investors in the RMBS of such RMBS Trusts) and the actions of the RMBS Trusts and the RMBS Trustees with respect to the Plan Support Agreement and the Plan, including the RMBS Settlement and the FGIC Settlement Agreement. (Plan, Art. IV.C.7.)

As a result, the proposed Confirmation Order includes the following findings (the "<u>Proposed Findings</u>"):

The Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement and all the transactions contemplated by each of the foregoing, including the releases given therein, are in the best interests of the Debtors, their Estates, their creditors, the Investors in each RMBS Trust, each such RMBS Trust, the RMBS Trustees and all other parties in interest. The RMBS Trustees acted reasonably, in good faith and in the best interests of the Investors in each RMBS Trust and each such RMBS Trust in (i) entering into the Plan Support Agreement, (ii) performing their obligations under the Plan Support Agreement, including voting in favor of the Plan, where applicable, and (iii) agreeing to, and performing under, the Global Settlement and each of the settlements embodied therein, including the RMBS Settlement and the FGIC Settlement Agreement. The RMBS Trustees' Notice of the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement and all the transactions contemplated by each of the foregoing, including the releases given therein, was sufficient and effective in satisfaction of federal and state due process requirements and other applicable law to put the parties in interest in these Chapter 11 Cases and others, including the Institutional Investors and the Investors in each RMBS Trust, on notice of the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement and all the transactions contemplated by each of the foregoing, including the releases given therein. The findings of fact and conclusions of law set forth in this paragraph shall be binding solely in connection with the RMBS Trustees, the RMBS Trusts (including the Investors in the RMBS of such RMBS Trusts) and the actions of the RMBS Trusts and the RMBS Trustees with respect to the Plan Support Agreement and Plan, including the RMBS Settlement and the FGIC Settlement Agreement. In addition, the Allowed

Fee Claim is reasonable and appropriate under the circumstances. (Confirmation Order I.II)

The Proposed Findings are a crucial component of the RMBS Settlement that is embodied in the Plan, without which the Plan and Plan Settlements cannot become effective. For the reasons set forth below and as will be demonstrated by the Record at the Confirmation Hearing, this Court has the jurisdiction to issue the Proposed Findings, and the Proposed Findings are supported by the Record.

### A.    The Court has Jurisdiction to Issue the Proposed Findings

As discussed in detail in Section III, above, bankruptcy courts have "related to" jurisdiction where a claim against a non-debtor may give rise to a contractual indemnification obligation by a debtor entity. Such jurisdiction to enter the Proposed Findings exists here because the governing documents with respect to the RMBS Trusts provide the RMBS Trustees with broad indemnification rights against the Debtors for any action the RMBS Trustees take that affects the administration of the property in the RMBS Trusts. Accordingly, the Debtors could potentially be obligated to indemnify the RMBS Trustees for expenses associated with litigating the RMBS Trustees' claims against the Debtors or in defending against investors' claims that the RMBS Trustees acted improperly in agreeing to the terms of the RMBS Settlement.

Indeed, this Court has already found that it had jurisdiction to enter nearly identical findings in connection with the Court's approval of the FGIC Settlement Agreement. *FGIC 9019 Opinion*, 497 B.R. at 744-52. There, the Court concluded that the assertion of indemnification claims by the trustees for FGIC-insured RMBS trusts was sufficient to invoke the Court's "related to" jurisdiction. *Id.* at 746 ("The Court has 'related to' jurisdiction to enter the Findings because the Governing Agreements provide the FGIC Trustees with broad indemnification rights against the Debtors for any action the FGIC Trustees take that affects the

- 157 -

administration of the property in the FGIC Insured Trusts."); *see also PSA Opinion*, 2013 Bankr.

LEXIS 2601, at *70-71 (Bankr. S.D.N.Y. June 27, 2013) (finding that RMBS Trustees acted in

good faith and in best interests of their respective constituencies in entering into Plan Support

Agreement).

      Accordingly, for the same reasons the Court concluded that it had jurisdiction to

issue the nearly identical findings required by the FGIC Settlement Agreement and the Plan

Support Agreement, the Court has jurisdiction to issue the Proposed Findings required by the

Plan.

      **B.**    **The Proposed Findings are Supported by the Record**

      The Court has already concluded that the FGIC Settlement Agreement is in the

best interests of the investors in the FGIC-insured RMBS Trusts. *FGIC 9019 Opinion*, 497 B.R.

at 729. In addition, the Court has already found that the RMBS Trustees have acted in good faith

in entering into the Plan Support Agreement, which required the RMBS Trustees to vote in favor

of, and support, the Plan. *PSA Opinion*, 2013 Bankr. LEXIS 2601, at *72. Accordingly, the

only required affirmative finding that the Court has not already made is the finding that the Plan

(including the RMBS Settlement) is in the best interests of the Investors in the RMBS Trust. As

discussed below and as will be demonstrated at the Confirmation Hearing, that finding will be

fully supported by the evidentiary record.

      In addition to being the product of good faith, arm's-length negotiations, the Plan

and the RMBS Settlement are in the best interests of the RMBS Investors. The Plan resolves

numerous disputes that posed significant risk to the RMBS Trusts and Investors therein. *First*,

the Plan creates the RMBS Claims Trust, which will receive distributions on account of

aggregate general unsecured claims of $7.301 billion comprised of (i) a $209.8 million general

unsecured claim against the GMACM Debtors and (ii) a $7.0912 billion claim against the RFC

Debtors.    The proceeds paid on those claims (which the Plan Proponents estimate to be approximately $660 million after deducting the Allowed Fee Claim) will be distributed to the RMBS Trusts for the benefit of the Investors in accordance with the RMBS Trust Allocation Protocol.

Absent the RMBS Settlement, a massive litigation would ensue in connection with the allowance of the RMBS Trust Claims.    And as discussed above in Section II.D.4.b, that litigation would present significant uncertainty, both to the Debtors and to the RMBS Trusts as well.    That litigation would also create significant expense to the RMBS Trusts and there can be no guarantee that such a litigation would produce a recovery for the RMBS Trusts even as favorable as that being provided under the Plan – much less a *greater* recovery that might justify the risk and delay of rejecting the current settlement.

*Second*, and perhaps most importantly, the estimated $660 million in near-term distributions to the RMBS Trusts (net of the Allowed Fee Claims) is made possible only by virtue of the Ally Contribution.    Absent confirmation of the Plan, the Ally Contribution will be unavailable, leaving the Debtors and third parties to pursue costly, lengthy, and uncertain litigation.    For the reasons set forth above in Section II.D.4.a, there is significant uncertainty that litigation against Ally, after factoring in defenses, delay, and costs, could produce recoveries comparable to those contemplated by the Plan and the Plan Settlements.

*Third*, the Plan resolves the claims of certain Monolines; namely MBIA, FGIC, Assured, Ambac, and Syncora.    Absent confirmation of the Plan and approval of the Plan Settlements, disputes would ensue between certain of the RMBS Trusts and the Monolines as to the entitlement to assert claims on behalf of Monoline-wrapped RMBS Trusts and the relative priority of such claims (*i.e.*, whether Monoline claims should be disallowed or subordinated to

- 159 -

the RMBS Trust Claims). The Plan avoids the additional delay, costs, and uncertainty presented by those intercreditor disputes. Moreover, the Plan reserves the ability of the wrapped-RMBS Trusts to enforce their rights against any Monoline (other than FGIC, which has settled its policies) to the extent the Monoline does not perform its obligations under its applicable insurance policies. (Plan, Art. IV.C.4.)

*Finally*, it bears emphasis that the Plan and the RMBS Settlement were negotiated, designed, and are supported by both the Talcott Franklin Consenting Claimants and the Steering Committee Consenting Claimants, who collectively hold over $45 billion in original face amount of RMBS. *See Verified Statement of Gibbs and Bruns LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Dkt. No. 1741] (holdings as of Sept. 26, 2012). Those claimants, together with the RMBS Trustees, were represented by highly skilled legal and financial advisors who fought aggressively throughout these cases and the Mediation to maximize recoveries for the Investors.

In sum, the recoveries under the Plan are meaningful and certain and far superior to the speculative recoveries, if any, that would emerge from the morass of litigation that would result should the Plan fail to be confirmed. Accordingly, the Plan is in the best interests of the Investors. Since the Court has already found that (i) the FGIC Settlement Agreement is in the best interests of the Investors in the FGIC-wrapped RMBS Trusts and (ii) the RMBS Trustees acted in good faith and in the best interests of the Investors in entering into the Plan Support Agreement, the Court should issue the Proposed Findings as required by Art. IV.C.7 of the Plan.

- 160 -

## <u>CONCLUSION</u>

The Plan, and the Plan Settlements embodied therein, satisfy all of the requirements of the Bankruptcy Code, Bankruptcy Rules, and other applicable law, and therefore the Plan should be confirmed.

Dated: November 12, 2013

Respectfully submitted,

/s/ Gary S. Lee
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the Debtors and*
*Debtors in Possession*

-and-

KRAMER LEVIN NAFTALIS & FRANKEL
LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Rachael Ringer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee*
*of Unsecured Creditors*