## **Exhibit 5**

### **Amended Complaint**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

M. FRANCINE MODDERNO,

         **Plaintiffs**

v..

RESIDENTIAL FUNDING COMPANY, LLC
GMAC MORTGAGE GROUP, INC.
ALLY FINANCIAL, INC.
HOMECOMINGS FINANCIAL
ALLY SECURITIES, LLC
TOM MARANO
GMAC RFC HOLDING COMPANY
EXECUTIVE TRUST SERVICES OF  VIRGINIA, INC
MARY LYNCH
FIRST SAVINGS MORTGAGE CORPORATION
LARRY PRATT,
PEGGY CLIFT
more below to added here

         **Defendants**

FILED

2011 NOV -2 P 5: 05

CLERK US DISTRICT COURT
ALEXANDRIA VIRGINIA

**CASE NO: <u>1:11CV1057</u>**

---

Plaintiff M. Francine Modderno brings this action .following an attempt by Residential

Funding, LLC , through ETS of Virginia as alleged trustee, to wrongfully foreclose on her home

at 17147 Needles Court, Leesburg, Virginia.


## JURISDICTION AND VENUE

1.     Plaintiff resides in Loudoun County, Virginia, where the above-said property is located.

Plaintiff initially filed a Complaint for Wrongful Foreclosure in the District Court of Loudoun

County. Defendants then removed the case to this court because federal issues are involved in the

complaint, and because Loudoun County is within the federal jurisdiction of this court.

## THE PARTIES

### Plaintiff

2.     Plaintiff M. Francine Modderno resides in, and is owner of, the home at 17147 Needles Court, Leesburg, Virginia 20176.  Plaintiff is a senior citizen and permanently retired.

### Defendants
### Residential Funding, et al — Companies with Which Residential Funding is Associated and Affiliated

3.     Defendant **Ally Financial Inc.**(Ally) is a multinational financial services firm with a corporate center in New York with an estimated $179 billion of assets and operations in approximately 25 countries. Ally is the parent and sole owner of Defendants Residential Funding, LLC, and GMAC Mortgage Group, Inc. Prior to 2010, Ally was known as GMAC, LLC.

4..     Defendant **GMAC Mortgage Group, Inc. (GMACM,  herein referred to as GMAC)** is a wholly-owned subsidiary and the mortgage arm of Ally. GMACM is incorporated in the State of Delaware, and its  principal place of business is at 1100 Virginia Avenue, Fort Washington, Pennsylvania 10934..

5.     Defendant **Residential Funding, LLC, (ResCap)** is a wholly-owned subsidiary of GMAC, and originates, services, and securitizes mortgage loans in the United States. ResCap was incorporated in Delaware, and its principal office is located at One Meridian Crossings, Minneapolis, Minnesota 55423. **Prior to 2007, ResCap was known as Residential Capital Corporation.**

6.     Defendant **GMAC-RFC Holding Company, LLC, which conducts business as GMAC Residential Funding Corporation ("GMAC-RFC"),** is a wholly-owned subsidiary of ResCap

- 2 -

and acquires residential mortgages and loans, which it then packages as mortgage-backed
securities and sells to institutional investors. GMAC-RFC was incorporated in the State of
Delaware, and its principal place of business is located at 8400 Normandale Lake Boulevard,
Minneapolis, Minnesota 55437.

7.      Defendant **Residential Funding, LLC ("RFC")** is a wholly-owned subsidiary of
GMAC-RFC. RFC, and is incorporated in Delaware. **Prior to October 2006, RFC was known
as Residential Funding Corporation**. RFC is the parent and sole owner of Homecomings
Financial LLC ("HFN"). RFC regularly conducts business in Virginia..

8.      Defendant **Homecomings Financial LLC ("HFN")**, formerly was known as
Homecomings Financial Networks Inc., is a limited liability company incorporated in the State of
Delaware. HFN's headquarters is in Minneapolis, Minnesota. HRN originates or orignated loans,
and regularly conducts business in Virginia.

9.      Defendant **Ally Securities, LLC**, is an SEC-registered broker-dealer registered to do
business in New York Prior to August 1, 2011, Ally Securities, LLC, was known as Residential
Funding Securities, LLC, which was doing business as GMAC RFC  Securities. Prior to 2007
Residential Funding Securities, LLC, was known as Residential Funding Securities (collectively,
"RFS"). RFS is a wholly-owned subsidiary of Ally .RFS underwrites or underwrote securities.

10.     Tom Marano, **Chief Executive Officer of Ally's mortgage operations** at least as of
January 25, 2011..

11.     Defendant **Executive Trustee Services of Virginia (ETS)** identifies itself as a  GMAC
company.as identified on its web site at *http://www.executivetrusteeservices.com/services.htm* .
The web site states that ETS is located in California, Iowa, Pennsylvania and Virginia, and offers
a broad  menu of non-judicial foreclosure services for mortgage lenders nationwide. in Arizona,

- 3 -

California, Nevada, Texas and Virginia. The ETS branch involved in this complaint is located at 3900 Westere Parkway, Ste 300, Richmond, Virginia 23233.

12.    Defendant Mary Lynch is notary public of the State of Pennsylvania, in Montgomery County of that state. Upon information and belief Ms Lynch also is an employee of GMAC. Upon information and belief, Ms. Lynch works in GMAC's facility at 1100 Virginia Avenue, Fort Washington, Pennsylvania.

### First Savings Mortgage Corporation Defendants

13.    Defendant First Savings Mortgage Corporation (First Savings) is a mortgage lender incorporated in the Commonwealth of Virginia. First Savings' web site at *http://www.firstsavingsmortgage.com/officedirectory* claims the company is a retail-only, primary lender, approving and funding loans. First Savings' is located at 8444 Westpark Drive, The Fourth Floor, McLean, Virginia 22102.

14.    Defendant Larry F. Pratt is the President and CEO of First Savings Mortgage, and upon information and belief, works out of First Savings' McLean, Virginia, office.

15.    Defendant Peggy Clift is listed as Vice President of First Savings Mortgage Corporation on First Savings' web site at *http://www.firstsavingsmortgage.com/officedirectory/* .Ms. Clift works out of First Savings' McLean, Virginia, office.

### INTRODUCTION

16.    Plaintiff brought this case because Defendant ETS, acting as allegedly lawful trustee for Residential Funding et al (hereinafter referred to as Residential Funding) advertised and scheduled a wrongful foreclosure sale of Plaintiff's home, despite the fact that Residential Funding has no lawful claim to be holder in due course of a mortgage note securing Plaintiff's property under several Virginia and Federal laws and regulations.

- 4 -

**Case No. 1:11CV1057**

17.    In scheduling and advertising the foreclosure sale on September 9, 2011, Defendants

violated a number of laws and regulations governing fraud and mortgage servicing and

seuritization of mortgages. Plaintiff contends that Defendants have, in bad faith, abused the law,

the courts, and Plaintiff., in committing fraud and unfair, deceptive, and unconscionable acts and

practices.

## HISTORY

18.    On or about October 20, 2003, Plaintiff M. Francine Modderno and Claude V. Bache

signed allegedly lawful settlement papers to obtain a five-year, interest-free Adjustable Rate

Mortgage (ARM) loan to purchase their home at 17147 Needles Court, Leesburg, Virginia

20176. The alleged Lender was First Savings Mortgage Corporation of Mclean, Virginia. The

amount of the loan was $600,000. The payment for the first five years was $2125. This amount

did not includehomeowner's insurance and real property taxes, which Plaintiff paid for directly.

19.    Plaintiff put down a cash deposit of about $350,000 on the house above the $600,000

loan.. Plaintiff obtained the approximate $350,000 in 2002 from settlement of a class action

lawsuit for discrimination in the workplace. The award to Plaintiff was for wages and retirement

benefits that would have been earned over approximately 25 years of employment. Plaintiff

placed the rest of the award money into a mutual fund account for her retirement. Part of the

annual interest Plaintiff earned on the mutual fund was used to pay real property taxes on the

home.

20.    The alleged trustee on the Deed of Trust (DoT) governing the alleged lawful note was

Larry V. Pratt of Fairfax County, Virginia, for the Benefit of Mortgage Electretronic Recording

System (MERS). Before closing, Plaintiff was told that she would be able to refinance just before

the date the interest rate on the loan was scheduled to adjust to a much higher rate. Plaintiff also

- 5 -

**Case No. 1:11CV1057**

had been told the ther ARM was a "special" loan available to wealthy borrowers whose financial situation was fluid.

21.    Upon information and belief, on or about October 30, 2003, First Savings sold Plaintiff's mortgage, apparently to Homecomings Financial. First Savings never informed Plaintiff to whom the loan was sold, but on or about November 13, 2003, Plaintiff received a letter from Homecomings announcing that Homecomings would be the new servicer of Plaintiff's loan. Upon information and belief, Homecomings bought and securitized mortgages during that time period.

22.    Toward the end of 2007, the U.S. national economy suddenly and precipitously deteriorated, caused by fraudulently secured mortgage investment vehicles and so-called predator lending by the largest mortgage lenders in the country, among whom was Residential Funding et al. Plaintiff's equity in the home began to plunge. About this time, Plaintiff's retirement investment account also began to plunge in value due to the mortgage crises caused by the major mortgage loan lenders, including Residential Financial et al.

23.    On or about December 6, 2007, President George Bush announced a plan to arrange an agreement with the mortgage industry to freeze interest rates for the next five years, to allow ARM borrowers who were current on their payments to keep their low introductory rates and escape an increase of 30 percent or more in their monthly payments when their introductory interest rates expired. The plan was meant to buy time for homeowners who potentially could be forced into foreclosure when their initial low interest rates jumped up at adjustment time.. The President said that homeowners who were able to take advantage of the frozen mortgage rates would later be able to refinance at better interest rates when the housing market stabilized.

24.    On or about February 14, 2008, Plaintiff telephoned HOPE NOW (this organization is not the present HOPE Hotline),  on the recommendation of then-Secretary of the U.S. Treasury

- 6 -

Department. Henry Paulson during a television appearance. In the television appearance, Mr.

Paulson said that the housing market was deteriorating rapidly and warned homeowners who

thought their loans would adjust soon to interest rates that were higher than they could afford,

and to avoid potential foreclosure, to call HOPE NOW to help them work with their lenders to

arrange refinancing or some sort of modification of their mortgages as soon as possible. Secretary

Paulson provided a telephone number for HOPE NOW.

25.     Plaintiff telephoned HOPE NOW. The mortgage counselor assessed Plaintiff's and her

co-borrower's financial situation and wrote a letter to Homecomings, then servicer of the said

mortgage, advising Homecomings to freeze the current interest rate and payments on their

mortgage, due to each being  retired and disabled, and advised Plaintiff to telephone

Homecomings' loss mitigation department.,  and providing the number.

26.     On or about February 14, 2008, Plaintiff telephoned the number at  Homecomings that

HOPE NOW gave her, and told the loan mitigation people that HOPE NOW was  sending it a

letter recommending that it freeze Plaintiff's interest rate. Plaintiff told Homecomings that she

and her co-borrower had always paid their mortgage on time, didn't want to default and wanted to

work something out that was of benefit to both Homecomings and the borrowers. Homecomings

told Plaintiff that it was too early to try to arrange an adjustment to the loan contract, and to call

back in September 2008. Increasingly worried and stressed about the situation, Plaintiff

continued to call Homecomings from February 2008, to in or about September 2008, every

month, several times a month, to try to work something out, but Homecomnigs kept telling

Plaintiff to call back in September and was told nothing could be done because Homecomings

didn't yet know what the interest rate would be the coming December of 2008, when Plaintiff's

interest rate was due to adjust. When Plaintiff called back at the beginning of September, she was

told to call back at the end of September.  When she called at the end of September, she was told

to call back in October. When Plaintiff called back in the middle of October 2008, she was told t

to call back at the end of November 2008. During one of the later telephone calls, Homecomings

acknowledged it had the letter from HELP NOW recommending an interest rate freeze.

27.     Plaintiff began to panic about this time because the interest rate on her loan was due to

adjust on December 1, 2008.  When Plaintiff called Homecomings back at the end of

November, she told Homecomings that the interest rate was due to adjust in a day or two, and

begged Homecomings to tell her what to do. The young woman on the phone told Plaintiff to just

keep paying the same amount she always had paid, $2125, and that Plaintiff had to be in default

before Homecomings could do anything. Plaintiff said this didn't seem helpful to either herself or

Homecomings, but the Homecomings representative told her it was company policy.

28.     Plaintiff continued to pay Homecomings $2125 each month from in or about December

2008 through in or about February 2009, as she was told to do. During this time, Plaintiff's credit

rating fell markedly.

28.     In or about March 2009, Plaintiff contacted Homecomings again, saying that she had

fulfilled her side of the bargain and asked if Homecomings  now could help her  with her

mortgage. Homecomings said Plaintiff could apply for a mortgage modification under the federal

Home Affordable Mortgage Program (HAMP).

29.     On or about April 15, 2009, before Plaintiff learned that the alleged lawful mortgage is

fraudulent, she wrote away for, and gathered voluminous documents to apply for a loan

modification. Her hardship letter, Plaintiff said that her co-borrower recently had suffered major

heart failure and that Plaintiff had increased expenses and loss of assets due to the stockmarket

crash.  Finally, after a number of letters from Homecomings citing lost paperwork and various

other reasons for Plaintiff to resubmit voluminous documents, Homecomings rejected Plaintiff's

application.

- 8 -

**Case No. 1:11CV1057**

30.    In the midst of the lengthy process of resubmitting another application for a loan

modification, GMAC took over Homecomings' operation. Plaintiff telephoned GMA, and asked

about the second application for a modification that she had sumbitted to Homecomings and

stated her concern. about her declining credit rating and the impending likelihood of a

foreclosure, In response, a young male employee of GMAC said Plaintiff would have to submit

yet another application and immediately gave Plaintiff a three-month forbearance while she

completed the application. GMAC requied Plaintiff to make the forbearance payments by cash,

only through Western Union. As Plaintiff paid the mortgage online every month, this seemed to

her an unnecessary additional hardship.

31.    On or about June 10, 2009, Homecomings and GMAC each sent a letter to Plaintiff

informing her that GMAC would now be servicing her mortgage. The Homecomings letter said

that Homecomings and GMAC Mortgage were affiliated companies and that Plaintiff's present

monthly payment was $3595.48 (not including payment for homeowner's insurance and real

property taxes)., and that as of June 4, 2009, Plaintiff's current principal balance was

$597,075.80.

32.    GMAC's letter, also dated June 10, 2009, said that GMAC was now servicing her account

on behalf of Residential Funding Corp., which currently owned the interest in her account, and

that as of June 4, 2009, the total amount of her debt was $613, 548.09.

33.    At that time, both Plaintiff and her co-borrower were relatively unknowledgeable about

modern mortgage lending practices and the difference between lenders and servicers -- in fact,

Plaintiff had never heard of a mortgage servicer and that a mortgage servicer was separate from a

lender -- nor that more than one party, in fact many parties, other than the entity from whom they

heard and to whom they sent payments were involved in her mortgage. Because in her past,

mortgage transactions were fairly simple and straight-forward, and provided by a single known

- 9 -

and trusted lender; and due to the impaired eyesight of old age and the trickery of the proverbial "fine print," Plaintiff and her co-borrower did not discern that there was an almost $16,000 difference in the outstanding debt alleged by Homecomings and the debt alleged by GMAC.

34.    Meanwhile, Plaintiff's retirement fund was dropping considerably, and, in fear of losing it all, Plaintiff took the money out of the mutual fund and placed it in a cash account. Not only did Plaintiff then have to pay down the cash for the real propery taxes, but she no longer earned interest with which to pay her the real estate taxes.

35.    In October 2009, GMAC finally approved Plaintiff's and her co-borrower's mortgage application. However, rather than giving Plaintiff a modification that helped her situation, as she was led to believe, GMAC's new contract increased her monthly mortgage payment by over $1,400, plus the approximately $1,000 required to pay her real property taxes. The large increase was a great hardship for Plaintiff and her co-borrower, but as they were held hostage by the imminent threat of losing their home at any minute, and with no other solution on the horizon, Plaintiff and her co-borrower signed the contract. Thus, during the following months, Plaintiff's retirement savings were almost completely wiped out. Plaintiff and her co-borrower were very stressed in keeping up the mortgage payments.

36.    On June 29, 2010, Plaintiff's domestic partner of 20-plus-years and the co-borrower of her mortgage loan, died. Because he was buried at Arlington Cemetery, where the current wars had caused burials to be backed up, his funeral had to be delayed until October 26, 2010, extending Plaintiff's mourning. During this time, Plaintiff used up almost all of her remaining savings to pay the mortgage because it was just too much to have to deal with finances and perhaps the prospect of losing her home while she mourned.

37.    Finally, on or about November 6, 2010, without much choice, Plaintiff faxed and sent a letter to GMAC, informing GMAC that she would not have enough funds to make her full

mortgage payment beginning December 1, 2010, and requesting a forebearance while she

applied for a loan modification due to the sudden financial hardship caused by the death of her

co-borrower, and because her mortgage was considerably "under water."

38.      Plaintiff was under the impression that the October 2009 modification was a HAMP

loan, and telephoned Homecomings to see if she was eligible for a second HAMP loan in her

own name alone because of the hardship. A young woman told Plaintiff that she could.

39.      Again, as soon as Plaintiff could write away for and compile the voluminous paperwork

required, she applied for a HAMP modification. Plaintiff included copies of Making Home

Affordable's (MHA) October 15, 2010 update and page 17 of MHA's November 2010 update.

The October 2010 update said that HAMP's updated policies regarding principal forgiveness for

homeowners who have lost considerable value in their homes and were under water on their

mortgages, which was Plaintiff's situation, when adding her second lien to her mortgage

obligation.

40.      Plaintiff noted to GMAC that the October update says that people may be considered for

principal write-downs, and that she would greatly appreciate consideration for a principal

write-down.

41.      Page 17 of the November 2010 update to the HAMP program laid out the tools for

creating a useful mortgage modification, These tools include but are not limited to, reduction in

the mortgage rate to two percent, lengthening the mortgage life to 40 years, and deferred interest.

rates. The MHA program brochure said that all of these tools could be used together if necessary

to determine a workable modification. Plaintiff said she would greatly appreciate it if GMAC

could use an or all of these tools to create a workable modification for her.

42.      Plaintiff soon received a letter from GMAC refusing the HAMP modification, saying the

investor (which Plaintiff later was told was Residential Lending) was not participating in HAMP,

even though, as Plaintiff thought, the present mortgage was a HAMP modification. The refusal letter also said GMAC was considering other possibilities for Plaintiff.

43.     On Friday, December 31, 2010, according to Plaintiff's contemporaneous notes, Plaintiff telephoned GMAC to see why she had not yet heard from GMAC about her mortgage. Plaintiff was told by several women in the Philippines that there was no record of Plaintiff's November 6, 2010 application, which actually was not the application, but was the fax Plaintiff sent to say she could not pay all of her December mortgage. Plaintiff asked to be connected to a senior associate. Paintiff  that woman that the November 2010 communication was not the application, and that GMAC had received her application package on December 15, 2010, according to another associate Plaintiff talked to earlier. After going away and searching a long time, the woman eventually said yes, GMAC did receive my December documents, but no one had put a work order on the application. In other words, it was not being examined. She then said she would put a work  order on it.

44.     On the following Monday, January 3, 2011, Plaintiff picked up a phone message telling her to telephone GMAC. Plaintiff  did so, and a woman with an American accent Plainitiff that Plaintiff that her application had been refused, because her reason for the modification (death of the co-borrower was "not valid." Plaintiff contends thatGMAC certainly would not have been able to examine all of the complicated and extensive application documents in the short time from late Friday to Monday  morning.

45.     Plaintiff then telephoned GMAC on or about the following Friday to ask why she hadn't yet received a letter informing her of the disposition of her modification application. Plaintiff told the associate that she had been waiting to get it, and didn't believe that a verbal refusal over the telephone could substitute for a letter notification that she believed GMAC was supposed to send her. Plaintiff told the associate that because Plaintiff got different information from different

- 12 -

GMAC employees each time whe called, some of whom couldn't even find that Plaintiff had

made any application, Plaintiff was afraid to trust any verbal statements from one of GMAC's

employees. Plaintiff told the associate that the reason she applied for the modification was

because her co-borrower had died, which, she was told by various people was a valid reason to

to be given a modification, and that the last woman she spoke to on the phone had said Plaintiff

was refused because her reason was invalid. Plaintiff said that whether or not she was awarded a

modification, she thought that death of her co-borrower certainly was a valid reason for a change

in her financial circumstances.

46.     This associate was very helpful, and asked how soon PlaintiffI could get another

application in to GMAC. She said that Plaintiff should realize that the foreclosure process could

proceed anyway if there was no resolution by March 1, or within the next 30 days, and that she

thought that if Plaintiff get her application in right away, she could beat the deadline. She also

asked if Plaintiff could pay something while she waited to show she could pay. Plaintiff told the

associate that she was told not to pay any more money until she received a loan modification,

because, if GMAC was determined to take her house anyway, Plaintiff would be throwing away

her diminishing money away, money the Plaintiff would need if she had to move.

47.     At no time throughout Plaintiff's interactions with Homecomings did anyone inform

Plaintiff that her October 2009 modification was not a HAMP modification, despite the fact that

they all had computer access to her account and that she kept referring to it as a HAMP loan, thus

by deceptively and/or recklessly denying her disclosure of the true facts and wasting the precious

time needed to obtain a mortgage modification before a foreclosure insued.

48.     Sometime shortly after June 2, 2011, when GMAC sent Plaintiff its letter in response to

Plaintiff's May 11, 2011 QWR, Plaintiff first learned that her allegedly lawful mortgage note was

unlawful when she discovered the robo-signature of a notorious robo-signer on the copy of the

- 13 -

allegedly lawful mortgage note that GMAC sent to Plaintiff. The discovery prompted Plaintiff to further investigate potential frauds and other violations that GMAC may have perpetrated against her.

49.     On or about June 25, 2011, *The Atlantic* magazine published an article that revealed the internal workings of Bear Stearns, the company that had launched the mortgage crises. The article said, "Former Bear Stearns mortgage executives who now run mortgage divisions" of the major mortgage lenders, including Tom Marano, "through the mortgage securities they created and sold while working at Bear Stearns' mortgage division" were involved with fraudulentl profit made in mortgage securities dealings. The article said, "Last week a lawsuit filed in 2008" against Bear Stearns' mortgage insurer was unsealed. Company internal e-mails "going back as far as 2005, highlight Bear traders telling their superiors they were selling investors . . .a "sack of shit." Whistleblowers "coming forward from Bear's mortgage servicing division admitted that Bearn Stearns analysts 'were sometimes told to falsify loan-level performance data provided to the ratings agencies who blessed Bear's billion-dollar deals.' But according to depositions and documents in the . . . lawsuit, Bear's misdeeds went even deeper. They say senior traders under Tom Marano, who was a Senior Managing Director and Global Head of Mortgages for Bear Stearns, were pocketing cash that should have gone to securities holders after Bear Stearns had already sold them bonds and moved the loans off its books. "According to the lawsuit, the Bear traders would sell toxic mortgage securities to investors and then sell back the bad loans with early payment defaults to the banks that originated them at a discount. The traders would pocket the refund, and would not pass it on to the mortgage trust, which was where it should have gone to be distributed to the investors who owned the bonds. The Marano-led traders also cut the time allowed for early payment defaults, without telling the bond investors. That way, Bear could quickly securitize defective loans, without leaving enough

- 14 -

time for investors to do their own due diligence after the bonds were sold and put-back any bad

loans to Bear. The traders were essentially double-dipping -- getting paid twice on the deal. How

was this possible? Once the security was sold, they didn't have a legal claim to get cash back

from the bad loans -- that they claim belonged to bond investors -- but they did so anyway and

kept the money. Bear deal manager Nicolas Smith wrote an e-mail on August 11th, 2006 to Keith

Lind, a Managing Director on the trading desk, referring to a particular bond, SACO 2006-8, as

'SACK OF SHIT [2006-]8' and said, 'I hope your [sic] making a lot of money off this trade.' It's

this blatant internal awareness inside the Bear mortgage trading division that the . . . suit says

led Bear to implement an across-the-board strategy to disregard its contractual promises and

conceal the defective loans. This allowed executives to reap tens of millions of dollars in

compensation from a bank that wouldn't have been able to buy Bear without tax payer assistance.

E-mails show" the "trading desk bragging to firm leadership that he made $55 million off

shorting insurers' stock  in just three weeks. Then in November 2007, Verschleiser wrote to his

risk committee that he knew insurers for mortgage securities were going to have big financial

problems. He suggested they multiply by ten times the short bet he'd just made against stocks like

Ambac. The lawsuit lists over $600 million in claims with $1.2 billion in damages from the

soured mortgage securities it invested in and insured against." "Depositions show internal Bear

executives saying" that they "were responsible for deciding how much risk to take when

acquiring loans and for aspects of the securitization process. They reported up to Marano.

Testimony shows Marano would have known about the decisions his head traders were making."

Tom Marano then was hired by GMAC 2011. Plaintiff believes Mr. Marano is a major player in

Residential Funding et al's apparent policy of defrauding anyone and everyone it deals with, as

well as obfuscating Residential Funding et al's incestuous relationships in order to confuse and

hide fraud and to perhaps avoid paying the internal revenue service some or most of the taxes it

rightfully owes.

50.     Since the refusal of her application for a loan modification after the death of Plaintiff's

co-borrower, Plaintiff has submitted several more applications to GMAC and has been rebuffed

each time.

51.     Shortly before September 9, 2011, ETS scheduled and advertised a foreclosure sale of

Plaintiff's property. After Plaintiff hurriedly file a Wrongful Foreclosure Complaint, ETS

withdrew the sale.

CAUSES OF ACTION

<u>FIRST CAUSE</u>.
<b>Violation of the Fair Debt Collection Practices Act (FDCPA)</b>

50.     Defendant ETS describes itself as a debt collector in the foreclosure papers sent to

Plaintiff. *Section 811(b) of FDCPA* says that "Nothing in this title shall be construed  to

authorize the bringing of legal actions by debt collectors."

51.     Defendants violated the FDCPA in failing to give Plaintiff 30 days to dispute the debt

before scheduling and advertising a foreclosure sale on September 9, 2011, when Defendants had

only just sent the The Debt Validation Notice on August 18, .2011.

52.     Defendants also violated FDCPA in failing to produce complete and full validation of the

debt before scheduling and advertising a foreclosure sale on September 9, 2011. Plaintiff

disputed and requested full validation of the alleged debt in a letter dated September 1, 2011. To

date, Defendants have failed to send to Plaintiff a letter validating the alleged debt under all laws

and regulations that govern its validation.

53.     Defendant also has failed to provide its Virginia license to collect the alleged debt, as

well as the "as of" date when the amount claimed was due, as requested in Plaintiff's September

1, 2011 letter.  None of the foreclosure documents sent to Plaintiff had a signature on it.

    *See in particular, Sections 3 & 4 under the Harassment or Abuse section of FDCPA;*

*subsection (a)(5)(b).*

- 16 -

## SECOND CAUSE.
## Violation of the Real Estate Settlement Procedures Act (RESPA)

54.    Defendants violated RESPA in proceeding with foreclosure before the servicer of the mortgage loan, GMAC, LLC, had answered all of the questions and items Plaintiff requested in three Qualified Written Requests (QWRs). she had written to GMAC under RESPA dated April 11, 2011, April 25, 2011 and May 18. 2011. *See  Section 6 of RESPA*. GMAC inadequately and deceptively responded to the three QWRs; and, in  fact, outright refused to supply the Pooling and Servicing Agreement (PSA), the document that governs the servicing and validity of a securitized mortgage loan, saying it was "protected" and priviledged information.Defendants sent the papers notifying Plaintiff of the sale and foreclosure action just days before the scheduled sale. This was a false and deceptive statement because all documents of securitized mortgage vechicles are fully disclosed on the internet by the Securities and Eschange Commission.

55.    Upon information and belief, First Savings has a warehouse agreement with RFC Asset Holdings II, LLC, Passive Asset Transactions,. LLC, Residential Capital, LLC, Residential Funding Company, LLC,  GMAC Mortgage, LLC, and certain of their affilatates as Grantors, GMAC Investment Management, LLC, as a Secured Party and GMAC, LLC, for the provision supplying capital to First Savings Mortgage by Residentional Funding. First Savings Mortgage did not disclose to Plaintiff  that Residential Funding supplied the capital for Plaintiff's mortgage. If First avings had a warehouse loan agreement, or other agreement, for Residential Funding to supply the capital for Plaintiff's mortgage, then First Savings was not the true originator of the loan, but acted as a broker, and did not reveal this relationship, and thus the standing of both entities.

## THIRD CAUSE.
## Violation of the Deed of Trust (DoT) and Virginia Codes § 55-59

56.    Defendants' attempt to foreclose Plaintiff's home on September 9, 2011 violated the

terms of the Deed of Trust that governs the alleged lawful mortgage note. Under Virginia law,

where the DoT provides for the substitution of trustee, the DoT controls.

57.      GMAC informed Plaintiff in its June 2, 2011 answer to Plaintiff's May 18 , 2011 QWR

that Residential Funding is the master servicer of her loan  The DoT for this mortgage specifies

that only "Lender and successors and assigns" of Lender are authorized to appoint a trustee. As

a master servicer of the loan, Residential Funding is not a Lender or successor or assign, thus

Defendant ETS cannot lawfully foreclose under the DoT.

58.      A sale in violation of Virginia law and the DoT subjects the would-be forecloser to

liability of up to hundreds of thousands of dollars. *See e.g., Bayview Loan Servicing, LLC v.*

*Simmons, 654 S..E. 2d, 898, 275 Va. 114 (Va. 2008..*


### FOURTH CAUSE
### Common Law Fraud


59.      Defendants presented a copy of an alleged legal note with their original Motion to

Dismiss Plaintiff's case their attempt to display Defendant's right to foreclose Plaintiff's home

under Virginia's non-judicial foreclosure law. However, mere presentation of a note is not

sufficient to prove standing in any court if it is a fraudulent. Defendants' copy of the alleged note

is not lawful, for a number of reasons.

60.      The copy of the alleged lawful note presented by Defendants in support of their right to

foreclose does not bear a signature representing Residential Funding. Instead, Defendants' copy

of the alleged lawful note is "signed" with the stamp of a well-known and self-admitted

robo-signer, Judy Faber. Ms. Faber's alleged signature is engraved on the stamp and is not an

actual, handwritten, "wet" signature. In fact, the stamped signature may not have been

placed on the alleged lawful note by Ms. Faber at all. As admitted by Ms. Faber herself, in

published and duly notarized depositions for other foreclosure cases, Ms. Faber has allowed

others to use her stamp on foreclosure documents thousands of times, which constitutes

intentional fraud perpetrated by Ms. Faber, forgery on the part of any person who used Ms.

Faber's stamp, and conspiracy by Ms. Faber, the forger, and the institution or institutions that

allowed or encouraged these or similar practices. Without Ms. Faber's duly notarized

handwritten, "wet" signature, we have no way of knowing if the stamp was used by Ms. Faber herself, another Residential Funding employee, or a person representing and "signing" for another of the mortgage lenders that allegedly house documents at Ms. Faber's place of work or anywhere else.. In fact. Ms. Faber herself has used other robo-signature stamps to "sign" documents in the name of a variety of mortgage companies other than Residential Funding.

61.     The attorney in an earlier foreclosure case in South Carolina sent a now published letter to the Honorable Joseph M.. Strickland, the presiding judge, stating, "Upon information and belief, Ms. Faber and her document custodian team at facilities described in the *Washington Post* article attached to this letter have fabricated and changed title in thousands of foreclosure cases."

62.     The September 10, 2010 *Washington Post* article that was mentioned in the letter to Judge Strickland announced that Ally Financial (formerly GMAC, now acting as servicer of Plaintiff's alleged lawful mortgage) had suspended foreclosures around the country due to discovering robo-signing problems on its foreclosure documents

63.     In just one case in Florida's Dale County Circuit Court, Judge Bernard Nachman sanctioned GMAC for false testimony in an order dated May 1, 2006, saying that the company "submitted false testimony to the court in the form of affidavits of indebtedness." The court ordered GMAC to submit an explanation and confirmation that the policies were changed, and to pay defendants' legal costs of $8,135.55. *See TCIF RE02, LLC,v. Marin Leibowitz , et al, Case number 16-2004-CA4385XXXX-M*

64.     The other signature on the copy of the Defendants' alleged lawful note, allegedly that of Peggy Clift, is a totally indecipherable scribble, which, when accompanying the so-called "signature" of self-admitted robosigner Judy Faber, along with GMAC's widelyl reported history of robo-signing in various media, is rightfully suspicious and could indicate that a person other than Ms. Clift forged Ms Clift's signature. The fact that neither of the signatures on the note provided by Defendants is notarized, or dated, makes it impossible to know whether the "signatures" on Defendants' copy of the alleged lawful note are truly lawful, unless Plaintiff is allowed discovery.

65.     At the least, the appearance of self-admitted robo-signer Judy Faber's stamp on the copy of the mortgage note presented by Defendants suggests that fraud likely was, or previously had

been, contemplated by Defendants by virtue of Residential Funding's history of robo-signing and making false statements. In Plaintiff's eyes, the robo-signature appears to have served the purpose of "setting up" Residential Funding to enable it to perpetrate fraud elsewhere in transactions with Plaintiff, and to enable the company to ram through foreclosure on Plaintiff's home hassle-free if necessary, or for some other improper purpose.

66.     Plaintiff also suspects forgery and notary violations in Defendants' August 5, 2011 filings of an allegedly lawful assignment of the mortgage loan and in the July 2011 substitution of an alleged lawful trustee of the mortgage. Mary Lynch, the person who allegedly notarized the alleged lawful assignment of the herein alleged lawful note on August 5, 2011, also signed and notarized the signatures of notorious robo-signer Jeffrey Stephan, who was part of the same document custodian team as Judy Faber. In each of two depositions for other foreclosure cases, Mr. Stephan stated that he signed thousands of mortgage documents per week, or about 500 per day, and that he did not review the mortgage documents before signing them. Mr. Stephan also said that his signatures on those documents were signed by Mary Lynch, and that Mary Lynch did not notarize the documents in his presence. Ms. Lynch also notorized other known robo-signers' signatures. Plaintiff needs discovery to verify whether Ms. Lynch indeed witnessed the signature of alleged representative of the alleged lawful mortgage note that Defendants have presented Plaintiff's all those signatures as they were being signed. Many documents bearing Ms. Lynch's allegedly lawful notary signature have been submitted in foreclosure caes in other courts and have been published on the Internet and elsewhere.

67.     As reported in various media outlets, a typical practice of robo-signers is to place their affidavits and signatures on an allonge to a mortgage note that can easily be replaced with another allonge bearing an assignment or signature by another person or persons. Plaintiff finds it curious that the alleged assignment to Residential Funding on the allegedely lawful note presented by Defendants is placed on the back of the note when there is more than ample room on the front of the document to place an assignment.

68.     It also has been reported in various media outlets that the chain of title to a mortgage often is broken in securized mortgages because of the number of people through whose hands the

mortgage note must pass before being duly and lawfully securitized. Thus, we don't know who

held the note between when it was made in McLean, Virginia, and allegedly arrived in

Montgomery County, Pennsylvania, or elsewhere, because Defendants have not provided that

information to Plaintiff, and possibly not to anyone else. And, since mortgage document

custodians have a sophisticated computer process for imaging a mortgage document that can be,

and is, accessed and manipulated by people from anywhere in the company, and possibly from

everywhere in the world. It stands to reason that if there is forgery or other fraud in signatures,

there can be fraud in the documents that bear those signatures. Discovery is the only way to

verify mortgage documents and the signatures on them.

## FIFTH CAUSE OF ACTION
### Violations of the Uniform Commercial Code (UCC)

69.     "A party cannot be the holder in due course of an instrument if the instrument when

issued or negotiated to the holder bears such apparent evidence of forgery or alteration or is

otherwise so irregular or incomplete as to call into question its authenticity;.and the transferee of

an instrument cannot acquire rights of a holder in due course by a transfee, from

a holder if the transferee engaged in fraud or illegality affecting the instrument." *UCC 3, §*

*3-302(a)(1.*

70.     An obligor is not obliged to pay the instrument if the person seeking enforcement of the

instrument does not have rights of a holder in due course and the obligor proves that the

instrument is a lost or stolen instrument  *(UCC) § 3-305(c).*

71.     Establishing the validity of a signature is on the person claiming validity. *UCC §*

*3-308b(b),* and pursuant to the preceding *UCC § 3-308b(a),* a person seeking enforcement of an

instrument under subsection (a) must prove the terms of the instrument and the person's right to

enforce the instrument. .

78.     Defendants have violated *UCC § 3-407(a).*by altering Plaintiff's  alleged lawful mortgage

note.  "Alteration" means (i) an unauthorized change in an instrument that purports to modify in

any respect the obligation of a party, or (ii) an unauthorized addition of words or numbers or

other change to an  relating to the obligation of a party."

79.     Defendants also violated *UCC § 3-407(b).* "Except as provided in subsection c), an

**Case No. 1:11CV1057**

alteration fraudulently made discharges an instrument whose obligation is affected by the alteration unless that party assents or is precluded from asserting the alteration." *§ 3-407.*

## SIXTH CAUSE
### Violations of April 13, 2011 Consent Order Ally Signed with
### the Federal Reserve System and the Federal Deposit Insurance Corporation

80.    The consent order mandates that Ally and its affilliates, including Residential Capital and GMAC, cease initiating *both judicial and nonjudicial foreclosures* without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document[s] were properly endorsed or assigned, and, "if necessary, in the possession of the appropriate party,". and "in compliance with the terms of mortgage documentation and related agreements with borrowers" as governed by requirements of all "state a and federal rules, regulations and court orders

81.    The Consent Order said that "in connection with the process leading to certain foreclosures, the defendants had "filed or caused to be filed" in various courts "numerous affidavits executed by employees . . . or employees of third party providers making various assertions, such as the ownership of the mortgage note and mortgage, the amount of principal and interest due and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review."

82.    The Consent Order also said that the defendants "filed or caused to be filed" in federal bankruptcy courts "or in the local land record offices, numerous affidavits and other mortgage related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary."

83.    The Consent Order also said that the defendants "litigated foreclosue and bankruptcy proceedings and *initiated non-judicial foreclosures* without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed and assigned and, if necessary, in the possession of the appropriate party."

- 2 2 -

84.     The Consent Order also said "the boards and directors of Ally Financial, ResCap, and
GMAC Mortgage adopted resolutions authorizing and directing" their officers, including Tom
Marano "to enter into this Consent Order to Cease and Desist on behalf" of their respective
entities "as defined in sections 3u and 8[b][3] of the Federal Deposit Insurance Act, as amended,
[12 U.S.C. §§ 1813(u) and 1818(b)(3)], and waiving any and all rights that Ally Financial,
ResCap, and GMAC Mortgage may have pursuant to section 8 of the FDI Act [12 U.S.C,
§ 1818], including but not limited to: . . . the issuance of a notice of charges . . .a hearing for the
purpose of taking evidence on any matters set forth in this Order, . . . judcial review of this
Order . . . contest the issuance of this Order by the Board of Governors . . . and challenge or
contest, in any manner, the basis, issuance, validity, terms, effectiveness or enforceability of this
Order or any provision thereof . . . "

85.     The Consent Order also ordered the said defendants to cease and desist the above
practices and take affirmative action. *See FRB Docket No. 11-020-B-HC, FRB Docket
11-020-B-DEO amd FDIC-11-123b.*

## SEVENTH CAUSE
## Violation of Virginia Title 55

86.     "Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or
personal, every suit commenced or decree, judgment or execution suffered or obtained and every
bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other
persons of or from what they are or may be lawfully entitled to shall, as to such creditors,
purchasers or other persons, their representatives or assigns, be void." *§ 55-80.*

87,     "A writing that is not properly notarized in accordance with the laws of the
Commonwealth shall not invalidate the underlying document, however, any such writing shall
not be in proper form for recordation. All writings admitted to record shall be presumed to be in
proper form for recording after having been recorded, and conclusively presumed to be in proper
form for recording after having been recorded for a period of three years, except in cases of
fraud." *§ 55-106.2.*

**EIGHTH CAUSE**
**Violation of the Federal Securities Act**

88.  For a securitized mortgage, standing to foreclose is governed not only by a Deed of Trust and mortgage note, but also by the Securities and Exchange Commission (SEC), and in particular, the Pooling and Servicing Agreement (PSA) and the Prospectus of the securitized vehicle into which a mortgages is, was, or should have been, placed.

89.  Recent reports in various media outlets indicate that many securitized mortgage vehicles have failed to preserve the chain of title. See U.S. Bank v. Antonio Alvarez Corruption of the chain of title in the securitized mortgage vehicle that governs a homeowner's mortgage loan, and/or trying to disguise any such corruption, voids a homeowner's mortgage contract.

90.  Upon information and belief, all MERS loans were or were intended to be securitized. Plaintiff believes Residential Funding et al corrupted the chain of title for her home because GMAC refused to provide a copy of the PSA requested by Plaintiff in her QWR of May 11, 2011, saying it was confidential. Plaintiff asserts that Residential Funding no longer has the PSA for her mortgage or that Residential Funding never securitized her mortgage as contracted, and thus never could provide a PSA for her mortgage.

**NINTH CAUSE**
**Violation of the Securities Act of Virginia**

91.  The above arguments concerning violations of the Federal Securities Act also pertain to the Securities Act of Virginia.

92.  *Chapter 96 of , 18 U.S.C. § 1961–1968 of the Virginia Code, § 13.1-502.* states,

"It shall be unlawful for any person in the offer or sale of any securities, directly or indirectly, (1) To employ any device, scheme or artifice to defraud, or , (2) To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) To engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser."

## TENTH CAUSE
### Perpetration of a Federal Crime

93.    Under *18 U.S.C., Sec. 35(b),* "Whoever willfully and maliciously, or with reckless

disregard for the safety of human life, imparts or conveys or causes to be imparted or conveyed

false information, knowing the information to be false, concerning an attempt or alleged attempt

being made or to be made, to do any act which would be a crime prohibited by this chapter or

chapter 97 or chapter 111 of this title—shall be fined under this title, or imprisoned not more

than five years, or both"


## ELEVENTH CAUSE
### Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)

94.    All of the said defendants have conducted and/or participated in a pattern of racketeering

activity and collection of unlawful debt. These activities include, among others, unlawful

origination of mortgages, violations of laws and federal regulations in the servicing of mortgages;

illegal foreclosures, unlawful denials of recently mandated federal mortgage modifications;

fraudulent robo-signing and fabrication of assignments and affidavits; and violations of PSAs..

Plaintiff has suffered all of these violations of law and  federal regulations -- and more.

Numerous law cases, recent federal regulatory investigations and findings, and recent U.S.

Congressional investigations, findings and testimony evidence these facts.


## TWELFTH CAUSE
### Violation of the Virginia Racketeer Influenced and Corrupt Organization (RICO) Act

95.    Please see the allegations under the above Federal RICO


## THIRTEENTH CAUSE
### Violations of the Truth in Lending Act (TILA)

96.    The mortgage that is the subject of this cause is an Adjustable Rate Mortgage (ARM).
TILA subpart 26 governs ARMs.

97.    The copy of the alleged lawful note given to Plaintiff at the mortgage settlement. has no

signatures whatsoever on it, not coborrowers' signatures, nor a notary signature, nor any other

signature. Because of the lack of duly notarized signatures on the two copies of an alleged note
given to Plaintiff, she has no way of knowing if the alleged lawful note presented by Defendants
is a copy of a specific mortgage note or any mortgage note, or if it is a valid document at all..
Nor can it verify that the alleged borrower's signatures on Defendants' copy of the alleged lawful
note indicate that the borrower's signatures were not forged or copied from other of the many
settlement papers provided to Plaintiff and her co-borrower, then illegally manipulated onto the
alleged lawful note that Defendants have presented. Because GMAC is known, in fact notorious,
and has been sanctioned, for forging and otherwise altering mortgage documents, Plaintiff cannot
trust the note presented by GMAC, and it deprived and deprives Plaintiff of the knowledge and
surety of the true specific provisions of her alleged valid contract. Thus, the lack of signatures on
Plaintiff's copy of the note violates disclosure provisions of TILA

98.    GMAC violated *§ 226.36(2(c)(3)(iii) of TILA* in failing to provide, after receiving a
request from Plaintiff in Plaintiff's QWR of Mary 18, 2011, an accurate statement of the total
outstanding balance of the loan to date.

99.    Upon information and belief, the alleged original lender of Plaintiff's mortgage loan,
First Savings Mortgage, has signed a warehouse contract with Residential Funding et al. It is
Plaintiff's belief that Residential Funding table-funded Plaintiff's mortgage loan, acting as
broker, rather than originator of Plaintiff's mortgage. If so, First Savings did not disclose the
relationship. A lender who pays a mortgage broker secret compensation may face liability for
inducing the broker to breach his fiduciary or contractual duties.

100.    After the initiation of foreclosure on a consumer's principal dwelling that secures the
credit obligation, the consumer shall have the right to rescind the transaction if: its servicing
practices, including, but not limited to, illegal robo-signing and notary violations on
foreclosure documents. Plaintiff did not discover the fraudulent robo-signature or signatures on
the Note produced to this Court by Defendants until some time after June 2, 2011, when GMAC
provided a copy of their alleged lawful note in its June 2 response letter to Plaintiff's March 11,
2011 QWR, which led Plaintiff to investigate whether the company perpetrated other fraud on
Plaintiff or violated other laws covering mortgages. Thus Plaintiff"s TILA recission rights should
be tolled to just after the June 2, 2011, when Defendants mailed to Plaintiff a copy of their

- 2-6 -

alleged lawful Mortgage note.

.

## FOURTEENTH CAUSE
### Violation to the Home Ownership Equity Protection Act (HOEPA)

101.    HOEPA is applicable to mortgages of owner-occupied primary residences, and it
prohibits deceptive mortgage practices. Plaintiff originally was under the impression that First
Savings Mortgage, LLC, supplied the funds to originate her mortgage loan. First Savings
Mortgage disclosed that it intended to sell the mortgage right after settlement, Subsequently, First
Savings allegedly quickly sold the mortgage to Residential Funding on October 30, 2003, 10 days
after the October 20th mortgage settlement.. Plaintiff has recently learned that First Savings
Mortgage and Residential Funding have cooperated similarly in other mortgage transactions.
Because of the very short time between mortgage settlement and First Savings'sale of the
mortgages, Plaintiff now believes that her mortgage and other mortgages were table-funded by
Residential Funding or its affiliate Homecomings Financial, LLC, which, if true, would place
First Mortgage Savings in the role of TILA-defined mortgage broker, rather than loan originator,
as it has claimed to be. Table-funding or warehoused mortgages by brokers are not illegal,
but the failure to disclose them to the borrower constitutes deception and jeopardizes and clouds
title if the borrower is mislead about who is the true lender. Plaintiff believes that if First Savings
Mortgage did  not  disclose to Plaintiff that it was a broker in the mortgage transaction and
possibly earned undisclosed broker fees charged to Plaintiff, and that the capital for the loan
actually was provided by Residential Funding or its affiliate Homecomings Financial at or just
before settlement, rather than on October 31, 2003, then First Savings Mortgage and Residential
Funding or Homecomings have engaged in a deceptive practice .that can mislead and mistate
who was the true lender for her mortgage at settlement, thus clouding the standing of each of
these entities, and thus clouding title to the mortgage.

102.    Both HOEPA and TILA are regulated by the Federal Reserve Board, and **HOEPA §
1639(m)** states that any violation of a regulation issued by the Federal Reserve Board shall be
treated as a violation of a rule promulgated under this title regarding unfair or  deceptive acts or
practices. This same rule provides for civil penalties for violations of this rule..

103.    **HOEPA subchapter § 1639(d)** states that the holder of the alleged lawful note may not

-27-

provide for an interest rate applicable after default that is higher than the interest rate that applied before default. Defendants now claim that Plaintiff owes more than $100,000 above the just-over $500,00 that she owed in December 2010, the first month she defaulted on the alleged lawful mortgage due to the unexpected death of her co-borrower. Plaintiff believes that something is wrong with such a large inflation of the debt within that short time, and that what is wrong may be a violation of § 1639(d). Plaintiff requested an accounting of her mortgage to date in her August 25, 2011 QWR, but Defendants refused to provide it, thus also violating RESPA.

### FIFTEENTH CAUSE
### Violation of Virginia Law 6-2-1614(6)

103. "No mortgage lender or mortgage broker required to be licensed under this chapter (6.2) shall: Recommend or encourage a person to default on an existing loan or other debt, if such default adversely affects such person's creditworthiness, in connection with the solicitation or making of a mortgage loan that refinances all or any portion of such existing loan or debt."

### SIXTEENTH CAUSE
### Slander of Title

104. Defendants have caused to be recorded variuous documents including a Notice of Trustee Sale that has impaired and slandered Plaintiff's title, thus Plaintiff should be awarded resulting damages, including any statutory punitive damages puruant to state and federal laws.

### SEVENTEENTH CAUSE
### Slander of Credit

105. Plaintiff contends that the actions and inactions of Defendants have impaired Plaintiff's credit, causing her to lose the ability to have good credit, thus entitling her to damages, including statutory punitive damages pursuant to state and federal laws mortgage documentation and related agreements with borrowers.

### EIGHTEENTH CAUSE
### Violation of the Federal Housing Administration's
### Making Home Affordable Program (MHAP) Directives

- 28 -

107. More than 100 HAMP SM-participating servicers are required to evaluate homeowners
for principal reduction. GMAC is among those 100 servicers, according to a list provided by
HAMP administrators.

108. Under MHAP's "Supplemental Directive 10-14 Principal Reduction Alternative Update"
issued on October 15, 2010, all mortgage servicers who participate in the HAMP program are
required to evaluate HAMP-eligible loans where the loan balance is greater than 115% of the
property's fair market value.Act this time, Plaintiff's property value has dropped well below
115% of her home's value when adding the obligation of Plaintiff's secondary mortgage.

109. MHHAP's Principal Reduction Alternative (PRA) was designed to help homeowners
whose homes are worth significantly less than they owe by encouraging servicers and investors to
reduce the amount a homeowner owes on her/his home. To qualify for PRA, a homeowner must
have a mortgage that is not owned or guaranteed by Fannie Mae or Freddie Mac; the homeowner
must owe more than the home is worth; the homeowner must live in the home carrying the
mortgage; the homeowner must have obtained their mortgage on or before January 1, 2009; the
mortgage payment is more than 31 percent of the homeowner's gross (pre-tax) monthly income;
the homeowner must owe up to $729,750 on their first mortgage; the homeowner must have a
financial hardship and are either delinquent or in danger of falling behind; the homeowner must
have sufficient, documented income to support the modified payment; and the homeowner must
not have been convicted within the last 10 years of felony larceny, theft, fraud or forgery, money
laundering or tax evasion, in connection with a mortgage or real estate transaction. Plaintiff has
all of the above qualifications and  requested GMAC to evaluate her for a
PRA, but GMAC refused to do so.

### NINETEENTH CAUSE
### Mail and Wire Fraud

110. As Defendants used the U.S. Mail and computer transmissions to send and share the
alleged lawful documents among Residential Funding's various offices and associated
companies, and likely including to a foreign country or countries; and as Defendants used the
U.S. Mail to send false representations and information to Plaintiff, it is logical that Defendants

has committed mail and wire fraud. *U.S.C. 18, Part 1, Chapter 63, § 1341, § 1343, § 1344, § 1346, § 1348, and § 1348.*

## NINETEENTH CAUSE
### Identity Theft

112.    Defendants have exposed Plaintiff's social security and other personal and private

information to "hordes" of untrustworthy, and in Plaintiff's view, unsavory institutions

with whom it associates and conives to exploit borrowers. In particular, Defendants have opened

to the world very private and sensitive information about Plaintiff's life that was unnecessy for

them or anyone else to be privy to in order for Plaintiff to qualify for a mortgage modification,

when there was sufficient information to determine her qualitications in other of the voluminous

and torturous paperwork she had to submit.

113.    Defendants illegally and without permission, revealed Plaintiff's social security number

and other personal identifiers to people and entities in the securitized trust in which Plaintiff's

mortgage resides, if, indeed they did place her mortgage in a trust as they were supposed to.

114.    The most frightening risk of identity theft fraud and cybercrime that Defendants exposed

Plaintiff to to was their transfer, without Plaintiff's permission, of her social security number and

other private financial and personal information to a Philippines contractor, which appears to

have been the initial recipient of loan modification documents and perhaps other financial

documents faxed and perhaps wired via the internet. A female employee in GMAC's head office

in Pennsylvania recently confirmed to Plaintiff and a HOPE Hotline counselor that GMAC

contracted with a Philippines company to assist in mortgage servicing.

115.    Plaintiff has read on the Internet that the Philippines has one of the weaker protections

against identity theft in East Asia and East Asian countries have access to sophisticated

technologies to perpetrate cybercrimes and identity theft. In the Philippines, corruption is

widespread, identity theft is a rising form of crime, identiy theives are increasingly savvy,

punishments for such crimes are relatively minor. and policing is relatively ineffectual. Thus,

policing from around the other side of the world in practically impossible.

116. An absent and faraway American citizen has no legal rights to protection in the

Phillipines, even though the same American has strong protections against identity theft and

American financial institutions suffer strict penalties for enabling identiy theft.

117.     (Plaintiff also wonders why GMAC is using the money American taxpayers

provided to bail them out with, especially when American taxpayers themselves need

their own tax money desperately right now to provide them jobs in this county. -- yet another of

GMAC's exploitations and extortions ef everyone else's wealth.for their own benefit.)


### TWEENTIETH CAUSE
### Slander of Plaintiff's Credit

118.     Defendants slandered and defamed Plaintiff's reputation by advertising the factually false
statement that Plaintiff had defaulted on her unlawful mortgage -- and by an incorrect large sum
of money -- and by specifically naming her as a mortgage loan defaulter in public media, which
harmed Plaintiff by negatively portraying her in the public's eye, as well as in the eye of any
person or entity who might enter, or has entered, into a financial transaction with Plaintiff.

119,     Defendants acted negligently in failing to determine the true facts before they foreclosed,
and by ignoring, and trying to cause the court to ignore, GMAC's own illegal acts. Foreclosure
traditionally has been viewed as a shame in this society, particularly in Plaintiff's generation.

120.     The true facts are that Plaintiff did not default on her mortgage because the note is
fraudulent, and because an obligor is not obliged to pay the instrument if the person seeking
enforcement of the instrument does not have rights of a holder in due course ... if the alleged
holder and/or transferee engaged in fraud. *UCC § 3-305(c).*

## TWENTY-FIRST CAUSE
### Libel and Defamation of Plaintiff's Name

119. Foreclosure traditionally has been viewed as shameful, scandalous, and humiliating in American society, particularly for Plaintiff's generation Defendants' wrongful publication of Plaintiff's name in national and local media harmed Plaintiff's reputation; decreases the respect, regard, and confidence in which Plaintiff is held, and induces disparaging or disagreeable opinions or feelings against Plaintiff.

120. Publication of Plaintiff name also risks subjecting Plaintiff to elder abuse and exploitation. In Plaintiff's view, Defendants themselves have committed elder emotional abuse by intentionally and neglectfully inflicting mental pain, anguish, depression and distress on her through verbal or nonverbal acts that have humiliated, intimidated and threatened her. For five long years, Plaintiff quite literally has been constantly, persistently, and shamefully tortured by Defendants.Residential Funding et al in their continuing efforts to exploit her.

## TWENTY-SECOND CAUSE
### Illegally, Intentionally, Recklessly and Unnecessarily
### Inflicting Emotional and Physical Distress on Plaintiff

122. Plaintiff has suffered not only extreme emotional stress, but extreme physical distress since 2007, when the corrupt actions of the major mortgage lenders, including GMAC, caused Plaintiff to lose almost all of her retirement investments, as well as almost half of the equity in her home, making it impossible for Plaintiff to refinance as planned to avoid a huge increase in her monthly mortgage payments at the adjustment of her ARM.

123. Plaintiff has suffered extreme emotional and physical distress particularly from February 14, 2008, when, through HOPE NOW, Plaintiff first started her attempts to work with GMAC to avoid default due to the rapidly declining equity in her mortgage and the rapidly declining national economy caused by the major mortgage lenders, including GMAC (which, per media reports, recently renamed Ally Bank to avoid the negative connotation attached to the name GMAC) because of their mutual and conspiratorial scheme to lessen their own risk by

transferring the risk to homeowners and their investors through securitizd mortgages, creating a

system that robbed the courts and the public of recording fees totaling a large sum of money in

their determined efforts to bypass the nation's traditional laws and regulations regarding the

recording of mortgages and mortgage transfers, and by aggressively selling sub-prime mortgage

loans, and by other attempts to exploit homeowners and the lenders' investors.

124.     Plaintiff has suffered the most extreme mental and physical stress since Defendants

illegally and prematurely scheduled and advertised a foreclosure sale of her home for September

9, 2011. Plaintiff has suffered constant and incredible stress for five long years.


## SUMMARY

125.     In *U.S. Bank National Association, trusteel v. Antoniao Ibanez, SJC-10694*, decided

on January 7, 2011, the Massachusetts Supreme Judicial Court reversed two foreclosures because

the banks involved acted as trustees for investors and couldn't prove that they actually owned

the mortgages. Judge Robert J. Cordy excoriated the bankds for their "utter carelessness." The

fact that the borrowers owed the money was "not the point," he wrote. The right to deprive

people of their property is a powerful one and banks have to prove they have the legal standing to

do so."

126.     Residential Funding and its cohorts continuously have shown complete disregard and

disrespect for the Rule of Law and for Plaintiff, who was sucked into a pattern of fraud that not

only is and was blatant and obvious, but that has been documented publicly for years through

various national media reports, court actions throughout the nation, findings and witness

testimony in federal government hearings, and even depositions of its own employees. Not only

have Defendants tried to convince us that they allegedly are too big to fail, but they've arrogantly

and successfully convinced many of us that they are too big to mess with. Defendants already

have stolen Plaintiff's wealth, health and taxes, and it now want to steal the roof over her head,

rendering her homeless, with nowhere to go, figuratively, but to the parks of Wall Street

## PRAYERS FOR RELIEF

WHEREFORE., having set forth various causes of action against Defendants, Plaintiff

prays for the following relief

1. That the Court grant a permanent injunction prohibiting Defendants from sheduling and advertising a foreclosure sale of Platintiff's home at any time in the future;.

2. That the actions of all Defendants who are determined to be accountablebe be determined unfair, deceptive, fraudulent and unlawfull practices under each of the causes Plaintff ciees in her complaint, and may cite as investigation, discovery and the case proceed, in particular actions of Defendants under the federal and state RICO Acts;

3. That Plaintiff be awarded discovery;

4. That Plaintiff be awarded the maximum statutory and punitive damages, fines and any other relief allowed under each of the causes cited by Plaintiff in the complaint;

5. That Defndants be ordered to remove any credit reports that any of them has made at any time to any credit reporting agency, and that all Defendants replace those credit reportswith the best reports available;

6. That Plaintiff be awarded any and all attorney's fees and costs retrospectively and prospectively that she has or will incur in dealings with Defendants;

7, That Plaintiff be awarded Quiet Title to her home;

8. That Plaintiff be awarded prejudgement interest at the maximum legal rate;

9. That Plaintiff be awarded a refund of all monies in her retirement account in an approximate amount of $150,000;

19, That Plaintiff be awarded a ewfund of any taxes paid to help bail out Residential Funding et al.;

20. That Plaintiff be awarded all fines, statutory and punitive damanges and any other relief allowed for emotional and physical distress;

21. That Plaiitiff be awarded her original TILA rights of recission tolled to just after June 1,

-33- 34 -

2011, and rule that Plaintiff need not first repay the outstanding mortgage loan to Defendants before rescission of her mortgage can be accomplished.

22.    That Defendant ETS be ordered to place classified advertisements in the *Washington Post* and *Washington Examiner* and any other public media it used to announce the forecloure sale of Plaintiff's home, apologizing for slandering Plaintiff's name and reputation by wrongfully and unlawfully advertising that Plaintiff's home was in foreclosure by advertising the September 9, 2011 foreclosure sale, and to place the apology advertisements the same number and days of the week that ETS placed the advertisement of the foreclosure sale of Plaintiff's home;.

23.    That the court award to Plaintiff any other relief the it deems just or equitable..

24.    That Plainiff be allowed a jury trial, as she hereinafter demands.

Respectfully submitted,

M. Francine Modderno
Pro Se
PLAINTIFF
17147 Needles Court
Leesburg, VA 20176
(703) 669-8687

## CERTIFICATE OF SWORN DECLARATION

.    Under penalty of perjury, I swear that the foregoing Complaint is true and correct.

Executed on November 1, 2011

M. Francine Modderno
Pro Se
PLAINTIFF
17147 Needles Court
Leesburg, VA 20176
(703) 669-8687

## CERTIFICATE OF SERVICE

I certifiy that I personally sent aa true and exact copy of the foregoing Complaint was sent via

U.S. Mail on November _____ 2 _____, 2011 to:

William W. Tunner, Esquire, and Robrt R. Musick, Esquire
*Thompsom*Millan, P.C.
100 Shockee Slip
Richmond, Virginia 23219
(804) 649-7545
representing Residential Funding et al

and to:

John T. Donelanm Esquiire
125 /sourh Royal Street
Alexandria, Virgina 22314--3327
(703) 684-7555
\representing First Savomgs Mortgage and its employees

M. Francine Modderno
Pro Se
PLAINTIFF
17147 Needles Court
Leesburg, VA 20176
(703) 669-8687