## Exhibit 7

**Memorandum in Support of Motion to Dismiss**

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 2 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16    Filed 11/16/11    Page 1 of 23 PageID# 141

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

M. FRANCINE MODDERNO,

       Plaintiff,

v.                            Case No. 1:11-cv-1057

RESIDENTIAL FUNDING COMPANY, LLC, et al.,

       Defendants.


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

       Now come defendants, Residential Funding Company, LLC, ("RFC"), GMAC Mortgage Group, LLC, incorrectly identified as GMAC Mortgage Group, Inc., ("GMAC"), Ally Financial Inc., incorrectly identified as Ally Financial, Inc., ("Ally"), Homecomings Financial, LLC, incorrectly identified as Homecomings Financial ("Homecomings Financial"), Ally Securities LLC, incorrectly identified as Ally Securities, LLC, Tom Marano, GMAC-RFC Holding Company, LLC, incorrectly identified as GMAC RFC Holding Company, ETS of Virginia, Inc., incorrectly identified as Executive Trust Services of Virginia, Inc. ("ETS") and Mary Lynch, for and in support of their motion to dismiss and state as follows:

### I.   PROCEDURAL HISTORY

       On or about September 6, 2011 the plaintiff filed a Complaint of Wrongful Foreclosure in the Circuit Court of Loudoun County, Virginia, alleging that ETS and RFC lacked the authority to foreclose on her property. She cited several federal statutes and the matter was removed to the United States District Court, Eastern District of Virginia, Alexandria Division by Notice of Removal filed on September 28, 2011. ETS and RFC filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and the matter was dismissed, without prejudice to

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 3 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16    Filed 11/16/11    Page 2 of 23 PageID# 142

refiling, on October 19, 2011. The court allowed the plaintiff leave to file an Amended

Complaint by November 2, 2011. The court required responsive pleadings by the defendants by

November 16, 2011.

II.    FACTS OF THE CASE

The plaintiff alleges that on or about October 20, 2003 she and Claude V. Bache obtained

a mortgage in the amount of $600,000.00 from First Savings Mortgage Corporation ("First

Savings"). She describes the loan as "a five year interest free adjustable rate mortgage loan" to

purchase her home at 1714 Seven Needles Court in Leesburg, Virginia. The amount of the loan

was for $600,000.00. The payment for the first five years was $2,125.00 a month, excluding

insurance and taxes. (Am. Compl. ¶ 18.) The plaintiff alleges that she put down a cash deposit

of about $350,000 on the house above the $600,000 loan. (Am. Compl. ¶ 19.)

Plaintiff alleges that First Savings sold her mortgage to Homecomings Financial on or

about October 13, 2003. The interest rate on her loan was due to adjust on December 1, 2008.

(Am. Compl. ¶ 27.)

On or about June 10, 2009, Homecomings Financial and GMAC each notified the

plaintiff that GMAC was the servicer of her loan. Her new monthly payment was $3,595.48.

(Am. Compl. ¶ 31.) She alleges that she applied for and obtained a new loan from GMAC in

October, 2009. She then notified GMAC on November 6, 2010 that she could not make her next

monthly mortgage payment due on December 1, 2010. (Am. Compl. ¶ 37). The plaintiff

acknowledges that she defaulted on her mortgage. (Am. Compl. ¶ 103). She alleges that she

applied for and was denied a loan modification under HAMP. (Am. Compl. ¶¶ 42, 43, 50.) A

Debt Validation Notice was sent to the plaintiff on August 18, 2011 and a foreclosure sale was

scheduled by ETS for September 9, 2011. (Am. Compl. ¶¶ 51, 52.) By correspondence dated

12-12020-mg   Doc 5728-7   Filed 11/13/13   Entered 11/13/13 11:44:11   Exhibit 7 -
Memorandum of Law   Pg 4 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16   Filed 11/16/11   Page 3 of 23 PageID# 143

September 1, 2011, the plaintiff requested validation of the debt. The foreclosure sale was then

cancelled. (Am. Compl. ¶ 52).


III.   **STANDARD OF LAW**

A defendant may move the court to dismiss a cause of action for "failure to state a claim

upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Under the motion to dismiss

standard, factual allegations must be accepted as true. *See Jenkins v. McKeithen*, 395 U.S. 411,

421-22 (1969); *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001).

The United States Supreme Court advised that "[w]hile a complaint attacked by a Rule

12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to

provide the grounds of his entitlement to relief requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*,

127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007).

The United States Supreme Court expanded on *Twombly* in *Ashcroft v. Iqbal*, 129 S. Ct

1937, 173 L. Ed. 2d 868 (2009).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter,
> accepted as true, to "state a claim to relief that is plausible on its face." (citation
> omitted.) A claim has facial plausibility when the plaintiff pleads factual content
> that allows the court to draw the reasonable inference that the defendant is liable
> for the misconduct alleged. *Id.* [*Twombly*], at 556, 127 S. Ct. 1955, 167 L. Ed. 2d
> 929. The plausibility standard is not akin to a "probability requirement," but it
> asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.*
> Where a complaint pleads facts that are "merely consistent with" a defendant's
> liability, it "stops short of the line between possibility and plausibility of
> 'entitlement to relief.'" *Id.* [*Twombly*], at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929
> (brackets omitted).
>
> Two working principles underlie our decision in *Twombly*. First, the tenet that a
> court must accept as true all of the allegations contained in a complaint is
> inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of
> action, supported by mere conclusory statements, do not suffice. *Id.* [*Twombly*], at

12-12020-mg   Doc 5728-7   Filed 11/13/13   Entered 11/13/13 11:44:11   Exhibit 7 -
Memorandum of Law   Pg 5 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16   Filed 11/16/11   Page 4 of 23 PageID# 144

555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* [*Twombly*], at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not "show[n]"--"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

*Iqbal*, 129 S. Ct. 1937, 1950 (U.S. 2009).  Thus, to survive a motion to dismiss under

FED. R. CIV. P. 12(b)(6), the Complaint must contain more than labels and conclusions and must

be plausible on its face.

IV.    ARGUMENT.

The plaintiff has failed to state a cause of action upon which relief may be granted.

Accordingly, the defendants are entitled to relief pursuant to Federal Rule of Civil Procedure 12

(b)(6) and the Amended Complaint should be dismissed with prejudice.

A.  First Cause of Action - Fair Debt Collection Practices Act (FDCPA)

The Amended Complaint alleges that ETS violated the FDCPA by: 1) failing to give

Plaintiff 30 days to dispute the debt before scheduling and advertising a foreclosure sale, 2)

failing to validate the debt after receiving a written notice that the debt was disputed, and 3)

failing to provide the Plaintiff a copy of its Virginia license to collect debts. (Am. Compl. ¶¶ 51-

53.) ETS has not violated the FDCPA and this count should be dismissed.

1.  Scheduling the foreclosure sale during the validation period did not violate the FDCPA.

The FDCPA does not require that all collection efforts cease during the 30 day validation

period. Section 1692g states as follows:

4

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 6 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16    Filed 11/16/11    Page 5 of 23 PageID# 145

(b) Disputed debts. If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt . . . . **Collection activities and communications that do not otherwise violate this title may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the consumer requests the name and address of the original creditor. . . .**

15 U.S.C. § 1692g(b) (emphasis added). Thus, it was not improper for ETS to continue collection efforts during the validation period. Once ETS received the Plaintiff's written dispute of the debt, it cancelled the foreclosure sale, thus halting all collection efforts pending validation. The Amended Complaint does not allege that ETS took any collection actions after receiving the validation request. Therefore, ETS complied with 15 U.S.C. § 1692g(b) and did not violate that section of the FDCPA.

    2. <u>ETS did not violate the FDCPA by failing to validate the Plaintiff's debt.</u>

  The Plaintiff next contends that ETS violated the FDCPA by failing to validate her debt. To the contrary, ETS was under no obligation to validate the debt once it terminated collection efforts. *See Smith v. Transworld Systems, Inc.*, 953 F.2d 1025, 1031-1032 (6th Cir. 1992) (holding that because defendant ceased collection activities the defendant was not obligated to send a separate validation of the debt to plaintiff).

  In *Jang v. A.M. Miller & Assoc.*, 122 F.3d 480 (7th Cir. 1997), the Seventh Circuit acknowledged that debt collectors have two options upon receipt of a written dispute of a debt.

Section 1692g(b) thus gives debt collectors two options when they receive requests for validation. They may provide the requested validations and continue their debt collecting activities, or they may cease all collection activities. *See Smith v. Transworld Systems, Inc.*, 953 F.2d 1025, 1031 (6th Cir. 1992) (debt collector does not violate the FDCPA when it ceases collection activity after receiving request for validation; debt collector need not first send validation

> before ceasing collection activity). The statute wisely anticipates that not all
> debts can or will be verified. After all, in the real world, creditors and debt
> collectors make mistakes, and sometimes initiate collection activities against
> persons who do not owe a debt. When a collection agency cannot verify a debt,
> the statute allows the debt collector to cease all collection activities at that point
> without incurring any liability for the mistake.

*Id.* at 483; *see also Purnell v. Arrow Fin. Servs., LLC,* 2008 U.S. App. LEXIS 25488 (6th Cir.

2008) (section 1692g(b) does not require a debt collector to validate a debt as long as it ceases

collection activity); *Elane v. Revenue Maximization Group,* 233 F. Supp. 2d 496, 501 (E.D.N.Y.

2002) (same); *Bey v. Daimler Chrysler Servs. of N. Am., LLC,* 2006 U.S. Dist. LEXIS 32879

(D.N.J. May 15, 2006) (same).

The Amended Complaint does not allege that ETS took any collection action after it

received the Plaintiff's validation request. Once ETS terminated its collection activity, it was not

required to validate the Plaintiff's debt. Therefore, ETS has not violated the FDCPA by not

sending the Plaintiff validation of her debt.

> 3.   Debt collectors are not regulated by any state or federal entity that
>      requires them to be licensed in the Commonwealth of Virginia.

The Plaintiff's argument that ETS violated the FDCPA by failing to provide her with its

Virginia license fails. The Commonwealth of Virginia does not require debt collectors to be

licenses to conduct business a debt collectors in the Commonwealth.

The Amended Complaint fails to state a claim upon which relief can be granted based

upon the FDCPA and the Court should dismiss this count with prejudice.

> B.   Second Cause of Action - Real Estate Settlement Procedures Act (RESPA)

The Amended Complaint fails to state a cause of action under the Real Estate Settlement

Protection Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq.* Paragraph 54 of the Amended Complaint

purports to make a claim under Section 6 (12 U.S.C. § 2605) of RESPA on the grounds that

GMAC failed adequately to respond to three separate Qualified Written Requests ("QWR"), as that term is defined in RESPA. Specifically, the Plaintiff sent what she alleges were QWRs on April 11, 2011, April 25, 2011, and May 18, 2011. Copies of those letters are attached hereto as Exhibits A to C respectively. Paragraph 54 of the Amended Complaint also alleges that GMAC's responses to those QWRs, dated April 18, 2011, May 4, 2011, and June 2, 2011, were somehow deficient. Copies of GMAC's responses are attached hereto as Exhibits D to F respectively. While the Amended Complaint does not include as exhibits the purported QWRs sent to GMAC or GMAC's responses thereto, these documents are specifically mentioned in the Amended Complaint, integral to the Amended Complaint, and may be relied on by the Court in deciding a motion to dismiss. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. Va. 1999); *Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 234 (4th Cir. Va. 2004).

Section 6 of RESPA imposes liability on loan servicers for failing to provide information related to the servicing of a loan to a borrower. Section 6 sets out the following requirements:

(e) Duty of loan servicer to respond to borrower inquiries.
(1) Notice of receipt of inquiry.
(A) In general. If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for **information relating to the servicing of such loan**, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period.
(B) Qualified written request. For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--
(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
(ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.
(2) Action with respect to inquiry. Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall--

12-12020-mg   Doc 5728-7   Filed 11/13/13   Entered 11/13/13 11:44:11   Exhibit 7 -
Memorandum of Law   Pg 9 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16   Filed 11/16/11   Page 8 of 23 PageID# 148

(A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--
**(i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer;** and
(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or
(C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--
**(i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer;** and
(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.
. . .

12 U.S.C. § 2605(e).

GMAC properly responded to each written request from the Plaintiff.

### 1. Plaintiff's Letter dated April 11, 2011

The Plaintiff's letter dated April 11, 2011 is not a qualified written request as defined in RESPA. A qualified written request must state in writing the reasons that the borrower thinks the account is in error. 12 U.S.C. § 2605(e)(1)(B).

The subject of the April 11 letter was the denial of the Plaintiff's loan modification request and had nothing to do with the actual servicing of the loan. Moreover, the April 11 letter does not allege any error in the servicing of the loan, it simply asks for an explanation of how the net present value was determined.

Even if the April 11 letter is deemed to be a QWR, GMAC responded timely and appropriately. By letter dated April 18, 2011, GMAC explained how the Plaintiff's loan was reviewed, under what standard, and provided a name and contact information from whom the

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 10 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16    Filed 11/16/11    Page 9 of 23 PageID# 149

Plaintiff could obtain additional information. Accordingly, GMAC has not violated RESPA with

respect to the Plaintiff's April 11 letter or its response thereto dated April 18, 2011.

### 2.  Plaintiff's Letter dated April 25, 2011

The Plaintiff's April 25 letter shows her misunderstanding of the requirements

imposed on a loan servicer under RESPA. A loan servicer is not required to answer all of

the borrower's questions; a loan servicer is required to respond to questions relating to

the servicing of that loan. 12 U.S.C. § 2605(e). The subject of the April 25th letter again is

the loan modification request made by the Plaintiff and denied by the noteholder. The

April 25th letter is not a QWR as defined in RESPA because it does not call into question

any error in servicing the loan.

Even if the April 25 letter is determined to be a QWR, GMAC responded timely and

adequately on May 4, 2011. GMAC answered the Plaintiff's questions regarding the loan

modification process, informed the Plaintiff where to find additional information not in the

possession of GMAC, and provided contact information if the Plaintiff had additional questions.

Therefore, the April 25, 2011 letter from the Plaintiff and GMAC's response dated May 4, 2011,

cannot form the basis of a RESPA violation.

### 3.  Plaintiff's Letter dated May 18, 2011

The May 18th letter is the only letter that could conceivably meet the definition of a

qualified written request. It contains the borrower's name and account number and asks for

servicing related information. The letter also largely addresses more concerns with the denial of

a modification request, but paragraphs 1a and 7a, b, and c are proper areas of inquiry for a QWR.

GMAC's response dated June 2, 2011 was complete and complied in all respects with

RESPA. The questions raised regarding the servicing of the account were answered fully and

12-12020-mg   Doc 5728-7   Filed 11/13/13   Entered 11/13/13 11:44:11   Exhibit 7 -
Memorandum of Law   Pg 11 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16   Filed 11/16/11   Page 10 of 23 PageID# 150

within the time required under RESPA. Accordingly, the May 18, 2011 letter from the Plaintiff

and GMAC's response of June 2, 2011 do not for the basis for a RESPA violation.

> 4. The Plaintiff has not alleged any actual damages resulting from the alleged RESPA violations.

RESPA provides that an individual who is aggrieved by § 2605 is entitled to the

following relief:

> (f) Damages and costs. Whoever fails to comply with any provision of this section
> shall be liable to the borrower for each such failure in the following amounts:
>    (1) Individuals. In the case of any action by an individual, an amount equal to
> the sum of--
>      (A) any actual damages to the borrower as a result of the failure; and
>      (B) any additional damages, as the court may allow, in the case of a pattern or
> practice of noncompliance with the requirements of this section, in an amount not
> to exceed $ 1,000.

12 U.S.C. § 2605(f). The Amended Complaint does not allege that the Plaintiff has been harmed

in any way by the alleged RESPA violations, thus the Plaintiff is not entitled to recover anything

from GMAC. "However, alleging a breach of RESPA duties alone does not state a claim under

RESPA. Plaintiffs must, at a minimum, also allege that the breach resulted in actual damages."

*Hutchinson v. Delaware Sav. Bank FSB*, 410 F.Supp.2d 374, 383 (D. N.J. 2006); *see Hamilton v.*

*Bank of Blue Valley*, 746 F. Supp. 2d 1160, 1175 (E.D. Cal. 2010) (same); *Ward v. Sec. Atl.*

*Mortg. Elec. Registration Sys.*, 2011 U.S. Dist. LEXIS 11371 (E.D.N.C. Feb. 4, 2011)

(dismissing a claim under § 2605(e) because the plaintiff failed to allege actual damages).

> 5. Paragraph 55 does not state a violation of RESPA

It is not at all clear what paragraph 55 purports to allege, but it certainly does not allege

RESPA violation. The Plaintiff alleges "upon information and belief" that First Savings

Mortgage had a warehouse line of credit with Residential Funding which actually provided the

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 12 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16    Filed 11/16/11    Page 11 of 23 PageID# 151

capital for Plaintiff's mortgage. The Amended Complaint fails to allege what section of RESPA was allegedly violated by this arrangement if it was in fact true.

RESPA provides for private causes of action for violations of sections 6, 8, and 9. Section 6 (12 U.S.C. § 2605) deals with loan servicers; Section 8 (12 U.S.C. § 2607) prohibits kickbacks and unearned fees; and Section 9 (12 U.S.C. § 2608) prohibits a seller of property from requiring a borrower to purchase title insurance from a particular title company. The allegations in paragraph 55 of the Amended Complaint do not state a cause of action under any of these provisions of RESPA that provide for a private cause of action.

C.    Third Cause of Action - Violation of the Deed of Trust and Virginia Code 55-59

The plaintiff's third cause of action for violation of the terms of the deed of trust also fails to state a cause of action upon which relief may be granted. This count mirrors the plaintiff's initial Complaint, in which she alleged that RFC lacked the authority to foreclose. In *Brown v. HSBC*, 2011 U.S. Dist. Lexis 80943 (E.D. Va. June 22, 2011), this court called similar arguments a "show me the note" claim, holding that this type of claim is contrary to Virginia's non-judicial foreclosure laws. A secured party is not required to proceed through the courts to foreclose, which is essentially the requirement that the plaintiff is attempting to impose. The plaintiff has not pointed to any provision of the Deed of Trust that was allegedly breached. Simply reciting language from the Deed of Trust and making a conclusory statement that one entity cannot appoint a substitute trustee, thereby preventing another entity from foreclosing under the Deed of Trust, does not state a cause of action. The Amended Complaint does not allege who executed the Substitution of Trustee document. Even considering the pleading in the light most favorable to the plaintiff, the Amended Complaint fails to state a cause of action for breach of contract based on the Deed of Trust.

11

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 13 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16    Filed 11/16/11    Page 12 of 23 PageID# 152

Moreover, the plaintiff is really asking the Court for a declaratory judgment requiring the

noteholder to produce the note securing the deed of trust.  Courts in the Commonwealth have

held that declaratory judgment actions are not appropriate to challenge non-judicial foreclosure

proceedings. *Bolouri v. Bank of Am., N.A.*, 2010 U.S. Dist. LEXIS 87170 (E.D. Va. Aug. 24,

2010) (declaratory judgment is inconsistent with Virginia law and the Commonwealth's status as

a non-judicial foreclosure state); *Areebuddin v. Onewest Bank, F.S.B.*, 2010 U.S. Dist. LEXIS

28469 (E.D. Va. Mar. 24, 2010) (declaratory judgment is inconsistent with Virginia's status as a

non-judicial foreclosure state, and also undermines a secured party's authority under Virginia law

to foreclose and sell property that is provided as security for a loan); *Hammett v. Deutsche Bank

Nat'l Co.*, 2010 U.S. Dist. LEXIS 29090 (E.D. Va. Mar. 25, 2010) (same); *Ruggia v. Wash. Mut.*,

2010 U.S. Dist. LEXIS 47373 (E.D. Va. May 13, 2010) (same); *Upperman v. Deutsche Bank

Nat'l Trust Co.*, 2010 U.S. Dist. LEXIS 38827 (E.D. Va. Apr. 16, 2010) (Plaintiff's theory for

declaratory judgment contradicts not only Virginia's well-established status as a non-judicial

foreclosure state, but also the authority vested in a trustee under Virginia law to foreclose and

sell property that is provided as security for a loan).

### The note is duly endorsed to RFC

Although the Note was not attached to the plaintiff's Complaint, it may be considered at

the 12(b)(6) stage, because the Note is integral to and relied upon in plaintiff's Complaint.

*Blankenship v Manchin*, 471 F.3d. 521, 523 (2006). *See also Am. Chiropractic v. Trigon

Healthcare*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609,

618 (4th Cir. 1999) (internal quotation marks omitted)). *See also Davis v. George Mason Univ.*,

395 F. Supp. 2d 331, 335 (E.D. Va.2005) (quoting *Gasner v. County Dinwiddie*, 162 F.R.D. 280,

282 (E.D. Va. 1995).

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 14 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16    Filed 11/16/11    Page 13 of 23 PageID# 153

The Note is attached as Exhibit G to this motion. The Note was first endorsed by First Savings Mortgage Corporation without recourse to RFC. RFC endorsed the Note in blank. RFC remains the noteholder and, therefore, has the right to foreclose. Accordingly, the plaintiff's claims should be dismissed.

### D. Fourth Cause of Action – Common Law Fraud

The Amended Complaint fails to state a cause of action for fraud. In support of her claim for fraud, the plaintiff alleges the following in paragraphs 59-68 of the Amended Complaint. The plaintiff contends that a stamp signature endorsement in favor of RFC is not effective. She accuses Ms. Faber of RFC of being a robo-signer and, therefore, concludes that fraud was committed in the assignment of the note. She also challenges the signature of Peggy Clift, but offers no reasons or facts to support an allegation of fraud. Plaintiff further alleges that notary Mary Lynch notarized the signatures of other alleged robo-signers and, therefore, the plaintiff suspects discovery is required to validate the August 5, 2011 assignment of the note.

None of these allegations supports a claim of fraud.

> In order to state a cause of action for fraud, a plaintiff must plead that there was 'a false representation of a material fact, made intentionally and knowingly, with intent to mislead.' *Elliott v. Shore Stop, Inc.*, 238 Va. 237, 244, 384 S.E.2d 752 (1989). The plaintiff must also plead that he relied on that false representation and his reliance led to damages. *Id.* In order to state a cause of action for constructive fraud, the plaintiff is only required to plead that the false representation was made innocently or negligently, while all other elements remain the same. *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 86, 515 S.E.2d 291, 297 (1999).

*Sales v. Kecoughtan Hous. Co.*, 279 Va. 475, 481 (2010).

The plaintiff has failed to allege any actual facts relevant to her note of a false misrepresentation, of a material fact, made intentionally and knowingly with the intent to mislead. Further, she fails to allege any detrimental reliance by her on the alleged fraudulent conduct. There was no detrimental reliance by the Plaintiff on any statement made by any of the

12-12020-mg   Doc 5728-7   Filed 11/13/13   Entered 11/13/13 11:44:11   Exhibit 7 -
Memorandum of Law   Pg 15 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16   Filed 11/16/11   Page 14 of 23 PageID# 154

defendants. The Plaintiff's home went into foreclosure not because of anything that RFC did, but rather because the Plaintiff failed to make her contractually obligated payments under the Note. Therefore, the Plaintiff cannot satisfy the final element of fraud: that the detrimental reliance led to damages. The plaintiff's claim of fraud must be dismissed.

E.   Fifth Cause of Action - Violation of the Uniform Commercial Code (UCC)

Count five of the Amended Complaint is difficult to understand and fails to articulate a cause of action upon which relief may be granted. The plaintiff asserts in paragraph 78 that the defendants altered her alleged lawful mortgage note. She does not state what about the instrument was altered, the manner in which it was altered or any other details concerning this alteration. She fails to allege any damages arising out of an alteration. Moreover, to the extent that she is referring to the endorsement on the Note, a note is a negotiable instrument and is negotiated through endorsements. Va. Code §§ 8.3A-104, -201, -204. This count should be dismissed.

F.   Sixth Cause of Action - Violation of April 13, 2011 Consent Order Signed
with the Federal Reserve System and the Federal Deposit Insurance
Corporation.

The plaintiff recites what she purports to be terms of a Consent Order between "Ally and its affiliates" and the Federal Reserve. The plaintiff is not a party to the alleged agreement and none of these alleges terms confer a private cause of action upon the plaintiff, nor does she articulate a breach, causing damages to her to support a private cause of action. This count fails to state a cause of action and should be dismissed.

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 16 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16    Filed 11/16/11    Page 15 of 23 PageID# 155

### G. Seventh Cause of Action - Violation of Virginia Title 55

Paragraphs 86 and 87 of the Amended Complaint fail to allege any facts. Rather, they purport to quote two sections of the Virginia Code. No facts are alleged. This count must be dismissed.

### H. Eighth Cause of Action - Violation of the Federal Securities Act

Count Eight of the Amended Complaint alleges that RFC must be authorized by a Pooling and Servicing Agreement to foreclose. This is another version of the "show me the note" legal theory that has already been rejected by Virginia Federal and state courts. Instead, this is the "show me the Pooling and Service Agreement" argument. Please refer *supra* to the arguments in response to count 3. This is an attempt to circumvent Virginia's non-judicial foreclosure status. Further, the plaintiff fails to allege any violation of "The Federal Securities Act". This count should be dismissed.

### I. Ninth Cause of Action - Violation of the Securities Act of Virginia

Count Nine of the Amended Complaint fails to state a cause of action under the "Securities Act of Virginia." No facts are alleged. Rather, the plaintiff purports to recite law defining conduct in violation of a criminal statute. No violations are recited. No cause of action can be maintained and this count should be dismissed.

### J. Tenth Cause of Action - Perpetration of a Federal Crime.

Like count 9 of the Amended Complaint, count ten purports to recite a criminal code section. No facts in violation of the statute are alleged, nor is any private cause of action. This count should be dismissed.

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 17 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16    Filed 11/16/11    Page 16 of 23 PageID# 156

### K. Eleventh Cause of Action - Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)

The Plaintiff is attempting to allege Civil RICO violations under 18 U.S.C. § 1962 (c)

and (d) which state:

> "(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
> (d) It shall be unlawful for any person to conspire or violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(c)-(d).

The Supreme Court requires a plaintiff to show "(1) the conduct (2) of an enterprise (3) through

a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469 (1997).

Additionally, a plaintiff must show that the RICO violation caused him an injury. *Field v.*

*GMAC LLC*, 660 F.Supp.2d 679, 686 (E.D. Va. 2008). The plaintiff alleges no facts to support a

cause of action under RICO. This count should be dismissed.

### L. Twelfth Cause of Action - Violation of the Virginia Racketeering Influenced and Corrupt Organizations Act (Virginia RICO)

The plaintiff relies on her statements contained in count 11 of the Amended Complaint.

For the same reasons, this count should be dismissed.

### M. Thirteenth Cause of Action – Truth in Lending Act

It is not entirely clear what rights the Plaintiff is attempting to raise under the Truth in

Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq*. In paragraph 97 of the Amended Complaint,

the Plaintiff acknowledges that she received two copies of the note at settlement. TILA and

Regulation Z, which implements TILA, do not require that a borrower receive signed copies of

the mortgage note. TILA and Regulation Z require that certain disclosure be provided to

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 18 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16    Filed 11/16/11    Page 17 of 23 PageID# 157

borrowers to help them compare the cost of credit. 15 U.S.C. § 1601. Accordingly, this

paragraph does not state a claim under TILA or Regulation Z.

Paragraph 98 alleges that GMAC failed to provide the Plaintiff with an "accurate

statement of the total outstanding balance of the loan to date" in response to an alleged qualified

written request dated May 18, 2011. See <u>Exhibit C</u>. The Plaintiff's May 18, 2011 letter was in

response to a letter dated May 4, 2011 from GMAC, which included a complete payment history

for the Plaintiff's loan. Moreover, the Plaintiff is misguided in what Regulation Z requires.

Regulation Z requires a servicer to provide, within a reasonable time, "an accurate statement of

the total outstanding balance that would be required to satisfy the consumer's obligation in full

as of a specified date." 12 C.F.R. § 226.36(c)(1)(iii). In other words, the servicer is to provide a

payoff statement upon request. However, the Plaintiff's letter of May 18th does not ask for a

payoff statement, it merely questions charges assessed and shown in her payment history. Thus,

the Plaintiff's May 18th letter does not ask for information required to be given under 12 C.F.R. §

226.36(c)(1)(iii), and no TILA violation has occurred.

Neither paragraphs 99 nor 100 state causes of action under TILA. Paragraph 100 attempts

to assert that the Plaintiff's right to rescind her mortgage loan should be tolled. However, the law

is well-settled in the Fourth Circuit that rescission under TILA is subject to a three year statute of

repose. *Beach v. Ocwen Fed. Bank*, 118 S. Ct. 1408 (U.S. 1998); *Jones v. Saxon Mortgage*, 537

F.3d 320 (4th Cir. 1998). Any right of rescission expired on October 20, 2006.

The Amended Complaint fails to state a claim upon which relief can be granted for

alleged violations of TILA and this count should be dismissed.

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 19 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16    Filed 11/16/11    Page 18 of 23 PageID# 158

N.    Fourteenth Cause of Action - Violation of the Home Ownership Equity
Protection Act (HOEPA)

Any alleged violation of HOEPA must be brought within one year of when the cause of

action accrued. 15 U.S.C. § 1640(e). Any allegations of violations that occurred on or about the

closing date of the loan in 2003 are time barred.

The plaintiff's reliance on 15 U.S.C. § 1639d as the basis for a violation is misplaced.

Section 1639d sets forth certain requirements for escrow accounts, such as when they are

required and certain servicing procedures. This count does not raise any issues or allege any facts

that fall within § 1639d. The fact that the plaintiff owes more on her mortgage today, almost a

year after she stopped making payments, is not a violation of HOEPA. The plaintiff has missed

payments, late fees, and interest charges that would all increase the amount due under the Note.

O.    Fifteenth Cause of Action - Violation of Virginia Law 6-2-1214(6)

The plaintiff recites a section of the Virginia Code dealing with mortgage lenders and

mortgage brokers, concerning a recommendation to a borrower to default on a loan.  The

plaintiff fails to allege any facts to support a cause of action under this code section.  Instead, she

alleges that she could not make her mortgage payments and, therefore, defaulted.  This count

should be dismissed.

P.    Sixteenth Cause of Action - Slander of Title

The plaintiff asserts that the defendants have caused to be filed documents that have

impaired her title.  She identifies the Notice of Trustee Sale.  The plaintiff fails to allege the

falsity of the document, that the defendants acted with malice or reckless disregard of the truth or

falsity of the document. *Wright v. Castles*, 232 Va. 218, 223 349 S.E.2d 125, 231 (1986).

However, this document does not affect title to her property.  Furthermore, the sale was

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 20 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16    Filed 11/16/11    Page 19 of 23 PageID# 159

cancelled, rendering the document ineffective and moot. The plaintiff acknowledges that she

defaulted on her mortgage. No cause of action can stand for slander of title based on the

allegations in the Amended Complaint. This count should be dismissed.

### Q.   Seventeenth Cause of Action - Slander of Credit

No cause of action lies for slander of credit or defamation of the plaintiff. In Virginia, a

private individual asserting a claim of defamation first must show that a defendant has published

a false factual statement that concerns and harms the plaintiff or the plaintiff's reputation. *WJLA-

TV v. Levin*, 264 Va. 140, 152-54, 564 S.E.2d 383, 390-91 (2002); *The Gazette, Inc. v. Harris*,

229 Va. 1, 15, 37, 325 S.E.2d 713, 725, 738 (1985). The plaintiff also must show that the

defendant knew that the statement was false or, believing that the statement was true, lacked a

reasonable basis for such belief, or acted negligently in failing to determine the facts on which

the publication was based. *WJLA-TV*, 264 Va. at 154, 564 S.E.2d at 391; *Food Lion, Inc. v.

Melton*, 250 Va. 144, 150, 458 S.E.2d 580, 584 (1995); *The Gazette*, 229 Va. at 15, 325 S.E.2d at

724-25. When a plaintiff asserts that the defendant acted negligently, the plaintiff further must

prove that the defamatory statement made apparent a substantial danger to the plaintiff's

reputation. *Union of Needletrades v. Jones*, 268 Va. 512, 519, 603 S.E.2d 920, 924 (2004);

*WJLA-TV*, 264 Va. at 154, 564 S.E.2d at 391; *The Gazette*, 229 Va. at 15, 325 S.E.2d at 724-25.

The plaintiff has alleged none of these essential facts necessary to maintain a cause of

action for defamation. These claims for relief should be dismissed.

### R.   Eighteenth Cause of Action - Violation of the Federal Housing
###        Administration's making Home Affordable Program (HAMP) Directives.

Regardless of whether GMAC or the other defendants were required to comply with the

Making Home Affordable Program, which includes Home Affordable Modification Program

("HAMP"), there is no private cause of action for non-compliance with HAMP or any other

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 21 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16   Filed 11/16/11   Page 20 of 23 PageID# 160

contract between GMAC and the Federal government. GMAC's alleged breach of an agreement between it and the Federal government cannot form the basis a private cause of action. *See Shurtliff v. Wells Fargo Bank, N.A.*, 2010 U.S. Dist. LEXIS 117962 (D. Utah Nov. 5, 2010) (there is no private cause of action under HAMP); *Marks v. Bank of Am., N.A.*, 2010 U.S. Dist. LEXIS 61489 (D. Ariz. June 21, 2010) (same); *Gallardo v. Wells Fargo Bank NA*, 2010 U.S. Dist. LEXIS 119066 (C.D. Cal. Oct. 26, 2010) (plaintiffs do not have standing to pursue a private cause of action under HAMP); *Zoher v. Chase Home Fin.*, 2010 U.S. Dist. LEXIS 109936, 11-13 (S.D. Fla. Oct. 14, 2010) (borrowers may not attempt to enforce HAMP compliance as third-party beneficiaries of a contract). This count should be dismissed.

### S.   Nineteenth Cause of Action - Mail and Wire Fraud

The plaintiff fails to assert any facts to support a cause of action of the Federal government's criminal statutes concerning wire fraud. This count should be dismissed.

### T.   Nineteenth Cause of Action - (misnumbered) Identity Theft

The plaintiff has failed to state a cause of action for Identity Theft. No such cause of action is articulated by the plaintiff. The plaintiff alleges no specifics instances in which her identity was stolen, used and in which losses were suffered by her. This count should be dismissed.

### U.   Twentieth Cause of Action - Slander of Plaintiff's Credit

This count is a repeat of count eighteen *supra*. It should be dismissed for the same reasons cited *supra*.

### V.   Twenty First Cause of Action - Defamation

This count for defamation is a repeat of the other defamation counts *supra*. Plaintiff fails to allege the essential elements of defamation. This count should be dismissed.

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 22 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16    Filed 11/16/11    Page 21 of 23 PageID# 161

W. Intentional Infliction of Emotional Distress

No facts have been alleged to support a cause of action for emotional distress. In order to recover on a claim of intentional infliction of emotional distress, a plaintiff must satisfy four elements of proof. The plaintiff must show that 1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe. *SuperValu, Inc. v. Johnson*, 276 Va. 356, 369-370, 666 S.E.2d 335 (2008) citing *Almy v. Grisham*, 273 Va. 68, 77, 639 S.E.2d 182, 186 (2007); *Womack v. Eldridge*, 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974); *accord Harris v. Kreutzer*, 271 Va. 188, 203, 624 S.E.2d 24, 33 (2006); *Delk v. Columbia/HCA Healthcare Corp.*, 259 Va. 125, 136, 523 S.E.2d 826, 833 (2000); *Jordan v. Shands*, 255 Va. 492, 498-99, 500 S.E.2d 215, 218-19 (1998).

The tort of intentional infliction of emotional distress is "not favored" in the law, because there are inherent problems in proving a claim alleging injury to the mind or emotions in the absence of accompanying physical injury. *Id.* at 370, citing *Almy*, 273 Va. at 77, 639 S.E.2d at 187; *Harris*, 271 Va. at 203-04, 624 S.E.2d at 33; *Russo v. White*, 241 Va. 23, 26, 400 S.E.2d 160, 162 (1991); *Ruth v. Fletcher*, 237 Va. 366, 373, 377 S.E.2d 412, 415-16 (1989). A plaintiff alleging intentional infliction of emotional distress must prove his case by clear and convincing evidence. *Id.* at 370 citing *Russo*, 241 Va. at 26, 400 S.E.2d at 162; *Ruth*, 237 Va. at 373, 377 S.E.2d at 416.

This plaintiff has alleged no facts to support a cause of action for the intentional infliction of emotional distress and this count should be dismissed.

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 23 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16   Filed 11/16/11   Page 22 of 23 PageID# 162

V.    <u>CONCLUSION</u>

The plaintiff's Amended Complaint fails under the standards set forth in *Twombly* and

*Iqbal*.  Defendants Residential Funding Company, LLC, GMAC Mortgage Group, LLC, Ally

Financial Inc., Homecomings Financial, LLC, Ally Securities LLC, Tom Marano, GMAC-RFC

Holding Company, LLC, ETS of Virginia, Inc. and Mary Lynch ask that this Court dismiss the

Amended Complaint with prejudice, and award them such other relief that the Court deems

appropriate.

Date:  November 16, 2011                    Respectfully Submitted,

                                           RESIDENTIAL FUNDING COMPANY, LLC,
                                           GMAC MORTGAGE GROUP, LLC, ALLY
                                           FINANCIAL INC., HOMECOMINGS
                                           FINANCIAL, LLC , ALLY SECURITIES LLC,
                                           TOM MARANO, GMAC-RFC HOLDING
                                           COMPANY, LLC, ETS OF VIRGINIA, INC.
                                           and MARY LYNCH


    /s/
William W. Tunner, VSB No. 38358
Robert R. Musick, VSB No. 48601
*Thompson*McMullan, P.C.
100 Shockoe Slip
Richmond, Virginia  23219
Tel:    (804) 649-7545
Fax:    (804) 780-1813
wtunner@t-mlaw.com
bmusick@t-mlaw.com

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 24 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16    Filed 11/16/11    Page 23 of 23 PageID# 163

## CERTIFICATE OF SERVICE

I certify that on this 16th day of November, 2011, a true and exact copy of the foregoing

Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint

was filed electronically on the Court's CM/ECF system and served on all parties entitled to a

copy thereof.

I further certify that a copy was mailed by first class mail to: M. Francine Modderno,

17147 Nettles Court, Leesburg, Virginia 20176.


___/s/_____ _____

William W. Tunner, VSB No. 38358
Robert R. Musick, VSB No. 48601
*Thompson*McMullan, P.C.
100 Shockoe Slip
Richmond, Virginia 23219
Tel:    (804) 649-7545
Fax:    (804) 780-1813
wtunner@t-mlaw.com
bmusick@t-mlaw.com
*Counsel for Defendants*

23

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 25 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16-1    Filed 11/16/11    Page 1 of 4 PageID# 164

*COPY FOR YOUR RECORDS*

M. Francine Moddemo
17147 Needles Court
Leesburg, VA 20176

April 11, 2011

*☆ PLEASE NOTE THAT
I AM ALSO RESUBMITTING
A NEW APPLICATION FOR
A LOAN MODIFICATION
WITH ADJUSTED NUMBERS*

## QUALIFIED WRITTEN REQUEST

**Via Certified Mail, Return Receipt Requested**

GMAC Mortgage, LLC
ATTN: Customer Service Dept. for Qualified Written Requests,
PO Box 4622
Waterloo, IA 50704-4622

**Re: GMAC Loan No. 7436819841**

Dear GMAC:

This is a "Qualified Written Request (QWR)" under Section 6 of the Real Estate Settlement Procedures Act (RESPA).

The information I am requesting regards your letter to me dated March 23, 2011 (which I did not receive until the end of March), denying my February 12, 2011, application for a loan modification.

Although that denial letter said the reason for denial was the result of your calculation that the net present value (NPV) of a modification of my loan was negative, you did not send me the numbers you used in your calculation so that I might be sure they were correct. Without the numbers you used, I was unable to correct, question or dispute them before you referred my mortgage to your foreclosure department on March 29, which, by chance, I was only advised of in a telephone conversation with your head office and a HOPE hot line counselor last week.

I have reason to believe that the numbers your company used in calculating the NPV may be incorrect because of some confusion your modification people had over two figures on my financial analysis form. Although I attempted to resolve the confusion by providing additional documentation on those numbers, the issue is somewhat complicated and I believe your modification people did not understand the supporting documentation and my explanation; and thus, that perhaps your calculation of the NPV was incorrect. I also deserve the right to double-check your appraisal value of my home, as values here are changing rapidly.

When I telephoned your company to request the numbers used in the NPV calculation, I was told you could not give those numbers out, which seems to me to deny me due process. My gut reaction to this rebuff could only have been that you are trying to hide something. Allowing me or any other borrower to experience such a gut reaction can only result in problems for your company.

It is my understanding that RESPA requires you to provide me with documentation of any loss mitigation evaluations on my mortgage loan, and I am confused about why the numbers were not provided to me before you referred my mortgage to the foreclosure department, when I had not even received the denial letter yet. And the only way I had of knowing my mortgage was referred to the foreclosure department before I had an opportunity to request more information on your denial was my just-by-chance call for information about the denial with the help of the HOPE hot line.



12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 26 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16-1   Filed 11/16/11   Page 2 of 4 PageID# 165

M. Francine Moddemo
17147 Needles Court
Leesburg. VA 20176

April 9, 2011

## QUALIFIED WRITTEN REQUEST
GMAC Loan No. 7436819841
page 2 of 4

Even then, the woman in the head office did not inform me about the real reason for the denial. I was mistakenly under the impression that the modification my co-borrower and I had obtained in October 2009 was a HAMP modification. Even while viewing my file on her computer, her response as to why I was refused a hardship (death of the co-borrower) modification under my own name was that I could only obtain a HAMP modification once -- she did not tell me that the previous modification under both our names was *not* a HAMP modification; nor did any of your employees in any of my dealings in applying for a loan modification. The woman in the head office did not say that I had been refused a modification due to the NPV calculation, nor offer to supply me with information on the NPV refusal.

The specific information and documents I am requesting in this QWR are:

1. An explanation of what net present value is (as I am not an accountant, statistician or mathematician, I need detailed information in order to understand NPV and how and why it is calculated);

2. Why NPV is allowed to be used to reject or accept a request for a loan modification, and how this benefits your company;

3. Each specific number you used to calculate the NPV;

4. Where you got each specific number used;

5. What each specific number represents;

6. Your logic for including each specific number to calculate an NPV and an explanation of why each specific number is relevant to your calculation;

7. The formula and method you use to calculate the NPV; and an explanation of the formula and method;

8. The exact mathematical workout of your calculation (i.e.. please show me visually the math problem, so to speak, as you would write out a subtraction or algebra problem, for instance);

9. What is a negative NPV and a positive NPV;

10. What is the range of numbers that is considered an acceptable NPV;

11. What measures you used to determine the possible loan modification that you denied (i.e. did you use an adjustment to my interest rate, and/or an extension of my mortgage length to 40 years, and/or deferral of interest, and/or a principal reduction?) And why you did or did not use each of these or other measures to determine a possible loan modification;

12-12020-mg   Doc 5728-7   Filed 11/13/13   Entered 11/13/13 11:44:11   Exhibit 7 -
Memorandum of Law   Pg 27 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16-1   Filed 11/16/11   Page 3 of 4 PageID# 166

M. Francine Modderno
17147 Needles Court
Leesburg, VA 20176

April 9, 2011

## QUALIFIED WRITTEN REQUEST
**GMAC Loan No. 7436819841**
**page 3 of 4**

12. A copy or copies of your company's advisory or advisories and manual or manuals on NPV;

13. A copy or copies of your mortgage trade association or associations' advisories and any manual or manuals it or they provide on NPV and how and why to use it, and the pros and cons of using it; as well as any advisory or advisories and manual or manuals on NPV of other trade associations (such as professional statistician, underwriter or accountant trade associations for instance) that your company or underwriters belong to;

14. An explanation of whether your underwriters and/or any mortgage underwriters are required by law to have any professional licenses, certifications, professional memberships or other qualifications to determine NPV and otherwise underwrite mortgages, and why or why not;

15. A copy or copies of any such professional criteria required by law that your company or underwriters do or must have to be allowed to determine NPV and otherwise underwrite mortgages;

16. A copy or copies of your company policies regarding any professional licenses or other qualifying credentials or professional memberships that your company itself requires of your underwriters;

17. A copy or copies of any company directives or rules of any kind that require or don't require a professional license(s) or other qualifications of your underwriters;

18. A copy of any company directives you have on NPV, underwriting, and related information;

19. Whether your company has a directive or rule of any kind requiring verification or quality control of an individual underwriter's NPV calculation through some sort of codified procedure and/or rework or validation of an underwriter's calculations by a superior or other underwriter.

\* [My point here is that if these people have the weighty power to completely destroy our lives, after we have already just suffered the death of the co-borrower, I would like to know if they have the professional qualifications, standards and professional ethics to do so responsibly. How can I trust that they are right? Or even care?]

20. The name or employee number of the underwriter and any other participants in determining the NPV of my mortgage loan.

21. The name or employee number of anyone in your company who establishes or established present policy on NPV and makes the decisions on carrying out that policy.

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 28 of 43
Case 1:11-cv-01057-GBL-TRJ  Document 16-1  Filed 11/16/11   Page 4 of 4 PageID# 167

M. Francine Modderno
17147 Needles Court
Leesburg, VA 20176

April 9, 2011

## QUALIFIED WRITTEN REQUEST
**GMAC Loan No. 7436819841**
**page 4 of 4**

I understand that RESPA requires you to acknowledge this request within 20 business days of receipt, and to provide the requested information and resolve any issues pertaining to this request within 60 business days. It is also my understanding that you may not report delinquency on the account to any credit bureau within those 60 days.

I greatly appreciate your efforts in fulfilling my requests.

Thank you,

Francine Modderno

cc:

1.    GMAC Mortgage, LLC
PO Box 780
Waterloo, IA 50704-0780

2.    Executive Trustee Services
Attn. Nate
3900 West Erre Street, Suite 300
Richmond, VA 23223

3.    GMAC Mortgage Company
Attn: Loss Mitigation
233 Gibralter Road, Suite 600
Horsham, PA 19044

M. Francine Modderno
17147 Needles Court
Leesburg, VA 20176

April 25, 2011

<u>QUALIFIED WRITTEN REQUEST</u>

Via Certified Mail, Return Receipt Requested

GMAC Mortgage, LLC
ATTN: Customer Service Dept. for Qualified Written Requests
PO Box 4622
Waterloo, IA 50704-4622

Re:   GMAC Loan No. 7436619041

Dear GMAC:

This is a "Qualified Written Request (QWR)" under Section 6 of the Real Estate Settlement Procedures Act (RESPA).

Thank you for your prompt response to my QWR of April 11, 2001. Unfortunately, perhaps it was too prompt, as you did not answer the individual questions I asked in my first QWR. RESPA requires that you answer all of my questions about my mortgage.

The information I am requesting in this QWR pertains to the answer you provided in your letter to me dated April 18, 2011 (which I did not receive until yesterday, April 24, 2011). Your April 18 letter was a response to questions I have about your denial of my application for a hardship loan modification due to the death of my co-borrower, which I submitted to you on February 12.

I am sending this second QWR because:

1. You did not answer the questions I asked in my April 18 QWR, which you are required to answer under RESPA. Please see each numbered question in my first QWR, a copy of which is enclosed for your convenience.

2. In the second paragraph of your April 18 letter, you explain the HAMP program as if it were the reason for your denial, when you had earlier denied me a modification saying the reason for refusal was that my investor is not participating in HAMP. HAMP has nothing to do with my April 11 QWR because I did not request a HAMP modification in my February 12 application. It also puts your honesty into question if on the one hand you say a HAMP is not possible because my investor is not participating in HAMP, while on the other hand saying you considered me for a HAMP modification but I do not qualify. Denying me a HAMP because I do not qualify suggests that my investor is, indeed, participating in HAMP.

3. In the fourth paragraph of your April 18 letter, you speak in a catchall, vague way about Net Present Value, but you do not answer any of my specific questions, numbered 1-11 in my first QWR.

4. In the fifth paragraph of your April 18 letter, you abrogate your responsibility for the NPV calculation by putting it off on the US Treasury. Yet you are the party responsible for providing the numbers to the Treasury. How do I or the Treasury know you provided it with the correct numbers? We need to know what numbers you provided and why. It is my belief that you did not provide Treasury with the correct numbers. See my questions numbered 3-6 in my first QWR, none of which you answered.



M. Francine Modderno
17147 Needles Court
Leesburg, VA 20176

April 25, 2011

## QUALIFIED WRITTEN REQUEST
### GMAC Loan No. 7436819041
page 2 of 4

Also, the US Treasury does not make the decision on whether to grant me a loan modification. You do. It is my understanding that the servicer is allowed complete discretion in deciding whether to grant a loan modification.

5.  When I telephoned your office this afternoon in response to a message you left on my answering system, your associate told me I could get the information I requested about the NPV from the Treasury Department. The Treasury Department is not a party to my mortgage. RESPA mandates that my lender has to provide me information about my mortgage.

6.  In your April 18 response to my first QWR, you included copies of two denial letters from you to me. One was your March 23 denial of a modification, which is what I am questioning; the second was dated April 15, 2011. I don't understand why you sent the April 15 denial to me because I did not apply again for a loan modification after February 12. Are you saying you just thought up an additional reason for denying my February 12 application? At any rate, I include that letter now as part of my query. The box you checked on the April 15 letter ("the information provided shows insufficient income...") reinforces my belief that you used incorrect numbers to calculate the NPV. You need to supply the specific numbers you used, and why, in order to allow me the due process of discovering whether your denial is justified. Again, please see my specific questions 1-11 in my first QWR, which you have not answered.

Therefore, the questions I am again asking in this second QWR are the questions I asked in my first QWR of April 11. Please refer to the enclosed copy of that April 11 QWR and answer each question separately, numbering your answers to each question according to the numbers I used for each question. That way we both will know whether you have answered all of my questions and hopefully avoid any unpleasant consequences resulting from a misunderstanding and/or a failure to provide me the answers.

Again, it is my understanding that RESPA requires you to provide me with documentation of any loss mitigation evaluations on my mortgage loan.

I also understand that RESPA requires you to acknowledge this request within 20 business days of receipt, and to provide the requested information and resolve any issues pertaining to this request within 60 business days. It is also my understanding that you may not report delinquency on the account to any credit bureau within those 60 days.

Thank you again for your efforts in attempting to answer my query.

Respectfully,

M. Francine Modderno

cc:     1. GMAC Mortgage, LLC
        PO Box 780
        Waterloo, IA 50704-0780

        2. Executive Trustee Services
        Attn: Main
        2255 West Pine Street, Suite 300
        Richmond, VA 23219

12-12020-mg   Doc 5728-7   Filed 11/13/13   Entered 11/13/13 11:44:11   Exhibit 7 -
Memorandum of Law   Pg 31 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16-3   Filed 11/16/11   Page 1 of 4 PageID# 170

M. Francine Meddems
17147 Needles Court
Leesburg, VA 20176

May 18, 2011

## QUALIFIED WRITTEN REQUEST
page 1 of 4

**Via Certified Mail, Return Receipt Requested**

GMAC Mortgage, LLC
ATTN: Customer Care Dept. for Qualified Written Requests.
PO Box 4622
Waterloo, IA 50704-4622

Re:   GMAC Loan No. 7436819841

Dear GMAC:

This is a "Qualified Written Request (QWR)" under Section 6 of the Real Estate Settlement Procedures Act (RESPA).

This is the third Qualified Written Request I have sent to you for specific information about my mortgage account that you thus far have failed to provide. I believe you have violated Section 6 of the Real Estate Settlement Procedures Act (RESPA). Please answer each of my specific questions in full and provide the documents I am requesting.

The information I am requesting in this QWR pertains to the answers you provided (and did not provide) in your letter to me dated May 4, 2011, as well as answers you provided (and did not provide) in your letter to me of April 18, 2011. These letters were your responses to my QWRs of April 25, 2011, and April 9, 2011.

I will address the responses in your May 4 letter by the numbers you used. However, since your responses mentioned other questions that I have within each of your numbered answers, I will herein number my questions 1a, 1b, etc. Please use these numbers in your response to this QWR, in order to avoid any misunderstanding. Please also note that I have added an additional no. 7 question category to this QWR.

The questions I am asking and the documents I am requesting in this QWR are:

1a.  You say you are servicing my loan on behalf of an investor. Who is/are my investor or investors? Please give me the name(s) of the individual investor or investors who provided money to fund my loan through any securitized mortgage pool(s). MHA's Supplemental Directive 10-15 of November 3, 2010, effective February 1, 2011, says that you must provide to me the name of the investor/guarantor and Pool ID if your reason for denial is "Investor/Guarantor Not Participating" in HAMP. This was your reason for the denial of my first application for a mortgage modification. Also, please provide the Pool ID for my mortgage, as well as the address or addresses of the investor or investors.

1b.  You say the investor on my loan determines the modification requirements. Please provide me any and all "servicing agreements," or Pooling and Servicing Agreements (PSAs) governing this mortgage loan, so that I can review the modification rules mandated in that agreement.

Also, I would appreciate it if you could please highlight (perhaps with a yellow marker) each category of



12-12020-mg   Doc 5728-7   Filed 11/13/13   Entered 11/13/13 11:44:11   Exhibit 7 -
Memorandum of Law   Pg 32 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16-3   Filed 11/16/11   Page 2 of 4 PageID# 171

M. Francine Medderno
17147 Needles Court
Leesburg, VA 20176

May 18, 2011

## QUALIFIED WRITTEN REQUEST
GMAC Loan No. 7436819041
page 2 of 4

information in the agreement that pertains to my loan specifically.

1c.  Again, you failed to tell me the specific numbers (other than a monthly income you provided) that you gave to the US Treasury Department to determine the Net Present Value (NPV) of modifying my loan.

MHA's Supplemental Directive 10-15 says that you *must provide me the NPV result value inputs and assumptions you used to determine the NPV of my mortgage in my Non-Approval Notice for a loan modification, whether or not the NPV result was negative* (see Questions 2a and 2b, below, regarding GAMC's participation in the HAMP program). Supplemental Directive 10-15 says *the purpose of providing the NPV input values is to allow a borrower who is determined ineligible for a modification because the transaction is NPV negative the opportunity to correct any information that may impact the evaluation of the borrower's eligibility.* Please provide the specific numbers you presented to the Treasury Department for each category of information that you listed in your response number 1 of your May 4, 2011, letter to me.

1d.  In your April 18 letter, paragraph five of the first page, you say "an NPV analysis incorporates a myriad of factors, including loan amount, property value, property value trends, state foreclosure laws, likelihood of loan remaining current in payment after modification, *to name only a few.*" Yet you failed to provide me with the specific numbers/values/inputs for the other categories of information that you provided to the Treasury Department. Please also provide the specific numbers/values/inputs of any other categories of information or relevant data you gave to the Treasury Department for determining the NPV.

1e.  With regard to the appraised value of my home that you must have provided to the Treasury Department in order to calculate my NPV, MHA's Supplemental Directive 10-15 indicates that I should be given the opportunity to dispute the appraisal value you used. Please provide me not only the value you determined for my home, but also how it was determined, who provided the appraisal, as well as the appraisal report itself.

1f.  I originally asked you in my April 9 QWR to provide the formula used to determine NPV. You have failed to do so. Since then, I have learned that MHA's Supplemental Directive 10-15 requires that you also include in your Non-Approval Notice the Data Input Fields and Values chart that determined the NPV result. Please send to me a copy of the Data Input Fields and Values chart that determined the NPV result for my loan. Please don't refer me to the Treasury Department for this information; again, the Treasury Department is not a party to my mortgage. GMAC is the entity servicing my loan; therefore, it is your responsibility to provide me with copies of the documentation you received from the Treasury Department that you used in any loss mitigation evaluation on my mortgage loan.

2a.  You say you were contacted by Making Home Affordable (MHA) on April 7, 2011, requesting that my account be reviewed again for a loan modification. I telephoned MHA a few days ago to ask if it is their practice to contact and ask a servicer whether he/she will reconsider a borrower for a modification after

12-12020-mg   Doc 5728-7   Filed 11/13/13   Entered 11/13/13 11:44:11   Exhibit 7 -
Memorandum of Law   Pg 33 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16-3   Filed 11/16/11   Page 3 of 4 PageID# 172

M. Francine Maddurno
17147 Needles Court
Leesburg, VA 20176

May 18, 2011

## QUALIFIED WRITTEN REQUEST
### GMAC Loan No. 7436819841
page 3 of 4

the servicer and or lender has denied a modification of their own. I was told that is not an MHA practice and that MHA did not contact you.

However, I did contact the HOPE Hotline on that date concerning my application for a modification. This must be the entity you are referring to. But this does not explain why you implied in paragraph two of your May 4 letter that you considered me for a Making Home Affordable Program (HAMP) modification, when you denied my first application for a modification with the reason that my investor is not participating in the HAMP program. Please clarify whether my investor is or is not participating in HAMP, as so far, your conflicting answers are confusing, and appear to me to be obfuscating.

2b. You say that you determined the NPV of my mortgage by reducing my interest rate to the lowest allowed and extending the term of my loan to the maximum time allowed in deciding that you still could not come up with an affordable payment for me. You are indicating that you did not consider principal reduction and/or interest deferral in your determination.

When I telephoned the MHA program administrators a few days ago, I learned that GMAC Mortgage, LLC is on the list of 100 servicers participating in HAMP and was told that these participants are required, through MHA's PRA program, to offer principal reductions to homeowners whose mortgage loans are not insured by Fannie Mae or Freddie Mac if the following requirements are met:

  - Their homes are worth significantly less than they owe;
  - they live in the home carrying the mortgage to be modified;
  - they obtained their mortgage on or before January 1, 2009;
  - their mortgage payment is more than 31 percent of their gross monthly income;
  - they owe up to $729,750 on their first mortgage;
  - they have a financial hardship (in my case, death of the co-borrower) and are either delinquent or in danger of falling behind;
  - and they have sufficient, documented income to support the modified payment.

All of these conditions apply to my mortgage. I believe I have sufficient income to support a modified payment if you add principal reduction to the previous measures in determining whether I qualify for a modification.

You can find information and rules of the PRA program online.

Please recalculate my NPV by adding principal reduction to your formula and provide me with a copy of the new Data Input Fields and Values chart.

3. See my other questions.

4a. See my questions 1a-1e, above
4b. See question 1a above

12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 34 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16-3   Filed 11/16/11   Page 4 of 4 PageID# 173

7010 0780 0000 8854 6510

M. Francine Maddanzo
17147 Needles Court
Leesburg, VA 20176

May 18, 2011

## QUALIFIED WRITTEN REQUEST
## GMAC Loan No. 7436819841
page 4 of 4.



5. See my questions 1a-1e, above

6. See all questions above.

I have an extra question category, number 7:

7a. You sent me your history of my account in your May 4, 2011, response to my QWRs; however, the history stops in November 2010. Does this mean that you suspended adding new charges to my account after November 2010? Or are you continuing to charge me late fees and other penalties? If so, please send me an updated history of charges and credits to my account to the date you answer this QWR, including all late fees, penalties, inspection fees, legal fees, appraisal fees, and any other fees.

7b. On your history of my account, you charged property inspection fees four times under the billing date November 1, 2010. Please provide the actual dates of each inspection; concrete and clear proof that each inspection was actually carried out; and the report (4) resulting from each inspection.

7c. Also on your history of my account, you charged me $83.00 on November 1, 2010, for "Corp ADV 3 DRM." Please explain what this definition of that charge represents, what this charge is, and why it was charged to my account.

Please note that MHA's Supplemental Directive 10-15 states that you may not conduct a foreclosure sale unless and until the Escalated Case is resolved in accordance with Supplemental Directive 10-15, and all other MHA Program guidelines. As you have not yet resolved issues included in the directive, I believe my case qualifies for Escalated Case status.

It is my understanding that MHA's Supplemental Directive 10-15 requires you to acknowledge an inquiry within five business days of the receipt of an Escalated Case.

It is also my understanding that RESPA forbids you to report delinquency on this account to any credit bureau until you have resolved the issues laid out in this QWR.

Thank you,

M. Francine Maddanzo

cc:    1. GMAC Mortgage, LLC
       PO Box 780
       Waterloo, IA 50704-0780

       2. GMAC Mortgage, LLC
       PO Box 4622
       Waterloo, IA 50704-4622

       3. Executive Trustee Services
       Attn: Nate
       2255 West Bay Street, Suite 300
       Richmond, VA 23233

12-12020-mg   Doc 5728-7   Filed 11/13/13   Entered 11/13/13 11:44:11   Exhibit 7 -
Memorandum of Law   Pg 35 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16-4   Filed 11/16/11   Page 1 of 2 PageID# 174

April 18, 2011

M Francine Modderno
17147 Needles Court
Leesburg VA 20176


RE:   Account Number        7436819841
      Property Address      17147 Needles Court
                            Leesburg VA 20176


Dear M Francine Modderno:

Please be advised that this letter serves as our response to your Qualified Written Request ("QWR") for information regarding the above-referenced GMAC Mortgage LLC account dated April 11, 2011 and received on April 13, 2011.

Our records reflect your account was last reviewed and denied for a loan modification on April 15, 2011. The loan was denied for a loan modification as the financial information you provided did not reflect you have sufficient income available to afford the property. The Making Home Affordable Program (HAMP) adjusts your interest rate and principal balance based on your income. The goal of the program is to adjust your payment to 31% of your gross monthly income. If reducing the interest rate and principal balance to the lowest allowed under HAMP still does not reduce your payment to the 31% requirement, you would not qualify for a loan modification due to insufficient income.

For information on other options such as a short sale, or deed in lieu of foreclosure, please contact our Loss Mitigation Department at 1-800-850-4622.

Additionally, the prior loan modification review completed on March 23, 2011 was denied due to negative Net Present Value (NPV). An NPV analysis incorporates a myriad of factors, including loan amount, property value, property value trends, state foreclosure laws, likelihood of loan remaining current in payment after modifications, to name only a few. Generally, a negative NPV typically means that the investor loss for modification exceeds the loss projected at foreclosure sale.

As the servicer of your loan, we do not calculate the NPV; rather, we submit all relevant loan data to the US Department of Treasury, and they calculate the NPV. In your case, the NPV results from the Treasury indicate a negative value, which means there is an increased financial risk prohibiting us from extending the loan modification.



12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 36 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16-4   Filed 11/16/11   Page 2 of 2 PageID# 175

April 18, 2011
Account number 7436819841
Page Two

While GMAC Mortgage, is unable to guarantee an acceptable resolution; the welfare of our
customers is of the utmost importance.  We will exhaust all available resources and applicable
options in an effort to offer assistance whenever possible.  Please contact our Loss Mitigation
Department directly at 1-800-850-4622 to discuss other options that may be available to you.

If after reviewing this information, you have any specific questions or concerns regarding the
mortgage loan servicing of this account, please contact Customer Care at 1-800-766-4622
between the hours of 6:00 am to 10:00 pm CT Monday through Friday and 9:00 am to 1:00 pm
CT on Saturday.

Customer Care/DW
Loan Servicing

Enclosures

May 4, 2011

M Francine Modderno
17147 Needles Court
Leesburg VA 20176

RE:    Account Number          7436819841
       Property Address        17147 Needles Court
                               Leesburg VA 20176

Dear M Francine Modderno:

Please be advised that this letter serves as our response to the Qualified Written Request ("QWR") for
information regarding the above-referenced GMAC Mortgage account dated April 25, 2011 and
received on April 29, 2011.

The following responses are in the same order as the inquiry we received:

1. GMAC Mortgage services your loan on behalf of an investor. The investor on your loan determines
the modification requirements. GMAC Mortgage does not determine the NPV; the NPV is determined
by the US Treasury. The information provided to the US Treasury to determine your NPV is as
follows:
       Unpaid principal balance on the original loan
       Interest rate
       Months delinquent
       Principal and interest payment before modification
       Monthly insurance payment (if applicable)
       Monthly real estate taxes (if applicable)
       Monthly gross income
       Borrower FICO
       Zip Code
       State

2. Your loan was denied for a traditional loan modification on March 23, 2011 due to a negative NPV
value. However, we were contacted by Making Home Affordable (MHA) on April 7, 2011. They
requested your account be reviewed again for a loan modification. Further review was completed and
was your loan was denied for a loan modification as the income you provided was not sufficient to
support a modified payment. Our records reflect the amount of gross monthly income used to
determine your eligibility was $3,749.13. By reducing your interest rate to the lowest allowed and
extending the term to the maximum allowed still does not allow your payment to be adjusted to an
affordable payment based on the income information your provided, your account does not qualify for
a loan modification.



12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 38 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16-5    Filed 11/16/11    Page 2 of 2 PageID# 177

May 4, 2011
Account number 7436819841
Page Two

3.  See response to 1.

4.  See response to 1 regarding information provided to the US Treasury.  Additionally, GMAC
Mortgage services your loan on behalf of the investor who determines the loan modification
requirements.

5.  See response to number 1 as how GMAC Mortgage obtains the NPV from the US Treasury.
Unfortunately, we are unable to advise of the US Treasury's procedures in determining NPV. A copy
of your Note, Mortgage/Deed of Trust, HUD 1 Settlement Statement, prior loan modification and
payment history are enclosed. This information is related to the servicing of your loan.

6.  Your account was denied for a loan modification due to negative NPV on March 23, 2011. We were
then contacted by MHA requesting we further review your account for a loan modification. After
further review, it was determined your income is not sufficient to support a loan modification. If you
wish to discuss alternate options such as a short sale, please contact our Default Department at 1-800-
850-4622.

Unfortunately, at this time we are unable to offer a loan modification on your account. Regardless of
the results of the NPV, your account would not qualify for a loan modification due to insufficient
income.

If your financial situation improves, please submit a new financial analysis package with the updated
financial information. If you wish to discuss alternate options available, please contact our Loss
Mitigation Department at 1-800-850-4622.

Any further correspondence that does not provide specific items or concerns on which research can be
completed and a response provided, will be considered as having already received a response.  If
specific concerns exist, those concerns may be sent in writing to:
        GMAC Mortgage LLC
        PO Box 4622
        Waterloo IA 50407-4622

If after reviewing this information, you have any specific questions or concerns regarding the mortgage
loan servicing of this account, please contact Customer Care at 1-800-766-4622 between the hours of
6:00 am to 10:00 pm CT Monday through Friday and 9:00 am to 1:00 pm CT on Saturday.

Customer Care
Loan Servicing

Enclosures

DW

12-12020-mg   Doc 5728-7   Filed 11/13/13   Entered 11/13/13 11:44:11   Exhibit 7 -
Memorandum of Law   Pg 39 of 43
Case 1:11-cv-01057-GBL-TRJ   Document 16-6   Filed 11/16/11   Page 1 of 2 PageID# 178

June 2, 2011


M Francine Modderno
17147 Needles Court
Leesburg VA 20176


RE:    Account Number          7436819841
       Property Address        17147 Needles Court
                               Leesburg VA 20176


Dear M Francine Modderno:

This letter is in response to your correspondence dated May 18, 2011 in which you request
additional documentation on the above-referenced account. The documents sent in response to
your previous inquiry dated April 18 and May 4, 2011, and identified as a Qualified Written
Request ("QWR"), relate to the servicing of your account, as the law, specifically the Real Estate
Settlement Practices Act ("RESPA"), requires.

Most of the information you request does not relate to the servicing of the account as 12 USC
§2605(e)(1)(A) requires.    This section of the statute says that QWR requests pertain to
"information relating to the servicing of such loan..." Our previous correspondence provided
you with the information that relates to the servicing of your account. Without specific issues or
concerns identified, sending documents unrelated to the servicing of the account, would not be
considered an effective and appropriate response or resolution for the customer.

In response to your additional questions:

1a - The current master servicer is Residential Funding Corporation. The current owner of your
loan is ING Bank, 1345 Avenue of Americas, New York, NY 10105, phone number 212-478-
4040. However, GMAC Mortgage, LLC is currently servicing your account, and all inquiries
should be directed to our office.

1b - Subject to business and trade practices which are proprietary and confidential.

1c - Your modification denial was based on a traditional Modification review process as your
investor does not participate in the MHA program. Details regarding NPV values are not
required to be released under a traditional modification review. However, this calculation is
based on financial information provided by you.

Please accept our apology for any misinformation which may have been provided regarding a
MHA modification review of the account.



12-12020-mg    Doc 5728-7    Filed 11/13/13    Entered 11/13/13 11:44:11    Exhibit 7 -
Memorandum of Law    Pg 40 of 43
Case 1:11-cv-01057-GBL-TRJ    Document 16-6    Filed 11/16/11    Page 2 of 2 PageID# 179

June 2, 2011
Account Number 743619841
Page Two

Please be advised, there is a relationship established for the MHA escalation team to contact our office for HAMP related inquiries on behalf of our customer.

1d through 6 - See item 1c response above.

7a-c - The payment history sent with our response dated May 4, 2011 provided your account history through April 29, 2011. The last payment received on the account was November 16, 2010 which was applied as the November 1, 2010 payment. Consequently, the history will continue to reflect the date of the last payment applied.

The property inspection fees are dated as follows: January 26, 2011, March 2, 2011, March 29, 2011 and April 29, 2011. Property inspection fees are assessed to the account when the account becomes delinquent and we have been unable to contact the customer so that payment arrangements can be made to bring the account current.

The fee assessed February 8, 2011 in the amount of $83.00 was a Broker's Price Opinion Fee.

As previously stated, because your investor does not participate in the MHA program regulations regarding the program do not affect your account.

Any further correspondence that does not provide specific items or concerns on which research can be completed and a response provided, will be considered as having already received a response. If specific concerns exist, those concerns may be sent in writing to:

GMAC Mortgage
P.O. Box 1330
Waterloo IA 50704

If after reviewing this information, you have any specific questions or concerns regarding the mortgage loan servicing of this account, please contact GMAC Mortgage Customer Care at 1-800-766-4622 between the hours of 6:00 am to 10:00 pm CT Monday through Friday and 9:00 am to 1:00 pm CT on Saturday.

Customer Care
Loan Servicing

DV

APP#: 24503061
LN #: 24503061
                                                  1141148-0024503061-7

# FIXED/ADJUSTABLE RATE NOTE
### (1 Year LIBOR Index - Rate Caps)

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

October 20, 2003              WOODBRIDGE                    Virginia
[Date]                        [City]                        [State]

17147 NEEDLES COURT           , LEESBURG, VA 20176
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 600,000.00  (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is FIRST SAVINGS MORTGAGE CORPORATION, A VIRGINIA CORPORATION

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of   4.2500  %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

Beginning on the first day of  December 1  , 2003, and on the first day of every month thereafter until the first day of November 1, 2008, I will pay only the interest on the unpaid balance of the Note. Thereafter, I will pay principal and interest by making payments every month as provided below.

I will make my monthly payments of principal and interest on the first day of each month beginning DECEMBER 1, 2008 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on  November 1  , 2033, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  1950 OLD GALLOWS RD. 8TH FL. VIENNA, VA 22182  or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $  2,125.00  . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of  November 1, 2008 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding  Two and One / Quarter  percentage points (  2.2500  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than  9.2500  % or less than  2.2500  %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points (2.0%) from the rate of interest I have been paying for the preceding twelve months. My interest rate will never be greater than  9.2500  %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of change in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given me and also the telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so. I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use my prepayments to reduce the amount of principal that I owe under this Note and to pay the interest then accruing as the Note rate as of the date any prepayments are applied. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to these changes. Any partial prepayment made on or before the first Change Date may reduce the amount of my monthly payment. Any partial

VIRGINIA FIXED/ADJUSTABLE RATE NOTE - 1 YEAR TREASURY INDEX
GMACM-CNR.1012.FIX(INT)(ADJ)(FRJ)-VA (3808)            01/08(Page 1 of 3)

Initials: _CUB_ _MM_

Case 1:11-cv-01057-GBL-TRJ   Document 16-7   Filed 11/16/11   Page 1 of 3 PageID# 180

prepayment made after the first Change Date may reduce the amount of my monthly payments when the amount of such payments are determined at the next Change Date. However, any such reduction in my monthly payments may be off set by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest r other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.0000    % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor and waive the homestead exemption. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**(A) UNTIL MY INITIAL FIXED INTEREST RATE CHANGES TO AN ADJUSTABLE INTEREST RATE UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:**

Transfer of the Property or a Beneficial Interest in Borrower.    If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require, upon such notice as required by law, payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of the Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may ...voke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

**(B) WHEN MY INITIAL FIXED INTEREST RATE CHANGES TO AN ADJUSTABLE INTEREST RATE UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANTS 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION (11)A ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

Transfer of the Property or a Beneficial Interest in the Borrower.    If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require, upon such notice as required by law, payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of the Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in the Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in the Security Instrument. Borrower will continue to be obligated under the Note and the Security Instrument unless Lender releases rower in writing.

VIRGINIA FIXED/ADJUSTABLE RATE NOTE - 1 YEAR TREASURY INDEX
GMACM-CNS.1013.FIX(INT/ADJ)(4-8)-VA (0005)    01/04(Page 2 of 3)    Initials: *EVB MAN*

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

**CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS NOTE BEFORE YOU SIGN IT.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)
CLAUDE V BACHE                   -Borrower

_____ (Seal)
N. FRANCINE NODDERNO             -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

*[Sign Original Only]*

*This is to certify that this is the Note described in and secured by a Deed of Trust dated* October 29, 2003 *on the property located in* LOUDOUN COUNTY , Virginia.

My Commission Expires: 12/31/06          _____
                                          Notary Public



PAY TO THE ORDER OF
WITHOUT RECOURSE
Residential Funding Corporation
By _____
Judy Faber, Vice President

Case 1:11-cv-01057-GBL-TRJ    Document 16-7    Filed 11/16/11    Page 43 of 43 PageID# 182

VIRGINIA FIXED/ADJUSTABLE RATE NOTE - 1 YEAR TREASURY INDEX
GMACM-CNS.1853.FIX(INT)/ARJ(F&Q-VA (0000)          (Page 3 of 3)