MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Norman S. Rosenbaum
Jordan A. Wishnew

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------ | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------ | ) | |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF**
**DEBTORS' FIFTIETH OMNIBUS OBJECTION TO CLAIMS**
<u>**(NO LIABILITY BORROWER CLAIMS – BOOKS AND RECORDS)**</u>

## Table of Contents

| | | Page |
|---|---|---|
| PRELIMINARY STATEMENT | | 1 |
| BACKGROUND | | 2 |
| REPLY | | 2 |
| A. | MARY CRITCHLEY (Claim No. 1576) | 3 |
| B. | RAINER P. WARNER (Claim No. 1574) | 8 |
| C. | PAMELA D. LONGONI, LACEY LONGONI AND JEAN M. GAGNON (Claim Nos. 2292, 2293, 2296 and 2297) | 10 |
| D. | JACQUELINE WARNER (Claim No. 3502) | 18 |
| E. | FELIX O. ABU (Claim Nos. 241 and 246) | 21 |
| F. | DENNIS G. AND MARCENE L. BURGIN (Claim No. 4494) | 22 |
| G. | JAMES C. JACKSON (Claim No. 4664) | 24 |
| H. | FLOYD GREEN (Claim No. 2578) | 25 |
| I. | MICHAEL A. AND GLORIA S. MCGUINTY (Claim Nos. 1963 and 5970) | 26 |
| J. | TOMAS DIAZ (Claim No. 5935) | 29 |
| K. | ISO GRADJAN (Claim No. 4602) | 31 |
| CONCLUSION | | 33 |

## Exhibit List

| Exhibit 1 | Responses to Fiftieth Omnibus Objection to Claims |
|---|---|
| Exhibit 2 | Disputed Claims |
| Exhibit 3 | Supplemental Declaration |

i

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Mortgage Network, Inc. v. Shelton*,
    486 F.3d 815 (4th Cir. 2007) ...................................................................20

*Feinberg v. Bank of N.Y. (In re Feinberg)*,
    442 B.R. 215 (Bankr. S.D.N.Y. 2010)........................................................3

*Gregory v. CitiMortgage*,
    890 F. Supp. 2d 791 (E.D. Mich. 2012)......................................................6

*Hampton v. Countrywide Home Loans, Inc.*,
    No. 2:10-CV-01775-RLH, 2011 WL 1792743 (D. Nev. May 11, 2011) ................................17

*In re Oneida Ltd.*,
    400 B.R. 384 (Bankr. S.D.N.Y. 2009), *aff'd sub nom.*, *Peter J. Solomon Co., L.P. v.
    Oneida, Ltd.*, No. 09-cv-2229, 2010 U.S. Dist. LEXIS 6500 (S.D.N.Y. Jan. 22, 2010) ...........1

*In re Rockefeller Center Properties*,
    272 B.R. 524 (Bankr. S.D.N.Y. 2000), *aff'd sub nom.*, *NBC v. Rockefeller Ctr. Props.
    (In re Rockefeller Ctr. Props)*, 266 B.R. 52 (S.D.N.Y. 2001), *aff'd*, 46 Fed. Appx. 40
    (2d Cir. 2002).....................................................................................1

*LaGrone v. Johnson*,
    534 F.2d 1360 (9th Cir. 1976) ................................................................20

*Martinez v. EMC Mortgage Corp.*,
    No. CV F 09-0813 LJO GSA, 2009 WL 2043013 (E.D. Cal. 2009)......................................19

*Tran v. Quality Loan Services Corp.*,
    No. 2:12-CV-01372-GMN, 2012 WL 4753308 (D. Nev. Oct. 4, 2012) ..........................11, 16

*Yamamoto v. Bank of N.Y.*,
    329 F.3d 1167 (9th Cir. 2003) ................................................................20

STATUTES

11 U.S.C. 502(b)(1) .............................................................................22

11 U.S.C. § 101(5) ..............................................................................22

15 U.S.C. §1635 .................................................................................19

15 U.S.C. §§1641 ................................................................................19

MCL §600.3204 .................................................................................6, 7

ii

NRS § 107.080...................................................................................................................17

NRS § 107.086..............................................................................................................16, 17

ny-1116812

Residential Capital, LLC ("ResCap") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this omnibus reply (the "Reply") to certain responses, objections, and oppositions (collectively, the "Responses") interposed by those claimants (collectively, the "Claimants"), listed on Exhibit 1 annexed hereto, to the *Debtors' Fiftieth Omnibus Objection to Claims (No Liability Borrower Claims – Books and Records)* [Docket No. 5162] (the "Objection").  In support of the Reply, the Debtors submit the Supplemental Declaration of Deanna Horst, ResCap's Chief Claims Officer, annexed hereto as Exhibit 3 (the "Supp. Horst Decl.").  In further support hereof, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors have examined each of the Responses and the statements and exhibits submitted in support thereof.    Exhibit 1 contains a summary of each Claimant's Response.  The Debtors examined their books and records and found no liability with respect to the asserted claims.  Copies of the claims that are at issue in the Responses are attached hereto as Exhibit 2.

2.      If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd sub nom.*, *Peter J. Solomon Co., L.P. v. Oneida, Ltd.*, No. 09-cv-2229, 2010 U.S. Dist. LEXIS 6500 (S.D.N.Y. Jan. 22, 2010); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000), *aff'd sub nom.*, *NBC v. Rockefeller Ctr. Props. (In re Rockefeller Ctr. Props)*, 266 B.R. 52 (S.D.N.Y. 2001), *aff'd*, 46 Fed. Appx. 40 (2d Cir. 2002).  Each Claimant has failed to provide a sufficient explanation as to why its claim represents a valid liability of the Debtors that should be allowed.  Accordingly, the relief sought in the Objection should be granted with respect to the Claimants.

## BACKGROUND

3.      In connection with the claims reconciliation process, the Debtors

identified certain claims filed by Borrowers[1] that either (i) contradict the information in the

Debtors' books and records and/or (ii) fail to establish a liability reflected in the Debtors' books

and records (together, the "No Liability Borrower Claims").

4.      After consulting with SilvermanAcampora LLP, special borrowers'

counsel to the official committee of unsecured creditors ("Special Counsel"), the Debtors sent

Request Letters to those Borrowers who filed the No Liability Borrower Claims with insufficient

or no supporting documentation requesting additional documentation in support of such claims.

The Request Letters required the Claimant to substantiate the legal and factual reasons as to why

the Claimant believes it is owed money or is entitled to other relief from the Debtors, and the

Claimant was required to provide copies of any and all documentation that the Claimant believes

supports the basis for its claim.

5.      The Debtors either did not receive any response to the Request Letters or

received insufficient information to establish a basis for liability with respect to the applicable

No Liability Borrower Claims.

6.      Accordingly, on September 20, 2013, the Debtors filed the Objection to

the No Liability Borrower Claims.  After the Debtors filed the Objection, each of the Claimants

submitted a Response, as summarized on Exhibit 1 annexed hereto.

## REPLY

7.      A filed proof of claim is "deemed allowed, unless a party in interest . . .

objects." 11 U.S.C. § 502(a).  Moreover, section 502(b)(1) of the Bankruptcy Code provides, in

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in each Objection.

2

relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law…." 11 U.S.C. 502(b)(1).  Furthermore, the burden of persuasion is on the holder of a proof of claim to establish a valid claim against a debtor.  *Feinberg v. Bank of N.Y. (In re Feinberg)*, 442 B.R. 215, 220-22 (Bankr. S.D.N.Y. 2010).

8.    Upon review of the Responses and as explained in further detail below and in the Supplemental Declaration, the Debtors conducted an exhaustive examination of their books and records to assess the allegations made in the No Liability Borrower Claims and the Responses.  The Debtors determined that the Claimants' allegations of liability have no factual or legal validity and are not proper grounds for the allowance of a claim.  Accordingly, the No Liability Borrower Claims should be disallowed and expunged from the Debtors' claims register. Below the Debtors address the Responses filed by each Claimant.

**A.    MARY CRITCHLEY (Claim No. 1576)**

9.    Ms. Critchley seeks recovery against GMACM in the amount of $970,917 on account of "wrongful foreclosure" and "wrongful conduct." For the reasons described herein, the Debtors assert that they acted appropriately and reasonably and are not responsible for the damages identified in Ms. Critchley's proof of claim.

10.    Ms. Critchley asserts that "GMAC in December 2009 arbitrarily increased her payments from $2,093.00 per month to $3,342.00 per month by requiring escrow of taxes and she responded that she would pay all payments and taxes when due as she always had."  The increase in payments was not "arbitrary."  More specifically, as a servicer, it is standard practice for GMACM to escrow for taxes in the event that a borrower does not pay taxes, which can threaten the lienholder's position against the real property.  As a result, Ms. Critchley 's monthly mortgage payment increased to include an escrow for taxes.  According to the Debtors' books

3

and records, property taxes began being escrowed because 2008 Town and County taxes had to be paid as well as the first installment of 2009 taxes. *See* Supp. Horst Decl. at ¶ 4. In fact, in January 2012, the Debtors provided Ms. Critchley with a written explanation for the escrow consistent with the aforementioned explanation. *Id.*

11.    Ms. Critchley next asserts that "GMAC advised her not to pay payments for 90 days and they would modify the loan (to where it was and had been)." This unsubstantiated allegation is entirely false. There is nothing in the Debtors' servicing notes to indicate that any GMACM employee advised Ms. Critchley to do so. *See* Supp. Horst Decl. at ¶ 5.

12.    In fact, the Debtors attempted to effectuate a workout with Ms. Critchley from January through April 2010; however, nothing came to fruition. More specifically, the Debtors first received a workout package for a loan modification on January 9, 2010, and Ms. Critchley supplemented that information on January 20, 21, 22 and 25th, 2010. GMACM attempted to call Ms. Critchley on February 11, 2010 to inform her of missing documents needed to complete the workout package; however, she was not able to be reached so a message was left for Ms. Critchley requesting a call back. *See* Supp. Horst Decl. at ¶ 6. Ms. Critchley sent in additional workout documents on March 5, 2010; however, the workout documents were deficient because a 3-month profit-and-loss ("P&L") statement was missing, thus preventing GMACM from advancing its review of the workout package. *Id.* at ¶ 7. On April 9, 2010, Ms. Critchley spoke with a GMACM employee and was advised that a P&L statement as well as the completed 4506-T form[2] needed to be submitted for the loan modification review to move

---

[2] The 4506-T form gave the Debtors permission to pull Ms. Critchley's income tax returns that had been filed.

ny-1116812

forward.  The form was a HAMP[3] requirement.  According to the Debtors' servicing notes, Ms.

Critchley acknowledged this and stated that she would be making a payment on the account by

the end of April, 2010. *Id.* at ¶ 8.  The Debtors received new workout documents on April 13,

2010; however, the 4506-T form was still not completely filled out.  Accordingly, a new missing

items letter was sent to Ms. Critchley. *See Id.* at ¶ 9.  On May 20, 2010, a second missing items

letter was sent to Ms. Critchley as the 4506-T was still not complete and the P&L statement in

the Debtors' file was dated.  On June 8, 2010, Ms. Critchley sent in another set of workout

documents; however, the account was denied because the workout package was invalid because

the data dated back to January 2010, when more recent information was required.  At no time

was Ms. Critchley offered a loan modification or promised a loan modification by the Debtors.

*Id.*

13.    A foreclosure sale was then set for June 15, 2010 because there was not a

valid and completed loan modification workout package submitted for review at that time.  The

property was sold at the foreclosure sale to MERS, solely as nominee for the lender and lender's

successors and assigns on June 15, 2010 (the "Foreclosure Sale"), with a six month redemption

period.  Contrary to Ms. Critchley's assertions, the Debtors' servicing notes do not indicate that a

GMACM employee ever advised Ms. Critchley that she was required to vacate her property

during the redemption period.  In fact, the redemption period permits a borrower to remain in

their home until the end of the six month period.  Only at the end of that period, do formal

eviction proceedings begin. *See* Supp. Horst Decl. at ¶ 10.

14.    In May 2011, the servicer (GMACM) elected to rescind the Foreclosure

Sale only because of an adverse ruling against MERS by the Michigan state court.  The loan was

---

[3]The Home Affordable Modification Program

in default and proper foreclosure notices were provided to Ms. Critchley.  Ms. Critchley's

account was subsequently reinstated on November 18, 2011.  On that date, GMACM advised

Ms. Critchley that her account remained past due and provided her with 30 days to reinstate the

loan. *See* Supp. Horst Decl. at ¶ 11.  Once the thirty days passed without Ms. Critchley curing

the outstanding amounts, the foreclosure process restarted on December 23, 2011.  The property

was subsequently sold on September 11, 2012, at which time the account was owing for

February 2010 through September 2011. *See Id.*

15.    Under Michigan Law, a wrongful foreclosure action arises when the

foreclosure does not meet the statutory requirements of MCL §§ 600.3204, 600.3208 or

600.3212.  *See Gregory v. CitiMortgage*, 890 F. Supp. 2d 791, 799 (E.D. Mich. 2012).  Ms.

Critchley cannot state a claim for wrongful foreclosure because the Debtors complied with all of

the relevant statutes with regards to both the June 15, 2010 and September 11, 2012 foreclosure

sales, and Ms. Critchley has not provided evidence to the contrary.

16.    MCL §600.3204(1) requires the following circumstances to exist for a

foreclosure to be valid:

> (a) A default in a condition of the mortgage has occurred, by which the power to sell
> became operative.
> (b) An action or proceeding has not been instituted, at law, to recover the debt secured by
> the mortgage or any part of the mortgage; or, if an action or proceeding has been
> instituted, the action or proceeding has been discontinued; or an execution on a judgment
> rendered in an action or proceeding has been returned unsatisfied, in whole or in part.
> (c) The mortgage containing the power of sale has been properly recorded.
> (d) The party foreclosing the mortgage is either the owner of the indebtedness or of an
> interest in the indebtedness secured by the mortgage or the servicing agent of the
> mortgage.

*See* MCL §600.3204(1).

In this case, the default condition occurred when Ms. Critchley failed to make the payments

required by her mortgage agreement.  There was no proceeding instituted to recover the debt

secured by her mortgage, the mortgage was properly recorded on December 22, 2005, and GMACM had an interest in the indebtedness (Mortgage Electronic Registration Systems, Inc. ("MERS") was the foreclosing party in the first foreclosure, US Bank National Association was the foreclosing party for the second foeclosure). *See* Supp. Horst Decl. at ¶ 12. As a result, the Debtors complied with all of the requirements of 600.3204(1).

17.    The statute also requires that the Debtors properly record a chain of title that evidences the assignment of the mortgage. *See* MCL § 600.3204(3). The Debtors properly recorded the assignment to MERS on April 22, 2010 and U.S. Bank National Association on February 29, 2012. *See Id.* at ¶ 13.

18.    The Debtors complied with MCL §600.3204(4) when they mailed notice to Ms. Crtichley on April 19, 2010 and July 6, 2012 informing her that the foreclosure process had commenced and that she had the right to request mediation. *See Id.* at ¶ 14.

19.    Finally, the Debtors complied with the notice requirements of MCL §§ 600.3208 and 600.3212 when they published the foreclosure notice in the Detroit Legal News and listed the information required under § 600.3212. *See Id.* at ¶ 15.

20.    As a result, Ms. Critchley would be unsuccessful in her wrongful foreclosure claim even if she were to allege violations of MCL §§ 600.3204, 600.3208, or 600.3212 because the Debtors complied with the relevant statutory requirements.

21.    In sum, GMACM, as servicer of Ms. Critchley's mortgage loan, acted properly in pursuing the foreclosure and utilized its best efforts to assist Ms. Critchley with a workout of her loan when payments became past due. Accordingly, there is no valid liability against GMACM on account of wrongful foreclosure or wrongful conduct.

7

B.    **RAINER P. WARNER (Claim No. 1574)**

22.    Mr. Warner seeks to recover against Debtor ResCap in the amount of $500,000 (the "R. Warner Claim") on account of purported "financial injury which occurred due to Errors, Misrepresentations, and Deficiencies leading to the foreclosure process."   For the reasons discussed herein, the Debtors assert that the Objection should be granted and Claim No. 1574 should be disallowed and expunged from the Debtors' claims register.

23.    The Debtors began the foreclosure process with Mr. Warner in January 2009. Ultimately, the property was sold on November 28, 2012.  During the interim period, as described herein, the Debtors pursued numerous loss mitigation options with Mr. Warner.  For example, on February 2, 2009, a repayment plan was set up but cancelled two days later when Mr. Warner requested different terms and a change in the due date of the loan.  Notwithstanding, one week later, on February 11, 2009, a traditional trial modification was approved, and by March 31, 2009, a permanent modification had been approved but was never completed because Mr. Warner neither signed the agreement or provided the initial contribution required by the agreement. *See* Supp. Horst Decl. at ¶ 17.

24.    In the time that followed, at least four other loan modifications (both HAMP and traditional) were sought, but those were denied for one of the following reasons: (i) GMACM was not able to reduce the payment, interest rate or defer enough of the principal to lower the payment and comport with investor guidelines, (ii) Mr. Warner's income was not sufficient to support the required monthly payments, or (iii) the net present value of the property was less than zero.  In sum, GMACM worked with Mr. Warner for nearly four years to avoid the foreclosure of his home, but the circumstances could not support an acceptable set of payment terms under which to modify the loan. *See* Supp. Horst Decl. at ¶ 18.

25.    Mr. Warner also asserts that GMACM "failed to submit any record evidence proving that it had the right to enforce the note on the date the complaint was filed." To the contrary, Florida is considered an "Original Document" state. A foreclosure cannot go forward unless the original Note is filed in the court. Mr. Warner also notes that "[t]here was a note introduced that had a blank endorsement in order to prove ownership, but there was nothing in the record which shows that the note was acquired prior to the filing/transfer of the complaint." *See* Warner Claim. Mr. Warner's note was held by MERS, as assignee for the lender and its successors. Accordingly, due to the electronic nature of the MERS system, the endorsement was allowed to be blank. More importantly, the original note, mortgage and title were included with the filed Complaint and Lis Pendens. Therefore, the filing of the foreclosure action was handled appropriately under the circumstances. *See* Supp. Horst Decl. at ¶¶ 19-20.

26.    Mr. Warner also asserts that the principal loan balance increased as a result of "fraudulent charges and fees." The increase in the loan balance noted in the R. Warner Claim was a result of costs associated with property valuations (i.e., broker price opinions or "BPOs") and property inspections, each of which are standard business practices when an account becomes delinquent. The Debtors' books and records indicate that nine BPOs were completed on the property during Loss Mitigation review between March 2009 and August 2012. A BPO has to be completed for either a Loss Mitigation Short sale or Modification review, and a BPO is only good for 120 days. Once that period of time expires, another BPO has to be completed if the loan is still in review for Loss Mitigation. Pursuant to the terms of the Note and Deed, the servicer is permitted to pass along these BPO expenses to the borrower. *See* Supp. Horst Decl. at ¶ 21. In addition, it is GMACM's standard servicing procedures to complete property inspections every month starting the month that the account falls 45 days

9

delinquent. The fees from the inspections are the borrower's responsibility to pay as the account is delinquent. *See Id.*

27.     Mr. Warner also alleges in his claim that "GMAC have not done any inspections or preservations of the property." To the contrary, the Debtors' Books and Records confirm that all inspections were complete when ordered.  A property inspection can range from driving by the home to see if it appears to be occupied to a knock on the door; the majority are a drive by as the goal of a property inspection is to make sure the property is maintained and occupied.  *See* Supp. Horst Decl. at ¶ 22.

28.     Finally, Mr. Warner asserts in his claim that "there were fees and charges that I should not have been required to pay in addition to the normally scheduled principal."  His complaint goes to the increase of $549 in his monthly payment.  The monthly payment increased because the Debtors had to satisfy $11,000 of past due 2007 county taxes as well as cover the cost of hazard insurance that the Mr. Warner did not have on the property in 2009.  *See* Supp. Horst Decl. at ¶ 23.

## C.    PAMELA D. LONGONI, LACEY LONGONI AND JEAN M. GAGNON (Claim Nos. 2292, 2293, 2296 and 2297)

29.     Ms. Gagnon and Ms. Longoni seek a recovery against Debtors GMACM, Executive Trustee Services, LLC ("ETS"), Residential Funding Company, LLC ("RFC"), and Residential Asset Mortgage Products, Inc. ("RAMP"). The Objection relates solely to the filed claims against RFC and RAMP, which, as explained below, lack any factual or legal merit and fail to state valid claims against RFC or RAMP[4] and should be disallowed and expunged from the Debtors' claims register.

---

[4] The Debtors have not yet filed an objection to Ms. Gagnon and Ms. Longoni's filed claims against GMACM and ETS, but fully reserve all rights to do so at a future date.

30.    On September 29, 2005, Jean M. Gagnon and Pamela Longoni refinanced a prior mortgage loan on real property located at 5540 Twin Creeks Drive, Reno, Nevada 89523 (the "Property") and entered into a $432,000 Note and Deed of Trust with EquiFirst Corporation (the "Loan"). (Am. Compl. ¶ 25, attached to Supp. Horst Decl. as Ex. C-1).

31.    RFC purchased the Loan from Equifirst Corporation in November of 2005. (Am. Resp. Pls.' First Set of Interrog. to Def. RFC at 3, attached to Supp. Horst Decl. as Ex. C-2). Pursuant to the Pooling and Servicing Agreement (the "PSA") between RAMP, RFC, and U.S. Bank, executed on December 1, 2005, the Loan was securitized on December 28, 2005. On December 28, 2005, RFC and RAMP also entered into an Assignment and Assumption Agreement, which provided for the automatic transfer of ownership of the Loan to the Trust, RAMP 2005-EFC7 (the "Trust").[5] Ownership of the Loan transferred to the Trust on December 28, 2005, thereby divesting RAMP of any ownership of the Loan. Pursuant to the PSA, U.S. Bank is the trustee for RAMP 2005-EFC7 and RFC is the master servicer of the Loan. On May 1, 2007, RFC delegated its servicing rights to GMACM under the terms of the Servicer Guide between RFC and GMACM. *See* Supp. Horst Decl. at ¶ 25.

32.    In November 2007, GMACM modified the Loan.  However, in 2008, Ms. Gagnon and Ms. Longoni's apparent financial difficulties continued and they defaulted on the Loan. *See* Supp. Horst Decl. at ¶ 26. GMACM referred the loan to its foreclosure trustee, ETS, who recorded a Notice of Breach and Default and of Election to Cause Sell of Real Property Under Deed of Trust on or about February 26, 2009. *See Id.*, with Ex. -4 attached thereto.

33.    Ms. Gagnon and Ms. Longoni contacted GMACM in early 2009 to discuss a second possible modification of the Loan. (Am. Compl., ¶ 9). GMACM sent a package of

---

[5] The Trust was created for the benefit of the Trust's certificate holders.

records to fill out and return in order to be considered for a possible loan modification. *Id.* In

March 2009, Ms. Gagnon and Ms. Longoni and GMACM entered into a three month **trial**

repayment plan, the terms of which included payments of $1,600.00 a month from April to June

2009. (*Id.* ¶¶ 10-11).[6] Longoni made her $1,600 payments in April, May, and June 2009. *See*

Supp. Horst Decl. at ¶ 27.

34.    In July 2009, GMACM informed Ms. Gagnon and Ms. Longoni that they

needed to submit an updated application in order to be considered for a loan modification under

HAMP, which had recently been enacted.  GMACM's records do not include any evidence that

Ms. Gagnon and Ms. Longoni ever submitted the financial package necessary for a review for a

permanent loan modification. *See* Supp. Horst Decl. at ¶ 28.

35.    Although GMACM had originally put the foreclosure on hold due to Ms.

Gagnon and Ms. Longoni's default on the Loan and their failure to submit the financial package

for review. On July 23, 2009, ETS recorded the Notice of Trustee's Sale and that notice also ran

in the local newspaper on July 24, 2009. *See* Supp. Horst Decl. at ¶ 29.  GMACM continued to

contact Ms. Longoni by phone and letter to ask that she complete the financial package for a

permanent loan modification review, which she never did. *See Id.*  Therefore, on August 14,

2009, ETS conducted a foreclosure sale, and the Property was sold to a third-party purchaser.

(Am. Compl. ¶ 59).

36.    On or about April 28, 2010, Ms. Gagnon and Ms. Longoni filed suit

against GMACM and ETS, along with several individual defendants, in the Second Judicial

District Court of the State of Nevada in Washoe County. The case was removed to the United

States District Court for the District of Nevada, Reno Division, Case No. 3:10-cv-00297. On

---

[6] The trial repayment plan originally called for monthly payments of $2,270 but Longoni advised GMACM that she
could not afford such payments. Therefore, the trial payments were reduced to $1600.

September 17, 2010, Ms. Gagnon and Ms. Longoni filed an Amended Complaint; on February 25, 2011, Ms. Gagnon and Ms. Longoni filed a second Amended Complaint, adding RFC as a defendant; on September 12, 2011, Ms. Gagnon and Ms. Longoni filed a third Amended Complaint, adding RAMP as a defendant. On May 17, 2012, Defendants GMACM, ETS, RFC, and RAMP filed their notice of bankruptcy, and on September 28, 2012, they filed an amended notice of bankruptcy.

        *a.*   *Ms. Gagnon and Ms. Longoni's Claims Against RFC Should Be Disallowed Because RFC Had No Direct Involvement In Ms. Gagnon and Ms. Longoni's Loan.*

      37.     According to Ms. Gagnon and Ms. Longoni, "even a cursory review" of RFC's responses to Ms. Gagnon and Ms. Longoni's interrogatories proves it was "directly involved in both the loan modification process and the foreclosure process." (D.E. 5420 at p. 4). Ms. Gagnon and Ms. Longoni base their entire argument for RFC's involvement on the original version of RFC's interrogatory responses (*Id.*) and conveniently ignore RFC's corrected Amended Responses to Plaintiffs' First Set of Interrogatories to Defendant RFC (the "Amended Responses"), which Ms. Gagnon and Ms. Longoni received on August 1, 2011, and which unequivocally demonstrate that RFC had no involvement in either the loan modification or foreclosure process at issue. By selectively and inaccurately citing RFC's **unamended** responses, Ms. Gagnon and Ms. Longoni fail to apprise the Court of RFC's definitive statements outlining its lack of involvement in the subject loan.

      38.     As master servicer, RFC "delegated [its] servicing rights to GMAC Mortgage, LLC ("GMACM"), under the terms contained in the Servicer Guide between RFC and GMACM," and "no individual at RFC had any further contact with GMACM relating to

13

Plaintiffs' loan." (*See* Am. Resp. Pls.' First Set of Interrog. to Def. RFC at 2, 6, attached to Supp.

Horst Decl. as Ex. C-3). Additionally, as outlined in RFC's Amended Responses:

- "RFC had no direct contact or dealings with Plaintiffs relating to their loan, all decisions and contact were handled through RFC's servicer, GMACM." (*Id.* at 2).

- "No persons employed at RFC had any contact with Plaintiffs during the time period in question." (*Id.* at 5).

- "No persons employed at RFC directly participated in [the] evaluation of [Ms. Gagnon and Ms. Longoni's] Loan." (*Id.* at 6).

- "There is no evidence in RFC's computer system that anyone at RFC performed any analytical oversight on the loan other than when requested by undersigned counsel [in this suit]." (*Id.* at 6-7).

- "RFC played no direct role in the decision to grant or deny any plaintiff a loan modification on this particular [l]oan." (*Id.* at 8).

- "[N]o individual at RFC had any direct contact with GMACM relating to Plaintiffs' loan and the subsequent foreclosure." (*Id.* at 10).

- "[A]ll requests [for a loan modification] were handled and considered by and through the servicer on the loan, GMACM." (*Id.* at 11).

- "RFC did not make any decisions concerning a loan modification request on this particular [l]oan. All of the decision making authority is delegated to GMACM through the Servicer Guide." (*Id.*)

- "RFC had no direct contact with Plaintiff regarding their loan and made no decision concerning the propriety of a modification of this [l]oan." (*Id.* at 12).

39.     RFC, in its role as master servicer, never interacted directly with Ms.

Gagnon and Ms. Longoni regarding their loan and never directed GMACM regarding Ms.

Gagnon and Ms. Longoni's loan.  All decision-making authority relating to Ms. Gagnon and Ms.

Longoni's loan was delegated to GMACM, and thus the claims against RFC should be

disallowed. *See* Supp. Horst Decl. at ¶ 30.

> b.  *Ms. Gagnon and Ms. Longoni's Claims Against RAMP Should Be Disallowed Because RAMP Had No Direct Involvement In* Ms. Gagnon and Ms. Longoni's Loan.

14

40.     As the basis of their Claim against RAMP, Ms. Gagnon and Ms. Longoni

incorrectly identify it as "the holder of the note and security interest in the plaintiffs' loan." (D.E.

5420 at 2). RAMP, however, is neither the holder of the Note nor the owner of the Loan. RAMP

simply bought Ms. Gagnon and Ms. Longoni's loan, along with many others, on the open market

and, immediately upon the creation of a pooling and servicing agreement, deposited Ms. Gagnon

and Ms. Longoni's loan into the Trust created for the benefit of the Trust's certificate holders.

Upon the December 2005 deposit of Ms. Gagnon and Ms. Longoni's loan into the Trust, RAMP

divested itself of any ownership of Ms. Gagnon and Ms. Longoni's loan. *See* Supp. Horst Decl.

at ¶ 31.

41.     Ms. Gagnon and Ms. Longoni inaccurately allege that RFC informed Ms.

Gagnon and Ms. Longoni that RAMP "was in fact the proper defendant," citing an e-mail from

counsel for RFC and RAMP, attached as Exhibit 2 to their Opposition. (D.E. 5420 at 3). The

August 5, 2011 e-mail, however, refutes this assertion as it actually outlines the role of RAMP as

depositor and U.S. Bank's role as trustee.

> The trust into which the loan at issue was deposited by RAMPI is
> identified as "RAMP 2005 EFC 7." The documentation showing the assignment
> of the loan passing from RFC to RAMPI is the Assignment and Assumption
> Agreement (previously produced). The Pooling and Servicing Agreement
> (previously produced) governs the trust, including without limitation the
> following: (a) RAMPI's deposit of the loan (among many others) into the trust,
> including "without recourse assignment of all right, title and interest" in the
> deposited loans, (b) RAMPI received certificates for the trust in exchange for
> depositing loans into the trust; and (c) the trustee for "RAMP 2005 EFC 7" is U.S.
> Bank National Association.

(D.E. 5420-2 Ex. 2 at 1).

42.     Thus, the e-mail cited by Ms. Gagnon and Ms. Longoni simply confirms

that RAMP acted solely as depositor back in 2005.  (*See also* Am. Resp. Pls.' First Set of

Interrog. to Def. RFC at 2, attached to Supp. Horst Decl. as Ex. C-3 (stating that U.S Bank

"operates as the Trustee for the Trust that owns the note. The owner of the note is the Trust itself,

RAMP 2005-EFC7")). Therefore, Ms. Gagnon and Ms. Longoni misstate the role of RAMP and

fail to articulate any claim against that entity.

> c.  Ms. Gagnon and Ms. Longoni*'s Claims Related To NRS § 107.086 Should Be
> Disallowed Because They Fail As A Matter Of Law.*

43.      Ms. Gagnon and Ms. Longoni allege that they were not given the

opportunity to mediate under the Nevada Foreclosure Mediation Program, per NRS § 107.086.

According to Ms. Gagnon and Ms. Longoni, "In this case, mediation was required[,] and

Residential Asset Mortgage Products, Inc., failed to participate in that process before the

property was foreclosed upon," making the "subsequent foreclosure unlawful." (D.E. 5420 at 5).

These arguments fail, however, because NRS § 107.086 only applies to foreclosures with notices

of default recorded on or after July 1, 2009, and NRS § 107.086 only applies to trustees, which

RAMP was not. *See supra* Section b.

44.      First, NRS § 107.086, which was enacted on July 1, 2009, only applies to

sales of owner-occupied housing where the notice of default was recorded on or after July 1,

2009. According to the Nevada legislature, "The amendatory provisions of this act governing

trust agreements which concern owner-occupied housing, as defined in section 1 of this act,

apply only with respect to such agreements for which a notice of default is recorded on or after

July 1, 2009."[7] 2009 Nevada Laws Ch. 364 (A.B. 149); *Tran v. Quality Loan Serv. Corp.*, No.

2:12-CV-01372-GMN, 2012 WL 4753308, at *5 (D. Nev. Oct. 4, 2012) ("As of July 1, 2009, a

Notice of Default such as the one here must include a 'form upon which the grantor or the person

---

[7] *See* Nev. Foreclosure Mediation R. 1 (2011) ("Pursuant to the jurisdictional authority provided by Chapter 107 of the Nevada Revised Statutes and the Nevada Supreme Court's inherent power to create rules for the efficient administration of justice, these rules are enacted to apply to the mediation of any owner-occupied residential foreclosure arising from the recording of a notice of default and election to sell on or after July 1, 2009.").

16

who holds the title of record may indicate an election to enter into mediation or to waive mediation'.") (citing NRS § 107.086); *Hampton v. Countrywide Home Loans, Inc.*, No. 2:10-CV-01775-RLH, 2011 WL 1792743, at *4 (D. Nev. May 11, 2011) ("Hampton also claims that Defendants failed to send the Election/Waiver of Mediation Form required by NRS § 107.086. However, NRS § 107.086 did not require such forms until July 1, 2009. Since Defendants filed the first Notice of Default in March 2009, and no statutory provision requires notices subsequent to the first to include the mediation forms, Defendants were not required to include the mediation forms.") (internal citation omitted).

45.     Here, ETS recorded the notice of default with the Washoe County Recorder on February 26, 2009, several months **before** NRS § 107.086's effective date of July 1, 2009. (*See* Notice of Breach and Default, attached to Supp. Horst Decl. as Ex. C-5). There is no other notice of default recorded. Thus, because NRS § 107.086 only applies to notices of default recorded on or after July 1, 2009, Ms. Gagnon and Ms. Longoni's allegations regarding NRS § 107.086 fail as a matter of law.

46.     Second, the requirements of NRS § 107.086 apply to Nevada **foreclosure trustees**. *See* NRS § 107.086(2) ("The **trustee** shall not exercise a power of sale pursuant to NRS § 107.080 unless the **trustee**...") (emphasis added). The foreclosure trustee in this matter was ETS, not RAMP. (*See* Am. Resp. Pls.' First Set of Interrog. to Def. RFC at 2, attached to Supp. Horst Decl. as Ex. C-3 ("Executive Trustee Services is the foreclosure Trustee of the Loan"). RAMP had no relationship with Ms. Gagnon and Ms. Longoni's loan at the time of foreclosure and thus no obligation to participate in any mediation program under NRS § 107.086. *See Id.* (stating that U.S. Bank "operates as the Trustee for the Trust that owns the note. The owner of the note is the Trust itself, RAMP 2005-EFC7")). Therefore, even if NRS § 107.086 applied to

17

notices of default recorded prior to July 1, 2009, the statute would not apply to a depositor such as RAMP.

### D.    JACQUELINE WARNER (Claim No. 3502)

47.    Ms. Warner seeks a recovery against Debtor GMAC-RFC Holding Company, LLC ("GMAC-RFC") on account of the purported rescission of her mortgage loan. The claim (a copy of which is attached as part of Ex. 2, the "Warner Claim"), as well as the response (the "Warner Response") (D.E. 5454), lack any legal merit, and Claim No. 3502 should be disallowed and expunged from the Debtors' claims register.

48.    As set forth in the Warner Response, Ms. Warner purportedly rescinded her acceptance of the mortgage originated by CMG Mortgage Inc.  It is Ms. Warner's belief that by delivery of the cancellation notice to GMACM, she voided the security interest against her real property.  Ms. Warner now asserts that she has a claim against the Debtors because she had to clear the "wrongfully-maintained lien on the property."  According to Claim No. 3502, Ms. Warner is owed over $1 million, which is the same amount required to pay off her mortgage loan. *See* Warner Response at 2.  Ms. Warner also asserts that GMACM's security interest in the real property (located in California) became unsecured, and as a result of her bankruptcy discharge, her unsecured obligation to the Debtors is fully discharged.

49.    Claim No. 3502 is not valid against any debtor entity for the following reasons: (i) the Debtors did not originate the loan or ever maintain an ownership interest in the loan; GMACM only serviced the loan for Ally Bank (formerly GMAC Bank) until the servicing was transferred to Ocwen Loan Servicing, LLC; (ii) a loan servicer is not responsible for a civil

18

action under TILA (15 U.S.C. §1635, *et seq*.); rather, the claim is against the lender[8]; and (iii) a

borrower cannot unilaterally rescind a loan.

50.    Generally, a civil action under TILA may be brought against the assignee

of the originating lender if (1) the TILA violation is apparent on the face of the disclosure

statement provided in connection with the loan transaction and (2) the assignment of the loan to

the assignee was voluntary. *See* 15 U.S.C. §§1641(e)(1)(A), (B).  Likewise, "any consumer [that]

has the right to rescind a transaction under section 1635 of this title may rescind the transaction

as against any assignee of [certain mortgages]."  (*Id*. at §1641(c).)  However, a "servicer of a

consumer obligation arising from a consumer credit transaction shall not be treated as an

assignee of such obligation for purposes of this section unless the servicer is or was the owner of

the obligation."  (*Id*. at §1641(f)(1).  As set forth in the Warner Claim, GMACM is the servicer,

and CMG Mortgage, Inc. was the lender and beneficiary on the Deed of Trust.  Nowhere does

Ms. Warner assert that GMACM or GMAC-RFC owned, or were ever assigned, an interest in

her mortgage loan.

51.    Ms. Warner has attempted, and purportedly believes that she has

successfully rescinded the mortgage loan.  However, "neither TILA nor Reg. Z 'establishes that

a borrower's mere assertion of the right of rescission has the automatic effect of voiding the

contract.'" *Martinez v. EMC Mortg. Corp*., No. CV F 09-0813 LJO GSA, 2009 WL 2043013, *4

(E.D. Cal. 2009) (quoting *Yamamoto v. Bank of N.Y.*, 329 F.3d 1167, 1172 (9th Cir. 2003)).  A

plaintiff's unilateral "rescission" does not effectuate rescission:

> This Court adopts the majority view of reviewing courts that
> unilateral notification of cancellation does not automatically void
> the loan contract.  As the Ninth Circuit observed in *Yamamoto* [*v*.

---

[8] By this Objection, the Debtors are not taking a position whether Ms. Warner's claim against the non-debtor lender
is a viable claim.

> *Bank of New York*, 329 F.3d 1167 (9th Cir. 2003)], "**[o]therwise, a borrower could get out from under a secured loan simply by claiming TILA violations, whether or not the lender had actually committed any**."
> . . . .
> "Until such decision is made [by the creditor acknowledging that the right of rescission is available or until an appropriate decision maker has so determined], the [borrowers] have only advanced a claim seeking rescission."

*Am. Mortg. Network, Inc. v. Shelton*, 486 F.3d 815, 821 (4th Cir. 2007) (emphasis added).

52.    Ms. Warner does not proffer any evidence that GMAC-RFC, GMACM or another one of the Debtors specifically agreed to rescind the mortgage loan.  Therefore, Ms. Warner's attempts to rescind the loan are invalid and have no legal effect.

53.    In addition, Ms. Warner never tendered any proceeds back to GMAC-RFC, GMACM or any other debtor to complete the attempt at rescission (even if it was valid). The Ninth Circuit has held that in applying TILA, "a trial judge has the discretion to condition rescission on tender by the borrower of the property he had received from the lender." *Yamamoto*, 329 F.3d at 1171 (internal punctuation omitted).)  Indeed, the Ninth Circuit has held that "rescission *should* be conditioned on repayment of the amounts advanced by the lender." *Id*. (emphasis in the original); *LaGrone v. Johnson*, 534 F.2d 1360, 1362 (9th Cir. 1976).  According to the Debtors' books and records, within two weeks after the Debtors commenced foreclosure proceedings against Ms. Warner, she paid off the loan in full in November 2012.  Before then, Ms. Warner never tendered payment to the Debtors.  Thereafter, the Debtors filed a "Notice of Rescission of Notice of Defaul" and a reconveyance document was recorded with the couty as document number 2012-183564 on December 6, 2012.  *See* Supp. Horst Decl. at ¶35.

54.    In sum, Ms. Warner has not proffered any evidence to substantiate a claim against GMAC-RFC or GMACM.

E.    **FELIX O. ABU (Claim Nos. 241 and 246)**

55.    On January 9, 2007, Greenpoint Mortgage Funding, Inc. originated a loan to Mr. Abu (the "Abu Loan").  On April 2, 2007, GMACM began sub-servicing the Abu Loan, and on February 16, 2013 servicing of the Abu Loan was transferred to Ocwen.  Nationstar Mortgage 42112 Series GPMF 2007-AR2 is the investor for the Abu Loan.  *See* Supp. Horst Decl. at ¶36.

56.    On July 2, 2012, Mr. Abu filed a proof of claim against ETS, which was designated as claim number 241 (the "ETS Claim"), and a second claim against ResCap designated as claim number 246 (the "GMACM Claim", and together with the ETS Claim, the "Abu Claims").[9]  The ETS Claim asserts a claim for $121,125.00, and the stated basis of the claim is a mortgage note.  The GMACM Claim asserts a claim for $1,248,955.60, which also relates to a mortgage note, and also includes a further description stating "improper and fraudulent foreclosure and transfer of title."

57.    Also attached to the GMACM Claim is what appears to be the purported basis for the Abu Claims, which is an adversary proceeding he commenced in his personal chapter 7 bankruptcy case before the United States Bankruptcy Court for the Eastern District of California on January 18, 2013.  Mr. Abu filed his adversary proceeding against "GMAC/ALLY BANK, INC. a Delaware Corporation, U.S. BANK NATIONAL ASSOCIATION on BEHALF OF GREENPOINT MORTGAGE FUNDING TRUST SERIES 2007-AR2'S, and any known or unknown dba used by GMAC/ALLY BANK, INC. a Delaware Corporation, Does 1-50."

58.    On February 21, 2013, GMACM moved to dismiss the adversary proceeding, stating that, among other things, Mr. Abu did not have standing to sue GMACM and

---

[9] On June 14, 2013, Mr. Abu filed an amendment to the GMACM Claim to assert the claim against GMACM instead of ResCap.

the other defendants as, upon the filing of his bankruptcy case, such affirmative claims vested in the chapter 7 trustee of his bankruptcy estate.   On April 5, 2013, the Honorable Thomas C. Holman, United States Bankruptcy Judge for the Eastern District of California, entered a civil minute order dismissing the adversary proceeding on account of Mr. Abu's lack of standing to prosecute the adversary proceeding. *See* Supp. Horst Decl. at ¶37.  Mr. Abu did not appeal Judge Holman's dismissal.  *See* Id.

59.     Pursuant to section 101 of the Bankruptcy Code, a creditor holds a claim against a bankruptcy estate only to the extent that it has a "right to payment" for the asserted liability.  *See* 11 U.S.C. § 101(5).  Likewise, section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that the Court shall allow a claim except to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1).

60.     The Eastern District of California Bankruptcy Court dismissed Mr. Abu's adversary proceeding.  Mr. Abu has not provided any information that suggests that there has been any material change in Mr. Abu's bankruptcy case to suggest that he now has standing to assert the claims of his chapter 7 estate against the Debtors.  The chapter 7 trustee has not filed a claim against the Debtors nor has the trustee replied to the Objection.  Until such time that Mr. Abu can demonstrate that these claims do not belong to the Chapter 7 trustee, Mr. Abu cannot properly assert these claims against the Debtors and therefore, the objection to his claims must be sustained.

### F.     DENNIS G. AND MARCENE L. BURGIN (Claim No. 4494)

61.     On May 22, 2007, Transcontinental Lending Group originated a home equity line of credit to Mr. and Ms. Burgin (the "Burgin HELOC").  *See* Supp. Horst Decl. at ¶

38.    On June 15, 2007, GMACM began sub-servicing the Burgin HELOC, Servicing of the Burgin HELOC was subsequently transferred to Macquarie Mortgage USA Inc. (MMUA CoBrand Recovery).  The current investor in the Burgin HELOC is also Macquarie Mortgage USA Inc.  *See Id.*

62.    On November 13, 2012, Mr. and Ms. Burgin filed a proof of claim against ResCap, which was designated as claim number 4494 (the "Burgin Claim") in the amount of $350,000.[10]  The Burgin Claim is seeking claims for "loss of income and breach of contract" due to GMACM freezing the Burgin HELOC on November 12, 2008.  GMACM froze the line of credit due to the loss of equity in the borrower's home.  Mr. and Ms. Burgin were also late on monthly payments at the time.  *See* Supp. Horst Decl. at ¶ 39.

63.    Pursuant to paragraph 10 of the Burgin HELOC, GMACM had the right to refuse to make any additional advances or reduce the credit limit of the Burgin HELOC or do both if certain conditions existed. *See* D.E. 5472 at ¶ 3.  Of the enumerated conditions listed in paragraph 10, GMACM determined that Mr. and Ms. Burgin were in violation of condition "(1) the value of the Property declines significantly below its appraised value for the purposes of [the] Account" and "(3) [Mr. and Ms. Burgin] were in default of any material obligation of this agreement." *See Id.*  On December 11, 2008, as required in paragraph 10 of the Burgin HELOC, GMACM sent the borrowers proper notice of the freeze of the Burgin HELOC.  *See* Supp. Horst Decl. at ¶ 40.  If Mr. and Ms. Burgin felt that the value of the property had increased and they were no longer in default on their obligations on the Burgin HELOC, then they could have notified GMACM in writing that such conditions had changed.  *See* D.E. 5472 at ¶ 3 (describing

---

[10] On July 9, 2013, Mr. and Ms. Burgin attempted to amend the Burgin Claim by sending a letter to Debtors' counsel that they were amending their claim to change it from an unsecured claim in the amount of $350,000 to a secured claim in the amount of $450,000.  The Debtors assert that a post-Bar Date claim amendment such as this is entirely improper and has no legal effect.

borrower's options to reinstate HELOC). GMACM would have been obligated to reinstate the borrowing privileges under the Burgin HELOC. However, Mr. and Ms. Burgin never provided any information to GMACM that would support reopening the credit line. *See Id.* .

64. None of the materials provided by Mr. and Ms. Burgin with the Burgin Claim rebut the Debtors' contention that Mr. and Ms. Burgin never provided the required written notice of changed circumstances that would obligate GMACM to reopen the Burgin HELOC. Therefore, the Debtors' actions were consistent with the terms of the Burgin HELOC, and the Court should sustain the objection to the Burgin Claim, because the information provided by Mr. and Ms. Burgin have not demonstrated by a preponderance of the evidence that the Burgin Claim is a viable claim against the Debtors.

## G.    JAMES C. JACKSON (Claim No. 4664)

65. On January 10, 2005, New State Mortgage LLC originated a mortgage to Mr. Jackson in the amount of $135,860 (the "Jackson Loan"). *See* Supp. Horst Decl. at ¶ 41. On March 12, 2007, Homecomings Financial began servicing the Jackson Loan, and on September 1, 2013, servicing of the Jackson Loan was transferred to Ocwen. *See Id.* The Bank of New York Mellon Trust Company, National Association FKA The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank, N.A., as Trustee for Residential Asset Mortgage Products, Inc., Mortgage Asset-Backed Pass-Through Certificates Series 2005-RS3 is the investor for the Jackson Loan. *See Id.*

66. On November 13, 2012, Mr. Jackson filed a proof of claim against ResCap, which was designated as claim number 4664 (the "Jackson Claim"). The Jackson Claim asserts a claim for an unknown amount stating that the "debtor holds mortgage on property sold to creditor fraudulently or negligently." To support the Jackson Claim, Mr. Jackson attached a fourth amended complaint filed by Winifred Collins-Lee, Rasheeda L. Fisher

24

and James Jackson against Foreit Properties, LLC and Mark Foreit in the Circuit Court of Cook County, County Department, Law Division (the "Jackson Complaint"). ResCap is not named in the Jackson Complaint.

67.     In his response to the Objection, Mr. Jackson alleges that he purchased a defective garden unit condominium that should not have been sold to him. Mr. Jackson notes that he is already involved in litigation pertaining to this matter with both the City of Chicago, which levied violations on the condo for flooding issues, and the developers from whom Mr. Jackson purchased the condominium.

68.     ResCap was not the seller of the property, *see* Supp. Horst Decl. at ¶ 42. Mr. Jackson's ongoing "flooding issues" relate to the physical condition of the property that was sold to him; he is not asserting claims about how the loan was serviced. The Debtors' records reflect that the Residential Funding Corp briefly held the Note on the real property, which was then endorsed to JP Morgan Chase. *See Id.* An exhaustive review of ResCap's books and records did not find anything related to this dispute. In fact, the Debtors records evidence that Mr. Jackson was making monthly payments and received a traditional loan modification on November 6, 2009. *See Id.*

69.     The objection to the Jackson Claim must be sustained because the claim does not prove by a preponderance of the evidence that ResCap is the party responsible for Mr. Jackson's current troubles, which is evidenced by the fact that the litigation relating to the "flooding issues" does not even identify a debtor entity as a defendant.

### H.    FLOYD GREEN (Claim No. 2578)

70.     On November 6, 2012, Mr. Green filed a proof of claim without listing a debtor on the proof of claim form, which was designated as claim number 2578 (the "Green Claim"). The Green Claim asserts a claim for $428,677.08 for the stated basis of a mortgage

note. *See* Ex. 2. To support the Green Claim, Mr. Green attached a Federal Truth-In-Lending Disclosure Statement that indicates that the creditor is Residential Finance Corp., with an address of 401 N. Front Street, Suite 300, Columbus Ohio, 43215. Residential Finance Corp. is a non-debtor and non-affiliated company.

71. Mr. Green's response to the Objection does not provide any further clarity as to which debtor his claim is against or any basis for a claim against any of the Debtors.

72. Therefore, the Objection must be sustained as there is no evidence before the Court that a debtor entity has a valid liability to Mr. Green. The Green Claim specifically fails to name one of the debtors on the proof of claim form, the supporting documentation asserts a non-debtor, non-affiliate as being associated with the Mr. Green's home loan, and Mr. Green's response to the Objection does not clarify any of these issues.

## I.    MICHAEL A. AND GLORIA S. MCGUINTY (Claim Nos. 1963 and 5970)

73. On August 12, 2003, GMACM originated a mortgage to Mr. and Ms. McGuinty in the amount of $273,500 (the "McGuinty Loan"). *See* Supp. Horst Decl. at ¶ 43. Also on August 12, 2003, GMACM began servicing the McGuinty Loan, and continued servicing the loan until the foreclosure sale in November. *See Id.* Fannie Mae was an investor in the McGuinty Loan. *See Id.*

74. On November 28, 2012, Mr. and Ms. McGuinty filed a proof of claim against GMACM, which was designated as claim number 5970 (the "McGuinty Claim").[11] The McGuinty Claim asserts a claim for an unspecified amount based on the denial of a HAMP modification. To support the McGuinty Claim, Mr. and Ms. McGuinty attached a multitude of

---

[11] Prior to filing the McGuinty Claim, Mr. and Ms. McGuinty filed another claim, which was designated claim number 1963. As part of the Objection, the Debtors objected to only to claim 5970. The Debtors reserve their rights to object to claim 1963 on the same or different bases in the future.

ny-1116812

documents and correspondence to support their allegations that (1) GMACM required Mr. and

Ms. McGuinty to provide "strange requests" . . . "for documents that dated back to 2000 or ten

years old" . . . to show "proof that I worked for General Motors, my 2000 retirement information

and proof that I was disabled" in order to review the modification, *see* McGuinty Claim,

(2) GMACM refused to approve a modification of the McGuinty Loan to make it more

affordable, first in 2009 for the reason that Mr. and Ms. McGuinty had too much capital wealth

and then again in 2010 for not having enough capital, and (3) GMACM sold the property in a

foreclosure sale for a profit.  Each allegation in the McGuinty Claim has no merit based on books

and records research.

75.     The paperwork requested by GMACM of Mr. and Ms. McGuinty was

necessary as the HAMP program requires a complete package of documents for an account to be

approved for the HAMP modification program.  GMACM's servicing notes indicate that Mr. and

Ms. McGuinty were informed of the missing information needed on February 24, 2010, which

was the award letter for Mr. and Ms. McGuinty's Chase IRA, award letter for GM retirement

plan and signed hardship affidavit.  The HAMP program required all of this information as proof

of income to confirm Mr. and Ms. McGuinty were receiving the income listed on their financial

form.  *See* Supp. Horst Decl. at ¶ 46 .

76.     According to the Debtors' books and records, Mr. and Ms. McGuinty

applied for a loan modification on June 6, 2009.  They were denied a modification on July 20,

2009 due to insufficient income to support the property.  GMACM denied the modification of

the McGuinty Loan under the HAMP program for insufficient income to support the property

based on the following information that was received in the Mr. and Ms. McGuinty's workout

package: Mr. and Ms. McGuinty received (1) $2,079.17 in pension income, (2) $1,883 in social

security income for Mr. McGuinty, and (3) $633 in social security income for Ms. McGuinty for a total of $4,595.17. Their listed total expenses based on the financial form received in the same workout package equal $7,345.70, which left a deficit of $2,750.53. The deficit amount was more than four times their monthly mortgage payment at the time of review, which was $620.45. Therefore, not even the complete elimination of their mortgage payment would have resolved the McGuinty's monthly income deficit. *See* Supp. Horst Decl. at ¶ 47.

77.    The Debtors' books and records indicate that Mr. and Ms. McGuinty again applied for a loan modification on February 7, 2010. The McGuinty's were not approved for a modification and were denied on March 10, 2010 due to insufficient income to support the modified payment. The McGuinty's loan modification was denied based on the following information that the Debtors received in Mr. and Ms. McGuinty's workout package: (1) $2,319.17 in pension income, (2) $1,883 in social security income for Mr. McGuinty, and (3) $633 in social security income for Ms. McGuinty for a total of $4,835.17. According to GMACM's servicing notes, the workout package also listed monthly income of $5,000 stemming from money borrowed from Mr. And Ms. McGuinty's IRA account. As borrowings do not qualify as monthly income, GMACM was unable to consider it in assessing Mr. and Ms. McGuinty's eligibility for loan modification. Mr. and Ms. McGuinty's workout package indicated that total monthly expenses were $7,998.78, which represented an increase in expenses from their previous modification request. After factoring Mr. and Ms. McGuinty's eligible monthly income and total expenses, this left a deficit of $3,153.61. This time, the monthly deficit amount was nearly four times more than the amount of the mortgage payment at the time of review, which was $798.04. Not even the elimination of their mortgage payment would have resolved the McGuinty's monthly income deficit. *See* Supp. Horst Decl. at ¶ 48.

28

78.     According to the Debtors' books and records, Mr. and Ms. McGuinty applied for a modification again on December 17, 2010.  At this time, the McGuinty's were approved for a HAMP trial plan with payments due March 1, 2011, April 1, 2011, and May 1, 2011.  Subsequently, the McGuinty's were denied a permanent modification on April 6, 2011 because Mr. and Ms. McGuinty did not make their first trial payment due March 1, 2011.  *See* Supp. Horst Decl. at ¶ 49.  A modification review cannot move forward if the trial plan is not completed by the claimant and Mr. and Ms. McGuinty did not comply with the terms of the trial plan. The Debtors sold the property in a foreclosure sale on November 18, 2011.  At the time the property was sold in foreclosure, the last payment made on the account was dated before August 1, 2010.  *See Id*. at ¶ 50.

79.     When Mr. and Ms. McGuinty failed to make their payments, the Debtors reviewed the McGuinty Loan three different times to assist Mr. and Ms. McGuinty with bringing their Loan current and making it more affordable for them.   The McGuinty's were denied modifications twice and were then offered a HAMP trial plan, in which Mr. and Ms. McGuinty failed to make the first payment.  The Debtors attempted to assist Mr. and Ms. McGuinty several times, however a permanent solution could not be reached and the McGuinty Loan was more than a year past due prior to the foreclosure.  Therefore, for the reasons stated above, the McGuinty Claim has no merit and the objection to the McGuinty Claim should be sustained.

**J.       TOMAS DIAZ (Claim No. 5935)**

80.     On April 26, 2006, Platinum Capital Group originated a mortgage to Mr. Diaz in the amount of $1,000,000 (the "Diaz Loan").  *See* Supp. Horst Decl. at ¶ 51.  On June 1, 2006, Homecomings Financial began servicing the Diaz Loan, and on April 1, 2008, servicing of the Jackson Loan was transferred to Aurora Loan Servicing.  *See Id.* at ¶ 51 .  Deutsche Bank under series RALI 2006-QO6 is the current investor for the Diaz Loan.  *See Id.* at ¶ 51.

81.    On November 27, 2012, Mr. Diaz filed a proof of claim against ResCap, which was designated as claim number 5935 (the "Diaz Claim").  The Diaz Claim asserts a claim for the stated bases of "Mortgage/Note Down Payment/and Investor" in the amount of $400,000, which is listed as a secured claim.  *See* Ex. 2.  Notwithstanding the absence of an accompanying explanation to support the Diaz Claim, Mr. Diaz attached several documents that seem to suggest that he challenges the validity of his mortgage.

82.    Mr. Diaz also alleges that the Debtors and their agents intentionally lost, misplaced and destroyed the document and records, and deleted all evidence to confuse the records of the court . . .[12]

83.    A review of the Debtors' books and records indicates that the Debtors do not have an outstanding liability to Mr. Diaz.  First, ResCap was not involved with the origination of the loan.  Furthermore, Homecomings Financial transferred the servicing of Mr. Diaz's loan in April 2008 to Aurora.  Neither Homecomings Financial nor any of the Debtors have had an interest in Mr. Diaz's Loan since the transfer of servicing.  At the time of transfer, the loan was in a foreclosure status.  *See* Supp. Horst Decl. at ¶ 52.  The Debtors' records show the endorsement chain is proper.  Deutsche was the investor, and Homecomings serviced the loan on behalf of the investor.  Internal records indicate Mr. Diaz sent in a Qualified Written Request (QWR) to GMAC Mortgage, LLC  in 2012 requesting account information and loan documents in connection with the Debtors' involvement with the Diaz Loan back in 2006-2008.  Debtor responded to Mr. Diaz in December 2012 and sent Mr. Diaz copies of pay history, TILA disclosures, the ARM note, HUD-1, and the mortgage application.  *See* Supp. Horst Decl. at ¶ 52.  To the extent Mr. Diaz is a party in ongoing foreclosure litigation the case is between

---

[12] Mr. Diaz includes a Last Note Affidavit ("LNA") in his claim anf response.  When a note cannot be located, a LNA takes the place of the original note and accompanies a foreclosure complaint/lis pendens.

Nationstar (as successor to Aurora) and Tomas Diaz. The Debtors are not involved in the foreclosure litigation.

84.    Mr. Diaz has not provided any information to support a claim against the Debtors. Not only were the Debtors not involved with the origination of the loan, the Debtors have not serviced the loan since 2008. Not only has Mr. Diaz not identified how or when he was damaged, he has also not met his burden to show by a preponderance of the evidence that he has a legal basis for a claim against the Debtors. Therefore, the Court should sustain the objection to the Diaz Claim.

**K.    ISO GRADJAN (Claim No. 4602)**

85.    On April 23, 2009, Virgin Money USA originated a mortgage to Mr. Gradjan in the amount of $197,000 (the "Gradjan Loan"). *See* Supp. Horst Decl. at ¶ 53. Also on April 23, 2009, GMACM began servicing the Gradjan Loan, and on February 16, 2013, servicing of the Gradjan Loan was transferred to Ocwen. *See Id.* at ¶ 53. Fannie Mae is the investor for the Gradjan Loan. *See Id.* at ¶ 53.

86.    On November 13, 2012, Mr. Gradjan filed a proof of claim against ResCap, which was designated as claim number 4602 (the "Gradjan Claim"). The Gradjan Claim asserts a claim for $197,000 for a stated basis of "Mortgage Note". *See Id.* at ¶ 53. To support the Gradjan Claim, Mr. Gradjan attached a copy of his mortgage with Virgin Money USA.

87.    In his response to the Objection, *see* Docket No. 5523, Mr. Gradjan asserts that Bank of America "over-appraised the value of the home (year 2006) and therefore the loan amount at the time of lending money was unrealistic." ResCap is not in any way associated with Bank of America, and cannot be held responsible for a purportedly faulty appraisal accepted by another lending institution three years before the Debtors began servicing the loan. Mr. Gradjan

31

also alleges that he "was unable to refinance the home since 2011, due to this Chapter 11." Notwithstanding that Mr. Gradjan's conclusory allegation are not sufficient to substantiate a claim against the Debtors, the Debtors did review their books and records and confirmed that they were neither involved with the origination of the loan or any refinancing of the loan. Therefore, there is no valid basis for the alleged liability being asserted against the Debtors by Mr. Gradjan.

ny-1116812

## **CONCLUSION**

WHEREFORE, the Debtors respectfully submit that the relief sought in the Objection

should be granted with respect to the Claimants.

Dated:  November 13, 2013                                    /s/  Norman S. Rosenbaum
       New York, New York                          Gary S. Lee
                                        Norman S. Rosenbaum
                                        Jordan A. Wishnew
                                        MORRISON & FOERSTER LLP
                                        1290 Avenue of the Americas
                                        New York, New York 10104
                                        Telephone: (212) 468-8000
                                        Facsimile: (212) 468-7900

                                        *Counsel for the Debtors and*
                                        *Debtors in Possession*

33