## Exhibit 2

**Disputed Claims**

## Critchley Claim

**(Claim No. 1576)**

Claim #1576   Date Filed: 10/26/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

**Name of Debtor and Case Number:** GMAC Mortgage, LLC, Case No. 12-12032

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

**Name of Creditor** (the person or other entity to whom the debtor owes money or property):
Mary Critchley

**Name and address where notices should be sent:**

Mayer Morganroth, Esq.
344 North Old Woodward Ave., Suite 200
Birmingham, MI 48009

Telephone number: 248/864-4000     email: mmorganroth@morganrothlaw.com

**Name and address where payment should be sent** (if different from above):

Telephone number:     email:

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:** _____
*(If known)*

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $   970,917.00

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Wrongful foreclosure, loss of income, rent paid during period deprived of home, mental suffering, credit damage
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:**
5951

**3a. Debtor may have scheduled account as:**
(See instruction #3a)

**3b. Uniform Claim Identifier** (optional):
(See instruction #3b)

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate ☐ Motor Vehicle ☐ Other
**Describe:**
**Value of Property:** $_____   **Annual Interest Rate** _____% ☐ Fixed ☐ Variable
(when case was filed)

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim,**

**if any:** $_____   **Basis for perfection:** _____

**Amount of Secured Claim:** $_____   **Amount Unsecured:** $   970,917.00

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.      $_____   (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature:** (See instruction #9) Check the appropriate box.
☑ I am the creditor.   ☐ I am the creditor's authorized agent.
(Attach copy of power of attorney, if any.)
☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)
☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Mary Critchley
Title: Creditor
Company:
Address and telephone number (if different from notice address above):
c/o Mayer Morganroth (address above)

c/o Mayer Morganroth (address above)

Telephone number:     Email:

(Signature)   Mary Critchley   10/24/12 (Date)

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C.

12120321210260000000000001

B 10 Modified (Official Form 10) (12/11) cont.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

### Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Claim Pursuant to 11 U.S.C. §503(b)(9):**
Check this box if you have a claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim. (See DEFINITIONS, below.)

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**9. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

## _____DEFINITIONS_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

## _____INFORMATION_____

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://www.kccllc.net/ResCap.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## SUMMARY OF SUPPORTING DOCUMENTS

1.    Mortgage and Deed
2.    12/17/09 payment increase letter
3.    1/6/10 a financial analysis package from Mary Critchley regarding increase payment request to debtor at lendor's request to modify the mortgage for Mary Critchley
4.    Communication to Mary Critchley to stop payments and mortgage will be modified as requested
5.    Documents sent for mortgage modification as requested
6.    Letters from GMAC stating mortgage modification is proceeding
7.    Extension documents
8.    Foreclosure sale notices of 6/15/10
9.    Foreclosure sale was rescinded August 2011, but Mary Critchley not informed
10.    Documents of Mary Critchley moving and finding new residence and renting same
11.    Credit documents of Mary Critchley stating her home had been foreclosed
12.    Letters from GMAC that Mary Critchley needs to place homeowners insurance on property
13.    12/26/10 notice that GMAC had placed insurance on property (which showed as foreclosed) and premium bill
14.    12/28/10 cancellation notice stating loan paid in full
15.    Tax bills 12/30/10 still showing Mary Critchley owner
16.    1/30/11 1099A for abandonment of property
17.    Judgment of Possession received in U.S. Bank v Mary Critchley
18.    5/16/11 Request Mary Critchley place hazard insurance on property
19.    3/30/11 Shows property placed on market
20.    5/13/11 Notice withdrawn from market
21.    6/17/11 GMAC notice that they understand property vacant
22.    6/25/11 Property vacant will get insurance from GMAC
23.    6/30/11 GMAC putting insurance on property unless Mary Critchley calls them
24.    7/1/11 taxes still in her name on new tax bill despite foreclosure
25.    Record of 5th call to GMAC who now states house never effectively sold at Sheriff's sale
26.    7/30/11 notice that GMAC was placing insurance on property and billing her for $6,444.00
27.    Public records: RASC 2006K51 owns property
28.    8/20/11 Sheriff sale expunged, public record no notice received
29.    Demand for payment or foreclosure 11/18/11
30.    Record of calls for payment request and Mary Critchley response of Sherriff sale dispute agreement to modify loan
31.    12/9/11 notes on calls from GMAC auto dialer, 3-5 times a day for payment and requesting Mary Critchley give them info on Sheriff's sale
32.    Original notice in 10/2010 demanding Mary Critchley change the locks
33.    Record of rent paid by Mary Critchley since being moved out of the house pursuant to the bogus foreclosure
34.    Documents regarding refusal to receive credit due to two (2) foreclosures
35.    Documents of a 2nd foreclosure on the property

36.  Documents of loss of income suffered by Mary Critchley as a result of GMAC's misconduct

37.  Documents regarding costs incurred by virtue of wrongful foreclosure

38.  Documents identifying pain and suffering since 12/17/09 due to loss of home, illness, hospitalization causing health problems, wrongful dislocation of Mary Critchley and her mother

39.  Credit damage documents identifying increases in costs for all insurances and incapability of obtaining credit

40.  Correspondence from GMAC promising modification

41.  Correspondence from Mary Critchley relying on promises of GMAC and complying with requests

## Rainer P.Warner Claim

**(Claim No. 1574)**

B 10 Modified (Official Form 10) (12/11)

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**   **PROOF OF CLAIM**

Claim #1574   Date Filed: 10/23/2012

| Name of Debtor and Case Number: | Residential Capital, LLC, Case No. 12-12020 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**RAINER P. WARNER**

Name and address where notices should be sent:

**RAINER WARNER
510 ENTRADA ST. SE
PALM BAY, FL 32909**

■ **Date Stamped Copy Returned**
☐ No self addressed stamped envelope
☐ No copy to return

Telephone number: 321.693.0045        email: wpr686@hotmail.com

Name and address where payment should be sent (if different from above):

**Same As Above**

Telephone number:          email:

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
(*If known*)

Filed on:_____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ 500,000

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Personal Injury / Mortgage Note
(See instruction #2)

| **3. Last four digits of any number by which creditor identifies debtor:** ___1234___ | **3a. Debtor may have scheduled account as:** Alison Tearnen (See instruction #3a) | **3b. Uniform Claim Identifier (optional):** (See instruction #3b) |
|---|---|---|

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ■ Real Estate   ☐ Motor Vehicle   ☐ Other
**Describe:**
**Value of Property:** $ 96,120      **Annual Interest Rate** 7.125 %   ☐ Fixed  ■ Variable
(when case was filed)

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:** $ 58,742.38 Interest Charged           **Basis for perfection:** _____

**Amount of Secured Claim:** $ 207,947.59        **Amount Unsecured:** $ 235,310.03

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.          $ None       (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature:** (See instruction #9) Check the appropriate box.
■ I am the creditor.   ☐ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)   ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)
(Attach copy of power of attorney, if any.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: RAINER P. WARNER
Title: _____
Company: _____
Address and telephone number (if different from notice address above):

_(Signature)_ Rainer P. Warner  17 Oct 12       _(Date)_

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**
$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**RECEIVED**
OCT 2 3 2012
KURTZMAN CARSON CONSULTANTS

Telephone number: 321.693.0045     Email: wpr686@hotmail.com

1212020121023000000000030

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**Rainer P. Warner**
510 Entrada St.
Palm Bay, Fl. 32909

16 October 2012

**GMAC Mortgage**
PO Box 780
Waterloo, IA 50704-0780

Re: Account Number:██████6197
Property Address: 520 SE ENTRADA STREET
                              PALM BAY, FL. 32909

GMAC Mortgage, LLC

**Financial Injury which occurred due to Errors, Misrepresentations, and
Deficiencies leading to the foreclosure process:**

<u>Section 1.</u>
This property is my primary residence; the mortgage balance amount at the time of the
foreclosure action was more than the amount actually owed on the mortgage.

The foreclosure action was pursued because mortgage payments were inaccurately
processed/applied. There was a policy issued by the servicer to have the payments made
in the event of unemployment, disability, illness, or default of the loan.

The modifications have been denied, although qualified, and all the necessary required
documents were obtained; for payment assistance or a mortgage modification prior to the
foreclosure action proceedings.

Feb 2009-2011 Loss mitigation denied modification; there was an escrow, P&I, and buy
down subsidy increase/change. PMI of course increased my monthly payment. This
insurance benefit's the mortgage company.

Apr 2009-2010 another Loss mitigation modification denied
        2011-2012 Denied a modification; GMAC incorrectly inserted information onto the
Financial Analysis form. GMAC provided their own readjustments to the Financial
Analysis form. Examples of GMAC's means of denial on the form in the blank for food
they inserted $450 and for gas $250.

There were fees and charges that I should not have been required to pay in addition to the
normally scheduled principal; after a trial period of three months with a payment of
$2189. The original loan amount was $1235 after the modification P&I became $1529
Escrow $254 total new payment was $1784 an increase of $549.

**Note not acquired prior to the filing and/or transfer of the complaint:**

<u>Section 2.</u>

There was a note introduced that had a blank endorsement in order to prove ownership, but there was nothing in the record which shows that the note was acquired prior to the filing/transfer of the complaint. The endorsement did not contain a **date**, nor did the affidavit filed in support of the motion for summary judgment contain any sworn statement that the note was owned by GMAC on the **date** that the complaint was filed/transferred.

Therefore, GMAC failed to submit any record evidence proving that it had the right to enforce the note on the date the complaint was filed. Summary judgment was improperly entered where this question of fact remained.

**Acceleration of Mortgage Principal through fraudulent charges and fees:**

<u>Section 3.</u>

The principal balance in 2006 was $208,000 (see Exh. B) payments made
The principal balance in 2009 became $220,000 (see Exh. C )

Escrow was requested in 2006 to be set up;  HomeComings a GMAC company inadequately performed the necessary procedures to establish the escrow.

Fraudulent property appraisals, property inspections, and property preservations with associated charges. Pre-accelerated late charges.
(GMAC have not done any inspections or preservations of the property)

Sincerely,

**RAINER P. WARNER**

IN THE CIRCUIT COURT OF THE
18TH JUDICIAL CIRCUIT, IN AND
FOR BREVARD COUNTY, FLORIDA
CIVIL DIVISION
CASE NO.:05-2009-CA-011336-XXXX-XX

DEUTSCHE BANK TRUST COMPANY
AMERICAS AS TRUSTEE FOR RALI 2006QA10,

        Plaintiff,

  vs.

RAINER WARNER;  UNKNOWN
SPOUSE OF RAINER WARNER;
JOHN DOE; JANE DOE
AS UNKNOWN TENANT (S) IN
POSSESSION OF THE SUBJECT PROPERTY,

        Defendants,

---

## ANSWER AND CROSS CLAIM

**COMES NOW,** the Defendant, Rainer Warner, by and through his undersigned attorney,
And hereby answers the Plaintiff's Complaint and would state:

   1.  That with regard to those allegations set forth in Count  I and Count  II of the
Plaintiff's Complaint, the Defendant,  Rainer Warner , admit the same.


   2.  That with regard to those allegations set forth in Count II sub section (s) 14, 20(f),
of the Plaintiff's Complaint,  the Defendant  Rainer Warner, denies the same.

## CROSS CLAIM

**COMES NOW,** the Defendant/ Cross Claimant, Rainer Warner, sues the Plaintiff,
DEUTSCHE BANK TRUSTEE COLMPANY AMERICAS AS TRUSTEE FOR RALI
2006QA10 and HOMECOMINGS FINANCIAL, for indemnification and would state:

   3. This is an action for general and special damages which exceed $500,000

   4. That in the Defendant,  Rainer Warner , duly notified HOME COMINGS FINANCIAL, of
the matters associated with the dissolution of the aforementioned mortgage payments prior to any
and all interruptions.

   5. That in the Defendant,  Rainer Warner, disclosed to HOMECOMINGS FINANCIAL, the
medical conditions, hardship letter, and request for escrow payment implementation for property
taxes, associated with the dissolution of the aforementioned mortgage payments.

   6. That in the Plaintiff, DEUTSCHE bank, and HOMECOMINGS FINANCIAL, after proper
request was presented to HOMECOMINGS FINANCIAL to begin and establish escrow for the

property 510 Entrada for property taxes. The representative, was given adequate time to establish the escrow request, and in addition was told that the homeowner had $2,000 dollars to pay toward the escrowed amount.

7. That in the Plaintiff, DEUTSCHE bank, and HOMECOMINGS FINANCIAL did not take into account a request for a special forbearance, loan modification, or assistance in regards to the hardship.

8. That in the Plaintiff, DEUTSCHE bank, and HOMECOMINGS FINANCIAL, did not provide an adequate or a timely procedure in association with request for escrow of the loan; and was given ample time to give a decision in regards to the hardship.

9. That in the Plaintiff, HOMECOMINGS, purposely with held information pertinent to the timely allocation of the escrow, and purposely took their time and did not disclose any information in conjunction and relative to the hardship.

10. That in the Plaintiff, DEUTSCHE bank, and HOMECOMINGS FINANCIAL , exhibited false assurance on their part to reconcile a situation once the request for escrow, hardship letter, and supporting documents were released.

11. That the Cross Claim Defendant, Rainer Warner, has incurred the following general and special damages: due to the incompetence, forced foreclosure, and untimely decisions of HOMECOMINGS FINANCIAL, as a whole or part to proceed or counter act with in the scope of reason and procedure.

     a     Costs and legal fees incurred in defending himself in this mortgage foreclosure.

     b     Any money judgments or deficiency judgments which may be entered against the Defendant / Cross Claim Plaintiff.

     c     Impairment to his Character and Credit as a result of this foreclosure.

     d     Due diligence and effort to reconcile with lender

**WHEREFORE**, the Defendant/Cross Claim Plaintiff , Rainer Warner, demands judgment against the Defendant/ Cross Claim Defendant, DEUTSCHE bank, and HOMECOMINGS FINANCIAL, for indemnification and for all sums that the Defendant/Cross Claim Plaintiff is required to pay as a result of the Plaintiff's Complaint, including all damages, costs of this action, attorney's fees in Defense thereof, and in prosecution of his claim, and for other and further relief as the Court deems just and proper.

**I HEREBY CERTIFY** that a true copy of the foregoing Answer and Cross Claim and the following supporting affidavits: Hardship, summarized dispute were delivered to the parties on the attached list by Certified mail this _____ day of _____, 2009.

Law Offices of Marshall C. Watson, P.A.
1800 N.W. 49TH Street, Suite 120
Fort Lauderdale, FL. 33309

| | |
|---|---|
| DEUTSCHE BANK TRUST COMPANY AMERICAS AS TRUSTEE FOR RALI 2006QA10, <br> Plaintiff, <br> vs. <br> RAINER P. WARNER, et al, <br> Defendants. | IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT, IN AND FOR BREVARD COUNTY, FLORIDA <br> CIVIL DIVISION: <br> CASE NO.: 05 2009 CA 011336 |

## NOTICE OF SERVING COURT'S ORDER SETTING RESIDENTIAL MORTGAGE FORECLOSURE CASE FOR NON-JURY TRIAL

COMES NOW, __DEUTSCHE BANK TRUST COMPANY AMERICAS AS TRUSTEE FOR RALI 2006QA10__, by and through its undersigned counsel, and hereby files this Notice of Service of a true and correct copy of the Court's Notice of Serving Court's Order Setting Residential Mortgage Foreclosure for Non-Jury Trial.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was delivered to all parties on the attached mailing list by mail this _____ day of _____, 20_____.  JUL 3 0 2012

Law Offices of Marshall C. Watson, P.A.
1800 N.W. 49TH Street, Suite 120
Fort Lauderdale, FL 33309
Telephone: (954) 453-0365/1-800-441-2438
Facsimile: (954) 771-6052

By: _____
Brian Humphrey McClain
Bar #463329

IN THE CIRCUIT COURT OF THE
18TH JUDICIAL CIRCUIT, IN AND FOR BREVARD
COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION

CASE NO.: 05 2009 CA 011336

 **COPY**

DEUTSCHE BANK TRUST COMPANY
AMERICAS AS TRUSTEE FOR RALI
2006QA10,
        Plaintiff,
vs.

RAINER P. WARNER;   MORTGAGE
ELECTRONIC          REGISTRATION
SYSTEMS    INCORPORATED    AS
NOMINEE   FOR   HOME   LOAN
CORPORATION   DBA   EXPANDED
MORTGAGE CREDIT; THE UNKNOWN
SPOUSE OF RAINER P. WARNER; IN
POSSESSION   OF   THE   SUBJECT
PROPERTY,
        Defendants.

## ORDER SETTING RESIDENTIAL MORTGAGE FORECLOSURE CASE FOR NON-JURY TRIAL

    It appearing that this cause is at issue and ready to be set for trial, it is hereby ORDERED AND

ADJUDGED as follows:

    1.    This cause is hereby set for Non-Jury Trial on August 28, 2012 at 1:30 PM EST or as soon

thereafter. The Non-jury trial shall be held before the **PRESIDING JUDGE**, 2825 Judge Fran Jamieson Way,

Room 3E, Viera FL 32940.

    2.    Prior to the Non-Jury Trial, counsel for the Plaintiff shall furnish to counsel for the Defendant and

file directly, with the Clerk, a list of names and address of all witnesses who are expected to testify at the trial of this

cause, including experts. Prior to the Non-Jury Trial, counsel for the Defendant shall furnish to counsel for the

Plaintiff, and file directly with the Clerk, a list of names and address of all witnesses that are expected to testify at

the trial of this cause, including experts and rebuttal witnesses. Each party's witness shall specifically designate all

expert witnesses and with respect to each expert witness each party shall disclose the expert's area of expertise, and

serve a copy of each expert's reports or answers to expert interrogatories. In the absence of answers to expert

5

interrogatories or an expert report, a party shall provide a summary of the testimony the expert is expected to provide.

3.    All motions shall be filed prior to the Non-Jury Trial. All motions, except motions in limine, not heard prior to the Non-Jury Trial shall be deemed abandoned.

4.    Counsel shall complete all discovery at least **25 days** prior to the non-jury trial date. Discovery conducted after this time period shall only be permitted on the order of the Court for good cause shown.

5.    The parties shall do all things reasonable and necessary to assure the availability of their witness for the entire trial period or to otherwise preserve their testimony for trial as provided by the Florida Rules Civil Procedure.

6.    Counsel shall immediately notify the Court in the event of settlement and submit a stipulation for an Order of Dismissal and a Final Disposition form.

7.    Prior to the Non-Jury Trial the attorneys for all parties shall, if desired, secure the services of a court reporter for trial.

8.    All provisions of this Order that require compliance by counsel are likewise applicable to any party appearing pro se.

DONE AND ORDERED in Brevard County, Tampa, Florida this 23 day of _____, 2012.

/s/ Robert J. Burger

**CIRCUIT JUDGE**


**PLAINTIFF'S COUNSEL IS HEREBY DIRECTED TO NOTICE ALL PARTIES.**

**Homecomings Financial**
*A GMAC Company*

4/10/2009

RAINER P WARNER
510 SE ENTRADA STREET
PALM BAY FL 32909

Re:     Account Number         ███6197
        Property               520 SE ENTRADA STREET
                               PALM BAY FL 32909

Dear RAINER P WARNER

**Congratulations!  Your request for a loan modification has been approved subject to the following:**
        -Receipt of your contribution in the form of certified funds
        -Receipt of the signed and notarized loan modification agreement and any attachments
        -Receipt of clear title, if applicable

Highlights of the enclosed Loan Modification Agreement and instructions for completing and returning it are as follows:

- The contribution amount of $ 2,189.62 in the form of certified funds, is due in our office by April 19, 2009.
- The interest rate is  7.12500%.
- The first modified payment begins June 1, 2009

| | |
|---|---|
| Principal and Interest | 1,529.65 |
| Escrow | 254.36 |
| **Total Payment** | **1,784.01** |

- Do NOT sign the enclosed Loan Modification Agreement unless you are in the presence of a notary.  This document must be signed in the presence of a notary and (if applicable) other witnesses.  All of the documents must be executed and the signatures must be exactly as the names are typed.
- The signed and notarized Loan Modification Agreement should be returned using the enclosed pre-paid overnight envelope.
- If any modification closing costs are more than projected, the difference will be assessed to the account.
- All miscellaneous fees and costs – excluding late charges – may not have been included in the loan modification and will remain outstanding.

The contribution and executed loan modification documents are due back by April 19, 2009.  Please return to:
                Homecomings Financial, LLC
                Attn: Loan Modification
                3451 Hammond Avenue
                Waterloo, IA 50702

IMPORTANT!  The loan modification will not be complete until we receive all properly executed documents and the contribution amount.  If the modification is not completed we will continue to enforce our lien.  If the conditions outlined above are not satisfied the modification will be withdrawn.

If you have any questions regarding this modification offer, please contact a modification specialist directly at 1-800-799-9250 Monday – Thursday 8:00 AM to 7:00 PM, Friday 8:00 AM to 5:00 PM, Central Time.

Loan Modification Specialist
Enclosures

Exh B

Loan No: ███0354
Borrower: RAINER P WARNER

Data ID: 743

# ADJUSTABLE RATE NOTE

MIN: 100056400637603542

(LIBOR Six-Month Index (As Published In The Wall Street Journal)—Rate Caps)

(Interest Only / ARM)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

June 29, 2006            PALM BAY                FLORIDA
[Date]                   [City]                  [State]

520 SE ENTRADA STREET
PALM BAY, FLORIDA 32909
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 208,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is HOME LOAN CORPORATION DBA EXPANDED MORTGAGE CREDIT. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.125 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS

(A)  Time and Place of Payments

I will pay interest only by making payments every month for the first 60 payments (the "Interest-Only Period") in the amount sufficient to pay the interest as it accrues. Every month thereafter I will pay principal and interest by making payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note. The principal and interest payment I pay may change as the interest rate I pay changes pursuant to Section 4 of this Note.

I will make monthly payments on the first day of each month beginning August 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on July 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my payments at 621 NW 53RD STREET, SUITE #140, BOCA RATON, FLORIDA 33487, or at a different place if required by the Note Holder.

(B)  Amount of My Initial Monthly Payments

Each of my initial interest-only monthly payments will be in the amount of U.S. $ 1,235.00. This amount may change.

MULTISTATE  ADJUSTABLE RATE NOTE - LIBOR Six-Month Index (As Published In The Wall Street Journal)
© 2006 Middleberg, Riddle & Gianna                Form MRG  7/03     (Page 1 of 5 Pages)

INITIALS: RW

Loan No: ███0354                                                                                            Data ID:  743

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A)  Change Dates**

The interest rate I will pay may change on the first day of July, 2011, and on that day every 6th month thereafter.  Each date on which my interest rate could change is called a "Change Date."

**(B)  The Index**

Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal.  The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

**(C)  Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO and ONE/FOURTH percentage points (2.250 %) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

Except as provided in Section 3(A) above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

**(D)  Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.1250 % or less than 7.1250 %.  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO  percentage points (2.00 %) from the rate of interest I have been paying for the preceding 6 months.  My interest rate will never be greater than 13.1250 % or less than 7.1250 %.

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change.  The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

MULTISTATE  ADJUSTABLE RATE NOTE - LIBOR Six-Month Index (As Published In The Wall Street Journal)
© 2006 Middleberg, Riddle & Gianna                                        Form MRG  7/03      (Page 2 of 5 Pages)

INITIALS: _RPW_____    _____

Record & Return To:
Homecomings Financial, LLC
Attn.: Loss Mitigation Department
3451 Hammond Avenue.
Waterloo, IA  50702

---------------------------------------- [Space Above This Line For Recorder's Use] ----------------------------------------

# ADJUSTABLE RATE LOAN MODIFICATION AGREEMENT

This Adjustable Rate Loan Agreement ("Agreement"), made this May 1, 2009 ("Effective Date") between RAINER P WARNER    ("Borrower") and Homecomings Financial, LLC ("Lender"), amends and supplements that certain promissory note ("Note") dated 6/29/2006, in the original principal sum of  Two Hundred Eight Thousand  Dollars and No Cents ($ 208,000.00)executed by Borrower. The Note is secured by a Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), and said security instrument covers the real and, if applicable, personal property described in such Security Instrument (the "Property") located at BREVARD County FL.  Said Security Instrument covers the real and, if applicable, personal property described in such Security Instrument (the "Property") located at 520 SE ENTRADA STREET  PALM BAY FL, 32909 which real property is more particularly described as follows:

(Legal Description)

Borrower acknowledges that Lender is the legal holder and the owner of the Note and Security Instrument and further acknowledges that if Lender transfers the Note, as amended by this Agreement, the transferee shall be the "Lender" as defined in this Agreement.

Borrower has requested, and Lender has agreed, to extend or rearrange the time and manner of payment of the Note and to extend and carry forward the lien(s) on the Property whether or not created by the Security Instrument.

Now, therefore, in consideration of the mutual promises and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

   1.  Borrower acknowledges that as of the Effective Date, the amount payable under the Note and secured by the Security Instrument (the "Principal Balance") is Two Hundred Twenty  Thousand Two Hundred Twenty Eight Dollars and Three Cents ($ 220,228.03). Borrower hereby renews and extends such indebtedness and promises to pay jointly and severally to the order of Lender the Principal Balance, consisting of the amounts(s) loaned to Borrower by Lender and any accrued but unpaid interest capitalized to date.
Interest will be charged on the unpaid Principal Balance until the full amount of principal has been paid.
   2.  Borrower will pay interest at yearly rate of  7.12500% from May 1, 2009.  The interest rate Borrower will pay will change in accordance with this Agreement. The interest rate required by this Agreement is the rate Borrower will pay both before and after any default under the terms of the Note, as amended by this Agreement.
   3.  Borrower promises to make monthly principal and interest payments of $ 1,529.65, beginning on June 1, 2009, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. If on July 1, 2036 Borrower still owes amount under the Note and Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower will make such payments at 3451 Hammond Avenue, Waterloo, IA 50702 or at such other place as Lender may require.
   4.  The monthly payment may change based on changes in the unpaid principal of the loan and in the interest rate Borrower must pay. Lender will determine the new interest rate and the changed amount of the monthly payment in accordance with this Agreement. The interest rate Borrower will pay may change on May 1, 2014 and on that day every six months thereafter. Each date on which the interest rate could change is called a "Change Date".
   5.  Beginning with the first Change Date, the interest rate will be based on the Index. The "Index" is the average of

744 198097
R. WARNER

interbank offered rates for six-month U.S. dollar-denominated deposits in the London Market("LIBOR") as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the change occurs is called the "Current Index." If the Index is no longer available, the lender will choose a new index which is based upon comparable information. Lender will give Borrower notice of this choice.

6.  Before each Change Date, Lender will calculate the new interest rate by adding Two point Two Five percentage points ( 2.25000%) to the Current Index. Lender will then round the result of this addition to the nearest on-eight of one percentage point (0.125%). Subject to the limits stated below, this rounded amount will be the new interest rate until the next Change Date. Lender will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that Borrower is expected to owe at the Change Date in full on the Maturity Date at the new interest rate in substantially equal payments. The result of this calculation will be the new amount of the monthly payment. Borrower will pay the amount of the new monthly payment beginning on the first monthly payment date after the Change Date until the amount of the monthly payment changes again. The monthly payments will be applied first to the payment of interest due and then to the principal.

7.  The interest rate Borrower is required to pay at the first Change Date will never be greater than 13.12500% or less than 7.12500%. Thereafter, the interest rate will never be increased or decreased on any single Change Date by more than one percentage points (1%) from the rate of interest Borrower has been paying for the preceding six months. The interest rate will never be greater than 13.12500%.

8.  Before the effective date of any change, Lender will deliver or mail to Borrower notice of any changes in the interest rate and the amount of the monthly payment. The notice will include information required by law to be given to Borrower and also the title and telephone number who will answer any questions Borrower may have. Unless applicable laws requires a different method, any notice that must be given to Borrower under this Agreement will be given by delivering it or mailing it by first class mail to Borrower at the property address stated above or at a different address if Borrower gives Lender notice of Borrower's different address. Any notice that must be given to Lender under this Agreement will be given by mailing it first class mail to the Lender at the address stated in Paragraph 3 above or at a different address if Borrower is given notice of that different address.

9.  If Lender has not received the full amount of any monthly payment by the end of the due date grace period established in the original note, Borrower will pay a late charge to Lender. The amount of the charge will be the late charge percentage provided for in the Note multiplied by the overdue payment of principal and interest required under this Agreement. Borrower will pay this late charge promptly but only once on each late payment. The late charge is not in lieu of any other remedy of Lender, including any default remedy.

10. It is the intention of the parties that all liens and security interests described in the Security Instrument are hereby renewed and extended (if the Maturity Date of the original Note has been changed) until the indebtedness evidenced by the Note and this Agreement has been fully paid. Lender and Borrower acknowledge and agree that such renewal, amendment, modification, rearrangement or extension (if applicable) shall in no manner affect or impair the Note or liens and security interests securing same, the purpose of this Agreement being simply to modify, amend rearrange or extend (if applicable) the time and the manner of payment of the Note and indebtedness evidenced thereby, and to carry forward all liens and security interests securing the Note, which are expressly acknowledged by Borrower to be valid and subsisting, and in full force and effect so as to fully secure the payment of the Note.

11. If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law. If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security instrument. If Borrower fails to pay these sums prior to the expiration of this period, lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower. For purposes of this paragraph, "interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is transfer of title by Borrower at a future date to a purchaser.

12. As amended hereby, the provisions of the Note and Security instrument shall continue in full and effect, and the Borrower acknowledges and reaffirms Borrower's liability to Lender thereunder. In the event of any inconsistency between this Agreement and the terms of the Note and Security Instrument, this Agreement shall govern. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement, including but not limited to, in the case of the Borrower, the obligation to pay items such as taxes, insurance premiums or

RAINER WAGNER
7441486197

**<u>Longoni Claims</u>**


**(Claim Nos. 2292, 2293, 2296 & 2297)**

**Claim No. 2292**

B 10 Modified (Official Form 10) (12/11)

Claim #2292 Date Filed: 11/5/2012

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor: Residential Funding Company, LLC | Case Number: 12-12020 (MG); 12-12019 (MG) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Erickson Thorpe & Swainston Ltd    Pamela D. Longoni, Ind. & as GAL for Lacey Longini

□ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:    NameID: 10853921
Erickson Thorpe & Swainston Ltd
LONGONI- PAMELA D LONGONI, INDIVIDUALLY & AS GUARDIAN AD LITEM FOR LACEY
LONGONI, & JEAN M GAGNON, VS GMAC MRTG, LLC, A ET AL
99 West Arroyo St, PO Box 3559
Reno, NV 89505
Telephone number: (775) 786-3930    email: tbeko@etsreno.com

**Court Claim**
Number:
(if known)

Filed on: _____

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

■ Date Stamped Copy Returned
☐ No self addressed stamped envelope
☐ No copy to return

Telephone number:    email:

**1. Amount of Claim as of Date Case Filed: $ 600,000**
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Wrongful Foreclosure: sale of residential property
(See instruction #2)    See attached complaint

**3. Last four digits of any number by which creditor identifies debtor:**
| 3a. Debtor may have scheduled account as: | 3b. Uniform Claim Identifier (optional): |
|---|---|
| (See instruction #3a) | (See instruction #3b) |

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:
Value of Property: $_____    Annual Interest Rate _____% ☐ Fixed ☐ Variable
(when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $_____    Basis for perfection: _____
Amount of Secured Claim: $_____    Amount Unsecured: $_____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
_____ (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

Amount entitled to priority:
$_____

* Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**9. Signature:** (See instruction #9) Check the appropriate box.
☐ I am the creditor.    ☒ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor, or their authorized agent.    ☐ I am a guarantor, surety, indorser, or other codebtor.
(Attach copy of power of attorney, if any.)    (See Bankruptcy Rule 3004.)    (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Thomas Beko
Title: Attorney
Company: Erickson, Thorpe & Swainston    (Signature)    11-01-12    (Date)
Address and telephone number (if different from notice address above):

Telephone number:    Email:

**RECEIVED**
NOV 05 2012
KURTZMAN CARSON CONSULTANTS

**COURT USE ONLY**

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

001KC0002_51765-2_domestic_18/015138/090824

12120191211050000000000022

# ⌐ERICKSON, THORPE & SWAINSTON, LTD.

THOMAS P. BEKO
JOHN A. ABERASTURI
JOHN C. BOYDEN
REBECCA BRUCH
BRENT L. RYMAN
ANDREA K. PRESSLER
PAUL M. BERTONE
ANN M. ALEXANDER
CHARITY F. FELTS
BRETT A. DIEFFENBACH

ATTORNEYS AT LAW

99 WEST ARROYO STREET
RENO, NEVADA 89509

MAILING ADDRESS:
P.O. BOX 3559, RENO, NEVADA 89505

WWW.ETSRENO.COM

*OF COUNSEL*
ROGER L. ERICKSON
DONALD A. THORPE

GEORGE W. SWAINSTON
1936 - 2007

TELEPHONE: 775.786.3930
FACSIMILE: 775.786.4160

TBEKO@ETSRENO.COM

November 1, 2012

***Via Priority Mail\****
RecCap Claims Processing Center c/o KCC
2335 Alaska Avenue
El Segundo, CA 90245

      **Re:  Debtors:  Residential Capital , LLC, <u>et al</u>**
                     **Case No.:12-12020 (MG)**
        **Claimants:  Pamela Longoni, individually and as GAL for Lacey Longoni,  and Jean M. Gagnon**

Dear Sir/Madam:

    I am enclosing 8 Proof of Claim forms in the above matter, i.e., 4 separate claims on behalf of each of my clients.  Attached to each claim is a copy of the related United States District Court Complaint (Third Amended Complaint).  Please provide confirmation to the undersigned of the timely filing of these Proofs of Claim.

                      Sincerely,

                      THOMAS P. BEKO, ESQ.

TPB:dmm

Enclosures: 8, as stated

*\*with Delivery Confirmation*

1　THOMAS P. BEKO, ESQ. (#002653)
　　99 West Arroyo Street
2　P.O. Box 3559
　　Reno, Nevada 89505
3　Telephone: (775) 786-3930
　　*Attorneys for Plaintiffs*

4

5

6

7　　　　　　　　　**UNITED STATES DISTRICT COURT**

8　　　　　　　**DISTRICT OF NEVADA - RENO DIVISION**

9

10　PAMELA D. LONGONI,
　　 individually and as Guardian Ad
11　Litem for LACEY LONGONI,
　　 and JEAN M. GAGNON,
12　　　　　　　　　　　　　　Case No.: 3:10-CV-00297-LRH-(VPC)

13

14　　　　　　Plaintiffs,

15　vs.

16　GMAC MORTGAGE, LLC., a Delaware
　　 Limited Liability Company, EXECUTIVE
　　 TRUSTEE SERVICES, LLC., a Delaware
17　Limited Liability Company, RESIDENTIAL
　　 FUNDING COMPANY, LLC., a Delaware
18　Limited Liability Company, fka RESIDENTIAL
　　 FUNDING CORPORATION, a Delaware
19　Corporation, RESIDENTIAL ASSET
　　 MORTGAGE PRODUCTS, INC., a Delaware
20　Corporation, ILLEANNA PETERSON,
　　 KATHLEEN GOWEN, individuals,
21　DOES 1-10; BLACK AND
　　 WHITE CORPORATIONS 1-10,
22　corporations; ABLE & BAKER
　　 COMPANIES 2-10, co-partnerships and or
23　limited liability companies,

24　　　　　　Defendants.　　　　　　　／

25　**THIRD AMENDED COMPLAINT FOR DAMAGES TO SUBSTITUTE PROPER**

26　　　　　　**PARTIES PURSUANT TO FRCP 15(c)**

27　　　　　　　　**(JURY DEMANDED)**

28　　　　COMES NOW, PAMELA D. LONGONI, individually and as the Guardian Ad Litem

　　for LACEY LONGONI, and JEAN M. GAGNON, by and through their attorneys,

1  ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and hereby

2  allege and complain as follows:

3  **PARTIES AND JURISDICTION**

4      1.      Plaintiff PAMELA D. LONGONI is an individual, residing in the State of

5  Nevada.  PAMELA D. LONGONI is the natural parent and guardian of the minor child

6  LACEY LONGONI.  At all times relevant hereto, PAMELA D. LONGONI was a lawful

7  owner of a certain parcel of real property commonly known as 5540 Twin Creeks Drive,

8  Reno, Nevada, 89523, which PAMELA D. LONGONI occupied as her sole personal

9  residence along with her minor children, including the plaintiff LACEY LONGONI.

10      2.      Plaintiff JEAN M. GAGNON is an individual, residing in the State of Nevada.

11  At all times relevant hereto, JEAN M. GAGNON was a lawful co-owner of a certain parcel

12  of real property commonly known as 5540 Twin Creeks Drive, Reno, Nevada, 89523.

13      3.      The plaintiffs are informed and believe and thereupon allege that the defendant

14  GMAC MORTGAGE, LLC., is a Delaware Limited Liability Company, licensed to do, and

15  doing business in the State of Nevada as a mortgage lender.

16      4.      The plaintiffs are informed and believe that GMAC MORTGAGE, LLC., is

17  wholly owned by General Motors Acceptance Corporation.

18      5.      The plaintiffs are further informed and believe that GMAC MORTGAGE,

19  LLC., was assigned, or somehow assumed the rights, liabilities and duties of EquiFirst

20  Corporation relative to a Promissory Note, Deed of Trust signed by the plaintiffs PAMELA

21  D. LONGONI and JEAN M. GAGNON, on or about September 29, 2005.

22      6.      The plaintiffs are further informed and believe and thereupon aver that

23  EXECUTIVE TRUSTEE SERVICES, LLC., is a subsidiary of GMAC MORTGAGE, LLC.,

24  contracted with, or is otherwise so affiliated with GMAC MORTGAGE, LLC., such that it

25  is legally responsible for the acts of EXECUTIVE TRUSTEE SERVICES, LLC. At all times

26  relevant hereto, GMAC MORTGAGE, LLC., employed an individual by the name of

27  Jonathan "Nate" Stephenson. At all times relevant hereto, Jonathan "Nate" Stephenson was

28  acting within the course and scope of his employment with GMAC MORTGAGE, LLC. The

1  plaintiffs are further informed and believe that at all times relevant hereto, Paul Williams,

2  was the Director of the GMAC Modification Team, and was acting within the course and

3  scope of his employment with GMAC MORTGAGE, LLC. The plaintiffs are informed and

4  believe, that Paul Williams approved the plaintiffs' loan modification request as set forth

5  herein below.

6         7.    The plaintiffs are informed and believe and thereupon allege that the defendant

7  EXECUTIVE TRUSTEE SERVICES, LLC., is a Delaware Limited Liability Company,

8  licensed to do business, and doing business in the State of Nevada by providing a broad menu

9  of non-judicial foreclosure services. The plaintiffs are informed and believe that the

10  defendant EXECUTIVE TRUSTEE SERVICES, LLC., is wholly owned by General Motors

11  Acceptance Corporation. The plaintiffs are further informed and believe, and thereupon

12  allege, that EXECUTIVE TRUSTEE SERVICES, LLC., is a subsidiary of, or is otherwise

13  affiliated with GMAC MORTGAGE, LLC., and that the defendants ILLEANNA

14  PETERSON and KATHLEEN GOWEN were, at all times relevant hereto, employees of

15  EXECUTIVE TRUSTEE SERVICES, LLC., and in doing the acts alleged herein were acting

16  within the course and scope of their employment, and/or at the express direction of, or with

17  the authorization and ratification of EXECUTIVE TRUSTEE SERVICES., LLC and GMAC

18  MORTGAGE, LLC.

19         8.    The plaintiffs are informed and believe and thereupon allege that the defendant

20  RESIDENTIAL FUNDING COMPANY, LLC., is a Delaware Limited Liability Company,

21  licensed to do business, and doing business in the State of Nevada. The plaintiffs are further

22  informed and believe and thereupon allege that said defendant is the successor in interest,

23  and has assumed any and all legal liabilities of Residential Funding Corporation, a Delaware

24  Corporation. RESIDENTIAL FUNDING COMPANY, LLC., is being substituted in this

25  action for the previously named Doe Defendant, ABLE & BAKER COMPANY 1.

26         9.    The plaintiffs are informed and believe and thereupon allege that

27  RESIDENTIAL FUNDING COMPANY, LLC., is wholly owned by the defendant General

28  Motors Acceptance Corporation.

1      10.    The plaintiffs are informed and believe that RESIDENTIAL FUNDING

2    COMPANY, LLC., claims to have obtained ownership interest in a certain parcel of real

3    property commonly known as 5540 Twin Creeks Drive, Reno, Nevada, 89523.  In this

4    regard, the plaintiffs allege that RESIDENTIAL FUNDING COMPANY, LLC., was

5    assigned, or somehow assumed the rights, liabilities and duties of EquiFirst Corporation

6    relative to a Promissory Note, Deed of Trust signed by the plaintiffs PAMELA D.

7    LONGONI and JEAN M. GAGNON, on or about September 29, 2005.

8      11.    The plaintiffs are informed and believe and thereupon allege that

9    RESIDENTIAL FUNDING COMPANY, LLC., engaged or retained the defendant GMAC

10    MORTGAGE, LLC., to service the loan on the plaintiffs' real property.  In this regard,

11    RESIDENTIAL FUNDING COMPANY, LLC., authorized GMAC MORTGAGE, LLC.,

12    to engage in certain loan activities, including, but not limited to the following:

13      a) Receipt of loan payments;

14      b) Issuance of legal notices to the plaintiffs; and

15      c) Loan modification activities including negotiation of new rates of interest, loan

16    payments, and principal sums due under the loan.

17      12.    That all statements made to the plaintiffs by employees of GMAC

18    MORTGAGE, LLC., as part of the plaintiffs' loan modification process, were statements

19    made on behalf of, and within the course and scope of GMAC MORTGAGE, LLC.,

20    activities on behalf of RESIDENTIAL FUNDING COMPANY, LLC., and thus

21    RESIDENTIAL FUNDING COMPANY, LLC., is responsible for all acts of GMAC

22    MORTGAGE, LLC related to modification of the plaintiffs' residential loan.

23      13.    The plaintiffs are informed and believe and thereupon allege that in performing

24    loan modification activities, RESIDENTIAL FUNDING COMPANY, LLC., provided

25    GMAC MORTGAGE, LLC., with certain policies, procedures and/or guidelines to follow

26    in the process of loan modification activities.

27      14.    The plaintiffs are informed and believe that RESIDENTIAL FUNDING

28    COMPANY, LLC., authorized GMAC MORTGAGE, LLC., to enter into binding loan

4

1   modifications on behalf of RESIDENTIAL FUNDING COMPANY, LLC.

2       15.   The plaintiffs are informed and believe and thereupon allege that the defendant

3   RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., was, at all times relevant hereto,

4   a Delaware corporation, licensed to do business, and doing business in the State of Nevada.

5   The plaintiffs are further informed and believe and thereupon allege RESIDENTIAL ASSET

6   MORTGAGE PRODUCTS, INC., was an entity that was governed or controlled by the other

7   named defendants herein, and doing the things set forth herein was acting under the direction

8   and control of the other defendants. RESIDENTIAL ASSET MORTGAGE PRODUCTS,

9   INC., is being substituted in this action for the previously named Doe Defendant, ABLE &

10   BAKER COMPANY 2.

11       16.   The plaintiffs are further informed and believe that RESIDENTIAL ASSET

12   MORTGAGE PRODUCTS, INC., claims to have purchased the plaintiffs' Promissory Note

13   and Deed of Trust from RESIDENTIAL FUNDING COMPANY, LLC., on or about

14   December 28, 2005, pursuant to an agreement entitled Assignment and Assumption

15   Agreement, however, the plaintiffs are informed and believe that RESIDENTIAL FUNDING

16   COMPANY, LLC., was not the owner of, nor was it in possession of, the plaintiffs'

17   Promissory Note and/or Deed of Trust on that day, and therefore could not transfer any

18   interest in either the Promissory Note or the Deed of Trust.

19       17.   Pursuant to said Assignment and Assumption Agreement, RESIDENTIAL

20   FUNDING CORPORATION (purportedly now RESIDENTIAL FUNDING COMPANY,

21   LLC., was obligated to deliver to RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.,

22   the original Promissory Note, endorsed to the order of U.S. Banking National Association,

23   as Trustee. The plaintiffs are informed and believe and thereupon aver that RESIDENTIAL

24   FUNDING COMPANY, LLC., never had legal title to said Promissory Note, and never

25   provided U.S. Banking National Association with the original of said Promissory Note, nor

26   did RESIDENTIAL FUNDING COMPANY, LLC., ever provide U.S. Banking National

27   Association with any proper endorsements of said Promissory Note to U.S. Banking National

28   Association. Based upon the foregoing, neither RESIDENTIAL FUNDING COMPANY,

1  LLC, nor RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., had any legal right to

2  order or authorize the foreclosure upon the plaintiffs' real property.

3      18.    That on December 28, 2005, (the same day that RESIDENTIAL FUNDING

4  COMPANY, LLC., purported to sell the plaintiffs' Promissory Note and Deed of Trust to

5  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.), RESIDENTIAL ASSET

6  MORTGAGE PRODUCTS, INC., claims that it assigned said Promissory Note and Deed of

7  Trust to U.S. Banking National Association as Trustee, pursuant to an agreement entitled

8  Pooling and Servicing Agreement.

9      19.    Pursuant to said Pooling and Servicing Agreement, RESIDENTIAL FUNDING

10  COMPANY, LLC., was obligated to, concurrently with the execution of said agreement,

11  deliver the agreement and the original Promissory Note, fully endorsed without recourse to

12  the Trustee, showing an unbroken chain of endorsements from the originator thereof to the

13  Person endorsing it to the Trustee.  The plaintiffs are informed and believe and thereupon

14  aver that RESIDENTIAL FUNDING COMPANY, LLC., never had legal title to said

15  Promissory Note and never provided U.S. Banking National Association with the original

16  of said Promissory Note.    The plaintiffs are further informed and believe that

17  RESIDENTIAL FUNDING COMPANY, LLC., never provided U.S. Banking National

18  Association with any Promissory Note which contained an unbroken chain of endorsements

19  from the originator of the Promissory Note (EquiFirst Corporation) through to the Trustee.

20      20.    The plaintiffs are informed and believe and thereupon aver, that on or about

21  November 15, 2007, the plaintiffs' original Promissory Note was modified pursuant to an

22  Adjustable Rate Loan Modification Agreement between the plaintiffs, as Borrower, and

23  Homecomings Financial, LLC., as Lender, however, Homecomings Financial was an entity

24  that had no right, title or interest in said Promissory Note since RESIDENTIAL FUNDING

25  COMPANY, LLC., claims it was the owner of said Promissory Note and that it had

26  transferred ownership of that Promissory Note to RESIDENTIAL ASSET MORTGAGE

27  PRODUCTS, INC., almost two years prior to this claimed modification.

28      21.    The plaintiffs are informed and believe and thereupon aver that each of the

6

1  defendants in this action took action upon the plaintiffs' Promissory Note purportedly

2  modified by Homecomings Financial, LLC., despite the fact that Homecomings Financial

3  had no right, title or interest in said Promissory Note, and as such, had no right to modify the

4  original Promissory Note.

5      22.    That in 2009, the defendant GMAC MORTGAGE, LLC., engaged and

6  authorized the defendant EXECUTIVE TRUSTEE SERVICES, LLC., to commence non-

7  judicial foreclosure proceedings against the plaintiffs' real property when GMAC

8  MORTGAGE, LLC., had neither the legal ownership of the Promissory Note, nor the Deed

9  of Trust which secured the obligations of the Promissory Note. As a result, neither GMAC

10  MORTGAGE, LLC., nor EXECUTIVE TRUSTEE SERVICES, LLC., had legal standing

11  to commence non-judicial foreclosure proceedings against the plaintiffs' real property.

12  Therefore, GMAC MORTGAGE, LLC., and EXECUTIVE TRUSTEE SERVICES, LLC.,

13  wrongfully foreclosed upon the plaintiffs' real property.

14      23.    The plaintiffs are informed and believe and thereupon allege that at all times

15  relevant hereto, the defendants, and each of them, were acting as agents and employees for

16  the other defendants, and in doing the things alleged herein were acting within the course and

17  scope of that agency. The plaintiffs are further informed and believe and thereupon allege,

18  that at all times relevant hereto, the defendants were acting as part of a common, planned,

19  scheme or design in conspiracy/concert with other defendants, thus making each legally

20  liable for the acts of all others.

21      24.    Plaintiffs do not know the true names or capacities of those defendants sued

22  herein as DOES 1-10, BLACK & WHITE CORPORATIONS 1-10, and ABLE & BAKER

23  COMPANIES 1-10, partnerships and/or limited liability companies. Therefore, plaintiffs sue

24  said defendants, and each of them, by such fictitious names. Plaintiffs are informed and

25  believe and based thereon allege that each of said defendants inclusive, were officers,

26  directors or managing agents and/or employees or were otherwise responsible for the daily

27  operation of said business, including, but not limited to the training and supervision of

28  employees of the company. That at all times relevant hereto, defendants herein fictitiously

1  sued were the owners, shareholders, agents, partners, or alter egos of defendants named

2  herein. Plaintiffs are further informed and believe that the DOE defendants are the holders

3  or owners of the deed of trust and/or promissory note executed by the plaintiffs, and thus are

4  legally responsible under the causes of action pled herein and proximately caused damages

5  to plaintiffs as herein alleged. Plaintiffs pray that when the true names of said defendants are

6  ascertained they may be inserted herein with appropriate allegations.

7      25.    In 2005, the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON

8  entered into a contract with EquiFirst to refinance a loan which was secured by the real

9  property located at 5540 Twin Creeks Drive, Reno, Nevada, 89523. This transaction was

10  accomplished through the use of a Promissory Note and Deed of Trust (hereinafter referred

11  to as the Note and/or Deed of Trust). As part of this transaction, PAMELA D. LONGONI

12  deeded a one-half interest to said real property and improvements to JEAN M. GAGNON.

13  Subsequent to the loan refinance, PAMELA D. LONGONI, LACEY LONGONI and JEAN

14  M. GAGNON lived at the property located at 5540 Twin Creeks Drive, Reno, Nevada,

15  89523.

16      26.    The plaintiffs are informed and believe and thereupon aver that after the

17  refinance was completed, EquiFirst assigned, or purported to assign, the Note and Deed of

18  Trust to a third party which may, or may not have been, Homecomings Financial, LLC.,

19  RESIDENTIAL FUNDING COMPANY, LLC, fka Residential Funding Corporation,

20  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., U.S. Banking National

21  Association, and/or GMAC MORTGAGE, LLC. At some point after the refinance,

22  Homecomings, Financial, LLC., RESIDENTIAL FUNDING COMPANY, LLC., and/or

23  GMAC MORTGAGE, LLC., claimed that it assumed the rights, duties and liabilities of

24  EquiFirst and conducted itself as though it was the lawful owner, and holder in due course

25  of the Note and Deed of Trust. Neither RESIDENTIAL FUNDING COMPANY, LLC., (or

26  its predecessor in interest Residential Funding Corporation), GMAC MORTGAGE, LLC.,

27  or any other defendant, recorded any notice in the Washoe County Recorder's Office

28  advising the plaintiffs (or any other person) that it held, owned or had been assigned the Note

8

1  and Deed of Trust.

2     27.    In early 2008, PAMELA D. LONGONI and JEAN M. GAGNON began to

3  suffer financial difficulties due to the fact that Mr. Gagnon was transferred, for his

4  employment, from northern Nevada to Las Vegas, Nevada. This caused a duplication of

5  many of the family's household expenses. As a result, the plaintiffs fell behind on their

6  mortgage payments. On or about January 15, 2009, the Plaintiff PAMELA D. LONGONI

7  sent a letter to Homecomings Financial, whom she believed to be the servicer of her loan,

8  asking for a modification of her loan.

9     28.    In response to her January 15, 2009, letter, on February 18, 2009, GMAC

10  MORTGAGE, LLC., sent the plaintiffs a package of records to fill out and return in order

11  to seek a loan modification.

12     29.    On February 19, 2009, without any contact with, or input or direction from

13  either the owner/holder of the Promissory Note or the Deed Of Trust, GMAC MORTGAGE,

14  LLC., made the decision on behalf of RESIDENTIAL FUNDING COMPANY, and/or

15  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National

16  Association to commence a non-judicial foreclosure upon the plaintiffs' real property. At

17  the time they did so, GMAC MORTGAGE, LLC., undertook no efforts to determine who

18  was the legal owner or holder of the plaintiffs' Promissory Note or the Deed of Trust.

19     30.    In accordance with their decision to commence foreclosure proceedings against

20  the plaintiffs' property, and without any contact with, or input or direction from either the

21  owner/holder of the Promissory Note or the Deed Of Trust, GMAC MORTGAGE, LLC.,

22  made the decision on behalf of RESIDENTIAL FUNDING COMPANY, and/or

23  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National

24  Association GMAC MORTGAGE, LLC., engaged with the defendant EXECUTIVE

25  TRUSTEE SERVICES, LLC., to undertake the process of foreclosure.

26     31.    On February 25, 2009, and without receipt of any assignment, authorization,

27  directive from the legal owner of the Promissory Note or the Deed of Trust, EXECUTIVE

28  TRUSTEE SERVICES prepared and recorded a Substitution of Trustee. This assignment

1   was in direct contradiction to the terms of the Deed of Trust, which required a change in

2   Trustee to be ordered by the Lender which was EquiFirst Corporation.

3       32.    Also on February 25, 2009, and without receipt of any assignment,

4   authorization, directive from the legal owner of the Promissory Note or the Deed of Trust,

5   EXECUTIVE TRUSTEE SERVICES, LLC., also prepared and recorded a Notice of Breach

6   and Default and of Election to Cause Sell of Real Property under Deed of Trust. Attached

7   as *Exhibit "1"* is a true, accurate and correct copy of this notice. This notice was defective,

8   since it lacked the information required by law.  EXECUTIVE TRUSTEE SERVICES,

9   LLC., caused this Notice to be recorded on February 26, 2011.

10      33.    On March 3, 2009, the Plaintiffs faxed GMAC their completed Loan

11  Modification application. In response, GMAC contacted the plaintiffs and asked for

12  additional information. The following day, March 4, 2009, EXECUTIVE TRUSTEE

13  SERVICES, LLC., caused the Notice of Breach and Default and of Election to Cause Sell

14  of Real Property under Deed of Trust to be mailed to the plaintiffs on March 4, 2009.

15      34.    On March 5, 2009, the plaintiff PAMELA LONGONI forwarded all requested

16  information to GMAC. The following day she spoke with a GMAC representative at which

17  time they discussed possible modifications to the plaintiffs' existing loan.  The plaintiffs

18  were informed of various options which they could pursue as an alternative to foreclosure.

19  At no time were the plaintiffs informed that GMAC MORTGAGE, LLC., had commenced

20  foreclosure proceedings, or that GMAC was not the owner, nor holder of the Promissory

21  Note or Deed of Trust on the plaintiffs' real property. The plaintiffs were, however, informed

22  that GMAC did have a program by which loans could be modified and that the plaintiffs

23  were candidates for such program. The plaintiffs fully and completely complied with all of

24  GMAC's demands in the application process.

25      35.    On or about March 10, 2009, a GMAC MORTGAGE, LLC., representative

26  informed the plaintiffs that their request for a loan modification had been approved. GMAC

27  MORTGAGE, LLC., sent the plaintiffs a proposed modification agreement. This agreement

28  called for a new monthly payment in the amount of $2,270.00.

36.    On or about March 19, 2008, the plaintiff PAMELA D. LONGONI contacted GMAC's representative and informed him that they could not meet the proposed monthly payment and the most that they could pay on a monthly basis was $1,600.00. In response, GMAC's representative Nate Stephenson developed a new loan modification plan pursuant to which the plaintiffs would be required to make payments in the amount of $1,600.00 per month. He instructed PAMELA D. LONGONI to begin making the payments in April of 2009. He further informed the plaintiff that GMAC would stop any effort to foreclose on the property. At not time did GMAC ever indicate that there was any time limit to this temporary plan. In making these statements, the GMAC representative was acting on behalf of, and within the course and scope of the authority granted to him by RESIDENTIAL FUNDING COMPANY, LLC., RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National Association, as Trustee. The plaintiffs made the required payment on or before the requested date.

37.    On April 2, 2009, the same GMAC MORTGAGE, LLC., representative informed the plaintiffs that all he was waiting on in order to make the change permanent was approval of the VP. Later that same day, said representative informed the plaintiffs that their trial loan modification was, in fact, approved. He further stated that because he was attempting to write off $176,000.00 from the loan, he needed approval from their VP, however, he also stated that he had already done the analysis and it seemed to be a win-win situation so he was fairly confident that it would get approved. At no time did GMAC ever advise the plaintiffs that this proposed plan would only be temporary or that it would need to be replaced with another plan. In making these statements, the GMAC MORTGAGE, LLC., representative was acting on behalf of, and within the course and scope of the authority granted to him by RESIDENTIAL FUNDING COMPANY, LLC., RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National Association, as Trustee.

38.    On April 6, 2009, GMAC MORTGAGE, LLC, made the decision to stop all foreclosure proceedings. In accordance with that decision, GMAC instructed EXECUTIVE TRUSTEE SERVICES, LLC., to stop the foreclosure process. EXECUTIVE TRUSTEE

11

1   SERVICES, LLC., received these instructions and stopped the foreclosure process.

2      39.   On April 21, 2009, the GMAC representative informed PAMELA D.

3   LONGONI that he was still awaiting approval from their "VP." On April 28, 2009, the same

4   GMAC representative informed PAMELA D. LONGONI that he had just looked at the notes

5   and it looked as if "one manager looked at it and agreed that it was a win-win situation, but

6   because it is a $186k that we were trying to write off, it has to go a little higher."

7      40.   On May 1, 2009, the plaintiffs attempted to make their next $1,600.00 payment

8   through an on-line system which GMAC specifically set up to accept the plaintiffs'

9   payments. This is the method by which the first $1,600.00 payment was made. However,

10   when PAMELA D. LONGONI attempted to make the payment, it was refused. In response,

11   PAMELA D. LONGONI contacted Nate Stephenson and advised him of the problem. He

12   informed her that someone had put a "Certified Funds Flag" on her account and that he had

13   removed it. He claimed he removed the flag but she still could not make the payment

14   through the system. Therefore, she sent the payment (with the extra fees) through Western

15   Union. The payment was accepted by GMAC.

16      41.   On May 5, 2009, the plaintiff received a telephone call from Homecomings

17   Financial, saying that they had not received her payment. In response, she contacted Nate

18   Stephenson who informed her that their records showed that they received the payment on

19   May 4, 2009, and as such, she was "Good to go." Nate Stephenson further informed her that

20   it didn't look like their VP has had a chance to look at the matter, however, the notes he saw

21   are good indicating that it "made sense to do the Modification." He further informed her that

22   "We still have 2 months before I would have to set up a plan. So everything is still sort of

23   on hold."

24      42.   On May 26, 2009, PAMELA D. LONGONI sent an e-mail communication to

25   Nate Stephenson asking about the status of her loan modification. She further informed him

26   that she had another friend who was suffering similar financial problems and asked if she

27   could refer him to Mr. Stephenson. Mr. Stephenson responded by saying that he did not have

28   an update, that she should just continue to make the $1,600.00 payment. Once the decision

1  was made, then paperwork will be sent out with the new terms.  He indicated that because

2  he would be moving to a new team the following week, he could not help Ms. Longoni's

3  friend.  He concluded by telling her to let him know if she could think of any further

4  questions.  At no time did he tell her he was unable to take any action relative to her loan

5  modification application.

6       43.    On or about May 26, 2009, GMAC sent the plaintiffs a letter advising the, that

7  help might be available to them through the new Home Affordable Modification program

8  which is part of the initiative announced by President Obama.

9       44.    In conformity with their agreement with GMAC MORTGAGE, LLC., the

10  plaintiffs made the required $1,600.00 payments for the months of April, May and June of

11  2009.  GMAC MORTGAGE, LLC., accepted said payments on behalf of itself and/or

12  RESIDENTIAL FUNDING COMPANY, LLC., or RESIDENTIAL ASSET MORTGAGE

13  PRODUCTS, INC.  None of these funds were ever returned to the plaintiffs.

14       45.    Over the next 3 weeks, the plaintiffs attempted to contact GMAC to find out

15  what was happening with their application for the loan modification.  On June 30, 2009, Ms.

16  Longoni sent another e-mail communication to Nate Stephenson asking for help.  He

17  responded by saying that he had emailed his old department yesterday and they responded

18  that the file has been sent for final management approval.  He further told her the person now

19  handling the matter was Landon Huck.  In response, Ms. Longoni asked for contact

20  information for Mr. Huck.  Nate Stephenson responded by saying he couldn't give her that

21  information, however, he informed her that he did receive an email stating that the

22  modification was approved the prior day.

23       46.    In response to this information, the plaintiffs made numerous attempts to make

24  the next $1,600.00 on-line payment, however, all attempts were rejected.  After numerous

25  attempts, plaintiff finally reached a live person on July 9, 2009, who informed her that their

26  modification was not approved, that they owed approximately $19,000.00, and that if

27  payment was not received, they would sell her home.  In response, PAMELA D. LONGONI

28  immediately sent Nate Stephenson an email asking for his assistance.  Mr. Stephenson

1   advised her that they were trying to put her into an Obama Modification. He specifically told

2   her that her foreclosure was on hold, and that GMAC did not want to take her home. He told

3   her that they would try to do everything they could before they proceeded with foreclosure.

4   He further informed her that the Obama program was subsidized and allowed them to drop

5   payments to 31% of the borrower's gross income. Because of that it allowed them to be a

6   little more aggressive with their rates and debt forgiveness.

7       47.    Contrary to these representations, on July 15, 2009, GMAC removed the hold

8   which it placed on the foreclosure. GMAC thereafter instructed EXECUTIVE TRUSTEE

9   SERVICES, LLC., to proceed forward with the foreclosure sale.

10       48.    The following day, GMAC sent the plaintiffs a letter informing them that the

11   repayment plan had been cancelled because payment had not been received by the payment

12   due date "as specified in the signed repayment agreement." The plaintiffs had never signed

13   any "repayment agreement".

14       49.    In accordance with GMAC's instructions, and without any legal standing as

15   set forth herein above, on July 20, 2009, EXECUTIVE TRUSTEE SERVICES, LLC.,

16   prepared a Notice of Trustee's Sale, setting a sell date of August 14, 2009. Attached as

17   *Exhibit "2"* is a true, accurate and correct copy of this notice. EXECUTIVE TRUSTEE

18   SERVICES, LLC., caused this Notice to be recorded on July 23, 2009.

19       50.    Seven days later on July 30, 2009, GMAC sent a an "Obama" package to the

20   plaintiffs via federal express. The plaintiffs received that package on August 4, 2009. The

21   letter which accompanied this package informed the plaintiffs to submit a signed letter

22   explaining the cause of default (which they had done previously), to submit copies of two

23   most recent pay stubs, and a copy of their most recent federal tax return. The letter informed

24   them to allow five business days for GMAC to process the financial package. Notably, this

25   letter contained a notation at the bottom of the letter which said "30 days to sale." The

26   plaintiffs returned the requested information on August 10, 2009.

27       51.    On August 14, fifteen days after the date of this letter, EXECUTIVE

28   TRUSTEE SERVICES, LLC., sold the plaintiffs' home at auction.

52.    Because GMAC received payments following the filing of the original Notice of Default, EXECUTIVE TRUSTEE SERVICES, LLC.,'s policies required it to recommence the foreclosure process through the issuance of a new Notice of Default. However, GMAC never informed EXECUTIVE TRUSTEE SERVICES, LLC., that it received any such payments. Therefore, EXECUTIVE TRUSTEE SERVICES, LLC., in violation of its own internal policies, continued with the existing foreclosure.

53.    The Notice of Breach and Default and Election to Cause Sell of Real Property Under Deed of Trust (Exhibit 1) prepared and recorded by EXECUTIVE TRUSTEE SERVICES, LLC., failed to satisfy the provisions of N.R.S. 107.085, in that GMAC did not provide plaintiffs with the notice specified in that section.

54.    Said Notice of Breach and Default and Election to Cause Sell of Real Property Under Deed of Trust (Exhibit 1) also failed to satisfy the provisions of N.R.S. 107.086.

55.    Said Notice of Breach and Default and Election to Cause Sell of Real Property Under Deed of Trust (Exhibit 1) was never served upon the plaintiffs PAMELA D. LONGONI or JEAN M. GAGNON as required by N.R.S. 107.080.

56.    The defendants, and each of them, failed to provide the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON with the notices which are required by law, including, but not limited to, N.R.S. 107.080, 107.085, 107.086.

57.    On August 14, 2009, the defendants, and each of them acting individually and on behalf of the others, and without legal standing to do so, sold or caused to be sold, the plaintiffs' real property located at 5540 Twin Creeks Drive, Reno, Nevada, 89523, to a third party. This property was sold without the proper advance notifications called for by N.R.S. 107.080, 107.085 and/or 107.086.

58.    On or about August 24, 2009, the plaintiff PAMELA D. LONGONI, again contacted GMAC to determine the status of the new loan modification application. At that time, she was for the first time informed that GMAC had gone forward with the foreclosure that it had promised was on hold. At that time, PAMELA D. LONGONI was informed that her home had already been sold to a third party and that there was nothing they could do

15

1   about it. The following day, August 25, 2009, the plaintiff learned through her daughter, that

2   a man had left a 5-day notice to vacate the premises on her porch.

3       59.    After the sale of the plaintiffs' home, one or more of the defendants sought to

4   recover the home back from the foreclosure sale purchaser.

5       60.    None of the defendants were able to recover the plaintiffs' home from the

6   foreclosure sale purchaser.

7       61.    In response to this notice, Ms. Longoni contacted the putative purchaser

8   seeking to recover her home. She was told that they had lawfully purchased the home and

9   that there was nothing she could do about it. She was told that if she vacated the premises

10   in a peaceful manner and left the property in tact, she would be paid the sum of $1,250.00.

11   Believing she had no choice in the matter, PAMELA D. LONGONI signed the agreement.

12   She was tendered a check in the amount of $1,250.00, however, said check was later

13   dishonored by the issuing bank.

14       62.    During the next five days, PAMELA D. LONGONI frantically searched for a

15   rental property to move into with her daughter LACEY LONGONI. After extensive efforts,

16   she was able to locate a home in the same school district where 5540 Twin Creeks Drive,

17   Reno, Nevada, 89523 was zoned. However, in order to gain the consent of the landlord to

18   lease said premises, PAMELA D. LONGONI was required to sign a two-year lease, and she

19   was required to have the lease co-signed by her former husband, and father of her daughters.

20       63.    On or about September 4, 2009, PAMELA D. LONGONI received a telephone

21   call from Michael Knapp, Esq., who advised her that he was counsel for GMAC. Mr. Knapp

22   stated to Ms. Longoni that "we've made a big mistake" and that she did not have to leave her

23   home. He further informed her that they were undertaking efforts to recover the home back.

24   PAMELA D. LONGONI informed Mr. Knapp that she had already moved from the property

25   and entered into a two-year lease on a substitute residential property. Mr. Knapp advised Ms.

26   Longoni that he was headed to the beach with his family, and that after the holiday weekend

27   he would contact her to discuss the matter further.

28       64.    The following week PAMELA D. LONGONI was contacted by Christy

16

1    Hancock, Esq., who sought information about the costs Ms. Longoni incurred in moving

2    from her home and in improving her home before the foreclosure. Ms. Hancock informed

3    PAMELA D. LONGONI that GMAC would reimburse her for these costs. Ms. Hancock

4    further informed Ms. Longoni that GMAC would take immediate steps to remove the

5    foreclosure from her credit history. Subsequently, GMAC or some other party, did in fact,

6    remove all references to this transaction from her credit history.

7         65.    Subsequently, however, the defendants, and each of them, through their

8    retained counsel, have refused to acknowledge their violations of Nevada law and have

9    instead sought to blame PAMELA D. LONGONI for losing her home.

10        66.    In the weeks which followed this unlawful eviction, PAMELA D. LONGONI

11    discovered that the defendants had unlawfully foreclosed upon her home, and they

12    unlawfully evicted her from the property. She made repeated requests for GMAC to recover

13    her home and return her and her family to their prior residence. GMAC refused, and

14    continues to refuse to return the plaintiffs to their home.

15                          **FIRST CLAIM FOR RELIEF**

16        **(Violation of N.R.S. 107.080, 107.085, 107.086, 107.087, 107.090)**

17        67.    Plaintiffs reallege each and every allegation as contained above and incorporate

18    them by reference as if fully set forth herein.

19        68.    At all times relevant hereto, there was in force and effect, certain Nevada

20    statutes, including, but not limited to, N.R.S. 107.080, N.R.S. 107.085, N.R.S. 107.086

21    N.R.S. 107.087 and N.R.S. 107.090, which regulate the manner in which non-judicial

22    foreclosures may be conducted in the State of Nevada. Among other things, these statutes

23    set time limits on when a non-judicial foreclosure can be conducted, the manner in which the

24    non-judicial foreclosure can be conducted, and the notices which must be provided to those

25    grantors or others with an interest in the subject property before any sale can be conducted.

26    These statutes were enacted to protect people in a class of which the plaintiffs were members,

27    and said statutes were intended to protect the plaintiffs from the very harm they have suffered

28    as a proximate result of the conduct of the defendants, and each of them.

69.    Because GMAC MORTGAGE, LLC., proposed and agreed to a loan modification, and accepted payments from the plaintiffs in accordance with this loan agreement, the non-judicial foreclosure proceedings which commenced on February 25, 2009, were rendered null and void. Despite that fact, and despite GMAC's promises that it would not foreclose upon the plaintiffs' property, GMAC and EXECUTIVE TRUSTEE SERVICES, LLC., proceeded forward with the foreclosure sale.

70.    Defendant GOWEN swore to, under oath, and caused to be filed with the Washoe County Recorder, in Nevada, a "Trustee's Deed of Sale," dated August 14th, 2009, and file stamped August 26th, 2009, under which GOWEN represented that the trustee had complied with all applicable statutory requirements of the State of Nevada, and performed all duties required by the Deed of Trust. Attached as *Exhibit "3"* is a true, accurate and correct copy of this notice. This was intentional or reckless misrepresentation, since GOWEN knew or should have known that" 1) the Trustee had not complied with all applicable statutory requirements, and that 2) all duties required by the Deed of Trust had not been extinguished.

71.    At the times the defendants undertook the process of non-judicial foreclosure, none of the defendants owned, possessed, or had any legal right to the Promissory Note or the Deed of Trust. In addition, none of the defendants had the authority to undertake any act in furtherance of the non-judicial foreclosure. Therefore, the foreclosure was wrongful and unlawful and in violation of Nevada law.

72.    The defendants, and each of them, by way of the above described acts and/or omissions, violated the provisions of the following Nevada Revised Statutes:

a) N.R.S. 107.080,

b) N.R.S. 107.085,

c) N.R.S. 107.086,

d) N.R.S. 107.087, and

e) N.R.S. 107.090.

73.    As a direct and proximate result of the wrongful acts of the defendants, and

18

1   each of them, the plaintiffs have suffered the permanent loss of their home and real property,

2   as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

3   of the property, the future value and earning capacity of said property, the loss of the use and

4   enjoyment of said property, and the loss of all improvements made to that property over the

5   past 14 plus years, all in an amount in excess of TEN THOUSAND DOLLARS

6   ($10,000.00).

7       73.   As a further direct and proximate result of the wrongful acts of the defendants

8   and each of them, the plaintiffs have been forced to incur costs associated with obtaining

9   replacement housing, including, but not necessarily limited to, moving and storage expenses,

10   rental charges, household furnishings, increased travel costs and increased utility bills and

11   expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

12       74.   As a further direct and proximate result of the wrongful acts of the defendants,

13   and each of them, the plaintiffs have suffered severe and disabling emotional distress and

14   anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

15   all to the Plaintiffs' general damages in an amount in excess of TEN THOUSAND

16   DOLLARS ($10,000.00).

17       75.   In doing the acts alleged herein, the defendants, and each of them acted, with

18   deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

19   such are guilty of oppression, thus warranting the imposition of exemplary and punitive

20   damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

21       76.   The plaintiffs have been required to retain the services of ERICKSON,

22   THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

23   future, incur expenses and costs and attorney's fees for which they are entitled to recover.

24   The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

25   **<u>SECOND CLAIM FOR RELIEF</u>**

26   **(Violation of N.R.S. 205.372)**

27       77.   Plaintiffs reallege each and every allegation as contained above and incorporate

28   them by reference as if fully set forth herein.

78.    At all times relevant hereto, there was in force and effect, certain Nevada statutes, including, but not limited to, N.R.S. 205.372 which makes it a crime for a person who, with intent to defraud a participant in a mortgage lending transaction, knowingly makes a false statement or misrepresentation concerning a material fact, or deliberately conceals or fails to disclose a material fact, as part of a mortgage lending transaction, or files, or causes to be filed, with a county recorder, any document that the person knows to include a misstatement, misrepresentation or omission concerning a material fact. These statutes were enacted to protect people in a class of which the plaintiffs were members, and said statutes were intended to protect the plaintiffs from the very harm they have suffered as a proximate result of the conduct of the defendants, and each of them. Therefore, a violation of this statute constitutes Negligence Per Se.

79.    Acting within the scope of their employment for EXECUTIVE TRUSTEE SERVICES, LLC., and as an agent of GMAC MORTGAGE, LLC., and/or RESIDENTIAL COMPANY, INC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., the defendants ILLENNA PETERSON and KATHLEEN GOWEN, made false statements and/or misrepresentations and recorded, or caused to be recorded with the Washoe County Recorder, documents that they knew included a misstatement, misrepresentation or omission of a material fact.

80.    Among other misrepresentations, the "Notice of Breach and Default and of Election to Cause sell (sic) of Real Property Under Deed of Trust" provides that "a breach of and default in the obligations for which such Deed of Trust and security has occurred, or that payment has not been made of ... ." (*See Exhibit 1*). This constitutes a violation of NRS 205.372(1)(e).

81.    Among other misrepresentations, the "Notice of Trustee's Sale" provides that the borrowers "are in default under a Deed of Trust". This is not correct. Further, proper notice was never provided of this Notice of Trustee's Sale. This also violates various provisions of NRS 205.372, et seq. (See Exhibit 2).

82.    By way of further example, the "Trustee's Deed Upon Sale" also filed with the

20

1  County Recorder, provides that all applicable statutory requirements and all duties required
2  by the Deed of Trust have been performed.  This is false and violates NRS 205.372, et seq.

3       83.   The false representations within these documents filed with the County
4  Recorder, made with knowledge or belief of their falsity, were part of a scheme which
5  included assurances of the loan modification and lack of danger of foreclosure, which were
6  intended to induce the reliance of the plaintiffs, and lull them into a sense of security, while
7  the fraudulently filed documents expedited the wrongful sale of their home, to the
8  Defendants' profit.

9       84.   The plaintiffs relied upon these misrepresentations of the finalized loan
10  modification, and absence of danger of foreclosure to their detriment.

11       85.   By such actions, by such misrepresentations, and by such filing of documents
12  with the County Recorder, which included misrepresentations, misstatements, and omissions
13  of material fact, the defendants acted with an intent to defraud the participant in the mortgage
14  lending transaction through the eventual wrongful sale of the plaintiffs' home without
15  process of law.

16       86.   As a direct and proximate result of the actions of these defendants and/or
17  KATHLEEN GOWEN, the plaintiffs' real property was purportedly sold at a public auction
18  on or about August 14, 2009.  As a further direct and proximate result of the actions of
19  ILLEANNA PETERSON, the plaintiffs were wrongfully ousted and ejected from their
20  lawful residence and real property.

21       87.   As a direct and proximate result of the wrongful acts of the defendants, and
22  each of them, the plaintiffs have suffered the permanent loss of their home and real property,
23  as well as all attributes thereto, including, but not necessarily limited to, the loss of the value
24  of the property, the future value and earning capacity of said property, the loss of the use and
25  enjoyment of said property, and the loss of all improvements made to that property over the
26  past 14 plus years, all in an amount in excess of TEN THOUSAND DOLLARS
27  ($10,000.00).

28       88.   As a further direct and proximate result of the wrongful acts of the defendants

1   and each of them, the plaintiffs have been forced to incur costs associated with obtaining

2   replacement housing, including, but not necessarily limited to, moving and storage expenses,

3   rental charges, household furnishings, increased travel costs and increased utility bills and

4   expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

5        89.   As a further direct and proximate result of the wrongful acts of the defendants

6   and each of them, the plaintiffs have suffered severe and disabling emotional distress and

7   anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

8   all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

9   DOLLARS ($10,000.00).

10       90.   In doing the acts alleged herein, the defendants and each of them acted with

11  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

12  such, are guilty of oppression, thus warranting the imposition of exemplary and punitive

13  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14       91.   The plaintiffs have been required to retain the services of ERICKSON,

15  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

16  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

17  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

18                        **THIRD CLAIM FOR RELIEF**

19                        **(Fraud and Misrepresentation)**

20       92.   Plaintiffs reallege each and every allegation as contained above and incorporate

21  them by reference as if fully set forth herein.

22       93.   As set forth above, the defendants, and each of them, provided false

23  representations of material fact, with either the knowledge or belief of such falsity, or without

24  sufficient foundation.  These representations included telling the plaintiff Longoni that

25  plaintiffs' loan modification was permanently approved, and that plaintiffs' loan payments

26  would be the amount of $1,600.00 per month, commencing in April of 2009, and that GMAC

27  would not foreclose upon her home. These misrepresentations included previously described

28  communications regarding the retraction of the permanently approved loan for a "trial

22

1  modification" only, subsequent representation indicating that the loan had again been

2  permanently approved, communications and representations concerning reduction in the

3  principal loan amount of approximately $169,000.00, representations regarding the need to

4  place plaintiffs into an "Obama Modification Plan", representations regarding the need to

5  submit a new loan modification application and supporting documentation, representations

6  that any effort to foreclose on the property had been placed on hold, and that "GMAC does

7  not want to take your home", as well as the omission to provide plaintiffs with requested

8  information as to whether new loans had in fact been approved, accepted, or declined, all as

9  previously described above.

10      94.      These false representations were made with the intent to induce the plaintiffs'

11  reliance, and the plaintiffs did, in fact, justifiably rely upon these false representations, to

12  their detriment. Such reliance is reflected by the above-described mortgage payments made

13  under the "permanently approved" loan modification, the last of which was rejected without

14  explanation. The plaintiffs further relied to their detriment upon these representations by not

15  undertaking more aggressive actions to qualify under an additional loan modification

16  program, by not making preparations to leave their home, thus forcing them to incur all the

17  additional cost and trouble of finding replacement housing with no notice. This detriment

18  was also reflected by the fact that, in spite of said payments, the plaintiffs lost their home.

19      95.      Fraudulent intent is also reflected by the fact that at the same time the

20  defendants were making the above-described false representations, they were, in fact,

21  proceeding on a course of foreclosure by denying the plaintiffs a myriad of statutory

22  protections regarding their mortgage and their home, including proper notices, the right and

23  opportunity to participate in the Nevada mandatory mediation process, while also filing

24  documents with the Washoe County Recorder containing false statements which were used

25  to expedite the sale of the home without the plaintiffs' knowledge. In addition, the

26  defendants were actively seeking to sell the plaintiffs' home pursuant to the Notice of Default

27  which it knew, or in the exercise of reasonable care, would have known, was defective thus

28  requiring the recommencement of the foreclosure process.

23

1        96.    The plaintiffs' reliance was justifiable.

2        97.    Damages resulted from this reasonable reliance. The defendants' above-

3    described misrepresentations proximately caused all of the plaintiffs' damages.

4        98.    As a direct and proximate result of the actions of the defendants and each of

5    them, the plaintiffs' real property was sold at a public auction on or about August 14, 2009.

6    As a further direct and proximate result of the actions of the defendants and each of them,

7    the plaintiffs were wrongfully ousted and ejected from their lawful residence and real

8    property.

9        99.    As a direct and proximate result of the wrongful acts of the defendants, and

10    each of them, the plaintiffs have suffered the permanent loss of their home and real property,

11    as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

12    of the property, the future value and earning capacity of said property, the loss of the use and

13    enjoyment of said property, and the loss of all improvements made to that property over the

14    past 14 plus years all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

15        100.    As a further direct and proximate result of the wrongful acts of the defendants

16    and each of them, the plaintiffs have been forced to incur costs associated with obtaining

17    replacement housing, including, but not necessarily limited to, moving and storage expenses,

18    rental charges, household furnishings, increased travel costs and increased utility bills and

19    expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

20        101.    As a further direct and proximate result of the wrongful acts of the defendants

21    and each of them, the plaintiffs have suffered severe and disabling emotional distress and

22    anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

23    all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

24    DOLLARS ($10,000.00).

25        102.    In doing the acts alleged herein, the defendants and each of them acted with

26    deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

27    such are guilty of oppression thus warranting the imposition of exemplary and punitive

28    damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

1       103.   The plaintiffs have been required to retain the services of ERICKSON,

2  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

3  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

4  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

5                       **FOURTH CLAIM FOR RELIEF**

6                **(Negligence and Negligent Misrepresentation)**

7       104.   Plaintiffs reallege each and every allegation as contained above and incorporate

8  them by reference as if fully set forth herein.

9       105.   The defendants, and each of them, owed a duty to the plaintiffs to refrain from

10  any conduct which unlawfully interfered with the plaintiffs' rights to peaceful occupancy of

11  the residence and real property.  The defendants, and each of them, breached said duty by

12  acting in a negligent fashion proximately causing the plaintiffs' home to be unlawfully sold

13  to a third party, and proximately causing the plaintiffs to be unlawfully ousted and ejected

14  from the home.

15       106.   Defendants, and each of them, had a duty of care regarding foreclosure

16  proceedings, such minimum duty pertaining to foreclosures defined by Nevada Revised

17  Statutes 107.080 through NRS 107.100.  In addition, the defendant GMAC MORTGAGE,

18  LLC., knew that it had agreed to a loan modification pursuant to which it received further

19  loan payments, thereby invalidating the Notice of Default which it had previously caused to

20  be prepared and recorded.  The defendant EXECUTIVE TRUSTEE SERVICES, LLC.,

21  knew, or through the exercise of reasonable care, should have known, that the plaintiffs had

22  made further payments to the modified Promissory Note, thereby invalidating the original

23  Notice of Default.

24       107.   As delineated above, the defendants, and each of them, violated these statutes

25  which established the duty and breach elements of negligence in that the plaintiffs belonged

26  to that class of persons the statutes were intended to protect, and the injury described above

27  is of the type against which the statute was intended to protect.  The defendants further

28  breached their general standard of care to the plaintiffs to conduct a foreclosure only when

1  they had the proper authority and standing, and in compliance with all Nevada statutes.

2      108.    As a proximate result of these statutory and other violations, plaintiffs have

3  sustained damages.

4      109.    At the time the power of sale was exercised, or that foreclosure occurred, the

5  defendants lacked the legal right to proceed forward with any non-judicial foreclosure.

6  Moreover, there was no breach of condition or failure to perform which existed on the

7  plaintiffs' part, which would have authorized the foreclosure or exercise of the power of sale.

8      110.    Defendants, and each of them, in the course of their business, profession or

9  employment, or in any other action in which they had a pecuniary interest, supplied false

10  information for the guidance of the defendants in their business transactions.

11      111.    The defendants, and each of them, failed to exercise reasonable care or

12  competence in obtaining and communicating such information.

13      112.    The plaintiffs justifiably relied upon such information to their legal and

14  pecuniary law which was caused thereby.

15      113.    Defendants, and each of them, gratuitously or for consideration, rendered

16  services to the plaintiffs which the defendants should have recognized as being necessary for

17  the protection of the plaintiffs, or the plaintiffs' possessions.

18      114.    Defendants, and each of them, are subject to liability to the plaintiffs for the

19  physical harm resulting from their failure to exercise reasonable care to perform this

20  undertaking – in particular, the represented loan modification – in that the defendants' failure

21  to exercise such care increased the risk of harm and foreclosure to the plaintiffs.

22      115.    The harm to the plaintiffs was suffered because of the plaintiffs' reliance upon

23  the defendants' undertaking regarding the mortgage services and modification.

24      116.    Through the above-described actions concerning representations of permanent

25  loan modification, and subsequent wrongful and fraudulent foreclosure of said home,

26  defendants' conduct is extreme and outrageous.

27      117.    As a result of the wrongful foreclosure, and other actions described herein,

28  plaintiffs have suffered emotional distress causing a physical impact and physical

1 manifestation.

2      118.  As a direct and proximate result of the wrongful acts of the defendants, and

3 each of them, the plaintiffs have suffered the permanent loss of their home and real property,

4 as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

5 of the property, the future value and earning capacity of said property, the loss of the use and

6 enjoyment of said property, and the loss of all improvements made to that property over the

7 past 14 plus years all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

8      119.  As a further direct and proximate result of the wrongful acts of the defendants

9 and each of them, the plaintiffs have been forced to incur costs associated with obtaining

10 replacement housing, including, but not necessarily limited to, moving and storage expenses,

11 rental charges, household furnishings, increased travel costs and increased utility bills and

12 expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

13      120.  As a further direct and proximate result of the wrongful acts of the defendants

14 and each of them, the plaintiffs have suffered severe and disabling emotional distress and

15 anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

16 all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

17 DOLLARS ($10,000.00).

18      121.  In doing the acts alleged herein, the defendants and each of them acted with

19 deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

20 such are guilty of oppression thus warranting the imposition of exemplary and punitive

21 damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

22      122.  The plaintiffs have been required to retain the services of ERICKSON,

23 THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

24 future, incur expenses and costs and attorney's fees for which they are entitled to recover.

25 The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

26                           **FIFTH CLAIM FOR RELIEF**

27                              **(Breach of Contract)**

28      123.  Plaintiffs reallege each and every allegation as contained above and incorporate

1    them by reference as if fully set forth herein.

2      124.   The plaintiffs entered into a contract with EquiFirst Corporation which contract

3    included a Promissory Note and Deed of Trust.  That contract contained certain provisions

4    relating to actions which may have be taken should the plaintiffs fail to fulfill their obligation

5    to make periodic payments on the mortgage.  These promises were binding upon and

6    enforceable against all who assumed the rights and liabilities under the Note and Deed of

7    Trust, including the defendants, and each of them.

8      125.   For example, the Deed of Trust provides under Subsection 15, that notices

9    required by the security agreement shall satisfy the applicable law.

10      126.   Subsection 16 of the Deed of Trust, (attached hereto as Exhibit 4) provides that

11    the security instrument is governed by the federal law, and the law of the jurisdiction in

12    which the property is located, and that all rights and obligations contained in the security

13    agreement are subject to the requirements and limitations of such law.

14      127.   Through the above-described conduct, including multiple violations of Nevada

15    statutes designed to protect plaintiffs from wrongful foreclosures, defendants, and each of

16    them, breached, in part and not limited thereto, the remedies and notice provisions, as well

17    as provisions regarding the sale of property at public auction within Section 22 of said Deed

18    of Trust.

19      129.   Moreover, the Adjustable Rate Note (attached hereto as Exhibit "5")

20    incorporates by reference the Deed of Trust, at Section 11, as well as the protections given

21    to the note holder therein.

22      130.   Vis-a-vis the above-described conduct, defendants have violated, in part and

23    not limited thereto, the terms of that incorporated Deed of Trust as applicable to the

24    Adjustable Rate Note, as well as notice provisions within Section 7(C), Section 8, and

25    Section 11 of the Adjustable Rate Note.

26      131.   The plaintiffs are informed and believe and thereupon allege that the

27    Defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY,

28    LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., assumed, or were

1 assigned, all the duties and obligations which EquiFirst Corporation owed to the plaintiffs

2 under the loan agreement.

3    132.    The defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL

4 FUNDING COMPANY, INC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS,

5 INC., breached said contracts with the plaintiffs when they wrongfully and unlawfully

6 constructively seized and sold the plaintiffs' real property and residence.

7    133.    In addition, and not by way of limitation, the defendants, through their above-

8 described conduct, breached an express and implied in fact agreement concerning permanent

9 approval of the loan modification.    A meeting of the minds occurred regarding this

10 permanently approved loan modification, as reflected both by written communication and the

11 conduct of the parties, showing, in light of the surrounding circumstances, their express and

12 tacit understandings.

13    134.    This understanding is evidenced, in part, by payment of, and acceptance of, the

14 reduced and modified loan amount as agreed upon by the parties.

15    135.    The plaintiffs performed by tendering these modified loan amounts from April

16 through July of 2009.  In spite of various oral and email correspondence regarding the terms

17 of the permanently approved loan modification, the defendants, and each of them, breached

18 the same.

19    136.    Breach of the Promissory Note, Deed of Trust, and subsequent express and

20 implied in fact agreements pertaining to permanently approved loan modifications, were also

21 breached by failure to comply with the above-described Nevada statutes designed to protect

22 the homeowners.

23    137.    Nevada implies a covenant of good faith and fair dealing into every contract.

24    138.    Defendants, by failing to comply with the loan modification agreement and the

25 promise not to foreclose upon the plaintiffs' property and by selling the property in question,

26 with malice, and not complying with statutory notice requirements, and other statutory

27 requirements, breached the implied covenant of good faith and fair dealing implied within

28 every contract in Nevada.

139.  As a direct and proximate result of the breach of contract, the plaintiffs have suffered the permanent loss of their home and real property, as well as all attributes thereto, including, but not necessarily limited to, the loss of the value of the property, the future value and earning capacity of said property, the loss of the use and enjoyment of said property, and the loss of all improvements made to that property over the past 14 plus years all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

140.  As a further direct and proximate result of the breach of the contract, the plaintiffs have been forced to incur costs associated with obtaining replacement housing, including, but not necessarily limited to, moving and storage expenses, rental charges, household furnishings, increased travel costs and increased utility bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

141.  The plaintiffs have been required to retain the services of ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the future, incur expenses and costs and attorney's fees for which they are entitled to recover. The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

## SIXTH CLAIM FOR RELIEF

### (Tortious Breach of The Implied Covenant of Good Faith and Fair Dealing)

### NOTE:

**The plaintiffs have included this claim for relief for appeal purposes only. Previously, the Court dismissed this claim pursuant to Document 52, and it appears that ruling would apply with equal force to all newly named defendants.**

142.  Plaintiffs reallege each and every allegation as contained above and incorporate them by reference as if fully set forth herein.

143.  The plaintiffs entered into a contract with EquiFirst Corporation which contract included a Promissory Note and Deed of Trust. That contract contained certain provisions relating to actions which may be taken should the plaintiffs fail to fulfill their obligation to make periodic payments on the mortgage. Implied into this contract is an implied covenant of good faith and fair dealing which requires each party to engage in no conduct which will

1   deprive the other party of the rights and benefits of said contract. Subsequently, the plaintiffs

2   PAMELA D. LONGONI and JEAN GAGNON entered into a binding loan modification

3   agreement which the parties partially performed.

4        144.    By reason of the relationship between the parties wherein the plaintiffs were

5   in a vastly inferior bargaining position, where the defendant GMAC had made promises and

6   agreements which it knew, or should have known, would be relied upon by the plaintiffs, and

7   because the defendants had failed to comply with certain statutes regulating the assignment

8   of mortgage rights, the defendant occupied a position of trust and reliance vis-a-vis the

9   plaintiffs. Therefore, there exists a special relationship of trust and reliance akin to a

10  fiduciary relationship.

11       145.    The above-described relationship is one of those situations involving an

12  element of reliance generating a need to protect the weak from the insults of the strong, that

13  is not adequately met by ordinary contract damages.

14       146.    The defendants, and each of them, were in a vastly superior or entrusted

15  position as compared to the plaintiffs, and have engaged in grievous or perfidious

16  misconduct.

17       147.    This superior/inferior power differential created a special element of reliance

18  on the credibility of the defendants and lenders concerning the permanently approved loan

19  modification, and promise not to foreclose without adequate notice and due process of law.

20       148.    The plaintiffs are informed and believe and thereupon allege that the Defendant

21  GMAC MORTGAGE, LLC., purportedly assumed or was assigned all the rights, duties and

22  obligations which EquiFirst Corporation owed to the plaintiffs under the loan agreement.

23       149.    The defendant GMAC MORTGAGE, LLC., breached said contracts with the

24  plaintiffs when it wrongfully and unlawfully constructively seized and sold the plaintiffs' real

25  property and residence. Because of the nature of the relationship between the parties and the

26  unique nature of real property, and because contractual damages will not make the plaintiffs

27  whole, an award of tort damages is appropriate under Nevada law.

28       150.    As a direct and proximate result of the breach of contract and breach of the

31

1   implied covenant of good faith and fair dealing, the plaintiffs have suffered the permanent
2   loss of their home and real property, as well as all attributes thereto, including, but not
3   necessarily limited to, the loss of the value of the property, the future value and earning
4   capacity of said property, the loss of the use and enjoyment of said property, and the loss of
5   all improvements made to that property over the past 14 plus years all in an amount in excess
6   of TEN THOUSAND DOLLARS ($10,000.00).

7       151.   As a further direct and proximate result of the breach of the contract and breach
8   of the implied covenant of good faith and fair dealing, the plaintiffs have been forced to incur
9   costs associated with obtaining replacement housing, including, but not necessarily limited
10  to, moving and storage expenses, rental charges, household furnishings, increased travel
11  costs and increased utility bills and expenses all in an amount in excess of TEN THOUSAND
12  DOLLARS ($10,000.00).

13      152.   As a further direct and proximate result of the wrongful acts of the defendants
14  and each of them, the plaintiffs have been forced to incur costs associated with obtaining
15  replacement housing, including, but not necessarily limited to, moving and storage expenses,
16  rental charges, household furnishings, increased travel costs and increased utility bills and
17  expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

18      153.   As a further direct and proximate result of the wrongful acts of the defendants
19  and each of them, the plaintiffs have suffered severe and disabling emotional distress and
20  anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry
21  all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND
22  DOLLARS ($10,000.00).

23      154.   In doing the acts alleged herein, the defendants and each of them acted with
24  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as
25  such are guilty of oppression thus warranting the imposition of exemplary and punitive
26  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

27      155.   The plaintiffs have been required to retain the services of ERICKSON,
28  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

1  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

2  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

3  <u>**SEVENTH CLAIM FOR RELIEF**</u>

4  **(Breach of Covenant of Quiet Enjoyment)**

5  <u>**NOTE:**</u>

6  **The plaintiffs have included this claim for relief for appeal purposes only.**
7  **Previously, the Court dismissed this claim pursuant to Document 52, and it appears**
8  **that ruling would apply with equal force to all newly named defendants.**

9       156.   Plaintiffs reallege each and every allegation as contained above and incorporate
10  them by reference as if fully set forth herein.

11       157.   At all times relevant hereto, the plaintiffs PAMELA D. LONGONI and JEAN
12  M. GAGNON were the lawful owners of the real property and residence located at 5540
13  Twin Creeks Drive, Reno, Nevada, 89523. In addition, the plaintiff LACEY LONGONI was
14  a lawful resident of said real property and residence.

15       158.   Into every real property sales transaction, the law implies a covenant that said
16  owners and lawful occupants of said property shall have peaceful and quiet enjoyment and
17  possession of said premises.

18       159.   The covenant of quiet enjoyment is the grantor's promise that the grantee's
19  possession will not be disturbed by any other claimant with a superior title.

20       160.   The covenant of quiet enjoyment runs with the land.

21       161.   The covenant of quiet enjoyment includes a covenant against disturbance by
22  an encumbrancer.

23       162.   The covenant of quiet enjoyment requires the grantor to protect the grantee
24  against lawful claims of ownership asserted by third persons, and comes to fruition once
25  there has been a disturbance in possession by actual or constructive eviction.

26       163.   The defendants, and each of them, by all actions taken to foreclose upon the
27  plaintiffs' real property and by selling said property to a third party, breached the implied
28  covenant of quiet enjoyment and as such are legally liable for all damages proximately

1 | caused by said conduct.

2 |     164.   As a direct and proximate result of the wrongful acts of the defendants, and

3 | each of them, the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON have suffered

4 | the permanent loss of their home and real property, as well as all attributes thereto, including,

5 | but not necessarily limited to, the loss of the value of the property, the future value and

6 | earning capacity of said property, the loss of the use and enjoyment of said property, and the

7 | loss of all improvements made to that property over the past 14 plus years all in an amount

8 | in excess of TEN THOUSAND DOLLARS ($10,000.00).

9 |     165.   As a further direct and proximate result of the wrongful acts of the defendants,

10 | and each of them, the plaintiffs have been forced to incur costs associated with obtaining

11 | replacement housing, including, but not necessarily limited to, moving and storage expenses,

12 | rental charges, household furnishings, increased travel costs and increased utility bills and

13 | expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14 |     166.   As a further direct and proximate result of the wrongful acts of the defendants,

15 | and each of them, the plaintiffs have suffered severe and disabling emotional distress and

16 | anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

17 | all to the Plaintiffs' general damages in an amount in excess of TEN THOUSAND

18 | DOLLARS ($10,000.00).

19 |     167.   In doing the acts alleged herein, the defendants, and each of them, acted with

20 | deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

21 | such are guilty of oppression thus warranting the imposition of exemplary and punitive

22 | damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

23 |     168.   The plaintiffs have been required to retain the services of ERICKSON,

24 | THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

25 | future, incur expenses and costs and attorney's fees for which they are entitled to recover.

26 | The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

27 | **EIGHTH CLAIM FOR RELIEF**

28 | **(Intentional Infliction of Emotional Distress)**

34

1    169.    Plaintiffs reallege each and every allegation as contained above and incorporate

2  them by reference as if fully set forth herein.

3    170.    By way of the above-described actions and omissions, the Defendants' conduct

4  was extreme and outrageous with the intention of, or reckless regard for, causing emotional

5  distress.

6    171.    Plaintiffs have suffered severe and extreme emotional distress with physical

7  manifestations of such distress.

8    172.    The defendants' above-described actions and omissions were the actual or

9  proximate causation of this emotional distress.

10    173.    The above-described foreclosure and wrongful ousting of the plaintiffs from

11  the family home was an invasion of the property owners' rights which occurred under

12  circumstances of malice, willfulness, wantonness, and inhumanity.

13    174.    The defendants', and each of them, wrongful acts and foreclosure were a

14  wilful use of power with the expectation to humiliate and distress the mortgagors and

15  plaintiffs.

16    175.    In doing the acts alleged herein, the defendants engaged in conduct that they

17  knew, or should have known and expected, would cause the plaintiffs to suffer and which

18  did, in fact, cause the plaintiffs to suffer severe mental and emotional pain, grief, sorrow,

19  anger, worry, and anxiety all to the plaintiffs' general damages in an amount in excess of

20  TEN THOUSAND DOLLARS ($10,000.00).

21    176.    In doing the acts alleged herein, the defendants, and each of them, acted with

22  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

23  such are guilty of oppression thus warranting the imposition of exemplary and punitive

24  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

25    177.    The plaintiffs have been required to retain the services of ERICKSON,

26  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

27  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

28  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

35

### NINTH CLAIM FOR RELIEF

#### (Promissory Estoppel)

178.   Plaintiffs reallege each and every allegation as contained above and incorporate them by reference as if fully set forth herein.

179.   The defendants, as the parties to be estopped, were apprised of the true facts. The defendants made representations that they knew, or should have known would be relied upon by the plaintiffs, and which were, in fact, relied upon by the plaintiffs to their legal detriment.

180.   The defendants intended that their conduct and misrepresentations would be acted upon, and acted in a fashion which would otherwise justify the plaintiffs' right to believe that the defendants so intended.

181.   The plaintiffs were ignorant of the true state of facts, especially in light of the defendants' intentional representations regarding loan modification and their intent not to foreclose upon the plaintiffs' property.

182.   The plaintiffs relied to their detriment on the defendants' conduct and misrepresentations.

183.   In making the representations as alleged above, the employees and agents of GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., knew, or in the exercise of reasonable care, should have known that said representations would be relied upon by the plaintiffs who did, in fact, rely to their detriment upon said statements and representations. Under the principles of equity, said representations are therefore binding and enforceable against GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.

184.   The defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., failed to perform the promises and guarantees which they made to the plaintiffs when they wrongfully and unlawfully constructively seized and sold the plaintiffs' real property

1   and residence and refused to modify the plaintiffs' existing Promissory Note.

2      185.  As a direct and proximate result of the defendants failure to perform their

3   promises and guarantees, the plaintiffs have suffered the permanent loss of their home and

4   real property, as well as all attributes thereto, including, but not necessarily limited to, the

5   loss of the value of the property, the future value and earning capacity of said property, the

6   loss of the use and enjoyment of said property, and the loss of all improvements made to that

7   property over the past 14 plus years all in an amount in excess of TEN THOUSAND

8   DOLLARS ($10,000.00).

9      186.  As a further direct and proximate result of the defendants' failure to perform

10  its promises and guarantees, the plaintiffs have been forced to incur costs associated with

11  obtaining replacement housing, including, but not necessarily limited to, moving and storage

12  expenses, rental charges, household furnishings, increased travel costs and increased utility

13  bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14     187.  The plaintiffs have been required to retain the services of ERICKSON,

15  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

16  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

17  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

18  **TENTH CLAIM FOR RELIEF**

19  **(Concert of Actions against All Defendants)**

20     188.  Plaintiffs   reallege each and every allegation as contained above and

21  incorporates them by reference as if fully set forth herein.

22     189.  By and through the above described behavior and actions, defendants, and each

23  of them, committed a tortuous acts in concert with one another and/or pursuant to a common

24  design, plan design or scheme with one another, or;

25     190.  Each of these defendants knew that the others' conduct constituted a breach

26  of duty and gave substantial assistance or encouragement to the other so to conduct, or;

27     191.  Each of these named defendants gave substantial assistance to the other in

28  accomplishing the tortuous result and each of their own conduct, separately considered,

37

1  constituted a breach of duty to the plaintiffs, and/or;

2      192.   Each of the defendants conspired to create separate entities in order to shield

3  and hide from public scrutiny their wrongful actions, and to attempt to avoid legal liability

4  for conduct which they knew, or should have known, was unlawful or wrongful,

5      193.   As a direct and proximate result of the above described concert of actions, the

6  plaintiffs have suffered and continue to suffer the permanent loss of their home and real

7  property, as well as all attributes thereto, including, but not necessarily limited to, the loss

8  of the value of the property, the future value and earning capacity of said property, the loss

9  of the use and enjoyment of said property, and the loss of all improvements made to that

10  property over the past 14 plus years all in an amount in excess of TEN THOUSAND

11  DOLLARS ($10,000.00).

12      194.   As a further direct and proximate result of the defendants' failure to perform

13  their promises and guarantees, the plaintiffs have been forced to incur costs associated with

14  obtaining replacement housing, including, but not necessarily limited to, moving and storage

15  expenses, rental charges, household furnishings, increased travel costs and increased utility

16  bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

17      195.   In doing the acts alleged herein, the defendants, and each of them, acted with

18  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

19  such, are guilty of oppression thus warranting the imposition of exemplary and punitive

20  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

21      196.   The plaintiffs have been required to retain the services of ERICKSON,

22  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

23  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

24  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

25      WHEREFORE, the plaintiffs, individually, and PAMELA D. LONGONI, in her

26  representative capacity, pray for judgment against the Defendants, and each of them, jointly

27  and severally, as follows:

28      1.   For special damages for all damages associated with the loss of their real

1  property and residence and related items when the same are ascertained;

2      2.      For general damages in a sum in excess of TEN THOUSAND DOLLARS

3  ($10,000.00);

4      3.      For exemplary damages in an amount in excess of TEN THOUSAND

5  DOLLARS ($10,000.00);

6      4.      For interest pursuant to statute; and

7      5.      For such other and further relief as this Court may deem equitable and just.

8  **Plaintiffs hereby demand a jury on all issues.**

9  DATED this 12th day of September, 2011.

10      ERICKSON, THORPE & SWAINSTON, LTD.

11      99 West Arroyo Street
       P. O. Box 3559
       Reno, Nevada 89505

12

13      By _____

14      THOMAS P. BEKO, ESQ.
       *Attorney for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

39

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I certify that I am an employee of ERICKSON, THORPE & SWAINSTON, LTD. and that on this day I personally served a true and correct copy of the attached document by:

- ☐ U.S. Mail
- ☐ Facsimile Transmission
- ☐ Personal Service
- ☐ Messenger Service
- ☒ CM/ECF System

addressed to the following:

David Hill Bahford
Bradley Arant Boult Cummungs LLP
100 N. Tyron Street, Suite 2690
Charlotte, NC 28202
*Attorney for Defendants GMAC Mortgage, LLC,*
*Executive Trustee Services, LLC,*
*Illeanna Peterson and Kathleen Gowen*

DATED this ___12th___ day of September, 2011.

**<u>Claim No. 2293</u>**

Claim #2293  Date Filed: 11/5/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |

Name of Debtor:  Residential Funding Company, LLC        Case Number: 12-12020 (MG); 12-12019 (MG)

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Erickson Thorpe & Swainston Ltd        Jean M. Gagnon

Name and address where notices should be sent:        NameID: 10853921
Erickson Thorpe & Swainston Ltd
LONGONI- PAMELA D LONGONI, INDIVIDUALLY & AS GUARDIAN AD LITEM FOR LACEY
LONGONI, & JEAN M GAGNON, VS GMAC MRTG, LLC, A ET AL
99 West Arroyo St, PO Box 3559
Reno, NV 89505

Telephone number: (775) 786-3930        email: tbeko@etsreno.com

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number:_____
(If known)

Filed on:_____

Name and address where payment should be sent (if different from above):

■ Date Stamped Copy Returned
☐ No self addressed stamped envelope
☐ No copy to return

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Telephone number:        email:

1. Amount of Claim as of Date Case Filed: $ 600,000 =
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: Wrongful Foreclosure : sale of residential property
(See instruction #2)        See attached complaint

3. Last four digits of any number by which creditor identifies debtor:

3a. Debtor may have scheduled account as:
(See instruction #3a)

3b. Uniform Claim Identifier (optional):
(See instruction #3b)

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:
Value of Property: $_____    Annual Interest Rate_____% ☐ Fixed ☐ Variable
(when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $_____    Basis for perfection: _____

Amount of Secured Claim: $_____    Amount Unsecured: $_____

6. Claim Pursuant to 11 U.S.C. § 503(b)(9):
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____  (See instruction #6)

7. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. (See instruction #8, and the definition of "redacted".)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

9. Signature: (See instruction #9) Check the appropriate box.
☐ I am the creditor.  ☒ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor, or  ☐ I am a guarantor, surety,
(Attach copy of power of attorney, if any.)  their authorized agent.  indorser, or other codebtor.
(See Bankruptcy Rule 3004.)  (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Thomas Beko
Title: Attorney
Company: Erickson, Thorpe & Swainston        (Signature)        11-01-12  (Date)
Address and telephone number (if different from notice address above):

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

Amount entitled to priority:

$_____

* Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

RECEIVED
NOV 05 2012
KURTZMAN CARSON CONSULTANTS

Telephone number:        Email:

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or b-

COURT USE ONLY

# ERICKSON, THORPE & SWAINSTON, LTD.

THOMAS P. BEKO
JOHN A. ABERASTURI
JOHN C. BOYDEN
REBECCA BRUCH
BRENT L. RYMAN
ANDREA K. PRESSLER
PAUL M. BERTONE
ANN M. ALEXANDER
CHARITY F. FELTS
BRETT A. DIEFFENBACH

ATTORNEYS AT LAW

99 WEST ARROYO STREET
RENO, NEVADA 89509

MAILING ADDRESS:
P.O. BOX 3559, RENO, NEVADA 89505

WWW.ETSRENO.COM

*OF COUNSEL*
ROGER L. ERICKSON
DONALD A. THORPE

GEORGE W. SWAINSTON
1936 - 2007

TELEPHONE: 775.786.3930
FACSIMILE: 775.786.4160

TBEKO@ETSRENO.COM

November 1, 2012

***Via Priority Mail\****
RecCap Claims Processing Center c/o KCC
2335 Alaska Avenue
El Segundo, CA 90245

Re:   **Debtors:**   **Residential Capital , LLC, <u>et al</u>**
      **Case No.:12-12020 (MG)**
      **Claimants:**   **Pamela Longoni, individually and as GAL for Lacey Longoni, and Jean M. Gagnon**

Dear Sir/Madam:

I am enclosing 8 Proof of Claim forms in the above matter, i.e., 4 separate claims on behalf of each of my clients. Attached to each claim is a copy of the related United States District Court Complaint (Third Amended Complaint). Please provide confirmation to the undersigned of the timely filing of these Proofs of Claim.

Sincerely,

THOMAS P. BEKO, ESQ.

TPB:dmm

Enclosures: 8, as stated

*\*with Delivery Confirmation*

1  THOMAS P. BEKO, ESQ. (#002653)
   99 West Arroyo Street
2  P.O. Box 3559
   Reno, Nevada 89505
3  Telephone: (775) 786-3930
   *Attorneys for Plaintiffs*

4

5

6

7              UNITED STATES DISTRICT COURT

8            DISTRICT OF NEVADA - RENO DIVISION

9

10  PAMELA D. LONGONI,
    individually and as Guardian Ad
11  Litem for LACEY LONGONI,
    and JEAN M. GAGNON,
12                                    Case No.: 3:10-CV-00297-LRH-(VPC)

13
           Plaintiffs,
14
    vs.
15
    GMAC MORTGAGE, LLC., a Delaware
16  Limited Liability Company, EXECUTIVE
    TRUSTEE SERVICES, LLC., a Delaware
17  Limited Liability Company, RESIDENTIAL
    FUNDING COMPANY, LLC., a Delaware
18  Limited Liability Company, fka RESIDENTIAL
    FUNDING CORPORATION, a Delaware
19  Corporation, RESIDENTIAL ASSET
    MORTGAGE PRODUCTS, INC., a Delaware
20  Corporation, ILLEANNA PETERSON,
    KATHLEEN GOWEN, individuals,
21  DOES 1-10; BLACK AND
    WHITE CORPORATIONS 1-10,
22  corporations; ABLE & BAKER
    COMPANIES 2-10, co-partnerships and or
23  limited liability companies,

24         Defendants.                    /

25  **THIRD AMENDED COMPLAINT FOR DAMAGES TO SUBSTITUTE PROPER**

26             **PARTIES PURSUANT TO FRCP 15(c)**

27                  **(JURY DEMANDED)**

28      COMES NOW, PAMELA D. LONGONI, individually and as the Guardian Ad Litem

    for LACEY LONGONI, and JEAN M. GAGNON, by and through their attorneys,

1  ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and hereby

2  allege and complain as follows:

3  **PARTIES AND JURISDICTION**

4       1.    Plaintiff PAMELA D. LONGONI is an individual, residing in the State of

5  Nevada. PAMELA D. LONGONI is the natural parent and guardian of the minor child

6  LACEY LONGONI. At all times relevant hereto, PAMELA D. LONGONI was a lawful

7  owner of a certain parcel of real property commonly known as 5540 Twin Creeks Drive,

8  Reno, Nevada, 89523, which PAMELA D. LONGONI occupied as her sole personal

9  residence along with her minor children, including the plaintiff LACEY LONGONI.

10       2.    Plaintiff JEAN M. GAGNON is an individual, residing in the State of Nevada.

11  At all times relevant hereto, JEAN M. GAGNON was a lawful co-owner of a certain parcel

12  of real property commonly known as 5540 Twin Creeks Drive, Reno, Nevada, 89523.

13       3.    The plaintiffs are informed and believe and thereupon allege that the defendant

14  GMAC MORTGAGE, LLC., is a Delaware Limited Liability Company, licensed to do, and

15  doing business in the State of Nevada as a mortgage lender.

16       4.    The plaintiffs are informed and believe that GMAC MORTGAGE, LLC., is

17  wholly owned by General Motors Acceptance Corporation.

18       5.    The plaintiffs are further informed and believe that GMAC MORTGAGE,

19  LLC., was assigned, or somehow assumed the rights, liabilities and duties of EquiFirst

20  Corporation relative to a Promissory Note, Deed of Trust signed by the plaintiffs PAMELA

21  D. LONGONI and JEAN M. GAGNON, on or about September 29, 2005.

22       6.    The plaintiffs are further informed and believe and thereupon aver that

23  EXECUTIVE TRUSTEE SERVICES, LLC., is a subsidiary of GMAC MORTGAGE, LLC.,

24  contracted with, or is otherwise so affiliated with GMAC MORTGAGE, LLC., such that it

25  is legally responsible for the acts of EXECUTIVE TRUSTEE SERVICES, LLC. At all times

26  relevant hereto, GMAC MORTGAGE, LLC., employed an individual by the name of

27  Jonathan "Nate" Stephenson. At all times relevant hereto, Jonathan "Nate" Stephenson was

28  acting within the course and scope of his employment with GMAC MORTGAGE, LLC. The

2

1  plaintiffs are further informed and believe that at all times relevant hereto, Paul Williams,
2  was the Director of the GMAC Modification Team, and was acting within the course and
3  scope of his employment with GMAC MORTGAGE, LLC. The plaintiffs are informed and
4  believe, that Paul Williams approved the plaintiffs' loan modification request as set forth
5  herein below.

6      7.    The plaintiffs are informed and believe and thereupon allege that the defendant
7  EXECUTIVE TRUSTEE SERVICES, LLC., is a Delaware Limited Liability Company,
8  licensed to do business, and doing business in the State of Nevada by providing a broad menu
9  of non-judicial foreclosure services.  The plaintiffs are informed and believe that the
10  defendant EXECUTIVE TRUSTEE SERVICES, LLC., is wholly owned by General Motors
11  Acceptance Corporation. The plaintiffs are further informed and believe, and thereupon
12  allege, that EXECUTIVE TRUSTEE SERVICES, LLC., is a subsidiary of, or is otherwise
13  affiliated with GMAC MORTGAGE, LLC., and that the defendants ILLEANNA
14  PETERSON and KATHLEEN GOWEN were, at all times relevant hereto, employees of
15  EXECUTIVE TRUSTEE SERVICES, LLC., and in doing the acts alleged herein were acting
16  within the course and scope of their employment, and/or at the express direction of, or with
17  the authorization and ratification of EXECUTIVE TRUSTEE SERVICES., LLC and GMAC
18  MORTGAGE, LLC.

19      8.    The plaintiffs are informed and believe and thereupon allege that the defendant
20  RESIDENTIAL FUNDING COMPANY, LLC., is a Delaware Limited Liability Company,
21  licensed to do business, and doing business in the State of Nevada. The plaintiffs are further
22  informed and believe and thereupon allege that said defendant is the successor in interest,
23  and has assumed any and all legal liabilities of Residential Funding Corporation, a Delaware
24  Corporation. RESIDENTIAL FUNDING COMPANY, LLC., is being substituted in this
25  action for the previously named Doe Defendant, ABLE & BAKER COMPANY 1.

26      9.    The plaintiffs are informed and believe and thereupon allege that
27  RESIDENTIAL FUNDING COMPANY, LLC., is wholly owned by the defendant General
28  Motors Acceptance Corporation.

3

1        10.    The plaintiffs are informed and believe that RESIDENTIAL FUNDING

2    COMPANY, LLC., claims to have obtained ownership interest in a certain parcel of real

3    property commonly known as 5540 Twin Creeks Drive, Reno, Nevada, 89523.  In this

4    regard, the plaintiffs allege that RESIDENTIAL FUNDING COMPANY, LLC., was

5    assigned, or somehow assumed the rights, liabilities and duties of EquiFirst Corporation

6    relative to a Promissory Note, Deed of Trust signed by the plaintiffs PAMELA D.

7    LONGONI and JEAN M. GAGNON, on or about September 29, 2005.

8        11.    The plaintiffs are informed and believe and thereupon allege that

9    RESIDENTIAL FUNDING COMPANY, LLC., engaged or retained the defendant GMAC

10   MORTGAGE, LLC., to service the loan on the plaintiffs' real property.  In this regard,

11   RESIDENTIAL FUNDING COMPANY, LLC., authorized GMAC MORTGAGE, LLC.,

12   to engage in certain loan activities, including, but not limited to the following:

13       a) Receipt of loan payments;

14       b) Issuance of legal notices to the plaintiffs; and

15       c) Loan modification activities including negotiation of new rates of interest, loan

16   payments, and principal sums due under the loan.

17       12.    That all statements made to the plaintiffs by employees of GMAC

18   MORTGAGE, LLC., as part of the plaintiffs' loan modification process, were statements

19   made on behalf of, and within the course and scope of GMAC MORTGAGE, LLC.,

20   activities on behalf of RESIDENTIAL FUNDING COMPANY, LLC., and thus

21   RESIDENTIAL FUNDING COMPANY, LLC., is responsible for all acts of GMAC

22   MORTGAGE, LLC related to modification of the plaintiffs' residential loan.

23       13.    The plaintiffs are informed and believe and thereupon allege that in performing

24   loan modification activities, RESIDENTIAL FUNDING COMPANY, LLC., provided

25   GMAC MORTGAGE, LLC., with certain policies, procedures and/or guidelines to follow

26   in the process of loan modification activities.

27       14.    The plaintiffs are informed and believe that RESIDENTIAL FUNDING

28   COMPANY, LLC., authorized GMAC MORTGAGE, LLC., to enter into binding loan

1   modifications on behalf of RESIDENTIAL FUNDING COMPANY, LLC.

2        15.    The plaintiffs are informed and believe and thereupon allege that the defendant

3 RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., was, at all times relevant hereto,

4 a Delaware corporation, licensed to do business, and doing business in the State of Nevada.

5 The plaintiffs are further informed and believe and thereupon allege RESIDENTIAL ASSET

6 MORTGAGE PRODUCTS, INC., was an entity that was governed or controlled by the other

7 named defendants herein, and doing the things set forth herein was acting under the direction

8 and control of the other defendants. RESIDENTIAL ASSET MORTGAGE PRODUCTS,

9 INC., is being substituted in this action for the previously named Doe Defendant, ABLE &

10 BAKER COMPANY 2.

11        16.    The plaintiffs are further informed and believe that RESIDENTIAL ASSET

12 MORTGAGE PRODUCTS, INC., claims to have purchased the plaintiffs' Promissory Note

13 and Deed of Trust from RESIDENTIAL FUNDING COMPANY, LLC., on or about

14 December 28, 2005, pursuant to an agreement entitled Assignment and Assumption

15 Agreement, however, the plaintiffs are informed and believe that RESIDENTIAL FUNDING

16 COMPANY, LLC., was not the owner of, nor was it in possession of, the plaintiffs'

17 Promissory Note and/or Deed of Trust on that day, and therefore could not transfer any

18 interest in either the Promissory Note or the Deed of Trust.

19        17.    Pursuant to said Assignment and Assumption Agreement, RESIDENTIAL

20 FUNDING CORPORATION (purportedly now RESIDENTIAL FUNDING COMPANY,

21 LLC., was obligated to deliver to RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.,

22 the original Promissory Note, endorsed to the order of U.S. Banking National Association,

23 as Trustee. The plaintiffs are informed and believe and thereupon aver that RESIDENTIAL

24 FUNDING COMPANY, LLC., never had legal title to said Promissory Note, and never

25 provided U.S. Banking National Association with the original of said Promissory Note, nor

26 did RESIDENTIAL FUNDING COMPANY, LLC., ever provide U.S. Banking National

27 Association with any proper endorsements of said Promissory Note to U.S. Banking National

28 Association. Based upon the foregoing, neither RESIDENTIAL FUNDING COMPANY,

1  LLC, nor RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., had any legal right to

2  order or authorize the foreclosure upon the plaintiffs' real property.

3       18.    That on December 28, 2005, (the same day that RESIDENTIAL FUNDING

4  COMPANY, LLC., purported to sell the plaintiffs' Promissory Note and Deed of Trust to

5  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.), RESIDENTIAL ASSET

6  MORTGAGE PRODUCTS, INC., claims that it assigned said Promissory Note and Deed of

7  Trust to U.S. Banking National Association as Trustee, pursuant to an agreement entitled

8  Pooling and Servicing Agreement.

9       19.    Pursuant to said Pooling and Servicing Agreement, RESIDENTIAL FUNDING

10  COMPANY, LLC., was obligated to, concurrently with the execution of said agreement,

11  deliver the agreement and the original Promissory Note, fully endorsed without recourse to

12  the Trustee, showing an unbroken chain of endorsements from the originator thereof to the

13  Person endorsing it to the Trustee. The plaintiffs are informed and believe and thereupon

14  aver that RESIDENTIAL FUNDING COMPANY, LLC., never had legal title to said

15  Promissory Note and never provided U.S. Banking National Association with the original

16  of said Promissory Note.  The plaintiffs are further informed and believe that

17  RESIDENTIAL FUNDING COMPANY, LLC., never provided U.S. Banking National

18  Association with any Promissory Note which contained an unbroken chain of endorsements

19  from the originator of the Promissory Note (EquiFirst Corporation) through to the Trustee.

20       20.    The plaintiffs are informed and believe and thereupon aver, that on or about

21  November 15, 2007, the plaintiffs' original Promissory Note was modified pursuant to an

22  Adjustable Rate Loan Modification Agreement between the plaintiffs, as Borrower, and

23  Homecomings Financial, LLC., as Lender, however, Homecomings Financial was an entity

24  that had no right, title or interest in said Promissory Note since RESIDENTIAL FUNDING

25  COMPANY, LLC., claims it was the owner of said Promissory Note and that it had

26  transferred ownership of that Promissory Note to RESIDENTIAL ASSET MORTGAGE

27  PRODUCTS, INC., almost two years prior to this claimed modification.

28       21.    The plaintiffs are informed and believe and thereupon aver that each of the

6

1   defendants in this action took action upon the plaintiffs' Promissory Note purportedly

2   modified by Homecomings Financial, LLC., despite the fact that Homecomings Financial

3   had no right, title or interest in said Promissory Note, and as such, had no right to modify the

4   original Promissory Note.

5       22.    That in 2009, the defendant GMAC MORTGAGE, LLC., engaged and

6   authorized the defendant EXECUTIVE TRUSTEE SERVICES, LLC., to commence non-

7   judicial foreclosure proceedings against the plaintiffs' real property when GMAC

8   MORTGAGE, LLC., had neither the legal ownership of the Promissory Note, nor the Deed

9   of Trust which secured the obligations of the Promissory Note. As a result, neither GMAC

10  MORTGAGE, LLC., nor EXECUTIVE TRUSTEE SERVICES, LLC., had legal standing

11  to commence non-judicial foreclosure proceedings against the plaintiffs' real property.

12  Therefore, GMAC MORTGAGE, LLC., and EXECUTIVE TRUSTEE SERVICES, LLC.,

13  wrongfully foreclosed upon the plaintiffs' real property.

14      23.    The plaintiffs are informed and believe and thereupon allege that at all times

15  relevant hereto, the defendants, and each of them, were acting as agents and employees for

16  the other defendants, and in doing the things alleged herein were acting within the course and

17  scope of that agency. The plaintiffs are further informed and believe and thereupon allege,

18  that at all times relevant hereto, the defendants were acting as part of a common, planned,

19  scheme or design in conspiracy/concert with other defendants, thus making each legally

20  liable for the acts of all others.

21      24.    Plaintiffs do not know the true names or capacities of those defendants sued

22  herein as DOES 1-10, BLACK & WHITE CORPORATIONS 1-10, and ABLE & BAKER

23  COMPANIES 1-10, partnerships and/or limited liability companies. Therefore, plaintiffs sue

24  said defendants, and each of them, by such fictitious names. Plaintiffs are informed and

25  believe and based thereon allege that each of said defendants inclusive, were officers,

26  directors or managing agents and/or employees or were otherwise responsible for the daily

27  operation of said business, including, but not limited to the training and supervision of

28  employees of the company. That at all times relevant hereto, defendants herein fictitiously

7

1  sued were the owners, shareholders, agents, partners, or alter egos of defendants named

2  herein. Plaintiffs are further informed and believe that the DOE defendants are the holders

3  or owners of the deed of trust and/or promissory note executed by the plaintiffs, and thus are

4  legally responsible under the causes of action pled herein and proximately caused damages

5  to plaintiffs as herein alleged. Plaintiffs pray that when the true names of said defendants are

6  ascertained they may be inserted herein with appropriate allegations.

7         25.    In 2005, the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON

8  entered into a contract with EquiFirst to refinance a loan which was secured by the real

9  property located at 5540 Twin Creeks Drive, Reno, Nevada, 89523. This transaction was

10  accomplished through the use of a Promissory Note and Deed of Trust (hereinafter referred

11  to as the Note and/or Deed of Trust). As part of this transaction, PAMELA D. LONGONI

12  deeded a one-half interest to said real property and improvements to JEAN M. GAGNON.

13  Subsequent to the loan refinance, PAMELA D. LONGONI, LACEY LONGONI and JEAN

14  M. GAGNON lived at the property located at 5540 Twin Creeks Drive, Reno, Nevada,

15  89523.

16         26.    The plaintiffs are informed and believe and thereupon aver that after the

17  refinance was completed, EquiFirst assigned, or purported to assign, the Note and Deed of

18  Trust to a third party which may, or may not have been, Homecomings Financial, LLC.,

19  RESIDENTIAL FUNDING COMPANY, LLC, fka Residential Funding Corporation,

20  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., U.S. Banking National

21  Association, and/or GMAC MORTGAGE, LLC. At some point after the refinance,

22  Homecomings, Financial, LLC., RESIDENTIAL FUNDING COMPANY, LLC., and/or

23  GMAC MORTGAGE, LLC., claimed that it assumed the rights, duties and liabilities of

24  EquiFirst and conducted itself as though it was the lawful owner, and holder in due course

25  of the Note and Deed of Trust. Neither RESIDENTIAL FUNDING COMPANY, LLC., (or

26  its predecessor in interest Residential Funding Corporation), GMAC MORTGAGE, LLC.,

27  or any other defendant, recorded any notice in the Washoe County Recorder's Office

28  advising the plaintiffs (or any other person) that it held, owned or had been assigned the Note

8

1  and Deed of Trust.

2      27.    In early 2008, PAMELA D. LONGONI and JEAN M. GAGNON began to

3  suffer financial difficulties due to the fact that Mr. Gagnon was transferred, for his

4  employment, from northern Nevada to Las Vegas, Nevada. This caused a duplication of

5  many of the family's household expenses. As a result, the plaintiffs fell behind on their

6  mortgage payments. On or about January 15, 2009, the Plaintiff PAMELA D. LONGONI

7  sent a letter to Homecomings Financial, whom she believed to be the servicer of her loan,

8  asking for a modification of her loan.

9      28.    In response to her January 15, 2009, letter, on February 18, 2009, GMAC

10  MORTGAGE, LLC., sent the plaintiffs a package of records to fill out and return in order

11  to seek a loan modification.

12      29.    On February 19, 2009, without any contact with, or input or direction from

13  either the owner/holder of the Promissory Note or the Deed Of Trust, GMAC MORTGAGE,

14  LLC., made the decision on behalf of RESIDENTIAL FUNDING COMPANY, and/or

15  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National

16  Association to commence a non-judicial foreclosure upon the plaintiffs' real property. At

17  the time they did so, GMAC MORTGAGE, LLC., undertook no efforts to determine who

18  was the legal owner or holder of the plaintiffs' Promissory Note or the Deed of Trust.

19      30.    In accordance with their decision to commence foreclosure proceedings against

20  the plaintiffs' property, and without any contact with, or input or direction from either the

21  owner/holder of the Promissory Note or the Deed Of Trust, GMAC MORTGAGE, LLC.,

22  made the decision on behalf of RESIDENTIAL FUNDING COMPANY, and/or

23  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National

24  Association GMAC MORTGAGE, LLC., engaged with the defendant EXECUTIVE

25  TRUSTEE SERVICES, LLC., to undertake the process of foreclosure.

26      31.    On February 25, 2009, and without receipt of any assignment, authorization,

27  directive from the legal owner of the Promissory Note or the Deed of Trust, EXECUTIVE

28  TRUSTEE SERVICES prepared and recorded a Substitution of Trustee. This assignment

1    was in direct contradiction to the terms of the Deed of Trust, which required a change in
2    Trustee to be ordered by the Lender which was EquiFirst Corporation.

3        32.    Also on February 25, 2009, and without receipt of any assignment,
4    authorization, directive from the legal owner of the Promissory Note or the Deed of Trust,
5    EXECUTIVE TRUSTEE SERVICES, LLC., also prepared and recorded a Notice of Breach
6    and Default and of Election to Cause Sell of Real Property under Deed of Trust. Attached
7    as *Exhibit "1"* is a true, accurate and correct copy of this notice. This notice was defective,
8    since it lacked the information required by law. EXECUTIVE TRUSTEE SERVICES,
9    LLC., caused this Notice to be recorded on February 26, 2011.

10        33.    On March 3, 2009, the Plaintiffs faxed GMAC their completed Loan
11    Modification application. In response, GMAC contacted the plaintiffs and asked for
12    additional information. The following day, March 4, 2009, EXECUTIVE TRUSTEE
13    SERVICES, LLC., caused the Notice of Breach and Default and of Election to Cause Sell
14    of Real Property under Deed of Trust to be mailed to the plaintiffs on March 4, 2009.

15        34.    On March 5, 2009, the plaintiff PAMELA LONGONI forwarded all requested
16    information to GMAC. The following day she spoke with a GMAC representative at which
17    time they discussed possible modifications to the plaintiffs' existing loan. The plaintiffs
18    were informed of various options which they could pursue as an alternative to foreclosure.
19    At no time were the plaintiffs informed that GMAC MORTGAGE, LLC., had commenced
20    foreclosure proceedings, or that GMAC was not the owner, nor holder of the Promissory
21    Note or Deed of Trust on the plaintiffs' real property. The plaintiffs were, however, informed
22    that GMAC did have a program by which loans could be modified and that the plaintiffs
23    were candidates for such program. The plaintiffs fully and completely complied with all of
24    GMAC's demands in the application process.

25        35.    On or about March 10, 2009, a GMAC MORTGAGE, LLC., representative
26    informed the plaintiffs that their request for a loan modification had been approved. GMAC
27    MORTGAGE, LLC., sent the plaintiffs a proposed modification agreement. This agreement
28    called for a new monthly payment in the amount of $2,270.00.

1      36.    On or about March 19, 2008, the plaintiff PAMELA D. LONGONI contacted

2    GMAC's representative and informed him that they could not meet the proposed monthly

3    payment and the most that they could pay on a monthly basis was $1,600.00.  In response,

4    GMAC's representative Nate Stephenson developed a new loan modification plan pursuant

5    to which the plaintiffs would be required to make payments in the amount of $1,600.00 per

6    month.  He instructed PAMELA D. LONGONI to begin making the payments in April of

7    2009.  He further informed the plaintiff that GMAC would stop any effort to foreclose on the

8    property. At not time did GMAC ever indicate that there was any time limit to this temporary

9    plan.  In making these statements, the GMAC representative was acting on behalf of, and

10    within the course and scope of the authority granted to him by RESIDENTIAL FUNDING

11    COMPANY, LLC., RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S.

12    Bank National Association, as Trustee.  The plaintiffs made the required payment on or

13    before the requested date.

14      37.    On April 2, 2009, the same GMAC MORTGAGE, LLC., representative

15    informed the plaintiffs that all he was waiting on in order to make the change permanent was

16    approval of the VP. Later that same day, said representative informed the plaintiffs that their

17    trial loan modification was, in fact, approved.  He further stated that because he was

18    attempting to write off $176,000.00 from the loan, he needed approval from their VP,

19    however, he also stated that he had already done the analysis and it seemed to be a win-win

20    situation so he was fairly confident that it would get approved. At no time did GMAC ever

21    advise the plaintiffs that this proposed plan would only be temporary or that it would need

22    to be replaced with another plan.  In making these statements, the GMAC MORTGAGE,

23    LLC., representative was acting on behalf of, and within the course and scope of the

24    authority granted to him by RESIDENTIAL FUNDING COMPANY, LLC., RESIDENTIAL

25    ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National Association, as Trustee.

26      38.    On April 6, 2009, GMAC MORTGAGE, LLC, made the decision to stop all

27    foreclosure proceedings. In accordance with that decision, GMAC instructed EXECUTIVE

28    TRUSTEE SERVICES, LLC., to stop the foreclosure process.  EXECUTIVE TRUSTEE

1    SERVICES, LLC., received these instructions and stopped the foreclosure process.

2       39.    On April 21, 2009, the GMAC representative informed PAMELA D.

3    LONGONI that he was still awaiting approval from their "VP." On April 28, 2009, the same

4    GMAC representative informed PAMELA D. LONGONI that he had just looked at the notes

5    and it looked as if "one manager looked at it and agreed that it was a win-win situation, but

6    because it is a $186k that we were trying to write off, it has to go a little higher."

7       40.    On May 1, 2009, the plaintiffs attempted to make their next $1,600.00 payment

8    through an on-line system which GMAC specifically set up to accept the plaintiffs'

9    payments. This is the method by which the first $1,600.00 payment was made. However,

10   when PAMELA D. LONGONI attempted to make the payment, it was refused. In response,

11   PAMELA D. LONGONI contacted Nate Stephenson and advised him of the problem. He

12   informed her that someone had put a "Certified Funds Flag" on her account and that he had

13   removed it. He claimed he removed the flag but she still could not make the payment

14   through the system. Therefore, she sent the payment (with the extra fees) through Western

15   Union. The payment was accepted by GMAC.

16      41.    On May 5, 2009, the plaintiff received a telephone call from Homecomings

17   Financial, saying that they had not received her payment. In response, she contacted Nate

18   Stephenson who informed her that their records showed that they received the payment on

19   May 4, 2009, and as such, she was "Good to go." Nate Stephenson further informed her that

20   it didn't look like their VP has had a chance to look at the matter, however, the notes he saw

21   are good indicating that it "made sense to do the Modification." He further informed her that

22   "We still have 2 months before I would have to set up a plan. So everything is still sort of

23   on hold."

24      42.    On May 26, 2009, PAMELA D. LONGONI sent an e-mail communication to

25   Nate Stephenson asking about the status of her loan modification. She further informed him

26   that she had another friend who was suffering similar financial problems and asked if she

27   could refer him to Mr. Stephenson. Mr. Stephenson responded by saying that he did not have

28   an update, that she should just continue to make the $1,600.00 payment. Once the decision

1  was made, then paperwork will be sent out with the new terms.  He indicated that because

2  he would be moving to a new team the following week, he could not help Ms. Longoni's

3  friend.  He concluded by telling her to let him know if she could think of any further

4  questions.  At no time did he tell her he was unable to take any action relative to her loan

5  modification application.

6      43.    On or about May 26, 2009, GMAC sent the plaintiffs a letter advising the, that

7  help might be available to them through the new Home Affordable Modification program

8  which is part of the initiative announced by President Obama.

9      44.    In conformity with their agreement with GMAC MORTGAGE, LLC., the

10  plaintiffs made the required $1,600.00 payments for the months of April, May and June of

11  2009.  GMAC MORTGAGE, LLC., accepted said payments on behalf of itself and/or

12  RESIDENTIAL FUNDING COMPANY, LLC., or RESIDENTIAL ASSET MORTGAGE

13  PRODUCTS, INC.  None of these funds were ever returned to the plaintiffs.

14      45.    Over the next 3 weeks, the plaintiffs attempted to contact GMAC to find out

15  what was happening with their application for the loan modification.  On June 30, 2009, Ms.

16  Longoni sent another e-mail communication to Nate Stephenson asking for help.  He

17  responded by saying that he had emailed his old department yesterday and they responded

18  that the file has been sent for final management approval.  He further told her the person now

19  handling the matter was Landon Huck.  In response, Ms. Longoni asked for contact

20  information for Mr. Huck.  Nate Stephenson responded by saying he couldn't give her that

21  information, however, he informed her that he did receive an email stating that the

22  modification was approved the prior day.

23      46.    In response to this information, the plaintiffs made numerous attempts to make

24  the next $1,600.00 on-line payment, however, all attempts were rejected.  After numerous

25  attempts, plaintiff finally reached a live person on July 9, 2009, who informed her that their

26  modification was not approved, that they owed approximately $19,000.00, and that if

27  payment was not received, they would sell her home.  In response, PAMELA D. LONGONI

28  immediately sent Nate Stephenson an email asking for his assistance.  Mr. Stephenson

1   advised her that they were trying to put her into an Obama Modification. He specifically told

2   her that her foreclosure was on hold, and that GMAC did not want to take her home. He told

3   her that they would try to do everything they could before they proceeded with foreclosure.

4   He further informed her that the Obama program was subsidized and allowed them to drop

5   payments to 31% of the borrower's gross income. Because of that it allowed them to be a

6   little more aggressive with their rates and debt forgiveness.

7        47.    Contrary to these representations, on July 15, 2009, GMAC removed the hold

8   which it placed on the foreclosure. GMAC thereafter instructed EXECUTIVE TRUSTEE

9   SERVICES, LLC., to proceed forward with the foreclosure sale.

10        48.    The following day, GMAC sent the plaintiffs a letter informing them that the

11   repayment plan had been cancelled because payment had not been received by the payment

12   due date "as specified in the signed repayment agreement." The plaintiffs had never signed

13   any "repayment agreement".

14        49.    In accordance with GMAC's instructions, and without any legal standing as

15   set forth herein above, on July 20, 2009, EXECUTIVE TRUSTEE SERVICES, LLC.,

16   prepared a Notice of Trustee's Sale, setting a sell date of August 14, 2009. Attached as

17   *Exhibit "2"* is a true, accurate and correct copy of this notice. EXECUTIVE TRUSTEE

18   SERVICES, LLC., caused this Notice to be recorded on July 23, 2009.

19        50.    Seven days later on July 30, 2009, GMAC sent a an "Obama" package to the

20   plaintiffs via federal express. The plaintiffs received that package on August 4, 2009. The

21   letter which accompanied this package informed the plaintiffs to submit a signed letter

22   explaining the cause of default (which they had done previously), to submit copies of two

23   most recent pay stubs, and a copy of their most recent federal tax return. The letter informed

24   them to allow five business days for GMAC to process the financial package. Notably, this

25   letter contained a notation at the bottom of the letter which said "30 days to sale." The

26   plaintiffs returned the requested information on August 10, 2009.

27        51.    On August 14, fifteen days after the date of this letter, EXECUTIVE

28   TRUSTEE SERVICES, LLC., sold the plaintiffs' home at auction.

14

52.    Because GMAC received payments following the filing of the original Notice of Default, EXECUTIVE TRUSTEE SERVICES, LLC.,'s policies required it to recommence the foreclosure process through the issuance of a new Notice of Default. However, GMAC never informed EXECUTIVE TRUSTEE SERVICES, LLC., that it received any such payments. Therefore, EXECUTIVE TRUSTEE SERVICES, LLC., in violation of its own internal policies, continued with the existing foreclosure.

53.    The Notice of Breach and Default and Election to Cause Sell of Real Property Under Deed of Trust (Exhibit 1) prepared and recorded by EXECUTIVE TRUSTEE SERVICES, LLC., failed to satisfy the provisions of N.R.S. 107.085, in that GMAC did not provide plaintiffs with the notice specified in that section.

54.    Said Notice of Breach and Default and Election to Cause Sell of Real Property Under Deed of Trust (Exhibit 1) also failed to satisfy the provisions of N.R.S. 107.086.

55.    Said Notice of Breach and Default and Election to Cause Sell of Real Property Under Deed of Trust (Exhibit 1) was never served upon the plaintiffs PAMELA D. LONGONI or JEAN M. GAGNON as required by N.R.S. 107.080.

56.    The defendants, and each of them, failed to provide the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON with the notices which are required by law, including, but not limited to, N.R.S. 107.080, 107.085, 107.086.

57.    On August 14, 2009, the defendants, and each of them acting individually and on behalf of the others, and without legal standing to do so, sold or caused to be sold, the plaintiffs' real property located at 5540 Twin Creeks Drive, Reno, Nevada, 89523, to a third party. This property was sold without the proper advance notifications called for by N.R.S. 107.080, 107.085 and/or 107.086.

58.    On or about August 24, 2009, the plaintiff PAMELA D. LONGONI, again contacted GMAC to determine the status of the new loan modification application. At that time, she was for the first time informed that GMAC had gone forward with the foreclosure that it had promised was on hold. At that time, PAMELA D. LONGONI was informed that her home had already been sold to a third party and that there was nothing they could do

15

1   about it. The following day, August 25, 2009, the plaintiff learned through her daughter, that

2   a man had left a 5-day notice to vacate the premises on her porch.

3       59.    After the sale of the plaintiffs' home, one or more of the defendants sought to

4   recover the home back from the foreclosure sale purchaser.

5       60.    None of the defendants were able to recover the plaintiffs' home from the

6   foreclosure sale purchaser.

7       61.    In response to this notice, Ms. Longoni contacted the putative purchaser

8   seeking to recover her home. She was told that they had lawfully purchased the home and

9   that there was nothing she could do about it. She was told that if she vacated the premises

10  in a peaceful manner and left the property in tact, she would be paid the sum of $1,250.00.

11  Believing she had no choice in the matter, PAMELA D. LONGONI signed the agreement.

12  She was tendered a check in the amount of $1,250.00, however, said check was later

13  dishonored by the issuing bank.

14      62.    During the next five days, PAMELA D. LONGONI frantically searched for a

15  rental property to move into with her daughter LACEY LONGONI. After extensive efforts,

16  she was able to locate a home in the same school district where 5540 Twin Creeks Drive,

17  Reno, Nevada, 89523 was zoned. However, in order to gain the consent of the landlord to

18  lease said premises, PAMELA D. LONGONI was required to sign a two-year lease, and she

19  was required to have the lease co-signed by her former husband, and father of her daughters.

20      63.    On or about September 4, 2009, PAMELA D. LONGONI received a telephone

21  call from Michael Knapp, Esq., who advised her that he was counsel for GMAC. Mr. Knapp

22  stated to Ms. Longoni that "we've made a big mistake" and that she did not have to leave her

23  home. He further informed her that they were undertaking efforts to recover the home back.

24  PAMELA D. LONGONI informed Mr. Knapp that she had already moved from the property

25  and entered into a two-year lease on a substitute residential property. Mr. Knapp advised Ms.

26  Longoni that he was headed to the beach with his family, and that after the holiday weekend

27  he would contact her to discuss the matter further.

28      64.    The following week PAMELA D. LONGONI was contacted by Christy

1    Hancock, Esq., who sought information about the costs Ms. Longoni incurred in moving

2    from her home and in improving her home before the foreclosure. Ms. Hancock informed

3    PAMELA D. LONGONI that GMAC would reimburse her for these costs. Ms. Hancock

4    further informed Ms. Longoni that GMAC would take immediate steps to remove the

5    foreclosure from her credit history. Subsequently, GMAC or some other party, did in fact,

6    remove all references to this transaction from her credit history.

7         65.    Subsequently, however, the defendants, and each of them, through their

8    retained counsel, have refused to acknowledge their violations of Nevada law and have

9    instead sought to blame PAMELA D. LONGONI for losing her home.

10         66.    In the weeks which followed this unlawful eviction, PAMELA D. LONGONI

11    discovered that the defendants had unlawfully foreclosed upon her home, and they

12    unlawfully evicted her from the property. She made repeated requests for GMAC to recover

13    her home and return her and her family to their prior residence. GMAC refused, and

14    continues to refuse to return the plaintiffs to their home.

15    **FIRST CLAIM FOR RELIEF**

16    **(Violation of N.R.S. 107.080, 107.085, 107.086, 107.087, 107.090)**

17         67.    Plaintiffs reallege each and every allegation as contained above and incorporate

18    them by reference as if fully set forth herein.

19         68.    At all times relevant hereto, there was in force and effect, certain Nevada

20    statutes, including, but not limited to, N.R.S. 107.080, N.R.S. 107.085, N.R.S. 107.086

21    N.R.S. 107.087 and N.R.S. 107.090, which regulate the manner in which non-judicial

22    foreclosures may be conducted in the State of Nevada. Among other things, these statutes

23    set time limits on when a non-judicial foreclosure can be conducted, the manner in which the

24    non-judicial foreclosure can be conducted, and the notices which must be provided to those

25    grantors or others with an interest in the subject property before any sale can be conducted.

26    These statutes were enacted to protect people in a class of which the plaintiffs were members,

27    and said statutes were intended to protect the plaintiffs from the very harm they have suffered

28    as a proximate result of the conduct of the defendants, and each of them.

17

1      69.    Because GMAC MORTGAGE, LLC., proposed and agreed to a loan
2    modification, and accepted payments from the plaintiffs in accordance with this loan
3    agreement, the non-judicial foreclosure proceedings which commenced on February 25,
4    2009, were rendered null and void. Despite that fact, and despite GMAC's promises that it
5    would not foreclose upon the plaintiffs' property, GMAC and EXECUTIVE TRUSTEE
6    SERVICES, LLC., proceeded forward with the foreclosure sale.

7      70.    Defendant GOWEN swore to, under oath, and caused to be filed with the
8    Washoe County Recorder, in Nevada, a "Trustee's Deed of Sale," dated August 14th, 2009,
9    and file stamped August 26th, 2009, under which GOWEN represented that the trustee had
10    complied with all applicable statutory requirements of the State of Nevada, and performed
11    all duties required by the Deed of Trust. Attached as *Exhibit "3"* is a true, accurate and
12    correct copy of this notice. This was intentional or reckless misrepresentation, since
13    GOWEN knew or should have known that" 1) the Trustee had not complied with all
14    applicable statutory requirements, and that 2) all duties required by the Deed of Trust had not
15    been extinguished.

16      71.    At the times the defendants undertook the process of non-judicial foreclosure,
17    none of the defendants owned, possessed, or had any legal right to the Promissory Note or
18    the Deed of Trust. In addition, none of the defendants had the authority to undertake any act
19    in furtherance of the non-judicial foreclosure. Therefore, the foreclosure was wrongful and
20    unlawful and in violation of Nevada law.

21      72.    The defendants, and each of them, by way of the above described acts and/or
22    omissions, violated the provisions of the following Nevada Revised Statutes:

23      a) N.R.S. 107.080,

24      b) N.R.S. 107.085,

25      c) N.R.S. 107.086,

26      d) N.R.S. 107.087, and

27      e) N.R.S. 107.090.

28      73.    As a direct and proximate result of the wrongful acts of the defendants, and

1  each of them, the plaintiffs have suffered the permanent loss of their home and real property,

2  as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

3  of the property, the future value and earning capacity of said property, the loss of the use and

4  enjoyment of said property, and the loss of all improvements made to that property over the

5  past 14 plus years, all in an amount in excess of TEN THOUSAND DOLLARS

6  ($10,000.00).

7      73.    As a further direct and proximate result of the wrongful acts of the defendants

8  and each of them, the plaintiffs have been forced to incur costs associated with obtaining

9  replacement housing, including, but not necessarily limited to, moving and storage expenses,

10  rental charges, household furnishings, increased travel costs and increased utility bills and

11  expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

12      74.    As a further direct and proximate result of the wrongful acts of the defendants,

13  and each of them, the plaintiffs have suffered severe and disabling emotional distress and

14  anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

15  all to the Plaintiffs' general damages in an amount in excess of TEN THOUSAND

16  DOLLARS ($10,000.00).

17      75.    In doing the acts alleged herein, the defendants, and each of them acted, with

18  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

19  such are guilty of oppression, thus warranting the imposition of exemplary and punitive

20  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

21      76.    The plaintiffs have been required to retain the services of ERICKSON,

22  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

23  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

24  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

25                      **SECOND CLAIM FOR RELIEF**

26                      **(Violation of N.R.S. 205.372)**

27      77.    Plaintiffs reallege each and every allegation as contained above and incorporate

28  them by reference as if fully set forth herein.

                                    19

78.    At all times relevant hereto, there was in force and effect, certain Nevada statutes, including, but not limited to, N.R.S. 205.372 which makes it a crime for a person who, with intent to defraud a participant in a mortgage lending transaction, knowingly makes a false statement or misrepresentation concerning a material fact, or deliberately conceals or fails to disclose a material fact, as part of a mortgage lending transaction, or files, or causes to be filed, with a county recorder, any document that the person knows to include a misstatement, misrepresentation or omission concerning a material fact. These statutes were enacted to protect people in a class of which the plaintiffs were members, and said statutes were intended to protect the plaintiffs from the very harm they have suffered as a proximate result of the conduct of the defendants, and each of them.  Therefore, a violation of this statute constitutes Negligence Per Se.

79.    Acting within the scope of their employment for EXECUTIVE TRUSTEE SERVICES, LLC., and as an agent of GMAC MORTGAGE, LLC., and/or RESIDENTIAL COMPANY, INC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., the defendants ILLENNA PETERSON and KATHLEEN GOWEN, made false statements and/or misrepresentations and recorded, or caused to be recorded with the Washoe County Recorder, documents that they knew included a misstatement, misrepresentation or omission of a material fact.

80.    Among other misrepresentations, the "Notice of Breach and Default and of Election to Cause sell (sic) of Real Property Under Deed of Trust" provides that "a breach of and default in the obligations for which such Deed of Trust and security has occurred, or that payment has not been made of ... ." (*See Exhibit 1*).  This constitutes a violation of NRS 205.372(1)(e).

81.    Among other misrepresentations, the "Notice of Trustee's Sale" provides that the borrowers "are in default under a Deed of Trust".  This is not correct.  Further, proper notice was never provided of this Notice of Trustee's Sale.  This also violates various provisions of NRS 205.372, et seq. (See Exhibit 2).

82.    By way of further example, the "Trustee's Deed Upon Sale" also filed with the

1  County Recorder, provides that all applicable statutory requirements and all duties required
2  by the Deed of Trust have been performed. This is false and violates NRS 205.372, et seq.

3       83.    The false representations within these documents filed with the County
4  Recorder, made with knowledge or belief of their falsity, were part of a scheme which
5  included assurances of the loan modification and lack of danger of foreclosure, which were
6  intended to induce the reliance of the plaintiffs, and lull them into a sense of security, while
7  the fraudulently filed documents expedited the wrongful sale of their home, to the
8  Defendants' profit.

9       84.    The plaintiffs relied upon these misrepresentations of the finalized loan
10 modification, and absence of danger of foreclosure to their detriment.

11      85.    By such actions, by such misrepresentations, and by such filing of documents
12 with the County Recorder, which included misrepresentations, misstatements, and omissions
13 of material fact, the defendants acted with an intent to defraud the participant in the mortgage
14 lending transaction through the eventual wrongful sale of the plaintiffs' home without
15 process of law.

16      86.    As a direct and proximate result of the actions of these defendants and/or
17 KATHLEEN GOWEN, the plaintiffs' real property was purportedly sold at a public auction
18 on or about August 14, 2009. As a further direct and proximate result of the actions of
19 ILLEANNA PETERSON, the plaintiffs were wrongfully ousted and ejected from their
20 lawful residence and real property.

21      87.    As a direct and proximate result of the wrongful acts of the defendants, and
22 each of them, the plaintiffs have suffered the permanent loss of their home and real property,
23 as well as all attributes thereto, including, but not necessarily limited to, the loss of the value
24 of the property, the future value and earning capacity of said property, the loss of the use and
25 enjoyment of said property, and the loss of all improvements made to that property over the
26 past 14 plus years, all in an amount in excess of TEN THOUSAND DOLLARS
27 ($10,000.00).

28      88.    As a further direct and proximate result of the wrongful acts of the defendants

1  and each of them, the plaintiffs have been forced to incur costs associated with obtaining

2  replacement housing, including, but not necessarily limited to, moving and storage expenses,

3  rental charges, household furnishings, increased travel costs and increased utility bills and

4  expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

5        89.    As a further direct and proximate result of the wrongful acts of the defendants

6  and each of them, the plaintiffs have suffered severe and disabling emotional distress and

7  anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

8  all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

9  DOLLARS ($10,000.00).

10       90.    In doing the acts alleged herein, the defendants and each of them acted with

11  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

12  such, are guilty of oppression, thus warranting the imposition of exemplary and punitive

13  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14       91.    The plaintiffs have been required to retain the services of ERICKSON,

15  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

16  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

17  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

18                      **THIRD CLAIM FOR RELIEF**

19                   **(Fraud and Misrepresentation)**

20       92.    Plaintiffs reallege each and every allegation as contained above and incorporate

21  them by reference as if fully set forth herein.

22       93.    As set forth above, the defendants, and each of them, provided false

23  representations of material fact, with either the knowledge or belief of such falsity, or without

24  sufficient foundation.  These representations included telling the plaintiff Longoni that

25  plaintiffs' loan modification was permanently approved, and that plaintiffs' loan payments

26  would be the amount of $1,600.00 per month, commencing in April of 2009, and that GMAC

27  would not foreclose upon her home. These misrepresentations included previously described

28  communications regarding the retraction of the permanently approved loan for a "trial

1    modification" only, subsequent representation indicating that the loan had again been

2    permanently approved, communications and representations concerning reduction in the

3    principal loan amount of approximately $169,000.00, representations regarding the need to

4    place plaintiffs into an "Obama Modification Plan", representations regarding the need to

5    submit a new loan modification application and supporting documentation, representations

6    that any effort to foreclose on the property had been placed on hold, and that "GMAC does

7    not want to take your home", as well as the omission to provide plaintiffs with requested

8    information as to whether new loans had in fact been approved, accepted, or declined, all as

9    previously described above.

10         94.    These false representations were made with the intent to induce the plaintiffs'

11   reliance, and the plaintiffs did, in fact, justifiably rely upon these false representations, to

12   their detriment. Such reliance is reflected by the above-described mortgage payments made

13   under the "permanently approved" loan modification, the last of which was rejected without

14   explanation. The plaintiffs further relied to their detriment upon these representations by not

15   undertaking more aggressive actions to qualify under an additional loan modification

16   program, by not making preparations to leave their home, thus forcing them to incur all the

17   additional cost and trouble of finding replacement housing with no notice. This detriment

18   was also reflected by the fact that, in spite of said payments, the plaintiffs lost their home.

19         95.    Fraudulent intent is also reflected by the fact that at the same time the

20   defendants were making the above-described false representations, they were, in fact,

21   proceeding on a course of foreclosure by denying the plaintiffs a myriad of statutory

22   protections regarding their mortgage and their home, including proper notices, the right and

23   opportunity to participate in the Nevada mandatory mediation process, while also filing

24   documents with the Washoe County Recorder containing false statements which were used

25   to expedite the sale of the home without the plaintiffs' knowledge.  In addition, the

26   defendants were actively seeking to sell the plaintiffs' home pursuant to the Notice of Default

27   which it knew, or in the exercise of reasonable care, would have known, was defective thus

28   requiring the recommencement of the foreclosure process.

1      96.    The plaintiffs' reliance was justifiable.

2      97.    Damages resulted from this reasonable reliance. The defendants' above-

3  described misrepresentations proximately caused all of the plaintiffs' damages.

4      98.    As a direct and proximate result of the actions of the defendants and each of

5  them, the plaintiffs' real property was sold at a public auction on or about August 14, 2009.

6  As a further direct and proximate result of the actions of the defendants and each of them,

7  the plaintiffs were wrongfully ousted and ejected from their lawful residence and real

8  property.

9      99.    As a direct and proximate result of the wrongful acts of the defendants, and

10  each of them, the plaintiffs have suffered the permanent loss of their home and real property,

11  as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

12  of the property, the future value and earning capacity of said property, the loss of the use and

13  enjoyment of said property, and the loss of all improvements made to that property over the

14  past 14 plus years all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

15     100.   As a further direct and proximate result of the wrongful acts of the defendants

16  and each of them, the plaintiffs have been forced to incur costs associated with obtaining

17  replacement housing, including, but not necessarily limited to, moving and storage expenses,

18  rental charges, household furnishings, increased travel costs and increased utility bills and

19  expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

20     101.   As a further direct and proximate result of the wrongful acts of the defendants

21  and each of them, the plaintiffs have suffered severe and disabling emotional distress and

22  anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

23  all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

24  DOLLARS ($10,000.00).

25     102.   In doing the acts alleged herein, the defendants and each of them acted with

26  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

27  such are guilty of oppression thus warranting the imposition of exemplary and punitive

28  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

1          103.    The plaintiffs have been required to retain the services of ERICKSON,

2     THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

3     future, incur expenses and costs and attorney's fees for which they are entitled to recover.

4     The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

5                            **FOURTH CLAIM FOR RELIEF**

6                    **(Negligence and Negligent Misrepresentation)**

7          104.    Plaintiffs reallege each and every allegation as contained above and incorporate

8     them by reference as if fully set forth herein.

9          105.    The defendants, and each of them, owed a duty to the plaintiffs to refrain from

10    any conduct which unlawfully interfered with the plaintiffs' rights to peaceful occupancy of

11    the residence and real property.    The defendants, and each of them, breached said duty by

12    acting in a negligent fashion proximately causing the plaintiffs' home to be unlawfully sold

13    to a third party, and proximately causing the plaintiffs to be unlawfully ousted and ejected

14    from the home.

15         106.    Defendants, and each of them, had a duty of care regarding foreclosure

16    proceedings, such minimum duty pertaining to foreclosures defined by Nevada Revised

17    Statutes 107.080 through NRS 107.100.    In addition, the defendant GMAC MORTGAGE,

18    LLC., knew that it had agreed to a loan modification pursuant to which it received further

19    loan payments, thereby invalidating the Notice of Default which it had previously caused to

20    be prepared and recorded.    The defendant EXECUTIVE TRUSTEE SERVICES, LLC.,

21    knew, or through the exercise of reasonable care, should have known, that the plaintiffs had

22    made further payments to the modified Promissory Note, thereby invalidating the original

23    Notice of Default.

24         107.    As delineated above, the defendants, and each of them, violated these statutes

25    which established the duty and breach elements of negligence in that the plaintiffs belonged

26    to that class of persons the statutes were intended to protect, and the injury described above

27    is of the type against which the statute was intended to protect.    The defendants further

28    breached their general standard of care to the plaintiffs to conduct a foreclosure only when

25

1  they had the proper authority and standing, and in compliance with all Nevada statutes.

2      108.    As a proximate result of these statutory and other violations, plaintiffs have

3  sustained damages.

4      109.    At the time the power of sale was exercised, or that foreclosure occurred, the

5  defendants lacked the legal right to proceed forward with any non-judicial foreclosure.

6  Moreover, there was no breach of condition or failure to perform which existed on the

7  plaintiffs' part, which would have authorized the foreclosure or exercise of the power of sale.

8      110.    Defendants, and each of them, in the course of their business, profession or

9  employment, or in any other action in which they had a pecuniary interest, supplied false

10  information for the guidance of the defendants in their business transactions.

11      111.    The defendants, and each of them, failed to exercise reasonable care or

12  competence in obtaining and communicating such information.

13      112.    The plaintiffs justifiably relied upon such information to their legal and

14  pecuniary law which was caused thereby.

15      113.    Defendants, and each of them, gratuitously or for consideration, rendered

16  services to the plaintiffs which the defendants should have recognized as being necessary for

17  the protection of the plaintiffs, or the plaintiffs' possessions.

18      114.    Defendants, and each of them, are subject to liability to the plaintiffs for the

19  physical harm resulting from their failure to exercise reasonable care to perform this

20  undertaking – in particular, the represented loan modification – in that the defendants' failure

21  to exercise such care increased the risk of harm and foreclosure to the plaintiffs.

22      115.    The harm to the plaintiffs was suffered because of the plaintiffs' reliance upon

23  the defendants' undertaking regarding the mortgage services and modification.

24      116.    Through the above-described actions concerning representations of permanent

25  loan modification, and subsequent wrongful and fraudulent foreclosure of said home,

26  defendants' conduct is extreme and outrageous.

27      117.    As a result of the wrongful foreclosure, and other actions described herein,

28  plaintiffs have suffered emotional distress causing a physical impact and physical

1 | manifestation.

2 |    118.   As a direct and proximate result of the wrongful acts of the defendants, and

3 | each of them, the plaintiffs have suffered the permanent loss of their home and real property,

4 | as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

5 | of the property, the future value and earning capacity of said property, the loss of the use and

6 | enjoyment of said property, and the loss of all improvements made to that property over the

7 | past 14 plus years all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

8 |    119.   As a further direct and proximate result of the wrongful acts of the defendants

9 | and each of them, the plaintiffs have been forced to incur costs associated with obtaining

10 | replacement housing, including, but not necessarily limited to, moving and storage expenses,

11 | rental charges, household furnishings, increased travel costs and increased utility bills and

12 | expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

13 |    120.   As a further direct and proximate result of the wrongful acts of the defendants

14 | and each of them, the plaintiffs have suffered severe and disabling emotional distress and

15 | anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

16 | all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

17 | DOLLARS ($10,000.00).

18 |    121.   In doing the acts alleged herein, the defendants and each of them acted with

19 | deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

20 | such are guilty of oppression thus warranting the imposition of exemplary and punitive

21 | damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

22 |    122.   The plaintiffs have been required to retain the services of ERICKSON,

23 | THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

24 | future, incur expenses and costs and attorney's fees for which they are entitled to recover.

25 | The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

26 |                           **FIFTH CLAIM FOR RELIEF**

27 |                              **(Breach of Contract)**

28 |    123.   Plaintiffs reallege each and every allegation as contained above and incorporate

27

1    them by reference as if fully set forth herein.

2        124.    The plaintiffs entered into a contract with EquiFirst Corporation which contract

3    included a Promissory Note and Deed of Trust.  That contract contained certain provisions

4    relating to actions which may have be taken should the plaintiffs fail to fulfill their obligation

5    to make periodic payments on the mortgage.  These promises were binding upon and

6    enforceable against all who assumed the rights and liabilities under the Note and Deed of

7    Trust, including the defendants, and each of them.

8        125.    For example, the Deed of Trust provides under Subsection 15, that notices

9    required by the security agreement shall satisfy the applicable law.

10       126.    Subsection 16 of the Deed of Trust, (attached hereto as Exhibit 4) provides that

11   the security instrument is governed by the federal law, and the law of the jurisdiction in

12   which the property is located, and that all rights and obligations contained in the security

13   agreement are subject to the requirements and limitations of such law.

14       127.    Through the above-described conduct, including multiple violations of Nevada

15   statutes designed to protect plaintiffs from wrongful foreclosures, defendants, and each of

16   them, breached, in part and not limited thereto, the remedies and notice provisions, as well

17   as provisions regarding the sale of property at public auction within Section 22 of said Deed

18   of Trust.

19       129.    Moreover, the Adjustable Rate Note (attached hereto as Exhibit "5")

20   incorporates by reference the Deed of Trust, at Section 11, as well as the protections given

21   to the note holder therein.

22       130.    Vis-a-vis the above-described conduct, defendants have violated, in part and

23   not limited thereto, the terms of that incorporated Deed of Trust as applicable to the

24   Adjustable Rate Note, as well as notice provisions within Section 7(C), Section 8, and

25   Section 11 of the Adjustable Rate Note.

26       131.    The plaintiffs are informed and believe and thereupon allege that the

27   Defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY,

28   LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., assumed, or were

1    assigned, all the duties and obligations which EquiFirst Corporation owed to the plaintiffs

2    under the loan agreement.

3        132.    The defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL

4    FUNDING COMPANY, INC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS,

5    INC., breached said contracts with the plaintiffs when they wrongfully and unlawfully

6    constructively seized and sold the plaintiffs' real property and residence.

7        133.    In addition, and not by way of limitation, the defendants, through their above-

8    described conduct, breached an express and implied in fact agreement concerning permanent

9    approval of the loan modification.   A meeting of the minds occurred regarding this

10    permanently approved loan modification, as reflected both by written communication and the

11    conduct of the parties, showing, in light of the surrounding circumstances, their express and

12    tacit understandings.

13        134.    This understanding is evidenced, in part, by payment of, and acceptance of, the

14    reduced and modified loan amount as agreed upon by the parties.

15        135.    The plaintiffs performed by tendering these modified loan amounts from April

16    through July of 2009. In spite of various oral and email correspondence regarding the terms

17    of the permanently approved loan modification, the defendants, and each of them, breached

18    the same.

19        136.    Breach of the Promissory Note, Deed of Trust, and subsequent express and

20    implied in fact agreements pertaining to permanently approved loan modifications, were also

21    breached by failure to comply with the above-described Nevada statutes designed to protect

22    the homeowners.

23        137.    Nevada implies a covenant of good faith and fair dealing into every contract.

24        138.    Defendants, by failing to comply with the loan modification agreement and the

25    promise not to foreclose upon the plaintiffs' property and by selling the property in question,

26    with malice, and not complying with statutory notice requirements, and other statutory

27    requirements, breached the implied covenant of good faith and fair dealing implied within

28    every contract in Nevada.

29

1     139.  As a direct and proximate result of the breach of contract, the plaintiffs have

2  suffered the permanent loss of their home and real property, as well as all attributes thereto,

3  including, but not necessarily limited to, the loss of the value of the property, the future value

4  and earning capacity of said property, the loss of the use and enjoyment of said property, and

5  the loss of all improvements made to that property over the past 14 plus years all in an

6  amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

7     140.  As a further direct and proximate result of the breach of the contract, the

8  plaintiffs have been forced to incur costs associated with obtaining replacement housing,

9  including, but not necessarily limited to, moving and storage expenses, rental charges,

10  household furnishings, increased travel costs and increased utility bills and expenses all in

11  an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

12     141.  The plaintiffs have been required to retain the services of ERICKSON,

13  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

14  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

15  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

16                        **SIXTH CLAIM FOR RELIEF**

17     **(Tortious Breach of The Implied Covenant of Good Faith and Fair Dealing)**

18                                **NOTE:**

19     **The plaintiffs have included this claim for relief for appeal purposes only.**

20  **Previously, the Court dismissed this claim pursuant to Document 52, and it appears**

21  **that ruling would apply with equal force to all newly named defendants.**

22     142.  Plaintiffs reallege each and every allegation as contained above and incorporate

23  them by reference as if fully set forth herein.

24     143.  The plaintiffs entered into a contract with EquiFirst Corporation which contract

25  included a Promissory Note and Deed of Trust. That contract contained certain provisions

26  relating to actions which may be taken should the plaintiffs fail to fulfill their obligation to

27  make periodic payments on the mortgage. Implied into this contract is an implied covenant

28  of good faith and fair dealing which requires each party to engage in no conduct which will

1    deprive the other party of the rights and benefits of said contract. Subsequently, the plaintiffs

2    PAMELA D. LONGONI and JEAN GAGNON entered into a binding loan modification

3    agreement which the parties partially performed.

4    144.    By reason of the relationship between the parties wherein the plaintiffs were

5    in a vastly inferior bargaining position, where the defendant GMAC had made promises and

6    agreements which it knew, or should have known, would be relied upon by the plaintiffs, and

7    because the defendants had failed to comply with certain statutes regulating the assignment

8    of mortgage rights, the defendant occupied a position of trust and reliance vis-a-vis the

9    plaintiffs. Therefore, there exists a special relationship of trust and reliance akin to a

10    fiduciary relationship.

11    145.    The above-described relationship is one of those situations involving an

12    element of reliance generating a need to protect the weak from the insults of the strong, that

13    is not adequately met by ordinary contract damages.

14    146.    The defendants, and each of them, were in a vastly superior or entrusted

15    position as compared to the plaintiffs, and have engaged in grievous or perfidious

16    misconduct.

17    147.    This superior/inferior power differential created a special element of reliance

18    on the credibility of the defendants and lenders concerning the permanently approved loan

19    modification, and promise not to foreclose without adequate notice and due process of law.

20    148.    The plaintiffs are informed and believe and thereupon allege that the Defendant

21    GMAC MORTGAGE, LLC., purportedly assumed or was assigned all the rights, duties and

22    obligations which EquiFirst Corporation owed to the plaintiffs under the loan agreement.

23    149.    The defendant GMAC MORTGAGE, LLC., breached said contracts with the

24    plaintiffs when it wrongfully and unlawfully constructively seized and sold the plaintiffs' real

25    property and residence. Because of the nature of the relationship between the parties and the

26    unique nature of real property, and because contractual damages will not make the plaintiffs

27    whole, an award of tort damages is appropriate under Nevada law.

28    150.    As a direct and proximate result of the breach of contract and breach of the

31

1    implied covenant of good faith and fair dealing, the plaintiffs have suffered the permanent

2    loss of their home and real property, as well as all attributes thereto, including, but not

3    necessarily limited to, the loss of the value of the property, the future value and earning

4    capacity of said property, the loss of the use and enjoyment of said property, and the loss of

5    all improvements made to that property over the past 14 plus years all in an amount in excess

6    of TEN THOUSAND DOLLARS ($10,000.00).

7         151.    As a further direct and proximate result of the breach of the contract and breach

8    of the implied covenant of good faith and fair dealing, the plaintiffs have been forced to incur

9    costs associated with obtaining replacement housing, including, but not necessarily limited

10    to, moving and storage expenses, rental charges, household furnishings, increased travel

11    costs and increased utility bills and expenses all in an amount in excess of TEN THOUSAND

12    DOLLARS ($10,000.00).

13         152.    As a further direct and proximate result of the wrongful acts of the defendants

14    and each of them, the plaintiffs have been forced to incur costs associated with obtaining

15    replacement housing, including, but not necessarily limited to, moving and storage expenses,

16    rental charges, household furnishings, increased travel costs and increased utility bills and

17    expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

18         153.    As a further direct and proximate result of the wrongful acts of the defendants

19    and each of them, the plaintiffs have suffered severe and disabling emotional distress and

20    anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

21    all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

22    DOLLARS ($10,000.00).

23         154.    In doing the acts alleged herein, the defendants and each of them acted with

24    deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

25    such are guilty of oppression thus warranting the imposition of exemplary and punitive

26    damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

27         155.    The plaintiffs have been required to retain the services of ERICKSON,

28    THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

32

1   future, incur expenses and costs and attorney's fees for which they are entitled to recover.

2   The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

3   **SEVENTH CLAIM FOR RELIEF**

4   **(Breach of Covenant of Quiet Enjoyment)**

5   **NOTE:**

6   **The plaintiffs have included this claim for relief for appeal purposes only.**

7   **Previously, the Court dismissed this claim pursuant to Document 52, and it appears**

8   **that ruling would apply with equal force to all newly named defendants.**

9        156.  Plaintiffs reallege each and every allegation as contained above and incorporate

10   them by reference as if fully set forth herein.

11        157.  At all times relevant hereto, the plaintiffs PAMELA D. LONGONI and JEAN

12   M. GAGNON were the lawful owners of the real property and residence located at 5540

13   Twin Creeks Drive, Reno, Nevada, 89523. In addition, the plaintiff LACEY LONGONI was

14   a lawful resident of said real property and residence.

15        158.  Into every real property sales transaction, the law implies a covenant that said

16   owners and lawful occupants of said property shall have peaceful and quiet enjoyment and

17   possession of said premises.

18        159.  The covenant of quiet enjoyment is the grantor's promise that the grantee's

19   possession will not be disturbed by any other claimant with a superior title.

20        160.  The covenant of quiet enjoyment runs with the land.

21        161.  The covenant of quiet enjoyment includes a covenant against disturbance by

22   an encumbrancer.

23        162.  The covenant of quiet enjoyment requires the grantor to protect the grantee

24   against lawful claims of ownership asserted by third persons, and comes to fruition once

25   there has been a disturbance in possession by actual or constructive eviction.

26        163.  The defendants, and each of them, by all actions taken to foreclose upon the

27   plaintiffs' real property and by selling said property to a third party, breached the implied

28   covenant of quiet enjoyment and as such are legally liable for all damages proximately

33

1 | caused by said conduct.

2 |     164.  As a direct and proximate result of the wrongful acts of the defendants, and

3 | each of them, the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON have suffered

4 | the permanent loss of their home and real property, as well as all attributes thereto, including,

5 | but not necessarily limited to, the loss of the value of the property, the future value and

6 | earning capacity of said property, the loss of the use and enjoyment of said property, and the

7 | loss of all improvements made to that property over the past 14 plus years all in an amount

8 | in excess of TEN THOUSAND DOLLARS ($10,000.00).

9 |     165.  As a further direct and proximate result of the wrongful acts of the defendants,

10 | and each of them, the plaintiffs have been forced to incur costs associated with obtaining

11 | replacement housing, including, but not necessarily limited to, moving and storage expenses,

12 | rental charges, household furnishings, increased travel costs and increased utility bills and

13 | expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14 |     166.  As a further direct and proximate result of the wrongful acts of the defendants,

15 | and each of them, the plaintiffs have suffered severe and disabling emotional distress and

16 | anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

17 | all to the Plaintiffs' general damages in an amount in excess of TEN THOUSAND

18 | DOLLARS ($10,000.00).

19 |     167.  In doing the acts alleged herein, the defendants, and each of them, acted with

20 | deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

21 | such are guilty of oppression thus warranting the imposition of exemplary and punitive

22 | damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

23 |     168.  The plaintiffs have been required to retain the services of ERICKSON,

24 | THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

25 | future, incur expenses and costs and attorney's fees for which they are entitled to recover.

26 | The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

27 | **EIGHTH CLAIM FOR RELIEF**

28 | **(Intentional Infliction of Emotional Distress)**

34

1        169.   Plaintiffs reallege each and every allegation as contained above and incorporate

2   them by reference as if fully set forth herein.

3        170.   By way of the above-described actions and omissions, the Defendants' conduct

4   was extreme and outrageous with the intention of, or reckless regard for, causing emotional

5   distress.

6        171.   Plaintiffs have suffered severe and extreme emotional distress with physical

7   manifestations of such distress.

8        172.   The defendants' above-described actions and omissions were the actual or

9   proximate causation of this emotional distress.

10        173.   The above-described foreclosure and wrongful ousting of the plaintiffs from

11   the family home was an invasion of the property owners' rights which occurred under

12   circumstances of malice, willfulness, wantonness, and inhumanity.

13        174.   The defendants', and each of them, wrongful acts and foreclosure were a

14   wilful use of power with the expectation to humiliate and distress the mortgagors and

15   plaintiffs.

16        175.   In doing the acts alleged herein, the defendants engaged in conduct that they

17   knew, or should have known and expected, would cause the plaintiffs to suffer and which

18   did, in fact, cause the plaintiffs to suffer severe mental and emotional pain, grief, sorrow,

19   anger, worry, and anxiety all to the plaintiffs' general damages in an amount in excess of

20   TEN THOUSAND DOLLARS ($10,000.00).

21        176.   In doing the acts alleged herein, the defendants, and each of them, acted with

22   deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

23   such are guilty of oppression thus warranting the imposition of exemplary and punitive

24   damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

25        177.   The plaintiffs have been required to retain the services of ERICKSON,

26   THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

27   future, incur expenses and costs and attorney's fees for which they are entitled to recover.

28   The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

### NINTH CLAIM FOR RELIEF

#### (Promissory Estoppel)

178.   Plaintiffs reallege each and every allegation as contained above and incorporate them by reference as if fully set forth herein.

179.   The defendants, as the parties to be estopped, were apprised of the true facts. The defendants made representations that they knew, or should have known would be relied upon by the plaintiffs, and which were, in fact, relied upon by the plaintiffs to their legal detriment.

180.   The defendants intended that their conduct and misrepresentations would be acted upon, and acted in a fashion which would otherwise justify the plaintiffs' right to believe that the defendants so intended.

181.   The plaintiffs were ignorant of the true state of facts, especially in light of the defendants' intentional representations regarding loan modification and their intent not to foreclose upon the plaintiffs' property.

182.   The plaintiffs relied to their detriment on the defendants' conduct and misrepresentations.

183.   In making the representations as alleged above, the employees and agents of GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., knew, or in the exercise of reasonable care, should have known that said representations would be relied upon by the plaintiffs who did, in fact, rely to their detriment upon said statements and representations. Under the principles of equity, said representations are therefore binding and enforceable against GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.

184.   The defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., failed to perform the promises and guarantees which they made to the plaintiffs when they wrongfully and unlawfully constructively seized and sold the plaintiffs' real property

1   and residence and refused to modify the plaintiffs' existing Promissory Note.

2      185.   As a direct and proximate result of the defendants failure to perform their

3   promises and guarantees, the plaintiffs have suffered the permanent loss of their home and

4   real property, as well as all attributes thereto, including, but not necessarily limited to, the

5   loss of the value of the property, the future value and earning capacity of said property, the

6   loss of the use and enjoyment of said property, and the loss of all improvements made to that

7   property over the past 14 plus years all in an amount in excess of TEN THOUSAND

8   DOLLARS ($10,000.00).

9      186.   As a further direct and proximate result of the defendants' failure to perform

10   its promises and guarantees, the plaintiffs have been forced to incur costs associated with

11   obtaining replacement housing, including, but not necessarily limited to, moving and storage

12   expenses, rental charges, household furnishings, increased travel costs and increased utility

13   bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14      187.   The plaintiffs have been required to retain the services of ERICKSON,

15   THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

16   future, incur expenses and costs and attorney's fees for which they are entitled to recover.

17   The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

18                          **TENTH CLAIM FOR RELIEF**

19               **(Concert of Actions against All Defendants)**

20      188.   Plaintiffs reallege each and every allegation as contained above and

21   incorporates them by reference as if fully set forth herein.

22      189.   By and through the above described behavior and actions, defendants, and each

23   of them, committed a tortuous acts in concert with one another and/or pursuant to a common

24   design, plan design or scheme with one another, or;

25      190.   Each of these defendants knew that the others' conduct constituted a breach

26   of duty and gave substantial assistance or encouragement to the other so to conduct, or;

27      191.   Each of these named defendants gave substantial assistance to the other in

28   accomplishing the tortuous result and each of their own conduct, separately considered,

1  constituted a breach of duty to the plaintiffs, and/or;

2     192.   Each of the defendants conspired to create separate entities in order to shield

3  and hide from public scrutiny their wrongful actions, and to attempt to avoid legal liability

4  for conduct which they knew, or should have known, was unlawful or wrongful,

5     193.   As a direct and proximate result of the above described concert of actions, the

6  plaintiffs have suffered and continue to suffer the permanent loss of their home and real

7  property, as well as all attributes thereto, including, but not necessarily limited to, the loss

8  of the value of the property, the future value and earning capacity of said property, the loss

9  of the use and enjoyment of said property, and the loss of all improvements made to that

10  property over the past 14 plus years all in an amount in excess of TEN THOUSAND

11  DOLLARS ($10,000.00).

12     194.   As a further direct and proximate result of the defendants' failure to perform

13  their promises and guarantees, the plaintiffs have been forced to incur costs associated with

14  obtaining replacement housing, including, but not necessarily limited to, moving and storage

15  expenses, rental charges, household furnishings, increased travel costs and increased utility

16  bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

17     195.   In doing the acts alleged herein, the defendants, and each of them, acted with

18  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

19  such, are guilty of oppression thus warranting the imposition of exemplary and punitive

20  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

21     196.   The plaintiffs have been required to retain the services of ERICKSON,

22  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

23  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

24  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

25     WHEREFORE, the plaintiffs, individually, and PAMELA D. LONGONI, in her

26  representative capacity, pray for judgment against the Defendants, and each of them, jointly

27  and severally, as follows:

28     1.   For special damages for all damages associated with the loss of their real

38

1   property and residence and related items when the same are ascertained;

2   　　　2.　　For general damages in a sum in excess of TEN THOUSAND DOLLARS

3   ($10,000.00);

4   　　　3.　　For exemplary damages in an amount in excess of TEN THOUSAND

5   DOLLARS ($10,000.00);

6   　　　4.　　For interest pursuant to statute; and

7   　　　5.　　For such other and further relief as this Court may deem equitable and just.

8   **Plaintiffs hereby demand a jury on all issues.**

9   DATED this 12th day of September, 2011.

10   　　　　　　ERICKSON, THORPE & SWAINSTON, LTD.
　　　　　　　99 West Arroyo Street
11   　　　　　P. O. Box 3559
　　　　　　Reno, Nevada 89505
12

13   By_____
　　　　　THOMAS P. BEKO, ESQ.
14   　　　　　*Attorney for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **CERTIFICATE OF SERVICE**

2          Pursuant to FRCP 5(b), I certify that I am an employee of ERICKSON, THORPE &

3    SWAINSTON, LTD. and that on this day I personally served a true and correct copy of the attached

4    document by:

5          ☐    U.S. Mail
            ☐    Facsimile Transmission
6          ☐    Personal Service
7          ☐    Messenger Service
8          ☒    CM/ECF System

9    addressed to the following:

10   David Hill Bahford
     Bradley Arant Boult Cummungs LLP
11   100 N. Tyron Street, Suite 2690
     Charlotte, NC 28202
12   *Attorney for Defendants GMAC Mortgage, LLC,*
     *Executive Trustee Services, LLC,*
13   *Illeanna Peterson and Kathleen Gowen*

14         DATED this ___12th___ day of September, 2011.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ERICKSON, THORPE &
SWAINSTON, LTD.

1

**<u>Claim No. 2296</u>**

B 10 Modified (Official Form 10) (12/11)

Claim #2296    Date Filed: 11/5/2012

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK    **PROOF OF CLAIM**

| Name of Debtor: Residential Assets Mortgage Products, Inc. | Case Number: 12-12020 (MG); 12-12053 (MG) |

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Jean M. Gagnon

Erickson Thorpe & Swainston Ltd

Name and address where notices should be sent:    NameID: 10853921
Erickson Thorpe & Swainston Ltd
LONGONI- PAMELA D LONGONI, INDIVIDUALLY & AS GUARDIAN AD LITEM FOR LACEY
LONGONI, & JEAN M GAGNON, VS GMAC MRTG, LLC, A ET AL
99 West Arroyo St, PO Box 3559
Reno, NV 89505
Telephone number: (775) 786-3930    email: tbeko@etsreno.com

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**
_____
(If known)

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Name and address where payment should be sent (if different from above):

☑ Date Stamped Copy Returned
☐ No self addressed stamped envelope
☐ No copy to return

Telephone number:    email:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

1. Amount of Claim as of Date Case Filed: $ 600,000=
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: Wrongful Foreclosure : Sale of residential property
(See instruction #2)    See attached complaint

3. Last four digits of any number by which creditor identifies debtor:

3a. Debtor may have scheduled account as:
_____
(See instruction #3a)

3b. Uniform Claim Identifier (optional):
_____
(See instruction #3b)

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:
Value of Property: $_____ Annual Interest Rate_____% ☐Fixed ☐Variable
(when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $_____    Basis for perfection: _____

Amount of Secured Claim: $_____    Amount Unsecured: $_____

6. Claim Pursuant to 11 U.S.C. § 503(b)(9):
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____ (See instruction #6)

7. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. Documents: Attached are *redacted* copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and *redacted* copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

9. Signature: (See instruction #9) Check the appropriate box.
☐ I am the creditor.    ☑ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor, or    ☐ I am a guarantor, surety,
(Attach copy of power of attorney, if any.)    their authorized agent.    indorser, or other codebtor.
(See Bankruptcy Rule 3004.)    (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Thomas Beko
Title: Attorney
Company: Erickson, Thorpe & Swainston (Signature)    (Date) 11-01-12
Address and telephone number (if different from notice address above):

Telephone number:    Email:

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**
$_____

* Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

RECEIVED
NOV 0 5 2012
KURTZMAN CARSON CONSULTANTS
**COURT USE ONLY**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or

001KC0002_51765-2_domestic_18/015138/090824

1212053121105000000000009

# ERICKSON, THORPE & SWAINSTON, LTD.

THOMAS P. BEKO
JOHN A. ABERASTURI
JOHN C. BOYDEN
REBECCA BRUCH
BRENT L. RYMAN
ANDREA K. PRESSLER
PAUL M. BERTONE
ANN M. ALEXANDER
CHARITY F. FELTS
BRETT A. DIEFFENBACH

ATTORNEYS AT LAW

99 WEST ARROYO STREET
RENO, NEVADA 89509

MAILING ADDRESS:
P.O. BOX 3559, RENO, NEVADA 89505

WWW.ETSRENO.COM

*OF COUNSEL*
ROGER L. ERICKSON
DONALD A. THORPE

GEORGE W. SWAINSTON
1936 - 2007

TELEPHONE: 775.786.3930
FACSIMILE: 775.786.4160

TBEKO@ETSRENO.COM

November 1, 2012

**_Via Priority Mail*_**
RecCap Claims Processing Center c/o KCC
2335 Alaska Avenue
El Segundo, CA 90245

|       |            |                                                                                     |
|-------|------------|-------------------------------------------------------------------------------------|
| **Re:** | **Debtors:** | **Residential Capital , LLC, et al** <br> **Case No.:12-12020 (MG)**                 |
|       | **Claimants:** | **Pamela Longoni, individually and as GAL for Lacey Longoni, and Jean M. Gagnon**  |

Dear Sir/Madam:

I am enclosing 8 Proof of Claim forms in the above matter, i.e., 4 separate claims on behalf of each of my clients.  Attached to each claim is a copy of the related United States District Court Complaint (Third Amended Complaint).  Please provide confirmation to the undersigned of the timely filing of these Proofs of Claim.

Sincerely,

THOMAS P. BEKO, ESQ.

TPB:dmm

Enclosures: 8, as stated

*with Delivery Confirmation

1  THOMAS P. BEKO, ESQ. (#002653)
   99 West Arroyo Street
2  P.O. Box 3559
   Reno, Nevada 89505
3  Telephone: (775) 786-3930
   *Attorneys for Plaintiffs*

4

5

6

7                    UNITED STATES DISTRICT COURT

8              DISTRICT OF NEVADA - RENO DIVISION

9

10  PAMELA D. LONGONI,
    individually and as Guardian Ad
11  Litem for LACEY LONGONI,
    and JEAN M. GAGNON,
12                                      Case No.: 3:10-CV-00297-LRH-(VPC)

13
              Plaintiffs,
14
    vs.
15
    GMAC MORTGAGE, LLC., a Delaware
16  Limited Liability Company, EXECUTIVE
    TRUSTEE SERVICES, LLC., a Delaware
17  Limited Liability Company, RESIDENTIAL
    FUNDING COMPANY, LLC., a Delaware
18  Limited Liability Company, fka RESIDENTIAL
    FUNDING CORPORATION, a Delaware
19  Corporation, RESIDENTIAL ASSET
    MORTGAGE PRODUCTS, INC., a Delaware
20  Corporation, ILLEANNA PETERSON,
    KATHLEEN GOWEN, individuals,
21  DOES 1-10; BLACK AND
    WHITE CORPORATIONS 1-10,
22  corporations; ABLE & BAKER
    COMPANIES 2-10, co-partnerships and or
23  limited liability companies,

24            Defendants.            /

25  **THIRD AMENDED COMPLAINT FOR DAMAGES TO SUBSTITUTE PROPER**

26            **PARTIES PURSUANT TO FRCP 15(c)**

27                    **(JURY DEMANDED)**

28      COMES NOW, PAMELA D. LONGONI, individually and as the Guardian Ad Litem

    for LACEY LONGONI, and JEAN M. GAGNON, by and through their attorneys,

1  ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and hereby

2  allege and complain as follows:

### PARTIES AND JURISDICTION

4    1.    Plaintiff PAMELA D. LONGONI is an individual, residing in the State of

5  Nevada. PAMELA D. LONGONI is the natural parent and guardian of the minor child

6  LACEY LONGONI. At all times relevant hereto, PAMELA D. LONGONI was a lawful

7  owner of a certain parcel of real property commonly known as 5540 Twin Creeks Drive,

8  Reno, Nevada, 89523, which PAMELA D. LONGONI occupied as her sole personal

9  residence along with her minor children, including the plaintiff LACEY LONGONI.

10    2.    Plaintiff JEAN M. GAGNON is an individual, residing in the State of Nevada.

11  At all times relevant hereto, JEAN M. GAGNON was a lawful co-owner of a certain parcel

12  of real property commonly known as 5540 Twin Creeks Drive, Reno, Nevada, 89523.

13    3.    The plaintiffs are informed and believe and thereupon allege that the defendant

14  GMAC MORTGAGE, LLC., is a Delaware Limited Liability Company, licensed to do, and

15  doing business in the State of Nevada as a mortgage lender.

16    4.    The plaintiffs are informed and believe that GMAC MORTGAGE, LLC., is

17  wholly owned by General Motors Acceptance Corporation.

18    5.    The plaintiffs are further informed and believe that GMAC MORTGAGE,

19  LLC., was assigned, or somehow assumed the rights, liabilities and duties of EquiFirst

20  Corporation relative to a Promissory Note, Deed of Trust signed by the plaintiffs PAMELA

21  D. LONGONI and JEAN M. GAGNON, on or about September 29, 2005.

22    6.    The plaintiffs are further informed and believe and thereupon aver that

23  EXECUTIVE TRUSTEE SERVICES, LLC., is a subsidiary of GMAC MORTGAGE, LLC.,

24  contracted with, or is otherwise so affiliated with GMAC MORTGAGE, LLC., such that it

25  is legally responsible for the acts of EXECUTIVE TRUSTEE SERVICES, LLC. At all times

26  relevant hereto, GMAC MORTGAGE, LLC., employed an individual by the name of

27  Jonathan "Nate" Stephenson. At all times relevant hereto, Jonathan "Nate" Stephenson was

28  acting within the course and scope of his employment with GMAC MORTGAGE, LLC. The

1    plaintiffs are further informed and believe that at all times relevant hereto, Paul Williams,

2    was the Director of the GMAC Modification Team, and was acting within the course and

3    scope of his employment with GMAC MORTGAGE, LLC. The plaintiffs are informed and

4    believe, that Paul Williams approved the plaintiffs' loan modification request as set forth

5    herein below.

6        7.    The plaintiffs are informed and believe and thereupon allege that the defendant

7    EXECUTIVE TRUSTEE SERVICES, LLC., is a Delaware Limited Liability Company,

8    licensed to do business, and doing business in the State of Nevada by providing a broad menu

9    of non-judicial foreclosure services. The plaintiffs are informed and believe that the

10    defendant EXECUTIVE TRUSTEE SERVICES, LLC., is wholly owned by General Motors

11    Acceptance Corporation. The plaintiffs are further informed and believe, and thereupon

12    allege, that EXECUTIVE TRUSTEE SERVICES, LLC., is a subsidiary of, or is otherwise

13    affiliated with GMAC MORTGAGE, LLC., and that the defendants ILLEANNA

14    PETERSON and KATHLEEN GOWEN were, at all times relevant hereto, employees of

15    EXECUTIVE TRUSTEE SERVICES, LLC., and in doing the acts alleged herein were acting

16    within the course and scope of their employment, and/or at the express direction of, or with

17    the authorization and ratification of EXECUTIVE TRUSTEE SERVICES., LLC and GMAC

18    MORTGAGE, LLC.

19        8.    The plaintiffs are informed and believe and thereupon allege that the defendant

20    RESIDENTIAL FUNDING COMPANY, LLC., is a Delaware Limited Liability Company,

21    licensed to do business, and doing business in the State of Nevada. The plaintiffs are further

22    informed and believe and thereupon allege that said defendant is the successor in interest,

23    and has assumed any and all legal liabilities of Residential Funding Corporation, a Delaware

24    Corporation. RESIDENTIAL FUNDING COMPANY, LLC., is being substituted in this

25    action for the previously named Doe Defendant, ABLE & BAKER COMPANY 1.

26        9.    The plaintiffs are informed and believe and thereupon allege that

27    RESIDENTIAL FUNDING COMPANY, LLC., is wholly owned by the defendant General

28    Motors Acceptance Corporation.

1      10.    The plaintiffs are informed and believe that RESIDENTIAL FUNDING

2    COMPANY, LLC., claims to have obtained ownership interest in a certain parcel of real

3    property commonly known as 5540 Twin Creeks Drive, Reno, Nevada, 89523. In this

4    regard, the plaintiffs allege that RESIDENTIAL FUNDING COMPANY, LLC., was

5    assigned, or somehow assumed the rights, liabilities and duties of EquiFirst Corporation

6    relative to a Promissory Note, Deed of Trust signed by the plaintiffs PAMELA D.

7    LONGONI and JEAN M. GAGNON, on or about September 29, 2005.

8      11.    The plaintiffs are informed and believe and thereupon allege that

9    RESIDENTIAL FUNDING COMPANY, LLC., engaged or retained the defendant GMAC

10    MORTGAGE, LLC., to service the loan on the plaintiffs' real property. In this regard,

11    RESIDENTIAL FUNDING COMPANY, LLC., authorized GMAC MORTGAGE, LLC.,

12    to engage in certain loan activities, including, but not limited to the following:

13        a) Receipt of loan payments;

14        b) Issuance of legal notices to the plaintiffs; and

15        c) Loan modification activities including negotiation of new rates of interest, loan

16    payments, and principal sums due under the loan.

17      12.    That all statements made to the plaintiffs by employees of GMAC

18    MORTGAGE, LLC., as part of the plaintiffs' loan modification process, were statements

19    made on behalf of, and within the course and scope of GMAC MORTGAGE, LLC.,

20    activities on behalf of RESIDENTIAL FUNDING COMPANY, LLC., and thus

21    RESIDENTIAL FUNDING COMPANY, LLC., is responsible for all acts of GMAC

22    MORTGAGE, LLC related to modification of the plaintiffs' residential loan.

23      13.    The plaintiffs are informed and believe and thereupon allege that in performing

24    loan modification activities, RESIDENTIAL FUNDING COMPANY, LLC., provided

25    GMAC MORTGAGE, LLC., with certain policies, procedures and/or guidelines to follow

26    in the process of loan modification activities.

27      14.    The plaintiffs are informed and believe that RESIDENTIAL FUNDING

28    COMPANY, LLC., authorized GMAC MORTGAGE, LLC., to enter into binding loan

4

1   modifications on behalf of RESIDENTIAL FUNDING COMPANY, LLC.

2       15.    The plaintiffs are informed and believe and thereupon allege that the defendant

3   RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., was, at all times relevant hereto,

4   a Delaware corporation, licensed to do business, and doing business in the State of Nevada.

5   The plaintiffs are further informed and believe and thereupon allege RESIDENTIAL ASSET

6   MORTGAGE PRODUCTS, INC., was an entity that was governed or controlled by the other

7   named defendants herein, and doing the things set forth herein was acting under the direction

8   and control of the other defendants. RESIDENTIAL ASSET MORTGAGE PRODUCTS,

9   INC., is being substituted in this action for the previously named Doe Defendant, ABLE &

10  BAKER COMPANY 2.

11      16.    The plaintiffs are further informed and believe that RESIDENTIAL ASSET

12  MORTGAGE PRODUCTS, INC., claims to have purchased the plaintiffs' Promissory Note

13  and Deed of Trust from RESIDENTIAL FUNDING COMPANY, LLC., on or about

14  December 28, 2005, pursuant to an agreement entitled Assignment and Assumption

15  Agreement, however, the plaintiffs are informed and believe that RESIDENTIAL FUNDING

16  COMPANY, LLC., was not the owner of, nor was it in possession of, the plaintiffs'

17  Promissory Note and/or Deed of Trust on that day, and therefore could not transfer any

18  interest in either the Promissory Note or the Deed of Trust.

19      17.    Pursuant to said Assignment and Assumption Agreement, RESIDENTIAL

20  FUNDING CORPORATION (purportedly now RESIDENTIAL FUNDING COMPANY,

21  LLC., was obligated to deliver to RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.,

22  the original Promissory Note, endorsed to the order of U.S. Banking National Association,

23  as Trustee. The plaintiffs are informed and believe and thereupon aver that RESIDENTIAL

24  FUNDING COMPANY, LLC., never had legal title to said Promissory Note, and never

25  provided U.S. Banking National Association with the original of said Promissory Note, nor

26  did RESIDENTIAL FUNDING COMPANY, LLC., ever provide U.S. Banking National

27  Association with any proper endorsements of said Promissory Note to U.S. Banking National

28  Association. Based upon the foregoing, neither RESIDENTIAL FUNDING COMPANY,

1  LLC, nor RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., had any legal right to

2  order or authorize the foreclosure upon the plaintiffs' real property.

3       18.    That on December 28, 2005, (the same day that RESIDENTIAL FUNDING

4  COMPANY, LLC., purported to sell the plaintiffs' Promissory Note and Deed of Trust to

5  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.), RESIDENTIAL ASSET

6  MORTGAGE PRODUCTS, INC., claims that it assigned said Promissory Note and Deed of

7  Trust to U.S. Banking National Association as Trustee, pursuant to an agreement entitled

8  Pooling and Servicing Agreement.

9       19.    Pursuant to said Pooling and Servicing Agreement, RESIDENTIAL FUNDING

10  COMPANY, LLC., was obligated to, concurrently with the execution of said agreement,

11  deliver the agreement and the original Promissory Note, fully endorsed without recourse to

12  the Trustee, showing an unbroken chain of endorsements from the originator thereof to the

13  Person endorsing it to the Trustee. The plaintiffs are informed and believe and thereupon

14  aver that RESIDENTIAL FUNDING COMPANY, LLC., never had legal title to said

15  Promissory Note and never provided U.S. Banking National Association with the original

16  of said Promissory Note.    The plaintiffs are further informed and believe that

17  RESIDENTIAL FUNDING COMPANY, LLC., never provided U.S. Banking National

18  Association with any Promissory Note which contained an unbroken chain of endorsements

19  from the originator of the Promissory Note (EquiFirst Corporation) through to the Trustee.

20       20.    The plaintiffs are informed and believe and thereupon aver, that on or about

21  November 15, 2007, the plaintiffs' original Promissory Note was modified pursuant to an

22  Adjustable Rate Loan Modification Agreement between the plaintiffs, as Borrower, and

23  Homecomings Financial, LLC., as Lender, however, Homecomings Financial was an entity

24  that had no right, title or interest in said Promissory Note since RESIDENTIAL FUNDING

25  COMPANY, LLC., claims it was the owner of said Promissory Note and that it had

26  transferred ownership of that Promissory Note to RESIDENTIAL ASSET MORTGAGE

27  PRODUCTS, INC., almost two years prior to this claimed modification.

28       21.    The plaintiffs are informed and believe and thereupon aver that each of the

6

1    defendants in this action took action upon the plaintiffs' Promissory Note purportedly

2    modified by Homecomings Financial, LLC., despite the fact that Homecomings Financial

3    had no right, title or interest in said Promissory Note, and as such, had no right to modify the

4    original Promissory Note.

5         22.    That in 2009, the defendant GMAC MORTGAGE, LLC., engaged and

6    authorized the defendant EXECUTIVE TRUSTEE SERVICES, LLC., to commence non-

7    judicial foreclosure proceedings against the plaintiffs' real property when GMAC

8    MORTGAGE, LLC., had neither the legal ownership of the Promissory Note, nor the Deed

9    of Trust which secured the obligations of the Promissory Note. As a result, neither GMAC

10   MORTGAGE, LLC., nor EXECUTIVE TRUSTEE SERVICES, LLC., had legal standing

11   to commence non-judicial foreclosure proceedings against the plaintiffs' real property.

12   Therefore, GMAC MORTGAGE, LLC., and EXECUTIVE TRUSTEE SERVICES, LLC.,

13   wrongfully foreclosed upon the plaintiffs' real property.

14        23.    The plaintiffs are informed and believe and thereupon allege that at all times

15   relevant hereto, the defendants, and each of them, were acting as agents and employees for

16   the other defendants, and in doing the things alleged herein were acting within the course and

17   scope of that agency. The plaintiffs are further informed and believe and thereupon allege,

18   that at all times relevant hereto, the defendants were acting as part of a common, planned,

19   scheme or design in conspiracy/concert with other defendants, thus making each legally

20   liable for the acts of all others.

21        24.    Plaintiffs do not know the true names or capacities of those defendants sued

22   herein as DOES 1-10, BLACK & WHITE CORPORATIONS 1-10, and ABLE & BAKER

23   COMPANIES 1-10, partnerships and/or limited liability companies. Therefore, plaintiffs sue

24   said defendants, and each of them, by such fictitious names. Plaintiffs are informed and

25   believe and based thereon allege that each of said defendants inclusive, were officers,

26   directors or managing agents and/or employees or were otherwise responsible for the daily

27   operation of said business, including, but not limited to the training and supervision of

28   employees of the company. That at all times relevant hereto, defendants herein fictitiously

1   sued were the owners, shareholders, agents, partners, or alter egos of defendants named

2   herein. Plaintiffs are further informed and believe that the DOE defendants are the holders

3   or owners of the deed of trust and/or promissory note executed by the plaintiffs, and thus are

4   legally responsible under the causes of action pled herein and proximately caused damages

5   to plaintiffs as herein alleged. Plaintiffs pray that when the true names of said defendants are

6   ascertained they may be inserted herein with appropriate allegations.

7       25.   In 2005, the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON

8   entered into a contract with EquiFirst to refinance a loan which was secured by the real

9   property located at 5540 Twin Creeks Drive, Reno, Nevada, 89523. This transaction was

10   accomplished through the use of a Promissory Note and Deed of Trust (hereinafter referred

11   to as the Note and/or Deed of Trust). As part of this transaction, PAMELA D. LONGONI

12   deeded a one-half interest to said real property and improvements to JEAN M. GAGNON.

13   Subsequent to the loan refinance, PAMELA D. LONGONI, LACEY LONGONI and JEAN

14   M. GAGNON lived at the property located at 5540 Twin Creeks Drive, Reno, Nevada,

15   89523.

16       26.   The plaintiffs are informed and believe and thereupon aver that after the

17   refinance was completed, EquiFirst assigned, or purported to assign, the Note and Deed of

18   Trust to a third party which may, or may not have been, Homecomings Financial, LLC.,

19   RESIDENTIAL FUNDING COMPANY, LLC, fka Residential Funding Corporation,

20   RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., U.S. Banking National

21   Association, and/or GMAC MORTGAGE, LLC. At some point after the refinance,

22   Homecomings, Financial, LLC., RESIDENTIAL FUNDING COMPANY, LLC., and/or

23   GMAC MORTGAGE, LLC., claimed that it assumed the rights, duties and liabilities of

24   EquiFirst and conducted itself as though it was the lawful owner, and holder in due course

25   of the Note and Deed of Trust. Neither RESIDENTIAL FUNDING COMPANY, LLC., (or

26   its predecessor in interest Residential Funding Corporation), GMAC MORTGAGE, LLC.,

27   or any other defendant, recorded any notice in the Washoe County Recorder's Office

28   advising the plaintiffs (or any other person) that it held, owned or had been assigned the Note

1  and Deed of Trust.

2    27. In early 2008, PAMELA D. LONGONI and JEAN M. GAGNON began to

3  suffer financial difficulties due to the fact that Mr. Gagnon was transferred, for his

4  employment, from northern Nevada to Las Vegas, Nevada. This caused a duplication of

5  many of the family's household expenses. As a result, the plaintiffs fell behind on their

6  mortgage payments. On or about January 15, 2009, the Plaintiff PAMELA D. LONGONI

7  sent a letter to Homecomings Financial, whom she believed to be the servicer of her loan,

8  asking for a modification of her loan.

9    28. In response to her January 15, 2009, letter, on February 18, 2009, GMAC

10  MORTGAGE, LLC., sent the plaintiffs a package of records to fill out and return in order

11  to seek a loan modification.

12    29. On February 19, 2009, without any contact with, or input or direction from

13  either the owner/holder of the Promissory Note or the Deed Of Trust, GMAC MORTGAGE,

14  LLC., made the decision on behalf of RESIDENTIAL FUNDING COMPANY, and/or

15  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National

16  Association to commence a non-judicial foreclosure upon the plaintiffs' real property. At

17  the time they did so, GMAC MORTGAGE, LLC., undertook no efforts to determine who

18  was the legal owner or holder of the plaintiffs' Promissory Note or the Deed of Trust.

19    30. In accordance with their decision to commence foreclosure proceedings against

20  the plaintiffs' property, and without any contact with, or input or direction from either the

21  owner/holder of the Promissory Note or the Deed Of Trust, GMAC MORTGAGE, LLC.,

22  made the decision on behalf of RESIDENTIAL FUNDING COMPANY, and/or

23  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National

24  Association GMAC MORTGAGE, LLC., engaged with the defendant EXECUTIVE

25  TRUSTEE SERVICES, LLC., to undertake the process of foreclosure.

26    31. On February 25, 2009, and without receipt of any assignment, authorization,

27  directive from the legal owner of the Promissory Note or the Deed of Trust, EXECUTIVE

28  TRUSTEE SERVICES prepared and recorded a Substitution of Trustee. This assignment

1   was in direct contradiction to the terms of the Deed of Trust, which required a change in

2   Trustee to be ordered by the Lender which was EquiFirst Corporation.

3        32.    Also on February 25, 2009, and without receipt of any assignment,

4   authorization, directive from the legal owner of the Promissory Note or the Deed of Trust,

5   EXECUTIVE TRUSTEE SERVICES, LLC., also prepared and recorded a Notice of Breach

6   and Default and of Election to Cause Sell of Real Property under Deed of Trust. Attached

7   as *Exhibit "1"* is a true, accurate and correct copy of this notice. This notice was defective,

8   since it lacked the information required by law. EXECUTIVE TRUSTEE SERVICES,

9   LLC., caused this Notice to be recorded on February 26, 2011.

10       33.    On March 3, 2009, the Plaintiffs faxed GMAC their completed Loan

11  Modification application. In response, GMAC contacted the plaintiffs and asked for

12  additional information. The following day, March 4, 2009, EXECUTIVE TRUSTEE

13  SERVICES, LLC., caused the Notice of Breach and Default and of Election to Cause Sell

14  of Real Property under Deed of Trust to be mailed to the plaintiffs on March 4, 2009.

15       34.    On March 5, 2009, the plaintiff PAMELA LONGONI forwarded all requested

16  information to GMAC. The following day she spoke with a GMAC representative at which

17  time they discussed possible modifications to the plaintiffs' existing loan. The plaintiffs

18  were informed of various options which they could pursue as an alternative to foreclosure.

19  At no time were the plaintiffs informed that GMAC MORTGAGE, LLC., had commenced

20  foreclosure proceedings, or that GMAC was not the owner, nor holder of the Promissory

21  Note or Deed of Trust on the plaintiffs' real property. The plaintiffs were, however, informed

22  that GMAC did have a program by which loans could be modified and that the plaintiffs

23  were candidates for such program. The plaintiffs fully and completely complied with all of

24  GMAC's demands in the application process.

25       35.    On or about March 10, 2009, a GMAC MORTGAGE, LLC., representative

26  informed the plaintiffs that their request for a loan modification had been approved. GMAC

27  MORTGAGE, LLC., sent the plaintiffs a proposed modification agreement. This agreement

28  called for a new monthly payment in the amount of $2,270.00.

36.     On or about March 19, 2008, the plaintiff PAMELA D. LONGONI contacted GMAC's representative and informed him that they could not meet the proposed monthly payment and the most that they could pay on a monthly basis was $1,600.00. In response, GMAC's representative Nate Stephenson developed a new loan modification plan pursuant to which the plaintiffs would be required to make payments in the amount of $1,600.00 per month. He instructed PAMELA D. LONGONI to begin making the payments in April of 2009. He further informed the plaintiff that GMAC would stop any effort to foreclose on the property. At not time did GMAC ever indicate that there was any time limit to this temporary plan. In making these statements, the GMAC representative was acting on behalf of, and within the course and scope of the authority granted to him by RESIDENTIAL FUNDING COMPANY, LLC., RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National Association, as Trustee. The plaintiffs made the required payment on or before the requested date.

37.     On April 2, 2009, the same GMAC MORTGAGE, LLC., representative informed the plaintiffs that all he was waiting on in order to make the change permanent was approval of the VP. Later that same day, said representative informed the plaintiffs that their trial loan modification was, in fact, approved. He further stated that because he was attempting to write off $176,000.00 from the loan, he needed approval from their VP, however, he also stated that he had already done the analysis and it seemed to be a win-win situation so he was fairly confident that it would get approved. At no time did GMAC ever advise the plaintiffs that this proposed plan would only be temporary or that it would need to be replaced with another plan. In making these statements, the GMAC MORTGAGE, LLC., representative was acting on behalf of, and within the course and scope of the authority granted to him by RESIDENTIAL FUNDING COMPANY, LLC., RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National Association, as Trustee.

38.     On April 6, 2009, GMAC MORTGAGE, LLC, made the decision to stop all foreclosure proceedings. In accordance with that decision, GMAC instructed EXECUTIVE TRUSTEE SERVICES, LLC., to stop the foreclosure process. EXECUTIVE TRUSTEE

1   SERVICES, LLC., received these instructions and stopped the foreclosure process.

2        39.   On April 21, 2009, the GMAC representative informed PAMELA D.
3   LONGONI that he was still awaiting approval from their "VP." On April 28, 2009, the same
4   GMAC representative informed PAMELA D. LONGONI that he had just looked at the notes
5   and it looked as if "one manager looked at it and agreed that it was a win-win situation, but
6   because it is a $186k that we were trying to write off, it has to go a little higher."

7        40.   On May 1, 2009, the plaintiffs attempted to make their next $1,600.00 payment
8   through an on-line system which GMAC specifically set up to accept the plaintiffs'
9   payments. This is the method by which the first $1,600.00 payment was made. However,
10   when PAMELA D. LONGONI attempted to make the payment, it was refused. In response,
11   PAMELA D. LONGONI contacted Nate Stephenson and advised him of the problem. He
12   informed her that someone had put a "Certified Funds Flag" on her account and that he had
13   removed it. He claimed he removed the flag but she still could not make the payment
14   through the system. Therefore, she sent the payment (with the extra fees) through Western
15   Union. The payment was accepted by GMAC.

16        41.   On May 5, 2009, the plaintiff received a telephone call from Homecomings
17   Financial, saying that they had not received her payment. In response, she contacted Nate
18   Stephenson who informed her that their records showed that they received the payment on
19   May 4, 2009, and as such, she was "Good to go." Nate Stephenson further informed her that
20   it didn't look like their VP has had a chance to look at the matter, however, the notes he saw
21   are good indicating that it "made sense to do the Modification." He further informed her that
22   "We still have 2 months before I would have to set up a plan. So everything is still sort of
23   on hold."

24        42.   On May 26, 2009, PAMELA D. LONGONI sent an e-mail communication to
25   Nate Stephenson asking about the status of her loan modification. She further informed him
26   that she had another friend who was suffering similar financial problems and asked if she
27   could refer him to Mr. Stephenson. Mr. Stephenson responded by saying that he did not have
28   an update, that she should just continue to make the $1,600.00 payment. Once the decision

1  was made, then paperwork will be sent out with the new terms.  He indicated that because

2  he would be moving to a new team the following week, he could not help Ms. Longoni's

3  friend.  He concluded by telling her to let him know if she could think of any further

4  questions.  At no time did he tell her he was unable to take any action relative to her loan

5  modification application.

6       43.    On or about May 26, 2009, GMAC sent the plaintiffs a letter advising the, that

7  help might be available to them through the new Home Affordable Modification program

8  which is part of the initiative announced by President Obama.

9       44.    In conformity with their agreement with GMAC MORTGAGE, LLC., the

10 plaintiffs made the required $1,600.00 payments for the months of April, May and June of

11 2009.  GMAC MORTGAGE, LLC., accepted said payments on behalf of itself and/or

12 RESIDENTIAL FUNDING COMPANY, LLC., or RESIDENTIAL ASSET MORTGAGE

13 PRODUCTS, INC.  None of these funds were ever returned to the plaintiffs.

14      45.    Over the next 3 weeks, the plaintiffs attempted to contact GMAC to find out

15 what was happening with their application for the loan modification. On June 30, 2009, Ms.

16 Longoni sent another e-mail communication to Nate Stephenson asking for help. He

17 responded by saying that he had emailed his old department yesterday and they responded

18 that the file has been sent for final management approval. He further told her the person now

19 handling the matter was Landon Huck.  In response, Ms. Longoni asked for contact

20 information for Mr. Huck. Nate Stephenson responded by saying he couldn't give her that

21 information, however, he informed her that he did receive an email stating that the

22 modification was approved the prior day.

23      46.    In response to this information, the plaintiffs made numerous attempts to make

24 the next $1,600.00 on-line payment, however, all attempts were rejected. After numerous

25 attempts, plaintiff finally reached a live person on July 9, 2009, who informed her that their

26 modification was not approved, that they owed approximately $19,000.00, and that if

27 payment was not received, they would sell her home. In response, PAMELA D. LONGONI

28 immediately sent Nate Stephenson an email asking for his assistance.  Mr. Stephenson

1   advised her that they were trying to put her into an Obama Modification. He specifically told

2   her that her foreclosure was on hold, and that GMAC did not want to take her home. He told

3   her that they would try to do everything they could before they proceeded with foreclosure.

4   He further informed her that the Obama program was subsidized and allowed them to drop

5   payments to 31% of the borrower's gross income. Because of that it allowed them to be a

6   little more aggressive with their rates and debt forgiveness.

7         47.      Contrary to these representations, on July 15, 2009, GMAC removed the hold

8   which it placed on the foreclosure. GMAC thereafter instructed EXECUTIVE TRUSTEE

9   SERVICES, LLC., to proceed forward with the foreclosure sale.

10         48.      The following day, GMAC sent the plaintiffs a letter informing them that the

11   repayment plan had been cancelled because payment had not been received by the payment

12   due date "as specified in the signed repayment agreement." The plaintiffs had never signed

13   any "repayment agreement".

14         49.      In accordance with GMAC's instructions, and without any legal standing as

15   set forth herein above, on July 20, 2009, EXECUTIVE TRUSTEE SERVICES, LLC.,

16   prepared a Notice of Trustee's Sale, setting a sell date of August 14, 2009. Attached as

17   *Exhibit "2"* is a true, accurate and correct copy of this notice. EXECUTIVE TRUSTEE

18   SERVICES, LLC., caused this Notice to be recorded on July 23, 2009.

19         50.      Seven days later on July 30, 2009, GMAC sent a an "Obama" package to the

20   plaintiffs via federal express. The plaintiffs received that package on August 4, 2009. The

21   letter which accompanied this package informed the plaintiffs to submit a signed letter

22   explaining the cause of default (which they had done previously), to submit copies of two

23   most recent pay stubs, and a copy of their most recent federal tax return. The letter informed

24   them to allow five business days for GMAC to process the financial package. Notably, this

25   letter contained a notation at the bottom of the letter which said "30 days to sale." The

26   plaintiffs returned the requested information on August 10, 2009.

27         51.      On August 14, fifteen days after the date of this letter, EXECUTIVE

28   TRUSTEE SERVICES, LLC., sold the plaintiffs' home at auction.

14

1    52.    Because GMAC received payments following the filing of the original Notice

2    of Default, EXECUTIVE TRUSTEE SERVICES, LLC.,'s policies required it to

3    recommence the foreclosure process through the issuance of a new Notice of Default.

4    However, GMAC never informed EXECUTIVE TRUSTEE SERVICES, LLC., that it

5    received any such payments.  Therefore, EXECUTIVE TRUSTEE SERVICES, LLC., in

6    violation of its own internal policies, continued with the existing foreclosure.

7    53.    The Notice of Breach and Default and Election to Cause Sell of Real Property

8    Under Deed of Trust (Exhibit 1) prepared and recorded by EXECUTIVE TRUSTEE

9    SERVICES, LLC., failed to satisfy the provisions of N.R.S. 107.085, in that GMAC did not

10    provide plaintiffs with the notice specified in that section.

11    54.    Said Notice of Breach and Default and Election to Cause Sell of Real Property

12    Under Deed of Trust (Exhibit 1) also failed to satisfy the provisions of N.R.S. 107.086.

13    55.    Said Notice of Breach and Default and Election to Cause Sell of Real Property

14    Under Deed of Trust (Exhibit 1) was never served upon the plaintiffs PAMELA D.

15    LONGONI or JEAN M. GAGNON as required by N.R.S. 107.080.

16    56.    The defendants, and each of them, failed to provide the plaintiffs PAMELA

17    D. LONGONI and JEAN M. GAGNON with the notices which are required by law,

18    including, but not limited to, N.R.S. 107.080, 107.085, 107.086.

19    57.    On August 14, 2009, the defendants, and each of them acting individually and

20    on behalf of the others, and without legal standing to do so, sold or caused to be sold, the

21    plaintiffs' real property located at 5540 Twin Creeks Drive, Reno, Nevada, 89523, to a third

22    party. This property was sold without the proper advance notifications called for by N.R.S.

23    107.080, 107.085 and/or 107.086.

24    58.    On or about August 24, 2009, the plaintiff PAMELA D. LONGONI, again

25    contacted GMAC to determine the status of the new loan modification application. At that

26    time, she was for the first time informed that GMAC had gone forward with the foreclosure

27    that it had promised was on hold. At that time, PAMELA D. LONGONI was informed that

28    her home had already been sold to a third party and that there was nothing they could do

15

1    about it. The following day, August 25, 2009, the plaintiff learned through her daughter, that

2    a man had left a 5-day notice to vacate the premises on her porch.

3        59.    After the sale of the plaintiffs' home, one or more of the defendants sought to

4    recover the home back from the foreclosure sale purchaser.

5        60.    None of the defendants were able to recover the plaintiffs' home from the

6    foreclosure sale purchaser.

7        61.    In response to this notice, Ms. Longoni contacted the putative purchaser

8    seeking to recover her home. She was told that they had lawfully purchased the home and

9    that there was nothing she could do about it. She was told that if she vacated the premises

10   in a peaceful manner and left the property in tact, she would be paid the sum of $1,250.00.

11   Believing she had no choice in the matter, PAMELA D. LONGONI signed the agreement.

12   She was tendered a check in the amount of $1,250.00, however, said check was later

13   dishonored by the issuing bank.

14       62.    During the next five days, PAMELA D. LONGONI frantically searched for a

15   rental property to move into with her daughter LACEY LONGONI. After extensive efforts,

16   she was able to locate a home in the same school district where 5540 Twin Creeks Drive,

17   Reno, Nevada, 89523 was zoned. However, in order to gain the consent of the landlord to

18   lease said premises, PAMELA D. LONGONI was required to sign a two-year lease, and she

19   was required to have the lease co-signed by her former husband, and father of her daughters.

20       63.    On or about September 4, 2009, PAMELA D. LONGONI received a telephone

21   call from Michael Knapp, Esq., who advised her that he was counsel for GMAC. Mr. Knapp

22   stated to Ms. Longoni that "we've made a big mistake" and that she did not have to leave her

23   home. He further informed her that they were undertaking efforts to recover the home back.

24   PAMELA D. LONGONI informed Mr. Knapp that she had already moved from the property

25   and entered into a two-year lease on a substitute residential property. Mr. Knapp advised Ms.

26   Longoni that he was headed to the beach with his family, and that after the holiday weekend

27   he would contact her to discuss the matter further.

28       64.    The following week PAMELA D. LONGONI was contacted by Christy

16

1  Hancock, Esq., who sought information about the costs Ms. Longoni incurred in moving

2  from her home and in improving her home before the foreclosure. Ms. Hancock informed

3  PAMELA D. LONGONI that GMAC would reimburse her for these costs. Ms. Hancock

4  further informed Ms. Longoni that GMAC would take immediate steps to remove the

5  foreclosure from her credit history. Subsequently, GMAC or some other party, did in fact,

6  remove all references to this transaction from her credit history.

7      65.    Subsequently, however, the defendants, and each of them, through their

8  retained counsel, have refused to acknowledge their violations of Nevada law and have

9  instead sought to blame PAMELA D. LONGONI for losing her home.

10      66.    In the weeks which followed this unlawful eviction, PAMELA D. LONGONI

11  discovered that the defendants had unlawfully foreclosed upon her home, and they

12  unlawfully evicted her from the property. She made repeated requests for GMAC to recover

13  her home and return her and her family to their prior residence. GMAC refused, and

14  continues to refuse to return the plaintiffs to their home.

### FIRST CLAIM FOR RELIEF

**(Violation of N.R.S. 107.080, 107.085, 107.086, 107.087, 107.090)**

17      67.    Plaintiffs reallege each and every allegation as contained above and incorporate

18  them by reference as if fully set forth herein.

19      68.    At all times relevant hereto, there was in force and effect, certain Nevada

20  statutes, including, but not limited to, N.R.S. 107.080, N.R.S. 107.085, N.R.S. 107.086

21  N.R.S. 107.087 and N.R.S. 107.090, which regulate the manner in which non-judicial

22  foreclosures may be conducted in the State of Nevada. Among other things, these statutes

23  set time limits on when a non-judicial foreclosure can be conducted, the manner in which the

24  non-judicial foreclosure can be conducted, and the notices which must be provided to those

25  grantors or others with an interest in the subject property before any sale can be conducted.

26  These statutes were enacted to protect people in a class of which the plaintiffs were members,

27  and said statutes were intended to protect the plaintiffs from the very harm they have suffered

28  as a proximate result of the conduct of the defendants, and each of them.

Case 3:10-cv-00297-LRH -VPC    Document 85    Filed 09/12/11    Page 18 of 40

69.    Because GMAC MORTGAGE, LLC., proposed and agreed to a loan modification, and accepted payments from the plaintiffs in accordance with this loan agreement, the non-judicial foreclosure proceedings which commenced on February 25, 2009, were rendered null and void. Despite that fact, and despite GMAC's promises that it would not foreclose upon the plaintiffs' property, GMAC and EXECUTIVE TRUSTEE SERVICES, LLC., proceeded forward with the foreclosure sale.

70.    Defendant GOWEN swore to, under oath, and caused to be filed with the Washoe County Recorder, in Nevada, a "Trustee's Deed of Sale," dated August 14th, 2009, and file stamped August 26th, 2009, under which GOWEN represented that the trustee had complied with all applicable statutory requirements of the State of Nevada, and performed all duties required by the Deed of Trust. Attached as *Exhibit "3"* is a true, accurate and correct copy of this notice. This was intentional or reckless misrepresentation, since GOWEN knew or should have known that" 1) the Trustee had not complied with all applicable statutory requirements, and that 2) all duties required by the Deed of Trust had not been extinguished.

71.    At the times the defendants undertook the process of non-judicial foreclosure, none of the defendants owned, possessed, or had any legal right to the Promissory Note or the Deed of Trust. In addition, none of the defendants had the authority to undertake any act in furtherance of the non-judicial foreclosure. Therefore, the foreclosure was wrongful and unlawful and in violation of Nevada law.

72.    The defendants, and each of them, by way of the above described acts and/or omissions, violated the provisions of the following Nevada Revised Statutes:

    a)  N.R.S. 107.080,

    b)  N.R.S. 107.085,

    c)  N.R.S. 107.086,

    d)  N.R.S. 107.087, and

    e)  N.R.S. 107.090.

73.    As a direct and proximate result of the wrongful acts of the defendants, and

1   each of them, the plaintiffs have suffered the permanent loss of their home and real property,

2   as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

3   of the property, the future value and earning capacity of said property, the loss of the use and

4   enjoyment of said property, and the loss of all improvements made to that property over the

5   past 14 plus years, all in an amount in excess of TEN THOUSAND DOLLARS

6   ($10,000.00).

7       73.   As a further direct and proximate result of the wrongful acts of the defendants

8   and each of them, the plaintiffs have been forced to incur costs associated with obtaining

9   replacement housing, including, but not necessarily limited to, moving and storage expenses,

10   rental charges, household furnishings, increased travel costs and increased utility bills and

11   expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

12       74.   As a further direct and proximate result of the wrongful acts of the defendants,

13   and each of them, the plaintiffs have suffered severe and disabling emotional distress and

14   anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

15   all to the Plaintiffs' general damages in an amount in excess of TEN THOUSAND

16   DOLLARS ($10,000.00).

17       75.   In doing the acts alleged herein, the defendants, and each of them acted, with

18   deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

19   such are guilty of oppression, thus warranting the imposition of exemplary and punitive

20   damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

21       76.   The plaintiffs have been required to retain the services of ERICKSON,

22   THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

23   future, incur expenses and costs and attorney's fees for which they are entitled to recover.

24   The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

### SECOND CLAIM FOR RELIEF

#### (Violation of N.R.S. 205.372)

27       77.   Plaintiffs reallege each and every allegation as contained above and incorporate

28   them by reference as if fully set forth herein.

19

78.    At all times relevant hereto, there was in force and effect, certain Nevada statutes, including, but not limited to, N.R.S. 205.372 which makes it a crime for a person who, with intent to defraud a participant in a mortgage lending transaction, knowingly makes a false statement or misrepresentation concerning a material fact, or deliberately conceals or fails to disclose a material fact, as part of a mortgage lending transaction, or files, or causes to be filed, with a county recorder, any document that the person knows to include a misstatement, misrepresentation or omission concerning a material fact. These statutes were enacted to protect people in a class of which the plaintiffs were members, and said statutes were intended to protect the plaintiffs from the very harm they have suffered as a proximate result of the conduct of the defendants, and each of them. Therefore, a violation of this statute constitutes Negligence Per Se.

79.    Acting within the scope of their employment for EXECUTIVE TRUSTEE SERVICES, LLC., and as an agent of GMAC MORTGAGE, LLC., and/or RESIDENTIAL COMPANY, INC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., the defendants ILLENNA PETERSON and KATHLEEN GOWEN, made false statements and/or misrepresentations and recorded, or caused to be recorded with the Washoe County Recorder, documents that they knew included a misstatement, misrepresentation or omission of a material fact.

80.    Among other misrepresentations, the "Notice of Breach and Default and of Election to Cause sell (sic) of Real Property Under Deed of Trust" provides that "a breach of and default in the obligations for which such Deed of Trust and security has occurred, or that payment has not been made of ... ." (*See Exhibit 1*). This constitutes a violation of NRS 205.372(1)(e).

81.    Among other misrepresentations, the "Notice of Trustee's Sale" provides that the borrowers "are in default under a Deed of Trust". This is not correct. Further, proper notice was never provided of this Notice of Trustee's Sale. This also violates various provisions of NRS 205.372, et seq. (See Exhibit 2).

82.    By way of further example, the "Trustee's Deed Upon Sale" also filed with the

20

1    County Recorder, provides that all applicable statutory requirements and all duties required

2    by the Deed of Trust have been performed. This is false and violates NRS 205.372, et seq.

3        83.    The false representations within these documents filed with the County

4    Recorder, made with knowledge or belief of their falsity, were part of a scheme which

5    included assurances of the loan modification and lack of danger of foreclosure, which were

6    intended to induce the reliance of the plaintiffs, and lull them into a sense of security, while

7    the fraudulently filed documents expedited the wrongful sale of their home, to the

8    Defendants' profit.

9        84.    The plaintiffs relied upon these misrepresentations of the finalized loan

10    modification, and absence of danger of foreclosure to their detriment.

11        85.    By such actions, by such misrepresentations, and by such filing of documents

12    with the County Recorder, which included misrepresentations, misstatements, and omissions

13    of material fact, the defendants acted with an intent to defraud the participant in the mortgage

14    lending transaction through the eventual wrongful sale of the plaintiffs' home without

15    process of law.

16        86.    As a direct and proximate result of the actions of these defendants and/or

17    KATHLEEN GOWEN, the plaintiffs' real property was purportedly sold at a public auction

18    on or about August 14, 2009. As a further direct and proximate result of the actions of

19    ILLEANNA PETERSON, the plaintiffs were wrongfully ousted and ejected from their

20    lawful residence and real property.

21        87.    As a direct and proximate result of the wrongful acts of the defendants, and

22    each of them, the plaintiffs have suffered the permanent loss of their home and real property,

23    as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

24    of the property, the future value and earning capacity of said property, the loss of the use and

25    enjoyment of said property, and the loss of all improvements made to that property over the

26    past 14 plus years, all in an amount in excess of TEN THOUSAND DOLLARS

27    ($10,000.00).

28        88.    As a further direct and proximate result of the wrongful acts of the defendants

21

1   and each of them, the plaintiffs have been forced to incur costs associated with obtaining

2   replacement housing, including, but not necessarily limited to, moving and storage expenses,

3   rental charges, household furnishings, increased travel costs and increased utility bills and

4   expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

5        89.    As a further direct and proximate result of the wrongful acts of the defendants

6   and each of them, the plaintiffs have suffered severe and disabling emotional distress and

7   anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

8   all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

9   DOLLARS ($10,000.00).

10       90.    In doing the acts alleged herein, the defendants and each of them acted with

11  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

12  such, are guilty of oppression, thus warranting the imposition of exemplary and punitive

13  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14       91.    The plaintiffs have been required to retain the services of ERICKSON,

15  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

16  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

17  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

18                        **THIRD CLAIM FOR RELIEF**

19                        **(Fraud and Misrepresentation)**

20       92.    Plaintiffs reallege each and every allegation as contained above and incorporate

21  them by reference as if fully set forth herein.

22       93.    As set forth above, the defendants, and each of them, provided false

23  representations of material fact, with either the knowledge or belief of such falsity, or without

24  sufficient foundation.  These representations included telling the plaintiff Longoni that

25  plaintiffs' loan modification was permanently approved, and that plaintiffs' loan payments

26  would be the amount of $1,600.00 per month, commencing in April of 2009, and that GMAC

27  would not foreclose upon her home. These misrepresentations included previously described

28  communications regarding the retraction of the permanently approved loan for a "trial

22

1   modification" only, subsequent representation indicating that the loan had again been

2   permanently approved, communications and representations concerning reduction in the

3   principal loan amount of approximately $169,000.00, representations regarding the need to

4   place plaintiffs into an "Obama Modification Plan", representations regarding the need to

5   submit a new loan modification application and supporting documentation, representations

6   that any effort to foreclose on the property had been placed on hold, and that "GMAC does

7   not want to take your home", as well as the omission to provide plaintiffs with requested

8   information as to whether new loans had in fact been approved, accepted, or declined, all as

9   previously described above.

10          94.     These false representations were made with the intent to induce the plaintiffs'

11  reliance, and the plaintiffs did, in fact, justifiably rely upon these false representations, to

12  their detriment. Such reliance is reflected by the above-described mortgage payments made

13  under the "permanently approved" loan modification, the last of which was rejected without

14  explanation. The plaintiffs further relied to their detriment upon these representations by not

15  undertaking more aggressive actions to qualify under an additional loan modification

16  program, by not making preparations to leave their home, thus forcing them to incur all the

17  additional cost and trouble of finding replacement housing with no notice. This detriment

18  was also reflected by the fact that, in spite of said payments, the plaintiffs lost their home.

19          95.     Fraudulent intent is also reflected by the fact that at the same time the

20  defendants were making the above-described false representations, they were, in fact,

21  proceeding on a course of foreclosure by denying the plaintiffs a myriad of statutory

22  protections regarding their mortgage and their home, including proper notices, the right and

23  opportunity to participate in the Nevada mandatory mediation process, while also filing

24  documents with the Washoe County Recorder containing false statements which were used

25  to expedite the sale of the home without the plaintiffs' knowledge. In addition, the

26  defendants were actively seeking to sell the plaintiffs' home pursuant to the Notice of Default

27  which it knew, or in the exercise of reasonable care, would have known, was defective thus

28  requiring the recommencement of the foreclosure process.

                                             23

1    96.    The plaintiffs' reliance was justifiable.

2    97.    Damages resulted from this reasonable reliance. The defendants' above-
3    described misrepresentations proximately caused all of the plaintiffs' damages.

4    98.    As a direct and proximate result of the actions of the defendants and each of
5    them, the plaintiffs' real property was sold at a public auction on or about August 14, 2009.
6    As a further direct and proximate result of the actions of the defendants and each of them,
7    the plaintiffs were wrongfully ousted and ejected from their lawful residence and real
8    property.

9    99.    As a direct and proximate result of the wrongful acts of the defendants, and
10    each of them, the plaintiffs have suffered the permanent loss of their home and real property,
11    as well as all attributes thereto, including, but not necessarily limited to, the loss of the value
12    of the property, the future value and earning capacity of said property, the loss of the use and
13    enjoyment of said property, and the loss of all improvements made to that property over the
14    past 14 plus years all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

15    100.    As a further direct and proximate result of the wrongful acts of the defendants
16    and each of them, the plaintiffs have been forced to incur costs associated with obtaining
17    replacement housing, including, but not necessarily limited to, moving and storage expenses,
18    rental charges, household furnishings, increased travel costs and increased utility bills and
19    expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

20    101.    As a further direct and proximate result of the wrongful acts of the defendants
21    and each of them, the plaintiffs have suffered severe and disabling emotional distress and
22    anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry
23    all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND
24    DOLLARS ($10,000.00).

25    102.    In doing the acts alleged herein, the defendants and each of them acted with
26    deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as
27    such are guilty of oppression thus warranting the imposition of exemplary and punitive
28    damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

1     103.   The plaintiffs have been required to retain the services of ERICKSON,

2  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

3  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

4  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

5                    **FOURTH CLAIM FOR RELIEF**

6             **(Negligence and Negligent Misrepresentation)**

7     104.   Plaintiffs reallege each and every allegation as contained above and incorporate

8  them by reference as if fully set forth herein.

9     105.   The defendants, and each of them, owed a duty to the plaintiffs to refrain from

10  any conduct which unlawfully interfered with the plaintiffs' rights to peaceful occupancy of

11  the residence and real property.  The defendants, and each of them, breached said duty by

12  acting in a negligent fashion proximately causing the plaintiffs' home to be unlawfully sold

13  to a third party, and proximately causing the plaintiffs to be unlawfully ousted and ejected

14  from the home.

15     106.   Defendants, and each of them, had a duty of care regarding foreclosure

16  proceedings, such minimum duty pertaining to foreclosures defined by Nevada Revised

17  Statutes 107.080 through NRS 107.100.  In addition, the defendant GMAC MORTGAGE,

18  LLC., knew that it had agreed to a loan modification pursuant to which it received further

19  loan payments, thereby invalidating the Notice of Default which it had previously caused to

20  be prepared and recorded.  The defendant EXECUTIVE TRUSTEE SERVICES, LLC.,

21  knew, or through the exercise of reasonable care, should have known, that the plaintiffs had

22  made further payments to the modified Promissory Note, thereby invalidating the original

23  Notice of Default.

24     107.   As delineated above, the defendants, and each of them, violated these statutes

25  which established the duty and breach elements of negligence in that the plaintiffs belonged

26  to that class of persons the statutes were intended to protect, and the injury described above

27  is of the type against which the statute was intended to protect.  The defendants further

28  breached their general standard of care to the plaintiffs to conduct a foreclosure only when

1  they had the proper authority and standing, and in compliance with all Nevada statutes.

2     108.   As a proximate result of these statutory and other violations, plaintiffs have

3  sustained damages.

4     109.   At the time the power of sale was exercised, or that foreclosure occurred, the

5  defendants lacked the legal right to proceed forward with any non-judicial foreclosure.

6  Moreover, there was no breach of condition or failure to perform which existed on the

7  plaintiffs' part, which would have authorized the foreclosure or exercise of the power of sale.

8     110.   Defendants, and each of them, in the course of their business, profession or

9  employment, or in any other action in which they had a pecuniary interest, supplied false

10  information for the guidance of the defendants in their business transactions.

11     111.   The defendants, and each of them, failed to exercise reasonable care or

12  competence in obtaining and communicating such information.

13     112.   The plaintiffs justifiably relied upon such information to their legal and

14  pecuniary law which was caused thereby.

15     113.   Defendants, and each of them, gratuitously or for consideration, rendered

16  services to the plaintiffs which the defendants should have recognized as being necessary for

17  the protection of the plaintiffs, or the plaintiffs' possessions.

18     114.   Defendants, and each of them, are subject to liability to the plaintiffs for the

19  physical harm resulting from their failure to exercise reasonable care to perform this

20  undertaking – in particular, the represented loan modification – in that the defendants' failure

21  to exercise such care increased the risk of harm and foreclosure to the plaintiffs.

22     115.   The harm to the plaintiffs was suffered because of the plaintiffs' reliance upon

23  the defendants' undertaking regarding the mortgage services and modification.

24     116.   Through the above-described actions concerning representations of permanent

25  loan modification, and subsequent wrongful and fraudulent foreclosure of said home,

26  defendants' conduct is extreme and outrageous.

27     117.   As a result of the wrongful foreclosure, and other actions described herein,

28  plaintiffs have suffered emotional distress causing a physical impact and physical

1   manifestation.

2      118.   As a direct and proximate result of the wrongful acts of the defendants, and

3   each of them, the plaintiffs have suffered the permanent loss of their home and real property,

4   as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

5   of the property, the future value and earning capacity of said property, the loss of the use and

6   enjoyment of said property, and the loss of all improvements made to that property over the

7   past 14 plus years all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

8      119.   As a further direct and proximate result of the wrongful acts of the defendants

9   and each of them, the plaintiffs have been forced to incur costs associated with obtaining

10   replacement housing, including, but not necessarily limited to, moving and storage expenses,

11   rental charges, household furnishings, increased travel costs and increased utility bills and

12   expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

13      120.   As a further direct and proximate result of the wrongful acts of the defendants

14   and each of them, the plaintiffs have suffered severe and disabling emotional distress and

15   anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

16   all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

17   DOLLARS ($10,000.00).

18      121.   In doing the acts alleged herein, the defendants and each of them acted with

19   deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

20   such are guilty of oppression thus warranting the imposition of exemplary and punitive

21   damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

22      122.   The plaintiffs have been required to retain the services of ERICKSON,

23   THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

24   future, incur expenses and costs and attorney's fees for which they are entitled to recover.

25   The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

26                             **FIFTH CLAIM FOR RELIEF**

27                               **(Breach of Contract)**

28      123.   Plaintiffs reallege each and every allegation as contained above and incorporate

1   them by reference as if fully set forth herein.

2       124.   The plaintiffs entered into a contract with EquiFirst Corporation which contract

3   included a Promissory Note and Deed of Trust.  That contract contained certain provisions

4   relating to actions which may have be taken should the plaintiffs fail to fulfill their obligation

5   to make periodic payments on the mortgage.  These promises were binding upon and

6   enforceable against all who assumed the rights and liabilities under the Note and Deed of

7   Trust, including the defendants, and each of them.

8       125.   For example, the Deed of Trust provides under Subsection 15, that notices

9   required by the security agreement shall satisfy the applicable law.

10      126.   Subsection 16 of the Deed of Trust, (attached hereto as Exhibit 4) provides that

11  the security instrument is governed by the federal law, and the law of the jurisdiction in

12  which the property is located, and that all rights and obligations contained in the security

13  agreement are subject to the requirements and limitations of such law.

14      127. · Through the above-described conduct, including multiple violations of Nevada

15  statutes designed to protect plaintiffs from wrongful foreclosures, defendants, and each of

16  them, breached, in part and not limited thereto, the remedies and notice provisions, as well

17  as provisions regarding the sale of property at public auction within Section 22 of said Deed

18  of Trust.

19      129.   Moreover, the Adjustable Rate Note (attached hereto as Exhibit "5")

20  incorporates by reference the Deed of Trust, at Section 11, as well as the protections given

21  to the note holder therein.

22      130.   Vis-a-vis the above-described conduct, defendants have violated, in part and

23  not limited thereto, the terms of that incorporated Deed of Trust as applicable to the

24  Adjustable Rate Note, as well as notice provisions within Section 7(C), Section 8, and

25  Section 11 of the Adjustable Rate Note.

26      131.   The plaintiffs are informed and believe and thereupon allege that the

27  Defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY,

28  LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., assumed, or were

1   assigned, all the duties and obligations which EquiFirst Corporation owed to the plaintiffs

2   under the loan agreement.

3       132.   The defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL

4   FUNDING COMPANY, INC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS,

5   INC., breached said contracts with the plaintiffs when they wrongfully and unlawfully

6   constructively seized and sold the plaintiffs' real property and residence.

7       133.   In addition, and not by way of limitation, the defendants, through their above-

8   described conduct, breached an express and implied in fact agreement concerning permanent

9   approval of the loan modification.   A meeting of the minds occurred regarding this

10   permanently approved loan modification, as reflected both by written communication and the

11   conduct of the parties, showing, in light of the surrounding circumstances, their express and

12   tacit understandings.

13       134.   This understanding is evidenced, in part, by payment of, and acceptance of, the

14   reduced and modified loan amount as agreed upon by the parties.

15       135.   The plaintiffs performed by tendering these modified loan amounts from April

16   through July of 2009.  In spite of various oral and email correspondence regarding the terms

17   of the permanently approved loan modification, the defendants, and each of them, breached

18   the same.

19       136.   Breach of the Promissory Note, Deed of Trust, and subsequent express and

20   implied in fact agreements pertaining to permanently approved loan modifications, were also

21   breached by failure to comply with the above-described Nevada statutes designed to protect

22   the homeowners.

23       137.   Nevada implies a covenant of good faith and fair dealing into every contract.

24       138.   Defendants, by failing to comply with the loan modification agreement and the

25   promise not to foreclose upon the plaintiffs' property and by selling the property in question,

26   with malice, and not complying with statutory notice requirements, and other statutory

27   requirements, breached the implied covenant of good faith and fair dealing implied within

28   every contract in Nevada.

139.    As a direct and proximate result of the breach of contract, the plaintiffs have suffered the permanent loss of their home and real property, as well as all attributes thereto, including, but not necessarily limited to, the loss of the value of the property, the future value and earning capacity of said property, the loss of the use and enjoyment of said property, and the loss of all improvements made to that property over the past 14 plus years all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

140.    As a further direct and proximate result of the breach of the contract, the plaintiffs have been forced to incur costs associated with obtaining replacement housing, including, but not necessarily limited to, moving and storage expenses, rental charges, household furnishings, increased travel costs and increased utility bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

141.    The plaintiffs have been required to retain the services of ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the future, incur expenses and costs and attorney's fees for which they are entitled to recover. The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

## SIXTH CLAIM FOR RELIEF

### (Tortious Breach of The Implied Covenant of Good Faith and Fair Dealing)

### NOTE:

**The plaintiffs have included this claim for relief for appeal purposes only. Previously, the Court dismissed this claim pursuant to Document 52, and it appears that ruling would apply with equal force to all newly named defendants.**

142.    Plaintiffs reallege each and every allegation as contained above and incorporate them by reference as if fully set forth herein.

143.    The plaintiffs entered into a contract with EquiFirst Corporation which contract included a Promissory Note and Deed of Trust. That contract contained certain provisions relating to actions which may be taken should the plaintiffs fail to fulfill their obligation to make periodic payments on the mortgage. Implied into this contract is an implied covenant of good faith and fair dealing which requires each party to engage in no conduct which will

1    deprive the other party of the rights and benefits of said contract. Subsequently, the plaintiffs

2    PAMELA D. LONGONI and JEAN GAGNON entered into a binding loan modification

3    agreement which the parties partially performed.

4         144.    By reason of the relationship between the parties wherein the plaintiffs were

5    in a vastly inferior bargaining position, where the defendant GMAC had made promises and

6    agreements which it knew, or should have known, would be relied upon by the plaintiffs, and

7    because the defendants had failed to comply with certain statutes regulating the assignment

8    of mortgage rights, the defendant occupied a position of trust and reliance vis-a-vis the

9    plaintiffs. Therefore, there exists a special relationship of trust and reliance akin to a

10   fiduciary relationship.

11        145.    The above-described relationship is one of those situations involving an

12   element of reliance generating a need to protect the weak from the insults of the strong, that

13   is not adequately met by ordinary contract damages.

14        146.    The defendants, and each of them, were in a vastly superior or entrusted

15   position as compared to the plaintiffs, and have engaged in grievous or perfidious

16   misconduct.

17        147.    This superior/inferior power differential created a special element of reliance

18   on the credibility of the defendants and lenders concerning the permanently approved loan

19   modification, and promise not to foreclose without adequate notice and due process of law.

20        148.    The plaintiffs are informed and believe and thereupon allege that the Defendant

21   GMAC MORTGAGE, LLC., purportedly assumed or was assigned all the rights, duties and

22   obligations which EquiFirst Corporation owed to the plaintiffs under the loan agreement.

23        149.    The defendant GMAC MORTGAGE, LLC., breached said contracts with the

24   plaintiffs when it wrongfully and unlawfully constructively seized and sold the plaintiffs' real

25   property and residence. Because of the nature of the relationship between the parties and the

26   unique nature of real property, and because contractual damages will not make the plaintiffs

27   whole, an award of tort damages is appropriate under Nevada law.

28        150.    As a direct and proximate result of the breach of contract and breach of the

31

1  implied covenant of good faith and fair dealing, the plaintiffs have suffered the permanent

2  loss of their home and real property, as well as all attributes thereto, including, but not

3  necessarily limited to, the loss of the value of the property, the future value and earning

4  capacity of said property, the loss of the use and enjoyment of said property, and the loss of

5  all improvements made to that property over the past 14 plus years all in an amount in excess

6  of TEN THOUSAND DOLLARS ($10,000.00).

7      151.  As a further direct and proximate result of the breach of the contract and breach

8  of the implied covenant of good faith and fair dealing, the plaintiffs have been forced to incur

9  costs associated with obtaining replacement housing, including, but not necessarily limited

10  to, moving and storage expenses, rental charges, household furnishings, increased travel

11  costs and increased utility bills and expenses all in an amount in excess of TEN THOUSAND

12  DOLLARS ($10,000.00).

13      152.  As a further direct and proximate result of the wrongful acts of the defendants

14  and each of them, the plaintiffs have been forced to incur costs associated with obtaining

15  replacement housing, including, but not necessarily limited to, moving and storage expenses,

16  rental charges, household furnishings, increased travel costs and increased utility bills and

17  expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

18      153.  As a further direct and proximate result of the wrongful acts of the defendants

19  and each of them, the plaintiffs have suffered severe and disabling emotional distress and

20  anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

21  all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

22  DOLLARS ($10,000.00).

23      154.  In doing the acts alleged herein, the defendants and each of them acted with

24  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

25  such are guilty of oppression thus warranting the imposition of exemplary and punitive

26  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

27      155.  The plaintiffs have been required to retain the services of ERICKSON,

28  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

1    future, incur expenses and costs and attorney's fees for which they are entitled to recover.

2    The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

3    ## SEVENTH CLAIM FOR RELIEF

4    **(Breach of Covenant of Quiet Enjoyment)**

5    **NOTE:**

6    **The plaintiffs have included this claim for relief for appeal purposes only.**

7    **Previously, the Court dismissed this claim pursuant to Document 52, and it appears**

8    **that ruling would apply with equal force to all newly named defendants.**

9    156.    Plaintiffs reallege each and every allegation as contained above and incorporate

10    them by reference as if fully set forth herein.

11    157.    At all times relevant hereto, the plaintiffs PAMELA D. LONGONI and JEAN

12    M. GAGNON were the lawful owners of the real property and residence located at 5540

13    Twin Creeks Drive, Reno, Nevada, 89523. In addition, the plaintiff LACEY LONGONI was

14    a lawful resident of said real property and residence.

15    158.    Into every real property sales transaction, the law implies a covenant that said

16    owners and lawful occupants of said property shall have peaceful and quiet enjoyment and

17    possession of said premises.

18    159.    The covenant of quiet enjoyment is the grantor's promise that the grantee's

19    possession will not be disturbed by any other claimant with a superior title.

20    160.    The covenant of quiet enjoyment runs with the land.

21    161.    The covenant of quiet enjoyment includes a covenant against disturbance by

22    an encumbrancer.

23    162.    The covenant of quiet enjoyment requires the grantor to protect the grantee

24    against lawful claims of ownership asserted by third persons, and comes to fruition once

25    there has been a disturbance in possession by actual or constructive eviction.

26    163.    The defendants, and each of them, by all actions taken to foreclose upon the

27    plaintiffs' real property and by selling said property to a third party, breached the implied

28    covenant of quiet enjoyment and as such are legally liable for all damages proximately

33

1   caused by said conduct.

2      164.   As a direct and proximate result of the wrongful acts of the defendants, and

3   each of them, the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON have suffered

4   the permanent loss of their home and real property, as well as all attributes thereto, including,

5   but not necessarily limited to, the loss of the value of the property, the future value and

6   earning capacity of said property, the loss of the use and enjoyment of said property, and the

7   loss of all improvements made to that property over the past 14 plus years all in an amount

8   in excess of TEN THOUSAND DOLLARS ($10,000.00).

9      165.   As a further direct and proximate result of the wrongful acts of the defendants,

10   and each of them, the plaintiffs have been forced to incur costs associated with obtaining

11   replacement housing, including, but not necessarily limited to, moving and storage expenses,

12   rental charges, household furnishings, increased travel costs and increased utility bills and

13   expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14      166.   As a further direct and proximate result of the wrongful acts of the defendants,

15   and each of them, the plaintiffs have suffered severe and disabling emotional distress and

16   anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

17   all to the Plaintiffs' general damages in an amount in excess of TEN THOUSAND

18   DOLLARS ($10,000.00).

19      167.   In doing the acts alleged herein, the defendants, and each of them, acted with

20   deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

21   such are guilty of oppression thus warranting the imposition of exemplary and punitive

22   damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

23      168.   The plaintiffs have been required to retain the services of ERICKSON,

24   THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

25   future, incur expenses and costs and attorney's fees for which they are entitled to recover.

26   The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

27                     **EIGHTH CLAIM FOR RELIEF**

28             **(Intentional Infliction of Emotional Distress)**

34

1    169.    Plaintiffs reallege each and every allegation as contained above and incorporate

2    them by reference as if fully set forth herein.

3    170.    By way of the above-described actions and omissions, the Defendants' conduct

4    was extreme and outrageous with the intention of, or reckless regard for, causing emotional

5    distress.

6    171.    Plaintiffs have suffered severe and extreme emotional distress with physical

7    manifestations of such distress.

8    172.    The defendants' above-described actions and omissions were the actual or

9    proximate causation of this emotional distress.

10    173.    The above-described foreclosure and wrongful ousting of the plaintiffs from

11    the family home was an invasion of the property owners' rights which occurred under

12    circumstances of malice, willfulness, wantonness, and inhumanity.

13    174.    The defendants', and each of them, wrongful acts and foreclosure were a

14    wilful use of power with the expectation to humiliate and distress the mortgagors and

15    plaintiffs.

16    175.    In doing the acts alleged herein, the defendants engaged in conduct that they

17    knew, or should have known and expected, would cause the plaintiffs to suffer and which

18    did, in fact, cause the plaintiffs to suffer severe mental and emotional pain, grief, sorrow,

19    anger, worry, and anxiety all to the plaintiffs' general damages in an amount in excess of

20    TEN THOUSAND DOLLARS ($10,000.00).

21    176.    In doing the acts alleged herein, the defendants, and each of them, acted with

22    deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

23    such are guilty of oppression thus warranting the imposition of exemplary and punitive

24    damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

25    177.    The plaintiffs have been required to retain the services of ERICKSON,

26    THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

27    future, incur expenses and costs and attorney's fees for which they are entitled to recover.

28    The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

## NINTH CLAIM FOR RELIEF

### (Promissory Estoppel)

178.    Plaintiffs reallege each and every allegation as contained above and incorporate them by reference as if fully set forth herein.

179.    The defendants, as the parties to be estopped, were apprised of the true facts. The defendants made representations that they knew, or should have known would be relied upon by the plaintiffs, and which were, in fact, relied upon by the plaintiffs to their legal detriment.

180.    The defendants intended that their conduct and misrepresentations would be acted upon, and acted in a fashion which would otherwise justify the plaintiffs' right to believe that the defendants so intended.

181.    The plaintiffs were ignorant of the true state of facts, especially in light of the defendants' intentional representations regarding loan modification and their intent not to foreclose upon the plaintiffs' property.

182.    The plaintiffs relied to their detriment on the defendants' conduct and misrepresentations.

183.    In making the representations as alleged above, the employees and agents of GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., knew, or in the exercise of reasonable care, should have known that said representations would be relied upon by the plaintiffs who did, in fact, rely to their detriment upon said statements and representations. Under the principles of equity, said representations are therefore binding and enforceable against GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.

184.    The defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., failed to perform the promises and guarantees which they made to the plaintiffs when they wrongfully and unlawfully constructively seized and sold the plaintiffs' real property

1    and residence and refused to modify the plaintiffs' existing Promissory Note.

2        185.    As a direct and proximate result of the defendants failure to perform their

3    promises and guarantees, the plaintiffs have suffered the permanent loss of their home and

4    real property, as well as all attributes thereto, including, but not necessarily limited to, the

5    loss of the value of the property, the future value and earning capacity of said property, the

6    loss of the use and enjoyment of said property, and the loss of all improvements made to that

7    property over the past 14 plus years all in an amount in excess of TEN THOUSAND

8    DOLLARS ($10,000.00).

9        186.    As a further direct and proximate result of the defendants' failure to perform

10    its promises and guarantees, the plaintiffs have been forced to incur costs associated with

11    obtaining replacement housing, including, but not necessarily limited to, moving and storage

12    expenses, rental charges, household furnishings, increased travel costs and increased utility

13    bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14        187.    The plaintiffs have been required to retain the services of ERICKSON,

15    THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

16    future, incur expenses and costs and attorney's fees for which they are entitled to recover.

17    The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

18                            **TENTH CLAIM FOR RELIEF**

19                        **(Concert of Actions against All Defendants)**

20        188.    Plaintiffs    reallege each and every allegation as contained above and

21    incorporates them by reference as if fully set forth herein.

22        189.    By and through the above described behavior and actions, defendants, and each

23    of them, committed a tortuous acts in concert with one another and/or pursuant to a common

24    design, plan design or scheme with one another, or;

25        190.    Each of these defendants knew that the others' conduct constituted a breach

26    of duty and gave substantial assistance or encouragement to the other so to conduct, or;

27        191.    Each of these named defendants gave substantial assistance to the other in

28    accomplishing the tortuous result and each of their own conduct, separately considered,

1  constituted a breach of duty to the plaintiffs, and/or;

2      192.    Each of the defendants conspired to create separate entities in order to shield

3  and hide from public scrutiny their wrongful actions, and to attempt to avoid legal liability

4  for conduct which they knew, or should have known, was unlawful or wrongful,

5      193.    As a direct and proximate result of the above described concert of actions, the

6  plaintiffs have suffered and continue to suffer the permanent loss of their home and real

7  property, as well as all attributes thereto, including, but not necessarily limited to, the loss

8  of the value of the property, the future value and earning capacity of said property, the loss

9  of the use and enjoyment of said property, and the loss of all improvements made to that

10  property over the past 14 plus years all in an amount in excess of TEN THOUSAND

11  DOLLARS ($10,000.00).

12      194.    As a further direct and proximate result of the defendants' failure to perform

13  their promises and guarantees, the plaintiffs have been forced to incur costs associated with

14  obtaining replacement housing, including, but not necessarily limited to, moving and storage

15  expenses, rental charges, household furnishings, increased travel costs and increased utility

16  bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

17      195.    In doing the acts alleged herein, the defendants, and each of them, acted with

18  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

19  such, are guilty of oppression thus warranting the imposition of exemplary and punitive

20  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

21      196.    The plaintiffs have been required to retain the services of ERICKSON,

22  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

23  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

24  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

25      WHEREFORE, the plaintiffs, individually, and PAMELA D. LONGONI, in her

26  representative capacity, pray for judgment against the Defendants, and each of them, jointly

27  and severally, as follows:

28      1.    For special damages for all damages associated with the loss of their real

38

1   property and residence and related items when the same are ascertained;

2       2.      For general damages in a sum in excess of TEN THOUSAND DOLLARS

3   ($10,000.00);

4       3.      For exemplary damages in an amount in excess of TEN THOUSAND

5   DOLLARS ($10,000.00);

6       4.      For interest pursuant to statute; and

7       5.      For such other and further relief as this Court may deem equitable and just.

8   **Plaintiffs hereby demand a jury on all issues.**

9   DATED this 12th day of September, 2011.

10                          ERICKSON, THORPE & SWAINSTON, LTD.
                            99 West Arroyo Street
11                          P. O. Box 3559
                            Reno, Nevada 89505
12

13                          By_____
                               THOMAS P. BEKO, ESQ.
14                               *Attorney for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2      Pursuant to FRCP 5(b), I certify that I am an employee of ERICKSON, THORPE &

3   SWAINSTON, LTD. and that on this day I personally served a true and correct copy of the attached

4   document by:

5      ☐   U.S. Mail
       ☐   Facsimile Transmission
6      ☐   Personal Service
7      ☐   Messenger Service
8      ☒   CM/ECF System

9   addressed to the following:

10  David Hill Bahford
    Bradley Arant Boult Cummungs LLP
11  100 N. Tyron Street, Suite 2690
    Charlotte, NC 28202
12  *Attorney for Defendants GMAC Mortgage, LLC,*
    *Executive Trustee Services, LLC,*
13  *Illeanna Peterson and Kathleen Gowen*

14      DATED this ___12th___ day of September, 2011.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Claim No. 2297</u>**

Claim #2297  Date Filed: 11/5/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor: **Residential Assets Mortgage Products, Inc.**    Case Number: 12-12020 (MG); 12-12053 (MG)

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Erickson Thorpe & Swainston Ltd    Pamela D. Longoni, Ind. & as GAL for Lacey Longini

Name and address where notices should be sent:
Erickson Thorpe & Swainston Ltd    MatID: 10853921
LONGONI- PAMELA D LONGONI, INDIVIDUALLY & AS GUARDIAN AD LITEM FOR LACEY
LONGONI, & JEAN M GAGNON, VS GMAC MRTG, LLC, A ET AL
99 West Arroyo St, PO Box 3559
Reno, NV 89505
Telephone number: (775) 786-3930    email: tbeko@etsreno.com

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
*(If known)*

Filed on:_____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Name and address where payment should be sent (if different from above):

■ Date Stamped Copy Returned
☐ No self addressed stamped envelope
☐ No copy to return

Telephone number:    email:

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

1. Amount of Claim as of Date Case Filed: $ **600,000**

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. **Basis for Claim:** Wrongful Foreclosure: sale of residential property
(See instruction #2)    See attached complaint

3. **Last four digits of any number by which creditor identifies debtor:**_____
3a. Debtor may have scheduled account as:_____
(See instruction #3a)
3b. Uniform Claim Identifier (optional):_____
(See instruction #3b)

4. **Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

Value of Property: $_____ Annual Interest Rate_____% ☐ Fixed ☐ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim,

if any: $_____ Basis for perfection: _____

Amount of Secured Claim: $_____ Amount Unsecured: $_____

6. **Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____ (See instruction #6)

7. **Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. **Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

9. **Signature:** (See instruction #9) Check the appropriate box.
☐ I am the creditor. ☒ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)    ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)    ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Thomas Beko
Title: Attorney
Company: Erickson, Thorpe & Swainston (Signature)    11-01-12 (Date)
Address and telephone number (if different from notice address above):

RECEIVED
NOV 05 2012

KURTZMAN CARSON CONSULTANTS

Telephone number:    Email:

**COURT USE ONLY**

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, o*


001KC0002_51765-2_domestic_18/015138/090824


12120531211050000000000008

# ERICKSON, THORPE & SWAINSTON, LTD.

THOMAS P. BEKO
JOHN A. ABERASTURI
JOHN C. BOYDEN
REBECCA BRUCH
BRENT L. RYMAN
ANDREA K. PRESSLER
PAUL M. BERTONE
ANN M. ALEXANDER
CHARITY F. FELTS
BRETT A. DIEFFENBACH

ATTORNEYS AT LAW

99 WEST ARROYO STREET
RENO, NEVADA 89509

MAILING ADDRESS:
P.O. BOX 3559, RENO, NEVADA 89505

WWW.ETSRENO.COM

*OF COUNSEL*
ROGER L. ERICKSON
DONALD A. THORPE

GEORGE W. SWAINSTON
1936 - 2007

TELEPHONE: 775.786.3930
FACSIMILE: 775.786.4160

TBEKO@ETSRENO.COM

November 1, 2012

***Via Priority Mail\****
RecCap Claims Processing Center c/o KCC
2335 Alaska Avenue
El Segundo, CA 90245

    Re:    **Debtors:**    **Residential Capital , LLC, et al**
                       **Case No.:12-12020 (MG)**
           **Claimants:**    **Pamela Longoni, individually and as GAL for Lacey**
                       **Longoni, and Jean M. Gagnon**

Dear Sir/Madam:

    I am enclosing 8 Proof of Claim forms in the above matter, i.e., 4 separate claims on behalf of each of my clients. Attached to each claim is a copy of the related United States District Court Complaint (Third Amended Complaint). Please provide confirmation to the undersigned of the timely filing of these Proofs of Claim.

Sincerely,

THOMAS P. BEKO, ESQ.

TPB:dmm

Enclosures: 8, as stated

*\*with Delivery Confirmation*

1  THOMAS P. BEKO, ESQ. (#002653)
   99 West Arroyo Street
2  P.O. Box 3559
   Reno, Nevada 89505
3  Telephone: (775) 786-3930
   *Attorneys for Plaintiffs*

4

5

6

7               **UNITED STATES DISTRICT COURT**

8         **DISTRICT OF NEVADA - RENO DIVISION**

9

10  PAMELA D. LONGONI,
    individually and as Guardian Ad
11  Litem for LACEY LONGONI,
    and JEAN M. GAGNON,
12                    Case No.: 3:10-CV-00297-LRH-(VPC)

13
        Plaintiffs,
14
  vs.
15
  GMAC MORTGAGE, LLC., a Delaware
16  Limited Liability Company, EXECUTIVE
    TRUSTEE SERVICES, LLC., a Delaware
17  Limited Liability Company, RESIDENTIAL
    FUNDING COMPANY, LLC., a Delaware
18  Limited Liability Company, fka RESIDENTIAL
    FUNDING CORPORATION, a Delaware
19  Corporation, RESIDENTIAL ASSET
    MORTGAGE PRODUCTS, INC., a Delaware
20  Corporation, ILLEANNA PETERSON,
    KATHLEEN GOWEN, individuals,
21  DOES 1-10; BLACK AND
    WHITE CORPORATIONS 1-10,
22  corporations; ABLE & BAKER
    COMPANIES 2-10, co-partnerships and or
23  limited liability companies,

24        Defendants.            /

25  **THIRD AMENDED COMPLAINT FOR DAMAGES TO SUBSTITUTE PROPER**

26        **PARTIES PURSUANT TO FRCP 15(c)**

27             **(JURY DEMANDED)**

28      COMES NOW, PAMELA D. LONGONI, individually and as the Guardian Ad Litem

for LACEY LONGONI, and JEAN M. GAGNON, by and through their attorneys,

1    ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and hereby

2    allege and complain as follows:

3    **PARTIES AND JURISDICTION**

4    1.    Plaintiff PAMELA D. LONGONI is an individual, residing in the State of

5    Nevada.  PAMELA D. LONGONI is the natural parent and guardian of the minor child

6    LACEY LONGONI.  At all times relevant hereto, PAMELA D. LONGONI was a lawful

7    owner of a certain parcel of real property commonly known as 5540 Twin Creeks Drive,

8    Reno, Nevada, 89523, which PAMELA D. LONGONI occupied as her sole personal

9    residence along with her minor children, including the plaintiff LACEY LONGONI.

10    2.    Plaintiff JEAN M. GAGNON is an individual, residing in the State of Nevada.

11    At all times relevant hereto, JEAN M. GAGNON was a lawful co-owner of a certain parcel

12    of real property commonly known as 5540 Twin Creeks Drive, Reno, Nevada, 89523.

13    3.    The plaintiffs are informed and believe and thereupon allege that the defendant

14    GMAC MORTGAGE, LLC., is a Delaware Limited Liability Company, licensed to do, and

15    doing business in the State of Nevada as a mortgage lender.

16    4.    The plaintiffs are informed and believe that GMAC MORTGAGE, LLC., is

17    wholly owned by General Motors Acceptance Corporation.

18    5.    The plaintiffs are further informed and believe that GMAC MORTGAGE,

19    LLC., was assigned, or somehow assumed the rights, liabilities and duties of EquiFirst

20    Corporation relative to a Promissory Note, Deed of Trust signed by the plaintiffs PAMELA

21    D. LONGONI and JEAN M. GAGNON, on or about September 29, 2005.

22    6.    The plaintiffs are further informed and believe and thereupon aver that

23    EXECUTIVE TRUSTEE SERVICES, LLC., is a subsidiary of GMAC MORTGAGE, LLC.,

24    contracted with, or is otherwise so affiliated with GMAC MORTGAGE, LLC., such that it

25    is legally responsible for the acts of EXECUTIVE TRUSTEE SERVICES, LLC. At all times

26    relevant hereto, GMAC MORTGAGE, LLC., employed an individual by the name of

27    Jonathan "Nate" Stephenson. At all times relevant hereto, Jonathan "Nate" Stephenson was

28    acting within the course and scope of his employment with GMAC MORTGAGE, LLC. The

2

1   plaintiffs are further informed and believe that at all times relevant hereto, Paul Williams,

2   was the Director of the GMAC Modification Team, and was acting within the course and

3   scope of his employment with GMAC MORTGAGE, LLC. The plaintiffs are informed and

4   believe, that Paul Williams approved the plaintiffs' loan modification request as set forth

5   herein below.

6         7.    The plaintiffs are informed and believe and thereupon allege that the defendant

7   EXECUTIVE TRUSTEE SERVICES, LLC., is a Delaware Limited Liability Company,

8   licensed to do business, and doing business in the State of Nevada by providing a broad menu

9   of non-judicial foreclosure services. The plaintiffs are informed and believe that the

10   defendant EXECUTIVE TRUSTEE SERVICES, LLC., is wholly owned by General Motors

11   Acceptance Corporation. The plaintiffs are further informed and believe, and thereupon

12   allege, that EXECUTIVE TRUSTEE SERVICES, LLC., is a subsidiary of, or is otherwise

13   affiliated with GMAC MORTGAGE, LLC., and that the defendants ILLEANNA

14   PETERSON and KATHLEEN GOWEN were, at all times relevant hereto, employees of

15   EXECUTIVE TRUSTEE SERVICES, LLC., and in doing the acts alleged herein were acting

16   within the course and scope of their employment, and/or at the express direction of, or with

17   the authorization and ratification of EXECUTIVE TRUSTEE SERVICES., LLC and GMAC

18   MORTGAGE, LLC.

19         8.    The plaintiffs are informed and believe and thereupon allege that the defendant

20   RESIDENTIAL FUNDING COMPANY, LLC., is a Delaware Limited Liability Company,

21   licensed to do business, and doing business in the State of Nevada. The plaintiffs are further

22   informed and believe and thereupon allege that said defendant is the successor in interest,

23   and has assumed any and all legal liabilities of Residential Funding Corporation, a Delaware

24   Corporation. RESIDENTIAL FUNDING COMPANY, LLC., is being substituted in this

25   action for the previously named Doe Defendant, ABLE & BAKER COMPANY 1.

26         9.    The plaintiffs are informed and believe and thereupon allege that

27   RESIDENTIAL FUNDING COMPANY, LLC., is wholly owned by the defendant General

28   Motors Acceptance Corporation.

1    10.    The plaintiffs are informed and believe that RESIDENTIAL FUNDING

2    COMPANY, LLC., claims to have obtained ownership interest in a certain parcel of real

3    property commonly known as 5540 Twin Creeks Drive, Reno, Nevada, 89523.  In this

4    regard, the plaintiffs allege that RESIDENTIAL FUNDING COMPANY, LLC., was

5    assigned, or somehow assumed the rights, liabilities and duties of EquiFirst Corporation

6    relative to a Promissory Note, Deed of Trust signed by the plaintiffs PAMELA D.

7    LONGONI and JEAN M. GAGNON, on or about September 29, 2005.

8    11.    The plaintiffs are informed and believe and thereupon allege that

9    RESIDENTIAL FUNDING COMPANY, LLC., engaged or retained the defendant GMAC

10    MORTGAGE, LLC., to service the loan on the plaintiffs' real property.  In this regard,

11    RESIDENTIAL FUNDING COMPANY, LLC., authorized GMAC MORTGAGE, LLC.,

12    to engage in certain loan activities, including, but not limited to the following:

13    a) Receipt of loan payments;

14    b) Issuance of legal notices to the plaintiffs; and

15    c) Loan modification activities including negotiation of new rates of interest, loan

16    payments, and principal sums due under the loan.

17    12.    That all statements made to the plaintiffs by employees of GMAC

18    MORTGAGE, LLC., as part of the plaintiffs' loan modification process, were statements

19    made on behalf of, and within the course and scope of GMAC MORTGAGE, LLC.,

20    activities on behalf of RESIDENTIAL FUNDING COMPANY, LLC., and thus

21    RESIDENTIAL FUNDING COMPANY, LLC., is responsible for all acts of GMAC

22    MORTGAGE, LLC related to modification of the plaintiffs' residential loan.

23    13.    The plaintiffs are informed and believe and thereupon allege that in performing

24    loan modification activities, RESIDENTIAL FUNDING COMPANY, LLC., provided

25    GMAC MORTGAGE, LLC., with certain policies, procedures and/or guidelines to follow

26    in the process of loan modification activities.

27    14.    The plaintiffs are informed and believe that RESIDENTIAL FUNDING

28    COMPANY, LLC., authorized GMAC MORTGAGE, LLC., to enter into binding loan

4

1  modifications on behalf of RESIDENTIAL FUNDING COMPANY, LLC.

2      15.    The plaintiffs are informed and believe and thereupon allege that the defendant

3  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., was, at all times relevant hereto,

4  a Delaware corporation, licensed to do business, and doing business in the State of Nevada.

5  The plaintiffs are further informed and believe and thereupon allege RESIDENTIAL ASSET

6  MORTGAGE PRODUCTS, INC., was an entity that was governed or controlled by the other

7  named defendants herein, and doing the things set forth herein was acting under the direction

8  and control of the other defendants. RESIDENTIAL ASSET MORTGAGE PRODUCTS,

9  INC., is being substituted in this action for the previously named Doe Defendant, ABLE &

10  BAKER COMPANY 2.

11      16.    The plaintiffs are further informed and believe that RESIDENTIAL ASSET

12  MORTGAGE PRODUCTS, INC., claims to have purchased the plaintiffs' Promissory Note

13  and Deed of Trust from RESIDENTIAL FUNDING COMPANY, LLC., on or about

14  December 28, 2005, pursuant to an agreement entitled Assignment and Assumption

15  Agreement, however, the plaintiffs are informed and believe that RESIDENTIAL FUNDING

16  COMPANY, LLC., was not the owner of, nor was it in possession of, the plaintiffs'

17  Promissory Note and/or Deed of Trust on that day, and therefore could not transfer any

18  interest in either the Promissory Note or the Deed of Trust.

19      17.    Pursuant to said Assignment and Assumption Agreement, RESIDENTIAL

20  FUNDING CORPORATION (purportedly now RESIDENTIAL FUNDING COMPANY,

21  LLC., was obligated to deliver to RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.,

22  the original Promissory Note, endorsed to the order of U.S. Banking National Association,

23  as Trustee. The plaintiffs are informed and believe and thereupon aver that RESIDENTIAL

24  FUNDING COMPANY, LLC., never had legal title to said Promissory Note, and never

25  provided U.S. Banking National Association with the original of said Promissory Note, nor

26  did RESIDENTIAL FUNDING COMPANY, LLC., ever provide U.S. Banking National

27  Association with any proper endorsements of said Promissory Note to U.S. Banking National

28  Association. Based upon the foregoing, neither RESIDENTIAL FUNDING COMPANY,

1  LLC, nor RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., had any legal right to

2  order or authorize the foreclosure upon the plaintiffs' real property.

3      18.    That on December 28, 2005, (the same day that RESIDENTIAL FUNDING

4  COMPANY, LLC., purported to sell the plaintiffs' Promissory Note and Deed of Trust to

5  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.), RESIDENTIAL ASSET

6  MORTGAGE PRODUCTS, INC., claims that it assigned said Promissory Note and Deed of

7  Trust to U.S. Banking National Association as Trustee, pursuant to an agreement entitled

8  Pooling and Servicing Agreement.

9      19.    Pursuant to said Pooling and Servicing Agreement, RESIDENTIAL FUNDING

10  COMPANY, LLC., was obligated to, concurrently with the execution of said agreement,

11  deliver the agreement and the original Promissory Note, fully endorsed without recourse to

12  the Trustee, showing an unbroken chain of endorsements from the originator thereof to the

13  Person endorsing it to the Trustee. The plaintiffs are informed and believe and thereupon

14  aver that RESIDENTIAL FUNDING COMPANY, LLC., never had legal title to said

15  Promissory Note and never provided U.S. Banking National Association with the original

16  of said Promissory Note. The plaintiffs are further informed and believe that

17  RESIDENTIAL FUNDING COMPANY, LLC., never provided U.S. Banking National

18  Association with any Promissory Note which contained an unbroken chain of endorsements

19  from the originator of the Promissory Note (EquiFirst Corporation) through to the Trustee.

20      20.    The plaintiffs are informed and believe and thereupon aver, that on or about

21  November 15, 2007, the plaintiffs' original Promissory Note was modified pursuant to an

22  Adjustable Rate Loan Modification Agreement between the plaintiffs, as Borrower, and

23  Homecomings Financial, LLC., as Lender, however, Homecomings Financial was an entity

24  that had no right, title or interest in said Promissory Note since RESIDENTIAL FUNDING

25  COMPANY, LLC., claims it was the owner of said Promissory Note and that it had

26  transferred ownership of that Promissory Note to RESIDENTIAL ASSET MORTGAGE

27  PRODUCTS, INC., almost two years prior to this claimed modification.

28      21.    The plaintiffs are informed and believe and thereupon aver that each of the

1 defendants in this action took action upon the plaintiffs' Promissory Note purportedly

2 modified by Homecomings Financial, LLC., despite the fact that Homecomings Financial

3 had no right, title or interest in said Promissory Note, and as such, had no right to modify the

4 original Promissory Note.

5   22. That in 2009, the defendant GMAC MORTGAGE, LLC., engaged and

6 authorized the defendant EXECUTIVE TRUSTEE SERVICES, LLC., to commence non-

7 judicial foreclosure proceedings against the plaintiffs' real property when GMAC

8 MORTGAGE, LLC., had neither the legal ownership of the Promissory Note, nor the Deed

9 of Trust which secured the obligations of the Promissory Note. As a result, neither GMAC

10 MORTGAGE, LLC., nor EXECUTIVE TRUSTEE SERVICES, LLC., had legal standing

11 to commence non-judicial foreclosure proceedings against the plaintiffs' real property.

12 Therefore, GMAC MORTGAGE, LLC., and EXECUTIVE TRUSTEE SERVICES, LLC.,

13 wrongfully foreclosed upon the plaintiffs' real property.

14   23. The plaintiffs are informed and believe and thereupon allege that at all times

15 relevant hereto, the defendants, and each of them, were acting as agents and employees for

16 the other defendants, and in doing the things alleged herein were acting within the course and

17 scope of that agency. The plaintiffs are further informed and believe and thereupon allege,

18 that at all times relevant hereto, the defendants were acting as part of a common, planned,

19 scheme or design in conspiracy/concert with other defendants, thus making each legally

20 liable for the acts of all others.

21   24. Plaintiffs do not know the true names or capacities of those defendants sued

22 herein as DOES 1-10, BLACK & WHITE CORPORATIONS 1-10, and ABLE & BAKER

23 COMPANIES 1-10, partnerships and/or limited liability companies. Therefore, plaintiffs sue

24 said defendants, and each of them, by such fictitious names. Plaintiffs are informed and

25 believe and based thereon allege that each of said defendants inclusive, were officers,

26 directors or managing agents and/or employees or were otherwise responsible for the daily

27 operation of said business, including, but not limited to the training and supervision of

28 employees of the company. That at all times relevant hereto, defendants herein fictitiously

1  sued were the owners, shareholders, agents, partners, or alter egos of defendants named

2  herein. Plaintiffs are further informed and believe that the DOE defendants are the holders

3  or owners of the deed of trust and/or promissory note executed by the plaintiffs, and thus are

4  legally responsible under the causes of action pled herein and proximately caused damages

5  to plaintiffs as herein alleged. Plaintiffs pray that when the true names of said defendants are

6  ascertained they may be inserted herein with appropriate allegations.

7       25.    In 2005, the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON

8  entered into a contract with EquiFirst to refinance a loan which was secured by the real

9  property located at 5540 Twin Creeks Drive, Reno, Nevada, 89523. This transaction was

10 accomplished through the use of a Promissory Note and Deed of Trust (hereinafter referred

11 to as the Note and/or Deed of Trust). As part of this transaction, PAMELA D. LONGONI

12 deeded a one-half interest to said real property and improvements to JEAN M. GAGNON.

13 Subsequent to the loan refinance, PAMELA D. LONGONI, LACEY LONGONI and JEAN

14 M. GAGNON lived at the property located at 5540 Twin Creeks Drive, Reno, Nevada,

15 89523.

16      26.    The plaintiffs are informed and believe and thereupon aver that after the

17 refinance was completed, EquiFirst assigned, or purported to assign, the Note and Deed of

18 Trust to a third party which may, or may not have been, Homecomings Financial, LLC.,

19 RESIDENTIAL FUNDING COMPANY, LLC, fka Residential Funding Corporation,

20 RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., U.S. Banking National

21 Association, and/or GMAC MORTGAGE, LLC. At some point after the refinance,

22 Homecomings, Financial, LLC., RESIDENTIAL FUNDING COMPANY, LLC., and/or

23 GMAC MORTGAGE, LLC., claimed that it assumed the rights, duties and liabilities of

24 EquiFirst and conducted itself as though it was the lawful owner, and holder in due course

25 of the Note and Deed of Trust. Neither RESIDENTIAL FUNDING COMPANY, LLC., (or

26 its predecessor in interest Residential Funding Corporation), GMAC MORTGAGE, LLC.,

27 or any other defendant, recorded any notice in the Washoe County Recorder's Office

28 advising the plaintiffs (or any other person) that it held, owned or had been assigned the Note

1    and Deed of Trust.

2    27.    In early 2008, PAMELA D. LONGONI and JEAN M. GAGNON began to

3    suffer financial difficulties due to the fact that Mr. Gagnon was transferred, for his

4    employment, from northern Nevada to Las Vegas, Nevada. This caused a duplication of

5    many of the family's household expenses. As a result, the plaintiffs fell behind on their

6    mortgage payments. On or about January 15, 2009, the Plaintiff PAMELA D. LONGONI

7    sent a letter to Homecomings Financial, whom she believed to be the servicer of her loan,

8    asking for a modification of her loan.

9    28.    In response to her January 15, 2009, letter, on February 18, 2009, GMAC

10    MORTGAGE, LLC., sent the plaintiffs a package of records to fill out and return in order

11    to seek a loan modification.

12    29.    On February 19, 2009, without any contact with, or input or direction from

13    either the owner/holder of the Promissory Note or the Deed Of Trust, GMAC MORTGAGE,

14    LLC., made the decision on behalf of RESIDENTIAL FUNDING COMPANY, and/or

15    RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National

16    Association to commence a non-judicial foreclosure upon the plaintiffs' real property. At

17    the time they did so, GMAC MORTGAGE, LLC., undertook no efforts to determine who

18    was the legal owner or holder of the plaintiffs' Promissory Note or the Deed of Trust.

19    30.    In accordance with their decision to commence foreclosure proceedings against

20    the plaintiffs' property, and without any contact with, or input or direction from either the

21    owner/holder of the Promissory Note or the Deed Of Trust, GMAC MORTGAGE, LLC.,

22    made the decision on behalf of RESIDENTIAL FUNDING COMPANY, and/or

23    RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National

24    Association GMAC MORTGAGE, LLC., engaged with the defendant EXECUTIVE

25    TRUSTEE SERVICES, LLC., to undertake the process of foreclosure.

26    31.    On February 25, 2009, and without receipt of any assignment, authorization,

27    directive from the legal owner of the Promissory Note or the Deed of Trust, EXECUTIVE

28    TRUSTEE SERVICES prepared and recorded a Substitution of Trustee. This assignment

9

1    was in direct contradiction to the terms of the Deed of Trust, which required a change in

2    Trustee to be ordered by the Lender which was EquiFirst Corporation.

3        32.    Also on February 25, 2009, and without receipt of any assignment,

4    authorization, directive from the legal owner of the Promissory Note or the Deed of Trust,

5    EXECUTIVE TRUSTEE SERVICES, LLC., also prepared and recorded a Notice of Breach

6    and Default and of Election to Cause Sell of Real Property under Deed of Trust. Attached

7    as *Exhibit "1"* is a true, accurate and correct copy of this notice. This notice was defective,

8    since it lacked the information required by law.  EXECUTIVE TRUSTEE SERVICES,

9    LLC., caused this Notice to be recorded on February 26, 2011.

10        33.    On March 3, 2009, the Plaintiffs faxed GMAC their completed Loan

11    Modification application. In response, GMAC contacted the plaintiffs and asked for

12    additional information. The following day, March 4, 2009, EXECUTIVE TRUSTEE

13    SERVICES, LLC., caused the Notice of Breach and Default and of Election to Cause Sell

14    of Real Property under Deed of Trust to be mailed to the plaintiffs on March 4, 2009.

15        34.    On March 5, 2009, the plaintiff PAMELA LONGONI forwarded all requested

16    information to GMAC. The following day she spoke with a GMAC representative at which

17    time they discussed possible modifications to the plaintiffs' existing loan. The plaintiffs

18    were informed of various options which they could pursue as an alternative to foreclosure.

19    At no time were the plaintiffs informed that GMAC MORTGAGE, LLC., had commenced

20    foreclosure proceedings, or that GMAC was not the owner, nor holder of the Promissory

21    Note or Deed of Trust on the plaintiffs' real property. The plaintiffs were, however, informed

22    that GMAC did have a program by which loans could be modified and that the plaintiffs

23    were candidates for such program. The plaintiffs fully and completely complied with all of

24    GMAC's demands in the application process.

25        35.    On or about March 10, 2009, a GMAC MORTGAGE, LLC., representative

26    informed the plaintiffs that their request for a loan modification had been approved. GMAC

27    MORTGAGE, LLC., sent the plaintiffs a proposed modification agreement. This agreement

28    called for a new monthly payment in the amount of $2,270.00.

1        36.    On or about March 19, 2008, the plaintiff PAMELA D. LONGONI contacted

2    GMAC's representative and informed him that they could not meet the proposed monthly

3    payment and the most that they could pay on a monthly basis was $1,600.00. In response,

4    GMAC's representative Nate Stephenson developed a new loan modification plan pursuant

5    to which the plaintiffs would be required to make payments in the amount of $1,600.00 per

6    month. He instructed PAMELA D. LONGONI to begin making the payments in April of

7    2009. He further informed the plaintiff that GMAC would stop any effort to foreclose on the

8    property. At not time did GMAC ever indicate that there was any time limit to this temporary

9    plan. In making these statements, the GMAC representative was acting on behalf of, and

10    within the course and scope of the authority granted to him by RESIDENTIAL FUNDING

11    COMPANY, LLC., RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S.

12    Bank National Association, as Trustee.  The plaintiffs made the required payment on or

13    before the requested date.

14        37.    On April 2, 2009, the same GMAC MORTGAGE, LLC., representative

15    informed the plaintiffs that all he was waiting on in order to make the change permanent was

16    approval of the VP. Later that same day, said representative informed the plaintiffs that their

17    trial loan modification was, in fact, approved. He further stated that because he was

18    attempting to write off $176,000.00 from the loan, he needed approval from their VP,

19    however, he also stated that he had already done the analysis and it seemed to be a win-win

20    situation so he was fairly confident that it would get approved. At no time did GMAC ever

21    advise the plaintiffs that this proposed plan would only be temporary or that it would need

22    to be replaced with another plan. In making these statements, the GMAC MORTGAGE,

23    LLC., representative was acting on behalf of, and within the course and scope of the

24    authority granted to him by RESIDENTIAL FUNDING COMPANY, LLC., RESIDENTIAL

25    ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National Association, as Trustee.

26        38.    On April 6, 2009, GMAC MORTGAGE, LLC, made the decision to stop all

27    foreclosure proceedings. In accordance with that decision, GMAC instructed EXECUTIVE

28    TRUSTEE SERVICES, LLC., to stop the foreclosure process. EXECUTIVE TRUSTEE

1    SERVICES, LLC., received these instructions and stopped the foreclosure process.

2    39.    On April 21, 2009, the GMAC representative informed PAMELA D.
3    LONGONI that he was still awaiting approval from their "VP." On April 28, 2009, the same
4    GMAC representative informed PAMELA D. LONGONI that he had just looked at the notes
5    and it looked as if "one manager looked at it and agreed that it was a win-win situation, but
6    because it is a $186k that we were trying to write off, it has to go a little higher."

7    40.    On May 1, 2009, the plaintiffs attempted to make their next $1,600.00 payment
8    through an on-line system which GMAC specifically set up to accept the plaintiffs'
9    payments. This is the method by which the first $1,600.00 payment was made. However,
10   when PAMELA D. LONGONI attempted to make the payment, it was refused. In response,
11   PAMELA D. LONGONI contacted Nate Stephenson and advised him of the problem. He
12   informed her that someone had put a "Certified Funds Flag" on her account and that he had
13   removed it. He claimed he removed the flag but she still could not make the payment
14   through the system. Therefore, she sent the payment (with the extra fees) through Western
15   Union. The payment was accepted by GMAC.

16   41.    On May 5, 2009, the plaintiff received a telephone call from Homecomings
17   Financial, saying that they had not received her payment. In response, she contacted Nate
18   Stephenson who informed her that their records showed that they received the payment on
19   May 4, 2009, and as such, she was "Good to go." Nate Stephenson further informed her that
20   it didn't look like their VP has had a chance to look at the matter, however, the notes he saw
21   are good indicating that it "made sense to do the Modification." He further informed her that
22   "We still have 2 months before I would have to set up a plan. So everything is still sort of
23   on hold."

24   42.    On May 26, 2009, PAMELA D. LONGONI sent an e-mail communication to
25   Nate Stephenson asking about the status of her loan modification. She further informed him
26   that she had another friend who was suffering similar financial problems and asked if she
27   could refer him to Mr. Stephenson. Mr. Stephenson responded by saying that he did not have
28   an update, that she should just continue to make the $1,600.00 payment. Once the decision

1  was made, then paperwork will be sent out with the new terms.  He indicated that because

2  he would be moving to a new team the following week, he could not help Ms. Longoni's

3  friend.  He concluded by telling her to let him know if she could think of any further

4  questions.  At no time did he tell her he was unable to take any action relative to her loan

5  modification application.

6      43.    On or about May 26, 2009, GMAC sent the plaintiffs a letter advising the, that

7  help might be available to them through the new Home Affordable Modification program

8  which is part of the initiative announced by President Obama.

9      44.    In conformity with their agreement with GMAC MORTGAGE, LLC., the

10  plaintiffs made the required $1,600.00 payments for the months of April, May and June of

11  2009.  GMAC MORTGAGE, LLC., accepted said payments on behalf of itself and/or

12  RESIDENTIAL FUNDING COMPANY, LLC., or RESIDENTIAL ASSET MORTGAGE

13  PRODUCTS, INC.  None of these funds were ever returned to the plaintiffs.

14      45.    Over the next 3 weeks, the plaintiffs attempted to contact GMAC to find out

15  what was happening with their application for the loan modification.  On June 30, 2009, Ms.

16  Longoni sent another e-mail communication to Nate Stephenson asking for help.  He

17  responded by saying that he had emailed his old department yesterday and they responded

18  that the file has been sent for final management approval.  He further told her the person now

19  handling the matter was Landon Huck.  In response, Ms. Longoni asked for contact

20  information for Mr. Huck.  Nate Stephenson responded by saying he couldn't give her that

21  information, however, he informed her that he did receive an email stating that the

22  modification was approved the prior day.

23      46.    In response to this information, the plaintiffs made numerous attempts to make

24  the next $1,600.00 on-line payment, however, all attempts were rejected.  After numerous

25  attempts, plaintiff finally reached a live person on July 9, 2009, who informed her that their

26  modification was not approved, that they owed approximately $19,000.00, and that if

27  payment was not received, they would sell her home.  In response, PAMELA D. LONGONI

28  immediately sent Nate Stephenson an email asking for his assistance.  Mr. Stephenson

1   advised her that they were trying to put her into an Obama Modification. He specifically told

2   her that her foreclosure was on hold, and that GMAC did not want to take her home. He told

3   her that they would try to do everything they could before they proceeded with foreclosure.

4   He further informed her that the Obama program was subsidized and allowed them to drop

5   payments to 31% of the borrower's gross income. Because of that it allowed them to be a

6   little more aggressive with their rates and debt forgiveness.

7        47.    Contrary to these representations, on July 15, 2009, GMAC removed the hold

8   which it placed on the foreclosure. GMAC thereafter instructed EXECUTIVE TRUSTEE

9   SERVICES, LLC., to proceed forward with the foreclosure sale.

10       48.    The following day, GMAC sent the plaintiffs a letter informing them that the

11  repayment plan had been cancelled because payment had not been received by the payment

12  due date "as specified in the signed repayment agreement." The plaintiffs had never signed

13  any "repayment agreement".

14       49.    In accordance with GMAC's instructions, and without any legal standing as

15  set forth herein above, on July 20, 2009, EXECUTIVE TRUSTEE SERVICES, LLC.,

16  prepared a Notice of Trustee's Sale, setting a sell date of August 14, 2009. Attached as

17  *Exhibit "2"* is a true, accurate and correct copy of this notice. EXECUTIVE TRUSTEE

18  SERVICES, LLC., caused this Notice to be recorded on July 23, 2009.

19       50.    Seven days later on July 30, 2009, GMAC sent a an "Obama" package to the

20  plaintiffs via federal express. The plaintiffs received that package on August 4, 2009. The

21  letter which accompanied this package informed the plaintiffs to submit a signed letter

22  explaining the cause of default (which they had done previously), to submit copies of two

23  most recent pay stubs, and a copy of their most recent federal tax return. The letter informed

24  them to allow five business days for GMAC to process the financial package. Notably, this

25  letter contained a notation at the bottom of the letter which said "30 days to sale." The

26  plaintiffs returned the requested information on August 10, 2009.

27       51.    On August 14, fifteen days after the date of this letter, EXECUTIVE

28  TRUSTEE SERVICES, LLC., sold the plaintiffs' home at auction.

52.    Because GMAC received payments following the filing of the original Notice of Default, EXECUTIVE TRUSTEE SERVICES, LLC.,'s policies required it to recommence the foreclosure process through the issuance of a new Notice of Default. However, GMAC never informed EXECUTIVE TRUSTEE SERVICES, LLC., that it received any such payments. Therefore, EXECUTIVE TRUSTEE SERVICES, LLC., in violation of its own internal policies, continued with the existing foreclosure.

53.    The Notice of Breach and Default and Election to Cause Sell of Real Property Under Deed of Trust (Exhibit 1) prepared and recorded by EXECUTIVE TRUSTEE SERVICES, LLC., failed to satisfy the provisions of N.R.S. 107.085, in that GMAC did not provide plaintiffs with the notice specified in that section.

54.    Said Notice of Breach and Default and Election to Cause Sell of Real Property Under Deed of Trust (Exhibit 1) also failed to satisfy the provisions of N.R.S. 107.086.

55.    Said Notice of Breach and Default and Election to Cause Sell of Real Property Under Deed of Trust (Exhibit 1) was never served upon the plaintiffs PAMELA D. LONGONI or JEAN M. GAGNON as required by N.R.S. 107.080.

56.    The defendants, and each of them, failed to provide the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON with the notices which are required by law, including, but not limited to, N.R.S. 107.080, 107.085, 107.086.

57.    On August 14, 2009, the defendants, and each of them acting individually and on behalf of the others, and without legal standing to do so, sold or caused to be sold, the plaintiffs' real property located at 5540 Twin Creeks Drive, Reno, Nevada, 89523, to a third party. This property was sold without the proper advance notifications called for by N.R.S. 107.080, 107.085 and/or 107.086.

58.    On or about August 24, 2009, the plaintiff PAMELA D. LONGONI, again contacted GMAC to determine the status of the new loan modification application. At that time, she was for the first time informed that GMAC had gone forward with the foreclosure that it had promised was on hold. At that time, PAMELA D. LONGONI was informed that her home had already been sold to a third party and that there was nothing they could do

1   about it. The following day, August 25, 2009, the plaintiff learned through her daughter, that

2   a man had left a 5-day notice to vacate the premises on her porch.

3          59.    After the sale of the plaintiffs' home, one or more of the defendants sought to

4   recover the home back from the foreclosure sale purchaser.

5          60.    None of the defendants were able to recover the plaintiffs' home from the

6   foreclosure sale purchaser.

7          61.    In response to this notice, Ms. Longoni contacted the putative purchaser

8   seeking to recover her home. She was told that they had lawfully purchased the home and

9   that there was nothing she could do about it. She was told that if she vacated the premises

10   in a peaceful manner and left the property in tact, she would be paid the sum of $1,250.00.

11   Believing she had no choice in the matter, PAMELA D. LONGONI signed the agreement.

12   She was tendered a check in the amount of $1,250.00, however, said check was later

13   dishonored by the issuing bank.

14          62.    During the next five days, PAMELA D. LONGONI frantically searched for a

15   rental property to move into with her daughter LACEY LONGONI. After extensive efforts,

16   she was able to locate a home in the same school district where 5540 Twin Creeks Drive,

17   Reno, Nevada, 89523 was zoned. However, in order to gain the consent of the landlord to

18   lease said premises, PAMELA D. LONGONI was required to sign a two-year lease, and she

19   was required to have the lease co-signed by her former husband, and father of her daughters.

20          63.    On or about September 4, 2009, PAMELA D. LONGONI received a telephone

21   call from Michael Knapp, Esq., who advised her that he was counsel for GMAC. Mr. Knapp

22   stated to Ms. Longoni that "we've made a big mistake" and that she did not have to leave her

23   home. He further informed her that they were undertaking efforts to recover the home back.

24   PAMELA D. LONGONI informed Mr. Knapp that she had already moved from the property

25   and entered into a two-year lease on a substitute residential property. Mr. Knapp advised Ms.

26   Longoni that he was headed to the beach with his family, and that after the holiday weekend

27   he would contact her to discuss the matter further.

28          64.    The following week PAMELA D. LONGONI was contacted by Christy

1    Hancock, Esq., who sought information about the costs Ms. Longoni incurred in moving

2    from her home and in improving her home before the foreclosure. Ms. Hancock informed

3    PAMELA D. LONGONI that GMAC would reimburse her for these costs. Ms. Hancock

4    further informed Ms. Longoni that GMAC would take immediate steps to remove the

5    foreclosure from her credit history. Subsequently, GMAC or some other party, did in fact,

6    remove all references to this transaction from her credit history.

7         65.    Subsequently, however, the defendants, and each of them, through their

8    retained counsel, have refused to acknowledge their violations of Nevada law and have

9    instead sought to blame PAMELA D. LONGONI for losing her home.

10       66.    In the weeks which followed this unlawful eviction, PAMELA D. LONGONI

11    discovered that the defendants had unlawfully foreclosed upon her home, and they

12    unlawfully evicted her from the property. She made repeated requests for GMAC to recover

13    her home and return her and her family to their prior residence. GMAC refused, and

14    continues to refuse to return the plaintiffs to their home.

15                            **FIRST CLAIM FOR RELIEF**

16         **(Violation of N.R.S. 107.080, 107.085, 107.086, 107.087, 107.090)**

17       67.    Plaintiffs reallege each and every allegation as contained above and incorporate

18    them by reference as if fully set forth herein.

19       68.    At all times relevant hereto, there was in force and effect, certain Nevada

20    statutes, including, but not limited to, N.R.S. 107.080, N.R.S. 107.085, N.R.S. 107.086

21    N.R.S. 107.087 and N.R.S. 107.090, which regulate the manner in which non-judicial

22    foreclosures may be conducted in the State of Nevada. Among other things, these statutes

23    set time limits on when a non-judicial foreclosure can be conducted, the manner in which the

24    non-judicial foreclosure can be conducted, and the notices which must be provided to those

25    grantors or others with an interest in the subject property before any sale can be conducted.

26    These statutes were enacted to protect people in a class of which the plaintiffs were members,

27    and said statutes were intended to protect the plaintiffs from the very harm they have suffered

28    as a proximate result of the conduct of the defendants, and each of them.

69.    Because GMAC MORTGAGE, LLC., proposed and agreed to a loan modification, and accepted payments from the plaintiffs in accordance with this loan agreement, the non-judicial foreclosure proceedings which commenced on February 25, 2009, were rendered null and void. Despite that fact, and despite GMAC's promises that it would not foreclose upon the plaintiffs' property, GMAC and EXECUTIVE TRUSTEE SERVICES, LLC., proceeded forward with the foreclosure sale.

70.    Defendant GOWEN swore to, under oath, and caused to be filed with the Washoe County Recorder, in Nevada, a "Trustee's Deed of Sale," dated August 14th, 2009, and file stamped August 26th, 2009, under which GOWEN represented that the trustee had complied with all applicable statutory requirements of the State of Nevada, and performed all duties required by the Deed of Trust. Attached as *Exhibit "3"* is a true, accurate and correct copy of this notice. This was intentional or reckless misrepresentation, since GOWEN knew or should have known that" 1) the Trustee had not complied with all applicable statutory requirements, and that 2) all duties required by the Deed of Trust had not been extinguished.

71.    At the times the defendants undertook the process of non-judicial foreclosure, none of the defendants owned, possessed, or had any legal right to the Promissory Note or the Deed of Trust. In addition, none of the defendants had the authority to undertake any act in furtherance of the non-judicial foreclosure. Therefore, the foreclosure was wrongful and unlawful and in violation of Nevada law.

72.    The defendants, and each of them, by way of the above described acts and/or omissions, violated the provisions of the following Nevada Revised Statutes:

a)  N.R.S. 107.080,

b)  N.R.S. 107.085,

c)  N.R.S. 107.086,

d)  N.R.S. 107.087, and

e)  N.R.S. 107.090.

73.    As a direct and proximate result of the wrongful acts of the defendants, and

1    each of them, the plaintiffs have suffered the permanent loss of their home and real property,
2    as well as all attributes thereto, including, but not necessarily limited to, the loss of the value
3    of the property, the future value and earning capacity of said property, the loss of the use and
4    enjoyment of said property, and the loss of all improvements made to that property over the
5    past 14 plus years, all in an amount in excess of TEN THOUSAND DOLLARS
6    ($10,000.00).

7        73.    As a further direct and proximate result of the wrongful acts of the defendants
8    and each of them, the plaintiffs have been forced to incur costs associated with obtaining
9    replacement housing, including, but not necessarily limited to, moving and storage expenses,
10   rental charges, household furnishings, increased travel costs and increased utility bills and
11   expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

12       74.    As a further direct and proximate result of the wrongful acts of the defendants,
13   and each of them, the plaintiffs have suffered severe and disabling emotional distress and
14   anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry
15   all to the Plaintiffs' general damages in an amount in excess of TEN THOUSAND
16   DOLLARS ($10,000.00).

17       75.    In doing the acts alleged herein, the defendants, and each of them acted, with
18   deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as
19   such are guilty of oppression, thus warranting the imposition of exemplary and punitive
20   damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

21       76.    The plaintiffs have been required to retain the services of ERICKSON,
22   THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the
23   future, incur expenses and costs and attorney's fees for which they are entitled to recover.
24   The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

25                      **SECOND CLAIM FOR RELIEF**
26                      **(Violation of N.R.S. 205.372)**

27       77.    Plaintiffs reallege each and every allegation as contained above and incorporate
28   them by reference as if fully set forth herein.

19

1      78.    At all times relevant hereto, there was in force and effect, certain Nevada

2  statutes, including, but not limited to, N.R.S. 205.372 which makes it a crime for a person

3  who, with intent to defraud a participant in a mortgage lending transaction, knowingly makes

4  a false statement or misrepresentation concerning a material fact, or deliberately conceals or

5  fails to disclose a material fact, as part of a mortgage lending transaction, or files, or causes

6  to be filed, with a county recorder, any document that the person knows to include a

7  misstatement, misrepresentation or omission concerning a material fact. These statutes were

8  enacted to protect people in a class of which the plaintiffs were members, and said statutes

9  were intended to protect the plaintiffs from the very harm they have suffered as a proximate

10  result of the conduct of the defendants, and each of them. Therefore, a violation of this

11  statute constitutes Negligence Per Se.

12      79.    Acting within the scope of their employment for EXECUTIVE TRUSTEE

13  SERVICES, LLC., and as an agent of GMAC MORTGAGE, LLC., and/or RESIDENTIAL

14  COMPANY, INC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., the

15  defendants ILLENNA PETERSON and KATHLEEN GOWEN, made false statements

16  and/or misrepresentations and recorded, or caused to be recorded with the Washoe County

17  Recorder, documents that they knew included a misstatement, misrepresentation or omission

18  of a material fact.

19      80.    Among other misrepresentations, the "Notice of Breach and Default and of

20  Election to Cause sell (sic) of Real Property Under Deed of Trust" provides that "a breach

21  of and default in the obligations for which such Deed of Trust and security has occurred, or

22  that payment has not been made of ... ." (*See Exhibit 1*). This constitutes a violation of NRS

23  205.372(1)(e).

24      81.    Among other misrepresentations, the "Notice of Trustee's Sale" provides that

25  the borrowers "are in default under a Deed of Trust". This is not correct. Further, proper

26  notice was never provided of this Notice of Trustee's Sale. This also violates various

27  provisions of NRS 205.372, et seq. (See Exhibit 2).

28      82.    By way of further example, the "Trustee's Deed Upon Sale" also filed with the

1   County Recorder, provides that all applicable statutory requirements and all duties required

2   by the Deed of Trust have been performed. This is false and violates NRS 205.372, et seq.

3        83.    The false representations within these documents filed with the County

4   Recorder, made with knowledge or belief of their falsity, were part of a scheme which

5   included assurances of the loan modification and lack of danger of foreclosure, which were

6   intended to induce the reliance of the plaintiffs, and lull them into a sense of security, while

7   the fraudulently filed documents expedited the wrongful sale of their home, to the

8   Defendants' profit.

9        84.    The plaintiffs relied upon these misrepresentations of the finalized loan

10   modification, and absence of danger of foreclosure to their detriment.

11        85.    By such actions, by such misrepresentations, and by such filing of documents

12   with the County Recorder, which included misrepresentations, misstatements, and omissions

13   of material fact, the defendants acted with an intent to defraud the participant in the mortgage

14   lending transaction through the eventual wrongful sale of the plaintiffs' home without

15   process of law.

16        86.    As a direct and proximate result of the actions of these defendants and/or

17   KATHLEEN GOWEN, the plaintiffs' real property was purportedly sold at a public auction

18   on or about August 14, 2009. As a further direct and proximate result of the actions of

19   ILLEANNA PETERSON, the plaintiffs were wrongfully ousted and ejected from their

20   lawful residence and real property.

21        87.    As a direct and proximate result of the wrongful acts of the defendants, and

22   each of them, the plaintiffs have suffered the permanent loss of their home and real property,

23   as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

24   of the property, the future value and earning capacity of said property, the loss of the use and

25   enjoyment of said property, and the loss of all improvements made to that property over the

26   past 14 plus years, all in an amount in excess of TEN THOUSAND DOLLARS

27   ($10,000.00).

28        88.    As a further direct and proximate result of the wrongful acts of the defendants

1    and each of them, the plaintiffs have been forced to incur costs associated with obtaining

2    replacement housing, including, but not necessarily limited to, moving and storage expenses,

3    rental charges, household furnishings, increased travel costs and increased utility bills and

4    expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

5          89.    As a further direct and proximate result of the wrongful acts of the defendants

6    and each of them, the plaintiffs have suffered severe and disabling emotional distress and

7    anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

8    all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

9    DOLLARS ($10,000.00).

10          90.    In doing the acts alleged herein, the defendants and each of them acted with

11    deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

12    such, are guilty of oppression, thus warranting the imposition of exemplary and punitive

13    damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14          91.    The plaintiffs have been required to retain the services of ERICKSON,

15    THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

16    future, incur expenses and costs and attorney's fees for which they are entitled to recover.

17    The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

18                            **THIRD CLAIM FOR RELIEF**

19                          **(Fraud and Misrepresentation)**

20          92.    Plaintiffs reallege each and every allegation as contained above and incorporate

21    them by reference as if fully set forth herein.

22          93.    As set forth above, the defendants, and each of them, provided false

23    representations of material fact, with either the knowledge or belief of such falsity, or without

24    sufficient foundation.  These representations included telling the plaintiff Longoni that

25    plaintiffs' loan modification was permanently approved, and that plaintiffs' loan payments

26    would be the amount of $1,600.00 per month, commencing in April of 2009, and that GMAC

27    would not foreclose upon her home. These misrepresentations included previously described

28    communications regarding the retraction of the permanently approved loan for a "trial

22

1  modification" only, subsequent representation indicating that the loan had again been

2  permanently approved, communications and representations concerning reduction in the

3  principal loan amount of approximately $169,000.00, representations regarding the need to

4  place plaintiffs into an "Obama Modification Plan", representations regarding the need to

5  submit a new loan modification application and supporting documentation, representations

6  that any effort to foreclose on the property had been placed on hold, and that "GMAC does

7  not want to take your home", as well as the omission to provide plaintiffs with requested

8  information as to whether new loans had in fact been approved, accepted, or declined, all as

9  previously described above.

10      94.    These false representations were made with the intent to induce the plaintiffs'

11  reliance, and the plaintiffs did, in fact, justifiably rely upon these false representations, to

12  their detriment. Such reliance is reflected by the above-described mortgage payments made

13  under the "permanently approved" loan modification, the last of which was rejected without

14  explanation. The plaintiffs further relied to their detriment upon these representations by not

15  undertaking more aggressive actions to qualify under an additional loan modification

16  program, by not making preparations to leave their home, thus forcing them to incur all the

17  additional cost and trouble of finding replacement housing with no notice. This detriment

18  was also reflected by the fact that, in spite of said payments, the plaintiffs lost their home.

19      95.    Fraudulent intent is also reflected by the fact that at the same time the

20  defendants were making the above-described false representations, they were, in fact,

21  proceeding on a course of foreclosure by denying the plaintiffs a myriad of statutory

22  protections regarding their mortgage and their home, including proper notices, the right and

23  opportunity to participate in the Nevada mandatory mediation process, while also filing

24  documents with the Washoe County Recorder containing false statements which were used

25  to expedite the sale of the home without the plaintiffs' knowledge. In addition, the

26  defendants were actively seeking to sell the plaintiffs' home pursuant to the Notice of Default

27  which it knew, or in the exercise of reasonable care, would have known, was defective thus

28  requiring the recommencement of the foreclosure process.

23

96.    The plaintiffs' reliance was justifiable.

97.    Damages resulted from this reasonable reliance. The defendants' above-described misrepresentations proximately caused all of the plaintiffs' damages.

98.    As a direct and proximate result of the actions of the defendants and each of them, the plaintiffs' real property was sold at a public auction on or about August 14, 2009. As a further direct and proximate result of the actions of the defendants and each of them, the plaintiffs were wrongfully ousted and ejected from their lawful residence and real property.

99.    As a direct and proximate result of the wrongful acts of the defendants, and each of them, the plaintiffs have suffered the permanent loss of their home and real property, as well as all attributes thereto, including, but not necessarily limited to, the loss of the value of the property, the future value and earning capacity of said property, the loss of the use and enjoyment of said property, and the loss of all improvements made to that property over the past 14 plus years all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

100.    As a further direct and proximate result of the wrongful acts of the defendants and each of them, the plaintiffs have been forced to incur costs associated with obtaining replacement housing, including, but not necessarily limited to, moving and storage expenses, rental charges, household furnishings, increased travel costs and increased utility bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

101.    As a further direct and proximate result of the wrongful acts of the defendants and each of them, the plaintiffs have suffered severe and disabling emotional distress and anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

102.    In doing the acts alleged herein, the defendants and each of them acted with deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as such are guilty of oppression thus warranting the imposition of exemplary and punitive damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

24

103.    The plaintiffs have been required to retain the services of ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the future, incur expenses and costs and attorney's fees for which they are entitled to recover. The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

### FOURTH CLAIM FOR RELIEF

### (Negligence and Negligent Misrepresentation)

104.    Plaintiffs reallege each and every allegation as contained above and incorporate them by reference as if fully set forth herein.

105.    The defendants, and each of them, owed a duty to the plaintiffs to refrain from any conduct which unlawfully interfered with the plaintiffs' rights to peaceful occupancy of the residence and real property. The defendants, and each of them, breached said duty by acting in a negligent fashion proximately causing the plaintiffs' home to be unlawfully sold to a third party, and proximately causing the plaintiffs to be unlawfully ousted and ejected from the home.

106.    Defendants, and each of them, had a duty of care regarding foreclosure proceedings, such minimum duty pertaining to foreclosures defined by Nevada Revised Statutes 107.080 through NRS 107.100. In addition, the defendant GMAC MORTGAGE, LLC., knew that it had agreed to a loan modification pursuant to which it received further loan payments, thereby invalidating the Notice of Default which it had previously caused to be prepared and recorded. The defendant EXECUTIVE TRUSTEE SERVICES, LLC., knew, or through the exercise of reasonable care, should have known, that the plaintiffs had made further payments to the modified Promissory Note, thereby invalidating the original Notice of Default.

107.    As delineated above, the defendants, and each of them, violated these statutes which established the duty and breach elements of negligence in that the plaintiffs belonged to that class of persons the statutes were intended to protect, and the injury described above is of the type against which the statute was intended to protect. The defendants further breached their general standard of care to the plaintiffs to conduct a foreclosure only when

1  they had the proper authority and standing, and in compliance with all Nevada statutes.

2      108.   As a proximate result of these statutory and other violations, plaintiffs have

3  sustained damages.

4      109.   At the time the power of sale was exercised, or that foreclosure occurred, the

5  defendants lacked the legal right to proceed forward with any non-judicial foreclosure.

6  Moreover, there was no breach of condition or failure to perform which existed on the

7  plaintiffs' part, which would have authorized the foreclosure or exercise of the power of sale.

8      110.   Defendants, and each of them, in the course of their business, profession or

9  employment, or in any other action in which they had a pecuniary interest, supplied false

10  information for the guidance of the defendants in their business transactions.

11      111.   The defendants, and each of them, failed to exercise reasonable care or

12  competence in obtaining and communicating such information.

13      112.   The plaintiffs justifiably relied upon such information to their legal and

14  pecuniary law which was caused thereby.

15      113.   Defendants, and each of them, gratuitously or for consideration, rendered

16  services to the plaintiffs which the defendants should have recognized as being necessary for

17  the protection of the plaintiffs, or the plaintiffs' possessions.

18      114.   Defendants, and each of them, are subject to liability to the plaintiffs for the

19  physical harm resulting from their failure to exercise reasonable care to perform this

20  undertaking – in particular, the represented loan modification – in that the defendants' failure

21  to exercise such care increased the risk of harm and foreclosure to the plaintiffs.

22      115.   The harm to the plaintiffs was suffered because of the plaintiffs' reliance upon

23  the defendants' undertaking regarding the mortgage services and modification.

24      116.   Through the above-described actions concerning representations of permanent

25  loan modification, and subsequent wrongful and fraudulent foreclosure of said home,

26  defendants' conduct is extreme and outrageous.

27      117.   As a result of the wrongful foreclosure, and other actions described herein,

28  plaintiffs have suffered emotional distress causing a physical impact and physical

1 | manifestation.

2 |     118.  As a direct and proximate result of the wrongful acts of the defendants, and

3 | each of them, the plaintiffs have suffered the permanent loss of their home and real property,

4 | as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

5 | of the property, the future value and earning capacity of said property, the loss of the use and

6 | enjoyment of said property, and the loss of all improvements made to that property over the

7 | past 14 plus years all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

8 |     119.  As a further direct and proximate result of the wrongful acts of the defendants

9 | and each of them, the plaintiffs have been forced to incur costs associated with obtaining

10 | replacement housing, including, but not necessarily limited to, moving and storage expenses,

11 | rental charges, household furnishings, increased travel costs and increased utility bills and

12 | expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

13 |     120.  As a further direct and proximate result of the wrongful acts of the defendants

14 | and each of them, the plaintiffs have suffered severe and disabling emotional distress and

15 | anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

16 | all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

17 | DOLLARS ($10,000.00).

18 |     121.  In doing the acts alleged herein, the defendants and each of them acted with

19 | deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

20 | such are guilty of oppression thus warranting the imposition of exemplary and punitive

21 | damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

22 |     122.  The plaintiffs have been required to retain the services of ERICKSON,

23 | THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

24 | future, incur expenses and costs and attorney's fees for which they are entitled to recover.

25 | The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

26 | **FIFTH CLAIM FOR RELIEF**

27 | **(Breach of Contract)**

28 |     123.  Plaintiffs reallege each and every allegation as contained above and incorporate

27

1   them by reference as if fully set forth herein.

2        124.    The plaintiffs entered into a contract with EquiFirst Corporation which contract

3   included a Promissory Note and Deed of Trust.  That contract contained certain provisions

4   relating to actions which may have be taken should the plaintiffs fail to fulfill their obligation

5   to make periodic payments on the mortgage.  These promises were binding upon and

6   enforceable against all who assumed the rights and liabilities under the Note and Deed of

7   Trust, including the defendants, and each of them.

8        125.    For example, the Deed of Trust provides under Subsection 15, that notices

9   required by the security agreement shall satisfy the applicable law.

10       126.    Subsection 16 of the Deed of Trust, (attached hereto as Exhibit 4) provides that

11   the security instrument is governed by the federal law, and the law of the jurisdiction in

12   which the property is located, and that all rights and obligations contained in the security

13   agreement are subject to the requirements and limitations of such law.

14       127.    Through the above-described conduct, including multiple violations of Nevada

15   statutes designed to protect plaintiffs from wrongful foreclosures, defendants, and each of

16   them, breached, in part and not limited thereto, the remedies and notice provisions, as well

17   as provisions regarding the sale of property at public auction within Section 22 of said Deed

18   of Trust.

19       129.    Moreover, the Adjustable Rate Note (attached hereto as Exhibit "5")

20   incorporates by reference the Deed of Trust, at Section 11, as well as the protections given

21   to the note holder therein.

22       130.    Vis-a-vis the above-described conduct, defendants have violated, in part and

23   not limited thereto, the terms of that incorporated Deed of Trust as applicable to the

24   Adjustable Rate Note, as well as notice provisions within Section 7(C), Section 8, and

25   Section 11 of the Adjustable Rate Note.

26       131.    The plaintiffs are informed and believe and thereupon allege that the

27   Defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY,

28   LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., assumed, or were

1    assigned, all the duties and obligations which EquiFirst Corporation owed to the plaintiffs

2    under the loan agreement.

3         132.   The defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL

4    FUNDING COMPANY, INC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS,

5    INC., breached said contracts with the plaintiffs when they wrongfully and unlawfully

6    constructively seized and sold the plaintiffs' real property and residence.

7         133.   In addition, and not by way of limitation, the defendants, through their above-

8    described conduct, breached an express and implied in fact agreement concerning permanent

9    approval of the loan modification.  A meeting of the minds occurred regarding this

10    permanently approved loan modification, as reflected both by written communication and the

11    conduct of the parties, showing, in light of the surrounding circumstances, their express and

12    tacit understandings.

13         134.   This understanding is evidenced, in part, by payment of, and acceptance of, the

14    reduced and modified loan amount as agreed upon by the parties.

15         135.   The plaintiffs performed by tendering these modified loan amounts from April

16    through July of 2009. In spite of various oral and email correspondence regarding the terms

17    of the permanently approved loan modification, the defendants, and each of them, breached

18    the same.

19         136.   Breach of the Promissory Note, Deed of Trust, and subsequent express and

20    implied in fact agreements pertaining to permanently approved loan modifications, were also

21    breached by failure to comply with the above-described Nevada statutes designed to protect

22    the homeowners.

23         137.   Nevada implies a covenant of good faith and fair dealing into every contract.

24         138.   Defendants, by failing to comply with the loan modification agreement and the

25    promise not to foreclose upon the plaintiffs' property and by selling the property in question,

26    with malice, and not complying with statutory notice requirements, and other statutory

27    requirements, breached the implied covenant of good faith and fair dealing implied within

28    every contract in Nevada.

139.    As a direct and proximate result of the breach of contract, the plaintiffs have suffered the permanent loss of their home and real property, as well as all attributes thereto, including, but not necessarily limited to, the loss of the value of the property, the future value and earning capacity of said property, the loss of the use and enjoyment of said property, and the loss of all improvements made to that property over the past 14 plus years all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

140.    As a further direct and proximate result of the breach of the contract, the plaintiffs have been forced to incur costs associated with obtaining replacement housing, including, but not necessarily limited to, moving and storage expenses, rental charges, household furnishings, increased travel costs and increased utility bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

141.    The plaintiffs have been required to retain the services of ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the future, incur expenses and costs and attorney's fees for which they are entitled to recover. The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

## SIXTH CLAIM FOR RELIEF

### (Tortious Breach of The Implied Covenant of Good Faith and Fair Dealing)

### NOTE:

**The plaintiffs have included this claim for relief for appeal purposes only. Previously, the Court dismissed this claim pursuant to Document 52, and it appears that ruling would apply with equal force to all newly named defendants.**

142.    Plaintiffs reallege each and every allegation as contained above and incorporate them by reference as if fully set forth herein.

143.    The plaintiffs entered into a contract with EquiFirst Corporation which contract included a Promissory Note and Deed of Trust. That contract contained certain provisions relating to actions which may be taken should the plaintiffs fail to fulfill their obligation to make periodic payments on the mortgage. Implied into this contract is an implied covenant of good faith and fair dealing which requires each party to engage in no conduct which will

1   deprive the other party of the rights and benefits of said contract. Subsequently, the plaintiffs

2   PAMELA D. LONGONI and JEAN GAGNON entered into a binding loan modification

3   agreement which the parties partially performed.

4        144.   By reason of the relationship between the parties wherein the plaintiffs were

5   in a vastly inferior bargaining position, where the defendant GMAC had made promises and

6   agreements which it knew, or should have known, would be relied upon by the plaintiffs, and

7   because the defendants had failed to comply with certain statutes regulating the assignment

8   of mortgage rights, the defendant occupied a position of trust and reliance vis-a-vis the

9   plaintiffs. Therefore, there exists a special relationship of trust and reliance akin to a

10  fiduciary relationship.

11       145.   The above-described relationship is one of those situations involving an

12  element of reliance generating a need to protect the weak from the insults of the strong, that

13  is not adequately met by ordinary contract damages.

14       146.   The defendants, and each of them, were in a vastly superior or entrusted

15  position as compared to the plaintiffs, and have engaged in grievous or perfidious

16  misconduct.

17       147.   This superior/inferior power differential created a special element of reliance

18  on the credibility of the defendants and lenders concerning the permanently approved loan

19  modification, and promise not to foreclose without adequate notice and due process of law.

20       148.   The plaintiffs are informed and believe and thereupon allege that the Defendant

21  GMAC MORTGAGE, LLC., purportedly assumed or was assigned all the rights, duties and

22  obligations which EquiFirst Corporation owed to the plaintiffs under the loan agreement.

23       149.   The defendant GMAC MORTGAGE, LLC., breached said contracts with the

24  plaintiffs when it wrongfully and unlawfully constructively seized and sold the plaintiffs' real

25  property and residence. Because of the nature of the relationship between the parties and the

26  unique nature of real property, and because contractual damages will not make the plaintiffs

27  whole, an award of tort damages is appropriate under Nevada law.

28       150.   As a direct and proximate result of the breach of contract and breach of the

31

1  implied covenant of good faith and fair dealing, the plaintiffs have suffered the permanent

2  loss of their home and real property, as well as all attributes thereto, including, but not

3  necessarily limited to, the loss of the value of the property, the future value and earning

4  capacity of said property, the loss of the use and enjoyment of said property, and the loss of

5  all improvements made to that property over the past 14 plus years all in an amount in excess

6  of TEN THOUSAND DOLLARS ($10,000.00).

7       151.    As a further direct and proximate result of the breach of the contract and breach

8  of the implied covenant of good faith and fair dealing, the plaintiffs have been forced to incur

9  costs associated with obtaining replacement housing, including, but not necessarily limited

10  to, moving and storage expenses, rental charges, household furnishings, increased travel

11  costs and increased utility bills and expenses all in an amount in excess of TEN THOUSAND

12  DOLLARS ($10,000.00).

13       152.    As a further direct and proximate result of the wrongful acts of the defendants

14  and each of them, the plaintiffs have been forced to incur costs associated with obtaining

15  replacement housing, including, but not necessarily limited to, moving and storage expenses,

16  rental charges, household furnishings, increased travel costs and increased utility bills and

17  expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

18       153.    As a further direct and proximate result of the wrongful acts of the defendants

19  and each of them, the plaintiffs have suffered severe and disabling emotional distress and

20  anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

21  all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

22  DOLLARS ($10,000.00).

23       154.    In doing the acts alleged herein, the defendants and each of them acted with

24  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

25  such are guilty of oppression thus warranting the imposition of exemplary and punitive

26  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

27       155.    The plaintiffs have been required to retain the services of ERICKSON,

28  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

32

1  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

2  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

3  ### SEVENTH CLAIM FOR RELIEF

4  **(Breach of Covenant of Quiet Enjoyment)**

5  ### NOTE:

6  **The plaintiffs have included this claim for relief for appeal purposes only.**

7  **Previously, the Court dismissed this claim pursuant to Document 52, and it appears**

8  **that ruling would apply with equal force to all newly named defendants.**

9  156.   Plaintiffs reallege each and every allegation as contained above and incorporate

10  them by reference as if fully set forth herein.

11  157.   At all times relevant hereto, the plaintiffs PAMELA D. LONGONI and JEAN

12  M. GAGNON were the lawful owners of the real property and residence located at 5540

13  Twin Creeks Drive, Reno, Nevada, 89523. In addition, the plaintiff LACEY LONGONI was

14  a lawful resident of said real property and residence.

15  158.   Into every real property sales transaction, the law implies a covenant that said

16  owners and lawful occupants of said property shall have peaceful and quiet enjoyment and

17  possession of said premises.

18  159.   The covenant of quiet enjoyment is the grantor's promise that the grantee's

19  possession will not be disturbed by any other claimant with a superior title.

20  160.   The covenant of quiet enjoyment runs with the land.

21  161.   The covenant of quiet enjoyment includes a covenant against disturbance by

22  an encumbrancer.

23  162.   The covenant of quiet enjoyment requires the grantor to protect the grantee

24  against lawful claims of ownership asserted by third persons, and comes to fruition once

25  there has been a disturbance in possession by actual or constructive eviction.

26  163.   The defendants, and each of them, by all actions taken to foreclose upon the

27  plaintiffs' real property and by selling said property to a third party, breached the implied

28  covenant of quiet enjoyment and as such are legally liable for all damages proximately

33

1  caused by said conduct.

2      164.   As a direct and proximate result of the wrongful acts of the defendants, and

3  each of them, the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON have suffered

4  the permanent loss of their home and real property, as well as all attributes thereto, including,

5  but not necessarily limited to, the loss of the value of the property, the future value and

6  earning capacity of said property, the loss of the use and enjoyment of said property, and the

7  loss of all improvements made to that property over the past 14 plus years all in an amount

8  in excess of TEN THOUSAND DOLLARS ($10,000.00).

9      165.   As a further direct and proximate result of the wrongful acts of the defendants,

10  and each of them, the plaintiffs have been forced to incur costs associated with obtaining

11  replacement housing, including, but not necessarily limited to, moving and storage expenses,

12  rental charges, household furnishings, increased travel costs and increased utility bills and

13  expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14      166.   As a further direct and proximate result of the wrongful acts of the defendants,

15  and each of them, the plaintiffs have suffered severe and disabling emotional distress and

16  anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

17  all to the Plaintiffs' general damages in an amount in excess of TEN THOUSAND

18  DOLLARS ($10,000.00).

19      167.   In doing the acts alleged herein, the defendants, and each of them, acted with

20  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

21  such are guilty of oppression thus warranting the imposition of exemplary and punitive

22  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

23      168.   The plaintiffs have been required to retain the services of ERICKSON,

24  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

25  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

26  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

27                 **EIGHTH CLAIM FOR RELIEF**

28           **(Intentional Infliction of Emotional Distress)**

169.   Plaintiffs reallege each and every allegation as contained above and incorporate them by reference as if fully set forth herein.

170.   By way of the above-described actions and omissions, the Defendants' conduct was extreme and outrageous with the intention of, or reckless regard for, causing emotional distress.

171.   Plaintiffs have suffered severe and extreme emotional distress with physical manifestations of such distress.

172.   The defendants' above-described actions and omissions were the actual or proximate causation of this emotional distress.

173.   The above-described foreclosure and wrongful ousting of the plaintiffs from the family home was an invasion of the property owners' rights which occurred under circumstances of malice, willfulness, wantonness, and inhumanity.

174.   The defendants', and each of them, wrongful acts and foreclosure were a wilful use of power with the expectation to humiliate and distress the mortgagors and plaintiffs.

175.   In doing the acts alleged herein, the defendants engaged in conduct that they knew, or should have known and expected, would cause the plaintiffs to suffer and which did, in fact, cause the plaintiffs to suffer severe mental and emotional pain, grief, sorrow, anger, worry, and anxiety all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

176.   In doing the acts alleged herein, the defendants, and each of them, acted with deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as such are guilty of oppression thus warranting the imposition of exemplary and punitive damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

177.   The plaintiffs have been required to retain the services of ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the future, incur expenses and costs and attorney's fees for which they are entitled to recover. The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

### NINTH CLAIM FOR RELIEF

#### (Promissory Estoppel)

178.    Plaintiffs reallege each and every allegation as contained above and incorporate them by reference as if fully set forth herein.

179.    The defendants, as the parties to be estopped, were apprised of the true facts. The defendants made representations that they knew, or should have known would be relied upon by the plaintiffs, and which were, in fact, relied upon by the plaintiffs to their legal detriment.

180.    The defendants intended that their conduct and misrepresentations would be acted upon, and acted in a fashion which would otherwise justify the plaintiffs' right to believe that the defendants so intended.

181.    The plaintiffs were ignorant of the true state of facts, especially in light of the defendants' intentional representations regarding loan modification and their intent not to foreclose upon the plaintiffs' property.

182.    The plaintiffs relied to their detriment on the defendants' conduct and misrepresentations.

183.    In making the representations as alleged above, the employees and agents of GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., knew, or in the exercise of reasonable care, should have known that said representations would be relied upon by the plaintiffs who did, in fact, rely to their detriment upon said statements and representations. Under the principles of equity, said representations are therefore binding and enforceable against GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.

184.    The defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., failed to perform the promises and guarantees which they made to the plaintiffs when they wrongfully and unlawfully constructively seized and sold the plaintiffs' real property

36

1    and residence and refused to modify the plaintiffs' existing Promissory Note.

2        185.    As a direct and proximate result of the defendants failure to perform their

3    promises and guarantees, the plaintiffs have suffered the permanent loss of their home and

4    real property, as well as all attributes thereto, including, but not necessarily limited to, the

5    loss of the value of the property, the future value and earning capacity of said property, the

6    loss of the use and enjoyment of said property, and the loss of all improvements made to that

7    property over the past 14 plus years all in an amount in excess of TEN THOUSAND

8    DOLLARS ($10,000.00).

9        186.    As a further direct and proximate result of the defendants' failure to perform

10    its promises and guarantees, the plaintiffs have been forced to incur costs associated with

11    obtaining replacement housing, including, but not necessarily limited to, moving and storage

12    expenses, rental charges, household furnishings, increased travel costs and increased utility

13    bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14        187.    The plaintiffs have been required to retain the services of ERICKSON,

15    THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

16    future, incur expenses and costs and attorney's fees for which they are entitled to recover.

17    The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

18        **TENTH CLAIM FOR RELIEF**

19        **(Concert of Actions against All Defendants)**

20        188.    Plaintiffs    reallege each and every allegation as contained above and

21    incorporates them by reference as if fully set forth herein.

22        189.    By and through the above described behavior and actions, defendants, and each

23    of them, committed a tortuous acts in concert with one another and/or pursuant to a common

24    design, plan design or scheme with one another, or;

25        190.    Each of these defendants knew that the others' conduct constituted a breach

26    of duty and gave substantial assistance or encouragement to the other so to conduct, or;

27        191.    Each of these named defendants gave substantial assistance to the other in

28    accomplishing the tortuous result and each of their own conduct, separately considered,

1    constituted a breach of duty to the plaintiffs, and/or;

2        192.    Each of the defendants conspired to create separate entities in order to shield

3    and hide from public scrutiny their wrongful actions, and to attempt to avoid legal liability

4    for conduct which they knew, or should have known, was unlawful or wrongful,

5        193.    As a direct and proximate result of the above described concert of actions, the

6    plaintiffs have suffered and continue to suffer the permanent loss of their home and real

7    property, as well as all attributes thereto, including, but not necessarily limited to, the loss

8    of the value of the property, the future value and earning capacity of said property, the loss

9    of the use and enjoyment of said property, and the loss of all improvements made to that

10    property over the past 14 plus years all in an amount in excess of TEN THOUSAND

11    DOLLARS ($10,000.00).

12        194.    As a further direct and proximate result of the defendants' failure to perform

13    their promises and guarantees, the plaintiffs have been forced to incur costs associated with

14    obtaining replacement housing, including, but not necessarily limited to, moving and storage

15    expenses, rental charges, household furnishings, increased travel costs and increased utility

16    bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

17        195.    In doing the acts alleged herein, the defendants, and each of them, acted with

18    deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

19    such, are guilty of oppression thus warranting the imposition of exemplary and punitive

20    damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

21        196.    The plaintiffs have been required to retain the services of ERICKSON,

22    THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

23    future, incur expenses and costs and attorney's fees for which they are entitled to recover.

24    The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

25        WHEREFORE, the plaintiffs, individually, and PAMELA D. LONGONI, in her

26    representative capacity, pray for judgment against the Defendants, and each of them, jointly

27    and severally, as follows:

28        1.    For special damages for all damages associated with the loss of their real

1   property and residence and related items when the same are ascertained;

2        2.     For general damages in a sum in excess of TEN THOUSAND DOLLARS

3   ($10,000.00);

4        3.     For exemplary damages in an amount in excess of TEN THOUSAND

5   DOLLARS ($10,000.00);

6        4.     For interest pursuant to statute; and

7        5.     For such other and further relief as this Court may deem equitable and just.

8   **Plaintiffs hereby demand a jury on all issues.**

9   DATED this 12th day of September, 2011.

10                ERICKSON, THORPE & SWAINSTON, LTD.
11                99 West Arroyo Street
                   P. O. Box 3559
12                Reno, Nevada 89505

13                By_____
14                  THOMAS P. BEKO, ESQ.
                  *Attorney for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I certify that I am an employee of ERICKSON, THORPE & SWAINSTON, LTD. and that on this day I personally served a true and correct copy of the attached document by:

- ☐ U.S. Mail
- ☐ Facsimile Transmission
- ☐ Personal Service
- ☐ Messenger Service
- ☒ CM/ECF System

addressed to the following:

David Hill Bahford
Bradley Arant Boult Cummungs LLP
100 N. Tyron Street, Suite 2690
Charlotte, NC 28202
*Attorney for Defendants GMAC Mortgage, LLC,*
*Executive Trustee Services, LLC,*
*Illeanna Peterson and Kathleen Gowen*

DATED this ___12th___ day of September, 2011.

## Passaretti Claim

**(Claim No. 5605)**

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number:
**Residential Capital, LLC, Case No. 12-12020**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**Albert A. Passaretti, Jr.,**

☐ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

**Albert A. Passaretti, Jr.**
**3660 Wilshire Blvd, Ste 1132**
**Los Angeles, CA 90010**

■ **Date Stamped Copy Returned**
☐ **No self addressed stamped envelope**
☐ **No copy to return**

Telephone number: 213/480-1960        email: Passarettilaw@yahoo.com

**Court Claim**
**Number:** _____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):

Telephone number:                            email:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ **1,000,000.00**

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Wrongful foreclosure
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:**

**3a. Debtor may have scheduled account as:**
Passaretti, Albert A. Passaretti, Jr.
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):**

(See instruction #3b)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐Real Estate  ☐Motor Vehicle  ☐Other
Describe:

Value of Property: $_____    Annual Interest Rate_____%  ☐Fixed  ☐Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $_____    Basis for perfection: _____

Amount of Secured Claim: $_____    Amount Unsecured: $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

**Amount entitled to priority:**

$_____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____    (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

* Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**9. Signature: (See instruction #9)** Check the appropriate box.
■ I am the creditor.  ☐ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: ALBERT A. PASSARETTI, JR.
Title: CREDITOR
Company: 
Address and telephone number (if different from notice address above):

(Signature)        11/13/12
(Date)

**RECEIVED**
**NOV 1 6 2012**
KURTZMAN CARSON CONSULTANTS

Telephone number:                            Email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18

121202012111600000000139

# ALBERT PASSARETTI
## Attorney at Law

*3660 Wilshire Boulevard., Suite 1132, Los Angeles, California 90010*
*Telephone: (213) 480-1960 - Facsimile (213) 480-1961*

November 15, 2012

By U.S. Mail, Express Mail

Residential Capital Claims Processing Center
c/o KCC
Post Office Box 5004
Hawthorne, CA 90250

Re:    GMAC Mortgage, LLC
       United States Bankruptcy Court, Southern District of New York
       Case No. 12-12020
       Albert Passaretti, Creditor
       Proof of Claim

Dear Claims Agent:

Enclosed please find the above referenced Proof of Claim with attachments, and a copy of the claim form and return, self-addressed, stamped envelope.

Please file the Proof of Claim and return a conformed copy of the claim form.

Please contact my office if you have any questions.

Your courtesy and cooperation are much appreciated.

Very truly yours,

Albert Passaretti
cc: Jonathan Dykstra, Esq.,   Jan T. Chilton, Esq.

LIST OF ATTACHMENTS TO PROOF OF CLAIM

Re:    GMAC Mortgage, LLC
       United States Bankruptcy Court, Southern District of New York
       Case No. 12-12020
       Albert Passaretti, Creditor
       Proof of Claim

1. Letter of Court of Appeal Staying Appeal
2. Schedule F-3, Page 166 of 242
3. Notice of Appeal
4. Minute Order dated 4/8/10
5. Minute Order dated 6/24/12
6. Minute Order dated 4/14/11
7. Appellant Albert Passaretti's Opening Brief

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
JOSEPH A. LANE, CLERK

DIVISION 1    November 13, 2012

Albert Anthony Passaretti. Esq.                    Jonathan Daniel Dykstra, Esq.
3660 Wilshire Boulevard, Ste. 1132                 Severson & Werson
Los Angeles, CA 90010                              19100 von Karmen Avenue, Ste. 700
                                                   Irvine, CA 92612

Jan T. Chilton, Esq.
Severson & Werson
On Embarcadero Center, Ste. 2600
San Francisco, CA 94111

        Passaretti v. GMAC Mortgage, LLC
        B234156
        Los Angeles County No. NC043183

Dear Counsel:

        The court has read and considered the parties' letter briefs concerning the effect of
GMAC's chapter 11 proceedings on the above appeal.  All proceedings before this court are
stayed pending determination of GMAC's bankruptcy proceedings before the bankruptcy court.
Although you may not be directly involved with the bankruptcy proceedings, it is still your
responsibility to keep this court advised of the status of the proceedings.  All update letters must
be served on opposing counsel and filed with this Court.

        Appellant is directed to file status letters with this court beginning on May 13, 2013  and
every 90 days thereafter.  Failure to timely file these letters WILL be viewed as an abandonment
of the appeal.

                                        Very truly yours,

                                        Joseph A. Lane, Clerk

                                        by: _____
                                                Deputy Clerk

cc:    File

                                        Second Appellate District, Div. One
                                        300 South Spring Street
                                        Los Angeles, CA  90013
                                        (213) 830-7000
                                        www.courts.ca.gov/2dca

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION: 1

DATE: November 13, 2012

Albert Anthony Passaretti
3660 Wilshire Boulevard, Ste. 1132
Los Angeles, CA 90010

ALBERT A. PASSARETTI, JR.,
Plaintiff and Appellant,
v.
GMAC MORTGAGE, LLC,
Defendant and Respondent.

B234156
Los Angeles County No. NC043183

THE COURT:

Matter taken off calendar.

cc:  File

12-12020-mg    Doc 550    Filed 06/30/12    Entered 06/30/12 18:20:07    Main Document
Pg 964 of 1365

In re: GMAC Mortgage, LLC
Case No. 12-12032
Schedule F-3
General Litigation
Creditors Holding Unsecured Claims

| Creditor's Name | Address 1 | Address 2 | City | State | Zip | Co-Debtor | Date claim was incurred and consideration for claim | Subject to setoffs Y/N | Contingent | Unliquidated | Disputed | Total amount of claim |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OWNER MANAGEMENT SERVICE LLC DBA TRUST HOLDING SERVICE CO., AS TRUSTEE FOR HARVARD TRUST VS. FIDELITY NATIONAL TITLE COMPANY; FIDELITY NATIONAL TITLE GROUP; FIDELITY NATIONAL FINANCIAL INC., POWER DEFAULT SERVICES, INC.; AMERICAN HOME MORTGAGE SERVICING INC.; DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE IN TRUST FOR THE BENEFIT OF THE CERTIFICATEHOLDERS FOR QUEST TRUST 2006-X2, ASSET BACKED CERTIFICATES, SERIES 2006-X2, A DELAWARE CORPORATION, TICOR TITLE COMPANY OF CALIFORNIA, A CALIFORNIA CORPORATION AND DOES 1 THROUGH 20, INCLUSIVE. Docket: BC448808 Matter: 722375 | LAW OFFICE OF RONALD D. TYM, ESQUIRE | 20960 Knapp Street, Suite B | Chatsworth | CA | 91311 | | General Litigation - Origination - Mortgage | | X | X | X | Unknown |
| Palladium Holdings, LLC, New Buffalo Auto Sales, LLC vs. GMAC Mortgage Corporation, Mortgage Electronic Registration Systems, Inc. Docket: 11-6007 Matter: 708644 | MACKALL CROUNSE & MOORE PLC - PRIMARY | 1400 AT&T Tower 901 Marquette Ave. | Minneapolis | MN | 55402 | | General Litigation - Servicing - Mortgage | | X | X | X | Unknown |
| PAMELA A WALKER AND MARGARET KAMEKA VS VELMORLYN WILLIAMS, GLADSTONE WILLIAMS, DEUTSCHE BANK TRUST COMPANY AMERICAS, and THE CITY OF NEW YORK Docket: 300715-11 Matter: 715692 | Fabricant Lipman & Frishberg, PLLC | One Harriman Square, P.O. Box 60 | Goshen | NY | 10924 | | General Litigation - Servicing - Mortgage | | X | X | X | Unknown |
| Pamela Stuckey v. Mortgage Electronic Registration Systems, Inc.; Clearvue Opportunity IX LLC; Michell Law Firm, P. A.; Heritage Service Co dba as Heritage Trustee Services Inc.; Worsham Law Firm, P. A.; Jam Equity Partners, LLC Docket: 60CV-10-7011 Matter: 722078 | 2500 S RINGO ST | | Little Rock | AR | 72206 | | General Litigation - Origination - Mortgage | | X | X | X | Unknown |
| Panfilo Flores, Jr. and Irene Flores v. GMAC Mortgage, LLC fka GMAC Mortgage Corporation; Executive Trustee Services, LLC dba ETS Services, LLC; Mortgage Electronic Registration Systems, Inc.; and Does 1 through 100, inclusive Docket: N12 0794 Matter: 725898 | LAW OFFICES OF MARK W. LAPHAM | 751 DIABLO ROAD | DANVILLE | CA | 94526 | | General Litigation - Servicing - Mortgage | | X | X | X | Unknown |
| PASSARETTI - ALBERT A. PASSARETTI, JR. #2 V. GMAC MORTGAGE, LLC, ETS SERVICES, LLC ET AL. Docket: NC043183 Matter: 694566 | 1609 256th Street | | Harbor City | CA | 90710 | | General Litigation - Foreclosure | | X | X | X | Unknown |

APP-002

| | FOR COURT USE ONLY |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):*<br>Albert Passaretti, Esq.<br>Albert Passaretti, SBN 79522<br>3660 Wilshire Blvd, Ste 1132<br>Los Angeles, CA 90010<br><br>TELEPHONE NO.: 213/480-1960    FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* Plaintiff In Pro Per | **ORIGINAL FILED**<br><br>JUL 0 1 2011<br><br>LOS ANGELES<br>SUPERIOR COURT |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles<br>STREET ADDRESS: 505 South Centre Street<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: San Pedro, CA 90731<br>BRANCH NAME: | |

PLAINTIFF/PETITIONER: Albert A. Passaretti, Jr.

DEFENDANT/RESPONDENT: GMAC Mortgage, LLC

| x   NOTICE OF APPEAL   ☐ CROSS-APPEAL<br>(UNLIMITED CIVIL CASE) | CASE NUMBER:<br>NC 043183 |
|---|---|

**Notice: Please read *Information on Appeal Procedures for Unlimited Civil Cases* (Judicial Council form APP-001) before completing this form. This form must be filed in the superior court, not in the Court of Appeal.**

NOTICE IS HEREBY GIVEN that *(name):* Albert A. Passaretti, Jr.

appeals from the following judgment or order in this case, which was entered on *(date):* 5/4/11

☐ Judgment after jury trial

☐ Judgment after court trial

☐ Default judgment

x Judgment after an order granting a summary judgment motion

☐ Judgment of dismissal under Code of Civil Procedure sections 581d, 583.250, 583.360, or 583.430

☐ Judgment of dismissal after an order sustaining a demurrer

☐ An order after judgment under Code of Civil Procedure section 904.1(a)(2)

☐ An order of judgment under Code of Civil Procedure section 904.1(a)(3)–(13)

x Other *(describe and specify code section that authorizes this appeal):* Orders sustaining demurrers to the Complaint, First Amended, and Second Amended Complaint, Orders denying motions to compel further response to Special Interrogatories, Request for Production of Documents.

*FEE RECEIVED   CHECK# 9089 65*

For cross-appeals only:

a. Date notice of appeal was filed in original appeal:

b. Date superior court clerk mailed notice of original appeal:

c. Court of Appeal case number *(if known):*

Date: 7/1/11

Albert Passaretti
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

Page 1 of 2

Form Approved for Optional Use
Judicial Council of California
APP-002 [Rev. July 1, 2010]

**NOTICE OF APPEAL/CROSS-APPEAL (UNLIMITED CIVIL CASE)**
(Appellate)

Cal. Rules of Court, rule 8.100

Legal Solutions Plus

AA-1102

**APP-002**

| | |
|---|---|
| CASE NAME: Passaretti vs. GMAC | CASE NUMBER:<br><br>NC 043183 |

NOTICE TO PARTIES: A copy of this document must be mailed or personally delivered to the other party or parties to this appeal. **A PARTY TO THE APPEAL MAY NOT PERFORM THE MAILING OR DELIVERY HIMSELF OR HERSELF.** A person who is at least 18 years old and is not a party to this appeal must complete the information below and mail (by first-class mail, postage prepaid) or personally deliver the front and back of this document. When the front and back of this document have been completed and a copy mailed or personally delivered, the original may then be filed with the court.

## PROOF OF SERVICE

<u>X</u> Mail    ☐ Personal Service

1. At the time of service I was at least 18 years of age and not a party to this legal action.

2. My residence or business address is (specify): 92 Sea Breeze Ave, Rancho Palos Verdes CA 90275

3. I mailed or personally delivered a copy of the *Notice of Appeal/Cross-Appeal (Unlimited Civil Case)* as follows (complete either a or b):

   a. <u>X</u> Mail. I am a resident of or employed in the county where the mailing occurred.

      (1) I enclosed a copy in an envelope and

         (a) <u>X</u> deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

         (b) placed the envelope for collection and mailing on the date and at the place shown in items below, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

      (2) The envelope was addressed and mailed as follows:

         (a) Name of person served: Jonathan Dykstra, Severson & Werson
         (b) Address on envelope: 19100 Von Karmen Ave, #700
                                  Irvine, CA 92612

         (c) Date of mailing: 7/1/11
         (d) Place of mailing (city and state): Los Angeles, CA

   b. Personal delivery. I personally delivered a copy as follows:
      (1) Name of person served:
      (2) Address where delivered:

      (3) Date delivered:
      (4) Time delivered:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 7/1/11

| | |
|---|---|
| Glenn Vega | ▶ *Glenn Vega* |
| (TYPE OR PRINT NAME) | (SIGNATURE OF DECLARANT) |

AA-1103

# SUPERIOR COURT C. CALIFORNIA, COUNTY OF LC ANGELES

Pg 203 of 468

04/08/10                                                    **DEPT. BEA88C**

ABLE Roy L. Paul                    JUDGE   J.M. GURNEE          DEPUTY CLERK

ABLE                        JUDGE PRO TEM              ELECTRONIC RECORDING MONITOR

       E. CARLOS          Deputy Sheriff  K. VILICICH #7634          Reporter

31 am  NC043183                    Plaintiff
                                   Counsel    LLOYD SIVERBERG (X)
       ALBERT A. PASSARETTI, JR.
       VS                          Defendant  JOHN CALVAGNA (X)
       GMAC MORTGAGE, LLC, ET AL   Counsel

**NATURE OF PROCEEDINGS:**

DEFENDANT'S (GMAC MORTGAGE, LLC)
1. DEMURRER TO FIRST AMENDED COMPLAINT.

2. MOTION TO STRIKE PORTIONS OF PLAINTIFF'S FIRST
   AMENDED COMPLAINT.

3. CASE MANAGEMENT CONFERENCE

The motions are called for hearing.

1. Demurrer is sustained with leave to amend as to
the third, fourth, sixth and seventh cause of action.

Demurrer is sustained without leave to amend.

Second Amended Complaint is to be filed within 10 days

2. Motion to Strike is denied.

Court does not consider sur-reply and takes judicial
notice of exhibits A-E.

3. Case Management Conference is continued to 6/15/
2010 at 8:30am in this department.

Defendant is to prepare and file the order and notice.

Page   1 of  1    DEPT. BEA88C

MINUTES ENTERED
04/08/10
COUNTY CLERK

AA-9

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

| | | DEPT. BEA88C |
|---|---|---|
| 06/24/10 | | |
| RABLE Roy L. Paul | JUDGE J.M. GURNEE | DEPUTY CLERK |
| RABLE | JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| E. CARLOS | Deputy Sheriff K. VILICICH #7634 | Reporter |

| | | |
|---|---|---|
| 31 am  NC043183 | Plaintiff Counsel | LLOYD SILVERBERG (X) |
| ALBERT A. PASSARETTI, JR. VS GMAC MORTGAGE, LLC, ET AL | Defendant Counsel | JONATHAN DYKSTRA (X) |

NATURE OF PROCEEDINGS:

1. DEFENDANT'S (GMAC MORTGAGE. LLC- ERRRONEOUSLY SUED
   AS EXECUTIVE TRUSTEE SERVICES, LLC) DEMURRER TO
   SECOND AMENDED COMPLAINT.
AND
2. CASE MANAGEMENT CONFERENCE

The matter is called for hearing.

1. Demurrer is sustained without leave to amend as to
the second cause of action. Demurrer is sustained with
20 days leave to amend as to the first cause of action
and Overruled as to the third cause of action.

Defendant has 15 days to file responsive pleading
to the third amended complaint.

2. Matter is continued to 8/12/2010 at 8:30am in this
department.

Notice is waived.

Page   1 of 1   DEPT. BEA88C

```
MINUTES ENTERED
06/24/10
COUNTY CLERK
```

SUPERIOR COURT C. CALIFORNIA, COUNTY OF LL  ANGELES

| 04/14/11 | | | DEPT. BEA88C |
|---|---|---|---|
| ABLE Roy L. Paul | JUDGE | J.M. GURNEE | DEPUTY CLERK |
| ABLE | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| E. CARLOS | Deputy Sheriff | K. VILICICH #7634 | Reporter |

| 30 am NC043185 | Plaintiff Counsel | LLOYD SILVERBERG (X) |
|---|---|---|
| ALBERT A. PASSARETTI, JR. VS GMAC MORTGAGE, LLC, ET AL | Defendant Counsel | JONATHAN DYKSTRA (X) |

NATURE OF PROCEEDINGS:

MOTION FOR SUMMARY JUDGMENT
AND
MOTION TO COMPEL

The motions are called for hearing.

GMAC's evidentiary objection to the Declaration of
Albert Passaretti, in its entirety, is overruled.
GMAC's evidentiary objections 1, 3, 4, 5, 7, 8, 10,
12 and 13 are sustained, while evidentiary
objections 2, 6, 9 and 11 are overruled.

The court finds that Plaintiff has failed to raise a
triable issue of material fact as to his claim for
promissory estoppel, and Defendant is entitled to
summary judgment as a matter of law.

The court finds Plaintiff's motions to compel are
moot and the Court will place them off calendar.

Defendant to prepare Notice of Ruling, Judgment and
Notice of Entry of Judgment.

Page   1 of  1   DEPT. BEA88C

MINUTES ENTERED
04/14/11
COUNTY CLERK

AA-11

B234156

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT

---

ALBERT PASSARETTI

Appellant,

vs.

GMAC MORTGAGE, LLC, et al.,

Respondent.

---

Appeal from the Los Angeles Superior Court, South District

Hon. Roy L. Paul, Judge of the Superior Court

NC043183

---

APPELLANT ALBERT PASSARETTI'S OPENING BRIEF

---

Albert Passaretti (Bar No. 79522)
Law Offices of Albert Passaretti
3660 Wilshire Blvd., Suite 1132
Los Angeles, CA 90010
Telephone: (213) 480-1960
Facsimile: (213) 480-1961
Passarettilaw@Yahoo.com
Plaintiff and Appellant
In Pro Per
Albert Passaretti

# TABLE OF CONTENTS

TABLE OF CONTENTS                                                i

TABLE OF AUTHORITIES                                            iii

CERTIFICATE OF INTERESTED ENTITIES                              v

I. Introduction                                                 1

II. Judgment and Orders  Appealed                               1

III.  Grounds of Appeal of Judgment and Orders                  1

IV.  Statement of Appealability                                 7

V. As to the Judgment on the
Motion for Summary Judgment                                     8

VI. As to the Orders Denying Appellant's
Motions for Order Compelling GMAC's
Further Response to Special Interrogatories
and Request for Production of Documents                         8

VII. As to the Orders Sustaining
Demurrers Without Leave to Amend                                8

VIII. Statement of Facts and
Proceedings below                                               9

IX.  Argument                                                  10

X.  Appellate Standard of Review                               10

XI.  Independent Review for Trial Court's
Orders Sustaining Demurrer Without
Leave to Amend as to the Second Cause
Of Action for Breach of Contract of the
Second Amended Complaint                                       10

XII.  2nd Cause of Action for Breach of Contract
of the Second Amended Complaint alleges
two distinct theories of breach of contract                    11

XIII.  As to the 4th Cause of Action for
Wrongful Foreclosure, of the First Amended
Complaint                                                      16

XIV. As to the 5th Cause of Action for
Violation of MERS of the First Amended Complaint               17

i

XV.  As to the 2nd Cause of Action for
violation of *Business and
Professions Code* §17200                                        18

XVI.   Abuse of Discretion Standard
Of Review for Trial Court's Orders
Denying Motion for Compelling
Further Response to Special Interrogatories
and Request For Production of Documents                         18

XVII.   De Novo Standard of Review
For Trial Court's Granting
Motion for Summary Judgment                                     19

XVIII. Certificate of Compliance                                31

# TABLE OF AUTHORITIES

*Blank vs. Kirwan* (1985) 39 Cal. 3d 311 — 9, 11

*Cariell vs. Superior Court*, 39 Cal. App. 3d 487
(2d Dist. 1974) — 8

*City of Torrance vs. Worker's Comp. Appeal Bd.*
32 Cal. 3d 371 (1982) — 14

*Ferguson v. Avelo Mortg. LLC*
195 Ca. Ap. 4th, 1618 (2d Dist. 2011,
as modified (June 20, 2011) — 5

*Glidden vs. Wills*, 139 Cal. App. 2d 168,
(3d Dist. 1956) — 11

*Guz v. Bechtel Nat'l In.* (2000) 24 Cal 4th 317 — 19

*Henard vs. Superior Court*,  26 Cal. App. 3d 129
(5th Dist. 1972) — 8

*Hood vs. Santa Barbara Bank & Trust*,
143 Cal. App. 4th 526 (2d Dist. 2006)' — 10

*Ion Equipment Corp. vs. Nelson* (1980)
110 Cal. App. 3d 868 — *16*

*Lazar vs. Hertz Corp.* (1999) 69 Cal. App. 4th 1494 — 10,  8

*Los Angeles Shipbuilding & Drydock vs.*
*Industrial Acc. Comm.* 57 Cal. App. 352
(2d Dist. 1922) — 14

*Meyer vs. Graphic Arts International Union*
(1979) 88 Cal. App. 3d 176 — 16

Pro Value Properties vs. Quality Loan Service
170 Cal  App 4th 579 (2009) — 15

Quong Ham Woh vs. Industrial
Accident Commission of California
184 Cal. 26 (1920) — 14

*Republic Indem. Co. v. Schofield* (1996)
47 Cal App 4th 220 — 19

*San Luis Obispo County vs. Goge*
139 Cal. 398 (1903) — 14

*Save Open Space Santa Monica Mountains*
*vs. Superior Court*, 84 Cal. App. 4th 235

(2d Dist. 2000)                                                            19

*Scripps Health vs. Superior Court*
09 Cal.App. 4th 529, (4th Dist. 2003)

*Serrano vs. Priest* (1971) 5 Cal. 3d 584                                  *16*

*Youngman vs. Nevada Ins. Dist*.
70 Cal. 2d 240 (1969)                                                     12

*Yuzon v. Collins* (2004) 116 Cal. App. 4th 149

Zumwalt vs. Hargrove 71 Cal. App. 2d 415,
(2d Dist. 1945)                                                           11

## **STATUTES**

Business and Professions Code § 17200                                     18
*Code of Civil Procedure* §437c(m)(1)                                     8
*Code of Civil Procedure* § 437c(m)(2)                                    20
*Code of Civil Procedure* §437c                                          19
Civil Code §2923.6                                                        12
*Civil Code* §1667(2)                                                     12

**TO BE FILED IN THE COURT OF APPEAL**

**APP-008**

| COURT OF APPEAL, second    APPELLATE DISTRICT, DIVISION 1 | Court of Appeal Case Number: B 234156 |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*

— Albert Passaretti, SBN 79522
3660 Wilshire Blvd, #1132
Los Angeles, CA  90010
TELEPHONE NO.: 213/480-1960    FAX NO. *(Optional):*
E-MAIL ADDRESS *(Optional):*
ATTORNEY FOR *(Name):* In Pro Per

Superior Court Case Number: NC 043183

*FOR COURT USE ONLY*

APPELLANT/PETITIONER:  Albert Passaretti

RESPONDENT/REAL PARTY IN INTEREST:  GMAC

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

*(Check one):* [xx] INITIAL CERTIFICATE    [ ] SUPPLEMENTAL CERTIFICATE

**Notice:  Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.**

1. This form is being submitted on behalf of the following party *(name):* Albert Passaretti

2. a. [X]  There are no interested entities or persons that must be listed in this certificate under rule 8.208.

   b. [ ]  Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested entity or person | Nature of interest *(Explain):* |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |

[ ] Continued on attachment 2.

**The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).**

Date:  March 30, 2012

Albert Passaretti
_____
(TYPE OR PRINT NAME)

► _____
(SIGNATURE OF PARTY OR ATTORNEY)

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
APP-008 [Rev. January 1, 2009]

**CERTIFICATE OF INTERESTED ENTITIES OR PERSONS**

Cal. Rules of Court, rules 8.208, 8.488
www.courtinfo.ca.gov

## I. **INTRODUCTION**

### i. **Judgment and Orders Appealed**

Albert Passaretti ("Appellant") appeals the Trial Court's rulings on the following Judgment and Orders:

a) Judgment granting defendant GMAC Mortgage, LLC's, ("GMAC") Notice of Motion and Motion for Summary Judgment.

b) Order sustaining GMAC's evidentiary objection numbers 1, 3, 4, 5, 7, 8, 10, 12, and 13 to the Declaration of Appellant.

c) Order denying Appellant's Notice of Motion and Motion for Order Compelling GMAC's Further Response to Special Interrogatories.

d) Order denying Appellant's Notice of Motion and Motion for Order Compelling GMAC's Further Response to Request for Production of Documents.

e) Order sustaining GMAC's Notice of Demurrer and Demurrer to the first, second, and fifth causes of action of the First Amended Complaint ("FAC") without leave to amend.

f) Order sustaining GMAC's Notice of Demurrer and Demurrer to the second cause of action of the Second Amended Complaint ("SAC") without leave to amend.

### ii.  **Grounds of Appeal of Judgment and Orders**

1

a) The Judgment granting Defendant GMAC Mortgage, LLC's, Notice of Motion and Motion for Summary Judgment is appealed on the following grounds:

1) Appellant's evidence demonstrated that there is a triable issue of fact with respect to estoppel and reliance.

2) Appellant's declaration demonstrated that there is a triable issue of fact regarding the implementation of the permanent or trial loan modification.

3) The Trial Court had already decided the motion for summary judgment before argument and denied Appellant's discovery motions before argument.

4) The Trial Court weighed the credibility of the evidence to make its determination in ruling on the motion for summary judgment.

5) The Trial Court should have allowed a brief continuance of the motion for summary judgment to allow the discovery so that Appellant could provide evidence that GMAC was not and is not the assignee of the note and trust deed. This is not a question of producing the much touted original note and trust deed. The question here is much more fundamental and basic. Was the note and trust deed actually, ever, assigned to GMAC ? If the note and trust deed were not assigned, should this reviewing Court allow GMAC to claim it was the foreclosing beneficiary when in fact it was not ? If there were an assignment to GMAC why did GMAC never record the assignment itself or any reference to an assignment ?

6) GMAC's motion for summary judgment never

2

stated as a material fact that GMAC was the owner of the note and trust deed, except for the recital in the trustee's deed upon sale which claims that GMAC was the foreclosing beneficiary.

b) The Order sustaining GMAC's evidentiary objections numbers 1, 3, 4, 5, 7, 8, 10, 12, and 13 to the Declaration of Appellant is appealed on the following grounds:

1) Appellant's declaration accurately sets for the substance of the 1st Cause of Action of the Third Amended Complaint.  The declaration is based on personal knowledge and describes facts and events within the observed by Appellant and are admissible into evidence.

c) The Order denying Appellant's Notice of Motion and Motion for Order Compelling GMAC's Further Response to Special Interrogatories is appealed on the following grounds:

1)  Appellant's discovery was based on then newly acquired information received from a real estate broker that Lehman Brothers was the owner of the note and trust deed.  As noted, Appellant is not and was not questioning the whereabouts of the original, paper, note and trust deed.  Appellant asserts  that the note and trust deed were **never assigned** to GMAC, or if purportedly assigned, the assignment was a fraud on the United States Bankruptcy Court and a fraud on the Lehman Brothers'

creditors.[1]

_____

[1] Lehman Brothers was in Bankruptcy, it could not transfer its interest in the note and trust deed, any such transfer would be a violation of bankruptcy code.   The Lehman Brothers bankruptcy was the largest ever in the United States.  According to *Reuters* Lehman Brothers has emerged on or about March 1, 2012 from bankruptcy in what *Reuters* called on March 6, 2012 a $639,000,000,000.00  (six-hundred-and-thirty-nine-billion-dollar) restructuring, which calls for a $65,000,000,000.00, (sixty-five-billion-dollar)  distribution to creditors who filed $300,000,000,000.00 (three-hundred-billion-dollars),  in claims.

Lehman Brothers' Chapter 11 Bankruptcy filed in the United States Bankruptcy Court, New York District, on September 15, 2008 prevented transfer or assignment of the note and trust deed to GMAC and therefore any attempted transfer or assignment of the note and trust deed was illegal and a fraud on the United States Bankruptcy Court and a fraud on the Lehman Brothers Bankruptcy creditors.  If GMAC was not the assignee then it is impossible for the trustee's foreclosure sale to have been properly conducted.

4

The Trial Court was doubtful about Appellant's challenge MERS probably based on the legislature's failure to rectify the banks' unilateral creation of MERS to disregard well established requirements of recording real estate transactions.

This is not an issue raised by *Ferguson v. Avelo Mortg. LLC*, 195 Ca. Ap. 4th, 1618 (2d Dist. 2011, as modified (June 20, 2011). It is not a question of whether MERS held the original note but was the not ever assigned to GMAC,  as GMAC claims it was ? The fact is there was no assignment, MERS did not even take the time or the trouble to bother with an assignment.  There was no assignment made by MERS or any one else.

d) The Order denying Appellant's Notice of Motion and

_____

Would this Court of Appeal affirm the judgment knowing that there was no assignment of the note and trust deed to GMAC, knowing that GMAC was not the assignee of the note and trust deed  ? Would this Court of Appeal affirm the judgment knowing that there was an improper transfer or purported transfer from the United States Bankruptcy Court to GMAC in violation of the United States Code and a fraud on creditors ?  Appellant should have an opportunity to present the evidence of improper transfer and fraud on Lehman Brothers' creditors to the Trial Court and let the Trial Court decide ?

5

Motion for Order Compelling GMAC's Further Response to Request for Production of Documents is appealed on the following grounds:

1) Appellant relies on the same grounds set forth immediately above under the sub-heading of Appellant's Motion to Compel GMAC's Further Response to Special Interrogatories.

e) The Order sustaining GMAC's Notice of Demurrer and Demurrer to the first, second, and fifth causes of action of the First Amended Complaint ("FAC") without leave to amend is appealed on the following grounds:

1) As to the fifth cause of action for Violation of MERS, GMAC's failure to record the purported assignment of the promissory note and trust deed is a breach of the contractual terms of the trust deed or a violation of statute, regardless of the name of the cause of action. GMAC offered a complete recorded history of the ownership of the note and trust deed for Judicial Notice which the Trial Court granted.  There was no assignment.

2) Appellant's allegation that GMAC failed to record the assignment of the note and trust deed transferring the loan to GMAC carries the inference that the note and trust deed were in fact not assigned.

3) The Trustee's Deed Upon Sale is GMAC's fraudulent representation that GMAC was the foreclosing beneficiary and the assignee of the note and trust deed, and had a right to credit bid on its own behalf at the private foreclosure sale, a sale that was conducted by the wholly

6

owned subsidiary of GMAC.

5) Whether the 2nd Cause of Action of the First Amended Complaint is labeled 'breach of contract' or 'violation of statute' the allegations state a cause of action for recovery of the property.

6) The second cause of action states a cause of action for violation of public policy. The Trial Court took a limited view of the application of Public Policy. The Trial Court ruled that the only thing Public Policy does is to make a contract void and further ruled that since the second cause of action alleged breach of the contract, that was alleged to be the violation of Public Policy there no cause of action. Public Policy is a much broader concept than allowed by the Trial Court. It was GMAC's failure to comply with Public Policy, and GMAC's refusal to comply with the mandate of Public Policy that established the second cause of action.

f) The Order sustaining GMAC's Notice of Demurrer and Demurrer to the second cause of action of the Second Amended Complaint ("SAC") without leave to amend is appealed on the following grounds:

1) The sufficiency of the 2nd Cause of Action for violation of Business and Professions Code 17200 is dependent on the decision of this court with respect to the other causes of action, and is dependent on the result of this appeal.

## II.  **STATEMENT OF APPEALABILITY**

7

## A.  As to the Judgment on the Motion for Summary Judgment.

An Appeal from a Judgment granting defendant GMAC's Motion for Summary Judgment in favor of Defendant GMAC  is authorized by *Code of Civil Procedure* §437c(m)(1).

## B.  As to the Orders Denying Appellant's Motions for Order Compelling GMAC's Further Response to Special Interrogatories and Request for Production of Documents.

An Appeal from a Order denying plaintiff's Motion for Order Compelling GMAC's Further Response to Special Interrogatories and Request for Production of Documents is appealable from the entry of final judgment. *Henard vs. Superior Court*,  26 Cal. App. 3d 129 (5th Dist. 1972); *Cariell vs. Superior Court*, 39 Cal. App. 3d 487 (2d Dist. 1974)

## C.  As to the Orders Sustaining Demurrers Without Leave to Amend.

Case law requires the Appellate Court to independently review the success of a demurrer. *Lazar vs. Hertz Corp.* (1999) 69 Cal. App. 4th 1494. In doing so, the Appellate Court treats the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or

conclusions of fact or law.  The Appellate Court also considers matters which may be judicially noticed.  Further, the Appellate Court give the complaint a reasonable interpretation, reading it as a who and its part in their context.  When a demurrer is sustained, the Appellate Court determines whether the complaint states facts sufficient to constitute a cause of action. And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused it discretion and the Appellate Court reverses; if not, there have been no abuse of discretion and the Appellate Court affirms.  *Blank vs. Kirwan* (1985) 39 Cal. 3d 311.

## III. STATEMENT OF FACTS AND PROCEEDINGS BELOW

The present case is an action to set aside a purported non-judicial trustee's foreclosure sale of a single family residence located at 1609 256th Street, Harbor City, California 90717 allegedly conducted on or about May 22, 2009. The original complaint was filed on August 12, 2009 alleging that the trustee's sale was improperly conducted and should be vacated and set aside based on GMAC's failure to follow proper procedures in conducting the non-judicial trustee's foreclosure sale, including but not limited to failing to give actual notice of the trustee's foreclosure sale, failing to properly state the correct amount in default, failing to comply with controlling federal and State statutes

and regulations with respect to loan modification, failing to modify the loan, and violating the Real Estate Settlement Procedures Act ("RESPA") as well as violating public policy.

## III.   ARGUMENT

### A.   APPELLATE STANDARD OF REVIEW

### i.  INDEPENDENT REVIEW FOR TRIAL COURT'S ORDERS SUSTAINING DEMURRER WITHOUT LEAVE TO AMEND AS TO THE SECOND CAUSE OF ACTION FOR BREACH OF CONTRACT OF THE SECOND AMENDED COMPLAINT.

An appeal from a judgment of dismissal after sustaining a demurrer without leave to amend the Appellate Court must consider whether the allegations state a cause of action under any legal theory.  *Hood vs. Santa Barbara Bank & Trust*, 143 Cal. App. 4th 526 (2d Dist. 2006)

Case law requires the Appellate Court to independently review the success of a demurrer. *Lazar vs. Hertz Corp.* (1999) 69 Cal. App. 4th 1494. In doing so, the Appellate Court treats the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law.  The Appellate Court also considers matters which may be judicially noticed.  Further, the Appellate Court gives the complaint a reasonable

interpretation, reading it as a whole and its part in their context. When a demurrer is sustained, the Appellate Court determines whether the complaint states facts sufficient to constitute a cause of action. And when it is sustained without leave to amend, the Appellate Court decides whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused it discretion and the Appellate Court reverses; if not, there have been no abuse of discretion and the Appellate Court affirms. *Blank vs. Kirwan* (1985) 39 Ca. 3d 311.

The 2nd Cause of Action for Breach of Contract of the Second Amended Complaint alleges two distinct theories of breach of contract:

The first theory was based on a violation of public policy and the second theory of breach of contract was based on violation of statute.

In considering the sufficiency of a complaint, questions as to the proper designation of the action or the prayer for relief are not matters of serious concern. The important question is whether the complaint states any cause of action entitling the plaintiff to any relief at law or in equity. *Glidden vs. Wills*, 139 Cal. App. 2d 168, (3d Dist. 1956); *Zumwalt vs. Hargrove* 71 Cal. App. 2d 415, (2d Dist. 1945)

On appeal from a judgment entered on demurrer, without leave to amend, the appellate court, in considering the sufficiency of the pleading, must liberally construe the

allegations of the complaint with a view to attaining substantial justice among the parties. *Youngman vs. Nevada Ins. Dist.* 70 Cal. 2d 240 (1969)

It is the public policy of the federal and California law to have loan servicer provide loan modification. The long history of Federal Programs to prevent foreclosures and to provide for loan modifications establishes a public policy supporting a duty on behalf of loan servicers to modify home loans.

California *Civil Code* §2923.6 specifically states that is the California Legislature intent the loan servicers offer the borrower a loan modification consistent with its contractual or other authority. Therefore, regardless of the legal theory, be it contractual, tort, or created by statute, GMAC's obligation is extent, and GMAC must properly perform its legal obligation.

Under *Civil Code* §1667(2) a contract that contravenes public policy is illegal and void and will not be enforced by the courts.  The term "public policy" has not be precisely defined by the courts , but has been left loose and free of definition.   Cal Jur, 3d, Contract, §162.  It has been expressly declared by the Federal and state law that it is the public policy to have servicers enter into loan modification.

The trial court in the instant case, determined that the application of public policy is limited to situations where

12

public policy renders a contract which contravenes public policy void; the trial court determined that the first amended complaint alleged that it was GMAC's breached public policy not that the contract was in violation of public policy.

Appellant asserts that GMAC's refusal to make SPA and HAMP part of the note and trust deed contract coupled with GMAC's refusal to modify the loan in compliance with SPA and HAMP rendered the note and trust deed void. In the instant case, public policy is termed in negative terms, failure to convert the note and trust deed into compliance with the SPA and HAMP, that is in compliance with public policy, rendered the note and trust deed void.  The trial court's ruling on this point should be reversed.

With respect to the breach of contract based on violation of statute, the trial court did not think that a statute became part of the note and trust deed; the trial court's view on this point is contrary to well established law.

Paragraph 'J' of the trust deed, states: "(J) 'Applicable Law' means all controlling applicable federal, state and local statutes, regulations ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinion."
Paragraph 16 of the trust deed states:   "16. Governing Law; Severability; Rules of Construction.  This Security Instrument shall be governed by federal law and

13

the law of the jurisdiction in which the Property is located.
All rights and obligations contained in this Security
Instrument are subject to any requirements and limitations
of Applicable Law.   ..."

It is a well established that existing statutes are part a
contract and in some instances future law is part of a
contract. *City of Torrance vs. Worker's Comp. Appeal Bd.*
32 Cal. 3d 371 (1982). Law attaches to a contract. *Los
Angeles Shipbuilding & Drydock vs. Industrial Acc. Comm.*
57 Cal. App. 352 (2d Dist. 1922)    See also, obligations
arising from contract: *San Luis Obispo County vs. Goge* 139
Cal. 398 (1903) and Ex Contractu: *Quong Ham Woh vs.
Industrial Accident Commission of California*   184 Cal. 26
(1920)

Now in the instant case, Appellant alleged a violation
of the cited statutes, rules, regulations, and law  and the
trial court's ruling on the demurrer should be reversed.

By becoming a party to the Servicer Participation
Agreement (SPA) for the Home Affordable Modification
Program (HAMP) under the Emergency Economic
Stabilization Act of 2008, GMAC was and is bound to follow
the guidelines promulgated under Act.  The SPA is attached
to the First Amended Complaint and is signed by GMAC.
Under SPA GMAC was and remains  under a duty to modify
the subject loan and failed to do so, and the first cause of
action of the First Amended Complaint alleges.  GMAC

14

attempted to avoid its legal obligations by using a specious argument based on alternating legal theory between tort and contract, a distinction without legal significance.

Under HAMP guidelines, GMAC is prevented from proceeding with the foreclosure sale. Under the guidelines, if a Servicer denies loan modification, the Servicer under the Supplemental Directive, 09-08, requires notices to borrower who fail to qualify for a trial or permanent HAMP modification, indicating that the borrower is still being considered for HAMP, and that a foreclosure sale should not take place. The notice must comply with the Net Present Value (NPV) test. Appellant sent GMAC a"qualified written request" (QWR) under the Real Estate Settlement Procedures Act (RESPA), GMAC failed to respond in the time, or at any other time, required by RESPA, and therefore, the trustee's foreclosure sale is invalid.

The court in *Pro Value Properties vs. Quality Loan Serivce* 170 Cal App 4th 579 (2009) held that a trustee's sale conducted by a trustee who had not been substituted in as a trustee, was void. In the present case ETS never substituted in as trustee, and therefore the sale is void.

GMAC's continued violation of HAMP, practices against public policy, failure to give notice, conducting a trustee's sale by a trustee who had no authority to sell the property, all amount to a violation of Business and Professions Code § 17200, et seq.

15

<u>As to the 4th Cause of Action for Wrongful Foreclosure,</u>
<u>of the First Amended Complaint.</u>

Appellant alleged that he did not receive Notice of
Sale. The trial court, looked at the exhibits attached to the
First Amended Complaint and concluded because the
documents had handwriting on them that Appellant/Plaintiff
had received the documents.  The handwritten notations
were not Appellant's they were his attorney, and the trial
court went beyond the function of a demurrer.  The trial
court's ruling on this point should be reversed.

It is a well established rule in California that the
standards for measuring the validity of a pleading that a
demurrer can be used only to challenge defects that appear
on the face of the pleading under attack or from matters
outside the pleading that are judicially noticeable.  *Ion
Equipment Corp. vs. Nelson* (1980) 110 Cal. App. 3d 868; a
complaint will withstand a general demurrer if the facts as
pleaded state a cause of action under any theory of
recovery.  For the purpose of testing the sufficiency of a
cause of action, the demurrer admits the truth of all
material facts properly pleaded. *Serrano vs. Priest* (1971) 5
Cal. 3d 584.  The sole issue raised by a general demurrer is
whether the facts pleaded state a valid cause of cause of
action, not whether they are true.  No matter how unlikely
or improbable, plaintiff's allegations must be accepted as
true for the purpose of ruling on the demurrer. *Meyer vs.
Graphic Arts International Union* (1979) 88 Cal. App. 3d
176.  In the present case,  GMAC based its demurrer on an

16

evidentiary attack and attempts to present evidence to this
court to attack the First Amended Complaint.  GMAC
claimed  that certain documents attached to the original
complaint contain plaintiff's handwritten notations, which,
plaintiff denies.   GMAC is incorrect in this assertion and the
assertion is beyond the face of the First Amended
Complaint, and therefore was an improper attack on the
First Amended Complaint on which the trial court apparently
relied.

   As to the 5th Cause of Action for Violation of MERS of
the First Amended Complaint.  This is a very serious trial
court error and really goes to the substance of this case.
Appellant has alleged that there was not record of the
assignment of the note and trust deed to GMAC.  The fact of
the matter is that there was no recording of the assignment
because there was no assignment.  The trial court took
judicial notice of recorded loan documents presented by
GMAC, there is no assignment or even any purported
assignment by MERS to GMAC. If there were an assignment
to GMAC, defense counsel would have introduced it into
evidence, but defense counsel did not.

   The trial court was misled by GMAC pretending to look
for a substitution of trustee, when the real issue was there
was no assignment of the note or trust deed to GMAC. This
Appellate Court should rectify this grievous error and
reverse the trial court's ruling on this point.  See GMAC's
Request for Judicial Notice.   See Appellant's Declaration as

17

part of Appellant's Motions to Compel GMAC's Further Response to Request for Production of Documents and Special Interrogatories.

The purported non-judicial trustee's sale resulted in the property "reverting" to GMAC, the alleged foreclosing beneficiary of the subject loan.  The "sale" GMAC speaks of is like the proverbial cat holding the canary in its mouth, pretending not to know where it is, while all while hiding the object of its desire in its own portfolio.

As to the 2nd Cause of Action for violation of *Business and Professions Code* §17200, etc.  of the Second Cause of Action.

This cause of action succeeds or fails based on the success or failure of the above causes of action, and the trial court's ruling sustaining the demurrer without leave to amend should be reversed as may be appropriate depending on the reversal of the incorporated causes of action.

## ii.  ABUSE OF DISCRETION STANDARD OF REVIEW FOR TRIAL COURT'S ORDERS DENYING MOTION FOR COMPELLING FURTHER RESPONSE TO SPECIAL INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS.

The Court of Appeal reviews discovery orders under the abuse of discretion standard. *Scripps Health vs. Superior Court* , 109 Cal.App. 4th 529, (4th Dist. 2003) *Save Open Space Santa Monica Mountains vs. Superior Court*, 84 Cal. App. 4th 235 (2d Dist. 2000)

A party opposing a motion for summary judgment may move for a continuance on the grounds that facts essential to support its opposition may exist, but cannot, for reasons stated, yet be presented. The trial court can order a continuance to permit the party opposing the motion for summary judgment to obtain affidavits or conduct further discovery, *Code of Civil Procedure* §437c mandates a continuance of a summary judgment hearing upon a good faith showing by affidavit that a continuance is needed to obtain facts essential to justify the opposition to the motion; however, if the facts sought are not material then the continuance may be denied. *Yuzon v. Collins* (2004) 116 Cal. App. 4th 149.

## iii. DE NOVO STANDARD OF REVIEW FOR TRIAL COURT'S GRANTING MOTION FOR SUMMARY JUDGMENT.

With respect to the evidence, an independent standard of review applies to evidence. The Appellate Court conducts a de novo review to determine whether any triable issues exist. *Guz v. Bechtel Nat'l In.* (2000) 24 Cal 4th 317, 334. *Republic Indem. Co. v. Schofield* (1996) 47 Cal App 4th 220,

225.

With respect to the law, parties must be given reasonable opportunity to address any new legal issue considered on Appeal.  Before a reviewing court affirms an order granting summary judgment on a ground not relied on by the trial court, the reviewing court is required to give the parties an opportunity to present their views on the issue by submitting supplemental briefs.  *Code of Civil Procedure* § 437c(m)(2).

The 1st Cause of Action of the Third Amended Complaint alleges as follows:

The instant action arises out of a residential mortgage loan transaction whereby Plaintiff ALBERT A. PASSARETTI, JR., was the purchaser of a real estate single family dwelling on or about August 25, 2006, whose common location is known as 1609 256th Street, Harbor City, CA 90710, (sometimes  hereinafter "the subject property" or,  the " Harbor City Property") The specific facts regarding the GMAC loan, and the real property, at issue are as follows:

1) GMAC Loan Number: 030 771 7484;

2) Property Address: 1609 256th Street, Harbor City, CA 90710        (although the Trust Deed  identifies the address is located at a fictitious location in "Lomita, California" and not the actual location which is

20

Harbor City, California);

3) Loan Amount: $620,000;

4) Date of Original loan: August 25, 2006

5) Monthly payment: $2,310.98 per month
(variable interest rate); and

6) Type of Loan: adjustable rate mortgage,
which is commonly known as an "Option ARM"
because it allows the borrower to elect any one
of three different monthly payment amounts.

Plaintiff, ALBERT A. PASSARETTI, JR., did not
receive actual notice of the May 22, 2009, non-
judicial trustee foreclosure sale from either
GMAC Mortgage or from ETS. No actual notice of
the Notice of Sale was received by Plaintiff
ALBERT A. PASSARETTI, JR., with respect to the
non-judicial trustee's foreclosure sale, which
purportedly occurred on May 22, 2009, of the
subject real property located at 1609 256th
Street, Harbor City, CA 90710. Failure to give
actual notice is further supported by virtue of
the facts that (a) the actual Trust Deed with
respect to the real property at issue sets forth a
**wrong property address** in its property
description on five (5) separate occasions, (b)
the address of the property listed on the Notice
of Default and Notice of Sale mimics the wrong
address set forth in the Trust Deed, and (c) the
correct address of the real property never

21

appears in the Trust Deed or any other loan
documents.  It appears almost all of Defendant
GMAC's reference to, and correspondence to, the
real property at issue identified the wrong
property, in the wrong city, with the wrong zip
code.  Plaintiff challenges and objects to the non-
judicial foreclosure sale of his home, and real
property, on or about May 22, 2009, by virtue of
lack of due process, lack of actual notice, lack of
proper notice and lack of reasonable notice, and
defendant's failure to fulfill and perform its
promises to Plaintiff.

Defendant ETS' non-judicial limited Trustee Sales
Officer in this matter is identified as Max. A.
Garcia, and others, employees of Defendant ETS.
ETS, through its employees, repeatedly
identified, and allegedly sent, its various  notices
to the following **wrongful address which does
not exist and has never existed, namely**:
1609 256th Street, Lomita, CA 90717.   The
Lomita address is wrong in the following ways:
1) wrong city;  2) wrong zip code;  3) this
property address does not  exist;  4) this
property address  has never existed;   5) Plaintiff
herein never received actual notice of the Notice
of Default or the Notice of Sale prior to the May
22, 2009,  non-judicial trustee foreclosure sale of
the subject real property;    6) Never within the

22

entire Trust Deed is the property correctly identified with respect to the common address of the real property.  Instead, the  wrong address is found in the Trust Deed on at least five (5) separate occasions on pages 2, 4,  18, 19 and 24.   Whereas, the true and correct address of the property at issue is:  1609 256th Street, Harbor City, CA 90710.


Plaintiff, ALBERT A. PASSARETTI, JR., requests that the non-judicial trustee sale on or about May 22, 2009, be set-aside, vacated and reversed consistent with justice, fair play, principles of due process and actual and reasonable notice and promissory estoppel as set forth below.

Plaintiff, ALBERT A. PASSARETTI, JR.,  challenges and disputes the May 22, 2009, non-judicial trustee sale based upon Plaintiff's reliance and substantial detriment induced by GMAC's promises and representations including but not limited to actual payment of four (4) substantial cashier's checks which GMAC accepted, and other substantial detriment incurred by Plaintiff as set forth below; the cashier's check which were paid to GMAC are namely:

1) Cashier's check in the sum of $20,365 dated

7/17/2007;

     2) Cashier's check in the sum of $23,632 dated 4/28/2008; and

     3) Two Cashier's checks through Western Union each in the amount of $5,000 dated 1/20/2009 and 1/21/2009, respectively.

The basis for these four (4) check payments whose total exceeds $54,000 and the other detriment incurred by Plaintiff were promises and representations made by GMAC's Craig Wilson, Marie Gutierrez who represented themselves to be loss mitigation and loan modification managers for GMAC to Plaintiff on or about 7/17/2007, 4/28/2008, and 1/20/2010;none of the four cashier's checks were sent or paid as regular monthly mortgage payments.  Through said loss mitigation and loan modification managers,  GMACM offered Plaintiff a loan modification whereby the principal balance of the loan would be reduced to $400,000 bearing 4% fixed interest, principal and interest payable over 40 years and that GMAC would not proceed with a foreclosure sale.  The amount of the difference between the total amount of payments to be made under the original loan as originally made and the total amount of the payments to be made under the loan after modification exceeds $1,000,000. Plaintiff was

24

ignorant of the truth of these promises and representations as evidenced by his payment of $54,000, which were not regular monthly mortgage payments,  to GMAC and by his abandoning obtaining refinancing of the property from another lender.

Plaintiff was induced to act upon GMACM's promises and representations and Plaintiff did so act and rely thereon to his substantial detriment which consisted of payment of the four cashier's checks and Plaintiff foregoing of refinancing the property through another lender.   GMACM failed to honor its promises and representations to Plaintiff to modify the subject loan and not to conduct a foreclosure sale.   Then, at the instruction of GMAC, defendants conducted a non-judicial foreclosure sale of the subject property (while Plaintiff remained ignorant of the foreclosure sale until after May 22, 2009, i.e. after the foreclosure sale of Plaintiff's home) and as a result of the foreclosure sale the property 'reverted' to GMACM.

Correspondence and communications between Plaintiff and  GMAC MORTGAGE's representatives Karen Moise, Patrick Ricard, Kathleen Gowen, Ms. Constance, and Ileanna Petersen, support

25

the application of promissory estoppel, namely:
(1) that GMACM's promises and representations
that GMACM would modify the subject loan and
would not conduct a foreclosure sale of the
subject property led to Plaintiff's making the
payments by certified checks and to Plaintiff's
foregoing the obtaining of refinancing through
another lender, (2) that GMACM made these
promises and representations to modify the loan
and not to conduct a foreclosure sale of the
property, (3) that Plaintiff was ignorant of the
true facts, (4) that GMACM intended Plaintiff to
rely upon GMACM's promises and
representations, (5) that Plaintiff was induced to
and did act upon GMACM's representations by
virtue of making payments of $54,000 directly to
GMACM and by forgoing a refinance of the
property.

GMACM/ETS sold Plaintiff's real property on or
about May 22, 2009, notwithstanding: (1) the
"auction" sales price of $374,400; (2) the
"auction" was not a true, public auction open to
all bidders; (3) the loan balance was
approximately $620,000 (and $729,760
according to GMACM); (4) Plaintiff was
continuing to make payments on the loan; (5)
Plaintiff paid GMACM $54,000 in cashiers check
payments which Plaintiff would not have paid in

26

the absence of Defendants' promises and representations to modify the loan.

Plaintiff alleges Defendants, and each Defendant, violated California Civil Code Sections 2924c et seq. , et al. which expressly protect property owners with respect to requirements of due process relating to Notice of Default and Notice of Sale.

Plaintiff alleges violation of California Civil Code Section 2924c which requires GMACM Mortgage to provide Plaintiff with an accurate Statement and status of his loan. GMACM failed to comply with this provision. In this case, the original loan principal amount was $620,000. Through an unknown mechanism, and not explainable by the variable interest rate ("ARM") loan, GMACM increased the loan principal to $729,760 – a staggering $109,760 without explanation. Plaintiff repeatedly requested, in writing, an explanation of the $109,760 increase. GMACM failed to comply.

Plaintiff was shocked to learn that his Harbor City real property had been sold on or about May 22, 2009, in light of three factors: (1) because all of the elements of promissory estoppel set forth

27

above are present, (2) plaintiff was not given actual knowledge of the May 22, 2009 non-judicial foreclosure sale and (3) plaintiff reasonably believed that GMAC, would not proceed with  foreclosure proceedings and would offer Plaintiff a loan modification.

Plaintiff believed that GMACM's representations to modify the loan and that said promises and representations  were  the basis for him to send the cashier's checks  to GMAC and to forego obtaining refinancing of the property from another lender.

**Heightened Scrutiny of Non-Judicial Foreclosure Much Greater Than For Judicial Foreclosure in California**: By virtue of the fact that no judge oversees the process, and the fairness, of a non-judicial foreclosure, it is well-settled California law, and set forth in California statutes at  California Civil Code Section 2920 to 2944.7.  More specifically, Civil Code Section 2924 (and other related sections) sets forth very precisely  the technical requirement that: "a statement setting forth the nature of each breach actually known to the beneficiary and of his or her election to sell or cause to be sold the property to satisfy that obligation ..."  Here, in this matter, Defendants, and each defendant,

28

patently failed to comply with the reasonable
notice provision set forth in the California Civil
Code Section 2924, et seq.

Through the principles of promissory estoppel,
Plaintiff  alleges that Defendant GMACM had a
legal duty to treat Plaintiff honestly, fairly, and
accurately in terms of GMACM promises and
representations to Plaintiff, including but not
limited to the notices and incorrect property
addresses and/or descriptions GMACM provided
to Plaintiff.    GMACM failed to modify the loan  –
instead, GMACM managed to secure $54,000 in
cashier's checks from Plaintiff which were not to
be applied to the loan balance and then did not
modify the loan but instead proceeded with the
foreclosure sale of the property at issue on May
22, 2009 a result of which the property 'reverted'
to GMAC. In so doing, GMAC was unjustly
enriched in the amount of $54,000 plus the value
of the property and GMAC never returned the
$54,000 or the property.


Plaintiff relied upon these promises and
representations from GMACM.  Plaintiff relied on
GMACM's representations  to offer him  a loan
modification.  Plaintiff did not refinance the
property which was available to Plaintiff by virtue

29

of relying upon the GMACM's promises and
representations.


Dated: March 30, 2012

_____
Albert Passaretti

## Certificate of Compliance

I certify that the attached Appellant's Opening Brief
uses 13 point Arial font and contains 6080 words.

Dated: March 30, 2012

Albert Passaretti

PROOF OF SERVICE

STATE OF CALIFORNIA,    )
COUNTY OF LOS ANGELES )

I, Erwin Palines, am employed in the aforesaid county, State of California. I am over the age of 18 years and not a party to the within action; my residence or business address is 3660 Wilshire Blvd, Los Angeles, CA 90010.

On March 30, 2012, I served the foregoing   --------

APPELLANT ALBERT PASSARETTI'S OPENING BRIEF

------ on the proper parties in this action, by depositing a true and correct copy thereof, enclosed in a sealed envelope with certified, first class postage fully prepaid, in United States Mail, at Los Angeles, California, addressed as follows:

Jonathan D. Dykstra, Esq.
Severson & Werson
19100 Von Karman Ave, Suite 700
Irvine, California 92612

Los Angeles Superior Court
Stanley Mosk Courthouse
Clerk of the Court
111 North Hill Street
Los Angeles, CA 90012

Supreme Court of California
350 McAllister Street
San Francisco, CA 94102-4797

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 30th day of March 2012, at Los Angeles, California.

_____
Erwin Palines

32

PROOF OF SERVICE

STATE OF CALIFORNIA,      )
COUNTY OF LOS ANGELES  )

I, Glenn Vega , am employed or reside in the aforesaid county, State of California. I am over the age of 18 years and not a party to the within action; my residence or business address is 3660 Wilshire Blvd, Los Angeles, CA  90010.

On November 15,  2012, I served the foregoing  --------

Proof of Claim

------ on the proper parties in this action, by depositing a true and correct copy thereof, enclosed in a sealed envelope with first class Express Mail  postage thereon fully prepaid,  in United States Mail, at Los Angeles, California, addressed as follows:

Residential Capital Claims Processing Center
c/o KCC
Post Office Box 5004
Hawthorne, CA 90250

Jonathan Dykstra
Severson & Werson
19100 Von Karman Ave, #700
Irvine, CA 91612

Jan T. Chilton
Severson & Werson
One Embarcadero Center, Suite 2600
San Francisco, CA 94111

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 15,  2012, at Los Angeles, California.

Glenn Vega

## Jacqueline Warner Claim

**(Claim No. 3502)**

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

**Name of Debtor and Case Number:** GMAC-RFC Holding Company, LLC, Case No. 12-12029

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Jacqueline A. Warner

☐ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

PO BOX 2414
Redwood City, CA 94064

■ Date Stamped Copy Returned
☐ No self addressed stamped envelope
☐ No copy to return

**Court Claim Number:**
*(If known)*
Filed on: _____

Telephone number: 650-520-5596     email: h7890p@yahoo.com

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Name and address where payment should be sent (if different from above):

Telephone number:     email:

**1. Amount of Claim as of Date Case Filed:** $ 1,044,565.75

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Alleged loan is claimed as Asset in GMAC Bankruptcy when already paid off in full and no longer value to GMAC
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:** 4840

**3a. Debtor may have scheduled account as:** Jacqueline A Warner
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):** N/A
(See instruction #3b)

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, and commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$ _____

*\* Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required documents, and provide the requested information.

Nature of property or right of setoff: ■ Real Estate ☐ Motor Vehicle ☐ Other
Describe:
Value of Property: $ 1,050,000.+     Annual Interest Rate _____% ☐ Fixed ■ Variable (when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $ 1,044,565.75     Basis for perfection: Bankruptcy Case 09-33436 Northern Dist of CA, Discharge

Amount of Secured Claim: $ 1,049,290.15     Amount Unsecured: $ _____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$ _____ (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature: (See instruction #9)** Check the appropriate box.

■ I am the creditor.  ☐ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Jacqueline A. Warner
Title:
Company:     (Signature)  11/6/2012  (Date)
Address and telephone number (if different from notice address above):

Telephone number:     Email:

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C.*

RECEIVED
NOV 07 2012
KURTZMAN CARSON CONSULTANTS
COURT USE ONLY

121202912110700000000000003



**FILED**

JAN 1 9 2010

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

COPY

**From:**

Jacqueline A. Warner
10 Emerald Lake Place
Redwood City, CA  94062

**Date: November 16, 2009**

**To/Respondents:**

GMAC MORTAGE LLC
3451 Hammond Avenue
Waterloo, IA  50702
Account Number: 8601931887

CMG MORTGAGE INC.
3160 Crow Canyon Road, #400
San Ramon, CA  94583
Loan #: ████0326

MERS
MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS INC.
3300 S.W. 34th Avenue, Ste 101, *Ocala, FL*
MIN:  1000724-0000006013-0    *34474*

First American Title Insurance Company
1855 Gateway Blvd., Suite 700
Concord, CA  94520
Escrow No: 3475075c
Recorded Date: November 16, 2009

**Re: Parcel Tax No. 057-143-280;** Original Deed of Trust No:  20540326, Dated 11/09/2007; Original Security Instrument No. 2007-163264; Recorded Date: November 16, 2007; Commonly Known Address: 10 Emerald Lake Place, Redwood City, CA  94062;

## *Notice of Right to Cancel*

*Notice to Agent is Notice to Principal/Notice to Principal is Notice to Agent*

**Parties:** Jacqueline A. Warner (Alleged Borrower, hereinafter **Borrower**) – and, GMAC Mortgage LLC; CMG Mortgage, Inc.; MERS (Mortgage Electronic Registration Systems, Inc.); First American Title Insurance Company (Alleged Lender(s) – hereinafter **Lender**)

**Attention:** All above named Respondents

This communication will serve as my ***Notice of Right to Cancel*** dated November 16, 2009. TILA (Truth in Lending Act, 15 USC §1601 et seq; 12 CFR Part 226) allows three (3) years to review Disclosure Documents.  The referenced 'Three Day Right to Cancel' must have a trigger to begin. That trigger, is when the Lender has provided the Borrower with <u>ALL</u> of the required Disclosures under TILA, and that the same are true, complete, accurate, and timely provided.

Notice of Right to Cancel

Being as the entire purported loan/mortgage process and Deed of Trust/Security Instrument referenced herein and throughout, was obtained by wrongful acts of fraud, fraudulent inducement, concealment, and fraudulent misrepresentation, the borrower has other recourse, right, and cause of action under numerous state and federal statutes. Acts of fraud taint/void everything it touches as the US Supreme Court has declared: *"There is no question of the general doctrine that fraud vitiates the most solemn contracts, documents, and even judgments."* (United States v. Throckmorton, 98 U.S. 61) In further support of the aforementioned wrongful acts, you will please find the attached 'Affidavit of Jacqueline A. Warner', referenced herein and throughout as <u>Attachment/Exhibit – B</u> and, the attached <u>Addendum - C</u>, all of which are made a part hereto, and incorporated herein in their entirety, the same of which contain important matters of record that have thus far remained unanswered, unrebutted, and uncontroverted by all Respondents listed above.

To this date, Lender has <u>never</u> provided Borrower with true, complete, accurate or timely documents as required. <u>ONLY AFTER</u> such provision has been done, can the '3 DAY RIGHT TO CANCEL' period begin. If the required full Disclosure(s) have not been provided, then the period in which to Cancel is extended for up to three (3) years, OR until Lender moves to foreclose. The records thus far evidence, that **Borrower** has requested to cancel within the stipulated three year time period, while still waiting to receive all Truth-in-Lending disclosures as required by Federal Law, the same of which have never been received.

A close perusal and audit of Borrower's mortgage/loan documents has revealed certain Disclosure Violations; and, that the Borrower has the remedial right and remedy (UCC 1-201 (32) (34)), inter alia, to invoke their Right of Rescission (ROR) as further evidenced by the original NOTICE OF RIGHT TO CANCEL. You will also please find Borrower's signed and dated NOTICE to the Lender(s), Successor(s) and Beneficiary as stated on the NOTICE OF RIGHT TO CANCEL, if provided in the loan package. If such Notice was not provided, **this written Notice of communication is provided in lieu thereof**.

After sufficient NOTICE has been given to Lender, the Lender is required by Federal Law to CANCEL any lien(s) and to CANCEL any security interest on the Borrower's property within twenty (20) days. The Lender must also return any money, interest, fee, and/or property to Borrower, as well as any money/funds given to any persons or other fiction in law/entity in connection with said transaction.

In accordance with both State and Federal law or until the Lender complies, Borrower may retain the proceeds of the transaction. If it should be 'impractical' or 'unfair' for the Borrower to return the property when gross discrepancies, fraud, or other wrongful acts are discovered - then he/she/they may offer its 'Reasonable Value'.

In the event the Lender should fail or refuse to take possession of the property or return the borrower's money offer within twenty (20) days . . . **Borrower** may then regain/acquire all rights to clear title and re-conveyance under Federal Law and provisions of TILA.

**Additionally,** Borrower has the right to offer Lender a Reasonable Value. **However**, the penalty that a bank can face for violations of TILA and other State and Federal law can be as much as triple damages . . . i.e., triple the amount of the interest the bank stood to fraudulently make off of the deed of trust/loan transaction. Therefore, the borrower does hereby in good faith make the following offer: Borrower will forgive GMAC Mortgage LLC, CMG Mortgage Inc, MERS, (Mortgage Electronic Registration Systems Inc., and First American Title Insurance Company, any liability incurred by its wrongful actions, provided GMAC Mortgage LLC, CMG Mortgage Inc., First American Title Insurance Company, and MERS, Mortgage Electronic Registration Systems Inc. rightfully forgives Borrower the full amount of deed of trust/credit GMAC Mortgage LLC., CMG Mortgage Inc. et al., fraudulently alleges to have given. In addition, Borrower makes the one time demand of $2,967,247.00 from GMAC Mortgage LLC, and CMG

Mortgage, Inc., for any loss, damage, and injury Borrower has sustained; and, that CMG Mortgage Inc., GMAC Mortgage LLC, MERS, First American Title Insurance Company et al., also immediately remove all/any negative comments on Borrower's credit report attributed to this transaction.

Any default, failures, or non-compliance on the Lender's part to perform as herein directed within twenty (20) days of receipt shall constitute this Notice of Right to Cancel as valid and fully agreed/accepted pursuant to the terms and conditions as set forth herein.

Sincerely,

*Jacqueline A. Warner*

Jacqueline A. Warner

## ACKNOWLEDGEMENT

State of California )

)

County of San Mateo )

**Subscribed and sworn to** (or affirmed) before me on this  16  day of  November , 2009,

by  Jacqueline A. Warner , proved to me on the basis of

satisfactory evidence to be the person who appeared before me.

Signature  Eric Hashemian  (Seal)

(Notary Public)

OFFICIAL SEAL
ERIC HASHEMIAN
NOTARY PUBLIC - CALIFORNIA
Commission #1857303
County of San Mateo
My Commission expires July 10, 2013

Notice of Right to Cancel

Order No:  3475075c
Reference No.:
Escrow Officer: Ada Ayon
Escrow Number: 3475075c

APN No: 057-143-280-6 JPN: 057-014-143-20.04.00A

## DESCRIPTION

All that certain land situated in the unincorporated area of the County of SAN MATEO, State of California, and described as follows:

PARCEL A:

PARCEL 2, AS SHOWN ON THAT CERTAIN MAP ENTITLED, "PARCEL MAP A RESUBDIVISION OF THE LANDS OF TURTURICI AND MCKEEGAN AS SAID LANDS ARE DESCRIBED IN DOCUMENT NO. 88043032, OFFICIAL RECORDS OF SAN MATEO COUNTY, SAN MATEO COUNTY, CALIFORNIA", FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON FEBRUARY 28, 1990 IN BOOK 63 OF PARCEL MAPS AT PAGES 69 AND 70.

PARCEL B:

A NON-EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS AND STORM DRAINAGE PURPOSES WITHIN A PORTION OF PARCEL 3 AS SHOWN ON THAT CERTAIN MAP ENTITLED "PARCEL MAP OF A RESUBDIVISION OF THE LANDS OF TURTURICI AND MCKEEGAN AS SAID LANDS ARE DESCRIBED IN DOCUMENT NO. 88043032, OFFICIAL RECORDS OF SAN MATEO COUNTY, SAN MATEO COUNTY, CALIFORNIA" FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN MATEO COUNTY, STATE OF CALIFORNIA OF FEBRUARY 28, 1990 IN VOLUME 63 OF PARCEL MAPS AT PAGES 69 AND 70, SAID PORTION BEING DESIGNATED AS "PROPOSED P.S.D.E. INGRESS/EGRESS, ESMT. FOR BENEFIT OF PARCELS 1 AND 2 AND P.U.E." ON SAID MAP.

SAID EASEMENT IS TO BE APPURTENANT TO AND FOR THE BENEFIT OF PARCEL "A" ABOVE.

PARCEL C:

A NON-EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS OVER A STRIP OF LAND 7.50 FEET WIDE LYING EASTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT THE NORTHWESTERLY CORNER OF THE LANDS CONVEYED TO RUSSEL L. WOLDEN AND WIFE BY DEED RECORDED JUNE 25, 1954 IN BOOK 2605 OF OFFICIAL RECORDS AT PAGE 723 (FILE NO. 66351-L) RECORDS OF SAN MATEO COUNTY, CALIFORNIA; AND THENCE NORTH 4° 20' WEST 158.30 FEET TO THE SOUTHERLY LINE OF SUMMIT DRIVE.

SAID EASEMENT IS APPURTENANT TO AND FOR THE BENEFIT OF PARCEL A ABOVE AND WAS CREATED BY GRANT OF RIGHT OF WAY FROM ARTHUR CINTI, ET UX, TO NEVADA V. WALDEN, RECORDED JUNE 27, 1932 IN BOOK 553 OF OFFICIAL RECORDS AT PAGE 499 (FILE NO. 9678-C) RECORDS OF SAN MATEO COUNTY, CALIFORNIA AND BY DEED FROM ARTHUR CINTI AND MARINA CINTI, TO JOHN M. UNDERHILL AND ELSIE W. UNDERHILL, RECORDED AUGUST 12, 1940 IN BOOK 905 OF OFFICIAL RECORDS AT PAGE 251 (FILE NO. 95911-D) RECORDS OF SAN MATEO COUNTY, CALIFORNIA AND BY DEED FROM ARTHUR CINTI AND MARINA CINTI, TO DOMINIC JACKMAN AND GIOVANNA JACKMAN, RECORDED NOVEMBER 28, 1945 IN BOOK 1219 OF OFFICIAL RECORDS AT PAGE 298 (FILE NO. 75500-F), RECORDS OF SAN MATEO COUNTY, CALIFORNIA.

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT | Northern District of California | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor:<br>Jacqueline Anne Warner | Case Number:<br>09-33436 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**Ally Bank f/k/a GMAC Bank.**

Name and address where notices should be sent:
**GMAC Mortgage, LLC**
**ATTN: Bankruptcy Department**
**1100 Virginia Drive**
**Ft. Washington, PA 19034**
Telephone number:
**1-800-850-4622**

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:_____**
*(If known)*

Filed on:_____

Name and address where payment should be sent (if different from above):
GMAC Mortgage, LLC
ATTN: Payment Processing
3451 Hammond Avenue
Waterloo, IA 50702
Telephone number:
**1-800-850-4622**

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:**    $_____**990,742.62**

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☑ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** __MONEY LOANED__
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** __xxxxxx1887__

**3a.** Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

**4. Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☑ Real Estate    ☐ Motor Vehicle    ☐ Other
**Describe:**  10 Emerald Lake Place, Redwood City, California 94062

**Value of Property:**$_____    **Annual Interest Rate**___%

**Amount of arrearage and other charges as of time case filed included in secured claim,**

**if any:** $_____0.00    **Basis for perfection:** _____

**Amount of Secured Claim:** $_____990,742.62    **Amount Unsecured:** $_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See definition of "redacted" on reverse side.*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| Date:<br>**12/09/2009** | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br>/s/ ATTY Melodie A. Whitson<br>Attorney for GMAC Mortgage, LLC, 4375 Jutland Drive, Suite 200; P.O. Box 17933, San Diego, CA 92177-0933    (858)750-7600 | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Form CAodsc7

# UNITED STATES BANKRUPTCY COURT
## Northern District of California (San Francisco)

| | |
|---|---|
| **In re:**<br>  Jacqueline Anne Warner<br>  10 Emerald Lake Place<br>  Redwood City, CA 94062 | **Case Number:  09–33436 DM 7**<br>**Chapter:  7** |

Debtor(s)

**Debtor/Joint Debtor Social Security Number(s):**
  xxx–xx–6562

## DISCHARGE OF DEBTOR

It appearing that the debtor(s) is/are entitled to a discharge, **IT IS ORDERED**:
The debtor(s) is/are granted a discharge under section 727 of title 11, United States Code, (the Bankruptcy Code).

Dated: 9/22/10

By the Court:

Dennis Montali
United States Bankruptcy Judge

## SEE THE BACK OF THIS ORDER FOR IMPORTANT INFORMATION.

Doc # 139

CAocsd7 continued

# EXPLANATION OF BANKRUPTCY DISCHARGE
## IN A CHAPTER 7 CASE

This court order grants a discharge to the person named as the debtor. It is not a dismissal of the case and it does not determine how much money, if any, the trustee will pay to creditors.

## Collection of Discharged Debts Prohibited

The discharge prohibits any attempt to collect from the debtor a debt that has been discharged. For example, a creditor is not permitted to contact a discharged debtor by mail, phone, or otherwise, to file or continue a lawsuit, to attach wages or other property, or to take any other action to collect a discharged debt from the debtor. *[In a case involving community property:]* A creditor who violates this order can be required to pay damages and attorney's fees to the debtor. [There are also special rules that protect certain community property owned by the debtor's spouse, even if that spouse did not file a bankruptcy case.] A creditor who violates this order can be required to pay damages and attorney's fees to the debtor.

However, a creditor may have the right to enforce a valid lien, such as a mortgage or security interest, against the discharged the debtor's property after the bankruptcy, if that lien was not avoided or eliminated in the bankruptcy case. Also, a debtor may voluntarily pay any debt that has been discharged.

## Debts That are Discharged

The chapter 7 discharge order eliminates a debtor's legal obligation to pay a debt that is discharged. Most, but not all, types of debts are discharged if the debt existed on the date the bankruptcy case was filed. (If this case was begun under a different chapter of the Bankruptcy Code and converted to chapter 7, the discharge applies to debts owed when the bankruptcy case was converted.)

## Debts that are Not Discharged.

Some of the common types of debts which are <u>not</u> discharged in a chapter 7 bankruptcy case are:

a. Debts for most taxes;

b. Debts incurred to pay nondischargeable taxes (applies to cases filed on or after 10/17/2005);

c. Debts that are domestic support obligations;

d. Debts for most student loans;

e. Debts for most fines, penalties, forfeitures, or criminal restitution obligations;

f. Debts for personal injuries or death caused by the debtor's operation of a motor vehicle, vessel, or aircraft while intoxicated;

g. Some debts which were not properly listed by the debtor;

h. Debts that the bankruptcy court specifically has decided or will decide in this bankruptcy case are not discharged;

i. Debts for which the debtor has given up the discharge protections by signing a reaffirmation agreement in compliance with the Bankruptcy Code requirements for reaffirmation of debts.

j. Debts owed to certain pension, profit sharing, stock bonus, other retirement plans, or to the Thrift Savings Plan for federal employees for certain types of loans from these plans (applies to cases filed on or after 10/17/2005).

**This information is only a general summary of the bankruptcy discharge. There are exceptions to these general rules. Because the law is complicated, you may want to consult an attorney to determine the exact effect of the discharge in this case.**



**U.S. Department of Justice**

United States Trustee, Region 17
*N.D. Cal.,  E.D. Cal.,  D. Nev.*

San Francisco Division
235 Pine Street, Suite 700                    415-705-3333
San Francisco, California  94104-3401       FAX 415-705-3379

December 28, 2010

Jacqueline Warner
10 Emerald Lake Place
Redwood City, CA 94062

     RE:    In re Jacqueline Warner, Bankruptcy Case No. 09-33436

Dear Ms. Warner,

    We are in receipt of your letters to the U.S. Trustee, the Court, and other communication you have delivered to the U.S. Trustee.  The most recent communication we received from you was dated December 23, 2010.  Based upon our review of your documents, we conclude that no further action is necessary or required by this office.

    Please note that your bankruptcy case was closed on December 16, 2010, and you received a discharge of your debts by order entered September 22, 2010.  In addition, all of your creditors were paid in full as evidenced by the trustee's final account.  Therefore, we consider your bankruptcy case to be fully administered and closed.

    As I have repeatedly informed you, this office does not represent your interests and does not act on your behalf.

Sincerely,
Office of the U.S. Trustee

Julie M. Glosson
Attorney for the U.S. Trustee

cc:    Donna S. Tamanaha
       Janina M. Hoskins (via email)
       Reidun Stromsheim (via email)

## REVISED PAYOFF STATEMENT

**GMAC Mortgage, LLC/CMG**                                                    10/10/12
PO Box 4622 3451 Hammond Avenue
Waterloo, IA 50704

Loan No.:    ████1887

Borrower:   JACQUELINE A. WARNER                    Property:
                                                    10 EMERALD LAKE PLACE
            10 EMERALD LAKE PLACE
                                                    REDWOOD CITY        CA
            REDWOOD CITY        CA 94062            94062

Statement Sent to Name:  BRANDY KELLY
Statement Sent to Fax Number:  408-402-3649

As of 10/10/12, the status of this loan is as follows:

| | | | |
|---|---|---|---|
| Next Payment Due: | 11/25/09 | Loan Type: | HELOC |
| Matures: | 11/2037 | Note Rate: | .98050% |
| Escrow Balance: | $-22870.75 | Escrow Retained (**pg. 2): | $0.00 |
| | | Mortgage Insurance: | $0.00 |

**\* \* \* THE FOLLOWING FIGURES ARE SUBJECT TO FINAL VERIFICATION BASED ON
THE RECEIPT OF FUNDS BY GMAC Mortgage, LLC/CMG\* \* \***

| ITEMS | AMOUNT DUE |
|---|---|
| Principal | $990742.62 |
| Interest Calculated to but not including 11/08/12 | $30463.53 |
| Escrow/Impound Funds Due (see P.3, Item G) | $22870.75 |
| Late Charges Outstanding | $824.50 |
| Unapplied Funds | $0.00 |
| Statement Fee | $0.00 |
| Recording Fee | $0.00 |
| Reconveyance/Trust | $0.00 |
| Release Fee | $0.00 |
| Fax Fee | $0.00 |
| Other Fees and Costs | $4388.75 |
| Deferred Amount | $.00 |
| Prepayment Penalty/Early Termination Fee | $0.00 |
| Optional Products | $0.00 |
| Uncollected P&I | $.00 |
| Buyer Assistance Amount | $ |
| **TOTAL DUE** | **$1049290.15** |
| Per Diem Interest | $26.5416 |

**\*\*Payoff funds must be
remitted in US dollars
by cashier's check,
certified check or bank
wire.\*\***

For Home Equity Line of Credit:  We require written authorization from our borrower(s) to close and terminate a
line of credit account and release the lien (please see below).  If we do not receive signed notification from the
borrower(s) with the amount necessary to pay off the line of credit, the line of credit will remain open.  If you are
wiring the payoff funds, please sign below and fax to 1-888-395-6626.

_____                    _____
        Signature                                    Signature

Page 2
1887

**\*\*ESTIMATED ESCROW/IMPOUND DISBURSEMENTS**

If any tax or insurance amounts are due within 45 days of the date interest is calculated to, these amounts are included in required funds and may be disbursed prior to payoff funds being received.

Items           Next due        Amount

## PAYOFF FUNDS REMITTANCE INSTRUCTIONS

To receive same-day credit and avoid additional day(s) interest, payoff funds must be remitted via wire by 2:00 P.M. Eastern Time, along with all of the required information provided below.  Please include $7.50 in addition to the total figures above for the incoming wire fee.

> JPMorgan Chase Bank, N.A.
> For GMAC Mortgage, LLC/CMG
> ABA ████0021
> Account # ████1175
> GMAC Mortgage, LLC/CMG Loan Number ████1887
> Name: JACQUELINE A. WARNER
> Remitter Name:
> Remitter Phone #:

To receive next-day credit and avoid additional day(s) interest, payoff funds must be remitted in U.S. Dollars by cashier's check, certified check, or bank wire by 2:00 P.M. Eastern Time.  All payoff funds received after 2:00 P.M. Eastern Time will be applied with interest on the next business day.  Payoff funds will not be applied or credited on weekends or holidays.

When remitting by check, please include the following information on the check:  Customer's name, loan number, remitter's name and remitter's phone number.  Please forward to the following address:

> GMAC Mortgage, LLC/CMG
> Payoff Processing Unit
> 6716 Grade Lane
> Building 9, Suite 910C
> Louisville KY 40213-1407

\* \* \* You are responsible for the compliance of this document. \* \* \*

\*\*\*\* Written authorization is required to close an account upon receipt of funds\*\*\*\*

Important information regarding the loan payoff:

A)  Add daily per diem interest from the interest through date to the date payoff funds are processed in the GMAC Mortgage, LLC/CMG office.  Interest is calculated on a 365-day year on a partial-month basis.  If interest is collected for 30 days, due date to due date, interest is calculated on a 360-day basis (February is calculated on 30 days).  You will be responsible for any additional interest due we would need to collect due to an improper calculation method.

Page 3

■■■■1887

B) If you are currently enrolled in our monthly ACH program and your scheduled draft date is three days or fewer after your anticipated payoff date, your draft will still be deducted. To cancel your drafting, call 866-346-3640.

C) A late charge may be assessed for any payment or payoff not received within the grace period.

D) The amount necessary to pay this loan in full is subject to final verification by the note holder. Title/escrow will be held liable for any shortage resulting from a returned item. Do not "stop payment" on any previous payment (check or draft) which has been credited to this account.

E) If this is an adjustable rate mortgage, it may be subject to interest rate changes and principal balance increases. Please contact our office prior to closing escrow.

F) If there is a prepayment penalty or early termination fee on your account, it will be included in the total funds due for payoff. If you are presently on active duty in military service please contact us to review any prepayment penalty that is reflected on this statement.

G) If the funds received are not sufficient to pay the account in full, we can utilize funds from the escrow account to complete the payoff with your authorization. Please sign page 1 and fax back to 1-888-395-6626. If there is not an escrow account, or you do not authorize us to use escrow funds, we will return the payoff funds in the same manner as they were remitted. Interest will continue to accrue and late charges may be incurred until sufficient funds are received to pay the account in full. To avoid a short payoff, please confirm the actual payoff amount by calling 866-346-3640.

H) All payments on this loan must be kept current. The escrow holder is responsible for determining the current status of this loan prior to closing of the escrow. **Issuance of this statement does not suspend the contract requirements to make monthly mortgage payments when due.**

I) Escrow account: Issuance of this statement does not alter GMAC Mortgage, LLC/CMG's responsibility to pay taxes and insurance. If a bill for these items is received prior to the receipt of payoff funds, we will pay them from the escrow account. Payment of a deficit is required before the loan can be paid in full. GMAC Mortgage, LLC/CMG is not responsible for private agreements between the mortgagor and a third party with regard to the disbursement of the escrow funds. If funds have accumulated in an escrow account, and if we have been required to pay interest on said funds as provided by state law, interest will be paid to the date the escrow closes. Any excess funds, after payoff is complete, will be remitted back to the customer. If forced place insurance has been charged to the escrow account prior to loan payoff, the full amount will be required to pay off the loan. If appropriate evidence of insurance is received, the applicable refund will be issued to borrowers of record within 4-6 weeks. Any escrow balance will be refunded after payoff, provided the last payment applied to the account has cleared the institution on which it was drawn.

J) If this account is 2 months or more past due, in foreclosure and/or bankruptcy, you must obtain an amended statement for updated fees within 5 business days of closing.

K) The reconveyance/satisfaction of mortgage will be forwarded to the county recorder's office after receipt of payoff funds.

L) If you have new address information, please contact Customer Care at 866-346-3640. Updating your address information will ensure timely return of any refund you may be due, as well as allowing your release and year-end information to be sent directly to you.

7:19

# NOTICE OF CANCELLATION OF LOAN
## AND
## AUTOMATIC VOIDING OF THE DEED OF TRUST

Notice to Agent is Notice to Principal
Notice to Principal is Notice to Agent

**Notice Date:** October 11, 2012

**From:**  **Alleged Borrower**
Jacqueline A. Warner
*Service by and respond to:*
c/o JAN SCHRIEBERL, Third Party Witness located at:
3494 Camino Casa Tassajara. Unit 308
Danville, CA 94506

**Property Address:** 10 Emerald Lake Place, Redwood City, CA 94062
**Original Loan No.** ███0326    **GMAC Servicer No.** ███1877
**MIN NUMBER:** 1000724-0000006013-0

To:

**Carlo Magno**
TRUSTEE SALE OFFICER
ETS Services, LLC, as Agent for Beneficiary
Executive Trustee Services, LLC dba ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, CA 91504-3120
Certified Mail: 7012 1010 0000 7351....

**Christopher George**
President and CEO
CMG Mortgage Inc.
3160 Crow Canyon Road, #400
San Ramon, CA 94583
Copy of Dispute Debt 10/04/12;
QWR 10/04/12
Certified Mail: 7012 1010 0000 7351 ....

**Gary S. Lee and/or Lorenzo Marinuzzi**
MORRISON & FORESTER, LLP
1290 Avenue of the Americas
New York, NY 10104
Case No. 12-12020
Copy of Dispute Debt 9/28/12 Letter
And QWR 10/04/12; Reservation of
Rights 10/08/12
Certified Mail: 7012 1010 0000 7351 ....

**ETS, LLC**
c/o EXECUTIVE TRUSTEE SERVICES, INC.
2255 North Ontario Street, Suite 400
Burbank, CA 91504-3120

Certified Mail: 7012 1010 0000 7351....

**ALLY BANK**
c/o EXECUTIVE TRUSTEE SERVICES, INC.
dba: ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, CA 91504-3120

Certified Mail: 7010 2780 0000 7351 ....

**ResCap/GMAC Mortgage**
c/o Kurtzman Carson Consultants LLC
PO Box 8013
Redondo Beach, CA 90277
Copy of Dispute Debt 9/28/12;
QWR 10/04/12

Certified Mail: 7012 1010 0000 7351 ....

NOTICE OF CANCELLATION OF LOAN

**ResCap Claims Processing Center, c/o KCC**
PO Box 5004
Hawthorne, CA 90250
Copy of Dispute Debt 9/28/12;
Reservation of Rights 10/08/12
Certified Mail: 7012 1010 0000 7357 ....

**GMAC Mortgage, LLC**
Attn: Customer Care
PO Box 1330
Waterloo, IA 50704-1330
Certified Mail: 7012 1010 0001 7357 ....
Copy of Dispute Debt 9/28/12

**Steve Abreu, President**
**GMAC Mortgage LLC at Ally Financial**
1100 Virginia Drive
Fort Washington, PA 19034
Copy of Dispute Debt 9/28/12,
QWR 10/04/12,
Reservation of Rights 10/08/12
Certified Mail: 7012 1010 0000 7357 ....

**Tom Morano, Chief Executive Officer**
**ResCap/GMAC Mortgage**
1100 Virginia Drive
Fort Washington, PA 19034
Copy of Dispute Debt 9/28/12,
QWR 10/04/12
Reservation of Rights 10/08/12
Certified Mail: 7012 1010 0000 7357 ....

**GMAC Mortgage, LLC**
**c/o EXECUTIVE TRUSTEE SERVICES, INC**
dba: ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, CA 91504-3120
Copy of Dispute Debt 9/28/12.
QWR 10/04/12
Certified Mail: 7012 1010 0000 7357 ....

**Claims & Noticing Agent**
**Kurtzman Carson Consultants**
2335 Alaska Avenue
El Segundo, CA 90245
Copy of Dispute Debt 9/28/12
QWR 10/04/12

Certified Mail: 7012 1010 0000 7357 ....

**MERS**
**Mortgage Electronic Registration Systems, Inc.**
1901 E. Voorhess Street, Suite C
Danville, IL 61834
Copy of Dispute Debt 9/28/12,
Reservation of Rights 10/08/12,
10/8/12
Certified Mail: 7012 1010 0000 7357 ....

**Tom Schlesinger**
**First American Title**
1855 Gateway Blvd. #700
Concord, CA 94520
Copy of Dispute Debt 9/28/12,
QWR 10/04/12, Reservation of Rights

Certified Mail: 7012 1010 0000 7357 ....

Re:    **Lender on the Deed of Trust:** CMG MORTGAGE, INC, a corporation organized and existing under the laws of the State of CALIFORNIA. Lenders address is 3160 Crow Canyon Road, Suite 400, San Ramon, California 94583
**Servicer: GMAC MORTGAGE, LLC,  Loan Number** 8601931887
**Deed of Trust Dated:**   11/09/2007
**Deed of Trust Record:** # 2007-163264
**Record Date:**    11/16/2007 in the County of San Mateo in the State of CALIFORNIA
**Subject property:** 10 EMERALD LAKE PLACE, REDWOOD CITY, CA 94062
**Deed of Trust Grantor/Trustor:** Jacqueline Warner
**Beneficiary on the Deed of Trust:**  Lender, CMG Mortgage, Inc.
**Property Owner:** Jacqueline Warner
**Loan:** CMG Loan No. ████0326,

NOTICE OF CANCELLATION OF LOAN

**Loan Amount in Dispute**: $1,000,000 principal on original Note, and $32,708.91 in interest and other charges claimed on the VOID, NOTICE OF DEFAULT dated 9/10/2012 and recorded in San Mateo County, California on 9/11/2012, Instrument No. 2012-130239 from Carlo Magno, TRUSTEE SALE OFFICER, ETS Services, LLC as Agent for Beneficiary, and any other payments that have been made by the Borrower to Lender.

**NOTICE OF CANCELATTION OF LOAN is hereby made by the undersigned to the above referenced Lender(s), Assign(s), Successor(s) Beneficiary(s), Trustee(s), Agent(s), Entities and any other Parties with interest, (herein after referred to as "Lender")** as provided for in (Reg. Z §§ 226.15(a)(2), 226.23(a)(2), Official Staff Commentary § 226.23(a)(2)-1) and 15 U.S.C. § 1635(b).and other applicable law contained in the Federal Truth in Lending Act (TILA) including all other applicable law.

**SERVICE OF THIS NOTICE is done in accordance with the above Law** by Certified Mail numbers referenced above with Electronic Return Receipt of proof of delivery to the above referenced Lender, Entities and Individuals and is proof of notification according to the Official Staff Commentary, 226.2(a)(22)-2 as authorizing service. All documents listed were sent by Jan Schieberl, Third Party Witness, with an Affidavit of Service.

**CERTIFIED MAILING AND PROOF OF DELIVERY with AFFIDAVIT of SERVICE** by Jan Schieberl of this NOTICE is done by mailing dates indicated below and within the three (3) year time period for Borrower's right to cancel as referenced herein.

**WHEREAS, the above referenced law provides the Borrower the absolute right to cancel** the above referenced Loan and to automatically VOID the mortgage/lien/security interest/Deed of Trust on the Subject Property located 10 Emerald Lake Place, Redwood City, California as referenced above. Upon serving the Notice of Rescission, the TILA statute and Regulation Z state that by operation of the law, the security interest automatically becomes void and the debtor is relieved of any obligation to pay any finance or other charge (15 U.S.C. § 1635(b), Reg. Z §§ 226.15(d)(1), 226.23(d)(1)). (In re Moore, 117 B.R. 135 (Bankr. E.D. Pa. 1990) (security interest eliminated upon effective rescission, reducing creditor to status of unsecured creditor). Thus, since the security interest is automatically voided per TILA and Regulation Z upon rescission, the secured mortgage note is no longer secured and must be classified as unsecured.

**WHEREAS, Regulation Z requires that the voiding be absolute and not subject to judicial modification** and is covered by a **Rule of law** of the Federal Truth-in-Lending Act which empowers the debtor/Borrower to exercise their right in writing by notifying creditors of the cancellation by mail to rescind the mortgage loan transactions per (Reg. Z §§226.15(a)(2), 226.23(a)(2), Official Staff Commentary § 226.23(a)(2)-1) and 15 U.S.C. § 1635(b). The statute and regulation specify that the security interest, promissory note or lien arising by operation of law on the property becomes automatically void. (15 U.S.C. §1635(b); Reg. Z §§ 226.15(d)(1), 226.23(d)(1)). As noted by the Official Staff Commentary, the creditor's interest in the property is "automatically negated regardless of its status and whether or not it was recorded or perfected." (Official Staff Commentary §§ 226.15(d)(1)-1, 226.23(d)(1)-1.).Thus, since the security interest is **automatically voided** per TILA and Regulation Z upon rescission, the secured mortgage note is no longer secured and must be classified as unsecured.

NOTICE OF CANCELLATION OF LOAN

**WHEREAS, the cancelation period** in § 226.15 right of rescission (3) states *"If the required notice and material disclosures are not delivered, the right to rescind shall expire three years after the occurrence giving rise to the right of rescission".*

**WHEREAS, the cancelation period in § 226.15 right of rescission notice and material disclosures were not delivered to the Borrower** including but not limited to: 1. In the "NOTICE OF RIGHT TO CANCEL" or other documents delivered to the Borrower there was no delivery of the material fact and disclosure that the right of rescission period extended beyond a three day period **to three (3) year period** after the occurrence giving rise to the rescission in the case where material disclosures are not delivered. 2. In the "NOTICE OF RIGHT TO CANCEL" or other documents there was no delivery of the material fact and disclosure of the Federal Truth in Lending Act (TILA) referenced above or any other applicable law to fully inform the Borrower of their rights, including no content, text, citing or information source for TILA to inform the borrower of the three (3) year recession period or any other part of the law that affected the borrower. 3. There was no delivery by the Lender of the material fact and disclosure of the right to cancel delivered to the "Borrower". 4. "THE NOTICE OF RIGHT TO CANCEL" delivered to the Borrower was devoid of the part of the law that provided for a three (3) year rescission period and therefore was concealed from the Borrower and mislead the Borrower to believe that the law only provided for a three (3) day recession period. Therefore, there was no delivery of the material fact and disclosure that the right of rescission period extended beyond a three (3) day period to a three (3) year period. The Right to Cancel is not limited to 1 through 4 above and include other factors that would extend the right to cancel to there (3) years from the time of the discovery of any material non-disclosure. The discovery of fraud in the origination of this Loan, the fraud in connection with the securitization and default insurance and the fraud in the chain of title and forged documents to claim the authority to foreclose are all instances of material concealment that upon discovery would trigger the three (3) year period and Right to Cancel.

**WHEREAS,** Borrower was vaguely informed of an option to cancel the loan in early September 2012, by a friend, Marshall Mikels, who shared the concept of the option to cancel per Regulation Z. Only after the Borrower did law research on the internet on October 2, 2012 was Borrower fully informed of the three (3) year rescission provision of the TILA law and of her right to cancel the loan and automatically void the security instrument/Deed of Trust.

**WHEREAS,** the law referenced herein state that the Lender, Assign(s) or authorized Agent(s) are required to cancel documents creating the security interest and file a Release or Termination Statements in the public record. (Official Staff Commentary §§ 226.15(d)(2)-3, 226.23(d)(2)-3.). Regulation Z makes it clear that, if the Debtor has the extended right and chooses to exercise it, the security interest and obligation to pay charges are automatically voided. (Cf. Semar v. Platte Valley Fed. Sav. & Loan Ass'n, 791 F.2d 699, 704-05 (9th Cir.1986) (courts do not have equitable discretion to alter substantive provisions of TILA, so cases on equitable modification are irrelevant). Also, it is clear from the statutory language that the court's modification authority extends only to the procedures specified by section 1625(b). The voiding of the security interest is not a procedure, in the sense of a step to be followed or an action to be taken. Thus, since the security interest is automatically voided per TILA and Regulation Z upon rescission, the secured mortgage note is no longer secured and must be classified as unsecured.

**WHEREAS, there are penalties for non-compliance,** the statute makes no distinction between the right to rescind in three days or extended in three years and neither case law nor statute give courts equitable discretion to alter TILA's substantive provisions. Since the rescission

NOTICE OF CANCELLATION OF LOAN

process was intended to be self-enforcing, failure to comply with the rescission obligations subjects the above referenced Lender(s) to liability. Non-compliance is a violation of the act which gives rise to a claim for actual and statutory damages under 15 USC 1640. Borrower has the option of enforcing the rescission right in federal district, state or bankruptcy court (See S. Rep. No. 368, 96th Cong. 2 Sess. 28 at 32 reprinted in 1980 U.S.C.A.N. 236, 268 ("The bill also makes explicit that a consumer may institute suit under section 130 [15 U.S.C., 1640] to enforce the right of rescission and recover costs and attorney fees in a successful action").

**WHEREAS, Lender must payback all money collected from Borrower plus damages.** TILA rescission does not only cancel a security interest in the property but it also cancels any liability for the Debtor to pay finance and other charges, including accrued interest, points, broker fees, closing costs and that the lender must refund to Borrower all finance charges, fees and other payments made by borrower. In addition, the Lender is liable to borrower for all damages borrower sustained as a result of any fraud or other illegal act committed by Lender(s).

**THEREFORE, based on the above law and facts the undersigned hereby RESCINDS AND CANCELS THE LOAN AND SECURITY INSTRUMENT/DEED OF TRUST referenced above, effective with the mailing and fax transmission of this NOTICE to the above referenced Lender(s). Therefore, the Lender(s) are obligated under the above referenced law to do the following:**

**Step one of the recession process,** the Lender(s) is obligated to acknowledge the Borrower's rescinding of the Loan transaction. As the bare bones nature of the FRB model notice demonstrates, it is not necessary to explain why the borrower is canceling. The FRB Model Notice simply says: "I WISH TO CANCEL," followed by a signature and date line (Arnold v. W.D.L. Invs., Inc., 703 F.2d 848, 850 (5th cir. 1983) (clear intention of TILA and Reg. Z is to make sure that the creditor gets notice of the Borrower's intention to rescind). The statute and Regulation Z states that if creditor disputes the Borrower's right to rescind, it should file a declaratory judgment action within the twenty days after receiving the rescission notice, before its deadline to return the Borrower's money or property and record the termination of its security interest (15 USC 1625(b)). Once the Lender(s) receives this Notice, the statute and Regulation Z mandate 3 steps to be followed.

**Step two of the recession process,** upon Borrower's rescinding of the Loan transaction, the Lender(s) must return any money, including that which may have been passed on to a third party, such as a broker or an appraiser and to take any action necessary to reflect the termination of the security interest within 20 calendar days of receiving the rescission Notice. The Lender(s)'s other task is to take any necessary or appropriate action to reflect the fact that the security interest was automatically terminated by the rescission within 20 days of the Lender(s)'s receipt of this rescission Notice (15 USC 1635(b); Reg. Z-226.15(d)(2),226.23(d)(2).

**Step three of the recession process,** the Borrower's tender obligation is based on an accounting and return of all money paid by borrower to the Lender(s) and satisfactory ways in which to meet this obligation. The termination of the security interest is required **before** tendering and step 1 and 2 have to be respected and performed by the Lender(s).

NOTICE OF CANCELLATION OF LOAN

**Conclusion:**                    **"I WISH TO CANCEL"**

Signature _Jacqueline Warner_ Date: _October 11, 2012_

I, Jacqueline Warner, am requesting an itemized statement of my payment record from the above referenced Lender(s) to facilitate a conclusion and final settlement of this Loan rescission and the obligations of Lender(s) and Borrower there under.  Courts have held that the rescission effectively voids the security interest, rendering the debt, if any, unsecured (See Exhibit #6). (See in re Perkins, 106 B.R. 863, 874 (Bankr. E.D.Pa. 1989); In re Brown, 134 B.R. 134 (Bankr. E.D.Pa. 1991); In re Moore, 117 B.R. 135 (Bankr.E.D. Pa. 1990)).

Once the court finds a violation such as not responding to the TILA rescission letter, no matter how technical, it has no discretion with respect to liability (in re Wright, supra. At 708; In re Porter v. Mid-Penn Consumer Discount Co., 961 F,2d 1066, 1078 (3d. Cir. 1992); Smith v. Fidelity Consumer Discount Co., Supra. At 898.  Any misgivings creditors may have about the technical nature of the requirements should be addressed to Congress or the Federal Reserve Board, not the courts.

If the Lender(s) have not cancelled the security interest and returned all monies paid by the undersigned Borrower within the 20 days of receipt of this Notice of Rescission dated October 11, 2012, the Lender(s) named above are responsible for actual and statutory damages pursuant to 15 U.S.C. § 1640(a).

The Lender(s) referenced above are to take any necessary or appropriate action to reflect the fact that the security interest was automatically terminated by the rescission (15 USC 1635(b); Reg. Z-226.15(d)(2),226.23(d)(2).  This requires canceling documents creating the security interest and filing release or termination statements in the public record of FREE and CLEAR TITLE to Jacqueline Warner.

**Existing claims,** this Notice of Cancellation of Loan does not relinquish, void, or cancel any previous agreement, claim, default, judgment, lien, or public recording that presently exists or may exist as a result of any previous claim by Borrower against Lender(s) and any agreement, judgment or lien against Lender(s) and obligation arising there from is preserved and remains in force and my be a separate claim subject to other jurisdiction. Note: the term Borrower as used herein shall mean alleged Borrower and Lender(s) as alleged Lender(s) in light of any existing or previous controversy, default or judgment as to whether an actual loan was made and received.

IN WITNESS WHEREOF I hereunto set my hand and seal on this 11ᵗʰ day of October 2012 and hereby certify all the statements made above are true, correct and complete to the best of my knowledge and belief..

Date _October 11, 2012_ Signed: _Jacqueline Warner_
                          Jacqueline Warner

NOTICE OF CANCELLATION OF LOAN

**JURAT**

STATE OF CALIFORNIA                )
                                   ) ss:
COUNTY OF CONTRA COSTA             )

Subscribed and sworn to (or affirmed) before me on this 11th day of October, 2012 , by Jacqueline M. Warner
By Jan Schieberl, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

_____
(seal) Signature

**NOTARY PUBLIC**

EUNHEE SONG
COMM #1944100
Notary Public-California
CONTRA COSTA COUNTY
My Comm. Exp. AUG 11, 2015

Enclosures:
Exhibit 4: STATE ATTORNEYS GENERAL Letter dated December 23, 2010 - 3 pages;
Exhibit 4.1: UNITED STATES SENATE Letter dated January 3, 2011 – 2 pages.

**Sources of Law in Truth in Lending Cases**, these include TILA itself, the Federal Reserve Board's Regulation Z which implements the Act, the Official Staff Commentary on Regulation Z, and case law. Except where Congress has explicitly relieved lenders of liability for noncompliance, it is a strict liability statute. (Truth-In-Lending, 5th Edition, National Consumer Law Center, 1.4.2.3.2, page 11)

NOTICE OF CANCELLATION OF LOAN

**<u>Abu Claims</u>**

**(Claim Nos. 241 & 246)**

**Claim No. 241**

Claim #241  Date Filed: 7/2/2012

B 10 (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT    Southern District of New York | PROOF OF CLAIM |
|---|---|

| | |
|---|---|
| Name of Debtor:<br>EXECUTIVE TRUSTEE SERVICES, LLC aba ETS SERVICES,L | Case Number:<br>12-20 MG |

RECEIVED
JUL – 2 2012
U.S. BANKRUPTCY COURT
SO. DIST. OF NEW YORK

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>FELIX O. ABU | COURT USE ONLY |
| Name and address where notices should be sent:<br>FELIX O. ABU<br>6999 ROMANZO WAY<br>ELK GROVE, CA 95758<br>Telephone number: (916) 714-7144    email: felixabu@gmail.com | ☐ Check this box if this claim amends a previously filed claim.<br><br>Court Claim Number:_____<br>(If known)<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br>FELIX O. ABU<br>P.O. BOX 231171<br>SACRAMENTO, CA 95823<br>Telephone number: (916) 714-7144    email: felixabu@gmail.com | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars. |

**1. Amount of Claim as of Date Case Filed:**    $            121,125.00

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:**    MORTGAGE NOTE
   (See instruction #2)

| 3. Last four digits of any number by which creditor identifies debtor:<br><br>8 9 4 3 | 3a. Debtor may have scheduled account as:<br><br>(See instruction #3a) | 3b. Uniform Claim Identifier (optional):<br><br>(See instruction #3b) |
|---|---|---|

| | |
|---|---|
| **4. Secured Claim (See instruction #4)**<br>Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information. | **Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:** |
| Nature of property or right of setoff: ☑Real Estate ☐Motor Vehicle ☐Other<br>Describe: | $            0.00<br><br>Basis for perfection:    WARRANTY DEED |
| Value of Property: $ 150,000.00 | **Amount of Secured Claim:** $    121,125.00 |
| Annual Interest Rate 0.000% ☐Fixed or ☐Variable<br>(when case was filed) | **Amount Unsecured:** $            0.00 |

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☑ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__).

**Amount entitled to priority:**

$            121,125.00

RECEIVED
JUL 0 9 2012

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the da

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See in

KURTZMAN CARSON CONSULTANTS

121202812070200000000001

B 10 (Official Form 10) (12/11)                                                                                                           2

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**RECEIVED**

JUL 0 9 2012

**KURTZMAN CARSON CONSULTANTS**

**8. Signature:** (See instruction #8)

Check the appropriate box.

☑ I am the creditor.    ☐ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor,    ☐ I am a guarantor, surety, indorser, or other codebtor.
(Attach copy of power of attorney, if any.)    or their authorized agent.    (See Bankruptcy Rule 3005.)
(See Bankruptcy Rule 3004.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:    FELIX O. ABU
Title:
Company:                                                        (Signature)                              6/27/12
Address and telephone number (if different from notice address above):                                           (Date)


Telephone number:                    email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

**INSTRUCTIONS FOR PROOF OF CLAIM FORM**
*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*
**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. In addition to the documents themselves, FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

RECORDING REQUESTED BY:
**Executive Trustee Services, LLC**

AND WHEN RECORDED MAIL TO:
**GMAC MORTGAGE, LLC**
**FKA GMAC MORTGAGE CORPORATION**
**1100 VIRGINIA DRIVE**
**FORT WASHINGTON, PA 19034**

**Forward Tax Statements to**
**the address given above**

Sacramento County Recorder
Craig A. Kramer, Clerk/Recorder
BOOK **20120124** PAGE **0351**
Check Number  1932
Tuesday, JAN 24, 2012  8:53:20 AM
Ttl Pd   $21.00    Rcpt # 0007121864

MCJ/07/1-2

---

TS # ▮▮▮▮423-C
LOAN #▮▮▮▮8433                 INVESTOR #: ▮▮▮8447
TITLE ORDER #▮▮▮▮▮▮▮A-MSI

SPACE ABOVE LINE FOR RECORDER'S USE

## TRUSTEE'S DEED UPON SALE

APN ▮▮▮▮▮0000          TRANSFER TAX: $00.00
"THIS TRANSACTION IS EXEMPT FROM THE REQUIREMENTS OF THE REVENUE AND TAXATION CODE, SECTION 480.3"
The Grantee Herein Was The Foreclosing Beneficiary.
The Amount Of The Unpaid Debt was $324,914.98
The Amount Paid By The Grantee was $121,125.00
Said Property Is In The City Of **ELK GROVE**, County of **Sacramento**

**Executive Trustee Services, LLC dba ETS Services, LLC**, as Trustee, (whereas so designated in the Deed of Trust hereunder more particularly described or as duly appointed Trustee) does hereby **GRANT** and **CONVEY** to

## U.S. Bank National Association on behalf of GreenPoint Mortgage Funding Trust, Series 2007-AR2

(herein called Grantee) but without covenant or warranty, expressed or implied, all right title and interest conveyed to and now held by it as Trustee under the Deed of Trust in and to the property situated in the county of **Sacramento**, State of California, described as follows:

LOT 598, AS SHOWN ON THE "PLAT OF LAGUNA PARK UNIT NO. 5", RECORDED IN BOOK 223 OF MAPS, MAP NO. 16, RECORDS OF SAID COUNTY.

This conveyance is made in compliance with the terms and provisions of the Deed of Trust executed by **FELIX O. ABU, AN UNMARRIED MAN** as Trustor, dated **01/09/2007** of the Official Records in the office of the Recorder of **Sacramento**, California under the authority and powers vested in the Trustee designated in the Deed of Trust or as the duly appointed Trustee, default having occurred under the Deed of Trust pursuant to the Notice of Default and Election to Sell under the Deed of Trust recorded on **01/17/2007** , instrument number  (or Book **20070117**, Page **1806**) of Official records. Trustee having complied with all applicable statutory requirements of the State of California and performed all duties required by the Deed of Trust including sending a Notice of Default and Election to Sell within ten days after its recording and a Notice of Sale at least twenty days prior to the Sale Date by certified mail, postage pre-paid to each person entitled to notice in compliance with California Civil Code 2924b.

[Page 1 of 2]

**12UD04948**

# TRUSTEE'S DEED UPON SALE

Trustee's Deed
T.S.# ■■■■■423-C
Loan #■■■■8433
Title Order #■■■■■■■A-MSI

All requirements per California Statutes regarding the mailing, personal delivery and publication of copies of Notice of Default and Election to Sell under Deed of Trust and Notice of Trustee's Sale, and the posting of copies of Notice of Trustee's Sale have been complied with. Trustee, in compliance with said Notice of Trustee's sale and in exercise of its powers under said Deed of Trust sold said real property at public auction on 01/19/2012. Grantee, being the highest bidder at said sale became the purchaser of said property for the amount bid, being **$121,125.00**, in lawful money of the United States, in pro per, receipt there of is hereby acknowledged in full/partial satisfaction of the debt secured by said Deed of Trust.

In witness thereof, **Executive Trustee Services, LLC dba ETS Services, LLC**, as Trustee, has this day, caused its name to be hereunto affixed by its officer thereunto duly authorized by its corporation by-laws

Date:  *1-20-2012*

**Executive Trustee Services, LLC dba ETS Services, LLC**

"This instrument is being recorded as an ACCOMMODATION ONLY, with no Representation as to its effect upon title"

By: _____
   **Phyllis Lam, Authorized Officer**

State of California        } S.S.
County of Los Angeles  }

On  *1-20-2012*  before me, **Sally Beltran** Notary Public, personally appeared **Phyllis Lam** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
   **Sally Beltran**

SALLY BELTRAN
Commission # 1962270
Notary Public - California
Los Angeles County
My Comm. Expires Dec 1, 2015

[Page 2 of 2]

**Claim No. 246**

Claim #246 Date Filed: 7/2/2012

B 10 (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT    Southern District of New York | | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor:<br>GMAC MORTGAGE CORPORATION | Case Number:<br>12-12020 MG |
|---|---|

**NOTE:** *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

**FELIX O. ABU**

Name and address where notices should be sent:

**FELIX O. ABU
6999 ROMANZO WAY
ELK GROVE, CA 95758**

Telephone number:                 email:   felixabu@gmail.com

Name and address where payment should be sent (if different from above):

**FELIX O. ABU
P.O. BOX 231171    23H  95823
SACRAMENTO, CA 23H  95823**

Telephone number:                 email:   felixabu@gmail.com

**COURT USE ONLY**

RECEIVED JUL - 2 2012 U.S. BANKRUPTCY COURT SO. DIST. OF NEW YORK

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:_____**
  (*If known*)

Filed on:_____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:**   $        ~~$1,248,955.60~~  1,248,955.60

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:**   MORTGAGE NOTE
    (See instruction #2)

| 3. Last four digits of any number by which creditor identifies debtor:<br><br>0  7  3  8 | 3a. Debtor may have scheduled account as:<br><br>(See instruction #3a) | 3b. Uniform Claim Identifier (optional):<br><br>(See instruction #3b) |
|---|---|---|

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☑ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

**Value of Property:** $ 150,000.00

**Annual Interest Rate** 0.000 % ☐Fixed  or  ☐Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:

                                           $        0.00

**Basis for perfection:** WARRANTY DEED/UCC

**Amount of Secured Claim:**   $  1,248,955.60

**Amount Unsecured:**   $        0.00

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☑ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__).

**Amount entitled to priority:**

$     1,248,955.60

RECEIVED JUL 0 9 2012

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*


KURTZMAN CARSON CONSULTANTS

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

B 10 (Official Form 10) (12/11)                                                                                                          2

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**RECEIVED**

**JUL 0 9 2012**

**KURTZMAN CARSON CONSULTANTS**

**8. Signature:** (See instruction #8)

Check the appropriate box.

☑ I am the creditor.   ☐ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)   ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)   ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  FELIX O. ABU
Title:
Company:
Address and telephone number (if different from notice address above):

(Signature)                                         6/27/12                     (Date)

Telephone number:                        email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

**INSTRUCTIONS FOR PROOF OF CLAIM FORM**

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*
Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check the appropriate box if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided in this claim is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

RECORD AND RETURN TO:

FELIX O. ABU_
Name
P.O BOX 231171
SACRAMENTO, CA.95823

Sacramento County Recorder
Craig A. Kramer, Clerk/Recorder
BOOK **20120131** PAGE **1963**
Check Number  2882
Tuesday, JAN 31, 2012  3:22:45 PM
Ttl Pd    $18.00    Rcpt # 0007132884

NND/89/1-1

STATE OF CALIFORNIA
COUNTY OF SACRAMENTO}

Above Space for Recorder's Use Only

## ADD DECLARATION OF HOMESTEAD AFFIAVIT
## DESIGNATION AND DECLARATION OF HOMESTEAD AFFIDAVIT

KNOW ALL MEN BY THESE PRESENTS that I, FELIX O. ABU , do hereby certify and declare that I AM the owner(s) of property located at 6113 Tom way in the City of Elk Grove and County of Sacramento, State of California, and more particularly described as follows:
LOT 545, AS SHOWN ON THE "MAP OF QUAIL RIDGE UNIT NO 9,"FILED FOR RECORDS IN BOOK 299 OF MAPS, MAP NO 8, DOCUMENT NUMBER 20051025/713, HAVING TAX ASSESSOR NUMBER 132-0960-017-0000; RECORDS OF SAID COUNTY DATED 10/25/2005.

I hereby claim this property and the dwelling(s) thereon as our homestead. This property is my principal dwelling and I own and reside in this property on the date that the homestead declaration is recorded. The facts stated in this homestead declaration are known to be true as of my own personal knowledge and I petition any court of competent jurisdiction, to make this election of my homestead a matter of public record in said court of the above stated County by recording or filing the same as provided by law. I make this written statement by virtue of the provisions of, and pursuant to California CC §1237 through 1304;  CCP §704.710-.850;  Family Code §770, 1100, 1102.

| Signature | Date | Signature | Date |
|---|---|---|---|

Print Name: Felix O. Abu

Print Name:

State of California
County of Sacramento                    } ss.

On this 07 day of January in the year 2012, before me, Melvin Mario Notary Public personally appeared Felix O Abu and N/A , and proved to me on the basis of satisfactory evidence to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument the persons, or the entity upon behalf of which the persons acted, executed the instrument. I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct. WITNESS my hand and official seal.

NOTARY SEAL

NOTARY SIGNATURE

MELVIN MARIO
COMM. # 1856898
NOTARY PUBLIC - CALIFORNIA
SACRAMENTO COUNTY
COMM. EXPIRES JULY 6, 2013

THIS IS A TRUE CERTIFIED
COPY OF THE RECORD IF IT
BEARS THE SEAL, IMPRINTED
IN PURPLE INK, OF THE
COUNTY OF SACRAMENTO

BY_____
DEPUTY COUNTY CLERK/RECORDER
SACRAMENTO COUNTY  CALIFORNIA

RE CORDING REQUESTED BY:
ALLIANCE TITLE CO.
1248-7015-810-Dt2

Recording Requested By:
**GreenPoint Mortgage Funding, Inc.**
Return To:
**GreenPoint Mortgage Funding, Inc.**
**981 Airway Court, Suite E**
**Santa Rosa, CA 95403-2049**

Sacramento County Recording
Craig A Kramer, Clerk/Recorder
BOOK **20070117** PAGE **1806**

Check Number 8628
**Wednesday, JAN 17, 2007  2:39:01 PM**
Tt1 Pd    $81.00    Nbr-0004702805

REB/51/1-25

Prepared By:
**GreenPoint Mortgage Funding, Inc.**
**100 Wood Hollow Drive,**
**Novato, CA 94945**

—————————|Space Above This Line For Recording Data]—————————

# DEED OF TRUST

MIN 100013800914378480

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **January 9, 2007**
together with all Riders to this document.
**(B) "Borrower"** is **Felix O. Abu, An Unmarried Man**

Borrower's address is **6113 Tom Way, Elk Grove, CA 95757**
. Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is **GreenPoint Mortgage Funding, Inc.**

Lender is a **Corporation**
organized and existing under the laws of **the State of New York**

7848

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3005  1/01

VMP -6A(CA) (0207).01
®
Page 1 of 15

VMP Mortgage Forms, Inc.

Lender's address is **100 Wood Hollow Drive, Novato, CA 94945**

**(D) "Trustee" is Marin Conveyancing Corp.**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated **January 9, 2007**
The Note states that Borrower owes Lender **two hundred seventy-three thousand six hundred and 00/100**                                              **Dollars**
(U.S. $**273,600.00**        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **February 1, 2037**

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [x] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |
| [ ] Occupancy Rider | [x] Interim Interest Rider | |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**7848**

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| County | of | Sacramento | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

As more particularly described in exhibit "A"attached hereto and made a part hereof.

Parcel ID Number: 116-0900-046-0000                  which currently has the address of
6999 Romanzo Way                                                                    [Street]
Elk Grove                                      [City], California 95758          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

7848

 -6A(CA) (0207).01                          Page 3 of 15                          Form 3005  1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

**7848**

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

**7848**

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

7848

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

7848

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

7848

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

7848

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

7848

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

7848

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

7848

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _____ (Seal)
                                     **Felix O. Abu**                -Borrower


_____    _____ (Seal)
                                                                    -Borrower


_____ (Seal)    _____ (Seal)
                          -Borrower                                 -Borrower


_____ (Seal)    _____ (Seal)
                          -Borrower                                 -Borrower


_____ (Seal)    _____ (Seal)
                          -Borrower                                 -Borrower

7848

VMP -6A(CA) (0207).01                Page 14 of 15                Form 3005  1/01

**State of California**
**County of** _Sacramento_ } ss.

On _Jan 11, 2007_ before me, _G. Staley, Notary Public_

**personally appeared**

**Felix O. Abu**

, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

GWEN S. PICKERING
Commission # 1395963
Notary Public - California
Sacramento County
My Comm. Expires Feb 19, 2007

7848

VMP -6A(CA) (0207).01          Page 15 of 15          Form 3005  1/01

12487015 -810 -DH2

**Exhibit A**
**Legal Description**

All that certain real property in the City of Elk Grove, County of Sacramento, State of California, described as follows:

Lot 598, as shown on the "Plat of Laguna Park Unit No. 5", recorded in Book 223 of Maps, Map No. 16, records of said County.

APN: ███████-0000

# ADJUSTABLE RATE RIDER
### Monthly Treasury Average Index - Payment and Rate Caps

THIS ADJUSTABLE RATE RIDER is made this 9th    day of January, 2007    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
GreenPoint Mortgage Funding, Inc.

("Lender") of the same date and covering the property described in the Security Instrument
and located at: 6999 Romanzo Way, Elk Grove, CA  95758

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE
MONTHLY PAYMENT. THE MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT
IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY
BORROWED, BUT NOT MORE THAN $300,960.00. THE INTEREST RATE CAN NEVER EXCEED THE LIMIT
STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

## 2. INTEREST
### (A) Interest Rate
Interest will be charged on unpaid principal until the full amount of Principal has been
paid. I will pay interest at a yearly rate of        2.000 %. The interest rate I will pay
may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of this Note.
### (B) Interest Rate Change Dates
The interest rate I will pay may change on the first day of March, 2007        ,
and on that day every month thereafter. Each date on which my interest rate could change is

7848

TRAR-OB (06/06) GreenPoint Mortgage Funding, Inc.

called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

**(C) Interest Rate Limit**

My interest rate will never be greater than                    **12.000 %.**

**(D) Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **three and one-half** percentage points ( **3.500 %**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **March 1, 2007**            . I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **February 1, 2037**          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 79363, City of Industry, CA 91716-9363**
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ **1,011.28**           .
This amount may change.

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first day of **March, 2008**          , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

7848

TRAR-OB (06/06) GreenPoint Mortgage Funding, Inc.

Page 2 of 6

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last monthly payment due before the Payment Change Date.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to 110% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month.

**(G) Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

7848

**TRAR-OB (06/06)  GreenPoint Mortgage Funding, Inc.**

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

7848

**TRAR-OB (06/06) GreenPoint Mortgage Funding, Inc.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
Felix O. Abu                   -Borrower          -Borrower


_____ (Seal)          _____ (Seal)
                               -Borrower          -Borrower


_____ (Seal)          _____ (Seal)
                               -Borrower          -Borrower


_____ (Seal)          _____ (Seal)
                               -Borrower          -Borrower


7848

TRAR-OB (06/06)  GreenPoint Mortgage Funding, Inc.

Page 6 of 6

# INTERIM INTEREST RIDER TO
# ADJUSTABLE RATE RIDER AND MORTGAGE, DEED OF TRUST OR
# DEED TO SECURE DEBT

This Rider is made this 9th day of **January, 2007**, and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Rider (the "Rider") and the Mortgage, Deed of Trust or Deed to Secure Debt (the "Security Instrument") of the same date herewith, given by undersigned ("Borrower") to evidence Borrower's indebtedness to **GreenPoint Mortgage Funding, Inc.** its successors and assigns ("Lender") which indebtedness is secured by a Security Instrument and covering the property described in the Security Instrument and located at:

**6999 Romanzo Way, Elk Grove, CA  95758**

Notwithstanding anything to the contrary set forth in the Note, Rider and Security Instrument, Lender and Borrower hereby acknowledge and agree to the following.

2.    **INTEREST**
      (A)    **Interest Rate**
      Interest will be charged on unpaid principal until the full amount of Principal has been paid.  Until the first day of the calendar month that immediately precedes the first payment date set forth in Section 3(A) of the Note, I will pay interest at a yearly rate of **8.375%**.  Thereafter, I will pay interest at a yearly rate of **2.000%**, until the first Interest Change Date (as defined in Section 2(B) of the Note).

      The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

All other provisions of the Note, Rider and Security Instrument are unchanged by this Addendum and remain in full force and effect.

_____  (Borrower)        _____  (Borrower)
**Felix O. Abu**


_____  (Borrower)        _____  (Borrower)


_____  (Borrower)        _____  (Borrower)


_____  (Borrower)        _____  (Borrower)


**7848**

# 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this **9th** day of **January, 2007** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **GreenPoint Mortgage Funding, Inc.**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at: **6999 Romanzo Way, Elk Grove, CA   95758**

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

7848

**MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3170 1/01**

Wolters Kluwer Financial Services
VMP ®-57R (0411).01
Page 1 of 3

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

7848

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)        _____ (Seal)
Felix O. Abu              -Borrower                              -Borrower


_____ (Seal)        _____ (Seal)
                         -Borrower                              -Borrower


_____ (Seal)        _____ (Seal)
                         -Borrower                              -Borrower


_____ (Seal)        _____ (Seal)
                         -Borrower                              -Borrower


                                                          7848

VMP®-57R (0411).01            Page 3 of 3            Form 3170 1/01



THIS IS A TRUE CERTIFIED
COPY OF THE RECORD IF IT
BEARS THE SEAL, IMPRINTED
IN PURPLE INK, OF THE
COUNTY OF SACRAMENTO

BY_____
DEPUTY COUNTY CLERK/RECORDER
SACRAMENTO COUNTY  CALIFORNIA

## · 8-K ·

## For 4/30/07

**Filed On**     12:19pm ET   ·   **SEC File**     ·   **Accession Number 1144204-**
7-25500

Find                          in   this entire Filing.     Show   Docs searched   · and   every "hit".

| As Of Issuer | Filer Agent | Filing | For/On/As | Docs:Size |
|---|---|---|---|---|
| 5/15/07  Greenpoint Mortgage Fun..2007-AR2 | 8-K{8,9} | 4/30/07 | 15:850 | |
| Vintage Filings LLC/FA | | | | |

### Current Report  ·  Form 8-K
### Filing Table of Contents

| Document/Exhibit | Description Size | Pages |
|---|---|---|
| 1: **8-K** | Current Report  44K | **HTML** |
| 2: EX-1.1 | Underwriting Agreement  39K | HTML |
| 3: EX-4.1 | Instrument Defining the Rights of Security Holders  1.43M | HTML |
| 4: EX-99.1 | Miscellaneous Exhibit  98K | HTML |
| 5: EX-99.2 | Miscellaneous Exhibit  469K | HTML |
| 6: EX-99.3 | Miscellaneous Exhibit  243K | HTML |
| 7: EX-99.4 | Miscellaneous Exhibit  358K | HTML |
| 8: EX-99.5 | Miscellaneous Exhibit  367K | HTML |
| 9: EX-99.6 | Miscellaneous Exhibit  525K | HTML |
| 10: EX-99.7 | Miscellaneous Exhibit  59K | HTML |
| 11: EX-99.8 | Miscellaneous Exhibit  166K | HTML |
| 12: EX-99.9 | Miscellaneous Exhibit  15K | HTML |
| 13: EX-99.10 | Miscellaneous Exhibit  158K | HTML |

| 14: | EX-99.11 | Miscellaneous Exhibit | HTML |
|---|---|---|---|
| | | 66K | |
| 15: | EX-99.12 | Miscellaneous Exhibit | HTML |
| | | 124K | |

## 8-K · Current Report

*This is an EDGAR HTML document rendered as filed.* [ *Alternative Formats* ]

Sponsored Ads...

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

FORM 8-K

CURRENT REPORT

PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported)
April 30, 2007

STRUCTURED ASSET SECURITIES CORPORATION (as Depositor under the Trust Agreement, dated as of April 1, 2007, providing for the issuance of GreenPoint Mortgage Funding Trust Mortgage Pass-Through Certificates, Series 2007-AR2)

GreenPoint Mortgage Funding Trust, Series 2007-AR2
(Issuing Entity)

Structured Asset Securities Corporation
(Exact Name of Depositor as Specified in its Charter)

Lehman Brothers Holdings Inc.
(Exact Name of Sponsor as Specified in its Charter)

Structured Asset Securities Corporation
(Exact Name of Registrant as Specified in its Charter)

| Delaware | 333-133985 | 74-2440850 |
|---|---|---|
| (State or Other Jurisdiction | (Commission | (I.R.S. Employer |
| Of Incorporation) | File Number) | Identification No.) |

745 Seventh Avenue, 7th Floor
New York, NY                                    10019_____
(Address of Principal Executive Offices)              (Zip Code)

Registrant's telephone number, including area code: (212) 526-7000

No Change
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

ITEM 8.01.        Other Events.

The Registrant registered issuances of GreenPoint Mortgage Funding Trust Mortgage Pass-Through Certificates on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended, by a Registration Statement on Form S-3 (Registration File No. 333-133985 (the *"Registration Statement"*)). Pursuant to the Registration Statement, the Registrant issued $1,279,245,000 in aggregate principal amount Class 1-A1, Class 1-A2A, Class 1-A2B, Class 1-A3, Class 1-A4A, Class 1-A4B, Class 1-A4C, Class 2-A1, Class 2-A2, Class 2-A3, Class 1-M1, Class 1-M2, Class 1-M3, Class 1-M4, Class 1-M5, Class 1-M6, Class 1-M7, Class 1-M8, Class 1-M9, Class 2-M1, Class 2-M2, Class 2-M3, Class 2-M4, Class 2-M5, Class 2-M6, Class 2-M7, Class 2-M8 and Class 2-M9 Certificates (the *"Public Certificates"*) of its GreenPoint Mortgage Funding Trust Mortgage Pass-Through Certificates, Series 2007-AR2 on April 30, 2007. This Current Report on Form 8-K is being filed to satisfy an undertaking, contained in the definitive Prospectus, dated March 26, 2007, as supplemented by the Prospectus Supplement, dated April 27, 2007, to file a copy of the Trust Agreement (as defined below) executed in connection with the issuance of the Certificates, a form of which was filed as an exhibit to the Registration Statement.

On April 30, 2007, the following classes of certificates (the *"Private Certificates"*) in the following amounts were sold by the Registrant to affiliates of the Registrant in private placements in reliance on Section 4(2) of the Securities Act of 1933:

| Class | Initial Principal Balance |
|---|---|
| Class 1-AP | $100 |
| Class 2-AP | $100 |
| Class 1-C | N/A |
| Class 2-C | N/A |
| Class 1-X | N/A |
| Class 2-X | N/A |
| Class R | N/A |

The net proceeds from the sale of these certificates were applied by the Registrant toward the purchase of the Mortgage Loans (as defined below).

The Public Certificates and the Private Certificates (together the *"Certificates"*) were issued pursuant to a Trust Agreement (the *"Trust Agreement"*), attached hereto as Exhibit 4.1, dated as of April 1, 2007, among Structured Asset Securities Corporation, as depositor (the *"Depositor"*), Aurora Loan Services LLC, as master servicer (the *"Master Servicer"*) and U.S. Bank National Association, as trustee (the *"Trustee"*). The Certificates evidence all the beneficial ownership interest in a trust fund that consists primarily of two pools of conventional, first lien, adjustable rate and hybrid, negative amortization, fully amortizing residential mortgage loans (the *"Mortgage Loans"*) with an aggregate outstanding principal balance of approximately $1,288,522,133 as of April 1, 2007. Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Trust Agreement.

---

Item 9.01. Financial Statements and Exhibits

(a)     Not applicable.

(b)     Not applicable.

(c)     Not applicable.

(d)     Exhibits:

| 1.1 | Terms Agreement, dated as of April 26, 2007, between Structured Asset Securities Corporation, as Depositor, and Lehman Brothers Inc., as Underwriter. |
|---|---|
| 4.1 | Trust Agreement, dated as of April 1, 2007, among Structured Asset Securities Corporation, as Depositor, Aurora Loan Services LLC, as Master Servicer and U.S. Bank National Association, as Trustee. |
| 99.1 | Mortgage Loan Sale and Assignment Agreement, dated as of April 1, 2007, between Lehman Brothers Holdings Inc., as Seller, and Structured Asset Securities Corporation, as Purchaser. |
| 99.2 | Servicing Agreement, dated as of April 1, 2007, between Lehman Brothers Holdings Inc. and Aurora Loan Services LLC. |
| 99.3 | Reconstituted Servicing Agreement, dated as of April 1, 2007, between Lehman Brothers Holdings Inc. and GreenPoint Mortgage Funding, Inc. |
| 99.4 | Flow Interim Servicing Agreement, dated as of April 10, 2006, between |

|  | Lehman Capital, a Division of Lehman Brothers Holdings Inc. and GreenPoint Mortgage Funding, Inc. |
|---|---|
| 99.5 | Amended and Restated Flow Interim Servicing Agreement, dated as of February 1, 2007, between Lehman Brothers Bank, FSB and GreenPoint Mortgage Funding, Inc. |
| 99.6 | Securitization Servicing Agreement, dated as of April 1, 2007, among GMAC Mortgage Corporation, as Servicer, Lehman Brothers Holdings Inc., as Seller, and Aurora Loan Services LLC, as Master Servicer. |

---

| 99.7 | Interest Rate Cap Agreement, dated as of April 30, 2007, between ABN AMRO Bank N.V. and GreenPoint Mortgage Funding Trust, Series 2007-AR2. |
|---|---|
| 99.8 | Deferred Interest Cap Agreements relating to the Class 1-A2A, Class 1-A2B, Class 1-A3 and Class 1-A4B Certificates, respectively, each dated as of April 30, 2007, and each between Lehman Brothers Special Financing Inc. and GreenPoint Mortgage Funding Trust, Series 2007-AR2. |
| 99.9 | Guarantee of Lehman Brothers Holdings Inc., dated as of April 30, 2007, relating to the Deferred Interest Cap Agreements. |
| 99.10 | ISDA Master Agreement, dated as of April 30, 2007, by and between ABN AMRO Bank N.V. and Supplemental Interest Trust, GreenPoint Mortgage Funding Trust Mortgage Pass-Through Certificates, Series 2007-AR2. |
| 99.11 | Confirmation, dated as of April 30, 2007, by and between ABN AMRO Bank N.V. and Supplemental Interest Trust, GreenPoint Mortgage Funding Trust Mortgage Pass-Through Certificates, Series 2007-AR2. |
| 99.12 | ISDA Credit Support Annex to the ISDA Master Agreement dated as of April 30, 2007, by and between ABN AMRO Bank N.V. and Supplemental Interest Trust, GreenPoint Mortgage Funding Trust Mortgage Pass-Through Certificates, Series 2007-AR2. |

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

STRUCTURED ASSET SECURITIES CORPORATION

By:       /s/ Michael C. Hitzmann
Name:       Michael C. Hitzmann
Title:       Senior Vice President

Date: May 15, 2007

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 1.1 | Terms Agreement, dated as of April 26, 2007, between Structured Asset Securities Corporation, as Depositor, and Lehman Brothers Inc., as Underwriter. |
| 4.1 | Trust Agreement, dated as of April 1, 2007, among Structured Asset Securities Corporation, as Depositor, Aurora Loan Services LLC, as Master Servicer and U.S. Bank National Association, as Trustee. |
| 99.1 | Mortgage Loan Sale and Assignment Agreement, dated as of April 1, 2007, between Lehman Brothers Holdings Inc., as Seller, and Structured Asset Securities Corporation, as Purchaser. |
| 99.2 | Servicing Agreement, dated as of April 1, 2007, between Lehman Brothers Holdings Inc. and Aurora Loan Services LLC. |
| 99.3 | Reconstituted Servicing Agreement, dated as of April 1, 2007, between Lehman Brothers Holdings Inc. and GreenPoint Mortgage Funding, Inc. |
| 99.4 | Flow Interim Servicing Agreement, dated as of April 10, 2006, between Lehman Capital, a Division of Lehman Brothers Holdings Inc. and GreenPoint Mortgage |

Funding, Inc.

| | |
|---|---|
| 99.5 | Amended and Restated Flow Interim Servicing Agreement, dated as of February 1, 2007, between Lehman Brothers Bank, FSB and GreenPoint Mortgage Funding, Inc. |
| 99.6 | Securitization Servicing Agreement, dated as of April 1, 2007, among GMAC Mortgage Corporation, as Servicer, Lehman Brothers Holdings Inc., as Seller, and Aurora Loan Services LLC, as Master Servicer. |
| 99.7 | Interest Rate Cap Agreement, dated as of April 30, 2007, between ABN AMRO Bank N.V. and GreenPoint Mortgage Funding Trust, Series 2007-AR2. |
| 99.8 | Deferred Interest Cap Agreements relating to the Class 1-A2A, Class 1-A2B, Class 1-A3 and Class 1-A4B Certificates, respectively, each dated as of April 30, 2007, and each between Lehman Brothers Special Financing Inc. and GreenPoint Mortgage Funding Trust, Series 2007-AR2. |
| 99.9 | Guarantee of Lehman Brothers Holdings Inc., dated as of April 30, 2007, relating to the Deferred Interest Cap Agreements. |

| | |
|---|---|
| 99.10 | ISDA Master Agreement, dated as of April 30, 2007, by and between ABN AMRO Bank N.V. and Supplemental Interest Trust, GreenPoint Mortgage Funding Trust Mortgage Pass-Through Certificates, Series 2007-AR2. |
| 99.11 | Confirmation, dated as of April 30, 2007, by and between ABN AMRO Bank N.V. and Supplemental Interest Trust, GreenPoint Mortgage Funding Trust Mortgage Pass-Through Certificates, Series 2007-AR2. |
| 99.12 | ISDA Credit Support Annex to the ISDA Master Agreement dated as of April 30, 2007, by and between ABN AMRO Bank N.V. and Supplemental Interest Trust, GreenPoint Mortgage Funding Trust Mortgage Pass-Through Certificates, Series 2007-AR2. |

**Dates Referenced Herein  *and*  Documents Incorporated By Reference**

| *This 8-K Filing* | *Date* | *Other Filings* |
|---|---|---|
| | 4/10/06 | |
| | 2/1/07 | |
| | 3/26/07 | |
| | 4/1/07 | |
| | 4/26/07 | |
| | 4/27/07 | |
| For The Period Ended | 4/30/07 | 8-K, 424B5 |
| Filed On / Filed As Of | 5/15/07 | |

Top                                             List All Filings

# Greenpoint Mortgage Funding Trust 2007-AR2 · '8-K'

## Accession Number 1144204-7-25500 · Documents containing "POOLING and AND and SERVICE and AGREEMENT" with Text matching "POOLING or AND or SERVICE or AGREEMENT" anywhere in This Filing

*Note:* **Words 'and', 'or' and 'near' are treated as text. Use '&', '|', '(', ')' and '""' for logic.**

| Find | POOLING AND SERV\ | in | this entire Filing. ▼ | Show | Docs searched ▼ | and | every "hit". ▼ |

**Help..** *Wildcards:* **?** (any letter). **\*** (many). *Logic:* for Docs: **&** (and). **|** (or); for Text: **|** (anywhere). **, "(&)"** (near).

| As Of | Filer | Doc | Filing | For/On /As | Docs:Size | Issuer | Agent |
|---|---|---|---|---|---|---|---|
| 5/15/07 | Greenpoint Mortgage Fun..2007-AR2 | 8-K{8,9} | | 4/30/07 | | 15:850 | |

Vintage Filings LLC/FA

1: 8-K.............. Current
Report -- HTML

2: EX-1.1............ Underwriting
Agreement -- HTML

3: EX-4.1............ Instrument
Defining the Rights of Security Holders -- HTML

4: EX-99.1..........
Miscellaneous Exhibit -- HTML

13: EX-99.10..........
Miscellaneous Exhibit -- HTML

14: EX-99.11..........
Miscellaneous Exhibit -- HTML

15: EX-99.12..........
Miscellaneous Exhibit -- HTML

5: EX-99.2...........
Miscellaneous Exhibit -- HTML

6: EX-99.3...........
Miscellaneous Exhibit -- HTML

7: EX-99.4...........
Miscellaneous Exhibit -- HTML

| EX-99.4 · 1st Page of 76± | | | |
|---|---|---|---|

*Line 46:* FLOW INTERIM SERVICING AGREEMENT

*Line 57:* ... and

*Line 71:* CONVENTIONAL FIXED AND ADJUSTABLE RATE RESIDENTIAL MORTGAGE LOANS

*Line 99:* FLOW INTERIM SERVICING AGREEMENT   This Flow Interim Servicing Agreement (the "Agreement") is entered into as of the 12 th day of December 2001, by and between GREENPOINT MORTGAGE FUNDING INC. (the "Seller"), a California corporation and LEHMAN CAPITAL, A DIVISION OF LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation (the "Purchaser").   WHEREAS, the Purchaser and Seller entered into a Mortgage Loan Purchase and Warranties Agreement dated as of the date hereof (the "Purchase Agreement") pursuant to which the Purchaser shall, from time to time, purchase from the Seller

certain conventional, residential, fixed and adjustable rate first and second lien mortgage loans (the "Mortgage ...

*Line 122*: Mortgage Loans, a "Mortgage Loan Package"); and   WHEREAS, the Purchaser desires to have the Seller service the Mortgage Loans in each Mortgage Loan Package during the period between the related Closing Date and the ...

*Line 131*: Period"), the Seller desires to service and administer the Mortgage Loans on behalf of the Purchaser during the Interim Period, and the parties desire to provide the terms and conditions of such interim servicing by the Seller.   NOW, THEREFORE, in consideration of the mutual covenants made herein and for other good and valuable consideration the sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows: ...

*Line 151*: ... capitalized terms not otherwise defined herein have the respective meanings set forth in the Purchase Agreement. The following terms are defined as follows (except as otherwise agreed by the parties).

*Line 158*: With respect to any Mortgage Loan, those mortgage servicing practices of (i) prudent mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located and (ii) in accordance with applicable state, local and federal laws, rules and regulations. Acknowledgment Agreement: The agreement, substantially in the form of Exhibit 6 hereto, to be executed by the Seller and the Purchaser on each Closing Date.   Agreement: This agreement between the Purchaser and the Seller for the interim servicing and administration of the Mortgage Loans.   Commission: The United States Securities and Exchange Commission.

*Line 211*: Account: The separate account or accounts created and maintained pursuant to Section 2.04.

*Line 217*: Investments: Any one or more of the obligations and securities listed below which investment provides for a date of maturity not later than the Determination Date in each ...

*Line 222*: ... (i)   direct obligations of, and obligations fully guaranteed by, the United States of America, or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America; and (ii)   federal funds, demand and time deposits in, certificates of deposits of, or bankers' acceptances issued by, any depository institution or trust company incorporated or organized under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state banking authorities, so long as at the time of such investment or contractual commitment ...

*Line 240*: ... holding company, the commercial paper or other short-term debt obligations of such holding company) are rated "P-1" by Moody's Investors Service, Inc. and the long-term debt obligations of such holding company) are rated "P-1" by Moody's Investors Service, Inc. and the long-term debt obligations of such depository institution or trust company (or, in the case of a depository institution or trust company which is the principal subsidiary of a holding company, the long-term debt obligations of such holding company) are rated at least "Aa" by Moody's Investors Service, Inc.

*Line 253*: ... such instrument shall be an Eligible Investment if such instrument evidences either (i) a right to receive only interest payments with respect to the obligations underlying such instrument, or (ii) both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a

| |
|---|
| yield to maturity of greater than 120% of the yield to maturity at par of such underlying ... |
| *Line 262:* Account: The separate account or accounts created and maintained pursuant to Section 2.06. |
| *Line 270:* ... respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and any other ... |
| *Line 304:* Mae Guides: The Fannie Mae Selling Guide and the Fannie Mae Servicing Guide and all amendments or additions thereto. |
| *Line 322:* Period: The period between the related Closing Date and the related Transfer Date. |
| *Line 351:* Purchaser, which shall be equal to the Mortgage Interest Rate minus the sum of (a) the Servicing Fee and (b) the LPMI Fee, if any. |
| *Line 358:* ... policy of primary mortgage guaranty insurance issued by a Qualified Insurer, as required by this Agreement with respect to certain Mortgage Loans. |
| *Line 367:* Purchase Agreement: The Flow Mortgage Loan Purchase and Warranties Agreement between the Purchaser and the Seller related to the purchase of the Mortgage Loans dated as of the related ... |
| *Line 376:* Purchaser: Shall have the meaning set forth in the first paragraph of this Agreement; provided, however, that, for the purpose of compliance with Regulation AB, references ... |
| *Line 401:* ... depository the accounts of which are insured by the FDIC through the BIF or the SAIF and the debt obligations of which are rated AA or better by Standard & Poor's Corporation. |
| *Line 407:* Insurer: A mortgage guaranty insurance company duly authorized and licensed where required by law to transact mortgage guaranty insurance business and approved as an insurer by Fannie Mae or Freddie Mac. |
| *Line 414:* Subpart 229.1100 - Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in ... |
| *Line 482:* Advances: All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance by the Seller of its servicing obligations, including, but not limited to, the cost of (a) the preservation, restoration and protection of the Mortgaged Property, (b) any enforcement or judicial proceedings, including foreclosures, (c) the management and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage and (d) compliance with the obligations under Section 2.08. |
| *Line 517:* With respect to each Mortgage Loan, an amount equal to $7.00 per month. Such fee shall be payable monthly and shall be pro rated for any portion of a month during which the Mortgage Loans is serviced pursuant to this Agreement. The obligation of the Purchaser to pay the Servicing Fee is limited to, and the Servicing Fee is payable solely from, the interest portion (including recoveries ... |
| *Line 532:* ... originals of all documents in the Mortgage File which are not delivered to the Purchaser or the Custodian for the benefit of the Purchaser and copies of the Mortgage Loan Documents listed on Exhibit B to the Purchase Agreement. |

*Line 541:* Officer: Any officer of the Seller involved in or responsible for, the administration and servicing of the Mortgage Loans whose name appears on a list of servicing ...

*Line 560:* Any Person that services Mortgage Loans on behalf of the Seller or any Subservicer and is responsible for the performance (whether directly or through Subservicers or Subcontractors) of a substantial portion of the material servicing functions required to be performed by the Seller under this Agreement or any Reconstitution Agreement that are identified in Item 1122(d) of Regulation AB.

*Line 570:* With respect to any Mortgage Loan Package, the date mutually agreed upon by the Seller and the Purchaser and set forth on the Acknowledgment Agreement, which shall not be more than 60 days following the related Closing Date, unless ...

*Line 604:* ... to Act as Servicer. With respect to the Mortgage Loans in each Mortgage Loan Package purchased by the Purchaser from the Seller, from and after the related Closing Date and the execution of the related Acknowledgment Agreement, the Seller, as an independent contractor, shall service and administer the Mortgage Loans and shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which the Seller may deem necessary or desirable, consistent with the terms of this Agreement and with Accepted Servicing Practices. Consistent with the terms of this Agreement, the Seller may waive, modify or vary any term of any Mortgage Loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Mortgagor if in the Seller's reasonable and prudent determination such waiver, modification, postponement or indulgence is not materially adverse to the Purchaser, provided, ...

*Line 630:* ... month in which any such principal or interest payment has been deferred, deposit in the Custodial Account from its own funds, in accordance with Section 2.04, the difference between (a) such month's principal and one month's interest at the Mortgage Loan Remittance Rate on the unpaid principal balance of such Mortgage Loan and (b) the amount paid by the Mortgagor. The Seller shall be entitled to reimbursement for such advances ...

*Line 637:* ... the same extent as for all other advances made pursuant to Section 2.05. Without limiting the generality of the foregoing, the Seller shall continue, and is hereby authorized and empowered, to execute and deliver on behalf of itself and the Purchaser, all instruments of satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Properties. If reasonably required by the Seller, the Purchaser shall furnish the Seller with any powers of attorney and other documents necessary or appropriate to enable the Seller to carry out its servicing and administrative duties under this Agreement.  In servicing and administering the Mortgage Loans, the Seller shall employ procedures (including collection procedures) and exercise the same care that it customarily employs and exercises in servicing and administering mortgage loans for its own account, giving due consideration to Accepted Servicing Practices where such practices do not conflict with the requirements of this Agreement, and the Purchaser's reliance on the Seller.  The Seller shall keep at its servicing office books and records in which, subject to ...

*Line 663:* ... of Mortgage Loans. No transfer of a Mortgage Loan may be made unless such transfer is in compliance with the terms hereof. For the purposes of this Agreement, Seller shall be under no obligation to deal with any Person with respect to this Agreement or the Mortgage Loans unless the Seller has been notified of such transfers as provided in this Section 2.01. The Purchaser may sell and transfer, in whole or in part, the Mortgage Loans, provided that no such

sale and transfer shall be binding upon Seller unless such transferee shall agree in writing in the form of the Assignment and Assumption Agreement attached to the Purchase Agreement as Exhibit H, to be bound by the terms of this Agreement and the Purchase Agreement, and an executed copy of the same shall have been delivered to the Seller. Upon receipt thereof, Seller shall mark its books and records to reflect the ownership of the Mortgage Loans by such assignee, and the previous Purchaser shall be released from its obligations hereunder. This Agreement shall be binding upon and inure to the benefit of the Purchaser and Seller and their permitted successors, assignees and designees.

*Line 698*: The Seller shall cause to be maintained for each Cooperative Loan a copy of the financing statements and shall file such financing statements and continuation statements as necessary, in accordance with the Uniform Commercial Code applicable in the jurisdiction in which the related Cooperative Apartment is located, to perfect and protect the security interest and lien of the Purchaser.

*Line 708*: ... of Mortgage Loans. In the event that any payment due under any Mortgage Loan and not postponed pursuant to Section 2.01 is not paid when the same becomes due and payable, or in the event the Mortgagor fails to perform any other covenant or obligation under the Mortgage Loan and such failure continues beyond any applicable grace period, the ...

*Line 719*: ... for investment, (2) shall be consistent with Accepted Servicing Practices, (3) the Seller shall determine prudently to be in the best interest of Purchaser, and (4) is consistent with any related PMI Policy. In the event that any payment due under any Mortgage Loan is not postponed pursuant to Section 2.01 and remains delinquent for a period of 90 days or any other default continues for a period of 90 days beyond ...

*Line 727*: ... proceedings, the Seller shall notify the Purchaser in writing of the Seller's intention to do so, and the Seller shall not commence foreclosure proceedings if the Purchaser objects to such action within 10 Business Days of receiving such notice. In such connection, the Seller shall from its own funds make all necessary and proper Servicing Advances, provided, however, that the Seller shall not be required to expend its own funds in connection with any foreclosure or towards the restoration or preservation of any Mortgaged Property, unless it shall determine (a) that such preservation, restoration and/or foreclosure will increase the proceeds of liquidation of the Mortgage Loan to Purchaser after reimbursement to itself for such expenses and (b) that such expenses will be recoverable by it either through Liquidation Proceeds (respecting which ...

*Line 748*: Continuously from the related Cut-off Date until the related Transfer Date the Seller shall proceed diligently to collect all payments due under each of the Mortgage Loans when the same shall become due and payable and shall take special care in ascertaining and estimating Escrow Payments and all other charges that will become due and payable with respect to the Mortgage Loans and each related Mortgaged Property, to the end that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable. ...

*Line 773*: Section 2.04    Establishment of and Deposits to Custodial Account. The Seller shall segregate and hold all funds collected and received pursuant to the Mortgage Loans separate and apart from any of its own funds and general assets and shall establish and maintain one or more Custodial Accounts, in the form of time deposit or demand accounts, titled "GreenPoint Mortgage Funding Inc. in trust for Lehman Capital, A Division of Lehman Brothers Holdings Inc., Residential Fixed and Adjustable Rate Mortgage Loans, Group No 2006-FLOW

and various Mortgagors". The Custodial Account shall be established with a Qualified ...

*Line 790:* Seller in accordance with Section 2.05. The creation of any Custodial Account shall be evidenced by a certification in the form of Exhibit 2 hereto, in the case of an account established with the Seller, or by a letter agreement in the form of Exhibit 3 hereto, in the case of an account held by a depository other than the Seller. A copy of such certification or letter agreement shall be furnished to the Purchaser and, upon request, to any subsequent Purchaser.

*Line 800:* Seller shall deposit in the Custodial Account on a daily basis, within two (2) Business Days of receipt, and retain therein, the following collections received by the Seller after the related Cut-off Date (other than with respect to each ...

*Line 816:* ... (iv)    all Insurance Proceeds including amounts required to be deposited pursuant to Section 2.11 (other than proceeds to be held in the Escrow Account and applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with Section 2.15), Section 2.12 and Section 2.16; ...

*Line 834:* ... (vii)    any amounts payable in connection with the repurchase of any Mortgage Loan pursuant to the terms of the Purchase Agreement; and  ...

*Line 856:* ...  (ix)    any prepayment penalties, late payment charges and assumption fees received in connection with the Mortgage Loans.

*Line 861:* The foregoing requirements for deposit into the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of assumption fees, to the extent permitted by Section 4.01, need not be deposited by the Seller into the Custodial Account. Any interest paid on funds deposited in the Custodial Account by the depository institution shall accrue to the benefit of the Seller and the Seller shall be entitled to retain and withdraw such interest from the Custodial Account pursuant to Section 2.05.

*Line 879:* ...  (i)    to make payments to the Purchaser in the amounts and in the manner provided for in ...

*Line 886:* ... reimburse itself for unreimbursed Servicing Advances, any unpaid Servicing Fees and for unreimbursed advances of Seller funds made pursuant to Section 2.17, the Seller's right to reimburse itself pursuant to this subclause (iii) with respect to any Mortgage Loan being limited to related Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds and such other amounts as may be collected by the ...

*Line 896:* ... thereto shall be prior to the rights of the Purchaser except that, where the Seller is required to repurchase a Mortgage Loan pursuant to the terms of the Purchase Agreement or Section 4.02 of this Agreement, the Seller's right to such reimbursement shall be subsequent to the payment to the Purchaser of the Repurchase Price pursuant to such sections and all other amounts required to be ...

*Line 906:* ...  (iv)    to reimburse itself for expenses incurred and reimbursable to it pursuant to Section 4.03;  (v)    to clear and terminate the Custodial Account upon the termination of this Agreement; and

*Line 941:* Section 2.06    Establishment of and Deposits to Escrow Account.  The Seller shall segregate and hold all funds collected and received pursuant to a Mortgage Loan constituting Escrow Payments separate and apart from any of its own funds and general assets and shall establish and maintain one or more Escrow Accounts, in the form of time deposit or demand

accounts, titled, "GreenPoint Mortgage Funding Inc., in trust for Lehman Capital, A Division of Lehman Brothers Holdings Inc. Residential Fixed and Adjustable Rate Mortgage Loans, Group No 2006-FLOW, and various Mortgagors". The Escrow Accounts shall be established with a Qualified ...

*Line 957:* ... be evidenced by a certification in the form of Exhibit 4 hereto, in the case of an account established with the Seller, or by a letter agreement in the form of Exhibit 5 hereto, in the case of an account held by a depository other than the Seller. A copy of such certification shall be furnished to the Purchaser and, upon request, to any subsequent Purchaser.  The Seller shall deposit in the Escrow Account or Accounts on a daily basis, within two (2) Business Days of receipt, and retain therein:

*Line 971:* ... of effecting timely payment of any such items as required under the terms of this Agreement; and

*Line 980:* The Seller shall make withdrawals from the Escrow Account only to effect such payments as are required under this Agreement, as set forth in Section 2.07. The Seller shall be entitled to retain any interest paid on ...

*Line 1,000:* ... (i)      to effect timely payments of ground rents, taxes, assessments, water rates, mortgage insurance premiums, condominium charges, fire and hazard insurance premiums or other items constituting Escrow Payments for the related ...

*Line 1,030:* ...  (iv)      for transfer to the Custodial Account and application to reduce the principal balance of the Mortgage Loan in accordance with the terms of the related Mortgage and Mortgage Note;

*Line 1,043:* ...  (vii)      to clear and terminate the Escrow Account on the termination of this Agreement; and

*Line 1,051:* Section 2.08      Payment of Taxes, Insurance and Other Charges.  With respect to each Mortgage Loan, the Seller shall maintain accurate records reflecting the status of ground rents, taxes, assessments, water rates, sewer rents, and other charges which are or may become a lien upon the Mortgaged Property and the status of PMI Policy premiums and fire and hazard insurance coverage and shall obtain, from time to time, all bills for the payment of such charges (including renewal premiums) and shall effect payment thereof prior to the applicable penalty or termination date, employing for such purpose deposits of the Mortgagor in the Escrow Account which shall have been estimated and accumulated by the Seller in amounts sufficient for such purposes, as allowed ...

*Line 1,068:* ... made by the Mortgagor at the time they first become due. The Seller assumes full responsibility for the timely payment of all such bills and shall effect timely payment of all such charges irrespective of each Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments, and the ...

*Line 1,078:* 2.09      PMI Obligations. The Seller shall comply with all provisions of applicable state and federal law relating to the cancellation of, or collection of premiums with respect to, PMI Policies, including, but not limited to, the provisions of the Homeowners Protection Act of 1998, and all regulations promulgated thereunder, as amended from time to time. If the Mortgagor fails to pay any ...

*Line 1,099:* The Seller shall bear any expenses, losses or damages sustained by the Purchaser because the Custodial Account and/or the Escrow Account are not demand deposit accounts.

Amounts on deposit in the Custodial Account and the Escrow Account may at the option of ...

*Line 1,125:* ... or gain realized from any such Eligible Investment shall be for the benefit of the Seller and may be withdrawn at any time by the Seller. Any losses incurred in respect of any such investment shall be deposited in the Custodial Account ...

*Line 1,153:* ... acceptable insurer rated A:VI or better in the current Best's Key Rating Guide ("Best's") against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located, in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements securing such Mortgage Loan and (ii) the greater of (a) the outstanding principal balance of the Mortgage Loan and (b) an amount such that the proceeds thereof shall be sufficient to prevent the ...

*Line 1,167:* ... in an area identified in the Federal Register by the Flood Emergency Management Agency as having special flood hazards (and such flood insurance has been made available) a flood insurance policy meeting the requirements of the current ...

*Line 1,175:* ... on a replacement cost basis (or the unpaid balance of the mortgage if replacement cost coverage is not available for the type of building insured) and (ii) the maximum amount of insurance which is available under the Flood ...

*Line 1,180:* ... of the Mortgage Loan, the Seller determines in accordance with applicable law and pursuant to the FNMA Guides that a Mortgaged Property is located in a special flood hazard area and is not covered by flood insurance or is covered in an amount less than the amount required by the Flood Disaster Protection Act of 1973, as amended, the Seller shall notify the related Mortgagor that the Mortgagor must obtain such flood insurance coverage, and if said Mortgagor fails ...

*Line 1,195:* Mortgage is secured by a unit in a condominium project, the Seller shall verify that the coverage required of the owner's association, including hazard, flood, liability, and fidelity coverage, is being maintained in accordance with then current Fannie Mae requirements, and secure from the owner's association its agreement to notify the Seller promptly of any change in the insurance coverage or of any condemnation or casualty loss that may have a material effect on ...

*Line 1,219:* Seller shall cause to be maintained on each Mortgaged Property earthquake or such other or additional insurance as may be required pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance, or pursuant to the requirements of any ...

*Line 1,227:* ... the event that the Purchaser or the Seller shall determine that the Mortgaged Property should be insured against loss or damage by hazards and risks not covered by the insurance required to be maintained by the Mortgagor pursuant to the terms of the Mortgage, the Seller shall communicate and consult with the Mortgagor with respect to the need for such insurance and bring to the Mortgagor's attention the desirability of protection of the Mortgaged ...

*Line 1,236:* All policies required hereunder shall name the Seller as loss payee and shall be endorsed with standard or New York mortgagee clauses, without contribution, ...

*Line 1,245:* ... either his insurance carrier or agent, provided, however, that the Seller shall not accept any such insurance policies from insurance companies unless such companies are rated A:VI or better in Best's and are licensed to do business in the jurisdiction in which the

Mortgaged Property is located. The Seller shall determine that such policies provide sufficient risk coverage and amounts, that they insure the property owner, and that they properly describe the property address. The Seller shall furnish to the Mortgagor a formal notice of expiration ...

*Line 1,256:* Pursuant to Section 2.04, any amounts collected by the Seller under any such policies (other than amounts to be deposited in the Escrow Account and applied to the restoration or repair of the related Mortgaged Property, or property ...

*Line 1,267:* ... of Mortgage Impairment Insurance. In the event that the Seller shall obtain and maintain a blanket policy insuring against losses arising from fire and hazards covered under extended coverage on all of the Mortgage Loans, then, to the extent such policy provides coverage in an amount equal to the amount required pursuant to Section 2.11 and otherwise complies with all other requirements of Section 2.11, it shall ...

*Line 1,281:* Section 2.05. Such policy may contain a deductible clause, in which case, in the event that there shall not have been maintained on the related Mortgaged Property a policy complying with Section 2.11, and there shall have been a loss which would have been covered by such policy, the Seller shall deposit ...

*Line 1,288:* ... such amount to be deposited from the Seller's funds, without reimbursement therefor. Upon request of the Purchaser, the Seller shall cause to be delivered to the Purchaser a certified true copy of such policy and a statement from the ...

*Line 1,310:* Section 2.13    Maintenance of Fidelity Bond and Errors and Omissions Insurance. The Seller shall maintain with responsible companies, at its own expense, a blanket Fidelity Bond and an Errors and Omissions Insurance Policy, with broad coverage on all officers, employees or other persons acting in any capacity requiring ...

*Line 1,319:* Employees"). Any such Fidelity Bond and Errors and Omissions Insurance Policy shall be in the form of the Mortgage Banker's Blanket Bond and shall protect and insure the Seller against losses, including forgery, theft, embezzle-ment, fraud, errors and omissions and negligent acts of such Seller Employees. Such Fidelity Bond and Errors and Omissions Insurance Policy also shall protect and insure the Seller against losses in connection with the release or satisfaction of a Mortgage Loan without having obtained payment in full of the indebtedness secured thereby. No provision of this Section 2.13 requiring such Fidelity Bond and Errors and Omissions Insurance Policy shall diminish or relieve the Seller from its duties and obligations as set forth in this Agreement. The minimum coverage under any such bond and insurance policy shall be at least equal to the corresponding amounts required by Fannie Mae in the Fannie Mae ...

*Line 1,334:* Upon the request of the Purchaser, the Seller shall cause to be delivered to the Purchaser a certified true copy of such fidelity bond and insurance policy and a statement from the surety and the insurer that such fidelity bond and insurance policy shall in no event be terminated or materially modified without 30 days' ...

*Line 1,347:* Seller to assure itself that the value of the Mortgaged Property is being preserved. In addition, if any Mortgage Loan is more than 60 days delinquent, the Seller immediately shall inspect the Mortgaged Property and shall conduct subsequent inspections in accordance with Accepted Servicing Practices or as ...

*Line 1,368:* ... (i)    the Seller shall receive satisfactory independent verification of completion of repairs and issuance of any required approvals with respect thereto; ...

*Line 1,390:* ... the Mortgage, including, but not limited to requiring waivers with respect to

mechanics' and materialmen's liens;    (iii)        the Seller shall verify that the Mortgage Loan is not in default; and

*Line 1,408:*  Section 2.16        Maintenance of PMI Policy and LPMI Policy; Claims.

*Line 1,417:* ... (i)        with respect to Mortgage Loans which are not LPMI Loans, in accordance with state and federal laws, the Seller shall, without any cost to the Purchaser, maintain or cause the Mortgagor to maintain in full force and effect a PMI Policy insuring that portion of the Mortgage Loan in excess of 75% of value, and shall pay or ...

*Line 1,437:* ... such reason. If the Seller determines that recoveries are so jeopardized, it shall notify the Purchaser and the Mortgagor, if required, and obtain from another Qualified Insurer a replacement insurance policy. The Seller shall not take any action ...

*Line 1,442:* ... which, but for the actions of the Seller would have been covered thereunder. In connection with any assumption or substitution agreement entered into or to be entered into pursuant to Section 4.01, the Seller shall promptly notify the insurer under the related PMI Policy, if any, of such assumption or substitution of liability in accordance with the terms of such PMI Policy and shall take all ...

*Line 1,468:* ... (ii)        with respect to LPMI Loans, maintain in full force and effect an LPMI Policy insuring that portion of the Mortgage Loan in excess of 75% (or such other percentage as stated in the related Acknowledgment Agreement) of value, and from time to time, ...

*Line 1,494:* ... such reason. If the Seller determines that recoveries are so jeopardized, it shall notify the Purchaser and the Mortgagor, if required, and obtain from another Qualified Insurer a replacement insurance policy. The Seller shall ...

*Line 1,499:* ... take any action which would result in noncoverage under any applicable LPMI Policy of any loss which, but for the actions of the Seller would have been covered thereunder. In connection with any assumption or substitution agreement entered into or to be entered into pursuant to Section 6.01, the Seller shall promptly notify the insurer under the related LPMI Policy, if any, of such assumption or substitution of liability in accordance with the terms of such LPMI Policy and shall take all actions which may be required by such insurer as ...

*Line 1,512:* ... (b)        In connection with its activities as servicer, the Seller agrees to prepare and present, on behalf of itself and the Purchaser, claims to the insurer under any PMI Policy in a timely fashion in accordance with the terms of such PMI Policy or LPMI Policy and, in this regard, to take such action as shall be necessary to ...

*Line 1,528:* ... obtain a PMI Policy for any Mortgage Loan which does not already have a PMI Policy in place. In any event, the Seller agrees to administer such PMI Policies in accordance with the Agreement or any Reconstitution Agreement.    Section 2.17        Title, Management and Disposition of REO Property. In the ...

*Line 1,543:*    The Seller shall manage, conserve, protect and operate each REO Property for the Purchaser solely for the purpose of its prompt disposition and sale. The Seller, either itself or through an agent selected by the Seller, shall manage, conserve, protect and operate the REO Property in the same manner that it manages, conserves, protects and operates other foreclosed property for its own account, and in the same manner that similar property in the same locality as the REO Property is managed. The Seller shall attempt to sell the same (and may temporarily rent the same for a period not greater than one year, except as otherwise provided below) on such terms and conditions as the Seller deems to be ...

*Line 1,574:* The Seller shall use its best efforts to dispose of the REO Property as soon as possible and shall sell such REO Property in any event within one year after title has been taken to such REO Property, unless the Seller determines, and gives an appropriate notice to the Purchaser to such effect, that a longer period is necessary for the orderly liquidation of such REO Property. If a period longer than one year is permitted under the foregoing sentence and is necessary to sell any REO Property, (i) the Seller shall report monthly to the Purchaser as to the progress being made in selling such REO Property and (ii) if, with the written consent of the Purchaser, a purchase money mortgage is taken in connection with such sale, such purchase money mortgage shall name the Seller as mortgagee, and such purchase money mortgage shall not be held pursuant to this Agreement, but instead a separate participation agreement among the Seller and Purchaser shall be entered into with respect to ...

*Line 1,591:* The Seller shall also maintain on each REO Property fire and hazard insurance with extended coverage in an amount which is at least equal to the maximum insurable value of the improvements which are a part of such property, liability insurance and, to the extent required and available under the Flood Disaster Protection Act of 1973, as amended, flood insurance in the amount required above.

*Line 1,600:* The disposition of REO Property shall be carried out by the Seller at such price, and upon such terms and conditions, as the Seller deems to be in the best interests of the Purchaser. The proceeds of sale of the REO Property shall ...

*Line 1,605:* ... promptly deposited in the Custodial Account. As soon as practical thereafter the expenses of such sale shall be paid and the Seller shall reimburse itself for any related unreimbursed Servicing Advances, unpaid Servicing Fees and unreimbursed advances made pursuant to this Section, and on the Remittance Date ...

*Line 1,614:* With respect to each REO Property, the Seller shall hold all funds collected and received in connection with the operation of the REO Property in the Custodial ...

*Line 1,619:* ... receipt thereof in each Custodial Account all revenues received with respect to the conservation and disposition of the related REO Property. Notwithstanding the foregoing, at any time and from time to time, the Purchaser may at its election terminate this Agreement with respect to one or more REO Properties as ...

*Line 1,633:* Seller shall withdraw REO funds on deposit in the Custodial Account with respect to each related REO Property necessary for the proper operation, management and maintenance of the REO Property, including the cost of maintaining any hazard insurance pursuant to Section 2.11 and the fees of any managing agent acting on behalf of the Seller. The Seller shall make monthly distributions ...

*Line 1,640:* ... each Remittance Date to the Purchaser of the net cash flow from the REO Property (which shall equal the revenues from such REO Property net of the expenses described in Section 2.17 and of any reserves reasonably required from time to time to be maintained to satisfy anticipated liabilities for such ...

*Line 1,666:* ... with respect to any REO Property covering the operation of such REO Property for the previous month and the Seller's efforts in connection with the sale of such REO Property and any rental of such REO Property incidental to the sale thereof for the previous month. That statement shall be accompanied by such other ...

*Line 1,686:* ... respect to each ARM Mortgage Loan, the Seller shall adjust the Mortgage Interest Rate on the related Interest Rate Adjustment Date in compliance with the requirements

of applicable law and the related Mortgage and Mortgage Note. The Seller shall execute and deliver any and all necessary notices required under applicable law and the terms of the related Mortgage Note and Mortgage regarding the Mortgage Interest Rate adjustments. The Seller shall promptly, upon written request therefor, deliver to the Purchaser such notifications and any additional applicable data regarding such adjustments and the methods used to calculate and implement such adjustments. Upon the discovery by the Seller or the receipt ...

*Line 1,705:* Section 2.22    Reports of Foreclosures and Abandonments of Mortgaged Property.  Following the foreclosure sale or abandonment of any Mortgaged Property, the ...

*Line 1,714:*  Reporting For each Mortgage Loan, the Seller shall accurately and fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information on its borrower credit files to each of the following credit repositories: Equifax Credit Information Services, Inc., TransUnion, LLC and Experian Information Solution, Inc. on a monthly basis.

*Line 1,733:*  Custodial Account the amount of such prepayment charge only if the related prepayment is not the result of a refinancing by the Seller or its designee and such waiver (a) relates to a defaulted Mortgage Loan or a reasonably foreseeable default, such waiver is standard and customary in servicing similar mortgage loans to the Mortgage Loans, and such waiver, in the reasonable judgment of the Seller, would maximize recovery of total proceeds from the Mortgage Loan, taking into account the amount of such prepayment charge and the related Mortgage Loan, ...

*Line 1,762:*  Customer Information. The Seller shall implement and maintain security measures designed to meet the objectives of the Interagency Guidelines Establishing Information Security Standards (the "Guidelines"), Section 216 of the Fair and Accurate Transactions Act (including its implementing regulations, "FACTA"), ...

*Line 1,774:*  ... to any incident of unauthorized access to Customer Information (as defined in the Guidelines). At all times during the term of this Agreement, the Seller shall maintain administrative, technical and physical safeguards, including proper information disposal procedures, to ensure the security, confidentiality and integrity of Customer Information, and to protect such information against any threats or hazards, including, without limitation, unauthorized access or use. The Seller will periodically (but not less than annually) review and update its information security procedures.

*Line 1,789:*  Information maintained by the Seller, including providing prompt notification to the Purchaser of any such incident and will, at the Purchaser's request, at the Seller's sole expense, notify the Purchaser's customers on the Purchaser's behalf of any such unauthorized access, use or disclosure. Nothing in this Section shall limit the Seller's obligations under Section 8.01 of this Agreement.

*Line 1,801:*  ... its designee (including any Master Servicer of the Mortgage Loans) which information shall include, but not be limited to, any Statement on Auditing Standards (SAS) No. 70 report covering the Seller's operations, and any other audit reports, summaries of test results or equivalent measures or evaluations ...

*Line 1,807:*  With respect to any third party provided access to Customer Information in accordance with this Agreement, the Seller will enter into a written agreement with such third party requiring safeguarding of Customer Information in a manner no less restrictive than the Seller's obligations under this Agreement, and including those affirmative obligations set forth in

this Section and in any other Section of this Agreement relating to the use or protection of Customer Information.

*Line 1,816:* The obligations set forth in this Section shall survive termination of the Agreement. ...

*Line 1,836:* Reporting. For each Mortgage Loan, the Seller shall accurately and fully furnish on a monthly basis and in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (e.g. favorable and unfavorable) on its borrower credit files to each of the following credit repositories: Equifax, Credit Information Services, Inc., Experian Information Solutions, Inc. and Trans Union, LLC.

*Line 1,869:* ... law. Such interest shall be deposited in the Custodial Account by the Seller on the date such late payment is made and shall cover the period commencing with the day following such second Business Day and ending with the Business Day on ...

*Line 1,888:* Remittance Advice, with a trial balance report attached thereto, in the form of Exhibit 1-1 annexed hereto and a Standard Layout for Defaulted Loan Report in the form of Exhibit 1-2 annexed hereto in hard copy and electronic medium mutually acceptable to the parties as to the preceding remittance and the period ending on the last day of the preceding month.

*Line 1,908:* The Seller shall prepare and file any and all tax returns, information statements or ...

*Line 1,913:* ... or to the Purchaser pursuant to any applicable law with respect to the Mortgage Loans and the transactions contemplated hereby. In addition, the Seller shall provide the Purchaser with such information concerning the Mortgage Loans as ...

*Line 1,938:* Business Days following request by the Purchaser or any Depositor, provide to the Purchaser and such Depositor (or, as applicable, cause each Subservicer to provide), in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, the information and materials specified in paragraphs (i), (ii) and (v) of this Section 3.02(b), and (2) as promptly as practicable following notice to or discovery by the Seller, provide to the Purchaser and any Depositor (in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor) the information specified in ...

*Line 1,951:* ... (i)    If so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding the Seller and each Subservicer, as applicable, as is requested for the purpose of compliance with Items 1103(a)(1), 1117 and 1119 of ...

*Line 1,960:* ... of Regulation AB) legal or governmental proceedings pending (or known to be contemplated) against the Seller and each Subservicer; and  (B)     a description of any affiliation or relationship between the Seller, each Subservicer and any of the following parties to a Securitization Transaction, as ...

*Line 1,992:* ...  8)     any enhancement or support provider; and

*Line 1,999:* ... (ii)    If so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding the Seller, as servicer of the Mortgage Loans, and each Subservicer (each of the Seller and each Subservicer, for purposes of this paragraph, a "Servicer"), as is requested for the purpose of compliance with ...

*Line 2,026:* ... loans; a general discussion of the Servicer's experience in servicing assets of any type as well as a more detailed discussion of the Servicer's experience in, and procedures

for, the servicing function it will perform under this Agreement and any Reconstitution Agreements; information regarding the size, composition and growth of the Servicer's portfolio of residential mortgage loans of a type similar to the Mortgage Loans and information on factors related to the Servicer that may be material, in the good faith judgment of the Purchaser or any ...

*Line 2,054:* ... the Servicer has been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; and

*Line 2,065:* ... preceding the related Securitization Transaction to the Servicer's policies or procedures with respect to the servicing function it will perform under this Agreement and any Reconstitution Agreements for mortgage loans of a type similar to the Mortgage Loans; ...

*Line 2,072:* ... material risk that an adverse financial event or circumstance involving the Servicer could have a material adverse effect on the performance by the Seller of its servicing obligations under this Agreement or any Reconstitution Agreement; ...

*Line 2,090:* (E)    information regarding advances made by the Servicer on the Mortgage Loans and the Servicer's overall servicing portfolio of residential mortgage loans for the three-year ...

*Line 2,097:* ... that the Servicer has made all advances required to be made on residential mortgage loans serviced by it during such period, or, if such statement would not be accurate, information regarding the percentage and type of advances not made as required, and the reasons for such failure to advance; (F)    a description of the Servicer's processes and procedures designed to address any special or unique factors involved in servicing loans of a similar type as ...

*Line 2,109:* (G)    a description of the Servicer's processes for handling delinquencies, losses, bankruptcies and recoveries, such as through liquidation of mortgaged properties, sale of defaulted mortgage loans or workouts; and   (H)    information as to how the Servicer defines or determines delinquencies and charge-offs, including the effect of any grace period, re-aging, restructuring, partial payments considered current or other practices with respect to delinquency and loss experience.

*Line 2,125:* ... asset-backed securities, the Seller shall (or shall cause each Subservicer to) (a) notify the Purchaser and any Depositor in writing of (1) any material (as determined in accordance with the provisions of Regulation AB) litigation or governmental proceedings pending against the Seller or any Subservicer and (2) any affiliations or relationships that develop following the closing date of a Securitization Transaction between the Seller or any Subservicer and any of the parties specified in clause (B) of paragraph (i) of this Section 3.02(b) (and any other parties identified in writing by the requesting party) with respect to such Securitization Transaction, and (b) provide to the Purchaser and any Depositor a description of such proceedings, affiliations or ...

*Line 2,143:* ... a condition to the succession to the Seller or any Subservicer as servicer or subservicer under this Agreement or any Reconstitution Agreement by any Person (i) into which the Seller or such Subservicer may be merged or consolidated, ...

*Line 2,148:* ... (ii) which may be appointed as a successor to the Seller or any Subservicer, the Seller shall provide to the Purchaser and any Depositor, at least 15 calendar days prior to the effective date of such succession or appointment, (x) written notice to the Purchaser and any Depositor of such succession or appointment and (y) in writing and in form and substance

reasonably satisfactory to the Purchaser and such Depositor, all information reasonably requested by the Purchaser or any Depositor in order to comply with its reporting obligation ...

*Line 2,174:* ... (v)      In addition to such information as the Seller, as servicer, is obligated to provide pursuant to other provisions of this Agreement, if so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding the ...

*Line 2,180:* ... of Regulation AB. Such information shall be provided concurrently with the monthly reports otherwise required to be delivered by the servicer under this Agreement, commencing with the first such report due not less than ten Business Days ...

*Line 2,186:* Section 3.03      Principal and Interest Advances by Seller.  The Seller shall have no obligation to advance any amounts constituting delinquent principal and interest payments.

*Line 2,202:* The Seller shall use its best efforts to enforce any "due-on-sale" provision contained in any Mortgage or Mortgage Note and to deny assumption by the person to whom the Mortgaged Property has been or is about to be sold whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains liable on the Mortgage and the Mortgage Note. When the Mortgaged Property has been conveyed by the Mortgagor, the Seller shall, to the extent ...

*Line 2,218:* ... the Seller reasonably believes it is unable under applicable law to enforce such "due-on-sale" clause, the Seller shall enter into (i) an assumption and modification agreement with the person to whom such property has been conveyed, pursuant to which such person becomes liable under the Mortgage Note and the original Mortgagor remains liable thereon or (ii) in the event the Seller is unable under applicable law to require that the original Mortgagor remain liable under the Mortgage Note and the Seller has the prior consent of the primary mortgage guaranty insurer, a substitution of liability agreement with the purchaser of the Mortgaged Property pursuant to which the original Mortgagor is released from liability and the purchaser of the Mortgaged Property is substituted as Mortgagor and becomes liable under the Mortgage Note. If an assumption fee is collected by the Seller for entering into an assumption agreement, a portion of such fee, up to an amount equal to one-half of one percent (0.5%) of the outstanding principal balance of the related Mortgage Loan, will be retained by the Seller as additional servicing compensation, and any portion thereof in excess of one-half of one percent (0.5%) shall be ...

*Line 2,243:* ... the extent that any Mortgage Loan is assumable, the Seller shall inquire diligently into the creditworthiness of the proposed transferee, and shall use the underwriting criteria for approving the credit of the proposed transferee which ...

*Line 2,248:* ... type as the Mortgage Loans. If the credit of the proposed transferee does not meet such underwriting criteria, the Seller diligently shall, to the extent permitted by the Mortgage or the Mortgage Note and by applicable law, accelerate the maturity of the Mortgage Loan.

*Line 2,267:* Section 4.02      Satisfaction of Mortgages and Release of Mortgage Files.  Upon the ...

*Line 2,272:* ... notification that payment in full will be escrowed in a manner customary for such purposes, the Seller shall notify the Purchaser in the Monthly Remittance Advice as provided in Section 3.02, and may request the release of any Mortgage Loan Documents from the Purchaser in accordance with this ...

*Line 2,287:* Account within 2 Business Days of receipt of such demand by the Purchaser. The Seller shall maintain the Fidelity Bond and Errors and Omissions Insurance Policy as provided for in Section 2.13 insuring the Seller against any loss ...

*Line 2,303:* ... month during which the Mortgage Loan is serviced by the Seller pursuant to this Agreement. The obligation of the Purchaser to pay the Servicing Fee is limited to, and the Servicing Fee is payable solely from, the interest portion (including recoveries with respect to interest from Condemnation Proceeds or ...

*Line 2,317:* ... all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement thereof except as specifically provided for herein.

*Line 2,324:* Statement as to Compliance. The Seller shall deliver to the Purchaser and any Depositor, on or before March 1 of each calendar year, commencing in 2007, and on the Transfer Date a statement of compliance addressed to the Purchaser and such Depositor and signed by an authorized officer of the Seller, to the effect that (i) a review of the Seller's activities during the immediately preceding calendar year (or applicable portion thereof) and of its performance under this Agreement and any applicable Reconstitution Agreement during such period has been made under such officer's supervision, and (ii) to the best of such officers' knowledge, based on such review, the Seller has fulfilled all of its obligations under this Agreement and any applicable Reconstitution Agreement in all material respects throughout such calendar year (or applicable portion thereof) or, if there has been a failure to fulfill any such obligation in any material respect, specifically identifying each such failure known to such officer and the nature and the status thereof. ...

*Line 2,366:* (A)    deliver to the Purchaser and any Depositor a report (in form and substance reasonably satisfactory to the Purchaser and such Depositor) regarding the Seller's assessment of compliance with the Servicing Criteria during the immediately preceding calendar year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB. Such report shall be addressed to the Purchaser and such Depositor and signed by an authorized officer of the Seller, and shall address each of the Servicing Criteria specified on a certification substantially in the form of Exhibit 8 hereto delivered to the Purchaser concurrently with the execution of this Agreement; (B)    deliver to the Purchaser and any Depositor a report of a registered public accounting firm reasonably acceptable to the Purchaser and such Depositor that attests to, and reports on, the assessment of compliance made by the Seller and delivered pursuant to the preceding paragraph. Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act; (C)    cause each Subservicer and each Subcontractor determined by the Seller pursuant to Section 4.07 to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB (each, a "Participating Entity"), to deliver to the Purchaser and any Depositor an assessment of compliance and accountants' attestation as and when provided in paragraphs (i) and (ii) of this Section 4.05; and

*Line 2,398:* ... requested by the Purchaser or any Depositor not later than February 1 of the calendar year in which such certification is to be delivered, deliver to the Purchaser, any Depositor and any other Person that will be responsible for signing the certification (a "Sarbanes Certification") required by Rules 13a-14(d) and 15d-14(d) under the Exchange Act (pursuant to Section 302 of the ...

*Line 2,412:* ... on the certification provided by the Seller pursuant to such clause in signing a Sarbanes Certification and filing such with the Commission. Neither the Purchaser nor any

Depositor will request delivery of a certification under ...

*Line 2,424:* ... 4.05(i)(A) shall address each of the Servicing Criteria specified on a certification substantially in the form of Exhibit 8 hereto delivered to the Purchaser concurrently with the execution of this Agreement or, in the case of a ...

*Line 2,453:* ...    (a)        The Purchaser shall have the right to examine and audit any and all of the books, records, or other information of the Seller, whether held by the Seller or by another on its behalf, with respect to or concerning this Agreement or the Mortgage Loans, during business hours or at such other times as may be ...

*Line 2,462:* ...    (b)        The Seller shall provide to the Purchaser and any supervisory agents or examiners representing a state or federal governmental agency having jurisdiction over ...

*Line 2,467:* Purchaser, including without limitation the Office of Thrift Supervision (or any successor thereto), the FDIC and other similar entities, access to any documentation regarding the Mortgage Loans in the possession of the Seller ...

*Line 2,473:* ... charge, upon reasonable request, during normal business hours, at the offices of the Seller and in accordance with any applicable regulations.

*Line 2,478:* 4.07        Use of Subservicers and Subcontractors. The Seller shall not hire or otherwise utilize the services of any Subservicer to fulfill any of the obligations of the Seller as servicer under this Agreement or any Reconstitution Agreement (a) without the prior written consent of the Purchaser and (b) unless the Seller complies with the provisions of paragraph (i) of this Section. The Seller shall not hire or otherwise utilize the services of any Subcontractor, and shall not permit any Subservicer to hire or otherwise utilize the services of any Subcontractor, to fulfill any of the obligations of the Seller as servicer under this Agreement or any Reconstitution Agreement (a) without the prior written consent of the Purchaser and (b) unless the Seller complies with the provisions of paragraph (ii) of this Section.

*Line 2,497:* ... (i)        The Seller shall cause any Subservicer used by the Seller (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of this Section and with Sections 3.02(b)(ii), 3.02(b)(iv), 4.04, 4.05, 6.04, 8.01(b) and 10.08 of this Agreement to the same extent as if such Subservicer were the Seller, and to provide the information required with respect to such Subservicer under Section 3.02(b)(iii) of this Agreement. The Seller shall be responsible for obtaining from each Subservicer and delivering to the Purchaser and any Depositor any servicer compliance statement required to be delivered by such Subservicer under Section 4.04, any assessment of compliance and attestation required to be delivered by such Subservicer under Section 4.05 and any certification required to be delivered to the Person that will be responsible for signing the Sarbanes Certification under Section 4.05 as and when required to be delivered.  (ii)        The Seller shall promptly upon request provide to the Purchaser and any Depositor (or any designee of the Depositor, such as a master servicer or administrator) a written description (in form and substance satisfactory to the Purchaser and such Depositor) of the role and function of each Subcontractor utilized by the Seller or any Subservicer, specifying (A) the identity of each such Subcontractor, (B) which (if any) of such Subcontractors are Participating Entities, and (C) which elements of the Servicing Criteria will be addressed in ...

*Line 2,547:* ... "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, the Seller shall cause any such Subcontractor used by the Seller (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of

Sections 4.05, 6.04 and 8.01(b) of this Agreement to the same extent as if such Subcontractor were the Seller. The Seller shall be responsible for obtaining from each Subcontractor and delivering to the Purchaser and any Depositor any assessment of compliance and attestation required to be delivered by such Subcontractor under Section 4.05, in each case as and when required to be delivered.

*Line 2,569:* Seller shall (A) respond as promptly as practicable to any good faith request by the Purchaser or any Depositor for information regarding each Subservicer and each Subcontractor and (B) cause each Subservicer and each Subcontractor with respect to which the Purchaser or any Depositor requests delivery of an assessment of compliance and accountants' attestation to deliver such within the time required under Section 4.05.  For purposes of this Agreement, the Seller shall be deemed to have received payments on Mortgage Loans immediately upon receipt by a subservicer of such payments. Notwithstanding any subservicing agreement or the provisions of this Agreement relating to agreements or arrangements between the Seller and a Subservicer or reference to actions taken through a Subservicer or otherwise, the Seller shall remain obligated and primarily liable to the Purchaser for servicing and administering of the Mortgage Loans in accordance with the provisions hereof ...

*Line 2,587:* ... subservicing agreements or arrangements or by virtue of indemnification from a Subservicer and to the same extent and under the same terms and conditions as if the Seller alone were servicing and administering the Mortgage Loans. All actions of each Subservicer performed pursuant to the related subservicing agreement shall be performed as an agent of the Seller with the same force and effect as if performed directly by the Seller and the Purchaser shall have no obligations, duties or liabilities with respect to any subservicer including no obligation, duty or liability of the Purchaser to pay any subservicer's fees and expenses. The Seller shall be entitled to enter into any agreement with each subservicer for indemnification of the Seller by the subservicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification.

*Line 2,627:* ... of Information.  During the term of this Agreement, the Seller shall furnish to the Purchaser such periodic, special, or other reports or information, whether or not provided for herein, as shall be necessary, reasonable, or appropriate with respect to the Purchaser or the purposes of this Agreement. All such reports or information shall be provided by and in accordance with all reasonable instructions and directions which the Purchaser may give.   The Seller shall execute and deliver all such instruments and take all such action as the Purchaser may reasonably request from time to time, in order to effectuate the purposes and to carry out the terms of this Agreement.

*Line 2,654:* Seller also shall make available any comparable interim statements to the extent any such statements have been prepared by or on behalf of the Seller (and are available upon request to members or stockholders of the Seller or to the public at large). If it ...

*Line 2,664:* ... knowledgeable financial or accounting officer for the purpose of answering questions respecting recent developments affecting the Seller or the financial statements of the Seller, and to permit any prospective Purchaser to inspect the Seller's servicing facilities for the purpose of satisfying such prospective Purchaser that the Seller have the ability to service the Mortgage Loans as provided in this Agreement.

*Line 2,674:* Transaction. The Purchaser and the Seller acknowledge and agree that the purpose of Sections 3.02(b), 4.04, 4.05, 4.07, 5.03, 6.04, 8.01(b) and 10.08 of this Agreement is to facilitate compliance by the Purchaser and any Depositor with the provisions of Regulation AB

and related rules and regulations of the Commission. Although Regulation AB is applicable by its terms only to offerings of asset-backed ...

*Line 2,685:* ... or any Depositor provide comparable disclosure in unregistered offerings. References in this Agreement to compliance with Regulation AB include provision of comparable disclosure in private offerings.

*Line 2,693:* ... information or other performance under these provisions other than in good faith, or for purposes other than compliance with the Securities Act, the Exchange Act and the rules and regulations of the Commission thereunder (or the ...

*Line 2,699:* ... requirements of Regulation AB may change over time, whether due to interpretive guidance provided by the Commission or its staff, consensus among participants in the asset-backed securities markets, advice of counsel, or otherwise, and agrees to comply with requests made by the Purchaser or any Depositor in good ...

*Line 2,706:* ... the Purchaser to deliver to the Purchaser (including any of its assignees or designees) and any Depositor, any and all statements, reports, certifications, records and any other information necessary in the good faith determination of the Purchaser or any Depositor to permit the Purchaser or such Depositor to comply with the provisions of Regulation AB, together with such disclosures relating to the Seller, any Subservicer and the Mortgage Loans, or the servicing of the Mortgage Loans, reasonably believed by the Purchaser or any Depositor ...

*Line 2,734:* ... the Seller by providing timely notice of requests for information under these provisions and by reasonably limiting such requests to information required, in ...

*Line 2,741:* The Purchaser shall indemnify the Seller and its Affiliates and the respective directors, officers, employees and agents of each of the foregoing, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of ...

*Line 2,751:* Transaction, including without limitation the registration statement, prospectus, prospectus supplement, any private placement memorandum, any offering circular, any computational materials, and any amendments or supplements to the foregoing (collectively, the "Securitization Materials") or ...

*Line 2,772:* 6.01    Damages. The Purchaser shall have the right at any time to seek and recover from the Seller any damages or losses suffered by it as a result of any failure by the Seller ...

*Line 2,800:* Procedures. . This Agreement shall terminate with respect to the Mortgage Loans or portion thereof transferred on the related Transfer Date as set forth in the related Purchase Price and Terms Letter.    The Purchaser may elect to terminate this Agreement and transfer the servicing from ...

*Line 2,814:* ... its intent to transfer the servicing from the Seller. On or before the date specified by the Purchaser in accordance with this paragraph (a) for the transfer of servicing from the Seller, the Seller shall prepare, execute and deliver to the successor entity designated by the Purchaser any and all documents and other instruments, place in such successor's possession all Mortgage Loan Documents necessary or appropriate to effect the purposes of such notice of termination, including but not limited to the transfer and endorsement or assignment of the Mortgage Loans and related documents, at the Seller's sole expense. The Seller shall cooperate

with the Purchaser and such successor in effecting the termination of the Seller's responsibilities and rights hereunder.

*Line 2,828:* ... the related Transfer Date, the Seller shall comply with all of the provisions of Section 5 of the Purchase Agreement to effect a complete transfer of the Servicing Rights. On the related Transfer Date for each Mortgage Loan, this Agreement, except for Articles VI, VIII, IX and X which shall survive the related Transfer Date, shall terminate.

*Line 2,839:* Transfer Date shall not be transferred from the Seller to the Purchaser or the successor servicer, as the case may be, and such Mortgage Loans shall continue to be serviced by the Seller pursuant to the terms of this Agreement. However, if the Purchaser so elects, the Purchaser may waive the provisions of this paragraph (b) and accept transfer of servicing of such Mortgage Loans and all amounts received by the Seller thereunder.

*Line 2,861:* ... (d)    Additional Termination Provisions. Notwithstanding and in addition to the foregoing, in the event that (i) a Mortgage Loan becomes delinquent for a period of 120 days or more (a ...

*Line 2,867:* ... or (ii) a Mortgage Loan becomes an REO Property, the Purchaser may at its election terminate this Agreement with respect to such Delinquent Mortgage Loan ...

*Line 2,899:* Reconstitution Date, the Mortgage Loans transferred shall cease to be covered by the Interim Servicing Agreement.

*Line 2,906:* ... connection, the Seller shall (a) execute any agreements related to any Securitization Transactions ("Reconstitution Agreements") within a reasonable period of time after receipt of any Reconstitution Agreement which time shall be sufficient for the Seller and Seller's counsel to review such Reconstitution Agreement, but such time shall not exceed ten (10) Business Days after such receipt, and (b) provide to the trustee or a third party purchaser, as the case may be, subject to any Reconstitution Agreement and/or the Purchaser: (i) any and all information and appropriate verification of information which may be reasonably available to the Seller, whether through letters of its auditors (the reasonable out-of-pocket cost of which will be borne by the Purchaser) and counsel or otherwise, as the Purchaser shall reasonably request; (ii) to bring each of the Mortgage Loan representations and warranties set forth in the Agreement current as of the date the Mortgage Loans are being transferred pursuant to a Securitization Transaction, provided that, such Mortgage Loan representations and warranties shall be revised, to the extent allowed or required by the rating agencies and the certificate insurer and acceptable to ...

*Line 2,927:* ... notwithstanding the foregoing, Seller shall, at the time of reconstitution, be entitled to state certain exceptions to the Mortgage Loan representations and warranties necessary to make same true and correct as of the time of the Securitization Transaction and (iii) such additional representations, warranties, covenants, opinions of counsel, letters from auditors, and certificates of public officials or officers of the Seller as are reasonably ...

*Line 2,944:* ... trustee or such third party, as the case may be, for each Mortgage Loan that is part of a Securitization Transaction and shall pay all preparation and recording costs associated therewith. The Seller shall execute each assignment of mortgage, track such assignments of mortgage to ensure they have been recorded and deliver them as required by the trustee or such third party, as the case may ...

*Line 2,953:* ... delivers an opinion of counsel in the applicable jurisdiction that it is not necessary to record the assignment of mortgage to protect the Purchaser's interest. Additionally,

the Seller shall prepare and execute, at the direction of the Purchaser, any Mortgage Note endorsements in connection with any and all ...

*Line 2,973:* ... (d)    The Reconstitution Agreement will require the Seller to advance principal and interest payments on each Mortgage Loan at the Mortgage Loan Interest Rate less the Reconstituted Servicing Fee (defined below) on the remittance date of the Reconstitution Agreement. The Reconstitution Agreement will also require in connection with any prepayments, in addition to any prepayment penalties ...

*Line 2,984:* ... shortfall in the interest component thereof, such that one month's interest shall be deposited in the Custodial Account, (as defined in the Interim Servicing Agreement), prior to the remittance date of the Reconstitution Agreement. The Seller's obligation to remit payments of principal and interest shall continue through the liquidation of the Mortgaged Property on the related Mortgage Loan, or until such time that the Seller deems that any future advances of principal and interest would be otherwise non-recoverable. The Reconstituted Servicing Fee shall be .25% per annum times the outstanding principal balance ...

*Line 2,995:* ... (e)    The Seller shall do all things necessary and required by a servicer who services Mortgage Loans under a Securitization Transaction which is a REMIC (defined ...

*Line 3,003:* ... (f)    All Mortgage Loans not sold or transferred pursuant to a Securitization Transaction and any Mortgage Loans repurchased by the Purchaser, shall be subject to the Interim Servicing Agreement and shall continue to be serviced in accordance with the terms of the Interim Servicing Agreement and with respect thereto the Interim Servicing Agreement shall remain in full force and effect.

*Line 3,016:* ... failure by the Seller, any Subservicer or any Subcontractor to deliver any information, report, certification, accountants' letter or other material when and as required under this Agreement, or any breach by the Seller of a representation or warranty set forth in Section 10.08(a) or in a writing furnished pursuant to Section 10.08(b) and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that ...

*Line 3,024:* ... representation or warranty in a writing furnished pursuant to Section 10.08(b) to the extent made as of a date subsequent to such closing date, shall, except as provided in clause (b) of this paragraph, immediately and automatically, without notice or grace period, constitute an Event of Default with respect to the Seller under this Agreement and any applicable Reconstitution Agreement, and shall entitle the Purchaser or Depositor, as applicable, in its sole discretion to terminate the rights and obligations of the Seller as servicer under this Agreement and/or any applicable Reconstitution Agreement without payment (notwithstanding anything in this Agreement or any applicable Reconstitution Agreement to the contrary) of any compensation to the Seller; provided that to the extent that any provision of this Agreement and/or any applicable Reconstitution Agreement expressly provides for the survival of certain rights or obligations following termination of the Seller as servicer, such provision ...

*Line 3,056:* ... (b)    Any failure by the Seller, any Subservicer or any Subcontractor to deliver any information, report, certification or accountants' letter when and as required under Section 4.04 or 4.05, including (except as provided below) any failure ...

*Line 3,064:* ... information, report, certification or accountants' letter was required to be delivered shall constitute an Event of Default with respect to the Seller under this Agreement and any applicable Reconstitution Agreement, and shall entitle the Purchaser or Depositor, as applicable, in its sole discretion to terminate the rights and obligations of the Seller as servicer

under this Agreement and/or any applicable Reconstitution Agreement without payment (notwithstanding anything in this Agreement to the contrary) of any compensation to the Seller; provided that to the extent that any provision of this Agreement and/or any applicable Reconstitution Agreement expressly provides for the survival of certain rights or obligations following termination of the Seller as servicer, such provision ...

*Line 3,077:*    Neither the Purchaser nor any Depositor shall be entitled to terminate the rights and obligations of the Seller pursuant to this subparagraph (ii)(B) if a failure ...

*Line 3,088:* ... (c)    The Seller shall promptly reimburse the Purchaser (or any designee of the Purchaser, such as a master servicer) and any Depositor, as applicable, for all reasonable expenses incurred by the Purchaser (or such designee) or such Depositor as such are incurred, in connection with the termination of the Seller as servicer and the transfer of servicing of the Mortgage Loans to a successor servicer. The provisions of this paragraph shall not limit whatever rights the Purchaser or any Depositor may have under other provisions of this Agreement and/or any applicable Reconstitution Agreement or otherwise, whether in equity or at law, such as an action for damages, specific performance or injunctive ...

*Line 3,105:*    BOOKS AND RECORDS

*Line 3,111:* ... of Servicing Files Prior to the Transfer Date. Prior to the related Transfer Date, the contents of each Servicing File are and shall be held in trust by the Seller for the benefit of the Purchaser as the owner thereof. The Seller shall maintain in the Servicing File a copy of the contents of each Mortgage File and the originals of the documents in each Mortgage File not delivered to the Purchaser. The possession of the Servicing File by the Seller is at the will of the Purchaser for the sole purpose of servicing the related Mortgage Loan, pursuant to this Agreement, and such retention and possession by the Seller is in its capacity as Servicer only and at the election of the Purchaser. The Seller shall release its custody of the contents of any Servicing File only in accordance with written instructions from the Purchaser, unless such release is required as incidental to the Seller's servicing of the Mortgage Loans pursuant to this Agreement, or is in connection with a repurchase of any Mortgage Loan pursuant to the terms of the Purchase Agreement. ...

*Line 3,142:*    The Seller shall be responsible for maintaining, and shall maintain, a complete set of books and records for each Mortgage Loan which shall be marked clearly to reflect the ownership of each Mortgage Loan by the Purchaser. In particular, the Seller shall maintain in its possession, available for inspection by the Purchaser or its designee, and shall deliver to the Purchaser or its designee upon demand, evidence of compliance with all federal, state and local laws, rules and regulations, and requirements of Fannie Mae or Freddie Mac, including but not limited to documentation as to the method used in determining the ...

*Line 3,155:* ... as amended, to the Mortgaged Property, documentation evidencing insurance coverage and eligibility of any condominium project for approval by Fannie Mae and periodic inspection reports as required by Section 2.14.   The Seller shall keep at its servicing office books and records in which, subject to ...

*Line 3,164:* ... of Mortgage Loans. No transfer of a Mortgage Loan may be made unless such transfer is in compliance with the terms hereof. For the purposes of this Agreement, the Seller shall be under no obligation to deal with any person with respect to this Agreement or the Mortgage Loans unless the books and records show such person as the owner of the Mortgage Loan. The Purchaser may, subject to the terms of this Agreement, sell or transfer one or more of

the Mortgage Loans. The Purchaser also shall advise the Seller of the transfer. Upon receipt of notice of the transfer, the Seller shall mark its books and records to reflect the ownership of the Mortgage Loans of such assignee, and shall release the previous Purchaser from its obligations hereunder with respect to the ...

*Line 3,179:*   INDEMNIFICATION AND ASSIGNMENT

*Line 3,184:* 8.01     Indemnification. iii) The Seller agrees to indemnify the Purchaser and hold it harmless against any and all claims, losses, damages, penalties, fines, and forfeitures, including, but not limited to reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that the Purchaser may sustain in any way related to the failure of Seller to (a) perform its duties and service the Mortgage Loans in strict compliance with the terms of this Agreement and/or (b) comply with applicable law. The Seller immediately shall notify the Purchaser if a claim is made by a third party with respect to this Agreement, assume (with the prior written consent of the Purchaser) the defense of any such claim and pay all expenses in connection therewith, including counsel fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against it or the Purchaser in respect of such claim. The Seller shall follow any ...

*Line 3,204:* ... by it pursuant to the preceding sentence except when the claim is in any way related to the Seller's indemnification pursuant to Section 8 of the Purchase Agreement, or the failure of the Seller to (a) service and administer the Mortgage Loans in strict compliance with the terms of this Agreement and/or (b) comply with applicable law.   (b)     The Seller shall indemnify the Purchaser, each affiliate of the Purchaser, and each of the following parties participating in a Securitization Transaction: each sponsor and issuing entity; each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission ...

*Line 3,223:* ... parties or the Depositor (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers, employees and agents of each of the foregoing and of the Depositor, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon: ...

*Line 3,248:* ... in any information, report, certification, accountants' letter or other material provided under this Agreement by or on behalf of the Seller, or provided in written or electronic form under this Agreement by or on behalf of any Subservicer or Subcontractor (collectively, the "Seller Information"), or (2) ...

*Line 3,260:* ... that clause (2) of this paragraph shall be construed solely by reference to the Seller Information and not to any other information communicated in connection with a sale or purchase of securities, without regard to whether the Seller ...

*Line 3,269:* ... failure by the Seller, any Subservicer or any Subcontractor to deliver any information, report, certification, accountants' letter or other material when and as required under this Agreement, including any failure by the Seller to identify pursuant to Section 4.07(ii) any Subcontractor "participating in the ...

*Line 3,276:* (C)     any breach by the Seller of a representation or warranty set forth in Section 10.08(a) or in a writing furnished pursuant to Section 10.08(b) and made as of a ...

*Line 3,291:* ... 8.01(b), the Seller shall promptly reimburse the Purchaser, any Depositor, as

applicable, and each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such ...

*Line 3,305:* Section 8.02      Limitation on Liability of Seller and Others.  Neither ...

*Line 3,310:* ... shall be under any liability to the Purchaser for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment, provided, however, that this provision shall not protect the Seller or any such person against any breach ...

*Line 3,315:* ... warranties or representations made herein, or failure to perform its obligations in strict compliance with any standard of care set forth in this Agreement, or any liability which would otherwise be imposed by reason of any breach of the terms and conditions of this Agreement. The Seller and any director, officer, employee or agent of the Seller may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder. The Seller shall not be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service the Mortgage loans in accordance with this Agreement and which in its opinion may involve it in any expense or liability, provided, however, that the Seller may, with the consent of the Purchaser, undertake any such action which it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto. In such event, the Seller shall be entitled to reimbursement from the Purchaser of the reasonable legal expenses and costs of such action.  ...

*Line 3,351:* Section 8.03      Limitation on Resignation and Assignment by Seller.  The Purchaser has entered into this Agreement with the Seller and subsequent Purchasers will purchase the Mortgage Loans in reliance upon the independent status of the Seller, and the representations as to the adequacy of its servicing facilities, plant, personnel, records and procedures, its integrity, reputation and financial standing, and the continuance thereof. Therefore, the Seller shall neither assign this Agreement or the servicing hereunder or delegate its rights or duties hereunder or any portion hereof or sell or ...

*Line 3,367:*    The Seller shall not resign from the obligations and duties hereby imposed on it except by mutual consent of the Seller and the Purchaser or upon the determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by the Seller. Any such determination permitting the resignation of the Seller shall be evidenced by ...

*Line 3,375:* Opinion of Counsel to such effect delivered to the Purchaser which Opinion of Counsel shall be in form and substance acceptable to the Purchaser. No such resignation shall become effective until a successor shall have assumed the Seller's responsibilities and obligations hereunder in the manner provided in Section 6.02.

*Line 3,382:* Without in any way limiting the generality of this Section 8.03, in the event that the Seller either shall assign this Agreement or the servicing responsibilities hereunder or delegate its duties hereunder or any portion thereof or sell or otherwise dispose of all or substantially all of its property or assets, without the prior written consent of the Purchaser, then the Purchaser shall have the right to terminate this Agreement upon notice given as set forth in Section 6.03, without any payment of any penalty or damages and without any liability whatsoever to the Seller or any third party.

*Line 3,397:* ... to the limit set forth in Section 2.01 hereof, to assign, in whole or in part, its

interest under this Agreement with respect to some or all of the Mortgage Loans, and designate any person to exercise any rights of the Purchaser hereunder, by executing an Assignment and Assumption Agreement substantially in the form of Exhibit H to the Purchase Agreement. Upon such assignment of rights and assumption of obligations, the assignee or designee shall accede to the rights and obligations hereunder of the Purchaser with respect to such Mortgage Loans and the Purchaser as assignor shall be released from all obligations hereunder with respect to such Mortgage Loans from and after the date of such assignment and assumption. All references to the Purchaser in this Agreement shall be deemed to include its assignee or ...

*Line 3,429:*   REPRESENTATIONS, WARRANTIES AND COVENANTS OF PURCHASER The Purchaser warrants and represents to, and covenants and agrees with, the Seller as follows: ...

*Line 3,437:*  Section 9.01    Authority and Capacity.  The execution, delivery and performance by the Purchaser of this Agreement has been and will remain duly and validly authorized by all necessary corporate action. This Agreement constitutes and will continue to constitute a legal, valid and enforceable obligation of the Purchaser.

*Line 3,448:*  9.02    Assistance.  To the extent possible, the Purchaser shall cooperate with and assist the Seller as requested by the Seller, in carrying out Seller's covenants, agreements duties and responsibilities under the Purchase Agreement and in connection therewith shall execute and deliver all such papers, documents and instruments as may be necessary and appropriate in furtherance thereof.

*Line 3,459:*   REPRESENTATIONS AND WARRANTIES OF INTERIM SERVICER  The Seller warrants and represents to, and covenants and agrees with, the Purchaser as follows: ...

*Line 3,467:*  Section 10.01    Due Organization and Authority.  The Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of California and has all licenses necessary to carry on its business as now being conducted and is licensed, qualified and in ...

*Line 3,477:*  ... such state require licensing or qualification in order to conduct business of the type conducted by the Seller, and in any event the Seller is in compliance with the laws of any such state to the extent necessary to ensure the enforceability of the related Mortgage Loan in accordance with the terms of this Agreement; the Seller has the full corporate power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement (including all instruments or transfer to be delivered pursuant to this Agreement) by the Seller and the consummation of the transactions contemplated hereby have been duly and validly authorized; this Agreement evidences the valid, binding and enforceable obligation of the Seller; and all requisite corporate action has been taken by the Seller to make this Agreement valid and binding upon the ...

*Line 3,511:*  Course of Business.  The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Seller; ...

*Line 3,518:*  Conflicts.  Neither the execution and delivery of this Agreement, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Seller's charter or by-laws or any legal restriction or any agreement or instrument to which the ...

*Line 3,532:*  Section 10.04    Ability to Service.  The Seller is an approved Seller/servicer of conventional residential mortgage loans for Fannie Mae or Freddie Mac, with the facilities,

procedures, and experienced personnel necessary for the sound servicing of mortgage loans of the same type as the Mortgage Loans. The Seller is in good standing to sell mortgage loans to and service mortgage loans for Fannie Mae or Freddie Mac, and no event has occurred, including but not limited to a change in insurance coverage, which ...

*Line 3,551:*  The Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

*Line 3,568:*  ... now conducted, or in any material liability on the part of the Seller, or which would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be taken in connection with the obligations of the Seller contemplated herein, or which would be likely to impair materially the ability of the Seller to perform under the terms of this Agreement;

*Line 3,580:*  ... consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Seller of or compliance by the Seller with this Agreement or the Servicing of the Mortgage Loans as evidenced by the consummation of the transactions contemplated by this Agreement, or if required, such approval has been obtained prior to the related Closing Date; ...

*Line 3,592:*  Untrue Information.  Neither this Agreement nor any statement, report or other document furnished or to be furnished pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of ...

*Line 3,617:*  Section 10.09        Additional Representations and Warranties. iv) The Seller shall be deemed to represent to the Purchaser and to any Depositor, as of ...

*Line 3,625:*  Depositor under Section 3.02(b) that, except as disclosed in writing to the Purchaser or such Depositor prior to such date: (i) the Seller is not aware and has not received notice that any default, early amortization or other performance triggering event has occurred as to any other ...

*Line 3,637:*  ... has been disclosed or reported by the Seller; (iv) no material changes to the Seller's policies or procedures with respect to the servicing function it will perform under this Agreement and any Reconstitution Agreement for mortgage loans of a type similar to the Mortgage Loans ...

*Line 3,643:*  ... condition that could have a material adverse effect on the performance by the Seller of its servicing obligations under this Agreement or any Reconstitution Agreement; (vi) there are no material legal or governmental proceedings pending (or known to be contemplated) against the Seller or any Subservicer; and (vii) there are no affiliations, relationships or transactions relating to the Seller or any Subservicer with respect to any Securitization Transaction and any party thereto identified by the related Depositor of a type described in ...

*Line 3,660:*  ... which information is first provided to the Purchaser or any Depositor under Section 3.02(b), the Seller shall, within five Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in paragraph (b) of this Section 10.08 or, if any such representation and warranty is not accurate as of the date of such request, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting ...

*Line 3,675:*  ... of Default. The following shall constitute an Event of Default under this Agreement on the part ...

*Line 3,682:* ... failure by the Seller to remit to the Purchaser any payment required to be made under the terms of this Agreement which continues unremedied for a period of five days after the date upon which written notice of such failure, requiring ...

*Line 3,691:* ... other of the covenants or agreements on the part of the Seller set forth in this Agreement which continues unremedied for a period of 30 days after the date on ...

*Line 3,719:* ... jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Seller and such decree or order shall have remained in force undischarged or unstayed for a period of 60 days; ...

*Line 3,728:* ... (d)    the Seller shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Seller or of or ...

*Line 3,753:* ... dispose of all or substantially all of its property or assets or to assign this Agreement or the servicing responsibilities hereunder or to delegate its duties hereunder or any portion thereof.

*Line 3,758:* In each and every such case, so long as an Event of Default shall not have been remedied, in addition to whatever rights the Purchaser may have at law or equity to damages, including injunctive relief and specific performance, the Purchaser, by notice in writing to the Seller, may terminate all the rights and obligations of the Seller under this Agreement and in and to the Mortgage Loans and the proceeds thereof. Upon receipt by the Seller of such written notice, all authority and power of the Seller under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the successor appointed pursuant to ...

*Line 3,777:* By a written notice, the Purchaser may waive any default by the Seller in the performance of its obligations hereunder and its consequences. Upon any waiver of a past default, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent ...

*Line 3,808:* 12.01    Notices. All notices, requests, demands and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given upon the delivery or mailing thereof, as the ...

*Line 3,880:* ... (a)    Waive compliance with any of the terms, conditions or covenants required to be complied with by the others hereunder; and

*Line 3,887:* The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other subsequent ...

*Line 3,893:* Section 12.03    Entire Agreement; Amendment. This Agreement and the Purchase Agreement constitute the entire agreement between the parties with respect to servicing of the Mortgages during the Interim Period. This Agreement may be amended and any provision hereof waived, but, only in writing signed by the party against whom such enforcement is ...

*Line 3,906:* Binding Effect. This Agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same

agreement. Subject to Section 8.03, this Agreement shall inure to the benefit of and be binding upon the Seller and the Purchaser and their respective successors and assigns.

*Line 3,931:*   12.05      Headings. Headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

*Line 3,937:*   12.06      Applicable Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

*Line 3,949:* Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties. The duties and responsibilities of the Seller shall be rendered by them as independent contractors and not as an agent of Purchaser. The Seller shall have full control of all of its acts, doings, proceedings, relating to or requisite in connection with the discharge of its duties and responsibilities under this Agreement.

*Line 3,960:* ... of Provisions.  If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

*Line 3,978:* ... records in all the counties or other comparable jurisdictions in which any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected at the ...

*Line 3,989:* Purchaser may, in its sole discretion from time to time, engage a master servicer (the "Master Servicer") to assist the Purchaser in the supervision of the performance by the Seller of its obligations and responsibilities arising under this Agreement. In the event that the Purchaser so appoints a Master Servicer, the Purchaser shall provide written notice thereof to the Seller.

*Line 3,996:* ... from the Purchaser that it has terminated or replaced such Master Servicer, the Seller shall deliver all notices, reports and remittances that the Seller is obligated to deliver to the Purchaser under this Agreement directly to the Master Servicer named in such notice (or to any successor master servicer named in any subsequent written notice received from the Purchaser). The Master Servicer, acting on behalf of the Purchaser, shall have the benefit of the covenants and agreements of the Seller under this Agreement and the Master Servicer, acting on behalf of the Purchaser, shall have the same rights as the Purchaser to enforce the obligations of the Seller arising under this Agreement. The Master Servicer shall be entitled to terminate the rights and obligations of the Seller under this Agreement upon the occurrence of an Event of Default as provided in this Agreement. Notwithstanding anything herein to the contrary, in no event shall the Master Servicer assume any of the obligations of the Purchaser under this Agreement; and in connection with the performance of the Master Servicer's duties hereunder the Seller agrees that the Master Servicer shall be entitled to all of the rights, protections, indemnities and limitations of liability afforded to the Purchaser under this Agreement. The Purchaser hereby appoints Aurora Loan Services LLC as its initial Master Servicer ...

*Line 4,037:* ... of Confidential Information. The Seller shall keep confidential and shall not

divulge to any party, without the ...

*Line 4,048:* ... regulations under Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et seq., pursuant to which regulations the Purchaser is required to obtain certain undertakings from the Seller with regard to the privacy, use and protection of nonpublic personal financial information of the Mortgagors. Therefore, notwithstanding anything to the contrary contained in this Agreement, the Seller agrees that (a) it shall not disclose or use any personally identifiable information relating to a mortgagor (as defined below, "Customer Information") except to the extent necessary to carry out its obligations under this Agreement and for no other purpose, (b) it shall not disclose Customer Information to any third party, including, without limitation, its third party service providers without the prior consent of the Purchaser and an agreement in writing from the third party to use or disclose such Customer Information only to the extent necessary to carry out the Seller's obligations under this Agreement and for no other purposes, (c) it shall maintain, and shall require all third parties approved under subsection (b) to maintain, effective information security measures to protect Customer Information from unauthorized disclosure or use, and (d) it shall provide the Purchaser with information regarding such security measures upon the reasonable request of the Purchaser and promptly provide the ...

*Line 4,072:* ... or any security breach related to Customer Information. The obligations set forth in this Section shall survive termination of the Agreement. For the purposes of this Agreement, "Customer Information" means the nonpublic personal information (as defined in 15 U.S.C. § 6809(4)) of the Purchaser's employees, clients or prospective clients, including the Mortgagors (and/or clients or prospective clients of the Purchaser's parent, affiliated or subsidiary companies) received by the Seller in connection with the performance of its obligations under the Agreement, including, but not limited to (i) an individual's name, address, e-mail address, IP address, telephone number and/or social security number, (ii) the fact that an individual has a relationship with the Purchaser and/or its parent, affiliated or subsidiary companies, or (iii) an individual's account information to the extent Nonpublic Personal Information (as defined) is, either intentionally or unintentionally, disclosed to or obtained by the Seller during the Agreement. The Seller covenants to keep such Nonpublic Personal Information strictly confidential and to strictly limit its use of such information to carrying out the services set forth herein. For the purposes of this provision, ...

*Line 4,109:*   IN WITNESS WHEREOF, the parties have executed this Agreement under seal as of the date and year first above written.

*Line 4,523:* SERVICE FEE RATE, REQUIRED ...

*Line 5,183:* Total of all cumulative expenses advanced by the servicer for non-escrow expenses such as but not limited to: FC fees and costs, bankruptcy fees and costs, property preservation and property inspections.

*Line 5,226:* Value obtained during the foreclosure process. Usually as a result of a BPO and typically used to calculate the bid.

*Line 5,470:* The date determined that the servicer and mortgagor agree to pursue a defined ...

*Line 5,746:* Amount of the contractual obligations (i.e.: note and mortgage/deed of trust).

*Line 5,787:* Date that the contractual obligations (i.e.: note and mortgage/deed of trust) ...

*Line 5,952:* ... to sell property 014=Military service 016=Unemployment ...

*Line 6,197:* Actual sales price agreed upon by both the purchaser and servicer as documented

| |
|---|
| on the HUD1 settlement statement. |
| *Line 6,302:*  The due date of the first scheduled payment due under a forbearance or repayment plan agreed to by both the mortgagor and servicer. |
| *Line 6,324:*  ... due date of the next outstanding payment due under a forbearance or repayment plan agreed to by both the mortgagor and servicer. |
| *Line 6,367:*  The date that both the mortgagor and servicer agree to the terms of a forbearance or repayment plan. |
| *Line 6,670:*  ... to sell property 014=Military service 016=Unemployment ... |
| *Line 6,809:*  ... hereby certifies that it has established the account described below as a Custodial Account pursuant to Section 2.04 of the Flow Interim Servicing Agreement, dated as of April 10, 2006, Fixed and Adjustable Rate Mortgage Loans, Group 2006-FLOW. |
| *Line 6,861:*    FORM OF CUSTODIAL ACCOUNT LETTER AGREEMENT |
| *Line 6,895:*  As Seller under the Flow Interim Servicing Agreement, dated as of April 10, 2006, Fixed and Adjustable Rate Mortgage Loans, Group 2001-1 (the "Agreement"), we hereby authorize and request you to establish an account, as a Custodial Account pursuant to Section 2.04 of the Agreement, to be designated as "GreenPoint Mortgage Funding Inc. in trust for the Fixed and Adjustable Rate Mortgage Loans - Group 2006-FLOW." All deposits in the account shall be subject to withdrawal therefrom ... |
| *Line 6,905:*  ... in violation of the requirement that the account be fully insured as described below. This letter is submitted to you in duplicate. Please execute and return one original to us. |
| *Line 6,923:*  ... undersigned, as Depository, hereby certifies that the above described account has been established under Account Number _____, at the office of the Depository indicated above, and agrees to honor withdrawals on such account as ... |
| *Line 6,964:*  Mortgage Funding Inc. hereby certifies that it has established the account described below as an Escrow Account pursuant to Section 2.06 of the Flow Interim Servicing Agreement, dated as of April 10, 2006, Fixed and Adjustable Rate Mortgage Loans, Group 2006-FLOW. |
| *Line 6,970:*  ... of Account: "GreenPoint Mortgage Funding Inc. in trust for the Purchaser of the Fixed and Adjustable Rate Mortgage Loans, Group ___, and various Mortgagors." ... |
| *Line 7,013:*    FORM OF ESCROW ACCOUNT LETTER AGREEMENT |
| *Line 7,047:*  As Seller under the Flow Interim Servicing Agreement, dated as of April 10, 2006, Fixed and Adjustable Rate Mortgage Loans, Group 2006-FLOW (the "Agreement"), we hereby authorize and request you to establish an account, as an Escrow Account pursuant to Section 2.06 of the Agreement, to be designated as "GreenPoint Mortgage Funding Inc., in trust for the Purchasers of Fixed and Adjustable Rate Mortgage Loans - Group 2006-FLOW." All deposits in the account shall be subject to ... |
| *Line 7,056:*  ... which would result in violation of the requirement that the account be fully insured as described below. This letter is submitted to you in duplicate. Please execute and return one original to us. |
| *Line 7,087:*  ... undersigned, as Depository, hereby certifies that the above described account has been established under Account Number _____, at the office of the Depository indicated above, and agrees to honor withdrawals on such account as ... |

*Line 7,122:*   ACKNOWLEDGMENT AGREEMENT

*Line 7,129:*  Holdings Inc., (the "Purchaser") as the Purchaser under that certain Flow Interim Servicing Agreement dated as of April 10, 2006, (the "Agreement"), does hereby contract with GreenPoint Mortgage Funding Inc. (the "Seller") as Seller under the Agreement, for the servicing responsibilities related to the Mortgage Loans listed on the Mortgage Loan Schedule attached hereto. The Seller hereby accepts the servicing responsibilities transferred hereby and on the date hereof assumes all servicing responsibilities related to the Mortgage Loans identified on the attached Mortgage Loan Schedule all in accordance with the Agreement. The contents of each Servicing File required to be delivered to service the Mortgage Loans pursuant to the Agreement have been or shall be delivered to the Seller by the Purchaser in accordance with the terms of the Agreement.   With respect to the Mortgage Loans made subject to the Agreement hereby, the Closing Date shall be _____ and the Transfer Date shall be _____.

*Line 7,152:*  All other terms and conditions of this transaction shall be governed by the Agreement.   Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement.

*Line 7,175:*  This Acknowledgment Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.  IN WITNESS WHEREOF, the Purchaser and the Seller have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

*Line 7,295:*  Re:The [      ] agreement dated as of [        ], 200[      ] (the "Agreement"), among [IDENTIFY PARTIES]   I, _____, the _____ of [NAME OF COMPANY], certify to [the Purchaser], [the Depositor], and the [Master Servicer] [Securities Administrator] [Trustee], and their officers, with the knowledge and intent that they will rely upon this certification, that: ...

*Line 7,311:*  ... report on assessment of the Seller's compliance with the servicing criteria set forth in Item 1122(d) of Regulation AB (the "Servicing Criteria"), provided in accordance with Rules 13a-18 and 15d-18 under Securities Exchange Act of 1934, as amended (the "Exchange Act") and Item 1122 of Regulation AB (the "Servicing Assessment"), the registered public accounting firm's attestation report provided in accordance with Rules 13a-18 and 15d-18 under the Exchange Act and Section 1122(b) of Regulation AB (the "Attestation Report"), and all servicing reports, officer's certificates and other information relating to the servicing of the Mortgage Loans by the Seller during 200[ ] that were delivered by the Seller to the [Depositor] [Master Servicer] [Securities Administrator] [Trustee] pursuant to the Agreement (collectively, the "Seller Servicing Information"); ...

*Line 7,335:*  Based on my knowledge, all of the Seller Servicing Information required to be provided by the Seller under the Agreement has been provided to the [Depositor] [Master Servicer] [Securities Administrator] [Trustee]; ...

*Line 7,340:* 4.      I am responsible for reviewing the activities performed by the Seller as servicer under the Agreement, and based on my knowledge and the compliance review conducted in preparing the Compliance Statement and except as disclosed in the Compliance Statement, the Servicing Assessment or the Attestation Report, the Seller has fulfilled its obligations under the Agreement in all material respects; and   5.      The Compliance Statement

required to be delivered by the Seller pursuant to the Agreement, and the Servicing Assessment and Attestation Report required to be provided by the Seller and by any Subservicer or Subcontractor pursuant to the Agreement, have been provided to the [Depositor] [Master Servicer]. Any material instances of noncompliance described in such reports have been disclosed to ...

*Line 7,377:* ... terms used but not defined herein shall have the meanings assigned in [the Trust Agreement] [the Pooling and Servicing Agreement] [the Servicing Agreement].

*Line 7,460:* Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements.

*Line 7,474:* If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities.

*Line 7,497:* A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the ...

*Line 7,513:* Cash Collection and Administration

*Line 7,524:* Payments on mortgage loans are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days ...

*Line 7,550:* Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements.

*Line 7,606:* Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; ...

*Line 7,613:* ... such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These ...

*Line 7,629:* Investor Remittances and Reporting

*Line 7,640:* Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with ...

*Line 7,648:* ... terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of mortgage loans serviced by the Servicer.

*Line 7,707:* Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements.

*Line 7,764:* Mortgage loan and related documents are safeguarded as required by the transaction agreements ...

*Line 7,777:* ... additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the ...

*Line 7,794:* ... records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in ...

*Line 7,820:* ... with respect to the terms or status of an obligor's mortgage loans (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents.

*Line 7,835:* Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the ...

*Line 7,856:* ... records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent mortgage loans including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or ...

*Line 7,890:* ... the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable mortgage loan documents and state laws; and (C) such funds are returned to the obligor ...

*Line 7,926:* ... late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or ...

*Line 7,951:* Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in ...

8: EX-99.5...........

Miscellaneous Exhibit -- HTML

| EX-99.5 · _1st Page of 75±_ | | |
|---|---|---|

*Line 49:*    AMENDED AND RESTATED FLOW INTERIM SERVICING AGREEMENT

*Line 60:* ...  and

*Line 74:*    CONVENTIONAL FIXED AND ADJUSTABLE RATE RESIDENTIAL MORTGAGE LOANS ...

*Line 107:*    AMENDED AND RESTATED FLOW INTERIM SERVICING AGREEMENT This Amended and Restated Flow Interim Servicing Agreement (the "Agreement") is entered into as of the 1 st day of February, 2007, by and between GREENPOINT MORTGAGE FUNDING INC. (the "Seller"), a New York corporation and LEHMAN BROTHERS BANK, FSB, ...

*Line 122:*    WHEREAS, the Purchaser and the Seller are parties to a Flow Interim Servicing Agreement, dated as of December 12, 2001 and amended as of March 14, 2003 and further amended as of November 23, 2005 (as amended, the "Existing Flow Agreement"), by and between the Purchaser and the Seller;   WHEREAS, the Purchaser and the Seller have determined to amend and restate the Existing Flow Agreement in its entirety;   WHEREAS, the Purchaser and Seller entered into a Mortgage Loan Purchase and Warranties Agreement dated as of the date hereof (the "Purchase Agreement") pursuant to which the Purchaser shall, from time to time, purchase from the Seller certain conventional, residential, fixed and adjustable rate first and second lien mortgage loans (the "Mortgage ...

*Line 141:* Mortgage Loans, a "Mortgage Loan Package"); and   WHEREAS, the Purchaser

desires to have the Seller service the Mortgage Loans in each Mortgage Loan Package during the period between the related Closing Date and the ...

*Line 150:*  Period"), the Seller desires to service and administer the Mortgage Loans on behalf of the Purchaser during the Interim Period, and the parties desire to provide the terms and conditions of such interim servicing by the Seller.  NOW, THEREFORE, in consideration of the mutual covenants made herein and for other good and valuable consideration the sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows: ...

*Line 171:*  ... capitalized terms not otherwise defined herein have the respective meanings set forth in the Purchase Agreement. The following terms are defined as follows (except as otherwise agreed by the parties).

*Line 178:*  With respect to any Mortgage Loan, those mortgage servicing practices of (i) prudent mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located and (ii) in accordance with applicable state, local and federal laws, rules and regulations.  ...

*Line 199:*   Acknowledgment Agreement: The agreement, substantially in the form of Exhibit 6 hereto, to be executed by the Seller and the Purchaser on each Closing Date.  Agreement: This agreement between the Purchaser and the Seller for the interim servicing and administration of the Mortgage Loans.

*Line 212:*  Commission: The United States Securities and Exchange Commission.

*Line 231:*  Account: The separate account or accounts created and maintained pursuant to Section 2.04.

*Line 237:*  Investments: Any one or more of the obligations and securities listed below which investment provides for a date of maturity not later than the Determination Date in each ...

*Line 242:*  ...  (i) direct obligations of, and obligations fully guaranteed by, the United States of America, or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America; and   (ii) federal funds, demand and time deposits in, certificates of deposits of, or bankers' acceptances issued by, any depository institution or trust company incorporated or organized under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state banking authorities, so long as at the time of such investment or contractual commitment ...

*Line 260:*  ... holding company, the commercial paper or other short-term debt obligations of such holding company) are rated "P-1" by Moody's Investors Service, Inc. and the long-term debt obligations of such holding company) are rated "P-1" by Moody's Investors Service, Inc. and the long-term debt obligations of such depository institution or trust company (or, in the case of a depository institution or trust company which is the principal subsidiary of a holding company, the long-term debt obligations of such holding company) are rated at least "Aa" by Moody's Investors Service, Inc.

*Line 286:*  ... such instrument shall be an Eligible Investment if such instrument evidences either (i) a right to receive only interest payments with respect to the obligations underlying such instrument, or (ii) both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity of greater than 120% of the yield to maturity at par of such underlying ...

*Line 295:* Account: The separate account or accounts created and maintained pursuant to Section 2.06.

*Line 303:* ... respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and any other ...

*Line 323:* Mae Guides: The Fannie Mae Selling Guide and the Fannie Mae Servicing Guide and all amendments or additions thereto.

*Line 341:* Period: The period between the related Closing Date and the related Transfer Date.

*Line 370:* Purchaser, which shall be equal to the Mortgage Interest Rate minus the sum of (a) the Servicing Fee and (b) the LPMI Fee, if any. ...

*Line 390:* ... policy of primary mortgage guaranty insurance issued by a Qualified Insurer, as required by this Agreement with respect to certain Mortgage Loans.

*Line 399:* Purchase Agreement: The Amended and Restated Flow Mortgage Loan Purchase and Warranties Agreement between the Purchaser and the Seller related to the purchase of the Mortgage Loans dated as of February 1, 2007.

*Line 407:* Purchaser: Shall have the meaning set forth in the first paragraph of this Agreement; provided, however, that, for the purpose of compliance with Regulation AB, references ...

*Line 418:* ... depository the accounts of which are insured by the FDIC through the BIF or the SAIF and the debt obligations of which are rated AA or better by Standard & Poor's Corporation.

*Line 424:* Insurer: A mortgage guaranty insurance company duly authorized and licensed where required by law to transact mortgage guaranty insurance business and approved as an insurer by Fannie Mae or Freddie Mac.

*Line 431:* Subpart 229.1100 - Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in ...

*Line 512:* Advances: All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance by the Seller of its servicing obligations, including, but not limited to, the cost of (a) the preservation, restoration and protection of the Mortgaged Property, (b) any enforcement or judicial proceedings, including foreclosures, (c) the management and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage and (d) compliance with the obligations under Section 2.08.

*Line 533:* With respect to each Mortgage Loan, an amount equal to $7.00 per month. Such fee shall be payable monthly and shall be pro rated for any portion of a month during which the Mortgage Loans is serviced pursuant to this Agreement. The obligation of the Purchaser to pay the Servicing Fee is limited to, and the Servicing Fee is payable solely from, the interest portion (including recoveries ...

*Line 548:* ... originals of all documents in the Mortgage File which are not delivered to the Purchaser or the Custodian for the benefit of the Purchaser and copies of the Mortgage Loan Documents listed on Exhibit B to the Purchase Agreement.

*Line 557:* Officer: Any officer of the Seller involved in or responsible for, the administration

and servicing of the Mortgage Loans whose name appears on a list of servicing ...

*Line 576*:  Any Person that services Mortgage Loans on behalf of the Seller or any Subservicer and is responsible for the performance (whether directly or through Subservicers or Subcontractors) of a substantial portion of the material servicing functions required to be performed by the Seller under this Agreement or any Reconstitution Agreement that are identified in Item 1122(d) of Regulation AB.

*Line 599*:  With respect to any Mortgage Loan Package, the date mutually agreed upon by the Seller and the Purchaser and set forth on the Acknowledgment Agreement, which shall not be more than 60 days following the related Closing Date, unless ...

*Line 619*:  ... to Act as Servicer. With respect to the Mortgage Loans in each Mortgage Loan Package purchased by the Purchaser from the Seller, from and after the related Closing Date and the execution of the related Acknowledgment Agreement, the Seller, as an independent contractor, shall service and administer the Mortgage Loans and shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which the Seller may deem necessary or desirable, consistent with the terms of this Agreement and with Accepted Servicing Practices.   Consistent with the terms of this Agreement, the Seller may waive, modify or vary any term of any Mortgage Loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Mortgagor if in the Seller's reasonable and prudent determination such waiver, modification, postponement or indulgence is not materially adverse to the Purchaser, provided, ...

*Line 646*:  ... month in which any such principal or interest payment has been deferred, deposit in the Custodial Account from its own funds, in accordance with Section 2.04, the difference between (a) such month's principal and one month's interest at the Mortgage Loan Remittance Rate on the unpaid principal balance of such Mortgage Loan and (b) the amount paid by the Mortgagor. The Seller shall be entitled to reimbursement for such advances ...

*Line 653*:  ... the same extent as for all other advances made pursuant to Section 2.05. Without limiting the generality of the foregoing, the Seller shall continue, and is hereby authorized and empowered, to execute and deliver on behalf of itself and the Purchaser, all instruments of satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Properties. If reasonably required by the Seller, the Purchaser shall furnish the Seller with any powers of attorney and other documents necessary or appropriate to enable the Seller to carry out its servicing and administrative duties under this Agreement.  ...

*Line 678*:   In servicing and administering the Mortgage Loans, the Seller shall employ procedures (including collection procedures) and exercise the same care that it customarily employs and exercises in servicing and administering mortgage loans for its own account, giving due consideration to Accepted Servicing Practices where such practices do not conflict with the requirements of this Agreement, and the Purchaser's reliance on the Seller.   The Seller shall keep at its servicing office books and records in which, subject to ...

*Line 692*:  ... of Mortgage Loans. No transfer of a Mortgage Loan may be made unless such transfer is in compliance with the terms hereof. For the purposes of this Agreement, Seller shall be under no obligation to deal with any Person with respect to this Agreement or the Mortgage Loans unless the Seller has been notified of such transfers as provided in this Section 2.01. The Purchaser may sell and transfer, in whole or in part, the Mortgage Loans, provided that no such

sale and transfer shall be binding upon Seller unless notice thereof shall have been delivered to the Seller. Upon receipt thereof, Seller shall mark its books and records to reflect the ownership of the Mortgage Loans by such assignee, and the previous Purchaser shall be released from its obligations hereunder. This Agreement shall be binding upon and inure to the benefit of the Purchaser and Seller and their permitted successors, assignees and designees.

*Line 717:* ... shall immediately notify the Purchaser of any such notice from or action by the First Lien lienholder and of the amount necessary to cure the default or reinstate the First Lien. The Seller shall further make recommendations to the Purchaser (including note sales to third parties) so as to best protect the Purchaser's interest in and the security of the related Mortgage Loan. If the Purchaser directs the Seller to cure a default under or otherwise reinstate ...

*Line 729:* ... action to recover from the Mortgagor the amount so advanced. The Purchaser shall notify the Seller in writing of any and all action which it requests the Seller to take.

*Line 748:* The Seller shall cause to be maintained for each Cooperative Loan a copy of the financing statements and shall file such financing statements and continuation statements as necessary, in accordance with the Uniform Commercial Code applicable in the jurisdiction in which the related Cooperative Apartment is located, to perfect and protect the security interest and lien of the Purchaser.

*Line 771:* ... of Mortgage Loans. In the event that any payment due under any Mortgage Loan and not postponed pursuant to Section 2.01 is not paid when the same becomes due and payable, or in the event the Mortgagor fails to perform any other covenant or obligation under the Mortgage Loan and such failure continues beyond any applicable grace period, the ...

*Line 782:* ... for investment, (2) shall be consistent with Accepted Servicing Practices, (3) the Seller shall determine prudently to be in the best interest of Purchaser, and (4) is consistent with any related PMI Policy. In the event that any payment due under any Mortgage Loan is not postponed pursuant to Section 2.01 and remains delinquent for a period of 90 days or any other default continues for a period of 90 days beyond the expiration of any grace ...

*Line 789:* ... cure period, the Seller shall commence foreclosure proceedings, provided that, prior to commencing foreclosure proceedings, the Seller shall notify the Purchaser in writing of the Seller's intention to do so, and the Seller shall not commence foreclosure proceedings if the Purchaser objects to such action within 5 Business Days of receiving such notice. In such connection, the Seller shall from its own funds make all necessary and proper Servicing Advances, provided, however, that the Seller shall not be required to expend its own ...

*Line 798:* ... of any Mortgaged Property, unless it shall determine (a) that such preservation, restoration and/or foreclosure will increase the proceeds of liquidation of the Mortgage Loan to Purchaser after reimbursement to itself for such expenses and (b) that such expenses will be recoverable by it either through Liquidation Proceeds (respecting which it shall have priority for ...

*Line 812:* Continuously from the related Cut-off Date until the related Transfer Date the Seller shall proceed diligently to collect all payments due under each of the Mortgage Loans when the same shall become due and payable and shall take special care in ascertaining and estimating Escrow Payments and all other charges that will become due and payable with respect to the Mortgage Loans and each related Mortgaged Property, to the end that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.    Section 2.04 Establishment of and Deposits to Custodial Account.    The Seller shall

segregate and hold all funds collected and received pursuant to the Mortgage Loans separate and apart from any of its own funds and general assets and shall establish and maintain one or more Custodial Accounts, in the form of time deposit or demand accounts, titled "GreenPoint Mortgage Funding Inc. in trust for Lehman Brothers Bank, FSB, Residential Fixed and Adjustable Rate Mortgage Loans, Group No. 2007-FLOW". The Custodial Account shall be established ...

*Line 842:* ... 2 hereto, in the case of an account established with the Seller, or by a letter agreement in the form of Exhibit 3 hereto, in the case of an account held by a depository other than the Seller. A copy of such certification or letter agreement shall be furnished to the Purchaser and, upon request, to any subsequent Purchaser.

*Line 864:* Seller shall deposit in the Custodial Account on a daily basis, within two (2) Business Days of receipt, and retain therein, the following collections received by the Seller after the related Cut-off Date (other than with respect to each ...

*Line 880:* ... (iv) all Insurance Proceeds including amounts required to be deposited pursuant to Section 2.11 (other than proceeds to be held in the Escrow Account and applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with Section 2.15), Section 2.12 and Section 2.16; ...

*Line 898:* ... (vii) any amounts payable in connection with the repurchase of any Mortgage Loan pursuant to the terms of the Purchase Agreement;

*Line 903:* ... amounts required to be deposited by the Seller pursuant to Section 2.11 in connection with the deductible clause in any blanket hazard insurance policy; and (ix) any prepayment penalties, late payment charges and assumption fees received in connection with the Mortgage Loans.

*Line 911:* The foregoing requirements for deposit into the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of assumption fees, to the extent permitted by Section 4.01, need not be deposited by the Seller into the Custodial Account. Any interest paid on funds deposited in the Custodial Account by the depository institution shall accrue to the benefit of the Seller and the Seller shall be entitled to retain and withdraw such interest from the Custodial Account pursuant to Section 2.05.

*Line 930:* ... (i) to make payments to the Purchaser in the amounts and in the manner provided for in Section 3.01; ...

*Line 949:* ... reimburse itself for unreimbursed Servicing Advances, any unpaid Servicing Fees and for unreimbursed advances of Seller funds made pursuant to Section 2.17, the Seller's right to reimburse itself pursuant to this subclause (iii) with respect to any Mortgage Loan being limited to related Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds and such other amounts as may be collected by the ...

*Line 959:* ... thereto shall be prior to the rights of the Purchaser except that, where the Seller is required to repurchase a Mortgage Loan pursuant to the terms of the Purchase Agreement or Section 4.02 of this Agreement, the Seller's right to such reimbursement shall be subsequent to the payment to the Purchaser of the Repurchase Price pursuant to such sections and all other amounts required to be ...

*Line 970:* ... (iv) to reimburse itself for expenses incurred and reimbursable to it pursuant to

Section 4.03; ...

*Line 975:* ... (v) to clear and terminate the Custodial Account upon the termination of this Agreement; and

*Line 992:* Section 2.06 Establishment of and Deposits to Escrow Account. The Seller shall segregate and hold all funds collected and received pursuant to a Mortgage Loan constituting Escrow Payments separate and apart from any of its own funds and general assets and shall establish and maintain one or more Escrow Accounts, in the form of time deposit or demand accounts, titled, "GreenPoint Mortgage Funding Inc., in trust for Lehman Brothers Bank, FSB, Residential Fixed and Adjustable Rate Mortgage Loans, Group No. 2007-FLOW, and various Mortgagors". The Escrow Accounts shall be established with a Qualified ...

*Line 1,008:* ... be evidenced by a certification in the form of Exhibit 4 hereto, in the case of an account established with the Seller, or by a letter agreement in the form of Exhibit 5 hereto, in the case of an account held by a depository other than the Seller. A copy of such certification shall be furnished to the Purchaser and, upon request, to any subsequent Purchaser. The Seller shall deposit in the Escrow Account or Accounts on a daily basis, within two (2) Business Days of receipt, and retain therein: ...

*Line 1,035:* ... of effecting timely payment of any such items as required under the terms of this Agreement; and

*Line 1,044:* The Seller shall make withdrawals from the Escrow Account only to effect such payments as are required under this Agreement, as set forth in Section 2.07. The Seller shall be entitled to retain any interest paid on ...

*Line 1,065:* ... effect timely payments of ground rents, taxes, assessments, water rates, mortgage insurance premiums, condominium charges, fire and hazard insurance premiums or ...

*Line 1,082:* ... (iv) for transfer to the Custodial Account and application to reduce the principal balance of the Mortgage Loan in accordance with the terms of the related Mortgage and Mortgage Note;

*Line 1,098:* ... (vii) to clear and terminate the Escrow Account on the termination of this Agreement; and

*Line 1,106:* Section 2.08 Payment of Taxes, Insurance and Other Charges. With respect to each Mortgage Loan, the Seller shall maintain accurate records reflecting the status of ground rents, taxes, assessments, water rates, sewer rents, and other charges which are or may become a lien upon the Mortgaged Property and the status of PMI Policy premiums and fire and hazard insurance coverage and shall obtain, from time to time, all bills for the payment of such charges (including renewal premiums) and shall effect payment thereof prior to the applicable penalty or termination date, employing for such purpose deposits of the Mortgagor in the Escrow Account which shall have been estimated and accumulated by the Seller in amounts sufficient for such purposes, as allowed under the terms of the Mortgage. The Seller assumes full responsibility for the timely payment of all such bills and shall effect timely payment of all such charges irrespective of each Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments, and the Seller shall make advances from its own funds to effect such payments. To the extent that a Mortgage Loan ...

*Line 1,153:* ... 2.09 PMI Obligations. The Seller shall comply with all provisions of applicable state and federal law relating to the cancellation of, or collection of premiums with respect to,

PMI Policies, including, but not limited to, the provisions of the Homeowners Protection Act of 1998, and all regulations promulgated thereunder, as amended from time to time. If the Mortgagor fails to pay any PMI Policy premium, the ...

*Line 1,172:* The Seller shall bear any expenses, losses or damages sustained by the Purchaser because the Custodial Account and/or the Escrow Account are not demand deposit accounts. Amounts on deposit in the Custodial Account and the Escrow Account may at the option of ...

*Line 1,198:* ... or gain realized from any such Eligible Investment shall be for the benefit of the Seller and may be withdrawn at any time by the Seller. Any losses incurred in respect of any such investment shall be deposited in the Custodial Account ...

*Line 1,224:* ... such that all buildings upon the Mortgaged Property are insured by a generally acceptable insurer, acceptable to Fannie Mae under the Fannie Mae Guides, against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located, in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements securing such Mortgage Loan and (ii) the greater of (a) the outstanding principal balance of the Mortgage Loan and (b) an amount such that the proceeds thereof shall be sufficient to prevent the ...

*Line 1,238:* ... in an area identified in the Federal Register by the Flood Emergency Management Agency as having special flood hazards (and such flood insurance has been made available) a flood insurance policy meeting the requirements of the current ...

*Line 1,246:* ... damage or loss on a replacement cost basis (or the unpaid balance of the mortgage if replacement cost coverage is not available for the type of building insured) and (ii) the maximum amount of insurance which is available under the Flood Disaster Protection Act of 1973, as amended. If at any time during the term of the Mortgage Loan, the Seller determines in accordance with applicable law and pursuant to the Fannie Mae Guides that a Mortgaged Property is located in a special flood hazard area and is not covered by flood insurance or is covered in an amount less than the amount required by the Flood Disaster Protection Act of 1973, as amended, the Seller shall notify the related Mortgagor that the Mortgagor must obtain such flood insurance coverage, and if ...

*Line 1,265:* Mortgage is secured by a unit in a condominium project, the Seller shall verify that the coverage required of the owner's association, including hazard, flood, liability, and fidelity coverage, is being maintained in accordance with then current Fannie Mae requirements, and secure from the owner's association its agreement to notify the Seller promptly of any change in the insurance coverage or of any condemnation or casualty loss that may have a material effect on ...

*Line 1,275:* Seller shall cause to be maintained on each Mortgaged Property earthquake or such other or additional insurance as may be required pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance, or pursuant to the requirements of any ...

*Line 1,283:* ... the event that the Purchaser or the Seller shall determine that the Mortgaged Property should be insured against loss or damage by hazards and risks not covered by the insurance required to be maintained by the Mortgagor pursuant to the terms of the Mortgage, the Seller shall communicate and consult with the Mortgagor with respect to the need for such insurance and bring to the Mortgagor's attention the desirability of protection of the Mortgaged ...

*Line 1,305:*   All policies required hereunder shall name the Seller as loss payee and shall be endorsed with standard or New York mortgagee clauses, without contribution, ...

*Line 1,314:* ... either his insurance carrier or agent, provided, however, that the Seller shall not accept any such insurance policies from insurance companies unless such companies are acceptable to Fannie Mae under the Fannie Mae Guides and are licensed to do business in the jurisdiction in which the Mortgaged Property is located. The Seller shall determine that such policies provide sufficient risk coverage and amounts, that they insure the property owner, and that they properly describe the property address. The Seller shall furnish to the ...

*Line 1,327:* Pursuant to Section 2.04, any amounts collected by the Seller under any such policies (other than amounts to be deposited in the Escrow Account and applied to the restoration or repair of the related Mortgaged Property, or property ...

*Line 1,338:* ... of Mortgage Impairment Insurance. In the event that the Seller shall obtain and maintain a blanket policy insuring against losses arising from fire and hazards covered under extended coverage on all of the Mortgage Loans, then, to the extent such policy provides coverage in an amount equal to the amount required pursuant to Section 2.11 and otherwise complies with all other requirements of Section 2.11, it shall ...

*Line 1,351:* ... deductible clause, in which case, in the event that there shall not have been maintained on the related Mortgaged Property a policy complying with Section 2.11, and there shall have been a loss which would have been covered by such policy, the Seller shall deposit in the Custodial Account at ...

*Line 1,358:* ... funds, without reimbursement therefor. Upon request of the Purchaser, the Seller shall cause to be delivered to the Purchaser a certified true copy of such policy and a statement from the insurer thereunder that such policy shall in no ...

*Line 1,365:* Section 2.13 Maintenance of Fidelity Bond and Errors and Omissions Insurance. The Seller shall maintain with responsible companies, at its own expense, a blanket Fidelity Bond and an Errors and Omissions Insurance Policy, with broad coverage on all officers, employees or other persons acting in any capacity requiring ...

*Line 1,374:* Employees"). Any such Fidelity Bond and Errors and Omissions Insurance Policy shall be in the form of the Mortgage Banker's Blanket Bond and shall protect and insure the Seller against losses, including forgery, theft, embezzle-ment, fraud, errors and omissions and negligent acts of such Seller Employees. Such Fidelity Bond and Errors and Omissions Insurance Policy also shall protect and insure the Seller against losses in connection with the release or satisfaction of a Mortgage Loan without having obtained payment in full of the indebtedness secured thereby. No provision of this Section 2.13 requiring such Fidelity Bond and Errors and Omissions Insurance Policy shall diminish or relieve the Seller from its duties and obligations as set forth in this Agreement. The minimum coverage under any such bond and insurance policy shall be at least equal to the corresponding amounts required by Fannie Mae in the Fannie Mae ...

*Line 1,389:* Upon the request of the Purchaser, the Seller shall cause to be delivered to the Purchaser a certified true copy of such fidelity bond and insurance policy and a statement from the surety and the insurer that such fidelity bond and insurance policy shall in no event be terminated or materially modified without 30 days' ...

*Line 1,415:* Seller to assure itself that the value of the Mortgaged Property is being preserved. In addition, if any Mortgage Loan is more than 60 days delinquent, the Seller immediately shall inspect the Mortgaged Property and shall conduct subsequent inspections in accordance with

Accepted Servicing Practices or as ...

*Line 1,436:* ... (i) the Seller shall receive satisfactory independent verification of completion of repairs and issuance of any required approvals with respect thereto;

*Line 1,444:* ... the Mortgage, including, but not limited to requiring waivers with respect to mechanics' and materialmen's liens;   (iii) the Seller shall verify that the Mortgage Loan is not in default; and

*Line 1,475:*   Section 2.16 Maintenance of PMI Policy and LPMI Policy; Claims.

*Line 1,485:* ... with respect to Mortgage Loans which are not LPMI Loans, in accordance with state and federal laws, the Seller shall, without any cost to the Purchaser, maintain or cause the Mortgagor to maintain in full force and effect a PMI Policy insuring that portion of the Mortgage Loan in excess of 75% of value, and shall pay or ...

*Line 1,504:* ... for such reason. If the Seller determines that recoveries are so jeopardized, it shall notify the Purchaser and the Mortgagor, if required, and obtain from another Qualified Insurer a replacement insurance policy. The Seller shall ...

*Line 1,509:* ... take any action which would result in noncoverage under any applicable PMI Policy of any loss which, but for the actions of the Seller would have been covered thereunder. In connection with any assumption or substitution agreement entered into or to be entered into pursuant to Section 4.01, the Seller ...

*Line 1,515:* ... assumption or substitution of liability in accordance with the terms of such PMI Policy and shall take all actions which may be required by such insurer as a ...

*Line 1,524:* ... (ii) with respect to LPMI Loans, maintain in full force and effect an LPMI Policy insuring that portion of the Mortgage Loan in excess of 75% (or such other percentage as stated in the related Acknowledgment Agreement) of value, and from time to time, ...

*Line 1,550:* ... for such reason. If the Seller determines that recoveries are so jeopardized, it shall notify the Purchaser and the Mortgagor, if required, and obtain from another Qualified Insurer a replacement insurance policy. The Seller shall ...

*Line 1,555:* ... take any action which would result in noncoverage under any applicable LPMI Policy of any loss which, but for the actions of the Seller would have been covered thereunder. In connection with any assumption or substitution agreement entered into or to be entered into pursuant to Section 6.01, the Seller shall promptly notify the insurer under the related LPMI Policy, if any, of such assumption or substitution of liability in accordance with the terms of such LPMI Policy and shall take all actions which may be required by such insurer as ...

*Line 1,581:* ...  (b) In connection with its activities as servicer, the Seller agrees to prepare and present, on behalf of itself and the Purchaser, claims to the insurer under any PMI Policy in a timely fashion in accordance with the terms of such PMI Policy or LPMI Policy and, in this regard, to take such action as shall be necessary to ...

*Line 1,597:* ... obtain a PMI Policy for any Mortgage Loan which does not already have a PMI Policy in place. In any event, the Seller agrees to administer such PMI Policies in accordance with the Agreement or any Reconstitution Agreement.   Section 2.17 Title, Management and Disposition of REO Property. In the ...

*Line 1,612:*    The Seller shall manage, conserve, protect and operate each REO Property for the Purchaser solely for the purpose of its prompt disposition and sale. The Seller, either itself or through an agent selected by the Seller, shall manage, conserve, protect and operate the REO

Property in the same manner that it manages, conserves, protects and operates other foreclosed property for its own account, and in the same manner that similar property in the same locality as the REO Property is managed. The Seller shall attempt to sell the same (and may temporarily rent the same for a period not greater than one year, except as otherwise provided below) on such terms and conditions as the Seller deems to be ...

*Line 1,629:* The Seller shall use its best efforts to dispose of the REO Property as soon as possible and shall sell such REO Property in any event within one year after title has been taken to such REO Property, unless the Seller determines, and gives an appropriate notice to the Purchaser to such effect, that a longer period is necessary for the orderly liquidation of such REO Property. If a period longer than one year is permitted under the foregoing sentence and is necessary to sell any REO Property, (i) the Seller shall report monthly to the Purchaser as to the progress being made in selling such REO Property and (ii) if, with the written consent of the Purchaser, a purchase money mortgage is taken in connection with such sale, such purchase money mortgage shall name the Seller as mortgagee, and such purchase money mortgage shall not be held pursuant to this Agreement, but instead a separate participation agreement among the Seller and Purchaser shall be entered into with respect to ...

*Line 1,659:* The Seller shall also maintain on each REO Property fire and hazard insurance with extended coverage in an amount which is at least equal to the maximum insurable value of the improvements which are a part of such property, liability insurance and, to the extent required and available under the Flood Disaster Protection Act of 1973, as amended, flood insurance in the amount required above.

*Line 1,668:* The disposition of REO Property shall be carried out by the Seller at such price, and upon such terms and conditions, as the Seller deems to be in the best interests of the Purchaser. The proceeds of sale of the REO Property shall ...

*Line 1,673:* ... promptly deposited in the Custodial Account. As soon as practical thereafter the expenses of such sale shall be paid and the Seller shall reimburse itself for any related unreimbursed Servicing Advances, unpaid Servicing Fees and unreimbursed advances made pursuant to this Section, and on the Remittance Date ...

*Line 1,682:* With respect to each REO Property, the Seller shall hold all funds collected and received in connection with the operation of the REO Property in the Custodial ...

*Line 1,687:* ... receipt thereof in each Custodial Account all revenues received with respect to the conservation and disposition of the related REO Property. Notwithstanding the foregoing, at any time and from time to time, the Purchaser may at its election terminate this Agreement with respect to one or more REO Properties as ...

*Line 1,701:* Seller shall withdraw REO funds on deposit in the Custodial Account with respect to each related REO Property necessary for the proper operation, management and maintenance of the REO Property, including the cost of maintaining any hazard insurance pursuant to Section 2.11 and the fees of any managing agent acting on behalf of the Seller. The Seller shall make monthly distributions ...

*Line 1,708:* ... each Remittance Date to the Purchaser of the net cash flow from the REO Property (which shall equal the revenues from such REO Property net of the expenses described in Section 2.17 and of any reserves reasonably required from time to time to be maintained to satisfy anticipated liabilities for such ...

*Line 1,720:* ... with respect to any REO Property covering the operation of such REO Property

for the previous month and the Seller's efforts in connection with the sale of such REO Property and any rental of such REO Property incidental to the sale thereof for the previous month. That statement shall be accompanied by such other ...

*Line 1,754:* ... respect to each ARM Mortgage Loan, the Seller shall adjust the Mortgage Interest Rate on the related Interest Rate Adjustment Date in compliance with the requirements of applicable law and the related Mortgage and Mortgage Note. The Seller shall execute and deliver any and all necessary notices required under applicable law and the terms of the related Mortgage Note and Mortgage regarding the Mortgage Interest Rate adjustments. The Seller shall promptly, upon written request therefor, deliver to the Purchaser such notifications and any additional applicable data regarding such adjustments and the methods used to calculate and implement such adjustments. Upon the discovery by the Seller or the receipt ...

*Line 1,773:* Section 2.22 Reports of Foreclosures and Abandonments of Mortgaged Property. Following the foreclosure sale or abandonment of any Mortgaged Property, the ...

*Line 1,782:* Reporting For each Mortgage Loan, the Seller shall accurately and fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information on its borrower credit files to each of the following credit repositories: Equifax Credit Information Services, Inc., TransUnion, LLC and Experian Information Solution, Inc. on a monthly basis.

*Line 1,801:* Custodial Account the amount of such prepayment charge only if the related prepayment is not the result of a refinancing by the Seller or its designee and such waiver (a) relates to a defaulted Mortgage Loan or a reasonably foreseeable default, such waiver is standard and customary in servicing similar mortgage loans to the Mortgage Loans, and such waiver, in the reasonable judgment of the Seller, would maximize recovery of total proceeds from the Mortgage Loan, taking into account the amount of such prepayment charge and the related Mortgage Loan, ...

*Line 1,816:* Customer Information. The Seller shall implement and maintain security measures designed to meet the objectives of the Interagency Guidelines Establishing Information Security Standards (the "Guidelines"), Section 216 of the Fair and Accurate Credit Transactions Act (including its implementing regulations, "FACTA"), ...

*Line 1,828:* ... to any incident of unauthorized access to Customer Information (as defined in the Guidelines). At all times during the term of this Agreement, the Seller shall maintain administrative, technical and physical safeguards, including proper information disposal procedures, to ensure the security, confidentiality and integrity of Customer Information, and to protect such information against any threats or hazards, including, without limitation, unauthorized access or use. The Seller will periodically (but not less than annually) review and update its information security procedures.

*Line 1,856:* Information maintained by the Seller, including providing prompt notification to the Purchaser of any such incident and will, at the Purchaser's request, at the Seller's sole expense, notify the Purchaser's customers on the Purchaser's behalf of any such unauthorized access, use or disclosure. Nothing in this Section shall limit the Seller's obligations under Section 8.01 of this Agreement.

*Line 1,868:* ... its designee (including any Master Servicer of the Mortgage Loans) which information shall include, but not be limited to, any Statement on Auditing Standards (SAS) No. 70 report covering the Seller's operations, and any other audit reports, summaries of test results

or equivalent measures or evaluations ...

*Line 1,874:* With respect to any third party provided access to Customer Information in accordance with this Agreement, the Seller will enter into a written agreement with such third party requiring safeguarding of Customer Information in a manner no less restrictive than the Seller's obligations under this Agreement, and including those affirmative obligations set forth in this Section and in any other Section of this Agreement relating to the use or protection of Customer Information.

*Line 1,883:* The obligations set forth in this Section shall survive termination of the Agreement.

*Line 1,911:* ... law. Such interest shall be deposited in the Custodial Account by the Seller on the date such late payment is made and shall cover the period commencing with the day following such second Business Day and ending with the Business Day on ...

*Line 1,943:* Remittance Advice, with a trial balance report attached thereto, in the form of Exhibit 1-1 annexed hereto and a Standard Layout for Defaulted Loan Report in the form of Exhibit 1-2 annexed hereto in hard copy and electronic medium mutually acceptable to the parties as to the preceding remittance and the period ending on the last day of the preceding month.

*Line 1,963:* The Seller shall prepare and file any and all tax returns, information statements or ...

*Line 1,968:* ... or to the Purchaser pursuant to any applicable law with respect to the Mortgage Loans and the transactions contemplated hereby. In addition, the Seller shall provide the Purchaser with such information concerning the Mortgage Loans as ...

*Line 1,980:* Business Days following request by the Purchaser or any Depositor, provide to the Purchaser and such Depositor (or, as applicable, cause each Subservicer to provide), in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, the information and materials specified in paragraphs (i), (ii) and (v) of this Section 3.02(b), and (2) as promptly as practicable following notice to or discovery by the Seller, provide to the Purchaser and any Depositor (in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor) the information specified in ...

*Line 1,994:* ... so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding the Seller and each Subservicer, as applicable, as is requested for the purpose of compliance with Items 1103(a)(1), 1117 and 1119 of ...

*Line 2,016:* ... of Regulation AB) legal or governmental proceedings pending (or known to be contemplated) against the Seller and each Subservicer; and   (B) a description of any affiliation or relationship between the Seller, each Subservicer and any of the following parties to a Securitization Transaction, as ...

*Line 2,041:* ... significant obligor; 8) any enhancement or support provider; and 9) any ...

*Line 2,049:* ... so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding the Seller, as servicer of the Mortgage Loans, and each Subservicer (each of the Seller and each Subservicer, for purposes of this paragraph, a "Servicer"), as is requested for the purpose of compliance with ...

*Line 2,062:* ... loans; a general discussion of the Servicer's experience in servicing assets of any type as well as a more detailed discussion of the Servicer's experience in, and procedures

for, the servicing function it will perform under this Agreement and any Reconstitution Agreements; information regarding the size, composition and growth of the Servicer's portfolio of residential mortgage loans of a type similar to the Mortgage Loans and information on factors related to the Servicer that may be material, in the good faith judgment of the Purchaser or any ...

*Line 2,103*: ... the Servicer has been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; and

*Line 2,114*: ... preceding the related Securitization Transaction to the Servicer's policies or procedures with respect to the servicing function it will perform under this Agreement and any Reconstitution Agreements for mortgage loans of a type similar to the Mortgage Loans; ...

*Line 2,121*: ... material risk that an adverse financial event or circumstance involving the Servicer could have a material adverse effect on the performance by the Seller of its servicing obligations under this Agreement or any Reconstitution Agreement;   (E) information regarding advances made by the Servicer on the Mortgage Loans and the Servicer's overall servicing portfolio of residential mortgage loans for the three-year ...

*Line 2,132*: ... that the Servicer has made all advances required to be made on residential mortgage loans serviced by it during such period, or, if such statement would not be accurate, information regarding the percentage and type of advances not made as required, and the reasons for such failure to advance;   (F) a description of the Servicer's processes and procedures designed to address any special or unique factors involved in servicing loans of a similar type as ...

*Line 2,144*: ... (G) a description of the Servicer's processes for handling delinquencies, losses, bankruptcies and recoveries, such as through liquidation of mortgaged properties, sale of defaulted mortgage loans or workouts; and   (H) information as to how the Servicer defines or determines delinquencies and charge-offs, including the effect of any grace period, re-aging, restructuring, partial payments considered current or other practices with respect to delinquency and loss experience.

*Line 2,160*: ... asset-backed securities, the Seller shall (or shall cause each Subservicer to) (a) notify the Purchaser and any Depositor in writing of (1) any material (as determined in accordance with the provisions of Regulation AB) litigation or governmental proceedings pending against the Seller or any Subservicer and (2) any affiliations or relationships that develop following the closing date of a Securitization Transaction between the Seller or any Subservicer and any of the parties specified in clause (B) of paragraph (i) of this Section 3.02(b) (and any other parties identified in writing by the requesting party) with respect to such Securitization Transaction, and (b) provide to the Purchaser and any Depositor a description of such proceedings, affiliations or ...

*Line 2,191*: ... a condition to the succession to the Seller or any Subservicer as servicer or subservicer under this Agreement or any Reconstitution Agreement by any Person (i) into which the Seller or such Subservicer may be merged or consolidated, ...

*Line 2,196*: ... (ii) which may be appointed as a successor to the Seller or any Subservicer, the Seller shall provide to the Purchaser and any Depositor, at least 15 calendar days prior to the effective date of such succession or appointment, (x) written notice to the Purchaser and any Depositor of such succession or appointment and (y) in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, all information reasonably requested

by the Purchaser or any Depositor in order to comply with its reporting obligation ...

*Line 2,208:* ... (v) In addition to such information as the Seller, as servicer, is obligated to provide pursuant to other provisions of this Agreement, if so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding the ...

*Line 2,214:* ... of Regulation AB. Such information shall be provided concurrently with the monthly reports otherwise required to be delivered by the servicer under this Agreement, commencing with the first such report due not less than ten Business Days ...

*Line 2,220:* Section 3.03 Principal and Interest Advances by Seller. The Seller shall have no obligation to advance any amounts constituting delinquent principal and interest payments.

*Line 2,236:* The Seller shall use its best efforts to enforce any "due-on-sale" provision contained in any Mortgage or Mortgage Note and to deny assumption by the person to whom the Mortgaged Property has been or is about to be sold whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains liable on the Mortgage and the Mortgage Note. When the Mortgaged Property has been conveyed by the Mortgagor, the Seller shall, to the extent ...

*Line 2,265:* ... the Seller reasonably believes it is unable under applicable law to enforce such "due-on-sale" clause, the Seller shall enter into (i) an assumption and modification agreement with the person to whom such property has been conveyed, pursuant to which such person becomes liable under the Mortgage Note and the original Mortgagor remains liable thereon or (ii) in the event the Seller is unable under applicable law to require that the original Mortgagor remain liable under the Mortgage Note and the Seller has the prior consent of the primary mortgage guaranty insurer, a substitution of liability agreement with the purchaser of the Mortgaged Property pursuant to which the original Mortgagor is released from liability and the purchaser of the Mortgaged Property is substituted as Mortgagor and becomes liable under the Mortgage Note. If an assumption fee is collected by the Seller for entering into an assumption agreement, a portion of such fee, up to an amount equal to one-half of one percent (0.5%) of the outstanding principal balance of the related Mortgage Loan, will be retained by the Seller as additional servicing compensation, and any portion thereof in excess of one-half of one percent (0.5%) shall be ...

*Line 2,290:* ... the extent that any Mortgage Loan is assumable, the Seller shall inquire diligently into the creditworthiness of the proposed transferee, and shall use the underwriting criteria for approving the credit of the proposed transferee which ...

*Line 2,295:* ... type as the Mortgage Loans. If the credit of the proposed transferee does not meet such underwriting criteria, the Seller diligently shall, to the extent permitted by the Mortgage or the Mortgage Note and by applicable law, accelerate the maturity of the Mortgage Loan.

*Line 2,300:* Section 4.02 Satisfaction of Mortgages and Release of Mortgage Files. Upon the ...

*Line 2,305:* ... notification that payment in full will be escrowed in a manner customary for such purposes, the Seller shall notify the Purchaser in the Monthly Remittance Advice as provided in Section 3.02(a), and may request the release of any Mortgage Loan Documents from the Purchaser in accordance with this ...

*Line 2,320:* Account within 2 Business Days of receipt of such demand by the Purchaser. The

Seller shall maintain the Fidelity Bond and Errors and Omissions Insurance Policy as provided for in Section 2.13 insuring the Seller against any loss ...

*Line 2,336:* ... month during which the Mortgage Loan is serviced by the Seller pursuant to this Agreement. The obligation of the Purchaser to pay the Servicing Fee is limited to, and the Servicing Fee is payable solely from, the interest portion (including recoveries with respect to interest from Condemnation Proceeds or ...

*Line 2,363:* ... all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement thereof except as specifically provided for herein.

*Line 2,370:* Statement as to Compliance. The Seller shall deliver to the Purchaser and any Depositor, on or before March 1 of each calendar year, commencing in 2008, and on the Transfer Date a statement of compliance addressed to the Purchaser and such Depositor and signed by an authorized officer of the Seller, to the effect that (i) a review of the Seller's activities during the immediately preceding calendar year (or applicable portion thereof) and of its performance under this Agreement and any applicable Reconstitution Agreement during such period has been made under such officer's supervision, and (ii) to the best of such officers' knowledge, based on such review, the Seller has fulfilled all of its obligations under this Agreement and any applicable Reconstitution Agreement in all material respects throughout such calendar year (or applicable portion thereof) or, if there has been a failure to fulfill any such obligation in any material respect, specifically identifying each such failure known to such officer and the nature and the status thereof.

*Line 2,398:* (A) deliver to the Purchaser and any Depositor a report (in form and substance reasonably satisfactory to the Purchaser and such Depositor) regarding the Seller's assessment of compliance with the Servicing Criteria during the immediately preceding calendar year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB. Such report shall be addressed to the Purchaser and such Depositor and signed by an authorized officer of the Seller, and shall address each of the Servicing Criteria specified on Exhibit 8 ...

*Line 2,410:* (B) deliver to the Purchaser and any Depositor a report of a registered public accounting firm reasonably acceptable to the Purchaser and such Depositor that attests to, and reports on, the assessment of compliance made by the Seller and delivered pursuant to the preceding paragraph. Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act; (C) cause each Subservicer and each Subcontractor determined by the Seller pursuant to Section 4.07 to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB (each, a "Participating Entity"), to deliver to the Purchaser and any Depositor an assessment of compliance and accountants' attestation as and when provided in paragraphs (i) and (ii) of this Section 4.05; and ...

*Line 2,443:* ... requested by the Purchaser or any Depositor not later than February 1 of the calendar year in which such certification is to be delivered, deliver to the Purchaser, any Depositor and any other Person that will be responsible for signing the certification (a "Sarbanes Certification") required by Rules 13a-14(d) and 15d-14(d) under the Exchange Act (pursuant to Section 302 of the ...

*Line 2,457:* ... on the certification provided by the Seller pursuant to such clause in signing a Sarbanes Certification and filing such with the Commission. Neither the Purchaser nor any Depositor will request delivery of a certification under ...

*Line 2,484:* ... (a) The Purchaser shall have the right to examine and audit any and all of the books, records, or other information of the Seller, whether held by the Seller or by another on its behalf, with respect to or concerning this Agreement or the Mortgage Loans, during business hours or at such other times as may be ...

*Line 2,493:* ... (b) The Seller shall provide to the Purchaser and any supervisory agents or examiners representing a state or federal governmental agency having jurisdiction over ...

*Line 2,498:* Purchaser, including without limitation the Office of Thrift Supervision (or any successor thereto), the FDIC and other similar entities, access to any documentation regarding the Mortgage Loans in the possession of the Seller ...

*Line 2,504:* ... charge, upon reasonable request, during normal business hours, at the offices of the Seller and in accordance with any applicable regulations.

*Line 2,509:* ... 4.07 Use of Subservicers and Subcontractors. The Seller shall not hire or otherwise utilize the services of any Subservicer to fulfill any of the obligations of the Seller as servicer under this Agreement or any Reconstitution Agreement (a) without the prior written consent of the Purchaser and (b) unless the Seller complies with the provisions of paragraph (i) of this Section. The Seller shall not hire or otherwise utilize the services of any Subcontractor, and shall not permit any Subservicer to hire or otherwise utilize the services of any Subcontractor, to fulfill any of the obligations of the Seller as servicer under this Agreement or any Reconstitution Agreement (a) without the prior written consent of the Purchaser and (b) unless the Seller complies with the provisions of paragraph (ii) of this Section.

*Line 2,541:* ... (i) The Seller shall cause any Subservicer used by the Seller (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of this Section and with Sections 3.02(b)(ii), 3.02(b)(iv), 4.04, 4.05, 6.04, 8.01(b) and 10.08 of this Agreement to the same extent as if such Subservicer were the Seller, and to provide the information required with respect to such Subservicer under Section 3.02(b)(iii) of this Agreement. The Seller shall be responsible for obtaining from each Subservicer and delivering to the Purchaser and any Depositor any servicer compliance statement required to be delivered by such Subservicer under Section 4.04, any assessment of compliance and attestation required to be delivered by such Subservicer under Section 4.05 and any certification required to be delivered to the Person that will be responsible for signing the Sarbanes Certification under Section 4.05 as and when required to be delivered. (ii) The Seller shall promptly upon request provide to the Purchaser and any Depositor (or any designee of the Depositor, such as a master servicer or administrator) a written description (in form and substance satisfactory to the Purchaser and such Depositor) of the role and function of each Subcontractor utilized by the Seller or any Subservicer, specifying (A) the identity of each such Subcontractor, (B) which (if any) of such Subcontractors are Participating Entities, and (C) which elements of the Servicing Criteria will be addressed in ...

*Line 2,577:* ... "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, the Seller shall cause any such Subcontractor used by the Seller (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of Sections 4.05, 6.04 and 8.01(b) of this Agreement to the same extent as if such Subcontractor were the Seller. The Seller shall be responsible for obtaining from each Subcontractor and delivering to the Purchaser and any Depositor any assessment of compliance and attestation required to be delivered by such Subcontractor under Section 4.05, in each case as and when required to be delivered.

*Line 2,599:*  Seller shall (A) respond as promptly as practicable to any good faith request by the Purchaser or any Depositor for information regarding each Subservicer and each Subcontractor and (B) cause each Subservicer and each Subcontractor with respect to which the Purchaser or any Depositor requests delivery of an assessment of compliance and accountants' attestation to deliver such within the time required under Section 4.05.   For purposes of this Agreement, the Seller shall be deemed to have received payments on Mortgage Loans immediately upon receipt by a subservicer of such payments. Notwithstanding any subservicing agreement or the provisions of this Agreement relating to agreements or arrangements between the Seller and a Subservicer or reference to actions taken through a Subservicer or otherwise, the Seller shall remain obligated and primarily liable to the Purchaser for servicing and administering of the Mortgage Loans in accordance with the provisions hereof ...

*Line 2,617:*  ... subservicing agreements or arrangements or by virtue of indemnification from a Subservicer and to the same extent and under the same terms and conditions as if the Seller alone were servicing and administering the Mortgage Loans. All actions of each Subservicer performed pursuant to the related subservicing agreement shall be performed as an agent of the Seller with the same force and effect as if performed directly by the Seller and the Purchaser shall have no obligations, duties or liabilities with respect to any subservicer including no obligation, duty or liability of the Purchaser to pay any subservicer's fees and expenses. The Seller shall be entitled to enter into any agreement with each subservicer for indemnification of the Seller by the subservicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification.

*Line 2,656:*  ... of Information.  During the term of this Agreement, the Seller shall furnish to the Purchaser such periodic, special, or other reports or information, whether or not provided for herein, as shall be necessary, reasonable, or appropriate with respect to the Purchaser or the purposes of this Agreement. All such reports or information shall be provided by and in accordance with all reasonable instructions and directions which the Purchaser may give.   The Seller shall execute and deliver all such instruments and take all such action as the Purchaser may reasonably request from time to time, in order to effectuate the purposes and to carry out the terms of this Agreement.

*Line 2,682:*  The Seller also shall make available any comparable interim statements to the extent any such statements have been prepared by or on behalf of the Seller (and are available upon request to members or stockholders of the Seller or to the public ...

*Line 2,692:*  ... knowledgeable financial or accounting officer for the purpose of answering questions respecting recent developments affecting the Seller or the financial statements of the Seller, and to permit any prospective Purchaser to inspect the Seller's servicing facilities for the purpose of satisfying such prospective Purchaser that the Seller has the ability to service the Mortgage Loans as provided in this Agreement.

*Line 2,702:*  Transaction. The Purchaser and the Seller acknowledge and agree that the purpose of Sections 3.02(b), 4.04, 4.05, 4.07, 5.03, 6.04, 8.01(b) and 10.08 of this Agreement is to facilitate compliance by the Purchaser and any Depositor with the provisions of Regulation AB and related rules and regulations of the Commission. Although Regulation AB is applicable by its terms only to offerings of asset-backed ...

*Line 2,713:*  ... or any Depositor provide comparable disclosure in unregistered offerings. References in this Agreement to compliance with Regulation AB include provision of comparable disclosure in private offerings.

*Line 2,734:* ... information or other performance under these provisions other than in good faith, or for purposes other than compliance with the Securities Act, the Exchange Act and the rules and regulations of the Commission thereunder (or the ...

*Line 2,740:* ... requirements of Regulation AB may change over time, whether due to interpretive guidance provided by the Commission or its staff, consensus among participants in the asset-backed securities markets, advice of counsel, or otherwise, and agrees to comply with requests made by the Purchaser or any Depositor in good ...

*Line 2,747:* ... the Purchaser to deliver to the Purchaser (including any of its assignees or designees) and any Depositor, any and all statements, reports, certifications, records and any other information necessary in the good faith determination of the Purchaser or any Depositor to permit the Purchaser or such Depositor to comply with the provisions of Regulation AB, together with such disclosures relating to the Seller, any Subservicer and the Mortgage Loans, or the servicing of the Mortgage Loans, reasonably believed by the Purchaser or any Depositor ...

*Line 2,761:* ... the Seller by providing timely notice of requests for information under these provisions and by reasonably limiting such requests to information required, in ...

*Line 2,768:* The Purchaser shall indemnify the Seller and its Affiliates and the respective directors, officers, employees and agents of each of the foregoing, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of ...

*Line 2,778:* Transaction, including without limitation the registration statement, prospectus, prospectus supplement, any private placement memorandum, any offering circular, any computational materials, and any amendments or supplements to the foregoing (collectively, the "Securitization Materials") or ...

*Line 2,812:* ... 6.01 Damages. The Purchaser shall have the right at any time to seek and recover from the Seller any damages or losses suffered by it as a result of any failure by the Seller ...

*Line 2,825:* Procedures. . This Agreement shall terminate with respect to the Mortgage Loans or portion thereof transferred on the related Transfer Date as set forth in the related Purchase Price and Terms Letter. The Purchaser may elect to terminate this Agreement and transfer the servicing from ...

*Line 2,838:* ... its intent to transfer the servicing from the Seller. On or before the date specified by the Purchaser in accordance with this paragraph (a) for the transfer of servicing from the Seller, the Seller shall prepare, execute and deliver to the successor entity designated by the Purchaser any and all documents and other instruments, place in such successor's possession all Mortgage Loan Documents necessary or appropriate to effect the purposes of such notice of termination, including but not limited to the transfer and endorsement or assignment of the Mortgage Loans and related documents, at the Seller's sole expense. The Seller shall cooperate with the Purchaser and such successor in effecting the termination of the Seller's responsibilities and rights hereunder.

*Line 2,852:* ... the related Transfer Date, the Seller shall comply with all of the provisions of Section 5 of the Purchase Agreement to effect a complete transfer of the Servicing Rights. On the related Transfer Date for each Mortgage Loan, this Agreement, except for Articles VI, VIII, IX and X which shall survive the related Transfer Date, shall terminate.

*Line 2,863:* Transfer Date shall not be transferred from the Seller to the Purchaser or the successor servicer, as the case may be, and such Mortgage Loans shall continue to be serviced by the Seller pursuant to the terms of this Agreement. However, if the Purchaser so elects, the Purchaser may waive the provisions of this paragraph (b) and accept transfer of servicing of such Mortgage Loans and all amounts received by the Seller thereunder.

*Line 2,898:* ... (d) Additional Termination Provisions. Notwithstanding and in addition to the foregoing, in the event that (i) a Mortgage Loan becomes delinquent for a period of 120 days or more (a ...

*Line 2,904:* ... or (ii) a Mortgage Loan becomes an REO Property, the Purchaser may at its election terminate this Agreement with respect to such Delinquent Mortgage Loan ...

*Line 2,922:* Reconstitution Date, the Mortgage Loans transferred shall cease to be covered by the Interim Servicing Agreement.

*Line 2,929:* ... connection, the Seller shall (a) execute any agreements related to any Securitization Transactions ("Reconstitution Agreements") within a reasonable period of time after receipt of any Reconstitution Agreement which time shall be sufficient for the Seller and Seller's counsel to review such Reconstitution Agreement, but such time shall not exceed ten (10) Business Days after such receipt, and (b) provide to the trustee or a third party purchaser, as the case may be, subject to any Reconstitution Agreement and/or the Purchaser: (i) any and all information and appropriate verification of information which may be reasonably available to the Seller, whether through letters of its auditors (the reasonable out-of-pocket cost of which will be borne by the Purchaser) and counsel or otherwise, as the Purchaser shall reasonably request; (ii) to bring each of the Mortgage Loan representations and warranties set forth in the Agreement current as of the date the Mortgage Loans are being transferred pursuant to a Securitization Transaction, provided that, such Mortgage Loan representations and warranties shall be revised, to the extent allowed or required by the rating agencies and the certificate insurer and acceptable to ...

*Line 2,950:* ... notwithstanding the foregoing, Seller shall, at the time of reconstitution, be entitled to state certain exceptions to the Mortgage Loan representations and warranties necessary to make same true and correct as of the time of the Securitization Transaction and (iii) such additional representations, warranties, covenants, opinions of counsel, letters from auditors, and certificates of public officials or officers of the Seller as are reasonably ...

*Line 2,967:* ... trustee or such third party, as the case may be, for each Mortgage Loan that is part of a Securitization Transaction and shall pay all preparation and recording costs associated therewith. The Seller shall execute each assignment of mortgage, track such assignments of mortgage to ensure they have been recorded and deliver them as required by the trustee or such third party, as the case may ...

*Line 2,976:* ... delivers an opinion of counsel in the applicable jurisdiction that it is not necessary to record the assignment of mortgage to protect the Purchaser's interest. Additionally, the Seller shall prepare and execute, at the direction of the Purchaser, any Mortgage Note endorsements in connection with any and all ...

*Line 2,995:* ... (d) The Reconstitution Agreement will require the Seller to advance principal and interest payments on each Mortgage Loan at the Mortgage Loan Interest Rate less the Reconstituted Servicing Fee (defined below) on the remittance date of the Reconstitution Agreement. The Reconstitution Agreement will also require in connection with any

prepayments, in addition to any prepayment penalties ...

*Line 3,006:* ... shortfall in the interest component thereof, such that one month's interest shall be deposited in the Custodial Account, (as defined in the Interim Servicing Agreement), prior to the remittance date of the Reconstitution Agreement. The Seller's obligation to remit payments of principal and interest shall continue through the liquidation of the Mortgaged Property on the related Mortgage Loan, or until such time that the Seller deems that any future advances of principal and interest would be otherwise non-recoverable. The Reconstituted Servicing Fee shall be .25% per annum times the outstanding principal balance ...

*Line 3,017:* ... (e) The Seller shall do all things necessary and required by a servicer who services Mortgage Loans under a Securitization Transaction which is a REMIC (defined ...

*Line 3,025:* ... (f) All Mortgage Loans not sold or transferred pursuant to a Securitization Transaction and any Mortgage Loans repurchased by the Purchaser, shall be subject to the Interim Servicing Agreement and shall continue to be serviced in accordance with the terms of the Interim Servicing Agreement and with respect thereto the Interim Servicing Agreement shall remain in full force and effect.

*Line 3,037:* ... failure by the Seller, any Subservicer or any Subcontractor to deliver any information, report, certification, accountants' letter or other material when and as required under this Agreement, or any breach by the Seller of a representation or warranty set forth in Section 10.08(a) or in a writing furnished pursuant to Section 10.08(b) and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that ...

*Line 3,045:* ... representation or warranty in a writing furnished pursuant to Section 10.08(b) to the extent made as of a date subsequent to such closing date, shall, except as provided in clause (b) of this paragraph, immediately and automatically, without notice or grace period, constitute an Event of Default with respect to the Seller under this Agreement and any applicable Reconstitution Agreement, and shall entitle the Purchaser or Depositor, as applicable, in its sole discretion to terminate the rights and obligations of the Seller as servicer under this Agreement and/or any applicable Reconstitution Agreement without payment (notwithstanding anything in this Agreement or any applicable Reconstitution Agreement to the contrary) of any compensation to the Seller; provided that to the extent that any provision of this Agreement and/or any applicable Reconstitution Agreement expressly provides for the survival of certain rights or obligations following termination of the Seller as servicer, such provision ...

*Line 3,076:* ... (b) Any failure by the Seller, any Subservicer or any Subcontractor to deliver any information, report, certification or accountants' letter when and as required under Section 4.04 or 4.05, including (except as provided below) any failure ...

*Line 3,084:* ... information, report, certification or accountants' letter was required to be delivered shall constitute an Event of Default with respect to the Seller under this Agreement and any applicable Reconstitution Agreement, and shall entitle the Purchaser or Depositor, as applicable, in its sole discretion to terminate the rights and obligations of the Seller as servicer under this Agreement and/or any applicable Reconstitution Agreement without payment (notwithstanding anything in this Agreement to the contrary) of any compensation to the Seller; provided that to the extent that any provision of this Agreement and/or any applicable Reconstitution Agreement expressly provides for the survival of certain rights or obligations following termination of the Seller as servicer, such provision ...

*Line 3,097:* Neither the Purchaser nor any Depositor shall be entitled to terminate the rights

| |
|---|
| and obligations of the Seller pursuant to this subparagraph (ii)(B) if a failure ... |
| *Line 3,108:* ... (c) The Seller shall promptly reimburse the Purchaser (or any designee of the Purchaser, such as a master servicer) and any Depositor, as applicable, for all reasonable expenses incurred by the Purchaser (or such designee) or such Depositor as such are incurred, in connection with the termination of the Seller as servicer and the transfer of servicing of the Mortgage Loans to a successor servicer. The provisions of this paragraph shall not limit whatever rights the Purchaser or any Depositor may have under other provisions of this Agreement and/or any applicable Reconstitution Agreement or otherwise, whether in equity or at law, such as an action for damages, specific performance or injunctive ... |
| *Line 3,125:*   BOOKS AND RECORDS |
| *Line 3,131:* ... of Servicing Files Prior to the Transfer Date.  Prior to the related Transfer Date, the contents of each Servicing File are and shall be held in trust by the Seller for the benefit of the Purchaser as the owner thereof. The Seller shall maintain in the Servicing File a copy of the contents of each Mortgage File and the originals of the documents in each Mortgage File not delivered to the Purchaser. The possession of the Servicing File by the Seller is at the will of the Purchaser for the sole purpose of servicing the related Mortgage Loan, pursuant to this Agreement, and such retention and possession by the Seller is in its capacity as Servicer only and at the election of the Purchaser. The Seller shall release its custody of the contents of any Servicing File only in accordance with written instructions from the Purchaser, unless such release is required as incidental to the Seller's servicing of the Mortgage Loans pursuant to this Agreement, or is in connection with a repurchase of any Mortgage Loan pursuant to the terms of the Purchase Agreement.  ... |
| *Line 3,161:*   The Seller shall be responsible for maintaining, and shall maintain, a complete set of books and records for each Mortgage Loan which shall be marked clearly to reflect the ownership of each Mortgage Loan by the Purchaser. In particular, the Seller shall maintain in its possession, available for inspection by the Purchaser or its designee, and shall deliver to the Purchaser or its designee upon demand, evidence of compliance with all federal, state and local laws, rules and regulations, and requirements of Fannie Mae or Freddie Mac, including but not limited to documentation as to the method used in determining the ... |
| *Line 3,174:* ... as amended, to the Mortgaged Property, documentation evidencing insurance coverage and eligibility of any condominium project for approval by Fannie Mae and periodic inspection reports as required by Section 2.14.   The Seller shall keep at its servicing office books and records in which, subject to ... |
| *Line 3,183:* ... of Mortgage Loans. No transfer of a Mortgage Loan may be made unless such transfer is in compliance with the terms hereof. For the purposes of this Agreement, the Seller shall be under no obligation to deal with any person with respect to this Agreement or the Mortgage Loans unless the books and records show such person as the owner of the Mortgage Loan. The Purchaser may, subject to the terms of this Agreement, sell or transfer one or more of the Mortgage Loans. The Purchaser also shall advise the Seller of the transfer. Upon receipt of notice of the transfer, the Seller shall mark its books and records to reflect the ownership of the Mortgage Loans of such assignee, and shall release the previous Purchaser from its obligations hereunder with respect to the ... |
| *Line 3,198:*   INDEMNIFICATION AND ASSIGNMENT |
| *Line 3,203:* ... 8.01 Indemnification. (a) The Seller agrees to indemnify the Purchaser and hold |

it harmless against any and all claims, losses, damages, penalties, fines, and forfeitures, including, but not limited to reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that the Purchaser may sustain in any way related to the failure of Seller to (a) perform its duties and service the Mortgage Loans in strict compliance with the terms of this Agreement and/or (b) comply with applicable law. The Seller immediately shall notify the Purchaser if a claim is made by a third party with respect to this Agreement, assume (with the prior written consent of the Purchaser) the defense of any such claim and pay all expenses in connection therewith, including counsel fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against it or the Purchaser in respect of such claim. The Seller shall follow any ...

*Line 3,223:* ... by it pursuant to the preceding sentence except when the claim is in any way related to the Seller's indemnification pursuant to Section 8 of the Purchase Agreement, or the failure of the Seller to (a) service and administer the Mortgage Loans in strict compliance with the terms of this Agreement and/or (b) comply with applicable law.

*Line 3,243:* ... (b) The Seller shall indemnify the Purchaser, each affiliate of the Purchaser, and each of the following parties participating in a Securitization Transaction: each sponsor and issuing entity; each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission ...

*Line 3,255:* ... parties or the Depositor (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers, employees and agents of each of the foregoing and of the Depositor, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon: ...

*Line 3,267:* ... any information, report, certification, accountants' letter or other material provided under this Agreement by or on behalf of the Seller, or provided in written or electronic form under this Agreement by or on behalf of any Subservicer or Subcontractor (collectively, the "Seller Information"), or (2) ...

*Line 3,279:* ... that clause (2) of this paragraph shall be construed solely by reference to the Seller Information and not to any other information communicated in connection with a sale or purchase of securities, without regard to whether the Seller ...

*Line 3,288:* ... failure by the Seller, any Subservicer or any Subcontractor to deliver any information, report, certification, accountants' letter or other material when and as required under this Agreement, including any failure by the Seller to identify pursuant to Section 4.07(ii) any Subcontractor "participating in the ...

*Line 3,295:* ... (C) any breach by the Seller of a representation or warranty set forth in Section 10.08(a) or in a writing furnished pursuant to Section 10.08(b) and made as of a ...

*Line 3,310:* ... 8.01(b), the Seller shall promptly reimburse the Purchaser, any Depositor, as applicable, and each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such ...

*Line 3,337:* Section 8.02 Limitation on Liability of Seller and Others. Neither ...

*Line 3,342:* ... shall be under any liability to the Purchaser for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment,

provided, however, that this provision shall not protect the Seller or any such person against any breach of warranties or representations made herein, or failure to perform its obligations in strict compliance with any standard of care set forth in this Agreement, or any liability which would otherwise be imposed by reason of any breach of the terms and conditions of this Agreement. The Seller and any director, officer, employee or agent of the Seller may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder. The Seller shall not be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service the Mortgage Loans in accordance with this Agreement and which in its opinion may involve it in any expense or liability, provided, however, that the Seller may, with the consent of the Purchaser, undertake any such action which it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto. In such event, the Seller shall be entitled to reimbursement from the Purchaser of the reasonable legal expenses and costs of ...

*Line 3,366:* Section 8.03 Limitation on Resignation and Assignment by Seller. The Purchaser has entered into this Agreement with the Seller and subsequent Purchasers will purchase the Mortgage Loans in reliance upon the independent status of the Seller, and the representations as to the adequacy of its servicing facilities, plant, personnel, records and procedures, its integrity, reputation and financial standing, and the continuance thereof. Therefore, the Seller shall neither assign this Agreement or the servicing hereunder or delegate its rights or duties hereunder or any portion hereof or sell or ...

*Line 3,382:* The Seller shall not resign from the obligations and duties hereby imposed on it except by mutual consent of the Seller and the Purchaser or upon the determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by the Seller. Any such determination permitting the resignation of the Seller shall be evidenced by ...

*Line 3,390:* Opinion of Counsel to such effect delivered to the Purchaser which Opinion of Counsel shall be in form and substance acceptable to the Purchaser. No such resignation shall become effective until a successor shall have assumed the Seller's responsibilities and obligations hereunder in the manner provided in Section 6.02.

*Line 3,397:* Without in any way limiting the generality of this Section 8.03, in the event that the Seller either shall assign this Agreement or the servicing responsibilities hereunder or delegate its duties hereunder or any portion thereof or sell or otherwise dispose of all or substantially all of its property or assets, without the prior written consent of the Purchaser, then the Purchaser shall have the right to terminate this Agreement upon notice given as set forth in Section 6.03, without any payment of any penalty or damages and without any liability whatsoever to the Seller or any third party.

*Line 3,425:* ... to the limit set forth in Section 2.01 hereof, to assign, in whole or in part, its interest under this Agreement with respect to some or all of the Mortgage Loans, and designate any person to exercise any rights of the Purchaser hereunder. Upon such assignment of rights and assumption of obligations, the assignee or designee shall accede to the rights and obligations hereunder of the Purchaser with respect to such Mortgage Loans and the Purchaser as assignor shall be released from all obligations hereunder with respect to such Mortgage Loans from and after the date of such assignment and assumption. All references to the Purchaser in this Agreement shall be deemed to include its assignee or ...

*Line 3,441:* REPRESENTATIONS, WARRANTIES AND COVENANTS OF PURCHASER

The Purchaser warrants and represents to, and covenants and agrees with, the Seller as follows: ...

*Line 3,449:*  Section 9.01 Authority and Capacity.  The execution, delivery and performance by the Purchaser of this Agreement has been and will remain duly and validly authorized by all necessary corporate action. This Agreement constitutes and will continue to constitute a legal, valid and enforceable obligation of the Purchaser.

*Line 3,460:*  ... 9.02 Assistance.  To the extent possible, the Purchaser shall cooperate with and assist the Seller as requested by the Seller, in carrying out Seller's covenants, agreements duties and responsibilities under the Purchase Agreement and in connection therewith shall execute and deliver all such papers, documents and instruments as may be necessary and appropriate in furtherance thereof.

*Line 3,471:*    REPRESENTATIONS AND WARRANTIES OF INTERIM SERVICER   The Seller warrants and represents to, and covenants and agrees with, the Purchaser as follows: ...

*Line 3,479:*  Section 10.01 Due Organization and Authority.  The Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of California and has all licenses necessary to carry on its business as now being conducted and is licensed, qualified and in ...

*Line 3,489:*  ... such state require licensing or qualification in order to conduct business of the type conducted by the Seller, and in any event the Seller is in compliance with the laws of any such state to the extent necessary to ensure the enforceability of the related Mortgage Loan in accordance with the terms of this Agreement; the Seller has the full corporate power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement (including all instruments or transfer to be delivered pursuant to this Agreement) by the Seller and the consummation of the transactions contemplated hereby have been duly and validly authorized; this Agreement evidences the valid, binding and enforceable obligation of the Seller; and all requisite corporate action has been taken by the Seller to make this Agreement valid and binding upon the Seller in accordance with its terms; ...

*Line 3,522:*  Course of Business.  The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Seller; ...

*Line 3,529:*  Conflicts.  Neither the execution and delivery of this Agreement, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Seller's charter or by-laws or any legal restriction or any agreement or instrument to which the Seller is now a party or by which it is bound, or ...

*Line 3,543:*  Section 10.04 Ability to Service.  The Seller is an approved seller/servicer of conventional residential mortgage loans for Fannie Mae or Freddie Mac, with the facilities, procedures, and experienced personnel necessary for the sound servicing of mortgage loans of the same type as the Mortgage Loans. The Seller is in good standing to sell mortgage loans to and service mortgage loans for Fannie Mae or Freddie Mac, and no event has occurred, including but not limited to a change in insurance coverage, which ...

*Line 3,562:*  The Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

*Line 3,577:* ... or ability of the Seller to carry on its business substantially as now conducted, or in any material liability on the part of the Seller, or which would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be taken in connection with the obligations of the Seller contemplated herein, or which would be likely to impair materially the ability of the Seller to perform under the terms of this Agreement;

*Line 3,589:* ... consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Seller of or compliance by the Seller with this Agreement or the servicing of the Mortgage Loans as evidenced by the consummation of the transactions contemplated by this Agreement, or if required, such approval has been obtained prior to the related Closing Date; ...

*Line 3,614:* Untrue Information. Neither this Agreement nor any statement, report or other document furnished or to be furnished pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of fact or omits to state ...

*Line 3,624:* Section 10.09 Additional Representations and Warranties. (a) The Seller shall be deemed to represent to the Purchaser and to any Depositor, as of ...

*Line 3,632:* Purchaser or such Depositor prior to such date: (i) the Seller is not aware and has not received notice that any default, early amortization or other performance triggering event has occurred as to any other ...

*Line 3,645:* ... disclosed or reported by the Seller; (iv) no material changes to the Seller's policies or procedures with respect to the servicing function it will perform under this Agreement and any Reconstitution Agreement for mortgage loans of a type similar to the Mortgage Loans ...

*Line 3,652:* ... condition that could have a material adverse effect on the performance by the Seller of its servicing obligations under this Agreement or any Reconstitution Agreement; (vi) ...

*Line 3,658:* ... legal or governmental proceedings pending (or known to be contemplated) against the Seller or any Subservicer; and (vii) there are no affiliations, relationships or transactions relating to the Seller or any Subservicer with respect to any Securitization Transaction and any ...

*Line 3,672:* ... which information is first provided to the Purchaser or any Depositor under Section 3.02(b), the Seller shall, within five Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in paragraph (b) of this Section 10.08 or, if any such representation and warranty is not accurate as of the date of such request, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting ...

*Line 3,687:* ... of Default. The following shall constitute an Event of Default under this Agreement on the part ...

*Line 3,694:* ... failure by the Seller to remit to the Purchaser any payment required to be made under the terms of this Agreement which continues unremedied for a period of five days after the date upon which written notice of such failure, requiring ...

*Line 3,716:* ... other of the covenants or agreements on the part of the Seller set forth in this Agreement which continues unremedied for a period of 30 days after the date on ...

*Line 3,731:* ... for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Seller and such decree

or order shall have remained in ...

*Line 3,739:* ... (d) the Seller shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Seller or of or ...

*Line 3,764:* ... dispose of all or substantially all of its property or assets or to assign this Agreement or the servicing responsibilities hereunder or to delegate its duties hereunder or any portion thereof.

*Line 3,769:* In each and every such case, so long as an Event of Default shall not have been remedied, in addition to whatever rights the Purchaser may have at law or equity to damages, including injunctive relief and specific performance, the Purchaser, by notice in writing to the Seller, may terminate all the rights and obligations of the Seller under this Agreement and in and to the Mortgage Loans and the proceeds thereof.   Upon receipt by the Seller of such written notice, all authority and power of the Seller under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the successor appointed pursuant to ...

*Line 3,788:* By a written notice, the Purchaser may waive any default by the Seller in the performance of its obligations hereunder and its consequences. Upon any waiver of a past default, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so ...

*Line 3,817:* ... 12.01 Notices.  All notices, requests, demands and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given upon the delivery or mailing thereof, as the ...

*Line 3,876:* ... (a) Waive compliance with any of the terms, conditions or covenants required to be complied with by the others hereunder; and

*Line 3,884:*    The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other subsequent ...

*Line 3,890:* Section 12.03 Entire Agreement; Amendment.  This Agreement and the Purchase Agreement constitute the entire agreement between the parties with respect to servicing of the Mortgages during the Interim Period. This Agreement may be amended and any provision hereof waived, but, only in writing signed by the party against whom such enforcement is ...

*Line 3,916:* Binding Effect.  This Agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement. Subject to Section 8.03, this Agreement shall inure to the benefit of and be binding upon the Seller and the Purchaser and their respective successors and assigns.

*Line 3,927:* ... 12.05 Headings.  Headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

*Line 3,933:* ... 12.06 Applicable Law.     THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), AND THE

OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

*Line 3,945:*  Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties. The duties and responsibilities of the Seller shall be rendered by them as independent contractors and not as an agent of Purchaser. The Seller shall have full control of all of its acts, doings, proceedings, relating to or requisite in connection with the discharge of its duties and responsibilities under this Agreement.

*Line 3,956:*  ... of Provisions.  If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

*Line 3,972:*  ... records in all the counties or other comparable jurisdictions in which any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected at the ...

*Line 3,983:*  Purchaser may, in its sole discretion from time to time, engage a master servicer (the "Master Servicer") to assist the Purchaser in the supervision of the performance by the Seller of its obligations and responsibilities arising under this Agreement. In the event that the Purchaser so appoints a Master Servicer, the Purchaser shall provide written notice thereof to the Seller.

*Line 3,990:*  ... from the Purchaser that it has terminated or replaced such Master Servicer, the Seller shall deliver all notices, reports and remittances that the Seller is obligated to deliver to the Purchaser under this Agreement directly to the Master Servicer named in such notice (or to any successor master servicer named in any subsequent written notice received from the Purchaser). The Master Servicer, acting on behalf of the Purchaser, shall have the benefit of the covenants and agreements of the Seller under this Agreement and the Master Servicer, acting on behalf of the Purchaser, shall have the same rights as the Purchaser to enforce the obligations of the Seller arising under this Agreement. The Master Servicer shall be entitled to terminate the rights and obligations of the Seller under this Agreement upon the occurrence of an Event of Default as provided in this Agreement. Notwithstanding anything herein to the contrary, in no event shall the Master Servicer assume any of the obligations of the Purchaser under this Agreement; and in connection with the performance of the Master Servicer's duties hereunder the Seller agrees that the Master Servicer shall be entitled to all of the rights, protections, indemnities and limitations of liability afforded to the Purchaser under this Agreement. The Purchaser hereby appoints Aurora Loan Services LLC as its initial Master Servicer ...

*Line 4,030:*  ... of Confidential Information. The Seller shall keep confidential and shall not divulge to any party, without the ...

*Line 4,041:*  ... regulations under Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et seq., pursuant to which regulations the Purchaser is required to obtain certain undertakings from the Seller with regard to the privacy, use and protection of nonpublic personal financial information of the Mortgagors. Therefore, notwithstanding anything to the contrary contained in this Agreement, the Seller agrees that (a) it shall not disclose or use any personally identifiable information relating to a mortgagor (as defined below, "Customer Information") except to the extent necessary to carry out its obligations under this Agreement and for no other purpose, (b) it

shall not disclose Customer Information to any third party, including, without limitation, its third party service providers without the prior consent of the Purchaser and an agreement in writing from the third party to use or disclose such Customer Information only to the extent necessary to carry out the Seller's obligations under this Agreement and for no other purposes, (c) it shall maintain, and shall require all third parties approved under subsection (b) to maintain, effective information security measures to protect Customer Information from unauthorized disclosure or use, and (d) it shall provide the Purchaser with information regarding such security measures upon the reasonable request of the Purchaser and promptly provide the ...

*Line 4,065:* ... or any security breach related to Customer Information. The obligations set forth in this Section shall survive termination of the Agreement. For the purposes of this Agreement, "Customer Information" means the nonpublic personal information (as defined in 15 U.S.C. § 6809(4)) of the Purchaser's employees, clients or prospective clients, including the Mortgagors (and/or clients or prospective clients of the Purchaser's parent, affiliated or subsidiary companies) received by the Seller in connection with the performance of its obligations under the Agreement, including, but not limited to (i) an individual's name, address, e-mail address, IP address, telephone number and/or social security number, (ii) the fact that an individual has a relationship with the Purchaser and/or its parent, affiliated or subsidiary companies, or (iii) an individual's account information to the extent Nonpublic Personal Information (as defined) is, either intentionally or unintentionally, disclosed to or obtained by the Seller during the Agreement. The Seller covenants to keep such Nonpublic Personal Information strictly confidential and to strictly limit its use of such information to carrying out the services set forth herein. For the purposes of this provision, ...

*Line 4,101:* IN WITNESS WHEREOF, the parties have executed this Agreement under seal as of the date and year first above written.

*Line 4,470:* SERVICE FEE RATE, REQUIRED ...

*Line 4,954:* Total of all cumulative expenses advanced by the servicer for non-escrow expenses such as but not limited to: FC fees and costs, bankruptcy fees and costs, property preservation and property inspections.

*Line 5,007:* Value obtained during the foreclosure process. Usually as a result of a BPO and typically used to calculate the bid.

*Line 5,169:* The date determined that the servicer and mortgagor agree to pursue a defined ...

*Line 5,389:* Amount of the contractual obligations (i.e.: note and mortgage/deed of trust).

*Line 5,440:* Date that the contractual obligations (i.e.: note and mortgage/deed of trust) ...

*Line 5,568:* 013=Inability to rent property   014=Military service  015=Other 016=Unemployment ...

*Line 5,773:* Actual sales price agreed upon by both the purchaser and servicer as documented on the HUD1 settlement statement.

*Line 5,834:* The due date of the first scheduled payment due under a forbearance or repayment plan agreed to by both the mortgagor and servicer.

*Line 5,850:* ... due date of the next outstanding payment due under a forbearance or repayment plan agreed to by both the mortgagor and servicer.

*Line 5,903:* The date that both the mortgagor and servicer agree to the terms of a forbearance or repayment plan.

*Line 6,147:* 013=Inability to rent property   014=Military service   015=Other
016=Unemployment ...

*Line 6,258:* ... _____ hereby certifies that it
has established the account described below as a Custodial Account pursuant to Section 2.04 of
the Amended and Restated Flow Interim Servicing Agreement, dated as of February 1, 2007,
Fixed and Adjustable Rate Mortgage Loans, Group 2007-FLOW.

*Line 6,266:* Account: "GreenPoint Mortgage Funding Inc. in trust for Lehman Brothers Bank,
FSB, Residential Fixed and Adjustable Rate Mortgage Loans, Group No. 2007-FLOW."

*Line 6,307:*    FORM OF CUSTODIAL ACCOUNT LETTER AGREEMENT

*Line 6,319:* As Seller under the Amended and Restated Flow Interim Servicing Agreement,
dated as of February 1, 2007, Fixed and Adjustable Rate Mortgage Loans, Group No. 2007-
FLOW (the "Agreement"), we hereby authorize and request you to establish an account, as a
Custodial Account pursuant to Section 2.04 of the Agreement, to be designated as "GreenPoint
Mortgage Funding Inc. in trust for Lehman Brothers Bank, FSB, Residential Fixed and
Adjustable Rate Mortgage Loans, Group No. 2007-FLOW." All deposits in the account shall be
subject to withdrawal therefrom ...

*Line 6,329:* ... in violation of the requirement that the account be fully insured as described
below. This letter is submitted to you in duplicate. Please execute and return one original to us.

*Line 6,345:* ... undersigned, as Depository, hereby certifies that the above described account
has been established under Account Number _____, at the office of the Depository
indicated above, and agrees to honor withdrawals on such account as ...

*Line 6,384:* Mortgage Funding Inc. hereby certifies that it has established the account
described below as an Escrow Account pursuant to Section 2.06 of the Amended and Restated
Flow Interim Servicing Agreement, dated as of February 1, 2007, Fixed and Adjustable Rate
Mortgage Loans, Group 2007-FLOW.

*Line 6,392:* Account: "GreenPoint Mortgage Funding Inc. in trust for Lehman Brothers Bank,
FSB, Residential Fixed and Adjustable Rate Mortgage Loans, Group No. 2007-FLOW, and
various Mortgagors." ...

*Line 6,438:*    FORM OF ESCROW ACCOUNT LETTER AGREEMENT

*Line 6,452:* As Seller under the Amended and Restated Flow Interim Servicing Agreement,
dated as of February 1, 2007, Fixed and Adjustable Rate Mortgage Loans, Group No. 2007-
FLOW (the "Agreement"), we hereby authorize and request you to establish an account, as an
Escrow Account pursuant to Section 2.06 of the Agreement, to be designated as "GreenPoint
Mortgage Funding Inc. in trust for Lehman Brothers Bank, FSB, Residential Fixed and
Adjustable Rate Mortgage Loans, Group No. 2007-FLOW, and various Mortgagors." All
deposits in the account shall be subject to withdrawal therefrom by order signed by the Seller.
You may refuse any ...

*Line 6,463:* ... be fully insured as described below. This letter is submitted to you in duplicate.
Please execute and return one original to us.

*Line 6,491:* ... undersigned, as Depository, hereby certifies that the above described account
has been established under Account Number _____, at the office of the Depository indicated
above, and agrees to honor withdrawals on such account as ...

*Line 6,524:*    ACKNOWLEDGMENT AGREEMENT



*Line 6,530:* ... _____ day of _____, 200_, Lehman Brothers Bank, FSB, (the "Purchaser") as the Purchaser under that certain Amended and Restated Flow Interim Servicing Agreement dated as of February 1, 2007, (the "Agreement"), does hereby contract with GreenPoint Mortgage Funding Inc. (the "Seller") as Seller under the Agreement, for the servicing responsibilities related to the Mortgage Loans listed on the Mortgage Loan Schedule attached hereto. The Seller hereby accepts the servicing responsibilities transferred hereby and on the date hereof assumes all servicing responsibilities related to the Mortgage Loans identified on the attached Mortgage Loan Schedule all in accordance with the Agreement. The contents of each Servicing File required to be delivered to service the Mortgage Loans pursuant to the Agreement have been or shall be delivered to the Seller by the Purchaser in accordance with the terms of the Agreement.   With respect to the Mortgage Loans made subject to the Agreement hereby, the Closing Date shall be _____ and the Transfer Date shall be _____.

*Line 6,553:* All other terms and conditions of this transaction shall be governed by the Agreement.   Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement. ...

*Line 6,575:* This Acknowledgment Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.  IN WITNESS WHEREOF, the Purchaser and the Seller have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

*Line 6,703:* Re:The [ ] agreement dated as of [ ], 200[ ] (the "Agreement"), among [IDENTIFY PARTIES]  I, _____, the _____ of [NAME OF COMPANY], certify to [the Purchaser], [the Depositor], and the [Master Servicer] [Securities Administrator] [Trustee], and their officers, with the knowledge and intent that they will rely upon this certification, that: ...

*Line 6,720:* ... assessment of the Seller's compliance with the servicing criteria set forth in Item 1122(d) of Regulation AB (the "Servicing Criteria"), provided in accordance with Rules 13a-18 and 15d-18 under Securities Exchange Act of 1934, as amended (the "Exchange Act") and Item 1122 of Regulation AB (the "Servicing Assessment"), the registered public accounting firm's attestation report provided in accordance with Rules 13a-18 and 15d-18 under the Exchange Act and Section 1122(b) of Regulation AB (the "Attestation Report"), and all servicing reports, officer's certificates and other information relating to the servicing of the Mortgage Loans by the Seller during 200[ ] that were delivered by the Seller to the [Depositor] [Master Servicer] [Securities Administrator] [Trustee] pursuant to the Agreement (collectively, the "Seller Servicing Information"); ...

*Line 6,746:* ... my knowledge, all of the Seller Servicing Information required to be provided by the Seller under the Agreement has been provided to the [Depositor] [Master Servicer] [Securities Administrator] [Trustee]; ...

*Line 6,752:* ... am responsible for reviewing the activities performed by the Seller as servicer under the Agreement, and based on my knowledge and the compliance review conducted in preparing the Compliance Statement and except as disclosed in the Compliance Statement, the Servicing Assessment or the Attestation Report, the Seller has fulfilled its obligations under the Agreement in all material respects; and   5. The Compliance Statement required to be delivered by the Seller pursuant to the Agreement, and the Servicing Assessment and Attestation Report

required to be provided by the Seller and by any Subservicer or Subcontractor pursuant to the Agreement, have been provided to the [Depositor] [Master Servicer]. Any material instances of noncompliance described in such reports have been disclosed to ...

*Line 6,788:* ... terms used but not defined herein shall have the meanings assigned in [the Trust Agreement] [the Pooling and Servicing Agreement] [the Servicing Agreement].

*Line 6,866:* Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements.

*Line 6,882:* If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities.

*Line 6,909:* A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the ...

*Line 6,927:* Cash Collection and Administration

*Line 6,938:* Payments on mortgage loans are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days ...

*Line 6,968:* Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements.

*Line 7,032:* Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; ...

*Line 7,039:* ... such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These ...

*Line 7,110:* Investor Remittances and Reporting

*Line 7,121:* Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with ...

*Line 7,129:* ... terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of mortgage loans serviced by the Servicer.

*Line 7,145:* Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements.

*Line 7,210:* Mortgage loan and related documents are safeguarded as required by the transaction agreements ...

*Line 7,225:* ... additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the ...

*Line 7,244:* ... records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or

other items (e.g., escrow) in ...

*Line 7,274:* ... with respect to the terms or status of an obligor's mortgage loans (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents.

*Line 7,291:* Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the ...

*Line 7,314:* ... records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent mortgage loans including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or ...

*Line 7,405:* ... the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable mortgage loan documents and state laws; and (C) such funds are returned to the obligor ...

*Line 7,445:* ... late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or ...

*Line 7,474:* Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in ...

| | |
|---|---|
| Miscellaneous Exhibit -- HTML | 9: EX-99.6........... |
| Miscellaneous Exhibit -- HTML | 10: EX-99.7........... |
| Miscellaneous Exhibit -- HTML | 11: EX-99.8........... |
| Miscellaneous Exhibit -- HTML | 12: EX-99.9........... |
| abnamro_logo-smcolor.jpg -- JPG:14K | GRAPHIC.11......... |
| lehman_logolarge.jpg -- JPG:15K | GRAPHIC.13......... |

### *Find Words in Filing - Greenpoint Mortgage Funding Trust 2007-AR2 · '8-K'*

15 textual documents within the filing were searched.

2 docs' text contained the words "POOLING *and* AND *and* SERVICE *and* AGREEMENT".

Each doc matched "POOLING *or* AND *or* SERVICE *or* AGREEMENT" *anywhere*.

2,100 document text matches are highlighted above.

Sponsored Ads...

```
GMAC Mortgage, LLC                          PAGE      1
PO Box 780                                  DATE 05/01/12
3451 Hammond Avenue
Waterloo           IA 50704-0780

                              HISTORY FOR ACCOUNT ████8433


      --------- MAIL -------------------- --------- PROPERTY ----------------


   FELIX O ABU

   P O BOX 231171                   6999 ROMANZO WAY

   SACRAMENTO         CA 95823-0000 ELK GROVE         CA 95758-0000


------ DATES ------  ---- CURRENT BALANCES -----   ------- UNCOLLECTED -------
PAID TO  08/01/09    PRINCIPAL     295193.54  LATE CHARGES         -760.68
NEXT DUE 09/01/09    ESCROW         -3009.55  OPTIONAL INS            0.00
LAST PMT 12/30/09    UNAPPLIED FUND     0.00  INTEREST                0.00
AUDIT DT 04/11/07    UNAPPLIED CODES             FEES             -9074.00
                     BUYDOWN   FUND     0.00  ------ YEAR TO DATE -------
   LAST ACTIVITY     BUYDOWN   CODE             INTEREST              0.00
      04/23/12                                 TAXES                 0.00
------------------------------------------------------------------------------


POST  TRN  DUE    TRANSACTION    PRINCIPAL      INTEREST      ESCROW
DATE  CDE  DATE     AMOUNT        PAID           PAID          PAID
------ --- ------ --------------- ------------- ------------- -------------
041009 UFU 100108   UNAPPLIED FUNDS (1)          1425.00  BALANCE     1425.00
  REF NUMBER    000000000000 DESC
                 BAL AFTER       288349.17                   -1918.50
T:00606    /B:001  OPTIONAL INS BAL      00.00  LATE CHARGE BAL  -760.68
041009 SRA 100108       1425.00       .00         .00          .00
                 BAL AFTER       288349.17                   -1918.50
T:00606    E/B:001  OPTIONAL INS BAL      00.00  LATE CHARGE BAL  -325.88


041309 UFU 100108   UNAPPLIED FUNDS (1)         -1425.00  BALANCE       0.00
  REF NUMBER    AUTOPOST     DESC
                 BAL AFTER       288349.17                   -1918.50
T:18928    /B:002  OPTIONAL INS BAL      00.00  LATE CHARGE BAL  -325.88
041309 UFN 100108   UNAPPLIED FUNDS (4)          1425.00  BALANCE     1425.00
                 BAL AFTER       288349.17                   -1918.50
T:00000    ./B:002  OPTIONAL INS BAL      00.00  LATE CHARGE BAL  -325.88


041309 SR  100108        .00         .00         .00          .00
  LC DATE   041009 BAL AFTER       288349.17                   -1918.50
T:18928    I/B:002  OPTIONAL INS BAL      00.00  LATE CHARGE BAL  -325.88
041709 AA  100108
                 LOAN MOD CAPITALIZED FOR ESC          1085.49  TLR: 32292
                 BAL AFTER       288349.17                   -1918.50
                 OPTIONAL INS BAL      00.00  LATE CHARGE BAL  -325.88



   INQ23694
```

```
HISTORY FOR ACCOUNT      ████8433                    PAGE      2
                                                     DATE 05/01/12


        --------- MAIL -------------------- --------- PROPERTY ----------------

        FELIX O ABU

        P O BOX 231171                    6999 ROMANZO WAY

        SACRAMENTO          CA 95823-0000 ELK GROVE          CA 95758-0000


------------------------------------------------------------------------
  POST  TRN  DUE   TRANSACTION     PRINCIPAL      INTEREST      ESCROW
  DATE  CDE  DATE    AMOUNT         PAID           PAID          PAID
------  ---  ------ -------------  -------------  -------------  -------------
041709 AA  100108         .00      -9247.31      -8161.82       1085.49
                    BAL AFTER      297596.48                     -833.01
T:32292     /B:000  OPTIONAL INS BAL      00.00  LATE CHARGE BAL   -325.88
042109 UI  040109         .00          .00           .00           .00
                    BAL AFTER      297596.48                     -833.01
                    OPT PREMIUMS          .00  LATE CHARGE PYMT  -130.44*
T:31268     /B:001  OPTIONAL INS BAL      00.00  LATE CHARGE BAL   -456.32


042109 AA  040109         .00          .00           .00           .00
                    BAL AFTER      297596.48                     -833.01
                    OPT PREMIUMS          .00  LATE CHARGE PYMT  -130.44*
T:31268     /B:001  OPTIONAL INS BAL      00.00  LATE CHARGE BAL   -456.32
042109 UFN 040109  UNAPPLIED FUNDS (4)        -1207.00  BALANCE      218.00
  REF NUMBER    SG0QO9VGR350 DESC
                    BAL AFTER      297596.48                     -833.01
T:31268     /B:001  OPTIONAL INS BAL      00.00  LATE CHARGE BAL   -456.32


042109 SR  040109         .00          .00           .00        1207.00
                    BAL AFTER      297596.48                      373.99
T:31268    I/B:001  OPTIONAL INS BAL      00.00  LATE CHARGE BAL   -456.32
042109 UFN 040109  UNAPPLIED FUNDS (4)         -218.00  BALANCE        0.00
  REF NUMBER    SG0QO9VGR350 DESC
                    BAL AFTER      297596.48                      373.99
T:31268     /B:001  OPTIONAL INS BAL      00.00  LATE CHARGE BAL   -456.32


042109 SR  040109     -218.00          .00           .00           .00
                    BAL AFTER      297596.48                      373.99
T:31268    I/B:001  OPTIONAL INS BAL      00.00  LATE CHARGE BAL   -456.32
042109 FE  040109       135.00 164 CORP ADV 3 DRM
  REF NUMBER    SG0QO9VGR350 DESC
T:31268     /B:001
042109 FE  040109        83.00 164 CORP ADV 3 DRM
                    SG0QO9VGR350
T:31268     /B:001


    INQ23694
```

```
HISTORY FOR ACCOUNT    ████8433                    PAGE      3
                                                   DATE 05/01/12


        --------- MAIL -------------------- --------- PROPERTY ----------------

    FELIX O ABU

    P O BOX 231171                      6999 ROMANZO WAY

    SACRAMENTO          CA 95823-0000 ELK GROVE        CA 95758-0000

--------------------------------------------------------------------------
  POST   TRN  DUE    TRANSACTION    PRINCIPAL     INTEREST       ESCROW
  DATE   CDE  DATE     AMOUNT         PAID          PAID          PAID
------ --- ------ --------------- ------------- ------------- -------------
061709 FB  040109         11.25  11 PROP INSPECTION FEE
T:32506      /B:001
072809 FB  040109         11.25  11 PROP INSPECTION FEE
T:32506      /B:001
082109 FB  040109         83.00 164 CORP ADV 3 DRM
  REF NUMBER    SG0RN0G9Q7B0 DESC
T:02726      /B:000


090309 UI  040109            .00           .00           .00           .00
                   BAL AFTER       297596.48                        373.99
                 OPT PREMIUMS              .00  LATE CHARGE PYMT  -304.36*
T:13318      /B:000  OPTIONAL INS BAL     00.00  LATE CHARGE BAL   -760.68
090309 AA  040109            .00           .00           .00           .00
                   BAL AFTER       297596.48                        373.99
                 OPT PREMIUMS              .00  LATE CHARGE PYMT  -304.36*
T:13318      /B:000  OPTIONAL INS BAL     00.00  LATE CHARGE BAL   -760.68


093009 RPL 093009   PAID  1455.26 DUE  1455.26 SHORT      .00 TELLER 31143
                   BAL AFTER       297596.48                        373.99
                   OPTIONAL INS BAL     00.00  LATE CHARGE BAL   -760.68
093009 RPL 093009   NO. OF PLAN PMTS=01
                   BAL AFTER       297596.48                        373.99
                   OPTIONAL INS BAL     00.00  LATE CHARGE BAL   -760.68
093009 GRU 000000 000000 GRACE UNAP AMT:       .00
  REF NUMBER    EM-866502289 DESC
093009 RP  050109        1455.26        598.71        669.59        186.96
                   BAL AFTER       296997.77                        560.95
T:31143      I/B:003  OPTIONAL INS BAL     00.00  LATE CHARGE BAL   -760.68
T:04058      /B:001


    INQ23694
```

```
HISTORY FOR ACCOUNT     ████8433                    PAGE      4
                                                    DATE 05/01/12


        --------- MAIL -------------------- --------- PROPERTY ----------------

        FELIX O ABU

        P O BOX 231171                    6999 ROMANZO WAY

        SACRAMENTO       CA 95823-0000 ELK GROVE      CA 95758-0000

     -----------------------------------------------------------------------
     POST  TRN  DUE    TRANSACTION    PRINCIPAL     INTEREST      ESCROW
     DATE  CDE  DATE     AMOUNT         PAID          PAID         PAID
     -----  ---  -----  --------------  -------------  -------------  -------------
     100609 FB  050109         63.24  40 EXPENSE ADVANCES
     T:32551      /B:000
     100609 FB  050109        300.00  40 EXPENSE ADVANCES
     T:32551      /B:000
     100609 FB  050109         36.00  40 EXPENSE ADVANCES
     T:32551      /B:000
     100609 FB  050109        600.00  40 EXPENSE ADVANCES
     T:32551      /B:000

     110209 RPL 103009    PAID  1455.26 DUE  1455.26 SHORT      .00 TELLER 19996
                          BAL AFTER          296997.77                   560.95
                                                  00.00                  -760.68
     110209 RPL 103009    NO. OF PLAN PMTS=01
                          BAL AFTER          296997.77                   560.95
                                                  00.00                  -760.68
     110209 GRU 000000 000000 GRACE UNAP AMT:         .00
     110209 RP  060109        1455.26        600.06       668.24        186.96
       LC DATE  103009 BAL AFTER          296397.71                     747.91
     T:19996     I/B:002  OPTIONAL INS BAL        00.00  LATE CHARGE BAL   -760.68
     111109 E90 060109       -1180.44  PAYEE = 0034.00000        .00     -1180.44
                          BAL AFTER          296397.71                   -432.53
     T:32687     /B:001  OPTIONAL INS BAL        00.00  LATE CHARGE BAL   -760.68
     113009 RPL 113009    PAID  1455.26 DUE  1455.26 SHORT      .00 TELLER 19344
                          BAL AFTER          296397.71                   -432.53
                          OPTIONAL INS BAL        00.00  LATE CHARGE BAL   -760.68
     113009 RPL 113009    NO. OF PLAN PMTS=01
                          BAL AFTER          296397.71                   -432.53
                          OPTIONAL INS BAL        00.00  LATE CHARGE BAL   -760.68
     113009 GRU 000000 000000 GRACE UNAP AMT:        .00
       REF NUMBER    EM-248501128 DESC
     113009 RP  070109        1455.26        601.41       666.89        186.96
       LC DATE  112909 BAL AFTER          295796.30                   -245.57
     T:19344     I/B:006  OPTIONAL INS BAL        00.00  LATE CHARGE BAL   -760.68
     123009 UFU 070109    UNAPPLIED FUNDS (1)         1455.26  BALANCE     1455.26
       REF NUMBER    SG0SO0N8U2UV DESC
                          BAL AFTER          295796.30                   -245.57
     T:00411     /B:001  OPTIONAL INS BAL        00.00  LATE CHARGE BAL   -760.68

        INQ23694
```

HISTORY FOR ACCOUNT ████8433                      PAGE      5
                                                  DATE 05/01/12


--------- MAIL -------------------- --------- PROPERTY ----------------

FELIX O ABU

P O BOX 231171                    6999 ROMANZO WAY

SACRAMENTO         CA 95823-0000 ELK GROVE          CA 95758-0000

------------------------------------------------------------------------
POST   TRN  DUE      TRANSACTION    PRINCIPAL     INTEREST     ESCROW
DATE   CDE  DATE     AMOUNT         PAID          PAID         PAID
------ ---  ------   --------------- ------------- ------------- --------------
123009 SRA 070109          1455.26          .00           .00         .00
                    BAL AFTER          295796.30                   -245.57
T:00411    P/B:001 OPTIONAL INS BAL      00.00 LATE CHARGE BAL   -760.68
123109 RPL 123009   PAID 1455.26 DUE  1455.26 SHORT      .00 TELLER 17759
                    BAL AFTER          295796.30                   -245.57
                    OPTIONAL INS BAL      00.00 LATE CHARGE BAL   -760.68
123109 RPL 123009   NO. OF PLAN PMTS=01
                    BAL AFTER          295796.30                   -245.57
                    OPTIONAL INS BAL      00.00 LATE CHARGE BAL   -760.68
123109 GRU 000000 000000 GRACE UNAP AMT:      .00
  REF NUMBER    AUTOPOST    DESC
123109 RP  080109          1455.26        602.76        665.54      186.96
  LC DATE  123009 BAL AFTER     295193.54                    -58.61
T:17759    I/B:002 OPTIONAL INS BAL      00.00 LATE CHARGE BAL   -760.68
123109 UFU 080109   UNAPPLIED FUNDS (1)        -1455.26  BALANCE      0.00
            AUTOPOST
                    BAL AFTER          295193.54                    -58.61
T:17759    /B:002 OPTIONAL INS BAL      00.00 LATE CHARGE BAL   -760.68
123109 SR0 080109         -1455.26          .00           .00         .00
                    BAL AFTER          295193.54                    -58.61
T:17759    I/B:002 OPTIONAL INS BAL      00.00 LATE CHARGE BAL   -760.68
123109 EI  080109             4.76          .00           .00        4.76
                    BAL AFTER          295193.54                    -53.85
T:32046    /B:001 OPTIONAL INS BAL      00.00 LATE CHARGE BAL   -760.68
020910 AA  080109              .00          .00           .00         .00
                    BAL AFTER          295193.54                    -53.85
T:13318    /B:000 OPTIONAL INS BAL      00.00 LATE CHARGE BAL   -760.68
020910 AA  080109              .00          .00           .00         .00
                    BAL AFTER          295193.54                    -53.85
T:13318    /B:000 OPTIONAL INS BAL      00.00 LATE CHARGE BAL   -760.68
022210 FB  080109            11.25  11 PROP INSPECTION FEE
T:32506    /B:001
022410 FB  080109            83.00 164 CORP ADV 3 DRM
  REF NUMBER    SG0T68V39UTG DESC
T:02726    /B:000


  INQ23694

```
HISTORY FOR ACCOUNT      ████8433                    PAGE      6
                                                     DATE 05/01/12


         --------- MAIL -------------------- --------- PROPERTY ----------------

         FELIX O ABU

         P O BOX 231171                      6999 ROMANZO WAY

         SACRAMENTO        CA 95823-0000 ELK GROVE          CA 95758-0000

    -------------------------------------------------------------------------
    POST  TRN  DUE    TRANSACTION      PRINCIPAL     INTEREST      ESCROW
    DATE  CDE  DATE     AMOUNT           PAID          PAID         PAID
    ------ --- ------ --------------- ------------- ------------- -------------
    030210 E20 080109     -566.13  PAYEE = 1600.00966     .00      -566.13
                       BAL AFTER         295193.54                  -619.98
    T:32022     /B:001  OPTIONAL INS BAL     00.00  LATE CHARGE BAL   -760.68
    030910 FB  080109       73.71  40 EXPENSE ADVANCES
    T:32551     /B:000
    030910 FB  080109      350.00  40 EXPENSE ADVANCES
    T:32551     /B:000


    030910 FB  080109      350.00  40 EXPENSE ADVANCES
    T:32551     /B:000
    030910 FB  080109       20.00  40 EXPENSE ADVANCES
    T:32551     /B:000
    030910 FB  080109      120.00  40 EXPENSE ADVANCES
    T:32551     /B:000
    031010 E90 080109    -1180.44  PAYEE = 0034.00000     .00     -1180.44
                       BAL AFTER         295193.54                 -1800.42
    T:32687     /B:001  OPTIONAL INS BAL     00.00  LATE CHARGE BAL   -760.68
    032610 FB  080109       11.25  11 PROP INSPECTION FEE
    T:32506     /B:001
    040910 AA  080109         .00          .00          .00          .00
                       BAL AFTER         295193.54                 -1800.42
    T:20055     /B:000                      00.00                   -760.68
    040910 AA  080109         .00          .00          .00          .00
                       BAL AFTER         295193.54                 -1800.42
    T:20055     /B:000                      00.00                   -760.68


    043010 FB  080109       11.25  11 PROP INSPECTION FEE
    T:32506     /B:001
    050710 UI  080109         .00          .00          .00          .00
                       BAL AFTER         295193.54                 -1800.42
                       OPT PREMIUMS         .00  LATE CHARGE PYMT  -304.36*
    T:26485     /B:000  OPTIONAL INS BAL     00.00  LATE CHARGE BAL  -1065.04
    050710 AA  080109         .00          .00          .00          .00
                       BAL AFTER         295193.54                 -1800.42
                       OPT PREMIUMS         .00  LATE CHARGE PYMT  -304.36*
    T:26485     /B:000  OPTIONAL INS BAL     00.00  LATE CHARGE BAL  -1065.04

        INQ23694
```

```
HISTORY FOR ACCOUNT  ████ 8433                    PAGE      7
                                                  DATE 05/01/12


        -------- MAIL -------------------- -------- PROPERTY ----------------

    FELIX O ABU

    P O BOX 231171                      6999 ROMANZO WAY

    SACRAMENTO          CA 95823-0000 ELK GROVE          CA 95758-0000

    ----------------------------------------------------------------------
    POST  TRN  DUE    TRANSACTION     PRINCIPAL       INTEREST        ESCROW
    DATE  CDE  DATE    AMOUNT          PAID            PAID            PAID
    ------ --- ------ --------------- ------------- -------------- --------------
    051910 FB  080109        110.00 164 CORP ADV 3 DRM
    T:26663      /B:000
    060710 UI  080109          .00          .00            .00            .00
                    BAL AFTER          295193.54                    -1800.42
                    OPT PREMIUMS           .00 LATE CHARGE PYMT      304.36*
    T:26485      /B:000  OPTIONAL INS BAL    00.00 LATE CHARGE BAL   -760.68
    060710 AA  080109          .00          .00            .00            .00
                    BAL AFTER          295193.54                    -1800.42
                    OPT PREMIUMS           .00 LATE CHARGE PYMT      304.36*
    T:26485      /B:000  OPTIONAL INS BAL    00.00 LATE CHARGE BAL   -760.68
    060710 AA  080109          .00          .00            .00            .00
                    BAL AFTER          295193.54                    -1800.42
    T:26485      /B:000  OPTIONAL INS BAL    00.00 LATE CHARGE BAL   -760.68
    060710 AA  080109          .00          .00            .00            .00
                    BAL AFTER          295193.54                    -1800.42
    T:26485      /B:000  OPTIONAL INS BAL    00.00 LATE CHARGE BAL   -760.68
    061010 FB  080109         11.25  11 PROP INSPECTION FEE
    T:32506      /B:001

    071510 FB  080109         11.25  11 PROP INSPECTION FEE
    T:32506      /B:001
    081610 FB  080109         11.25  11 PROP INSPECTION FEE
    T:32506      /B:001
    091310 FB  080109         11.25  11 PROP INSPECTION FEE
    T:32506      /B:001
    092510 FB  080109        150.00 164 CORP ADV 3 DRM
      REF NUMBER     SG0URRK9I0RO DESC
    T:26663      /B:000
    102810 FB  080109         11.25  11 PROP INSPECTION FEE
    T:32506      /B:001
    113010 FB  080109         11.25  11 PROP INSPECTION FEE
    T:32506      /B:001
    123110 FB  080109         11.25  11 PROP INSPECTION FEE
    T:32506      /B:001
    020211 FB  080109         11.25  11 PROP INSPECTION FEE
    T:32506      /B:001


    INQ23694
```

HISTORY FOR ACCOUNT    ████8433                          PAGE      8
                                                         DATE 05/01/12


        --------- MAIL -------------------- --------- PROPERTY ----------------

        FELIX O ABU

        P O BOX 231171                      6999 ROMANZO WAY

        SACRAMENTO          CA 95823-0000 ELK GROVE        CA 95758-0000

------------------------------------------------------------------------
POST  TRN  DUE   TRANSACTION      PRINCIPAL      INTEREST       ESCROW
DATE  CDE  DATE  AMOUNT           PAID           PAID           PAID
------ --- ------ --------------- ------------- ------------- -------------
030111 FB  080109         11.25  11 PROP INSPECTION FEE
T:32506      /B:001
030111 E20 080109       -566.13  PAYEE = 1600.00966        .00      -566.13
              BAL AFTER          295193.54                        -2366.55
T:32022      /B:001                        00.00                    -760.68
030311 FB  080109        110.00 164 CORP ADV 3 DRM
   REF NUMBER     SG1043QAFGA8 DESC
T:02773      /B:000

032911 FB  080109         11.25  11 PROP INSPECTION FEE
T:32506      /B:001
042611 FB  080109         11.25  11 PROP INSPECTION FEE
T:32506      /B:001
052411 FB  080109         11.25  11 PROP INSPECTION FEE
T:32506      /B:001
062711 FB  080109         11.25  11 PROP INSPECTION FEE
T:32506      /B:001

071111 FB  080109         83.00 164 CORP ADV 3 DRM
   REF NUMBER     SG11404IOVR8 DESC
T:02775      /B:000
071411 FB  080109        110.00 164 CORP ADV 3 DRM
              SG115FI4CP98
T:02773      /B:000
081511 FB  080109         11.25  11 PROP INSPECTION FEE
T:32506      /B:001

082311 FB  080109         11.25  11 PROP INSPECTION FEE
T:32506      /B:001
092711 FB  080109         11.25  11 PROP INSPECTION FEE
T:32506      /B:001
102411 FB  080109         11.25  11 PROP INSPECTION FEE
T:32506      /B:001
102811 FB  080109         58.88  40 EXPENSE ADVANCES
T:32551      /B:000


    INQ23694

HISTORY FOR ACCOUNT ▓▓▓8433                          PAGE      9
                                                     DATE 05/01/12


        --------- MAIL -------------------- --------- PROPERTY ----------------

     FELIX O ABU

     P O BOX 231171                    6999 ROMANZO WAY

     SACRAMENTO         CA 95823-0000 ELK GROVE         CA 95758-0000

--------------------------------------------------------------------------
 POST  TRN  DUE    TRANSACTION    PRINCIPAL      INTEREST        ESCROW
 DATE  CDE  DATE   AMOUNT         PAID           PAID            PAID
------ --- ------ --------------- ------------- ------------- -------------
102811 FB  080109        388.75  40 EXPENSE ADVANCES
T:32551      /B:000
102811 FB  080109         18.00  40 EXPENSE ADVANCES
T:32551      /B:000
102811 FB  080109        120.00  40 EXPENSE ADVANCES
T:32551      /B:000
111911 FB  080109         83.00 164 CORP ADV 3 DRM
  REF NUMBER      SG125Q2I980G DESC
T:02775      /B:000
112111 FB  080109         11.25  11 PROP INSPECTION FEE
T:32506      /B:001
010512 AA  080109          .00           .00            .00             .00
             BAL AFTER       295193.54                          -2366.55
T:12303      /B:000 OPTIONAL INS BAL      00.00 LATE CHARGE BAL   -760.68
010512 AA  080109          .00           .00            .00             .00
             BAL AFTER       295193.54                          -2366.55
T:12303      /B:000 OPTIONAL INS BAL      00.00 LATE CHARGE BAL   -760.68

011012 FB  080109         13.00  11 PROP INSPECTION FEE
T:32506      /B:001
012512 FB  080109       3384.28  40 EXPENSE ADVANCES
  REF NUMBER      SG12MQDOMCEO DESC
T:19086      /B:000
012512 E23 080109       -238.00  PAYEE = 1600.00350        .00        -238.00
             BAL AFTER       295193.54                          -2604.55
T:32022      /B:001 OPTIONAL INS BAL      00.00 LATE CHARGE BAL   -760.68

020312 FB  080109         10.00  40 EXPENSE ADVANCES
T:32551      /B:000
022112 E23 080109       -135.00  PAYEE = 1600.00350        .00        -135.00
             BAL AFTER       295193.54                          -2739.55
T:32022      /B:001 OPTIONAL INS BAL      00.00 LATE CHARGE BAL   -760.68
022212 FB  080109        721.85  40 EXPENSE ADVANCES
T:32551      /B:000


     INQ23694

```
HISTORY FOR ACCOUNT     ████8433                      PAGE    10
                                                       DATE 05/01/12


        --------- MAIL -------------------- -------- PROPERTY ----------------

        FELIX O ABU

        P O BOX 231171                   6999 ROMANZO WAY

        SACRAMENTO          CA 95823-0000 ELK GROVE        CA 95758-0000

--------------------------------------------------------------------------
POST  TRN  DUE    TRANSACTION      PRINCIPAL       INTEREST       ESCROW
DATE  CDE  DATE    AMOUNT           PAID            PAID           PAID
------ --- ----- --------------- -------------- -------------- --------------
030712 FB  080109      1292.03  40 EXPENSE ADVANCES
   REF NUMBER    SG131DF7O4MG DESC
T:04043      /B:000
030712 FB  080109      1174.57  40 EXPENSE ADVANCES
               SG131DI9IU80
T:04043      /B:000
032112 FE  080109        63.24  40 EXPENSE ADVANCES
   REF NUMBER    50373460    DESC
   LC DATE  032012
T:04058      /B:001
032112 FE  080109       300.00  40 EXPENSE ADVANCES
   REF NUMBER    50373460    DESC
   LC DATE  032012
T:04058      /B:001
032112 FE  080109        36.00  40 EXPENSE ADVANCES
               50373460
   LC DATE  032012
T:04058      /B:001


032112 FE  080109       600.00  40 EXPENSE ADVANCES
   REF NUMBER    50373460    DESC
   LC DATE  032012
T:04058      /B:001
032112 FE  080109        73.71  40 EXPENSE ADVANCES
               50373460
   LC DATE  032012
T:04058      /B:001


032112 FE  080109       219.08  40 EXPENSE ADVANCES
   REF NUMBER    50373460    DESC
   LC DATE  032012
T:04058      /B:001
032112 E23 080109      -135.00  PAYEE = 1600.00350       .00        -135.00
               BAL AFTER       295193.54                          -2874.55
T:32022      /B:001                         00.00                   -760.68



     INQ23694
```

```
HISTORY FOR ACCOUNT     ████8433                          PAGE     11
                                                          DATE 05/01/12


        --------- MAIL -------------------- --------- PROPERTY ----------------

        FELIX O ABU

        P O BOX 231171                      6999 ROMANZO WAY

        SACRAMENTO          CA 95823-0000 ELK GROVE          CA 95758-0000

--------------------------------------------------------------------------
 POST  TRN  DUE    TRANSACTION      PRINCIPAL      INTEREST       ESCROW
 DATE  CDE  DATE    AMOUNT            PAID           PAID          PAID
------ --- ------ --------------- -------------- -------------- --------------
032912 FB  080109       176.72  40 EXPENSE ADVANCES
T:32551       /B:000
042312 E23 080109      -135.00  PAYEE = 1600.00350        .00       -135.00
                   BAL AFTER        295193.54                      -3009.55
T:32022       /B:001                   00.00                        -760.68




 END OF HISTORY

     INQ23694
```

## **Burgin Claim**

**(Claim No. 4494)**

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number:
*RESIDENTIAL CAPITAL, LLC        12-12020 (MG)*

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
*DENNIS G. BURGIN + MARCENE L. BURGIN*

Name and address where notices should be sent:
*DENNIS BURGIN
8759 QUAIL VALLEY DR.
REDDING, CA 96002*

Telephone number: *530-223-6114*    email: *primedesign@clearwire.net*

Name and address where payment should be sent (if different from above):
*SAME*

Telephone number:    email:

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
(If known)

Filed on:_____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ *350,000.00*

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** *PLEASE SEE ATTACHED EXPLANATION*
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:** *2869*

**3a. Debtor may have scheduled account as:**
_____
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):**
_____
(See instruction #3b)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

**Value of Property:** $_____ **Annual Interest Rate**_____% ☐ Fixed ☐ Variable
(when case was filed)

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim,**

if any: $_____    Basis for perfection: _____

**Amount of Secured Claim:** $_____    **Amount Unsecured:** $ *350,000.00*

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____    (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are *redacted* copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and *redacted* copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature: (See instruction #9)** Check the appropriate box.

☒ I am the creditor.  ☐ I am the creditor's authorized agent.
(Attach copy of power of attorney, if any.)

☐ I am the trustee, or the debtor, or their authorized agent.
(See Bankruptcy Rule 3004.)

☐ I am a guarantor, surety, indorser, or other codebtor.
(See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: *DENNIS BURGIN/MARCENE BURGIN*    *Marcene L. Burgin 11/8/12*
Title: *OWNERS*    *Dennis G Burgin 11/8/12*
Company: _____    (Signature)    (Date)
Address and telephone number (if different from notice address above):
*SAME*

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**RECEIVED**

**NOV 13 2012**

KURTZMAN CARSON CONSULTANTS

COURT USE ONLY

Telephone number: *530-223-6114*    Email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years,

1212020121113000000000017

Residential Capital, LLC
Morrison & Foerster, LLP
1290 Avenue of the Americas
New York, New York 10104

This loan was originally a 30 year access HELOC loan with a credit line issued to the borrower (up to 90% of the home's value). The line of credit was basically used as a checking account with all income being deposited into the line of credit which lowered the principle on the loan. This was supposed to allow the loan to be paid off much faster by lowering the interest.  In 2007 when the loan was started, the house appraised at $570,000 so a line of credit was granted for $450,000.00. We were using the line of credit to fund some investments but when the property values began to decline GMAC froze the line of credit account thus tying up our funds and crippling our way of generating income. We have since been able to make the interest payments on the original loan amount but not able to make any headway on the original loan amount. The property value is now down in the $250,000.00 range which puts us way underwater. When this loan turns to a conventional loan in 5 years we see no way of making the payments.

**Although we do take responsibility for signing on the dotted line for this loan we do not think this loan product was presented to the borrowers in a completely ethical manor. I am not sure how many of these loans were sold by Residential Capital but I am sure we are not the only ones finding themselves in this situation.**

 If this loan could be adjusted in some way so we could continue to make reasonable payments to Residential Capital and start paying on the principal, it seems that it would be to Residential Capital's benefit over us going into foreclosure.

Thank you for your consideration,

Dennis G. Burgin
Marcene L. Burgin

DATE:              **May 22, 2007**
BORROWER(S):       **DENNIS G. BURGIN**
                   **MARCENE L. BURGIN**
LOAN NUMBER:       ████**2435**
PROPERTY ADDRESS:  **8759 QUAIL VALLEY DRIVE, REDDING, CALIFORNIA 96002**

**NOTICE TO BORROWER: THIS DOCUMENT CONTAINS PROVISIONS FOR A VARIABLE INTEREST RATE.**

# HOME OWNER'S LINE OF CREDIT AGREEMENT AND INITIAL DISCLOSURE STATEMENT

This Home Owner's Line of Credit Agreement and Initial Disclosure Statement ("Agreement") governs my Home Equity Credit Line Account ("Account") with you.

The words "I," "me" and "my" refer to the Borrower signing this Agreement. If more than one Borrower signs this Agreement, the words "I," "me" and "my" refer to all who sign, separately and together. The words "you" and "your" refer to **Transcontinental Lending Group, Inc.**, and its successors and assigns.

## 1. LOANS: INTEREST ONLY PERIOD AND REPAYMENT PERIOD.

Subject to the limitations explained in this Agreement, upon my request for advances, you agree to lend money to me from time to time during the term of this Agreement up to the Credit Limits indicated in paragraph 4 below. (You will not make any advances if my Account is sooner terminated or suspended under paragraphs 10.B, 10.D, 11.B or 15.A below.) I understand that you will not make any advances before the earlier of the 10th business day following the signing of this Agreement or until I receive the checkbook for my Account.

The "Interest Only Period" will be 120 monthly billing cycles (approximately 120 months), commencing on the date of this Agreement. After the Interest Only Period ends, I must pay the outstanding balance over a 240-month period commencing at the end of the Interest Only Period (the "Repayment Period"), unless my Account is sooner terminated under paragraph 11.B below, in which case my Account may be due and payable in full at the time of such termination.

## 2. LOANS: REQUESTING ADVANCES.

After the earlier of the 10th business day following the signing of this Agreement or my receipt of the checkbook for my Account, you will make advances under this Agreement by (i) honoring checks that you provide me that directly access my Account requesting advances; (ii) honoring my written request in a form you approve to disburse monies to other accounts or to third parties; (iii) paying closing costs and **FINANCE CHARGES** in accordance with paragraph 7 below; (iv) paying certain other amounts on my behalf in accordance with my disbursement authorization provided to you at or before the time I sign this Agreement; (v) paying any unpaid taxes, assessments, property insurance or other sums as provided under this Agreement or the Deed of Trust; or (vi) any other method or procedure you establish. You may honor a request for an advance made by any person signing this Agreement as a Borrower.

## 3. PROMISE TO PAY; MINIMUM PAYMENT; METHOD OF PAYMENT.

A. I promise to pay to your order, when and as due, but not later than the end of the Repayment Period, without set-off or counterclaim, all advances made under this Agreement, plus all unpaid **FINANCE CHARGES**, insurance premiums, collection costs and other charges I owe to you now or in the future. Unless you and I otherwise agree in writing, I promise to make my payments of the Minimum Payment Due (defined below) in United States Dollars by pre-authorized electronic funds transfers from an account at a bank or financial institution acceptable to you. Such transfers shall be in amounts sufficient to pay my Minimum Payment Due by the applicable Payment Due Date (defined below). If I discontinue or reduce the amount of such electronic funds transfers so that such transfers are no longer sufficient to pay my Minimum Payment Due by the applicable Payment Due Date, then the Margin (defined below) and the Maximum APR (defined below) may be increased, as described in paragraph 5.D below. Payments of amounts in excess of the Minimum Payment Due may be made by any method of payment acceptable to you. You may refuse to credit to my Account payments made with advances under this Agreement.

B. I will pay my Minimum Payment Due monthly by the Payment Due Date shown on my periodic statement. You will send me periodic statements monthly, commencing in the first calendar month following the date my Account is opened. The periodic statement will show all activity on my Account during the billing cycle and contain other important information, including my "New Balance," my **ANNUAL PERCENTAGE RATE** (defined below), the amount of my "Minimum Payment Due," the date my "Payment Must Be Received By" (the "Payment Due Date"), my "Total Credit Line" (defined below as my "Credit Limit") and any amount past due (any "Amount Past Due").

C. I may pay all or any part, in excess of my Minimum Payment Due, of my Account balance at any time subject to an Early Termination Fee if required by paragraph 7.D below. Because periodic **FINANCE CHARGES** will accrue on my Account balance until it is fully repaid, payment of the "New Balance" shown on my periodic statement will not fully repay my Account balance. If I want to include those **FINANCE CHARGES** with the payment of the "New Balance" shown on my most recent periodic statement, I will contact Lender at the address indicated in paragraph 17.L or such other address as

Lender may designate by written notice to me as provided in paragraph 17.L., for details concerning the amount I must include.

D. Unless you terminate my Account and require immediate payment of the entire outstanding balance as provided in paragraph 11.B below, I must pay you at least the Minimum Payment Due for each billing cycle by the Payment Due Date.

E. During the Interest Only Period, my "Minimum Payment Due" for my Account equals all overdrafts, unpaid **FINANCE CHARGES** and other charges imposed during the billing cycle together with any "Amount Past Due" shown on my most recent periodic statement for my Account. My Minimum Payment Due during the Interest Only Period will not reduce the principal balance that is outstanding on my Account.

F. During the Repayment Period, my "Minimum Payment Due" for my Account equals for each Payment Due Date, any "Amount Past Due" shown on my most recent periodic statement plus the amount, if any, by which the outstanding principal balance at the end of the applicable billing cycle exceeds my Credit Limit for my Account for such billing cycle, plus finance and other charges accrued or imposed on my Account during such billing cycle. During the Repayment Period, my Minimum Payment Due may not reduce the principal balance that is outstanding on my Account, depending upon how much of my Credit Limit is available for advances.

G. You will apply payments I make to amounts due under this Agreement and/or the Deed of Trust (defined below) in any order you choose.

H. If upon the crediting of a payment to my Account, my Account would have a credit balance, you may, to the extent permitted by law, in your discretion:

(a) refuse to accept that payment and refund it to me;

(b) credit that payment to my Account and refund to me the amount by which my Account has a credit balance; or

(c) credit that payment to my Account and leave my Account with a credit balance.

Except as required by law, no interest will be payable to me on any credit balance.

## 4. CREDIT LIMIT.

During the Interest Only Period, my "Credit Limit" under this Agreement is

| $ 456,000.00 for my Account. |
|---|

During the Repayment Period, my "Credit Limit" under this Agreement is for each billing cycle, an amount equal to the Credit Limit as of the expiration of the Interest Only Period multiplied by the number of billing cycles remaining in the term of this Agreement (including the billing cycle for which my Credit Limit is being calculated) and divided by 240.

I promise not to request an advance that would cause the unpaid principal balance of any Account to exceed my Credit Limit. You can refuse to make advances that cause my obligations under this Agreement to exceed my Credit Limit. You will make advances on my Account to the extent my Credit Limit exceeds the sum of any principal balance, any Amount Past Due, all accrued and unpaid **FINANCE CHARGES** and other charges imposed during the billing cycle. In addition to each Minimum Payment Due, I must pay immediately, without notice or demand from you, any part of the principal balance of my Account that exceeds my Credit Limit.

## 5. ANNUAL PERCENTAGE RATE.

A. The initial Daily Periodic Rate is 0.021287% and the corresponding **ANNUAL PERCENTAGE RATE** (the "Initial APR") is 7.770%. The initial Daily Periodic Rate and corresponding **ANNUAL PERCENTAGE RATE** will remain in effect until the end of the first billing cycle. After the first billing cycle, my Daily Periodic Rate (and corresponding **ANNUAL PERCENTAGE RATE**) may increase or decrease. My Daily Periodic Rate will equal the sum of a margin (the "Margin") (defined below) and the Index (defined below), divided by 365. If the Daily Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** increase, I will have to pay additional periodic **FINANCE CHARGES**, and, as a result, my Minimum Payment Due will increase.

B. After the first billing cycle, my **ANNUAL PERCENTAGE RATE** and Daily Periodic Rate may increase or decrease. My **ANNUAL PERCENTAGE RATE** will be calculated by adding the applicable Margin (which may be negative) to the Index.

☒ If this box is checked, the applicable Index for my Account is the one month LIBOR rate as published in the "Money Rates" table of *The Wall Street Journal*, rounded to three decimal places (the "LIBOR rate") on the first business day of the month during the billing cycle to which such rate is to apply. The "Margin" is equal to the number of percentage points disclosed in paragraph 5.C below. Each billing cycle will (i) begin on the first calendar day of the month, and (ii) end on the last day of each calendar month in each billing day term of this Agreement, subject however, to (iii) if the last day of any calendar month is a Saturday or a Sunday or a federal holiday then the last day of the applicable billing cycle will be the last business day of the month. For example, if the last day of any calendar month is a Saturday or Sunday or a federal holiday then those days will be carried over to the following billing cycle, and such billing cycle will commence on the relevant Saturday or Sunday or federal holiday and the new Index value shall be effective as of the first day of the billing cycle in which such new Index value occurs.

## Jackson Claim

**(Claim No.4664)**

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Claim #4664    Date Filed: 11/13/2012

**Name of Debtor and Case Number:** Residential Capital, LLC, Case No. 12-12020

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

**James Jackson**

Name and address where notices should be sent:

c/o Jessica Tovrov
Goodman Law Offices
105 West Madison St.
Suite 1500
Chicago IL 60602

Telephone number: 312.252.7362          email: jessica@tovrovlaw.com

Name and address where payment should be sent (if different from above):

Telephone number:                              email:

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
*(If known)*

Filed on:_____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ *unknown*

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** debtor holds mortgage on property sold to creditor fraudulently or negligently (see attached complaint)
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:**
___ ___ ___ ___

**3a. Debtor may have scheduled account as:**
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):**
(See instruction #3b)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe:

**Value of Property:** $_____  **Annual Interest Rate**_____% ☐ Fixed ☐ Variable
(when case was filed)

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim,**

if any: $_____          **Basis for perfection:** _____

**Amount of Secured Claim:** $_____     **Amount Unsecured:** $_____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____ (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature:** (See instruction #9) Check the appropriate box.
☐ I am the creditor.  ■ I am the creditor's authorized agent.
(Attach copy of power of attorney, if any.)

☐ I am the trustee, or the debtor, or their authorized agent.
(See Bankruptcy Rule 3004.)

☐ I am a guarantor, surety, indorser, or other codebtor.
(See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Jessica Tovrov                                          November 9, 2012
Title: attorney
Company: Goodman Law Offices          (Signature)          (Date)
Address and telephone number (if different from notice address above):

Telephone number: 312.252.7362          Email: jessica@tovrovlaw.com

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**RECEIVED**

NOV 1 3 2012

KURTZMAN CARSON CONSULTANTS
COURT USE ONLY

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

FIRM ID #36443

FILED

**CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, LAW DIVISION** PM 3:07

WINIFRED COLLINS-LEE,           )
RASHEEDA L. FISHER, AND JAMES   )
JACKSON,                        )
                                )
        Plaintiffs,             )
                                )
v.                              )        Case No. 11 L 8162
                                )
FOREIT PROPERTIES, LLC AND      )
MARK FOREIT                     )
                                )
        Defendants.             )

## FOURTH AMENDED COMPLAINT

Plaintiffs Winifred Collins-Lee, Rasheeda L. Fisher and James Jackson, by and through

their attorneys, Goodman Law Offices LLC, for their complaint against Foreit Properties, LLC

("Foreit") and Mark Foreit ("Mark) state and allege as follows:

### Facts Common to All Counts

1.      This matter arises out of the development of a condominium building and sale

of condominiums located at 5936-5948 South King Drive, Chicago, Illinois, commonly

referred to as the Courtyard on the Park Condominiums (the "Building").

2.      Beginning sometime prior to December 31, 2004, Foreit was the developer of

the Building.

3.      Presently and at all times referred to herein, Mark is and was a Foreit manager.

4.      Sometime prior to December 31, 2004, Foreit reconfigured and renovated the

Building, including modifying the Building's lower levels from spaces not designed as living

quarters into garden apartments (the "Garden Units").

1



EXHIBIT

A

5.      The Garden Units are partially below ground and the front door of each Garden Unit faces the Building's open courtyard.

6.      On or about January 10, 2005, Foreit sold one of the Garden Units, specifically the unit located at 5940 S. King Drive, Unit 1W ("One West") to James Jackson.  (Copy of Deed attached as Exhibit 1.)

7.      At some point prior to September 11, 2006, Foreit sold one of the Garden Units, specifically the unit located at 5948 S. Martin Luther King Drive Unit 1 ("One") to Claire Okula.

8.      On or about September 13, 2006, the Garden Units flooded during a rainfall.

9.      Drainage from the Building's gutters collected and rainwater fell into the courtyard, and flowed into unit One, unit One West and the Garden Unit located at 5944 S. Martin Luther King Dr. Unit 1E ("One East").

10.     Rainwater from the gutters located in the rear of the Building drained into unit One, unit One West and unit One East through the units' doors.

11.     Many of Jackson's personal belongings were damaged or destroyed as a result of this flooding.

12.     Many of Okula's personal belongings were damaged or destroyed as a result of this flooding.

13.     Following the flooding, Foreit, through its agents and representatives, including Mark, promised Jackson that the water damage would be properly repaired and that the Building would be reconfigured to ensure that Garden Units would not flood again.

14.     In reliance upon these promises, Jackson continued to live in unit One West, did not investigate or attempt to remediate the cause of the flooding, and did not take other action to compel Foreit to do so or seek other remedies against Defendants.

15.     At some point after September 11, 2006 but before June 14, 2007, Defendants installed a sump pump at the Building in such a way that it would not prevent the Garden Units from flooding again in the same manner as in the September 11, 2006 flood.

16.     At some point after September 11, 2006 but before June 14, 2007, Foreit purchased unit One back from Okula.

17.     On or about June 14, 2007, Foreit resold unit One to Winifred Collins-Lee ("Lee").  (Copy of Purchase Agreement attached as Exhibit 2.)

18.     Prior to the sale, Foreit, through its agents and representatives, including Mark, told Lee that unit One was brand new and had not been previously owned or occupied.

19.     Defendants did not disclose to Lee that the unit had previously been owned and occupied by Okula or that Foreit had purchased unit One back from Okula after the unit flooded.

20.     Prior to the sale, Foreit, through its agents and representatives, including Mark, informed Lee that unit One had experienced water infiltration caused by a backup of the city storm drain system that caused water to infiltrate unit One from underneath the unit's back door, that the city had corrected the problem and that Defendants had installed a sump pump to prevent this occurrence from happening again.  (Copy of Residential Real Property Disclosure Report attached as Exhibit 3.)

21.     At the time of this representation, Defendants knew or should have known that back-up of a city storm drain was not the sole cause of the flooding.

3

22.    At the time of this representation, Defendants knew or should have known that the sump pump was not properly installed, was installed without a permit and would not prevent the Garden Units from flooding again in the same manner as in the September 13, 2006 flood.

23.    At the time of this representation, Defendants knew or should have known that the cause of the flooding was latent defects in the design, construction and management of the reconfiguration of the Building's lower level into residential condominiums, which caused the Building's drain water to drain into units One, One West and One East.

24.    Defendants did not disclose to Lee that the Garden Units, including unit One, had had substantial flooding.

25.    Defendants did not disclose to Lee that the Garden Units, including unit One, had experienced flooding due to latent defects in the design, construction and management of the reconfiguration and renovation of the Building's lower level into residential condominiums.

26.    Defendants did not disclose to Lee that Defendants did not properly install a sump pump or that the sump pump installed would not prevent flooding from happening again.

27.    In reliance upon these representations and omissions, Lee purchased unit One from Foreit.

28.    On or about October 8, 2007, Foreit sold unit One East to Rasheeda Fisher. (Copy of Deed attached as Exhibit 4.)

29.    Prior to the sale, Foreit, through its agents and representatives, including Mark, informed Fisher that unit One East had experienced water infiltration caused by a backup of

4

the city storm drain system that caused water to infiltrate unit One East from underneath the unit's back door, that the city had corrected the problem and that Defendants had installed a sump pump to prevent this occurrence from happening again.  (Copy of Residential Real Property Disclosure Report attached as Exhibit 5.)

30.     At the time of this representation, Defendants knew or should have known that back-up of a city storm drain was not the sole cause of the flooding.

31.     At the time of this representation, Defendants knew or should have known that the sump pump was not properly installed, was installed without a permit and would not prevent the Garden Units from flooding again in the same manner as in the September 13, 2006 flood.

32.     At the time of this representation, Defendants knew or should have known that the cause of the flooding was latent defects in the design, construction and management of the reconfiguration of the Building's lower level into residential condominiums, which caused the Building's drain water to drain into units One, One West and One East.

33.     Defendants did not disclose to Fisher that the Garden Units, including unit One East, had had substantial flooding.

34.     Defendants did not disclose to Fisher that the Garden Units, including unit One East, had experienced flooding due to latent defects in the design, construction and management of the reconfiguration and renovation of the Building's lower level into residential condominiums.

35.     Defendants did not disclose to Fisher that Defendants did not properly install a sump pump or that the sump pump installed would not prevent flooding from happening again.

5

36.     In reliance upon these representations and omissions, Fisher purchased unit One East from Foreit.

37.     On or about August 11, 2008, units One, One West and One East all flooded in the same manner as in the September 13, 2006 flood.

38.     On or about July 13, 2010, units One, One West and One East all flooded again in the same manner.

39.     On or about July 24, 2011, units One, One West and One East all flooded again in the same manner.

40.     At some point following the August 11, 2008 flood, units One, One West and One East became infested with mold.

41.     On or about October 5, 2010, the Defendants were ordered by the City of Chicago Department of Buildings to remove the sump pump they had installed.  (Copy of City of Chicago Department of Buildings citation instructing Defendants to remove sump pump and other outdoor plumbing attached as Exhibit 6.)

42.     On or about April 8, 2011, the Building was inspected by a private inspection company that determined that the cause of flooding was latent defects in the design, construction and management of the reconfiguration of the Building's lower level into residential condominiums, which caused the Building's drain water to drain into units One, One West and One East.  (Copy of inspection report attached as Exhibit 7.)

43.     As a result of the August 11, 2008, July 13, 2010 and July 24, 2011 flooding and of the mold infestation, many of Jackson's, Lee's and Fisher's personal belongings were damaged or destroyed; units One, One West and One East were damaged and lost value;

Plaintiffs suffered emotional distress and Lee suffered severe physical injuries requiring significant past and ongoing medical treatment.

### Count I – Negligence
### Jackson v. Foreit

44.     Jackson re-allege paragraphs 1-43.

45.     Jackson brings Count I against Foreit.

46.     Sometime prior to December 31, 2004, Foreit reconfigured and renovated the Building, including modifying the Building's lower levels from spaces not designed as living quarters into garden apartments.

47.     The Garden Units are partially below ground and the front door of each Garden Unit faces the Building's open courtyard.

48.     On or about January 10, 2005, Foreit sold one of the Garden Units, specifically the unit One West, to Jackson.

49.     As developer of the Building and the Garden Units, Foreit had a duty to Jackson to properly design and manage the construction of the reconfiguration of the Building's lower levels into garden unit condominiums, including a duty to design and manage the reconfiguration of the Building in such a way that would not cause the Garden Units, including Jackson's unit, to experience flooding in the manner described herein.

50.     As developer of the Building and the Garden Units and due to its promises and affirmative undertakings described herein, Foreit had a duty to properly repair and manage the repairs to Jackson's units following the flooding.

51.     As developer of the Building and the Garden Units and due to its statements and affirmative undertakings described herein, Foreit had a duty to investigate the source of the

flooding and correctly reconfigure the Building as necessary to prevent the Garden Units, including Jackson's unit from flooding in the manner described herein.

52.     Foreit breached its duties by designing, managing the design, modifying and supervising the modification of the Building improperly, in such a way that caused the Garden Units, including Jackson's unit, to experience flooding in the manner described herein.

53.     Foreit breached its duties by failing to repair and manage the repairs to clean and dry Jackson's units following the flooding.

54.     Foreit breached its duties by failing to investigate the source of the September 13, 2006 flooding or to correctly reconfigure the Building as necessary to prevent the Garden Unit, including Jackson's unit, from subsequent flooding in the manner described herein (as it did on August 11, 2008, July 23, 2010, and July 24, 2011).

55.     Foreit breached its duties by failing to correct the condition of the Building to prevent additional flooding to Jackson's unit.

56.     As a direct and proximate result of one or more of the aforesaid breaches, Jackson's condominium unit was damaged, his personal belongings were damaged or destroyed and the value of his condominium greatly reduced.

57.     As a direct and proximate result of one or more of the aforesaid breaches Jackson suffered real and compensatory damages.

WHEREFORE, Plaintiff, James Jackson, requests judgment against Foreit Properties, LLC and in his behalf, in excess of $50,000 as shall represent fair and just compensation.

### Count II – Negligence
### Lee v. Foreit

58.     Lee re-allege paragraphs 1-43.

59.     Lee brings Count II against Foreit.

8

60.    Sometime prior to December 31, 2004, Foreit reconfigured and renovated the Building, including modifying the Building's Garden Units.

61.    The Garden Units are partially below ground and the front door of each Garden Unit faces the Building's open courtyard.

62.    On or about June 14, 2006, Foreit sold unit One to Lee.

63.    As developer of the Building and the Garden Units, Foreit had a duty to Lee to properly design and manage the construction of the reconfiguration of the Building's lower levels into garden unit condominiums, including a duty to design and manage the reconfiguration of the Building in such a way that would not cause the Garden Units, including Lee's unit, to experience flooding in the manner described herein (flooding on August 11, 2008, July 13, 2010, and July 24, 2011).

64.    Foreit breached its duties by designing, managing the design, modifying and supervising the modification of the Building improperly, in such a way that caused the Garden Units, including Lee's unit, to experience flooding in the manner described herein.

65.    As a direct and proximate result of one or more of the aforesaid breaches, Lee's condominium unit became infested with toxic mold.

66.    As a direct and proximate result of one or more of the aforesaid breaches, Lee's condominium units was damaged, her personal belongings were damaged or destroyed and the value of his condominium unit is greatly reduced.

67.    As a direct and proximate result of one or more of the aforesaid breaches Lee suffered real and compensatory damages including damage to his personal property, decreased value of her condominium, and mental anguish.

9

68.    As a direct and proximate result of one or more of the aforesaid breaches, Plaintiff Lee suffered severe physical injuries, required significant medical treatment, and will require ongoing medical treatment.

WHEREFORE, Plaintiff Lee requests judgment against Foreit and in her behalf, in excess of $50,000 as shall represent fair and just compensation.

### Count III Negligence
### Fisher v. Foreit

69.    Fisher re-allege paragraphs 1-43.

70.    Fisher brings Count III against Foreit.

71.    Sometime prior to December 31, 2004, Foreit reconfigured and renovated the Building, including modifying the Building's Garden Units.

72.    The Garden Units are partially below ground and the front door of each Garden Unit faces the Building's open courtyard.

73.    On or about October 8, 2007, Foreit sold unit One East to Fisher.

74.    As developer of the Building and the Garden Units, Foreit had a duty to Fisher to properly design and manage the construction of the reconfiguration of the Building's lower levels into garden unit condominiums, including a duty to design and manage the reconfiguration of the Building in such a way that would not cause the Garden Units, including Fisher's unit, to experience flooding in the manner described herein (flooding on August 11, 2008, July 13, 2010, and July 24, 2011).

75.    Foreit breached its duties by designing, managing the design, modifying and supervising the modification of the Building improperly, in such a way that caused the Garden Units, including Fisher's unit, to experience flooding in the manner described herein.

76.    As a direct and proximate result of one or more of the aforesaid breaches, Fisher's condominium unit became infested with toxic mold.

77.    As a direct and proximate result of one or more of the aforesaid breaches, Fisher's condominium units was damaged, her personal belongings were damaged or destroyed and the value of his condominium unit is greatly reduced.

78.    As a direct and proximate result of one or more of the aforesaid breaches Fisher suffered real and compensatory damages including damage to his personal property, decreased value of her condominium, and mental anguish.

WHEREFORE, Plaintiff Fisher requests judgment against Foreit and in her behalf, in excess of $50,000 as shall represent fair and just compensation.

### Count IV – Breach of Implied Warranty of Workmanship
### Jackson v. Foreit

79.    Jackson re-alleges paragraphs 1-43.

80.    Jackson brings Count IV against Foreit.

81.    In developing and reconfiguring the Building to include the Garden Units, Foreit impliedly warranted to perform the work in a reasonably workmanlike manner.

82.    In agreeing to repair Jackson's units and modify his unit and the Building to prevent future flooding, Foreit impliedly warranted to perform the work in a reasonably workmanlike manner.

83.    The development and reconfiguration of the Building and Jackson's unit were not performed in a reasonable workmanlike manner.

84.    Repairs to Jackson's unit were not performed in a reasonably workmanlike manner.

85.    Repairs to and reconfiguration of Jackson's units and the Building to prevent additional flooding were not performed in a reasonably workmanlike manner.

86.    As a result of Foreit's breaches of the implied warranty Jackson suffered pecuniary damages and the loss of value of the Property.

WHEREFORE, Jackson requests judgment against Foreit Properties, LLC and in her behalf, in excess of $50,000 as shall represent fair and just compensation.

### Count V – Fraud
**Lee and Fisher v. Foreit and Mark**

87.    Lee and Fisher re-allege paragraphs 1-43.

88.    Lee and Fisher bring Count III against Foreit and Mark.

89.    During Lee's and Fisher's respective purchases of their Garden Units, Foreit, through its agents and representatives, including Mark, made the following misrepresentations:

   a.    failed to disclose at any time the latent defects described above;

   b.    failed to disclose to Lee and Fisher the extent to which the Garden Units they purchased had previously flooded;

   c.    incorrectly informed Lee and Fisher that the defect that had caused water to infiltrate the units had been corrected;

   d.    stated in writing to Lee and Fisher that "water infiltration" into the units had been caused by a backup of the city storm drain, that the city had corrected the problem and that Defendants had installed a sump pump to prevent future flooding;

   e.    told Lee that unit One was brand new and had never been lived in.

90.    At the time Defendants made these statements they knew or should have known:

   a.    that back-up of a city storm drain was not the sole cause of the flooding;

b.  that the sump pump was not properly installed, was installed without a permit and would not prevent the Garden Units from flooding again in the same manner as in the September 11, 2006 flood;

c.  that the cause of flooding in the Garden Units was latent defects in the design, construction and management of the reconfiguration of the Building's lower level into residential condominiums, which caused the Building's drain water to drain into units One, One West and One East.

d.  that unit One had previously been owned and occupied by Okula and that Foreit had purchased unit One back from Okula after the unit flooded.

91.    All of the misrepresentations and omissions were made with the intention of inducing Lee and Fisher to purchase Garden Units.

92.    Lee and Fisher relied on the misrepresentations listed above in deciding to purchase Garden Units.

93.    As a result, Lee and Fisher have each suffered pecuniary damages, emotional distress and the loss of value of the Property and Lee suffered personal injury.

WHEREFORE, Plaintiffs, Winifred Collins-Lee and Rasheeda L. Fisher, each request judgment against Foreit Properties, LLC and Mark Foreit and in their behalf in excess of $50,000 as shall represent fair and just compensation.

## Count VI – Consumer Fraud Act
### Lee and Fisher v. Foreit and Mark

94.    Plaintiffs re-allege paragraphs 1-43.

95.    Plaintiffs Lee and Fisher bring Count IV against Foreit and Mark.

96.    During the purchase of their Garden Units, Defendants made the following misrepresentations to Lee and Fisher:

a.  failed to disclose at any time the latent defects described above;

b.  failed to disclose to Lee and Fisher the extent to which the Garden Units they purchased had previously flooded;

13

   c.  provided false statements to Lee and Fisher that the defect that had caused water to infiltrate the units had been corrected;

   d.  stated in writing to Lee and Fisher that the "water infiltration" had been caused by a back-up of the city storm drain, that the city had corrected the problem and that Defendants had installed a sump pump to prevent future flooding;

   e.  provided false statements to Lee that unit One was brand new and had never been lived in.

97.    All of the misrepresentations were made with the intention of inducing Lee and Fisher to purchase Garden Units.

98.    Lee and Fisher relied on the misrepresentations listed above in deciding to purchase Garden Units.

99.    At the time Defendants made these statements they knew or should have known:

   a.  that the flooding was not solely the result of a backup of a city storm drain;

   b.  that the sump pump was not properly installed, was installed without a permit and would not prevent future flooding;

100.    As a result, Lee and Fisher have each suffered pecuniary damages, emotional distress and the loss of value of the Property, and Lee suffered personal injury.

WHEREFORE, Plaintiffs, Winifred Collins-Lee and Rasheeda L. Fisher, each request judgment against Foreit Properties, LLC., and Mark Foreit and in their behalf in excess of $50,000 as shall represent fair and just compensation, plus attorneys' fees, exemplary damages and court costs.

14

Respectfully submitted,

By: _____
One of the attorneys for Plaintiffs, Winifred
Collins-Lee, Rasheeda L. Fisher and James
Jackson

Gabriel P. Hardy
Adam Goodman
Jessica Tovrov
Wesley Johnson
Alexis Hawker
GOODMAN LAW OFFICES LLC
105 West Madison Street, Suite 1500
Chicago, IL 60602
(312) 752-4756
Fax: (312)264-2535
gabe@thehardylawoffices.com

## CERTIFICATE OF SERVICE

I, Gabriel Hardy, an attorney, hereby certify that a copy of the attached Fourth Amended Complaint was served on November 6, 2012 via U.S. mail upon the following:

Jaffe & Berlin, L.L.C.
111 W. Washington, Suite 900
Chicago, Illinois 60602
*Counsel for Foreit Properties, LLC*

Gabriel Hardy

Record & Return To:

GMAC Mortgage, LLC
Attention: Loss Mitigation
3451 Hammond Avenue
Waterloo, IA 50702

─────────────────────[Space Above This Line For Recorder's Use]─────────────────────

# FIXED RATE LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement ("Agreement") made this December 9, 2009 ("Effective Date") between JAMES C JACKSON           ("Borrower") and GMAC Mortgage, LLC ("Lender"), amends and supplements that certain promissory note ("Note") dated January 10, 2005 in the original principal sum of One Hundred Thirty Five Thousand Eight Hundred Sixty Dollars and No Cents ($ 135,860.00)executed by Borrower except that since Borrower has received a chapter 7 bankruptcy discharge, this Agreement will not create personal liability under the Note.. The Note is secured by a Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), dated the same date as the Note, and if applicable, recorded on  with Instrument Number  in Book and/or Page Number  of the real property records of COOK County, IL. Said Security Instrument covers the real and personal property described in such Security Instrument (the "Property") located at 5940 SOUTH KING DRIVE #1W   CHICAGO IL 60637, which real property is more particularly described as follows:

**(Legal Description – Attach as Exhibit if Recording Agreement)**

Borrower acknowledges that Lender is the legal holder and the owner of the Note and Security Instrument and further acknowledges that if Lender transfers the Note, as amended by this Agreement, the transferee shall be the "Lender" as defined in this Agreement.

Borrower has requested, and Lender has agreed, to extend or rearrange the time and manner of payment of the Note and to extend and carry forward the lien(s) on the Property whether or not created by the Security Instrument.

Borrower understands that Borrower is not personally obligated to repay the mortgage loan and that [GMAC Mortgage, LLC] is not attempting to collect any debt from Borrower.  Signing this Agreement will not make Borrower personally liable for the mortgage loan.  Borrower understands that [GMAC Mortgage, LLC] will continue to retain its lien on the Property, along with all rights to enforce such lien against the Property.  Whether Borrower chooses to make voluntary payments in the amount of the original monthly payment as set forth in the Note or the modified monthly payments as set forth in this Agreement, such payments will reduce the amount of the lien.

Now, therefore, in consideration of the mutual promises and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. Borrower acknowledges that as of the Effective Date, the amount payable under the Note and secured by the Security Instrument (the "Principal Balance") is One Hundred Thirty  Thousand Six Hundred Fifty Four Dollars and Seventy Cents S  130,654.70.

**EXHIBIT**

B

Blumberg No. 5119

2. Interest will be charged on the unpaid Principal Balance until the full amount of principal has been paid. Borrower will pay interest at the rate of 3.25000% per year from the Effective Date.

3. Borrower promises to make monthly principal and interest payments of $ 635.32, beginning on January 9, 2010, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. If on January 9, 2035 (the "Maturity Date"), amounts remain due under the Note and Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower will make such payments at 3451 Hammond Avenue, Waterloo, IA 50702 or at such other place as Lender may require. The amounts indicated in this paragraph do not include any required escrow payments for items such as hazard insurance or property taxes; if such escrow payments are required the monthly payments will be higher and may change as the amounts required for escrow items change.

4. If Lender has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, Borrower will pay a late charge to Lender. The amount of the charge will be the late charge percentage provided for in the Note multiplied by the overdue payment of principal and interest required under this Agreement. Borrower will pay this late charge promptly but only once on each late payment. The late charge is not in lieu of any other remedy of Lender, including any default remedy.

5. It is the intention of the parties that all liens and security interests described in the Security Instrument are hereby renewed and extended (if the Maturity Date of the original Note has been changed) until the indebtedness evidenced by the Note and this Agreement has been fully paid. Lender and Borrower acknowledge and agree that such renewal, amendment, modification, rearrangement or extension (if applicable) shall in no manner affect or impair the Note or liens and security interests securing same, the purpose of this Agreement being simply to modify, amend rearrange or extend (if applicable) the time and the manner of payment of the Note and indebtedness evidenced thereby, and to carry forward all liens and security interests securing the Note, which are expressly acknowledged by Borrower to be valid and subsisting, and in full force and effect so as to fully secure the payment of the Note.

6. If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law. If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower. For purposes of this paragraph, "interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is transfer of title by Borrower at a future date to a purchaser.

7. As amended hereby, the provisions of the Note and Security Instrument shall continue in full force and effect, except that since Borrower has received a chapter 7 bankruptcy discharge, this Agreement will not create personal liability under the Note. In the event of any inconsistency between this Agreement and the terms of the Note and Security Instrument, this Agreement shall govern. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement, including but not limited to, in the case of the Borrower, the obligation to pay items such as taxes, insurance premiums or escrow items, as applicable. Any default by Borrower in the performance of its obligations herein contained shall constitute a default under the Note and Security Instrument, and shall allow Lender to exercise all of its remedies set forth in said Security Instrument. **Notwithstanding the foregoing, Lender cannot enforce the debt against Borrower personally and Lender's only remedy upon default is to enforce the lien against the Property.**

8. Lender does not, by its execution of this Agreement, waive any rights it may have against any person not a party hereto. This Agreement may be executed in multiple counterparts, each of which shall constitute an original instrument, but all of which shall constitute one and the same Agreement. EACH OF THE BORROWER AND THE LENDER ACKNOWLEDGE THAT NO REPRESENTATIONS, AGREEMENTS OR PROMISES WERE MADE BY THE OTHER PARTY OR ANY OF ITS REPRESENTATIVES OTHER THAN THOSE REPRESENTATIONS, AGREEMENTS OR PROMISES SPECIFICALLY CONTAINED HEREIN. THIS AGREEMENT, AND THE NOTE AND SECURITY INSTRUMENT (AS AMENDED HEREBY) SETS FORTH THE ENTIRE UNDERSTANDING BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

Executed effective as of the day and year first above written.

JAMES C JACKSON

**BORROWER ACKNOWLEDGMENT**

State of _Illinois_
County of _Cook_

On this _23rd_ day of _Nov 2009_, before me, the undersigned, a Notary Public in and for said county and state, personally appeared JAMES C JACKSON personally known to me or identified to my satisfaction to be the person(s) who executed the within instrument, and they duly acknowledged that said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

Notary Public

My Commission Expires: _5-9-2011_

"OFFICIAL SEAL"
CATRICE D. THOMAS
Notary Public, State of Illinois
My Commission Expires May 09, 2011

**Green Claim**

**(Claim No. 2578)**

Claim #2578    Date Filed: 11/6/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY **COURT FOR THE SOUTHERN DISTRICT OF NEW YORK** | PROOF OF CLAIM |
|---|---|

| Name of Debtor: | Case Number: |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

**FLOYD GREEN**

Name and address where notices should be sent:              NameID: 10865617

**FLOYD GREEN
3 MISTLTOE LANE
NEWNAN, GA 30265**

☐ Check this box if this claim amends a previously filed claim.

**Court Claim
Number:_____**
*(If known)*

Filed on:_____

Telephone number: 770-253-1950              email: flgreen2@hotmail.com

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Name and address where payment should be sent (if different from above):

Telephone number:              email:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

1. Amount of Claim as of Date Case Filed: $ 428,677.08

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☑ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: Mortgage note
(See instruction #2)

| 3. Last four digits of any number by which creditor identifies debtor: 3644 | 3a. Debtor may have scheduled account as: Carrington Mortgage (See instruction #3a) | 3b. Uniform Claim Identifier (optional): (See instruction #3b) |
|---|---|---|

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☑Real Estate ☐Motor Vehicle ☐Other

Describe:

Value of Property: $ 116,000    Annual Interest Rate 8.503 %  ☑Fixed ☐Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim,

if any: $_____    Basis for perfection: _____

Amount of Secured Claim: $_____    Amount Unsecured: $_____

6. Claim Pursuant to 11 U.S.C. § 503(b)(9).
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____ (See instruction #6)

7. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**Priority categories:**

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

9. Signature: (See instruction #9) Check the appropriate box.
☑ I am the creditor.    ☐ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)    ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)    ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Floyd Green
Title:
Company:              (Signature) Floyd Green    (Date) 11/1/2012
Address and telephone number (if different from notice address above):

Telephone number:              Email:

**RECEIVED
NOV 06 2012**

**KURTZMAN CARSON CONSULTANTS**
COURT USE ONLY

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

# FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT   Exhibit 2
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Loan Number: ████ 8026                                    Date: JULY 2, 2008
Creditor: RESIDENTIAL FINANCE CORP
Address: 401 N. FRONT STREET, SUITE 300, COLUMBUS, OHIO 43215

Borrower(s): FLOYD GREEN

Address: 3 MISTLETOE LN, NEWNAN, GEORGIA 30265

Lines containing an "x" are applicable:

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. | ☐ Total Sale Price<br>The total cost of your purchase on credit including your down-payment of $ |
|---|---|---|---|---|
| 8.503 % | $271,540.48 | $157,136.60 | $428,677.08 | $ |

PAYMENTS: Your payment schedule will be:

| Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning | | | Monthly Beginning | | | Monthly Beginning |
| 12 | 1,225.17 | 09/01/08 | 12 | 1,212.69 | 09/01/20 | | | |
| 12 | 1,224.49 | 09/01/09 | 12 | 1,211.07 | 09/01/21 | | | |
| 12 | 1,223.77 | 09/01/10 | 12 | 1,209.32 | 09/01/22 | | | |
| 12 | 1,222.97 | 09/01/11 | 12 | 1,207.44 | 09/01/23 | | | |
| 12 | 1,222.16 | 09/01/12 | 11 | 1,205.42 | 09/01/24 | | | |
| 12 | 1,221.25 | 09/01/13 | 156 | 1,156.71 | 08/01/25 | | | |
| 12 | 1,220.28 | 09/01/14 | 1 | 1,154.30 | 08/01/38 | | | |
| 12 | 1,219.24 | 09/01/15 | | | | | | |
| 12 | 1,218.12 | 09/01/16 | | | | | | |
| 12 | 1,216.91 | 09/01/17 | | | | | | |
| 12 | 1,215.60 | 09/01/18 | | | | | | |
| 12 | 1,214.20 | 09/01/19 | | | | | | |

_____ **DEMAND FEATURE:** This obligation has a demand feature.

_____ **VARIABLE RATE FEATURE:** Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

**INSURANCE:** The following insurance is required to obtain credit:
_____ Credit life insurance and credit disability   __X__ Property Insurance  _____ Flood Insurance   __X__ Mortgage Insurance
You may obtain property insurance from any insurer that is acceptable to the Lender.
**SECURITY:** You are giving a security interest in: 3 MISTLETOE LN, NEWNAN, GEORGIA 30265
_____ The goods or property being purchased   __X__ Real property you already own.
**FILING FEES:** $ 558.43
**LATE CHARGE:** If payment is more than _____ 15 _____ days late, you will be charged _____ 4.000 __ % of the payment.
**PREPAYMENT:** If you pay off early, you
_____ may   __X__ will not   have to pay a penalty.
__X__ may  _____ will not   be entitled to a refund of part of the finance charge.
**ASSUMPTION:** Someone buying your property
_____ may  _____ may, subject to conditions  _____ may not   assume the remainder of your loan on the original terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.
__X__ "e" means an estimate   __X__ all dates and numerical disclosures except the late payment disclosures are estimates.

Each of the undersigned acknowledge receipt of a complete copy of this disclosure.  The disclosure does not constitute a contract or a commitment to lend.

Lender: RESIDENTIAL FINANCE CORP, AN OHIO CORPORATION

☐ This Good Faith Estimate is being provided by

a mortgage broker, and no lender has yet been obtained.

Re: FLOYD GREEN
3 MISTLETOE LN
NEWNAN, GEORGIA 30265

Date: JULY 2, 2008
Loan Number: 0806028026

## GOOD FAITH ESTIMATE OF SETTLEMENT CHARGES

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates - the actual charges may be more or less. Your transaction may not involve a fee for every item listed.

The numbers listed in the left hand column generally correspond to the numbered lines contained on the HUD-1 or HUD-1A settlement statement which you will be receiving at settlement. The HUD-1 or HUD-1A settlement statement will show you the actual cost for items paid at settlement.

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property.

| Ref HUD-1 Statement | ITEMIZATION OF AMOUNT FINANCED | | |
|---|---|---|---|
| | • Amount given to you directly | $ | -$3,111.83 |
| | • Amount paid on your account | | |
| 1001 | Insurance Reserves | | |
| 1004 | Tax Reserves | | |
| | Other Reserves | | |
| 1009 | Aggregate Adjustment | | |
| | • Amount paid to others on your behalf: | | |
| 803 | Appraisal Fee  to: Other | 500.00 | (500.00 POC/B) |
| 804 | Credit Reporting Fee | | |
| 903 | Hazard Insurance Premium | | |
| 809 | Document Preparation Fee | | |
| 1106 | Notary Fee | | |
| 1108 | Title Ins. Premium  to: MEYMAX TITLE AGENCY - GA | 569.00 | |
| 1201 | Recording Fee  to: Other | 56.00 | |
| | TITLE EXAM FEE to: Other | 375.00 | |
| | STATE TAX STAMPS to: GEORGIA - STATE TAX/STAMPS | 502.43 | |
| | TAX SEARCH to: Other | 25.00 | |
| | PAYOFF: SEE ATTACHED SCHEDULE | 158,721.00 | |
| | Loan Proceeds to: | | |
| | • AMOUNT FINANCED | $ | 157,136.60 |
| | • Prepaid Finance Charge | $ | 10,338.40 |
| | • Itemization of Prepaid Finance Charge: | • Loan Amount $ | 167,475.00 |
| 801 | Loan Origination Fee  to: RESIDENTIAL        $ | 1,650.00 | |
| 802 | Loan Discount Fee  to: RESIDENTIAL FINANCE | 3,349.50 | |
| 806 | Tax Service Fee | | |
| | Prepaid Interest ( 11        days) | | |
| 901 | @      7.375 % per annum | 377.40 | |
| 902 | Mtge. Ins. Premium | | |
| 1002 | Mtge. Ins. Reserves | 0.00 | |
| 808 | Origination Fee  to: RESIDENTIAL FINANCE | | |
| | PROCESSING FEE to: RESIDENTIAL FINANCE | 705.00 | |
| | UNDERWRITING FEE to: RESIDENTIAL FINANCE | 705.00 | |
| | DOC PREP - NATIONAL DOCUMENT GROUP to: | 245.00 | |
| | LENDER ADMINISTRATIVE FEE to: Other | 300.00 | |
| | GEORGIA LICENSING FEE to: Other | 6.50 | |
| | CLOSING FEE to: MEYMAX TITLE AGENCY - GA | 425.00 | |
| | COURIER FEE AND/OR COPY FEE to: Other | 100.00 | |
| | MIP (FINANCED) to: RESIDENTIAL FINANCE | 2,475.00 | |

total   10338.40

**This form does not cover all items you will be required to pay in cash at settlement, for example, deposits in escrow for real estate taxes and insurance may be different. You may wish to inquire as to the amounts of such other items. You may be required to pay other**

**VI. ASSETS AND LIABILITIES (cont'd)**

**Schedule of Real Estate Owned (If additional properties are owned, use continuation sheet.)**

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) ▼ | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| | | | | | | | |
| | | $ | $ | $ | $ | $ | $ |

**List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):**

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

| **VII. DETAILS OF TRANSACTION** | | **VIII. DECLARATIONS** | Borrower | | Co-Borrower | |
|---|---|---|---|---|---|---|
| a. Purchase price | $ | If you answer "Yes" to any questions a through i, please use continuation sheet for explanation. | Yes | No | Yes | No |
| b. Alterations, improvements, repairs | .00 | | | | | |
| c. Land (if acquired separately) | | a. Are there any outstanding judgments against you? | ☐ | ☒ | ☐ | ☐ |
| d. Refinance (incl. debts to be paid off) | 158,721.00 | b. Have you been declared bankrupt within the past 7 years? | ☐ | ☒ | ☐ | ☐ |
| e. Estimated prepaid items | 34.31 | c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | ☐ | ☒ | ☐ | ☐ |
| f. Estimated closing costs | 5,663.93 | d. Are you a party to a lawsuit? | ☐ | ☒ | ☐ | ☐ |
| g. PMI, MIP, Funding Fee | 2,475.00 | e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of titlein lieu of foreclosure, or judgment? | ☐ | ☒ | ☐ | ☐ |
| h. Discount (if Borrower will pay) | 3,349.50 | (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | | | |
| i. Total costs (add items a through h) | 170,243.74 | | | | | |
| j. Subordinate financing | .00 | f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? | ☐ | ☒ | ☐ | ☐ |
| k. Borrower's closing costs paid by Seller | .00 | If "Yes," give details as described in the preceding question. | | | | |
| l. Other Credits (explain) | | g. Are you obligated to pay alimony, child support, or separate maintenance? | ☐ | ☒ | ☐ | ☐ |
| | | h. Is any part of the down payment borrowed? | ☐ | ☒ | ☐ | ☐ |
| | | i. Are you a co-maker or endorser on a note? | ☐ | ☒ | ☐ | ☐ |
| | | j. Are you a U.S. citizen? | ☒ | ☐ | ☐ | ☐ |
| | | k. Are you a permanent resident alien? | ☐ | ☒ | ☐ | ☐ |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 165,000.00 | l. Do you intend to occupy the property as your primary residence? | ☒ | ☐ | ☒ | ☐ |
| | | If "Yes," complete question in below. | | | | |
| n. PMI, MIP, Funding Fee financed | 2,475.00 | m. Have you had an ownership interest in a property in the last three years? | ☒ | ☐ | | |
| o. Loan amount (add m & n) | 167,475.00 | (1) What type of property did you own - principal residence (PR), second home (SH), or investment property (IP)? | PR | | | |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | 2,768.74 | (2) How did you hold title to the home - solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | | | |

**IX. ACKNOWLEDGEMENT AND AGREEMENT**

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18 United States Code, Sec. 1001, et. seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors, and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors, or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

Acknowledgement. Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | | X | |

**X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES**

The following information is requested by the Federal Government for certain types of loans related to dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish this information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER ☐ I do not wish to furnish this information | CO-BORROWER ☐ I do not wish to furnish this information |
|---|---|
| Ethnicity: ☐ Hispanic or Latino ☐ Not Hispanic or Latino | Ethnicity: ☐ Hispanic or Latino ☐ Not Hispanic or Latino |

## McGuinty Claims

**(Claim Nos. 1963 & 5970)**

**<u>Claim No. 1963</u>**

Claim #1963  Date Filed: 10/29/2012

*Michael and Gloria McGuinty*

*Address line 18708 53rd Terrace East/ 4757 Rounrtree Brighton Mi 48116*

*Bradenton*

*Fl*

*34211*

Phone Number 941-752-6340

October 14, 2012

United States Bankruptcy Court          Case No 12-12020 (MG)
Southern District of New York             Chapter 11
In re:
RESIDENTIAL CAPITAL, LLC, et al;         Jointly Administered

Debtors

To Whom It May Concern

Subject **Destruction of the Michael McGuinty Family ( 4757 Roundtree Brighton Mi 48116)**

Dear Madam or Sir:

I am not a lawyer, I am a seventy-four old on Social Security Disability. In November 2006 my wife and I each established trusts for the purpose that our estates at a combined valued of 0ne million five hundred thousand would be protected. These assets would then pass to our four grandchildren to provide for their education and well being in the event of our demise . Their mother is deaf and as of today a single parent. In May 2010 forty two months later Gloria and me entered into Chapter 7 Bankruptcy. This RESULT was not caused by me my wife Gloria S McGuinty or our family. This abuse is the RESULT of foolish greed by those entrusted to protect our country, our economy and the welfare of it's citizens and to protect those who take out loans backed by our Federal Government (Gennie May and Freddie Mac).

If you have any interest in the above Tragedy you can read the attached pages and examine the attached photos.

**Again WE suffer this abuse with funds from the US Government.**

Sincerely,

Michael and Gloria McGuinty

INTRO TO IAA OF 27

**RECEIVED**

OCT 1 8 2012

KURTZMAN CARSON CONSULTANTS


1212020121018000000000038

. Mike McGuinty

8708  53rd Terrace East  4757 Roundtree Dr Brighton Mi 48116

Bradenton

Fl

34211

Phone Number 941-799-0439 /941-752-6340

August 5, 2012

C/O Consumers Financial Protection Bureau
    600 Pennsylvania Avenue
    Washington DC
    20580

Subject:  Destruction of the Michael McGuinty Family

Dear Madam or Sir:

From 1971 thru August 17,2006 I was a valued customer of GMAC and a General Motors
Salary Retiree (See Pages 9 of 27 -10 of 27). I continued to make my 13 mortgage
payments each year along with using my General Motors Credit Card Rewards  to pay
down my mortgage principal on my home at 4757 Roundtree brighton Michigan 34211
I continued making these payments thru May 30,2010 when I realized after a 39 year
working  relationship with GMAC I was no longer a VALUED CUSTOMER. GMAC WAS OUT
TO DESTROY ME, MY WIFE  GLORIA and OUR DEAF DAUGHTER PAMELA McGUINTY  A
SINGLE MOTHER WITH FOUR DAUGHTERS.

PLEASE  SEE ATTACHED DOCUMENTS AND PHOTOS

                                        Sincerely,

                                        Mike McGuinty

I A-OF-27

**Section 3:** *continued*

While traveling in Michigan the first week of July 2012 I discovered your website WWW. Indepent
Foreclosure review PH 1-888-952-9105. This information immediately recalled my living nightmare

of 2009. In 2009 I applied for President Obama's Hamp "Home Affordable Mortgage Program".
After several months of providing proof of my request I was denied the reason I had to much capital

wealth. During that 2009 time frame GMAC requested that I would provide GMAC with documents

that dated back to 2000 or ten years old. (See pg22 of 27) proof that I worked for General Motors, my 2000
retirement information and proof that I was disabled which I did (See pages 6-7-8). These strange

request also gave me concern since in 2006 documents GMAC Reports dated 08/17/2006 (See pages 9-10
of pg 27) Gloria and I were valued customers. We were offered a $158,303.00 cash out refinance

option (See Above pages 9-10 ). By this time suspicious of GMAC's actions and intent. I now kept a
daily log of all GMAC'S contacts and dates (See pg 23,24,25 and 26 of pg 27). After my 2009
GMAC modification denial Mark from GMAC told me to keep making my 13 payments along with
using my GMAC credit card rewards to reduce my mortgage principal
( Example if I spent $50,000.00 this reduced my mortgage by $500.00).
For me and Gloria to spend $50,000.00 on our credit card was no problem since our daughter
Pamela McGuinty is deaf a single mother with four daughters. I did as GMAC requested making my
13 payments each year and using my GMAC credit card rewards to reduce my mortgage balance.
In 2010 again I reapplied for the HAMP program and again after submitting hundreds of pages of proof
I was again denied this time " I did not have enough capital". My next move in 2010 was to apply to the
State of Michigan Governor Jennifer M.Grandhom "Michigan Hardest Hit Program" for mortgage relief
which we did. After attending 5 meetings the State of Michigan's findings GMAC was working to deplete
me of all my capital assets and then take both of my homes. In order to protect one home they suggested I
file Chapter 7 Bankruptcy which I did. I was able to acquire 27 pages of proof which I am including today.
I have saved all documents for the above three years which are in Florida and I will be driving to
Bradenton Florida on September 15,2012 if you need additional information just let me know.


I purchased the above home in 1998 for $331,000.00 with 20% down or $66200.00 plus closing cost
The original above mortgage was September 08,2003 was $273,500.00 (See Attachments A B C)
In 2009 the mortgage was approximately $225,000.00 payback of $48,500.00
In 1998 this house was abandoned for almost two years. I totally rebuilt this house the kitchen ceiling
was falling down from water damage,pluming leaked,golf balls had broken windows I had totally rebuild
this house worth thousands. PLEASE note inclosed photos

I E-OF-27



K. MOORE

# MIKE MCGUINTY

8708 53rd Terrace East
Bradenton Fl, 34211

January 11, 2011

Dear Ms Gina Bell

Thank you for taking an interest in my and Gloria's problem. I know this was written by lawyers I am not a lawyer; but will try and answer their questions and concerns as best I can.

**HAMP REQUIREMENT** Determine imminent default hardship; Long term or permanent disability or illness of borrower/co borrower or dependent family member.

MY Answer: I 2009 I wrote to GMAC'S employee Mark ID# 06544629422 QUOTE " I receive disability social security as a result of polio, heart murmur and have an injured left hand" Today I also suffer from spinal stenosis and I was treated on December 23,2010 at Lakewood Ranch Hospital by Dr Patrick J Contino M.D. Ph 941-907-0588 I take three different drugs to control my back pain.
( SEE ATTACHMENT 1 )

MY Answer: Federal US Government Claim Activities Questionnaire #000128300639 Federal 42CFT 45CFR completed my me. This document is a requirement for social security disability note it was signed by me February 7,2000 ( SEE ATTACHMENT 2 )

As a result of the above I did qualify for relief as early as February 2009.

GMAC claim was I did not have sufficient income for the program I told GMAC in the above letter I was using my Chase IRA and Gloria's trust to make my payments. GMAC's Mark told me phone call I had much capital to qualify. GMAC'S Mark ID# 06544629422 told me keep making my thirteen payments and use my FIA card rewards to reduce my Principal and reapply in 2010.

GMAC states the value of the property is $ 225,508.08 Question what is the value stated on the GMAC asset records is it the above number or is it higher. MY Question? who caused the property values to fall? In August 2006 GMAC wanted me to refinance my Florida home and give me a check for $158,303. I did not accept .My reason this was not a sound financial move. Why would any one want to give an individual a 30 year mortgage at almost 70yrs old to me it made no sense. This document ( SEE ATTACHMENT 3 ) shows how reckless the banks and mortgage companies were abusing and misused their authority. The result they destroyed the home values nation wide, The American Dream of owning your own home. We now enjoy the GREAT DEPRESSION that they created.

Attached also is a report by Michael Osinski "My Manhattan Project" this article explains how economy ,property values were destroyed with CMO (collateralized mortgage obligations) and DMO (collateralized debt obligations) ( SEE ATTACHMENT 4 )

Lindsey East in the letter dated December 16,2010 Question 4 "the GMAC goal is to assist borrowers in continuing to live in their home ."GMAC'S quote *"It is important to note that this residence does not appear to be owner occupies or the McGuinty's primary residence"*

1-OF-27

**K- MOORE**

MY Answer: Lindsey East YOU ARE 100% CORRECT EXECPT YOU LEFT OUT ONE IMPORTANT FACT I WAS FOR 72 YEARS 7 MONTHS and 6 DAYS until AUGUST 6 2010. UNTIL YOUR COMPANY Lindsey East DROVE ME OUT OF MICHIGAN I paid my Michigan homestead tax in Michigan from 1962 thru 2009. I did not homestead in Florida. Today January 11,2011 I pay Michigan income tax. My Michigan income tax for 2010 is $240.00.( SEE ATTACHMENT 5 ). LET ME EXPLAIN: I was a G M Salary employee for 30 years not protect by the GM union. When GM declared BANKRUPTCY. I lost almost everything. At one time my life insurance was $ 225,000 now it's $10,000, Lost My Medicare supplement $90.00 per month, Medical Gap Insurance, dental, vision, prescription drugs

IF I preceded Gloria in death my pension is reduced to her at just above $1000.00 and Gloria would loose her Social Security of $600.00 plus per month. I tried to sell my house for two years on my own. One person saw it and has leased it for one year. He required I move out in 10 days Gloria and I drove to Florida on July 22,2010. We gave all our Florida furniture to Raul G(United Lawn Service Ph 941-954-1018) he knew a lady who had nothing. We then flue back to Michigan on July 27,2010. Ten days later I paid Mayflower Movers $5600.00 to move us to Bradenton. Gloria and I had acquired many valuable items Painting, oriental rugs, German made Schimmell GRAND PIANO . If you would Google a Schimmell an Upright Schimmell sell for almost $10,000  We ended up donating most of our treasures to the Salvation Army and The German Schimmell went to "The Church Of The Incarnation in Sarasota Florida. We were forced to move from a 4000 Plus sq ft home to one just over 1500sq feet.

Gloria and I had to leave our daughter a single deaf mother with four children ages 5 thru 17 years of age.

We were forced to move in a community were we had few friends find new doctors, dentist, eye doctors I still required their services even thou I lost my GM benefits.

Lindsey East states that I did not meet the requirements of The Obama Administration Home Affordable Modification Program or the Michigan Hardest Hit Fund. Reason: As I stated above these institutions used Michael Osinski computer programs to destroy the housing market. Quote Michael Osinski " I wrote the software that turned mortgages into bonds"  Read The New York Magazine Titled "My Manhattan Project" March 29,2009. The Manhattan Project code name for the World War II Atom Bomb that destroyed Hiroshima and Nagasaki and wounded or killed thousands of innocent Japanese. Mr. Osinski believes his work is also guilty of destroying many American lives without firing shot or dropping a bomb. The only guilt I have is the belief in the American dream of owning a house and the theme that was preached. Your home is Your Biggest Asset.

In the two years of attempting to work with GMAC they always wanted one more piece of data one more question one more excuse. I would call GMAC and ask for help. I was shifted from one person to another. This left me with feeling of stone walling. The GMAC MOTTO don't call us we will contact you by mail. As a result of the above I made of a time table of contacts by id number ,day, month and year.
( SEE ATTACHMENT 6 )

In November 0f 2010 I wrote Jeffery Fieger with an explanation of my problem. I have enclosed an answer to my request. ( SEE ATTACHMENT 7 ). Mr. Fieger believes I have been abused If you could help me with finding a lawyer in Michigan that would really help.

In conclusion the above abuse by GM has caused great emotional stress and physical damage on me and Gloria at a time in our lives when it is hard to recover.

Sincerely
Michael A McGuinty

**Metro Community**
DEVELOPMENT

CC

**KAHLIA MOORE**
Housing Counselor

☎ 810.767.4622 ext. 29
🖷 810.767.4664
✉ kahliamoore@flint.org
www.metro-community.org

503 S. Saginaw St. Suite 604, Flint Michigan 48502

**2 - OF - 27**

ATTACHMENT #2



000128300639

Claimant: MICHAEL A MCGUINTY
SSN: ████3593    Examiner: Q -DAJ

K-MOORE

## CLAIMANT ACTIVITIES QUESTIONNAIRE

To understand what you are able to do and for how long, please answer the
following questions. Be very specific about what causes any limitations
you have. Use the reverse side if more space is needed.

1. **WALKING:** Does your condition affect your ability to walk?
   Yes ✓   No ____. If no, go to question 2. If yes:

   How far can you walk on a level surface without stopping?
   I HAVE A HEART CONDITION ALONG WITH MY POLIO. IF I DON'T WALK
   TO FAST ON A SMOOTH SURFACE ABOUT ONE CITY BLOCK

   How long does it take you to walk this far and why?

   APPROXIMATELY 10 MINUTES

   If you must rest or stop, explain why and for how long?
   I STOP AND REST IF I HAVE HEART PAIN

   What, if anything, prevents you from walking farther?
   AFTER WALKING A DISTANCE I TEND   TO DRAG MY LEFT LEG WHICH
   HAS CAUSED ME TO TRIP AND FALL WITH AGE HAS GOTTEN WORSE

   How long has your condition affected your ability to walk?

   MOST OF MY LIFE

2. **CLIMBING:** Does your condition affect your ability to climb stairs?
   Yes ✓   No ____. If no, go to question 3. If yes:

   How many stairs are you able to climb at a normal pace without resting?
   BECAUSE OF MY POLIO AND HEART CONDITION I WAS NEVER ABLE
   TO CLIMB AT A NORMAL PACE. ALONG WITH MES

   How long does it take for you to climb this far and why?

   SEE ABOVE

   If you must rest or stop, explain why and for how long?

   SEE ABOVE

   6-OF-27

   If this has changed, describe HOW it has gotten better or worse.

   WITH AGE IT HAS GOTTEN WORSE. I HAVE A TREADMILL LAST YEAR
   I COULD WORK OUT AT A COMFORTABLE 6.0 PACE TODAY I HAVE DIFFIC
   ACTY AT A 2.8 PACE MAX

DDS-408 (G) 09/99

Authority   Federal 42 CFR 424 CFR.   Commission: Voluntary
Consequence: Possible ineligibility of program benefits.
The Family Independence Agency will not discriminate against any individual or group because of race, sex,
religion, age, national origin, color, marital status, handicap, or political beliefs.

## ATTACHMENT #2

Claimant: **MICHAEL A MCGUINTY**
SSN: ██████-3593   Examiner: Q -DAJ

000126300639

3. **SHOPPING**   K-MOORE

Do you grocery shop? Yes X  No____ .  If yes, how do you get there?
If no, go to question 4.
I DRIVE MYSELF; MY WIFE DOES GROCERY SHOPPING

If you must rest while shopping, please explain why and for how long?


If you need help, please explain what kind and why:


If this has changed, describe HOW it has gotten better or worse.

WITH AGE IT HAS GOTTEN WORSE

4. **HOUSEHOLD DUTIES:**

Describe what kind of chores you do at home:
I LIVE IN A condo WHERE THEY cut my GRASS, SHOVEL
MY SNOW, And do my MAINTENANCE, I MOVED HERE FRI MY
HOME 18 MONTHS AGO,
How long does it take you to finish?_____ .  If you
must stop, how long before you can work again?_____
Does anyone help you with this work? Yes ____  No ____ .  If yes,  _____
explain what kind of help you get and why:


If this has changed, describe HOW it has gotten better or worse.


5. Do you have problems with any of the following?  Please explain.
Dressing: Yes X  No____
WEAKNESS ON MY LEFT SIDE
I MUST COMPENSATE FOR IT, I USE THE RIGHT
SIDE OF MY BODY

Bathing or showering:  Yes X  No____

Shaving, grooming:  Yes X  No____

Sleeping or eating:  Yes X  No____

DDS-408 (G)  09/99      7-OF-27

Authority.   Federal 45 CFR 42 CFR.   Completing: Voluntary.   The Family Independence Agency will not discriminate against any individual or group because of race, sex, religion, age, national origin, color, marital status, handicap or political belief.

APR-1-2009 17:09 FROM GLORIA

*ATTACHMENT #2*

Claimant: **MICHAEL A MCGUINTY**
SSN: ████-3593   Examiner: Q -DAJ

000128300639

6. Are you able to use public transportation? Yes ✓   No____.  If not,
   please explain why:

   K-MOORE

7. Have there been any changes in your recreational activities: YES

8. What other activities are included in your normal daily routine?
   MY HEART DOCTOR RECOMMENDED I RETIRE

9. Has your physician prescribed any medication? Yes ✗   No____.  If
   yes, please list all medication you take.  How much, how often?
   ZOCOR

10. Do you have any side effects from any medication you are currently
    taking?  Yes ✗   No____.  If yes, please describe.
    PAIN IN MY ARMS

11. Has your doctor(s) told you to limit your activities in any way?  If
    yes, please list limitations. Y. B. I USED TO RUN AND JOG
    SINCE THE EARLY EIGHTIES & HE HAS MADE ME CUT BACK
    TO WALKING.

    _____          810-229-4872          2-7-2000
    Signature                           Phone                  Date

DDS-408 (G)  09/99

8-OF-27

*ATTACHMENT #3*

*GMAC FLORIDA HOME*

*ATT MARK ACCOUNT # 29422*

*Michael/Gloria McGuinty*

# Your SmartWatch Report.

...matter what plans you have (or don't have) for your home, the information we've provided
is to help you make smart financing decisions.

## Your current loan information as of: 8/17/2006

Property: 8708 53rd Terrace East
Bradenton, FL 34202

*KMORE*

Loan #: ▮▮▮8630

Loan type: 30 Year Fixed Rate

Rate: 5.375%

Monthly payment: $620.45 (Principal and interest only)

Approximate principal balance[1]: $102,751.91

Remaining term: 324 months

Adjusted remaining term: 302 months
(After pre-paid principal or extra payments, for
example.)

Original appraised home value:
$225,000.00

Estimated current value[2]: $400,000.00

Total estimated equity[3]: $198,303.00

Home equity loan/line of credit balance(s): $98,945.

## Goal: Get cash now.

Do a "cash out" refinance with a new 30 Year
Fixed Rate mortgage and assuming a rate of 6.750%
(6.805% APR).[3]

Get up to $158,303 cash. If you choose the maximum
amount, your monthly payment (principal and interest)
would be about $1,693.

Do a "cash out" refinance with the same or
lower payment (principal and interest), with a new
30 Year Fixed Rate mortgage, and assuming a rate of
7.125% (7.185% APR).[3]

A 'cash-out' refinance, for the same payment you have
today, may not make sense for you now.  Please call us for
more information.

Get a home equity loan or line of credit.[4]

You already have a GMAC Mortgage home
equity line of credit with a line limit of $100,000. Use
your line of credit to pay for home improvements,
consolidate debts, pay for education and much more.

*Gloria Mcguinty
4757 Roundtree Drive
Brighton, MI 48116-5140*

## Goal: Lower your monthly payment.

Refinance your current balance with a 30 Year
Fixed Rate loan and assuming a rate of 6.750%
(6.805% APR).[3]

You're already in good shape , because your rate is
about the same as or better than today's rate.

Refinance and change to a 15 Year Fixed Rate
loan and assuming a rate of 6.500% (6.586% APR).[3]

No monthly savings. If you switched to a 15 Year Fixed
Rate mortgage, your monthly payment (principal and
interest) would actually go UP by about $275 per month.
You may achieve significant savings, however, over the life
of your loan. See G on the next page.

*9-OF-27*

SWCA00706

*ATTAchMENT #3*

*Michael/Gloria McGuinty*  *GMAC FLORIDA HOME*

## Goal: Save over the life of your loan.

*#ATT*
*MARK ACCOUNT #* ▓▓▓▓ *9Y22*

*K—MOORE*

| | |
|---|---|
| ⬤ Refinance your current balance with a 30 Year Fixed Rate and assuming a rate of 6.750% (6.805% APR).[3] | No long-term savings. You would actually pay $52,546 MORE than your current loan. You may, however, lower your monthly payment. See D on the previous page. |
| ⬤ Refinance and change to a 15 Year Fixed Rate loan and assuming a rate of 6.500% (6.586% APR).[3] | $26,262 life-of-loan savings. Your monthly payment (principal and interest) would be about $895. |
| ⬤ Get an Instant Decision on a GMAC Mortgage Equity Rewards Card, the MasterCard credit card that helps pay down your mortgage![3] | Every Purchase you make pays down your mortgage! For every $1 you charge to the card, you earn one point. Each time you earn 2,500 points, $25 will be applied to your GMAC Mortgage balance automatically on a quarterly basis. Call 1.800.821.8758 to apply now! |

## Goal: Buy your next home.

| | |
|---|---|
| ⬤ Available equity for down payment. The estimated amount you would have for a new home down payment from the sale of your existing home.[4] | $174,303. This figure represents 94% of your estimated equity, based on your loan balance and approximate home value less 6% Real Estate commission. |
| ⬤ You qualify for HomeCommand™, a guaranteed way to lock in the rate on the home you want and close on time.[7,8,9] | Receive a credit pre-approval decision, rate lock, and guaranteed closing date so you can shop without interest rate worries. Lock in your rate for up to 120 days while you shop for a new home. You'll get your initial lock-in rate or the rate in effect 10 days prior to closing, whichever is lower. If we don't meet your date, we'll give you $250. |
| ⬤ Real Estate Cash Back Offer. Advance registration is required and certain restrictions apply. Not available in all states. Call 1.877.531.4622 for more information or to register.[10] | Get $3 cash back per $1,000 of the sale price and/or purchase price of your home when you sell or buy through our affiliated nationwide network of real estate brokers. |

**Building a custom home or making renovations to your existing home?**
**GMAC Bank has the experience, resources, and construction financing options to support you from the ground up, every step of the way.** **Call your Construction Loan Consultant today at 1.888.691.4622.**

Gloria Mcguinty
4747 Randfare Drive
h MI 43115-5149

**Questions?** Just c

*10-0F-27*

967

**These examples are based on mortgage rates as of 8/17/2006**

22-OF-27

# GM SALARIED RETIREMENT PROGRAM



**Funding Breakdown**

Payment Type:                          Installment
Advice Number:                         00034868895
Advice Date:                           December 1, 2010

SALARIED RET PROGRAM
CONTRIBUTIONS
THE LEVEL BENEFIT

MICHAEL A MC GUINTY
Questions? Please call 1-800-489-4646

| Description | Current | Year to Date |
|---|---|---|
| GROSS PAYMENT | $2,191.10 | $26,293.20 |
| NON-TAXABLE | $24.08 | $288.96 |
| MI STATE TAX | $20.00 | $240.00 |

| Description | Current |
|---|---|
| TAXABLE | $2,167.02 |
| FED WITHHOLDING | $154.30 |
| NET PAYMENT | $2,012.71 |

ATTAChMENT #5

Michael/Gloria McGuire    ACCOUNT ▮▮▮▮9422
GMAC CONTACTS    4/24/2010

# March 2010

February 2010
S M T W T F S
1 2 3 4 5 6
7 8 9 10 11 12 13
14 15 16 17 18 19 20
21 22 23 24 25 26 27
28

April 2010
S M T W T F S
1 2 3
4 5 6 7 8 9 10
11 12 13 14 15 16 17
18 19 20 21 22 23 24
25 26 27 28 29 30

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 28  K-MOORE | 1  GMAC Sherina ID 1162 Ph-888-714-4622 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8  GMAC Matt Id-20257 Ph-888-7140622 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |

ATTACHMENT #6    23-OF-27

GMAC CONTACTS          4/24/2010

# July 2009

June 2009
S M T W T F S
1 2 3 4 5 6
7 8 9 10 11 12 13
14 15 16 17 18 19 20
21 22 23 24 25 26 27
28 29 30

August 2009
S M T W T F S
1
2 3 4 5 6 7 8
9 10 11 12 13 14 15
16 17 18 19 20 21 22
23 24 25 26 27 28 29
30 31

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 28 | 29 | 30 | 1 | 2 | 3 | 4 |
| K-MOORE | | | | | | |
| 5 | 6 GMAC Eddie Id 19516 Ph-866-783-6054 | 7 GMAC 1-800-783-6050 GMAC PN 215-734-5421 | 8 GMAC Friends PH 800-790-9250 Mark ID7703SE9 Ph-800753-4622 Keja ID 7703S26 Ph-888-521-4622 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 GMAC Veronica 8651043 Ph888-714-4622 Renata Ph-888714-4622 Mike Cavanaugh Refinance Walter JeyID 897806 Saveta ID 31734 |
| 26 | 27 | 28 | 29 | 30 | 31 | 1 |

ATTACHMENT #6          24-OF- 27

Michael / Gloria McGuire
GMAC Contacts Account ███ 9422
4/24/2010

# February 2010

January 2010
S M T W T F S
1 2
3 4 5 6 7 8 9
10 11 12 13 14 15 16
17 18 19 20 21 22 23
24 25 26 27 28 29 30
31

March 2010
S M T W T F S
1 2 3 4 5 6
7 8 9 10 11 12 13
14 15 16 17 18 19 20
21 22 23 24 25 26 27
28 29 30 31

K-Moore

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 GMAC Candy PH- 888-714-4622 | 17 | 18 GMAC Felicia PH- 888-714-4622 | 19 | 20 |
| 21 | 22 | 23 | 24 GMAC Cherry ID26753 PH- 888714-4622 GMAC Shawon | 25 GMAC Eric ID- 13065 ON-888- 714-4622 | 26 | 27 |
| 28 | 1 | 2 | 3 | 4 | 5 | 6 |

ATTACHMENT#6        25-OF-27

888 -714- 4622
866- 709- 4744 FOt

K-MOORE

| 1 | July 6 - 866 -783- 6054 | EDDIE 19516 |
| 2 | July 7 -1800 -799- 9250 | GMAC |
| 3 | July 7  215 -734- 3421 | Refer to Call 8000 July 7 |
| 4 | July 8  800 -799- 9250 | Franco |
| 5 | July 8  800 -753- 4622 | Mark- 7703569 |
| 6 | 888 -521- 4622 | Raja  7703528 |

26-0273

1-866-205-4457

Option for Sale

Option for Refinance

~~July 25~~

| 7 | July 25 | VERONICA 8691043 |
| 8 | | RENETTA |
| 9 | July 25 | (IN PERSON) MIKE CAVANAUGH Refinance |
| 10 | July 25 | YAy  B- Watanda 897806  (WINTER CO)  IOWA |

2010  SAJERA 31734

Feb 16 — Candy
Feb 18 —  FELICIA
Feb 24  Chey Chery  26753
Feb 24  SHANON
Feb 25  ERIC  13965
3-1-2010  SLARINA  1162
SLARINA

3-8-2010  Matt  20257
4-19-2010  Kimshanna
3957

26-OF-27

K - MOORE

## FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX
### A PROFESSIONAL CORPORATION

Bernard J. Fieger (1922-1988)
MI and NY Bar

Geoffrey Nels Fieger
MI, FL and AZ Bar
Direct Dial: (248) 355-9022

Jeremiah Joseph Kenney
MI and OH Bar   (1949-2005)

Ven R. Johnson
MI, NY and Washington, D.C. Bar
Direct Dial: (248) 355-9544

Robert M. Giroux
MI Bar
Direct Dial: (248) 355-5933

ATTORNEYS AND COUNSELORS AT LAW SINCE 1950
19390 WEST TEN MILE ROAD
SOUTHFIELD, MICHIGAN 48075-2463
TELEPHONE (248) 355-5555
FAX (248) 355-5148
WEBSITE: WWW.FIEGERLAW.COM
E-MAIL: INFO@FIEGERLAW.COM

Todd J. Weglarz
Rebecca S. Walsh
William J. McHenry
Arnold J. Matusz
Paul W. Broschay
Jeffrey A. Danzig
James J. Harrington, IV
Thomas M. Lizza
Helen K. Joyner
Leon J. Weiss
MI and FL Bar

Gregory W. Wix
MI and CA Bar

Michael T. Batton
Thomas E. Warnicke
APPELLATE DEPARTMENT
Victor S. Valenti
Heather A. Glazer
Michael R. Dezsi

Of Counsel
Barry Payne
Jack Beam

December 8, 2010

**Mike McGuinty**
**4757 Roundtree Drive**
**Brighton, MI 48116**

    *Re:    Potential Legal Representation*

Dear Mr. McGuinty:

    It was a pleasure to make your acquaintance and review your possible legal claim. However, I am writing to inform you that this firm will not be able to represent you in any legal matter relative to your recent inquiry. Our decision is not based on any determination that there is no case here, but rather on our determination that it simply would not be economically feasible for us to proceed on your behalf based upon the estimate of time necessary to be expended for a successful prosecution of this matter and a reasonable expectation of recovery.

    Please remember that <u>by deciding not to pursue this matter</u> on your behalf, we are indicating a matter of our opinion, only, and another attorney or law firm looking at the same fact situation and the same circumstances might come to me to a different conclusion. Therefore, we urge you to attempt to seek other opinions in this regard by talking to other attorneys or law firms.

    It is important for you to realize that there is a Statute of Limitations governing cases such as this, and therefore, if you do intend to proceed with your possible case, we urge you to consult another attorney or law firm as quickly as possible since you have only a limited time within which to act. **NOTE:** Failure to file the lawsuit within the applicable Statute of Limitations will forever bar your case no matter how meritorious it would have been.

    Thank you for considering our firm. If I can be of assistance in the future, kindly advise.

                            Very truly yours,
                            *Fieger, Fieger, Kenney, Johnson & Giroux, P.C.*

27-OF-27

                            Geoffrey N. Fieger

GNF/kg

ATTACHMENT #7

# GMAC Mortgage

**CUSTOMER INFORMATION**

Name: Michael A. McGuinty
Gloria S. McGuinty

Account Number: 8630
Home Phone #: (810)229-4872

8708 53RD TERRACE EAST
BRADENTON  FL 34202

Visit us at www.gmacmortgage.com for account information or to apply on-line.

MICHAEL A. MCGUINTY
GLORIA S. MCGUINTY
8708 53RD TER E
BRADENTON FL 34211-3702

*ATTACHMENT A* (handwritten)

Customer Care Inquiries: 1-800-766-4622

Please verify your mailing address, borrower and co-borrower information. Make necessary corrections on this portion of the statement, detach and mail to address listed for inquiries on the reverse side.

| | |
|---|---|
| Account Number | 8630 |
| Statement Date | June 01, 2012 |
| Maturity Date | September 01, 2033 |
| Interest Rate | 5.37500 |
| Interest Paid Year-to-Date | $1,915.02 |
| Taxes Paid Year-to-Date | $0.00 |
| Escrow Balance | $0.00 |
| Principal Balance(PB)* | $84,782.89 |

| | |
|---|---|
| Principal and Interest | $620.45 |
| Subsidy/Buydown | $0.00 |
| Escrow | $0.00 |
| Unpaid Amount | $0.00 |
| Late Charges | $0.00 |
| Other | $0.00 |
| Total Unpaid Amount | $620.45 |
| Payment Date | July 01, 2012 |

For questions on the servicing of your account, call 1-800-766-4622.

## Account Activity Since Last Statement

| Description | Post Date | Tran. Date | Tran. Total | Principal | Interest | Escrow | Add'l Products | Late Charge | Other |
|---|---|---|---|---|---|---|---|---|---|
| Payment | 06/01/12 | 05/30/12 | $620.45 | $239.62 | $380.83 | | | | |

*IG-OF-27* (handwritten)

*This is your Principal Balance only, not the amount required to pay the loan in full. For payoff figures and mailing instructions, call the Customer Care number above or you may obtain necessary payoff figures through our automated system (24 hours a day, 7 days a week). See back for automatic payment sign-up information and other payment options.

## Important News

Our records indicate that you have filed for bankruptcy protection. This statement applies to our lien on your property and is being provided for informational purposes only. If you choose to continue to remit payments, please include the coupon below with any payments you send. If you do not want us to send you mortgage account statements in the future, please contact us at the number listed above.

**See Reverse Side For Important Information And State Specific Disclosures**

## Mortgage Payment Coupon

| Account Number | Payment Date | Payment Amount | Late Fee | Payment Amount With Late Fee | Unpaid Amount | GMAC Mortgage |
|---|---|---|---|---|---|---|
| 8630 MICHAEL A. MCGUINTY | 07/01/12 | $620.45 | $31.02 | $651.47 | $620.45 | |

This statement is being furnished for informational purposes only.

Please assist GMAC Mortgage in applying your payment

Extra Funds:
Full Payment(s) $
ADDITIONAL Principal $
ADDITIONAL Escrow $
Late Charge $
Other Fees (please specify) $
Total Amount Enclosed $

Sign here to enroll in monthly ACH. (See back for details.)

GMAC MORTGAGE
PO BOX 9001719
LOUISVILLE KY 40290-1719

02   0712   0654628630   00062045   03102   22222   1

**BORROWER INFORMATION**

| | |
|---|---|
| Name: | MICHAEL A. MCGUINTY |
| Account Number: | ████9422 |
| Home Phone #: | (810) 229-4872 |

4757 ROUNDTREE DR
BRIGHTON MI 48116

**CO-BORROWER INFORMATION**

| | |
|---|---|
| Name: | GLORIA S. MCGUINTY |
| Home Phone #: | (313) 562-8043 |



Services provided
by GMAC Mortgage

*ATTAchMENt*
*B*

```
57E201 06/25/03 13:58  000002I 09/10/03 D4089791 090801  102    0065124144= VISUAL + DTCH01    ONE OUNCE
#BWNHJPY
·#KW7770B37430#
||.|.|..||...||.||..|...|...||..||||...|||..|.|..|||..||.|.|
```

MICHAEL A. MCGUINTY
GLORIA S. MCGUINTY
4757 ROUNDTREE DR
BRIGHTON MI 48116-5140

Customer Care Inquiries: 1-800-766-4622
Home Financing Needs : 1-877-433-4933

Please verify your mailing address, borrower and co-borrower information. Make necessary corrections on this portion of the statement, detach and mail to address listed for inquiries on the reverse side.

## Account Information

| | |
|---|---|
| Account Number | ████9422 |
| Current Statement Date | September 08, 2003 |
| Original Maturity Date | September 01, 2033 |
| Interest Rate | 5.75 |
| Current Principal Balance* | $273,500.00 |
| Current Escrow Balance | $0.00 |
| Interest Paid Year-to-Date | $524.21 |
| Taxes Paid Year-to-Date | $0.00 |

### For questions on the servicing of your account, call 1-800-766-4622.

See back for automatic payment sign-up information and express mail address.

## Details of Amount Due/Paid

| | |
|---|---|
| Principal and Interest | $1,596.08 |
| Subsidy/Buydown | $0.00 |
| Escrow | $0.00 |
| Additional Products/Services | $0.00 |
| Amount Past Due | $0.00 |
| Outstanding Late Charges | $0.00 |
| Other | $0.00 |
| Total Amount Due | $1,596.08 |
| Account Due Date | October 01, 2003 |

*Pd ck# 5534*

## Account Activity Since Last Statement

| Description | Due Date | Tran. Date | Transaction Total | Principal | Interest | Escrow | Other |
|---|---|---|---|---|---|---|---|
| Preliminary Interest | | 09/05/03 | $524.21 | | $524.21 | | |

*1 H-of 27*

\*This is your Principal Balance only, not the amount required to pay the loan in full. For payoff figures and mailing instructions, call the
Customer Care number above or you may obtain necessary payoff figures through our automated system (24 hours a day, 7 days a week).

## Important News



**Heading back to school** - need to pull out money for college tuition? A fixed-rate Home Equity
Loan or a variable-rate Home Equity Line of Credit are two great ways to tap into your home's
equity. Log on to www.ditech.com or call 1-800-71-FIXED to find out more. ditech.com – Your
mortgage solution. Delivered.

# GMAC Mortgage

**CUSTOMER INFORMATION**

| | |
|---|---|
| Name: | MICHAEL A. MCGUINTY |
| | GLORIA S. MCGUINTY |
| Account Number: | ████9422 |
| Home Phone #: | (810)229-4872 |

**PROPERTY ADDRESS**

4757 ROUNDTREE DR
BRIGHTON      MI 48116

Visit us at www.gmacmortgage.com for account information or to apply on-line.

*ATTACHMENT C*

For information about your existing account or obtaining a new loan please call: (800) 964-4622

Login today to our redesigned website at www.gmacmortgage.com to see the array of benefits for customers who are moving.

```
020802 0027787 12:30 0020025 20071205 GL83E106 FFACH    1 OZ DOM GL03818260a 148316    FF
#BWNHJPY
#KW07770B374344
```

MICHAEL A. MCGUINTY
GLORIA S. MCGUINTY
4757 ROUNDTREE DR
BRIGHTON MI 48116-5140

Please verify your mailing address, borrower and co-borrower information. Make necessary corrections on this portion of the statement, detach and mail to address listed for inquiries on the reverse side.

## DO NOT PAY, AMOUNT WILL AUTOMATICALLY BE DRAFTED FROM YOUR ACCOUNT

| | |
|---|---|
| Account Number | ████9422 |
| Current Statement Date | December 03, 2007 |
| Maturity Date | September 01, 2033 |
| Interest Rate | 5.75000 |
| Current Principal Balance* | $248,298.55 |
| Current Escrow Balance | $0.00 |
| Interest Paid Year-to-Date | $13,282.75 |
| Taxes Paid Year-to-Date | $0.00 |

| | |
|---|---|
| Principal and Interest | $1,596.08 |
| Subsidy/Buydown | $0.00 |
| Escrow | $0.00 |
| Amount Past Due | $0.00 |
| Outstanding Late Charges | $0.00 |
| Other | $0.00 |
| Total Amount Due | $1,596.08 |
| Account Due Date | January 01, 2008 |

For Customer Care inquiries call: **1-800-964-4622**
For Insurance inquiries call: **1-800-256-9962**

GM FAMILY FIRST

### Account Activity Since Last Statement

| Description | Due Date | Tran. Date | Tran. Total | Principal | Interest | Escrow | Add'l Products | Late Charge | Other |
|---|---|---|---|---|---|---|---|---|---|
| Principal Curtailment | 12/01/07 | 11/30/07 | $798.04 | $798.04 | | | | | .98.04- |
| Payment | 12/01/07 | 11/16/07 | $798.04 | $400.57 | $1,195.51 | | | | $798.04 |
| Receipt | 11/01/07 | 11/02/07 | $798.04 | | | | | | |

*I I-0F-27*

*This is your Principal Balance only, not the amount required to pay the loan in full. For payoff figures and mailing instructions, call the Customer Care number above or you may obtain necessary payoff figures through our automated system (24 hours a day, 7 days a week).

See back for automatic payment sign-up information and other payment options.

### Important News

Happy Holidays!  Your Annual Loan Statement (Form 1098) information will be mailed with your mortgage account statement in January to the address above.  In addition, you can obtain year-end tax information at www.gmacmortgage.com as early as 1/7/2008.
Our office hours for customer service and payment processing on Monday, 12/31/2007 will be 6:00AM - 7:00PM CT.  Payments received after 7:00PM CT on 12/31 will be posted in 2008 for tax purposes.

**See Reverse Side For Important Information**

**Claim No. 5970**

Claim #5970  Date Filed: 11/28/2012

address line 18708 53rd Terrace East/ 4757 Rountree Brighton Mi 48116

Bradenton

Fl

34211

Phone Number 941-752-6340

November 22, 2012

United States Bankruptcy Court          Case No 12-12020 (MG)
Southern District of New York            Chapter 11
In re:
RESIDENTIAL CAPITAL, LLC, et al;        Jointly Administered
claim Number 1963
Debtors

To Whom It May Concern

Subject **Destruction of the Michael McGuinty Family ( 4757 Roundtree Brighton MI 48116)**

Dear Madam or Sir:

FYI Please refer to Claim Number 1963  ADDITIONAL INFORMATIOM

SEE PAGE 3 of 3 GMAC Attempts to over charge my GMAC Account #████8630 for
$2873.56 I purchased this property in March1996 ALWAYS PAID MY OWN INSURANCE AND
PROPERTY TAX. GMAC ATTEMPTS TO SET UP ESCROW ACCOUNT

SEE Page 2 of 3 My reply to GMAC. This is another example of senior citizens fraud.
GMAC belives I am 75 yrs old Iwill just pay these extra charges. GMAC forced me into
Chapter 7 Bankruptcy destroying me and my family

GMAC refused to work withme to save my home at 4757 Roundtree Brighton Michigan
48116 unit #5 . GMAC then took my home sold it to a 3rd party at a deep discount of 70%.
I once belived your home was your safest investment. This is what my government
preached to me for 50yrs.          WHAT HAS HAPPENED?

RasCap Claims Processing Center
c/o KCC
2335 Alaska Ave
El Segundo, CA 90245

FIRST CLASS
US POSTAGE I
EL SEGUNDO
PERMIT NO. 4

RECEIVED

NOV 2 8 2012

KURTZMAN CARSON CONSULTANTS

1212020211128000000000018

Michael and Gloria McGuinty
18708 53rd Terrace East
Bradenton, FL 34211

Sincerely
Michael and Gloria McGuinty

PROOF OF CLAIM CONFIRMATION
Your proof of claim filed against Residential Capital, LLC,
case no 12-12020 was received on 10/29/2012
and assigned claim number 1963

1-OF-3

For more information, please visit www.kccllc.net/rescap or call 1-888-251-2914

*11/22/2012*

*CLAIM NUMBER*
*1943*

# MIKE MCGUINTY

8708 53Rd Terrace East
Bradenton Fl. 34211

October 25, 2012

FYI: Lindsey East
Re Account Number ████8630 GMAC  Letter Dated October 16,2012
Property Address 8708 53 rd Terrace East
Bradenton   FL 34211

Dear  Lindsey East

Thank you for taking an interest in Gloria and my GMAC problem. I will try to explain Gloria and my experience with your employer GMAC. My active career with General Motors began October 6,1969 until my retirement on March 2001. My first experience with GMAC March of 1971 when I purchased my first General Motors 1970 Chevrolet Impala Convertible which was financed thru your GMAC Company. Our valued relationship with GMAC continued until May 30, 2010 when I and Gloria entered Chapter 7 bankruptcy . In my active years of employment I always purchased at least one new GM product each year always financed thru GMAC and always paid when due.  Also, there were years when I purchased three GM products each year one for myself one for my wife Gloria and my daughter Pamela. In addition to these GM automobiles I have financed several homes thru GMAC. During this 39 year time frame I have never missed a loan payment to GMAC whether a GM automobile or real estate property.  In fact there were many years if your would recheck your GMAC records I have made 13 payments on my homes used my GMAC REWARDS instead of  receiving cash payments to myself or Gloria chose to apply those funds to reduce my mortgage balance on my Florida and Michigan homes. ALSO, In thirty nine years I have never  missed paying my insurance or property tax bills. If YOU would check your GMAC records in August 17, 2006 Gloria and I were such GMAC VALUED customers we were offered a $158.300.00 cash out to refinance by your company GMAC. In March of 1996 I purchased this Florida property and AGAIN I have NEVER MISSED A LOAN, INSURANCE OR PROPERTY TAX PAYMENT IN FACT I HAVE GIVEN EXTRA PAYMENTS TO GMAC.

HENCE FORTH AFTER THIS THIRY NINE  YEAR RELATIONSHIP I CONSIDERR YOUR LETTERS PERSONAL HARRASMENT TO A SENIOR CITIZENS LIKE GLORIA AND ME. I WILL NOW SEND ALL CORESPONDECE AS REGISTERED MAIL SINCE I CANNOT CORESPOND W ITH GMAC IN A NORMAL MANNER

To summarize in addition too the above since General Motors declared Bankruptcy in 2009 *I lost as a salary NON UNION CLERK*  all our Medical, Dental, Prescription Drug  coverage, life insurance once valued at $ 108,000 reduced too $10,000.00 and my $90.00 dollar a month Medicare Supplement. This is the result of thirty years of effort.

 In conclusion the above abuses by GMAC and GM has caused great emotional stress and physical damage on me and Gloria at a time in our lives when it is hard to recover.

Sincerely

*Michael A McGuinty*
Michael A McGuinty

CC: MS Bethann Dillon
Office of the Florida Attorney General
PL01 The  Capitol
Tallahasee FL 32399-1O50

*2 -OF- 3*

**CUSTOMER INFORMATION**

Name: Michael A. McGuinty
Gloria S. McGuinty

PROPERTY ADDRESS
8708 53RD TERRACE EAST
BRADENTON    FL 34202

Account Number: &#9608;&#9608;&#9608;8630
Home Phone #: (810)229-4872

# GMAC Mortgage

Visit us at www.gmacmortgage.com for account information or to apply on-line.

02/15110 11 00.3   0002900 20120606 LK027102 FFBKB   1 0Z DOM LK02710007 146316  FF

MICHAEL A. MCGUINTY
GLORIA S. MCGUINTY
8708 53RD TER E
BRADENTON FL  34211-3702



11/22/2012
CLAIM
NUMBER
1963

| | |
|---|---|
| Customer Care Inquiries: | 1-800-766-4622 |

Please verify your mailing address, borrower and co-borrower information.  Make necessary corrections on this portion of the statement, detach and mail to address listed for inquiries on the reverse side.

## Account Information

| | |
|---|---|
| Account Number | &#9608;&#9608;8630 |
| Statement Date | September 03, 2012 |
| Maturity Date | September 01, 2033 |
| Interest Rate | 5.37500 |
| Interest Paid Year-to-Date | $3,051.06 |
| Taxes Paid Year-to-Date | $0.00 |
| Escrow Balance | $0.00 |
| Principal Balance(PB)* | $84,057.58 |

## Details of Amount Due/Paid

| | |
|---|---|
| Principal and Interest | $620.45 |
| Subsidy/Buydown | $0.00 |
| Escrow | $0.00 |
| Unpaid Amount | $0.00 |
| Late Charges | $0.00 |
| Other | $0.00 |
| Total Unpaid Amount | $620.45 |
| Payment Date | October 01, 2012 |

**For questions on the servicing of your account,
call 1-800-766-4622.**

## Account Activity Since Last Statement

| Description | Pmt Date | Tran. Date | Tran. Total | Principal | Interest | Escrow | Add'l Products | Late Charge | Other |
|---|---|---|---|---|---|---|---|---|---|
| Payment | 09/01/12 | 08/30/12 | $620.45 | $242.85 | $377.60 | | | | |
| Escrow Receipt | 08/01/12 | 08/14/12 | $2,873.56 | | | $2,873.56 | | | |

*This is your Principal Balance only, not the amount required to pay the loan in full.  For payoff figures and mailing instructions, call the Customer Care number above or you may obtain necessary payoff figures through our automated system (24 hours a day, 7 days a week). See back for automatic payment sign-up information and other payment options.

## Important News

Our records indicate that you have filed for bankruptcy protection.  This statement applies to our lien on your property and is being provided for informational purposes only.  If you choose to continue to remit payments, please include the coupon below with any payments you send. If you do not want us to send you mortgage account statements in the future, please contact us at the number listed above.

**See Reverse Side For Important Information And State Specific Disclosures**

## Mortgage Payment Coupon

| Account Number | Payment Date | Payment Amount | Late Fee | Payment Amount With Late Fee | Unpaid Amount | GMAC Mortgage |
|---|---|---|---|---|---|---|
| &#9608;&#9608;8630 MICHAEL A. MCGUINTY | 10/01/12 | $620.45 | $31.02 | $651.47 | $620.45 | |

This statement is being furnished for informational purposes only.

**Please assist GMAC Mortgage in applying your payment**

| Extra Funds | | |
|---|---|---|
| Full Payment(s) | $ |
| ADDITIONAL Principal | $ |
| ADDITIONAL Escrow | $ |
| Late Charge | $ |
| Other Fees (please specify) | $ |
| Total Amount Enclosed | $ |

Sign here to receive information on monthly ACH. See back for details.

GMAC MORTGAGE
PO BOX 9001719
LOUISVILLE KY  40290-1719

3-OF-3

02  1012  &#9608;&#9608;&#9608;&#9608;8630  00062045  03102  22222  5

**<u>Diaz Claim</u>**

**(Claim No. 5935)**

B 10 Modified (Official Form 10) (12/11)

Claim #5935    Date Filed: 11/27/2012
PRF   53002-2

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor: RESIDENTIAL FUNDING COMPANY LLC

Case Number: 12-12019 (MG)

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
TOMAS DIAZ

☐ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:
TOMAS DIAZ
5200 SW 122 AVE
MIAMI FLA 33175
Telephone number: 305-244-5159      email: MasterPicasso@yahoo.com

**Court Claim Number:**
_____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):
TOMAS DIAZ
5200 SW 122 AVE
MIAMI FLA 33175 (305-244-5159)
Telephone number:      email: MasterPicasso@yahoo.com

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ 400,000.00

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Mortgage / Note Down Payment / And Investor
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:** 4849

**3a. Debtor may have scheduled account as:**
_____
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):**
_____
(See instruction #3b)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☒ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe:

Value of Property: $ 1,600,000   Annual Interest Rate 7.498 %   ☐ Fixed ☒ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim,

if any: $ _____      Basis for perfection: _____

Amount of Secured Claim: $ 400,000.00      Amount Unsecured: $ _____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__).

**Amount entitled to priority:**

$ _____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$ 0 (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. (See instruction #6, and the definition of "redacted".)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

*12120191211270000000001*

\* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

$ _____

**9. Signature:** (See instruction #9) Check the appropriate box.

☐ I am the creditor.   ☐ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor, or their authorized agent.   ☐ I am a guarantor, surety, indorser, or other codebtor.
(Attach copy of power of attorney, if any.)   (See Bankruptcy Rule 3004.)   (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: TOMAS DIAZ
Title: _____
Company: _____
Address and telephone number (if different from notice address above):

(Signature) Tomas Diaz      (Date) 11/20/2012

RECEIVED
NOV 27 2012
KURTZMAN CARSON CONSULTANTS
COURT USE ONLY

Telephone number: 305-244-5159      Email: MasterPicasso@yahoo.com

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

CFN 2007R0084035
OR Bk 25305 Ps 0654; (1ps)
RECORDED 01/25/2007 08:40:02
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA
LAST PAGE

TRI-COUNTY
WILL CALL
WATSON TITLE & INSURANCE, INC.

WATSON TITLE INSURANCE, INC.
1800 N.W. 49th ST.
SUITE 120
F. LAUDERDALE, FL 33309

RECORD AND RETURN TO

CORPORATION ASSIGNMENT of MORTGAGE

Return To:
RESIDENTIAL FUNDING COMPANY, LLC
One Meridian Crossings
Minneapolis, MN 55423

MIN: ███████3521          MERS Phone: 1-888-679-6377
RFC Loan Number: ████4849
Seller Loan Number: ███0352

FOR VALUE RECEIVED, Mortgage Electronic Registration Systems, Inc. ("MERS")
AS NOMINEE FOR PLATINUM CAPITAL GROUP

the undersigned hereby grants, assigns and transfers to

**Deutsche Bank Trust Company Americas as Trustee**

**3 Park Plaza, 16th Floor, Irvine, CA  92714-8505**

all beneficial interest under that certain Mortgage dated 04/27/2006
executed by THOMAS DIAZ

TO/FOR:    THE UNDERSIGNED

and recorded in Book **24526**  on Page **3829**  as Instrument No. _____  on **5/15/2006**  of Official
Records in the County Recorder's Office of ___MIAMI-DADE_____ County, Florida.

LEGAL:    AS IN MORTGAGE REFERENCED HEREIN

MORTGAGE AMOUNT:  $1,000,000.00
PROPERTY ADDRESS:  5200 SOUTHWEST 122ND AVENUE  MIAMI, FL  33175
TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest,
and all rights accrued or to accrue under said Mortgage.

Mortgage Electronic Registration Systems, Inc. ("MERS")

STATE OF                                    BY: _____
COUNTY OF               Minnesota )         NAME: Matt Favorite
                        Hennepin )          TITLE: Vice President

On 10/26/2006 before me, the undersigned, a Notary Public in and for said State personally appeared Matt Favorite, Vice
President of Mortgage Electronic Registration Systems, Inc. ("MERS") personally known to me to be the person whose
name is subscribed to the within instrument and acknowledged to me that s/he executed the same in his/her authorized
capacity, and that by his/her signature on the instrument the entity upon behalf of which the person acted, executed the
instrument. WITNESS my hand and official seal.

_____
Notary Public in and for said State

KAREN E. STEFFENSEN
MY COMMISSION EXPIRES 1-31-2010

Prepared 10/26/2006 by Matt Favorite, Residential
Funding Company, LLC, One Meridian Crossings,
Suite 100, Minneapolis, MN 55423, (952) 979-4000.

06-07296

## LOST NOTE AFFIDAVIT

**AFFIDAVIT OF LOST NOTE**

### (Photocopy of Note Attached)

**Loan Number ▇▇4849**

*TOMAS DIAZ*
*5200 SW 122 AVE*
*MIAMI FLA 33175*

STATE OF MINNESOTA

COUNTY OF HENNEPIN

**On this 30 day of May 2007 before me appeared S. Seidel, Assistant Secretary who being first duly sworn, does depose and say that**

**Residential Funding Company, LLC**

    Was the holder of a certain NOTE dated April 27, 2006 in the amount of One Million   Dollars and 0/100 ($1,000,000.00) made by THOMAS  DIAZ to Platinum Capital Group. and does further depose and say that said NOTE, a copy of which is attached as a true and correct photocopy of the front and back and any and all endorsements, has either been lost, misplaced, or destroyed and can not be produced.

**IN THE EVENT THE ORIGINAL NOTE IS HEREAFTER LOCATED, RESIDENTIAL FUNDING COMPANY, LLC SHALL DELIVER IT TO THE APPROPRIATE CUSTODIAN**

Residential Funding Company, LLC

By: *S. Seidel*

**S. Seidel**
**Assistant Secretary**

On *5-30-07* before me,  **B.Nolan** , personally appeared S. Seidel   ☒ personally known to me -  ☐ or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacity, and that by their signatures on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

Witness my hand and official seal.

B. NOLAN
NOTARY PUBLIC- MINNESOTA
MY COMMISSION EXPIRES 4-81-2010

PAY TO THE ORDER OF
RESIDENTIAL FUNDING CORPORATION
WITHOUT RECOURSE
PLATINUM CAPITAL GROUP
A CALIFORNIA CORPORATION

BY
ASST. SECRETARY
Carleton Fyfrom II

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

By Judy Faber
Judy Faber, Vice President

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Loan Number: ███0352                                        Date: APRIL 27, 2006

Creditor: PLATINUM CAPITAL GROUP
Address: 17101 ARMSTRONG AVENUE SUITE 200, IRVINE, CALIFORNIA 92614

Borrower(s): TOMAS DIAZ

Address: 5200 SOUTHWEST 122ND AVENUE, MIAMI, FLORIDA 33175

Lines containing an "x" are applicable:

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. | ☐ Total Sale Price<br>The total cost of your purchase on credit including your down-payment of $ |
|---|---|---|---|---|
| 7.498 % | $1,777,571.91 | $981,107.00 | $2,758,678.91 | $ |

PAYMENTS: Your payment schedule will be:

| Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning | | | Monthly Beginning | | | Monthly Beginning |
| 1 | 3,451.20 | 07/01/06 | | | | | | |
| 11 | 3,451.20 | 08/01/06 | | | | | | |
| 12 | 3,710.04 | 07/01/07 | | | | | | |
| 12 | 3,988.29 | 07/01/08 | | | | | | |
| 12 | 4,287.41 | 07/01/09 | | | | | | |
| 11 | 4,608.97 | 07/01/10 | | | | | | |
| 300 | 8,381.18 | 06/01/11 | | | | | | |
| 1 | 8,382.96 | 06/01/36 | | | | | | |

_____ DEMAND FEATURE: This obligation has a demand feature.

__X__ VARIABLE RATE FEATURE: Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

INSURANCE: The following insurance is required to obtain credit:
_____ Credit life insurance and credit disability   __X__ Property Insurance   __X__ Flood Insurance   _____ Private Mortgage Insurance
You may obtain property insurance from any insurer that is acceptable to the Lender.

SECURITY: You are giving a security interest in: 5200 SOUTHWEST 122ND AVENUE, MIAMI, FLORIDA 33175
_____ The goods or property being purchased   __X__ Real property you already own.

FILING FEES: $225.00

LATE CHARGE: If payment is more than ____15____ days late, you will be charged ____5.000____ % of the payment.

PREPAYMENT: If you pay off early, you
__X__ may   _____ will not   have to pay a penalty.
_____ may   __X__ will not   be entitled to a refund of part of the finance charge.

ASSUMPTION: Someone buying your property
_____ may   _____ may, subject to conditions   __X__ may not   assume the remainder of your loan on the original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.

**Attention: Honorable Judge Martin Glenn,**
United States Bankruptcy in Courtroom 501,
Of the United States Bankruptcy Court for the Southern District of New York
One Bowling Green, New York NY 10004-1408

## CONFIDENTIAL OBJECTION

**Case Number:** 12-12019(MG)

I formally present to you my objection and claim for $400,000.00, money given as down payment by myself, creditor and investor, Tomas Diaz.

Respectfully,

Rev. Tomas Diaz
5200 SW 122nd Ave
Miami,FL 33175

Note: The documents here presented as evidence are only summaries of the 800+ pages of documents that proof all I've affirmed. If all documentation is needed I have it all under my possession and can submit it electronically.



## My Home



**miamidade.gov**    ACTIVE TOOL: SELECT

**Show Me:**
Property Information ▼

**Search By:**
Select Item ▼

Text only

Property Appraiser Tax Estimator

### Summary Details:

| | |
|---|---|
| Folio No.: | 30-4924-001-2322 |
| Property: | 5200 SW 122 AVE |
| Mailing Address: | TOMAS DIAZ |
| | 5200 SW 122 AVE MIAMI FL 33175-5529 |

### Property Information:

| | |
|---|---|
| Primary Zone: | 9000 AGRICULTURE |
| CLUC: | 0001 RESIDENTIAL- SINGLE FAMILY |
| Beds/Baths: | 5/3 |
| Floors: | 1 |
| Living Units: | 1 |
| Adj Sq Footage: | 5,735 |
| Lot Size: | 2 ACRES |
| Year Built: | 1970 |
| Legal Description: | 24 54 39 2.33 AC BIRD ROAD FARMSITES PB 46-3 S1/2 OF TR 226 LOT SIZE IRREGULAR OR 19560-3055 032001 1 COC 23302-0698 04 2005 1 |

### Sale Information:

| | |
|---|---|
| Sale O/R: | 23302-0698 |
| Sale Date: | 4/2005 |
| Sale Amount: | $1,400,000 |

### Assessment Information:

| Year: | 2006 | 2005 |
|---|---|---|
| Land Value: | $733,950 | $559,200 |
| Building Value: | $385,109 | $316,979 |
| Market Value: | $1,119,059 | $876,179 |
| Assessed Value: | $1,119,059 | $535,974 |
| Homestead Exemption: | $0 | $25,000 |
| Total Exemptions: | $0 | $25,000 |
| Taxable Value: | $1,119,059 | $510,974 |



SW 51ST ST

SW 122ND AVE

Digital Orthophotography - 2006        0 ———— 134 ft

We appreciate your feedback, please take a minute to complete our survey.

My Home | Property Information | Property Taxes
| My Neighborhood | Property Appraiser

Home | Using Our Site | About | Phone Directory | Privacy | Disclaimer

If you experience technical difficulties with the Property Information application,
please click here to let us know.

E-mail your comments, questions and suggestions to Webmaster

Web Site
© 2002 Miami-Dade County.
rights reserved.

**Homecomings Financial**
P.O. Box 890036
Dallas TX 75389

**Homecomings Financial**
*A GMAC Company*

www.homecomings.com

June 13, 2006

#BWNFNYZ
#ZSSPRWTQSR1#
+ 0006519 000002204 09ATRL 0932826 P18
Thomas Diaz
5200 SW 122nd Ave
Miami FL 33175-5529

Re: **Homecomings Financial Loan Number** ████5243
    Property Address 5200 Southwest 122nd Avenu
    Miami, FL 33175

Dear Thomas Diaz:

Welcome to Homecomings Financial℠, your new mortgage servicer!  Effective 07/01/06, your mortgage transfers to Homecomings Financial from Platinum Capital Group.

**Your new Homecomings Financial loan number is** ████5243.  It is important that you write your loan number on all payments and correspondence, so that we can identify your account and post your payments quickly and accurately.  Please know that the transfer of your mortgage does not in any way affect the terms and conditions of your loan.

**Payments -** Payments will be accepted by your current mortgage holder until 07/01/06.  Please mail any payments due on or after 07/01/06 to:

Homecomings Financial
P.O. Box 650515
Dallas, TX  75265-0515

If you have already sent a payment for the current month, simply use one of the coupons attached for your next payment due.  By sending your check to us, you authorize Homecomings Financial to convert the check into an electronic funds transfer.  Your bank account may be debited the same day we receive your payment.  You will soon begin receiving monthly billing statements from us.  Please keep this letter and extra coupons in case you need to make a payment before you receive your first monthly billing statement.  After receiving your first statement, you can discard any remaining coupons attached and use the coupon and return envelope provided in the monthly statement.

We invite you to enroll in our automated payment program, in which your monthly payments are automatically withdrawn from your bank account on the day you specify.  Just visit us on the Internet at www.homecomings.com or call our Customer Service Department at the number below and sign up today!

**CONTACTING US—You can access your up-to-date loan information via the Internet.  Just go to www.homecomings.com and select the "View My Account Info" button.**  In addition, you are welcome to contact us at 1.800.206.2901.  Our automated phone system, which provides specific loan information and can answer many of your questions, is available 24 hours a day, 7 days a week, and our helpful Account Managers are available from 8:00 a.m. to 7:00 p.m., Monday through Thursday, and 8:00 a.m. to 5:00 p.m. on Fridays, Central time.  We also provide the special address below for your qualified, written requests.  Please be sure to note your loan number on your correspondence.

Correspondence Address:

Homecomings Financial
P.O. Box 890036
Dallas, TX  75389

Again, welcome to Homecomings Financial!  We look forward to having you as a customer and serving all of your financing needs.

Sincerely,

Homecomings Financial

SX0269-00A

**KCC**

Search All KCC Court Documents
Client Login     

Corporate Restructuring : Active Cases : Residential Capital, LLC et al.

FAQs for Counterparties to Assumed Contracts

FAQs for Notice of Bar Date

Adversary Proceedings

Court Documents

Claims Register

First Day Motions

First Day Orders

Monthly Service List

Prepetition Credit Documents

Press Releases

Sale Documents

Schedules/Statements

Voluntary Petition(s)

Disclaimer

Help

Bankruptcy Industry Links    Proof Of Claim Form    Claim/Creditor Search    Submit an Inquiry

### Residential Capital, LLC et al. Search Results
**Debtor(s): Homecomings Financial, LLC**
**Creditor Name: Begins With "tomas diaz"**
**Claim Amount Type: Filed Claim Amount**
**Claim #: 1913**
**Claim Amount Between $400,000.00 And $400,000.00**
**Claim Filed Between 10/29/2012 And 10/29/2012**
**Claim Nature: Secured**

| Date Claim Filed | Claim No. | Name | Filed Claim Amount | Filed Claim Nature | Debtor |
|---|---|---|---|---|---|
| 10/29/2012 | 1913 | Tomas Diaz | $400,000.00 | Secured | Homecomings Financial, LLC |

This website is maintained for the public's convenience and for informational purposes only. Users of this website should not take or refrain from taking any action based upon content included in this website or in the results of any search made on this site without seeking legal counsel on the particular facts and circumstances at issue from a licensed attorney. All search results provided through this website are qualified in their entirety by the official register of claims and the Schedules of Assets and Liabilities ("Schedules") filed in the bankruptcy cases of the debtors.

Without limiting the generality of the foregoing, any failure by a debtor to designate a claim listed on the Schedules as "disputed", "contingent", or "unliquidated" does not constitute an admission that such amounts are not "disputed", "contingent", or "unliquidated". Further, each debtor reserves the right to amend their Schedules and Statements of Financial Affairs as necessary and appropriate. Debtors further reserve the right to dispute, on any grounds, or to assert offsets or defenses to, any claim reflected on their schedules or filed against a Debtor, including objecting to the amount, liability classification or priority of such claim, or to otherwise subsequently designate any claim as "disputed", "contingent", or "unliquidated".

Kurtzman Carson Consultants   Terms of Use   Privacy Statement

## **Gradjan Claim**

**(Claim No. 4602)**

Claim #4602  Date Filed: 11/13/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number:
**Residential Capital, LLC, Case No. 12-12020**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**Iso Gradjan**

Name and address where notices should be sent:

**9429 Sayre Avenue
Morton Grove, Illinois 60053**

Telephone number: 773-727-1977          email: gradjan@yahoo.com

Name and address where payment should be sent (if different from above):

Telephone number:                         email:

☐ Check this box if this claim amends a previously filed claim.

**Court Claim
Number:_____**
(If known)

Filed on:_____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

1. Amount of Claim as of Date Case Filed: $ **189,000.00**
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: Mortgage Note
(See instruction #2)

| 3. Last four digits of any number by which creditor identifies debtor: 7357 | 3a. Debtor may have scheduled account as: Iso Gradjan (See instruction #3a) | 3b. Uniform Claim Identifier (optional): (See instruction #3b) |
|---|---|---|

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.
Nature of property or right of setoff: ☑ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe:
Value of Property: $ **220,000**     Annual Interest Rate **5.375** % ☑ Fixed ☐ Variable (when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $_____       Basis for perfection: _____

Amount of Secured Claim: $ **220,000**       Amount Unsecured: $_____

6. Claim Pursuant to 11 U.S.C. § 503(b)(9):
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____     (See instruction #6)

7. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. (See instruction #8, and the definition of "redacted".)
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

9. Signature: (See instruction #9) Check the appropriate box.
☑ I am the creditor.   ☐ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)   ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)   ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Iso Gradjan
Title:
Company:
Address and telephone number (if different from notice address above):

_____          11/6/2012
(Signature)                                        (Date)

Telephone number:                         Email:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

Amount entitled to priority:

$_____

* Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**RECEIVED**
NOV 1 3 2012
KURTZMAN CARSON CONSULTANTS
**COURT USE ONLY**

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C.

12120201211300000000072

This Instrument Prepared By:

*[signature]*

After Recording Return To:
VIRGIN MONEY USA, INC
46 LIZOTTE DRIVE
MARLBOROUGH,
MASSACHUSETTS 01752

———————————————— [Space Above This Line For Recording Data] ————————————————

Loan Number: ████7754     **MORTGAGE**

**MIN:** 1007313-0602347754-5

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** **"Security Instrument"** means this document, which is dated    APRIL 23, 2009    , together with all Riders to this document.

**(B)** **"Borrower"** is    ISO GRADJAN AND EDINA GRADJAN , *HUSBAND AND WIFE*

Borrower is the mortgagor under this Security Instrument.

**(C)** **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D)** **"Lender"** is    VIRGIN MONEY USA, INC

Lender is a   MASSACHUSETTS CORPORATION                                 organized
and existing under the laws of   MASSACHUSETTS
Lender's address is   46 LIZOTTE DRIVE, MARLBOROUGH, MASSACHUSETTS 01752

**(E)** **"Note"** means the promissory note signed by Borrower and dated    APRIL 23, 2009
The Note states that Borrower owes Lender   ONE HUNDRED NINETY-SEVEN THOUSAND AND 00/100
Dollars (U.S. $ 197,000.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MAY 1, 2039

**(F)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider          ☐ Planned Unit Development Rider
☐ Balloon Rider                  ☐ Biweekly Payment Rider
☐ 1-4 Family Rider               ☐ Second Home Rider
☐ Condominium Rider              ☐ Other(s) [specify]

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** **"Escrow Items"** means those items that are described in Section 3.

**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the

COUNTY              of                    COOK                    :
[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".

which currently has the address of      9429 SAYRE AVE
                                        [Street]

MORTON GROVE                    , Illinois    60053      ("Property Address"):
       [City]                                [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim

ILLINOIS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3014 1/01                          Page 3 of 14                          DocMagic *eFarms* 800-649-1362
                                                                             www.docmagic.com

which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree

in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.    Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.    Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any

form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate

as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's

ILLINOIS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3014 1/01                    Page 9 of 14                    DocMagic *eForms* 800-649-1362
www.docmagic.com

address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16.  Governing Law; Severability; Rules of Construction.**  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event  that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean  and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the  plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17.  Borrower's Copy.**  Borrower shall be given one copy of the Note and of this Security Instrument.

**18.  Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19.  Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will

state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

## NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified

in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. **Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
ISO GRADJAN                    -Borrower

_____ (Seal)
EDINA GRADJAN                  -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

Witness:                                        Witness:

_____                 _____

——————————————— [Space Below This Line For Acknowledgment] ———————————————

State of Illinois

County of __COOK_____

     The foregoing instrument was acknowledged before me this ___4·23·09_____

by __ISO GRADJAN AND EDINA GRADJAN_____

_____

_____

"OFFICIAL SEAL"
LAURIE HALLORAN
Notary Public, State of Illinois
My Commission Expires 10/2/2010

Signature of Person Taking Acknowledgment

    (Seal)

Title _____

Serial Number, if any _____

 # CHICAGO TITLE INSURANCE COMPANY

**ORDER NUMBER:** 1409  008465535 AH
**STREET ADDRESS:** 9429 SAYRE AVE.
**CITY:** MORTON GROVE          **COUNTY:** COOK
**TAX NUMBER:** 10-18-112-014-0000

**LEGAL DESCRIPTION:**

LOT 14 IN 4TH ADDITION TO MILLS PARK ESTATES, BEING MILLS, AND SONS SUBDIVISION
IN SECTION 18, TOWNSHIP 41 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN,
IN COOK COUNTY, ILLINOIS

LEGALD                    LH3                    04/22/09