**<u>Exhibit 3</u>**

**Supplemental Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

---------------------------------------------------------

**SUPPLEMENTAL DECLARATION OF DEANNA HORST WITH RESPECT TO**
**DEBTORS' FIFTIETH OMNIBUS OBJECTION TO CLAIMS**
**(NO LIABILITY BORROWER CLAIMS – BOOKS AND RECORDS)**

Deanna Horst, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury:

1.     I am the Chief Claims Officer for Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "Debtors"). I have been employed by affiliates of ResCap since August of 2001, and have held my current position since June of 2012. I began my association with ResCap in 2001 as the Director, Responsible Lending Manager, charged with managing the Debtors' responsible lending on-site due diligence program. In 2002, I became the Director of Quality Asset Management, managing Client Repurchase, Quality Assurance and Compliance—a position I held until 2006, at which time I became the Vice President of the Credit Risk Group, managing Correspondent and Broker approval and monitoring. In 2011, I became the Vice President, Business Risk and Controls, and supported GMAC Mortgage, LLC ("GMACM") and Ally Bank in this role. In my current position, I am responsible for Claims Management and Reconciliation and Client Recovery. I am authorized to submit this supplemental declaration (the "Supplemental Declaration") with respect to the *Debtors' Omnibus Reply in Support of Debtors'*

*Fiftieth Omnibus Objection to Claims (No Liability Borrower Claims - Books and Records)* (the "Reply").[1]

2.      Except as otherwise indicated, all facts set forth in this Supplemental Declaration are based upon my familiarity with the Debtors' books and records, information learned from my review of relevant documents and information I have received through my discussions with other members of the Debtors' management or other employees of the Debtors, and/or the Debtors' professionals and consultants.  If I were called upon to testify, I could and would testify competently to the facts set forth in the Reply on that basis.

3.      The Debtors have examined each of the Responses and the statements and exhibits submitted in support thereof.  Upon review of the Responses, the Debtors diligently examined their books and records in order to assess the validity of the allegations made in the No Liability Borrower Claims and the Responses.  These examinations included a review of the Claimant's payment history and the Debtors' internal servicing notes for the Claimant's loan.  In addition, where applicable, my team reviewed the Claimant's loan modification applications, loan modification approval letters, loan modification denial letters, compliance with loan modifications (trial and/or permanent) and the Claimant's compliance with any other payment plans.  In addition, the Debtors reviewed the relevant investor guidelines and/or directions relating to loan modification requests.  For the reasons set forth below, the Debtors determined that the Claimants' allegations of liability are unsubstantiated and have no validity.

## A.    MARY CRITCHLEY (CLAIM NO. 1576)

4.      Ms. Critchley asserts that "GMAC in December 2009 arbitrarily increased her payments from $2,093.00 per month to $3,342.00 per month by requiring escrow of taxes

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Reply.

2

and she responded that she would pay all payments and taxes when due as she always had." The increase in payments was not "arbitrary." More specifically, as a servicer, it is standard practice for GMACM to escrow for taxes in the event that a borrower does not pay taxes, which can threaten the lienholder's position against the real property. As a result, Ms. Critchley's monthly mortgage payment increased to include an escrow for taxes. According to the Debtors' books and records, property taxes began being escrowed because 2008 Town and County taxes had to be paid as well as the first installment of 2009 taxes. In fact, on January 6, 2012, the Debtors provided Ms. Critchley with a written explanation for the escrow consistent with the aforementioned explanation. *See* **Exhibit A-1**.

5.     Ms. Critchley next asserts that "GMAC advised her not to pay payments for 90 days and they would modify the loan (to where it was and had been)." This unsubstantiated allegation is entirely false. There is nothing in the Debtors' servicing notes to indicate that any GMACM employee advised Ms. Critchley to do such a thing.

6.     In fact, the Debtors attempted to effectuate a workout with Ms. Critchley from January through April 2010; however, nothing came to fruition. More specifically, the Debtors first received a workout package for a loan modification on January 9, 2010, and Ms. Critchley supplemented that information on January 20, 21, 22 and 25th, 2010. GMACM attempted to call Ms. Critchley on February 11, 2010 to inform her of missing documents needed to complete the workout package; however, she was not able to be reached so a message was left for Ms. Critchley requesting a call back.

7.     Ms. Critchley sent in additional workout documents on March 5, 2010; however, the workout documents were deficient because a 3-month profit and loss ("P&L")

3

statement was missing, thus preventing GMACM from advancing its review of the workout package.

8.    On April 9, 2010, Ms. Critchley spoke with a GMACM employee and was advised that a P&L statement as well as the completed 4506-T form needed to be submit for the loan modification review to move forward.  According to the Debtors' servicing notes, Ms. Critchley acknowledged this and stated that she would be making a payment on the account by the end of April, 2010.

9.    The Debtors received new workout documents on April 13, 2010; however the 4506-T form was still not completely filled out.  Accordingly, a new missing items letter was sent to Ms. Critchley.  On May 20, 2010, a second missing items letter was sent to Ms. Critchley as the 4506-T was still not complete and the P&L statement in the Debtors' file was too old.  On June 8, 2010, Ms. Critchley sent in another set of workout documents; however, the account was denied because the workout package was too old because data dated back to January 2010, when more recent information was required.  At no time was Ms. Critchley offered a loan modification or promised a loan modification.

10.    A foreclosure sale was then set for June 15, 2010 because there was not a valid and completed loan modification workout package submitted for review at that time.  The property was sold at the sale to MERS, solely as nominee for the lender and lender's successors and assigns on June 15, 2010 (the "Foreclosure Sale"), with a six month redemption period.  Contrary to Ms. Critchley's assertions, the Debtors' servicing notes do not indicate that a GMACM employee ever advised Ms. Critchley that she was required to vacate her property during the redemption period.  In fact, the redemption period permits a borrower to remain in

4

their home until the end of the six month period.  Only at the end of that period, do formal eviction proceedings begin.

11.    In May 2011, the servicer elected to rescind the Foreclosure Sale only because of an adverse ruling by the Michigan state court against MERS (the purchaser).  Ms. Critchley's account was reinstated on November 18, 2011.  On that date, GMACM advised Ms. Critchley that her account remained past due and provided her with 30 days to reinstate the loan. *See* **Exhibit A-2**.  Once the thirty days passed without Ms. Critchley curing the outstanding amounts, the foreclosure process restarted on December 23, 2011.  The property was subsequently sold on September 11, 2012, at which time the account was owing for February 2010 through September 2011.

12.    There was no proceeding instituted to recover the debt secured by her mortgage, the mortgage was properly recorded on December 22, 2005 (*See* **Exhibit A-3**), and the foreclosing party in each instance had an interest in the indebtedness (Mortgage Electronic Registration Systems, Inc. ("MERS") was the foreclosing party in the first foreclosure, US Bank National Association was the foreclosing party for the second).

13.    The Debtors properly recorded the assignment to MERS on April 22, 2010 and U.S. Bank National Association on February 29, 2012. *See* **Exhibits A-4 and A-5**.

14.    The Debtors mailed notice to Ms. Critchley on April 19, 2010 and July 6, 2012 informing her that the foreclosure process had commenced and that she had the right to request mediation. *See* **Exhibits A-6 and A-7**.

15.    The Debtors published the foreclosure notice in the Detroit Legal News and listed the information required under MCL § 600.3212. *See* **Exhibits A-8 and A-9**.

**B.    RAINER P. WARNER (CLAIM NO. 1574)**

5

16.     Mr. Warner seeks recovery against Debtor Residential Capital, LLC ("ResCap") in the amount of $500,000 (the "R. Warner Claim") on account of purported "financial injury which occurred due to Errors, Misrepresentations, and Deficiencies leading to the foreclosure process."

17.     The Debtors began the foreclosure process with Mr. Warner in January 2009. Ultimately, the property was sold on November 28, 2012.  During that extensive period of time, as set forth herein, the Debtors pursued numerous loss mitigation options with Mr. Warner. For example, on February 2, 2009, a repayment plan was set up but cancelled two days later when Mr. Warner requested different terms and a change in the due date of the loan. Notwithstanding, one week later, on February 11, 2009, a traditional trial modification was approved, and by March 31, 2009, a permanent modification had been approved but was never completed because Mr. Warner neither signed the agreement or provided the initial contribution required by the agreement.

18.     In the time that followed, at least four other loan modifications (both HAMP and traditional) were sought, but each was denied for one of the following reasons: (i) GMACM was not able to reduce the payment, interest rate or defer enough of the principal to lower the payment and comport with investor guidelines, (ii) Mr. Warner's income was not sufficient to support the required monthly payments, or (iii) the net present value of the property was less than zero.  In sum, GMACM worked with Mr. Warner for nearly four years to avoid the foreclosure of his home, but the circumstances could not support an acceptable set of payment terms under which to modify the loan.

19.     Mr. Warner also asserts that GMACM "failed to submit any record evidence proving that it had the right to enforce the note on the date the complaint was filed."

To the contrary, Florida is considered an "Original Document" state. A foreclosure cannot go forward unless the original Note is filed in the court. The original note, mortgage and title were included with the filed Complaint and Lis Pendens. The filing of the foreclosure action was handled appropriately and consistent with state law.

20.      Moreover, because this was an instance in which MERS (Mortgage Electronic Registration Systems) served as the nominee for the corresponding owner/lender of Mr. Warner's promissory note, the note was endorsed to "blank." As mortgagee of record, MERS holds mortgage liens. When MERS serves as mortgagee of record, it does so as a nominee of the corresponding Lender and that Lender's successors and assigns. It is through this nominee relationship with the current Lender that any separation or splitting of the mortgage from the note is prevented. In other words, if the Lender is succeeded in interest by another party (e.g. through a merger or acquisition) or if the Lender transfers the note to another party (e.g. the note is sold and negotiated) then MERS will continue to act as mortgagee on behalf of (i.e. as a nominee of) that new Lender, which is a successor or assign of the previous Lender. It is only when MERS actually assigns the mortgage (i.e. a MERS Signing Officer executes an assignment of mortgage) that MERS no longer holds any interest in the mortgage and the lien is transferred

21.      Mr. Warner also asserts that the principal loan balance increased as a result of "fraudulent charges and fees." The increase in the loan balance noted in the R. Warner Claim was a result of costs associated with property valuations (i.e., broker price opinions or "BPOs") and property inspections, each of which are standard business practices when an account becomes delinquent. The Debtors' books and records indicate that nine BPOs were completed on the property during Loss Mitigation review between March 2009 and August 2012. A BPO has to be completed for either a Loss Mitigation Short sale or Modification review, and a BPO is only good for 120 days. Once that period of time expires, another BPO has

7

to be completed if the loan is still in review for Loss Mitigation.  Pursuant to the terms of the Note and Deed, the servicer is permitted to pass along these BPO expenses to the borrower. In addition, it is GMACM's standard servicing procedures to complete property inspections every month starting the month that the account falls 45 days delinquent. The fees from the inspections are the borrower's responsibility to pay as the account is delinquent.

22.    Mr. Warner also alleges in his claim that "GMAC have not done any inspections or preservations of the property." To the contrary, the Debtors' Books and Records confirm that all inspections were complete when ordered.  A property inspection can range from a drive by to see if the home appears to be occupied to a knock on the door, the majority are a drive by as the goal of a property inspection is to make sure the property is maintained and occupied.

23.    The monthly payment increased because the Debtors had to satisfy $11,000 of past due 2007 county taxes as well as cover the cost of hazard insurance that the Mr. Warner did not have on the property in 2009.

## C.    PAMELA D. LONGONI, LACEY LONGONI AND JEAN M. GAGNON (Claim NOS. 2292, 2293, 2296 & 2297)

24.    On September 29, 2005, Jean M. Gagnon and Pamela Longoni refinanced a prior mortgage loan on real property located at 5540 Twin Creeks Drive, Reno, Nevada 89523 (the "Property") and entered into a $432,000 Note and Deed of Trust with EquiFirst Corporation (the "Loan"). (Am. Compl. ¶ 25, attached hereto as **Ex. C-1**).

25.    RFC purchased the Loan from Equifirst Corporation in November of 2005. (Am. Resp. Pls.' First Set of Interrog. to Def. RFC at 3, attached hereto as **Ex. C-2**). Pursuant to the Pooling and Servicing Agreement (the "PSA") between Residential Assets Mortgage Products, Inc. ("RAMP"), Residential Funding Company, LLC ("RFC"), and U.S.

Bank, executed on December 1, 2005, the Loan became securitized on December 28, 2005. (*Id.*
at 3-4). On December 28, 2005, RFC and RAMP also entered into an Assignment and
Assumption Agreement, which provided for the automatic transfer of ownership of the Loan to
the Trust, RAMP 2005-EFC7 (the "<u>Trust</u>"). (*Id.* at 4).[2] Ownership of the Loan transferred to the
Trust on December 28, 2005, thereby divesting RAMP of any ownership of the Loan. Pursuant
to the PSA, U.S. Bank is the trustee for RAMP 2005-EFC7 and RFC is the master servicer of the
Loan. (<u>Id.</u> pp. 2-4). On May 1, 2007, RFC delegated its servicing rights to GMACM under the
terms of the Servicer Guide between RFC and GMACM. (*Id.* at pp. 2, 4).  Moreover, "no
individual at RFC had any further contact with GMACM relating to Plaintiffs' loan." (*See* Am.
Resp. Pls.' First Set of Interrog. to Def. RFC at 2, 6, attached hereto as **Ex. C-2**).

26.     In November 2007, GMACM modified the Loan. (*See* Adjustable Rate
Loan Modification Agreement, attached hereto as **Ex. C-3**).  However, in 2008, Ms. Gagnon and
Ms. Longonis' apparent financial difficulties continued and they defaulted on the Loan. (Am.
Compl. ¶ 8, attached hereto as **Ex. C-1**). GMACM referred the loan to its foreclosure trustee,
ETS, who recorded a Notice of Breach and Default and of Election to Cause Sell of Real
Property Under Deed of Trust on or about February 26, 2009. (*See* Notice of Breach and Default,
attached hereto as **Ex. C-4**)

27.     Ms. Gagnon and Ms. Longoni contacted GMACM in early 2009 to discuss
a second possible modification of the Loan. (Am. Compl., ¶ 9). GMACM sent a package of
records to fill out and return in order to be considered for a possible loan modification. (*Id.*). In
March 2009, Ms. Gagnon and Ms. Longoni and GMACM entered into a three month **<u>trial</u>**

---

[2] The Trust was created for the benefit of the Trust's certificate holders.

repayment plan, the terms of which included payments of $1,600.00 a month from April to June 2009. (*Id.* ¶¶ 10-11).[3] Longoni made her $1,600 payments in April, May, and June 2009.

28.    In July 2009, GMACM informed Ms. Gagnon and Ms. Longoni they needed to submit an updated application in order to be considered for a loan modification under HAMP,[4] which had recently been enacted. (*Id.* ¶ 12). Ms. Gagnon and Ms. Longoni assert that they "provided the requested information" but they admit they were "never told whether the new plan was approved or not." (*Id.*). GMACM's records do not include any evidence that Ms. Gagnon and Ms. Longoni ever submitted the financial package necessary for a review for a permanent loan modification.

29.    Although GMACM had originally put the foreclosure on hold, it released the hold on July 15, 2009 due to Ms. Gagnon and Ms. Longoni's default on the Loan and their failure to submit the financial package for review. ETS recorded the notice of default with the Washoe County Recorder on February 26, 2009, several months *before* NRS § 107.086's effective date of July 1, 2009. (*See* Notice of Breach and Default, attached hereto as **Ex. C-4**). On July 23, 2009, ETS recorded the Notice of Trustee's Sale and that notice also ran in the local newspaper on July 24, 2009. (*See* Affidavit of Publication, attached hereto as **Ex. C-5**). GMACM continued to contact Ms. Longoni by phone and letter to ask that she complete the financial package for a permanent loan modification review, which she never did. Therefore, on August 14, 2009, ETS conducted a foreclosure sale, and the Property was sold to a third-party purchaser. (Am. Compl. ¶ 57).

---

[3] The trial repayment plan originally called for monthly payments of $2,270 but Longoni advised GMACM that she could not afford such payments. Therefore, the trial payments were reduced to $1600.

[4] Home Affordable Modification Program.

ny-1116812

30.     RFC, in its role as master servicer, never interacted directly with Ms. Gagnon and Ms. Longoni regarding their loan and never directed GMACM regarding Ms. Gagnon and Ms. Longoni's loan. All decision-making authority relating to Ms. Gagnon and Ms. Longoni's loan was delegated to GMACM.

31.     RAMP, however, is neither the holder of the Note nor the owner of the Loan. RAMP simply bought Ms. Gagnon and Ms. Longoni's loan, along with many others, on the open market and, immediately upon the creation of a pooling and servicing agreement, deposited Ms. Gagnon and Ms. Longoni's loan into the Trust created for the benefit of the Trust's certificate holders. Upon the December 2005 deposit of Ms. Gagnon and Ms. Longoni's loan into the Trust, RAMP divested itself of any ownership of Ms. Gagnon and Ms. Longoni's loan.

32.     On or about April 28, 2010, Ms. Gagnon and Ms. Longoni filed suit against GMACM and ETS, along with several individual defendants, in the Second Judicial District Court of the State of Nevada in Washoe County. The case was removed to the United States District Court for the District of Nevada, Reno Division, Case No. 3:10-cv-00297. On September 17, 2010, Ms. Gagnon and Ms. Longoni filed an Amended Complaint; on February 25, 2011, Ms. Gagnon and Ms. Longoni filed a second Amended Complaint, adding RFC as a defendant; on September 12, 2011, Ms. Gagnon and Ms. Longoni filed a third Amended Complaint, adding RAMP as a defendant. On May 17, 2012, Defendants GMACM, ETS, RFC, and RAMP filed their notice of bankruptcy, and on September 28, 2012, they filed an amended notice of bankruptcy.

33.     Ms. Gagnon and Ms. Longoni inaccurately allege that RFC informed them that RAMP "was in fact the proper defendant," citing an e-mail from counsel for RFC and

11

RAMP, attached as Exhibit 2 to their Opposition. (Doc. 5420 at 3). The August 5, 2011 e-mail,

however, refutes this assertion as it actually outlines the role of RAMP as depositor and U.S.

Bank's role as trustee.

**D.    JACQUELINE WARNER (Claim NO. 3502)**

34.    Ms. Warner seeks a recovery against Debtor GMAC-RFC Holding

Company, LLC ("<u>GMAC-RFC</u>") on account of her purported rescission of her mortgage loan.

35.    The Debtors' books and records reflect that Ms. Warner never tendered

any proceeds back to GMAC-RFC, GMACM or any other debtor to complete the rescission

(even if it was valid).    Rather, within two weeks after the Debtors commenced foreclosure

proceedings against Ms. Warner, she paid off the loan in full in November 2012.  Before then,

Ms. Warner never tendered payment to the Debtors.  Thereafter, the Debtors filed a "Notice of

Rescission of Notice of Default" and a reconveyance document was recorded with the county as

document number 2012-183546 on December 6, 2012. (*See* Notice of Rescission, attached

hereto as **Ex. D-1**).

**E.    FELIX O. ABU (Claim Nos. 241 and 246)**

36.    On January 9, 2007, Greenpoint Mortgage Funding, Inc. originated a loan

to Mr. Abu (the "<u>Abu Loan</u>").  On April 2, 2007, GMACM began sub-servicing the Abu Loan,

and on February 16, 2013 servicing of the Abu Loan was transferred to Ocwen.  Nationstar

Mortgage 42112 Series GPMF 2007-AR2 is the investor for the Abu Loan.

37.    As part of his own personal bankruptcy case, Mr. Abu brought an

adversary proceeding against, among others, the Debtors.  On April 5, 2013, the Honorable

Thomas C. Holman, United States Bankruptcy Judge for the Eastern District of California,

entered a civil minute order dismissing the adversary proceeding.  Attached as **Exhibit E-1** is the

order dismissing the adversary proceeding. No appeal of Judge Holman's decision was filed. Attached as **Exhibit E-2** is the docket of that adversary proceeding evidencing that no appeal was taken.

### F.   DENNIS G. AND MARCENE L. BURGIN (Claim No. 4494)

38.   On May 22, 2007, Transcontinental Lending Group originated a home equity line of credit to Mr. and Ms. Burgin (the "Burgin HELOC"). On June 15, 2007, GMACM began sub-servicing the Burgin HELOC. Servicing of the Burgin HELOC was subsequently transferred to Macquarie Mortgage USA Inc. (MMUA CoBrand Recovery). The current investor in the Burgin HELOC is also Macquarie Mortgage USA Inc.

39.   GMACM froze the line of credit due to the loss of equity in the borrower's home. Mr. and Ms. Burgin were also late on monthly payments at the time.

40.   On December 11, 2008, as required in paragraph 10 of the Burgin HELOC, GMACM sent borrower proper notice of the freeze of the Bergin HELOC. If Mr. and Ms. Burgin felt that the value of the property had increased and they were no longer in default on their obligations on the Burgin HELOC, then they could have notified GMACM in writing that such conditions had changed. *See* D.E. 5472 at ¶ 3 (describing borrower's options to reinstate HELOC). GMACM would have been obligated to reinstate the borrowing privileges under the Burgin HELOC. However, Mr. and Ms. Burgin never provided any information to GMACM that would support reopening the credit line

### G.   JAMES C. JACKSON (Claim No. 4664)

41.   On January 10, 2005, New State Mortgage LLC originated a mortgage to Mr. Jackson in the amount of $135,860 (the "Jackson Loan"). On March 12, 2007, Homecomings Financial began servicing the Jackson Loan, and on September 1, 2013, servicing of the Jackson Loan was transferred to Ocwen. The Bank of New York Mellon Trust Company,

National Association FKA The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank, N.A., as Trustee for Residential Asset Mortgage Products, Inc., Mortgage Asset-Backed Pass-Through Certificates Series 2005-RS3 is the investor for the Jackson Loan.

42.     ResCap was not the seller of the property, as evidenced by the Note, attached hereto as **Exhibit G-1**, and only briefly held the Note on the real property, which was then endorsed to JP Morgan Chase.   A review of ResCap's books and records did not find anything noted in the system notes related to this dispute.   In fact, the notes show that Mr. Jackson was making monthly payments and received a traditional loan modification on November 6, 2009.  Attached hereto as **Exhibit G-2** is a copy of Mr. Jackson's Fixed Rate Loan Modification Agreement.

**H.     MICHAEL A. AND GLORIA S. MCGUINTY (Claim Nos. 1963 and 5970)**

43.     On August 12, 2003, GMACM originated a mortgage to Mr. and Ms. McGuinty in the amount of $273,500 (the "McGuinty Loan").   Also on August 12, 2003, GMACM began servicing the McGuinty Loan, and continued servicing the loan until the foreclosure sale in November 2011.  Fannie Mae is the current investor in the McGuinty Loan.

44.     Mr. and Ms. McGuinty applied for a loan modification on June 6, 2009. They were denied a modification on July 20, 2009 due to insufficient income to support the property.

45.     Mr. and Ms. McGuinty again applied for a loan modification on February 7, 2010.   Mr. and Ms. McGuinty were informed that certain information was missing on February 24, 2010, which was the award letter for Mr. and Ms. McGuinty's Chase IRA, award letter for GM retirement plan and signed hardship affidavit.   The McGuinty Loan was not

14

approved for modification and was denied on March 10, 2010 due to insufficient income to support the property.

46.     The paperwork requested by GMACM of Mr. and Ms. McGuinty was necessary as the HAMP program requires a complete package of documents for an account to be approved for the HAMP modification program.  GMACM's servicing notes indicate that Mr. and Ms. McGuinty were informed of the missing information needed on February 24, 2010, which was the award letter for Mr. and Ms. McGuinty's Chase IRA, award letter for GM retirement plan and signed hardship affidavit.  The HAMP program required all of this information as proof of income to confirm Mr. and Ms. McGuinty were receiving the income listed on their financial form.

47.     According to the Debtors' books and records, Mr. and Ms. McGuinty applied for a loan modification on June 6, 2009.  They were denied a modification on July 20, 2009 due to insufficient income to support the property.  GMACM denied the modification of the McGuinty Loan under the HAMP program for insufficient income to support the property based on the following information that was received in the Mr. and Ms. McGuinty's workout package: Mr. and Ms. McGuinty received (1) $2,079.17 in pension income, (2) $1,883 in social security income for Mr. McGuinty, and (3) $633 in social security income for Ms. McGuinty for a total of $4,595.17.  Their listed total expenses based on the financial form received in the same workout package equal $7,345.70, which left a deficit of $2,750.53.  The deficit amount was more than four times their monthly mortgage payment at the time of review, which was $620.45. Therefore, not even the complete elimination of their mortgage payment would have resolved the McGuinty's monthly income deficit.

15

48.     The Debtors' books and records indicate that Mr. and Ms. McGuinty again applied for a loan modification on February 7, 2010.  The McGuinty's were not approved for a modification and were denied on March 10, 2010 due to insufficient income to support the modified payment.  The McGuinty's loan modification was denied based on the following information that the Debtors received in Mr. and Ms. McGuinty's workout package: (1) $2,319.17 in pension income, (2) $1,883 in social security income for Mr. McGuinty, and (3) $633 in social security income for Ms. McGuinty for a total of $4,835.17.  According to GMACM's servicing notes, the workout package also listed monthly income of $5,000 stemming from money borrowed from Mr. and Ms. McGuinty's IRA account. As borrowings do not qualify as monthly income, GMACM was unable to consider it in assessing Mr. and Ms. McGuinty's eligibility for loan modification.  Mr. and Ms. McGuinty's workout package indicated that total monthly expenses were $7,988.78, which represented an increase in expenses from their previous modification.  After factoring Mr. and Ms. McGuinty's eligible monthly income and total expenses, this left a deficit of $3,153.61.  This time, the monthly deficit amount was nearly four times more than the amount of the mortgage payment at the time of review, which was $798.04. Not even the elimination of their mortgage payment would have resolved the McGuinty's monthly income deficit.

49.     Mr. and Ms. McGuinty again applied for a modification on December 17, 2010.  At this time, the McGuinty's were approved for a HAMP trial plan with payments due March 1, 2011, April 1, 2011, and May 1, 2011.  Attached hereto as **Exhibit H-1** is a copy of the trial Plan.  Subsequently, the McGuinty's were denied a permanent modification on April 6, 2011 because Mr. and Ms. McGuinty did not make their first trial payment due March 1, 2011.

50.     The Debtors sold the property in a foreclosure sale on November 18, 2011. At the time the property was sold in foreclosure, the last payment made on the account was dated before August 1, 2010.

## I.     TOMAS DIAZ (Claim No. 5935)

51.     On April 26, 2006, Platinum Capital Group originated a mortgage to Mr. Diaz in the amount of $1,000,000 (the "Diaz Loan").  On June 1, 2006, Homecomings Financial transferred the servicing of Mr. Diaz's Loan, and on April 1, 2008, servicing of the Jackson Loan was transferred to Aurora Loan Servicing.  Deutsche Bank under series RALI 2006-QO6 is the current investor for the Diaz Loan.

52.     At the time of transfer, the loan was in a foreclosure status.  The Debtors' records show the endorsement chain is proper.  Deutsche was the investor, and Homecomings serviced the loan on behalf of the investor.  Internal records indicate Mr. Diaz sent in a qualified written request (QWR) in 2012 requesting account information and loan documents in connection with the Debtors' involvement with the Diaz Loan back in 2006-2008.   Debtor responded to Mr. Diaz in December 2012 and sent Mr. Diaz copies of pay history, TILA disclosures, the ARM note, HUD-1, and the mortgage application. A copy of the December 2012 Letter, attached hereto as Ex. I-1.

## J.     ISO GRADJAN (Claim No. 5935)

53.     On April 23, 2009, Virgin Money USA originated a mortgage to Mr. Gradjan in the amount of $197,000 (the "Gradjan Loan").  Also on April 23, 2009, GMACM began servicing the Gradjan Loan, and on February 16, 2013 servicing of the Gradjan Loan was transferred to Ocwen.  Fannie Mae is the investor for the Gradjan Loan.

Dated:  November 13, 2013

/s/ Deanna Horst
Deanna Horst
Chief Claims Officer for Residential Capital,
LLC

**Exhibit A-1**

# GMAC Mortgage

January 6, 2012

Mary Critchley
30752 Everett St
Southfield MI  48076

RE:    Account Number    7426205951
       Property Address   3487 W Maple Road
                          Bloomfield Hills MI  48301

Dear Mary Critchley:

This letter is in response to the inquiries received from Morganroth and Morganroth PLLC regarding the above-referenced account dated December 28, 2011 and December 30, 2011 and received in our office on January 3, 2012 and January 4, 2012.

Our response is being provided to you, as we do not have authorization for Marganroth and Morganroth PLLC. Please share this response at your discretion. A letter with an authorization form has been provided to Morganroth and Morganroth PLLC advising we must have your signature to provide authorization for account information.

We apologize for any inconvenience you have experienced. Exceptional customer service is our top priority and we regret if this has not been your experience.

GMAC Mortgage was notified by your local tax collector of delinquent taxes. A letter was mailed to you on September 18, 2009 advising if we did not receive proof of payment or proof of a payment arrangement, the delinquent taxes would be paid and an escrow account would be established. As we did not receive a response to our letter, the delinquent taxes were paid on December 9, 2009 and the escrow account was established.

An escrow analysis was completed on December 17, 2009 and mailed to you. This analysis advised of the escrow shortage and the payment would adjust to $3,342.56 beginning with the February 1, 2010 payment.

You contacted our offices for payment assistance in January 2010. You were provided a financial package to complete and return for a loan modification. We do not have record of you being advised to stop making payments to be approved for a loan modification.

3451 Hammond Ave            Tel: (800) 766-4622
Waterloo, IA 50702

# <u>GMAC</u> Mortgage

January 6, 2012
Account Number 7426205951
Page Two

On January 19, 2010, a partial workout package was received. A GMAC Mortgage representative tried to contact you by phone on February 11, 2011. A message was left advising of items required to continue reviewing the account for a loan modification. A letter dated February 17, 2010 was also mailed advising of the missing items required to continue reviewing your account for a loan modification.

As we did not receive a response to our call or our letter a second, third, and fourth letters were issued on March 23, 2010, April 13, 2011, and May 20, 2011, requesting the required missing items for a loan modification review.

GMAC Mortgage did not receive the required current financial information as requested and a letter was issued on June 9, 2011 advising we no longer had sufficient time to review the account for a loan modification and the foreclosure sale would occur.

Our records indicate the foreclosure process was started on May 15, 2010. A foreclosure sale was then completed on June 15, 2010. However, this foreclosure sale was rescinded. On August 18, 2011, GMAC Mortgage updated your credit file to indicate the account was in foreclosure but the foreclosure sale was removed.

If you would like to pursue a short sale, please complete and return the enclosed financial form.

If you have any further questions, please contact Customer Care at 1-800-766-4622 between the hours of 6:00 am to 10:00 pm CT Monday through Friday and 9:00 am to 1:00 pm CT on Saturday.

Customer Care
Loan Servicing

Enclosure

JS

3451 Hammond Ave        Tel: (800) 766-4622
Waterloo, IA 50702

Ref: Correspondence Imaged

COPP   3/1/12
Type      Date

March 7, 2012

Morganroth & Morganroth PLLC
Attn: Mayer Morganroth
344 North Old Woodward Avenue
Suite 200
Birmingham MI  48009-5310

Re:   Account Number   7426205951
      Mortgagor        Mary Critchley
      Property Address 3487 W Maple Road
                       Bloomfield Hills MI  48301

Dear Mayer Morganroth:

This letter is in response to your inquiries dated March 1, 2012 and received in our office on
March 1, 2012 and March 5, 2012 regarding the above-referenced account.

Our records indicate a response was mailed to Ms. Mary Critchley regarding the reasons why the
account was referred to foreclosure, the loan modification attempt, and the foreclosure sale
issues on January 6, 2012. For your reference, enclosed is a copy of the letter.

Our records indicate a letter was mailed to the borrower on September 18, 2009 requesting proof
of payment or payment arrangements for the delinquent taxes. As proof was not received, the
delinquent 2008 Oakland County taxes for a total of $3,582.16 and delinquent 2009 Oakland
County taxes for a total of $5,124.21 were paid on December 9, 2009 in order to protect our
interest in the property. An escrow account was established at that time to pay future taxes and to
pay back the disbursed tax amounts.

An escrow analysis was completed on December 17, 2009 to adjust the payment to include the
escrow account. Effective February 1, 2010, the payment increased from $2,093.84 to $3,342.56.
Enclosed is a copy of the escrow analysis statement that was sent to Ms. Critchley at that time to
advise of the escrow shortage and the new payment amount.

Ms. Critchley contacted our offices on January 6, 2010 in regards to the increased payment
amount. As she was aware of the increased payment amount and had questioned the affordability
of the new payment amount, a financial analysis package was mailed to her.

March 7, 2012
Account Number 7426205951
Page Two

Our records indicate a partial financial analysis package was received. However, a complete
package was not received even though we advised of the missing documents via three letters and
phone calls. Unfortunately, we are unable to review an account for any of our payment assistance
options without a complete financial analysis package.

A letter was mailed on March 5, 2010 advising if the defaulted amount was not cured within 30
days of the letter, the account may be referred to foreclosure. The default was not cured;
therefore, the account was referred to foreclosure on April 17, 2010 as the February 1, 2010
through April 1, 2010 payments were due.

As of May 25, 2010, the completed 4506-T form, an up to date three month profit and loss
statement, and a copy of the 2009 extension filed for tax returns was needed in order to begin the
process to review the account for another loan modification. The 2009 extension document was
received June 3, 2010. However, the other two documents were not received.

The property was sold at a foreclosure sale on June 15, 2010. However, the foreclosure sale was
rescinded in August 2011 as notice was given by advertisement and must be re-done.

If the borrower no longer has an interest in the property, she may wish to pursue a short sale or
deed in lieu of foreclosure. Enclosed is information pertaining to these two options. Please have
her complete and return the required financial analysis forms if she is interested in either option.

The account is currently in foreclosure. The foreclosure action is being handled by Schneiderman
& Associates PC, telephone number 1-248-539-7400. You may contact our attorney or trustee if
you have foreclosure-related questions.

If you have any further questions, please contact Customer Care at 1-800-766-4622 between the
hours of 6:00 am to 10:00 pm CT Monday through Friday and 9:00 am to 1:00 pm CT on
Saturday.

Customer Care
Loan Servicing

Enclosures

KS

**Exhibit A-2**

GMAC Mortgage
3451 Hammond Ave
PO Box 780
Waterloo, IA 50704-0780

 **GMAC Mortgage**

November 18, 2011

05/23/11 10:00 3   0000769 20111119 GK41P101 GMACDUPL 1 OZ DOM GK41P10000* 180275  DM



MARY CRITCHLEY
30752 EVERETT ST
SOUTHFIELD, MI 48076-1506

RE:    Account Number        7426205951
       Property Address       3487 W. MAPLE ROAD
                              BLOOMFIELD HILLS MI 48301

Dear MARY CRITCHLEY:

We have not received your mortgage payments for the months of 02/01/10 through 11/01/11. This means your account is now in default. This is a demand for payment of the total amount due as of November 18, 2011:

| | |
|---|---|
| Payments | $ 68555.36 |
| Late charges | $ 2303.18 |
| Fees, costs, and other accrued to date | $ 4462.36 |
| Suspense | $ - 0.00 |
| Total Amount Due | $ 75320.90 |

To avoid foreclosure, you need to pay this amount no later than 30 days from the date of this notice. You also need to pay for all additional payments and fees that accumulate during this period.

Unless we receive full payment of all past-due amounts within 30 days from the date of this notice, we will require immediate payment of your entire loan and begin foreclosure proceedings. This could result in the loss of your home. You may have the right to bring a court action to challenge the default, or assert other defenses to immediate payment and sale that may be available in your mortgage documents or under state law.

If your payment is not accepted for any reason or your payment is for less than the total amount due (which we may accept without waiving any of our rights), this matter will not be resolved.

(Continued on next page)



November 18, 2011
Account Number 7426205951
Page Two

Once in foreclosure, you have the right to reinstate your account up to five days before the foreclosure sale of your home if: 1) you pay the total amount due plus any fees, costs, and other amounts that accumulate through the reinstatement date, and 2) you take any other action reasonably required by us to assure the security of the property. Your obligations under the loan documents will still apply during this time.

Your credit rating may be negatively affected if you do not resolve this matter. We may visit your property from time to time to determine its condition and occupancy status. You will be responsible for the costs of these inspections.

HUD-approved counseling is available on FHA guaranteed loans by calling 1-800-569-4287. If you would like to discuss this letter, we encourage you to contact our loan counselors immediately at 800-850-4622 (weekdays, 8:00 a.m. - 11:00 p.m. CT; Saturday, 8:00 a.m. - 12:00 p.m.).

Sincerely,


Collection Department
Loan Servicing


Please Note:
This is an attempt to collect a debt and any information obtained will be used for that purpose.

If you have filed for bankruptcy and your case is still active or if you have received an order of discharge, please be advised that this is not an attempt to collect a pre-petition or discharged debt. Any action taken by us is for the sole purpose of protecting our lien interest in your property and is not to recover any amounts from you personally. If you have surrendered your property during your bankruptcy case, please disregard this notice.

If you are currently in bankruptcy under Chapter 13, you should continue to make payments in accordance with your Chapter 13 Plan and disregard this notice.

5020

**Exhibit A-3**



*First American*
*Title Insurance Company*
NATIONAL DEFAULT TITLE SERVICES

18663

**NATIONAL DEFAULT TITLE SERVICES**
3 FIRST AMERICAN WAY
SANTA ANA, CA  92707
SUSAN ALVARADO
*Ph*: 714-250-4212
*Fx*: 714-800-7806
*Email*: SUALVARADO@FIRSTAM.COM

## 2 OWNER
## FORECLOSURE INFORMATION REPORT

**GMAC Mortgage Corporation**
**1100 Virginia Drive**
**ATTN: Default**
**Fort Washington, PA  19034**

| | |
|---|---|
| NDTS ORDER NO.: | **5951119** |
| CUSTOMER REFERENCE NO.: | **7426205951** |
| PROPERTY ADDRESS: | **3487 West Maple Road** |
| | **Bloomfield Hills, MI  48301** |
| AS OF THE DATE HEREOF: | **4/05/2010** |

**A.**  THE LAST RECORDED DOCUMENT PURPORTING TO TRANSFER TITLE TO THE
LAND DESCRIBED HEREIN SHOWS THE FOLLOWING PURPORTED OWNER:

- **Mary Critchley**

Means of Conveyance: **Warranty Deed**
Grantee: **Mary Critchley, a single woman**
Grantor: **Ella Louise Nasher**
Date Recorded: **12/08/2003**
Book: **31627**
Page: **867**

Means of Conveyance: **Warranty Deed**
Grantee: **E. Louise Nashar, (a widow)**
Grantor: **Mary Jo Nashar (a single woman)**
Date Recorded: **11/07/1980**
Book: **7901**
Page: **43**

**B.** ACCORDING TO THE LATEST EQUALIZED ASSESSMENT ROLL THE FOLLOWING AD VALOREM TAX INFORMATION IS SHOWN:

TAX PARCEL NO: **19-34-126-002**

State Equalized Value: $113,790.00
Principal Residence Exemption as of Past December 31st: 100%

2009 Summer Taxes in the amount of $2,537.57 are PAID.
2009 Winter Taxes in the amount of $2,485.14 are PAID.

Special Assessments: None

The amounts shown as unpaid do not include collection fees, penalties or interest.

**C.** OFFICIAL RECORDS OF THE COUNTY WHERE THE LAND IS LOCATED SHOWS THE FOLLOWING UNRELEASED DOCUMENTS AFFECTING THE LAND:

MORTGAGE TO BE FORECLOSED:

- Mortgage in the original stated principal amount of $282,000.00, dated 12/07/2005 recorded 12/22/2005 in Liber 36831 Page 821, between Mary Critchley, an unmarried woman, as mortgagor, and Mortgage Electronic Registration Systems, Inc., as nominee for John Adams Mortgage Company, as mortgagee.

  Assignment of Mortgage from John Adams Mortgage Company, a Michigan Corporation, as Assignor, to Homecomings Financial Network Inc., as Assignee, recorded 12/23/2005 in Liber 36841 Page 873.

SENIOR ITEMS:

- None

JUNIOR ITEMS:

- None

**D.** BANKRUPTCY INFORMATION:

- Final Order of the Bankruptcy Court removing any stay of the foreclosure of the mortgage to be foreclosed or a final order of dismissal of the bankruptcy proceedings of the Debtors listed below. The names of the Debtors listed below were disclosed to us after a telephone reply to the Office of the Clerk of the Bankruptcy Court for the Eastern District of Michigan in Detroit, Michigan. The evidence of the Bankruptcy of a mortgagor or vestee of the land to be foreclosed may be filed in an Office of the Clerk of the Bankruptcy Court but not disclosed to us by the above office.
  Debtors: None

**Note:** We have not searched any additional parties vested in title above, if any, due to insufficient information necessary to conduct a bankruptcy search.

**Exhibit A-4**



2010 MAY 10  AM 11: 26



92899
LIBER 42063 PAGE   586
$10.00 MISC RECORDING
$4.00 REMONUMENTATION
05/12/2010 02:02:51 P.M.  RECEIPT# 35964

PAID   RECORDED - OAKLAND COUNTY
RUTH JOHNSON, CLERK/REGISTER OF DEEDS

## CORPORATION ASSIGNMENT OF REAL ESTATE MORTGAGE

FOR VALUE RECEIVED, the undersigned, HOMECOMINGS FINANCIAL, LLC F/K/A
HOMECOMINGS FINANCIAL NETWORK, INC., assignee of mortgagee, hereby
grants, assigns and transfers to Mortgage Electronic Registration Systems, Inc.
("MERS"), solely as nominee for lender and lender's successors and assigns,, c/o
1100 Viginia Drive, P. O. Box 8300, Fort Washington, PA 19034, all the rights, title
and interest of the undersigned in and to that certain Real Estate Mortgage dated
December 7, 2005 and recorded December 22, 2005, in Liber 36831, Page 821,
Oakland County Records, executed by MARY CRITCHLEY, AN UNMARRIED
WOMAN, to Mortgage Electronic Registration Systems, Inc. ("MERS"), solely as
nominee for lender and lender's successors and assigns,.

LEGALLY DESCRIBED AS FOLLOWS: Township of Blomfield , County of
Oakland.

THE WEST 100 FEET OF LOT 394 AND THE EAST 20 FEET OF LOT 395,
WESTCHESTER VILLAGE NO. 3, AS RECORDED IN LIBER 90, PAGES 25, 26 AND
27 OF PLATS, OAKLAND COUNTY RECORDS.
(A/K/A 3487 WEST MAPLE ROAD, BLOOMFIELD HILLS, MI 48301)  90025
Tax ID No. 19-34-126-002

TOGETHER with the note or notes therein described or referred to, the money due
and to become due thereon with interest, and all rights accrued or to accrue under
said Real Estate Mortgage.

Dated: 4/22/10

HOMECOMINGS FINANCIAL, LLC F/K/A
HOMECOMINGS FINANCIAL NETWORK,
INC.

By: _____
Stephen A. Rice, Limited Officer

STATE OF MI)
                          ) ss.
COUNTY OF Oakland)

The foregoing instrument was acknowledged before me this 22nd day of
April, 2010, by Stephen A. Rice, Limited Officer of HOMECOMINGS FINANCIAL,
LLC F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.

CHECKING COMPLETED
AT REGISTER OF DEEDS
MAY 1 0 2010
Ruth Johnson Register of Deeds
Oakland County, MI

Betty A. Ward, Notary Public
Oakland County, MI
My Commission Expires: 6/17/2013
Acting in Oakland County

Drafted by and when recorded
return to:
BETTY A. WARD
SCHNEIDERMAN & SHERMAN,
P.C.
23938 Research Drive, Suite 300
Farmington Hills, Michigan 48335
Loan Number 7426205951
GMAC.9913

HW - OK

RETURN TO:
ONE STOP RECORDING
23938 RESEARCH DR., STE 200
FARMINGTON HILLS, MI 48335

**Exhibit A-5**



46876
LIBER 43935 PAGE 725
$13.00 MISC RECORDING
$4.00 REMONUMENTATION
03/14/2012 08:48:51 A.M.   RECEIPT# 23424
PAID   RECORDED - OAKLAND COUNTY
BILL BULLARD JR, CLERK/REGISTER OF DEEDS

## ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, the undersigned, Mortgage Electronic Registration Systems, Inc., as nominee for JOHN ADAMS MORTGAGE COMPANY, its successors and assigns, located at P.O. Box 2026, Flint Michigan 48501-2026, hereby grants, assigns and transfers to U.S. Bank National Association as Trustee for RASC 2006KS1 c/o GMAC Mortgage, LLC, 1100 Virginia Drive, P.O. Box 8300, Fort Washington, Pennsylvania 19034, all its rights, title and interest in and to that certain real estate mortgage dated December 7,2005 made by MARY CRITCHLEY, AN UNMARRIED WOMAN to Mortgage Electronic Registration Systems, Inc., as nominee for JOHN ADAMS MORTGAGE COMPANY, its successors and assigns in the amount of $282,000.00 and recorded on December 22, 2005 at the Oakland County Register of Deeds Office in Liber 36831, Page 821, Document No. 0357967 described as follows:

SEE LEGAL DESCRIPTION ATTACHED AS 'EXHIBIT A'

Commonly known as: 3487 WEST MAPLE ROAD BLOOMFIELD HILLS, MI 48301

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said real estate mortgage.

DATE: _2-29 12_

Mortgage Electronic Registration Systems, Inc., as nominee for JOHN ADAMS MORTGAGE COMPANY, its successors and assigns

By: _Jeanette Piccora_

Its: _Assistant Secretary_

CHECKING COMPLETED
ATS CISTER OF DEEDS
MAR 05 2012
Register of Deeds
Oakland County, MI

STATE OF _Pennsylvania_ )
)  ss.
COUNTY OF _Montgomery_ )

The foregoing instrument was acknowledged before me this _28th_ day of _February_, 20 _12_, by _Jeanette Piccora_, its _Assistant Secretary_ of Mortgage Electronic Registration Systems, Inc., as nominee for JOHN ADAMS MORTGAGE COMPANY, its successors and assigns

_Christine Morales_

_Pennsylvania_ County, _Montgomery_
Notary Public
My Commission Expires: _1/28/2015_
Acting in _Montgomery_ County

Drafted by and when recorded return to:
Jean M. Kwasnik
SCHNEIDERMAN & SHERMAN, P.C.
23938 Research Drive, Suite 300
Farmington Hills, Michigan 48335
GMAC.009913

MIN # 100062604262059514
MERS PHONE # 888-679-6377

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
CHRISTINE MORALES, Notary Public
Abington Twp., Montgomery County
My Commission Expires January 28, 2015

O.K. - GK

**<u>Exhibit A-6</u>**

EXHIBIT "A"    LIBER 42155 PG 788



**SCHNEIDERMAN & SHERMAN** P.C.

23938 Research Drive
Suite 300
Farmington Hills, MI 48335

Peter M. Schneiderman*
Neil R. Sherman
Michelle C. Levy
Tobias J. Lipski

*Telephone:* 248.539.7400
*Toll Free:* 866.867.7688
*Facsimile:* 248.539.7401

Tricia A. Nelson
Andrew J. Hubbs**
Brett A. Border
Erin R. Katz
Jonas M. Parker

www.sspclegal.com
attorneys@sspclegal.com

*Of Counsel:*
Dennis J. Dlugokinski

*Also admitted in CO and TX
**Also admitted in IL

## BORROWER'S RIGHT TO REQUEST MEDIATION
### PRIOR TO COMMENCEMENT OF FORECLOSURE

*SSPC Reference Nbr: GMAC.9913*

Date of Notice: April 19, 2010

Mary Critchley

3487 West Maple Road
BLOOMFIELD HILLS, MI 48301

<u>**Via First Class Mail and Certified Mail**</u>
<u>**Restricted Delivery**</u>
<u>**Return Receipt Requested**</u>
<u>**Certified Nbr: 70100290000173010728**</u>

Re:    **GMAC MORTGAGE, LLC** / Borrower's Right to Request Mediation Prior to
Commencement of Foreclosure

Dear Mary Critchley:

1.    <u>WHY IS THIS LETTER BEING SENT?</u>

Please be advised that your mortgage loan at GMAC MORTGAGE, LLC, account
#7426205951, is in default.  It is in default because you have not made your monthly
mortgage payment(s).  As of the date of this letter, the outstanding amount due GMAC
MORTGAGE, LLC is $286,816.67.  Such amount includes fees and costs to date.

2.    <u>WHO DO I CONTACT AT GMAC MORTGAGE, LLC?</u>

GMAC MORTGAGE, LLC has authorized Schneiderman & Sherman, P.C. to be their
Designated Agent.

3.    <u>HOW DO I CONTACT GMAC MORTGAGE, LLC'S DESIGNATED AGENT?</u>

Our contact information is:

Schneiderman & Sherman, P.C.
c/o Designated Agent Department
23938 Research Drive, Suite 300
Farmington Hills, Michigan 48335
248-539-7400 x240 to schedule Mediation hearings
248-539-7400 x312 for reinstatement and document questions
248-539-7401 Facsimile
Web – Contact us through our website at www.sspclegal.com.  Click on the blue
bar located beneath our logo which reads "MEDIATION REQUEST".

4.    <u>WHAT IS THE TIME FRAME TO REQUEST MEDIATION?</u>

You, as borrower(s), have the right, within fourteen (14) days from the date this notice is
sent, to request a meeting with us as the Designated Agent for GMAC MORTGAGE,
LLC to attempt to work out a modification of your mortgage loan.

LIBER 2155 PG 789

5.  CAN I HAVE A HOUSING COUNSELOR ATTEND THE MEDIATION HEARING?

You may also request a housing counselor to attend the meeting.  A list of the housing counselors (attached hereto) who may attend the meeting has been prepared by the Michigan State Housing Development Authority ("MSHDA").  To contact a housing counselor please contact MSHDA at:

> Michigan State Housing Development Authority
> 735 E. Michigan Avenue
> P.O. Box 30044
> Lansing, MI 48909
> Website www.michigan.gov/mshda
> Tel: (866) 946-7432

6.  IF I REQUEST MEDIATION WILL THE COMMENCMENT OF FORECLOSURE BE ADJOURNED?

If you request a meeting with us as the Designated Agent for GMAC MORTGAGE, LLC, we will not commence foreclosure proceedings until ninety (90) days from the date of this notice.

7.  IF A MODIFICATION AGREEMENT IS AGREED UPON WILL THE COMMENCEMENT OF FORECLOSURE BE CANCELLED?

If you and us as the Designated Agent reach an agreement to modify the mortgage loan, no foreclosure will be commenced if you abide by the terms of the mortgage modification.

8.  WHAT HAPPENS IF NO AGREEMENT TO MODIFY THE MORTGAGE IS AGREED UPON?

If you and us, as the Designated Agent for GMAC MORTGAGE, LLC, do not agree to modify the mortgage loan, but you meet the criteria for a modification under Public Act 29 of 2009, Section 3205c(1), then "foreclosure by advertisement" will not be allowed under State of Michigan law.  The mortgage foreclosure will then be commenced judicially in the State of Michigan Circuit Court where the property is located.

9.  DO I HAVE THE RIGHT TO CONTACT AND/OR BRING AN ATTORNEY TO THE MEDIATION?

You have the right to contact an attorney of your choice to assist you, or in the alternative you may contact the State Bar of Michigan Lawyers Referral Service at

> State Bar of Michigan Lawyers Referral Service
> Michael Franck Building
> 306 Townsend Street
> Lansing, MI 48933-2012
> Tel: (800) 968-0738

You further have the right to contact the local Legal Aid Office serving the area in which the property is located.  A list of local Legal Aid Offices is attached to this letter.

Very truly yours,

Schneiderman & Sherman, P.C.

**<u>Exhibit A-7</u>**

SCHNEIDERMAN
& SHERMAN P.C.

23938 Research Drive    Telephone:  248.539.7400    www.sspclegal.com
Suite 300              Toll Free:  866.867.7688    attorneys@sspclegal.com
Farmington Hills, MI 48335    Facsimile:  248.539.7401

| | | |
|---|---|---|
| Peter M. Schneiderman* | Tricia A. Nelson | Catherine A. Clougherty |
| Neil R. Sherman | Brett A. Border | Christina M. Ventimiglia |
| Michelle C. Levy | Erin R. Katz | Dennis J. Dlugokinski |
| Tobias J. Lipski | Jonas M. Parker | *Also admitted in CO and TX |

**MED-600**

**SCHNEIDERMAN & SHERMAN, P.C. IS ATTEMPTING TO COLLECT A DEBT,**
**ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE**
**To the extent your original obligation has been discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this notice is for compliance and/or informational purposes only and/or is notice of the creditor's intent to enforce a lien against the property and does not constitute a demand for payment or an attempt to impose personal liability for such obligation.**

**Attention Servicemembers and dependents: The Federal Servicemembers' Civil Relief Act ("SCRA") and certain state laws provide important protections for you, including prohibiting foreclosure under most circumstances. If you or an individual in your household upon whom you depend are currently in the military service, or were recently discharged, please notify our office immediately.  When contacting our office as to your military service, you must provide positive proof as to your military status.  If you do not provide this information, we will assume you or an individual in your household upon whom you depend are not entitled to protection under applicable law.**

<u>**BORROWER S RIGHT TO REQUEST MEDIATION**</u>
<u>PRIOR TO COMMENCEMENT OF FORECLOSURE</u>

*SSPC Reference Nbr: GMAC.009913*

Date of Notice: Friday, July 6, 2012

MARY CRITCHLEY                      <u>Via First Class Mail and Certified Mail</u>
3487 West Maple Road                <u>Restricted Delivery</u>
BLOOMFIELD HILLS, MI 48301         <u>Return Receipt Requested</u>
                                    Certified Nbr: 70120470000138874299

**Also Mailed to: 30752 EVERETT STREET SOUTHFIELD, MI 48076**
Re:    **GMAC MORTGAGE, LLC** / Borrower s Right to Request Mediation Prior to Commencement of Foreclosure

Dear MARY CRITCHLEY:

1.    <u>WHY IS THIS LETTER BEING SENT</u>?

     Please be advised that your mortgage loan at GMAC MORTGAGE, LLC, account #7426205951, is in default.  It is in default because you have not made your monthly mortgage payment(s).  As of the date of this letter, the outstanding amount due GMAC MORTGAGE, LLC is $339,881.15.  Such amount includes fees and costs to date.

2.    <u>WHO DO I CONTACT AT GMAC MORTGAGE, LLC?</u>

     GMAC MORTGAGE, LLC, servicer for, and on behalf of, U.S. Bank National Association as Trustee for RASC 2006KS1, has authorized Schneiderman & Sherman, P.C. to be their Designated Agent.

3. <u>HOW DO I CONTACT GMAC MORTGAGE, LLC'S DESIGNATED AGENT</u>?

> Schneiderman & Sherman, P.C.
> c/o Designated Agent Department
> 23938 Research Drive, Suite 300
> Farmington Hills, Michigan 48335
> 248-539-7400 x240 to schedule Mediation hearings
> 248-539-7400 x312 for reinstatement or payoff information
> 248-715-8136 Facsimile
> mediation@ssplegal.com
> Web   Contact us through our website at www.ssplegal.com.  Click on the blue
> bar located beneath our logo which reads  MEDIATION REQUEST .

4. <u>WHAT IS THE TIME FRAME TO REQUEST MEDIATION?</u>

You, as borrower(s), have the right, within thirty (30) days from the date this notice is sent, to request or have a housing counselor (see below) request on your behalf, a meeting with us as the Designated Agent for GMAC MORTGAGE, LLC to attempt to work out a modification of your mortgage loan.

5. <u>CAN I HAVE A HOUSING COUNSELOR ATTEND THE MEDIATION HEARING?</u>

You may also request that a housing counselor from the attached list of housing counselors prepared by the Michigan State Housing Development Authority ( MSHDA ) attend any meetings with the Designated Agent.  To contact housing counselor please contact MSHDA at:

> Michigan State Housing Development Authority
> 735 E. Michigan Avenue
> P.O. Box 30044
> Lansing, MI 48909
> Website www.michigan.gov/mshda
> Tel: (866) 946-7432

6. <u>IF I REQUEST MEDIATION WILL THE COMMENCMENT OF FORECLOSURE BE ADJOURNED</u>?

If you request a meeting with us as the Designated Agent for GMAC MORTGAGE, LLC <u>and</u> furnish all documentation subsequently requested by the Designated Agent within 60 days from the date this notice is sent, we will not commence foreclosure proceedings until ninety (90) days from the date of this notice.

7. <u>IF A MODIFICATION AGREEMENT IS AGREED UPON WILL THE COMMENCEMENT OF FORECLOSURE BE CANCELLED</u>?

If you and us as the Designated Agent reach an agreement to modify the mortgage loan, no foreclosure will be commenced if you abide by the terms of the mortgage modification.

8.        WHAT HAPPENS IF NO AGREEMENT TO MODIFY THE MORTGAGE IS AGREED UPON?

If you and us, as the Designated Agent for GMAC MORTGAGE, LLC, do not agree to modify the mortgage loan, but the Designated Agent or GMAC MORTGAGE, LLC has determined that you meet the criteria for a modification under Public Act 29 of 2009, Section 3205c(1), then foreclosure by advertisement will not be allowed under State of Michigan law.  The mortgage foreclosure will then be commenced judicially in the State of Michigan Circuit Court where the property is located and the redemption period will be six (6) months

If you do not meet the criteria for a modification under Public Act 29 of 2009, Section 3205c(1), and foreclosure proceeds by advertisement, the redemption period will be six (6) months, unless on the date of the notice of foreclosure the amount claimed to be due on the mortgage is less than or equal to 66-2/3% of the original indebtedness or the property is used for agricultural purposes, in which case the redemption period will be one (1) year.  However, if the property is later determined abandoned under MCL 600.3241a, the redemption period may be shortened to one (1) month. If the property is determined abandoned under MCL 600.3241, the redemption period may be shortened to one (1) month, unless the amount claimed to be due on the mortgage is less than or equal to 66-2/3% of the original indebtedness--in which case the redemption period may be shortened to three (3) months.

If the property is sold at a foreclosure sale under Chapter 600 of the Michigan Compiled Laws, under MCL 600.3278, the borrower will be held responsible to the person who buys the property at the mortgage foreclosure sale or to the mortgage holder for damaging the property during the redemption period.

9.        DO I HAVE THE RIGHT TO CONTACT AND/OR BRING AN ATTORNEY TO THE MEDIATION?

You have the right to contact an attorney of your choice to assist you, or in the alternative you may contact the State Bar of Michigan Lawyers Referral Service at

> State Bar of Michigan Lawyers Referral Service
> Michael Franck Building
> 306 Townsend Street
> Lansing, MI 48933-2012
> Tel:  (800) 968-0738

You further have the right to contact the local Legal Aid Office serving the area in which the property is located.  A list of local Legal Aid Offices is attached to this letter.

> Very truly yours,
> Schneiderman & Sherman, P.C.

**Exhibit A-8**

**THE DETROIT LEGAL NEWS   1409 Allen Road, Troy, Michigan 48083-4003**
## SHORT FORECLOSURE NOTICE - Oakland COUNTY

**SCHNEIDERMAN & SHERMAN, P.C.,  IS ATTEMPTING TO COLLECT A DEBT, ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. PLEASE CONTACT OUR OFFICE AT (248)539-7400 IF YOU ARE IN ACTIVE MILITARY DUTY.**

MORTGAGE SALE   Default has been made in the conditions of a mortgage made by MARY CRITCHLEY, AN UNMARRIED WOMAN, to Mortgage Electronic Registration Systems, Inc. ("MERS"), solely as nominee for lender and lender's successors and assigns,, Mortgagee, dated December 7, 2005, and recorded on December 22, 2005, in Liber 36831, on Page 821, and assigned by said mortgagee to Mortgage Electronic Registration Systems, Inc. ("MERS"), solely as nominee for lender and lender's successors and assigns,, as assigned,Oakland County Records, Michigan, on which mortgage there is claimed to be due at the date hereof the sum of Two Hundred Eighty-Eight Thousand Five Hundred Eight Dollars and Seventy-One Cents ($288,508.71), including interest at 8.125% per annum.

Under the power of sale contained in said mortgage and the statute in such case made and provided, notice is hereby given that said mortgage will be foreclosed by a sale of the mortgaged premises, or some part of them, at public venue, public venue, on the 1st floor Main entrance to the Court House in Pontiac, Michigan at 10:00 AM o clock, on June 15, 2010

Said premises are located in Oakland County, Michigan and are described as:
THE WEST 100 FEET OF LOT 394 AND THE EAST 20 FEET OF LOT 395, WESTCHESTER VILLAGE NO. 3, AS RECORDED IN LIBER 90, PAGES 25, 26 AND 27 OF PLATS, OAKLAND COUNTY RECORDS.


The redemption period shall be 6 months from the date of such sale unless determined abandoned in accordance with 1948CL 600.3241a, in which case the redemption period shall be 30 days from the date of such sale.

Dated: May 11, 2010

Mortgage Electronic Registration Systems, Inc. ("MERS"), solely as nominee for lender and lender's successors and assigns, Mortgagee/Assignee

Schneiderman & Sherman, P.C.
23938 Research Drive, Suite 300
Farmington Hills, MI 48335

Please Post:   3487 WEST MAPLE ROAD
BLOOMFIELD HILLS, MI 48301

Scheduled to start Publication on: May 18, 2010

If 1st Publication is different from date above please contact our office and let us know of that date. Our clients now have to report with FHA and need correct publication date.

Client I.D. No. GMAC.009913 (DO NOT PUBLISH THIS INFORMATION)

**Exhibit A-9**

## SHORT FORECLOSURE NOTICE - OAKLAND COUNTY

SCHNEIDERMAN & SHERMAN, P.C.,  IS ATTEMPTING TO COLLECT A DEBT, ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. PLEASE CONTACT OUR OFFICE AT (248)539-7400 IF YOU ARE IN ACTIVE MILITARY DUTY.

MORTGAGE SALE - Default has been made in the conditions of a mortgage made by MARY CRITCHLEY, AN UNMARRIED WOMAN to Mortgage Electronic Registration Systems, Inc. ("MERS"), solely as nominee for lender and lender's successors and assigns,, Mortgagee, dated December 7, 2005 and recorded December 22, 2005 in Document No. 0357967, Liber 36831, on Page 821,  Oakland County Records, Michigan. Said mortgage is now held by U.S. Bank National Association as Trustee for RASC 2006KS1 by assignment. There is claimed to be due at the date hereof the sum of Three Hundred Forty-One Thousand Nine Hundred Thirty-One Dollars and Forty-Nine Cents ($341,931.49) including interest at 8.125% per annum.

Under the power of sale contained in said mortgage and the statute in such case made and provided, notice is hereby given that said mortgage will be foreclosed by a sale of the mortgaged premises, or some part of them, at public venue at Inside the Oakland County Circuit Court, 14 East, West Entrance 1st Floor, located at 1200 N Telegraph Rd. Pontiac, MI 48341 in Oakland County, Michigan at 10:00 AM on **September 11, 2012**.

Said premises are located in the Township of Bloomfield, Oakland County, Michigan, and are described as: Land situated in the Township of Bloomfield, County of Oakland, State of Michigan, is described as follows:

THE WEST 100 FEET OF LOT 394 AND THE EAST 20 FEET OF LOT 395, WESTCHESTER VILLAGE NO. 3, AS RECORDED IN LIBER 90, PAGES 25, 26 AND 27 OF PLATS, OAKLAND COUNTY RECORDS.

The redemption period shall be **6** months from the date of such sale, unless determined abandoned in accordance with MCLA §600.3241a, in which case the redemption period shall be 30 days from the date of such sale.  TO ALL PURCHASERS: The foreclosing mortgagee can rescind the sale.  In that event, your damages, if any, are limited solely to the return of the bid amount tendered at sale, plus interest.  If the property is sold at a foreclosure sale, the borrower will be held responsible to the person who buys the property at the mortgage foreclosure sale or to the mortgage holder for damaging the property during the redemption period.

If you are a tenant in the property, you may have certain rights.

Dated:  August 9, 2012

U.S. Bank National Association as Trustee for RASC 2006KS1

Mortgagee/Assignee

SCHNEIDERMAN & SHERMAN, P.C.
23938 Research Drive, Suite 300
Farmington Hills, Michigan 48335

Scheduled to start Publication: August 9, 2012

Please post:      3487 WEST MAPLE ROAD
                  BLOOMFIELD HILLS, MI 48301

**Exhibit C-1**

THOMAS P. BEKO, ESQ. (#002653)
99 West Arroyo Street
P.O. Box 3559
Reno, Nevada 89505
Telephone: (775) 786-3930
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA - RENO DIVISION

PAMELA D. LONGONI,
individually and as Guardian Ad
Litem for LACEY LONGONI,
and JEAN M. GAGNON,

Plaintiffs,

vs.

GMAC MORTGAGE, LLC., a Delaware
Limited Liability Company, EXECUTIVE
TRUSTEE SERVICES, LLC., a Delaware
Limited Liability Company, RESIDENTIAL
FUNDING COMPANY, LLC., a Delaware
Limited Liability Company, fka RESIDENTIAL
FUNDING CORPORATION, a Delaware
Corporation, RESIDENTIAL ASSET
MORTGAGE PRODUCTS, INC., a Delaware
Corporation, ILLEANNA PETERSON,
KATHLEEN GOWEN, individuals,
DOES 1-10; BLACK AND
WHITE CORPORATIONS 1-10,
corporations; ABLE & BAKER
COMPANIES 2-10, co-partnerships and or
limited liability companies,

_____Defendants._____/

Case No.: 3:10-CV-00297-LRH-(VPC)

## **THIRD AMENDED COMPLAINT FOR DAMAGES TO SUBSTITUTE PROPER**

## **PARTIES PURSUANT TO FRCP 15(c)**

## **(JURY DEMANDED)**

COMES NOW, PAMELA D. LONGONI, individually and as the Guardian Ad Litem
for LACEY LONGONI, and JEAN M. GAGNON, by and through their attorneys,

1  ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and hereby

2  allege and complain as follows:

3  ## PARTIES AND JURISDICTION

4      1.     Plaintiff PAMELA D. LONGONI is an individual, residing in the State of

5  Nevada.  PAMELA D. LONGONI is the natural parent and guardian of the minor child

6  LACEY LONGONI.  At all times relevant hereto, PAMELA D. LONGONI was a lawful

7  owner of a certain parcel of real property commonly known as 5540 Twin Creeks Drive,

8  Reno, Nevada, 89523, which PAMELA D. LONGONI occupied as her sole personal

9  residence along with her minor children, including the plaintiff LACEY LONGONI.

10     2.     Plaintiff JEAN M. GAGNON is an individual, residing in the State of Nevada.

11 At all times relevant hereto, JEAN M. GAGNON was a lawful co-owner of a certain parcel

12 of real property commonly known as 5540 Twin Creeks Drive, Reno, Nevada, 89523.

13     3.     The plaintiffs are informed and believe and thereupon allege that the defendant

14 GMAC MORTGAGE, LLC., is a Delaware Limited Liability Company, licensed to do, and

15 doing business in the State of Nevada as a mortgage lender.

16     4.     The plaintiffs are informed and believe that GMAC MORTGAGE, LLC., is

17 wholly owned by General Motors Acceptance Corporation.

18     5.     The plaintiffs are further informed and believe that GMAC MORTGAGE,

19 LLC., was assigned, or somehow assumed the rights, liabilities and duties of EquiFirst

20 Corporation relative to a Promissory Note, Deed of Trust signed by the plaintiffs PAMELA

21 D. LONGONI and JEAN M. GAGNON,  on or about September 29, 2005.

22     6.     The plaintiffs are further informed and believe and thereupon aver that

23 EXECUTIVE TRUSTEE SERVICES, LLC., is a subsidiary of GMAC MORTGAGE, LLC.,

24 contracted with, or is otherwise so affiliated with GMAC MORTGAGE, LLC., such that it

25 is legally responsible for the acts of EXECUTIVE TRUSTEE SERVICES, LLC. At all times

26 relevant hereto, GMAC MORTGAGE, LLC., employed an individual by the name of

27 Jonathan "Nate" Stephenson. At all times relevant hereto, Jonathan "Nate" Stephenson was

28 acting within the course and scope of his employment with GMAC MORTGAGE, LLC. The

1    plaintiffs are further informed and believe that at all times relevant hereto, Paul Williams,

2    was the Director of the GMAC Modification Team, and was acting within the course and

3    scope of his employment with GMAC MORTGAGE, LLC. The plaintiffs are informed and

4    believe, that Paul Williams approved the plaintiffs' loan modification request as set forth

5    herein below.

6        7.    The plaintiffs are informed and believe and thereupon allege that the defendant

7    EXECUTIVE TRUSTEE SERVICES, LLC., is a Delaware Limited Liability Company,

8    licensed to do business, and doing business in the State of Nevada by providing a broad menu

9    of non-judicial foreclosure services. The plaintiffs are informed and believe that the

10   defendant EXECUTIVE TRUSTEE SERVICES, LLC., is wholly owned by General Motors

11   Acceptance Corporation. The plaintiffs are further informed and believe, and thereupon

12   allege, that EXECUTIVE TRUSTEE SERVICES, LLC., is a subsidiary of, or is otherwise

13   affiliated with GMAC MORTGAGE, LLC., and that the defendants ILLEANNA

14   PETERSON and  KATHLEEN GOWEN were, at all times relevant hereto, employees of

15   EXECUTIVE TRUSTEE SERVICES, LLC., and in doing the acts alleged herein were acting

16   within the course and scope of their employment, and/or at the express direction of, or with

17   the authorization and ratification of EXECUTIVE TRUSTEE SERVICES., LLC and GMAC

18   MORTGAGE, LLC.

19       8.    The plaintiffs are informed and believe and thereupon allege that the defendant

20   RESIDENTIAL FUNDING COMPANY, LLC., is a Delaware Limited Liability Company,

21   licensed to do business, and doing business in the State of Nevada. The plaintiffs are further

22   informed and believe and thereupon allege that said defendant is the successor in interest,

23   and has assumed any and all legal liabilities of Residential Funding Corporation, a Delaware

24   Corporation. RESIDENTIAL FUNDING COMPANY, LLC., is being substituted in this

25   action for the previously named Doe Defendant, ABLE & BAKER COMPANY 1.

26       9.    The plaintiffs are informed and believe and thereupon allege that

27   RESIDENTIAL FUNDING COMPANY, LLC., is wholly owned by the defendant General

28   Motors Acceptance Corporation.

10.    The plaintiffs are informed and believe that RESIDENTIAL FUNDING COMPANY, LLC., claims to have obtained ownership interest in a certain parcel of real property commonly known as 5540 Twin Creeks Drive, Reno, Nevada, 89523.  In this regard, the plaintiffs allege that RESIDENTIAL FUNDING COMPANY, LLC., was assigned, or somehow assumed the rights, liabilities and duties of EquiFirst Corporation relative to a Promissory Note, Deed of Trust signed by the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON, on or about September 29, 2005.

11.    The plaintiffs are informed and believe and thereupon allege that RESIDENTIAL FUNDING COMPANY, LLC., engaged or retained the defendant GMAC MORTGAGE, LLC., to service the loan on the plaintiffs' real property.  In this regard, RESIDENTIAL FUNDING COMPANY, LLC., authorized GMAC MORTGAGE, LLC., to engage in certain loan activities, including, but not limited to the following:

a) Receipt of loan payments;

b) Issuance of legal notices to the plaintiffs; and

c) Loan modification activities including negotiation of new rates of interest, loan payments, and principal sums due under the loan.

12.    That all statements made to the plaintiffs by employees of GMAC MORTGAGE, LLC., as part of the plaintiffs' loan modification process, were statements made on behalf of, and within the course and scope of GMAC MORTGAGE, LLC., activities on behalf of RESIDENTIAL FUNDING COMPANY, LLC., and thus RESIDENTIAL FUNDING COMPANY, LLC., is responsible for all acts of GMAC MORTGAGE, LLC related to modification of the plaintiffs' residential loan.

13.    The plaintiffs are informed and believe and thereupon allege that in performing loan modification activities, RESIDENTIAL FUNDING COMPANY, LLC., provided GMAC MORTGAGE, LLC., with certain policies, procedures and/or guidelines to follow in the process of loan modification activities.

14.    The plaintiffs are informed and believe that RESIDENTIAL FUNDING COMPANY, LLC., authorized GMAC MORTGAGE, LLC., to enter into binding loan

4

1    modifications on behalf of RESIDENTIAL FUNDING COMPANY, LLC.

2        15.    The plaintiffs are informed and believe and thereupon allege that the defendant

3    RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., was, at all times relevant hereto,

4    a Delaware corporation, licensed to do business, and doing business in the State of Nevada.

5    The plaintiffs are further informed and believe and thereupon allege RESIDENTIAL ASSET

6    MORTGAGE PRODUCTS, INC., was an entity that was governed or controlled by the other

7    named defendants herein, and doing the things set forth herein was acting under the direction

8    and control of the other defendants. RESIDENTIAL ASSET MORTGAGE PRODUCTS,

9    INC., is being substituted in this action for the previously named Doe Defendant, ABLE &

10   BAKER COMPANY 2.

11       16.    The plaintiffs are further informed and believe that RESIDENTIAL ASSET

12   MORTGAGE PRODUCTS, INC., claims to have purchased the plaintiffs' Promissory Note

13   and Deed of Trust from RESIDENTIAL FUNDING COMPANY, LLC., on or about

14   December 28, 2005, pursuant to an agreement entitled Assignment and Assumption

15   Agreement, however, the plaintiffs are informed and believe that RESIDENTIAL FUNDING

16   COMPANY, LLC., was not the owner of, nor was it in possession of, the plaintiffs'

17   Promissory Note and/or Deed of Trust on that day, and therefore could not transfer any

18   interest in either the Promissory Note or the Deed of Trust.

19       17.    Pursuant to said Assignment and Assumption Agreement, RESIDENTIAL

20   FUNDING CORPORATION (purportedly now RESIDENTIAL FUNDING COMPANY,

21   LLC., was obligated to deliver to RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.,

22   the original Promissory Note, endorsed to the order of U.S. Banking National Association,

23   as Trustee.  The plaintiffs are informed and believe and thereupon aver that RESIDENTIAL

24   FUNDING COMPANY, LLC., never had legal title to said Promissory Note, and never

25   provided U.S. Banking National Association with the original of said Promissory Note, nor

26   did RESIDENTIAL FUNDING COMPANY, LLC., ever provide U.S. Banking National

27   Association with any proper endorsements of said Promissory Note to U.S. Banking National

28   Association.  Based upon the foregoing, neither RESIDENTIAL FUNDING COMPANY,

1  LLC, nor RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., had any legal right to
2  order or authorize the foreclosure upon the plaintiffs' real property.

3       18.    That on December 28, 2005, (the same day that RESIDENTIAL FUNDING
4  COMPANY, LLC., purported to sell the plaintiffs' Promissory Note and Deed of Trust to
5  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.), RESIDENTIAL ASSET
6  MORTGAGE PRODUCTS, INC., claims that it assigned said Promissory Note and Deed of
7  Trust to U.S. Banking National Association as Trustee, pursuant to an agreement entitled
8  Pooling and Servicing Agreement.

9       19.    Pursuant to said Pooling and Servicing Agreement, RESIDENTIAL FUNDING
10  COMPANY, LLC., was obligated to, concurrently with the execution of said agreement,
11  deliver the agreement and the original Promissory Note, fully endorsed without recourse to
12  the Trustee, showing an unbroken chain of endorsements from the originator thereof to the
13  Person endorsing it to the Trustee. The plaintiffs are informed and believe and thereupon
14  aver that RESIDENTIAL FUNDING COMPANY, LLC., never had legal title to said
15  Promissory Note and never provided U.S. Banking National Association with the original
16  of said Promissory Note.  The plaintiffs are further informed and believe that
17  RESIDENTIAL FUNDING COMPANY, LLC., never provided U.S. Banking National
18  Association with any Promissory Note which contained an unbroken chain of endorsements
19  from the originator of the Promissory Note (EquiFirst Corporation) through to the Trustee.

20       20.    The plaintiffs are informed and believe and thereupon aver, that on or about
21  November 15, 2007, the plaintiffs' original Promissory Note was modified pursuant to an
22  Adjustable Rate Loan Modification Agreement between the plaintiffs, as Borrower, and
23  Homecomings Financial, LLC., as Lender, however, Homecomings Financial was an entity
24  that had no right, title or interest in said Promissory Note since RESIDENTIAL FUNDING
25  COMPANY, LLC., claims it was the owner of said Promissory Note and that it had
26  transferred ownership of that Promissory Note to RESIDENTIAL ASSET MORTGAGE
27  PRODUCTS, INC., almost two years prior to this claimed modification.

28       21.    The plaintiffs are informed and believe and thereupon aver that each of the

1   defendants in this action took action upon the plaintiffs' Promissory Note purportedly

2   modified by Homecomings Financial, LLC., despite the fact that Homecomings Financial

3   had no right, title or interest in said Promissory Note, and as such, had no right to modify the

4   original Promissory Note.

5       22.   That in 2009, the defendant GMAC MORTGAGE, LLC., engaged and

6   authorized the defendant EXECUTIVE TRUSTEE SERVICES, LLC., to commence non-

7   judicial foreclosure proceedings against the plaintiffs' real property when GMAC

8   MORTGAGE, LLC., had neither the legal ownership of the Promissory Note, nor the Deed

9   of Trust which secured the obligations of the Promissory Note.  As a result, neither GMAC

10  MORTGAGE, LLC., nor EXECUTIVE TRUSTEE SERVICES, LLC., had legal standing

11  to commence non-judicial foreclosure proceedings against the plaintiffs' real property.

12  Therefore, GMAC MORTGAGE, LLC., and EXECUTIVE TRUSTEE SERVICES, LLC.,

13  wrongfully foreclosed upon the plaintiffs' real property.

14      23.   The plaintiffs are informed and believe and thereupon allege that at all times

15  relevant hereto, the defendants, and each of them, were acting as agents and employees for

16  the other defendants, and in doing the things alleged herein were acting within the course and

17  scope of that agency.  The plaintiffs are further informed and believe and thereupon allege,

18  that at all times relevant hereto, the defendants were acting as part of a common, planned,

19  scheme or design in conspiracy/concert with other defendants, thus making each legally

20  liable for the acts of all others.

21      24.   Plaintiffs do not know the true names or capacities of those defendants sued

22  herein as DOES 1-10, BLACK & WHITE CORPORATIONS 1-10, and ABLE & BAKER

23  COMPANIES 1-10, partnerships and/or limited liability companies.  Therefore, plaintiffs sue

24  said defendants, and each of them, by such fictitious names.  Plaintiffs are informed and

25  believe and based thereon allege that each of said defendants inclusive, were officers,

26  directors or managing agents and/or employees or were otherwise responsible for the daily

27  operation of said business, including, but not limited to the training and supervision of

28  employees of the company. That at all times relevant hereto, defendants herein fictitiously

1   sued were the owners, shareholders, agents, partners, or alter egos of defendants named
2   herein.  Plaintiffs are further informed and believe that the DOE defendants are the holders
3   or owners of the deed of trust and/or promissory note executed by the plaintiffs, and thus are
4   legally responsible under the causes of action pled herein and proximately caused damages
5   to plaintiffs as herein alleged.  Plaintiffs pray that when the true names of said defendants are
6   ascertained they may be inserted herein with appropriate allegations.

7        25.    In 2005, the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON
8   entered into a contract with EquiFirst to refinance a loan which was secured by the real
9   property located at 5540 Twin Creeks Drive, Reno, Nevada, 89523. This transaction was
10  accomplished through the use of a Promissory Note and Deed of Trust (hereinafter referred
11  to as the Note and/or Deed of Trust).  As part of this transaction, PAMELA D. LONGONI
12  deeded a one-half interest to said real property and improvements to JEAN M. GAGNON.
13  Subsequent to the loan refinance, PAMELA D. LONGONI, LACEY LONGONI and JEAN
14  M. GAGNON lived at the property located at 5540 Twin Creeks Drive, Reno, Nevada,
15  89523.

16       26.    The plaintiffs are informed and believe and thereupon aver that after the
17  refinance was completed, EquiFirst assigned, or purported to assign, the Note and Deed of
18  Trust to a third party which may, or may not have been, Homecomings Financial, LLC.,
19  RESIDENTIAL FUNDING COMPANY, LLC, fka Residential Funding Corporation,
20  RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., U.S. Banking National
21  Association, and/or GMAC MORTGAGE, LLC.  At some point after the refinance,
22  Homecomings, Financial, LLC., RESIDENTIAL FUNDING COMPANY, LLC., and/or
23  GMAC MORTGAGE, LLC., claimed that it assumed the rights, duties and liabilities of
24  EquiFirst and conducted itself as though it was the lawful owner, and holder in due course
25  of the Note and Deed of Trust. Neither RESIDENTIAL FUNDING COMPANY, LLC., (or
26  its predecessor in interest Residential Funding Corporation), GMAC MORTGAGE, LLC.,
27  or any other defendant, recorded any notice in the Washoe County Recorder's Office
28  advising the plaintiffs (or any other person) that it held, owned or had been assigned the Note

and Deed of Trust.

27.    In early 2008, PAMELA D. LONGONI and JEAN M. GAGNON began to suffer financial difficulties due to the fact that Mr. Gagnon was transferred, for his employment, from northern Nevada to Las Vegas, Nevada. This caused a duplication of many of the family's household expenses. As a result, the plaintiffs fell behind on their mortgage payments. On or about January 15, 2009, the Plaintiff PAMELA D. LONGONI sent a letter to Homecomings Financial, whom she believed to be the servicer of her loan, asking for a modification of her loan.

28.    In response to her January 15, 2009, letter, on February 18, 2009, GMAC MORTGAGE, LLC., sent the plaintiffs a package of records to fill out and return in order to seek a loan modification.

29.    On February 19, 2009, without any contact with, or input or direction from either the owner/holder of the Promissory Note or the Deed Of Trust, GMAC MORTGAGE, LLC., made the decision on behalf of RESIDENTIAL FUNDING COMPANY, and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National Association to commence a non-judicial foreclosure upon the plaintiffs' real property. At the time they did so, GMAC MORTGAGE, LLC., undertook no efforts to determine who was the legal owner or holder of the plaintiffs' Promissory Note or the Deed of Trust.

30.    In accordance with their decision to commence foreclosure proceedings against the plaintiffs' property, and without any contact with, or input or direction from either the owner/holder of the Promissory Note or the Deed Of Trust, GMAC MORTGAGE, LLC., made the decision on behalf of RESIDENTIAL FUNDING COMPANY, and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National Association GMAC MORTGAGE, LLC., engaged with the defendant EXECUTIVE TRUSTEE SERVICES, LLC., to undertake the process of foreclosure.

31.    On February 25, 2009, and without receipt of any assignment, authorization, directive from the legal owner of the Promissory Note or the Deed of Trust, EXECUTIVE TRUSTEE SERVICES prepared and recorded a Substitution of Trustee. This assignment

9

1 was in direct contradiction to the terms of the Deed of Trust, which required a change in
2 Trustee to be ordered by the Lender which was EquiFirst Corporation.

3     32.    Also on February 25, 2009, and without receipt of any assignment,
4 authorization, directive from the legal owner of the Promissory Note or the Deed of Trust,
5 EXECUTIVE TRUSTEE SERVICES, LLC., also prepared and recorded a Notice of Breach
6 and Default and of Election to Cause Sell of Real Property under Deed of Trust. Attached
7 as *Exhibit "1"* is a true, accurate and correct copy of this notice. This notice was defective,
8 since it lacked the information required by law. EXECUTIVE TRUSTEE SERVICES,
9 LLC., caused this Notice to be recorded on February 26, 2011.

10     33.    On March 3, 2009, the Plaintiffs faxed GMAC their completed Loan
11 Modification application. In response, GMAC contacted the plaintiffs and asked for
12 additional information. The following day, March 4, 2009, EXECUTIVE TRUSTEE
13 SERVICES, LLC., caused the Notice of Breach and Default and of Election to Cause Sell
14 of Real Property under Deed of Trust to be mailed to the plaintiffs on March 4, 2009.

15     34.    On March 5, 2009, the plaintiff PAMELA LONGONI forwarded all requested
16 information to GMAC. The following day she spoke with a GMAC representative at which
17 time they discussed possible modifications to the plaintiffs' existing loan. The plaintiffs
18 were informed of various options which they could pursue as an alternative to foreclosure.
19 At no time were the plaintiffs informed that GMAC MORTGAGE, LLC., had commenced
20 foreclosure proceedings, or that GMAC was not the owner, nor holder of the Promissory
21 Note or Deed of Trust on the plaintiffs' real property. The plaintiffs were, however, informed
22 that GMAC did have a program by which loans could be modified and that the plaintiffs
23 were candidates for such program. The plaintiffs fully and completely complied with all of
24 GMAC's demands in the application process.

25     35.    On or about March 10, 2009, a GMAC MORTGAGE, LLC., representative
26 informed the plaintiffs that their request for a loan modification had been approved. GMAC
27 MORTGAGE, LLC., sent the plaintiffs a proposed modification agreement. This agreement
28 called for a new monthly payment in the amount of $2,270.00.

36.    On or about March 19, 2008, the plaintiff PAMELA D. LONGONI contacted GMAC's representative and informed him that they could not meet the proposed monthly payment and the most that they could pay on a monthly basis was $1,600.00. In response, GMAC's representative Nate Stephenson developed a new loan modification plan pursuant to which the plaintiffs would be required to make payments in the amount of $1,600.00 per month. He instructed PAMELA D. LONGONI to begin making the payments in April of 2009. He further informed the plaintiff that GMAC would stop any effort to foreclose on the property. At not time did GMAC ever indicate that there was any time limit to this temporary plan. In making these statements, the GMAC representative was acting on behalf of, and within the course and scope of the authority granted to him by RESIDENTIAL FUNDING COMPANY, LLC., RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National Association, as Trustee. The plaintiffs made the required payment on or before the requested date.

37.    On April 2, 2009, the same GMAC MORTGAGE, LLC., representative informed the plaintiffs that all he was waiting on in order to make the change permanent was approval of the VP. Later that same day, said representative informed the plaintiffs that their trial loan modification was, in fact, approved. He further stated that because he was attempting to write off $176,000.00 from the loan, he needed approval from their VP, however, he also stated that he had already done the analysis and it seemed to be a win-win situation so he was fairly confident that it would get approved. At no time did GMAC ever advise the plaintiffs that this proposed plan would only be temporary or that it would need to be replaced with another plan. In making these statements, the GMAC MORTGAGE, LLC., representative was acting on behalf of, and within the course and scope of the authority granted to him by RESIDENTIAL FUNDING COMPANY, LLC., RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., and U.S. Bank National Association, as Trustee.

38.    On April 6, 2009, GMAC MORTGAGE, LLC, made the decision to stop all foreclosure proceedings. In accordance with that decision, GMAC instructed EXECUTIVE TRUSTEE SERVICES, LLC., to stop the foreclosure process. EXECUTIVE TRUSTEE

11

1  SERVICES, LLC., received these instructions and stopped the foreclosure process.

2      39.   On April 21, 2009, the GMAC representative informed PAMELA D.
3  LONGONI that he was still awaiting approval from their "VP." On April 28, 2009, the same
4  GMAC representative informed PAMELA D. LONGONI that he had just looked at the notes
5  and it looked as if "one manager looked at it and agreed that it was a win-win situation, but
6  because it is a $186k that we were trying to write off, it has to go a little higher."

7      40.   On May 1, 2009, the plaintiffs attempted to make their next $1,600.00 payment
8  through an on-line system which GMAC specifically set up to accept the plaintiffs'
9  payments. This is the method by which the first $1,600.00 payment was made. However,
10  when PAMELA D. LONGONI attempted to make the payment, it was refused. In response,
11  PAMELA D. LONGONI contacted Nate Stephenson and advised him of the problem. He
12  informed her that someone had put a "Certified Funds Flag" on her account and that he had
13  removed it. He claimed he removed the flag but she still could not make the payment
14  through the system. Therefore, she sent the payment (with the extra fees) through Western
15  Union. The payment was accepted by GMAC.

16      41.   On May 5, 2009, the plaintiff received a telephone call from Homecomings
17  Financial, saying that they had not received her payment. In response, she contacted Nate
18  Stephenson who informed her that their records showed that they received the payment on
19  May 4, 2009, and as such, she was "Good to go." Nate Stephenson further informed her that
20  it didn't look like their VP has had a chance to look at the matter, however, the notes he saw
21  are good indicating that it "made sense to do the Modification." He further informed her that
22  "We still have 2 months before I would have to set up a plan. So everything is still sort of
23  on hold."

24      42.   On May 26, 2009, PAMELA D. LONGONI sent an e-mail communication to
25  Nate Stephenson asking about the status of her loan modification. She further informed him
26  that she had another friend who was suffering similar financial problems and asked if she
27  could refer him to Mr. Stephenson. Mr. Stephenson responded by saying that he did not have
28  an update, that she should just continue to make the $1,600.00 payment. Once the decision

1    was made, then paperwork will be sent out with the new terms.  He indicated that because

2    he would be moving to a new team the following week, he could not help Ms. Longoni's

3    friend.  He concluded by telling her to let him know if she could think of any further

4    questions.  At no time did he tell her he was unable to take any action relative to her loan

5    modification application.

6         43.    On or about May 26, 2009, GMAC sent the plaintiffs a letter advising the, that

7    help might be available to them through the new Home Affordable Modification program

8    which is part of the initiative announced by President Obama.

9         44.    In conformity with their agreement with GMAC MORTGAGE, LLC., the

10    plaintiffs made the required $1,600.00 payments for the months of April, May and June of

11    2009.  GMAC MORTGAGE, LLC., accepted said payments on behalf of itself and/or

12    RESIDENTIAL FUNDING COMPANY, LLC., or RESIDENTIAL ASSET MORTGAGE

13    PRODUCTS, INC.  None of these funds were ever returned to the plaintiffs.

14         45.    Over the next 3 weeks, the plaintiffs attempted to contact GMAC to find out

15    what was happening with their application for the loan modification. On June 30, 2009, Ms.

16    Longoni sent another e-mail communication to Nate Stephenson asking for help. He

17    responded by saying that he had emailed his old department yesterday and they responded

18    that the file has been sent for final management approval. He further told her the person now

19    handling the matter was Landon Huck.  In response, Ms. Longoni asked for contact

20    information for Mr. Huck. Nate Stephenson responded by saying he couldn't give her that

21    information, however, he informed her that he did receive an email stating that the

22    modification was approved the prior day.

23         46.    In response to this information, the plaintiffs made numerous attempts to make

24    the next $1,600.00 on-line payment, however, all attempts were rejected. After numerous

25    attempts, plaintiff finally reached a live person on July 9, 2009, who informed her that their

26    modification was not approved, that they owed approximately $19,000.00, and that if

27    payment was not received, they would sell her home. In response, PAMELA D. LONGONI

28    immediately sent Nate Stephenson an email asking for his assistance.  Mr. Stephenson

13

1   advised her that they were trying to put her into an Obama Modification. He specifically told

2   her that her foreclosure was on hold, and that GMAC did not want to take her home. He told

3   her that they would try to do everything they could before they proceeded with foreclosure.

4   He further informed her that the Obama program was subsidized and allowed them to drop

5   payments to 31% of the borrower's gross income. Because of that it allowed them to be a

6   little more aggressive with their rates and debt forgiveness.

7       47.     Contrary to these representations, on July 15, 2009, GMAC removed the hold

8   which it placed on the foreclosure. GMAC thereafter instructed EXECUTIVE TRUSTEE

9   SERVICES, LLC., to proceed forward with the foreclosure sale.

10      48.     The following day, GMAC sent the plaintiffs a letter informing them that the

11  repayment plan had been cancelled because payment had not been received by the payment

12  due date "as specified in the signed repayment agreement." The plaintiffs had never signed

13  any "repayment agreement".

14      49.     In accordance with GMAC's instructions, and without any legal standing as

15  set forth herein above, on July 20, 2009, EXECUTIVE TRUSTEE SERVICES, LLC.,

16  prepared a Notice of Trustee's Sale, setting a sell date of August 14, 2009. Attached as

17  *Exhibit "2"* is a true, accurate and correct copy of this notice. EXECUTIVE TRUSTEE

18  SERVICES, LLC., caused this Notice to be recorded on July 23, 2009.

19      50.     Seven days later on July 30, 2009, GMAC sent a an "Obama" package to the

20  plaintiffs via federal express. The plaintiffs received that package on August 4, 2009. The

21  letter which accompanied this package informed the plaintiffs to submit a signed letter

22  explaining the cause of default (which they had done previously), to submit copies of two

23  most recent pay stubs, and a copy of their most recent federal tax return. The letter informed

24  them to allow five business days for GMAC to process the financial package. Notably, this

25  letter contained a notation at the bottom of the letter which said "30 days to sale." The

26  plaintiffs returned the requested information on August 10, 2009.

27      51.     On August 14, fifteen days after the date of this letter, EXECUTIVE

28  TRUSTEE SERVICES, LLC., sold the plaintiffs' home at auction.

14

52. Because GMAC received payments following the filing of the original Notice of Default, EXECUTIVE TRUSTEE SERVICES, LLC.,'s policies required it to recommence the foreclosure process through the issuance of a new Notice of Default. However, GMAC never informed EXECUTIVE TRUSTEE SERVICES, LLC., that it received any such payments. Therefore, EXECUTIVE TRUSTEE SERVICES, LLC., in violation of its own internal policies, continued with the existing foreclosure.

53. The Notice of Breach and Default and Election to Cause Sell of Real Property Under Deed of Trust (Exhibit 1) prepared and recorded by EXECUTIVE TRUSTEE SERVICES, LLC., failed to satisfy the provisions of N.R.S. 107.085, in that GMAC did not provide plaintiffs with the notice specified in that section.

54. Said Notice of Breach and Default and Election to Cause Sell of Real Property Under Deed of Trust (Exhibit 1) also failed to satisfy the provisions of N.R.S. 107.086.

55. Said Notice of Breach and Default and Election to Cause Sell of Real Property Under Deed of Trust (Exhibit 1) was never served upon the plaintiffs PAMELA D. LONGONI or JEAN M. GAGNON as required by N.R.S. 107.080.

56. The defendants, and each of them, failed to provide the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON with the notices which are required by law, including, but not limited to, N.R.S. 107.080, 107.085, 107.086.

57. On August 14, 2009, the defendants, and each of them acting individually and on behalf of the others, and without legal standing to do so, sold or caused to be sold, the plaintiffs' real property located at 5540 Twin Creeks Drive, Reno, Nevada, 89523, to a third party. This property was sold without the proper advance notifications called for by N.R.S. 107.080, 107.085 and/or 107.086.

58. On or about August 24, 2009, the plaintiff PAMELA D. LONGONI, again contacted GMAC to determine the status of the new loan modification application. At that time, she was for the first time informed that GMAC had gone forward with the foreclosure that it had promised was on hold. At that time, PAMELA D. LONGONI was informed that her home had already been sold to a third party and that there was nothing they could do

15

1  about it. The following day, August 25, 2009, the plaintiff learned through her daughter, that

2  a man had left a 5-day notice to vacate the premises on her porch.

3      59.    After the sale of the plaintiffs' home, one or more of the defendants sought to

4  recover the home back from the foreclosure sale purchaser.

5      60.    None of the defendants were able to recover the plaintiffs' home from the

6  foreclosure sale purchaser.

7      61.    In response to this notice, Ms. Longoni contacted the putative purchaser

8  seeking to recover her home. She was told that they had lawfully purchased the home and

9  that there was nothing she could do about it. She was told that if she vacated the premises

10  in a peaceful manner and left the property in tact, she would be paid the sum of $1,250.00.

11  Believing she had no choice in the matter, PAMELA D. LONGONI signed the agreement.

12  She was tendered a check in the amount of $1,250.00, however, said check was later

13  dishonored by the issuing bank.

14      62.    During the next five days, PAMELA D. LONGONI frantically searched for a

15  rental property to move into with her daughter LACEY LONGONI. After extensive efforts,

16  she was able to locate a home in the same school district where 5540 Twin Creeks Drive,

17  Reno, Nevada, 89523 was zoned. However, in order to gain the consent of the landlord to

18  lease said premises, PAMELA D. LONGONI was required to sign a two-year lease, and she

19  was required to have the lease co-signed by her former husband, and father of her daughters.

20      63.    On or about September 4, 2009, PAMELA D. LONGONI received a telephone

21  call from Michael Knapp, Esq., who advised her that he was counsel for GMAC. Mr. Knapp

22  stated to Ms. Longoni that "we've made a big mistake" and that she did not have to leave her

23  home. He further informed her that they were undertaking efforts to recover the home back.

24  PAMELA D. LONGONI informed Mr. Knapp that she had already moved from the property

25  and entered into a two-year lease on a substitute residential property. Mr. Knapp advised Ms.

26  Longoni that he was headed to the beach with his family, and that after the holiday weekend

27  he would contact her to discuss the matter further.

28      64.    The following week PAMELA D. LONGONI was contacted by Christy

1  Hancock, Esq., who sought information about the costs Ms. Longoni incurred in moving

2  from her home and in improving her home before the foreclosure.  Ms. Hancock informed

3  PAMELA D. LONGONI that GMAC would reimburse her for these costs.  Ms. Hancock

4  further informed Ms. Longoni that GMAC would take immediate steps to remove the

5  foreclosure from her credit history.  Subsequently, GMAC or some other party, did in fact,

6  remove all references to this transaction from her credit history.

7       65.    Subsequently, however, the defendants, and each of them, through their

8  retained counsel, have refused to acknowledge their violations of Nevada law and have

9  instead sought to blame PAMELA D. LONGONI for losing her home.

10      66.    In the weeks which followed this unlawful eviction, PAMELA D. LONGONI

11  discovered that the defendants had unlawfully foreclosed upon her home, and they

12  unlawfully evicted her from the property.  She made repeated requests for GMAC to recover

13  her home and return her and her family to their prior residence.  GMAC refused, and

14  continues to refuse to return the plaintiffs to their home.

## FIRST CLAIM FOR RELIEF

### (Violation of N.R.S. 107.080, 107.085, 107.086, 107.087, 107.090)

17      67.    Plaintiffs reallege each and every allegation as contained above and incorporate

18  them by reference as if fully set forth herein.

19      68.    At all times relevant hereto, there was in force and effect, certain Nevada

20  statutes, including, but not limited to, N.R.S. 107.080, N.R.S. 107.085, N.R.S. 107.086

21  N.R.S. 107.087 and N.R.S. 107.090, which regulate the manner in which non-judicial

22  foreclosures may be conducted in the State of Nevada.  Among other things, these statutes

23  set time limits on when a non-judicial foreclosure can be conducted, the manner in which the

24  non-judicial foreclosure can be conducted, and the notices which must be provided to those

25  grantors or others with an interest in the subject property before any sale can be conducted.

26  These statutes were enacted to protect people in a class of which the plaintiffs were members,

27  and said statutes were intended to protect the plaintiffs from the very harm they have suffered

28  as a proximate result of the conduct of the defendants, and each of them.

17

69.     Because GMAC MORTGAGE, LLC., proposed and agreed to a loan modification, and accepted payments from the plaintiffs in accordance with this loan agreement, the non-judicial foreclosure proceedings which commenced on February 25, 2009, were rendered null and void. Despite that fact, and despite GMAC's promises that it would not foreclose upon the plaintiffs' property, GMAC and EXECUTIVE TRUSTEE SERVICES, LLC., proceeded forward with the foreclosure sale.

70.     Defendant GOWEN swore to, under oath, and caused to be filed with the Washoe County Recorder, in Nevada, a "Trustee's Deed of Sale," dated August 14th, 2009, and file stamped August 26th, 2009, under which GOWEN represented that the trustee had complied with all applicable statutory requirements of the State of Nevada, and performed all duties required by the Deed of Trust. Attached as *Exhibit "3"* is a true, accurate and correct copy of this notice. This was intentional or reckless misrepresentation, since GOWEN knew or should have known that" 1) the Trustee had not complied with all applicable statutory requirements, and that 2) all duties required by the Deed of Trust had not been extinguished.

71.     At the times the defendants undertook the process of non-judicial foreclosure, none of the defendants owned, possessed, or had any legal right to the Promissory Note or the Deed of Trust. In addition, none of the defendants had the authority to undertake any act in furtherance of the non-judicial foreclosure. Therefore, the foreclosure was wrongful and unlawful and in violation of Nevada law.

72.     The defendants, and each of them, by way of the above described acts and/or omissions, violated the provisions of the following Nevada Revised Statutes:

a) N.R.S. 107.080,

b) N.R.S. 107.085,

c) N.R.S. 107.086,

d) N.R.S. 107.087, and

e) N.R.S. 107.090.

73.     As a direct and proximate result of the wrongful acts of the defendants, and

18

1    each of them, the plaintiffs have suffered the permanent loss of their home and real property,

2    as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

3    of the property, the future value and earning capacity of said property, the loss of the use and

4    enjoyment of said property, and the loss of all improvements made to that property over the

5    past 14 plus years, all in an amount in excess of TEN THOUSAND DOLLARS

6    ($10,000.00).

7        73.    As a further direct and proximate result of the wrongful acts of the defendants

8    and each of them, the plaintiffs have been forced to incur costs associated with obtaining

9    replacement housing, including, but not necessarily limited to, moving and storage expenses,

10    rental charges, household furnishings, increased travel costs and increased utility bills and

11    expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

12        74.    As a further direct and proximate result of the wrongful acts of the defendants,

13    and each of them, the plaintiffs have suffered severe and disabling emotional distress and

14    anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

15    all to the Plaintiffs' general damages in an amount in excess of TEN THOUSAND

16    DOLLARS ($10,000.00).

17        75.    In doing the acts alleged herein, the defendants, and each of them acted, with

18    deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

19    such are guilty of oppression, thus warranting the imposition of exemplary and punitive

20    damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

21        76.    The plaintiffs have been required to retain the services of ERICKSON,

22    THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

23    future, incur expenses and costs and attorney's fees for which they are entitled to recover.

24    The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

25        **<u>SECOND CLAIM FOR RELIEF</u>**

26        **(Violation of N.R.S. 205.372)**

27        77.    Plaintiffs reallege each and every allegation as contained above and incorporate

28    them by reference as if fully set forth herein.

19

78.    At all times relevant hereto, there was in force and effect, certain Nevada statutes, including, but not limited to, N.R.S. 205.372 which makes it a crime for a person who, with intent to defraud a participant in a mortgage lending transaction, knowingly makes a false statement or misrepresentation concerning a material fact, or deliberately conceals or fails to disclose a material fact, as part of a mortgage lending transaction, or files, or causes to be filed, with a county recorder, any document that the person knows to include a misstatement, misrepresentation or omission concerning a material fact. These statutes were enacted to protect people in a class of which the plaintiffs were members, and said statutes were intended to protect the plaintiffs from the very harm they have suffered as a proximate result of the conduct of the defendants, and each of them.  Therefore, a violation of this statute constitutes Negligence Per Se.

79.    Acting within the scope of their employment for EXECUTIVE TRUSTEE SERVICES, LLC., and as an agent of GMAC MORTGAGE, LLC., and/or RESIDENTIAL COMPANY, INC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.,  the defendants ILLENNA PETERSON and KATHLEEN GOWEN, made false statements and/or misrepresentations and recorded, or caused to be recorded with the Washoe County Recorder, documents that they knew included a misstatement, misrepresentation or omission of a material fact.

80.    Among other misrepresentations, the "Notice of Breach and Default and of Election to Cause sell (sic) of Real Property Under Deed of Trust" provides that "a breach of and default in the obligations for which such Deed of Trust and security has occurred, or that payment has not been made of ... ." (*See Exhibit 1*). This constitutes a violation of NRS 205.372(1)(e).

81.    Among other misrepresentations, the "Notice of Trustee's Sale" provides that the borrowers "are in default under a Deed of Trust".  This is not correct.  Further, proper notice was never provided of this Notice of Trustee's Sale.  This also violates various provisions of NRS 205.372, et seq. (See Exhibit 2).

82.    By way of further example, the "Trustee's Deed Upon Sale" also filed with the

20

1  County Recorder, provides that all applicable statutory requirements and all duties required

2  by the Deed of Trust have been performed. This is false and violates NRS 205.372, et seq.

3      83.    The false representations within these documents filed with the County

4  Recorder, made with knowledge or belief of their falsity, were part of a scheme which

5  included assurances of the loan modification and lack of danger of foreclosure, which were

6  intended to induce the reliance of the plaintiffs, and lull them into a sense of security, while

7  the fraudulently filed documents expedited the wrongful sale of their home, to the

8  Defendants' profit.

9      84.    The plaintiffs relied upon these misrepresentations of the finalized loan

10  modification, and absence of danger of foreclosure to their detriment.

11      85.    By such actions, by such misrepresentations, and by such filing of documents

12  with the County Recorder, which included misrepresentations, misstatements, and omissions

13  of material fact, the defendants acted with an intent to defraud the participant in the mortgage

14  lending transaction through the eventual wrongful sale of the plaintiffs' home without

15  process of law.

16      86.    As a direct and proximate result of the actions of these defendants and/or

17  KATHLEEN GOWEN, the plaintiffs' real property was purportedly sold at a public auction

18  on or about August 14, 2009. As a further direct and proximate result of the actions of

19  ILLEANNA PETERSON, the plaintiffs were wrongfully ousted and ejected from their

20  lawful residence and real property.

21      87.    As a direct and proximate result of the wrongful acts of the defendants, and

22  each of them, the plaintiffs have suffered the permanent loss of their home and real property,

23  as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

24  of the property, the future value and earning capacity of said property, the loss of the use and

25  enjoyment of said property, and the loss of all improvements made to that property over the

26  past 14 plus years, all in an amount in excess of TEN THOUSAND DOLLARS

27  ($10,000.00).

28      88.    As a further direct and proximate result of the wrongful acts of the defendants

1  and each of them, the plaintiffs have been forced to incur costs associated with obtaining

2  replacement housing, including, but not necessarily limited to, moving and storage expenses,

3  rental charges, household furnishings, increased travel costs and increased utility bills and

4  expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

5      89.   As a further direct and proximate result of the wrongful acts of the defendants

6  and each of them, the plaintiffs have suffered severe and disabling emotional distress and

7  anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

8  all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

9  DOLLARS ($10,000.00).

10     90.   In doing the acts alleged herein, the defendants and each of them acted with

11  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

12  such, are guilty of oppression, thus warranting the imposition of exemplary and punitive

13  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14     91.   The plaintiffs have been required to retain the services of ERICKSON,

15  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

16  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

17  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

18                          **THIRD CLAIM FOR RELIEF**

19                          **(Fraud and Misrepresentation)**

20     92.   Plaintiffs reallege each and every allegation as contained above and incorporate

21  them by reference as if fully set forth herein.

22     93.   As set forth above, the defendants, and each of them, provided false

23  representations of material fact, with either the knowledge or belief of such falsity, or without

24  sufficient foundation.   These representations included telling the plaintiff Longoni that

25  plaintiffs' loan modification was permanently approved, and that plaintiffs' loan payments

26  would be the amount of $1,600.00 per month, commencing in April of 2009, and that GMAC

27  would not foreclose upon her home. These misrepresentations included previously described

28  communications regarding the retraction of the permanently approved loan for a "trial

22

modification" only, subsequent representation indicating that the loan had again been permanently approved, communications and representations concerning reduction in the principal loan amount of approximately $169,000.00, representations regarding the need to place plaintiffs into an "Obama Modification Plan", representations regarding the need to submit a new loan modification application and supporting documentation, representations that any effort to foreclose on the property had been placed on hold, and that "GMAC does not want to take your home", as well as the omission to provide plaintiffs with requested information as to whether new loans had in fact been approved, accepted, or declined, all as previously described above.

94.    These false representations were made with the intent to induce the plaintiffs' reliance, and the plaintiffs did, in fact, justifiably rely upon these false representations, to their detriment. Such reliance is reflected by the above-described mortgage payments made under the "permanently approved" loan modification, the last of which was rejected without explanation. The plaintiffs further relied to their detriment upon these representations by not undertaking more aggressive actions to qualify under an additional loan modification program, by not making preparations to leave their home, thus forcing them to incur all the additional cost and trouble of finding replacement housing with no notice. This detriment was also reflected by the fact that, in spite of said payments, the plaintiffs lost their home.

95.    Fraudulent intent is also reflected by the fact that at the same time the defendants were making the above-described false representations, they were, in fact, proceeding on a course of foreclosure by denying the plaintiffs a myriad of statutory protections regarding their mortgage and their home, including proper notices, the right and opportunity to participate in the Nevada mandatory mediation process, while also filing documents with the Washoe County Recorder containing false statements which were used to expedite the sale of the home without the plaintiffs' knowledge. In addition, the defendants were actively seeking to sell the plaintiffs' home pursuant to the Notice of Default which it knew, or in the exercise of reasonable care, would have known, was defective thus requiring the recommencement of the foreclosure process.

23

1      96.     The plaintiffs' reliance was justifiable.

2      97.     Damages resulted from this reasonable reliance. The defendants' above-

3  described misrepresentations proximately caused all of the plaintiffs' damages.

4      98.     As a direct and proximate result of the actions of the defendants and each of

5  them, the plaintiffs' real property was sold at a public auction on or about August 14, 2009.

6  As a further direct and proximate result of the actions of the defendants and each of them,

7  the plaintiffs were wrongfully ousted and ejected from their lawful residence and real

8  property.

9      99.     As a direct and proximate result of the wrongful acts of the defendants, and

10  each of them, the plaintiffs have suffered the permanent loss of their home and real property,

11  as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

12  of the property, the future value and earning capacity of said property, the loss of the use and

13  enjoyment of said property, and the loss of all improvements made to that property over the

14  past 14 plus years all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

15      100.    As a further direct and proximate result of the wrongful acts of the defendants

16  and each of them, the plaintiffs have been forced to incur costs associated with obtaining

17  replacement housing, including, but not necessarily limited to, moving and storage expenses,

18  rental charges, household furnishings, increased travel costs and increased utility bills and

19  expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

20      101.    As a further direct and proximate result of the wrongful acts of the defendants

21  and each of them, the plaintiffs have suffered severe and disabling emotional distress and

22  anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

23  all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

24  DOLLARS ($10,000.00).

25      102.    In doing the acts alleged herein, the defendants and each of them acted with

26  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

27  such are guilty of oppression thus warranting the imposition of exemplary and punitive

28  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

24

103.   The plaintiffs have been required to retain the services of ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the future, incur expenses and costs and attorney's fees for which they are entitled to recover. The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

## FOURTH CLAIM FOR RELIEF

### (Negligence and Negligent Misrepresentation)

104.   Plaintiffs reallege each and every allegation as contained above and incorporate them by reference as if fully set forth herein.

105.   The defendants, and each of them, owed a duty to the plaintiffs to refrain from any conduct which unlawfully interfered with the plaintiffs' rights to peaceful occupancy of the residence and real property.  The defendants, and each of them, breached said duty by acting in a negligent fashion proximately causing the plaintiffs' home to be unlawfully sold to a third party, and proximately causing the plaintiffs to be unlawfully ousted and ejected from the home.

106.   Defendants, and each of them, had a duty of care regarding foreclosure proceedings, such minimum duty pertaining to foreclosures defined by Nevada Revised Statutes 107.080 through NRS 107.100.  In addition, the defendant GMAC MORTGAGE, LLC., knew that it had agreed to a loan modification pursuant to which it received further loan payments, thereby invalidating the Notice of Default which it had previously caused to be prepared and recorded.  The defendant EXECUTIVE TRUSTEE SERVICES, LLC., knew, or through the exercise of reasonable care, should have known, that the plaintiffs had made further payments to the modified Promissory Note, thereby invalidating the original Notice of Default.

107.   As delineated above, the defendants, and each of them, violated these statutes which established the duty and breach elements of negligence in that the plaintiffs belonged to that class of persons the statutes were intended to protect, and the injury described above is of the type against which the statute was intended to protect.  The defendants further breached their general standard of care to the plaintiffs to conduct a foreclosure only when

1    they had the proper authority and standing, and in compliance with all Nevada statutes.

2    108.    As a proximate result of these statutory and other violations, plaintiffs have

3    sustained damages.

4    109.    At the time the power of sale was exercised, or that foreclosure occurred, the

5    defendants lacked the legal right to proceed forward with any non-judicial foreclosure.

6    Moreover, there was no breach of condition or failure to perform which existed on the

7    plaintiffs' part, which would have authorized the foreclosure or exercise of the power of sale.

8    110.    Defendants, and each of them, in the course of their business, profession or

9    employment, or in any other action in which they had a pecuniary interest, supplied false

10    information for the guidance of the defendants in their business transactions.

11    111.    The defendants, and each of them, failed to exercise reasonable care or

12    competence in obtaining and communicating such information.

13    112.    The plaintiffs justifiably relied upon such information to their legal and

14    pecuniary law which was caused thereby.

15    113.    Defendants, and each of them, gratuitously or for consideration, rendered

16    services to the plaintiffs which the defendants should have recognized as being necessary for

17    the protection of the plaintiffs, or the plaintiffs' possessions.

18    114.    Defendants, and each of them, are subject to liability to the plaintiffs for the

19    physical harm resulting from their failure to exercise reasonable care to perform this

20    undertaking – in particular, the represented loan modification – in that the defendants' failure

21    to exercise such care increased the risk of harm and foreclosure to the plaintiffs.

22    115.    The harm to the plaintiffs was suffered because of the plaintiffs' reliance upon

23    the defendants' undertaking regarding the mortgage services and modification.

24    116.    Through the above-described actions concerning representations of permanent

25    loan modification, and subsequent wrongful and fraudulent foreclosure of said home,

26    defendants' conduct is extreme and outrageous.

27    117.    As a result of the wrongful foreclosure, and other actions described herein,

28    plaintiffs have suffered emotional distress causing a physical impact and physical

26

1   manifestation.

2       118.    As a direct and proximate result of the wrongful acts of the defendants, and

3   each of them, the plaintiffs have suffered the permanent loss of their home and real property,

4   as well as all attributes thereto, including, but not necessarily limited to, the loss of the value

5   of the property, the future value and earning capacity of said property, the loss of the use and

6   enjoyment of said property, and the loss of all improvements made to that property over the

7   past 14 plus years all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

8       119.    As a further direct and proximate result of the wrongful acts of the defendants

9   and each of them, the plaintiffs have been forced to incur costs associated with obtaining

10  replacement housing, including, but not necessarily limited to, moving and storage expenses,

11  rental charges, household furnishings, increased travel costs and increased utility bills and

12  expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

13      120.    As a further direct and proximate result of the wrongful acts of the defendants

14  and each of them, the plaintiffs have suffered severe and disabling emotional distress and

15  anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

16  all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

17  DOLLARS ($10,000.00).

18      121.    In doing the acts alleged herein, the defendants and each of them acted with

19  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

20  such are guilty of oppression thus warranting the imposition of exemplary and punitive

21  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

22      122.    The plaintiffs have been required to retain the services of ERICKSON,

23  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

24  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

25  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

26                      **FIFTH CLAIM FOR RELIEF**

27                        **(Breach of Contract)**

28      123.    Plaintiffs reallege each and every allegation as contained above and incorporate

27

1   them by reference as if fully set forth herein.

2        124.   The plaintiffs entered into a contract with EquiFirst Corporation which contract

3   included a Promissory Note and Deed of Trust. That contract contained certain provisions

4   relating to actions which may have be taken should the plaintiffs fail to fulfill their obligation

5   to make periodic payments on the mortgage. These promises were binding upon and

6   enforceable against all who assumed the rights and liabilities under the Note and Deed of

7   Trust, including the defendants, and each of them.

8        125.   For example, the Deed of Trust provides under Subsection 15, that notices

9   required by the security agreement shall satisfy the applicable law.

10        126.   Subsection 16 of the Deed of Trust, (attached hereto as Exhibit 4) provides that

11   the security instrument is governed by the federal law, and the law of the jurisdiction in

12   which the property is located, and that all rights and obligations contained in the security

13   agreement are subject to the requirements and limitations of such law.

14        127.   Through the above-described conduct, including multiple violations of Nevada

15   statutes designed to protect plaintiffs from wrongful foreclosures, defendants, and each of

16   them, breached, in part and not limited thereto, the remedies and notice provisions, as well

17   as provisions regarding the sale of property at public auction within Section 22 of said Deed

18   of Trust.

19        129.   Moreover, the Adjustable Rate Note (attached hereto as Exhibit "5")

20   incorporates by reference the Deed of Trust, at Section 11, as well as the protections given

21   to the note holder therein.

22        130.   Vis-a-vis the above-described conduct, defendants have violated, in part and

23   not limited thereto, the terms of that incorporated Deed of Trust as applicable to the

24   Adjustable Rate Note, as well as notice provisions within Section 7(C), Section 8, and

25   Section 11 of the Adjustable Rate Note.

26        131.   The plaintiffs are informed and believe and thereupon allege that the

27   Defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY,

28   LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., assumed, or were

Case 3:11-cv-00297-RPH - Filed 11/13/13    Document 65    Filed 09/12/11 13:37:11    Page 29 of 40

1    assigned, all the duties and obligations which EquiFirst Corporation owed to the plaintiffs

2    under the loan agreement.

3        132.    The defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL

4    FUNDING COMPANY, INC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS,

5    INC., breached said contracts with the plaintiffs when they wrongfully and unlawfully

6    constructively seized and sold the plaintiffs' real property and residence.

7        133.    In addition, and not by way of limitation, the defendants, through their above-

8    described conduct, breached an express and implied in fact agreement concerning permanent

9    approval of the loan modification.    A meeting of the minds occurred regarding this

10   permanently approved loan modification, as reflected both by written communication and the

11   conduct of the parties, showing, in light of the surrounding circumstances, their express and

12   tacit understandings.

13       134.    This understanding is evidenced, in part, by payment of, and acceptance of, the

14   reduced and modified loan amount as agreed upon by the parties.

15       135.    The plaintiffs performed by tendering these modified loan amounts from April

16   through July of 2009. In spite of various oral and email correspondence regarding the terms

17   of the permanently approved loan modification, the defendants, and each of them, breached

18   the same.

19       136.    Breach of the Promissory Note, Deed of Trust, and subsequent express and

20   implied in fact agreements pertaining to permanently approved loan modifications, were also

21   breached by failure to comply with the above-described Nevada statutes designed to protect

22   the homeowners.

23       137.    Nevada implies a covenant of good faith and fair dealing into every contract.

24       138.    Defendants, by failing to comply with the loan modification agreement and the

25   promise not to foreclose upon the plaintiffs' property and by selling the property in question,

26   with malice, and not complying with statutory notice requirements, and other statutory

27   requirements, breached the implied covenant of good faith and fair dealing implied within

28   every contract in Nevada.

139.    As a direct and proximate result of the breach of contract, the plaintiffs have suffered the permanent loss of their home and real property, as well as all attributes thereto, including, but not necessarily limited to, the loss of the value of the property, the future value and earning capacity of said property, the loss of the use and enjoyment of said property, and the loss of all improvements made to that property over the past 14 plus years all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

140.    As a further direct and proximate result of the breach of the contract, the plaintiffs have been forced to incur costs associated with obtaining replacement housing, including, but not necessarily limited to, moving and storage expenses, rental charges, household furnishings, increased travel costs and increased utility bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

141.    The plaintiffs have been required to retain the services of ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the future, incur expenses and costs and attorney's fees for which they are entitled to recover. The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

## SIXTH CLAIM FOR RELIEF

**(Tortious Breach of The Implied Covenant of Good Faith and Fair Dealing)**

## NOTE:

**The plaintiffs have included this claim for relief for appeal purposes only. Previously, the Court dismissed this claim pursuant to Document 52, and it appears that ruling would apply with equal force to all newly named defendants.**

142.    Plaintiffs reallege each and every allegation as contained above and incorporate them by reference as if fully set forth herein.

143.    The plaintiffs entered into a contract with EquiFirst Corporation which contract included a Promissory Note and Deed of Trust.  That contract contained certain provisions relating to actions which may be taken should the plaintiffs fail to fulfill their obligation to make periodic payments on the mortgage. Implied into this contract is an implied covenant of good faith and fair dealing which requires each party to engage in no conduct which will

30

1    deprive the other party of the rights and benefits of said contract. Subsequently, the plaintiffs
2    PAMELA D. LONGONI and JEAN GAGNON entered into a binding loan modification
3    agreement which the parties partially performed.

4         144.    By reason of the relationship between the parties wherein the plaintiffs were
5    in a vastly inferior bargaining position, where the defendant GMAC had made promises and
6    agreements which it knew, or should have known, would be relied upon by the plaintiffs, and
7    because the defendants had failed to comply with certain statutes regulating the assignment
8    of mortgage rights, the defendant occupied a position of trust and reliance vis-a-vis the
9    plaintiffs. Therefore, there exists a special relationship of trust and reliance akin to a
10   fiduciary relationship.

11        145.    The above-described relationship is one of those situations involving an
12   element of reliance generating a need to protect the weak from the insults of the strong, that
13   is not adequately met by ordinary contract damages.

14        146.    The defendants, and each of them, were in a vastly superior or entrusted
15   position as compared to the plaintiffs, and have engaged in grievous or perfidious
16   misconduct.

17        147.    This superior/inferior power differential created a special element of reliance
18   on the credibility of the defendants and lenders concerning the permanently approved loan
19   modification, and promise not to foreclose without adequate notice and due process of law.

20        148.    The plaintiffs are informed and believe and thereupon allege that the Defendant
21   GMAC MORTGAGE, LLC., purportedly assumed or was assigned all the rights, duties and
22   obligations which EquiFirst Corporation owed to the plaintiffs under the loan agreement.

23        149.    The defendant GMAC MORTGAGE, LLC., breached said contracts with the
24   plaintiffs when it wrongfully and unlawfully constructively seized and sold the plaintiffs' real
25   property and residence. Because of the nature of the relationship between the parties and the
26   unique nature of real property, and because contractual damages will not make the plaintiffs
27   whole, an award of tort damages is appropriate under Nevada law.

28        150.    As a direct and proximate result of the breach of contract and breach of the

31

1    implied covenant of good faith and fair dealing, the plaintiffs have suffered the permanent

2    loss of their home and real property, as well as all attributes thereto, including, but not

3    necessarily limited to, the loss of the value of the property, the future value and earning

4    capacity of said property, the loss of the use and enjoyment of said property, and the loss of

5    all improvements made to that property over the past 14 plus years all in an amount in excess

6    of TEN THOUSAND DOLLARS ($10,000.00).

7         151.   As a further direct and proximate result of the breach of the contract and breach

8    of the implied covenant of good faith and fair dealing, the plaintiffs have been forced to incur

9    costs associated with obtaining replacement housing, including, but not necessarily limited

10   to, moving and storage expenses, rental charges, household furnishings, increased travel

11   costs and increased utility bills and expenses all in an amount in excess of TEN THOUSAND

12   DOLLARS ($10,000.00).

13        152.   As a further direct and proximate result of the wrongful acts of the defendants

14   and each of them, the plaintiffs have been forced to incur costs associated with obtaining

15   replacement housing, including, but not necessarily limited to, moving and storage expenses,

16   rental charges, household furnishings, increased travel costs and increased utility bills and

17   expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

18        153.   As a further direct and proximate result of the wrongful acts of the defendants

19   and each of them, the plaintiffs have suffered severe and disabling emotional distress and

20   anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

21   all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND

22   DOLLARS ($10,000.00).

23        154.   In doing the acts alleged herein, the defendants and each of them acted with

24   deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

25   such are guilty of oppression thus warranting the imposition of exemplary and punitive

26   damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

27        155.   The plaintiffs have been required to retain the services of ERICKSON,

28   THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

1  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

2  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

3  **SEVENTH CLAIM FOR RELIEF**

4  **(Breach of Covenant of Quiet Enjoyment)**

5  **NOTE:**

6  **The plaintiffs have included this claim for relief for appeal purposes only.**

7  **Previously, the Court dismissed this claim pursuant to Document 52, and it appears**

8  **that ruling would apply with equal force to all newly named defendants.**

9      156.   Plaintiffs reallege each and every allegation as contained above and incorporate

10  them by reference as if fully set forth herein.

11      157.   At all times relevant hereto, the plaintiffs PAMELA D. LONGONI and JEAN

12  M. GAGNON were the lawful owners of the real property and residence located at 5540

13  Twin Creeks Drive, Reno, Nevada, 89523. In addition, the plaintiff LACEY LONGONI was

14  a lawful resident of said real property and residence.

15      158.   Into every real property sales transaction, the law implies a covenant that said

16  owners and lawful occupants of said property shall have peaceful and quiet enjoyment and

17  possession of said premises.

18      159.   The covenant of quiet enjoyment is the grantor's promise that the grantee's

19  possession will not be disturbed by any other claimant with a superior title.

20      160.   The covenant of quiet enjoyment runs with the land.

21      161.   The covenant of quiet enjoyment includes a covenant against disturbance by

22  an encumbrancer.

23      162.   The covenant of quiet enjoyment requires the grantor to protect the grantee

24  against lawful claims of ownership asserted by third persons, and comes to fruition once

25  there has been a disturbance in possession by actual or constructive eviction.

26      163.   The defendants, and each of them, by all actions taken to foreclose upon the

27  plaintiffs' real property and by selling said property to a third party, breached the implied

28  covenant of quiet enjoyment and as such are legally liable for all damages proximately

1 | caused by said conduct.

2 |     164.   As a direct and proximate result of the wrongful acts of the defendants, and

3 | each of them, the plaintiffs PAMELA D. LONGONI and JEAN M. GAGNON have suffered

4 | the permanent loss of their home and real property, as well as all attributes thereto, including,

5 | but not necessarily limited to, the loss of the value of the property, the future value and

6 | earning capacity of said property, the loss of the use and enjoyment of said property, and the

7 | loss of all improvements made to that property over the past 14 plus years all in an amount

8 | in excess of TEN THOUSAND DOLLARS ($10,000.00).

9 |     165.   As a further direct and proximate result of the wrongful acts of the defendants,

10 | and each of them, the plaintiffs have been forced to incur costs associated with obtaining

11 | replacement housing, including, but not necessarily limited to, moving and storage expenses,

12 | rental charges, household furnishings, increased travel costs and increased utility bills and

13 | expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14 |     166.   As a further direct and proximate result of the wrongful acts of the defendants,

15 | and each of them, the plaintiffs have suffered severe and disabling emotional distress and

16 | anxiety, suffering, anger, frustration, depression, embarrassment, grief, sorrow, and worry

17 | all to the Plaintiffs' general damages in an amount in excess of TEN THOUSAND

18 | DOLLARS ($10,000.00).

19 |     167.   In doing the acts alleged herein, the defendants, and each of them, acted with

20 | deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

21 | such are guilty of oppression thus warranting the imposition of exemplary and punitive

22 | damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

23 |     168.   The plaintiffs have been required to retain the services of ERICKSON,

24 | THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

25 | future, incur expenses and costs and attorney's fees for which they are entitled to recover.

26 | The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

27 | **EIGHTH CLAIM FOR RELIEF**

28 | **(Intentional Infliction of Emotional Distress)**

34

169.    Plaintiffs reallege each and every allegation as contained above and incorporate them by reference as if fully set forth herein.

170.    By way of the above-described actions and omissions, the Defendants' conduct was extreme and outrageous with the intention of, or reckless regard for, causing emotional distress.

171.    Plaintiffs have suffered severe and extreme emotional distress with physical manifestations of such distress.

172.    The defendants' above-described actions and omissions were the actual or proximate causation of this emotional distress.

173.    The above-described foreclosure and wrongful ousting of the plaintiffs from the family home was an invasion of the property owners' rights which occurred under circumstances of malice, willfulness, wantonness, and inhumanity.

174.    The defendants', and each of them, wrongful acts and foreclosure were a wilful use of power with the expectation to humiliate and distress the mortgagors and plaintiffs.

175.    In doing the acts alleged herein, the defendants engaged in conduct that they knew, or should have known and expected, would cause the plaintiffs to suffer and which did, in fact, cause the plaintiffs to suffer severe mental and emotional pain, grief, sorrow, anger, worry, and anxiety all to the plaintiffs' general damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

176.    In doing the acts alleged herein, the defendants, and each of them, acted with deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as such are guilty of oppression thus warranting the imposition of exemplary and punitive damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

177.    The plaintiffs have been required to retain the services of ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the future, incur expenses and costs and attorney's fees for which they are entitled to recover. The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

## NINTH CLAIM FOR RELIEF

### (Promissory Estoppel)

178. Plaintiffs reallege each and every allegation as contained above and incorporate them by reference as if fully set forth herein.

179. The defendants, as the parties to be estopped, were apprised of the true facts. The defendants made representations that they knew, or should have known would be relied upon by the plaintiffs, and which were, in fact, relied upon by the plaintiffs to their legal detriment.

180. The defendants intended that their conduct and misrepresentations would be acted upon, and acted in a fashion which would otherwise justify the plaintiffs' right to believe that the defendants so intended.

181. The plaintiffs were ignorant of the true state of facts, especially in light of the defendants' intentional representations regarding loan modification and their intent not to foreclose upon the plaintiffs' property.

182. The plaintiffs relied to their detriment on the defendants' conduct and misrepresentations.

183. In making the representations as alleged above, the employees and agents of GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., knew, or in the exercise of reasonable care, should have known that said representations would be relied upon by the plaintiffs who did, in fact, rely to their detriment upon said statements and representations. Under the principles of equity, said representations are therefore binding and enforceable against GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.

184. The defendants GMAC MORTGAGE, LLC., and/or RESIDENTIAL FUNDING COMPANY, LLC., and/or RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., failed to perform the promises and guarantees which they made to the plaintiffs when they wrongfully and unlawfully constructively seized and sold the plaintiffs' real property

1  and residence and refused to modify the plaintiffs' existing Promissory Note.

2      185.  As a direct and proximate result of the defendants failure to perform their
3  promises and guarantees, the plaintiffs have suffered the permanent loss of their home and
4  real property, as well as all attributes thereto, including, but not necessarily limited to, the
5  loss of the value of the property, the future value and earning capacity of said property, the
6  loss of the use and enjoyment of said property, and the loss of all improvements made to that
7  property over the past 14 plus years all in an amount in excess of TEN THOUSAND
8  DOLLARS ($10,000.00).

9      186.  As a further direct and proximate result of the defendants' failure to perform
10  its promises and guarantees, the plaintiffs have been forced to incur costs associated with
11  obtaining replacement housing, including, but not necessarily limited to, moving and storage
12  expenses, rental charges, household furnishings, increased travel costs and increased utility
13  bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

14      187.  The plaintiffs have been required to retain the services of ERICKSON,
15  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the
16  future, incur expenses and costs and attorney's fees for which they are entitled to recover.
17  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

18            **TENTH CLAIM FOR RELIEF**

19        **(Concert of Actions against All Defendants)**

20      188.  Plaintiffs  reallege each and every allegation as contained above and
21  incorporates them by reference as if fully set forth herein.

22      189.  By and through the above described behavior and actions, defendants, and each
23  of them, committed a tortuous acts in concert with one another and/or pursuant to a common
24  design, plan design or scheme with one another, or;

25      190.  Each of these defendants knew that the others' conduct constituted a breach
26  of duty and gave substantial assistance or encouragement to the other so to conduct, or;

27      191.  Each of these named defendants gave substantial assistance to the other in
28  accomplishing the tortuous result and each of their own conduct, separately considered,

1  constituted a breach of duty to the plaintiffs, and/or;

2      192. Each of the defendants conspired to create separate entities in order to shield

3  and hide from public scrutiny their wrongful actions, and to attempt to avoid legal liability

4  for conduct which they knew, or should have known, was unlawful or wrongful,

5      193. As a direct and proximate result of the above described concert of actions, the

6  plaintiffs have suffered and continue to suffer the permanent loss of their home and real

7  property, as well as all attributes thereto, including, but not necessarily limited to, the loss

8  of the value of the property, the future value and earning capacity of said property, the loss

9  of the use and enjoyment of said property, and the loss of all improvements made to that

10  property over the past 14 plus years all in an amount in excess of TEN THOUSAND

11  DOLLARS ($10,000.00).

12      194. As a further direct and proximate result of the defendants' failure to perform

13  their promises and guarantees, the plaintiffs have been forced to incur costs associated with

14  obtaining replacement housing, including, but not necessarily limited to, moving and storage

15  expenses, rental charges, household furnishings, increased travel costs and increased utility

16  bills and expenses all in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

17      195. In doing the acts alleged herein, the defendants, and each of them, acted with

18  deliberate indifference to, and in conscious disregard of, the rights of the plaintiffs and as

19  such, are guilty of oppression thus warranting the imposition of exemplary and punitive

20  damages in an amount in excess of TEN THOUSAND DOLLARS ($10,000.00).

21      196. The plaintiffs have been required to retain the services of ERICKSON,

22  THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and they have, and will in the

23  future, incur expenses and costs and attorney's fees for which they are entitled to recover.

24  The plaintiffs are also entitled to pre and post judgment interest in accordance with the law.

25      WHEREFORE, the plaintiffs, individually, and PAMELA D. LONGONI, in her

26  representative capacity, pray for judgment against the Defendants, and each of them, jointly

27  and severally, as follows:

28      1. For special damages for all damages associated with the loss of their real

1   property and residence and related items when the same are ascertained;

2        2.     For general damages in a sum in excess of TEN THOUSAND DOLLARS

3   ($10,000.00);

4        3.     For exemplary damages in an amount in excess of TEN THOUSAND

5   DOLLARS ($10,000.00);

6        4.     For interest pursuant to statute; and

7        5.     For such other and further relief as this Court may deem equitable and just.

8   **Plaintiffs hereby demand a jury on all issues.**

9   DATED this 12th day of September, 2011.

10                 ERICKSON, THORPE & SWAINSTON, LTD.
                      99 West Arroyo Street

11                 P. O. Box 3559
                      Reno, Nevada 89505

13                 By_____

14                    THOMAS P. BEKO, ESQ.
                    *Attorney for Plaintiffs*

39

1            **CERTIFICATE OF SERVICE**

2               Pursuant to FRCP 5(b), I certify that I am an employee of ERICKSON, THORPE &

3  SWAINSTON, LTD. and that on this day I personally served a true and correct copy of the attached

4  document by:

5        ☐   U.S. Mail

6        ☐   Facsimile Transmission

          ☐   Personal Service

7        ☐   Messenger Service

8        ☒   CM/ECF System

9  addressed to the following:

10  David Hill Bahford
    Bradley Arant Boult Cummungs LLP
11  100 N. Tyron Street, Suite 2690
    Charlotte, NC 28202
12  *Attorney for Defendants GMAC Mortgage, LLC,*
    *Executive Trustee Services, LLC,*
13  *Illeanna Peterson and Kathleen Gowen*

14        DATED this _12th_ day of September, 2011.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ERICKSON, THORPE &
SWAINSTON, LTD.

1

EXHIBIT 1

EXHIBIT 1

02/26/2009 03:56:10 PM
Requested By
TICOR TITLE - RENO
Washoe County Recorder
Kathryn L. Burke - Recorder
Fee: $15.00 RPTT: $0
Page 1 of 2

RECORDING REQUESTED BY:

3220 EL CAMINO REAL
IRVINE, CA 92602

AND WHEN RECORDED MAIL TO:
Executive Trustee Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120

APN: 204-081-05  0 80038307

T.S. No.: GM-157884-C   Loan No.: 7440353498

0 800 900

SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY

# NOTICE OF BREACH AND DEFAULT AND OF ELECTION TO CAUSE SELL OF REAL PROPERTY UNDER DEED OF TRUST

**NOTICE IS HEREBY GIVEN THAT: EXECUTIVE TRUSTEE SERVICES, LLC** is the duly appointed Trustee under a Deed of Trust dated 9/29/2005, executed by JEAN M. GAGNON and PAMELA LONGONI AN UNMARRIED WOMAN AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP, as trustor in favor of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., recorded 10/7/2005, under instrument no. 3288814, in book , page , of Official Records in the office of the County recorder of Washoe, County, Nevada securing, among other obligations.

One note(s) for the Original sum of $432,000.00, that the beneficial interest under such Deed of Trust and the obligations secured hereby are presently held by the undersigned; that a breach of and default in the obligations for which such Deed of Trust is security has occurred or that payment has not been made of:

Installment of Principal and Interest plus impounds and/or advances which became due on 12/1/2008 plus late charges, and all subsequent installments of principal, interest, balloon payments, plus impounds and/or advances and late charges that become payable.

That by reason thereof the present Beneficiary under such deed of Trust has executed and delivered to said duly appointed Trustee a written Declaration of Default and Demand for Sale and has deposited with said duly appointed Trustee such Deed of Trust and all documents evidencing obligations secured thereby and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

(PAGE 1 of 2)

Case 3:10-cv-895-RH-VPC Document 33 Filed 06/13/10 Page 3 of 39
12-120 3:10-cv-00297-BRH-VPC Document 85 entered Filed 09/12/13 Page 3 of 3
Pg 91 of 176

T.S. No.: GM-157884-C        Loan No.: 7440353498

## NOTICE

You may have the right to cure the default hereon and reinstate the one obligation secured by such Deed of Trust above described. Section NRS 107.080 permits certain defaults to be cured upon the Payment of the amounts required by that statutory section without requiring payment of that portion of principal and interest which would not be due had no default occurred. Where reinstatement is possible, if the default is not cured within 35 days following recording and mailing of this Notice to Trustor of Trustor's successor in interest, the right of reinstatement will terminate and the property may thereafter be sold. The Trustor may have the right to bring a court action to assert the nonexistence of a default or any other defense of Trustor to acceleration and Sale.

**To determine if reinstatement is possible and the amount, if any, to cure the default, contact:**

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
C/O Executive Trustee Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120
(818) 260-1600 phone

Dated: 2/25/2009

Executive Trustee Services, LLC As Agent for Beneficiary

By:

Joyce A. Petty, Limited Signing Officer

State of   California      } SS.
County of  Los Angeles   }

On 2/25/2009 before me, Dee C. Ortega Notary Public, personally appeared Joyce A. Petty who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____  (Seal)
           Dee C. Ortega

DEE C. ORTEGA
Commission # 1672751
Notary Public - California
Los Angeles County
My Comm. Expires Jun 5, 2010

(PAGE 2 OF 2)

EXHIBIT 2

EXHIBIT 2

Case 3:10-cv-002... LRH-VPC Document 33 Filed 09... Page 93 of 176
Case 2:10-cv-00297-RFJ-VPC Filed Document 55 Entered Filed 09/12/10 Page 93 of ...
Pg 93 of 176

RECORDING REQUESTED BY
Washoe County Recorder
Kathryn L. Burke – Recorder
Fee: $15.00  RPTT: $0
Page 1 of 2

RECORDING REQUESTED BY:
**Executive Trustee Services, LLC**

AND WHEN RECORDED MAIL TO:
**Executive Trustee Services, LLC**
**2255 North Ontario Street, Suite 400**
**Burbank, California 91504-3120**

APN: 204-081-05
T.S. No. GM-157884-C
Loan No. 7440353498

SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 9/29/2005. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state, will be held by the duly appointed trustee. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to satisfy the obligation secured by said Deed of Trust. This property is sold as-is, lender is unable to validate the condition, defects or disclosure issues of said property and Buyer waives the disclosure requirements under NRS 113.130 by purchasing at this sale and signing said receipt. The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein.

TRUSTOR: JEAN M. GAGNON and PAMELA LONGONI AN UNMARRIED WOMAN AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP
Recorded 10/7/2005 as Instrument No. 3288814 in Book , page of Official Records in the office of the Recorder of Washoe County, Nevada,
Date of Sale: 8/14/2009 at 11:00 AM
Place of Sale:   At the Virginia Street entrance to the County Courthouse, Virginia Street at Court Street, Reno, Nevada
Property Address is purported to be:    5540 TWIN CREEKS DRIVE
RENO, Nevada 89523

The total amount secured by said instrument as of the time of initial publication of this notice is $468,730.95, which includes the total amount of the unpaid balance (including accrued and unpaid interest) and reasonable estimated costs, expenses, and advances at the time of initial publication of this notice.

Date: 7/20/2009

Executive Trustee Services, LLC,
2255 North Ontario Street, Suite 400,
Burbank, California 91504-3120
Sale Line: 714-730-2727

Ileanna Petersen, Limited Signing Officer

Case 3:10-cv-00___-LRH-VPC Document 33 Filed 05/13/10 Page 6 of 39

12-12020-mg Doc 9-1 Filed 05/14/13 Entered 05/14/13 Page 6 of 69
Case 9:10-cv-00297-LRH-VPC Document 85 filed 09/12/11 Page 6 of 69
Pg 94 of 176

State of   California      } SS.
County of Los Angeles   }

On 7/20/2009 before me, **Christine E. Gomez-Schwab** Notary Public, personally appeared **ILEANNA PETERSEN** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
          Christine E. Gomez-Schwab

CHRISTINE E. GOMEZ SCHWAB
Commission # 1651121
Notary Public - California
Los Angeles County
My Comm. Expires Mar 12, 2010

EXHIBIT 3

EXHIBIT 3

DOC #3795669
08/26/2009 03:49:40 PM
Electronic Recording Requested By
WESTERN TITLE INC RIDGE
Washoe County Recorder
Kathryn L. Burke - Recorder
Fee: $16.00 RPTT: $707.25
Page 1 of 3

RECORDING REQUESTED BY:

AND WHEN RECORDED MAIL TO: Page Ventures LLC dba
**NATIONAL REALSTATE SERVICES**
**1692 COUNTY RD SUITE B**
**MINDON, NV 89423**
RPTT $ 707.25
**Forward Tax Statements to the address given above**

APN: 204-081-05
TS # GM-157884-C    LOAN # 7440353498
INVESTOR #: 0000000000000
TITLE ORDER # 090138307-NV-GNO

This document is being
recorded as an
accommodation only.

SPACE ABOVE LINE FOR RECORDER'S USE

## TRUSTEE'S DEED UPON SALE

**TRANSFER TAX: $00.00**
The Grantee Herein Was Not The Foreclosing Beneficiary.
The Amount Of The Unpaid Debt was $467,758.23
The Amount Paid By The Grantee Was $172,500.00
Said Property Is In The City Of RENO, County of Washoe

**EXECUTIVE TRUSTEE SERVICES, INC,** as Trustee, (whereas so designated in the Deed of Trust hereunder more particularly described or as duly appointed Trustee) does hereby **GRANT** and **CONVEY** to: NATIONAL REALSTATE SERVICES/ Page Ventures, LLC a Nevada limited liability co. DBA National Real Estate Services (Herein called Grantee) but without covenant or warranty, expressed or implied, all right title and interest conveyed to and now held by it as Trustee under the Deed of Trust in and to the property situated in the county of Washoe, State of Nevada, described as follows: **SEE EXHIBIT "A" ATTACHED**

This conveyance is made in compliance with the terms and provisions of the Deed of Trust executed by **JEAN M. GAGNON and PAMELA LONGONI AN UNMARRIED WOMAN AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP** as Trustor, dated 9/29/2005 of the Official Records in the office of the Recorder of Washoe, Nevada under the authority and powers vested in the Trustee designated in the Deed of Trust or as the duly appointed Trustee, default having occurred under the Deed of Trust pursuant to the Notice of Breach and Election to Sell under the Deed of Trust recorded on 10/7/2005 , Instrument number 3288814, Book , Page , of Official records. Trustee having complied with all applicable statutory requirements of the State of Nevada and performed all duties required by the Deed of Trust including sending a Notice of Breach and Election to Sell within ten days after its recording and a Notice of Sale at least twenty days prior to the Sale Date by certified mail, postage pre-paid to each person entitled to notice in compliance with Nevada Civil Code 107.050

[Page 1 of 2]

12-12020-mg Doc 9236-4 Filed 09/13/13 Entered 09/13/13 Page 9 of 39
Case 3:10-cv-00257-RCJ-VPC Document 33 Filed 09/13/13 Page 9 of 39 Exhibit 3
3795669 Page 2 of 3 09/26/2009 03:49:40 PM

# TRUSTEE'S DEED UPON SALE

Trustee's Deed
T.S.# GM-157884-C
Loan # 7440353498
Title Order # 090138307-NV-GNO

All requirements per Nevada Statutes regarding the mailing, personal delivery and publication of copies of Notice of Default and Election to Sell under Deed of Trust and Notice of Trustee's Sale, and the posting of copies of Notice of Trustee's Sale have been complied with. Trustee, in compliance with said Notice of Trustee's sale and in exercise of its powers under said Deed of Trust sold said real property at public auction on 8/14/2009. Grantee, being the highest bidder at said sale became the purchaser of said property for the amount bid, being $ $172,500.00, in lawful money of the United States, in pro per, receipt there of is hereby acknowledged in full/partial satisfaction of the debt secured by said Deed of Trust.

In witness thereof, **EXECUTIVE TRUSTEE SERVICES, INC.**, as Trustee, has this day, caused its name to be hereunto affixed by its officer thereunto duly authorized by its corporation by-laws

Date: 8/14/2009                          EXECUTIVE TRUSTEE SERVICES, INC.

                                         By: _____
                                         Kathleen Gowen, Limited Signing Officer

On **8/20/2009**, before me ,Gisela A. Clark Notary Public, personally appeared **Kathleen Gowen** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
           Gisela A. Clark

GISELA A. CLARK
Commission # 1662574
Notary Public - California
Los Angeles County
My Comm. Expires May 1, 2010

[Page 2 of 2]

Case 3:10-cv-00136-LRH-VPC Document 33 Filed 05/14/10 Page 10 of 39
12-12020-mg Doc 3795-3 Filed 05/15/13 Entered 05/15/13 Page 10 of 33
3795669 Page 3 of 3

EXHIBIT "A"

Lot 51, in Block C of SILVERADO RANCH ESTATES UNIT 3 PHASE 1,
according to the map recorded August 11, 1994, in the Office
of the Washoe County Recorder, as File No. 1823523, Tract Map
No. 3064

APN 204-081-05



Case 3:10-cv-00297-SRH-VPC    Document 85    Filed 03/12/11    Page 1 of 99    Exhibit 3

EXHIBIT 4

EXHIBIT 4

12-12098-mg  v-002  RHEE  Document 85  Entered 09/12/13 3:4ge 12 of 09 3
Case 3:10-cv-00236-2RH-VP  Filed  Document 85  Filed 09/13/10  Page 12 of 39
Pg 100 of 176

Assessor's Parcel Number:
20408105
Return To: EquiFirst Corporation
Attn: Collateral M
500 Forest Point Circle
Charlotte, NC 28273

Prepared By: Rachel Read

500 Forest Point Circle, Charlotte,
NC 28273
Recording Requested By:

—————————— [Space Above This Line For Recording Data] —————— 146561-5

# DEED OF TRUST

MIN 100200100081894218

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated September 29, 2005
together with all Riders to this document.

(B) "Borrower" is Jean M. Gagnon an unmarried man and Pamela Longoni an
unmarried woman as joint tenants with right of survivorship.

Borrower is the trustor under this Security Instrument.

(C) "Lender" is EquiFirst Corporation

Lender is a Corporation
organized and existing under the laws of North Carolina
818942
NEVADA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3029  1/01
WITH MERS

-6A(NV) (0307).01
Page 1 of 15          Initials: _____
VMP Mortgage Solutions (800)521-7291

Lender's address is 500 Forest Point Circle, Charlotte, NC 28273

(D) "Trustee" is First Centennial Title Company of Nevada

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated September 29, 2005
The Note states that Borrower owes Lender four hundred thirty-two thousand and 00/100
                                                                                    Dollars
(U.S. $432,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than November 1, 2035

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | [x] Other(s) [specify] |
| | | ARM Floor/ Prepay/ Interest Only Rider |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
618942

-6A(NV) (0307).01                    Page 2 of 15              Initials _____         Form 3029  1/01

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County                    [Type of Recording Jurisdiction]
of Washoe                                          [Name of Recording Jurisdiction]:
See Attached Exhibit A

Parcel ID Number: 20408105                          which currently has the address of
5540 Twin Creeks Drive                                                      [Street]
Reno                                    [City], Nevada 89523            [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

818942

⑥-6A(NV) (0307).01                    Page 3 of 15                Initials          Form 3029  1/01

OCT. 2005 3:27PM FIRST CENTENNIAL NO. 919 P. 12/33

12-12020 Case 3:10-cv-00236-RLH-VPC Document 33 Filed 09/11/13 Page 15 of 39
Case 3:10-cv-00236-RLH-VPC Document 86 Entered 09/12/13 Page 15 of 39

Pg 103 of 176

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives

818942

Initials: ___

Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

81.8942

VMP® -6A(NV) (0307).01                    Page 5 of 15                    Initials: _____    Form 3029 1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

818942

VMP®-6A(NV) (0307).01                    Page 6 of 15                    Initials: [signature]    Form 3029 1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

918942

-6A(NV) (0307).01                    Page 7 of 15          Initials                    Form 3029  1/01

12-12Case 3:10-cv-0026-RLH-VPC Document 33 Filed 09/10, Page 19 of 39
Case 3:10-cv-00297-LRH-VPC Filed Document 85 Entered 09/12/13 Page 15 of 103
Pg 107 of 176

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

818942

VMP®-6A(NV) (0307).01          Page 8 of 15          Initials_____          Form 3029 1/01

OCT. 2005 3:30PM FIRST CENTENNIAL NO.713 P.17/33

12-12020-mg Case 3:10-cv-00236-RHB-VPC Document 33 Filed 09/ 10 Page 20 of 39
Case 3:10-cv-00236-RHB-VPC Document 36 Entered 09/12/13 Page 20 of 30
Pg 108 of 176

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

818942

VMP -6A(NV) (0307).01                          Page 9 of 15                          Initials:____            Form 3029 1/01

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

818942

-6A(NV) (0307).01 Page 10 of 15 Initials: [signature] Form 3029 1/01

OCT. 2005 3:32PM FIRST CENTENNIAL NO.515 P. 19/39
12-12098-mg Doc 3-10 Rev 007 36-3 Filed 12/10/12 Entered 09/13/13 Page 22 of 39
Case 3:11-cv-00297-RCJ-VPC Document 8 Filed 09/13/13 Page 22 of 30
Pg 110 of 176

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

818942

VMP®-6A(NV) (0307).01      Page 11 of 15      Initials: _____      Form 3029 1/01

12-12026 Case 3:10-cv-00296-RLH-VPC Document 23 Filed 09/09 Page 23 of 39
Case 3:10-cv-00296-RLH-VPC Document 85 Entered 05/12/13 Page 23 of 103
Pg 111 of 176

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

818942

VMP®-6A(NV) (0307).01                    Page 12 of 15                    Initials ____                    Form 3029  1/01

OCT 1 '05 3:33PM FIRST CENTENNIAL NO. 919 P. 21/39
Case 3:10-cv-0024 RH-VPC Document 83 Filed 09/ 03 P 24 of 39
12-12020-mg Doc 8 v-00295 RH-VP led Document 85 hered led 09/12/13 Page 24 of 09 3
Pg 112 of 176

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S. $350.00

818942

-6A(NV) (0307).01                    Page 13 of 15                    Initials: ___    Form 3029  1/01

OCT. 005 3:34PM FIRST CENTENNIAL NO. 212 P. 27/39
Case 3:10-cv-0026 -RH-EG Document 13 Filed 09/ 10 Page 25 of 39
12-12 Case 3:10-cv-00297-LRH-VPC Document 85-1 Filed 03/12/13 Page 25 of 90 3
Pg 113 of 176

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____         _____ (Seal)
                                     Jean M Gagnon                -Borrower

_____         _____ (Seal)
                                       Pamela Longoni                -Borrower

_____ (Seal)       _____ (Seal)
                -Borrower                                    -Borrower

_____ (Seal)       _____ (Seal)
                -Borrower                                    -Borrower

_____ (Seal)       _____ (Seal)
                -Borrower                                    -Borrower

818942

VMP-6A(NV) (0307).01               Page 14 of 15                    Form 3029   1/01

STATE OF NEVADA
COUNTY OF Washoe

This instrument was acknowledged before me on October 3, 2005 by
Jean M Gagnon & Pamela Longoni



SHERRY BAKER
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 99-43264-2 - Expires November 5, 2009

Mail Tax Statements To:
EquiFirst Corporation
EquiFirst Corporation , 500 Forest Point Circle , Charlotte, NC 28273

818942

VMP -6A(NV) (0307).01                    Page 15 of 15        Initials:        Form 3029  1/01

EXHIBIT 5

EXHIBIT 5

12-12063-RfeMC-1Doacrmnen2-33 Filed 09/13/10 Pa e 28 of 39
Case 3:10-cv-00297-LRH-VPC Filed 08/13/13 Page 26 of 60
Pg 116

# ADJUSTABLE RATE NOTE

(LIBOR Index - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND
MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN
CHANGE AT ANY ONE TIME AND THE MAXIMUM AND MINIMUM RATE I MUST PAY.

| September 29, 2005 | Reno | NV |
|---|---|---|
| (Date) | (City) | (State) |

5540 Twin Creeks Drive, Reno, NV 89523
(Property Address)

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 432,000.00 (this amount is called
"principal"), plus interest, to the order of the Lender. The Lender is EquiFirst Corporation . I will make all
payments under this Note in the form of cash, check or money order. I understand that the Lender may transfer this
Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this
Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest
at a yearly rate of 7.150 %. The interest rate I will pay may change in accordance with Section 4 of the Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after
any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.
I will make my monthly payments on the 1st day of each month beginning on December 1, 2005
I will make these payments every month until I have paid all of the principal and interest and any other
charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled
due date and will be applied to interest before principal. If on November 1, 2035 , I still owe amounts under
this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at
EquiFirst Corporation , 500 Forest Point Circle , Charlotte, NC 28273
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 2,574.00 .
This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest
rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly
payment in accordance with Section 4 of this Note.

Multistate Adjustable Rate Note-Libor Index
EF815N (2/00)   (Nevada Version)
Loan Number 818942                     Page 1 of 4

Initial

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**
The interest rate I will pay may change on November 1, 2007, and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding 5.240 percentage points ( 5.240 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than 10.150% or less than 7.150 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.000%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 13.150% or less than the initial interest rate provided for in Section 2 of this Note.

**(E) Effective Date of Change**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER RIGHT TO PREPAY

**(A) Prepayment**    I have the right to make payments at any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing I am doing so. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

**(B) Prepayment Penalty**

In the event, during the first 2 years after the execution of this Note, I make a prepayment and the prepayment exceeds twenty percent (20%) of the original principal amount of the loan in any twelve (12) month period, I will pay a prepayment charge in an amount equal to six (6) months' advance interest on the amount prepaid which is in excess of twenty percent (20%) of the original principal amount of the loan within the twelve (12) month period. The Note Holder will not assess a repayment penalty after the 2nd anniversary of the date of execution of this Note.

LONG-0004

OCT. 2005 3:38PM    FIRST CENTENNIAL    NO. 515    P. 32/34

12-12992-mg  Case 3:10-cv-00297-SRH-VPC  Document 33-1 Filed 08/13/03  Pg 30 of 39
Case 3:10-cv-00297-SRH-VPC  Document 85-1 Filed 05/12/14  Page 30 of 39
Pg 118 of 176

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00 % of my overdue payment of principal and interest. I will pay this late charge but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

EF815N
Loan Number: 818942

Page 3 of 4

Initials

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred), without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

"WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED"

_____ (Seal)
                                 -Borrower
Jean M Gagnon

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower
Pamela Longoni

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

EF815N
Loan Number 818942

Page 4 of 4

Initials _____

LONG-0006

Case 3:10-cv-0026 -RHW DC  1 Document 33  Filed 09/ /10  Page 32 of 39
12-12029-  Case 3:10-cv-00297-RHH-VPC   Document 33   Entered: ADJUSTABLE RATE NOTE ADDENDUM Page 32 of 39 3
Pg 120

**ADJUSTABLE RATE NOTE ADDENDUM**
**FOR THE INTEREST ONLY PAYMENT PERIOD**

THIS ADDENDUM TO THE ADJUSTABLE RATE NOTE PROVIDES FOR AN INITIAL PERIOD OF MONTHLY PAYMENTS OF INTEREST ONLY AND FOR SUBSEQUENT MONTHLY PAYMENTS OF BOTH PRINCIPAL AND INTEREST.

This Adjustable Rate Note Addendum is made this 29th day of September , 2005, and is incorporated into and shall be deemed to amend the Adjustable Rate Note of the same date (the "Note") and any Addenda to the Note given by the undersigned (the "Borrower") to evidence Borrower's indebtedness to EquiFirst Corporation (the "Lender"), which indebtedness is secured by a Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date and covering the property described in the Security Instrument located at:

5540 Twin Creeks Drive, Reno, NV 89523
(Property Address)

ADDITIONAL COVENANTS: Unless specifically defined in this Addendum, any capitalized terms shall have the same meaning as in the Note. Notwithstanding anything to the contrary set forth in the Note, Addenda to the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

I.   Section 3 and 4 of the Note are modified to provide for sixty (60) monthly payments of interest only ("Interest Only Period") at the interest rate determined in accordance with Sections 2 and 4 of the Note.  Sections 3 and 4 of the Note are modified as follows:

**3. PAYMENTS**
(A) Time and Place of Payments
I will pay interest during the Interest Only Period, and principal and interest thereafter during the Amortization Period, by making a payment every month.

Interest Only Period:  The "Interest Only Period" is the period from the date of the Note through 11/01/2010.

Amortization Period:  The "Amortization Period" is the period after the Interest Only Period and continuing until the Maturity Date.

I will make my monthly payments on the 1st day of each month beginning on December 1, 2005.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to scheduled interest and principal. If on November 1, 2035, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at
EquiFirst Corporation , 500 Forest Point Circle , Charlotte, NC 28273
or at a different place if required by the Note Holder.

(B) Amount of My Interest Only Payments
The first 24 monthly payments will be in the full amount of U.S. $ 2,574.00, which equals one twelfth (1/12th) of the amount of yearly interest due on the principal at the time the loan was made. These payments are called the "Interest Only Payments".  No payments of principal are due during the Interest Only Period.  The Interest Only Payments will not reduce the principal amount of this Note. Additional Payments of principal may be made in accordance with the provisions of this Note.

(C) Monthly Payment Changes
During the Interest Only Period, changes in my monthly payment will reflect changes in the interest rate that I must pay.  During the Amortization Period, changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay.  The Note Holder will determine my new interest rate and the changed amount of my monthly  payment in accordance with Section 4 of this Note.

EF9691 (3/04)
Loan Number  818942                                      Page 1 of 2

LONG-0007

**(A) Change Dates**

The interest rate I will pay may change on November 1, 2007, and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index.. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding 5.240 percentage points ( 5.249 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

For the Interest Only Period, after calculating my new interest rate as provided above, the Note Holder will then calculate the amount of the monthly payment to be one-twelfth (1/12th) of one (1) year's interest at the new interest rate. The result of this calculation will be the new amount of my monthly payment until the next Interest Rate Change Date.

During the Amortization Period, after calculating my new interest rate as provided above, the Note Holder will then calculate the amount of the monthly payment that would be sufficient to fully repay the remaining unpaid principal in substantially equal monthly payments by the Maturity Date, assuming, for purposes of each calculation, that the interest rate remained unchanged during that period. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.150% or less than 7.150 % . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.000%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 13.150% or less than the initial interest rate provided for in Section 2 of this Note.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my Interest Rate and the amount of my monthly payment before the effective date of any changes. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

II.    All other provisions of the Note and any Addenda are unchanged by this Addendum to Adjustable Rate Note and remain in full force and effect.

I understand that for the Interest Only Period I will not be reducing the principal balance. After Five (5) years if I only made my minimum payment, my principal balance will not be reduced.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and conditions contained in the Adjustable Rate Note Addendum.

Jean M Gagnon

Pamela Longoni

EF9692 (3/04)
Loan Number 818942

Page 2 of 2

LONG-0008

Case 3:10-cv-00214-RH-VPC Document 85 Entered 09/12/13 3 Page 34 of 39
12-1202 3:10-cv-00214-RH-VPC Document 85 Entered 09/12/13 3 Page 34 of 39
Pg 122 of 176

ADJUSTABLE RATE INTEREST RATE FLOOR &

### PREPAYMENT PENALTY Addendum to Note

This ADJUSTABLE INTEREST RATE FLOOR & PREPAYMENT PENALTY ADDENDUM is made this 29th day of September, 2005, and amends the Note in the amount of U.S. $ 432,000.00 dated the same date and given by the person(s) who signs below (the "Borrower(s)") to EquiFirst Corporation (the "Lender").

In addition to the agreements and provisions made in the Note and the Security Instrument, and notwithstanding any provisions to the contrary contained in said Note or the Security Instrument, both the Borrower(s) and the Lender further agree as follows:

#### ADJUSTABLE INTEREST RATE FLOOR

This loan has an Interest Rate "Floor" which will limit the amount the Interest Rate can decrease. Regardless of any changes in the index, the Interest Rate during the term of this loan will never be less than the initial Interest Rate provided for in Section 2 of the Note.

#### PREPAYMENT PENALTY

In the event, during the first 2 years after the execution of this Note, I make a prepayment and the prepayment exceeds twenty percent (20%) of the original principal amount of the loan in any twelve (12) month period, I will pay a prepayment charge in an amount equal to six (6) months' advance interest on the amount prepaid which is in excess of twenty percent (20%) of the original principal amount of the loan within the twelve (12) month period. The Note Holder will not assess a repayment penalty after the 2nd anniversary of the date of execution of this Note.

_____
Jean M Gagnon

_Pamela Lougon_
_____
Pamela Lougoni

_____          _____

_____          _____

818942
EF057 (12/99)

LONG-0009

OCT. '005 3:34PM   FIRST CENTENNIAL   NO. 919   P. 24/55

12-12 Case 3:10-cv-0024 -RLH-VPC  Document 33   Filed 09/  /10   Page 35 of 39
Case 3:10-cv-00297-LRH-VPC  Filed Document 85  Entered 05/12/13  Page 35 of 00 3
Pg 123 of 176

## ADJUSTABLE RATE RIDER to Security Instrument

(LIBOR 6 Month Index - As Published in *The Wall Street Journal* - Rate Caps)

(To Be Recorded Together with Security Instrument)

THIS ADJUSTABLE RATE RIDER is made this 29th day of September , 2005 and incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to EquiFirst Corporation (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

5540 Twin Creeks Drive, Reno, NV  89523

(property address)

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM AND MINIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS.

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of 7.150 % .  The Note provides for changes in the interest rate and the monthly payment as follows:

(A) Change Dates

The interest rate I will pay may change on November 1, 2007 and on that day every sixth month thereafter.  Each date on which my interest rate could change is called a "Change

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is the "Current Index." If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, The Note Holder will calculate my new interest rate by adding 5.240 percentage points (5.240 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 10.150% or less than 7.150% .  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point(s) (1.00%) the rate of interest I have been paying for the preceding six months.  My interest rate will never be greater than 13.150 %  or less than the initial interest rate provided for in Section 2 of this Note.

818942          EF0611 (05/02)          Page 1 of 2

LONG-0010

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my new interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 17 of the Security Instrument is amended to read as follows:

Transfer of Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person), without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in the Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____
Jean M. Gagnon

_____
Pamela Longoni

_____

_____

818942
EF0612 (5/02)

Page 2 of 2

UCT. 2005 3:59PM FIRST CENTENNIAL NO. 915

12-12 Case 3:10-cv-00296-RLH-VPC Document 33 Filed 09/19 Page 37 of 39
Case 3:10-cv-00296-RLH-VPC Document 85 Entered 03/12/13 Page 37 of 39
Pg 125 of 176

## ADJUSTABLE RATE INTEREST RATE FLOOR & PREPAYMENT PENALTY Rider to Security Instrument
### (To Be Recorded Together with Security Instrument)

This ADJUSTABLE INTEREST RATE FLOOR & PREPAYMENT PENALTY RIDER (the "Rider") is made this 29th day of September, 2005, and amends the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") dated the same date and given by the person(s) who signs below (the "Borrower(s)") to EquiFirst Corporation (the "Lender") to secure prepayment of a Note in the amount of U.S. $432,000.00.

In addition to the agreements and provisions made in the Note and the Security Instrument, and notwithstanding any provisions to the contrary contained in said Note or the Security Instrument, both the Borrower(s) and the Lender further agree as follows

### ADJUSTABLE INTEREST RATE FLOOR

This loan has an Interest Rate "Floor" which will limit the amount the Interest Rate can decrease. Regardless of any changes in the index, the Interest Rate during the term of this loan will never be less than the initial Interest Rate provided for in Section 2 of the Note.

### PREPAYMENT PENALTY

In the event, during the first 2 years after the execution of this Note, I make a prepayment and the prepayment exceeds twenty percent (20%) of the original principal amount of the loan in any twelve (12) month period, I will pay a prepayment charge in an amount equal to six (6) months' advance interest on the amount prepaid which is in excess of twenty percent (20%) of the original principal amount of the loan within the twelve (12) month period. The Note Holder will not assess a repayment penalty after the 2nd anniversary of the date of execution of this Note.


_____
Jean M Gagnon

_____
Pamela Longoni

_____


BF058 (05/02)   818942

LONG-0012

OCT. 2005 3:36PM FIRST CENTENNIAL NO. 515 P. 21/39
Case 3:10-cv-00236-LRH-VPC Document 33 Filed 09/13/10 Page 38 of 39
12-12023-mg Doc 9711 Filed 03/12/16 Entered 03/12/16 Page 36 of 60
Pg 126 of 176

**INTEREST ONLY PAYMENT PERIOD RIDER**
**ADJUSTABLE RATE MORTGAGE**

THIS RIDER TO THE SECURITY INSTRUMENT PROVIDES FOR AN INITIAL PERIOD OF MONTHLY PAYMENTS OF INTEREST ONLY AND FOR SUBSEQUENT MONTHLY PAYMENTS OF BOTH PRINCIPAL AND INTEREST.

THIS INTEREST ONLY RIDER is made this 29th day of September , 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to EquiFirst Corporation (the "Lender"), of the same date and covering the property described in the Security Instrument located at:

5540 Twin Creeks Drive, Reno, NV 89523
(Property Address)

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

I.   Section 3 and 4 of the Note are modified to provide for sixty (60) monthly payments of interest only ("Interest Only Period") at the interest rate determined in accordance with Sections 2 and 4 of the Note. Sections 3 and 4 of the Note are modified as follows:

**3. PAYMENTS**
   **(A) Time and Place of Payments**
   I will pay interest during the Interest Only Period, and principal and interest thereafter during the Amortization Period, by making a payment every month.

   Interest Only Period: The "Interest Only Period" is the period from the date of the Note through 11/01/2010.

   Amortization Period: The "Amortization Period" is the period after the Interest Only Period and continuing until the Maturity Date.

   I will make my monthly payments on the 1st day of each month beginning on December 1, 2005. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to scheduled interest and principal. If on November 1, 2035, I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
   I will make my monthly payments at
EquiFirst Corporation , 500 Forest Point Circle , Charlotte, NC 28273
   or at a different place if required by the Note Holder.

   **(B) Amount of My Interest Only Payments**
   The first 24 monthly payments will be in the full amount of U.S. $ 2,574.00, which equals one twelfth (1/12th) of the amount of yearly interest due on the principal at the time the loan was made. These payments are called the "Interest Only Payments". No payments of principal are due during the Interest Only Period. The Interest Only Payments will not reduce the principal amount of the Note. Additional Payments of principal may be made in accordance with the provisions of the Note.

   **(C) Monthly Payment Changes**
   During the Interest Only Period, changes in my monthly payment will reflect changes in the interest rate that I must pay. During the Amortization Period, changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of the Note.

EF9701 (3/05)                                              Page 1 of 2
Loan Number 818942

LONG-0013

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on November 1, 2007, and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding 5.240 percentage points ( 5.240 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

For the Interest Only Period, after calculating my new interest rate as provided above, the Note Holder will then calculate the amount of the monthly payment to be one-twelfth (1/12th) of one (1) year's interest at the new interest rate. The result of this calculation will be the new amount of my monthly payment until the next Interest Rate Change Date.

During the Amortization Period, after calculating my new interest rate as provided above, the Note Holder will then calculate the amount of the monthly payment that would be sufficient to fully repay the remaining unpaid principal in substantially equal monthly payments by the Maturity Date, assuming, for purposes of each calculation, that the interest rate remained unchanged during that period. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.150% or less than 7.150 % . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.000%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 13.150% or less than the initial interest rate provided for in Section 2 of this Note.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my Interest Rate and the amount of my monthly payment before the effective date of any changes. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

II. All other provisions of the Security Instrument and any Rider are unchanged by this Rider to the Security Instrument for Interest Only Payments and remain in full force and effect.
I understand that for the Interest Only Period I will not be reducing the principal balance. After Five (5) years if I only made my minimum payment, my principal balance will not be reduced.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and conditions contained in this Interest Only Payment Period Rider.

_____     _____
Jean M Gagnon                                Pamela Longoni

_____     _____

EF9702 (3/04)  Loan Number 818942            Page 2 of 2

LONG-0014

**Exhibit C-2**

DAVID HILL BASHFORD (Nevada Bar # 11744)
Bradley Arant Boult Cummings LLP
Bank of America Corporate Center
100 N. Tryon Street, Suite 2690
Charlotte, NC 28202
Phone: (704) 338-6000
Fax: (704) 332-8858
dbashford@babc.com
*Attorney for Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA - RENO DIVISION

PAMELA D. LONGONI,
individually and as Guardian Ad
Litem for LACEY LONGONI,
and JEAN M. GAGNON,

Case No.: 3:10-CV-00297-LRH-(VPC)

          Plaintiffs,

vs.

GMAC MORTGAGE, LLC., a Delaware
Limited Liability Company, EXECUTIVE
TRUSTEE SERVICES, LLC., a Delaware
Limited Liability Company, RESIDENTIAL
FUNDING COMPANY, LLC, a Delaware
Limited Liability Company, f/k/a
RESIDENTIAL FUNDING
CORPORATION, a Delaware Corporation,
ILLEANNA PETERSON, KATHLEEN
GOWEN, individuals, DOES 1-10; BLACK
AND WHITE CORPORATIONS 1-10,
corporations; ABLE & BAKER
COMPANIES 1-10, co-partnerships and or
limited liability companies,

          Defendants.                               /

## AMENDED RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT RESIDENTIAL FUNDING COMPANY, LLC

1

Defendant Residential Funding Company, LLC ("RFC") hereby amends its responses to Plaintiffs' First Set of Interrogatories as follows:

## PRELIMINARY STATEMENT

While it was originally believed that RFC acted as the investor on the loan at issue, during the time period at issue in this litigation, RFC in truth acted as the Master Servicer of the loan, pursuant to the Pooling and Servicing Agreement between RFC and U.S. Bank National Association (recently produced at RFC-001-000634-000864). U.S. Bank National Association ("US Bank") operates as the Trustee for the Trust that owns the note. The owner of the note is the Trust itself, RAMP 2005-EFC7. RFC was granted servicing rights of the loan at issue pursuant to the Pooling and Servicing Agreement. RFC then delegated those servicing rights to GMAC Mortgage, LLC ("GMACM"), under the terms contained in the Servicer Guide between RFC and GMACM (recently produced at RFC-001-000293-000546). Consistent with this delegation of authority, RFC had no direct contact or dealings with Plaintiffs relating to their loan, all decisions and contact were handled through RFC's servicer, GMACM. The majority of the answers responsive to Plaintiffs' Interrogatories have been previously provided by GMACM; however, to the extent that RFC can respond to the below Interrogatories, RFC has amended its responses to fully and accurately respond to the Interrogatories posed below.

## AMENDED RESPONSES TO INTERROGATORIES

INTERROGATORY NO. 1

1. Please identify each individual or entity who currently has or has had, or who has claimed to have had, possession and/or an ownership interest in the Note (GMAC-01-0129-0138) and Deed of Trust (GMAC-01-0088-0108) executed by the plaintiffs on or about September 29, 2005, relative to the property at 5540 Twin Creeks Drive, Reno, Nevada. Further state, the following:

a) The date upon which said person or entity obtained possession and/or ownership of said Note and/or Deed of Trust;

b) The date which said person or entity transferred possession or ownership of said documents;

c) The person or entity from which the person or entity obtained possession or a legal interest in the Note and/or Deed of Trust;

d) The person or entity to whom the Note and/or Deed of Trust were transferred; and

e) The consideration paid for the interest in the Note and/or Deed of Trust.

RESPONSE: On September 29, 2005, Equifirst Corporation originated the Note and Deed of Trust in the amount of $432,000.00; said Deed of Trust was recorded on October 7, 2005. MERS was listed as "Nominee" on the Deed of Trust. RFC purchased the Loan from Equifirst in November, 2005. On December 1, 2005, the Pooling and Servicing Agreement between

3

Residential Asset Mortgage Products, Inc., RFC, and U.S. Bank ("the PSA") was executed. The

closing date of the PSA was December 28, 2005, and that is the date all of the Loans became

securitized. Also on December 28, 2005, the Assignment and Assumption Agreement between

RFC and Residential Asset Mortgage Products, Inc. ("RAMP") was generated. That document

has been produced herewith as part of documents labeled RFC-002. That Assignment and

Assumption Agreement provided for an automatic transfer of ownership to the Trust of the loans

held by RFC for a stated period of time. Pursuant to the Assignment and Assumption

Agreement, ownership of the loan at issue transferred to the Trust on that date—December 28,

2005. GMAC Mortgage, LLC obtained the right to service the loan on behalf of RFC on May 1,

2007. The investor on the loan currently is the Trust, RAMP 2005-EFC7.

INTERROGATORY NO. 2:

2. Please identify each individual who made contact with any plaintiff relative to any

of the following:

a) Any plaintiffs' failure to make timely payments of any loan amount;

b) Any plaintiffs' request for modifications or changes to any loan amount or

payment;

c) Anything associated with a loan modification or request for changes in

any loan; and

(d) Any notification to a plaintiff that their request for a loan modification

had been approved, rejected, or that said request was under consideration.

4

RESPONSE: No persons employed at RFC had any contact with Plaintiffs during the time period in question. In further response, RFC refers Plaintiffs to response no. 2 contained in GMACM's responses to Plaintiffs' First Set of Interrogatories.

INTERROGATORY NO. 3:

3. Please identify each and every person who played any part in the following:

a) The decision to allow a plaintiff to seek a loan modification;

b) The decision to grant or deny a plaintiffs' request for loan modification;

c) The recommendation that the plaintiffs seek an "Obama" plan loan modification;

d) The decision to foreclose upon the plaintiffs' real property;

e) The decision to seek to recover the plaintiffs' real property from a third party;

f) The providing of any notice to the plaintiffs associated with the foreclosure process;

g) The denial of the request by any plaintiff for a loan modification;

h) The decision on when and what notices should be provided to a plaintiff; and

i) The request that any plaintiff provide documentation or information to RESIDENTIAL FUNDING COMPANY;

j) The receipt of any legal interest in the subject real property.

5

RESPONSE: No persons employed at RFC directly participated in evaluation of this Loan.
Pieter VanZyl signed RFC's Pooling and Servicing Agreement with US Bank National
Association, and the Servicer Guide which contains RFC's delegation of authority to GMACM
(the document that is the basis of the decisions referenced in this Interrogatory concerning the
loan modification review process) was unsigned. GMACM managed communications,
modification review processes and foreclosure process subject to the terms and limitations of
RFC's delegation of authority. After thorough investigation, it has been determined that no
individual at RFC had any further contact with GMACM relating to Plaintiffs' loan. Consistent
with the terms of the Servicer Guide, GMACM generates a document known as Form 2415. This
Form captures data that includes key milestone events (such as initiation of foreclosure; whether
the loan was placed in loss mitigation, etc.) and is generated automatically to RFC through an
automatic interface. (RFC and GMACM have attempted to locate the Form 2415 for this Loan
during the time period at issue; however, given the massive amount of data, those records are
only preserved for 90 days and are then destroyed—the documents no longer exist.). A report is
then automatically generated from the Forms through RFC's computer software, and all of this
information is pulled into a spreadsheet. RFC then loads that spreadsheet onto the Vision
Website, which is viewable by all investors. Those documents have been produced herewith as
part of the RFC-002 production. There is no analytical oversight performed at RFC during this
process, the whole process is automatic. There is no evidence in RFC's computer system that
anyone at RFC performed any analytical oversight on the loan other than when requested by

6

undersigned counsel. In further response, RFC refers Plaintiffs to response no. 3, subsections (a)

through (h), contained in GMACM's responses to Plaintiffs' First Set of Interrogatories.

INTERROGATORY NO. 4:

4. Please identify any compensation, remuneration, money, asset, exchange, stipend,

gain, offset, forbearance, or other benefit of any sort received by Residential Funding Company

as a result of the foreclosure upon the plaintiffs' real property.

RESPONSE: RFC received $172,500.00 as payment from the third party purchaser as a result of

the foreclosure upon the plaintiffs' real property, and forwarded all of that money to the Trust,

consistent with the PSA.

INTERROGATORY NO. 5:

5. Please identify any and all lawsuits or claims made against RESIDENTIAL

FUNDING COMPANY during the last 3 years wherein it is alleged that the company wrongfully

participated in any fashion in a non-judicial foreclose upon any loan made, or owned, by the

company.

RESPONSE: Objection. This Interrogatory is overly broad, unduly burdensome, is not relevant

to any party's claim or defense, and is not reasonably calculated to lead to the discovery of

admissible evidence.

INTERROGATORY NO. 6:

6. What role, if any, did RESIDENTIAL FUNDING COMPANY play in the decision

to grant or deny any plaintiff a modification of their loan with EquiFirst Corporation.

7

RESPONSE: RFC played no direct role in the decision to grant or deny any plaintiff a loan modification on this particular Loan. RFC states that it was the Master Servicer on the loan and, in that role, provided the second tier servicers, such as GMACM, with a general list of delegated authority criteria that provides guidelines and criteria for evaluating the propriety of a loan modification on RFC accounts, including Plaintiffs'. The Servicer Guide between GMACM and RFC provides this delegated authority criteria, and only requires that GMACM collect data to send to RFC as part of its reporting process. RFC then automatically converts this data into a report for investors, such as the Trust. As discussed above, there is no analytical oversight performed at RFC during this process, the whole process is automatic. There is no evidence in RFC's computer system that anyone at RFC performed any analytical oversight on the loan other than when requested by undersigned counsel.

INTERROGATORY NO. 7:

7. Please identify any relationship between RESIDENTIAL FUNDING COMPANY, and any of the following companies:

   a) EXECUTIVE TRUSTEE SERVICES, LLC.

   b) EquiFirst Corporation

   c) Homecomings Financial. LLC

   d) GMAC MORTGAGE, LLC

RESPONSE: The following relationships exist:

   (a) Executive Trustee Services is the foreclosure Trustee of the Loan; ETS is an

indirect sister company of RFC.

(b) RFC purchased the Note and Deed of Trust from EquiFirst Corporation in November 2005; there is no corporate relationship with RFC.

(c) Homecomings Financial, LLC was the second-tier servicer on the Loan for RFC; Homecomings is an indirect sister company of RFC.

(d) GMAC Mortgage, LLC was the second-tier servicer of the Loan for RFC; there is no corporate relationship with RFC. GMAC is an indirect sister company of RFC.

INTERROGATORY NO. 8:

8. Please identify each individual who took any part in seeking the removal of negative information from the plaintiffs' credit history.

RESPONSE: Objection. RFC states that no individual at RFC took any part in seeking the removal of negative information from the Plaintiffs' credit history. In further response, RFC refers Plaintiffs to response no. 8 contained in GMACM's responses to Plaintiffs' First Set of Interrogatories.

INTERROGATORY NO. 9:

9. Did anyone ever indicate to RESIDENTIAL FUNDING COMPANY that there were any problems with the non-judicial foreclosure which was undertaken against the plaintiffs' real property?

If so, state the following:

1. The person who made the statement;

9

2. The person to whom the statement was made; and

3. The date the statement was made.

RESPONSE: No. As stated above, no individual at RFC had any direct contact with GMACM

relating to Plaintiffs' loan and the subsequent foreclosure. The reporting required by the Servicer

Guide is all generated automatically and there is no analytical oversight performed by RFC

before the report is generated and posted for the investors.

INTERROGATORY NO. 10:

10. Please identify the person most knowledgeable from RESIDENTIAL FUNDING

COMPANY relating to the following:

1. Any Plaintiffs' request for a loan modification;

2. The policies, procedures or guidelines of RESIDENTIAL FUNDING COMPANY

relative to requests for loan modifications, and/or, the criteria to be followed when deciding

whether to grant a loan modification;

3. Any decision to accept or reject a plaintiffs' request for loan modification.

RESPONSE: RFC will designate a Rule 30(b)(6) corporate witness to testify generally about the

policies, procedures, or guidelines RFC recommends when evaluating any account for a loan

modification. As discussed in response to Interrogatories 2, 3, and 6, RFC had no direct contact

with Plaintiffs relating to their loan.

INTERROGATORY NO. 11:

11. On how many occasions did RESIDENTIAL FUNDING COMPANY consider a

10

request from the plaintiff to modify their home loan?

RESPONSE: None, all requests were handled and considered by and through the servicer on the loan, GMACM. Notwithstanding this objection, RFC states that pursuant to rule 33(d) of the Federal Rules of Civil Procedure, the answer to the above Interrogatory may be determined by examining the documents previously produced by GMACM, Bates labeled GMAC01-0013—01-0087, and the burden of determining the answer is substantially the same for RFC and Plaintiffs.

INTERROGATORY NO. 12:

12. Please identify the rules, regulations, criteria, policy or other guideline or directive which RESIDENTIAL FUNDING COMPANY utilized when deciding each and every request for loan modification made by a plaintiff.

RESPONSE: As stated above, RFC did not make any decisions concerning a loan modification request on this particular Loan. All of the decision making authority is delegated to GMACM through the Servicer Guide. By way of further answer, pursuant to rule 33(d) of the Federal Rules of Civil Procedure, the answer to the above Interrogatory may be determined by examining the documents previously produced at Bates label RFC001-000293-000881, and the burden of determining the answer is substantially the same for RFC and Plaintiffs.

INTERROGATORY NO. 13:

13. Please identify each decision which was made relative to each and every request made by a plaintiff for a modification of their residential loan.

RESPONSE: Objection. This Interrogatory is overly broad and ambiguous. Notwithstanding the

11

objection, as discussed in response to Interrogatories Nos. 2, 3, and 12, RFC had no direct

contact with Plaintiffs regarding their loan and made no decision concerning the propriety of a

modification on this Loan. In addition, RFC states that pursuant to rule 33(d) of the Federal

Rules of Civil Procedure, the answer to the above Interrogatory may be determined by

examining the documents previously produced by GMACM, Bates labeled GMAC01-0013—01-

0087, and the burden of determining the answer is substantially the same for RFC and Plaintiffs.

## **VERIFICATION**

Juan Aguirre being duly sworn, deposes and states:

That he/she is a _Signing Officer_ for Residential Funding Company, LLC and, as

such, is authorized to verify the foregoing Amended Responses to Plaintiff's First Set of

Interrogatories on behalf of Residential Funding Company, LLC, that he/she has read said

amended Responses and knows the contents thereof, and that the same are true of his own

knowledge and review of Residential Funding Company LLC's available corporate records.

Residential Funding Company, LLC

By: _____
Name: Juan Aguirre
Title: _Signing Officer_

SWORN TO AND SUBSCRIBED before me
This 28 day of July, 2011.

_____
Notary Public
My Commission Expires: 9|21|11



[SEAL]      ROSEMARY E. MEEKER
            MY COMMISSION EXPIRES
            September 21, 2011

12

Submitted this _31st_ day of July, 2011.

David H. Bashford
Attorney for Defendants Residential Funding
Company, LLC, GMAC Mortgage, LLC,
Executive Trustee Services, LLC,
Illeanna Peterson and Kathleen Gowen

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served the above and foregoing Amended Response to Interrogatories on:

> Thomas P. Beko, Esq.
> Paul M. Bertone, Esq.
> Attorneys for Plaintiffs
> ERICKSON, THORPE & SWAINSTON, LTD.
> 99 West Arroyo Street
> P. 0. Box 3559
> Reno, Nevada 895 5

by placing copies of same in the United States Mail, first-class postage prepaid and addressed to their regular mailing address, on this ___1st___ day of August, 2011.

OF COUNSEL

13

**Exhibit C-3**

GMACM Loan #  7440353498

Record & Return To:

4-0237

**10086338**

Homecomings Financial, LLC
Attention: Loss Mitigation
3451 Hammond Avenue
Waterloo, IA 50702

————————————————————[Space Above This Line For Recorder's Use]————————————————————

# ADJUSTABLE RATE LOAN MODIFICATION AGREEMENT

This Adjustable Rate Loan Modification Agreement ("Agreement") made this SECOND day of
NOVEMBER, 2007("Effective Date") between JEAN GAGNON and PAMELA LONGONI("Borrower")
and Homecomings Financial, LLC ("Lender"), amends and supplements that certain promissory note
("Note") dated 9/25/07, in the original principal amount of FOUR HBUNDRED THIRTY TWO
THOUSAND DOLLARS ($432,000 ) executed by Borrower. The Note is secured by a Mortgage, Deed
of Trust, or Deed to Secure Debt (the "Security Instrument"), and said security instrument covers the real
and, if applicable, personal property described in such Security Instrument (the "Property") located at
5540 TWIN CREEKS DRIVE.

      Borrower acknowledges that Lender is the legal holder and the owner of the Note and Security
Instrument and further acknowledges that if Lender transfers the Note, as amended by this Agreement, the
transferee shall be the "Lender" as defined in this Agreement.

      Borrower has requested, and Lender has agreed, to extend or rearrange the time and manner of
payment of the Note and to extend and carry forward the lien(s) on the Property whether or not created by
the Security Instrument.

      Now, therefore, in consideration of the mutual promises and agreements contained herein, and
other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and
intending to be legally bound, the parties hereto agree as follows (notwithstanding anything to the
contrary contained in the Note or Security Instrument):

      1. Borrower acknowledges that as of the Effective Date, the amount payable under the Note and
secured by the Security Instrument (the "Principal Balance") is FOUR HUNDRED THIRTY NINE
THOUSAND ONE HUNDRED SEVENTY SEVEN AND SIXTY THREE CENTS ($439,177.63).
Borrower hereby renews and extends such indebtedness and promises to pay jointly and severally to the
order of Lender the Principal Balance, consisting of the amount(s) loaned to Borrower by Lender and any
accrued but unpaid interest capitalized to date.

      2. Interest will be charged on the unpaid Principal Balance until the full amount of principal has
been paid. Borrower will pay interest at a yearly rate of 6.8% from 01/01/08. The interest rate Borrower
will pay will change in accordance with this Agreement. The interest rate required by this Agreement is
the rate Borrower will pay both before and after any default under the terms of the Note, as amended by
this Agreement.

3. Borrower promises to make initial monthly principal and interest payments of $2488.67, beginning on 01/01/08, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. If on 11/1/2035 ("Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower will make such payments at 3451 Hammond Avenue, Waterloo, IA 50702 or at such other place as Lender may require.

4. The monthly payment may change based on changes in the unpaid principal of the loan and in the interest rate Borrower must pay. Lender will determine the new interest rate and the changed amount of the monthly payment in accordance with this Agreement. The interest rate Borrower will pay may change on 05/1/2010, and on that day every 6 thereafter. Each date on which the interest rate could change is called a "Change Date".

5. Beginning with the first Change Date, the interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London Market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date forty-five (45) days before each Change Date is called the "Current Index." If the Index is no longer available, the Lender will choose a new index which is based upon comparable information. Lender will give Borrower notice of this choice.

6. Before each Change Date, Lender will calculate the new interest rate by adding ONE AND EIGHT HUNDREDTHS percentage points (1.8%) to the Current Index. Lender will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated below, this rounded amount will be the new interest rate until the next Change Date. Lender will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that Borrower is expected to owe at the Change Date in full on the Maturity Date at the new interest rate in substantially equal payments. The result of this calculation will be the new amount of the monthly payment. Borrower will pay the amount of the new monthly payment beginning on the first monthly payment date after the Change Date until the amount of the monthly payment changes again. The monthly payments will be applied first to the payment of interest due and then to principal.

7. The interest rate Borrower is required to pay at the first Change Date will not be greater than 13.15% or less than 7.15%. Thereafter, the interest rate will never be increased or decreased on any single Change Date by more than one percentage points (1%) from the rate of interest Borrower has been paying for the preceding six months. The interest rate will never be greater than 13.15%.

8. Before the effective date of any change, Lender will deliver or mail to Borrower notice of any changes in the interest rate and the amount of the monthly payment. The notice will include information required by law to be given to Borrower and also the title and telephone number of a person who will answer any questions Borrower may have. Unless applicable law requires a different method, any notice that must be given to Borrower under this Agreement will be given by delivering it or mailing it by first class mail to Borrower at the property address stated above or at a different address if Borrower gives Lender notice of Borrower's different address. Any notice that must be given to Lender under this Agreement will be given by mailing it first class mail to the Lender at the address stated in Paragraph 3 above or at a different address if Borrower is given notice of that different address.

9. If Lender has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, Borrower will pay a late charge to Lender. The amount of the charge will be the late charge percentage provided for in the Note multiplied by the overdue payment of principal and

interest required under this Agreement. Borrower will pay this late charge promptly but only once on each late payment. The late charge is not in lieu of any other remedy of Lender, including any default remedy.

10. It is the intention of the parties that all liens and security interests described in the Security Instrument are hereby renewed and extended (if the Maturity Date of the original Note has been changed) until the indebtedness evidenced by the Note and this Agreement has been fully paid. Lender and Borrower acknowledge and agree that such renewal, amendment, modification, rearrangement or extension (if applicable) shall in no manner affect or impair the Note or liens and security interests securing same, the purpose of this Agreement being simply to modify, amend rearrange or extend (if applicable) the time and the manner of payment of the Note and indebtedness evidenced thereby, and to carry forward all liens and security interests securing the Note, which are expressly acknowledged by Borrower to be valid and subsisting, and in full force and effect so as to fully secure the payment of the Note.

11. If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law. If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower. For purposes of this paragraph, "interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is transfer of title by Borrower at a future date to a purchaser.

12. As amended hereby, the provisions of the Note and Security Instrument shall continue in full force and effect, and the Borrower acknowledges and reaffirms Borrower's liability to Lender thereunder. In the event of any inconsistency between this Agreement and the terms of the Note and Security Instrument, this Agreement shall govern. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement, including but not limited to, in the case of the Borrower, the obligation to pay items such as taxes, insurance premiums or escrow items, as applicable. Any default by Borrower in the performance of its obligations herein contained shall constitute a default under the Note and Security Instrument, and shall allow Lender to exercise all of its remedies set forth in said Security Instrument.

13 Lender does not, by its execution of this Agreement, waive any rights it may have against any person not a party hereto. This Agreement may be executed in multiple counterparts, each of which shall constitute an original instrument, but all of which shall constitute one and the same Agreement. EACH OF THE BORROWER AND THE LENDER ACKNOWLEDGE THAT NO REPRESENTATIONS, AGREEMENTS OR PROMISES WERE MADE BY THE OTHER PARTY OR ANY OF ITS REPRESENTATIVES OTHER THAN THOSE REPRESENTATIONS, AGREEMENTS OR PROMISES SPECIFICALLY CONTAINED HEREIN. THIS AGREEMENT, AND THE NOTE AND SECURITY INSTRUMENT (AS AMENDED HEREBY) SETS FORTH THE ENTIRE UNDERSTANDING BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

Executed effective as of the day and year first above written.

(Jean Gagnon)

(Pamela Longoni)

(Borrower)

(Borrower)

Homecomings Financial, LLC

By: _____

Title: _____

**BORROWER ACKNOWLEDGMENT**

State of NV
County of WASHOE

→ Jean Gagnon

On this 15 day of November, 2007, before me, the undersigned, a Notary Public in and for said county and state, personally appeared Pam Longoni & _____, personally known to me or identified to my satisfaction to be the person(s) who executed the within instrument, and they duly acknowledged that said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

Notary Public
My Commission Expires: 9/20/2011

**LENDER ACKNOWLEDGMENT**

State of IOWA
County of BLACKHAWK

LOUISE M. LIGOURI
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 99-25139-2 - Expires September 20, 2011

On this _ day of _____, 2007, before me, the undersigned, a Notary Public in and for said county and state, personally appeared _____, personally known to me or identified to my satisfaction to be the person who executed the within instrument as _____ of Homecomings Financial, LLC, said instrument is the act and deed of said entity, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

Notary Public
My Commission Expires: _____

YESENIA CARRILLO
Iowa Notarial Seal
Commission Number: 746479
My Commission Expires: 04/18/2010

Page 4 of 4

**Exhibit C-4**

DOC #3733525
02/26/2009 03:56:10 PM
Electronic Recording Requested By
TICOR TITLE - RENO
Washoe County Recorder
Kathryn L. Burke - Recorder
Fee: $15.00 RPTT: $0
Page 1 of 2

RECORDING REQUESTED BY:

3220 EL CAMINO REAL
IRVINE, CA 92602

AND WHEN RECORDED MAIL TO:
Executive Trustee Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120

APN: 204-081-05  0 8003830 7
T.S. No. : GM-157884-C    Loan No.: 7440353498

0 9 001 900

SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY

# NOTICE OF BREACH AND DEFAULT AND OF ELECTION TO CAUSE SELL OF REAL PROPERTY UNDER DEED OF TRUST

**NOTICE IS HEREBY GIVEN THAT: EXECUTIVE TRUSTEE SERVICES, LLC** is the duly appointed Trustee under a Deed of Trust dated 9/29/2005, executed by **JEAN M. GAGNON and PAMELA LONGONI AN UNMARRIED WOMAN AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP,** as trustor in favor of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,** recorded 10/7/2005, under instrument no. 3288814, in book , page , of Official Records in the office of the County recorder of **Washoe,** County, Nevada securing, among other obligations.

One note(s) for the Original sum of $432,000.00, that the beneficial interest under such Deed of Trust and the obligations secured hereby are presently held by the undersigned; that a breach of and default in the obligations for which such Deed of Trust is security has occurred or that payment has not been made of:

**Installment of Principal and Interest plus impounds and/or advances which became due on 12/1/2008 plus late charges, and all subsequent installments of principal, interest, balloon payments, plus impounds and/or advances and late charges that become payable.**

That by reason thereof the present Beneficiary under such deed of Trust has executed and delivered to said duly appointed Trustee a written Declaration of Default and Demand for Sale and has deposited with said duly appointed Trustee such Deed of Trust and all documents evidencing obligations secured thereby and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

**(PAGE 1 of 2)**

**T.S. No. :  GM-157884-C**                      **Loan No.: 7440353498**

## NOTICE

You may have the right to cure the default hereon and reinstate the one obligation secured by such Deed of Trust above described.  Section NRS 107.080 permits certain defaults to be cured upon the Payment of the amounts required by that statutory section without requiring payment of that portion of principal and interest which would not be due had no default occurred.  Where reinstatement is possible, if the default is not cured within 35 days following recording and mailing of this Notice to Trustor of Trustor's successor in interest, the right of reinstatement will terminate and the property may thereafter be sold.  The Trustor may have the right to bring a court action to assert the nonexistence of a default or any other defense of Trustor to acceleration and Sale.

**To determine if reinstatement is possible and the amount, if any, to cure the default, contact:**

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
C/O Executive Trustee Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120
(818) 260-1600 phone

Dated:  **2/25/2009**

Executive Trustee Services, LLC As Agent for
Beneficiary

By:

Joyce A. Petty, Limited Signing Officer

**State of    California        } SS.**
**County of  Los Angeles  }**

On **2/25/2009** before me, **Dee C. Ortega** Notary Public, personally appeared **Joyce A. Petty** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.  I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
        **Dee C. Ortega**

DEE C. ORTEGA
Commission # 1672751
Notary Public - California
Los Angeles County
My Comm. Expires Jun 5, 2010

**(PAGE 2 OF 2)**

**Exhibit C-5**

08/11/2009   08 45   7753593937              SPARKS TRIBUNE                    PAGE   03

## Affidavit of Publication

STATE OF NEVADA
County of Washoe   SS

Jodie Johnston

being duly sworn deposes and says that she is the
Record Clerk of the SPARKS TRIBUNE a daily
Newspaper published in Sparks Washoe County
Nevada that she has charge of and knows the adver
tising appearing in said newspaper and the

NOTICE OF TRUSTEE SALE

ASAP 3193603

T S   GM 157884 C

of which copy is hereunto attached, was first pub
lished in said newspaper in its issue dated

July 24th    2009

and was published in each of the following issues
thereafter

7 31 8 7   2009

the date of the last publication being in the issue of

August 7th    2009



Subscribed and sworn to before me this the

7th   day of August   2009

Notary Public in and for the County of Washoe
State of Nevada

KENZIE J CLAY
Notary Public   State of Nevada
Appointment Recorded in Washoe County
No 04 88006-2   Expires May 15 2012

NOTICE OF TRUSTEE'S SALE APN 204-061-05 T S No GM-157884 C Loan No 7440335498 YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 9/29/2005 UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY IT MAY BE SOLD AT A PUBLIC SALE IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU YOU SHOULD CONTACT A LAWYER A public auction sale to the highest bidder for cash cashier's check drawn on a state or national bank, check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state, will be held by the duly appointed trustee The sale will be made but without covenant or warranty expressed or implied regarding title possession or encumbrance to satisfy the obligation secured by said Deed of Trust. This property is sold as-is, lender is unable to validate the condition defects or disclosure issues f said property and buyer waives the all closure require ments under NRS 113 130 by purchasing at the sale and agreeing said receipt The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common des ignation, if any shown herein. TRUSTOR JEAN M GAGNON and PAMELA LONGONI AN UNMARRIED WOMAN AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP Recorded 10/7/2005 as Instrument No 3288814 in Book, page of Official R cords in the office of the Recorder of Washoe County Nevada, Date of Sale 8/14/2009 at 11 00 AM Place of Sale At the Virginia Street entrance to the County Courthouse Virginia Street at Court Street Reno Nevada Prop rty Address is purported to be 5540 TWIN CREEKS DRIVE RENO Nevada 89523 The total amount secured by said instrument as of the time of initial publication of this notice 1 $488,730.93 which includes the total amount of the unpaid balance (including accrued and unpaid interest) and reasonable estimated costs expenses and advances at the time of initial publication of this notice Date 7/20/2009 Executive Trustee Services LLC 2255 North Ontario Street, Suite 400 Burbank, California 91504-3120 Sale Line 714-730-2727 Tieanne Petersen Limited Signing Officer ASAP# 3193603 07/24/2009 07/31/2009 08/07/2009

**Exhibit D-1**

RECORDING REQUESTED BY
FIRST AMERICAN TITLE INSURANCE COMPANY

**RECORDING REQUESTED BY:**

**AND WHEN RECORDED MAIL TO**

ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, CA 91504-3120

5166893

CERTIFIED BY FIRST AMERICAN TITLE
INSURANCE COMPANY TO BE A COPY
OF THE DOCUMENT RECORDED ON 11/29/2012
AS INSTRUMENT NO. 2012-178330
IN BOOK                    PAGE
OFFICIAL RECORDS OF SAN MATEO

Loan No.: 8601931887
Address: 10 EMERALD LAKE PLACE
REDWOOD CITY, CA 94062

SPACE ABOVE THIS LINE FOR RECORDER'S USE
T.S. No.: GM-278852-C
APN No.: 057-143-280-6

## NOTICE OF RESCISSION OF NOTICE OF DEFAULT

**NOTICE IS HEREBY GIVEN:** That **Executive Trustee Services, LLC dba ETS Services, LLC** is duly appointed Trustee under a Deed of Trust dated **11/09/2007**, executed by *JACQUELINE A. WARNER*, **AN UNMARRIED WOMAN**, as Trustor, to secure certain obligations in favor of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., ("MERS") AS NOMINEE FOR CMG MORTGAGE, INC., its successors and assigns**, as Beneficiary, recorded 11/16/2007, as Instrument No. **2007-163264**, in book **XX**, page **XX**, of Official Records in the Office of the Recorder of **San Mateo** County, California describing land therein as more fully described on the above referenced deed of trust.

said obligations including one note for the sum of **$1,000,000.00**.

Whereas, the present beneficiary under that certain Deed of Trust herein above described, heretofore delivered to the Trustee thereunder written Declaration of Default and Demand for Sale; and Whereas, Notice was heretofore given of breach of obligations for which said Deed of Trust is security and of election to cause to be sold the property therein described; and Whereas, a Notice of Default was recorded on the day and in the book and page set forth below:

Notice was recorded on **09/11/2012** in the office of the Recorder of **San Mateo** County, California, Instrument No. **2012-130239**, in Book , of Official Records.

**NOW, THEREFORE, NOTICE IS HEREBY GIVEN**  that the present Beneficiary and/or the Trustee, does hereby rescind, cancel and withdraw said Declaration of Default and Demand for Sale and said Notice of Breach and Election to Cause Sale; it being understood, however, that this rescission shall not in any manner be construed as waiving or affecting any breach or default--past, present or future under said Deed of Trust, or as impairing any right or remedy thereunder, but is, and shall be deemed to be, only an election, without prejudice, not to cause a sale to be made pursuant to said Declaration and Notice, and shall nowise jeopardize or impair any right, remedy or privilege secured to the Beneficiary and/or the Trustee, under said Deed of Trust, nor modify nor alter in any respect any of the terms, covenants, conditions or obligations thereof, and said Deed of Trust and all obligations secured thereby are hereby reinstated and shall be and remain in force and effect the same as if said Declaration of Default and Notice of Breach had not been made and given.

Dated: **Nov 27, 2012**

ETS Services, LLC

By:

Gina Avila, TRUSTEE SALE OFFICER

**Exhibit E-1**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
## CIVIL MINUTE ORDER

---

| | | |
|---|---|---|
| **Adversary Title :** | Abu v. GMAC/Ally Bank, Inc. et al | **Case No :  12–36170 – B – 7** |
| | | **Adv No :  13–02020 – B** |
| | | **Date :**   4/2/13 |
| | | **Time :**   09:32 |
| **Matter :** | [18] – Motion/Application to Dismiss Adversary Proceeding/Notice of Removal [PD–2] Filed by Defendant GMAC/Ally Bank, Inc. (mgrs) | |
| **Judge :** | Thomas Holman | |
| **Courtroom Deputy :** | Sheryl Arnold | |
| **Reporter :** | Diamond Reporters | |
| **Department :** | B | |

**APPEARANCES for :**
**Movant(s) :**
      Defendant's Attorney – Eddie Jimenez
**Respondent(s) :**

---

## CIVIL MINUTE ORDER

Findings of fact and/or conclusions of law are appended to the civil minutes and good cause appearing.

IT IS ORDERED that the defendants GMAC/ALLY BANK, INC. and U.S. Bank National Association on behalf of GreenPoint Mortgage Funding Trust, Series 2007–AR2's ("Defendant") (collectively, the "Defendants") motion is granted in part. The plaintiff debtor's (the "Debtor") complaint (the "Complaint") filed on January 18, 2013 (Dkt. 1) is dismissed.

Dated: April 05, 2013

Thomas C. Holman
United States Bankruptcy Judge

**Exhibit E-2**

**CLOSED**

# U.S. Bankruptcy Court [LIVE-CM 5.1]
## Eastern District of California (Sacramento)
## Adversary Proceeding #: 13-02020

*Assigned to:* Hon. Thomas Holman         *Date Filed:* 01/18/13
*Lead BK Case:* 12-36170              *Date Terminated:* 04/23/13
*Lead BK Title:* Felix O. Abu                *Date Dismissed:* 04/05/13
*Lead BK Chapter:* 7
*Demand:* $400000

*Nature[s] of Suit:* 13 Recovery of money/property - 548 fraudulent transfer
                       72 Injunctive relief - other

**Plaintiff**
-----------------------
**Felix O. Abu**                    represented by **Felix O. Abu**
6999 Romanzo Way                           PRO SE
Elk Grove, CA 95758
916-425-4300
SSN / ITIN: xxx-xx-2458

V.

**Defendant**
-----------------------
**GMAC/Ally Bank, Inc.**              represented by **Eddie R. Jimenez**
                                    4375 Jutland Dr., Suite 200
                                    P.O. Box 17933
                                    San Diego, CA 92177
                                    858-750-7600
                                    *LEAD ATTORNEY*

                                    **Unknown at time of filing**
                                    *LEAD ATTORNEY*

**Defendant**
-----------------------
**U.S. Bank National Association**      represented by **Eddie R. Jimenez**
                                    (See above for address)

                                    **Unknown at time of filing**
                                    *LEAD ATTORNEY*

| Filing Date | # | Docket Text |
|---|---|---|
| 01/18/2013 | 1 | (13 (Recovery of money/property - 548 fraudulent transfer)), (72 (Injunctive relief - other)) : Complaint by Felix O. Abu against GMAC/Ally Bank, Inc., U.S. Bank National Association. Fee Amount of $293.00 is Exempt. (swas) (Entered: 01/22/2013) |
| 01/18/2013 | 2 | Adversary Proceeding Cover Sheet (auto) (Entered: 01/22/2013) |
| 01/18/2013 | 6 | Motion/Application for Preliminary Injunction Filed by Plaintiff Felix O. Abu (mgrs) (Entered: 01/23/2013) |
| 01/18/2013 | 7 | Declaration of Felix O. Abu in support of 6 Motion/Application for Preliminary Injunction (mgrs) (Entered: 01/23/2013) |
| 01/22/2013 | 3 (4 pgs) | Copy of Summons Issued Re: 1 Complaint; Status Conference to be held on 3/20/2013 at 09:30 AM at Sacramento Courtroom 32, Department B (swas) (Entered: 01/22/2013) |
| 01/22/2013 | 4 (1 pg) | Notice of Availability of Bankruptcy Dispute Resolution Program (swas) (Entered: 01/22/2013) |
| 01/22/2013 | 5 (1 pg) | Order to Confer on Initial Disclosures and Setting Deadlines (swas) (Entered: 01/22/2013) |
| 01/24/2013 | 8 | Order Denying 6 Motion/Application For Preliminary Injunction (mgrs) (Entered: 01/25/2013) |
| 01/25/2013 | 9 (1 pg) | Court's Certificate of Mailing of 8 Order on Motion/Application for Preliminary Injunction (mgrs) (Entered: 01/25/2013) |
| 01/29/2013 | 10 | Certificate of Service of Summons and Complaint (mgrs) (Entered: 01/29/2013) |
| 01/29/2013 | 11 | Certificate of Service of Summons and Complaint (mgrs) (Entered: 01/29/2013) |
| 01/29/2013 | 12 | Certificate of Service of Summons and Complaint (mgrs) (Entered: 01/29/2013) |
| | 13 | Certificate of Service of Summons and Complaint (mgrs) |

| | | |
|---|---|---|
| 01/29/2013 | | (Entered: 01/29/2013) |
| 01/29/2013 | 14 | Certificate of Service of Summons and Complaint (mgrs) (Entered: 01/29/2013) |
| 02/06/2013 | 15 | Notice of Bankruptcy and Suggestion of Automatic Stay [PD-1] (mgrs) (Entered: 02/06/2013) |
| 02/06/2013 | 16 | Exhibit(s) in support of 15 Notice [PD-1] (mgrs) (Entered: 02/06/2013) |
| 02/06/2013 | 17 | Certificate/Proof of Service of 15 Notice [PD-1] (mgrs) (Entered: 02/06/2013) |
| 02/21/2013 | 18 | Motion/Application to Dismiss Adversary Proceeding/Notice of Removal [PD-2] Filed by Defendant GMAC/Ally Bank, Inc. (mgrs) (Entered: 02/22/2013) |
| 02/21/2013 | 19 | Notice of Hearing Re: 18 Motion/Application to Dismiss Adversary Proceeding/Notice of Removal [PD-2] to be held on 4/2/2013 at 09:32 AM at Sacramento Courtroom 32, Department B. (mgrs) (Entered: 02/22/2013) |
| 02/21/2013 | 20 | Memorandum of Points and Authorities in support of 18 Motion/Application to Dismiss Adversary Proceeding/Notice of Removal [PD-2] (mgrs) (Entered: 02/22/2013) |
| 02/21/2013 | 21 | Request for Judicial Notice Re: 18 Motion/Application to Dismiss Adversary Proceeding/Notice of Removal [PD-2] Filed by Defendant GMAC/Ally Bank, Inc. (mgrs) (Entered: 02/22/2013) |
| 02/21/2013 | 22 | Certificate/Proof of Service of 18 Motion/Application to Dismiss Adversary Proceeding/Notice of Removal [PD-2], 19 Notice of Hearing, 20 Memorandum of Points and Authorities, 21 Request for Judicial Notice (mgrs) (Entered: 02/22/2013) |
| 02/21/2013 | 23 | Exhibit(s) in support of 21 Request for Judicial Notice [PD-2] (mgrs) (Entered: 02/22/2013) |
| 03/19/2013 | 24 | Opposition/Objection Filed by Plaintiff Felix O. Abu Re: 18 Motion/Application to Dismiss Adversary Proceeding/Notice of Removal [PD-2] (mgrs) (Entered: 03/19/2013) |
| 03/19/2013 | 25 | Certificate/Proof of Service of 24 Opposition/Objection [PD-2] (mgrs) (Entered: 03/19/2013) |

| Date | Doc | Description |
|------|-----|-------------|
| 03/20/2013 | | Docket Entry Reserved for Internal Use/Order Processing. (Service List Attached). (sars) (Entered: 03/20/2013) |
| 03/21/2013 | 27 | Civil Minute Order/Order to Continue Status Conference Re: 1 Complaint ; Status Conference to be held on 4/3/2013 at 09:30 AM at Sacramento Courtroom 32, Department B (mgrs) (Entered: 03/21/2013) |
| 03/21/2013 | 28 (2 pgs) | Copy of Document as transmitted to BNC for service. (mgrs) (Entered: 03/21/2013) |
| 03/21/2013 | 29 (4 pgs) | Certificate of Mailing of Document as provided by the Bankruptcy Noticing Center (Admin.) (Entered: 03/23/2013) |
| 03/26/2013 | 30 | Response/Reply [PD-2] Filed by Defendants GMAC/Ally Bank, Inc., U.S. Bank National Association Re: 24 Opposition/Objection (mgrs) (Entered: 03/27/2013) |
| 03/26/2013 | 31 | Certificate/Proof of Service of 30 Response/Reply [PD-2] (mgrs) (Entered: 03/27/2013) |
| 04/02/2013 | 33 (2 pgs) | Civil Minutes -- Hearing Held/Concluded Re: 18 Motion/Application to Dismiss Adversary Proceeding/Notice of Removal [PD-2] GRANTED IN PART (sars) (Entered: 04/04/2013) |
| 04/03/2013 | 32 (1 pg) | Civil Minutes -- Status Conference Dropped Re: 1 Complaint (sars) (Entered: 04/03/2013) |
| 04/05/2013 | | Docket Entry Reserved for Internal Use/Order Processing. (sars) (Entered: 04/05/2013) |
| 04/05/2013 | 35 | Civil Minute Order Granting in Part 18 Motion/Application to Dismiss Adversary Proceeding/Notice of Removal [PD-2] (mgrs) (Entered: 04/05/2013) |
| 04/05/2013 | 36 (1 pg) | Notice of Entry of Order/Judgment as Transmitted to BNC for Service Re: 35 Civil Minute Order Granting in Part 18 Motion/Application to Dismiss Adversary Proceeding/Notice of Removal [PD-2] (mgrs) (mgrs) (Entered: 04/05/2013) |
| 04/05/2013 | 37 (3 pgs) | Certificate of Mailing of Notice of 36 Notice of Entry of Order/Judgment as provided by the Bankruptcy Noticing Center (Admin.) (Entered: 04/07/2013) |
| 04/23/2013 | | Adversary Proceeding 2:13-ap-2020 Closed (mgrs) (Entered: 04/23/2013) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/12/2013 13:45:38 | | | |
| **PACER Login:** | mf1354 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 13-02020 Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Headers: included Format: html Page counts for documents: included |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

**Exhibit G-1**

7438965501

MIN: 1002725-0200006690-6                    Loan Number: 04-6465

# ADJUSTABLE RATE NOTE

## (LIBOR One-Year Index (As Published In *The Wall Street Journal*)NRate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

JANUARY 10, 2005          MERRILLVILLE              INDIANA
[Date]                    [City]                    [State]

5940 SOUTH KING DRIVE #1W, CHICAGO, ILLINOIS 60637
[Property Address]

## 1.   BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $135,860.00          (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is NEW STATE MORTGAGE, LLC, AN INDIANA LLC (CFL # 97-0347-LB)            .
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.   INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      6.500 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.   PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    9th   day of each month beginning on FEBRUARY 9      , 2005   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    JANUARY 9, 2035       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 8401 VIRGINIA STREET, MERRILLVILLE, INDIANA 46410
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $858.73          . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTENWSJ One-Year LIBOR
Single FamilyNFannie Mae MODIFIED INSTRUMENT
Form 3526  6/01                            Page 1 of 5

DocMagic CFSFO00S 800-649-1362
www.docmagic.com

## 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the 9th   day of   JANUARY, 2008   , and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding FOUR AND 250/1000              percentage points (       4.250  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than       8.500  % or less than      4.500  %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO AND 000/1000              percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than    12.500  %.My interest rate will never be less than   4.250  %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

MULTISTATE ADJUSTABLE RATE NOTENWSJ One-Year LIBOR
Single FamilyNFannie Mae MODIFIED INSTRUMENT
Form 3526  6/01                              Page 2 of 5

DocMagic *eRrms* 800-649-1362
www.docmagic.com

### 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000   % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

### 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

### 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

MULTISTATE ADJUSTABLE RATE NOTENWSJ One-Year LIBOR
Single FamilyNFannie Mae MODIFIED INSTRUMENT
Form 3526  6/01                              Page 3 of 5

*DocMagic* 800-649-1362
www.docmagic.com

## 11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if:  (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

> To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

> If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE NOTENWSJ One-Year LIBOR
Single FamilyNFannie Mac MODIFIED INSTRUMENT
Form 3526  6/01                                    Page 4 of 5

DocMagic €Rtmus  800-649-1362
www.docmagic.com

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


_James C. Jackson_ _____ X(Seal)
JAMES C. JACKSON          -Borrower

_____ (Seal)
                          -Borrower


~~PAY TO THE ORDER OF~~ ___ (Seal)
                          -Borrower

**RESIDENTIAL FUNDING CORPORATION**

**WITHOUT RECOURSE**
**NEW STATE MORTGAGE LLC**
_____ (Seal)
                          -Borrower
**BY:** _Milos Torbica_

**MILOS TORBICA, S V P**


_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower


PAY TO THE ORDER OF
JP MORGAN CHASE BANK, AS TRUSTEE
WITHOUT RECOURSE
Residential Funding Corporation

By _Judy Faber_

Judy Faber, Vice President

*[Sign Original Only]*

**Exhibit G-2**

Record & Return To:

GMAC Mortgage, LLC
Attention: Loss Mitigation
3451 Hammond Avenue
Waterloo, IA 50702



————————————————[Space Above This Line For Recorder's Use]——————————————

7438965501

## FIXED RATE LOAN MODIFICATION AGREEMENT 9814669

This Loan Modification Agreement ("Agreement") made this December 9, 2009 ("Effective Date") between  JAMES C JACKSON                 ("Borrower") and GMAC Mortgage, LLC ("Lender"), amends and supplements that certain promissory note ("Note") dated January 10, 2005 in the original principal sum of  One Hundred Thirty Five Thousand Eight Hundred Sixty  Dollars and No Cents ($ 135,860.00) executed by Borrower except that since Borrower has received a chapter 7 bankruptcy discharge, this Agreement will not create personal liability under the Note.. The Note is secured by a Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), dated the same date as the Note, and if applicable, recorded on  with Instrument Number  in Book and/or Page Number  of the real property records of  COOK County, IL.  Said Security Instrument covers the real and personal property described in such Security Instrument (the "Property") located at 5940 SOUTH KING DRIVE #1W    CHICAGO IL 60637, which real property is more particularly described as follows:

**(Legal Description – Attach as Exhibit if Recording Agreement)**

Borrower acknowledges that Lender is the legal holder and the owner of the Note and Security Instrument and further acknowledges that if Lender transfers the Note, as amended by this Agreement, the transferee shall be the "Lender" as defined in this Agreement.

Borrower has requested, and Lender has agreed, to extend or rearrange the time and manner of payment of the Note and to extend and carry forward the lien(s) on the Property whether or not created by the Security Instrument.

Borrower understands that Borrower is not personally obligated to repay the mortgage loan and that [GMAC Mortgage, LLC] is not attempting to collect any debt from Borrower.  Signing this Agreement will not make Borrower personally liable for the mortgage loan.  Borrower understands that [GMAC Mortgage, LLC] will continue to retain its lien on the Property, along with all rights to enforce such lien against the Property.  Whether Borrower chooses to make voluntary payments in the amount of the original monthly payment as set forth in the Note or the modified monthly payments as set forth in this Agreement, such payments will reduce the amount of the lien.

Now, therefore, in consideration of the mutual promises and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. Borrower acknowledges that as of the Effective Date, the amount payable under the Note and secured by the Security Instrument (the "Principal Balance") is One Hundred Thirty  Thousand Six Hundred Fifty  Four Dollars and Seventy  Cents $ 130,654.70.

2. Interest will be charged on the unpaid Principal Balance until the full amount of principal has been paid. Borrower will pay interest at the rate of 3.25000% per year from the Effective Date.

3. Borrower promises to make monthly principal and interest payments of $ 635.32, beginning on January 9, 2010, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. If on January 9, 2035 (the "Maturity Date"), amounts remain due under the Note and Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower will make such payments at 3451 Hammond Avenue, Waterloo, IA 50702 or at such other place as Lender may require. The amounts indicated in this paragraph do not include any required escrow payments for items such as hazard insurance or property taxes; if such escrow payments are required the monthly payments will be higher and may change as the amounts required for escrow items change.

4. If Lender has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, Borrower will pay a late charge to Lender. The amount of the charge will be the late charge percentage provided for in the Note multiplied by the overdue payment of principal and interest required under this Agreement. Borrower will pay this late charge promptly but only once on each late payment. The late charge is not in lieu of any other remedy of Lender, including any default remedy.

5. It is the intention of the parties that all liens and security interests described in the Security Instrument are hereby renewed and extended (if the Maturity Date of the original Note has been changed) until the indebtedness evidenced by the Note and this Agreement has been fully paid. Lender and Borrower acknowledge and agree that such renewal, amendment, modification, rearrangement or extension (if applicable) shall in no manner affect or impair the Note or liens and security interests securing same, the purpose of this Agreement being simply to modify, amend rearrange or extend (if applicable) the time and the manner of payment of the Note and indebtedness evidenced thereby, and to carry forward all liens and security interests securing the Note, which are expressly acknowledged by Borrower to be valid and subsisting, and in full force and effect so as to fully secure the payment of the Note.

6. If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law. If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower. For purposes of this paragraph, "interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is transfer of title by Borrower at a future date to a purchaser.

7. As amended hereby, the provisions of the Note and Security Instrument shall continue in full force and effect, except that since Borrower has received a chapter 7 bankruptcy discharge, this Agreement will not create personal liability under the Note. In the event of any inconsistency between this Agreement and the terms of the Note and Security Instrument, this Agreement shall govern. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement, including but not limited to, in the case of the Borrower, the obligation to pay items such as taxes, insurance premiums or escrow items, as applicable. Any default by Borrower in the performance of its obligations herein contained shall constitute a default under the Note and Security Instrument, and shall allow Lender to exercise all of its remedies set forth in said Security Instrument. **Notwithstanding the foregoing, Lender cannot enforce the debt against Borrower personally and Lender's only remedy upon default is to enforce the lien against the Property.**

8. Lender does not, by its execution of this Agreement, waive any rights it may have against any person not a party hereto. This Agreement may be executed in multiple counterparts, each of which shall constitute an original instrument, but all of which shall constitute one and the same Agreement. EACH OF THE BORROWER AND THE LENDER ACKNOWLEDGE THAT NO REPRESENTATIONS, AGREEMENTS OR PROMISES WERE MADE BY THE OTHER PARTY OR ANY OF ITS REPRESENTATIVES OTHER THAN THOSE REPRESENTATIONS, AGREEMENTS OR PROMISES SPECIFICALLY CONTAINED HEREIN.  THIS AGREEMENT, AND THE NOTE AND SECURITY INSTRUMENT (AS AMENDED HEREBY) SETS FORTH THE ENTIRE UNDERSTANDING BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

Executed effective as of the day and year first above written.

_____
JAMES C JACKSON

**BORROWER ACKNOWLEDGMENT**

State of _Illinois_
County of _Cook_
On this _23rd_ day of _Nov_ _2009_, before me, the undersigned, a Notary Public in and for said county and state, personally appeared JAMES C JACKSON          personally known to me or identified to my satisfaction to be the person(s) who executed the within instrument, and they duly acknowledged that said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

_____
Notary Public

"OFFICIAL SEAL"
CATRICE D. THOMAS
Notary Public, State of Illinois
My Commission Expires May 09, 2011

My Commission Expires: _5-9-2011_

GMAC Mortgage, LLC

By: _____

Title: <u>LIMITED SIGNING OFFICER</u>

**LENDER ACKNOWLEDGMENT**

State of IOWA
County of BLACKHAWK

On this ___ day of _____, _____, before me, the undersigned, a Notary Public in and for said county and state, personally appeared KRIS M. CAYA, personally known to me or identified to my satisfaction to be the person who executed the within instrument as Limited Signing Officer of GMAC Mortgage, LLC, and they duly acknowledged that said instrument is the act and deed of said entity, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

_____
Notary Public
My Commission Expires: _____

**Exhibit H-1**

Previous    **Current**    Next

## DELINQUENT/REPAY/PLAN

681  8/29/2013  12:40:45 PM ETPFSP293            3 4 5 6

Account Number  654629422      Borrower Name  MICHAEL A. MCGUINTY

**General Information**                                    **Codes**
Loan Type  1 CONVENTION    Loan Subtype:  0        Stop Code 1  0    Warning Code  0
Investor  40409 FANNIE MAE                         Stop Code 2  0    Lockout Code  0
Contract  0                                        Stop Code 3  1

                                                   Payment Due Notification        N

**Repayment Plan**                        Next 13 Payments    Previous 13 Payments

Plan Number  1                                             BKR Indicator

| | Plan Due Date | Plan Payment | Amt to Reg Pmt | Amt to Lc/Uncoll/Opt | Unapplied Balance | Reg Pmts Covered | Plan Balance |
|---|---|---|---|---|---|---|---|
| 1 | 03/01/11 | 1490.60 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 2 | 04/01/11 | 1490.60 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 3 | 05/01/11 | 1490.60 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0 | 00/00/00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0 | 00/00/00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0 | 00/00/00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0 | 00/00/00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0 | 00/00/00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0 | 00/00/00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0 | 00/00/00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0 | 00/00/00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0 | 00/00/00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0 | 00/00/00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |

                                                   Plan Total        4471.80

**Save/Approve Plan**
                        Schedule N    Print Letter N    Text Type 0    Text Nbr 0    Form Nbr 0
Override  0

Message:                                    OK                        MORE...
Command:                                        Submit  Reset  PrintAll

**Exhibit I-1**

# **GMAC** Mortgage

December 3, 2012

Tomas Diaz
5200 SW 122nd Avenue
Miami, FL 33175

RE:   Account Number      █████████
      Property Address    5200 SW 122nd Avenue
                          Miami, FL 33175

Dear Tomas Diaz:

This letter is in response to your request for documentation on the above-referenced purged account.

Please find enclosed the documentation as requested.

If you have any further questions, please contact Customer Care at 1-800-766-4622, during the following hours: Monday through Friday 6:00 am to 10:00 pm CT or Saturday 9:00 am to 1:00 pm CT.

Customer Care
Loan Servicing

Enclosure

JP

GMAC Mortgage LLC    www.gmacmortgage.com
3451 Hammond Avenue
PO Box 780
Waterloo IA 50704 0780