**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------- | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------- | ) | |
| | ) | |
| RESIDENTIAL CAPITAL, LLC; et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Adv. Case No. 13-01343 (MG) |
| UMB BANK, N.A., IN ITS CAPACITY AS INDENTURE TRUSTEE FOR THE 9.625% JUNIOR SECURED GUARANTEED NOTES, et al., | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| ------------------------------- | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the estate of the Debtors, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adversary Proceeding |
| v. | ) | No. 13-01277 (MG) |
| | ) | |
| UMB BANK, N.A., AS SUCCESSOR INDENTURE TRUSTEE UNDER THAT CERTAIN INDENTURE, dated as of June 6, 2008, et al., | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| ------------------------------- | ) | |

## CORRECTED DIRECT TESTIMONY OF ROBERT S. BINGHAM

1.    I, Robert S. Bingham, under penalty of perjury, testify as follows:

## I.     PROFESSIONAL BACKGROUND

2.     I am a Senior Director with Zolfo Cooper LLC ("Zolfo Cooper"). I have 35 years of experience in a variety of auditing, financial and accounting management and consulting positions.  I have provided over 15,000 hours of service as either an officer of or advisor to companies operating, restructuring and/or liquidating in bankruptcy.

3.     My experience includes working on several large bankruptcies involving multiple affiliated entities and significant intercompany claims among the entities.   I served as a confirmation hearing witness related to the treatment of intercompany claims in the Enron Corp., Prime Motor Inns, Inc. and The Loewen Group International, Inc. bankruptcy proceedings.  I have also provided financial advisory services in bankruptcy matters including New Stream Secured Capital, Inc., New York Racing Association, Blue Bird, Sunbeam Corporation, and the Washington Group.

4.     In August 2011, I issued an expert report in an adversary proceeding (Adv. Pro. No. 2:10-CV-198-MHT) related to the Colonial Bancgroup, Inc. chapter 11 bankruptcy for the Middle District of Alabama Case No. 2:10-cv-00409-MHT-WC (Bankr. Case No. 09-32303 (DHW)).   My opinions and observations expressed in that report related to the treatment of intercompany transactions pursuant to a corporate tax sharing agreement.

5.     I am a Certified Insolvency and Restructuring Advisor.  I was also named the 2002 Gold Medal winner for achieving the highest score on the Certified Insolvency and Restructuring Advisor Exam.  I served on a panel at the 2011 Association of Insolvency and Restructuring Advisors' annual conference discussing the treatment of intercompany claims in bankruptcy.

6.      I began my career in public accounting, serving as an auditor with Ernst & Young for nine years.

7.      I have a B.S. in mathematics from Trinity College, Hartford, CT, and an M.B.A from the Amos Tuck School at Dartmouth College.

8.      My Curriculum Vitae is attached as Exhibit A.

## II.    SCOPE OF OPINION

9.      I, with the assistance of my firm Zolfo Cooper, was asked to provide an expert report[1] and expert testimony (if necessary) on certain topics and issues related to these Consolidated Adversary Proceedings and the confirmation of the Debtors' plan of reorganization by White & Case LLP and Milbank, Hadley, Tweed, & McCloy LLP as counsel to the Ad Hoc Group of Junior Secured Noteholders (the "JSNs") of the 9.625% Junior Secured Guaranteed Notes due 2015 and counsel to UMB Bank, N.A. as Trustee for the JSNs, and also by Akin Gump Strauss Hauer Feld LLP as special litigation counsel to the Trustee relating to the Chapter 11 proceedings of the Debtors in the United States Bankruptcy Court for the Southern District of New York, Case No. 12-12020.

10.     Counsel and the Trustee have asked me to review and assess the following:

- The Debtors' use of a centralized cash management system (the "Debtors' Cash Management System") in their normal business operations;

- The nature of the transactions that comprise the Debtors' nine largest intercompany balances as of May 14, 2012 (the "Petition Date"), the date of the Debtors' bankruptcy petitions (the "Nine Largest Petition Date Intercompany Balances"). These nine balances comprise $8 billion of the total $8.4 billion intercompany balances scheduled by the Debtors; and

---

[1] Expert Report of Robert S. Bingham, dated October 18, 2013, attached hereto as Exhibit B.

- The presentation of the Debtors' intercompany balances as reflected in the Debtors' pre-petition internal accounting records and external reports, including SEC filings, audited financial statements provided to various lenders and used to determine compliance with certain federal and state licensing agency minimum net worth and solvency requirements and federal income tax returns.

## III.    COMPENSATION

11.    No portion of Zolfo Cooper's compensation is dependent upon the nature of my opinions or on the outcome of this proceeding.  In connection with the preparation of the expert report and my testimony, Zolfo Cooper is being compensated based on the time incurred providing such services.  My hourly billing rate is $750.00.

## IV.    BACKGROUND

12.    On July 3, 2013, Residential Capital, LLC ("ResCap" or the "Company"), GMAC Mortgage LLC ("GMACM"), Residential Funding Company, LLC ("RFC") and each of their affiliated debtors (collectively, the "Debtors"), and the Official Committee of Unsecured Creditors (together with the Debtors, the "Plan Proponents") filed the Joint Chapter 11 Plan of Residential Capital, LLC, et al. (the "Plan") and the related disclosure statement on July 4, 2013.  On August 16, 2013, the Plan Proponents filed the revised disclosure statement in support of the Plan (the "Disclosure Statement"),[2] which the Court approved on August 23, 2013.[3]

13.    In the Disclosure Statement, the Plan Proponents assert that the intercompany balances that were scheduled on the Debtors' Schedules of Assets and

---

[2] Revised Disclosure Statement for Debtors' Revised Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 4733], Aug. 16., 2013.
[3] Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan Proponents' Joint Chapter 11 Plan, (III) Approving the Form of Ballots, (IV) Scheduling a Hearing on Confirmation of the Plan, (V) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of Plan, and (VI) Granting Related Relief [Dkt. No. 4809], Aug. 23, 2013.

Liabilities ("SOALs") as general unsecured claims (the "Intercompany Claims") (and not scheduled as contingent, unliquidated, or disputed), can be waived and settled for zero value because, among other things, they represent debt that should be recharacterized as equity.

14.    A review of the Company's books and records reveals that the Debtors accounted for the transfer of value between and among affiliates as debt transactions, resulting in corresponding intercompany payables and receivables being recorded in the Company's general ledgers.    Intercompany balances fluctuated as transactions ("Intercompany Transactions") were recorded into the intercompany accounts.

15.    Occasionally, intercompany receivables, or portions thereof, were forgiven by the obligee in order to permit the obligor to meet regulatory or loan agreement net worth and solvency requirements applicable to ResCap and certain of its subsidiaries including, but not limited to, GMAC Residential Holding, LLC ("ResHolding"), RFC, GMACM and Executive Trustee Services ("ETS").    As to relationships between entities that are now Debtors, such forgiveness was infrequent and required the approval of ResCap's Chief Financial Officer ("CFO") and/or the Board of Directors or the Executive Committee.    Forgiveness of an intercompany receivable of more than $50 million also required the approval of the Board of Directors of Ally Financial Inc. ("Ally," formerly known as GMAC).

16.    Pre-petition note receivables, intercompany receivables and intercompany payables among ResCap, GMACM, RFC and their affiliates arose from a variety of types of transactions.    As discussed more fully throughout my testimony and

in the Ally/ResCap accounting policies for intercompany accounting (effective January 1, 2011 and November 28, 2011), it appears that the balances in the note receivables, note payables, intercompany receivables and intercompany payables fluctuate primarily as a result of the following types of transactions:

- Functioning of the Cash Management System:  Typically, cash generated at the subsidiary level was swept up to the parent level as part of the Debtors' Cash Management System.  The recipient of cash recorded an intercompany payable to the transferor and the transferor recorded an intercompany receivable from the recipient.

- Intercompany Loans:  Loans from one entity to another generated an intercompany note or accounts payable on the books of the borrower and an intercompany note or accounts receivable on the books of the lender.

- Charges for Services:  Charges for services provided by affiliates created an intercompany liability on the books of the service beneficiary to the service provider and an intercompany receivable from the beneficiary on the books of the service provider for the value of the services provided.  For example, the general ledger data provided by the Debtors includes certain intercompany transactions that are described as relating to "Service Fee Accruals", "IT and Marketing Cross Charge" and  "OPEX Allocation."

- Interest Accrual:  The accrual of interest on certain intercompany loans generated an intercompany accounts payable on the books of the borrower and an intercompany accounts receivable on the books of the lender.

- Payments:  Payments against intercompany notes payable or accrued intercompany interest payable reduced the intercompany assets on the books of the lender and the intercompany liabilities on the books of the borrower.

- Transfers or Sales of Assets:  A transfer or sale of assets between Debtor entities created an intercompany receivable from the transferee on the books of the transferor and an intercompany payable to the transferor on the books of the transferee for the value of the assets transferred.

- Debt Forgiveness:  Occasional forgiveness of intercompany obligations resulted in a reduction of the intercompany note or account payable on the books of the obligor and a reduction in the

intercompany note or account receivable on the books of the beneficiary.

## V.   SUMMARY OF OPINIONS

17.    The Debtors consistently treated intercompany obligations as valid liabilities.  Those liabilities arose from accurately recorded transactions entered into in the normal course of business.  The liabilities were included in the Debtors' financial statements, which were prepared in accordance with the Generally Accepted Accounting Principles ("GAAP").  Accordingly, the Debtors assessed the obligors' ability to satisfy these intercompany liabilities before determining whether they should be included in the reported financial statements.

18.    I found no evidence suggesting that the transactions recorded that comprise the intercompany liabilities (i) were not accurately recorded in amount, (ii) were not recorded between the proper entities, (iii) were not recorded in the appropriate general ledger account, or (iv) not done in the normal course of business, for legitimate business purposes.  Further, I found no evidence that, prior to the Petition Date, the Debtors viewed these intercompany liabilities as anything other than valid and collectible obligations.  In fact, the Ally General Intercompany Accounting Policy (applicable to Ally affiliates, including ResCap) states that:  "The objective of this Policy is to reduce the risk of inaccurate record keeping, unreliable financial information, misappropriation of assets, incorrect payments, and fraud, as well as to establish uniform standard for all Ally Business Units (BUs) and operations to facilitate an efficient consolidation process."[4]

---

[4] DX AUH (RCJSNII10131858) at 10131859, attached hereto as Exhibit C.

## VI.    BASIS FOR OPINIONS AND OBSERVATIONS

19.    My review and analysis of the Debtors' external financial reports and internal records revealed that the Debtors consistently treated and reported intercompany balances as either intercompany receivables, payables or borrowings in their internal accounting records and external financial reports.  They also relied on these financial records for determining and certifying compliance with certain regulatory and licensing requirements.  Such accounting and reporting is an indication that the ResCap entities expected the intercompany balances would be repaid, and/or that repayment could be demanded.  For example, Barbara Westman, one of the Debtors' corporate representatives, testified about the validity and collectability of the $1.8 billion RFC intercompany receivable due from ResCap as of December 31, 2011, explaining that "it was a valid receivable as there was an ability for that to be collected, if necessary."[5]

20.    Specifically, the Debtors identified and reported intercompany balances as intercompany receivables, payables or borrowings in each of the following:

- Audited financial statements for certain ResCap subsidiaries that were provided to the Department of Housing and Urban Development ("HUD") and certain government-sponsored enterprises such as Ginnie Mae, and made available to certain lenders through an Intralinks site;

- ResCap's Federal income tax returns;

- ResCap's SEC filings;

- Trial balances and general ledgers; and

- Internal memoranda regarding intercompany accounting and intercompany balances.

---

[5] Transcript of the Deposition of Barbara Westman, dated October 15, 2013 ("Westman Tr.") at 188: 9-11.

21.     Based on my review and analysis of the general ledger data produced by the Debtors, the intercompany transactions and their related descriptions that were recorded in the Debtors' general ledgers for the Nine Largest Petition Date Intercompany Balances are generally consistent with the information contained in the following Debtor-prepared documents and the testimony of Ms. Westman, one of the Debtors' Corporate Representatives:

- The Disclosure Statement, including Exhibit 6 (Top Seven Intercompany Net Balances) to the Disclosure Statement;

- The Debtors' SOALs;

- The April 4, 2013 presentation prepared by the Debtors, Morrison & Foerster LLP and FTI Consulting, Inc. relating to intercompany balances as of the Petition Date, including information related to the debt forgiveness transactions from 2008 through the Petition Date (the "Debtors' Intercompany Analysis");[6]

- Email attachment containing fifteen intercompany balances as of the Petition Date and descriptions related to certain of those balances (the "January 2013 Intercompany Analysis");[7] and

- The Debtors' Motion for Order Under Bankruptcy Code Sections 105(a), 345, 363, 364, and 503(b)(1) and Bankruptcy Rules 6003 and 6004 Authorizing (I) Continued Use of Cash Management Services and Practices… [Dkt. No. 16] (the "Cash Management Motion").

22.     Occasionally, intercompany debt was forgiven to allow an intercompany obligor to comply with regulatory and/or loan agreement net worth or solvency requirements applicable to various Debtors.  A September 2007 ResCap Board Presentation noted that "Rescap and its subsidiaries have approximately 40 debt facilities

---

[6] DX ATL (RCUCCJSN11979451) at RCUCCJSN11979453, attached hereto as Exhibit D.
[7] DX AUC (RCUCCJSN30004106) at RCUCCJSN30004112, attached hereto as Exhibit E.

that contain financial covenants. Failure of covenants not desirable as in most cases would trigger cross defaults and/or potential cross acceleration on other facilities."[8]

23. In many cases, the debt forgiveness was necessary to allow the Debtors to continue to operate their business. One of the Debtors' Corporate Representatives, Tammy Hamzehpour, in testifying about a $2 billion forgiveness in 2008 from parent company ResCap to subsidiary RFC, described the result of a failure of ResCap to provide such forgiveness as follows:

> Q. And if [RFC] had breached its financial covenants in March of 2008, would it have been able to continue to operate?
>
> MR. KERR: Objection. Asked and answered.
>
> A. It would have triggered a cross-default across all the company's credit facilities, putting in danger everyone's ability to operate.
>
> Q. And the forgiveness of the indebtedness in 2008 by Residential Capital at least alleviated the danger that you just testified to; correct?
>
> A. Correct.[9]

24. Intercompany debt forgiveness required approval of the ResCap CFO, Board of Directors, and/or Executive Committee, and in some instances could be effectuated only after receiving the approval of the Ally Board of Directors. These debt forgiveness transactions were generally effectuated by way of capital contributions. Significant capital contributions made to any direct or indirect Ally subsidiary required the advance approval of the Ally Board of Directors.

25. The fact that the Debtors followed this formal process—requiring Board-level approvals for capital contributions—reinforces the notion that the Debtors

---

[8] DX AYE (EXAM10199064) at EXAM10199076, attached hereto as Exhibit F.
[9] *See* Transcript of the Deposition of Tammy Hamzehpour, dated October 18, 2013 ("Hamzehpour Tr.") at 23:10-23.

regarded the transactions underlying the Intercompany Claims as debt.  If the underlying

intercompany transactions were actually created by way of capital contributions or equity

distributions, clearly such debt forgiveness would have been unnecessary.  James Young,

former CFO of ResCap, agreed that to forgive a debt you must, in the first place, have

debt:

> Q. Without a debt -- you can't forgive debt that isn't owed, do you agree
> with that?
>
> A.   I agree with that.
>
> Q.   Okay.  So if you're talking about forgiving debt, there has to be a
> debt that's owed, right?
>
> A.  On the face of it, yes.[10]

26.     Moreover, if the intercompany transactions were actually equity

transactions, effectuating them on a regular basis, in the ordinary course, without

requesting or receiving CFO, Board or Executive Committee approval, would have

violated the policies and procedures governing when a subsidiary was permitted to make

capital contributions and equity distributions.

27.     My experience related to companies' use of centralized cash

management systems is consistent with how the Debtors used the Debtors' Cash

Management System, including the creation of intercompany accounts receivable and

intercompany accounts payable as a result of the movement of cash resulting from the

Debtors' Cash Management System.   In my experience, I have not seen equity

transactions among affiliates flow through centralized cash management systems; instead,

transactions flowing through centralized cash management systems generally result from

---

[10]  Transcript of the Deposition of James Young, dated November 6 ("Young Tr."), at 117:3-10; 120:6-10.

ordinary course operating transactions and result in the creation of intercompany assets and liabilities.  Similarly, Mark Renzi, one of the Debtors' experts, testified that he did not believe that he had ever been involved with a company that used a centralized cash management system where balances that accrued pursuant to the centralized cash management process were recharacterized from debt to equity.[11]

28.    Although I generally focus on the nine largest Intercompany Claims in my direct testimony, I have no reason to believe that my analysis would not apply equally to the intercompany transactions representing the remaining $0.4 billion of Intercompany Claims.

## VII.    OPINIONS AND OBSERVATIONS REGARDING THE DEBTORS' CASH MANAGEMENT SYSTEM

29.    The Intercompany Claims reflect intercompany receivables and payables between Debtor entities that were made in the ordinary course of the Debtors' businesses and were tracked and recorded by the Debtors' Cash Management System.

30.    As the Debtors explained in the Cash Management Motion:

> In the normal operation of the Debtors' businesses, the Debtors maintain business relationships and undertake transactions with each other (the 'Intercompany Transactions').  As a result, there are numerous intercompany claims that reflect intercompany receivables and payments made to each other in the ordinary course of the Debtors businesses (the 'Intercompany Claims'). Debtors maintain records of all Intercompany Transactions and can ascertain, trace, and account for all Intercompany Claims.
>
> The Intercompany Transactions are ordinary course transactions that are integral to the Debtors' businesses and the function of their Cash Management System.[12]

---

[11] Transcript of Mark Renzi, dated November 6, 2013 ("Renzi Tr.") at 152:16-23.
[12] Cash Management Motion at 36-37.

31.     The Debtors also explained in the Cash Management Motion that "the Cash Management System is an ordinary course, customary, and essential business system comprising a group of bank accounts and cash management practices. . . ."[13]

32.     The Debtors' assertion that, as of the Petition Date, the Intercompany Claims generally were a result of the Debtors' Cash Management System is consistent with the information I reviewed and analyzed in connection with preparing my expert report.  I found no evidence suggesting that the Debtors' statement that the various intercompany payables and receivables were largely accumulated through tens of thousands of separate transactions over a period of years under pre-petition loan agreements for the benefit of other Debtors or by operation of the Debtors' Cash Management System is inaccurate.

33.     Based on my review of the information related to the Debtors' Cash Management System, including its bank account structure and funds transfer processes, I believe the practices used by the Debtors to aggregate liquidity were, though somewhat less automated, generally consistent with my experience and understanding of how other companies use centralized cash management tools to process and record ordinary course operating transactions.

34.     Based on my understanding of the Debtors' Cash Management System and the testimony of the Debtors' Corporate Representative (Westman), it is reasonable to conclude that the Debtors' Nine Largest Petition Date Intercompany Balances primarily arose from either: a) ordinary course operating transactions that flowed through the Debtors' Cash Management System, b) other ordinary course business transactions such as overhead allocations and asset sales, and/or c) transactions

---

[13] *Id.* at 4.

related to a specific borrowing arrangement. The Debtors' businesses did not require substantial capital expenditures. Consequently, it is unlikely that balances arose from capital investments. In fact, one of the Debtors' Corporate Representatives, Cathy Dondzila, testified that during her tenure at ResCap no material capital improvements were made.[14]

35.    My analysis of the intercompany balances indicates that the balances changed frequently and often materially in the years leading up to the Petition Date. The Debtors' Corporate Representative (Westman) testified that the intercompany balances changed monthly during the period 2008 through March 31, 2012.[15] For a number of the intercompany relationships discussed in my expert report and my direct testimony, the "creditor" and the "debtor" in the intercompany relationship reversed over time. This is not unusual with the normal operation of a cash management system, where operating subsidiaries both generate cash (creating a receivable) and use cash (creating a payable) in the ordinary course of their activities. In my opinion, this pattern is consistent with treating the intercompany balances as debt because the balances are typically incurred with an expectation that they will be repaid as business circumstances require.

36.    If the Debtors had intended the Intercompany Transactions to be equity contributions they would have recorded them as "additional paid-in capital" rather than as intercompany liabilities.[16] Indeed, the frequent movement of cash between an operating subsidiary and parent company, with both entities playing the roles of lender and borrower at various times, is not consistent with an equity investment. Moreover, if

---

[14] Transcript of Cathy Dondzila, dated October 17, 2013 ("Dondzila Tr.") at 91:5-9.
[15] Westman Tr. at 200:9-16.
[16] Westman Tr. at 44:15-19.

the Debtors had intended to treat the intercompany cash movement as a dividend from a subsidiary to a parent, they would have recorded the transaction as a reduction of paid-in capital of the subsidiary.

37.    As Mr. Young explained, if the accounting professionals had information suggesting that there was no intent to pay an intercompany balance, "it wouldn't be recorded as a receivable or a payable."[17]

38.    Equity investments in the parent-subsidiary context tend to be made by the parent to the operating subsidiary, typically to facilitate large capital expenditures and without recording an intercompany obligation.  I have not seen any evidence that this type of activity generated the balances recorded in the intercompany accounts I examined.

## VIII.   OPINIONS AND OBSERVATIONS REGARDING THE DEBTORS' INTERNAL AND EXTERNAL PRESENTATION OF INTERCOMPANIES BALANCES

39.    The Debtors consistently recorded and reported intercompany balances as either intercompany receivables, payables or borrowings in their external financial reports and internal accounting records.  Such reporting is another indication that the ResCap entities expected these intercompany balances to be repaid.  Specifically, the Debtors clearly identified and reported intercompany balances as intercompany receivables, payables or borrowings in each of the following:

- Audited financial statements for certain ResCap subsidiaries that were provided to HUD and certain government-sponsored enterprises such as Ginnie Mae, and made available to certain lenders through an Intralinks site;

- ResCap's Federal income tax returns;

---

[17] Young Tr. at 103:13-20.

- ResCap's SEC filings;

- Trial balances and general ledgers; and

- Internal memoranda regarding intercompany accounting and intercompany balances.

A.    **Audited Financial Statements of Certain ResCap Subsidiaries**

40.    Because of various state licenses and certain liquidity facilities and contracts, including contracts with HUD and Ginnie Mae, GMACM, RFC, and HomeComings were required to have their own independent financial statements. The independently audited consolidated financial statements of all three Debtors entities clearly identified and reported intercompany receivables and payables and borrowings in their respective balance sheets. Additionally, in an April 22, 2012 email exchange, the Debtors' Controller, Cathy Dondzila, was asked by the Debtors' advisor, FTI, whether intercompany balances reported in public or regulatory filings reported as debt or equity. Ms. Dondzila explained that "[i]n standalone financial statements of the operating companies [intercompany balances] are reported as affiliate receivables/payables/debt."[18]

41.    These financial statements were prepared in accordance with GAAP, which requires that the preparer of financial statements conclude that receivables reflected on the balance sheet are collectible. Here, the collectability of intercompany receivables was evaluated by both the preparer and the auditors and the receivable amounts were determined to be collectible. The Debtors' Corporate Representative (Dondzilla) testified that intercompany receivables were evaluated for valuation or

---

[18] DX AUI (RCUCCJSN30023149) at 30023151, attached hereto as Exhibit G.

potential impairment under GAAP and were only reflected in the financial statements as receivables after an evaluation of whether the receivable needed to be impaired.[19]

42.    In my opinion, the reporting of intercompany balances on audited financial statements is a strong indicator that the reporting ResCap entities regarded the receivable balances as valid and collectable.

**B.    Rescap's Federal Income Tax Returns**

43.    In its 2009, 2010, and 2011 federal income tax returns, ResCap reported intercompany payables as "Other Liabilities" (line 21) in Schedule L ("Balance Sheet per Books") of its Form 1120.

44.    In addition, the supporting schedule for the "Other Liabilities" category on Schedule L indicates that there are "Intercompany Payables" and "Accounts Payable – Affiliates" that are recorded as liabilities on ResCap's balance sheet.

45.    Such reporting is an indicator that the ResCap entities believed these intercompany balances were accurate and properly recorded as liabilities.

46.    In my opinion, the reporting of intercompany payable balances in schedules attached to the Debtors' tax returns is an indicator that ResCap entities regarded the payable balances as valid liabilities.

**C.    Rescap's Securities & Exchange Commission Filings**

47.    ResCap also regularly reported supplemental financial information that included separate parent and subsidiary balance sheet information to the Securities and Exchange Commission.  For example, in its Form 10Q/A for the quarterly period ended June 30, 2009, ResCap reported in excess of $5.5 billion of borrowings outstanding among ResCap and its subsidiaries as of June 30, 2009 in the liabilities

---

[19] Dondzila Tr. at 61:23-62:6, 62:17-21.

section of its condensed consolidating balance sheet. ResCap similarly disclosed borrowings by its subsidiaries as liabilities in its SEC filings for the years ended December 31, 2007 and December 31, 2008 and for the quarterly periods ended March 31, 2008, June 30, 2008, September 30, 2008 and March 31, 2009. The table below sets forth a summary of this information.

| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| *Borrowings from Parent ($, 000s)* | | | | | |
| 6/30/09 | - | 4,774,831 | 3,694,134 | (5,537,796) | 2,931,169 |
| 3/31/09 | - | 4,829,939 | 2,922,968 | (5,342,982) | 2,409,925 |
| 12/31/08 | - | 5,345,597 | 3,266,399 | (5,948,675) | 2,663,321 |
| 9/30/08 | 2,172,124 | 6,911,201 | 4,370,387 | (10,183,129) | 3,270,583 |
| 6/30/08 | 2,750,000 | 6,955,000 | 6,891,937 | (11,896,937) | 4,700,000 |

48. In my opinion, the public reporting of intercompany balances is a strong indicator that the ResCap entities regarded these balances as consisting of valid debt transactions (*i.e.,* receivables and payables).

**D. Rescap's Trial Balances and General Ledgers**

49. The intercompany accounts in the Debtors' general ledgers are generally titled/named, "Note Receivable," "Intercompany," "Intercompany Receivable," "Intercompany Recvable," "Intercompany Rec," "Intercompany Payable/Recvable," "Interco LOC," "Interco Payable," "Intracompany payable – US Subs" and/or "A/P affiliates". The Debtors consistently tracked these intercompany account balances as either intercompany receivables, payables or borrowings in their trial balances.

50.    In my opinion, the internal tracking of intercompany balances is a strong indicator that the ResCap entities regarded the transactions as valid debt transactions.

**E.    Internal Memorandum**

51.    An April 22, 2012 email between the Debtors' Controller, Cathy Dondzila, and the Debtors' financial advisor, FTI, titled "Intercompany Follow Up"[20] indicates that the ResCap entities expected the intercompany balances to be repaid:

- "As the operating companies generate cash, through asset sales, borrowings, asset liquidations etc., this cash moves upstream to ResCap.  This again creates the payable on the Parent and the receivable at the operating company."

- "[I]in order to maintain sufficient regulatory net worth to satisfy requirements, and to clean up balance sheets as part of entity minimization or sale activities, intercompany balances have been forgiven.  In many cases, with the approval of the Ally Board of Directors."

-  "In standalone financial statements of the operating companies they are reported as affiliate receivables/payables/debt."

52.    Further, Ms. Dondzila was asked in the email whether intercompany balances were considered loans or equity infusions and whether there was an expectation that the balances would be repaid.  She replied that, "[t]o the extent we have deemed a collateralized affiliate balance impaired we have impaired it through earnings.  Otherwise we have concluded for GAAP financial statement purposes the balances were expected to be repaid."

53.    Other internal documents also indicate that the Debtors intended to repay intercompany balances that were recorded as payables or borrowings.  For

---

[20] DX AUI (RCUCCJSN30023149), attached hereto as Exhibit G.

example, a 2011 netting agreement between GMACM, RFC, ResHolding, and ResCap,[21] executed in connection with the sale of certain mortgage loans from GMACM to RFC, recognized that "[p]ursuant to various intercompany loans," ResHolding owed money to ResCap that needed to be repaid, ResCap owed money to RFC that needed to be repaid, and GMACM owed money to ResHolding that needed to be repaid. The netting agreement provides for the repayment of these Debtor entity loan obligations. Pursuant to the agreement, the loan obligations will be "netted against each other so that the respective obligations will be discharged." According to an Ally accounting policy (applicable to Ally affiliates, including ResCap), when an obligation is "discharged" in a netting agreement, "the debt is considered paid, and the amount will never have to be paid to the creditor in the future."[22]

## IX.    OPINIONS AND OBSERVATIONS REGARDING THE NINE LARGEST PETITION DATE INTERCOMPANY BALANCES

54.    The Debtors have represented in their SOALs that they "have made every attempt to properly characterize, prioritize and classify all intercompany transaction(s)."[23]

55.    Prior to filing their SOALs in this bankruptcy, the Debtors did a significant amount of work analyzing the intercompany balances. The Debtors' Corporate Representative (Dondzila), who was responsible for preparing the SOALS, testified that the intercompany balances were an "area of focus" for her and her team.[24] The Debtors' Corporate Representative (Westman) also testified about the months of diligence she engaged in with the Debtors' lawyers and financial advisors to collect

---

[21] DX AYI (RCJSNII10074531) at 10074537, attached hereto as Exhibit H.
[22] DX AYH (RC40000082) at 40000083, 40000086, attached hereto as Exhibit I.
[23] *See, e.g.* RFC SOAL [Dkt No. 548] at 5.
[24] Dondzila Tr. at 135:14-136:5.

information regarding the intercompany balances, before they were scheduled.[25]   She testified that she was "responsible for providing information that went into the[] schedules", and that "when we provided information for the SOAL, [ ] we believed it was accurate to the best of our knowledge at the time."[26]   She further specifically testified to the accuracy of the intercompany balances discussed herein.

56.    I will discuss each of the nine largest intercompany balances below.

**A.    Intercompany Claim No. 1 – Residential Capital, LLC Claim against GMAC Residential Holding Company, LLC**

**1.    Background**

57.    According to Exhibit 6 to the Revised Disclosure Statement, GMAC Residential Holding Company, LLC ("ResHolding") owes ResCap $3,333.9 million of intercompany liabilities (the "ResHolding-ResCap Petition Date Intercompany Balance").   The ResHolding Schedule F-1 and the ResCap Schedule B-18 reflect amounts owing by ResHolding to ResCap as follows:



*($ in Millions)*

| Account # (per Stmt of Assets) | Account Name (per General Ledger) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
|---|---|---|---|---|
| 1140500006 | Note Receivable from RESI | GMAC Residential Holding Company, LLC | Residential Capital, LLC | $ 3,295.6 |
| 1140500007 | Interest Rec from RFC/RESI | GMAC Residential Holding Company, LLC | Residential Capital, LLC | 38.3 |
| | | | | $ 3,333.9 |

**2.    Observations**

58.    The Debtors' Corporate Representative (Westman) testified that the above balances were accurately reported as intercompany receivables and intercompany payables.   As the Debtors noted in Exhibit 6 to the Revised Disclosure

---

[25] Westman Tr. at 116:3-5.
[26] Westman Tr. at 116:3-5; 112:13-15.   Mr. Renzi also testified that the information on the SOALs was accurate.   Renzi Tr. at 14:2-17.

Statement, this "[b]alance generally arose from transactions under an agreement between ResCap and ResHolding.  ResHolding borrowed funds from ResCap and then distributed funds to GMACM for general operating purposes…"

59.    The Debtors further noted that "[w]hile there was no fixed interest rate in the loan agreement, interest was paid regularly until the Petition Date".

60.    The Debtors' disclosures appear consistent with what I observed in examining the general ledger data and other information produced by the Debtors.

61.    In a March 20, 2012 memorandum from Barbara Westman discussing whether ResCap had the capacity to meet its intercompany obligations to RFC, Ms. Westman notes that "ResCap also maintains a $3.6 billion receivable from GMACM, and could move assets from GMACM to RFC to reduce both outstanding balances."[27]

62.    Interest accrued on the ResCap/ResHolding intercompany balance, and ResHolding regularly (up until the Petition Date) paid interest on this balance at an average rate of 9.6%.

63.    According to Exhibit 6 to the Revised Disclosure Statement, "In 2009, $2.52 billion of debt owed by GMACM to ResHolding was forgiven so that GMACM could meet certain tangible net worth debt covenants.  ResCap did not forgive any of ResHolding's debt at that time because ResHolding was not at risk of defaulting on its net worth requirements."  Based on my review of the Intercompany Transactions that the Debtors extracted from their general ledgers, the $2.52 billion of debt owed by GMACM to ResHolding that was forgiven in 2009 was effectuated at GMACM by reducing its intercompany liability and increasing its member's equity.  This forgiveness

---

[27] DX ATQ (RCUCCJSN20051022) at RCUCCJSN20051023, attached hereto as Exhibit J.

was effected through a formal process, including approval of the Executive Committee of the ResCap Board of Directors and the Ally Board of Directors. As described above, if the intercompany payable did not reflect a bona fide liability, such forgiveness of the debt would have been unnecessary.

64.     There is other evidence in the record that suggests that the Debtors treated this intercompany payable as a bona fide liability. The Company's Controller, Cathy Dondzila, testified that the intercompany receivable between ResHolding and RFC acted as a "line of credit" between ResCap and ResHolding (for the benefit of ResHolding's operating subsidiary GMACM).[28]     Internal documents similarly characterized this intercompany balance as a line of credit for GMACM to borrow funds, or contribute funds, to ResCap as needed, with the borrowing funneled through ResHolding.

65.     Similarly, this intercompany balance was used to facilitate other large intercompany transfers of value between GMACM and ResCap. For example, on April 22, 2011, GMACM, RFC, ResHolding, and ResCap executed a letter agreement regarding netting in connection with the sale of certain mortgage loans from GMACM to RFC, (the "Netting Agreement").[29]     The Netting Agreement stated that "Pursuant to various intercompany loans, [ResHolding] owes amounts to [ResCap] in excess of the Purchase Price as of the date hereof." Under the Netting Agreement, among other things, ResCap "fully and finally discharges [ResHolding] from its obligation to repay $171,323,565.91 to ResCap under the intercompany loans (and subtracts such amount from the total amount due by [ResHolding] to ResCap under the intercompany loans)."

---

[28] Dondzila Tr. at 32:6.
[29] DX AYI (RCJSNII10074531) at 10074537, attached hereto as Exhibit H.

66.    Moreover, the lending relationship between ResCap and ResHolding is documented in a 2006 loan agreement between and among ResCap, ResHolding, GMACM, and RFC.  The ResCap Loan Agreement automatically renewed every year unless it was terminated in writing by either party.  There is no indication that the ResCap Loan Agreement was ever terminated.

### B.    Intercompany Claim No. 2 – Residential Funding Company, LLC Claim against Residential Capital, LLC

#### 1.    Background

67.    According to Exhibit 6 to the Revised Disclosure Statement, ResCap owes its direct subsidiary, RFC, $1,954.9 million (net) of intercompany liabilities (the "ResCap-RFC Petition Date Intercompany Balance").[30]  The RFC Schedule F-1, the ResCap Schedule F-1, the RFC Schedule B-18 and the ResCap Schedule B-18 reflect net amounts owing by ResCap to RFC as follows:



($ in Millions)

| Account # (per Stmt of Assets) | Account Name (per General Ledger) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
|---|---|---|---|---|
| 2041200001 | Intracompany payable - US Subs | Residential Funding Company, LLC | Residential Capital, LLC | $ (0.1) |
| 2020100002 | ResCap Intercompany | Residential Capital, LLC | Residential Funding Company, LLC | 1,955.0 |
| | | | | $ 1,954.9 |

#### 2.    Observations

68.    The Debtors' Corporate Representative (Westman) testified that the above balances were accurately reported as intercompany receivables and intercompany payables.  As the Debtors disclosed in Exhibit 6 to the Revised Disclosure Statement, this Balance generally arose out of operation of the company's centralized cash management system.  As RFC generated cash, that cash would be swept to ResCap.  This Balance changed frequently.

---

[30] Revised Disclosure Statement at Ex. 6, p. 2.

69.    Based on my review of RFC's independently audited financial statements for the years ended December 31, 2011 and 2010, RFC treated and recorded its intercompany balance due from ResCap as a fully collectible intercompany receivable. In fact, RFC clearly identified and reported $1.84 billion and $2.30 billion of receivables from its parent (ResCap) in the asset section of its balance sheet as of December 31, 2011 and December 31, 2010, respectively.

70.    In a memorandum drafted to provide support for the year-end audit, Barbara Westman analyzed the RFC receivable from ResCap and determined that it should be treated as a fully collectible intercompany receivable for accounting purposes as of December 31, 2011.[31]  A summary of this memorandum is presented below:

- "This memo supports the appropriate accounting treatment for intercompany balances between RFC and ResCap.  As of 12/31/11, RFC has an intercompany receivable balance from ResCap.  This receivable is carried at its full value."

- "To best facilitate this process, ResCap centralizes cash balances, and does not hold cash within most of its operating units.  As operating entities acquire cash, it is moved through intercompany transactions to ResCap.  Likewise, as operating entities require cash, the cash is provided by ResCap to those entities."

- "Generally, assets presented in accordance with GAAP would be assessed for collectability.  FASB Codification Subtopic 310-10-35-22 provides guidance on the impairment of receivables.  A creditor is deemed impaired when it is probable that a creditor will be unable to pay all amounts due according to the contractual terms of the loan agreement."

- "If required, ResCap could support its payable to RFC through sales or other liquidations of its GMACM holdings.  ResCap also maintains a $3.6 billion receivable from GMACM, and could move assets from GMACM to RFC to reduce both outstanding balances."

- "Due to these circumstances, management concludes that ResCap maintains the ability to support its intercompany obligations with RFC, and therefore, no

---

[31]  DX ATQ (RCUCCJSN20051022) at RCUCCJSN20051023), attached hereto as Exhibit J.

impairment of this receivable is warranted for the RFC stand-alone financial statements."

71.      The Debtors' Corporate Representative (Westman) testified that in April 2011 and again in March 2012, they considered whether the intercompany receivable from ResCap could remain on RFC's balance sheet.  In both instances, after making a GAAP determination for collectability, i.e., considering whether the receivable could be collected, and conferring with their auditors Deloitte & Touche, the Debtors concluded that the receivable could remain on the balance sheet of RFC.[32]

72.      According to Exhibit 6 to the Revised Disclosure Statement, "In 2008, $2 billion of debt owed by RFC to ResCap was forgiven so that RFC could meet certain tangible net worth debt covenants."  Based on my review of the Intercompany Transactions that the Debtors extracted from their general ledgers, the $2 billion of debt owed by RFC to ResCap that was forgiven in 2009 was effectuated at RFC by reducing its intercompany liability and increasing its member's equity.  This forgiveness was effected through a formal process, including approval of the Executive Committee of the ResCap Board of Directors.  As described above, if the intercompany payable did not reflect a bona fide liability, such forgiveness of the debt would have been unnecessary.

73.      There is other evidence in the record that suggests that the Debtors treated this intercompany payable as a bona fide liability.  The Company's Controller, Cathy Dondzila, testified that the Intercompany receivable between ResCap and RFC acted as a "line of credit" between ResCap and RFC.[33]

74.      Similarly, this intercompany balance was used to facilitate other large intercompany transfers of value between RFC and ResCap.  As noted above, the

---

[32] Westman Tr. 183:4-190:11.
[33] Dondzila Tr. at 31:16-32:11.

April 22, 2011 Netting Agreement stated that, "[p]ursuant to various intercompany loans, ResCap owes amounts to [RFC] in excess of the Purchase Price as of the date hereof."[34] Under the Netting Agreement, among other things, RFC "fully and finally discharges ResCap from its obligation to repay $171,323,565.91 to [RFC] under the intercompany loans (and subtracts such amount from the total amount due by ResCap to [RFC] under the intercompany loans)."[35]

### C.    Intercompany Claim No. 3 – Homecomings Financial, LLC Claim against Residential Funding Company, LLC

#### 1.    Background

75.    According to Exhibit 6 to the Revised Disclosure Statement, RFC owes its direct subsidiary Homecomings $1,251.5 million of intercompany liabilities (the "RFC-Homecomings Petition Date Intercompany Balance").[36]    The RFC Schedule F-1 and the Homecomings Schedule B-18  reflect amounts owing by RFC to Homecomings as follows:

($ in Millions)



| Account # (per Stmt of Assets) | Account Name (per General Ledger) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
|---|---|---|---|---|
| 2041200001 | Intracompany payable - US Subs | Residential Funding Company, LLC | Homecomings Financial, LLC | $       1,251.5 |

#### 2.    Observations

76.    The Debtors' Corporate Representative (Westman) testified that the above balances were accurately reported as intercompany receivables and intercompany payables.    Debtors disclosed in Exhibit 6 to the Revised Disclosure Statement that this "[b]alance generally arose out of operation of the company's

---

[34] DX AYI (RCJSNII10074531) at RCJSNII10074537, attached hereto as Exhibit H.
[35] *Id.* at RCJSNII10074538.
[36] Revised Disclosure Statement at Ex. 6, p. 3.

centralized cash management system.  Homecomings sold loans to RFC for securitization as part of normal business operations, subserviced loans, and generated other cash through operations that was swept up to RFC.  The receivable balance consists largely of this, less payables to RFC for general overhead expenses.  The balance changed frequently until 2008."[37]

77.    By 2008, all of the business activities of Homecomings "were sold, transferred, or discontinued and it no longer had any licensing requirements that required financial statements.[38]  Nevertheless, Homecomings still maintained assets as it "was listed as the named servicer for a variety of different. . . private label securitizations and the cost, effort, and exercise of having that changed was prohibitive. . . ."[39]

78.    The Debtors further noted that while Homecomings became largely dormant in 2008, it continued to have wind down activity that created cash that was swept up to RFC.

79.    The Debtors also stated that interest was accrued but not settled in cash on the intercompany balance (this amount was included in the intercompany balance).

80.    The information appears consistent with what I observed in examining the general ledger data produced by the Debtors.

81.    By virtue of the Debtors' Cash Management System, cash was routinely swept up from Homecomings to RFC, creating an intercompany payable owed to Homecomings.  Homecomings clearly identified and reported intercompany receivable

---

[37] Revised Disclosure Statement at Ex. 6, p. 3.
[38] Dondzila Tr. at 14:13-16.
[39] Dondzila Tr. at 15:10-15.

balances as affiliate receivables (net), in its independently audited financial statements.

For example:

- Homecomings reported $1.05 billion of affiliate receivables, net, as of December 31, 2008 in the assets section of its balance sheet.

- Homecomings stated that "[a]ffiliate receivables are comprised of amounts due for servicing advances transferred at carrying value, fees charged for subservicing activities, and mortgage loans sold to affiliates of the Company. These receivables are recorded at their net realizable value."[40]

82.     Indeed, it is apparent from the contemporaneous financial statements prepared by Homecomings that Homecomings expected its intercompany receivable balance due from RFC to be repaid.

83.     The Debtors also observed that interest was accrued but not settled in cash.  The audited financial statements prepared by Homecomings clearly reports that the interest income, like the principal, was recorded on the books and records of Homecomings.  For example, the Homecomings December 31, 2008 audited financial statements states as follows:

> "[Homecomings] is charged or credited interest by RFC for the net affiliate receivable/payable balance outstanding each month at a rate that represents RFC's borrowing rate.  At December 31, 2008, $1,051,047 [$ is thousands] net receivable was outstanding at an interest rate of 8.9%. The net interest credited and included in the consolidated statement of operations for the year ended December 31, 2008 is $45,125 [$ in thousands]."[41]

84.     Debtors have identified a loan agreement that relates to the intercompany relationship between Homecomings and RFC, although the lender-borrower relationship appears to have reversed.  The Debtors' Corporate Representative (Westman) testified that neither she, nor anyone within the Company, knew the

---

[40] DX AME (EXAM00122166) at EXAM00122176, attached hereto as Exhibit L.
[41] DX AME (EXAM00122166) at EXAM00122176, attached hereto as Exhibit L.

particulars about this agreement, including whether it would apply to the current Intercompany Balance. The Debtors' Corporate Representative (Westman) noted that interest accrued on this balance at the same rate provided for in the agreement identified.[42]

### D. Intercompany Claim No. 4 – Passive Asset Transactions, LLC Claim against GMAC Mortgage, LLC

#### 1. Background

85. According to Exhibit 6 to the Revised Disclosure Statement, GMACM owes its direct subsidiary, Passive Asset Transaction, LLC ("PATI") $697.0 million.[43] The GMACM Schedule F-1 and the PATI Schedule B-18 reflect amounts owing by GMACM to PATI as follows:



| ($ in Millions) | | | | |
|---|---|---|---|---|
| Account # (per Stmt of Assets) | Account Name (per General Ledger ) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
| 24000195 | Interco Payable (001 / 095) | GMAC Mortgage, LLC | Passive Asset Transactions, LLC | $ 689.2 |
| 20412001 | Intercompany Payable/Recvable | GMAC Mortgage, LLC | Passive Asset Transactions, LLC | 7.8 |
| | | | | $ 697.0 |

#### 2. Observations

86. The Debtors' Corporate Representative (Westman) testified that the above balances were accurately reported as intercompany receivables and intercompany payables. The Debtors disclosed in Exhibit 6 to the Revised Disclosure Statement that this "[b]alance generally arose out of operation of the company's centralized cash management system. Majority of balance reflects cash collected by PATI from non-Debtor entities (Flume and GX II) that were swept to GMACM and then to ResCap." [44] As the Debtors' Corporate Representative (Westman) explained, "Passive

---

[42] Westman Tr. 143:19-144:3; 153:7-155:16.
[43] Revised Disclosure Statement at Ex. 6, p. 3.
[44] Revised Disclosure Statement at Ex. 6, p. 3.

Asset Transactions was a holder of international notes and it would receive cash as a holder of those international notes in receipt of that cash through the cash management process, it would have pushed that cash up to its parent, GMAC Mortgage."[45]

87.    The information is consistent with what I observed in examining the general ledger data and other information produced by the Debtors.

88.    According to Exhibit 6 to the Revised Disclosure Statement, "In 2008, $44 million of debt owed by PATI to GMACM was forgiven so that PATI could meet certain tangible net worth debt covenants."[46]   Based on my review of the Intercompany Transactions that the Debtors extracted from their general ledgers, the $44 million of debt owed by PATI to GMACM that was forgiven in 2008 was effectuated at PATI by reducing its intercompany liability and increasing its member's equity.   The Debtors' Corporate Representative (Westman) testified that all debt forgiveness received the appropriate approvals as required by a particular transaction.   Thus, it is my understanding that the ResCap CFO approved this debt forgiveness in accordance with the RFC/GMACM Debt Forgiveness Procedures.   As described above, if the intercompany payable did not reflect a bona fide liability, such forgiveness of the debt would have been unnecessary.

### E.    Intercompany Claim No. 5 – Executive Trustee Services, LLC Claim against GMAC Mortgage, LLC

#### 1.    Background

89.    According to Exhibit 6 to the Revised Disclosure Statement, GMACM owes its direct subsidiary, ETS, $265.4 million (net).   The GMACM Schedule

---

[45] Westman Tr. at 205:24-206:10.
[46] Revised Disclosure Statement at Ex. 6, p. 3.

F-1, the ETS Schedule F-1, the GMACM Schedule B-18 and the ETS Schedule B-18

reflect net amounts owing by GMACM to ETS as follows:

($ in Millions)

| Account # (per Stmt of Assets) | Account Name (per General Ledger ) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
|---|---|---|---|---|
| 20412001 | Intercompany Payable/Recvable | Executive Trustee Services, LLC | GMAC Mortgage, LLC | $ (10.9) |
| 2041200001 | Intracompany payable - US Subs | Executive Trustee Services, LLC | GMAC Mortgage, LLC | (0.2) |
| 24008888 | Interco Payable Self Elim | Executive Trustee Services, LLC | GMAC Mortgage, LLC | (0.0) |
| 24000102 | A/P Affiliates - 001 / 002 | GMAC Mortgage, LLC | Executive Trustee Services, LLC | 276.5 |
| | | | | $ 265.4 |

## 2.   Observations

90.   The Debtors' Corporate Representative (Westman) testified that
the balances above were accurately reported as intercompany receivables and
intercompany payables.   Debtors disclosed in Exhibit 6 to the Revised Disclosure
Statement that this:

- "Balance generally arose out of operation of the company's centralized cash management system.  Revenue received by ETS (as foreclosure trustee) was swept to GMACM.  GMACM, in turn, satisfied ETS's cash needs.  Intercompany balances were created to record impact to ETS, but no cash settlements occurred." [47]

- As explained the Debtors' Corporate Representatives (Dondzila), ETS is composed of a group of companies whose principal business activities, for which they received revenue, "were attempts at recovery against losses that were incurred for liquidated loans.  So attempting to collect from borrowers any amounts that had been lost through other avenues, and also providing Trustee Services around the foreclosure process. . . ."[48]  Cash was generated by ETS's business activities.

91.   Interest accrued on the ETS/GMACM intercompany balance and
was recorded in the general ledger as a receivable or a payable.

92.   As noted above, the Intercompany Balances created through the
ordinary course activities of an operating subsidiary are generally recorded as debt.  In this

---

[47] Revised Disclosure Statement at Ex. 6, p. 3.
[48] Dondzila Tr. at 36:25-37:7.

instance, ETS performed services and received cash in consideration for those services. The cash was swept up to GMACM as part of the cash management process and, in return for its cash, ETS recorded a receivable from GMACM.   As described above, this accounting is consistent with recording the receivable as debt and inconsistent with an equity transaction.

### F.    Intercompany Claim No. 6 – Residential Funding Company, LLC Claim against RFC Asset Holdings II, LLC

#### 1.    Background

93.    According to Exhibit 6 to the Revised Disclosure Statement, RFC Asset Holdings II, LLC ("RAHI") owes its direct parent, RFC $231.9 million.  The RAHI Schedule F-1 and the RFC Schedule B-18 reflect amounts owing by RAHI to RFC as follows:



($ in Millions)

| Account # (per Stmt of Assets) | Account Name (per General Ledger ) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
|---|---|---|---|---|
| 2041200001 | Intracompany payable - US Subs | RFC Asset Holdings II, LLC | Residential Funding Company, LLC | $        231.9 |

#### 2.    Observations

94.    Debtors disclosed in Exhibit 6 to the Revised Disclosure Statement that this "[b]alance generally arose out of operation of the company's centralized cash management system.  RAHI owned a portfolio of non-economic residuals that generated excess inclusion income that resulted in current taxes payable. Balance primarily attributable to settlement of taxes under the tax sharing agreement."[49]

95.    The Debtors' Corporate Representative (Westman) testified that the balance above was accurately reported as intercompany receivables and intercompany

---

[49] Revised Disclosure Statement at Ex. 6, p. 5.

payables. As Ms. Westman explained, this balance reflected monies used for accounts payable and interest expense.

96.     Interest accrued on the RFC/RAHI intercompany balance and was recorded in the general ledger as a receivable or a payable.

97.     According to Exhibit 6 to the Revised Disclosure Statement, "In 2008, $1.2 billion of debt owed by RAHI to RFC was forgiven so that RAHI could meet certain tangible net worth debt covenants."[50] Based on my review of the Intercompany Transactions that the Debtors extracted from their general ledgers, the $1.2 billion of debt owed by RAHI to RFC that was forgiven in 2008 was effectuated at RAHI by reducing its intercompany liability and increasing its member's equity. The Debtors' Corporate Representative (Westman) testified that all debt forgiveness received the appropriate approvals as required by a particular transaction. Thus, it is my understanding that the Ally Board of Directors approved this debt forgiveness in accordance with the RFC/GMACM Debt Forgiveness Procedures. As described above, if the intercompany payable did not reflect a bona fide liability, such forgiveness of the debt would have been unnecessary.

G.     **Intercompany Claim No. 7 – Residential Funding Company, LLC Claim against GMAC Mortgage, LLC**
   1.     **Background**

98.     According to Exhibit 6 to the Revised Disclosure Statement, GMACM owes an affiliate, RFC $139.7 million. The GMACM Schedule F-1 and the RFC Schedule B-18 reflect amounts owing by GMACM to RFC as follows:

---

[50] Revised Disclosure Statement at Ex. 6, p. 3.



*($ in Millions)*

| Account # (per Stmt of Assets) | Account Name (per General Ledger) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
|---|---|---|---|---|
| 2020100001 | GMAC RESI Intercompany | GMAC Mortgage, LLC | Residential Funding Company, LLC | $ 133.7 |
| 20412001 | Intercompany Payable/Recvable | GMAC Mortgage, LLC | Residential Funding Company, LLC | 6.0 |
| | | | | $ 139.7 |

## 2.    Observations

99.    The Debtors disclosed in Exhibit 6 to the Revised Disclosure Statement that the "[m]ajority of balance consists of: (i) amounts recorded in connection with AFI billings for shared services (e.g. payroll, outside counsel) – RFC routinely remitted payment to AFI for services and RFC then charged GMACM for its portion; and (ii) service fee income received by GMACM as subservicer relating to RFC MSR."

100.    The Debtors' Corporate Representative (Dondzila), the former Controller for ResCap, explained with respect to the shared services balance that "Ally Financial allocated costs.  Those allocations and charges related to those allocations were recorded initially to [RFC], and then the appropriate portion would then be moved from [RFC] down to GMAC Mortgage."[51]  Ms. Dondzila then explained that GMACM and RFC were actually sister companies and that she did not know why Ally did not just allocate its costs directly to GMACM.

101.    The fact that the Intercompany Balance was between two sister companies (rather than a parent making an investment in a wholly-owned subsidiary) is also reflective of an intent to treat this balance as debt.  I would not expect an equity investment between sister companies to be reflected on a company's books and records as an intercompany receivable.  Indeed, the sister company would receive none of the

---

[51] Dondzila Tr. at 46:16-47:5.

customary benefits attributable to an equity investment in connection with this type of transaction.

102.    GMACM clearly identified and reported intercompany balances as "Other Liabilities – Payable to RFC" in its independently audited financial statements. For example, GMACM reported approximately $70 million of payables owed to RFC as of December 31, 2011. [52]  Similarly, in its audited financial statements for that year, RFC clearly identified and reported an intercompany receivable of approximately $70 million.[53]

103.    It is apparent from these contemporaneous financial statements that the intercompany balance was treated as a valid liability on GMACM's statements and as a valid and collectible receivable on RFC's statements.  Such accounting is an indication that these entities expected the intercompany balances would be repaid, and/or that repayment could be demanded.

**H.    Intercompany Claim No. 8 – Home Connect Lending Services, LLC Claim against GMAC Residential Holding Company, LLC**

**1.    Background**

104.    According to the January 2013 Intercompany Analysis, ResHolding owes Home Connects Lending Services, LLC $54.6 million.  The ResHolding Schedule F-1 and the Home Connects Lending Services, LLC Schedule B-18 reflect amounts owing by GMACM to Home Connects Lending Services, LLC as follows:

---

[52] DX ASH (EXAM00234281) at EXAM0023416, attached hereto as Exhibit M.
[53] DX ASI (RCUCCJSN00007239) at RCUCCJSN00007269, attached hereto as Exhibit N.



| ($ in Millions) | | | | |
| Account # (per Stmt of Assets) | Account Name (per General Ledger ) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance |
|---|---|---|---|---|
| 24000267 | Intercompany Payable (033/067) | GMAC Residential Holding Company, LLC | Home Connects Lending Services, LLC | $            54.6 |

### 2.    Observations

105.    The Debtors' Corporate Representative (Westman) testified that the balance above was accurately reported as intercompany receivables and intercompany payables.    According to the January 2013 Intercompany Analysis, "[t]he balances at October 31, 2012 have not changed significantly since December 2008.    The balances resulted from intercompany transfers and clean up related to the closure of HCLS, LLC (SS097) and related entities."    The Debtors' Corporate Representative testified that this intercompany balance also reflected, in part, the movement of cash through the cash management system.[54]

106.    The information is consistent with what I observed in examining the general ledger data and other information produced by the Debtors, and the testimony of the Debtors' witnesses and Corporate Representatives that have proceeded to date

### I.    Intercompany Claim No. 9 – GMAC Residential Holding Company, LLC Claim against GMAC Mortgage, LLC

### 1.    Background

107.    According to the January 2013 Intercompany Analysis, GMACM owes ResHolding $51.4 million (net).    The GMACM Schedule F-1, the ResHolding Schedule F-1 the GMACM Schedule B-18 and the ResHolding Schedule B-18 reflect net amounts owing by GMACM to ResHolding as follows:

---

[54] Westman Tr. at 76:8-79:23.



($ in Millions)

| Account # (per Stmt of Assets) | Account Name (per General Ledger) | Accounts Payable Entity | Accounts Receivable Entity | Petition Date Intercompany Balance | |
|---|---|---|---|---|---|
| 24000033 | Interest Rec/Pay (001/033) | GMAC Mortgage, LLC | GMAC Residential Holding Company, LLC | $ | 108.0 |
| 20412001 | Intercompany Payable/Recvable | GMAC Mortgage, LLC | GMAC Residential Holding Company, LLC | | 1.5 |
| 24000233 | Interco LOC (001/033) | GMAC Residential Holding Company, LLC | GMAC Mortgage, LLC | | (58.2) |
| | | | | $ | 51.4 |

## 2.    Observations

108.    The Debtors' Corporate Representative (Westman) testified that the above balances were accurately reported as intercompany receivables and intercompany payables.

109.    The Debtors disclosed in the January 2013 Intercompany Analysis that "The balance at October 31, 2102 represents borrowings under an unsecured credit facility between GMAC Mortgage and its parent, RHC. This agreement was originally entered into in December 1998. The monthly activity represents the borrowings for the general operating needs of GMAC Mortgage. Repayments on these borrowings were made on a recurring basis until the petition date." The Debtors' Corporate Representative (Westman) testified that this intercompany balance also reflected, in part, the movement of cash through the cash management system.[55]

110.    The Debtors further stated that "[t]he interest rate under this agreement fluctuates monthly and is a stated margin, agreed between the Company and RHC, which is generally between 100 and 300 basis points above a quoted short-term market rate. Interest was accrued on a monthly basis until the petition date. The credit facility is payable upon demand."[56]

---

[55] Westman Tr. 79:12-18.
[56] DX AUC (RCUCCJSN30004106; RCUCCJSN30004112), attached hereto as Exhibit E.

111.    GMACM clearly identified and reported intercompany balances, including the Intercompany Balance between GMACM and ResHolding as receivables from affiliates or borrowings from parent (ResHolding) in its independently audited financial statements.  For example, GMACM reported approximately $4.1 billion of affiliate borrowings as of December 31, 2007.[57]  Similarly, in its audited financial statements for that year ResHolding reported "Accounts receivable – intercompany" of $4.5 billion, which included the $4.1 billion from GMACM as well as borrowings from other entities.[58]

112.    It is apparent from these contemporaneous financial statements that the intercompany balance was treated as a valid liability on GMACM's statements and as a valid and collectible receivable on RFC's statements.  Such accounting is an indication that these entities expected the intercompany balances would be repaid, and/or that repayment could be demanded.

113.    The Debtors also observed that interest was accrued on these borrowings.  The audited financial statements prepared by GMACM clearly reports that the interest expense, like the principal, was recorded on the books and records of GMACM.  For example, GMACM reported $15.54 million and $30.15 million of interest expense on borrowings from parent (ResHolding) for the years ended December 31, 2010 and December 31, 2009, respectively.

X.    **OPINIONS AND OBSERVATIONS REGARDING DEBT FORGIVENESS AMONG RESCAP ENTITIES**

114.    According to Article II, Section K of the Revised Disclosure Statement: "On numerous occasions, where the existence of an intercompany payable on

---

[57] DX ANE (EXAM00234058) at EXAM00234060, attached hereto as Exhibit O.
[58] DX ASJ (EXAM00125358) at EXAM00125416, attached hereto as Exhibit P.

a Debtor's balance sheet threatened the solvency and net worth thresholds required under external funding agreements, or by federal or state regulations, the putative debt obligations were forgiven.  Additionally, putative debt obligations were forgiven among the Debtors and certain non-Debtor subsidiaries in connection with the Debtors' international transactions and the dissolution of entities.  Approximately $16.6 billion of debt was forgiven without consideration from 2007 through the Petition Date."[59]

115.    The Debtors' Corporate Representative (Dondzila) testified that debt forgiveness was effectuated through a capital contribution (*i.e.,* through the equity account) to comply with GAAP requirements.[60]  Internal communications reflect that the Debtors were relying upon AICPA Practice Alert 00-1 (Extinguishment of related Party Debt) ¶¶ 27-28 in arriving at their determination to use the equity account to effectuate the debt forgiveness.

116.    Intercompany debt forgiveness required various levels of approval depending upon the amount forgiven.  As the Debtors' Corporate Representative (Westman) explained, "[g]enerally, it would be determined that a particular debt was a balance that we would look to forgive to solve a certain net worth issue, et cetera.  That balance would be identified and documentation would be put together in a request form.  That would -- that request would go through Cathy, generally, and would be provided to the CFO or on up to board of directors or Executive Committee, depending on where it - where it needed to go for the particular balance and dollar amount, and it would be presented for recommendation and approval."[61]  To the knowledge of the Debtors' Corporate Representative (Westman): "all debt forgiveness received the appropriate

---

[59] Revised Disclosure Statement at 47.
[60] Dondzila Tr. at 84:13-86:6.
[61] Westman Tr. at 219:12-24.

approvals as required by the particular transaction."[62]  This review and approval process is set forth in detail in a document prepared by Ms. Westman in 2010.[63]

117.    The ResCap Debt Forgiveness Schedule by Legal Entity (the "Debt Forgiveness Schedule")[64] identifies approximately $16.6 billion of debt forgiveness between 2008 and 2012.  Of this amount, approximately $7.9 billion, $4.1 billion, $1.9 billion, $2.3 billion and $0.4 billion was forgiven in 2008, 2009, 2010, 2011 and 2012 respectively.  This schedule does not appear to specifically enumerate the $44 million in debt owed to GMACM by PATI that was forgiven in 2008 noted above.

118.    The Debt Forgiveness Schedule identifies the specific "debt forgiveness":

- $2.151 billion owed by ResFunding to ResCap was forgiven between 2008 ($2.0 billion) and 2009 ($0.151 billion).  The ResCap Executive Committee approved the forgiveness of the $2.0 billion on March 26, 2008 (RCUCCJSN10025065).

- $2.52 billion owed by GMACM to GMAC Residential Holding Co, LLC was forgiven in 2009.  The ResCap Executive Committee approved the forgiveness of $0.5 billion on June 3, 2009 (RCJSNII10118387-88) and $2 billion on June 25, 2009 (RC40006569 – 70).

- $1.228 billion owed by RHAI to ResFunding was forgiven in 2008.

- The majority of the remaining forgiveness ($10.69 billion) relates to approximately 50 entities; consisting of foreign affiliates, special purpose entities and entities that were dissolved or sold.

- This schedule does not appear to include the $44 million in debt owed to GMACM by PATI that was forgiven in 2008 (See Section VII. D. to this report).

---

[62] Westman Tr. at 219:25-220:6.
[63] DX ANQ (EXAM10362088) at 10362089, attached hereto as Exhibit Q.
[64] DX ATF (RCUCCJSN11270924), attached hereto as Exhibit R.

119.    Concerning the first two items above, analysis of entries in Debtors' general ledgers shows that the debt forgiveness transactions were recorded as capital injections, in the form of forgiveness of debt or debt for equity exchanges. The entries recorded on the books of the obligor were:

- Debit:  Intercompany Payable – reducing the amount of the obligation by the "forgiven" amount.

- Credit:  Additional Paid in Capital (a component of the equity section of a company's balance sheet) – increasing equity by the "forgiven" amount.

120.    It should be noted that a description field in the Debtors' general ledgers for the entries reflecting these "forgiveness" transactions identifies the transactions as "Debt Forgiveness."  Regardless of whether such a transaction is recorded as a forgiveness or a capital infusion, the impact on the obligor's balance sheet is essentially identical:

- Intercompany debt is reduced by the amount of the "forgiveness."

- The obligor's equity is increased by the amount of the "forgiveness."

121.    Releasing intercompany obligors from amounts owing required approval of ResCap's Chief Executive Officer, Board of Directors and/or Executive Committee.  Debt forgiveness in amounts greater than $50 million also required the approval of the Ally Board of Directors.  The Debtors' Corporate Representative (Westman) testified that all debt forgiveness received appropriate approvals as required by a particular transaction. [65]  The formal process described and carefully followed for each such transaction is further evidence that the transactions that resulted in the intercompany balances were considered debt transactions, not equity investments or

---

[65] Westman Tr. at 220:4-6.

distributions, when they were completed. As Ms. Westman testified, generating intercompany receivables or payables happened in the normal course of business and did not require Board approval. In contrast, "a capital contribution or a dividend would have been something that had to be declared by the board of those entities and would have been a specific type of transaction."[66]

122. The Debtors focused on both the interests of the "lender" and the "borrower" entity in connection with the debt forgiveness process. Ms. Hamzehpour testified that the entity forgiving intercompany debt would have had no desire to forgive more than the amount required to meet net worth or solvency requirements.[67] This suggests that the ResCap entities only exchanged debt for equity when it was absolutely necessary to do so in order to continue normal operations and avoid defaults under debt agreements. As articulated in a contemporaneous communication from Ms. Hamzehpour (in which she articulates the interests of the "lender" being asked to forgive the "debt"): "It is not in ResCap's or the Group's best interest to release debt in excess of the amount needed to meet the above goals and, for this reason, the GMAC Inc. Board Resolutions authorizing debt forgiveness for certain ResCap subsidiaries referred to releases 'up to' a maximum amount."[68]

123. As set forth *supra*, the debt forgiveness process was formal and, according to the Debtors' Corporate Representative (Hamzepour), enabled the Debtors to continue operating from 2008 on. Complying with the various tangible net worth requirements imposed on the Debtors by liquidity providers, state and federal regulators, and the GSE's were all, to varying degrees, critical to the continued operations of the

---

[66] Westman Tr. at 45:25-46:5.
[67] Hamzehpour Tr. at 31:13-16.
[68] DX AOK (EXAM11148024), attached hereto as Exhibit S.

Debtors.   In that way, the debt forgiveness (which facilitated compliance with those tangible net worth requirements) provided value to both the obligor and obligee of the debt being forgiven.

124.    In my opinion, there is nothing about the debt forgiveness process that would suggest to me that the Debtors intended to treat the Intercompany Balances as anything other than debt.

Robert S. Bingham
November 13, 2013