**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>RESIDENTIAL CAPITAL, LLC, *et al.*,<br><br>          Debtors. | **FOR PUBLICATION**<br><br>Chapter 11<br>Case No. 12-12020 (MG)<br>Jointly Administered |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the estates of the Debtors,<br><br>          Plaintiff,<br><br>          v.<br><br>UMB Bank, N.A., as successor indenture trustee under that certain Indenture, dated as of June 6, 2008; and WELLS FARGO BANK, N.A., third priority collateral agent and collateral control agent under that certain Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009,<br><br>          Defendants. | Adversary Proceeding<br>No. 13-01277(MG) |
| RESIDENTIAL CAPITAL, LLC, *et al*,<br><br>          Plaintiffs,<br><br>          v.<br><br>UMB BANK, N.A., as successor indenture trustee under that certain Indenture, dated as of June 6, 2008; and WELLS FARGO BANK, N.A., third priority collateral agent and collateral control agent under that certain Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009,<br><br>          Defendants. | Adversary Proceeding<br>No. 13-01343 (MG) |

**MEMORANDUM OPINION, AND FINDINGS OF FACT AND CONCLUSIONS OF**
**LAW, AFTER PHASE I TRIAL**

*A P P E A R A N C E S:*

MORRISON & FOERSTER LLP
*Attorneys for Debtors*
1290 Avenue of the Americas
New York, NY 10104
By:    Gary S. Lee, Esq.
         Jamie A. Levitt, Esq.
         Stefan W. Engelhardt, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Counsel for the Official Creditors' Committee*
1177 Avenue of the Americas
New York, NY 10036
By:    Kenneth H. Eckstein, Esq.
         Gregory A. Horowitz, Esq.


PACHULSKI STANG ZIEHL & JONES
*Conflicts Counsel to Official Creditors' Committee*
780 Third Avenue
36th Floor
New York, NY 10017
By:    Robert J. Feinstein, Esq.
         John A. Morris, Esq.


WHITE & CASE LLP
*Attorneys for Ad Hoc Group of Junior Secured Noteholders*
1155 Avenue of the Americas
New York, NY 10036
By:    J. Christopher Shore, Esq.
         Douglas P. Baumstein, Esq.
         Dwight A. Healy, Esq.

AKIN GUMP STRAUSS HAUER & FELD LLP
*Special Counsel to UMB Bank, N.A.*
One Bryant Park
New York, NY 10036
By:    David M. Zensky, Esq.
         Deborah Newman, Esq.
         Brian T. Carney, Esq.

REED SMITH LLP
*Attorneys for Wells Fargo as Collateral Agent*
599 Lexington Avenue
22nd Floor
New York, NY 10022
By:    David M. Schlecker, Esq.


**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

ResCap and the Creditors' Committee (the "Plaintiffs") are co-proponents of a

reorganization plan that treats the junior secured noteholders ("JSNs") as undersecured, but

would pay them the face amount of all principal and prepetition interest ($ 2.222 billion, less

$1.1 billion repaid postpetition).  The JSNs voted against and oppose confirmation of the plan.

The JSNs contend they are oversecured and entitled to postpetition interest (at the default

rate) and fees; they also contend they are entitled to recover an adequate protection claim of $515

million based on alleged diminution in value of their prepetition collateral used during the case

under a series of consensual cash collateral orders.[1]  They also contend that their collateral

should be increased as the result of an "all assets" pledge, which purportedly attaches to the

Debtors' assets that (1) were once excluded from the "all assets" pledge but no longer are, (2)

were released from the JSNs' liens but were subsequently reacquired by the Debtors, or (3) were

never properly released from the JSNs' liens at all.

The Plaintiffs contend that (1) the JSNs are undersecured and, therefore, not entitled to

postpetition interest and fees; (2) the JSNs' collateral has not declined in value since the petition

date and thus the JSNs cannot assert an adequate protection claim; (3) the JSNs' collateral should

be reduced from lien challenges to deposit accounts and real estate owned ("REO") assets;

---

[1]    The value of the JSNs' purported adequate protection claim will increase or decrease based on the value of
the JSNs' Collateral on the Petition Date and on the Effective Date.  This Opinion will resolve some issues relating
to both values.

(4) the Debtors' transfers of approximately $270 million of collateral to the undersecured JSNs in the 90 days before bankruptcy are avoidable preferences; and (5) and the principal amount of the JSNs' claim must be reduced by approximately $386 million for unmatured interest arising from original issue discount ("OID") created as part of the Debtors' "fair value" debt-exchange offer in 2008.

The swing between the JSNs' projected recoveries under the proposed plan and their "ask" is at least $350 million, or perhaps more.  In other words, the parties are fighting about a lot of money.

The legal issues are framed in two adversary proceedings, one filed by the Debtors and the other by the Creditors' Committee (the "Committee") after it was given standing in an order granting an STN motion.  The two adversary proceedings, asserting both claims and counterclaims, were consolidated.  In two earlier written decisions, the Court granted in part (sometimes with prejudice and sometimes without prejudice) and denied in part motions to dismiss some of the claims and counterclaims.  (*See In re Residential Capital, LLC*, 495 B.R. 250 (Bankr. S.D.N.Y. 2013), ECF Doc. # 74, and *In re Residential Capital, LLC*, 497 B.R.403 (Bankr. S.D.N.Y. 2013), ECF Doc. # 100.[2])  Familiarity with those decisions is assumed.

The Court established an expedited schedule for discovery and trial.  The trial was bifurcated into two phases because some issues involve only the Plaintiffs and Defendants (as defined below) while other issues potentially involve other creditor constituencies in the case. The Phase I trial, conducted between October 15–23 and on November 6, 2013, was limited to disputed issues between the Plaintiffs and Defendants, to simplify the trial and limit the number of parties that felt it necessary to actively participate; the Phase II trial, involving issues potentially affecting the Plaintiffs, Defendants and a broader group of parties in interest in the

---

[2]         All docket numbers listed refer to the Adversary Proceeding Docket 13-01277, unless otherwise noted.

bankruptcy case, will be part of the contested plan confirmation hearing now scheduled to begin

on November 19, 2013.

On August 23, 2013, the parties submitted an agreed list of issues for trial.  (ECF Doc.

# 84.)  A Joint Pretrial Conference Order, approved by the Court on October 18, 2013, provides

stipulations of fact, the parties' factual and legal contentions, and exhibit and witness lists.  (ECF

Doc. # 161.)  All direct fact and expert sworn witness testimony was filed in advance, with the

witnesses in court during the trial for cross and re-direct examination.  Motions *in limine* to

preclude some of the proposed expert testimony were granted in part and denied in part.  (Oct. 16

Tr. 8:2–15.[3])  Deposition designations and counter-designations were introduced into evidence at

trial mostly without objections.[4]  Voluminous exhibits were admitted in evidence at trial, mostly

without objections. The parties' filed post-trial submissions on November 1, 2013, and

conducted closing arguments on November 6, 2013.

This Opinion resolves the legal and factual issues in the Phase I trial.  The Court

completed the Opinion quickly because the outcome of the Phase I trial impacts Phase II and the

confirmation hearing.  This Opinion contains the Court's findings of fact and conclusions of law

pursuant to FED. R. CIV. P. 52, made applicable to these adversary proceedings by FED. R.

BANKR. P. 7052.  In making its findings of fact, the Court has resolved credibility issues and the

weight appropriately given to conflicting evidence.  Where contested or disputed facts or

opinions were offered during trial, this Opinion reflects the Court's resolution of those disputes,

---

[3]     [Date] Tr. [Citation] refers to transcripts of the Phase I trial.  References to [Name] Direct [Citation] refer
to direct testimony submitted in writing before the trial began and available on the public docket.  Plaintiffs' exhibits
are referenced by number (e.g., PX 1), and Defendants' exhibits are referenced by letter (e.g., DX A).  All references
to page numbers in the Plaintiffs' exhibits refer to the PX page numbers at the bottom of each page (e.g., PX 1 at 51
refers to PX 1 at page 51 of 120.)  All references to page numbers in the Defendants' exhibits refer to the DX page
numbers at the bottom of the each page.  References to [Name] Dep. [Citation] refer to the deposition testimony
designated for the Phase I trial.  Citations to "PTO ¶ __" are to the stipulated facts contained in the Revised Joint
Pretrial Order entered in the consolidated adversary proceedings.  (ECF Doc. # 161.)

[4]     Any remaining objections to deposition designations are overruled.

whether or not the opinion specifically refers to the contrary evidence introduced by the opposing parties.

All of the issues in the Phase I trial are "core," as provided in 28 U.S.C. § 157(b)(2). Because the JSNs (through UMB, the indenture trustee) submitted a proof of claim in this case, seeking to recover all principal, prepetition and postpetition interest and fees, and have asserted an adequate protection claim, all of the issues raised and resolved in these adversary proceedings necessarily must be resolved as part of the claims-allowance process. Therefore, the Court concludes that it has the constitutional authority to enter final orders and judgment in these adversary proceedings. Because issues in these adversary proceedings remain to be resolved following the Phase II trial and confirmation hearing, no final judgment can be entered now. This Opinion does include the Court's final resolution of the issues upon which it now rules.

The results of the Phase I trial can be viewed as a split decision—some issues have been resolved in favor of the Plaintiffs and some in favor of the Defendants. Subject to the outcome of the Phase II trial, the Court concludes that the JSNs' claim should not be reduced for unmatured OID; the JSNs have failed to establish that they are entitled to recover an adequate protection claim; the JSNs have liens on certain contested collateral, including certain intangible assets, but the JSNs do not have liens on the full extent of the collateral claimed; the Plaintiffs have failed to establish that the JSNs received avoidable preferences during the preference period (as defined below); and the JSNs are undersecured and not entitled to postpetition interest and fees. As explained below, the Court concludes that (subject to the results of the Phase II trial) the JSNs are undersecured by approximately $318 million.

# I.    **BACKGROUND**

On May 14, 2012 (the "Petition Date"), the Debtors filed voluntary petitions for relief

under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued to

operate their businesses and manage their properties as debtors in possession.  Before filing for

bankruptcy, the Debtors were a leading originator of residential mortgage loans and, together

with their non-Debtor affiliates, the fifth largest servicer of residential mortgage loans in the

United States, servicing approximately $374 billion of domestic residential mortgage loans and

working with more than 2.4 million mortgage loans across the United States.  (Marano Direct

¶ 23.)

Defendant UMB Bank, N.A. ("UMB") is the successor indenture trustee (in such

capacity, the "Notes Trustee") for the 9.625% Junior Secured Guaranteed Notes due 2015 issued

by ResCap (the "Junior Secured Notes" or the "Notes").  (PTO ¶ 3.)  Wells Fargo Bank, N.A.

("Wells Fargo")—also a defendant—is the third priority collateral agent and collateral control

agent for the Junior Secured Notes.  (*Id.* ¶ 4.)  Defendant Ad Hoc Group of holders of Junior

Secured Notes (the "Ad Hoc Group" or the "JSNs" and, together with the Notes Trustee, the

"Defendants"[5]) comprises entities that hold, or manage entities that hold, Junior Secured Notes.

Membership in the Ad Hoc Group changes from time to time, as set forth in the Ad Hoc Group's

statements periodically filed with the Court pursuant to Rule 2019 of the Federal Rules of

Bankruptcy Procedure.  (*Id.* ¶ 6.)

The Defendants' claims against the Debtors' estates arise from Junior Secured Notes that

ResCap issued pursuant to an Indenture dated June 6, 2008.  (PX 1.)  Those notes and the

collateral securing those notes are discussed in greater detail below.  As of the Petition Date, the

---

[5]    Although Wells Fargo is also a defendant, this opinion refers to UMB and the Ad Hoc Group as the "Defendants" to simplify referring to those parties.

JSNs held secured claims against ResCap, and certain of its affiliates as guarantors and grantors, in the face amount of $2.222 billion, consisting of $2.120 billion in unpaid principal as of the Petition Date, and $101 million in unpaid prepetition interest.  (DX ABF at 3.)  The issue whether the face amount of the claim should be reduced by unamortized OID is discussed in section III.A below.

### A.    The Adversary Proceedings

#### 1.    Complaints and Counterclaims

In or about July 2012, the Committee began investigating what it believed to be security interests improperly asserted by the Defendants.  The Committee filed its complaint on February 28, 2013 (ECF Doc. # 1), seeking among other things (1) a declaratory judgment on claims that (a) certain of the Debtors' property is not subject to liens or security interests in favor of the JSNs, and that (b) certain liens or security interests on property of the Debtors are unperfected; (2) an order avoiding the JSNs' allegedly unperfected liens on or security interests in certain property; (3) an order avoiding as preferential certain liens or security interests allegedly granted for the Defendants' benefit within 90 days of the Petition Date; (4) an order characterizing postpetition payments to the Defendants' professionals as payments of principal;[6] (5) an order clarifying the priority of the JSNs' liens; and (6) an order disallowing  the JSNs' claims pending final resolution of the Committee's complaint; and (7) an order disallowing a portion of the JSNs' claims as a result of unmatured interest allegedly arising from the 2008 debt-for-debt exchange.  (*Id*.)

---

[6]    Paragraph 16(c)(v) of the Final Cash Collateral Order provides that the JSNs are entitled to, as part of adequate protection, prompt payment of reasonable fees and expenses, whether accrued prepetition or postpetition, for certain identified professionals.  (PX 76 at 30.)  The provision also provides that "nothing shall prejudice the rights of any party to seek to recharacterize any such payments . . . as payments of principal under the Junior Secured Notes."  (*Id*.)  The issue was not addressed by the parties during the Phase I trial.

On May 3, 2013, the Debtors filed a Complaint (ECF 13-01343, Doc. # No. 1), and filed

an Amended Complaint on June 19, 2013.  (ECF 13-01343 Doc. # 8.)  In their amended

complaint, the Debtors seek declaratory judgments, including among other things that:  (1) the

JSNs' lien on general intangibles does not include any lien on the proceeds of, or value attributed

to, the sale of assets pursuant to the Ocwen Asset Purchase Agreement dated November 2, 2012

("Ocwen APA"); (2) the JSNs are not entitled to an adequate protection replacement lien; (3) the

JSNs are not entitled to a lien on the assets that secure the Amended and Restated Loan

Agreement, dated December 30, 2009 ("AFI LOC"), or any other collateral under the Notes

Indenture (defined below) that was released by Wells Fargo; (4) the JSNs are not entitled to a

lien on any recoveries of any future avoidance actions brought by or on behalf of the Debtors'

estates; (5) the JSNs are undersecured and not entitled to postpetition interest; (6) if the JSNs are

found to be entitled to postpetition interest, the interest should be awarded at the contractual

nondefault rate of interest; and (7) the JSNs are undersecured because they are not oversecured at

any individual Debtor entity.

On June 21, 2013, the Court entered an order consolidating the Committee's action with

the Debtors' action.  (ECF Doc. # 41.)  On June 28, the Defendants filed an Answer, Affirmative

Defenses and Counterclaims to the Debtors' Amended Complaint.  (ECF 13-01343 Doc. # 14.)

On July 29, 2013, the Defendants amended their answer and counterclaims.  (ECF 13-01343

Doc. # 29.)  Those amended counterclaims seek declaratory relief:  (1) establishing the

ownership and value of the stipulated and disputed collateral and the assets pledged in support of

the JSNs; (2) establishing that the JSNs have a lien on claims against Ally Financial, Inc.

("AFI"); (3) determining the distributable value to be generated from all intercompany claims

and causes of action; (4) allocating the purchase prices of Debtor assets sold in Court-approved

7

sales; (5) establishing that the JSNs have a lien on the purportedly released assets;

(6) determining that the use of cash collateral results in diminution in the collateral's value;

(7) enforcing the Debtors' section 506(c) waiver; (8) defining the exact quantum of the direct

costs of liquidating collateral; (9) determining the amount of the JSNs' adequate protection liens;

(10) reallocating administrative expenses; (11) establishing that the JSNs are entitled to

postpetition interest, default interest, fees, and expenses; (12) determining that the claims

asserted by any residential mortgage backed security trust ("RMBS Trust"), monoline insurers,

and RMBS certificate-holders must be subordinated; and (13) establishing that the claims against

AFI identified by the Examiner[7] appointed in the chapter 11 proceedings and/or the property that

is the subject of those claims, constitute the JSNs' collateral.

### 2.    Motions to Dismiss

On April 30, 2013, UMB filed a motion to dismiss with prejudice Counts I, IV, V, VII,

XI, XII, XIII and XIV of the Committee's complaint in their entirety, and Counts III and X in

part. (ECF Doc. # 20.)  UMB later withdrew its motion to dismiss certain of those counts, and

on July 26, 2013, the Court heard oral argument on UMB's motion. (ECF. Doc. # 61.)  The

Court entered an opinion and order granting in part and denying in part UMB's motion. (ECF

Doc. # 74.)  In that opinion, the Court dismissed Count V and denied without prejudice UMB's

motion to dismiss Counts I, IV, and XIII. (*Id.*)  *See Residential Capital*, 495 B.R. at 250.

On July 16, 2013, the Defendants filed a Motion to Dismiss Counts 3 and 5 of the

Debtors' Amended Complaint. (ECF Doc. # 52.)  That same day, the Plaintiffs filed a motion to

dismiss fourteen of the Defendants' counterclaims. (ECF Doc. # 53.)  The Court heard oral

argument on both of those motions to dismiss on August 28, 2013, and subsequently issued a

---

[7]    On June 20, 2012, the Court directed that an examiner be appointed (ECF 12-12020 Doc. # 454).  On July 30, 2012, the Court approved Arthur J. Gonzalez as the examiner ("Examiner") (ECF 12-12020, Doc. # 674), and on June 26, 2013, the *Report of Arthur J. Gonzalez, as Examiner* was made publicly available (ECF Doc. # 3698).

memorandum opinion and order (1) denying the Defendants' motion without prejudice, and

(2) granting in part and denying in part the Plaintiffs' motion.  (ECF. Doc. # 100.)  *See*

*Residential Capital*, 497 B.R. at 403.

### B.   The Trial

On August 23, 2013, the parties entered into a Joint Statement of Issues, which the Court

so-ordered.  (ECF Doc. # 84.)  That statement of issues contemplated a bifurcated adjudication

whereby certain issues would be decided in a Phase I trial, and others would be decided in a

Phase II trial (if necessary).  The Phase I trial issues include (1) "[w]hether and to what extent

any unamortized portion of the alleged original issue discount on the Junior Secured

Note[holders]' claim should be disallowed as unmatured interest," (2) "valuation of each

Debtor's collateral . . . securing the JSN claims, on a debtor-by-debtor basis, and the appropriate

methodologies for conducting such valuation,"[8] (3) "[w]hether and to what extent the JSNs have

liens on various items of disputed collateral . . . including issues related to avoidance of

preferential transfers, disputed lien releases, asserted equitable liens resulting therefrom, and

potential avoidance of any such equitable liens," (4) adequate protection issues, including

"[w]hether and to what extent the JSNs' collateral has diminished in value as a result of the

Debtors' use of cash collateral; whether the JSNs are entitled to an adequate protection claim for

some or all of that value diminution; and, if the Court deems it appropriate to decide during

Phase I, whether as a matter of law the JSNs might be entitled to adequate protection for any

diminution in value associated with the Debtors' entry into the Global Settlement," (5) "the

appropriate allocation of proceeds to JSN collateral from the Debtors' asset sales to Ocwen and

Walter" (described below), (6) "[w]hether the JSNs have a lien on all or any portion of the AFI

---

[8]      The parties did not present evidence at trial of the value of the JSNs' collateral on a debtor-by-debtor basis,
but instead focused on the aggregate value of the JSNs' collateral.

Contribution,[9] and/or all or any of causes of action of the Debtors or avoidance claims that the

Debtors may bring that are being settled in the Global Settlement,"[10] and (7) "[w]hether under

section 506 of the Bankruptcy Code, the [Noteholders] may recover postpetition interest and

other fees, costs, or charges under the Indenture (a) only to the extent they are oversecured by

assets at a single Debtor entity without reference to collateral at other Debtor entities; (b) to the

extent they are oversecured with reference to all collateral held by any Debtor, collectively;

and/or (c) to the extent that the Debtors collectively have sufficient assets to pay the

[Noteholders'] claims in full and/or any particular Debtor is solvent."  (*Id*.)[11]

The Court conducted a six-day hearing on Phase I from October 15–17 and October 21–

23, 2013.  The parties submitted the written direct testimony of 13 witnesses:  Teresa Rae Farley

("Ms. Farley"), John D. Finnerty ("Dr. Finnerty"), James Gadsden ("Gadsden"), Marc E. Landy

("Mr. Landy"), Thomas Marano ("Mr. Marano"), Marc D. Puntus ("Mr. Puntus"), and Mark

Renzi ("Mr. Renzi"), for the Plaintiffs; and Michael Fazio ("Mr. Fazio"), Jeffrey M. Levine

("Mr. Levine"), Ronald J. Mann ("Mr. Mann"), P. Eric Siegert ("Mr. Siegert"), John A. Taylor

("Mr. Taylor"), and Scott Winn ("Mr. Winn"), for the Defendants.  Each of these witnesses was

subjected to cross-examination and redirect at trial.  Neither party called any rebuttal witnesses.

The Plaintiffs and the Defendants sent their final exhibit lists to the Court post trial.  More than

---

[9]        The "AFI Contribution" is a $2.1 billion cash contribution AFI agreed to make to the Debtors' estates
pursuant to the terms of the settlement among the Debtors, the Committee, AFI, and the Consenting Claimants set
forth in Article IV of the Debtors' Joint Chapter 11 Plan.

[10]        During the trial, the Court determined that issues relating to liens on the AFI Contribution would be tried in
Phase II.

[11]        The issues reserved for Phase II include (1) the value of intercompany balances, (2) the treatment of
various claimant classes, (3) allocation of the AFI Contribution, (4) the value of collateral, oversecurity, and interest
and fees if not determined in Phase I, and (5) a final calculation of the Defendants' adequate protection claim, if
applicable.  (*Id*.)

700 exhibits were admitted in evidence, some for limited purposes.  The Parties filed amended

consolidated deposition designations on October 29, 2013 (ECF Doc. # 179).

## II.   **FINDINGS OF FACT**

### A.   **The Notes, the Collateral, and the Loan Facilities**

#### 1.   *The AFI Revolver and the Junior Secured Notes*

On or about June 4, 2008, Residential Funding Company, LLC ("RFC") and GMAC

Mortgage LLC ("GMAC"), as borrowers, ResCap and certain other entities as guarantors, and

certain entities as obligors, entered into a revolving loan facility (the "Revolver") as amended

from time to time.  The Revolver was provided under a Loan Agreement (the "Original Revolver

Loan Agreement"), dated June 4, 2008 (and amended from time to time before December 30,

2009), with AFI as initial lender and lender agent.  (PTO ¶ 10; PX 5.)  To secure the obligations

under the Revolver, ResCap and certain of its subsidiaries, as grantors, granted a security interest

in favor of Wells Fargo, as First Priority Collateral Agent and Collateral Control Agent, pursuant

to a First Priority Pledge and Security Agreement and Irrevocable Proxy (the "Original Revolver

Security Agreement"), dated June 4, 2008 (and amended from time to time before December 30,

2009).  (PTO ¶ 11; PX 7.)  ResCap also issued $4.01 billion in face principal amount of Junior

Secured Notes (the "Junior Secured Notes") pursuant to an indenture dated as of June 6, 2008

(the "Notes Indenture").  (PX 1 § 1.01.)  Interest accrues on the Junior Secured Notes at an

annual 9.625% rate.[12]  (*Id.* at 8.)  ResCap issued those Junior Secured Notes with certain other

---

[12]     The Notes Indenture also provided that "[t]he [Borrower] will pay interest (including postpetition interest
in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to 1% per annum in excess of
the then applicable interest rate on the Notes to the extent lawful; it will pay interest (including postpetition interest
in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Interest (without
regard to any applicable grace period) at the same rate to the extent lawful."  (PX 1 § 4.01.)

entities serving as guarantors and obligors,[13] and with U.S. Bank National Association, as the original indenture trustee.  (*Id*.)  To secure the obligations under the notes, ResCap and the guarantors under the Notes Indenture granted a security interest in favor of Wells Fargo—the Third Priority Collateral Agent—pursuant to the Third Priority Pledge and Security Agreement and Irrevocable Proxy (the "Original JSN Security Agreement"), dated June 6, 2008 (and amended from time to time before December 30, 2009).  (PTO ¶ 13; PX 3.)

Pursuant to Original Revolver Security Agreement and the Original JSN Security Agreement, the collateral securing the Revolver was identical to the collateral securing the Junior Secured Notes.  (*See* PX 7, PX 3.)[14]  On December 30, 2009, the Original Revolver Security Agreement, the Original Revolver Loan Agreement, and Original JSN Security Agreement were amended and restated, giving rise to the "Revolver Loan Agreement," the "Revolver Security Agreement," and the "JSN Security Agreement."  Following those amendments, the collateral securing the agreements remained identical.  (*See* PX 8, PX 4.)  The Plaintiffs contend that certain collateral was later pledged to the Revolver but not to the JSNs, which the Court will address below.

Since the collateral securing the Revolver and the Junior Secured Notes was identical, the creditors entered into an Intercreditor Agreement on June 6, 2008.  (PX 2.)  That agreement governs the Revolver Collateral Agent's ability to enforce rights associated with collateral.  The governing documents expressly authorize the Collateral Agent, at the request of the Debtors, to

---

[13]    The guarantor entities that are Debtors in these chapter 11 proceedings (the "Guarantor Debtors") guaranteed ResCap's obligations under the Notes Indenture, including the obligation to pay in full all principal, interest, fees, and premiums, if any, with respect to the Junior Secured Notes.  (PX 1 § 10.01.)

[14]    ResCap also issued senior secured notes that were secured by the same collateral, but those notes were satisfied in full before the petition date and are not central to the present dispute.

release liens on the collateral previously securing the Revolver and the JSNs. Any lien releases

executed by the Revolver Collateral Agent were binding on the Junior Secured Notes.

2.    *Primary Collateral and Blanket Lien Collateral*

The Revolver and Junior Secured Notes were secured by two categories of collateral:

Primary Collateral and Blanket Lien Collateral. (PTO ¶ 12.) Primary Collateral was specifically

delineated on the schedules to the AFI Revolver and served as the borrowing base under the AFI

Revolver. Primary Collateral was subject to various operational and reporting requirements.

(Farley Direct ¶ 24; Farley Dep. 48:14–21.)

Blanket Lien Collateral encompassed the balance of the collateral pledged as security

under the AFI Revolver and not falling within the definition of "Excluded Assets."[15] (Farley

Direct ¶ 25.) The Blanket Lien Collateral included assets that were not Primary Collateral,

"whether [such assets were] now or hereafter existing, owned or acquired and wherever located

and howsoever created, arising or evidenced." (PX 3 at 11–12; *see also* PX 4 at 15.) All of the

assets that came in to ResCap (except Excluded Assets) after the parties executed the Original

JSN Security Agreement were subject to the JSNs' third priority lien due to the blanket lien.

(*See* PX 3 at 11–13; PX 4 at 15–17.)

Between the Primary and Blanket Lien Collateral, the JSNs' collateral included (1) assets

and property of ResCap, the Notes Guarantors, and the Additional Notes Grantors (other than

Excluded Assets);[16] (2) certain equity interests, certain promissory notes and other debt

instruments, certain deposit and security accounts, and certain related assets of the Notes Equity

---

[15]    *See infra* II.H.5 for discussion of Excluded Assets.

[16]    Pursuant to the JSN Security Agreement, the assets included "accounts, chattel paper, commercial tort claims, deposit accounts, financial assets, investment property, intellectual property, and general intangibles" of ResCap and the Notes Guarantors and Additional Grantors. (PX 4.) Although the JSN Security Agreement listed "Commercial Tort Claim described on Schedule V" as collateral, no commercial tort claims were identified or listed on Schedule V. Schedule V was never amended or modified. As a result, the Court previously found that the Defendants do not have a properly perfected lien on any Commercial Tort Claims. (*See* ECF Doc. # 100.)

Pledgors; (3) all "Financial Assets" (as defined in Article 8 of the U.C.C.) and certain related

assets of the FABS Grantors (as defined in the JSN Security Agreement); and (4) certain deposit

accounts and certain related assets of the Additional Account Parties (collectively, the "JSN

Collateral").  (PX 4.)

Primary Collateral could only be released if proceeds of that collateral were used to pay

down the AFI Revolver or to buy replacement collateral.  (*See* PX 1 at 56.)  Blanket Lien

Collateral, on the other hand, could be released without the same restrictive requirements.

(Farley Direct ¶ 25; Oct. 16 Tr. 180:4–8.)

The Notes Indenture and the JSN Security Agreement combined to permit the Debtors to

incur future indebtedness secured by liens, to conduct certain asset sales, and to release JSN

Collateral so long that release was part of a transaction not prohibited by the Notes Indenture.

(PX 1 §§ 1.01, 4.01, 8.04(a)(i); PX 4 § 7.)  Additionally, the Intercreditor Agreement allowed the

First Priority Collateral Agent to release liens on any collateral in connection with a sale or

disposition of the collateral allowed under the Revolver Agreements and the Junior Secured

Notes Agreement.  (PX 2 § 3.1.)  That collateral release would be binding on the JSNs.  (*Id.*)

The Debtors could only release JSN Collateral pursuant to the JSN Security Agreement, the

Notes Indenture, and the Intercreditor Agreement.  Additionally, the JSN Indenture allowed the

Debtors to move assets among their subsidiaries, and to create new subsidiaries, as long as the

JSNs continued to maintain liens on such assets.  (PX 1 § 4.7 (requiring all "Significant

Subsidiaries" to become "Guarantors" and thus also "Grantors" under the JSN Pledge

Agreement).)

3.    *The AFI LOC and Released Blanket Collateral*

In 2009, the Debtors determined that they needed additional financing to continue

operating their businesses.  To that end, on or about December 30, 2009, RFC and GMAC, as

borrowers, entered into the AFI LOC, provided under an Amended and Restated Loan

Agreement ("LOC Loan Agreement" with AFI as initial lender and lender agent).  (PTO ¶ 18;

PX 9.)  To secure the obligations under the AFI LOC, ResCap and certain other Debtors granted

a security interest to AFI pursuant to the Amended and Restated Pledge and Security Agreement

and Irrevocable Proxy, dated December 30, 2009 (as amended from time to time, the "LOC

Security Agreement") with GMAC Investment Management LLC, as secured party, and AFI, as

omnibus agent, lender agent, lender and secured party.  (PTO ¶ 19.)  Granting that security

interest to secure the AFI LOC required the First Priority Collateral Agent and Third Priority

Collateral Agent to release their respective liens on certain collateral.  (PX 134; Farley Direct

¶¶ 52–61.)

In 2010 and 2011, the Third Priority Collateral Agent released its lien on a variety of

assets included in the JSN Collateral so the collateral could be pledged to secure the AFI LOC,

including (1) certain mortgage loans, servicing rights and other assets (the "Released Loan

Collateral"), and (2) certain Freddie Mac servicing advances (the "Released Advances," and

collectively with the Released Loan Collateral, the "Released Blanket Collateral").  (PX 134.)

To effectuate the releases, the Third Priority Collateral Agent executed (1) a Partial Release of

Collateral, dated May 14, 2010, releasing the security interest in the Released Loan Collateral

that previously secured the Junior Secured Notes, and (2) a Partial Release of Collateral, dated

May 27, 2011, that released the security interest in the Released Advances that previously

secured the Junior Secured Notes (together with the May 14, 2010 release, the "Blanket

15

Releases"). (PX 130 at 1176–1305, PX 134.) The Third Priority Collateral Agent also filed

U.C.C.-3 amendments that removed the Released Blanket Collateral from the collateral set forth

in the original U.C.C.-1s (as amended) filed by the Third Priority Collateral Agent. (PX 131; PX

133.) Exhibits annexed to these U.C.C.-3s contained descriptions of the Released Blanket

Collateral that were identical to those in the Blanket Releases themselves. (*Id.*)

The May 14, 2010 release described various categories of Released Loan Collateral,

including any existing or future rights in "Subject Mortgage Loan[s]." The release defined those

loans as:

> Any Mortgage Loan (a) which is identified in a Mortgage Schedule delivered
> under the LOC Loan Agreement, (b) the carrying value of which is included in
> the calculation of the borrowing base included in a borrowing base report or a
> monthly collateral report under the LOC Loan Agreement, or (c) which is
> indicated in a Relevant Party's[17] books and records as having been pledged to the
> Lender Agent.[18]

(PX 134 at 8.) Thus, a mortgage loan listed as AFI LOC collateral on the Debtors' books and

records would qualify as a Subject Mortgage Loan that was released. The LOC Loan Agreement

defines mortgage loans to mean residential mortgage loans and any right to receive payment

from the Federal Housing Administration and Department of Veterans Affairs ("FHA/VA") for

insurance or guarantees of residential mortgage loans.[19] (PX 9 at 87; PX 10 at 100.)

Other categories of collateral released under the Blanket Loan Release included

(1) "Servicing Rights Collateral," defined as all of RFC's and GMAC's rights under existing or

future agreements pursuant to which they were obligated to perform collection, enforcement or

---

[17]    A "Relevant Party" is an obligor under the Revolver Security Agreement or the JSN Security Agreement.

[18]    AFI was the Lender Agent.

[19]    FHA/VA loans are repurchased whole loans from Ginnie Mae trusts. (DX ABI at 58.) Since these assets
are partially insured, the amounts paid by the Debtors to repurchase these loans are substantially reimbursable. (*Id.*)
The Debtors also have the choice of modifying or selling these Ginnie Mae repurchased loans to a Ginnie Mae trust
or third party. (*Id.*) The Debtors always intended to sell the FHA/VA loans but ultimately pulled the FHA loans
from the auction because they felt the bids received were not high enough. (Puntus Direct ¶ 117.)

similar services to maintain and remit funds collected from mortgagees; and (2) all intangible

assets and other general intangibles relating to Subject Mortgage Loans and Servicing Rights

Collateral.  (PX 134 at 6–8.)

    The May 27, 2011 release described various categories of Released Advances that were

being released from the JSNs' liens.  These assets included any existing and future advances

relating to mortgage loans and real estate owned property made pursuant to certain contracts with

Freddie Mac.  (*See* PX 130 at 1181–83.)

## B.    The Debtors' Books and Records

     To comply with the numerous collateral tracking and reporting requirements of the

Revolver Loan Agreement, the Debtors developed and implemented technological systems and

operational procedures.  (Farley Direct ¶ 29.)  Starting in 2008, the Consolidated Financial Data

Repository, or "CFDR," became the Debtors' primary record for tracking their assets and was

maintained in the ordinary course of the Debtors' business.  (Farley Direct ¶¶ 29–30; *see also* PX

139.)  The CFDR tracks various categories of assets, including without limitation, held for sale

("HFS") and held for investment ("HFI") mortgage loans, FHA/VA receivables, servicing

advances, lending receivables, service fees and late charges, REO property, trading securities,

and mortgage servicing rights.  (Farley Direct ¶ 30 n.4.)  Each asset is marked in the CFDR to

reflect the facility to which it has been pledged.  (Oct. 16 Tr. 194:3–10.)  Because the collateral

pools for the Revolver and the Junior Secured Notes were the same, the CFDR tracked the JSN

Collateral by tracking the Revolver collateral.  (Farley Direct ¶ 30.)

    Assets comprising Primary Collateral under the Revolver Security Agreement are tracked

and marked in the CFDR as pledged to the Revolver.  (Oct. 16 Tr. 194:3–6.)  Assets comprising

Blanket Lien Collateral under the Revolver are also tracked, but before the Petition Date, those

assets were marked as "Unpledged" in the CFDR because (1) the Debtors were not required, and

the CFDR was not used, to report on Blanket Lien Collateral; and (2) Blanket Lien Collateral

was not subject to the same constraints relating to use of proceeds as Primary Collateral.  (Farley

Direct ¶ 35.)  Not all unpledged assets constituted Blanket Lien Collateral, though, because

Excluded Assets under the Revolver Security Agreement and JSN Security Agreement would

also be listed as unpledged.  (Farley Direct ¶ 35; Oct. 16 Tr. 194:7–10.)

Shortly before the Petition Date, the Debtors updated the CFDR to comply with stricter

reporting and cash tracking requirements attendant to the bankruptcy process and recoded assets

constituting Blanket Lien Collateral from "Unpledged" to "Blanket Lien Collateral."  (Ruhlin

Dep. 119:4–9, 155:16–156:2, 156:15–21; Farley Direct ¶ 36; Farley Dep. 115:4–14.)  When the

Debtors repurposed the CFDR in 2012 and began specifically tracking blanket lien collateral,

"what [ResCap] viewed as blanket lien collateral was no longer included as unpledged.  It was

marked otherwise to be more specific that it related to pledged collateral in some way."  (Ruhlin

Dep. 119:4–9; *see also* Farley Dep. 138:4-11 ("Shortly before the filing date . . . since [ResCap

was] going to have to start reporting on all assets which had been subject to the blanket lien at

the time of the filing date, there was an effort undertaken to label all of the assets which were in

[ResCap's] view . . . subject to the blanket lien.").)

During the trial, Ms. Farley testified that the CFDR is a Sarbanes-Oxley ("SOX")

compliant financial tool that is auditable, verifiable, and subject to a heightened level of scrutiny

and attention by the Debtors'/AFI's SOX teams and the Debtors' external auditors, Deloitte &

Touche.  (Farley Direct ¶ 43; Oct. 16 Tr. 233:1–6, 234:23–235:25.)  Ms. Farley also testified that

these controls were rigorous because the CFDR was a critical financial technology for the

Debtors.  (Oct. 16 Tr. 235:24–25.)  Ms. Farley further detailed the strict controls on the collateral

18

tracking process under the CFDR, including the processes for (1) designating an asset as being

pledged to a particular facility; (2) changing an asset's designation; (3) reconciling any

inconsistencies between the CFDR data, the general ledger, and source data submitted by various

business units; and (4) submitting collateral reports under the Revolver and LOC Facility.

(Farley Direct ¶¶ 30 n.4, 33–34, 38–42; Oct. 16 Tr. 194:1–10; *see also* PX 162.)

Following Ms. Farley's testimony, over the Defendants' objection, the Court admitted the

CFDR in evidence as a business record maintained by the Debtors in the ordinary course of

business. (Oct. 17 Tr. 32:17–33:17, 40:7–41:18.) The Court expressly finds that the CFDR is a

reliable and accurate business record containing a contemporaneous record of the Debtors'

business transactions concerning the assets tracked in the system. The Court also expressly finds

that the Defendants' challenge to the CFDR is unpersuasive.

### 1.    *The CFDR and the Released Blanket Collateral*

The CFDR constituted the Debtors' books and records by which the they tracked

collateral pledged to various facilities. Thus, collateral listed as pledged to the AFI LOC in the

CFDR would meet the definition of a Subject Mortgage Loan released by the Third Party

Collateral Agent (discussed above) as part of the Blanket Releases.

The JSNs claim that they have a lien on $910 million of collateral that was identified in

the CFDR as pledged to the AFI LOC on the Petition Date. That collateral is composed of

categories of assets that were released under either of the Blanket Releases.[20] (Farley Direct

---

[20]    The $910 million questioned by the Ad Hoc Group is composed of four categories of assets (domestic
mortgage loans, FHA/VA receivables, REO properties, and servicing advances) and three of these categories
(comprising approximately 97% of the assets at issue) are covered by the Blanket Loan Release. Mortgage loans
($550.4 million) and FHA/VA receivables ($324.7 million) fall within the express definition of "Subject Mortgage
Loans." REO properties ($5.9 million) are merely proceeds obtained upon foreclosure of mortgage loans and are
therefore covered as well. (*See* DX AHD at 24 (setting forth the values of the various asset classes purportedly
lacking evidence of release).) The last category of assets questioned by the Ad Hoc Group—servicing advances
($29.4 million)—is covered by the Servicing Advance Release. The Servicing Advance Release covers Freddie
Mac servicing advances (PX 130 at 1181–83), which were the only types of servicing advances pledged as collateral

¶ 62.)  The JSNs argue that other evidence of the release of this $910 million of JSN Collateral

should exist, including schedules of mortgage loans, notices of collateral additions to the LOC

Loan Agreement, and electronic templates used to update the CFDR.  The Debtors, though,

either did not maintain all these documents or did not locate them in their searches during

discovery.  (*See* ECF 13-01343 Doc. # 117; *see also* Oct. 16 Tr. 237:6–239:14.)

Regardless, there is no dispute that $910 million of collateral is listed in the CFDR as

pledged to the AFI LOC; nor is there any dispute that the $910 million comprises categories of

assets that were released under the Blanket Releases.  In ruling on the motions to dismiss, the

Court held that the description of the collateral covered by the releases satisfied the requirements

of the Uniform Commercial Code ("U.C.C.") section 9-108(b).  *Residential Capital*, 497 B.R. at

418.  Therefore, the Court finds that the $910 million was effectively released, and no further

evidence is necessary to support those releases.  The absence of the additional records sought by

the Defendants is not sufficient to overcome the evidence that was introduced at trial.  The Court

expressly finds that a preponderance of the evidence supports the finding that the $910 million of

collateral was released from the JSNs' lien and pledged to the AFI LOC.

### C.    Events Leading Up to the Debtors' Bankruptcy

In August 2011, the Debtors began to contemplate out-of-court restructuring

opportunities, a potential chapter 11 filing, financing alternatives and asset sales.  To that end, in

October 2011, ResCap retained Centerview Partners LLC ("Centerview") to assist in this

process.  (Puntus Direct ¶¶ 1, 16, 40, 41, 43; Marano Direct ¶ 28.)  In December 2011 and

January 2012, faced with significant debt maturities coming due in spring 2012, the Debtors and

Centerview began evaluating, and launched a process to obtain, a stalking horse bid(s) for a

---

to the AFI LOC on the Petition Date.  Farley Direct ¶ 62 & n.7.  Therefore, the Servicing Advance Release covered
all servicing advances that were pledged as collateral to secure the LOC Facility.

chapter 11 sale of all or a substantial portion of the Debtors' assets.  (Puntus Direct ¶¶ 3, 16, 44;

Marano Direct ¶ 29.)  Contemplating a potential bankruptcy filing, the Debtors wanted to obtain

debtor-in-possession ("DIP") financing, secure a stalking horse bid, and continue to work with

government-sponsored entities ("GSEs") and regulators to maintain the Debtors' GSE mortgage

servicing rights ("MSRs").  (Marano Direct ¶ 31.)  The Debtors also wanted to resolve potential

claims against AFI to obtain AFI's support for the business and resolve litigation threats asserted

by RMBS trustees.  (*Id.*)

### 1.    *Stalking Horse Bids*

On or about January 23, 2012, Centerview launched a marketing process for the Debtors'

assets.  (Puntus Direct ¶ 48.)  After developing a list of potential bidders, Centerview contacted

five potential bidders and negotiated nondisclosure agreements with each one.  (*Id.*)  Centerview

made clear that the Debtors would consider bids for any and all asset combinations, including

bids on individual assets.  (*Id.*)  Centerview also opened a data room to facilitate bidder due

diligence, and the Debtors held multi-day management presentations with three of the five

potential bidders.  (*Id.*)

In February 2012, Centerview received three preliminary indications of interest from

(a) Nationstar Mortgage LLC ("Nationstar") (PX 27), (b) Ocwen Loan Servicing LLC

("Ocwen") (PX 25), and (c) a certain undisclosed financial bidder (PX 17).  The financial

bidder's letter of intent ("LOI") included a bid of $1.5 billion for the Debtors' mortgage loan

origination and servicing assets (the "Servicing and Origination Assets") and portions of the

Debtors' whole loan portfolio (the "Whole Loan Portfolio").  Nationstar also submitted an LOI,

which included a bid of $2.6 billion for a substantial portion of the Debtors' assets.  (Puntus

Direct ¶ 49.)  Ocwen's initial LOI was a bid of $1.426 billion to acquire solely the Debtors'

private label securitization ("PLS") MSRs and associated advances.  (*Id.*)  The Debtors and their

advisors determined that proceeding with two of the three bidders—Nationstar and the financial

bidder—was most prudent.  (*Id.* ¶ 50.)  Centerview then approached each of the two with a

detailed request for supplemental information.  (*Id.*)  To that end, on February 22, 2012,

Centerview sent a letter to Fortress Investment Group LLC ("Fortress")—Nationstar's primary

shareholder—requesting additional clarification related to Nationstar's bid.  (PX 366.)

Centerview asked Nationstar to clarify how it would allocate its bid among the purchased assets,

"including but not limited to a separate allocation for each of the financial assets (MSR,

advances, whole loan portfolio) as well as the servicing and origination platforms,

respectively."[21]  (*Id.*)  In its response to Centerview's questions about bid allocation, Fortress

specified that it would allocate no value to either the consumer lending or servicing platforms.

(PX 28 at 2.)

Nationstar submitted a revised LOI on February 28, 2012, increasing the purchase price

on assets included in its initial bid by $100 million, and expanding the assets purchased to

include GSE and PLS advances.  (Puntus Direct ¶ 51.)  It also increased its total bid for the

Debtors' mortgage loan origination and servicing assets and Whole Loan Portfolio to $4.2 billion

for the Debtors' mortgage loan origination and servicing assets and Whole Loan Portfolio.  (*Id.*)

Nationstar's bid on the Whole Loan Portfolio was contingent on AFI providing better-than-

market debt financing for such portfolio.  (*Id.*)  After this bid, the Debtors decided to proceed

with Nationstar as the exclusive bidder on the assets.  (*Id.* ¶ 52.)  In early March 2012, the

Debtors and their advisers negotiated the terms of the asset purchase agreement with Nationstar

---

[21]    The servicing platform related to the MSRs includes, *inter alia*, software servicing contracts, employee
contracts and certain other operating expenses relating to the MSRs (Oct. 15 Tr. 171: 8–17), and the origination
platform related to the MSRs includes the call center.  (Oct. 15 Tr. 172: 1–6.)

(the "Nationstar APA"), and Nationstar completed its analysis of the Debtors' business.

(*Id.* ¶ 55.)

During April and May of 2012, AFI decided not to provide Nationstar debt financing related to the Debtors' Whole Loan Portfolio, and offered its own bid of $1.4 to $1.6 billion to acquire those assets, depending on whether the sale was effectuated through a section 363 sale or chapter 11 plan. (*Id.* ¶ 56.) AFI's decision not to provide financing caused the value of Nationstar's overall bid to decrease. (*See* PX 52 at 6.) The Debtors' professionals determined that AFI's bid to acquire the Whole Loan Portfolio was superior to Nationstar's bid for those assets, particularly because AFI was not seeking any stalking horse protections in connection with the sale and had submitted a draft asset purchase agreement with very favorable terms for the Debtors. (Puntus Direct ¶ 56.) Thus, the Debtors and their advisors negotiated the terms of an asset purchase agreement with AFI (the "AFI APA").

The Debtors' Board of Directors approved both APAs. (*Id.* ¶ 57.) On May 13, 2012, both APAs were executed and delivered by the parties. (*Id.*) On the Petition Date, the Debtors filed two stalking horse bids with the Bankruptcy Court: Nationstar's $2.3 billion stalking horse bid for the Debtors' mortgage loan origination and servicing assets (encompassed in the Nationstar APA), and AFI's $1.4 to 1.6 billion bid for the Debtors' Whole Loan Portfolio (encompassed in the AFI APA). (Puntus Direct ¶ 57; Marano Direct ¶ 58.)

### 2. *Communications and Settlements with Various Parties*

During the prepetition auction process, the Debtors regularly communicated with the GSEs concerning the proposed agreement and plans for maintaining the Debtors' origination and servicing operations as a going concern until closing of the final sale to preserve the value of the MSRs and associated advances. (Marano Direct ¶ 50; Puntus Direct ¶ 45.) Through these

regular contacts, the Debtors convinced the GSEs that the Debtors could sell the assets without damaging the MSRs and associated advances. (Puntus Direct ¶ 46.) The stakes were high: if the GSEs had concluded that ResCap could not operate or credibly pursue an orderly sale of the mortgage servicing assets, and that the GSE-related assets might therefore have been subject to liquidation, the GSEs would raise the cost of doing business and seize their assets. (Marano Direct ¶ 51.) By obtaining financing, use of cash, continuity of management through the end of sale, and a stalking horse bidder, the Debtors reassured the GSEs that during the chapter 11 sale process, the Debtors' business would continue to function as usual pending the sale. (*Id.*)

Before the Petition Date, the Debtors negotiated a settlement with the Department of Justice, the Department of Housing and Urban Development, and the attorneys general of 49 states (the "DOJ/AG Settlement") to resolve potential claims arising out of origination and servicing activities and foreclosure matters. (*Id.* ¶ 7.) The DOJ/AG Settlement required that the Debtors pay approximately $110 million in cash and provide various specified forms of borrower relief with a value of at least $200 million and that the Debtors—and any purchaser of the Debtors' assets—implement a remedial program of loan modification and enhanced servicing measures, both subject to ongoing regulatory monitoring and oversight, and imposed increased operational costs. (*Id.* ¶ 53.) Also before the bankruptcy filing, the Debtors entered into a consent order settling an investigation by the Federal Reserve Board (the "FRB Consent Order") arising out of the same general facts as the DOJ/AG Settlement. (*Id.* ¶ 54.) The terms of the FRB Consent Order required ResCap to pay a penalty of $207 million, as well as to enhance various aspects of their origination and servicing business, including their compliance and internal audit programs, internal audit, communications with borrowers, vendor management, employee training, and oversight by the Board of Directors. (*Id.*) The Consent Order required

24

the Debtors—and any purchaser of the Debtors' assets—to maintain compliance with the terms

of the order.[22]  (*Id.*)

### 3.    *Prepetition Settlements and Plan Support Agreements*

Before the Petition Date, the Debtors entered into plan support agreements with AFI and

certain other parties in interest—including certain of the current Ad Hoc Group members—

whereby the parties committed to support, subject to certain terms and conditions, the Debtors'

effort to pursue a chapter 11 plan pursuant to the terms provided in the Plan Term Sheet, dated

May 14, 2012 (the "Prepetition Plan Term Sheet").  (PX 432.)  The Prepetition Plan Term Sheet

contemplated, among other things, that AFI would make a cash contribution in exchange for

estate and third party releases.  (PTO ¶ 24.)  The Debtors and AFI reached a prepetition

settlement approved by the ResCap board on May 13, 2012 (the "Original AFI Settlement").

(Marano Direct ¶ 40.)  That settlement was memorialized in a Plan Sponsor Agreement.  (*Id.*)

Under the terms of the Original AFI Settlement, AFI agreed to pay the Debtors $750 million,

continue to support the Debtors' origination business in chapter 11, provide a stalking horse bid

for the Whole Loan Portfolio, provide DIP financing, and continue to provide the Debtors the

shared services it needed to run its business.  (*Id*. ¶ 41.)  The Original AFI Settlement and Plan

Sponsor Agreement also provided for the automatic termination of the agreements if the Court

did not approve a chapter 11 plan on or before October 31, 2012.  AFI and the Debtors agreed to

monthly waivers of this automatic termination through February 28, 2013.  (*Id*. ¶ 41; Puntus

Direct ¶ 35.)

Under the plan support agreement entered into with the JSNs (the "JSN PSA"), the JSNs

would have waived all rights to postpetition interest through December 31, 2012, so long as no

---

[22]        A significant modification of the FRB Consent Order—effectively reducing the Debtors' costs of
compliance—was negotiated during this case and approved by the Court.

unsecured creditor received postpetition interest, the JSN PSA did not terminate, and the effective date of the plan occurred by December 31, 2012, or (1) the closing of contemplated asset sales occurred by December 31, 2012, and (2) the effective date of the plan occurred by March 31, 2013.  (Puntus Direct ¶ 33.)  The JSN PSA also would have provided that AFI would subordinate a portion of its liens and claims to the JSNs.  (*Id.*)

At the same time that the Debtors were negotiating with AFI, they were also negotiating with the trustees of certain RMBS trusts (the "RMBS Trusts") for which the Debtors acted as sponsor, depositor, or in a similar capacity.  (*Id.* ¶ 37.)  These negotiations related to resolution of approximately $44 billion of potential liability for representation and warranty and servicing claims arising out of the Debtors' private-label residential mortgage backed securities.  (Marano Direct ¶ 43.)  The Debtors believed that resolving these private-label securities claims was crucial to enhancing the value of the Debtors' assets for a potential sale.  (*Id.*)  The overhang of this litigation exposure had impeded the Debtors' sale efforts in the years before the chapter 11 filing and would have diminished the value the Debtors' creditors could have obtained in a chapter 11 sale.  (*Id.*)  Further, the RMBS Trustees (the "RMBS Trustees") threatened to assert the right to withhold servicing advances owed to the Debtors as an offset against origination and servicing liabilities allegedly owed to them.  (*Id.*)

In May 2012, the Debtors reached a proposed settlement with the institutional investors holding a substantial stake in the RMBS Trusts (the "RMBS Settlement").  (*Id.* ¶ 44.)  ResCap's board of directors approved that agreement on May 13, 2012.  (*Id.*)

With the stalking horse bids, proposed settlements, and plan support agreements in place, the Debtors filed their chapter 11 cases on May 14, 2012.  Any notion that the Court was being

presented with a pre-packaged bankruptcy was short-lived, however, and these cases rapidly

descended into warfare threatening the Debtors' ability to continue operating as a going concern.

### 4.    Termination of the Initial Plan Support Agreements

By late September 2012, two events occurred that altered the calculus of the JSNs who

supported the prepetition PSA.  (Siegert Direct ¶ 12.)  First, with the auction still a month away,

there was no longer any possibility of an expedited distribution upon a rapid sale closing.  (*Id.*)

Second, the Committee challenged certain of the JSNs' liens within the challenge period

prescribed by the Cash Collateral Order.  (*Id.*)  The Ad Hoc Group then terminated the

prepetition term sheet and inserted an express reservation of rights regarding adequate protection

and allocation of expenses in each extension of the Cash Collateral Order.  (*Id.*)

### D.    The Cash Collateral Order

To keep their business operating as debtors-in-possession, the Debtors sought to obtain

postpetition financing and authorization to use the cash collateral encumbered by existing debt

facilities.  (Marano Direct ¶ 33; Puntus Direct ¶ 17.)  The continued funding would allow the

Debtors to (1) continue to issue loans and offer loan modifications to thousands of borrowers;

(2) continue to service mortgages and make advances associated with such servicing obligations;

(3) comply with the Federal Reserve and FDIC consent order; (4) comply with the DOJ/AG

Settlement; (5) comply with the agreements that had been entered into with the GSEs mandating

the care with which their loans should be serviced and refinanced, and repurchase loans from the

GSEs; and (6) maintain hundreds of employees through retention payments so that delinquencies

would not increase and thus diminish the value of, and jeopardize the sale of, the Debtors' MSRs

and other assets.  (Marano Direct ¶ 34.)  For example, the Debtors needed to continue funding

their servicing advance obligations for the RMBS and other PLS, as well as GSE loans.  (*Id.* ¶

27

35.)  With respect to the GSE loans, the GSEs actually owned the Debtors' servicing rights, so if the Debtors failed to make the requisite advances, the GSEs could have revoked the Debtors' servicing rights, and re-assigned those rights to another company.  (Marano Direct ¶ 35; Puntus Direct ¶ 19.)

The Debtors ultimately obtained DIP financing facilities from Barclays Bank PLC and AFI, as well as consensual use of cash collateral from their prepetition lenders, including the JSNs.  (Marano Direct ¶ 37.)  On May 14, 2012, the Debtors filed motions seeking authorization to (1) enter the Barclays postpetition financing facility (the "Barclays DIP Facility"); (2) make postpetition draws under the AFI LOC up to $200 million; and (3) use cash collateral securing each of the Revolver, the AFI LOC, and the Junior Secured Notes to fund the cash needs related to operations and assets of each of the respective collateral pools.  (*Id.*; Puntus Direct ¶ 28.)  The motions were approved on an interim basis on May 15, 2012, and were approved on a final basis, with the consent of the JSNs and AFI, pursuant to orders entered on June 25, 2012 (the "Cash Collateral Order").  (PX 76; Marano Direct ¶ 37.)

Under the Cash Collateral Order, the Debtors were authorized to use cash collateral in accordance with the Forecasts (as defined in the Cash Collateral Order), and the JSNs were protected to the extent of the aggregate diminution in value of the JSN Collateral.  (PTO ¶ 29.)  Among other things, the JSNs were granted adequate protection liens on all of the collateral securing the AFI Revolver, the AFI LOC, and all of the equity interests of the Barclays DIP Borrowers.  (PX 76.)

The parties dispute whether, in determining an adequate protection claim based on diminution in value of collateral, the value of the collateral at the Petition Date should be determined by the foreclosure value of the collateral in the hands of the secured creditor (as

argued by the Plaintiffs), or by the going concern value of the collateral in the hands of the

Debtors (as argued by the Defendants).  The legal issue is discussed below in section III.B.3.

The Defendants' expert Mr. Siegert testified that when negotiating the Cash Collateral Order, the

parties never discussed that adequate protection and diminution in value of JSN Collateral would

be determined using foreclosure value.  (Oct. 23 Tr. 195:9–13.)  According to Mr. Siegert, that

would have been contrary to the spirit of the negotiations, which were aimed at easing the

Debtors' bankruptcy filing.  (DX AIJ at 7.)

     The Forecasts provided for the pro rata allocation of the cash disbursements during the

relevant period to various silos of assets securing the Debtors' various secured credit facilities, as

well as to unencumbered assets.  (Puntus Direct ¶ 26.)  The Debtors delivered updated Forecasts

to the JSNs and AFI every four weeks as required by the Cash Collateral Order, and, although

the JSNs did not have consent rights, at no point during the case did they object to any Forecast.

(*Id*.)  The Cash Collateral Order also obligated the Debtors to deliver to the JSNs a 20-week

forecast of anticipated cash receipts and disbursements for the 20-week period.  (PX 76 at 22.)

The Debtors were only permitted to use cash collateral for the "purposes detailed within the

Initial 20-Week Forecast and each subsequent Forecast."  (*Id*. at 23–24.)

     The Cash Collateral Order contained a waiver of the Debtors' right to surcharge against

prepetition collateral pursuant to Bankruptcy Code section 506(c).  (PX 76 at 42–43.)

Specifically, the Cash Collateral Order states that:  "[N]o expenses of administration of the

Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in

bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or

recovered from the Prepetition Collateral and [Cash] Collateral pursuant to sections 105 or

506(c) of the Bankruptcy Code . . . ."  (*Id.*)  The Cash Collateral Order also expressly waived the

"equities of the case" exception contained in section 552(b) of the Code.  (*Id.* at 35.)

The Debtors negotiated several extensions regarding the use of the cash collateral of AFI

and the JSNs, including a stipulation entered on June 28, 2013.  (ECF 12-12020 Doc. # 4115.)

On July 10, 2013, the Court entered the Stipulation and Order in Respect of the Debtors' Motion

for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral (ECF 12-12020

Doc. # 3374) (the "Cash Collateral Stipulation") among the Debtors, AFI, and the JSNs, which

terminated the use of cash collateral effective as of July 11, 2013, with certain limited

exceptions.  (PX 85 ¶ 2.)

The Debtors also negotiated a "Carve Out" in the Cash Collateral Order (PX 76 at 31–

32.)  The Cash Collateral Stipulation served as the Carve Out Notice.  No party disputes that a

section 506(c) waiver was provided for the benefit of the JSNs.  The parties dispute whether the

JSNs are entitled to an adequate protection claim for amounts of cash collateral expended by the

Debtors consistent with the agreed budget under the Cash Collateral Order.  The issue also

remains whether the Debtors may use an additional $143 million of the JSNs' cash collateral

covered by the Carve Out in the Cash Collateral Order after the termination of the use of cash

collateral where sufficient unencumbered cash is available to make the payments.  The issue is

addressed below in section III.D.8.

### E.        Stipulation of Liens under the Cash Collateral Order

In the Cash Collateral Order, the Debtors stipulated that the JSNs' collateral included, but

was not limited to, all categories of assets identified in the "Ally Revolver" and "Blanket"

columns on Exhibit A to the Cash Collateral Order.  (PTO ¶ 28.)  The Debtors further stipulated,

pursuant to paragraph 5(g) of the Cash Collateral Order, that security interests granted to the

JSNs "are valid, binding, perfected and enforceable priority liens on and security interests in the

personal and real property constituting 'Collateral' under and as defined in the Junior Secured

Note Documents." (PX 76 at 11–12.) Under the Cash Collateral Order, the "Junior Note

Documents" included the JSN Security Agreement, the Notes Indenture, "and all other

documents executed in connection therewith." (*Id.* at 4) The Defendants contend that, under

paragraph 5(g), the Debtors stipulated that the JSNs' liens extend to all collateral to which a

security interest was initially granted, including the AFI LOC Collateral that was previously

released by the Third Priority Collateral Agent under the Blanket Release. (PTO JSN

Contentions ¶ 18.) The JSNs' witness, Mr. Siegert—the lead engagement partner for Houlihan

Lokey Capital, Inc. ("Houlihan")—testified that as of the Petition Date, he had no belief that the

Debtors' stipulations in paragraph 5(g) would revive the JSNs' previously released liens. (Oct.

23 Tr. 102:4–6, 102:19–24, 105:3–25, 115:4–8, 125:12–126:15, 126:23–127:21.) Mr. Siegert

explained that if counsel for the JSNs had concluded that paragraph 5(g) would revive more than

$1 billion of AFI LOC Collateral, that would have been material information for Houlihan and

the Ad Hoc Group to know, as well as a material factor in estimating the value of the JSNs'

liens. (Oct. 23 Tr. 127:25–128:16.) But Houlihan's May 14, 2012 public presentation (the "May

14 Presentation") that presented an estimation of the JSNs' recovery on their prepetition

collateral did not incorporate or disclose the existence of the billion dollars of AFI LOC

Collateral. (PX 169; Oct. 23 Tr. 128:17–21; 132:18–133:4.) Mr. Siegert testified that if

Houlihan had known that paragraph 5(g) revived $1 billion worth of JSNs' liens, it would have

incorporated that fact in the May 14 Presentation. (Oct. 23 Tr. 128:23–133:4.)

Further, in paragraph 5(g), the Debtors stipulated that the JSNs' liens are "subject and

subordinate only" to those prepetition liens that were granted under the Revolver. (PX 76 at 11–

12.)  But this provision does not subordinate the JSNs' purported lien on the AFI LOC Collateral to AFI (i.e., the lender).  So under the Defendants' proposed interpretation of paragraph 5(g), the JSNs' purported liens on the AFI LOC Collateral would be elevated ahead of the AFI's liens in that same collateral.  Additionally, while granting the JSNs a postpetition adequate protection lien on the Revolver Collateral and the AFI LOC Collateral, the Cash Collateral Order subordinated those liens to any existing liens on the same collateral.  To that end, with respect to the JSNs' adequate protection lien on the Revolver Collateral the Order acknowledges that the lien is junior to the "existing liens granted to the Junior Secured Parties."  (*Id.* at 28.) With respect to AFI LOC Collateral, though, the Cash Collateral Order does not mention the JSNs' purported existing lien on that collateral.  (*Id*. at 28–29.)

Other documents also indicate that paragraph 5(g) was not intended to revive any previously released JSN liens.  For example, in the JSN PSA, the JSNs expressly reserved the right to make a claim for an equitable lien on the AFI LOC Collateral.  (PX 252 § 5.6.)  That would have been superfluous if the JSNs believed that paragraph 5(g) already granted them a lien on that collateral.  Moreover, when the Debtors sought approval of the Barclays DIP Facility, they argued that any asserted equitable JSN lien on the AFI LOC Collateral was invalid and not perfected.  (PX 88 at 55.)  That position would have been inconsistent with a stipulation granting the JSNs a lien on that collateral in paragraph 5(g).  Neither the motion for approval of the use of cash collateral, nor any disclosures to the Court in connection with the interim or final cash collateral orders, disclose that the JSNs believed they were getting a perfected security interest in any previously released collateral.

### F.    The Asset Sales

On the Petition Date, the Debtors filed motions to approve stalking horse bids from AFI and Nationstar with respect to the Debtors' Whole Loan Portfolio and Servicing and Origination Assets, respectively.  (*See* PX 61.)  The Debtors entered into the initial stalking-horse bid with Nationstar to sell the servicing, origination, and capital markets platforms (which included people, software, and IT) of the Debtors.  (PX 33.)  The Debtors also agreed to sell Nationstar contracts, servicing agreements, MSRs owned by the Debtors, certain Ginnie Mae-guaranteed whole loans, and intellectual property, goodwill, and general intangibles "Related to the Business" for $2.3 billion. (*Id*. at 38–41.)

After the Petition Date, on June 15, 2012, Berkshire Hathaway, Inc. ("Berkshire") submitted competing bids to become the stalking horse bidder for both sets of assets.  (Puntus Direct ¶ 59.)  The bids, which were submitted without Berkshire having performed any due diligence, were in the form of executed asset purchase agreements virtually identical to the agreements executed by Nationstar (for the Servicing and Origination Assets) and AFI (for the Whole Loan Portfolio).  (*Id*.)  Due, at least in part, to Berkshire's bids, a "pre-auction" auction (the "Mini Auction") ensued in advance of and during the sale procedures hearing, with the Court ultimately directing that final proposed stalking horse bids be submitted to the Debtors on June 18, 2012.  (*Id*.)  In accordance with the Court's direction, both Nationstar and Berkshire submitted revised stalking horse bids.  (*Id*.)  With the support of the Committee, the Debtors sought and obtained Court approval of the Nationstar and Berkshire stalking horse bids and the bid and sales procedures at a hearing on June 19, 2012.[23]  (*Id*. ¶ 60.)

---

[23]    The Mini Auction resulted in increases in the sales prices by a total of $150 million, as well as a reduction in the proposed break-up fees for the origination and servicing platform.

In the lead-up to the Asset Sales, the Debtors maintained the servicing and origination platforms as going concerns. (Marano Direct ¶¶ 50–51.) The Debtors considered, but rejected, the possibility of liquidation, because, according to Mr. Marano, the Debtors did not believe that a liquidation was in the best interests of the creditors, and the Debtors did "everything [they] could" to prevent a foreclosure. (Oct. 15 Tr. 164:10–25.)

### 1.    The Servicing and Origination Assets Sale

The Court approved the sale and bid procedures with respect to the Servicing and Origination Assets (PX 44), and Centerview approached those institutions that it believed would have an interest in purchasing, and the financial resources and expertise necessary to purchase, the Servicing and Origination Assets, to gauge their respective interest. (Puntus Direct ¶ 61.) Following these initial contacts and an introductory due diligence period for interested parties, the Debtors' management team and Centerview made formal presentations to five prospective purchasers, during which they described in detail the Servicing and Origination Assets being sold and afforded them an opportunity to visit the Debtors' locations and perform detailed on-site due diligence with the Debtors' business units. (*Id*.) The Debtors received responses from three potential purchasers: (1) Berkshire, (2) a consortium of two bidders, and (3) a consortium composed of Ocwen and Walter Investment Management Corporation ("Walter"). (*Id.* ¶ 63.) The Debtors focused their marketing efforts on these three potential purchasers. (*Id*.)

On October 19, 2012, the Debtors received two qualifying bids for the Servicing and Origination Assets: (1) the stalking horse bid previously submitted by Nationstar at a value of $2.357 billion; and (2) a bid from Ocwen and Walter at a value of $2.397 billion. (PX 48; PX 47.) The Debtors determined that the Ocwen bid was the highest and best bid for the Servicing and Origination Assets and decided that they would open the auction with the Ocwen bid.

(Puntus Direct ¶ 64; PTO ¶ 34.)  On October 23, 2012, the Debtors began the auction for the Servicing and Origination Assets with Ocwen's bid as the opening bid.  Two bidders, Nationstar and Ocwen, submitted offers for these assets.  Although Ocwen was a bidder of record for these assets, the Ocwen APA provided for the assignment of the Debtors' Fannie Mae assets to Walter.  (PX 47; Puntus Direct ¶ 69.)

During the auction, the Debtors negotiated with Nationstar and Ocwen to obtain certain adjustments to their bids and asset purchase agreements.  As required by Ginnie Mae, both bidders agreed to remove the Ginnie Mae liability bifurcation condition in the asset purchase agreements.  (Puntus Direct ¶ 71.)  Consequently, Ginnie Mae would be able to seek satisfaction of all liabilities relating to Ginnie Mae loans, either pre- or post-closing, related to servicing or origination, from the purchaser of the Servicing and Origination Assets.  (*Id*.)  Also, although both Ocwen's and Nationstar's bid did not contractually obligate them to acquire the servicing and origination platforms, both bidders agreed to include a commitment to acquire the platforms and associated liabilities as part of the bid.  (Puntus Direct ¶ 72; Marano Direct ¶ 62.)  To induce Ocwen and Nationstar to make this commitment, the Debtors offered the bidders a bid credit in the amount of $108.4 million, which represented the estimated liabilities associated with the platforms.  (PX 56 at 37–41; Puntus Direct ¶ 72.)  After 28 rounds of bidding, Ocwen made the highest and best offer to purchase the Debtors' Servicing and Origination Assets for itself and Walter, with a winning purchase price of approximately $3 billion.  (PX 57 at 9–10.)  The Court approved the Ocwen Sale on November 19, 2012, and entered an Order approving the asset sales on November 21, 2012.  (PX 45; Puntus Direct ¶ 79; PTO ¶ 36.)

The parties effectuated the Ocwen Sale through the Ocwen APA, dated as of November 2, 2012 (and as later amended), among Ocwen, ResCap, and certain other Debtor signatories.

(PX 19; PX 20; PX 21; PX 22; PX 23; PX 24; PTO ¶ 37.)  The Ocwen APA provided that

Ocwen was buying "goodwill and other intangible assets Related to the Business or related to the

Purchased Assets."  (DXPT at 41.)  In total, over 2,000 ResCap employees, including those

associated with call centers and management, were "migrat[ed]" to Ocwen as part of the

purchase of ResCap's servicing and origination platform with no significant reduction in

personnel.  (Ziegenfuse Dep. 63:16–19:6, 65:7–21, 67:17–23.)

In the APA, Ocwen attributed zero value to goodwill and intangibles, but in a subsequent

10-Q filing, the company attributed approximately $210 million to those assets.  (DX ZH at 30.)

The APA contains a provision that any purchase price allocation in the APA would only bind the

parties for tax purposes, and not for any other purpose.  (PX 19 at 50.)  The parties dispute

whether a portion of the purchase price must be allocated to general intangibles and goodwill, as

to which the JSNs claim to have a perfected lien.

### 2.    The Whole Loan Portfolio Sale

Contemporaneously with the marketing process for the Servicing and Origination Assets,

Centerview considered those institutions that it believed would be interested in and financially

capable of purchasing the Whole Loan Portfolio.  (Puntus Direct ¶ 65.)  Centerview approached

those potential purchasers to gauge their respective interest.  (*Id.*)  On October 19, 2012, the bid

deadline approved by the Court, the Debtors received two qualifying bids for the Whole Loan

Portfolio:  (1) the stalking horse bid previously submitted by Berkshire at a value of $1.324

billion; and (2) a bid from a consortium of four financial bidders led by DLJ Mortgage Capital

(the "DLJ Consortium") at a value of $1.339 billion.  (*Id.* ¶ 66)  The Debtors determined that the

DLJ Consortium bid was the highest and best bid for the Whole Loan Portfolio and decided that

they would open the auction with the DLJ Consortium bid.  (*Id.*; PTO ¶ 35.)

On October 25, 2012, ResCap held an auction for its Whole Loan Portfolio.  (Puntus

Direct ¶ 79.)  After 11 rounds of bidding, Berkshire won the auction with the highest and best

offer of $1.5 billion, an amount $175 million higher than the original stalking horse bid.  (*Id.*; PX

58 at 22–23.)   Before the auction, Berkshire had agreed to continue compliance with certain

aspects of the FRB Consent Order and the DOJ/AG Settlement.  (Puntus Direct ¶ 79.)  The Court

approved the Berkshire sale on November 19, 2012, and entered an order approving the asset

sales on November 21, 2012.  (ECF 12-12020 Doc. # 2247; PX 46.)

### G.     Facts related to Original Issue Discount

The Junior Secured Notes were issued in connection with a 2008 debt-for-debt exchange

offering (the "Exchange").  On May 5, 2008, ResCap issued an Offering Memorandum in which

it offered to exchange $9.537 billion face value amount of its then-outstanding unsecured notes

maturing from 2010 through 2015 (the "Old Notes") for the Junior Secured Notes.  (PTO ¶ 7; PX

175.)  Under the Exchange, ResCap offered to exchange $1,000 face principal amount of

outstanding unsecured notes for $800 face value of Junior Secured Notes.  (PTO ¶ 8.)  Pursuant

to a modified Dutch Auction, the clearing price was $650 per $1,000 principal amount of Junior

Secured Notes, which was the lowest level at which tenders were accepted.  (*Id.*)  Through the

Exchange, ResCap exchanged approximately $6 billion of Old Notes for approximately $4

billion in Junior Secured Notes and $500 million in cash.  Approximately 63% of the Old Notes

were exchanged in the Exchange.  (*Id.* ¶ 9.)  The issue price of the Junior Secured Notes was

established as $613.75 based on trading activity from the first day of trading.  Using this price,

AFI calculated the amount of OID for tax purposes as of the Petition Date to be $377,262,728.

(*Id.* ¶ 52; PX 189; Finnerty Direct ¶ 55.)  As an economic matter the Exchange created OID.

(Finnerty Direct ¶ 10.)  AFI amortized the OID by compounding it on a semi-annual basis.

Amortizing OID on a daily compounding basis results in a slightly larger amount of OID:  $386 million.  (*Id*. ¶ 60.)

The Plaintiffs argue that the OID should be disallowed in bankruptcy as unmatured interest.  The Defendants, on the other hand, argue that the OID should be allowed as part of their claim based on Second Circuit precedent.  The Plaintiffs and Defendants each offered expert testimony on issues relating to the bankruptcy treatment of the OID generated in the Exchange.  John D. Finnerty, Ph.D., a Managing Director in the Financial Advisory Services Group at AlixPartners, LLP and Professor of Finance at Fordham University's Graduate School of Business Administration, testified on behalf of the Plaintiffs, and Mr. Siegert testified on behalf of the Defendants.

The parties do not dispute that the Exchange was a "fair value" exchange—*i.e.*, that old securities were exchanged for new securities with a reduced principal amount that in theory approximated the market value of the old securities.  The Second Circuit's decision in *LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.)*, 961 F.2d 378 (2d Cir. 1992), addressed the bankruptcy treatment of OID generated in connection with a "face value" exchange—*i.e.*, one in which the principal amount of the debt is not reduced.[24]  (Finnerty Direct ¶ 102; Oct. 21 Tr. 151:11–14.)  The experts also agreed that investors in the Notes were sophisticated investors who understood how to analyze risks associated with investing in OID bonds.  (Finnerty Direct ¶ 92; Oct. 21 Tr. 184:8-11.)

---

[24]    The Second Circuit explained the distinction between the two types of exchanges, writing:

> An exchange offer made by a financially troubled company can be either a "fair market value exchange" or a "face value exchange."  In a fair market value exchange, an existing debt instrument is exchanged for a new one with a reduced principal amount, determined by the market value at which the existing instrument is trading.  By offering a fair market value exchange, an issuer seeks to reduce its overall debt obligations. . . .  A face value exchange, by contrast, involves the substitution of new indebtedness for an existing debenture, modifying terms or conditions but not reducing the principal amount of the debt.

*Chateaugay*, 961 F.2d at 381–82 (citations omitted).

In addition, Dr. Finnerty calculated that using semi-annual compounding, $377 million in OID remained unamortized as of the Petition Date. (Finnerty Direct, App'x 6A.) Dr. Finnerty, though, believed that daily compounding was the more appropriate method, which he calculated to yield $386 million of unamortized OID as of the Petition Date. (*Id.* at App'x 6B.) Mr. Siegert, on the other hand, testified that he believed that semi-annual compounding was the best method. (*See* Oct. 21 Tr. 163:21-25.)

Dr. Finnerty stressed the economic incentives built into the Exchange: yield, security, and seniority. (Finnerty Direct ¶ 62.) In addition, the Exchange allowed ResCap to reduce its overall debt obligations and extend its debt maturities, thereby enhancing the credit strength of the JSNs' obligor, allowing ResCap to avoid bankruptcy for four more years. (*Id.*) In fact, the JSNs will achieve a greater recovery than the noteholders who did not exchange and whose notes remained outstanding on the Petition Date. The Debtors Disclosure Statement (ECF 12-12020 Doc. # 4811) indicates that while the hold-outs have retained a $1,000 par amount unsecured claim, they are projected to recover only 36.3%, or $363.00. (Finnerty Direct ¶ 88.) In contrast, the holders of the JSNs, who received $800 of new secured notes in June 2008, are projected to recover $840. (*Id.*) The Exchange was attractive—and future exchanges could likewise be attractive regardless of the bankruptcy treatment of OID—because of the competitive effective yield of the Junior Secured Notes at issuance, the fact that the Junior Secured Notes, unlike the Old Notes, were secured, and the fact that the Junior Secured Notes were structurally senior to the Old Notes. (*Id.* ¶¶ 62–67, 93.)

Mr. Siegert, in contrast, testified, among other things, that: (1) the disclosures made by ResCap in the Exchange, along with general market evidence, are inconsistent with the conclusion that the Exchange generated disallowable OID for bankruptcy purposes; and

(2) disallowing OID in fair value exchanges such as the Exchange would likely cause debt-holders to either reject such exchanges or demand more from distressed companies, thereby discouraging out-of-court workouts and leading to a greater number of bankruptcies.  (Siegert Direct ¶ 30.)  Mr. Siegert noted that the disclosures did not warn that the Exchange could create OID that would be disallowed in bankruptcy.  (*Id.* ¶ 31.)  Mr. Siegert also testified that the market did not place much value on the structural enhancements to the Notes that the Exchange created since 63% of noteholders participated in the Exchange, which was a lower participation rate than typical debt-for-debt exchanges.  (*Id.* ¶ 32.)  ResCap was expecting a significantly higher level of participation in the Exchange; the company and its advisors originally projected a base case participation level of 76%.  (*See* Hall Dep. 53:10–21.)

If ResCap had not executed the Exchange, the Company would not have had an ability to meet its debt service obligations as they came due without some third party intervention.  (Hall Dep. 43:10–16.)  The successful completion of the Exchange enhanced shareholder value by reducing the amount of the Company's outstanding debt.  (Hall Dep. 55:14–23; Oct. 21 Tr. 64:5–8; 64:25–65:2.)  The successful completion of the Exchange also provided ResCap, its creditors, and other stakeholders with several other valuable benefits, including reducing ResCap's debt service and extending the maturities on ResCap's outstanding debt.  (DX BB at 13; Oct. 21 Tr. 18:10–14; 63:6–15; 64:5–8.)

Both experts testified that there is little difference between a face value exchange and a fair value exchange, making disparate treatment for the two exchanges in bankruptcy economically illogical.  (Siegert Direct ¶ 37; Oct. 21 Tr. 67:10–69:9.)  Mr. Siegert explained that both fair and face value exchanges offer companies the opportunity to restructure out-of-court,

40

avoiding the time and costs—both direct and indirect—of a bankruptcy proceeding.  (DX AIJ at 7.)

The Second Circuit treats OID created by face value exchanges as allowable in bankruptcy, despite the Code's provision that unmatured interest is disallowed.  *See Chateaugay*, 961 F.2d at 384.  The *Chateaugay* decision left open the possibility that fair value exchanges could be treated differently, but it did not resolve the issue.  Both Dr. Finnerty and Mr. Siegert acknowledged that under *Chateaugay*, there would be no disallowable OID here if the Junior Secured Notes were issued at 100% face value, and all other inducements for participation remained the same.  (Oct. 21 Tr. 136:9–20; 214:2–4.)  Dr. Finnerty and Mr. Siegert also both acknowledged that if creditors knew that OID created in fair value exchanges would be disallowed, distressed issuers would need to offer greater incentives to participate. (Siegert Direct ¶ 38; DX ABC; Oct. 21 Tr. 101:15–17.)  According to Mr. Siegert, this would make distressed debt exchanges more difficult and would likely lead to more bankruptcy filings as opposed to out-of-court workouts.  Additionally, bondholders could simply reject fair value exchanges altogether.  (Siegert Direct ¶ 38.)  The experts also both testified that they are unaware of any other creditors whose claim would be determined in bankruptcy based on the trading prices of bonds used to determine the issue price.  (DX AIJ 10; Oct. 21 Tr. 23:20–24:2.)  Thus, a holder of the Old Notes would not know the amount of OID that would be disallowed in bankruptcy before tendering.  (Oct. 21 Tr. 50:24–51:21.)  The legal analysis of OID is found in section III.A below.

### H.    The Paydowns

On or about June 13, 2013, the Debtors made a payment in the amount of $800 million on account of the outstanding principal of the Junior Secured Notes.  (*See* ECF Doc. # 3967.)

On or about July 30, 2013, the Debtors made an additional $300 million payment on account of the outstanding principal of the Junior Secured Notes.  (*See* ECF Doc. # 4404.)  Together these repayments reduced the outstanding principal balance by $1.1 billion.

## I.    Expert Valuations of JSN Collateral on Petition Date

The JSNs offered valuation testimony from four proposed experts affiliated with Houlihan:  Messers. Fazio, Levine, Taylor, and Siegert.  Mr. Fazio offered opinions on the Petition Date value of the Debtors' sold and unsold HFS assets and certain other unsold assets. (Fazio Direct ¶¶ 2–3; Oct. 22 Tr. 122:10-13.)  He also offered an opinion on the Petition Date value of a hypothetical entity consisting solely of the Debtors' MSRs, servicing operations, and originations platform.  (Fazio Direct ¶¶ 2, 7; Oct. 22 Tr. 122:14-16.)  Mr. Levine offered opinions on the Petition Date value of the Debtors' MSRs, refinancing opportunities associated with the MSRs, and Servicing Advances.  (Levine Direct ¶ 2.)  Mr. Taylor offered an opinion on the allocation of value to certain assets associated with the Ocwen asset sale, including intangible assets, goodwill, and liabilities acquired by Ocwen and Walter.  (Taylor Direct ¶¶ 2–3, 7.)

Mr. Siegert offered a single "Global Summary" of these Houlihan opinions suggesting the net fair market value of the JSN Collateral on the Petition Date totaled $2.79 billion.  (Siegert Direct ¶¶ 4, 25; Oct. 23 Tr. 134:1–14, 141:14–142:6; DX ABF at 10.)  He arrived at this value by first summing (1) the valuations of the Debtors' cash, HFS assets, unsold servicing advances, FHA/VA loans, equity interests, hedge contracts, and certain other contracts; (2) the valuation of the Debtors' sold servicing advances; and (3) his own valuation of the Debtors' intangible assets, derived from his own analysis of Messrs. Fazio, Taylor, and Levine's valuations.  (DX ABF at 9–10.)  This totaled $4.450 billion.  (*Id*. at 10.)  Mr. Siegert then subtracted $747 million owed to

Ally on the Ally Revolver, and $912 million owed on two facilities,[25] to reach $2.791 billion. (Siegert Direct ¶ 25 & n.6; DX ABF at 10.)

The Houlihan experts' valuation assumes that the assets could have been sold on the Petition Date by the Debtors.  (Oct. 22 Tr. 139:18–142:4; Oct. 23 Tr. 147:23–149:3, 149:18–22.) But when valuing the assets, the Defendants' experts did not look to sales conducted by other distressed entities on the brink of insolvency; rather, the experts treated ResCap as a solvent seller able to capture fair value for its assets.

The Plaintiffs, on the other hand, offered the opinion of Mr. Puntus, Partner and Co-Head of the Restructuring Group at Centerview.  Mr. Puntus has been the lead investment banker for the Debtors for over two years.  (Puntus Direct ¶ 1, 16; Oct. 16 Tr. 98:9–16.)  He was heavily involved in the Debtors' decision to market their assets, the prepetition marketing process and the postpetition sale process, serving as the lead business negotiator for the Debtors on the stalking horse agreements as well as the auction process.  (Oct. 16 Tr. 97:23–98:16, 103:6–9.)

Mr. Puntus used the initial Nationstar and AFI stalking horse agreements to determine the benchmark value in his analysis ($1.736 billion), even though these agreements were never consummated.  He also endeavored to estimate what the JSNs' Collateral would have been worth upon foreclosure, where the disposition of the assets would have been controlled, in the first instance, by the First Priority Collateral Agent (directed by AFI) or the lenders (*i.e.,* Barclays and AFI for GSAP and BMMZ, respectively).

Mr. Puntus's benchmark did not represent his opinion of the value of the JSNs' Collateral for purposes of adequate protection because the purchase prices reflected in the stalking horse deals were contingent upon the continued operation of the Debtors' business in chapter 11 (Oct.

---

[25]    The GMAC Mortgage Services Advance Funding Company Ltd. ("GSAP") Facility and the BMMZ Holding LLC Facility.

16 Tr. 103:10–22.)  To estimate the value of the JSNs' Collateral as of the Petition Date in the

hands of the creditors' agents upon foreclosure, Mr. Puntus therefore made certain downward

adjustments from his benchmark valuation.  Mr. Puntus based these adjustments on two

alternative scenarios, differing in how long he assumed the creditors would take to dispose of the

collateral:  "Alternative A" assumed the collateral would be monetized by the collateral agents

over a three to four month time period ($1.474 billion), while "Alternative B" assumed a five to

six-month period ($1.594 billion).  (Puntus Direct, ¶¶ 86–88.)  Mr. Puntus further made

reductions to account for RMBS and government set off risks, which reduced the "Alternative

A" valuation to $1.046 billion, and the "Alternative B" valuation to $1.135 billion.  (Puntus

Direct Ex. 1 at 9.)

Mr. Puntus's methodology was dependent upon his subjective valuations of risks

associated with the collateral.  At trial, Mr. Puntus conceded that he had never seen a valuation

analysis relying on similar methodology before.  (Oct. 16 Tr. 36:6–8.)  Nor is it likely that Mr.

Puntus's valuation methodology could be used in other contexts.  While Mr. Puntus's

methodology is unsupportable, the numbers he reached may well be closer to the actual value of

the JSN Collateral on the Petition Date.

### J.    Effective Date Value of JSN Collateral

The parties agree to a value of $1.88 billion as the baseline valuation for the JSNs'

collateral as of December 15, 2013 (the assumed "Effective Date"), but the Debtors contend that

only $1.75 billion of that collateral is properly distributable to the JSNs.  The Plaintiffs seek to

reduce the JSNs' potential recovery by assessing $143 million of expenses under the Carve Out

against the JSN Collateral.  The Plaintiffs argue that the Cash Collateral Order expressly made

the JSNs' liens subordinate to the Carve Out. The Defendants countered that the Plaintiffs

should use unencumbered cash to pay the Carve Out rather than JSN cash collateral.

          1.    *Deposit Accounts*

Except for the Controlled Accounts (defined below), the Deposit Accounts listed on

Schedule 5 to the Committee Action are not subject to an executed control agreement among the

relevant Debtor, the Third Priority Collateral Agent, and the bank where such Deposit Accounts

are maintained. (PX 126; Landy Direct ¶¶ 3(d), 24(a), 40.) The uncontroverted evidence at trial

established that, as of the Petition Date, the Deposit Accounts held funds in the amount of

$48,502,829. (Landy Direct ¶ 41.)

Executed control agreements were admitted into evidence for the following Deposit

Accounts (collectively, the "Controlled Accounts"): Account Nos. xxxx7570, xxx6190,

xxx8567, xxxx7618, xxxx2763, and xxxx0593. (*See* DX AIU; DX AIV; DX AIW; DX AIX;

DX AIY; DX AIZ.) As of the Petition Date, the Controlled Accounts held an aggregate amount

of $16,885. (PX 126.) Deposit Account Nos. xxxx2607, xxxx7877, and xxxx1176 (collectively,

the "WF Accounts") are maintained at Wells Fargo, which is the Third Priority Collateral Agent.

The WF Accounts contained $38,321 as of the Petition Date. (PX 126.)

Deposit Account Nos. xxxx3803 and xxxx6323 (together, the "Ally Accounts") are

maintained at Ally Bank, which is an indirect, wholly-owned subsidiary of the AFI, the Revolver

Lender. (PTO JSN Contentions ¶ 103.) Ally Bank is not a party to the Junior Notes Documents,

the Revolver Documents or the Intercreditor Agreement and is therefore not a "secured party"

within the meaning of the U.C.C. for purposes of control and perfection. Further, the Third

Priority Secured Parties are not perfected by virtue of the Revolver Lender and Ally Bank being

affiliates. First, given that they are not the same entity, the Revolver Lender's lien is not

perfected under the U.C.C. through automatic control.  Second, even if AFI's lien were perfected

through automatic control, that would be the case only with respect to its own security interest

(under the Revolver).

Deposit Account No. xxxx2599, which is maintained at J.P. Morgan Chase Bank, N.A.

and contained $8,091 as of the Petition Date, contains proceeds of the JSN Collateral (the

"Proceeds Account").  (Oct. 17 Tr. 173:4–174:11; PX 6 at 18–19.)  The Court finds that the

Third Priority Secured Parties have a perfected interest in that account under the U.C.C. because

it contains proceeds of JSN Collateral.  The Defendants failed to proffer evidence at trial that any

of the Deposit Accounts other than the Proceeds Account contain proceeds of the JSN Collateral.

### 2.    *Real Property*

Various Debtors owned the real property and leasehold interests listed on Schedule 2 to

the Committee Action, and that portion of Schedule 6 to the Committee Action that identifies

REO properties (*i.e.*, mortgaged properties acquired through foreclosure or other exercise of

remedies under mortgages or deeds of trust that secured the associated mortgage loan

instruments) as of the Petition Date.  The property and leasehold interests are not subject to

either a mortgage or a deed of trust in favor of the Third Priority Collateral Agent (the

"Unencumbered Real Property").  (PX 124; PX 127 at 44–47; Landy Direct ¶¶ 3(b), 24(b), 36;

Oct. 17 Tr. 175:1–23.)  The uncontroverted evidence at trial established that, as of the Petition

Date, the fair market value of the Unencumbered Real Property was $21 million.  (Landy Direct

¶ 38.)

The Third Priority Collateral Agent did not know whether it had received any mortgage

or deed of trust with respect to the Unencumbered Real Property, nor did it know whether any

property owner ever granted or signed a mortgage or deed of trust with respect to the

Unencumbered Real Property.  (Pinzon Dep. 24:7–11, 29:2–11.)  No mortgage or deed of trust

for the Unencumbered Real Property was proffered by any party or admitted into evidence

during the trial.  (Landy Direct ¶ 37.)

The JSNs, therefore, do not have a perfected security interest in or lien on any of the

Unencumbered Real Property because that property was not subject to an executed and filed

mortgage or deed of trust.

> 3.      *Executive Trustee Services, LLC and Equity Investment I, LLC Assets*

The Plaintiffs argue that the JSNs do not have liens on assets of Executive Trustee

Services, LLC ("ETS") and Equity Investment I, LLC ("Equity I").  According to the Plaintiffs,

ETS pledged all of its assets to the Revolver in February 2011, but did not pledge any assets to

the JSNs.  The Plaintiffs also claim that any security interest in Equity I was released on

December 29, 2009.

On February 16, 2011, ETS executed a joinder to the Revolver Documents and pledged

all of its assets to AFI under the Revolver as a guarantor.  Neither the Debtors nor the JSNs have

identified a similar joinder agreement whereby ETS became an obligor under any of the Notes

Agreements or granted any security interest to the Noteholders.  The JSNs have argued that

Section 4.17 of the Notes Indenture and Section 2.3(c) of the Intercreditor Agreement dictate that

ETS is a guarantor of the Junior Secured Notes.  Section 4.17 of the Notes Indenture provides the

process by which future guarantors execute supplemental indentures guaranteeing the Junior

Secured Notes, and Section 2.3(c) of the Intercreditor Agreement provides that any party

pledging assets to the Revolver must also pledge such assets to the JSNs.  (PX 1 at 59–60; PX 2

at 17.)  But these provisions are not self-effectuating, and ETS was not a party to the

Intercreditor Agreement.  Absent an indication that ETS actually did pledge assets to the JSNs,

the JSNs cannot establish a lien on any ETS assets.

47

As for Equity I, that entity was an obligor under the Original Revolver Loan Agreement and the Original JSN Security Agreement, but it was removed as an obligor in the amended versions of those agreements.  (PX 3; PX 4; PX 5; PX 6; PX 7; PX 8.)  Further, On December 29, 2009, the Third Priority Collateral Agent executed a U.C.C.-3 termination statement terminating the security interest in all assets pledged by Equity I.  (PX 131 at 841–45.)  The next day, the parties executed the amended JSN Security Agreement that removed Equity I as an obligor.  (PX 4.)  Also on December 30, 2009, Equity I became a guarantor under the AFI LOC. (PX 9.)  The JSNs therefore do not have a lien on any Equity I assets.

### 4.    Reacquired Mortgage Loans

Count IV of the Committee' complaint alleges that the JSNs do not have perfected security interests in certain mortgage loans that were (1) released from the JSNs' liens and security interests in May 2010 to be sold to certain Citi and Goldman Repurchase Agreement Facilities ("Repo Facilities"), and (2) subsequently repurchased by the Debtors between September 2010 and the Petition Date (the "Reacquired Mortgage Loans").  As of the Petition Date, the Debtors owned the Reacquired Mortgage Loans, which were coded as "Blanket Lien Collateral" in the CFDR.  The Debtors repurchased the majority of the Reacquired Mortgage Loans in January 2012.  (*See* DX ABM, Schedule 1.)  The Committee's complaint alleges that the Reacquired Mortgage Loans total approximately $14 million at book value and $10 million at fair value. (PX 125; PX 241 at 9.)

Wells Fargo, acting in its capacity as the Third Priority Collateral Agent, filed U.C.C.-3 financing statement amendments in May 2010 terminating the JSNs' security interests in, among other things, loans that later became the Reacquired Mortgage Loans.  (*See, e.g.*, PX 133; PX 136.)  Those U.C.C.-3 amendments made clear that the assets that were subject to the release

were being sold to Repo Facilities by expressly referencing the Repo Facilities and identifying

the assets subject to the U.C.C.-3 amendments as the Mortgage Loans listed on certain Schedules

to the Repo Facilities. (*See, e.g.*, PX 133; PX 136.) The loans listed on the U.C.C.-3 amendment

were within the scope of and were covered by preexisting U.C.C.-1 financing statements. The

U.C.C.-3 amendments provided notice of a collateral change, not a termination of the

effectiveness of the identified financing statement. (*See, e.g.*, PX 133; PX 136.)

The U.C.C.-1 financing statements, which remained in effect notwithstanding the filing

of the U.C.C.-3 financing statements, continued in force and operated to perfect the JSNs'

security interests in the Reacquired Mortgage Loans after the Debtors repurchased those loans.

(*See, e.g.*, PX 132; PX 4 § 2.) The U.C.C.-1 financing statements and U.C.C.-3 amendments

filed by Wells Fargo provided notice to any potential lender seeking to obtain a security interest

in the Reacquired Mortgage Loans of the possibility that the JSNs held a perfected security

interest therein. Any potential lender inquiring about the collateral (1) could learn that the

Reacquired Mortgage Loans had been reacquired by the Debtors subsequent to the filing of the

U.C.C.-3 amendments (by virtue of the fact that they were owned by the Debtors); and (2) would

have access to the U.C.C.-1 financing statements providing that the JSNs held a perfected

security interest in all assets that the Debtors subsequently acquired. (Oct. 23 Tr. 36:5–37:19.)

Had any actual or potential unsecured creditor inquired of ResCap into the status of the

Reacquired Mortgage Loans prepetition, that creditor would have learned that the loans were

once again subject to AFI's and the JSNs' Blanket Lien, which was reflected in the CFDR. (*See*

Farley Dep. 95:3–14, 110:5–111:14, 115:4–14, 137:21–24, 138:4–11, 176:21–177:3, Oct. 16 Tr.

190:21–192:18; Hall Dep. 117:6–12; Ruhlin Dep. 65:19–22, 66:6–21, 106:8–12, 119:4–9,

155:16–156:2, 156:15–21.)

Therefore, the Court finds that the Reacquired Mortgage Loans are properly treated as collateral for the JSNs at the Petition Date.

### 5.    Excluded Assets

Count I of the Committee's complaint alleges that, pursuant to the JSN Security Agreement, the JSNs do not have perfected security interests in assets that were (1) pledged to a Bilateral Facility (as defined by the JSN Security Agreement) on the date that the Junior Secured Notes were issued by ResCap, (2) subsequently released from the applicable Bilateral Facility prior to May 14, 2012 (the "Petition Date"), and (3) owned by the Debtors on the Petition Date and coded as "Blanket Lien Collateral" (the "Former Bilateral Facilities Collateral").[26]  The Plaintiffs' expert Mr. Landy valued the Former Bilateral Facilities Collateral at $24 million as of the Petition Date using fair market valuation.  (*See* PX 241 at 9.)

On June 6, 2008, Wells Fargo, acting in its capacity as the Third Priority Collateral Agent, filed U.C.C.-1 financing statements indicating that the JSNs held a security interest in "[a]ll assets [of each grantor] now owned or hereafter acquired and wherever located."  (PX 132.)  Section 2 of the JSN Security Agreement (the "All-Assets Granting Clause") reaches all of the Debtors' assets that are legally and practicably available both at the time, and after, the JSN Security Agreement was executed.  (PX 4 at 4–17, 18–19 (providing that the pledge includes assets "whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced").)

The JSN Security Agreement carves out from the JSNs' Collateral certain assets (the "Excluded Assets") that could not be pledged to the JSNs for legal or business reasons.  (PX 4 at 15–17 ("provided that, notwithstanding the foregoing, the 'Collateral' described in this Section 2

---

[26]    The "Former Bilateral Facilities Collateral" is referred to as "Released Bilateral Facilities Collateral" in the Committee's complaint and briefings by the Plaintiffs.

shall not include Excluded Assets.").)  "Excluded Assets" are defined under the JSN Security

Agreement as "(c) any asset . . . to the extent that the grant of a security interest therein would

. . . provide any party thereto with a right of termination or default with respect . . . to any

Bilateral Facility to which such asset is subject as of the Issue Date [(June 6, 2008)]."  (PX 4 at

4–15.)  The Excluded Assets category included assets pledged to Bilateral Facilities as of the

Issue Date, because the terms of the Bilateral Facilities precluded those assets from being

pledged to the AFI Revolver or the JSNs.  (Oct. 16 Tr. 184:24–185:3.)

The Court previously ruled that the JSN Security Agreement is ambiguous with respect to

"whether an Excluded Asset becomes part of the Secured Parties' collateral pursuant to the All-

Asset Granting Clause once it ceases to constitute an Excluded Asset."  *Residential Capital*, 495

B.R. at 262.  The Court therefore allowed the parties to present extrinsic evidence to determine

the parties' intended meaning.

Ms. Farley, the Senior Director of Asset Disposition for ResCap, was involved in

negotiating and implementing the Revolver.  She testified that she understood that if the Bilateral

Facilities had not precluded the Debtors' assets pledged thereunder from being pledged to AFI

and the JSNs, and if those assets otherwise fell within the broad scope of the Blanket Lien, then

the Debtors would have included those assets as Revolver and JSN Collateral.  (Oct. 16 Tr.

184:24–185:12; Farley Dep. 26:7–18, 58:12–20, 65:13–66:2, 71:5–18.)  She also testified that

AFI and ResCap understood that the Excluded Assets would change over time.  (Oct. 16 Tr.

182:13–21.)

Lara Hall of AFI testified at her deposition that:

- "AFI's intent was as soon as the assets rolled off the bilateral facility, they would become
  subject to the blanket lien." (Hall Dep. 123:19–23; *see also id.* 119:7–15);

- at the time the original AFI Revolver and Revolver Security Agreement were negotiated, in exchange for funding the AFI Revolver, AFI was "trying to secure whatever remained unencumbered that we could, that was legally available to be pledged, not an excluded asset and was operationally feasible for the company, being ResCap." (Hall Dep. 106:2–20; 113:2–13); and

- "[t]he blanket lien basically suggested that anytime an asset became uncovered, it would be subject to the blanket lien." (Hall Dep. 116:6–14.)

Joseph Ruhlin, the Debtors' former Treasurer, testified that the Debtors understood that the Former Bilateral Facilities Collateral "would be covered by the blanket lien as long as they . . . were owned [by the Debtors] and not pledged elsewhere to another bilateral facility," and that the Debtors' "understanding" was that "once an asset was released from a funding facility, depending on the asset, it would become part of the blanket lien." (Ruhlin Dep. 89:14–2, 93:8–14, 165:5–9.)

Ms. Farley, in her capacity as the Debtors' corporate representative, admitted at her deposition that if a loan was initially excluded from the collateral pool because it was pledged to a Bilateral Facility as of the Issue Date, the loan would be transferred into the pool of Blanket Lien Collateral if and when that Bilateral Facility subsequently terminated. (Farley Dep. 105:17–106:21.) At trial, Ms. Farley testified that, with respect to assets that were Excluded Assets as of June 2008 (because they were pledged under a Bilateral Facility), those assets would become part of the revolver and JSN Collateral pools if they fell within the scope of the security grant when the Bilateral Facility terminated. (Oct. 16 Tr. 186:23–187:9.) Ms. Farley further testified that, in negotiating the terms of the AFI revolver, Ally sought to secure the revolver with as much collateral as possible. (Farley Dep. 45:21–46:4; Farley Direct ¶ 13.)

Additionally, in December 2008, the Debtors' outside counsel sent an email explaining that "if at any point while owned by GMAC [] the assets are removed from a Bilateral Facility,

the [AFI] Revolver and [JSN] Indenture liens may cover these assets and they will constitute

Collateral (if and to the extent Sections 9-406/8 of the U.C.C. are applicable)."  (DX ES at 1.)

Given the extrinsic evidence presented at trial about the parties' intent "whether an

Excluded Asset becomes part of the Secured Parties' collateral pursuant to the All-Asset

Granting Clause once it ceases to constitute an Excluded Asset," the Court is satisfied that the

Former Bilateral Facilities Collateral is properly treated as JSN Collateral at the Petition Date.

### III.   CONCLUSIONS OF LAW

**A.   The JSNs Are Entitled to Recover All Original Issue Discount.**

The Plaintiffs ask the Court to disallow a portion of the JSNs' claim to the extent the

claim seeks recovery of unamortized OID.  OID is a form of "deferred interest" created when a

bond is issued for less than the face value the borrower contracts to pay at maturity.  (Finnerty

Direct ¶ 10.)  Unlike the more common periodic cash interest "coupon" payments made to

noteholders, OID interest accretes over the life of the note but is payable only at maturity.  (*Id.*)

OID is amortized for tax and accounting purposes over the life of the bond.  The Exchange

Offer, which was a fair value exchange (*see supra* at II.F), created $1.549 billion of OID, which

amortized over the life of the Junior Secured Notes.  (*Id.* at ¶ 11.)  As of the Petition Date,

unamortized OID on the remaining outstanding Junior Secured Notes was $386 million.[27]  (*Id.*)

The JSNs contend that their claim should be allowed in full and should not be reduced by

any OID.  For the following reasons, the Court agrees that the JSNs' claim should not be reduced

by the amount of unamortized OID.

---

[27]   The parties dispute whether the amount of OID at the Petition Date is $386 million (according to the
Plaintiffs) or $377 million (according to the Defendants).  Since the Court concludes that the amount of the JSNs'
claim should not be reduced by OID, the Court need not resolve this dispute.

*1.*      In re Chateaugay *Controls and Supports Allowing the JSNs' Claim in Full.*

Bankruptcy Code Section 502(b)(2) provides that a creditor's claim should be allowed in

full, "except to the extent that . . . such claim is for unmatured interest."  11 U.S.C. § 502(b)(2).

The Second Circuit ruled in *Chateaugay* that unamortized OID is "unmatured interest" within

the meaning of section 502(b)(2).  961 F.2d at 380.  Nevertheless, the Second Circuit found that

debt-for-debt "face value" exchanges offered as part of a consensual workout do not generate

OID that is disallowable as unmatured interest for purposes of section 502(b)(2).  *Id.* at 383.

The Second Circuit explained that "application . . . of OID to exchange offers . . . does

not make sense if one takes into account the strong bankruptcy policy in favor of the speedy,

inexpensive, negotiated resolution of disputes, that is an out-of-court or common law

composition."  *Id.* at 382.  The Second Circuit explained further:

> If unamortized OID is unallowable in bankruptcy, and if exchanging debt
> increases the amount of OID, then creditors will be disinclined to cooperate in a
> consensual workout that might otherwise have rescued a borrower from the
> precipice of bankruptcy.  We must consider the ramifications of a rule that places
> a creditor in the position of choosing whether to cooperate with a struggling
> debtor, when such cooperation might make the creditor's claims in the event of
> bankruptcy smaller than they would have been had the creditor refused to
> cooperate.  The bankruptcy court's ruling [excluding OID recovery] places
> creditors in just such a position, and unreversed would likely result in fewer out-
> of-court debt exchanges and more Chapter 11 filings.

*Id.*

Applying that reasoning, the Second Circuit held "that a face value exchange of debt

obligations in a consensual workout does not, for purposes of section 502(b)(2), generate new

OID."  *Id.*  Rather than "chang[ing] the character of the underlying debt," a face value exchange

"reaffirms and modifies" the debt.  *Id.*  But the court specifically left open whether the same

rules should apply to a fair value exchange such as the one in this case.  The court stated:

[Disallowing OID recovery] might make sense in the context of a fair market value exchange, where the corporation's overall debt obligations are reduced. In a face value exchange such as LTV's, however, it is unsupportable.

*Id*.

Here, in ruling on the motions to dismiss, the Court concluded that it would benefit from a fuller evidentiary record before resolving whether as a matter of law the Exchange generated disallowable OID. *Residential Capital*, 495 B.R. at 266. Now having the benefit of a full record and argument, the Court concludes that despite the differences between face value and fair value debt-exchanges, the same rule on disallowance of OID should apply in both circumstances. Since *Chateaugay* is the law of the Circuit, and holds that unamortized OID should not be disallowed in the case of a face value exchange, the Court concludes that the unamortized OID generated by the fair value exchange here should not be disallowed from the JSNs' claim.

### 2.    *The Legislative History of Section 502(b)(2)*

Section 502(b)(2) was enacted in 1978. The legislative history states that disallowed interest shall include "any portion of prepaid interest that represents an original discounting of the claim [but] would not have been earned on the date of bankruptcy," and gives as an example: "postpetition interest that is not yet due and payable, and any portion of prepaid interest that represents an original discounting of the claim, yet that would not have been earned on the date of the bankruptcy." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 352–54 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6308.

At the time that Congress passed section 502(b)(2), debt-for-debt exchanges did not create OID for tax purposes. *See* Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, § 101, 92 Stat. 2549 (1978). The Internal Revenue Code Tax Code") was first amended in 1990 to provide that both distressed face value exchanges and distressed fair value exchanges create taxable OID.

*See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 11325, 104 Stat. 1388–

466 (1990).  Since that time, both the Second and Fifth Circuits have found that face value

exchanges do not create disallowable unmatured interest, notwithstanding that they may create

OID under the Tax Code.  *See Chateaugay*, 961 F.2d at 383 ("The tax treatment of a transaction .

. . need not determine the bankruptcy treatment. . . . The tax treatment of debt-for-debt exchanges

derives from the tax laws' focus on realization events, and suggests that an exchange offer may

represent a sensible time to tax the parties.  The same reasoning simply does not apply in the

bankruptcy context."); *Texas Commerce Bank, N.A. v. Licht (In re Pengo Indus., Inc.)*, 962 F.2d

543, 550 (5th Cir. 1992) ("As bluntly stated by the Second Circuit, the reasoning underlying the

tax treatment of debt-for-debt exchanges simply does not apply in the bankruptcy context.")

(internal quotation marks omitted).

The parties do not dispute that disallowable OID is created for bankruptcy purposes when

a company issues new debt in an original cash issuance for less than its face value.  (Finnerty

Direct ¶ 76; Oct. 21 Tr. 155:7–15.)  Dr. Finnerty testified that "as an economic matter the bond

exchange generated OID," but Dr. Finnerty never defines "economic matter" beyond references

to taxable OID.  (*Id.* at ¶ 10.)  Under *Chateaugay*, however, creation of OID for tax purposes is

irrelevant in the context of face value exchanges.  Because the Court finds no basis for

distinguishing OID generated by fair value exchanges from OID generated by face value

exchanges, *Chateaugay* controls.  Even though the Exchange may have generated OID under the

Tax Code, that does not dicatate that it created disallowable unmatured interest.

> 3.    *There is No Reason to Distinguish OID Generated by Fair Value
>        Exchanges from OID Generated by Face Value Exchanges under the
>        Second Circuit's Reasoning in* Chateaugay.

As the Second Circuit observed in *Chateaugay*, an exchange offer made by a financially

impaired company "can be either a 'fair market value exchange' or a 'face value exchange.'"

961 F.2d at 381 (citations omitted).[28]  Because the Second Circuit in *Chateaugay* was presented

with a face value exchange, the court did not address whether its decision would extend to a fair

value exchange.  Instead, the Court explicitly limited its holding to face value exchanges, noting

that it "might make sense" to disallow OID in a fair market value exchange.  *Id.*  The Court

concludes, having the benefit of a full record and argument, that there is no meaningful basis

upon which to distinguish between the two types of exchanges.

The Plaintiffs' expert Dr. Finnerty admitted at trial that distinguishing between face value

and fair value exchanges is "somewhat arbitrary."  (Oct. 21 Tr. 67:10–13.)  In fact, Dr. Finnerty

acknowledged that nearly all of the features that companies consider in connection with a debt-

for-debt exchange can be used in both face value and fair value exchanges:  (1) granting of

security in the issuer's collateral; (2) interest rate; (3) maturity date; (4) payment priorities; (5)

affiliate guarantees; (6) other lending covenants; (7) redemption features; (8) adding or removing

a sinking fund or conversion feature; and (9) offering stock with the new debt.  (*Id.* at 67:17–

69:9.)  Other than changing the face value of the bond (which is not possible in face value

exchanges), an issuer "could adjust every other factor" available to it.  (*Id.* at 69:4–9.)  For

example, an issuer could provide the exchanging noteholders with security.  Both experts

testified that there would be no disallowable OID if the Junior Secured Notes were issued at

$1,000 face value, even though the new notes were secured while the Old Notes were unsecured,

because that exchange would be expressly governed by *Chateaugay*.  (*Id.* at 136:9–20; 214:2–4.)

Thus, despite the Plaintiffs' contention that the consideration involved in the Exchange—trading

the unsecured notes for secured and structurally senior obligations—justifies breaking from the

Second Circuit's decision in *Chateaugay*, the evidence presented at trial indicated that the two

---

[28]    *See supra* note 24 for the differences between fair market value and face value exchanges.

57

types of exchanges are virtually identical, and it would be arbitrary for the Court to distinguish between them.

The Court thus concludes that there is no commercial or business reason, or valid theory of corporate finance, to justify treating claims generated by face value and fair value exchanges differently in bankruptcy.  First, the market value of the old debt is likely depressed in both a fair value and face value exchange.  Second, OID is created for tax purposes in both fair value and face value exchanges.  Third, there are concessions and incentives in both fair value and face value exchanges.  In addition, both fair and face value exchanges offer companies the opportunity to restructure out-of-court, avoiding the time and costs—both direct and indirect—of a bankruptcy proceeding.

The Plaintiffs argue that the "plain language" of the statute must be enforced unless it leads to an absurd result.  They contend that applying the language of section 502(b) to disallow OID will not lead to absurd results because even if OID is disallowed, the JSNs' recovery exceeds the recovery of the still-outstanding Original Noteholders.  But the term "unmatured interest" in section 502(b)(2) is not defined, making application of the plain language rule debatable.  And whatever rules are adopted by courts should provide predictability to parties in planning transactions.  The outcome—whether a transaction results in disallowed OID for bankruptcy purposes—should not hinge on whether, with the benefit of hindsight, noteholders that exchanged their notes did better than those that did not exchange.  Determining whether the transaction created disallowable OID should not depend on if the noteholders or the debtors got a "good deal" in bankruptcy.  That rule would create confusion in the market and would likely complicate a financially distressed company's attempts to avoid bankruptcy with the cooperation of its creditors.  The reasoning of *Chateaugay* supports this conclusion.  961 F.2d at 383.

For the foregoing reasons, the Court concludes that the JSNs' claim should not be reduced by the amount of unamortized OID.

**B.      The JSNs Are Not Entitled to an Adequate Protection Claim.**

*1.      Generally*

The Bankruptcy Code requires a debtor to provide a secured lender with adequate protection against a diminution in value of the secured lender's collateral resulting from:  (1) the imposition of the automatic stay under section 362; (2) the use, sale, or lease of the property under section 363; and (3) the granting of a lien under section 364.  11 U.S.C. § 361(1).  The Bankruptcy Code does not articulate what constitutes "adequate protection" for purposes of the statute, but section 361 articulates three separate examples of what may constitute adequate protection:  (1) periodic cash payments; (2) offering a replacement lien "to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property"; and (3) other relief that will assure the creditor that its position will not be adversely affected by the stay.  *Id.*; *see also* 3 COLLIER ON BANKRUPTCY ¶¶ 362.07[3][b]–[d] (16th ed. 2011).

A secured creditor is entitled to adequate protection of its interest in the value of its collateral and can obtain adequate protection either after a contested cash collateral hearing, or, as is more often the case, by a consensual cash collateral order.  At the commencement of this case, the parties negotiated, and the Court signed, a Cash Collateral Order that, among other things, established the JSNs' right to adequate protection for the use of their collateral and the means by which such adequate protection would be provided.  Pursuant to paragraph 16 of the Cash Collateral Order, the JSNs are entitled to

> [A]dequate protection of their interests in Prepetition Collateral, including Cash
> Collateral, in an amount equal to the aggregate diminution in value of the

Prepetition Collateral to the extent of their interests therein, including any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of any Prepetition Collateral, including Cash Collateral, the priming of the AFI Lenders' liens on the AFI LOC Collateral by the Carve Out and AFI DIP Loan, and the automatic stay pursuant to section 362 of the Bankruptcy Code[.]

(PX 76 at 24.)  As adequate protection, the JSNs were granted adequate protection liens on all of the collateral securing the AFI Revolver, the AFI LOC, and all of the equity interests of the Barclays DIP Borrowers, and, to the extent that such liens were insufficient to provide adequate protection, the right to assert a claim under section 507(b) of the Bankruptcy Code.  (*Id.* at 29.) The JSNs now contend they are entitled to recover an adequate protection claim of $515 million based on alleged diminution in value of their prepetition collateral used during the case under a series of consensual cash collateral orders.  The Plaintiffs disagree, asserting that the JSN Collateral has not declined in value since the Petition Date and that the JSNs therefore cannot assert an adequate protection claim.

The parties agree that the amount of any adequate protection claim is to be measured by the difference in value of the collateral on the Petition Date and the Effective Date.[29]  The parties also largely agree about the Effective Date value of the JSN Collateral, subject to adjustments discussed elsewhere in this Opinion.  Thus, much of the testimony offered at trial was aimed at establishing the Petition Date value of the JSNs' collateral.

2.    *The JSNs Bear the Burden of Showing Diminution in Value.*

The burden of proving valuation falls on different parties at different times.  In establishing its claim, a secured creditor generally bears the burden under section 506(a) of proving the amount and extent of its lien.  *In re Sneijder*, 407 B.R. 46, 55 (Bankr. S.D.N.Y.

---

[29]        Here, the cash collateral motion was filed as a first day motion, so there is no issue of whether a later date should apply for purposes of an adequate protection claim.  *See* 4 COLLIER ON BANKRUPTCY ¶ 506.03[7][a][iv] ("In general, courts typically hold that, for purposes of adequate protection, the value of the collateral is to be determined either as of the petition date or as of the date on which the request for adequate protection was first made.").

2009); *see also In re Heritage Highgate, Inc.*, 679 F.3d 132, 140 (3d Cir. 2012) (holding that

"the ultimate burden of persuasion is upon the creditor to demonstrate by a preponderance of the

evidence both the extent of its lien and the value of the collateral securing its claim") (quoting *In

re Robertson,* 135 B.R. 350, 352 (Bankr. E.D. Ark. 1992)).  Once the amount and extent of the

secured claim has been set, the burden shifts to a debtor seeking to use, sell, lease, or otherwise

encumber the lender's collateral under sections 363 or 364 of the Code to prove that the secured

creditor's interest will be adequately protected.  *See Wilmington Trust Co. v. AMR Corp. (In re

AMR Corp.)*, 490 B.R. 470, 477–78 (S.D.N.Y. 2013) (holding that the creditor seeking adequate

protection "need only establish the validity, [priority, or extent] of its interest in the collateral,

while the Debtor bears the initial burden of proof as to the issue of adequate protection")

(internal quotation marks and citation omitted); *see also Resolution Trust Corp. v. Swedeland

Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) (holding, in

the context of granting a priming lien under section 364(d)(1), that the "debtor has the burden to

establish that the holder of the lien to be subordinated has adequate protection") (citation

omitted).  In contrast, a secured creditor seeking to lift the automatic stay under section 362(d)(1)

"for cause, including lack of adequate protection," bears the burden of showing that the debtor

lacks equity in the property.  11 U.SC. §§ 362(d)(1), 362(g)(1);  *see also In re Elmira Litho, Inc.*,

174 B.R. 892, 900–03 (Bankr. S.D.N.Y. 1994).  But in all cases, the creditor bears the burden in

the first instance of establishing the amount and extent of its lien under section 506(a).

The JSNs recognize that they must establish their section 507(b) adequate protection

claim within the rubric of section 506(a).  Further, they concede that the burden of proving the

extent of a claim is typically born by the creditor seeking to establish the claim.  Nonetheless, the

JSNs argue that because their claim seeks adequate protection, the Debtors should have the

burden of proving that the JSNs' interests were adequately protected. The Court disagrees.

The parties established at the outset of this case that the JSNs' interest in their collateral

was adequately protected, when they negotiated, and the Court signed, the Cash Collateral

Order.[30] As the Court explained in its ruling on the motions to dismiss:

> If the value of the JSNs' collateral actually diminishes, then the JSNs may assert
> an adequate protection claim. . . . The Defendants caution against establishing
> new rules on adequate protection and valuation, but the Court's decision is
> premised on the terms of the Cash Collateral Order, which the JSNs helped
> negotiate. That Order provided the JSNs with bargained-for adequate protection.

*Residential Capital*, 497 B.R. at 420. The bargained-for adequate protection included several

liens and the right to assert a claim under section 507(b) for any diminution in value not

otherwise protected. (PX 76 at 29.) That the JSNs now seek to assert this adequate protection

claim based on diminution in value does not shift the initial burden of proving the extent and

validity of the claim under section 506(a) to the Debtors. Rather, this burden remains squarely

with the secured creditor—the JSNs.[31] *See, e.g., Qmect, Inc. v. Burlingame Capital Partners II,*

*L.P.*, 373 B.R. 682, 690 (N.D. Cal. 2007) (affirming bankruptcy court's requirement that secured

---

[30]    There is no question here that the JSNs received adequate protection by a very substantial postpetition lien
on collateral (far beyond the property covered by the JSNs' liens on the petition date). Had there been a contested
cash collateral hearing the Debtors would have had the burden of establishing adequate protection; that was
unnecessary because of the agreement of the parties. The issue now is different: Are the JSNs entitled to recover a
claim based on a diminution in the aggregate value of their collateral at the petition date? As explained in the text,
on that issue the JSNs have the burden of proof.

[31]    None of the cases cited by the Defendants support the proposition that in a post-hoc analysis of the
sufficiency of adequate protection, the debtor continues to bear the burden of proving adequate protection. Rather,
they all involve the well-established rule that, before a debtor may use, sell, lease, or otherwise encumber the
lender's collateral, the debtor must show that the creditor's interest will be adequately protected. *See Swedeland*, 16
F.3d at 564 (discussing whether adequate protection existed sufficient to grant a priming lien); *Wilmington Trust Co.
v. AMR Corp. (In re AMR Corp.)*, 490 B.R. 470, 477–78 (S.D.N.Y. 2013) (discussing whether a secured lender was
entitled to adequate protection during the pendency of the case); *In re Erewhon, Inc.*, 21 B.R. 79, 84 (Bankr. D.
Mass. 1982) (stating that a secured creditor worried about diminution in value need only object to use of collateral
"since the burden of proving adequate protection is substantially that of the Debtor"); *Hamilton Bank v. Diaconx
Corp. (In re Diaconx Corp.)*, 69 B.R. 333, 338 (Bankr. E.D. Pa. 1987) (denying use of cash collateral because debtor
failed to carry burden of showing that secured lender's interest would be adequately protected"). As the Court
already explained, the parties already agreed that the JSNs' interest in their collateral would be adequately protected
when they signed the Cash Collateral Order.

lenders prove diminution in value of collateral prior to foreclosing on replacement liens, because "the purpose of adequate protection is to protect lenders from diminution in the value of their collateral").

> 3.    *Fair Market Value in the Hands of the Debtors is the Proper Petition Date Valuation Methodology.*

The Plaintiffs argue that for adequate protection purposes, the collateral should be valued at the Petition Date based on the foreclosure value of the collateral in the hands of the secured creditor. The Defendants argue that the collateral should be valued based on the fair market value of the collateral in the hands of the Debtors. The Court agrees with the Defendants that fair market value rather than foreclosure value applies, but as explained below, this holding provides little benefit to the Defendants because the Defendants' fair market valuation evidence introduced by their expert witnesses is unreliable, vastly overstates the value of the collateral on the Petition Date, and is rejected by the Court as a basis to establish an adequate protection claim.

To establish their entitlement to an adequate protection claim, the JSNs must show that the aggregate value of their collateral diminished from the Petition Date to the Effective Date. The JSNs will only be entitled to adequate protection, if at all, to the extent of the value of their interest in the collateral as of the Petition Date. 11 U.S.C. § 361. The Supreme Court has explained that the phrase "value of such entity's interest" in section 361 means the same as the phrase "value of such creditor's interest" in section 506(a): the value of the collateral. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372 (1988). Thus, the question becomes how to value the JSN Collateral as of the Petition Date. To answer this question, the Court looks to valuation principles under section 506(a). *See In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72, 74 (1st Cir. 1995) (stating that "a valuation for § 361 [i.e.

adequate protection] purposes necessarily looks to § 506(a) for a determination of the amount of

a secured claim").

       Section 506(a) provides:

> An allowed claim of a creditor secured by a lien on property in which the estate
> has an interest . . . is a secured claim to the extent of the value of such creditor's
> interest in the estate's interest in such property . . . and is an unsecured claim to
> the extent that the value of such creditor's interest . . . is less than the amount of
> such allowed claim. *Such value shall be determined in light of the purpose of the
> valuation and of the proposed disposition or use of such property . . . .*"

11 U.S.C. § 506(a)(1) (emphasis added).

       In *Associates Commercial Corp. v. Rash*, the Supreme Court interpreted section 506(a) in

the context of a chapter 13 plan, where the chapter 13 debtor sought to cram down a plan over

the objection of a secured creditor, keeping the secured lender's collateral.  520 U.S. 953, 955

(1997).  In calculating the value of the lender's secured claim, the Court looked at the first

sentence of section 506(a) and observed that the phrase "value of such creditor's interest" did not

explain *how* to value the interest.  *Id*. at 960–61.  Therefore, the Court looked to the second

sentence of 506(a) and held that "the 'proposed disposition or use' of the collateral is of

paramount importance to the valuation question."  *Id*. at 962.  Based on the proposed disposition

of the property in that case, the Court held that foreclosure value could not be the proper

methodology for valuing the secured creditor's claim.  *Id*. at 963.  Rather, the Court applied

replacement value; the amount a willing buyer would have paid a willing seller for the collateral.

*Id*.

       Although this case involves the consensual use of collateral in the context of a sale under

chapter 11, the reasoning of *Rash* is equally applicable here.  *See In re Motors Liquidation Co.*,

482 B.R. 485, 492 (Bankr. S.D.N.Y. 2012) (holding that "*Rash*'s underlying thought process is

still instructive" in calculating value in a 363 sale and further noting that "[p]ost–*Rash* case law

64

suggests that *Rash* can be applied to the provisions of all three reorganization chapters—11, 12,

and 13—because these chapters all treat secured claims similarly"); *see also Heritage Highgate*,

679 F.3d at 141 (applying *Rash* in chapter 11 to value secured claim under 506(a)).

The Defendants cite only one case that deals with the exact scenario of this case—

diminution of collateral in the context of a consensual use of cash collateral that funded a going

concern sale—in which the district court affirmed application of the *Rash* reasoning in the

adequate protection context. *See Salyer v. SK Foods, L.P. (In re SK Foods, L.P.)*, 487 B.R. 257,

262 n.11 (E.D. Cal. 2013). In *SK Foods*, secured creditors and the chapter 11 trustee had

negotiated a settlement on the amount of the creditors' adequate protection claim, conducting

their valuation based on the proposed disposition of the collateral on the petition date—a going

concern sale. *Id.* at 259–60. The bankruptcy court approved the settlement. *Id.* The appellants

objected, asserting that the proper valuation could only be liquidation value, setting the value of

the secured creditors' adequate protection claim at "0." *Id.* at 260. The district court rejected

that argument, holding that "the Bankruptcy Court properly relied upon the 'liquidation' value

for those assets which were to be liquidated, and as required by *Rash,* properly relied upon the

'going-concern' value for those assets which were to be sold as part of the business as a going

concern." *Id.* at 263.

None of the other cases that the Defendants cite involve the calculation of an adequate

protection claim based on diminution in value due to consensual use of collateral. Instead, the

cases cited by the Defendants involve valuations performed for forward-looking determinations

of whether secured creditors' interests would be adequately protected.[32] Nonetheless, the Court

---

[32]    *See In re Walck*, No. 11-37706 (MER), 2012 WL 2918492, at *2 (Bankr. D. Colo. Jul. 17, 2012) (in the context of a motion for relief from stay, construing section 506(a) in light of *Rash*, finding that secured creditor was adequately protected based on the fair market value of collateral projected to be earned by sale); *Bank R.I. v. Pawtuxet Valley Prescription & Surgical Ctr.*, 386 B.R. 1, 4 (D.R.I. 2008) (holding that going concern/fair market

views the current valuation exercise as similar in nature. That is, the Court is being asked to

apply a Petition Date valuation of the JSN Collateral to determine whether the JSNs' interests as

of that date were adequately protected. In doing so, the Court agrees with the holdings of

*SK Foods* and the other cases cited by the Defendants that the proper valuation methodology

must account for the proposed disposition of the collateral.

The Debtors would like this Court to apply a foreclosure standard based on the JSNs'

interest in the collateral as of the Petition Date, which, the Debtors contend, was simply to be

able to foreclose on the property. Thus, because "the purpose of providing adequate protection is

to insure that the secured creditor receives the value for which the creditor bargained for prior to

the debtor's bankruptcy," *In re WorldCom, Inc.*, 304 B.R. 611, 618–19 (Bankr. S.D.N.Y. 2004),

the JSNs should be entitled to foreclosure value of the collateral as of the Petition Date—and no

---

value could be used where secured lender objected to finding that it was adequately protected); *In re Eskim LLC*, No. 08-509, 2008 WL 4093574, at *2–4 (Bankr. N.D. W. Va. Aug. 28, 2008) (in the context of motion for relief from stay, temporarily permitting debtor to use collateral to bridge to a going concern sale, and finding secured creditor might be adequately protected given that "the court's accepted valuation of the property depends on its being sold at a going concern value – not one of foreclosure"); *In re Pelham Enters., Inc.*, 376 B.R. 684, 690–93 (Bankr. N.D. Ill. 2007) (in the context of a motion for relief from stay, construing section 506(a) in light of *Rash* and rejecting estimated liquidation value of collateral in the hands of creditor given undisputed evidence that the collateral was actually being used as part of debtor's going concern); *In re Deep River Warehouse, Inc.*, No. 04-52749, 2005 WL 1287987, at *7–8 (Bankr. M.D.N.C. Mar. 14, 2005) (construing section 506(a) in the context of a motion for relief from stay, and finding secured creditor to be adequately protected based on real property's going concern value in light of debtor's proposal to retain property as a going concern); *In re Davis*, 215 B.R. 824, 825–26 (Bankr. N.D. Tex. 1997) (construing section 506(a) in the adequate protection context in light of *Rash*, and holding that secured creditor in chapter 13 case was adequately protected based on the car's fair market value as of the petition date when debtor intended to retain and use the collateral); *In re Savannah Gardens-Oaktree*, 146 B.R. 306, 308–10 (Bankr. S.D. Ga. 1992) (adopting going concern valuation where collateral was to be retained and used under chapter 11 plan, in order to determine amount of secured claim under 506(a) and evaluate whether claim would be adequately protected by value of collateral); *In re Kids Stop of Am., Inc.*, 64 B.R. 397, 401–02 (Bankr. M.D. Fla. 1986) (construing section 506(a) in the adequate protection context, and concluding that secured creditor was entitled to continue receiving adequate protection payments because the collateral as of petition date was worth the amount actually realized from asset sales during the case); *Bank Hapoalim B.M. v. E.L.I., Ltd.*, 42 B.R. 376, 379 (N.D. Ill. 1984) (in context of motion for relief from stay, affirming bankruptcy court's utilization of an executed sale contract for valuation of sold collateral under section 506(a) to determine whether the secured creditor was adequately protected); *First Trust Union Bank v. Automatic Voting Mach. Corp. (In re Automatic Voting Machine Corp.)*, 26 B.R. 970, 972 (Bankr. W.D.N.Y. 1983) (for purposes of determining whether secured creditor was adequately protected on motion for relief from stay, rejecting evidence of liquidation value and holding that going concern methodology is appropriate when collateral is to be retained and used).

more.  In support, the Debtors cite to a line of cases holding that under a section 506(a) analysis, a secured lender's interest is limited to the right to foreclose upon the property.[33]

The Court disagrees, and in light of the Supreme Court's rulings in *Rash* and *Timbers*, the Court finds the cases cited by the Plaintiffs unpersuasive.  *See Winthrop,* 50 F.3d at 75–76 (disapproving of cases that "render[] the second sentence of § 506(a) virtually meaningless" and holding that "a court remains faithful to the dictates of § 506(a) by valuing the creditor's interest in the collateral in light of the proposed post-bankruptcy reality: no foreclosure sale and economic benefit for the debtor derived from the collateral equal to or greater than its fair market value").  In this case, the parties were not contemplating on the Petition Date that the creditors might conduct a foreclosure sale.  The Debtors never had any intention of turning over the JSN Collateral to the collateral agent.  (Oct. 15 Tr. 164:21–165:2, 249:6–16.)  Nor did the JSNs foreclose or attempt to foreclose on the assets.  Rather, the JSNs entered into a cash collateral stipulation to allow the sale of assets as a going concern.  (DX AIJ at 5.)  A going concern valuation is consistent with the Debtors' stated purpose in this case as of the Petition Date, which, among other things was "preserv[ing] the Debtors' servicing business on a going concern basis for sale."  (PX 137 at 7.)  The testimony at trial confirmed that the parties always intended to market and sell the properties as a going concern.  This is also evident by looking at the

---

[33]    *See In re Scotia Dev., LLC,* No. 07-20027, slip op. at 23–24 (Bankr. S.D. Tex. July 7, 2008) ("With non-cash property, the interest that secured creditor has a right to is the right to foreclose.  Therefore, the case law suggests that the appropriate value to protect is the foreclosure value of the property and not the fair market value of the property.")*, aff'd in part, In re SCOPAC,* 624 F.3d 274, 285-86 (5th Cir. 2010); *In re Ralar Distribs., Inc.,* 166 B.R. 3, 7 (Bankr. D. Mass. 1994) ("The value relevant for adequate protection purposes, however, is not book value.  It is liquidation value realizable by the creditor."), *aff'd,* 182 B.R. 81 (D. Mass. 1995), *aff'd,* 69 F.3d 1200 (1st Cir. 1995); *Sharon Steel Corp. v. Citibank, N.A. (In re Sharon Steel Corp.),* 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993) (using liquidation value for adequate protection purposes); *United States v. Case (In re Case),* 115 B.R. 666, 670 (9th Cir. B.A.P. 1990) ("If we were attempting to value FmHA's interest in the property for adequate protection purposes, the possibility of forced liquidation would be assumed and a deduction for selling costs would be logical.")*; La Jolla Mortg. Fund v. Rancho El Cajon Assocs.,* 18 B.R. 283, 289 (Bankr. S.D. Cal. 1982) ("In this regard, we must evaluate the collateral, being the adequate protection, in the hands of the claim holder.  It is the creditors' expected costs to liquidate the property that is relevant, not those of the debtor.").

stalking horse APAs that were in place on the Petition Date.[34]  Thus, in determining the value of

the JSN Collateral on the Petition Date, the Court must apply that value based on the proposed

disposition of the collateral—fair market value in the hands of the Debtors.

> 4.    *The JSNs Did Not Calculate the Fair Market Value of the Impaired
> Collateral in the Hands of an Insolvent Company and Have Therefore
> Failed to Carry Their Burden of Proving a Diminution in Value.*

While the Court agrees with the Defendants that the correct methodology for Petition

Date valuation is fair market value in the hands of the Debtors, the Court finds that the

Defendants have not provided a credible valuation of their collateral as of that date.  Therefore,

the Defendants have failed to carry their burden of proving a diminution in the value of their

collateral, and their adequate protection claim fails.[35]

As detailed above, the JSNs offered valuation testimony from four experts affiliated with

Houlihan.  The Houlihan opinions of the fair market value of each asset comprising the JSN

Collateral was informed, where applicable, by the prices obtained in the auction process,

adjusted for cash flows and loan balances back to the Petition Date.  (Siegert Direct ¶ 18.)  In

addition, Houlihan performed a "bottoms-up" fair market valuation as of the Petition Date.  Mr.

Siegert offered a single "Global Summary" of the Houlihan opinions suggesting the net fair

market value of the JSN Collateral on the Petition Date totaled $2.79 billion—nearly $1 billion

more than the stipulated Effective Date value of the same collateral.  (Siegert Direct ¶¶ 4, 25;

---

[34]    The Nationstar APA states clearly that the purchased assets are "Related to the Business."  (PX 33 at 38.)
Related to the Business is defined in the Nationstar APA as "required for, held for, or used in the conduct of the
Business."  (*Id.* at 30.)  The Business described in the Nationstar APA is, broadly, the Debtors' servicing and
origination business.  (*Id.* at 13, definition of "Business.")  In addition, the Nationstar APA specifically enumerates
goodwill as a purchased asset.  (*Id.* at 40.)  Finally, in a provision requiring the Debtors to effect "Separation
Services," the Nationstar APA states that a stand-alone business was part of the bargain, and that "Sellers
acknowledge and agree that Separation Services are intended to permit Sellers to deliver at Closing to the Purchaser
the Business and Purchased Assets as a stand-alone business . . . ."  (*Id.* at 84.)

[35]    The Court notes that it was equally unimpressed with the testimony presented by Mr. Puntus on behalf of
the Plaintiffs.  But since the burden of proof lies with the Defendants, the shortcomings of Mr. Puntus's
methodology do not alter the result.

Oct. 23 Tr. 134:1–14, 141:14–142:6; DX ABF at 10.)  While the Court recognizes that the

Houlihan experts used accepted valuation methodologies, the assumptions and inputs they used

were seriously flawed.  As a result, Houlihan's conclusions regarding value are not credible.

First, the Houlihan experts' valuation assumes that the JSN Collateral could have been

sold on the Petition Date by the Debtors.  (Oct. 22 Tr. 139:18–142:4; Oct. 23 Tr. 147:23–149:3,

149:18–22.)  This assumption ignores reality.  For example, Mr. Levine's opinion assumes a sale

with appropriate representations, warranties, and market indemnifications from the seller; he

valued the assets assuming that they could be sold free and clear of certain obstacles to

sale.  (Oct. 22 Tr. 62:17–21.)  But at trial, Mr. Levine conceded that a sale of MSRs would have

required the consent of the RMBS Trustees and of the GSEs.  (*Id.* at 64:8–65:9.)  Mr. Levine did

not take into account the costs associated with obtaining the requisite consents, and simply

assumed that the transaction would have closed upon the receipt of all required consents.  (*Id.* at

63:15–25.)  Those costs were considerable, including hundreds of millions of dollars in

payments to GSEs to cure alleged liabilities to those entities and obtain their consent to the

sale.  (*Id.* at 67:1–22; PX 388 ¶ 1.)  There was no assurance that the consents could be

obtained.  In addition, the Debtors agreed to settle billions of dollars of potential RMBS liability

to obtain consent of the RMBS Trustees and be able sell the assets free and clear.  (Marano

Direct ¶ 43.)  Mr. Levine's valuation did not account for the potential reduction in funds

available to the lender or seller in a sale of those assets nor did his valuation take into account the

time and difficulty in obtaining those consents.  (*Id.* at 72:7–73:10, 69:10–69:20.)

Second, even assuming that the Debtors could have sold their assets on the Petition

Date—an assumption the Court views with considerable skepticism—the Houlihan valuation

suffers from another, fatal flaw.  When valuing the assets, the Defendants' experts did not look

to sales conducted by other distressed entities on the brink of insolvency.  The experts instead

only considered a solvent company, able to capture fair value for its assets.  Thus, even if the

Court accepts that the assets were saleable on the Petition Date—before all of the of work

conducted during the bankruptcy necessary to make them saleable—the Houlihan experts'

valuation cannot be relied upon because it provides a fair market value of the assets in the hands

of a solvent company.  Most of the assets could not simply be turned over to a buyer who could

instantly reap full value as if the assets were commodity products.  MSRs require that accurate

mortgage security records are provided.  The Houlihan valuation ignores the reality of the period

leading up to this bankruptcy:  ResCap was an insolvent company, over-burdened with debt,

owning assets that had to be "fixed" before they could be sold, and facing a real possibility of

being shut down.  As Mr. Levine testified, the GSEs had the right to terminate ResCap's

servicing rights and transfer the rights to another party upon any breach of their servicing

agreement.  (*Id.* at 96:22–97:7.)  Therefore, the Court finds the Houlihan analysis flawed in its

premise, and unreliable.

The Court is mindful that the Debtors have spent money that belonged to the JSNs.  But

while the JSNs' cash collateral has been consumed during the case consistent with the Cash

Collateral Forecasts, this does not mean that the JSNs have suffered a diminution in the

aggregate value of their collateral.[36]  As already held by the Court, the JSNs are not entitled to an

adequate protection claim on a dollar-for-dollar basis for cash collateral used during the case.

---

[36]      As Collier explains:

> However, often a secured party will consent to limited use of cash collateral to
> preserve the value of his interest in other collateral.  Payment of expenses of
> preserving non-cash collateral, payroll expenses to keep the business operating
> and other immediate cash needs may be as important to a secured party early in
> the case as it is to the debtor in possession.

3 COLLIER ON BANKRUPTCY ¶ 363.03[4], at 363–34.

*Residential Capital,* 497 B.R. at 420.  Where cash collateral use is permitted according to an

approved budget, and the cash collateral order includes a section 506(c) waiver, the two

provisions work in tandem.  Unless the remaining value of the cash and non-cash collateral at the

effective date falls below the value of the collateral on the petition date, the creditor is not

entitled to compensation for the amount of cash collateral spent under the approved budget.  But

the debtor does not get to charge the secured creditor again for any costs of preserving or

enhancing the collateral.

Rather, the Defendants have the burden of showing that there has been a diminution in

the aggregate value of JSN Collateral.  Case law and the Cash Collateral Order both impose this

requirement.  The Defendants failed to make this required showing.  Simply put, the Court

cannot accept that the value of the JSN Collateral on the Effective Date does not exceed the

value of their collateral on the Petition Date, even after the expenditure of the JSNs' cash

collateral.  This result was achieved because the value of the collateral at the Petition Date (even

valued in the hands of the Debtors on a going concern basis) was very substantially impaired by

reason of existing defaults that prevented Debtors from disposing of most of their collateral at

that time.  Through the settlements and consents achieved over many months, with great effort

and expense, the Debtors successfully closed the sales of most of their assets on very favorable

terms.  The JSNs and all estate creditors will benefit from this accomplishment.

C.      **The JSNs Can Establish Whether They Are Oversecured by Aggregating Their Claims against Debtor Entities.**

Under section 506(b) of the Bankruptcy Code, a secured creditor is entitled to postpetition interest, fees, costs and charges to the extent the value of the property securing the creditor's claim is greater than the amount of the creditor's claim.  11 U.S.C. § 506(b).  The Debtors contend that under applicable law, the JSNs must be oversecured at a single Debtor entity—without reference to JSN Collateral held by other Debtor entities—to be entitled to postpetition interest.  In contrast, the JSNs argue that a determination of their oversecured status must be made based on the aggregate value of their collateral, across Debtor entities.  There is a surprising dearth of case law explicitly addressing the issue of valuing the extent of a creditor's security in multi-debtor cases.  The statute likewise does not provide much guidance.  The Court agrees with the JSNs that they are entitled to aggregate their collateral across debtor entities.  Any other reading of the statute would lead to inequitable and illogical results.

Section 506(b) permits a secured creditor to collect postpetition interest to the extent that its "allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim."  11 U.S.C. § 506(b).  Section 506(a), in turn, establishes the rule governing the calculation of secured claims.  That section provides that a creditor's claim is secured "to the extent of the value of such creditor's interest in the estate's interest in [the securing] property."  11 U.S.C. § 506(a)(1).

Based on the language of the statue, the Plaintiffs argue that even where a creditor's claim is secured by collateral pledged by other debtors, it is necessary to examine the value of a specific "estate's interest" under section 506(a) to determine whether the secured creditor is entitled to postpetition interest with respect to its claim against that particular debtor under

72

section 506(b).[37]  This view seems to follow from the general principle that, absent substantive

consolidation, a court will not pool the assets of multiple debtors to satisfy their liabilities.  *See*

*Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515,

518 (2d Cir. 1988).  "Because of the dangers in forcing creditors of one debtor to share on a

parity with creditors of a less solvent debtor, . . . substantive consolidation . . . [is] to 'be used

sparingly.'"  *Id.* (quoting *Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d 845, 847 (2d

Cir.1966)) (citation omitted).  But aggregating collateral for purposes of determining whether a

secured creditor is oversecured and entitled to postpetition interest and fees does not run afoul of

this rule.  No debtor in a multi-debtor case will be required to pay a secured creditor more than

the value of the secured creditor's collateral.  The secured creditor by definition has a superior

right to the value of the collateral; junior creditors have no right to share on a parity with the

secured creditor.

In support of their interpretation of section 506(a), the Plaintiffs cite to *DeNofa v. Nat'l*

*Loan Investors L.P. (In re DeNofa)*, 124 F. App'x 729 (3d Cir. 2005).  In *DeNofa*, the Third

Circuit addressed whether a secured creditor, secured by both debtor and non-debtor assets, was

entitled to aggregate its collateral to become oversecured.  *Id.* at 730–31.  The court held that it

was not, stating that "the allowed secured claim of [a secured lender to] examine for purposes of

postpetition interest under § 506(b) is limited to the extent of the value of the property of the

---

[37]       As a matter of statutory construction, the Defendants argue that while section 506 of the Bankruptcy
Code—and indeed, the entire Bankruptcy Code— is written for a single debtor, section 102(7) of the Bankruptcy
Code (the "Rules of Construction" section) explicitly provides that "the singular includes the plural."  11 U.S.C. §
102(7).  Thus, in multi-debtor cases, courts will treat Bankruptcy Code provisions that refer to a single debtor as
referring to all debtors.  *See, e.g., In re Vagi*, 351 B.R. 881, 885 (Bankr. N.D. Ohio 2006) (holding that, in a case
involving co-debtors, under subsection 102(7), the phrase "acquired for the personal use of the debtor" in subsection
1325(a) "may also be read, 'acquired for the personal use of the debtors'").  The Defendants contend therefore that
section 506(a)(1) is properly read as follows: "an allowed claim of a creditor secured by lien[s] on property in which
the estate[s] have an interest . . . is a secured claim to the extent of the value of such creditor's interest in the
estate[s'] interest in such property . . . ."  (Defendants' Motion to Dismiss, ECF No. 13-01343 Doc. # 21-1 at 9.)
The Court is unconvinced by either party's statutory interpretation argument.  Indeed, the statute seems silent on the
issue at hand.

[debtor's] bankruptcy estate which secures it [under § 506(a)]." *Id.* at 731. But *DeNofa* dealt with debtor and non-debtor entities; it did not address the situation presented here—multiple debtor obligors may own collateral sufficient, in the aggregate, to render a secured creditor oversecured. While the Plaintiffs contend this is a distinction without a difference, the Court disagrees. There is no scenario where a debtor will ever have to pay on a secured claim more than the value of the collateral securing the debt. However, when all of the secured lender's obligors are in bankruptcy, to the extent that the aggregate value of the collateral exceeds the lender's claim, the estates' unencumbered assets are unaffected by the payment of postpetition interest, and there is nothing inequitable about permitting the secured lender to apply its collateral towards postpetition interest once its prepetition claim has been paid in full. Therefore, *DeNofa*'s analysis is not dispositive of the questions presented here.[38]

In another ill-fated attempt to shed light on the issue, the Plaintiffs cite to a Second Circuit case holding that the filing of a joint petition by spouses under section 302 of the Bankruptcy Code "does not automatically consolidate their estates," nor does it "allow the property of one spouse to be used to satisfy the debts of the other spouse." *Wornick v. Gaffney*, 544 F.3d 486, 491 (2d Cir. 2008). In *Wornick*, the Second Circuit held that "the trustee may not reach assets in a joint filing that he could not have reached had the spouses filed separately." *Id.* The Plaintiffs assert that the same principle should prevail in the context of section 506(a).

---

[38]     Another case cited by the Plaintiffs is equally unhelpful because it also deals with non-debtor entities. *See Official Comm. of Unsecured Creditors of Toy King Distribs., Inc. v. Liberty Sav. Bank (In re Toy King Distribs., Inc.)*, 256 B.R. 1, 187 (Bankr. M.D. Fla. 2000) ("Although the collateral subject to [creditor's] loan includes the property of the individual guarantors and property of the debtor, only the debtor's property is relevant to the court's determination of the secured status of [creditor's] claim against the debtor under Section 506."). The Defendants also argue out that even if *Denofa*'s interpretation of subsection 506(b) is correct, it would not change the outcome here, because pursuant to section 102(7), "the singular includes the plural," and the term "estate" must be interpreted as including all debtor "estates" holding collateral. Therefore, *DeNofa* could still be read to include all debtor estates in the section 506(b) calculation.

But comparison to *Wornick* ignores the important fact that only collateral securing the

debt is at stake here; *Wornick* is easily distinguishable and of little utility to the Court.  The

interests at question in *Wornick* were the cash surrender values of several life insurance policies.

*Id.* at 488.  The Second Circuit found that under the applicable state insurance law, had the

spouses filed separately, neither spouse's creditors could have claimed an interest in the policies'

surrender values.  *Id.* at 489–91 (finding that "the beneficiary has no legal or equitable interest in

the policy that could be made part of the property of the beneficiary's bankruptcy estate" and that

"the trustee would have been powerless to administer the cash surrender value as part of the

estate of the owner/insured because [insurance law] provides an express exemption in favor of

the beneficiary").  Under those facts, the court held that "[a] joint filing does not vest the trustee

with the power to reach a spouse's assets that would have otherwise been insulated . . . ."  *Id.* at

491.  The facts in front of this Court are completely different.  The JSNs do have a right to assert

claims against property held at each of the individual Debtors.  Thus, the question presented here

does not involve property that does not form part of the secured creditor's collateral; only

collateral pledged to the secured creditor will be used to pay postpetition interest.  Rather, the

question is whether property subject to the JSNs' liens, held across multiple debtors, can be

aggregated for the purposes of making the JSNs oversecured.

The Defendants cite two cases explicitly rejecting arguments that a secured creditor had

to be oversecured at a single debtor in order to be entitled to postpetition interest.[39]  *See In re SW*

*Hotel Venture, LLC,* 460 B.R. 4, 26 (Bankr. D. Mass. 2011), *aff'd in part and rev'd on other*

---

[39]    Other cases cited by the Defendants either involved substantively consolidated debtors or merely assumed, without discussing, that collateral could be aggregated across debtors.  *See, e.g., In re Gen. Growth Props., Inc.,* No. 09-11977 (ALG), 2011 WL 2974305, *1 n.3 (Bankr. S.D.N.Y. July 20, 2011); *In re Capmark Fin. Grp., Inc.,* 438 B.R. 471, 490, 501 (Bankr D. Del. 2010); *In re Dana Corp.,* 367 B.R. 409, 412 (Bankr. S.D.N.Y. 2007); *In re Urban Communicators PCS Ltd. P'ship,* 379 B.R. 232, 244 (Bankr. S.D.N.Y. 2007), *aff'd in part and rev'd in part on other grounds,* 394 B.R. 325 (S.D.N.Y.2008); *In re Fiberglass Indus., Inc.,* 74 B.R. 738, 740 (Bankr. N.D.N.Y. 1987).

grounds sub nom. *Prudential Ins. Co. of Am. v. City of Boston (In re SW Boston Hotel Venture, LLC)*, 479 B.R. 210 (B.A.P. 1st Cir. 2012); *In re Revolution Dairy, LLC*, Case No. 13-20770 (Bankr. D. Utah Apr. 29, 2013) Hr'g Tr. [Docket No. 206] (the "Rev. Dairy Tr."). In *SW Hotel Venture*, the debtors, like the Plaintiffs here, argued that a secured creditor "cannot aggregate the value of all of the Debtors' assets to establish an entitlement to postpetition interest." 460 B.R. at 22. The court "unequivocally reject[ed]" this argument, ruling instead that "the determination of [a secured creditor's] status as an oversecured (or undersecured) creditor must be made aggregating the collateral of all the Debtors . . . ." *Id.* at 33.[40] In *Revolution Dairy*, the court reached the same conclusion. There, affiliated debtors argued that the collateral held by each debtor should be considered separately for purposes of determining the secured creditors' entitlement to postpetition interest and fees under section 506(b). In rejecting the debtors' position, the court noted that the debtors' failure to "cite . . . case authority in support of their argument" was "not surprising," as "[t]he argument is clearly inconsistent with the code and cannot stand modest scrutiny." *Revolution Dairy*, No. 13-20770, Rev. Dairy Tr. at 12:19-13:3.

In this case, given the facts that lead to the creation of the JSNs' liens, the Court believes that the Defendants' interpretation of section 506 best reflects reality and comports with the purpose underlying the Bankruptcy Code. The Plaintiffs argue that adopting the Defendants' suggestion that courts can "cavalierly pool collateral from multiple debtors" runs contrary to the plain text of the statute and the principle of law "deeply ingrained" in American corporate and bankruptcy jurisprudence that corporate separateness must be respected absent extraordinary circumstances. *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (refusing to disturb corporate separateness to penalize shareholders of polluting company). According to the

---

[40]    While the court reached this conclusion in the context of a plan that provided for limited substantive consolidation under section 1123(a)(5)(C), the court seemingly reached its conclusion independently, rejecting the debtor's argument "particularly in view of the provisions of [the] Plan." *SW Hotel Venture*, 460 B.R. at 33.

76

Plaintiffs, "arbitrarily merging the assets and liabilities of multiple distinct entities would upset

creditors' expectation that the assets of their debtor will be available to satisfy their claim."

(Plaintiffs' Post Trial Brief, ECF Doc. # 186 at 66.) *See, e.g.*, *Augie/Restivo,* 860 F.2d at 518–19

("[C]reditors who make loans on the basis of the financial status of a separate entity expect to be

able to look to the assets of their particular borrower for satisfaction of that loan."); *In re Tribune

Co*., 464 B.R. 126, 182 (Bankr. D. Del. 2011) ("In the absence of substantive consolidation,

entity separateness is fundamental.").

The Plaintiffs woefully mischaracterize the present situation.    Only the value of the JSN

Collateral would be used to satisfy their claims.    They would have this Court ignore the reality

of their business arrangement with the JSNs, in favor of a formulaic adherence to fictional

corporate separateness.    Far from "arbitrarily merging" assets of distinct entities, the Court is

giving the JSNs the benefit of their bargain.    The JSN Indenture explicitly provides that the JSNs

are entitled to collect interest until the principal was paid in full.    (DX CN at 7; PX 1 at 51.)    In

the Offering Memorandum, the Debtors represented that the JSNs would be secured by ResCap

and its subsidiaries, together, jointly and severally.    (PX 175 at 1 ("The new notes will be issued

by ResCap and will be secured by substantially all of our existing and after-acquired

unencumbered assets remaining available to be pledged as collateral as described below.    The

notes will also be unconditionally guaranteed by subsidiaries of ResCap."); PX 1. at 79–80.)

"Guarantor" is defined in the JSN Indenture as "(i) each of the Subsidiaries of the Company that

is a party to this Indenture, and (ii) any other Subsidiary that executes a supplemental indenture

in accordance with the provisions of this Indenture."    (PX 1 at 14.)    The Guarantors provided

unconditional guarantees to the JSNs *jointly and severally*.    (*Id.* at 79–80.)    Additionally, the JSN

Indenture required that if the Debtors moved assets to a Significant Subsidiary or created a

Significant Subsidiary,[41] such Significant Subsidiary would become a Guarantor, subject to

certain exceptions. (*See, e.g.*, *id.* at 59–60 (Section 4.17 requiring all "Significant Subsidiaries"

to become "Guarantors" and thus also "Grantors" under the JSN Pledge Agreement).)

Outside of bankruptcy court the JSNs would have been entitled to levy against the assets

of any and all of the Obligors and Guarantors to secure their rights to collect interest until

principal was paid in full. (*Id.* at 79–80.) The JSN Indenture explicitly states that the JSNs are

entitled to collect postpetition interest in the event of a bankruptcy proceeding, to the extent

allowed by law. (*Id.* at 51.) The JSN Indenture contains no provision conditioning those interest

payments on the JSNs being oversecured at any single Debtor entity.

Additionally, the Debtors routinely reported their financial status in consolidated

financial statements. (*See, e.g.*, DX GU; DX HQ; DX IT; DX JT.) The Debtors continued to

report collateral value in the aggregate after the Petition Date. (*See, e.g.*, Monthly Operating

Report for the Period from September 1, 2012 through September 30, 2012, ECF 12-12020 Doc.

# 1914; Monthly Operating Report for the Period from August 1, 2013 through August 31, 2013,

ECF 12-12020 Doc. # 5209.)

The Defendants' view more accurately reflects the reality of this case. It also reflects the

workings of the business world at large. For example, like the JSN Indenture at issue here, most

indentures allow debtors to move assets among their subsidiaries, and to create new subsidiaries,

as long as the creditors continue to maintain liens in such assets. (See PX 1 § 4.7 (requiring all

---

[41]        "Subsidiary" is defined in the JSN Indenture as "any corporation, partnership, limited liability company,
association or other entity of which at least majority of the outstanding stock or other interest having by its terms
ordinary voting power to elect majority of the board of directors, managers or trustees of such corporation,
partnership, limited liability company, association or other entity (irrespective of whether or not at the time stock or
other interest of any other class or classes of such Person shall have or might have voting power by reason of the
happening of any contingency) is at the time owned by the Company, or owned by one or more Subsidiaries, or
owned by the Company and one or more Subsidiaries (it being understood that GMAC Bank is not Subsidiary)."
(PX 1 at 24.) "Significant Subsidiary" is defined in the JSN Indenture as any Subsidiary that met certain threshold
conditions respecting the income or proportionate share of the total assets of the Company and Subsidiaries on a
consolidated basis. (*Id.*)

"Significant Subsidiaries" to become "Guarantors" and thus also "Grantors" under the JSN

Pledge Agreement).)  This flexibility is beneficial to borrowers, as it enables them to employ

varying corporate structures in order to avail themselves of tax benefits, limit their liability, and

comply with a multiplicity of regulatory requirements (for example, state laws requiring that

construction or other permits be obtained by a domestic entity).  *See, e.g.*, *In re Owens Corning*,

419 F.3d 195, 200 (3d Cir. 2005) ("[Parent] and its subsidiaries (which include corporations and

limited liability companies) comprise a multinational corporate group. Different entities within

the group have different purposes.  Some, for example, exist to limit liability concerns (such as

those related to asbestos), others to gain tax benefits, and others have regulatory reasons for their

formation.").  For these Debtors, the use of special purpose subsidiaries was particularly

necessary in order to allow the Debtors to obtain financing secured by mortgage loans.  (*See* ECF

12-12020 Doc. # 1546 ¶ 49 ("Presumably to avoid the burden and expense of preparing and

recording separate mortgages on each parcel of property, the Debtors are permitted to transfer

real property to SPVs whose equity were pledged under the Security Agreements.").)

        If, to be oversecured, and thus entitled to payment in full of all amounts owing, including

postpetition interest, fees, costs, and charges in a bankruptcy case, secured lenders were required

to be oversecured at a single entity, credit agreements and indentures might begin to prohibit

corporate families from employing the type of complex subsidiary and affiliate structures that are

currently commonplace and borrowers will be required to hold all collateral at a single entity.

Lenders might also require their approval before collateral could be moved among entities.

Absent these precautions, lenders would be less willing to extend credit (especially to borrowers

in precarious economic situations, who may be most in need of financing), or would charge

higher interest rates to compensate for the possibility that their contractual rights to postpetition interest, fees, costs, and charges will not be honored in bankruptcy.

Moreover, if the Plaintiffs' view is accepted, section 506(b) will effectively be nullified in multi-debtor cases where a secured creditor is not oversecured at any single debtor, even in instances where the creditor is vastly oversecured by the property held by the debtors in the aggregate.  An interpretation of section 506(b) that allows for this scenario defies common sense. For all of these reasons, the Court holds that the JSNs must be allowed to aggregate collateral held at each of the Debtors in order to calculate the extent of their security.

**D.      Since the Debtors Can Aggregate Collateral, the Court Must Determine What Constitutes JSN Collateral.**

The parties agree to a $1.88 billion baseline valuation of the JSN Collateral on the Effective Date, but the Defendants want to add to that figure, and the Plaintiffs want to subtract from it.  The analysis below addresses both the Defendants' attempts to add to their collateral along with the Plaintiffs' challenges to certain JSN liens on collateral.

*1.      The JSNs Are Not Entitled to Additional Sale Proceeds for the HFS Collateral.*

The Defendants claim that the JSNs' liens attach to an additional $66 million of cash proceeds from the Berkshire sale, based on their expert's allocation of the sale price to the HFS loans.  Mr. Fazio conducted an analysis of the value of the HFS loans sold to Berkshire, reaching a value that was $66 million higher than that provided by the Plaintiffs.  Mr. Fazio testified that he did not rely on the pricing formula in the Berkshire APA, which broke the HFS loan portfolio into categories based on only one criterion, but instead looked at all the credit quality and credit statistics associated with each of the portfolios to determine value.  (Oct. 22 Tr. 167:16–24.)  In general, those statistics—including borrower credit rating, interest rate, and delinquency—were better for the JSN loan collateral than for the non-JSN Collateral.  (*See* DX ABI at 5–7.)

80

The Court does not find Mr. Fazio's calculation the best indicator of the value of the HFS

loans.  In applying his own methodology to allocate the value of the HFS Portfolio between JSN

and non-JSN Collateral, Mr. Fazio disregarded the actual purchase prices that Berkshire

Hathaway agreed to pay for the collateral pursuant to § 3.1(a) of the Berkshire APA, which was

an arm's-length agreement.[42]  (PX 31 at 27.)  The Berkshire APA classified the loans within the

HFS Portfolio into six buckets based on certain characteristics:  (1) Performing First Lien;

(2) Non-Performing First Lien; (3) Performing Second Lien; (4) Non-Performing Second Lien;

(5) Other; and (6) Securitized Advances.  (Oct. 22 Tr. 161:20–162:11, 163:7–17; PX 31 at 19.)

The Berkshire APA established different purchase prices calculated as percentages to be

multiplied by the unpaid principal balance of the loans, for each category (plus any adjustments

for the document deficiency multiplier).  (Oct. 22 Tr. 162:12–19; 164:8–166:13; 167:25–168:18;

PX 31 at 20.)  Rejecting these contractual purchase prices, Mr. Fazio reclassified the loans based

on characteristics such as origination vintage, product type, or adjustable or fixed rate mortgage,

and valued the loans within his classifications based on metrics such as borrower credit scores

and interest rates, to derive his bottoms-up valuation.  (Oct. 22 Tr. 154:24–158:11, 159:3–9,

164:1–7, 169:2–10; DX ABI at 5, 19–22.)

Where, as here, an asset is sold in an arm's-length transaction, the fair market value of

such asset is conclusively determined by the price paid.  *See Romley v. Sun Nat'l Bank (In re*

*Two "S" Corp.),* 875 F.2d 240, 244 (9th Cir. 1989); *see also Covey v. Davlin (In re Hobbick*),

No. 97-83543, 2001 WL 34076375, at *14 (Bankr. C.D. Ill. Sept. 10, 2001).  The Berkshire APA

was the result of a highly competitive auction process approved by the Court, and the price paid

---

[42]   Here, the Court distinguishes between allocation and calculation.  As the Court already held in connection
with the Ocwen APA, any purchase price allocation in the Berkshire APA was for tax purposes only.  (PX 31 at 30.)
This is distinct from the calculations relied upon here, which set out actual formulas for determining the amount
Berkshire would eventually pay for different categories of loans.

for the whole loans was the result of arm's-length negotiations that established the fair market value of each category of loans. The Court will not rely on Mr. Fazio's reallocation of Berkshire's price calculation. The Court finds that the JSNs are not entitled to a lien on additional sale proceeds for the HFS loans.

>    2.    *The JSNs Are Entitled to a $17 Million Increase in FHA/VA Loan Value*.

The Defendants seek to add an additional $17 million to the baseline collateral, to reflect a net increase to the value of the FHA/VA loans. The difference between the Plaintiffs' and Defendants' valuations of the FHA/VA loans is attributable to their methodologies. The Plaintiffs' expert Mr. Renzi employed a recovery analysis, discounting the figures in the Debtors' April 30, 2013 balance sheet for assumed costs of collection. (Oct. 16 Tr. 139:5–11.) Mr. Renzi assumed a recovery rate of 91.1% of book value, deducting the costs, expenses and risks associated with disposing of the assets. (Renzi Direct ¶ 13; Oct. 16 Tr. 144:20–145:2.) The Defendants' expert Mr. Fazio employed a fair market value analysis. Mr. Fazio assumed that the loans would monetize over a 30–36 month period. (DX ABI at 59.) Mr. Fazio discounted the estimated cash flow at 5% over the three year period, taking into consideration the risk of loss and government insurance. (*Id.*) Ultimately, Mr. Fazio valued the FHA/VA loans at 95% of book value. (*Id.*) The Plaintiffs challenge Mr. Fazio's assumption that the loans would be run-off in three years, claiming that the Debtor documents on which he relied actually project a seven-year timetable. (Oct. 22 Tr. 169:15–175:8; DX ABI at 58; *see also* Puntus Direct ¶ 162.) Mr. Fazio stated at trial that while his calculations were based on a 100% monetization by the end of the third year, it is possible that some small "insignificant amount" of the loans would not be monetized until years later. (Oct. 22 Tr. 174:22–175:8.)

The Court believes that fair market value, and not recovery value, was the correct methodology for valuing the FHA/VA loans.  Even if there are costs in monetizing the loans, the JSNs should not be charged with these costs when valuing the amount of their secured claim pursuant to section 506(b).  Under section 506(b), postpetition interest, fees, costs and charges may only be offset by the amounts chargeable to collateral under section 506(c).  11 U.S.C. §§ 506(b)–(c).  Here, there are no such costs under section 506(c) because the Debtors waived their section 506(c) rights in the Cash Collateral Order.  (PX 76.)  Thus, the premise of the Plaintiffs' recovery analysis—that the assets will continue to generate expenses and cost money to monetize—runs counter to section 506(b).  The Court finds that the JSNs are entitled to a lien on an additional $17 million for the FHA/VA loans.

>    3.    *The JSNs Are Entitled to Another $40 Million in Liens on Non-Debtor Equity*.

The JSNs claim they have a lien on an additional $40 million of equity interests in non-Debtor subsidiaries.  Their argument is based on a report filed by the Debtors, titled *Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Debtors' Estates Hold a Substantial or Controlling Interest* (the "Periodic Report"), which included a summary balance sheet for each of the non-Debtor subsidiaries.  (*See* DX ABI at 68–69.)  Using the Periodic Report as a guide, Mr. Fazio concluded that the value of the equity pledges in non-Debtor Subsidiaries was approximately $40 million.  (*Id.*)  Specifically, Mr. Fazio calculated that the value of the equity pledges in the Non-Debtor subsidiaries were $26 million in CAP RE of Vermont, LLC; $3 million in CMH Holdings LLC; $1 million in GMAC-RFC Europe Limited; and $10 million in GMAC-RFC Holdings Limited.  (*Id.*)

The Plaintiffs have not offered any evidence regarding these equity interests.  At trial, Mr. Renzi testified that Plaintiffs' counsel told him that the non-Debtor subsidiaries had very

limited equity value due to contingent liabilities, namely litigation liability. (Oct. 16 Tr. 153:16–154:3.) Plaintiffs' counsel further informed Mr. Renzi that the probability was high that the Debtors would not prevail in the litigation. (*Id.* at 154:4–9.) Instead of presenting a risk-adjusted equity value to account for the litigation risk at the Non-Debtor subsidiaries, based upon his conversations with counsel, Mr. Renzi presented the equity value in those entities as zero. (*Id*. at 153:12–154:15.)

Moreover, the Plaintiffs have not refuted that the JSNs have a lien on equity pledges. The Defendants have carried their initial burden of putting forth evidence to show they have an interest in the equity of these non-Debtor subsidiaries, in an amount totaling $40 million. The Plaintiffs' expert did not produce a value for the equity; Mr. Renzi simply valued the equity at "0." The Plaintiffs have therefore failed to put forth sufficient evidence to rebut the Defendants' claim. *See Heritage Highgate*, 679 F.3d at 140 ("It is only fair . . . that the party seeking to negate the presumptively valid amount of a secured claim—and thereby affect the rights of a creditor—bear the initial burden. . . . If the movant establishes with sufficient evidence that the proof of claim overvalues a creditor's secured claim because the collateral is of insufficient value, the burden shifts."). The Court finds that the JSNs have a lien on $40 million of equity at non-Debtor entities.

### 4.    *The JSNs Do Not Have a Lien on Any Collateral Pledged to the AFI LOC*.

The Defendants offer two arguments for why the JSNs have liens on approximately $910 million in collateral pledged to the AFI LOC. First, the Defendants claim that the collateral was previously pledged to the JSNs and was never properly released from the JSNs' liens, so their liens still attach to the collateral. Second, the Defendants assert that even if their liens on the collateral were released, paragraph 5(g) of the Cash Collateral Order revived those liens. Both arguments fail.

84

a.    All JSN Collateral Subsequently Pledged to the AFI LOC Was
Properly Released Before Being Pledged to the AFI LOC.

In 2010 and 2011, Wells Fargo, acting as Third Priority Collateral Agent (i.e., the

collateral agent for the Junior Secured Notes) consented in writing to the release of a variety of

assets from the Notes Collateral that were then pledged to AFI under the LOC Facility.  Wells

Fargo did this by executing the Blanket Loan Release, which released the JSNs' security interest

in the Released Loan Collateral, and the Servicing Advance Release, which released the JSNs'

security interest in the Released Advances.  Wells Fargo then filed U.C.C.-3 amendments that

deleted the Blanket Released Collateral from the collateral provided in the original U.C.C.-1

financing statements (as amended) filed by the Third Priority Collateral Agent.

The Defendants previously contested the effectiveness of those releases.  The Court

rejected the Defendants' arguments, holding that the releases were effective and entitled to

enforcement.  *See Residential Capital*, 497 B.R. at 416–17.  Specifically reviewing the Blanket

Loan Release—which accounts for approximately 97% of the $910 million in dispute—the Court

found that the descriptions of the collateral covered by that release satisfied U.C.C. 9-108(b)'s

requirement for reasonably identifying the released collateral, and the U.C.C.-3s "are therefore

valid."  *Id*. at 418.

At trial, the Defendants tried to attack the releases of the collateral pledged to the AFI

LOC by arguing that there was an insufficient paper trail documenting the releases.  This is not

so.  The Blanket Loan Release released, among other things, "Servicing Rights Collateral" and

"Subject Mortgage Loans."  The releases provided three means for determining whether an asset

was a Subject Mortgage Loan that had been released from the Revolver and Junior Secured

Notes:

- a "Mortgage Schedule delivered under the LOC Loan Agreement";

85

- in the backup to the monthly borrowing base reports or monthly collateral reports under the LOC Loan Agreement, which reflected the carrying value of the assets pledged to the LOC Facility; or

- most broadly, any of the Debtors' "books and records" reflecting that a loan had been pledged to the LOC Facility. This category would include, among other things, the CFDR, which tracked various details concerning the Debtors' loans, including the facility (if any) to which such loans were pledged.

(PX 134.)

Under these terms, if a loan was listed on the CFDR as pledged to the AFI LOC, it was covered by the Blanket Loan Release. There is no dispute that the collateral in question was listed in the CFDR as pledged to the AFI LOC. The Court has already admitted the CFDR as a reliable record that was subject to rigorous audits and controls. Therefore, the releases were effective since the loans appeared in the CFDR as pledged to the AFI LOC. Moreover, a written description of the released collateral was attached as an exhibit to the U.C.C.-3 amendments, which the Third Priority Collateral Agent also filed to delete the Blanket Released Collateral from the collateral set forth in the original U.C.C.-1 financing statements. These written descriptions put all potential creditors on notice that the collateral they covered includes certain servicing rights and mortgage loans (among other assets), and that further diligence may be required to determine to whom they are pledged. As the Court has explained, the U.C.C.-3s are sufficient to satisfy the lenient description standards outlined in U.C.C. § 9-108(b)(6) because the descriptions of the collateral released "reasonably identif[ied]" the collateral released, satisfying the U.C.C. permissive standard. *See Residential Capital*, 497 B.R. at 418.

The Court's conclusion applies with equal force to the Servicing Advance Release. Like the Blanket Loan Release, the Servicing Advance Release contained a description of various categories of Released Advances that were being released from the JSNs' liens, which included, among others, any existing and future advances relating to mortgage loans and REO property,

made pursuant to certain contracts with Freddie Mac.  Moreover, the Servicing Advance Release described all servicing advances pledged to the AFI LOC.

The Defendants contend that other back-up documentation should exist regarding the release of this $910 million of assets, including schedules of mortgage loans, collateral addition notices to the LOC Facility, and electronic templates used to update the CFDR.  But there is no need for this type of additional back-up.  The CFDR suffices for the Blanket Loan Release, and the Servicing Advance Release effectively released all advances pledged to the AFI LOC.

> b.    Paragraph 5(g) Did Not Revive Any Liens on Collateral Pledged to the AFI LOC or to Any Other Previously Released Collateral.

The Defendants ask the Court to interpret paragraph 5(g) of the Cash Collateral Order to mean that the Debtors agreed that assets released from the JSNs' liens years earlier were revived by the Order.  If so, the Defendants would have a lien on the collateral pledged to the AFI LOC, totaling an additional $1.1 billion in value.  In ruling on the motions to dismiss, the Court determined that it would benefit from a greater factual record on this issue, and extrinsic evidence could be submitted to establish the meaning of paragraph 5(g).  *Residential Capital,* 497 B.R. at 403.  Based on the evidence submitted by both sides, the Court concludes that the Defendants' interpretation of paragraph 5(g) fails on multiple grounds.

*First*, the Court notes that no party ever disclosed this purported effect of paragraph 5(g) to the Court when the Cash Collateral Order was proposed or at any contemporaneous hearing, despite Local Rule 4001-2(a)(6).  That rule requires disclosure of provisions in a cash collateral motion that would secure prepetition debt with liens on assets that the creditor would not otherwise have by virtue of the prepetition security agreement or applicable law.  The Court will not countenance the Defendants' attempt to slide a $1.2 billion windfall past the Court and past the Plaintiffs.

87

*Second*, other portions of the Cash Collateral Order reveal the parties' intent at the time the order was submitted. For instance, the very next stipulation in the Cash Collateral Order provides an overview of the collateral securing the Junior Secured Notes:

> [T]he collateral securing the Junior Secured Notes Obligations includes, among others . . . the categories of assets under the columns labeled "Ally Revolver" and "Blanket" set forth on Exhibit A to this Final Order . . . .

(PX 76 at 12.) If, at the time the Cash Collateral Order was negotiated, the JSNs actually believed that they were being granted new liens on the AFI LOC collateral, paragraph 5(h) should have included "AFI LOC" in the categories of assets securing the Junior Secured Notes on Exhibit A to the Cash Collateral Order.

Moreover, the Defendants reading of Paragraph 5(g) is also not supported by the language of the Cash Collateral Order. For example, in Paragraph 5(g), the Debtors acknowledge that the JSNs' liens are "subject and subordinate *only*" to the liens granted under the Revolver. (*Id.* at 11–12 (emphasis added).) This provision does not also subordinate JSNs' purported lien to the LOC Lenders' lien under the LOC Facility. Under the Defendants' proposed interpretation of Paragraph 5(g), the JSNs' purportedly revived lien on the AFI LOC collateral is elevated ahead of the LOC Lenders' (uncontrovertibly senior) lien in that collateral. AFI would not have agreed to such a provision, especially since it relied on the AFI LOC collateral to make the postpetition advances under the Cash Collateral Order.

In addition, in granting the JSNs a postpetition adequate protection lien on the Revolver Collateral and the AFI LOC collateral, the Cash Collateral Order subordinated adequate protection liens to any *existing* liens on the same collateral. To that end, with respect to the JSNs' adequate protection lien on the Revolver Collateral, the order acknowledges that the adequate protection lien is junior to (among other things) the "*existing liens granted to the Junior*

88

*Secured Parties*." (*Id*. at 28 (emphasis added).)  But the order does not contain similar language with respect to the adequate protection lien in the AFI LOC collateral, indicating that the JSNs did not have an existing lien on that collateral.  (*Id*. at 28–29.)

Aside from the terms of the Cash Collateral Order, other documents filed simultaneously in the bankruptcy court reflect that the stipulations in paragraph 5(g) were not intended to revive previously released liens.  For example, the Debtors indicated in their motion seeking approval of the Barclays DIP Facility that any purported equitable lien asserted by the JSNs on the assets securing the AFI LOC was not a valid, perfected, and nonavoidable lien or security interest as of the Petition Date.  (PX 88 at 55.)  Offering that argument is squarely at odds with a purported stipulation to the validity of a lien on that collateral.

*Third*, the testimony of Mr. Siegert indicates that when the parties were negotiating the Cash Collateral Order, the JSNs did not believe that the Order would revive liens on more than $1 billion in released collateral.  The JSNs did not include the value of the assets securing the AFI LOC in their own contemporaneous analysis of the collateral securing the Junior Secured Notes.  On cross-examination, Mr. Siegert was shown a Houlihan presentation dated May 14, 2012, which was prepared immediately before the Petition Date.  (PX 169; Oct. 23 Tr. 110:8–23.)  That presentation valued the JSNs' collateral.  Mr. Siegert acknowledged that if the counsel for the JSNs had concluded that the Debtors had stipulated to JSN liens on the AFI LOC collateral, that would have been a material fact for Houlihan to consider when presenting estimates of the value of the JSN Collateral.  (Oct. 23 Tr. 127:25–128:21.)  And further, that would have been a material fact for Houlihan to convey to the JSNs.  (*Id.*)  But the May 14 Houlihan presentation did not reflect any liens on the AFI LOC collateral.  (*Id.*)

It defies the parties' conduct and the terms of the Cash Collateral Order to argue that paragraph 5(g) revived previously leased liens. The JSNs do not have a lien on any AFI LOC collateral by virtue of paragraph 5(g).

### 5.    General Intangibles

The Defendants argue that the value of the JSN Collateral on the Effective Date should increase beyond the $1.88 baseline valuation because the baseline valuation does not account for certain JSN liens on intangible assets. Specifically, the Defendants argue that the Debtors sold intangible assets subject to JSN liens during the Ocwen asset sale, but the Debtors did not allocate any portion of the proceeds to intangibles subject to JSN liens. These intangibles include software, certain refinancing opportunities, trademarks, and goodwill. According to the Plaintiffs, Ocwen and Walter did not place any value on these intangibles, so it is not proper to allocate any proceeds to intangible value. Further, the Plaintiffs argue that to the extent the JSNs had any lien on goodwill, that goodwill was created postpetition and is not subject to any JSN lien. The Defendants respond that they had a lien on assets sold to Ocwen, but have received no benefit of the sale simply because the Ocwen APA assigned no value to the intangibles, even though the Ocwen APA provided that Ocwen and Walter were buying "goodwill and other intangible assets." (PX 19.) According to the Defendants, the Court may still assign value to the intangible assets based on the work of the Defendants' expert Mr. Taylor, who used general accounting principles to value the intangible assets.

### a.    The JSNs Had Liens on Software Sold to Ocwen.

In the JSN Security Agreement, the JSNs were specifically granted a lien on computer software as well as general intangibles. (*See* PX 4.) The Debtors used software in connection with the PLS MSRs and the GSE MSRs. (Oct. 15 Tr. 171:10–12.) The Plaintiffs argue the JSNs' lien on software associated with the PLS MSRs was released under the May 14, 2010

90

Blanket Release.  That release specifically stated that all general intangibles were released "if

and to the extent related to the Servicing Rights Collateral" (i.e., the PLS MSRs).  (PX 134 at 6.)

The Defendants counter, though, that "Servicing Rights Collateral" was defined to specifically

exclude computer programs.  (*Id.* at 8.)  The Court therefore finds that the JSNs' lien on software

associated with the PLS MSRs was not released by virtue of the Blanket Release.  Any value

associated with software sold to Ocwen and Walter would be allocable to the JSNs as JSN

Collateral.

The next question is how to value the collateral.  The Defendants' expert Mr. Taylor

endeavored to value the Debtors' software and associated know-how by using an accounting

method that considers what a typical market participant would have paid for the asset, regardless

of any particular incentives (e.g., synergies) or disincentives that may have existed in the market

at the time.  The Plaintiffs challenged Mr. Taylor's analysis on several grounds, including that

(1) Mr. Taylor's analysis ignores the allocations of assets in the Ocwen APA; (2) the Debtors

gave Ocwen and Walter a substantial bid credit (exceeding $100 million) so Ocwen and Walter

would buy the Debtors' servicing platform, including the software; (3) Ocwen and Walter later

attributed lower values to software, ostensibly using the same accounting principles that Mr.

Taylor applied; (4) Mr. Taylor's "avoided cost" analysis assumed that Ocwen and Walter

planned to use the Debtors' software for three years, contrary to Ocwen's and Walter's actual

plans; and (5) Mr. Taylor put inordinate weight on certain precedent transactions when applying

his "relief from royalty method."

*First*, the Court finds that the allocations in the Ocwen APA do not control here.  Section

3.3(b) of that APA provided that the Debtors and Ocwen were bound by the allocations for tax

purposes, "*but not for any other purpose*."  (PX 19 at 50 (emphasis in original).)  *Second*, the

Debtors' bid credit awarded to Ocwen did not render the Debtors' software valueless. Rather, Ocwen and Walter intended to use and did use the Debtors' software associated with the platforms they were buying. Their public filings attributed value to software, whether as a standalone asset or built into the premises and equipment asset category.[43]  (*See* DX ZH at 9; DX ST at 3; DX WK at 13.)  Therefore, the software had and provided value.

Turning to Mr. Taylor's analysis, the Court is not satisfied with his valuation of the software and associated know-how. The Plaintiffs are correct that Mr. Taylor's avoided cost analysis unreasonably assumes a duration of software use that is contrary to the actual intended use in the Ocwen and Walter sale. As for his "relief from royalty" analysis, the Plaintiffs sufficiently demonstrated flaws in Mr. Taylor's methodology. For example, Mr. Taylor gave no weight to certain transactions between seemingly related parties because those may not have been arm's-length deals. (DX ABH at 135.)  But Mr. Taylor then attributed 33.34% of his outcome to a transaction that appears to be between related parties. (*Id.*)  Not only is this transaction given greater weight than any other transaction, but it is also a significant outlier in terms of its "point estimate." (*Id.*)  Simply removing Mr. Taylor's weight assigned to this transaction would yield a $100 million lower software value. Thus, the Court finds that Mr. Taylor's "relief from royalty" analysis is unreliable.

Rather than relying on Mr. Taylor's analysis, the Court turns to how Ocwen and Walter actually reported the value of the software using a fair value accounting method. Walter's public filings indicate a $17.1 million value for software (DX WK at 13), and Ocwen's filing and its third-party valuation reflect a $1.295 value for software (DX ZH at 9; DX ST at 3.)  The Court

---

[43]    As explained in Mr. Taylor's report, Ocwen engaged a third-party valuation expert (Applied Economics) to appraise the fair value of certain assets. (DX ABH; DX ST.)  Applied Economics considered the ResCap software to be worth $1.295 million (DX ST at 3), and that figure served as a portion of the "premises and equipment" allocation in Ocwen's 10-Q reporting on the ResCap sale.

therefore finds that $18.395 million of the Ocwen sale proceeds should be attributed to JSN liens on software.

         b.      The JSNs Have a Lien on the Tradename, Iconography, and Logotype Associated With the Assets Sold to Ocwen and Walter.

The Defendants submitted expert evidence that $10 million of proceeds from the Ocwen and Walter sale was allocable to "tradename/marks, iconography and logotype." (DXABH at 42–45.) The Plaintiffs did not rebut this analysis at trial. Mr. Taylor notes that the Ocwen APA required the purchasers to rebrand assets within 120 days, but a 10-Q filed by Walter shows that it attributed value to tradename with an estimated eight-year life. (DX ABH at 43.) Thus, there may have been some intangible tradename or logotype value that would not cease to exist after 120 days. The Plaintiffs did not rebut this contention. Nor did the Plaintiffs demonstrate that any tradename value was associated only with the Servicing Rights Collateral or Subject Mortgage Loans and would therefore have been released in the Blanket Release. The Court is satisfied with Mr. Taylor's valuation of the intangible tradename assets associated with the Ocwen sale and finds that a $10 million allocation to the JSNs' liens is appropriate.

         c.      The Defendants Do Not Have a Lien on Refinancing Opportunities Associated With GSE MSRs.

At trial, the Defendants' expert Mr. Levine testified to the value of refinancing opportunities associated with certain GSE MSRs. The JSNs do not have liens on GSE MSRs since those are Excluded Assets, but the Defendants argue that the JSNs have a lien on intangible assets associated with GSE MSRs. Although the Defendants may be correct that the JSNs could have a lien on intangible assets absent a lien on an underlying asset, the value created by refinancing opportunities is inherent to the value of the GSE MSRs. In other words, the opportunities are not a separate intangible asset.

Mr. Levine testified that he regularly values refinancing opportunities separately from servicing rights.  (Oct. 22 Tr. 100:9–16.)  Even so, the value of the refinancing opportunities are inextricably linked to the MSRs themselves:  Mr. Levine conceded that "to the buyer of the servicing, there would not be value to the HARP [refinancing opportunities] without the servicing rights."  (*Id.* at 91:11–23.)  In fact, Mr. Levine had never seen an instance where refinancing opportunities were sold separately from servicing rights.  (*Id.* at 101:9–11.)  Therefore, the value is properly attributable to the GSE MSRs themselves.  As such, the JSNs do not have a lien on any refinancing opportunities.

> d.    The JSNs Did Not Establish the Value of Their Lien on Goodwill as of the Petition Date.

The JSNs argue that they have a lien on goodwill associated with the Debtors' assets sold to Ocwen.  Goodwill is "an intangible asset that represents the ability of a company to generate earnings over and above the operating value of the company's other tangible and intangible assets."  *In re Prince*, 85 F.3d 314, 322 (7th Cir. 1996).  Goodwill may include "name recognition, consumer brand loyalty, or special relationships with suppliers or customers."  *Id.*  To calculate the value of goodwill, generally accepted accounting principles ("GAAP") look to "any excess of [a] purchase price over the fair value of the assets acquired and the liabilities assumed."  *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011).  Although GAAP does not require a company to record internally developed goodwill absent an asset sale, *see Sanders v. Jackson*, 209 F.3d 998, 1001–02 (7th Cir. 2000), the existence of goodwill does not depend on an asset sale.  *See Prince*, 85 F.3d at 323–24 (describing valuation of goodwill in context of assigning value to company stock); *see also Ackerman v. Schultz (In re Schultz)*, 250 B.R. 22, 29 (E.D.N.Y. 2000) (valuing goodwill outside context of asset sale).  So the question becomes whether any goodwill existed on the Petition Date subject to JSN liens.

94

The Defendants use two methods to calculate goodwill on the Petition Date.  First, they look to the Ocwen and Walter asset sale and calculate a present value of the goodwill in that sale as of the Petition Date.  Second, the Defendants perform a "top down" analysis of the intangibles associated with the MSRs and servicing and originating platforms, including goodwill.  While Houlihan's methodologies may have been textbook, the assumptions and inputs they used were seriously flawed.  As a result, Houlihan's conclusions regarding the values of intangibles and goodwill are not credible.

Regarding the first method, the Court cannot conclude that any goodwill derived from the Ocwen and Walter sale existed on the Petition Date.  The value of the Debtors' assets on that date was seriously impaired, subject to steep reductions in value by litigation risks, potential seizure of certain MSRs, and termination of rights and setoff by the RMBS Trustees.  Ocwen and Walter, the eventual buyers, were not committed to paying the Debtors anything for their assets on the Petition Date, let alone a price above the fair value of the Debtors' assets and liabilities.  The Debtors facilitated the asset sale to Ocwen and Walter by maintaining the value of the assets throughout the bankruptcy, along with decreasing the liabilities associated with those assets.  The Debtors worked very hard at substantial expense to achieve settlements and consents that allowed the sales to close.  If the Debtors had not taken those actions, Ocwen and Walter may not have bought any assets at all, and likely would not have paid any price above the fair value of the assets and liabilities.  To be sure, there may have been name recognition or special market relationships associated with the Debtors' assets on the Petition Date, but that name recognition or those relationships could have been valueless in the eyes of a buyer on the Petition Date.  The Court cannot indulge the speculation that the Ocwen and Walter purchase price provides an adequate starting point for the goodwill that would have been generated by an

asset sale on the Petition Date.  After all, "goodwill often fluctuates widely for innumerable

reasons."  *Sanders*, 209 F.3d at 1002.

As for the "top down" valuation, the Plaintiffs raised serious problems with the

Defendants' market multiple analysis that provided the starting point for the "top down"

valuation.  *First*, the Defendants' expert Mr. Fazio acknowledged that his market multiple

analysis only weighed comparable companies in terms of their equity, rather than their total

enterprise value.  (Oct. 22 Tr.198:20–199:6; 199:19–22.)  *Second*, Mr. Fazio's analysis failed to

account for any value that would be attributable to the Debtors' servicing advances.  (Oct. 22 Tr.

200:1–22; DX ABG at 35, 38, 41.)  Since those assets were not properly accounted for, and were

not properly deduced from Mr. Fazio's valuation, it is possible that what the Defendants

concluded was goodwill actually represented value attributable to servicing advances.  Thus, the

Defendants' second method for determining goodwill is unpersuasive.

Having failed to provide an adequate basis for valuing goodwill on the Petition Date,

the JSNs have not met their burden in demonstrating the extent of their lien on goodwill as of the

Petition Date.

e.      The JSNs Do Not Have a Lien on Goodwill Generated after the
        Petition Date.

Although the JSNs have a lien on the proceeds of their prepetition collateral, any

goodwill generated in connection with the assets sold to Ocwen and Walter was not the proceeds

of that collateral and is not subject to JSN liens.  Bankruptcy Code Section 552(b) provides that

if a prepetition security agreement extends to proceeds of collateral, then postpetition proceeds

would also be subject to that security agreement, unless the court orders otherwise after a hearing

based on the equities of the case.  11 U.S.C. § 552(b).  The JSN Security Agreement granted the

JSNs a lien on "all Proceeds, products, offspring, rents, issues, profits and returns of and from,

and all distributions on and rights arising out of any of the [collateral described in the JSN

Security Agreement]." (PX 4 at 17.) Additionally, the Cash Collateral Order provided that the

proceeds of prepetition JSN Collateral are "deemed to be cash collateral of the [JSNs]." (PX

76 at 22.) To establish a lien on the goodwill created by the Ocwen sale, the JSNs would need to

demonstrate that the goodwill was the product of their prepetition collateral. They did not meet

this burden.

"Section 552(b) is intended to cover after-acquired property that is directly attributable to

prepetition collateral, *without addition of estate resources*." 5 COLLIER ON BANKRUPTCY

¶ 552.02[2][a] (emphasis added). Here, even if JSN Collateral was used to generate goodwill

(either by maintaining or improving the value of assets or by diminishing liabilities), Debtor

resources were used as well. The Debtors improved the value of the assets sold to Ocwen by

negotiating settlements with government entities and RMBS Trustees. That involved time,

effort, and expense by the Debtors' estates. The Debtors did not merely take some JSN

Collateral and convert it into goodwill without any other resources. That means that the

goodwill is not the proceeds of JSN Collateral. *See In re Delco Oil, Inc.*, 365 B.R. 246, 250

(Bankr. M.D. Fla. 2007) ("The concept of proceeds is only implicated when one asset is disposed

of and another is acquired as its substitute.") (internal quotation marks omitted). Even if a

portion of the goodwill was directly attributable to JSN Collateral, without any other additional

resources, the JSNs have failed to separate the value of that goodwill. Thus, the JSNs have not

met their burden of establishing a lien on goodwill generated postpetition.

    6. *Miscellaneous Collateral Categories*

    a. The JSNs Have Liens on the "Contested Assets."

  The JSNs claim to have liens on "Contested Assets," which consist of (1) the Former

Bilateral Facilities Collateral and (2) the Reacquired Mortgage Loans. The Court has previously

ruled that the JSN Security Agreement is ambiguous with respect to "whether an Excluded Asset

becomes part of the Secured Parties' collateral pursuant to the All-Asset Granting Clause once it

ceases to constitute an Excluded Asset." *Residential Capital*, 495 B.R. at 262.  Where a contract

is ambiguous, courts may consider extrinsic evidence in order to determine the parties' intended

meaning.  *See Bank of New York Trust Co., N.A. v. Franklin Advisers, Inc.*, 726 F.3d 269, 276

(2d Cir. 2013) (stating that a principle of New York contract law is that, "if contract terms are

ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning

intended by the parties during the formation of the contract") (citations omitted).  Extrinsic

evidence can include testimony of the parties' intent.  *See Webb v. GAF Corp.*, 936 F. Supp.

1109, 1124 (N.D.N.Y. 1996) ("The court is of the opinion that testimony regarding the

understandings of the parties . . . was both competent and helpful to the triers of fact . . . .").

Having the benefit of a full evidentiary record, including an examination of both the

contractual language and the extrinsic evidence provided by witness testimony, the Court

concludes that the JSN Security Agreement grants the JSNs liens on the Contested Assets.

i.      The JSNs Have Liens on the Collateral Released from the
        Bilateral Facilities.

The Plaintiffs argue that the JSNs do not have a lien on the Former Bilateral Facilities

Collateral, which has an alleged fair market value of approximately $24 million.[44]  The Plaintiffs

argue that the JSNs were never granted liens in the Former Bilateral Facilities Collateral because

the underlying loans were originally Excluded Assets.  Additionally, the Plaintiffs assert that no

"springing lien" exists with respect to the Former Bilateral Facilities Collateral and, even if it

did, the JSN Security Agreement is ambiguous whether the Former Bilateral Facilities Collateral

automatically reverted to JSN Collateral before the Petition Date when the reason for the

---

[44]     This total does not include the $25 million of BMMZ assets that JSNs claim a lien on and that were subject
to an earlier motion to dismiss.

98

exclusion of the Former Bilateral Facilities Collateral no longer existed.  The Plaintiffs contend

that the testimony presented at trial did not sufficiently establish a course of dealing among the

parties.  The Defendants argue that even though the Former Bilateral Facilities Collateral

consists of assets that were carved out of the JSN Collateral as "Excluded Assets" at the time the

JSN Security Agreement was executed, the collateral was subsequently released from Bilateral

Facilities before the Petition Date and treated as AFI and JSN Collateral.  The Court finds that

the JSNs have liens on the Former Bilateral Facilities Collateral.

The JSN Security Agreement provides that "the 'Collateral' . . . shall not include

Excluded Assets."  (PX 4 § 2.)  "Excluded Assets" in turn means, in relevant part:

> (c) any asset . . . to the extent that the grant of a security interest therein would
> violate applicable Requirements of Law, result in the invalidation thereof or
> provide any party thereto with a right of termination or default with respect
> thereto or with respect to any Bilateral Facility to which such asset is subject as of
> the Issue Date . . . .

(*Id.* at 4–15).

The testimony presented at trial revealed that employees for both the Debtors and AFI

understood the JSN Security Agreement and the All-Asset Granting Clause to convert the

Former Bilateral Facilities Collateral to Notes Collateral when the Bilateral Facilities terminated

or when collateral was released from those facilities.  The witnesses also testified that once an

asset that otherwise fell within the scope Blanket Lien was released from a Bilateral Facility, that

asset would become part of the JSN Collateral.  Lara Hall testified at her deposition that "AFI's

intent was as soon as the assets rolled off the bilateral facility, they would become subject to the

blanket lien."  (Hall Dep. 123:19–23.)  She also said that "[t]he blanket lien basically suggested

that anytime an asset became uncovered, it would be subject to the blanket lien."  (*Id.* at 116:6–

14.)  Joseph Ruhlin, the Debtors' former Treasurer, testified in his deposition that the Debtors

99

understood the Former Bilateral Facilities Collateral "would be covered by the blanket lien as long as they . . . were owned [by the Debtors] and not pledged elsewhere to another bilateral facility," and that the Debtors' "understanding" was that "once an asset was released from a funding facility, depending on the asset, it would become part of the blanket lien." (Ruhlin Dep. 89:14–25; 93:8–14, 165:5–9.) Ms. Farley, the Debtors' appointed 30(b)(6) witness on the assets constituting JSN Collateral, testified that Former Bilateral Facilities Collateral would "absolutely" become JSN Collateral when the Bilateral Facilities terminated, "[t]o the extent they fell within the security grant." (Oct. 16 Tr. 186:24–187:9.)

Finally, the Debtors were told by their outside counsel via email in December 2008 that "if at any point while owned by GMAC [] the assets are removed from a Bilateral Facility, the [AFI] Revolver and [JSN] Indenture liens may cover these assets and they will constitute Collateral (if and to the extent Sections 9-406/8 of the U.C.C. are applicable)." (DX ES at 1.) The extrinsic evidence presented at trial indicates that the parties to the JSN Security Agreement understood and intended that the JSN Collateral would include Former Bilateral Facilities Collateral. The Court therefore finds that the JSNs have liens on the Former Bilateral Facilities Collateral.[45]

ii.    The JSNs Have Liens on the Released and Reacquired Collateral.

The Plaintiffs seek a declaration that the Defendants have not perfected any interest in the Reacquired Mortgage Loans. According to the Plaintiffs, even if the JSNs retained a continuing security interest in the Released Mortgage Loans when those assets were re-acquired by the Debtors, which the Plaintiffs contest, the JSNs never perfected their security interest, and it is

---

[45]    The Court already dismissed the Committee's attempt to recharacterize the BMMZ assets as Debtor assets. *Residential Capital*, 495 B.R. at 261. In its opinion, the Court rejected the Committee's contention that the BMMZ collateral was pledged to a bilateral facility as of the Petition Date. In fact, the Debtors did not own the BMMZ collateral on the Petition Date.

100

avoidable.  The Defendants contend that (1) the Reacquired Mortgage Loans are assets that were initially JSN Collateral, subsequently released by the Collateral Agent in May 2010 so that they could be sold to a Repo Facility, and then reacquired by the Debtors between September 2010 and the Petition Date, thereby falling within the scope of the Blanket Lien, and (2) the JSNs' lien on the Reacquired Mortgage Loans is perfected because the original U.C.C. filings perfecting those liens provided adequate notice to potential creditors.  The book value of the Reacquired Mortgage Loans is approximately $14.1 million and has an alleged fair market value of approximately $10 million.[46]

The Court finds that the Defendants have perfected liens on the Reacquired Mortgage Loans.

> (a)    The Reacquired Mortgage Loans Fall within the Blanket Lien's Grasp.

The Defendants argue that the loans that were released from the JSNs' liens in May 2010 to be sold to the Citi and Goldman Repo Facilities and subsequently repurchased by the Debtors between September 2010 and the Petition Date are JSN Collateral due to the Blanket Lien.  The Blanket Lien arises from the All-Assets Granting Clause expressly covering all of the Debtors' assets, "whether not or hereafter existing, owned or acquired and wherever located and howsoever created . . . ."  (JSN Security Agreement at 13.)  "[U]nder the Uniform Commercial Code, the proper perfection of a security interest may create an enforceable lien in after-acquired property, without regard to any entitlement to an equitable lien under common law."  *In re Minor*, 443 B.R. 282, 288 n.3 (Bankr. W.D.N.Y. 2011) (citing N.Y. U.C.C. § 9-204 (2001)).  A security interest "arising by virtue of an after-acquired property clause is no less valid than a security interest in collateral in which the debtor has rights at the time value is given . . . no

---

[46]    The Reacquired Mortgage Loans are distinct from the $910 million of loans in the AFI LOC.

further action by the secured party—such as a supplemental agreement covering the new

collateral—is required."  N.Y. U.C.C. § 9-204 cmt. 2 (2013).

No language in the JSN Security Agreement suggests that the Blanket Lien does not

apply to the Reacquired Mortgage Loans.  Instead, the Debtors' and AFI's employees testified

that they understood that assets sold and repurchased by the Debtors would become JSN

Collateral upon their reacquisition.  (*See* Oct. 16 Tr. 190:21–191:24 (when an asset that had been

released from the JSN Collateral package to be sold to a third party was repurchased by the

Debtors, "the blanket lien would pick it up"); Ruhlin Dep. 65:19–22, 66:6–14 ("[A]ssets such as

loans that were acquired in the future would be subject to the lien," and those assets could have

been "[r]epurchases . . . previously owned by ResCap," or "[t]hey . . . could be repurchased

outside from a third party.").)  Thus, under the Blanket Lien, the Reacquired Mortgage Loans

became JSN Collateral when the Debtors repurchased them.

    (b)  The JSNs' Interest in the Reacquired Mortgage
        Loans Is Perfected.

The Plaintiffs argue that the U.C.C.-3 statements filed in May 2010 terminated the

U.C.C.-1 financing statements as to these assets, rendering any security interests the JSNs had in

the Reacquired Mortgage Loans unperfected.  However, because the Court finds that the

U.C.C.-1 financing statements continued in effect notwithstanding the filing of the U.C.C.-3

financing statements, the U.C.C.-1 statements operated to perfect the JSNs' security interests.

The U.C.C. employs a notice filing system requiring that a financing statement provide "a

simple record providing a limited amount of information" that puts parties on notice to inquire

further to ascertain "the complete state of affairs."  N.Y. U.C.C. § 9-502 cmt. 2.  "UCC Article 9

only requires information sufficient to engage in further inquiry.  When the authorization

underlying a previously filed termination statement matters to a subsequent lender (as it usually

will), the lender can simply include any necessary further inquiry as part of its due diligence."

*Official Comm. v. JPMorgan Chase Bank, NA (In re Motors Liquidation Co.)*, 486 B.R. 596, 644

(Bankr. S.D.N.Y. 2013).  In cases where courts have addressed inconsistent financing

statements, courts have found that the inconsistency in the statements itself was sufficient to put

the creditor on notice.  *See In re A.F. Evans Co.*, No. 09-41727 (EDJ), 2009 WL 2821510, at *5

(Bankr. N.D. Cal. July 14, 2009) ("Here, CNB's financing statements, as amended by the

U.C.C.-3 Amendment statements, each with two conflicting boxes checked [(a termination box

plus a release of collateral box)], would raise a red flag for any person conducting a search

alerting such person of the possibility that a full termination may not have been intended.").

In this case, because the U.C.C.-1s were on file, potential lenders were on notice to

investigate the extent of the JSNs' security interest in the Reacquired Mortgage Loans

notwithstanding the U.C.C.-3s relating to those assets.  After further inquiry, they would have

been informed that the Reacquired Mortgage Loans were automatically pledged once again to

AFI and the JSNs under the Blanket Lien, and were coded first as unpledged and later as Blanket

Lien Collateral in the CFDR.  (*See* Farley Dep. 95:3–14, 110:5–111:14, 115:4–14, 137:21–24,

138:4–11, 176:21–177:3; Oct. 16 Tr. 190:21–192:18; Hall Dep. 117:6–12; Ruhlin Dep. 65:19–

22, 66:6–21, 106:8–12, 119:4–9, 155:16–156:2, 156:15–21.)

For the foregoing reasons, the Court finds that the JSNs' interest in the Reacquired

Mortgage Loans was perfected, and the JSNs are entitled to their lien on the released and

reacquired collateral.

b.      The JSNs Have Liens on a Portion of the Deposit Accounts.

The Plaintiffs also challenge JSN liens on certain deposit accounts, which the Plaintiffs

refer to as "Avoidable Deposit Accounts."[47]  The Avoidable Deposit Accounts hold

approximately $48.4 million.  The Plaintiffs allege that the JSNs have not perfected their security

interests in the Avoidable Deposit Accounts.

The Court finds that, except for the Controlled Accounts and the WF Accounts, the JSNs

do not have perfected liens on the Avoidable Deposit Accounts.  Under the U.C.C., "a security

interest in a deposit account may be perfected only by control" of the account.  N.Y. U.C.C.

§ 9-312(b)(1).  A secured party has control of a deposit account if: "(1) the secured party is the

bank with which the deposit account is maintained; (2) the debtor, secured party, and bank have

agreed in an authenticated record that the bank will comply with instructions originated by the

secured party directing disposition of the funds in the deposit account without further consent by

the debtor; or (3) the secured party becomes the bank's customer with respect to the deposit

account."  *Id.* at § 9-104(a)(1)–(3).

The parties requested executed control agreements in discovery.  (Landy Direct ¶ 40.)

The Defendants offered evidence of control agreements for certain accounts (the "Controlled

Accounts").  (*See* DX AIU; DX AIV; DX AIW; DX AIX; DX AIY; DX AIZ.)  Given the control

agreements, the JSNs have established control over those accounts.  Additionally, the Plaintiffs

concede that certain accounts the Committee initially challenged are controlled by Wells Fargo,

which is the Third Priority Collateral Agent.  Since Wells Fargo controls those accounts and is

the secured party for the Junior Secured Notes, the JSNs have sufficiently established control

---

[47]      Account Nos. xxxx7286, xxxx3803, xxxx6323, xxxx9917, xxxx9454, xxxx4806, xxxx2482, xxxx2540,
xxxx2565, xxxx2573, xxxx1781, xxxx1799, and xxxx1718.  (Plaintiffs' Proposed Findings of Fact ECF Doc. # 187
at ¶ 293.)

over the WF Accounts.  The Court finds that the Controlled Accounts and the WF Accounts are the only Deposit Accounts over which the JSNs have established control.

The JSNs claim to have liens on certain Ally Bank accounts by virtue of Ally's corporate relationship with AFI, the Revolver Lender.  But Ally and AFI are not the same entity.  The JSNs cannot establish control over Ally Bank accounts due to the corporate relationship between Ally and AFI.  And even if AFI had control over those accounts by virtue of its relationship with Ally Bank, that would not benefit the JSNs.

Under the U.C.C., the Notes Trustee has the burden of tracing funds to "identifiable cash proceeds" of collateral that would be automatically perfected under U.C.C. § 9-514(c).  U.C.C. § 9-315.  *See also In re Milton Abeles, LLC*, No. 812-70158-reg, 2013 WL 530414 at *2 (Bankr. E.D.N.Y. Sept. 20, 2013) ("[S]ection 9-315 provides that 'proceeds' of a secured creditor's collateral must be 'identifiable proceeds.'  Proceeds that are commingled with other property are 'identifiable' only if 'the secured party identifies the proceeds by a method of tracing.'"); *Matter of Guaranteed Muffler Supply Co., Inc.*, 1 B.R. 324, 330 (Bankr. N.D. Ga. 1979) ("secured parties bear the burden of identifying, or tracing, the proceeds obtained upon the sale of property in which they have an interest . . .").  But for a single account that the Plaintiffs concede contains proceeds of JSN Collateral, the Defendants have failed to provide sufficient evidence that any deposit accounts contain proceeds of JSN Collateral.

After excluding the Controlled Assets, the WF Accounts, and the proceeds account, the amount of funds in the remaining deposit accounts (i.e., the Avoidable Deposit Accounts) as of the Petition Date was $48,439,532.  Accordingly, the JSNs do not have a lien on the Avoidable Deposit Accounts pursuant to sections 544(a)(1)–(2) of the Bankruptcy Code.  The property or the value of the property represented by the Avoidable Deposit Accounts should be recovered

105

and/or preserved for the benefit of the Debtors' estates pursuant to sections 550(a) and 551 of the

Bankruptcy Code.

For the foregoing reasons, the Court finds that the value of the JSNs' collateral should be

reduced by $48,439,532, the amount of cash in the Avoidable Deposit Accounts as of the

Petition Date.

> c.    The JSNs Do Not Have a Lien on the Unencumbered Real
>        Property.

To perfect a lien on real property, a secured party must execute a mortgage or a deed of

trust and duly record it against the title of such real property. *See In re Churchill Mortg. Inv.*

*Corp.*, 233 B.R. 61, 70 (Bankr. S.D.N.Y. 1999) ("Under the New York Real Property Law § 291,

a security interest in real property can be perfected only by filing written notice with the Clerk of

the County where the property is located so that the lien may be publicly recorded, giving notice

of the encumbrance to potential purchasers or future creditors.").  The Court finds that the JSNs

do not have a perfected security interest in or lien on any of the Unencumbered Real Property

because that property was not subject to an executed and filed mortgage or deed of trust.

Accordingly, any JSN lien with respect to the Unencumbered Real Property is avoidable

pursuant to sections 544(a)(1) and (2) of the Bankruptcy Code, and the property or the value of

the property represented by the Unencumbered Real Property should be recovered and/or

preserved for the benefit of the Debtors' estates pursuant to sections 550(a) and 551 of the

Bankruptcy Code.

For the foregoing reasons, the Court finds that the value of the JSNs' collateral should be

reduced by $21 million, the fair market value of the Unencumbered Real Property as of the

Petition Date.

7.    *The Plaintiffs Failed to Establish Preferential Transfers to the JSNs.*

The Plaintiffs seek to avoid $270 million of the JSNs' claim as preferential transfers (the "Alleged Preferential Transfers").  The Alleged Preferential Transfers, listed on Schedule 6 to the Committee's complaint (PX 127), consist of (1) mortgage loan instruments, including HFS Loans and FHA/VA loans, (2) REO property, and (3) government insurance claims arising as a result of expenditures incurred by the Debtors in connection with FHA/VA Loans.[48]  The Plaintiffs contend that these assets first became JSN Collateral on or after February 29, 2012, during the Modified Preference Period.[49]  To prove this contention, the Plaintiffs point to how the collateral was recorded in the CFDR as of February 29, 2012, and as of the Petition Date.  As such, the Plaintiffs claim to have met their prima facie burden of proof for a preference claim under Bankruptcy Code sections 547(b)(1)-(5).

The Defendants offer two reasons why the Plaintiffs are not entitled to avoid the Alleged Preferential Transfers: (1) the Plaintiffs failed to make a prima facie case for avoidance, and (2) even if the Plaintiffs could make such a showing, their Preference Claim is barred by the "improvement in position test."  Because the Court concludes that the Plaintiffs have failed to make a prima facie case for avoidance of the Alleged Preferential Transfers the Court need not consider the "improvement in position test."

---

[48]    The "Adjusted Preference Assets" asserted by the Plaintiffs do NOT include the following assets identified on Schedule 6 of the Committee Action: (1) 18 loans identified as "HFS Revolver" or "HFS Blanket," with a net book value of $1,950,188.00, (2) two REO properties identified as "HFS Blanket," with a net book value of $50,478.00, (3) three mortgage loans that were refinanced (the "Refinanced Mortgages"), with a net book value of $1,021,096.00, and (4) certain REO properties that Mr. Landy acknowledges were "never transferred to or for the benefit of the [Noteholders] during the preference period," with a net book value of $12,106,073.00.  (Landy ¶ 57; DX ABN at 12; DX AIS at 4; PX 127.)

[49]    The Committee used a reduced preference period from February 29, 2012 through the Petition Date (75 days instead of 90) (the "Modified Preference Period").  (ECF Doc. # 97.)

Section 547(b) of the Bankruptcy Code "permits a trustee to avoid certain prepetition transfers as 'preferences.'"[50]  5 COLLIER ON BANKRUPTCY ¶ 547.01.  Section 547(b) lays out the elements of an avoidable preference as a transfer of an interest in debtor property:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
>> (A) on or within 90 days before the date of the filing of the petition; or
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to received more than such creditor would receive if—
>> (A) the case were a case under chapter 7 of this title;
>> (B) the transfer had not been made; and
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).  Unless the trustee proves each and every one of these elements, a transfer is not avoidable as a preference under section 547(b).  *See* 11 U.S.C. § 547(g) ("For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section . . . ."); *see also Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 706 F.2d 171, 172 (6th Cir. 1983) ("As is facially evident from this provision, all five enumerated criteria must be satisfied before a trustee may avoid any transfer of property as a preference.").

> a.    The Plaintiffs Failed to Show that the JSNs Were Undersecured as of February 29, 2012.

The Defendants argue that the Plaintiffs failed to make a showing that the JSNs were undersecured at the start of the Modified Preference Period, immunizing them "from [a] preference attack because [they] would have been paid in full in a hypothetical Chapter 7 liquidation by virtue of [their] realization on [their] collateral."  *Official Comm. V. AAF-McQuay (In re 360nettworks(USA), Inc.)*, 327 B.R. 187, 190 (Bankr. S.D.N.Y. 2005); *see also In re*

---

[50]    A preconfirmation debtor-in-possession has the power to initiate and prosecute preference actions.  *See* 11 U.S.C. § 1107.

*Santoro Excavating, Inc.*, 32 B.R. 947, 948 (Bankr. S.D.N.Y. 1983) ("[A] payment [during the preference period] to a creditor with an allowed fully secured claim is not a preference.") (collecting cases). Where a creditor asserts that it was oversecured at the time of the alleged preferential transfer, it is the plaintiff's burden to refute that assertion. *See Savage & Assocs., P.C. v. Cnty. of Fairfax (In re Teligent, Inc.)*, No. 01-12974 (SMB), 2006 WL 1030417 at *3 (Bankr. S.D.N.Y. Apr. 13, 2006) ("*Teligent II*") ("[W]here the defendant in a preference action asserts that it was oversecured, the plaintiff must prove a negative, to wit that the defendant was not oversecured."), *aff'd sub nom In re Teligent Servs. Inc.*, No. 06 Civ. 03721 (KMW), 2009 WL 2152320 (S.D.N.Y. July 17, 2009) ("*Teligent III*"). A defendant's assertion that it was fully secured is not a defense pursuant to section 547(c), but "rather a negation of one of the elements of a preference action, pursuant to section 547(b)." *Teligent III*, 2009 WL 2152320, at *6.

Throughout this case, the Defendants have maintained that they were oversecured as of the start of the Modified Preference Period, placing the burden squarely on the Plaintiffs to prove that the Defendants were not oversecured. While the Plaintiffs' expert Mr. Puntus provided a proposed valuation of the JSNs' collateral as of the Petition Date,[51] he did not calculate the value as of the start of the Modified Preference Period. In fact, none of the Plaintiffs' experts provided a valuation of the JSN Collateral at the beginning of the Modified Preference Period, or at any time during that period. As a result, the Plaintiffs have failed to satisfy section 547(b)(5) and are not entitled to avoid the portion of the Defendants' liens related to the so-called "Preferential Transfers."

---

[51]    The Court reiterates comments made during closing arguments that it has serious problems with the methodology employed by Mr. Puntus in his valuation.

b.    The Plaintiffs Failed to Prove the Identity or Scope of Transfers of
      Collateral to Defendants During the Modified Preference Period.

Even assuming that the Plaintiffs had shown that the Defendants were undersecured at

the beginning of the Modified Preference Period, the Plaintiffs have failed to show the identity or

scope of these Alleged Preferential Transfers.  The Plaintiffs' only evidence in support of their

preference claim, the CFDR, is reliable as a business record to establish when AFI LOC

Collateral was properly released, but it is not sufficient to establish the identity or scope of the

Alleged Preferential Transfers.  The Plaintiffs' expert Mr. Landy identified the Alleged

Preferential Transfers by performing a comparison of CFDR extracts as of February 29, 2012,

and the Petition Date.  (Oct. 17 Tr. 152:16–153:13, 162:12–15.)  He concluded that any asset

appearing in the CFDR for the first time as JSN Collateral during the Modified Preference Period

was a preferential transfer, though he "did not attempt to understand the circumstances for why

each loan may have appeared on 5/13 . . . ."  (Oct. 17 Tr. 153:10–22; 155:5–7.)  Indeed, the

CFDR contains little information explaining why an asset would appear for the first time or

reappear after an absence in the database.  (*See* PX 139.)  At trial, the Defendants raised a variety

of explanations why these assets may have appeared in the CFDR during the Modified

Preference Period, tending to negate their status as preferential transfers.  For example, the loans

may have been modified, repaid in full and then subsequently drawn upon, or they may represent

refinancings of old loans that formerly constituted JSN Collateral.  (Oct. 22 Tr. 26:23–27:9,

28:3–10, 31:18–32:15, 33:18–34:4, 35:18–21, 42:14–43:3, 56:25.)  Under any example, they

would not be preferential transfers.

The Defendants' expert Mr. Winn specifically identified a variety of alleged "Preferential

Transfers" that should not have been included in Schedule 6.  (DX ABN 12 ("[T]he CFDR

shows that approximately $18 million of the alleged Preference Assets were owned by the

Debtors and served as JSN Collateral as of or prior to 2/29/12 and thus should not be listed as

Preference Assets.").)  Mr. Landy, who prepared Schedule 6, conceded that certain of these

assets were inaccurately included on Schedule 6.  (*See* Landy Direct ¶ 56 ("I have determined

that I concur with Mr. Winn's observations regarding (a) 18 loans identified as 'FHA/VA

Reclassified as Loans HFS' . . . with a net book value of approximately $1.95 million, and (b) 2

loans identified as 'REO Reclassified as Loans' . . . , with a net book value of $50,478.") ("Mr.

Winn identifies approximately $12 million of 'REO' assets that were pre-existing components of

the JSN Collateral pool as of February 29, 2012, and were therefore never transferred to or for

the benefit of the JSNs during the preference period.").)  Specifically, Mr. Landy concurred with

Mr. Winn's conclusions that the following do not constitute preferential transfers:

- The FHA/VA assets for which no Loan Funding Date exists within the CFDR and for which the Debtors have provided no information nor conducted any inquiry whether such assets are refinancings (despite the acknowledgment that such assets could be refinancings);

- The approximately $12 million of REO assets which the Committee's expert Marc E. Landy concedes were within the CFDR in the JSN Collateral before the Modified Preference Period.  The Committee seeks to avoid these assets "to the extent . . . ownership of these REO properties was transferred . . . to an REO special purpose vehicle during the preference period," yet offered no evidence that such transfers to special purpose vehicles occurred during the Modified Preference Period;

- The HFS loans appearing for the first time in the CFDR during the Modified Preference Period with Loan Funding Dates before the Modified Preference Period, for which neither the Committee nor the Debtors can offer a reasonable and consistent explanation, the majority of which have "Loan Modification Dates" and a portion of which are coded as HELOCs (suggesting that their appearance is the result of loan modifications or draws on HELOCs); and

- The HFS and FHA/VA loans that appeared in the CFDR before the Modified Preference Period, disappeared from the CFDR and reappeared within the CFDR during the Modified Preference Period.

Given these errors, appearance in the CFDR alone cannot be enough to identify a preferential

transfer.  Too many questions and inconsistencies remain to conclude that the JSNs first acquired

an interest in these assets during the Modified Preference Period. Thus, the Plaintiffs have failed to prove the identity and scope of the Alleged Preferential Transfers and are not entitled to avoid this portion of the JSNs' claim.

> 8.      *The Plaintiffs Are Not Entitled to Charge the JSNs with a $143 Million Carve Out Payment If the Plaintiffs Can Pay Professional Fees and Administrative Expenses with Unencumbered Cash.*

The Plaintiffs seek a declaration permitting them to charge up to an additional $143 million in Carve Out expenses, thereby further reducing the JSNs' secured claim on the Effective Date. The Court holds that the Plaintiffs are not entitled to this declaration if they can pay fees and expenses with unencumbered cash. While this case is not over, it appears that the Debtors have substantial unencumbered cash available to pay administrative expenses.

A carve out is a provision of a cash collateral order that allows for some expenditure of administrative and/or professional fees to be paid before a secured creditor gets paid on its collateral. *See In re Blackwood Associates, L.P.*, 153 F.3d 61, 68 (2d Cir. 1998) (stating that "absent an agreement to the contrary, a secured creditor's collateral may only be charged for administrative expenses, including attorney's fees, to the extent these expenses directly benefited that secured creditor," but "if a secured party consents to allowing such administrative expenses, that party may be liable for such expenses even in the absence of conferred benefit"); 3 COLLIER ON BANKRUPTCY ¶ 364.04[2][d] ("A carve-out gives the benefitted claimants a priority in the postpetition lender's collateral ahead of the lender's priority and, if the carve-out is for the benefit of only certain named administrative claimants, above other administrative claimants as well."); Richard B. Levin, *Almost All You Ever Wanted to Know About Carve Out*, 76 AM. BANKR. L.J. 445, 445 (2002) ("As generally used, a carve out is an agreement between a secured lender, on the one hand, and the trustee or debtor in possession . . . on the other, providing that a portion of the secured creditor's collateral may be used to pay administrative expenses.").

112

The Bankruptcy Code does not deal with carve out provisions typically included in cash collateral orders. *See In re White Glove, Inc.*, No. 98-12493 DWS, 1998 WL 731611 at *6 (Bankr. E.D. Pa. Oct. 14, 1998) ("The term 'carve out' is one of those uniquely bankruptcy phrases, much like 'cram down,' that appears nowhere in the bankruptcy statute but connotes definite meaning to the parties."); *see also* Levin at 445 ("Unlike 'cram down,' . . . which has a relatively well-defined meaning derived from ¶ 1129(b) of the Bankruptcy Code, 'carve out' does not derive its substance from any particular section of the Bankruptcy Code."). Unless it conflicts with provisions of the Bankruptcy Code, a carve out is construed applying normal contract interpretation provisions. *See Blackwood*, 153 F.3d at 67 (applying "the statutory context underlying cash collateral stipulations[] and the text of the Stipulation itself" to conclude that a disputed carve out provision did not grant the chapter 11 debtor's counsel payment from cash collateral when the debtor failed to meet the terms of the cash collateral stipulation).

The usual purpose of a carve out is to assure the payment of specified administrative expenses from a secured creditor's collateral in the event that the case goes badly, use of cash collateral is terminated, and sufficient unencumbered funds are no longer available to administer the case, usually after conversion to chapter 7. *See* Levin at 451 ("The carve out becomes important to the protected administrative claimants *only* when the unencumbered assets in the bankruptcy estate that remain after application of the collateral proceeds to the secured claim are not adequate to pay all administrative claims, so that the administrative claimants will need to look to the carve out as an alternative source for payment.") (emphasis added).

Here, the Cash Collateral Order controls the priority of the JSN liens with respect to the Carve Out. The Final Cash Collateral Order creates a Carve Out from the JSNs' cash collateral

that subjects and subordinates the JSN liens to the Carve Out amount but does not otherwise

affect the validity of the JSN liens on carved out JSN cash collateral:

> the [JSN Liens] are valid, binding, perfected, and enforceable first priority liens on and security interests in the personal and real property constituting "Collateral" under, and as defined in, the Junior Secured Notes Documents . . . and (iii) are subject and subordinate only to (A) the liens and security interests granted to the AFI Lender under the AFI Revolver, all subject to the terms and conditions of the Intercreditor Agreement, dated as of June 6, 2008 . . . , (B) the Carve Out, and (C) the liens and security interests granted to secure the Adequate Protection Obligations . . . .

(PX 76 at 11–12.)  The Carve Out, in turn, is defined as the sum of:  (1) court and United States

Trustee fees, (2) accrued and unpaid professional fees following a termination event in an

aggregate amount not exceeding $25 million (plus all unpaid professional fees allowed by the

Court at any time that were incurred on or before the business day following the Carve Out

Notice), and (3) unpaid professional fees that were allowed prior to the termination event;

provided that,

> (A) the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Adequate Protection Parties, (B) so long as no event of default shall have occurred and be continuing, the Carve Out shall not be reduced by the payment of fees and expenses allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code, and (C) nothing in this Final Order shall impair the right of any party to object to any such fees or expenses to be paid by the Debtors' estates.

(*Id.* at 31–32.)

The Cash Collateral Order clearly requires the JSNs to subordinate their secured claim to

the payment of the Carve Out, but is silent whether the Debtors may use those funds, further

reducing the JSNs' secured claim, when other unencumbered funds are available.  Absent

contractual language requiring that result, the Court concludes that the Cash Collateral Order

114

does not go beyond the ordinary purpose of assuring funds to pay the specified expenses if unencumbered funds are no longer available to do so.

The JSNs' liens remain subordinated to the Carve Out. If during the remainder of the case, unencumbered funds are no longer available to pay the expenses, the JSN Collateral can be used for that purpose. At this stage, however, there is no reason to believe that will occur. The Court holds that the JSNs' Collateral should not be reduced at this time.

### E.    Given the Court's Findings on What Constitutes JSN Collateral, the JSNs are Undersecured.

Notwithstanding the JSNs' ability to aggregate their collateral across debtors, the Court finds that, as of the conclusion of Phase I, the JSNs are undersecured and not entitled to postpetition interest and fees.[52] As of the Petition Date, the JSNs held secured claims against ResCap, and certain of its affiliates as guarantors and grantors, in the face amount of $2.222 billion, consisting of $2.120 billion in unpaid principal as of the Petition Date, and $101 million in unpaid prepetition interest. (DX ABF at 3.) As the Court discussed in section III.A above, the JSNs' claim will not be reduced by unamortized OID. Assuming an effective date of December 15, 2013, the JSNs will assert a claim for postpetition interest at the default rate, in the amount of $342 million. (JSN Corrected Proposed Findings of Fact, ECF Doc. # 190 § II ¶ 15.) The JSNs are only entitled to receive postpetition interest up to the value of their collateral. 11 U.S.C. § 506(b). Thus, to receive their full claim for postpetition interest, the JSNs have to establish an effective date value of their collateral of at least $2.564 billion. At this point in the case, they fall well shy of the mark.

The parties have largely agreed on $1.888 billion as a baseline estimation of the Effective Date value of the JSN Collateral. (DX AIR at 5.) The Plaintiffs seek to subtract from the

---

[52]    This finding is not a final decision whether the JSNs are oversecured or undersecured. Issues relating to certain other alleged JSN collateral were reserved for Phase II of the trial.

baseline; the Defendants seek to add to it.  Based on the Court's rulings, the following amounts

will be added to the baseline:

- $40 million in equity held at certain non-Debtors;

- $17 million for a net increase in the value of the FHA/VA Loans;

- $18.395 million for software; and

- $10 million for tradename, iconography, and logotype.

The following amounts will be subtracted from the baseline:

- $48,439,532 in Deposit Accounts (the JSNs retain an interest in $63,297); and

- $20.8 million of unencumbered real property.

Based on the Court's ruling, the following factors will not affect the baseline valuation:

- The Plaintiffs may not charge an additional $143 million of expenses to the JSNs' collateral under the cash collateral carve out at this time.

- The Plaintiffs have not carried their burden in proving any preferential transfers.

- The JSNs do not have a lien on the $1.1 billion of AFI LOC Collateral.

- The JSNs have a lien on $24 million of Former Bilateral Facilities Collateral.

- The JSNs have a lien on $10 million of Reacquired Mortgage Loans.

- The JSNs are not entitled to a $66 million allocation from sale proceeds for net increases in HFS Collateral.

- The JSNs do not have a lien on any other intangibles or goodwill.

Based on the above findings, the JSNs have established that the Effective Date value of

their collateral is $1,904,155,468.  Because their claim is for the face amount of $2.222 billion,

the JSNs are undersecured at the end of Phase I.  A final determination of the extent of their

security will be deferred until after Phase II of the trial.

## IV.   <u>CONCLUSION</u>

The Phase I trial presented a large number of complex factual and legal issues requiring extraordinary time and expense for the parties and considerable effort for the Court to reach a result leaving the JSNs substantially undersecured.  The JSNs have achieved that result in a case in which the proposed plan would pay the JSNs *all* prepetition principal and interest.  The JSNs have pursued from the start a strategy where they contest everything and concede nothing (even when the Court has questioned whether they are acting in good faith).  The JSNs have made clear that they will continue to follow the same strategy in the Phase II trial and contested confirmation hearing beginning on November 19, 2013.

The Court will continue to decide all issues fairly (the JSNs did prevail on some of the important issues in the Phase I trial), but it should not be lost on anyone that the JSNs stand virtually alone in this case in failing to reach a consensual agreement to resolve their issues.  The result has been protracted proceedings that have burdened the estate and reduced funds available to satisfy creditor claims.  That is unfortunate!

Dated:  November 15, 2013
        New York, New York

                          *Martin Glenn*
                          MARTIN GLENN
                          United States Bankruptcy Judge