1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------x
In re:                              Case No. 12-12020 (MG)
RESIDENTIAL CAPITAL, LLC, et al.,   Chapter 11
                                    Jointly Administered
            Debtors.
----------------------------------x
RESIDENTIAL CAPITAL, LLC, et al.,

            Plaintiffs,        Adv. Case No.

            V.                 13-01343 (MG)

UMB BANK, N.A., IN ITS CAPACITY AS
INDENTURE TRUSTEE FOR THE 9.625%
JUNIOR SECURED GUARANTEED
NOTES, et al.,

            Defendants.
----------------------------------x
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, on behalf of the estate
of the Debtors,

            Plaintiff,         Adv. Case No.

            v.                 13-01277 (MG)

UMB BANK, N.A., AS SUCCESSOR
INDENTURE TRUSTEE UNDER THAT
CERTAIN INDENTURE, dated as of
June 6, 2008, et al.,

            Defendants.
----------------------------------x
              DEPOSITION OF MICHAEL PINZON
                   September 3, 2013
                   New York, New York
                      9:36 a.m.
Reported by:
ERICA L. RUGGIERI, RPR, CSR, CLR
JOB NO: 31423

Purple Highlighting = Wells Fargo
Bank, N.A. Designation

**The Debtors and Committee object to the use of the deposition of Mr. Pinzon on the ground that this deposition may not be used under Bankruptcy Rule 7032.**

**Page 2**

```
1
2
3
4          September 3, 2013
5          9:36 a.m.
6
7
8
9          Deposition of MICHAEL PINZON,
10   held at the offices of Kramer, Levin,
11   Naftalis & Frankel, LLP, 1177 Avenue
12   of the Americas, New York, New York,
13   pursuant to Notice, before Erica Lynn
14   Ruggieri, RPR, CSR, CLR and Notary
15   Public within and for the State of New
16   York.
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1
2    APPEARANCES:
3    Attorneys for the Official Committee of
4    Unsecured Creditors:
5        PACHULSKI, STANG, ZIEHL & JONES, LLP
6        780 Third Avenue, 36th Floor
7        New York, New York 10017
8        BY:   JOHN A. MORRIS, ESQ.
9            jmorris@pszjlaw.com
10           ROBERT J. FEINSTEIN, ESQ.
11           rfeinstein@pszjlaw.com
12           JASON H. ROSELL, ESQ.
13           jrosell@pszjlaw.com
14   -and-
15       KRAMER LEVIN NAFTALIS & FRANKEL, LLP
16       1177 Avenue of the Americas
17       New York, New York 10036
18       BY:  NATAN HAMERMAN, ESQ.
19           nhamerman@kramerlevin.com
20
21
22
23
24
25
```

**Page 4**

```
1
2    APPEARANCES:
3    Conflicts Counsel for the Debtors:
4        CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
5        101 Park Avenue
6        New York, New York 10178
7        BY:   MICHAEL J. MOSCATO, ESQ.
8            mmoscato@curtis.com
9
10   Counsel for UMB BANK, N.A.:
11       AKIN GUMP STRAUSS HAUER & FELD, LLP
12       One Bryant Park
13       New York, New York 10036
14       BY:  DAVID M. ZENSKY, ESQ.
15           dzensky@akingump.com
16   -and-
17       KELLEY DRYE & WARREN, LLP
18       101 Park Avenue
19       New York, NY 10178
20       BY:  JASON R. ADAMS, ESQ.
21           jadams@kelleydrye.com
22
23
24
25
```

**Page 5**

```
1
2    APPEARANCES:
3    Counsel for the Debtors:
4        MORRISON & FOERSTER, LLP
5        1290 Avenue of the Americas
6        New York, New York 10104
7        BY:   ARIEL RUIZ, ESQ.
8            aruiz@mofo.com
9
10   Counsel for Ad Hoc Group of Junior
11   Secured Noteholders:
12       WHITE & CASE, LLP
13       1155 Avenue of the Americas
14       New York, New York 10036
15       BY:  JULIA M. WINTERS, ESQ.
16           jwinters@whitecase.com
17
18   Counsel for the Wells Fargo Bank, N.A.:
19       REED SMITH, LLP
20       599 Lexington Avenue, 22nd Floor
21       New York, NY 10022
22       BY:  DAVID M. SCHLECKER, ESQ.
23           dschlecker@reedsmith.com
24           ERIC A. SCHAFFER, ESQ.
25           eschaffer@reedsmith.com
```

2 (Pages 2 to 5)

6

```
 1
 2          S T I P U L A T I O N S
 3
 4          IT IS HEREBY STIPULATED AND
 5   AGREED, by and between counsel for the
 6   respective parties hereto, that the
 7   filing, sealing and certification of
 8   the within deposition shall be and the
 9   same are hereby waived;
10          IT IS FURTHER STIPULATED AND
11   AGREED that all objections, except as
12   to the form of the question, shall be
13   reserved to the time of the trial;.
14          IT IS FURTHER STIPULATED AND
15   AGREED that the within deposition may
16   be signed before any Notary Public
17   with the same force and effect as if
18   signed and sworn to before the Court.
19
20
21
22
23
24
25
```

7

```
 1          MICHAEL PINZON
 2   M I C H A E L   P I N Z O N, called as a
 3   witness, having been duly sworn by a
 4   Notary Public, was examined and
 5   testified as follows:
 6   EXAMINATION BY
 7   MR. MORRIS:
 8      Q.   Can you please state your name
 9   for the record.
10      A.   Michael Pinzon.
11      Q.   Good morning, Mr. Pinzon.  My
12   name is John Morris.  I'm with Pachulski
13   Stang Ziehl & Jones, co-counsel to the
14   unsecured creditors committee.  We are
15   here today for the deposition of Wells
16   Fargo, and I just want to go over some
17   simple ground rules for the depositions.
18      I will ask questions, and I
19   would ask that you wait until I have
20   completed my question, before beginning
21   your answer, and I will attempt to do the
22   same, that is, to allow you to finish your
23   answer, before I begin my next question.
24      Every answer of yours has to be
25   verbal, so no nods of the heads or shakes
```

8

```
 1          MICHAEL PINZON
 2   or anything like that.  If you do that, I
 3   will simply ask you to articulate your
 4   answer; is that fair?
 5      A.   Yes.
 6      Q.   If you need a break at any time,
 7   just let me know and I'll be happy to
 8   accommodate you.  Okay?
 9      A.   Okay.
10      Q.   We are going to mark as Wells
11   Exhibit 1 a series of definitions that we
12   have prepared.  There's a lot of language
13   and a lot of words that we will be using
14   today that may be complex, and from time
15   to time I may simply refer to the list of
16   definitions to help us both.
17      Is that okay?
18      A.   Okay.
19      (Wells Exhibit 1, series of
20   definitions, marked for
21   identification, as of this date.)
22      Q.   We will refer to this document
23   as needed, Mr. Pinzon; is that okay?
24      A.   Okay.
25      MR. SCHLECKER:  Can I ask you
```

9

```
 1          MICHAEL PINZON
 2   where, can you make a representation
 3   about where these definitions came
 4   from?
 5      MR. MORRIS:  Sure.  They largely
 6   come from either the complaint or some
 7   of the operative documents.  But I
 8   wanted there to be a clear
 9   understanding as to what the committee
10   means, when it uses each of these
11   terms.
12      MR. SCHLECKER:  Okay.
13      Q.   Mr. Pinzon, are you currently
14   employed?
15      A.   Yes.
16      Q.   By whom?
17      A.   Wells Fargo bank NA.
18      Q.   Do you have a title at Wells
19   Fargo?
20      A.   A functional title and, you
21   know, a designation title.
22      Q.   What's your functional title?
23      A.   Relationship manager.
24      Q.   And what is your designation
25   title?
```

3 (Pages 6 to 9)

10

1          MICHAEL PINZON
2      A.   Vice president.
3      Q.   Are your duties and
4    responsibilities as the relationship
5    manager the same as your duties and
6    responsibilities as a vice president?
7      A.   Yes.
8      Q.   Can you describe for me your
9    duties and responsibilities as the
10   relationship manager and vice president at
11   Wells Fargo?
12     A.   I am responsible for the review
13   and on boarding of documents that come in
14   to Wells Fargo.  I am responsible for
15   working with the salespeople to review new
16   deals that come in to Wells Fargo.  I am
17   responsible for the ongoing administration
18   of transactions that we sign up to.  And
19   I'm responsible for the relationships of
20   the various parties that are our clients.
21     Q.   How long have you been employed
22   by Wells Fargo?
23     A.   Eight years.
24     Q.   When did you first become a vice
25   president at Wells Fargo?

11

1          MICHAEL PINZON
2      A.   I was a vice president when --
3    before I came to Wells Fargo.
4      Q.   So upon your arrival, you were
5    given the title of vice president; is that
6    right?
7      A.   Yes, I believe so.
8      Q.   Does part of your duties and
9    responsibilities concern the issuance of
10   lien releases?
11     A.   I don't understand the issuance.
12       What do you mean by "the
13   issuance"?
14     Q.   Do you know what a lien release
15   is?
16     A.   Yes.
17     Q.   So as part of your duties and
18   responsibilities, are you involved with
19   the process by which Wells would execute a
20   lien release?
21     A.   Yes.
22     Q.   Are you the primary person at
23   Wells responsible for executing and
24   reviewing lien releases, with respect to
25   ResCap and its affiliates?

12

1          MICHAEL PINZON
2      A.   Yes.
3      Q.   With respect to ResCap, has
4    Wells served as the first, second and
5    third priority collateral agent?
6      A.   Yes.
7      Q.   And has that been the case since
8    around June of 2008?
9      A.   Yes.
10     Q.   Does Wells also serve as the
11   collateral control agent, with respect to
12   certain ResCap financings?
13     A.   Yes.
14     Q.   Can you describe generally the
15   function that Wells plays as the first,
16   second and third priority collateral
17   agent?
18       MR. SCHLECKER:  Object to the
19   form of the question.
20       MR. ZENSKY:  Object to the form
21   of the question.
22     Q.   Do you understand the question,
23   sir?
24     A.   It's a broad question.  You have
25   to be more specific.

13

1          MICHAEL PINZON
2      Q.   What does Wells do, as the
3    first, second and third priority control
4    agent?
5        MR. ZENSKY:  Objection.
6        MR. SCHLECKER:  Same objection.
7      Q.   Does it have a defined role in
8    those capacities?
9      A.   It's whatever, you know,
10   whatever the documentation states.
11     Q.   And is the same true with
12   respect to Wells' role as the collateral
13   control agent?
14     A.   Yes.
15     Q.   Is there a business unit within
16   Wells that provides services as the
17   collateral control agent?
18     A.   Corporate trust.
19     Q.   And is that the same unit that
20   Wells provides services through, with
21   respect to its role as the first, second
22   and third priority collateral agent?
23     A.   A subdivision of that division.
24     Q.   And what is the subdivision?
25     A.   Corporate municipal escrow

4 (Pages 10 to 13)

14

MICHAEL PINZON

1 solutions. It's known as CMES.
2 **Q. Is there a particular person at**
3 **Wells who is responsible for overseeing**
4 **its role as collateral agent and**
5 **collateral control agent, with respect to**
6 **the ResCap financings?**
7 A. I don't know what you mean by
8 that. I'm the person responsible, you
9 know, for this particular transaction, so.
10 **Q. Okay. And when did you first**
11 **become responsible for those transactions?**
12 **Has it been since the outset?**
13 A. No.
14 **Q. So when did you first become**
15 **responsible for those transactions?**
16 A. Around 2009, I believe. I'm not
17 quite sure.
18 **Q. Do you know who was responsible**
19 **for those transactions at Wells before**
20 **you?**
21 A. From looking at the
22 documentation, its Nick Tally; and I
23 believe another person was Jeff Rose.
24 **Q. Prior to taking on the**

15

MICHAEL PINZON

1 **responsibility of overseeing the ResCap**
2 **transactions for Wells, did you have any**
3 **conversations with Mr. Tally or Mr. Rose,**
4 **regarding those responsibilities?**
5 A. No. They were gone before I
6 came.
7 **Q. Did anybody at Wells explain to**
8 **you what your duties and responsibilities**
9 **were, with respect to the Wells**
10 **transactions?**
11 A. Alfia Monastra, my manager.
12 **Q. Do you recall what he told you?**
13 A. She.
14 **Q. She.**
15 A. We had discussions about the
16 transaction, like we do any, at the
17 beginning of, you know, any transaction
18 I'm given by any manager.
19 **Q. Do you recall anything about**
20 **those discussions?**
21 **Did she tell you what you were**
22 **expected and required to do?**
23 A. Yes. She explained the
24 transaction documents that were involved.

16

MICHAEL PINZON

1 She explained the roles, the first
2 priority, second and third priority in the
3 collateral control agent. She explained
4 whatever -- at the time there was a
5 release going on, she explained, you know,
6 the documents at hand to be released, to
7 show me an example of how the process
8 worked. And she introduced -- what else?
9 -- introduced me to counsel, our external
10 counsel, Seward & Kissel.
11 **Q. What services did Seward &**
12 **Kissel provide to Wells, with respect to**
13 **your duties and responsibilities on the**
14 **ResCap financings?**
15 A. It provided counsel for any
16 questions I may have, in reference to the
17 transaction, broadly speaking; and
18 specifically, any release, any document
19 that I would sign, Seward & Kissel would
20 review, for the most part, the majority of
21 the documents that I signed.
22 **Q. Was it your practice to have**
23 **Seward & Kissel review any documents,**
24 **before you signed them?**

17

MICHAEL PINZON

1 A. Yes.
2 **Q. Can you think of any document**
3 **today that you signed on behalf of Wells**
4 **that Seward & Kissel did not review in**
5 **advance?**
6 MR. SCHLECKER: You are talking
7 about in connection with this deal?
8 MR. MORRIS: Yes.
9 A. I can't think of anything at the
10 moment.
11 **Q. And the documents that Seward &**
12 **Kissel reviewed, would they include the**
13 **lien releases?**
14 A. Yes.
15 **Q. Can you think of any lien**
16 **release that you signed on behalf of Wells**
17 **that Seward & Kissel did not review in**
18 **advance?**
19 A. No.
20 **Q. Was there anybody at Wells**
21 **involved in the process of reviewing and**
22 **executing lien releases besides yourself?**
23 MR. ZENSKY: Objection to form.
24 MR. SCHLECKER: You are talking

5 (Pages 14 to 17)

18

MICHAEL PINZON
1    about on this deal?
2    MR. MORRIS: Um-hmm.
3    A.   If I was out on vacation, for
4    coverage, my colleague Julius Zamora
5    likely released it, or my manager herself
6    might have released documents early on in
7    the transition.
8    Q.   But other than that, you were
9    the primary person responsible at Wells
10   for reviewing and issuing or executing
11   lien releases, with respect to the ResCap
12   transactions; is that right?
13   A.   Yes.
14   MR. MORRIS:  I'd like to mark as
15   Wells Exhibit 2 the 30(b)(6)
16   deposition notice.
17   (Wells Exhibit 2, 30(b)(6)
18   deposition notice, marked for
19   identification, as of this date.)
20   Q.   Was there a particular attorney
21   or attorneys at Seward & Kissel with whom
22   you dealt in the ordinary course, with
23   respect to lien releases on the ResCap
24   transactions?
25

19

MICHAEL PINZON
1    A.   Gregg Bateman, Sagar Patel.
2    Q.   Can you please take a look at
3    Wells Exhibit 2.
4    Have you seen this document
5    before?
6    A.   There's another name, I can't
7    remember the last name, Dmitri and I just
8    can't recall last name right now.
9    Q.   So Mr. Bateman, Mr. Patel --
10   A.   And Dmitri.
11   Q.   -- and Dmitri. And those are
12   the three people at Seward & Kissel with
13   whom you regularly communicated about lien
14   releases; is that right?
15   A.   Yeah.
16   Q.   Can you take a look at
17   Exhibit 2?
18   A.   Yes.
19   Q.   Have you seen this before?
20   A.   Yes.
21   Q.   When did you first see this?
22   A.   When it came across, when you
23   issued this. I don't know.
24   Q.   What is your understanding of
25

20

MICHAEL PINZON
1    what this document is?
2    MR. SCHLECKER:  Object to the
3    form of the question.
4    Q.   Do you know what this document
5    is?
6    A.   It's a 30(b)(6) notice.
7    Q.   And have you personally been
8    designated as Wells' representative to
9    answer questions about each topic in this
10   notice?
11   A.   Yes.
12   Q.   Can you please take a look at
13   topics 1 through 13 on pages 2 and 3.
14   A.   Okay.
15   Q.   Is there any topic for which you
16   do not intend to answer questions on
17   behalf of Wells today?
18   MR. SCHLECKER:  Objection. I'm
19   not sure what you are talking about,
20   that he intends to answer. He'll
21   answer questions to the best of his
22   ability.
23   Q.   Are you the designated
24   representative to answer questions
25

21

MICHAEL PINZON
1    about --
2    A.   Yes.
3    Q.   -- each of the 13 topics?
4    MR. SCHLECKER:  He's the
5    designated 30(b)(6) representative at
6    Wells Fargo. To the extent he can
7    answer questions under the 30(b)(6)
8    notice, he will.
9    Q.   Did you do anything to prepare
10   for this deposition?
11   A.   I met with counsel a couple of
12   times.
13   Q.   When did you meet with counsel?
14   A.   Over the last couple of weeks.
15   Q.   And when you use the term
16   "counsel," are you referring to the two
17   lawyers to your left?
18   A.   Yes.
19   Q.   Is there any other counsel that
20   you met with to prepare for this
21   deposition?
22   A.   Sarah Kam.
23   Q.   She's also employed by Reed
24   Smith?
25

6 (Pages 18 to 21)

22

MICHAEL PINZON

1
2    A.    Yes.
3    Q.    Did you meet with any lawyers
4  for UMB Bank?
5    A.    No.
6    Q.    Did you meet with any lawyers
7  for the ad hoc group of junior secured
8  noteholders?
9    A.    No.
10    Q.    Did you review any documents in
11  preparation for this deposition?
12    A.    I looked at the indenture.
13    Q.    Do you recall looking at any
14  other documents?
15    A.    Intercreditor agreement.
16    Q.    Do you recall looking at any
17  other documents?
18    A.    Yes.
19    Q.    What other documents do you
20  recall looking at?
21    A.    Third priority collateral
22  security agreement, I think it's called.
23    Q.    Anything else?
24    A.    The loan agreement.
25    Q.    Did you look at the committee's

23

MICHAEL PINZON

1
2  complaint in this action?
3    A.    Yes, when it was initially
4  issued.
5    Q.    Did you look at Wells Fargo's
6  answers to the complaint?
7    A.    Yes.
8    Q.    Did you look at any lien
9  releases that were executed by Wells, with
10  respect to ResCap?
11    A.    Yes.
12    Q.    Do you recall which lien
13  releases you reviewed?
14    A.    No, not particularly.
15    MR. MORRIS:  I'd like to mark as
16  Wells Exhibit 3 the committee's
17  complaint.
18    (Wells Exhibit 3, copy of the
19  committee's complaint, marked for
20  identification, as of this date.)
21    MR. MORRIS:  And then we will
22  mark as Wells Exhibit 4 a document
23  that is titled Schedule Two.
24    (Wells Exhibit 4, document
25  titled Schedule Two, marked for

24

MICHAEL PINZON

1
2  identification, as of this date.)
3    Q.    Taking a look first at the
4  complaint, can you please turn to page 16?
5    A.    Okay.
6    Q.    Is this the complaint that you
7  referred to earlier, that you had seen
8  prior to today's deposition?
9    A.    Without reading the whole thing,
10  on the face of it, yes, that appears to be
11  the case.
12    Q.    And do you understand that, in
13  count 2, the committee alleges that none
14  of the property owners, as defined in that
15  count, granted or signed any mortgage or
16  deed of trust, with respect to what's
17  defined as the unencumbered real property?
18    A.    Well, it says here this is
19  unencumbered real property, and it's
20  quoted, so it's a defined term.
21    Q.    So now take a look at what we
22  have marked as Wells Exhibit 4.  And
23  you'll see in the lower right-hand corner
24  it says "Schedule Two."
25    Do you see that?

25

MICHAEL PINZON

1
2    A.    Yes.
3    Q.    I represent to you that this is
4  the schedule that's referred to in count
5  number 2.
6    A.    Okay.
7    Q.    Do you know whether Wells ever
8  received a mortgage or deed of trust, with
9  respect to any asset listed on Schedule
10  Two?
11    A.    I don't know that.
12    Q.    Do you know whether Wells ever
13  took any steps to perfect any security
14  interests in any asset listed on Schedule
15  Two?
16    MR. ZENSKY:  Object to the form
17  of the question.
18    A.    I don't know that.
19    Q.    Do you know whether --
20    MR. MORRIS:  Withdrawn.
21    Q.    Does Wells know whether anyone
22  acting on behalf of any of the secured
23  parties took any steps to perfect any
24  security interest in any of the assets
25  listed on Schedule Two?

7 (Pages 22 to 25)

26

MICHAEL PINZON

2  MR. ZENSKY: Objection.
3  A. I don't know.
4  Q. Do you understand if you -- if
5  you'd take a look at Exhibit 1, "Secured
6  Parties." I'm using the term Secured
7  Parties to mean, individually or
8  collectively, Wells as the collateral
9  agent, the indentured trustee and the
10  junior secured noteholders.
11  So with the understanding that
12  that's the definition of Secured Parties
13  that we are using, does Wells know whether
14  any of the secured parties took any steps
15  to perfect a security interest in any of
16  the assets listed on Schedule Two?
17  MR. ZENSKY: Objection.
18  A. I don't know.
19  Q. Has Wells made any effort to
20  determine whether any property owner, as
21  defined in count 2, has granted or signed
22  a mortgage or deed of trust, with respect
23  to any asset on Schedule Two?
24  MR. ZENSKY: Objection.
25  A. Again, I do not know.

27

MICHAEL PINZON

2  Q. You don't know whether Wells has
3  made any effort?
4  MR. SCHLECKER: Objection.
5  MR. MORRIS: I just want to make
6  sure he understands the question.
7  A. I don't know whether -- you are
8  giving me a list of properties.
9  Q. Correct.
10  A. I can't tell you -- we did
11  releases; and if you showed me a release
12  and said, this property is attached to
13  this release, I could confirm that for
14  you.
15  You are just showing me a list
16  of properties. It's like showing me -- it
17  could be anything here. I wouldn't know
18  in a vacuum like this, just listing a list
19  of properties.
20  Q. Okay. But the question doesn't
21  pertain to lien releases. It pertains to
22  whether or not any property owner granted
23  or signed a mortgage or deed of trust,
24  with respect to any assets on Schedule
25  Two.

28

MICHAEL PINZON

2  MR. ZENSKY: Objection.
3  MR. SCHLECKER: I object to the
4  form, but if you can answer.
5  A. I don't know if they did or
6  didn't.
7  Q. And now the next question is
8  whether Wells has made any effort to find
9  out the answer to that question.
10  MR. SCHLECKER: Object to the
11  form.
12  MR. ZENSKY: Objection.
13  A. I don't know.
14  Q. Does Wells know whether anyone
15  acting on behalf of any of the secured
16  parties has made any effort to determine
17  whether a property owner issued or signed
18  a mortgage or deed of trust, with respect
19  to any asset on Schedule Two?
20  MR. ZENSKY: Can you read the
21  question back?
22  (Whereupon, a portion of the
23  record was read.)
24  A. I wouldn't know that.
25  MR. ZENSKY: Objection.

29

MICHAEL PINZON

2  Q. To the best of Wells' current
3  knowledge, has any property owner granted
4  or signed a mortgage or a deed of trust,
5  with respect to any asset listed on
6  Schedule Two?
7  MR. ZENSKY: Objection.
8  MR. SCHLECKER: Just note my
9  objection.
10  You can answer.
11  A. I wouldn't know that.
12  Q. Do you know whether Wells
13  intends to make any effort prior to trial
14  to determine whether any property owner
15  has signed or executed a mortgage or deed
16  of trust, with respect to any asset on
17  Schedule Two?
18  MR. SCHLECKER: Just don't --
19  let me first get my objection.
20  I'm going to object to the form
21  of the question. It also is way
22  beyond the scope of the 30(b)(6)
23  deposition. It calls for -- you are
24  essentially asking him his lawyer's
25  intent to do something.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

30

MICHAEL PINZON
1
2      MR. MORRIS: I'm not asking
3  anything about the lawyer. I'm asking
4  whether or not, as set forth in
5  topic 2 of the 30(b)(6) notice,
6  whether the secured parties have any
7  mortgages or deeds of trust with
8  respect to any of the unencumbered
9  real property, which is the subject of
10  count 2. So I think it's --
11      MR. SCHLECKER: You can answer
12  it, but --
13  A.   I can't tell you that now.
14  Q.   Can you turn to page 19 of the
15  complaint, please.
16  A.   Sure.
17  Q.   I apologize, 18. We are going
18  to talk about count 3.
19  A.   Count --
20  Q.   3.
21  A.   3, page 18.
22  Q.   And as set forth in
23  paragraph 114, do you understand that the
24  committee alleges that the secured parties
25  do not have a security interest in or

31

MICHAEL PINZON
1
2  liens, either perfected or unperfected, on
3  any assets of nonobligor's debt --
4  nonobligor debtors, as defined in count 3?
5      MR. SCHLECKER: I'll object to
6  the form, but you can answer.
7      MR. ZENSKY: Counsel, do you
8  have the schedule referenced in this
9  count to show the witness?
10      MR. MORRIS: I'm about to get to
11  that.
12  A.   Okay.
13      MR. MORRIS: I'd like to mark as
14  the next exhibit the declaration of
15  John Morris in support of the
16  committee's opposition to partial
17  motion to dismiss, which is docket
18  number 29.
19      (Wells Exhibit 5, declaration of
20  John Morris in support of committee's
21  opposition to partial motion to
22  dismiss, marked for identification, as
23  of this date.)
24      MR. SCHLECKER: Is there a
25  question?

32

MICHAEL PINZON
1
2  A.   Go ahead.
3      MR. MORRIS: I'm just being
4  patient for the witness.
5  Q.   Have you seen Exhibit 1 attached
6  to my declaration before?
7  A.   I don't recall.
8  Q.   Do you know whether Wells has
9  taken any step to perfect a lien or a
10  security interest in any asset owned by
11  any entity on Exhibit 1?
12      MR. SCHLECKER: Objection to the
13  form.
14      MR. ZENSKY: Objection.
15  A.   I couldn't tell you, because
16  those names, they are all similar to other
17  names, you know, to the parties of the
18  transaction. So I can't tell you.
19  Q.   Do you know whether any entity
20  on Exhibit 1 is a guarantor of the junior
21  secured notes?
22  A.   I don't know.
23  Q.   Has Wells made any effort to
24  determine whether any entity listed on
25  Exhibit 1 is a guarantor of the junior

33

MICHAEL PINZON
1
2  secured notes?
3      MR. SCHLECKER: Note my
4  objection. You are talking about in
5  connection with this deposition?
6      MR. MORRIS: Or otherwise.
7      MR. SCHLECKER: Well, it's a
8  broad period of time that you are
9  talking about. It's since 2008.
10      Okay, answer as best you can.
11  A.   Can you repeat the question
12  again.
13  Q.   Has Wells made any effort to
14  determine whether any entity listed on
15  Exhibit 1 is a guarantor under the junior
16  secured notes?
17  A.   I don't know.
18  Q.   Do you know whether any entity
19  on Exhibit 1 owes any obligations or has
20  any duties, with respect to the junior
21  secured notes?
22      MR. SCHLECKER: Objection to the
23  form, but you can answer.
24  A.   I do not know.
25  Q.   Has Wells made any effort to

9  (Pages 30 to 33)

34

MICHAEL PINZON

1  determine whether any entity on Exhibit 1
2  owes any duties or has any obligations
3  under the junior secured notes?
4      MR. SCHLECKER:  Same objection,
5  but you can answer.
6      A.  I don't know.
7      Q.  To the best of Wells current
8  knowledge, is any entity on the list a
9  guarantor under the junior secured notes?
10      MR. ZENSKY:  Objection.
11      MR. SCHLECKER:  It's asked and
12  answered, but you can answer.
13      A.  I don't know.
14      Q.  To the best of Wells' current
15  knowledge, does any entity on the list
16  have any obligations under the junior
17  secured notes?
18      MR. ZENSKY:  Objection.
19      MR. SCHLECKER:  Objection to
20  form, but you can answer.
21      MR. ZENSKY:  Counsel, can you
22  hold your questions for 30 seconds?
23      MR. MORRIS:  Sure.
24      (Brief recess.)

35

MICHAEL PINZON

1      MR. MORRIS:  I'd like to mark as
2  Exhibit 6 a document that in the lower
3  right hand corner says schedule three.
4      (Wells Exhibit 6, document
5  titled Schedule Three, marked for
6  identification, as of this date.)
7      Q.  If you could just turn to
8  page 19 and take a look at count 4 of the
9  complaint.
10      A.  19.
11      Q.  So now we are turning to
12  count 4.
13      A.  Okay.
14      Q.  Have you seen what's been marked
15  as Wells Exhibit 6 before?
16      A.  I don't, specifically, recall
17  this list.
18      Q.  Do you know whether Wells has
19  made any effort to determine whether the
20  assets listed on Schedule Three were the
21  subject of the pledge release described in
22  count 4?
23      A.  Can you repeat that again,
24  please.

36

MICHAEL PINZON

1      Q.  Has Wells made any effort to
2  determine whether any of the assets listed
3  on Exhibit 6 were the subject of the
4  pledge release that's described in
5  paragraph 120 of count 4?
6      A.  I don't think so.
7      Q.  Does Wells know whether the
8  assets listed in Exhibit 6 were the
9  subject of the pledge release described in
10  paragraph 120?
11      A.  Can you say that again, please.
12      MR. MORRIS:  Can you read the
13  question back.
14      (Record read.)
15      MR. SCHLECKER:  Just note my
16  objection to the characterization of
17  Exhibit 6.
18      A.  Was this document attached to
19  something before it?
20      Q.  It was attached to the
21  complaint.
22      A.  And to any other documents other
23  than the complaint?
24      Q.  I have no idea.

37

MICHAEL PINZON

1      MR. SCHLECKER:  Are you able to
2  answer his question?
3      THE WITNESS:  No.
4      A.  I don't know.
5      Q.  Do you know of any documents
6  that you could review to enable you to
7  answer the question?
8      MR. SCHLECKER:  Just note my
9  objection.  Calls for speculation.
10      Q.  I don't want you to speculate.
11  I'm asking you for your knowledge.
12      A.  It says there that on May 17th
13  the collateral agent signed a partial
14  release, dated May 17, 2010, a pledge
15  release.
16      Q.  So is the partial release
17  referred to in paragraph 120 the place you
18  would look to, in order to determine
19  whether or not the assets on Schedule
20  Six -- I apologize, on Schedule Three were
21  the subject of that lien release?
22      A.  It says that there we signed it,
23  so if you show me something that we
24  signed.

10  (Pages 34 to 37)

38

```
1                MICHAEL PINZON
2       Q.  Is there any other place that
3   you know of that you could look to, in
4   order to determine whether or not the
5   assets on Schedule Three were the subject
6   of the partial release identified in
7   paragraph 120?
8       A.  The signed partial release
9   itself.
10      Q.  Anything else?
11      A.  No.
12      Q.  There's also a reference in
13  paragraph 123 to certain termination
14  statements.
15      Do you see that?
16      A.  Yes.
17      Q.  Do you know what a UCC 3
18  termination statement is?
19      A.  Yes.
20      Q.  What is your understanding of
21  what a UCC 3 termination statement is?
22      A.  In the Uniform Commercial Code,
23  once a UCC 1 is filed, the UCC 3 is the
24  form used to terminate whatever part of
25  the UCC, original UCC 1 needs to be
```

39

```
1                MICHAEL PINZON
2   released; and it's filed with whatever
3   count the original filing was filed with.
4       Q.  And in the ordinary course of
5   Wells' business, was a UCC 3 prepared and
6   filed in connection with each of the lien
7   releases that Wells executed?
8       MR. SCHLECKER:  Object to the
9   form of the question.  Assumes facts.
10      A.  When you say "you" or "they,"
11  who are you referring to?
12      Q.  From time to time Wells reviewed
13  and executed lien releases with respect to
14  the ResCap transactions; is that correct?
15      A.  Yes.
16      Q.  And in connection with each of
17  those lien releases, were UCC 3s also
18  prepared and filed?
19      A.  They were prepared and filed,
20  yes.
21      Q.  Has Wells made any effort to
22  determine whether the assets listed on
23  Schedule Three were the subject of the
24  termination statements referred to in
25  paragraph 123?
```

40

```
1                MICHAEL PINZON
2       A.  When you say, has Wells Fargo
3   made a determination, what do you mean by
4   that?
5       Q.  I'm asking if any effort was
6   made to try to determine whether the
7   assets listed on Schedule Three were
8   subject to the termination statements
9   referred to in paragraph 123.
10      A.  I don't know.
11      Q.  Do you know whether anyone,
12  acting on behalf of any secured party, has
13  attempted to determine whether any asset
14  listed on Schedule Three was subject to
15  the termination statements described in
16  paragraph 123 of count 4?
17      MR. ZENSKY:  Objection.
18      MR. SCHLECKER:  Objection to the
19  form of the question.  I'm not sure
20  what you mean by "secured party."
21      MR. MORRIS:  I'm using the same
22  definition that's been referred to
23  earlier, and I will continue to use
24  that definition.
25      MR. SCHLECKER:  No, no, you are
```

41

```
1                MICHAEL PINZON
2   now referring to Exhibit 1?
3       MR. MORRIS:  Correct, number 31.
4       MR. SCHLECKER:  Okay.  So let's
5   take a look.
6       THE WITNESS:  Collateral
7   agent... I understand now.
8       Q.  So you understand what I mean by
9   the term "Secured Parties"?
10      A.  Yes.
11      Q.  And have you understood that
12  since the first time we looked at
13  Exhibit 1?
14      MR. SCHLECKER:  Well, objection.
15      A.  You pointed it to me before, so
16  yes.
17      Q.  With that understanding, do you
18  know whether anybody, on behalf of a third
19  party, has attempted to determine whether
20  any asset on Schedule Three was the
21  subject of the termination statements in
22  paragraph 123?
23      A.  I don't know.
24      Q.  To the best of Wells' current
25  knowledge, was each asset listed on
```

11 (Pages 38 to 41)

42

**MICHAEL PINZON**
1
2    **Schedule Three the subject of the pledge**
3    **release described in paragraph 120?**
4        MR. SCHLECKER:  Objection to the
5    form of the question.
6        MR. ZENSKY:  Objection.
7    A.   Can you please repeat the
8    question.
9        (Record read.)
10       MR. SCHLECKER:  Same objection.
11   A.   I don't know.
12   **Q.   To the best of Wells current**
13   **knowledge, was each asset listed on**
14   **Schedule Three the subject of the**
15   **termination statements described in**
16   **paragraph 123?**
17   A.   By just showing me a list, I
18   don't know.  I can't tell you if that's
19   connected on a particular release or not.
20   **Q.   And Wells hasn't made any effort**
21   **to make that determination as of today; is**
22   **that right?**
23   A.   As far as I know, no.
24   **Q.   And Wells hasn't made any effort**
25   **to determine whether any of the assets on**

43

**MICHAEL PINZON**
1
2    **Schedule Three were also the subject of**
3    **the termination statements referred to in**
4    **paragraph 123, correct?**
5        MR. SCHLECKER:  Objection.
6    Asked and answered.
7    A.   I don't know.
8    **Q.   You don't know?**
9    A.   No.
10   **Q.   Can you turn to count 6, please,**
11   **which is page 25 of the complaint.**
12   A.   Yes.
13       MR. MORRIS:  And we will mark as
14   Wells Exhibit 7 Schedule Five that was
15   attached to the complaint.
16       (Wells Exhibit 7, document
17   entitled Schedule Five, marked for
18   identification, as of this date.)
19   **Q.   Have you seen the document**
20   **marked as Exhibit 7 before?**
21   A.   Yeah, I believe so.
22   **Q.   And do you recall when you saw**
23   **it?**
24   A.   When this complaint was filed,
25   when the court documents came across.  I

44

MICHAEL PINZON
1
2    don't know the exact title of the
3    document.
4        **Q.   Do you have an understanding of**
5    **what is reflected on Schedule Five?**
6    A.   Yes.
7        **Q.   What is your understanding of**
8    **what is reflected on Schedule Five?**
9    A.   It's a list of deposit accounts
10   that are not subject to control
11   agreements.
12       **Q.   Does Wells know whether any**
13   **account on Wells Exhibit 7 is subject to**
14   **any control agreement?**
15       MR. ZENSKY:  Objection to form.
16       MR. SCHLECKER:  Note my
17   objection to the form, but you can
18   answer.
19   A.   We signed many deposit account
20   control agreements, DACAs.  I can't you
21   from just looking at this list.
22       As you can tell, also the
23   account numbers are blurred out.  I
24   couldn't tell you which ones are the ones
25   we signed and which aren't ones we

45

MICHAEL PINZON
1
2    signed, from just looking at this list.
3        **Q.   Can you describe for me your**
4    **understanding of what a control agreement**
5    **is?**
6    A.   Yes.  It's, a control agreement
7    is pledged to a party, so that the debtor
8    or the original company is not able to use
9    those funds or release those funds,
10   without the release of the lien by the
11   bank that accepted -- that signed the
12   deposit control agreement, so.
13       **Q.   Has Wells made any effort to**
14   **determine whether or not there is a**
15   **control agreement, with respect to any**
16   **account identified on Wells Exhibit 7?**
17       MR. ZENSKY:  Objection.
18   A.   I don't know.
19       **Q.   Does Wells maintain control**
20   **agreements in one particular either**
21   **computer file or other place, in the**
22   **ordinary course of business?**
23   A.   In the ordinary course of
24   business, yes.
25       **Q.   And is there a particular file**

12 (Pages 42 to 45)

46

MICHAEL PINZON
1
2  name in which the control agreements for
3  the ResCap financings are held?
4      A.  Well, the closing documents
5  themselves I know had a number of deposit
6  account control agreements, so the file
7  that contained the closing documents and
8  any subsequent deposit account control
9  agreements or changes to the deposit
10 control agreements would also be saved,
11 you know, under the ResCap GMAC file.
12     Q.  If Wells had the account number
13 for a particular ResCap deposit account,
14 could Wells do a search to determine
15 whether or not a control agreement exists,
16 with respect to that account?
17     A.  If we were given a -- yeah, if
18 we knew the bank that it was from and the
19 account number, we could look to see if we
20 had that particular -- what do you call
21 that? -- deposit account control agreement
22 with that designated account number from
23 that bank.
24     Q.  But as of today, Wells has not
25 done the type of search that you just

47

MICHAEL PINZON
1
2  described, with respect to the deposit
3  accounts listed on Schedule Five; is that
4  right?
5      A.  I don't believe so.
6      Q.  And as you sit here today, do
7  you have any knowledge --
8      MR. MORRIS:  Withdrawn.
9      Q.  As you sit here today, does
10 Wells have any knowledge that any account
11 listed on Schedule Five is the subject of
12 a control agreement?
13     MR. ZENSKY:  Objection.
14     A.  Say that again, please.
15     Q.  As you sit here today, does
16 Wells know whether any account listed on
17 Schedule Five is the subject of a control
18 agreement?
19     MR. ZENSKY:  Objection.
20     A.  I wouldn't know that, just from
21 this list you presented.
22     Q.  Can you turn to page --
23     MR. MORRIS:  Withdrawn.
24     I'd like to mark as the next
25 exhibit Wells' partial answer to the

48

MICHAEL PINZON
1
2  complaint.
3      Just so the record is clear, the
4  document is amended answer and
5  affirmative defenses of Wells Fargo,
6  dated August 27th, bearing docket
7  number 91.
8      (Wells Exhibit 8, amended answer
9  and affirmative defenses of Wells
10 Fargo, dated August 27th, docket
11 number 91, marked for identification,
12 as of this date.)
13     Q.  Have you seen this document
14 before, sir?
15     A.  Yes.
16     Q.  Do you know what this document
17 is?
18     A.  It's an affirmative, Wells
19 Fargo's affirmative defense.
20     Q.  Can you please turn to page 31.
21 I'm directing your attention to the 241st
22 paragraph, the second affirmative defense.
23 Just take a moment to read that to
24 yourself.
25     A.  Okay.

49

MICHAEL PINZON
1
2      Q.  Does Wells know of any facts
3  that concern or relate to its second
4  affirmative defense, that the committee's
5  claim are barred by unclean hands?
6      MR. SCHLECKER:  Just note my
7  objection.
8      I know you couched it in terms
9  of facts, but I think this really,
10 these types of questions you are now
11 asking the witness, about affirmative
12 defenses that have been alleged,
13 really touch, really go to the heart
14 of what the judge's rule, in terms of
15 what's really beyond the scope of a
16 30(b)(6) witness.
17     MR. MORRIS:  I'm only asking for
18 facts, and you can --
19     MR. SCHLECKER:  You can ask for
20 facts.
21     MR. MORRIS:  That's all I want.
22     MR. ZENSKY:  Let me just add to
23 counsel comments the discussion we had
24 last week, which I don't believe Reed
25 Smith was on, about not asking legal

13 (Pages 46 to 49)

50

MICHAEL PINZON
1
2    contentions.  I understand the way you
3    are posing the question.
4        MR. MORRIS:  I'm trying to be
5    sensitive to all of those concerns.
6    And I really want to be clear that I'm
7    not asking for legal conclusions,
8    legal contentions.  It's just any
9    facts that might support any of the
10    affirmative defenses, if he knows of
11    any.
12        MR. SCHLECKER:  Sure.  You can
13    answer the question.
14    **Q.    So does Wells know of any facts**
15    **that concern or relate to its defense that**
16    **the committee's claims are barred by**
17    **unclean hands?**
18    A.    I don't know.
19    **Q.    Looking at the third affirmative**
20    **defense, does Wells know of any facts that**
21    **concern or relate to its defense that the**
22    **committee's claims are barred under the**
23    **doctrine of equitable estoppel?**
24    A.    Those are legal things that
25    counsel will address.

51

MICHAEL PINZON
1
2    **Q.    So is it fair to say the answer**
3    **is no?**
4    A.    No.
5    **Q.    Looking at the fourth**
6    **affirmative defense, does Wells know of**
7    **any facts that support its affirmative**
8    **defense that the committee's claims are**
9    **barred by the doctrine of unjust**
10    **enrichment?**
11    A.    Same thing, no.  I don't know.
12    **Q.    Looking at the fifth affirmative**
13    **defense, does Wells know of any facts that**
14    **support its defense that the committee's**
15    **claims are barred by the doctrine of res**
16    **judicata?**
17        MR. SCHLECKER:  Just note my
18    objection.
19    A.    I don't know what that Latin
20    term means.
21    **Q.    Does Wells have any knowledge of**
22    **any facts that support its sixth**
23    **affirmative defense that the committee's**
24    **claims are barred by the doctrine of**
25    **collateral estoppel?**

52

**MICHAEL PINZON**
1
2    A.    It's legal in nature.  Counsel
3    will address that.  I don't know.
4    **Q.    So you have no facts to Wells'**
5    **knowledge; is that right?**
6    A.    Right.
7    **Q.    Turning to the seventh**
8    **affirmative defense, does Wells have any**
9    **knowledge of any facts to support its**
10    **defense that the committee's claims are**
11    **barred by waiver?**
12        MR. SCHLECKER:  Same objection.
13    A.    I don't know.
14    **Q.    Does Wells have knowledge of any**
15    **facts to support its affirmative defense**
16    **that the committee's claims are barred by**
17    **estoppels?**
18    A.    Wasn't that the sixth?
19        No.
20    **Q.    Does Wells have any knowledge of**
21    **any facts to support its affirmative**
22    **defense that the committee's claims are**
23    **barred by latches?**
24    A.    Again, legal in nature.  That's
25    something that counsel can -- we would

53

MICHAEL PINZON
1
2    review with counsel.
3    **Q.    I'm just asking if you, as**
4    **Wells's 30(b)(6) witness today, have**
5    **knowledge of any facts.**
6    A.    No.
7    **Q.    Does Wells have any knowledge of**
8    **any facts that would support its**
9    **affirmative defense that the committee's**
10    **claims are barred by ratification?**
11    A.    No.
12    **Q.    Does Wells have any knowledge of**
13    **any facts that would support its**
14    **affirmative defense that the committee's**
15    **claims are barred by acquiescence?**
16    A.    No.
17    **Q.    Does Wells have any knowledge of**
18    **any facts that the committee's claims are**
19    **barred by accord and satisfaction?**
20    A.    No.
21    **Q.    Does Wells have any knowledge of**
22    **any facts that the committee's claims are**
23    **barred by setoff?**
24    A.    No.
25    **Q.    Does Wells have any knowledge of**

14 (Pages 50 to 53)

54

MICHAEL PINZON

1
2  any facts that the committee's claims are
3  barred by the statute of limitations?
4      A.  No.
5      Q.   Turning to the 12th affirmative
6  defense, does Wells know the identity of
7  the party referred to in paragraph 251?
8      MR. SCHLECKER:  Note my
9  objection.
10     You can answer.
11     A.  This is, again, legal in nature.
12 I wouldn't know offhand.
13     Q.   And the 14th affirmative
14 defense, does Wells have any knowledge of
15 any facts that would support its
16 contention that the remedies claimed by
17 the committee are barred, to the extent
18 that they are inequitable?
19     A.  No.
20     MR. MORRIS:  Let's just take a
21 short ten-minute break.
22     THE WITNESS:  Sure.
23     (Whereupon, there is a recess in
24 the proceedings.)
25     Q.  Sir, I want to go back --

55

MICHAEL PINZON

1
2      MR. ZENSKY:  Can I just note an
3  objection?  In the break I was looking
4  at your Exhibit 1, and your Exhibit 1,
5  which you really didn't take the
6  witness through, has a definition for
7  the collateral agent that includes the
8  first priority collateral agent,
9  second priority collateral agent or
10 third priority collateral agent.  And
11 the problem is that your 30(b)(6)
12 notice in footnote 1 tells the witness
13 and Wells itself to look at the
14 definitions in your complaint, and in
15 your complaint you define the
16 collateral agent solely as Wells in
17 its capacity to a third priority
18 collateral agent.  So I don't know if
19 that's a misstatement because two
20 different people prepared the
21 documents or in an effort to trick the
22 witness but I think it's inappropriate
23 to use a different set of issues
24 definition in something you hand the
25 witness at the outset of a deposition

56

MICHAEL PINZON

1
2  and the definitions that you give them
3  in the 30(b)(6) notice.
4      So I object to any question that
5  incorporates and has incorporated or
6  attempted to incorporate the
7  definition in item 8 of Exhibit 1,
8  which I believe was implicated in
9  several questions you asked this
10 witness already.  Any other definition
11 here, I haven't reviewed them all,
12 that differs from the definitions that
13 were identified in the 30(b)(6)
14 notice.
15     MR. MORRIS:  Thank you.  There's
16 no attempt at all to trick the
17 witness.  People use different
18 definitions for different purposes all
19 the time and I just want to make sure
20 that you understand as the witness
21 that the definitions we are using
22 today of the terms that I ask you
23 about are those that are set forth in
24 Exhibit 1.
25     MR. ZENSKY:  I object to that as

57

MICHAEL PINZON

1
2  being completely beyond the scope of
3  your notice then.
4      MR. MORRIS:  Okay.  You have
5  your objection.
6      MR. SCHLECKER:  I'll actually
7  join in the objection but continue.
8      MR. ZENSKY:  Will you give me a
9  running objection or you want me to
10 object every time you ask a question?
11     MR. MORRIS:  I don't give
12 running objections so you'll need to
13 preserve the record as you think it
14 appropriate.
15     MR. ZENSKY:  No problem.
16     Q.   I want to go back to a phrase
17 you used earlier in describing your duties
18 and responsibilities, and that was
19 onboarding of documents.  Do I have that
20 term right?
21     A.  Okay, yes.
22     Q.   What did you mean by the phrase,
23 "onboarding of documents"?
24     A.  The review of the documents by
25 the relation -- whoever was responsible

15  (Pages 54 to 57)

58

1          MICHAEL PINZON
2   for reviewing them.  I did not review the
3   originals so I can't tell you exactly what
4   the predecessor's exact process was as
5   individuals.  But I can tell you what the
6   Wells Fargo process is in general.
7          Q.   Can you tell me what the Wells
8   Fargo process is in general?
9          A.   Yes.  Upon winning of the bid,
10  the new business, the relationship manager
11  needs to do some administrative review of
12  the debtor party known as -- in the
13  industry as KYC, know your customer.  That
14  process entails a review of, you know,
15  articles of formation, certain basic
16  documentation that establishes they are
17  who they are, they say who they are
18  through these.
19         In addition to that process,
20  it's the process of review of the actual
21  agreements presented to us and in that
22  process we review the documents with the
23  engaged counsel, Seward & Kissel in this
24  case, and go through, you know, a process
25  of putting forth our comments as we see to

59

1          MICHAEL PINZON
2   the documentation presented.  Those are
3   discussed with our counsel Seward &
4   Kissel.
5          Seward & Kissel then presents
6   those or any counsel would present those
7   comments to the other parties to the
8   agreements.  And through their counsels,
9   comments are made back and forth until a
10  final arrival at all parties agreeing to
11  the terms of the agreement.  And after
12  that they are executed.
13         Q.   And that process for the ResCap
14  transactions is one that occurred prior to
15  your assuming responsibility on behalf of
16  Wells for overseeing the ResCap
17  transactions; is that correct?
18         A.   That is correct.
19         Q.   Do you understand that that
20  process was followed by your predecessor?
21         MR. ZENSKY:  Objection.
22         A.   I don't know -- I didn't speak
23  to those individuals.  But that's the
24  process that the manager described, which
25  is the process in any corporate trust shop

60

1          MICHAEL PINZON
2   I have worked with.
3          Q.   Are you aware that in June 2008
4   ResCap and certain affiliates issued what
5   came to be known as the junior secured
6   notes?
7          A.   I was aware of the document,
8   yes.
9          Q.   And what document are you
10  referring to, the indenture?
11         A.   The indenture.
12         Q.   And I think you testified
13  earlier that you've seen the indenture
14  before today?
15         A.   Yes, that's right.
16         Q.   And did you see that indenture
17  at the time you assumed responsibility for
18  Wells' role in the ResCap transactions?
19         A.   Yes.
20         Q.   That's one of the documents you
21  familiarized yourself with at the time?
22         A.   Yeah.  The indenture, more
23  specifically the pledge agreements, which
24  are the ones that in trying -- are the
25  document we signed up to and the

61

1          MICHAEL PINZON
2   Intercreditor Agreement.
3          Q.   We are going to spend some time
4   now looking at each of those documents.
5          A.   Okay.
6          MR. MORRIS:  I'd like to mark as
7   the next exhibit the indenture.
8          Q.   Is this the indenture that you
9   referred to moments ago?
10         A.   I believe so.
11         Q.   If you take a look at page 3,
12  the definition of collateral agent.  Did
13  Wells know and understand that it was
14  designated as the collateral agent under
15  the indenture in its capacity as the third
16  priority collateral agent?
17         MR. ZENSKY:  Objection.
18         MR. SCHLECKER:  Objection to the
19  form.
20         A.   Well, I didn't sign the original
21  agreement but, yes, from taking over the
22  duties when I did there's a designation of
23  a collateral control agent and that's one
24  of our capacities.
25         Q.   Can you describe for me

**62**

MICHAEL PINZON

1  MICHAEL PINZON
2  generally Wells's understanding of its
3  duties and responsibilities as the
4  collateral agent under the indenture?
5      A.   Basically to hold whatever
6  physical collateral was provided to Wells
7  Fargo in a vault.  And with reference to
8  any collateral that is listed as
9  collateral in the agreements, that would
10  be the collateral that would be taken and
11  most of that is not physical but just
12  documentation.  It's documentation by the
13  debtor saying this is the collateral.
14      Q.   What documentation did the
15  debtor use to say this is collateral?
16      A.   They could have been various
17  exhibits listing the entities that were
18  involved in the collateral listing deposit
19  account control agreements for example.
20      Q.   Was there a practice by which
21  the debtors delivered the information
22  you've described to Wells?
23      MR. SCHLECKER:  Objection to the
24  form.  You can answer.
25      A.   It would be whatever they

**63**

1  MICHAEL PINZON
2  delivered at the time of closing.  And it
3  would be reflected in the closing
4  documents more specifically.
5      MR. ZENSKY:  Can you read that
6  answer back, please.
7      (Record read.)
8      Q.   Since the closing, have any of
9  the debtors delivered to Wells any of the
10  documents -- any documents or exhibits of
11  the type you described earlier?
12      A.   You mean additional collateral?
13  Like from time to time something could be
14  delivered in terms of saying this is the
15  collateral in reference to this
16  transaction and that would be the
17  collateral for that transaction for the --
18      Q.   Since the time that you assumed
19  the responsibility for the ResCap
20  transactions, would the delivery of those
21  documents and exhibits go to you?
22      A.   Yes.  Counsel and -- yes.
23      Q.   Can you describe for me
24  generally how Wells maintains the
25  documents that it receives from any of the

**64**

1  MICHAEL PINZON
2  debtors?
3      A.   It would either be maintained in
4  a shared drive, and if a CD was produced
5  and delivered, that would be saved as well
6  in a physical form capacity.
7      Q.   And is that shared drive and CD
8  or CDs available to you in your capacity
9  as a vice president of Wells Fargo?
10      A.   Yes.
11      Q.   Did any of the debtors ever
12  provide to Wells Fargo a regular
13  collateral report?
14      MR. SCHLECKER:  Objection to the
15  form.  If you can understand it, you
16  can answer it.
17      A.   Yeah, I don't know what you mean
18  by regular collateral report.
19      Q.   Have you ever seen a report
20  prepared by any of the debtors that
21  purports to list all of the collateral
22  under the indenture?
23      A.   I wouldn't qualify it as a
24  report.  It's whatever collateral is
25  delivered to us or listed would be part of

**65**

1  MICHAEL PINZON
2  closing, part of the ongoing subsequent
3  list of information.  There was no report
4  that I recall in a vacuum just saying
5  here's a report.  It's always part of the
6  process of, you know, taking on the
7  collateral, releasing the collateral,
8  whatever it may be.
9      Q.   So is it your understanding that
10  the practice was that debtor would deliver
11  to Wells a list of any assets that were
12  being added to the collateral pool at the
13  time each transaction closed?
14      MR. ZENSKY:  Objection.
15      MR. SCHLECKER:  Objection to the
16  form.  But you can answer.
17      A.   I can only answer to the fact of
18  whatever was delivered to me.  I don't
19  know if there was other collateral as part
20  of the collateral, you know, to the
21  obligators or whatever.  If they had other
22  collateral, I don't know.
23      Q.   Is it Wells' understanding that
24  at the time the notes were issued
25  U.S. Bank National Association was

17 (Pages 62 to 65)

---

66

MICHAEL PINZON

1　　　　　MICHAEL PINZON
2　designated as the trustee under the
3　indenture?
4　　　A.　That's what it has in the
5　documentation, yes.
6　　　Q.　Can you please turn to page 66
7　of the indenture.
8　　　A.　Yes.
9　　　Q.　And I would just ask you to read
10　section 8.03 A to yourself.
11　　　A.　Okay.
12　　　Q.　Did Wells know and understand at
13　the time the notes were issued that each
14　holder of notes, as defined in the
15　indenture, consented and agreed to be
16　bound by the terms of the security
17　document and the Intercreditor Agreement?
18　　　MR. ZENSKY:　Objection.
19　　　MR. SCHLECKER:　I'll -- note my
20　objection to the form of the question.
21　If you can answer the question, you
22　can answer the question.
23　　　A.　I don't know about the trustee.
24　I don't know what, you know.
25　　　Q.　I'm not asking about the trustee

---

67

MICHAEL PINZON

1　right now.　I'm just asking about Wells.
2　Did Wells understand, and if I said
3　trustee I made a mistake so let me
4　withdraw it and start again.
5　　　Did Wells understand at the time
6　the notes were issued that each holder of
7　notes consented to be bound by the
8　security documents and the Intercreditor
9　Agreement?
10　　　MR. ZENSKY:　Objection.
11　　　MR. SCHLECKER:　You are talking
12　about at the time this document was
13　executed?
14　　　MR. MORRIS:　Yes.
15　　　MR. SCHLECKER:　Just note my
16　objection.　Wells Fargo was not a
17　signatory to this document.　But you
18　can answer.
19　　　A.　I don't know.
20　　　Q.　Did Wells know and understand
21　that each holder of notes authorized Wells
22　as the collateral agent to enter into the
23　security documents to which it was a
24　party?

---

68

MICHAEL PINZON

1　　　A.　I don't know.
2　　　Q.　Did Wells know and understand
3　that each holder of notes authorized Wells
4　as the collateral agent to enter into,
5　execute and deliver the Intercreditor
6　Agreement?
7　　　A.　In reference to the
8　Intercreditor Agreement -- again with the
9　question.
10　　　Q.　Did Wells execute the
11　Intercreditor Agreement?
12　　　A.　Yes.
13　　　Q.　Did Wells know at the time that
14　it did so that it was authorized by the
15　holder of notes to do so?
16　　　A.　I recall specifically the holder
17　of notes as defined here.
18　　　Q.　If you take a look at page 7, it
19　has a definition of the term "holder" and
20　it means the person in whose name a note
21　is registered on the registration books
22　kept for that purpose in accordance with
23　section 2.03?
24　　　A.　I wasn't a party to the

---

69

MICHAEL PINZON

1　indenture so I don't --
2　　　Q.　I understand, but Wells was; is
3　that correct?
4　　　A.　A party to the indenture, no.
5　　　Q.　I apologize.　I'm asking about
6　the Intercreditor Agreement.
7　　　A.　Yes.
8　　　Q.　Is Wells a party to the
9　Intercreditor Agreement?
10　　　A.　Yes.
11　　　Q.　And did Wells know and
12　understand at the time that it signed the
13　Intercreditor Agreement that it was
14　authorized to do so by each holder of the
15　notes?
16　　　A.　I don't recall specifically.
17　　　Q.　Do you recall anything generally
18　about that?
19　　　A.　No.
20　　　Q.　Did Wells sign security
21　documents in connection with the junior
22　secured notes?
23　　　MR. ZENSKY:　Objection.
24　　　A.　What security documents are you

18　(Pages 66 to 69)

70

MICHAEL PINZON

1   MICHAEL PINZON
2   referring to?
3   Q.   If you look at page 16 of the
4   indenture.
5   A.   Yes, okay.  So.
6   Q.   With that understanding of the
7   security documents did Wells execute the
8   security documents as defined?
9   A.   Yes.
10   Q.   And at the time Wells executed
11   the security documents did it know and
12   understand that each holder of notes
13   authorized it to do so?
14   MR. ZENSKY:  Objection.
15   A.   Again, I don't know specifically
16   or generally.
17   Q.   At the time the notes were
18   issued did Wells know and understand that
19   each holder of notes authorized Wells as
20   the collateral agent to bind the holders
21   of the notes as set forth in the security
22   documents?
23   MR. ZENSKY:  Objection.
24   MR. SCHLECKER:  Note my
25   objection.  It touches on legal

71

1   MICHAEL PINZON
2   conclusions.
3   MR. MORRIS:  Their understanding
4   may be right, it may be wrong, I'm
5   just asking for their understanding.
6   MR. SCHLECKER:  You can answer
7   the question.
8   A.   Can you repeat the question,
9   please.
10   (Record read.)
11   A.   Not specifically.
12   Q.   Does Wells have any
13   understanding today as to whether the
14   holder of notes authorized Wells to do
15   anything with respect to the ResCap
16   transactions?
17   MR. SCHLECKER:  Objection to the
18   form.
19   A.   I don't know.
20   MR. MORRIS:  Okay.  Let's mark
21   as the next exhibit the Intercreditor
22   Agreement.
23   (Wells Exhibit 10, Intercreditor
24   Agreement, marked for identification,
25   as of this date.)

72

1   MICHAEL PINZON
2   Q.   Have you seen this document
3   before, sir?
4   A.   Yes.
5   Q.   And could you turn to the page
6   immediately after the last numbered page
7   58.
8   A.   Yes.
9   Q.   You said you've seen this
10   document before; is that right?
11   A.   Yes.
12   Q.   And did you see it at the time
13   you assumed the responsibility for the
14   ResCap transactions, as you described
15   earlier?
16   A.   Yes.
17   Q.   And what is this document?
18   A.   The Intercreditor Agreement.
19   Q.   Now, turning back to the page I
20   asked you.  Is it your understanding as
21   Wells' representative today that Wells
22   Fargo executed the Intercreditor Agreement
23   in its capacity as first priority
24   collateral agent?
25   A.   Appears to be so.  Nick Tally's

73

1   MICHAEL PINZON
2   signature is here.
3   Q.   Can you turn the page, please.
4   A.   Yes.
5   Q.   Is it Wells' understanding that
6   it signed the Intercreditor Agreement in
7   its capacity as second priority collateral
8   agent?
9   A.   Yes.
10   Q.   And the next page.  Is it Wells'
11   understanding that it signed the
12   Intercreditor Agreement in its capacity as
13   third priority collateral agent?
14   A.   Yes.
15   Q.   And if you turn the page, can
16   you tell me if it's Wells' understanding
17   that it signed the Intercreditor Agreement
18   in its capacity as collateral control
19   agent?
20   A.   Yes.
21   Q.   Do you have an understanding,
22   irrespective of any definition used
23   elsewhere, do you have an understanding of
24   what first priority collateral agent
25   means?

19  (Pages 70 to 73)

74

MICHAEL PINZON

1
2   A.   Yes.
3   Q.   What is your understanding of
4   that term?
5   A.   That as a priority lien over all
6   junior liens to the collateral in
7   question.
8   Q.   And what financing or
9   transaction is it that has priority over
10  the other liens as you've described it?
11  MR. ZENSKY:  Objection.
12  MR. SCHLECKER:  Object to the
13  form of the question.
14  A.   Which transaction?  You mean in
15  general or do you mean this transaction?
16  Q.   In what transaction did Wells
17  act as the first priority collateral
18  agent?
19  A.   Oh.  In the transaction, the
20  ResCap junior transaction.
21  Q.   Can we refer to that as the
22  revolver?
23  A.   The loan agreement?
24  Q.   Yes.
25  A.   Yes.

75

MICHAEL PINZON

1
2   Q.   Is it your understanding that
3   that's a revolver?
4   A.   Yes.
5   Q.   It's a line of credit, right?
6   A.   It's a loan agreement.
7   Q.   It's a loan agreement, okay.
8   Do you know whether Wells has
9   served as the collateral control agent
10  under the Intercreditor Agreement from
11  June 6, 2008 to the present?
12  A.   Yes.
13  Q.   Does Wells know whether any
14  other person or entity ever served as the
15  collateral control agent under the
16  Intercreditor Agreement?
17  A.   I don't think anyone else has
18  served other than Wells Fargo.
19  Q.   Can you please turn to page 30
20  of the document.  Are you generally
21  familiar with the provision 5.6 that
22  contains what's described in the heading
23  as special provisions relating to
24  collateral control agreement?
25  MR. ZENSKY:  Objection.

76

MICHAEL PINZON

1
2   Q.   I'm only going to ask you some
3   very narrow and specific questions.
4   A.   Yes, I know this provision.  I
5   have seen this provision.
6   Q.   Can you turn to page 37.
7   A.   Okay.
8   Q.   And first we will look at 5.6(w)
9   on page 37.  If you could just take a look
10  at that and let me know when you are done.
11  A.   Okay.
12  Q.   Did Wells understand that as the
13  collateral control agent under the
14  Intercreditor Agreement it was required to
15  maintain accurate and complete books and
16  records with respect to all matters
17  directly related to the administration of
18  collateral?
19  MR. ZENSKY:  Objection.
20  A.   It appears on here, yes.
21  Q.   I know that it appears there.
22  But I'm asking you if that was Wells's
23  understanding?
24  A.   Yes.
25  Q.   And if you take a moment to look

77

MICHAEL PINZON

1
2   at exhibit -- subparagraph X, 5.6(x).
3   A.   Yes.
4   Q.   Did Wells know and understand
5   that as the collateral control agent under
6   the Intercreditor Agreement it was
7   required to make available to what's
8   defined as relevant directing parties
9   Wells' books and records in respect of the
10  collateral?
11  A.   Yes.
12  Q.   Do you have an understanding of
13  what the phrase "relevant directing party"
14  refers to?
15  A.   Yeah.  It's a defined term.  In
16  this case it would be a lender agent.
17  Q.   Can you take a look at page 8,
18  please.  And the definition of relevant
19  directing party, if you could just read
20  that to yourself.
21  A.   Yes.
22  Q.   With that definition in mind, do
23  you know whether any relevant directing
24  party ever asked to see Wells' books and
25  records in respect of collateral under

20  (Pages 74 to 77)

78

MICHAEL PINZON

1 section 5.6(x)?
2
3    A.   I don't specifically recall a
4 specific instance that they requested.
5    Q.   Now, I have asked the broad
6 question.  I ask for your patience.  I'm
7 going to ask some specific questions about
8 that.
9    Did the indenture trustee under
10 the junior secured notes ever ask at any
11 time to see Wells's books and records in
12 respect of collateral?
13    A.   I don't recall any specific.
14    Q.   Did the lender agent ever ask at
15 any time to see Wells' books and records
16 in respect of the collateral?
17    A.   I don't, specifically, recall.
18    Q.   Did any junior secured
19 noteholder or anybody acting on behalf of
20 any junior secured noteholder ever ask to
21 see Wells' books and records in respect of
22 the collateral?
23    A.   I don't recall any such
24 incident.
25    Q.   In the ordinary course of your

79

MICHAEL PINZON

1
2 business, if a request was made by either
3 the lender agent, anyone on behalf of any
4 junior secured noteholder or the 2015
5 trustee under the notes would that request
6 have been brought to your attention?
7    A.   The request would have been
8 brought to my attention.
9    Q.   And in your capacity as a vice
10 president responsible for the ResCap
11 financing --
12    A.   Right.
13    Q.   -- financings, you are not aware
14 of any request ever having been made by
15 either the 2015 trustee, the lender agent
16 or anyone on behalf of any junior secured
17 noteholder; is that correct?
18    MR. ZENSKY:  Objection.
19    A.   In reference to what?
20    MR. SCHLECKER:  In reference to
21 what?
22    Q.   The books and records of Wells
23 in respect of collateral.
24    MR. ZENSKY:  Objection.
25    A.   I don't recall any specific

80

MICHAEL PINZON

1
2 incident.
3    Q.   You know what, I want to try and
4 ask that question more cleanly because
5 there was an objection.
6    Has the 2015 trustee under the
7 notes ever requested to see Wells' books
8 and records in respect of collateral?
9    A.   In respect of collateral, no.
10    Q.   Has anyone acting on behalf of
11 any junior secured noteholder ever
12 requested to see Wells' books and records
13 in respect of collateral?
14    MR. SCHLECKER:  Just note my
15 objection.  I don't know whether
16 anyone meaning lawyers on behalf of
17 any of the parties requested -- he
18 wouldn't know about requests other
19 than what came into Wells Fargo.  So
20 if you keep it to that, that's fine.
21    MR. MORRIS:  That's all I'm
22 asking.
23    MR. SCHLECKER:  Okay.  That's
24 fine.
25    A.   Any requests would usually come

81

MICHAEL PINZON

1
2 through counsel Seward & Kissel.  I don't
3 recall ever speaking to any junior nor
4 would I because I would do that through
5 the trustee.
6    Q.   Now I'm going to ask the broad
7 question.
8    A.   Okay.
9    Q.   Prior to the petition date, did
10 anyone ever ask to see Wells's books and
11 records in respect of collateral?
12    MR. SCHLECKER:  Do you know what
13 the petition date means?
14    THE WITNESS:  I know it's date.
15    A.   But what date is it, the
16 specific date?
17    Q.   The petition date is May 14,
18 2012.  So at any time prior to May 14,
19 2012, did anyone ever ask to see Wells
20 books and records in respect of
21 collateral?
22    A.   I don't recall any specific.
23    MR. MORRIS:  All right.  I'd
24 like to mark as the next document the
25 Note Security Agreement.  That will be

21 (Pages 78 to 81)

82

```
 1          MICHAEL PINZON
 2    Exhibit 11.
 3          THE WITNESS:  Can I take a
 4    moment to go to the bathroom?
 5          MR. MORRIS:  Absolutely.
 6          (Whereupon, there is a recess in
 7    the proceedings.)
 8          MR. MORRIS:  I would like to
 9    mark as Wells Exhibit 12 (sic) a
10    document titled Amended and Restated
11    Third Priority Pledge and Security
12    Agreement and Irrevocable Proxy.
13          (Wells Exhibit 11, Amended and
14    Restated Third Priority Pledge and
15    Security Agreement and Irrevocable
16    Proxy, marked for identification, as
17    of this date.)
18    Q.    Have you seen this document
19    before, sir?
20    A.    Yes.
21    Q.    Do you have an understanding of
22    what it is?
23    A.    It's the security agreement in
24    reference to, you know, sort of our main
25    duties in reference to the transaction.
```

83

```
 1          MICHAEL PINZON
 2    Q.    Do you recall when you first saw
 3    this document?
 4    A.    A little prior to the date
 5    that's stated here because I signed it.
 6          MR. ZENSKY:  Can I ask the
 7    report to read back the answer before
 8    this one because the witness's voice
 9    got lost.
10          (Record read.)
11    Q.    Is this security agreement
12    related to the junior secured notes?
13    A.    Yes.
14          MR. SCHLECKER:  Object to the
15    form.
16    Q.    Do you understand the term
17    "junior secured notes"?
18    A.    I believe -- is it in reference
19    to the indenture you just showed me
20    before?
21    Q.    Yes.  With that understanding,
22    is this security agreement executed in
23    connection with the junior secured notes?
24    A.    Yeah.  It's in -- yes.
25    Q.    Can you turn to the page with
```

84

```
 1          MICHAEL PINZON
 2    the Bates number in the lower right-hand
 3    corner of 3051, ending in 3051.
 4    A.    Yes.
 5    Q.    Is that your signature on the
 6    page?
 7    A.    Yes.
 8    Q.    And did you personally sign this
 9    security agreement on behalf of Wells
10    Fargo Bank as the third priority
11    collateral agent?
12    A.    Yes.
13    Q.    And did you personally sign this
14    document on behalf of Wells Fargo Bank in
15    its capacity as collateral control agent
16    under the security agreement?
17    A.    Yes.
18    Q.    Was it your understanding that
19    this -- withdrawn.
20          If I use the phrase "security
21    agreement," I'm going to be referring to
22    this particular document, is that fair?
23    A.    This amended and restated third
24    priority pledge, right?
25    Q.    Correct.  If I use the phrase
```

85

```
 1          MICHAEL PINZON
 2    "security agreement," this is the document
 3    I'm talking about, Wells Exhibit 11?
 4    A.    Right.
 5    Q.    Was it your understanding at the
 6    time you signed the security agreement
 7    that it governed the security interests of
 8    the notes?
 9    A.    Yes.
10          MR. SCHLECKER:  Can I just
11    interrupt you?  Is this Exhibit 11 or
12    12.
13          MR. HAMERMAN:  I think we said
14    12 by accident but we corrected it.
15          MR. SCHLECKER:  It's 11.  Sorry.
16          MR. ZENSKY:  Can you read the
17    question back.
18          (Record read.)
19          MR. MORRIS:  I'm going to
20    withdraw the question.
21          MR. ZENSKY:  There was colloquy
22    in the middle of the question and
23    answer.
24          MR. MORRIS:  No problem.
25    Q.    If I use the term "notes," will
```

22 (Pages 82 to 85)

86

MICHAEL PINZON

1
2  you understand that I'm referring to the
3  junior secured notes that were the subject
4  of the indenture that we talked about
5  earlier?
6      A.   Yes.
7      Q.   At the time that you executed
8  the security agreement did you understand
9  that it governed the security interests of
10 the notes?
11         MR. ZENSKY:  Objection.
12         MR. SCHLECKER:  Note my
13 objection.
14     A.   I don't know that.  I just know
15 the documents I signed -- the document I
16 signed.
17     Q.   And what's your -- withdrawn.
18         What's Wells' understanding of
19 the purpose of the document that you
20 signed on its behalf?
21         MR. SCHLECKER:  Objection to
22 form.
23     Q.   This is Exhibit 11.
24         MR. ZENSKY:  Objection.
25         MR. SCHLECKER:  I think he

87

1          MICHAEL PINZON
2  answered.  But you can answer.
3      A.   It's a security agreement in
4  reference to the third priority pledge.
5      Q.   Can you please turn to page 24.
6  Section 11 recites certain agreements of
7  the grantors.  Do you see that?
8      A.   Yes.
9      Q.   Do you have an understanding of
10 the term "grantors" as used in the
11 security agreement?
12     A.   Well -- yes.  It's ResCap and
13 its affiliates.
14     Q.   With that understanding, are you
15 generally aware that the grantors made the
16 agreements set forth in section 11?
17         MR. SCHLECKER:  Note my
18 objection to the form.  It states what
19 it states.  You can answer it.
20     A.   The question again, please.
21     Q.   Are you generally aware that the
22 grantors made the agreements set forth in
23 section 11?
24     A.   It's what it states here.
25     Q.   Have you ever looked at section

88

1          MICHAEL PINZON
2  11 before today?
3      A.   Yes.
4      Q.   Can you please turn to page 25,
5  which is section 11 A little 4.  And I
6  just ask you to read that to yourself and
7  let me know when you are done.
8      A.   Wait, section 11 A Romanette 4?
9      Q.   Yes.  On page 25.
10     A.   Yes, okay.
11     Q.   Did Wells know and understand
12 that each grantor was required to keep its
13 records concerning the collateral in a
14 manner that would enable Wells to
15 determine at any time the status of the
16 collateral?
17     A.   I don't know what the grantor
18 would do.
19     Q.   Did Wells ever ask the grantor
20 to see any grantor's books and records
21 relating to the collateral?
22         MR. ZENSKY:  Objection.
23     A.   It's not my duty to do that.
24     Q.   I'm not asking you what is or
25 isn't your duty.  I'm just asking whether

89

1          MICHAEL PINZON
2  Wells ever inquired of any grantor to see
3  their books and records in respect of
4  collateral?
5          MR. ZENSKY:  Objection.
6      A.   We would ask to see whatever
7  collateral they presented us that we would
8  be the collateral agent for.
9      Q.   And are you referring to
10 particular transactions or more generally?
11     A.   No.  Well this transaction.  The
12 transaction in question here.
13     Q.   Which transaction are you
14 referring to?
15     A.   The ResCap GMAC transaction
16 which entails this agreement, the
17 intercreditor, the indenture, all the
18 agreements we discussed.
19     Q.   But since the time that those
20 agreements were executed, did Wells ever
21 request of any grantor that it be given
22 access to their books and records in
23 respect of collateral?
24     A.   I don't recall any.
25     Q.   Did Wells know that each grantor

23  (Pages 86 to 89)

90

MICHAEL PINZON

1
2  or was required to keep books and records
3  in respect of collateral?
4      A.   Objection to the form of the
5  question.
6          MR. ZENSKY:  Same objection.
7          MR. SCHLECKER:  It assumes
8  facts.
9      A.   What do you mean by know?  What
10 is that?  I don't understand know.
11     Q.   I guess there's knowledge, which
12 are facts that you aware of.  There's
13 beliefs, right?  On the spectrum of
14 knowledge there's beliefs, something that
15 you believe to be true even if I don't
16 necessarily know it to be true.  I'm
17 asking for knowledge.  Do you know whether
18 or not each grantor maintained books and
19 records in respect of collateral?
20     A.   I don't know that.
21     Q.   You could have asked somebody
22 that question but, right?
23         MR. SCHLECKER:  Well -- don't
24 answer that question.
25     Q.   If you look at subparagraph 5

91

MICHAEL PINZON

1
2  for a moment.  Tell me when you are done
3  looking at that.  You know what, before
4  you do that let me ask some more specific
5  questions.
6      A.   Okay.
7      Q.   Did anybody at Wells --
8  withdrawn.
9          Did Wells ever discuss with any
10 grantor the records that the grantor kept
11 concerning collateral?
12     A.   I don't recall.
13     Q.   Does Wells know of any assertion
14 by anyone that any grantor's records were
15 insufficient to allow Wells to determine
16 the status of the collateral?
17         MR. ZENSKY:  Objection.
18         MR. SCHLECKER:  Objection.
19     A.   I wouldn't know that.
20         MR. SCHLECKER:  Give me time to
21 object.  Then you can answer.
22     Q.   Did Wells rely on the grantors
23 to keep their records in a manner that
24 would enable Wells to determine the status
25 of collateral?

92

MICHAEL PINZON

1
2      A.   I don't know.
3      Q.   Did Wells understand that it had
4  the right under section 11 A-5 to request
5  information concerning the collateral?
6      A.   Okay.  Your question again now
7  that I read it.
8      Q.   Did Wells understand that it had
9  the right to ask of any grantor for
10 information concerning the collateral?
11     A.   Yes.
12     Q.   Did Wells ever exercise that
13 right?
14     A.   I don't recall, specifically.
15     Q.   Are you aware of the phrase
16 "CFDR"?
17     A.   No.
18     Q.   Do you know whether any of the
19 debtors kept information relating to the
20 ResCap transactions on a database that's
21 referred to as CFDR?
22     A.   I don't, specifically, recall,
23 no.
24     Q.   Take a look at A-6 at the bottom
25 of page 25.  And read that to yourself and

93

MICHAEL PINZON

1
2  let me know when you are done.
3      A.   Okay.
4      Q.   Did Wells understand that it had
5  the right to inspect and audit all records
6  pertaining to collateral?
7      A.   Yes.
8      Q.   Did Wells ever request the
9  opportunity to inspect and audit all
10 records pertaining to the collateral?
11     A.   What date?  Prior to the
12 petition?
13     Q.   Sure, if that's helpful.  Let me
14 rephrase the question in that context.
15 Prior to the petition date did Wells ever
16 request to inspect and audit all records
17 pertaining to the collateral?
18     A.   I don't recall.
19     Q.   Do you know whether Wells has
20 ever made that request since the petition
21 date?
22         MR. ZENSKY:  Objection.
23     A.   We asked for discovery
24 information.  That's all I know.  In the
25 general term that might relate to some of

24 (Pages 90 to 93)



94

MICHAEL PINZON

1
2  the things that you are asking here now.
3      Q.   Do you know of any other request
4  for the inspection and audit of records
5  pertaining to collateral other than the
6  discovery requests made in this
7  litigation?
8      A.   I don't recall.
9      Q.   Now subparagraph little Roman 6
10 also refers to the trustee.  Do you see
11 that?
12     A.   6?
13     Q.   Yeah.
14     A.   Yes.
15     Q.   Do you have an understanding of
16 what the phrase "the trustee" refers to?
17     A.   Yes.
18     Q.   What's your understanding?
19     A.   The trustee at the time,
20 U.S. Bank.
21     Q.   Prior to the petition date does
22 Wells know whether the trustee ever
23 requested the opportunity to inspect and
24 audit all records pertaining to the
25 collateral?

95

MICHAEL PINZON

1
2      A.   I don't know.
3      Q.   Do you know whether any trustee
4  since the petition date, other than in the
5  context of the document requests, has
6  sought to inspect or audit all records
7  pertaining to the collateral?
8      A.   I don't know that.
9      Q.   Do you know whether any grantor
10 at any time refused a request to inspect
11 and audit records pertaining to
12 collateral?
13     A.   I don't recall.
14     MR. ZENSKY:  Objection.
15     MR. SCHLECKER:  Objection.
16     A.   I don't know.
17     MR. MORRIS:  I'm just asking for
18 their knowledge.
19     Q.   Can you please turn to page 36.
20     A.   Okay.
21     Q.   Have you seen section 15 of this
22 document before?
23     A.   Yes.
24     Q.   Do you understand -- withdrawn.
25     Is it Wells' understanding that

96

MICHAEL PINZON

1
2  section 15 governs the third priority
3  collateral agent's rights, powers,
4  obligations and duties under the security
5  agreement?
6      A.   Yes.
7      Q.   Can you please turn to page 44,
8  subsection z.
9      A.   Okay.
10     Q.   Did Wells understand that it was
11 required to maintain accurate and complete
12 books and records with respect to all
13 matters related to directly to the
14 administration of collateral?
15     A.   Yeah.
16     Q.   Did Wells have customary
17 procedures for fulfilling its obligations
18 under this subsection?
19     MR. SCHLECKER:  Objection to the
20 form of the question.
21     Q.   There's a reference to customary
22 procedures in section 15 little z, do you
23 see that?
24     A.   Yes.
25     Q.   Do you have an understanding of

97

MICHAEL PINZON

1
2  what that phrase "customary procedures"
3  means?
4      A.   It's a general description of
5  what I guess a corporate trustee would
6  do -- well, a corporate trus- -- agent in
7  this case not a trustee.
8      Q.   Can you tell me what the
9  customary procedures were for that agent
10 with respect to the maintenance of
11 accurate and complete books and records as
12 set forth in 15(z)?
13     A.   It means that whatever we sign
14 to we should have a copy of and that when
15 we are asked to release a document, that
16 we review that document from
17 administrative point of view and in
18 conjunction with counsel to review that
19 prior to any release of any collateral
20 that was pledged to us prior to its
21 release to make sure that the proper
22 documentation was provided prior to its
23 release.
24     Q.   And to the best of your
25 knowledge, did Wells follow its customary

25  (Pages 94 to 97)

98

MICHAEL PINZON

1
2  procedures with respect to its duties as
3  the third priority collateral agent?
4      A.   Yes.
5      Q.   We may have covered this a
6  little bit before but please bear with me.
7  Can you describe how Wells maintained its
8  books and records concerning the
9  administration of collateral?
10     A.   Whatever physical collateral was
11 delivered was deposited in a secure vault.
12 Whatever document at the time of closing
13 or subsequent providing of collateral from
14 the same parties, that that documentation
15 was kept also.  If it's a physical copy of
16 that documentation that was provided, we
17 keep the physical copy.  If there was an
18 electronic copy that was provided, that
19 would be saved in the shared drive as
20 described before.
21     Q.   Prior to the petition date, did
22 anybody on behalf of the 2015 trustee ever
23 inquire as to how Wells maintained its
24 books and records with respect to the
25 administration of collateral?

99

MICHAEL PINZON

1
2      A.   I don't recall that.
3      Q.   Prior to the petition date, did
4  anybody on behalf of the 2015 trustee ever
5  inquire of Wells about the status of the
6  collateral?
7      A.   No, I don't recall that
8  specifically.
9      Q.   Prior to the petition date, did
10 anybody on behalf of any junior secured
11 noteholder ask how Wells maintained its
12 books and records with respect to the
13 administration of collateral?
14     A.   I don't recall that.
15     Q.   Prior to the petition date, did
16 anybody on behalf of any junior secured
17 noteholder ever inquire of Wells about the
18 status of the collateral?
19     A.   I don't recall that.
20     Q.   Prior to the petition date, did
21 Wells ever discuss with anybody on behalf
22 of the 2015 trustee the topic of lien
23 releases?
24     That was a bad question.
25 Withdrawn.

100

MICHAEL PINZON

1
2      We will get to that.
3      Take a look at subsection AA,
4  please, and let me know when you are done?
5      A.   Okay.
6      Q.   Did Wells understand that as the
7  third priority collateral agent it was
8  required to make available to the trustee
9  its books and records in respect of
10 collateral?
11     MR. SCHLECKER:  Object to the
12 form of the question.  But you can
13 answer.
14     A.   It says make available.
15     Q.   Correct.  I'm just asking
16 whether Wells understood that it had the
17 obligation as the third-party (sic)
18 collateral agent to make available to the
19 trustee its books and records in respect
20 of collateral.
21     MR. SCHLECKER:  Upon request.
22 That's why I objected to the form.
23 You can answer.
24     A.   If they asked of us -- of it, we
25 would provide it.

101

MICHAEL PINZON

1
2      Q.   And did the trustee under the
3  indenture ever make a written request of
4  Wells for the type of information
5  described in 15(aa)?
6      A.   They may have requested
7  information.  I don't know specifically.
8  I can't tell you -- recall what exactly
9  what agreement or document they requested.
10     Q.   Do you have any memory as to
11 when any such request was made?
12     A.   No, not specifically.
13     Q.   Do you have any particular
14 recollection of the trustee making a
15 request or are you just allowing for the
16 possibility that it may have happened?
17     A.   No, I think I made a request for
18 some document, I just don't recall
19 specifically what it was.
20     Q.   Do you recall if the request was
21 made directly to you?
22     A.   Yeah, I think it was.
23     Q.   And did the direct -- withdrawn.
24     Did the request come directly
25 from the indentured trustee or did it come

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

102

MICHAEL PINZON

1
2  through counsel?  Do you have that --
3      A.   It came from the trustee I
4  believe.
5      Q.   Do you recall if it was a
6  written request or an oral request?
7      A.   I don't recall, specifically.
8      Q.   Do you recall ever having had a
9  conversation with anybody at U.S. Bank
10  concerning collateral?
11     A.   No.
12     Q.   Do you recall whether Wells
13  received more than one written request
14  from the trustee for information relating
15  to collateral?
16         MR. SCHLECKER:  Just note my
17  objection.  If it's written or oral.
18  You can answer.
19     A.   I don't recall.
20     Q.   Do you recall anything at all
21  about the request that you have in your
22  mind?
23     A.   Just that they made a request
24  and I would have -- I think I checked with
25  counsel to see if I could provide the

103

MICHAEL PINZON

1
2  information.  That's it.
3      Q.   Did you provide the information?
4      A.   Yeah.
5      Q.   Do you recall what information
6  you provided?
7      A.   Some documentation but it
8  wasn't, as I recall, specifically in
9  reference to collateral.
10     Q.   Do you recall whether the
11  request related to any lien releases?
12     A.   No.  No, it didn't.
13     Q.   Did the 2015 trustee ever make a
14  request for information relating to any
15  lien release executed by Wells Fargo?
16     A.   Not that I --
17         MR. ZENSKY:  Are you asking
18  prepetition, Counsel or?
19         MR. MORRIS:  Yes.  Thank you for
20  the clarification.  Let me ask the
21  question again.
22     Q.   Prior to the petition date, did
23  the 2015 trustee ever ask Wells for any
24  information relating to any lien releases
25  executed by Wells?

104

MICHAEL PINZON

1
2      A.   I don't recall.
3          MR. MORRIS:  Okay.  We are going
4  to mark the next and last document,
5  the revolver of the loan agreement.
6          (Wells Exhibit 12, amended and
7  restated loan agreement, marked for
8  identification, as of this date.)
9      Q.   Have you seen this document
10  before, sir?
11         MR. ZENSKY:  Can you just wait?
12  We are just waiting for the exhibit.
13     Q.   Have you seen this document
14  before, sir?
15     A.   Yes.
16     Q.   Do you have an understanding as
17  to what it is?
18     A.   It's a loan agreement.
19     Q.   And do you know generally what
20  this loan agreement relates to?
21     A.   To a loan that the borrower and
22  the grantors entered into with Wells
23  Fargo.
24     Q.   Fair enough.  Can you please
25  turn to page S-6.

105

MICHAEL PINZON

1
2      A.   Is it towards the back or?
3      Q.   Yes.
4      A.   After the pagination?
5      Q.   It's actually in the middle,
6  yes.
7      A.   Okay, got it.
8      Q.   Is that your signature on the
9  document?
10     A.   Yes, it is.
11     Q.   And did you sign this document
12  on behalf of Wells in its capacity as the
13  first priority collateral agent under the
14  security agreement?
15     A.   For purposes of 12.11(b), yes.
16     Q.   Thank you for the clarification.
17  Do you know whether Wells also acted as
18  the collateral control agent under this
19  agreement?
20         MR. ZENSKY:  I'm going to object
21  to questions on this as outside the
22  scope of the 30(b)(6).
23         MR. MORRIS:  Okay.
24         MR. SCHLECKER:  Note my
25  objection.  You can answer the

27 (Pages 102 to 105)

106

MICHAEL PINZON

1
2  question.
3  A.   Yes.
4      MR. MORRIS:  I just want to
5  respond to the objection.  I believe
6  these questions and this agreement,
7  while some background may be required
8  for context, I believe that the
9  questions will ultimately relate to
10  30(b)(6) topics 9, 10, 11.
11      Can we take a moment break.
12      (Whereupon, there is a recess in
13  the proceedings.)
14      MR. MORRIS:  I'm just going to
15  note for the record, as I explained to
16  Mr. Zensky during the break, we made a
17  mistake.  The 30(b)(6) notice that we
18  had marked as, I think, Exhibit 2 is
19  actually the original 30(b)(6) notice.
20      We had intended to mark as an
21  exhibit the 30(b)(6) notice that was
22  sent, that, on August 15th.  We are
23  getting a copy of that.  We will
24  provide that to you as soon as it's
25  available, which I hope will be before

107

MICHAEL PINZON

1
2  the end of this deposition.
3      MR. ZENSKY:  You can show him
4  mine.  I have the August 15th.
5      MR. MORRIS:  Is there any
6  handwriting on it?
7      MR. ZENSKY:  Yes, there is.
8      MR. MORRIS:  We will get the
9  right one.
10      Q.   Looking at the -- can I refer to
11  this as the loan agreement?
12      A.   Okay, that's fine.
13      Q.   And I believe you earlier
14  testified that you signed this on behalf
15  of Wells, for purposes of 12.11(b), in its
16  capacity as first priority collateral
17  agent?
18      A.   Yes.
19      Q.   Can you turn to page 20, please.
20      Are you generally familiar with
21  this document?
22      MR. ZENSKY:  Objection.
23      A.   I reviewed the document at the
24  time that I signed it.  It's some time
25  ago, so I don't remember all the

108

MICHAEL PINZON

1
2  provisions offhand.
3      Q.   Right.  But you did review it
4  before signing it; is that correct?
5      MR. ZENSKY:  Objection.
6      MR. SCHLECKER:  You can answer
7  it.
8      Did you review it, before you
9  signed this document?
10      A.   Yes.
11      Q.   And did Wells have the advice of
12  counsel, before you executed this document
13  on its behalf?
14      A.   Yes, they did.
15      MR. ZENSKY:  Objection.
16      Q.   Are you generally aware that
17  article 7 provides for certain covenants
18  of the obligors?
19      MR. ZENSKY:  Objection.
20      MR. SCHLECKER:  Note my
21  objection to the form.  If you want to
22  look at the document --
23      Q.   Let me take a step back.
24      Do you have an understanding of
25  the phrase "obligors," as used in the loan

109

MICHAEL PINZON

1
2  agreement?
3      MR. ZENSKY:  Objection.
4      A.   I can tell you by looking at it.
5      Q.   Why don't you tell me what your
6  understanding is of the phrase "obligors."
7      MR. ZENSKY:  Objection.
8      A.   Okay.  ResCap and subsidiary
9  pledgers, the guarantors and the borrower.
10      MR. SCHLECKER:  What are you
11  looking at?
12      THE WITNESS:  I'm looking here
13  at the, just from looking at the
14  definitions of this agreement, of the
15  loan agreement.
16      Q.   And turning back to page 20, if
17  you will --
18      A.   Um-hmm.
19      Q.   -- did you have an
20  understanding, at the time you signed this
21  document, that the obligors had made
22  certain covenants, as set forth in
23  section 7.01?
24      MR. SCHLECKER:  Object to the
25  form of the question.

28 (Pages 106 to 109)

110

MICHAEL PINZON

1
2    You can answer.
3    MR. ZENSKY: Objection.
4    A.   It states here the obligors are
5    making certain, or are performing certain
6    obligations, and agrees to perform certain
7    obligations.
8    **Q.   I know that's what it says. I'm**
9    **just asking you if that was your**
10   **understanding at the time you signed the**
11   **agreement?**
12       MR. ZENSKY: Objection.
13       MR. SCHLECKER: If you had an
14   understanding at the time.
15   A.   I don't recall thinking about my
16   understanding or not understanding of what
17   the obligors did at the time.
18       MR. MORRIS: Mr. Zensky, is your
19   objection because you believe the
20   questions of this particular document
21   are beyond the scope of the 30(b)(6)?
22       MR. ZENSKY: Indeed it is.
23       MR. MORRIS: Okay. I am going
24   to give you your standing objection
25   for this limited purpose.

111

MICHAEL PINZON

1
2        MR. ZENSKY: I was having so
3    much fun.
4        MR. MORRIS: You know what, then
5    continue to object, if that really
6    gets you excited.
7        MR. ZENSKY: I will accept your
8    exception to your rule.
9        MR. MORRIS: I never want to be
10   known as a party pooper.
11   BY MR. MORRIS:
12   **Q.   Can you turn to page 25. And**
13   **I'm looking at section 7.01(r), and I'm**
14   **just going to ask generally whether it was**
15   **Wells' understanding that each obligor --**
16       MR. MORRIS: Withdrawn.
17       Before we do that, I'd like to
18   mark as Exhibit 13 the committee's
19   30(b)(6) notice to Wells Fargo dated
20   August 15, 2013.
21       (Wells Exhibit 13, the
22   committee's 30(b)(6) notice to Wells
23   Fargo dated August 15, 2013, marked
24   for identification, as of this date.)
25       MR. SCHLECKER: Do you want him

112

MICHAEL PINZON

1
2    to look at the new exhibit or go back
3    to what you were talking about?
4        MR. MORRIS: Yeah. I want to
5    deal with Mr. Zensky's objection.
6    **Q.   And I want you to just put Wells**
7    **Exhibit 2 alongside Wells Exhibit 13,**
8    **because I'd like to just represent that**
9    **the only difference between the two**
10   **documents, I believe, are the the, the only**
11   **substantive differences are the addition**
12   **of topics 12, 13, 14 and 15 in the Wells**
13   **Exhibit 13.**
14       **And I want to know first whether**
15   **or not you are here as Wells'**
16   **representative to provide testimony with**
17   **regard to topics 12, 13, 14 and 15.**
18   A.   12, 13 and 14?
19   **Q.   And 15.**
20   A.   And 15.
21       Yes.
22       MR. MORRIS: I don't know if
23   this will satisfy your objection, but
24   I believe all of the questions that
25   I'm asking with respect to the

113

MICHAEL PINZON

1
2    revolver and the other operative
3    documents are laying the foundation
4    for questions concerning topics 9, 10,
5    11, 12, 13, 14 and 15.
6        MR. ZENSKY: I maintain the
7    objection.
8        MR. MORRIS: Does everybody
9    understand the difference between what
10   we had marked as Exhibit 2 and what's
11   now being marked as Exhibit 13?
12       MR. SCHLECKER: Um-hmm.
13   A.   Yeah.
14       MR. ZENSKY: There's one other
15   difference you didn't identify. You
16   dropped a topic.
17       MR. MORRIS: Can you tell me
18   which topic I dropped?
19       MR. ZENSKY: It appears you
20   dropped topic 12 of the original one,
21   based on the court's ruling.
22       MR. MORRIS: Correct. And I
23   think I also lower-cased the word
24   "concern."
25       I did drop that topic. Thank

29 (Pages 110 to 113)

114

1          MICHAEL PINZON
2    you.
3          Q.   Let's go back to the revolver,
4    and we are looking at (r), and I just want
5    to know generally whether it was Wells'
6    understanding that each obligor under this
7    agreement was required to deliver to
8    Wells, as the collateral agent and first
9    priority collateral agent, such documents
10   as Wells requested to evidence and
11   describe the collateral.
12         A.   Yes.
13         Q.   And did Wells ever make any
14   request for the information described in
15   (r)?
16         A.   I don't recall, specifically,
17   but in general, we always request -- if
18   the documents are not attached with
19   appropriate exhibits, because they are
20   just execution copies, we would request
21   the collateral that is marked as a certain
22   exhibit, but it's blank; and then we would
23   request that that exhibit that they are
24   noting as the particular collateral is
25   actually provided to us.  We would have

115

1          MICHAEL PINZON
2    done that at closing or at subsequent
3    closing of these agreements.
4          Q.   Do you recall whether any
5    obligor ever refused to comply with a
6    request for the information of the type
7    you are describing?
8          A.   I don't recall that, no.
9          Q.   Do you recall whether any
10   obligor failed to provide the information
11   that Wells was requesting, as you are
12   describing?
13         MR. SCHLECKER:  Just note my
14   objection to the form.  If such advice
15   had been made.
16         MR. MORRIS:  I think he
17   testified that requests were made, and
18   that's what I'm following up on.
19         Let's clean it up.  Let's clean
20   it up.
21         Q.   Did Wells make requests of
22   obligors for information of the type
23   described in paragraph (r)?
24         A.   Only to the extent that they
25   were identified in the original

116

1          MICHAEL PINZON
2    agreements.  Not beyond that.
3          Q.   And to the best of Wells'
4    knowledge, did each obligor comply with
5    such requests?
6          A.   Yes.
7          Q.   So you don't recall any instance
8    where an obligor failed to provide
9    information that was requested by Wells,
10   do you?
11         A.   I don't recall.
12         Q.   Can you turn to page 32.
13         And is it Wells' understanding
14   that section 7.03 describes certain
15   additional covenants by the obligors?
16         A.   Yes.
17         Q.   Can you turn to page 35, and
18   let's look at section 7.03(q) at the
19   bottom of 35 and continuing to the top of
20   36.
21         A.   Can you give me that section
22   again?
23         Q.   Q.
24         A.   On 35?
25         Q.   Yes.

117

1          MICHAEL PINZON
2          A.   Okay.
3          Q.   And was it Wells' understanding
4    that each obligor, under this provision,
5    was required to deliver to Wells such
6    information with respect to collateral as
7    Wells may have from time to time
8    requested?
9          A.   Yes.
10         Q.   So Wells knew, at all times
11   prior to the petition date, that it could
12   request information of any obligor
13   relating to collateral; is that right?
14         A.   Yes.
15         Q.   Let's put the documents aside
16   for a moment.  And I want to ask you
17   questions generally about the process of
18   lien releases.
19         A.   Okay.
20         Q.   Can you tell me again your
21   understanding of what a lien release is,
22   with respect to the ResCap transactions?
23         MR. ZENSKY:  Objection.
24         A.   A lien release is when a company
25   comes forth before us to request the

30 (Pages 114 to 117)

118

MICHAEL PINZON

1
2  release of collateral.
3      Q.   Did Wells understand that if it
4  released collateral, in its capacity as
5  the first priority collateral agent, that
6  that release would be binding on the
7  second priority collateral agent and the
8  third priority collateral agent?
9      MR. ZENSKY:  Objection.
10     A.   The collateral release was
11 released as first priority collateral
12 agent, and there was documentation at the
13 time of the collateral release that
14 addressed the second and third priority
15 collateral release as well.
16     Q.   Let's go back to the security
17 agreement, which is Exhibit 11.
18     A.   Okay.
19     Q.   I'm sorry, the loan agreement,
20 Exhibit 12, page 50.
21     MR. ZENSKY:  Running objection
22 back in force.
23     MR. MORRIS:  You got it.
24     A.   Page 50?  Okay.
25     Q.   Are you familiar with

120

MICHAEL PINZON

1
2  third priority collateral agent and the
3  collateral control agent under the
4  security agreement marked as Exhibit 11,
5  that it was authorized to execute and
6  deliver to any applicable grantor any
7  documents the grantor may request to
8  evidence a release of collateral?
9      MR. ZENSKY:  Objection.
10     MR. SCHLECKER:  I'll object to
11 the form, but you can answer the
12 question.
13     A.   Yes.
14     Q.   Wells was -- it was Wells'
15 understanding that it was authorized to do
16 that; is that right?
17     MR. ZENSKY:  Objection.
18     A.   Yes.
19     Q.   Did Wells understand that it was
20 allowed to conclusively rely upon an
21 officer's certificate and an opinion of
22 counsel delivered in connection with
23 releases?
24     A.   Yes.
25     Q.   Did Wells from time to time

119

MICHAEL PINZON

1
2  section 12.11?
3      A.   Yes.
4      Q.   You've read that before; is that
5  right?
6      A.   Yes.
7      Q.   Did Wells know and understand
8  that each lender, under this agreement,
9  authorized Wells to execute and deliver to
10 the borrowers lien releases and
11 termination statements, to the extent
12 permitted by this document?
13     A.   Yes.
14     Q.   And if you turn now to
15 Exhibit 11, page 24.  I'm looking at
16 section 10.  Take your time.
17     A.   Okay.
18     Q.   I'm just asking generally
19 whether it was Wells' understanding that
20 as the first priority collateral agent and
21 the collateral control agent, it was
22 authorized to execute and deliver to the
23 borrowers --
24     MR. MORRIS:  Withdrawn.
25     Q.   Did Wells understand that as the

121

MICHAEL PINZON

1
2  execute lien releases?
3      A.   Yes.
4      Q.   And by executing each lien
5  release, did Wells intend to release and
6  terminate the liens and security interests
7  covered by that particular lien release?
8      MR. ZENSKY:  Objection.
9      A.   We released it.
10     Q.   And that was your intent; is
11 that correct?
12     A.   Yes.
13     Q.   When you signed a lien release,
14 the intent was to relinquish the lien and
15 security interests on the assets referred
16 to in the lien release; is that correct?
17     A.   Yes.
18     Q.   Was there a standardized process
19 or practice by which Wells executed lien
20 releases?
21     A.   Yes.
22     Q.   Can you describe that for me?
23     A.   Well, when I received the early
24 lien releases -- excuse me, I'm just --
25     Q.   Do you want the question read

31 (Pages 118 to 121)

122

**MICHAEL PINZON**

1
2  back?
3      A.   No, it's okay.  I understand.
4          When I received probably the
5  original -- the earlier releases, because
6  I hadn't come onto this deal in the
7  beginning, I reviewed the documentation
8  and reviewed, I guess, the requirements
9  under the intercreditor and the pledge
10  agreement.  And I think there's ancillary
11  prohibitions under the indenture, which
12  stated you need an officer's certificate
13  and an opinion of counsel, and I think
14  those were under the indenture and the
15  intercreditor.
16          Then under the loan agreement
17  there would be a consent and direction to
18  release, in reference to the first lien
19  pledge agreements, and reviewed that they
20  were in the same form as noted in those
21  agreements, in reference to those three
22  documents.
23          And upon review of those, any
24  release sent was reviewed against those
25  and subsequent releases.  If I had done

123

MICHAEL PINZON

1
2  the prior release, there were black lines
3  against the prior release I had already
4  reviewed, to see -- to note any
5  differences in the subsequent releases and
6  reviewed those.
7          If there were any comments that
8  I had, in terms of something they were
9  asserting in the release that was not
10  true, in terms of -- or had any kind of
11  typos or whatever, I would present those
12  to counsel.  Counsel would tell me what
13  comments they had, in reference to the
14  release, if any.
15          Those comments were then
16  provided to the other counsel parties to
17  the transaction, to the request for
18  release, and we would need to receive -- I
19  would provide counsel with my signature
20  page in escrow until the time we received
21  all the appropriate documents described,
22  that I just described, in execution form
23  and executed.
24          And in addition to those
25  documents, there would be the actual UCC 1

124

MICHAEL PINZON

1
2  that was originally filed and referenced
3  to the collateral; and then there would be
4  a collateral description within that UCC
5  and I think within the officer's
6  certificate, describing what the
7  collateral in question to be released is
8  and any defined terms in reference to that
9  release.
10          In addition, the UCC 3, the
11  termination or, in most cases, the partial
12  release describing that collateral that
13  was being partially released accompanied
14  these documents.  And upon that whole
15  package presented to Wells Fargo and
16  satisfactory to us and counsel, we would
17  sign the release, the collateral release.
18      **Q.   Do you remember ever signing a**
19  **release that deviated from the practice**
20  **you just described?**
21      A.   No.
22      **Q.   So Wells had an opportunity to**
23  **review each lien release before you signed**
24  **it; is that right?**
25      A.   Yes.

125

MICHAEL PINZON

1
2      **Q.   And you had an opportunity to**
3  **confer with counsel about the substance**
4  **and form of each release, before Wells**
5  **signed it; is that right?**
6          MR. ZENSKY:  Objection.
7      A.   You say "substance."  What,
8  specifically, are you referring to?
9      **Q.   Wells had an opportunity to**
10  **confer with counsel about the content of**
11  **each lien release, before Wells signed it;**
12  **is that right?**
13      A.   Yes.
14      **Q.   And Wells, in fact, did from**
15  **time to time discuss with counsel the**
16  **content of each lien release, before it**
17  **signed it; is that right?**
18          MR. SCHLECKER:  Note my
19  objection to the form.
20          MR. MORRIS:  Fine.  Withdrawn.
21      **Q.   Was there anybody within Wells**
22  **who had to approve of a lien release,**
23  **before you signed it?**
24      A.   Unless I had a question about
25  it, no.

32 (Pages 122 to 125)

126

MICHAEL PINZON

Q. Did Wells ever sign a lien release in accordance with the practice you described, without first receiving the officer's certificate and opinion of counsel that you referred to?

A. I would have provided the signature like as I described to counsel, and the parties may have held the signature physically, prior to those documents being in hand, but they never were consented to be released, by myself or counsel, until we had indicated that our signatures were released; and hence, no.

Q. Okay. I just want to make sure that I understand that.

You may have signed a lien release prior to receiving an officer's certificate or opinion of counsel, but your signature would have been held in escrow until your counsel received those documents; is that right?

A. Well, I wouldn't have even sent the signature, if I hadn't seen the form

127

MICHAEL PINZON

of it first. So it wouldn't have -- it would have been given to them, with the understanding that the form was there, it was just not an executed form, perhaps, and since a lot of parties have to deal with all the transaction documents. But we would have to have seen the form of any of these even before I would have sent my signature to counsel or to someone else.

Q. And would your signature be released --

MR. MORRIS: Withdrawn.

Q. Was your signature ever released before receiving signed copies of the officer's certificate and opinion of counsel?

A. Not that I ever recall.

Q. I think you also mentioned that a written consent form was also part of the practice in executing lien releases; is that right?

A. Consent and direction, yes.

Q. And the consent and direction form came from the lender's agent; is that

128

MICHAEL PINZON

right?

A. Yes.

Q. And the lender's --

MR. MORRIS: Withdrawn.

Q. Was your signature ever released without either Wells or its counsel having received a signed copy of the consent that you've described?

A. No.

Q. Now, when I asked you earlier about Wells' practice, you used the phrase with respect to "Earlier releases."

Did there come a time when the practice you've described changed at all?

A. I'm not quite sure I understand.

Q. You've described a practice for me whereby Wells reviewed and obtained documents before it executed lien releases; is that right?

A. Yes.

Q. Did that practice ever change over time?

A. No.

MR. MORRIS: I'd like to mark as

129

MICHAEL PINZON

the next exhibit a lien release package that was attached as Exhibit F to the committee's complaint.

(Wells Exhibit 14, lien release package attached as Exhibit F to the committee's complaint, marked for identification, as of this date.)

Q. Have you seen this document before?

A. Yes.

Q. Did you look at it in preparation for this deposition?

A. Yes.

Q. Can you tell me what the first two pages are of the document entitled, "Partial Release of Collateral"?

A. It's Wells Fargo's release of the collateral in question, and it attaches as exhibits all the documentation that gave us comfort to execute that release.

Q. And is that your signature on the second page, with Bates number 768 in the bottom right corner?

33 (Pages 126 to 129)

130

**MICHAEL PINZON**

1
2     A.    Yes, it is, for all capacities
3  indicated.
4     **Q.    Was this document signed in the**
5  **ordinary course of your duties as a vice**
6  **president of Wells?**
7     A.    For this transaction, yes.
8     **Q.    Do you know who prepared this**
9  **particular document?**
10    MR. ZENSKY:  Objection.
11    MR. MORRIS:  I'm referring only
12  to the partial release of collateral.
13    MR. ZENSKY:  Just the first two
14  pages?
15    MR. MORRIS:  Yes.
16    A.    I don't recall exactly who
17  prepared it, but it was a counsel; and our
18  counsel reviewed it, and I reviewed it.
19    **Q.    Do you remember this particular**
20  **partial release of collateral --**
21    MR. MORRIS:  Withdrawn.
22    **Q.    Do you remember this particular**
23  **transaction, the one that's reflected in**
24  **Wells 14?**
25    A.    When I saw it again, it's my

131

MICHAEL PINZON

1
2  signature, and I know I signed it.  I
3  can't tell you something from 2010.  I
4  can't recall what I signed back in 2010.
5     **Q.    Based on your practice, do you**
6  **know whether Wells had in its possession**
7  **the officer's certificates referred to in**
8  **the document, prior to the time your**
9  **signature was released?**
10    MR. ZENSKY:  Objection.
11    MR. SCHLECKER:  I'll object to
12  the form of the question, but you can
13  answer it.
14    A.    I believe so.
15    **Q.    And based on your practice, do**
16  **you know whether Wells had in its**
17  **possession the legal opinions referred to**
18  **in the partial release of collateral,**
19  **prior to the time your signature was**
20  **released?**
21    MR. ZENSKY:  Objection.
22    A.    I believe so.
23    **Q.    Do you recall if this partial**
24  **release of collateral was executed in**
25  **connection with certain Goldman Sachs and**

132

**MICHAEL PINZON**

1
2  **Citibank repo transactions?**
3     A.    I can't recall that.  I'm sorry.
4     **Q.    Let's take a look at**
5  **schedule A -- I'm sorry, Exhibit A to your**
6  **partial release of collateral.**
7     **Do you know what Exhibit A is?**
8     MR. SCHLECKER:  Can you point to
9  a Bates stamp number?
10    MR. MORRIS:  Sure.  It's the
11  document with Bates number 70770
12  through 71.
13    MR. ZENSKY:  I'm sorry, what was
14  the Bates number again?
15    MR. SCHLECKER:  There's several
16  Exhibit As within the document.
17    MR. MORRIS:  It's just the third
18  and fourth pages, also known as 70770
19  through 70771.
20    MR. ZENSKY:  That conforms to
21  the exhibit.
22    **Q.    Have you seen this document**
23  **before?**
24    A.    Yes.
25    **Q.    Do you know what this document**

133

**MICHAEL PINZON**

1
2  is?
3     A.    It's the consent and direction
4  to release the collateral.
5     **Q.    Is this one of the documents**
6  **that would have been required by Wells,**
7  **before your signature was released on the**
8  **partial release of collateral?**
9     A.    Yes.
10    **Q.    Do you have an understanding of**
11  **what this consent means?**
12    A.    Yes.  It's directing us to
13  execute our partial release, based on the
14  documents that they needed to provide, in
15  order for me to sign that release.
16    **Q.    And is it Wells' understanding**
17  **that this consent was required, before it**
18  **could issue the partial release?**
19    MR. SCHLECKER:  Objection.
20  Asked and answered.
21    Go ahead, you can answer.
22    A.    Yes.
23    **Q.    Now, this consent form contains**
24  **its own Exhibit A, which is the next page,**
25  **with Bates numbers 70772 through 73.**

34  (Pages 130 to 133)

134

MICHAEL PINZON

1
2     Do you see that?
3     A.   Yes.
4     Q.   In the ordinary course of Wells'
5     practice, would Wells require some
6     description of the released collateral to
7     be accompanied by the content and
8     direction form?
9     A.   I don't know what you mean by
10    "required."  If that was -- I can't recall
11    offhand, but if that's part of the exhibit
12    and would be required or is described in
13    the documentation that would be required,
14    then it would be required, and we would
15    need to see it.
16    Q.   Okay.  Well, in this instance,
17    Exhibit A describes the collateral that's
18    going to be released; is that right?
19    A.   Yes.
20    Q.   And that's something that Wells
21    knew, at the time it executed and released
22    your signature?
23    MR. SCHLECKER:  Note my
24    objection to the form as to what he
25    did.  If it was present, it was

135

MICHAEL PINZON

1
2     present.
3     Q.   Prior to the time your signature
4     was released, do you know whether Wells
5     had received Exhibit A?
6     A.   Yes.
7     Q.   And it had; is that right?
8     A.   I can't recall each instance,
9     but if it was part of the documentation
10    that was being reviewed, I wouldn't
11    release it.  If it was part of the
12    original documents that we were shown, and
13    then if they showed us the same documents
14    without that exhibit, we wouldn't have
15    accepted that.  It would have had to have
16    been the same as what was reviewed.
17    Q.   Now, is this form --
18    MR. MORRIS:  Withdrawn.
19    Q.   Looking at Exhibit A --
20    MR. ZENSKY:  Can you give us the
21    Bates page?
22    MR. MORRIS:  Yes, sir.  No
23    problem.
24    Q.   Looking at Exhibit A, with Bates
25    number ending in 772 and continuing to

136

MICHAEL PINZON

1
2     773, is that a form with which you are
3     familiar, in terms of a recitation of
4     released collateral?
5     A.   It's the recitation of this
6     particular released collateral.
7     Q.   Looking at the beginning of the
8     document, it refers to "All right, title
9     and interests into and under, whether now
10    or hereafter existing."
11    Do you see that?
12    A.   Yes.
13    Q.   Do you know why the description
14    of released collateral refers to assets
15    that are now or hereafter existing?
16    MR. ZENSKY:  Objection.
17    A.   I don't know why they do that,
18    but that's what they do.
19    MR. SCHLECKER:  If you don't
20    know, you don't know.  That's the
21    answer.
22    Q.   At the time that Wells executed
23    the partial release of collateral, did
24    Wells know which assets were being
25    released?

137

MICHAEL PINZON

1
2     A.   What is described here in
3     Exhibit A, page 72 and 73.
4     Q.   So Wells relied on the
5     description of the collateral in this
6     exhibit at Bates number 772 to 773, in
7     executing the partial release of
8     collateral; is that correct?
9     MR. SCHLECKER:  I'll object.  It
10    mischaracterizes his testimony,
11    completely.  He never testified that
12    he relied on this description for
13    anything.
14    MR. MORRIS:  Okay, so I'm asking
15    him now.
16    MR. SCHLECKER:  That's why I'm
17    objecting.
18    MR. MORRIS:  That's fine.
19    Q.   Let's take it in small pieces.
20    Before your signature was
21    released, did Wells receive a copy of this
22    Exhibit A at Bates numbers 772 to 73?
23    A.   Yes.
24    Q.   Did Wells understand, prior to
25    the time it released its signature on the

35 (Pages 134 to 137)

138

MICHAEL PINZON

1  
2  partial release of collateral, which
3  assets were being released?
4      A.   Well, as described here and as
5  described in the UCC 3, in conjunction.
6  They are sort of together, they are
7  repeated throughout the document, because
8  they become exhibits of each other.
9      Q.   Did anyone, on behalf of the
10  2015 trustee, ever ask Wells, prior to the
11  petition date, what assets were being
12  released under the partial release of
13  collateral in Exhibit 14?
14      A.   I don't recall being asked that.
15      Q.   At any time prior to the
16  petition date, did anybody ask Wells on
17  behalf of any junior secured noteholder,
18  what asset --
19      MR. MORRIS:  Withdrawn.  Let me
20  start over.
21      Q.   Prior to the petition date, did
22  anyone, on behalf of any junior secured
23  noteholders, ask Wells what assets were
24  released, pursuant to the partial release
25  of collateral in Exhibit 14?

139

MICHAEL PINZON

1  
2      A.   I don't recall that, no.
3      Q.   Now you mentioned UCC 3s before.
4      A.   Yes.
5      Q.   What is Wells' understanding --
6      MR. MORRIS:  Withdrawn.
7      Q.   Does Wells have an understanding
8  as to what a UCC 3 is?
9      MR. SCHLECKER:  Objection, asked
10  and answered.
11      MR. ZENSKY:  Objection.
12      A.   A UCC 3 is a form filed with an
13  applicable state or county in reference to
14  a release -- or in reference to a
15  termination or change in terms of the
16  original information provided in the
17  UCC 1.
18      Q.   What is Wells' understanding of
19  the purpose of the UCC 3?
20      MR. ZENSKY:  Objection.
21      MR. SCHLECKER:  I think we are
22  getting into legal issues.
23      MR. MORRIS:  Not at all.
24      MR. SCHLECKER:  We are.
25      MR. MORRIS:  Their understanding

140

MICHAEL PINZON

1  
2  may be right or wrong, but I want to
3  know why Wells is doing this.
4      MR. SCHLECKER:  I think it calls
5  for a legal conclusion as to what it
6  does.
7      But go ahead, you can answer the
8  question.
9      A.   A UCC 3 would be to denote some
10  changes, as I indicated, from the original
11  UCC 1.  A termination, more specifically.
12      Q.   And was it Wells' understanding
13  that the UCC 3 would put the public on
14  notice that Wells was terminating the
15  manner by which its liens and security
16  interests were perfected?
17      MR. SCHLECKER:  Objection to the
18  form of the question.
19      A.   I don't know that.
20      Q.   The UCC 3s that you've referred
21  to, were those supposed to be attached to
22  the officer's certificates that you
23  described?
24      A.   It was an entire package.  So
25  what was attached to what, I can't tell

141

MICHAEL PINZON

1  
2  you if it's the UCC attached to the
3  officer's certificate or the officer's
4  certificate to the UCC attached to
5  something else, but there was one package.
6      Q.   And the UCC 3s were part of the
7  package; is that right?
8      A.   Yes.
9      MR. MORRIS:  I'd like to mark as
10  the next exhibit --
11      Q.   Actually, before we do that, you
12  testified earlier about a request that was
13  made by the 2015 trustee for information.
14  Do you recall that?
15      A.   Yes.
16      Q.   I think you testified that to
17  the best of your recollection, that
18  request for information had nothing to do
19  with lien releases; is that right?
20      A.   That's correct.
21      Q.   Did that request for information
22  have anything to do with collateral?
23      A.   No.
24      Q.   Do you have any memory as to
25  what the request related to?

36  (Pages 138 to 141)

142

MICHAEL PINZON

1
2    A.   Some documentation, but I can't
3    remember.  I don't remember it being
4    specific about collateral or any lien
5    release.
6    Q.   Okay.
7       MR. MORRIS:  Let's mark as the
8    next exhibit a document that's titled
9    Exhibit 5, even though we are going to
10   call it Wells Exhibit 14.  And it's --
11      THE WITNESS:  15.
12      MR. MORRIS:  15.  It is docket
13   number 8-5.
14      (Wells Exhibit 15, document
15   titled Exhibit 5, docket number 8-5,
16   marked for identification, as of this
17   date.)
18   Q.   I'm just going to go through
19   another example or two of lien releases to
20   make sure I understand your practice and
21   the meaning of the documents that you
22   reviewed.
23         Turning to the second and third
24   pages, which are pages 2 and 3 of 34,
25   respectively, if you look at the top.

143

MICHAEL PINZON

1
2       Do you see that?
3    A.   Yes.
4    Q.   Is that a copy of a UCC 3 that
5    you were referring to earlier?
6    A.   Yes.
7    Q.   And is this the document that
8    would be filed to establish that Wells had
9    relinquished the lien and the assets
10   described in the document?
11   A.   Yes.
12   Q.   Looking at Exhibit A, which is
13   page 3 of 4, do you see that?
14   A.   Yes.
15   Q.   And, again, in the introduction
16   there's the phrase "Whether now or
17   hereafter existing," do you see that?
18   A.   Yes.
19   Q.   And do I understand that by
20   Exhibit A, Wells was releasing its lien on
21   what's defined as "Servicing rights
22   collateral," in (a)?
23      MR. SCHLECKER:  Objection to
24   form.
25      You can answer.

144

MICHAEL PINZON

1
2    A.   That's what it states there.
3    Q.   And was that Wells' intention?
4       MR. ZENSKY:  Objection.
5    A.   It's not an intention, it's
6    whatever it was described to be released
7    is -- in that exhibit is what was
8    released.
9    Q.   So Wells did, in fact, release
10   its lien on the assets described in this
11   Exhibit A; is that right?
12      MR. SCHLECKER:  Object to the
13   form.
14      You can answer the question.
15   A.   It appears to be so, as
16   described here in this exhibit, yes.
17   Q.   Now I'm just focusing on the
18   servicing rights collateral.
19      That's a defined term in this
20   document; is that right?
21   A.   Yes.
22   Q.   And prior to executing the lien
23   release and the filing of the UCC 3, Wells
24   understood what servicing rights
25   collateral meant, in the context of this

145

MICHAEL PINZON

1
2    exhibit; is that right?
3       MR. ZENSKY:  Objection.
4       MR. SCHLECKER:  Objection to the
5    form.
6    A.   I don't know that.
7    Q.   Did Wells try to --
8       MR. MORRIS:  Withdrawn.
9    Q.   Did you review the definition of
10   servicing rights collateral, before you
11   signed your signature on the lien release?
12   A.   I read the document at the time,
13   so I would have read that definition,
14   along with all the others.
15   Q.   And if you had any questions
16   about that definition, would it have been
17   your practice to ask counsel or somebody
18   else in your office?
19   A.   If I had a question about it,
20   yes.
21   Q.   Did Wells understand that as the
22   third priority collateral agent, it was,
23   in this UCC 3, releasing its lien on all
24   servicing rights, as defined in the
25   exhibit?

37 (Pages 142 to 145)

146

MICHAEL PINZON

MR. SCHLECKER: Objection to the form. The UCC 3 speaks for itself.

A.   Repeat the question back, please.

(Record read.)

MR. SCHLECKER: Same objection. You can answer, if you can.

A.   I don't know.

Q.   I may have covered this in bits and pieces before, but I want to cover the next topic kind of all at once.

Was there a practice whereby Wells notified the 2015 trustee of lien releases?

A.   No.

Q.   Did Wells ever provide --

MR. MORRIS: Withdrawn.

Q.   Prior to the petition date, did Wells ever provide copies of any lien releases to the 2015 trustee?

MR. SCHLECKER: You are talking about Wells Fargo, as opposed to counsel for Wells?

MR. MORRIS: Well, any -- no,

147

MICHAEL PINZON

this is actually Wells Fargo or anybody acting on behalf of Wells Fargo. We are talking about the period prior to the petition date.

Q.   So the question is: Prior to the petition date, did Wells Fargo, or anybody acting on behalf of Wells Fargo, provide to the 2015 trustee copies of any lien releases?

A.   The release documentation, the officer's certificate opinion is addressed to Wells Fargo and U.S. Bank as trustee. So they are the addressed party. I didn't myself provide them copies.

Q.   That's all I was asking, so thank you.

Did Wells Fargo, prior to the petition date, ever provide copies of any lien releases or UCC 3s to anybody acting on behalf of any junior secured noteholder?

A.   I don't recall us providing that information.

Q.   Did Wells ever speak with the

148

MICHAEL PINZON

lender agency about the assets that were covered by any particular lien release?

A.   I don't recall specific conversations. We spoke to them, I'm sure, over the course of the transaction, but I can't recall exactly, specifically what.

Q.   Did you have a contact person at the lender's agent with whom you spoke, in the ordinary course of your business, about lien releases?

A.   The contacts were usually through counsel first.

Q.   Did you ever speak with any employee of the lender's agent, with respect to any lien release?

A.   I don't recall that, specifically, no.

Q.   Did you ever speak with any obligor --

MR. MORRIS: Withdrawn.

Q.   Did Wells ever speak directly to any obligor, with respect to the collateral that was subject to any

149

MICHAEL PINZON

particular lien release?

A.   I don't recall, specifically.

Q.   Do you recall generally?

A.   I don't recall.

Q.   Can you turn within Exhibit 15 to the document with Bates number ending in 70276?

A.   70 --

Q.   276.

A.   Okay.

Q.   Is this another partial release of collateral that you personally executed, on behalf of Wells Fargo?

A.   Yes.

Q.   I'm looking at the second paragraph of that document.

Did Wells understand that it could take directions from the lender agent to release and terminate liens on collateral, as long as it received the consent form, the officer's certificates and the legal opinions referred to in the release?

MR. ZENSKY: Objection.

38 (Pages 146 to 149)

150

MICHAEL PINZON

2 MR. SCHLECKER: Objection to
3 form, but you can answer the question.
4 A. Yes.
5 Q. And what's the basis for that
6 understanding?
7 A. What I described before as the
8 documents required to execute a release,
9 which is what's described as what they are
10 providing.
11 Q. Now, I believe that you said
12 that Wells needed have the consent, the
13 officer's certificates and the legal
14 opinions, before you would sign the lien
15 release; is that right?
16 MR. ZENSKY: Objection.
17 MR. SCHLECKER: I do have to
18 object, because it's a big
19 summarization of his testimony, and he
20 talked about a lot.
21 MR. MORRIS: Fine.
22 MR. SCHLECKER: That's all
23 right.
24 MR. MORRIS: I'll take it in
25 pieces.

151

MICHAEL PINZON

2 Q. Before you signed a lien
3 release, Wells needed --
4 MR. MORRIS: Withdrawn.
5 Q. Before your signature on a lien
6 release was released, Wells needed to
7 receive an officer's certificate; is that
8 correct?
9 A. Yes.
10 Q. And before your signature was
11 released on any lien release, Wells needed
12 to receive the legal opinion; is that
13 correct?
14 A. Yes.
15 Q. And before your signature was
16 released on any lien release, Wells needed
17 to receive the consent form; is that
18 correct?
19 A. Yes.
20 Q. And before your signature was
21 released on any lien release, Wells needed
22 to see the UCC 3s; is that correct?
23 A. Forms in the UCC 3, yes.
24 Q. Before your signature was
25 released on any lien release, Wells needed

152

MICHAEL PINZON

2 to see a description of the collateral
3 that was being released; is that correct?
4 A. That was attached to the UCC,
5 yes.
6 Q. So those are five items that we
7 have identified?
8 A. The UCC 1 as well.
9 Q. And the UCC 1 makes six.
10 Are there any other documents
11 that Wells required, before executing the
12 lien release?
13 A. I think those are the main ones.
14 I don't know if there are others.
15 Q. You can't think --
16 A. I can't recall them right now.
17 Q. As you sit here today, did Wells
18 ever release your signature on a lien
19 release, without having in its possession
20 or in the possession of its counsel the
21 six documents that you just identified?
22 A. I don't believe so.
23 MR. MORRIS: Let me just get to
24 the last exhibit. We have as the next
25 exhibit a very, very voluminous set of

153

MICHAEL PINZON

2 documents. We are going to provide a
3 copy of the exhibit to all counsel, as
4 soon as the deposition is over, via
5 e-mail. It's just way too big to copy
6 and pull across town too many times.
7 I'm not asking any
8 particularized questions, they will be
9 just questions about authenticity. I
10 mean if you want to come look at the
11 documents, anybody is welcome to.
12 We are going to mark as the next
13 exhibit a series of lien releases and
14 UCC 3s that are in redwells marked
15 sets 1 of 2 and 2 of 2. Copies of
16 these documents will be delivered to
17 all counsel immediately after the
18 deposition, in the form of an
19 electronic delivery.
20 MR. ZENSKY: What did you say
21 they were?
22 MR. MORRIS: They are pretty
23 much every lien release and UCC 3 that
24 we found in the various document
25 productions. So there won't be any

39 (Pages 150 to 153)

154

MICHAEL PINZON

1  question, as soon as we send you this
2  e-mail when we are done, about what
3  the contents of the exhibit are.
4      MR. ZENSKY:  Is it your intent
5  to have the witness review every page
6  there, as we sit here, even for just
7  authentication purposes?
8      MR. MORRIS:  No.  Let me just
9  ask some questions and see how we do.
10     (Wells Exhibit 16A-D, series of
11  lien releases and UCC 3s in redwelds,
12  marked for identification, as of this
13  date.)
14     (Wells Exhibit 17A-B, series of
15  lien releases and UCC 3s in redwelds,
16  marked for identification, as of this
17  date.)
18  **Q.   I don't know if you are aware of**
19  **this, but we sent electronically these**
20  **documents to your counsel at about 2:00**
21  **Friday afternoon.**
22      **Have you had a chance to look at**
23  **these documents?**
24  A.   No.

155

MICHAEL PINZON

1      MR. MORRIS:  I would just ask
2  that over the coming days or weeks
3  prior to trial, I would ask Wells to
4  let me know if these documents were
5  prepared and maintained in the
6  ordinary course of business.
7      I believe, for multiple reasons,
8  they would be admissible in evidence,
9  and I would ideally like to simply
10  stipulate to their admissibility.
11     MR. SCHLECKER:  Are they Bates
12  stamped?
13     MR. MORRIS:  Yeah, but not
14  consecutively.  We just went through
15  the database and pulled.
16     MR. SCHLECKER:  So this is a
17  compilation of documents from multiple
18  sources that you have put together to
19  represent your understanding of all
20  the UCC 3s?
21     MR. MORRIS:  As it exists today,
22  what I'm asking for is a stipulation,
23  really, from all parties as to the
24  admissibility of all of the lien

156

MICHAEL PINZON

1  releases and UCC 3s that are the
2  subject of Exhibit 16 and 17.
3      Everybody will have the exact
4  electronic copy momentarily, as well
5  as Creditors Committee Exhibit F and
6  the Debtor's Exhibits 5 and 6.
7      We believe --
8      MR. ZENSKY:  Are those included
9  now?
10     MR. MORRIS:  I don't think
11  they're in this stack, they are
12  separately.  So it's Creditors
13  Committee Exhibit F, Debtor's
14  Exhibit 5, Debtor's Exhibit 6 and then
15  Wells Exhibits 16 and 17 that are here
16  on the table today.  And we believe
17  that that's the entirety.
18      If we have any further, we will
19  certainly share them with you and ask
20  for the same stipulation.
21      But whether it's business
22  record, publicly filed document,
23  admission of a party, on multiple
24  levels I don't think ultimately there

157

MICHAEL PINZON

1  will be any question about
2  admissibility; but we certainly want
3  to give you all an opportunity to look
4  at the documents before even asking
5  you to agree to that.
6      MR. SCHLECKER:  Okay.
7      MR. MORRIS:  I just have a few
8  more questions, and I think we will be
9  done.
10  **Q.   Prior to the petition date, did**
11  **the 2015 trustee ever object to any lien**
12  **release that was executed by Wells?**
13      MR. ZENSKY:  Objection.
14  **A.   I don't know that.**
15  **Q.   Prior to the petition date, did**
16  **anybody, on behalf of any junior secured**
17  **noteholder, ever object to any lien**
18  **release executed by Wells?**
19      MR. ZENSKY:  Objection.
20  **A.   I don't know that.**
21  **Q.   Prior to the petition date, did**
22  **the 2015 trustee ever object to any UCC 3**
23  **that was filed by Wells, in its capacity**
24  **as a collateral agent?**

40  (Pages 154 to 157)

158

MICHAEL PINZON

1
2  A.  I don't recall ever being told
3  that.
4  Q.  And prior to the petition date,
5  did anybody, on behalf of any junior
6  secured noteholder, ever object to any
7  UCC 3 that was filed in Wells' name?
8  MR. ZENSKY:  Objection.
9  A.  I don't recall ever being told
10  that.
11  Q.  Has any person or party made any
12  claim against Wells, that Wells was
13  unauthorized to issue any of the lien
14  releases in this case?
15  MR. SCHLECKER:  Note my
16  objection.  The pleadings in this case
17  are a matter of public record.  I'm
18  not sure what you are getting at by
19  asking him that.
20  MR. MORRIS:  I want to know
21  whether any particular claim has been
22  made against Wells, with respect to
23  the lien releases that it signed in
24  connection with any ResCap financing.
25  MR. SCHLECKER:  If you know the

159

MICHAEL PINZON

1
2  answer.
3  A.  I'm not aware of any.
4  MR. MORRIS:  Can we just take a
5  very short break to let me consult
6  with my counsel and see if there's
7  anything that I missed.
8  (Whereupon, there is a recess in
9  the proceedings.)
10  Q.  I just have, hopefully, just a
11  few more questions.
12  Is there anything you wanted to
13  clarify about any testimony you've given
14  so far, particularly as it relates to
15  UCC 3s?
16  A.  When describing the package of
17  documents we would have received prior to
18  signing my release, I would have received
19  a form of the UCC 3, not necessarily the
20  filed one.  That would come subsequent,
21  with the understanding that we would be
22  provided copies of the filed UCC 3
23  afterwards.
24  Q.  And is that because the UCC
25  couldn't be filed until your signature was

160

MICHAEL PINZON

1
2  released?
3  A.  Right.  Chicken before the egg.
4  Q.  So at the time that you executed
5  each lien release, you had the form of
6  UCC 3, but it had not been filed yet; is
7  that right?
8  A.  Right.  I don't believe those
9  were filed.
10  Q.  At the end of my questions I
11  asked you a few questions about whether
12  anybody objected to lien releases and
13  UCC 3s.  I just want to ask them again a
14  little bit more clearly, to make sure that
15  I get the information I want.
16  Is Wells aware of any objection
17  by the 2015 trustee --
18  MR. MORRIS:  Withdrawn.
19  Q.  Is Wells aware that the 2015
20  trustee made any objection to any lien
21  release that was signed by Wells Fargo?
22  MR. ZENSKY:  Objection.
23  A.  No.
24  You mean Wells, meaning me,
25  because I would be the officer?

161

MICHAEL PINZON

1
2  Q.  As a representative of Wells.
3  A.  Representative of Wells.  No.
4  Q.  And prior to the petition date,
5  was Wells aware of any objection by the
6  2015 trustee to any UCC 3 that was filed
7  by Wells Fargo?
8  A.  Repeat that question again.
9  MR. SCHLECKER:  Let me object to
10  the form of that question, because it
11  mischaracterizes his testimony.
12  MR. MORRIS:  I'm not
13  characterizing any testimony.  I
14  specifically said I'm asking a new
15  question.
16  MR. SCHLECKER:  Go ahead.
17  Q.  Prior to the petition date, is
18  Wells aware of any objection by the 2015
19  trustee to any UCC that was filed on
20  behalf of Wells?
21  MR. SCHLECKER:  Filed on behalf
22  of Wells?
23  MR. MORRIS:  Yes.
24  MR. SCHLECKER:  I'll object to
25  the form.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

162

MICHAEL PINZON
2  You can answer.
3  A.  I don't know of any.
4  Q.  Prior to the petition date, is
5  Wells aware of any objection by anybody
6  representing any junior secured noteholder
7  to any lien release that was executed by
8  Wells?
9  A.  I do not know.  I do not know of
10 any.
11 Q.  Prior to the petition date, is
12 Wells aware of any objection by anyone
13 acting on behalf of any junior secured
14 noteholder to any UCC 3 that was filed in
15 the name of Wells Fargo?
16 A.  I do not know of any.
17 Q.  Can you go back to Exhibit 14?
18 A.  Yes.
19 Q.  I'm going to ask you to turn to
20 Exhibit A, "Released Collateral," which
21 can be found on the documents that end in
22 772 to 773.
23 A.  Okay.
24 Q.  You'll see there's a reference
25 to repo loans in (a)?

163

MICHAEL PINZON
2  A.  Yes.
3  Q.  And that term "repo loans" is
4  defined later in this document; is that
5  right?
6  A.  Let me check.
7  Okay, yes.
8  Q.  And is it fair to say that
9  before signing the partial release of
10 collateral at the beginning of this
11 exhibit, that Wells understood the general
12 category of assets that were being
13 released?
14 MR. SCHLECKER:  Objection to
15 form.
16 MR. ZENSKY:  Objection.
17 Q.  Let me ask it a different way.
18 Did Wells know what assets --
19 MR. MORRIS:  Withdrawn.
20 Q.  Did Wells know, prior to the
21 release of your signature on the lien
22 release, what assets were being released,
23 pursuant to Exhibit 14?
24 A.  Whatever was described in
25 Exhibit A.  Beyond that, I wouldn't know.

164

1  MICHAEL PINZON
2  Q.  Okay.  If you wanted to know
3  beyond that, if you wanted to know every
4  specific asset that was being released, do
5  you know whether you could have obtained
6  that information?
7  MR. SCHLECKER:  Object to the
8  form.  Calls for speculation.
9  A.  I don't really get that
10 question.
11 Q.  Well, "repo loan," under this
12 exhibit, means any mortgage loan.
13 Do you see that?
14 A.  Yes.
15 Q.  If you wanted to know each
16 particular mortgage loan that was the
17 subject of the release, how would you find
18 that out?
19 A.  I don't know.  I mean it's
20 whatever is represented here, the debtor
21 presented as repo loan is the repo loan,
22 whatever they said it is is what it is.  I
23 didn't go beyond whatever it said on face
24 value.
25 Q.  Okay.  I appreciate that.

165

1  MICHAEL PINZON
2  And I'm asking you now to tell
3  me if you know what you would do, if you
4  wanted to go beyond that.
5  A.  If I wanted to know, I would ask
6  counsel.
7  Q.  Okay.  Fair enough.
8  MR. MORRIS:  I have no further
9  questions.
10 MR. ZENSKY:  I have a few
11 questions.  I don't know if anyone
12 else does.
13 EXAMINATION BY
14 MR. ZENSKY:
15 Q.  Good afternoon, sir.  I'm David
16 Zensky from the firm of Akin Gump.  I
17 represent UMB Bank, the successors and
18 indenture trustee.  I have just a handful
19 of questions to follow up on things you
20 were asked today, earlier.
21 A.  Okay.
22 Q.  You testified that UCC 3
23 statements were filed from time to time,
24 in connection with the collateral that
25 formed part of this transaction?

42 (Pages 162 to 165)

166

MICHAEL PINZON

1  A.  Right.
2  Q.  Do you know who actually filed
3  the UCC 3s?
4      And I don't mean the name of the
5  person.  I mean, was it the borrower or
6  the obligors or Wells Fargo or someone
7  else?
8  A.  It was not Wells Fargo.
9  Q.  Do you know who actually filed
10 the UCC 3s?
11 A.  I think it was ResCap.
12 Q.  Okay.  When UCC 3s were filed
13 and termination statements were executed,
14 do you know what ResCap or the other
15 grantors would do with the assets that
16 were being released?
17 A.  No.
18 Q.  By way of example.  I don't mean
19 every single transaction.
20 A.  No.
21 Q.  To the extent --
22     MR. ZENSKY:  Strike that.
23 Q.  You were shown by Mr. Morris a
24 variety of the documents that governed
25

167

MICHAEL PINZON

1  this transaction --
2  A.  Yes.
3  Q.  -- and the collateral itself.
4      Do you recall that?
5  A.  Yes.
6  Q.  Do you know whether, in those
7  documents, there are any requirements as
8  to what ResCap or the other borrowers can
9  do, once an asset is released, with the
10 proceeds that they receive from selling or
11 disposing of those assets?
12     MR. MORRIS:  Object to the form
13 of the question.
14     MR. ZENSKY:  Let me reask it.
15 Q.  Let me represent to you that
16 when assets were released from time to
17 time, that one of the things that ResCap
18 might do with the asset was to sell it.
19 A.  Right.
20 Q.  Do you know whether, in the
21 transaction documents that you were shown
22 today, there were any requirements as to
23 what ResCap was supposed to do with the
24 proceeds of such a sale, if it happened?
25

168

MICHAEL PINZON

1      MR. MORRIS:  Objection to the
2  form of the question.
3  Q.  You can answer.
4  A.  I don't know.
5  Q.  Okay.  So would it also follow
6  that you don't know whether ResCap
7  complied with any such requirements that
8  might exist in the various transaction
9  documents to that effect?
10     MR. MORRIS:  Objection to the
11 form of the question.
12 A.  I don't know.
13 Q.  Towards the beginning of the
14 deposition, Mr. Pinzon, I think I heard
15 you testify to the effect that outside the
16 context of termination statements and that
17 type of paperwork, that from time to time
18 you would receive a report, and I don't
19 think that was your word, but something
20 like a report from ResCap that would list
21 the collateral.
22     Do you recall that?
23     MR. MORRIS:  Objection to the
24 form of the question.
25

169

MICHAEL PINZON

1  A.  Yeah.  Whether we received a
2  report from the company from time to time,
3  and I think I answered I don't recall ever
4  receiving it.
5  Q.  You do not recall?
6  A.  I don't recall ever receiving.
7  That's what I told Mr. Morris.
8  Q.  Okay.  I'm sorry.  It was a
9  little hard to hear down there.
10     So is it your best testimony and
11 recollection that Wells Fargo did not
12 receive reports purporting to list all the
13 loans and other assets that formed part of
14 the collateral, from time to time, before
15 the petition date?
16     MR. MORRIS:  Objection to the
17 form of the question.
18 A.  What do you mean by "reports"?
19 Like what would be in these reports that
20 you allege exist?
21 Q.  Did you ever receive -- did
22 Wells ever receive, from the time you took
23 over the relationship, lists of various
24 mortgage loans or other assets that were
25

43 (Pages 166 to 169)

170

MICHAEL PINZON

1
2  part of the collateral, as defined in the
3  security agreement?
4        MR. MORRIS:  Object to the form
5  of the question.
6        A.   We received notices from time to
7  time, listing -- with an officer's
8  certificate and opinion sent to us,
9  listing certain mortgages being released.
10       Q.   Okay.  So you would receive such
11  lists but only in connection with a
12  release request?
13       A.   Those were just information
14  provided to Wells Fargo as to what was
15  released.
16       Q.   Okay.  So --
17       A.   And they were not -- I don't
18  think they were cumulative.  They were
19  just, this is the report -- this the
20  officer's certificate and opinion that I'm
21  sending to you, in reference to these
22  particular loans that are being released.
23       Q.   Okay.  I now understand.
24        Just to make sure it's clear,
25  you did not --

171

MICHAEL PINZON

1
2        MR. ZENSKY:  Strike that.
3        Q.   -- Wells did not receive a list
4  or report at any time that listed all of
5  the assets and loans that --
6        MR. ZENSKY:  Strike that.
7        Q.   Wells did not receive lists that
8  showed all or some of the collateral that
9  was not being released, but was remaining
10  part of the asset base?
11       A.   Not that I recall, no.
12        MR. ZENSKY:  I think that's all
13  I had sir.  Thank you.
14        MR. MORRIS:  I have a few more
15  questions.
16  EXAMINATION BY
17  MR. MORRIS:
18       Q.   You mentioned that ResCap filed
19  the UCC 3s; is that right?
20       A.   I believe so.
21       Q.   Was that part of the customary
22  practice for lien releases, with respect
23  he to the ResCap financing?
24        MR. SCHLECKER:  Objection to the
25  form.  I'm not sure what you mean by

172

MICHAEL PINZON

1
2  "ResCap financing."
3        Q.   Did Wells expect ResCap to be
4  the entity that filed the UCC 3s?
5        MR. SCHLECKER:  Objection to the
6  form.
7        You can answer.
8        A.   Per the agreements, it was the
9  responsibility of the company to file the
10  UCCs.
11       Q.   And that was Wells'
12  understanding at all times; is that
13  correct?
14        MR. ZENSKY:  Objection.
15       A.   We had the permissive right, but
16  not the obligation.
17       Q.   And did Wells ever see a filed
18  UCC 3 that differed in any respect from
19  the form UCC 3 that you had
20  reviewed before signing the lien release?
21        MR. SCHLECKER:  If you can
22  recall.
23       A.   That's such a -- it's too broad.
24  I can't -- you know.
25       Q.   I'll ask it the inverse.

173

MICHAEL PINZON

1
2        Do you recall ever discussing
3  with anyone a filed UCC 3 that differed
4  from an UCC 3 that you would have reviewed
5  before signing a lien release?
6        MR. ZENSKY:  Objection.
7        A.   I don't recall specific
8  instances.
9        Q.   Do you recall any general
10  instance?
11       A.   No.
12       Q.   So to the best of Wells'
13  knowledge, ResCap was authorized to file
14  UCC 3s; is that correct?
15       A.   Yes.
16       Q.   And in carrying out that
17  responsibility, ResCap did not file any
18  UCC 3 that differed from those that you
19  reviewed prior to signing a lien release;
20  is that right?
21        MR. ZENSKY:  Objection,
22  foundation.
23       A.   I don't know if I would know of
24  all they did, you know.  I only can tell
25  you in reference to the documents we

44  (Pages 170 to 173)

174

```
 1            MICHAEL PINZON
 2  released and that we received --
 3       Q.    That's all I'm asking about.
 4       A.    -- UCC 3s that were filed that
 5  were the same.
 6       Q.    At the end, Mr. Zensky asked you
 7  a couple of questions about reports, I
 8  guess, that weren't delivered to Wells,
 9  with respect to collateral.
10            Do you remember those questions?
11       A.    Yes.
12       Q.    Do you know whether any debtor
13  or obligor had any obligation to deliver
14  lists of collateral to Wells?
15            MR. SCHLECKER:  Note my
16  objection to the form.
17       Q.    You can answer.
18            MR. SCHLECKER:  If you are able
19  to answer, you can answer.  There's a
20  lot of transaction documents.
21            MR. MORRIS:  David, you
22  objected.  You objected.
23            MR. SCHLECKER:  You can answer
24  the question.
25       A.    The question, please.
```

176

```
 1            MICHAEL PINZON
 2       Q.    Can you please pull Exhibit 11.
 3       A.    Sure.
 4       Q.    And if you can turn to page 25.
 5  If you look at little four and little
 6  five, is it fair to say that each grantor
 7  had to keep records concerning the
 8  collateral in a manner that would allow
 9  Wells Fargo, as the third priority
10  collateral agent, to determine the status
11  of the collateral?
12            MR. SCHLECKER:  Object to the
13  form of the question.
14            You can answer.
15            MR. ZENSKY:  Objection.
16       A.    Yes.
17       Q.    And in five, is it fair to say
18  that each grantor was required to furnish
19  to Wells, as the third priority collateral
20  agent, such information that the
21  collateral agent may, from time to time,
22  request?
23       A.    Yes.
24       Q.    And other than --
25            MR. MORRIS:  Withdrawn.
```

175

```
 1            MICHAEL PINZON
 2            (Record read.)
 3       A.    I don't know.
 4       Q.    Did Wells ever ask any debtor or
 5  obligor for any lists of collateral, other
 6  than the lists that related to particular
 7  lien releases?
 8       A.    Only what was delivered at the
 9  time of closing of whatever, the original
10  transaction or the amended and restated
11  transaction.
12       Q.    And Wells knew and understood
13  that it had the right, under the documents
14  as we looked at earlier, to ask ResCap or
15  its affiliates for any information
16  relating to collateral; isn't that right?
17            MR. ZENSKY:  Objection.
18            MR. SCHLECKER:  Objection to
19  form.
20            If you want to look at
21  documents, feel free.  I think these
22  documents really speak for themselves
23  as to what the obligations are.
24       A.    What particular document are you
25  referring to?
```

177

```
 1            MICHAEL PINZON
 2       Q.    Wells Fargo never requested of
 3  any grantor a collateral report that
 4  specifically described and listed every
 5  asset that was subject to the note's
 6  collateral; is that correct?
 7            MR. SCHLECKER:  Object to the
 8  form of the question.
 9            But you can answer that
10  question.
11       A.    We requested at the time, as I
12  explained before, at the time of closing
13  and at the time of subsequent closing.
14  That's when we requested, to make sure we
15  had what it was they were representing was
16  the collateral package.
17       Q.    And every one of those requests
18  was complied with; is that correct?
19       A.    As far as I know, yes.
20       Q.    So you are not aware, as you sit
21  here today, of any requests for any
22  information from any grantor, relating to
23  the collateral, that wasn't positively
24  responded to; is that right?
25       A.    I'm not aware of any.
```

45 (Pages 174 to 177)

178

```
 1        MICHAEL PINZON
 2        MR. MORRIS:  No further
 3   questions.
 4        MR. SCHLECKER:  Thank you very
 5   much.  We will read and sign.
 6        (Time noted:  2:04 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

180

```
 1          C E R T I F I C A T I O N
 2   STATE OF NEW YORK     )
 3               ss.:
 4   COUNTY OF NEW YORK    )
 5
 6        I, ERICA L. RUGGIERI, RPR and a
 7   Notary Public within and for the State
 8   of New York, do hereby certify:
 9        That I reported the proceedings
10   in the within-entitled matter, and
11   that the within transcript is a true
12   record of such proceedings.
13        I further certify that I am not
14   related by blood or marriage, to any
15   of the parties in this matter and
16   that  I am in no way interested in the
17   outcome of this matter.
18        IN WITNESS WHEREOF, I have
19   hereunto set my hand this 3rd day of
20   September, 2013.
21
22          ERICA L. RUGGIERI, RPR
23
24
25
```

179

```
 1
 2   STATE OF NEW YORK      )
 3               ) :ss
 4   COUNTY OF NEW YORK     )
 5
 6        I, MICHAEL PINZON, the witness
 7   herein, having read the foregoing
 8   testimony of the pages of this deposition,
 9   do hereby certify it to be a true and
10   correct transcript, subject to the
11   corrections, if any, shown on the attached
12   page.
13
14        _____
15          MICHAEL PINZON
16
17
18
19   Sworn and subscribed to before me,
20   this _____ day of _____, 2013.
21   _____
22      Notary Public
23
24
25
```

181

```
 1
 2   ------------- I N D E X -----------------
 3   WITNESS      EXAMINATION BY    PAGE
 4   MICHAEL PINZON  Mr. Morris      7, 171
 5          Mr. Zensky       165
 6
 7   -------------- EXHIBITS -----------------
 8   WELLS              FOR I.D.
 9   Exhibit 1, series of definitions   8
10   Exhibit 2, 30(b)(6) deposition     18
11   notice
12   Exhibit 3, copy of the         23
13   committee's complaint
14   Exhibit 4, document titled       23
15   Schedule Two
16   Exhibit 5, declaration of John    31
17   Morris in support of committee's
18   opposition to partial motion to
19   dismiss
20   Exhibit 6, document titled       35
21   Schedule Three
22   Exhibit 7, document entitled     43
23   Schedule Five
24
25
```

46  (Pages 178 to 181)

182

```
 1
 2    2  ------------- EXHIBITS -----------------
 3    WELLS              FOR I.D.
 4    Exhibit 8, amended answer and      48
 5    affirmative defenses of Wells
 6    Fargo, dated August 27th, docket
 7    number 91
 8    Exhibit 9, Indenture          61
 9    Exhibit 10, Intercreditor       72
10    Agreement
11    Exhibit 11, Amended and Restated  82
12    Third Priority Pledge and
13    Security Agreement and
14    Irrevocable Proxy
15    Exhibit 12, amended and restated  104
16    loan agreement
17    Exhibit 13, the committee's      111
18    30(b)(6) notice to Wells Fargo
19    dated August 15, 2013
20    Exhibit 14, lien release package  129
21    attached as Exhibit F to the
22    committee's complaint
23    Exhibit 15, document titled      142
24    Exhibit 5, docket number 8-5
25
```

183

```
 1
 2    ------------- EXHIBITS -----------------
 3    WELLS              FOR I.D.
 4    Exhibit 16A-D, series of lien    154
 5    releases and UCC 3s in redwells
 6    Exhibit 17A-B, series of lien    154
 7    releases and UCC 3s in redwells
 8
 9
10
11
12    *** EXHIBITS RETAINED BY KRAMER LEVIN ***
13
14
15
16
17
18
19
20
21
22
23
24
25
```

184

```
 1
 2          INSTRUCTIONS TO WITNESS
 3
 4        Please read your deposition over
 5    carefully and make any necessary
 6    corrections.  You should state the reason
 7    in the appropriate space on the errata
 8    sheet for any corrections that are made.
 9        After doing so, please sign the
10    errata sheet and date it.
11        You are signing same subject to the
12    changes you have noted on the errata
13    sheet, which will be attached to your
14    deposition.
15        It is imperative that you return
16    the original errata sheet to the deposing
17    attorney within thirty (30) days of
18    receipt of the deposition transcript by
19    you.  If you fail to do so, the deposition
20    transcript may be deemed to be accurate
21    and may be used in court.
22
23
24
25
```

185

```
 1
 2              E R R A T A
 3
 4
 5    I wish to make the following changes,
 6    for the following reasons:
 7
 8    PAGE LINE
 9    ___ ___ CHANGE:_____
10    REASON:_____
11    ___ ___ CHANGE:_____
12    REASON:_____
13    ___ ___ CHANGE:_____
14    REASON:_____
15    ___ ___ CHANGE: _____
16    REASON:_____
17    ___ ___ CHANGE: _____
18    REASON:_____
19    ___ ___ CHANGE: _____
20    REASON:_____
21
22    _____  _____
23    WITNESS' SIGNATURE        DATE
24
25
```

47 (Pages 182 to 185)

ERRATA SHEET TO DEPOSITION OF MICHAEL PINZON

I wish to make the following changes,

for the following reasons:

PAGE  LINE

_11_  _3_    CHANGE:  "before" to "after"

REASON:    Error in transcript

_39_  _3_    CHANGE:  "count" to "county"

REASON:    Transcription error

_44_  _20_   CHANGE:  "I can't tell you…"

REASON:    Word "tell" is missing

_65_  _21_   CHANGE:  "obligators" to "obligors"

REASON:    Transcription error

_74_  _5_    CHANGE:  "as" to "has"

REASON:    Transcription error

_81_  _3_    CHANGE:  "junior" to "junior noteholder"

REASON:    Word "noteholder" is missing

_101_  _17_  CHANGE:  "I" to "it"

REASON:    Transcription error

_104_  _2_   CHANGE:  "I don't recall" to "Not that I can recall."

REASON:    Accuracy of response

__104__  __21-23__  CHANGE:  "To a loan that the borrower and the guarantors

_____ entered into with the lenders." _____

REASON:    Accuracy of response _____

__122__  __11__  CHANGE:  "prohibitions" to "provisions" _____

REASON:    Transcription error _____

__135__  __9__  CHANGE:  "but if it was part of the documentation…"

___ to "but if it was not part of the documentation…" ___

REASON:    Word "not" is missing _____

__148__  __2__  CHANGE:  "agency" to "agent" _____

REASON:    Transcription error _____


_____          __9/26/2013__

MICHAEL PINZON                            DATE


Sworn and subscribed to before me,

this _26_ day of _September_, 2013.

_____
                Notary Public

JANET M. JOLLEY
Notary Public, State of New York
No. 01JO6121000
Qualified in Kings County
Commission Expires Jan. 3, 20_17_