Page 1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     In re:                         Chapter 11
3    RESIDENTIAL CAPITAL, LLC, et al.,   Case No.
                        Debtors.    12-12020 (MG)
4                                    Jointly
                                     Administered
5    ------------------------------x
     RESIDENTIAL CAPITAL, LLC, et al,
6                        Plaintiffs,
                                     Adversary Proceeding
7         v.                         No. 13-01343 (MG)
     UMB BANK, N.A., as successor
8    indenture trustee under that
     certain Indenture, dated as of      Purple Highlighting = Wells Fargo
9    June 6, 2008; and WELLS FARGO BANK,     Bank, N.A. Designation
     N.A., third priority collateral
10   agent and collateral control agent
     under that certain Amended and
11   Restated Third Priority Pledge
     and Security Agreement and
12   Irrevocable Proxy, dated as of
     December 30, 2009,
13                        Defendants.
     ------------------------------x
14   OFFICIAL COMMITTEE OF UNSECURED
     CREDITORS, on behalf of the estates
15   of the Debtors,
                   Plaintiff,
16        v.                         Adversary Proceeding
                                     No. 13-01277 (MG)
17
     UMB BANK, N.A., as successor
18   indenture trustee under that
     certain Indenture, dated as of     VIDEOTAPED
19   June 6, 2008; and WELLS FARGO     DEPOSITION OF:
     BANK, N.A., third priority     TERESA RAE FARLEY
20   collateral agent and
     collateral control agent under
21   that certain Amended and Restated Third
     Priority Pledge and Security Agreement and
22   Irrevocable Proxy, dated as of
     December 30, 2009,
23                        Defendants.
     ------------------------------x
24        September 18, 2013 - New York, New York
25   Mary F. Bowman                 Job No. 65729

Page 2

```
 1
 2
 3
 4
 5              September 18, 2013
 6                 9:35 a.m.
 7
 8
 9
10         Deposition of TERESA RAE FARLEY,
11    held at the offices of  Akin, Gump, Strauss,
12    Hauer & Feld, One Bryant Park, New York,
13    New York, before Mary F. Bowman, a Registered
14    Professional Reporter, Certified Realtime Reporter,
15    and Notary Public of the State of New Jersey.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2              APPEARANCES:
 3    MORRISON & FOERSTER
 4    Attorneys for Debtor and the Witness
 5       1290 Avenue of the Americas
 6       New York, New York  10104
 7    BY:  STEFAN ENGELHARDT, ESQ.
 8
 9    AKIN GUMP STRAUSS HAUER & FELD
10    Attorneys for UMB Bank
11       One Bryant Park
12       New York, New York  10036
13    BY:  DEBORAH NEWMAN, ESQ.
14       JULIA COHEN, ESQ.
15
16    KRAMER LEVIN
17    Attorneys for Unsecured Creditors Committee
18       1177 Avenue of the Americas
19       NEW YORK, NEW YORK  10036
20    BY:  NATAN HAMERMAN, ESQ.
21       ALISSA GOODMAN, ESQ.
22
23
24
25
```

Page 4

```
 1
 2              APPEARANCES:
 3
 4    WHITE & CASE
 5    Attorneys for Junior Secured Noteholders
 6       1155 Avenue of the Americas
 7       New York, New York   10036
 8    BY:  DOUGLAS BAUMSTEIN, ESQ.
 9       VANESSA SODERBERG, ESQ.
10
11    KIRKLAND & ELLIS
12    Attorneys for Ally Financial
13       655 fifteenth Street NW
14       Washington DC  20005
15    BY:  JUDSON BROWN, ESQ.
16
17
18    MILBANK TWEED HADLEY & McCLOY
19    Attorneys for Junior Secured Lenders
20       One Chase Manhattan Plaza
21       New York, New York  10005
22    BY:  HAILEY DeKRAKER, ESQ.
23
24
25
```

Page 5

```
 1
 2              APPEARANCES:
 3    REED SMITH
 4    Attorneys for Wells Fargo
 5       599 Lexington Avenue
 6       New York, New York  10022
 7    BY:  SARAH KAM, ESQ.
 8
 9    PACHULSKI STANG ZIEHL & JONES
10    Attorneys for Creditors Committee
11       780 Third Avenue
12       New York, New York  10017
13    BY:  JASON ROSELL, ESQ.
14
15
16    Also Present:  Steve Sanpietro, Videographer
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

Page 6

1
2
3
4          THE VIDEOGRAPHER:  This is the
5   start of the tape labeled number one of
6   the videotape deposition of Terry Farley
7   in the matter of In re: Residential
8   Capital, LLC, Chapter 11, Case Number
9   12-12020, in the United States Bankruptcy
10  Court for the Southern District of
11  New York.
12         This deposition is being held at
13  One Bryant Park, New York, New York, on
14  Wednesday, September the 18th, 2013, at
15  approximately 9:44 a.m.
16         My name is Steve Sanpietro from TSG
17  Reporting, Inc., and I am the legal video
18  specialist.  The court reporter is today
19  Mary Bowman in association with TSG
20  Reporting.
21         May I please have counsel introduce
22  themselves for the record, starting to my
23  right.
24         MR. ENGELHARDT:  Stefan Engelhardt,
25

Page 7

1
2   from Morrison & Foerster, on behalf of
3   the debtors and the witness.
4          MR. BROWN:  Judson Brown,
5   Kirkland & Ellis, on behalf of Ally
6   Financial.
7          MS. GOODMAN:  Alissa Goodman,
8   Kramer, Levin, Naftalis & Frankel, LLP,
9   for the unsecured creditors committee.
10         MR. HAMERMAN:  Natan Hamerman, also
11  from the creditors committee.
12         MR. ROSELL:  Jason Rosell,
13  Pachulski, Stang, Ziehl & Jones, for
14  creditors committee.
15         MS. KAM:  Sarah Kam, Reed Smith, on
16  behalf of Wells Fargo.
17         MS. DeKRAKER:  Hailey DeKraker,
18  Milbank, Tweed, Hadley & McCloy, for the
19  junior secured lenders.
20         MS. SODERBERG:  Vanessa Soderberg,
21  White & Case, for the junior secured
22  noteholders.
23         MR. BAUMSTEIN:  Doug Baumstein,
24  White & Case, for the junior secured
25  noteholders.

Page 8

1
2          MS. COHEN:  Julia Cohen, from Akin
3   Gump, for UMB Bank.
4          MS. NEWMAN:  Deborah Newman, also
5   from Akin Gump, on behalf of UMB Bank.
6          THE VIDEOGRAPHER:  Will the court
7   reporter please swear in the witness.
8   TERRY FARLEY,
9      called as a witness by the parties,
10     having been duly sworn, testified as
11     follows:
12  EXAMINATION BY
13  MS. NEWMAN:
14     Q.   Good morning, Ms. Farley.
15     A.   Yes.
16     Q.   As I said, I am Deborah Newman with
17  Akin Gump.  We represent UMB Bank as
18  successor indenture trustee to the junior
19  secured noteholders, who I will refer to
20  today as the JSNs.  Do you understand that?
21     A.   Absolutely.
22     Q.   Thank you.
23         Are you represented by counsel
24  today, Ms. Farley?
25     A.   I am.

Page 9

1
2      Q.   Is that Mr. Engelhardt?
3      A.   Yes, it is.
4      Q.   Anyone else in this room
5   representing you?
6      A.   No.
7      Q.   Have you been deposed before?
8      A.   No.
9      Q.   I am going to go over a few ground
10  rules.  It will just make everything go, I
11  think, a little quicker and easier today.
12         The court reporter is going to be
13  taking down our conversation, as you can see,
14  so it is important that you let me finish my
15  questions before you begin answering, and
16  I'll try to do the same with you with respect
17  to your answers.  OK?
18     A.   Um-hm.
19     Q.   And the next one is that you have
20  to answer my questions verbally, because the
21  court reporter obviously can't take down a
22  head nod or --
23     A.   Right.
24     Q.   Does that make sense?
25     A.   Yes.

Page 10

1
2      Q.   If any of my questions are unclear,
3   please let me know, and I will try to
4   rephrase them in a way that's more easily
5   understood.  Does that make sense?
6      A.   Sure.
7      Q.   From time to time, your counsel or
8   someone else in the room may object to a
9   question that I ask.  Unless your counsel
10   instructs you not to answer the question, you
11   can go ahead and answer.  Does that make
12   sense?
13      A.   Yes.
14      Q.   If you need a break at any time
15   today, please let me know, and I will try to
16   accommodate you.  I would just ask if there
17   is a question pending, that you go ahead and
18   answer the question, and then we will take a
19   break.
20      A.   OK.
21      Q.   Ms. Farley, do you understand that
22   you are under oath today?
23      A.   Yes, I do.
24      Q.   Is there any reason, such as taking
25   medication or anything like that, that you

Page 11

1
2   would be unable to answer my questions to the
3   best of your ability today?
4      A.   No.
5      Q.   Ms. Farley, what did you do to
6   prepare for today's deposition?
7      A.   Spent the last two days with my
8   counsel at MoFo and various other attorneys.
9      Q.   Can you tell me, please, what other
10   attorneys were there?
11      A.   I may need some help with that.
12   Stefan was there.  Samantha Martin was there
13   from MoFo.
14      Q.   Anyone else from MoFo?
15      A.   No.
16           Alissa and Natan.
17      Q.   From Kramer Levin?
18      A.   From Kramer Levin.
19           And John was there for the first
20   day as well.
21      Q.   Is that John Morris?
22      A.   I believe so.
23      Q.   OK.  Anyone else?
24      A.   Mike was there, and I'm not going
25   to recall the firm Mike was with.

Page 12

1
2      Q.   Do you know Mike's last name?
3      A.   I don't recall it.
4      Q.   Do you know who Mike represents in
5   this matter?
6      A.   I don't recall it.  He was
7   introduced, but --
8      Q.   OK.  You said you met for the past
9   two days.  So I am having trouble keeping
10   track of what day it is, but I guess Monday
11   would be the first day you met?
12      A.   Right.
13      Q.   How long did you meet on Monday?
14      A.   We met approximately 20 hours over
15   the past two days.
16      Q.   Wow, OK.  Were you shown documents?
17      A.   Yes.
18      Q.   Can you tell me what documents you
19   were shown?
20           MR. ENGELHARDT:  Objection, and
21      instruct the witness not to answer.
22           MS. NEWMAN:  What's the basis for
23      the instruction?
24           MR. ENGELHARDT:  Work product
25      privilege.

Page 13

1
2           MS. NEWMAN:  I would note for the
3      record we obviously dispute that there is
4      any privilege that attends to
5      communications between the debtor and the
6      committee with respect to the committee
7      complaint.
8      Q.   Ms. Farley, about how many
9   documents were you shown?
10      A.   What is your definition of
11   "documents"?
12      Q.   I guess something that's reduced to
13   paper.
14      A.   In terms of executed documents,
15   probably four or five.
16      Q.   And when you say "executed
17   documents," are you referring to agreements?
18      A.   Yes.
19      Q.   Were you shown documents other than
20   agreements?
21      A.   Yes.
22      Q.   Such as e-mails?
23      A.   Yes.
24      Q.   And approximately how many?
25      A.   Maybe a hundred, 75 to 100.

4 (Pages 10 to 13)

Page 14

1
2    Q.    OK.  And who led the discussion?
3    A.    Largely Stefan.  John and Natan to
4    a lesser degree.
5    Q.    Other than the two meetings that
6    you just told me about that lasted for
7    approximately 20 hours, did you do anything
8    else to prepare for this deposition?
9    A.    I reviewed certain provisions of
10   the revolver, and of the pledge and security
11   agreement relating to the revolver.
12   Q.    Any other documents?
13   A.    No.
14   Q.    Which provisions of the revolver
15   agreement did you review?
16   A.    Some of the definitions, the
17   provisions relating to collateral, and the
18   lien releases.  I also quickly reviewed some
19   of the covenants.
20   Q.    When you say the definitions --
21   actually, strike that.
22       Which provisions of the revolver
23   pledge and -- pledge agreement did you
24   review?
25   A.    Some of the definitions, the lien

Page 15

1
2    release provisions and some of the granting
3    provisions.
4    Q.    Did you review the definition of
5    "collateral" under the revolver pledge
6    agreement?
7    A.    I would have reviewed the
8    definition -- the definitions relating to
9    collateral also.
10   Q.    OK.  And then would that include
11   the definition of "excluded assets"?
12   A.    Yes.
13   Q.    OK.  What were the portions of, or
14   what were the topics for which Mr. Morris or
15   Natan led the discussion?
16       MR. ENGELHARDT:  Objection.  I
17   instruct the witness not to answer.
18       MS. NEWMAN:  OK.  And I'll note for
19   the record that we dispute that there is
20   a privilege that would apply to that
21   question.
22   Q.    OK.  Other than what you have told
23   me about, did you do anything else to prepare
24   for this deposition?
25   A.    I had a brief conversation with

Page 16

1
2    Barb Westman and a brief conversation with
3    Joe Ruhlin.
4    Q.    Anyone else?
5    A.    No.
6    Q.    Who is Ms. Westman?
7    A.    Barb Westman works in the finance
8    department of ResCap.
9    Q.    What are her responsibilities in
10   the finance department?
11   A.    Well, I was just -- she is working
12   with a lot of the financial reporting and
13   with CFDR.
14   Q.    OK.  And CFDR is the debtors'
15   collateral tracking database?
16   A.    It is an Oracle database that is
17   used for finance and some treasury functions.
18   I discussed with her some of the financial
19   components relating to that.
20   Q.    Can you tell me what were the
21   financial components of the CFDR that you
22   discussed with Ms. Westman?
23   A.    I discussed a little bit of the
24   development.  I discussed the reconciliation
25   to the ledger.  And I discussed -- discussed

Page 17

1
2    I think CFDR a little bit generally.
3    Q.    When you say "development," you
4    mean the development of the CFDR?
5    A.    She was involved with the
6    development of the CDFR back in 2008.
7    Q.    2008.  OK.  Were you involved in
8    that as well?
9    A.    Tangentally.
10   Q.    Who is Mr. Ruhlin?
11   A.    Mr. Ruhlin is currently an employee
12   of Green Tree.
13   Q.    What's Green Tree?
14   A.    It's a company in the -- it's a
15   company in Minneapolis.  No longer
16   affiliated.
17   Q.    No longer affiliated with ResCap?
18   A.    Yes.
19   Q.    What kind of company is Green Tree?
20   A.    He works in a mortgage origination
21   group.
22   Q.    And what was Mr. Ruhlin's
23   affiliation with ResCap?
24   A.    At the time I started ResCap, Joe
25   was responsible for the roll-forwards, which

Page 18

1
2  was really cash forecasting, and we worked
3  very closely as it related to understanding
4  the needs of ResCap from a financial
5  perspective. Ultimately, Joe took over some
6  of my managerial responsibilities within the
7  treasury group.
8      Q.   And what did you discuss with
9  Mr. Ruhlin in connection with this
10 deposition?
11     A.   Joe actually called me, we talked
12 just a little bit about the lien release
13 process which he had taken over. And we
14 discussed how well we worked together.
15     Q.   Other than what you have told me,
16 did you do anything else to prepare for
17 today's deposition?
18     A.   No.
19     Q.   Ms. Farley, can you tell -- give me
20 a brief description of your educational
21 background, beginning with college?
22     A.   I went to the College of
23 St. Benedict, Saint John's University, in
24 Minnesota. Graduated from there in 1982, and
25 then I went to law school at the University

Page 19

1
2  of Minnesota until 1985.
3      Q.   And can you please give me a brief
4  description of your employment background,
5  beginning with your first job after
6  graduating from law school?
7      A.   Started at Dorsey & Whitney, where
8  I was in the corporate department. I went
9  over to the business side in 1989, where I
10 was at RFC. I ran -- I grew into various
11 positions there. But over time, I ran the
12 securitization group, including all of the
13 sales and operations relating to that. I ran
14 parts of master servicing. I ran the
15 investor relations group.
16     I was involved in a number of new
17 product developments, a number of board
18 committees, particularly those relating to
19 expansions into various business
20 opportunities, and restructuring of the
21 company.
22     After RFC, several of us left to
23 establish a new conduit funded by DLJ that --
24 DLJ was subsequently acquired by Credit
25 Suisse First Boston, and, you know, at that

Page 20

1
2  time, we implemented our business plan for
3  CSFB. I basically was -- was involved in
4  establishing an origination, mortgage loan
5  origination platform there, established a
6  warehouse lending platform there.
7      We brought the trading desk into a
8  variety of new products. I was involved with
9  some corporate finance activities. I was
10 also involved with vendor diligence, vendor
11 selection, and the creation of various
12 service-level agreements to monitor and
13 compensate vendors appropriately.
14     I went from there to Merrill Lynch,
15 where I set up an asset-based lending
16 company. I was at Merrill Lynch until the
17 meltdown occurred, and then everything was
18 pretty much closed at Merrill Lynch.
19     At that point, I received a phone
20 call from several ResCap employees asking if
21 I was interested in coming on board to help
22 with the restructuring and, you know, what is
23 known as the revolver now. They knew the
24 right words to say. I came on for a two- to
25 three-week engagement.

Page 21

1
2      I was there until -- with two small
3  breaks, until this past November, as a
4  consultant, and then in November, just before
5  Thanksgiving, I recall, I came on board as a
6  full-time employee.
7      Q.   Thank you.
8      You mentioned RFC. What is RFC?
9      A.   RFC is Residential Funding
10 Corporation. It was the -- it was the
11 original conduit established by Norwest Bank.
12 At that point, it was owned by -- I think it
13 was owned by Anchor Bank. Norwest had sold
14 it to Anchor Bank. Anchor Bank subsequently
15 sold it to Salomon -- no. Norwest sold it to
16 Salomon, Salomon sold it to Anchor, and then
17 Anchor Bank sold it to GMAC.
18     Q.   When was -- was it owned by GMAC
19 during the time that you were working there?
20     A.   I started when it was owned by
21 Anchor Bank, and then I was there during the
22 acquisition by GMAC.
23     Q.   What is a conduit?
24     A.   The conduit was basically the
25 entity that took originated mortgage loans

Page 22

1
2    and basically securitized them, sold them
3    into the secondary market.
4        Q.    And you said that you left Merrill
5    when the meltdown occurred.  I think it could
6    be interpreted to have been a series of
7    meltdowns during a particular period in
8    recent history.
9            What exactly was the time frame you
10   were referring to when you said "meltdown"?
11       A.    2008.  Wait, 2007, I'm sorry.
12       Q.    2007?
13       A.    Um-hm.
14       Q.    Just to make sure that we are on
15   the same page as I'm going through and asking
16   my questions today, I just want to make clear
17   that I am going to be referring -- when I say
18   "ResCap," I'm referring to Residential
19   Capital, LLC, and its former and current --
20   and direct and indirect subsidiaries.  So not
21   the entities above ResCap -- Residential
22   Capital, LLC.
23       A.    OK.
24       Q.    Does that make sense?
25       A.    Yes.

Page 23

1
2        Q.    And when I say Ally or AFI, I am
3    referring to the entity now known as Ally
4    Financial Inc., formerly loan as GMAC Inc.
5    Does that make sense?
6        A.    Yes.
7            (Exhibit 1, notice of deposition
8        marked for identification, as of this
9        date.)
10       Q.    Ms. Farley, you have just been
11   handed what has been marked as Farley
12   Exhibit 1, which is the deposition notice
13   that was served on the debtors in this
14   matter.  Have you seen this document before?
15       A.    No.
16       Q.    Can you just take a minute -- I'm
17   going to represent that the numbers that are
18   highlighted are the topics for which you have
19   been designated to serve as ResCap's
20   corporate representative during this
21   deposition.  Can you please take a look at
22   those highlighted topics and let me know if
23   you have knowledge of each of the highlighted
24   topics.
25           MR. ENGELHARDT:  You want her to go

Page 24

1
2    one by one through all 30-some-odd --
3            MS. NEWMAN:  I want her to look at
4        them and tell me if there are any that
5        she does not have knowledge of.
6            MR. ENGELHARDT:  Counsel, for the
7        record, with respect to the topics, the
8        variety of topics, listed communications
9        with the committee and/or AFI, generally
10       we designated two witnesses for those
11       topics.  Ms. Farley is here as a
12       corporate designee on those categories
13       with respect to communications with AFI
14       only.
15           MS. NEWMAN:  Thank you for the
16       clarification.
17       A.    As Stefan said, I did not have any
18   communications with the committee on any of
19   these.
20       Q.    OK.
21       A.    So that would not be appropriate to
22   look to me for that.
23           With respect to 52, I did not have
24   any communications with anyone about the
25   notes collateral in a preferential transfer.

Page 25

1
2    I have knowledge of what happened in the
3    90 days prior, but I don't know if there is
4    another party or if any conversations
5    occurred.
6        Q.    So you do not know if anyone at
7    ResCap, other than yourself, had such
8    communications?
9        A.    Correct.
10           And I don't have the listing
11   Schedule 6 in items 56 and 57.
12       Q.    Have you seen those schedules?
13       A.    I don't know.
14       Q.    Have you seen the committee
15   complaint?
16       A.    Very briefly.
17           I am familiar with transactions,
18   categories of transactions and the assets
19   that were on the revolver and pledged to the
20   JSNs, however.
21       Q.    Thank you.
22           You said that you were -- and I'm
23   using my own language now -- lured back to
24   ResCap in 2007.
25           MR. ENGELHARDT:  Objection to form.

Page 26

1
2     Q.   Is that correct?
3     A.   No.
4     Q.   OK.  What's incorrect about that?
5     A.   I left Merrill in 2007.  I joined
6  ResCap in May of 2008.
7     Q.   Understood.
8          And what was it that you were
9  asked -- when ResCap contacted you to come
10 back in or about May 2008, what was it that
11 they were asking you to come -- or to come to
12 ResCap as a consultant, what was it that they
13 were asking you to do?
14    A.   To help close the restructuring and
15 negotiate and close the revolver.
16    Q.   And what are you referring to when
17 you say "the restructuring"?
18    A.   The bond exchange.
19    Q.   And what was the status of the bond
20 exchange at that time?
21         MR. ENGELHARDT:  Objection to form.
22    Q.   You can answer.
23         MR. ENGELHARDT:  You can answer.
24    A.   I joined on the Monday after the
25 offering memoranda had been printed.

Page 27

1
2     Q.   OK.  So did you -- is it correct
3  then that you did not participate in any
4  negotiations with bondholders respecting the
5  terms of the exchange?
6     A.   I was on conversations including
7  bondholders' counsel relating to the pledge
8  and security agreements associated with the
9  junior and senior bondholders.  I was a -- I
10 provided comments, and I suspect I was on
11 conversations, again, with a variety of
12 attorneys, including JSN attorneys, and
13 likely business people, with respect to some
14 of the indenture provisions.
15         I don't believe the indenture had
16 been final at the time the offering memo was
17 created.
18    Q.   Did you have any involvement in
19 discussions about the exchange of the
20 existing notes for the JSNs and the terms of
21 what that exchange would be, other than what
22 you have just described?
23    A.   No.
24    Q.   So for example, you were not a
25 participant in any conversations respecting

Page 28

1
2  whether the principal amount of the existing
3  notes would be reduced?
4          MR. ENGELHARDT:  Objection to form.
5     A.   I was aware those conversations
6  were taking place.  I don't recall being on
7  or participating in any of those.
8     Q.   OK.  Who did participate in those?
9     A.   John Peterson from ResCap.  Laura
10 Hall and Corey Pinkston from Ally.  There may
11 have been other individuals, but that's my
12 knowledge.
13    Q.   Do you know the terms of the
14 exchange -- and again, I'm differentiating
15 the exchange from the security agreement and
16 indenture --
17    A.   Right.
18    Q.   How the terms of the exchange
19 changed during the period between which the
20 exchange was first envisioned and the time
21 that it was consummated?
22         MR. ENGELHARDT:  Objection to form.
23    A.   I don't recall if I ever knew.
24    Q.   OK.  You don't know if you ever
25 knew at one time?

Page 29

1
2     A.   Correct.
3     Q.   But you do not know now; is that
4  correct?
5     A.   I do not know now.
6     Q.   And would the same people that you
7  named in response to my question about
8  negotiations with bondholders be the people
9  who would know about the way in which the
10 terms of the exchange may have changed over
11 time?
12    A.   Yes.
13    Q.   Anyone else?
14    A.   Not that I can think of.  Attorneys
15 representing those business people, but --
16    Q.   OK, thank you.
17         (Exhibit 2, Terry Farley's LinkedIn
18    profile marked for identification, as of
19    this date.)
20    Q.   Ms. Farley, you have just been
21 handed Farley Exhibit 2, which is your
22 LinkedIn profile that I downloaded off of the
23 LinkedIn website.
24    A.   Um-hm.
25    Q.   Looking at the information that's

8 (Pages 26 to 29)

Page 30

1
2 listed under Terry Farley's experience, was
3 this information written by you?
4     A.   Yes.
5     Q.   And I'm particularly focused on the
6 second blurb, which says, "Financial services
7 professional consultant, GMAC ResCap."  The
8 first sentence says, "Involved with
9 developing and implementing business
10 strategies in order to manage GMAC ResCap's
11 liquidity needs."
12        Can you explain to me what that
13 entailed?
14     A.   Sure.  When I joined in 2008,
15 obviously it was a crisis time for ResCap.
16 And even before the revolver was executed, we
17 realized there wasn't going to be enough cash
18 coming off of that facility to maintain
19 business operations.  So everybody knew that
20 we were going to need to continue to find
21 ways to monetize assets, to put new lines in,
22 to expand lines.
23        So after the -- well, as the
24 revolver was closed, and the Resort was
25 pulled out, separate financing happened

Page 31

1
2 there, I believe the factoring started about
3 that time.  I was very involved with Joe
4 Ruhlin and some other senior management in
5 looking at what the cash flow needs were
6 going to be for the company moving forward.
7 And we had roll-forwards which showed
8 expenditures that were anticipated, you know,
9 either by business units or because large
10 payments were coming due.  And we also were
11 able to forecast revenues we expected to
12 receive in.
13        We worked through lists of assets,
14 you know, because we had lists of every asset
15 in the company, pledged, unpledged, whatever,
16 and we were looking to see where we could
17 find value, where we could monetize assets to
18 be able to meet the financial needs of the
19 company.
20        That happened actually, you know,
21 through the tenure there.  Looking at the
22 roll-forwards, figuring out what monies we
23 would have available, what we would be short,
24 and having a forecast like that, we would
25 have some time to react and trying to figure

Page 32

1
2 out how we were going to manage to make the
3 payments we needed to manage -- we needed to
4 make.
5        So that's an overview of what that
6 meant.
7     Q.   Of that first sentence.
8     A.   Um-hm.
9     Q.   OK.  Let's take a step back on this
10 point.  What was -- what were the sources of
11 funding for ResCap's business prior to the
12 implementation of the restructuring?
13        MR. ENGELHARDT:  Objection to form.
14     A.   There was obviously cash, although
15 not that significant, and there were lines,
16 there were financing lines.  And ResCap also
17 funded itself through the sale of assets,
18 through the securitization and sale of loans,
19 of servicing.
20     Q.   OK.  And what were the lines of
21 financing that you referenced?
22     A.   There were a number of them.  When
23 I came on, they were being consolidated into
24 a single line, I believe led by B of A.
25        You're talking about before the

Page 33

1
2 revolver and the bond exchange?
3     Q.   Yes.
4     A.   So to my knowledge, there were a
5 lot of lines out there.
6     Q.   OK.  And were they -- were those
7 lines actually consolidated into a single
8 line?
9     A.   A number of them were, not all of
10 them.
11     Q.   And what about bilateral
12 facilities?  Were there bilateral facilities
13 in place at that time?
14        MR. ENGELHARDT:  Objection to form.
15        You can answer.
16     A.   The bilateral facilities were the
17 other lines.
18     Q.   And what is a bilateral facility?
19     A.   It is a lending arrangement between
20 ResCap and a third party.  The third party
21 may be an individual party -- a named party
22 acting on behalf of several banks or lenders,
23 or it may be a single lender.
24     Q.   OK.  What were the -- what was the
25 duration of the bilateral facilities that

9 (Pages 30 to 33)

Page 34

1
2  were in place prior to the restructuring?
3         MR. ENGELHARDT:  Objection to form.
4      A.   I was not involved with the
5  restructuring of those bilateral facilities,
6  except as it related to incorporating that
7  information in the revolver and working with
8  the remaining facilities going forward.  So I
9  don't have an answer to that question.
10     Q.   OK.  To your knowledge, were those
11 typically long-term facilities that lasted
12 for a period of years?
13        MR. ENGELHARDT:  Objection to form.
14     A.   Typically facilities have
15 approximately a one-year term, with the
16 expectation that it would be renewed barring
17 business changes, you know, either in the
18 interest of the lender, exiting the business,
19 or the needs of the borrowers.
20     Q.   OK.  Do you know if at the time of
21 the restructuring, there was an expectation
22 that the bilateral facilities then in place
23 would be renewed?
24     A.   There was an expectation that the
25 bilateral facilities remaining in place after

Page 35

1
2  the restructuring would exist for a period of
3  time, and the expectation was that they would
4  be renewed or that we would need to find
5  alternative funding sources if they weren't.
6      Q.   OK.  Was part -- what was the
7  impetus for putting the revolver in place?
8         MR. ENGELHARDT:  Objection to form.
9      A.   I was not involved with those
10 discussions, so this is speculation based on
11 my conversations of the time.
12        But ResCap was basically out of
13 money and was not going to be able to meet
14 its debts going forward, and this was a way
15 of monetizing assets so that ResCap would get
16 money coming in and it could pay down some of
17 the debts which it knew were coming, and as
18 well as to fund its ongoing business
19 operations.
20     Q.   OK.  Was there a -- was the
21 expectation that the revolver would exist
22 coincident with the bilateral facilities?
23     A.   Yes.
24     Q.   So it wasn't the expectation that
25 certain of the bilateral facilities would

Page 36

1
2  terminate?
3      A.   My understanding, and recollection
4  of the time, is that some of the bilateral
5  facilities terminated, some of the bilateral
6  facilities were combined into a single
7  facility managed by, it might have been B of
8  A but I'm not sure, and some of the bilateral
9  facilities would continue.
10     Q.   OK.  Looking back at the LinkedIn
11 profile, the second sentence reads, "Manage
12 structuring -- manage structuring, ops and
13 compliance teams relating to secured funding
14 facilities, domestically and internationally,
15 and provide legal expertise relating to
16 various business arrangements."
17        Can you give me a broad description
18 of what that entailed?
19     A.   Over time -- well, after the
20 initial closing happened, which was the two
21 to three weeks I came on board for, first
22 they asked me to stay through the end of the
23 summer to help operationalize the revolver
24 and to work with them in terms of some of the
25 assets and other funding needs.

Page 37

1
2         And during that time -- let me see,
3  what's it -- during that time, I was very
4  largely involved in setting up a lot of the
5  procedures and processes utilized by the
6  company to fulfill the various obligations
7  under the revolver, and that included
8  training and working very closely with all of
9  the structuring and operational individuals
10 and people who led the various business units
11 around, you know, the ResCap organization.
12        I eventually ended up -- I thought
13 I was going to be gone, and then I was
14 extended and asked to take on -- over time
15 asked to take on management of the
16 structuring and operational roles.  So I
17 managed those groups.
18        I managed -- I was subsequently
19 asked to take on the internal treasury
20 compliance group.  So I managed that group.
21 This was all happening as a consultant.
22     Q.   OK.
23     A.   And the secured funding facilities,
24 domestically and internationally, the team I
25 took over that I worked very closely with

Page 38

1
2  before, during and after my management of
3  them, you know, we managed facilities across
4  the country.  We managed the facilities in
5  the UK, we managed the facilities in Europe.
6      Q.   OK.  And that would include the
7  revolver?
8      A.   That included the revolver.
9      Q.   OK.
10     A.   And it included the LOC and credit
11  agreement and other docs.
12     Q.   OK.  You said -- you used the term
13  "operationalize" the revolver.  What does
14  that mean?
15     A.   It means taking legal constructs
16  set out in the agreement and turning them
17  into reality.
18     Q.   OK.  Can you give me an example of
19  that?
20     A.   We had to create a borrowing base
21  on a monthly basis and provide that to Ally,
22  Wells and U.S. Bank.  So the document
23  basically said, you are going to deliver
24  information.  That first month, there was a
25  paper, actually a variety of papers that

Page 39

1
2  actually needed to be delivered.
3      Operationalizing is basically
4  taking the concept of a report being
5  delivered and then working with the various
6  people and systems inside the company to
7  actually create a report that satisfies the
8  provisions of the document.  That would be an
9  example.
10     Q.   OK.
11     A.   And another example would be
12  needing to get BPOs on, you know, our
13  properties every 90 days.  Somebody needed to
14  communicate that that was necessary, insure
15  the business units set up that process, and
16  then set up a process to make sure that the
17  people that were supposed to do that, indeed
18  were doing that.
19     But that's operationalizing.
20     Q.   OK.  What is a BPO?
21     A.   Broker price opinion.
22     Q.   Would that include -- this
23  operationalizing the revolver, did that
24  include the creation of the CFDR?
25     A.   Not directly.

Page 40

1
2      Q.   I'm not sure I understand your
3  answer.
4      A.   The CFDR --
5      MR. ENGELHARDT:  There is no
6  question.
7      Q.   Can you explain it for me further,
8  please?
9      A.   The CFDR is an Oracle database used
10  within the finance world.  It had been
11  conceptualized before the revolver came into
12  place.  The creation of the revolver was the
13  impetus for finance developing that
14  particular database and that technology.
15     Q.   Who are the people at ResCap who
16  are the most knowledgeable of the way in
17  which the CFDR works as far as tracking
18  collateral?
19     A.   Barb Westman.
20     Q.   And you said she was involved in
21  creating the CFDR; is that correct?
22     A.   She was involved in creating the
23  CFR.
24     Q.   You are using the term "CFR."  Is
25  that how it is referred to?

Page 41

1
2      A.   CFDR.  I'm probably just softly
3  saying the D.
4      Q.   OK, I missed it.
5      OK.  Can you turn back to the
6  LinkedIn profile, please.  The third sentence
7  in the section we have been looking at says,
8  "In conjunction with GMAC ResCap senior
9  management, strategized, negotiated and
10  implemented multibillion debt
11  restructurings."
12     What does that refer to?
13     A.   It refers to the bond exchange, and
14  it refers to other projects that never came
15  to fruition within the company.
16     Q.   And does that primarily relate to
17  the indenture and pledge agreement relating
18  to the restructuring?
19     A.   Yes, as well as again
20  operationalizing the provisions in the
21  indenture that we needed to insure were
22  followed.
23     Q.   OK.
24     MR. ENGELHARDT:  Which one do you
25  have?  Which one is that?

Page 42

1
2      MS. NEWMAN:  It is the original
3  revolver agreement and the original
4  pledge agreement.  Do you have your own
5  copy?
6      MR. ENGELHARDT:  I might have my
7  own copy.  Original loan agreement and
8  the what?  I'm sorry.
9      MS. NEWMAN:  Original revolver
10  security agreement.
11      MR. ENGELHARDT:  First priority or
12  third priority?
13      MS. NEWMAN:  First.
14      MR. ENGELHARDT:  I have them.
15  Thank you.
16      (Exhibit 3, first priority pledge
17  and security agreement marked for
18  identification, as of this date.)
19      (Exhibit 4, loan agreement marked
20  for identification, as of this date.)
21      MR. ENGELHARDT:  3 is the revolver?
22      MS. NEWMAN:  The loan agreement is
23  going -- I believe the loan agreement is
24  3?
25      THE WITNESS:  The loan agreement is

Page 43

1
2  4.
3      MS. NEWMAN:  Oh, OK.  That's fine.
4  I don't think it matters.
5      MR. HAMERMAN:  Just for clarity,
6  are we re-marking these as Farley 3 and
7  4?
8      MS. NEWMAN:  Yes.
9      MR. HAMERMAN:  That's what we are
10  doing?
11      MS. NEWMAN:  Yes.
12      MR. BAUMSTEIN:  Apparently the loan
13  agreement is Farley 4.
14      Q.   Ms. Farley, you have been handed
15  the loan agreement relating to the revolver,
16  and the first priority pledge and security
17  agreement relating to the revolver.  Have you
18  seen these documents before?
19      A.   Yes.
20      Q.   Let's start with the loan
21  agreement.  Were you involved in negotiating
22  this agreement?
23      A.   Yes.
24      Q.   And who else, who else was involved
25  in those negotiations?

Page 44

1
2      A.   John Peterson, and Joe Ruhlin would
3  provide feedback on some aspects.  He was not
4  directly involved with the conversations for
5  the most part.
6      Q.   And those -- you, Mr. Ruhlin and
7  Mr. Peterson were acting on behalf of ResCap
8  in these negotiations?
9      A.   Correct.
10      Q.   Was there anyone else acting on
11  behalf of ResCap in these negotiations?
12      A.   There were other individuals likely
13  involved and providing feedback on various
14  sections as to which they may have some
15  expertise, but no, no parties come to mind.
16      Q.   OK.
17      A.   Documents such as this are
18  distributed fairly widely.
19      Q.   OK.
20      A.   Sue Bode probably was involved, but
21  I don't have direct recollection of
22  conversations with her.
23      Q.   Who is Sue Bode?
24      A.   Finance.
25      Q.   Is she still with ResCap?

Page 45

1
2      A.   No.
3      Q.   Do you know where she -- who she
4  works for now?
5      A.   I think that several years ago, she
6  left to go to Marquette, but I could be
7  wrong, and I'm not sure if she is still
8  there.
9      Q.   Who negotiated the loan agreement
10  on behalf of Ally?
11      A.   Laura Hall.  She had an associate
12  working with her out of the New York office
13  whose name I do not recall.  And Mary
14  Fontaine, Mary Fontaine from Mayer Brown.
15  The associate was working out of the New York
16  Mayer Brown office.
17      Mary -- I'm sorry.  Laura and Corey
18  Pinkston were negotiating, and they may have
19  had a junior analyst or they may not have.  I
20  don't recall.
21      Q.   What was Ally's focus in these
22  negotiations?
23      MR. ENGELHARDT:  Objection to form.
24      MR. BROWN:  Objection to form.
25      A.   Ally largely wanted to be secured

Page 46

1
2  by as many assets as was feasible, and Ally
3  also wanted a great deal of control over the
4  business and the operations of ResCap.
5      Q.   OK. So just to be clear, you are
6  talking about security. So turning to the
7  secured -- the pledge and security agreement,
8  were these -- these negotiations that you
9  told me about, did they relate to that
10  agreement as well?
11     A.   Yes. The revolver really happened
12  first. The PSA happened towards the closing,
13  if you will -- the end of the revolver
14  negotiations in terms of timing.
15     Q.   OK, OK. And it would be the same
16  people who you told me --
17     A.   Yes.
18     Q.   -- participated in the
19  negotiations --
20     A.   Yes.
21     Q.   -- were involved in negotiations
22  relating to the security?
23     A.   Yes.
24     Q.   What was ResCap's response to
25  Ally's desire to be secured by as many assets

Page 47

1
2  as possible?
3          MR. HAMERMAN:  Objection to form.
4      A.   ResCap largely appreciated Ally's
5  need to have their lines secured, but ResCap
6  also wanted to retain the flexibility in its
7  business management so that it could make
8  intelligent and efficient business decisions
9  relating to collateral to continue to fund
10  its operations. We obviously were trying to
11  protect the collateral to the extent we
12  could, so that it would be available for
13  future use should that be necessary, as we
14  all expected it would be.
15         We were trying to make the facility
16  operationally workable. This is a very, very
17  complicated facility, and it was a very
18  difficult facility, you know, to manage, both
19  to set up operationally and from a business
20  perspective with all of the business
21  restrictions here.
22         So we were continuing to try to
23  ease what was going to be a very significant
24  burden on the company to comply with this.
25     Q.   And what was the ultimate solution

Page 48

1
2  or resolution -- strike that.
3          What was the ultimate agreement
4  with respect to the scope of the collateral
5  that was granted to Ally in connection with
6  the revolver?
7          MR. ENGELHARDT:  Objection to form
8  and to the extent it calls for a legal
9  conclusion.
10         MR. HAMERMAN:  I join in the
11  objection.
12     Q.   You can go ahead and answer.
13         MR. ENGELHARDT:  You can answer.
14     A.   There were two sets of collateral
15  associated ultimately with the revolver. One
16  was designated as primary collateral. That
17  was collateral as to which a lien was given.
18  It was listed initially on an exhibit to the
19  pledge and security agreement. It was the
20  collateral that became the source of the
21  borrowing base.
22         The value of that collateral came
23  into play to determine the commitment amounts
24  and, you know, whether the loan amounts were
25  adequately collateralized. That primary

Page 49

1
2  collateral was the collateral that was
3  subject to the terms of the revolver relating
4  to everything from requirements associated
5  with collateral disposition to the cash
6  flows.
7          There was a second group of
8  collateral that was subject to what we refer
9  to as the blanket lien. That was collateral
10  that was not primary collateral, but
11  collateral which was -- which grantors,
12  parties to the pledge and security agreement
13  gave a security interest. It wasn't excluded
14  collateral. And over time, primary
15  collateral would change, and that would be
16  reflected on the borrowing base.
17         Over time, the blanket lien also --
18  that collateral also changed as assets as to
19  which an interest was granted, liens were
20  released with respect to that collateral, and
21  you had new assets being originated, coming
22  in, that if it was subject to the grant, it
23  would become new blanket lien collateral, and
24  then of course you had the "excluded assets"
25  definition, which at times that changed, as

13  (Pages 46 to 49)

Page 50

```
1
2    collateral subject to the excluded assets
3    could change as well.
4        Q.   OK.
5        A.   It was a complicated concept.
6        Q.   Just one second, please.
7            So you just identified, I think,
8    three categories of assets: the primary
9    collateral, the blanket lien and the excluded
10   assets.  Were there any other -- were there
11   any assets of ResCap that did not fall into
12   one of those three categories?
13           MR. ENGELHARDT:  Objection to form
14   and object to the extent it calls for a
15   legal conclusion.
16           MR. HAMERMAN:  Join in the
17   objection.
18       A.   Yes.  To the extent that there was
19   collateral that a security interest had not
20   been granted in that collateral under the
21   pledge and security agreement, and it was not
22   covered under the definition of "excluded
23   assets," those assets were not subject to the
24   blanket lien.
25           So that would be another category
```

Page 51

```
1
2    of assets that's not definitionally --
3    doesn't have a sound bite definition.
4        Q.   OK.  And can you give me an example
5    of an asset like that?
6        A.   The South American and Central
7    American assets.
8        Q.   OK.  So was that -- is that because
9    the South American and Central American
10   entities who owned those South American and
11   Central American assets were not obligors or
12   guarantors under the revolver agreement?
13           MR. ENGELHARDT:  Objection to form
14   and objection to the extent it calls for
15   a legal conclusion.
16           MR. HAMERMAN:  Same.
17       A.   To the extent that any party,
18   including some of the South and Central
19   American parties, were not parties to the
20   pledge and security agreement and providing
21   an assignment of a specific asset, that asset
22   would not be covered.
23       Q.   OK.
24       A.   And so the South and Central
25   American assets were not parties to this
```

Page 52

```
1
2    agreement who gave a security interest in the
3    assets they owned.
4        Q.   OK.  Understood.
5            Let me clarify my question.  Are
6    there assets owned by entity -- by ResCap
7    entities who were obligors, guarantors or
8    pledgors under the revolver agreement or
9    pledge and security agreement that do not
10   fall into the three categories of assets that
11   you identified, which are primary collateral,
12   assets subject to the blanket lien, or
13   excluded assets?
14           MR. ENGELHARDT:  Objection to form
15   and to the extent it calls for a legal
16   conclusion.
17           MR. HAMERMAN:  I join in that
18   objection.
19       A.   It's possible.
20       Q.   OK, it's possible.  And how would
21   that -- what would the circumstances be that
22   would make that possible?
23       A.   If you had a party giving a
24   security interest, for example, a FAS-B
25   grantor, or whatever that term is, they would
```

Page 53

```
1
2    have just provided a security interest under
3    the document in those specific assets.  There
4    are three different provisions here where
5    grantors are given an interest in specific
6    assets, specific delineated assets.
7            If that entity happened to own
8    assets beyond the assets which it gave the
9    interest in, that would be a circumstance in
10   which you would have an asset that a grantor
11   owned that would fall outside the blanket
12   lien.
13       Q.   Understood, thank you.
14           Can you turn to page 7 of the
15   pledge and security agreement, please.  I'm
16   going to ask the same question that I just
17   asked with respect to guarantors, borrowers
18   and pledgors in connection with the revolver
19   with respect to only the entities listed in
20   the title to Section 2.  So that's borrowers,
21   guarantors and model home.
22           MR. ENGELHARDT:  Objection to form.
23   I don't understand it.
24           MR. HAMERMAN:  I don't understand
25   the question.
```

14 (Pages 50 to 53)

Page 54

1
2       MS. NEWMAN:  Let me see if the
3   witness does.
4       MR. ENGELHARDT:  There is not a
5   question on the record.
6       MS. NEWMAN:  I said I'm going to
7   ask the same question with respect to --
8   that I asked, but now I'm limiting it
9   with respect to these three entities.
10      MR. ENGELHARDT:  Can you get on the
11  record what that question is so we have
12  clarity first?
13      MS. NEWMAN:  I will, but first I
14  want to ask the witness another question.
15      Q.   Which is, Ms. Farley, do you
16  understand what it is that I am trying to get
17  at with the question that I just attempted to
18  ask that your counsel is objecting to?
19      A.   I'm not entirely sure.
20      Q.   OK.
21      A.   I would like a chance to look at
22  this.
23      Q.   Sure.
24      A.   And then if you could restate the
25  question, that would be great.

Page 55

1
2       Q.   Sure.  Why don't you let me know
3   when you're ready.
4       A.   OK.
5       Q.   So my question is, could there be
6   assets owned by the borrowers, guarantors or
7   model home referenced in Section 2 that we
8   are looking at, that are not -- that do not
9   fall within one of the three categories that
10  you listed for me or that you identified for
11  me, which are primary collateral, collateral
12  subject to the blanket lien or excluded
13  assets?
14      MR. ENGELHARDT:  Objection to form
15      and to the extent it calls for a legal
16      conclusion.
17      You can answer.
18      MR. HAMERMAN:  Join in the
19      objection.
20      Q.   Getting the hang of it?
21      A.   Starting to.
22      Yes, I think there are assets that
23  could be in that fourth category.
24      Q.   OK.  And could you explain to me
25  what those assets would be?

Page 56

1
2       A.   I can't think of any specific
3   examples, but it would be assets owned by one
4   of the borrowers or guarantors or model home,
5   I guess, that don't fit within one of these
6   delineated categories.
7       Q.   OK.  But sitting here today and
8   having just looked at, reading through the
9   definition, you can't think of an example of
10  what that asset might be; is that correct?
11      A.   Correct.
12      MR. ENGELHARDT:  Objection.
13      Q.   Can you turn please to page 9.  And
14  where it says in U, "to the extent not
15  included in the foregoing, all other personal
16  assets and property of any kind or
17  description, together with all books,
18  records, writings, databases, information and
19  other property relating to, used or useful in
20  connection with, or evidencing, embodying,
21  incorporating or referring to any of the
22  foregoing, all claims and/or insurance
23  proceeds arising out of the loss,
24  nonconformity or any interference with the
25  use of or any defect or infringement of

Page 57

1
2   rights in or damage to any of the foregoing,
3   and all proceeds, products, offspring, rents,
4   issues, profits and returns of and from, and
5   all distributions on rights arising out
6   of any of the foregoing, provided that
7   notwithstanding the foregoing, the collateral
8   described in this Section 2 shall not include
9   excluded assets."
10      I'm asking, can you think of any
11  asset that -- other than excluded assets,
12  that wouldn't be covered by this language?
13      MR. ENGELHARDT:  Objection to form
14      to the extent it calls for a legal
15      conclusion and asked and answered.
16      MR. HAMERMAN:  I join in the
17      objection.
18      A.   This was a very broad grant, but I
19  do not know of any specific example.  I
20  cannot speak to whether legally every asset
21  had been described here.  I think it is
22  possible there are assets that didn't fit
23  within one of these categories that was owned
24  by the borrower, the grantor or model home
25  that wouldn't be covered, that also would not

Page 58

1
2  fit within the definition of "excluded
3  assets."
4      Q.   OK.  But again, you can't think of
5  an example?
6          MR. ENGELHARDT: Objection.
7      A.   I cannot think of an example.
8      Q.   OK.  How was it determined what
9  assets would be defined as excluded assets
10 under the pledge and security agreement that
11 we are looking at?
12     A.   At the time of the creation of the
13 agreement -- and as we said, there was a
14 delineation of the assets which were
15 included.  In the delineation of these assets
16 as defined, we realized that there were
17 assets that basically if they were to be
18 pledged, it would create some significant
19 issues with respect to those assets or the
20 business of ResCap at that time.  And it was
21 not in anyone's interest to basically
22 eliminate assets or to create those
23 significant economic problems.
24     Q.   Were you involved in discussions
25 with Ally about the scope --

Page 59

1
2      A.   Yes.
3      Q.   Let me finish my question.  About
4  the scope of the excluded assets?
5      A.   Yes.
6      Q.   Were there any discussions that --
7  with Ally in which it was discussed that
8  excluded assets would include assets other
9  than those which would cause significant
10 issues for the company if the company pledged
11 those assets?
12         MR. ENGELHARDT: Objection to form.
13         MR. HAMERMAN: Objection to form.
14     Q.   To Ally?
15         MR. ENGELHARDT: Objection to form.
16         MR. HAMERMAN: Objection.
17     A.   The "excluded asset" definition was
18 heavily discussed.
19     Q.   OK.
20     A.   And it was, you know -- it was
21 added in a way to over time, over the time of
22 the negotiations, as ResCap and Ally started
23 to understand what assets there were, that it
24 would be -- that needed to be included in
25 this "excluded asset" definition.

Page 60

1
2          And it was also understood that we
3  might not be able to identify all of those
4  assets at that time.  This was happening
5  very, very quickly.  And so there was -- we
6  tried to create a little bit of more general
7  language to catch things where if something
8  were discovered after the closing, that
9  basically the asset would lose value or we
10 would lose a line or there was a prohibition,
11 that that asset would fit within one of the
12 definitions.
13     Q.   OK.  Are you done with your answer?
14     A.   I think so.
15     Q.   OK, let me try to unpack that a
16 little bit.
17         You said, I'm going to paraphrase a
18 little bit here, that there was an
19 understanding that you might not be able to
20 identify all of those assets, and that's
21 actually -- that's a direct quote.  So when
22 you were referring to identifying those
23 assets, were you talking about assets that
24 would lose value if they were pledged to Ally
25 or that might cause ResCap to lose funding or

Page 61

1
2  for which there might be a prohibition on
3  pledging to Ally?
4          MR. ENGELHARDT: Objection to form.
5          MR. HAMERMAN: I join in the
6  objection.
7      A.   Yes.  And those are my terms, of
8  course, you know, in looking at the general
9  types of assets that we were including under
10 the "excluded asset" definition.  We were
11 trying to identify specific assets, but we
12 knew we didn't necessarily know the universe
13 or certainly have the time to uncover things.
14     Q.   Understood.
15         My question is, other than those
16 considerations, the potential loss of value,
17 loss of funding or prohibition on pledging
18 assets to Ally, were there any other
19 considerations that would have led to an
20 asset falling -- would have led to the
21 parties determining that an asset should be
22 deemed an excluded asset?
23         MR. ENGELHARDT: Objection to form.
24         MR. HAMERMAN: Join in the
25 objection.

TSG Reporting - Worldwide      877-702-9580

Page 62

1
2       A.   The excluded asset category is
3  generally a category that removes assets from
4  the grant which was otherwise given, right?
5  And I think as we have already said before,
6  once -- if an asset wasn't included in that
7  grant to start with, the "excluded asset"
8  definition really wouldn't apply to assets
9  not included in that grant.
10      The "excluded asset" definition
11 itself -- I'm sorry, I forgot the train of
12 thought. Could you --
13      Q.   My question was, you named three
14 considerations that the parties discussed in
15 trying to formulate the definition of
16 "excluded assets," and that those are loss of
17 value, loss of funding or prohibition on
18 pledging.
19      A.   Those are --
20      Q.   Correct?
21      MR. ENGELHARDT:  Objection to form.
22      MR. HAMERMAN:  Objection.
23      A.   Those are generally the -- those
24 are generally the rationale that parties were
25 OK with including them in the excluded

Page 63

1
2  assets.
3      Q.   Right.
4      A.   I might have missed something that
5  was in Ally or John's mind, but my
6  recollection, those really were the reasons.
7      Q.   And my question is, essentially,
8  were there any other reasons that you can
9  think of that would have led an asset to
10 be -- to fall within this "excluded asset"
11 definition?
12      MR. ENGELHARDT:  Objection to form.
13      MR. HAMERMAN:  Objection.
14      A.   I can't think of any more at this
15 time.
16      Q.   You also said something like you
17 tried -- the parties tried to give themselves
18 some flexibility based on the understanding
19 that they probably were not going to be able
20 to identify all of the assets that could
21 potentially lead to loss of value, loss of
22 funding or prohibition on pledging. Can you
23 point me to the language in the definition of
24 "excluded assets" that provides that
25 flexibility?

Page 64

1
2      MR. ENGELHARDT:  Objection to
3  form --
4      MR. HAMERMAN:  Objection.
5      MR. ENGELHARDT:  -- and to the
6  extent it calls for a legal conclusion.
7      Q.   If you know.
8      A.   Yeah. The way this came about was
9  we at ResCap identified some of the assets
10 that had challenges, right, like the Ginnie
11 Mae, for example, or the bilat facilities,
12 where there were clear prohibitions and
13 certainly consequences if those prohibitions
14 had been violated.
15      As I recall -- and this may not be
16 entirely accurate, but Ally would have liked
17 to have seen a listing of exact assets that
18 were removed. We could not do that. We were
19 not comfortable doing that.
20      And so when you look in the
21 "excluded asset" definition, you look at A,
22 "specific goods securing purchase money
23 indebtedness or capital lease obligations
24 existing as of the closing date," that's a
25 general description of a category. It's not

Page 65

1
2  specific assets that fall within that.
3      Tax.
4      You know the -- in B, you have got
5  voting capital stock, you know, and there is
6  "including without limitation."
7      In C, again, it's "any asset
8  including." So that's what I mean by
9  "general language." It was an asset category
10 that was described as opposed to the specific
11 assets.
12      Q.   Understood.
13      You mentioned that -- you said we
14 identified some of the assets that had
15 challenges, and you gave as an example the
16 bilateral facilities. Can you explain to me
17 what the challenges were on pledging assets
18 that were pledged under bilateral facilities
19 to Ally?
20      MR. ENGELHARDT:  Objection to form.
21      A.   As I recall, the bilateral
22 facilities generally -- and one would have to
23 look at each of the bilateral facilities
24 specifically, prohibited the granting of
25 additional liens on the assets which secured

Page 66

1
2  those facilities.
3      Q.   And what was Ally's response when
4  ResCap notified it that the pledges -- excuse
5  me, that the assets that were pledged to the
6  bilateral facilities might not be able to be
7  pledged to Ally?
8          MR. ENGELHARDT:  Objection to form.
9          MR. HAMERMAN:  I join in the
10 objection.
11     A.   They clearly weren't happy.  There
12 was a provision put into -- or I recall there
13 was a provision put into the revolver of 2008
14 which required us to use reasonable efforts
15 to go to the various bilateral counterparts
16 and see if we could get that restriction
17 lifted.  And we did do that over the course
18 of, you know, the required time frames, and
19 that was a direct response by Ally.
20     Q.   Can you please turn in the loan
21 agreement to page 24, and read Section Q
22 that's listed there, and that's in the --
23 that's in covenants.  The heading of that
24 section, the section that Q is in, is on
25 page 21, just for your reference, if you want

Page 67

1
2  to take a look.
3      A.   OK.
4      Q.   Is this the provision -- actually,
5  let me point you to the language that I'm
6  focused on, which is, it says -- the heading
7  is "Structuring for Eligible Collateral
8  Acquisition, Excluded Assets, non-UCC
9  Assets," and then it goes on to say, "Such
10 obligor will use commercially reasonable
11 efforts to," and I'm skipping now to two,
12 (ii).  Do you see that?
13     A.   Um-hm.
14     Q.   That says, "cause any excluded
15 assets, other than assets that were excluded
16 assets pursuant to Clauses B, C, D, F or G of
17 the definition thereof on the closing date,
18 to become eligible for inclusion in the
19 collateral."
20          Was there discussion with Ally on
21 including the bilateral facilities in this
22 provision?
23          MR. ENGELHARDT:  Objection to form.
24     A.   There was discussion with Ally
25 about approaching the bilateral counterparts

Page 68

1
2  to allow for a second or third or fourth, as
3  the case may be, lien on the assets in their
4  bilateral facilities, and that was done.
5      Q.   OK.  And what were the lenders to
6  the bilat- -- what was the response of the
7  lenders to the bilateral facilities to that
8  request?
9          MR. ENGELHARDT:  Objection to form.
10     A.   "No."
11     Q.   OK.  And that was in advance of the
12 execution -- those conversations took place
13 in advance of the execution of the revolver?
14     A.   No.
15     Q.   No?
16     A.   They did not.
17     Q.   When did they take place?
18     A.   They took place over the, probably,
19 you know, three- to four-month period after
20 the close of the revolver.  We had discussed
21 the time frames around that approach with
22 Ally at the time the revolver was executed.
23     Q.   OK.  And you said then that you
24 thought that there might have been something
25 that related to this put into the amendment.

Page 69

1
2      A.   No.
3          MR. ENGELHARDT:  Objection to form.
4      A.   Sorry, no.  I don't.
5          I should also add that there may
6  have been conversations with the bilats at
7  the time of the bond restructuring and
8  closing by some of the other individuals
9  within treasury working with those bilats as
10 to allowing, and I don't think those were
11 successful.
12     Q.   OK.
13     A.   But that is a shadowy recollection.
14     Q.   OK.  And when you say "allowing,"
15 you mean allowing a secondary or tertiary
16 interest in the --
17     A.   A second interest.
18     Q.   A secondary interest in the assets
19 securing the bilateral facilities; is that
20 correct?
21     A.   I mean liens behind the liens that
22 they had -- that the bilateral facilities
23 had.
24     Q.   Understood.
25          I think you did say something, and

Page 70

1
2  I'll draw an objection, and you can correct
3  me if I am incorrect, but I thought you said
4  something about talking to Ally about trying
5  to terminate the bilateral facilities.  Did
6  you say something like that?  No?
7        MR. ENGELHARDT:  Objection to form.
8    A.  No.
9    Q.  All of it was about setting the
10  secondary -- trying to get the secondary
11  interest; is that correct?
12        MR. ENGELHARDT:  Objection,
13    objection to form.
14        MR. HAMERMAN:  Objection to form.
15    A.  The conversations with Ally related
16  to being able to put liens behind the liens
17  they had.  We all understood that the
18  bilateral facilities were critical to the
19  ongoing survival of ResCap, and that assets
20  would be added to those, we would probably
21  have new lines in place.
22        They had an interest obviously in
23  insuring -- in, in encouraging those
24  bilateral counterparts to allow for liens
25  behind it.  But obviously, we were not in the

Page 71

1
2  driver's seat, Ally was not in the driver's
3  seat.  The party providing the money under
4  those bilats made that determination.
5    Q.  If there had not been a restriction
6  under the bilateral facility to providing a
7  security interest to Ally in the assets
8  securing the bilateral facility, would ResCap
9  have granted the security interest to Ally?
10        MR. ENGELHARDT:  Objection to
11    form --
12        MR. HAMERMAN:  Objection.
13        MR. ENGELHARDT:  -- and to the
14    extent it calls for a legal conclusion.
15    A.  To the extent that the assets on
16  the bilats fit within the grant of the assets
17  provided by the grantors, the answer would be
18  yes.
19        MS. NEWMAN:  We are just about to
20    run out of tape.  Why don't we take a
21    break, and then we can reconvene.
22        THE VIDEOGRAPHER:  That is the end
23    of tape number 1.  The time is now
24    11:07 a.m.  We are now off the record.
25        (Recess)

Page 72

1
2        THE VIDEOGRAPHER:  This is the
3    start of tape number 2.  The time is now
4    11:20 a.m.  We are now back on the
5    record.
6        (Exhibit 5, document Bates stamped
7    Note Trustee 0000001 through 139 marked
8    for identification, as of this date.)
9  BY MS. NEWMAN:
10    Q.  OK. Ms. Farley, you have just been
11  handed what has been marked as Farley
12  Exhibit 5.  Have you seen this document
13  before?
14    A.  Yes, I have.
15    Q.  And can you identify it for the
16  record for me, please.
17    A.  This appears to be the offering
18  memorandum relating to the bond exchange from
19  May of 2008.
20    Q.  OK.  Do you know who drafted this
21  document?
22    A.  I think the lawyers associated
23  probably with Ally, ResCap and the
24  bondholders drafted it.
25    Q.  Did you review it while it was

Page 73

1
2  being prepared?
3    A.  No.
4    Q.  Did you have any role in its
5  preparation at all?
6    A.  No.
7    Q.  Have you read it?
8    A.  It was the first thing handed to me
9  when I walked in the door as a consultant.
10  So I read it at that time.
11    Q.  Are you aware of any statements
12  that are not correct in the offering
13  memorandum?
14        MR. ENGELHARDT:  Objection to form.
15        MR. HAMERMAN:  Objection.
16    A.  I've not read it since May of 2008,
17  except perhaps for individual sections to
18  refer to as we were operationalizing.  So
19  while I'm not aware of anything, I cannot
20  answer yes or no.
21    Q.  Well, you are not aware of any, but
22  I guess you're saying you can't say
23  definitively --
24    A.  I can't say definitively.
25    Q.  -- whether there are or there are

Page 74

1
2    not; is that correct?
3          MR. ENGELHARDT:  Objection to form.
4      A.   I cannot say definitively.
5      Q.   Can you please turn to page 2,
6    which is about this far back (indicating).
7    I'm looking at the first bullet and the last
8    sentence of the language in that bullet,
9    which is discussing the notes that would be
10   issued in connection with the exchange offer,
11   and it says, "The new notes would be secured
12   by a second or third priority lien on the
13   assets that would secure the proposed senior
14   secured credit facility with GMAC."
15         Is that a correct statement?
16         MR. ENGELHARDT:  Objection to form
17     and to the extent it calls for a legal
18     conclusion.
19         MR. HAMERMAN:  I join in that
20     objection.
21     A.   Yes, I think that's a correct
22   statement.
23     Q.   Was the collateral that was granted
24   to the JSNs identical in scope with the
25   collateral that was granted to AFI in

Page 75

1
2    connection with the revolver agreement?
3          MR. ENGELHARDT:  Objection to the
4      extent it calls for a legal conclusion.
5          MR. HAMERMAN:  Same objection.
6      A.   That is my understanding.
7      Q.   Are there any exceptions to that?
8          MR. ENGELHARDT:  Objection to the
9      extent it calls for a legal conclusion.
10         MR. HAMERMAN:  Same.
11     A.   No.  Not to my knowledge.
12     Q.   And did that remain true throughout
13   the life of the revolver?
14         MR. ENGELHARDT:  Objection to the
15     extent it calls for a legal conclusion.
16         MR. HAMERMAN:  I join in the
17     objection.
18     A.   Yes.  Our understanding was that
19   the JSNs had a second and third interest in
20   the collateral as to which Ally had a first
21   security interest.
22     Q.   Also on page 2 of the offering
23   memorandum, in this second bullet, is a
24   statement relating to the revolver.  And I am
25   reading the last sentence of this paragraph,

Page 76

1
2    which says, "Such facility," referring to the
3    revolver, "would be secured by a
4    first-priority lien, and substantially all of
5    our existing and after-acquired unencumbered
6    assets remaining available to be pledged as
7    collateral, as more fully described under
8    collateral for the proposed senior secured
9    credit facility and the new notes."
10         Is the language that appears before
11   the comma, which says, "Such facility would
12   be secured by a first-priority lien, and
13   substantially all of our existing and
14   after-acquired unencumbered assets remaining
15   available to be pledged as collateral," is
16   that consistent with your understanding of
17   the collateral that was pledged to AFI in
18   connection with the revolver?
19         MR. ENGELHARDT:  Objection to form.
20         MR. HAMERMAN:  Objection to form
21     and to the extent it calls for a legal
22     conclusion.
23     A.   There is no question that the grant
24   was a very broad grant.  And while it didn't
25   cover everything, it covered an awful lot.

Page 77

1
2    And so I think that is consistent with this
3    statement.
4          MS. NEWMAN:  Can we mark this as 6,
5      please.
6          (Exhibit 6, document Bates stamped
7      RCUCCJSN10831851 through 876 marked for
8      identification, as of this date.)
9      Q.   All set?
10     A.   A lot of e-mails here.
11     Q.   Yes.
12     A.   Not quite.
13     Q.   Take your time.
14     A.   OK.
15     Q.   Can you turn back, please, to the
16   page that ends with 1874.  It's, let's see,
17   three pages from the end.
18         Actually, before we do that, I want
19   to ask, do you remember sending and receiving
20   the e-mails that are reflected in this
21   exhibit?
22         MR. ENGELHARDT:  Objection to form.
23         You can answer.
24     A.   I don't.
25     Q.   Do you have any reason to believe

Page 78

1
2    that you -- let me make sure you're on the
3    top one. I think you may not be on...
4        Who is Terry@redrocklake?
5        A.    That's a home e-mail address for
6    myself.
7        Q.    So it looks like the last e-mail
8    that you appear on is on the page that ends
9    with 1856. Do you see that?
10        A.    I see on 1857 -- oh, there I am.
11    Yes, I see that.
12        Q.    Do you have any reason to believe
13    that you did not send and receive the e-mails
14    that -- the bottom e-mail that appears on
15    1856 and those that appear below it in this
16    exhibit?
17        A.    I have no reason to believe.
18        Q.    OK. Now, can you please go back to
19    the page that ends in 1874.
20        Who is Matthew Rosen?
21        A.    Matt Rosen, I believe he is an
22    analyst in ResCap's capital markets division.
23        Q.    Mr. Rosen, in the bottom e-mail on
24    the page, is sending an e-mail to William
25    Tyson. Who is that?

Page 79

1
2        A.    Bill Tyson is an employee of ResCap
3    in the asset disposition group.
4        Q.    Is he still -- is Mr. Tyson still
5    with ResCap?
6        A.    Yes, he is.
7        Q.    So Mr. Rosen says to Mr. Tyson that
8    "Mark Schaffer was about to send the loan
9    list to Randy Newman per Heather Anderson's
10    direction to bang against the facilities to
11    see which, if any, loans are pledged."
12        Do you know why that exercise that
13    he is describing was being undertaken?
14        MR. ENGELHARDT:  Objection to form.
15        A.    That exercise was undertaken every
16    time there was a sale. The business units
17    selling the assets, in this case it would
18    have been -- looks like charged-off
19    first-lien mortgage loans was sent to
20    treasury. Treasury would then take the list
21    of the assets being sold, and they would
22    compare it to the list of assets within the
23    CFDR to see if CFDR had it marked as being
24    pledged to any facility, and with that
25    knowledge, the pledges -- I am sorry, with

Page 80

1
2    that knowledge, treasury would then go about
3    the lien release process as required, and it
4    would perform all of the operational
5    activities necessary to update the records,
6    the reporting associated with those assets
7    and the facilities.
8        So this is a standard process.
9        Q.    OK. What is this sale? This is a
10    sale of CO first liens; is that correct?
11        MR. ENGELHARDT:  Objection to form.
12        A.    According to the e-mails, the
13    subject line is "CO First Liens," so I would
14    assume that means charged-off first liens.
15        Q.    And would you also assume that this
16    work was being done in connection with a sale
17    of charged-off first liens?
18        A.    Yes.
19        MR. ENGELHARDT:  Objection to form.
20        Q.    And that's based on your
21    understanding of the way in which this
22    business works in the ordinary course; is
23    that correct?
24        A.    That was common practice, yes.
25        Q.    And what does "charged off" mean?

Page 81

1
2        A.    A loan is charged off typically
3    when there is no more value associated with
4    it. A good example would be if it is a
5    second lien defaulted, the value of the
6    property is in -- is not enough to cover even
7    the first lien, let alone the second lien.
8        So the asset then would be charged
9    off. There would be no more work done. It
10    would not be included in the accounting or
11    financial records any longer, because it had
12    zero value.
13        Q.    So how do you sell a lien like
14    that? Or excuse me, a loan like that?
15        A.    You sell it as you would sell
16    defaulted, unsecured credit card charge-offs.
17    There are a few purchasers out there who will
18    take assets like that for 3 to 5 cents on the
19    dollar, and if they get lucky and a borrower
20    will actually make a payment, you know,
21    that's what they are betting on.
22        This is a 2012 e-mail, so they were
23    clearly trying to sell charged-off loans.
24        Q.    Was it ever the case over the
25    course of the time that the CFDR existed that

21 (Pages 78 to 81)

Page 82

1
2 a lien would be -- or excuse me, a loan would
3 be considered charged off and then for some
4 reason or another it would no longer be
5 categorized as charged off, meaning it would
6 be categorized as having value at a later
7 date?
8        MR. ENGELHARDT:  Objection to form.
9        MR. HAMERMAN:  Objection to form.
10    A.   Are you speaking categorized within
11 the financial and accounting records as
12 having value?
13    Q.   I'm referring to categorized in the
14 CFDR.
15        MR. ENGELHARDT:  Same objection.
16        MR. HAMERMAN:  Same objection.
17    A.   Not to my knowledge.
18    Q.   Is there -- would the answer be
19 different if I was asking categorized from --
20 within the financial and accounting records?
21        MR. ENGELHARDT:  Objection to form.
22    A.   No.  If something was changed in
23 the -- or re-added, if you will, to the
24 financial and accounting records, it would
25 show up on the general ledger.  The general

Page 83

1
2 ledger was uploaded to CFDR on a monthly
3 basis, and on a monthly basis, the businesses
4 also -- and there were a number of different
5 businesses -- would upload their entire asset
6 list, and then there was a process to insure
7 that the general ledger and the business
8 asset lists matched.
9        So no.  If it was update -- updated
10 in a ledger, it would be updated in the CFDR.
11    Q.   OK.
12    A.   To my knowledge, charged-off loans
13 did not come back on the books as loans with
14 value.  Possible there were some
15 circumstances, but I can't think of any.
16    Q.   Why don't we take a step back.  I
17 would like to ask how the CFDR worked in the
18 period initially after -- in the period after
19 the revolver was initially entered into to
20 track loans and what the CFDR actually did
21 track.
22        MR. ENGELHARDT:  Objection to form,
23    just because I think there is two
24    questions in there, but --
25    A.   The CFDR was put in place at the

Page 84

1
2 time the revolver was put in place.  This had
3 been, as I mentioned earlier, an initiative
4 that finance had wanted to do for quite some
5 time.  It became important at the time of the
6 revolver, because the revolver, unlike any
7 other facility we had, was based on carry
8 value.  And the various tools and places
9 within the businesses and the other areas
10 that treasury could go for data didn't have
11 carry value in an easy way.  We had to go to
12 the ledger for that.
13        So CFDR was put in place with
14 the -- to basically report on loans,
15 servicing advances.  They were both on
16 initially, and then the other assets relating
17 to the revolver were added very quickly
18 thereafter.
19        On a monthly basis, the business
20 units would upload their asset -- their total
21 asset lists, so we would have -- and there
22 would be a -- you know, the checks and
23 balances that usually took place associated
24 with that.
25        On a monthly basis, the treasury

Page 85

1
2 group would, you know, go through the process
3 with finance of the monthly reporting.  And
4 we would pull down the data from the CFDR,
5 and the financial teams had prepared, these
6 would also pull down the data from the CFDR,
7 and we would come up with an updated
8 borrowing base based on the assets and the
9 values in the CFDR for the assets marked as
10 primary collateral at that time.
11        We would then sit down with
12 finance, and early on it was -- it was
13 myself, Melissa White, who ran the group, the
14 head of the ops groups or head of the ops
15 team within the treasury group, and then a
16 couple of individuals from finance, and we
17 would compare the last month's borrowing base
18 with primary collateral to this month's
19 borrowing base with primary collateral, and
20 we would like to see what the differences
21 are.
22        Over the course of the month,
23 actions happened, of course, with respect to
24 the loans.  Not just, you know, a carry value
25 change perhaps, because UPBs came in,

22 (Pages 82 to 85)

Page 86

1
2  prepayments came in, markets may have
3  changed, because "carry value" was a
4  financial concept, and there was -- there
5  were markings of the loans to the extent
6  required under FAS-B and in the financial
7  practices.
8         But over the course of the month,
9  if there had been a sale of assets, the
10 business units would have uploaded a template
11 with respect to the loans that were being
12 sold. Structured finance and ops within
13 treasury were also aware of that. You know,
14 so we were usually watching for that.
15        But that would have been uploaded.
16 At the time the template was uploaded, CFDR,
17 which is an Oracle database, would have
18 updated the files of all these individual
19 assets with respect to the sale, and CFDR
20 would have marked it as a sale, and we would
21 expect that those assets would have come off
22 for the purposes of the next month report.
23        We also used that information to
24 track where the sales proceeds were going and
25 insure that the proceeds were going to the

Page 87

1
2  appropriate accounts within the appropriate
3  time frames.
4         If there were loans added to the
5  facility, we would identify the loans that
6  were added to the facility. That included
7  the work we needed to do with GMAC and the
8  different groups. We would send -- within
9  the treasury group, we would send a listing
10 off to the business units, so they knew what
11 assets were now subject to the various
12 facilities, that was revolver, but that could
13 also be other funding facilities.
14        And we within treasury would upload
15 a template to indicate and update CFDR as it
16 related to those assets. Those templates
17 basically triggered an automatic update, so
18 that again, any loans which were added to the
19 revolver or another facility would be
20 reflected in the CFDR as of the time the
21 template was uploaded.
22        There was also on a monthly basis a
23 file called a POCO, paid-off/charge-offs. So
24 as loans over the course of the month were
25 paid off or charged off, obviously they were

Page 88

1
2  removed. They had no value for the
3  charge-offs, but payoffs, we had received
4  payment in full, those templates were also
5  uploaded to CFDR, and that would have also
6  gone -- all this would also eventually flow
7  through the ledger as well.
8         And so those assets, again, would
9  be updated within the CFDR as having no
10 value, and they would come off the CFDR at
11 that point.
12        So as we sat down every month to
13 look at the current borrowing base facility
14 as it related to primary collateral, because
15 that's all we were required to report on, we
16 would compare what we reported last month to
17 what we were reporting this month, and we
18 would go through all of the actions that had
19 happened with respect to the assets on the
20 facility to make sure it tied out.
21        So that the numbers at the end --
22 the new numbers, you could look and say this
23 much was POCO and it was these assets, this
24 much was charge-off, this was -- you know, in
25 terms that is POCO. This much was

Page 89

1
2  reinvested, this much was sold.
3         And so every single month we had a
4  tie-out. If for some reason there was --
5  there were some glitches, because, you know,
6  things happen, particularly early on in the
7  development, as a matter of practice, we
8  would discover what the issue was, reconcile
9  it. We would go back to the businesses where
10 we saw the issue and we would resolve it.
11        And so by the time the reports --
12 typically by the time we sat down, the issues
13 had all been identified and resolved. At the
14 time -- if not, at the time we sat down, the
15 issues were identified, and then they were
16 quickly resolved, because obviously we had
17 borrowing base reports that had to go out and
18 had to be correct.
19     Q.  I want to make sure that I
20 understand what assets were listed in the
21 CFDR. So I think you said -- well, let me
22 ask you, loans were reflected in the CFDR; is
23 that correct?
24     A.  Yes.
25     Q.  And servicing advances were also

23 (Pages 86 to 89)

Page 90

1
2    tracked; is that correct?
3        A.    Yes.
4        Q.    What the company refers to as real
5    estate owned was also -- or REO, was also
6    tracked; is that correct?
7        A.    Yes.
8        Q.    OK.  And what is that, REO?
9        A.    REO is -- it is the changing of an
10   asset form, if you will.  REOs are real
11   estate owned.  It is basically when a loan
12   goes into foreclosure, at the time of a
13   foreclosure, the loan is extinguished and you
14   get the property back, typically.
15           So REO is what the loan becomes
16   after it has gone through foreclosure, to the
17   extent it has not been sold to a third party.
18       Q.    OK.  So if I was going -- so when
19   you see "REO" in the CFDR, is it the case
20   that that REO at some point was reflected as
21   a loan in the CFDR?
22       A.    That REO is the property that
23   secured a loan in the CFDR.
24       Q.    So would you see -- if you were
25   tracking, if you went historically and looked

Page 91

1
2    at the REO, as it had been reported in prior
3    months, eventually would you get to a place
4    where it was a loan?
5           MR. ENGELHARDT:  Objection to form.
6        Q.    Where it was reflected as a loan,
7    or would it always be REO?
8        A.    No.  You should be able to go to
9    historical records and find the loan to which
10   that REO related.  And you should be able to
11   find that.
12           Now, please understand, there are
13   businesses of REO, right, buying and selling
14   of REO.  ResCap was not in that business, but
15   it's possible somebody bought some asset at
16   some point.
17       Q.    OK.  So that would be an exception
18   to the general rule --
19       A.    And those were not pledged on as
20   primary collateral on the revolver.
21       Q.    OK.  Other than loans, servicing
22   advances and REO, what other types of assets
23   were tracked in the CFDR?
24       A.    All of the assets on the revolver,
25   and then when the LOC was put in place, all

Page 92

1
2    of those assets were in the CFDR.
3        Q.    The CFDR didn't track cash, did it?
4           MR. ENGELHARDT:  Objection to form.
5        A.    At some point, and I think it was
6    relatively early on, cash in the sale
7    proceeds or restricted accounts was tracked
8    through CFDR.  Other cash accounts were not.
9        Q.    So it's not -- there are -- it's
10   not the case that all assets that were
11   pledged under the revolver were reflected in
12   the CFDR, is it?
13          MR. ENGELHARDT:  Objection to the
14      form and to the extent it calls for a
15      legal conclusion.
16       A.    My understanding, that all of the
17   assets, including the cash that was sale
18   proceeds accounts, so therefore kind of
19   primary collateral, and cash to which Ally
20   was entitled, those were tracked in the CFDR.
21       Q.    And how would that be listed?  How
22   would I locate that if I was looking for cash
23   in the CFDR?
24       A.    I think it's called cash.
25       Q.    OK.  How was it reflected in the

Page 93

1
2    CFDR which facility an asset was pledged to?
3        A.    In the underlying data, there was a
4    code for the facility, be it revolver, be it
5    LOC, be it Lehman, and if it didn't -- was
6    not pledged to a facility, it would be
7    unpledged, and in the reporting that was
8    created to come out of the revolver, by
9    asset, you could go by asset grouping or you
10   could go into the individual asset, and it
11   would show what facility that belonged to.
12   And you could group assets by facility or you
13   could group by assets.
14       Q.    And what did it mean if an asset
15   was categorized as unpledged?
16          MR. ENGELHARDT:  Objection to form.
17       A.    It simply meant that it was not
18   pledged as primary collateral to the revolver
19   or pledged on any other facility.
20       Q.    So does the unpledged category mean
21   that those assets, those assets listed in the
22   unpledged category fell under the blanket
23   lien for the revolver?
24          MR. ENGELHARDT:  Objection to form
25      and to the extent it calls for a legal

Page 94

1
2    conclusion.
3         MR. HAMERMAN:  I join in the
4    objection.
5         A.   No.
6         Q.   Did the assets that were listed as
7    unpledged fall under the blanket revolver?
8         MR. ENGELHARDT:  Objection to form
9    and to the extent it calls for a legal
10   conclusion.
11        MR. HAMERMAN:  Join in the
12   objection.
13        A.   Now I have forgotten the question.
14   Can you restate?
15        Q.   Yes.
16        Did the assets in the unpledged
17   category fall under the blanket lien?
18        MR. ENGELHARDT:  Same objection.
19        Q.   In connection with the revolver?
20        MR. ENGELHARDT:  Same objection.
21        MR. HAMERMAN:  Same.  And I think
22   we also need a time frame.
23        Q.   I am sorry, this whole line of
24   questioning, as I said at the outset, is the
25   period after the execution of the revolver.

Page 95

1
2    But I think that's good to remind you.
3         A.   Can you restate that one more time.
4    I'm sorry.  I'm bouncing.
5         Q.   Sure.
6         Did the assets in the unpledged
7    category fall under the blanket lien?
8         MR. ENGELHARDT:  Repeat the
9    objection.
10        MR. HAMERMAN:  Same.
11        A.   To the extent that those assets
12   were pledged under the pledge and security
13   agreement and weren't excluded assets and
14   weren't subject to a lien release, yes.
15        Q.   OK.  If the assets were subject to
16   a lien release, would that be reflected in
17   the CFDR?
18        A.   To the extent the assets were
19   subject to a lien release, no.
20        Q.   No, it would not be reflected in
21   the CFDR?
22        A.   It would not be reflected as being
23   subject to a lien release from the revolver
24   in the CFDR.
25        Q.   Were assets released from the

Page 96

1
2    revolver -- let me ask you this.  Why were --
3    why would assets be released from the
4    revolver?
5         A.   Assets would be released from the
6    revolver for a sale, and assets would be
7    released from the revolver to go on to
8    another bilateral facility.
9         Q.   Any other reasons?
10        A.   I can't think of one.
11        Q.   OK.  So if an asset was released
12   for a sale, that -- I think you said before,
13   that the sale would be reflected in the CFDR,
14   you would be able -- what I mean by that is
15   you would be able to tell by looking at the
16   CFDR that the asset had been sold; is that
17   correct?
18        A.   That's correct.  That's correct.
19   The asset would no longer be reflected in the
20   CFDR after it had been sold.
21        Q.   OK.  And if an asset had -- if the
22   lien in an asset had been released so that
23   the asset could be pledged to another
24   facility, wouldn't you also be able to tell
25   that by looking at the CFDR?

Page 97

1
2         A.   You would --
3         MR. ENGELHARDT:  Objection to form.
4         MR. HAMERMAN:  Objection.
5         Q.   Well, actually, you know what?
6    Strike that.  Let me restate the question.
7         If the asset -- if AFI's lien in an
8    asset had been released so that the lien
9    could be pledged to another facility,
10   wouldn't you see when looking at the CFDR
11   that the asset was recorded as being pledged
12   to another facility?
13        MR. ENGELHARDT:  Objection to form.
14        MR. HAMERMAN:  Objection.
15        A.   Yes.  The CFDR would have been
16   updated to reflect the new facility.  The
17   historical records, because there is -- there
18   is history kept, would reflect that it had
19   previously been on the revolver.  But you
20   would have to go back into history.
21        Q.   OK.  So if an asset was categorized
22   as unpledged, that meant that it was not
23   pledged to a facility other than the
24   revolver, didn't it?
25        MR. ENGELHARDT:  Objection to form

25 (Pages 94 to 97)

## Page 98

1
2  and to the extent it calls for a legal
3  conclusion.
4      MR. HAMERMAN:  I join in that
5  objection.
6      A.   No.  Any asset that was subject to
7  a facility, including assets which were
8  primary collateral on the revolver, were
9  reflected as belonging -- or not belonging,
10  being financed or subject to that particular
11  facility.  So you would see revolver, LOC,
12  Lehman, GSAP.  If it was unpledged, it simply
13  meant that it was not pledged to a financing
14  facility.
15      Q.   Other than potentially the
16  revolver, correct?
17      MR. ENGELHARDT:  Objection to form
18  and to the extent it calls for a legal
19  conclusion.
20      MR. HAMERMAN:  Join in the
21  objection.
22      A.   "Unpledged" was not synonomous with
23  "blanket lien."  The unpledged assets could
24  be subject to the blanket lien.  They might
25  not be subject to the blanket lien.

## Page 99

1
2      Q.   Right.
3      A.   So --
4      Q.   Understood.  I'm sorry, I didn't
5  mean to cut you off.  But that was the point
6  of my clarification, because you said, you
7  said -- you said if it was unpledged, it
8  simply meant that it was not pledged to a
9  financing facility.  And I think that there
10  is a distinction that you failed to draw,
11  which is except that it may be pledged to the
12  revolver; isn't that correct?
13      MR. ENGELHARDT:  Objection to form
14  and to the extent it calls for a legal
15  conclusion.
16      MR. HAMERMAN:  Join in the
17  objection.
18      A.   We might be talking semantics here.
19      Q.   OK.
20      A.   Because pledged to the revolver is
21  primary collateral.  The blanket lien is also
22  a pledge to the revolver.  So if it was
23  primary collateral, it would have been
24  reflected as being pledged to the revolver.
25  If it was called unpledged, it may or may not

## Page 100

1
2  have been subject to the blanket lien.  That
3  was not captured in CFDR.
4      Q.   And I think we have established
5  that it also meant that it was not pledged to
6  any financing facility other than the
7  revolver, because if it had been, the CFDR
8  would have noted it; isn't that correct?
9      MR. ENGELHARDT:  Objection to form
10  and to the extent it calls for a legal
11  conclusion.
12      MR. HAMERMAN:  Join in the
13  objection.
14      A.   That's correct, but it may or may
15  not have been subject to the lien of the
16  revolver.
17      Q.   OK.  And I think you also said that
18  if it had been sold, that if the asset had
19  been sold, then it wouldn't have been
20  reflected in the CFDR any longer; is that
21  correct?
22      MR. ENGELHARDT:  Objection to form.
23      A.   After the updating of the CFDR, it
24  would have been no longer reflected in the
25  CFDR.

## Page 101

1
2      Q.   OK.  And --
3      A.   Or the ledger.
4      Q.   So I think the only thing that's
5  left is if the asset was unpledged, it was
6  either pledged to no facility or pledged to
7  the -- pledged under the blanket lien; is
8  that correct?
9      MR. ENGELHARDT:  Objection to form
10  and to the extent it calls for a legal
11  conclusion.
12      A.   Not exactly.  It was -- it could
13  have been pledged to no facility, it could
14  have been pledged to the blanket lien, and it
15  could have been no facility and no blanket
16  lien.  Are we saying the same thing?
17      Q.   Yes.  I understand what you are
18  saying.  It could have been pledged to no
19  facility and not included within the blanket
20  lien, or it could have been included within
21  the blanket lien?
22      MR. ENGELHARDT:  Objection to the
23  extent it calls for a legal conclusion.
24      Q.   Is that correct?
25      A.   Yes.

Page 102

1
2      Q.   And those are really the only two
3  options; isn't that correct?
4          MR. ENGELHARDT:  Objection.
5          MR. HAMERMAN:  Join in the
6  objection.
7      A.   No facility --
8      Q.   Including the blanket lien?
9      A.   Including the blanket lien.
10  Subject to the blanket, subject to the
11  blanket lien.  Let me think.  I think that's
12  right.  I just want to make it clear that
13  just because it was labeled unpledged didn't
14  mean it was subject to the blanket lien.
15      Q.   OK.  I understand that.
16          But you and I had discussed earlier
17  this morning that at least with respect to
18  the borrowers and guarantors listed in
19  Section 2 of the pledge and security
20  agreement relating to the revolver, that you
21  could not think of an example of an asset
22  that wouldn't either be an excluded asset,
23  primary collateral or pledged to the blanket
24  lien.  Do you remember that discussion?
25          MR. ENGELHARDT:  Objection to form.

Page 103

1
2          MR. HAMERMAN:  Objection.
3      A.   I remember the discussion.  I
4  remember saying that I thought it was
5  possible there were assets, but I couldn't
6  think of any asset types.  And that was at
7  the inception of the revolver.
8          But going forward, if liens had
9  been released from the revolver to go on to
10  another bilat and -- the lien release was a
11  broad lien release, and so when the liens --
12  if the bilat terminated or the loan came off
13  the bilateral agreement, that would be an
14  example on a go-forward basis where a loan or
15  an asset would not be subject to the blanket
16  lien because there had already been a release
17  of that asset.
18      Q.   OK.  Let's -- did you have any
19  discussions with Ally about what would
20  happen -- whether -- strike that.
21          Did you have any discussions with
22  Ally about whether a loan that was pledged to
23  a bilateral facility would be subject to the
24  blanket lien or become primary collateral
25  once that bilateral facility terminated or

Page 104

1
2  the lien, the loan was released from the
3  bilateral facility?
4          MR. ENGELHARDT:  Objection to form.
5          MR. BROWN:  Objection to form.
6      A.   I don't recall.
7      Q.   Do you have any understanding of
8  what Ally's expectation was with respect to
9  such loans?
10          MR. ENGELHARDT:  Objection to form.
11          MR. HAMERMAN:  Objection to form.
12      A.   I do not.
13      Q.   OK.  I think you testified earlier
14  that Ally was unhappy when it was told that
15  it could not obtain a lien in the assets
16  pledged to the bilateral facility.  Is that
17  correct?
18      A.   That's correct.
19          MR. BROWN:  Objection to form.
20          MR. HAMERMAN:  Objection.
21      Q.   And that -- and you also told me
22  that the only reason that Ally was not
23  obtaining a lien in those assets was because
24  it was -- because ResCap could not grant such
25  a lien to Ally without putting at risk the

Page 105

1
2  bilateral facility to which that loan was
3  pledged; is that correct?
4          MR. ENGELHARDT:  Objection to form.
5          MR. HAMERMAN:  Objection to form.
6          MR. BROWN:  Objection.
7      A.   Mostly.  I think what I also said
8  was, one, if that asset was of a type that
9  was from -- that the grantor had granted an
10  interest in.
11          And the second point I would make
12  is, just because Ally wasn't happy didn't
13  mean they had or thought they had a legal
14  right to those assets, even after the lien
15  would have been released, unless it was
16  otherwise described in the documents.
17      Q.   OK.  But isn't a loan described in
18  the documents as an asset in which Ally was
19  taking a lien?
20          MR. ENGELHARDT:  Objection to form.
21          MR. HAMERMAN:  Objection.
22      A.   If it was -- if it was owned by one
23  of the grantors and it wasn't otherwise
24  excluded, it had a lien on it, unless and
25  until that lien was released.

27 (Pages 102 to 105)

Page 106

1
2      Q.   OK.  So in the situation where at
3  the inception of the revolver agreement, a
4  lien -- a loan was subject to a bilateral
5  facility, and then that bilateral facility
6  terminated, what happened to the loan that
7  had been subject to the bilateral facility?
8  Did it become part of Ally's collateral?
9      MR. ENGELHARDT:  Objection to form
10     and to the extent it calls for a legal
11     conclusion.
12     MR. HAMERMAN:  I join in the
13     objection.
14     A.   Once a bilateral was terminated, if
15  the assets and loans, as you say, were an
16  asset that was -- an interest was granted in
17  under the security agreement by some of the
18  grantors, if the grantor owned that loan and
19  it had not been released to go on the bilat,
20  if it came off the bilat and fit within the
21  grant, then there was a lien on it.
22      If it had been released to go on
23  the bilat, then there would have been a
24  release of that asset, and that lien release
25  was very broad in perspective.

Page 107

1
2      Q.   Let me ask you something else.
3  Let's go back and look at the pledge and
4  security agreement that we were looking at
5  before.  I think it's 4.
6      MR. ENGELHARDT:  3.
7      Q.   3.  And let's go back to Section 2.
8  And I'm on page 7.  And I'm looking at the
9  language -- well, please read, actually, the
10  paragraph that comes after 2 but before the
11  little A, and then I'm going to focus on some
12  specific language in that paragraph.
13     A.   OK.
14      OK.
15     Q.   So I am focused on the language at
16  the end of the paragraph that says -- well,
17  actually, let me try to put this --
18  selectively quote, so I can get across the
19  question I'm trying to ask.
20      The paragraph begins, "As security
21  for the prompt payment in full in cash and
22  performance of all obligations, each of the
23  borrowers and guarantors and model home and
24  each other grantor (other than a grantor that
25  is an equity pledgor, a FABS grantor or an

Page 108

1
2  additional account pledgor), hereby pledges
3  to the first-priority collateral agent for
4  the benefit of the lender parties and hereby
5  grants a continuing" -- I guess I am just
6  going to read the whole thing -- "and hereby
7  grants a continuing security interest to the
8  first-priority collateral agent for the
9  benefit of the lender parties in all of each
10  such borrower's or guarantor's or model
11  home's or any such grantor's right, title and
12  interest in, to and under," and here is the
13  focus -- the language I was particularly
14  focused on, "whether now or hereafter
15  existing, owned or acquired, and wherever
16  located and howsoever created, arising or
17  evidenced."
18      Was your business understanding of
19  this -- of this language that if a loan was
20  released but then subsequently -- excuse me,
21  let me ask this a little more carefully --
22  that if a loan subject to Ally's security
23  interests was released from that security
24  interest, pledged to another entity, and then
25  the pledge was terminated to the other

Page 109

1
2  entity, that this language is not broad
3  enough to then grant Ally a new lien in that
4  asset?
5      MR. ENGELHARDT:  Objection to form
6     and to the extent it calls for a legal
7     conclusion.
8      MR. HAMERMAN:  I join.
9     A.   To really answer that question, you
10  would have to look at the language in the
11  UCCs and the lien releases that were
12  generally filed.  But our understanding, as
13  those releases were always very broad and
14  forward looking, is that the lien release was
15  good, going forward.  If a loan was released
16  to go on a bilat, that bilat was no longer in
17  existence, the loan would come off the bilat,
18  but the lien would not then reattach.  It had
19  already been released.
20     Q.   OK.  And was that always your
21  understanding since the inception of the
22  revolver?
23     A.   Yes.  We had conversations, I had
24  conversations with our internal and external
25  counsel around --

TSG Reporting - Worldwide    877-702-9580

Page 110

1
2        MR. ENGELHARDT:  Don't, don't,
3    don't state the substance of your
4    conversations with counsel.
5        Q.    And I am going to ask a similar
6    question but with a bit of a twist, which is
7    what about a lien -- a loan that was
8    originally pledged to AFI, that the AFI's
9    lien was released so that the loan could be
10    sold to a third party, and then that loan was
11    subsequently reacquired by one of the
12    guarantors, borrowers, or grantors, as it is
13    defined in this Section 2 here?  Was your
14    understanding -- what was your understanding
15    as to whether -- excuse me, Ally's lien --
16    Ally would have a lien in the asset once it
17    was reacquired by ResCap?
18        MR. ENGELHARDT:  Objection to form.
19        MR. HAMERMAN:  Join in the
20    objection.
21        A.    If the --
22        MR. HAMERMAN:  And to the extent it
23    calls for a legal conclusion.
24        A.    If the loan fit within the grant,
25    which I think you're describing it is fitting

Page 111

1
2    within the grant and not being an excluded
3    asset, that was a new legal ownership, and
4    yes, the lien would reattach to assets that
5    were acquired even if it was a reacquisition.
6        Q.    And the lien that you're talking
7    about that would reattach would be Ally's
8    lien; is that correct?
9        MR. ENGELHARDT:  Objection to form
10    and to the extent it calls for a legal
11    conclusion.
12        MR. HAMERMAN:  Same.
13        A.    It would be Ally and the JSNs'
14    liens, yes.
15        MS. NEWMAN:  Can we just take a
16    five-minute break?
17        MR. ENGELHARDT:  Sure.
18        THE VIDEOGRAPHER:  The time is now
19    12:14 p.m.  We are now off the record.
20        (Recess)
21        THE VIDEOGRAPHER:  This is the
22    start of tape number 3.  The time is now
23    1:12 p.m.  You are now back on the
24    record.
25    BY MS. NEWMAN:

Page 112

1
2        Q.    Ms. Farley, before we broke for
3    lunch, I was asking you a series of questions
4    about whether certain assets would or would
5    not be subject to Ally's lien in connection
6    with the revolver.
7        Now, did you understand when I was
8    asking those questions that I was asking your
9    opinion based on your experience as a
10    business person who was involved in the
11    negotiation of the pledge and security
12    agreement relating to the revolver?
13        A.    Yes.
14        MR. ENGELHARDT:  Objection to form.
15        A.    Yes.
16        Q.    Is that how you answered the
17    questions, based on that understanding?
18        A.    Yes.
19        Q.    Thank you.
20        MS. NEWMAN:  This is going to be 7
21    and 8.
22        (Exhibit 7, document Bates stamped
23    RCUCCJSN 11712385 through 90 marked for
24    identification, as of this date.)
25        (Exhibit 8, document Bates stamped

Page 113

1
2    RCUCCJSN 11864412 through 20 marked for
3    identification, as of this date.)
4        A.    I should clarify that, negotiating
5    and implementing the revolver.
6        Q.    Negotiating and implementing the
7    revolver, I am sorry?
8        A.    How I was answering the questions,
9    someone who was involved with negotiating and
10    implementing the revolver.
11        Q.    Thank you for the clarification.
12        MR. ENGELHARDT:  Counsel, which is
13    which?
14        MS. NEWMAN:  The one with the Bates
15    number ending in 12385 is Farley
16    Exhibit 7.  Bates Number 64412 is Farley
17    Number 8.
18        MR. ENGELHARDT:  Thank you.
19        Q.    Ms. Farley, you have been handed
20    what has been marked as Farley Exhibits 7 and
21    8.  If you could take a minute to familiarize
22    yourself with the e-mail chain.  I will give
23    you time to take a more detailed look if I am
24    going to ask you a specific question.
25        A.    OK.

Page 114

1
2      Q.   All set?
3      A.   I am set.
4      Q.   So I will start with the one that's
5   marked Farley Exhibit 7.  And you are on the
6   e-mail at the top of the first page, and do
7   you remember sending and receiving the
8   e-mails that are reflected in this chain?
9      A.   No.
10     Q.   Do you have any reason to doubt
11  that you did send and receive them as
12  reflected on the page?
13     A.   I have no reason to doubt that.
14     Q.   Or let me -- as reflected on the
15  pages.  Is it the same answer?
16     A.   Same answer.
17     Q.   And with respect to Farley
18  Exhibit 8, which is another e-mail chain, and
19  you are the sender of the e-mail at the top
20  of the chain, do you remember sending and
21  receiving the e-mails that are reflected in
22  this e-mail chain?
23     A.   No.
24     Q.   Do you have any reason to doubt
25  that you did not send and receive them as is

Page 115

1
2   reflected in the e-mails?
3      A.   I have no reason to doubt.
4      Q.   Ms. Farley, at some point in
5   time -- strike that.
6          Did there come a time when ResCap
7   began changing the way assets coded as
8   unpledged in the CFDR were categorized?
9          MR. ENGELHARDT:  Objection to form.
10     A.   The unpledged assets, shortly
11  before the filing, were marked blanket lien
12  if they were subject to the blanket lien, and
13  remained unpledged if they were not subject
14  to the blanket lien.
15     Q.   And who made the -- how -- I
16  apologize, let me take this in pieces.
17         How was the determination of
18  whether an asset categorized as unpledged
19  should be recategorized as blanket lien or
20  should remain unpledged?
21         MR. ENGELHARDT:  Objection to form.
22         You can answer.
23     A.   I was not involved in those
24  conversations or those decisions.  My
25  understanding of the way this worked was that

Page 116

1
2   the people marking the assets generally
3   marked loans as belonging to the blanket lien
4   and servicing advances as belonging to the
5   blanket lien without independent
6   investigation as to whether that was the
7   case.  They would have had to go back into
8   the historical archives.
9          With respect to the other assets,
10  my understanding is there was more of a
11  diligence done with respect to those assets
12  and then they were marked.
13         There was some back and forth, as
14  there were a lot of people involved, to
15  insure the markings were correct, as I recall
16  it.  But ultimately everything was marked in
17  the system.
18     Q.   OK.  And why -- do you have an
19  understanding -- well, strike that.
20         I think you testified that with
21  respect to loans and servicing advances,
22  those were recategorized as blanket without
23  any independent verification; is that
24  correct?
25     A.   That is my understanding.

Page 117

1
2      Q.   And do you have an understanding as
3   to why it was done in that way?
4      A.   No.
5      Q.   Assuming that your understanding is
6   correct?
7      A.   No.
8      Q.   How did you come to gain that
9   understanding?
10     A.   Through conversations with Barb
11  Westman.  I can speculate, but I don't know.
12     Q.   OK.  There was -- is it correct
13  that you are testifying that there was
14  diligence performed around whether assets,
15  other than loans and servicing advances,
16  marked as unpledged should continue to remain
17  marked as unpledged or should be converted to
18  be listed as blanket lien?
19         MR. ENGELHARDT:  Objection to form.
20     A.   That is my understanding.
21     Q.   And did you also gain that
22  understanding from Barb Westman?
23     A.   Yes.
24     Q.   Other than Barb Westman, who was
25  involved in this process?

30 (Pages 114 to 117)

Page 118

1
2      A.   To my knowledge, Joe Ruhlin may
3   have been a bit involved.  Randy Newman may
4   have been a bit involved.  I suspect there
5   were other individuals, largely within
6   finance and treasury, who may or may not have
7   had history with the revolver, involved.
8      Q.   OK.  Can you turn back to Farley 7,
9   please.  Do you have it there right in front
10  of you?
11     A.   I do.
12     Q.   Great.
13          I'm looking at the e-mail at the
14  top, and you say, "Just remember, any U.S.
15  loan that is owned by ResCap family and that
16  is not GNMA" -- does that mean Ginnie Mae?
17     A.   Um-hm.
18     Q.   "And is not pledged to LOC (or any
19  other facility) is subject to the revolver."
20     A.   Um-hm.
21     Q.   "Any loan asset subject to the
22  revolver also is subject to a second lien by
23  the junior bondholders."
24          Are those statements accurate?
25     A.   Please keep in mind that this was a

Page 119

1
2   very complex business -- complex facility.
3   And we communicated to the various business
4   groups, both domestically and
5   internationally, what we needed to
6   communicate to insure that we were accurately
7   able to do what we needed to do with respect
8   to the revolver.
9          We routinely told various business
10  groups -- and there were many of them -- that
11  if it wasn't marked to the revolver, they had
12  to assume it was blanket lien.  So that way
13  they would communicate to us everything that
14  was going and not make assumptions that
15  things didn't need to be released, things
16  didn't need to be reported, that things
17  didn't -- that they were free to do with the
18  collateral what they will, because the
19  experts really were in a very small group
20  that managed the facilities.
21          So we would routinely tell people
22  in the business units in our training, assume
23  blanket lien.  Things are blanket lien unless
24  they are primary or pledged to a facility.
25          So anytime you have a sale of any

Page 120

1
2   sort, you have got to tell us about it.  And
3   then the work as to whether it needed to be
4   released or what the releases were, and I
5   mean it went beyond just the collateral, it
6   went to business obligations as well, that
7   was then determined.
8          So this is a business communication
9   to somebody whom at this point in time I had
10  probably had numerous conversations about the
11  revolver, and I was always try -- continuing
12  to remind him in easy terms that the blanket
13  lien was something that needed to be dealt
14  with.  You couldn't assume that if it wasn't
15  listed to primary, that it was -- and just
16  because it said unpledged, there weren't
17  obligations.
18          So is it true?  No, it's not
19  particularly true.  But is it shorthand we
20  used in our business communications?
21  Absolutely.
22     Q.   Thank you.
23          Ms. Farley, are you aware that the
24  pledge agreement related to the revolver was
25  amended in 2009?

Page 121

1
2      A.   Yes.
3      Q.   And were you involved with that
4   amendment?
5      A.   Yes.
6      Q.   Can you explain to me what your
7   involvement was, please?
8      A.   This was at the time of the
9   amendment and restatement of the revolver,
10  and so I would have reviewed the documents
11  and negotiated the documents, along with
12  other individuals within the firm.  But I
13  would have taken lead.
14     Q.   So I -- is it safe to assume then
15  that you have an understanding of the way in
16  which that pledge and security agreement
17  works and the obligations that it imposes?
18     A.   Yes.
19          (Discussion held off the record)
20          MS. NEWMAN:  Let's go off the
21  record.
22          THE VIDEOGRAPHER:  The time is
23  1:25 p.m.  We are now off the record.
24          (Discussion held off the record)
25          THE VIDEOGRAPHER:  The time is

31 (Pages 118 to 121)

Page 122

1
2      1:26 p.m.  We are now back on the record.
3      Q.  Ms. Farley, I think you mentioned
4  John Peterson earlier.  Can you tell me who
5  Mr. Peterson is?
6      A.   Mr. Peterson was in finance,
7  responsible when I joined for the treasury
8  group within ResCap.  I'm not sure of his
9  official title.  And he actually was the one
10  who hired me.
11      Q.   OK.  Was Mr. Peterson -- did
12  Mr. Peterson have an understanding of the way
13  in which the revolver pledge and security
14  agreement worked?
15          MR. ENGELHARDT:  Objection to form.
16      Q.  To your knowledge?
17      A.  To my knowledge, he did.
18      Q.  Did he understand the way in which
19  the blanket lien worked?
20          MR. ENGELHARDT:  Objection to form.
21      A.  To my knowledge, I would expect so.
22      (Exhibit 9, document Bates stamped
23  RCUCCJSN 10063316 through 328 marked for
24  identification, as of this date.)
25      Q.  Ms. Farley, you have just been

Page 123

1
2  handed what has been marked as Farley
3  Exhibit 9, and you are a recipient of the
4  e-mail -- the second e-mail on the first
5  page.
6          Do you recall receiving that
7  e-mail?
8      A.   No.
9      Q.  Do you have any reason to doubt
10  that you did receive it?
11      A.  I have no reason.
12      Q.  Do you recall having a meeting or a
13  conference call to discuss -- and I'm reading
14  now from the second page of the e-mail --
15  where the subject of the meeting or the call
16  was to begin to understand the revolver and
17  the flow of information needed, impact on
18  asset sales and where the cash goes with the
19  cash-forecasting process?
20      A.  I don't recall this specific
21  meeting.
22      Q.  If you look at the document behind
23  the e-mail, it's in a -- like a meeting
24  summary with an agenda.  Under the agenda
25  section, it says, number 1, "How revolver

Page 124

1
2  works, general categories," and then there is
3  some additional language that I think are
4  referencing documents.  And to the right of
5  that, it says, "Discussed by John Peterson."
6          Do you remember participating in
7  either a call or a meeting where Mr. Peterson
8  discussed this subject?
9          MR. HAMERMAN:  Objection, form.
10          MR. ENGELHARDT:  Objection to form.
11  Any call or meeting at any time?
12          MS. NEWMAN:  Yes.
13      A.  I recall participating in
14  regular -- and this was, I think, the start
15  of weekly meetings -- regular meetings to
16  discuss the revolver business happenings with
17  the business people.  I recall John being on
18  some of those meetings and generally
19  providing an introduction.  I don't recall
20  John going through detail with respect to any
21  of these schedules.
22      Q.  OK.
23          MS. NEWMAN:  Why don't we just go
24      off the record for a second.
25          THE VIDEOGRAPHER:  The time is

Page 125

1
2      1:32 p.m.  We are off the record.
3          (Discussion held off the record.)
4          (Exhibit 10, Adversary Complaint
5      for Declaratory Judgment, Avoidance of
6      Liens and Disallowance of Claims with
7      Schedules 1 through 5 marked for
8      identification, as of this date.)
9          THE VIDEOGRAPHER:  The time is now
10      1:36 p.m.  We are now back on the record.
11  BY MS. NEWMAN:
12      Q.  OK.  So Ms. Farley, you have just
13  been handed what has been marked as Farley
14  Exhibit 10, which is a copy of the complaint
15  that has been filed in this action, along
16  with the schedules to that complaint, but
17  omits the exhibits to the complaint.
18          Have you seen the committee
19  complaint before?  I think I asked you that
20  earlier.  I apologize for repeating, but can
21  you refresh my recollection, please?
22      A.  No.  I may have been handed it
23  during prep, but I don't know this document.
24      Q.  And is the same -- would you give
25  the same answer with respect to the schedules

Page 126

1
2    behind the text of the complaint?
3        A.    No.  I saw the schedules in my
4    prep.
5        Q.    In your prep.  Had you seen them
6    before that time?
7        A.    No.
8        Q.    So I assume you did not see any
9    part of the committee complaint before it was
10   filed?
11       A.    That's correct.
12       Q.    And I think you testified earlier
13   that you have not had any communications with
14   any of the committee members or committee
15   advisors with respect to the committee
16   complaint other than the prep session; is
17   that correct?
18       A.    That's correct.
19       Q.    What about conversations with AFI?
20   Have you had any conversations with anyone at
21   AFI in connection with the committee
22   complaint?
23       A.    No.
24       Q.    OK.  Can you turn to Schedule 1,
25   please.  All set?

Page 127

1
2        A.    Yes.
3        Q.    When was the first time that you
4    saw this schedule?
5        A.    Yesterday.
6        Q.    Do you know how this schedule was
7    prepared?
8        A.    I believe it was prepared by the
9    unsecured creditors committee or their
10   advisors.  This was not prepared by the
11   company.
12       Q.    OK.  Can you tell by looking at it
13   how it was prepared?
14       A.    This looks like it would have come
15   from CFDR information.
16       Q.    OK.  Looking back to the summary
17   page on the first page -- or the first page,
18   underneath the text, there are some numbers
19   that are labeled 1, 2, 3, 4, 5.  And 5 is
20   "BMMZ former bilateral."  Do you know what
21   that means?
22           MR. ENGELHARDT:  Objection to form.
23           MR. HAMERMAN:  Object to the form.
24       A.    I don't know what BMMZ stands for,
25   but my understanding is this was the facility

Page 128

1
2    that took the collateral that came off of the
3    Goldman and Citi lines when they expired.
4        Q.    There is something called a BMMZ
5    repo facility, correct?
6        A.    Correct.
7        Q.    And is that the facility that you
8    are referring to?
9        A.    Yes.
10       Q.    Is that a bilateral facility?
11       A.    I don't know how it was
12   characterized at the time.
13       Q.    Have you ever seen the term "BMMZ
14   former bilateral" before?  Before viewing
15   this yesterday.
16       A.    The complete term, no.
17       Q.    Have you seen some form of that
18   term?
19       A.    BMMZ.
20       Q.    OK.  Have you or anyone at the
21   company done any work to determine whether
22   the loans and other assets listed in this
23   Schedule 1 are loans and assets that were at
24   one time pledged -- or excuse me, were at the
25   inception of the revolver pledged to a

Page 129

1
2    bilateral facility and that were then
3    subsequently released from that bilateral
4    facility at a time prior to the petition
5    date?
6            MR. ENGELHARDT:  Objection to form.
7            MR. HAMERMAN:  Objection to form.
8        A.    I don't know.
9        Q.    You don't know if anyone at the
10   company has done that work?
11       A.    I don't know.
12           (Exhibit 11, spreadsheet marked for
13   identification, as of this date.)
14       Q.    All set?
15       A.    OK.
16       Q.    Ms. Farley, I will represent to you
17   this is an abstract that we took from the
18   CFDR with -- and the only revisions that we
19   made to it was to add the highlighting.
20           Does this look familiar -- is this
21   the format of the CFDR that you are familiar
22   with?
23           MR. ENGELHARDT:  One moment.  Could
24   we have a representation as to the date
25   on which this snapshot was taken?

33 (Pages 126 to 129)

Page 130

1
2       MS. NEWMAN:  I can tell you that it
3   was -- no, actually, because it comes
4   from the debtor information, and so I
5   don't know if that's a live database that
6   was produced, so that -- I mean, I can
7   tell you that it was pulled by us this
8   week.  But I don't know when the debtors
9   pulled it to give it to us.
10      MR. ENGELHARDT:  OK.
11      Q.   This is -- I will also represent to
12  you that this is one of the loans that --
13  that the loan ID here, which is the -- let me
14  ask you a question before I make that
15  representation.
16      In the second column from the
17  right, there is a heading that says "Mortgage
18  Loan Sequence ID."  Do you see that?
19      A.   Yes.
20      Q.   Is that a unique identifier that is
21  given to assets in the CFDR?
22      A.   It is, from my understanding, a
23  unique identifier for groups of assets in the
24  CFDR.  Each asset also has a unique number
25  that can be tracked back.  This is only one

Page 131

1
2   view and one report that can be pulled from
3   that database.
4       Q.   So there would be another number
5   associated with a particular loan; is that
6   correct?
7       A.   That is correct.
8       Q.   OK.  My understanding -- and you
9   are more familiar with this database by far
10  than I am, but my understanding is that this
11  shows the way in which one particular loan
12  was recorded in the CFDR from July 31, 2008,
13  through May 13, 2012.  Can you tell if that
14  understanding is correct?
15      MR. ENGELHARDT:  Objection to form.
16      MR. HAMERMAN:  Objection to form.
17      A.   That appears to be the case.
18      Q.   OK.  So now I'm looking at the
19  "Fund Facility Name" column, which is a
20  little bit more than center towards the right
21  of the page.  Do you see that?  Another of
22  the highlighted rows.
23      What is the -- what does that
24  column show?
25      A.   That shows to which facility the

Page 132

1
2   asset would have been pledged, if any.
3       Q.   And what does "FB" in that first
4   row mean?
5       A.   I am speculating.  So I am thinking
6   that might have been one of the facilities
7   that paid off.  I don't really know.
8       Q.   OK.  This shows, does it not, that
9   the particular loan reflected on this page
10  was either listed as -- was either unpledged
11  or pledged to the revolver throughout the
12  life of the revolver?
13      MR. ENGELHARDT:  Objection to form.
14      MR. HAMERMAN:  Objection.
15      Q.   Is that correct?
16      MR. ENGELHARDT:  And to the extent
17  it calls for a legal conclusion.
18      MR. HAMERMAN:  Objection.
19      A.   To the extent that this report is
20  accurate, which you have represented it is,
21  it does show that.
22      Q.   So can you think of why the
23  committee would have thought -- is there
24  anything -- is there anything reflected on
25  this page suggesting that this loan was

Page 133

1
2   pledged to a bilateral facility at the time
3   that the revolver was executed?
4       MR. ENGELHARDT:  Objection.
5       Q.   You can answer.
6       MR. HAMERMAN:  Objection.
7       A.   FB may relate to a facility.  I do
8   not know.  If it does, then the answer would
9   be yes.
10      Q.   OK.  Is there -- other than that,
11  is there any other indication that this loan
12  was pledged to a bilateral facility?
13      MR. HAMERMAN:  Objection.
14      MR. ENGELHARDT:  Objection.
15      A.   There is no other indication.
16      Q.   Do you know, Ms. Farley, whether
17  there was a bilateral facility that
18  terminated between 7/31/2008 and 8/31/2008?
19      A.   I don't recall.
20      Q.   You don't know.  We are done with
21  that, you can set it aside.
22      Can you please turn to Schedule 6.
23      MR. HAMERMAN:  Was this marked,
24  this chart that we have been talking
25  about?  Has it been marked as an exhibit?

34 (Pages 130 to 133)

Page 134

1
2          MR. ENGELHARDT: 11.
3          MR. HAMERMAN: 11, thank you.
4      Q.   I misrepresented something to you.
5  Can we actually -- I am actually going to ask
6  another question about Farley Exhibit 11.
7          The GMAC revolver notation that is
8  listed under the fund facility name,
9  beginning as of 9/30/2008, what is the --
10 what does that -- what is that intended to
11 convey respecting whether or not this loan is
12 pledged to the revolver?
13         MR. ENGELHARDT: Objection to form.
14     A.   It is intended to convey that this
15 particular asset was pledged as primary
16 collateral to the revolver and thus would be
17 subject to all of the reporting and other
18 provisions within the revolver document.
19     Q.   OK. Thank you.
20         Have you seen Schedule 6 before?
21     A.   I may have seen it in the last two
22 days.
23     Q.   Did you see it prior to that time?
24     A.   No.
25     Q.   Do you know as you sit here today

Page 135

1
2  whether the assets reflected on Schedule 6 --
3  excuse me, strike that.
4          Do you know sitting here today
5  whether the JSNs were granted a lien in the
6  assets reflected on Schedule 6 during the
7  75 days preceding ResCap's bankruptcy filing?
8          MR. ENGELHARDT: Objection to the
9  form and to the extent it calls for a
10 legal conclusion.
11         MR. HAMERMAN: I join in that
12 objection.
13     A.   I am not aware of any new liens
14 granted to the JSNs or to Ally during that
15 period of time. Unless there were new assets
16 which had come into the company which were
17 granted under the PSAs and hadn't been
18 otherwise excluded. Or subject to the lien
19 releases.
20     Q.   Well, if there were new assets
21 coming in, they wouldn't be subject -- I'm
22 just a little confused about something you
23 said. If there were new assets coming in,
24 they wouldn't be subject to the lien releases
25 at that point, would they?

Page 136

1
2          MR. ENGELHARDT: Objection to form
3  and to the extent it calls for a legal
4  conclusion.
5          MR. HAMERMAN: Join in the
6  objection.
7      A.   The only situation I can think of
8  is if there had been a bilat expiring to
9  which there had been a lien release executed
10 to place it onto that bilat.
11     Q.   Understood. Thank you.
12         Do you know whether the assets
13 listed on Schedule 6 were acquired by ResCap
14 during the 75 days preceding the bankruptcy?
15         MR. ENGELHARDT: Objection to form.
16         MR. HAMERMAN: Join in the
17 objection.
18     A.   I do not know.
19     Q.   Would it be reasonable --
20 consistent with ResCap's ordinary course of
21 business that these assets would have been
22 purchased by ResCap during the 75 days
23 preceding the petition date?
24         MR. ENGELHARDT: Objection.
25         MR. HAMERMAN: Join in the

Page 137

1
2  objection.
3      A.   To my knowledge, we were not doing
4  a lot of purchases before the preference
5  date, within that time period.
6      Q.   Not doing a lot of purchases --
7      A.   I don't know as we were doing
8  purchases of mortgage loans. There may have
9  been FHA or VA loans created or modifications
10 done, but we were not purchasing packages of
11 loans during that time.
12     Q.   OK. Can you think of any reason
13 why the committee would think, for example,
14 that ResCap purchased 137 approximately --
15 actually, 138 million HFS loans during the
16 75 days preceding the petition date?
17         MR. ENGELHARDT: Objection.
18         MR. HAMERMAN: Objection.
19         THE WITNESS: I can respond?
20         MR. ENGELHARDT: You can respond.
21     A.   The unpledged assets, whether or
22 not they were subject to the blanket lien,
23 were simply marked as unpledged in the CFDR
24 facility. That was because we had no other
25 obligations with respect to those assets from

35 (Pages 134 to 137)

Page 138

1
2  a reporting standpoint or really a cash
3  management standpoint.
4        Shortly before the filing date, the
5  decision was made, since we were going to
6  have to start reporting on all assets which
7  had been subject to the blanket lien at the
8  time of the filing date, there was an effort
9  undertaken to label all of the assets which
10  were in our view, and based on the processes
11  I described, subject to the blanket lien.
12        And so the CFDR reporting with
13  respect to those assets would have gone from
14  unpledged to, you know, blanket lien, and I
15  speculate that perhaps the unsecured
16  creditors committee may be looking at that
17  change in the facility as moving from
18  unpledged to a pledged status.
19    Q.   Do you know if anyone at ResCap has
20  had conversations about the committee's
21  allegation that new liens were granted to the
22  JSNs in the assets listed on Schedule 6
23  during the 75 days preceding the petition
24  date?
25        MR. HAMERMAN:  Objection to form,

Page 139

1
2        and can you clarify whether you're
3        talking about during prep or when
4        you're -- when these conversations might
5        occur -- might have occurred that you are
6        asking about?
7    Q.   Other than in prep sessions.  Do
8  you remember -- do you recall the question?
9    A.   Could you restate it, please.
10    Q.   Yes.
11        Do you know if anyone at ResCap has
12  had conversations about the committee's
13  allegation that new liens were granted to the
14  JSNs in the assets listed on Schedule 6
15  during the 75 days preceding the petition
16  date, other than conversations that have
17  taken place in preparation for depositions in
18  this matter?
19    A.   I do not know.
20    Q.   You mentioned that although the
21  debtors were not doing a lot of purchasing of
22  loans in the 75 days preceding the petition
23  date, they did do some purchasing of FHA/VA;
24  is that correct?
25    A.   The primary business, as I recall,

Page 140

1
2  in the 75 days, was the continuation of the
3  origination business.  So the loans weren't
4  really being purchased, they were being
5  originated.
6        And there was a relationship
7  between the bank and ResCap where one
8  originated, you know, and one brokered the
9  loans.  And I consider that as part of the
10  origination activity.  So those were done as
11  they had always been done.
12    Q.   OK.
13    A.   Modifications were done as they had
14  been done.  But we were not, to my knowledge,
15  actively going out and looking for pools of
16  loans to purchase.
17    Q.   And the loans, pools of loans would
18  be reflected in the -- is it correct that
19  pools of loans would be reflected in the HFS
20  category?
21        MR. ENGELHARDT:  Objection to form.
22    A.   I believe everything that was a
23  loan as of year ended at the time of filing
24  was designated for accounting purposes as
25  HFS.

Page 141

1
2    Q.   OK.  And what is FHA/VA?
3    A.   FHA/VA is a designation that refers
4  to loans which are eligible for sale because
5  they meet the parameters described by FHA and
6  VA, respectively.
7    Q.   OK.  And what is -- can you explain
8  to me the distinction, I'm not sure I follow
9  it, between HFS and FHA/VA?
10    A.   HFS is an accounting designation
11  which means held for sale, and that
12  designation means you have to do certain
13  things and follow FAS-B pronouncements as it
14  relates to carrying those assets on your
15  books and updating the values for financial
16  purposes.  So HFS revolver here, and I'm
17  speculating, means those loans on the
18  revolver that were in the HFS category.
19        Number 2 would relate to those
20  loans subject to the blanket lien that
21  were -- or they're alleging are removed
22  subject to the blanket lien that were, again,
23  in the HFS accounting category.
24        The 212 -- again, I'm
25  speculating -- are FHA/VA loans that were not

Page 142

1
2  included in 1 or 2.
3     Q.   OK.  And what would be the reason
4  that a loan would be categorized as FHA/VA
5  rather than HFS?
6     A.   FHA/VA typically had an accounting
7  designation of HFS as well, so this, I
8  speculate, just has to do with the breakout
9  of the categories here.
10        The revolver and the blanket lien
11 had a number of different loan types
12 associated with them, including FHA/VA.  So
13 whomever prepared this schedule just decided
14 to break those out in that manner.
15    Q.   Did the CFDR list loans as either
16 HFS or FHA/VA or another designation that I'm
17 not aware of?  Let me try to ask this in a
18 more artful way.
19        Would the CFDR note whether a loan
20 that was one of FHA or HFS or both, would it
21 have a label of either HFS or FHA/VA?
22        MR. ENGELHARDT:  Objection to form.
23        MR. HAMERMAN:  Objection to form.
24    A.   They are different designations.
25 So within CFDR, a loan would have a

Page 143

1
2  designation if it were FHA or VA or if it
3  were a different sort of loan, to be able to
4  bucket those loans appropriately.  The loans
5  should also have a designation of HFS, HFI.
6  There were a couple of other accounting
7  designations used primarily for some of the
8  overseas collateral.  And that would also be
9  assigned on an asset level or on a loan
10 level.
11        So a loan could have both
12 designations.  It would definitely have space
13 for designations of the type that the field
14 required.
15    Q.   I understand, thank you.
16        If these loans -- if you turn to
17 the next page, you can see that each of the
18 loans listed on Schedule 6 have a mortgage
19 loan sequence ID.  Is that a unique
20 identification for an individual loan?
21        MR. HAMERMAN:  Objection to form.
22    A.   I believe that is one of them, yes.
23    Q.   Do you believe or is it consistent
24 with your understanding that ResCap purchased
25 approximately 213 million FHA/VA loans in the

Page 144

1
2  75 days preceding the bankruptcy filing?
3        MR. ENGELHARDT:  Objection to form.
4        MR. HAMERMAN:  Objection to form.
5     A.   Again, not purchase.  Originate, as
6  I kind of defined that within the family,
7  including the relationship with the bank.
8  Those numbers do not seem out of line to me
9  with origination activity.
10    Q.   How does originating work?  Can you
11 walk me through the process of how ResCap
12 would originate a loan?
13    A.   OK.
14        MR. HAMERMAN:  Objection to form.
15    A.   The way the origination process
16 worked, which was only one of the channels
17 within ResCap over the years to access
18 mortgage loans, but the process of
19 originating really begins with a person
20 wanting to buy a house and approaching a
21 broker or approaching a firm, in this case it
22 would be a company or a correspondent owned
23 by the ResCap family.  There is an
24 application entered into.
25        I'm going to be short here, just

Page 145

1
2  because the origination process, as you may
3  know from buying houses, is lengthy, with a
4  lot of documents, but there are -- there is
5  the application turned in, a lot of
6  supporting documents turned in.  There is
7  disclosures made by the borrower -- by the
8  lender to the borrower.  There is a back and
9  forth in terms of the various terms, the
10 various product types that are worked on.
11        At some point you get to a closing
12 table where all the appropriate disclosure
13 documents have been laid out, all the
14 appropriate loan documents are there, all the
15 insurance policies and binders and, you know,
16 everything that's required is there.  The
17 borrower is there.  The borrower signs up,
18 signs up the paperwork.  The money is
19 released for the purchase of the house, or,
20 you know, if it is a refinancing or
21 something, the money is basically released
22 upon the execution of that document.
23        There are two ways that the lender
24 basically funds that asset.  One is wet
25 funding, which basically is sending money to

Page 146

1
2  the closing table prior to the lender's
3  receipt of the documentation, so basically
4  there is no document in the control of the
5  lender at that point in time.
6          The other way is basically waiting
7  until the documents are there -- I take that
8  back.  The wet fundings either can be done of
9  the lines with wet funding limits.  Not every
10 line had wet funding limits.  Most lines
11 don't.  Those are very tightly controlled, as
12 you can imagine, because of the risk
13 associated with that.  Or the company had to
14 fund those out of its own cash.
15         And once the documents arrived at
16 the designated spot, the custodian -- and
17 were checked in, got the reporting, at that
18 point in time, those loans became eligible to
19 put on -- generally became eligible to put
20 into other funding facilities and not in the
21 wet category.
22         So then you have got the loan
23 within ResCap, right, and either placed on a
24 funding facility or not, depending on the
25 asset type.  If it had already been placed in

Page 147

1
2  a funding facility in the wet component, and
3  when the documents came in, at that point,
4  that loan would be moved into a different
5  subcategory on the same facility.  I don't
6  think typically it came off that facility to
7  move on to another facility, because
8  generally that would not be that economic to
9  do so.
10     Q.    So what were the sources of funding
11 for loan origination that ResCap accessed
12 during the 75 days preceding the bankruptcy
13 petition?
14     A.    It would have been the BMMZ.  I
15 think at that point Goldman and revolver
16 were -- I am sorry, Goldman and Citi were
17 probably fully amortizing at that point.
18         I believe -- let me see.  I believe
19 the LOC could have still been used to fund
20 loans.  Not wet, but to fund loans.  I think
21 there was -- there is a servicing receivable
22 asset created at the time there is a loan.
23 The Citi receivable -- the Citi line would
24 have been available to fund work associated
25 with that particular asset.

Page 148

1
2          And then on a servicing front, GSAP
3  would have been available to fund the
4  advances associated with that loan that came
5  in.
6      Q.    And if those sources of funding
7  that you just outlined were utilized to
8  originate a loan, were there any limitations
9  on whether the loan could then be pledged
10 under the revolver?
11         MR. ENGELHARDT:  Objection to form
12 and to the extent it calls for a legal
13 conclusion.
14         MR. HAMERMAN:  Objection to form.
15     Q.    From an operational perspective?
16     A.    If we had determined that we wanted
17 to pledge loans on any given funding facility
18 or bilat, we wanted to move them to the
19 revolver, we could have done that, as long as
20 we -- well, as long as several things, right?
21 One, we paid out the funding facility to the
22 extent required by removal of that asset.
23 The asset itself met the eligibility
24 requirements associated with the revolver.
25 We got the necessary approvals, typically

Page 149

1
2  from Ally, to be able to place loans on the
3  revolver.
4          At that point, the revolver -- the
5  revolver became an amortizing facility at the
6  time of the amendment and restatement, so it
7  was not taking new loans at that point.  We
8  could have agreed with Ally to add loans,
9  most likely.
10         And the other requirements
11 associated really with the movement of
12 collateral from one facility to the other,
13 like movement of the custodial functions,
14 things like that, would have had to occur.
15     Q.    OK.  I want to focus on something
16 you just said, which is the necessary
17 approvals to place loans on the revolver.
18 I'm not sure I understand that.  Are you
19 saying that after the amendment to the
20 revolver in 2009, ResCap needed to obtain
21 approval from ResCap in order to -- excuse
22 me, from Ally, in order to put a new loan,
23 pledge a new loan under the revolver?
24         MR. ENGELHARDT:  Objection to form.
25     A.    As primary collateral.

38 (Pages 146 to 149)

Page 150

1
2    Q.   Oh, as primary.
3    A.   I'm talking about primary
4    collateral.  The revolver became an
5    amortizing facility --
6    Q.   OK.
7    A.   -- and we would have needed to
8    obtain approval to amend those terms to add
9    new assets to that funding facility as
10   primary collateral, and that really, when we
11   speak of it, it wouldn't be added -- taken
12   off a funding facility and added, if you
13   will, to the revolver in any other way,
14   because there was no money that we would get
15   as a result of it from the blanket lien.
16   Q.   So I'm trying to understand how it
17   would be that there would be 2 --
18   approximately 213 million in loan
19   originations that occur during the 75 days
20   preceding the petition date, and that those
21   loans become subject to the JSNs' liens.
22        MR. ENGELHARDT:  There is no
23   question there.
24   Q.   Do you have a sense of that?
25        MR. ENGELHARDT:  Objection to form

Page 151

1
2    and to the extent it calls for a legal
3    conclusion.
4         MR. HAMERMAN:  I join in that
5    objection.
6    Q.   Let me change the question.  Do you
7    have an understanding as to how that could be
8    the case?
9         MR. ENGELHARDT:  Objection to form.
10        MR. HAMERMAN:  I join that
11   objection.
12   A.   My speculation is that these loans
13   were originated or modified, whatever, but
14   these loans came in, were marked as
15   unpledged, because they were not put on any
16   particular funding facility, and then when
17   the CFDR field was updated to reflect the
18   blanket lien for those assets that the
19   company in the processes I described were
20   subject to the blanket lien, there was that
21   conversion of approximately 213 million of
22   assets that had come in, in the 75 days that had
23   been marked as unpledged, they were now
24   marked as blanket lien.
25   Q.   OK.  Based on my review of certain

Page 152

1
2    filings that have been made by the debtors, I
3    believe that cash collateral under the
4    revolver decreased by approximately
5    93 million dollars between 2/29/12 and
6    3/15/12 -- I am sorry, I think I got my --
7    that's not right -- and 5/13/12.  Does
8    that -- do you know by how much cash
9    collateral decreased during that period?
10   Cash collateral under the revolver decreased
11   during that period?
12        MR. ENGELHARDT:  Objection.
13        You can answer.
14        MR. HAMERMAN:  Join in the
15   objection.
16   A.   No.
17   Q.   Assuming that it was 93 million, do
18   you have an understanding of what -- actually
19   strike that.
20        Do you have an understanding of
21   what cash collateral pledged under the
22   revolver was used for during the 75 days
23   preceding the petition date?
24        MR. ENGELHARDT:  Objection.
25        MR. HAMERMAN:  Objection to form.

Page 153

1
2    A.   I'm speculating.  But I would
3    expect that cash collateral under the
4    revolver, to the extent that cash collateral
5    related to sales proceeds of assets that were
6    on the revolver, would have gone into the
7    sale proceeds accounts.  I don't know if
8    whether prior to the petition date those
9    sales proceeds accounts were being released
10   to Ally as required or if the freeze had
11   started at that time, but at the petition
12   date, my understanding was anytime the cash
13   went into the sale proceeds accounts, it was
14   restricted and it stayed there.
15   Q.   Is that the freeze you are talking
16   about?
17   A.   Yes.
18        MR. ENGELHARDT:  Objection.
19   A.   And that's sale proceeds.
20        To the extent that there was cash
21   coming in on the assets subject to the
22   revolver lien that were not related to sales
23   proceeds account, they would be used for
24   normal business purposes.
25   Q.   And were sales proceeds -- strike

39 (Pages 150 to 153)

Page 154

1
2  that.
3       Are sales proceeds, proceeds
4  derived from sales of collateral pledged
5  under the revolver?
6     A.   Sales proceeds are proceeds derived
7  from the sale of primary collateral under the
8  revolver.
9     Q.   And were those sales proceeds
10 placed in an account that was segregated from
11 other cash?
12    A.   That's a little longer answer than
13 just that. It's a complicated facility, and
14 it was a very complicated business model.
15       Again, there were various business
16 units that were a piece of this. There were
17 as few as eight, eight, 10, 12, 15 different
18 business units with whom we were working and
19 had sales. And the business units varied
20 just a little bit in terms of the initial
21 account the sales proceeds would come into.
22 Those accounts were subject to account
23 control agreements and were specified sales
24 proceeds accounts.
25       Within a set period of time, they

Page 155

1
2  went to a common sales proceeds -- proceed
3  account. In the U.S. that was designated as
4  sale proceeds accounts. There may have been
5  a stop at a business-level sale proceed
6  account along the way. Internationally,
7  there were a few more accounts than there
8  were domestically. Those sales proceeds
9  moved into that final sales proceeds account
10 within 3 to 5 business days, depending on the
11 type of asset and the business unit that was
12 selling it.
13       And then at that point, when it hit
14 the sale proceeds account, every account
15 along the way, to my knowledge, was subject
16 to an account control agreement, and I'm
17 pretty aware of that, and then the account
18 control agreement -- and then once it hit the
19 sales proceeds account, the ultimate one, it
20 was restricted in that we could not withdraw
21 cash from that account once the sales
22 proceeds hit that.
23       (Exhibit 12, spreadsheet marked for
24 identification, as of this date.)
25    Q.   I will represent to you that this

Page 156

1
2  is an extract that we took from the CFDR --
3  that these are both extracts that we took
4  from the CFDR, and the only changes that we
5  made was adding the highlighting.
6       This -- if you look at the
7  acquisition loan -- I think it says
8  acquisition -- I'm not sure what the full
9  name is, but the second column on both
10 documents is "Acquisition Loan" something.
11 Do you see that?
12    A.   Yup, "Acquisition Loan ID."
13    Q.   "Acquisition Loan ID."
14       So let's look at the first row, for
15 example. In the 2/29 set of pages, the first
16 acquisition loan ID is 10723969. Do you see
17 that?
18    A.   Yes.
19    Q.   And in the 5/13 set of pages, it's
20 the same acquisition loan ID in the first
21 row. Do you see that?
22    A.   Yes.
23    Q.   Does that mean that the first row
24 for each of these sets of documents relates
25 to the same loan?

Page 157

1
2       MR. HAMERMAN:  Objection to form.
3       MR. ENGELHARDT:  Objection to form.
4     A.   Yes.
5     Q.   Do you have any understanding of
6  why the committee would think that a loan
7  that was pledged or that was listed under --
8  as GMAC revolver in the fund facility column
9  on 2/29/12, and it was also listed in the
10 GMAC revolver fund facility column as of
11 5/13/2012, was added to the JSNs' collateral
12 package during that period, during the time
13 between 2/29/2012 and 5/13/2012?
14       MR. ENGELHARDT:  Objection.
15       MR. HAMERMAN:  Join in the
16 objection.
17    A.   I do not know.
18    Q.   OK. Assuming that these are
19 accurate extracts from the CFDR, do they show
20 that the loans listed on these pages were
21 pledged -- well, actually, let's focus on the
22 first one.
23       Assuming that this is an accurate
24 extract from the CFDR, does it show that the
25 loan listed in the first row was pledged as

Page 158

1
2    collateral to the JSNs on February 29, 2012?
3        MR. ENGELHARDT:  Objection to form
4    and to the extent it calls for a legal
5    conclusion.
6        MR. HAMERMAN:  Objection to the
7    form and calls for a legal conclusion.
8        A.   It shows that this particular asset
9    was primary collateral under the GMAC
10   revolver.  The pledge actually in the REOs
11   was indirect.  The revolver and the JSNs had
12   an interest in the SPV.  But this doesn't
13   show the pledge necessarily.
14       Q.   OK.  But does -- this shows there
15   was a pledge as of February 29, 2012; isn't
16   that correct, or no?
17       MR. ENGELHARDT:  Objection to form
18   and to the extent it calls for a legal
19   conclusion.
20       MR. HAMERMAN:  Objection.
21       A.   This shows that this asset was
22   primary collateral under the GMAC revolver.
23   It doesn't necessarily -- this particular
24   column is just designed to show the facility
25   to which that asset relates or if it's

Page 159

1
2    unpledged.
3        So I don't think you can use the
4    term "pledged" or "not pledged" as it relates
5    to this report, because it doesn't show kind
6    of the -- everything that's pledged or not
7    pledged in the sense that was there a lien or
8    wasn't there a lien.  We went through that
9    conversation about what "unpledged" kind of
10   meant or didn't mean before.
11       Q.   Um-hm.
12       A.   And it doesn't go through the
13   distinctions between direct and indirect
14   pledges, if you will, supporting collateral.
15   You are probably familiar with that term.
16       In this case, the REO would not
17   have been directly pledged, if you will, to
18   the revolver.  It would have been put into an
19   SPV, that the SPV equity was pledged to the
20   revolver.  There is a distinction.
21       Q.   Sure.
22       But the 2/29 page shows that the
23   equity in the SPV was -- served as collateral
24   for the revolver and the JSNs as of
25   2/29/2012, doesn't it?

Page 160

1
2        MR. ENGELHARDT:  Objection to form
3    and to the extent it calls for a legal
4    conclusion.
5        MR. HAMERMAN:  What he said.
6        A.   This shows that the REO was placed
7    into an SPV that was subject to the lien of
8    the revolver and was primary collateral.
9        Q.   As of February --
10       A.   As of February -- yes.
11       Q.   Let me just ask the question.  As
12   of February 29, 2012; is that correct?
13       A.   Yes.  That REO was added value as
14   primary collateral to the revolver.  How
15   about that?
16       Q.   So the REO listed in column 1 --
17   excuse me, row 1, was not added -- does not
18   appear from these pages to have been added to
19   the revolver collateral package after --
20   after February 29, 2012; is that correct?
21       MR. HAMERMAN:  Objection.
22       MR. ENGELHARDT:  Objection.
23       A.   It appears to be primary collateral
24   on both days for the revolver.
25       Q.   Is there any document you can think

Page 161

1
2    of other than these pages that would
3    explain -- let me strike that.
4        Is there any document that the
5    debtors would have that would explain why the
6    committee would think that such an asset was
7    added to the JSNs' collateral package between
8    February 29, 2012, and 5/13/2012?
9        MR. ENGELHARDT:  Objection.
10       MR. HAMERMAN:  Objection.
11       A.   This specific asset, no.
12       (Exhibit 13, spreadsheet marked for
13   identification, as of this date.)
14       Q.   This is -- I will represent that
15   this is another extract, or these are two
16   extracts that we took from the CFDR, and the
17   only change or modification that we made was
18   to add the highlighting.
19       I think you touched upon this a
20   little bit earlier when we were speaking.
21   This shows or these extracts show that there
22   were certain loans reflected in the CFDR as
23   of 2/29/2012 that appear to have been
24   recharacterized -- excuse me, recategorized
25   in the CFDR as REO as of 5/13/2012.  Do you

Page 162

1
2  see that?
3      A.   Yes.
4      Q.   OK.  Can you explain to me what the
5  process was that led to that, if you know?
6      A.   This is a normal process of a
7  severely delinquent loan that goes into
8  foreclosure.  At the time of foreclosure, the
9  loan is extinguished and it becomes a real
10  property.  So no longer do we have a loan
11  asset that's secured by real property.  There
12  has been a default under the loan
13  documentation, and we have taken the real
14  property.
15          And the REO is a representation of
16  the property that we now have.  It's really a
17  change in form of the asset from a loan to a
18  REO.  REO stands for real estate owned.
19      Q.   OK.  So looking at the first --
20  let's focus on the first row in 2/29/2012.
21  Does this row show that there was reflected
22  in the CFDR a loan with a carrying value of
23  approximately 394,000 dollars?
24      A.   Yes.
25      Q.   OK.  And then if I look up to the

Page 163

1
2  first row on 5/13/2012, that loan has now
3  been -- is it fair -- is it accurate to say
4  that that loan has now been extinguished for
5  real property with a carrying value of
6  328,000 dollars?
7          MR. HAMERMAN:  Objection to the
8      extent it calls for a legal conclusion.
9          MR. ENGELHARDT:  Object to the
10      form.
11      A.   The loan itself, you know, is no
12  longer.  In its place, there is this REO.
13  The REO as of 5/13 has a different carry
14  value than the loan had four months earlier,
15  and that carry value would have been assigned
16  to the REO property in accordance with the
17  conventions that FAS-B requires for carry
18  value on REOs.
19      Q.   And it's the same with respect to
20  the other REOs listed on the remaining
21  columns on the spreadsheet?
22      A.   That's correct.
23          MR. ENGELHARDT:  Objection to form.
24          MR. HAMERMAN:  Join in the
25  objection.

Page 164

1
2      A.   That's correct.
3          (Exhibit 14, spreadsheet marked for
4      identification, as of this date.)
5      Q.   All set?
6          I will represent again that this is
7  an extract that we took from the CFDR with
8  the sole modification that we added the
9  highlighting.  These are REO that we were
10  able to locate in the CFDR as of 2/29/2012
11  that then disappeared from the CFDR after
12  that time, and we weren't able to figure out
13  what happened to them.
14          Would it -- if REO was sold, would
15  you typically be able to tell from the CFDR
16  that REO was sold?
17          MR. HAMERMAN:  Objection to the
18      form of the question.
19      A.   You would have to go into the
20  history.  But that really becomes in a way
21  part of the pay-off/charge-offs.  The REO is
22  sold, we get cash, the property is gone, the
23  collateral is there no longer.
24      Q.   OK.  So if I were trying to trace
25  that, how would I go about doing it?

Page 165

1
2      A.   There should have been an upload
3  from one of the servicing groups that
4  reflected the sale of the REO.  And that
5  template upload should be reflected in the
6  history of the CFDR.
7      Q.   And would it be keyed to the
8  specific loan sequencing ID?
9      A.   It would be keyed to a -- the
10  specific loan asset, which would go into the
11  records relating to that specific asset.
12          (Exhibit 15, spreadsheet marked for
13      identification, as of this date.)
14          (Exhibit 16, spreadsheet marked for
15      identification, as of this date.)
16      Q.   All set?  So these are --
17          MR. ENGELHARDT:  Excuse me,
18      counsel, I don't have a copy of the
19      document.
20          MS. NEWMAN:  Oh, I think maybe
21      they're a page or two pages behind --
22      yes.  I think they're identical.
23      Q.   So I will represent that these are
24  also extracts from the CFDR, except that the
25  two columns to the right we imported from

42 (Pages 162 to 165)

Page 166

1
2    another section of the CFDR.
3        A.    OK.
4        Q.    These are -- excuse me, and there
5    was another addition, which was that we added
6    the totals at the bottom of the page.
7            These are assets that were
8    reflected in the CFDR as of 5/13/2012.  And
9    not onto -- I don't believe onto 2/29/2012,
10   but were reflected in the CFDR at an earlier
11   date.  And you can see the earlier date on
12   the far right-hand column.
13           MR. ENGELHARDT:  There is no
14   question there yet.
15       Q.   Do you see that?
16       A.   I do.
17           MR. ENGELHARDT:  Objection.
18           MR. HAMERMAN:  Objection.
19       Q.   Do you know why these assets would
20   have disappeared from the CFDR and then
21   reappeared?
22           MR. ENGELHARDT:  Objection to form.
23           MR. HAMERMAN:  Join in the
24   objection.
25       A.   It would only be speculation, and

Page 167

1
2    it might be an incomplete speculation at
3    that.
4            It is possible that some of these
5    loans were sold and then we repurchased them
6    due to a breach of rep or warranty.  I'm not
7    sure.  I think that's a possibility.
8        Q.   OK.  If they were -- assuming that
9    that's correct, without knowing, if these
10   loans were repurchased by ResCap, where would
11   the funds for such -- what would the source
12   of the funds for such repurchase be?
13           MR. ENGELHARDT:  Objection to form.
14           MR. HAMERMAN:  Objection.
15       Q.   In the ordinary course of business?
16       A.   The funds for the repurchase could
17   have been out of just normal operating cash.
18   We could have done a draw off the LOC.
19       Q.   And if there was a draw off the LOC
20   and the loan was repurchased, would the loan
21   then be subject -- be categorized as primary
22   collateral under the revolver?
23           MR. ENGELHARDT:  Objection to form
24   and to the extent it calls for a legal
25   conclusion.

Page 168

1
2            MR. HAMERMAN:  I join in the
3    objection.
4        A.    No, the LOC and the revolver were
5    two completely different facilities and they
6    operated in a different way.
7            So if a loan were repurchased out
8    of the draw off the LOC, the loan would not
9    necessarily be classified as an LOC asset,
10   because they have not put -- it would not
11   necessarily have been pledged to the LOC
12   unless we'd have gone through the addition
13   process there.
14           It would not have been put on the
15   revolver as reinvestment collateral unless we
16   had gone through the process there, and it
17   would not be on any other facility unless we
18   had pledged it to that other facility.
19           So it would go in, if it was
20   funded -- if the proceeds were received from
21   the LOC and it was not part of any pledge, it
22   would just go in as unpledged, and it would
23   be subject to the blanket lien to the extent
24   that, you know, it fit the grant and the
25   grantor under the PSA and it wasn't excluded.

Page 169

1
2            That's the way a repurchase would
3    typically work.
4        Q.   OK.
5            MS. NEWMAN:  I think we have to go
6    off so that the tape can be changed.
7            THE VIDEOGRAPHER:  That is the end
8    of tape number 3.  The time is 2:44 p.m.
9    We are now off the record.
10           (Recess)
11           THE VIDEOGRAPHER:  This is the
12   start of tape number 4.  The time is now
13   2:56 p.m.  We are now back on the record.
14           MR. ENGELHARDT:  Counsel, before
15   you begin, the witness just mentioned to
16   me that she would like to clarify one of
17   her prior answers.  I don't know which
18   one.
19           MS. NEWMAN:  OK.
20       A.   I just wanted to say just because I
21   don't remember why something would disappear
22   and come back on doesn't mean there wouldn't
23   be another reason for that to happen.  This
24   particular database was a SOX database.
25           So in connection with that, there

Page 170

1
2  would have been risks laid out.  One of the
3  risks would have been things removed and just
4  that disappear and there have would have been
5  controls put in place around that.
6        Just because that's a situation
7  that I could think of, there may have been
8  other explanations and there would have been
9  controls put in place to identify and figure
10  out things like this.
11     Q.   Thank you, I appreciate that
12  clarification.
13        If I wanted to try to get a better
14  understanding of why that happened, who at
15  the company, at ResCap do you think would
16  have the most knowledge about that?
17     A.   Barb Westman.
18     Q.   Can you turn back to the summary
19  page on schedule 6, the first page of
20  schedule 6.
21        If I wanted to try to figure out --
22  well, let me ask you this first.  Is it
23  possible that 1, 2 and 3 of the summary page
24  could all be originations that occurred
25  during the 75 days preceding the petition

Page 171

1
2  date?
3        MR. ENGELHARDT:  Objection, form.
4     A.   I do not think 1 would have been
5  originations.
6     Q.   OK.
7     A.   Two and 3 would have been
8  originations.
9     Q.   What's the distinction you're
10  drawing between 1 and 2 and 3?
11     A.   The revolver primary collateral was
12  a static pool.  It was amortizing.  There
13  were not loans added really much after 2008.
14  It was an inefficient funding facility.  So
15  loans would not have been added to that
16  facility because it was amortizing.
17        But with respect to the blanket,
18  that would cover, you know, certain loans
19  coming in as originations during that period
20  unless they were pledged someplace else.
21  With respect to the FHA/VA, those assets
22  could well have come in in the origination
23  channel.
24     Q.   Are you drawing a distinction that
25  you think it would be more likely that the

Page 172

1
2  FHA/VA would be originations than the amount
3  listed under HFS blanket?
4        MR. ENGELHARDT:  Objection to form.
5     A.   No, I think 2 and 3 could equally
6  be originations.
7     Q.   OK.
8     A.   And they could include
9  modifications as well as the originations.
10  And again, originations, the broad sense of
11  that definition.
12     Q.   How would a modification -- strike
13  that.
14        Would there be a difference in the
15  way loans were reflected in the CFDR if
16  the loan was a modification versus an
17  origination?
18     A.   Modification would be treated as a
19  new loan.
20     Q.   Would the modification have or be
21  associated with an asset that had existed in
22  the CFDR before the modification day?
23        MR. ENGELHARDT:  Objection to form.
24     A.   It is my understanding that there
25  would be an association back, but that

Page 173

1
2  modification has new terms to it and those
3  new terms are what would be reflected in
4  CFDR.
5     Q.   How would I -- how would I discern
6  from the CFDR if this -- if the loan was a
7  modification or an origination?
8     A.   I think there would be a field you
9  would need to look at and it would likely be
10  historical.
11     Q.   OK.  And that field would show me
12  if there had been an asset that existed prior
13  to the loan modification in the CFDR
14  associated with the same loan, is that
15  correct?
16     A.   It would -- it should show you --
17  this is my understanding -- an association to
18  a previous loan, but then you have a new
19  loan.
20     Q.   OK, when you say they will be in
21  historical -- this is probably because I
22  don't really have an understanding of how the
23  CFDR works -- but is there a tab I can click
24  on in the CFDR that will show me the
25  historical notes associated with a particular

Page 174

1
2  loan?
3      A.    No, I think it is a bit more
4  complicated than that, sadly.  Sometimes you
5  simply go back to a previous time, that is
6  saved.  Sometimes -- or you may be able to
7  see it in a field like you saw in the
8  previous funding facility.  In a way, that's
9  historical information associated with that
10  asset, but there is -- but as with any
11  system, a technical record of all changes
12  made.
13      Q.    And one who was looking at the CFDR
14  should be able to access that, that
15  historical record, is that correct?
16      A.    Someone with technical abilities
17  should be able to access that.  I don't
18  believe those are widely available to the
19  casual user.  They do exist.
20      Q.    Other than looking at the
21  historical information in the CFDR, are there
22  other sources of information that I could
23  look at to try to discern whether the loans
24  listed here were modifications?  And when I
25  say here, I mean on the summary page of

Page 175

1
2  schedule 6?
3      A.    They may be found in the detail to
4  the ledger entries as of the time of the
5  modification.  I'm not certain as I have not
6  looked for them myself, but I think that the
7  ledger may have that detail.
8      Q.    OK.  And if a loan, if a loan was
9  listed -- well, strike that.
10          If an asset was listed as, as
11  revolver in the fund facility column of the
12  CFDR on February 29, 2012, and is also listed
13  in the -- as revolver in the fund facility
14  column of the CFDR on May 13, 2012, can you
15  think of any basis for the allegation that
16  that asset was added to the revolver
17  collateral between 2/29/2012 and 5/1/2012?
18          MR. ENGELHARDT:  Objection to form.
19          MR. HAMERMAN:  Objection, and to
20      the extent it calls for a legal
21      conclusion.
22      A.    If it was listed as revolver in
23  February, and it was listed as revolver in
24  May, I don't know of any reason why the
25  committee would be alleging a transfer.

Page 176

1
2      Q.    OK.  And if an asset was listed as
3  unpledged in the CFDR -- in the fund facility
4  column of the CFDR on February 29, 2012 and
5  then as either revolver or blanket lien in
6  the fund facility column of the CFDR as of
7  5/13/2012, can you think of any basis for the
8  allegation that that asset was added to the
9  revolver collateral package during the period
10  between February 29, 2012 and May 13, 2012?
11          MR. ENGELHARDT:  Objection to form.
12          MR. HAMERMAN:  Objection to form
13      and to the extent it calls for a legal
14      conclusion.
15      A.    I don't know why the committee
16  would have alleged that it would have been
17  added unless for some reason the work done at
18  ResCap involving whomever else they included
19  of marking the unpledged assets to the
20  blanket lien improperly picked up some of the
21  assets because, as we discussed before, the
22  work done at the time of the filing in order
23  to enable the company to report on unpledged
24  assets and on blanket lien assets was to
25  determine as of that date which of the

Page 177

1
2  unpledged assets were subject to the blanket
3  lien.
4          And if they accidentally,
5  inadvertently labeled an asset that was not
6  subject to the blanket lien as subject to the
7  blanket lien, that possibly may be a reason
8  for the committee to think that.
9          If the labeling was accurate,
10  however, and the identification of the assets
11  is blanket lien -- is changing them from
12  unpledged to blanket lien and that labeling
13  was accurate, I cannot think of a reason.
14      Q.    OK.  And as you sit here today, are
15  you aware of any instances where an asset was
16  inaccurately or inadvertently labeled as
17  blanket lien as of 5/13/2012?
18          MR. HAMERMAN:  Objection.
19      A.    I am aware that there were
20  discrepancies in conversations around the
21  original markings to insure that they were
22  done appropriately.
23          My understanding is that all of the
24  loans were marked, the servicing advances
25  were marked as blanket lien without further

Page 178

1
2  diligence.  So I don't know whether things
3  were inadvertently picked up in that process.
4     Q.   So you don't know one way or
5  another whether or not there were
6  inaccuracies in the relabeling, is that
7  correct?
8        MR. HAMERMAN:  Objection.
9     A.   Given the confidence we have in
10 CFDR, I would say the labeling is fairly
11 accurate.  I can -- I do not know if it was
12 entirely accurate based on the interpretation
13 of what the blanket lien related to.
14        (Exhibit 17, document entitled
15    "Final Order" marked for identification,
16    as of this date.)
17    Q.   I'm only going to be asking you
18 about Exhibit A to that document and I'll
19 give you time to review it after I ask my
20 specific questions.
21        I'm going to use that in tandem
22 with the committee complaint, the text of the
23 committee complaint, so if you want to just
24 pull that out.  Can you turn to page 17 of
25 the complaint, please.

Page 179

1
2        Can you read paragraph 96, please.
3        MR. ENGELHARDT:  That's not on page
4  17.
5        MS. NEWMAN:  I'm on page 17.
6        MR. ENGELHARDT:  Are you looking at
7  the numbers at the top or the bottom?
8        MS. NEWMAN:  On the bottom, are
9  there numbers on the top of the
10 complaint?  I don't have a -- I don't
11 have a docketed copy.  So it is 17 on the
12 bottom.
13        MR. HAMERMAN:  I am sorry, where
14 are we looking?  Paragraph 96 or page 17?
15        MS. NEWMAN:  Paragraph 96.  I think
16 it is page 17 on the bottom.
17        MR. HAMERMAN:  Mine is page 17 at
18 the top of the document.
19        MS. NEWMAN:  I don't know why my
20 numbering is different.  As long as it is
21 paragraph 96.  OK.
22    Q.   So this paragraph identifies
23 certain -- or defines the term "unencumbered
24 real property," do you see that?
25    A.   Yes.

Page 180

1
2     Q.   If you actually turn to schedule
3  2 -- I'm sorry, not in the DIP order.  It
4  should be in this pile right here, schedule 2
5  to the complaint.  It lists the real property
6  falling within the committee's definition of
7  unencumbered real property.  Do you see that?
8     A.   Yes, I do.
9     Q.   Do you know if anyone at ResCap has
10 worked with the committee to identify the
11 real property listed on 2?
12    A.   I do not know.
13    Q.   Do you know whether there are
14 mortgages that exist in favor of the JSNs in
15 connection with the real property listed on
16 schedule 2?
17    A.   I do not know.  I could speculate
18 on some of this.
19    Q.   OK.  Why don't you share with me
20 what your speculation is.
21        MR. ENGELHARDT:  Objection to form.
22    A.   Real property -- I apologize, I was
23 actually thinking of primary collateral as
24 opposed to JSN possible blanket lien.  So I
25 withdraw.

Page 181

1
2     Q.   OK.  Do you know of any reason, as
3  you sit here today, why there would -- why it
4  would be the case that there are no mortgages
5  in favor of the JSNs in connection with the
6  real property listed on schedule 2?
7        MR. ENGELHARDT:  Objection to form.
8        MR. HAMERMAN:  Objection to form.
9     A.   All right.  Under the terms of the
10 revolver, there was, there is primary
11 collateral and there was blanket lien
12 collateral.  With respect to the -- and those
13 documents, including the PSA, we granted
14 liens on that collateral and we agreed to do
15 as a company what was requested of us to
16 perfect.
17        Just because a lien was granted
18 didn't mean it was necessarily perfected.
19 And in the course of -- case of real
20 property, it doesn't necessarily mean that
21 there was ever a request made to put a
22 mortgage on it or to otherwise demonstrate
23 that lien.
24        There was a brief period of time
25 relating to some of the BCG which was really

Page 182

1
2   more the commercial construction groups to
3   put mortgages on some assets in favor of Ally
4   and of the JSNs, the second -- first, second,
5   third liens.  That was relatively
6   short-lived, and it was quite cumbersome as
7   properties were being sold.
8        But to my knowledge, there was no
9   other request coming from Ally or the JSNs to
10  put mortgages or do anything else other than
11  the initial grant where the lien would
12  automatically apply to the properties coming
13  in if the assets were described in the
14  granting clauses by the grantors and weren't
15  subject to excluded assets or lien releases
16  otherwise.
17      Q.   Can you turn back to paragraph 103
18  of the complaint, please.  Do you see that
19  that paragraph references Exhibit A to the
20  AFI DIP order?
21      A.   Um-hm.
22      Q.   And that is the document that you
23  have in there in front of you.  Do you know
24  if the real property listed on schedule 2 to
25  the complaint is reflected in the revolver or

Page 183

1
2   blanket columns on this Exhibit A to the AFI
3   DIP order?
4        MR. ENGELHARDT:  Objection,
5   objection to form.
6        MR. HAMERMAN:  Objection.
7      A.   My understanding is that whatever
8   real property the company had as of the
9   filing date was reflected within CFDR, and so
10  if this were created off of CFDR and that
11  information had been back-dated to 2/29, then
12  whatever property was out there at that time
13  would be reflected here.
14       I don't know if that is a full
15  listing of everything the committee put on or
16  if that is not.
17       So you may have some timing
18  differences between the two, and I do not
19  know whether or not the statement that the
20  assets -- that the real property are in the
21  revolver and blanket categories.  Even if
22  they are in the revolver and blanket
23  categories, again, doesn't mean there was a
24  mortgage on it, doesn't mean it was
25  perfected.  It just means that the company

Page 184

1
2   believed that it was subject to it.
3        If it was Ally revolver, that
4   property would have been primary collateral
5   for the purposes of calculating the value of
6   the facility, the reporting, things like
7   that.  And, you know, subject to the other
8   requirements there.
9        If it was under blanket, it meant
10  that the company believed as of the time it
11  entered blanket that it was subject to the
12  blanket lien.  It not mean it was perfected.
13      Q.   If you turn and look again at
14  schedule 2, do you know if the -- well,
15  first, let's look at the owned real property
16  which are the two rows at the top of the
17  page.  Do you know if these two interests in
18  property were reflected in the CFDR as Ally
19  revolver or blanket?
20      A.   I do not.
21      Q.   And then with respect to the
22  leasehold interests listed below, which carry
23  on for a few pages, do you know if those
24  leasehold interests were reflected in the
25  CFDR as revolver or blanket?

Page 185

1
2      A.   I do not.
3      Q.   OK.  If I wanted to find out the
4   answer to that, those questions, who would
5   I -- who at the debtors would be the most
6   knowledgeable on that topic?
7      A.   That again would be Barb.  Please
8   note that they would not be in the CFDR if
9   they did not have any values associated with
10  them, similar to pay-off and charge-offs.
11      Q.   OK.
12      A.   And --
13      Q.   So how would I, I think you will
14  notice that in schedule 2 there, I don't
15  believe there are any values listed.  How
16  would I go about figuring out what the value
17  attributed to these interests in property is?
18      A.   I would speak to someone in finance
19  or to Barb.
20      Q.   And are there particular databases
21  or documents that I could look at that might
22  have that information?
23      A.   It would be in a CFDR if these
24  assets were in the CFDR and it would be in
25  the ledger if not.  Or frankly, it would be

47 (Pages 182 to 185)

Page 186

1
2    in the ledger even if it was in the CFDR.
3        Q.   Can you turn please to paragraph
4    110.
5        A.   OK.
6        Q.   110 alleges that the rows entitled
7    "cash" and "cash equivalents" and other
8    assets in the blanket column on Exhibit A to
9    the AFI DIP order includes asset or include
10   assets owned by the debtors that -- for
11   debtors that have not guaranteed the junior
12   secured notes and it goes on.  I think you
13   read it before.
14       Do you know if it is true that the
15   cash and cash equivalent and other asset
16   column, other asset rows listed in the
17   blanket column on Exhibit A to the AFI DIP
18   order includes assets owned by what's defined
19   as nonobligor debtors in paragraph 110 of the
20   complaint?
21       MR. ENGELHARDT:  Objection.
22       MR. HAMERMAN:  Objection to the
23   form.
24       A.   Would you restate that one more
25   time.

Page 187

1
2        Q.   I can try and why don't we take it
3    in pieces.
4        Paragraphs 110 and 111 identify
5    what are alleged to be nonobligor debtors.
6    Do you see that?
7        A.   I do.
8        Q.   And there is an allegation in
9    paragraph 110 that assets owned by the
10   nonobligor debtors are included or the value
11   of assets owned by the nonobligor debtors are
12   included in the blanket column of the -- of
13   Exhibit A to the AFI DIP order.  Do you know
14   if that is true?
15       MR. ENGELHARDT:  Objection.
16       MR. HAMERMAN:  I join in that
17   objection.
18       A.   I do not know if that was true.
19       Q.   Can you please turn to paragraph
20   166.  I'm sorry, actually.  Why don't you
21   read first paragraphs 160 through 163.
22       A.   OK.
23       Q.   And paragraph 171.
24       These paragraphs allege that there
25   are certain deposit accounts in which the

Page 188

1
2    JSNs do not have or for which the JSNs do not
3    have deposit account control agreements.  Do
4    you understand that?
5        A.   Yes.
6        Q.   And if you turn to schedule 5, that
7    lists the accounts that are subject -- that
8    are the subject of that allegation.  Would
9    you take a look at that and let me know when
10   you're through, please.
11       A.   OK.
12       Q.   Sitting here today, do you know
13   whether there are deposit account control
14   agreements in favor of the JSNs with respect
15   to the deposit accounts listed on schedule 5?
16       A.   I don't know if there are control
17   agreements in place of these specific
18   accounts.
19       Q.   Has anyone at ResCap had any
20   conversations about whether this is the
21   case -- about whether there are deposit
22   account control agreements in favor of the
23   JSNs with respect to the deposit accounts
24   listed on schedule 5 with the committee or
25   any of its advisors?

Page 189

1
2        A.   To my knowledge -- I don't know
3    whether they have had conversations with the
4    committee or any of their advisors outside of
5    the two days I spent in prep.
6        Q.   Thank you for the clarification.
7        Do you know if the funds listed on
8    schedule 5 are reflected in either the Ally
9    revolver or blanket columns on Exhibit A to
10   the AFI DIP order?
11       MR. ENGELHARDT:  Objection.
12       A.   They would not be reflected in the
13   Ally revolver.  I am not sure if they are in
14   the blanket or not.
15       MS. NEWMAN:  OK.  Let's just take a
16   two-minute break.  I don't think I have
17   anything else, but I just want to confer.
18       THE VIDEOGRAPHER:  The time is now
19   3:30 p.m.  We are now off the record.
20       (Exhibit 18, notice of deposition
21   of ResCap marked for identification, as
22   of this date.)
23       - - - -
24       THE VIDEOGRAPHER:  The time is now
25   3:38 p.m.  We are now back on the record.

48  (Pages 186 to 189)

Page 190

```
1
2    EXAMINATION BY
3    MR. BAUMSTEIN:
4        Q.   Good afternoon, Ms. Farley.  My
5    name is Doug Baumstein.  I am an attorney at
6    White & Case.  We represent the junior
7    secured noteholders or ad hoc group of junior
8    secured noteholders.  Thank you for your
9    patience today and hopefully we won't be too
10   much longer.
11           I have handed you what has been
12   marked as Farley Exhibit 18.  It is a copy of
13   the 30(b)(6) notice that my client, the ad
14   hoc group of junior secured noteholders,
15   served on the debtors.
16           MR. ENGELHARDT:  Counsel, did I get
17   a copy?
18       Q.   First of all, have you seen this
19   document before?
20       A.   No.
21       Q.   Could you take a look at -- do you
22   understand that you are here to testify as to
23   topics 3 and 16 as identified herein?
24       A.   Yes.
25       Q.   And did you talk to anyone at
```

Page 191

```
1
2    ResCap with respect to either of the subjects
3    in 3 or 16 of this Rule 30(b)(6) notice?
4        A.   It's -- the only conversation I had
5    was a very short conversation with Joe
6    Ruhlin.
7        Q.   And what was the topic of your
8    conversation with Mr. Ruhlin?
9        A.   Basically the fact that when he
10   took over management of the group from me,
11   that he assumed the processes for lien
12   release as in place and didn't change them.
13       Q.   And when did Mr. Ruhlin take over
14   the processes for the lien releases?
15       A.   That particular -- Joe assumed my
16   managerial responsibilities sometime
17   during -- gosh, I don't even remember, to be
18   honest with you, 2010 or 2011.  The processes
19   were set at that point and there was no
20   change.
21       Q.   OK.
22       A.   And I continued to work really
23   closely with he and his group.
24       Q.   With respect to lien releases, you
25   said you were in charge of that process prior
```

Page 192

```
1    to Mr. Ruhlin, is that accurate?
2        A.   Yes.  I established the lien
3    release processes when the revolver initially
4    took place.  I worked with the operations and
5    treasury group to insure they understood
6    them.  I handled the lien release processes
7    until the structured people were up to speed.
8    I handled a number of lien releases after the
9    fact, but it became a very routine process
10   done by operations people, at least as the
11   automatic releases occurred.
12           And so Joe would have assumed
13   responsibility of that role, but it wasn't
14   like he was actually doing the releases, as I
15   wasn't either, and if there were questions
16   when he was managing that group about them, I
17   was still there.
18       Q.   OK.  That's actually very helpful.
19           Why don't we go to the -- and
20   actually, let's use the document as a talking
21   point.  Why don't we go to that talking point
22   right here.
23           (Exhibit 19, document Bates stamped
24   RCUCCJSN 10339000 through 9001 marked for
```

Page 193

```
1    identification, as of this date.)
2        Q.   Do you recognize what has been
3    handed to you as Farley Exhibit 19?
4        A.   I see it's an e-mail with an
5    attachment to it.
6        Q.   And is this an e-mail that you
7    wrote to Joe Ruhlin on or about August 11,
8    2010?
9        A.   It seems to be.
10       Q.   And what is the subject of the
11   e-mail?
12       A.   It's basically a summary of the
13   terms of the junior secured bonds as it
14   relates to the collateral.
15       Q.   This e-mail is dated August 11,
16   2010.  Does this refresh your recollection
17   when Mr. Ruhlin took over responsibility for
18   lien releases?
19       A.   No.
20       Q.   In the attachment, is this an
21   attachment that you prepared?
22       A.   It appears to be.
23       Q.   OK.  And it says, under lien
24   releases that, "Lien releases required for
```

Page 194

1
2  the sale of both primary and supporting
3  collateral, as well as collateral subject to
4  the blanket lien."
5        First of all, did I read that
6  correctly?
7     A.   Yes.
8     Q.   What do you understand to be the
9  meaning of what I just read to you?
10    A.   That when ResCap sold assets which
11 were primary collateral or collateral used to
12 support the value of the revolver and the
13 liens and as to which there were a whole host
14 of restrictions, that required a lien release
15 under the junior bondholders, the junior and
16 senior bondholders at the time.
17       The supporting collateral as
18 defined in the revolver also required the --
19 the sale of supporting collateral also
20 required lien releases, and if collateral
21 were subject to the blanket lien, that also
22 required lien releases under the JSNs.
23    Q.   Did ResCap also understand that
24 lien releases were required before there were
25 any other dispositions of collateral?

Page 195

1
2     A.   I'm not sure I understand your
3  question.
4     Q.   Well, what are the circumstances
5  where assets that are previously pledged to
6  the JSNs would be released?
7        MR. HAMERMAN:  Objection to form.
8     A.   Every time that assets were
9  primary, supporting, or blanket, and every
10 time those assets were sold or moved to a
11 bilat, a security release would have to be --
12 a lien release would have to be accomplished.
13    Q.   OK.  And could you describe the
14 process -- when you said moved to another
15 facility, does that also include the AFI
16 letter of credit?
17    A.   Yes.
18    Q.   Could you describe the process by
19 which lien releases would be effected by
20 ResCap?
21    A.   There were two different processes.
22 There was a group of collateral that -- there
23 were requirements under the revolver which
24 allowed for the automatic lien release of the
25 first lien in certain circumstances.

Page 196

1
2        Largely those were sales to the
3  agency, sales in normal practice under a
4  hundred million.  There were several
5  categories there.  So if that was the
6  situation, what would happen would be within
7  the treasury group, we would get -- we would
8  have knowledge of all the sales occurring
9  within the various business groups.  And as
10 those -- as the assets which were to be sold
11 were identified, we would get the asset lists
12 within the treasury group.
13       We would basically continue to
14 monitor that because assets would sometimes
15 fall out, there was movement of assets prior
16 to the actual sale.  But we would bounce that
17 list up against the CFDR to determine if --
18 what facilities the assets were pledged to,
19 and it might be the revolver, it might have
20 been the Lehman facility.  But we would
21 determine that and we would determine what
22 was unpledged.
23       We would also alert other people
24 within the firm -- namely, the legal
25 department -- that there was a release

Page 197

1
2  coming.  This -- at the time that the asset
3  listing was final, we would basically take
4  that asset listing, again, run it against the
5  CFDR, determine what was on what facility.
6        If it was, if it was labeled the
7  revolver, as primary supporting collateral,
8  or if it was labeled unpledged, we would
9  basically create a listing for that and then
10 we had developed an officer certificate to
11 which that listing was attached.  That
12 officer certificate was in the form required
13 under the indenture.
14       It did have a requirement in there
15 that the terms of the indenture be complied
16 with.  Whoever the structuring person or
17 myself would basically insure that was the
18 case, and particularly the fair value
19 component by talking to the business
20 individual, sometimes we got -- sometimes we
21 had some, you know, very interesting
22 conversations and a lot of documentation
23 around that to insure it.
24       We would sign that certificate with
25 the loans attached to it.  That would then go

50 (Pages 194 to 197)

Page 198

1
2  down to the legal department.  The legal
3  department had developed opinions based on
4  the forms attached to the indentures.  Those
5  opinions would be created, reviewed.
6       When they were comfortable -- I
7  mean, obviously if there were questions, we
8  would address those, and then those would be
9  sent off, e-mailed, faxed and then Fed-Ex'd
10 to Wells Fargo and U.S. Bank.
11    Q.   All right.  And just for the
12 record, who are Wells Fargo and U.S. Bank in
13 this scenario?
14    A.   U.S. Bank was a trustee.  Wells
15 Fargo was the collateral agent.  So that's
16 the automatic release process and that
17 happened at times daily.
18    Q.   And when you say that happened at
19 times daily, does that mean that every day,
20 there was a new listing sent off to Wells
21 Fargo of specific loans to be released?
22    A.   Yes.
23    Q.   Why don't we mark -- I'm going to
24 mark two things at once here.
25    A.   At some point early on, the legal

Page 199

1
2  department may have changed that to weekly,
3  so that all of the asset sales happening
4  during the course of that week were included
5  in a single opinion.
6    Q.   OK, why don't we mark these as
7  Exhibit 20 and 21.  20 will be the one with
8  Bates stamp 401 and 783 will be 21.
9       (Exhibit 20, document Bates stamped
10 RCUCCJSN 11889401 through 11 marked for
11 identification, as of this date.)
12      (Exhibit 21, document Bates stamped
13 RCUCCJSN 11888783 through 858 marked for
14 identification, as of this date.)
15    Q.   I've marked for you two packages
16 of -- well, I guess they are both really
17 e-mails with attachments which seem to show
18 some of the exhibits you just described.
19      I also will represent to you, based
20 on our review of the CFDR database, some of
21 the loans identified in the Exhibit As here
22 were eventually repledged at some point to
23 the AFI LOC.
24      So -- but having looked at this,
25 are these the types of lien releases you just

Page 200

1
2  described in your testimony that were
3  executed in the ordinary course?
4       MR. ENGELHARDT:  Objection to form.
5       MR. HAMERMAN:  Objection to form.
6    Q.   Strike that.
7       Were these the type of documents
8  that were executed in the ordinary course to
9  effectuate releases of collateral that was
10 pledged to the revolver?
11      MR. ENGELHARDT:  Objection to form.
12    A.   These are examples of the lien
13 releases effectuated in connection with these
14 sales or movements to bilats that were
15 automatically released from the first lien.
16      The other point I would like to
17 make is what is attached as the exhibit of
18 the assets being released, there is -- there
19 may or may not be primary as the sale may not
20 have included primary.  And we decided, I
21 decided early on as we set these processes
22 up, that we would release -- we were tracking
23 assets on the facility.  Anything else that
24 was not on a facility was unpledged.
25      In order to make this operationally

Page 201

1
2  feasible, every time we had a sale, we would
3  produce asset listings that included the
4  primary collateral which would include
5  supporting, but -- well, I don't -- take that
6  back about supporting.
7       It would include primary collateral
8  and it would include all assets in that sale
9  that were labeled as unpledged.  There was no
10 independent investigation because unpledged
11 didn't necessarily mean it was pledged.  But
12 we made the determination that we were better
13 off releasing collateral that wasn't subject
14 to the lien because it would have no effect
15 than we were trying to set up even more
16 complicated processes and not releasing liens
17 on collateral that was subject to the blanket
18 lien because that would have consequences.
19      So the attachments are all of the
20 assets that were in the sale that were
21 primary collateral or unpledged.
22    Q.   OK.
23    A.   And this is, again, this is the
24 release process with respect to those asset
25 sales as to which the revolver automatically

51 (Pages 198 to 201)

Page 202

1   released its interest.
2       Q.   And I'll talk to you about
3   nonautomatic releases in a second, so I
4   understand what that consequence is, but just
5   looking at these then, these, the annex A is
6   the listing by loan numbers of the specific
7   assets that are either primary collateral or
8   unpledged collateral which, as you said,
9   likely but not definitely would have been
10  pledged to the revolver, is that accurate?
11          MR. ENGELHARDT:  Objection to form.
12  Which annex A are you referring to?
13          MR. BAUMSTEIN:  Both actually.
14      A.   I'm not sure.  As with any given
15  sale, I could say the unpledged was likely
16  blanket lien.  It could well have been, but I
17  can't make that categorical statement.
18      Q.   Now, earlier in your testimony
19  today, you talked about how CFDR -- that then
20  listings of loans would then be uploaded on a
21  template and then reflected on the CFDR?
22      A.   Yes.
23      Q.   So would there be, with respect to
24  the annex As that are set out here, would

Page 203

1   these then be uploaded on a template and then
2   loaded into the CFDR in the ordinary course?
3       A.   Yes.
4       Q.   And am I also correct that that
5   reconciliation takes place within a month of
6   each one of these lien releases being
7   effectuated?
8       A.   There was -- there was always a
9   check at the time the lien release was done
10  because we were getting the collateral lists
11  directly from the business.  So we had the
12  final collateral lists.  Generally they were
13  the collateral lists that were attached to
14  any sale documentation or that were, you
15  know, kind of the evidence of the sale if you
16  will.  So we had that separately from the
17  business unit.
18          If we were to go into the CFDR and
19  it hadn't been uploaded yet, we would know
20  that.  Right.  That was really more of a
21  situation with the LOC.  But we would know
22  that.  We had an independent check and
23  monitored that.
24          At the end of every month, as part

Page 204

1   of the month-end financial processes, there
2   was a -- and the business was to have
3   uploaded on a real-time basis.
4       At the end of every month, the
5   business would upload its entire asset list
6   and that would go up and then that is what
7   was reconciled to the reporting that was done
8   under the revolver during, you know, it was
9   really the first probably five to eight
10  business days after some of -- everything had
11  been done from month end.
12          So it would have been within five
13  days if the sale was at the end of the month.
14  It would have been the full month if the sale
15  was at the beginning.
16          So there were processes in the
17  interim and then there were processes at the
18  end.
19      Q.   I understand.  So -- or at least I
20  think I understand.
21          So initially the business unit
22  would identify with a specific list of loans
23  which loans were to be shown as being
24  released under the CFDR because of sale or

Page 205

1   transfer or for whatever other reason, and
2   then at month end, your group would then go
3   in and check that that process accurately
4   reflected the transaction.  Is that a fair
5   characterization of what you described?
6           MR. ENGELHARDT:  Objection to form.
7           MR. HAMERMAN:  Objection to form.
8       A.   Not quite.  If it was a sale, there
9   was the relationship between treasury and
10  business getting -- the asset list from the
11  business group.
12          Upon completion of the sale, the
13  business group would upload the template into
14  CFDR and we would execute the lien releases,
15  provide -- we would execute the documentation
16  relating to the indenture lien releases and
17  provide them to the lawyers who would then do
18  their opinions and send that off.
19          At the end of the month, the
20  businesses would upload the complete listing.
21  That would go into the CFDR.  There would be
22  a comparison of the ledger to the -- to what
23  the businesses uploaded to confirm that was
24  the case.  The work behind the monthly

Page 206

2  reporting would be done.  We would sit down,
3  and it would be myself, when Melissa ran the
4  group, Melissa.  When Melissa didn't run the
5  group, just me, perhaps Mike, a structuring
6  person I had as key on this and then the ops
7  people and finance people.
8          And we would take what was showed
9  as all the collateral on the revolver from
10  the month before and what we had on all the
11  collateral on the revolver that month and we
12  would look to see what the differences were
13  and there should have been a template
14  uploaded to reflect any differences or
15  reductions as a result of a sale because we
16  could tell by just the various categories how
17  the assets and why the assets had moved.
18          That process was a SOX process as
19  well because -- so we had to identify the
20  risks and controls.  So it wasn't just us
21  putting together the processes which were
22  really very robust.  It was that.
23      Q.    And this process was undertaken in
24  the ordinary course with respect to every
25  automatic release of collateral during your

Page 207

2  time at ResCap, is that correct?
3          MR. ENGELHARDT:  Objection to form.
4      A.    Yes.  One clarification being if it
5  was movement to a bilat that somehow fell
6  under an automatic release -- and I'm not
7  sure that was the case -- the business unit
8  would not have uploaded the template.  We
9  would have done that out of treasury.
10      Q.    In that circumstance, would the
11  template have been uploaded in more or less
12  real time?
13      A.    Absolutely.
14      Q.    Were there ever any exceptions to
15  following this procedure?
16      A.    Not that I am aware of.  The only
17  exceptions which really aren't exceptions I'm
18  aware of is there was consternation around
19  the timing early in 2008 because sales,
20  agency sales were happening every single day,
21  and so there were some glitches in terms of
22  sometimes it would happen a day or two later,
23  the legal group may have ultimately
24  determined just to do things once a month.
25  But no, this was followed with respect to

Page 208

2  everything.
3      Q.    And just to follow through, as I
4  said, not necessarily all, but at least some
5  of the mortgage loans identified in the two
6  exhibits I just handed you, we have been able
7  to identify as being subsequently pledged to
8  the AFI letter of credit, are you aware of
9  what the process is to have specific loans
10  pledged to the AFI LOC?
11          MR. ENGELHARDT:  Objection to form.
12      A.    Yes.
13          MR. HAMERMAN:  Join in the
14  objection.
15      Q.    What is that process?
16      A.    The process of adding was basically
17  the population of assets we wanted to add to
18  the LOC was determined.  If the asset group
19  would have been provided to AFI, so Ally
20  would have agreed that the loans could go on
21  and given us an advance rate associated with
22  that.  There would have been a collateral
23  addition notice created and executed.
24          Upon the execution of that and the
25  addition of the collateral, we would have

Page 209

2  uploaded a template into CFDR which indicated
3  the funding facility to be the LOC.  We would
4  also have sent off information to the
5  business unit whom were responsible for the
6  various assets, indicating to them that they
7  were -- these assets were now subject to the
8  LOC, and then that was done real time and the
9  LOC reporting, we had daily reporting
10  requirements.  So we always insured that the
11  documentation relating to that was uploaded
12  to CFDR for that day's reports.
13      Q.    Under the AFI LOC, did you just
14  testify that AFI had to approve having
15  collateral added to the LOC?  Was that what
16  you just testified to?
17      A.    AFI had to price all of the
18  collateral that went on.  And then went on to
19  the LOC in groups.  So yes, AFI reviewed and
20  in essence approved.
21      Q.    OK.  You talked about this with
22  respect to automatic releases.  What are --
23  what are nonautomatic releases?  Could you
24  describe what the process is that was gone
25  through for any nonautomatic release of

Page 210

1
2  collateral that was securing the revolver?
3      A.   Sure.  Those were typically larger
4  sales or sales that for whatever reason
5  didn't fall within the release parameters.
6          At that point in time, as we
7  learned about the sale, I would send off an
8  e-mail to Ally and -- or maybe it was a phone
9  call to Ally and to Mayer Brown telling them
10  that we had an upcoming sale, giving them the
11  details to the extent I knew it.
12         We would work with the business
13  units with respect to that sale -- again, to
14  confirm that all of the requirements around
15  fair value were met and there typically were
16  a number of questions that Ally and Mayer
17  Brown would ask.
18         So once we got everyone satisfied
19  that the sale met the terms of the revolver,
20  Mayer Brown typically -- early on, it might
21  have been Skadden as well -- but Mayer Brown
22  typically would prepare the documentation
23  associated with the approvals and lien
24  releases.
25         In that documentation typically

Page 211

1
2  would be the directions to the collateral
3  agent to release the collateral relating to
4  the second and the third liens.  Drafts of
5  that would be sent around.  Seward & Kissel
6  and, you know, the -- I believe the Wells
7  Fargo business folk were on, but Seward &
8  Kissel really spoke for them, Mayer Brown and
9  Skadden or whomever on our side was
10  representing us would also get copies.  I
11  typically would get copies.  I'm sure when
12  Mike was doing it and Joe was his manager,
13  Joe would also get copies.
14         Mayer Brown would prepare the UCCs.
15  The lawyers would be responsible for getting
16  the documentation including the UCCs signed
17  up and those would be filed upon completion
18  of the sale.  Occasionally this process would
19  be followed with the more automatic releases
20  simply because the purchaser of the assets
21  wanted evidence that the liens had been
22  released.
23         With respect to putting new
24  facilities up, which everyone knew we were
25  going to do, that was the same process that

Page 212

1
2  was followed.
3      Q.   So with respect to the
4  documentation for these larger sales of
5  assets you described, would that
6  documentation include listings of individual
7  mortgage loans to be released pursuant to the
8  sale or sold in that process?
9          MR. ENGELHARDT:  Object to form.
10         MR. HAMERMAN:  Objection to form.
11     A.   Perhaps.  We always sent off the
12  lists of the individual assets and a
13  description of what they were.  The
14  attachments to the UCC were decided upon by
15  Mayer Brown in -- possibly in consultation
16  with the other law firms involved.
17         So we would not be involved with
18  what the attachments were.  We just would be
19  to the extent we knew it was happening and
20  were monitoring it's happening so we could
21  effectively close the transactions within the
22  firm and then we would upload, of course, the
23  templates or confirm the templates were
24  uploaded to CFDR and the normal process would
25  take place there.

Page 213

1
2      Q.   The templates that you are
3  identifying in that circumstance, those would
4  have individual loan detail, correct?
5      A.   Yes.
6      Q.   Are you aware whether Mayer Brown
7  would have sent Wells Fargo or their
8  representatives individual loan detail for
9  any of these larger sales?
10     A.   I do not know.
11     Q.   Do you know whether -- when you're
12  talking about larger sales, are you talking
13  about sales for which a UCC3 was filed?
14         MR. ENGELHARDT:  Objection to form.
15         MR. HAMERMAN:  Join in the
16  objection.
17     A.   Not necessarily.  When I say larger
18  sale, sales, and it's, the bilats, it really
19  means sales or transactions that did not meet
20  the automatic lien release requirements of
21  the revolver.
22         Typically they were larger sales,
23  but not always.  They might be sales of
24  assets that don't fit within a nonordinary
25  course type of sale.  So it's not necessarily

54 (Pages 210 to 213)

Page 214

1
2    just the larger sales.
3        And I think I have lost my train of
4    thought so what was your question?
5        Q.    Whether each of these, what I'll
6    call nonautomatic sales was accompanied by a
7    UCC3 at the time of the transaction?
8        MR. HAMERMAN:  Objection, again.
9    Same objection.
10        A.    I think they generally were, but
11    that was not a decision the company was
12    involved with.  That was really again run by
13    Mayer Brown and the lawyers associated with
14    the transaction.
15        Q.    Are you aware of any releases or
16    pledged mortgage loans -- strike that.
17        Are you aware of any releases of
18    loans that had been previously pledged to the
19    AFI revolver that were not supported by an
20    individualized schedule of mortgage loans to
21    be released under the revolver?
22        MR. ENGELHARDT:  Objection to form.
23        MR. HAMERMAN:  Objection to the
24    form.
25        A.    I'm not sure what you mean by

Page 215

1
2    "supported by."  I am not aware of any
3    transaction as to which an individual asset
4    list was not either through the automatic
5    release process attached to the business
6    certificate or with respect to the other
7    process which was not provided to the
8    attorneys.
9        I am -- I am aware that often,
10    Mayer Brown determined to put text on the
11    UCCs and I don't think they necessarily
12    attached the individual asset list to them.
13    But again that was a Mayer Brown
14    determination.
15        Q.    And if --
16        A.    And not ours.
17        Q.    To the extent that a transaction
18    result was consummated -- strike that.
19        To the extent that a transaction
20    ultimately resulted in a UCC3 being filed,
21    would any of the releases of collateral in
22    connection with that transaction have taken
23    place and been recorded on CFDR within a
24    month of that transaction?
25        A.    Yes.

Page 216

1
2        MR. HAMERMAN:  Objection.
3        A.    They should have been recorded
4    within a few days.  Obviously, the validation
5    process would have happened at the end of the
6    month with the close of the books.
7        Q.    Was there any -- did anyone at
8    ResCap have authority to change the markings
9    of which facility assets were securing absent
10    there being a specific lien release
11    supporting that?
12        MR. ENGELHARDT:  Objection to form.
13        MR. HAMERMAN:  Objection, objection
14    to the form and to the extent it calls
15    for a legal conclusion.
16        A.    Could you repeat that, please.
17        Q.    Sure, did anyone at ResCap have the
18    authority to change the markings in the CFDR
19    of which facility certain assets secured
20    absent there being a specific lien release
21    with mortgage that identified the mortgage
22    loans to be released?
23        MR. ENGELHARDT:  Objection to form.
24        MR. HAMERMAN:  Same objection.
25        A.    The only method -- and this may

Page 217

1
2    have changed just before the filing date --
3    the only means by which an asset could be
4    updated to reflect a sale or a new facility
5    was through the templates.
6        Q.    And does -- are those templates
7    consistent with the documents used in
8    connection with obtaining any releases,
9    mortgage loans under -- that serve as
10    collateral under the revolver?
11        MR. ENGELHARDT:  Objection to form.
12        MR. HAMERMAN:  Join the objection.
13        A.    The data came from the same place.
14    The data was consistent.  The template had
15    three to four fields for each asset.
16    Minimally.  That -- for each asset for which
17    a template was uploaded.
18        With respect to the lien releases,
19    again, it would be the same base source for
20    the data having been used, but with the lien
21    releases, we just put on typically the asset
22    number.
23        Q.    I got it.  So there is actually
24    more information in the template?
25        A.    Yes.  For the loan --

55 (Pages 214 to 217)

Page 218

1
2      Q.    Does ResCap maintain the lien
3    releases in the ordinary course of its
4    business?
5      A.    No.  John Ruckdaschel who is an
6    attorney who executed a large number of the
7    lien releases and a paralegal who worked for
8    John, she, as a matter of course, maintained
9    the automatic lien releases in a file and
10   that was provided with the discovery.
11          She also, as a matter of course,
12   more for John's personal back-up, once it was
13   printed out, she would attach the Fed Ex
14   receipt to it, staple it and throw it in a
15   box.  And that box was also provided.
16     Q.    So to the extent there are releases
17   that -- of collateral that was previously
18   identified in the CFDR as being pledged to
19   the revolver, is it your testimony that
20   ResCap has turned such -- all such releases
21   over to it's attorneys for production in this
22   case?
23          MR. ENGELHARDT:  Objection to form.
24     A.    To my knowledge, yes.
25     Q.    And are there any -- to the extent

Page 219

1
2    that assets were previously identified as
3    being pledged to revolver are not supported
4    by a -- an identifiable lien release, is
5    there a basis by which those such loans could
6    have been released absent there being any
7    documentation supporting it?
8          MR. ENGELHARDT:  Objection to form
9    and to the extent it calls for a legal
10   conclusion.
11          MR. HAMERMAN:  Objection to form.
12     A.    I think I'm confused by your
13   question.  Could you please restate.
14     Q.    Sure, let me take a step back.
15     A.    OK.
16     Q.    There are certain, as you know, the
17   CFDR is -- do you agree that the CFDR
18   contains data on individual loans?
19     A.    Yes.
20     Q.    And those -- that, those loans
21   either identify sometimes primary collateral,
22   sometimes it says unpledged, which I
23   understand is assumed to be secondary
24   collateral but may not be, and sometimes it
25   says AFI LOC as the case may be or some other

Page 220

1
2    facility.  Is that right?
3          MR. ENGELHARDT:  Objection to form.
4          MR. HAMERMAN:  Objection.
5      A.    That's correct.
6      Q.    We identified certain -- for
7    example, I handed to you certain lien
8    releases that you talked about as being part
9    of the automatic releases and there were
10   lengthy releases there and those identified
11   mortgage loans that I believe in the CFDR
12   were indicated as having previously been
13   pledged to the revolver?
14     A.    At the time this would have been
15   created, each of these asset numbers would
16   have been in the CFDR with a notation that it
17   either was the revolver collateral which was
18   primary or it would have been noted as
19   unpledged.
20          So this is a list of all assets in
21   the sale that were either revolver or
22   unpledged at the time of its -- the creation.
23     Q.    And in addition to those loans,
24   there were lots of assets that are identified
25   in the CFDR as being pledged, either

Page 221

1
2    unpledged or primary collateral to the
3    revolver, is that right?
4          MR. ENGELHARDT:  Objection to form.
5      A.    That's correct, but they would not
6    have been the subject of this particular
7    sale.
8      Q.    Of course.  And then some of those
9    assets, some assets that, over time, by
10   looking at the CFDR, we have identified some
11   loans that have been -- were showed at one
12   time to have been either unpledged or to have
13   been primary collateral and at a subsequent
14   time are shown to be pledged to the AFI LOC.
15   Do you understand that?
16     A.    Um-hm.
17          MR. ENGELHARDT:  Objection to form.
18          MR. BAUMSTEIN:  It wasn't a
19   question.  I guess do you understand,
20   that is a question.
21     Q.    In order for a loan to be pledged
22   to the AFI LOC that had been previously
23   pledged to the revolver, is it your
24   understanding that there would have been a
25   lien release identification by loan number

Page 222

1
2   executed with respect to such loan?
3       A.   Yes.
4           MR. ENGELHARDT:  Objection to form.
5           MR. HAMERMAN:  Objection.
6       A.   Yes.
7       Q.   And that's how ResCap managed the
8   lien release process in its ordinary course,
9   is that correct?
10          MR. HAMERMAN:  Objection.
11      A.   The entire conversation, but yes.
12      Q.   Exactly, you would take the
13  release, it would be uploaded through a
14  template, you would then, at month end, make,
15  do your reconciliations?
16      A.   The lien release process --
17          MR. ENGELHARDT:  Is that a
18  question?
19      A.   Sorry.
20      Q.   Is there anything else that you
21  would like to explain about the lien release
22  process?
23      A.   I just wanted to clarify what you
24  just said.  The lien release process itself
25  was the matching of the asset list that was

Page 223

1
2   being sold or transferred to a bilat,
3   comparison of that final asset list to
4   determine what facilities from which liens
5   needed to be released or the unpledged
6   assets, and then it was the creation of the
7   business certificates attaching the list of
8   those assets that we determined, using the
9   CFDR, delivering it to the legal group, the
10  legal group sending the e-mail or the fax
11  followed by the Fed Ex to Wells Fargo and to
12  the trustee.
13          With respect to the nonautomatic
14  sales, the process was really Mayer Brown
15  running it, getting the signatures, doing
16  whatever filing they determined was necessary
17  in conjunction with the other lawyers
18  associated with it.  That was the process.
19          Everything else we discussed was
20  how to insure that the CFDR accurately
21  reflected the happenings and that the
22  business units knew what was happening so
23  that they could continue to let us know and
24  keep us involved as they did things so that
25  we could insure that things were being

Page 224

1
2   complied with.
3       Q.   OK.
4       A.   And to insure we could satisfy our
5   own obligations.
6       Q.   And when you say the CFDR is
7   reflected -- the happenings, those -- if we
8   didn't have the CFDR, could you reconstruct
9   the happenings by looking at the loan
10  releases themselves?
11          MR. ENGELHARDT:  Objection to form.
12          MR. HAMERMAN:  Objection.
13      A.   I think you could reconstruct it
14  going to the ledger.  I think it would be
15  difficult but not impossible to deal with the
16  loan releases themselves.
17      Q.   But that's -- but the loan releases
18  themselves would, in fact, have enough
19  information to figure out what -- what -- if
20  an asset had been pledged and it later moved
21  over, it would show it had been released
22  prior to such repledging, is that correct?
23          MR. ENGELHARDT:  Objection to form.
24          MR. HAMERMAN:  Objection to form.
25      A.   If you had a complete listing of

Page 225

1
2   the lien releases which the collateral agent
3   should have and U.S. Bank also should have
4   because they were always party to them or
5   they were always being sent them, you should
6   be able to, asset by asset, go through and
7   determine every single asset that was
8   released.
9           MR. HAMERMAN:  If you are moving on
10  to the next topic, this is where I will
11  jump off.
12          MR. BAUMSTEIN:  I am.  I may have
13  things that touch on it, but I think it
14  is going to be different.
15          MR. HAMERMAN:  Regrettably, I have
16  to leave.  I guess the record will
17  reflect that I'm gone at this point.  The
18  committee's attorneys, other committee's
19  attorneys are still here.
20          (Exhibit 22, document Bates stamped
21  RCUCCJSN 10292807 through 808 marked for
22  identification, as of this date.)
23      Q.   I've handed you what has been
24  marked as Farley Exhibit 22 which appears to
25  be an e-mails between you and Sue Bode.  Do

57 (Pages 222 to 225)

Page 226

```
1
2    you recognize this document at all?
3        A.   I saw it during my prep.
4        Q.   Is it correct that ResCap did not
5    have the ability to track the value of the
6    revolver collateral in the ordinary course?
7            MR. ENGELHARDT:  Objection to form.
8            MS. GOODMAN:  Objection.
9        A.   That's incorrect.
10       Q.   In the first e-mail you asked
11   Ms. -- I am sorry, you asked Ms. Bode, "Do we
12   know what the value of all the collateral
13   including that covered by the blanket lien is
14   under the revolver"?
15       A.   Um-hm.
16       Q.   Do you know why you were asking
17   Ms. Bode that question?
18       A.   It appears from this e-mail,
19   Monday, June 29, it appears from this e-mail
20   that they were looking to see the aggregate
21   of all collateral covered by the blanket lien
22   including what the primary collateral was.
23           I knew we could go back into the
24   ledger and construct that which would be
25   possible.  Not always an efficient easy
```

Page 227

```
1
2    process, this is being done at the end of the
3    month.  So I suspect I was looking to see if
4    they had set up a process whereby that
5    information could be easily and readily
6    obtained.
7        Q.   So is it true that CFDR doesn't
8    allow for the readily ascertainment of the
9    value of all the collateral that supports the
10   revolver, is that correct?
11           MR. ENGELHARDT:  Objection to form.
12       A.   At this point in time, it did not
13   have the ability to break out the blanket
14   lien collateral and its value, as you recall,
15   the CFDR, it had the LOC collateral, it had
16   the revolver primary and supporting
17   collateral.  It had unpledged, but what was
18   unpledged was not necessarily blanket lien,
19   and the unpledged collateral, some of the
20   blanket lien assets were not in categories
21   relating to revolver categories.
22           The grants you saw earlier
23   were some asset groups that we did not get
24   value for on the borrowing base on which we
25   were not primary collateral.
```

Page 228

```
1
2            So some of those particular asset
3    groups at that time, since they were not part
4    of primary or supporting collateral, they
5    were not on any other facilities, they may
6    not have been added at that point to the
7    CFDR.
8        Q.   At that time, how would you have
9    gone about determining all the nonprimary
10   collateral at -- maintained by ResCap?
11           MS. GOODMAN:  Objection to form.
12           MR. ENGELHARDT:  Objection to form.
13       A.   I would have basically taken what I
14   could out of the CFDR, including anything
15   marked as unpledged at that time, I would
16   have gone to the general ledger, looked at
17   the complete asset list including asset level
18   detail.
19           I would have looked to see if the
20   assets in unpledged and any assets in the
21   ledger which were not reflected in CFDR were
22   covered by the blanket lien.  And then I
23   would have looked to the value of those
24   assets as reflected in the detailed back-up
25   to the financial statements.
```

Page 229

```
1
2            MR. BAUMSTEIN:  Why don't we take a
3    minute to change the tape.
4            THE VIDEOGRAPHER:  That is the end
5    of tape number 4.  The time is now 4:29
6    p.m.  We are now off the record.
7        (Recess)
8            THE VIDEOGRAPHER:  This is the
9    start of tape number 5.  The time is 4:36
10   p.m.  We are now back on the record.
11       Q.   Were all loans maintained by ResCap
12   tracked in the CFDR?
13       A.   As of the time the revolver closed,
14   yes.  Loans were there and servicing advances
15   were there.
16       Q.   Was there any circumstances where
17   there would be loans that were not tracked in
18   CFDR?
19       A.   I can't think of any.  The only
20   situation might be a timing difference where
21   loans had been originated or purchased and
22   CFDR hadn't been updated during a week or two
23   period.
24       (Exhibit 23, document Bates stamped
25   RCUCCJSN 10721290 through 304 marked for
```

58 (Pages 226 to 229)

Page 230

1
2      identification, as of this date.)
3      Q.   I'll direct you toward the end, you
4  don't have to look at the whole document,
5  although you're -- there is a fair amount in
6  here. I'm actually going to direct you
7  toward the last four or five pages of this
8  document.
9      A.   OK.
10     Q.   So you can just tell me when you
11 have had a chance to review this.
12     A.   If we are just going to the last
13 three or four pages, I've looked at that.
14     Q.   Do you recognize the document that
15 that's been marked as Farley Exhibit 23?
16     A.   I think we looked at this earlier
17 today.
18     Q.   We looked at -- there are a lot of
19 similarities. It is hard to tell if it was
20 identical, but in the e-mail, it looks like
21 Randy Newman was sending at the end says,
22 "Here is a breakdown Matt found in the CFDR."
23     Do you see that, the July 17 e-mail
24 on Bates stamped 300?
25     A.   Yes.

Page 231

1
2      Q.   And the first category says "not in
3  CFDR."
4      A.   Um-hm.
5      MR. ENGELHARDT:  Counsel, could you
6  tell me the Bates number, please?
7      MR. BAUMSTEIN:  I am sorry, Bates
8  page 300 and 301.
9      Q.   Do you know what was -- what "not
10 in CFDR" referred to?
11     A.   From the subject, the sale related
12 to charged-off first liens. They would have
13 been removed from CFDR at the point in time
14 that we determined there was no longer any
15 value with respect to those assets, and it
16 would have come off of the accounting and
17 finance records as well.
18     Q.   OK, so essentially, the reason that
19 these are, quote, not in CFDR is that they
20 were marked down for accounting purposes to
21 zero value?
22     MR. ENGELHARDT:  Objection to form.
23     MS. GOODMAN:  Objection to form.
24     A.   That is correct, and there was no
25 longer any work done any of the assets.

Page 232

1
2      (Exhibit 24, document Bates stamped
3  AFI JSN 0000273 through 280 marked for
4  identification, as of this date.)
5      Q.   One document starting with Bates
6  stamp AFIJSN 273. You can take a moment to
7  review. Just so you know, I'm going to focus
8  on the e-mail from Cecilia Laub dated
9  February 9, 2010 at 9:33 p.m. That starts on
10 page 278, and eventually, I will also ask you
11 a question, an e-mail from April 7 from you.
12     But I'll start with the Cecilia
13 Laub one from February of 2010. So take as
14 much time as you want though.
15     Have you had a chance to review the
16 document?
17     A.   Yes.
18     Q.   Do you recognize this document?
19     A.   No.
20     Q.   Having read it, there is the
21 subject makes reference to a BCG
22 intercompany. Do you understand what the BCG
23 intercompany is?
24     A.   I do understand what I think this
25 reference is.

Page 233

1
2      Q.   And what is the BCG intercompany?
3      A.   BCG is a description of the
4  business groups within ResCap relating to the
5  commercial and construction business. It's a
6  generic business label. For a number, a
7  large number of entities within that world.
8  It was very complex because -- let me just
9  preface this by saying whenever -- the BCG
10 world had a combination of properties, loans,
11 joint ventures, the list kind of goes on.
12     Whenever something went south and
13 it ended up being converted to an REO
14 property or a property owned, there was a new
15 SPE, if you will, created to hold that. And
16 monies within the BCG group transferred
17 ultimately up to the parent, but for -- we
18 had to basically establish a legal means
19 which by which monies could go because you
20 just don't send monies between different
21 entities.
22     So there was a whole series of
23 intercompanies created with monies flowing up
24 and back between all of the business group --
25 business -- legal business entities within

Page 234

1
2    BCG.
3        So the intercompany refers to the
4    fact that you had all of these intercompany
5    lines in that business unit.
6    Q.    By intercompany, you mean
7    intercompany credits and receivables among
8    these various SPVs and other entities that
9    were part of the BCG group?
10   A.    Amounts paid and amounts owed.
11       MR. ENGELHARDT:  I will give you a
12   little leeway on this intercompany, but I
13   think it is a phase two issue.
14       MR. BAUMSTEIN:  I don't think there
15   is an issue on -- the valuation, we are
16   not getting into a valuation issue here,
17   I assure you.  But certainly whether
18   there is a lien on them is part of this
19   case.
20       MR. ENGELHARDT:  I think it is an
21   issue that affects more than just JSNs.
22   Q.    Could you, by the way, looking at
23   the February 9 e-mail from Cecilia Laub, who
24   is Ms. Laub?
25   A.    CeeCee was an individual who worked

Page 235

1
2    in the ResCap treasury group.  She was one of
3    the structuring individuals and I had given
4    her primary responsibility for the
5    international and BCGS banks of the line.
6    Q.    On point one, it says, "The
7    intercompany debt that would not fit with the
8    current definition of excluded debt is
9    strictly caused by our operational (BCG
10   systems) to move cash around various BCG
11   entities."
12       First of all, do you know what
13   excluded debt refers to there?
14   A.    Excluded debt, I believe, is a
15   defined term within the revolver.
16   Q.    Do you know what the operational
17   constraints were that Ms. Laub was referring
18   to?
19   A.    These were really cash management
20   or, you know, the cash operations
21   constraints.  It's the cash system.
22   Q.    By the way, what did you understand
23   excluded debt to be?
24   A.    Without looking at the revolver at
25   this point, I couldn't give you a good

Page 236

1
2    definition.
3    Q.    Do you want to look at the
4    revolver?  Would that help refresh your
5    recollection?
6    A.    Do I want to?
7    Q.    Well, let's see where we go first,
8    we may be able to avoid that.  I really want
9    to focus on point 3.
10       MR. ENGELHARDT:  I am sorry, with
11   what page are you on again?
12       MR. BAUMSTEIN:  Page 279.
13       MR. ENGELHARDT:  OK.
14   Q.    It says, "Under our proposed
15   solution," Ms. Laub writes to you among
16   others, "we understand that the rationale for
17   the above restriction is to insure that the
18   intercompany, quote/unquote, lender has
19   encumbered the intercompany receivable in
20   favor of GMAC."
21       Did I read that correctly?
22   A.    Yes.
23   Q.    Did ResCap understand in February
24   of 2010 that the blanket lien under the GMAC
25   revolver would encumber intercompany

Page 237

1
2    receivables?
3        MR. ENGELHARDT:  Objection, I will
4    instruct the witness not to answer.  I
5    think we need to go and check -- I would
6    like to see the statement of issues as to
7    whether this is covered specifically.
8        MR. BAUMSTEIN:  I would -- well,
9    first of all, I don't think there is any
10   basis to instruct the witness not to
11   answer because she is also here in her
12   personal capacity.
13       I also think part of the what we
14   were discussing was ways not to have to
15   bring witnesses back more than once so we
16   could ask them questions.
17       MR. ENGELHARDT:  No.  What was
18   discussed specifically in court was that
19   the debtors in their electronic
20   production would make -- would include
21   phase two issues in that production.
22       However, with regard to
23   depositions, because the depositions
24   specifically -- because the intercompany
25   issue could affect the rights of other

60 (Pages 234 to 237)

Page 238

1
2 creditors other than the JSNs and those
3 other creditors were not participating in
4 these depositions, those topics were not
5 to be covered in phase one depositions.
6 Those were specifically reserved for the
7 depositions in phase two.
8      MR. BAUMSTEIN:  And I think -- and
9 I'm sure someone will pull it up
10 momentarily -- that for phase one was the
11 existence but not the value of any
12 intercompany obligations that may --
13      MS. NEWMAN:  How does the question
14 of whether the JSNs have liens and
15 intercompany balance differ from the
16 question of whether the JSN have any
17 other assets that --
18      MR. ENGELHARDT:  I would like -- I
19 would like to see the statement of issues
20 first.
21      MS. NEWMAN:  We are having it
22 brought.
23      MR. BAUMSTEIN:  Why don't we go off
24 the record then while we wait.
25      MR. ENGELHARDT:  Sure, if I am

Page 239

1
2 incorrect, I'm incorrect.  I just want to
3 see the statement of issues.
4      THE VIDEOGRAPHER:  The time is now
5 4:53 p.m.  We are off the record.
6      (Recess)
7      THE VIDEOGRAPHER:  The time is now
8 5:21 p.m.  We are now back on the record.
9      MR. ENGELHARDT:  Counsel, with
10 respect to the issue that you are
11 discussing, I'll allow some limited
12 examination into this document.  I will
13 note that whether or not the JSNs have a
14 lien on intercompany claims is a matter
15 of law.  So there will be a standing
16 objection that any such questions call
17 for legal conclusions.
18      I will also note that the witness
19 is not designated as a 30(b)(6) witness
20 on this topic, and in fact, there are no
21 30(b)(6) topics listed in the notices, I
22 believe, on this topic.
23      I will not allow any examination or
24 inquiry into the topics of valuation of
25 intercompany claims, and to the extent

Page 240

1
2 that any of the documents that you show
3 the witness discuss that valuation, I
4 will not allow testimony on those
5 portions of the documents.
6      MR. BAUMSTEIN:  OK.  Well,
7 obviously the witness is here in a
8 personal capacity as well which I will
9 point out for the record, I will now ask
10 the court reporter to reread the previous
11 question and republish it in the
12 transcript because I'm sure it has been
13 long enough that no one here to state it
14 exactly.
15      MR. ENGELHARDT:  I would like to
16 apologize to the witness for the extended
17 break and thank her for her forbearance
18 during the past half hour.
19      (Record read as follows: "Did
20 ResCap understand in February of 2010
21 that the blanket lien under the GMAC
22 revolver would encumber intercompany
23 receivables?")
24      MR. ENGELHARDT:  I am going to
25 object to the form of the question to the

Page 241

1
2 extent it reads "ResCap," as the witness
3 is not a designated witness for ResCap on
4 this topic.
5 Q.   You can answer.
6 A.   We understood intercompany
7 receivables to be subject to the lien only if
8 they were part of the collateral that was
9 pledged by the grantor under -- the
10 applicable grantor, there were a number of
11 liens under the PSA and not otherwise subject
12 to an exclusion or prior release.
13 Q.   And Ms. Laub wrote that, "We
14 understand that the rationale for the above
15 restriction" -- and she was talking about a
16 rationale.  Did you understand it was an
17 intentional feature for the revolver to
18 create the lien on intercompany claims with
19 respect to guarantor, to grantors or
20 pledgors?
21 A.   No.
22      MR. ENGELHARDT:  Hold on, if I can
23 get a reference on that.  I am sorry, I
24 lost the page where you were --
25      MR. BAUMSTEIN:  It was on page 279.

Page 242

1
2      A.   OK.
3      Q.   Did you ever correct anything
4   Ms. Laub said here about her understanding of
5   the rationale -- do you understand what
6   Ms. Laub meant by the rationale for the above
7   restriction?
8          MR. ENGELHARDT:  Objection to form.
9      A.   This was a very complex topic,
10  particularly because the number of BCG
11  entities that were associated with this.
12         You also have to know that CeeCee
13  was not a native English speaker.  So
14  oftentimes her wording was not all that
15  precise, and so I suspect that I did probably
16  correct her.
17         Obviously, as she is talking in
18  here, she says, "Our proposal is to amend the
19  current definition to include any entity
20  subject to a blanket lien."  That's not
21  really a concept.  Our proposal was really
22  something different which is more clearly
23  articulated in one of these subsequent
24  e-mails.
25         So now that being said, I don't

Page 243

1
2   think -- the restrictions really -- and the
3   conversations in there were -- many were
4   really around the excluded debt, and at what
5   point you could include intercompany in
6   excluded debt.  And to my knowledge, the
7   conversations with Ally at that time in
8   August, of these starting that October, had
9   to do with insuring cash was in blocked
10  accounts.
11     Q.   Going to your April 7, 2010 e-mail,
12  on the front of the document, I want to
13  direct you to the second point three that
14  says, "The accounting treatment is changed,
15  the intercompany lines and the Cerberus
16  entities would be reduced to zero so there
17  would be no issue under the revolver."
18         First of all, did I read that
19  correctly?
20         MR. ENGELHARDT:  Hold on a second.
21     A.   Yes.
22     Q.   Did you understand if intercompany
23  claims were reduced to zero through an
24  accounting process, there would be no
25  intercompany claims subject to the blanket

Page 244

1
2   lien under the revolver as a result of such
3   change?
4          MR. ENGELHARDT:  Objection to form.
5          MS. GOODMAN:  Objection to form.
6          MR. ENGELHARDT:  Objection to the
7      extent it calls for a legal conclusion
8      and objection to the grounds that it is
9      not 30(b)(6) topic.
10         MR. BAUMSTEIN:  I asked did you
11     understand.
12         MR. ENGELHARDT:  I know.  I just
13     want to make my position clear as well.
14     A.   Could you plead please repeat that.
15         (Record read)
16     A.   The question assumes that the
17  intercompany line was subject to the blanket
18  lien and I don't think that we necessarily
19  agree that it was.  We have already talked
20  about that.
21         If an intercompany line was reduced
22  to zero through an accounting change and
23  there happened to be a blanket lien which
24  there may or may not have been, then the
25  value of that lien would be zero.

Page 245

1
2      Q.   Did you personally have an
3   understanding whether the blanket lien
4   covered intercompany obligations?
5          MR. ENGELHARDT:  Objection to form
6      and objection to the extent it calls for
7      a legal conclusion.
8          MS. GOODMAN:  Same objection.
9      A.   Only if that would have been
10  specified in the GSA and the grantor would
11  have been a grantor or the PSA and the
12  grantor would have been a grantor.
13     Q.   And when you say only if specified,
14  does -- do you understand that an
15  intercompany receivable is an asset?
16     A.   Yes.
17     Q.   And do you understand that -- and
18  we can go to the document there, that the
19  grant of security extends to all assets less
20  excluded assets?
21         MR. ENGELHARDT:  Objection to form.
22     Objection to the extent it calls for a
23     legal conclusion.
24     A.   I'm not --
25         MS. GOODMAN:  Same objections.

62 (Pages 242 to 245)

Page 246

1
2      A.   I'm not sure if the definition of
3   intercompany receivables falls within the
4   definitions you are referring to.  I
5   understand it is an asset, lower cased, not
6   defined term.
7         I can't, sitting here, tell you if
8   that is an asset within the meaning of the
9   PSA and I can't, sitting here, tell you that
10  the intercompanies that we are referring to
11  are owned by parties which gave an interest
12  in their assets.
13     Q.   Would you just go to Farley Exhibit
14  3 for a moment.
15        MR. ENGELHARDT:  Which document is
16     that, Counsel?
17        MR. BAUMSTEIN:  That's the first
18     priority pledge agreement.
19     Q.   In discussing whether intercompany
20  claims would be an asset, do you agree that
21  if an intercompany claims falls under the
22  definition of assets on page 7, that it would
23  be covered for the entities covered under
24  paragraph -- section 2 on page 7?
25        MR. ENGELHARDT:  Objection to form.

Page 247

1
2      Objection to the extent it calls for a
3      legal conclusion.
4         MS. GOODMAN:  Same objections.
5      A.   Are you looking at subparagraph A?
6      Q.   Yes.
7      A.   I think that it -- this is my
8   interpretation.  I think that if an
9   intercompany was owned by borrowers, grantors
10  or the mobile home and the intercompany were
11  same type of asset as described on schedule 6
12  to this agreement, then it's possible that it
13  would be covered.
14     Q.   Are you thinking specifically the
15  second number three here?
16     A.   In the e-mail you pointed me to.
17     Q.   Yes.  Well, I'm now not pointing to
18  the second number three.
19        By the way, did you understand that
20  the first priority and pledge agreements,
21  that everything that follows "all assets" was
22  meant to limit the scope of assets?
23        MR. ENGELHARDT:  Objection to form.
24     Objection to the extent it calls for a
25     legal conclusion.

Page 248

1
2         MS. GOODMAN:  Join in that
3      objection.
4      A.   I think that is the way I interpret
5   it given there is this long litany of other
6   assets.
7      Q.   OK.  Can I just direct your
8   attention to the words that follow "assets"
9   which says "including without limitation."
10  Does that cause you to question whether, in
11  fact, those assets, those lists were not
12  supposed to be limitations on what "all
13  assets" applied to?
14        MR. ENGELHARDT:  Objection to form.
15     Objection to the extent it calls for a
16     legal conclusion.
17        MS. GOODMAN:  Same objections.
18     A.   Not necessarily, but that I think
19  is a matter of law.
20     Q.   New topic so you can put that away.
21        Were you involved at all in
22  negotiating the cash collateral order?
23     A.   No.
24     Q.   Did you ever have any discussions
25  with anyone concerning the terms of the cash

Page 249

1
2   collateral order as it was being negotiated?
3      A.   No.
4         (Exhibit 25, document Bates stamped
5      RCUCCJSN 10828362 through 65 marked for
6      identification, as of this date.)
7      Q.   I'm just going to direct you to the
8   e-mail that you wrote here on -- it really is
9   the text is on the third page, but it is
10  dated September 6, 2012 at 5:38 p.m.
11     A.   OK.
12        MR. ENGELHARDT:  I am sorry, what
13     number exhibit is this?
14        THE REPORTER:  That was 25.
15     Q.   Ms. Farley, I want to direct your
16  attention to the middle of your September 6,
17  2012 e-mail where you wrote, "Periodically,
18  when GMAC/Ally (as our owner) wanted ResCap
19  to change accounting treatment or take some
20  action that would have a negative impact on
21  the revolver, they would, quote/unquote,
22  'revalue' certain assets on the revolver."
23        Did I read that correctly?
24     A.   Yes.
25     Q.   What did you mean by that sentence?

63  (Pages 246 to 249)

Page 250

1
2      A.   We were a wholly-owned subsidiary
3   of Ally, and within the finance group, they
4   reported all the way up through Ally.
5          If the finance group at Ally
6   determined that they were making some sort of
7   an accounting change, that would impact the
8   ResCap financials, they would obviously have
9   the ability to tell the finance groups
10  reporting up to them that a financial change
11  was necessary.
12         To the extent that Ally or GMAC --
13  or GMAC, same thing, determined to make a
14  finance -- an accounting adjustment that then
15  would impact the carry value of the assets on
16  the revolver or something else having to do
17  with the assets that was material would
18  generally have noticed that that was
19  happening through our own finance folk and
20  Ally would typically revalue -- look at the
21  collateral through their trade desk, and they
22  may well revalue so that the advance rates
23  came in higher on those assets and there was
24  not a borrowing base issue.
25      Q.   And how would that negatively

Page 251

1
2   impact the revolver?
3      A.   Some of the accounting treatments
4   like, for example, when loans moved from HFI
5   to HFS, the value of those loans, the carry
6   value of those loans dropped relatively
7   significantly.  In fact, very significantly.
8          On a stand-alone basis, if you took
9   what that adjustment was going to do to those
10  assets and then multiplied it by the existing
11  advance rates, there would be been a
12  borrowing base shortfall.  We knew that was
13  coming.
14         So that's the type of accounting
15  change that then would create a negative
16  impact because you would have a borrowing
17  base shortfall.
18      Q.   And Ally would direct those things,
19  is that correct?
20      A.   Ally as our parent had ultimate
21  financial control over the workings of the
22  finance department and the interpretations of
23  FAS-B, CBS.
24         It is not to say within the finance
25  department they didn't have some push-back or

Page 252

1
2   dialog or things happened within our own
3   finance department that didn't necessarily
4   impact Ally.  But Ally needed to be aware of
5   it.
6          But the situation I'm talking about
7   here is situations where Ally accounting
8   treatments changed.  They determined that
9   they wanted a different interpretation of
10  FAS-B, something was coming into play in the
11  accounting world and they would direct its
12  business units, including ResCap, to take
13  that into account.
14      Q.   And what is your understanding why
15  Ally may have wanted ResCap to have taken
16  actions that would have a negative impact on
17  the revolver?
18         MR. ENGELHARDT:  Objection to form.
19      A.   I don't think that Ally was taking
20  actions that would create borrowing base
21  shortfalls because it would create borrowing
22  base shortfalls or have a negative impact.
23         I think they were taking actions
24  because they thought, from a finance
25  standpoint, that that was the prudent thing

Page 253

1
2   to do, or in the case of -- there was a very
3   large write-down within the BCG world and
4   that was mandated by the government as a part
5   of their -- the government investment, when
6   Ally received the money from the government
7   in January of 2009.
8          So I don't think it was
9   intentionally to hurt the revolver, but -- I
10  think that there were consequences.
11      Q.   In the sentence you wrote, you put
12  the world "revalue" in quotes.  Is that
13  because you questioned the legitimacy of such
14  valuations?
15         MR. ENGELHARDT:  Objection to form.
16         MS. GOODMAN:  Objection to form.
17      A.   You have to ask Ally what exactly
18  they did whenever they looked at the
19  collateral as they changed their advance
20  rates.  We didn't have visibility into what
21  exactly they were doing.  We would send them
22  off their tapes and they would come back with
23  numbers.
24         It's the nature of a borrower to be
25  a bit suspicious in terms of the work that

64 (Pages 250 to 253)

Page 254

1
2  was done in terms of valuation and whether or
3  not advance rates were changed independent of
4  valuations.  But we don't know -- I don't
5  know exactly what they did.  You would have
6  to address that with them.
7      Q.   But you were suspicious?
8          MR. ENGELHARDT:  Objection to form.
9          MS. GOODMAN:  Same objection.
10     A.   It was in our nature to be
11 suspicious.
12     Q.   Why was it in your nature to be
13 suspicious?
14         MR. ENGELHARDT:  Objection to form.
15     A.   We always thought the advance rates
16 were little low.  We always thought the
17 valuation was a little bit low, and we were
18 always trying to protect our capital, protect
19 our assets and increase the capital we could
20 get or money we could get for them.
21         They were always trying just the
22 opposite.  You know, that's the natural give
23 and take of a lender and a borrower.
24     Q.   In the penultimate sentence, you
25 said, "I don't recall any revolver debt being

Page 255

1
2  forgiven.  Ally preferred to forgive other
3  debts first because by writing down the
4  revolver debt, the assets securing the debt
5  would more quickly benefit the bondholders."
6          Could you explain what you were
7  referring to in that sentence?
8      A.   I think I was just responding to
9  the question and giving some context to
10 Heather as to why I don't recall any Ally
11 write-downs.
12     Q.   Why do you believe that Ally
13 preferred to forgive other debts first?
14     A.   At the time I wrote this, I must
15 have been aware of other debt that had been
16 forgiven.
17     Q.   What is the consequence to the JSNs
18 of other debt being forgiven other than the
19 debt under the revolver?
20         MR. ENGELHARDT:  Objection to form
21 and to the extent it calls for a legal
22 conclusion.
23         MS. GOODMAN:  Same objection.
24     A.   To the extent that the revolver was
25 paid -- was -- debt was forgiven on the

Page 256

1
2  revolver and the collateral was not released,
3  which it very likely would not have been,
4  there would have been -- that there would
5  have been more over collateralization of the
6  revolver debt as a result of the forgiveness,
7  and accordingly, after the revolver was paid
8  off, there would be more assets left to
9  support the payments on the senior and junior
10 bank holders.
11         (Exhibit 26, document Bates stamped
12 RCUCCJSN 11714493 through 97 marked for
13 identification, as of this date.)
14     A.   I should say, Doug, that note there
15 was a blanket lien there and people were
16 certainly cognizant there were blanket lien
17 assets, but the value of the borrowing base
18 and how we looked at all the
19 collateralization was really associated with
20 the primary collateral and how we reported on
21 that and the blanket lien collateral could be
22 used without restrictions in the normal
23 course of business and the primary could not.
24         So in essence that was more out
25 of -- reliable or secure collateral for both

Page 257

1
2  the revolver and the bondholders.
3      Q.   I'm going to direct your attention,
4  really, I guess, to the top e-mail, but if
5  you need to read a little bit more context, I
6  understand as well.
7          Do you recognize this document,
8  Ms. Farley?
9      A.   I don't remember sending this.  I
10 mean -- I have not seen this document.
11     Q.   OK.  Do you have any reason to
12 doubt that in October of last year, you sent
13 an e-mail to Bill Tyson?
14     A.   No reason at all.
15     Q.   Do you recall what the issue being
16 discussed here was?
17     A.   It was really, I think, two issues.
18 One just related to the RF -- the population
19 of loans held by RFOC serviced by MCAP, and
20 the second is related to a tax liability that
21 would -- that will come about should an
22 intercompany loan not be paid by the end of
23 this year.
24     Q.   And do you recall what the concern
25 was that you, in the second paragraph --

65 (Pages 254 to 257)

Page 258

1
2  let's start with the first paragraph of the
3  top e-mail, you talk about how, with respect
4  to certain funds, about that were at issue,
5  RFC doesn't have the ability to use those
6  funds for other reasons unless both Ally and
7  the bondholders agree.  What did that refer
8  to?
9      A.   In order to -- in order for RFOC to
10  avoid this tax liability, RFC would have to
11  pay the amount it owes to RFOC.  If it is not
12  repaid by December 31, 2013, taxes of
13  approximately 550,000 dollars will accrue
14  because that lending receivable, if you will,
15  will be converted into a dividend and then
16  taxes will apply.  This is an issue that's
17  floated around.
18      What we did in December of 2012
19  with respect to the same type of issue,
20  basically, there was an RFC -- RFC owed money
21  to RFOC, the timing requirement was up as of
22  12/31/2012.  The debt would be converted to a
23  dividend, taxes would accrue.  What we did
24  was RFC sent out money to RFOC in the amount
25  of the receivable.  RFOC, on the next

Page 259

1
2  business day, sent money in the amount of
3  that paid, the amount paid back to RFC.  And
4  that came back as a return of capital.  And
5  so it was a cash neutral transaction to RFC.
6  It was a manner by which RFOC did not -- was
7  able to maintain more money because it didn't
8  end up having this tax liability.
9      So the proposal here was
10  basically -- or what we were discussing is
11  RFC sending money to RFOC out of, you know,
12  U.S. bankrupt cash, the cash in the various
13  accounts, to a nondebtor entity in Canada.
14  And that's really what we were talking about
15  in terms of -- that's what I was talking
16  about.  In terms of RFC, to my knowledge, in
17  the bankruptcy scenario last fall could not
18  send money to nondebtor entities in payment
19  of intercompany debt.
20      Q.   Right.  And your understanding is
21  that if they were to make such a payment,
22  that would hurt Ally who, at that point,
23  there had been no settlement reached and was
24  I guess in the first lien position and the
25  bondholders by reducing their recovery by

Page 260

1
2  550,000 dollars?
3          MR. ENGELHARDT:  Objection to form
4      and to the extent it would call for a
5      legal conclusion.
6          MS. GOODMAN:  Same objection.
7          MR. BROWN:  Objection to form.
8      A.   I'm not sure whom it would hurt
9  without thinking about that a little bit more
10  right here.
11      But basically what it would do is
12  it would reduce the estate by 550,000 dollars
13  because those taxes would be paid and,
14  ultimately, in the RFOC liquidation, the
15  monies coming back up into RFC and into the
16  bankrupt -- into the ResCap estate would be
17  less than 5 -- 550,000 dollars.  Whether who
18  it would hurt if this were not paid would
19  really be a legal interpretation of where the
20  money came from.
21      Q.   Well, in the --
22      A.   Or who would be entitled to get it.
23      Q.   In the middle paragraph, you have a
24  proposal and you say that would be cash
25  neutral to ROC, not impact Ally or junior

Page 261

1
2  bondholders, and increase the eventual return
3  to the unsecured creditors.  What did you
4  mean by that?
5      A.   I think that I probably thought
6  that RFOC -- I guess I still think this --
7  RFOC assets are not assets that are subject
8  to the -- as primary collateral or subject to
9  the blanket lien.
10      If they are not subject to the
11  blanket lien or part of primary collateral,
12  then the cash would come up into the
13  unsecured creditors silo.  It wouldn't impact
14  Ally, wouldn't impact the junior bondholders
15  because it is not assets that you would have
16  otherwise gotten or they would have otherwise
17  gotten.
18      Q.   OK.  Then just so I'm -- now I'm a
19  little bit confused.  In the first paragraph,
20  you said that RFC is contractually obligated
21  to send the monies related to a sale of
22  pledged assets to a revolver account?
23      A.   I'm probably talking about whatever
24  Bill is doing down here, but let me look.
25      I know what he is talking about.

Page 262

1
2    His proposal is basically -- OK, the RFOC
3    assets that were sold, basically the
4    economics of those assets were pledged as
5    primary collateral, and so because they were
6    pledged as primary collateral, the sale
7    proceeds needed to be deposited in the
8    various accounts and ultimately would go to
9    the benefit of Ally and the junior
10   bondholders.  OK.
11         His proposal was let's just
12   carve out the 550 dollars -- 550,000 dollars
13   from the sale proceeds.  And so we will send
14   up the sale proceeds related to these loans,
15   include, you know, the economic interest in
16   these loans into the Ally and bondholder
17   accounts, but it will be short the 550,000
18   dollars, and that way, we will cover the
19   taxes, and that way, everyone is happy, and
20   my response to him is really there are two
21   different things.  We can't take the 550,000
22   dollars out of the sale proceeds.  We just
23   can't.  That would hurt obviously Ally.  It
24   would hurt the junior bondholders and you
25   would actually have to agree to that before

Page 263

1
2    we could do that.
3          So this was basically saying can't,
4    can't short the sale proceeds.  We have to
5    come about it a different way.
6    Q.   Were you trying to come up with
7    ways that would ultimately benefit the
8    unsecureds but would also result in a
9    potential reduction of the recovery of the
10   secured bondholders?
11         MR. ENGELHARDT:  Objection to form.
12         MS. GOODMAN:  Objection.
13   A.   Not at all.  This would be neutral
14   to Ally and the junior bondholders.  Ally and
15   the junior bondholders interest was in the
16   assets that were sold, the sale proceeds came
17   through to them.
18         To the extent that RFOC can
19   maximize its value by not paying taxes which
20   it would not need to pay, then that's good
21   for the estate and the unsecured creditors,
22   but there is no impact on this.
23         MR. BAUMSTEIN:  I have nothing
24   further.  I think Ms. Newman had a couple
25   questions she wanted to follow up.

Page 264

1
2          MS. NEWMAN:  I have a few.
3          MR. ENGELHARDT:  I don't understand
4    procedurally how you can do that.
5          MS. NEWMAN:  Are you telling me I
6    can't?
7          MR. ENGELHARDT:  I don't know why
8    you can.
9          MS. NEWMAN:  Why wouldn't I be able
10   to?
11         MR. ENGELHARDT:  You ended your
12   examination.  He continued the
13   examination.  You are not --
14         MS. NEWMAN:  Well, I didn't intend
15   to foreclose our ability to ask
16   additional questions.  I don't know how
17   the prior depositions have been handled.
18   Have they been not doing it --
19         MR. BAUMSTEIN:  I have only been in
20   one.
21         MR. ENGELHARDT:  They haven't been
22   done by this method.
23         MS. NEWMAN:  Are you going to tell
24   us we can't have --
25         MR. ENGELHARDT:  I am not going to

Page 265

1
2    tell you but I am not going to sit here
3    for another 20 minutes.  If you have got
4    a few follow-up questions --
5          MS. NEWMAN:  I don't know what the
6    basis to end the deposition in advance of
7    seven hours and I don't believe we have
8    gone more than seven hours.  With all the
9    breaks, so I don't know what the basis
10   would be for you to tell us we are not
11   entitled to our seven hours.
12         MR. ENGELHARDT:  The basis would be
13   is that you concluded your examination.
14   You said you have no further questions.
15   You're done.  He had his questions, he is
16   done.  That's the end of UMB's
17   examination.  That's the end of the ad
18   hoc group's examination.
19         MS. NEWMAN:  Are you taking the
20   position that the ending the deposition
21   and the deposition won't go on for 20
22   minutes because I think that's something
23   we would have it an objection to.
24         MR. ENGELHARDT:  I said I will
25   allow you to ask questions --

Page 266

1
2        MS. NEWMAN: Then I think we should
3    stop having this colloquy.
4        MR. ENGELHARDT: I am going to get
5    the colloquy on the record. I think this
6    is a not the proper way doing it.
7        MS. NEWMAN: You have gotten your
8    colloquy on the record.
9        MR. ENGELHARDT: One moment,
10    please.
11    EXAMINATION BY
12    MS. NEWMAN:
13        Q.    Ms. Farley, thank you for your
14    time. I think it has been a long day for
15    everyone.
16        I have a few follow-up questions.
17    The first, were you involved in the
18    negotiation of the intercreditor agreement?
19        A.    Yes.
20        MR. ENGELHARDT: Objection.
21        MS. NEWMAN: And you have -- what's
22    the objection to when you --
23        MR. ENGELHARDT: Withdrawn,
24    withdrawn.
25        Q.    And do you have an understanding of

Page 267

1
2    the terms of the intercreditor agreement?
3        A.    Yes, I have an understanding of the
4    terms.
5        Q.    I can't remember if you said this
6    earlier today, I apologize if I am repeating
7    myself, were you also involved in the
8    negotiation of the pledge and security
9    agreement relating to the junior secured
10    notes?
11        A.    Yes.
12        Q.    And you have an understanding of
13    the terms of that agreement, is that correct?
14        A.    Yes.
15        Q.    Ms. Farley, are you familiar with
16    the way ResCap operated its business during
17    the 75 days preceding the bankruptcy filing?
18        A.    Generally, yes.
19        Q.    Do you still have schedule 6 in
20    front of you?
21        A.    OK.
22        Q.    Schedule 6 to the -- I am sorry,
23    not Exhibit 6. It was --
24        A.    The preference assets.
25        Q.    Yes, exactly, I think that is it, I

Page 268

1
2    believe. Great. Would there be any way for
3    me to tell if cash collateral under the
4    revolver was used to fund loan originations
5    during the 75 days preceding the bankruptcy
6    filing?
7        A.    You aren't talking about cash from
8    sale proceeds, you're talking about cash
9    subject -- what -- what cash are you thinking
10    of?
11        Q.    So let me ask you first, would it
12    be possible that cash from sale proceeds --
13    first of all, is cash from sale proceeds cash
14    from the proceeds of the sale of primary
15    collateral?
16        A.    Yes.
17        Q.    And would it be possible under the
18    terms of the revolver and the pledge and
19    security agreement relating to the revolver
20    for such cash proceeds to be used to fund
21    loan originations?
22        A.    No.
23        Q.    OK. So would it be possible for
24    other cash subject to the security interests
25    of AFI in connection with a revolver to be

Page 269

1
2    used to fund loan originations?
3        A.    Prior to the bankruptcy, yes.
4        Q.    And if that took place during the
5    75 days preceding the bankruptcy filing, how
6    would I figure that out?
7        A.    We would basically have to go into
8    the cash system and see where the wires had
9    been sent and we would be able to track it
10    that way.
11        Q.    Would that depend on determining
12    which deposit accounts the cash used to fund
13    the originations was derived from?
14        A.    It would be easiest if we knew the
15    dates and the amounts. But we have cash
16    records that show every withdrawal from every
17    account and so I think it would be possible
18    to go into the cash management system on a
19    daily basis and look at all of the accounts
20    and see the monies which came out of each
21    account and to where they had been sent. And
22    based on that information, you could probably
23    tell.
24        Q.    OK. And based on your
25    understanding of the way in which the debtors

68 (Pages 266 to 269)

Page 270

1
2  operated their business in the 75 days
3  preceding the bankruptcy filing, is it likely
4  that loan originations were funded with this
5  type of cash collateral that we are talking
6  about now?
7        MR. ENGELHARDT:  Objection to form.
8        MS. GOODMAN:  Objection to form.
9    A.    It's likely that the fundings
10  occurred out of accounts with collateral, the
11  control agreements on them.  And whether or
12  not those particular accounts were subject to
13  the blanket lien is something, you know, I
14  can't really say right now.
15        But under the revolver, we were
16  allowed to use all cash except for sale
17  proceeds for business purposes.  And this
18  clearly was an ongoing business purpose.
19    Q.    Would there be a source for these
20  loan -- for loan originations that occurred
21  in the 75 days preceding the bankruptcy
22  filing other than deposit accounts that were
23  subject to control agreements in favor of AFI
24  in connection with the revolver?
25        MR. ENGELHARDT:  Objection to form.

Page 271

1
2        MS. GOODMAN:  Objection to form.
3    A.    We would be able to tell when loans
4  were originated by going into the origination
5  systems and the servicing systems of the
6  various businesses.
7        Once loans were originated, they
8  were also put in the general ledger, they
9  would have been uploaded to the CFDR.  There
10  would have been an origination date
11  associated with them.
12    Q.    My question is just was there
13  another source of funding other than the
14  accounts that were subject to control
15  agreements in favor of AFI?
16    A.    I am not sure if the BMMZ facility
17  would have been used for that or not.  But
18  other than that particular facility, I think
19  everything likely came out of the accounts.
20  the accounts subject to collateral control
21  agreements which were not the sale proceeds
22  accounts.
23    Q.    OK.  Looking now at schedule 6,
24  number 4 on the summary page, it lists
25  approximately 14 million dollars of REO.  And

Page 272

1
2  I think we discussed earlier that REO is real
3  property that ResCap acquires as a result of
4  foreclosure, is that correct?
5    A.    Yes.
6    Q.    Would there be any REO coming into
7  the estate in the 75 days preceding the
8  bankruptcy filing as a result of something
9  other than a foreclosure?
10        MR. ENGELHARDT:  Objection to form.
11        MS. GOODMAN:  Objection to form.
12    A.    I can't think of one.
13    Q.    Now I want to ask you a question
14  about the loan modifications we talked about
15  earlier and we talked a little bit about how
16  I would try to figure out, based on the
17  debtor's information, whether a loan with a
18  new ID number is a modification.  Do you
19  remember having that conversation?
20    A.    Um-hm, yes.
21    Q.    Is there any identifier associated
22  with a modified loan that would be the same
23  as the loan identifier associated with the
24  loan that was modified?
25    A.    I'm not sure.

Page 273

1
2    Q.    OK.  Again, it is hard for me to
3  understand what's really associated with this
4  because I'm not that familiar with the CFDR.
5  But if I were going to try to figure out if a
6  new loan ID was the result of a modification,
7  how would I tell someone how to do that?
8        MR. ENGELHARDT:  Objection to form.
9    A.    Using the -- in the CFDR, if you
10  can explain it.
11        MS. GOODMAN:  Same objection.
12    A.    I think there is probably an
13  identifier of some sort or something that
14  links it back in the CFDR.  I'm not sure what
15  that is.  But if there is something there,
16  you could look up -- you could do a sort,
17  really by that identifier.  If it is not in
18  the CFDR, I would expect that there would be
19  something in the business unit, probably the
20  servicing systems that would create a link or
21  perhaps the origination system.  At the time
22  of the modification, the servicing system was
23  updated for the new terms of that loan by --
24  I think there may be something there as well.
25    Q.    What is the servicing systems?

Page 274

1
2      A.   Each business group has its own or
3  had its own systems that all fed in in
4  various ways, shapes and forms to the ledger
5  and to CFDR.  The servicing systems would be
6  the systems used by the servicing groups that
7  serviced the loan.
8          There were different servicing
9  systems and there were different groups
10  within ResCap that serviced assets.  That
11  could be determined by the loan number.
12      MS. NEWMAN:  OK.  Stefan, we are
13    going to request the facilitation of
14    another conversation between Zolfo Cooper
15    and Ms. Westman to try to figure out how
16    we would acquire or access this
17    information and we will follow that up
18    with a written request.
19      MR. ENGELHARDT:  Certainly.
20      MS. NEWMAN:  Now that is all I
21    have.  And Ms. Farley, thank you again
22    for your time today.
23      THE WITNESS:  You're welcome.
24      MR. ENGELHARDT:  Anybody else?
25      MS. GOODMAN:  I have some

Page 275

1
2  questions.
3      MS. NEWMAN:  I did not realize the
4    committee was going to ask questions, so
5    I will have to reserve my right to ask
6    some questions in response to any
7    questions that are asked.
8      MR. ENGELHARDT:  I don't think you
9    have to reserve your right to do that, I
10    agree you would be entitled to do that so
11    long as it is within the scope of the
12    committee's examination.
13      MS. NEWMAN:  Great.
14        - - - -
15
16
17
18
19
20
21
22
23
24
25

Page 276

1
2  EXAMINATION BY
3  MS. GOODMAN:
4      Q.   It is Alissa Goodman from Kramer
5  Levin Naftalis & Frankel on behalf of
6  unsecured creditors committee.
7          Earlier this afternoon, Ms. Newman
8  showed you Farley Exhibit 10 which is a copy
9  of the creditors committee complaint and the
10  schedules to that complaint.  Do you remember
11  that?
12      A.   Yes.
13      Q.   She also asked you some questions
14  about the committee's complaint and those
15  schedules.  Do you remember that?
16      A.   Yes.
17      Q.   And I think that you testified
18  earlier that you had never seen the
19  committee's complaint before, correct?
20      A.   Except for the last two days.
21      Q.   And until the past two days -- and
22  I assume you are referring to your
23  preparation for your deposition?
24      A.   Yes.
25      Q.   You also had never seen the

Page 277

1
2  schedules attached to the committee's
3  complaint, correct?
4      A.   That is correct.
5      Q.   Ms. Farley, you were not involved
6  in preparing the committee's complaint,
7  correct?
8      A.   Correct.
9      Q.   You were also not consulted by the
10  committee or any of its advisors when they
11  were drafting the committee complaint, right?
12      A.   Correct.
13      Q.   And you were not involved in
14  preparing any of the schedules to the
15  committee complaint, correct?
16      A.   Correct.
17      Q.   You were also not consulted by the
18  committee or any of its advisors when they
19  were preparing the schedules to the
20  committee's complaint, correct?
21      A.   Correct.
22      MS. NEWMAN:  I want to clarify, for
23    the record, you are asking in an
24    individual capacity, not as a
25    representative of ResCap?

Page 278

1
2      MS. GOODMAN:  Yes.  Or any
3 capacity.
4      Q.    You personally were not consulted,
5 correct?
6      A.    Correct.
7      MS. NEWMAN:  I guess my question
8 when you is say you, your question is
9 Ms. Farley, correct?
10      MS. GOODMAN:  Yes.
11      Q.    And Ms. Farley, you do not know
12 what the committee or its advisors looked at
13 in preparing the committee's complaint,
14 correct?
15      A.    Correct.
16      MR. BAUMSTEIN:  Objection.
17      Q.    And you also do not know what the
18 committee or its advisors looked at in
19 preparing the schedules to the committee's
20 complaint, correct?
21      MR. BAUMSTEIN:  Objection to form.
22      A.    Correct.
23      Q.    You did not have any discussions
24 with the committee members or the committee's
25 advisors regarding the preparation of the

Page 279

1
2 committee's complaint, is that correct?
3      MS. NEWMAN:  Objection.
4      MR. BAUMSTEIN:  Objection to form.
5      A.    Correct.
6      Q.    And you also did not have any
7 discussions with the committee members or the
8 committee's advisors regarding the
9 preparation of the schedules to the
10 committee's complaint, is that correct?
11      MS. NEWMAN:  Objection.
12      MR. BAUMSTEIN:  Objection to the
13 form.
14      A.    Correct.
15      Q.    So when you were answering
16 Ms. Newman's questions earlier today about
17 the committee's complaint and the schedules
18 to the committee's complaint, you were
19 speculating, correct?
20      MS. NEWMAN:  Objection.
21      MR. BAUMSTEIN:  Objection to form.
22      A.    I don't recall what all the
23 questions were.  But I suspect that it was
24 based on my review here and my knowledge of
25 the business and some speculation, yes.

Page 280

1
2      MS. GOODMAN:  No further questions.
3      MS. NEWMAN:  I have nothing in
4 response.
5      MR. BAUMSTEIN:  Nothing.  Thank you
6 very much, Ms. Farley.
7      MR. ENGELHARDT:  Thank you.
8      THE VIDEOGRAPHER:  That concludes
9 the video record for today.  The time is
10 now 6:15 p.m.  We are now off the record.
11            _____
12
13            TERESA RAE FARLEY
14 Subscribed and sworn to
15 before me this      day
16 of MO        , 2013.
17
18 _____

Page 281

1
2            INDEX
3 WITNESS      EXAM BY:        PAGE:
4 T. Farley      Ms. Newman        9, 267
5                Mr. Baumstein      191
6                Ms. Goodman        277
7
8      EXHIBIT INDEX:
9 NUMBER       DESCRIPTION       PAGE:
10 Exhibit 1   notice of deposition      27
11 Exhibit 2   Terry Farley's LinkedIn      33
12       profile
13 Exhibit 3   first priority pledge and      46
14       security agreement
15 Exhibit 4   loan agreement       46
16 Exhibit 5   document Bates stamped Note      76
17       Trustee 0000001 through 139
18 Exhibit 6   document Bates stamped      81
19       RCUCCJSN10831851 through 876
20 Exhibit 7   document Bates stamped      116
21       RCUCCJSN 11712385 through 90
22 Exhibit 8   document Bates stamped      116
23       RCUCCJSN 11864412 through 20
24 Exhibit 9   document Bates stamped      126
25       RCUCCJSN 10063316 through 328

Page 282

1
2          EXHIBIT INDEX:
3    NUMBER        DESCRIPTION          PAGE:
4    Exhibit 10  Adversary Complaint for      129
5          Declaratory Judgment,
6          Avoidance of Liens and
7          Disallowance of Claims with
8          Schedules 1 through 5
9    Exhibit 11  spreadsheet        133
10   Exhibit 12  spreadsheet        159
11   Exhibit 13  spreadsheet        165
12   Exhibit 14  spreadsheet        168
13   Exhibit 15  spreadsheet        169
14   Exhibit 16  spreadsheet        169
15   Exhibit 17  document entitled "Final      182
16          Order"
17   Exhibit 18  Notice of deposition of ResCap   193
18   Exhibit 19  document Bates stamped      196
19          RCUCCJSN 10339000 through 9001
20   Exhibit 20  document Bates stamped      203
21          RCUCCJSN 11889401 through 11
22   Exhibit 21  document Bates stamped      203
23          RCUCCJSN 11888783 through 858
24   Exhibit 22  document Bates stamped      229
25          RCUCCJSN 10292807 through 808

Page 283

1
2          EXHIBIT INDEX:
3    NUMBER        DESCRIPTION          PAGE:
4    Exhibit 23  document Bates stamped      233
5          RCUCCJSN 10721290 through 304
6    Exhibit 24  document Bates stamped AFI JSN    236
7          0000273 through 280
8    Exhibit 25  document Bates stamped      253
9          RCUCCJSN 10828362 through 65
10   Exhibit 26  document Bates stamped      260
11          RCUCCJSN 11714493 through 97
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 284

1
2          CERTIFICATE
3    STATE OF NEW JERSEY )
4          )ss:
5    COUNTY OF UNION    )
6       I, MARY F. BOWMAN, a Registered
7    Professional Reporter, Certified Realtime
8    Reporter, and Notary Public within and
9    for the State of New Jersey, do hereby
10   certify:
11      That TERESA RAE FARLEY, the witness
12   whose deposition is hereinbefore set
13   forth, was duly sworn by me and that such
14   deposition is a true record of the
15   testimony given by such witness.
16      I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage and that I am
19   in no way interested in the outcome of
20   this matter.
21      In witness whereof, I have hereunto
22   set my hand this 18th day of September,
23   2013.
24
25        _____

Page 285

1
2
3          * * *ERRATA SHEET* * *
4    NAME OF CASE:  In Re Residential Capital LLC
5    DATE OF DEPOSITION:  September 18, 2013
6    NAME OF WITNESS:  Teresa Rae Farley
7    Reason codes:
8       1. To clarify the record.
        2. To conform to the facts.
9       3. To correct transcription errors.
10   Page ____ Line ____ Reason ____
     From _____ to _____
11
12   Page ____ Line ____ Reason ____
     From _____ to _____
13
14   Page ____ Line ____ Reason ____
     From _____ to _____
15
16   Page ____ Line ____ Reason ____
     From _____ to _____
17
18   Page ____ Line ____ Reason ____
     From _____ to _____
19
20   Page ____ Line ____ Reason ____
     From _____ to _____
21
22   Page ____ Line ____ Reason ____
     From _____ to _____
23
24
25        _____

72 (Pages 282 to 285)