1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------x
In re:                             Case No. 12-12020 (MG)
RESIDENTIAL CAPITAL, LLC, et al.,  Chapter 11
                                   Jointly Administered
            Debtors.
---------------------------------x
RESIDENTIAL CAPITAL, LLC, et al.,

            Plaintiffs,            Adv. Case No.

            V.                     13-01343 (MG)

UMB BANK, N.A., IN ITS CAPACITY AS
INDENTURE TRUSTEE FOR THE 9.625%
JUNIOR SECURED GUARANTEED
NOTES, et al.,

            Defendants.
---------------------------------x
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, on behalf of the estate
of the Debtors,

            Plaintiff,             Adv. Case No.

            v.                     13-01277 (MG)

UMB BANK, N.A., AS SUCCESSOR
INDENTURE TRUSTEE UNDER THAT
CERTAIN INDENTURE, dated as of
June 6, 2008, et al.,

            Defendants.
---------------------------------x
```

DEPOSITION OF CONOR BASTABLE
November 1, 2013
New York, New York
9:42 a.m.

Reported by:
ERICA L. RUGGIERI, RPR, CSR, CLR
JOB NO: 32297

Yellow Highlighting = JSN Designations
Pink Highlighting = Plaintiff's Designations
Orange Highlighting = Joint Designations

2

1

2

3

4                    November 1, 2013

5                    9:42 a.m.

6

7

8

9          Deposition of CONOR BASTABLE,

10      held at the offices of Curtis,

11      Mallet-Prevost, Colt & Mosle, LLP

12      101 Park Avenue, New York, New York,

13      pursuant to Notice, before Erica Lynn

14      Ruggieri, RPR, CSR, CLR and Notary

15      Public within and for the State of New

16      York.

17

18

19

20

21

22

23

24

25

3

A P P E A R A N C E S:


Conflicts Counsel for the Debtors:

    CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP

    101 Park Avenue

    New York, New York 10178

    BY:   JONATHAN J. WALSH, ESQ.

        jwalsh@curtis.com

        JULIA B. MOSSE, ESQ.

        jmosse@curtis.com

        JACQUES SEMMELMAN, ESQ.

        jsemmelman@curtis.com


Counsel for the Wells Fargo Bank, N.A.:

    REED SMITH, LLP

    599 Lexington Avenue, 22nd Floor

    New York, NY 10022

    BY:   DAVID A. KOCHMAN, ESQ.

        dkochman@reedsmith.com

        MARK D. SILVERSCHOTZ, ESQ.

        msilverschotz@reedsmith.com

4

1

2    A P P E A R A N C E S: (Cont'd)

3

4    Counsel for Davidson Kempner Capital Management LLC.:

5         MILBANK, TWEED, HADLEY & MCCLOY, LLP

6         1850 K Street, NW, Suite 1100

7         Washington, DC 20006

8         BY:   AARON L. RENENGER, ESQ.

9               arenenger@milbank.com

10              ERIN CULBERTSON, ESQ.

11              eculbertson@milbank.com

12

13

14

15

16

17

18

19    ALSO PRESENT:

20         TRAVIS TROYER, Davidson Kempner

21

22

23

24

25

5

1

2                S T I P U L A T I O N S

3

4            IT IS HEREBY STIPULATED AND

5        AGREED, by and between counsel for the

6        respective parties hereto, that the

7        filing, sealing and certification of

8        the within deposition shall be and the

9        same are hereby waived;

10            IT IS FURTHER STIPULATED AND

11        AGREED that all objections, except as

12        to the form of the question, shall be

13        reserved to the time of the trial;

14            IT IS FURTHER STIPULATED AND

15        AGREED that the within deposition may

16        be signed before any Notary Public

17        with the same force and effect as if

18        signed and sworn to before the Court.

19

20

21

22

23

24

25

6

1                    BASTABLE

2          C O N O R   B A S T A B L E,   called

3          as a witness, having been duly sworn

4          by a Notary Public, was examined and

5          testified as follows:

6     EXAMINATION BY

7     MR. WALSH:

8          Q.    Good morning.  Could you state

9     your name for the record.

10          A.    Conor Bastable.

11          Q.    Good morning, Mr. Bastable.  You

12     understand, Mr. Bastable, that you are

13     attending this deposition as both an

14     individual and also as a corporate

15     representative for the Davidson Kempner

16     companies, correct?

17          A.    I do.

18          Q.    And you have been selected as

19     well as the corporate representative on

20     select topics that were addressed to the

21     ad hoc group.  Do you understand that as

22     well?

23          A.    Yes, I do.

24          Q.    When I refer to the ad hoc group

25     you understand that that refers to the ad

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 7 of 211

7

1                     BASTABLE

2      hoc group of junior secured noteholders --

3          A.    Yes.

4          Q.    -- in this case?

5                Have you ever been deposed

6      before?

7          A.    I have.

8          Q.    Just a few ground rules for my

9      benefit and the court reporter's.  Let me

10     finish my question before you give your

11     answer.  I will try to do the same.  If at

12     any point you don't understand my

13     question, let me know and I'll rephrase.

14     If at any point you need to take a break,

15     just let us know.  I only ask that you

16     finish the answer to my question before we

17     take a break.

18         A.    Sure.

19         Q.    Mr. Bastable, can you start with

20     your educational background.

21         A.    Yeah.  I went to undergrad at

22     Princeton University.  Graduated in 1995

23     and business school at Harvard Business

24     School.  I graduated in 2002.

25         Q.    Where did you go to work after

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 8 of 211

8

1              BASTABLE

2    Harvard?

3         A.    I joined Davidson Kempner.

4         Q.    In what position?

5         A.    As an associate in their

6    distress investments area.

7         Q.    And can you just briefly

8    overview your promotion or positions?

9         A.    Yeah.  From 2002 to 2007 --

10   sorry, excuse me.  From 2002 to 2005 I was

11   an associate there.  From 2005 to the end

12   of 2007 I was a managing director.  And

13   since two thousand, the beginning of 2008

14   I have been a partner at the firm.

15        Q.    Is Davidson Kempner a hedge fund

16   for lack of a better word?

17        A.    Yes.

18        Q.    And how many funds are under the

19   Davidson Kempner name?

20        A.    As a legal matter, there's, I

21   believe, nine funds but there's really

22   three different strategies, I guess, that

23   we would invest in.

24        Q.    Can you give us an overview of

25   those three investment strategies?

9

BASTABLE

1

2      A.    When I say three investment, we

3  have a large multistrategy fund that

4  invests in a variety of different

5  strategies, including distressed, equity

6  long/short, convertible arbitrage, risk

7  arbitrage.  Then we have a distressed only

8  fund that invests in distressed

9  opportunities.  And then we have two sort

10  of longer duration funds that also pursue

11  opportunities in the distressed space.

12      Q.    Which of those fund areas are

13  you employed?

14      A.    I oversee the distressed or one

15  of three portfolio managers who oversees

16  the distressed component of the

17  multistrategy fund.  And then I am one of

18  the three portfolio managers who is

19  directly responsible for managing the

20  distressed only funds that I mentioned.

21      Q.    Would you give us the name of

22  the multistrategy funds and then the names

23  of the distressed only funds?

24      A.    Yeah.  There's -- well, entity

25  wise, I may not be stating these, the

10

1                    BASTABLE

2      exact legal names.  There's four funds in

3      the multistrategy fund:  MH Davidson &

4      Co., Davidson Kempner Partners, Davidson

5      Kempner International, Limited, and

6      Davidson Kempner Investment Partners, I

7      believe.  So those are the four primary

8      funds that invest in -- that are part of

9      the multistrategy fund.

10         Q.    Would you give us the name of

11     the funds that are involved in the

12     distressed strategy?

13         A.    There's basically.  Reason these

14     exist, there's onshore/offshore funds.  So

15     there's an onshore distressed

16     opportunities fund and then an offshore

17     distressed opportunities fund.  And then

18     similarly for longer duration funds it

19     would be the same thing, where there's an

20     onshore and an offshore fund for each of

21     those.

22             MR. RENENGER:  I'm just going to

23         interject here to designate this

24         deposition confidential under the

25         protocol.

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 11 of 211

11

                     BASTABLE

1

2       Q.    Would you just go through the

3   names of the funds for the distressed

4   area.

5       A.    One would be these may not be --

6   we can get the exact legal title but the

7   Davidson Kempner Distressed Opportunities

8   Fund, LP, Davidson Kempner Distressed

9   Opportunity, Limited, would be the two

10  distressed funds.  And then similarly for

11  what we call our drawdown funds, it would

12  be Davidson Kempner Long-Term Distressed

13  Opportunities Fund, LP, and similarly

14  named fund, which is I think an Ltd. or

15  another offshore entity.

16          MR. WALSH:  Let me mark a few

17      exhibits, including our deposition

18      notices.

19          (DK Exhibit 1, deposition

20      notice, marked for identification, as

21      of this date.)

22          (DK Exhibit 2, deposition

23      notice, marked for identification, as

24      of this date.)

25      Q.    Mr. Bastable, I have handed you

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 12 of 211

12

1                        BASTABLE

2        DK-1 and DK-2.  Do you recognize those as

3        the deposition notices under rule

4        30(b)(6)?

5               A.    I do.

6               Q.    And we will go through this in a

7        little bit more detail.  But am I correct,

8        sir, that you are the witness that will

9        address topics in each of these notices.

10       With respect to the ad hoc group, we have

11       identified the specific topics.

12                    MR. RENENGER:  The exhibit you

13              handed out for the ad hoc group has

14              all 45 topics on it.

15                    MR. WALSH:  Right.  If you look

16              at page 2, you'll see Mr. Bastable is

17              designated, per our discussions with

18              counsel for topics 21, 22, 23, 34 and

19              35.

20              Q.    And you understand,

21       Mr. Bastable, that you are here today to

22       testify as a corporate witness for the ad

23       hoc group for those topics?

24              A.    I do.

25              Q.    Can you tell us what you did to

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 13 of 211

13

1                    BASTABLE

2      prepare for today's deposition, please?

3          A.    Yeah.  I would have spent time

4      reviewing certain documents related to the

5      case.  I spent time consulting with

6      counsel.  And I spent some time in, having

7      discussions with several colleagues of

8      mine who would have worked on the ResCap

9      matter.

10         Q.    Let's start with the documents.

11     Do you recall which documents you reviewed

12     in preparing for today's deposition?

13         A.    Well, I prepared -- you know, we

14     reviewed a number of the documents that I

15     believe were delivered as part of the

16     discovery relating to this deposition.

17     And then I would have reviewed, you know,

18     the PS -- the PSA I think was included in

19     that and, you know, several other

20     documents.  I believe I looked at the

21     summary of the examiner's report in the

22     case.  And probably a few other documents.

23         Q.    When you refer to the PSA,

24     that's the plan support agreement?

25         A.    That's right.

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 14 of 211

14

1                          BASTABLE

2          Q.     And that's the plan support

3     agreement from May 2012?

4          A.     Yes.

5          Q.     Did you have an opportunity to

6     look at the security agreement that was

7     prepared in connection with the notes?

8          A.     I did not review that in advance

9     of this discussion.

10         Q.     Have you reviewed any of the

11    filings in the case besides the examiner's

12    report in preparing for today's

13    deposition?

14         A.     I looked at the ad hoc group's

15    plan objection and then there were -- I

16    think there were a couple of other filings

17    that we looked at in preparation for the

18    deposition.

19         Q.     Do you recall which?

20         A.     Not specifically.  I mean, we

21    were looking at, yesterday we were looking

22    at, you know, something that was filed in

23    association with the sale of the, both the

24    servicing and HFS assets.  You know, I

25    don't remember exactly what number on the

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 15 of 211

15

1                       BASTABLE

2    docket it was.  But it was items like

3    that.

4         Q.    You also mentioned that you met

5    with counsel.  Is that Mr. Renenger?

6         A.    Yeah.  Mr. Renenger, Mr. Uzzi,

7    and those were the two primary.

8         Q.    And when was that?

9         A.    That was two days ago.

10        Q.    And how long did you meet?

11        A.    Probably met for three hours.

12        Q.    Anyone else in attendance?

13        A.    Yes.  There was three of my

14   colleagues were there at various points.

15   Sara Tirschwell, Kunal Shah and Ephraim

16   Diamond.  Those are the three individuals

17   at DK who would have been involved in the

18   ResCap transaction most directly.  In

19   addition, at one point Dan Groper from

20   Aurelius Capital Management joined for a

21   period of time.

22        Q.    Anyone else?

23              THE WITNESS:  You were there.

24        And that's I think it.

25        Q.    You are referring to Erin?

16

1                    BASTABLE

2        A.    Erin, yeah.

3        Q.    Was anyone from Houlihan in

4    attendance?

5        A.    No.

6        Q.    Were there any other meetings in

7    connection with this deposition besides

8    the one 2 days ago, any other meetings

9    with counsel?

10       A.    There were no other actual

11   meetings, no.

12       Q.    You referred to discussions with

13   people within DK, the same people you

14   mentioned would have attended?

15       A.    Yeah, it would have been those

16   three.

17       Q.    When would that have occurred?

18       A.    We would have had conversations

19   on Tuesday.

20       Q.    On Tuesday.  And what was

21   discussed in those meetings?

22       A.    It was, you know, general issues

23   relating to what we were going to be --

24   what I was going to be addressing in the

25   deposition.

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 17 of 211

17

1                        BASTABLE

2          Q.    Did you review the topics in the

3     30(b)(6) notice?

4          A.    Yes.

5          Q.    Did you review any documents

6     with your colleagues at DK?

7          A.    We did in conjunction with the

8     meeting on Wednesday.  Not separate from

9     that.

10         Q.    Did you review any e-mails,

11    historic e-mails with your colleagues in

12    connection with your deposition?

13         A.    Sorry, let me -- just to be

14    clear, we did meet -- I guess we did meet

15    this morning prior to this depo.

16         Q.    I'll include that as well.

17    Going back to the meetings with people at

18    DK, did you review any historic e-mails?

19         A.    We did.

20         Q.    Do you recall which e-mails?

21         A.    There was a number of e-mails.

22    Most of which you probably would have.

23         Q.    Let me ask you about the

24    document collection.  Were you involved in

25    the document collection in response to our

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 18 of 211

18

1                    BASTABLE

2     document request?

3          A.    Not directly, no.

4          Q.    How were you involved?

5          A.    Well, I wasn't really involved.

6          Q.    Do you know who was involved in

7     that collection?

8          A.    Yeah.

9          Q.    Who was that?

10         A.    Travis Troyer who is here today.

11         Q.    And I'm sorry, the last name is

12    Troyer?

13         A.    Troyer, yeah.

14         Q.    Did Mr. Troyer collect your

15    documents in connection with that document

16    collection?

17         A.    He did.

18         Q.    How did he go about doing that?

19         A.    I believe he did it by scanning,

20    primarily scanning e-mails and collecting

21    hard copies of documents that we would

22    have delivered to him.

23         Q.    And do you know if he did that

24    for other people who worked on the ResCap

25    matters?

19

1                      BASTABLE

2        A.    He did.

3        Q.    How many other people?

4        A.    Well, I'm sure he did it for the

5   three people I mentioned before.  An

6   e-mail would have gone out to a broader

7   group, which probably would have included

8   the other partners in the distressed

9   group, specifically Tony Yosilov and Avi

10  Friedman.  I'm not sure if anyone else

11  would have received anything.  But the

12  idea obviously would have been to collect

13  any documents we would have had relating

14  to ResCap.

15       Q.    And all of those documents were

16  delivered to counsel?

17       A.    Yes.

18       Q.    For their review and production?

19       A.    Yes.

20       Q.    Do you recall roughly how many

21  documents were produced to counsel?

22       A.    I don't.

23       Q.    Do you use Bloomberg messaging

24  at DK?

25       A.    Occasionally.

20

1                       BASTABLE

2        Q.      Did you use it in connection

3    with ResCap?

4        A.      I don't recollect.

5        Q.      Let me ask you, when did DK

6    first become involved in ResCap?

7        A.      We have been involved in ResCap

8    since, I believe, 2009.

9        Q.      How did that happen?

10       A.      You know, following the

11   financial crisis ResCap and at that time

12   what was GMAC were in financial distress

13   and as a result securities that they had

14   issued started trading as a discount.  And

15   the primary -- one of the primary

16   strategies of our firm is to look at and

17   invest in distressed corporate bonds.  So

18   as result, we started to do work to

19   understand what was going on in the

20   combined kind of ResCap GMAC corporate

21   entity.

22       Q.      Had DK invested in any ResCap

23   securities prior to that time?

24       A.      No.

25       Q.      How did DK initially invest in

21



                    BASTABLE

1

2    ResCap?

3             MR. RENENGER:  Object to the

4        form of the question.

5             MR. WALSH:  Let me rephrase.

6        Q.    What was DK's first investment          JSN Objection
                                                        21:6–23:13 FRE 402
7    in ResCap?                                         (Not relevant)

8        A.    I'd have to go back and get the

9    specifics but at various points prior to

10   the petition date we would have owned both

11   unsecured bonds issued by ResCap and

12   junior secured -- and the so-called JSNs.

13       Q.    And when we refer to JSNs, you

14   understand that to be the 9 and 5/8ths

15   notes that are at issue in this case?

16       A.    That's right.

17       Q.    So if I refer to them as JSNs

18   throughout the deposition --

19       A.    Yes.

20       Q.    -- you understand what I mean?

21       A.    Yes.

22       Q.    Roughly when was your first

23   investment in JSNs?

24       A.    I'm going to say we were first

25   involved in them sometime in 2011.  We

22

BASTABLE

1

2 would have that information.  I'm not sure

3 that -- I don't remember the exact date,

4 but it would have been, I think, in 2011.

5      Q.    Do you recall the amount of JSNs

6 that you purchased, that DK purchased at

7 that time?

8      A.    Our initial investment would

9 have been relatively small, which is, you

10 know, order of magnitude might have been

11 10 or 20 million face value.  It may have

12 been early 2012.

13      Q.    So either late 2011, early 2012.

14 And do you recall what price you paid?

15      A.    I believe the initial purchase

16 would have been around $0.65 on the

17 dollar.

18      Q.    And were there any subsequent

19 purchases of JSNs by DK?

20      A.    Yes.

21      Q.    What were they?

22      A.    Again, a combination of JSNs and

23 unsecured notes.

24      Q.    And when were they, when were

25 these purchases?

23

BASTABLE

1

2      A.      We would have made significant

3    additional purchases of JSNs throughout

4    the first half of 2012.   And then at that

5    point I think we owned a small amount of

6    unsecured notes.   And then our position --

7    our position may have moved around a

8    little bit after the company filed for

9    bankruptcy but has remained somewhat

10   constant, although there has been some

11   trading activity in addition.   And more

12   recently we did increase our exposure on

13   the unsecured notes.

14       Q.    I'm going to show you some of

15   the Rule 2019 statements that are filed in

16   the case.   You are familiar with those

17   documents?

18       A.    Yes.

19          MR. WALSH:   This will be DK 3.

20          (DK Exhibit 3, verified

21   statement of White & Case, marked for

22   identification, as of this date.)

23       Q.    Sir, if you turn to the first

24   page on corrected Exhibit A, that's page 3

25   of the document.   You'll see a reference

24

```
 1                    BASTABLE

 2    to Davidson Kempner Capital Management,

 3    LLC?

 4         A.    Yes.

 5         Q.    Does that accurately reflect the

 6    holdings of notes, JSNs, as of June 11,

 7    2012?

 8         A.    It does.

 9         Q.    And is Davidson Kempner Capital

10    Management, LLC, for the funds you

11    discussed earlier?

12         A.    Yes, it is.  Correct.

13         Q.    Do you recall, roughly, the

14    breakout of fund's holdings of the 115

15    million of notes that are reflected here

16    as of this time?

17         A.    All of these notes would have

18    been held in funds that are under our,

19    what I described before as our

20    multistrategy fund.  I wouldn't know the

21    breakdown.  However, the allocation would

22    simply be based on the relative size of

23    each of those funds.

24         Q.    Do you recall if there were any

25    sales of JSNs prior to this date, June 11,
```

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 25 of 211

25

1                    BASTABLE

2      2012?

3                    MR. RENENGER:  Object to the

4          form of the question.

5          Q.     Were there any sales of JSNs?

6          A.     I do not believe that there were

7      prior to this date.

8          Q.     Has DK or any of DK funds ever

9      sold any of the JSNs that it holds?

10         A.     I would have to look.  It is

11     possible that we have, although I'm not

12     sure that we have actually sold them.

13         Q.     What information did DK review

14     in connection with its initial investment

15     of JSNs?

16         A.     At the time, we would have

17     relied on public financial information.

18     You know, ResCap filed 10-Ks and 10-Qs.

19     We would have used that information.  We

20     would have reviewed whatever public

21     information was available with regard to

22     the notes themselves including, you know,

23     evaluating the security package associated

24     with those notes.  We would have looked at

25     other debt instruments in the company's

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 26 of 211

26

1                           BASTABLE

2      capital structure.  We would have

3      obviously evaluated what we thought was

4      likely to happen to ResCap over the

5      subsequent period of time.  We would have

6      been aware that there was some risk that

7      ResCap might be forced to file for

8      bankruptcy.  And we would have evaluated

9      the implications of that.

10          Q.    You said you would have

11     evaluated the security package.  What did

12     you mean by that?

13          A.    Meaning that there would be --

14     there would have been some amount of

15     public information related to the JSNs,

16     including the collateral that was

17     associated with those notes, you know,

18     what entity obviously issued the notes,

19     what entities were guarantors on the

20     notes.  And we would have used that to

21     inform our investment decision.

22          Q.    What was DK's understanding of

23     the collateral that was secured by these

24     notes?

25          A.    Well, we knew that there was a

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 27 of 211

27

1          BASTABLE

2    direct -- there was direct blanket

3    security lien that the notes were entitled

4    to.  We also understood that there were

5    intangible assets that were part of the

6    company's collateral package.  We believed

7    that there were intercompanies that

8    existed between various entities within

9    ResCap and that the notes were

10   potentially, could be potentially

11   beneficiaries of that from a collateral

12   perspective.

13        Q.    What do you mean by that,

14   intercompanies?

15        A.    Meaning it's very typical in a

16   large corporate organization that has

17   various entities that there would be money

18   flowing back and forth between those

19   entities.  And it would not be unusual for

20   a secured creditor to take a lien over

21   those to ensure that if money left one of

22   the entities that we were a direct

23   guarantor from or the entity that was our

24   borrower, that we would still have a claim

25   on that value.

28

1                      BASTABLE

2          Q.    Were you aware that a noteholder

3      actually had a lien on intercompanies at

4      ResCap, JSN noteholder?

5                MR. RENENGER:  Object to the

6          form of the question.

7          Q.    And were you aware of that at

8      the time of the purchase?

9                MR. RENENGER:  Same objection.

10         A.    I would have to go back and look

11     at our analysis at that time.  So I don't

12     recollect what exactly we were aware of

13     when we made our initial -- when we made

14     our initial purchase.

15         Q.    When you say you'd have to go

16     back and look at your analysis, what are

17     you referring to?

18         A.    We would have prepared an

19     investment memorandum.  And some of the

20     individuals who would have worked for me

21     might have done other work to evaluate the

22     investment opportunity.

23         Q.    Did you look at that investment

24     memorandum in connection with this

25     deposition?

29

                        BASTABLE

1

2       A.    I don't know if I went back and

3    looked at that one specifically.  There

4    would have been a number of different -- a

5    number of different types of material

6    prepared during the time that we were

7    invested in securities of ResCap.  I

8    believe I did go back and look at some of

9    that material.

10      Q.    Did DK prepare an investment

11   memorandum for each of its purchases of

12   JSNs over the time period?

13      A.    No.

14      Q.    Did it prepare more than one

15   investment memorandum?

16      A.    Yes.

17      Q.    Do you recall how many?

18      A.    I don't.

19      Q.    More than two?

20      A.    Probably, yeah.

21      Q.    What type of information is

22   discussed in the information -- I'm

23   sorry -- in the investment memo?  What is

24   the review?

25      A.    The review would be the

30

1                        BASTABLE

2     individuals I described before, Sara

3     Tirschwell, Kunal Shah, Ephraim Diamond

4     would have put together this memo which

5     would be, you know, a number of pages in

6     length outlining the investment

7     opportunity, specifically addressing some

8     of the things we talked about before,

9     financial analysis, security package,

10    other relevant considerations relating to

11    the investment.  And that would be

12    presented to myself, Tony Yosilov and Avi

13    Friedman, who were the three portfolio

14    managers for the strategy.

15        Q.    Do you recall any of the

16    investment memoranda with respect to

17    ResCap specifically mentioning

18    intercompany balances as part of the

19    collateral?

20        A.    I don't.  But I believe at some

21    point that those would have been included

22    in the analysis that was provided.

23        Q.    At which point?

24        A.    I would have to go back and

25    look.

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 31 of 211

31

BASTABLE

1

2    Q.    Do you know if it was 2012 or

3    2013?

4    A.    It would very likely have been

5    2012.

6    Q.    Do you recall if it was the

7    beginning of 2012 or the end of 2012?

8    A.    I don't recall.

9    Q.    What other collateral was

10   considered by DK in connection with its

11   initial investment of JSNs?

12         MR. RENENGER:  Object to the

13   form of the question.

14   A.    Would you like to repeat.

15   Q.    Yeah, I'm happy to.  You

16   mentioned that one of the pieces of the

17   analysis was an analysis of the collateral

18   and you mentioned the intercompany

19   balances.  What other collateral was

20   considered by DK in connection with its

21   initial investment of ResCap JSNs?

22   A.    We would have considered the

23   direct collateral that we believe the JSNs

24   were entitled to, which was, again, our

25   read of the documents at that time would

32

BASTABLE

2    have led us to conclude that we had, you

3    know, a blanket lien, although which was

4    subordinated to an ally revolver over the

5    vast majority of the assets of ResCap.

6    And that analysis would have been done to

7    evaluate the asset coverage on the JSNs.

8         Q.    Anything else?

9         A.    Not that I specifically

10   recollect at that time.

11        Q.    We were looking at the 2019, and

12   listing for DK is 115 million of notes.

13   That's face value I presume?

14        A.    Yes.

15        Q.    Do you recall if these funds are

16   proprietary accounts of DK or if they are

17   held for investors?

18        A.    No, they are held for investors.

19        Q.    All of the funds are held for

20   investors?

21        A.    Yes -- yeah, all of the funds at

22   least in part.  And in most cases in their

23   entirety are held for investors.

24        Q.    And when I say all of the funds,

25   I'm referencing all of the DK funds?

33

BASTABLE

1

2      A.    That's right.

3      Q.    And I assume the same answer for

4   all of the DK funds that specifically

5   invested in JSNs?

6      A.    That's right.

7      Q.    They are held for investors?

8      A.    That's correct.

9           MR. WALSH:  Next exhibit.

10          (DK Exhibit 4, Rule 2019

11      statement, marked for identification,

12      as of this date.)

13     Q.    Mr. Bastable, are you looking at

14   the 2019 that is docket entry 488?  Do you

15   see that at the top?

16     A.    Yes.

17     Q.    Do you recognize this as the

18   Rule 2019 statement filed by the ad hoc

19   group in June of 2012?

20     A.    Yes.

21     Q.    If you turn to page 1, page 3 of

22   9, is it correct, you'll see at the top of

23   the page it references to page 3 of 9.

24     A.    Yes.

25     Q.    There was no increase or

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 34 of 211

34

```
1                    BASTABLE

2     decrease in the holdings of DK and JSNs

3     from the prior 2019?

4          A.    This is as of the same date as

5     the prior one so.

6          Q.    Just a correction as with

7     respect to other holders; is that right?

8     If you turn to the back of the page,

9     there's other ones that have been

10    corrected.

11             MR. RENENGER:  Object to the

12        form of the question.

13         A.    Yeah.

14         Q.    For example, page 7.

15         A.    Yes.

16         Q.    Did you have any involvement in

17    the preparation of these Rule 2019s?

18         A.    No.

19         Q.    Do you know if anyone at DK

20    provided the information to counsel to

21    prepare these 2019s?

22         A.    Yes.  Someone would have

23    provided that information.

24             MR. WALSH:  I'm going to mark

25        the next two DK 5 and 6.
```

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 35 of 211

35

1          BASTABLE

2              (DK Exhibit 5, May 7, 2013 2019,

3          marked for identification, as of this

4          date.)

5              (DK Exhibit 6, May 17, 2013

6          2019, marked for identification, as of

7          this date.)

8          Q.    Sir, I have given you the 2019s

9      from May 7, 2013, and May 17, 2013.  Just

10     quickly, if we look at page 4 of 6 of DK

11     5, it reflects holdings by Davidson

12     Kempner Capital Management, LLC, of 157

13     million of notes.  And just to jump ahead,

14     it appears that shortly after that the ad

15     hoc group submitted, this is DK 6, page 4,

16     a second 2019 reflecting an increase in

17     the value of the DK holdings to 191 of

18     notes.

19         A.    Right.

20         Q.    Was there an increase in value

21     of the two dates or was the initial report

22     inaccurate?

23             MR. RENENGER:  I'm going to just

24         object that this is beyond the scope

25         of the 30(b)(6) topics.  I'll give you

36

1                      BASTABLE

2          a little bit of leeway.  The topic in

3          the notes have to do with decisions

4          made in 2012 and now we are in 2013.

5                  MR. WALSH:  This will be quick.

6          Q.    I just want to find out what

7     your holdings were.

8          A.    I'm sorry.  The only thing I'm

9     looking at is the May 2, 2013, report that

10    has the 157 million.

11         Q.    And was that the holdings of DK

12    at the time?

13         A.    I believe so.

14         Q.    And then if you look at the next

15    document, which is May 17th.  It's DK 6.

16         A.    I have the same document twice.

17         Q.    Page 4 reflects 191 million face

18    value notes?

19         A.    Right.

20         Q.    Was there an increase in value

21    over the week period?

22         A.    No.

23         Q.    So as of May 2013 DK's holdings

24    of JSNs was approximately or was 191 face

25    value, 191 million face value?

37

1                    BASTABLE

2          A.    Yes.

3                MR. RENENGER:  Object to the

4          form of the question.

5          Q.    Has Davidson Kempner increased

6     its holdings of JSNs since May of 2013?

7                MR. RENENGER:  Again, object as

8          beyond the scope.  Go ahead.

9          A.    I believe we were about to file

10    an additional 2019.  I think the number

11    has maybe increased very modestly,

12    although I'm actually not sure.  It is

13    very close to this figure.

14         Q.    Going back to 2012.  You said

15    the initial investment in JSNs was late

16    2011, early 2012.  When did DK first

17    become involved in the ad hoc group as it

18    relates to the JSNs?

19         A.    That would have been in the

20    spring, late spring of 2012.

21         Q.    And how did DK become involved

22    in the ad hoc group?

23                MR. RENENGER:  Object to the

24         form of the question.

25         A.    The ad hoc group would have

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 38 of 211

38

```
 1                        BASTABLE

 2       formed as a result of a number of large or

 3       a low number of JSN holders becoming

 4       increasingly concerned about the prospect

 5       of ResCap having to file for bankruptcy.

 6       It's very common in our market that

 7       holders would at that time retain counsel

 8       and begin to work in what is typically

 9       called an ad hoc group.  And we would have

10       gone out, and likely there was

11       conversations probably with a couple

12       different law firms, I don't recollect who

13       else we spoke to at the time other than

14       what was, would have been White & Case.

15       And a decision was made to hire, to retain

16       White & Case as counsel to the ad hoc

17       group for purposes of representing us in

18       the scenario that the company would file

19       for bankruptcy or that there would be

20       other out of court discussions.

21            Q.   When was that decision made to

22       hire White & Case?

23            A.    I would estimate in March or

24       April of -- March or April of 2012.  But

25       that would be someone could provide that
```

39

1           BASTABLE

2     information to you.  I'm sure there's a --

3           Q.    DK-6 is previously marked as

4     PX 355.  This is the Houlihan engagement

5     letter.

6               MR. RENENGER:  Would it be DK-7?

7               MR. WALSH:  DK-7.

8               (DK Exhibit 7, Houlihan

9         engagement letter, marked for

10        identification, as of this date.)

11          Q.    Do you recognize this document?

12          A.    I do.

13          Q.    And this is dated February 17,

14    2012.  Does that refresh your recollection

15    roughly --

16          A.    Yes.

17          Q.    -- when White & Case was hired?

18          A.    Well, this is obviously Houlihan

19    Lokey, but this retention letter relates

20    to Houlihan Lokey but White & Case is

21    referenced here.  So I would have assumed

22    we would have retained them prior to this

23    call.

24          Q.    Do you recall how much earlier

25    White & Case was retained?

40

                    BASTABLE

1

2        A.    I would imagine it was in the

3    month prior to this.  So we will call it

4    either early February or late January of

5    2012.

6        Q.    If you flip through the

7    signature pages at the end, it starts at

8    page 11 of 25, are the entities that are

9    identified in the signature pages from

10   page 12 through, I guess they are the same

11   on each page, page 12, for example, the

12   entities that are involved in the ad hoc

13   group?

14       A.    As of this date, yes.

15       Q.    You see that Davidson Kempner is

16   one of the members?

17       A.    I do.

18       Q.    Was Davidson Kempner one of the

19   first members of that ad hoc group?

20       A.    Yes.

21       Q.    Were all of these entities the

22   first members of the ad hoc group?

23           MR. RENENGER:  I'm going to

24       object to the form of the question.

25       And just say there's another page with

41

```
 1                      BASTABLE

 2          other members on it.  If you look at

 3          page 18 of 25, for example.

 4          A.    I was going to say the group

 5    that I recollect included a broader group.

 6    Now that I'm looking at the subsequent

 7    signature pages, this, I think, covers all

 8    the initial members of the ad hoc group.

 9          Q.    Just for clarity, would you just

10    list out the members as of this time

11    period?

12               MR. RENENGER:  Object to the

13          form of the question.

14          Q.    You can do it quickly.

15          A.    The signature pages?

16          Q.    Yes.

17          A.    AllianceBernstein, LP; Appaloosa

18    Management, LP; CQS Global Services,

19    Limited; Davidson Kempner Capital

20    Management, LLC; Loomis, Sayles & Company,

21    LP; P. Schoenfeld Asset Management, LP;

22    Paulson & Co., Inc.; Pentwater Capital

23    Management, LP, Silver Point Capital, LP;

24    York Capital Management Global Advisors,

25    LLC.
```

42

1                    BASTABLE

2        Q.    Thank you.  Was there any

3    written document with respect to the ad

4    hoc group?  Was there a charter, for

5    example?

6             MR. RENENGER:  Object to the

7         form of the question.

8        A.    No.  I don't believe there was a

9    charter, as you would describe it.

10       Q.    Any document that reflected the

11   relationship amongst the ad hoc group?

12       A.    There would have obviously been

13   an engagement letter with White & Case and

14   that might have provided for some

15   governance as it were.  I don't think

16   there was anything specifically along the

17   lines of what you are describing.

18       Q.    With respect to the decisions

19   that the ad hoc group made, was there any

20   written document regarding how decisions

21   would be made?

22             MR. RENENGER:  Are you referring

23        to any particular point in time?

24             MR. WALSH:  At this time period.

25        Early 2012.

43

1              BASTABLE

2      A.    Not that I recollect.

3      Q.    At any later point?

4      A.    I don't believe so.

5      Q.    How were decisions made in early

6    2012 by the ad hoc group?

7      A.    You know, generally speaking,

8    there would have been -- well, again, I'm

9    not sure the chronology of this.  At some

10   point the group broke -- the larger

11   members of the group formed a steering

12   committee.  So that was formed in order to

13   facilitate communications with counsel.

14   It's unwieldy to have as many members on

15   calls as would be listed on these

16   documents.  So a smaller group would have

17   been a steering committee.  We would have

18   had regular calls with counsel and

19   financial advisors to discuss relevant

20   issues.

21     Q.    At what point was the steering

22   committee formed?

23     A.    I believe the steering committee

24   would have been formed in the spring of

25   2012.

44

BASTABLE

1

2       Q.    And who were the members of the

3   steering committee at that time?

4       A.    I believe the steering committee

5   would have consisted of ourselves, I

6   believe Silver Point, I think Paulson was

7   on the committee at the time.  May have

8   been -- I would have to go back and look

9   to see what other members were on that, on

10  it at that point in time.

11      Q.    Has the membership of the

12  steering committee changed over time?

13      A.    Yes, it has.

14      Q.    And can you quickly go through

15  the changes as you recall?

16      A.    Over time other security holders

17  would have acquired positions.  For

18  example, Marathon Asset Management became

19  a large holder and joined the steering

20  committee at some point.  I believe

21  Paulson dropped off the steering committee

22  at some point because they had sold out of

23  their position.  Those are examples of how

24  the committee -- Appaloosa was also

25  participating in the committee.  I believe

45

                      BASTABLE

1

2      both in the committee, certainly in the

3      steering committee.  They also dropped off

4      at some point.

5          Q.    Did Loomis drop off at some

6      point?

7          A.    Loomis dropped off.  They would

8      have sold their position.

9          Q.    Did anyone join at that time

10     period, spring 2012 through the present?

11             MR. RENENGER:  Object to the

12         form of the question.

13         Q.    Did anyone join the steering

14     committee?

15         A.    As I mentioned before, at some

16     point I believe Marathon did.  And then --

17         Q.    And then anyone else -- thank

18     you.  Anyone else besides Marathon?

19         A.    Aurelius Capital,

20     A-u-r-e-l-i-u-s.

21         Q.    And when did Aurelius join?

22         A.    That would have been in the fall

23     of 2012.

24         Q.    Do you recall which month?

25         A.    I believe on November of 2012.

46

1              BASTABLE

2       Q.    Anyone else join the steering

3    committee?

4       A.    Not that I recollect.  But

5    again, there were enough changes in the

6    composition of the committee that I

7    wouldn't be able to tell you everyone.

8       Q.    Who currently is in the steering

9    committee?

10      A.    Well, the participants right

11   now, I believe ourselves, Aurelius are

12   still involved, Silver Point, Marathon I

13   believe is still involved.  But we could

14   get you that list if you want the exact

15   composition.

16      Q.    Going back to 2012.  Do you

17   recall if it was a group decision to

18   retain White & Case or if it was the

19   steering committee's decision?

20           MR. RENENGER:  Object to the

21      form of the question.

22      A.    Yeah, I think the retention of

23   White & Case would have been prior to the

24   forming of the steering committee.  So it

25   would have been the group's decision.

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 47 of 211

47

1                    BASTABLE

2        Q.    How was that decision made, do

3    you know?

4        A.    There would have been

5    conversations with White & Case about

6    their qualifications to advise the group

7    and very likely conversations with one or

8    two other law firms who were being

9    considered.  And then based on those

10   conversations, the group would have

11   discussed the best firm to retain and the

12   decision was made to retain White & Case.

13       Q.    Let me ask you the same question

14   about Houlihan.  How was the decision to

15   hire Houlihan made?

16       A.    Yeah.  It was a similar process.

17   At that point I think White & Case was

18   involved but it was based on the

19   experience that the principals and that

20   Houlihan as an institution brought to the

21   table.  And we decided they were best

22   qualified to represent us.

23       Q.    What was your understanding of

24   what Houlihan's role would be going

25   forward from February 2012?

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 48 of 211

48

BASTABLE

1

2     A.   It wasn't clear from the --

3     exactly what their role would be.  But

4     again, the idea of hiring a financial

5     advisor to represent a group of creditors

6     is a very conventional one.  And, you

7     know, broadly speaking, we felt like it

8     was very likely that we were going to need

9     to do some financial analysis on ResCap to

10    evaluate their position, our rights as

11    creditors, the potential recoveries, I

12    guess, for us as creditors.  And in many

13    cases the information that we might get

14    would not be public.  So we could use,

15    potentially use Houlihan as an

16    intermediary and also they could do, even

17    if it was public information, they could

18    be helpful in supplementing our own

19    financial analysis of the company.

20    Q.   Let me ask, before Houlihan was

21    retained, what information, if any,

22    besides public information, did DK have

23    with respect to ResCap?

24    A.   Well, I mean I think we only had

25    access to public information.  I guess can

49

1                     BASTABLE

2     you be more specific.

3          Q.    Sure.  I want to get into any          JSN Objection
                                                        49:3-20 FRE 402
4     discussions that DK alone would have had          (Not relevant)

5     with the debtors, with ResCap.  Were there

6     any discussions between DK and ResCap or

7     any ResCap representative prior to

8     February 2012?

9          A.    I'm sure there were.  Again, it

10    would be very typical for us as part of

11    our due diligence process to try to

12    contact a company to verify or ask

13    questions about some of the conclusions

14    that we had reached doing our own

15    independent analysis.  And we would have

16    had -- we would have reached out to them

17    in an attempt to clarify those.  And they

18    would either have investor relations or

19    other members of ResCap's management would

20    have addressed those issues for us.

21         Q.    Do you recall when the first

22    instance of DK contacting debtors?

23         A.    I don't.

24         Q.    Do you recall if it was prior to

25    February 2012?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

50

1               BASTABLE

2       A.    I don't.

3             MR. WALSH:  This will be DK-8.

4       It's the security agreement.

5             (DK Exhibit 8, Security

6       agreement between ResCap, U.S. Bank

7       and Wells Fargo, marked for

8       identification, as of this date.)

9       Q.    Do you recognize DK-8?

10      A.    Yes, I do.

11      Q.    What is that?

12      A.    It's the Amended and Restated

13      Third Priority Pledge Security Agreement

14      and Irrevocable Proxy between ResCap and

15      U.S. Bank and Wells Fargo.

16      Q.    Is this the security agreement

17      that reflects the JSNs security interest

18      in ResCap?

19      A.    Yes.

20      Q.    When was the first time that DK

21      saw this document?

22      A.    I don't know.

23      Q.    When was the first time you saw

24      the document?

25      A.    I don't know if I have seen this

51

1                     BASTABLE

2    document.  There would certainly be

3    individuals at DK who would have reviewed

4    this document.

5         Q.    Do you know with respect to the

6    initial investment by DK in JSNs, whether

7    anyone at DK reviewed this document?

8         A.    I think it is extremely likely

9    that someone reviewed this document.

10        Q.    Again, I'm referring to the

11   period before Houlihan was retained.  Do

12   you know what financial information DK

13   received from ResCap for that time period?

14             MR. WALSH:  Let me fix the time

15        period.

16        Q.    So there was an initial

17   investment?

18        A.    Correct.

19        Q.    Fair to say you didn't have any

20   contact with ResCap before that initial

21   investment?

22        A.    No, it's not safe to say that.

23        Q.    You did have contact?

24        A.    I don't know.  We would have --

25   again, I think it's actually likely that

52

1                    BASTABLE

2     we would have reached out to them before

3     making the initial investment.

4          Q.   Do you know who at DK would have

5     done that?

6          A.    It was probably Sara Tirschwell

7     and/or Kunal Shah.

8          Q.   Do you know for a fact whether

9     either one of those individuals did speak

10    to ResCap?

11         A.   I don't know.

12         Q.   Do you know whether they spoke

13    to ResCap after the initial investment?

14             MR. RENENGER:  Object.  Any time

15         between then and now.

16             MR. WALSH:  Let's fix it.

17         Q.   Any time between the initial

18    investment and the Houlihan engagement

19    letter of February 2012.

20         A.   Right.  Again, I can't say

21    definitively, but I think it's very likely

22    that they would have had contact with

23    someone at ResCap.

24         Q.   I assume you are basing this

25    testimony on custom and practice by DK in

53

                         BASTABLE

 1

 2     connection with their investment?

 3         A.    Yes.

 4         Q.    You don't know one way or the

 5     other whether they actually did?

 6         A.    I can't definitively say, but I

 7     think it's extremely likely that they did.

 8         Q.    Let me just fix on the custom

 9     and practice of DK because it appears you

10     don't know exactly whether these

11     individuals spoke to ResCap.  Is it the

12     custom and practice for DK to receive

13     additional financial information besides

14     10-Ks and 10-Qs from companies?

15         A.    No.

16         Q.    Do you know if -- what type of

17     information DK obtains from companies in

18     connection with its investments.  I mean,

19     is it analyst reports?  I'm trying to

20     understand besides --

21         A.    Companies don't typically

22     provide us with any information directly.

23     The companies are willing to discuss

24     public information and answer questions

25     about their business.  Those are the types

54

BASTABLE

1

2    of discussions that we would typically

3    have.

4        Q.    Just give me again examples

5    based on custom and practice of the types

6    of questions that DK would ask the

7    question?

8            MR. RENENGER:  Object to the

9        form of the question.  Go ahead.

10       A.    Yeah.  I mean, we would -- we

11   would review the company's financial

12   statements.  A company like ResCap is very

13   complicated.  There's a certain amount you

14   can learn by looking at those financials.

15   And -- but that inevitably leads to a lot

16   of questions and the company can be

17   helpful in clarifying questions that we

18   might have about the financial condition

19   of the company.

20       Q.    It's your position that the

21   custom and practice you are only

22   discussing publicly available information?

23       A.    That's right.

24       Q.    Let me ask you this.  Do you

25   know if at any point before Houlihan was

55

```
1                    BASTABLE

2      retained whether DK received any nonpublic

3      information from ResCap?

4          A.    We would not have received any

5      nonpublic information.

6          Q.    Let me ask the same question

7      about the ad hoc group.  Before February

8      2012, did the ad hoc group receive any

9      public information from ResCap?

10               MR. RENENGER:  Object to the

11          form of the question.  Beyond the

12          scope.

13         A.    No, I do not believe the ad hoc

14     group received any nonpublic information.

15         Q.    Was there a point in time when

16     the ad hoc group entered a nondisclosure

17     agreement with ResCap?

18         A.    Yes.

19         Q.    When was that?

20         A.    That would have been for

21     purposes of negotiating the PSA so I

22     believe we would have signed that

23     agreement in May of 2012.

24         Q.    That was the first NDA between

25     the ad hoc group and ResCap?
```

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 56 of 211

56

1                    BASTABLE

2        A.    Yes.

3        Q.    And is it your understanding

4   that prior to that date the ad hoc group,

5   no member of the ad hoc group was privy to

6   nonpublic information of ResCap?

7             MR. RENENGER:  Object to the

8        form of the question.  To the extent

9        you can speak to whether any member of

10       the ad hoc group had information, of

11       course feel free to speak to it.

12       A.    Yeah.  I mean, I can't -- I

13   obviously can't address what any of other

14   firms would have received.  The group was

15   never provided any information directly

16   and Davidson Kempner was never provided

17   any information directly.

18       Q.    Nonpublic?

19       A.    Yeah, nonpublic.

20       Q.    The group was provided public

21   information?

22       A.    I'm not even sure the group was

23   necessarily provided public information.

24   Again, are you talking about from the

25   company?

57

BASTABLE

1

2      Q.    From the company, yes --

3      A.    There would have been some

4  correspondence between our counsel and our

5  financial advisors in the company.

6  Whether or not that resulted in them

7  providing us anything, I actually don't

8  recall.

9              MR. RENENGER:  Can I just

10         interject?  I think maybe this will be

11         a clarification on this.  When you say

12         the ad hoc group, are you talking

13         about the members of the group as

14         forming the group or are you also

15         including information that may have

16         been received by advisors.  Because

17         I'm just concerned that if Houlihan or

18         Milbank got information, I just don't

19         want there to be an implication that

20         they did or didn't.  That wasn't

21         intended to be in the scope of your

22         answer.

23              MR. WALSH:  I am referring to

24         both, either members of the ad hoc

25         group or advisors to the ad hoc group.

58

1                    BASTABLE

2        A.    Give me the time frame again.

3        Q.    At any point in early 2012.

4        A.    Prior to the --

5        Q.    The NDA?

6        A.    Prior to the NDA being signed.

7    I don't recall.  Again, there may have

8    been some information in that time frame

9    provided to Milbank or Houlihan, but that

10   information would not have been provided

11   to the ad hoc group.

12       Q.    I just want to clarify for the

13   record we are going to be taking the ad

14   hoc group's 30(b)(6) next week and that is

15   something we will want to address with

16   that witness.

17            Let me ask you, you are familiar

18   with something called Interlinks?

19       A.    Yes.

20       Q.    What is Interlinks?

21       A.    Intralinks.

22       Q.    Intralinks.  Thank you.

23       A.    Intralinks is kind of an online

24   portal that is used in the financial

25   services business that allows for

59

1                        BASTABLE

2     information to be posted onto a secured

3     website.  And in many cases there would be

4     a public and private portion of an

5     Intralink site.  And to the extent you

6     want to get access to the private

7     information, you would have to make an

8     election on the site.  So it allows -- it

9     sort of provides effectively sort of a

10    digital record of who is seeing private

11    information relating to a specific company

12    or whatever the situation that people are

13    involved in.

14        Q.   Do you know if in this time

15    period, early 2012, whether ResCap had an

16    Intralink system?

17        A.   Prior to signing the NDA, I

18    don't.

19        Q.   And same question for 2011.  Do

20    you know if in 2011 ResCap had an

21    Intralink system available?

22        A.   I don't.  But it is possible

23    that they did.

24        Q.   Let me ask the same question

25    after the NDA was signed.  After the NDA

60

BASTABLE

1

2   was signed, were you aware whether ResCap

3   made an Intralinks system available?

4       A.    I specifically don't.  Again, at

5   DK I would not be the person accessing

6   Intralinks' site directly.  So it is --

7   again, it's quite possible they used that

8   in some way to provide information, but I

9   just don't specifically know.

10      Q.    Who at DK would have accessed

11  Intralinks?

12      A.    Again, I think it would be the

13  individuals I referenced before Sara

14  Tirschwell, Kunal Shah, Ephraim Diamond.

15           MR. WALSH:  Is now a good time

16      for a break?

17           MR. RENENGER:  Sure.

18           (Whereupon, there is a recess in

19      the proceedings.)

20           (DK Exhibit 9, plan support

21      agreement, marked for identification,

22      as of this date.)

23      Q.    Sir, I have handed you

24  Exhibit 9.  It's the plan support

25  agreement.  Do you recognize this?

61

1                   BASTABLE

2        A.    No, I don't actually have that

3   in front of me.

4        Q.    Sorry.  Handing you Exhibit 9.

5        A.    Okay.  Yes, I do.

6        Q.    And if you turn to the back of

7   the documents and flip through the

8   signature pages.  The fourth signature

9   page, is that your signature?

10        A.    Yes, it is.

11        Q.    This was the plan support

12   agreement from May 14, 2012?

13        A.    Correct.

14        Q.    Do you recall when it was            JSN Objection
                                                      61:14-18:
15   signed, at least when you signed it?  Did    FRE 611(a) (Compound)

16   you sign it on May 14th?

17        A.    If I didn't sign it that day, I

18   would have signed it prior to.

19        Q.    You see that some of the

20   signature pages are May 11th, May 13th.

21   Does that refresh your recollection

22   whether you signed it either May 11th or

23   May 13th?

24        A.    I'm sure I signed -- where is

25   it?

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 62 of 211

62

1              BASTABLE

2              MR. RENENGER:  Back a couple

3        pages.

4        Q.    For example, AllianceBernstein

5   is dated May 11th.

6        A.    Yes.  Sure.  We all would have

7   signed within a few days of the --

8        Q.    Is it fair to say you signed

9   before May 14th?

10       A.    Yes.

11       Q.    We were talking about the ad hoc

12   group and how decisions were made by the

13   ad hoc group.  How was the decision made

14   by the ad hoc group to enter this PSA?

15              MR. RENENGER:  Object to the

16        form of the question.

17       A.    I guess I can --

18       Q.    Let me rephrase just to make

19   sure I can address the objection.  Was

20   there a decision by the ad hoc group that

21   signed, at least the members of the ad hoc

22   group, that signed this plan support

23   agreement to enter this plan support

24   agreement?

25       A.    There was a decision made by

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 63 of 211

63

1                    BASTABLE

2    each individual firm to sign up to this

3    PSA and obviously we all reached the same

4    decision.  So as a result the group was

5    full supportive of signing the PSA.  But

6    those, Davidson Kempner made an

7    independent decision to sign the PSA.

8          Q.    How did Davidson Kempner come to

9    its decision to sign the PSA?

10         A.    The PSA provides certain

11   benefits for process holders and in

12   exchange for that we were providing

13   certain benefits to both the debtor and

14   Alli.  And at its core it was, I would say

15   it was sort of a business decision for us

16   informed by what we believed were our

17   rights as creditors, and we thought it was

18   a favorable economic deal that increased

19   both the speed with which we would get

20   repaid on our notes and increased the

21   certainty that we would get repaid on

22   those notes.  And we were willing to

23   accept some of the terms that are included

24   in the PSA in exchange for that, for those

25   benefits.

64



1                       BASTABLE

2        Q.       What was your understanding as

3    of this time period what you would be paid

4    on the notes?

5        A.       We believed -- we believed we

6    would be paid par, plus all of our

7    prepetition interest, plus to the extent

8    that we would have not been repaid by the

9    end of 2012, then we would have

10   received -- we would have begun to receive

11   post petition interest on whatever that

12   residual claim was.

13       Q.       Did DK calculate what, in fact,

14   the payments would be to DK on the notes

15   on par and as of accrued interest?

16       A.       Yes.

17       Q.       And what was that amount?

18       A.       The amount for all bondholders,

19   and I'm quoting this on a kind of cents on

20   the dollar basis, was just under 105 cents

21   on the dollar as of the petition date.

22       Q.       Was there any calculation what

23   the post petition interest would be if the

24   plan was not confirmed by the end of 2012?

25            MR. RENENGER:   Object to the

JSN Objection
64:2-12
FRE 611(a) (Vague and ambiguous)

JSN Objection 64:13-21
FRE 611(a) (Compound)

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 65 of 211

65

BASTABLE

1

2      form of the question.

3          A.     Yes, there would have been some

4      calculation of that as well.

5          Q.     Do you recall what that

6      calculation resulted in?

7          A.     No.

8          Q.     You said that in connection with

9      signing the PSA you provided certain

10     benefits to the debtors and to Alli.  What

11     were those benefits?

12         A.     Primarily releases to both the

13     debtor and Alli.  But in addition to that,

14     you know, I think the -- having the plan

15     support agreement presumably in general

16     was viewed by certainly the debtor and I

17     believe Alli as a positive step towards

18     the ultimate restructuring of the company.

19         Q.     Did you understand that Alli was

20     making a contribution to the bankruptcy,

21     prepetition bankruptcy, in connection with

22     this PSA?

23         A.     We did.

24         Q.     What was your understanding of

25     the amount of the Alli contribution?

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 66 of 211

66

BASTABLE

1

2      A.   We understood that they were

3   going to be contributing $750 million.

4      Q.   And did DK do an analysis of

5   that $750 million to determine whether

6   that was an adequate contribution by Alli?

7      A.   We did not.

8      Q.   Did the ad hoc group do an

9   analysis like that?

10      A.   Not in that form, no.

11      Q.   What type of analysis, if any,

12   did the ad hoc group do to determine

13   whether the Alli contribution was

14   adequate?

15      A.   Well, we weren't particularly

16   focused on the adequacy of that number.

17   We didn't have enough information at that

18   time to evaluate it.  That was obviously

19   satisfying a number of potential issues

20   that related to intercompany transactions

21   that existed between Alli and ResCap prior

22   to the petition date.  And it was a very

23   complicated analysis and we didn't have

24   enough information to evaluate it.  And

25   the, part of the reason we entered into

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 67 of 211

67

1          BASTABLE

2    the PSA was we felt like -- one of the

3    benefits we got from the PSA was Alli was

4    going to be subordinating a portion of

5    their revolver which would have had a

6    senior claim to us on collateral proceeds.

7    So we kind of viewed everything as a

8    comprehensive transaction.  And we felt

9    that if $750 million came into the estate,

10   that would be sufficient under the terms

11   of the PSA to pay us off at par plus our

12   prepetition interest and plus, to the

13   extent there was still debt outstanding

14   after the end of 2012, post petition

15   interest on that amount.

16        Q.    If the plan was confirmed

17   consistent with the PSA in 2012, however,

18   you understand that the noteholders would

19   not receive post petition interest?

20        A.    If the plan had been confirmed

21   and all of our debt had been extinguished

22   as of that date, we would not have been

23   entitled to subsequent post petition

24   interest.

25        Q.    That was one of the benefits

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 68 of 211

68

1                    BASTABLE

2    that you were providing to the debtors in

3    connection with signing the PSA?

4        A.    Yes.

5             MR. RENENGER:   Object to the

6        form of the question.

7        Q.    You were waiving your rights to

8    post petition interest accrued from the

9    date of the petition through the end of

10   2012 if those events you mentioned

11   occurred in 2012?

12       A.    That's right.

13       Q.    You also understood that in

14   signing the PSA you are waiving at least

15   some portion of your right to liens on

16   intercompany balances, correct?

17       A.    That's right.

18       Q.    What analysis did DK do with

19   respect to the intercompany balances prior

20   to signing the PSA?

21       A.    We would have tried to do some

22   analysis.  However, the public disclosure

23   before the company filed was relatively

24   limited vis-‡-vis the amounts -- the size

25   of the intercompanies and the value

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 69 of 211

69

1                    BASTABLE

2      attributed to those.  However, we were

3      aware that we had potential collateral

4      value from those intercompanies and we

5      believed that there was likely substantial

6      value associated with those intercompany

7      assets.  However, there wasn't

8      deconsolidating financial statements until

9      the company filed for bankruptcy that

10     would have given us enough information to

11     evaluate those figures with a high degree

12     of certainty.

13          Q.    What was your belief that there

14     was substantial value in the intercompany

15     balances based upon?

16          A.    We did have some information

17     relating to guarantor and nonguarantor

18     entities.  So you could look at those

19     balance sheets and that could inform your

20     decision.  And then I believe there was

21     some incremental disclosure about

22     specific, at least the book value of

23     certain intercompany assets that we did

24     use to inform that opinion.

25          Q.    Did you have an understanding of

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 70 of 211

70

1                       BASTABLE

2    the value, the approximate dollar value of

3    those intercompany balances prior to the

4    PSA?

5         A.    We had an estimate of those

6    values.

7         Q.    What was that estimate?

8         A.    I'd have to go back and look.

9    But it was not an immaterial amount

10   relative to the recoveries or the size of

11   the debt outstanding.

12        Q.    Was it more or less than a

13   billion dollars?

14        A.    I believe we thought it was less

15   than a billion dollars.

16        Q.    Was it more or less than $500

17   million?

18        A.    I think we thought it was less.

19   I'd have to go back.  We may have believed

20   in certain scenarios that it was in excess

21   of $500 million.

22        Q.    You reference certain balance

23   sheets of guarantors.  Do you recall which

24   guarantors?

25        A.    These were the guarantors under

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 71 of 211

71

1                    BASTABLE

2       the JSNs.

3            Q.    These are the GMAC guarantors or

4       specifically who are you referring to?

5            A.    Yeah.  These would be -- no,

6       these are ResCap entities.

7            Q.    ResCap entities?

8            A.    Yeah.

9            Q.    And is it your understanding

10      that prior to the PSA date, May 14, 2012,

11      that Houlihan had done an analysis of the

12      intercompany balances?

13           A.    They -- yes.  They had looked at

14      that.

15           Q.    And do you know what information

16      Houlihan received in connection with the

17      intercompany balances prior to May 14th?

18           A.    Yeah, they -- I believe they

19      would have been provided more specificity

20      in terms of the exact size of those

21      intercompany loans.  And then they would

22      have presumably had individual balance

23      sheets for all the ResCap entities which

24      could help inform that analysis.

25           Q.    And where did they receive those

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 72 of 211

72

1                          BASTABLE

2       individual balance sheets?

3            A.    They would have received those

4       from ResCap.

5            Q.    And those -- that would have

6       been nonpublic information?

7            A.    That's right.

8            Q.    Provided pursuant to the NDA?

9            A.    Correct.

10           Q.    Do you recall when that

11      information was provided?

12           A.    I don't recall the specific

13      date, but it was in this, you know,

14      general time frame that we are talking

15      about.

16           Q.    May of -- April, May of 2012?

17           A.    Correct.

18           Q.    And was there any other

19      information that either Houlihan -- well,

20      any other information that Houlihan

21      received in connection with the

22      intercompany balances besides the items

23      that you've listed?

24           A.    Relating to the intercompanies

25      specifically?

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 73 of 211

73

```
1                    BASTABLE

2        Q.    The analysis.

3        A.    Yeah.  I'm sure that it's

4   possible there was other supplemental

5   information provided to them.  I'm sure

6   they would have attempted to get as

7   thorough a picture as possible regarding

8   the intercompanies but I don't

9   specifically know.

10        Q.    We looked at the Rule 2019

11   report that reflected increased holdings

12   by DK from 2012 to 2013.  I can't remember

13   if I asked.  Do you recall specifically

14   when that increase occurred, which month

15   in the time period?

16        A.    No.

17        Q.    Do you recall if it was 2012 or

18   2013?

19        A.    It would have been both in 2012

20   and 2013.

21        Q.    And you mentioned these

22   investment memos.  You did review some of

23   those investment memos in connection with

24   today's deposition?

25        A.    Yes.  I looked at least one
```

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 74 of 211

74

1                     BASTABLE

2       investment memo that we had put together.

3            Q.    And did that document help

4       refresh your recollection about some of

5       the items that we are talking about today?

6            A.    Yes.

7            Q.    Do you recall any of these

8       investment memos actually addressing

9       intercompany balances?

10           A.    I believe -- and there would

11      have been different information provided,

12      I don't want to just -- at DK we would

13      have specific -- an investment memo is

14      sort of a specific document.  There might

15      be other documents provided to me by Kunal

16      or Sara that would have addressed the

17      intercompany issue.  Whether or not it

18      made it into an investment memo, I don't

19      know.

20           MR. WALSH:  I'm going to mark

21         the Houlihan presentation.

22           (DK Exhibit 10, Houlihan

23         presentation, marked for

24         identification, as of this date.)

25           MR. WALSH:  Just for the record,

75

```
 1                    BASTABLE

 2         DK-10 was previously marked as PX 169.

 3         Q.    Do you recognize this document?

 4         A.    Yes, I do.

 5         Q.    And when was the first time you

 6    saw this document?

 7         A.    This would have been, I'm

 8    looking at it, it's, you know, labeled May

 9    of 2012, it would have been presented to

10    us in May of 2012 prior to signing the

11    PSA.

12         Q.    Do you recall in what context it

13    was presented to you?  Was there a

14    meeting?

15         A.    I may not have been at the

16    meeting where this was presented, if there

17    was one.  It would have either been at a

18    meeting or on a call.  But certainly there

19    would have been representatives from DK

20    party to that meeting or call.

21         Q.    When you met with your

22    colleagues at DK to prepare for the

23    deposition, did you review this document

24    with them?

25         A.    We did not review this document.
```

76

                           BASTABLE

1

2        Q.    Do you know if the document was

3    presented in early May?

4        A.    I don't.

5        Q.    Do you recall who else was, if

6    you know, who else was present for this

7    presentation?

8        A.    Again, I mean it would have been

9    certainly members of the steering

10   committee at that time.  So

11   representatives from those firms and I'm

12   sure counsel was also involved in that

13   meeting.

14       Q.    What is your understanding of

15   the purpose of this presentation?

16       A.    You know, this is what we have

17   been talking about, which is Houlihan had

18   gone in, done an analysis of the

19   company's, you know, financial position

20   and, you know, the purpose of that was to

21   help our due diligence process and inform

22   our decision as to whether or not we

23   should sign up to the PSA.

24       Q.    And by this time the ad hoc

25   group had signed the NDA with debtors,

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 77 of 211

77

1                          BASTABLE

2     correct?

3          A.    Yeah.  This has -- yeah, subject

4     to the NDA, sure.

5          Q.    And this presentation contains

6     information that was provided by the

7     debtors that was not public?

8          A.    At the time, yes, this would

9     have been nonpublic information.

10         Q.    If you turn, for example, to

11    page 5 of the document.  I'm using the

12    Houlihan Lokey numbers there at the bottom

13    right.  Do you know if this adjusted

14    balance sheet information was public

15    information or nonpublic?

16         A.    I believe this would have been

17    nonpublic information.

18         Q.    And if you keep turning the

19    pages, there is a page 10 of the document

20    that is entitled Summary of Estimated

21    Recovery.  Is it your understanding that

22    the presentation included an estimate of

23    recovery for JSNs?  Part of the

24    presentation was Houlihan providing an

25    estimated recovery of JSNs?

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 78 of 211

78

1                    BASTABLE

2        A.    Yeah.  Part of this has been

3    redacted but, yes.  I mean, yes, in

4    looking at the subsequent slides clearly

5    part of this was an attempt to estimate

6    recovery of -- for the JSNs.

7        Q.    If you look at the right side of

8    the page, there's a reference to Alli

9    contribution, 950 million.  That is the

10   750 million contribution that we referred

11   to earlier and an additional 200 million

12   in connection with certain asset sales,

13   correct?

14       A.    Correct.

15       Q.    The reference is to sold assets

16   above Fortress and Alli.  What does that

17   refer to, if you know?

18       A.    At the time that the company

19   filed for bankruptcy, they had stalking

20   horse bids for both their servicing assets

21   and other loans that were on the company's

22   balance sheet.  And at that point Fortress

23   and Alli were the stalking horse bidders

24   for those assets.

25       Q.    When it says percentage of book

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 79 of 211

79

```
 1                    BASTABLE

 2    value, what does is that referring to?

 3        A.    Sorry, where is that?  I'm

 4    sorry, in parens.  So that is, you know,

 5    the company would have accounted for

 6    those -- the company's books would have

 7    accounted for them at a certain value and

 8    the Fortress and Alli market value would

 9    have been a certain percentage, it would

10    have allocated a certain percentage of

11    that book value.

12        Q.    So, for example, on mortgage

13    loans the percentage of book value is 100

14    to 104.  What does that mean?

15        A.    Meaning if there was $100 of

16    book value Fortress would have paid 100 to

17    $104 for those assets.

18        Q.    Is that true for the other items

19    listed here, GNMA, MSRs, for example, is

20    26 percent?

21        A.    Yes.

22        Q.    So what that is reflecting is

23    that the Fortress-Alli bid was 26 percent

24    of book value for that asset?

25        A.    Let me see if that's -- yeah, I
```

80

```
 1                    BASTABLE
 2     believe so.
 3          Q.    The items liabilities is blacked
 4     out, that's redacted.  Is that your
 5     understanding?
 6          A.    Yes.
 7               MR. WALSH:  Counsel, that's
 8          redacted because of counsel's work
 9          product, is that the argument?
10               MR. RENENGER:  It appears to me,
11          I think it's not produced by DK.  So I
12          don't know specifically who redacted
13          this or when.
14          Q.    If you turn to the next page,
15     11, it appears to be redacted as well.  If
16     you turn to page 22 of the document, sir.
17          A.    This is the Houlihan page 22?
18          Q.    Yes.  Thank you.  You see that
19     Houlihan has stated that the intercompany
20     claims have been excluded from the
21     analysis.  Is that your understanding,
22     that this analysis excludes the value of
23     intercompany claims?
24          A.    The analysis on this slide, yes,
25     would have excluded intercompany claims.
```

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 81 of 211

81

```
 1                    BASTABLE

 2        Q.    Is it fair to say that the

 3   analysis, and I'm not asking you to waive

 4   work product obviously, but the analysis

 5   that was provided to the JSNs at this time

 6   period, the recovery analysis excluded any

 7   recovery of intercompany claims?

 8              MR. RENENGER:  Object to the

 9        form of the question.  You are talking

10        about this analysis or any analysis?

11              MR. WALSH:  This analysis.  The

12        analysis in Exhibit 10.

13        A.    No, I'm not sure that's the

14   case.  I would say this slide in this

15   analysis excluded.

16        Q.    Which is redacted.  Do you know

17   if there was a subsequent analysis by

18   Houlihan that did include the value of

19   intercompany claims?

20              MR. RENENGER:  I'm going to

21        object to the form of the question and

22        caution the witness that to the extent

23        you are not aware -- you are talking

24        about Houlihan work product.  If it's

25        public, you can talk about it.  But if
```

82

1                    BASTABLE

2        it was done in the context of work

3        product, we would instruct you not to

4        answer that question.

5        A.     With that advice taken, there is

6    a specific reference even in this

7    presentation to intercompany claims as

8    being a part of our assets.  So clearly

9    this was something that we were running

10   scenarios where we were including

11   intercompany receivables as part of our

12   asset recovery.  And that's evident on

13   page 12 of this presentation.

14       Q.    So at least to page 12, and it's

15   hard to do because it's redacted, but

16   Houlihan performed an analysis of this

17   recovery including intercompany

18   receivables?

19       A.    Correct.

20       Q.    Let me show you one more

21   document.

22            MR. WALSH:  This was previously

23       marked as PX 357.  It will be DK-11.

24            (DK Exhibit 11, document

25       entitled, Statement of Limiting

83

1                          BASTABLE

2          Conditions, marked for identification,

3          as of this date.)

4          Q.    Before we get to the

5     document 11, the prior document, DK-10, do

6     you know if that was shared with anyone

7     outside of the ad hoc group?

8          A.    Not --

9          Q.    I include in the ad hoc group

10    the representatives of Houlihan.

11             MR. RENENGER:  At this time?

12             MR. WALSH:  At any point.

13             MR. RENENGER:  Let me just

14         object to the question.  I sort of

15         lost the train on the question.

16             MR. WALSH:  Let me make it

17         clear.

18         Q.    Initially this document was

19    prepared for the benefit of the ad hoc

20    group.

21         A.    Right.

22         Q.    It was prepared by Houlihan as

23    FA to the ad hoc group.  Do you know if an

24    unredacted version of this was shared

25    outside of the ad hoc group?

84

1                    BASTABLE

2        A.    No, it was not.  At some point

3    there was a release of information that

4    Houlihan had provided to us, of the

5    nonpublic information that Houlihan had

6    provided to us.  So that would have been

7    shared to anyone who wanted to look at it.

8        Q.    To your knowledge, this document

9    in unredacted form has not been shared in

10   the ad hoc group?

11       A.    That's correct.

12            MR. RENENGER:  For the record,

13       that document is DK-10.

14            MR. WALSH:  Yes.  Now on DK-11.

15       Q.    Do you recognize this document?

16       A.    Yes.

17       Q.    What is this?

18       A.    This is to, again, sort of

19   summary analysis provided by Houlihan

20   addressing the recoveries to JSNs under

21   the PSA construct.  And then that's what

22   slide, the first page, which is I guess

23   number 2 of 3 here.  And then the one

24   that's number 3 of 3 outlines the timing

25   of recovery for the JSNs.

85

1                    BASTABLE

2        Q.    And if you look at slide 2, the

3    bottom right corner of the estimated

4    waterfall recovery, you see total recovery

5    105 percent.  Is that the 105 percent that

6    you referred to earlier?

7        A.    That's right.

8        Q.    This was the estimate, at least

9    at this time, of the JSN recovery under

10   the PSA that was to be signed shortly

11   thereafter?

12       A.    Yes.

13       Q.    You see on the front page the

14   document is dated May 14th.  So it's

15   contemporaneous with the signing of the

16   PSA?

17       A.    Yeah.

18       Q.    Do you know what assets are

19   included within the pledged collateral on

20   that right side?

21       A.    Well, the pledged collateral on

22   the right side is a summary of what's on

23   the left side.  So there is, yeah, I mean

24   on the slide there's information provided.

25   As you can see, the assets purchased by

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 86 of 211

86

1                  BASTABLE

2      Fortress, the assets purchased by Alli are

3      included.  There was an amount of cash on

4      the company's balance sheet as of that

5      time and then there was various other

6      residual assets that were going to remain

7      on the company's balance sheet after the

8      sale, asset sales.

9         Q.    Am I correct that what Houlihan

10     has done on the left side is taken the

11     book value as of February 29, 2012, as

12     reflected on the cash collateral motion

13     and rolled that forward to February 29,

14     2012, and then rolled forward to

15     December 31, 2012?

16             MR. RENENGER:  I'm going to

17         object to the form of the question.

18        Q.    Let me ask it in a more

19     straightforward way, if that's easier.

20     What is your understanding of the analysis

21     on the left as it reflects book value

22     February 29, 2012 -- what is your

23     understanding of the various headings

24     under pledged assets?

25        A.    Yeah, I mean, I think the first

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 87 of 211

87

1                    BASTABLE

2        column is straightforward.  That's just

3        the book value as of that date.  It would

4        have been reported in their public

5        financials.  The second was an attempt to

6        estimate, I guess, what the market value

7        of those assets were in part based on we

8        knew what Fortress and Alli were paying

9        for certain assets.  And I believe

10       Houlihan would have had conversations with

11       the debtor about what the other assets

12       would be worth versus book value.  And

13       then obviously then there was an attempt

14       to, I think the debtor had provided

15       Houlihan with additional information

16       relating to how the balance sheet had

17       changed between February and the petition

18       date.  And that information was

19       incorporated into the last column, which

20       was then rolled forward, I guess, to

21       December 31, 2012.  But there would have

22       been additional information basically

23       provided to Houlihan from the debtor to

24       formulate the last call.

25            Q.   Let me ask the same question

88

BASTABLE

1

2    with respect to the column under Estimated

3    Waterfall Recovery, Illustrative Market

4    Value, December 31, 2012.  What does that

5    include?

6        A.   The asset side of it is simply a

7    summary of what's on the left.  And then

8    when you get down to beginning at secured

9    recovery distribution, that that is

10   Houlihan's analysis of how those assets

11   would be shared between -- would be shared

12   under the waterfall in the PSA between the

13   Alli senior secured notes and the JSNs.

14       Q.   And the recovery is consistent

15   with the PSA recovery, the first 400 goes

16   to Alli, the next billion to the JSNs, and

17   then there is an 81 percent to JSNs and

18   19 percent to Alli?

19       A.   Right, yes.

20       Q.   And that's what that waterfall

21   reflects?

22       A.   Yeah.

23       Q.   And then there's a second line

24   of unsecured recovery distributions.  Is

25   it your understanding that that also

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 89 of 211

89

1                   BASTABLE

2       reflects the distributions, the deficiency

3       distributions that are in the PSA?

4               MR. RENENGER:  Object to the

5           form of the question.

6           Q.    It's the 81/19 percent split.

7           A.    I believe the Waterfall One

8       there is.  And then Waterfall Two was,

9       there would be, once we had received our

10      full par plus post petition interest, Alli

11      would look to whatever was remaining for

12      the final portion of their recovery.

13          Q.    You said post petition interest.

14      Do you mean prepetition interest?

15          A.    Pre and to the extent we weren't

16      paid out by December 31, 2012, post

17      petition interest.

18          Q.    At that time period had someone

19      calculated what the post petition interest

20      would be after December 2012?

21              MR. RENENGER:  Object to the

22          form of the question.

23          A.    I don't know -- I believe we,

24      Davidson Kempner, were doing some analysis

25      to that effect.  To the extent we weren't

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 90 of 211

90

BASTABLE

1

2    paid off -- to be clear we were hopeful

3    and certainly part of the -- what we were,

4    the bargain we were negotiating for was to

5    get paid off as of that date or have the

6    large majority of our claim paid off as of

7    that date.  But I believe we did do some

8    analysis to estimate what our rate of

9    return would be on the remaining debt

10    outstanding to the extent we weren't paid

11    off as of that date.

12         Q.    The 105 percent recovery as of

13    this time period though assumed payment in

14    full by December 31, 2012?

15         A.    I think -- yeah.  I mean, yes.

16    If you got paid off by December 31, 2012,

17    you would be entitled to 105 cents on the

18    dollar.

19         Q.    And you accepted the PSA based

20    on that assumption?  You signed the PSA

21    with Davidson Kempner based on the

22    assumption that there was a 105 percent

23    recovery?

24              MR. RENENGER:  Object to the

25         form of the question.

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 91 of 211

91

BASTABLE

2    Q.    Under that PSA?

3    A.    Yeah.  The PSA is a much broader

4    document.  If you are asking me in a state

5    of the world where we signed the PSA and

6    then were subsequently paid off in full

7    including prepetition interest by

8    December 31, 2012, we would have been

9    entitled to 105, approximately 105 cents

10   on the dollar.

11   Q.    Am I correct that this analysis

12   does not include any value for

13   intercompany balances?

14   A.    This specific analysis does not

15   include any value.

16   Q.    Was there any other

17   contemporaneous analysis, either by DK or

18   the ad hoc group, including intercompany

19   value?

20   A.    Well, we just looked at some.

21   But it was --

22   Q.    It was redacted?

23   A.    -- it was pretty clear that

24   there was a line item there that includes

25   value for the intercompanies.

92

1           BASTABLE

2        Q.    And am I correct that the ad hoc

3    group is taking the position that that

4    information is privileged?

5            MR. RENENGER:  Well, I will

6        state for the record what I stated

7        before, which is that it was redacted

8        by counsel for the ad hoc group and we

9        stand by the redactions.  I believe

10       it's on the basis of work product.

11       Q.    First, if you look at footnote

12   3, which is a footnote to the unsecured

13   recovery distributions on the right, you

14   see that there's -- I'll just read it for

15   you quickly and slowly.  "Unsecured

16   recovery is based on a legal entity

17   priority analysis and assumes illustrative

18   estimates of approximately 600 million and

19   9.0 billion of admin\priority and

20   contingent liability claims, respectfully,

21   as well as the additional $1.4 billion of

22   other general unsecured claims."

23           MR. RENENGER:  Object to the

24       form of the question.  Just note that

25       was an incorrect reading.  The word

93

                    BASTABLE

1

2         "the" should be "and."

3              MR. WALSH:  Thanks for that

4         correction.

5         Q.    Do you have an understanding

6    what that footnote refers to?

7         A.    Yes.  Generally.

8         Q.    What does that refer to?

9         A.    There would have been -- the

10   waterfall above only addresses the Alli

11   revolver and the JSNs in terms of their

12   recovery.  There were other claims in this

13   case.  Admin claims, unfortunately, we

14   were already anticipating were going to be

15   $600 million, which is I mean costs,

16   generally costs of running ResCap and all

17   of the fees that were paid out during the

18   bankruptcy.

19        Q.    What is the reference to

20   contingent liability claims?

21        A.    And then the 9 billion, that I

22   believe would have been an estimate of

23   what the other claims in the case

24   primarily relating to the private label

25   so-called private label RMBS claims.  And

94

1                          BASTABLE

2      then also the claims relating to the

3      monoline contingent liabilities.  And then

4      in addition to that there were 1.4 billion

5      of general unsecured claims which would

6      have been primarily unsecured notes but

7      I'm sure there were other smaller pools of

8      unsecured claims as well.

9           Q.   Did you understand at this time

10     period that there was going to be a

11     separate PSA with the RMBS trustees or at

12     least some number of RMBS plaintiffs

13     settling their claims at approximately

14     $8 billion?

15               MR. RENENGER:  Object to the

16          form of the question.

17          A.   We knew that that would be

18     required to get a planned confirmed.

19     So -- and we, I believe at that time we

20     were aware that there would have been, you

21     know, there had to have been some dialogue

22     with those parties.  So yeah.

23          Q.   And am I correct that this

24     analysis on the right side includes a

25     resolution of at least some portion of

95

1                      BASTABLE

2      those RMBS claims?

3              MR. RENENGER:  Just to clarify,

4          you are on the right of page 2 of 3

5          still?

6              MR. WALSH:  I am.

7          A.    Yes.

8          Q.    And your understanding was that

9      it would not resolve all of the RMBS

10     claims, that settlement?

11             MR. RENENGER:  Object to the

12         form of the question.

13         Q.    Did you have an understanding of

14     the PSA with the RMBS plaintiffs did not

15     resolve all of the RMBS claims?

16         A.    At this time?

17         Q.    At this time, yes.

18         A.    I'm not sure we knew enough to

19     know whether it would or would not resolve

20     all of those claims.

21         Q.    Did you have an understanding

22     what the treatment would be in the

23     bankruptcy of the RMBS claims?  Again, as

24     of this time period.

25         A.    As of this time period.  No, we

96

1                        BASTABLE

2     did not know exactly how those claims

3     would be treated.

4         Q.    Why not?

5         A.    Again, those claims arose from

6     various subsidiaries of ResCap.  And the

7     company had never disclosed which entities

8     they had arisen and, therefore, we didn't

9     know enough to have a view as to where

10    those claims would sit in the company's

11    corporate structure.

12        Q.    When did you first become aware

13    of the treatment of the RMBS claims in the

14    PSA, the May PSA, May 2012 PSA?

15        A.    Well, I think right around the

16    petition date there was a disclosure that

17    the debtor had reached an agreement with

18    the private label RMBS holders.  So at

19    least at that point we knew what that

20    headline number was.  We did not know the

21    specifics of the proposal beyond that.

22        Q.    And you did not terminate your

23    PSA based on the information that was

24    provided regarding the RMBS?

25        A.    No, we didn't.

97

1                    BASTABLE

2              MR. RENENGER:  Object to the

3       form of the question.

4       Q.    As of that time period.

5              You learned of the RMBS PSA, you

6    did not terminate your PSA based on the

7    RMBS PSA?

8       A.    We didn't.  But we specifically

9    included language in the PSA that

10   protected us from any economic impact

11   associated with that settlement.  So

12   basically the debtors made a rep that the

13   RMBS settlement would not have an economic

14   effect on the recoveries for the JSNs.

15      Q.    What was your understanding of

16   what an economic effect would be?

17      A.    Meaning that it wouldn't impact

18   the timing or the dollar amount of our

19   recoveries.

20             MR. WALSH:  This will be DK-12.

21             (DK Exhibit 12, e-mail chain,

22       marked for identification, as of this

23       date.)

24      Q.    DK-12 is an e-mail from Dennis

25   Prieto, dated June 26, to a number of

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 98 of 211

98

1                        BASTABLE

2      people, including yourself, Mr. Bastable,

3      correct?

4           A.    Yes.

5           Q.    And you received this e-mail on

6      June 26, 2012?

7           A.    Um-hmm.

8           Q.    And the e-mail attaches a letter

9      from Mark Brodsky.  Who is Mark Brodsky?

10          A.    Per this and my knowledge, Mark

11     is the chairman of Aurelius Capital

12     Management, LP.

13          Q.    Were you familiar with Aurelius

14     prior to this date?

15          A.    Yes.

16          Q.    How were you familiar with them?

17          A.    They were another hedge fund.

18     They are involved in some of the same

19     types of investment strategies as we are.

20     So I have gotten to know them over the

21     years from being involved in other

22     situations alongside them.

23          Q.    In what other situations?

24          A.    You know, there's been a number

25     of them over the years.  One recent one

99

1                        BASTABLE

2      was we were both creditors of a company

3      called Vitro.  But we have probably been

4      involved in dozens of cases or certainly a

5      large number of cases together over the

6      years.

7           Q.    Were you involved in the

8      Adelphia case?

9           A.    I was not.

10          Q.    Were you involved --

11          A.    Well, excuse me.  And when I say

12     I personally was not.

13          Q.    Was the firm --

14          A.    DK did have exposure to

15     Adelphia.  But it would have -- I did not

16     have any direct involvement in that case.

17          Q.    Ultimately Aurelius became a

18     member of the ad hoc group, correct?

19          A.    That's right.

20          Q.    Are you aware of any other ad

21     hoc groups formed in connection with

22     distressed situations in which both DK and

23     Aurelius were members?

24          A.    Yeah.  For example, Vitro was

25     one.  But there would have been others.

100

1                        BASTABLE

2        Q.    Do you know the others?

3        A.    I wouldn't want to give you a

4   list of them because it wouldn't be a

5   comprehensive one.  But it could be a

6   reasonably large number, although not, not

7   dozens but certainly it could be in the

8   double digits, over -- over a long period

9   of time.

10       Q.    Can you give me some names of

11  names you remember?

12            MR. RENENGER:  I'm going to

13        object to the question as beyond the

14        scope.  I'm not sure how this relates

15        to the topics that are, that have been

16        noticed.  Do you want to make a

17        representation along those lines?

18            MR. WALSH:  I'm asking about the

19        ad hoc group and this is a connection

20        with -- Aurelius is a member of the ad

21        hoc group so I think I'm entitled to

22        ask if there had been prior

23        relationships.

24            MR. RENENGER:  He answered that.

25            MR. WALSH:  If he can remember

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 101 of 211

101

1                    BASTABLE

2        three or four names.

3        Q.    Three or four bankruptcies or

4   distressed situations where both Aurelius

5   and DK have been members of an ad hoc

6   group?

7        A.    One of the reasons I'm

8   hesitating here is that there's situations

9   we may have been involved with where we

10  were on an ad hoc group.  I don't know if

11  they would have been on the ad hoc group.

12  I just don't want to -- I don't want to go

13  there because I think it would be quite

14  easy to misremember whether we were both

15  participating.  Vitro is a relatively

16  recent one where we were both on an ad hoc

17  group together.

18       Q.    Let's look at DK-11 and the

19  letter that Mr. Brodsky sent.

20            MR. RENENGER:  DK-12.

21       Q.    We, thank you.  Did you read

22  this letter when you received it?

23       A.    Yes.

24       Q.    Is it your understanding the

25  letter was addressed to the ad hoc group?

102

1          BASTABLE

2     A.   It is addressed to the ad hoc

3     group.

4     Q.   And if you look at the cover

5     letter, there are members of the ad hoc

6     included in the cover e-mail?

7     A.   Yes.

8     Q.   Mr. Brodsky refers in the fourth

9     full paragraph to an ad hoc group's

10    May 14, 2012, presentation.  Is that the

11    Houlihan presentation we previously looked

12    at?

13          MR. RENENGER:  Object --

14    Q.   Well, let me ask another

15    question.  Which, if either, of the

16    Houlihan presentations is that referring

17    to, if you know?

18    A.   I don't know.

19    Q.   If you see the one, and I don't

20    remember that exhibit number but is that

21    11?

22    A.   Yes.

23    Q.   DK-11 is dated May 14th.  Do you

24    have any reason to question that that is

25    in fact what Mr. Brodsky is referring to?

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 103 of 211

103

1                    BASTABLE

2        A.    No.

3        Q.    You see Mr. Brodsky writes in

4    that paragraph, "We believe the secured

5    notes are substantially oversecured,

6    hence, would be entitled to post petition

7    interest for 2012 and beyond in the

8    absence of the PSA."

9              What was your understanding of

10   that statement?

11       A.    I'm sorry.  Could you repeat

12   that.

13       Q.    The last sentence I read is the

14   sentence beginning "Indeed."  Do you see

15   that sentence?

16       A.    Yes.

17       Q.    What is your understanding of

18   that sentence?

19       A.    I guess it's somewhat

20   straightforward, right.  That they believe

21   that there was enough value to cover our

22   notes plus prepetition interest as of the

23   petition date and presumably post petition

24   interest and that if the PSA didn't exist,

25   that we would be entitled to recover that

104

1              BASTABLE

2     through the bankruptcy process.

3          Q.    And is it your understanding

4     Mr. Brodsky was challenging the ad hoc

5     group's decision to waive post petition

6     interest, at least through December 31,

7     2012?

8              MR. RENENGER:  Object to the

9          form of the question.

10         Q.    Is that your understanding?

11         A.    You can read this letter.  I

12    think it speaks for itself.

13         Q.    What was your understanding as

14    to Mr. Brodsky's position regarding post

15    petition interest?

16         A.    He believed that the JSNs were

17    entitled to full or would be entitled to

18    full post petition interest and was laying

19    out the case for that in this letter.

20         Q.    If you'll turn to the second

21    page, there's a heading entitled

22    Intercompany Claims.  Take your time and

23    read that.

24         A.    (Witness reviews document.)

25              Yeah.

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 105 of 211

105

1              BASTABLE

2      Q.    Mr. Brodsky is identifying the

3   intercompany receivables as a potential

4   collateral source?

5      A.    Right.

6      Q.    And you said you were aware of

7   that prior to entering the PSA, yes?

8      A.    Yes.

9           MR. RENENGER:  Object.

10     Q.    He references the last ResCap

11  consolidating financials made public in

12  2009.  Do you know what he's referring to

13  there?

14     A.    I do know in general what this

15  would be referring to, which would have

16  been that there would have been financials

17  that would have broken out individual

18  ResCap entities as opposed to a single

19  balance sheet for ResCap as a whole.

20  So -- but I couldn't speak to the exact

21  disclosure in those financials.

22     Q.    Do you know if anyone from DK

23  reviewed those financials at or around --

24  at or before the date of the PSA?

25     A.    I think it's very likely we did.

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 106 of 211

106

```
 1                    BASTABLE

 2       Q.    Do you know one way or other?

 3       A.    I can't definitively say.  But

 4  again, I'm almost positive we did review

 5  those financials.

 6       Q.    Mr. Brodsky writes, "The

 7  intercompany claims are not counted in the

 8  Presentation."  Does that refresh your

 9  recollection whether intercompany claims

10  are included in the waterfall analysis

11  that we looked at previously in DK-11?

12       A.    Can you repeat the question?

13       Q.    Mr. Brodsky writes that "The

14  intercompany claims are not counted in the

15  Presentation," capital P presentation,

16  which is DK-11 we referred to earlier.

17  Does that refresh your recollection that

18  in the waterfall analysis the intercompany

19  claims are not included?

20            MR. RENENGER:  Object to the

21       form of the question.  I don't believe

22       he needed his memory refreshed on

23       that.  He stated that affirmatively

24       before.  Go ahead.

25       Q.    I'll let you testify.  Is your
```

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 107 of 211

107

1                    BASTABLE

2    understanding --

3        A.    Yes.   That exhibit, DK-11, does

4    not include recoveries from the

5    intercompany claims.

6        Q.    If you turn to page 3 of the

7    Brodsky letter, there's a heading Alli

8    Settlement Proceeds.   I'll let you read

9    that and let me know when you are ready to

10   answer the question.

11       A.    Okay.

12       Q.    What is Mr. Brodsky referring to

13   there?

14            MR. RENENGER:   Object to the

15       form of the question.

16       Q.    If you know.   What's your

17   understanding of what that paragraph

18   addresses?

19       A.    He's talking about again,

20   obviously he's talking about the Alli

21   settlement and he has concerns about the

22   fact that it appears that unsecured bond

23   holders are going to benefit from a

24   portion of the proceeds put into the

25   estate by Alli to satisfy potential legal

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 108 of 211

108

1                    BASTABLE

2    actions or, you know, potential avoidance

3    of ResCap transfers to Alli.

4        Q.    Did you have an understanding

5    before this letter whether causes of

6    actions against Alli constituted

7    collateral to the JSNs?

8            MR. RENENGER:  I'm just going to

9        admonish the witness to the extent

10       that any answer you give is based on

11       communications with counsel, I'll

12       instruct you not to answer.  But based

13       on otherwise, you are free to answer.

14       A.    Yeah.  I think this area gets

15   into privilege.  It would have been an

16   analysis that would have been privileged

17   because it was almost entirely based on

18   legal analysis that our counsel did.

19       Q.    Taking that into account, can

20   you tell me when was the first time that

21   you became aware that causes of action

22   against Alli could be collateral to the

23   JSNs?

24           MR. RENENGER:  Same instruction

25       but --

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 109 of 211

109

1                    BASTABLE

2        A.    I mean, I'll have to -- I don't

3   recall the exact date but I think -- but

4   again, around this time we were cognizant

5   of the fact that those -- that was

6   potentially a source of collateral value

7   for us.

8        Q.    And was it around the June time

9   period or --

10       A.    Earlier.

11       Q.    When?

12       A.    I don't remember the specific

13  date.

14       Q.    Do you remember if it was before

15  or after you signed the PSA?

16       A.    I believe before.

17       Q.    How much before?

18       A.    I don't recall.

19       Q.    Again, I'm not asking for the

20  content of your communications but can you

21  tell me who provided you, who first told

22  you that there was the potential that

23  these causes of action could constitute

24  collateral for the JSNs?

25       A.    Likely counsel.  So I believe

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 110 of 211

110

1                    BASTABLE

2      White & Case would have informed us.

3           Q.    Do you recall specifically who

4      at White & Case?

5           A.    No.

6           Q.    Do you recall if this was an

7      oral communication or if there was a

8      written memorandum on the subject?

9           A.    I don't recall if there was a

10     written memorandum.  There certainly would

11     have been oral communication, but I don't

12     recall if there was a written memorandum

13     on the subject.

14          Q.    Mr. Brodsky on the last page

15     writes, "We are truth seekers so we

16     welcome whatever correction this letter

17     deserves."  Did you have any discussions

18     with Mr. Brodsky after this letter was

19     sent regarding the letter?

20          A.    The counsel for the ad hoc group

21     would have had discussions with

22     Mr. Brodsky about the contents of this

23     letter.

24          Q.    That's White & Case?

25          A.    At the time -- well, no, Milbank

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 111 of 211

111

1                        BASTABLE

2     at this point I think.

3          Q.    When did Milbank first become

4     involved?

5          A.    When J.R. Uzzi moved from White

6     & Case to Milbank, which was sometime, I

7     believe, in late -- actually, no, this

8     would have still been -- sorry, that would

9     have been a subsequent date.

10         Q.    I believe Mr. Uzzi moved firms

11    at the end of 2012.

12         A.    Yeah.  I was confused about the

13    date.

14         Q.    So still White & Case?

15         A.    Still White & Case.

16         Q.    Did you have any discussions

17    outside the presence of White & Case with

18    Mr. Brodsky about this letter, after it

19    was sent?

20         A.    I believe Mr. Brodsky called me

21    to let us know, to let me and our firm

22    know that this letter was coming and would

23    have at that point described at a very

24    high level why he was sending it to the

25    group.

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 112 of 211

112

1                         BASTABLE

2          Q.     What did he tell you?

3          A.     It was a short conversation,

4     effectively saying, you know, we believe

5     that the JSNs are oversecured and you

6     should not be agreeing to a deal that

7     would give up any of your post petition

8     interest.  And then would let the letter

9     obviously provide the details that it does

10    regarding the specifics of his position.

11         Q.     What was your understanding of

12    what he meant by a deal?  Was he referring

13    to the PSA or?

14         A.     Yes.

15         Q.     Was he asking you to terminate

16    the PSA?

17         A.     No.

18         Q.     What was he asking?

19         A.     Well, he wasn't asking anything.

20    He was just putting us on notice that this

21    letter was coming.

22              (DK Exhibit 13, series of

23         e-mails, Bates DK 233, marked for

24         identification, as of this date.)

25         Q.     This is DK-13.  It's Bates

113

                        BASTABLE

1

2     stamped DK 233.  A series of e-mails dated

3     July 3rd, 2012.  This is an e-mail that

4     you received, Mr. Bastable?

5         A.   Yes.

6         Q.   This is from Mr. Brodsky?

7         A.   Yes.

8         Q.   And Mr. Brodsky is referring to

9     the bankruptcy schedules that ResCap

10    released around this time period?

11        A.   Right.

12        Q.   And what did those bankruptcy

13    schedules disclose?

14        A.    I think the relevant thing

15    they -- there would have been a lot that

16    it disclosed, but the relevant thing was

17    that it would have deconsolidated balance

18    sheets for the rep -- for the ResCap

19    entities.

20        Q.    Prior to this date, though, the

21    ad hoc group had some trial balances that

22    were reflected in the company receivables,

23    correct?

24             MR. RENENGER:  Object to the

25        form of the question.

114

1                    BASTABLE

2        Q.    You referenced that Houlihan

3    received certain balance sheets from

4    guarantors.  That would have shown

5    intercompany receivables, correct?

6        A.    Yeah, I mean -- we just want to

7    make sure that we are distinguishing when

8    we get into these issues between our

9    advisors and the ad hoc group.

10       Q.    Thank you.  Houlihan, at least

11   prior to this time, had that some

12   information on intercompany receivables?

13       A.    Yes.

14       Q.    When was the first time the ad

15   hoc group received information regarding

16   ResCap's intercompany receivables?

17       A.    The -- again, Houlihan presented

18   us with some estimate of recoveries I

19   think relating to intercompany

20   receivables, but we would not have

21   received specifics in terms of seeing the

22   balance sheets of these entities until --

23   I believe until these schedules were

24   published.

25       Q.    Well, you knew a ballpark

115

1                       BASTABLE

2      number, right?  You testified earlier

3      about something north of 500 million,

4      correct?  You knew there were substantial

5      intercompany receivables?

6          A.    Yes.  And I did not testify that

7      it was necessarily a number north of 500

8      million, but we did think there was

9      potentially substantial value in the

10     intercompanies.

11         Q.    He refers to, Mr. Brodsky refers

12     to 30 bond points.  What is he referring

13     to there, if you know?

14         A.    He's talking about bond points

15     relative to the face amount of JSNs, which

16     call it 2 billion, slightly more than

17     that, 2.1 billion.  So 30 bond points

18     would be 30 percent of that number.

19         Q.    How would that relate to the

20     price of the notes?

21         A.    The price of the notes?

22         Q.    Right.  We talked about, you

23     know, you bought these notes somewhere in

24     the neighborhood of $0.60?

25         A.    The first purchase.

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 116 of 211

116

1              BASTABLE

2       Q.     First notes.  You had subsequent

3    purchases I assume at higher numbers?

4       A.     Yes.

5       Q.     How would the 30 points relate

6    to --

7       A.     Yeah, it would be the same --

8    effectively the same manner of speaking.

9    Meaning he would be talking about

10   something that would be $0.30 on the

11   dollar effectively.

12      Q.     And do you know how he

13   calculated 30 bond points as they related

14   to the intercompany receivables?  Was that

15   something you and he discussed?

16      A.     We did not discuss it, no.

17      Q.     Do you know if he had that

18   discussion with White & Case?

19      A.     I don't know if he had that

20   specific discussion with White & Case.

21      Q.     There's a reference to a meeting

22   of principals.  And you forward the e-mail

23   to Ms. Tirschwell and Mr. Shah.  Do you

24   know if there was a meeting of principals

25   after this e-mail, as it relates to these

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 117 of 211

117

1                    BASTABLE

2      issues?

3          A.    I don't believe there was.  I

4      don't believe there was.

5          Q.    Was there a meeting between

6      Mr. Brodsky and the Aurelius people and

7      White & Case?

8          A.    I think very likely there

9      certainly would have been communication

10     between them.

11              MR. WALSH:  This will be 14.

12              (DK Exhibit 14, series of

13          e-mails, marked for identification, as

14          of this date.)

15         Q.    DK-14 is an e-mail from Dennis

16     Prieto dated July 5th, 2012, to you and

17     others, Mr. Bastable, correct?

18         A.    Yes.

19         Q.    And you received this e-mail on

20     July 5th?

21         A.    Yes.

22         Q.    Attaching Mr. Brodsky's letter?

23         A.    Yes.

24         Q.    And this letter is addressing

25     the intercompany receivables, correct?

118

                    BASTABLE

1

2       A.    Yes.

3       Q.    And again, Mr. Brodsky has

4    provided an analysis of the effect of

5    these receivables on the collateral value,

6    correct?

7       A.    Yes.

8       Q.    He's estimated 64 to 72 bond

9    points of collateral value?

10      A.    Yes.

11      Q.    Did you have a position at the

12   time of this letter whether that was an

13   accurate estimate?

14      A.    We did do some independent

15   analysis to verify their claims.  I think

16   that analysis concluded that it was very

17   likely that there was, and probably more

18   likely than we thought before, substantial

19   value to the intercompany claims.  But I'm

20   not sure that our analysis completely

21   agreed with their analysis.  But we did

22   come to a conclusion that there was --

23   there was very likely substantial value of

24   the intercompany claims.

25      Q.    What was the result of your

119

```
 1                    BASTABLE

 2    analysis as it relates to bond points?

 3         A.    I don't recall, specifically.

 4         Q.    Was it in the neighborhood of 64

 5    to 72 points?

 6         A.    We were coming up with a

 7    slightly lower number.

 8              MR. RENENGER:  John, could you

 9         just clarify who the "we" is there, ad

10         hoc group or --

11              MR. WALSH:  I'm focused on DK.

12         A.    This would have been an analysis

13    that DK was doing independently.

14         Q.    Do you know if the ad hoc group

15    was doing a separate analysis of the

16    intercompany receivables?

17         A.    There were certainly

18    conversations with our advisors about

19    them.  And obviously there was additional

20    public disclosure.  So yes, there would

21    have been some -- there would have been

22    some additional thought given to the value

23    of intercompanies at this time.

24         Q.    Do you know what, if anything,

25    were the results of the ad hoc group's
```

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 120 of 211

120

1                        BASTABLE

2      analysis as it relates to bond points?

3                MR. RENENGER:  I'll interpose an

4           objection only to instruct the witness

5           that to the extent he can only answer

6           that question by relying on work

7           product delivered by advice to the ad

8           hoc group, I'll instruct you not to

9           answer.  But to the extent you can

10          answer without getting into privileged

11          information, you may do so.

12               THE WITNESS:  Right.

13     Q.    Can you answer the question

14     without getting into privileged

15     information?

16     A.    I don't think it would be

17     possible to answer, give you number.  If

18     that number was provided to us, it would

19     be something that Houlihan would have

20     provided.

21     Q.    Mr. Brodsky goes on to talk

22     about the proposed RMBS settlement.  Do

23     you see that in the letter?

24     A.    Where are you specifically

25     referring to?

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 121 of 211

121

1              BASTABLE

2        Q.    The last full paragraph, last

3    two sentences.

4        A.    On the first page.

5        Q.    On the first page.

6        A.    Yes.

7        Q.    Did you have an understanding

8    before this letter that the settlement

9    with the RMBS trusts and the monoline

10   insurers would not be subordinated

11   pursuant to bankruptcy section 510?

12            MR. RENENGER:  And again, I'm

13        going to instruct the witness to the

14        extent that his answer would call for

15        privileged information not to answer

16        that.  But of not, he can answer it.

17       A.    I think that was based on the

18   advice of counsel.

19       Q.    I can ask whether you had a

20   position one why are the other.  I won't

21   get into the content with the

22   communication with counsel.  Did you know

23   one way or other how the RMBS settlement

24   and monoline settlements would be treated

25   under 510 prior to this --

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 122 of 211

122

```
 1              BASTABLE
 2              MR. RENENGER:  I think that
 3         calls for a yes or no answer, so if
 4         you can limit your answer.
 5         A.    I'm a little confused as to what
 6    the -- what is the question you are asking
 7    me?
 8         Q.    Let me rephrase.  Mr. Brodsky
 9    has made a point here about whether the
10    settlements or the claims related to these
11    settlements should or should not be
12    subordinated.
13         A.    Right.
14         Q.    You have an understanding what
15    subordinated means?
16         A.    Yeah.
17         Q.    Is this the first time that you
18    are aware of that issue or were you aware
19    of that issue prior to the letter?
20         A.    I was aware of that issue prior
21    to the letter.
22         Q.    When was the first time you
23    became aware of the issue of subordination
24    as it relates to the RMBS and monolines
25    claims?
```

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 123 of 211

123

BASTABLE

1

2    A.    I don't recall the exact date.

3    Q.    Was it before or after you

4 signed the PSA?

5    A.    Honestly, I don't recall.

6    Q.    And again, I'm not asking you to

7 disclose the content but do you recall who

8 provided you with the first notice of this

9 issue?  Was it White & Case?

10    A.    Most likely.

11    Q.    Do you recall who at White &

12 Case?

13    A.    No.

14    Q.    Do you recall if it was an oral

15 communication or if it was in writing?

16    A.    I don't, I don't recall.

17    Q.    Do you recall at the time of the

18 PSA, signing the PSA, how the RMBS

19 settlement would be treated under the

20 bankruptcy code?  Was it received in a

21 general unsecured claim or something else?

22 And I understand you didn't see it

23 until -- I understand the timing of when

24 you saw that document.  But do you recall

25 appreciating at the time of that document

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 124 of 211

124

1                        BASTABLE

2        in May how the RMBS settlement would be

3        treated in the bankruptcy?

4              A.    I think that's a broad question.

5              Q.    Do you recall specifically

6        whether it would be -- knowing one way or

7        the other whether it would be subordinated

8        or whether it would be treated as a

9        general unsecured claim?

10             A.    I believe my understanding at

11       that time was that those claims were not

12       going to be subordinated under 510B.

13             Q.    What effect, if any, would the

14       fact that the claims were not subordinated

15       have on the recoveries of the JSNs?

16             A.    Well, again, per the PSA they

17       were repping that they would have no

18       effect on the recoveries for the JSNs.

19             Q.    Did you have an understanding

20       that there was at least a potential that

21       the settlement, the RMBS settlement could

22       have an effect on JSN recoveries?

23             A.    If the debtor wanted to breach

24       that rep, then presumably it could have

25       had an effect on us.  Or conversely if it

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 125 of 211

125

BASTABLE

1
2    had an affect on us, that would have been

3    a breach of the rep and allowed us to walk

4    away from the PSA.  So that was a -- I

5    mean that was a key component of the PSA

6    for us, was ensuring that whatever deal

7    got cut with the RMBS holders was not

8    going to have an economic impact on the

9    deal that we agreed to under the PSA.

10       Q.    And you are aware of the

11   subordination issue, at least as of the

12   time of the July 5th letter?

13           MR. RENENGER:  Object to the

14       form of the question.

15       Q.    You are aware that these claims

16   were not going to be subordinated, at

17   least by the time of the July 5th letter?

18           MR. RENENGER:  Object to the

19       form of the question.

20       Q.    We were trying to fix a time

21   when you first became aware of the issue,

22   at least by July 5th?

23       A.    Yes.

24       Q.    At some point prior?

25       A.    Yeah.



126

1                    BASTABLE

2              MR. WALSH:  Take a quick break.

3         A.    Sure.

4              (Whereupon, there is a recess in

5    the proceedings.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

127

1              BASTABLE

2        A F T E R N O O N    S E S S I O N

3           (Time noted:  1:01 p.m.)

4    C O N O R    B A S T A B L E, resumed and

5    testified as follows:

6    EXAMINATION BY (Cont'd.)

7    MR. WALSH:

8        Q.    Mr. Bastable, we are back on the

9    record.  You understand you are still

10   under oath?

11       A.    Yes.

12       Q.    We were talking about the RMBS

13   claims prior to the break.  Were you aware

14   that there were RMBS claims at the time or

15   was DK aware of the RMBS claims at the

16   time of DK's initial investment in ResCap

17   notes?

18       A.    Some of these claims would have

19   really arose -- I'd have to -- I honestly

20   don't recall whether or not we were aware

21   at that point in time.

22       Q.    Do you recall if the investment

23   memos that you mentioned earlier were

24   reference -- did reference?

25       A.    I'm not sure.

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 128 of 211

128

1                    BASTABLE

2        Q.     -- those claims?

3        A.     I'm not sure.

4        Q.     What due diligence, if any, did

5   DK do in advance of signing the PSA with

6   respect to the RMBS claims?

7        A.     We would have done somewhat

8   limited due diligence because it was just,

9   again, it was very opaque as to what

10   amounts would have been due to the RMBS

11   claimants.  I think we did have -- we did

12   make an attempt based on some prior

13   settlements that other counterparties had

14   made with RMBS claim holders about what --

15   how the general framework might look like.

16   But we really didn't have enough

17   information to estimate it with a high

18   degree of specificity.

19        Q.     Which prior settlements do you

20   refer to?

21        A.     There had been -- well, in

22   particular, this may have been maybe more

23   applicable to the monolines where they had

24   reached settlements with other banks who

25   had rep and warranty settlements with

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 129 of 211

129

                        BASTABLE

1

2    other banks who had originated mortgages.

3    But the same framework might be applicable

4    or could be somewhat applicable for the

5    RMBS claimants.

6        Q.    Let me ask the same question

7    about the ad hoc group.  What due

8    diligence, if any, did the ad hoc group do

9    with respect to the RMBS claims prior to

10   the PSA?

11       A.    Are you including advisors?

12       Q.    Yes.

13       A.    Although I can't speak to how

14   much analysis Houlihan did.  Again, I

15   think the primary comfort we took

16   vis-‡-vis the RMBS settlement was the

17   language in the PSA that protected us from

18   any economic harm associated with that

19   settlement.

20       Q.    Would you pull the PSA and point

21   me to that language?

22       A.    It's on page 14 under the 7.1,

23   which is the termination events section.

24       Q.    Item L?

25       A.    Item L, approving any settlement

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 130 of 211

130

1                        BASTABLE

2      of any contingent or disputed liability or

3      allocating -- or allocating proceeds to be

4      paid pursuant to the Alli settlement

5      agreement in a manner which would

6      materially or -- and adversely affect the

7      recoveries of consenting holders.

8          Q.    But with respect to the RMBS

9      settlement you are referring to Romanette

10     one?

11         A.    Yes, I am.

12             (DK Exhibit 15, e-mail chain

13         dated May 11th entitled, ResCap

14         Steering Committee Plan Term Sheet,

15         marked for identification, as of this

16         date.)

17         Q.    There was a plan term sheet that

18     was attached to the PSA, correct?

19         A.    Yes.

20         Q.    And that term sheet provided for          JSN Objection
                                                           130:20-24:
21     how claims would be treated in the                 FRE 1002
                                                           (Best evidence)
22     bankruptcy?

23         A.    Yeah.  Do I have that term sheet

24     here?

25         Q.    We will make that the next

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 131 of 211

131

```
 1                    BASTABLE
 2     exhibit.
 3              (DK Exhibit 16, plan term sheet
 4        attached to the PSA, marked for
 5        identification, as of this date.)
 6              MR. WALSH:   Just so we have a
 7        clear record, 15 is an e-mail chain
 8        dated May 11th entitled, ResCap
 9        Steering Committee Plan Term Sheet.
10        16 is the plan term sheet that was
11        attached to the PSA.
12        Q.    Do you recognize 16?
13        A.    Yes.
14        Q.    When was the first time you saw
15     a draft term sheet?
16        A.    I assume it was prior to signing
17     the PSA.  Probably in the days or low
18     number of weeks before that.
19        Q.    And if you look at 15, I see you
20     are not on this e-mail chain, but Mr. Shah
21     is one of your colleagues, correct?
22        A.    Yes.
23        Q.    As well as Ms. Tirschwell?
24        A.    Yes.
25        Q.    That's Mr. Ephraim?
```

JSN
Objection
131:19-22:
FRE 611(a)
(Compound)

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 132 of 211

132

BASTABLE

2    A.    Mr. Diamond, yeah.

3    Q.    All three of these individuals

4    were working at DK in connection with the

5    ResCap investments?

6    A.    Yes.

7    Q.    And they received a draft term

8    sheet on or about May 11th?

9    A.    Yes.

10    Q.    Do you know if that was the

11    first term sheet that was circulated, the

12    one on May 11th?

13    A.    I don't.

14    Q.    At some point you saw that the

15    RMBS claims were not subordinated in the

16    plan that was proposed in connection with

17    the PSA, the May PSA?

18    MR. RENENGER:  Object to the

19    form.

20    Q.    We talked earlier about

21    subordination?

22    A.    Yes.

23    Q.    At some point you determined

24    that these RMBS claims were not going to

25    be subordinated?

JSN Objection
132:20 –133:6:
FRE 602 (Lacks personal
knowledge, calls for
speculation)

JSN Objection
132:23 –133:6:
FRE 611(a) (Vague and
ambiguous)

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 133 of 211

133

BASTABLE

2      A.    Yes.

3      Q.    Do you recall when the first

4   time was that you realized that?

5      A.    It was prior to us signing the

6   PSA.

7      Q.    Do you know if Houlihan did any

8   analysis of the RMBS claims in connection

9   with the prepetition PSA?

10         MR. RENENGER:  I'm just going to

11      go ahead and instruct the witness as

12      before.  To the extent you can answer

13      that yes or no, that's fine.  To the

14      extent you can't and the answer would

15      otherwise divulge privileged

16      discussions, I instruct you not to

17      answer.

18      Q.    If you can, answer the question

19   yes or no.

20      A.    I don't know.

21      Q.    Had you worked with Houlihan          JSN Objection
                                                    FRE 402 (Not relevant)
22   prior to this engagement?

23      A.    Yes.

24      Q.    Had you worked with the

25   individuals at Houlihan prior to this

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 134 of 211

134

1                    BASTABLE

2    engagement, the same individuals?

3        A.    Which individuals are you

4    referring to?

5        Q.    Who are the individuals that

6    worked on this engagement, to your

7    knowledge?

8            MR. RENENGER:    Object to the

9        form.

10       A.    Eric Siegert was the senior most

11   individual.    And then there would have

12   been a fairly large team of people who

13   would have worked for him.

14       Q.    Had you worked with Mr. Siegert

15   prior to this?

16       A.    Yes.    We as a firm had worked

17   with him on transactions prior to this.

18       Q.    How many?

19       A.    I couldn't tell you.

20   Houlihan -- what's that?    I mean, we have

21   been involved in dozen of bankruptcies.

22   Houlihan is the largest creditor financial

23   advisory firm.    So it would be -- that

24   would be in the dozens of transactions.

25       Q.    What is the number for, the

JSN Objection
134:10–135:15
FRE 402 (Not relevant)
FRE 602, 701, 702
(Lacks foundation, calls
for expert opinion)

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 135 of 211

135

1                    BASTABLE

2    number of transactions that Mr., you've

3    worked with Mr. Siegert on?

4        A.    I couldn't tell you.  But he is

5    a very senior member of the Houlihan

6    restructuring and financial advisory

7    group.  So I'm sure he had involvement in

8    a number of those transactions.

9        Q.    And he's an expert in this case,

10   correct?

11       A.    He is.

12       Q.    And you have no question -- you

13   have no reason to question his

14   qualifications or competence?

15       A.    No.

16       Q.    You had full confidence in his

17   ability and the abilities of the Houlihan

18   team in connection with their analysis

19   prior to the prepetition PSA?

20              MR. RENENGER:  Object to the

21       form.

22       Q.    Let me rephrase.  You had no

23   reason to question Mr. Siegert's

24   competence in connection with providing

25   financial advice to the ad hoc committee

JSN Objection
135:22–136:6
FRE 402 (Not relevant)
FRE 602, 701, 702 (Lacks
foundation, calls for
expert opinion)

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 136 of 211

136



1                          BASTABLE

2        prior to signing the prepetition PSA?

3              A.       I did not.

4              Q.       And you've had not had any

5        reason to question his competence since

6        signing the PSA?

7                      MR. RENENGER:   Object to form.

8              A.       I mean, I have not.

9              Q.       Is there any reason today that

10       you would have any reason to question

11       Mr. Siegert's competence and abilities as

12       a financial advisor?

13             A.       No.

14             Q.       And I'll ask the same question

15       about Houlihan as a firm.   At the time of

16       the PSA, you had no reason to question

17       Houlihan's competence as a financial

18       advisor in connection with the work they

19       did for ResCap?

20             A.       No.

21             Q.       And today you have no reason to

22       question Houlihan's competence and

23       abilities with respect to providing

24       financial advice to the ad hoc group?

25             A.       I do not.

JSN Objection
136:8-136:25
FRE 402 (Not relevant)
FRE 602, 701, 702
(Lacks foundation,
calls for expert
opinion)

137

1               BASTABLE

2               (DK Exhibit 17, e-mail from

3       Mr. Shah to Mr. Bastable dated

4       July 5th, marked for identification,

5       as of this date.)

6       Q.    DK-17 is an e-mail from Mr. Shah

7  to you, Mr. Bastable, dated July 5th.  Is

8  this in connection with the July 5th

9  Brodsky letter we looked at earlier?

10      A.    It appears to be, yes.

11      Q.    Mr. Shah writes, "The interco

12 and pledge analysis is correct."  Do you

13 understand that he's referring to the

14 Brodsky letter and analysis in that

15 Brodsky letter?

16      A.    Yes.

17      Q.    He continues, "I don't know

18 exactly how they get to their bond PT

19 contribution."  Do you know what Mr. Shah

20 is referring to there?

21      A.    Yeah.  This is the same concept

22 we were talking about before.  PT means

23 points here.  So he's, again, referring to

24 the number of bond points that Aurelius

25 believed were attributable to the

138

1                    BASTABLE

2      intercompanies.

3          Q.    He writes, "Appears to assume

4      limited or no contingent claims and no

5      impairment to stated book values."  What's

6      your understanding of that sentence?  What

7      is he referring to?

8          A.    Again, this may not be exactly

9      what he's referring to, but I will give

10     you a sense of what I think he's talking

11     about, was as we've talked about the RMBS

12     claims would have been a contingent claim

13     in this case and then book value wouldn't

14     necessarily tie to market value associated

15     with individual assets.  Although as we

16     have seen with the purchases by Fortress

17     sometimes market value can exceed book

18     value.

19         Q.    And at this point DK knew the

20     amount of the RMBS claims that were going

21     to be settled as part of bankruptcy?

22              MR. RENENGER:  Object to the

23         form of the question.

24         Q.    There was a PSA with respect to

25     the RMBS claims that settled them for

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 139 of 211

139

1                    BASTABLE

2      approximately $8 billion, correct?

3          A.    Yes.

4          Q.    But Mr. Brodsky's analysis does

5      not consider those claims?

6              MR. RENENGER:  Object to the

7          form.

8          Q.    Mr. Brodsky's analysis does not

9      take into account those claims?

10         A.    Yeah.  Well, it says limited or

11     no contingent claims.  So I don't want to

12     say that they weren't taking them into

13     account.  But perhaps we had a different

14     view as to the impact of those claims.

15         Q.    And your view was that

16     Mr. Brodsky was taking a limited view of

17     the claims?  DK's view was that

18     Mr. Brodsky was taking a limited view of

19     the claims, the contingent claims?

20             MR. RENENGER:  Object to the

21         form.

22         A.    Yeah, that appears to be what

23     this says.

24             MR. WALSH:  This is 18.

25             (DK Exhibit 18, Cantor

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 140 of 211

140

1                    BASTABLE

2         Fitzgerald analyst report, marked for

3         identification, as of this date.)

4         Q.    Do you know who York Capital is,

5    Mr. Bastable?

6         A.    Yes, I do.

7         Q.    Are they one of the members of

8    the ad hoc committee as of July 2, 2012?

9             MR. RENENGER:  Object to the

10        form.

11        A.    I don't know, but I believe so.

12        Q.    Do you know who Erin Andrews is

13   of Cantor Fitzgerald?

14        A.    No.

15        Q.    Did you receive analyst reports

16   in this time period from any analyst on

17   ResCap?

18        A.    I'm sure we did.

19        Q.    Do you recall which analyst

20   reports you would have received?

21        A.    No.

22        Q.    You see Ms. Andrews writes about

23   the intercompany claims, and at the end of

24   that paragraph, first paragraph, she

25   writes, "However, there's reason to doubt

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 141 of 211

141

BASTABLE

1

2    some of the intercos."  Do you know if

3    there were discussions within the ad hoc

4    committee questioning the value of the

5    intercompany claims as of this time

6    period?

7         A.    Discussions between whom and

8    whom?

9         Q.    Any members of the ad hoc

10   committee.

11        A.    I can't speak to what

12   conversations other people would have had.

13        Q.    Were there any discussions

14   within DK about the value of the

15   intercompany claims as of this time period

16   July 2012?

17        A.    I think we have covered that.

18   We did have discussions about what we

19   thought the value of those intercompany

20   claims were.

21        Q.    Did you disagree that they were

22   as valuable as Mr. Brodsky had assessed

23   them to be?

24        A.    We had a difficult time

25   reconciling exactly how he got to the

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 142 of 211

142

1                   BASTABLE

2      numbers he got to.  But we actually did --

3      we believed that his analysis was right

4      with given all the facts that he had.  It

5      was just how you then translate that into

6      the recoveries for the junior secured

7      notes was a challenging exercise because

8      we never had enough disclosure from the

9      debtor to do that comprehensively.

10          Q.    Well, as of July you had

11     received the schedules, correct?

12          A.    Yes.

13          Q.    What other information did you

14     need to determine the value of the

15     intercompany claims?

16          A.    I'd say it's a very complicated

17     analysis that would involve needing to

18     know the value of assets at each

19     subsidiary, what other claims would have

20     been at those subsidiary levels, either,

21     you know, actual or contingent.  And as we

22     have discussed, there were some very large

23     contingent claims.  And we did not know

24     what entities those claims were going to

25     be sitting at.  Nonetheless, we did

143

1                       BASTABLE

2       believe that there was a real potential

3       for there to be recoveries under the

4       intercompany claims and we felt strongly

5       that the intercompany claims were a part

6       of our collateral package.

7           Q.      When did you first come to that

8       conclusion?  You meaning DK.

9           A.      I think since -- I think since

10      early on in our investment we had a view

11      that the intercompanies could have value.

12      That became more important once the

13      company filed for bankruptcy.  But I think

14      from our getting involved in the

15      investment, we would have had some view

16      that there was -- that in the event of a

17      bankruptcy filing where it was necessary

18      to get recoveries from those

19      intercompanies that that was a potential

20      source of collateral for the JSNs.

21          Q.      And you knew prepetition that

22      the security agreement provided for liens

23      on those intercompany claims?

24          A.      That's right.

25              MR. WALSH:   This is Exhibit 19.

JSN Objection
143:25-148:13
FRE 802 (Hearsay)
FRE 1002 (Best
evidence)

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 144 of 211

144

1                    BASTABLE

2                    (DK Exhibit 19, e-mail dated

3          July 10th from Bastable to himself,

4          marked for identification, as of this

5          date.)

6          Q.    This is an e-mail dated

7     July 10th, Mr. Bastable.  Is this an

8     e-mail that you sent to yourself?

9          A.    It is.

10          Q.    You write, "Intercompanies are

11     not as strong as you think."  What were

12     you referring to there?

13          A.    This was -- just to frame this,

14     right, we were in a position here where

15     Aurelius had obviously approached the

16     group with their view of what the

17     intercompanies were worth and what all

18     their collateral was worth.  We knew the

19     debtors were taking a very different view

20     of that.  We had signed up to the PSA with

21     the knowledge that our intercompanies were

22     potentially quite valuable or very

23     valuable.  But we felt that the economic

24     deal that was offered under the PSA was a

25     good one because of the certainty we got

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 145 of 211

145

1          BASTABLE

2    from it and the speed with which we would

3    get our recoveries.  It was not an

4    admission that we didn't think there was

5    recoveries under the intercompany notes.

6    It was just a business deal that we felt

7    was a good one for us so.

8         Q.    With that context, what do you

9    mean when you write, "Intercompanies are

10   not as strong as you think"?

11        A.    I think this gets back to our

12   view on what maybe the potential value of

13   the intercompanies was relative to what

14   Aurelius had articulated.  We did think

15   there was real value to the intercompanies

16   or very likely to be really value

17   associated with the intercompanies but

18   perhaps not as much as Aurelius had

19   outlined in their letter.

20        Q.    Who is the you in that sentence?

21        A.    I believe that would have

22   referred to the position that Aurelius was

23   taking.

24        Q.    You go on to write, "Other GUCs

25   where you might have to share value."

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 146 of 211

146

1                          BASTABLE

2      What is that referring to?

3          A.    That's GUC stands for general

4      unsecured claims.  So again, as I was

5      talking about before, an analysis of the

6      value of not only intercompanies but any

7      deficiency claim you might have had would

8      be shared with potentially other

9      intercompanies at different entities

10     within ResCap.

11         Q.    And was that a position that you          JSN Objection
                                                           146:11-17 FRE
12     gave to Mr. Brodsky?  I assume Aurelius             611(a)
                                                           (Compound)
13     here you are talking to Mr. Brodsky or was

14     it somebody else?

15         A.    I don't recall speaking with

16     Mr. Brodsky subsequent to this date about

17     this.

18         Q.    The title of the e-mail is

19     ResCap MTG, which I assume is meeting,

20     with Aurelius?

21         A.    Yeah.

22         Q.    Were these notes that you took

23     from that meeting?

24         A.    No.  I think this was -- I think

25     this might have been in anticipation of a

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 147 of 211

147

1                          BASTABLE

2    meeting that ultimately did not happen.

3         Q.    So you were going to meet the        JSN
                                                     Objection
4    Aurelius folks and you wrote this down in       147:3-6
                                                     FRE 611(a)
5    anticipation of that meeting?                    (Compound)

6         A.    I believe that's what this was.

7         Q.    Were these the statements that

8    you were going to make to the Aurelius

9    folks?

10        A.    They were notes to myself about,

11   you know, what some of the issues we

12   wanted to talk with them about, what had

13   been in their letter.

14        Q.    What do you mean when you write,

15   "Reattaching liens could be difficult"?

16        A.    I don't recollect what that

17   specifically refers to.

18        Q.    And last you write, "As long as

19   we like this deal."  What are you

20   referring to there?

21        A.    Yeah.  I mean, as I was talking

22   about before we -- the PSA was, at its

23   core was a business deal.  We had agreed

24   to give up post petition interest, our

25   right to post petition interest up through

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 148 of 211

148

1                    BASTABLE

2    December 31.  In exchange for that, Alli

3    was subordinating a part of their claim.

4    We were getting a cash collateral order,

5    adequate protection.  Other benefits from

6    that deal that ensured we would get paid

7    quickly and with a high degree of

8    certainty.  So I think I was beyond --

9    whether or not we thought the

10   intercompanies were worth 20 bond points

11   or 50 bond points, we still liked the

12   economic deal that we had cut under the

13   PSA.

14       Q.    Would you have cut the deal if

15   the intercompanies were worth 100 points

16   to 112 points?

17            MR. RENENGER:  Object to the

18       form of the question.

19       A.    Yeah, I think that's hard to

20   answer.

21       Q.    Was there any analysis by DK

22   prior to the prepetition PSA going through

23   that type of analysis if the

24   intercompanies are worth X amount, we may

25   ask for a different deal?

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 149 of 211

149

                        BASTABLE

1

2        A.    We didn't -- our claim, even if

3    we were going to get all of our post

4    petition interest, obviously there's a

5    limit to how much we could potentially

6    recover.  So at some point if the --

7    whether the intercompanies are worth 50 or

8    a hundred bond points is not particularly

9    relevant for us.  So I'm not sure it would

10   have been made any difference in that

11   regard.

12       Q.    Ultimately you made a decision

13   to terminate that prepetition PSA,

14   correct?

15       A.    Yeah.

16       Q.    And that decision was based on

17   the debtors' failure to reach milestones

18   that are set forth in that PSA?

19       A.    Yes.

20       Q.    That was the reason for the

21   termination?

22       A.    Yes.  It was the justification

23   for the termination.

24            (DK Exhibit 20, ResCap document,

25        marked for identification, as of this

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 150 of 211

150

1              BASTABLE

2         date.)

3         Q.    In all seriousness, could you

4    just briefly tell us what Exhibit 20 is on

5    the first page?

6         A.    Yeah.  This is a portion of the

7    financial analysis that we would have put

8    together to analyze ResCap and probably

9    more specifically looks like, you know,

10   some of the specific assets on ResCap's

11   balance sheet and what those might be

12   worth for the JSNs.

13        Q.    When was this prepared?

14        A.    I don't --

15        Q.    There's a date on the top right

16   corner of the first page.

17        A.    Yeah.  This says just to be

18   clear here, this says, "As of August 24,

19   2012."  The way this date functioned would

20   work on a spreadsheet like this is

21   whenever it was printed out, it would have

22   that date on there.  It does not reflect

23   when it was prepared necessarily.

24        Q.    Do you know if there's -- are

25   you able to tell from the document or from

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 151 of 211

151

1            BASTABLE

2       your memory when this was first prepared?

3            A.    Well, it's just there are

4       different parts of this.  The first page

5       shows the corporate structure of ResCap.

6       Some of this was probably prepared before

7       we made our first initial investment and

8       then I would guess that as we got

9       additional information regarding different

10      entities within the corporate structure

11      that this analysis was expanded.  So it

12      would not have all been together on any

13      single date.

14           Q.    There's some handwriting,

15      forgive me if you mentioned this, is that

16      your handwriting on the first page?

17           A.    No, it's not.

18           Q.    Do you know whose handwriting

19      that is?

20           A.    I don't.

21           Q.    Do you know what the handwriting

22      refers to?

23           A.    I have a general sense that it

24      is highlighting some of the intercompany

25      assets or claims that run from various

152

1                    BASTABLE

2    entities within ResCap.

3          Q.    Would you turn to the page

4    ending 1086.  Do you see the handwriting

5    on the bottom right?

6          A.    Yes.

7          Q.    Do you know whose handwriting

8    that is?

9          A.    I don't.

10         Q.    Can you read it?

11         A.    Yes.

12         Q.    What does this say?

13         A.    It is says, "Unsecured

14   deficiency," and, I believe, "interco

15   claims."

16         Q.    And the top of this page it

17   reads Aurelius Analysis.  Is this an

18   analysis that Aurelius provided to DK?

19         A.    No, it is not.  It would have

20   been an analysis that we would have done

21   to vet some of what Aurelius had

22   represented in their letter.

23         Q.    Is this testing the points

24   calculation?

25         A.    Yes.  It does appear that that's

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 153 of 211

153

1                      BASTABLE

2      a part of this analysis.

3           Q.    You understand that DK

4      terminated the prepetition PSA around the

5      same time period that other members of the

6      ad hoc group also terminated the

7      prepetition PSA.  How did the ad hoc group

8      go about making that decision?

9                MR. RENENGER:  Object to the

10          form.

11          Q.    I'm just asking process.  Not so

12     much reasons.

13          A.    Right.

14          Q.    You had said --

15          A.    Okay.  Sorry, go ahead.

16          Q.    So with respect to the PSA, each

17     signing party obviously made its own

18     decision and signed the PSA.

19          A.    Yes.

20          Q.    It was independent, I assume.

21     Each of the entities that wanted to sign

22     it, signed it.  Is it fair to say there

23     was no vote amongst the group, this is the

24     PSA let's all sign it?

25          A.    Yes.

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 154 of 211

154

1                    BASTABLE

2            Q.    What was that process with

3    respect to terminating the PSA.  Was it an

4    individual assessment or was there a vote

5    among the members of the steering

6    committee or any other group of ad hocs

7    that deliberated over whether or not to

8    terminate and made a decision to

9    terminate?

10           A.    I would not have been on the

11   calls directly, but I could say that there

12   would certainly have been discussions

13   about it.  We knew we were within our

14   rights to terminate the PSA.  It was very

15   clear that the company had not lived up to

16   several milestones.  And there were also

17   several -- there were also other things

18   going on in the case that made it very

19   difficult for us to stay within the PSA.

20   For example, the unsecured committee had

21   filed a challenge to our liens.  And it

22   was also clear at that point in time that

23   we were not going to get paid out anywhere

24   near as quickly as the debtor had

25   indicated when we signed up to the PSA.

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 155 of 211

155

1                        BASTABLE

2      So a combination of those factors would

3      have led the group to discuss terminating

4      the PSA.  I don't know if there was a

5      formal vote, but there would have been

6      some level of consensus.

7          Q.    Who would know whether there was

8      a vote, if there was one?

9          A.    Certainly our counsel and

10     whoever from, I think people from DK who

11     participated on those calls could tell you

12     if there was anything, any type of --

13         Q.    Who are those people?

14         A.    I would think Kunal Shah and

15     Sara Tirschwell and Ephraim Diamond.

16         Q.    And the two factors that led to

17     the termination were failure to reach the

18     milestones and the creditor committee's

19     assertion challenging the liens?

20              MR. RENENGER:  Object to the

21         form.

22         A.    Those were major considerations.

23     I wouldn't say those were the only

24     considerations.

25         Q.    At some point there was a second

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 156 of 211

156

1                        BASTABLE

2      PSA proposed by the debtors with respect

3      to the Alli claims and the RMBS claims.

4      And that PSA has led to the current plan

5      as proposed.  Did the JSNs, did the ad hoc

6      group of JSNs vote to determine whether

7      they would object to the plan as proposed?

8              MR. RENENGER:  Object to the

9          form of the question.  It's beyond the

10         scope.

11         Q.    You said one of the things you

12     reviewed in connection with today's

13     deposition was the objections by the ad

14     hoc group to the plan as proposed?

15         A.    Right.

16         Q.    And those objections were filed

17     recently in the last few weeks, correct?

18         A.    Yes.

19         Q.    Was there a vote by the ad hoc

20     group regarding whether or not to make

21     those objections?

22         A.    Again, I don't know if there was

23     a vote.  I don't believe there was but

24     there was a decision made that that was an

25     appropriate objection to make.

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 157 of 211

157

1                          BASTABLE

2          Q.    Who made the decision?

3          A.    It would have been --

4                MR. RENENGER:  I'm going to

5          object to the form.  Standing

6          objection to this line of questioning

7          as beyond scope, but I'm not going to

8          cut you off.

9          A.    I think it's fair they would

10    have been the steering committee and

11    counsel for the committee.

12                MR. WALSH:  Let me take a break

13          and see if I have any other questions.

14                (Whereupon, there is a recess in

15          the proceedings.)

16          A.    Can I clarify one thing that you

17    had asked me previously?

18          Q.    Sure.

19          A.    Which is as it relates to the

20    vote to terminate the PSA.  There was no

21    vote to the group.  It was a decision, a

22    consensus-driven decision but there was no

23    vote to terminate.

24          Q.    Was there anyone who was opposed

25    to terminating the PSA?

158

BASTABLE

1

2      A.    The group reached consensus on

3   the issue.

4      Q.    Let me ask about the mediation,

5   one of the topics you've been designated

6   on as the decision to not participate and

7   then to participate in the mediation.

8           Were you individually involved

9   in the decision not to participate in the

10  mediation initially?

11          MR. RENENGER:   Object to the

12      form of the question.

13      A.    I don't think we -- we as an ad

14  hoc group did not object to participating

15  in the mediation.   We wanted to

16  participate in the mediation.   And our

17  advisors did participate in the mediation.

18  We tried very hard to get an NDA signed in

19  substantially identical form to the NDA,

20  the NDA that was agreed upon to sign

21  the -- to get the PSA.   But the debtor was

22  not willing to provide us with that form

23  of NDA.   And as a result, it was

24  impossible for principals of the ad hoc

25  group to participate in the mediation.   As

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 159 of 211

159

1          BASTABLE

2   you know, Berkshire Hathaway, the largest

3   noteholder, did participate in the

4   mediation.  So I don't think it's a fair

5   characterization to suggest that we

6   voluntarily did not participate in the

7   mediation.

8          Q.    At some point did you ask the

9   court to enter an order that allowed ad

10  hoc group members to trade,

11  notwithstanding their involvement in the

12  mediation?

13             MR. RENENGER:   Can I just get

14        you to clarify.  When you say

15        mediation, just so the record is

16        clean, is there a particular session

17        you have in mind?  My understanding it

18        was a prolonged and multiphase

19        process.

20        Q.    Let's take it each step.  At

21  some point there was -- Judge Peck was

22  appointed as mediator?

23        A.    Yes.

24        Q.    At that point in time did the ad

25  hoc group want to participate in

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 160 of 211

160

1                    BASTABLE

2    mediation?

3         A.    We did.

4         Q.    And what happened that prevented

5    the ad hoc group from initially

6    participating in mediation?

7         A.    Like I said, the company was not

8    willing to provide us with an NDA.  And

9    just to clarify why we needed the NDA,

10   obviously we are all investment firms with

11   fiduciary obligations to our investors and

12   you one of those is to be able to maintain

13   an ability to trade in securities.  We

14   were all very willing to get restricted

15   for a period of time.  We just needed an

16   ability to get unrestricted as some future

17   date.  And again, that's exactly what the

18   NDA provided for when we negotiated the

19   PSA.  But because the debtor wasn't

20   willing to provide us with a similar NDA,

21   it effectively prevented us from

22   participating in that mediation.

23        Q.    Ultimately the ad hoc group

24   was -- did get involved in the mediation.

25   At what point in time was that?

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 161 of 211

161

BASTABLE

    A.    That would have been -- where
are we now?

            MR. RENENGER:   November 1st.

    A.    The late summer, early fall of
this year.

    Q.    And what happened that allowed
the ad hoc group to participate in that
mediation?

    A.    Ultimately, Judge Peck was
willing to request and get signed an
order, which would have effectively
protected us from getting sued, I guess,
for trading on the basis of having
information relating to bids and asks that
would have been engaged in -- that would
have, you know, stemmed from that type of
negotiation to the extent that that
negotiation ultimately did not result in a
settlement.

    Q.    And it's your understanding that
that was the initial request of the ad hoc
group and that the debtor denied that
request?

    A.    The debtor denied our request.

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 162 of 211

162

1                    BASTABLE

2    We offered it up to, as we said you can --

3    we can get an NDA or we can get this

4    protective order.  Either one would have

5    been acceptable to us.  The debtor was not

6    willing to provide the NDA for some time.

7    There was not a willingness to provide the

8    protective order.  We had Sara Tirschwell

9    from our office spoke directly with Gary

10   Lee about this issue and he said that he

11   thought Judge Peck would not provide this

12   order and he also said that they did not

13   need us to be involved in the mediation.

14   I know Dan Groper had several

15   conversations with Ken Eckstein on the

16   same issue, expressing repeated

17   willingness to sign an NDA, to engage in

18   negotiations, and we were told that we

19   were not needed at that time.  So it

20   effectively prevented us from engaging in

21   the mediation.

22           MR. WALSH:  That's all I have at

23       this time.  I want to let counsel for

24       Wells Fargo ask the questions.

25               I just want to say on the record

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 163 of 211

163

```
 1                      BASTABLE

 2         the ad hoc group is continuing to

 3         produce documents.  Actually, I

 4         haven't received any documents yet.

 5         We reserve the right to reopen this

 6         deposition based on the production of

 7         any DK relevant documents.

 8              MR. RENENGER:  I'll just put on

 9         the record that Mr. Walsh is referring

10         to the production of the ad hoc group,

11         call it ad hoc group, not DK a member

12         of the ad hoc group.  DK has completed

13         its production.  And obviously to the

14         extent that there's an attempt to

15         redepose Mr. Walsh based upon the

16         production of the advisors to the ad

17         hoc group, we'd be happy to have that

18         discussion but we believe there would

19         be no need to.

20    EXAMINATION BY

21    MR. KOCHMAN:

22         Q.   Good afternoon, Mr. Bastable.

23    My name is David Kochman.  I represent

24    Wells Fargo in its capacity as third

25    private collateral agent, first priority
```

164

1                    BASTABLE

2    collateral agent in this case.  All of the

3    instructions that were applicable with

4    respect to Mr. Walsh's examination are

5    going to continue here.  Do you understand

6    that?

7        A.    Yes, I do.

8        Q.    And I want also to state right

9    up front that I am not going to ask you

10   any questions that require you or even ask

11   you to divulge any conversations with

12   counsel or any privilege conversations.

13   So when I ask you a question, you should

14   assume as part of the question that I am

15   not asking you to disclose anything that

16   would divulge a privilege conversation.

17   Does that make sense?

18       A.    Yes.

19       Q.    Speaking about your experience

20   generally, I believe you testified

21   previously that the majority of your

22   professional experience has been dealing

23   with investments in distressed assets; is

24   that right?

25       A.    The professional experience at

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 165 of 211

165

```
 1                    BASTABLE

 2    Davidson Kempner has primarily dealt with

 3    that.

 4        Q.    In such capacity, have you had

 5    the opportunity to deal with the rights

 6    and responsibilities of trustees that

 7    oversee collateral in distressed

 8    situations?

 9             MR. RENENGER:  Object to the

10        form of the question.

11        A.    We have had -- I'm not sure I

12    can answer that question directly.  We

13    have had, you know, we have had

14    involvement with trustees in situations

15    that I have been involved with at Davidson

16    Kempner.

17        Q.    Have you been involved in

18    situations where a trustee has been

19    responsible to hold collateral that

20    accessed security for a DK position?

21        A.    We have invested in securities

22    where a trustee would have that general

23    responsibility, yes.

24        Q.    In such situations, do you have

25    an understanding as to the trustee's
```

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 166 of 211

166

1                     BASTABLE

2        obligations vis-‡-vis preservation of the

3        collateral?

4              MR. RENENGER:  I'm going to

5           object to the form of the question.

6           And also just ask for a representation

7           about how this relates to the 30(b)(6)

8           topics or which one it relates to.

9              MR. KOCHMAN:  Well, first off,

10          I'm going back through just his

11          experience.  I want to get an

12          understanding as to foundationally

13          what his knowledge is respecting the

14          investment that DK was going into.

15              I think he said that there was

16          an evaluation of the documents

17          themselves and the position that DK

18          would be taking when it purchased

19          these notes.  And then specifically I

20          think I am, this would fall under at

21          least the DK notice 3, 4, 8, 12, 13,

22          16 and potentially also the ad hoc

23          notice 34 and 35.  That's just off the

24          top of my head so we obviously reserve

25          our right if it can be other things.

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 167 of 211

167

1          BASTABLE

2          MR. RENENGER:  Well, I hear the

3     representation.  I'll obviously give

4     you leeway until I sort of see where

5     it's going.  But it's really hard for

6     me to hear or understand how in any

7     way a trustee's obligations to

8     preserve collateral could relate to

9     these topics he just covered, but

10    we'll give you some leeway and see

11    where it goes.

12         MR. KOCHMAN:  Thank you.

13    Q.    You want me to repeat the

14 question?

15    A.    Sure.

16    Q.    What is your general

17 understanding of a collateral agent's role

18 in the context of holding collateral for,

19 as security for notes?

20         MR. RENENGER:  I'm going to

21    instruct the witness that to the

22    extent the answer to that question

23    would require you to divulge advice of

24    counsel that I would instruct you not

25    to answer that.  If you have an

168

1                           BASTABLE

2            understanding away from that, then go

3            ahead.

4            A.    I would rather not attempt to

5      answer that question.

6                     MR. RENENGER:  Is that based on

7            privilege?

8            Q.    I think, look, I have given an

9      instruction at the outset that I'm not

10     asking you to divulge anything specific

11     with respect to counsel.  You are here

12     today testifying on behalf of DK as their

13     corporate representative; is that correct?

14           A.    Yeah.

15           Q.    I'm just asking, in your

16     experience, you stated you deal with

17     investment products and distressed assets.

18     In the context of this transaction here,

19     did you understand that there was a

20     trustee and a collateral agent?

21           A.    Yes.

22           Q.    Did you have an understanding as

23     to the rights and responsibilities of the

24     trustee and the collateral agent in the

25     context of the notes that DK was

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 169 of 211

169

1                    BASTABLE

2       purchasing?

3                    MR. RENENGER:  Same instruction.

4            A.    Honestly, I'm not sure the legal

5       responsibilities that the trustee has or

6       that the trustee collateral manager has

7       under the agreement.

8            Q.    I'm not asking for the legal

9       responsibilities.  I'm talking about just

10      their general obligations.  What do they

11      do?  Do you have an understanding as to

12      what they do -- let's try to restate it

13      again.

14                   Prior to purchasing these notes,

15      both the junior secured and the unsecured,

16      did you have an understanding as to what

17      physical responsibilities the collateral

18      agent and the trustee would have?

19           A.    At a high level, yes.

20           Q.    Could you explain to me what

21      that understanding was?

22           A.    That the collateral agent would

23      be responsible for making sure that -- we

24      have obviously have a security package

25      under the terms of the agreement and there

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 170 of 211

170

                        BASTABLE

1       would be certain collateral associated

2       with that.  And you know, the company

3       would have a certain amount of flexibility

4       to potentially do things with that

5       collateral.  And part of the collateral

6       agent's responsibility would be to ensure

7       that anything that was done to that

8       collateral didn't compromise our rights as

9       creditors with respect to that collateral

10      or ran afoul of the collateral provisions

11      of the security agreement or whatever

12      other governing documents there were.

13          Q.    Sitting here today, are you

14      aware of any facts that would suggest that

15      Wells Fargo ran afoul of the documents?

16              MR. RENENGER:  I'm going to

17          object to that question as certainly

18          being well beyond the scope of a

19          30(b)(6) and on that basis instruct

20          the witness not to answer.

21              MR. KOCHMAN:  We are going to go

22          through a series of questions, you can

23          instruct him not to answer, but we

24          will just create a record for the

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 171 of 211

171

1                    BASTABLE

2        court.

3        Q.    Let's refer to DK-8.  If you

4    don't mind pulling that out.  Please

5    correct me if I'm wrong.  I believe you

6    testified earlier that you personally

7    don't recall reviewing the security

8    agreement prior to DK taking a position in

9    ResCap; is that right?

10        A.    That's right.

11        Q.    But you believe that someone at

12    DK probably did?

13        A.    Yes.

14        Q.    Are you aware who that person

15    might be?

16        A.    I'm not positive who it would

17    have been.  But likely one of the

18    individuals that I have referenced or

19    potentially someone else in our legal

20    department.

21        Q.    Is it your understanding that

22    the general practice of the legal

23    department or whomever would have reviewed

24    this document would have reviewed it

25    thoroughly?

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 172 of 211

172

1                    BASTABLE

2          MR. RENENGER:  Object to the

3     form of the question.  Calls for

4     speculation.  If you know, you can

5     answer.

6     A.    I'm not sure how you define

7     thoroughly.  There are certain things that

8     are important to us as investors in an

9     instrument like this that we would have

10    reviewed and focused on here.  There may

11    be other components of an agreement like

12    this that are sort of more, let's call it,

13    boilerplate where we wouldn't have felt

14    necessarily the need to review in as much

15    detail.  But there would have been some

16    review and understanding of the debt

17    instrument that we were buying into.

18    Q.    I'm going to direct your

19    attention to section 10 and section 15 of

20    DK-8 and my question to you with respect

21    to each section is going to be whether

22    those provisions would be of the

23    boilerplate variety or be something you

24    would delve into more deeply?  And

25    specifically, I'll direct you to --

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 173 of 211

173

1                     BASTABLE

2          A.    Section 10?

3          Q.    Yes.  Which I believe is on page

4      24 of 19 of 785.

5               MR. RENENGER:  Is there a

6          question pending?

7               MR. KOCHMAN:  Yes.

8          A.    I'm sorry, I'm on the page.

9          Q.    The question was whether

10     provision 10 would have been a provision

11     that you would have focused on or whether

12     this would fall under what you

13     characterized as the most boilerplate

14     variety.

15               MR. RENENGER:  I'm going to

16          object to the form of the question in

17          that he's already said he wasn't

18          involved in reviewing this document

19          and believes somebody would have

20          reviewed it but doesn't know who or

21          how much time they devoted to it.  So

22          you are in the realm of very wide

23          speculation here.  I'm not quite sure

24          what you are asking for.

25               MR. KOCHMAN:  It's fine if you

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 174 of 211

174

1                          BASTABLE

2          want to put an objection on.  I'd ask

3          you please do not give a speaking

4          objection to counsel your witness.

5          The witness is here in his capacity as

6          a corporate representative and so I'm

7          asking him a question.  He has also

8          characterized that Davidson Kempner

9          would review such documents, focusing

10         on certain provisions more and other

11         provisions would be of more

12         boilerplate frankly.

13               MR. RENENGER:  And you are,

14         again, quite far afield of the

15         30(b)(6) topics.  You told me what

16         topics they relate to but have made no

17         representation how the questions

18         you're asking relate to the topics.

19         To me they don't.  And absent such a

20         proffer, this deposition is going to

21         be concluded.

22               MR. KOCHMAN:  Are you

23         instructing your witness not to

24         answer?

25               MR. RENENGER:  Are you willing

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 175 of 211

175

1          BASTABLE

2     to make a proffer?

3          MR. KOCHMAN:  Well, I think my

4     questions will all relate to -- my

5     questions related to the topics that I

6     have already put on here.  So I think

7     maybe I have to ask you how my

8     questions do not in your view relate

9     to the topics, the many topics that I

10    have identified.

11         MR. RENENGER:  Topic 3, first

12    one you identified, "The content of

13    any analysis provided to you by

14    Houlihan Lokey."  This document has

15    nothing to do with Houlihan Lokey.

16         Topic 4, "You or any noteholders

17    expected recovery under the

18    prepetition plan support agreement."

19    That didn't come into existence until

20    May 2012, this document is dated 2009.

21    Every other topic on the list that you

22    referenced also is a 2012 era

23    document, not a 2009 era document.

24         MR. KOCHMAN:  My questions

25    relating to this document here go to

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable    Pg 176 of 211

176

1                      BASTABLE

2        Davidson Kempner's belief as to what

3        claims they may have.  Which would

4        fall under whether Houlihan Lokey

5        believed that there were claims that

6        the JSNs may have.  I believe this all

7        falls within the broad topic of what

8        claims the JSNs believed they may have

9        for recovery outside of the debtors'

10       estate.

11            MR. RENENGER:  Does it relate to

12       their decision to enter into the PSA?

13            MR. KOCHMAN:  At this point

14       right now, you can instruct your

15       witness not to answer.  You can let me

16       ask my questions and put your

17       objection on, but I don't believe that

18       this colloquy is useful.

19            MR. RENENGER:  Okay.  Then we

20       are done.

21            MR. KOCHMAN:  So with respect to

22       all of my other questions, you are

23       walking out?  You will not let us --

24            MR. RENENGER:  Frankly, I

25       haven't heard an adequate proffer yet.

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 177 of 211

177

1            BASTABLE

2        I think you are trying to take

3        discovery on something completely

4        unrelated to the topic 30(b)(6) and

5        completely unrelated to our objection

6        to the plan.  I think it's -- I'm not

7        sure what you are doing here, but it

8        sounds like you are trying to lay a

9        foundation for something unrelated.  I

10        think it's improper, I think it's an

11        abuse of process.  This discovery is

12        limited to Phase II and plan

13        objections and that's not what this

14        is.

15            MR. KOCHMAN:  So let's go to one

16        area and you can instruct your witness

17        not to answer if you'd like.

18            Let's mark this as DK-21.

19            (DK Exhibit 21, summary of the

20        examiner's findings, marked for

21        identification, as of this date.)

22        Q.   Mr. Bastable, I believe you

23   testified earlier that one of the

24   documents you reviewed in preparation for

25   this deposition was the summary of the

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 178 of 211

178

1                        BASTABLE

2      examiner's findings; is that correct?

3          A.    Yes, it was.

4          Q.    Is this the document that you

5      reviewed?

6          A.    Yes.

7          Q.    I want to direct your attention

8      to page 43 of this document on to page 44

9      under the heading, Junior Secured

10     Noteholder Causes of Action.  I'd like you

11     to read that paragraph that goes from page

12     43 to 44.

13             Do you have an understanding as

14     to what that section I just directed to

15     you means?

16             MR. RENENGER:  I'm going to

17         object to the question as being beyond

18         the scope of the 30(b)(6) topics and

19         on that basis instruct the witness not

20         to answer.

21         Q.    Does DK agree with the opinion

22     expressed by the examiner in the section

23     that I have pointed out to you?

24             MR. RENENGER:  Same instruction,

25         same objection.  Anything else?

179

1              BASTABLE

2              MR. KOCHMAN:  Give us a minute.

3              (Whereupon, there is a recess in

4        the proceedings.)

5         Q.    Among the objections to the plan

6    that you reviewed, did you review Wells

7    Fargo's objection to the plan?

8         A.    I did not.  I did not review

9    their specific objection.

10        Q.    Apart from any discussions with

11   counsel, did you have any discussions,

12   excluding counsel or privileged

13   conversations, about Wells Fargo's

14   objection to the plan?

15             MR. RENENGER:  I am going to

16        object to the form of the question as

17        being -- you know what, I'll let him

18        answer this one.

19        A.    I have not had any

20   conversations.

21             MR. KOCHMAN:  That's it.

22             MR. RENENGER:  Okay, thanks.

23             (Time noted:  2:20 p.m.)

24

25

180

1

2     STATE OF NEW YORK          )

3                               )  :ss

4     COUNTY OF NEW YORK         )

5

6          I, CONOR BASTABLE, the witness

7     herein, having read the foregoing

8     testimony of the pages of this deposition,

9     do hereby certify it to be a true and

10    correct transcript, subject to the

11    corrections, if any, shown on the attached

12    page.

13

14                     _____

15                         CONOR BASTABLE

16

17

18

19    Sworn and subscribed to before me,

20    this _____ day of _____, 2013.

21    _____

22          Notary Public

23

24

25

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 181 of 211

181

1              C E R T I F I C A T I O N

2     STATE OF NEW YORK          )

3                      ss.:

4     COUNTY OF NEW YORK        )

5

6              I, ERICA L. RUGGIERI, RPR and a

7        Notary Public within and for the State

8        of New York, do hereby certify:

9              That I reported the proceedings

10       in the within-entitled matter, and

11       that the within transcript is a true

12       record of such proceedings.

13             I further certify that I am not

14       related by blood or marriage, to any

15       of the parties in this matter and

16       that  I am in no way interested in the

17       outcome of this matter.

18             IN WITNESS WHEREOF, I have

19       hereunto set my hand this 4th day of

20       November, 2013.

21

22                  ERICA L. RUGGIERI, RPR

23

24

25

182

------------- I N D E X ------------------

WITNESS                 EXAMINATION BY        PAGE

CONOR BASTABLE    Mr. Walsh                6

                  Mr. Kochman            163


-------------- EXHIBITS ------------------

DK                              FOR I.D.

 Exhibit 1, deposition notice        11

 Exhibit 2, deposition notice        11

 Exhibit 3, verified statement of   23

 White & Case

 Exhibit 4, Rule 2019 statement      33

 Exhibit 5, May 7, 2013 2019         35

 Exhibit 6, May 17, 2013 2019        35

 Exhibit 7, Houlihan engagement      39

 letter

 Exhibit 8, Security agreement       50

 between ResCap, U.S. Bank and

 Wells Fargo

 Exhibit 9, plan support agreement  60

 Exhibit 10, Houlihan presentation  74

 Exhibit 11, document entitled,     82

 Statement of Limiting Conditions

 Exhibit 12, e-mail chain           97

183

1

2       ------------ EXHIBITS -----------------

3       DK                          FOR I.D.

4       Exhibit 13, series of e-mails,    112

5       Bates DK 233

6       Exhibit 14, series of e-mails     117

7       Exhibit 15, e-mail chain dated    130

8       May 11th entitled, ResCap

9       Steering Committee Plan Term

10      Sheet

11      Exhibit 16, plan term sheet       131

12      attached to the PSA

13      Exhibit 17, e-mail from Mr. Shah  137

14      to Mr. Bastable dated July 5th

15      Exhibit 18, Cantor Fitzgerald     139

16      analyst report

17      Exhibit 19, e-mail dated          144

18      July 10th from Bastable to

19      himself

20      Exhibit 20, ResCap document       149

21      Exhibit 21, summary of the        177

22      examiner's findings

23

24            *** EXHIBITS ATTACHED ***

25

184

1

2                    INSTRUCTIONS TO WITNESS

3

4          Please read your deposition over

5     carefully and make any necessary

6     corrections.  You should state the reason

7     in the appropriate space on the errata

8     sheet for any corrections that are made.

9          After doing so, please sign the

10    errata sheet and date it.

11         You are signing same subject to the

12    changes you have noted on the errata

13    sheet, which will be attached to your

14    deposition.

15          It is imperative that you return

16    the original errata sheet to the deposing

17    attorney within thirty (30) days of

18    receipt of the deposition transcript by

19    you.  If you fail to do so, the deposition

20    transcript may be deemed to be accurate

21    and may be used in court.

22

23

24

25

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 185 of 211

185

1

2                         E R R A T A

3

4

5      I wish to make the following changes,

6      for the following reasons:

7

8      PAGE LINE

9      ____  ____ CHANGE:_____

10     REASON:_____

11     ____  ____ CHANGE:_____

12     REASON:_____

13     ____ ____ CHANGE:_____

14     REASON:_____

15     ____ ____ CHANGE: _____

16     REASON:_____

17     ____ ____ CHANGE: _____

18     REASON:_____

19     ____ ____ CHANGE: _____

20     REASON:_____

21

22     _____   _____

23     WITNESS' SIGNATURE              DATE

24

25

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 186 of 211

186

| A | | | | |
|---|---|---|---|---|
| **AARON** 4:8 | **activity** 23:11 | 163:12,16 | 128:5 | **agreement** |
| **abilities** | **actual** 16:10 | 166:22 | **adversely** | 13:24 14:3 |
| 135:17 | 142:21 | **addition** | 130:6 | 14:6 50:4,6 |
| 136:11,23 | **ad** 6:21,24,25 | 15:19 23:11 | **advice** 82:5 | 50:13,16 |
| **ability** 135:17 | 12:10,13,22 | 65:13 94:4 | 120:7 | 55:17,23 |
| 160:13,16 | 14:14 33:18 | **additional** | 121:18 | 60:21,25 |
| **able** 46:7 | 35:14 37:17 | 23:3 37:10 | 135:25 | 61:12 62:23 |
| 150:25 | 37:22,25 | 53:13 78:11 | 136:24 | 62:24 65:15 |
| 160:12 | 38:9,16 | 87:15,22 | 167:23 | 96:17 130:5 |
| **absence** | 40:12,19,22 | 92:21 | **advise** 47:6 | 143:22 |
| 103:8 | 41:8 42:3 | 119:19,22 | **advisor** 48:5 | 169:7,25 |
| **absent** | 42:11,19 | 151:9 | 136:12,18 | 170:12 |
| 174:19 | 43:6 55:7,8 | **address** 12:9 | **advisors** | 171:8 |
| **abuse** 177:11 | 55:13,16,25 | 56:13 58:15 | 41:24 43:19 | 172:11 |
| **accept** 63:23 | 56:4,5,10 | 62:19 | 57:5,16,25 | 175:18 |
| **acceptable** | 57:12,24,25 | **addressed** | 114:9 | 182:18,21 |
| 162:5 | 58:11,13 | 6:20 49:20 | 119:18 | **ahead** 35:13 |
| **accepted** | 62:11,13,14 | 74:16 | 129:11 | 37:8 54:9 |
| 90:19 | 62:20,21 | 101:25 | 158:17 | 106:24 |
| **access** 48:25 | 66:8,12 | 102:2 | 163:16 | 133:11 |
| 59:6 | 76:24 83:7 | **addresses** | **advisory** | 153:15 |
| **accessed** | 83:9,19,23 | 93:10 | 134:23 | 168:3 |
| 60:10 | 83:25 84:10 | 107:18 | 135:6 | **al** 1:4,6,10,18 |
| 165:20 | 91:18 92:2 | **addressing** | **affect** 125:2 | **Alli** 63:14 |
| **accessing** | 92:8 99:18 | 16:24 30:7 | 130:6 | 65:10,13,17 |
| 60:5 | 99:20 | 74:8 84:20 | **affirmatively** | 65:19,25 |
| **account** | 100:19,20 | 117:24 | 106:23 | 66:6,13,21 |
| 108:19 | 101:5,10,11 | **Adelphia** | **afield** 174:14 | 67:3 78:8 |
| 139:9,13 | 101:16,25 | 99:8,15 | **afoul** 170:11 | 78:16,23 |
| **accounted** | 102:2,5,9 | **adequacy** | 170:16 | 79:8 86:2 |
| 79:5,7 | 104:4 | 66:16 | **afternoon** | 87:8 88:13 |
| **accounts** | 110:20 | **adequate** | 163:22 | 88:16,18 |
| 32:16 | 113:21 | 66:6,14 | **agent** 163:25 | 89:10 93:10 |
| **accrued** | 114:9,14 | 148:5 | 164:2 | 107:7,20,25 |
| 64:15 68:8 | 119:9,14,25 | 176:25 | 168:20,24 | 108:3,6,22 |
| **accurate** | 120:7 129:7 | **adjusted** | 169:18,22 | 130:4 148:2 |
| 118:13 | 129:8 | 77:13 | **agent's** | 156:3 |
| 184:20 | 135:25 | **Admin** 93:13 | 167:17 | **AllianceBe...** |
| **accurately** | 136:24 | **Administer...** | 170:7 | 41:17 62:4 |
| 24:5 | 140:8 141:3 | 1:4 | **ago** 15:9 16:8 | **allocated** |
| **acquired** | 141:9 153:6 | **admin\prio...** | **agree** 178:21 | 79:10 |
| 44:17 | 153:7 154:6 | 92:19 | **agreed** 5:5,11 | **allocating** |
| **action** 108:21 | 156:5,13,19 | **admission** | 5:15 118:21 | 130:3,3 |
| 109:23 | 158:13,24 | 145:4 | 125:9 | **allocation** |
| 178:10 | 159:9,24 | **admonish** | 147:23 | 24:21 |
| **actions** 108:2 | 160:5,23 | 108:9 | 158:20 | **allowed** |
| 108:6 | 161:8,22 | **Adv** 1:7,14 | **agreeing** | 125:3 159:9 |
| | 163:2,10,11 | **advance** 14:8 | 112:6 | 161:7 |

Second column header:

| | | | | |
|---|---|---|---|---|
| | | | **agreement** | **allows** 58:25 |
| | | | | 59:8 |

Far right column:

**allows** 58:25
59:8
**ally** 32:4
**alongside**
98:22
**Amended**
50:12
**amount** 22:5
23:5 26:14
54:13 64:17
64:18 65:25
67:15 70:9
86:3 97:18
115:15
138:20
148:24
170:4
**amounts**
68:24
128:10
**analysis**
28:11,16
30:9,22
31:17,17
32:6 48:9
48:19 49:15
66:4,9,11
66:23 68:18
68:22 71:11
71:24 73:2
76:18 80:21
80:22,24
81:3,4,6,10
81:10,11,12
81:15,17
82:16 84:19
86:20 88:10
89:24 90:8
91:11,14,17
92:17 94:24
106:10,18
108:16,18
118:4,15,16
118:20,21
119:2,12,15
120:2
129:14
133:8

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 187 of 211

187

135:18
137:12,14
139:4,8
142:3,17
146:5
148:21,23
150:7
151:11
152:17,18
152:20
153:2
175:13
**analyst** 53:19
140:2,15,16
140:19
183:16
**analyze** 150:8
**Andrews**
140:12,22
**and/or** 52:7
**answer** 7:11
7:16 33:3
53:24 57:22
82:4 107:10
108:10,12
108:13
120:5,9,10
120:13,17
121:14,15
121:16
122:3,4
133:12,14
133:17,18
148:20
165:12
167:22,25
168:5
170:21,24
172:5
174:24
176:15
177:17
178:20
179:18
**answered**
100:24
**anticipating**
93:14

**anticipation**
146:25
147:5
**Apart** 179:10
**Appaloosa**
41:17 44:24
**appear**
152:25
**appears**
35:14 53:9
80:10,15
107:22
137:10
138:3
139:22
**applicable**
128:23
129:3,4
164:3
**appointed**
159:22
**appreciating**
123:25
**approached**
144:15
**appropriate**
156:25
184:7
**approving**
129:25
**approximate**
70:2
**approxima...**
36:24 91:9
92:18 94:13
139:2
**April** 38:24
38:24 72:16
**arbitrage** 9:6
9:7
**area** 8:6 11:4
108:14
177:16
**areas** 9:12
**arenenger...**
4:9
**argument**
80:9

**arisen** 96:8
**arose** 96:5
127:19
**articulated**
145:14
**asked** 73:13
157:17
**asking** 81:3
91:4 100:18
109:19
112:15,18
112:19
122:6 123:6
153:11
164:15
168:10,15
169:8
173:24
174:7,18
**asks** 161:15
**assertion**
155:19
**assessed**
141:22
**assessment**
154:4
**asset** 32:7
41:21 44:18
78:12 79:24
82:12 86:8
88:6
**assets** 14:24
27:5 32:5
69:7,23
78:15,20,24
79:17 82:8
85:18,25
86:2,6,24
87:7,9,11
88:10
138:15
142:18
150:10
151:25
164:23
168:17
**associate** 8:5
8:11

**associated**
25:23 26:17
69:6 97:11
129:18
138:14
145:17
170:2
**association**
14:23
**assume** 33:3
52:24 116:3
131:16
138:3
146:12,19
153:20
164:14
**assumed**
39:21 90:13
**assumes**
92:17
**assumption**
90:20,22
**attached**
130:18
131:4,11
180:11
183:12,24
184:13
**attaches** 98:8
**Attaching**
117:22
**attempt**
49:17 78:5
87:5,13
128:12
163:14
168:4
**attempted**
73:6
**attendance**
15:12 16:4
**attended**
16:14
**attending**
6:13
**attention**
172:19
178:7

**attorney**
184:17
**attributable**
137:25
**attributed**
69:2
**August**
150:18
**Aurelius**
15:20 45:19
45:21 46:11
98:11,13
99:17,23
100:20
101:4 117:6
137:24
144:15
145:14,18
145:22
146:12,20
147:4,8
152:17,18
152:21
**available**
25:21 54:22
59:21 60:3
**Avenue** 2:12
3:6,17
**Avi** 19:9
30:12
**avoidance**
108:2
**aware** 26:6
28:2,7,12
60:2 69:3
81:23 94:20
96:12 99:20
105:6
108:21
122:18,18
122:20,23
125:10,15
125:21
127:13,15
127:20
170:15
171:14
**A-u-r-e-l-i-...**

45:20
**a.m** 1:21 2:5

———— **B** ————

**B** 3:10 6:2,2
127:4,4
**back** 17:17
21:8 27:18
28:10,16
29:2,8
30:24 34:8
37:14 44:8
46:16 61:6
62:2 70:8
70:19 127:8
145:11
166:10
**background**
7:20
**balance**
69:19 70:22
71:22 72:2
77:14 78:22
86:4,7
87:16
105:19
113:17
114:3,22
150:11
**balances**
30:18 31:19
68:16,19
69:15 70:3
71:12,17
72:22 74:9
91:13
113:21
**ballpark**
114:25
**Bank** 1:9,16
3:15 50:6
50:15
182:19
**bankruptcies**
101:3
134:21
**bankruptcy**
1:1 23:9

12-12020-mg   Doc 5803-3   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Conor Bastable   Pg 188 of 211

188

26:8 38:5
38:19 65:20
65:21 69:9
78:19 93:18
95:23 104:2
113:9,12
121:11
123:20
124:3
130:22
138:21
143:13,17
**banks** 128:24
129:2
**bargain** 90:4
**based** 24:22
47:9,18
54:5 69:15
87:7 90:19
90:21 92:16
96:23 97:6
108:10,12
108:17
121:17
128:12
149:16
163:6,15
168:6
**basically**
10:13 87:22
97:12
**basing** 52:24
**basis** 64:20
92:10
161:14
170:20
178:19
**Bastable** 1:20
2:9 6:1,10
6:11,12 7:1
7:19 8:1 9:1
10:1 11:1
11:25 12:1
12:16,21
13:1 14:1
15:1 16:1
17:1 18:1
19:1 20:1

21:1 22:1
23:1 24:1
25:1 26:1
27:1 28:1
29:1 30:1
31:1 32:1
33:1,13
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1,2 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
113:4 114:1

115:1 116:1
117:1,17
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
127:8 128:1
129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:1
137:1,3,7
138:1 139:1
140:1,5
141:1 142:1
143:1 144:1
144:3,7
145:1 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1
161:1 162:1
163:1,22
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
177:22
178:1 179:1
180:6,15
182:4
183:14,18
**Bates** 112:23
112:25
183:5
**becoming**
38:3
**beginning**
8:13 31:7
88:8 103:14

**begun** 64:10
**behalf** 1:13
168:12
**belief** 69:13
176:2
**believe** 8:21
10:7 13:15
13:20 18:19
20:8 22:15
25:6 29:8
30:20 31:23
36:13 37:9
42:8 43:4
43:23 44:4
44:6,20,25
45:16,25
46:11,13
55:13,22
65:17 69:20
70:14 71:18
74:10 77:16
80:2 87:9
89:7,23
90:7 92:9
93:22 94:19
103:4,20
106:21
109:16,25
111:7,10,20
112:4
114:23
117:3,4
124:10
140:11
143:2
145:21
147:6
152:14
156:23
163:18
164:20
171:5,11
173:3 176:6
176:17
177:22
**believed** 27:6
63:16 64:5
64:5 69:5

70:19
104:16
137:25
142:3 176:5
176:8
**believes**
173:19
**beneficiaries**
27:11
**benefit** 7:9
83:19
107:23
**benefits**
63:11,13,25
65:10,11
67:3,25
148:5
**Berkshire**
159:2
**best** 47:11,21
**better** 8:16
**beyond** 35:24
37:8 55:11
96:21
100:13
103:7 148:8
156:9 157:7
170:19
178:17
**bid** 79:23
**bidders** 78:23
**bids** 78:20
161:15
**billion** 70:13
70:15 88:16
92:19,21
93:21 94:4
94:14
115:16,17
139:2
**bit** 12:7 23:8
36:2
**blacked** 80:3
**blanket** 27:2
32:3
**blood** 181:14
**Bloomberg**
19:23

**boilerplate**
172:13,23
173:13
174:12
**bond** 107:22
115:12,14
115:17
116:13
118:8 119:2
120:2
137:18,24
148:10,11
149:8
**bondholders**
64:18
**bonds** 20:17
21:11
**book** 69:22
78:25 79:11
79:13,16,24
86:11,21
87:3,12
138:5,13,17
**books** 79:6
**borrower**
27:24
**bottom** 77:12
85:3 152:5
**bought**
115:23
**breach**
124:23
125:3
**break** 7:14
7:17 60:16
126:2
127:13
157:12
**breakdown**
24:21
**breakout**
24:14
**briefly** 8:7
150:4
**broad** 124:4
176:7
**broader** 19:6
41:5 91:3

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 189 of 211

189

**broadly** 48:7
**Brodsky** 98:9
98:9 101:19
102:8,25
103:3 104:4
105:2 106:6
106:13
107:7,12
110:14,18
110:22
111:18,20
113:6,8
115:11
117:6 118:3
120:21
122:8 137:9
137:14,15
139:16,18
141:22
146:12,13
146:16
**Brodsky's**
104:14
117:22
139:4,8
**broke** 43:10
**broken**
105:17
**brought**
47:20
**business** 7:23
7:23 53:25
58:25 63:15
145:6
147:23
**buying**
172:17

———————
**C**
**C** 3:2 4:2 6:2
127:4 181:1
181:1
**calculate**
64:13
**calculated**
89:19
116:13
**calculation**

64:22 65:4
65:6 152:24
**call** 11:11
39:23 40:3
75:18,20
87:24
115:16
121:14
163:11
172:12
**called** 6:2
38:9 58:18
99:3 111:20
**calls** 43:15,18
122:3
154:11
155:11
172:3
**Cantor**
139:25
140:13
183:15
**capacity** 1:9
163:24
165:4 174:5
**capital** 1:4,6
4:4 15:20
24:2,9 26:2
35:12 41:19
41:22,23,24
45:19 98:11
106:15
140:4
**carefully**
184:5
**case** 1:3,7,14
7:4 13:5,22
14:11 21:15
23:16,21
38:14,16,22
39:17,20,25
42:13 46:18
46:23 47:5
47:12,17
81:14 93:13
93:23 99:8
99:16
104:19

110:2,4,24
111:6,14,15
111:17
116:18,20
117:7 123:9
123:12
135:9
138:13
154:18
164:2
182:12
**cases** 32:22
48:13 59:3
99:4,5
**cash** 86:3,12
148:4
**causes** 108:5
108:21
109:23
178:10
**caution** 81:22
**cents** 64:19
64:20 90:17
91:9
**certain** 1:17
13:4 54:13
63:10,13
65:9 69:23
70:20,22
78:12 79:7
79:9,10
87:9 114:3
170:2,4
172:7
174:10
**certainly**
45:2 51:2
65:16 75:18
76:9 90:3
99:4 100:7
110:10
117:9
119:17
154:12
155:9
170:18
**certainty**
63:21 69:12

144:25
148:8
**certification**
5:7
**certify** 180:9
181:8,13
**chain** 97:21
130:12
131:7,20
182:25
183:7
**chairman**
98:11
**challenge**
154:21
**challenging**
104:4 142:7
155:19
**CHANGE**
185:9,11,13
185:15,17
185:19
**changed**
44:12 87:17
**changes**
44:15 46:5
184:12
185:5
**Chapter** 1:4
**characteriz...**
159:5
**characteriz...**
173:13
174:8
**charter** 42:4
42:9
**chronology**
43:9
**circulated**
132:11
**claim** 27:24
64:12 67:6
90:6 123:21
124:9
128:14
138:12
146:7 148:3
149:2

**claimants**
128:11
129:5
**claims** 80:20
80:23,25
81:7,19
82:7 92:20
92:22 93:12
93:13,20,23
93:25 94:2
94:5,8,13
95:2,10,15
95:20,23
96:2,5,10
96:13
104:22
106:7,9,14
106:19
107:5
118:15,19
118:24
122:10,25
124:11,14
125:15
127:13,14
127:15,18
128:2,6
129:9
130:21
132:15,24
133:8 138:4
138:12,20
138:25
139:5,9,11
139:14,17
139:19,19
140:23
141:5,15,20
142:15,19
142:23,24
143:4,5,23
146:4
151:25
152:15
156:3,3
176:3,5,8
**clarification**
57:11

**clarify** 49:17
58:12 95:3
119:9
157:16
159:14
160:9
**clarifying**
54:17
**clarity** 41:9
**clean** 159:16
**clear** 17:14
48:2 83:17
90:2 91:23
131:7
150:18
154:15,22
**clearly** 78:4
82:8
**close** 37:13
**CLR** 1:22
2:14
**code** 123:20
**cognizant**
109:4
**collateral**
26:16,23
27:6,11
30:19 31:9
31:17,19,23
67:6 69:3
85:19,21
86:12 105:4
108:7,22
109:6,24
118:5,9
143:6,20
144:18
148:4
163:25
164:2 165:7
165:19
166:3 167:8
167:17,18
168:20,24
169:6,17,22
170:2,6,6,9
170:10,11
**colleagues**

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 190 of 211

190

| | | | | | |
|---|---|---|---|---|---|
| 13:7 15:14 | 46:19 | 9:16 125:5 | 28:24 31:10 | **contact** 49:12 | 87:10 |
| 17:6,11 | 155:18 | **components** | 31:20 53:2 | 51:20,23 | 119:18 |
| 75:22 | **common** 38:6 | 172:11 | 53:18 65:8 | 52:22 | 141:12 |
| 131:21 | **communica...** | **composition** | 65:21 68:3 | **contacting** | 162:15 |
| **collect** 18:14 | 110:7,11 | 46:6,15 | 71:16 72:21 | 49:22 | 164:11,12 |
| 19:12 | 117:9 | **comprehen...** | 73:23 78:12 | **contains** 77:5 | 179:13,20 |
| **collecting** | 121:22 | 67:8 100:5 | 99:21 | **contempor...** | **conversely** |
| 18:20 | 123:15 | **comprehen...** | 100:19 | 85:15 91:17 | 124:25 |
| **collection** | **communica...** | 142:9 | 132:4,16 | **content** | **convertible** |
| 17:24,25 | 43:13 | **compromise** | 133:8 | 109:20 | 9:6 |
| 18:7,16 | 108:11 | 170:9 | 135:18,24 | 121:21 | **copies** 18:21 |
| **colloquy** | 109:20 | **concept** | 136:18 | 123:7 | **core** 63:14 |
| 176:18 | **companies** | 137:21 | 137:8 | 175:12 | 147:23 |
| **Colt** 2:11 3:5 | 6:16 53:14 | **concerned** | 156:12 | **contents** | **corner** 85:3 |
| **column** 87:2 | 53:17,21,23 | 38:4 57:17 | **Conor** 1:20 | 110:22 | 150:16 |
| 87:19 88:2 | **company** | **concerns** | 2:9 6:10 | **context** 75:12 | **corporate** |
| **combination** | 23:8 38:18 | 107:21 | 180:6,15 | 82:2 145:8 | 6:14,19 |
| 22:22 155:2 | 41:20 48:19 | **conclude** | 182:4 | 167:18 | 12:22 20:17 |
| **combined** | 49:12 54:12 | 32:2 | **consensus** | 168:18,25 | 20:20 27:16 |
| 20:20 | 54:16,19 | **concluded** | 155:6 158:2 | **contingent** | 96:11 151:5 |
| **come** 63:8 | 56:25 57:2 | 118:16 | **consensus-...** | 92:20 93:20 | 151:10 |
| 118:22 | 57:5 59:11 | 174:21 | 157:22 | 94:3 130:2 | 168:13 |
| 143:7 | 65:18 68:23 | **conclusion** | **consenting** | 138:4,12 | 174:6 |
| 175:19 | 69:9 78:18 | 118:22 | 130:7 | 139:11,19 | **correct** 6:16 |
| **comfort** | 79:5 96:7 | 143:8 | **consider** | 142:21,23 | 12:7 24:12 |
| 129:15 | 99:2 113:22 | **conclusions** | 139:5 | **continue** | 33:8,22 |
| **coming** | 143:13 | 49:13 | **considerati...** | 164:5 | 51:18 61:13 |
| 111:22 | 154:15 | **condition** | 30:10 | **continues** | 68:16 72:9 |
| 112:21 | 160:7 170:3 | 54:18 | 155:22,24 | 137:17 | 72:17 77:2 |
| 119:6 | **company's** | **Conditions** | **considered** | **continuing** | 78:13,14 |
| **committee** | 25:25 27:6 | 83:2 182:24 | 31:10,20,22 | 163:2 | 82:19 84:11 |
| 1:12 43:12 | 54:11 76:19 | **confidence** | 47:9 | **contributing** | 86:9 91:11 |
| 43:17,22,23 | 78:21 79:6 | 135:16 | **consisted** | 66:3 | 92:2 94:23 |
| 44:3,4,7,12 | 86:4,7 | **confidential** | 44:5 | **contribution** | 98:3 99:18 |
| 44:20,21,24 | 96:10 | 10:24 | **consistent** | 65:20,25 | 113:23 |
| 44:25 45:2 | **competence** | **confirmed** | 67:17 88:14 | 66:6,13 | 114:5 115:4 |
| 45:3,14 | 135:14,24 | 64:24 67:16 | **consolidating** | 78:9,10 | 117:17,25 |
| 46:3,6,9,24 | 136:5,11,17 | 67:20 94:18 | 105:11 | 137:19 | 118:6 |
| 76:10 | 136:22 | **Conflicts** 3:4 | **constant** | **Cont'd** 4:2 | 130:18 |
| 130:14 | **completed** | **confused** | 23:10 | 127:6 | 131:21 |
| 131:9 | 163:12 | 111:12 | **constitute** | **conventional** | 135:10 |
| 135:25 | **completely** | 122:5 | 109:23 | 48:6 | 137:12 |
| 140:8 141:4 | 118:20 | **conjunction** | **constituted** | **conversation** | 139:2 |
| 141:10 | 177:3,5 | 17:7 | 108:6 | 112:3 | 142:11 |
| 154:6,20 | **complicated** | **connection** | **construct** | 164:16 | 149:14 |
| 157:10,11 | 54:13 66:23 | 14:7 16:7 | 84:21 | **conversatio...** | 156:17 |
| 183:9 | 142:16 | 17:12 18:15 | **consulting** | 16:18 38:11 | 168:13 |
| **committee's** | **component** | 20:2 25:14 | 13:5 | 47:5,7,10 | 171:5 178:2 |

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 191 of 211

191

corrected
  23:24 34:10
correction
  34:6 93:4
  110:16
corrections
  180:11
  184:6,8
correspond...
  57:4
costs 93:15
  93:16
counsel 3:4
  3:15 4:4 5:5
  12:18 13:6
  15:5 16:9
  19:16,21
  34:20 38:7
  38:16 43:13
  43:18 57:4
  76:12 80:7
  92:8 108:11
  108:18
  109:25
  110:20
  121:18,22
  155:9
  157:11
  162:23
  164:12
  167:24
  168:11
  174:4
  179:11,12
counsel's
  80:8
counted
  106:7,14
counterpar...
  128:13
COUNTY
  180:4 181:4
couple 14:16
  38:11 62:2
course 56:11
court 1:1
  5:18 7:9
  38:20 159:9

171:2
  184:21
cover 102:4,6
  103:21
coverage
  32:7
covered
  141:17
  167:9
covers 41:7
CQS 41:18
create 170:25
creditor
  27:20
  134:22
  155:18
creditors
  1:13 48:5
  48:11,12
  63:17 99:2
  170:10
crisis 20:11
CSR 1:22
  2:14
CULBERT...
  4:10
current 156:4
currently
  46:8
Curtis 2:10
  3:5
custom 52:25
  53:8,12
  54:5,21
cut 125:7
  148:12,14
  157:8
———————
      D
D 3:21 182:2
Dan 15:19
  162:14
date 11:21,24
  21:10 22:3
  23:22 24:25
  25:7 33:12
  34:4 35:4,7
  39:10 40:14

50:8 56:4
  60:22 64:21
  66:22 67:22
  68:9 71:10
  72:13 74:24
  83:3 87:3
  87:18 90:5
  90:7,11
  96:16 97:23
  98:14
  103:23
  105:24
  109:3,13
  111:9,13
  112:24
  113:20
  117:14
  123:2
  130:16
  131:5 137:5
  140:3 144:5
  146:16
  150:2,15,19
  150:22
  151:13
  160:17
  177:21
  184:10
  185:23
dated 1:17
  39:13 62:5
  85:14 97:25
  102:23
  113:2
  117:16
  130:13
  131:8 137:3
  137:7 144:2
  144:6
  175:20
  183:7,14,17
dates 35:21
David 3:19
  163:23
Davidson 4:4
  4:20 6:15
  8:3,15,19
  10:3,4,4,6

11:7,8,12
  24:2,9
  35:11 37:5
  40:15,18
  41:19 56:16
  63:6,8
  89:24 90:21
  165:2,15
  174:8 176:2
day 61:17
  180:20
  181:19
days 15:9
  16:8 62:7
  131:17
  184:17
DC 4:7
deal 63:18
  112:6,12
  125:6,9
  144:24
  145:6
  147:19,23
  148:6,12,14
  148:25
  165:5
  168:16
dealing
  164:22
dealt 165:2
debt 25:25
  67:13,21
  70:11 90:9
  172:16
debtor 63:13
  65:13,16
  87:11,14,23
  96:17
  124:23
  142:9
  154:24
  158:21
  160:19
  161:23,25
  162:5
debtors 1:5
  1:13 3:4
  49:5,22

65:10 68:2
  76:25 77:7
  97:12
  144:19
  149:17
  156:2 176:9
December
  86:15 87:21
  88:4 89:16
  89:20 90:14
  90:16 91:8
  104:6 148:2
decided
  47:21
decision
  26:21 38:15
  38:21 46:17
  46:19,25
  47:2,12,14
  62:13,20,25
  63:4,7,9,15
  69:20 76:22
  104:5
  149:12,16
  153:8,18
  154:8
  156:24
  157:2,21,22
  158:6,9
  176:12
decisions
  36:3 42:18
  42:20 43:5
  62:12
deconsolid...
  113:17
deconsolid...
  69:8
decrease 34:2
deemed
  184:20
deeply
  172:24
Defendants
  1:11,19
deficiency
  89:2 146:7
  152:14

define 172:6
definitively
  52:21 53:6
  106:3
degree 69:11
  128:18
  148:7
deliberated
  154:7
delivered
  13:15 18:22
  19:16 120:7
delve 172:24
denied
  161:23,25
Dennis 97:24
  117:15
department
  171:20,23
depo 17:15
deposed 7:5
deposing
  184:16
deposition
  1:20 2:9 5:8
  5:15 6:13
  10:24 11:17
  11:19,22
  12:3 13:2
  13:12,16
  14:13,18
  16:7,25
  17:12 21:18
  28:25 73:24
  75:23
  156:13
  163:6
  174:20
  177:25
  180:8 182:9
  182:10
  184:4,14,18
  184:19
describe 42:9
described
  24:19 30:2
  111:23
describing

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 192 of 211

192

42:17
**deserves**
110:17
**designate**
10:23
**designated**
12:17 158:5
**detail** 12:7
172:15
**details** 112:9
**determine**
66:5,12
142:14
156:6
**determined**
132:23
**devoted**
173:21
**dialogue**
94:21
**Diamond**
15:16 30:3
60:14 132:2
155:15
**difference**
149:10
**different** 8:22
9:4 29:4,5
38:12 74:11
139:13
144:19
146:9
148:25
151:4,9
**difficult**
141:24
147:15
154:19
**digital** 59:10
**digits** 100:8
**diligence**
49:11 76:21
128:4,8
129:8
**direct** 27:2,2
27:22 31:23
99:16
172:18,25

178:7
**directed**
178:14
**directly** 9:19
15:18 18:3
53:22 56:15
56:17 60:6
154:11
162:9
165:12
**director** 8:12
**disagree**
141:21
**disclose**
113:13
123:7
164:15
**disclosed**
96:7 113:16
**disclosure**
68:22 69:21
96:16
105:21
119:20
142:8
**discount**
20:14
**discovery**
13:16 177:3
177:11
**discuss** 43:19
53:23
116:16
155:3
**discussed**
16:21 24:11
29:22 47:11
116:15
142:22
**discussing**
54:22
**discussion**
14:9 116:18
116:20
163:18
**discussions**
12:17 13:7
16:12 38:20

49:4,6 54:2
110:17,21
111:16
133:16
141:3,7,13
141:18
154:12
179:10,11
**disputed**
130:2
**distinguish...**
114:7
**distress** 8:6
20:12
**distressed** 9:5
9:7,8,11,14
9:16,20,23
10:12,15,17
11:3,7,8,10
11:12 19:8
20:17 99:22
101:4
164:23
165:7
168:17
**distribution**
88:9
**distributions**
88:24 89:2
89:3 92:13
**DISTRICT**
1:2
**divulge**
133:15
164:11,16
167:23
168:10
**DK** 11:19,22
15:17 16:13
17:6,18
19:24 20:5
20:22,25
22:6,19
23:19,20
25:8,8,13
29:10 31:10
31:20 32:12
32:16,25

33:4,10
34:2,19,25
35:2,5,10
35:15,17
36:11,15
37:16,21
39:8 48:22
49:4,6,22
50:5,20
51:3,6,7,12
52:4,25
53:9,12,17
54:6 55:2
60:5,10,20
64:13,14
66:4 68:18
73:12 74:12
74:22 75:19
75:22 80:11
82:24 91:17
97:21 99:14
99:22 101:5
105:22
112:22,23
113:2
117:12
119:11,13
127:15
128:5
130:12
131:3 132:4
137:2
138:19
139:25
141:14
143:8 144:2
148:21
149:24
152:18
153:3
155:10
163:7,11,12
165:20
166:14,17
166:21
168:12,25
171:8,12
177:19

178:21
182:8 183:3
183:5
**dkochman...**
3:20
**DK's** 21:6
26:22 36:23
127:16
139:17
**DK-1** 12:2
**DK-10** 75:2
83:5 84:13
**DK-11** 82:23
84:14
101:18
102:23
106:11,16
107:3
**DK-12** 97:20
97:24
101:20
**DK-13**
112:25
**DK-14**
117:15
**DK-17** 137:6
**DK-2** 12:2
**DK-21**
177:18
**DK-6** 39:3
**DK-7** 39:6,7
**DK-8** 50:3,9
171:3
172:20
**docket** 15:2
33:14
**document**
17:24,25
18:2,15
23:25 36:15
36:16 39:11
42:3,10,20
50:21,24
51:2,4,7,9
74:3,14
75:3,6,23
75:25 76:2
77:11,19

80:16 82:21
82:24 83:5
83:5,18
84:8,13,15
85:14 91:4
104:24
123:24,25
149:24
150:25
171:24
173:18
175:14,20
175:23,23
175:25
178:4,8
182:23
183:20
**documents**
13:4,10,11
13:14,20,22
17:5 18:15
18:21 19:13
19:15,21
23:17 31:25
43:16 61:7
74:15 163:3
163:4,7
166:16
170:13,16
174:9
177:24
**doing** 18:18
49:14 89:24
119:13,15
177:7 184:9
**dollar** 22:17
64:20,21
70:2 90:18
91:10 97:18
116:11
**dollars** 70:13
70:15
**double** 100:8
**doubt** 140:25
**dozen** 134:21
**dozens** 99:4
100:7
134:24

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 193 of 211

193

132:7
**drawdown**
11:11
**drop** 45:5
**dropped**
44:21 45:3
45:7
**due** 49:11
76:21 128:4
128:8,10
129:7
**duly** 6:3
**duration** 9:10
10:18

**E**

**E** 3:2,2 4:2,2
6:2 127:2,2
127:4 181:1
182:2 185:2
**earlier** 24:11
39:24 78:11
85:6 106:16
109:10
115:2
127:23
132:20
137:9 171:6
177:23
**early** 22:12
22:13 37:16
40:4 42:25
43:5 58:3
59:15 76:3
143:10
161:5
**easier** 86:19
**easy** 101:14
**Eckstein**
162:15
**economic**
63:18 97:10
97:13,16
125:8
129:18
144:23
148:12
**eculbertson...**

4:11
**educational**
7:20
**effect** 5:17
89:25 97:14
97:16 118:4
124:13,18
124:22,25
**effectively**
59:9 112:4
116:8,11
160:21
161:12
162:20
**either** 22:13
40:4 49:18
52:9 57:24
61:22 72:19
75:17 91:17
102:15
142:20
162:4
**election** 59:8
**employed**
9:13
**engage**
162:17
**engaged**
161:16
**engagement**
39:4,9
42:13 52:18
133:22
134:2,6
182:16
**engaging**
162:20
**ensure** 27:21
170:7
**ensured**
148:6
**ensuring**
125:6
**enter** 62:14
62:23 159:9
176:12
**entered** 55:16
66:25

**entering**
105:7
**entirely**
108:17
**entirety**
32:23
**entities** 26:19
27:8,17,19
27:22 40:8
40:12,21
69:18 71:6
71:7,23
96:7 105:18
113:19
114:22
142:24
146:9
151:10
152:2
153:21
**entitled** 27:3
31:24 67:23
77:20 82:25
90:17 91:9
100:21
103:6,25
104:17,17
104:21
130:13
131:8
182:23
183:8
**entity** 9:24
11:15 20:21
26:18 27:23
92:16
**entry** 33:14
**Ephraim**
15:15 30:3
60:14
131:25
155:15
**equity** 9:5
**era** 175:22,23
**Eric** 134:10
**Erica** 1:22
2:13 181:6
181:22

**Erin** 4:10
15:25 16:2
140:12
**errata** 184:7
184:10,12
184:16
**ESQ** 3:8,10
3:12,19,21
4:8,10
**estate** 1:13
67:9 107:25
176:10
**estimate**
38:23 70:5
70:7 77:22
78:5 85:8
87:6 90:8
93:22
114:18
118:13
128:17
**estimated**
77:20,25
85:3 88:2
118:8
**estimates**
92:18
**et** 1:4,6,10,18
**evaluate**
28:21 32:7
48:10 66:18
66:24 69:11
**evaluated**
26:3,8,11
**evaluating**
25:23
**evaluation**
166:16
**event** 143:16
**events** 68:10
129:23
**evident** 82:12
**exact** 10:2
11:6 22:3
46:14 71:20
105:20
109:3 123:2
**exactly** 14:25

28:12 48:3
53:10 96:2
137:18
138:8
141:25
160:17
**examination**
6:6 127:6
163:20
164:4 182:3
**examined** 6:4
**examiner**
178:22
**examiner's**
13:21 14:11
177:20
178:2
183:22
**example**
34:14 40:11
41:3 42:5
44:18 62:4
77:10 79:12
79:19 99:24
154:20
**examples**
44:23 54:4
**exceed**
138:17
**excess** 70:20
**exchange**
63:12,24
148:2
**excluded**
80:20,25
81:6,15
**excludes**
80:22
**excluding**
179:12
**excuse** 8:10
99:11
**exercise**
142:7
**exhibit** 11:19
11:22 12:12
23:20,24
33:9,10

35:2,5 39:8
50:5 60:20
60:24 61:4
74:22 81:12
82:24 97:21
102:20
107:3
112:22
117:12
130:12
131:2,3
137:2
139:25
143:25
144:2
149:24
150:4
177:19
182:9,10,11
182:13,14
182:15,16
182:18,21
182:22,23
182:25
183:4,6,7
183:11,13
183:15,17
183:20,21
**exhibits**
11:17 182:7
183:2,24
**exist** 10:14
103:24
**existed** 27:8
66:21
**existence**
175:19
**expanded**
151:11
**expected**
175:17
**experience**
47:19
164:19,22
164:25
166:11
168:16
**expert** 135:9

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 194 of 211

194

**explain**
169:20
**exposure**
23:12 99:14
**expressed**
178:22
**expressing**
162:16
**extent** 56:8
59:5 64:7
67:13 81:22
89:15,25
90:10 108:9
120:5,9
121:14
133:12,14
161:18
163:14
167:22
**extinguished**
67:21
**extremely**
51:8 53:7
**e-mail** 19:6
97:21,24
98:5,8
102:6 113:3
116:22,25
117:15,19
130:12
131:7,20
137:2,6
144:2,6,8
146:18
182:25
183:7,13,17
**e-mails** 17:10
17:11,18,20
17:21 18:20
112:23
113:2
117:13
183:4,6

**F**
**F** 127:2 181:1
**FA** 83:23
**face** 22:11

32:13 36:17
36:24,25
115:15
**facilitate**
43:13
**fact** 52:8
64:13
102:25
107:22
109:5
124:14
**factors** 155:2
155:16
**facts** 142:4
170:15
**fail** 184:19
**failure**
149:17
155:17
**fair** 51:19
62:8 81:2
153:22
157:9 159:4
**fairly** 134:12
**fall** 45:22
161:5
166:20
173:12
176:4
**falls** 176:7
**familiar**
23:16 58:17
98:13,16
**far** 174:14
**Fargo** 3:15
50:7,15
162:24
163:24
170:16
182:20
**Fargo's** 179:7
179:13
**favorable**
63:18
**February**
39:13 40:4
47:25 49:8
49:25 52:19

55:7 86:11
86:13,22
87:17
**feel** 56:11
**fees** 93:17
**felt** 48:7 67:2
67:8 143:4
144:23
145:6
172:13
**fiduciary**
160:11
**figure** 37:13
**figures** 69:11
**file** 26:7 37:9
38:5,18
**filed** 14:22
23:8,15
25:18 33:18
68:23 69:9
78:19
143:13
154:21
156:16
**filing** 5:7
143:17
**filings** 14:11
14:16
**final** 89:12
**financial**
20:11,12
25:17 30:9
43:19 48:4
48:9,19
51:12 53:13
54:11,18
57:5 58:24
69:8 76:19
134:22
135:6,25
136:12,17
136:24
150:7
**financials**
54:14 87:5
105:11,16
105:21,23
106:5

**find** 36:6
**findings**
177:20
178:2
183:22
**fine** 133:13
173:25
**finish** 7:10,16
**firm** 8:14
20:16 47:11
63:2 99:13
111:21
134:16,23
136:15
**firms** 38:12
47:8 56:14
76:11
111:10
160:10
**first** 20:6
21:6,22,24
23:4,23
37:16 40:19
40:22 49:21
50:20,23
55:24 75:5
84:22 86:25
88:15 92:11
96:12
108:20
109:21
111:3
114:14
115:25
116:2 121:4
121:5
122:17,22
123:8
125:21
131:14
132:11
133:3
140:24
143:7 150:5
150:16
151:2,4,7
151:16
163:25

166:9
175:11
**Fitzgerald**
140:2,13
183:15
**fix** 51:14
52:16 53:8
125:20
**flexibility**
170:4
**flip** 40:6 61:7
**Floor** 3:17
**flowing** 27:18
**focused** 66:16
119:11
172:10
173:11
**focusing**
174:9
**folks** 147:4,9
**following**
20:10 185:5
185:6
**follows** 6:5
127:5
**footnote**
92:11,12
93:6
**force** 5:17
**forced** 26:7
**foregoing**
180:7
**forgive**
151:15
**form** 5:12
21:4 25:4
28:6 31:13
34:12 37:4
37:24 40:24
41:13 42:7
45:12 46:21
54:9 55:11
56:8 62:16
65:2 66:10
68:6 81:9
81:21 84:9
86:17 89:5
89:22 90:25

92:24 94:16
95:12 97:3
104:9
106:21
107:15
113:25
125:14,19
132:19
134:9
135:21
136:7
138:23
139:7,21
140:10
148:18
153:10
155:21
156:9 157:5
158:12,19
158:22
165:10
166:5 172:3
173:16
179:16
**formal** 155:5
**formed** 38:2
43:11,12,22
43:24 99:21
**forming**
46:24 57:14
**formulate**
87:24
**forth** 27:18
149:18
**Fortress**
78:16,22
79:8,16
86:2 87:8
138:16
**Fortress-Alli**
79:23
**forward**
47:25 86:13
86:14 87:20
116:22
**foundation**
177:9
**foundation...**

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 195 of 211

195

166:12
**four** 10:2,7
101:2,3
**fourth** 61:8
102:8
**frame** 58:2,8
72:14
144:13
**framework**
128:15
129:3
**frankly**
174:12
176:24
**free** 56:11
108:13
**Friedman**
19:10 30:13
**front** 61:3
85:13 164:9
**full** 63:5
89:10 90:14
91:6 102:9
104:17,18
121:2
135:16
**functioned**
150:19
**fund** 8:15 9:3
9:8,12,17
10:3,9,16
10:17,20
11:8,13,14
24:20 98:17
**funds** 8:18,21
9:10,20,22
9:23 10:2,8
10:11,14,18
11:3,10,11
24:10,18,23
25:8 32:15
32:19,21,24
32:25 33:4
**fund's** 24:14
**further** 5:10
5:14 181:13
**future** 160:16

---

**G**

**Gary** 162:9
**general** 16:22
65:15 72:14
92:22 94:5
105:14
123:21
124:9
128:15
146:3
151:23
165:22
167:16
169:10
171:22
**generally**
43:7 93:7
93:16
164:20
**getting**
120:10,14
143:14
148:4
161:13
**give** 7:10
8:24 9:21
10:10 35:25
54:4 58:2
100:3,10
108:10
112:7
120:17
138:9
147:24
167:3,10
174:3 179:2
**given** 35:8
69:10
119:22
142:4 168:8
**Global** 41:18
41:24
**GMAC** 20:12
20:20 71:3
**GNMA** 79:19
**go** 7:25 11:2
12:6 18:18
21:8 28:10

---

28:15 29:8
30:24 37:8
44:8,14
54:9 70:8
70:19
101:12
106:24
133:11
145:24
153:8,15
168:2
170:22
175:25
177:15
**goes** 88:15
120:21
167:11
178:11
**going** 10:22
16:23,24
17:17 20:19
21:24 23:14
34:24 35:23
37:14 40:23
41:4 46:16
47:24 48:8
58:13 66:3
67:4 74:20
81:20 86:6
86:16 93:14
94:10
100:12
107:23
108:8
121:13
124:12
125:8,16
132:24
133:10
138:20
142:24
147:3,8
148:22
149:3
154:18,23
157:4,7
164:5,9
166:4,10,14

---

167:5,20
170:17,22
172:18,21
173:15
174:20
178:16
179:15
**good** 6:8,11
60:15
144:25
145:7
163:22
**gotten** 98:20
**governance**
42:15
**governing**
170:13
**graduated**
7:22,24
**Groper** 15:19
162:14
**ground** 7:8
**group** 6:21
6:24 7:2
12:10,13,23
19:7,9
33:19 35:15
37:17,22,25
38:9,17
40:13,19,22
41:4,5,8
42:4,11,19
43:6,10,11
43:16 46:17
47:6,10
48:5 55:7,8
55:14,16,25
56:4,5,10
56:14,20,22
57:12,13,14
57:25,25
58:11 62:12
62:13,14,20
62:22 63:4
66:8,12
76:25 83:7
83:9,20,23
83:25 84:10

---

91:18 92:3
92:8 99:18
100:19,21
101:6,10,11
101:17,25
102:3
110:20
111:25
113:21
114:9,15
119:10,14
120:8 129:7
129:8 135:7
136:24
144:16
153:6,7,23
154:6 155:3
156:6,14,20
157:21
158:2,14,25
159:10,25
160:5,23
161:8,23
163:2,10,11
163:12,17
**groups** 99:21
**group's** 14:14
46:25 58:14
102:9 104:5
119:25
**GUARAN...**
1:10
**guarantor**
27:23 69:17
**guarantors**
26:19 70:23
70:24,25
71:3 114:4
**GUC** 146:3
**GUCs** 145:24
**guess** 8:22
17:14 40:10
48:12,25
62:17 84:22
87:6,20
103:19
151:8
161:13

---

**H**

**HADLEY**
4:5
**half** 23:4
**hand** 181:19
**handed** 11:25
12:13 60:23
**Handing** 61:4
**handwriting**
151:14,16
151:18,21
152:4,7
**happen** 20:9
26:4 147:2
**happened**
160:4 161:7
**happy** 31:15
163:17
**hard** 18:21
82:15
148:19
158:18
167:5
**harm** 129:18
**Harvard** 7:23
8:2
**Hathaway**
159:2
**head** 166:24
**heading**
104:21
107:7 178:9
**headings**
86:23
**headline**
96:20
**hear** 167:2,6
**heard** 176:25
**hedge** 8:15
98:17
**held** 2:10
24:18 32:17
32:18,19,23
33:7
**help** 71:24
74:3 76:21
**helpful** 48:18
54:17

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 196 of 211

196

**hereto** 5:6
**hereunto**
181:19
**hesitating**
101:8
**HFS** 14:24
**high** 69:11
111:24
128:17
148:7
169:19
**higher** 116:3
**highlighting**
151:24
**hire** 38:15,22
47:15
**hired** 39:17
**hiring** 48:4
**historic** 17:11
17:18
**hoc** 6:21,24
7:2 12:10
12:13,23
14:14 33:18
35:15 37:17
37:22,25
38:9,16
40:12,19,22
41:8 42:4
42:11,19
43:6 55:7,8
55:13,16,25
56:4,5,10
57:12,24,25
58:11,14
62:11,13,14
62:20,21
66:8,12
76:24 83:7
83:9,19,23
83:25 84:10
91:18 92:2
92:8 99:18
99:21
100:19,21
101:5,10,11
101:16,25
102:2,5,9

104:4
110:20
113:21
114:9,15
119:10,14
119:25
120:8 129:7
129:8
135:25
136:24
140:8 141:3
141:9 153:6
153:7 156:5
156:14,19
158:14,24
159:10,25
160:5,23
161:8,22
163:2,10,11
163:12,17
166:22
**hocs** 154:6
**hold** 165:19
**holder** 44:19
**holders** 34:7
38:3,7
44:16 63:11
96:18
107:23
125:7
128:14
130:7
**holding**
167:18
**holdings** 24:6
24:14 34:2
35:11,17
36:7,11,23
37:6 73:11
**holds** 25:9
**honestly**
123:5
127:19
169:4
**hopeful** 90:2
**horse** 78:20
78:23
**Houlihan**

16:3 39:4,8
39:18,20
47:14,15,20
48:15,20
51:11 52:18
54:25 57:17
58:9 71:11
71:16 72:19
72:20 74:21
74:22 76:17
77:12,24
80:17,19
81:18,24
82:16 83:10
83:22 84:4
84:5,19
86:9 87:10
87:15,23
102:11,16
114:2,10,17
120:19
129:14
133:7,21,25
134:20,22
135:5,17
136:15
175:14,15
176:4
182:16,22
**Houlihan's**
47:24 88:10
136:17,22
**hours** 15:11
**hundred**
149:8
_____ **I** _____
**idea** 19:12
48:4
**identical**
158:19
**identification**
11:20,23
23:22 33:11
35:3,6
39:10 50:8
60:21 74:24
83:2 97:22

112:24
117:13
130:15
131:5 137:4
140:3 144:4
149:25
177:21
**identified**
12:11 40:9
175:10,12
**identifying**
105:2
**II** 177:12
**illustrative**
88:3 92:17
**imagine** 40:2
**immaterial**
70:9
**impact** 97:10
97:17 125:8
139:14
**impairment**
138:5
**imperative**
184:15
**implication**
57:19
**implications**
26:9
**important**
143:12
172:8
**impossible**
158:24
**improper**
177:10
**inaccurate**
35:22
**include** 17:16
81:18 83:9
88:5 91:12
91:15 107:4
**included**
13:18 19:7
30:21 41:5
63:23 77:22
85:19 86:3
97:9 102:6

106:10,19
**includes**
91:24 94:24
**including** 9:5
11:17 25:22
26:16 57:15
82:10,17
91:7,18
98:2 129:11
**incorporated**
87:19
**incorrect**
92:25
**increase**
23:12 33:25
35:16,20
36:20 73:14
**increased**
37:5,11
63:18,20
73:11
**increasingly**
38:4
**incremental**
69:21
**INDENTU...**
1:9,17,17
**independent**
49:15 63:7
118:14
153:20
**independen...**
119:13
**indicated**
154:25
**individual**
6:14 63:2
71:22 72:2
105:17
134:11
138:15
154:4
**individually**
158:8
**individuals**
15:16 28:20
30:2 51:3
52:9 53:11

60:13 132:3
133:25
134:2,3,5
171:18
**inevitably**
54:15
**inform** 26:21
69:19,24
71:24 76:21
**information**
22:2 25:13
25:17,19,21
26:15 29:21
29:22 34:20
34:23 39:2
48:13,17,21
48:22,25
51:12 53:13
53:17,22,24
54:22 55:3
55:5,9,14
56:6,10,15
56:17,21,23
57:15,18
58:8,10
59:2,7,11
60:8 66:17
66:24 69:10
69:16 71:15
72:6,11,19
72:20 73:5
74:11 77:6
77:9,14,15
77:17 84:3
84:5 85:24
87:15,18,22
92:4 96:23
114:12,15
120:11,15
121:15
128:17
142:13
151:9
161:15
**informed**
63:16 110:2
**initial** 22:8
22:15 25:14

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 197 of 211

197

28:13,14
31:11,21
35:21 37:15
41:8 51:6
51:16,20
52:3,13,17
127:16
151:7
161:22
**initially**
20:25 83:18
158:10
160:5
**instance**
49:22
**institution**
47:20
**instruct** 82:3
108:12
120:4,8
121:13
133:11,16
167:21,24
170:20,24
176:14
177:16
178:19
**instructing**
174:23
**instruction**
108:24
168:9 169:3
178:24
**instructions**
164:3 184:2
**instrument**
172:9,17
**instruments**
25:25
**insurers**
121:10
**intangible**
27:5
**intended**
57:21
**interco**
137:11
152:14

**intercompa...**
27:7,14
28:3 68:25
69:4 72:24
73:8 91:25
115:10
119:23
138:2
143:11,19
144:10,17
144:21
145:9,13,15
145:17
146:6,9
148:10,15
148:24
149:7
**intercompa...**
30:18 31:18
66:20 68:16
68:19 69:6
69:14,23
70:3 71:12
71:17,21
72:22 74:9
74:17 80:19
80:23,25
81:7,19
82:7,11,17
91:13,18
104:22
105:3 106:7
106:9,14,18
107:5 114:5
114:12,16
114:19
115:5
116:14
117:25
118:19,24
119:16
140:23
141:5,15,19
142:15
143:4,5,23
145:5
151:24
**intercos**

141:2
**interest** 50:17
64:7,11,15
64:23 67:12
67:15,19,24
68:8 89:10
89:13,14,17
89:19 91:7
103:7,22,24
104:6,15,18
112:8
147:24,25
149:4
**interested**
181:16
**interject**
10:23 57:10
**Interlinks**
58:18,20
**intermediary**
48:16
**International**
10:5
**interpose**
120:3
**Intralink**
59:5,16,21
**Intralinks**
58:21,22,23
60:3,6,11
**invest** 8:23
10:8 20:17
20:25
**invested**
20:22 29:7
33:5 165:21
**investment**
8:25 9:2
10:6 21:6
21:23 22:8
25:14 26:21
28:19,22,23
29:10,15,23
30:6,11,16
31:11,21
37:15 51:6
51:17,21
52:3,13,18

53:2 73:22
73:23 74:2
74:8,13,18
98:19
127:16,22
143:10,15
151:7
160:10
166:14
168:17
**investments**
8:6 53:18
132:5
164:23
**investor**
49:18
**investors**
32:17,18,20
32:23 33:7
160:11
172:8
**invests** 9:4,8
**involve**
142:17
**involved**
10:11 15:17
17:24 18:4
18:5,6 20:6
20:7 21:25
37:17,21
40:12 46:12
46:13 47:18
59:13 76:12
98:18,21
99:4,7,10
101:9 111:4
134:21
143:14
158:8
160:24
162:13
165:15,17
173:18
**involvement**
34:16 99:16
135:7
159:11
165:14

**Irrevocable**
50:14
**issue** 21:15
74:17
122:18,19
122:20,23
123:9
125:11,21
158:3
162:10,16
**issued** 20:14
21:11 26:18
**issues** 16:22
43:20 49:20
66:19 114:8
117:2
147:11
**item** 91:24
129:24,25
**items** 15:2
72:22 74:5
79:18 80:3
**I.D** 182:8
183:3

_____

**J**
**J** 3:8
**JACQUES**
3:12
**January** 40:4
**jmosse@cu...**
3:11
**JOB** 1:23
**John** 119:8
**join** 45:9,13
45:21 46:2
**joined** 8:3
15:20 44:19
**Jointly** 1:4
**JONATHAN**
3:8
**jsemmelma...**
3:13
**JSN** 28:4
38:3 85:9
124:22
**JSNs** 21:12
21:13,17,23

22:5,19,22
23:3 24:6
24:25 25:5
25:9,15
26:15 29:12
31:11,21,23
32:7 33:5
34:2 36:24
37:6,15,18
50:17 51:6
71:2 77:23
77:25 78:6
81:5 84:20
84:25 88:13
88:16,17
93:11 97:14
104:16
108:7,23
109:24
112:5
115:15
124:15,18
143:20
150:12
156:5,6
176:6,8
**Judge** 159:21
161:10
162:11
**JULIA** 3:10
**July** 113:3
117:16,20
125:12,17
125:22
137:4,7,8
140:8
141:16
142:10
144:3,7
183:14,18
**jump** 35:13
**June** 1:18
24:6,25
33:19 97:25
98:6 109:8
**junior** 1:10
7:2 21:12
142:6

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 198 of 211

198

169:15
178:9
**justification**
149:22
**jwalsh@cu...**
3:9
**J.R** 111:5

**K**

**K** 4:6
**keep** 77:18
**Kempner** 4:4
4:20 6:15
8:3,15,19
10:4,5,6
11:7,8,12
24:2,9
35:12 37:5
40:15,18
41:19 56:16
63:6,8
89:24 90:21
165:2,16
174:8
**Kempner's**
176:2
**Ken** 162:15
**key** 125:5
**kind** 20:20
58:23 64:19
67:7
**knew** 26:25
87:8 94:17
95:18 96:19
114:25
115:4
138:19
143:21
144:18
154:13
**know** 7:13,15
13:13,17,19
14:22,24
16:22 18:6
18:23 20:10
22:10 24:20
25:18,22
26:17 29:2

30:5 31:2
32:3 34:19
43:7 47:3
48:7 50:22
50:25 51:5
51:12,24
52:4,8,11
52:12 53:4
53:10,16
54:25 59:14
59:20 60:9
65:14 71:15
72:13 73:9
74:19 75:8
76:2,6,16
76:19,20
77:13 78:17
79:4 80:12
81:16 83:6
83:23 85:18
89:23 94:21
95:19 96:2
96:9,20
98:20,24
100:2
101:10
102:17,18
105:12,14
105:22
106:2 107:9
107:16
108:2
111:21,22
112:4
115:13,23
116:12,17
116:19,24
119:14,24
121:22
132:10
133:7,20
137:17,19
140:4,11,12
141:2
142:18,21
142:23
147:11
150:9,24

151:18,21
152:7 155:4
155:7
156:22
159:2
161:17
162:14
165:13
170:3 172:4
173:20
179:17
**knowing**
124:6
**knowledge**
84:8 98:10
134:7
144:21
166:13
**Kochman**
3:19 163:21
163:23
166:9
167:12
170:22
173:7,25
174:22
175:3,24
176:13,21
177:15
179:2,21
182:5
**Kunal** 15:15
30:3 52:7
60:14 74:15
155:14

**L**

**L** 1:22 4:8 5:2
6:2 127:4
129:24,25
181:6,22
**label** 93:24
93:25 96:18
**labeled** 75:8
**lack** 8:16
**language**
97:9 129:17
129:21

**large** 9:3
27:16 38:2
44:19 90:6
99:5 100:6
134:12
142:22
**larger** 43:10
**largest**
134:22
159:2
**late** 22:13
37:15,20
40:4 111:7
161:5
**law** 38:12
47:8
**lay** 177:8
**laying** 104:18
**leads** 54:15
**learn** 54:14
**learned** 97:5
**led** 32:2
155:3,16
156:4
**Lee** 162:10
**leeway** 36:2
167:4,10
**left** 27:21
85:23 86:10
86:21 88:7
**legal** 8:20
10:2 11:6
92:16
107:25
108:18
169:4,8
171:19,22
**length** 30:6
**letter** 39:5,9
39:19 42:13
52:19 98:8
101:19,22
101:25
102:5
104:11,19
107:7 108:5
110:16,18
110:19,23

111:18,22
112:8,21
117:22,24
118:12
120:23
121:8
122:19,21
125:12,17
137:9,14,15
145:19
147:13
152:22
182:17
**let's** 13:10
52:16
101:18
153:24
159:20
169:12
171:3
172:12
177:15,18
**level** 111:24
155:6
169:19
**levels** 142:20
**Lexington**
3:17
**liabilities**
80:3 94:3
**liability**
92:20 93:20
130:2
**lien** 27:3,20
28:3 32:3
**liens** 68:15
143:22
147:15
154:21
155:19
**liked** 148:11
**limit** 122:4
149:5
**limited** 10:5
11:9 41:19
68:24 128:8
138:4
139:10,16

139:18
177:12
**Limiting**
82:25
182:24
**line** 88:23
91:24 157:6
185:8
**lines** 42:17
100:17
**list** 41:10
46:14 100:4
175:21
**listed** 43:15
72:23 79:19
**listing** 32:12
**little** 12:7
23:8 36:2
122:5
**lived** 154:15
**LLC** 1:4,6
4:4 24:3,10
35:12 41:20
41:25
**LLP** 2:11 3:5
3:16 4:5
**loans** 71:21
78:21 79:13
**Lokey** 39:19
39:20 77:12
175:14,15
176:4
**long** 15:10
100:8
147:18
**longer** 9:10
10:18
**Long-Term**
11:12
**long/short**
9:6
**look** 12:15
14:6 20:16
25:10 28:10
28:16,23
29:8 30:25
35:10 36:14
41:2 44:8

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 199 of 211

199

69:18 70:8
78:7 84:7
85:2 89:11
92:11
101:18
102:4
128:15
131:19
168:8
**looked** 13:20
14:14,17
25:24 29:3
71:13 73:10
73:25 91:20
102:11
106:11
137:9
**looking** 14:21
14:21 32:11
33:13 36:9
41:6 54:14
75:8 78:4
**looks** 150:9
**Loomis** 41:20
45:5,7
**lost** 83:15
**lot** 54:15
113:15
**low** 38:3
131:17
**lower** 119:7
**LP** 11:8,13
41:17,18,21
41:21,23,23
98:12
**Lynn** 2:13

**M**
**magnitude**
22:10
**maintain**
160:12
**major** 155:22
**majority** 32:5
90:6 164:21
**making** 52:3
65:20 153:8
169:23

**Mallet-Pre...**
2:11 3:5
**management**
4:4 15:20
24:2,10
35:12 41:18
41:20,21,23
41:24 44:18
49:19 98:12
**manager**
169:6
**managers**
9:15,18
30:14
**managing**
8:12 9:19
**manner**
116:8 130:5
**Marathon**
44:18 45:16
45:18 46:12
**March** 38:23
38:24
**mark** 3:21
11:16 34:24
74:20 98:9
98:9,10
177:18
**marked**
11:20,23
23:21 33:11
35:3,6 39:3
39:9 50:7
60:21 74:23
75:2 82:23
83:2 97:22
112:23
117:13
130:15
131:4 137:4
140:2 144:4
149:25
177:20
**market** 38:6
79:8 87:6
88:3 138:14
138:17
**marriage**

181:14
**material** 29:5
29:9
**materially**
130:6
**matter** 8:20
13:9 181:10
181:15,17
**matters**
18:25
**MCCLOY**
4:5
**mean** 14:20
21:20 26:12
27:13 48:24
53:18 54:10
56:12 76:8
78:3 79:14
85:23 86:25
89:14 90:15
93:15 109:2
114:6 125:5
134:20
136:8 145:9
147:14,21
**meaning**
26:13 27:15
79:15 97:17
116:9 143:8
**means** 122:15
137:22
178:15
**meant** 112:12
**mediation**
158:4,7,10
158:15,16
158:17,25
159:4,7,12
159:15
160:2,6,22
160:24
161:9
162:13,21
**mediator**
159:22
**meet** 15:10
17:14,14
147:3

**meeting** 17:8
75:14,16,18
75:20 76:13
116:21,24
117:5
146:19,23
147:2,5
**meetings**
16:6,8,11
16:21 17:17
**member** 56:5
56:9 99:18
100:20
135:5
163:11
**members**
40:16,19,22
41:2,8,10
43:11,14
44:2,9
49:19 57:13
57:24 62:21
76:9 99:23
101:5 102:5
140:7 141:9
153:5 154:5
159:10
**membership**
44:11
**memo** 29:23
30:4 74:2
74:13,18
**memoranda**
30:16
**memorand...**
28:19,24
29:11,15
110:8,10,12
**memory**
106:22
151:2
**memos** 73:22
73:23 74:8
127:23
**mentioned**
9:20 15:4
16:14 19:5
31:16,18

45:15 68:10
73:21
127:23
151:15
**mentioning**
30:17
**messaging**
19:23
**met** 15:4,11
75:21
**MG** 1:3,8,15
**MH** 10:3
**Milbank** 4:5
57:18 58:9
110:25
111:3,6
**milestones**
149:17
154:16
155:18
**million** 22:11
24:15 32:12
35:13 36:10
36:17,25
66:3,5 67:9
70:17,21
78:9,10,11
92:18 93:15
115:3,8
**mind** 159:17
171:4
**mine** 13:8
**minute** 179:2
**misremem...**
101:14
**modestly**
37:11
**money** 27:17
27:21
**monoline**
94:3 121:9
121:24
**monolines**
122:24
128:23
**month** 40:3
45:24 73:14
**morning** 6:8

6:11 17:15
**mortgage**
79:12
**mortgages**
129:2
**Mosle** 2:11
3:5
**MOSSE** 3:10
**motion** 86:12
**moved** 23:7
111:5,10
**msilversch...**
3:22
**MSRs** 79:19
**MTG** 146:19
**multiphase**
159:18
**multistrate...**
9:3,17,22
10:3,9
24:20

**N**
**N** 3:2 4:2 5:2
6:2 127:2,2
127:2,4
181:1 182:2
**name** 6:9
8:19 9:21
10:10 18:11
163:23
**named** 11:14
**names** 9:22
10:2 11:3
100:10,11
101:2
**NDA** 55:24
58:5,6
59:17,25,25
72:8 76:25
77:4 158:18
158:19,20
158:23
160:8,9,18
160:20
162:3,6,17
**near** 154:24
**necessarily**

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 200 of 211

200

56:23 115:7
138:14
150:23
172:14
**necessary**
143:17
184:5
**need** 7:14
48:8 142:14
162:13
163:19
172:14
**needed**
106:22
160:9,15
162:19
**needing**
142:17
**negotiated**
160:18
**negotiating**
55:21 90:4
**negotiation**
161:18,19
**negotiations**
162:18
**neighborho...**
115:24
119:4
**never** 56:15
56:16 96:7
142:8
**New** 1:2,21
1:21 2:12
2:12,15 3:7
3:7,18
180:2,4
181:2,4,8
**nine** 8:21
**nondisclos...**
55:16
**nonguaran...**
69:17
**nonpublic**
55:2,5,14
56:6,18,19
72:6 77:9
77:15,17

84:5
**north** 115:3,7
**Notary** 2:14
5:16 6:4
180:22
181:7
**note** 92:24
**noted** 127:3
179:23
184:12
**noteholder**
28:2,4
159:3
178:10
**noteholders**
7:2 67:18
175:16
**notes** 1:10
14:7 21:15
22:23 23:6
23:13 24:6
24:15,17
25:22,24
26:17,18,20
26:24 27:3
27:9 32:12
35:13,18
36:3,18
63:20,22
64:4,14
88:13 94:6
103:5,22
115:20,21
115:23
116:2
127:17
142:7 145:5
146:22
147:10
166:19
167:19
168:25
169:14
**notice** 2:13
11:20,23
17:3 112:20
123:8
166:21,23

182:9,10
**noticed**
100:16
**notices** 11:18
12:3,9
**notwithsta...**
159:11
**November**
1:20 2:4
45:25 161:4
181:20
**number**
13:14 14:25
17:21 29:4
29:5 30:5
37:10 38:2
38:3 66:16
66:19 84:23
84:24 94:12
96:20 97:25
98:24 99:5
100:6
102:20
115:2,7,18
119:7
120:17,18
131:18
134:25
135:2,8
137:24
**numbers**
77:12 116:3
142:2
**NW** 4:6
**NY** 3:18
**N.A** 1:9,16
3:15
_____
**O**
**O** 5:2 6:2,2
127:2,2,2,4
127:4 181:1
**oath** 127:10
**object** 21:3
25:3 28:5
31:12 34:11
35:24 37:3
37:7,23
**objections**

40:24 41:12
42:6 45:11
46:20 52:14
54:8 55:10
56:7 62:15
64:25 68:5
81:8,21
83:14 86:17
89:4,21
90:24 92:23
94:15 95:11
97:2 100:13
102:13
104:8 105:9
106:20
107:14
113:24
125:13,18
132:18
134:8
135:20
136:7
138:22
139:6,20
140:9
148:17
153:9
155:20
156:7,8
157:5
158:11,14
165:9 166:5
170:18
172:2
173:16
178:17
179:16
**objection**
14:15 28:9
62:19 120:4
156:25
157:6 174:2
174:4
176:17
177:5
178:25
179:7,9,14
**objections**

5:11 156:13
156:16,21
177:13
179:5
**obligations**
160:11
166:2 167:7
169:10
**obtains** 53:17
**obviously**
19:12 26:3
26:18 39:18
42:12 56:13
63:3 66:18
81:4 87:13
107:20
112:9
119:19
144:15
149:4
153:17
160:10
163:13
166:24
167:3
169:24
**Occasionally**
19:25
**occurred**
16:17 68:11
73:14
**offered**
144:24
162:2
**office** 162:9
**offices** 2:10
**OFFICIAL**
1:12
**offshore**
10:16,20
11:15
**Okay** 61:5
107:11
153:15
176:19
179:22
**once** 89:9
143:12

**ones** 34:9
**online** 58:23
**onshore**
10:15,20
**onshore/off...**
10:14
**opaque** 128:9
**opinion** 69:24
178:21
**opportuniti...**
9:9,11
10:16,17
11:7,13
**opportunity**
11:9 14:5
28:22 30:7
165:5
**opposed**
105:18
157:24
**oral** 110:7,11
123:14
**order** 22:10
43:12 148:4
159:9
161:12
162:4,8,12
**organization**
27:16
**original**
184:16
**originated**
129:2
**outcome**
181:17
**outlined**
145:19
**outlines**
84:24
**outlining**
30:6
**outset** 168:9
**outside** 83:7
83:25
111:17
176:9
**outstanding**
67:13 70:11

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 201 of 211

201

**oversecured**
103:5 112:5
**oversee** 9:14
165:7
**oversees** 9:15
**overview** 8:8
8:24
**owned** 21:10
23:5

**P**
**P** 3:2,2 4:2,2
5:2 41:21
106:15
**package**
25:23 26:11
27:6 30:9
143:6
169:24
**page** 12:16
23:24,24
33:21,21,23
33:23 34:8
34:14 35:10
35:15 36:17
40:8,10,11
40:11,25
41:3 61:9
77:11,19
78:8 80:14
80:16,17
82:13,14
84:22 85:13
95:4 104:21
107:6
110:14
121:4,5
129:22
150:5,16
151:4,16
152:3,16
173:3,8
178:8,8,11
180:12
182:3 185:8
**pages** 30:5
40:7,9 41:7
41:15 61:8

61:20 62:3
77:19 180:8
**paid** 22:14
64:3,6
79:16 89:16
90:2,5,6,10
90:16 91:6
93:17 130:4
148:6
154:23
**par** 64:6,15
67:11 89:10
**paragraph**
102:9 103:4
107:17
121:2
140:24,24
178:11
**parens** 79:4
**Park** 2:12 3:6
**part** 10:8
13:15 27:5
30:18 32:22
49:10 66:25
77:23 78:2
78:5 82:8
82:11 87:7
90:3 138:21
143:5 148:3
153:2
164:14
170:6
**participants**
46:10
**participate**
158:6,7,9
158:16,17
158:25
159:3,6,25
161:8
**participated**
155:11
**participating**
44:25
101:15
158:14
160:6,22
**particular**

42:23
128:22
159:16
**particularly**
66:15 149:8
**parties** 5:6
94:22
181:15
**partner** 8:14
**partners** 10:4
10:6 19:8
**parts** 151:4
**party** 75:20
153:17
**Paulson**
41:22 44:6
44:21
**pay** 67:11
**paying** 87:8
**payment**
90:13
**payments**
64:14
**Peck** 159:21
161:10
162:11
**pending**
173:6
**Pentwater**
41:22
**people** 16:13
16:13 17:17
18:24 19:3
19:5 59:12
98:2 117:6
134:12
141:12
155:10,13
**percent** 79:20
79:23 85:5
85:5 88:17
88:18 89:6
90:12,22
115:18
**percentage**
78:25 79:9
79:10,13
**performed**

82:16
**period** 15:21
26:5 29:12
36:21 41:11
42:24 45:10
51:11,13,15
59:15 64:3
73:15 81:6
89:18 90:13
94:10 95:24
95:25 97:4
100:8 109:9
113:10
140:16
141:6,15
153:5
160:15
**person** 60:5
171:14
**personally**
99:12 171:6
**perspective**
27:12
**petition**
21:10 64:11
64:21,23
66:22 67:14
67:19,23
68:8,9
87:17 89:10
89:13,17,19
96:16 103:6
103:23,23
104:5,15,18
112:7
147:24,25
149:4
**Phase** 177:12
**physical**
169:17
**picture** 73:7
**pieces** 31:16
**Plaintiff** 1:14
**plaintiffs** 1:7
94:12 95:14
**plan** 13:24
14:2,15
60:20,24

61:11 62:22
62:23 64:24
65:14 67:16
67:20
130:14,17
131:3,9,10
132:16
156:4,7,14
175:18
177:6,12
179:5,7,14
182:21
183:9,11
**planned**
94:18
**please** 13:2
171:4 174:3
184:4,9
**pledge** 50:13
137:12
**pledged**
85:19,21
86:24
**plus** 64:6,7
67:11,12
89:10
103:22
**point** 7:12,14
15:19 23:5
30:21,23
41:23 42:23
43:3,10,21
44:6,10,20
44:22 45:4
45:6,16
46:12 47:17
54:25 55:15
58:3 78:22
83:12 84:2
96:19 111:2
111:23
122:9
125:24
127:21
129:20
132:14,23
138:19
149:6

154:22
155:25
159:8,21,24
160:25
176:13
**pointed**
178:23
**points** 15:14
21:9 115:12
115:14,17
116:5,13
118:9 119:2
119:5 120:2
137:23,24
148:10,11
148:15,16
149:8
152:23
**pools** 94:7
**portal** 58:24
**portfolio** 9:15
9:18 30:13
**portion** 59:4
67:4 68:15
89:12 94:25
107:24
150:6
**position** 8:4
23:6,7
44:23 45:8
48:10 54:20
76:19 92:3
104:14
112:10
118:11
121:20
144:14
145:22
146:11
165:20
166:17
171:8
**positions** 8:8
44:17
**positive**
65:17 106:4
171:16
**possible**

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 202 of 211

202

25:11 59:22
60:7 73:4,7
120:17
**post** 64:11,23
67:14,19,23
68:8 89:10
89:13,16,19
103:6,23
104:5,14,18
112:7
147:24,25
149:3
**posted** 59:2
**potential**
48:11 66:19
69:3 105:3
107:25
108:2
109:22
124:20
143:2,19
145:12
**potentially**
27:10,10
48:15 109:6
115:9
144:22
146:8 149:5
166:22
170:5
171:19
**practice**
52:25 53:9
53:12 54:5
54:21
171:22
**Pre** 89:15
**preparation**
14:17 34:11
177:24
**prepare** 13:2
29:10,14
34:21 75:22
**prepared**
13:13 14:7
28:18 29:6
83:19,22
150:13,23

151:2,6
**preparing**
13:12 14:12
**prepetition**
64:7 65:21
67:12 89:14
91:7 103:22
133:9
135:19
136:2
143:21
148:22
149:13
153:4,7
175:18
**presence**
111:17
**present** 4:19
45:10 76:6
**presentation**
74:21,23
76:7,15
77:5,22,24
82:7,13
102:10,11
106:8,15,15
182:22
**presentatio...**
102:16
**presented**
30:12 75:9
75:13,16
76:3 114:17
**preservation**
166:2
**preserve**
167:8
**presumably**
65:15 71:22
103:23
124:24
**presume**
32:13
**pretty** 91:23
**prevented**
160:4,21
162:20
**previously**

39:3 75:2
82:22
102:11
106:11
157:17
164:21
**price** 22:14
115:20,21
**Prieto** 97:25
117:16
**primarily**
18:20 65:12
93:24 94:6
165:2
**primary** 10:7
15:7 20:15
20:15
129:15
**Princeton**
7:22
**principals**
47:19
116:22,24
158:24
**printed**
150:21
**prior** 17:15
20:23 21:9
24:25 25:7
34:3,5
39:22 40:3
46:23 49:7
49:24 56:4
58:4,6
59:17 61:18
66:21 68:19
70:3 71:10
71:17 75:10
83:5 98:14
100:22
105:7
113:20
114:11
121:25
122:19,20
125:24
127:13
128:12,19

129:9
131:16
133:5,22,25
134:15,17
135:19
136:2
148:22
169:14
171:8
**priority**
50:13 92:17
163:25
**private** 59:4
59:6,10
93:24,25
96:18
163:25
**privilege**
108:15
164:12,16
168:7
**privileged**
92:4 108:16
120:10,14
121:15
133:15
179:12
**privy** 56:5
**probably**
13:22 15:11
17:22 19:7
29:20 38:11
52:6 99:3
118:17
131:17
150:8 151:6
171:12
**proceedings**
60:19 126:5
157:15
179:4 181:9
181:12
**proceeds**
67:6 107:8
107:24
130:3
**process** 47:16
49:11 63:11

76:21 104:2
153:11
154:2
159:19
177:11
**produce**
163:3
**produced**
19:21 80:11
**product** 80:9
81:4,24
82:3 92:10
120:7
**production**
19:18 163:6
163:10,13
163:16
**products**
168:17
**professional**
164:22,25
**proffer**
174:20
175:2
176:25
**prolonged**
159:18
**promotion**
8:8
**proposal**
96:21
**proposed**
120:22
132:16
156:2,5,7
156:14
**proprietary**
32:16
**prospect** 38:4
**protected**
97:10
129:17
161:13
**protection**
148:5
**protective**
162:4,8
**protocol**

10:25
**provide**
38:25 53:22
60:8 112:9
158:22
160:8,20
162:6,7,11
**provided**
30:22 34:20
34:23 42:14
56:15,16,20
56:23 58:9
58:10 65:9
71:19 72:8
72:11 73:5
74:11,15
77:6 81:5
84:4,6,19
85:24 87:14
87:23 96:24
109:21
118:4
120:18,20
123:8
130:20
143:22
152:18
160:18
175:13
**provides** 59:9
63:10
**providing**
57:7 63:12
68:2 77:24
135:24
136:23
**provision**
173:10,10
**provisions**
170:11
172:22
174:10,11
**Proxy** 50:14
**PS** 13:18
**PSA** 13:18,23
55:21 62:14
63:3,5,7,9
63:10,24

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 203 of 211

203

65:9,22
67:2,3,11
67:17 68:3
68:14,20
70:4 71:10
75:11 76:23
84:21 85:10
85:16 88:12
88:15 89:3
90:19,20
91:2,3,5
94:11 95:14
96:14,14,14
96:23 97:5
97:6,7,9
103:8,24
105:7,24
109:15
112:13,16
123:4,18,18
124:16
125:4,5,9
128:5
129:10,17
129:20
130:18
131:4,11,17
132:17,17
133:6,9
135:19
136:2,6,16
138:24
144:20,24
147:22
148:13,22
149:13,18
153:4,7,16
153:18,24
154:3,14,19
154:25
155:4 156:2
156:4
157:20,25
158:21
160:19
176:12
183:12
**PT** 137:18,22

**public** 2:15
5:16 6:4
25:17,20
26:15 48:14
48:17,22,25
53:24 55:9
56:20,23
59:4 68:22
77:7,14
81:25 87:4
105:11
119:20
180:22
181:7
**publicly**
54:22
**published**
114:24
**pull** 129:20
**pulling** 171:4
**purchase**
22:15 28:8
28:14
115:25
**purchased**
22:6,6
85:25 86:2
166:18
**purchases**
22:19,25
23:3 29:11
116:3
138:16
**purchasing**
169:2,14
**purpose**
76:15,20
**purposes**
38:17 55:21
**pursuant**
2:13 72:8
121:11
130:4
**pursue** 9:10
**put** 30:4 74:2
107:24
150:7 163:8
174:2 175:6

176:16
**putting**
112:20
**PX** 39:4 75:2
82:23
**p.m** 127:3
179:23

———————
**Q**
qualificatio...
47:6 135:14
**qualified**
47:22
**question** 5:12
7:10,13,16
21:4 25:4
28:6 31:13
34:12 37:4
37:24 40:24
41:13 42:7
45:12 46:21
47:13 54:7
54:9 55:6
55:11 56:8
59:19,24
62:16 65:2
68:6 81:9
81:21 82:4
83:14,15
86:17 87:25
89:5,22
90:25 92:24
94:16 95:12
97:3 100:13
102:15,24
104:9
106:12,21
107:10,15
113:25
120:6,13
122:6 124:4
125:14,19
129:6
133:18
135:12,13
135:23
136:5,10,14
136:16,22

138:23
148:18
156:9
158:12
164:13,14
165:10,12
166:5
167:14,22
168:5
170:18
172:3,20
173:6,9,16
174:7
178:17
179:16
**questioning**
141:4 157:6
**questions**
49:13 53:24
54:6,16,17
157:13
162:24
164:10
170:23
174:17
175:4,5,8
175:24
176:16,22
**quick** 36:5
126:2
**quickly** 35:10
41:14 44:14
92:15 148:7
154:24
**quite** 60:7
101:13
144:22
173:23
174:14
**quoting**
64:19

———————
**R**
**R** 3:2 4:2 6:2
127:2,4
181:1 185:2
185:2
**ran** 170:11

170:16
**rate** 90:8
**reach** 149:17
155:17
**reached**
49:14,16
52:2 63:3
96:17
128:24
158:2
**read** 31:25
92:14
101:21
103:13
104:11,23
107:8
152:10
178:11
180:7 184:4
**reading**
92:25
**reads** 152:17
**ready** 107:9
**real** 143:2
145:15
**realized**
133:4
**really** 8:21
18:5 127:19
128:16
145:16
167:5
**realm** 173:22
**reason** 10:13
66:25
102:24
135:13,23
136:5,9,10
136:16,21
140:25
149:20
184:6
185:10,12
185:14,16
185:18,20
**reasonably**
100:6
**reasons** 101:7

153:12
185:6
**Reattaching**
147:15
**recall** 13:11
14:19 17:20
19:20 22:5
22:14 24:13
24:24 29:17
30:15 31:6
31:8 32:15
39:24 44:15
45:24 46:17
49:21,24
57:8 58:7
61:14 65:5
70:23 72:10
72:12 73:13
73:17 74:7
75:12 76:5
109:3,18
110:3,6,9
110:12
119:3 123:2
123:5,7,11
123:14,16
123:17,24
124:5
127:20,22
133:3
140:19
146:15
171:7
**receipt**
184:18
**receivables**
82:11,18
105:3
113:22
114:5,12,16
114:20
115:5
116:14
117:25
118:5
119:16
**receive** 53:12
55:8 64:10

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 204 of 211

204

67:19 71:25
140:15
**received**
19:11 51:13
55:2,4,14
56:14 57:16
64:10 71:16
72:3,21
89:9 98:5
101:22
113:4 114:3
114:15,21
117:19
123:20
132:7
140:20
142:11
163:4
**recess** 60:18
126:4
157:14
179:3
**recognize**
12:2 33:17
39:11 50:9
60:25 75:3
84:15
131:12
**recollect** 20:4
28:12 32:10
38:12 41:5
43:2 46:4
147:16
**recollection**
39:14 61:21
74:4 106:9
106:17
**reconciling**
141:25
**record** 6:9
58:13 59:10
74:25 84:12
92:6 127:9
131:7
159:15
162:25
163:9
170:25

181:12
**recover**
103:25
149:6
**recoveries**
48:11 70:10
84:20 97:14
97:19 107:4
114:18
124:15,18
124:22
130:7 142:6
143:3,18
145:3,5
**recovery**
77:21,23,25
78:6 81:6,7
82:12,17
84:25 85:4
85:4,9 88:3
88:9,14,15
88:24 89:12
90:12,23
92:13,16
93:12
175:17
176:9
**redacted** 78:3
80:4,8,12
80:15 81:16
82:15 91:22
92:7
**redactions**
92:9
**redepose**
163:15
**REED** 3:16
**refer** 6:24
13:23 21:13
21:17 78:17
93:8 128:20
171:3
**reference**
23:25 70:22
78:8,15
82:6 93:19
116:21
127:24,24

**referenced**
39:21 60:13
114:2
171:18
175:22
**references**
33:23
105:10
**referencing**
32:25
**referred**
16:12 78:10
85:6 106:16
145:22
**referring**
15:25 28:17
42:22 51:10
57:23 71:4
79:2 102:16
102:25
105:12,15
107:12
112:12
113:8
115:12
120:25
130:9 134:4
137:13,20
137:23
138:7,9
144:12
146:2
147:20
163:9
**refers** 6:25
93:6 102:8
115:11,11
147:17
151:22
**reflect** 24:5
150:22
**reflected**
24:15 42:10
73:11 86:12
113:22
**reflecting**
35:16 79:22
**reflects** 35:11

36:17 50:17
86:21 88:21
89:2
**refresh** 39:14
61:21 74:4
106:8,17
**refreshed**
106:22
**regard** 25:21
149:11
**regarding**
42:20 73:7
96:24
104:14
110:19
112:10
114:15
151:9
156:20
**regular** 43:18
**relate** 115:19
116:5 167:8
174:16,18
175:4,8
176:11
**related** 13:4
26:15 66:20
116:13
122:10
175:5
181:14
**relates** 37:18
39:19
100:14
116:25
119:2 120:2
122:24
157:19
166:7,8
**relating**
13:16 16:23
19:13 30:10
59:11 69:17
72:24 87:16
93:24 94:2
114:19
161:15
175:25

**relations**
49:18
**relationship**
42:11
**relationships**
100:23
**relative** 24:22
70:10
115:15
145:13
**relatively**
22:9 68:23
101:15
**release** 84:3
**released**
113:10
**releases**
65:12
**relevant**
30:10 43:19
113:14,16
149:9 163:7
**relied** 25:17
**relying** 120:6
**remain** 86:6
**remained**
23:9
**remaining**
89:11 90:9
**remember**
14:25 22:3
73:12
100:11,25
102:20
109:12,14
**Renenger** 4:8
10:22 12:12
15:5,6 21:3
25:3 28:5,9
31:12 34:11
35:23 37:3
37:7,23
39:6 40:23
41:12 42:6
42:22 45:11
46:20 52:14
54:8 55:10
56:7 57:9

60:17 62:2
62:15 64:25
68:5 80:10
81:8,20
83:11,13
84:12 86:16
89:4,21
90:24 92:5
92:23 94:15
95:3,11
97:2 100:12
100:24
101:20
102:13
104:8 105:9
106:20
107:14
108:8,24
113:24
119:8 120:3
121:12
122:2
125:13,18
132:18
133:10
134:8
135:20
136:7
138:22
139:6,20
140:9
148:17
153:9
155:20
156:8 157:4
158:11
159:13
161:4 163:8
165:9 166:4
167:2,20
168:6 169:3
170:17
172:2 173:5
173:15
174:13,25
175:11
176:11,19
176:24

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 205 of 211

205

178:16,24
179:15,22
**reopen** 163:5
**rep** 97:12
113:18
124:24
125:3
128:25
**repaid** 63:20
63:21 64:8
**repeat** 31:14
103:11
106:12
167:13
**repeated**
162:16
**rephrase**
7:13 21:5
62:18 122:8
135:22
**report** 13:21
14:12 35:21
36:9 73:11
140:2
183:16
**reported** 1:22
87:4 181:9
**reporter's**
7:9
**reports** 53:19
140:15,20
**repping**
124:17
**represent**
47:22 48:5
163:23
**representat...**
100:17
166:6 167:3
174:17
**representat...**
6:15,19
49:7 168:13
174:6
**representat...**
75:19 76:11
83:10
**represented**

152:22
**representing**
38:17
**request** 18:2
161:11,22
161:24,25
**require**
164:10
167:23
**required**
94:18
**ResCap** 13:8
15:18 18:24
19:14 20:3
20:6,7,11
20:20,22
21:2,7,11
25:18 26:4
26:7 27:9
28:4 29:7
30:17 31:21
32:5 38:5
48:9,23
49:5,6,7
50:6,14,18
51:13,20
52:10,13,23
53:11 54:12
55:3,9,17
55:25 56:6
59:15,20
60:2 66:21
71:6,7,23
72:4 93:16
96:6 105:10
105:18,19
108:3 113:9
113:18
127:16
130:13
131:8 132:5
136:19
140:17
146:10,19
149:24
150:8 151:5
152:2 171:9
182:19

183:8,20
**ResCap's**
49:19
114:16
150:10
**reserve** 163:5
166:24
**reserved** 5:13
**RESIDEN...**
1:4,6
**residual**
64:12 86:6
**resolution**
94:25
**resolve** 95:9
95:15,19
**respect** 12:10
30:16 34:7
42:3,18
48:23 51:5
68:19 88:2
128:6 129:9
130:8
136:23
138:24
153:16
154:3 156:2
164:4
168:11
170:10
172:20
176:21
**respectfully**
92:20
**respecting**
166:13
**respective**
5:6
**response**
17:25
**responsibil...**
165:6
168:23
169:5,9,17
**responsibil...**
165:23
170:7
**responsible**

9:19 165:19
169:23
**restate**
169:12
**Restated**
50:12
**restricted**
160:14
**restructuri...**
65:18 135:6
**result** 20:13
20:18 38:2
63:4 118:25
158:23
161:19
**resulted** 57:6
65:6
**results**
119:25
**resumed**
127:4
**retain** 38:7
38:15 46:18
47:11,12
**retained**
39:22,25
48:21 51:11
55:2
**retention**
39:19 46:22
**return** 90:9
184:15
**review** 14:8
17:2,5,10
17:18 19:18
25:13 29:24
29:25 54:11
73:22 75:23
75:25 106:4
172:14,16
174:9 179:6
179:8
**reviewed**
13:11,14,17
14:10 25:20
51:3,7,9
105:23
156:12

171:23,24
172:10
173:20
177:24
178:5 179:6
**reviewing**
13:4 171:7
173:18
**reviews**
104:24
**revolver** 32:4
67:5 93:11
**right** 12:15
13:25 21:16
33:2,6 34:7
35:19 36:19
46:10 52:20
54:23 68:12
68:15,17
72:7 77:13
78:7 83:21
85:3,7,20
85:22 88:19
92:13 94:24
95:4 96:15
99:19
103:20
105:5
113:11
115:2,22
120:12
122:13
142:3
143:24
144:14
147:25
150:15
152:5
153:13
156:15
163:5 164:8
164:24
166:25
171:9,10
176:14
**rights** 48:10
63:17 68:7
154:14

165:5
168:23
170:9
**risk** 9:6 26:6
**RMBS** 93:25
94:11,12
95:2,9,14
95:15,23
96:13,18,24
97:5,7,13
120:22
121:9,23
122:24
123:18
124:2,21
125:7
127:12,14
127:15
128:6,10,14
129:5,9,16
130:8
132:15,24
133:8
138:11,20
138:25
156:3
**role** 47:24
48:3 167:17
**rolled** 86:13
86:14 87:20
**Romanette**
130:9
**roughly**
19:20 21:22
24:13 39:15
**RPR** 1:22
2:14 181:6
181:22
**Ruggieri** 1:22
2:14 181:6
181:22
**rule** 12:3
23:15 33:10
33:18 34:17
73:10
182:13
**rules** 7:8
**run** 151:25

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 206 of 211

206

**running** 82:9
93:16

**S**

**S** 3:2 4:2 5:2
5:2 6:2
127:2,2,2,4
**safe** 51:22
**sale** 14:23
86:8
**sales** 24:25
25:5 78:12
86:8
**Sara** 15:15
30:2 52:6
60:13 74:16
155:15
162:8
**satisfy** 107:25
**satisfying**
66:19
**saw** 50:21,23
75:6 123:24
131:14
132:14
**saying** 112:4
**Sayles** 41:20
**says** 78:25
139:10,23
150:17,18
152:13
**scanning**
18:19,20
**scenario**
38:18
**scenarios**
70:20 82:10
**schedules**
113:9,13
114:23
142:11
**Schoenfeld**
41:21
**school** 7:23
7:24
**scope** 35:24
37:8 55:12
57:21

100:14
156:10
157:7
170:19
178:18
**sealing** 5:7
**second** 35:16
87:5 88:23
104:20
155:25
**section**
121:11
129:23
172:19,19
172:21
173:2
178:14,22
**secured** 1:10
7:2 21:12
26:23 27:20
59:2 88:8
88:13 103:4
142:6
169:15
178:9
**securities**
20:13,23
29:7 160:13
165:21
**security** 14:6
25:23 26:11
27:3 30:9
44:16 50:4
50:5,13,16
50:17
143:22
165:20
167:19
169:24
170:12
171:7
182:18
**see** 12:16
23:25 33:15
33:22 40:15
44:9 61:19
79:25 80:18
85:4,13,25

92:14
102:19
103:3,14
120:23
123:22
131:19
140:22
152:4
157:13
167:4,10
**seeing** 59:10
114:21
**seekers**
110:15
**seen** 50:25
138:16
**select** 6:20
**selected** 6:18
**SEMMEL...**
3:12
**sending**
111:24
**senior** 67:6
88:13
134:10
135:5
**sense** 138:10
151:23
164:17
**sent** 101:19
110:19
111:19
144:8
**sentence**
103:13,14
103:15,18
138:6
145:20
**sentences**
121:3
**separate** 17:8
94:11
119:15
**series** 112:22
113:2
117:12
170:23
183:4,6

**seriousness**
150:3
**services**
41:18 58:25
**servicing**
14:24 78:20
**session**
159:16
**set** 149:18
181:19
**settled**
138:21,25
**settlement**
95:10 97:11
97:13 107:8
107:21
120:22
121:8,23
123:19
124:2,21,21
129:16,19
129:25
130:4,9
161:20
**settlements**
121:24
122:10,11
128:13,19
128:24,25
**settling** 94:13
**Shah** 15:15
30:3 52:7
60:14
116:23
131:20
137:3,6,11
137:19
155:14
183:13
**share** 145:25
**shared** 83:6
83:24 84:7
84:9 88:11
88:11 146:8
**sheet** 77:14
78:22 86:4
86:7 87:16
105:19

130:14,17
130:20,23
131:3,9,10
131:15
132:8,11
150:11
183:10,11
184:8,10,13
184:16
**sheets** 69:19
70:23 71:23
72:2 113:18
114:3,22
**short** 112:3
**shortly** 35:14
85:10
**show** 23:14
82:20
**shown** 114:4
180:11
**shows** 151:5
**side** 78:7
85:20,22,23
86:10 88:6
94:24
**Siegert**
134:10,14
135:3
**Siegert's**
135:23
136:11
**sign** 61:16,17
63:2,7,9
76:23
153:21,24
158:20
162:17
184:9
**signature**
40:7,9 41:7
41:15 61:8
61:8,9,20
185:23
**signed** 5:16
5:18 55:22
58:6 59:25
60:2 61:15
61:15,18,22

61:24 62:7
62:8,21,22
76:25 85:10
90:20 91:5
109:15
123:4
144:20
153:18,22
154:25
158:18
161:11
**significant**
23:2
**signing** 59:17
63:5 65:9
68:3,14,20
75:10 85:15
123:18
128:5
131:16
133:5 136:2
136:6
153:17
184:11
**Silver** 41:23
44:6 46:12
**SILVERS...**
3:21
**similar** 47:16
160:20
**similarly**
10:18 11:10
11:13
**simply** 24:22
88:6
**single** 105:18
151:13
**sir** 12:8 23:23
35:8 60:23
80:16
**sit** 96:10
**site** 59:5,8
60:6
**sitting** 142:25
170:14
**situation**
59:12
**situations**

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 207 of 211

207

98:22,23
99:22 101:4
101:8 165:8
165:14,18
165:24
**size** 24:22
68:24 70:10
71:20
**slide** 80:24
81:14 84:22
85:2,24
**slides** 78:4
**slightly**
115:16
119:7
**slowly** 92:15
**small** 22:9
23:5
**smaller** 43:16
94:7
**SMITH** 3:16
**sold** 25:9,12
44:22 45:8
78:15
**somebody**
146:14
173:19
**somewhat**
23:9 103:19
128:7 129:4
**sorry** 8:10
17:13 18:11
29:23 36:8
61:4 79:3,4
103:11
111:8
153:15
173:8
**sort** 9:9 59:9
59:9 63:15
74:14 83:14
84:18 167:4
172:12
**sounds** 177:8
**source** 105:4
109:6
143:20
**SOUTHERN**

1:2
**so-called**
21:12 93:25
**space** 9:11
184:7
**speak** 52:9
56:9,11
105:20
129:13
141:11
**speaking**
43:7 48:7
116:8
146:15
164:19
174:3
**speaks**
104:12
**specific** 12:11
49:2 59:11
69:22 72:12
74:13,14
82:6 91:14
109:12
116:20
150:10
168:10
179:9
**specifically**
14:20 19:9
29:3 30:7
30:17 32:9
33:4 42:16
60:4,9 71:4
72:25 73:9
73:13 80:12
97:8 110:3
119:3
120:24
124:5
147:17
150:9
166:19
172:25
**specificity**
71:19
128:18
**specifics** 21:9

96:21
112:10
114:21
**speculation**
172:4
173:23
**speed** 63:19
145:2
**spent** 13:3,5
13:6
**split** 89:6
**spoke** 38:13
52:12 53:11
162:9
**spreadsheet**
150:20
**spring** 37:20
37:20 43:24
45:10
**ss** 180:3
181:3
**stalking**
78:19,23
**stamped**
113:2
**stand** 92:9
**Standing**
157:5
**stands** 146:3
**start** 7:19
13:10
**started** 20:14
20:18
**starts** 40:7
**state** 2:15 6:8
91:4 92:6
164:8 180:2
181:2,7
184:6
**stated** 80:19
92:6 106:23
138:5
168:16
**statement**
23:21 33:11
33:18 82:25
103:10
182:11,13

182:24
**statements**
23:15 54:12
69:8 147:7
**STATES** 1:1
**stating** 9:25
**stay** 154:19
**steering**
43:11,17,21
43:23 44:3
44:4,12,19
44:21 45:3
45:13 46:2
46:8,19,24
76:9 130:14
131:9 154:5
157:10
183:9
**stemmed**
161:17
**step** 65:17
159:20
**STIPULA...**
5:4,10,14
**straightfor...**
86:19 87:2
103:20
**strategies**
8:22,25 9:5
20:16 98:19
**strategy**
10:12 30:14
**Street** 4:6
**strong** 144:11
145:10
**strongly**
143:4
**structure**
26:2 96:11
151:5,10
**subject** 77:3
110:8,13
180:10
184:11
**submitted**
35:15
**subordinated**
32:4 121:10

122:12,15
124:7,12,14
125:16
132:15,25
**subordinati...**
67:4 148:3
**subordinati...**
122:23
125:11
132:21
**subscribed**
180:19
**subsequent**
22:18 26:5
41:6 67:23
78:4 81:17
111:9 116:2
146:16
**subsequently**
91:6
**subsidiaries**
96:6
**subsidiary**
142:19,20
**substantial**
69:5,14
115:4,9
118:18,23
**substantially**
103:5
158:19
**SUCCESS...**
1:16
**sued** 161:13
**sufficient**
67:10
**suggest** 159:5
170:15
**Suite** 4:6
**summary**
13:21 77:20
84:19 85:22
88:7 177:19
177:25
183:21
**summer**
161:5
**supplement...**

73:4
**supplement...**
48:18
**support**
13:24 14:2
60:20,24
61:11 62:22
62:23 65:15
175:18
182:21
**supportive**
63:5
**sure** 7:18
19:4,10
22:2 25:12
37:12 39:2
43:9 49:3,9
56:22 60:17
61:24 62:6
62:19 73:3
73:5 76:12
77:4 81:13
94:7 95:18
100:14
114:7
118:20
126:3
127:25
128:3 135:7
140:18
149:9
157:18
165:11
167:15
169:4,23
172:6
173:23
177:7
**sworn** 5:18
6:3 180:19
**system** 59:16
59:21 60:3

———————
**T**
**T** 5:2,2 6:2
127:2,4
181:1,1
185:2

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 208 of 211

208

**take** 7:14,17
27:20
104:22
126:2 139:9
157:12
159:20
177:2
**taken** 82:5
86:10
**talk** 81:25
120:21
147:12
**talked** 30:8
115:22
132:20
138:11
**talking** 56:24
57:12 62:11
72:14 74:5
76:17 81:9
81:23
107:19,20
115:14
116:9
127:12
137:22
138:10
146:5,13
147:21
169:9
**team** 134:12
135:18
**tell** 12:25
46:7 108:20
109:21
112:2
134:19
135:4 150:4
150:25
155:11
**term** 130:14
130:17,20
130:23
131:3,9,10
131:15
132:7,11
183:9,11
**terminate**

96:22 97:6
112:15
149:13
154:8,9,14
157:20,23
**terminated**
153:4,6
**terminating**
154:3 155:3
157:25
**termination**
129:23
149:21,23
155:17
**terms** 63:23
67:10 71:20
93:11
114:21
169:25
**testified** 6:5
115:2 127:5
164:20
171:6
177:23
**testify** 12:22
106:25
115:6
**testifying**
168:12
**testimony**
52:25 180:8
**testing**
152:23
**thank** 42:2
45:17 58:22
80:18
101:21
114:10
167:12
**thanks** 93:3
179:22
**thing** 10:19
36:8 113:14
113:16
157:16
**things** 30:8
154:17
156:11

166:25
170:5 172:7
**think** 11:14
13:18 14:16
15:24 22:4
23:5 37:10
41:7 42:15
44:6 46:22
47:17 48:24
51:8,25
52:21 53:7
57:10 60:12
65:14 70:18
80:11 86:25
87:14 90:15
96:15
100:21
101:13
104:12
105:25
108:14
109:3 111:2
113:14
114:19
115:8 117:8
118:15
120:16
121:17
122:2 124:4
128:11
129:15
138:10
141:17
143:9,9,13
144:11
145:4,10,11
145:14
146:24,24
148:8,19
155:10,14
157:9
158:13
159:4
166:15,20
168:8 175:3
175:6 177:2
177:6,10,10
**third** 50:13

163:24
**thirty** 184:17
**thorough**
73:7
**thoroughly**
171:25
172:7
**thought** 26:3
63:17 70:14
70:18
118:18
119:22
141:19
148:9
162:11
**thousand**
8:13
**three** 8:22,25
9:2,15,18
15:11,13,16
16:16 19:5
30:13 101:2
101:3 132:3
**tie** 138:14
**time** 5:13
13:3,5,6
15:21 20:11
20:23 22:7
24:16 25:16
26:5 28:8
28:11 29:6
29:12 31:25
32:10 36:12
38:7,13
41:10 42:23
42:24 44:3
44:7,10,12
44:16 45:9
50:20,23
51:13,14
52:14,17
55:15 58:2
58:8 59:14
60:15 64:3
66:18 72:14
73:15 75:5
76:10,24
77:8 78:18

81:5 83:11
85:9 86:5
89:18 90:13
94:9,19
95:16,17,24
95:25 97:4
100:9
104:22
108:20
109:4,8
110:25
113:10
114:11,14
118:12
119:23
122:17,22
123:17,25
124:11
125:12,17
125:20
127:3,14,16
127:21
131:14
133:4
136:15
140:16
141:5,15,24
153:5
154:22
159:24
160:15,25
162:6,19,23
173:21
179:23
**timing** 84:24
97:18
123:23
**Tirschwell**
15:15 30:3
52:6 60:14
116:23
131:23
155:15
162:8
**title** 11:6
146:18
**today** 12:21
18:10 74:5

136:9,21
168:12
170:14
**today's** 13:2
13:12 14:12
73:24
156:12
**told** 109:21
162:18
174:15
**Tony** 19:9
30:12
**top** 33:15,22
150:15
152:16
166:24
**topic** 36:2
175:11,16
175:21
176:7 177:4
**topics** 6:20
12:9,11,14
12:18,23
17:2 35:25
100:15
158:5 166:8
167:9
174:15,16
174:18
175:5,9,9
178:18
**total** 85:4
**trade** 159:10
160:13
**trading** 20:14
23:11
161:14
**train** 83:15
**transaction**
15:18 67:8
168:18
**transactions**
66:20
134:17,24
135:2,8
**transcript**
180:10
181:11

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 209 of 211

209

184:18,20
**transfers**
108:3
**translate**
142:5
**Travis** 4:20
18:10
**treated** 96:3
121:24
123:19
124:3,8
130:21
**treatment**
95:22 96:13
**trial** 5:13
113:21
**tried** 68:21
158:18
**Troyer** 4:20
18:10,12,13
18:14
**true** 79:18
180:9
181:11
**trustee** 1:9,17
165:18,22
168:20,24
169:5,6,18
**trustees**
94:11 165:6
165:14
**trustee's**
165:25
167:7
**trusts** 121:9
**truth** 110:15
**try** 7:11
49:11
169:12
**trying** 53:19
125:20
177:2,8
**Tuesday**
16:19,20
**turn** 23:23
33:21 34:8
61:6 77:10
80:14,16

104:20
107:6 152:3
**turning** 77:18
**TWEED** 4:5
**twice** 36:16
**two** 8:13 9:9
11:9 15:7,9
29:19 34:25
35:21 47:8
89:8 121:3
155:16
**type** 29:21
53:16 66:11
148:23
155:12
161:17
**types** 29:5
53:25 54:5
98:19
**typical** 27:15
49:10
**typically** 38:8
53:21 54:2

_____
**U**

**U** 5:2
**ultimate**
65:18
**ultimately**
99:17 147:2
149:12
160:23
161:10,19
**UMB** 1:9,16
**Um-hmm**
98:7
**undergrad**
7:21
**understand**
6:12,21,25
7:12 12:20
20:19 21:14
21:20 53:20
65:19 67:18
94:9 123:22
123:23
127:9
137:13

153:3 164:5
167:6
168:19
**understand...**
26:22 47:23
56:3 64:2
65:24 69:25
71:9 76:14
77:21 80:5
80:21 86:20
86:23 88:25
93:5 95:8
95:13,21
97:15
101:24
103:9,17
104:3,10,13
107:2,17
108:4
112:11
121:7
122:14
124:10,19
138:6
159:17
161:21
165:25
166:12
167:17
168:2,22
169:11,16
169:21
171:21
172:16
178:13
**understood**
27:4 66:2
68:13
**unfortunat...**
93:13
**UNITED** 1:1
**University**
7:22
**unredacted**
83:24 84:9
**unrelated**
177:4,5,9
**unrestricted**

160:16
**unsecured**
1:12 21:11
22:23 23:6
23:13 88:24
92:12,15,22
94:5,6,8
107:22
123:21
124:9 146:4
152:13
154:20
169:15
**unusual**
27:19
**unwieldy**
43:14
**use** 19:23
20:2 48:14
48:15 69:24
**useful** 176:18
**Uzzi** 15:6
111:5,10
**U.S** 50:6,15
182:19

_____
**V**

**v** 1:8,15
**valuable**
141:22
144:22,23
**value** 22:11
27:25 32:13
35:17,20
36:18,20,25
36:25 68:25
69:4,6,14
69:22 70:2
70:2 79:2,7
79:8,11,13
79:16,24
80:22 81:18
86:11,21
87:3,6,12
88:4 91:12
91:15,19,25
103:21
109:6 115:9

118:5,9,19
118:23
119:22
138:13,14
138:17,18
141:4,14,19
142:14,18
143:11
145:12,15
145:16,25
146:6
**values** 70:6
138:5
**variety** 9:4
172:23
173:14
**various** 15:14
21:9 27:8
27:17 86:5
86:23 96:6
151:25
**vast** 32:5
**verified**
23:20
182:11
**verify** 49:12
118:15
**version** 83:24
**versus** 87:12
**vet** 152:21
**view** 96:9
139:14,15
139:16,17
139:18
143:10,15
144:16,19
145:12
175:8
**viewed** 65:16
67:7
**vis** 68:24,24
129:16,16
166:2,2
**Vitro** 99:3,24
101:15
**voluntarily**
159:6
**vote** 153:23

154:4 155:5
155:8 156:6
156:19,23
157:20,21
157:23

_____
**W**

**waive** 81:3
104:5
**waived** 5:9
**waiving** 68:7
68:14
**walk** 125:3
**walking**
176:23
**Walsh** 3:8
6:7 11:16
12:15 21:5
23:19 33:9
34:24 36:5
39:7 42:24
50:3 51:14
52:16 57:23
60:15 74:20
74:25 80:7
81:11 82:22
83:12,16
84:14 93:3
95:6 97:20
100:18,25
117:11
119:11
126:2 127:7
131:6
139:24
143:25
157:12
162:22
163:9,15
182:4
**Walsh's**
164:4
**want** 36:6
46:14 49:3
57:19 58:12
58:15 59:6
74:12 100:3
100:16

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 210 of 211

210

101:12,12
114:6
139:11
159:25
162:23,25
164:8
166:11
167:13
174:2 178:7
**wanted** 84:7
124:23
147:12
153:21
158:15
**warranty**
128:25
**Washington**
4:7
**wasn't** 18:5
48:2 57:20
69:7 112:19
160:19
173:17
**waterfall**
85:4 88:3
88:12,20
89:7,8
93:10
106:10,18
**way** 53:4
60:8 86:19
106:2
121:23
124:6
150:19
167:7
181:16
**website** 59:3
**Wednesday**
17:8
**week** 36:21
58:14
**weeks** 131:18
156:17
**welcome**
110:16
**Wells** 3:15
50:7,15

162:24
163:24
170:16
179:6,13
182:20
**went** 7:21
29:2
**weren't** 66:15
89:15,25
90:10
139:12
**we'll** 167:10
**we've** 138:11
**WHEREOF**
181:18
**White** 23:21
38:14,16,22
39:17,20,25
42:13 46:18
46:23 47:5
47:12,17
110:2,4,24
111:5,14,15
111:17
116:18,20
117:7 123:9
123:11
182:12
**wide** 173:22
**willing** 53:23
63:22
158:22
160:8,14,20
161:11
162:6
174:25
**willingness**
162:7,17
**wise** 9:25
**wish** 185:5
**within-enti...**
181:10
**witness** 6:3
12:8,22
15:23 58:16
81:22
104:24
108:9 120:4

120:12
121:13
133:11
167:21
170:21
174:4,5,23
176:15
177:16
178:19
180:6
181:18
182:3 184:2
185:23
**word** 8:16
92:25
**work** 7:25
20:18 28:21
38:8 80:8
81:4,24
82:2 92:10
120:6
136:18
150:20
**worked** 13:8
18:24 28:20
133:21,24
134:6,13,14
134:16
135:3
**working**
132:4
**world** 91:5
**worth** 87:12
144:17,18
148:10,15
148:24
149:7
150:12
**wouldn't**
24:20 46:7
97:17 100:3
100:4
138:13
155:23
172:13
**write** 144:10
145:9,24
147:14,18

**writes** 103:3
106:6,13
110:15
137:11
138:3
140:22,25
**writing**
123:15
**written** 42:3
42:20 110:8
110:10,12
**wrong** 171:5
**wrote** 147:4

———
**X**
x 1:3,5,12,19
148:24
182:2

———
**Y**
**yeah** 7:21 8:9
9:24 13:3
15:6 16:2
16:15 18:8
18:13 29:20
31:15 32:21
34:13 46:22
47:16 54:10
56:12,19
71:5,8,18
73:3 77:3,3
78:2 79:25
85:17,23
86:25 88:22
90:15 91:3
94:22 99:24
104:25
108:14
111:12
114:6 116:7
122:16
125:25
130:23
132:2
137:21
139:10,22
146:21
147:21

148:19
149:15
150:6,17
168:14
**year** 161:6
**years** 98:21
98:25 99:6
**yesterday**
14:21
**York** 1:2,21
1:21 2:12
2:12,16 3:7
3:7,18
41:24 140:4
180:2,4
181:2,4,8
**Yosilov** 19:9
30:12

———
**$**
**$0.30** 116:10
**$0.60** 115:24
**$0.65** 22:16
**$1.4** 92:21
**$100** 79:15
**$104** 79:17
**$500** 70:16
70:21
**$600** 93:15
**$750** 66:3,5
67:9
**$8** 94:14
139:2

———
**1**
**1** 1:20 2:4
11:19 33:21
182:9
**1st** 161:4
**1.4** 94:4
**1:01** 127:3
**10** 22:11
74:22 77:19
81:12
172:19
173:2,10
182:22
**10th** 144:3,7

183:18
**10-Ks** 25:18
53:14
**10-Qs** 25:18
53:14
**100** 79:13,16
148:15
**10022** 3:18
**101** 2:12 3:6
**10178** 3:7
**104** 79:14
**105** 64:20
85:5,5
90:12,17,22
91:9,9
**1086** 152:4
**11** 1:4 24:6
24:25 40:8
80:15 82:24
83:5 102:21
182:9,10,23
**11th** 61:20,22
62:5 130:13
131:8 132:8
132:12
183:8
**1100** 4:6
**112** 148:16
183:4
**115** 24:14
32:12
**117** 183:6
**12** 40:10,11
82:13,14
97:21
166:21
182:25
**12-12020** 1:3
**13** 112:22
166:21
183:4
**13th** 61:20,23
**13-01277**
1:15
**13-01343** 1:8
**130** 183:7
**131** 183:11
**137** 183:13

12-12020-mg    Doc 5803-3    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Conor Bastable    Pg 211 of 211

211

| | | | | | |
|---|---|---|---|---|---|
| **139** 183:15 | 140:8 | 88:4 89:16 | 86:22 | **44** 178:8,12 | **82** 182:23 |
| **14** 61:12 | 182:10 | 89:20 90:14 | | **45** 12:14 | |
| 71:10 | **2.1** 115:17 | 90:16 91:8 | **3** | **488** 33:14 | **9** |
| 102:10 | **2:20** 179:23 | 96:14 98:6 | **3** 23:19,20,24 | | **9** 21:14 33:22 |
| 117:11,12 | **20** 22:11 | 102:10 | 33:21,23 | **5** | 33:23 60:20 |
| 129:22 | 148:10 | 103:7 104:7 | 84:23,24,24 | **5** 34:25 35:2 | 60:24 61:4 |
| 183:6 | 149:24 | 111:11 | 92:12 95:4 | 35:11 77:11 | 93:21 |
| **14th** 61:16 | 150:4 | 113:3 | 107:6 | 182:14 | 182:21 |
| 62:9 71:17 | 183:20 | 117:16 | 166:21 | **5th** 117:16,20 | **9.0** 92:19 |
| 85:14 | **200** 78:11 | 140:8 | 175:11 | 125:12,17 | **9.625** 1:9 |
| 102:23 | **20006** 4:7 | 141:16 | 182:11 | 125:22 | **9:42** 1:21 2:5 |
| **144** 183:17 | **2002** 7:24 8:9 | 150:19 | **3rd** 113:3 | 137:4,7,8 | **950** 78:9 |
| **149** 183:20 | 8:10 | 175:20,22 | **30** 115:12,17 | 183:14 | **97** 182:25 |
| **15** 130:12 | **2005** 8:10,11 | **2013** 1:20 2:4 | 115:18 | **5/8ths** 21:14 | |
| 131:7,19 | **2007** 8:9,12 | 31:3 35:2,5 | 116:5,13 | **50** 148:11 | |
| 172:19 | **2008** 1:18 | 35:9,9 36:4 | 184:17 | 149:7 | |
| 183:7 | 8:13 | 36:9,23 | **30(b)(6)** 12:4 | 182:18 | |
| **157** 35:12 | **2009** 20:8 | 37:6 73:12 | 17:3 35:25 | **500** 115:3,7 | |
| 36:10 | 105:12 | 73:18,20 | 58:14 166:7 | **510** 121:11 | |
| **16** 131:3,10 | 175:20,23 | 180:20 | 170:20 | 121:25 | |
| 131:12 | **2011** 21:25 | 181:20 | 174:15 | **510B** 124:12 | |
| 166:22 | 22:4,13 | 182:14,15 | 177:4 | **599** 3:17 | |
| 183:11 | 37:16 59:19 | **2019** 23:15 | 178:18 | | |
| **163** 182:5 | 59:20 | 32:11 33:10 | **31** 86:15 | **6** | |
| **169** 75:2 | **2012** 14:3 | 33:14,18 | 87:21 88:4 | **6** 1:18 34:25 | |
| **17** 35:5,9 | 22:12,13 | 34:3 35:2,6 | 89:16 90:14 | 35:5,10,15 | |
| 39:13 137:2 | 23:4 24:7 | 35:16 37:10 | 90:16 91:8 | 36:15 182:4 | |
| 182:15 | 25:2 31:2,5 | 73:10 | 104:6 148:2 | 182:15 | |
| 183:13 | 31:7,7 | 182:13,14 | **32297** 1:23 | **60** 182:21 | |
| **17th** 36:15 | 33:19 36:4 | 182:15 | **33** 182:13 | **600** 92:18 | |
| **177** 183:21 | 37:14,16,20 | **2019s** 34:17 | **34** 12:18 | **64** 118:8 | |
| **18** 41:3 | 38:24 39:14 | 34:21 35:8 | 166:23 | 119:4 | |
| 139:24,25 | 40:5 42:25 | **21** 12:18 | **35** 12:19 | | |
| 183:15 | 43:6,25 | 177:19 | 166:23 | **7** | |
| **1850** 4:6 | 45:10,23,25 | 183:21 | 182:14,15 | **7** 34:14 35:2 | |
| **19** 88:18 | 46:16 47:25 | **22** 12:18 | **355** 39:4 | 35:9 39:8 | |
| 143:25 | 49:8,25 | 80:16,17 | **357** 82:23 | 182:14,16 | |
| 144:2 173:4 | 52:19 55:8 | **22nd** 3:17 | **39** 182:16 | **7.1** 129:22 | |
| 183:17 | 55:23 58:3 | **23** 12:18 | | **72** 118:8 | |
| **191** 35:17 | 59:15 61:12 | 182:11 | **4** | 119:5 | |
| 36:17,24,25 | 64:9,24 | **233** 112:23 | **4** 33:10 35:10 | **74** 182:22 | |
| **1995** 7:22 | 67:14,17 | 113:2 183:5 | 35:15 36:17 | **750** 78:10 | |
| | 68:10,11 | **24** 150:18 | 166:21 | **785** 173:4 | |
| **2** | 71:10 72:16 | 173:4 | 175:16 | | |
| **2** 11:22 12:16 | 73:12,17,19 | **25** 40:8 41:3 | 182:13 | **8** | |
| 16:8 36:9 | 75:9,10 | **26** 79:20,23 | **4th** 181:19 | **8** 50:5 166:21 | |
| 84:23 85:2 | 86:11,14,15 | 97:25 98:6 | **400** 88:15 | 182:18 | |
| 95:4 115:16 | 86:22 87:21 | **29** 86:11,13 | **43** 178:8,12 | **81** 88:17 | |
| | | | | **81/19** 89:6 | |