123

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------x
In re:                                Case No. 12-12020 (MG)
RESIDENTIAL CAPITAL, LLC, et al.,     Chapter 11
                                      Jointly Administered
                Debtors.
------------------------------------x
RESIDENTIAL CAPITAL, LLC, et al.,

                Plaintiffs,           Adv. Case No.

                v.                    13-01343 (MG)

UMB BANK, N.A., IN ITS CAPACITY AS
INDENTURE TRUSTEE FOR THE 9.625%
JUNIOR SECURED GUARANTEED
NOTES, et al.,

                Defendants.
------------------------------------x
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, on behalf of the estate
of the Debtors,

                Plaintiff,            Adv. Case No.

                v.                    13-01277 (MG)

UMB BANK, N.A., AS SUCCESSOR
INDENTURE TRUSTEE UNDER THAT
CERTAIN INDENTURE, dated as of
June 6, 2008, et al.,

                Defendants.
------------------------------------x
```

VOLUME II
CONTINUED DEPOSITION OF REID SNELLENBARGER
November 8, 2013

Reported by:
ERICA L. RUGGIERI, RPR, CSR, CLR
JOB NO: 32435

Yellow Highlighting = JSN Designation
Pink Highlighting = Plaintiff's Designation
Orange Highlighting = Joint Designation Light
Blue = Wells Fargo Designation
Dark Blue = Wells Fargo Designation overlaps
with Plaintiff's Designation

124

1

2

3

4                                November 8, 2013

5                                  9:46 a.m.

6

7

8          Continued deposition of REID

9      SNELLENBARGER, held at the offices of

10     Curtis, Mallet-Prevost, Colt & Mosle, LLP,

11     101 Park Avenue, New York, New York,

12     pursuant to Notice, before Erica Lynn

13     Ruggieri, RPR, CSR, CLR and Notary Public

14     within and for the State of New York.

15

16

17

18

19

20

21

22

23

24

25

125

1

2    A P P E A R A N C E S:

3    Conflicts Counsel for the Debtors:

4    CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

5        101 Park Avenue

6        New York, New York 10178

7        BY:   JONATHAN J. WALSH, ESQ.

8              jwalsh@curtis.com

9              JULIA B. MOSSE, ESQ.

10             jmosse@curtis.com

11             JACQUES SEMMELMAN, ESQ.

12             jsemmelman@curtis.com

13

14   Counsel for the Wells Fargo Bank, N.A.:

15   REED SMITH, LLP

16       599 Lexington Avenue, 22nd Floor

17       New York, NY 10022

18       BY:   DAVID A. KOCHMAN, ESQ.

19             dkochman@reedsmith.com

20             MARK D. SILVERSCHOTZ, ESQ.

21             msilverschotz@reedsmith.com

22

23

24

25

126

1

2      A P P E A R A N C E S: (Cont'd)

3      Counsel for Houlihan Lokey:

4      MILBANK, TWEED, HADLEY & MCCLOY, LLP

5           1850 K Street, NW, Suite 1100

6           Washington, DC 20006

7           BY:    AARON L. RENENGER, ESQ.

8                  arenenger@milbank.com

9                  ERIN CULBERTSON, ESQ.

10                 eculbertson@milbank.com

11

12     Counsel for Bank of New York and

13     Bank of New York Mellon Trust Co, NA:

14     DECHERT, LLP

15          1095 Avenue of the Americas

16          New York, New York 10036

17          BY:    NEGISA BALLUKU, ESQ.

18                 Negisa.balluku@dechert.com

19

20     Counsel for MBIA:

21     CADWALADER WICKERSHAM & TAFT, LLP

22          One World Financial Center

23          New York, New York 10281

24          BY:    MICHELE C. MAMAN, ESQ.

25                 Michele.maman@cwt.com

127

1

2                    S T I P U L A T I O N S

3

4            IT IS HEREBY STIPULATED AND

5       AGREED, by and between counsel for the

6       respective parties hereto, that the

7       filing, sealing and certification of

8       the within deposition shall be and the

9       same are hereby waived;

10           IT IS FURTHER STIPULATED AND

11      AGREED that all objections, except as

12      to the form of the question, shall be

13      reserved to the time of the trial;

14           IT IS FURTHER STIPULATED AND

15      AGREED that the within deposition may

16      be signed before any Notary Public

17      with the same force and effect as if

18      signed and sworn to before the Court.

19

20

21

22

23

24

25

128

1          SNELLENBARGER

2          R E I D   S N E L L E N B A R G E R,

3          called as a witness, having been

4          previously duly sworn by a Notary

5          Public, was examined and testified as

6          follows:

7               (AHG Exhibit 8, Notice of

8          Deposition, marked for identification,

9          as of this date.)

10    EXAMINATION BY

11    MR. WALSH:

12          Q.    Good morning, Mr. Snellenbarger.

13    I'm John Walsh.  I'll be taking your

14    deposition today.  I have discussed with

15    your counsel certain limitations on your

16    testimony today.  I have marked, as AHG

17    Exhibit 8, the Notice of Deposition and I

18    just quickly want to review for the record

19    the limitations that your counsel and I

20    have agreed upon.

21               With respect to topic 1.

22    Mr. Snellenbarger will "identify the

23    intercompany balances on which the ad hoc

24    group claims the noteholders possess a

25    lien based upon a review of the debtors'

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 7 of 329

129

1                  SNELLENBARGER

2      schedules and other relevant documents."

3                  With respect to topics 2 and 4

4      through 11.  "The debtors are not seeking

5      expert testimony from Mr. Snellenbarger

6      about the value of the intercompany

7      balances and are only seeking testimony as

8      to how, if at all, the ad hoc group valued

9      the intercompany balances prior to the

10     termination of the prepetition PSA

11     (September 25th, 2012)."

12                 There will be no limitations on

13     topics 3, 24 to 28 and 30 to 32.

14                 With respect to topics 12, 16,

15     17, 20, 29, 33 and 38 Mr. Snellenbarger's

16     testimony will be limited to "Houlihan's

17     communications with the debtors and any

18     significant meetings between the debtors

19     or their representatives and the ad hoc

20     group or its representatives."

21                 With respect to topics 13

22     through 15 and 18 and 19, we are not

23     seeking, "the debtors are not seeking

24     expert testimony from Mr. Snellenbarger

25     and are seeking testimony as to the fact

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 8 of 329

130

1          SNELLENBARGER

2     of what, if any, analysis was done by the

3     ad hoc group with respect to each topic."

4            Topics 36 and 41 through 44 with

5     the understanding that Mr. Snellenbarger

6     "will testify about the expected

7     recoveries by reference to the plain

8     language of the plan and will testify as

9     to the fact of whether or not the ad hoc

10    group conducted an analysis of its

11    expected recoveries under the plan."

12           With respect to topic 37,

13    Mr. Snellenbarger will testify about "the

14    business reasons for objecting to the

15    plan."

16           With respect to topic 39, "with

17    the understanding that the ad hoc group

18    has not objected to the amount of the Ally

19    contribution and that Mr. Snellenbarger

20    will testify to that effect."

21           With respect to topic 40 "with

22    the clarification that this topic seeks

23    testimony about the ad hoc group's

24    objection to the releases provided to Ally

25    under the plan in exchange for the Ally

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 9 of 329

131

1              SNELLENBARGER

2      contribution."

3              And finally, with respect to

4      topic 45, "with the clarification that we

5      are seeking testimony from Mr.

6      Snellenbarger about nonprivileged

7      communications between Aurelius and the ad

8      hoc group or its representatives,

9      concerning the debtors that predate

10     Aurelius's joining the ad hoc group."

11             MR. RENENGER:  And if I could

12         just clarify a few things for the

13         record.  Number one, the deposition

14         notice that was recirculated two days

15         ago also included topics 21 to 23, 34

16         and 35, which Mr. Snellenbarger is not

17         testifying about.  In fact, those have

18         already been covered by Mr. Bastable

19         last week.

20             Further, with respect to topics

21         18 to 19, the testimony would be

22         limited to phase two issues with

23         respect to those topics and not phase

24         one issues with respect to those

25         topics.  And generally speaking, for

132

                    SNELLENBARGER

1

2          all topics, Mr. Snellenbarger is here

3          as a fact witness, neither an expert

4          witness nor a witness who is in a

5          position to speak to legal issues.  So

6          on topic 40, for example, we would

7          further limit that topic or request

8          limitation of that topic to purely

9          fact issues and not legal issues and

10         we will make that objection when and

11         if the questions are asked that would

12         go beyond what we believe are the fact

13         issues.

14              And then finally, on topic 45,

15         the further clarification that I

16         believe we have agreed to Mr. Walsh is

17         that that would be limited to

18         communications between Houlihan and

19         Aurelius or significant meetings

20         involving ad hoc group professionals

21         and Aurelius prior to Aurelius

22         becoming a member of the ad hoc group.

23         Q.    Did you follow all that?

24         A.    Got it.

25         Q.    Mr. Snellenbarger, you

133

1          SNELLENBARGER

2    understand that you are still under oath?

3        A.    I do.

4        Q.    What did you do to prepare for

5    today's deposition?

6        A.    I met with Milbank and with one

7    of my Houlihan colleagues to discuss the

8    topics here.

9        Q.    Who is that?

10       A.    Who is my colleague?  Jeffrey

11   Lewis.

12       Q.    Who from Milbank did you meet

13   with?

14       A.    Aaron and Jerry Uzzi.

15       Q.    And when was that?

16       A.    Yesterday.

17       Q.    For how long?

18       A.    4 or 5 hours.

19       Q.    Was anyone else present, either

20   personally or telephonically?

21       A.    One of my other colleagues

22   briefly, Ben Ilhardt, in person.

23       Q.    Anyone else?

24       A.    No.

25       Q.    Did you have any other meetings

134

1          SNELLENBARGER

2     with counsel to prepare for today's

3     deposition?

4          A.    No.

5          Q.    Any other phone calls with

6     counsel?

7          A.    No.

8          Q.    When did you first learn that

9     you would be the witness for this

10    deposition?

11         A.    Couple weeks ago maybe.

12         Q.    How did you learn?

13         A.    I'm sorry?

14         Q.    How did you learn of that fact?

15         A.    Via e-mail from Aaron.

16         Q.    And did you review any documents

17    at that time or up through today to

18    prepare to testify today?

19         A.    Yes.

20         Q.    What documents?

21         A.    Just a few, like the plan

22    objection, disclosure statement, variety

23    of e-mails.

24         Q.    What e-mails?

25         A.    Certain e-mails related to

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 13 of 329

135

1              SNELLENBARGER

2      correspondence between myself and the ad

3      hoc group or Houlihan and the ad hoc

4      group.

5          Q.    Do you know if those e-mails

6      were provided to counsel for production to

7      the parties in this case?

8          A.    I believe they were, yes.

9          Q.    How far back did the e-mails go

10     back in time?

11         A.    I believe back through, I'm not

12     sure -- we adhered to the protocol as

13     agreed to.  I believe it was back through

14     even prepetition, the spring of 2012, I

15     believe.

16         Q.    Do you know if it went back to

17     2011?

18         A.    I don't recall.  It may have.  I

19     mean, I do know that whatever protocol was

20     agreed to, we adhered to that so.

21         Q.    Do you know who at Houlihan

22     assisted counsel in the collection of

23     documents?

24         A.    Under my direction Jeffrey Lewis

25     with Houlihan's internal counsel.

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 14 of 329

136

SNELLENBARGER

1

2      Q.    Did you have any discussions

3  outside of the presence of counsel with

4  anyone to prepare for today's deposition?

5      A.    No.

6      Q.    Did you have any meetings with

7  other counsel besides Milbank to prepare

8  for today's deposition?

9      A.    No.

10     Q.    Do you know if you are going to

11 be a witness at the trial or plan

12 confirmation in phase two?

13     A.    I'm not aware of that.

14     Q.    Do you know if anyone from

15 Houlihan is going to be a witness at that

16 trial?

17     A.    I believe we have an expert

18 there, Michael Fazio.

19     Q.    Anyone else?

20     A.    I don't believe so.

21     Q.    When did you first start working

22 at Houlihan?

23     A.    Spring of 2005.

24     Q.    And do you have a particular

25 expertise in your practice?

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 15 of 329

137

1                 SNELLENBARGER

2         A.    I'm a managing director in the

3    financial restructuring group.  I have

4    been doing, involved in advising companies

5    and creditors in restructuring stress

6    situations for close to 16 years.

7         Q.    Is there a particular industry

8    that you provide expertise in?

9         A.    We are fairly industry agnostic.

10   I tended to do a variety of different

11   industries, real estate is one of them

12   that I focus on.  But I have done a

13   variety of different industries.

14        Q.    How much experience do you have

15   anyone the real estate industry?

16        A.    A fair -- decent amount.  I have

17   done several distressed and healthy deals

18   in the real estate space over my career.

19        Q.    Have you worked for companies

20   that do securitizations of real estate

21   investments?

22        A.    Before ResCap not that I recall.

23        Q.    Had you done any work for ResCap

24   prior to this case?

25        A.    ResCap specifically, no.

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 16 of 329

138

1          SNELLENBARGER

2      Q.    Had you done work for Ally?

3            MR. RENENGER:   Object to the

4      form of the question.

5      A.    Yes.

6      Q.    When?

7      A.    Several years ago.  We helped

8  them examine, they had a time share

9  portfolio they wanted us to examine

10  alternatives for, which we helped with.

11      Q.    Do you know if that work in any

12  way informed the work that you've done in

13  this case?

14      A.    No, it did not.

15      Q.    Do you know if anyone from

16  Houlihan, besides yourself, has done work

17  for either Ally or ResCap?

18      A.    Yes.

19      Q.    Do you know who that is?

20      A.    Matt Niemann, Andrew Turnbull.

21      Q.    What work did they do?

22      A.    Well, I guess let me back up.

23  Matt Niemann actually worked for ResCap

24  several years ago as an employee after he

25  left Houlihan.  And then the Houlihan

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 17 of 329

139

1                    SNELLENBARGER

2    engagement, Andrew Turnbull was my partner

3    on the engagement.

4          Q.      Where is Mr. Niemann working

5    now?

6          A.      At Houlihan.

7          Q.      So he was at Houlihan, went to

8    ResCap and then back to Houlihan?

9          A.      Well, he actually left Houlihan

10   to work for Cerberus.  Cerberus is an

11   investor/owner of ResCap.  So he was, in

12   his capacity as a service employee worked

13   at ResCap, as I understand.

14         Q.      For how long?

15         A.      I believe a couple years.

16         Q.      And do you recall which years?

17         A.      Maybe '06 to '08.  2006 to 2008.

18         Q.      Do you recall when your

19   involvement in this engagement generally

20   first began?

21         A.      Yes.

22         Q.      When was that?

23         A.      The engagement -- we had been

24   tracking ResCap as a name, as a potential

25   client for some time.  We actually

140

1                    SNELLENBARGER

2    interviewed for the position of advisor to

3    the company in late 2011.  We were not

4    selected as the company's investment

5    banker and so we began discussions, on a

6    public basis, with noteholders that were

7    invested in the junior secured bonds.

8         Q.    Did you meet with management at

9    ResCap to pitch work?

10        A.    We did.

11        Q.    Do you recall who you met with?

12        A.    Tom Marano, and I just don't

13   recall the other -- there were other

14   senior management people there, I just

15   don't recall who else was there.

16        Q.    You said late 2011.  Do you

17   recall which month?

18        A.    I think it was November.

19        Q.    Where did you meet?

20        A.    At ResCap's offices here in New

21   York.

22        Q.    Do you recall how long you met

23   with them?

24        A.    An hour or two.

25        Q.    Did you put together a pitch

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 19 of 329

141

1                SNELLENBARGER

2      book for that meeting?

3          A.    We did.

4          Q.    And what information was in the

5      pitch book?

6          A.    Just public information.  ResCap

7      had filed publicly financial statements

8      and there was articles out on ResCap, et

9      cetera.  So we had just assembled an

10     analysis -- or I wouldn't say analysis,

11     just a presentation based on the public

12     information.

13         Q.    How long prior to that meeting

14     had you been tracking ResCap as a

15     potential client?

16         A.    I would say 3 or 4 months.

17         Q.    What led you to begin tracking

18     ResCap as a potential client?

19         A.    There was various reports of

20     ResCap's financial distress, some of their

21     bonds were trading very low.  And we, just

22     on a public basis, knew that they had

23     significant maturities coming up that had

24     to be dealt with, and so they might, we

25     thought they might need assistance in

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 20 of 329

142

1                SNELLENBARGER

2    dealing with those issues.

3         Q.    What public information did you

4    review in connection with the pitch that

5    you gave?

6         A.    There was I think SEC filed

7    public financials that were available that

8    we reviewed.

9         Q.    Were there analyst reports that

10   you reviewed?

11        A.    Yeah, I believe so.  There were

12   analyst reports and also articles and

13   things like that that were publicly

14   available.

15        Q.    Did Mr. Niemann participate in

16   the pitch?

17        A.    He did.

18        Q.    Mr. Niemann was generally

19   familiar with ResCap as a company,

20   correct?

21            MR. RENENGER:  Object to the

22        form of the question.

23        Q.    To your knowledge?

24        A.    To my knowledge, yes.  I mean,

25   it had been a few years since he had

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 21 of 329

143

SNELLENBARGER

1

2    worked there so things may have changed

3    but, yes, he was generally aware.

4         Q.    Do you know if he knew

5    Mr. Marano before that meeting?

6         A.    I believe he did.

7         Q.    Was Mr. Niemann the connection

8    that led to that meeting?

9         A.    I don't know if I would say

10   that.  I mean, we had several, I think,

11   relationships from a firm perspective with

12   ResCap and I think everyone employed those

13   relationships to see if we could get a

14   meeting.

15        Q.    And do you know who ultimately

16   ResCap hired as their investment advisors?

17        A.    Yes.

18        Q.    Who was that?

19        A.    Centerview Partners.

20        Q.    Did you have any other meetings,

21   besides that November 2011 meeting, with

22   respect to pitching ResCap for work?

23        A.    No.

24        Q.    When was the first time that

25   you -- well, you are engaged here in

144



SNELLENBARGER

2    connection with the ad hoc group, correct?

3        A.    Correct.   And the trustee

4    currently.

5        Q.    And the trustee.   When did that

6    first begin, when did you first start

7    working for the trustee?

8        A.    With the trustee?

9        Q.    Yes.

10       A.    This was probably last summer,

11   summer 2013, I believe.

12       Q.    Is there an engagement letter

13   between Houlihan and the trustee?

14       A.    Yes.

15       Q.    Is that something that you

16   provided to counsel that's produce in this

17   case?

18       A.    I believe so and during the

19   phase one process.

20       Q.    We have seen an engagement

21   letter from February 2012 between Houlihan

22   and the ad hoc group.   How did that

23   engagement arise?

24       A.    As indicated previously, after

25   we were not selected to be the company's

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 23 of 329

145

1          SNELLENBARGER

2    investment banker, we reached out to a

3    variety of holders that were invested in

4    the junior secured notes, began discussion

5    with them.  They formed their own kind of

6    ad hoc group and then called and said they

7    would like to retain us as their financial

8    advisor.  And so we began that process and

9    ultimately signed up or agreed to an

10   engagement letter with them.

11        Q.     When did that process start?

12        A.     Discussions started in December

13   and then ultimately we, I think we signed

14   a letter in February.

15        Q.     And did you meet in person with

16   members of the ad hoc group at that time?

17        A.     We had a lot of telephone calls.

18   I think we met individually, you know, in

19   person on kind of an ad, for lack of a

20   better term, an ad hoc basis.

21        Q.     Which members did you meet

22   personally at that time?

23             MR. RENENGER:  Object to the

24        form of the question.  With respect to

25        when in time you mean?

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 24 of 329

146

1                    SNELLENBARGER

2                    MR. WALSH:  Well, this is all in

3        late 2011.

4        Q.    Is that correct?

5        A.    Or early 2012.

6        Q.    Fixing that as the time period,

7    when and who did you meet with?

8        A.    I believe we met with Davidson

9    Kempner, Pentwater Capital I believe in

10   person.  Others I think we had telephone

11   calls with.

12       Q.    Pentwater is in Chicago?

13       A.    Correct.

14       Q.    You met with them?

15       A.    Yes.

16       Q.    Had you worked with Pentwater

17   before?

18       A.    No.

19       Q.    Had you worked with Davidson

20   Kempner before?

21       A.    Yes.

22       Q.    In what matters?

23       A.    I'm trying to think.  They were

24   involved in St. Vincent Catholic Medical

25   Centers years back on our committee or

147

1                    SNELLENBARGER

2        investor.  I think they are involved in

3        general growth properties, if I recall.

4            Q.    Any other holders of the JSNs

5        that you met with in 2011, early 2012?

6            A.    In person, no, not that I

7        remember.

8            Q.    Same question but

9        telephonically?

10           A.    Yeah.  We spoke to Appaloosa.

11       We spoke to, I believe, Marathon, Silver

12       Point.

13           Q.    When you met with the various

14       holders of the JSNs, did you provide a

15       pitch book to them?

16           A.    We did.

17                 MR. WALSH:  This will be AHG 9.

18                 (AHG Exhibit 9, e-mail, marked

19       for identification, as of this date.)

20           Q.    Mr. Snellenbarger, you have

21       Exhibit 9 in front of you.  Do you

22       recognize this e-mail from May 2012?

23           A.    I see it.  It's been a long

24       time, but I generally understand the

25       reason for the e-mail.

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 26 of 329

148



SNELLENBARGER

1

2    Q.    Ben Ilhardt is the Houlihan

3    colleague that you mentioned earlier,

4    correct?

5    A.    Correct.

6    Q.    He sent this on May 11, 2012, to

7    Alan Leavitt at Beach Point?

8    A.    Yes.

9    Q.    Do you know who that is?

10    A.    I believe he's an investment

11    advisor at a hedge fund.

12    Q.    Beach Point is a hedge fund?

13    A.    I believe so, yes.

14    Q.    Were they a holder -- we have

15    even using the word "JSN," junior secured

16    notes.  You understand what I mean by

17    that, correct?

18    A.    Yes.

19    Q.    Was he a holder of JSNs?

20    A.    I don't remember whether he was

21    a current investor or whether he was

22    looking to invest.

23    Q.    You see that you are copied on

24    this e-mail?

25    A.    Yes.

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 27 of 329

149

1        SNELLENBARGER

2        Q.      And the title of the e-mail is

3    ResCap Public Book.  Do you know what that

4    refers to?

5        A.      Yeah.  We had put together some

6    discussion materials based on public

7    information that we could share with

8    investors or potential investors that may

9    be interested in ResCap on a public basis.

10       Q.      And if you see the e-mail, it's

11   three items that Ben has forwarded to

12   Alan.  Set of discussion materials from

13   third quarter 2011, supplemental update

14   for fourth quarter and a draft company org

15   structure.  And your understanding is all

16   of these materials were based on publicly

17   available information?

18       A.      Correct.

19       Q.      Turn to the page ending 561.

20       A.      Okay.  Yes.  I'm here.

21       Q.      Are these the discussion

22   materials for third quarter 2011?

23       A.      I believe so, yes.

24       Q.      Do you know who prepared these?

25       A.      Houlihan did.

150

1                SNELLENBARGER

2        Q.    Do you know who at Houlihan was

3    involved?

4        A.    I was, Jeffrey Lewis, Ben

5    Ilhardt, Matt Niemann.

6        Q.    Do you recall roughly when this

7    was prepared?

8        A.    It was in probably late 2011.

9    It's based on ResCap's publicly financials

10   as of end of third quarter 2011.  So it

11   was sometime late fall.

12       Q.    Did you provide this document to

13   members of the, holders of the JSNs in

14   late 2011, early 2012?

15       A.    I believe we did, yes.

16       Q.    Is this the pitch book for the

17   pitch?

18       A.    I don't recall whether we did

19   anything else or not.  We just kind of

20   showed, summarized, you know, the

21   financials and the situation for the

22   holders.  I don't know if we had any other

23   materials.  We may have sent some -- I

24   guess we had the Houlihan Lokey overview

25   phase II.  This is probably similar to

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 29 of 329

151

1                    SNELLENBARGER

2      what we sent.

3           Q.    Was this the first set of

4      materials that Houlihan prepared on

5      ResCap?

6           A.    I believe so.

7           Q.    If you turn to the page, I'm

8      going to use the page numbers from the

9      presentation, page 5 of the presentation.

10          A.    Okay.

11          Q.    What does this page reflect?

12          A.    It's a brief summary of ResCap

13     the company and a summary of its assets

14     and liabilities.

15          Q.    Do you know if by this time

16     Houlihan had reviewed the security

17     agreement that was underlying the junior

18     secured notes?

19          A.    By this time, what time are you

20     referring to?

21          Q.    By late 2011 when this document

22     was prepared.

23          A.    If it was public, if the

24     security agreement was public.  I just

25     don't recall if it was.  If it was -- I

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 30 of 329

152

1                    SNELLENBARGER

2    think it was -- then I think we would

3    have.

4         Q.    We will look later at some of

5    the analysis of the collateral and if that

6    refreshes your recollection, let us know.

7         A.    Okay.

8         Q.    The last bullet on this page 5

9    refers to "Ultimate value recoveries

10   associated with ResCap's borrowings."

11   What are you referring to there?

12        A.    I think ResCap had a significant

13   number of different debt obligations and

14   we were just highlighting ultimately what

15   recoveries those different debt

16   obligations may be.  It would be dependent

17   on a variety of different issues.

18        Q.    Including how different

19   collateral pools would be allocated to

20   various subsidiaries, correct?

21        A.    Correct.

22        Q.    And what does that mean?

23             MR. RENENGER:  Object to the

24   form of the question.

25        A.    On a public basis, because

JSN Objection:
152:18 – 153:8, FRE 611(a)
(Vague and ambiguous)

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 31 of 329

153

1            SNELLENBARGER

2    that's all we had at the time, we knew

3    that different collateral was at different

4    legal entities and determining who had

5    guarantors there, who had liens there, et

6    cetera, I think we determined the

7    recoveries or the various debt

8    obligations.

9        Q.    And you knew at this time that

10   the junior secured noteholders had liens

11   on certain assets?

12       A.    I believe so.  To what extent I

13   don't think we knew.  But I think we knew

14   that they had liens to some extent.

15       Q.    What was your understanding of

16   what their liens were as of this time,

17   late 2011?

18       A.    Yeah.  In the public financials,

19   there was some liens that were attached to

20   the junior secured notes.  And so we knew

21   that they had some.  That that was based

22   on the public information.

23       Q.    Do you recall which assets were

24   subject to those liens?

25       A.    I just don't remember what the

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 32 of 329

154

1                    SNELLENBARGER

2     public financials had said.  I mean, I

3     know now.  Obviously everything, liens

4     that they had, I just don't remember what

5     was disclosed in the public financials.  I

6     know on a public basis they had certain

7     servicer advances, I believe, and held for

8     sale loans.

9          Q.    The bullet point goes on to

10    reference "the amount and treatment of

11    contingent liabilities beyond what ResCap

12    has currently reserved for."  What is

13    referenced there?

14         A.    Well, I think we are referring

15    to the various potential claims against

16    the estate with respect to RMBS claims

17    and, you know, different holders of those

18    securities asserting claims against the

19    company for the performance of those

20    securities.

21         Q.    And what was your knowledge of

22    those claims based upon as of this time?

23         A.    Just I think there was public --

24    I think ResCap had made some reserve for

25    those liabilities.  And then there was, I

155

1                    SNELLENBARGER

2     think, articles out there discussing

3     whether that was, you know, if there were

4     additional claims that might be asserted,

5     et cetera.

6              MR. RENENGER:  I just want to

7         clarify for the record, there's

8         multiple page 5s in this one Exhibit 9

9         since there's three attachments to the

10        e-mail that are all together so the

11        Bates number for the page we have been

12        discussing is 9566.

13              MR. WALSH:  Thank you.

14    Q.     If you turn to page 9.

15              MR. WALSH:   570 are the Bates

16    numbers.

17    A.     I'm here.

18    Q.     This is entitled, Summary of

19    Historical Borrowing Funding Facilities.

20    Briefly, can you describe what this page

21    reflects?

22        A.    I think this is a brief summary

23    of ResCap's historical borrowing and how

24    it raised debt, consolidated debt, and

25    then we provided a simple schedule down

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 34 of 329

156

1                    SNELLENBARGER

2    below based on public financials of the

3    total of ResCap's debt outstanding over

4    the last four years.

5        Q.    You understood that there was a

6    revolver with Ally, correct?

7        A.    Yes.

8        Q.    And that the junior secured

9    notes -- well, you understood they were

10   senior secured notes and that there were

11   junior secured notes, correct?

12       A.    Correct.

13       Q.    And you had a basic

14   understanding based on public filings of

15   the assets that formed the collateral for

16   each?

17       A.    Based on the public financials.

18       Q.    So if you turn to page 12 of the

19   presentation, Bates number ending 573.

20   This is a summary of pledged assets, and

21   if you look at footnote 2, it reads

22   "Junior secured notes are partially

23   secured by same collateral as parent

24   senior secured credit facility."

25             What does that refer to?

157

1          SNELLENBARGER

2          A.      I believe based on the public

3     financials, it showed that the junior

4     secureds have a second lien on the

5     collateral related to the Ally senior

6     secured facility.

7          Q.      And that, again, was based on

8     public information?

9          A.      Correct.

10         Q.      If you turn to page 16, Bates

11    number ending 577.

12         A.      I'm here.

13         Q.      This page is entitled 9 5/8s

14    Junior Secured Notes, Summary of Select

15    Provisions.   What does this refer to?

16         A.      This answers my question

17    previously.   It's a summary of the junior

18    secured note indenture based on its being

19    publicly filed.

20         Q.      You had read and reviewed -- you

21    had read that document in preparing this

22    document?

23         A.      Correct.

24         Q.      And that document was publicly

25    available as of June 2008 or at least the

158

1                    SNELLENBARGER

2    filing of the 10-Q dated June 30, 2008?

3         A.    I believe so.  That's what the

4    source says on this document.

5         Q.    You see that one of the items

6    laid out here is collateral.  You had read

7    the provisions in the indenture document

8    regarding the collateral for the junior

9    secured noteholders?

10        A.    I believe we had reviewed what

11   was in the indenture.

12        Q.    Including the collateral

13   provisions?

14        A.    Yeah.  As a general matter.  I

15   mean, we weren't obviously lawyers.  We

16   were just trying to get a general sense of

17   what that was.  But, yes.

18        Q.    Is it fair to say this was an

19   important document in analyzing any

20   potential recovery by junior secured

21   noteholders?

22             MR. RENENGER:  Object to the

23        form of the question.

24        A.    Absolutely.  And indenture is

25   very important with respect to what rights

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 37 of 329

159

1              SNELLENBARGER

2    the junior secured notes have with respect

3    to recovery collateral or otherwise.

4        Q.    Did you study the indenture

5    document in preparing this presentation?

6        A.    Well, yes.  I mean, we reviewed

7    it and put a summary together, you know,

8    to the best of our knowledge at the time.

9    I can't say we had full extent of

10   understanding of every detail but we

11   reviewed the best we could.

12       Q.    Do you know if White & Case was

13   involved in any of the ResCap issues as

14   they relate to junior secured noteholders

15   by this time?

16            MR. RENENGER:  Object to the

17       form of the question.

18       A.    By what time?

19       Q.    By late 2011 when this document

20   was prepared.

21       A.    We had become aware by some of

22   the holders that they had begun

23   discussions with White & Case.  And I

24   don't remember if it was late 2011 or

25   early 2012.  And then one of the holders,

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 38 of 329

160

SNELLENBARGER

1   I don't remember, one or two of the

2   holders, I don't remember who, recommended

3   that we sit down with White & Case.

4   Q.   When was that?

5   A.   It was either late 2011 or early

6   2012.

7   Q.   Do you know who was retained

8   first, Houlihan or White & Case?

9   A.   I believe White & Case was.

10   Q.   Were there any other documents

11   besides the indenture that you reviewed in

12   connection with this presentation?

13   A.   Well, as I said before, the

14   ResCap's public financial statements and

15   research reports and various articles.

16   Q.   If you turn to 21 of the

17   presentation.  It's Bates number ending

18   582.  This is an overview of contingent

19   liabilities.  What are the contingent

20   liabilities that are reflected here?

21   A.   I believe it summarizes rep and

22   warranty claims and other securities

23   claims against ResCap from a variety of

24   different security noteholders.

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 39 of 329

161

1          SNELLENBARGER

2          Q.      On the right side there's a

3    column entitled Liability.  What does that

4    column reflect?

5          A.      I believe it provided a high

6    level estimate of range of what those

7    claims could be.

8          Q.      And you see footnote 2, which is

9    hard to read but I will represent that it

10   reads, "Range of approximate and

11   preliminary industry and HL estimates."

12             Do you know what that footnote

13   refers to?

14         A.      I believe there were research

15   reports out there and discussions about --

16   as a general matter, there were -- these

17   types of claims were being asserted

18   against a variety of different financial

19   institutions.  And there were some

20   settlement, public settlements or

21   potential settlements going on on a public

22   basis.  So there were, I think, research

23   analyst reports out there trying to

24   estimate using those templates about what

25   maybe the liability would be here based on

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 40 of 329

162

1          SNELLENBARGER

2    the amount of loans that were originated

3    by ResCap, et cetera.  So these estimates

4    were prepared just based on a very high

5    level based on that kind of data.

6         Q.    These were estimates that

7    Houlihan made?

8              MR. RENENGER:  Object to the

9         form of the question.

10        Q.    Let me rephrase it.  Were these

11   estimates that Houlihan made?

12        A.    I think that we clearly utilized

13   the input that I described and utilized

14   information from various research reports

15   and laid out a range of values on a high

16   level basis.

17        Q.    Am I correct that if, if you

18   look at the left column, there's a group

19   of claims identified as representation and

20   warranty claims and fraudulent

21   underwriting\securities litigation.  Am I

22   correct that the right column, liability,

23   where you see a dotted line around, those

24   are estimates for that set of claims?

25        A.    For the private label and whole

163

1          SNELLENBARGER

2     loan, yes.

3          Q.    I see.  So you separated the

4     agency claims?

5          A.    Correct.

6          Q.    Is it correct that by that time

7     the agency claims had been settled?

8          A.    I think that's why we separated.

9     I think most of them had been settled by

10    that time, correct.

11         Q.    So am I correct that at this

12    time the estimate, preliminary estimate

13    and Houlihan estimate for private label

14    and whole loans claims was 2.5 to

15    3.5 billion?

16         A.    And I think as we noted, it

17    could be up to 5 to 6 billion.

18         Q.    That was the estimate as of this

19    time?

20         A.    Yes.  And again, this was based

21    purely on public financial information.

22    We weren't retained by anybody at the

23    time.  We had limited knowledge it was --

24    it was a -- almost illustrative at best.

25         Q.    If you turn to page 27 of the

164

1                    SNELLENBARGER

2    presentation.   Page ending 588.

3          A.      I'm here.

4          Q.      This is a situation overview.

5    And on the right side Houlihan has

6    identified constraints and challenges.

7    And there's a heading, Contingent

8    Liabilities.

9          A.      Yes.

10         Q.      You see it?

11         A.      I do.

12         Q.      The second bullet,

13   "Reps\warranty obligations could be

14   meaningfully larger than the $829 million

15   reserve currently in place."

16         A.      I see that.

17         Q.      And that was Houlihan's position

18   as of this time period?

19             MR. RENENGER:   Object to the

20         form of the question.

21         Q.      Is that consistent with

22   Houlihan's position as of this time

23   period?

24         A.      I would say so.   I mean, as I

25   said before, you know, based on public

165

1                    SNELLENBARGER

2    kind of settlement comparables and so

3    forth, I think the general consensus in

4    the market, too, was that those claims

5    could be much larger than 800 million.

6         Q.     If you turn to page 30 of the

7    document.

8         A.     I'm here.

9         Q.     Page ending 591, entitled

10   Contingent Liability Management.  And the

11   page reads, second bullet, "Addressing

12   these issues will be crucial to evaluate

13   options to reduce their negative potential

14   impacts on the company, its parent and the

15   ability to carry out a successful

16   long-term transaction."

17              What is your understanding of

18   that sentence?

19        A.     I think we were simply saying

20   that the claims were not quantified.  It

21   could be significant.  And given the

22   company was not in bankruptcy at the time,

23   that it was hindering the company's

24   ability to operate and to raise additional

25   financing given the unknown quantity.

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 44 of 329

166

1            SNELLENBARGER

2        Q.    And then the first full bullet

3    reads, "A deep dive diligence on these

4    liabilities will be necessary to fully

5    understand and communicate the issues and

6    available options to outside parties and

7    government entities whose support will be

8    necessary to move forward."

9            What is referred to there?

10       A.    I think we were merely trying to

11   say that given the limited public

12   information, that you'd have to do a full

13   analysis of what we thought those

14   liabilities may or may not be.   And you

15   had to deal with those parties in order to

16   understand what their concerns and issues

17   were to facilitate some kind of

18   resolution.

19       Q.    Turn to page 33.   It's 594 Bates

20   number.

21       A.    I'm here.

22       Q.    Noteholder Considerations.

23   What's reflected on this page?

24       A.    I think here we were just trying

25   to summarize what we thought were issues

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 45 of 329

167

1                SNELLENBARGER

2    to consider with respect to the junior

3    secured noteholders as they evaluated

4    their position.

5        Q.    The first bullet point, second

6    sentence references the collateral pledged

7    under the Ally facility and a fair value

8    of 1.4 billion.  And it reads, "Implying

9    excess of $602 million available for the

10   $2.1 billion of junior secured notes."

11            What is that referencing?

12       A.    In the public financials, there

13   is, I believe there was a collateral

14   summary.  And it showed, I believe, an

15   Ally revolver column or something to that

16   effect, and showed those assets, how to

17   value at 1.4.  We knew the debt

18   outstanding in the Ally facility was 766.

19   We knew we had a second lien that resulted

20   in 600 million available for us.  As we

21   ultimately know, that there was -- debtors

22   disclosed there was additional collateral

23   available for both of those parties.  But

24   on a public basis, this was the only thing

25   available at the time.

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 46 of 329

168

SNELLENBARGER

1

2      Q.     The next bullet, it reads,

3   "Beyond the secured collateral noteholders

4   will need to fully understand other

5   sources\pockets of value available for

6   secured and unsecured recoveries."

7          What's referenced there?

8      A.     I think we were saying merely

9   that, look, based on the public financials

10  this is the column they are showing, but

11  the junior secured may have other

12  collateral available to them and we need

13  to examine that.

14     Q.     And that was important to the

15  junior secured noteholders?

16     A.     Absolutely.  Or we would assume

17  so, yes, and we would think so.

18     Q.     Houlihan certainly considered it

19  important?

20     A.     Yes.

21     Q.     And Houlihan determined that was

22  something that had to be analyzed in

23  connection with any recovery that the

24  junior secured noteholders would obtain?

25          MR. RENENGER:  Object to the

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 47 of 329

169

```
 1              SNELLENBARGER

 2          form of the question.

 3              Q.    Let me rephrase.   At some point

 4      you were retained by members of the ad hoc

 5      group?

 6              A.    Yes.

 7              Q.    Is it correct that part of the

 8      assignment in connection with that

 9      retainment was analyzing the collateral

10      available to the junior secured

11      noteholders?

12              A.    I believe so.

13              Q.    And in order to perform that

14      task, you would need to fully understand

15      other sources, pockets of value available

16      for secured and unsecured recoveries,

17      correct?

18              A.    Correct.

19              Q.    There's a row entitled

20      Intracompany Agreements.   What's

21      referenced there?

22                  MR. RENENGER:  Where are you?

23                  MR. WALSH:  The second full row

24          is Intracompany Agreements.

25                  MR. RENENGER:   Thanks.
```

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 48 of 329

170

1              SNELLENBARGER

2      A.      We were aware on a public basis

3    that ResCap and Ally had a variety of

4    agreements between the two companies, a

5    parent subsidiary relationship.  And we

6    were just highlighting the issue that

7    those would have to be examined to

8    determine whether they were arm's length,

9    they were there, that no one side was

10   getting a better deal than the other.

11     Q.      And that was something that

12   Houlihan would need to review in order to

13   assist the junior secured noteholders in

14   determining the value of their recoveries?

15            MR. RENENGER:  Object to the

16        form of the question.

17     A.      Yes.  As a general matter, I

18   think we were at this time uncertain what

19   that impact, what that would have on the

20   junior secured recoveries.  But we thought

21   it was an issue that at least needed to be

22   explored.

23     Q.      If you turn to the page 37 of

24   the presentation, page ending 958.

25            This is strategic

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 49 of 329

171

1            SNELLENBARGER

2    considerations, strategic approach.  Is it

3    fair to say this page reflects next steps

4    that Houlihan suggested for the junior

5    secured noteholders?

6        A.    Yes.  I think we -- our view was

7    we were trying to highlight services that

8    we could provide and help assist the

9    junior secured noteholders in their

10   evaluation of their position.

11       Q.    And those services included

12   under high level process overview,

13   financial due diligence, correct?

14       A.    Correct.

15       Q.    And that financial due diligence

16   included evaluating all financial and

17   operational aspects of the company and

18   performing a deep dive analysis of all

19   assets pool servicing and origination

20   platforms and liabilities, correct?

21       A.    That's correct.  I mean, this

22   was our hope and goal that we'd be able to

23   do all this.

24       Q.    And you did, in fact, do all

25   that?

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 50 of 329

172

1              SNELLENBARGER

2        A.      Well, we were --

3                MR. RENENGER:    Object to the

4        form of the question.

5        A.      Ultimately, we got some

6   information.    We were able to do as much

7   as we could based on the information that

8   was provided to us.

9        Q.    We will get into that soon.

10               MR. WALSH:  Let's take a break

11       now.  Five minutes, is that okay?

12               THE WITNESS:  Sure.

13               (Whereupon, there is a recess in

14       the proceedings.)

15               (AHG Exhibit 10, Letter to Mr.

16       Uzzi from ResCap, marked for

17       identification, as of this date.)

18               (AHG Exhibit 11, e-mail chain,

19       marked for identification, as of this

20       date.)

21       Q.    Still looking at Exhibit 9,

22   Mr. Snellenbarger.

23       A.    Okay.

24       Q.    If you flip through, you'll see

25   there's another presentation.  It's the

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 51 of 329

173

1              SNELLENBARGER

2      second page ending 9539.

3          A.    I see it.

4          Q.    And it's entitled, Discussion

5      Materials, Financials Updated For Fourth

6      Quarter '11.  Then it's dated April 2012.

7      Is this an update of a previous

8      presentation?

9          A.    I believe so.

10         Q.    Houlihan prepared a presentation

11     that was entitled Fourth Quarter 2011,

12     correct?

13         A.    Well, I believe we prepared the

14     presentation as of the third quarter,

15     which is the presentation we went through.

16     And then several months later, ResCap

17     produced financials for the fourth quarter

18     so we updated our numbers accordingly.

19         Q.    And that was something that was

20     shown at your first deposition, if you

21     recall?

22         A.    I believe so.

23              (Brief interruption.)

24         Q.    And approximately when was that

25     presentation prepared?

174

1                    SNELLENBARGER

2          A.    The fourth quarter update

3     presentation?

4          Q.    No.  The one that you -- there

5     were two presentations.  We looked at the

6     third quarter and then there was one that

7     was based on fourth quarter information.

8     And then there's a third, I assume, in

9     May, which updates the fourth quarter.

10    I'm asking about the second.

11         A.    I don't know if --

12                MR. RENENGER:  Object to the

13         form of the question.

14         Q.    The one that we are looking at

15    now, Mr. Snellenbarger, that document was

16    prepared in 2012, correct?

17         A.    Correct.

18         Q.    And that document was prepared

19    based on publicly available information?

20         A.    Correct.

21         Q.    At some point the counsel for

22    the noteholders entered a nondisclosure

23    agreement with ResCap?

24         A.    Yes.

25         Q.    I'm showing you what has been

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 53 of 329

175

1                SNELLENBARGER

2    marked as Exhibit 10.  Is this that NDA?

3         A.    I believe so.

4         Q.    Do you know if there was an NDA

5    that was signed by Houlihan?

6         A.    I think so, yes.

7         Q.    Is that something that you

8    provided to counsel?

9         A.    I believe so.

10        Q.    Do you know approximately when

11   that NDA was signed, the one with

12   Houlihan?

13        A.    I believe it was around the same

14   time that White & Case signed.

15        Q.    Next exhibit is Exhibit 11.

16   It's an e-mail from Harrison Denman dated

17   February 28, 2012.  Let me know when you

18   are ready to discuss this.

19        A.    I see it.

20        Q.    Is this a due diligence request

21   list that Houlihan prepared for the

22   debtors?

23        A.    Yes.

24        Q.    At this time it was ResCap,

25   correct?

176

1                SNELLENBARGER

2        A.      Correct.

3        Q.      And was this due diligence

4    request list provided to counsel for

5    ResCap at this time period, February 28,

6    2012?

7                MR. RENENGER:   Object to the

8        form of the question.

9        Q.      Well, let me take it one piece

10   at a time.  The bottom half of the e-mail

11   is an e-mail from Jeff Lewis to K. Chopra

12   at Centerview Partners.  Who is to your

13   knowledge K. Chopra at Centerview

14   Partners?

15       A.      Karan Chopra, he's a -- he works

16   at Centerview.

17       Q.      And who did they represent at

18   this time period?

19       A.      The company ResCap.

20       Q.      And you are copied on that

21   e-mail, correct?

22       A.      I am.

23       Q.      What was Mr. Lewis forwarding to

24   Mr. Chopra?

25       A.      A due diligence information

12-12020-mg  Doc 5803-4  Filed 11/18/13  Entered 11/18/13 11:51:57  Exhibit
Deposition Designations: Reid Snellenbarger  Pg 55 of 329

177

1              SNELLENBARGER

2     request list.  The kind of information

3     that both Houlihan and White & Case would

4     like to obtain from the company.

5          Q.    And why did Houlihan and White &

6     Case want to obtain this information?

7          A.    To -- well, once we had signed

8     the confidentiality agreement we were told

9     we could have access to confidential

10    private information not available to the

11    public.  And we wanted to continue our

12    diligence of the company and the situation

13    on a private basis.

14         Q.    When was the first time that

15    either Houlihan or White & Case received

16    nonpublic information from Residential

17    Capital?

18         A.    I don't recall.  I would assume

19    it would be sometime shortly after this

20    was sent over.

21         Q.    Are you familiar with

22    Intralinks?

23         A.    I am.

24         Q.    Do you know if either Houlihan

25    or White & Case or any of the noteholders'

178

1                    SNELLENBARGER

2    representatives obtained access to

3    Intralinks around this time period?

4         A.    There was a data room.  I don't

5    know if it was Intralinks or not.  But I

6    know there was a data room and we got --

7    we Houlihan, and I think White & Case as

8    well got access to it.  I'm not sure

9    exactly what time.  There were, I think, a

10   variety of different data rooms set up by

11   ResCap.  So we got access to a data room

12   during that time, I believe.

13        Q.    And what was your understand ing

14   of what was in the data room at that time?

15        A.    Some information on the company

16   on a private basis.  I mean, it was

17   populated with certain, you know,

18   financial information and other

19   agreements.

20        Q.    Do you recall if at this time

21   period Residential Capital was trying to

22   sell certain of its assets?

23        A.    Yes.

24        Q.    And do you recall that the data

25   room that you referred to was prepared in

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 57 of 329

179

1              SNELLENBARGER

2    connection with the sale of those assets?

3         A.    There was a data room prepared

4    for the buyers.  I believe initially we

5    had a separate data room.  We didn't have

6    the buyer data room.  I think we had a

7    separate data room just for us that had

8    certain information in it.

9         Q.    What type of information?

10        A.    As I recall, certain financial

11   information, certain agreements.  It

12   was -- you know, we had sent this

13   exhaustive list over.  They began

14   populating the data room with some of the

15   information.  There was a continual, you

16   know, back and forth request of trying to

17   get more information from the company.

18        Q.    The list that we are looking at

19   in Exhibit 11, is this a standard list

20   that Houlihan has --

21             MR. RENENGER:  Object to the --

22        Q.    -- or was it prepared

23   specifically for this engagement?

24             MR. RENENGER:  Object to the

25        form of the question.

180

                    SNELLENBARGER

1

2       Q.    Let me rephrase.

3             How was this document prepared,

4    to your knowledge?

5       A.    We prepared it based on what we

6    thought was important to review for

7    ResCap.

8       Q.    And who at Houlihan prepared the

9    list?

10      A.    Myself and my team.

11      Q.    That would include Mr. Lewis?

12      A.    Correct.

13      Q.    That would include the other

14   individuals listed on the e-mail,

15   Mr. Ilhardt?

16      A.    Yes.

17      Q.    Anyone else?

18      A.    Mr. Karl as well.

19      Q.    Mr. Karl works at Houlihan as

20   well?

21      A.    He did at the time.

22      Q.    He's since left?

23      A.    Correct.

24      Q.    Mr. Denman, is he a lawyer at

25   White & Case?

181

1          SNELLENBARGER

2      A.    He is.

3      Q.    Do you recall roughly how long

4  it took to prepare the list?

5      A.    A week or so.

6      Q.    And do you recall if you

7  coordinated with White & Case on the list?

8      A.    I believe we did.

9      Q.    Do you recall if White & Case

10  added or deleted any materials on that

11  list?

12      A.    I don't recall.  I mean, the

13  e-mail says it's a compilation of both

14  White & Case billing requests.  So I

15  believe that we had some dialogue back and

16  forth about what to add, et cetera, what

17  to include.

18      Q.    And many of the items that are

19  listed here are nonpublic items, correct?

20      A.    Yeah.  Looks like it.  I believe

21  so, yes.

22      Q.    If you look at the first page of

23  the information requests at page ending

24  551.  Under Capital Structure, item 5,

25  you've requested "supporting detail of all

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 60 of 329

182

1                    SNELLENBARGER

2    collateral currently pledged to each

3    borrowing facility, including but not

4    limited to," and then you go through a

5    number of specific issues or specific

6    items.  Why were you asking for that

7    information?

8         A.    I think we wanted to get a lay

9    of the land frankly of what the company's

10   view of the collateral that was pledged to

11   each of the secured facilities.

12        Q.    Did you obtain that information?

13        A.    We got, received a schedule

14   actually in a meeting we had with the

15   debtors sometime maybe in March, I

16   believe, in which they provided columns of

17   debt facilities and laid out assets.  And

18   the debtors had tried to lay out what they

19   thought the collateral was in each of

20   those debt silos.

21        Q.    Who was the meeting with?

22        A.    It was between Houlihan and

23   White & Case and the company's advisors,

24   Morrison Foerster, Centerview, and I

25   believe FTI was there as well.

183

1            SNELLENBARGER

2        Q.    Where did the meeting take

3    place?

4        A.    I believe Morrison Foerster's

5    office.

6        Q.    Here in New York?

7        A.    I think so, yes.   Yes,

8    definitely New York.

9        Q.    How long was the meeting?

10       A.    Couple hours.

11       Q.    And you were at the meeting?

12       A.    I was.

13       Q.    Were you free to ask questions

14   of Morrison Foerster, Centerview, anyone

15   out there about the collateral, the

16   collateral sheet that you were provided?

17       A.    Yes.   I mean, we had just

18   received it when we walked in the room so

19   we didn't have time to really examine it.

20   But, yeah, we discussed the collateral.   I

21   mean, it was, as compared to the public

22   information, there was significantly more

23   detail and more, as it showed, more

24   collateral available to the junior secured

25   noteholders.

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 62 of 329

184

1                    SNELLENBARGER

2        Q.    Did you at that meeting and

3    thereafter ask for more information

4    regarding that collateral?

5        A.    We did.

6        Q.    And did you receive that

7    information?

8        A.    Not all of it, no.

9        Q.    What information did you not

10   receive regarding the collateral?

11       A.    Yeah, we -- I mean, we had

12   continued to ask a bunch of details about,

13   you know, what specific loans we had liens

14   on, which servicer advances, why certain

15   collateral was allocated to the Ally LLC

16   versus the Ally revolver and our silo.

17   We -- you know, a variety of different

18   other types of, are there other ancillary,

19   you know, other collateral.  We have an

20   all asset lien, does that encompass

21   anything else.  Those types of questions.

22                And the debtors, there's a lot

23   of things we went around.  The debtors

24   were talking to a lot of different parties

25   so we could get some information, not

Plaintiff's Objection
184:2-186:18
Beyond the scope of
affirmative testimony

185

1                    SNELLENBARGER

2    everything.  Sometimes the debt collateral

3    sheet were moved and balances were moved

4    in between silos so we were trying to

5    figure out why they were being moved, et

6    cetera.

7         Q.    Was there any information

8    regarding the collateral that you asked

9    for and didn't receive that you felt you

10   needed to receive in order to perform your

11   work?

12             MR. RENENGER:  Object to the

13        form of the question.

14        A.    Yeah, I mean, look, we had this

15   extensive list of diligence.  We didn't

16   receive all of this on this list.  It was

17   not all provided.  We got some

18   information.  I don't recall exactly what

19   information.  We didn't -- I know we

20   had -- we didn't get everything we wanted.

21   And we tried to examine things the best we

22   could based on the information we

23   received.

24        Q.    Do you know if the reason that

25   you didn't get the information was that

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 64 of 329

186

1            SNELLENBARGER

2      the debtors did not have that information

3      or the opposite, they had the information

4      and they just didn't provide it to you?

5          A.    I don't know.

6              MR. RENENGER:   Object to the

7      form of the question.

8          A.    I don't know.

9          Q.    Let me rephrase.   Was there any

10     information that you asked from the

11     debtors that they told you they did not

12     have in existence?

13         A.    I'm sure there may have been.   I

14     just don't know exactly what -- it's

15     difficult for me to determine what the

16     debtors had and didn't give to us versus

17     what they just didn't possess.   I think

18     there was a mixture of both.

19         Q.    Do you recall how long you had

20     access to the data room that you

21     referenced earlier?   Was it days or weeks,

22     months?

23         A.    I don't recall when we first got

24     access to the data room.   I think it was

25     sometime in March maybe.

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 65 of 329

187

SNELLENBARGER

1

2    Q.    How long did you have access?

3    A.    We may still have access to it

4    now.  I know it's changed over time and so

5    forth.

6    Q.    If you turn to the second page

7    ending 552, there are a number of items

8    listed under D, Financial Performance.  Do

9    you recall if you asked -- well, you

10   obviously asked for all of these items,

11   correct?

12   A.    Correct.

13   Q.    Are any of these items under D

14   that you did not receive?

15   A.    I believe so.  I don't remember

16   which ones.  I know we had asked for

17   exhaustive, you know, financials.  They

18   provided us some, not at all.

19   Q.    Did you keep copies of

20   unconsolidated financial statements

21   prepared by the company or anyone else?

22   A.    We were provided some copies.  I

23   don't think all those financial statements

24   since 2008, no.

25   Q.    You did receive copies of

Plaintiff's Objection
187:6-18
Beyond the scope of
affirmative testimony

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 66 of 329

188

SNELLENBARGER

1

2   unconsolidated financial statements from

3   some period?

4        A.    I believe so, yes.

5             MR. RENENGER:   I just object and

6        I think there was a bit of ambiguity

7        when things would be received.   I

8        don't know if you are asking about

9        that period before the PSA or...

10            MR. WALSH:   Let me fix the time

11       period.

12       Q.    The PSA was signed approximately

13   May 14th -- 13th, 2012.

14       A.    I believe so.

15       Q.    Did you receive copies of the

16   unconsolidated financial statements prior

17   to that date?

18       A.    Certain unconsolidated financial

19   information, yes, not all of it.

20       Q.    Item 1 is Annual Consolidated

21   and Consolidating Financial Statements.

22   Did you receive that prior to the petition

23   date?

24       A.    We received some, not all.

25       Q.    If you turn to the third page

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 67 of 329

189

1              SNELLENBARGER

2    ending 553.

3         A.    Okay.

4         Q.    There's an item H, Affiliate and

5    third-party relationships\transactions.

6    What are you requesting here?

7         A.    We were trying to understand all

8    of the transactions between ResCap and

9    Ally and ResCap and third parties.  So the

10   major material transactions that occurred.

11        Q.    Why was that something you

12   requested?

13        A.    Well, we thought it was

14   important to understand the relationship

15   between Ally and ResCap and whether those

16   were on play, whether there was

17   appropriate value traded between the two

18   companies.  And also understanding if

19   ResCap, any other material transactions

20   with outside third parties that would

21   affect the performance of the company.

22        Q.    Item 3 in the list is, refers to

23   all material capital transactions between

24   individual ResCap subsidiaries.  What are

25   you requesting there?  When I say 3,

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 68 of 329

190

                    SNELLENBARGER

2   romanette (iii) in item 1.

3                   MR. RENENGER:   Thanks.   I was

4       lost.

5       A.      Well, I think we were aware that

6   ResCap had significant operating

7   subsidiaries, RSC, GMAC mortgage.   And I

8   think we just wanted to make sure that we

9   were capturing transactions related to

10  those entities as well.

11      Q.     Did you receive information in

12  response to this request prior to the

13  petition date?

14                  MR. RENENGER:   Object to the

15      form.   Are you talking (iii) request?

16      Q.      Let me be more broad.   With

17  respect to H(i), we have asked for a

18  summary or list of all material, capital

19  transactions between the various entities

20  between Ally Financial, ResCap and ResCap

21  subsidiaries.   Did you receive information

22  in response to that request prior to the

23  petition date?

24      A.      We received some information,

25  not all.

191

1            SNELLENBARGER

2        Q.    What information?

3        A.    I don't recall exactly what

4    pieces of information they received.  I

5    think they sent some, some summaries of

6    certain transactions, not all of them.

7        Q.    You are aware, at least prior to

8    the petition date, that the company did

9    have material transactions between

10   subsidiaries?

11       A.    Yes.

12       Q.    Were you aware of the scope of

13   those transactions prior to the petition

14   date?

15            MR. RENENGER:   Objection.

16       Q.    Either by number of transactions

17   or by dollar amount?

18       A.    I don't know if we knew the

19   magnitude or how many.  It wasn't really

20   publicly available so we were just trying

21   to understand the nature of those, you

22   know, transactions.  We knew, as I said,

23   RSC and GMAC were their main operating

24   subsidiaries so we assumed that there were

25   significant transactions there but.  I

192

1          SNELLENBARGER

2    mean, we were trying to understand all

3    that.

4         Q.     Would you come back to Exhibit

5    9, please.

6         A.     Okay.

7         Q.     And we were looking at the third

8    quarter 2011 presentation.  If you look at

9    the very last -- it's in the appendices.

10   The very last page of the document and the

11   very last page of the presentation, I

12   believe, you see that there is a ResCap

13   corporate structure set forth, correct?

14        A.     Yes.

15        Q.     Where was this information

16   obtained?  From where was this information

17   obtained?

18        A.     I think it was through ResCap

19   financial statements and I think there is

20   the Fed Reserve had certain public

21   information available for, on ResCap.  I

22   think it was a combination of the two.

23        Q.     And Houlihan was aware of this

24   information by late 2011?

25        A.     Of this corporate structure,

193



1                 SNELLENBARGER

2     yes.

3          Q.     And Houlihan included it in the

4     presentation for the pitch to the junior

5     secured noteholders, correct?

6          A.     Correct.

7          Q.     Why?

8          A.     I think any kind of complex kind

9     of distressed situation, understanding the

10    legal entity corporate structure I think

11    is important.   Understanding where the

12    operations reside and where the debt

13    obligations are issued and who the

14    guarantors are I think are important.

15         Q.     And that could have an impact on        JSN Objection:
                                                          193:15 – 194:3, FRE
16    the collateral underlying the junior               602 (Lack of
                                                          foundation)
17    secured notes, correct?

18                MR. RENENGER:   Object to the

19         form of the question.

20         Q.     Could that have an impact, the

21    understanding of the corporate structure

22    and where certain obligations lay, could

23    that have an impact the collateral for the

24    junior secured notes?

25         A.     Yes.

194

1          SNELLENBARGER

2              MR. RENENGER:   Object to the          Plaintiff's Objection
                                                       194:2-3
3          form of the question.                       Beyond the scope of
                                                       affirmative testimony

4          Q.    And that's why you included it

5      in the presentation?

6          A.    Yes.

7          Q.    And turning back to the due

8      diligence request at Exhibit 11.

9              MR. RENENGER:   I just want to

10             point out, I think this is a separate

11             document in the presentation.  If you

12             look at the -- it's not paginated.  If

13             you look at the cover e-mail, it says

14             that there's a separate attachment, a

15             draft company org chart.  So I just

16             want to clarify for the record that

17             this document does not appear to be

18             attached to that.

19         Q.    Well, Mr. Snellenbarger, this

20     chart was available as of late 2011,

21     correct?

22         A.    I believe -- you know, it's a

23     good question.  Only because we sent this

24     e-mail in 2012 as a separate attachment

25     not attached to the 2011 agreement.  I

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 73 of 329

195

1              SNELLENBARGER

2    know it was based on public information.

3    I can't tell you whether we had it in late

4    2011 or not now that it's been pointed out

5    that it was not included in the document.

6         Q.    It's fair to say at least

7    prepetition you had the agreement,

8    correct?

9         A.    Yes.  I believe so.

10        Q.    And if we turn back to the due

11   diligence requests.

12        A.    Yes.

13        Q.    You requested a list of all

14   material capital transactions among these

15   various ResCap subsidiaries, correct?

16        A.    Yes.

17        Q.    If you look at item 2, you've

18   also asked, in this due diligence request,

19   for a summary/list of all the material

20   intercompany operating transactions since

21   the beginning of 2008, again, with respect

22   to the three items that are in request 1,

23   the Ally Financial and ResCap

24   transactions, the ResCap and outside

25   third-party transactions and transactions

Plaintiff's Objection
195:13-197:3
Beyond the scope of
affirmative
testimony

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 74 of 329

196

1              SNELLENBARGER

2    among and between individual ResCap

3    subsidiaries.   That is one of the items

4    that you asked for?

5         A.    Yes.

6         Q.    Why?

7         A.    Again, we were trying to

8    determine -- not determine -- trying to

9    get an assessment of understanding of the

10   relationship between Ally and ResCap and

11   the relationship between ResCap's

12   subsidiaries amongst themselves.

13        Q.    Why?

14        A.    Because we wanted to understand

15   how value was flowing in between the

16   various entities and whether that would

17   affect the junior secured note's position.

18        Q.    And you received information in

19   response to request H(ii), correct?

20        A.    We received some information,

21   not all.

22        Q.    What information do you recall

23   did you receive?

24        A.    I know we received the company's

25   trial balance.   And that had laid out

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 75 of 329

197

1             SNELLENBARGER

2    certain intercompany balances between

3    subsidiaries.   I believe we received that.

4        Q.    And do you recall the trial

5    balance date, the date that the trial

6    balance covered?

7        A.    I don't remember.  I think it

8    was December 31, 2011.

9        Q.    And for what -- well, what did

10   you do with the trial balance once you

11   received it?

12       A.    Just reviewed it.  Trying to

13   understand where the various assets and

14   liabilities were by entity.

15       Q.    If you look back at H(i).

16   You've included in the request not just

17   the capital contributions, buybacks or

18   exchanges, but you also included

19   forgiveness.  What does that refer to,

20   forgiveness?

21       A.    I think on a public basis we

22   understood that Ally had forgiven certain

23   obligations with ResCap over a period of

24   years.  So we were trying to understand

25   that better.

198

                    SNELLENBARGER

1

2    Q.    Were you aware whether ResCap

3    entities had forgiven intercompany

4    balances?

5         MR. RENENGER:  Object to the

6    form of --

7    Q.    As of this time period?

8         MR. RENENGER:  -- question.

9    A.    I don't think we were, no.

10   Q.    Well, you included this request

11   with respect to individual ResCap

12   subsidiaries, correct?

13   A.    Yeah, we requested it.  I don't

14   think we knew it at the time.

15   Q.    It was a piece of information

16   you wanted to learn, whether or not there

17   had been forgiveness between ResCap

18   subsidiaries?

19   A.    Correct.

20   Q.    Did you receive information on

21   that?

22   A.    I don't believe so.

23   Q.    And if you turn to the last

24   page, J.  This refers to litigation and

25   contingent liabilities.  What were you

Plaintiff's Objection
198:15-200:3
Beyond the scope of
affirmative testimony

199

1              SNELLENBARGER

2     requesting here?

3          A.    We were trying to get detail

4     regarding the rep and warranty notice

5     security obligations that ResCap had with

6     respect to security holders.

7          Q.    And that included liabilities

8     for rep and warranty cases, correct?

9          A.    Correct.

10         Q.    And what information did you

11    receive in response to this request?

12         A.    Not much.   I think at the time

13    the company had said that a lot of this

14    detail was clearly confidential but they

15    weren't willing to share it with us at the

16    time, given their discussions with the

17    various constituents.

18         Q.    You are aware that the company

19    had reserves for this litigation, correct?

20         A.    Yes.

21         Q.    Did you ask for information

22    about that reserve?

23         A.    We did.

24         Q.    And what information, if any,

25    did you receive on the reserve?

200

                    SNELLENBARGER

1

2       A.    Nothing other than what was in

3   the trial balance I believe.

4           (AHG Exhibit 12, e-mail from

5   Alexandra Barrage at Morrison

6   Foerster, attaching six documents,

7   marked for identification, as of this

8   date.)

9           (AHG Exhibit 13, e-mail from

10  Mr. Ben Ilhardt at Houlihan dated

11  June 12, 2012, marked for

12  identification, as of this date.)

13      Q.    I have handed you Exhibits 12

14  and 13, Mr. Snellenbarger.

15          12 is an e-mail from Alexandra

16  Barrage at Morrison Foerster to a number

17  of people, attaching six documents.

18          And then Exhibit 13 is an e-mail

19  from Mr. Ben Ilhardt at Houlihan dated

20  June 12, 2012.  I really want to focus on

21  Exhibit 12.

22          Is it your recollection that the

23  documents that Ms. Barrage forwarded on

24  April 30, 2012, ultimately were given to

25  Houlihan around that time period?

201

1          SNELLENBARGER

2          A.    I believe they were.

3          Q.    If you look at Exhibit 13, you

4    see that Mr. Ilhardt references the six

5    documents he received in late April.

6          A.    I see that.

7          Q.    What are the documents that are

8    attached to Ms. Barrage's e-mail,

9    Exhibit 12?

10         A.    What are they?

11         Q.    Yes.

12         A.    I believe they are certain

13   intercompany agreements between certain

14   subsidiaries.

15         Q.    And are these documents that

16   Houlihan or any of Houlihan's

17   representatives requested from the ResCap

18   people?

19         A.    I believe so.

20         Q.    And why did Houlihan request

21   these documents?

22         A.    Well, I think -- I believe this

23   went to White & Case so maybe White & Case

24   requested the documents.  I think we were

25   trying to determine or understand better

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 80 of 329

202

1          SNELLENBARGER

2     what the intercompanies related to with

3     respect to between the subsidiaries.

4          Q.     Did Houlihan review these

5     documents on or around April 30, 2012?

6          A.     I don't know when we received

7     these from White & Case.  I know these

8     went to White & Case on April 30th.  I

9     just don't know when Houlihan received

10    them from -- Mr. Ilhardt's e-mail is from

11    June, so I don't know how quickly we got

12    those versus from White & Case.

13         Q.     Did Houlihan receive these

14    documents prior to the petition date?

15         A.     I don't know.

16         Q.     Do you know if anyone at White &

17    Case received these documents prior to the

18    petition date?

19         A.     It appears so, yes.

20         Q.     Mr. Denman is from White & Case?

21         A.     Correct.

22         Q.     The e-mail dated June 12th or,

23    sorry, 19th, Exhibit 13, references

24    paragraph, second paragraph, "discussions

25    on this topic in late April."  Do you know

203

1              SNELLENBARGER

2    what Mr. Ilhardt is referring to there?

3         A.    I know we had requested more

4    detail on intercompanies and just asked

5    for -- we are trying to understand what

6    they are, what they relate to, et cetera.

7    Can you send us any information you have

8    on them.

9         Q.    And those requests were all in

10   April of 2012?

11        A.    Yes.

12        Q.    Did you have a face-to-face

13   meeting with anyone from Residential

14   Capital or their representatives on

15   intercompany balances prior to the

16   petition date?

17        A.    Face-to-face, no.

18        Q.    Did you have any telephone calls

19   on the subject prior to the petition date

20   with anyone from Residential Capital or

21   any of its representatives?

22        A.    Financial advisors we did.

23        Q.    You were dealing with either --

24   was it FTI?

25        A.    FTI or Centerview.

204

SNELLENBARGER



1

2      Q.    Who did FTI work for at that

3    time period?

4      A.    ResCap.

5      Q.    And who at FTI did Houlihan

6    interact with on intercompany balances?

7      A.    Primarily Mark Renzi.

8      Q.    And did you participate in any

9    phone calls with Mr. Renzi about

10   intercompany balances?

11     A.    Yes.

12     Q.    How many?

13     A.    A couple.

14     Q.    And in what time period?

15     A.    Prepetition?

16     Q.    Prepetition, that's fine.

17     A.    Sometime in late April, early

18   May kind of time frame, I believe.

19     Q.    And all of these discussions

20   were prepetition?

21     A.    Yes.

22     Q.    And why were you having these

23   phone calls with Mr. Renzi?

24     A.    Well, we, you know, counsel,

25   White & Case, had believed that the JSNs

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 83 of 329

205

1              SNELLENBARGER

2    had a lien on certain intercompany

3    balances.   So we were trying to understand

4    what those balances were and what impact

5    that would have on recovery.

6         Q.    And did Mr. Renzi provide

7    information on the intercompany balances

8    during those phone calls?

9         A.    What he provided really was the

10   balances pursuant to the -- the

11   intercompany balances pursuant to the

12   trial balance which we had had.   We were

13   trying to -- at the time, both FTI and

14   Houlihan were building recovery models.

15   And so we were primarily focused on how

16   to, frankly both sides, build or model

17   this correctly and get the tos and froms

18   and the flows correctly so we could

19   provide a better view of what the impact

20   on these intercompanies would be based on

21   a variety of assumptions.

22        Q.    Why were you doing that?

23        A.    Because we were trying to get a

24   better assessment of what the junior

25   secured collateral and recovery would be.

206

1          SNELLENBARGER

2    And one component of that was

3    intercompanies.

4         Q.    At this time period, do you know

5    roughly the dollar amounts of the

6    intercompany balances?

7         A.    I believe so.  The balances were

8    in the trial balance.  So I think we

9    understood what the net balances were

10   between different entities.

11        Q.    Do you recall the amounts?

12        A.    I don't.  I know some were 3

13   billion.  Some were several hundred

14   million.  They were significant balances

15   and some not that much.  I know there was

16   a range of that.

17        Q.    Do you recall if you had any

18   meetings with FTI in person about any

19   subject prior to the petition date?

20        A.    We did.  Yes.

21        Q.    How many?

22        A.    A few.  And then we also had the

23   settlement meeting.

24        Q.    What was discussed at these

25   meetings prior to the petition date?  What

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 85 of 329

207

1                    SNELLENBARGER

2    was discussed between Houlihan and FTI?

3                    MR. RENENGER:    Object to the

4         form of the question.

5         Q.    What were the discussions with

6    FTI prior to the petition date?

7         A.    Primarily we were trying to get

8    more information, some information we

9    hadn't received.  We were continuing to

10   press the company to try to provide us

11   more information.  Some information we

12   received didn't reconcile with other

13   information we received.  So we were

14   trying to tie those out and get FTI to

15   help us do that.  All of which to try to

16   get a general understanding of what our

17   position was.

18        Q.    What do you mean by our

19   position?

20        A.    What the JSNs, what collateral

21   they had available to them, what ultimate,

22   you know, views on the claims of the

23   estate would be, ultimate recoveries, et

24   cetera.

25        Q.    Roughly how many meetings, if

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 86 of 329

208

1                    SNELLENBARGER

2    you remember, with FTI?

3        A.    There were a few face-to-face

4    and then several phone calls, I believe.

5        Q.    More than three phone calls,

6    more than four phone calls?

7        A.    Maybe.  I mean, again, they were

8    talking to a variety of different

9    constituents, not just us, so their time

10   was limited.  So, you know, we did the

11   best we could.

12       Q.    And you also had face-to-face

13   meetings with Centerview, correct?

14       A.    I believe so.  I don't know if

15   it was separately.

16       Q.    How many?

17       A.    I think they were the same type.

18   They were there with the same meetings.

19       Q.    Was there a division of, you

20   know, a division of responsibilities

21   between Centerview and FTI with respect to

22   the information that you were requesting?

23       A.    Yes.  I mean Centerview was

24   primarily responsible for the sale process

25   at the time and those types of

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 87 of 329

209

1            SNELLENBARGER

2    discussions.   FTI was running more what we

3    call detail underlying financials.   They

4    were building a model in parallel to us.

5    That kind of distinction.

6         Q.    Did you have a point of contact

7    at FTI that you were dealing with in this

8    time period?

9         A.    Yes.

10        Q.    Who was that?

11        A.    Mark Renzi.

12        Q.    And did you exchange recovery

13   models with Mr. Renzi or anyone else at

14   FTI?

15        A.    We didn't exchange recovery

16   models.   But what we did is, we both would

17   go through a set of assumptions and say,

18   okay, if you assume the value of the

19   assets are X, if you assume intercompany

20   claims are turned on, if you assume the

21   RMBS claims are Y, what is your recovery

22   for the JSNs or the unsecured notes.   And

23   we would compare those results.   And we

24   were -- because what we wanted to do is if

25   we got to a settlement discussion we

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 88 of 329

210

1                    SNELLENBARGER

2    wanted to discuss the merits.  We didn't

3    want to debate math.  And so we wanted to

4    ensure that our models were working or in

5    alignment as far as the math and how they

6    were flowing.  So that's what we did.

7                    MR. WALSH:  Mark the next

8         Exhibit 14.

9                    (AHG Exhibit 14, series of

10        e-mails, marked for identification, as

11        of this date.)

12        Q.    Exhibit 14 is a series of

13   e-mails, apparently all on May 10th.

14   These are e-mails between FTI and

15   Houlihan, correct?

16        A.    And Evercore.

17        Q.    Who was Evercore working for in

18   this time period?

19        A.    Ally.

20        Q.    What was the purpose of these --

21   well, what was discussed in these e-mails

22   in Exhibit 14?

23        A.    Give me a second.  Again, this

24   was we were running hypothetical

25   scenarios.  Evercore built a model

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 89 of 329

211

SNELLENBARGER

1

2   themselves too.  So we were all trying to

3   see if we were getting the same results.

4   To make sure the math was -- we were in

5   agreement on the math, I guess, any one

6   party between us, Evercore and FTI, we

7   weren't missing something.

8       Q.    Was it important in your words,

9   to get the math correct?

10      A.    Yeah, I believe so.  Again, we

11   wanted to avoid any debate about the math.

12   We wanted to focus discussions on merits

13   of arguments if we got to a settlement

14   discussion.

15      Q.    Take a look at the first e-mail

16   in the chain that's dated May 10th,

17   1:43 p.m. from Jeff Lewis.  Mr. Lewis

18   references an illustrative hypothetical

19   downside case.  What is he referring to

20   there?

21      A.    Again, this was just an

22   illustrative hypothetical scenario to put,

23   for all of us to put inputs into our

24   respective models to see what the recovery

25   would be.  Just to test our models, to

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 90 of 329

212

1          SNELLENBARGER

2     stress test it effectively, to make sure

3     there weren't any blows in the respective

4     models.

5          Q.     Mr. Lewis proposes four changes,

6     correct?

7          A.     Yes.

8          Q.     What is the first change?

9          A.     Reduce all Fortress and Ally

10    purchase prices 100 basis points.   One of

11    the inputs in the various models was the

12    value of the assets.   And so we were just

13    saying, okay, if you reduce the value of

14    those assets by X percent, we used

15    hypothetically 100 basis points, what

16    would that do.

17         Q.     What was the second change to

18    the model?

19         A.     Reduce all unsold assets value

20    500 basis points.   Again, there were

21    certain assets being sold at the time to

22    Fortress and Ally and there were certain

23    assets not being sold.   The assets not

24    being sold were, again, the,

25    hypothetically said, okay, let's lower

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 91 of 329

213

1          SNELLENBARGER

2    that a hundred basis points, again to

3    stress test the model.

4        Q.    And what was the third change?

5        A.    Take contingent liabilities up

6    one and a half times.  So instead of, I

7    don't know, 5 to 7 or 32 billion of

8    claims, we raised it one and a half times.

9    Again, I think the goal was to try to make

10   a very draconian scenario with a model

11   just to make sure there weren't any blows

12   in it, that they weren't causing any

13   destructions in the model.  Again, it was

14   all just testing the math.

15       Q.    You reference PLS and RMW.  What

16   are you referring to there?  What is

17   Mr. Lewis referring to?

18       A.    I believe private label security

19   claims and rep and warranty claims.

20       Q.    And what he was proposing was to

21   increase the assumption for PLS from

22   5.7 billion to 8.6 billion, correct?

23       A.    That's right.  Hypothetically,

24   again, just to stress test the model.

25       Q.    And for the reps and warranty

214

SNELLENBARGER

2  liabilities he proposed changing that from

3  3.2 billion to 4.8 billion, correct?

4        A.    That's right.

5        Q.    What is the fourth change he

6  proposes to the model?

7        A.    Use both a set of waterfall and

8  new waterfall 400.   There was a proposed

9  agreement between Ally and the junior

10  secured notes of splitting the proceeds of

11  their collateral.   And we were running a,

12  you know, there was an agreement on that

13  split and then there was a new split of

14  first 100 to Ally the next billion to

15  junior secured notes and a 20/80 split

16  after that.   And so we were testing that

17  as well, to make sure everyone was getting

18  the same results on a mathematical basis

19  only.

20        Q.    Was the formula for the split

21  determined fairly early in the process?

22            MR. RENENGER:   Object to the

23    form of the question.

24        Q.    You referenced an 80/20 split

25  and I think a waterfall, right, that

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 93 of 329

215

1                    SNELLENBARGER

2    provided certain recovery to Ally and

3    certain recovery to the junior secureds.

4    Was that piece of the negotiations agreed

5    upon early on?

6         A.    I don't know what you mean by

7    early on.

8         Q.    Well, we are in May now.

9         A.    I mean, yeah, we met, I'm not

10   sure when, maybe it was earlier that week,

11   when we had a settlement meeting and we

12   came to a, I would say a verbal agreement

13   between us and Ally on what that split

14   would be.

15        Q.    And what was the split that was

16   agreed upon?

17        A.    I believe it was, if I recall,

18   that based on proceeds Ally would get the

19   first 400 million, junior secured notes

20   would get the next billion and then there

21   would be a 20/80 split -- 20 percent to

22   Ally, 80 percent to junior secured notes,

23   although I think that was modified a

24   little bit, maybe 79/21 or 81/19,

25   ultimately got settled out, but somewhere

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 94 of 329

216

1                      SNELLENBARGER

2      around there.

3          Q.    I'll represent to you it ended

4      up as an 81/19 split on the final

5      prepetition.

6          A.    Fair enough.

7          Q.    Do you know what caused that

8      final adjustment?

9          A.    I think subsequent discussions

10     and negotiations.  I believe just final

11     tweaks.

12         Q.    Were there phone calls at or

13     around May 10 about the models and working

14     through the math, as you discuss?

15         A.    Yes.

16         Q.    How many?

17         A.    Several.  I think we would send

18     these e-mails around, lay out a

19     hypothetical case, everyone would put in

20     their number, get on a call, say what are

21     you getting, what are you getting.  Okay,

22     I'm not getting that.  Okay, let me work

23     on something.  Let's have a call in two

24     hours.  That kind of stuff.

25         Q.    Ultimately you did reach

217

1                    SNELLENBARGER

2    agreement on the math?

3         A.    I think so, yes.  Again, these

4    were not discussions on merits or any

5    arguments.  We tabled all that.  So let's

6    just focus on the math and modeling, is

7    all what the purpose of these were.

8               MR. WALSH:  This will be

9         Exhibit 15.

10              (AHG Exhibit 15, series of

11         e-mails from May 12, 2012, marked for

12         identification, as of this date.)

13         Q.    Exhibit 15 is a series of

14   e-mails from May 12, 2012.  I believe

15   between you, Mr. Snellenbarger and Karan

16   Chopra at Centerview?

17        A.    Yes.

18        Q.    And what were you and Mr. Chopra

19   discussing in these e-mails?

20        A.    Just give me a moment.

21        Q.    Sure.

22        A.    Okay.

23        Q.    What were you and Mr. Chopra

24   discussing in these e-mails?

25        A.    There was a lot of -- the

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 96 of 329

218

1          SNELLENBARGER

2     debtors had laid out in their estimates

3     what the collateral was by debt silo.   But

4     unfortunately, about every other day a new

5     schedule would come up where the

6     collateral would move again based on a new

7     review by the debtors.   And so I was

8     talking to Karan about how we lock that in

9     or how we get comfort that this is not

10    going to continue to move around.

11         Q.    When you say move around, what

12    do you mean?

13         A.    The assets moving from one debt

14    silo to another debt silo.   You know, one

15    day though showed hypothetically a hundred

16    million of HFS loans in our silo.   The

17    next day they still revised it to 85.

18    Okay, what's going on.   How do we lock

19    this down so that it stops moving and how

20    do we protect against that movement.

21         Q.    There were no changes in the

22    value of the assets, just --

23         A.    No, there were --

24              MR. RENENGER:   Object to the

25         form of the question.

219

1          SNELLENBARGER

2          Q.    Let me rephrase.  Were there

3     changes in the values of the assets?

4          A.    Well, yes.  Because there was

5     assets -- I mean, the value of the assets

6     themselves?  No, because the schedule is

7     based on book value.  So the book values

8     weren't changing.  It was the types and

9     amounts of those assets that were moving

10    around.

11         Q.    Just so we are clear.  There was

12    a book value assigned for various assets

13    held by ResCap, correct?

14         A.    Correct.

15         Q.    And there were discussions

16    between you and Centerview about which

17    silos those assets would be put in?

18         A.    Correct.

19         Q.    And when I refer to silos, that

20    refers to who would be entitled to

21    recovery on those assets, correct?

22         A.    Correct.

23         Q.    And at this point there were

24    silos for the Ally revolver?

25         A.    Yes.

220

1                    SNELLENBARGER

2        Q.      And there were silos for the JSN

3    recovery, correct?

4        A.      Well, the JSN and the Ally were

5    the same collateral silo because they

6    shared in that collateral.

7        Q.      That was my next question.   So

8    there was an individual Ally silo and then

9    there was a shared silo between JSNs and

10   Ally as of this time period?

11       A.      Well, let me clarify.   There was

12   two different debt obliga- -- or debts by

13   Ally.   There was an Ally line of credit

14   and then there was the Ally revolver.   The

15   debtors had said that we share or we were

16   junior in the collateral of the Ally

17   revolver silo and blanket lien, there's a

18   blanket lien silo as well.   We shared in

19   that.   We don't share in the Ally line of

20   credit silo.   So there was -- and then

21   there were other secured debt obligations

22   across the sheet as well.

23       Q.      And in this time period,

24   May 12th and earlier, there were

25   discussions between Houlihan and

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 99 of 329

221

1              SNELLENBARGER

2    Centerview about the silos and who, whose

3    collateral was whose, correct?

4         A.    Yes.

5         Q.    But the book values did not

6    change in that time period?

7         A.    I don't believe so.  I think it

8    was more about assets shifting on us, an

9    amount.

10             MR. WALSH:   This will be

11         Exhibit 16.

12             (AHG Exhibit 16, two e-mails

13         between Mr. Lewis and Mr. Renzi,

14         marked for identification, as of this

15         date.)

16         Q.    Exhibit 16 is an e-mail, two

17    e-mails between Mr. Lewis and Mr. Renzi.

18    The first is dated May, the second is

19    May 9, 2012.  Do you recognize this,

20    Mr. Snellenbarger?

21         A.    Let me look at it.

22             Okay.

23         Q.    There's a file that's attached

24    to the e-mail.  Can you tell me what the

25    file is?

222

SNELLENBARGER

2   A.    I believe it's the way the

3   debtors had showed their assets and

4   liabilities on a public basis as of

5   March 31, 2012.

6   Q.    Does it also reflect the silos

7   that we have been discussing?

8   A.    Not entirely, no.

9   Q.    What does it reflect?

10   A.    It doesn't include the blanket

11   lien silo.

12   Q.    But it does reflect the Ally

13   revolver and the Ally line of credit,

14   correct?

15   A.    It does.  But again, I think

16   this is a very similar format that ResCap

17   had filed publicly for many years, I

18   think.  So it does reflect the Ally --

19   yes, it does reflect those columns but it

20   doesn't reflect all the appropriate silos.

21   Q.    Does it reflect which silo the

22   JSNs are entitled to recover from?

23   MR. RENENGER:  Object to the

24   form of the question.

25   A.    Can you repeat the question?

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 101 of 329

223

SNELLENBARGER

1

2      Q.      Does it reflect the silo from

3  which the JSNs are entitled to recover

4  from?

5      A.      Partially.   It footnotes the --

6  says that the value of the proceeds from

7  the sale of this collateral were used to

8  pay the Ally revolver and then the third

9  lien notes.   Third lien notes I think are

10  referred to as the junior secured notes.

11  Again, this is only the public silo basis.

12  It doesn't include these blanket lien

13  silo.

14      Q.      And in this time period you and

15  Mr. Renzi were exchanging this type of

16  information regarding the collateral?

17      A.      Yes.

18      Q.      Do you recall roughly how many

19  discussions in this time period you had

20  with Mr. Renzi about the collateral?

21      A.      I mean some.   You know, we were

22  trying to -- again, we were trying to lock

23  down the best we could what the debtors'--

24  what the debtors' position was on our

25  collateral.   And again, you know, things

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 102 of 329

224

1                    SNELLENBARGER

2      kind of kept moving around a bit so we

3      were trying our best to try to reconcile

4      those.

5          Q.    Was there any information

6      regarding the collateral or how the

7      collateral would be allocated between Ally

8      and the JSNs that you requested and did

9      not receive prior to the prepetition date?

10         A.    Yes.

11         Q.    And what information was that?

12         A.    Well, it was really trying to --

13     what we kept asking for and really never

14     received was, we would get these

15     spreadsheets that said, okay, here's your

16     collateral, here's what you have.  Okay.

17     Well, how did you determine that?  Well,

18     we looked at this and that.  It was really

19     full descriptive explanations.  So

20     ultimately, when we got to negotiating a

21     settlement we really just had to rely on

22     the debtors' numbers.  Look, this is what

23     you have.  We weren't able to

24     independently verify, okay, this really

25     should be in our bucket or this should not

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 103 of 329

225

1                SNELLENBARGER

2    be in our bucket.  We just didn't have

3    time to do that.  We didn't have the

4    information available to say whatever.

5    They were just saying, look, this is it.

6    So that's what we went with.

7        Q.    From your perspective, what was

8    the most important piece of information

9    regarding the collateral that you did not

10   receive prior to the petition date?

11          MR. RENENGER:  Object to the

12       form of the question.

13       A.    Can you repeat the question?

14       Q.    From your perspective what was

15   the most important piece of information

16   about the collateral that you requested

17   and did not receive prior to the petition

18   date?

19          MR. RENENGER:  Same objection.

20       A.    I would say just the detail and

21   support and the rationale of why the

22   collateral was allocated to certain silos

23   versus not.  Again, we received the

24   spreadsheet.  It had moved around.  And we

25   couldn't really verify why it was moving

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 104 of 329

226

1                    SNELLENBARGER

2     around.   That was the challenge for us.

3          Q.    Ultimately, you made a

4     presentation to the junior secured

5     noteholders regarding their recovery?

6                    MR. RENENGER:  Object to the

7          form of the question.

8          Q.    Let me rephrase.   Ultimately,

9     you made a presentation to the ad hoc

10    group regarding JSN recoveries, correct?

11                   MR. RENENGER:   Same objection.

12         A.    We made a presentation to the

13    junior secured noteholders in a general

14    way just about the status of their

15    position, yes.

16         Q.    I realize we're getting into

17    areas that may be privileged.   Do you

18    recall roughly -- I'm going to ask the

19    who, what and when, not necessarily the

20    what.   Do you recall when that

21    presentation was?

22         A.    I believe it was early May.

23         Q.    Was it around the May 10, May 12

24    period that we've been discussing?

25         A.    Yeah.   Yes.

227

SNELLENBARGER

2    Q.    It was prior to petition date?

3    A.    Yes.

4    Q.    It was prior to the execution of

5 the prepetition PSA with the ad hoc group,

6 correct?

7    A.    Yes, definitely.

8    MR. RENENGER:  Object to the

9 form of the question.

10    Q.    And where was that presentation

11 given?

12    A.    In New York, I believe White &

13 Case's office.

14    Q.    How long was the meeting?

15    A.    Couple of hours.

16    Q.    Who was there?

17    A.    Houlihan, White & Case and

18 certain members of the ad hoc group that

19 had signed confidentiality agreements.

20    Q.    Which ones?

21    A.    Paulson, Appaloosa, Davidson

22 Kempner, Silver Point, Pentwater.

23    MR. WALSH:  This will be

24 Exhibit 17.

25    (AHG Exhibit 17, e-mail with

228

SNELLENBARGER

1

2      attachment, marked for identification,

3      as of this date.)

4              MR. WALSH:   This was used at

5      Mr. Siegert's deposition.

6      Q.    If you look at the attachment to

7  Exhibit 17, the page Bates stamped 4690.

8      A.    Yes.

9      Q.    Is this the cover page for the

10  presentation?

11              MR. RENENGER:   Object to the

12      form of the question.

13      Q.    Let me ask a different question.

14  What is the page ending 4690?

15      A.    I'm sorry, repeat the question.

16      Q.    There's a presentation that's

17  attached to this e-mail.   I believe it

18  starts at 4690.   What is the document?

19      A.    It was a draft of a presentation

20  we had proposed to give to our noteholder

21  group that we had sent to Centerview for

22  their review.

23      Q.    And Centerview did, in fact,

24  review it, correct?

25      A.    Yes.

229

1                  SNELLENBARGER

2                       MR. RENENGER:  Object to the

3            form of the question.

4            Q.     Was this presentation ultimately

5      used in connection with the meeting that

6      we just discussed.  The meeting with the

7      members of the ad hoc group?

8            A.     A version of this was.  Not this

9      exact presentation.

10                       (AHG Exhibit 18, presentation,

11           marked for identification, as of this

12           date.)

13                       MR. WALSH:  This will be

14           Exhibit 18.

15           Q.     Just trying to fix a time,

16      Mr. Snellenbarger, when this presentation

17      was.  It was prepetition, correct?

18                       MR. RENENGER:  Object --

19           Q.     The meeting with the ad hoc

20      group.  I'm trying to fix in time when

21      that meeting was.  It was prior to the

22      petition date, correct?

23           A.     Correct.

24           Q.     And it was sometime after you

25      provided a draft of the presentation to

230

1                    SNELLENBARGER

2     Centerview, correct?

3          A.    Correct.

4          Q.    So sometime between May 6th and

5     May 14th?

6          A.    Yes.

7          Q.    And it was it was in White &

8     Case's offices here in New York?

9          A.    I believe so.

10         Q.    If you look at Exhibit 18.  Is

11    this the presentation -- is this the

12    document that was reviewed at that meeting

13    to your knowledge?  And I recognize it's

14    redacted.

15         A.    This may be a version of it.

16    This says draft.  I don't know if this is

17    the final version.

18         Q.    If you look at page 5 of the

19    presentation, Bates stamp 4685, top right

20    corner says "Previously sent to the

21    company."

22         A.    I'm sorry, where are you?

23         Q.    Page 5 of the presentation.

24    Houlihan page 5.  And it's on a number of

25    other pages previously sent to the

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 109 of 329

231

1                    SNELLENBARGER

2    company?

3        A.    Yes, I see it.

4        Q.    Does that refresh your

5    recollection that this was prepared after

6    it was sent to Centerview?

7        A.    This was prepared after it was

8    sent to Centerview, yes.  I just don't

9    know if this was the final version that we

10    ultimately presented to the ad hoc group.

11        Q.    Would you look now and see if

12    there's anything in the document that

13    refreshes your recollection whether this

14    was, in fact, what you presented to the ad

15    hoc group at that meeting?

16        A.    I don't believe it is the final

17    version, no.

18        Q.    Why do you say that?

19        A.    Because I think we had certain

20    additional caveats that were included in

21    the version that we presented to our

22    client.

23        Q.    Where are you looking?

24        A.    The very beginning of the

25    document.

232

                    SNELLENBARGER

1

2      Q.    What caveats within the version

3    that you presented to the client, if you

4    recall?

5            MR. RENENGER:  I'm just going to

6        object and instruct the witness that

7        to the extent the information the

8        questioner is asking about relate to

9        information that was contained in a

10       deck pursuant to discussions with

11       counsel, or at the direction of

12       counsel, I will instruct you not to

13       answer on the basis of attorney-client

14       privilege.  But if it's otherwise, you

15       may answer.

16           THE WITNESS:  Then I can't

17       answer.

18     Q.    Due to your counsel's

19   instruction?

20     A.    Correct.

21     Q.    Well, is it fair to say that the

22   final presentation that you did give, the

23   presentation that you did give to your

24   clients included a recovery analysis for

25   JSNs?

233

1          SNELLENBARGER

2              MR. RENENGER:  I would give the

3      same instruction to the extent you can

4      answer that based upon, other than

5      conversations with counsel, or even

6      based on what's in front of you, you

7      may do so.

8          Q.    Just look at page 3, Contents.

9      You'll see that one of the items that is

10     within the document, according to this

11     page at least, is "potential recovery

12     outcomes."  It's the third line down in

13     the middle of the page?

14         A.    What page are you on?

15         Q.    Page 3 of the presentation, page

16     4694 of the document.  Sorry, 4693.

17         A.    I see that, yes.

18         Q.    Without disclosing what the

19     potential recovery outcome was, is it fair

20     to say that one of the things that was

21     discussed with your clients at the meeting

22     that we have been discussing prepetition

23     was a potential recovery outcome?

24         A.    Yes.

25         Q.    You see above the item contents

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 112 of 329

234

SNELLENBARGER

2  there's a summary of tasks performed.  Am

3  I correct that by this date, the date of

4  the meeting, Houlihan had completed these

5  tasks?

6      A.    Yes.

7      Q.    If you can turn to page 5 of the

8  document.  It's the page ending 4695.  Is

9  this a collateral overview?  And when I

10  say this, I'm referring to the chart, the

11  numerical chart on this page.

12      A.    I see it.

13      Q.    Is this a collateral overview?

14      A.    Provided by the debtors, yes.

15      Q.    And this provides, additionally,

16  information about the silos that we have

17  been discussing, correct?

18      A.    Correct.

19      Q.    Does it provide information on

20  the silo that is assigned to Ally?

21      A.    Yes.

22      Q.    And does it also provide

23  information regarding silos available to

24  the JSNs?

25      A.    Yes.  Again, these weren't

235

SNELLENBARGER

2  Houlihan's numbers.  These were just

3  provided by the debtors, or I guess ResCap

4  at the time, to us.

5      Q.    At this point, did Houlihan have

6  any reason to question the number that the

7  debtors had provided regarding the

8  collateral?

9      A.    Yes.

10     Q.    Why?  What was the reason?

11     A.    Because the, as I had said

12 before, these collateral silo buckets had

13 continued to move around a bit.  And the

14 debtors had said, okay, this is in the

15 Ally LLC, this is in the Ally revolver and

16 then it would change.  And so we were

17 continually concerned about whether this

18 was an accurate representation but we

19 didn't have the information at the time to

20 evaluate whether it was or it wasn't so we

21 used the debtors' numbers.

22     Q.    Did you relay your concerns to

23 your clients?

24     A.    Yes.

25     Q.    What was their response?

236

SNELLENBARGER

1

2          MR. RENENGER:  And I'm going to

3      instruct the witness to the extent

4      that this discussion was part of a

5      privileged discussion with counsel, I

6      would instruct you not to the answer.

7      To the extent it wasn't in connection

8      with the request for legal advice or

9      something done at the direction of

10     counsel, you may answer.

11     A.    I cannot answer.

12     Q.    Due to the instruction?

13     A.    Correct.

14     Q.    If you turn to the page 10 of

15 the presentation.

16     A.    Okay.

17     Q.    I recognize some portion of this

18 has been redacted.  I believe the bottom

19 right corner.  But it does reflect an Ally

20 contribution of $950 million.  Do you see

21 that?

22     A.    I see that, yes.

23     Q.    And what does that reflect?

24     A.    I believe the proposal on the

25 table at the time was Ally was going to

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 115 of 329

237

1                    SNELLENBARGER

2      contribute 750 million of cash.   And then,

3      I believe, pay an incremental $200 million

4      on the held for sale loan portfolio of

5      what they agreed to purchase.   I think, I

6      think that's how it was derived.

7          Q.     And what was your understanding

8      of what Ally would receive in return for

9      their contribution?

10         A.     Full releases from the

11     interested parties with ResCap.

12         Q.     At this point or any point prior

13     to the petition date, did Houlihan

14     understand whether the JSNs had a lien on

15     causes of actions against Ally?

16            MR. RENENGER:   I'm going to

17         object to the form of the question and

18         instruct the witness, to the extent

19         you can answer that question without

20         getting into privileged discussions

21         that you may have had with counsel or

22         work you did at the direction of

23         counsel, you may answer.   Otherwise, I

24         will instruct you not to answer on the

25         basis of privilege.

238

SNELLENBARGER

2        A.    I can't answer.

3        Q.    You are following your counsel's

4    instruction?

5        A.    Correct.

6        Q.    Just for sake of simplicity,

7    every time you say I can't answer, it is

8    because you are following your counsel's

9    instruction?

10        A.    Yes, thank you.   Thank you for

11    that clarification.

12        Q.    Turn to page 22 of the document.

13    Again, I recognize that some portion of

14    page 22, which is Bates stamped 4712, is

15    redacted.   But do you see the item

16    Intercompany Claims?

17        A.    I do.

18        Q.    What does that line reflected

19    regarding intercompany claims?

20        A.    We would simply say for purposes

21    of the analysis, the impact of the

22    intercompany claims may be excluded but if

23    they were allowed, it would increase the

24    security coverage to the secured notes.

25        Q.    And you advised your client of

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 117 of 329

239

1                    SNELLENBARGER

2    that fact?

3                    MR. RENENGER:   I'm going to

4        again object to the form of the

5        question.  To the extent the actual

6        discussions with your client as

7        opposed to what's in this deck

8        involved legal advice or was done at

9        the direction of counsel as work

10       product, I'm going to instruct you not

11       to answer.

12       A.    I can't answer with the

13   instruction of counsel.

14       Q.    Going back to page 10.

15       A.    Okay.

16       Q.    The title of this is Summary of

17   Estimated Recovery Assumptions.  It's fair

18   to say that what's reflected on this page

19   are the assumptions that had an impact on

20   estimated recovery, correct?

21       A.    Yes.

22       Q.    And that included the Ally

23   contribution?

24       A.    Yes.  Well, let me clarify that.

25   To the extent we were oversecured, then

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 118 of 329

240

1                SNELLENBARGER

2    the Ally contribution would be less

3    impactful for the junior secured recovery.

4    We had full hard assets that showed a full

5    secured recovery.  The Ally contribution

6    wouldn't impact our recovery.  We could

7    get our share of the Ally contribution

8    through our deficiency claim or account of

9    increased intercompany value, if

10   necessary.

11       Q.    Did Houlihan have a position one

12   way or the other whether the JSNs were

13   oversecured at the time of the petition

14   date?

15            MR. RENENGER:  I'm going to

16       instruct the witness that to the

17       extent Houlihan's view on that issue

18       was based upon work product or advice

19       of counsel, I would instruct you not

20       to answer.  Otherwise, you can answer.

21       A.    I can't answer on the

22   instruction of counsel.

23       Q.    If the JSNs were unsecured you

24   would agree with me that the Ally

25   contribution would have an impact on their

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 119 of 329

241

1              SNELLENBARGER

2    recovery, correct?

3        A.      Correct.

4        Q.      What assumptions, if any, did

5    this analysis that's contained in the

6    document have with respect to the RMBS

7    litigations?

8        A.      Would you repeat the question.

9        Q.      What assumptions, if any,

10   regarding the RMBS litigations are

11   included or reflected in this document?

12       A.      Well, the assumptions are

13   redacted but if to develop a hypothetical

14   recovery model you needed to make certain

15   assumptions on what the other claims were,

16   where they may be asserted so that you

17   could determine ultimately what our

18   recoveries were.  If we were undersecured

19   it would impact our deficiency level.

20       Q.      How?

21       A.      We would -- we would share or

22   receive distribution -- our -- if we were

23   undersecured, hypothetically, then our

24   deficiency claim would share in

25   distributions pro rata with other

242

1          SNELLENBARGER

2    unsecured claims depending where those

3    claims resided or whatever these, et

4    cetera.

5          Q.    We saw in the correspondence

6    between Mr. Renzi and yourself and

7    Mr. Lewis one of the changes you were

8    making to the models was changes with

9    respect to those contingent liabilities,

10   correct?

11         A.    Correct.

12         Q.    And during this time period, you

13   were analyzing the impact of those

14   contingent liabilities, including the

15   impact of the RMBS litigation, correct?

16         A.    I wouldn't say the impact of

17   litigation.  I guess really the impact of

18   what claim amount they may be.  We weren't

19   really privy to the litigation or what

20   those discussions were.  We just were

21   using a range of claim estimates to try to

22   understand what impact that may have.

23         Q.    Prior to the petition date, were

24   there any discussions within Houlihan or

25   within any of the ad hoc group members and

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 121 of 329

243

1            SNELLENBARGER

2    Houlihan regarding whether the RMBS

3    litigation claims should be subordinated

4    in the plan that was being proposed?

5            MR. RENENGER:   I'm going to

6        instruct the witness that due to the

7        extent you can answer that question

8        without getting into discussions that

9        may have involved counsel or work that

10       you did under the direction of

11       counsel, then you may answer.

12       Otherwise, I would instruct you not to

13       answer.

14       A.    I can't answer at the

15   instruction of counsel.

16       Q.    Do you understand what it means

17   to be subordinated in a bankruptcy claim?

18       A.    I do.

19       Q.    What impact, if any, would

20   subordination of RMBS claims have on JSNs

21   recovery?

22       A.    It would improve the recovery.

23   Assuming we are -- well, it would impact

24   it two ways.  If we were undersecured,

25   undersecured, excuse me, our deficiency

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 122 of 329

244

1                SNELLENBARGER

2    claim would -- value would increase

3    because we are not sharing with those

4    other claims.   They would be paid after

5    us.  So we would have a first look of

6    unrecovered value.  Also, the value or the

7    impact on the intercompany claims would

8    increase if those claims were paid before

9    these subordinated claims were.

10        Q.    You are familiar with the issue

11   of subordination prior to your involvement

12   in ResCap, correct?  You were generally

13   familiar --

14        A.    As a general matter, yes.

15        Q.    You were generally familiar that

16   securities claims are subordinated below

17   general unsecured claims, right?

18             MR. RENENGER:  Object to the

19        form of the question.

20        Q.    I'm not asking whether you are a

21   lawyer or not.

22        A.    Okay.

23        Q.    You were familiar prior to this

24   engagement that subordination existed.

25   That was something that could be done in a

245

1                SNELLENBARGER

2    bankruptcy claim?

3         A.    As a general matter, yes.   Not

4    in a lot of detail.

5         Q.    At least with respect to an

6    economic recovery, you understood that

7    subordination could have an impact on a

8    stakeholder's recovery?

9         A.    Yes.

10        Q.    And were there any discussions

11   with respect to subordination in the

12   ResCap engagement prior to the petition

13   date, any discussions among Houlihan any

14   discussions between Houlihan and the ad

15   hoc group?

16        MR. WALSH:   Just on the topic.

17   I understand your instruction, Aaron.

18   I'm not asking for the content of the

19   discussions.

20        Q.    All I'm asking for is a yes-no

21   answer.   Was the issue of subordination

22   discussed either within Houlihan or

23   between Houlihan and the ad hoc group?

24        MR. RENENGER:   And I would just

25   instruct the witness if you can answer

246

SNELLENBARGER

2      the question yes or no, but I wouldn't

3      go beyond that in response to this

4      question, please.

5      A.     Yes.

6      Q.     Was it discussed multiple times?

7      A.     I don't recall.

8      Q.     Let me break it up.  Were there

9      discussions between Houlihan and the ad

10     hoc group regarding the issue of

11     subordination prior to the petition date?

12          MR. RENENGER:  You may answer it

13          yes or no.  For this entire series of

14          questions if it calls for a yes or no,

15          I would encourage you to answer yes or

16          no, given those concerns.

17     A.     We did not have any discussions

18     without counsel present with respect to

19     that.

20     Q.     Let me include counsel.  I'm not

21     asking you to divulge the discussions but

22     the topic of subordination, was that

23     discussed among the ad hoc group prior to

24     the petition date?

25     A.     Yes.

247

1                    SNELLENBARGER

2          Q.    Was it discussed as it related

3     to the RMBS litigation?

4          A.    I'm not certain --

5               MR. RENENGER:  Again, it's a yes

6          or no question or I don't recall in

7          response to that particular question.

8          A.    Yeah, I don't recall.

9          Q.    You appreciated at least at the

10    time you were performing those models

11    prepetition that the RMBS claims would not

12    be subordinated, correct?

13               MR. RENENGER:  Object to the

14         form of the question.

15         Q.    I saw some e-mails.

16         A.    I'm sorry, can you repeat the

17    question?

18         Q.    Feel free to refer to any of the

19    documents.  But we saw e-mails regarding

20    various changes to the models and the

21    discussions with FTI about those changes

22    to the models.  The changes to the models

23    with respect to the RMBS reflected the

24    changes in amounts, correct?

25         A.    Correct.

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 126 of 329

248

1                SNELLENBARGER

2        Q.      You were aware that the RMBS

3    claims would be treated as general

4    unsecured claims in a proposed bankruptcy,

5    correct?

6        A.      We were aware that that's what

7    the debtors had proposed.

8        Q.      And you also analyzed the impact

9    of that treatment with respect to JSN

10   recovery prior to the petition date?

11       A.      Yes.

12               (AHG Exhibit 19, document,

13       Statement of Limiting Conditions,

14       marked for identification, as of this

15       date.)

16       Q.      Exhibit 19 is a three-page

17   document, Mr. Snellenbarger.  This is a

18   document prepared by Houlihan, correct?

19       A.      Yes.

20       Q.      And it's dated May 14th,

21   correct?

22       A.      Yes.

23       Q.      And this is the document where

24   the JSNs disclosed their estimate of

25   recoveries, correct?

249

SNELLENBARGER

2      A.     No.  I would say this is simply

3    a summary of the debtors' numbers that

4    were provided and what the output is of

5    that.

6      Q.     You understand this document was

7    disclosed publicly, right?

8      A.     Yes.

9      Q.     What was the purpose of that

10   disclosure?

11     A.     Certain ad hoc group members had

12   signed confidentiality agreements for

13   settlement purposes.  They were shown

14   certain information.  The agreement was

15   that all the information they were shown

16   would be disclosed publicly within a

17   certain time period.  The debtors

18   disclosed certain information and we

19   disclosed certain other information to

20   ensure that all was borne out.

21     Q.     And Houlihan reviewed this

22   information before it was publicly

23   disclosed, correct?

24     A.     Correct.

25     Q.     Did Houlihan make any changes to

250

SNELLENBARGER

2  the information?

3          MR. RENENGER:   Object to the

4      form of the question.

5      Q.    Before it was disclosed?

6          MR. RENENGER:   Changes as

7      compared to what?

8      Q.    Well, let me -- you reviewed the

9  information that was going to be disclosed

10  publicly, correct?

11      A.    Um-hmm, yes.

12      Q.    At some point you received a

13  draft of that document?

14      A.    Yes.

15      Q.    Was that draft prepared by

16  Houlihan or by the debtors?

17      A.    This draft?

18      Q.    Draft of this document.

19      A.    Well, we prepared this document

20  but we utilized the debtors' numbers for

21  this document.

22      Q.    Let's look at page 2 ending

23  3474.  Am I correct that the information

24  on the left side of the page under Pledged

25  Assets was provided by the debtors?

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 129 of 329

251

1                    SNELLENBARGER

2          A.    Yes.

3          Q.    And it's the information that

4    was contained in the motion for cash

5    collateral, correct, at least the

6    information with respect to book value?

7          A.    Yeah.  I'm just --

8          Q.    First bullet point.

9          A.    Yes, correct.  Thank you.

10         Q.    The book value information was

11   provided by the debtors in the form of a

12   motion for the cash collateral, correct?

13         A.    Yes.

14         Q.    What is reflected under

15   illustrative market value?

16         A.    These were assumptions made or

17   really these were estimates provided to us

18   by the debtors advisors on what the market

19   value was of those assets as compared to

20   the book value.

21         Q.    At particular points in time,

22   correct?

23         A.    Correct.

24         Q.    One point in time was

25   February 29, 2012, and the other point in

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 130 of 329

252

1                   SNELLENBARGER

2    time was December 31, 2012?

3         A.    Correct.

4         Q.    Did you or anyone at Houlihan

5    review that information to determine its

6    reliability?

7         A.    We reviewed it but we didn't

8    make a determination of reliability.  We

9    were simply using the debtors' numbers,

10   what they said that their estimates were

11   for these assets.

12        Q.    For what purpose were you

13   reviewing their estimates?

14        A.    To understand what the debtors'

15   view of our recovery was.

16        Q.    And this reflected recoveries as

17   of -- well, market value as of

18   February 29th and market value as of

19   December 31st, correct?

20        A.    Yes.  As provided by the

21   debtors.

22        Q.    What was the significance of the

23   December 31st date?

24        A.    Well, under the PSA agreement

25   the hope, or not even the hope, the

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 131 of 329

253

1                   SNELLENBARGER

2    agreement was that the debtors were going

3    to exit bankruptcy by December 31, 2012.

4         Q.     And the information in that

5    column, which related to the proposed date

6    by which the debtors would exit bankruptcy

7    was carried over to the right side,

8    correct?

9         A.     Correct.

10        Q.     And that's where the estimated

11   waterfall recovery is reflected?

12        A.     Correct.

13        Q.     And this is the waterfall that

14   was included in the prepetition PSA,

15   correct?

16        A.     Correct.

17        Q.     First 400 million goes to Ally

18   and the next billion to the JSNs, correct?

19        A.     Yes.

20        Q.     And then there was an

21   81/19 percent split with respect to the

22   secured recovery, correct?

23        A.     Correct.

24        Q.     And what this waterfall has

25   reflected is a 93 percent secured recovery

254

1                SNELLENBARGER

2    for the JSNs, correct?

3          A.    That's correct.

4          Q.    And then there's deficiency,

5    correct?

6          A.    Correct.

7          Q.    And the deficiency recovery

8    would provide additional collateral to the

9    JSN recovery, correct?

10         A.    Provide additional recovery,

11   yes.

12         Q.    Additional recovery.  And

13   ultimately the JSNs, under this waterfall

14   analysis, were expected to receive

15   105 percent of their claim?

16         A.    Correct.

17         Q.    And this information you

18   discussed with the JSNs prepetition,

19   correct?

20         A.    Yes.  It was part of the

21   information, yes.

22         Q.    And to your knowledge, this was

23   information that the noteholders who

24   signed the prepetition PSA relied upon in

25   signing that PSA, correct?

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 133 of 329

255

1                SNELLENBARGER

2          A.    Yes.  They understood that this

3    was the debtors' view of the JSN recovery.

4          Q.    And they relied upon that          JSN Objection:
                                                     255:4 – 6, FRE 602
5    information in signing the prepetition          (Calls for speculation)

6    PSA, correct?

7                MR. RENENGER:  Object to the

8          form of the question.

9          A.    Among many other factors, but it

10   was one of the things they looked at.

11         Q.    At any point prior to the

12   petition date, did Houlihan advise the

13   JSNs who signed the prepetition PSA not to

14   sign the prepetition PSA?

15         A.    I mean, any discussions related

16   to the PSA I think were privileged.

17               MR. RENENGER:  To the extent the

18         advice that he's asking about would

19         have been provided in connection with

20         discussions with counsel, meetings

21         involving counsel and under the

22         direction of counsel, I would instruct

23         you not to answer on the basis of

24         privilege.

25         A.    I can't answer at the

256

1          SNELLENBARGER

2   instruction of counsel.

3          Q.   I'm only asking a yes-no.   Let

4   me try to rephrase it.   Was the issue

5   about whether or not to sign the

6   prepetition PSA discussed between Houlihan

7   and the JSNs who signed it?

8          MR. RENENGER:   You can answer

9      that on a yes or no basis?

10         A.   Yes.

11         Q.   Did at any point in time

12   Houlihan instruct those noteholders not to

13   sign the prepetition PSA?

14         MR. RENENGER:   I'm going to

15      object and instruct you not to answer

16      on the basis of privilege.

17         Q.   Are you going to follow that

18   instruction?

19         A.   Yes.

20         Q.   If you look at footnote 3 on

21   this page.

22         A.   I see it.

23         Q.   You see that the unsecured

24   recovery assumes -- includes certain

25   assumptions regarding contingent

257

SNELLENBARGER

1

2    liabilities, correct?

3        A.    Correct.

4        Q.    Including a $9 billion value --

5    well, $9 billion for contingent liability

6    claims?

7        A.    Correct.

8        Q.    Does that amount include claims

9    for RMBS litigation?

10       A.    Yes.

11       Q.    And that value was included in

12   the waterfall recovery that is reflected

13   here?

14       A.    Yes.

15           MR. WALSH:   Why don't we take

16   our lunch break.

17   (Luncheon recess taken at 12:13 p.m.)

18

19

20

21

22

23

24

25

258

SNELLENBARGER

A F T E R N O O N   S E S S I O N

(Time noted:  12:54 p.m.)

R E I D   S N E L L E N B A R G E R,

resumed and testified as follows:

EXAMINATION BY (Cont'd.)

MR. WALSH:

Q.    Before we get to Exhibit 20,
Mr. Snellenbarger.  I asked you a number
of questions about whether or not the
junior secured noteholders were
oversecured at the time of the petition
date.  And I believe you answered that it
was -- I asked you about whether Houlihan
believed that -- and I think you got an
instruction from counsel whether that's
privileged or not.  I'm going to ask the
question one more time just to make sure
we have it in the record.  You understand
you are a witness so I'm here on behalf of
the ad hoc group.  So I'm asking this
question as the witness on behalf of the
ad hoc group.

Did the ad hoc group as of the
petition date believe that it was

258:8 – 259:2, FRE 611(a)
(Vague and ambiguous,
misstates witness's
testimony)

259

1                SNELLENBARGER

2     oversecured as of that date?

3            MR. RENENGER:   And I will

4        instruct the witness that to the

5        extent that your view on that, as even

6        a fact witness for the ad hoc group,

7        is based upon discussions with counsel

8        and not a discussion that was a

9        position publicly taken but rather

10       privately held and shared between

11       members of the ad hoc group from

12       counsel, then I would instruct you not

13       to answer on the basis of privilege.

14       Q.    Are you going to follow that

15    instruction, sir?

16       A.    Yes.

17       Q.    I have handed you Exhibit 20.

18            (AHG Exhibit 20, Houlihan

19       engagement letter from February 2012,

20       marked for identification, as of this

21       date.)

22       Q.    Is this the Houlihan engagement

23    letter from February 2012?

24       A.    I believe so.

25       Q.    I'm not asking for exact amounts

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 138 of 329

260

1              SNELLENBARGER

2      but do you recall roughly how much

3      Houlihan was paid in connection with its

4      work up through and until the petition

5      date?

6           A.    I believe it was 200,000 a

7      month.

8           Q.    Is that set forth in the -- an

9      engagement letter?

10          A.    I believe so.

11          Q.    I see.   Monthly fees on page 3?

12          A.    Correct.

13          Q.    And did the ad hoc group pay you

14     for those services?

15          A.    Actually, the company paid us.

16          Q.    The company paid you up through

17     the petition date?

18          A.    Yes.

19          Q.    And after the petition date, did

20     you continue to provide services to the ad

21     hoc group?

22          A.    We did.

23          Q.    In fact, you continue to provide

24     services to the ad hoc group up until

25     today, correct?

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger    Pg 139 of 329

261

1                SNELLENBARGER

2        A.      Correct.

3        Q.      And you continue to incur and be

4    paid for your services, amounts for those

5    services?

6        A.      We were paid monthly, our

7    monthly fees by the company, through

8    sometime last summer, I believe.  And then

9    those payments stopped by the company.  We

10   were then retained by the U.S. trus- -- by

11   the indenture trustee.  And the trustee

12   has made our monthly payments since then.

13       Q.      Do you recall roughly when that

14   summer that happened?

15       A.      Early in the summer, I think.

16       Q.      I'm sorry, that was summer of

17   20?

18       A.      '13.

19       Q.      2013?

20       A.      Correct.

21       Q.      And am I correct that the first

22   month for which you were paid for

23   providing your services was February 2012?

24       A.      I believe so.

25       Q.      So you would have been paid

262

SNELLENBARGER

1

2  February 2012, March 2012, April 2012 and

3  May 2012?

4       A.    I believe so.

5       Q.    And you were performing work

6  continuously in that time period?

7       A.    Yes.

8       Q.    How many members from Houlihan

9  were working in that time period,

10  prepetition?

11      A.    Five or six.

12      Q.    Can you give us the names?

13      A.    Eric Siegert, Matt Niemann,

14  Jeffrey Lewis, myself, Ben Ilhardt, Frank

15  Karl.

16      Q.    Were you preparing time sheets

17  in connection with your work on this

18  matter?

19      A.    No.  We don't --

20      Q.    You don't --

21      A.    Houlihan, we don't do time

22  sheets there.

23      Q.    Do you know roughly how many

24  hours Houlihan spent in connection with

25  this engagement prior to the petition

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 141 of 329

263

1                    SNELLENBARGER

2    date?

3         A.    I don't.  It's not something we

4    track.  We are paid a flat monthly fee so

5    we don't track our hours.

6         Q.    During the April-May time

7    period, is it fair to say, at least for

8    you, that this matter took up most of your

9    time?

10        A.    I believe so, yes.

11        Q.    Would you say you were working

12   40, 50 hours in that time period?

13        A.    Maybe.  It's hard to say but I

14   mean, yeah, it was a significant amount of

15   time.

16        Q.    And would you say the same for

17   the other members of your team?

18        A.    Varying degrees.

19        Q.    In that time period, April to

20   May your team was working anywhere from

21   40 to -- more than 40 hours a week on this

22   matter?

23            MR. RENENGER:  Object to the

24        form of the question.

25        Q.    Well, let me break it up.  If

264

1                    SNELLENBARGER

2    you could just review.  I assume you were

3    one of the busiest people on the

4    engagement?

5         A.    Correct.

6         Q.    Who was the next busiest person?

7         A.    Probably Jeffery Lewis.

8         Q.    Roughly how much time was Mr.

9    Lewis spending --

10        A.    Probably the same amount of time

11   as me or more, same as Ben Ilhardt and

12   Frank Karl.  The more senior people on the

13   deal, Matt Niemann and Eric, were involved

14   but not on a day-to-day basis.

15        Q.    In that time period, were you

16   working late hours?

17        A.    At times.

18        Q.    Were the other members of your

19   team also working late hours?

20        A.    Yes.

21        Q.    In many instances you worked

22   past 9:00?

23             MR. RENENGER:  Object to the

24        form of the question.

25        A.    Yes.

265

1              SNELLENBARGER

2          Q.      Seeing e-mails produced, in

3    fact, that there were e-mails exchanged at

4    1:00 in the morning, 2:00 in the morning.

5          A.      Yes.    Unfortunately, I recall

6    those nights.

7          Q.      That was not infrequent?

8          A.      No.

9          Q.      And this engagement was

10   obviously a very important engagement to

11   Houlihan?

12              MR. RENENGER:    Object to the

13       form of the question.

14         Q.      Let me rephrase it.    Was this an

15   important engagement to Houlihan?

16              MR. RENENGER:    Object to the

17       form of the question.

18         A.      Well, they are all important

19   engagements.    But, yes.

20         Q.      And Houlihan devoted its full

21   attention to the engagement?

22         A.      Correct.

23         Q.      And no one at the company or,

24   I'm sorry, no one within the ad hoc group

25   has ever questioned the quality of

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 144 of 329

266

1                    SNELLENBARGER

2    Houlihan's work during that time period?

3                    MR. RENENGER:   Object to the

4         form of the question.

5         A.    I don't believe so.

6         Q.    And you had a number of calls

7    with Centerview during this time period,

8    April-May?

9         A.    Yes.

10        Q.    And you had a number of calls

11   with FTI as well in that time period?

12        A.    Yes.

13        Q.    At any point during those calls

14   or at any point in that time period, did

15   you raise with either Centerpoint (sic),

16   FTI or any of the company's

17   representatives that you did not receive

18   adequate information?

19        A.    Yes.

20        Q.    And did you at any point in that

21   time period, April or May, specifically

22   raise that you were not provided enough

23   information on the intercompany balances?

24        A.    I believe so.   Yes, is the

25   answer.

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 145 of 329

267

1                  SNELLENBARGER

2        Q.      Are you aware of any writing

3    that reflects your raising with the

4    company or any of the company's

5    representatives that you were not provided

6    enough information regarding the

7    intercompany balances?

8        A.      I don't recall.

9        Q.      Do you recall any point in time

10    in April or May that you or anyone at

11    Houlihan raised that you were not provided

12    enough information about the RMBS claims?

13        A.      Yes.

14        Q.      And do you recall if that issue

15    was raised in writing?

16        A.      I just don't recall.

17        Q.      In preparing for today's

18    deposition, did you review any writings,

19    e-mails, notes, which reflected that you

20    had raised concerns about intercompany

21    claims or the RMBS claims with any of the

22    debtors' representatives?

23              MR. RENENGER:  Again, April-May

24        time period.

25        Q.    April-May time period.

268

1          SNELLENBARGER

2     A.    No.

3     Q.    Did you keep notes of your work

4   in this time period?

5     A.    I'm not a great note taker so I

6   wouldn't have anything that I could refer

7   back to, no.

8     Q.    Did you retain the e-mails from

9   this time period?

10     A.    Yes.

11     Q.    At one point in time were you

12   instructed to keep all of your e-mails?

13     A.    Yes.

14     Q.    What point in time was that?

15     A.    I think when this litigation

16   first began, as a matter, I think Houlihan

17   because of the investment bank we are we

18   have to retain all of our e-mails anyway

19   so they are always kept.  But pursuant to

20   this situation when the litigation began,

21   whenever, several months ago.

22     Q.    You are not aware of any e-mail

23   that you either sent or received in the

24   April or May 2012 time period that's been

25   destroyed?

269

1                    SNELLENBARGER

2        A.    No.

3        Q.    And in connection with the

4   document requests that we have served in

5   the case you've provided your e-mails to

6   counsel for that time period?

7             MR. RENENGER:  Object to the

8        form of the question.

9        A.    Pursuant to what protocol was

10  agreed to, we complied to that.

11       Q.    Was anyone at Houlihan or anyone

12  within the ad hoc group aware prior to the

13  petition date that certain ResCap

14  subsidiaries had forgiven liabilities owed

15  to other ResCap subsidiaries?

16       A.    I don't recall if we were aware

17  of that or not.

18       Q.    You are aware that that has

19  happened?

20       A.    I am now.

21       Q.    Historically, prior to the

22  petition date, certain ResCap entities

23  have forgiven intercompany balances that

24  were owed to other ResCap subsidiaries?

25       A.    I'm aware of that now.  That

Plaintiff's Objection
269:21-270:6
Beyond the scope of
affirmative testimony;
incomplete (FRE 106)

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 148 of 329

270

```
1                SNELLENBARGER

2    that occurred.

3         Q.    When was the first time you were

4    aware of that fact?

5         A.    Not that long ago.  Maybe the

6    last few months.

7         Q.    Certainly prepetition you were

8    aware that Ally had forgiven certain --

9    certain amounts owed to ResCap, correct?

10        A.    Correct.

11              MR. RENENGER:  Object to the

12        form of the question.  Do you mean

13        Ally had forgiven amounts owed to

14        ResCap or?

15        Q.    Well, let me ask it more

16   broadly.  You are aware, prior to

17   petition, that prior to the petition date,

18   Ally and ResCap had certain amounts owed

19   and owing, correct?

20        A.    Between Ally and ResCap?

21        Q.    Yes.

22        A.    Yes.

23        Q.    And you are aware that Ally had

24   forgiven certain of those amounts?

25        A.    Yes.
```

Plaintiff's Objection
270:15-25
Beyond the scope of
affirmative
testimony;
incomplete (FRE
106)

271

1            SNELLENBARGER

2        Q.    And we talked about this before

3    the lunch break.  You were also aware that

4    ResCap had a number of subsidiaries, you

5    are aware of that fact, prior to the

6    petition date?

7        A.    Correct.

8        Q.    And you're aware based on your

9    experience in this field and in investment

10    banking that companies with a large number

11    of subsidiaries often have intercompany

12    balances owed between those subsidiaries?

13        A.    Correct.

14        Q.    It's a well-known fact that when

15    you have a large company like this, there

16    will be amounts transferred from one

17    company to the other within the parent

18    organization?

19            MR. RENENGER:  Object to the

20        form of the question.

21        A.    Each have their different

22    issues, but as a general matter, yes.

23        Q.    And you are aware that the

24    balances owed generally between companies

25    within one corporation could represent

272

1           SNELLENBARGER

2      collateral for certain liabilities?

3           MR. RENENGER:  Object to the

4        form of the question.

5        A.    Yes.

6        Q.    Do you recall any time prior to

7      petition date discussing with any of the

8      noteholders, your clients, that they were

9      entitled to collateral that, the

10     collateral that was the intercompany

11     balances?

12          MR. RENENGER:  I'm going to

13       again instruct the witness that to the

14       extent he can answer that question

15       without revealing privileged

16       conversations or work done at the

17       direction of counsel, then he can

18       answer that.

19       A.    Can you repeat the question?

20       Q.    Let me rephrase the question.

21       A.    Okay.

22       Q.    We looked at a presentation that

23     Houlihan prepared in 2012 that reflected

24     the analysis that was included in the

25     presentation, did not include intercompany

273

1              SNELLENBARGER

2    balances, correct?  Do you recall that

3    document?  It's the May 2012 presentation,

4    I believe it's Exhibit 18.

5         A.    I believe there's a comment in

6    there about intercompanies.

7         Q.    Are you looking at 18?

8         A.    Yes.

9         Q.    It's page 22 of that document,

10   2234.

11        A.    Okay, I see it.  Can you repeat

12   the question?

13        Q.    So at least as a subject matter

14   you are aware that there were intercompany

15   balances that could be, could represent

16   collateral for the JSNs?

17        A.    Yes.

18        Q.    And the question I'm asking is

19   did you have discussions with your clients

20   prepetition about those intercompany

21   balances?  Just generally.

22        A.    Yes.

23        Q.    And did you have discussions

24   that certain of those intercompany

25   balances could have been forgiven,

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 152 of 329

274

SNELLENBARGER

1

2    prepetition, discussions with your clients

3    prepetition about whether certain of those

4    intercompany balances were forgiven,

5    historically forgiven between

6    subsidiaries?

7            MR. RENENGER:  I'm going to

8        object and tell the witness it's a yes

9        or no question.

10       A.    Not that I recall.

11       Q.    But you are aware from your

12   experience in this field and obviously in

13   all the other engagements that you worked

14   on that large companies with many

15   subsidiaries have intercompany balances

16   and those intercompany balances are often

17   forgiven?

18           MR. RENENGER:  Object to the

19       form of the question.

20       Q.    Let me rephrase it.

21           That large companies, based on

22   your experience, you were aware that large

23   companies that had multiple subsidiaries

24   were subsidiaries owed certain amounts

25   amongst those subsidiaries, it was not

Plaintiff's Objection
274:21-275:13

Beyond the scope of
affirmative testimony;
incomplete (FRE 106)

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 153 of 329

275

1          SNELLENBARGER

2     uncommon for a subsidiary to forgive those

3     debts?

4          A.    I don't know if I would say

5     that.  I mean, I don't think you can make

6     a broad assertion with respect to

7     intercompany claims.  I think each

8     individual company and each individual

9     case is distinct and had to be evaluated,

10    you know, based on that.  Maybe some

11    companies do that, maybe some companies

12    didn't.  I don't know as a general matter

13    if you can make a broad conclusion.

14         Q.    Let me narrow the question.  Are

15    you aware at least some companies, in

16    fact, allowed subsidiaries to forgive debt

17    owed to other subsidiaries?

18              MR. RENENGER:  Just as a general

19         matter?

20         Q.    Yes.  Based on your experience

21    working in this field and working other

22    engagements, are you aware that companies

23    forgave debts owed among subsidiaries?

24         A.    It can happen.  But again, it's

25    really depending on the individual

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 154 of 329

276

1            SNELLENBARGER

2    situation.

3        Q.    Not only that it can happen, you

4    are aware that it had happened at other

5    companies at another engagements prior to

6    this engagement?

7        A.    Not engagements I have been

8    involved in personally.  So I can't really

9    speak to that.

10       Q.    Were you aware generally that

11   companies, prior to a position date, prior

12   to this engagement, were you aware that,

13   of any instance where a company had

14   forgiven debts owed between subsidiaries?

15       A.    As a general matter, maybe.  I

16   mean, it's difficult for me to -- my

17   particular specific engagements, no.  So

18   did it happen in other situations, I can't

19   really speak to.

20       Q.    Have you had an engagement where

21   the value of the intercompany claims

22   represented the collateral for a client?

23            MR. RENENGER:  Object to the

24       form of the question.

25       Q.    Or for any holder of security

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger    Pg 155 of 329

277

1                SNELLENBARGER

2    interests?

3                MR. RENENGER:  Object to the

4        form of the question.

5        A.    I just don't remember.

6        Q.    Are you aware of any Houlihan

7    engagement where either the client or the

8    company at issue had intercompany balances

9    that represented collateral for a secured

10   interest?

11       A.    I don't know specifically.

12               MR. RENENGER:  Object to the

13       form of the question.

14       A.    I don't know specifically.  I'm

15   sure we had.  I mean, we do a variety of

16   different restructuring transactions all

17   over the place.  I'm sure we've dealt with

18   that situation.

19       Q.    Can you name a few?

20               MR. RENENGER:  Again, object to

21       the form of the question.

22       A.    Again, it's not my involvement

23   so it would be difficult for me to know

24   whether they were or not.  I don't know if

25   I can answer that.

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 156 of 329

278

SNELLENBARGER

1

2    Q.    Is this the first time in your

3    experience where the engagement exchange

4    of e-mails from May 8th with Mr. Chopra

5    from Centerview involved claims for

6    intercompany balances as collateral?  Is

7    this the first time you've seen that?

8    A.    As collateral.  Likely.  I'm

9    just thinking.  I have had a lot of

10   different cases.  So it's hard for me to

11   remember.  We have dealt with intercompany

12   balances before.  I just can't remember

13   whether they were collateral or not

14   collateral to certain creditors in my

15   prior engagements.

16   Q.    Just referring generally back to

17   Exhibit 20, the Houlihan engagement

18   letter.  Am I correct that part of the

19   engagement that Houlihan was retained for

20   by the ad hoc group was to perform an

21   independent analysis of the information

22   provided by debtors in connection with JSN

23   recoveries?

24       MR. RENENGER:  Object to the

25   form of the question.

279

1            SNELLENBARGER

2        A.    It was certainly our goal.

3        Q.    Let me rephrase the question.

4    You see that the scope of the engagement

5    is described in the first paragraph of the

6    engagement letter?

7        A.    Yes.

8        Q.    And you see that a number of the

9    tasks that are included in the scope of

10   the engagement involve review and

11   analysis?

12       A.    Yes.

13       Q.    Is it fair to say that with          279:13 – 23, FRE 611(a)
                                                     (Vague and ambiguous)
14   respect to each of these tasks, Houlihan

15   performed an independent analysis?

16            MR. RENENGER:   Object to the

17       form of the question.

18            MR. WALSH:   Can you explain why

19       that's objectionable?

20            MR. RENENGER:   Yeah.   I don't

21   know what you mean by independent

22   analysis.   Independent of what?   It's

23   vague.

24       Q.    Is it fair to say,

25   Mr. Snellenbarger, that Houlihan performed

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 158 of 329

280

SNELLENBARGER

1

2      its own analysis with respect to each of

3      the items that are listed in the scope of

4      engagement?

5           A.    I don't know if I can say that.

6      I mean, we certainly, as I said before, it

7      was our intent and goal to do that.  We

8      had some information of the company, we

9      didn't have all the information.  So it

10     was difficult to do a complete independent

11     analysis.  When we put our information

12     together in the presentations, we had to

13     rely on a lot of the debtors' information

14     and analysis.  We didn't have all the

15     information opportunity to evaluate

16     everything on its own merits

17     independently.

18          Q.    What was Houlihan being paid to

19     do?

20          A.    To review as much information as

21     possible for the debtors, summarize it for

22     the ad hoc group and give our thoughts on

23     that information and, you know, how to

24     provide advice with respect to whatever

25     issues arise.

281

SNELLENBARGER

2      Q.     And did Houlihan provide its own

3   thoughts on the information that was

4   provided by the debtors?

5      A.     Yes.

6      Q.     And did Houlihan perform its own

7   analysis of the information provided by

8   the debtors?

9      A.     We provided as much analysis as

10   we could given the information that was

11   provided to us.

12      Q.     And at any point did the clients

13   question whether Houlihan had performed

14   its own analysis?

15      A.     I think the clients understood

16   the limitations of our analysis given the

17   information that was provided.

18      Q.     And were there discussions

19   between Houlihan and the clients regarding

20   those limitations?

21      A.     Yes.

22      Q.     And at any point did you tell

23   the clients not to proceed with the PSA

24   based on the limitations of information

25   that you were provided?

282

1           SNELLENBARGER

2           A.    I think that's privileged.   I

3    don't think I can answer that.

4           Q.    You are not going to answer that

5    question?

6           A.    No.

7                 (AHG Exhibit 21, exchange of

8           e-mails from May 8th with Mr. Chopra

9           from Centerview, marked for

10          identification, as of this date.)

11          Q.    Mr. Snellenbarger, this is

12   Exhibit 21.   It's an exchange of e-mails

13   from May 8th with Mr. Chopra from

14   Centerview.   And you see that these are

15   two e-mails that you sent, correct?

16          A.    Yes.

17          Q.    What did you provide to

18   Mr. Chopra by these e-mails?

19          A.    It looks like a simple waterfall

20   schedule that summarizes the secured

21   recovery of the JSNs.

22          Q.    Did you prepare this summary?

23          A.    Houlihan did.

24          Q.    Houlihan.   And did you have any

25   input in the summary?

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 161 of 329

283

1          SNELLENBARGER

2          A.    I believe so.   This was, I think

3     it's a -- basically we put this together

4     based on these, the inputs, the substance

5     that the debtors gave us and we were

6     putting in the waterfall and saying, look,

7     based on the assumptions you gave us and

8     the waterfall we agreed to, does this look

9     like what the outcome should be.

10         Q.    I am sorry, I'm looking at the

11    e-mail, Mr. Snellenbarger.   It says, "Take

12    a look at this simple asset recovery

13    spreadsheet and let me know if you agree

14    with our assumptions."   These are your

15    assumptions, correct?

16         A.    Well, okay, it says our

17    assumptions, but these were the

18    assumptions based on the discussions we

19    had had with the company.   And so we put

20    them in a spreadsheet and I said let me

21    know if you agree with this.

22         Q.    What are the assumptions?

23         A.    The assumptions are the value of

24    the sold assets.   The amount of cash on

25    hand.   The value of the unsold assets.

284

SNELLENBARGER

The amount of derivative cash.  The value
for the equity pledges.  And the
assumptions up above, the claim amounts,
the Ally revolver of the junior secured
notes.

Q.     You point out to Mr. Chopra to
focus on the revised as of May 8th, 2012
line.  What are you referring to there?

A.     I think I'm just telling him to
focus on the inputs and the value of the
assets.  I mean, the claim assumptions at
the top are public.

Q.     This is information that
Houlihan revised?

A.     They were revised based on
discussions with the debtors.  As I said
before, these schedules of what our assets
were and weren't were continually moving
around.  So we would continue to get
updates from the debtors and so based --
for the revised version based on that
update we then sent it to Centerview and
said take a look at it.  Do you agree with
this.

285

1          SNELLENBARGER

2          Q.    And you write, "Let me know if

3     you agree with our assumptions," correct?

4          A.    Yes.  And again, they were

5     assumptions based our discussions with the

6     debtors.

7          Q.    And did you say that to

8     Mr. Chopra in your e-mail, these

9     assumptions are based on the information

10    you provided?

11         A.    The words are not here, no.

12         Q.    Did you perform any independent

13    analysis, when I say independent I mean

14    Houlihan by itself performing the

15    analysis, of the information that the

16    debtors provided regarding the collateral?

17         A.    Prepetition?

18         Q.    Prepetition.

19         A.    We did not -- Houlihan did not

20    arrive at any independent conclusions of

21    our collateral value.  We utilized the

22    debtors' numbers and their assumptions and

23    then showed you can sensitize those

24    assumptions, show a range of recoveries

25    based those debtors' numbers to give the

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 164 of 329

286

1                    SNELLENBARGER

2    ad hoc group a view of what the debtors'

3    view of our potential recovery was.

4    Again, we had limited information and time

5    to do a full blown bottoms-up analysis.

6    That's what our experts ultimately did a

7    year later.  This is the best we could do

8    given the time we had and our ad hoc group

9    understood that.

10       Q.    Did you inform the debtors that

11   you had did not have sufficient

12   information or time to complete an

13   analysis?

14       A.    Yes.

15       Q.    Is that reflected in any

16   writing?

17       A.    I don't recall.

18       Q.    Did Houlihan provide a

19   recommendation to the junior secured

20   noteholders regarding what their recovery

21   would be under the prepetition PSA?

22            MR. RENENGER:  I'm just going to

23        instruct the witness and remind him

24        that's a yes or no question.  Anything

25        beyond that could get into privileged

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger    Pg 165 of 329

287

```
1              SNELLENBARGER

2         areas so keep that in mind, please.

3         A.    So could you repeat the

4    question.

5         Q.    Did Houlihan provide a

6    recommendation to the junior secured

7    noteholders regarding the recoveries under

8    the prepetition PSA?  This is prior to the

9    signing of the prepetition PSA.

10        A.    Yes.

11        Q.    What was that recommendation?

12        A.    I think that's privileged.  I

13   don't think I can answer that.

14        Q.    I'm not sure which exhibit

15   number it is.  But it's the third quarter

16   2011 presentation.  Exhibit 9.  Would you

17   take a look at that.

18        A.    I got it.

19        Q.    That's not the one I was looking

20   for.

21             MR. RENENGER:  19.  Just

22        guessing where he's going.

23             MR. WALSH:  Well, it's actually

24        18.  Close.

25        Q.    If you turn to page 6 of 18,
```

288

1              SNELLENBARGER

2    it's Bates stamped AHG 4696.

3         A.    I'm sorry, what's the page

4    again?

5         Q.    4696.  Page 6 of the document.

6         A.    4696?

7         Q.    Right.  It's Legal Entity

8    Overview.

9         A.    Got it.

10        Q.    We talked earlier about public

11   information that you had obtained

12   regarding the family structure of the

13   ResCap entities, the legal entities.  Does

14   this refresh your recollection that you

15   had had that information prior to the --

16   prior to the petition date?

17        A.    Yes.

18        Q.    And it's your understanding that

19   the information was publicly available?

20        A.    Yes.  I'm not sure if this

21   particular chart was public or not.  There

22   may be more detail here that was private

23   originally but we did have that public

24   chart that we had shown.

25        Q.    You can put that aside.

289

1         SNELLENBARGER

2         MR. WALSH:   22.

3         (AHG Exhibit 22, series of

4     e-mails between Dennis Prieto and a

5     number of other people, marked for

6     identification, as of this date.)

7     Q.    22 is a series of e-mails

8  between Dennis Prieto and a number of

9  other people, including yourself,

10  Mr. Snellenbarger.   Do you recall this

11  correspondence?

12     A.    I do.

13     Q.    And did you know Mr. Prieto

14  prior to the ResCap engagement?

15     A.    I did not.

16     Q.    Did you know anyone at Aurelius?

17     A.    I personally did not know.

18     Q.    Did the company Houlihan?

19     A.    I believe so.  I believe they

20  dealt with them on other engagements.

21     Q.    Had Houlihan worked for Aurelius

22  on other engagements?

23     A.    I think so maybe.  I think may

24  have been on a committee or two that

25  Houlihan was advising or had advised

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 168 of 329

290

                    SNELLENBARGER

1

2    previously.

3        Q.    If you go to the very last page,

4    there's an e-mail from Dan Gropper from

5    Aurelius?

6        A.    Yes, I see it.

7        Q.    And you see that Mr. Gropper is

8    trying to get an introduction to you.

9        A.    I see it.

10       Q.    And ultimately he did make an

11   introduction to you, right?  You

12   eventually caught up with each other?

13       A.    Correct.

14       Q.    And what did Mr. Gropper want to

15   talk to you about?

16       A.    He wanted to, I think at that

17   time they had bought some junior secured

18   bonds and let us know that they were

19   holders.  And they had, on a public basis

20   had some thoughts about the value of

21   the -- available for the junior secured

22   noteholders and wanted to understand a

23   little better the PSA agreement that the

24   ad hoc group had entered into.

25       Q.    Did you have a meeting with

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 169 of 329

291

```
 1              SNELLENBARGER

 2     Mr. Gropper or anyone else at Aurelius

 3     around this time period?

 4          A.     We had some phone calls first.

 5     I think we met with them ultimately in

 6     July, I believe.

 7          Q.     The e-mails are, I know there's

 8     a number of different e-mails, but the

 9     first series of e-mails are from May and

10     earlier, May 15th, which I believe is --

11          A.     The day after the --

12          Q.     -- the day after the petition,

13     right.  Do you know if you spoke to anyone

14     at Aurelius in May?

15          A.     I think I only spoke to them

16     after the filing.  So yes, in May but I

17     think after the filing.

18          Q.     If you -- right.  I'm focused on

19     the May 15th date.  If you look at the

20     page ending 8871.

21          A.     Right.

22          Q.     It looks like you and Mr. Prieto

23     catch up on May 15th?

24          A.     Yes.

25                 MR. RENENGER:  8771 just to
```

292

1              SNELLENBARGER

2         clarify.

3              MR. WALSH:  Yes, thank you.

4         Q.    What did you and Mr. Prieto talk

5     about on that phone call?

6         A.    This same discussion of

7     Aurelius, I think, had bought some junior

8     secured note bonds and were holders and

9     they wanted to understand in parallel with

10    the filing, I think the PSA had been

11    filed.  I think that had been made public

12    so they wanted to understand what it was,

13    what the ad hoc group agreed to, et

14    cetera.

15        Q.    And did you provide that

16    information to him?

17        A.    Whatever was publicly available

18    we discussed.

19        Q.    We looked at the three-page

20    document reflecting recoveries of JSNs

21    that was publicly filed.  Did you share

22    any information that was in that document

23    with anyone from Aurelius in May?

24        A.    It was already public at that

25    point so they had it, so I didn't have to

293

1              SNELLENBARGER

2     share it with them.

3         Q.    Was that one of the things you

4     discussed on the phone call?

5         A.    It may have been, yeah.

6         Q.    Did Mr. Prieto raise the issue

7     of whether the JSNs had a collateral

8     interest in intercompany balances on that

9     phone call?

10        A.    That phone call I don't know.  I

11    just don't remember whether it was that

12    phone call or not.

13        Q.    We will get to the later phone

14    call.  So at some point you did have

15    discussions with Aurelius about

16    intercompany balances, correct?

17        A.    Correct.

18        Q.    Did you have an understanding

19    why Mr. Prieto was reaching out to you as

20    opposed to someone in the JSN group?

21             MR. RENENGER:  Object to the

22        form of the question.

23        Q.    If you know.  Why was he

24    reaching out to Houlihan rather than to

25    individual noteholders?

294

1          SNELLENBARGER

2          A.    I assume because we were the

3     financial advisor to the holder and

4     probably had done more diligence, even on

5     a public basis, than individual holders.

6     I can't say.  He may have had other

7     discussions with individual holders, I

8     don't know.

9          Q.    Did you share with Mr. Prieto

10    any nonpublic information?

11         A.    No.

12         Q.    Did you discuss the RMBS

13    contingent liabilities on that phone call?

14         A.    I don't remember.  I think the

15    RMBS proposed settlement was made public I

16    think around the same time as the filing

17    so it was out there.  So we may have

18    talked -- we may have talked about it.

19         Q.    Did you discuss with him whether

20    those liabilities, those claims, would be

21    subordinated in the bankruptcy?

22         A.    I don't believe so on that call.

23         Q.    Did you review the RMBS PSA when

24    it came out?

25         A.    Yes.

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 173 of 329

295

SNELLENBARGER

1

2    Q.    And did you understand that PSA

3    did not provide for subordination of those

4    claims?

5    A.    Yes.

6    Q.    If you turn to the first page,

7    Mr. Prieto has latched on to -- has

8    followed up on the May correspondence with

9    a new e-mail dated June 21, 2012.  And he

10   writes, "Reid, we are in the process of

11   drafting a letter to the ad hoc group

12   expressing the view that the junior

13   secured settlement could be dramatically

14   improved."

15         Did you on June 21st or

16   thereabouts have a discussion with

17   Mr. Prieto about that issue?

18   A.    I believe so, yes.

19   Q.    What was the discussion?

20   A.    They basically said that they

21   wanted to highlight several issues and

22   areas of value that they thought were

23   important to the JSNs.  And that their

24   belief that they were, the junior secureds

25   were significantly oversecured.  And that

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 174 of 329

296

1                 SNELLENBARGER

2     they were concerned that the PSA had

3     forgone six months of post petition

4     interest unnecessarily.

5          Q.    Did you disagree with the view

6     that the JSNs were oversecured at that

7     time?  This is June 2012.

8          A.    No.  What I said, I said his --

9     the points that he raised we were aware

10    of, we had considered.  But there were

11    other considerations that factored into

12    the group agreeing to the PSA.

13         Q.    What were those considerations?

14         A.     Speed and certainty.  The

15    bargain that the ad hoc group was making

16    was that, even if they ultimately were

17    oversecured or not, I think they were

18    willing to waive 6 or 7 months of post

19    petition interest if they could get paid

20    out before the end of the year.  That is

21    really what they were doing.  And get

22    their full claim paid out.  So that was

23    really what, you know, what that group

24    kind of hung their hat on.

25         Q.    And you understand that in

297

1          SNELLENBARGER

2    connection with the prepetition PSA the ad

3    hoc group had also waived their rights to

4    certain intercompany balances?

5          A.    I don't know.  I don't recall

6    that.

7          Q.    Do you recall that at least with

8    respect to the RFC intercompany balances

9    those intercompany balances would be

10   waived in the prepetition PSA?

11         A.    Well, actually I do recall that

12   was actually a mistake in the drafting and

13   that White & Case had then reached out to

14   MoFo to correct that drafting and had

15   alerted MoFo that they had a problem

16   there, that waivers shouldn't be applied

17   because we weren't waiving any of the

18   intercompany claims amongst any of the

19   entities.

20         Q.    When did that happen?

21         A.    Subsequent to the filing of the

22   PSA.

23         Q.    Had White & Case reviewed the

24   term sheet prior to the signing of the

25   PSA?

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger    Pg 176 of 329

298

1                SNELLENBARGER

2        A.    I don't believe so.

3        Q.    That error was in the

4   prepetition PSA term sheet?

5        A.    It was.  There were a lot of

6   documents flying around, people working

7   late trying to get everything done.  So it

8   was just missed and White & Case alerted

9   MoFo of that fact.

10        Q.    With respect to the discussion

11   with Mr. Prieto in June, did he provide

12   you with a draft of the letter that he

13   ultimately sent or that was sent to

14   noteholders on June 26th?

15        A.    You know, I can't remember if he

16   sent us a draft ahead of time or not.  He

17   may have.  I just -- I honestly don't

18   recall.  I know we talked about the

19   substance of it.  But whether he sent me a

20   draft ahead of time I just can't remember.

21        Q.    While we are getting the letter,

22   you see at the top of this page Mr. Prieto

23   asks you for the e-mail addresses for

24   Alliance, Loomis and CQS.  Did you provide

25   those e-mail addresses to him?

299

1          SNELLENBARGER

2          A.    I can't remember if we did.  You

3     know, ultimately, I don't think we needed

4     to because they actually tracked them down

5     themselves I think.  We may have, I just

6     don't remember.

7                (AHG Exhibit 23, June 26th

8           e-mail from Dennis Prieto to a number

9           of people, marked for identification,

10          as of this date.)

11         Q.    Exhibit 23 is June 26th e-mail

12    from Dennis Prieto to a number of people,

13    including yourself, Mr. Snellenbarger.  It

14    attaches a letter from Mr. Brodsky of

15    Aurelius.  You are familiar with this?

16         A.    I am.

17         Q.    Does this refresh your

18    recollection whether you saw a draft of

19    this before it was sent?

20         A.    I just don't remember.  I

21    remember -- I obviously remember the

22    letter and I just don't know if we had a

23    copy of it before or not.

24         Q.    But at least with respect to

25    some of the issues in the letter, you had

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 178 of 329

300

1          SNELLENBARGER

2     a discussion with Mr. Prieto on those

3     issues before the letter was sent?

4          A.    Yes.

5          Q.    Could you review the letter and

6     tell me which issues you discussed with

7     him?

8          A.    I think it primarily revolved

9     around the incremental value and the sale

10    process.  We talked about intercompany

11    claims.

12         Q.    Let me stop you there.  What

13    were your discussions on the intercompany

14    claims?

15         A.    I think by then the debtors had

16    filed their schedules and so forth and the

17    intercompany claim balances were public.

18    And I think they thought that those would

19    have significant value in a plan.

20         Q.    If you look at the paragraph on

21    intercompany claims, Mr. Brodsky refers to

22    the last ResCap consolidated financials

23    from 2009.  Do you know what he's

24    referring to there?

25         A.    Yeah.  I believe historically

301

1            SNELLENBARGER

2    several years ago ResCap had provided more

3    detailed financials in public.  And they

4    had actually on a public basis had shown

5    financials by legal entity.  And in those

6    legal entities there were certain

7    intercompany balances shown.  So this

8    refers to that.  So maybe the schedules

9    hadn't been filed by then.  I don't know.

10       Q.    We will look at a separate

11   letter which was sent after that schedule.

12       A.    Maybe that's what it was

13   referring to.  But that's the answer to

14   your question, I think.

15       Q.    Had Houlihan reviewed those 2009

16   financial statements in connection with

17   his work for the ad hoc group prior to the

18   petition date?

19       A.    No.  Because we had updated

20   information on a private basis.  So we had

21   more recent information that showed that

22   consolidated information so we didn't need

23   to look at the '09 one.

24       Q.    You had information on

25   intercompany balances prior to the

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 180 of 329

302

1                    SNELLENBARGER

2    petition date?

3         A.    Yes, to the trial balance.

4         Q.    What were the issues that

5    Mr. Prieto raised with you on the sale

6    process?

7         A.    He just said that the stalking

8    horse bids -- that there's a lot of future

9    opportunity for the values to increase.

10   The stalking horse bids have already

11   increased by 175 million.  That, you know,

12   it was thought there was a lot of -- you

13   know, there could be potential upside in

14   the value of that, and you know, higher

15   bids would enhance our collateral and our

16   recovery.

17        Q.    If you turn to the first page of

18   the letter.  Mr. Brodsky refers to a

19   May 14, 2012, presentation.  Is that the

20   Houlihan presentation that we looked at

21   previously?

22             MR. RENENGER:  Object to the

23        form of the question.

24        Q.    What's the document, what

25   document is he referring to there if you

303

1                    SNELLENBARGER

2     know?

3          A.    I believe he's referring to the

4     public document that was issued, three

5     pager.

6          Q.    That we looked at previously?

7          A.    Yes.

8          Q.    Exhibit 19?

9          A.    Yes.

10         Q.    You see on page 2 that

11    Mr. Brodsky has identified that the

12    intercompany claims are not included in

13    the presentation, that's correct?  They

14    were not included in the presentation?

15         A.    That's correct.

16         Q.    He also on the third page

17    identifies collateral related to the Ally

18    contribution that is not counted in the

19    presentation.  Do you see that?

20         A.    Yes.

21         Q.    What is he referring to there?

22         A.    I think what he is referring to

23    is he's saying that a portion of the 750

24    million -- he's asserting that the JSNs

25    perhaps had a lien on a certain portion of

304

1              SNELLENBARGER

2    the $750 million, that that should be

3    counted in the secured recovery as opposed

4    to part of any unsecured recovery.

5         Q.    Was Houlihan aware of that fact

6    prior to the petition date?

7              MR. RENENGER:  Object to the

8         form of the question.

9         A.    That?

10         Q.    That there was the potential

11   that the JSNs had collateral on certain

12   causes of action against Ally?  Was that

13   discussed or was that something that

14   Houlihan knew prior to the petition date?

15         A.    Yes.

16         Q.    Was that discussed with the JSNs

17   that were your clients prior to the

18   petition date?

19              MR. RENENGER:  I'm going to

20         object to the question to the extent

21         it calls for privileged information.

22         To the extent that you had

23         nonprivileged discussions with members

24         of the ad hoc group on that subject,

25         you can answer.

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 183 of 329

305

1          SNELLENBARGER

2          Q.    I'm just asking for a yes-no

3     question.  The subject, the subject matter

4     being the potential that the JSNs had a

5     collateral interest on causes of action of

6     actions against Ally.  Was that subject

7     matter discussed between Houlihan and your

8     JSN clients prior to the petition date?

9          A.    Yes.

10         Q.    Do you recall how many times

11    that was discussed?

12         A.    No.

13         Q.    More than once?

14         A.    I think it was discussed part of

15    our settlement discussions.

16         Q.    Discussed prior to the

17    settlement?

18         A.    No.  I think it was during.

19         Q.    And was it a discussion that

20    occurred with the debtor or debtors'

21    representatives?

22         A.    With the ad hoc group in

23    presence?  I mean --

24         Q.    Let me reframe the question.

25    You had a number of discussions with the

306

1              SNELLENBARGER

2    advisors to ResCap and I assume also with

3    ResCap personnel?

4        A.    Yes.

5        Q.    Was the issue of whether the

6    JSNs had a collateral interest in causes

7    of action of actions against Ally

8    discussed at those meetings, phone calls?

9        A.    Between advisors?

10       Q.    Yes.

11       A.    I believe so.

12       Q.    How many times?

13       A.    I couldn't recall.  The issue

14   was raised.  How many times, I couldn't --

15   I don't know.

16       Q.    Same question with respect to

17   internal discussions, internal with

18   respect to Houlihan and the ad hoc group.

19   Were the discussions, prior to the

20   petition date, between Houlihan and the ad

21   hoc group regarding whether the JSNs had a

22   collateral interest in the causes of

23   action against Ally?

24           MR. RENENGER:  Object to the

25       form of the question.

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 185 of 329

307

1            SNELLENBARGER

2        Q.    Were there discussions prior to

3    the petition?

4            MR. RENENGER:  I heard it the

5        same way she wrote it actually.

6        Q.    Were there discussions between

7    Houlihan and the clients, the JSN clients

8    regarding whether the JSNs had a security

9    interest, a collateral interest in causes

10   of action against Ally?

11           MR. RENENGER:  Object to the

12       form of the question as asked and

13       answered.  Yes or no question.

14       A.    Yes.

15       Q.    There were discussions.  Did you

16   have -- let me ask more broadly.  Did

17   Houlihan have discussions with the ad hoc

18   members that were Houlihan's clients about

19   the Brodsky letter at or around the time

20   of the Brodsky letter?  This is the

21   June 26th letter that's 23?

22       A.    Yes.

23       Q.    How many discussions?

24       A.    A few.  I mean it was made

25   public.  It was sent to them.  They

308

                    SNELLENBARGER

1

2    called.   Asked questions.

3              (AHG Exhibit 24, e-mail chain,

4         marked for identification, as of this

5         date.)

6              (AHG Exhibit 25, e-mail chain,

7         marked for identification, as of this

8         date.)

9         Q.   Mr. Snellenbarger, I have handed

10   you Exhibits 24 and 25.  24 is an e-mail

11   from July 3rd.  The last e-mail dated July

12   3rd, 9:39 a.m. from Liz Park from FTI.

13   You see your colleague Ben Ilhardt is

14   copied on these e-mails?

15        A.   Yes.

16        Q.   You see that Ms. Park has

17   provided to Jeff Lewis and Ben Ilhardt the

18   top ten intercompany schedule?

19        A.   Yes.

20        Q.   Had Houlihan received this

21   document prior to this date?

22        A.   No.

23        Q.   Houlihan was aware, though, that

24   in late June the debtor had filed its

25   schedules that included information on the

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 187 of 329

309

1                    SNELLENBARGER

2      intercompany balances, correct?

3           A.      Correct.

4           Q.      Did Houlihan do an analysis of

5      those schedules to determine the value of

6      the intercompany balances?

7           A.      No.

8           Q.      Do you know why FTI was

9      providing this to Houlihan on July 3rd?

10          A.      Yeah.  I mean, we had continued

11     to ask about the intercompany's balances.

12     We had looked at the schedules, saw the

13     balances there.  I think they were trying

14     to provide a little more detail to us

15     about what those balances were and what it

16     contained, et cetera.

17          Q.      Why were you asking for that

18     information?

19          A.      To, you know, further refine our

20     recovery model to understand what the

21     potential outcomes may be with respect to

22     intercompanies.  Again, like we discussed

23     previously, both sides built a recovery

24     model.  Both sides included and developed

25     intercompany relationships as part of

310

SNELLENBARGER

1

2    those models.  So we were trying to refine

3    that analysis to make it more accurate so

4    we had the right correct balances in

5    there.  So that if we ran waterfalls, that

6    they would -- the output would be more

7    accurate, more refined.

8         Q.    Take a look at Exhibit 25.

9         A.    Okay.

10        Q.    This is an e-mail from Dennis

11   Prieto, July 3rd as well, time 11:40 a.m.

12   He asks for a call with you on that day.

13   Did you talk to Mr. Prieto on July 3rd?

14        A.    I may have, perhaps, yes.

15        Q.    He writes he wants to discuss

16   planned next steps in light of the ResCap

17   schedules.  What's your understanding of

18   that?

19        A.    I think he wanted to, there's a

20   lot of information in this file much more

21   interface with the public.  He wanted to

22   understand what our plan was to review and

23   go through them.

24        Q.    Do you know if anyone at

25   Aurelius had performed their own analysis

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 189 of 329

311

```
 1              SNELLENBARGER

 2    of the intercompany schedules?

 3         A.    I know they had looked at the

 4    intercompany balances and saw that there

 5    were balances.  You know, saw what the

 6    balances were.  I think they were trying

 7    to develop again, their own, on a public

 8    basis, their own recovery model.

 9         Q.    Did they perform their own

10    recovery mold, to your knowledge?

11         A.    I think they were trying to kind

12    of develop what they thought the ranges of

13    outputs, what the intercompanies could

14    receive based on a variety of inputs.  I

15    think they were trying to come up with

16    that range.

17         Q.    He also asked about the footnote

18    3 to the presentation.  If you turn back

19    to Exhibit 19, it's on page 2 Bates

20    stamped 3474.  It's Exhibit 19 if you have

21    it handy.

22         A.    Yeah.  Okay.

23         Q.    What was Mr. Prieto's question

24    about the 1.4 billion of other general

25    unsecured claims?
```

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 190 of 329

312

1                    SNELLENBARGER

2        A.    I think because the schedules

3    didn't have that high a number.  The 14 in

4    the presentation on Exhibit 19 was the

5    estimate given to us by the debtors.  And

6    then when they filed their schedules, the

7    statements, that number was significantly

8    less.  So I think he was trying to

9    understand why there was a difference.

10       Q.    Do you have an understanding why

11   there was a difference?

12       A.    The debtors overestimated.

13       Q.    What impact, if any, would that

14   have on junior secured recovery?

15       A.    Only to the extent that we had

16   deficiency claims.  Well, in two ways.

17   Whether -- if we were undersecured, it

18   would -- that there were less ducks,

19   general unsecured claims then the value of

20   our deficiency would be higher.  Also with

21   respect to intercompany claims.  If the

22   amount of general secured claims were

23   lower, those -- the value of intercompany

24   claims would be higher.

25       Q.    In a sense this was good news,

313

```
 1              SNELLENBARGER

 2      they had overestimated?

 3          A.   Correct.

 4          Q.   You can put that aside.

 5               (AHG Exhibit 26, July 5th, 2012

 6          letter from Mr. Brodsky, marked for

 7          identification, as of this date.)

 8          Q.   26 is the July 5th, 2012 letter

 9      from Mr. Brodsky to a number of people

10      including yourself, Mr. Snellenbarger.

11      Did you receive this letter on July 5th?

12          A.   I did.

13          Q.   Do you know if you saw a draft

14      of this letter before July 5th?

15          A.   I don't recall.

16          Q.   The letter includes a discussion

17      on the intercompany claims, correct?

18          A.   Yes.

19          Q.   Mr. Brodsky refers to the

20      schedules that were recently filed by the

21      ResCap debtors?

22          A.   Yes.

23          Q.   Those are the same schedules

24      that we have been discussing?

25          A.   Correct.
```

314

1          SNELLENBARGER

2          Q.     You see that Mr. Brodsky has --

3     well, someone as Aurelius has performed an

4     analysis of the collateral value of the

5     intercompany receivables, correct?

6          A.     Yes.

7          Q.     And he's calculated 64-72 bond

8     points of collateral value for those

9     intercompany claims.  To the lawyers who

10    are laymen in room, what does that

11    represent, 64-72 bond points?

12         A.     I think he's trying to say that

13    that could equal 64 to 72 percent of

14    amount of bonds or amount of recovery.

15         Q.     It was a substantial amount?

16         A.     Yes.

17         Q.     Increased value?

18         A.     Correct.

19         Q.     Did you agree with that analysis

20    as of July 5th, 2012?

21         A.     Aurelius had used -- in order to

22    determine a range of recoveries for the

23    intercompany claims, it involves a whole

24    host of different assumptions to be put in

25    to any analysis.  Aurelius only had public

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger    Pg 193 of 329

315

1              SNELLENBARGER

2      information.  So they were trying to look

3      at it on a public basis.  There was

4      limited information publicly.  We had more

5      private information internally.  Our

6      recovery output estimates on those

7      recoveries were probably more refined.  We

8      thought it could be potentially

9      significant.  Whether it was to that

10     magnitude, I'm not sure.

11          Q.   Do you know if anyone at

12     Houlihan or Houlihan generally reached a

13     conclusion on the value of the

14     intercompany claims prepetition?

15          A.   No.

16          Q.   At some point though, at least

17     prior to July 5th, Houlihan had concluded

18     there was a value to those intercompany

19     claims, correct?

20          A.   We never had did a valuation.  I

21     just want to draw the distinction.  The

22     intercompany -- we never looked at the

23     validity of the claims and whether this

24     intercompany claim was valid or this one

25     wasn't valid or whatever.  We never did

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger    Pg 194 of 329

316

1          SNELLENBARGER

2     that analysis.  What we did was simply put

3     the balances as stated in our recovery

4     model and then made assumptions on asset

5     values and so forth, primarily, you know,

6     the substance given to us by the debtor

7     and different claim assumptions for other

8     creditors.  You run that through a

9     waterfall model and out comes a, you know,

10    recovery estimate for those intercompany

11    claims.

12          So you can provide recovery

13    estimate ranges based those assumptions

14    but we didn't do a value, you know, of

15    that intercompany because we didn't do a

16    validity analysis whether they were not.

17    It was simply binary.  We turn them on, we

18    turn them off and we show what that range

19    is.

20       Q.    What was the amount?

21          MR. RENENGER:  Object to the

22    form.

23       Q.    You said you assumed that the

24    amounts were valid.  What were the

25    amounts, the total amounts?

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 195 of 329

317

1                    SNELLENBARGER

2          A.    The recovery amounts or the

3    balances?

4          Q.    The balances.

5          A.    I don't have the numbers in

6    front of me.  As I discussed before, I

7    know there were different intercompany

8    counts back and forth.  Some were in the

9    billions some were in hundreds of

10   millions.

11         Q.    It was north of 2 or 3 billion?

12         A.    In aggregate, yes.

13         Q.    The recovery model and the

14   waterfall model that was presented in the

15   presentation, Exhibit 19, does not include

16   recovery for intercompany balances,

17   correct?

18         A.    No.  Because the debtors at the

19   time of the settlement said they didn't

20   believe they would be allowed and,

21   therefore, we were limited to what we

22   could disclose to our client and what the

23   debtors would allow us to disclose.  So we

24   couldn't show intercompany recovery

25   estimates to them because they weren't --

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 196 of 329

318

1                    SNELLENBARGER

2     they didn't want us disclosing that

3     publicly.

4          Q.     The debtors informed Houlihan

5     that the intercompany balances should not

6     be disclosed to their clients?

7          A.     Not the balances but the --

8     well, balances and recovery estimates.

9     That information was not public at the

10    time of the PSA and they weren't going to

11    divulge it inside settlement negotiations.

12    They didn't want to divulge it or blow it

13    out once the confi period had ended.

14         Q.     The ad hoc group had signed a

15    nondisclosure agreement, correct?

16         A.     Correct.

17         Q.     And that nondisclosure agreement

18    allowed the debtors to see provide the

19    noteholders to sign that NDA with

20    nonpublic information?

21         A.     Yeah.  Certain nonpublic

22    information that would ultimately be borne

23    out.

24         Q.     And is it your testimony that

25    the nonpublic information regarding the

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 197 of 329

319

1              SNELLENBARGER

2      intercompany balances were only provided

3      to Houlihan and not provided to the funds?

4          A.    That's correct.

5          Q.    And the recoveries that included

6      claims for intercompany balances was also

7      not provided to the JSNs?

8          A.    That's correct.

9          Q.    So I'm not going to ask you to

10     divulge what's redacted in the

11     presentation that we looked at earlier but

12     it's your point of view that those

13     presentations do not include recoveries

14     for intercompany balances?

15         A.    That's correct.  We just simply

16     said in the presentation that if they were

17     valid, they would increase the secured

18     recovery.

19         Q.    Without quantifying for the JSNs

20     the amount of the increase in recovery?

21         A.    That's correct.

22         Q.    Did you at any point raise with

23     your clients prior to the petition date

24     that that information should be provided

25     to the signatories to the NDA?

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 198 of 329

320

1              SNELLENBARGER

2              MR. RENENGER:  I'm going to

3         object to the form of the question and

4         instruct the witness to the extent the

5         answer to that question would divulge

6         work product or attorney-client

7         privileged communications, I'll direct

8         you not to answer.

9         A.    I can't answer at the direction

10    of counsel.

11        Q.    If you turn back to the July 5th

12    letter.

13        A.    Sure.

14        Q.    First page of the letter has a

15    footnote 2, referring to the RMBS trust

16    and monoline claims and subordination.

17        A.    Yes.

18        Q.    Was this the first time that

19    Houlihan became aware that the RMBS and

20    monoline claims could be subject to

21    subordination in the plan?

22              MR. RENENGER:  Object to the

23         form of the question.

24        Q.    We asked a number of questions

25    prepetition about subordination.  I think

321

1                    SNELLENBARGER

2       most respects your counsel advised you not

3       to disclose confidential and privileged

4       information.  I'm just asking generally.

5       When was the first time with respect to

6       this engagement that Houlihan became aware

7       that the RMBS and monoline claims could be

8       subordinated in the plan?

9                    MR. RENENGER:  I'm going to

10          object to the form of the question.

11          Q.    At some point, either at the

12      date of this letter or at some point prior

13      to the date of the letter, you

14      Mr. Snellenbarger became aware that these

15      claims, the RMBS and monoline claims,

16      could be subordinated in the plan.  They

17      were not subordinated but Mr. Brodsky is

18      saying they could be subordinated?

19          A.    Correct.

20          Q.    Is this the first time you

21      learned that fact or did you know it

22      before?

23          A.    No.

24          Q.    Did you know it before the

25      petition date?

322

1                SNELLENBARGER

2        A.    I think as a general matter,

3    we -- I think we were aware that it was

4    possible.

5        Q.    And you discussed it with your

6    clients prior to petition date?

7              MR. RENENGER:  Objection.

8        Q.    Yes or no answer.  The issue of

9    subordination with respect to the RMBS and

10   monoline claims, did you discuss that

11   issue with your clients prepetition?

12             MR. RENENGER:  Object.  I think

13        it's been asked and answered earlier,

14        but go ahead.

15       A.    I believe so.

16             MR. WALSH:  If we take a break,

17        I can shorten what we have.

18             MR. RENENGER:  Sure.

19             (Whereupon, there is a recess in

20        the proceedings.)

21       Q.    Exhibit 26.  Where it says, "We

22   look forward to meeting with you next

23   week," Mr. Brodsky is writing to among

24   others you.  Did you, in fact, meet with

25   anyone from Aurelius at around that time?

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 201 of 329

323

1              SNELLENBARGER

2        A.    Yes.

3        Q.    In person?

4        A.    Yes.

5        Q.    What happened at that meeting?

6        A.    We discussed the letters that

7    they had sent around publicly and also

8    discussed kind of generally on a public

9    basis the history of the case and the

10   discussions and the rationale for entering

11   into the PSA.

12       Q.    Was there a discussion about

13   intercompany claims at that meeting?

14       A.    I believe so.

15       Q.    Where was the meeting?

16       A.    I believe it was at White & Case

17   offices.

18       Q.    And how long did the meeting

19   last?

20       A.    About an hour or two.

21       Q.    Were you there at the meeting?

22       A.    I was.

23       Q.    Who else was at the meeting?

24       A.    Mr. Brodsky, Mr. Prieto, Jerry

25   Uzzi from White & Case, I believe Jeffrey

324

1              SNELLENBARGER

2     Lewis from Houlihan, Matt Niemann may have

3     been there.  I don't remember if he was or

4     not.

5          Q.     And what -- did the Aurelius

6     folks take a position on whether the

7     prepetition PSA should be supported or not

8     supported?

9          A.     I'm sorry, can you repeat the

10    question?

11         Q.     Did the Aurelius people at this

12    meeting take a position one way or the

13    other whether the prepetition PSA that was

14    in place should be supported or not

15    supported?

16         A.     No, they didn't go that far in

17    the meeting.

18         Q.     Were they asking questions to

19    you and the other attendees about why they

20    should support the prepetition PSA?

21         A.     I think they wanted to

22    understand based on the items that they

23    had laid out in the -- excuse me -- the

24    significant value that they thought was

25    available to the JSNs, what was the

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 203 of 329

325

1              SNELLENBARGER

2    rationale for entering into the PSA.

3         Q.    Was that information provided to

4    them at that meeting?

5         A.    Yes.

6         Q.    Were there any other meetings

7    with the Aurelius folks regarding any of

8    these issues after July 5th or after the

9    July meeting?

10        A.    Yeah.  I believe we met with

11   them.

12        Q.    I'm fixing this pretermination.

13   So any meetings between July and September

14   regarding support for the PSA?

15        A.    Well, I think we met with them

16   again, I don't know whether it was

17   regarding support for the PSA or not, but

18   I had subsequent discussions just

19   generally about the case and where things

20   were headed, et cetera.

21        Q.    Do you recall how many times you

22   met with them?

23        A.    Couple times, I believe.

24        Q.    How many times in person?

25        A.    I think twice I think.

326

1           SNELLENBARGER

2      Q.    Here in New York?

3      A.    Yes.

4      Q.    Do you recall when?

5      A.    Well, the first one was around

6  right after July 5th.  The second one may

7  have been a couple weeks later.  It could

8  have been in August, too, I don't know.

9           (AHG Exhibit 27, e-mail from Ben

10      Ilhardt at Houlihan to Arthur Kaz,

11      marked for identification, as of this

12      date.)

13      Q.    Exhibit 27, Mr. Snellenbarger,

14  is an e-mail from Ben Ilhardt at Houlihan

15  to Arthur Kaz.  Do you know who Arthur Kaz

16  is?

17      A.    I do.

18      Q.    Who is he?

19      A.    He was a professional at

20  Pentwater Capital at the time.

21      Q.    Was he the professional at

22  Pentwater that was supervising Pentwater's

23  investment in JSNs?

24      A.    He was the day-to-day guy.

25      Q.    Were there discussions with

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 205 of 329

327

1          SNELLENBARGER

2    Mr. Kaz about the value of the

3    intercompany claims at or around July 5th,

4    2012?

5         A.    He had seen the letter that

6    Aurelius had sent around and, you know,

7    about the, you know Aurelius's kind of

8    assertion about the magnitude those

9    intercompany claims may yield in recovery.

10   And so he called and said where do or you

11   think -- how are you getting the rates

12   numbers.  He said we don't know exactly

13   how they're quantifying them but I think

14   they are looking at the schedules.  And he

15   said can you point me to where they are in

16   the schedule, et cetera.  So we sent him

17   this summary of where they were in these

18   schedules.

19        Q.    So the listing that's attached

20   reflects the docket entries for the

21   schedules?

22        A.    I believe so, yes.

23        Q.    That also includes the amounts

24   to the intercompany receivables, correct?

25        A.    Correct.

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 206 of 329

328

1          SNELLENBARGER

2      Q.    And this is information that the

3  debtors made public at the end of June?

4      A.    Correct.

5      Q.    Did you have subsequent

6  discussions with Pentwater about the

7  intercompany balances?

8      A.    Yes.

9      Q.    What were those discussions?

10     A.    They were trying to develop

11 their own model to come up with a range of

12 recovery, ranges of what those

13 intercompanies may yield based on

14 assumptions.  So they were trying to

15 figure that out on a public basis.  So we

16 were doing our best on a public basis to

17 guide him on what assumptions he used on a

18 public basis to try to help him there.

19     Q.    So by this time we had a

20 recovery model by Aurelius and we also had

21 Pentwater doing a recovery model of their

22 own?

23     A.    Correct.

24     Q.    Do you know if the amounts in

25 the Aurelius recovery analysis matched the

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 207 of 329

329

1              SNELLENBARGER

2     amounts in the Pentwater recovery

3     analysis?

4          A.    I don't recall.  I don't believe

5     they did.  Again, a recovery model with a

6     case is complex.  There's a variety of

7     different assumptions that can be used

8     that would impact what those ranges would

9     be.

10         Q.    Did Aurelius and Pentwater have

11    different assumptions with respect to the

12    intercompany claims?

13         A.    I just don't remember what the

14    different assumptions were.

15         Q.    Well, you mentioned that

16    Aurelius's assumptions regarding the

17    intercompany claims were different than

18    Houlihan's assumptions, correct?

19         A.    Right.

20         Q.    Do you recall if Pentwater's

21    assumptions regarding the intercompany

22    claims were also different from

23    Houlihan's?

24         A.    Yes.  Only because both

25    Pentwater and Aurelius were, could only

330

1              SNELLENBARGER

2     use public information.  We had the

3     benefit of some private information.

4          Q.    Did you receive any analysis

5     from any other signatory to the PSA

6     regarding the intercompany claims,

7     Marathon, York?

8          A.    No, not that I recall.

9          Q.    Silver Point?

10         A.    I don't think so.

11         Q.    Prior to the petition date, were

12    you provided a recovery analysis by any of

13    the ad hoc group members?

14         A.    Prior to the petition date?

15         Q.    Correct.

16         A.    No.

17         Q.    Were you aware whether members

18    of the ad hoc group were doing their own

19    recovery analysis prior to the petition

20    date?

21         A.    I don't remember.  I mean, I

22    think based on the public information it

23    had been very difficult to try to do that,

24    to ascertain what that was or wasn't.

25         Q.    Well, by the petition date,

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger    Pg 209 of 329

331

1          SNELLENBARGER

2     though -- by the petition date those

3     members had signed an NDA and had received

4     some nonpublic information?

5          A.    I'm sorry.  I apologize.

6          Q.    I'm trying to fix before the

7     petition date just so we have all the

8     questions squared.  Prior to the petition

9     date, were you aware whether any members

10     of the ad hoc group were performing their

11     own recovery analysis with respect to the

12     JSNs?

13          A.    I don't believe so because the

14     information they received on a

15     confidential basis was such a short time

16     period between that and when we did the

17     settlement.  I don't think they had time

18     to do their own recovery analysis based on

19     that information.  My guess.

20          Q.    You don't know one way or the

21     other?

22          A.    But I don't know.

23          Q.    At some point Houlihan shared

24     its recovery analysis with the members of

25     the ad hoc group prior to the petition

332

1                    SNELLENBARGER

2    date?  We saw the redactions but I'm not

3    going to ask you what's in the recovery

4    analysis but there was a recovery analysis

5    by Houlihan that was provided to the ad

6    hoc group?

7         A.    Yeah.  Based on the information

8    provided in the petition.

9              (AHG Exhibit 28, e-mail from

10        Arthur Kaz, marked for identification,

11        as of this date.)

12             (AHG Exhibit 29, e-mail from Ben

13        Ilhardt, marked for identification, as

14        of this date.)

15        Q.    28, Mr. Snellenbarger, is an

16    e-mail from Arthur Kaz to you and others

17    at Houlihan from August 23rd.  Do you

18    recall this e-mail?

19        A.    I do.

20        Q.    Mr. Kaz refers to an analysis

21    that's attached, appears to be his

22    waterfall, well, Pentwater's waterfall

23    analysis, correct?

24        A.    Yes.

25        Q.    And it's based on the publicly

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 211 of 329

333

1              SNELLENBARGER

2    available information on the schedules,

3    correct?

4         A.    Yes.

5         Q.    And it includes a recovery based

6    on recovery on intercompany balances,

7    correct?

8         A.    Just give me a second.  I just

9    want to reread the e-mail.

10             Can you repeat the question?

11        Q.    While you are looking at it --

12             MR. WALSH:  Aaron, would you

13        look at page printed from November

14        5th, 12:24.  It's the first page of

15        the analysis.  Can I ask you, the

16        intercompany receivables are blacked

17        out, is that a redaction or is that

18        a --

19             MR. RENENGER:  No, that's not a

20        redaction.

21        A.    I'm sorry, can you repeat the

22    question?

23        Q.    So if you look at the attachment

24    that is Pentwater's analysis.

25        A.    Hmm.

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 212 of 329

334

1              SNELLENBARGER

2          Q.    You see under assets there's an

3     item for intercompany receivables?

4          A.    Yes.

5          Q.    MV.  Do you know what MV refers

6     to?

7          A.    I don't know actually.  I don't

8     know.

9          Q.    In the cover e-mail, Mr. Kaz is

10    asking -- asking the Houlihan folks to

11    forward any analytical work that Aurelius

12    has sent to date.  Do you know what he's

13    referring to there?

14         A.    I think he was trying to --

15    based on the letter, Aurelius provided a

16    range of recovery estimates.  On the

17    second letter on the intercompanies and he

18    was trying to understand if they provided

19    any analytical support behind that to

20    understand how they got to that number, he

21    wanted to see that.

22         Q.    Had they, had Aurelius provided

23    underlying support?

24         A.    They did not provide that to us,

25    no.

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 213 of 329

335

1          SNELLENBARGER

2     Q.    Do you know if Aurelius ever

3     provided that support to --

4     A.    No.  We had some discussions

5     with them about what their assumptions

6     were but they didn't provide the actual,

7     their recovery.

8     Q.    Did Pentwater perform its own

9     analysis of the intercompany balances?

10     A.    They tried to create their own

11     waterfall model to determine some, a range

12     of outcomes for the intercompanies.

13     Q.    Did they provide that to

14     Houlihan?

15     A.    Yes.

16     Q.    Do you know when?

17     A.    Well, it looks like from this

18     e-mail he sent it in August but he said he

19     had sent it a month before as well.  So if

20     that's correct, then I assume the first

21     time he sent it was in July.

22     Q.    If you turn to the last page of

23     the document.

24     A.    Yes.

25     Q.    Do you see at the top third

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 214 of 329

336

1           SNELLENBARGER

2       intercompany receivables, there are

3       certain values listed in the various, I'll

4       call them silos, for lack of a better

5       word?

6           A.    Yes.

7           Q.    Is it your understanding those

8       reflect the intercompany receivables at

9       each of those silos?

10          A.    I'd have to go back and check

11      but I assume he was using the balances

12      that were provided in the schedules.

13          Q.    And those were balances,

14      intercompany balances, between certain

15      ResCap entities and other ResCap entities?

16          A.    I believe so, yes.

17          Q.    Did you have any meetings with

18      Pentwater about this analysis?

19          A.    Yes.

20          Q.    And when did you meet with them?

21          A.    Probably in late August.

22          Q.    If you look at Exhibit 29?

23          A.    Yes.

24          Q.    Before we move to 29, can you

25      look back at 28?

337

1           SNELLENBARGER

2      A.    Um-hmm.

3      Q.    The first e-mail from Pentwater.

4  Mr. Barrett Eynon at Pentwater is asking

5  for a side-by-side analysis of how

6  Aurelius gets to the intercompany

7  recoveries versus how you guys, Houlihan,

8  get to the recoveries using different

9  methodologies and clearly only public

10  information.  Do you know what he's

11  referring to there?

12      A.    Yeah.  I think he was trying to

13  say, if we developed our public model, if

14  we developed a public model, what would

15  our range of recoveries on the

16  intercompanies be versus what Aurelius

17  did.  That's the question he asks.

18      Q.    Did you have a model that was

19  based only on public information?

20      A.    We did not at the time so we

21  created one.

22      Q.    And in your meeting with

23  Pentwater, did you perform the

24  side-by-side analysis?

25      A.    We never prepared the

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 216 of 329

338

1              SNELLENBARGER

2    side-by-side analysis because we didn't --

3    we didn't want to -- we were careful not

4    to relay any of our thoughts on what the

5    recovery estimates on the companies may or

6    may not be.  So what we did, we developed

7    a base kind of public model that Pentwater

8    could insert their own assumptions and

9    play around with it to develop a range of

10   what the intercompanies may or may not be.

11       Q.    I thought Pentwater had signed

12   an NDA?

13       A.    They had.  But by August that

14   NDA had expired.  So they were on a public

15   only basis at that point.

16       Q.    Was there any difference between

17   the Houlihan model based on public

18   information and the Aurelius model based

19   on public information, at least with

20   respect to intercompany receivables?

21       A.    Again, we didn't run that for

22   Pentwater.  We basically -- we didn't --

23   what we sent over to Pentwater was a

24   recovery model that had zero recovery for

25   the intercompanies.  Not that we didn't

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 217 of 329

339

1                    SNELLENBARGER

2      think they were worth anything but we

3      simply just said, look, put your own

4      assumptions in, play around with it.  We

5      can see what outcomes result from that.

6      Basically they could have done it

7      themselves.  We were trying to be helpful

8      and just did it for them basically as a

9      mathematical exercise for them.

10         Q.    What type of assumptions could

11     change on the intercompany receivable

12     issue?

13         A.    The size of the unsecured

14     claims, the value of the assets, where

15     those assets and claims reside, at what

16     entities, would impact the value or the

17     output recoveries of the intercompanies.

18         Q.    Is it fair to say that

19     reasonable people could disagree on the

20     value of intercompany claims that were

21     publicly disclosed?

22            MR. RENENGER:  Object to the

23         form of the question.

24         A.    Based on public information,

25     there would be -- definitely a range of

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 218 of 329

340

1              SNELLENBARGER

2     outcomes could be concluded because it

3     wasn't enough public information to be

4     very specific and find out about some of

5     those assumptions.

6          Q.    At some point, either in the

7     summer of 2012 or later, did Houlihan

8     perform an analysis of the intercompany

9     receivables based on nonpublic

10    information?

11         A.    We never did a valuation.  We,

12    as I said before, we continued to update

13    our recovery model based on refinements

14    and inputs provided to us by the debtors

15    and based on the different scenarios and

16    our range of scenarios we would -- at the

17    direction of counsel we would provide --

18    counsel would provide different scenarios

19    for us, we would run it through our model.

20    We would provide those outputs to them.

21         Q.    Did the refinements include

22    refinements on the value of the

23    intercompany receivables?

24              MR. RENENGER:  Object to the

25         form of the question.  I'm going to

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 219 of 329

341

1          SNELLENBARGER

2          instruct the witness to the extent

3          that the work in question was work

4          done at the direction of counsel, you

5          are not to provide any detail on that

6          work.  But just whether or not the

7          work was done is okay.

8          A.    Yes, the work was done.

9          Q.    Let's look at Exhibit 29.

10         A.    Okay.

11         Q.    Mr. Ilhardt, is he attaching the

12    model that you referenced earlier that

13    does not assign a value to the

14    intercompany claims?

15         A.    Yes.

16         Q.    This is an illustrative model?

17         A.    Correct.

18         Q.    And it was provided in

19    electronic form such that Pentwater could

20    perform its own analysis?

21         A.    Correct.

22         Q.    Did Pentwater ever share with

23    you it's own analysis based on the

24    illustrative waterfall that you provided

25    to them?

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 220 of 329

342

1                SNELLENBARGER

2        A.    I don't know if they sent their

3    estimates back.  I think they played

4    around with it to come up with different

5    ranges.  And we talked about what those

6    ranges may be, you know, generally.

7                (AHG Exhibit 30, e-mail between

8          Mr. Snellenbarger and Mr. Prieto dated

9          July 10th, 2012, marked for

10         identification, as of this date.)

11       Q.    Exhibit 30 is an e-mail between

12   you and Mr. Prieto July 10th.  Tail end of

13   a number of other e-mails.  Mr. Prieto

14   seems to reply to all in the same e-mail.

15   Did you have a discussion -- if you look

16   at the bottom of the first page, you had

17   offered Mr. Prieto to meet or discuss, I

18   guess -- turn to page 2.  The page ending

19   in 81.  You see at the top Mr. Prieto

20   e-mails you, references an in-person

21   meeting you had and says, "We want to

22   better understand the tax issue and the

23   treatment of the monoline claims," and

24   asks if you can meet, well, chat.  Did you

25   in fact talk to Mr. Prieto or around

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 221 of 329

343

1                    SNELLENBARGER

2      July 10th?

3           A.     I believe we did.

4           Q.     And did you talk about the

5      monoline issue?

6           A.     Yes.

7           Q.     What was the discussion?

8           A.     I mean, as I recall, it's been a

9      long time.  I think just to understand

10     what the -- I think they were trying to

11     figure out where the monoline claims

12     should be asserted, what entities.  And

13     based on public information.  And we were

14     trying to help them through public

15     information and public information

16     available to the RMBS trusts at ResCap

17     where those securities were created, at

18     what entities to try to come to a

19     determination of what they were supposed

20     to put in their model with respect to

21     those claims.

22                    MR. WALSH:  This will be 31.

23                    (AHG Exhibit 31, e-mail from

24          Mr. Snellenbarger to David Reid

25          forwarding an e-mail from Mr. Prieto,

344

SNELLENBARGER

1

2        marked for identification, as of this

3        date.)

4        Q.    Exhibit 31 is an e-mail from

5    you, Mr. Snellenbarger, to David Reid

6    forwarding an e-mail from Mr. Prieto.  Are

7    you sending that to yourself?

8        A.    Yeah.  That's my e-mail address.

9        Q.    I figured that.  But I want to

10    focus on the e-mail from Mr. Prieto.  What

11    is Mr. Prieto forwarding to you?

12        A.    I think he was trying to -- they

13    did an analysis of where these securities

14    were issued and what the loss estimates

15    were to try to determine where the

16    appropriate claims should be, what

17    entities the appropriate claim should be

18    assessed at.

19        Q.    Where did he get the information

20    to perform this analysis, if you know?

21        A.    There's a service called Intex

22    that has a lot of this securities RMBS,

23    CMBS type of information that's publicly

24    available.

25        Q.    Was that available prepetition?

345

1                    SNELLENBARGER

2          A.    I believe so.

3          Q.    Did Houlihan access Pretex --

4          A.    Intex.

5          Q.    Intex.  Thank you.  Prior to the

6    petition date?

7          A.    I don't recall if we did or not.

8          Q.    Did Houlihan or anyone for the

9    ad hoc group perform the analysis that

10   Mr. Prieto has included here or any form

11   of that analysis prior to the petition

12   date?

13         A.    No, because the debtors had told

14   us what their assumptions were with

15   respect to those claims, what entities so

16   we utilized those assumptions.

17         Q.    But the information was

18   available in Intex prepetition?

19         A.    Yes.  It's one way to look at

20   it.  It's not the definitive guide of how

21   those claims should be assessed and what

22   entity.  It's one way to look at it on a

23   public basis.  The debtors made an

24   assumption based on their knowledge and

25   that's what was utilized in the recovery

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 224 of 329

346

1              SNELLENBARGER

2    models at the time on a private basis.

3        Q.    Did the debtors provide the

4    information that is included in this

5    spreadsheet prior to the petition date?

6        A.    No.

7        Q.    Is this additional information

8    that you could have accessed prior to the

9    petition date to understand the RMBS

10   settlement?

11       A.    Well, the RMBS settlement

12   happened before the date of the filing.

13   So I don't know if we could have had time

14   to do that.

15       Q.    Let me ask a different question.

16   Did anyone at Intex -- sorry.  Did anyone

17   at Houlihan access Intex prior to the

18   petition date to either confirm what the

19   debtors had provided on the RMBS claims or

20   to investigate what the debtors had

21   provided on the RMBS claims?

22       A.    We had ancillary financial

23   institution group professionals that have

24   experience in RMBS and CMBS.  I wasn't at

25   the time that familiar with the

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger    Pg 225 of 329

347

1          SNELLENBARGER

2    securitizations.  I think they had

3    generally looked at it but not on a deep

4    dive of it generally.

5          Q.    Who are they?

6          A.    I think her name was Kinga Elo.

7          Q.    She was a Houlihan employee?

8          A.    She was at the time.

9          Q.    Anyone else at Houlihan that

10   look at the RMBS claims?

11         A.    She was the person that did that

12   always.

13         Q.    Did she prepare an analysis of

14   the RMBS claims prior to the petition

15   date?

16         A.    No.  I think she on a public

17   basis.  Well, I would say when we were

18   putting together, we talked about our

19   estimates way back when and she was the

20   one that had looked at the research

21   reports and looked at the comparable

22   settlement deals.  I think had looked at

23   Intex a little bit to kind of develop some

24   kind of best guess range on a public

25   basis.

348

1           SNELLENBARGER

2       Q.    We had looked at a document that

3   provided a preliminary and HL estimate.

4   Was she involved in that?

5       A.    Yes.

6       Q.    If you look back at Exhibit 24,

7   you see Ms. Park refers to Intralinks at

8   the top?

9       A.    Yes.

10      Q.    Does this refresh your

11  recollection that Houlihan had access to

12  Intralinks during this time period?

13      A.    Yes.  And again, I think

14  Intralinks had different data rooms -- or,

15  excuse me, Intralinks ResCap had different

16  data rooms set up on Intralinks so I know

17  we had access to a data room on the

18  Intralinks site from ResCap.

19      Q.    At least through July 3rd, 2012?

20      A.    Yes.

21      Q.    You don't know one way or the

22  other but you potentially could still have

23  access to Intralinks?

24      A.    Right.

25            (AHG Exhibit 32, Notice, marked

349

SNELLENBARGER

1

2          for identification, as of this date.)

3          Q.     Mr. Snellenbarger, you are a

4     30(b)(6) witness on the public disclosure

5     document that I have just handed you.

6     This is Exhibit 32.   Are you familiar with

7     this document?

8          A.     I am.

9          Q.     You reviewed it in connection

10    with today's deposition?

11         A.     Yes.

12         Q.     Turn to the last page.

13         A.     Okay.

14         Q.     The title of the last page is

15    intercompany claims and estimated

16    recoveries.   Is this a disclosure that the

17    ad hoc group was required to make in

18    connection with confidentiality agreements

19    previously signed?

20         A.     Yes.

21         Q.     And here the ad hoc group is

22    disclosing -- well, what are they

23    disclosing here?

24         A.     They are disclosing a range of,

25    on a -- we are disclosing a recovery

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 228 of 329

350

SNELLENBARGER

1

2    estimate on the intercompany claims based

3    on certain assumptions outlined here.

4        Q.    What were the assumptions?

5        A.    The assumptions were that the

6    Ally contributes $2.1 billion for the POR,

7    JSN collateral is assumed to include

8    1.69 billion of debtor stipulated secured

9    recovery, 180 million of cash collateral

10    projected to be used post April 30th that

11    had not been authorized.   If you want me

12    to read this, I can.

13        Q.    No, I don't need that.   I'm more

14    interested in the numbers below the line.

15        A.    Okay.

16        Q.    You see that the value that the

17    ad hoc group has placed on the

18    intercompany claims recovery is

19    approximately 462 million?

20        A.    Yes.

21        Q.    What analysis, if any, did

22    Houlihan do with respect to that number?

23        A.    This is a result of, again, our

24    recovery model that we had built basically

25    putting the assumptions that we summarized

351

1              SNELLENBARGER

2    and the bullets on the top half of the

3    page, putting into the recovery model and

4    the output of what that means for the

5    intercompany balances.

6         Q.    How do you go about calculating

7    the percentage of recoveries for each of

8    these intercompany claims?

9         A.    The percentage recovery is

10   simply the math of the output recovery

11   value divided by the net claim number.

12        Q.    Okay.  Let me ask it a different

13   way.

14        A.    I apologize if I didn't

15   understand your question.

16        Q.    Ask an obvious question, get an

17   obvious answer.  How did you go about

18   calculating the value of each of the

19   intercompany claims?

20        A.    Again, we had a recovery model.

21   We put the assumptions in that we describe

22   on the top half of the page.  Those values

23   flow through the model and based on the

24   intercompany claim balances per entities,

25   they are shared with other unsecured

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 230 of 329

352

1                    SNELLENBARGER

2     claims.  And that results in what

3     recoveries those intercompany claims would

4     get through the estate.

5         Q.    Let me take the first one.  You

6     have an intercompany claim between

7     Residential Capital, LLC and GMAC

8     Residential Holding Company, LLC.  And the

9     net claim is 3.3 billion.  Do you see

10    that?

11        A.    I do.

12        Q.    And this document places a value

13    of zero on that.  What analysis did the ad

14    hoc group perform to come to that value?

15        A.    Again, it wasn't -- we didn't

16    determine whether the intercompanies were

17    valid or not.  I think for the purpose of

18    this, we assumed they all were valid.  I

19    think the result is I don't think there's

20    really any assets or value at GMAC

21    Residential Holding Company, LLC.  So they

22    are the ones that are paying the claim.

23    There was no value there.  There wouldn't

24    be any ability to pay on that claim.

25    That's why there would be zero ascribed to

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 231 of 329

353

SNELLENBARGER

2  that.

3      Q.    If you look at the next item,

4  the receiving entity is Residential

5  Funding Company.  And the paying entity is

6  Residential Capital, LLC.  The net claim

7  is 1.9 billion.  And the value ascribed

8  here is 350 million.  How did the ad hoc

9  group come to that value of 350 million?

10      A.    Again, this is like, it's a

11  mathematical output based on the

12  assumptions of what the value of the

13  assets at Residential Capital, LLC, the

14  secured collateral that goes to the

15  secured creditors.  There's unencumbered

16  collateral or unencumbered value available

17  at that entity.  The unsecured claims

18  share in that value.  The intercompany

19  claim would share in that value and their

20  pro rata should be -- is shown here.

21      Q.    And Houlihan performed that

22  analysis with respect to each of these

23  intercompany claims?

24      A.    Yeah, pursuant to our recovery

25  model.  Again, we weren't opining on the

354

1          SNELLENBARGER

2    validity of the claims.  We were just

3    simply saying if they are valid, here's

4    what the output is.

5         Q.    How much work went into the

6    preparation of these numbers, roughly in

7    hours or --

8         A.    Well, I mean, this is a -- it's

9    really a result of our model that we had

10   built over time.  We built it prepetition

11   and had refined it throughout the case.

12   So it's not too difficult to put the

13   numbers in and see what the output is.

14        Q.    And you had confidence in the          354:14 FRE 611(a) (Vague
                                                       and ambiguous)
15   numbers that you provided for this

16   disclosure?

17        A.    Yeah.  I mean, they were based

18   on the assumptions -- we basically said we

19   had confidence in our model that the math

20   works.  As we talked about before, we were

21   trying to test it with every client.

22   Yeah, I think we were getting the same

23   results.  So we felt comfortable that our

24   model from a mathematical perspective

25   worked.  And given the assumptions that we

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 233 of 329

355

1          SNELLENBARGER

2     described here, this is what the output

3     could be.

4          Q.    And you were comfortable with

5     the value ascribed to each of these claims

6     as presented in this public disclosure?

7          A.    Yeah.   I was comfortable that

8     that would be the recovery on these

9     intercompany claims based on the

10    assumptions that are provided here.   If

11    the assumptions changed, then the recovery

12    numbers would change.

13         Q.    Okay.  You can put that aside.

14              Mr. Snellenbarger, you've been

15    designated as the corporate representative

16    on the decision to object to the plan, the

17    ad hoc group decision to object to plan,

18    and I understand we've limited that to the

19    business reasons for objecting to the

20    plan.  Do you have an understanding, as

21    the witness for this issue, of what the

22    plan provides with respect to JSN

23    recoveries?

24         A.    Yes.

25         Q.    What does it provide?

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 234 of 329

356

1              SNELLENBARGER

2        A.    A payment in full on account of

3    our principal amount of our claim plus

4    accrued prepetition interest.

5        Q.    And if there is a judicial

6    determination that the JSNs are

7    oversecured, what does the plan provide?

8        A.    I believe then we would be

9    entitled to post petition interest.

10       Q.    And if there is a judicial

11   determination that the JSNs are not

12   oversecured, do you have an understanding

13   that the recoveries of the JSNs would be

14   reduced?

15            MR. RENENGER:  Object to the

16       form of the question.

17       Q.    Let me ask a different way.  Do

18   you have an understanding of what the

19   recoveries for the JSNs would be if

20   there's a judicial determination that the

21   JSNs are undersecured?

22       A.    I believe it would be the

23   principal amount of our claim plus accrued

24   prepetition interest.

25       Q.    Do you understand that the plan,

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 235 of 329

357

1              SNELLENBARGER

2     as presented, provides that if there is a

3     judicial determination, either with

4     respect to phase one or phase two, that

5     the JSNs were oversecured, the JSNs will

6     receive full recovery of both par

7     prepetition interest and post petition

8     interest?

9         A.    I believe that's the case.  We

10    wanted -- I think it wasn't clear in the

11    plan, in the actual document.  I think

12    through court appearances we tried to

13    clarify that.

14        Q.    And is it correct that the ad

15    hoc group is still objecting to the plan?

16        A.    Yes.

17        Q.    And what is the basis for the

18    objection?

19            MR. RENENGER:  I'm going to

20        object to the form of the question and

21        just remind the witness that he's here

22        to testify about business reasons for

23        the objection and not necessarily the

24        legal grounds for the objection.

25        A.    Right now the plan provides that

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 236 of 329

358

1              SNELLENBARGER

2    the intercompany claims are waived.  We

3    believe that there is substantial value

4    available to us on account of those

5    intercompany claims.  Until such time that

6    we -- in fact, would help prove that we're

7    oversecured and entitled to post petition

8    interest.  So we think that the plan is

9    unfair with respect to the treatment of

10   those intercompany claims and our

11   collateral.

12              Secondly, we believe we are not

13   giving a distribution on account of the

14   Ally contribution and we are asked to

15   provide Ally a full release in exchange

16   for no distribution on account of the Ally

17   contribution.  Those are the two primary

18   reasons.

19              MR. RENENGER:  Object to the

20       form.

21       Q.    Do you understand that each of

22   those issues will be subject to phase two

23   of this litigation?

24       A.    I believe so, yes.

25       Q.    And if there is a judicial

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 237 of 329

359

1              SNELLENBARGER

2    determination that there is a right to the

3    intercompany balances and a right to some

4    portion of the Ally contribution, the plan

5    provides that the JSNs will receive

6    recovery consistent with that finding?

7         A.    I think as we -- as is described

8    in the plan objection, if we are found to

9    be oversecured entitled to full post

10   petition interest -- I believe it's

11   described in our plan objection, if we are

12   found about oversecured entitled to full

13   post petition interest, I think these

14   issues become moot.

15        Q.    The plan provides that you will

16   receive a recovery based on the judicial

17   determinations, either in phase one or

18   phase two.  So if there's a finding that

19   you are entitled to either a lien on the

20   intercompany balances or a lien on the

21   causes of actions, you will receive under

22   the plan what you are claiming is due.

23   I'm trying to understand why you are

24   objecting to a plan that provides exactly

25   what you are seeking?

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 238 of 329

360

1          SNELLENBARGER

2          MR. RENENGER:  I'm going to

3      object on the basis that this has been

4      asked and answered.

5      A.   Can you repeat the question?

6      Q.   Can you explain to me why the ad

7  hoc group is objecting to a plan that

8  would provide them exactly what they are

9  asking for if there is a judicial finding

10  in their favor?

11          MR. RENENGER:  I'm going to

12      object on the basis that it's been

13      asked and answered and I'm also going

14      to instruct the witness, remind the

15      witness that he's here to testify as

16      to business reasons for objection not

17      necessarily legal arguments about the

18      validity of -- the arguments made in

19      the objection in light of what could

20      or could not happen in phase one and

21      phase two.

22      A.   I have answered why I believe we

23  objected to the plan.  I think we believe

24  our, again, our intercompany claims are

25  being waived and we think there's value

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger    Pg 239 of 329

361

1                    SNELLENBARGER

2     and we are not getting consideration on

3     account of the Ally settlement.

4              MR. WALSH:  Let me see if I have

5         any other questions and then I will

6         cede the floor to my colleague.

7              (Whereupon, there is a recess in

8         the proceedings.)

9              MR. WALSH:  I pass the witness.

10        I just want to reserve the right to

11        reopen the deposition based on our

12        review of the documents produced last

13        night and our ongoing discussions with

14        counsel about additional documents we

15        are seeking.  And the privilege log

16        issues that we discussed earlier.

17             MR. RENENGER:  We are happy to

18        entertain all such discussions.  Of

19        course, given the schedule remaining,

20        we think any further depositions would

21        be impracticable and also

22        inappropriate given how exhaustive

23        this one was.

24    EXAMINATION BY

25    MR. KOCHMAN:

362

SNELLENBARGER

1

2    Q.    Good afternoon,

3    Mr. Snellenbarger, my name is David

4    Kochman, I represent Wells Fargo.    I'd

5    like you to pull out what's been marked as

6    No. 8.    It should be the 30(b)(6) notice.

7    A.    I have it.

8    Q.    I understand that there was some

9    agreement reached concerning the scope of

10    the topics identified in this.    I'd like

11    to go through some of these topics and

12    I'll ask both counsel here to clarify to

13    the extent I misconstrue what the

14    understandings were.

15        Mr. Snellenbarger, you are here

16    to testify as a 30(b)(6) witness on behalf

17    of the ad hoc group of junior secured

18    noteholders; is that correct?

19    A.    Yes.

20    Q.    Looking at topic 19 in No. 8, is

21    it your understanding that you are here to

22    testify about any diminution in the value

23    of any noncash collateral during the

24    pendency of the Chapter 11 cases?

25    A.    Yes.

JSN Objection to
Wells Fargo
Designation
362:2 – 391:18
FRE 601, 611 (Outside
the scope of 30(b)(6)
topics)

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 241 of 329

363

1          SNELLENBARGER

2          Q.      And that your testimony will be

3     given with the understanding that I am not

4     seeking any expert testimony and I am

5     seeking testimony only as to the fact of

6     what, if any, analysis was done by the ad

7     hoc group with respect to such topic?

8          A.      Correct.

9              MR. RENENGER:    And just in terms

10    of that particular agreement this

11    morning when Mr. Walsh discussed the

12    agreement on topics 18 and 19, in

13    particular, I pointed out that we

14    would be objecting to the extent the

15    questions went beyond phase two

16    issues.   There's phase one issues that

17    have a lot of do with that topic and

18    some phase two issues.   And the phase

19    two issues are basically limited to

20    the intercompany claims with respect

21    to the value of adequate protection

22    liens.

23              MR. KOCHMAN:    Certainly.   And

24    would Mr. Snellenbarger's testimony

25    extend to phase two and plan

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 242 of 329

364

SNELLENBARGER

1
2  confirmation issues.

3       MR. RENENGER:   Interesting

4  question.   I have to look at the front

5  page of this agreement, part of the

6  depo notice.

7       MR. RENENGER:   Look, I mean, the

8  scheduling order that's described in

9  this document I believe relates to

10  phase two discovery, not necessarily

11  plan confirmation discovery.   I could

12  be wrong about that.

13       MR. KOCHMAN:   I think it's both.

14       MR. RENENGER:   But, I'll tell

15  you, we are not going to shut it down

16  to the extent it goes to plan

17  confirmation issues with respect to

18  any valuation, you know, sort of as

19  limited by the topics you read into

20  the record.

21       MR. KOCHMAN:   That was precisely

22  the understanding I wanted to make

23  sure that we had, which is that

24  provided the questions concern phase

25  two and plan confirmation as they

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 243 of 329

365

1          SNELLENBARGER

2          relate to the topics identified and as

3          amended by your understanding with

4          Mr. Walsh, they are fair game.

5               MR. RENENGER:  Yes.

6          Q.    Mr. Snellenbarger, do you have

7     an understanding as to the definition of

8     collateral as used in topic 19?

9          A.    I believe so.

10         Q.    When I refer to collateral here

11    and in the discussions of No. 8, the

12    30(b)(6) notice, I am going to refer to

13    collateral as used in the definition here.

14         A.    Okay.

15         Q.    Is it the JSNs' view that there

16    has been diminution in the value of its

17    noncash collateral during the pendency of

18    the Chapter 11 cases?

19         A.    I think that's a topic that's

20    been covered by the expert.  That was

21    covered by Mr. Siegert in phase one.

22         Q.    And I'm not asking about the

23    amount of any such diminution, simply

24    whether you have an understanding if there

25    has been any diminution.  You can answer

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 244 of 329

366

1           SNELLENBARGER

2    it yes or no?

3        A.    Yes.

4        Q.    So there has been diminution?

5        A.    Yes.

6        Q.    Is it the JSNs' view that any

7    diminution in the value of the noncash

8    collateral is attributable to actions

9    taken or not taken by Wells Fargo?

10           MR. RENENGER:  I'm going to

11       object to the form of the question

12       only to really remind -- it's a broad

13       question, and I just want to remind

14       the witness that he's not to testify

15       on expert topics but simply any

16       analysis undertaken, let's see, by the

17       ad hoc group that was nonexpert in

18       nature on that question.

19       A.    Can you repeat the question?

20       Q.    I'd be happy to because I'd like

21   to get a clean record on this.  And just

22   to make certain that I'm crystal clear,

23   none of my questions ask you to disclose

24   any confidences or communications with

25   counsel.  You should assume that every

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 245 of 329

367

SNELLENBARGER

2  single one of my questions, implicit

3  within the question is a direction that

4  you should not disclose anything to do

5  with counsel, any confidences.  If you are

6  unable to answer a question on the basis

7  that it would reveal a confidence, please

8  so state.  But otherwise, none of my

9  questions ask you to disclose those

10  confidences.  Do you understand that?

11      A.    I do.

12      Q.    Is it the JSNs' view -- let's

13  take a step back.  You've testified that

14  it is the JSNs' view that there has been

15  diminution in the value of its noncash

16  collateral; is that correct?

17      A.    Correct.

18      Q.    Is it the JSNs' view that Wells

19  Fargo's actions or omissions are in any

20  way attributable to the diminution in the

21  value of the JSNs' noncash collateral?

22      A.    It's a privileged discussion.  I

23  can't answer at the direction of counsel.

24      Q.    Have you had any discussions,

25  apart from discussions with counsel, about

JSN Objection to Wells
Fargo Designation

367:15-16, FRE 611(a)
(Vague and ambiguous)

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 246 of 329

368



1    SNELLENBARGER

2  whether or not Wells Fargo's actions or

3  omissions have caused the diminution in

4  the value of the noncash collateral?

5       A.    No.

6       Q.    Have you had conversations with

7  counsel about whether -- without

8  disclosing the substance of those

9  conversations -- have you had

10  conversations with counsel about whether

11  Wells Fargo's acts or omissions have

12  caused a diminution in the value of

13  noncash collateral?

14       A.    Yes.

15            MR. RENENGER:   You mean during

16       the pendency of the Chapter 11 cases,

17       because that's the topic?

18            MR. KOCHMAN:   Yes.

19            MR. RENENGER:   Okay.

20       A.    Yes.

21       Q.    Let's turn to topic 36.

22  Noteholders expected recovery under the

23  plan.   Have the JSNs -- in the event that

24  JSNs are held to be undersecured and not

25  entitled to post petition interest, have

JSN Objection to
Wells Fargo
Designation
 368:23 – 369:4, FRE
611(a) (Vague and
ambiguous)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

369

SNELLENBARGER

1

2    you had discussions apart from discussions

3    with counsel about whether or not there

4    are other sources of recovery?

5            MR. RENENGER:   Object to the

6        form of the question.

7        A.    Can you repeat the question?

8            MR. KOCHMAN:   I'll have the

9        reporter read it back.

10           (Record read.)

11           MR. RENENGER:   Same objection.

12       A.    No.

13       Q.    In the event the JSNs are held

14   to be undersecured and not entitled to

15   post petition interest, without disclosing

16   the substance of communications with

17   counsel, if any, have you had discussions

18   with counsel about other sources of

19   recovery?

20       A.    Yes.

21       Q.    Again, without disclosing the

22   substance of those communications, have

23   you had discussions about any recovery

24   from Wells Fargo in the event the JSNs are

25   held undersecured and do not receive post

JSN Objection to Wells
Fargo Designation
369:21 – 370:2, FRE 402
(Not relevant)

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 248 of 329

370

1                    SNELLENBARGER

2        petition interest?

3                    MR. RENENGER:    I'm going to

4        object to the question and ask for a

5        proffer about how this relates to

6        recoveries under the plan.

7                    MR. KOCHMAN:    What's your

8        objection to the question?

9                    MR. RENENGER:    It's beyond the

10       scope of the 30(b)(6) topic.

11                   MR. KOCHMAN:    Of this specific

12       question here?

13                   MR. RENENGER:    Right.    The topic

14       is the noteholders expect to recover

15       under the plan and you are talking

16       recoveries, as I understand it,

17       outside of the plan.    But if I'm

18       misunderstanding that, I'm happy to

19       hear a proffer.

20                   MR. KOCHMAN:    We can certainly

21       go and capture it under a number of

22       other topics.    I was just trying to

23       make it nice and neat, but that's

24       fine.

25        Q.    Look at topic 45.    "Copies of

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 249 of 329

371

1            SNELLENBARGER

2    all communications between Aurelius and

3    the ad hoc group, its members and/or its

4    advisors concerning the debtors prior to

5    Aurelius becoming a member of the ad hoc

6    group."   Have any of the discussions

7    encompassed within topic 45 concerned

8    the -- let's withdraw that question.

9            Have there been discussions that

10   fall within the scope of topic 45

11   concerning a recovery from Wells Fargo

12   apart from discussions with counsel?

13          MR. RENENGER:   David, I want to

14      point out that that topic was narrowed

15      by agreement of counsel, although not

16      reflected in this list to be

17      communications between Houlihan and

18      Aurelius or, let's see, or significant

19      meetings between the ad hoc group's

20      financial advisors and Aurelius.

21          MR. KOCHMAN:   That's fine.

22      Q.    Do you understand your counsel's

23   limitation as explained?

24      A.    I do.   Could you repeat the

25   question?

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 250 of 329

372

SNELLENBARGER

Q.    I'd be happy to.   Have there
been communications falling within the
scope of topic 45 concerning a recovery
from Wells Fargo in the event the JSNs are
held to be undersecured?   And again, I'm
not asking about any communications that
would implicate a privileged conversation?

        MR. RENENGER:   And just to
    clarify, that's prior to Aurelius
    becoming a member of the ad hoc group,
    which happened in November of 2005.

        Q.    Have there been any
communications or conversations again
falling within the scope of topic 45 as
clarified by your counsel concerning Wells
Fargo's breach of any duties or
obligations to the JSNs?

        A.    No.

            MR. KOCHMAN:   Mark this as 33.

            (AHG Exhibit 33, objection of
    Wells Fargo Bank to the plan that was
    filed in this case at docket 5410,
    marked for identification, as of this
    date.)

373



SNELLENBARGER

2    Q.    Mr. Snellenbarger, I'm showing

3  you the objection of Wells Fargo Bank to

4  the plan that was filed in this case at

5  docket 5410.   Have you seen this document

6  before?

7    A.    I'm aware of its filing.   I

8  can't say I have reviewed it.

9    Q.    Do you recall how you became

10  aware of it, apart from communications,

11  privileged communications with counsel?

12    A.    I believe one of the people that

13  worked at Houlihan just advised us of the

14  various objections to the plan made by

15  numerous parties.

16    Q.    Was this person an attorney at

17  Houlihan?

18    A.    No.

19    Q.    Who was the person that advised

20  you of Wells Fargo's filing of an

21  objection?

22    A.    One of my guys.   I don't know

23  which one it was.   One of my guys did.

24  Again, they were just -- came in and said

25  that various people had filed objections

JSN Objection to
Wells Fargo
Designation 373:2 –
379:25, FRE 402
(Not relevant)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

374

SNELLENBARGER

1

2  to the plan.

3      Q.    Was it in an e-mail

4  communication or a telephone call?

5      A.    I think they just walked into my

6  office and told me.

7      Q.    Did they describe any

8  substantive aspects of Wells Fargo's

9  Objection.

10     A.    No.

11     Q.    Have you had occasion to review

12  Wells Fargo's objection to the plan?

13     A.    I have not.

14     Q.    Do you have an understanding as

15  to any bases for Wells Fargo's objection

16  to the plan?

17     A.    I'm going to object to the

18  question as beyond the scope of the

19  30(b)(6) topics and on that basis instruct

20  the witness not to answer, although I'm

21  happy to hear a proffer as to how it

22  relates to the topics.

23         MR. KOCHMAN:   I believe it

24     relates directly to the plan

25     confirmation.

375

SNELLENBARGER

1

2          MR. RENENGER:   There's no topic

3      on plan confirmation.

4          MR. KOCHMAN:   Is it your

5      position that the scope of this

6      deposition is limited to the 30(b)(6)

7      topics only and not plan confirmation

8      generally?

9          MR. RENENGER:   Limited to the

10     30(b)(6) topics included in the

11     deposition notice, correct.

12     Q.     Mr. Snellenbarger, I'm going to

13  direct your attention to paragraphs 38

14  through 43 of Wells Fargo's plan.   I'd

15  like you to review this.   Let me know when

16  you've had an opportunity to do so.

17     A.     (Witness reviews document.)

18          Okay.

19     Q.     Do you have an understanding as

20  to -- withdrawn.

21          Do you understand that Wells

22  Fargo has a claim against the debtors for

23  its fees and expenses incurred in

24  connection with its actions as collateral

25  agent?

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 254 of 329

376

1                 SNELLENBARGER

2            A.    I'm going to object to the

3    question as beyond the scope of the

4    30(b)(6) and on that basis instruct the

5    witness not to answer.

6            MR. KOCHMAN:   I would like an

7        explanation as -- well, take a step

8        back.

9        Q.    Do you have an understanding as

10    to whether Wells Fargo is entitled to its

11    fees and expenses from the debtors'

12    estate?

13            MR. RENENGER:   Same objections

14        and instruction.

15            MR. KOCHMAN:   Let's go off the

16    record for a second here.

17            (Whereupon, there is an

18        off-the-record discussion.)

19        Q.    Direct your attention to

20    paragraph 38 of Wells Fargo's objection,

21    which references the JSNs' answer and

22    affirmative defenses and first amendment

23    counterclaims.   Did you have any role in

24    preparing that document?

25            A.    No.

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 255 of 329

377

SNELLENBARGER

1

2    Q.    Did you have occasion to review

3    that document prior to the time that it

4    was filed?

5        MR. RENENGER:  I'm going to

6    object to the question as being beyond

7    the scope of the 30(b)(6) topics and

8    on that basis instruct the witness not

9    to answer.

10    Q.    Direct your attention to

11    paragraph 41 of Wells Fargo's plan

12    objection.  Which references a statement

13    by ad hoc group's counsel that if there's

14    evidence of a lien release gets released,

15    that's Wells's issue now.  Do you see

16    that?

17    A.    I do.

18    Q.    Do you have an understanding as

19    to what counsel was referring to when he

20    stated that's Wells's issue now?

21        MR. RENENGER:  I'm going to

22    object to the question as being beyond

23    the scope of the 30(b)(6) topics.  I'm

24    also going to instruct the witness not

25    to answer on the basis that any

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 256 of 329

378

SNELLENBARGER

knowledge he would have about what

counsel meant by that would be

attorney-client privileged.

Q.     Same question, specifically

carving out nonattorney-client privileged

communications.

MR. RENENGER:   I'm going to

object to that question as being

beyond the scope of the 30(b)(6)

topics and on that basis instruct the

witness not to answer.

Q.     Direct your attention to

paragraph 42 of Wells Fargo's plan

objection.  Apart from any communications,

privileged communications with counsel,

have you had occasion -- withdrawn.

Apart from information learned

through privileged communications with

counsel, do you have an understanding as

to whether there have been any requests by

the collateral agent to the ad hoc group

inquiring about whether claims will be

asserted by the ad hoc group against Wells

Fargo?

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 257 of 329

379

1         SNELLENBARGER

2              MR. RENENGER:  I'm going to

3     object to the question as being beyond

4     the scope of the 30(b)(6) topics and

5     on that basis instruct the witness not

6     to answer.

7         Q.    Are you going to follow your

8     counsel's instruction?

9         A.    Yes.

10        Q.    Direct your attention to

11    paragraph 43 of Wells Fargo's objection.

12    Apart from communications with counsel,

13    have there been discussions among the ad

14    hoc group concerning any claims they

15    intend to bring against Wells Fargo in the

16    event it is judicially determined that the

17    JSNs were undersecured?

18             MR. RENENGER:  I'm going to

19    object to the question on the basis

20    that it's beyond the scope of the

21    30(b)(6) topics and on that basis

22    instruct the witness not to answer.

23        Q.    Are you going to follow your

24    counsel's instruction?

25        A.    Yes.

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 258 of 329

380

1          SNELLENBARGER

2          MR. KOCHMAN:   Let's take a break

3     for a second.

4          (Whereupon, there is a recess in

5     the proceedings.)

6          MR. KOCHMAN:   If you pull out

7     No. 8, the deposition topics.

8     Q.     Directing your attention to

9     paragraph 38, "The content of all

10    communications with, by or among present

11    and former noteholders concerning the plan

12    and the global settlement described in the

13    disclosure statement."  Do you see that

14    paragraph?

15    A.     Yes.

16    Q.     And I understand that that

17    paragraph has been limited to your -- to

18    Houlihan's communications with the debtors

19    and any significant meetings between the

20    debtors or their representative and the ad

21    hoc group or its representatives.  Do you

22    have an understanding that that topic has

23    been so limited?

24    A.     Yes.

25    Q.     Have any of the communications

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 259 of 329

381

SNELLENBARGER

falling within the scope of topic 38, as

clarified, concerned Wells Fargo?

       MR. RENENGER:  I'm going to put

before him the narrow topic so he can

see.  This is to clarify.

    A.    Any communications would be

privileged.

    Q.    So there have been

communications; is that correct?  That's

just a yes or no question.

    A.    Can you repeat the question

again?

    Q.    Have there been any

communications falling within the scope of

paragraph 38, as amended, concerning Wells

Fargo?

       MR. RENENGER:  Just to avoid

confusion, the answer that he gave

before I think might reflect

confusion, the limitation is Houlihan

discussions with the debtors or

discussions between the ad hoc

professionals and the debtors at

significant meetings.

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 260 of 329

382

1          SNELLENBARGER

2               Do you agree with that

3      limitation?

4               MR. KOCHMAN:   I wasn't a party

5      to those communications.   To me, it is

6      Houlihan's communications with, A,

7      debtors and any significant meeting

8      between the debtors, B, the debtors'

9      representatives and, C, the ad hoc

10     group or its representatives.

11              MR. RENENGER:   Yeah, I can

12     clarify that it's two topics.   It's

13     Houlihan and the debtors'

14     communications or meetings,

15     significant meetings where Houlihan --

16     well, Houlihan didn't have to be

17     present, or the ad hoc group had

18     meetings with the debtors in terms of

19     significant meetings.

20              MR. KOCHMAN:   So this topic,

21     it's your contention, does not

22     encompass Houlihan's communications

23     with the ad hoc group and its

24     representatives not involving the

25     debtors?

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 261 of 329

383



1          SNELLENBARGER

2          MR. RENENGER:   That's correct.

3          Mr. Walsh, is that your

4      understanding?

5          MR. WALSH:   We reached that

6      agreement based on our understanding

7      that all those communications would be

8      privileged.

9      Q.     So to clarify your answer, if

10     there were any such communications

11     concerning Wells Fargo not involving the

12     debtors, you could not testify about them

13     because they would implicate privileged

14     communications?

15     A.     Yes.

16     Q.     So without disclosing the

17     substance of any privileged communication,

18     I'm simply asking whether there were

19     conversations between and among Houlihan

20     and the ad hoc group concerning Wells

21     Fargo that fall within the scope of topic

22     38.

23          MR. RENENGER:   I'm going to

24     object to the question as being beyond

25     the scope of topic 38 as narrowed by

384

SNELLENBARGER

1

2      agreements between debtors' counsel

3      and ad hoc group counsel and on that

4      basis instruct the witness not to

5      answer.

6          Q.      Directing your attention to

7      paragraph 39, "The reasonable, sufficiency

8      or adequacy of the global settlement

9      described in the disclosure statement or

10     the Ally contribution."

11             Do you see that topic?

12         A.    Yes, I do.

13         Q.    I see that it's been clarified

14     and I don't believe the clarification is

15     going to implicate any of my questions but

16     I'll refer you to the clarification on the

17     e-mail.

18             Have there been any

19     communications between or among the ad hoc

20     group, excluding communications with

21     counsel that implicate privileged

22     considerations, concerning Wells Fargo?

23         A.    No.

24         Q.    Topic 40, "The scope of the

25     releases provided in connection with the

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 263 of 329

385

1          SNELLENBARGER

2    Ally contribution."  Do you see that?

3         A.    I do.

4         Q.    Excluding communications with

5    counsel, have there been any

6    communications between or among the ad hoc

7    group falling within the scope of topic 40

8    concerning Wells Fargo?

9         A.    Not to my knowledge.

10        Q.    Is there anyone else that would

11   have knowledge concerning that?

12        A.    Not that I'm aware of.

13        Q.    Turning to topic 41, "The

14   noteholders expected recovery under the

15   plan and the global settlement described

16   in the disclosure statement."  Do you see

17   that topic?

18        A.    I do.

19        Q.    Are you aware of any documents

20   communications, apart from privileged

21   materials, concerning Wells Fargo that

22   fall within the scope of topic 41?

23        A.    Not to my knowledge.

24        Q.    Topic 42, "The effect of the

25   Ally contribution on the noteholders

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 264 of 329

386

SNELLENBARGER

1

2   expected recovery."  Do you see that

3   topic?

4        A.     I do.

5        Q.     Are you aware of any

6   communications or correspondence about the

7   actions or omissions of Wells Fargo that

8   had an effect on the Ally contribution

9   and/or the noteholders expected recovery?

10           MR. RENENGER:  Object to the

11       form of the question.  I don't

12       understand the question.

13       A.     Can you repeat the question?

14       Q.     Are you aware of any

15   communications between or among the ad hoc

16   group, excluding privileged

17   communications, concerning Wells Fargo

18   that fall within the scope of topic 42?

19           MR. RENENGER:  Just to clarify,

20       Counsel, your -- 42 is limited by

21       agreement of counsel in advance of the

22       deposition.  All these topics have

23       been limited by counsel but.

24           MR. KOCHMAN:  I don't see a

25       limitation as to paragraph 42.

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 265 of 329

387

1          SNELLENBARGER

2          MR. RENENGER:   Topics 36 and 41

3     through 44, you'll see it in the

4     middle of the list.

5          MR. KOCHMAN:   The limitation you

6     are referring to is that

7     Mr. Snellenbarger will testify as to

8     whether or not the ad hoc group

9     conducted an analysis of its expected

10    recoveries under the plan.

11    Q.    Do you understand that?

12    A.    Yes.

13    Q.    With such limitation, have there

14    been nonprivileged communications

15    concerning Wells Fargo that fall within

16    the scope of topic 42?

17    A.    Not to my knowledge.

18    Q.    Topic 43, "The impact of the

19    plan, the Ally contribution or the global

20    settlement described in the disclosure

21    statement on the expected recoveries for

22    general unsecured creditors."

23          Do you see that?

24    A.    I do.

25    Q.    Do you understand that it

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 266 of 329

388

1          SNELLENBARGER

2    contains the same limitation that applied

3    to topic 42?

4         A.    I do.

5         Q.    Are you aware of any

6    communications between or among the ad hoc

7    group concerning Wells Fargo that fall

8    within the scope of topic 43?

9         A.    Not to my knowledge.

10        Q.    Are you aware of anyone else

11   that would have greater knowledge

12   concerning any communications about Wells

13   Fargo falling within the scope of topic

14   43?

15        A.    Not that I'm aware of.

16        Q.    Topic 44.   Are you aware of any

17   communications between or among the ad hoc

18   group falling within the scope of topic 44

19   as amended by agreement?

20        A.    Not to my knowledge.

21        Q.    Are you aware of any facts --

22   withdrawn.

23             Are you aware of any actions

24   taken by Wells Fargo that would impact the

25   plan, the Ally contribution or the global

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 267 of 329

389

1        SNELLENBARGER

2    settlement described in the disclosure

3    statement?

4            MR. RENENGER:   Object to the

5        form of the question as being beyond

6        the scope of the 30(b)(6) topics and

7        on that basis instruct the witness not

8        to answer.

9        Q.   Are you going to follow your

10   counsel's instructions?

11       A.   I am.

12       Q.   Are you aware of any actions

13   taken by Wells Fargo that have impacted

14   the plan -- withdraw that question.   I'm

15   trying to be too cute.

16           MR. KOCHMAN:   I'd just like to

17       put one thing on the record here.   We

18       are going to reserve our right to

19       recall this witness to answer the

20       questions that he has been directed

21       not to answer on the basis that we

22       believe our plan objection and the

23       nature of our questions unquestionably

24       fall well within the scope of these

25       30(b)(6) topics and our follow-up

390

SNELLENBARGER

1

2    questions as well as fall within the

3    scope of those 30(b)(6) topics.

4         I understand that you disagree

5    but I wanted to put on the record that

6    we reserve our right to recall the

7    witness on that basis.

8         MR. RENENGER:   And I will add to

9    the record, since we are making a

10   record here, that our view is that

11   these questions relate entirely, all

12   the questions we objected to, to

13   whether the ad hoc group intend to

14   pursue claims against Wells Fargo and

15   issues that have been addressed by the

16   court in prior orders.  Those topics

17   unquestionably, to use your word, in

18   our view, do not fall within the

19   30(b)(6) topics.  The Wells Fargo

20   chose not to serve its own document or

21   rather its own deposition notice,

22   setting forth clearly the Wells Fargo

23   topics and instead, from our

24   perspective, has tried to rather

25   ambush a witness who is in no way

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 269 of 329

391

1             SNELLENBARGER

2        prepared to answer any questions about

3        claims against Wells Fargo.  It's not

4        a topic with which he's familiar.  He

5        would not be the witness in any event

6        on those topics.  Those topics are

7        purely legal, have to do with

8        discretion of counsel.  And so we

9        understand keeping the record open but

10       we wanted to make our objection to any

11       further attempt to recall this witness

12       clear on the record as well.

13             MR. KOCHMAN:  I have nothing

14       further.

15             MR. SILVERSCHOTZ:  We take

16       exception to the term "ambush," that's

17       certainly not our intention.  Other

18       than that...

19             MR. RENENGER:  I do have a

20       couple questions for the witness on

21       the record.

22   EXAMINATION BY

23   MR. RENENGER:

24       Q.   Mr. Snellenbarger, prior to the

25   petition date in these cases, did the

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 270 of 329

392

SNELLENBARGER

1

2    debtors or any of their representatives

3    inform you of their view as to whether or

4    not the intercompany claims were valid?

5        A.    Yes.

6        Q.    What did they tell you?

7        A.    The morning of the first

8    settlement meeting, representatives of FTI

9    or Centerview pulled me aside and said

10    based on preliminary review by Morrison &

11    Foerster they believe that the

12    intercompanies would -- may not be valid.

13        Q.    Did you have a discussion with

14    them about their view?

15        A.    Briefly I asked how are they

16    coming to that conclusion.  They said at

17    that time they didn't know really yet that

18    Morrison & Foerster performed -- that that

19    was their preliminary conclusion.  I told

20    them, well, we can't clearly agree to that

21    nor agree to that and so as part of the

22    settlement discussions, we went forward

23    and pursuant to the settlement agreement

24    we reserved our rights with respect to

25    intercompany claims and validity.

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 271 of 329

393

1                    SNELLENBARGER

2        Q.    Did you tell the debtors whether

3   or not you believed there was value at all

4   in the intercompany claims?

5        A.    Well, I --

6              MR. WALSH:   Objection.   You can

7        answer.

8        A.    Well, I think frankly both sides

9   in the recovery model built in the

10  intercompany balances utilizing

11  assumptions that noted that if they were

12  valid, that there was significant value

13  attributable to it.

14       Q.    When you testified a moment ago

15  that we reserved our rights with respect

16  to intercompany claim and validity, what

17  did you mean by that?

18       A.    When we agreed to the PSA, we

19  didn't waive any rights with respect to

20  pursuing our arguments with respect to the

21  value of our collateral, including

22  intercompany claims.   We agreed simply to

23  waive post petition interest to the end of

24  the year in exchange for getting a par

25  payout by the end of the year.   So we were

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 272 of 329

394

1                SNELLENBARGER

2    doing that for certainty and speed.  But

3    we didn't waive any rights with respect to

4    that.  So we preserve those rights to

5    argue our collateral value in the future.

6         Q.    Why was the ad hoc group willing

7    to continue the negotiations and, in fact,

8    reach an agreement, given that there was

9    the question mark hanging over the

10   collateral value, given what the debtors

11   had told you about their position on the

12   value of intercompany claims?

13              MR. WALSH:   Objection.

14         A.    There were significant -- I

15   think given the fact that there was

16   significant intercompany balances, I think

17   our position was we didn't have any

18   information to do the full diligence of

19   whether they were valid or not valid or

20   whether they were 20 percent or

21   80 percent.  But just from a plausibility

22   perspective, it seems that there was

23   likely value there, period.  But given

24   the -- and we preserved those rights with

25   respect to PSA.  But again, given the

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 273 of 329

395

SNELLENBARGER

2    opportunity for speed and recovery with

3    respect to the plan and ultimate payout

4    before the end of the year, the ad hoc

5    group was willing to forego the post

6    petition interest for 6 or 7 months.

7              MR. RENENGER:  I have no further

8         questions.

9              (AHG Exhibit 34, Plan Term

10        Sheet, marked for identification, as

11        of this date.)

12    EXAMINATION BY

13    MR. WALSH:

14         Q.    Mr. Snellenbarger, did you

15    review the deposition testimony of Conor

16    Bastable in preparing for today's

17    deposition?

18         A.    I did not.

19         Q.    Are you generally familiar with

20    his testimony or are you familiar at all

21    with his testimony regarding intercompany

22    claims and whether the prepetition PSA

23    waived those claims?

24         A.    I'm not.

25         Q.    Did you review the term sheet

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 274 of 329

396

1                SNELLENBARGER

2    that I have handed you, Exhibit 34, which

3    is the term sheet that was attached to the

4    prepetition PSA in connection with your

5    preparation for the deposition?

6        A.    Yes.

7        Q.    You testified earlier that there

8    was a typo.  Would you direct me to the

9    typo that you referred to that you said

10   that White & Case had identified and

11   followed up with Morrison & Foerster.  If

12   it helps, look at page 12.

13              MR. RENENGER:  I'm just going to

14        interpose an objection that it's

15        beyond the scope of the direct.  But

16        I'm not going to cut you off.  I'm

17        just going to state it now and we will

18        see where it goes.

19       A.    Yes, I see that.

20       Q.    Where is the typo?

21       A.    I believe it's on page 12 class

22   RS-9 intercompany claims where it says

23   "Holders of intercompany claims shall

24   receive no recovery on account of

25   intercompany claims."  I believe that the

397

SNELLENBARGER

1

2   language on page 10 on class GS-11 should

3   carry forward onto RS-9.  I believe that

4   was the discussion, as I understand it.

5        Q.    You believe that that typo was

6   corrected in a later filing in the

7   bankruptcy?

8        A.    I don't know if it was

9   ultimately corrected in the bankruptcy

10  filing or not.  I just know that the

11  conversation happened and that we needed

12  to -- that there was a discussion that

13  that needed to be cleaned up.

14       Q.    You understand that the

15  prepetition PSA that the ad hoc group

16  signed included this language waiving

17  intercompany claims as they related to

18  RFC?

19            MR. RENENGER:  Object to the

20       form of the question.

21       Q.    That's what the document says,

22  right?  There was a waiver of the

23  intercompany claims as they related to

24  RFC?

25       A.    That's what the document says.

JSN Objection
397:14-398:7 FRE 611(c)
(Leading)

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 276 of 329

398

                    SNELLENBARGER

1

2    But as I testified, Counsel, based on the

3    amount of documents moved back and forth,

4    White & Case called Morrison & Foerster,

5    as I understand, after the fact and said,

6    look, there is a blow in the document, we

7    need to correct it.

8         Q.    There's a blow?

9         A.    Yes.  An error, whatever you

10   want to describe it.

11        Q.    And you understand that White &

12   Case in fact reviewed the term sheet

13   before the junior secured signed the PSA,

14   correct?

15        A.    Correct.

16        Q.    And your analysis that we saw in

17   Exhibit 19 did not include any

18   consideration for intercompany balances,

19   correct?  We looked at that document

20   before, the three pager.

21        A.    Correct.

22             MR. WALSH:  That's all I have.

23             (Time noted:  4:00 p.m.)

24

25

399

1

2   STATE OF NEW YORK          )

3                             )  :ss

4   COUNTY OF NEW YORK         )

5

6          I, REID SNELLENBARGER, the

7   witness herein, having read the foregoing

8   testimony of the pages of this deposition,

9   do hereby certify it to be a true and

10  correct transcript, subject to the

11  corrections, if any, shown on the attached

12  page.

13

14          _____

15                      REID SNELLENBARGER

16

17

18

19  Sworn and subscribed to before me,

20  this _____ day of _____, 2013.

21  _____

22  Notary Public

23

24

25

400

```
 1              C E R T I F I C A T I O N

 2     STATE OF NEW YORK        )

 3                      ss.:

 4     COUNTY OF NEW YORK        )

 5

 6              I, ERICA L. RUGGIERI, RPR and a

 7        Notary Public within and for the State

 8        of New York, do hereby certify:

 9              That I reported the proceedings

10        in the within-entitled matter, and

11        that the within transcript is a true

12        record of such proceedings.

13              I further certify that I am not

14        related by blood or marriage, to any

15        of the parties in this matter and

16        that  I am in no way interested in the

17        outcome of this matter.

18              IN WITNESS WHEREOF, I have

19        hereunto set my hand this 10th day of

20        August, 2013.

21

22                   ERICA L. RUGGIERI, RPR

23

24

25
```

401

------------- I N D E X -----------------

WITNESS            EXAMINATION BY      PAGE

SNELLENBARGER   Mr. Walsh          128, 395

                Mr. Kochman          361

                Mr. Renenger         269

-------------- EXHIBITS ------------------

AHG                             FOR I.D.

  Exhibit 8, Notice of Deposition    128

  Exhibit 9, e-mail                  147

  Exhibit 10, Letter to Mr. Uzzi     172

  from ResCap

  Exhibit 11, e-mail chain           172

  Exhibit 12, e-mail from Alexandra  200

  Barrage at Morrison Foerster,

  attaching six documents

  Exhibit 13, e-mail from Mr. Ben    200

  Ilhardt at Houlihan dated

  June 12, 2012

  Exhibit 14, series of e-mails      210

  Exhibit 15, series of e-mails      217

  from May 12, 2012

  Exhibit 16, two e-mails between    221

  Mr. Lewis and Mr. Renzi

402

```
1

2        --------------- EXHIBITS ------------------

3        AHG                            FOR I.D.

4        Exhibit 17, e-mail with            227

5        attachment

6        Exhibit 18, presentation           229

7        Exhibit 19, document, Statement    248

8        of Limiting Conditions

9        Exhibit 20, Houlihan engagement    259

10       letter from February 2012

11       Exhibit 21, exchange of e-mails    282

12       from May 8th with Mr. Chopra from

13       Centerview

14       Exhibit 22, series of e-mails      289

15       between Dennis Prieto and a

16       number of other people

17       Exhibit 23, June 26th e-mail from  299

18       Dennis Prieto to a number of

19       people

20       Exhibit 24, e-mail chain           308

21       Exhibit 25, e-mail chain           308

22       Exhibit 26, July 5th, 2012 letter  313

23       from Mr. Brodsky

24       Exhibit 27, e-mail from Ben        326

25       Ilhardt at Houlihan to Arthur Kaz
```

403

1

2          --------------- EXHIBITS ------------------

3      AHG                              FOR I.D.

4      Exhibit 28, e-mail from Arthur      332

5      Kaz

6      Exhibit 29, e-mail from Ben         332

7      Ilhardt

8      Exhibit 30, e-mail between Mr.      342

9      Snellenbarger and Mr. Prieto

10     dated July 10th, 2012

11     Exhibit 31, e-mail from             343

12     Mr. Snellenbarger to David Reid

13     forwarding an e-mail from

14     Mr. Prieto

15     Exhibit 32, Notice                  348

16     Exhibit 33, objection of Wells      372

17     Fargo Bank to the plan that was

18     filed in this case at docket 5410

19     Exhibit 34, Plan Term Sheet         395

20

21

22

23          *** EXHIBITS ATTACHED ***

24

25

404

INSTRUCTIONS TO WITNESS

Please read your deposition over
carefully and make any necessary
corrections.  You should state the reason
in the appropriate space on the errata
sheet for any corrections that are made.

After doing so, please sign the
errata sheet and date it.

You are signing same subject to the
changes you have noted on the errata
sheet, which will be attached to your
deposition.

It is imperative that you return
the original errata sheet to the deposing
attorney within thirty (30) days of
receipt of the deposition transcript by
you.  If you fail to do so, the deposition
transcript may be deemed to be accurate
and may be used in court.

405

1

2                        E R R A T A

3

4

5      I wish to make the following changes,

6      for the following reasons:

7

8      PAGE LINE

9      ____  ____ CHANGE:_____

10     REASON:_____

11     ____  ____ CHANGE:_____

12     REASON:_____

13     ____ ____ CHANGE:_____

14     REASON:_____

15     ____ ____ CHANGE: _____

16     REASON:_____

17     ____ ____ CHANGE: _____

18     REASON:_____

19     ____ ____ CHANGE: _____

20     REASON:_____

21

22     _____   _____

23     WITNESS' SIGNATURE              DATE

24

25

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 284 of 329

406

**A**

**Aaron** 126:7
133:14
134:15
245:17
333:12
**ability** 165:15
165:24
352:24
**able** 171:22
172:6
224:23
**Absolutely**
158:24
168:16
**access** 177:9
178:2,8,11
186:20,24
187:2,3
345:3
346:17
348:11,17
348:23
**accessed**
346:8
**account**
240:8 356:2
358:4,13,16
361:3
396:24
**accrued**
356:4,23
**accurate**
235:18
310:3,7
404:20
**action** 304:12
305:5 306:7
306:23
307:10
**actions**
237:15
305:6 306:7
359:21
366:8
367:19
368:2

375:24
386:7
388:23
389:12
**acts** 368:11
**actual** 239:5
335:6
357:11
**ad** 128:23
129:8,19
130:3,9,17
130:23
131:7,10
132:20,22
135:2,3
144:2,22
145:6,16,19
145:20
169:4 226:9
227:5,18
229:7,19
231:10,14
242:25
245:14,23
246:9,23
249:11
258:21,23
258:24
259:6,11
260:13,20
260:24
265:24
269:12
278:20
280:22
286:2,8
290:24
292:13
295:11
296:15
297:2
301:17
304:24
305:22
306:18,20
307:17
318:14

330:13,18
331:10,25
332:5 345:9
349:17,21
350:17
352:13
353:8
355:17
357:14
360:6
362:17
363:6
366:17
371:3,5,19
372:11
377:13
378:22,24
379:13
380:20
381:23
382:9,17,23
383:20
384:3,19
385:6
386:15
387:8 388:6
388:17
390:13
394:6 395:4
397:15
**add** 181:16
390:8
**added** 181:10
**additional**
155:4
165:24
167:22
231:20
254:8,10,12
346:7
361:14
**additionally**
234:15
**address** 344:8
**addressed**
390:15
**addresses**

298:23,25
**Addressing**
165:11
**adequacy**
384:8
**adequate**
266:18
363:21
**adhered**
135:12,20
**adjustment**
216:8
**Administer...**
123:4
**Adv** 123:7,14
**advance**
386:21
**advances**
154:7
184:14
**advice** 236:8
239:8
240:18
255:18
280:24
**advise** 255:12
**advised**
238:25
289:25
321:2
373:13,19
**advising**
137:4
289:25
**advisor** 140:2
145:8
148:11
294:3
**advisors**
143:16
182:23
203:22
251:18
306:2,9
371:4,20
**affect** 189:21
196:17

**Affiliate**
189:4
**affirmative**
376:22
**afternoon**
362:2
**agency** 163:4
163:7
**agent** 375:25
378:22
**aggregate**
317:12
**agnostic**
137:9
**ago** 131:15
134:11
138:7,24
268:21
270:5 301:2
393:14
**agree** 240:24
283:13,21
284:24
285:3
314:19
382:2
392:20,21
**agreed** 127:5
127:11,15
128:20
132:16
135:13,20
145:9 215:4
215:16
237:5
269:10
283:8
292:13
393:18,22
**agreeing**
296:12
**agreement**
151:17,24
174:23
177:8
194:25
195:7 211:5

214:9,12
215:12
217:2
249:14
252:24
253:2
290:23
318:15,17
362:9
363:10,12
364:5
371:15
383:6
386:21
388:19
392:23
394:8
**agreements**
169:20,24
170:4
178:19
179:11
201:13
227:19
249:12
349:18
384:2
**ahead** 298:16
298:20
322:14
**AHG** 128:7
128:16
147:17,18
172:15,18
200:4,9
210:9
217:10
221:12
227:25
229:10
248:12
259:18
282:7 288:2
289:3 299:7
308:3,6
313:5 326:9
332:9,12

342:7
343:23
348:25
372:21
395:9 401:9
402:3 403:3
**al** 123:4,6,10
123:18
**Alan** 148:7
149:12
**alerted**
297:15
298:8
**Alexandra**
200:5,15
401:15
**alignment**
210:5
**Alliance**
298:24
**allocated**
152:19
184:15
224:7
225:22
**allow** 317:23
**allowed**
238:3
275:16
317:20
318:18
**Ally** 130:18
130:24,25
138:2,17
156:6 157:5
167:7,15,18
170:3
184:15,16
189:9,15
190:20
195:23
196:10
197:22
210:19
212:9,22
214:9,14
215:2,13,18

215:22
219:24
220:4,8,10
220:13,13
220:14,16
220:19
222:12,13
222:18
223:8 224:7
234:20
235:15,15
236:19,25
237:8,15
239:22
240:2,5,7
240:24
253:17
270:8,13,18
270:20,23
284:5
303:17
304:12
305:6 306:7
306:23
307:10
350:6
358:14,15
358:16
359:4 361:3
384:10
385:2,25
386:8
387:19
388:25
**alternatives**
138:10
**ambiguity**
188:6
**ambush**
390:25
391:16
**amended**
365:3
381:16
388:19
**amendment**
376:22

**Americas**
126:15
**amount**
130:18
137:16
154:10
162:2
191:17
221:9
242:18
257:8
263:14
264:10
283:24
284:2
312:22
314:14,14
314:15
316:20
319:20
356:3,23
365:23
398:3
**amounts**
206:5,11
219:9
247:24
259:25
261:4 270:9
270:13,18
270:24
271:16
274:24
284:4
316:24,25
316:25
317:2
327:23
328:24
329:2
**analysis**
130:2,10
141:10,10
152:5
166:13
171:18
232:24

238:21
241:5
254:14
272:24
278:21
279:11,15
279:22
280:2,11,14
281:7,9,14
281:16
285:13,15
286:5,13
309:4 310:3
310:25
314:4,19,25
316:2,16
328:25
329:3 330:4
330:12,19
331:11,18
331:24
332:4,4,20
332:23
333:15,24
335:9
336:18
337:5,24
338:2 340:8
341:20,23
344:13,20
345:9,11
347:13
350:21
352:13
353:22
363:6
366:16
387:9
398:16
**analyst** 142:9
142:12
161:23
**analytical**
334:11,19
**analyzed**
168:22
248:8

**analyzing**
158:19
169:9
242:13
**ancillary**
184:18
346:22
**Andrew**
138:20
139:2
**and/or** 371:3
386:9
**Annual**
188:20
**answer**
232:13,15
232:17
233:4 236:6
236:10,11
237:19,23
237:24
238:2,7
239:11,12
240:20,20
240:21
243:7,11,13
243:14
245:21,25
246:12,15
255:23,25
256:8,15
259:13
266:25
272:14,18
277:25
282:3,4
287:13
301:13
304:25
320:5,8,9
322:8
351:17
365:25
367:6,23
374:20
376:5,21
377:9,25

378:12
379:6,22
381:19
383:9 384:5
389:8,19,21
391:2 393:7
**answered**
258:13
307:13
322:13
360:4,13,22
**answers**
157:16
**anybody**
163:22
**anyway**
268:18
**apart** 367:25
369:2
371:12
373:10
378:15,18
379:12
385:20
**apologize**
331:5
351:14
**Appaloosa**
147:10
227:21
**apparently**
210:13
**appear**
194:17
**appearances**
357:12
**appears**
202:19
332:21
**appendices**
192:9
**applied**
297:16
388:2
**appreciated**
247:9
**approach**

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 286 of 329

408

171:2
**appropriate**
189:17
222:20
344:16,17
404:7
**approximate**
161:10
**approxima...**
173:24
175:10
188:12
350:19
**April** 173:6
200:24
201:5 202:5
202:8,25
203:10
204:17
262:2
263:19
266:21
267:10
268:24
350:10
**April-May**
263:6 266:8
267:23,25
**areas** 226:17
287:2
295:22
**arenenger...**
126:8
**argue** 394:5
**arguments**
211:13
217:5
360:17,18
393:20
**arm's** 170:8
**arrive** 285:20
**Arthur**
326:10,15
326:15
332:10,16
402:25
403:4

**articles** 141:8
142:12
155:2
160:16
**ascertain**
330:24
**ascribed**
352:25
353:7 355:5
**aside** 288:25
313:4
355:13
392:9
**asked** 132:11
185:8
186:10
187:9,10,16
190:17
195:18
196:4 203:4
258:9,14
307:12
308:2
311:17
320:24
322:13
358:14
360:4,13
392:15
**asking** 174:10
182:6 188:8
224:13
232:8
244:20
245:18,20
246:21
255:18
256:3
258:21
259:25
273:18
305:2
309:17
321:4
324:18
334:10,10
337:4 360:9

365:22
372:7
383:18
**asks** 298:23
310:12
337:17
342:24
**aspects**
171:17
374:8
**assembled**
141:9
**asserted**
155:4
161:17
241:16
343:12
378:24
**asserting**
154:18
303:24
**assertion**
275:6 327:8
**assessed**
344:18
345:21
**assessment**
196:9
205:24
**asset** 184:20
283:12
316:4
**assets** 151:13
153:11,23
156:15,20
167:16
171:19
178:22
179:2
182:17
197:13
209:19
212:12,14
212:19,21
212:23,23
218:13,22
219:3,5,5,9

219:12,17
219:21
221:8 222:3
240:4
250:25
251:19
252:11
283:24,25
284:12,18
334:2
339:14,15
352:20
353:13
**assign** 341:13
**assigned**
219:12
234:20
**assignment**
169:8
**assist** 170:13
171:8
**assistance**
141:25
**assisted**
135:22
**associated**
152:10
**assume**
168:16
174:8
177:18
209:18,19
209:20
264:2 294:2
306:2
335:20
336:11
366:25
**assumed**
191:24
316:23
350:7
352:18
**assumes**
256:24
**Assuming**
243:23

**assumption**
213:21
345:24
**assumptions**
205:21
209:17
239:17,19
241:4,9,12
241:15
251:16
256:25
283:7,14,15
283:17,18
283:22,23
284:4,12
285:3,5,9
285:22,24
314:24
316:4,7,13
328:14,17
329:7,11,14
329:16,18
329:21
335:5 338:8
339:4,10
340:5
345:14,16
350:3,4,5
350:25
351:21
353:12
354:18,25
355:10,11
393:11
**attached**
153:19
194:18,25
201:8
221:23
228:17
327:19
332:21
396:3
399:11
403:23
404:13
**attaches**

299:14
**attaching**
200:6,17
341:11
401:17
**attachment**
194:14,24
228:2,6
333:23
402:5
**attachments**
155:9
**attempt**
391:11
**attendees**
324:19
**attention**
265:21
375:13
376:19
377:10
378:13
379:10
380:8 384:6
**attorney**
373:16
404:17
**attorney-cli...**
232:13
320:6 378:4
**attributable**
366:8
367:20
393:13
**August** 326:8
332:17
335:18
336:21
338:13
400:20
**Aurelius**
131:7
132:19,21
132:21
289:16,21
290:5 291:2
291:14

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 287 of 329

409

293:15
299:15
310:25
314:3,21,25
322:25
324:5,11
325:7 327:6
328:20,25
329:10,25
334:11,15
334:22
335:2 337:6
337:16
338:18
371:2,5,18
371:20
372:10
**Aurelius's**
131:10
327:7
329:16
**authorized**
350:11
**available**
142:7,14
149:17
157:25
166:6 167:9
167:20,23
167:25
168:5,12
169:10,15
174:19
177:10
183:24
191:20
192:21
194:20
207:21
225:4
234:23
288:19
290:21
292:17
324:25
333:2
343:16

344:24,25
345:18
353:16
358:4
**Avenue**
124:11
125:5,16
126:15
**avoid** 211:11
381:18
**aware** 136:13
143:3
159:21
170:2 190:5
191:7,12
192:23
198:2
199:18
248:2,6
267:2
268:22
269:12,16
269:18,25
270:4,8,16
270:23
271:3,5,8
271:23
273:14
274:11,22
275:15,22
276:4,10,12
277:6 296:9
304:5
308:23
320:19
321:6,14
322:3
330:17
331:9 373:7
373:10
385:12,19
386:5,14
388:5,10,15
388:16,21
388:23
389:12
**a.m** 124:5

308:12
310:11

**B**
**B** 125:9 128:2
258:4 382:8
**back** 135:9
135:10,11
135:13,16
138:22
139:8
146:25
179:16
181:15
192:4 194:7
195:10
197:15
239:14
268:7
278:16
311:18
317:8
320:11
336:10,25
342:3
347:19
348:6
367:13
369:9 376:8
398:3
**balance**
196:25
197:5,6,10
200:3
205:12
206:8 302:3
**balances**
128:23
129:7,9
185:3 197:2
198:4
203:15
204:6,10
205:3,4,7
205:10,11
206:6,7,9
206:14
266:23

267:7
269:23
271:12,24
272:11
273:2,15,21
273:25
274:4,15,16
277:8 278:6
278:12
293:8,16
297:4,8,9
300:17
301:7,25
309:2,6,11
309:13,15
310:4 311:4
311:5,6
316:3 317:3
317:4,16
318:5,7,8
319:2,6,14
328:7 333:6
335:9
336:11,13
336:14
351:5,24
359:3,20
393:10
394:16
398:18
**BALLUKU**
126:17
**bank** 123:9
123:16
125:14
126:12,13
268:17
372:22
373:3
403:17
**banker** 140:5
145:2
**banking**
271:10
**bankruptcy**
123:1
165:22

243:17
245:2 248:4
253:3,6
294:21
397:7,9
**bargain**
296:15
**Barrage**
200:5,16,23
401:16
**Barrage's**
201:8
**Barrett** 337:4
**base** 338:7
**based** 128:25
141:11
149:6,16
150:9
153:21
154:22
156:2,14,17
157:2,7,18
161:25
162:4,5
163:20
164:25
168:9 172:7
174:7,19
180:5
185:22
195:2
205:20
215:18
218:6 219:7
233:4,6
240:18
259:7 271:8
274:21
275:10,20
281:24
283:4,7,18
284:16,21
284:22
285:5,9,25
311:14
316:13
324:22

328:13
330:22
331:18
332:7,25
333:5
334:15
337:19
338:17,18
339:24
340:9,13,15
341:23
343:13
345:24
350:2
351:23
353:11
354:17
355:9
359:16
361:11
383:6
392:10
398:2
**bases** 374:15
**basic** 156:13
**basically**
283:3
295:20
338:22
339:6,8
350:24
354:18
363:19
**basis** 140:6
141:22
145:20
149:9
152:25
154:6
161:22
162:16
167:24
170:2
177:13
178:16
197:21
212:10,15

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 288 of 329

410

212:20
213:2
214:18
222:4
223:11
232:13
237:25
255:23
256:9,16
259:13
264:14
290:19
294:5 301:4
301:20
311:8 315:3
323:9
328:15,16
328:18
331:15
338:15
345:23
346:2
347:17,25
357:17
360:3,12
367:6
374:19
376:4 377:8
377:25
378:11
379:5,19,21
384:4 389:7
389:21
390:7
**Bastable**
131:18
395:16
**Bates** 155:11
155:15
156:19
157:10
160:18
166:19
228:7
230:19
238:14
288:2

311:19
**Beach** 148:7
148:12
**becoming**
132:22
371:5
372:11
**began** 139:20
140:5 145:4
145:8
179:13
268:16,20
**beginning**
195:21
231:24
**begun** 159:22
**behalf** 123:13
258:20,22
362:16
**belief** 295:24
**believe**
132:12,16
135:8,11,13
135:15
136:17,20
139:15
142:11
143:6
144:11,18
146:8,9
147:11
148:10,13
149:23
150:15
151:6
153:12
154:7 157:2
158:3,10
160:10,22
161:5,14
167:13,14
169:12
173:9,13,22
175:3,9,13
178:12
179:4 181:8
181:15,20

182:16,25
183:4
187:15
188:4,14
192:12
194:22
195:9 197:3
198:22
200:3 201:2
201:12,19
201:22
204:18
206:7 208:4
208:14
211:10
213:18
215:17
216:10
217:14
221:7 222:2
226:22
227:12
228:17
230:9
231:16
236:18,24
237:3
258:13,25
259:24
260:6,10
261:8,24
262:4
263:10
266:5,24
273:4,5
283:2
289:19,19
291:6,10
294:22
295:18
298:2
300:25
303:3
306:11
317:20
322:15
323:14,16

323:25
325:10,23
327:22
329:4
331:13
336:16
343:3 345:2
356:8,22
357:9 358:3
358:12,24
359:10
360:22,23
364:9 365:9
373:12
374:23
384:14
389:22
392:11
396:21,25
397:3,5
**believed**
204:25
258:15
393:3
**Ben** 133:22
148:2
149:11
150:4
200:10,19
262:14
264:11
308:13,17
326:9,14
332:12
401:18
402:24
403:6
**benefit** 330:3
**best** 159:8,11
163:24
185:21
208:11
223:23
224:3 286:7
328:16
347:24
**better** 145:20

170:10
197:25
201:25
205:19,24
290:23
336:4
342:22
**beyond**
132:12
154:11
168:3 246:3
286:25
363:15
370:9
374:18
376:3 377:6
377:22
378:10
379:3,20
383:24
389:5
396:15
**bids** 302:8,10
302:15
**billing** 181:14
**billion** 163:15
163:17
167:8,10
206:13
213:7,22,22
214:3,3,14
215:20
253:18
257:4,5
311:24
317:11
350:6,8
352:9 353:7
**billions** 317:9
**binary**
316:17
**bit** 188:6
215:24
224:2
235:13
347:23
**blacked**

333:16
**blanket**
220:17,18
222:10
223:12
**blood** 400:14
**blow** 318:12
398:6,8
**blown** 286:5
**blows** 212:3
213:11
**bond** 314:7
314:11
**bonds** 140:7
141:21
290:18
292:8
314:14
**book** 141:2,5
147:15
149:3
150:16
219:7,7,12
221:5 251:6
251:10,20
**borne** 249:20
318:22
**borrowing**
155:19,23
182:3
**borrowings**
152:10
**bottom**
176:10
236:18
342:16
**bottoms-up**
286:5
**bought**
290:17
292:7
**breach**
372:17
**break** 172:10
246:8
257:16
263:25

271:3
322:16
380:2
**brief** 151:12
155:22
173:23
**briefly**
133:22
155:20
392:15
**bring** 379:15
**broad** 190:16
275:6,13
366:12
**broadly**
270:16
307:16
**Brodsky**
299:14
300:21
302:18
303:11
307:19,20
313:6,9,19
314:2
321:17
322:23
323:24
402:23
**bucket**
224:25
225:2
**buckets**
235:12
**build** 205:16
**building**
205:14
209:4
**built** 210:25
309:23
350:24
354:10,10
393:9
**bullet** 152:8
154:9
164:12
165:11

166:2 167:5
168:2 251:8
**bullets** 351:2
**bunch** 184:12
**busiest** 264:3
264:6
**business**
130:14
355:19
357:22
360:16
**buybacks**
197:17
**buyer** 179:6
**buyers** 179:4
——————
**C**
**C** 125:2 126:2
126:24
382:9 400:1
400:1
**CADWAL...**
126:21
**calculated**
314:7
**calculating**
351:6,18
**call** 209:3
216:20,23
292:5 293:4
293:9,10,12
293:14
294:13,22
310:12
336:4 374:4
**called** 128:3
145:6 308:2
327:10
344:21
398:4
**calls** 134:5
145:17
146:11
203:18
204:9,23
205:8 208:4
208:5,6
216:12

246:14
266:6,10,13
291:4
304:21
306:8
**capacity**
123:9
139:12
**capital** 123:4
123:6 146:9
177:17
178:21
181:24
189:23
190:18
195:14
197:17
203:14,20
326:20
352:7 353:6
353:13
**capture**
370:21
**capturing**
190:9
**career** 137:18
**careful** 338:3
**carefully**
404:5
**carried** 253:7
**carry** 165:15
397:3
**carving** 378:6
**case** 123:3,7
123:14
135:7
137:24
138:13
144:17
159:12,23
160:4,9,10
175:14
177:3,6,15
177:25
178:7
180:25
181:7,9,14

182:23
201:23,23
202:7,8,12
202:17,20
204:25
211:19
216:19
227:17
269:5 275:9
297:13,23
298:8 323:9
323:16,25
325:19
329:6
354:11
357:9
372:23
373:4
396:10
398:4,12
403:18
**cases** 199:8
278:10
362:24
365:18
368:16
391:25
**Case's** 227:13
230:8
**cash** 237:2
251:4,12
283:24
284:2 350:9
**catch** 291:23
**Catholic**
146:24
**caught**
290:12
**caused** 216:7
368:3,12
**causes** 237:15
304:12
305:5 306:6
306:22
307:9
359:21
**causing**

213:12
**caveats**
231:20
232:2
**cede** 361:6
**Center**
126:22
**Centerpoint**
266:15
**Centers**
146:25
**Centerview**
143:19
176:12,13
176:16
182:24
183:14
203:25
208:13,21
208:23
217:16
219:16
221:2
228:21,23
230:2 231:6
231:8 266:7
278:5 282:9
282:14
284:23
392:9
402:13
**Cerberus**
139:10,10
**certain**
123:17
128:15
134:25
153:11
154:6
178:17,22
179:8,10,11
184:14
188:18
191:6
192:20
193:22
197:2,22

201:12,13
205:2
212:21,22
215:2,3
225:22
227:18
231:19
241:14
247:4
249:11,14
249:17,18
249:19
256:24
269:13,22
270:8,9,18
270:24
272:2
273:24
274:3,24
278:14
297:4 301:6
303:25
304:11
318:21
336:3,14
350:3
366:22
**certainly**
168:18
270:7 279:2
280:6
363:23
370:20
391:17
**certainty**
296:14
394:2
**certification**
127:7
**certify** 399:9
400:8,13
**cetera** 141:9
153:6 155:5
162:3
181:16
185:6 203:6
207:24

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 290 of 329

412

| | | | | | |
|---|---|---|---|---|---|
| 242:4 | 234:10,11 | 207:22 | 344:16 | 386:19 | **collateral** |
| 292:14 | 288:21,24 | 209:20,21 | 345:15,21 | **class** 396:21 | 152:5,19 |
| 309:16 | **chat** 342:24 | 213:8,19,19 | 346:19,21 | 397:2 | 153:3 |
| 325:20 | **check** 336:10 | 238:16,19 | 347:10,14 | **clean** 366:21 | 156:15,23 |
| 327:16 | **Chicago** | 238:22 | 349:15 | **cleaned** | 157:5 158:6 |
| **chain** 172:18 | 146:12 | 241:15 | 350:2,18 | 397:13 | 158:8,12 |
| 211:16 | **Chopra** | 242:2,3 | 351:8,19 | **clear** 219:11 | 159:3 167:6 |
| 308:3,6 | 176:11,13 | 243:3,20 | 352:2,3 | 357:10 | 167:13,22 |
| 401:14 | 176:15,24 | 244:4,7,8,9 | 353:17,23 | 366:22 | 168:3,12 |
| 402:20,21 | 217:16,18 | 244:16,17 | 354:2 355:5 | 391:12 | 169:9 182:2 |
| **challenge** | 217:23 | 247:11 | 355:9 358:2 | **clearly** | 182:10,19 |
| 226:2 | 278:4 282:8 | 248:3,4 | 358:5,10 | 162:12 | 183:15,16 |
| **challenges** | 282:13,18 | 257:6,8 | 360:24 | 199:14 | 183:20,24 |
| 164:6 | 284:7 285:8 | 267:12,21 | 363:20 | 337:9 | 184:4,10,15 |
| **change** 212:8 | 402:12 | 267:21 | 378:23 | 390:22 | 184:19 |
| 212:17 | **chose** 390:20 | 275:7 | 379:14 | 392:20 | 185:2,8 |
| 213:4 214:5 | **claim** 240:8 | 276:21 | 390:14 | **client** 139:25 | 193:16,23 |
| 221:6 | 241:24 | 278:5 | 391:3 392:4 | 141:15,18 | 205:25 |
| 235:16 | 242:18,21 | 294:20 | 392:25 | 231:22 | 207:20 |
| 339:11 | 243:17 | 295:4 | 393:4,22 | 232:3 | 214:11 |
| 355:12 | 244:2 245:2 | 297:18 | 394:12 | 238:25 | 218:3,6 |
| 405:9,11,13 | 254:15 | 300:11,14 | 395:22,23 | 239:6 | 220:5,6,16 |
| 405:15,17 | 284:4,12 | 300:21 | 396:22,23 | 276:22 | 221:3 223:7 |
| 405:19 | 296:22 | 303:12 | 396:25 | 277:7 | 223:16,20 |
| **changed** | 300:17 | 311:25 | 397:17,23 | 317:22 | 223:25 |
| 143:2 187:4 | 315:24 | 312:16,19 | **clarification** | 354:21 | 224:6,7,16 |
| 355:11 | 316:7 | 312:21,22 | 130:22 | **clients** 232:24 | 225:9,16,22 |
| **changes** | 344:17 | 312:24 | 131:4 | 233:21 | 234:9,13 |
| 212:5 | 351:11,24 | 313:17 | 132:15 | 235:23 | 235:8,12 |
| 218:21 | 352:6,9,22 | 314:9,23 | 238:11 | 272:8 | 251:5,12 |
| 219:3 242:7 | 352:24 | 315:14,19 | 384:14,16 | 273:19 | 254:8 272:2 |
| 242:8 | 353:6,19 | 315:23 | **clarified** | 274:2 | 272:9,10 |
| 247:20,21 | 356:3,23 | 316:11 | 372:16 | 281:12,15 | 273:16 |
| 247:22,24 | 375:22 | 319:6 | 381:3 | 281:19,23 | 276:22 |
| 249:25 | 393:16 | 320:16,20 | 384:13 | 304:17 | 277:9 278:6 |
| 250:6 | **claiming** | 321:7,15,15 | **clarify** 131:12 | 305:8 307:7 | 278:8,13,14 |
| 404:12 | 359:22 | 322:10 | 155:7 | 307:7,18 | 285:16,21 |
| 405:5 | **claims** 128:24 | 323:13 | 194:16 | 318:6 | 293:7 |
| **changing** | 154:15,16 | 327:3,9 | 220:11 | 319:23 | 302:15 |
| 214:2 219:8 | 154:18,22 | 329:12,17 | 239:24 | 322:6,11 | 303:17 |
| **Chapter** | 155:4 | 329:22 | 292:2 | **close** 137:6 | 304:11 |
| 123:4 | 160:23,24 | 330:6 | 357:13 | 287:24 | 305:5 306:6 |
| 362:24 | 161:7,17 | 339:14,15 | 362:12 | **CLR** 123:22 | 306:22 |
| 365:18 | 162:19,20 | 339:20 | 372:10 | 124:13 | 307:9 314:4 |
| 368:16 | 162:24 | 341:14 | 381:6 | **CMBS** | 314:8 350:7 |
| **chart** 194:15 | 163:4,7,14 | 342:23 | 382:12 | 344:23 | 350:9 |
| 194:20 | 165:4,20 | 343:11,21 | 383:9 | 346:24 | 353:14,16 |

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 291 of 329

413

358:11
362:23
365:8,10,13
365:17
366:8
367:16,21
368:4,13
375:24
378:22
393:21
394:5,10
**colleague**
133:10
148:3
308:13
361:6
**colleagues**
133:7,21
**collection**
135:22
**Colt** 124:10
125:4
**column** 161:3
161:4
162:18,22
167:15
168:10
253:5
**columns**
182:16
222:19
**combination**
192:22
**come** 192:4
218:5
311:15
328:11
342:4
343:18
352:14
353:9
**comes** 316:9
**comfort**
218:9
**comfortable**
354:23
355:4,7

**coming**
141:23
392:16
**comment**
273:5
**committee**
123:12
146:25
289:24
**communicate**
166:5
**communica...**
374:4
383:17
**communica...**
129:17
131:7
132:18
320:7
366:24
369:16,22
371:2,17
372:3,7,14
373:10,11
378:7,15,16
378:19
379:12
380:10,18
380:25
381:7,10,15
382:5,6,14
382:22
383:7,10,14
384:19,20
385:4,6,20
386:6,15,17
387:14
388:6,12,17
**companies**
137:4,19
170:4
189:18
271:10,24
274:14,21
274:23
275:11,11
275:15,22

276:5,11
338:5
**company**
140:3
142:19
149:14
151:13
154:19
165:14,22
171:17
176:19
177:4,12
178:15
179:17
187:21
189:21
191:8
194:15
199:13,18
207:10
230:21
231:2
260:15,16
261:7,9
265:23
267:4
271:15,17
275:8
276:13
277:8 280:8
283:19
289:18
352:8,21
353:5
**company's**
140:4
144:25
165:23
182:9,23
196:24
266:16
267:4
**comparable**
347:21
**comparables**
165:2
**compare**

209:23
**compared**
183:21
250:7
251:19
**compilation**
181:13
**complete**
280:10
286:12
**completed**
234:4
**complex**
193:8 329:6
**complied**
269:10
**component**
206:2
**concern**
364:24
**concerned**
235:17
296:2 371:7
381:3
**concerning**
131:9 362:9
371:4,11
372:4,16
379:14
380:11
381:16
383:11,20
384:22
385:8,11,21
386:17
387:15
388:7,12
**concerns**
166:16
235:22
246:16
267:20
**concluded**
315:17
340:2
**conclusion**
275:13

315:13
392:16,19
**conclusions**
285:20
**Conditions**
248:13
402:8
**conducted**
130:10
387:9
confi 318:13
**confidence**
354:14,19
367:7
**confidences**
366:24
367:5,10
**confidential**
177:9
199:14
321:3
331:15
**confidentia...**
177:8
227:19
249:12
349:18
**confirm**
346:18
**confirmation**
136:12
364:2,11,17
364:25
374:25
375:3,7
**Conflicts**
125:3
**confusion**
381:19,21
**connection**
142:4 143:7
144:2
160:13
168:23
169:8 179:2
229:5 236:7
255:19

260:3
262:17,24
269:3
278:22
297:2
301:16
349:9,18
375:24
384:25
396:4
**Conor** 395:15
**consensus**
165:3
**consider**
167:2
**considerati...**
361:2
398:18
**considerati...**
166:22
171:2
296:11,13
384:22
**considered**
168:18
296:10
**consistent**
164:21
359:6
**consolidated**
155:24
188:20
300:22
301:22
**Consolidati...**
188:21
**constituents**
199:17
208:9
**constraints**
164:6
**contact** 209:6
**contained**
232:9 241:5
251:4
309:16
**contains**

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 292 of 329

414

388:2
**content**
245:18
380:9
**contention**
382:21
**contents**
233:8,25
**contingent**
154:11
160:19,20
164:7
165:10
198:25
213:5 242:9
242:14
256:25
257:5
294:13
**continual**
179:15
**continually**
235:17
284:19
**continue**
177:11
218:10
260:20,23
261:3
284:20
394:7
**continued**
123:20
124:8
184:12
235:13
309:10
340:12
**continuing**
207:9
**continuously**
262:6
**contribute**
237:2
**contributes**
350:6
**contribution**

130:19
131:2
236:20
237:9
239:23
240:2,5,7
240:25
303:18
358:14,17
359:4
384:10
385:2,25
386:8
387:19
388:25
**contributions**
197:17
**Cont'd** 126:2
258:6
**conversation**
372:8
397:11
**conversatio...**
233:5
272:16
368:6,9,10
372:14
383:19
**coordinated**
181:7
**copied**
148:23
176:20
308:14
**copies** 187:19
187:22,25
188:15
370:25
**copy** 299:23
**corner**
230:20
236:19
**corporate**
192:13,25
193:10,21
355:15
**corporation**

271:25
**correct**
142:20
144:2,3
146:4,13
148:4,5,17
149:18
152:20,21
156:6,11,12
157:9,23
162:17,22
163:5,6,10
163:11
169:7,17,18
171:13,14
171:20,21
173:12
174:16,17
174:20
175:25
176:2,21
180:12,23
181:19
187:11,12
192:13
193:5,6,17
194:21
195:8,15
196:19
198:12,19
199:8,9,19
202:21
208:13
210:15
211:9 212:6
213:22
214:3
219:13,14
219:18,21
219:22
220:3 221:3
222:14
226:10
227:6
228:24
229:17,22
229:23

230:2,3
232:20
234:3,17,18
236:13
238:5
239:20
241:2,3
242:10,11
242:15
244:12
247:12,24
247:25
248:5,18,21
248:25
249:23,24
250:10,23
251:5,9,12
251:22,23
252:3,19
253:8,9,12
253:15,16
253:18,22
253:23
254:2,3,5,6
254:9,16,19
254:25
255:6 257:2
257:3,7
260:12,25
261:2,20,21
264:5
265:22
270:9,10,19
271:7,13
273:2
278:18
282:15
283:15
285:3
290:13
293:16,17
297:14
303:13,15
309:2,3
310:4 313:3
313:17,25
314:5,18

315:19
317:17
318:15,16
319:4,8,15
319:21
321:19
327:24,25
328:4,23
329:18
330:15
332:23
333:3,7
335:20
341:17,21
357:14
362:18
363:8
367:16,17
375:11
381:10
383:2 398:7
398:14,15
398:19,21
399:10
**corrected**
397:6,9
**corrections**
399:11
404:6,8
**correctly**
205:17,18
**correspond...**
135:2 242:5
289:11
295:8 386:6
**counsel** 125:3
125:14
126:3,12,20
127:5
128:15,19
134:2,6
135:6,22,25
136:3,7
144:16
174:21
175:8 176:4
204:24

232:11,12
233:5 236:5
236:10
237:21,23
239:9,13
240:19,22
243:9,11,15
246:18,20
255:20,21
255:22
256:2
258:16
259:7,12
269:6
272:17
320:10
321:2
340:17,18
341:4
361:14
362:12
366:25
367:5,23,25
368:7,10
369:3,17,18
371:12,15
372:16
373:11
377:13,19
378:3,16,20
379:12
384:2,3,21
385:5
386:20,21
386:23
391:8 398:2
**counsel's**
232:18
238:3,8
371:22
379:8,24
389:10
**counted**
303:18
304:3
**counterclai...**
376:23

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 293 of 329

415

**COUNTY**
399:4 400:4
**couple** 134:11
139:15
183:10
204:13
227:15
325:23
326:7
391:20
**course** 361:19
**court** 123:1
127:18
357:12
390:16
404:21
**cover** 194:13
228:9 334:9
**coverage**
238:24
**covered**
131:18
197:6
365:20,21
**CQS** 298:24
**create** 335:10
**created**
337:21
343:17
**credit** 156:24
220:13,20
222:13
**creditors**
123:13
137:5
278:14
316:8
353:15
387:22
**crucial**
165:12
**crystal**
366:22
**CSR** 123:22
124:13
**CULBERT...**
126:9

**current**
148:21
**currently**
144:4
154:12
164:15
182:2
**Curtis** 124:10
125:4
**cut** 396:16
**cute** 389:15

_____

**D**
**D** 125:20
128:2 187:8
187:13
258:4 401:2
**Dan** 290:4
**data** 162:5
178:4,6,10
178:11,14
178:24
179:3,5,6,7
179:14
186:20,24
348:14,16
348:17
**date** 128:9
147:19
172:17,20
188:17,23
190:13,23
191:8,14
197:5,5
200:8,12
202:14,18
203:16,19
206:19,25
207:6
210:11
217:12
221:15
224:9
225:10,18
227:2 228:3
229:12,22
234:3,3
237:13

240:14
242:23
245:13
246:11,24
248:10,15
252:23
253:5
255:12
258:13,25
259:2,21
260:5,17,19
263:2
269:13,22
270:17
271:6 272:7
276:11
282:10
288:16
289:6
291:19
299:10
301:18
302:2 304:6
304:14,18
305:8
306:20
308:5,8,21
313:7
319:23
321:12,13
321:25
322:6
326:12
330:11,14
330:20,25
331:2,7,9
332:2,11,14
334:12
342:10
344:3 345:6
345:12
346:5,9,12
346:18
347:15
349:2
372:25
391:25

395:11
404:10
405:23
**dated** 123:17
158:2 173:6
175:16
200:10,19
202:22
211:16
221:18
248:20
295:9
308:11
342:8
401:19
403:10
**David** 125:18
343:24
344:5 362:3
371:13
403:12
**Davidson**
146:8,19
227:21
**day** 218:4,15
218:17
291:11,12
310:12
399:20
400:19
**days** 131:14
186:21
404:17
**day-to-day**
264:14
326:24
**DC** 126:6
**deal** 166:15
170:10
264:13
**dealing** 142:2
203:23
209:7
**deals** 137:17
347:22
**dealt** 141:24
277:17

278:11
289:20
**debate** 210:3
211:11
**debt** 152:13
152:15
153:7
155:24,24
156:3
167:17
182:17,20
185:2
193:12
218:3,13,14
220:12,21
275:16
**debtor**
305:20
308:24
316:6 350:8
**debtors** 123:5
123:13
125:3
128:25
129:4,17,18
129:23
131:9
167:21
175:22
182:15,18
184:22,23
186:2,11,16
218:2,7
220:15
222:3
223:23,24
224:22
234:14
235:3,7,14
235:21
248:7 249:3
249:17
250:16,20
250:25
251:11,18
252:9,14,21
253:2,6

255:3
267:22
278:22
280:13,21
281:4,8
283:5
284:17,21
285:6,16,22
285:25
286:2,10
300:15
305:20
312:5,12
313:21
317:18,23
318:4,18
328:3
340:14
345:13,23
346:3,19,20
371:4
375:22
376:11
380:18,20
381:22,24
382:7,8,8
382:13,18
382:25
383:12
384:2 392:2
393:2
394:10
**debts** 220:12
275:3,23
276:14
**December**
145:12
197:8 252:2
252:19,23
253:3
**decent**
137:16
**DECHERT**
126:14
**decision**
355:16,17
**deck** 232:10

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 294 of 329

416

239:7
**deemed**
404:20
**deep** 166:3
171:18
347:3
**Defendants**
123:11,19
**defenses**
376:22
**deficiency**
240:8
241:19,24
243:25
254:4,7
312:16,20
**definitely**
183:8 227:7
339:25
**definition**
365:7,13
**definitive**
345:20
**degrees**
263:18
**deleted**
181:10
**Denman**
175:16
180:24
202:20
**Dennis** 289:4
289:8 299:8
299:12
310:10
402:15,18
**dependent**
152:16
**depending**
242:2
275:25
**depo** 364:6
**deposing**
404:16
**deposition**
123:20
124:8 127:8

127:15
128:8,14,17
131:13
133:5 134:3
134:10
136:4,8
173:20
228:5
267:18
349:10
361:11
375:6,11
380:7
386:22
390:21
395:15,17
396:5 399:8
401:10
404:4,14,18
404:19
**depositions**
361:20
**derivative**
284:2
**derived** 237:6
**describe**
155:20
351:21
374:7
398:10
**described**
162:13
279:5 355:2
359:7,11
364:8
380:12
384:9
385:15
387:20
389:2
**descriptive**
224:19
**designated**
355:15
**destroyed**
268:25
**destructions**

213:13
**detail** 159:10
181:25
183:23
199:3,14
203:4 209:3
225:20
245:4
288:22
309:14
341:5
**detailed**
301:3
**details** 184:12
**determinat...**
252:8
343:19
356:6,11,20
357:3 359:2
**determinat...**
359:17
**determine**
170:8
186:15
196:8,8
201:25
224:17
241:17
252:5 309:5
314:22
335:11
344:15
352:16
**determined**
153:6
168:21
214:21
379:16
**determining**
153:4
170:14
**develop**
241:13
311:7,12
328:10
338:9
347:23

**developed**
309:24
337:13,14
338:6
**devoted**
265:20
**dialogue**
181:15
**difference**
312:9,11
338:16
**different**
137:10,13
152:13,15
152:17,18
153:3,3
154:17
160:25
161:18
178:10
184:17,24
206:10
208:8
220:12
228:13
271:21
277:16
278:10
291:8
314:24
316:7 317:7
329:7,11,14
329:17,22
337:8
340:15,18
342:4
346:15
348:14,15
351:12
356:17
**difficult**
186:15
276:16
277:23
280:10
330:23
354:12

**diligence**
166:3
171:13,15
175:20
176:3,25
177:12
185:15
194:8
195:11,18
294:4
394:18
**diminution**
362:22
365:16,23
365:25
366:4,7
367:15,20
368:3,12
**direct** 320:7
375:13
376:19
377:10
378:13
379:10
396:8,15
**directed**
389:20
**Directing**
380:8 384:6
**direction**
135:24
232:11
236:9
237:22
239:9
243:10
255:22
272:17
320:9
340:17
341:4 367:3
367:23
**directly**
374:24
**director**
137:2
**disagree**

296:5
339:19
390:4
**disclose**
317:22,23
321:3
366:23
367:4,9
**disclosed**
154:5
167:22
248:24
249:7,16,18
249:19,23
250:5,9
318:6
339:21
**disclosing**
233:18
318:2
349:22,23
349:24,25
368:8
369:15,21
383:16
**disclosure**
134:22
249:10
349:4,16
354:16
355:6
380:13
384:9
385:16
387:20
389:2
**discovery**
364:10,11
**discretion**
391:8
**discuss** 133:7
175:18
210:2
216:14
294:12,19
310:15
322:10

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 295 of 329

417

342:17
**discussed**
128:14
183:20
206:24
207:2
210:21
229:6
233:21
245:22
246:6,23
247:2
254:18
256:6
292:18
293:4 300:6
304:13,16
305:7,11,14
305:16
306:8
309:22
317:6 322:5
323:6,8
361:16
363:11
**discussing**
155:2,12
217:19,24
222:7
226:24
233:22
234:17
272:7
313:24
**discussion**
145:4 149:6
149:12,21
173:4
209:25
211:14
236:4,5
259:8 292:6
295:16,19
298:10
300:2
305:19
313:16

323:12
342:15
343:7
367:22
376:18
392:13
397:4,12
**discussions**
136:2 140:5
145:12
159:23
161:15
199:16
202:24
204:19
207:5 209:2
211:12
216:9 217:4
219:15
220:25
223:19
232:10
237:20
239:6
242:20,24
243:8
245:10,13
245:14,19
246:9,17,21
247:21
255:15,20
259:7
273:19,23
274:2
281:18
283:18
284:17
285:5
293:15
294:7
300:13
304:23
305:15,25
306:17,19
307:2,6,15
307:17,23
323:10

325:18
326:25
328:6,9
335:4
361:13,18
365:11
367:24,25
369:2,2,17
369:23
371:6,9,12
379:13
381:22,23
392:22
**distinct** 275:9
**distinction**
209:5
315:21
**distress**
141:20
**distressed**
137:17
193:9
**distribution**
241:22
358:13,16
**distributions**
241:25
**DISTRICT**
123:2
**dive** 166:3
171:18
347:4
**divided**
351:11
**division**
208:19,20
**divulge**
246:21
318:11,12
319:10
320:5
**dkochman...**
125:19
**docket**
327:20
372:23
373:5

403:18
**document**
150:12
151:21
157:21,22
157:24
158:4,7,19
159:5,19
165:7
174:15,18
180:3
192:10
194:11,17
195:5
228:18
230:12
231:12,25
233:10,16
234:8
238:12
241:6,11
248:12,17
248:18,23
249:6
250:13,18
250:19,21
269:4 273:3
273:9 288:5
292:20,22
302:24,25
303:4
308:21
335:23
348:2 349:5
349:7
352:12
357:11
364:9 373:5
375:17
376:24
377:3
390:20
397:21,25
398:6,19
402:7
**documents**
129:2

134:16,20
135:23
160:11
200:6,17,23
201:5,7,15
201:21,24
202:5,14,17
247:19
298:6
361:12,14
385:19
398:3
401:17
**doing** 137:4
205:22
296:21
328:16,21
330:18
394:2 404:9
**dollar** 191:17
206:5
**dotted** 162:23
**downside**
211:19
**draconian**
213:10
**draft** 149:14
194:15
228:19
229:25
230:16
250:13,15
250:17,18
298:12,16
298:20
299:18
313:13
**drafting**
295:11
297:12,14
**dramatically**
295:13
**draw** 315:21
**ducks** 312:18
**due** 171:13
171:15
175:20

176:3,25
194:7
195:10,18
232:18
236:12
243:6
359:22
**duly** 128:4
**duties** 372:17

___
**E**
**E** 125:2,2
126:2,2
128:2,2,2,2
258:2,2,4,4
258:4,4
400:1 401:2
405:2
**earlier** 148:3
186:21
215:10
220:24
288:10
291:10
319:11
322:13
341:12
361:16
396:7
**early** 146:5
147:5
150:14
159:25
160:6
204:17
214:21
215:5,7
226:22
261:15
**economic**
245:6
**eculbertson...**
126:10
**effect** 127:17
130:20
167:16
385:24
386:8

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 296 of 329

418

| | | | | | |
|---|---|---|---|---|---|
| **effectively** | 260:9 | 344:17 | 352:4 | **evaluating** | 209:12,15 |
| 212:2 | 262:25 | 345:15 | 376:12 | 171:16 | 278:3 282:7 |
| **either** 133:19 | 264:4 265:9 | 351:24 | **estimate** | **evaluation** | 282:12 |
| 138:17 | 265:10,15 | **entitled** | 161:6,24 | 171:10 | 358:15 |
| 160:6 | 265:21 | 155:18 | 163:12,12 | **event** 368:23 | 393:24 |
| 177:15,24 | 276:6,12,20 | 157:13 | 163:13,18 | 369:13,24 | 402:11 |
| 191:16 | 277:7 278:3 | 161:3 165:9 | 248:24 | 372:5 | **exchanged** |
| 203:23 | 278:17,19 | 169:19 | 312:5 | 379:16 | 265:3 |
| 245:22 | 279:4,6,10 | 173:4,11 | 316:10,13 | 391:5 | **exchanges** |
| 266:15 | 280:4 | 219:20 | 348:3 350:2 | **eventually** | 197:18 |
| 268:23 | 289:14 | 222:22 | **estimated** | 290:12 | **exchanging** |
| 277:7 | 321:6 402:9 | 223:3 272:9 | 239:17,20 | **Evercore** | 223:15 |
| 321:11 | **engagements** | 356:9 358:7 | 253:10 | 210:16,17 | **excluded** |
| 340:6 | 265:19 | 359:9,12,19 | 349:15 | 210:25 | 238:22 |
| 346:18 | 274:13 | 368:25 | **estimates** | 211:6 | **excluding** |
| 357:3 | 275:22 | 369:14 | 161:11 | **evidence** | 384:20 |
| 359:17,19 | 276:5,7,17 | 376:10 | 162:3,6,11 | 377:14 | 385:4 |
| **electronic** | 278:15 | **entity** 193:10 | 162:24 | **exact** 229:9 | 386:16 |
| 341:19 | 289:20,22 | 197:14 | 218:2 | 259:25 | **excuse** 243:25 |
| **Elo** 347:6 | **enhance** | 288:7 301:5 | 242:21 | **exactly** 178:9 | 324:23 |
| **employed** | 302:15 | 345:22 | 251:17 | 185:18 | 348:15 |
| 143:12 | **ensure** 210:4 | 353:4,5,17 | 252:10,13 | 186:14 | **execution** |
| **employee** | 249:20 | **entries** | 315:6 | 191:3 | 227:4 |
| 138:24 | **entered** | 327:20 | 317:25 | 327:12 | **exercise** |
| 139:12 | 174:22 | **equal** 314:13 | 318:8 | 359:24 | 339:9 |
| 347:7 | 290:24 | **equity** 284:3 | 334:16 | 360:8 | **exhaustive** |
| **encompass** | **entering** | **Eric** 262:13 | 338:5 342:3 | **EXAMINA...** | 179:13 |
| 184:20 | 323:10 | 264:13 | 344:14 | 128:10 | 187:17 |
| 382:22 | 325:2 | **Erica** 123:22 | 347:19 | 258:6 | 361:22 |
| **encompassed** | **entertain** | 124:12 | **et** 123:4,6,10 | 361:24 | **exhibit** 128:7 |
| 371:7 | 361:18 | 400:6,22 | 123:18 | 391:22 | 128:17 |
| **encourage** | **entire** 246:13 | **ERIN** 126:9 | 141:8 153:5 | 395:12 | 147:18,21 |
| 246:15 | **entirely** 222:8 | **errata** 404:7 | 155:5 162:3 | 401:3 | 155:8 |
| **ended** 216:3 | 390:11 | 404:10,12 | 181:16 | **examine** | 172:15,18 |
| 318:13 | **entities** 153:4 | 404:16 | 185:5 203:6 | 138:8,9 | 172:21 |
| **engaged** | 166:7 | **error** 298:3 | 207:23 | 168:13 | 175:2,15,15 |
| 143:25 | 190:10,19 | 398:9 | 242:3 | 183:19 | 179:19 |
| **engagement** | 196:16 | **ESQ** 125:7,9 | 292:13 | 185:21 | 192:4 194:8 |
| 139:2,3,19 | 198:3 | 125:11,18 | 309:16 | **examined** | 200:4,9,18 |
| 139:23 | 206:10 | 125:20 | 325:20 | 128:5 170:7 | 200:21 |
| 144:12,20 | 269:22 | 126:7,9,17 | 327:16 | **example** | 201:3,9 |
| 144:23 | 288:13,13 | 126:24 | **evaluate** | 132:6 | 202:23 |
| 145:10 | 297:19 | **estate** 123:13 | 165:12 | **exception** | 210:8,9,12 |
| 179:23 | 301:6 | 137:11,15 | 235:20 | 391:16 | 210:22 |
| 244:24 | 336:15,15 | 137:18,20 | 280:15 | **excess** 167:9 | 217:9,10,13 |
| 245:12 | 339:16 | 154:16 | **evaluated** | **exchange** | 221:11,12 |
| 259:19,22 | 343:12,18 | 207:23 | 167:3 275:9 | 130:25 | 221:16 |

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 297 of 329

419

227:24,25
228:7
229:10,14
230:10
248:12,16
258:8
259:17,18
273:4
278:17
282:7,12
287:14,16
289:3 299:7
299:11
303:8 308:3
308:6 310:8
311:19,20
312:4 313:5
317:15
322:21
326:9,13
332:9,12
336:22
341:9 342:7
342:11
343:23
344:4 348:6
348:25
349:6
372:21
395:9 396:2
398:17
401:10,11
401:12,14
401:15,18
401:21,22
401:24
402:4,6,7,9
402:11,14
402:17,20
402:21,22
402:24
403:4,6,8
403:11,15
403:16,19
**Exhibits**
200:13
308:10

401:8 402:2
403:2,23
**existed**
244:24
**existence**
186:12
**exit** 253:3,6
**expect** 370:14
**expected**
130:6,11
254:14
368:22
385:14
386:2,9
387:9,21
**expenses**
375:23
376:11
**experience**
137:14
271:9
274:12,22
275:20
278:3
346:24
**expert** 129:5
129:24
132:3
136:17
363:4
365:20
366:15
**expertise**
136:25
137:8
**experts** 286:6
**expired**
338:14
**explain**
279:18
360:6
**explained**
371:23
**explanation**
376:7
**explanations**
224:19

**explored**
170:22
**expressing**
295:12
**extend**
363:25
**extensive**
185:15
**extent** 153:12
153:14
159:9 232:7
233:3 236:3
236:7
237:18
239:5,25
240:17
243:7
255:17
259:5
272:14
304:20,22
312:15
320:4 341:2
362:13
363:14
364:16
**Eynon** 337:4
**e-mail** 134:15
147:18,22
147:25
148:24
149:2,10
155:10
172:18
175:16
176:10,11
176:21
180:14
181:13
194:13,24
200:4,9,15
200:18
201:8
202:10,22
211:15
221:16,24
227:25

228:17
268:22
283:11
285:8 290:4
295:9
298:23,25
299:8,11
308:3,6,10
308:11
310:10
326:9,14
332:9,12,16
332:18
333:9 334:9
335:18
337:3 342:7
342:11,14
343:23,25
344:4,6,8
344:10
374:3
384:17
401:11,14
401:15,18
402:4,17,20
402:21,24
403:4,6,8
403:11,13
**e-mails**
134:23,24
134:25
135:5,9
210:10,13
210:14,21
216:18
217:11,14
217:19,24
221:12,17
247:15,19
265:2,3
267:19
268:8,12,18
269:5 278:4
282:8,12,15
282:18
289:4,7
291:7,8,9

308:14
342:13,20
401:21,22
401:24
402:11,14

——————
**F**
——————
**F** 258:2 400:1
**face-to-face**
203:12,17
208:3,12
**facilitate**
166:17
**facilities**
155:19
182:11,17
**facility**
156:24
157:6 167:7
167:18
182:3
**fact** 129:25
130:9
131:17
132:3,9,12
134:14
171:24
228:23
231:14
239:2 259:6
260:23
265:3 270:4
271:5,14
275:16
298:9 304:5
321:21
322:24
342:25
358:6 363:5
394:7,15
398:5,12
**factored**
296:11
**factors** 255:9
**facts** 388:21
**fail** 404:19
**fair** 137:16
158:18

167:7 171:3
195:6 216:6
232:21
233:19
239:17
263:7
279:13,24
339:18
365:4
**fairly** 137:9
214:21
**fall** 150:11
371:10
383:21
385:22
386:18
387:15
388:7
389:24
390:2,18
**falling** 372:3
372:15
381:2,15
385:7
388:13,18
**familiar**
142:19
177:21
244:10,13
244:15,23
299:15
346:25
349:6 391:4
395:19,20
**family** 288:12
**far** 135:9
210:5
324:16
**Fargo** 125:14
362:4 366:9
369:24
371:11
372:5,22
373:3
375:22
376:10
378:25

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 298 of 329

420

379:15
381:3,17
383:11,21
384:22
385:8,21
386:7,17
387:15
388:7,13,24
389:13
390:14,19
390:22
391:3
403:17
**Fargo's**
367:19
368:2,11
372:17
373:20
374:8,12,15
375:14
376:20
377:11
378:14
379:11
**favor** 360:10
**Fazio** 136:18
**February**
144:21
145:14
175:17
176:5
251:25
252:18
259:19,23
261:23
262:2
402:10
**Fed** 192:20
**fee** 263:4
**Feel** 247:18
**fees** 260:11
261:7
375:23
376:11
**felt** 185:9
354:23
**field** 271:9

274:12
275:21
**figure** 185:5
328:15
343:11
**figured** 344:9
**file** 221:23,25
310:20
**filed** 141:7
142:6
157:19
222:17
292:11,21
300:16
301:9
308:24
312:6
313:20
372:23
373:4,25
377:4
403:18
**filing** 127:7
158:2
291:16,17
292:10
294:16
297:21
346:12
373:7,20
397:6,10
**filings** 156:14
**final** 216:4,8
216:10
230:17
231:9,16
232:22
**finally** 131:3
132:14
**financial**
126:22
137:3 141:7
141:20
145:7
160:15
161:18
163:21

171:13,15
171:16
178:18
179:10
187:8,20,23
188:2,16,18
188:21
190:20
192:19
195:23
203:22
294:3
301:16
346:22
371:20
**financials**
142:7 150:9
150:21
153:18
154:2,5
156:2,17
157:3
167:12
168:9 173:5
173:17
187:17
209:3
300:22
301:3,5
**financing**
165:25
**find** 340:4
**finding** 359:6
359:18
360:9
**fine** 204:16
370:24
371:21
**firm** 143:11
**first** 134:8
136:21
139:20
143:24
144:6,6
151:3 160:9
166:2 167:5
173:20

177:14
181:22
186:23
211:15
212:8
214:14
215:19
221:18
244:5 251:8
253:17
261:21
268:16
270:3 278:2
278:7 279:5
291:4,9
295:6
302:17
320:14,18
321:5,20
326:5
333:14
335:20
337:3
342:16
352:5
376:22
392:7
**Five** 172:11
262:11
**fix** 188:10
229:15,20
331:6
**fixing** 146:6
325:12
**flat** 263:4
**flip** 172:24
**floor** 125:16
361:6
**flow** 351:23
**flowing**
196:15
210:6
**flows** 205:18
**flying** 298:6
**focus** 137:12
200:20
211:12

217:6 284:8
284:11
344:10
**focused**
205:15
291:18
**Foerster**
182:24
183:14
200:6,16
392:11,18
396:11
398:4
401:16
**Foerster's**
183:4
**folks** 324:6
325:7
334:10
**follow** 132:23
256:17
259:14
379:7,23
389:9
**followed**
295:8
396:11
**following**
238:3,8
405:5,6
**follows** 128:6
258:5
**follow-up**
389:25
**footnote**
156:21
161:8,12
256:20
311:17
320:15
**footnotes**
223:5
**force** 127:17
**forego** 395:5
**foregoing**
399:7
**forgave**

275:23
**forgive** 275:2
275:16
**forgiven**
197:22
198:3
269:14,23
270:8,13,24
273:25
274:4,5,17
276:14
**forgiveness**
197:19,20
198:17
**forgone** 296:3
**form** 127:12
138:4
142:22
145:24
152:24
158:23
159:17
162:9
164:20
169:2
170:16
172:4
174:13
176:8
179:25
185:13
186:7
190:15
193:19
194:3 198:6
207:4
214:23
218:25
222:24
225:12
226:7 227:9
228:12
229:3
237:17
239:4
244:19
247:14

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 299 of 329

421

250:4
251:11
255:8
263:24
264:24
265:13,17
266:4 269:8
270:12
271:20
272:4
274:19
276:24
277:4,13,21
278:25
279:17
293:22
302:23
304:8
306:25
307:12
316:22
320:3,23
321:10
339:23
340:25
341:19
345:10
356:16
357:20
358:20
366:11
369:6
386:11
389:5
397:20
**format**
222:16
**formed** 145:5
156:15
**former**
380:11
**formula**
214:20
**forth** 165:3
179:16
181:16
187:5

192:13
260:8
300:16
316:5 317:8
390:22
398:3
**Fortress**
212:9,22
**forward**
166:8
322:22
334:11
392:22
397:3
**forwarded**
149:11
200:23
**forwarding**
176:23
343:25
344:6,11
403:13
**found** 359:8
359:12
**four** 156:4
208:6 212:5
**fourth** 149:14
173:5,11,17
174:2,7,9
214:5
**frame** 204:18
**Frank** 262:14
264:12
**frankly** 182:9
205:16
393:8
**fraudulent**
162:20
**free** 183:13
247:18
**froms** 205:17
**front** 147:21
233:6 317:6
364:4
**FTI** 182:25
203:24,25
204:2,5

205:13
206:18
207:2,6,14
208:2,21
209:2,7,14
210:14
211:6
247:21
266:11,16
308:12
309:8 392:8
**full** 159:9
166:2,12
169:23
224:19
237:10
240:4,4
265:20
286:5
296:22
356:2 357:6
358:15
359:9,12
394:18
**fully** 166:4
168:4
169:14
**fund** 148:11
148:12
**Funding**
155:19
353:5
**funds** 319:3
**further**
127:10,14
131:20
132:7,15
309:19
361:20
391:11,14
395:7
400:13
**future** 302:8
394:5

_____
**G**
**G** 128:2
258:4

**game** 365:4
**general** 147:3
158:14,16
161:16
165:3
170:17
207:16
226:13
244:14,17
245:3 248:3
271:22
275:12,18
276:15
311:24
312:19,22
322:2
387:22
**generally**
131:25
139:19
142:18
143:3
147:24
244:12,15
271:24
273:21
276:10
278:16
315:12
321:4 323:8
325:19
342:6 347:3
347:4 375:8
395:19
**getting**
170:10
211:3
214:17
216:21,21
216:22
226:16
237:20
243:8
298:21
327:11
354:22
361:2

393:24
**give** 186:16
210:23
217:20
228:20
232:22,23
233:2
262:12
280:22
285:25
333:8
**given** 165:21
165:25
166:11
199:16
200:24
227:11
246:16
281:10,16
286:8 312:5
316:6
354:25
361:19,22
363:3 394:8
394:10,15
394:23,25
**giving** 358:13
**global** 380:12
384:8
385:15
387:19
388:25
**GMAC** 190:7
191:23
352:7,20
**go** 132:12
135:9 182:4
209:17
246:3 290:3
310:23
322:14
324:16
336:10
351:6,17
362:11
370:21
376:15

**goal** 171:22
213:9 279:2
280:7
**goes** 154:9
253:17
353:14
364:16
396:18
**going** 136:10
136:15
151:8
161:21
218:10,18
226:18
232:5 236:2
236:25
237:16
239:3,10,14
240:15
243:5 250:9
253:2
256:14,17
258:17
259:14
272:12
274:7 282:4
286:22
287:22
304:19
318:10
319:9 320:2
321:9 332:3
340:25
357:19
360:2,11,13
364:15
365:12
366:10
370:3
374:17
375:12
376:2 377:5
377:21,24
378:8 379:2
379:7,18,23
381:4
383:23

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 300 of 329

422

384:15
389:9,18
396:13,16
396:17
**good** 128:12
194:23
312:5
362:2
**government**
166:7
**great** 268:5
**greater**
388:11
**Gropper**
290:4,7,14
291:2
**grounds**
357:24
**group** 128:24
129:8,20
130:3,10,17
131:8,10
132:20,22
135:3,4
137:3 144:2
144:22
145:6,16
162:18
169:5
226:10
227:5,18
228:21
229:7,20
231:10,15
242:25
245:15,23
246:10,23
249:11
258:21,23
258:24
259:6,11
260:13,21
260:24
265:24
269:12
278:20
280:22

286:2,8
290:24
292:13
293:20
295:11
296:12,15
296:23
297:3
301:17
304:24
305:22
306:18,21
318:14
330:13,18
331:10,25
332:6 345:9
346:23
349:17,21
350:17
352:14
353:9
355:17
357:15
360:7
362:17
363:7
366:17
371:3,6
372:11
378:22,24
379:14
380:21
382:10,17
382:23
383:20
384:3,20
385:7
386:16
387:8 388:7
388:18
390:13
394:6 395:5
397:15
**group's**
130:23
371:19
377:13

**growth** 147:3
**GS-11** 397:2
**GUARAN...**
123:10
**guarantors**
153:5
193:14
**guess** 138:22
150:24
211:5 235:3
242:17
331:19
342:18
347:24
**guessing**
287:22
**guide** 328:17
345:20
**guy** 326:24
**guys** 337:7
373:22,23

———————
**H**
**H** 189:4
**HADLEY**
126:4
**half** 176:10
213:6,8
351:2,22
**hand** 283:25
400:19
**handed**
200:13
259:17
308:9 349:5
396:2
**handy** 311:21
**hanging**
394:9
**happen**
275:24
276:3,18
297:20
360:20
**happened**
261:14
269:19
276:4 323:5

346:12
372:12
397:11
**happy** 361:17
366:20
370:18
372:2
374:21
**hard** 161:9
240:4
263:13
278:10
**Harrison**
175:16
**hat** 296:24
**headed**
325:20
**heading**
164:7
**healthy**
137:17
**hear** 370:19
374:21
**heard** 307:4
**hedge** 148:11
148:12
**held** 124:9
154:7
219:13
237:4
259:10
368:24
369:13,25
372:6
**help** 171:8
207:15
328:18
343:14
358:6
**helped** 138:7
138:10
**helpful** 339:7
**helps** 396:12
**hereto** 127:6
**hereunto**
400:19
**HFS** 218:16

**high** 161:5
162:4,15
171:12
312:3
**higher** 302:14
312:20,24
**highlight**
171:7
295:21
**highlighting**
152:14
170:6
**hindering**
165:23
**hired** 143:16
**historical**
155:19,23
**historically**
269:21
274:5
300:25
**history** 323:9
**HL** 161:11
348:3
**Hmm** 333:25
**hoc** 128:23
129:8,19
130:3,9,17
130:23
131:8,10
132:20,22
135:3,3
144:2,22
145:6,16,20
169:4 226:9
227:5,18
229:7,19
231:10,15
242:25
245:15,23
246:10,23
249:11
258:21,23
258:24
259:6,11
260:13,21
260:24

265:24
269:12
278:20
280:22
286:2,8
290:24
292:13
295:11
296:15
297:3
301:17
304:24
305:22
306:18,21
307:17
318:14
330:13,18
331:10,25
332:6 345:9
349:17,21
350:17
352:14
353:8
355:17
357:15
360:7
362:17
363:7
366:17
371:3,5,19
372:11
377:13
378:22,24
379:14
380:21
381:23
382:9,17,23
383:20
384:3,19
385:6
386:15
387:8 388:6
388:17
390:13
394:6 395:4
397:15
**holder** 148:14

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 301 of 329

423

148:19
276:25
294:3
**holders** 145:3
147:4,14
150:13,22
154:17
159:22,25
160:3 199:6
290:19
292:8 294:5
294:7
396:23
**Holding**
352:8,21
**honestly**
298:17
**hope** 171:22
252:25,25
**horse** 302:8
302:10
**host** 314:24
**Houlihan**
126:3
132:18
133:7 135:3
135:21
136:15,22
138:16,25
138:25
139:6,7,8,9
144:13,21
148:2
149:25
150:2,24
151:4,16
160:9 162:7
162:11
163:13
164:5
168:18,21
170:12
171:4
173:10
175:5,12,21
177:3,5,15
177:24

178:7
179:20
180:8,19
182:22
192:23
193:3
200:10,19
200:25
201:16,20
202:4,9,13
204:5
205:14
207:2
210:15
220:25
227:17
230:24
234:4 235:5
237:13
240:11
242:24
243:2
245:13,14
245:22,23
246:9
248:18
249:21,25
250:16
252:4
255:12
256:6,12
258:14
259:18,22
260:3 262:8
262:21,24
265:11,15
265:20
267:11
268:16
269:11
272:23
277:6
278:17,19
279:14,25
280:18
281:2,6,13
281:19

282:23,24
284:15
285:14,19
286:18
287:5
289:18,21
289:25
293:24
301:15
302:20
304:5,14
305:7
306:18,20
307:7,17
308:20,23
309:4,9
315:12,12
315:17
318:4 319:3
320:19
321:6 324:2
326:10,14
331:23
332:5,17
334:10
335:14
337:7
338:17
340:7 345:3
345:8
346:17
347:7,9
348:11
350:22
353:21
371:17
373:13,17
381:21
382:13,15
382:16
383:19
401:19
402:9,25
**Houlihan's**
129:16
135:25
164:17,22

201:16
235:2
240:17
266:2
307:18
329:18,23
380:18
382:6,22
**hour** 140:24
323:20
**hours** 133:18
183:10
216:24
227:15
262:24
263:5,12,21
264:16,19
354:7
**hundred**
206:13
213:2
218:15
**hundreds**
317:9
**hung** 296:24
**hypothetical**
210:24
211:18,22
216:19
241:13
**hypothetic...**
212:15,25
213:23
218:15
241:23
**H(ii)** 196:19
**H(i)** 190:17
197:15

_____

**I**
_____
**identification**
128:8
147:19
172:17,19
200:7,12
210:10
217:12
221:14

228:2
229:11
248:14
259:20
282:10
289:6 299:9
308:4,7
313:7
326:11
332:10,13
342:10
344:2 349:2
372:24
395:10
**identified**
162:19
164:6
303:11
362:10
365:2
396:10
**identifies**
303:17
**identify**
128:22
**II** 123:20
150:25
**iii** 190:2,15
**Ilhardt**
133:22
148:2 150:5
180:15
200:10,19
201:4 203:2
262:14
264:11
308:13,17
326:10,14
332:13
341:11
401:19
402:25
403:7
**Ilhardt's**
202:10
**illustrative**
163:24

211:18,22
251:15
341:16,24
**impact**
170:19
193:15,20
193:23
205:4,19
238:21
239:19
240:6,25
241:19
242:13,15
242:16,17
242:22
243:19,23
244:7 245:7
248:8
312:13
329:8
339:16
387:18
388:24
**impacted**
389:13
**impactful**
240:3
**impacts**
165:14
**imperative**
404:15
**implicate**
372:8
383:13
384:15,21
**implicit** 367:2
**Implying**
167:8
**important**
158:19,25
168:14,19
180:6
189:14
193:11,14
211:8 225:8
225:15
265:10,15

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 302 of 329

424

265:18
295:23
**impractica...**
361:21
**improve**
243:22
**improved**
295:14
**inappropri...**
361:22
**include**
180:11,13
181:17
222:10
223:12
246:20
257:8
272:25
317:15
319:13
340:21
350:7
398:17
**included**
131:15
171:11,16
193:3 194:4
195:5
197:16,18
198:10
199:7
231:20
232:24
239:22
241:11
253:14
257:11
272:24
279:9
303:12,14
308:25
309:24
319:5
345:10
346:4
375:10
397:16

**includes**
256:24
313:16
327:23
333:5
**including**
152:18
158:12
182:3
242:14
257:4 289:9
299:13
313:10
393:21
**increase**
213:21
238:23
244:2,8
302:9
319:17,20
**increased**
240:9
302:11
314:17
**incremental**
237:3 300:9
**incur** 261:3
**incurred**
375:23
**indenture**
123:9,17,17
157:18
158:7,11,24
159:4
160:12
261:11
**independent**
278:21
279:15,21
279:22
280:10
285:12,13
285:20
**independe...**
224:24
280:17
**indicated**

144:24
**individual**
189:24
196:2
198:11
220:8 275:8
275:8,25
293:25
294:5,7
**individually**
145:18
**individuals**
180:14
**industries**
137:11,13
**industry**
137:7,9,15
161:11
**inform**
286:10
392:3
**information**
141:4,6,12
142:3 149:7
149:17
153:22
157:8
162:14
163:21
166:12
172:6,7
174:7,19
176:25
177:2,6,10
177:16
178:15,18
179:8,9,11
179:15,17
181:23
182:7,12
183:22
184:3,7,9
184:25
185:7,18,19
185:22,25
186:2,3,10
188:19

190:11,21
190:24
191:2,4
192:15,16
192:21,24
195:2
196:18,20
196:22
198:15,20
199:10,21
199:24
203:7 205:7
207:8,8,11
207:11,13
208:22
223:16
224:5,11
225:4,8,15
232:7,9
234:16,19
234:23
235:19
249:14,15
249:18,19
249:22
250:2,9,23
251:3,6,10
252:5 253:4
254:17,21
254:23
255:5
266:18,23
267:6,12
278:21
280:8,9,11
280:13,15
280:20,23
281:3,7,10
281:17,24
284:14
285:9,15
286:4,12
288:11,15
288:19
292:16,22
294:10
301:20,21

301:22,24
304:21
308:25
309:18
310:20
315:2,4,5
318:9,20,22
318:25
319:24
321:4 325:3
328:2 330:2
330:3,22
331:4,14,19
332:7 333:2
337:10,19
338:18,19
339:24
340:3,10
343:13,15
343:15
344:19,23
345:17
346:4,7
378:18
394:18
**informed**
138:12
318:4
**infrequent**
265:7
**ing** 178:13
**initially** 179:4
**input** 162:13
282:25
**inputs** 211:23
212:11
283:4
284:11
311:14
340:14
**inquiring**
378:23
**insert** 338:8
**inside** 318:11
**instance**
276:13
**instances**

264:21
**institution**
346:23
**institutions**
161:19
**instruct**
232:6,12
236:3,6
237:18,24
239:10
240:16,19
243:6,12
245:25
255:22
256:12,15
259:4,12
272:13
286:23
320:4 341:2
360:14
374:19
376:4 377:8
377:24
378:11
379:5,22
384:4 389:7
**instructed**
268:12
**instruction**
232:19
233:3
236:12
238:4,9
239:13
240:22
243:15
245:17
256:2,18
258:16
259:15
376:14
379:8,24
**instructions**
389:10
404:2
**intend** 379:15
390:13

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 303 of 329

425

**intent** 280:7
**intention**
  391:17
**interact**
  204:6
**intercompa...**
  202:2 203:4
  205:20
  206:3 273:6
  309:22
  311:13
  328:13
  334:17
  335:12
  337:16
  338:10,25
  339:17
  352:16
  392:12
**intercompa...**
  128:23
  129:6,9
  195:20
  197:2 198:3
  201:13
  203:15
  204:6,10
  205:2,7,11
  206:6
  209:19
  238:16,19
  238:22
  240:9 244:7
  266:23
  267:7,20
  269:23
  271:11
  272:10,25
  273:14,20
  273:24
  274:4,15,16
  275:7
  276:21
  277:8 278:6
  278:11
  293:8,16
  297:4,8,9

297:18
300:10,13
300:17,21
301:7,25
303:12
308:18
309:2,6,25
311:2,4
312:21,23
313:17
314:5,9,23
315:14,18
315:22,24
316:10,15
317:7,16,24
318:5 319:2
319:6,14
323:13
327:3,9,24
328:7
329:12,17
329:21
330:6 333:6
333:16
334:3 335:9
336:2,8,14
337:6
338:20
339:11,20
340:8,23
341:14
349:15
350:2,18
351:5,8,19
351:24
352:3,6
353:18,23
355:9 358:2
358:5,10
359:3,20
360:24
363:20
392:4,25
393:4,10,16
393:22
394:12,16
395:21

396:22,23
396:25
397:17,23
398:18
**intercompa...**
  309:11
**interest**
  277:10
  293:8 296:4
  296:19
  305:5 306:6
  306:22
  307:9,9
  356:4,9,24
  357:7,8
  358:8
  359:10,13
  368:25
  369:15
  370:2
  393:23
  395:6
**interested**
  149:9
  237:11
  350:14
  400:16
**Interesting**
  364:3
**interests**
  277:2
**interface**
  310:21
**internal**
  135:25
  306:17,17
**internally**
  315:5
**interpose**
  396:14
**interruption**
  173:23
**interviewed**
  140:2
**Intex** 344:21
  345:4,5,18
  346:16,17

347:23
**Intracomp...**
  169:20,24
**Intralinks**
  177:22
  178:3,5
  348:7,12,14
  348:15,16
  348:18,23
**introduction**
  290:8,11
**invest** 148:22
**invested**
  140:7 145:3
**investigate**
  346:20
**investment**
  140:4
  143:16
  145:2
  148:10
  268:17
  271:9
  326:23
**investments**
  137:21
**investor**
  147:2
  148:21
**investors**
  149:8,8
**investor/ow...**
  139:11
**involve**
  279:10
**involved**
  137:4
  146:24
  147:2 150:3
  159:13
  239:8 243:9
  264:13
  276:8 278:5
  348:4
**involvement**
  139:19
  244:11

277:22
**involves**
  314:23
**involving**
  132:20
  255:21
  382:24
  383:11
**in-person**
  342:20
**issue** 170:6
  170:21
  240:17
  244:10
  245:21
  246:10
  256:4
  267:14
  277:8 293:6
  295:17
  306:5,13
  322:8,11
  339:12
  342:22
  343:5
  355:21
  377:15,20
**issued** 193:13
  303:4
  344:14
**issues** 131:22
  131:24
  132:5,9,9
  132:13
  142:2
  152:17
  159:13
  165:12
  166:5,16,25
  182:5
  271:22
  280:25
  295:21
  299:25
  300:3,6
  302:4 325:8
  358:22

359:14
361:16
363:16,16
363:18,19
364:2,17
390:15
**item** 181:24
  188:20
  189:4,22
  190:2
  195:17
  233:25
  238:15
  334:3 353:3
**items** 149:11
  158:5
  181:18,19
  182:6 187:7
  187:10,13
  195:22
  196:3 233:9
  280:3
  324:22
**I.D** 401:9
  402:3 403:3

————————
        **J**
**J** 125:7
  198:24
**JACQUES**
  125:11
**Jeff** 176:11
  211:17
  308:17
**Jeffery** 264:7
**Jeffrey**
  133:10
  135:24
  150:4
  262:14
  323:25
**Jerry** 133:14
  323:24
**jmosse@cu...**
  125:10
**JOB** 123:23
**John** 128:13
**joining**

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 304 of 329

426

131:10
Jointly 123:4
JONATHAN
125:7
jsemmelma...
125:12
JSN 148:15
220:2,4
226:10
248:9 254:9
255:3
278:22
293:20
305:8 307:7
350:7
355:22
JSNs 147:4
147:14
148:19
150:13
204:25
207:20
209:22
220:9
222:22
223:3 224:8
232:25
234:24
237:14
240:12,23
243:20
248:24
253:18
254:2,13,18
255:13
256:7
273:16
282:21
292:20
293:7
295:23
296:6
303:24
304:11,16
305:4 306:6
306:21
307:8 319:7

319:19
324:25
326:23
331:12
356:6,11,13
356:19,21
357:5,5
359:5
365:15
366:6
367:12,14
367:18,21
368:23,24
369:13,24
372:5,18
376:21
379:17
judicial 356:5
356:10,20
357:3
358:25
359:16
360:9
judicially
379:16
JULIA 125:9
July 291:6
308:11,11
309:9
310:11,13
313:5,8,11
313:14
314:20
315:17
320:11
325:8,9,13
326:6 327:3
335:21
342:9,12
343:2
348:19
402:22
403:10
June 123:18
157:25
158:2
200:11,20

202:11,22
295:9,15
296:7
298:11,14
299:7,11
307:21
308:24
328:3
401:20
402:17
junior 123:10
140:7 145:4
148:15
151:17
153:10,20
156:8,11,22
157:3,14,17
158:8,20
159:2,14
167:2,10
168:11,15
168:24
169:10
170:13,20
171:4,9
183:24
193:4,16,24
196:17
205:24
214:9,15
215:3,19,22
220:16
223:10
226:4,13
240:3
258:11
284:5
286:19
287:6
290:17,21
292:7
295:12,24
312:14
362:17
398:13
jwalsh@cu...
125:8

K
K 126:5
176:11,13
Karan
176:15
217:15
218:8
Karl 180:18
180:19
262:15
264:12
Kaz 326:10
326:15,15
327:2
332:10,16
332:20
334:9
402:25
403:5
keep 187:19
268:3,12
287:2
keeping
391:9
Kempner
146:9,20
227:22
kept 224:2,13
268:19
kind 145:5,19
150:19
162:5 165:2
166:17
177:2 193:8
193:8
204:18
209:5
216:24
224:2
296:24
311:11
323:8 327:7
338:7
347:23,24
Kinga 347:6
knew 141:22
143:4 153:2

153:9,13,13
153:20
167:17,19
191:18,22
198:14
304:14
know 135:5
135:16,19
135:21
136:10,14
138:11,15
138:19
143:4,9,15
145:18
148:9 149:3
149:24
150:2,20,22
151:15
152:6 154:3
154:6,17
155:3 159:7
159:12
160:8
161:12
164:25
167:21
174:11
175:4,10,17
177:24
178:5,6,17
179:12,16
184:13,17
184:19
185:19,24
186:5,8,14
187:4,16,17
188:8
191:18,22
194:22
195:2
196:24
202:6,7,9
202:11,15
202:16,25
203:3
204:24
206:4,12,15

207:22
208:10,14
208:20
213:7
214:12
215:6 216:7
218:14
223:21,25
230:16
231:9
262:23
275:4,10,12
277:11,14
277:23,24
279:21
280:5,23
283:13,21
285:2
289:13,16
289:17
290:18
291:7,13
293:10,23
294:8
296:23
297:5
298:15,18
299:3,22
300:23
301:9
302:11,13
302:14
303:2
306:15
309:8,19
310:24
311:3,5
313:13
315:11
316:5,9,14
317:7
321:21,24
325:16
326:8,15
327:6,7,12
328:24
331:20,22

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 305 of 329

427

334:5,7,8
334:12
335:2,16
337:10
342:2,6
344:20
346:13
348:16,21
364:18
373:22
375:15
392:17
397:8,10
**knowledge**
142:23,24
154:21
159:8
163:23
176:13
180:4
230:13
254:22
311:10
345:24
378:2 385:9
385:11,23
387:17
388:9,11,20
**Kochman**
125:18
361:25
362:4
363:23
364:13,21
368:18
369:8 370:7
370:11,20
371:21
372:20
374:23
375:4 376:6
376:15
380:2,6
382:4,20
386:24
387:5
389:16

391:13
401:5

————
**L**
L 123:22
126:7 127:2
128:2,2
258:4,4
400:6,22
**label** 162:25
163:13
213:18
**lack** 145:19
336:4
**laid** 158:6
162:15
182:17
196:25
218:2
324:23
**land** 182:9
**language**
130:8 397:2
397:16
**large** 271:10
271:15
274:14,21
274:22
**larger** 164:14
165:5
**latched** 295:7
**late** 140:3,16
146:3 150:8
150:11,14
151:21
153:17
159:19,24
160:6
192:24
194:20
195:3 201:5
202:25
204:17
264:16,19
298:7
308:24
336:21
**lawyer**

180:24
244:21
**lawyers**
158:15
314:9
**lay** 182:8,18
193:22
216:18
**laymen**
314:10
**learn** 134:8
134:12,14
198:16
**learned**
321:21
378:18
**Leavitt** 148:7
**led** 141:17
143:8
**left** 138:25
139:9
162:18
180:22
250:24
**legal** 132:5,9
153:4
193:10
236:8 239:8
288:7,13
301:5,6
357:24
360:17
391:7
**length** 170:8
**letter** 144:12
144:21
145:10,14
172:15
259:19,23
260:9
278:18
279:6
295:11
298:12,21
299:14,22
299:25
300:3,5

301:11
302:18
307:19,20
307:21
313:6,8,11
313:14,16
320:12,14
321:12,13
327:5
334:15,17
401:12
402:10,22
**letters** 323:6
**let's** 172:10
212:25
216:23
217:5
250:22
341:9
366:16
367:12
368:21
371:8,18
376:15
380:2
**level** 161:6
162:5,16
171:12
241:19
**Lewis** 133:11
135:24
150:4
176:11,23
180:11
211:17,17
212:5
213:17
221:13,17
242:7
262:14
264:7,9
308:17
324:2
401:25
**Lexington**
125:16
**liabilities**

151:14
154:11,25
160:20,21
164:8 166:4
166:14
171:20
197:14
198:25
199:7 213:5
214:2 222:4
242:9,14
257:2
269:14
272:2
294:13,20
**liability** 161:3
161:25
162:22
165:10
257:5
**lien** 128:25
157:4
167:19
184:20
205:2
220:17,18
222:11
223:9,9,12
237:14
303:25
359:19,20
377:14
**liens** 153:5,10
153:14,16
153:19,24
154:3
184:13
363:22
**light** 310:16
360:19
**limit** 132:7
**limitation**
132:8
371:23
381:21
382:3
386:25

387:5,13
388:2
**limitations**
128:15,19
129:12
281:16,20
281:24
**limited**
129:16
131:22
132:17
163:23
166:11
182:4
208:10
286:4 315:4
317:21
355:18
363:19
364:19
375:6,9
380:17,23
386:20,23
**Limiting**
248:13
402:8
**line** 162:23
220:13,19
222:13
233:12
238:18
284:9
350:14
405:8
**list** 175:21
176:4 177:2
179:13,18
179:19
180:9 181:4
181:7,11
185:15,16
189:22
190:18
195:13
371:16
387:4
**listed** 180:14

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 306 of 329

428

181:19
187:8 280:3
336:3
**listing** 327:19
**litigation**
162:21
198:24
199:19
242:15,17
242:19
243:3 247:3
257:9
268:15,20
358:23
**litigations**
241:7,10
**little** 215:24
290:23
309:14
347:23
**Liz** 308:12
**LLC** 123:4,6
184:15
235:15
352:7,8,21
353:6,13
**LLP** 124:10
125:4,15
126:4,14,21
**loan** 163:2
237:4
**loans** 154:8
162:2
163:14
184:13
218:16
**lock** 218:8,18
223:22
**log** 361:15
**Lokey** 126:3
150:24
**long** 133:17
139:14
140:22
141:13
147:23
181:3 183:9

186:19
187:2
227:14
270:5
323:18
343:9
**long-term**
165:16
**look** 152:4
156:21
162:18
168:9
181:22
185:14
192:8
194:12,13
195:17
197:15
201:3
211:15
221:21
224:22
225:5 228:6
230:10,18
231:11
233:8 244:5
250:22
256:20
283:6,8,12
284:24
287:17
291:19
300:20
301:10,23
310:8 315:2
322:22
333:13,23
336:22,25
339:3 341:9
342:15
345:19,22
347:10
348:6 353:3
364:4,7
370:25
396:12
398:6

**looked** 174:5
224:18
255:10
272:22
292:19
302:20
303:6
309:12
311:3
315:22
319:11
347:3,20,21
347:22
348:2
398:19
**looking**
148:22
172:21
174:14
179:18
192:7
231:23
273:7
283:10
287:19
327:14
333:11
362:20
**looks** 181:20
282:19
291:22
335:17
**Loomis**
298:24
**loss** 344:14
**lost** 190:4
**lot** 145:17
184:22,24
199:13
217:25
245:4 278:9
280:13
298:5 302:8
302:12
310:20
344:22
363:17

**low** 141:21
**lower** 212:25
312:23
**lunch** 257:16
271:3
**Luncheon**
257:17
**Lynn** 124:12

——————
**M**
**magnitude**
191:19
315:10
327:8
**main** 191:23
**major** 189:10
**making** 242:8
296:15
390:9
**Mallet-Pre...**
124:10
125:4
**MAMAN**
126:24
**management**
140:8,14
165:10
**managing**
137:2
**Marano**
140:12
143:5
**Marathon**
147:11
330:7
**March**
182:15
186:25
222:5 262:2
**mark** 125:20
204:7
209:11
210:7
372:20
394:9
**marked**
128:8,16
147:18

172:16,19
175:2 200:7
200:11
210:10
217:11
221:14
228:2
229:11
248:14
259:20
282:9 289:5
299:9 308:4
308:7 313:6
326:11
332:10,13
342:9 344:2
348:25
362:5
372:24
395:10
**market** 165:4
251:15,18
252:17,18
**marriage**
400:14
**matched**
328:25
**material**
189:10,19
189:23
190:18
191:9
195:14,19
**materials**
149:6,12,16
149:22
150:23
151:4 173:5
181:10
385:21
**math** 210:3,5
211:4,5,9
211:11
213:14
216:14
217:2,6
351:10

354:19
**mathemati...**
214:18
339:9
353:11
354:24
**Matt** 138:20
138:23
150:5
262:13
264:13
324:2
**matter**
158:14
161:16
170:17
244:14
245:3
262:18
263:8,22
268:16
271:22
273:13
275:12,19
276:15
305:3,7
322:2
400:10,15
400:17
**matters**
146:22
**maturities**
141:23
**MBIA** 126:20
**MCCLOY**
126:4
**mean** 135:19
142:24
143:10
145:25
148:16
152:22
154:2
158:15
159:6
164:24
171:21

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 307 of 329

429

178:16
181:12
183:17,21
184:11
185:14
192:2
207:18
208:7,23
215:6,9
218:12
219:5
223:21
255:15
263:14
270:12
275:5
276:16
277:15
279:21
280:6
284:12
285:13
305:23
307:24
309:10
330:21
343:8 354:8
354:17
364:7
368:15
393:17
**meaningfully**
164:14
**means** 243:16
351:4
**meant** 378:3
**Medical**
146:24
**meet** 133:12
140:8,19
145:15,21
146:7
322:24
336:20
342:17,24
**meeting**
141:2,13

143:5,8,14
143:21
182:14,21
183:2,9,11
184:2
203:13
206:23
215:11
227:14
229:5,6,19
229:21
230:12
231:15
233:21
234:4
290:25
322:22
323:5,13,15
323:18,21
323:23
324:12,17
325:4,9
337:22
342:21
382:7 392:8
**meetings**
129:18
132:19
133:25
136:6
143:20
206:18,25
207:25
208:13,18
255:20
306:8 325:6
325:13
336:17
371:19
380:19
381:25
382:14,15
382:18,19
**Mellon**
126:13
**member**
132:22

371:5
372:11
**members**
145:16,21
150:13
169:4
227:18
229:7
242:25
249:11
259:11
262:8
263:17
264:18
304:23
307:18
330:13,17
331:3,9,24
371:3
**mentioned**
148:3
329:15
**merely**
166:10
168:8
**merits** 210:2
211:12
217:4
280:16
**met** 133:6
140:11,22
145:18
146:8,14
147:5,13
215:9 291:5
325:10,15
325:22
**methodolo...**
337:9
**MG** 123:3,8
123:15
**Michael**
136:18
**MICHELE**
126:24
**Michele.m...**
126:25

**middle**
233:13
387:4
**Milbank**
126:4 133:6
133:12
136:7
**million**
164:14
165:5 167:9
167:20
206:14
215:19
218:16
236:20
237:2,3
253:17
302:11
303:24
304:2 350:9
350:19
353:8,9
**millions**
317:10
**mind** 287:2
**minutes**
172:11
**misconstrue**
362:13
**missed** 298:8
**missing** 211:7
**mistake**
297:12
**misunderst...**
370:18
**mixture**
186:18
**model** 205:16
209:4
210:25
212:18
213:3,10,13
213:24
214:6
241:14
309:20,24
311:8 316:4

316:9
317:13,14
328:11,20
328:21
329:5
335:11
337:13,14
337:18
338:7,17,18
338:24
340:13,19
341:12,16
343:20
350:24
351:3,20,23
353:25
354:9,19,24
393:9
**modeling**
217:6
**models**
205:14
209:13,16
210:4
211:24,25
212:4,11
216:13
242:8
247:10,20
247:22,22
310:2 346:2
**modified**
215:23
**MoFo** 297:14
297:15
298:9
**mold** 311:10
**moment**
217:20
393:14
**monoline**
320:16,20
321:7,15
322:10
342:23
343:5,11
**month**

140:17
260:7
261:22
335:19
**monthly**
260:11
261:6,7,12
263:4
**months**
141:16
173:16
186:22
268:21
270:6 296:3
296:18
395:6
**moot** 359:14
**morning**
128:12
265:4,4
363:11
392:7
**Morrison**
182:24
183:4,14
200:5,16
392:10,18
396:11
398:4
401:16
**mortgage**
190:7
**Mosle** 124:10
125:4
**MOSSE**
125:9
**motion** 251:4
251:12
**move** 166:8
218:6,10,11
235:13
336:24
**moved** 185:3
185:3,5
225:24
398:3
**movement**

12-12020-mg Doc 5803-4 Filed 11/18/13 Entered 11/18/13 11:51:57 Exhibit
Deposition Designations: Reid Snellenbarger Pg 308 of 329

430

218:20
**moving**
218:13,19
219:9 224:2
225:25
284:19
**msilversch...**
125:21
**multiple**
155:8 246:6
274:23
**MV** 334:5,5

**N**
**N** 125:2 126:2
127:2 128:2
128:2 258:2
258:2,2,4,4
400:1 401:2
**name** 139:24
277:19
347:6 362:3
**names** 262:12
**narrow**
275:14
381:5
**narrowed**
371:14
383:25
**nature**
191:21
366:18
389:23
**NDA** 175:2,4
175:11
318:19
319:25
331:3
338:12,14
**neat** 370:23
**necessarily**
226:19
357:23
360:17
364:10
**necessary**
166:4,8
240:10

404:5
**need** 141:25
168:4,12
169:14
170:12
301:22
350:13
398:7
**needed**
170:21
185:10
241:14
299:3
397:11,13
**negative**
165:13
**NEGISA**
126:17
**Negisa.ball...**
126:18
**negotiating**
224:20
**negotiations**
215:4
216:10
318:11
394:7
**neither** 132:3
**net** 206:9
351:11
352:9 353:6
**never** 224:13
315:20,22
315:25
337:25
340:11
**new** 123:2
124:11,11
124:14
125:6,6,17
126:12,13
126:16,16
126:23,23
140:20
183:6,8
214:8,13
218:4,6

227:12
230:8 295:9
326:2 399:2
399:4 400:2
400:4,8
**news** 312:25
**nice** 370:23
**Niemann**
138:20,23
139:4
142:15,18
143:7 150:5
262:13
264:13
324:2
**night** 361:13
**nights** 265:6
**nonattorne...**
378:6
**noncash**
362:23
365:17
366:7
367:15,21
368:4,13
**nondisclos...**
174:22
318:15,17
**nonexpert**
366:17
**nonprivileg...**
131:6
304:23
387:14
**nonpublic**
177:16
181:19
294:10
318:20,21
318:25
331:4 340:9
**north** 317:11
**Notary**
124:13
127:16
128:4
399:22

400:7
**note** 157:18
268:5 292:8
**noted** 163:16
258:3
393:11
398:23
404:12
**noteholder**
166:22
228:20
**noteholders**
128:24
140:6
153:10
158:9,21
159:14
160:25
167:3 168:3
168:15,24
169:11
170:13
171:5,9
174:22
177:25
183:25
193:5 226:5
226:13
254:23
256:12
258:11
272:8
286:20
287:7
290:22
293:25
298:14
318:19
362:18
368:22
370:14
380:11
385:14,25
386:9
**notes** 123:10
145:4
148:16

151:18
153:20
156:9,10,11
156:22
157:14
159:2
167:10
193:17,24
209:22
214:10,15
215:19,22
223:9,9,10
238:24
267:19
268:3 284:6
**note's** 196:17
**notice** 124:12
128:7,17
131:14
199:4
348:25
362:6 364:6
365:12
375:11
390:21
401:10
403:15
**November**
123:21
124:4
140:18
143:21
333:13
372:12
**number**
131:13
152:13
155:11
156:19
157:11
160:18
166:20
182:5 187:7
191:16
200:16
216:20
230:24

235:6 258:9
266:6,10
271:4,10
279:8
287:15
289:5,8
291:8 299:8
299:12
305:25
312:3,7
313:9
320:24
334:20
342:13
350:22
351:11
370:21
402:16,18
**numbers**
151:8
155:16
173:18
224:22
235:2,21
249:3
250:20
252:9
285:22,25
317:5
327:12
350:14
354:6,13,15
355:12
**numerical**
234:11
**numerous**
373:15
**NW** 126:5
**NY** 125:17
**N.A** 123:9,16
125:14

**O**
**O** 127:2
258:2,2,2
400:1
**oath** 133:2
**object** 138:3

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 309 of 329

431

145:23
152:23
158:22
159:16
162:8
164:19
168:25
170:15
172:3
174:12
176:7
179:21,24
185:12
186:6 188:5
190:14
193:18
194:2 198:5
207:3
214:22
218:24
222:23
225:11
226:6 227:8
228:11
229:2,18
232:6
237:17
239:4
244:18
247:13
250:3 255:7
256:15
263:23
264:23
265:12,16
266:3 269:7
270:11
271:19
272:3 274:8
274:18
276:23
277:3,12,20
278:24
279:16
293:21
302:22
304:7,20

306:24
307:11
316:21
320:3,22
321:10
322:12
339:22
340:24
355:16,17
356:15
357:20
358:19
360:3,12
366:11
369:5 370:4
374:17
376:2 377:6
377:22
378:9 379:3
379:19
383:24
386:10
389:4
397:19
**objected**
130:18
360:23
390:12
**objecting**
130:14
355:19
357:15
359:24
360:7
363:14
**objection**
130:24
132:10
134:22
191:15
225:19
226:11
322:7
357:18,23
357:24
359:8,11
360:16,19

369:11
370:8
372:21
373:3,21
374:9,12,15
376:20
377:12
378:15
379:11
389:22
391:10
393:6
394:13
396:14
403:16
**objectionable**
279:19
**objections**
127:11
373:14,25
376:13
**obliga** 220:12
**obligations**
152:13,16
153:8
164:13
193:13,22
197:23
199:5
220:21
372:18
**obtain** 168:24
177:4,6
182:12
**obtained**
178:2
192:16,17
288:11
**obvious**
351:16,17
**obviously**
154:3
158:15
187:10
265:10
274:12
299:21

**occasion**
374:11
377:2
378:17
**occurred**
189:10
270:2
305:20
**offered**
342:17
**office** 183:5
227:13
374:6
**offices** 124:9
140:20
230:8
323:17
**OFFICIAL**
123:12
**off-the-rec...**
376:18
**okay** 149:20
151:10
152:7
172:11,23
189:3 192:6
209:18
212:13,25
216:21,22
217:22
218:18
221:22
224:15,16
224:24
235:14
236:16
239:15
244:22
272:21
273:11
283:16
310:9
311:22
341:7,10
349:13
350:15
351:12

355:13
365:14
368:19
375:18
**omissions**
367:19
368:3,11
386:7
**once** 177:7
197:10
305:13
318:13
**ones** 187:16
227:20
352:22
**ongoing**
361:13
**open** 391:9
**operate**
165:24
**operating**
190:6
191:23
195:20
**operational**
171:17
**operations**
193:12
**opining**
353:25
**opportunity**
280:15
302:9
375:16
395:2
**opposed**
239:7
293:20
304:3
**opposite**
186:3
**options**
165:13
166:6
**order** 166:15
169:13
170:12

185:10
314:21
364:8
**orders** 390:16
**org** 149:14
194:15
**organization**
271:18
**original**
404:16
**originally**
288:23
**originated**
162:2
**origination**
171:19
**outcome**
233:19,23
283:9
400:17
**outcomes**
233:12
309:21
335:12
339:5 340:2
**outlined**
350:3
**output** 249:4
310:6 315:6
339:17
351:4,10
353:11
354:4,13
355:2
**outputs**
311:13
340:20
**outside** 136:3
166:6
189:20
195:24
370:17
**outstanding**
156:3
167:18
**overestima...**
312:12

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 310 of 329

432

313:2
**oversecured**
239:25
240:13
258:12
259:2
295:25
296:6,17
356:7,12
357:5 358:7
359:9,12
**overview** 171:18
150:24
160:19
164:4
171:12
234:9,13
288:8
**owed** 269:14
269:24
270:9,13,18
271:12,24
274:24
275:17,23
276:14
**owing** 270:19

**P**
**P** 125:2,2
126:2,2
127:2
**page** 149:19
151:7,8,9
151:11
152:8 155:8
155:11,14
155:20
156:18
157:10,13
163:25
164:2 165:6
165:9,11
166:19,23
170:23,24
171:3 173:2
181:22,23
187:6
188:25

192:10,11
198:24
228:7,9,14
230:18,23
230:24
233:8,11,13
233:14,15
233:15
234:7,8,11
236:14
238:12,14
239:14,18
250:22,24
256:21
260:11
273:9
287:25
288:3,5
290:3
291:20
295:6
298:22
302:17
303:10,16
311:19
320:14
333:13,14
335:22
342:16,18
342:18
349:12,14
351:3,22
364:5
396:12,21
397:2
399:12
401:3 405:8
**pager** 303:5
398:20
**pages** 230:25
399:8
**paginated**
194:12
**paid** 244:4,8
260:3,15,16
261:4,6,22
261:25

263:4
280:18
296:19,22
**par** 357:6
393:24
**paragraph**
202:24,24
279:5
300:20
376:20
377:11
378:14
379:11
380:9,14,17
381:16
384:7
386:25
**paragraphs**
375:13
**parallel** 209:4
292:9
**parent**
156:23
165:14
170:5
271:17
**Park** 124:11
125:5
308:12,16
348:7
**part** 169:7
236:4
254:20
278:18
304:4
305:14
309:25
364:5
392:21
**partially**
156:22
223:5
**participate**
142:15
204:8
**particular**
136:24

137:7 247:7
251:21
276:17
288:21
363:10,13
**parties** 127:6
135:7 166:6
166:15
167:23
184:24
189:9,20
237:11
373:15
400:15
**partner** 139:2
**Partners**
143:19
176:12,14
**party** 211:6
382:4
**pass** 361:9
**Paulson**
227:21
**pay** 223:8
237:3
260:13
352:24
**paying**
352:22
353:5
**payment**
356:2
**payments**
261:9,12
**payout**
393:25
395:3
**pendency**
362:24
365:17
368:16
**Pentwater**
146:9,12,16
227:22
326:20,22
328:6,21
329:2,10,25

335:8
336:18
337:3,4,23
338:7,11,22
338:23
341:19,22
**Pentwater's**
326:22
329:20
332:22
333:24
**people** 140:14
200:17
201:18
264:3,12
289:5,9
298:6 299:9
299:12
313:9
324:11
339:19
373:12,25
402:16,19
**percent**
212:14
215:21,22
253:21,25
254:15
314:13
394:20,21
**percentage**
351:7,9
**perform**
169:13
185:10
278:20
281:6
285:12
311:9 335:8
337:23
340:8
341:20
344:20
345:9
352:14
**performance**
154:19

187:8
189:21
**performed**
234:2
279:15,25
281:13
310:25
314:3
353:21
392:18
**performing**
171:18
247:10
262:5
285:14
331:10
**period** 146:6
164:18,23
176:5,18
178:3,21
188:3,9,11
197:23
198:7
200:25
204:3,14
206:4 209:8
210:18
220:10,23
221:6
223:14,19
226:24
242:12
249:17
262:6,9
263:7,12,19
264:15
266:2,7,11
266:14,21
267:24,25
268:4,9,24
269:6 291:3
318:13
331:16
348:12
394:23
**person**
133:22

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 311 of 329

433

145:15,19
146:10
147:6
206:18
264:6 323:3
325:24
347:11
373:16,19
**personally**
133:20
145:22
276:8
289:17
**personnel**
306:3
**perspective**
143:11
225:7,14
354:24
390:24
394:22
**petition**
188:22
190:13,23
191:8,13
202:14,18
203:16,19
206:19,25
207:6
225:10,17
227:2
229:22
237:13
240:13
242:23
245:12
246:11,24
248:10
255:12
258:12,25
260:4,17,19
262:25
269:13,22
270:17,17
271:6 272:7
288:16
291:12

296:3,19
301:18
302:2 304:6
304:14,18
305:8
306:20
307:3
319:23
321:25
322:6
330:11,14
330:19,25
331:2,7,8
331:25
332:8 345:6
345:11
346:5,9,18
347:14
356:9 357:7
358:7
359:10,13
368:25
369:15
370:2
391:25
393:23
395:6
**phase** 131:22
131:23
136:12
144:19
150:25
357:4,4
358:22
359:17,18
360:20,21
363:15,16
363:18,18
363:25
364:10,24
365:21
**phone** 134:5
204:9,23
205:8 208:4
208:5,6
216:12
291:4 292:5

293:4,9,10
293:12,13
294:13
306:8
**piece** 176:9
198:15
215:4 225:8
225:15
**pieces** 191:4
**pitch** 140:9
140:25
141:5 142:4
142:16
147:15
150:16,17
193:4
**pitching**
143:22
**place** 164:15
183:3
277:17
324:14
**placed** 350:17
**places** 352:12
**plain** 130:7
**Plaintiff**
123:14
**Plaintiffs**
123:7
**plan** 130:8,11
130:15,25
134:21
136:11
243:4
300:19
310:22
320:21
321:8,16
355:16,17
355:20,22
356:7,25
357:11,15
357:25
358:8 359:4
359:8,11,15
359:22,24
360:7,23

363:25
364:11,16
364:25
368:23
370:6,15,17
372:22
373:4,14
374:2,12,16
374:24
375:3,7,14
377:11
378:14
380:11
385:15
387:10,19
388:25
389:14,22
395:3,9
403:17,19
**planned**
310:16
**platforms**
171:20
**plausibility**
394:21
**play** 189:16
338:9 339:4
**played** 342:3
**please** 192:5
246:4 287:2
367:7 404:4
404:9
**pledged**
156:20
167:6 182:2
182:10
250:24
**pledges** 284:3
**PLS** 213:15
213:21
**plus** 356:3,23
**pockets**
169:15
**point** 147:12
148:7,12
154:9 167:5
169:3

174:21
194:10
209:6
219:23
227:22
235:5
237:12,12
250:12
251:8,24,25
255:11
256:11
266:13,14
266:20
267:9
268:11,14
281:12,22
284:7
292:25
293:14
315:16
319:12,22
321:11,12
327:15
330:9
331:23
338:15
340:6
371:14
**pointed** 195:4
363:13
**points** 212:10
212:15,20
213:2
251:21
296:9 314:8
314:11
**pool** 171:19
**pools** 152:19
**populated**
178:17
**populating**
179:14
**POR** 350:6
**portfolio**
138:9 237:4
**portion**
236:17

238:13
303:23,25
359:4
**position**
132:5 140:2
164:17,22
167:4
171:10
196:17
207:17,19
223:24
226:15
240:11
259:9
276:11
324:6,12
375:5
394:11,17
**possess**
128:24
186:17
**possible**
280:21
322:4
**post** 296:3,18
350:10
356:9 357:7
358:7 359:9
359:13
368:25
369:15,25
393:23
395:5
**potential**
139:24
141:15,18
149:8
154:15
158:20
161:21
165:13
233:11,19
233:23
286:3
302:13
304:10
305:4

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 312 of 329

434

| | | | | | |
|---|---|---|---|---|---|
| 309:21 | 267:17 | **presentation** | 355:6 357:2 | 207:7 | 319:23 |
| **potentially** | 376:24 | 141:11 | **preserve** | 208:24 | 321:12 |
| 315:8 | 395:16 | 151:9,9 | 394:4 | 300:8 316:5 | 322:6 |
| 348:22 | **prepetition** | 156:19 | **preserved** | **primary** | 330:11,14 |
| **practice** | 129:10 | 159:5 | 394:24 | 358:17 | 330:19 |
| 136:25 | 135:14 | 160:13,18 | **press** 207:10 | **principal** | 331:8,25 |
| **precisely** | 195:7 | 164:2 | **pretermina...** | 356:3,23 | 345:5,11 |
| 364:21 | 204:15,16 | 170:24 | 325:12 | **printed** | 346:5,8,17 |
| **predate** 131:9 | 204:20 | 172:25 | **Pretex** 345:3 | 333:13 | 347:14 |
| **preliminary** | 216:5 224:9 | 173:8,10,14 | **previous** | **prior** 129:9 | 371:4 |
| 161:11 | 227:5 | 173:15,25 | 173:7 | 132:21 | 372:10 |
| 163:12 | 229:17 | 174:3 192:8 | **previously** | 137:24 | 377:3 |
| 348:3 | 233:22 | 192:11 | 128:4 | 141:13 | 390:16 |
| 392:10,19 | 247:11 | 193:4 194:5 | 144:24 | 188:16,22 | 391:24 |
| **preparation** | 253:14 | 194:11 | 157:17 | 190:12,22 | **private** |
| 354:6 396:5 | 254:18,24 | 226:4,9,12 | 230:20,25 | 191:7,13 | 162:25 |
| **prepare** | 255:5,13,14 | 226:21 | 290:2 | 202:14,17 | 163:13 |
| 133:4 134:2 | 256:6,13 | 227:10 | 302:21 | 203:15,19 | 177:10,13 |
| 134:18 | 262:10 | 228:10,16 | 303:6 | 206:19,25 | 178:16 |
| 136:4,7 | 270:7 | 228:19 | 309:23 | 207:6 224:9 | 213:18 |
| 181:4 | 273:20 | 229:4,9,10 | 349:19 | 225:10,17 | 288:22 |
| 282:22 | 274:2,3 | 229:16,25 | **prices** 212:10 | 227:2,4 | 301:20 |
| 347:13 | 285:17,18 | 230:11,19 | **Prieto** 289:4 | 229:21 | 315:5 330:3 |
| **prepared** | 286:21 | 230:23 | 289:8,13 | 237:12 | 346:2 |
| 149:24 | 287:8,9 | 232:22,23 | 291:22 | 242:23 | **privately** |
| 150:7 151:4 | 297:2,10 | 233:15 | 292:4 293:6 | 244:11,23 | 259:10 |
| 151:22 | 298:4 | 236:15 | 293:19 | 245:12 | **privilege** |
| 159:20 | 315:14 | 272:22,25 | 294:9 295:7 | 246:11,23 | 232:14 |
| 162:4 | 320:25 | 273:3 | 295:17 | 248:10 | 237:25 |
| 173:10,13 | 322:11 | 287:16 | 298:11,22 | 255:11 | 255:24 |
| 173:25 | 324:7,13,20 | 302:19,20 | 299:8,12 | 262:25 | 256:16 |
| 174:16,18 | 344:25 | 303:13,14 | 300:2 302:5 | 269:12,21 | 259:13 |
| 175:21 | 345:18 | 303:19 | 310:11,13 | 270:16,17 | 361:15 |
| 178:25 | 354:10 | 311:18 | 323:24 | 271:5 272:6 | **privileged** |
| 179:3,22 | 356:4,24 | 312:4 | 342:8,12,13 | 276:5,11,11 | 226:17 |
| 180:3,5,8 | 357:7 | 317:15 | 342:17,19 | 278:15 | 236:5 |
| 187:21 | 395:22 | 319:11,16 | 342:25 | 287:8 | 237:20 |
| 231:5,7 | 396:4 | 402:6 | 343:25 | 288:15,16 | 255:16 |
| 248:18 | 397:15 | **presentations** | 344:6,10,11 | 289:14 | 258:17 |
| 250:15,19 | **presence** | 174:5 | 345:10 | 297:24 | 272:15 |
| 272:23 | 136:3 | 280:12 | 402:15,18 | 301:17,25 | 282:2 |
| 337:25 | 305:23 | 319:13 | 403:9,14 | 304:6,14,17 | 286:25 |
| 391:2 | **present** | **presented** | **Prieto's** | 305:8,16 | 287:12 |
| **preparing** | 133:19 | 231:10,14 | 311:23 | 306:19 | 304:21 |
| 157:21 | 246:18 | 231:21 | **primarily** | 307:2 | 320:7 321:3 |
| 159:5 | 380:10 | 232:3 | 204:7 | 308:21 | 367:22 |
| 262:16 | 382:17 | 317:14 | 205:15 | 315:17 | 372:8 |

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 313 of 329

435

| | | | | | |
|---|---|---|---|---|---|
| 373:11 | 240:18 | 281:2 | 301:2 | 297:2,10,22 | 300:17 |
| 378:4,6,16 | 320:6 | 282:17 | 308:17 | 297:25 | 301:3,4 |
| 378:19 | **production** | 286:18 | 319:2,3,7 | 298:4 | 303:4 |
| 381:8 383:8 | 135:6 | 287:5 | 319:24 | 318:10 | 307:25 |
| 383:13,17 | **professional** | 292:15 | 325:3 | 323:11 | 310:21 |
| 384:21 | 326:19,21 | 295:3 | 330:12 | 324:7,13,20 | 311:7 |
| 385:20 | **professionals** | 298:11,24 | 332:5,8 | 325:2,14,17 | 314:25 |
| 386:16 | 132:20 | 309:14 | 334:15,18 | 330:5 | 315:3 318:9 |
| **privy** 242:19 | 346:23 | 316:12 | 334:22 | 393:18 | 323:8 328:3 |
| **pro** 241:25 | 381:24 | 318:18 | 335:3 | 394:25 | 328:15,16 |
| 353:20 | **proffer** 370:5 | 334:24 | 336:12 | 395:22 | 328:18 |
| **probably** | 370:19 | 335:6,13 | 340:14 | 396:4 | 330:2,22 |
| 144:10 | 374:21 | 340:17,18 | 341:18,24 | 397:15 | 337:9,13,14 |
| 150:8,25 | **projected** | 340:20 | 346:19,21 | 398:13 | 337:19 |
| 264:7,10 | 350:10 | 341:5 346:3 | 348:3 | **public** 124:13 | 338:7,14,17 |
| 294:4 315:7 | **properties** | 355:25 | 354:15 | 127:16 | 338:19 |
| 336:21 | 147:3 | 356:7 | 355:10 | 128:5 140:6 | 339:24 |
| **problem** | **proposal** | 358:15 | 364:24 | 141:6,11,22 | 340:3 |
| 297:15 | 236:24 | 360:8 | 384:25 | 142:3,7 | 343:13,14 |
| **proceed** | **proposed** | **provided** | **provides** | 149:3,6,9 | 343:15 |
| 281:23 | 214:2,8 | 130:24 | 234:15 | 151:23,24 | 345:23 |
| **proceedings** | 228:20 | 135:6 | 355:22 | 152:25 | 347:16,24 |
| 172:14 | 243:4 248:4 | 144:16 | 357:2,25 | 153:18,22 | 349:4 355:6 |
| 322:20 | 248:7 253:5 | 155:25 | 359:5,15,24 | 154:2,5,6 | 399:22 |
| 361:8 380:5 | 294:15 | 161:5 172:8 | **providing** | 154:23 | 400:7 |
| 400:9,12 | **proposes** | 175:8 176:4 | 261:23 | 156:2,14,17 | **publicly** |
| **proceeds** | 212:5 214:6 | 182:16 | 309:9 | 157:2,8 | 141:7 |
| 214:10 | **proposing** | 183:16 | **provisions** | 160:15 | 142:13 |
| 215:18 | 213:20 | 185:17 | 157:15 | 161:20,21 | 149:16 |
| 223:6 | **protect** | 187:18,22 | 158:7,13 | 163:21 | 150:9 |
| **process** | 218:20 | 205:9 215:2 | **PSA** 129:10 | 164:25 | 157:19,24 |
| 144:19 | **protection** | 229:25 | 188:9,12 | 166:11 | 174:19 |
| 145:8,11 | 363:21 | 234:14 | 227:5 | 167:12,24 | 191:20 |
| 171:12 | **protocol** | 235:3,7 | 252:24 | 168:9 170:2 | 222:17 |
| 208:24 | 135:12,19 | 249:4 | 253:14 | 177:11 | 249:7,16,22 |
| 214:21 | 269:9 | 250:25 | 254:24,25 | 183:21 | 250:10 |
| 295:10 | **prove** 358:6 | 251:11,17 | 255:6,13,14 | 192:20 | 259:9 |
| 300:10 | **provide** 137:8 | 252:20 | 255:16 | 195:2 | 288:19 |
| 302:6 | 147:14 | 255:19 | 256:6,13 | 197:21 | 292:17,21 |
| **produce** | 150:12 | 266:22 | 281:23 | 222:4 | 315:4 318:3 |
| 144:16 | 171:8 186:4 | 267:5,11 | 286:21 | 223:11 | 323:7 |
| **produced** | 205:6,19 | 269:5 | 287:8,9 | 284:13 | 332:25 |
| 173:17 | 207:10 | 278:22 | 290:23 | 288:10,21 | 339:21 |
| 265:2 | 234:19,22 | 281:4,7,9 | 292:10 | 288:23 | 344:23 |
| 361:12 | 254:8,10 | 281:11,17 | 294:23 | 290:19 | **pull** 362:5 |
| **product** | 260:20,23 | 281:25 | 295:2 296:2 | 292:11,24 | 380:6 |
| 239:10 | 280:24 | 285:10,16 | 296:12 | 294:5,15 | **pulled** 392:9 |

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 314 of 329

436

**purchase**
212:10
237:5
**purely** 132:8
163:21
391:7
**purpose**
210:20
217:7 249:9
252:12
352:17
**purposes**
238:20
249:13
**pursuant**
124:12
205:10,11
232:10
268:19
269:9
353:24
392:23
**pursue**
390:14
**pursuing**
393:20
**put** 140:25
149:5 159:7
211:22,23
216:19
219:17
280:11
283:3,19
288:25
313:4
314:24
316:2 339:3
343:20
351:21
354:12
355:13
381:4
389:17
390:5
**putting** 283:6
347:18
350:25

351:3
**p.m** 211:17
257:17
258:3
398:23

———
**Q**
**quality**
265:25
**quantified**
165:20
**quantifying**
319:19
327:13
**quantity**
165:25
**quarter**
149:13,14
149:22
150:10
173:6,11,14
173:17
174:2,6,7,9
192:8
287:15
**question**
127:12
138:4
142:22
145:24
147:8
152:24
157:16
158:23
159:17
162:9
164:20
169:2
170:16
172:4
174:13
176:8
179:25
185:13
186:7
193:19
194:3,23
198:8 207:4

214:23
218:25
220:7
222:24,25
225:12,13
226:7 227:9
228:12,13
228:15
229:3 235:6
237:17,19
239:5 241:8
243:7
244:19
246:2,4
247:6,7,14
247:17
250:4 255:8
258:18,22
263:24
264:24
265:13,17
266:4 269:8
270:12
271:20
272:4,14,19
272:20
273:12,18
274:9,19
275:14
276:24
277:4,13,21
278:25
279:3,17
281:13
282:5
286:24
287:4
293:22
301:14
302:23
304:8,20
305:3,24
306:16,25
307:12,13
311:23
320:3,5,23
321:10

324:10
333:10,22
337:17
339:23
340:25
341:3
346:15
351:15,16
356:16
357:20
360:5 364:4
366:11,13
366:18,19
367:3,6
369:6,7
370:4,8,12
371:8,25
374:18
376:3 377:6
377:22
378:5,9
379:3,19
381:11,12
383:24
386:11,12
386:13
389:5,14
394:9
397:20
**questioned**
265:25
**questioner**
232:8
**questions**
132:11
183:13
184:21
246:14
258:10
308:2
320:24
324:18
331:8 361:5
363:15
364:24
366:23
367:2,9

384:15
389:20,23
390:2,11,12
391:2,20
395:8
**quickly**
128:18
202:11

———
**R**
**R** 125:2 126:2
128:2,2,2
258:2,4,4,4
400:1 405:2
405:2
**raise** 165:24
266:15,22
293:6
319:22
**raised** 155:24
213:8
267:11,15
267:20
296:9 302:5
306:14
**raising** 267:3
**ran** 310:5
**range** 161:6
161:10
162:15
206:16
242:21
285:24
311:16
314:22
316:18
328:11
334:16
335:11
337:15
338:9
339:25
340:16
347:24
349:24
**ranges**
311:12
316:13

328:12
329:8 342:5
342:6
**rata** 241:25
353:20
**rates** 327:11
**rationale**
225:21
323:10
325:2
**reach** 216:25
394:8
**reached**
145:2
297:13
315:12
362:9 383:5
**reaching**
293:19,24
**read** 157:20
157:21
158:6 161:9
350:12
364:19
369:9,10
399:7 404:4
**reads** 156:21
161:10
165:11
166:3 167:8
168:2
**ready** 175:18
**real** 137:11
137:15,18
137:20
**realize** 226:16
**really** 183:19
191:19
200:20
205:9
224:12,13
224:18,21
224:24
225:25
242:17,19
251:17
275:25

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 315 of 329

437

276:8,19
296:21,23
352:20
354:9
366:12
392:17
**reason**
147:25
185:24
235:6,10
404:6
405:10,12
405:14,16
405:18,20
**reasonable**
339:19
384:7
**reasons**
130:14
355:19
357:22
358:18
360:16
405:6
**recall** 135:18
137:22
139:16,18
140:11,13
140:15,17
140:22
147:3 150:6
150:18
151:25
153:23
173:21
177:18
178:20,24
179:10
181:3,6,9
181:12
185:18
186:19,23
187:9 191:3
196:22
197:4
206:11,17
215:17

223:18
226:18,20
232:4 246:7
247:6,8
260:2
261:13
265:5 267:8
267:9,14,16
269:16
272:6 273:2
274:10
286:17
289:10
297:5,7,11
298:18
305:10
306:13
313:15
325:21
326:4 329:4
329:20
330:8
332:18
343:8 345:7
373:9
389:19
390:6
391:11
**receipt**
404:18
**receivable**
339:11
**receivables**
314:5
327:24
333:16
334:3 336:2
336:8
338:20
340:9,23
**receive** 184:6
184:10
185:9,10,16
187:14,25
188:15,22
190:11,21
196:23

198:20
199:11,25
202:13
224:9
225:10,17
237:8
241:22
254:14
266:17
311:14
313:11
330:4 357:6
359:5,16,21
369:25
396:24
**received**
177:15
182:13
183:18
185:23
188:7,24
190:24
191:4
196:18,20
196:24
197:3,11
201:5 202:6
202:9,17
207:9,12,13
224:14
225:23
250:12
268:23
308:20
331:3,14
**receiving**
353:4
**recess** 172:13
257:17
322:19
361:7 380:4
**recirculated**
131:14
**recognize**
147:22
221:19
230:13

236:17
238:13
**recollection**
152:6
200:22
231:5,13
288:14
299:18
348:11
**recommen...**
286:19
287:6,11
**recommen...**
160:3
**reconcile**
207:12
224:3
**record**
128:18
131:13
155:7
194:16
258:19
364:20
366:21
369:10
376:16
389:17
390:5,9,10
391:9,12,21
400:12
**recover**
222:22
223:3
370:14
**recoveries**
130:7,11
152:9,15
153:7 168:6
169:16
170:14,20
207:23
226:10
241:18
248:25
252:16
278:23

285:24
287:7
292:20
314:22
315:7 319:5
319:13
337:7,8,15
339:17
349:16
351:7 352:3
355:23
356:13,19
370:6,16
387:10,21
**recovery**
158:20
159:3
168:23
205:5,14,25
209:12,15
209:21
211:24
215:2,3
219:21
220:3 226:5
232:24
233:11,19
233:23
239:17,20
240:3,5,6
241:2,14
243:21,22
245:6,8
248:10
252:15
253:11,22
253:25
254:7,9,10
254:12
255:3
256:24
257:12
282:21
283:12
286:3,20
302:16
304:3,4

309:20,23
311:8,10
312:14
314:14
315:6 316:3
316:10,12
317:2,13,16
317:24
318:8
319:18,20
327:9
328:12,20
328:21,25
329:2,5
330:12,19
331:11,18
331:24
332:3,4
333:5,6
334:16
335:7 338:5
338:24,24
340:13
345:25
349:25
350:9,18,24
351:3,9,10
351:20
353:24
355:8,11
357:6 359:6
359:16
368:22
369:4,19,23
371:11
372:4
385:14
386:2,9
393:9 395:2
396:24
**redacted**
230:14
236:18
238:15
241:13
319:10
**redaction**

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 316 of 329

438

| | | | | | |
|---|---|---|---|---|---|
| 333:17,20 | 211:19 | 239:18 | 306:21 | 130:24 | 162:8 |
| **redactions** | 213:16,17 | 241:11 | 307:8 | 237:10 | 164:19 |
| 332:2 | 234:10 | 247:23 | 318:25 | 384:25 | 168:25 |
| **reduce** | 278:16 | 251:14 | 325:7,14,17 | **relevant** | 169:22,25 |
| 165:13 | 284:9 | 252:16 | 329:16,21 | 129:2 | 170:15 |
| 212:9,13,19 | 300:24 | 253:11,25 | 330:6 | **reliability** | 172:3 |
| **reduced** | 301:13 | 257:12 | 395:21 | 252:6,8 | 174:12 |
| 356:14 | 302:25 | 267:19 | **Reid** 123:20 | **relied** 254:24 | 176:7 |
| **REED** 125:15 | 303:3,21,22 | 272:23 | 124:8 | 255:4 | 179:21,24 |
| **refer** 156:25 | 320:15 | 286:15 | 295:10 | **rely** 224:21 | 185:12 |
| 157:15 | 334:13 | 371:16 | 343:24 | 280:13 | 186:6 188:5 |
| 197:19 | 337:11 | **reflecting** | 344:5 399:6 | **remaining** | 190:3,14 |
| 219:19 | 377:19 | 292:20 | 399:15 | 361:19 | 191:15 |
| 247:18 | 387:6 | **reflects** | 403:12 | **remember** | 193:18 |
| 268:6 | **refers** 149:4 | 155:21 | **relate** 159:14 | 147:7 | 194:2,9 |
| 365:10,12 | 152:9 | 171:3 267:3 | 203:6 232:8 | 148:20 | 198:5,8 |
| 384:16 | 161:13 | 327:20 | 365:2 | 153:25 | 207:3 |
| **reference** | 189:22 | **reframe** | 390:11 | 154:4 | 214:22 |
| 130:7 | 198:24 | 305:24 | **related** | 159:24 | 218:24 |
| 154:10 | 219:20 | **refresh** 231:4 | 134:25 | 160:2,3 | 222:23 |
| 213:15 | 300:21 | 288:14 | 157:5 190:9 | 187:15 | 225:11,19 |
| **referenced** | 301:8 | 299:17 | 202:2 247:2 | 197:7 208:2 | 226:6,11 |
| 154:13 | 302:18 | 348:10 | 253:5 | 277:5 | 227:8 |
| 168:7 | 313:19 | **refreshes** | 255:15 | 278:11,12 | 228:11 |
| 169:21 | 332:20 | 152:6 | 303:17 | 293:11 | 229:2,18 |
| 186:21 | 334:5 348:7 | 231:13 | 397:17,23 | 294:14 | 232:5 233:2 |
| 214:24 | **refine** 309:19 | **regarding** | 400:14 | 298:15,20 | 236:2 |
| 341:12 | 310:2 | 158:8 184:4 | **relates** 364:9 | 299:2,6,20 | 237:16 |
| **references** | **refined** 310:7 | 184:10 | 370:5 | 299:21,21 | 239:3 |
| 167:6 201:4 | 315:7 | 185:8 199:4 | 374:22,24 | 324:3 | 240:15 |
| 202:23 | 354:11 | 223:16 | **relationship** | 329:13 | 243:5 |
| 211:18 | **refinements** | 224:6 225:9 | 170:5 | 330:21 | 244:18 |
| 342:20 | 340:13,21 | 226:5,10 | 189:14 | **remind** | 245:24 |
| 376:21 | 340:22 | 234:23 | 196:10,11 | 286:23 | 246:12 |
| 377:12 | **reflect** 151:11 | 235:7 | **relationships** | 357:21 | 247:5,13 |
| **referencing** | 161:4 222:6 | 238:19 | 143:11,13 | 360:14 | 250:3,6 |
| 167:11 | 222:9,12,18 | 241:10 | 309:25 | 366:12,13 | 255:7,17 |
| **referred** | 222:19,20 | 243:2 | **relationshi...** | **Renenger** | 256:8,14 |
| 166:9 | 222:21 | 246:10 | 189:5 | 126:7 | 259:3 |
| 178:25 | 223:2 | 247:19 | **relay** 235:22 | 131:11 | 263:23 |
| 223:10 | 236:19,23 | 256:25 | 338:4 | 138:3 | 264:23 |
| 396:9 | 336:8 | 267:6 | **release** | 142:21 | 265:12,16 |
| **referring** | 381:20 | 281:19 | 358:15 | 145:23 | 266:3 |
| 151:20 | **reflected** | 285:16 | 377:14 | 152:23 | 267:23 |
| 152:11 | 160:21 | 286:20 | **released** | 155:6 | 269:7 |
| 154:14 | 166:23 | 287:7 | 377:14 | 158:22 | 270:11 |
| 203:2 | 238:18 | 288:12 | **releases** | 159:16 | 271:19 |

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 317 of 329

439

| | | | | | |
|---|---|---|---|---|---|
| 274:7,18 | 395:7 | **reports** | 197:16 | 176:5,19 | **research** |
| 275:18 | 396:13 | 141:19 | 198:10 | 178:11 | 160:16 |
| 276:23 | 397:19 | 142:9,12 | 199:11 | 180:7 189:8 | 161:14,22 |
| 277:3,12,20 | 401:6 | 160:16 | 201:20 | 189:9,15,19 | 162:14 |
| 278:24 | **Renzi** 204:7,9 | 161:15,23 | 236:8 | 189:24 | 347:20 |
| 279:16,20 | 204:23 | 162:14 | **requested** | 190:6,20,20 | **reserve** |
| 286:22 | 205:6 | 347:21 | 181:25 | 192:12,18 | 154:24 |
| 287:21 | 209:11,13 | **represent** | 189:12 | 192:21 | 164:15 |
| 291:25 | 221:13,17 | 161:9 | 195:13 | 195:15,23 | 192:20 |
| 293:21 | 223:15,20 | 176:17 | 198:13 | 195:24 | 199:22,25 |
| 302:22 | 242:6 | 216:3 | 201:17,24 | 196:2,10 | 361:10 |
| 304:7,19 | 401:25 | 271:25 | 203:3 224:8 | 197:23 | 389:18 |
| 306:24 | **reopen** | 273:15 | 225:16 | 198:2,11,17 | 390:6 |
| 307:4,11 | 361:11 | 314:11 | **requesting** | 199:5 | **reserved** |
| 316:21 | **rep** 160:22 | 362:4 | 189:6,25 | 201:17 | 127:13 |
| 320:2,22 | 199:4,8 | **representat...** | 199:2 | 204:4 | 154:12 |
| 321:9 322:7 | 213:19 | 162:19 | 208:22 | 219:13 | 392:24 |
| 322:12,18 | **repeat** 222:25 | 235:18 | **requests** | 222:16 | 393:15 |
| 333:19 | 225:13 | **representat...** | 181:14,23 | 235:3 | **reserves** |
| 339:22 | 228:15 | 355:15 | 195:11 | 237:11 | 199:19 |
| 340:24 | 241:8 | 380:20 | 203:9 269:4 | 244:12 | **reside** 193:12 |
| 356:15 | 247:16 | **representat...** | 378:21 | 245:12 | 339:15 |
| 357:19 | 272:19 | 129:19,20 | **required** | 269:13,15 | **resided** 242:3 |
| 358:19 | 273:11 | 131:8 178:2 | 349:17 | 269:22,24 | **Residential** |
| 360:2,11 | 287:3 324:9 | 201:17 | **reread** 333:9 | 270:9,14,18 | 123:4,6 |
| 361:17 | 333:10,21 | 203:14,21 | **ResCap** | 270:20 | 177:16 |
| 363:9 364:3 | 360:5 | 266:17 | 137:22,23 | 271:4 | 178:21 |
| 364:7,14 | 366:19 | 267:5,22 | 137:25 | 288:13 | 203:13,20 |
| 365:5 | 369:7 | 305:21 | 138:17,23 | 289:14 | 352:7,8,21 |
| 366:10 | 371:24 | 380:21 | 139:8,11,13 | 300:22 | 353:4,6,13 |
| 368:15,19 | 381:12 | 382:9,10,24 | 139:24 | 301:2 306:2 | **resolution** |
| 369:5,11 | 386:13 | 392:2,8 | 140:9 141:6 | 306:3 | 166:18 |
| 370:3,9,13 | **rephrase** | **represented** | 141:8,14,18 | 310:16 | **respect** |
| 371:13 | 162:10 | 276:22 | 142:19 | 313:21 | 128:21 |
| 372:9 375:2 | 169:3 180:2 | 277:9 | 143:12,16 | 336:15,15 | 129:3,14,21 |
| 375:9 | 186:9 219:2 | **reps** 213:25 | 143:22 | 343:16 | 130:3,12,16 |
| 376:13 | 226:8 256:4 | **Reps\warra...** | 149:3,9 | 348:15,18 | 130:21 |
| 377:5,21 | 265:14 | 164:13 | 151:5,12 | 401:13 | 131:3,20,23 |
| 378:8 379:2 | 272:20 | **request** 132:7 | 152:12 | **ResCap's** | 131:24 |
| 379:18 | 274:20 | 175:20 | 154:11,24 | 140:20 | 143:22 |
| 381:4,18 | 279:3 | 176:4 177:2 | 159:13 | 141:20 | 145:24 |
| 382:11 | **reply** 342:14 | 179:16 | 160:24 | 150:9 | 154:16 |
| 383:2,23 | **reported** | 190:12,15 | 162:3 170:3 | 152:10 | 158:25 |
| 386:10,19 | 123:22 | 190:22 | 172:16 | 155:23 | 159:2 167:2 |
| 387:2 389:4 | 400:9 | 194:8 | 173:16 | 156:3 | 190:17 |
| 390:8 | **reporter** | 195:18,22 | 174:23 | 160:15 | 195:21 |
| 391:19,23 | 369:9 | 196:19 | 175:24 | 196:11 | 198:11 |

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 318 of 329

440

199:6 202:3
208:21
241:6 242:9
245:5,11
246:18
247:23
248:9 251:6
253:21
275:6
279:14
280:2,24
297:8
298:10
299:24
306:16,18
309:21
312:21
321:5 322:9
329:11
331:11
338:20
343:20
345:15
350:22
353:22
355:22
357:4 358:9
363:7,20
364:17
392:24
393:15,19
393:20
394:3,25
395:3
**respective**
127:6
211:24
212:3
**respects**
321:2
**response**
190:12,22
196:19
199:11
235:25
246:3 247:7
**responsibili...**

208:20
**responsible**
208:24
**restructuring**
137:3,5
277:16
**result** 339:5
350:23
352:19
354:9
**resulted**
167:19
**results**
209:23
211:3
214:18
352:2
354:23
**resumed**
258:5
**retain** 145:7
268:8,18
**retained**
160:8
163:22
169:4
261:10
278:19
**retainment**
169:9
**return** 237:8
404:15
**reveal** 367:7
**revealing**
272:15
**review**
128:18,25
134:16
142:4
170:12
180:6 202:4
218:7
228:22,24
252:5 264:2
267:18
279:10
280:20

294:23
300:5
310:22
361:12
374:11
375:15
377:2
392:10
395:15,25
**reviewed**
142:8,10
151:16
157:20
158:10
159:6,11
160:12
197:12
230:12
249:21
250:8 252:7
297:23
301:15
349:9 373:8
398:12
**reviewing**
252:13
**reviews**
375:17
**revised**
218:17
284:8,15,16
284:22
**revolved**
300:8
**revolver**
156:6
167:15
184:16
219:24
220:14,17
222:13
223:8
235:15
284:5
**RFC** 297:8
397:18,24
**right** 161:2

162:22
164:5
213:23
214:4,25
230:19
236:19
244:17
249:7 253:7
288:7
290:11
291:13,18
291:21
310:4 326:6
329:19
348:24
357:25
359:2,3
361:10
370:13
389:18
390:6
397:22
**rights** 158:25
297:3
392:24
393:15,19
394:3,4,24
**RMBS**
154:16
209:21
241:6,10
242:15
243:2,20
247:3,11,23
248:2 257:9
267:12,21
294:12,15
294:23
320:15,19
321:7,15
322:9
343:16
344:22
346:9,11,19
346:21,24
347:10,14
**RMW** 213:15

**role** 376:23
**romanette**
190:2
**room** 178:4,6
178:11,14
178:25
179:3,5,6,7
179:14
183:18
186:20,24
314:10
348:17
**rooms** 178:10
348:14,16
**roughly**
150:6 181:3
206:5
207:25
223:18
226:18
260:2
261:13
262:23
264:8 354:6
**row** 169:19
169:23
**RPR** 123:22
124:13
400:6,22
**RSC** 190:7
191:23
**RS-9** 396:22
397:3
**Ruggieri**
123:22
124:13
400:6,22
**run** 316:8
338:21
340:19
**running**
209:2
210:24
214:11

_____
**S**
**S** 125:2 126:2
127:2,2

128:2 258:2
258:2,2,4
**sake** 238:6
**sale** 154:8
179:2
208:24
223:7 237:4
300:9 302:5
**saw** 242:5
247:15,19
299:18
309:12
311:4,5
313:13
332:2
398:16
**saying** 165:19
168:8
212:13
225:5 283:6
303:23
321:18
354:3
**says** 158:4
181:13
194:13
223:6
230:16,20
283:11,16
322:21
342:21
396:22
397:21,25
**scenario**
211:22
213:10
**scenarios**
210:25
340:15,16
340:18
**schedule**
155:25
182:13
218:5 219:6
282:20
301:11
308:18

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 319 of 329

441

327:16
361:19
**schedules**
129:2
284:18
300:16
301:8
308:25
309:5,12
310:17
311:2 312:2
312:6
313:20,23
327:14,18
327:21
333:2
336:12
**scheduling**
364:8
**scope** 191:12
279:4,9
280:3 362:9
370:10
371:10
372:4,15
374:18
375:5 376:3
377:7,23
378:10
379:4,20
381:2,15
383:21,25
384:24
385:7,22
386:18
387:16
388:8,13,18
389:6,24
390:3
396:15
**sealing** 127:7
**SEC** 142:6
**second** 157:4
164:12
165:11
167:5,19
169:23

173:2
174:10
187:6
202:24
210:23
212:17
221:18
326:6 333:8
334:17
376:16
380:3
**Secondly**
358:12
**secured**
123:10
140:7 145:4
148:15
151:18
153:10,20
156:8,10,11
156:22,23
156:24
157:6,14,18
158:9,20
159:2,14
167:3,10
168:3,6,11
168:15,24
169:10,16
170:13,20
171:5,9
182:11
183:24
193:5,17,24
196:17
205:25
214:10,15
215:19,22
220:21
223:10
226:4,13
238:24
240:3,5
253:22,25
258:11
277:9
282:20

284:5
286:19
287:6
290:17,21
292:8
295:13
304:3
312:14,22
319:17
350:8
353:14,15
362:17
398:13
**secureds**
157:4 215:3
295:24
**securities**
154:18,20
160:23
244:16
343:17
344:13,22
**securizati...**
137:20
347:2
**security**
151:16,24
160:25
199:5,6
213:18
238:24
276:25
307:8
**see** 143:13
147:23
148:23
149:10
158:5 161:8
162:23
163:3
164:10,16
172:24
173:3
175:19
192:12
201:4,6
211:3,24

231:3,11
233:9,17,25
234:12
236:20,22
238:15
256:22,23
260:11
273:11
279:4,8
282:14
290:6,7,9
298:22
303:10,19
308:13,16
314:2
318:18
334:2,21
335:25
339:5
342:19
348:7
350:16
352:9
354:13
361:4
366:16
371:18
377:15
380:13
381:6
384:11,13
385:2,16
386:2,24
387:3,23
396:18,19
**Seeing** 265:2
**seeking** 129:4
129:7,23,23
129:25
131:5
359:25
361:15
363:4,5
**seeks** 130:22
**seen** 144:20
278:7 327:5
373:5

**Select** 157:14
**selected**
140:4
144:25
**sell** 178:22
**SEMMEL...**
125:11
**send** 203:7
216:17
**sending**
344:7
**senior** 140:14
156:10,24
157:5
264:12
**sense** 158:16
312:25
**sensitize**
285:23
**sent** 148:6
150:23
151:2
177:20
179:12
191:5
194:23
228:21
230:20,25
231:6,8
268:23
282:15
284:23
298:13,13
298:16,19
299:19
300:3
301:11
307:25
323:7 327:6
327:16
334:12
335:18,19
335:21
338:23
342:2
**sentence**
165:18

167:6
**separate**
179:5,7
194:10,14
194:24
301:10
**separated**
163:3,8
**separately**
208:15
**September**
129:11
325:13
**series** 210:9
210:12
217:10,13
246:13
289:3,7
291:9
401:21,22
402:14
**serve** 390:20
**served** 269:4
**service**
139:12
344:21
**servicer**
154:7
184:14
**services**
171:7,11
260:14,20
260:24
261:4,5,23
**servicing**
171:19
**set** 149:12
151:3
162:24
178:10
192:13
209:17
214:7 260:8
348:16
400:19
**setting**
390:22

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 320 of 329

442

**settled** 163:7
163:9
215:25
**settlement**
161:20
165:2
206:23
209:25
211:13
215:11
224:21
249:13
294:15
295:13
305:15,17
317:19
318:11
331:17
346:10,11
347:22
361:3
380:12
384:8
385:15
387:20
389:2 392:8
392:22,23
**settlements**
161:20,21
**share** 138:8
149:7
199:15
220:15,19
240:7
241:21,24
292:21
293:2 294:9
341:22
353:18,19
**shared** 220:6
220:9,18
259:10
331:23
351:25
**sharing** 244:3
**sheet** 183:16
185:3

220:22
297:24
298:4
395:10,25
396:3
398:12
403:19
404:8,10,13
404:16
**sheets** 262:16
262:22
**shifting** 221:8
**short** 331:15
**shorten**
322:17
**shortly**
177:19
**show** 285:24
316:18
317:24
**showed**
150:20
157:3
167:14,16
183:23
218:15
222:3 240:4
285:23
301:21
**showing**
168:10
174:25
373:2
**shown** 173:20
249:13,15
288:24
301:4,7
353:20
399:11
**shut** 364:15
**sic** 266:15
**side** 161:2
164:5 170:9
250:24
253:7
**sides** 205:16
309:23,24

393:8
**side-by-side**
337:5,24
338:2
**Siegert**
262:13
365:21
**Siegert's**
228:5
**sign** 255:14
256:5,13
318:19
404:9
**signatories**
319:25
**signatory**
330:5
**SIGNATU...**
405:23
**signed** 127:16
127:18
145:9,13
175:5,11,14
177:7
188:12
227:19
249:12
254:24
255:13
256:7
318:14
331:3
338:11
349:19
397:16
398:13
**significance**
252:22
**significant**
129:18
132:19
141:23
152:12
165:21
190:6
191:25
206:14

263:14
300:19
315:9
324:24
371:18
380:19
381:25
382:7,15,19
393:12
394:14,16
**significantly**
183:22
295:25
312:7
**signing**
254:25
255:5 287:9
297:24
404:11
**silo** 184:16
218:3,14,14
218:16
220:5,8,9
220:17,18
220:20
222:11,21
223:2,11,13
234:20
235:12
**silos** 182:20
185:4
219:17,19
219:24
220:2 221:2
222:6,20
225:22
234:16,23
336:4,9
**Silver** 147:11
227:22
330:9
**SILVERS...**
125:20
391:15
**similar**
150:25
222:16

**simple** 155:25
282:19
283:12
**simplicity**
238:6
**simply**
165:19
238:20
249:2 252:9
316:2,17
319:15
339:3
351:10
354:3
365:23
366:15
383:18
393:22
**single** 367:2
**sir** 259:15
**sit** 160:4
**site** 348:18
**situation**
150:21
164:4
177:12
193:9
268:20
276:2
277:18
**situations**
137:6
276:18
**six** 200:6,17
201:4
262:11
296:3
401:17
**size** 339:13
**SMITH**
125:15
**Snellenbar...**
123:20
124:9 128:1
128:12,22
129:1,5,24
130:1,5,13

130:19
131:1,6,16
132:1,2,25
133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1 146:1
147:1,20
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1,22
173:1 174:1
174:15
175:1 176:1
177:1 178:1
179:1 180:1
181:1 182:1
183:1 184:1
185:1 186:1
187:1 188:1
189:1 190:1
191:1 192:1
193:1 194:1
194:19
195:1 196:1
197:1 198:1
199:1 200:1
200:14
201:1 202:1
203:1 204:1
205:1 206:1
207:1 208:1
209:1 210:1
211:1 212:1

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 321 of 329

443

| | | | | | |
|---|---|---|---|---|---|
| 213:1 214:1 | 294:1 295:1 | 370:1 371:1 | 168:5 | 331:8 | 123:1 |
| 215:1 216:1 | 296:1 297:1 | 372:1 373:1 | **SOUTHERN** | ss 399:3 | **status** 226:14 |
| 217:1,15 | 298:1 299:1 | 373:2 374:1 | 123:2 | 400:3 | **step** 367:13 |
| 218:1 219:1 | 299:13 | 375:1,12 | **space** 137:18 | **St** 146:24 | 376:7 |
| 220:1 221:1 | 300:1 301:1 | 376:1 377:1 | 404:7 | **stakeholder's** | **steps** 171:3 |
| 221:20 | 302:1 303:1 | 378:1 379:1 | **speak** 132:5 | 245:8 | 310:16 |
| 222:1 223:1 | 304:1 305:1 | 380:1 381:1 | 276:9,19 | **stalking** | **stipulated** |
| 224:1 225:1 | 306:1 307:1 | 382:1 383:1 | **speaking** | 302:7,10 | 127:4,10,14 |
| 226:1 227:1 | 308:1,9 | 384:1 385:1 | 131:25 | **stamp** 230:19 | 350:8 |
| 228:1 229:1 | 309:1 310:1 | 386:1 387:1 | **specific** 182:5 | **stamped** | **stop** 300:12 |
| 229:16 | 311:1 312:1 | 387:7 388:1 | 182:5 | 228:7 | **stopped** |
| 230:1 231:1 | 313:1,10 | 389:1 390:1 | 184:13 | 238:14 | 261:9 |
| 232:1 233:1 | 314:1 315:1 | 391:1,24 | 276:17 | 288:2 | **stops** 218:19 |
| 234:1 235:1 | 316:1 317:1 | 392:1 393:1 | 340:4 | 311:20 | **strategic** |
| 236:1 237:1 | 318:1 319:1 | 394:1 395:1 | 370:11 | **standard** | 170:25 |
| 238:1 239:1 | 320:1 321:1 | 395:14 | **specifically** | 179:19 | 171:2 |
| 240:1 241:1 | 321:14 | 396:1 397:1 | 137:25 | **start** 136:21 | **Street** 126:5 |
| 242:1 243:1 | 322:1 323:1 | 398:1 399:6 | 179:23 | 144:6 | **stress** 137:5 |
| 244:1 245:1 | 324:1 325:1 | 399:15 | 266:21 | 145:11 | 212:2 213:3 |
| 246:1 247:1 | 326:1,13 | 401:4 403:9 | 277:11,14 | **started** | 213:24 |
| 248:1,17 | 327:1 328:1 | 403:12 | 378:5 | 145:12 | **structure** |
| 249:1 250:1 | 329:1 330:1 | **Snellenbar...** | **speed** 296:14 | **starts** 228:18 | 149:15 |
| 251:1 252:1 | 331:1 332:1 | 129:15 | 394:2 395:2 | **state** 124:14 | 181:24 |
| 253:1 254:1 | 332:15 | 363:24 | **spending** | 367:8 | 192:13,25 |
| 255:1 256:1 | 333:1 334:1 | **sold** 212:21 | 264:9 | 396:17 | 193:10,21 |
| 257:1 258:1 | 335:1 336:1 | 212:23,24 | **spent** 262:24 | 399:2 400:2 | 288:12 |
| 258:9 259:1 | 337:1 338:1 | 283:24 | **split** 214:13 | 400:7 404:6 | **study** 159:4 |
| 260:1 261:1 | 339:1 340:1 | **soon** 172:9 | 214:13,15 | **stated** 316:3 | **stuff** 216:24 |
| 262:1 263:1 | 341:1 342:1 | **sorry** 134:13 | 214:20,24 | 377:20 | **subject** |
| 264:1 265:1 | 342:8 343:1 | 202:23 | 215:13,15 | **statement** | 153:24 |
| 266:1 267:1 | 343:24 | 228:15 | 215:21 | 134:22 | 203:19 |
| 268:1 269:1 | 344:1,5 | 230:22 | 216:4 | 248:13 | 206:19 |
| 270:1 271:1 | 345:1 346:1 | 233:16 | 253:21 | 377:12 | 273:13 |
| 272:1 273:1 | 347:1 348:1 | 247:16 | **splitting** | 380:13 | 304:24 |
| 274:1 275:1 | 349:1,3 | 261:16 | 214:10 | 384:9 | 305:3,3,6 |
| 276:1 277:1 | 350:1 351:1 | 265:24 | **spoke** 147:10 | 385:16 | 320:20 |
| 278:1 279:1 | 352:1 353:1 | 283:10 | 147:11 | 387:21 | 358:22 |
| 279:25 | 354:1 355:1 | 288:3 324:9 | 291:13,15 | 389:3 402:7 | 399:10 |
| 280:1 281:1 | 355:14 | 331:5 | **spreadsheet** | **statements** | 404:11 |
| 282:1,11 | 356:1 357:1 | 333:21 | 225:24 | 141:7 | **subordinated** |
| 283:1,11 | 358:1 359:1 | 346:16 | 283:13,20 | 160:15 | 243:3,17 |
| 284:1 285:1 | 360:1 361:1 | **sort** 364:18 | 346:5 | 187:20,23 | 244:9,16 |
| 286:1 287:1 | 362:1,3,15 | **source** 158:4 | **spreadsheets** | 188:2,16,21 | 247:12 |
| 288:1 289:1 | 363:1 364:1 | **sources** | 224:15 | 192:19 | 294:21 |
| 289:10 | 365:1,6 | 169:15 | **spring** 135:14 | 301:16 | 321:8,16,17 |
| 290:1 291:1 | 366:1 367:1 | 369:4,18 | 136:23 | 312:7 | 321:18 |
| 292:1 293:1 | 368:1 369:1 | **sources\poc...** | **squared** | **STATES** | **subordinati...** |

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 322 of 329

444

243:20
244:11,24
245:7,11,21
246:11,22
295:3
320:16,21
320:25
322:9
**subscribed**
399:19
**subsequent**
216:9
297:21
325:18
328:5
**subsidiaries**
152:20
189:24
190:7,21
191:10,24
195:15
196:3,12
197:3
198:12,18
201:14
202:3
269:14,15
269:24
271:4,11,12
274:6,15,23
274:24,25
275:16,17
275:23
276:14
**subsidiary**
170:5 275:2
**substance**
283:4
298:19
316:6 368:8
369:16,22
383:17
**substantial**
314:15
358:3
**substantive**
374:8

**successful**
165:15
**SUCCESS...**
123:16
**sufficiency**
384:7
**sufficient**
286:11
**suggested**
171:4
**Suite** 126:5
**summaries**
191:5
**summarize**
166:25
280:21
**summarized**
150:20
350:25
**summarizes**
160:22
282:20
**summary**
151:12,13
155:18,22
156:20
157:14,17
159:7
167:14
190:18
234:2
239:16
249:3
282:22,25
327:17
**summary/list**
195:19
**summer**
144:10,11
261:8,14,15
261:16
340:7
**supervising**
326:22
**supplemental**
149:13
**support**

166:7
225:21
324:20
325:14,17
334:19,23
335:3
**supported**
324:7,8,14
324:15
**supporting**
181:25
**supposed**
343:19
**sure** 135:12
172:12
178:8
186:13
190:8 211:4
212:2
213:11
214:17
215:10
217:21
258:18
277:15,17
287:14
288:20
315:10
320:13
322:18
364:23
**sworn** 127:18
128:4
399:19

**T**

**T** 127:2,2
258:2 400:1
400:1 405:2
**table** 236:25
**tabled** 217:5
**TAFT** 126:21
**Tail** 342:12
**take** 172:10
176:9 183:2
211:15
213:5
257:15

283:11
284:24
287:17
310:8
322:16
324:6,12
352:5
367:13
376:7 380:2
391:15
**taken** 257:17
259:9 366:9
366:9
388:24
389:13
**taker** 268:5
**talk** 290:15
292:4
310:13
342:25
343:4
**talked** 271:2
288:10
294:18,18
298:18
300:10
342:5
347:18
354:20
**talking**
184:24
190:15
208:8 218:8
370:15
**task** 169:14
**tasks** 234:2,5
279:9,14
**tax** 342:22
**team** 180:10
263:17,20
264:19
**telephone**
145:17
146:10
203:18
374:4
**telephonica...**

133:20
147:9
**tell** 195:3
221:24
274:8
281:22
300:6
364:14
392:6 393:2
**telling** 284:10
**templates**
161:24
**ten** 308:18
**tended**
137:10
**term** 145:20
297:24
298:4
391:16
395:9,25
396:3
398:12
403:19
**termination**
129:10
**terms** 363:9
382:18
**test** 211:25
212:2 213:3
213:24
354:21
**testified**
128:5 258:5
367:13
393:14
396:7 398:2
**testify** 130:6
130:8,13,20
134:18
357:22
360:15
362:16,22
366:14
383:12
387:7
**testifying**
131:17

**testimony**
128:16
129:5,7,16
129:24,25
130:23
131:5,21
318:24
363:2,4,5
363:24
395:15,20
395:21
399:8
**testing**
213:14
214:16
**thank** 155:13
238:10,10
251:9 292:3
345:5
**Thanks**
169:25
190:3
**thereabouts**
295:16
**thing** 167:24
389:17
**things** 131:12
142:13
143:2
184:23
185:21
188:7
223:25
233:20
255:10
293:3
325:19
**think** 140:18
142:6
143:10,12
145:13,18
146:10,23
147:2 152:2
152:2,12
153:6,13,13
154:14,23
154:24

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 323 of 329

445

| | | | | | |
|---|---|---|---|---|---|
| 161:22 | 292:7,10,11 | 150:10 | 139:25 | 249:17 | 305:10 |
| 162:12 | 294:14,16 | 173:14 | 143:24 | 251:21,24 | 306:12,14 |
| 163:8,9,16 | 296:17 | 174:6,8 | 145:16,22 | 252:2 | 325:21,23 |
| 165:3,19 | 299:3,5 | 188:25 | 145:25 | 256:11 | 325:24 |
| 166:10,24 | 300:8,15,18 | 189:9,20 | 146:6 | 258:3,12,18 | **title** 149:2 |
| 168:8,17 | 301:14 | 192:7 213:4 | 147:24 | 262:6,9,16 | 239:16 |
| 170:18 | 303:22 | 223:8,9 | 151:15,19 | 262:21 | 349:14 |
| 171:6 175:6 | 305:14,18 | 233:12 | 151:19 | 263:6,9,12 | **today** 128:14 |
| 178:7,9 | 309:13 | 287:15 | 153:2,9,16 | 263:15,19 | 128:16 |
| 179:6 182:8 | 310:19 | 303:16 | 154:22 | 264:8,10,15 | 134:17,18 |
| 183:7 | 311:6,11,15 | 335:25 | 159:8,15,18 | 266:2,7,11 | 260:25 |
| 186:17,24 | 312:2,8 | **third-party** | 163:6,10,12 | 266:14,21 | **today's** 133:5 |
| 187:23 | 314:12 | 189:5 | 163:19,23 | 267:9,24,25 | 134:2 136:4 |
| 188:6 190:5 | 320:25 | 195:25 | 164:18,22 | 268:4,9,11 | 136:8 |
| 190:8 191:5 | 322:2,3,12 | **thirty** 404:17 | 165:22 | 268:14,24 | 267:17 |
| 192:18,19 | 324:21 | **thought** | 167:25 | 269:6 270:3 | 349:10 |
| 192:22 | 325:15,25 | 141:25 | 170:18 | 272:6 278:2 | 395:16 |
| 193:8,10,14 | 325:25 | 166:13,25 | 175:14,24 | 278:7 286:4 | **told** 177:8 |
| 194:10 | 327:11,13 | 170:20 | 176:5,10,18 | 286:8,12 | 186:11 |
| 197:7,21 | 330:10,22 | 180:6 | 177:14 | 290:17 | 345:13 |
| 198:9,14 | 331:17 | 182:19 | 178:3,9,12 | 291:3 | 374:6 |
| 199:12 | 334:14 | 189:13 | 178:14,20 | 294:16 | 392:19 |
| 201:22,24 | 337:12 | 295:22 | 180:21 | 296:7 | 394:11 |
| 206:8 | 339:2 342:3 | 300:18 | 183:19 | 298:16,20 | **Tom** 140:12 |
| 208:17 | 343:9,10 | 302:12 | 187:4 | 307:19 | **top** 230:19 |
| 213:9 | 344:12 | 311:12 | 188:10 | 310:11 | 284:13 |
| 214:25 | 347:2,6,16 | 315:8 | 198:7,14 | 317:19 | 298:22 |
| 215:23 | 347:22 | 324:24 | 199:12,16 | 318:10 | 308:18 |
| 216:9,17 | 348:13 | 338:11 | 200:25 | 320:18 | 335:25 |
| 217:3 221:7 | 352:17,19 | **thoughts** | 204:3,14,18 | 321:5,20 | 342:19 |
| 222:15,18 | 352:19 | 280:22 | 205:13 | 322:25 | 348:8 351:2 |
| 223:9 | 354:22 | 281:3 | 206:4 208:9 | 326:20 | 351:22 |
| 231:19 | 357:10,11 | 290:20 | 208:25 | 328:19 | **topic** 128:21 |
| 237:5,6 | 358:8 359:7 | 338:4 | 209:8 | 331:15,17 | 130:3,12,16 |
| 255:16 | 359:13 | **three** 149:11 | 210:18 | 335:21 | 130:21,22 |
| 258:15 | 360:23,25 | 155:9 | 212:21 | 337:20 | 131:4 132:6 |
| 261:15 | 361:20 | 195:22 | 220:10,23 | 343:9 346:2 | 132:7,8,14 |
| 268:15,16 | 364:13 | 208:5 303:4 | 221:6 | 346:13,25 | 202:25 |
| 275:5,7 | 365:19 | 398:20 | 223:14,19 | 347:8 | 245:16 |
| 281:15 | 374:5 | **three-page** | 225:3 | 348:12 | 246:22 |
| 282:2,3 | 381:20 | 248:16 | 229:15,20 | 354:10 | 362:20 |
| 283:2 | 393:8 | 292:19 | 235:4,19 | 358:5 377:3 | 363:7,17 |
| 284:10 | 394:15,16 | **tie** 207:14 | 236:25 | 392:17 | 365:8,19 |
| 287:12,13 | **thinking** | **time** 127:13 | 238:7 | 398:23 | 368:17,21 |
| 289:23,23 | 278:9 | 134:17 | 240:13 | **times** 213:6,8 | 370:10,13 |
| 290:16 | **third** 149:13 | 135:10 | 242:12 | 246:6 | 370:25 |
| 291:5,15,17 | 149:22 | 138:8 | 247:10 | 264:17 | 371:7,10,14 |

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 324 of 329

446

372:4,15
375:2
380:22
381:2,5
382:20
383:21,25
384:11,24
385:7,13,17
385:22,24
386:3,18
387:16,18
388:3,8,13
388:16,18
391:4
**topics** 129:3
129:13,14
129:21
130:4
131:15,20
131:23,25
132:2 133:8
362:10,11
363:12
364:19
365:2
366:15
370:22
374:19,22
375:7,10
377:7,23
378:11
379:4,21
380:7
382:12
386:22
387:2 389:6
389:25
390:3,16,19
390:23
391:6,6
**tos** 205:17
**total** 156:3
316:25
**track** 263:4,5
**tracked** 299:4
**tracking**
139:24

141:14,17
**traded**
189:17
**trading**
141:21
**transaction**
165:16
**transactions**
189:8,10,19
189:23
190:9,19
191:6,9,13
191:16,22
191:25
195:14,20
195:24,25
195:25
277:16
**transcript**
399:10
400:11
404:18,20
**transferred**
271:16
**treated** 248:3
**treatment**
154:10
248:9
342:23
358:9
**trial** 127:13
136:11,16
196:25
197:4,5,10
200:3
205:12
206:8 302:3
**tried** 182:18
185:21
335:10
357:12
390:24
**true** 399:9
400:11
**trus** 261:10
**trust** 126:13
320:15

**trustee** 123:9
123:17
144:3,5,7,8
144:13
261:11,11
**trusts** 343:16
**try** 207:10,15
213:9 224:3
242:21
256:4
328:18
330:23
343:18
344:15
**trying** 146:23
158:16
161:23
166:10,24
171:7
178:21
179:16
185:4 189:7
191:20
192:2 196:7
196:8
197:12,24
199:3
201:25
203:5 205:3
205:13,23
207:7,14
211:2
223:22,22
224:3,12
229:15,20
290:8 298:7
309:13
310:2 311:6
311:11,15
312:8
314:12
315:2
328:10,14
331:6
334:14,18
337:12
339:7

343:10,14
344:12
354:21
359:23
370:22
389:15
**turn** 149:19
151:7
155:14
156:18
157:10
160:17
163:25
165:6
166:19
170:23
187:6
188:25
195:10
198:23
234:7
236:14
238:12
287:25
295:6
302:17
311:18
316:17,18
320:11
335:22
342:18
349:12
368:21
**Turnbull**
138:20
139:2
**turned**
209:20
**turning** 194:7
385:13
**tweaks**
216:11
**TWEED**
126:4
**twice** 325:25
**two** 131:14
131:22

136:12
140:24
160:2 170:4
174:5
189:17
192:22
216:23
220:12
221:12,16
243:24
282:15
289:24
312:16
323:20
357:4
358:17,22
359:18
360:21
363:15,18
363:19,25
364:10,25
382:12
401:24
**type** 179:9
208:17
223:15
339:10
344:23
**types** 161:17
184:18,21
208:25
219:8
**typo** 396:8,9
396:20
397:5

— U —
**U** 127:2
**ultimate**
152:9
207:21,23
395:3
**ultimately**
143:15
145:9,13
152:14
167:21
172:5

200:24
215:25
216:25
224:20
226:3,8
229:4
231:10
241:17
254:13
286:6
290:10
291:5
296:16
298:13
299:3
318:22
397:9
**UMB** 123:9
123:16
**Um-hmm**
250:11
337:2
**unable** 367:6
**uncertain**
170:18
**uncommon**
275:2
**unconsolid...**
187:20
188:2,16,18
**underlying**
151:17
193:16
209:3
334:23
**undersecur...**
241:18,23
243:24,25
312:17
356:21
368:24
369:14,25
372:6
379:17
**understand**
133:2
139:13

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 325 of 329

447

| | | | | | |
|---|---|---|---|---|---|
| 147:24 | understand... | 218:4 265:5 | 390:17 | 218:22 | 219:3,7 |
| 148:16 | 130:5,17 | **UNITED** | **utilized** | 219:5,7,12 | 221:5 302:9 |
| 166:5,16 | 149:15 | 123:1 | 162:12,13 | 223:6 240:9 | 316:5 336:3 |
| 168:4 | 153:15 | **unknown** | 250:20 | 244:2,6,6 | 351:22 |
| 169:14 | 156:14 | 165:25 | 285:21 | 251:6,10,15 | **variety** |
| 178:13 | 159:10 | **unnecessarily** | 345:16,25 | 251:19,20 | 134:22 |
| 189:7,14 | 165:17 | 296:4 | **utilizing** | 252:17,18 | 137:10,13 |
| 191:21 | 189:18 | **unquestion...** | 393:10 | 257:4,11 | 145:3 |
| 192:2 | 193:9,11,21 | 389:23 | **Uzzi** 133:14 | 276:21 | 152:17 |
| 196:14 | 196:9 | 390:17 | 172:16 | 283:23,25 | 160:24 |
| 197:13,24 | 207:16 | **unrecovered** | 323:25 | 284:2,11 | 161:18 |
| 201:25 | 237:7 | 244:6 | 401:12 | 285:21 | 170:3 |
| 203:5 205:3 | 288:18 | **unsecured** | **U.S** 261:10 | 290:20 | 178:10 |
| 237:14 | 293:18 | 123:12 | | 295:22 | 184:17 |
| 242:22 | 310:17 | 168:6 | **V** | 300:9,19 | 205:21 |
| 243:16 | 312:10 | 169:16 | **v** 123:8,15 | 302:14 | 208:8 |
| 245:17 | 336:7 | 209:22 | **vague** 279:23 | 309:5 | 277:15 |
| 249:6 | 355:20 | 240:23 | **valid** 315:24 | 312:19,23 | 311:14 |
| 252:14 | 356:12,18 | 242:2 | 315:25 | 314:4,8,17 | 329:6 |
| 258:19 | 362:21 | 244:17 | 316:24 | 315:13,18 | **various** |
| 290:22 | 363:3 | 248:4 | 319:17 | 316:14 | 141:19 |
| 292:9,12 | 364:22 | 256:23 | 352:17,18 | 324:24 | 147:13 |
| 295:2 | 365:3,7,24 | 304:4 | 354:3 392:4 | 327:2 | 152:20 |
| 296:25 | 374:14 | 311:25 | 392:12 | 339:14,16 | 153:7 |
| 309:20 | 375:19 | 312:19 | 393:12 | 339:20 | 154:15 |
| 310:22 | 376:9 | 339:13 | 394:19,19 | 340:22 | 160:16 |
| 312:9 | 377:18 | 351:25 | **validity** | 341:13 | 162:14 |
| 324:22 | 378:20 | 353:17 | 315:23 | 350:16 | 190:19 |
| 334:18,20 | 380:22 | 387:22 | 316:16 | 351:11,18 | 195:15 |
| 342:22 | 383:4,6 | **unsold** | 354:2 | 352:12,14 | 196:16 |
| 343:9 346:9 | **understand...** | 212:19 | 360:18 | 352:20,23 | 197:13 |
| 351:15 | 362:14 | 283:25 | 392:25 | 353:7,9,12 | 199:17 |
| 355:18 | **understood** | **update** | 393:16 | 353:16,18 | 212:11 |
| 356:25 | 156:5,9 | 149:13 | **valuation** | 353:19 | 219:12 |
| 358:21 | 197:22 | 173:7 174:2 | 315:20 | 355:5 358:3 | 247:20 |
| 359:23 | 206:9 245:6 | 284:23 | 340:11 | 360:25 | 336:3 |
| 362:8 | 255:2 | 340:12 | 364:18 | 362:22 | 373:14,25 |
| 367:10 | 281:15 | **updated** | **value** 129:6 | 363:21 | **Varying** |
| 370:16 | 286:9 | 173:5,18 | 152:9 167:7 | 365:16 | 263:18 |
| 371:22 | **undertaken** | 301:19 | 167:17 | 366:7 | **verbal** 215:12 |
| 375:21 | 366:16 | **updates** | 168:5 | 367:15,21 | **verify** 224:24 |
| 380:16 | **underwriti...** | 174:9 | 169:15 | 368:4,12 | 225:25 |
| 386:12 | 162:21 | 284:21 | 170:14 | 393:3,12,21 | **version** 229:8 |
| 387:11,25 | **unencumbe...** | **upside** | 189:17 | 394:5,10,12 | 230:15,17 |
| 390:4 391:9 | 353:15,16 | 302:13 | 196:15 | 394:23 | 231:9,17,21 |
| 397:4,14 | **unfair** 358:9 | **use** 151:8 | 209:18 | **valued** 129:8 | 232:2 |
| 398:5,11 | **unfortunat...** | 214:7 330:2 | 212:12,13 | **values** 162:15 | 284:22 |
| | | | 212:19 | | |

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 326 of 329

448

**versus** 184:16
186:16
202:12
225:23
337:7,16
**view** 171:6
182:10
205:19
240:17
252:15
255:3 259:5
286:2,3
295:12
296:5
319:12
365:15
366:6
367:12,14
367:18
390:10,18
392:3,14
**views** 207:22
**Vincent**
146:24
**VOLUME**
123:20

**W**

**waive** 296:18
393:19,23
394:3
**waived** 127:9
297:3,10
358:2
360:25
395:23
**waiver**
397:22
**waivers**
297:16
**waiving**
297:17
397:16
**walked**
183:18
374:5
**Walsh** 125:7
128:11,13

132:16
146:2
147:17
155:13,15
169:23
172:10
188:10
210:7 217:8
221:10
227:23
228:4
229:13
245:16
257:15
258:7
279:18
287:23
289:2 292:3
322:16
333:12
343:22
361:4,9
363:11
365:4 383:3
383:5 393:6
394:13
395:13
398:22
401:4
**want** 128:18
155:6 177:6
194:9,16
200:20
210:3
290:14
315:21
318:2,12
333:9 338:3
342:21
344:9
350:11
361:10
366:13
371:13
398:10
**wanted** 138:9
177:11

182:8
185:20
190:8
196:14
198:16
209:24
210:2,3
211:11,12
290:16,22
292:9,12
295:21
310:19,21
324:21
334:21
357:10
364:22
390:5
391:10
**wants** 310:15
**warranty**
160:23
162:20
199:4,8
213:19,25
**Washington**
126:6
**wasn't**
191:19
235:20
236:7
315:25
330:24
340:3
346:24
352:15
357:10
382:4
**waterfall**
214:7,8,25
253:11,13
253:24
254:13
257:12
282:19
283:6,8
316:9
317:14

332:22,22
335:11
341:24
**waterfalls**
310:5
**way** 138:12
222:2
226:14
240:12
307:5
324:12
331:20
345:19,22
347:19
348:21
351:13
356:17
367:20
390:25
400:16
**ways** 243:24
312:16
**week** 131:19
181:5
215:10
263:21
322:23
**weeks** 134:11
186:21
326:7
**Wells** 125:14
362:4 366:9
367:18
368:2,11
369:24
371:11
372:5,16,22
373:3,20
374:8,12,15
375:14,21
376:10,20
377:11
378:14,24
379:11,15
381:3,16
383:11,20
384:22

385:8,21
386:7,17
387:15
388:7,12,24
389:13
390:14,19
390:22
391:3
403:16
**Wells's**
377:15,20
**well-known**
271:14
**went** 135:16
139:7
173:15
184:23
201:23
202:8 225:6
354:5
363:15
392:22
**weren't**
158:15
163:22
199:15
211:7 212:3
213:11,12
219:8
224:23
234:25
242:18
284:19
297:17
317:25
318:10
353:25
**we're** 226:16
358:6
**we've** 226:24
277:17
355:18
**WHEREOF**
400:18
**White** 159:12
159:23
160:4,9,10

175:14
177:3,5,15
177:25
178:7
180:25
181:7,9,14
182:23
201:23,23
202:7,8,12
202:16,20
204:25
227:12,17
230:7
297:13,23
298:8
323:16,25
396:10
398:4,11
**WICKERS...**
126:21
**willing**
199:15
296:18
394:6 395:5
**wish** 405:5
**withdraw**
371:8
389:14
**withdrawn**
375:20
378:17
388:22
**within-enti...**
400:10
**witness** 128:3
132:3,4,4
134:9
136:11,15
172:12
232:6,16
236:3
237:18
240:16
243:6
245:25
258:20,22
259:4,6

12-12020-mg   Doc 5803-4   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Reid Snellenbarger   Pg 327 of 329

449

272:13
274:8
286:23
320:4 341:2
349:4
355:21
357:21
360:14,15
361:9
362:16
366:14
374:20
375:17
376:5 377:8
377:24
378:12
379:5,22
384:4 389:7
389:19
390:7,25
391:5,11,20
399:7
400:18
401:3 404:2
405:23
**word** 148:15
336:5
390:17
**words** 211:8
285:11
**work** 137:23
138:2,11,12
138:16,21
139:10
140:9
143:22
185:11
204:2
216:22
237:22
239:9
240:18
243:9 260:4
262:5,17
266:2 268:3
272:16
301:17

320:6
334:11
341:3,3,6,7
341:8 354:5
**worked**
137:19
138:23
139:12
143:2
146:16,19
264:21
274:13
289:21
354:25
373:13
**working**
136:21
139:4 144:7
210:4,17
216:13
262:9
263:11,20
264:16,19
275:21,21
298:6
**works** 176:15
180:19
354:20
**World** 126:22
**worth** 339:2
**wouldn't**
141:10
240:6
242:16
246:2 268:6
352:23
**write** 285:2
**writes** 295:10
310:15
**writing** 267:2
267:15
286:16
322:23
**writings**
267:18
**wrong** 364:12
**wrote** 307:5

**X**
**x** 123:3,5,12
123:19
209:19
212:14
401:2

**Y**
**Y** 209:21
**yeah** 142:11
147:10
149:5
153:18
158:14
181:20
183:20
184:11
185:14
198:13
211:10
215:9
226:25
247:8 251:7
263:14
279:20
293:5
300:25
309:10
311:22
318:21
325:10
332:7
337:12
344:8
353:24
354:17,22
355:7
382:11
**year** 286:7
296:20
393:24,25
395:4
**years** 137:6
138:7,24
139:15,16
142:25
146:25

156:4
197:24
222:17
301:2
**Yesterday**
133:16
**yes-no** 245:20
256:3 305:2
**yield** 327:9
328:13
**York** 123:2
124:11,11
124:14
125:6,6,17
126:12,13
126:16,16
126:23,23
140:21
183:6,8
227:12
230:8 326:2
330:7 399:2
399:4 400:2
400:4,8

**Z**
**zero** 338:24
352:13,25

**$**
**$2.1** 167:10
350:6
**$200** 237:3
**$602** 167:9
**$750** 304:2
**$829** 164:14
**$9** 257:4,5
**$950** 236:20

**0**
**06** 139:17
**08** 139:17
**09** 301:23

**1**
**1** 128:21
188:20
190:2

195:22
**1.4** 167:8,17
311:24
**1.69** 350:8
**1.9** 353:7
**1:00** 265:4
**1:43** 211:17
**10** 172:15
175:2
216:13
226:23
236:14
239:14
397:2
401:12
**10th** 210:13
211:16
342:9,12
343:2
400:19
403:10
**10-Q** 158:2
**100** 212:10,15
214:14
**10022** 125:17
**10036** 126:16
**101** 124:11
125:5
**10178** 125:6
**10281** 126:23
**105** 254:15
**1095** 126:15
**11** 123:4
129:4 148:6
172:18
173:6
175:15
179:19
194:8
362:24
365:18
368:16
401:14
**11:40** 310:11
**1100** 126:5
**12** 129:14
156:18

200:4,11,13
200:15,20
200:21
201:9
217:11,14
226:23
396:12,21
401:15,20
401:23
**12th** 202:22
220:24
**12-12020**
123:3
**12:13** 257:17
**12:24** 333:14
**12:54** 258:3
**128** 401:4,10
**13** 129:21
200:9,14,18
201:3
202:23
261:18
401:18
**13th** 188:13
**13-01277**
123:15
**13-01343**
123:8
**14** 210:8,9,12
210:22
302:19
312:3
401:21
**14th** 188:13
230:5
248:20
**147** 401:11
**15** 129:22
217:9,10,13
401:22
**15th** 291:10
291:19,23
**16** 129:14
137:6
157:10
221:11,12
221:16

401:24
**17** 129:15 227:24,25 228:7 402:4
**172** 401:12,14
**175** 302:11
**18** 129:22 131:21 229:10,14 230:10 273:4,7 287:24,25 363:12 402:6
**180** 350:9
**1850** 126:5
**19** 129:22 131:21 248:12,16 287:21 303:8 311:19,20 312:4 317:15 362:20 363:12 365:8 398:17 402:7
**19th** 202:23

**2**

**2** 129:3 156:21 161:8 195:17 250:22 303:10 311:19 317:11 320:15 342:18
**2.5** 163:14
**2:00** 265:4
**20** 129:15 215:21 258:8 259:17,18 261:17 278:17 394:20 402:9
**20/80** 214:15 215:21
**200** 401:15,18
**200,000** 260:6
**20006** 126:6
**2005** 136:23 372:12
**2006** 139:17
**2008** 123:18 139:17 157:25 158:2 187:24 195:21
**2009** 300:23 301:15
**2011** 135:17 140:3,16 143:21 146:3 147:5 149:13,22 150:8,10,14 151:21 153:17 159:19,24 160:6 173:11 192:8,24 194:20,25 195:4 197:8 287:16
**2012** 129:11 135:14 144:21 146:5 147:5 147:22 148:6 150:14 159:25 160:7 173:6 174:16 175:17 176:6 188:13 194:24 200:11,20 200:24 202:5 203:10 217:11,14 221:19 222:5 251:25 252:2 253:3 259:19,23 261:23 262:2,2,2,3 268:24 272:23 273:3 284:8 295:9 296:7 302:19 313:5,8 314:20 327:4 340:7 342:9 348:19 401:20,23 402:10,22 403:10
**2013** 123:21 124:4 144:11 261:19 399:20 400:20
**21** 131:15 160:17 282:7,12 295:9 402:11
**21st** 295:15
**210** 401:21
**217** 401:22
**22** 238:12,14 273:9 289:2 289:3,7 402:14
**22nd** 125:16
**221** 401:24
**2234** 273:10
**227** 402:4
**229** 402:6
**23** 131:15 299:7,11 307:21 402:17
**23rd** 332:17
**24** 129:13 308:3,10,10 348:6 402:20
**248** 402:7
**25** 308:6,10 310:8 402:21
**25th** 129:11
**259** 402:9
**26** 313:5,8 322:21 402:22
**26th** 298:14 299:7,11 307:21 402:17
**269** 401:6
**27** 163:25 326:9,13 402:24
**28** 129:13 175:17 176:5 332:9 332:15 336:25 403:4
**282** 402:11
**289** 402:14
**29** 129:15 251:25 332:12 336:22,24 341:9 403:6
**29th** 252:18
**299** 402:17

**3**

**3** 129:13 141:16 189:22,25 206:12 233:8,15 256:20 260:11 311:18 317:11
**3rd** 308:11,12 309:9 310:11,13 348:19
**3.2** 214:3
**3.3** 352:9
**3.5** 163:15
**30** 129:13 158:2 165:6 200:24 202:5 342:7 342:11 403:8 404:17
**30th** 202:8 350:10
**30(b)(6)** 349:4 362:6 362:16 365:12 370:10 374:19 375:6,10 376:4 377:7 377:23 378:10 379:4,21 389:6,25 390:3,19
**308** 402:20,21
**31** 197:8 222:5 252:2 253:3 343:22,23 344:4 403:11
**31st** 252:19 252:23
**313** 402:22
**32** 129:13 213:7 348:25 349:6 403:15
**32435** 123:23
**326** 402:24
**33** 129:15 166:19 372:20,21 403:16
**332** 403:4,6
**34** 131:15 395:9 396:2 403:19
**342** 403:8
**343** 403:11
**3474** 250:23 311:20
**348** 403:15
**35** 131:16
**350** 353:8,9
**36** 130:4 368:21 387:2
**361** 401:5
**37** 130:12 170:23
**372** 403:16
**38** 129:15 375:13 376:20 380:9 381:2 381:16 383:22,25
**39** 130:16 384:7
**395** 401:4 403:19

**4**

**4** 129:3 133:18 141:16
**4.8** 214:3
**4:00** 398:23
**40** 130:21 132:6 263:12,21

12-12020-mg    Doc 5803-4    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Reid Snellenbarger    Pg 329 of 329

451

263:21
384:24
385:7
**400** 214:8
215:19
253:17
**41** 130:4
377:11
385:13,22
387:2
**42** 378:14
385:24
386:18,20
386:25
387:16
388:3
**43** 375:14
379:11
387:18
388:8,14
**44** 130:4
387:3
388:16,18
**45** 131:4
132:14
370:25
371:7,10
372:4,15
**462** 350:19
**4685** 230:19
**4690** 228:7,14
228:18
**4693** 233:16
**4694** 233:16
**4695** 234:8
**4696** 288:2,5
288:6
**4712** 238:14

———
**5**
**5** 133:18
151:9 152:8
163:17
181:24
213:7
230:18,23
230:24
234:7

**5s** 155:8
**5th** 313:5,8
313:11,14
314:20
315:17
320:11
325:8 326:6
327:3
333:14
402:22
**5.7** 213:22
**5/8s** 157:13
**50** 263:12
**500** 212:20
**5410** 372:23
373:5
403:18
**551** 181:24
**552** 187:7
**553** 189:2
**561** 149:19
**570** 155:15
**573** 156:19
**577** 157:11
**582** 160:19
**588** 164:2
**591** 165:9
**594** 166:19
**599** 125:16

———
**6**
**6** 123:18
163:17
287:25
288:5
296:18
395:6
**6th** 230:4
**600** 167:20
**64** 314:13
**64-72** 314:7
314:11

———
**7**
**7** 213:7
296:18
395:6
**72** 314:13

**750** 237:2
303:23
**766** 167:18
**79/21** 215:24

———
**8**
**8** 123:21
124:4 128:7
128:17
362:6,20
365:11
380:7
401:10
**8th** 278:4
282:8,13
284:8
402:12
**8.6** 213:22
**80** 215:22
394:21
**80/20** 214:24
**800** 165:5
**81** 342:19
**81/19** 215:24
216:4
253:21
**85** 218:17
**8771** 291:25
**8871** 291:20

———
**9**
**9** 147:17,18
147:21
155:8,14
157:13
172:21
192:5
221:19
287:16
401:11
**9.625** 123:9
**9:00** 264:22
**9:39** 308:12
**9:46** 124:5
**93** 253:25
**9539** 173:2
**9566** 155:12
**958** 170:24

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099