1                          B. WESTMAN
2      UNITED STATES BANKRUPTCY COURT
       FOR THE SOUTHERN DISTRICT OF NEW YORK
3      -------------------------------x
       In re:                        : Chapter
4      RESIDENTIAL CAPITAL, LLC,     : Case No. 12-12020(MG)
       et al.,                       : Jointly Administered
5                     Debtors.       :
       -------------------------------x
6      RESIDENTIAL CAPITAL, LLC,     :
       et al.,                       :
7                     Plaintiffs,    :
                 v.                  : Adversary Proceeding
8      UMB BANK, N.A., as successor  : No. 13-01343(MG)
       indenture trustee under that  :
9      certain indenture, dated as of:
       June 6, 2008; and WELLS       :
10     FARGO BANK, N.A., third       :
       priority collateral agent and :
11     collateral control agent under:
       that certain Amended and      :
12     Restated Third Priority Pledge:
       and Security Agreement and    :
13     Irrevocable Proxy, dated as of:
       December 30, 2009,            :
14                     Defendants.   :
       -------------------------------x
15     (Caption continued on Page 2)
16
17          VIDEOTAPED DEPOSITION OF BARBARA WESTMAN
18                    October 15, 2013
19                  New York, New York
20
21          Yellow Highlighting = JSN Designation
22          Pink Highlighting = Plaintiff's Counter-Designation
23          Orange Highlighting = Joint Designation
24     Reporter: Kathy Klepfer
25     Job 66939

1    (Caption continued from previous page)

2    OFFICIAL COMMITTEE OF            :

     UNSECURED CREDITORS, on behalf:

3    of the estates of the Debtors,:

                    Plaintiff,    :

4         v.                      : Adversary Proceeding

     UMB BANK, N.A., as successor  : No. 13-01277(MG)

5    indenture trustee under that  :

     certain Indenture, dated as of:

6    June 6, 2008; and WELLS       :

     FARGO BANK, N.A. third        :

7    priority collateral agent and :

     collateral control agent under:

8    that certain Amended and      :

     Restated Third Priority Pledge:

9    and Security Agreement and    :

     Irrevocable Proxy, dated as of:

10   December 30, 2009,            :

                    Defendants.  :

11   ------------------------------x

12              October 15, 2013

13

14         Videotaped deposition of BARBARA

15    WESTMAN, held at Morrison Foerster LLP,

16    1290 Avenue of the Americas, New York,

17    New York, before Kathy S. Klepfer, a

18    Registered Professional Reporter,

19    Registered Merit Reporter, Certified

20    Realtime Reporter, Certified Livenote

21    Reporter, and Notary Public of the State

22    of New York.

23

24

25

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman     Pg 3 of 243

Page 3

1          B. WESTMAN

2          A P P E A R A N C E S:

3    MORRISON & FOERSTER

4    Attorneys for the Debtors and the Witness

5         1290 Avenue of the Americas

6         New York, New York  10104

7    BY:  CHARLES KERR, ESQ.

8         J. ALEXANDER LAWRENCE, ESQ.

9         JENNIFER MARINES, ESQ.

10        LORENZO MARINUZZI, ESQ.

11

12   KRAMER LEVIN NAFTALIS & FRANKEL

13   Attorneys for the Committee of Unsecured Creditors

14        1177 Avenue of the Americas

15        New York, New York  10036

16   BY:  PHILIP KAUFMAN, ESQ.

17

18   MILBANK, TWEED, HADLEY & McCLOY

19   Attorneys for the Ad Hoc Committee of Junior

20   Secured Creditors

21        1 Chase Manhattan Plaza

22        New York, New York  10005

23   BY:  ATARA MILLER, ESQ.

24        DANIEL WHITE, ESQ.

25

Page 4

1                    B. WESTMAN

2          A P P E A R A N C E S:  (Cont'd.)

3

4    KIRKLAND & ELLIS

5    Attorneys for Ally Financial

6         655 Fifteenth Street, N.W.

7         Washington, D.C.  20005

8    BY:  JODI WU, ESQ.

9

10   REED SMITH

11   Attorneys for Wells Fargo Bank

12        599 Lexington Avenue

13        New York, New York  10022

14   BY:  MARK SILVERSCHOTZ, ESQ.

15

16   DECHERT

17   Attorneys for BNY Mellon

18        1095 Avenue of the Americas

19        New York, New York  10036

20   BY:  JAMES MOORE, ESQ.

21

22   ALSO PRESENT:

23        MICHAEL PINEIRO, Legal Video Specialist

24        ANTHONY R. MILAZZO, FTI

25

12-12020-mg    Doc 5803-5    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Desposition Designations: Barbara Westman    Pg 5 of 243

Page 5

B. WESTMAN

1
2          THE VIDEOGRAPHER:  This is the start
3      of the tape labeled number 1 of the
4      videotaped deposition of Barbara Westman in
5      the matter In re Residential Capital, LLC.
6          Today is October 15, 2013.  The time
7      is approximately 10:09 A.M.  Appearances
8      have already been noted by the court
9      reporter.
10         Will the court reporter please swear
11     in the witness.
12                  * * *
13 B A R B A R A   W E S T M A N, called as a
14     witness, having been duly sworn by a Notary
15     Public, was examined and testified as
16     follows:
17 EXAMINATION BY
18 MS. MILLER:
19     Q.   Good morning, Ms. Westman.  My name is
20 Atara Miller and I work at Milbank Tweed Hadley
21 & McCloy and we represent the Junior Secured
22 Noteholders in this action.
23         Before we begin the deposition, I just
24 want to note for the record that Debtors
25 produced last night an additional 500

Page 6

B. WESTMAN

1   documents -- 500 pages of documents for which

2   you were designated the custodian.

3          MS. MILLER:  We have not had an

4          opportunity to even load the documents,

5          nevertheless review them, and we reserve all

6          rights to recall the witness, as necessary,

7          after review of those documents.

8          MR. KERR:  I just have one question.

9   Do you have appearances for everybody?

10          COURT REPORTER:  I do.

11   BY MS. MILLER:

12      Q.    Good morning.  Can you please -- have

13   you ever been deposed before?

14      A.    One other time.

15      Q.    And in what context was that?

16      A.    It was an employee litigation matter.

17      Q.    And was that an employee of ResCap?

18      A.    Yes.

19      Q.    And in what capacity were you

20   testifying?

21      A.    As a company representative testifying

22   about accounts payable policies.

23      Q.    And do you understand that you're

24   testifying here today in part also as a company

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman    Pg 7 of 243

Page 7

<sup>1</sup>                          B. WESTMAN

<sup>2</sup> representative?

<sup>3</sup>     A.     Yes.

<sup>4</sup>     Q.     I'm going to just go over some very

<sup>5</sup> quick instructions.  You have been deposed

<sup>6</sup> before, so hopefully you know them.  But I'm

<sup>7</sup> going to ask you questions.  You're going to

<sup>8</sup> answer them.  The court reporter is going to

<sup>9</sup> take everything down.  She can't record both of

<sup>10</sup> us speaking at the same time, so I ask that you

<sup>11</sup> wait until I finish asking a question before you

<sup>12</sup> answer, and I'll try to do the same.

<sup>13</sup>          Also, you need to give audible

<sup>14</sup> responses.  The court reporter can't take down,

<sup>15</sup> although they have creative ways, can't take

<sup>16</sup> down nods of the heads, knowing glances and the

<sup>17</sup> like.

<sup>18</sup>          There may be times during this

<sup>19</sup> deposition that your counsel will object to a

<sup>20</sup> question that I pose.  I ask that unless you're

<sup>21</sup> specifically instructed by your counsel not to

<sup>22</sup> answer the question, that you still answer the

<sup>23</sup> question that I asked.

<sup>24</sup>          Of course, if at any time you don't

<sup>25</sup> understand a question or need clarification, I

1          B. WESTMAN

2    would be happy to restate the question or

3    explain it further for you.

4          I also ask that you not take breaks to

5    confer with counsel or for any other reason

6    while a question is pending.  Please answer the

7    question and then I'd be happy to, you know,

8    take a break whenever you feel you need one.

9    Just let me know and I'd be happy to go off the

10   record.

11          MR. KERR:  Atara, on that, I respect

12      that and you should try to answer questions

13      and not take breaks.  However, if there is

14      an issue of privilege that comes up that

15      you're not able to respond to the question

16      without knowing whether or not you might be

17      stepping into privilege areas, for that I

18      think you should let Atara know and then we

19      can discuss it at that time.

20          THE WITNESS:  Okay.

21   BY MS. MILLER:

22      Q.   So I think the instruction that your

23   counsel just gave you is that if you think it's

24   privileged, note that you're not sure if the

25   question implicates privileged information and

Page 9

B. WESTMAN

1

2   you would like to confer regarding that

3   specifically.

4        A.    Okay.

5        Q.    What did you do to prepare for today's

6   deposition?

7        A.    I reviewed documents, refreshed my

8   memory on several sets of documents, talked with

9   various individuals.

10        Q.    And who did you speak to?

11        A.    Spoke with people from FTI,

12   individuals from MoFo.

13        Q.    And who specifically at FTI did you

14   speak with?

15        A.    Anthony Milazzo.

16        Q.    And who from MoFo did you confer with?

17        A.    The individuals in this room.

18        Q.    And did you meet with MoFo and FTI

19   together or separately?

20        A.    Together.

21        Q.    And how long did you meet with them

22   for?

23        A.    Two days.

24        Q.    And when you said you reviewed

25   documents, were those documents that you

Page 10

B. WESTMAN

1    independently determined to review?

3        A.    They were mainly documents that MoFo

4    pulled together for review.

5        Q.    Were there any documents that you went

6    back to your files or the company records to

7    review?

8        A.    I did look at e-mails from my own

9    records.

10       Q.    And what were the topics of those

11   e-mails?

12       A.    Regarding various intercompany

13   schedules and information.

14       Q.    Were those intercompany schedules that

15   you prepared?

16       A.    I don't recall specifically.

17       Q.    And do you know if all of the e-mails

18   that you looked at have been produced in

19   connection with this litigation?

20       A.    I don't know.  I'm not aware of all

21   the materials that have been produced.

22       Q.    Do you know what the process was for

23   collecting and producing your materials in this

24   litigation?

25       A.    I know that my e-mails were produced.

Page 11

1                       B. WESTMAN

2   I don't know of the process to do that.

3       Q.    Did you assist counsel in obtaining

4   relevant materials or responsive materials from

5   your records?

6            MR. KERR:  Objection.

7       A.    Not from e-mails, but from other

8   documents that met some of the requests.

9       Q.    Did you keep a record of the specific

10  e-mails that you looked at to prepare for

11  today's deposition?

12      A.    I did not.

13           MS. MILLER:  I would like to mark --

14           And I'm going to go with "Westman

15      Exhibit No." for tracking purposes, does

16      that work?

17           MR. KERR:  That's fine.

18           MS. MILLER:   I would like to mark as

19      Westman Exhibit 1 the Ad Hoc Group of Junior

20      Secured Noteholders 30(b)(6) Notice in this

21      case.

22           (Westman Exhibit 1, Ad Hoc Group of

23      Junior Secured Noteholders 30(b)(6) Notice

24      of Deposition, marked for identification, as

25      of this date.)

Page 12

1                         B. WESTMAN

2    BY MS. MILLER:

3         Q.     Ms. Westman, the court reporter has

4    marked as Exhibit -- as Westman Exhibit 1 the Ad

5    Hoc Group of Junior Secured Noteholders Notice

6    of Rule 30(b)(6) Deposition, and beginning on

7    page 8 of that document, there are deposition

8    topics enumerated.  Do you see that?

9         A.     Yes.

10        Q.     And do you see that the first topic

11   states is, "All matters relating to the cash

12   management system and treasury management system

13   used by or amongst the Debtors and their

14   affiliates, including but not limited to the

15   daily movement of cash between Debtor entities

16   and the movement of cash in connection with

17   Intercompany Transactions"?

18        A.     Yes.

19        Q.     And do you understand that you've been

20   designated by the company as the corporate

21   representative on that topic?

22        A.     Yes.

23        Q.     And do you believe that you're the

24   person most knowledgeable within ResCap to speak

25   to that topic?

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 13 of 243

Page 13

1                        B. WESTMAN

2          A.     Yes.

3          Q.     And looking at topic number 2, it

4    reads, "All matters relating to Intercompany

5    Transactions and/or Intercompany Claims

6    including, but not limited to, (i) corporate

7    practices, policies, procedures, and guidelines,

8    including approvals concerning, including but

9    not limited to the accounting treatment of

10   Intercompany Claims and Intercompany

11   Transactions; (ii) the general nature of the

12   types of transactions that were recorded in the

13   Intercompany Accounts; (iii) whether interest

14   accrued and/or was paid on the Intercompany

15   Claims; (iv) corporate practices, policies,

16   procedures, guidelines and decisions to forgive,

17   cancel, settle and/or waive Intercompany Claims;

18   and (v) corporate practices, policies,

19   procedures, and guidelines for documenting

20   Intercompany Transactions and the location of

21   such documentation," and there are two

22   additional romanettes which I'll spare the court

23   reporter from typing because you weren't

24   designated as a representative on those.

25                    Do you understand that you were

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 14 of 243

Page 14

1                           B. WESTMAN

2      designated by the Debtors as a corporate

3      representative on topics 2 (i), (ii), (iii), and

4      (v)?

5           A.     Yes.

6           Q.     And do you believe that you're the

7      person most knowledgeable within the company

8      about those topics?

9           A.     Yes.

10          Q.     And topic number 3 is, "All matters

11     relating to the accounting and audit -- and/or

12     audit of the Debtors' financial statements on a

13     non-consolidated basis."  Do you see that?

14          A.     Yes.

15          Q.     And do you understand that you were

16     designated by the Debtors as the corporate

17     representative on that topic?

18          A.     Yes.

19          Q.     And do you believe that you're the

20     person most knowledgeable within the company

21     about that subject?

22          A.     Yes.

23          Q.     What's your educational background?

24          A.     I have a bachelor of business

25     administration with an emphasis in accounting.

Page 15

1                          B. WESTMAN

2        Q.    And where do you have that degree

3   from?

4        A.    The University of Wisconsin, Oshkosh.

5        Q.    Do you have any other degrees?

6        A.    No other degrees.  I have other

7   insurance or industry designations.

8        Q.    And what other insurance or industry

9   designations do you have?

10       A.    And HIA, Health Insurance Associate;

11   FLMA, a Fellow Life Management Associate; and

12   one other I don't recall the initials.

13       Q.    Are you a CPA?

14       A.    I am.

15       Q.    And when did you become a CPA?

16       A.    I took the exam in 1981.

17       Q.    And did you pass?

18       A.    I did pass.

19       Q.    I thought you were going to say you

20   then took it five more times.

21       A.    I took it once.

22       Q.    Good to hear.

23             You said that you have an HIA.  What

24   is that?

25       A.    It's a health insurance designation.

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 16 of 243

Page 16

<sup>1</sup>                          B. WESTMAN

<sup>2</sup>   At the time I worked in an insurance

<sup>3</sup>   organization.  It's an insurance designation.

<sup>4</sup>       Q.    And what is an insurance designation?

<sup>5</sup>       A.    It's a series of courses that you can

<sup>6</sup>   take to learn different terminology, processes,

<sup>7</sup>   et cetera, related to insurance.

<sup>8</sup>       Q.    And when did you graduate from

<sup>9</sup>   college?

<sup>10</sup>       A.    1981.

<sup>11</sup>       Q.    And where were you first employed when

<sup>12</sup>   you graduated from college?

<sup>13</sup>       A.    Sentry Insurance in Stevens Point,

<sup>14</sup>   Wisconsin.

<sup>15</sup>       Q.    And how long did you work at Sentry

<sup>16</sup>   Insurance?

<sup>17</sup>       A.    Five years.

<sup>18</sup>       Q.    And what was your position there?

<sup>19</sup>       A.    Internal audit.

<sup>20</sup>       Q.    And what were your responsibilities?

<sup>21</sup>       A.    I assisted in performing audits of

<sup>22</sup>   various divisions or branches or offices of the

<sup>23</sup>   organization.

<sup>24</sup>       Q.    And where did you work after Sentry

<sup>25</sup>   Insurance?

                        B. WESTMAN

1

2       A.      I moved to Minnesota and joined an

3   organization North American Life and Casualty,

4   which later changed its name to Allianz Life.

5       Q.      And what were your responsibilities --

6   or, what was your position at North American

7   Life and Casualty?

8       A.      I held several.

9       Q.      And what was your first position?

10      A.      Internal audit.

11      Q.      And how long were you an internal

12  auditor?

13      A.      I don't remember exactly.  Six months

14  to a year.

15      Q.      And what was your next position?

16      A.      I moved into several financial manager

17  positions.  I don't recall each of the titles.

18      Q.      What were your responsibilities in the

19  financial manager positions?

20      A.      For a time period I worked within the

21  Claims Department and Managed Claims.  I managed

22  financial claims audits.  I don't recall other

23  specifics while a manager.

24      Q.      And did you have any other positions

25  at North America Life and Casualty?

Page 18

B. WESTMAN

1

2    A.    Yes.  I also held several comptroller

3    and/or CFO positions for several divisions of

4    the organization.

5    Q.    And did you hold those comptroller and

6    CFO positions contemporaneous with your

7    financial manager positions?

8    A.    No, those were promotions.

9    Q.    Okay.  And so how long -- when did you

10   move into a comptroller position?

11   A.    I don't recall the date.

12   Q.    Do you remember approximately what

13   year?

14   A.    I don't.

15   Q.    Do you recall how long you were in

16   comptroller or CFO positions?

17   A.    Ten to fifteen years.

18   Q.    And how long were you at North America

19   Life in total?

20   A.    Twenty years.

21   Q.    And what were your responsibilities as

22   comptroller?

23   A.    They varied.  Generally, financial

24   analysis, managing budgets and expenses,

25   management reporting.

Page 19

B. WESTMAN

1

2       Q.    And when did -- where did you go after

3   North America Life and Casualty, which I guess

4   was Allianz Life at that time?

5       A.    I worked at a consulting firm Hudson

6   Financial.

7       Q.    And what kind of consulting does

8   Hudson Financial do?

9       A.    Financial, financial consulting for

10  businesses.

11      Q.    And who were your primary clients when

12  you were at Hudson Financial?

13      A.    My initial client was a non-profit

14  organization, ELCA Board of Pensions.

15      Q.    Did you have any subsequent clients?

16      A.    My next client was ResCap, Residential

17  Capital.

18      Q.    And what financial services did you

19  provide to ResCap?

20      A.    I was a member of the Financial

21  Control Team, so I worked on various projects

22  within that team.

23      Q.    And do you recall what year you

24  started working with ResCap?

25      A.    19 -- excuse me, 2007.

Page 20

B. WESTMAN

1

2    Q.    And what projects did you work on

3 within the Financial Control Team?

4    A.    I worked -- the main project that I

5 worked on was establishing process and

6 procedures for the Ally revolver facility.

7    Q.    Can you describe what the Ally

8 revolver facility that you're referring to is?

9    A.    It is the -- was a parent borrowing

10 from -- that ResCap borrowed from its parent

11 Ally and it was a funding facility.

12    Q.    And what processes and procedures had

13 to be put in place in connection with that

14 facility?

15    A.    Mainly, the tracking and monitoring of

16 the collateral that supported the facility.

17    Q.    And why did you have to track and

18 monitor the collateral that secured that

19 facility?

20    A.    We had required monthly reporting of

21 the collateral for that facility and produced

22 that monthly collateral report.

23    Q.    You said "we had required monthly

24 reporting".  Is that Hudson required ResCap to

25 provide the monthly reporting?

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 21 of 243

Page 21

B. WESTMAN

1

2    A.    I was working under the direction of

3 ResCap, so this was a ResCap funding facility

4 with its parent Ally.

5    Q.    So who required the monthly reporting

6 of collateral?

7    A.    Ally as part of the revolver facility.

8    Q.    And were there certain minimum or

9 maximum thresholds regarding net worth or

10 solvency that had to be demonstrated in

11 connection with that facility?

12         MR. KERR:   Objection.

13    A.    Not in connection with the monthly

14 reporting, but under the facility there were net

15 worth requirements.

16    Q.    And what were the net worth

17 requirements?

18    A.    There was a requirement for obligors

19 under that agreement to maintain a minimum net

20 worth or be in a solvent position.

21    Q.    And who were the obligors under that

22 agreement?

23    A.    There were -- there were a variety.

24 There were subsidiaries of ResCap.

25    Q.    Were all of ResCap's facilities

Plaintiff's
Objection
21:8-15
Objection to
form; vague
and
ambiguous

Page 22

1          B. WESTMAN

2    obligors under the facility?

3        A.    Not to my knowledge, no.

4        Q.    Did you track intercompany

5    transactions in connection with the monthly

6    reporting on that facility?

7        A.    No.

8        Q.    Did you track intercompanies for the

9    purpose of evaluating whether the obligors under

10   that facility maintained their minimum net worth

11   requirements?

12          MR. KERR:   Objection.

13       A.    An intercompany balance would have

14   been part of any balance sheet and would have

15   impacted their net worth.

16       Q.    What do you mean when you say "part of

17   their balance sheet"?

18       A.    Net worth is defined by the equity

19   within the individual entity, and intercompany

20   transactions were part of the balance sheet of

21   that entity; therefore, they impacted the

22   equity.

23       Q.    You say balance sheet, do you mean

24   assets and liabilities of the company?

25       A.    Yes.

Page 23

B. WESTMAN

1

2    Q.     And how long did you remain in a

3    consulting role for ResCap at Hudson Financial?

4    A.     I became an employee at ResCap in

5    2010.  I'm sorry, I -- I may have misspoke.  I

6    started with ResCap in 2008, March of 2008.

7    Q.     Did you -- sorry.

8    A.     I'm sorry.  I was a contractor from

9    2008 through 2010 and then was an employee.

10   Q.     And so you were technically employed

11   by Hudson Financial, but you were under contract

12   with ResCap?

13   A.     From 2008 until 2010, yes.

14   Q.     And did you work for any other clients

15   during that time?

16   A.     No.

17   Q.     And were your offices at ResCap?

18   A.     Yes.

19   Q.     And what was your position when you

20   transitioned to being an employee of ResCap in

21   2010?

22   A.     Senior director.

23   Q.     And what were your responsibilities as

24   senior director?

25   A.     I was responsible for financial

1                        B. WESTMAN

2    controls, which included continuing with the

3    Ally revolver and Ally line of credit funding

4    facility, reporting process; was also

5    responsible for Sarbanes-Oxley or SOx work for

6    ResCap, and also managed the -- responsible for

7    the general ledger functions within ResCap and a

8    change management function.

9         Q.    I didn't hear the last?  And a?

10        A.    A change management function.

11        Q.    What is a change management function?

12        A.    It was a process that ResCap had to

13   monitor significant events or transactions

14   within the company and ensure that that change

15   was implemented in a controlled manner.

16        Q.    Can you give me an example of a

17   significant event or transaction that would be

18   monitored?

19        A.    Could be entering into a sale

20   transaction, a new funding transaction, a

21   significant organizational change, anything that

22   may impact the financial statements.  It was

23   focused on impact to the financial statements.

24        Q.    Can you -- you said you had

25   responsibility for the general ledger function?

Plaintiff's
Objection
24:24-26:8
Incomplete
(FRE 106)

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman    Pg 25 of 243

Page 25

1                           B. WESTMAN

2       A.      Yes.

3       Q.      Can you describe how ResCap maintained

4    its general ledger?

5       A.      ResCap had one or more general ledger

6    systems at different periods of time and

7    transactions were entered into the general

8    ledger and a monthly close process would be

9    performed to produce trial balances and

10   financial statements on a monthly basis.

11      Q.      And was the general ledger maintained

12   on a consolidated basis?

13      A.      The general ledger was maintained for

14   each individual legal entity and then those

15   legal entities were consolidated.

16      Q.      And what were your responsibilities in

17   connection with the general ledger function?

18      A.      The team that managed the month-end

19   process reported to me, so ensuring that the

20   month-end -- that transactions were entered,

21   that the month-end was properly closed and

22   consolidated, and that we produced monthly trial

23   balances and financial statements in a timely

24   manner.

25      Q.      And were intercompany transactions

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 26 of 243

Page 26

1                     B. WESTMAN

2   recorded in the general ledger?

3        A.      Yes, they were.

4        Q.      And were there specific accounts that

5   intercompany transactions were recorded into?

6        A.      Yes.   Intercompany receivables and

7   payables were recorded in certain general ledger

8   accounts.

9        Q.      And do you recall which specific

10  intercompany accounts they would have been

11  recorded into?

12       A.      I do not.   There were many.

13       Q.      And you said intercompany receivables

14  and payables were recorded in certain general

15  ledger accounts.   Were there other intercompany

16  transactions that were recorded elsewhere?

17       A.      There would be other transactions that

18  were with two different entities.   For instance,

19  if an entity sold an asset to another entity,

20  each entity would have a gain -- one would have

21  a gain and one would have a loss.   Those would

22  be considered intercompany balances, but they

23  were not intercompany receivable payables.   They

24  were intercompany transactions that needed to be

25  monitored for financial statement purposes.

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 27 of 243

Page 27

1                    B. WESTMAN

2       Q.      And would those also be recorded in

3    the intercompany accounts?

4       A.      The gain and loss would not be

5    recorded in the intercompany

6    receivable/payables.   They would be recorded in

7    income statement accounts, for instance.   If

8    they generated an intercompany receivable or

9    payable, those would be recorded in the

10   intercompany accounts.

11      Q.      Can you give me an example of how they

12   would generate an intercompany receivable or

13   payable?

14      A.      Again, if one entity sold assets to

15   another entity, that the purchasing entity would

16   record that asset.   They may also record a gain

17   or a loss.   If they did not pay cash for those

18   assets, then they would record an intercompany

19   payable to the entity they purchased that from.

20           An entity that sold the assets would

21   have an intercompany receivable from the entity

22   purchasing the assets, and they would remove the

23   assets from their balance sheet and they would

24   also have the associated gain or loss.

25      Q.      And in your experience at ResCap, were

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 28 of 243

Page 28

1                         B. WESTMAN

2      sale transactions like that recorded as

3      intercompany receivables and payables when cash

4      was not transferred?

5           A.      Yes, they were.

6           Q.      Did you have any other positions other

7      than senior director at ResCap?

8           A.      No.

9           Q.      Is that your current position?

10          A.      I'm currently a senior director.   I am

11     also currently the comptroller.

12          Q.      And when did you become the

13     comptroller?

14          A.      February or March of this year.

15          Q.      Did your responsibilities change at

16     any time between joining ResCap as an employee

17     in 2010 and today?

18          A.      Yes, they changed earlier this year

19     when I also took over responsibility for --

20     larger responsibility for the month-end

21     financial statements and analysis of the

22     financial statements.   I also took over managing

23     the CFDR, which is a data repository.

24          Q.      What kind of data is maintained in the

25     CFDR?

Plaintiff's
Objection
28:9-14
Incomplete
(FRE 106)

Page 29

B. WESTMAN

1

2     A.    It tracks certain assets within the

3 organization and maintains asset-level detail

4 that will tie to the general ledger for certain

5 asset populations, and that data is also used as

6 an input into the revolver line of credit

7 reporting processes.

8     Q.    What do you mean by "asset

9 populations"?

10    A.    For instance, mortgage loans that

11 ResCap owns are maintained in CFDR.  Each

12 individual mortgage loan is listed within the

13 database.

14    Q.    Is there any information regarding

15 intercompany transactions in the CFDR?

16    A.    Not prior to bankruptcy, but

17 post-bankruptcy there may have been certain

18 intercompany balances that were maintained in

19 CFDR for intercompany balances with our parent

20 or other outside affiliates.

21    Q.    So there are no intercompany -- there

22 is no data relating to intercompany transactions

23 within the ResCap group in CFDR?

24         MR. KERR:  Objection.

25    A.    Correct.

Page 30

B. WESTMAN

1

2      Q.    I've been using the term intercompany

3  transactions.  Can you, just so that we're

4  clear, can you explain what your understanding

5  of an intercompany transaction is?

6          MR. KERR:  Are you asking for her to

7      explain your understanding of it or -- she's

8      been using "intercompany balances."

9          MS. MILLER:  Okay.

10     Q.    What is your understanding of an

11  intercompany transaction?

12     A.    An intercompany transaction would be,

13  as I explained earlier, when entities have

14  entered into a transaction with each other which

15  may generate various different types of

16  intercompany items within the general ledger.

17  One of those types might be intercompany

18  receivables or payable balances.

19     Q.    And what's an intercompany balance?

20     A.    An intercompany receivable or payable

21  is an entry within the general ledger that

22  represents a receivable from one entity and a

23  payable from another entity on a GAAP

24  perspective.

25     Q.    What's an intercompany balance?

Page 31

B. WESTMAN

2      MR. KERR:   Objection.   Asked and

3   answered.

4      A.     An intercompany balance is not a

5   defined term, to my knowledge.   I would use that

6   to indicate an intercompany receivable or

7   payable.

8      Q.     Would you use that to indicate the net

9   intercompany receivable or payable as a result

10   of aggregating all intercompany transactions?

11      A.     It could be used in that context.

12      Q.     Is that how you would use it?

13      A.     It depends what -- what I was talking

14   about, whether I was talking about individual

15   transactions or a listing of net balances of

16   intercompany transactions.   So it would depend

17   on the context or the source that I was looking

18   at.

19      Q.     I'm not trying to be difficult, but

20   your counsel indicated that you were using the

21   term "intercompany balance" as opposed to my use

22   of "intercompany transactions."   I'm just trying

23   to understand if there is a difference between

24   those in the way you would use those terms.

25         So let me just try one more time.   If

B. WESTMAN

2  you used the term "intercompany balance," what

3  would you be referring to?

4       MR. KERR:  Objection.  Asked and

5    answered.

6    A.    Generally, the intercompany

7  receivables and payables between the

8  organizations.

9    Q.    And you noted that ResCap had certain

10  intercompany balances between Ally and other

11  outside affiliates that are non-Debtors.  For

12  sake of clarity, unless I specify, when I refer

13  to "intercompany balances" or "intercompany

14  transactions" today, I'm going to be limiting my

15  questions to those intercompany -- those

16  intra-ResCap subsidiary and affiliate

17  intercompany balance -- intercompany

18  transactions or balances.

19    A.    Okay.

20    Q.    Ms. Westman, did there come a time

21  before ResCap filed for bankruptcy that you were

22  asked to collect information regarding the

23  intercompany balances?

24    A.    Yes.

25    Q.    And who asked you for that

Page 33

1                          B. WESTMAN

2    information?

3         A.    I believe it generally started with a

4    request from our parent for a project that they

5    were working on to review intercompany balances.

6         Q.    And when was that request made?

7         A.    In the fall of 2011.

8         Q.    And do you understand what the scope

9    of the review of intercompany balances was?

10        A.    Could you repeat the question?

11        Q.    Do you understand what the scope of

12   Ally's review of intercompany balances was?

13             MS. WU:   Objection.

14        A.    I knew generally what they were asking

15   us to review as part of that project.

16        Q.    And what were they asking you to

17   review?

18        A.    To review our intercompany balances

19   and compliance with their intercompany -- Global

20   Intercompany Policy.

21        Q.    Did you undertake that review?

22        A.    Yes.

23        Q.    And who assisted you with that review?

24        A.    Various members of the Finance Team

25   were involved in that --

Page 34

B. WESTMAN

1

2    Q.    And what --

3    A.    -- process.

4    Q.    What specifically did you do?

5    A.    We created lists of the various

6  intercompany receivables and payables among the

7  various entities, and we reviewed information

8  about those intercompany balances, determining

9  whether or not they had interest charged, if

10  they were settled, if there were agreements that

11  supported the balances.

12    Q.    And prior to this review, had you ever

13  looked into whether there were agreements that

14  supported the balances?

15       MR. KERR:  Objection.

16    A.    Not that I recall.  There may have

17  been an individual question throughout the

18  history of -- at ResCap, but not as a

19  consolidated project that I was aware of.

20    Q.    And have you ever before considered

21  whether interest was charged?

22    A.    Personally, no.

23    Q.    And upon your review, was it

24  determined that ResCap was in compliance with

25  the Global Intercompany Policy?

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 35 of 243

Page 35

B. WESTMAN

1

2   A.    Certain balances were in compliance

3   and certain balances were not.

4   Q.    And what about -- what did compliance

5   require?

6         MR. KERR:  Objection.

7         MS. WU:  Objection.

8   A.    Generally, that they were

9   cash-settled, the items that I mentioned that

10  were in the policy.

11        MS. MILLER:  I apologize.  Given the

12  volume of documents produced last week --

13        MR. KERR:  No.  No.  No.  Take your

14  time.

15        MS. MILLER:  -- they're not in the

16  best order.

17        I'd like to mark as Westman Exhibit 2

18  a document that was marked for production

19  RCJSN1004 through -- no, 10041452 through

20  1455, with its attachments.

21        (Westman Exhibit 2, a document with

22  attachments bearing Bates Nos. RCJSN10041452

23  through 1455, marked for identification, as

24  of this date.)

25  BY MS. MILLER:

Plaintiff's
Objection
35:17-36:7
Lack of
foundation
(FRE 602, 901,
903);
incomplete
(FRE 106)

Page 36

1          B. WESTMAN

2     Q.    Ms. Westman, I have marked as Exhibit

3  2 an e-mail from you, a chain of e-mails, the

4  top one of which is an e-mail from you to Stan

5  Venne and Jacob Bazella dated 9/10/11, with the

6  subject Intercompany Files.   Do you see that?

7     A.    Yes.

8     Q.    Do you recall this document?

9     A.    Generally, yes.

10    Q.    And does this document relate to the

11  review of intercompanies that you conducted in

12  the fall of 2011 to determine whether ResCap's

13  intercompanies were in compliance with Ally's

14  Global Policy?

15    A.    Yes, this would have been in the early

16  stages of that project.

17    Q.    In bullet 2 or the numbered 2 in the

18  text of your e-mail, you state in the last

19  sentence of the first paragraph, "If the balance

20  just changes because we push cash up and down

21  the food chain, that needs to go in the

22  exception category."   What are you referring to?

23    A.    Let me read the document.

24    Q.    Sure.

25          (Document review.)

Page 37

B. WESTMAN

1

2    A.    What that's referring to is the

3 categorization of intercompany balances within

4 the document.  Again, this was an early working

5 version and there were balances that indicated

6 that they settled, but in fact I believed they

7 belonged down in Section 4, where they were

8 actually part of our cash management process

9 where cash was moved between entities, and so I

10 was asking Stan to move them to the other

11 category.

12    Q.    Can you describe the cash management

13 system in place at ResCap at this time?

14    A.    The cash management process generally

15 referred to the aggregation of cash within

16 ResCap so that it could be most efficiently used

17 for any entity within the organization that

18 required cash.

19    Q.    And where was the cash aggregated?

20    A.    The cash generally was aggregated up

21 to the ResCap level for distribution back down

22 to those subsidiaries that would require it.  It

23 was held in different accounts within the

24 organization but generally brought up to the top

25 level, as needed.

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Barbara Westman   Pg 38 of 243

Page 38

1                          B. WESTMAN

2        Q.     So if, for example, Homecomings

3   Financial, LLC generated cash, how did that cash

4   move?

5        A.     It could have moved a variety of ways.

6   That cash could have moved directly to ResCap.

7   It could have moved to RFC, its parent.   There

8   was not necessarily a standard way that would

9   occur.   It depended on the transaction, time

10  period, et cetera.

11       Q.     And if it got moved up to RFC, would

12  it then get swept up the next level to ResCap in

13  an aggregating account?

14       A.     It could, unless RFC needed the cash.

15  It could be swept to RFC to be used by RFC.   If

16  it wasn't needed by RFC, it may have been swept

17  up to ResCap to be used by another entity.

18       Q.     And did subsidiaries or individual

19  entities within the ResCap family make their own

20  disbursements?

21           MR. KERR:   Objection.

22       A.     Could you rephrase the question?

23       Q.     Did ResCap's subsidiaries have their

24  own accounts from which disbursements were made

25  on their behalf?

Plaintiff's Objection 38:18-22: objection to form; vague and ambiguous

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 39 of 243

Page 39

1                           B. WESTMAN

2        A.    Certain subsidiaries had accounts

3   where they would make disbursements.  Not every

4   subsidiary had those types of accounts.

5        Q.    Do you recall which subsidiaries had

6   disbursement accounts?

7        A.    I don't recall offhand.  GMAC Mortgage

8   and RFC would have made disbursements.  Beyond

9   those entities, I don't recall which other

10  individual subsidiaries.

11       Q.    Do you know whether there were other

12  individual subsidiaries that had their own

13  disbursement accounts?

14       A.    Yes, I believe there were.

15       Q.    And were those accounts held in the

16  name of, in the case of GMAC Mortgage, GMAC

17  Mortgage?

18       A.    Yes, if it was GMAC Mortgage's account

19  on GMAC Mortgage's balance sheet, it should be

20  in the name of GMAC Mortgage.

21       Q.    And were there instances where ResCap

22  would make disbursements on behalf of RFC?

23       A.    It could have occurred.

24       Q.    And if it did occur, how would it be

25  recorded in the books and records?

Plaintiff's
Objection
39:24-40:7,
lack of
personal
knowledge
(FRE 602);
impermissible
lay opinion

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 40 of 243

Page 40

1                    B. WESTMAN

2           MR. KERR:   Objection.

3      A.    If ResCap made a disbursement on

4  behalf of RFC, it would have recorded an

5  intercompany transaction that RFC had a payable

6  to ResCap for that disbursement ResCap made on

7  its behalf.

8      Q.    And would that be recorded in an

9  intercompany account?

10     A.    Yes, that payable balance would be

11 recorded in an intercompany account.

12     Q.    Do you know if Homecomings Financial

13 had its own disbursement account?

14     A.    I don't recall.

15     Q.    Do you know whether RFC Asset Holdings

16 II, LLC had its own disbursement account?

17     A.    I don't know.

18     Q.    Who would know?

19     A.    Over different time periods, that

20 would be different individuals.   I'm not sure

21 there is anyone left in the organization that

22 would have that entire historical perspective.

23     Q.    Would anyone in the company know as of

24 the fall of 2011?

25     A.    Someone in the company may be able to

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 41 of 243

Page 41

1                          B. WESTMAN

2       look at records to determine that.

3            Q.      Have you looked at those records?

4            A.      I have not.

5            Q.      How frequently was cash swept up to

6       the parent entity in the cash management

7       process?

8            A.      Cash could be moved daily.

9            Q.      Was the cash management process

10      formalized in a policy?

11           A.      It was not formally documented.  It

12      was generally due to a requirement under the

13      Ally line of Credit Agreement as to what cash

14      ResCap could maintain.

15           Q.      Was there any assessment of the amount

16      of cash that ResCap could maintain under the

17      Ally line of Credit Agreement when the daily

18      sweep occurred?

19           A.      Yes.  That had to be forecasted on a

20      daily basis to make ensure that we met the

21      requirements of that agreement.

22           Q.      How was it determined which account --

23      which amounts would be swept?

24           A.      I don't know the specific process, but

25      there was a forecasting process and cash -- the

Page 42

1                          B. WESTMAN

2    Treasury Department managed those cash balances

3    so would know what cash was available and could

4    calculate -- calculate that cash and determine

5    what was required to be repaid or what borrowing

6    might need to occur to meet the cash needs.

7    There was a cash forecasting process.

8         Q.    And who was responsible for the cash

9    forecasting process?

10        A.    The Treasury Department.

11        Q.    And who specifically within the

12   Treasury Department?

13        A.    It was different over different

14   periods of time.

15        Q.    In the fall of 2011, who was

16   responsible for it?

17        A.    I don't recall specifically.  Most

18   likely was Joe Ruhlin, but I'm not positive of

19   the dates that he was the ResCap treasurer.

20        Q.    And who -- do you know who had that

21   position before Joe?

22        A.    I don't know the exact individual.  I

23   know individuals within Treasury.

24        Q.    And do you know if it was Treasury's

25   responsibility to effectuate the sweeps?

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 43 of 243

Page  43

1              B.  WESTMAN

2        A.      Yes, it was.

3        Q.      Would you describe it as an automated

4   process?

5        A.      No, I don't believe it was necessarily

6   automated.   It was performed by implementing

7   various wire transfers, performing calculations,

8   doing wire transfers of money.

9        Q.      How are the sweeps documented?

10        A.      The wire transfer transactions would

11   be performed.   Those would create journal

12   entries within the general ledger.   They would

13   also be documented within the various bank

14   accounts and bank statements.

15        Q.      Would they also result in intercompany

16   payables and receivables being booked in the

17   intercompany accounts?

18        A.      Yes, they would.

19        Q.      Were these -- were these cash

20   management sweeps done in the ordinary course on

21   a daily basis?

22        A.      Yes.

23        Q.      And other than the wire transfers and

24   bank account records and entries in the general

25   ledger, was there any formal documentation of

Plaintiff's
Objection
43:9-22
Incomplete
(FRE 106)

Page 44

1              B. WESTMAN

2    those transactions?

3              MR. KERR:  Objection.

4       A.    That would be the formal documentation

5    of those transactions.

6       Q.    So the fact that the transaction

7    happened was recorded?

8       A.    Correct.

9       Q.    Was there any documentation of a

10   request that the transfer happen?

11      A.    There would have been an approval

12   process for performing a wire transfer, so there

13   would be documents that were created to generate

14   that cash movement.

15      Q.    How was an equity contribution from a

16   parent to a subsidiary recorded in the general

17   ledger?

18      A.    It would be recorded as additional

19   paid-in capital for the subsidiary.

20      Q.    And during your time at ResCap, were

21   there instances where such capital contributions

22   were made from parent to subsidiaries?

23      A.    There may have been.  I don't

24   specifically recall an instance.

25      Q.    And would those have been recorded in

1                       B.  WESTMAN

2      the intercompany accounts receivable and

3      payable?

4           A.     They would not.

5           Q.     And what if a subsidiary wanted to

6      provide a dividend or a distribution to a parent

7      entity, how would that be reflected in the

8      general ledger?

9           A.     It would be a reduction of paid-in

10     capital from the subsidiary.   They would be

11     returning paid-in capital or returning retained

12     earnings.  So it would be recorded as an equity

13     transaction.

14          Q.     And would that be recorded in the

15     intercompany accounts payable and receivable in

16     the general ledger?

17          A.     It would not assuming cash and that it

18     was an actual cash contribution or cash

19     distribution back to the parent.

20          Q.     And who determined whether a

21     transaction should be accounted for in an

22     intercompany accounts payable or a receivable as

23     opposed to a capital account?

24          A.      Intercompany payables and receivables

25     happened in the normal course of business.  A

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 46 of 243

Page 46

1                        B. WESTMAN

2    capital contribution or a dividend would have

3    been something that had to be declared by the

4    board of those entities and would have been a

5    specific type of transaction.

6         Q.    And based on your review of the

7    intercompany transactions that occurred within

8    the ResCap group, would you say that they're --

9    are they consistent with -- strike that.

10             Did intercompany transactions require

11   specific board approval?

12        A.    Generating an intercompany receivable

13   or payable did not.

14        Q.    Okay.   I'd like to go back to the

15   document that we marked Westman 2, and with that

16   context, hopefully I can understand it.

17             Focusing now on bullet 4, which you

18   referenced earlier, which is titled "Tab for the

19   Cash Management exception request," what is the

20   cash management exception request?

21        A.    As part of the certification process

22   to Ally that I mentioned, we reviewed the cash

23   management function with Ally to determine if

24   they would agree that that met the requirements

25   of the accounting policy, and they did in fact

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 47 of 243

Page 47

1                        B. WESTMAN

2    agree that that activity or process was in

3    compliance with their policy.

4        Q.    And what was their policy?

5        A.    The policy generally discussed that

6    transactions would be settled on a regular

7    basis, and we determined that due to the

8    functions of the cash management process, that

9    that would meet the requirement, did not need to

10   be fully cash-settled, which would be

11   counterintuitive to the cash management process.

12       Q.    Can you explain what you mean by "that

13   would be counterintuitive to the cash management

14   process"?

15       A.    The intercompany receivables or

16   payables are created by moving cash up to the

17   parent in order to use that cash or use that

18   cash to pay down the line of credit.  You

19   couldn't, therefore, also give the cash back to

20   settle that intercompany.

21            That cash up or down could happen on a

22   regular basis, so cash would move either

23   direction depending on the needs of the

24   organization.

25       Q.    I'd like to -- if you could turn to

Page 48

B. WESTMAN

2  the first exhibit, which is Bates-stamped

3  RCJSN10041456, which every page has the same

4  Bates number, which makes me believe that it was

5  produced in native format and, unfortunately,

6  the printing is not the easiest to follow, but

7  hopefully we can work through it.

8          I think the way it works, and you can

9  correct me if I'm wrong, is that the table runs

10  across the first page and the back of that page,

11  and then the next table starts with the columns

12  to the right are printing out on the reverse

13  page.

14      A.    Okay.

15      Q.    So, turning to what is the second tab

16  in the spreadsheet on the page titled

17  "Intercompany Relationships that have Cash

18  Movement," what do you mean -- or, sorry, let me

19  step back.  Do you recognize this spreadsheet?

20      A.    I do.  It's a working copy of a

21  document that ultimately became our -- part of

22  our certification.

23      Q.    And is it a document that you

24  prepared?

25      A.    I did not prepare it myself, but I

Page 49

1                          B. WESTMAN

2    reviewed it.

3        Q.    And did you assist in the preparation?

4        A.    I made comments, et cetera, but didn't

5    make any -- make those changes to the document,

6    to my knowledge.

7        Q.    Focusing on the second page, which is

8    the tab of the spreadsheet titled "Intercompany

9    Relationships that have Cash Movement," do you

10   know what's meant by "cash movement"?

11       A.    I don't specifically since this was a

12   working version.  To my recollection, these

13   would have been balances where we were seeing

14   activity in the general ledger continuing to

15   occur.

16       Q.    And how is that distinct from

17   intercompany relationships that cash-settled?

18       A.    I believe that -- excuse me.  Let me

19   review a minute.

20             I don't specifically recall the

21   distinction in these two tabs.

22       Q.    So do you know what "Intercompany

23   Relationships that have Netting Position

24   Agreements" is referring to?

25       A.    Intercompany positions that have

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 50 of 243

Page 50

B. WESTMAN

1   relationships that have netting position

2   agreements, these were generally derivatives or

3   other arrangements where cash would be moved

4   between entities in relation to a particular

5   agreement that required that cash.

6       Q.    And if you turn to the second

7   attachment, which is Bates-stamped

8   RCJSN10041457, it says "Intercompany

9   Relationship" -- it's titled "Intercompany

10  Relationships that Do Not Settle."  What are --

11  what's your understanding of what intercompany

12  relationships that do not settle are?

13      A.    These were transactions that were not

14  having any type of a cash payment made

15  associated with them to reduce the balance.

16      Q.    Was cash being exchanged to generate

17  the balance?

18      A.    Cash may have been exchanged to

19  generate the balance depending on the type of

20  transaction.

21      Q.    So in the Account Description column,

22  I note that some of the entries are -- some of

23  the account descriptions are designated

24  intra-company payable and some are interco

B. WESTMAN

1

2   payable.  Do you have an understanding of what

3   that distinction is?

4       A.    I don't believe there is a

5   distinction.  In some instances, that may have

6   been an account description that came directly

7   from the ledger, and in others it may have been

8   something that an individual typed in to

9   describe the balance, depending on the

10  particular line item.

11      Q.    And so that's not an attempt to

12  distinguish between intra-ResCap intercompanies

13  and ResCap/Ally intercompanies?

14      A.    No.

15      Q.    And if you turn to the third page of

16  the exhibit, which is, if I'm following the

17  spreadsheet properly, actually the continuation

18  of the first page, the columns that would

19  continue to the right of the first page, and for

20  a number of them there the Action Proposal is

21  Cash Management Exception.

22          Does that mean that ResCap was to

23  request from Ally that these accounts not be

24  settled; that Ally not require that these

25  accounts be settled on a regular basis but

Page 52

1                         B. WESTMAN

2       instead be subject to a cash management process

3       exception that you described earlier?

4           A.    Correct.

5               MS. MILLER:  I'd like to mark as

6       Westman Exhibit 3 a document that was

7       Bates-stamped for identification

8       RCJSN10041500 through 502.

9               (Westman Exhibit 3, a document bearing

10      Bates Nos. RCJSN10041500 through 502, marked

11      for identification, as of this date.)

12              (Document review.)

13      BY MS. MILLER:

14          Q.    Ms. Westman, I marked as Westman

15      Exhibit 3 an e-mail chain, the top one of which

16      is from Brooke Jeffress to -- I'm not going to

17      do this properly -- Kwab Gyasi-twum and Stan

18      Venne, dated 9/12/11, and the subject is Cash

19      Management Policy, and you're copied on this

20      e-mail.  Do you see that?

21          A.    Yes.

22          Q.    And does this e-mail relate to the

23      analysis that you were undertaking in the fall

24      of 2011 to determine whether ResCap's

25      intercompanies complied with Ally's Global

Page 53

                         B. WESTMAN

1

2   Policy?

3       A.    I'm sorry.  Could you repeat the

4   question?

5       Q.    Yes.  I'll say it more succinctly.

6             Does this -- does this e-mail relate

7   to the same analysis that was being conducted in

8   the e-mail chain that was marked as Westman 2

9   that we were just discussing?

10      A.    Yes.

11      Q.    And do you recall this e-mail?

12      A.    Yes.

13      Q.    And if you were CC'd on an e-mail like

14  this, would it be your general practice to read

15  it?

16      A.    Generally, yes.

17      Q.    And if you were CC'd on a chain that

18  was not -- that you were not included on

19  initially in a subsequent correspondence, would

20  you generally go down and read the original

21  e-mails in the chain?

22      A.    It would depend on the topic and

23  whether it was relevant.

24      Q.    You were specifically involved in this

25  project, correct?

Page 54

B. WESTMAN

1

2      A.      Correct.

3      Q.      The first e-mail in this chain is an

4  e-mail dated September 12, 2011 between -- from

5  Mr. Venne to Mr. Gyasi-twum and in which he

6  notes --

7              First of all, who is Mr. Venne?

8      A.      He was on the General Ledger Team.  He

9  was one of the individuals that was working on

10  creating an inventory of the intercompany

11  balances.

12      Q.      So he was a ResCap employee?

13      A.      Yes.

14      Q.      And who is Mr. Gyasi-twum?

15      A.      He was within the Treasury Department.

16      Q.      And was he also a ResCap employee?

17      A.      Yes, he worked for ResCap.  He may

18  have -- excuse me.  Treasury was a centralized

19  function, so he may have been an Ally employee

20  who was responsible for ResCap.

21      Q.      So that's why he has an Ally title and

22  an Ally e-mail address?

23              MR. KERR:  Objection.

24      Q.      So in that first e-mail, Mr. --

25              MR. KERR:  Are you at the bottom of

Page 55

1                        B. WESTMAN

2        the chain?

3               MS. MILLER:  I'm at the bottom of the

4        chain, the first chronologically, the 10:48

5        e-mail of September 12 from Mr. Venne to Mr.

6        Gyasi-twum.

7    BY MS. MILLER:

8        Q.    And do you see that Mr. Venne states

9    that, in the second sentence, "We have a number

10   of intercompany relationships within ResCap (RFC

11   and Resi) that do not cash settle and the

12   balance continues to grow"?

13       A.    Yes.

14       Q.    Do you believe that that was an

15   accurate statement?

16       A.    Yes.

17       Q.    And just for clarity, what entity is

18   "Resi" referring to?

19       A.    In this context, I believe "Resi" may

20   mean GMAC Mortgage, but it can be used to mean

21   GMAC Mortgage or GMAC Residential Holding,

22   Mortgage's parent.

23       Q.    So "Resi" can be -- can be referring

24   to either GMAC Residential Holding or GMAC

25   Mortgage?

Page 56

1                     B. WESTMAN

2        A.     Depending on the individual.

3        Q.     Good way to confuse things.

4               But you believe here it's referring to

5    GMAC Mortgage?

6        A.     That would be my belief, yes.

7        Q.     So I'm going to ask you now, just

8    because it seems like everything is up in the

9    air, to confirm what is "RFC" referring to?

10       A.     Residential Funding Company.

11       Q.     Okay.  Is that one consistently used

12   throughout the organization?

13       A.     Should be, yes.

14       Q.     And Mr. Venne then continues, "Many of

15   these relationships seem to be created by cash

16   movement."  And do you agree with that

17   statement?

18       A.     I'm not sure what he's basing that on

19   so I guess I can't opine on that.

20       Q.     Is it your understanding that many of

21   the intercompany relationships between RFC and

22   Resi are created by cash movement?

23       A.     That is -- that is a way that balances

24   can be created, yes.

25       Q.     Have you ever looked at the

Page 57

1                         B. WESTMAN

2    intercompany balances and how they arose?

3        A.    We've reviewed intercompany balances,

4    but there are thousands of transactions.

5        Q.    And are the majority of those

6    transactions cash movement through the cash

7    management process?

8        A.    I couldn't say.

9        Q.    Any reason to believe that the

10   majority of those transactions are not generated

11   through the movement of cash through the cash

12   management process?

13       A.    They can be created for many different

14   processes.  They can be generated from the lack

15   of movement of cash rather than the movement of

16   cash.

17       Q.    Can you explain how an intercompany

18   receivable or payable can be generated through a

19   lack of movement of cash?

20       A.    If one entity pays an expense for

21   another entity and it'll create a receivable

22   from that entity that it paid that expense on

23   behalf of.  It didn't actually exchange cash

24   with that entity.  The reason it has an

25   intercompany is because it did not exchange

Page 58

1                           B. WESTMAN
2          cash.
3          Q.    And so the payment, for example, of --
4     by RFC on behalf of RFC Asset Holdings -- sorry.
5     Strike that.
6              Would you consider the payment of an
7     obligation of RFC Asset Holdings II, LLC by Res
8     Funding Company to be a movement of cash --
9              MR. KERR:  Objection.
10         Q.    -- within the intercompany accounts?
11         A.    Could you repeat the question?
12         Q.    Yes.
13             Would the payment of an expense on
14    behalf of a subsidiary be part of the cash
15    management process?
16         A.    I wouldn't necessarily put that in the
17    cash management process, but it's not -- it's
18    not a specific definition for the process.
19         Q.    Well, if, for example, Homecomings'
20    cash is swept on a daily basis up to RFC, is
21    there an -- is there an alternative method other
22    than through the cash management process that
23    Homecomings could satisfy any of its financial
24    obligations?
25             MR. KAUFMAN:  Object to form.

1                           B. WESTMAN

2              MR. KERR:   Objection.

3         A.    If Homecomings kept cash and

4    maintained cash, it may pay its own obligations

5    and excess cash may be swept.   I'm not familiar

6    with how Homecomings' payments were made.

7         Q.    Just so I'm clear, when you refer to

8    the cash management process, are you referring

9    only to the maintenance of certain cash balances

10   within the ResCap group and the movement of

11   money to accomplish those balances?

12        A.    I would generally be referring to the

13   process where cash was aggregated for use within

14   the organization in conjunction with the line of

15   credit.

16        Q.    But you would not consider the use of

17   that cash that has been aggregated to also fall

18   within the cash management process?

19             MR. KERR:   Objection.

20        A.    It could.   I did not think of it that

21   way, but the cash management process is not a

22   set, defined process.   It's an explanation of a

23   cash-sweeping process.

24        Q.    Do you know when the cash-sweeping

25   process was first put in place within ResCap?

Page 60

1                    B. WESTMAN

2        A.    To my knowledge, associated with the

3   line of credit, the requirement came into

4   effect.  I'm not familiar with the process prior

5   to that.

6        Q.    And when was the line of credit

7   entered into?

8        A.    November of 2008.

9        Q.    And was establishing the cash-sweeping

10  process part of your responsibilities as a

11  consultant when you were working for ResCap at

12  Hudson Financial?

13       A.    No, that was a Treasury function.

14       Q.    And did you work with Treasury on

15  developing that system?

16       A.    No.

17       Q.    While you were at Hudson Financial

18  working as a contractor for ResCap, were you

19  advised of the cash-sweeping process that was

20  being put in place?

21       A.    I was generally aware of it.  I was

22  not advised on it.

23       Q.    And how did you become generally aware

24  of it?

25       A.    Because I was involved in other

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 61 of 243

Page 61

1                    B. WESTMAN

2   functions or other processes within the line of

3   credit so had a general knowledge of the

4   agreement and the processes within the

5   organization, and also, due to work on

6   Sarbanes-Oxley, may have been aware of various

7   process.

8       Q.    Have you ever had any responsibility

9   for monitoring the cash management process

10  within the company?

11      A.    No.

12           MR. KERR:  Atara, we've been going an

13       hour and a half, so whenever a good time to

14       take a break or whatever.

15           MS. MILLER:  Let me finish with this

16       document.

17           MR. KERR:  That's fine.

18           MS. MILLER:  And we'll take a break.

19  BY MS. MILLER:

20      Q.    Does ResCap still have a cash

21  management process in place?

22      A.    Yes, it has a form of a cash

23  management process in place.

24      Q.    And is it substantially different from

25  the cash management that was in place

Page 62

1                          B. WESTMAN

2    prepetition?

3         A.    Yes, in that ResCap no longer borrows

4    or pays back to the line of credit so that

5    process is not in place anymore.

6         Q.    Are subsidiary accounts swept daily up

7    to the parent entity?

8         A.    They are.   Generally, there is a sweep

9    process so that cash can be aggregated in

10   various concentration accounts.

11        Q.    And who's responsible for overseeing

12   that process?

13        A.    Treasury.

14        Q.    And who in Treasury?

15        A.    Paul Grande.

16        Q.    And was Mr. Grande employed by ResCap

17   prepetition?

18        A.    He was, but he was not within

19   Treasury.

20        Q.    Looking back at the first e-mail in

21   the chain, first chronological e-mail in the

22   chain in Westman 3, Mr. Venne states toward the

23   middle of the paragraph, "With this cash

24   management strategy in place, Barb Westman is

25   suggesting that we write this up as an exception

Page 63

B. WESTMAN

1

2  to the Ally policy for cash settlement."

3          Was there ever a formal write-up

4  submitted to Ally?

5      A.    There was not to my recollection, no.

6      Q.    Was there ever a formal write-up of

7  the exception that was prepared for your review?

8      A.    I don't recall if there was a formal

9  write-up of the exception.  It was generally

10  discussed through meetings and it was documented

11  in our final results of what were sent to Ally.

12      Q.    What form did the final results that

13  you submitted to Ally take?

14      A.    There was a document similar to what

15  we looked at before, a final version of the

16  spreadsheet within Exhibit 2.

17      Q.    Do you know when the final spreadsheet

18  was submitted to Ally?

19      A.    Sometime in the first quarter of 2012.

20      Q.    And how many meetings did you have

21  with Ally to discuss the cash management

22  exception?

23      A.    I don't recall.

24      Q.    Do you recall having more than one

25  meeting?

Page 64

1                        B. WESTMAN

2       A.     Yes.

3       Q.     More than five meetings?

4       A.     The meetings were generally to discuss

5  the intercompany project.  I don't recall on how

6  many occasions we would have discussed the cash

7  management process.

8       Q.     And how frequently did you meet to

9  discuss the intercompany process, generally?

10      A.     I don't recall specifically.

11      Q.     Were there regular meetings scheduled?

12      A.     I don't believe they were weekly, but

13 they were ongoing.

14      Q.     Did you generally participate in those

15 meetings?

16      A.     Generally, yes.

17      Q.     And were those meetings held in

18 person?

19      A.     They were via conference call.

20      Q.     And what did you tell Ally regarding

21 the cash management strategy that ResCap had in

22 place?

23      A.     We discussed the aggregation of cash

24 to meet the requirements under the line of

25 credit and how that created or involved the

Page 65

B. WESTMAN

1  various intercompany balances.

2      Q.    And did Ally ask any questions about

3  the cash management exception?

4      A.    I don't recall.

5      Q.    Do you recall having any discussions

6  other than beyond -- sorry.  Strike that.

7          Do you recall having any discussions

8  beyond describing the cash management process

9  and requesting an exception about the

10  intercompany balances that don't settle?

11      MR. KERR:  Objection.

12      A.    I don't recall the specific

13  discussions.

14      Q.    And there's a question in here.  The

15  next line says, "Do you have anything written up

16  that shows this as a company policy or do you

17  have a list of guidelines/process that is

18  followed to maintain a certain cash position?"

19          I know you have said there's no

20  policy, but are there guidelines or processes

21  regarding the cash management process that

22  exists within ResCap?

23      A.    I believe Kwab answered that and

24  indicated that there generally are not.

Page 66

1              B. WESTMAN

2      Q.    And is that consistent with your

3   understanding?

4      A.    It's consistent with my reading of his

5   response and my understanding at the time.

6      Q.    Do you have a different understanding

7   sitting here today?

8      A.    No.

9           MS. MILLER:  Okay.  I think we can

10      take a break now.

11          MR. KERR:  Good time?  Okay.

12          THE VIDEOGRAPHER:  The time is 11:42,

13      this is the end of tape labeled number 1.

14      We're going off the record.

15          (Recess.)

16          THE VIDEOGRAPHER:  This is the start

17      of tape label number 2.  The time is 11:58.

18      We're back on the record.

19   BY MS. MILLER:

20      Q.    Ms. Westman, did you speak or meet

21   with anyone within Treasury in connection with

22   preparing for your deposition today?

23      A.    No.

24      Q.    So, looking one e-mail up the chain in

25   the document that was marked Westman Exhibit 3

Page 67

B. WESTMAN

1   to the e-mail from Mr. Gyasi-twum to Mr. Venne,

2   time-stamped 12:06 P.M., responding to the

3   e-mail we were just talking about, Mr.

4   Gyasi-twum says in the first bullet,

5   "Intercompany transactions - I believe these do

6   involve cash movement (i.e., there's daily cash

7   movement between Mortgage and ResCap)."

8        Do you believe that the intercompany

9   transactions involve cash movement between

10  Mortgage and ResCap?

11       A.    Intercompany transactions can include

12  cash management -- cash movement between

13  entities.

14       Q.    Do you believe that the intercompany

15  balances that you were reviewing in connection

16  with this review in the fall of 2011 that Mr.

17  Gyasi-twum is referring to in fact do involve

18  cash movement between Mortgage and ResCap?

19       A.    I can't speak specifically between

20  Mortgage and ResCap, but intercompany

21  transactions can include cash movement.

22       Q.    And looking up at the first e-mail,

23  the last chronologically but the one at the top

24  of the page from 5:03 P.M. from Ms. Jeffress to

B. WESTMAN

1  Mr. Gyasi-twum -- sorry, just going back down to

2  the second e-mail that we were looking at, Mr.

3  Gyasi-twum then says, "Brooke, please validate

4  our process for the intercompany settlements,"

5  and then at the top of this page, Brooke then

6  replies and states, "Intercompany transactions

7  between Mortgage and ResCap represent daily

8  paydowns/advances which support Mortgage's need

9  for cash to fund outgoing cash obligations or

10 concentrate Mortgage's excess cash for the

11 parent which is ultimately used to pay down the

12 outstanding balance on the LOC."

13       Is that an accurate description of the

14 intercompany transactions between Mortgage and

15 ResCap that were being reviewed?

16       MR. KERR:  Objection.

17    A.    That can be one of the reasons or one

18 of the items that creates intercompany

19 transactions.  It can be created for many

20 different reasons.

21    Q.    If you believed that the

22 intercompanies that were being considered in

23 this review process represented something other

24 than what Mr. Gyasi-twum and Ms. Jeffress were

Page 69

1                          B. WESTMAN

2    saying, would you have responded and said so?

3         A.    I understood the context of how they

4    were responding to our question here, so I

5    didn't have any follow-up questions.

6         Q.    And did you have any reason to doubt

7    that what they were saying was accurate?

8         A.    I didn't take that to be an

9    all-inclusive statement speaking to all of the

10   intercompany transactions.  They were responding

11   to our request about information about cash

12   movement.

13        Q.    And where do you see the request that

14   was made to them?

15        A.    The context of the request was to

16   determine whether they had any documentation

17   that we could use that described the cash

18   movement process, and the response was they did

19   not, other than our general knowledge that it

20   was done in conjunction with the line of credit.

21        Q.    And they also confirmed that in fact

22   the intercompanies were related to the cash

23   movement under the cash management process?

24             MR. KERR:  Objection.

25        A.    I don't believe that's what they were

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 70 of 243

Page 70

B. WESTMAN

1

2  stating.  They were stating that that is an

3  activity that can occur.

4          MS. MILLER:  I would like to mark as

5  Westman Exhibit 4 a document that's been

6  marked for identification --

7          I'm sorry, the printing looks weird.

8  It's okay.  A document that's been marked

9  for identification in this case

10  RCJSN10037951 with two attachments.

11          (Westman Exhibit 4, a document, with

12  attachments, bearing Bates No.

13  RCJSN10037951, marked for identification, as

14  of this date.)

15          (Document review.)

16  BY MS. MILLER:

17    Q.    Ms. Westman, I have mark as Westman

18  Exhibit 4 an e-mail from you to MaryLou Lee and

19  a number of other people dated 11/15/11, with

20  the subject line "ResCap intercompany

21  information," attaching a Word document and an

22  Excel spreadsheet.  Do you see that?

23    A.    Yes.

24    Q.    Do you recognize this document?

25    A.    I don't specifically recall it, no.

Plaintiff's Objection 70:4-23 Lack of foundation (FRE 602, 901, 903); incomplete (FRE 106)

Page 71

B. WESTMAN

1

2   Q.    Do you recall sending materials to

3   Ally in advance of your meetings regarding the

4   intercompany balance project?

5   A.    I'm sorry, could you repeat the

6   question?

7   Q.    Do you recall sending materials to

8   Ally in advance of any meetings you had with

9   them regarding the intercompany balance project?

10   A.    I don't recall specifically which

11   meetings I sent materials or all the materials

12   that were sent, no.

13   Q.    But you do recall on occasion sending

14   materials, though?

15   A.    Yes.

16   Q.    And do you recall, looking at the

17   second attachment, do you recall sending them

18   versions of the spreadsheet listing the

19   intercompany -- various intercompany

20   relationships and categorizing them in different

21   ways?

22   A.    I know the spreadsheets were sent.  I

23   don't recall how many versions were sent.

24   Q.    You have no reason to doubt these

25   documents were sent to Ally, right?

Page 72

B. WESTMAN

1

2      A.     I don't doubt it.  I just don't

3  specifically recall this particular one.

4      Q.     And you don't doubt that you

5  personally sent them, right?

6      A.     I sent the e-mail --

7      Q.     And the e-mail attaches the

8  documents?

9      A.     -- if these were attachments.

10      Q.     I'll represent that the documents

11  attached to this Westman Exhibit 4 are in fact

12  the attachments that, as produced to us, are the

13  attachments to the cover e-mail.

14      A.     Okay.

15      Q.     Looking at the first attachment that's

16  titled "Intercompany Process," do you recognize

17  this document?

18      A.     I don't recall this document, no.

19      Q.     Do you recall there being a write-up

20  of the intercompany process with Ally --

21          MR. KERR:  Objection.

22      Q.     -- that was prepared in the fall of

23  2011?

24      A.     I don't recall doing a write-up.

25      Q.     Do you recall ever reviewing a

Page 73

1                            B. WESTMAN

2    write-up?

3         A.    I don't remember.  I know that we

4    worked with Ally and we provided information to

5    Ally.  I don't remember all the specific

6    information provided.

7         Q.    Do you think you would have sent --

8    would you have sent a document to Ally that you

9    didn't think was accurate?

10        A.    Not intentionally, but if it was a

11   draft document as part of a working group, there

12   may have been drafts that were sent back and

13   forth as we worked through the project.

14        Q.    Would you have reviewed documents that

15   you submitted to Ally?

16        A.    Yes, I would have reviewed them.

17        Q.    Would you have provided comments to

18   whoever prepared the documents if something

19   struck you as inaccurate or incorrect?

20             MR. KERR:  Objection.

21        A.    Since they were working documents, we

22   may have provided them each step along the way

23   as we were working through issues.  So I don't

24   specifically recall if we were presenting them

25   as complete documents or -- this was not a final

Page 74

1                          B. WESTMAN

2   document.

3       Q.    How do you know this was not the final

4   document?

5       A.    The final document was not completed

6   until early 2012.

7       Q.    How would I know if the document I'm

8   looking at is the final document?

9       A.    I believe it was sent to Ally

10  indicating that that -- this would be the final

11  document that we would be certifying, would be

12  supporting our certification.

13      Q.    Do you know whether that document was

14  produced in connection with this litigation?

15      A.    I believe it was, but I don't have

16  direct knowledge of what was produced.

17          MS. MILLER:  To the extent it was

18      produced, we request under the protocol that

19      Debtors provide us the specific Bates

20      reference for that final document, and in

21      the event that the document was not produced

22      in connection with this litigation, we call

23      for its production.

24          MR. KERR:  Take it under advisement.

25      That's fair.

12-12020-mg    Doc 5803-5    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Desposition Designations: Barbara Westman    Pg 75 of 243

Page 75

1                    B. WESTMAN

2   BY MS. MILLER:

3        Q.    Looking at the first attachment titled

4   "Intercompany Process," the second-to-last

5   bullet, black built-in bullet states that,

6   "ResCap has a number of intercompany balances

7   with ResCap legal entities that are created as a

8   result of the cash management process that moves

9   money regularly but does not completely settle

10  and will need to be listed as an exception."

11          Is that the same cash management

12  process and exception that we have been

13  discussing --

14       A.    Yes.

15       Q.    -- this morning?

16          And the next step is, "To obtain

17  approval from Ally; decide if balances should be

18  reduced."

19          Was approval obtained from Ally?

20       A.    Yes, Ally agreed.  I wouldn't

21  necessarily -- I can't necessarily state if they

22  called it an exception or an exception approval,

23  but they did approve that that was valid

24  intercompany process and met the requirements

25  for us to certify the balances.

Plaintiff's
Objection
75:2-80:6
Lack of
personal
knowledge
(FRE 620);
lack of
foundation
(FRE 602,
901, 903)

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 76 of 243

Page 76

1                    B. WESTMAN

2        Q.    And do you know if Ally -- sorry.

3   Strike that.

4              Do you know if a decision was made

5   that any of the balances should be reduced?

6        A.    To my knowledge, none of the balances

7   were reduced.

8        Q.    Looking at the second attachment,

9   which is, based on your testimony, the working

10  draft of the spreadsheet of intercompany

11  balances, and turning to the fourth page, the

12  worksheet titled "Intercompany Relationships

13  Related to Cash Management and Do Not Settle,"

14  is the description of the cash management

15  process or practice, rather, at the top of that

16  spreadsheet consistent with your understanding

17  of how the cash management process worked at

18  ResCap?

19              MR. KERR:   Did you read it?

20              THE WITNESS:   I'm reading it.

21              MR. KERR:   It's a little hard to read.

22              MS. MILLER:   I should have brought

23     magnifying glasses for everyone.

24              (Document review.)

25              THE WITNESS:   Okay.   Could you repeat

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 77 of 243

Page 77

1                              B. WESTMAN

2          the question, please?

3    BY MS. MILLER:

4          Q.      Sure.    Is the description of the cash

5    management process at ResCap and the resulting

6    intercompany balances consistent with your

7    understanding?

8          A.      Yes, that fits with my understanding

9    of the cash management process within ResCap.

10         Q.      And are all of the intercompany

11   balances listed on the spreadsheet -- strike

12   that.

13                 How is it decided whether an

14   intercompany balance should be listed on this

15   worksheet?

16         A.      In this particular section of the

17   worksheet?

18         Q.      Yes.

19         A.      If these were relationships where cash

20   movement continued to occur because of the cash

21   management process, so they would have been

22   identified by looking at activity within those

23   particular intercompany balances and determining

24   whether they were involved in the process of the

25   movement of cash.

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 78 of 243

Page 78

1                       B. WESTMAN

2        Q.    And the intercompany balance between

3    RFC and ResCap in the first line is one of those

4    intercompanies that were identified as relating

5    to the movement of cash; is that correct?

6        A.    This intercompany balance has cash

7    movement within it.

8        Q.    And the intercompany between

9    Homecomings Financial and Res Funding Co., LLC

10   on the second line is similarly identified as a

11   relationship related to cash management,

12   correct?

13       A.    It's identified as a balance that has

14   cash movement within that intercompany balance.

15       Q.    And the same is true for the Passive

16   Asset Transaction and GMAC Mortgage intercompany

17   balance on the third line of the worksheet,

18   correct?

19       A.    Correct.

20       Q.    And it's also the same for the

21   Executive Trustee Services and GMAC Mortgage

22   Trust -- sorry, and the GMAC Mortgage

23   intercompany balance listed two lines below,

24   right?

25       A.    Correct.

Page 79

1                    B. WESTMAN

2       Q.    And also for the Residential Funding

3  Co., RFC Asset Holdings LLC inter-balance, that

4  balance was related to the movement of cash

5  within the cash management process, correct?

6       A.    I'm sorry, which balance is that?

7       Q.    The one immediately below the

8  Executive Trustee Services balance, the

9  Residential Funding Co., LLC and RFC Asset

10  Holdings II, LLC?

11      A.    Yes.

12      Q.    And going down six rows, the GMAC

13  Residential Holding Corp., GMAC Mortgage

14  intercompany balance also related to the

15  movement of cash resulting from the cash

16  management process, correct?

17      A.    The cash management process created

18  certain transactions within that balance, yes.

19      Q.    And the same is true for the GMAC

20  Mortgage and Home Connects Lending Services

21  intercompany listed on the line below that,

22  correct?

23      A.    Yes.

24      Q.    And moving down five rows, the GMAC

25  Residential and ResCap intercompany balance was

Page 80

B. WESTMAN

1

2     also identified as an intercompany relationship

3     that had activity related to the movement of

4     cash resulting from the cash management process,

5     correct?

6          A.     Correct.

7               MS. MILLER:  I'd like to mark as

8     Westman Exhibit 5 a document that's been

9     marked for identification in this case

10    RCJSN00003340.

11               (Westman Exhibit 5, a document bearing

12    Bates Nos. RCJSN00003340, marked for

13    identification, as of this date.)

14    BY MS. MILLER:

15        Q.     Ms. Westman, do you recognize this

16    document?

17        A.     Yes.

18        Q.     And what is it?

19        A.     It is an internal certification

20    process that was performed around intercompany

21    relationships within ResCap.

22        Q.     And who -- was this -- sorry.  Strike

23    that.

24               Was the certification submitted to

25    anybody?

Page 81

1                      B. WESTMAN

2      A.    It was a ResCap internal certification

3  process.

4      Q.    Was it required to be sent to Ally?

5      A.    It was not.

6      Q.    Is this certification related to the

7  Ally Global Intercompany Policy that we've been

8  discussing?

9      A.    Indirectly.  It's not directly related

10 to that policy.

11     Q.    Do you recognize the signature on this

12 document?

13     A.    It is my signature.

14     Q.    And this document is dated January 6,

15 2012.  Have you prepared a similar certification

16 for any period before this one?

17     A.    I don't recall.  I may have.

18     Q.    Was it a requirement that the

19 intercompany certification document be prepared

20 in connection with the quarter-end?

21     A.    Yes, I believe this was a quarterly

22 required process.

23     Q.    And would you have been the person

24 responsible for signing these certifications on

25 a quarterly basis?

Page 82

1                          B. WESTMAN

2        A.     I was one of several individuals that

3   were required to sign the certification over

4   various points of time.

5        Q.     And who were the other individuals?

6        A.     Other accounting directors that were

7   responsible for intercompany relationships or

8   activities.

9        Q.     And who were those accounting

10  directors?

11       A.     I don't recall the specific names and

12  any accounting director that would have had

13  responsibility for accounting within the

14  organization for the particular time period.

15       Q.     Would more than one accounting

16  director have to sign an intercompany

17  certification document for the same quarter?

18       A.     Yes.

19       Q.     Would it be the same certification?

20       A.     It would be the same document.  Each

21  director was certifying to a set population of

22  activities, so they were responsible -- each

23  director was responsible for signing for the

24  transactions that they were assigned within the

25  document that supports this.

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 83 of 243

Page 83

1          B. WESTMAN

2      Q.      And which transactions were you

3   assigned or were assigned to you?

4      A.      A specific set of transactions that

5   were performed by the General Ledger Team.

6      Q.      And what are those specific set of

7   transactions?

8      A.      General -- generally were

9   eliminations.   This was a certification to

10  ensure that elimination entries were prepared as

11  part of the consolidation of the financial

12  statements.   So those were generally

13  eliminations related to investment in

14  subsidiaries and the intercompany balance is

15  properly eliminated for consolidation purposes.

16     Q.      Was it necessary for the elimination

17  process to work properly that transactions be

18  recorded in the proper accounts in the general

19  ledger?

20     A.      Yes, that's what this certification

21  identified; the places where intercompany

22  activities occurred so that we could ensure

23  those were properly eliminated within the

24  financial statements.

25     Q.      And did you review intercompany

Plaintiff's
Objection
83:16-24
Incomplete
(FRE 106)

Page 84

B. WESTMAN

2  transactions during the period and assure that

3  they were accounted for in the proper accounts?

4       MR. KERR:  Objection.

5    A.    I reviewed the supporting

6  documentation behind this that indicated the

7  types of intercompany relationships that were

8  covered by the certifications.  It was not a

9  certification of transactions but of types of

10  activities, so I would have reviewed that

11  documentation prior to signing.

12    Q.    And what type of documentation would

13  have been provided?

14    A.    There's a spreadsheet that supports

15  the certification.

16    Q.    Do you know who prepared that

17  spreadsheet?

18    A.    I don't specifically recall.  It was

19  prepared by various accounting individuals over

20  different periods of time.

21    Q.    Do you recall in late 2011, early 2012

22  who would have been responsible for preparing

23  that document?

24    A.    I believe it would have been Jake

25  Bazella.

Page 85

B. WESTMAN

1

2     Q.    Do you know whether the documents

3  supporting the certification has been produced

4  in connection with this litigation?

5     A.    I'm not sure what has been --

6  everything that has been produced.

7          MS. MILLER:  I'm going to ask that

8     under the discovery protocol the specific

9     document, Excel spreadsheet document

10    described by Ms. Westman be identified by

11    Bates range.

12         MR. KERR:  Okay.

13         MS. MILLER:  And to the extent that

14    it's not in the repository, we call for the

15    production of that document.

16 BY MS. MILLER:

17    Q.    Have you signed more than one

18 intercompany certification document during your

19 time at ResCap?

20    A.    I don't recall how many of this

21 particular certification I signed.

22    Q.    Do you know if it was more than this

23 one?

24    A.    I don't recall.

25    Q.    But someone would have signed this

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 86 of 243

Page 86

1          B. WESTMAN

2    type of certification for each quarter?

3      A.    Correct.

4      Q.    Did there come a time after the first

5    quarter of -- did there come a time within the

6    first quarter of 2012 that you engaged in

7    another review of intercompany balances?

8      A.    We continued the review that we had

9    started under the Ally project, and we continued

10   that review in conjunction with information that

11   would be needed for bankruptcy filings.

12     Q.    And who was responsible for that

13   review?

14     A.    I don't know a specific individual

15   that was responsible.  I would have been

16   involved in that process.

17     Q.    And who told you what information was

18   necessary relating to intercompany transactions

19   for the bankruptcy filings?

20     A.    I worked with my supervisor Cathy

21   Dondzila.

22     Q.    Did there come a time that the law

23   firm of Morrison & Foerster was retained by

24   ResCap to represent it in connection with the

25   restructuring?

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 87 of 243

Page 87

1                    B. WESTMAN

2          A.    Yes, Morrison & Foerster was involved.

3    I wasn't specifically involved in when or how

4    that occurred.

5          Q.    And did FTI work as a financial

6    advisor to ResCap and its counsel in connection

7    with the anticipated bankruptcy filing?

8          A.    Yes.

9          Q.    Did you receive requests from FTI for

10   information relating to intercompany

11   transactions?

12         A.    Yes.

13         Q.    A lot of requests?

14         A.    Yes.

15         Q.    Did you respond to the requests?

16         A.    I responded to many requests.

17         Q.    Did you provide FTI with as much

18   information as you had available to you?

19         A.    Yes, to my knowledge.

20         Q.    Did you provide FTI with any

21   information that you believed was false or

22   inaccurate?

23         A.    Not knowingly.

24         Q.    Did you receive requests for

25   information relating to the intercompanies from

Page 88

1                        B. WESTMAN

2    your counsel?

3        A.    I don't specifically recall if I did

4    or not.

5        Q.    Who was the main person you liaised

6    with on the intercompany review leading up to

7    the bankruptcy filing?

8        A.    From -- from Morrison & Foerster or

9    anyone?

10       Q.    Generally.

11       A.    Generally, with Cathy Dondzila, and

12   there were several different people involved

13   with FTI.

14       Q.    Who at FTI do you recall specifically

15   being involved in the intercompany balances?

16       A.    Mark Renzi.  Liz Parks.  Those are the

17   two I probably specifically recall.

18       Q.    And did you have any meetings with FTI

19   where you discussed intercompany balances?

20       A.    I don't specifically recall.  I'm sure

21   we did.

22       Q.    How frequently did you -- were you

23   speaking to FTI in the first quarter of 2012?

24       A.    I don't recall.

25       Q.    Weekly?

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 89 of 243

Page 89

B. WESTMAN

1

2     A.    Most likely there would have been some

3  communication weekly, whether it was e-mail or

4  physically speaking with them.

5     Q.    Do you think it would have been more

6  frequently than weekly?

7     A.    I don't recall.

8     Q.    And what type of information was FTI

9  requesting relating to the intercompany

10  balances?

11     A.    I don't specifically recall the nature

12  of all the requests.  I know that we did work on

13  compiling a list of intercompany balances

14  leading up to the bankruptcy date.

15     Q.    When you say "we," who are you

16  referring to?

17     A.    Myself, Cathy Dondzila and other

18  members of Cathy or my team that assisted in

19  that preparation.

20     Q.    And were you and Cathy primarily

21  responsible for the list of intercompany

22  balances?

23     A.    Yes, individuals within our teams

24  would have been responsible for maintaining

25  those transactions.

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 90 of 243

Page 90

1          B. WESTMAN

2     Q.    What other information did you provide

3  to FTI regarding the intercompany balances?

4     A.    I don't specifically recall.  There

5  were many requests.  I don't recall the details.

6     Q.    Do you have a sense of how much time

7  you spent researching, compiling information,

8  and responding to their requests?

9     A.    We were responding to many requests

10 outside of intercompany, but we spent a

11 significant amount of time researching and

12 gathering data related to intercompany balances.

13    Q.    And did the review of intercompany

14 balances leading up to the bankruptcy continue

15 for a matter of months?

16    A.    I believe so.  I don't remember the

17 specific dates, but I believe we worked on it

18 beginning at least a few months prior to

19 bankruptcy and worked on it through bankruptcy

20 date.

21    Q.    Do you recall when you first started

22 getting requests for information from FTI?

23    A.    I don't recall specifically.  I

24 believe I would have brought -- been brought

25 into the bankruptcy process perhaps in March.  I

Page 91

1                              B. WESTMAN

2    don't recall specifically.

3        Q.    Do you recall specifically when the

4    company filed for bankruptcy?

5        A.    In May of 2012.

6        Q.    And do you believe that from the time

7    you were brought into the bankruptcy process

8    through the filing you were actively involved in

9    responding to requests related to intercompany

10   balances?

11       A.    I don't specifically recall which

12   requests were related to intercompany balances.

13   I was actively involved in responding to

14   requests.  I can't say whether they were related

15   to intercompany through that entire time period.

16       Q.    Did you provide information to FTI

17   regarding the intercompany balances?

18       A.    I'm sure I did.

19       Q.    Did you prepare a spreadsheet of top

20   ten intercompany balances?

21       A.    I don't recall who prepared the

22   spreadsheet.  I'm familiar with the spreadsheet.

23            MS. MILLER:  I'm going to mark an

24       exhibit.  It's being marked as it was

25       produced, but it seems to be -- possibly be

Page 92

1                       B. WESTMAN

2    a compilation of two different exhibits.  So

3    I'm going to -- I'm going to mark as Westman

4    Exhibit --

5           MR. KERR:  6 I think we're up to.

6           MS. MILLER:  -- 6 a document

7    Bates-stamped RCUCCJSN30016049 with its

8    attachment.

9           (Westman Exhibit 6, a document, with

10    attachment, bearing Bates Nos.

11    RCUCCJSN30016049, marked for identification,

12    as of this date.)

13           MS. MILLER:  Can I have one of those?

14           MR. KERR:  Sure.

15           (Document handed.)

16           MS. MILLER:  So I'll represent that

17    this document, as I have it printed from the

18    original, begins with the document -- the

19    e-mail that was the first -- that is the

20    first page of Westman Exhibit 6, but then

21    somewhere about halfway through --

22           MR. SILVERSCHOTZ:  Do you have another

23    copy?

24           MS. MILLER:  I'm going to pass it down

25    in one second.

Page 93

B. WESTMAN

1

2      -- after the first attachment,

3  actually attaches a second e-mail, which

4  then attaches the same agreement and then

5  attaches another document.  So it probably

6  was intended to be produced as two separate

7  documents, and what happened here in the

8  copy that's been marked is it looks like the

9  second e-mail reattaching the first

10  attachment was dropped, and so the range

11  actually -- in the exhibit actually runs

12  from RCUCCJSN30016049 through 16100 and then

13  goes to RCUCCJSN30016164, and the e-mail in

14  the original document that is not included

15  in the exhibit is an e-mail in the chain of

16  the original cover e-mail "Re:  Waterfall

17  Questions."

18      MR. KERR:  So that's not part of what

19  you marked as --

20      MS. MILLER:  So that's not part of

21  this exhibit, but in case anyone wants to

22  know what it is, it's just more of that same

23  chain -- actually less of that same chain,

24  reattaching the documents that are attached

25  at the beginning, but also, the spreadsheet

Page 94

1                        B. WESTMAN

2         of top ten intercompany balance -- Top Ten

3         Intercompany Relationships Spreadsheet.

4              And I note for the record that this is

5         not our production.  No explanation.

6    BY MS. MILLER:

7         Q.    So, looking at the very confused

8    exhibit Westman Exhibit 6, do you recognize this

9    e-mail?

10        A.    Yes.

11        Q.    And did you prepare this e-mail?

12             MR. KERR:  Are you talking about the

13        cover e-mail or the attachments?

14             MS. MILLER:  The cover e-mail.  The

15        e-mail.

16             THE WITNESS:  It's portions of the

17        e-mail I prepared.

18   BY MS. MILLER:

19        Q.    I'd like to refer you to the last page

20   of the exhibit, which is a spreadsheet titled

21   Summary of Top Ten Intercompany Relationships.

22             Are you familiar -- I see the witness

23   flipping pages and looking confused.  I share

24   your confusion.  I think that there are actually

25   two different versions of this Top Ten

Page 95

1                         B. WESTMAN

2    Intercompany Relationship that are part of what

3    is in the database as a single document.  The

4    first one appears as the fourth page of the

5    exhibit Bates-stamped 16053.

6              MR. KERR:  That's --

7              MR. LAWRENCE:  Not in my document.

8              MR. KERR:  Yes, it's not in the

9        document.

10             MS. MILLER:  It's not?

11             MR. KERR:  No.  It goes from, just so

12       you know, it goes from 16052 to 16054.  Just

13       so -- I noticed it, but it's obviously

14       missing a page.

15             MS. MILLER:  Right.  Okay.  So that is

16       probably our error because this looks like

17       it was produced --

18             MR. KERR:  Do you want to make a copy

19       of that.

20             MS. MILLER:  Yes, so maybe -- well,

21       this is going to have my notes on it.  So,

22       no, I don't want --

23             MR. LAWRENCE:  You want to come back

24       after a break?

25             MS. MILLER:  Yes, let's come back

Page 96

B. WESTMAN

1   after this.  We'll get -- if we get a copy

2   e-mailed, can we --

3          MR. KERR:  Yes.

4          MS. MILLER:  Can we pull it from the

5   repository?

6          MR. KERR:  That's fine.  So you want

7   to come back to this document?

8          MS. MILLER:  Yes, we'll come back to

9   this document.  I apologize for the

10  confusion that created.

11         MR. KERR:  No, don't worry about it.

12  BY MS. MILLER:

13     Q.    Sorry, just looking back at the cover

14  e-mail in Westman Exhibit 6, Ms. Westman, do you

15  see that the e-mail is dated March 23, 2012?

16     A.    Yes.

17     Q.    And does this document, does this

18  e-mail chain which starts on March 19, 2012,

19  relate to intercompany balances, in part?

20     A.    Yes.

21     Q.    And is this an e-mail between you and

22  certain people at FTI concerning their requests

23  for information regarding this intercompany

24  balances?

Page 97

1                B. WESTMAN

2    A.    Yes.

3        MS. MILLER:   I'd like to mark as

4    Westman Exhibit 7 a document Bates-stamped

5    RCUCCJSN20064737 through 4801.   It's an

6    e-mail with multiple attachments.

7        (Westman Exhibit 7, an e-mail with

8    attachments, bearing Bates Nos.

9    RCUCCJSN20064737 through 4801, marked for

10   identification, as of this date.)

11       (Document review.)

12       MR. LAWRENCE:   They do seem to be

13   missing pages in this as well.

14       MR. KERR:   Yes, I think page 64743 is

15   missing.

16       MR. LAWRENCE:   Unless it's

17   double-sided.

18       MR. KERR:   I don't see it.   64751 --

19   no, that's double-sided.

20       MS. MILLER:   45 appears to be missing

21   and 47.   I wonder if these are the slip

22   sheets that say "produced in native."

23       MR. KERR:   Could be.   Could be.   I

24   don't know.

25       MS. MILLER:   That's at least

Plaintiff's Objection
97:3-10 Lack of
foundation (FRE 602,
901, 903)

Page 98

B. WESTMAN

1    consistent with the printout that I have of

2    that document.  So we'll check and see if

3    there are in fact any pages missing and I'll

4    supplement the exhibit.

5        MR. KERR:  I know that in some of the

6    productions there was a -- there would be a

7    slip sheet that would said "produced in

8    native" or something like that, so that may

9    be a part of it.

10       MR. LAWRENCE:  But there would still

11   be a native document.

12       MR. KERR:  Yes.  Whatever.  We'll

13   figure it out.

14   BY MS. MILLER:

15       Q.    Ms. Westman, have you had an

16   opportunity to review the cover e-mail?

17       A.    Yes.

18       Q.    You see that this e-mail is from April

19   20, this e-mail chain is from April 20, 2012?

20       A.    Yes.

21       Q.    And looking down at the opening e-mail

22   in the chain, can you describe what that e-mail

23   is?

24       A.    My -- my comments?

1      B. WESTMAN

2      Q.      No, the one below yours.

3      A.      This appears to be a request from Mark

4   Renzi for certain information related to

5   intercompany balances.

6      Q.      Did you understand why Mark Renzi was

7   asking for this information?

8      A.      I don't know specifically, other than

9   we were working on gathering information related

10   to intercompany balances.

11      Q.      Did you provide Mr. Renzi with all of

12   the information that you had relating --

13   responsive to his questions?

14      A.      I don't know.

15      Q.      Do you believe that there's any

16   information that you have that you did not

17   provide to FTI in response to their requests for

18   information related to the intercompany

19   balances?

20      A.      I don't believe there's information

21   that I had.  I don't specifically recall

22   responding to this request.  This is not a

23   response to this request.  So I'm not sure what

24   I responded to Mark.

25      Q.      Do you believe that you or Cathy would

Plaintiff's
Objection
99:6-10: lack
of personal
knowledge
(FRE 602)

Plaintiff's
Objection
99:25-100:8:
lack of
personal
knowledge
(FRE 602)

1                          B. WESTMAN

2   have collected and provided as much information

3   to FTI in response to their specific requests as

4   you had available?

5               MR. KERR:   Objection.

6       A.    Yes, I believe we would have.   I don't

7   specifically recall what we provided or that we

8   were able to answer these questions.

9       Q.    Do you recall looking for information

10  in response to requests from FTI related to

11  intercompany balances?

12      A.    Yes.

13      Q.    And do you recall providing the

14  information that you found in response to those

15  requests to FTI?

16      A.    In general, yes.

17      Q.    Do you recall any instances where you

18  found information responsive to a request from

19  FTI but did not provide that information to FTI?

20      A.    Not that I'm aware of.

21      Q.    Going to -- looking at the first

22  attachment, it's an e-mail from -- sorry, it's

23  Bates-stamped RCUCCJSN20064740, and it's an

24  e-mail from you to Janel Farley regarding

25  agreements from March 20, 2012?

Page 101

B. WESTMAN

1

2      MR. KERR:  Actually, I think if you're

3  talking about the top one, I think that's

4  from Janel to Barb.  The one below is from

5  Barb.  It's a different date.

6      MS. MILLER:  You're right.

7  BY MS. MILLER:

8    Q.    So either the March 19 e-mail from --

9  focusing first on the March 19 e-mail from you

10  to Janel?

11    A.    I'm sorry, could you repeat the

12  question?

13    Q.    Do you recognize the e-mail, the March

14  19 e-mail from you to Ms. Farley?

15    A.    Yes.

16    Q.    Do you know what this e-mail is about?

17    A.    Yes.

18    Q.    What's it about?

19    A.    This was as part of research

20  attempting to document the reasons behind

21  certain intercompany transactions, and these

22  particular transactions I had requested that

23  Janel determine whether she was familiar with

24  these, if she had recently worked on a project

25  that might have made her familiar with these

Page 102

B. WESTMAN

1

2  particular balances.

3      Q.    And did you -- do you understand her

4  response in the March 20 e-mail?

5      A.    She basically is -- isn't responding.

6  She's indicating that the one particular

7  transaction may look familiar but that she was

8  working on other issues and then she would look

9  further to research this issue.

10     Q.    So what is a topside entry?

11     A.    That was another project that she was

12  working on unrelated to this.  Simply a

13  reference of what -- of her time commitment and

14  what her first priority was before she could

15  look at this particular transaction.

16     Q.    Does it relate at all to intercompany

17  balances?

18     A.    I don't specifically recall.  It's not

19  related to this request.

20     Q.    Do you know if the topside entry for

21  GMAC are to include RFC advances relates to

22  intercompany balances between those entities?

23     A.    I believe so.  I believe it's

24  referring to the servicing advances.

25     Q.    Would those servicing advances have

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 103 of 243

Page 103

1                       B. WESTMAN

2    been accounted for in the intercompany balances?

3         A.    I have no knowledge about that.

4         Q.    Looking at the document with the Bates

5    range ending in 4744, there's an e-mail from

6    Michaeline Dugan to you dated February 23, 2012

7    regarding Executive Custody Services.

8               On the second page of that exhibit,

9    there's an e-mail from you to Michaeline on

10   February 23, 2012 in which you state there's a

11   $250 million intercompany balance between EST

12   and GMAC -- sorry, ETS -- I think there's a typo

13   there.  "ETS has the receivable.  Gary was

14   looking into this and just noted it was

15   'Recovery income and foreclosure trustee fees.'

16   Can someone expand on this?"

17              Do you see that?

18        A.    Yes.

19        Q.    And do you know in what context you

20   were looking into the intercompany balance

21   between ETS and GMACM in February of 2012?

22        A.    In an attempt to look at the

23   intercompany, the larger intercompany balances

24   and gain an understanding of what might have

25   created those balances or what could be

Page 104

1                    B. WESTMAN

2   contained within those balances.

3        Q.    And was that part of your review

4   leading up to the bankruptcy filing?

5        A.    Yes, it was during that time period.

6        Q.    And do you understand the response

7   that you get from Michaeline about the ETS

8   balance?

9        A.    Generally.

10       Q.    Can you explain how the ETS GMAC

11   intercompany balance arose?

12       A.    I think Michaeline is laying out the

13   various journal entries here, indicating in

14   this -- that ETS generates cash in its normal,

15   daily operations and that cash generally makes

16   its way up to GMAC Mortgage, so this is

17   indicating the types of entries that would have

18   been made reflecting some of that activity.

19            MS. MILLER:   I'd like to mark as

20       Westman Exhibit 8 a document Bates-stamped

21       EXAM122636518 through 521.   It's an e-mail

22       with an attachment.

23            (Westman Exhibit 8, a document bearing

24       Bates Nos. EXAM122636518 through 521, marked

25       for identification, as of this date.)

Plaintiff's
Objection
104:19-15:
Lack of
foundation
(FRE 602, 901,
903)

Page 105

1          B. WESTMAN

2          MR. KERR:  Atara, I'm just looking at

3     this document and we may have a privilege

4     issue on this.  I don't know.  I need to

5     speak to somebody separately.  Can we put

6     this aside?

7          MS. MILLER:  You want to table it?

8          MR. KERR:  Yes.

9          MS. MILLER:  And we'll come back to

10    that.

11         MR. KERR:  And we may not.  I just --

12         MS. MILLER:  I'm going to use the

13    document to establish the fact of the

14    communication and then will not touch the

15    substance until --

16         MR. KERR:  If you want to just

17    establish the fact of the communication,

18    that's fine.  I just -- I've got to check on

19    the substance of it.  I just, I just don't

20    know the answer, but if --

21         MS. MILLER:  Understood.  So I won't

22    touch the substance until you get back to

23    me.

24         MR. KERR:  Okay.  Fair enough.

25    BY MS. MILLER:

Page 106

1                      B. WESTMAN

2        Q.     Ms. Westman, were, in light of your

3    counsel's stated concern that this document may

4    be privileged, and subject to his further review

5    of that question and giving us an answer on it,

6    I'm not going to ask you to comment on the

7    substance of this document so I'd like you to

8    focus only on the identifying information at the

9    top of the document.

10       A.     Okay.

11       Q.     Ms. Westman, do you see that this is

12   an e-mail dated April 23, 2012, from Mark Renzi

13   to Todd Goren and Alex Barrage, copying a number

14   of people, including yourself?

15       A.     Yes.

16       Q.     And that the subject of the e-mail is

17   "Bounce - Intercompany Follow-Up - request for

18   call tomorrow at 1 to 2"?

19       A.     Yes.

20       Q.     And it attaches a document titled

21   "Intercompany Questions Version 2.xls"?

22       A.     Yes.

23       Q.     In or around the April 2012 timeframe,

24   were you having calls with FTI regarding

25   intercompany balances?

Page 107

1                    B. WESTMAN

2        A.      It appears as such from the e-mail.   I

3   don't specifically recall dates of calls.

4        Q.      Do you recall throughout the February

5   to May 2012 time period conferring with FTI

6   regarding intercompany balances?

7        A.      Yes.   During that time, I would have

8   talked with FTI.

9        Q.      You mentioned that you continued to

10  work on the intercompany balances -- a review of

11  the intercompany balances beyond the May 2012

12  bankruptcy petition.   Was that in response to

13  continuing requests from FTI?

14       A.      I don't recall who would have

15  requested that.

16       Q.      Do you recall if -- strike that.   Did

17  you continue to provide information to FTI

18  regarding intercompany balances even after the

19  filing of the bankruptcy petition?

20       A.      I don't recall the dates that we

21  provided information.   We would have continued

22  to respond to requests from any parties that

23  were requesting it.   I don't remember the dates.

24            MR. LAWRENCE:   I'll just note that

25       lunch is outside, so whenever anyone wants

Page 108

1                    B. WESTMAN

2   to --

3          MS. MILLER:  Okay.

4          MR. LAWRENCE:  I'll let Barb decide

5   when she wants to stop.

6          MS. MILLER:  Do you want to take a

7   break?

8          THE WITNESS:  It's 1.  It might be

9   good.

10          MS. MILLER:  Okay.

11          MR. KERR:  How long do you want to

12   take?  A half an hour or less?

13          MS. MILLER:  I'm thinking maybe a

14   little bit more so we can all circle our

15   teams --

16          MR. KERR:  Oh, sure.  Sure.  Sure.

17          MS. MILLER:  -- and get the document

18   issue situated.

19          MR. KERR:  That's fine.

20          MS. MILLER:  Can we go off the record?

21          MR. KERR:  Let's go off the record.

22          THE VIDEOGRAPHER:  The time is 1:06.

23   This is the end of tape labeled number 2.

24   We're going off the record.

25

1          B. WESTMAN

2       AFTERNOON SESSION

3          THE VIDEOGRAPHER:  This is the start

4    of tape labeled number 3.  The time is 1:54.

5    We are back on the record.

6  B A R B A R A   W E S T M A N, resumed and

7       testified further as follows:

8  FURTHER EXAMINATION BY

9  MS. MILLER:

10      Q.    Good afternoon, Ms. Westman.

11      A.    Good afternoon.

12      Q.    Welcome back.

13      A.    Thank you.

14          MR. KERR:  Atara, let me just make a

15    statement about this.

16          MS. MILLER:  Sure.

17          MR. KERR:  I have had an opportunity

18    over lunch to look at what has been marked

19    as Westman Exhibit 8, and after reviewing it

20    and reviewing the text of the e-mail more

21    carefully, we're not going to assert

22    privilege over this specific e-mail and you

23    are fee to question Ms. Westman about it.

24          Obviously if she -- your questioning

25    leads into conversations she might have had

Page 110

                           B. WESTMAN

1

2       with MoFo, we'll have to deal with that

3       issue, whatever it is, but with respect to

4       this e-mail, you are free to question her as

5       much as you wish.

6                MS. MILLER:   Thank you.

7                On that note, I'm going to ask the

8       reporter to mark as Westman Exhibit 9 the

9       Schedule of Assets and Liabilities for RFC

10      Asset Holdings II, LLC, filed in the

11      bankruptcy proceedings of Residential

12      Capital, LLC, et al., Docket No. 586.

13               (Westman Exhibit 9, Schedule of Assets

14      and Liabilities for RFC Asset Holdings II,

15      LLC, filed in the bankruptcy proceedings of

16      Residential Capital, LLC, et al., Docket No.

17      586, marked for identification, as of this

18      date.)

19               (Document review.)

20      BY MS. MILLER:

21          Q.   Ms. Westman, have you had an

22      opportunity to review this document?

23          A.   Yes.

24          Q.   And have you seen this document

25      before?

1                          B. WESTMAN

2       A.    At least parts of the document, if not

3    the full document.

4       Q.    And what parts of the document do you

5    specifically recall having seen before?

6       A.    I would have looked at intercompany

7    balances and I may have looked at other

8    schedules.  I don't recall each particular

9    portion.

10      Q.    And this Schedule of Assets and

11   Liabilities was filed with the court on June 30,

12   2012; is that correct?

13      A.    Correct.

14      Q.    And turning your attention to the

15   document -- sorry, to the page marked page 6 of

16   50 on the top or page 5 on the bottom, you see

17   there's a paragraph describing intercompany

18   transactions?  It's the first full paragraph on

19   the page.

20      A.    Okay.  Yes.

21      Q.    The second-to-last sentence states

22   that, "The Debtors have made every attempt to

23   properly characterize, prioritize and classify

24   all intercompany transactions."  Do you see

25   that?

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 112 of 243

Page 112

1              B. WESTMAN

2        A.      Yes.

3        Q.      Would you have reviewed this

4    paragraph?

5        A.      I don't recall reviewing this

6    paragraph.

7        Q.      Do you believe that that's an accurate

8    description of the Debtors' efforts leading up

9    to July 30 -- sorry, June 30, 2012 regarding

10   intercompany balances?

11              MR. KERR:   Objection.   Lack of

12       foundation.

13       A.      I believe when we provided information

14   for the SOAL, that we believed it was accurate

15   to the best of our knowledge at the time.

16       Q.      Turning now to the page 44 of 50, do

17   you see that Residential Funding Company is

18   listed as a creditor of RFC Asset Holdings II?

19       A.      Yes.

20       Q.      And the consideration -- the "Date

21   claim was incurred and consideration for claim"

22   notes that it is an intercompany payable?

23       A.      Yes.

24       Q.      And the total amount of the claim is

25   listed as $231,862,293.11?

Plaintiff's
Objection
112:7-15:
lack of
personal
knowledge
(FRE 602)

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman    Pg 113 of 243

Page 113

B. WESTMAN

2    A.    Yes.

3    Q.    And do you believe that that was an

4  accurate reflection of the debt owing from RFC

5  Asset Holdings II to Residential Funding

6  Company, LLC as of June 30, 2012?

7         MR. KERR:  Objection to form.

8    A.    That was the intercompany payable

9  between those two entities.  Again, there would

10 have been other intercompany receivables as

11 well.  This schedule was filed on a gross basis,

12 so that would have been an intercompany payable.

13    Q.    And would you have been responsible --

14 strike that.  Do you know how the total amount

15 of the claim was derived?

16        MR. KERR:  I'm sorry, I'm not sure I

17        understand.  What was the claim you were

18        referring to?

19        MS. MILLER:  The Residential Funding

20        Company, LLC total amount of claim listed in

21        the last column.

22        MR. KERR:  Objection to form.

23        THE WITNESS:  This would have been

24        supported by our listing of intercompany

25        balances between the entities, again, on a

Page 114

1                          B. WESTMAN

2       gross basis.

3    BY MS. MILLER:

4          Q.    And were you involved in preparing the

5    listing of intercompany balances on a gross

6    basis?

7          A.    Yes, I was involved in that.

8          Q.    And do you believe that that $231-plus

9    million number was accurate as of the time that

10   this was filed?

11         A.    It was an accurate reflection of the

12   payable balance between these entities.

13              MS. MILLER:   Thank you.   I would like

14       to mark as Westman Exhibit 10 the Amended

15       Schedules of Assets and Liabilities for

16       Residential Capital, LLC dated July 3, 2012

17       and bearing docket -- filed in the

18       bankruptcy proceedings of In re Residential

19       Capital, LLC, et al. at Docket No. 683.

20              (Westman Exhibit 10, Amended Schedules

21       of Assets and Liabilities for Residential

22       Capital, LLC dated July 3, 2012, marked for

23       identification, as of this date.)

24   BY MS. MILLER:

25         Q.    Ms. Westman, do you recognize this

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 115 of 243

Page  115

B. WESTMAN

document?

A.      Yes.

Q.      And have you reviewed this document in
the past?

A.      I may have seen this document or parts
of the document.

Q.      Were you involved in preparing the
schedule of certain claims against Residential
Capital, LLC?

MR. KERR:   Objection.

A.      Can you repeat the question?

Q.      Strike the question.

Can you turn to -- please turn to page
5 of 26 in the document.   See the last line
identifies Residential Funding Company, LLC as a
creditor holding an unsecured claim against
Residential Capital, LLC in the amount of
1,955 -- $1,955,105,299.08?

A.      Yes, I see the balance.

Q.      And would you have -- would you have
been responsible for -- strike that.

Were you involved in preparing this
listing of the intercompany balance between
Residential Capital, LLC and Res Funding Co. on

Page 116

1                       B. WESTMAN

2    a gross basis?

3        A.    I would have been responsible for

4    providing information that went into these

5    schedules.

6        Q.    And do you believe that the

7    information that you provided was accurate as of

8    July 3, 2012?

9        A.    The information we provided was

10   accurate to the best of our knowledge.

11           MS. MILLER:  I'd like to mark as

12       Westman Exhibit 11 the Amended Schedules of

13       Assets and Liabilities for Residential

14       Funding Company, LLC filed on July 3, 2012

15       in the bankruptcy proceedings of In re

16       ResCap, LLC, et al., at Docket No. 684.

17           (Westman Exhibit 11, Amended Schedules

18       of Assets and Liabilities for Residential

19       Funding Company, LLC filed on July 3, 2012,

20       marked for identification, as of this date.)

21   BY MS. MILLER:

22       Q.    Ms. Westman, were you responsible for

23   providing information relating to the

24   intercompany balances that were included in the

25   schedule?

Page 117

1                          B. WESTMAN

2           A.      Yes.

3           Q.      And looking at the page marked 11 of

4    139 on the top, or 7 of 17 on the bottom, a

5    little more than halfway down, Homecomings

6    Financial, LLC is listed as a creditor holding

7    an unsecured claim against Residential Funding

8    Company in the amount of $1,251,521,436.97.

9                Is that the information that you would

10   have provided relating to intercompany claims

11   that was included in the schedule?

12                MR. KERR:   Objection.

13           A.      That would have been based on

14   information that we provided for intercompany

15   transactions on a gross basis that were in our

16   general ledger from a GAAP perspective.

17           Q.      And do you believe that the

18   information that you provided was accurate as of

19   the time you provided it?

20           A.      Yes.

21                MS. MILLER:   I'd like to mark as

22   Westman Exhibit 12 -- Exhibit 12, the

23   Amended Schedules of Assets and Liabilities

24   for GMAC Mortgage, LLC filed in the

25   bankruptcy proceedings In re Residential

Plaintiff's
Objection
117:3-16:
objection to
form; vague
and
ambiguous;
lack of
personal
knowledge
(FRE 602)

Page 118

1                    B. WESTMAN

2          Capital, LLC, on July 7 -- on July 3, 2012,

3          at Docket No. 685.

4                (Westman Exhibit 12, Amended Schedules

5          of Assets and Liabilities for GMAC Mortgage,

6          LLC filed on July 3, 2012, at Docket No.

7          685, marked for identification, as of this

8          date.)

9    BY MS. MILLER:

10         Q.    Ms. Westman, were you responsible for

11   providing information relating to the

12   intercompany balances that were included in the

13   schedules?

14         A.    Yes.

15         Q.    And does that include information

16   relating to the general unsecured claim of

17   Executive Trustee -- sorry, looking at page 20

18   of 623, page 16 of 52, does that include the

19   claim identified as being -- the general

20   unsecured claim that's being identified as being

21   held by Executive Trustee Services, LLC in the

22   amount of $276,515,932.65?

23               MR. KERR:   Objection.

24         A.    I'm sorry, could you repeat the

25   question?

Page 119

1            B. WESTMAN

2       Q.     Would you have provided the

3    information underlying the gross balance

4    identified in the middle of page 16 of 52

5    relating to the claim held by Executive Trustee

6    Services against GMAC Mortgage, LLC in the

7    amount of $276,515,932.65?

8              MR. KERR:   Objection.

9       A.     Yes, I would have provided information

10   regarding the intercompany payable balance from

11   our general ledger that supported this balance.

12       Q.     And would you also have provided

13   information underlying the gross balance

14   identified on the bottom few lines on page 23

15   identified as intercompany payable claims from

16   amounts owing to GMAC Residential Holding

17   Company, LLC in the amount of $1.528 million --

18   $1,528,088.16 as well as the balance -- the

19   scheduled claim of GMAC Residential Holding

20   Company, LLC in the amount of $108 million?

21             MR. KERR:   Objection.

22       A.     I would have provided information from

23   our general ledger showing the intercompany

24   payable balances for these two items.

25       Q.     Do you believe that the information

*Plaintiff's Objection 119:2-11: lack of personal knowledge (FRE 602)*

*Plaintiff's Objection 119:12-24, lack of personal knowledge (FRE 602)*

Page 120

B. WESTMAN

1

2    from your general ledger would have supported

3    the balances included in the Schedule of Assets

4    and Liabilities?

5        A.    I believe the information we provided

6    was accurate to the best of our knowledge.

7        Q.    And it's consistent with the numbers

8    that are reflected in the schedule?

9            MR. KERR:  Objection.

10       A.    We would have provided a support

11   schedule that would have tied to this number.

12       Q.    And looking at page 40 of 623 on the

13   top, page 36 of 52 on the bottom, is the same

14   true for the information that you would have

15   provided in support of the Schedule of Claims of

16   Passive Asset Transactions, LLC in the amount of

17   $7,768,304.09 and in the amount of

18   $689,191,786.68?

19           MR. KERR:  Objection.

20       A.    I would have provided the same support

21   schedule that were tied to those balances.

22           MS. MILLER:  I'd like to mark as

23       Westman Exhibit 13 the Amended Schedules of

24       Assets and Liabilities for GMAC Residential

25       Holding Company, LLC filed on July 3, 2012,

Page 121

1                          B. WESTMAN

2       in the bankruptcy proceedings of In re

3       Residential Capital, LLC at Docket No. 687.

4              (Westman Exhibit 13, Amended Schedules

5       of Assets and Liabilities for GMAC

6       Residential Holding Company, LLC filed on

7       July 3, 2012, marked for identification, as

8       of this date.)

9   BY MS. MILLER:

10      Q.     Ms. Westman, would you have identified

11  intercompany payables to Debtors' advisors in

12  connection with the schedules?

13      A.     We provided a list from the general

14  ledger of intercompany receivable/payable

15  balances for the Debtors.

16      Q.     Is it your understanding that the list

17  of general ledger intercompany receivables and

18  payable balances were accurate when you provided

19  them to the Debtors -- or, when you provided

20  them for the Debtors?

21            MR. KERR:   Objection.

22      A.     They reflected the information from

23  our general ledger to the best of your

24  knowledge.

25      Q.     Do you have any reason to believe that

Page 122

1                    B. WESTMAN

2    the information in your general ledger was

3    inaccurate?

4        A.    No.

5        Q.    Do you have any reason to believe that

6    the transactions as characterized -- strike

7    that.

8              Turning to page 4 of 13 in Westman

9    Exhibit 13, would you have provided the

10   information -- schedules to support the four

11   identified intercompany payable amounts included

12   in this schedule?

13       A.    Would have provided a support schedule

14   from the general ledger for the intercompany

15   payables on a gross basis in the schedule.

16       Q.    And so that includes the intercompany

17   payable from GMAC Residential Holding Company to

18   GMAC Mortgage, LLC in the amount of

19   $58,173,460.04, correct?

20       A.    Correct.

21       Q.    And it would also include the

22   intercompany payable from GMAC Mortgage --

23   sorry, GMAC Residential Holding Company, LLC to

24   Home Connects Lending Services, LLC in the

25   amount of $54,584,051.22, correct?

Page 123

1                    B. WESTMAN

2        A.       Correct.

3        Q.       And it would also have included the

4    intercompany payable between GMAC Residential

5    Holding Company, LLC and Residential Capital,

6    LLC in the amount of -- sorry, $38,284,486.27

7    and in the amount of $3,295,635,793.50, correct?

8        A.       Correct.

9            (Discussion off the record.)

10           MS. MILLER:  I would like to mark as

11   Westman Exhibit 14 an e-mail chain dated

12   July 31, 2012, and marked for identification

13   in this matter with Bates No. RCJSN10028118

14   through 28119.

15           (Westman Exhibit 14, an e-mail chain

16   dated July 31, 2012, bearing Bates Nos.

17   Bates Nos. RCJSN10028118 through 28123,

18   marked for identification, as of this date.)

19           MR. KERR:  Actually, I think the Bates

20   numbers run to 28123.

21           MS. MILLER:  Yes, there are two --

22   e-mails or two attachments?  I think that

23   the document is actually just the first two

24   pages and then there's another e-mail that

25   starts after that.  I think it's two

Page 124

1          B. WESTMAN

2      documents stapled together.

3          MR. KERR:  Okay.

4          (Document review.)

5  BY MS. MILLER:

6      Q.    Ms. Westman -- sorry, are you still

7  reviewing?  Are you still reviewing the

8  document?

9      A.    Oh, no.  I'm fine.  Thank you.

10      Q.    Did you continue to receive requests

11  for information related to the intercompany

12  payables after the Debtors filed their Statement

13  of Assets and Liabilities?

14      A.    Yes, there were requests from various

15  different parties throughout the year.

16      Q.    And was one of those parties the

17  Unsecured Creditors Committee?

18      A.    Most likely, yes.

19      Q.    Looking at Westman Exhibit 14, does

20  this refresh your recollection that UCC,

21  beginning at least in July of 2012, requested

22  information regarding intercompany relationships

23  and intercompany balances?

24          MR. KERR:  Objection.

25      A.    This indicates that a list was

Page 125

1                    B. WESTMAN

2  reviewed with the UCC.

3       Q.    Do you recall having discussions with

4  the UCC or any of their advisors relating to

5  intercompany balances?

6            MR. KERR:  You're talking about Ms.

7       Westman herself?

8            MS. MILLER:  Yes.

9            THE WITNESS:  I don't specifically

10      recall.  I had discussions with several

11      different creditors.  I don't recall that I

12      had a direct conversation with the UCC.

13  BY MS. MILLER:

14      Q.    Do you know who the UCC's financial

15  advisors were or are in connection with this

16  matter?

17      A.    I don't know them all by name, no.

18      Q.    Do you know which firm is acting as

19  financial consultant to the UCC?

20      A.    There were different firms over

21  different periods of time.  I don't know all the

22  names.

23      Q.    Do you know whether Alix Partners is

24  acting as financial advisor to the UCC in this

25  matter?

Page 126

B. WESTMAN

1

2   A.    I don't recall which firm represents

3   each creditor.

4   Q.    Do you know whether people within

5   ResCap had communications with the UCC or their

6   advisors relating to intercompany balances?

7   A.    I don't know about others, meetings

8   with other people.

9        MS. MILLER:  I would like to mark as

10       Westman Exhibit 15 a document Bates-stamped

11       for identification in this case UCC12846

12       through UCC12852.

13       (Westman Exhibit 15, a document

14       bearing Bates Nos. UCC12846 through

15       UCC12852, marked for identification, as of

16       this date.)

17  BY MS. MILLER:

18  Q.    Ms. Westman, have you ever seen the

19  attachment -- the document attached -- the first

20  attachment to this e-mail?  It's a chart titled

21  "Intercompany Balance Analysis Based on Summary

22  of Top Ten Intercos."

23  A.    Yes, I've seen it.

24  Q.    Did you review this document?

25  A.    I've seen it.  I don't believe I was

Page 127

1                         B. WESTMAN

2    ever asked to review it.

3        Q.    Do you know what the column Debt --

4    what the columns Debt and Equity are referring

5    to in this chart?

6        A.    I don't.

7        Q.    Looking at the e-mail, it's an e-mail

8    dated September 17, 2012, from Mark Renzi to a

9    number of people at Alix Partners and at MoFo

10   and at FTI and at other places that I can't

11   identify based on the e-mail addresses.  Do you

12   see that?

13       A.    Yes.

14       Q.    Did you understand that there was an

15   analysis being done regarding whether or not the

16   intercompany payables and receivables were

17   properly -- were proper debt transactions?

18            MR. KERR:   Objection.

19       A.    I was aware that there was discussion

20   around the intercompany receivable/payables and

21   how they would be treated in the bankruptcy.  I

22   wasn't involved in specific discussions.

23       Q.    But you have seen a copy of this

24   document?

25       A.    Over the course of the year, I've seen

Page 128

1                         B. WESTMAN

2   this document, yes.

3        Q.    And what's your understanding of what

4   this document is?

5              MR. KERR:  Objection.

6        A.    It's a document that's talking about

7   the top ten balances and providing some

8   information about those balances.

9        Q.    What kind of information is it

10  providing about those balances?

11       A.    I didn't prepare the document, so I'm

12  not sure I can answer that.  It must be

13  someone's analysis, but...

14       Q.    And there are facts included in both

15  the Debt and the Equity column for the listed

16  transactions, correct?

17       A.    There's information listed there.

18       Q.    In both columns, correct?

19       A.    There's information in both columns.

20       Q.    And just so that the record is clear,

21  there are facts and information listed with

22  respect to transactions number 1, 2, 3, 7 and 8

23  in both the Debt and the Equity columns,

24  correct?

25       A.    I'm sorry, can you repeat the

Page 129

                              B. WESTMAN

1

2   question?

3       Q.    There -- is it correct that there are

4   facts and information listed with respect to

5   transactions number 1, 2, 3, 7 and 8 in the

6   column -- in both the column titled Debt and the

7   column titled Equity, correct?

8       A.    There is information in both columns.

9            MR. KERR:  Atara, just so the record

10      is clear, I would note that the document --

11      the attachment you're referring to says on

12      it it's for settlement discussion purposes

13      only, so...

14           MS. MILLER:  Understood.

15           I'd like to mark as Westman Exhibit 16

16      an e-mail with attachments, Bates-stamped

17      RCUCCJSN30002758 through 2769.

18           (Westman Exhibit 16, an e-mail with

19      attachments, bearing Bates Nos.

20      RCUCCJSN30002758 through 2769, marked for

21      identification, as of this date.)

22   BY MS. MILLER:

23      Q.    Ms. Westman, do you recall receiving

24   requests for information relating to

25   intercompany balances in 2013?

Plaintiff's
Objection
129:15-21
Lack of
foundation
(FRE 602,
901, 903)

Page 130

B. WESTMAN

1

2    A.    Yes.

3    Q.    Do you recall who you received those

4    requests for information from?

5    A.    I don't know all the individuals I

6    received requests from.

7    Q.    Do you remember which groups or

8    representative parties?

9    A.    I do not.

10   Q.    Looking at the document that's been

11   marked Westman Exhibit 16, the e-mail that

12   starts on the first page of the document is a

13   e-mail dated March 4, 2013 from you to Mark

14   Renzi, Brian McDonalds -- sorry, Brian McDonald,

15   CC-ing Jacob Bazella and Jill Horner, attaching

16   a number of documents, and you write, "Here are

17   two responses to the UCC questions in the

18   attached document Intercompany Questions 25 --

19   2_25_13."

20          Does that refresh your recollection

21   that in March -- in or around February and March

22   2013 you were receiving and responding to

23   inquiries from the UCC regarding intercompany

24   balances?

25          MR. KERR:   Objection.

Plaintiff's
Objection
130:10-131:4:
objection to form;
compound; vague
and ambiguous

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 131 of 243

Page 131

1                          B. WESTMAN

2        A.      In this e-mail I was responding to a

3    request looks like from FTI from Mark Renzi for

4    information related to UCC questions.

5        Q.      And what did you understand "UCC

6    questions" to mean?

7        A.      The UCC had asked questions about the

8    intercompany balances and we were working to

9    respond to those requests.

10           MS. MILLER:   I'd like to mark as

11       Westman Exhibit 17 a document that was

12       Bates-stamped in this case RCJSN00025680,

13       which at least for right now is an e-mail

14       without the attachment.

15           (Westman Exhibit 17, an e-mail bearing

16       Bates Nos. RCJSN00025680, marked for

17       identification, as of this date.)

18           MR. KERR:   This is number 17, right?

19           MS. MILLER:   This is 17, and I promise

20       I won't ask questions about the attachment.

21   BY MS. MILLER:

22       Q.    Ms. Westman, this e-mail is an e-mail

23   from you to Mark Renzi and Filip Szymik dated --

24   with a subject line "Additional Intercompany

25   Information," and you start by writing in this

Page 132

1                          B. WESTMAN

2      document, you start by stating, "A couple

3      additional documents or explanations for the

4      deck."

5              Do you recall what deck you are

6      referring to?

7      A.    I don't recall.  We responded to many

8      different requests.

9      Q.    Do you recall that FTI was preparing a

10     PowerPoint presentation relating to intercompany

11     transactions?

12     A.    FTI prepared many documentations.  I

13     don't know which specific deck you're referring

14     to.

15     Q.    And in this e-mail you include

16     excerpts from an older e-mail that we have

17     somewhere in the repository in which Cathy

18     explained the general cash movement within the

19     company and the development of the intercompany

20     balances.  Do you see that?

21     A.    Yes.

22     Q.    And in this e-mail -- I'm going to

23     refer to it as what Cathy said, even though

24     you're including it in your e-mail, but based on

25     what you said, is it your understanding that the

Page 133

B. WESTMAN

1

2  indented portion is -- was actually written by

3  Cathy Dondzila?

4      A.     That's correct.

5      Q.     And Ms. Dondzila explains that, "In

6  the beginning," and it sounds very Biblical, I'm

7  not sure what was meant by "in the beginning,"

8  but in the beginning, the intention was that

9  ResCap, the parent entity, would be receiving

10  money and pushing it down to its operating

11  entities.

12          Is that your understanding of how the

13  ResCap structure and use of cash worked in the

14  beginning?

15      MR. KERR:  Objection.

16      A.     That was my understanding from

17  discussion with Cathy.

18      Q.     Do you have any sense of what

19  timeframe "in the beginning" is referring to?

20      A.     I don't.

21      Q.     During your time -- throughout your

22  time -- sorry.  Strike that.

23          Was that the cash flow situation at

24  any point while you were a ResCap employee?

25      MR. KERR:  Objection.

Page 134

1                        B. WESTMAN

2       A.    ResCap issued public debt to the JSNs

3    in 2008 after I was a contractor with the

4    organization.

5       Q.    Have there been any other instances

6    since that time of ResCap parent entity

7    generating money that then got pushed down to

8    its subsidiaries?

9             MR. KERR:  Objection.

10      A.    I'm not aware of all the instances

11   where ResCap may generate cash.  There could be

12   a variety of ways they would generate cash.

13      Q.    And how does Ms. Dondzila explain the

14   market changing or the -- sorry, strike that.

15            How does Ms. Dondzila explain that the

16   flow of cash changed within ResCap after the

17   credit crisis and the market implosion?

18            MR. KERR:  Objection.  You're asking

19       her what Cathy said in the document, in the

20       inserted part of the e-mail?

21      Q.    What was your understanding of how the

22   flow of cash changed within ResCap following the

23   credit crisis and the market implosion?

24      A.    I believe this is a reference to the

25   fact that the underlying subsidiaries, RFC and

Page 135

1                     B. WESTMAN

2    GMAC Mortgage, became borrowers and generated

3    cash through borrowings and/or through their

4    operations, and that cash would have flowed

5    through the organization up to ResCap as part of

6    that cash management process.

7        Q.    And would that include also the

8    operations at their subsidiaries?

9        A.    Yes.

10       Q.    Is it your understanding that the

11   daily sweep process described in the next

12   paragraph refers to the cash management process

13   we were discussing earlier?

14           MR. KERR:   Objection.

15       A.    Yes, that would be my understanding of

16   what she's describing.

17           MS. MILLER:  I would like to mark as

18   Westman Exhibit 18 -- as Westman Exhibit 18

19   a document Bates-stamped EXAM0034894 through

20   905.

21           (Westman Exhibit 18, a document

22   bearing Bates Nos. EXAM0034894 through 905,

23   marked for identification, as of this date.)

24   BY MS. MILLER:

25       Q.    Ms. Westman, do you recognize this

Plaintiff's Objection 135:10-16: hearsay (FRE 802), lack of personal knowledge (FRE 602), irrelevant (FRE 401, 402)

Page 136

B. WESTMAN

1
2  document?

3      A.    I do.

4      Q.    And can you tell me what this document

5  is?

6      A.    It was a deck regarding intercompany

7  transactions put together by FTI.

8      Q.    Do you know what purpose this deck was

9  put together for?

10     A.    There may have been a couple versions

11 of this.  This looks similar to a deck that was

12 put together for the SUN.  I can't say if that

13 is in fact that exact deck.

14     Q.    And would you have provided

15 information to FTI that was included in this

16 deck?

17     A.    Yes, this would have been based on

18 information we provided --

19     Q.    And specifically --

20     A.    -- in that regard.

21     Q.    And specifically, would you have

22 provided the Net Payable Balance information

23 listed on page 3 of the deck?

24     A.    That would have been -- we would have

25 provided a support file from the general ledger

Page 137

1                          B. WESTMAN

2    with the intercompany receivable/payable

3    balances that would support that.

4         Q.    Looking at page 6 of the deck,

5    looking, for example, at Accounts Receivable

6    entity number 2, Residential Funding Company,

7    RFC, the comments say, "Balance generally arose

8    out of operation of the company's centralized

9    cash management system."

10            Do you know what centralized cash

11   management system the FTI is referring to in

12   this deck or is being referred to here?

13        A.    The information in this deck, these

14   were general assumptions or high-level

15   explanations that we were looking to gather

16   about these individual balances.  That

17   particular statement would have been referencing

18   the cash management process where cash is swept

19   through the organization.

20        Q.    So there isn't another formal system

21   that's in place, just a general process?

22        A.    Correct.

23            MR. KERR:  Objection.

24        Q.    Would you have provided information to

25   FTI to support their comments?

Page 138

1          B. WESTMAN

2          MR. KERR:  Which specific comments are

3     you talking about?  The ones -- which

4     comments?

5          MS. MILLER:  The ones in support of --

6     sorry, the ones listed on pages 6 through 8.

7          THE WITNESS:  I can't speak to every

8     comment, whether we provided information for

9     each of the comments.  We provided

10    information as input, but I don't know

11    whether that was for every item, every

12    comment in this deck.

13    BY MS. MILLER:

14    Q.    Would you have provided information

15    regarding whether a balance arose out of the

16    company's centralized cash management system?

17    A.    When we provided information that a

18    balance was related to the cash management

19    system, that means that that is a possible

20    explanation or a partial explanation for those

21    balances.

22          So those particular entities would

23    have been impacted by that situation of managing

24    cash.  It doesn't imply that that's the complete

25    explanation for that balance.  It's an example

Page 139

1          B. WESTMAN

2  of the type of activity that could create

3  intercompany balances.

4     Q.    So looking, for example, at the first

5  line relating to Res -- to the RFC balance, it

6  says, "Balance generally arose out of operation

7  of the company's centralized cash management

8  system."

9          Would you have provided information to

10 FTI to support the statement that "the balance

11 generally arose out of operation of the

12 company's centralized cash management system"?

13     MR. KERR:  Objection.

14     A.    We would have provided commentary that

15 said that that is a situation that's applicable

16 and that our belief would be that that was a --

17 an example of what would have created this

18 transaction or this balance.

19          It doesn't imply that that's the

20 complete explanation.  It's a portion or a part

21 of the way that this balance is created; that

22 this entity is impacted by that cash management

23 situation.

24     Q.    Understood.  Is it -- do you believe

25 that it's accurate to say that the balance

Plaintiff's
Objection
139:24-140:9
Lack of
personal
knowledge
(FRE 602)

Page 140

B. WESTMAN

1

2  generally arose out of the operation of the

3  company's centralized cash management system?

4      A.    Because it's very, very difficult to

5  tie individual transactions to the reason for

6  the transaction, to the best of our knowledge,

7  that was our belief; that that is a reason for

8  those balances, but there isn't specific

9  documentation to support that.

10      MS. MILLER:  We've been I think going

11  for about an hour.  I don't know if you want

12  to take a break on.

13      MR. KERR:  Sure.  You want to take a

14  break?

15      THE VIDEOGRAPHER:  The time is 2:51.

16  This is the end of tape labeled number 3.

17  We'll be going off the record.

18      (Recess.)

19      (Recess.)

20      THE VIDEOGRAPHER:  This is the start

21  of tape labeled number 4.  The time is 3:07.

22  We're back on the record.

23      MS. MILLER:  I would like to mark as

24  Westman Exhibit 19 a document Bates-stamped

25  EXAM00107037 through 41.

Page 141

B. WESTMAN

1

2        (Westman Exhibit 19, a document

3      bearing Bates Nos. EXAM00107037 through 41,

4      marked for identification, as of this date.)

5   BY MS. MILLER:

6      Q.    Ms. Westman, do you recognize this

7   document?

8      A.    Yes.

9      Q.    And what is it?

10     A.    This is a loan agreement between

11  ResCap and GMAC Residential Holding Company.

12     Q.    Is it also a loan agreement between

13  ResCap and GMAC Mortgage Corporation and

14  Residential Funding Corporation?

15     A.    Yes.

16     Q.    And do you understand what this

17  agreement relates to?

18     A.    This is an intercompany agreement that

19  we identified in our research representing a

20  relationship between the entities within this

21  agreement.  It's an old document so I'm not

22  familiar with the origin of it.

23     Q.    And before you started doing your

24  research in connection with the intercompany

25  claims that we've been talking about starting in

Page 142

B. WESTMAN

1    the fall of 2011, were you familiar with any

2    agreements that governed the intercompany

3    relationship between ResCap and its

4    subsidiaries?

5         MR. KERR:  Objection.

6    A.    Can you repeat the question?

7    Q.    Yes.  Sorry.  Let me restate that.

8         Prior to the fall of 2011, were you

9    familiar with any loan agreements governing

10   intercompany balances between ResCap and any of

11   its subsidiaries?

12   A.    I think prior to that I didn't

13   personally have occasion to look at the loan

14   documents.

15   Q.    And since you started collecting

16   documentation relating to the intercompany loan

17   balances -- let me strike that.

18        You have no personal knowledge of

19   whether or not there are any other loan

20   agreements other than the ones you identified in

21   connection with your collection of materials

22   related to the intercompany balances, correct?

23        MR. KERR:  Objection.

24   A.    Could you restate the question?

Page 143

1                        B.  WESTMAN

2        Q.      Do you know personally whether there

3   are any loan agreements between any ResCap

4   entities regarding -- that you have not

5   collected in connection with your review of

6   intercompany balances?

7        A.      No.

8        Q.      When you say this is an old document,

9   specifically the agreement is dated as of

10  January 1, 2006, correct?

11       A.      Correct.

12           MS. MILLER:  I'd like to mark as          Plaintiff's
                                                       Objection
13   Westman Exhibit 20 a document Bates-stamped       143:12-144:3

14   EXAM001030 through 35.                            Lack of
                                                       foundation
15           (Westman Exhibit 20, a document           (FRE 602, 901,
                                                       903)
16   bearing Bates Nos. EXAM001030 through 35,

17   marked for identification, as of this date.)

18  BY MS. MILLER:

19       Q.      I've marked as Westman Exhibit 20 an

20  Amended and Restated Intercompany Advance

21  Agreement dated as of June 30, 2006 between

22  Homecomings Financial Network, Inc. and

23  Residential Funding Corporation.

24           Ms. Westman, have you seen this

25  document before?

Page 144

B. WESTMAN

2    A.    I don't specifically recall this

3  document.    I may have.

4    Q.    When you collected documentation

5  relating to the intercompany balances, did you

6  review the agreements?

7    A.    When we identified agreements, we

8  looked for agreements between the parties.  For

9  instance, if we were looking related to the top

10  ten, we would have looked specifically for

11  agreements between those particular entities.

12        We also looked for agreements that had

13  intercompany, so did searches for those

14  agreements, and we produced whatever documents

15  we found.  We weren't necessarily able to

16  connect those agreements to the balances other

17  than that they impacted the parties that we were

18  looking for.

19    Q.    You have no understanding of whether

20  this agreement would govern the situation where

21  the lending relationship contemplated by the

22  agreement is reversed, do you?

23    A.    No knowledge of that.  This is a very

24  old document as well.

25    Q.    Is there anyone within ResCap who

Page 145

1                    B. WESTMAN

2    would have context for these agreements?

3            MR. KERR:   Objection.

4        A.    I'm not aware of anyone left within

5    ResCap that would have knowledge of these

6    agreements.

7        Q.    Do you know if at the time that you

8    started collecting documentation related to the

9    intercompany balance there was anyone within

10   ResCap who had personal information regarding

11   these agreements?

12       A.    Not to our knowledge.   We attempted to

13   reach out to parties who might have knowledge to

14   get information about those relationships and

15   what they might know, but we were not very

16   successful on finding individuals that could

17   speak to any particular agreement or a

18   particular relationship.

19           MS. MILLER:   I'd like to mark as

20       Westman Exhibit 21 a document Bates-stamped

21       EXAM00107022 through 29.

22           (Westman Exhibit 21, a document

23       bearing Bates Nos. EXAM00107022 through 29,

24       marked for identification, as of this date.)

25   BY MS. MILLER:

Plaintiff's
Objection
145:19-24: lack
of foundation
(FRE 602, 901,
903)

Page 146

1                       B. WESTMAN

2        Q.    Ms. Westman, do you recognize this

3   document?

4        A.    I don't specifically recall this

5   document.  I may have seen it.

6        Q.    Is it your understanding that there is

7   an agreement that governs the lending

8   relationship between Residential Capital, LLC

9   and RFC Asset Holdings II, LLC?

10            MR. KERR:  Objection.

11        A.    I'm aware that this agreement exists.

12   I don't know any information about the

13   agreement.  I'm not familiar with the

14   arrangement.

15        Q.    In the process of -- this document --

16   sorry.  The document that's been identified

17   as -- that's been marked as Westman Exhibit 21

18   is an Intercompany Advance Agreement dated as of

19   June 1, 2009 between Residential Capital, LLC

20   and RFC Asset Holdings II, LLC.

21            Do you have any reason to believe that

22   this is not an accurate copy of the agreement

23   that it purports to be?

24        A.    This is a document that we identified.

25   I don't know anything more about the document.

Page 147

B. WESTMAN

2  Q.    And this document is a lot less old
3  than the other ones.  Did you attempt to find
4  anybody within ResCap in the process of your
5  collection of materials who was personally
6  familiar with this agreement?
7  A.    We did not find anyone who was
8  personally familiar with it.
9  Q.    Did you make those inquiries?
10  A.    I don't remember specifically
11  inquiring about this agreement, but we did make
12  inquiries in general about the relationships.  I
13  don't remember anyone specifically calling out
14  this agreement or indicating they were aware of
15  it.
16  Q.    And so you don't know if an agreement
17  between Residential Capital, LLC and RFC Asset
18  Holdings would also govern intercompany payables
19  that arise out of money flowing from RFC --
20  sorry, from money flowing to RFC Asset Holdings
21  through Residential Funding Company, do you?
22  A.    We can't tie transactions to an
23  agreement.  So, no, I don't have any knowledge
24  of that.
25  Q.    So you don't know one way or the

Page 148

1                            B. WESTMAN

2   other?

3        A.    Correct.

4              MS. MILLER:  I'd like to mark as

5   Westman Exhibit 22 a document Bates-stamped

6   EXAM00107300 through 307.

7              (Westman Exhibit 22, a document

8   bearing Bates Nos. EXAM00107300 through 307,

9   marked for identification, as of this date.)

10  BY MS. MILLER:

11       Q.    Ms. Westman, is there anyone within

12  ResCap who would have more information about

13  these agreements than you?

14       A.    Not to my knowledge.

15       Q.    We marked as Westman Exhibit 22 an

16  Intercompany Advance Agreement dated as of June

17  1, 2009 between Residential Capital, LLC and

18  Passive Asset Transactions, LLC.  Do you see

19  that?

20       A.    Yes.

21       Q.    And do you recognize this agreement?

22       A.    Yes.

23       Q.    You don't know whether this agreement

24  would also govern intercompany transactions that

25  flow from Passive Asset Transactions to GMAC

Page 149

1              B. WESTMAN

2    Mortgage LLC, do you?

3         A.    No, I don't know anything about this

4    agreement.

5         Q.    And so you don't know if it could also

6    include subsidiaries of Residential Capital?

7              MR. KERR:   Objection.

8         Q.    Correct?

9         A.    I don't know.  It doesn't indicate

10   anything about subsidiaries, but we were not

11   able to find anyone with knowledge about this

12   agreement.

13             MS. MILLER:   I'd like to mark as

14        Westman Exhibit 23 a document Bates-stamped

15        EXAM12263381 through 406.

16             (Westman Exhibit 23, a document

17        bearing Bates Nos. EXAM12263381 through 406,

18        marked for identification, as of this date.)

19   BY MS. MILLER:

20        Q.    Ms. Westman, we have marked as Westman

21   Exhibit 23 an e-mail chain with some

22   attachments.  The top e-mail is dated March 22,

23   2012, and it's an e-mail from you to Jeremy

24   Stern and Mark Renzi with a CC to Liz Park and

25   Cathy Dondzila regarding waterfall questions,

Page 150

1                        B. WESTMAN

2   and it attaches a spreadsheet entitled Top Ten

3   Intercompany Relationships and a zip file which

4   appears to have three files contained within it.

5           Looking at the e-mail that you sent to

6   Jeremy, you note in the second sentence of the

7   second paragraph that, "Some of the balances

8   have flipped and the subs are now lending money

9   instead."

10          Do you have an understanding of why

11  that's the case?

12      A.    No, it was simply an observation.

13  Again, we were attempting to find agreements

14  with the parties on the top ten list, and so

15  this was -- I was providing documentation that

16  we found that could in any way be related or

17  that was intercompany, and so simply noting

18  that, while we found agreements, they may not be

19  between the correct parties that we were looking

20  for or they may not go in the direction as

21  specified in the agreement.  So it was just

22  calling out what we had identified and what we

23  had found.  I don't have any knowledge about the

24  agreements themselves.

25      Q.    Okay.  And looking at the second

Page 151

1                    B. WESTMAN

2  attachment, which is -- there's the Bates stamp

3  EXAM12263385 through 90, does this refresh your

4  recollection that you have in fact previously

5  seen the Amended and Restated Intercompany

6  Advance Agreement dated as of June 30 between

7  Homecomings Financial Network and Residential

8  Funding Corporation?

9       A.    Yes.

10      Q.    And that is the same agreement that we

11 previously marked as Westman Exhibit 20,

12 correct?

13      A.    Yes.

14      Q.    Do you have an understanding whether

15 interest was to be accrued and paid under each

16 of the intercompany loan agreements we looked

17 at?

18      A.    I don't without looking at the

19 documents.

20      Q.    Can we look back at Westman Exhibit

21 19.  Sorry.  If you could look -- focusing first

22 on Westman Exhibit 20, which was the Homecomings

23 agreement we were just looking at, can you tell

24 whether interest was to accrue on this balance?

25      A.    Within this agreement, or whatever is

Page 152

1                      B. WESTMAN

2   being referenced by this agreement, it does have

3   an interest provision in item number 2.

4       Q.    Did ResCap accrue interest on

5   intercompany balances that weren't specifically

6   governed by an agreement that interest would

7   accrue?

8             MR. KERR:  Objection.

9       A.    Certain balances had interest accrued

10  and other balances did not.  They were generally

11  historical practice and so don't necessarily

12  have a reason why interest was accrued in

13  certain instances and not in others.

14      Q.    Do you know what the basis was for the

15  historical practices?

16      A.    Historical practice.  So, from my

17  knowledge, certain balances were accruing

18  interest and they continued to accrue interest.

19  I don't know the -- when it started or the

20  reason that interest would have accrued on

21  certain balances.

22            MS. MILLER:  I'd like to mark as

23  Westman Exhibit 24, a document Bates-stamped

24  RCJSN10034044 through 050.  The natives

25  threw it off.

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 153 of 243

Page 153

1                         B. WESTMAN

2               (Westman Exhibit 24, a document

3          bearing Bates Nos. RCJSN10034044 through

4          050, marked for identification, as of this

5          date.)

6     BY MS. MILLER:

7          Q.    Ms. Westman, I'd like to refer you to

8     the document with the number -- that ends in the

9     number 049.  This is a January 11, 2012 e-mail

10    from Jacob Bazella to Cathy Dondzila copying you

11    with a "re" line "forward:  Missed allocation in

12    December."  Do you recall this e-mail?

13         A.    Yes, somewhat.

14         Q.    Can you explain what this e-mail is

15    dealing with?

16         A.    For certain entities within the RFC

17    side of the organization, interest accruals were

18    run through a system entry that ran through the

19    PeopleSoft system, and in this particular

20    instance, it appears that that interest entry

21    didn't run.

22         Q.    Is there a specific intercompany

23    balance that interest was supposed to accrue on

24    that this -- sorry.  Let me start over.

25               Is there a specific intercompany

Page 154

1                              B. WESTMAN

2    balance that interest did not accrue on in this

3    situation that's being addressed in the January

4    11, 2012 e-mail?

5         A.    This indicates that the interest

6    accrual between RFC and HFN, which is

7    Homecomings Financial, did not run.

8         Q.    Is it your understanding that, in the

9    intercompany balance that's being referred to in

10   this e-mail, Homecomings Financial is the lender

11   and RFC is the borrower?

12            MR. KERR:   Objection.

13        A.    In this particular intercompany

14   balance, Homecomings was receiving the interest

15   income.  So it would have been the entity that

16   held the receivable.

17        Q.    And it says in the next paragraph

18   that, "This allocation is based off an interest

19   rate that is received by Treasury during close

20   and I believe represents a blended COF rate

21   across ResCap."

22            Do you know where that interest rate

23   is derived from?

24        A.    I don't.  It was a normal input into

25   the month-end close process.  I don't know how

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 155 of 243

Page 155

1                         B. WESTMAN

2    it was derived.

3         Q.     Do you know what "COF" means?

4         A.     Cost of funds.

5         Q.     Can you turn back to Westman Exhibit

6    20, please, which is the Amended and Restated

7    Intercompany Advance Agreement between

8    Homecomings Financial Network and Residential

9    Funding Corporation.

10             In looking at paragraph number 2, can

11   you tell me how interest -- what rate interest

12   was supposed to accrue at under this agreement?

13        A.     At a rate per annum equal to the

14   lender's cost of funds for such date, but in no

15   event at a rate per annum greater than the

16   highest rate permitted by applicable law.

17             MS. MILLER:  I'd like to mark as

18        Westman Exhibit 25 a document Bates-stamped

19        RCUCCJSN10895541 through 5550.

20             (Westman Exhibit 25, a document

21        bearing Bates Nos. RCUCCJSN10895541 through

22        5550, marked for identification, as of this

23        date.)

24   BY MS. MILLER:

25        Q.     Ms. Westman, I have marked as Exhibit

Page 156

1                          B. WESTMAN

2    25 a e-mail chain between different groups of

3    people, so I'm not going to go through them all,

4    beginning on May 31, 2012, through June 1, 2012,

5    "Re:  Resi interest - May," and if you would

6    flip to the end -- the beginning of that chain,

7    which is at the end of the document, do you

8    recall the situation that was being discussed in

9    this e-mail chain?

10        A.    Yes.

11        Q.    And what happened?

12        A.    An interest payment on intercompany

13   balance between ResCap and Resi Holdings was

14   generated through a system process

15   post-bankruptcy, and because of the bankruptcy,

16   that interest should not have been generated.

17        Q.    Is it your understanding that the

18   interest that accrued between ResCap and Resi

19   Holdings accrued in the ordinary course of

20   business?

21             MR. KERR:  Objection.

22        Q.    Sorry.  Let me restate that.

23             Is it your understanding that this was

24   a regular accrual of interest between ResCap and

25   Resi Holdings?

Page 157

B. WESTMAN

1

2    A.    Yes.

3         MS. MILLER:   I'd like to mark as

4    Westman Exhibit 26 a document Bates-stamped

5    RCUCJSN10692261 through 2266.

6         (Westman Exhibit 26, a document

7    bearing Bates Nos. RCUCJSN10692261 through

8    2266, marked for identification, as of this

9    date.)

10   BY MS. MILLER:

11   Q.    Ms. Westman, I have marked as Westman

12   Exhibit 26 an e-mail.   It's an e-mail chain with

13   the top e-mail being an e-mail dated December 1,

14   2012, from you to Brian McDonald, Mark Renzi and

15   Liz Park at FTI, copying Cathy Dondzila and Jill

16   Horner, relating to open items for various

17   requests.   Do you see that?

18   A.    Yes.

19   Q.    And it attaches three documents, do

20   you see that?

21   A.    Yes.

22   Q.    And in specific, item number 4, which

23   is titled "Schedule of Intercompany Interest

24   payments for Alix Partners," you note,

25   "Complete.  ResCap intercompany interest

Page 158

1                    B. WESTMAN

2    schedule attached.  Please forward to the UCC."

3            MR. KERR:  Objection.

4            MS. MILLER:  The basis of your

5        objection?

6            MR. KERR:  Actually, I see.  I

7        withdraw my objection.  I read the e-mail

8        wrong.  No objection.

9    BY MS. MILLER:

10       Q.    Ms. Westman, did you prepare a

11   schedule of intercompany interest?

12       A.    I did not prepare the schedule.

13       Q.    Do you know who did prepare it?

14       A.    I don't know who prepared it.

15       Q.    Did you review the schedule?

16       A.    I passed the schedule on.  I don't

17   recall if I reviewed it.  I believe it might

18   have been prepared by Matt McGarvey.

19       Q.    Do you have any reason to believe that

20   the information in the schedule is not accurate,

21   an accurate reflection of ResCap's business

22   records?

23       A.    No.

24       Q.    Looking at the schedule, which is the

25   second attachment to the e-mail, starting at

1                       B. WESTMAN

2    Bates No. RCUCCJSN10692265, the schedule

3    identifies interest being accrued on

4    intercompany balances between GMAC Residential

5    Holdings and Residential Capital on the balance

6    of $38-plus million, do you see that?

7        A.    I'm sorry, could you rephrase your

8    question?

9        Q.    Yes.   Which intercompany balances does

10   the schedule reflect interest being accrued on?

11       A.    I'm not sure I fully understand the

12   schedule.

13       Q.    Do you understand that the schedule

14   identifies certain intercompany balances and

15   whether interest was accrued and/or paid on

16   those balances?

17       A.    Yes.

18       Q.    Can you identify those intercompany

19   balances that, according to this schedule, had

20   interest accrue on?

21       A.    For the first set of items between

22   GMAC Residential Holding and Residential

23   Capital, that relationship had interest accrued.

24   The $38 million in this instance is the interest

25   accrual on the balance.

Plaintiff's
Objection
159:13-160:4
Incomplete
(FRE 106)

12-12020-mg    Doc 5803-5    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Desposition Designations: Barbara Westman    Pg 160 of 243

Page 160

B. WESTMAN

2    The schedule also indicates that RFC

3  Asset Holding II and Residential Funding Company

4  balance had interest accrued but not paid.

5    Q.    What does it mean when interest was

6  accrued and not paid?

7    A.    It means that interest was calculated

8  and recorded in the general ledger as interest

9  receivable/payable, but it was not cash-settled.

10    Q.    And would it have increased the net

11  intercompany balance -- or, sorry, would it have

12  increased or decreased -- let me start over.

13    Would it have increased the net

14  intercompany balance between the two entities?

15    A.    It was reflected within the

16  intercompany balances between the entities.  It

17  was included in the interest accruals on either

18  side.

19    Q.    Which other intercompanies are

20  reflected as having interest accrued?

21    A.    GMAC Mortgage and GMAC Residential

22  Holding Company had interest accrued but not

23  paid.  Residential Funding Company and RFC Asset

24  Management had interest accrued but not paid.

25    Q.    And again, when you say "interest

Page 161

1                          B. WESTMAN

2    accrued but not paid," that means a change in

3    the intercompany balance as opposed to a

4    transfer of cash, correct?

5        A.    Yes, it means we would have -- would

6    have recorded an interest receivable, an

7    intercompany interest receivable, an

8    intercompany interest payable transaction, and

9    that would have been included in the

10   intercompany balances.

11       Q.    Ms. Westman, did any of the ResCap

12   entities file financial statements on an

13   unconsolidated basis?

14       A.    Several ResCap subsidiaries filed

15   their own consolidated financials for that

16   subsidiary where they're consolidated

17   subsidiaries.   There may have been entities that

18   filed on a standalone basis in prior periods.

19       Q.    And which entities -- how would you

20   refer to the filing of a rolled-up consolidated

21   filing at a subsidiary level?

22       A.    Would -- for instance, a consolidated

23   financial statement for GMAC Mortgage would have

24   included GMAC Mortgage and all of its

25   subsidiaries consolidated.

Page 162

1                          B. WESTMAN

2        Q.    So which entities within the ResCap

3    group filed consolidated financial statements?

4        A.    That varies for different periods of

5    time.

6        Q.    Starting when you first started

7    working with ResCap in 2008, do you know which

8    ResCap entities filed consolidated financial

9    statements?

10            MR. KERR:   Objection.

11       A.    To my knowledge for 2008, ResCap RFC

12   and GMAC Mortgage created consolidated financial

13   statements.

14            When you indicate "filed," I'm not

15   sure how you're defining that term, but they did

16   have audited financial statements produced.

17       Q.    And were those audited financial

18   statements submitted to any third parties?

19       A.    The ResCap financial statements for

20   2008 and a period of 2009 were filed with the

21   SEC, and after that, they were privately filed

22   on a Website.

23            They were also provided -- may have

24   been provided to various regulatory agencies

25   and/or creditors under various agreements.

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 163 of 243

Page 163

1                    B. WESTMAN

2        Q.    Do you know which regulatory agencies

3    ResCap submitted its financials to?

4        A.    I do not.

5        Q.    Do you know which regulatory agencies

6    GMAC Mortgage submitted its financials to?

7        A.    GMAC Mortgage submitted their

8    financials to HUD, and copies of financials

9    would have been submitted to Compliance, who may

10   have provided them to other entities.

11       Q.    Do you know whether GMAC Mortgage

12   filed its own tax returns, state tax returns?

13       A.    I'm not familiar with the filing of

14   tax returns.

15       Q.    Do you know whether Residential

16   Funding Company submitted -- which regulatory

17   agencies RFC submitted its financials to?

18       A.    RFC would have also submitted

19   financials to HUD and to Compliance.

20       Q.    What do you mean by "Compliance"?

21       A.    The Compliance Department handled

22   various state licensing or other regulatory

23   licensing, so they received copies of the

24   financials.  I don't know who they provide them

25   to.

Page 164

1                    B. WESTMAN

2       Q.    Is it your understanding that they do

3  in fact provide them to certain licensing

4  agencies?

5       A.    I don't have any knowledge of what

6  they do with them.

7       Q.    Do you know -- do you know if

8  they're -- do you know whether in 2009 any

9  ResCap subsidiaries other than GMAC Mortgage and

10 Residential Funding Company filed consolidated

11 financial statements?

12      A.    To my knowledge --

13            MR. KERR:  Objection.

14      A.    To my knowledge, after --

15            MR. KERR:  Objection.

16      Q.    Okay.  Do you know whether in 2009 any

17 ResCap subsidiaries other than GMAC Mortgage and

18 Residential Funding Company prepared audited

19 consolidated financial statements?

20      A.    Not to my knowledge.

21      Q.    Is it your understanding that in 2009

22 GMAC Mortgage and RFC prepared audited

23 consolidated financial statements?

24      A.    Yes.

25      Q.    Is it your understanding that GMAC

12-12020-mg    Doc 5803-5    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Desposition Designations: Barbara Westman    Pg 165 of 243

Page 165

1              B. WESTMAN

2      Mortgage and RFC prepared audited consolidated

3      financial statements for 2010?

4          A.    Yes.

5          Q.    And for 2011?

6          A.    Yes.

7          Q.    And in 2000 were GMAC Mortgage's

8      audited consolidated financial statements

9      submitted to HUD in 2009, '10 and '11?

10         A.    To my knowledge, yes.

11         Q.    And were they also submitted to the

12     Compliance Department for purposes of evaluating

13     compliance with state licensing requirements?

14         A.    To my knowledge, yes.

15         Q.    And were RFC's audited consolidated

16     financial statements for 2009, '10, '11

17     submitted to HUD?

18         A.    To my knowledge, yes.

19         Q.    And were they also submitted to the

20     Compliance Department for consideration of

21     whether RFC was in compliance with certain state

22     licensing requirements?

23         A.    To my knowledge, yes.

24         Q.    And do you know whether RFC had to

25     affirmatively report compliance to certain state

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman    Pg 166 of 243

Page 166

1              B. WESTMAN

2    licensing agencies?

3         A.    I'm not aware of what the licensing

4    requirements were or reporting requirements.

5         Q.    Do you know if there were any net

6    worth requirements?

7         A.    I don't know for the various states.

8         Q.    Do you know if any state had a net

9    worth requirement?

10        A.    I don't have any knowledge of that.

11        Q.    Do you know if HUD had a net worth

12   requirement?

13        A.    Yes, HUD had a net worth requirement.

14        Q.    And do you know whether the standalone

15   consolidated financial statements for GMAC

16   Mortgage reflected its intercompany receivables

17   and intercompany payables?

18        A.    Could you repeat the question?

19        Q.    Do you know whether -- sorry.   Strike

20   it.

21        A.    Excuse me.   Could I correct my answer?

22   You had earlier asked about state, whether any

23   state licensing had net worth, and in fact,

24   there were states that had a net worth

25   requirement that were monitored.

Page 167

1                    B. WESTMAN

2        Q.     And do you know which states?

3        A.     I don't recall which states offhand.

4   We had a spreadsheet where for certain periods

5   of time those were monitored.   If there was a

6   requirement, whether it was a particular state

7   for a particular license, if there were net

8   worth requirements, those were monitored.

9        Q.     And do you know if ResCap reported

10  compliance to those states where there were net

11  worth requirements?

12       A.     I don't know how the reporting of that

13  information worked.

14       Q.     Is it your understanding that some of

15  the amount -- is it your understanding that some

16  amount of reporting of net worth was required?

17            MR. KERR:   Objection.

18       A.     We monitored net worth requirements.

19  I'm not aware of -- of what Compliance did with

20  that information or how they received that

21  information.

22       Q.     Were intercompany balances

23  receivable -- payables and receivables reflected

24  in the consolidated audited financial statements

25  of GMAC Mortgage?

Page 168

B. WESTMAN

1

2      A.      Intercompany receivables and payables

3   with GMAC Mortgage and any of its subsidiaries

4   would have been eliminated in those financial

5   statements under GAAP rules.   Any intercompany

6   balance with an entity outside of the GMAC

7   Mortgage consolidation point would have been

8   included in those financial statements.

9      Q.      And so that would have included any

10  intercompany balance between GMAC Mortgage, LLC

11  and GMAC Residential Holding Company, LLC,

12  correct?

13     A.      Correct.

14     Q.      And it would have also included any

15  intercompany balance between GMAC Mortgage, LLC

16  and Residential Funding Company, LLC, correct?

17     A.      Correct.

18     Q.      Were intercompany receivables and

19  payables outside of the Residential Funding

20  Company consolidated group reflected in

21  Residential Funding Company's audited financial

22  statements?

23     A.      Yes.

24     Q.      And that would include the

25  intercompany balance between -- payable or

1                           B. WESTMAN

2    receivable between Residential Funding Company,

3    LLC and Residential Capital, LLC, correct?

4         A.    To the extent there was a balance,

5    yes.

6         Q.    And it would also reflect any

7    intercompany payable or receivable between

8    Residential Funding Company, LLC and GMAC

9    Mortgage, LLC, correct?

10        A.    Correct.

11        Q.    What impact, if any, did intercompany

12   balances have on net worth calculations?

13        A.    A specific net worth calculation,

14   there were different calculations for different

15   state licenses or HUD licenses, et cetera, for

16   different reasons.

17        Q.    What impact, if any, did intercompany

18   balances have on net worth calculations for HUD?

19        A.    For HUD, intercompany receivables were

20   not an allowed asset.   They were removed as an

21   asset.

22        Q.    And how are intercompany payables

23   treated?

24        A.    Intercompany receivables and payables

25   were netted within a relationship.   So, to the

Page 170

B. WESTMAN

2  extent that a balance created -- the net balance

3  was a receivable, it was ignored.  To the extent

4  that the net balance was a payable, it was

5  included in the calculation.  So it was a very

6  conservative calculation.

7      Q.    Do you know whether GMAC Mortgage

8  reported financials to Fannie Mae?

9      A.    I don't specifically recall if they

10  did.

11      Q.    Do you know whether GMAC Mortgage had

12  to -- whether Freddie Mac had net worth

13  requirements that GMAC Mortgage had to comply

14  with?

15      A.    I don't recall.  I believe that that

16  was included in our net worth calculations; that

17  there was monitoring of those net worth

18  balances.  I don't know how that information was

19  provided, who it was provided to.

20      Q.    Do you know if GMAC Mortgage had to

21  monitor its net worth for Ginnie Mae

22  requirements also?

23      A.    If it's in the net worth monitoring

24  schedule, then we were monitoring it.

25      Q.    You mentioned also that consolidated

Plaintiff's
Objection
170:25-171:12:
lack of personal
knowledge
(FRE 602)

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 171 of 243

Page 171

1              B. WESTMAN

2    financial statements of GMAC Mortgage and

3    Residential Funding Company were provided to

4    creditors.  Which creditors received audited

5    financial statements?

6              MR. KERR:   Objection.

7         Q.    Of GMAC Mortgage or Residential

8    Funding.

9              MR. KERR:   Objection.

10        A.    The audited financials were provided

11   to Treasury, who posted them to an Intralink

12   site.  I don't know who had access to that.

13        Q.    Do you know -- do you know which

14   agreements required reporting of audited

15   financial statements for GMAC Mortgage?

16        A.    I don't.

17        Q.    Do you know any lending agreement that

18   required reporting of financial statements for

19   GMAC Mortgage?

20        A.    I don't offhand.  I assume the Ally

21   revolver may have required it, but I don't know

22   in particular.

23        Q.    And do you know of any specific credit

24   agreements that required reporting of the

25   Residential Funding Company, LLC audited

12-12020-mg    Doc 5803-5    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Desposition Designations: Barbara Westman    Pg 172 of 243

Page 172

1                          B. WESTMAN

2    financial statements?

3          A.      I believe those were also required by

4    the Ally revolver.  Beyond that, I don't.

5          Q.      To the best of your knowledge, those

6    audited financial statements were also given to

7    Treasury and then posted on an Intralink site

8    for the appropriate creditors to access?

9          A.      Correct.

10         Q.      And would intercompany balance --

11   sorry.  Would intercompany payables and

12   receivables outside of the consolidated

13   subsidiary group be reflected in its financial

14   statements?

15         A.      Yes.  At the consolidation, any

16   intercompany balance outside of that

17   consolidation would have been reflected in those

18   audited financial statements.

19         Q.      And where would they be reflected?

20         A.      Various places depending on if it was

21   an intercompany receivable or an intercompany

22   payable, and depending on the size of the

23   balance, the receivables may have been reported

24   in other assets.  They may have been called out

25   as a separate line item.  Payables would have

12-12020-mg    Doc 5803-5    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Desposition Designations: Barbara Westman    Pg 173 of 243

Page 173

                              B. WESTMAN

1

2    been reported in borrowings.

3        Q.    Do you know whether GMAC Residential

4    Holding Company ever prepared its own

5    consolidated financial statements?

6        A.    I believe historically it did.

7        Q.    And do you know whether Homecomings

8    Financial, LLC ever prepared its own financial

9    statements?

10       A.    Again, historically, I believe it did.

11            MS. MILLER:  Do you want to take a

12    break or keep going?

13            THE WITNESS:  I'm fine.

14            MR. KERR:  Keep going.  That's fine.

15    Keep going.  When you do want to take a

16    break, just let us know.

17            MS. MILLER:  I'm having fun, but...

18            (Pause in the proceedings.)

19            THE WITNESS:  We can take a break.

20            MR. KERR:  Why don't we take a break.

21            THE VIDEOGRAPHER:  The time is 4:10.

22    This is the end of tape labeled number 4.

23    We'll be going off the record.

24            (Recess.)

25            THE VIDEOGRAPHER:  This is the start

Page 174

1                        B. WESTMAN

2        of tape labeled number 5.  The time is 4:21.

3        We are back on the record.

4              MS. MILLER:  I would like to mark as

5        Westman Exhibit 27 a document Bates-stamped

6        EXAM00123277 through 336, and it is the

7        consolidated financial statements for the

8        years ended December 31, 2010 and 2009 of

9        Residential Funding Company, LLC.

10             (Westman Exhibit 27, a document

11        bearing Bates Nos. EXAM00123277 through 336,

12        marked for identification, as of this date.)

13   BY MS. MILLER:

14        Q.    Ms. Westman, could you identify for me

15   where in Exhibit 27 intercompany payables and

16   receivables are reflected?

17        A.    So, within page 4 in the consolidated

18   balance sheet, in the assets, there is a

19   receivable from parent and within liabilities

20   there's also a line for borrowings from parent

21   and affiliates.

22        Q.    Do you have an understanding of which

23   affiliate Residential Funding Company had a

24   lending relationship with?

25             MR. KERR:  Objection.

Plaintiff's Objection 174:22-175:, lack of personal knowledge (FRE 602)

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 175 of 243

Page 175

1                          B. WESTMAN

2          A.      Within the borrowings, it indicates

3    borrowings from parent and affiliate.   The only

4    reference to affiliate is within the borrowings

5    footnote.

6          Q.      And what page is that on?

7          A.      On page 36 and indicates Cerberus

8    Secured Model Home Revolving Loan.

9          Q.      Do you know whether intercompany --

10              MR. KERR:   I'm sorry, have you

11         finished looking into the document?

12              THE WITNESS:   Uh-huh.

13   BY MS. MILLER:

14         Q.      Do you know whether intercompany

15   payables and receivables would also be reflected

16   in the related-party transactions note on page

17   58?

18         A.      Yes, to the, again, to the extent that

19   there was a balance that survived this

20   consolidation, it would be reflected on page 58

21   in Receivable From Parent and Borrowings -

22   Parent and Affiliates.

23              MS. MILLER:   I would like to mark as

24         Westman Exhibit 28 a document Bates-stamped

25         EXAM00234281 through 4349, which is the

Page 176

1                    B. WESTMAN

2      consolidated financial statements for the

3      years ending December 31, 2011 and 2010 for

4      GMAC Mortgage, LLC.

5            (Westman Exhibit 28, a document

6      bearing Bates Nos. EXAM00234281 through

7      4349, marked for identification, as of this

8      date.)

9            MR. KERR:  Atara, do you want her to

10     do the same exercise?

11            MS. MILLER:  Yes.

12     BY MS. MILLER:

13     Q.    I was going to say I'm going to ask

14     you to identify for me where in this document

15     intercompany payables and receivables are

16     reflected.

17            (Document review.)

18            THE WITNESS:  Okay.  Are we ready?

19            MR. KERR:  Go ahead.

20            THE WITNESS:  On page 4 within the

21     balance sheet, there could be intercompany

22     receivables included in the Other Asset line

23     item and also under Liabilities in

24     Borrowings From Parent.

25            Also would be included on page 31 in

Page 177

B. WESTMAN

1

2      Other Assets.   It could be included under

3      Receivables From Affiliates.   On page 32

4      within the Borrowings footnote, Intercompany

5      Balances could be reflected in the

6      Borrowings From Affiliates.

7           On page 34, under the heading

8      Borrowings From Parent and on page 65 in the

9      Related Party footnote, it's Receivable from

10     ResCap and Receivable from other affiliates,

11     with Borrowings from RHC.

12   BY MS. MILLER:

13     Q.     Would consolidated financial

14   statements prepared by GMAC Residential Holding

15   Company, LLC similarly reflect intercompany

16   payables and receivables outside of the

17   consolidated group?

18     A.     I'm sorry, which financial statements?

19     Q.     GMAC Residential Holding Company, LLC?

20          MR. KERR:   Objection.

21     A.     I'm not familiar with the GMAC

22   Residential Holding Company financial

23   statements.   I'd have to look at them.

24          MS. MILLER:   I'm going to mark as what

25     has been Exhibit 29 a document Bates-stamped

Plaintiff's Objection 177:13-23: objection to form; vague and ambiguous; lack of personal knowledge (FRE 602)

Page 178

1                       B. WESTMAN

2        EXAM00125358 through 416, which is the

3        consolidated financial statements as of and

4        for the years ending December 31, 2007 and

5        2006 of GMAC Residential Holding Company,

6        LLC.

7               (Westman Exhibit 29, a document

8        bearing Bates Nos. EXAM00125358 through 416,

9        marked for identification, as of this date.)

10              THE WITNESS:   So on page 1, this

11       financial statement has liabilities for

12       affiliate borrowings.   I don't know what

13       affiliates are included within that balance,

14       but that could include intercompany payable

15       balances.

16              On page 36 under Borrowings footnote,

17       the same affiliate borrowings.   There's also

18       page 53, Related Party Transactions, that

19       may or may not include information on

20       receivables.   This is listing out

21       transactions with related parties.

22   BY MS. MILLER:

23       Q.    Also on the consolidated balance sheet

24   on page 56, there's a line item under Assets

25   that says "Accounts receivable intercompany"?

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 179 of 243

Page 179

1           B. WESTMAN

2           MR. KERR:  What page?

3           MS. MILLER:  56.

4           MR. KERR:  Oh, 56.  Okay.

5     BY MS. MILLER:

6       Q.   And then Affiliate Borrowings or

7     Accounts Payable Intercompany under Liabilities.

8     Those would also reflect intercompany payables

9     or receivables?

10      A.   Yes, this is a -- yes, it would be

11    included in those balances, to the extent they

12    exist.

13      Q.   Just so the record is clear, that was

14    the consolidated balance sheet of GMAC

15    Residential Holding Company and its subsidiaries

16    supplemental schedule?

17          MS. MILLER:  I would like to mark as

18    Westman Exhibit 30 a document Bates-stamped

19    RCUCCJSN30014296 through 299.

20          (Westman Exhibit 30, a document

21    bearing Bates Nos. RCUCCJSN30014296 through

22    299, marked for identification, as of this

23    date.)

24    BY MS. MILLER:

25      Q.   Ms. Westman, is it your

Page 180

1                    B. WESTMAN

2      understanding -- sorry.  Ms. Westman, were GMAC

3      Mortgage's financial statements prepared in

4      accordance with GAAP?

5           A.     For what time period?

6           Q.     For 2008 through 2011?

7           A.     Yes.

8           Q.     And were Residential Funding Company's

9      financial statements prepared in accordance with

10     GAAP for that same period?

11          A.     Yes.

12          Q.     Looking at the document that I have

13     marked Westman Exhibit 30, it's an e-mail chain

14     from July 10 and 11, 2012, regarding legal

15     entity trial balance.  Tell me what this

16     document is relating to.

17          A.     We produced a ResCap-level proforma

18     trial balance that identifies assets and the

19     particular facility that those assets are

20     collateral for, and we also prepare a version of

21     that document at each individual legal entity

22     FTI used for various presentations, and this

23     e-mail is discussing questions about how to

24     identify certain balances within that schedule.

25          Q.     Do you know what it means that

Page 181

B. WESTMAN

1  recoveries on interco are pledged assets?

3      A.    That's not my statement so I can't
4  interpret that statement.

5      Q.    Looking at the e-mail at the bottom of
6  the page numbered with the Bates number ending
7  296 from you to Liz Park and Filip Szymik,
8  copying Mark Renzi and Rob Joslin, you state,
9  "When we break these out by each individual
10  legal entity, there are very large intercompany
11  balances that show for each legal entity."

12      Do you know why you mentioned that in
13  this context?

14      A.    We produced this workbook at the
15  ResCap level and the only intercompanies, as we
16  have been discussing, that survived are with
17  affiliates outside of ResCap.  That is what
18  normally at the ResCap level appears within this
19  balance.

20      However, when we produced that
21  workbook for every individual legal entity,
22  while all those intercompanies eliminating
23  consolidation, the question was how would we
24  present them.  Those particular intercompanies
25  don't give the relationships, et cetera, and FTI

Page 182

1                           B. WESTMAN

2    was using other intercompany documents to

3    reflect however they were presenting those

4    intercompany balances, so we were simply asking

5    how they wanted it produced in the schedule so

6    that they could use it appropriately for their

7    purpose.

8         Q.    And do you recall what the instruction

9    you received was?

10        A.    In reading Liz's response, she

11   indicates that, "we can show the intercompany

12   under revolver."

13        Q.    What does that mean?

14        A.    There's a column within the

15   spreadsheet that indicates revolver.  It

16   indicates the collateral islands and she

17   indicated we could leave it there; they would be

18   removing them and replacing it with other

19   information.

20             MS. MILLER:  I would like to mark as

21        Westman Exhibit 31 a document Bates-stamped

22        RCJSN10015251 through 15268.

23             (Westman Exhibit 31, a document

24        bearing Bates Nos. RCJSN10015251 through

25        15268, marked for identification, as of this

Page 183

1                       B. WESTMAN

2       date.)

3    BY MS. MILLER:

4        Q.    I've marked as Westman Exhibit 31 an

5    e-mail chain -- well, an e-mail exchange between

6    you and Janel Farley in March 2012 relating to

7    an exchange that occurred in April, late April

8    of 2011.  Do you see that?

9        A.    Yes.

10       Q.    Is that an accurate description of

11   what this e-mail chain is?

12       A.    Yes.

13       Q.    Do you remember the issue that was

14   being addressed in April of 2011?

15       A.    I don't.   I need to read the e-mail

16   chain.

17       Q.    Sure.   Take your time.

18             (Document review.)

19       Q.    I'm going to direct your attention

20   specifically to page 10015254 and the comment

21   toward the bottom under Intercompany that says,

22   "Inquiry of the appropriateness of considering

23   collectability for intercompany receivables for

24   standalone financial statements when the ability

25   to be settled is in question.  The facts for

1                       B. WESTMAN

2    this question is that RFC has a $2.3 billion

3    receivable from its parent ResCap."

4              Does that refresh your recollection

5    about what this e-mail chain in April of 2011

6    was about?

7       A.    I'm familiar with that statement.  I'm

8    not necessarily familiar with this particular

9    e-mail chain.  It seems to be about a variety of

10   topics, but I'm familiar with that statement.

11      Q.    And what does that statement mean?

12      A.    As part of our financial statements

13   for RFC, there is a receivable from ResCap on

14   its financial statements, and we had to evaluate

15   that receivable for collectability as part of

16   our year-end audit.  And we did that evaluation

17   and I think that question was coming up in this

18   e-mail string of whether that was an open issue

19   or a closed issue.

20      Q.    And do you recall whether it was an

21   open issue or a closed issue?

22      A.    It was a closed issue.

23      Q.    And what was the determination?

24      A.    The determination was, from a GAAP

25   perspective, that that intercompany receivable

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 185 of 243

Page 185

1                         B. WESTMAN

2    could be reflected within the financial

3    statements and it met the GAAP determination for

4    collectability.

5        Q.    And what is the GAAP determination for

6    collectability?

7        A.    It's just an analysis that we did and

8    discussed with the auditors on whether that

9    receivable could be collectable for GAAP

10   purposes.

11       Q.    So looking now, turning now to the

12   page ending in 258, there's an e-mail about a

13   week later in which Janel says to Kim Walsh,

14   "The affiliate balance repayments aren't tied

15   directly to any specific collateral cash flows,

16   but we have a reasonable expectation that ResCap

17   will have the capability to meet its obligations

18   so no entry was recorded."

19           Is that consistent with your

20   recollection of the conclusion of this inquiry?

21           MR. KERR:   Objection.

22       A.    The conclusion from the inquiry that

23   we had with D&T was that the receivable could

24   remain on the balance sheet of RFC Financial.

25       Q.    And was that based on an assessment of

Page 186

1                   B. WESTMAN

2   whether ResCap had the ability to meet its

3   obligations?

4        A.    Yes, it was based on a GAAP assessment

5   of that.

6             MS. MILLER:  I'd like to mark as

7        Westman Exhibit 32 --

8             (Discussion off the record.)

9             MS. MILLER:  I'd like to mark as

10       Westman Exhibit 32 an document Bates-stamped

11       EXAM12412896 through 897.

12            (Westman Exhibit 32, a document

13       bearing Bates Nos. EXAM12412896 through 897,

14       marked for identification, as of this date.)

15  BY MS. MILLER:

16       Q.    I've marked as Exhibit 32 an e-mail

17  dated March 22, 2012 from you to Cathy Dondzila

18  regarding RFC/ResCap Receivable Support Memo and

19  attaching a 12/31/12 Receivable Support Memo.

20            Do you recognize this document?

21       A.    I do.

22       Q.    Is it a document --

23            MR. KERR:  Just I think the top e-mail

24       is from Cathy to Barb.

25            MS. MILLER:  Oh, sorry.  You're right,

Page 187

1                         B. WESTMAN

2          from Cathy to Barb.

3    BY MS. MILLER:

4        Q.    The bottom e-mail is from you to Cathy

5    Dondzila, but the top e-mail is in fact from

6    Cathy to you.

7              MR. KERR:    Right.

8        Q.    Do you recognize the attachment to

9    this e-mail?

10       A.    Yes.

11       Q.    And is it a document that you drafted?

12       A.    Yes.

13       Q.    Why did you prepare this

14   intercompany -- this memo regarding the

15   intercompany receivable between RFC and ResCap?

16       A.    I drafted this memo to provide support

17   to D&T as part of the year-end audit of RFC

18   Financial statements in response to their

19   question on that intercompany receivable

20   reflected in those financial statements.

21       Q.    And was the memo that you provided

22   intended to support the recording of that

23   intercompany receivable as a valid debt?

24             MR. KERR:    Objection.

25       A.    The memo was intended to support that

Page 188

1                         B. WESTMAN

2    receivable being on our balance sheet within

3    those financial statements and that it was a

4    valid receivable to reflect in the financial

5    statements.

6        Q.    What was the basis for determining --

7    upon which you concluded that it was a valid

8    receivable?

9        A.    That it was a valid receivable as

10   there was an ability for that to be collected,

11   if necessary.

12       Q.    And specifically, did you state that

13   ResCap has $2.6 billion in equity and other

14   major operating subsidiaries -- in its other

15   major operating subsidiary GMAC Mortgage, and if

16   required, ResCap could support its payable to

17   RFC through sales or other liquidations of its

18   GMACM holdings and that ResCap also maintains a

19   $3.6 billion receivable from GMACM and could

20   move assets from GMACM to RFC to reduce both

21   outstanding balances?

22       A.    Yes, that's stated in the memo.

23       Q.    So is your conclusion that ResCap

24   maintains the ability to support its

25   intercompany obligations with RFC based in part

Page 189

1                       B. WESTMAN

2   on ResCap's receivable from GMAC Mortgage?

3              MR. KERR:   Objection.

4       A.    Could you rephrase your question?

5       Q.    You conclude in the memo that, "ResCap

6   maintains the ability to support its

7   intercompany obligations with RFC," correct?

8       A.    Correct.

9       Q.    Is that -- is that, based on your

10  assessment of -- strike.

11             That conclusion is based, at least in

12  part, on the intercompany receivable that ResCap

13  has from GMACM, correct?

14      A.    That the financial statements reflect

15  that there is a receivable from GMAC Mortgage

16  and that that could support the ability for

17  ResCap to meet that obligation to RFC for

18  financial statement purposes.

19      Q.    And did you meet with Deloitte &

20  Touche about this?

21      A.    We did.

22      Q.    Deloitte & Touche was GMACM's auditor;

23  is that right?

24      A.    And ResCap's auditor.

25      Q.    And was Deloitte -- did Deloitte &

Plaintiff's Objection 189:25-190:4: lack of personal knowledge (FRE 602), hearsay (FRE 802)

Page 190

B. WESTMAN

1

2  Touche get comfort based on your memo that there

3  should be no impairment to the receivable that

4  RFC has from ResCap?

5          MR. KERR:   Objection.

6      A.    D&T signed off on the RFC Financial

7  statements as they were presented.

8      Q.    And as they were presented, included

9  the full value of the receivable, correct?

10     A.    It included the receivable from

11 ResCap.

12         MS. MILLER:  I'd like to mark as

13     Westman Exhibit 33 a document Bates-stamped

14     RCJSN10074531 through 536.

15         (Westman Exhibit 33, a document

16     bearing Bates Nos. RCJSN10074531 through

17     536, marked for identification, as of this

18     date.)

19         MS. MILLER:  Let me just clarify that.

20     Westman Exhibit 33 is -- has the Bates range

21     RCJSN100074531 through 540.  I have marked

22     as Westman Exhibit 33 a Bill of Sale and

23     Transfer Agreement dated as of April 22,

24     2011 by and between GMAC Mortgage, LLC and

25     Residential Funding Company as well as a

Page 191

1                          B. WESTMAN

2          related letter agreement re netting relating

3          to transferred mortgage loans between

4          Residential Funding Company, GMAC Mortgage,

5          LLC, GMAC Residential Holding Company, LLC,

6          and Residential Capital, LLC.

7     BY MS. MILLER:

8          Q.    Ms. Westman, have you ever seen these

9     documents before?

10         A.    I don't specifically recall if I have

11    seen this.

12         Q.    Looking at the document, do you see

13    that the Bill of Sale and Transfer Agreement

14    states that, "The seller, GMAC Mortgage, in

15    consideration of $171,323,565.91 does hereby

16    absolutely sell, transfer and assign to the

17    Purchaser, without recourse except as set forth

18    in this Bill of Sale, all right, title and

19    interest in and to the Mortgage loans listed on

20    Exhibit A"?

21         MR. KERR:  I'm sorry.  I apologize.

22    Where are you reading from?  You're reading

23    from the --

24         MS. MILLER:  The very first sentence

25    of the agreement.

Page 192

1               B. WESTMAN

2          MR. KERR:  I see.  Okay.  Thank you.

3     Apologize.

4          THE WITNESS:  Yes, it says that.

5     BY MS. MILLER:

6     Q.    And turning now to the netting, the

7     letter agreement re netting relating to transfer

8     mortgage loans, have you ever seen this document

9     before?

10    A.    I don't recall seeing it.

11    Q.    Do you see that this document refers

12    back to the Bill of Sale and Transfer Agreement

13    that we just looked at?

14    A.    Yes.

15    Q.    And the netting letter says that, at

16    the end of the first paragraph, "The purchaser,

17    pursuant to the Bill of Sale, the purchaser is

18    obligated to pay the seller $171-plus million as

19    the purchase price for the mortgage loans?

20    A.    Yes.

21    Q.    Then if you look at page 2, can you

22    read page 2 and tell me what's going on in this

23    agreement?  What's being accomplished by this

24    netting agreement?

25          MR. KERR:  She said she's never seen

Page 193

B. WESTMAN

1
2   this agreement before, so if you want her to

3   read the words, she can, but I --

4        MS. MILLER:  I believe this was -- I

5   believe this document was produced as Ms.

6   Westman as the custodian, but we'll confirm

7   that.

8        MR. KERR:  Okay.  That's fine.

9        THE WITNESS:  "In order to avoid cash

10  transfers between themselves and to

11  discharge their payment obligations in the

12  amount set forth above, the parties hereto

13  each agree that the obligations:  (A) of the

14  purchaser to pay the purchase price to the

15  seller as consideration for the purchase of

16  the mortgage loans pursuant to the Bill of

17  Sale; (B) of the seller to pay

18  $171,323,565.91 to GMAC-RHC as repayment of

19  certain intercompany loans, of GMAC-RHC to

20  pay $171,323,565.91 to ResCap as repayment

21  of certain intercompany loans and of ResCap

22  to pay $171,323,565.91 to the purchaser as

23  repayment of certain intercompany loans will

24  be netted against each other so that the

25  respective obligations will be discharged

Page 194

1                          B. WESTMAN

2         without a cash payment having been made as

3         of the date thereof."

4              Do you want me to continue reading?

5    BY MS. MILLER:

6         Q.   Sure.

7         A.   "As a consequence of the foregoing

8    netting (W) the seller hereby fully and finally

9    discharges the purchaser from its obligation to

10   pay the purchase price as consideration for the

11   purchaser of the Mortgage loans pursuant to the

12   Bill of Sale; (X) GMAC-RHC hereby fully and

13   finally discharges the seller from its

14   obligation to repay $171,323,565.91 to GMAC-RHC

15   under the intercompany loans and subtract such

16   amount from the total amount due by the seller

17   to GMAC-RHC under the intercompany loans; (Y)

18   ResCap hereby fully and finally discharges

19   GMAC-RHC from its obligation to repay

20   $171,323,565.91 to ResCap under the intercompany

21   loans and subtract such amounts from the total

22   amount due by GMAC-RHC to ResCap under the

23   intercompany loans; (Z) the purchaser hereby

24   fully and finally discharges ResCap from its

25   obligation to repay $171,323,565.91 to the

Page 195

B. WESTMAN

1   purchaser under the intercompany loans and

2   subtract such amounts from the total amount due

3   by ResCap to the purchaser under the

4   intercompany loans."

5   Q.    In your experience at ResCap, have you

6   seen other instances where the transfer of real

7   assets were accomplished by intercompany

8   receivable -- payables and receivable in lieu of

9   actual transfer of cash?

10  MR. KERR:  Objection.

11  A.    I'm not aware of particular

12  transactions, but yes, that's one of the reasons

13  that we indicated can create intercompany or

14  reduce intercompany balances is the transfer of

15  assets without the exchange of cash.

16  Q.    You see a reference in this document

17  to intercompany loans between the seller GMAC

18  Mortgage and GMAC-RHC?

19  A.    Yes.

20  Q.    And do you see a reference to

21  intercompany loans in -- sorry, between GMAC-RHC

22  and ResCap?

23  A.    Yes.

24  Q.    And do you also see a reference to

Page 196

B. WESTMAN

1

2  intercompany loans between ResCap and

3  Residential Funding Company, LLC, the purchaser

4  here?

5      A.   Yes.

6          MS. MILLER:  I've confirmed that Ms.

7  Westman was the custodian for these

8  documents.

9          MR. KERR:  Okay.

10          MS. MILLER:  A lot of paper goes

11  across your desk, I understand.

12          I'd like to mark as Westman Exhibit 34

13  a document Bates-stamped RCUCCJSN30003025

14  through -- through 3029, and the documents I

15  handed out, you can just pull off the pages

16  after the second loose slip sheet.

17          MR. KERR:  I'm sorry, what are you

18  pulling off?

19          MS. MILLER:  Pages after the second

20  slip sheet are not related to this document.

21          (Westman Exhibit 34, a document

22  bearing Bates Nos. RCUCCJSN30003025 through

23  3029, marked for identification, as of this

24  date.)

25          MR. KERR:  So just so we're clear, the

Plaintiff's
Objection
196:12-197:19
Lack of
foundation
(FRE 602,
901, 903)

Page 197

1                          B. WESTMAN

2        document that -- the exhibit that has been

3        marked goes from RCUCCJSN30003025 to 3029,

4        right?

5                MS. MILLER:  Yes.  Exactly.

6                MR. KERR:  Okay.  Thanks.

7    BY MS. MILLER:

8        Q.    Ms. Westman, I have marked as Exhibit

9    34 a document chain that seems to trail over a

10   number of months from November 30, 2012, through

11   February 8, 2013 re:  "Interco file," and in the

12   top e-mail in that chain, the most recent one

13   from February 8, 2013, which is an e-mail from

14   Jacob Bazella to you and Mark Renzi, with a copy

15   to Cathy Dondzila, Jake Bazella attaches a

16   spreadsheet called "IC Relationships Balances

17   Jan. 2008 through March 2012 to 2/8/13."

18           Do you see that?

19       A.    Yes.

20       Q.    Can you look at the attachment to the

21   e-mail?  Do you know what's identified, what's

22   being identified on the first page of the

23   attachment Bates-stamped 30 -- they're all

24   Bates-stamped 3029, the first page of that

25   spreadsheet?

Page 198

1                          B. WESTMAN

2      A.      This reflects a section of our

3  intercompany receivable/payable spreadsheet for

4  the top six balances.  It was providing

5  information about those balances.

6      Q.      And can you tell me, looking at the

7  second page to the sheet titled "IC

8  Relationships January 2008 through March 2012,"

9  can you describe this document to me?

10     A.      This document was created to attempt

11 to research the intercompany -- these

12 intercompany relationships and the types of

13 transactions that created the intercompany

14 receivable/payables.

15         So this is a monthly roll-forward of

16 our monthly depiction of those balances looking

17 for fluctuations in the balance to try to a

18 identify and pinpoint transactions that may have

19 generated portions of the balance.

20     Q.      Looking at this spreadsheet which

21 records changes in intercompany balances for

22 each of the top six intercompany relationships

23 for -- on a monthly basis for the years 2008,

24 2009, 2010, 2012 and the first quarter -- sorry,

25 2011 and the first quarter of 2012, is it

Page 199

B. WESTMAN

1

2  accurate to say that the balances in each

3  intercompany account changed on a monthly basis

4  within this period?

5      A.   I'm going to take a while to confirm

6  that every balance changed on a monthly basis on

7  this spreadsheet for every month.

8          MR. KERR:  We're all going to go blind

9      while you do that, but that's okay.

10     A.   I can't really see the numbers to a

11 hundred percent verify that.

12     Q.   Do you have any reason to doubt that

13 the balances changed every month during that

14 period?

15     A.   I wouldn't know without reviewing

16 them.

17     Q.   You can go ahead and review them.

18     A.   Okay.

19         (Document review.)

20         MR. KERR:  Atara, we can have her read

21     this if you want.  I have noticed ones where

22     they haven't changed.  Many do change.

23         THE WITNESS:  One did change.

24         MR. KERR:  Having her sit here and

25     look at all this stuff in this thing is --

Page 200

B. WESTMAN

2    you can use your time as you wish, but

3    that -- if you look at the, for example, if

4    you look at the GMAC Mortgage to Passive

5    Asset Transaction for the first and second

6    quarters of 2012.  Those are just ones I

7    found.

8  BY MS. MILLER:

9    Q.    Ms. Westman, having reviewed this

10  document and in particular the schedule, would

11  you agree that in the vast majority of months,

12  the balances -- the intercompany balances

13  changed month over month for the -- in the years

14  2008 through Q12012?

15    A.    For the ones that I have reviewed so

16  far, yes.

17    Q.    And is that consistent with your

18  understanding of how these intercompany account

19  balances were changed over time?

20         MR. KERR:  Objection.

21         MS. MILLER:  That's not a question.

22    Strike it.

23  BY MS. MILLER:

24    Q.    Is that consistent with your

25  understanding of how these intercompany payables

1                       B. WESTMAN

2   and receivables were incurred?

3        A.    I can't make a general statement about

4   intercompany payables and receivables.  Some of

5   them may change and some of them did not change.

6   It depended on whether transactions were

7   recorded for those particular entities.

8             MS. MILLER:  How do you want to deal

9        with what we previously marked as Westman

10       Exhibit 6 that we now have --

11            MR. KERR:  Should we make it 6A?

12            MS. MILLER:  -- a full set?

13       You want to replace 6?

14            MR. KERR:  However you want to do it.

15            MS. MILLER:  I guess 6A would be good.

16            MR. KERR:  You replace it.  Whatever

17       you want to do.  I'll do anything you want

18       to do.

19            MS. MILLER:  And we'll have a whole

20       record discussion, but that's irrelevant.

21       You know what, let's just mark it

22       where we are.

23            MR. KERR:  Sure.

24            MS. MILLER:  Okay.  I'm going to mark

25       as Westman Exhibit 35 the complete version

Page 202

<sup>1</sup>                              B. WESTMAN

<sup>2</sup>        of the document that we previously marked as

<sup>3</sup>        Westman Exhibit 6, which has a Bates range

<sup>4</sup>        of RCUCCJSN30016049 through 16164.

<sup>5</sup>                    (Westman Exhibit 35, a document

<sup>6</sup>        bearing Bates Nos. RCUCCJSN30016049 through

<sup>7</sup>        16164, marked for identification, as of this

<sup>8</sup>        date.)

<sup>9</sup>    BY MS. MILLER:

<sup>10</sup>        Q.    So, as we discussed on the record a

<sup>11</sup>    little bit earlier, this document seems to

<sup>12</sup>    include two different portions of an e-mail

<sup>13</sup>    chain, one that begins on the first page of the

<sup>14</sup>    exhibit and one that begins at RCUCCJSN30016101.

<sup>15</sup>            I'm going to ask you to turn to the

<sup>16</sup>    second iteration of this e-mail chain.  In the

<sup>17</sup>    e-mail on the bottom of page 16102, it's a March

<sup>18</sup>    20, 2012 e-mail from you to Jeremy Stern copying

<sup>19</sup>    Cathy Dondzila in which you state, "Jeremy,

<sup>20</sup>    attached is a listing of the top intercompany

<sup>21</sup>    balances and some information about each.  As I

<sup>22</sup>    noted on the phone, this is still rough.  I was

<sup>23</sup>    just starting to work on it."

<sup>24</sup>        A.    I'm sorry, which document were you

<sup>25</sup>    reading?  The front document?

Page 203

B.  WESTMAN

1

2      Q.    No, 16102.  It's infinitely confusing.

3           If you turn to the very last page of

4  Exhibit 35, is this the top ten intercompany

5  listing that you referred to in your e-mail to

6  Jeremy?

7           MR. KERR:  Objection.

8      Q.    If you look at the beginning of that

9  e-mail on page 16101, the e-mail chain attaches

10  two documents, one titled Top Ten Intercompany

11  Relationships -- actually, three documents.  One

12  titled Top Ten Intercompany Relationships.xls,

13  and one titled GMAC ResCap Note Issuance

14  Facility Deed, and the third one "Note

15  Certificate, 12/19/11.pdf."

16           Looking at the last page of Westman

17  Exhibit 35, are you familiar with this document?

18      A.    Yes.

19      Q.    Can you tell me what it is?

20      A.    It's a list of top ten intercompany

21  balances and some information about the

22  balances.

23      Q.    Is this a list that you prepared?

24      A.    To my knowledge, I did not prepare

25  this list.

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 204 of 243

Page 204

1                           B. WESTMAN

2        Q.     Did you provide the information that's

3   contained in this list?

4        A.     I may have provided some of the

5   information that's contained in the list.

6        Q.     Are you familiar with the information

7   contained in this list?

8        A.     I've seen the document.

9        Q.     Looking at the second entry for ResCap

10  and Residential Funding Co., do you know what

11  kind of transactions generated the intercompany

12  balance between ResCap and Res Funding Co.?

13       A.     I can't specifically say for any

14  particular intercompany balance exactly what

15  generated them because they're made up of

16  thousands of different transactions.

17       Q.     Do you know generally what kind of

18  transactions?

19       A.     So, generally, this is one of the

20  relationships we have indicated that RFC was

21  generating cash and pushing that up to ResCap

22  through the cash management process.  It's one

23  of the ways that parts of this balance could be

24  created.

25       Q.     Okay.  And looking at the intercompany

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 205 of 243

Page 205

1                            B. WESTMAN

2    balance between Res Funding Co. and Homecomings

3    Financial, do you know what type of transactions

4    resulted in this intercompany balance?

5        A.    The information provided in here was

6    the best estimated reason why that balance was

7    created.  So, again, this was created -- this

8    information was provided through conversations

9    and looking at transactions to determine

10   possible reasons, and so this was one of the

11   reasons.

12           It was one of the activities that the

13   two entities had with each other and could have

14   created that balance.

15       Q.    And what was that activity?

16       A.    It indicates that loans were sold from

17   Homecoming to its parent RFC and no cash was

18   exchanged and an intercompany was recorded.

19       Q.    So if I understand that, that's an

20   exchange of assets for -- in exchange for an

21   intercompany receivable?

22       A.    Correct.  That would be one example of

23   an activity with those entities.

24       Q.    And looking now at the intercompany

25   between GMAC Mortgage and Passive Asset

Plaintiff's
Objection
205:24-206:10
Incomplete (FRE
106)

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 206 of 243

Page 206

1                     B. WESTMAN

2     Transaction, do you know what type of activities

3     resulted in this -- in this intercompany

4     balance?

5          A.     Passive Asset Transactions was a

6     holder of international notes and it would

7     receive cash as a holder of those international

8     notes in receipt of that cash through the cash

9     management process, it would have pushed that

10    cash up to its parent, GMAC Mortgage.

11               And so, again, that's an example of a

12    relationship that we are aware of between those

13    entities and a way that cash would be generated.

14    It's not connected to any particular transaction

15    or balance but a type of activity that would

16    have occurred.

17         Q.     And what about for GMAC Mortgage

18    Servicer Advance and GMAC Mortgage?

19         A.     GMAC Mortgage Servicer Advance, GMAC

20    Mortgage Service -- excuse me, GMAC Mortgage

21    Servicer Advance is not a ResCap owned legal

22    entity, so this is a GAAP transaction to record

23    GAAP accounting that's required between those

24    entities because of the consolidation of that

25    entity.  And that GAAP recording of those

Page 207

B. WESTMAN

1  balances creates an -- can create intercompany

2  transactions.

3      Q.    Looking down to transaction 7 or

4  intercompany relationship 7, "Balance Between

5  GMAC Mortgage and Executive Trustee Services,"

6  what type of activities resulted in that

7  intercompany balance?

8      A.    Generally, this is indicating that --

9  these are the types of activities that ETS

10 performed in its normal operations, and those

11 operations generated cash and that cash would

12 have been swept through the intercompany process

13 through the cash management process.

14     Q.    And what about for the intercompany

15 balance between RFC Asset Holdings II and

16 Residential Funding Co.?

17     A.    This indicates that this was used for

18 accounts payable, taxes payable and interest

19 expense, but we weren't able to find much other

20 documentation of the types of transactions that

21 went through those particular entities.

22     Q.    Did you conduct further research into

23 what types of activities would generate that

24 intercompany balance?

Page 208

B. WESTMAN

1

2      A.    We researched as much as we could as

3  much information as we could identify.

4            MS. MILLER:  I'd like to mark as

5      Westman Exhibit 36 a document Bates-stamped

6      RC40000118 through 137.

7            (Westman Exhibit 36, a document

8      bearing Bates Nos. RC40000118 through 137,

9      marked for identification, as of this date.)

10  BY MS. MILLER:

11      Q.    Ms. Westman, I have marked at Exhibit

12  36 a document titled "Ally Accounting Policy

13  1040 Intercompany Accounting," effective date

14  January 1, 2011.  Do you see that?

15      A.    Yes.

16      Q.    Are you familiar with this document?

17      A.    Yes.

18      Q.    What is this document?

19      A.    It's one of Ally's accounting policies

20  that talks about intercompany accounting and how

21  that should be reflected within the financial

22  statements.

23      Q.    And did this accounting policy govern

24  accounting within ResCap entities as well?

25      A.    Yes.

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 209 of 243

Page 209

B. WESTMAN

1  

2     Q.    And looking at the bottom of page 122,

3  the page with the ending Bates 122, under

4  Intercompany Reporting and Reconciliations, does

5  it state that, "Intercompany transactions should

6  be booked to proper intercompany accounts, for

7  both balance sheet and income statement

8  accounts, to ensure efficiencies and

9  consolidation and proper elimination of

10 intercompany transactions"?

11    A.    Yes, it states that.

12    Q.    And did the same proposition that

13 intercompany transactions should be booked to

14 proper intercompany accounts hold true within

15 ResCap?

16    A.    Yes, certain intercompanies were

17 booked through intercompany accounts.  As we

18 discussed earlier today, certain balances may

19 not have been within specified intercompany

20 accounts.

21    Q.    What kind of balances would not have

22 been within specified intercompany accounts?

23    A.    Gain and loss between two ResCap

24 entities or service fee income, service fee

25 expense, may not -- those portions of the

Page 210

B. WESTMAN

1

2    transaction would not have been in an

3    intercompany account but were maintained in

4    another way to ensure that they were eliminated

5    upon consolidation.

6        Q.    Would you expect to see those in the

7    P&L statements for the individual entities?

8        A.    Those accounts would be.  Those

9    transactions would be within their income

10   statements, yes.

11       Q.    But the piece of the transaction that

12   doesn't relate specifically to the gain or loss

13   would be booked through the intercompany --

14   would be recorded in the intercompany accounts;

15   is that correct?

16       A.    If the intercompany transaction

17   created intercompany receivables or payables, it

18   would have been booked within intercompany

19   accounts.

20       Q.    Looking at page -- the page ending

21   with the Bates 123, under Intercompany

22   Transactions, it states that, "Prior to

23   implementation, significant intercompany

24   transactions should be reviewed and approved by

25   business unit management and the tax department.

Page 211

1          B. WESTMAN

2     These intercompany transactions should also be

3     formally documented."

4          Did that happen within ResCap?

5     A.     ResCap had a program to review

6     significant transactions or significant changes

7     and document those, and so items of this nature

8     could be involved in that change management

9     process or that change management review.

10          This would be for new transactions, so

11    that wouldn't apply necessarily on an ongoing

12    activity posted under a transaction, but if

13    there was a new relationship or a new type of

14    transaction between the entities, that would be

15    covered by the change management program.

16    Q.     So would you consider fluctuations in

17    intercompany balances based on the cash

18    management process and the movement of cash to

19    fall within this policy?

20          MR. KERR:  This specific paragraph of

21     the policy?

22    Q.     The specific paragraph of the policy?

23    A.     No, I would not.  Those would be

24    ongoing -- the change management process would

25    be to review something that was a new or a

Page 212

1                         B. WESTMAN

2    significant item, and once an operational

3    process was established around that, additional

4    activity within, that would not be considered a

5    significant event.

6         Q.    And so it's your understanding that no

7    formal documentation would be required for

8    additional activity?

9              MR. KERR:  Objection.

10        A.    I would not interpret this paragraph

11   as indicating we had some obligation under this

12   policy to document ongoing cash management

13   transactions.

14        Q.    And looking at the document -- sorry,

15   looking at the page ending 125, under Debt

16   Transactions, is it also your understanding

17   that -- well, the second paragraph under Debt

18   Transactions state that, "Intercompany loans

19   between LoBs should not be funded until signed

20   note or loan agreement has been finalized."

21             Is it your understanding that

22   additional activity under existing intercompany

23   relationships are also not subject to that

24   requirement under this policy?

25        A.    This requirement is for intercompany

Page 213

B. WESTMAN

2  transactions between lines of business.  All of

3  ResCap was defined as one line of business, so

4  this would have been applicable if ResCap was

5  having dealings with other Ally entities.

6      Q.    And so it didn't matter if you were on

7  the RFC or the GMAC side of the house; you were

8  all one line of business?

9      A.    Correct.  Mortgage operations was one

10  line of business.

11      Q.    And looking at page 128 under

12  Dividends, there's a description, a specific

13  description of how dividends paid from a

14  subsidiary to a payment company should be

15  accounted for and eliminated in consolidation --

16  sorry, recorded and eliminated in consolidation.

17          Is that how subsidiaries -- dividends

18  paid from a subsidiary within the ResCap group

19  was accounted?

20      A.    I'm not familiar with specific

21  transactions where dividends would have

22  occurred, but that would meet my general

23  understanding of how it would occur.

24          MS. MILLER:  I would like to mark as

25      Westman 37 a document Bates-stamped

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 214 of 243

Page 214

1           B. WESTMAN

2      RCJSN10131858 through 878.

3           (Westman Exhibit 37, a document

4      bearing Bates Nos. RCJSN10131858 through

5      878, marked for identification, as of this

6      date.)

7  BY MS. MILLER:

8      Q.   Ms. Westman, looking at Exhibit 36 at

9  the very top, it says "Next Review Date:

10 December 1, 2012," and if you look at Westman

11 Exhibit 37 --

12     A.   I'm sorry, I'm not --

13          MR. KERR:  I think she's referring to

14     Exhibit 36.

15     Q.   I'm sorry, looking back at Exhibit 36,

16 it says, "Next Review Date:  December 1, 2012,"

17 and then Westman 37 has an effective date of

18 November 28, 2011 and a last review date of

19 November 17, 2011.

20          Do you know if Exhibit 37 is an

21 updated version of the same policy in Exhibit

22 36?

23     A.   To my knowledge, they're two separate

24 policies.

25     Q.   And Exhibit 37 is titled "Ally General

Page 215

1                    B. WESTMAN

2    Intercompany Accounting Policy."   What did --

3    what does Exhibit 37 govern?

4         A.    This is a policy regarding

5    intercompany transactions and guidance that

6    should be followed when performing those

7    transactions.

8         Q.    And is it your understanding that

9    intercompany transactions that are governed by

10   this agreement include additional activity

11   within existing intercompany relationships?

12        A.    This would cover those intercompany

13   relationships.   I don't know whether it covers

14   particular transactions, but it would cover the

15   intercompany relationships.

16        Q.    Was this intended to address

17   intra-ResCap intercompanies?

18             MR. KERR:   Objection.

19        Q.    Sorry.   Let me restate it.   Does this

20   policy relate to intra-ResCap intercompany?

21        A.    Yes, I would interpret this as

22   applying to those balances.

23        Q.    Looking under Intercompany

24   Responsibilities on page 10131872, which of

25   these functions were to be performed by ResCap

Plaintiff's Objection
215:16-22: lack of
personal knowledge
(FRE 802), hearsay
(FRE 802)

Page 216

1                          B. WESTMAN

2    employees as distinct from Ally employees?

3         A.    So Ally would have performed A,

4    Corporate Controller.  Ally would have performed

5    B, Enterprise Global Intercompany Process Owner.

6    C would have been applicable to ResCap as a

7    business unit.

8         Q.    Who specifically at ResCap would have

9    been responsible for complying with this portion

10   of the policy?

11        A.    Of this policy, Cathy Dondzila.

12        Q.    Do you know whether she was the

13   designated intercompany process owner for

14   ResCap?

15        A.    I do not know who was the designated

16   process owner.  So D would have been applicable

17   to ResCap.

18        Q.    Just going back to C for a minute, did

19   you ever provide information during this period

20   to Cathy Dondzila regarding whether business

21   units -- whether ResCap was recording

22   intercompany transactions on a timely, accurate

23   and consistent basis?

24        A.    I don't recall providing specific

25   information.  That would have been part of our

Page 217

B. WESTMAN

1    normal month-end close process that intercompany

2    transactions were recorded in the normal course

3    of business.

4        Q.    And that's something that you were

5    responsible for; is that right?

6        A.    I was partially responsible along with

7    others for that.

8            MS. MILLER:  It's 5:45.  I'm happy to

9        keep going.  I have one topic left and

10       then --

11           MR. KERR:  How much longer do you

12       think you'll be on that topic?

13           MS. MILLER:  Maybe half an hour.

14           MR. KERR:  Let's take a break.  Take a

15       break, okay?

16           THE VIDEOGRAPHER:  The time is 5:52.

17       This is the end of tape labeled number 5.

18       We're going off the record.

19           (Recess.)

20           THE VIDEOGRAPHER:  This is the start

21       of tape labeled number 6.  The time is 6:07.

22       We're back on the record.

23           MS. MILLER:  I'd like to mark as

24       Westman Exhibit 38 a document Bates-stamped

Page 218

1                       B. WESTMAN

2       RCUCCJSN20080786 through 80790.

3            (Westman Exhibit 38, a document

4       bearing Bates Nos. RCUCCJSN20080786 through

5       80790, marked for identification, as of this

6       date.)

7   BY MS. MILLER:

8       Q.    Ms. Westman, I have marked as Exhibit

9   38 an e-mail chain, the top e-mail -- the top

10  e-mail of which is an e-mail from Cathy Dondzila

11  to Mark Renzi and yourself dated April 22, 2012

12  regarding balance intercompany follow-up and

13  attaching a spreadsheet titled Intercompany

14  Questions Version 2, do you see that?

15      A.    Yes.

16      Q.    Can you describe for me how ResCap

17  determined whether to forgive intercompany

18  balances?

19      A.    From the time period that I was

20  involved, intercompany balances were forgiven

21  generally to meet certain obligations for the

22  particular entities.  That might be to meet net

23  worth requirements, and with certain

24  international notes there were rights to do debt

25  forgiveness included within those documents.

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 219 of 243

Page 219

1                          B. WESTMAN

2       Q.     When you say to meet net -- certain --

3   sorry.  When you say to meet certain obligations

4   for the particular entities, including net worth

5   requirements, are those the net worth

6   requirements that we discussed earlier, both

7   regulatory and under certain borrowing

8   facilities?

9       A.     Correct.

10      Q.     And how was a debt -- the forgiveness

11  of debt effectuated?

12      A.     Generally, it would be determined that

13  a particular debt was a balance that we would

14  look to forgive to solve a certain net worth

15  issue, et cetera.  That balance would be

16  identified and documentation would be put

17  together in a request form.

18             That would -- that request would go

19  through Cathy, generally, and would be provided

20  to the CFO or on up to board of directors or

21  Executive Committee, depending on where it --

22  where it needed to go for the particular balance

23  and dollar amount, and it would be presented for

24  recommendation and approval.

25      Q.     Were debts ever forgiven without

12-12020-mg   Doc 5803-5   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Desposition Designations: Barbara Westman   Pg 220 of 243

Page  220

1                          B. WESTMAN

2    receiving CFO and/or board approval or Executive

3    Committee approval?

4         A.    To my knowledge, all debt forgiveness

5    received the appropriate approvals as required

6    by the particular transaction.

7         Q.    And how were debt -- how is debt

8    forgiveness recorded in the -- in ResCap's books

9    and records?

10        A.    The intercompany receivable/payable

11   balances that were being forgiven would be

12   reversed and the transaction would be recorded

13   through equity through, depending on the

14   direction of the balance, as an additional paid

15   in capital transaction, either additional

16   capital or reversal of capital.

17        Q.    What do you mean when you say that the

18   intercompany receivable or payable was -- that

19   was being forgiven would be reversed?

20        A.    If there was an intercompany

21   receivable/payable between two entities and the

22   receiving entity was going to forgive that

23   balance, then on the particular entity with the

24   receivable, that receivable would be credited

25   and there would be a debit on that entity in

Page 221

B. WESTMAN

1

2    equity and then the reverse transaction on the

3    entity with the payable.

4        Q.    Could the debt forgiveness have been

5    effectuated through a write-down of the

6    receivable?

7        A.    That would be a write-down of a

8    receivable, as I just explained.

9        Q.    I'm sorry, could the debt forgiveness

10   have been effectuated through a write-down of

11   the receivable without a corresponding entry in

12   the equity balance?

13       A.    The only instance that I'm aware of

14   where debt forgiveness was not performed through

15   equity was again in regard to certain

16   international notes, where the receiving entity

17   was within the GMAC Mortgage structure and the

18   paying entity was within the ResCap structure,

19   so they were not considered parent and

20   subsidiary, they were considered more sister

21   organizations, and in that case, the accounting

22   guidance was that that could be effectuated

23   through the income statement and so there would

24   have been an income statement impact for the

25   reversal of the intercompany balance.

Page 222

B. WESTMAN

1

2      Q.    Do you know if there was -- if the

3  there would have been a different tax

4  consequence for forgiving the -- for

5  effectuating the debt forgiveness, not for the

6  equity account?

7      A.    I'm not aware of the tax -- I wasn't a

8  tax -- in the Tax Department.  I'm not aware of

9  how Tax treated the balances.

10     Q.    In the process of collecting

11 information and documents related to the

12 intercompany balances, did you also collect

13 information and documents related to debt

14 forgiveness?

15     A.    I did.

16     Q.    And did you attempt to link the -- or,

17 did you schedule -- sorry.  Strike that.  Did

18 you schedule the debt forgiveness within the

19 ResCap entities?

20     A.    Could you rephrase the question?  I'm

21 not sure what you're referring to?

22     Q.    Did you prepare a schedule of debt

23 forgivenesses from 2008 forward within the

24 ResCap entities?

25     A.    I didn't personally create the

Page 223

1                      B. WESTMAN

2    schedule, but yes, a schedule was created.

3        Q.    And were efforts -- strike that.

4        Did you confirm that there were

5    appropriate approvals for each debt forgiveness

6    on that schedule?

7        A.    We gathered all the debt forgiveness

8    documents, so I gathered documents that I had in

9    my team's possession and I believe Legal also

10   provided additional documents so that, to my

11   knowledge, documentation was obtained on all of

12   the transactions.

13       MS. MILLER:  I'm going to mark as

14       Westman Exhibit 39 a document Bates-stamped

15       RCUCCJSN00030215 through 3 -- it's all

16       30215.  It's a native document, a document

17       that was produced in native form.

18       (Westman Exhibit 39, a document

19       bearing Bates Nos. RCUCCJSN00030215, marked

20       for identification, as of this date.)

21   BY MS. MILLER:

22       Q.    This is an example of a debt

23   forgiveness schedule that was prepared in

24   connection with your review of intercompany

25   transactions and debt forgiveness?

Page 224

1              B. WESTMAN

2          MR. KERR:  You are testing our eyes.

3          MS. MILLER:  I promise I won't make

4      her read it.

5          THE WITNESS:  Yes, this is a version

6      of the schedule.

7   BY MS. MILLER:

8      Q.    Do you know how frequently cash -- do

9   you know how frequently transactions that ran

10  through -- that resulted from the cash

11  management process were recorded in the general

12  ledger?

13     A.    Daily.

14     Q.    And who aggregated the transactions

15  that occurred during the day?

16         MR. KERR:  Objection.

17     A.    The general ledger.

18     Q.    Were all transactions that occurred

19  during that day -- sorry.  Did all transactions

20  that occurred through the cash management

21  process happen at the same time in a given day?

22     A.    I don't know what time of day they

23  occurred.

24     Q.    Is it possible that there were two

25  transactions that occurred at different times?

Page 225

1                         B. WESTMAN

2        A.     Yes.

3        Q.     From the same entity?

4        A.     Yes, it's possible if there were two

5   different wire transactions or two transactions

6   that occurred.

7        Q.     And would those be reflected in the

8   general ledger as two different transactions or

9   would they be aggregated on a daily basis and

10  input in the general ledger?

11       A.     Every journal entry transaction or

12  wire transfer would be entered in the general

13  ledger.  It depends on how the transaction was

14  fed to the ledger.  If the transaction was fed

15  through certain systems, I still believe each

16  individual transaction would be recorded, but

17  from those system feeds I'm not a hundred

18  percent aware of how the system feed recorded

19  those transactions.

20       Q.     Was there any other system that

21  tracked cash management process generated

22  transactions?

23       A.     There were other systems involved in

24  Treasuries.  There was a Quantum system where

25  certain transactions or wire transfers were

Page 226

1                          B. WESTMAN

2    performed through the Quantum system.

3         Q.    Any other systems?

4         A.    That's the main system that I'm aware

5    of.  There may be others from a Treasury

6    perspective.

7         Q.    What is the Quantum system?

8         A.    The Quantum system was a system used

9    by Treasury to perform certain transactions.  So

10   wire transfers could be effected through that

11   system.  They could also set up certain

12   instruments in that system.  For instance, the

13   Ally revolver may be set up as an instrument

14   within that system.

15        Q.    And would Quantum then feed

16   information to the general ledger?

17        A.    Yes.  Quantum produced its own trial

18   balance and that would be uploaded to the

19   general ledger.

20        Q.    And how frequently was the Quantum

21   trial balance uploaded to the general ledger?

22        A.    I'm not aware of the cycle for

23   uploading Quantum to the general ledger.

24        Q.    Who at ResCap is the most

25   knowledgeable person about the Quantum system?

Page 227

                          B. WESTMAN

1

2       A.      Currently, I -- I would say Paul

3   Grande as the treasurer.

4       Q.      Is there a central distributing agent

5   within the cash management process?

6       A.      I'm not sure what you mean by that.

7       Q.      I mean was there a centralized account

8   from which most disbursements on behalf of

9   ResCap family entities were made?

10      A.      Each entity may have an operating

11  account, so GMAC Mortgage had an operating

12  account and RFC had an operating account, and so

13  in general, ordinary-course transactions might

14  go through those operating accounts.

15      Q.      And was cash aggregated at the ResCap

16  level?

17      A.      Yes.  Generally, cash would be

18  aggregated up to ResCap for payment to Ally

19  under the line of credit or to ResCap to push

20  back down to one of its other subsidiaries, so

21  not all cash.  If one of the operating entities

22  needed cash, they may aggregate cash from their

23  subsidiaries and use it.

24      Q.      Who determined whether cash flowed up

25  to ResCap or not or was held at the subsidiary

Plaintiff's
Objection
227:7-23
Incomplete
(FRE 106)

Page 228

1                         B. WESTMAN

2    level?

3        A.    Treasury.

4              MS. MILLER:  That's all that I have.

5    Thank you.

6              THE WITNESS:  Okay.  Thank you.

7              MR. KERR:  You all done?

8              MS. MILLER:  I'm done.

9              MR. KERR:  I just have a couple quick

10   questions.

11   EXAMINATION BY

12   MR. KERR:

13       Q.    Can you pull out Exhibit 35.

14             MS. MILLER:  Give me a minute.  Mine

15   are on the floor.

16             MR. KERR:  Sure.  It's this

17   (indicating).

18   BY MR. KERR:

19       Q.    If you could turn, Ms. Westman, to

20   Bates page 16101.

21             MR. SILVERSCHOTZ:  Which exhibit are

22   you on?

23             MR. KERR:  35.

24       Q.    Okay.  And that is -- that was an

25   e-mail that Ms. Miller asked you questions

Page 229

1                        B. WESTMAN

2    about, do you recall that?

3        A.    Yes.

4        Q.    And there is a reference to attachment

5    of Top Ten Intercompany Relationships.xls.  Do

6    you see that?

7        A.    Yes.

8        Q.    Okay.  If you would turn to the first

9    attachment after this e-mail, which is -- at the

10   top of the page says "Document Produced

11   Natively" and that is 16106?

12       A.    Yes.

13       Q.    And right after that is a spreadsheet.

14   Do you know what that is?

15       A.    Yes, that's an excerpt from our

16   intercompany spreadsheet that we maintained --

17       Q.    Okay.

18       A.    -- within my team.

19       Q.    And if you turn to the last page of

20   this exhibit, which Ms. Miller asked you some

21   questions about?

22       A.    Yes.

23       Q.    Is this a document that you prepared?

24       A.    No.

25       Q.    Is it a document that ResCap prepared?

Page 230

                    B. WESTMAN

1

2    A.      Not to my knowledge.

3    Q.      Okay.

4            MR. KERR:  No further questions.

5            Anybody else?

6            (No response.)

7            MR. KERR:  You're done?  Thank you.

8            MS. MILLER:  Thank you.

9            THE VIDEOGRAPHER:  The time is 6:28.

10   That's the end of today's deposition.  We'll

11   be going off the record.

12                    oOo

13

14

15

16

17

18           _____

             BARBARA WESTMAN

19

20   Subscribed and sworn to

     before me this    day

21   of             2013.

22

     _____

23

24

25

Page 231

1                    B. WESTMAN

2

3                    CERTIFICATE

4    STATE OF NEW YORK )

                            :  ss

5    COUNTY OF NEW YORK)

6         I, Kathy S. Klepfer, a Registered

7    Merit Reporter and Notary Public within and

8    for the State of New York, do hereby

9    certify:

10        That BARBARA WESTMAN, the witness

11   whose deposition is herein before set forth,

12   was duly sworn by me and that such

13   deposition is a true record of the testimony

14   given by such witness.

15        I further certify that I am not

16   related to any of the parties to this action

17   by blood or marriage and that I am in no way

18   interested in the outcome of this matter.

19        In witness whereof, I have hereunto

20   set my hand this 16th day of October, 2015.

21

22        --------------------------------

          KATHY S. KLEPFER, RPR, RMR, CRR, CLR

23

24

25

Page 232

1                          B. WESTMAN

2                            INDEX

3   TESTIMONY OF B. WESTMAN:                        PAGE

4   Examination by Ms. Miller                          5

5   Examination by Mr. Kerr                          228

6

7   WESTMAN EXHIBITS:                                PAGE

8   Exhibit 1, Ad Hoc Group of Junior Secured         11

9   Noteholders 30(b)(6) Notice of Deposition

10  Exhibit 2, a document with attachments bearing     35

11  Bates Nos. RCJSN10041452 through 1455

12  Exhibit 3, a document bearing Bates Nos.           52

13  RCJSN10041500 through 502

14  Exhibit 4, a document, with attachments,           70

15  bearing Bates No. RCJSN10037951

16  Exhibit 5, a document bearing Bates Nos.           80

17  RCJSN00003340

18  Exhibit 6, a document, with attachment,            92

19  bearing Bates Nos. RCUCCJSN30016049

20  Exhibit 7, an e-mail with attachments,             97

21  bearing Bates Nos. RCUCCJSN20064737 through 4801

22  Exhibit 8, a document bearing Bates Nos.          104

23  EXAM122636518 through 521

24

25

Page 233

1                          B. WESTMAN

2                        INDEX (Cont'd.)

3    WESTMAN EXHIBITS:                                   PAGE

4    Exhibit 9, Schedule of Assets and Liabilities      110

5    for RFC Asset Holdings II, LLC, filed in the

6    bankruptcy proceedings of Residential

7    Capital, LLC, et al., Docket No. 586

8    Exhibit 10, Amended Schedules of Assets and        114

9    Liabilities for Residential Capital, LLC

10   dated July 3, 2012

11   Exhibit 11, Amended Schedules of Assets and        116

12   Liabilities for Residential Funding Company,

13   LLC filed on July 3, 2012

14   Exhibit 12, Amended Schedules of Assets and        118

15   Liabilities for GMAC Mortgage, LLC filed on

16   July 3, 2012, at Docket No. 685

17   Exhibit 13, Amended Schedules of Assets and        121

18   Liabilities for GMAC Residential Holding

19   Company, LLC filed on July 3, 2012

20   Exhibit 14, an e-mail chain dated July 31, 2012,   123

21   bearing Bates Nos. Bates Nos. RCJSN10028118

22   through 28123

23   Exhibit 15, a document bearing Bates Nos.          126

24   UCC12846 through UCC12852

25

Page 234

1                           B. WESTMAN

2                        INDEX (Cont'd.)

3    WESTMAN EXHIBITS:                            PAGE

4    Exhibit 16, an e-mail with attachments,       129

5    bearing Bates Nos. RCUCCJSN30002758 through

6    2769

7    Exhibit 17, an e-mail bearing Bates Nos.       131

8    RCJSN00025680

9    Exhibit 18, a document bearing Bates Nos.      135

10   EXAM0034894 through 905

11   Exhibit 19, a document bearing Bates Nos.      141

12   EXAM00107037 through 41

13   Exhibit 20, a document bearing Bates Nos.      143

14   EXAM001030 through 35

15   Exhibit 21, a document bearing Bates Nos.      145

16   EXAM00107022 through 29

17   Exhibit 22, a document bearing Bates Nos.      148

18   EXAM00107300 through 307

19   Exhibit 23, a document bearing Bates Nos.      149

20   EXAM12263381 through 406

21   Exhibit 24, a document bearing Bates Nos.      153

22   RCJSN10034044 through 050

23   Exhibit 25, a document bearing Bates Nos.      155

24   RCUCCJSN10895541 through 5550

25

Page 235

1                        B. WESTMAN

2                     INDEX (Cont'd.)

3   WESTMAN EXHIBITS:                              PAGE

4   Exhibit 26, a document bearing Bates Nos.      157

5   RCUCJSN10692261 through 2266

6   Exhibit 27, a document bearing Bates Nos.      174

7   EXAM00123277 through 336

8   Exhibit 28, a document bearing Bates Nos.      176

9   EXAM00234281 through 4349

10  Exhibit 29, a document bearing Bates Nos.      178

11  EXAM00125358 through 416

12  Exhibit 30, a document bearing Bates Nos.      179

13  RCUCCJSN30014296 through 299

14  Exhibit 31, a document bearing Bates Nos.      182

15  RCJSN10015251 through 15268

16  Exhibit 32, a document bearing Bates Nos.      186

17  EXAM12412896 through 897

18  Exhibit 33, a document bearing Bates Nos.      190

19  RCJSN10074531 through 536

20  Exhibit 34, a document bearing Bates Nos.      196

21  RCUCCJSN30003025 through 3029

22  Exhibit 35, a document bearing Bates Nos.      202

23  RCUCCJSN30016049 through 16164

24  Exhibit 36, a document bearing Bates Nos.      208

25  RC40000118 through 137

Page 236

1                    B. WESTMAN

2                 INDEX (Cont'd.)

3    WESTMAN EXHIBITS:                          PAGE

4    Exhibit 37, a document bearing Bates Nos.    214

5    RCJSN10131858 through 878

6    Exhibit 38, a document bearing Bates Nos.    218

7    RCUCCJSN20080786 through 80790

8    Exhibit 39, a document bearing Bates Nos.    223

9    RCUCCJSN00030215

10

11   REQUESTS FOR PRODUCTION:

12   Page 74, Line 17

13   Page 85, Line 7

14

15

16

17

18

19

20

21

22

23

24

25

Page 237

1                           B. WESTMAN
2   NAME OF CASE:  In Re Residential Capital LLC
3   DATE OF DEPOSITION:  October 15, 2013
4   NAME OF WITNESS:  Barbara Westman
5   Reason Codes:
6         1.  To clarify the record.
          2.  To conform to the facts.
7         3.  To correct transcription errors.
8   Page _____ Line _____ Reason _____
    From _____ to _____
9
    Page _____ Line _____ Reason _____
10  From _____ to _____
11  Page _____ Line _____ Reason _____
    From _____ to _____
12
    Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
    From _____ to _____
15
    Page _____ Line _____ Reason _____
16  From _____ to _____
17  Page _____ Line _____ Reason _____
    From _____ to _____
18
    Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
    From _____ to _____
21
    Page _____ Line _____ Reason _____
22  From _____ to _____
23  Page _____ Line _____ Reason _____
    From _____ to _____
24

                            _____
25                          BARBARA  WESTMAN

**RESCAP**

Adam J. Hunt
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

Adam,

Attached is my signed and notorized deposition and errata sheet.

Thank you.

**Barb Westman**
RESCAP
Senior Director / Controller
952-857-7789
barbara.westman@gmacrescap.com

Page 230

1                    B. WESTMAN

2    A.      Not to my knowledge.

3    Q.      Okay.

4            MR. KERR:  No further questions.

5            Anybody else?

6            (No response.)

7            MR. KERR:  You're done?  Thank you.

8            MS. MILLER:  Thank you.

9            THE VIDEOGRAPHER:  The time is 6:28.

10   That's the end of today's deposition.  We'll

11   be going off the record.

12                    oOo

13

14

15

16

17

18        *Barbara Westman (signature)*

          BARBARA WESTMAN

19

20   Subscribed and sworn to

     before me this 7th day

21   of November 2013.

22

          *Kay Turner (signature)*

23   _____

24

25

KAY TURNER
Notary Public Minnesota
My commission expires
January 31, 2015

### Deposition Errata Sheet

### *In re Residential Capital, LLC, et al.,*
### Case No. 12-12020(MG)

Deponent:        Barbara Westman
Deposition Date:   October 15, 2013

| Citation | Testimony |
|---|---|
| 8:14-19 | However, if there is an issue of privilege that comes up ~~that~~ and you're not able to respond to the question without knowing whether or not you might be stepping into privilege areas, for that I think you should let Atara know and then we can discuss it at that time. |
| 15:10 | ~~And~~ HIA, Health Insurance Associate; |
| 17:2-4 | I moved to Minnesota and joined an organization called North American Life and Casualty, which later changed its name to Allianz Life. |
| 17:8 | I held several positions. |
| 17:20-25 | For a time period I worked within the  Claims Department and ~~Managed Claims~~ managed claims. I managed financial claims audits. I don't recall other specifics while a manager.<br>Q. And did you have any other positions at North ~~America~~ American Life and Casualty? |
| 18:2-22 | Yes. I also held several ~~comptroller~~ controller and/or CFO positions for several divisions of the organization.<br>Q. And did you hold those ~~comptroller~~ controller and CFO positions contemporaneous with your financial manager positions?<br>A. No, those were promotions.<br>Q. Okay. And so how long -- when did you move into a ~~comptroller~~ controller position?<br>A. I don't recall the date.<br>Q. Do you remember approximately what year?<br>A. I don't.<br>Q. Do you recall how long you were in ~~comptroller~~ controller or CFO positions?<br>A. Ten to fifteen years.<br>Q. And how long were you at North ~~America~~ American Life in total?<br>2. Twenty years.<br>Q. And what were your responsibilities as ~~comptroller~~ controller? |
| 19:9 | Financial~~, financial~~ consulting for businesses. |
| 21:7 | Ally, as part of the revolver facility. |

| Citation | Testimony |
|---|---|
| 23:25-24:8 | I was responsible for financial controls, which included continuing with the Ally revolver and Ally line of credit funding facility, reporting process;. I was also responsible for Sarbanes-Oxley or SOx SOX work for ResCap, and also managed the — I was responsible for the general ledger functions within ResCap and a change management function. |
| 25:-18-24 | The team that managed month-end process reported to me, so my responsibilities were ensuring that the month-end — that transactions were entered, that the month-end was properly closed and consolidated, and that we produced monthly trial balances and financial statements in a timely manner. |
| 27:14-16 | Again, if one entity sold assets to another entity, that the purchasing entity would record that asset. |
| 28:10-13 | I'm currently a senior director. I am also currently the comptroller controller.<br><br>Q. And when did you become the comptroller controller? |
| 30:6-8 | Are you asking for her to explain your understanding of it or an intercompany transaction – she's been using "intercompany balances." |
| 30:19-21 | That had to be forecasted on a daily basis to make ensure sure that we met the requirements of that agreement. |
| 41:24-42:6 | I don't know the specific process, but there was a forecasting process and cash —the Treasury Department managed those cash balances so it would know what cash was available and could calculate —calculate that cash and determine what was required to be repaid or what borrowing might need to occur to meet the cash needs. |
| 47:5-11 | The policy generally discussed that transactions would be settled on a regular basis, and we determined that due to the functions of the cash management process, that that the policy would meet the requirement, and did not need to be fully cash-settled, which would be counterintuitive to the cash management process. |
| 60:25 – 61:7 | Because I was involved in other functions or other processes within the line of credit so had a general knowledge of the agreement and the processes within the organization, and also, due to work on Sarbanes-Oxley, may have been aware of various process processes. |
| 71:22-23 | I know the that spreadsheets were sent. I don't recall how many versions were sent. |
| 75:21-25 | I wouldn't necessarily – I can't necessarily state if they called it an exception or an exception approval, but they did approve that that was a valid intercompany process and met the requirements for us to certify the balances. |

| Citation | Testimony |
|---|---|
| 101:19-102:2 | This was as part of research attempting to document the reasons behind certain intercompany transactions, and ~~these particular transactions~~ I had requested that Janel determine whether she was familiar with these particular transactions, ~~if~~ as she had recently worked on a project that might have made her familiar with these particular balances. |
| 102:23-24 | I don't believe so. I believe it's referring to the servicing advances. |
| 103:4-7 | Looking at the document with the Bates range ending in 4744, there's an e-mail from Michaeline Dugan to you dated February 23, 2012 regarding Executive ~~Custody~~ Trustee Services. |
| 109:17-23 | MR. KERR:  I have had an opportunity over lunch to look at what has been marked as Westman Exhibit 8, and after reviewing it and reviewing the text of the e-mail more carefully, we're not going to assert privilege over this specific e-mail and you are ~~fee~~ free to question Ms. Westman about it. |
| 121:23-24 | They reflected the information from our general ledger to the best of ~~your~~ our knowledge. |
| 164:20 | ~~Other than Ditech, n~~ot to my knowledge. |
| 165:7-9 | And ~~in 2000~~ were GMAC Mortgage's audited consolidated financial statements submitted to HUD in 2009, '10 and '11? |
| 181:20-182:7 | However, when we produced that workbook for every individual legal entity, while all those intercompanies ~~eliminating~~ eliminate in consolidation, the question was how would we present them. Those particular intercompanies don't give the relationships, et cetera, and FTI was using other intercompany documents to reflect however they were presenting those intercompany balances, so we were simply asking how they wanted it produced in the schedule so that they could use it appropriately for their purpose. |
| 185:21-24 | The conclusion from the inquiry that we had with D&T was that the receivable could  remain on the balance sheet of ~~RFC Financial~~ RFC's financials. |
| 187:16-20 | I drafted this memo to provide support to D&T as part of the year-end audit of RFC ~~Financial~~ financial statements in response to their question on that intercompany receivable reflected in those financial statements. |
| 193:9-194:3 | "In order to avoid cash transfers between themselves and to discharge their payment obligations in the amounts set forth above, the parties hereto each agree that the obligations: (a) of the Purchaser to pay the Purchase Price to the Seller as consideration for the purchase of the mortgage loans pursuant to the Bill of Sale; (b) of the seller to pay $171,323,565.91 to GMAC-RHC as repayment of certain intercompany loans; (c) of GMAC-RHC to pay $171,323,565.91 to ResCap as repayment of certain intercompany loans; and (d) of ResCap to pay $171,323,565.91 to the Purchaser as repayment of certain intercompany loans; will be netted against each other so that the respective obligations will be discharged without a cash payment having been made as of the date thereof." |

| Citation | Testimony |
|---|---|
| 194:7-195:5 | "As a consequence of the foregoing netting: (w) the seller hereby fully and finally discharges the Purchaser from its obligation to pay the Purchase Price as consideration for the purchaser of the mortgage loans pursuant to the Bill of Sale; (x) GMAC-RHC hereby fully and finally discharges the Seller from its obligation to repay $171,323,565.91 to GMAC-RHC under the intercompany loans (and subtracts such amount from the total amount due by the Seller to GMAC-RHC under the intercompany loans); (y) ResCap hereby fully and finally discharges GMAC-RHC from its obligation to repay $171,323,565.91 to ResCap under the intercompany loans (and subtracts such amounts from the total amount due by GMAC-RHC to ResCap under the intercompany loans); (z) the Purchaser hereby fully and finally discharges ResCap from its obligation to repay $171,323,565.91 to the Purchaser under the intercompany loans (and subtracts such amounts from the total amount due by ResCap to the purchaser under the intercompany loans)." |
| 198:16-19 | So this is a monthly roll-forward ~~of our~~ or a monthly depiction of those balances looking for fluctuations in the balance to try to ~~a~~ identify and pinpoint transactions that may have generated portions of the balance. |
|  |  |
| 208:2-3 | We researched as much as we could.  We looked at as much information as we could identify. |
| 211:23-12:5 | Those would be ongoing – the change management process would be to review something that was a new or a significant item, and once an operational process was established around that, additional activity within~~,~~ that would not be considered a significant event. |
| 213:11-16 | And looking at page 128 under Dividends, there's a description, a specific description of how dividends paid from a subsidiary to a ~~payment~~ parent company should be accounted for and eliminated in consolidation -- sorry, recorded and eliminated in consolidation. |
| 220:10-16 | The intercompany receivable/payable balances that were being forgiven would be reversed and the transaction would be recorded through equity ~~through.~~ Depending on the direction of the balance, it would be recorded as an additional paid in capital transaction, either additional capital or reversal of capital. |
| 222:20-21 | Could you rephrase the question?  I'm not sure what you're referring to~~?~~. |
| 225:23-226:2 | There were other systems involved in ~~Treasuries~~ Treasury. There was a Quantum system where certain transactions or wire transfers were performed through the Quantum system. |

Date:    11 - 7 - 13

Signed:    *Barbara J westman*

Barbara Westman