Page 1

1                         C. Dondzila

2              UNITED STATES BANKRUPTCY COURT

3               SOUTHERN DISTRICT OF NEW YORK

4                   Case No. 12-12020(MG)

5    _____

6    In re:                                    )

7    RESIDENTIAL CAPITAL, LLC,                 )

8    et al                                     )

9                   Debtors.                   )

10   _____ )

11

12

13

14

15         DEPOSITION OF CATHY DONDZILA

16               Washington, D.C.

17               October 17, 2013

18

19   Yellow Highlighting = JSN Designation

     Pink Highlighting = Plaintiff's Designation & Counter-Designation

20   Orange Highlighting = Joint Designation

21

22

23

24   Reported by:  Mary Ann Payonk, NCRR

25   Job No. 66921

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 2 of 198

Page 2

1              C. Dondzila

2

3

4

5              October 17, 2013

6              10:04 a.m.

7

8         Deposition of CATHY DONDZILA, held at

9    the law offices of Morrison & Foerster, 2000

10   Pennsylvania Avenue, N.W., Washington, D.C.,

11   pursuant to Notice before Mary Ann Payonk,

12   NCRR, Nationally Certified Realtime Reporter

13   and Notary Public of the District of Columbia.

14

15

16

17

18

19

20

21

22

23

24

25

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 3 of 198

Page 3

                         C. Dondzila

1

2    APPEARANCES:

3    ON BEHALF OF DEBTOR and THE WITNESS:

4            JEFFREY LIPPS, ESQUIRE

5            CARPENTER LIPPS & LELAND

6            280 Plaza

7            Columbus, OH 43215

8

9    ON BEHALF OF THE COMMITTEE OF UNSECURED

10   CREDITORS:

11           P. BRADLEY O'NEILL, ESQUIRE

12           KRAMER LEVIN NAFTALIS & FRANKEL

13           1177 Avenue of the Americas

14           New York, NY 10036

15

16   ON BEHALF OF JUNIOR SECURED LENDERS:

17           DAN PERRY, ESQUIRE

18           HAILEY DeKRAKER, ESQUIRE

19           MILBANK TWEED HADLEY & McCLOY

20           One Chase Manhattan Plaza

21           New York, NY 10005

22

23

24

25

1          C. Dondzila

2     Appearances (Cont'd.):

3     ON BEHALF OF ALLY:

4          JODI WU, ESQUIRE

5          KIRKLAND & ELLIS

6          655 Fifteenth Street, N.W.

7          Washington, D.C. 20005

8

9     ON BEHALF OF DEBTORS:

10         ALEXANDRA STEINBERG BARRAGE, ESQUIRE

11         ROBERT BAEHR, ESQUIRE

12         MORRISON & FOERSTER

13         2000 Pennsylvania Avenue, N.W.

14         Washington, D.C. 20006

15

16

17    ON BEHALF OF WELLS FARGO

18         MARK SILVERSCHOTZ, ESQUIRE (By phone)

19         ReedSmith

20         599 Lexington Avenue

21         New York, NY 10022

22

23

24

25

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 5 of 198

Page 5

1                    C. Dondzila

2     Appearances (Cont'd.)

3     ON BEHALF OF BoNY MELLON TRUST COMPANY NA AS

4     TRUSTEE FOR INDENTURED TRUSTEE:

5           JAMES MOORE, ESQUIRE (By phone)

6           DECHERT

7           1095 Avenue of the Americas

8           New York, NY 10036

9

10    ALSO PRESENT:

11          Jordan Mummert, Legal Video Specialist

12          Jennifer Scoliard, Esquire

13            V.P., Assistant General Counsel

14            Ocwen Financial Corporation

15

16

17

18

19

20

21

22

23

24

25

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 6 of 198

Page 6

1                    C. Dondzila

2        THE VIDEOGRAPHER:  This is the

3    start of the tape labeled number 1 of

4    the videotaped deposition of Cathy

5    Dondzila In Re: Residential Capital LLC.

6        This deposition is taking place at

7    2000 Pennsylvania Avenue, Northwest,

8    Washington, D.C. on October 17, 2013, at

9    approximately 10:04 a.m.

10       My name is Jordan Mummert from

11   TSG Reporting, Inc.  I'm the legal video

12   specialist.

13       The court reporter is Mary Ann

14   Payonk, in association with

15   TSG Reporting.

16       Will the counsel please introduce

17   yourselves?

18       (Whereupon, counsel placed their

19   appearances on the video record.)

20       THE VIDEOGRAPHER:  The reporter may

21   swear the witness.

22

23

24

25

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 7 of 198

Page 7

1                     C. Dondzila

2    CATHY DONDZILA,

3           called as a witness, having been duly

4           sworn, was examined and testified as

5           follows:

6                     EXAMINATION

7    BY MR. PERRY:

8        Q.    Good morning, Ms. Dondzila.

9        A.    Good morning.

10       Q.    So have you been deposed before?

11       A.    I have not.

12       Q.    Let me just go over a few of the

13   ground rules for you.

14           I'm going to be asking you some

15   questions.  You're going to be giving answers.

16   For the court reporter to take everything down,

17   I'd ask that you let me finish my question

18   before you start giving an answer.  If you

19   remember verbal responses, she can't take down

20   head nods and the like.  And I'll try and

21   remind you as we go through the day.

22           If you don't understand one of my

23   questions, please let me know and I'll do my

24   best to rephrase it and make it more clear to

25   you.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila    Pg 8 of 198

Page 8

1                    C. Dondzila

2            If you have a concern or a question

3    about privilege, you're entitled to consult

4    with your counsel.  Otherwise, you may be

5    hearing objections being made during the course

6    of the deposition.  I'd ask that you answer the

7    question unless the objection involves

8    privilege.

9            Do you have any questions?

10    A.   I do not.

11    Q.    Okay.  Can you give me a run-through

12    of your resume?

13    A.    I am a graduate of Washington

14    University in St. Louis, graduating in December

15    of 1983.  Immediately went into the employ of

16    Touche Ross, now Deloitte & Touche.  Worked

17    with them for approximately nine years, left

18    for a short turn with Credit Suisse First

19    Boston in their internal audit department, and

20    after probably six or eight months, left Credit

21    Suisse First Boston and joined Bear Stearns.

22    Left Bear Stearns in January of 2004 to join

23    Freddie Mac, and in 2006 left Freddie Mac, did

24    some private consulting with various clients,

25    including GMAC, now Ally Financial, and in I

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 9 of 198

Page 9

1                    C. Dondzila

2    believe April of 2008 joined Residential

3    Capital as a full-time employee.  And left

4    there in February of 2013 and am now employed

5    at Ocwen Financial.

6         Q.   So let's go back.  Did you obtain a

7    degree from Washington University?

8         A.   I did.  I have a Bachelor of Science

9    with a concentration in accounting and finance.

10        Q.   Are you a CPA?

11        A.   I have passed the CPA exam.  I am not

12   active.

13        Q.   Do you currently hold any

14   professional licenses?

15        A.   I do not.

16        Q.   And other than the CPA license, have

17   you ever held any other professional licenses?

18        A.   I have.  When I was at Bear Stearns,

19   I believe, I had several Series 7, and there

20   could have been another possibly Series 63.  I

21   don't remember exactly the number, but I did

22   have some licenses at Bear Stearns.

23        Q.   And what did you do at Touche Ross?

24        A.   I was a member of the audit

25   department and progressed from assistant to

C. Dondzila

1   senior manager performing audits for various

2   clients.

3   Q.   And what did you do at Credit Suisse?

4   A.   I was a manager in the internal audit

5   department.

6   Q.   And how about at Bear Stearns?

7   A.   I was part of the accounting

8   department, progressing through the course of

9   my career to be the senior managing director,

10  business unit, controller for fixed income

11  sales and trading.

12  Q.   And what was your position at Freddie

13  Mac?

14  A.   I was a senior vice president,

15  business unit -- I forget if we called

16  ourselves business unit controllers or business

17  unit accountants, but I was responsible for all

18  of the accounting for the various business

19  units within Freddie Mac.

20  Q.   What was the nature of the private

21  consulting work that you did for GMAC before

22  you started there?

23  A.   I was engaged to assist with a

24  corporate objective of improving their close

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 11 of 198

Page 11

1                    C. Dondzila

2    process and worked to project manage across the

3    organization to achieve that objective.

4        Q.   And when you start with -- did you

5    start with ResCap in 2008?

6        A.   In --

7        Q.   Let me ask this.  What entity did you

8    begin work for in April 2008?

9        A.   I was employed by ResCap in 2008.

10       Q.   And did you remain employed by ResCap

11   for the entirety of your employment?

12       A.   I did not.  There was a period of

13   time where we were switched to become employees

14   of Ally, GMAC at that point, but now Ally

15   Financial.  And subsequently, we were then

16   rebadged back to ResCap.

17       Q.   Did your job responsibilities change

18   when you were switched to Ally?

19       A.   No.

20       Q.   What were your responsibilities

21   during the first time that you were employed at

22   ResCap?

23       A.   I started as the controller for the

24   residential finance group, which was a segment

25   then of ResCap.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 12 of 198

Page 12

1                    C. Dondzila

2          Q.     Do you know what entities, legal

3     entities were housed in the residential finance

4     group?

5          A.     It would have cut across various

6     legal entities, the most significant of which

7     would have been GMAC Mortgage Corporation and

8     Residential Funding Company, but would have

9     included activities that were recorded and

10    executed by other subsidiaries of those two

11    entities.

12         Q.     Did your title as controller for the

13    residential financial group change during your

14    five years with ResCap and Ally?

15         A.     My role and my title did change, yes.

16         Q.     Okay.   When did that change occur?

17         A.     The -- I believe it would have been

18    in January or February of 2009.   The

19    then-controller of Residential Capital resigned

20    and I was asked to take that role, which I did,

21    and so in early 2009, I would have stepped into

22    the role of controller for Residential Capital.

23         Q.     And what additional responsibilities

24    were involved in being the controller of

25    Residential Capital?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 13 of 198

Page 13

1                      C. Dondzila

2        A.      There were a variety of segments

3    within Residential Capital, so within my role I

4    would have been responsible for the entire

5    consolidated results -- the accounting process

6    related to the entire consolidated results, and

7    additionally, the preparation and review and

8    issuance of financial statements for

9    Residential Capital and any of its subsidiaries

10   that required separate financial statements.

11       Q.      Why did -- which of Residential

12   Capital's subsidiaries required separate

13   financial statements?

14            MR. LIPPS:   At what particular

15       point in time?

16            MR. PERRY:   From 2009 forward.

17       A.      Residential Capital as a condition of

18   their indentures and as, at the time, a

19   registered public company with the SEC, GMAC

20   Mortgage in connection with its various state

21   licenses, certain of its liquidity facilities

22   and certain of its other contracts, including

23   HUD and Ginnie Mae, Residential Funding Company

24   for similar reasons as GMAC Mortgage, Ditech, I

25   believe it was Ditech Financial but I may not

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 14 of 198

Page 14

1          C. Dondzila

2    be getting the full name of that entity

3    correct, but Ditech again for state licenses.

4    And I don't know exactly what year Homecomings

5    Financial stopped issuing financial statements.

6    It may have been 2008 was the last set of

7    financial statements for Homecomings, but

8    Homecomings Financial also as part of its

9    licensed activities had separate company

10   financial statements prepared.

11        Q.   Why did Homecomings stop issuing

12   separate financial statements?

13        A.   All of its business activities were

14   sold, transferred, or discontinued, and it no

15   longer had any licensing requirements that

16   required financial statements.

17        Q.   Was Homecomings -- when you say

18   Homecomings, are you referring to Homecomings

19   Financial LLC?

20        A.   Yes.

21        Q.   Did it stop conducting business

22   activities in or around 2008?

23        A.   I don't know the exact year that it

24   stopped doing its business activities.

25        Q.   And at the point that it stopped

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 15 of 198

Page 15

1                    C. Dondzila

2    doing its business activities did it maintain

3    any assets?

4        A.   It did.

5        Q.   And what were its assets?

6        A.   I don't know.

7        Q.   And do you know why it wasn't wound

8    up at the point in time when it stopped doing

9    business?

10       A.   Homecomings was listed as the named

11   servicer for a variety of different, I believe

12   private label securitizations, and the cost,

13   effort, and exercise of having that changed was

14   prohibitive, but until that was completed, it

15   could not be shut down.

16       (Dondzila Exhibit No. 1 was marked for

17       identification.)

18   BY MR. PERRY:

19       Q.   Before you is Deposition

20   Exhibit Dondzila 1.  It purports to be a

21   consolidated financial statement for

22   Homecomings Financial LLC for the year ended

23   December 2008.  I'll represent to you,

24   Ms. Dondzila, that we've looked in the

25   production of documents that have been made in

Page 16

C. Dondzila

1  the case.  This is the last financial statement

2  for Homecomings that we see produced.  Can you

3  just take a moment to review it?

4       My question to you is:  Do you have

5  any reason to believe that financial statements

6  were prepared for Homecomings at any point

7  after the year ended December 31, 2008?

8       MR. LIPPS:  Objection.  I think she

9       answered that before, but go ahead.

10      A.   I have no reason to believe that

11 financials would have been issued for

12 Homecomings Financial LLC after the period

13 presented.

14      Q.   And in terms of Homecomings' assets,

15 are you able to identify from your review of

16 Dondzila Exhibit 1 the nature of Homecomings'

17 assets, at least as of year ended December 31,

18 2008?

19      MR. LIPPS:  Objection to form.  Go

20      ahead.

21      A.   I can review and see the balance

22 sheet as presented, the consolidated balance

23 sheet, and could recite certainly the assets

24 and liabilities presented.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 17 of 198

Page 17

C. Dondzila

1

2   Q.   Well, there's a notation on the

3   balance sheet -- and this for the record is the

4   page stamped 2 and Bates labeled 122168.  Do

5   you see there it says affiliate receivables

6   net?  Is that a billion-dollar number?

7   A.   The amount presented is

8   $1,051,047,000.

9   Q.   Okay.

10   A.   Rounded, presented in thousands.

11   Q.   And do you know the nature of the

12   affiliate receivable that was carried on the

13   balance sheet of Homecomings?

14   A.   I don't recall.

15   Q.   Do you know which entities owed funds

16   to Homecomings?

17   A.   I don't know that without either

18   closer review of the financial statements in

19   the event that it's disclosed.  I don't know

20   that.

21   Q.   Do you know whether there was ever

22   any attempt to reconcile or pay, cash-settle

23   the affiliate balances with Homecomings LLC?

24   A.   There were monthly activities that

25   ensured that balances between affiliates

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 18 of 198

Page 18

1                      C. Dondzila

2    reconciled, so I can confirm that there would

3    have been reconciliation activities that

4    occurred.

5              I am not aware of any activities

6    related to settlements or payments related to

7    those.

8         Q.    Are you aware of any debt forgiveness

9    with respect to Homecomings Financial LLC?

10        A.    No.

11        Q.    Is it correct that Homecomings

12   Financial LLC was a guarantor on the junior

13   secured notes, to your knowledge?

14        A.    Not that I recall.

15        Q.    Did the -- did your department

16   maintain a list or an organizational chart that

17   identified which entities served as guarantors

18   and borrowers under the various facilities that

19   the Residential Capital business had in place?

20        A.    We would have as part of our SEC

21   filings been required to provide schedules that

22   identified guarantor entities.

23        Q.    Did there come a time when -- strike

24   that.

25              Did there come a time when you and

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 19 of 198

Page 19

1                          C. Dondzila

2    the people that reported to you began to

3    scrutinize the intercompany balances among the

4    various entities under Residential Capital LLC?

5          A.     As I mentioned earlier, there would

6    have been monthly activities that would have

7    reconciled to ensure that all intercompany

8    balances and activity was properly eliminated

9    and also that any balances reconciled.  So that

10   would have been an ongoing, recurring close

11   activity.

12              Separately, at some point, Ally --

13   well, sorry.  So we would have then

14   periodically had occasion to review

15   intercompany balances and other intercompany

16   activities to the extent that we were looking

17   at solvency and calculating various

18   calculations for adjusted net worth, which

19   would have occurred on a monthly basis, because

20   we had to first off make sure that all entities

21   were solvent under the definition as provided

22   in the legal documents and contracts.

23              We also would have had as applicable

24   calculations of adjusted net worth which did

25   involve in certain states, in certain

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 20 of 198

Page 20

1                    C. Dondzila

2   instances, evaluations of intercompany

3   balances.

4              We would have also, in connection

5   with the dissolution of entities and legal

6   entity minimization type initiatives on behalf

7   of the organization, would have looked at, had

8   occasion to look at intercompany balances.

9              We would have also looked at

10  intercompany balances if or when there were

11  circumstances that suggested we might need to

12  use debt forgiveness as a means of maintaining

13  compliance with adjusted net worth calculations

14  and regulatory compliance with requirements.

15             We also then separately, sometime in

16  2012, as a result of the implementation of our

17  parent, Ally Financial, of a certification

18  requirement, and also due to the issuance of a

19  policy, would have undertaken an initiative to

20  determine whether or if we were in compliance

21  with that policy, and in order to support our

22  certification.

23       Q.    Okay.  Let me try and unpack that a

24  little bit.

25             Focusing on the first item that you

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 21 of 198

Page 21

1                    C. Dondzila

2    referenced in your prior answer, as I

3    understood it, you -- there was an effort on

4    the part of the controller's office to make

5    sure that all of the entities under the ResCap

6    LLC umbrella were solvent.  Is that correct?

7             MR. LIPPS:  Objection.  Go ahead.

8        A.   We monitored for solvency as part of

9    the requirements of various of our liquidity

10   facilities.

11       Q.   And which of your liquidity

12   facilities had solvency requirements in them?

13       A.   The Ally Financial revolver, Ally

14   Financial line of credit, and then I believe

15   by -- at some point, all other liquidity

16   facilities had it in large part because they

17   all began to reference, mirror and sort of

18   attach to each other in some fashion, so if

19   changes were made to one, they were effective

20   for all.

21       Q.   And when you say monitor for

22   solvency, what do you mean by that?

23       A.   The definition of solvency was

24   prescribed within each of the documents, and we

25   would, on a monthly basis, be required to

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 22 of 198

Page 22

1                    C. Dondzila

2    ensure that each entity to which that solvency

3    requirement applied met the threshold.

4        Q.    And was there a document that you had

5    that you would refer to that contained the

6    definition of solvency prescribed in the

7    documents?

8        A.    Yes.

9        Q.    Did you look at the lending documents

10   themselves, or did you have some form of sheet

11   that provided a test for you?

12       A.    There was a sheet that was circulated

13   by the treasury department that had summaries

14   of the relevant certification requirements

15   under each of the agreements that we used.

16       Q.    And for purposes of making your

17   solvency determination, did you consider

18   intercompany balances for each of the

19   individual entities for which you were

20   evaluating solvency?

21       A.    They would have formed assets or

22   liabilities of the entities as recorded and so

23   they would have been considered.   There were no

24   special adjustments for them, but they would

25   have been considered as assets or liabilities

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 23 of 198

Page 23

1                          C. Dondzila

2    of the respective companies.

3          Q.    Okay.  So just to be clear, when you

4    were evaluating solvency of, let's just say,

5    GMAC Mortgage LLC, any receivables that GMAC

6    Mortgage had from its affiliates pursuant to an

7    intercompany was taken as an asset for purposes

8    of your solvency analysis; correct?

9          A.    That's correct.

10              MR. LIPPS:    Objection to form.

11          A.    Sorry.

12          Q.    And do you -- maybe I asked this

13    before, and if I did, I apologize.  Do you

14    recall which of the entities were monitored for

15    solvency, let's just say, in 2009 forward?

16          A.    I don't recall all of them.

17    Obviously, GMAC Mortgage and Residential

18    Funding Company were part of that, but there

19    were certainly other entities that were

20    monitored under those provisions.

21          Q.    Was GMAC Residential Holding Company

22    LLC monitored for solvency purposes?

23          A.    I don't recall.

24          Q.    Was Home Connects Lending Services

25    LLC monitored for solvency purposes?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 24 of 198

Page 24

1                    C. Dondzila

2        A.   I don't recall.

3        Q.   Was Passive Asset Transactions LLC

4   monitored for solvency purposes?

5        A.   I believe, yes, that that entity was.

6        Q.   Was Residential Capital LLC monitored

7   for solvency purposes?

8        A.   Yes.

9        Q.   And was Executive Trustee Services

10  LLC monitored for solvency purposes?

11       A.   I don't recall.

12       Q.   Was RFC Asset Holdings II LLC

13  monitored for solvency purposes?

14       A.   I don't recall.

15       Q.   And was Homecomings Financial LLC

16  monitored for solvency purposes?

17       A.   I don't recall.

18       Q.   Okay.  Turning to the -- you've

19  testified there was solvency monitoring for

20  purposes of the liquidity facilities.  You also

21  referenced regulatory compliance requirements

22  with certain states.  Can you explain what you

23  meant by that?

24       A.   In connection with the state licenses

25  held by one or more of the entities within the

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 25 of 198

Page 25

1                     C. Dondzila

2   ResCap family, states would have a variety of

3   different requirements, some of which were

4   financial, and a member of my team would

5   monitor the financial requirements that

6   could -- and those states could involve

7   establishment of a minimum net worth amount,

8   each having their own definition of net worth.

9   We did not monitor every state license

10  requirement.  We monitored the most restrictive

11  of them.

12           In certain states, there were also

13  requirements that could be linked to the size

14  of the serviced portfolio.  That was also

15  monitored by us, and that would set sort of the

16  amount of net worth that was required to be

17  held.

18      Q.   Now, did the state solvency

19  requirements or the state net worth

20  requirements, were they -- were the

21  requirements the same or did they vary from

22  state to state?

23           MR. LIPPS:  Objection, asked and

24      answered.  Go ahead.

25      A.   They varied by state.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 26 of 198

Page 26

1                    C. Dondzila

2        Q.    Okay.   And what about on a

3    state-to-state basis, were the assets and

4    liabilities you could consider for purposes of

5    the net worth analysis the same or did they

6    differ?

7        A.    Each had their own definition of what

8    was allowable and what went into the

9    calculation or didn't.

10        Q.    And is it fair to say that in some

11    states, intercompany balances were allowable

12    and in other states, they were not, for

13    purposes of the net worth calculation?

14        A.    Yes, that's fair to say.

15        Q.    Now, you also referenced a -- let me

16    back up for a second.

17            Was there -- would Residential

18    Funding have to make an affirmative

19    certification to the various state regulators

20    as a result of the net worth analysis that you

21    did?

22        A.    I don't know if there were any

23    affirmative certifications that were provided.

24        Q.    Who would have provided those

25    certifications if they were required?

Page 27

C. Dondzila

1

2    A.    People in the compliance department.

3    Q.    And would you send the results of the

4  analysis that your department did on net worth

5  to the compliance department on a regular

6  basis?

7    A.    I don't know if we sent them the

8  actual results or if we just sent a

9  notification that we were in compliance.

10    Q.    And who from the compliance

11  department was in charge of ensuring compliance

12  with the adjusted net worth requirements of the

13  various states?

14    A.    I don't recall who in compliance did

15  that.

16    Q.    You also mentioned in your answer a

17  certification requirement that came down in

18  2012.  What did you mean by that?

19        MR. LIPPS:  Objection, form.  But

20    go ahead.

21    A.    In connection with the issuance of

22  their public financials on a quarterly and

23  annual basis, Ally Financial required each of

24  the business segments, as they define them, to

25  provide certifications in support of the

Page 28

C. Dondzila

1  signatures that executives would be -- and

2  affirmations that executives of Ally Financial

3  would be making in connection with those

4  financial statements.

5          A component of those certifications,

6  in 2012, there was a part that was added that

7  related to compliance with the recently issued

8  intercompany accounting policy.

9          Q.   Do you know what led to the issuance

10 of an intercompany policy in 2012?

11         A.   I don't recall.

12         Q.   Do you recall the nature of that

13 policy?

14         A.   No.

15         Q.   In terms of certifying compliance

16 with the policy, did you have occasion to

17 evaluate whether the intercompany balances that

18 were reflected on ResCap's books and records

19 were actually collectable?

20         A.   I don't recall all of the specific

21 requirements of the policy.

22         Q.   Was it more than simply ensuring that

23 intercompany balance is eliminated in

24 consolidation?

Page 29

1          C. Dondzila

2          MR. O'NEILL:  Objection, form.

3     A.   I don't recall all the components of

4 the policy.

5     (Dondzila Exhibit No. 2 was marked for

6     identification.)

7 BY MR. PERRY:

8     Q.   Before you, Ms. Dondzila, is Dondzila

9 Deposition Exhibit 2.  It's an email with an

10 accompanying Excel spreadsheet.  It bears the

11 Bates label RCUCCJSN20085254.  Can you just

12 take a moment to familiarize yourself with the

13 document?

14          Have you completed your review of

15 Dondzila Exhibit 2?

16     A.   I have.

17     Q.   First question:  The subject line --

18 well, who's Barbara Westman?

19     A.   Barbara Westman at the time of this

20 email, February 23, 2012, was reporting to me

21 as a senior director of accounting operations

22 and compliance.

23     Q.   And she writes you an email with the

24 subject line "Intercompany Questions."

25          First question:  Who was it that had

1              C. Dondzila

2    raised questions about intercompanies in or

3    around February of 2012?

4         A.   I don't recall.

5         Q.   Do you know for what purpose the

6    Excel spreadsheet attached to the email in

7    Dondzila Exhibit 2 was prepared?

8         A.   I do not.

9         Q.   And if you go to the first page of

10   the spreadsheet, there's some analysis of five

11   intercompany balances.  Do you see that?

12        A.   I do.

13        Q.   Focusing in the first instance on the

14   description of the balance between Residential

15   Capital and GMAC Residential Holdings, you see

16   it says, "This balance acts as an LOC where

17   GMACM can borrow funds, or contribute funds to

18   ResCap as needed.  This borrowing is funneled

19   through its parent, Resi Holdings."  Do you see

20   that?

21        A.   I do.

22        Q.   Do you understand the term LOC to

23   mean letter of credit?

24        A.   I do.

25        Q.   And is this, in your view, an

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 31 of 198

Page 31

1                    C. Dondzila

2      accurate statement of how the balance between

3      Residential Capital and GMAC Residential

4      Holdings functioned in or around February 2012?

5           A.    Can you repeat the question, please?

6           Q.    Is the description contained on this

7      document consistent with your understanding of

8      how the intercompany balance between GMACM or

9      GMAC Residential Holdings and Residential

10     Capital functioned in 2012 and previously?

11          A.    Yes, I would say that that's

12     consistent for the period of time that I was

13     part of ResCap.   I cannot speak to any time

14     prior to my taking a permanent role within

15     ResCap.

16          Q.    Okay.   And focusing your attention on

17     the description one down of the Residential

18     Capital/Residential Funding Company

19     relationship, would you agree that that

20     relationship was similar to the Residential

21     Capital/GMAC Residential Holdings intercompany

22     balance, at least insofar as the balance acted

23     as a letter of credit where Residential Funding

24     Company could borrow funds or contribute funds

25     to ResCap as needed?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 32 of 198

Page 32

1          C. Dondzila

2          MR. LIPPS:  Objection to form.

3      A.   I first need to correct my earlier

4  agreement with your statement that it's a

5  letter of credit.  I would actually call it a

6  line of credit, not a letter of credit.  But I

7  would say that it -- again, for the period of

8  time that I was there, this relationship would

9  have been similar between Residential Capital

10  and Residential Funding Company to the one

11  above.

12      Q.   Okay.  And just so I understand it,

13  the main operating companies were GMACM and

14  Residential Funding Company; correct?

15      A.   Those were the primary operating

16  companies, yes.

17      Q.   And when they needed capital, they

18  were able to access it from Residential Capital

19  LLC through intercompany transfers; correct?

20      A.   Residential Capital, as the holding

21  company that issued public debt, would then use

22  those funds, yes, would deploy those funds into

23  its operating companies, Residential Funding --

24  principally, Residential Funding Company and

25  GMAC Mortgage.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 33 of 198

Page 33

1                    C. Dondzila

2        Q.    And the concept was it was like a

3    line of credit where, when the operating

4    companies needed money, they'd have access to

5    it, and then when they -- conversely, when they

6    generated funds, they would upstream them to

7    the parent in satisfaction of the line of

8    credit; correct?

9              MR. LIPPS:   Objection to form.

10       A.    I don't believe that I can

11   definitively state that the repatriation of

12   cash back was, in fact, in a form intended to

13   be a repayment.   It was cash that was cycled

14   up -- back to the holding company, but I

15   would -- I do not have knowledge that it was

16   specifically and solely intended to function as

17   a repayment of debt.

18       Q.    Okay.   But whatever the intention

19   was, the cycling of cash up would result in a

20   reduction of the line of credit; correct?

21       A.    That is correct.

22       Q.    Looking at the third balance between

23   Residential Funding and Homecomings Financial,

24   it says the majority of this balance was

25   created in 2008 when loans were sold from

Page 34

C. Dondzila

1

2  Homecomings to its parent.  No cash was

3  exchanged.

4        Do you have any knowledge of how the

5  Homecomings intercompany balance was created?

6      A.   I don't have detailed knowledge of

7  how that balance was created, no.

8      Q.   And by this point in time, the only

9  reason that Homecomings had not been wound up

10 was because of the testimony you provided

11 earlier about it being prohibitively expensive

12 to do so, given its role as servicer under

13 certain of the private label securitizations

14 and other related issues; correct?

15        MR. LIPPS:  Objection, form,

16     characterization.  And it's already been

17     asked and answered and testified to by

18     her.  Go ahead.

19     A.   I don't believe that my response was

20 solely limited to the prohibitive expense.

21 There were also administrative and other issues

22 in addition to expense, so it wasn't solely

23 limited to just the cost of doing it.

24        But my understanding is that that was

25 a significant reason for why those were not --

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 35 of 198

Page 35

1                    C. Dondzila

2       Q.   Okay.

3       A.   -- liquidated.  That entity, sorry,

4  was not liquidated.

5       Q.   Going down to the balance of GMAC

6  Mortgage and Passive Assets Transactions.  Is

7  Passive Asset Transactions, did you call it

8  PATI internally?

9       A.   We did.

10      Q.   And do you have any personal

11  knowledge about the nature of the balance

12  between PATI and GMAC Mortgage?

13      A.   PATI was the owner of notes issued by

14  two special purpose entities that were secured

15  in whole by assets from our international

16  operations.  Those notes were as -- as those

17  special purpose vehicles liquidated those

18  assets, proceeds from those asset liquidations

19  would have been distributed to the noteholders,

20  which PATI was, and that would have generated

21  cash within PATI, and as part of the sweeps

22  that would occur, cash would be taken out of

23  entities and swept up to a consolidated sort of

24  treasury cash management function.  And the

25  sweep of cash would have resulted from the

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 36 of 198

Page 36

1               C. Dondzila

2    creation of intercompany balances.

3       Q.   How frequently did the cash sweeps

4    occur?

5       A.   I don't know how quickly -- how

6    frequently those happened.

7       Q.   Was it on a monthly, daily, weekly

8    basis?

9            MR. LIPPS:   Objection.   Go ahead.

10      A.   You'd have to check with treasury.

11      Q.   And by this point in time in 2012,

12   did PATI have any remaining assets, or had all

13   the loans that served as its assets been sold?

14      A.   Those were not the only assets within

15   PATI that I recall.   So it's possible that

16   there were other assets within the entity.

17      Q.   And going down to the next

18   intercompany balance between GMAC Mortgage and

19   Executive Trustee Services.   What was the

20   business of Executive Trustee Services?

21      A.   To my knowledge, the business

22   activities -- the principal business activities

23   of Executive Trustee Services, which was

24   composed of more than just a single entity, but

25   that group of companies were attempts at

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 37 of 198

Page 37

1                    C. Dondzila

2   recovery against losses that were incurred for

3   liquidated loans.   So attempting to collect

4   from borrowers any amounts that had been lost

5   through other avenues, and also providing

6   trustee services around the foreclosure

7   process, so -- and for that, they received

8   revenue.

9        Q.    And is it the case that the revenue

10  was then swept up as part of the process you

11  described earlier in your testimony?

12       A.    The revenue of the organization less

13  the expenses that it incurred in connection

14  with its business activities would have been

15  part of the treasury centralized cash

16  management process and would have been swept

17  up.

18       Q.    Okay.   And similar to PATI, after

19  the -- when the cash was swept up, Executive

20  Trustee Services would receive a receivable in

21  the form of an intercompany notation; correct?

22       A.    That is correct.

23       Q.    Okay.   Now, do you know whether

24  Executive Trustee Services pledged its equity

25  in connection with the junior secured notes?

Page 38

C. Dondzila

1

2      A.   I don't recall.

3      Q.   And do you -- similarly, do you know

4  whether PATI was a pledger of its equity under

5  the junior secured notes?

6      A.   I don't recall.

7      (Dondzila Exhibit No. 3 was marked for

8      identification.)

9  BY MR. PERRY:

10      Q.   Before you is Dondzila Exhibit 3.  It

11  appears to be a draft -- well, is this

12  document -- can you identify this document as a

13  draft of the GMAC Mortgage LLC consolidated

14  financial statements for the years ended

15  December 2011 and December 2010?

16      MR. LIPPS:   Talking about the

17      attachment to the email?

18      MR. PERRY:   The attachment, yes.

19      A.   It's not obvious from the review of

20  the attachment that it's a draft, but based on

21  the cover memo, which I assume included the

22  documents that were printed as the attachment,

23  I would assume that that -- these would be

24  drafts, yes.

25      Q.   Why were you preparing financial

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 39 of 198

Page 39

1                         C. Dondzila

2    statements for two years rather than just a

3    single year?

4         A.   I don't recall.

5         Q.   Was it always the case that the

6    financial statements for GMAC Mortgage LLC

7    contained two years of financial information?

8         A.   To my knowledge for the period while

9    I was there and responsible for the issuance,

10   yes, it included two years.

11        Q.   Okay.  And was it prepared annually,

12   or every two years?

13        A.   It was prepared annually.

14        Q.   Now, at some point in time, did you

15   begin meeting with representatives of

16   FTI Consulting?

17        A.   Yes, in connection with the ResCap

18   bankruptcy.

19        Q.   Do you recall roughly when you began

20   meeting with representatives of FTI Consulting

21   in connection with the ResCap bankruptcy?

22        A.   I don't recall the exact date.

23        (Dondzila Exhibit No. 4 was marked for

24        identification.)

25   BY MR. PERRY:

Page 40

C. Dondzila

1

2      Q.    Before you is Dondzila Exhibit 4.

3  It's an email bearing the hopelessly complex

4  Bates label RCJSNII10014735, and it's an email

5  from Jeremy Stern to you and others.

6          First question:  Is this in or around

7  the time that you first began meeting with FTI?

8      A.    I don't recall when our first

9  interactions began.

10     Q.    And do you recall FTI being

11 interested and asking you to focus on ResCap

12 intercompany information?

13     A.    We -- yes, FTI was interested in

14 intercompany information.

15     Q.    Did they explain to you why they were

16 interested in intercompany information?

17     A.    As I recall, it was in part in

18 connection with their waterfall analysis, and

19 it was in part in connection with inquiries

20 coming from various interested parties in the

21 bankruptcy.

22     Q.    And what did you understand FTI's

23 waterfall analysis to be?

24     A.    An analysis of the possible outcome

25 of -- upon disposition of the ResCap assets and

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 41 of 198

Page 41

C. Dondzila

1

2    settlement of its liabilities, the disposition

3    of proceeds or net proceeds, I guess, to the

4    various parties with an interest in the

5    bankruptcy.

6       Q.   And did they explain to you how the

7    treatment of intercompanies would affect their

8    waterfall analysis?

9       A.   For the interactions that I had with

10   them, we ignored the intercompany balances.

11      Q.   What do you mean by that?

12      A.   The information that I provided with

13   regard to intercompany balances was more in

14   response to inquiries from parties to the

15   bankruptcy.  In any documentation information

16   that I sent or interacted with them in terms of

17   the waterfall, the intercompany balances were

18   excluded or separated.

19      Q.   Okay.  Did you ever ask them why they

20   were separating the intercompany balances from

21   the waterfall analysis they were running?

22      A.   I did not, that I recall.

23      Q.   Did they ever explain to you why

24   parties to the bankruptcy were interested in

25   the intercompanies?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 42 of 198

Page 42

1                           C. Dondzila

2          A.   I don't recall a specific

3   conversation about why other parties would be

4   interested.

5          Q.   Did you understand at the time you

6   were talking to FTI whether the treatment of

7   the intercompanies as debt versus equity would

8   have an impact on the waterfall analysis?

9          A.   Over the course of my interactions

10  over the course of the ResCap bankruptcy --

11  whether it was at this specific time or not, I

12  do not know -- but I was aware of the -- I was

13  aware that there could be different views about

14  the treatment of these balances as either debt

15  or equity.   And yes, I was aware that that

16  could have an impact on the financial

17  disposition of the net assets of the company.

18         Q.   And did FTI express a view to you at

19  any point in time about whether they viewed the

20  intercompanies as debt or equity?

21         A.   Not that I recall.

22         Q.   Did you sense that they were

23  resistant to treating the intercompanies as

24  debt?

25              MR. LIPPS:   Objection to form.

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 43 of 198

Page 43

1                    C. Dondzila

2        A.    I have no idea.

3        Q.    Did you ever express a view to FTI

4   about your views about whether the

5   intercompanies were more properly expressed as

6   debt or equity?

7        A.    I view that as a legal decision, and

8   if I did share any view, it would have been

9   that that's up to lawyers to decide.

10       Q.    Okay.

11            MR. LIPPS:    Yeah, and I don't want

12       you disclosing any conversations you had

13       with lawyers.

14       Q.    Putting aside conversations with

15   lawyers, is it fair to say as a -- from a

16   financial perspective, the intercompanies were

17   debt, in your view?

18            MR. LIPPS:    Objection to

19       characterization.    Go ahead.

20            MR. O'NEILL:    Objection.

21       A.    The characterization of intercompany

22   balances in accordance with generally accepted

23   accounting principles would have classified

24   certain of them as receivables and payables and

25   certain of them as debt.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 44 of 198

Page 44

1           C. Dondzila

2       Q.    And in terms of -- what -- in

3   accordance with generally accepted accounting

4   principles, what intercompany balances are

5   classified as payables and receivables?

6       A.    Those would be more likely to be

7   balances driven by activities that were not

8   governed by a legal document, indicating more

9   structure or form to the activity.

10          They would have involved transfers

11  between entities for more ancillary activities,

12  such as an erroneous payment of a -- I don't

13  know, a -- an invoice by one or the other, or a

14  payment of an invoice by one entity that was

15  applicable to both that then needed to be

16  charged over to the other.

17          So receivables and payables were,

18  generally speaking, not interest bearing and

19  would not have been governed by a legal

20  contract document that would be otherwise

21  characterized as debt.

22      Q.    And did you form a view, just going

23  back to a prior exhibit that we looked at, that

24  listed -- is it Dondzila 3?

25      A.    Okay.

Page 45

C. Dondzila

1

2     Q.   Did you form a view from a finance

3  perspective, not from a legal perspective,

4  whether -- actually --

5          MR. LIPPS:  So we're going to

6      Exhibit 2?

7          MR. PERRY:  Exhibit 2.

8          MR. LIPPS:  First page of the Excel

9      attachment?

10         MR. PERRY:  Yes.

11     Q.   So did you form a view of, from a

12  finance perspective, which of the balances

13  reflected on this chart were debt and which

14  ones were payables and receivables?

15         MR. LIPPS:  Objection, form.

16     A.   To look at the financial statements.

17  I don't recall.

18     Q.   Okay.  So ultimately, if one wanted

19  to determine how Residential Capital LLC was

20  treating these balances from a financial

21  perspective, you'd simply look at the financial

22  statements of each of the entities reflected on

23  the chart on Dondzila 2; correct?

24         MR. LIPPS:  Objection, form.

25     A.   The conclusions in terms of financial

1                    C. Dondzila

2    statement presentation, yes, would be in there

3    to the extent that one or the other was

4    obviously disclosed.

5              MR. PERRY:  Do you want to take a

6         break?  We have been going for an hour.

7              MR. LIPPS:  Sure.

8              THE VIDEOGRAPHER:  The time is

9         11:11.  We're off the record.

10        (Recess taken.)

11             THE VIDEOGRAPHER:  The time is

12        11:19.  We're on the record.

13        (Dondzila Exhibit No. 5 was marked for

14        identification.)

15   BY MR. PERRY:

16        Q.    Before you, Ms. Dondzila, is Dondzila

17   Deposition Exhibit 5.  It's an email from

18   Ms. Westman to you dated March 19, 2012.

19   There's some description at the top of her

20   email to you about an allocation of the GMACM

21   management fee.  Do you have an understanding

22   of what Ms. Westman's telling you there?

23        A.    Ally Financial allocated costs.

24   Those allocations and charges related to those

25   allocations were recorded initially to RFC,

Page 47

1                          C. Dondzila

2        Residential Funding Company, and then the

3        appropriate portion would then be moved from

4        Residential Funding Company down to GMAC

5        Mortgage.

6            Q.    When you say down to GMAC Mortgage,

7        were they sister companies?

8            A.    They are sisters, so it would have

9        been over.

10           Q.    Across or over; correct?

11           A.    Uh-huh, correct.

12           Q.    Do you know why Ally didn't just

13       allocate a portion directly to GMACM?

14           A.    I don't know.

15           Q.    And did the allocation of management

16       fees from Residential Funding to GMACM create

17       an intercompany balance?

18           A.    Yes, the -- yes, it would have

19       created an intercompany balance between GMAC

20       Mortgage and Residential Funding Company.

21           Q.    And were there other transactions

22       between Residential Funding Company and GMAC

23       Mortgage that led to an -- intercompany

24       balances between the two companies?

25           A.    Yes.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 48 of 198

Page 48

1              C. Dondzila

2      Q.    And what were those items?

3      A.    I'm sure there are many.   There was

4   thousands of opportunities for activity.   The

5   most significant of which I know of would be

6   the subservicing agreement between GMAC

7   Mortgage with service, subservice loans on

8   behalf of RFC.

9      Q.    And as a result of subservicing on

10  behalf of RFC, what was the -- was that -- was

11  compensation for that activity handled through

12  the intercompany accounts?

13     A.    Yes, it would have been.

14     Q.    And were there actual cash transfers

15  that would go back and forth in consideration

16  for that activity?

17     A.    I don't recall.

18     Q.    Was the intercompany account between

19  GMAC Mortgage LLC and Residential Funding

20  Company LLC cash-settled from time to time?

21     A.    I don't recall.

22     Q.    Just look at the schedule of other

23  liabilities in Ms. Westman's email to you.   And

24  I'm focused -- does the liability payable to

25  RFC reflect the intercompany balance between

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 49 of 198

Page 49

1              C. Dondzila

2    GMAC Mortgage LLC and RFC?

3         A.   Given this isn't the final draft of

4    the financial statement, so not knowing if it

5    officially and finally ended up with that being

6    the balance, yes, at whatever point in time

7    this email was drafted, that would represent

8    what we believed to be the balance of the

9    payable to RFC.

10        (Dondzila Exhibit No. 6 was marked for

11        identification.)

12   BY MR. PERRY:

13        Q.   Before you is Dondzila Deposition 6.

14   It's an email with a group of attachments.  I'm

15   interested in the first attachment, and

16   specifically the second page of the attachment,

17   which describes relationship number 7.

18             MR. LIPPS:  It's the page that ends

19   with the Bates number, last three, 113?

20             MR. PERRY:  That's correct.

21             MR. LIPPS:  Okay.

22        Q.   Can you take a moment to review the

23   description of relationship 7?

24        A.   I've read it.

25        Q.   Is the description provided -- well,

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 50 of 198

Page 50

1                    C. Dondzila

2       first of all, did you participate in the

3       creation of this document?

4            A.    I don't recall.

5            Q.    Is the description contained

6       concerning relationship 7 consistent with your

7       understanding of the intercompany relationship

8       between GMAC Mortgage and Residential Funding

9       Company?

10           A.    Yes, the three bullets that are

11      called out are consistent with my

12      understanding.

13           Q.    Okay.   Do you see there's a notation

14      that says the last pre-petition settlement was

15      in May 2012?

16                 Do you have any knowledge of a cash

17      settlement in connection with this intercompany

18      in May of 2012?

19           A.    I don't recall.

20           Q.    And how would a -- would it require

21      your approval for there to be a cash settlement

22      of some or all of an intercompany balance --

23           A.    No, it did not require --

24                 MR. LIPPS:   Let -- did you finish

25           the question?

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 51 of 198

Page 51

1              C. Dondzila

2              MR. PERRY:    Yeah.

3         Q.    You can answer.

4              THE WITNESS:    I'm sorry.

5         A.    No, it did not require my approval.

6         Q.    Okay.    And who would be the person or

7    people that would determine whether to

8    cash-settle an intercompany balance?

9         A.    I don't recall.

10        Q.    Is it people that reported to you,

11   people that you reported to?    How did it come

12   to be that balances were cash-settled?

13             MR. LIPPS:    Objection to form.

14   That's about two questions.    But go

15   ahead.

16        A.    I don't know.

17        Q.    If you go to relationship number 9,

18   you see there's a description of the

19   relationship between GMAC Mortgage and GMAC

20   Residential Holding Company.    Is GMAC

21   Residential Holding Company something that

22   people called Resi --

23        A.    No.

24        Q.    -- Holdings?

25             MR. LIPPS:    Well, that's a

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 52 of 198

Page 52

                        C. Dondzila

2    different question.

3        Q.    What was GMAC Residential Holding

4    Company called internally?

5        A.    In short form, if it was ever

6    referred that way, it would have been Resi

7    Holdings.

8        Q.    Resi Holdings?   Okay.

9              And just so I understand it, cash

10   flowed from Residential Capital LLC to GMAC

11   Residential Holding Company LLC and then down

12   to GMACM; is that correct?

13       A.    That is correct.

14       Q.    And do you -- there's a notation here

15   that says the interest rate under this

16   agreement fluctuates monthly and is a stated

17   margin agreed to between the company and RHC,

18   which is generally between 100 and 300 basis

19   points above a quoted short-term market rate.

20   Do you see that text?

21       A.    I do.

22       Q.    Do you believe that to be accurate?

23       A.    I would have to look at the

24   agreement.

25       Q.    Okay.   Did you -- did your group

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 53 of 198

Page 53

C. Dondzila

1

2  participate in the determination of the

3  interest rate to be charged on this particular

4  intercompany balance at any point in time?

5      A.   I don't recall.

6      Q.   It says interest was accrued on a

7  monthly basis until the petition date.   Who

8  would have been in charge of determining the

9  interest accrual on this particular balance?

10      A.   A member of my team would have

11  calculated and recorded the accrual.

12      Q.   Do you know why some of the

13  intercompany relationships contain written

14  credit facilities while others do not?

15      A.   I don't.

16      Q.   Was there any policy or procedure in

17  place while you were controller that spoke to

18  when an intercompany relationship had an

19  underlying agreement and when it didn't?

20      A.   Until the implementation of the Ally

21  Financial intercompany policy, and only to the

22  extent that that required it, which I don't

23  recall, there was nothing during my term there

24  that required it.

25      Q.   Okay.   And do you know why some of

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 54 of 198

Page 54

1                    C. Dondzila

2    the balances accrued interest and others did

3    not?

4         A.    I do not.

5         Q.    Where were the contracts between the

6    affiliated entities kept at Residential

7    Capital?

8         A.    I don't know with certainty who would

9    have had them.

10         Q.    Did your group have contracts between

11    the -- between these entities?

12         A.    We might.

13         Q.    But you don't know one way or

14    another?

15         A.    Correct.

16              MR. LIPPS:   Objection, asked and

17         answered.

18         (Dondzila Exhibit No. 7 was marked for

19         identification.)

20    BY MR. PERRY:

21         Q.    Before you is Dondzila Exhibit 7.

22    It's an email from Barbara Westman to Jeremy

23    Stern.   You're copied on the email.   It

24    attaches a -- back at the page ending 5117,

25    something called ResCap restated loan

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 55 of 198

Page 55

1                           C. Dondzila

2    agreement.

3                Were you aware prior to receiving

4    this email that there was a loan agreement

5    between ResCap, Residential Capital LLC, and

6    GMAC Mortgage -- well, strike that.

7                Were you aware prior to receiving

8    this email that there was a loan agreement

9    between Residential Capital Corporation and its

10   wholly owned direct and indirect subsidiaries

11   GMAC Residential Holding Corp., GMAC Mortgage

12   Corp., and Residential Funding Corp.?

13        A.    Yes.

14        Q.    And what did you -- what was your

15   understanding about the nature of that

16   agreement?

17        A.    My understanding of the agreement was

18   what we disclosed in both of the respective

19   GMAC Mortgage financial statements and in the

20   Residential Funding Company financial

21   statements, that there was a -- well, we'd have

22   to look at the financial statements to see

23   exactly how they were described.  It would have

24   been in accordance with the disclosures that we

25   made.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 56 of 198

Page 56

1                    C. Dondzila

2          Q.    And did you understand that loan

3    agreement to be in effect in 2011 and 2010?

4               MR. LIPPS:   Let me object to the

5          extent you're asking for some legal

6          conclusion.   But go ahead.

7          A.    Yes, I was aware the agreement was

8    outstanding during those periods.

9          Q.    So your understanding -- I'm not

10   asking for a legal conclusion, I'm just asking

11   for your understanding as a financial

12   professional -- was that there was a loan

13   agreement, it was outstanding in 2010 and 2011.

14         A.    That's correct.

15         Q.    Okay.   And was interest charged on

16   any of the balances in connection with the loan

17   agreement that's before you as Dondzila

18   Exhibit 7?

19         A.    I can confirm that it was in

20   connection with a loan with Residential

21   Holdings.   I do not recall whether it was on

22   the loan with Residential Holding Corp., or

23   Residential Funding Corp.

24         Q.    And who was it who would have been in

25   charge of analyzing and assessing interest with

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 57 of 198

Page 57

1                          C. Dondzila

2     respect to this particular loan agreement?

3          A.    A member of my team.

4          Q.    Do you know who?

5          A.    Matt McGarvey in the 2011, certainly,

6     period.  I don't recall when he joined the

7     company.

8          Q.    And would he have kept schedules of

9     the interest charged?

10         A.    Yes.

11         Q.    And did -- who made -- was there a

12    decision made not to charge interest on other

13    of the balances between Residential Capital LLC

14    and, say, Residential Funding Company LLC?

15         A.    I don't recall if interest was

16    charged.

17         Q.    Okay.  May have been, may not have

18    been, you just don't know?

19         A.    Correct.

20              MR. LIPPS:  Objection, asked and

21         answered.

22              THE WITNESS:  Sorry.

23         Q.    And so to the extent that interest

24    was not charged, do you know who would have

25    made that judgment?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 58 of 198

Page 58

1               C. Dondzila
2        A.    The accountant responsible for review
3    of the contract and in the context of the
4    entries that were required each period.
5        Q.    And how would interest have been
6    recorded to the extent it was charged?
7        A.    We would have debited -- well, if
8    it's a receivable, you would debit interest
9    receivable and credit interest income; and if
10   it was a payable, it would credit interest
11   payable and debit interest expense.
12       Q.    So if I had an accounting
13   professional that I wanted to direct to check
14   whether interest was either credited or debited
15   between, say, Residential Capital LLC and
16   Residential Fundings LLC, could that
17   professional in fact do that through reviewing
18   the company's books and records?
19       A.    Yes, they should be able to.
20       Q.    Okay.  And do you think -- are there
21   individual entries on the general ledger for
22   the interest charges?
23       A.    I don't know that level of
24   granularity.
25       Q.    Could it also be the case that

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 59 of 198

Page 59

1              C. Dondzila

2  intercompany transactions are recorded net of

3  any interest charge?

4          MR. LIPPS:   Objection to form, but

5      go ahead.

6      A.   Is your question on the balance sheet

7  or on the income statement?

8      Q.   Well, on the balance sheet.

9      A.   It is possible that the interest

10 could have been recorded to an intercompany

11 balance that would have been netting against

12 the principal amount of the receivable or

13 payable.

14     Q.   Okay.  And in that circumstance, how

15 would somebody go back to figure out if and how

16 much interest was charged in that particular

17 period?

18     A.   In regards to interest that was

19 charged or earned, the best way to do it would

20 be to go to the income statement.

21     Q.   And how would that be recorded on the

22 income statement?

23     A.   It would have either been part of a

24 journal entry to interest income or expense, or

25 would have been the journal entry.  And if it

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 60 of 198

Page 60

1                      C. Dondzila

2      was part of a journal entry, there would

3      presumably be documentation that would provide

4      more granular detail of the components of that

5      journal entry.

6          Q.   And what would that documentation be?

7              MR. LIPPS:  What, the journal

8      entry?

9              MR. PERRY:  Yeah.

10         Q.   You referenced supporting

11     documentation for a journal entry on the income

12     statement.

13             MR. LIPPS:  Oh.

14         A.   It could include an Excel

15     spreadsheet, could be a handwritten document

16     saved in a file.

17         Q.   Do you know whether Ms. Westman or

18     anybody else ever undertook that particular

19     review in connection with the prebankruptcy

20     process where you're meeting with FTI?

21         A.   The efforts that I'm aware of that

22     Barb or others would have been involved in were

23     reviews of the balance sheet, not the income

24     statement.

25         Q.   And do you know if anybody from FTI

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 61 of 198

Page 61

C. Dondzila

1  
2  ever asked Barb or others to review the income
3  statement in connection --
4      A.   I'm not aware.
5      Q.   Okay.  In terms of identifying the
6  loan agreement that's before you on Dondzila 7,
7  do you know what efforts were undertaken to
8  find the agreement?
9          MR. LIPPS:  I'm not sure I
10         understand -- objection.  I'm not sure I
11         understand that question, but go ahead
12         if you do.
13     A.   Since I didn't provide it, I don't
14  know what efforts went into procuring it.
15     Q.   And nobody told you what efforts went
16  into procuring the contract for Mr. Stern;
17  right?
18     A.   Not specifically.
19     Q.   Now, did there come a time when you
20  began evaluating whether to impair the
21  intercompany between Residential Capital LLC
22  and Residential Funding Company LLC?
23     A.   In accordance with the issuance of
24  separate company financial statements, we would
25  have an obligation to evaluate all of the

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 62 of 198

Page 62

1              C. Dondzila

2    assets of those entities for valuation or

3    potential impairment under GAAP.

4         Q.   And that would include intercompany

5    payables or receivables; correct?

6         A.   That is correct.

7         Q.   And so just to summarize, if, in

8    fact, you determined that Residential Capital

9    LLC was not able to pay back the intercompany

10   payable to Residential Funding Company LLC,

11   Residential Funding Company LLC would then need

12   to take an impairment on its books and records;

13   correct?

14            MR. LIPPS:   Objection.

15            MR. O'NEILL:   Mischaracterizes the

16       testimony.

17         A.   In the event that based on

18   qualitative and quantitative assessment,

19   there's an impairment of an asset, there would

20   be, in fact, a charge to the income statement

21   of the entity on whose books that asset sat.

22            Okay.  Before you is Westman

23   Deposition Exhibit 31.  It's a series of

24   emails.  Directing your attention to the second

25   page of the exhibit, there's an email from you

Page 63

1                      C. Dondzila

2  to Mary Riskey and Janel Farley.  Second page.

3           MR. LIPPS:  Well, she's still

4      looking through the exhibit.

5           THE WITNESS:  Oh, the second

6      exhibit.

7           MR. LIPPS:  Second page.

8           MR. PERRY:  Second page of the

9      email.

10          MR. LIPPS:  The one that has cc to

11     Brandy Frank?

12          MR. PERRY:  That's correct.

13     Q.   So is it the case that at least as of

14  April of 2011, your view was from a financial

15  perspective, there was a reasonable expectation

16  that Residential Funding Company LLC -- strike

17  that.  Strike that.

18          In April of 2011, is it accurate

19  that, in your view, there was a reasonable

20  expectation that Residential Capital LLC would

21  have the capability of meeting its intercompany

22  obligations to Residential Funding Company LLC?

23     A.   This document doesn't make clear what

24  I thought at that point in time related to

25  ResCap to -- any payable that ResCap had to

Page 64

1                         C. Dondzila

2    RFC.

3         Q.    Okay.  So why don't you go to the

4    second attachment, which is an email from

5    Ms. Farley to Ms. Riskey, copying you.

6              MS. BARRAGE:  The Bates number?

7              MR. PERRY:  It ends 15262.

8         Q.    First of all, who's Kim Walsh?

9         A.    Kim Walsh had several roles within

10   the company, and I don't -- so at one point in

11   time, she was the chief accounting officer for

12   Ally Bank.  She left and then came back at some

13   point, and the dates, I don't know, but at some

14   point, she came back and was a member of the

15   accounting policy team working for Ally

16   Financial.

17        Q.    Okay.  Looking at the second page,

18   ending 15263, based on the time frame that this

19   was sent, are you able to -- and Ms. Walsh's

20   email signature, are you able to deduce whether

21   she was a chief accounting officer or member of

22   the accounting policy group at the time she

23   sent this email?

24        A.    At this point, she was part of the

25   accounting policy group.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 65 of 198

Page 65

C. Dondzila

1

2    Q.    And do you recall Ms. Walsh ever

3 taking the view that the receivable between

4 ResCap, Residential Capital LLC and Residential

5 Funding Company LLC ought to be written down?

6    A.    Not that I recall.

7    Q.    And who's Janel Farley?

8    A.    Janel Farley was a member of my team

9 who assisted us with accounting policy

10 questions.

11    Q.    And who's Mary Riskey?

12    A.    Mary Riskey was a director

13 responsible for certain aspects of the

14 accounting for ResCap.

15    Q.    Okay.  And if you go one paragraph

16 down in Ms. Farley's email, she writes, "Based

17 on Cathy's response earlier, I would recommend

18 we respond to Kim, indicating that we have a

19 reasonable expectation that ResCap will have

20 the capability to meet its obligations.  Since

21 the receivable is not considered impaired, no

22 entry was required.  Do you agree?"

23         Do you have any recollection of what

24 Ms. Farley's referring to there in that

25 paragraph?

1                     C. Dondzila

2          A.    I don't recall.

3          Q.    Do you recall Ms. Farley or anybody

4     else from your group doing an assessment of

5     whether the Residential Capital LLC,

6     Residential Funding Company LLC needed to be

7     impaired in 2011?

8          A.    As I'd indicated earlier, we would

9     have, in connection with the issuance of the

10    separate company financial statements, needed

11    to undertake an evaluation as to whether there

12    were any impairments to any of the assets

13    required.

14         Q.    And do you recall any impairment

15    taken with respect to the intercompany between

16    Residential Capital LLC and Residential Funding

17    Company LLC in 2011?

18         A.    I do not.

19         Q.    Do you have any knowledge -- well, do

20    you believe -- well, strike that.

21         (Dondzila Exhibit No. 8 was marked for

22         identification.)

23    BY MR. PERRY:

24         Q.    Before you is Dondzila Exhibit 8.

25    It's an email from you to Ms. Westman and it

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 67 of 198

Page 67

1          C. Dondzila

2     attaches a memorandum from Ms. Westman to the

3     files.  Can you take a moment to review the

4     email and the attached document?

5          A.   I've reviewed it.

6          Q.   Okay.  Do you recall the

7     circumstances that led Ms. Westman to prepare

8     this memo to file?

9          A.   This would have been prepared in

10    connection with the issuance -- the preparation

11    and issuance of the annual financial statements

12    for Residential Funding Company.

13         Q.   And the -- this would have been the

14    2010/2011 annual financial statements of

15    Residential Funding Company; correct?

16         A.   That is correct.

17         Q.   Okay.  And do you recall -- D&T I

18    take it is a reference -- in the email is a

19    reference to Deloitte & Touche?

20         A.   That would be correct.

21         Q.   And Deloitte & Touche was the

22    independent auditor for Residential Funding

23    Company LLC in 2010 and '11; correct?

24         A.   They definitely were in 2011.  We did

25    switch auditors from PriceWaterhouse to

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 68 of 198

Page 68

1                    C. Dondzila

2    Deloitte & Touche at some point.  I don't

3    recall if that was 2009 or 2010.

4         Q.   Okay.  But at least by the time that

5    you had written your email to Ms. Westman,

6    Deloitte & Touche was the independent auditor;

7    correct?

8         A.   That's correct, for the 2011

9    financial statement, they were absolutely the

10   auditor.

11        Q.   And do you recall Deloitte & Touche

12   raising concerns that the receivable from

13   the -- the RFC receivable from ResCap ought to

14   be impaired?

15        A.   They -- we did not take an

16   impairment, and they issued an unqualified

17   opinion with an emphasis paragraph in

18   connection with those financial statements, so

19   no, they did not have an issue with the

20   decision to not impair.

21        Q.   Okay.  But is it fair to say that you

22   engaged in dialogue with them about the

23   decision not to impair in March of 2012?

24        A.   In connection with the audit, we

25   dialogued with the auditors in regards to every

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 69 of 198

Page 69

                    C. Dondzila

1    significant matter, and this was one.

2        Q.   And do you recall a meeting, an

3    in-person meeting with somebody from Deloitte &

4    Touche on this particular issue?

5        A.   I don't recall a meeting specific to

6    this.

7        Q.   Do you recall a telephone call,

8    discussions with Deloitte & Touche on this

9    particular issue?

10       A.   During the course of the year, and

11   particularly during reporting cycles, I had

12   weekly calls with Deloitte.

13       Q.   And I'm just focused on whether you

14   have a specific recollection as you sit here

15   today of the content of a call or a meeting

16   with Deloitte & Touche on this particular

17   issue.

18       A.   I do not.

19       Q.   Okay.  Turning to the conclusion

20   paragraphs on page 2 of the memorandum, is it

21   accurate that at least in March of 2012,

22   management had concluded that ResCap maintained

23   the ability to support its intercompany

24   obligations with RFC, and therefore, no

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 70 of 198

Page 70

1                       C. Dondzila

2    impairment of this receivable was warranted for

3    the RFC standalone financial statements?  Is

4    that accurate?

5            A.    It is accurate.

6            Q.    And the preceding paragraph contains

7    some analysis.  Is that an accurate statement

8    of the reason that management of ResCap Funding

9    LLC believed no impairment was warranted in

10   March of 2012?

11           MR. LIPPS:  Objection to form.

12           MR. O'NEILL:  Are you talking about

13       the entirety of the preceding part?

14           MR. PERRY:  I am.

15           A.    Now I've forgotten the question.  I'm

16   sorry.

17           Q.    Okay.  The preceding paragraph, which

18   begins with the text "ResCap has 2.6 billion in

19   equity," and continues on, was that -- that

20   paragraph the basis, the analytical basis for

21   your conclusion that no receivable was

22   warranted?

23           MR. LIPPS:  No receivable?  You

24       mean no impairment.

25           MR. PERRY:  No impairment was

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 71 of 198

Page 71

1                          C. Dondzila

2          warranted.   Thanks.

3          A.    Taking as fact the 2.6 billion, yes,

4    that would be the support for that conclusion.

5          Q.    Okay.   Were there any other factors,

6    including factors that may not be expressed in

7    this paragraph, that played into your

8    conclusion that no impairment of the receivable

9    was warranted?

10         A.    As documented on the preceding page

11   ending 065, under "Analysis," there are

12   reference to other matters that would have been

13   considered, including but not limited to the

14   fact that the receivable was not tied to any

15   specific collateral cash flows, etc.   So yes,

16   there were other factors that were considered.

17         Q.    Okay.   And those -- all of the

18   factors that you considered are reflected in

19   this memorandum that's before you as Dondzila

20   Exhibit 8; correct?

21         A.    To my knowledge, this would be the

22   considerations, yes.

23         Q.    Okay.   There's some discussion in the

24   last paragraph of the first page of the memo,

25   and it reads:   "Intercompany balance repayments

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 72 of 198

Page 72

1                    C. Dondzila

2  under the receivable are not tied directly to

3  any specific collateral cash flows.  The

4  company does have a practice of impairing

5  receivables in situations where repayment is

6  tied directly to specific cash flows."

7            And then there's a reference to the

8  PATI notes.  Can you explain what this

9  paragraph means?

10     A.    PATI held notes issued by special

11  purpose entities that were collateralized by

12  assets that came from our international

13  operations.  And as the value of those assets

14  were declining and/or as those assets were

15  sold, we performed an assessment of the

16  availability of future cash flows, and to the

17  extent we determined that there were

18  insufficient cash flows likely to manifest

19  themselves, we impaired the notes that were

20  held by PATI.

21     Q.    I see.  The -- who was the Deloitte &

22  Touche auditor or auditors that you interacted

23  with on the 2010 and 2011 Residential Funding

24  Company LLC audit?

25            A.    The partner, the signing partner for

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 73 of 198

Page 73

1                    C. Dondzila

2   ResCap and its subsidiaries was Tom Robinson.

3   And there were two other senior members of his

4   team.  I don't recall their positions at the

5   time.  Brad Stevenson and Dave -- his last name

6   is escaping me.

7           Q.   Now, when you were meeting with FTI

8   in connection with their consideration of the

9   intercompany receivables, did you reference or

10  discuss with them the conclusions that you had

11  arrived at in Dondzila Exhibit -- the memo in

12  Dondzila Exhibit 8?

13          A.   I don't recall having a specific

14  conversation with them about that.

15          Q.   Do you know whether FTI was provided

16  with a copy of the memorandum set forth on

17  Dondzila Exhibit 8?

18          A.   I don't.

19          Q.   I take it you would have no reason

20  not to provide it to them if they asked.

21  Right?

22              MR. LIPPS:  Objection to form, but

23      go ahead.

24          A.   We provided thousands of documents

25  that were requested, so no, we wouldn't have

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 74 of 198

Page 74

1            C. Dondzila

2   had any reason to withhold it.

3       Q.   Do you recall them ever asking for

4   any impairment analysis that you or your staff

5   had done on the various intercompany

6   receivables?

7       A.   No, I don't recall that.

8       Q.   Before you is Westman Deposition

9   Exhibit 28.  Do you know -- just directing your

10  attention to the first --

11          MR. LIPPS:  Did you say 28?

12          MR. PERRY:  What number is it?

13          MR. LIPPS:  7 on mine.

14          MR. PERRY:  Okay.  Thank you.

15      Q.   Before you is Westman Deposition

16  Exhibit 7.  Directing your attention to the

17  second email in the group, you're not copied on

18  it, my question is:  Do you understand what the

19  issue here being discussed is?

20          MR. LIPPS:  This is the one from

21      Janel Farley to Barbara Westman?

22          MR. PERRY:  Yes.

23      A.   I don't know exactly what the context

24  was for the request.

25      Q.   Do you have any knowledge of the

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 75 of 198

Page 75

1                      C. Dondzila

2   topside entry for GMACM to include RFC advances

3   made in or around March of 2012?

4        A.    In or around that time, we were

5   working on ensuring that the separate legal

6   entity accounting for the GSAP entity, which is

7   GMAC Mortgage Advance Service, or Advance -- I

8   forget the name of the entity, but it was a

9   servicer advance facility, which is a special

10  purpose entity but was required to be

11  consolidated under GAAP because we had a

12  controlling interest in the entity.  And we

13  were making some adjustments to the actual

14  individual legal entity recordation to comply

15  with a requirement from our parent, Ally

16  Financial, that each entity's individual

17  standalone financial statements were prepared

18  appropriately.

19       Q.   When you say prepared appropriately,

20  do you mean prepared in accordance with GAAP or

21  was there some other standard that Ally

22  required?

23       A.   The standard was that they were in

24  the general ledger uniquely and identifiably

25  and in accordance with GAAP.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 76 of 198

Page 76

C. Dondzila

1    Q.   Did Ally have any -- from the

2    purposes of -- from the perspective of Ally the

3    lender, did they have any requirements with

4    respect to the intercompany transactions

5    between the ResCap entities that we have been

6    talking about today?

7         MR. O'NEILL:   Objection.

8    A.   Not that I'm aware of.

9    Q.   What is the reference to STM1388?

10   A.   STM means significant transaction

11   memorandum.  1388 would be the numerical

12   reference that was assigned when that

13   significant transaction was entered into the

14   log, the transaction log.

15   Q.   So can you describe to me what the

16   significant transaction memorandum is?

17        MR. LIPPS:   Generally what they

18        are?

19        MR. PERRY:   Yeah.

20   A.   Okay.  Generally, Residential Capital

21   had a program related to change management, and

22   the administration of that change management

23   was through the identification of significant

24   change matters.  And those significant change

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 77 of 198

Page 77

C. Dondzila

1
2 matters that were identified would be logged

3 into the change management process and would be

4 assigned a number and a significant transaction

5 memorandum would be completed.

6          Based upon the significance of the

7 matter, it could be an abbreviated form or it

8 could be the full form, just depended on what

9 the assessment of the amount of change and the

10 significance of the change was.

11          That document required notification

12 to a variety of different people, including the

13 tax department, the financial reporting team,

14 and had to be signed off by various people,

15 including the business owner of the change up

16 to and including the accounting policy

17 representative.

18      Q.   Were significant transaction

19 memorandums prepared from time to time with

20 respect to intercompany transactions?

21      A.   It's possible.

22      Q.   Do you -- there were times where

23 significant intercompany balances were written

24 off in 2008 and 2009.   Are you aware of that

25 fact?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 78 of 198

Page 78

1                    C. Dondzila

2        A.    Are you referring to debt

3   forgiveness?

4        Q.    Debt forgiveness, yes.

5        A.    Yes, I'm aware that debt forgiveness

6   was executed during that time period.

7        Q.    Okay.  Do you know whether

8   significant transaction memorandum -- memoranda

9   were prepared in connection with that debt

10  forgiveness?

11       A.    I can't say for certain that it was

12  in all cases, but yes, those would be

13  transactions that would meet the threshold of

14  being included in the process.

15       Q.    And do you know whether Ms. Westman

16  or you reviewed the significant transaction

17  memoranda in connection with the review of the

18  intercompany accounts that were conducted at

19  FTI's direction in early 2013?

20       A.    I'm sorry, I need you to repeat the

21  question.

22       Q.    Did anybody look at the significant

23  transaction memoranda in connection with the

24  intercompany review in early 2013?

25       A.    I don't know that we pulled any

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 79 of 198

Page 79

1                    C. Dondzila

2    significant transaction memos directly in

3    response to requests for the intercompany

4    review.

5         Q.    Okay.

6         (Dondzila Exhibit No. 9 was marked for

7         identification.)

8    BY MR. PERRY:

9         Q.    Before you, Ms. Dondzila, is Dondzila

10   Exhibit 9.   Can you take a moment to review and

11   familiarize yourself with the document?

12        A.    Okay.

13        Q.    Am I correct that you wrote the text

14   in the first page and a half of the document

15   and then interlineated some response to

16   Mr. Renzi's email to you that starts halfway

17   down the second page?

18        A.    Yes.

19        Q.    Now, at the bottom of the second

20   paragraph, you talk about you take a walk down

21   Memory Lane and you note that in the beginning,

22   ResCap takes on some debt and distributes cash

23   down through the entity, which is then used.

24         Then you note this would have created

25   a receivable on the books of the ResCap holding

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 80 of 198

Page 80

1                    C. Dondzila

2   company and a payable on the operating company

3   books.  These were likely interest-bearing

4   agreements.  Do you see that?

5        A.   I do.

6        Q.   What was the basis for your

7   conclusion that these initial distributions

8   were likely interest-bearing agreements?

9             MR. LIPPS:  Objection to form.  Go

10       ahead.

11       A.   The previous agreement that you had

12   shown me.

13       Q.   I see.  Okay.  You see the fourth

14   paragraph down, the first sentence, "The

15   company also uses a daily sweep process to

16   consolidate all of its available liquidity at

17   the parent."

18             Is that a reference to the cash sweep

19   process that you testified about earlier?

20       A.   That would be a reference to the

21   centralized cash management, yes.

22       Q.   Okay.  And does this refresh your

23   recollection that the centralized cash

24   management sweeps were performed on a daily

25   basis?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 81 of 198

Page 81

C. Dondzila

1

2      A.   It doesn't refresh my recollection,

3  but it's obviously a statement that I've made.

4      Q.   Moving to the next paragraph on the

5  second page, top paragraph, you write -- you're

6  talking about debt forgiveness.

7          You write:   "In most cases but not

8  all the forgiveness has been treated as equity.

9  In limited cases where the forgiveness occurred

10  with respect to collateralized borrowing, it

11  may have been treated as income expense."  Do

12  you see that?

13      A.   I do.

14      Q.   And the limited cases that you're

15  referring to, is that the testimony you gave

16  earlier, I believe, about the PATI transaction

17  and the notes in PATI?   Is that the reference

18  here?

19      A.   That is correct.

20      Q.   Okay.   And in those circumstances,

21  what was the -- what was the intercompany

22  balance that was being forgiven?   What were the

23  two entities where it was being forgiven?

24          MR. LIPPS:   You're talking about

25      the PATI?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 82 of 198

Page 82

1                     C. Dondzila

2           MR. PERRY:   In the PATI

3        transaction.

4           A.   The special purpose entity -- well,

5     so the -- so I'm forgetting the name of the

6     international entity that originally held the

7     assets, but we would have had an entity that

8     would have owned these international mortgage

9     loans.

10           That entity would have sold those

11    assets through a transferor entity that was

12    part of our consolidated group, onto the

13    special purpose entities Flume and Viaduct.

14           Under GAAP, we failed sale for the

15    first sale from the originator entity to the

16    transferor and also from the transferor to the

17    special purpose entity.  But we also were the

18    primary beneficiary of the special purpose

19    entity; therefore, we consolidated the Flume

20    and Viaduct special purpose entities into our

21    financial statements.  So those, by all

22    appearances, would look to be subsidiaries of

23    Residential Funding Corporation.

24           And so at a consolidated level, it

25    would have appeared to be between Residential

Page 83

1                    C. Dondzila

2  Funding Company and GMAC Mortgage.   In fact, it

3  was going to be between PATI, Passive Asset

4  Trust, and the Flume and Viaduct special

5  purpose entities that were over in the RFC

6  consolidated group.

7         Q.   And so when you're assembling

8  intercompany balances, the top, you know, seven

9  or nine or 15, whatever the number is for FTI,

10 does it include any of the PATI-related

11 balances that you were just talking about?

12        A.   I believe the PATI -- the notes

13 related to Flume and Viaduct that PATI held

14 were extinguished by that time.

15        Q.   Okay.

16        A.   Or were so immaterial that they did

17 not meet the threshold for the -- the dollar

18 threshold for the top intercompanies.

19        Q.   Now, with respect to the top

20 intercompanies that were the focus of your

21 analysis in 2013, in circumstances where there

22 was forgiveness of debt, was it always for

23 purposes of those intercompanies treated as

24 equity?

25        A.   There may have been some other

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 84 of 198

Page 84

1                       C. Dondzila

2    situations in regards to legal entity

3    minimization where we might have had smaller

4    situations of forgiveness between siblings as

5    opposed to parents and child, that would have

6    been accounted for similar to how PATI was

7    held.

8            So I can't say with certainty that

9    all of them were, but that was more -- the

10   equity was the more likely form of debt

11   forgiveness than the income statement

12   treatment.

13       Q.    Just so I've got it right, was there

14   any accounting policy that required you to

15   treat the debt forgiveness as equity?

16       A.    I can't quote chapter and verse of

17   the actual standards, but as I recall, the GAAP

18   requirements would presume that debt

19   forgiveness between a parent and a child, or a

20   child and a parent, would be in the form of

21   equity, as opposed to debt forgiveness between

22   two sibling entities would be treated through

23   the income statement.

24       Q.    So if for whatever -- well, let me

25   ask you this:  Was debt forgiveness done as

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 85 of 198

Page 85

1                    C. Dondzila

2  equity because that was the way the accounting

3  rules required you to execute the debt

4  forgiveness?

5       A.   Any debt forgiveness would have been

6  recorded in the financial statements in

7  accordance with GAAP.   That might not be the

8  reason why we did the debt forgiveness, but we

9  would record any debt forgiveness in accordance

10  with GAAP.

11       Q.   That's my question.   In other words,

12  there was no effort to treat it as equity

13  rather than debt, for example, to avoid

14  cancellation of indebtedness income being

15  attributed to one of the entities; right?

16            MR. LIPPS:   Objection to form.

17       A.   I'm not aware of any preference or

18  attempt to structure anything for that purpose.

19       Q.   Okay.   So from your perspective, it

20  was purely the fact that GAAP required the

21  forgiveness of indebtedness to be structured as

22  an equity transaction when you were talking

23  about forgiveness between a parent and

24  subsidiary relationship; correct?

25            MR. LIPPS:   Objection.   Objection

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 86 of 198

Page 86

1       C. Dondzila

2   to form.

3       A.   We would have reviewed every

4   transaction against the standards under GAAP,

5   and so we would have followed whatever the

6   final conclusion suggested.

7       Q.   Okay.  Do you know whether the

8   standard in question is paragraph 27 to 28 of

9   the AICPA Practice Alert?  Is that something

10  that sounds familiar?

11      A.   I don't recall.

12          MR. O'NEILL:  Object to form.

13          THE WITNESS:  Sorry.

14          MR. O'NEILL:  Go ahead.

15      A.   I don't recall the exact standard

16  references.

17      Q.   I'll try to dig something out at

18  lunch and maybe we can walk through it.  Okay.

19  Go to -- now focusing on Mr. Renzi's email, I'm

20  looking at 1A.  And am I correct that Mr. Renzi

21  asks the question:  "Explain intent for each

22  balance, loan, or equity."  And you

23  interlineate the response -- and the second

24  question:  "Was there an expectation of

25  repayment?"  And you interlineate the response,

1           C. Dondzila

2    "This is not a question accounting can answer.

3    To the extent we have deemed a collateralized

4    affiliate balance impaired, we've impaired it

5    through earnings.  Otherwise, we have concluded

6    for GAAP financial statement purposes that the

7    balances were expected to be repaid."

8           MR. LIPPS:  You want to know if

9        that portion that you just read,

10       beginning with "This is not a question,"

11       if that's her interlineation?

12           MR. PERRY:  Yes.

13       Q.   If that's your text.

14       A.   It's not clear, but it seems like a

15   reasonable conclusion, yes.

16       Q.   Looking at 1C, there's a series of

17   questions, and then my question is, does it

18   appear that you provide the textual response,

19   "Yes, the company expects to continue to follow

20   its cash management practices post-petition"?

21       A.   Yes, that's reasonable.

22       Q.   Okay.  And to your knowledge, did

23   ResCap's cash management practices change in

24   any respect post-petition?

25       A.   No, I believe under the -- whatever

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 88 of 198

Page 88

1                    C. Dondzila

2  those motion things -- first day motions are

3  called, or whenever they filed it, I believe it

4  continued the practice, the same practices.

5       Q.   Okay.  So there never -- at least in

6  your -- by your recollection, there never came

7  a time where anybody said to you, you know, we

8  have been doing things incorrectly

9  pre-petition, we've got to change how we do it

10  post-petition?  That never happened; right?

11            MR. LIPPS:  Objection to form.  But

12       go ahead.

13       A.   I don't recall that ever coming up.

14       Q.   Anybody ever from FTI criticize the

15  way you had done things pre-petition in terms

16  of cash management practices?

17       A.   I don't recall them talking to me

18  about that.

19       Q.   Okay.  The next question is, "Were

20  the funds used for capital improvements or

21  operating expenses?"  Is that your text where

22  you say, "Yes, among other things, including

23  running its servicing business activities and

24  funding the purchase of new assets"?

25       A.   That's a reasonable assumption, yes.

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 89 of 198

Page 89

1                    C. Dondzila

2        Q.    Okay.    And do you consider running

3    the servicing activities and funding the

4    purchase of new assets to be capital

5    improvements or operating expenses?

6        A.    I believe them to be neither.

7        Q.    How would you characterize running

8    servicing business activities and funding the

9    purchase of new assets?

10       A.    It's core business activities.

11       Q.    Core business?    Okay.

12            And so it's fair to say that the

13   intercompany transfers were used to fund core

14   business activities; correct?

15            MR. LIPPS:    Objection to form.

16            MR. O'NEILL:    Object.

17       A.    It is fair to say that, among other

18   things, cash that was required by the operating

19   companies was used for its core business

20   activities, yes.

21       Q.    Are you aware of the operating

22   companies using cash for capital improvements

23   at any point in time while you were controller?

24       A.    As the owner of two physical real

25   properties, meaning ResCap, I would expect that

Page 90

C. Dondzila

1  there would have been capital improvements,

2  yes, that were done during the period that I

3  was there.

4      Q.   Okay.  And what were the physical

5  real properties?

6      A.   There's the data center in Eden

7  Prairie, Minnesota, and the call center,

8  servicing center in Waterloo, Iowa.

9      Q.   And other than fixing up the data

10  center and the call center, are there any other

11  capital improvement funds -- are there any

12  other funds that you can think of that would

13  have been used for capital improvements during

14  the time that you were the controller?

15      A.   I'm sure there were.

16      Q.   And would those capital improvements

17  be reflected as such in the financial

18  statements of the varying operating companies?

19      A.   We did maintain a fixed asset

20  register that was specific to the entities that

21  had possession of those fixed assets, and it

22  would have included leasehold improvements,

23  real property, other improvements to real

24  property, etc.  Would have included the

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 91 of 198

Page 91

1              C. Dondzila

2    acquisition of other ancillary fixed assets,

3    desks, desktops, all hard assets would have

4    been included on that register.

5         Q.    And do you have any sense of the size

6    of the capital improvements that would have

7    been undertaken during your time as controller?

8         A.    I would characterize it as not

9    material.

10        Q.    Okay.  If you go down to F, it says,

11   "Have principal payments been made?  If so,

12   when, how, how often, and how much?"

13            And my first question is, do you

14   believe your response starts with the text "My

15   guess is that certain of these balances," and

16   goes on?  Do you believe that to be your

17   response to Mr. Renzi's questions?

18        A.    Yes.

19        Q.    Okay.  And you phrase it here as a

20   guess and you ask -- at least you state, you'll

21   see if Barb can have someone evaluate.  Do you

22   know whether anybody ever did the evaluation of

23   whether there were regular principal repayments

24   and draws?

25        A.    I don't recall.

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 92 of 198

Page 92

C. Dondzila

1

2    Q.    And by principal repayments and

3    draws, what you mean is essentially accessing

4    and distributing up on the line of credit that

5    we talked about earlier in your testimony?  Is

6    that what you're referring to here?

7            MR. LIPPS:  Objection to form.

8            MR. O'NEILL:  Objection.

9    A.    Yes, that would be a reasonable

10   reference, yes.

11   Q.    Okay.  Go to number 4.  I'm

12   interested in the text that says, "On a monthly

13   basis, the outstanding balances on the

14   revolving and LOC are recorded to the operating

15   companies in proportion to their pledged

16   collateral.  As such, each month there will be

17   changes in the balance of the interchange

18   generated."  Do you see that text?

19   A.    I do.

20   Q.    Can you explain what you mean there?

21   A.    The revolver and a line of credit are

22   liquidity facilities that were outstanding

23   between Ally Financial and Residential Capital

24   and named borrowers.

25            The outstanding balance -- both --

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 93 of 198

Page 93

1                    C. Dondzila

2   there are a variety of different -- and there

3   are named borrowers, specifically named

4   borrowers, of which two are Residential Funding

5   Company and GMAC Mortgage.  There are others, I

6   believe.  And each of those entities have

7   assets that are pledged as collateral to one or

8   both of those agreements.  That collateral sits

9   within those individual borrower entities.

10          We concluded that the line of credit

11  and the revolver should both be represented on

12  the financial statements of each of the

13  borrower -- actual borrower entities as opposed

14  to having the revolver and line of credit at

15  the Residential Capital holding company level.

16  And as such, because the documents, the

17  governing documents were not specific about how

18  those borrowings were split between the

19  borrower entities, they were only specific in

20  terms of the collateral that was pledged by

21  each of those entities, we used our judgment.

22  And our judgment was such that we on a monthly

23  basis would evaluate the collateral value that

24  was pledged to both of those by each of the

25  borrower entities, and would allocate the

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 94 of 198

Page 94

1                      C. Dondzila

2    outstanding borrowings to each based on the

3    proportion of collateral that they had pledged.

4        Q.    Okay.   So let me just make sure I

5    understand that.   I'm going to try and work

6    with a hypothetical just to use easy numbers,

7    and you tell me if it's confusing or I get it

8    wrong.

9              Assume there was a $2 million

10   facility, the Ally facility was $2 million, and

11   in month one, ResCap Funding Company LLC had

12   pledged half the collateral and GMAC Mortgage

13   LLC had pledged half the collateral.   Is it the

14   case that --

15              MR. LIPPS:   Talking about the

16         collateral value pledged?

17              MR. PERRY:   The collateral value

18         pledged.

19        Q.    Is it the case that each of those

20   entities would then have a million dollar loan

21   on its books from Ally?   Is that how it would

22   be accounted for?

23        A.    We would have recorded a payable,

24   yes, on the books of each of the respective

25   entities for a million dollars in that example.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 95 of 198

Page 95

1                    C. Dondzila

2        Q.    Okay.   And then in month two, the

3    collateral value changed such that Residential

4    Funding Company LLC had all of the collateral

5    and GMAC Mortgage LLC had none of the

6    collateral.

7            MR. LIPPS:   Talking about

8        collateral value?

9            MR. PERRY:   Collateral value.

10       Q.   So disappears on the GMAC side and

11   increases by a million dollars on the

12   Residential Funding side.   How would that

13   change on a month-to-month basis be recorded on

14   the books of the company?

15       A.   We would have increased the payable

16   or the liability to Ally on the books of

17   Residential Funding Company from 1 million to

18   2 million, so the outstanding liability at that

19   point in time would be 2 million.   And the GMAC

20   Mortgage financial statements would have shown

21   a reduction of their payable such that their

22   outstanding balance was zero.

23           In order for those entries to

24   balance, because we have to make entries

25   balance, there would have been an offset

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 96 of 198

Page 96

1                    C. Dondzila

2    through intercompany accounts which I

3    suspect -- I cannot confirm, but I suspect

4    would have been not with each other but

5    actually up through ResCap and back down

6    through ResCap --

7         Q.    Okay.

8         A.    -- as if -- as if the money from Ally

9    Financial had actually sort of moved its way

10   through the food chain, if you will.

11        Q.    Right.    And by the food chain, if

12   we're talking about GMAC Mortgage, it would go

13   up to GMAC Residential Holding Company, up to

14   Residential Capital LLC and then down to

15   Residential Funding Company LLC?

16        A.    No, it actually would have gone the

17   other way.    So by increasing the liability on

18   the books of Residential Funding Company, there

19   could have been a de facto sort of assumption

20   that cash would have been raised by them, and

21   so the cash would have -- it wasn't truly cash,

22   but it would have said that then $1 million in

23   your example, an additional $1 million would

24   have moved from Residential Funding Company up

25   to ResCap, and then ResCap would have moved it

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 97 of 198

Page 97

1                    C. Dondzila

2   down into GMAC Mortgage so that GMAC Mortgage

3   could actually repay in a virtual sense its

4   liability that had been on its books.

5        Q.    Okay.   I understand that.

6             And was this calculation done on a

7   monthly basis?

8        A.    It was.

9        Q.    And was there a schedule that was

10  prepared that reflected the changes in

11  collateral valuation for this particular

12  purpose?

13       A.    I don't have direct knowledge of it

14  but I would expect that there would be a

15  schedule that would support the journal entry

16  that would be posted to the financial

17  statements.

18       Q.    And do you know whether that was a

19  standalone journal entry or done as a part of a

20  group of intercompany journal entries?

21       A.    I don't know.

22       Q.    If you go to 7, there's a question,

23  "Was the ResCap restated loan agreement dated

24  as of January 1, 2006 amended or extended

25  beyond its termination date"?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 98 of 198

Page 98

1                    C. Dondzila

2              Do you recall ever learning the

3    answer to that question?

4         A.    I don't recall.

5         Q.    Okay.   But at least from your

6    perspective, by 2011, beginning of 2012, the

7    ResCap restated loan agreement was in effect

8    insofar as at least interest was being charged

9    on that agreement?

10             MR. LIPPS:   Well, objection to

11        form.   And I know you're not asking her

12        for a legal conclusion.

13             MR. PERRY:   Yeah, not --

14        Q.    From your perspective as the

15    controller of the company.

16        A.    So assuming that the ResCap restated

17    loan agreement is the form of the agreement

18    that governed the relationship between GMAC

19    Mortgage and Resi Holdings and Resi Holdings

20    and ResCap, I think I've stated that, yes, I

21    believe that that was still in existence and

22    that interest was being charged.   I do not know

23    if correspondingly interest was being charged

24    on the piece that was between Residential

25    Capital and Residential Funding Company.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 99 of 198

Page 99

1          C. Dondzila

2      Q.    Okay.  Go to the next page, the text

3  under A.  Does this -- does your response to

4  Mr. Renzi's question begin with the text "This

5  results from the cash management activities,"

6  and goes on?

7      A.    I believe so, yes.

8      Q.    There's a reference to Project Rodeo

9  in Mr. Renzi's email.  Do you have an

10  understanding of what that is?

11      A.    I believe Project Rodeo is what Ally

12  Financial called their view of the ResCap

13  bankruptcy.

14      Q.    So Ally had named the ResCap

15  bankruptcy Project Rodeo?

16      A.    That's what I believe.

17      Q.    And at least as it relates to the

18  ETS, intercompany balance between ETS and GMAC,

19  there was actual cash that was being generated

20  by ETS's business?

21          MR. LIPPS:   Objection, asked and

22  answered.  Go ahead.

23      A.    Yes, that's correct.

24      Q.    And that the cash was swept up as

25  part of the cash management process; right?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 100 of 198

Page 100

1              C. Dondzila

2              MR. LIPPS:  Objection, asked and

3       answered.  Go ahead.

4       A.   Yes, that's my understanding.

5       Q.   And you make a note here that the

6  intercompany is awfully close to the retained

7  earnings.  Why is that significant to you?

8       A.   That was more to provide some context

9  around the linkage between the cash management,

10  which would have been revenues received less

11  operating expenses paid, and that is a

12  reasonable proxy for retained earnings.

13       Q.   Okay.  And I take it if the -- well,

14  strike that.  The retained earnings of which

15  entity?

16       A.   I'm sorry, ETS.

17       Q.   Okay.  And if at some point in time

18  ETS determined that the intercompany receivable

19  from GMACM was impaired or GMACM was not

20  capable of paying it, would it have to adjust

21  the retained earnings figure?

22              MR. LIPPS:  Well, objection.  I'm

23       not sure that's what -- proper

24       foundation, but go ahead.

25       A.   Not seeing the form of whatever

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 101 of 198

Page 101

1                    C. Dondzila

2    transaction that might be, if it was impaired,

3    it would in all likelihood under GAAP be deemed

4    to be an equity -- it would have been deemed to

5    be a component of equity, which would have been

6    recorded as a dividend, so it would have been

7    recorded as a dividend from ETS to its parents,

8    GMAC Mortgage.

9         Q.   After the -- giving effect of the

10   dividend, would the retained earnings figure

11   need to change?

12        A.   No, retained earnings would stay the

13   same but equity would decline.

14        Q.   I see.  Okay.  And do you know, was

15   there ever any -- was there ever any

16   forgiveness of debt between GMACM and ETS?

17        A.   Not that I recall.

18             MR. PERRY:  Now is a good stopping

19        point.

20             MR. LIPPS:  All right.

21             THE VIDEOGRAPHER:  The time is

22        12:51.  We're off the record.

23        (A luncheon recess was taken from

24        12:51 p.m. through 1:32 p.m.)

25   BY MR. PERRY:

Page 102

C. Dondzila

Q.   Before you, Ms. Dondzila, is Westman

Deposition Exhibit 28.  Can you identify the

document?

A.   These are the audited consolidated

financial statements for GMAC Mortgage LLC for

the periods December 31, 2011 and 2010.

Q.   Do these appear to be the financial

audited financial statements?

A.   They do by the appearance of the

independent auditor's report.

Q.   If you could go to page 36 in the

document, ends with 4316 if you are looking at

the Bates stamps.  We had earlier in your

testimony been focused on the other liabilities

table, and particularly the payable to RFC.  Do

you see the payable to RFC reflected in the

other liabilities table contained on Westman

Deposition Exhibit 28?

A.   I do in footnote 9, yes.

Q.   And am I correct that it reflects a

payable to RFC of 69,785,000 at the end of

2011?

A.   That is correct.

Q.   And there was no similar payable at

Page 103

C. Dondzila

1

2    the end of 2010; correct?

3        A.    That is correct.

4        Q.    Does that suggest to you that the --

5    any payable was cash-settled at the end of

6    2010?

7            MR. LIPPS:  Do you mean the absence

8        of the entry?

9            MR. PERRY:  The absence of an

10        entry.

11        A.    Can you repeat the question?

12        Q.    Does the absence of an entry under

13    the line item "payable to RFC" on the table

14    under 2010 suggest to you a cash settlement of

15    an intercompany balance between those two

16    entities at the end of 2010?

17        A.    No, it doesn't suggest that to me.

18        Q.    What are the possible reasons for the

19    absence of an entry under the "payable to RFC"

20    column in 2010?

21        A.    It could have been a receivable to

22    RFC at the end of 2010; or there could have

23    been no relationship that would have driven a

24    balance at the end of 2010; and/or it could be

25    that there was a relationship and there was a

Page 104

1                        C. Dondzila

2    settlement of some sort, or a continuing

3    recordation of activity such that that -- what

4    was previously a payable flipped to a

5    receivable.

6        Q.    Do you know whether the practice of

7    allocating corporate expense in the first

8    instance to RFC and then having RFC charge GMAC

9    Mortgage was in place in 2010?

10       A.    I don't recall.

11       Q.    Do you recall the practice of

12   allocation of corporate expense changing at any

13   point in time while you were controller?

14       A.    I don't have a recollection of it,

15   no.

16       Q.    And if I wanted to figure out whether

17   there was a receivable from RFC at the end of

18   2010, is there some place in this document that

19   I could discern that information?

20       A.    Absent being shown on the face of the

21   balance sheet uniquely, to the extent it was

22   material, we would have included a footnote for

23   other assets or other accounts receivable, here

24   presented in footnote 6 on page 31, Bates

25   number ending 311, or footnote 7, other assets,

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila    Pg 105 of 198

Page 105

1                       C. Dondzila

2    same page.

3        Q.   And looking at footnotes 6 and 7, do

4    you see any receivable -- well, would a

5    receivable -- would a receivable from RFC be

6    listed under the "Receivables from affiliates"

7    line item in the other assets table, note 7?

8        A.   It's possible, yes.  I can't say with

9    certainty, but it's possible, yes.

10        (Dondzila Exhibit No. 10 was marked for

11        identification.)

12   BY MR. PERRY:

13        Q.   Before you is Dondzila Deposition

14   Exhibit 10.  Can you identify the document?

15        A.   Yes.  This is the audit -- the annual

16   financial statements, consolidated financial

17   statements of Residential Funding Company LLC

18   for the years ending December 31, 2011 and

19   2010.

20        Q.   Does this appear to be the final

21   consolidated financial statements?

22        A.   It does, by inclusion of the

23   independent auditor's report.

24        Q.   What's the principal place of

25   business of Residential Funding Company LLC?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 106 of 198

Page 106

1          C. Dondzila

2          MR. LIPPS:  Did you ask her where

3     it is?

4          MR. PERRY:  Yeah, where.

5     A.    I believe that its corporate address

6     was in Bloomington, Minnesota.

7          Q.    Go to the statement of income.  You

8     had testified earlier, I believe, that you were

9     not certain whether interest was charged on the

10    receivable that Residential Funding Company LLC

11    held from its parent, Residential Capital LLC,

12    and you had directed me to the income

13    statement.  My question is, reviewing the

14    income statement, are you able to deduce

15    whether interest was in fact charged on the

16    balance, the intercompany balance between

17    Residential Capital LLC and Residential Funding

18    Company LLC, at least during these periods?

19          MR. LIPPS:  Objection to

20        characterization of prior testimony.

21        But go ahead and answer the question if

22        you can.

23        A.    From the face of the income

24    statement, no, you cannot discern that.

25          Q.    Are you able to discern that based on

Page 107

1                    C. Dondzila

2    your review of any other portion of the

3    document?

4         A.   I would direct you in all cases to

5    the related party transaction footnote, in this

6    case starting on page 60, Bates number ending

7    298, and continuing on Bates number 299, page

8    61.  And in regards to material related party

9    balances, both income statement, balance sheet

10   and statement of changes in equity, we would

11   have disclosed again material amounts that

12   existed as of the dates of the financial

13   statements.

14            And I do not see in any case under

15   the statement of income any reference to

16   interest income with Residential Capital.

17        Q.   There is a reference to interest

18   expense with affiliates.  Do you see that?

19        A.   I do.

20        Q.   Do you know what that refers to?

21        A.   I do not.

22        Q.   There's also a reference to

23   discontinued operations interest expense,

24   parent and affiliates.  Do you know what that

25   refers to?

Page 108

C. Dondzila

1
2       A.    Discontinued operations in the

3   context of generally accepted accounting

4   principles are business operations that meet --

5   the elimination or discontinuation of certain

6   business operations that meet certain standards

7   can be classified as discontinued operations.

8            What that, generally speaking, means

9   is that there's a reclassification of amounts

10  in the income statement that would have

11  otherwise been in other parts of the income

12  statement line items of revenue and other

13  revenue.  It removes current and prior period

14  amounts and moves them down to a single line

15  called gain or loss from discontinued

16  operations.

17           In this case, if you look at footnote

18  2 on page 19, Bates last three 257, you can see

19  here that in October of 2010, we completed the

20  sale of certain of our international

21  operations, principally the United Kingdom and

22  continental Europe.  Those platforms in fact

23  met the requirements for classification as

24  discontinued operations.  As such, we made

25  reclassifications of prior period amounts.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 109 of 198

Page 109

1                         C. Dondzila

2              Correspondingly, the reference in the

3    related party transaction footnote 19, again on

4    page 61, taking you back there, would purport

5    to represent the interest expense that those

6    operations would have incurred and -- or would

7    have recognized.

8              And I'll take you back.  This may be

9    in part but not wholly -- this is likely

10   interest expense that RFC and the entities

11   would have recognized on those PATI notes and

12   other notes of that nature.  That is, interest

13   expense that would have been recorded in all

14   likelihood in Viaduct and Flume, but in a more

15   complicated way that's not necessarily helpful,

16   would have been recorded previously in the

17   financial statements of RFC.

18        Q.   I see.

19        A.   But that would show as interest

20   expense that was paid to parent and affiliates.

21        (Dondzila Exhibit No. 11 was marked for

22        identification.)

23   BY MR. PERRY:

24        Q.   Before you is Dondzila Deposition

25   Exhibit 11.  It's an email and a series of

C. Dondzila

1

2   attachments.  If you could take a moment and

3   review Ms. Westman's email to Mr. Stern and

4   Mr. Renzi.  You're copied on it at the top of

5   the first page.

6      A.   Got it.

7      Q.   You give some description of

8   intercompany agreements that existed at least

9   in 2012.  Do you see that?

10      MR. LIPPS:  Where are you

11      referencing?

12      MR. PERRY:  She says:  "Note, in

13      many cases we have agreements that

14      support ResCap lending money to the

15      subsidiaries; however, some of these

16      balances have flipped and the subs are

17      now lending money instead.  The

18      agreements are sometimes with ResCap,

19      but the intercompany balances are with

20      the direct parent, not with ResCap

21      itself."

22      Q.   Do you see that text?

23      A.   I do.

24      Q.   And Ms. Westman writes,

25   "Unfortunately, this is a little rough, but the

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 111 of 198

Page 111

1                    C. Dondzila

2     best we have."

3            Do you have any understanding of how

4     it came to be that, for example, there were

5     intercompany balances with the direct parents,

6     not with ResCap itself, but intercompany

7     agreements between ResCap and the subsidiary in

8     question?

9        A.   Can you repeat the question, please?

10       Q.   Well, it's a bad question so let's

11    just go to one of the agreements.  It ends with

12    the Bates label 30819.

13       A.   I have it.

14       Q.   This is an agreement between

15    Residential Capital LLC and PATI; correct?

16       A.   That is correct.

17       Q.   And Residential Capital LLC is the

18    ultimate parent; correct?

19       A.   Yes.

20       Q.   And the intercompany balances, at

21    least as they respected PATI, were between PATI

22    and GMAC Mortgage LLC; correct?

23       A.   The balances that we've covered

24    previously were between, yes, PATI and GMAC

25    Mortgage.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 112 of 198

Page 112

1                    C. Dondzila

2        Q.    Are you aware of any direct balances

3    between PATI and Residential Capital LLC?

4        A.    I'm not, no.

5        Q.    Do you know whether -- first of all,

6    did you participate in the drafting of this

7    intercompany advance agreement?

8        A.    I did not.

9        Q.    Do you know how it came to be that

10   the advance agreement was put in place in June

11   of 2009?

12       A.    I would expect this to have been

13   executed in or about the time of the ResCap

14   debt restructuring.

15       Q.    Okay.

16       A.    Or was that 2008?   Was that 2008?   So

17   no, I don't know.   I don't know why this would

18   have been done in June of 2009.

19       Q.    Do you see there's a block on the top

20   right-hand corner that says T930?   What does

21   that mean?

22       A.    I don't know.

23       Q.    Is there some centralized system at

24   ResCap where contracts for each of the relevant

25   legal entities was kept?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 113 of 198

Page 113

C. Dondzila

2    A.   Not that I'm aware.

3    Q.   Was there any general policy about

4 when an intercompany relationship needed to be

5 memorialized with a contract or an advance

6 agreement or something like that, versus just

7 simply having an intercompany relationship

8 recorded on the books and records of the

9 company?

10    A.   Not that I was aware.

11    Q.   And if you go to the signature page,

12 the signature by John Peterson, do you know who

13 Mr. Peterson is?

14    A.   He was serving within -- I knew him

15 to be serving within the treasury department.

16 It clearly indicates here that his title at

17 that point was assistant treasurer.

18    Q.   I take it Mr. Peterson didn't report

19 to you.  Right?

20    A.   He did not.

21    Q.   Who did he report to?

22    A.   I believe he reported to the chief

23 financial officer, Jim Young, at the time.

24    Q.   If you look at Exhibit A to the

25 intercompany agreement, there's a promissory

C. Dondzila

1   note.  Did your department keep promissory

2   notes reflecting the intercompany relationships

3   anywhere within the department?

4        A.   Not that I'm aware.

5        Q.   Is this type of agreement something

6   that would have been maintained by treasury?

7        A.   Yes.

8        Q.   And do you know what attempts were

9   made -- strike that.

10            Was there an attempt in 2012 to try

11   and identify all of the intercompany

12   agreements, at least as they respected the

13   intercompany obligations?

14        A.   In 2012, we undertook to analyze our

15   intercompany balances and relationships for

16   compliance with the newly issued Ally Financial

17   policy, but I'm not aware of any other reason

18   why we would have undertaken in 2012 any other

19   comprehensive review of our intercompany

20   relationships.

21        Q.   I guess the reason I'm asking is

22   Ms. Westman appears to be transmitting a series

23   of agreements to folks from FTI.

24            MR. LIPPS:  So what's the question?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 115 of 198

Page 115

1                    C. Dondzila

2        Q.    I'm wondering if you're aware of FTI

3    making a request for intercompany policies or

4    agreements of Ms. Westman.

5        A.    So my mistake.  Clearly, we were

6    headed toward filing for bankruptcy, or -- no,

7    actually -- yeah, we filed in 2012 for

8    bankruptcy, so this would have been in

9    anticipation of the bankruptcy.

10       Q.    So just to orient you, I think you

11   filed in May of --

12       A.    Correct.

13       Q.    -- 2012.

14       A.    That is correct.

15       Q.    Do you know of any effort to search

16   the treasury department for potentially

17   applicable agreements between these -- the

18   legal entities with -- under Residential

19   Capital LLC?

20       A.    You'd have to ask Barb.  Barb was

21   primarily the one that was searching those out,

22   Barb Westman.

23       Q.    And if I want to talk to somebody

24   from treasury about how records were -- records

25   and contracts and agreements were kept in the

Page 116

1                       C. Dondzila

2    ordinary course in that department, who would

3    be the person best to speak with?

4         A.   Well, certainly for the period -- for

5    some part of the period, it would be John

6    Peterson.  After he left, I believe Joe --

7    there's a gentleman, Joe Ruhlin, who also

8    served in a capacity within the treasury

9    department.  I think there was someone that

10   served in a treasury capacity in between those

11   two, but I don't recall his name.

12        Q.   By the time you left in 2013, or at

13   the time you left in 2013, who were the folks

14   in charge of the treasury department?

15        A.   Joe Ruhlin.

16        Q.   I don't want you to speculate, but if

17   you go back to the PATI intercompany agreement

18   that we were looking at, remember I asked you

19   about the box in the upper right-hand corner?

20        A.   Uh-huh.

21        Q.   And it said T930.  Does the use of

22   the letter T -- well, are you able to identify

23   this as some filing system or marking system

24   that the treasury department used for their

25   contracts?

Page 117

1          C. Dondzila

2          MR. LIPPS:  Objection, asked and

3       answered already.  But go ahead.

4       A.    I don't know if that corresponded to

5    a filing system that they used.

6       Q.    Okay.  Were there entities within the

7    ResCap system that could not perform debt

8    forgiveness without approval from a federal

9    agency?

10          MR. LIPPS:  Just note my objection

11       to the extent you're asking her for some

12       legal conclusion on that.  But go ahead

13       if you know.

14       A.    I'm not aware that any of the

15    entities within the ResCap family -- I guess

16    I'll take that back.  It's possible that in the

17    international entities, although I don't have

18    direct knowledge of it, it's possible that in

19    the international space that there could have

20    been restrictions on debt forgiveness in

21    connection with some regulatory guidance or

22    other.  But domestically, I'm not aware of

23    anything that would have required approval by a

24    federal agency.

25       Q.    Was there ever an effort in 2012 to

Plaintiff's
Objection
117:25-118:18
Objection to
form; vague
and
ambiguous

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 118 of 198

Page 118

1           C. Dondzila

2    track the intercompany, the largest

3    intercompany balances on a year-by-year basis

4    and track how they moved?

5            MR. LIPPS:  Objection to form.  I'm

6        not sure I know what you're asking.  But

7        go ahead.

8        A.   In connection with satisfying data

9    requests from parties with interests in the

10   bankruptcy, we did go back and, to the best of

11   our abilities, pull year-end intercompany

12   balances for certain relationships based on

13   those requests.

14       Q.   And do you have any understanding of

15   why parties were seeking that information?

16       A.   I wasn't interested in why they were

17   seeking that information.  I was just providing

18   what they asked us for.

19       Q.   Anybody ever tell you why they were

20   interested in that particular information?

21       A.   Not directly.

22       Q.   What about indirectly?

23       A.   I could infer that it was in relation

24   to the question of whether it was debt or

25   equity.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 119 of 198

Page 119

1          C. Dondzila

2     Q.    And on the question of whether it was

3 debt or equity, is that an issue that you ever

4 arrived at any conclusion about?

5          MR. LIPPS:   Objection.   I think

6     you've already asked that and she's

7     already answered it, but go ahead.

8     A.    The answer's no.

9     Q.    Were you ever asked to provide a

10 conclusion about that --

11    A.    I was not.

12         MR. LIPPS:   Note my objection.   I

13    think that was asked and answered too.

14    Q.    Did there come a point in time when

15 AlixPartners began analyzing the intercompany

16 balances?

17    A.    And who did AlixPartners represent?

18    Q.    The unsecured creditors.   Creditors

19 committee.   Do you know?

20    A.    There were a lot of people who were

21 asking us for things.   The name is familiar.   I

22 don't --

23    Q.    Who other than FTI did you -- did you

24 have any meetings with professionals other than

25 FTI about the intercompany balances?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 120 of 198

Page 120

C. Dondzila

1

2       MR. LIPPS:  I don't want you to

3   talk about any meetings you may have had

4   with lawyers.

5       A.   Yes, FTI would facilitate phone calls

6   where we would participate to be available to

7   answer questions in regard to documentation

8   that we had provided in response to some

9   inquiry they'd made.

10      Q.   Okay.  And do you have any particular

11  recollection of the names of the firms that you

12  met with during one or all of the phone calls?

13      A.   No.  I don't have any particular

14  recollection.

15      Q.   Did you -- your counsel objected

16  earlier.  Without going into -- I don't want

17  any detail, but just yes or no.  Did you meet

18  with lawyers about the intercompany balances in

19  the beginning of 2012?

20      MR. LIPPS:  I think that that

21   question assumes some specific

22   communications which would intrude on

23   the privilege.

24      MR. PERRY:  I think the question --

25   I tried to frame the question generally

Page 121

C. Dondzila

1
2    enough --

3        MR. LIPPS:  Yeah, but you got the

4    subject matter.  You're asking her

5    particular meetings that she had on a

6    particular subject, and I think that

7    invades the privilege.

8        MR. PERRY:  Right.  But you would

9    put a subject matter, broadly, as

10    broadly as I expressed it, on a

11    privilege log.  So I don't think that

12    level of question with that level of

13    specificity invades the privilege.

14        MR. LIPPS:  I'll let her answer it

15    yes or no as long as you agree that

16    that's not going to be argued that

17    that's some waiver of the privilege.

18        MR. PERRY:  So stipulated.

19        THE WITNESS:  The question again,

20    please?

21        MR. LIPPS:  Did you ever meet with

22    lawyers.

23    Q.   Did you meet with lawyers about the

24    question of -- about the issue of the

25    intercompanies?

Page 122

                              C. Dondzila

1

2      A.   Yes.

3      Q.   Did you meet with lawyers from the

4  Kramer Levin firm about the issue of the

5  intercompanies?

6           MR. O'NEILL:  The beginning of 2012

7      still?

8           MR. PERRY:  Or the beginning of

9      2013.

10     Q.   At any point in time, let me put it

11 that way.

12     A.   I don't recall if it was with

13 representatives of Kramer Levin, no.

14     Q.   What did you do to prepare for your

15 deposition here?

16          MR. LIPPS:  I don't want you to

17     talk about any specific conversations

18     that you had, but you can certainly

19     identify what you did.

20     A.   We met first to acclimate me to what

21 the process is, given that I've never been --

22     Q.   Don't go into detail.

23          MR. LIPPS:  Don't go into detail.

24 Just you had a meeting.

25     A.   Yes, we had a meeting.  We had a

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila    Pg 123 of 198

Page 123

1                    C. Dondzila

2   meeting.   Thank you.   We had a meeting.

3        Q.    Who were the lawyers present at your

4   meeting?

5        A.    Mr. Lipps to my left, to my far left;

6   Alex Barrage across the table and to my left.

7   And I'm forgetting the other Alex from

8   Morrison & Foerster who is not here today.

9        Q.    And roughly how long did you prepare

10  for?

11       A.    Our meeting lasted a little bit over

12  probably three and a half hours.

13       Q.    Just one meeting?

14       A.    Just one.

15       (Dondzila Exhibit No. 12 was marked for

16       identification.)

17  BY MR. PERRY:

18       Q.    Directing your attention to

19  Mr. McDonald's email to Ms. Westman at the

20  bottom of the second page, you're copied on it.

21  Mr. McDonald writes to Ms. Westman, "I think to

22  the extent that any of these are 'off the

23  shelf' and easily answered, we should provide

24  these answers."   Do you see that?

25       A.    I do.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 124 of 198

Page 124

                        C. Dondzila

1

2       Q.   Do you -- were there requests for

3  information provided by third-party advisors

4  that you were ultimately not able to satisfy in

5  connection with your review of the intercompany

6  loans?

7       A.   I'm sure that there were requests we

8  did not satisfy to the extent that the

9  requester would have liked us to respond.  But

10  we did respond to every request, to my

11  knowledge, to the best of our abilities.

12       Q.   And so you never ignored a request

13  because it was too difficult to respond to or

14  because the answers weren't off the shelf and

15  easy; right?

16            MR. LIPPS:  Objection to form,

17       characterization.  Go ahead.

18       A.   We frequently negotiated with the

19  requesters in the event that it was either

20  time-consuming or the request could not be

21  fulfilled in the way that they had asked it to

22  be fulfilled.  So there was a significant

23  amount of give-and-take, generally speaking,

24  arbitrated and intermediated by FTI on our

25  behalf.  But again, I'm not aware of anything

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 125 of 198

Page 125

1            C. Dondzila

2    that we did not provide that someone asked for.

3        Q.    Between March of 2012 and the time

4    you left the company, how much work did you and

5    your staff do on the intercompany balance

6    issue?

7        A.    I couldn't even estimate.  Lots.

8        Q.    A lot of time spent?

9        A.    Yes, a lot of time.

10        Q.    And Ms. Westman spent a lot of time

11    working on the issue; correct?

12        A.    She would have been the principal --

13    the principal contact for that, yes.

14        Q.    Okay.  And who else was tasked with

15    doing that review, assisting Ms. Westman?

16        A.    She would have delegated portions of

17    the work to members of the general ledger team

18    that would have included Jake Bazella and

19    others under his day-to-day management.

20        Q.    Is it fair to say this was a

21    substantial project that your staff worked on

22    between March of 2012 and the time you left the

23    company?

24            MR. LIPPS:  Objection, form.

25        A.    I don't think I'd put it in the class

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 126 of 198

Page 126

1                        C. Dondzila

2    of substantial, but I would put it on one of

3    the higher lists that did require a lot of

4    resources.

5         Q.    From your perspective, this was an

6    important issue in the bankruptcy case.   Is

7    that fair?

8              MR. LIPPS:   Objection.   Go ahead.

9         A.    From my perspective, it was a topic

10   that required a lot of follow-up and a lot of

11   analysis on our part to satisfy requests.

12        Q.   If you go to the last page of this

13   document, there's an email from Marc Landy to

14   Mark Renzi and Brian McDonagh, and I'm

15   interested in the very last page that says

16   "Other Follow-up."

17             MR. LIPPS:   Bates number 7040 is

18        the last four?

19             MR. PERRY:   You know what?   Go to

20        the Bates number ending 7034.

21   A.    Uh-huh.

22             MR. LIPPS:   Okay, 7034.

23   Q.    You see question number 2?

24   A.    I do.

25   Q.    Do you know whether you or your staff

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 127 of 198

Page 127

1                          C. Dondzila

2    was ever able to answer this question?

3         A.    I believe there was follow-up work on

4    that item.

5         Q.    Do you know what the answer was?

6         A.    I don't recall what the final

7    conclusion was.

8         Q.    You understand the question as you

9    sit here today?

10              MR. LIPPS:    Objection, but go

11         ahead.

12         A.    The question as it's written, the way

13    that I read this question, is asking why if

14    there was 2.6 billion of forgiveness,

15    3.3 billion minus 2.6, which would be

16    700 million, why the balance between GMAC

17    Mortgage and -- why there was a disparity of

18    differences because it was 51 million versus

19    700 million.  And there was an expectation that

20    these two balances moved in tandem.

21         Q.    And I take it -- did the two balances

22    move in tandem?

23         A.    They did not in all cases, no.

24         Q.    Okay.  So Res Holdings is purely a

25    holding company; right?

Page 128

C. Dondzila

1
2     A.    That is correct.

3     Q.    Why would they have not moved in

4  tandem?

5     A.    I don't have the details of exactly

6  why they didn't move in tandem.

7     Q.    Do you recall being told that the

8  waterfall team at FTI was trying to analyze

9  cash balances without the intercompany movement

10  of cash?

11     A.    I don't recall that.

12     (Dondzila Exhibit No. 13 was marked for

13     identification.)

14  BY MR. PERRY:

15     Q.    Before you is Dondzila Exhibit 13.

16  Just take a minute to familiarize yourself with

17  the document.

18     A.    Okay.

19     Q.    Do you have any understanding of the

20  purpose of the exercise identified in

21  Mr. McDonagh's email at the bottom of the third

22  page of the document?

23     A.    No, I don't actually understand what

24  the purpose of -- what his actual purpose was

25  for doing this, from this email.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 129 of 198

Page 129

1                    C. Dondzila

2        Q.   Do you know whether this project was

3   ever completed?

4        A.   I don't know definitively if it was

5   ever completed, no.

6        Q.   Is it a project that you participated

7   in in any meaningful way?

8        A.   Clearly from the email I was provided

9   a copy of something that I reviewed.  I

10  provided comments and received feedback in

11  regards to those comments.  I wouldn't say that

12  that was substantive or significant, but I

13  clearly was part of the process.

14       Q.   Other than receiving a copy of a

15  document and commenting on it, do you recall

16  doing anything else in connection with this

17  project?

18       A.   I don't.

19       Q.   Were you involved in the decision to

20  schedule the intercompany loans on the debtor's

21  statement of assets and liabilities filed in

22  connection with the bankruptcy?

23       A.   Yes.  My team and I prepared the SOFA

24  and SOL.

25       Q.   Do you recall whether there was an

1            C. Dondzila

2     issue about how the intercompanies would be

3     characterized on those documents?

4          A.   I don't recall any issue with that,

5     no.

6          Q.   Were you aware of anybody giving any

7     consideration to not scheduling the

8     intercompanies on the SOFA and the SOL?

9          A.   No, I'm not aware of that.

10         Q.   Is it fair to say that by the time

11    the SOFA and the SOL were filed, you and your

12    staff had done a significant amount of work

13    analyzing the intercompany balances?

14         A.   We would have done -- yes, we would

15    have done a fair amount of analysis on the

16    intercompany balances by then, yes.

17         Q.   And as part of that analysis --

18    strike that.

19         (Dondzila Exhibit No. 14 was marked for

20         identification.)

21    BY MR. PERRY:

22         Q.   Before you is Dondzila Exhibit 14.

23    It's an email from Ms. Westman to you, and it

24    appears to forward a string of emails to

25    Mr. Renzi -- starting on the second page, to

Page 131

C. Dondzila

1  Mr. Renzi from folks at Houlihan.

3          Do you have any understanding of who
4  Houlihan represented?

5      A.   I don't recall.

6      Q.   You believe there's some bolded text
7  that appears to be interlineated in Mr. Lewis
8  from Houlihan's email.  Are you able to tell
9  either by the face of the email or through
10 recollection whether that's your text or
11 Ms. Westman's?

12         MR. LIPPS:  Just so the record's
13     clear, you're talking about the bolding
14     on 512 and 513?

15         MR. PERRY:  Yes.

16     A.   It's not clear to me that it's mine
17 or Barb's.

18     Q.   Well, do you have any recollection of
19 writing any of the bolded text?

20     A.   No, I do not.

21     Q.   If you look at -- go to 513,
22 Mr. Lewis writes:  "We know the schedules will
23 be published this week, but since we have not
24 seen them, we do not know how the intercompany
25 claims will be described/detailed in the

Page 132

1                       C. Dondzila

2     schedules.  We anticipate we'll start getting

3     calls on the schedules starting on Monday.

4     We'd like to be able to say more than, dot,

5     dot, dot, the company has indicated the

6     intercompany claims should be treated as equity

7     contributions."

8            And then there's some bolded text

9     that reads, "I believe this is what is holding

10    things up.  We are not disclosing that these

11    claims should be treated as equity

12    contributions, therefore, we haven't responded

13    as of yet."

14           Did you write those words?

15    A.    I don't know.  I don't recall.

16           MR. LIPPS:  Objection, asked and

17    answered.

18    Q.    Do you have any understanding of

19    the -- well, were the schedules held up for a

20    period of time before they were published in

21    June of 2012?

22    A.    I'm not sure what the reference to

23    schedules means, so no, I'm not aware of

24    anything being held up.  I'm not aware we

25    didn't file everything that we were required to

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 133 of 198

Page 133

C. Dondzila

1

2 file timely.

3          Q.    Regardless of timely or not timely,

4 my question is, do you recall there being a

5 delay while people considered how to

6 characterize certain things on the schedules,

7 for example?

8               MR. LIPPS:    Doesn't delay assume

9          timely, or untimely?    Go ahead and

10         answer.    I'll object.

11              MR. PERRY:    Linguistically, no.

12         Q.    Do you understand my question?

13         A.    I do.    Given that none of us on the

14 ResCap side had been through a bankruptcy

15 before and were not familiar with the specific

16 requirements around certain of the filings that

17 we had to make, I am positive that we took time

18 to understand how things should be presented,

19 and I'm equally positive that there were things

20 that came up where we had questions about how

21 to present something in a schedule.    But I'm

22 not aware of anything that got held up because

23 of disagreements or, as this seems to imply,

24 that there was some question about how

25 something would be disclosed here.

Plaintiff's
Objection
133:3-134:3
Beyond the
scope of
affirmative
testimony

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 134 of 198

Page 134

1                    C. Dondzila

2              But I'm positive we had questions

3      about how to disclose things.

4          Q.    Okay.   And particularly with respect

5      to whether the intercompany balances would be

6      disclosed as debt, equity, or something else,

7      do you recall that being an issue that you and

8      your staff had questions about in preparing the

9      schedules?

10             MR. LIPPS:   In answering that I

11         don't want you to disclose any

12         conversations that you may have had with

13         counsel.

14         A.    I don't recall there being any

15     questions about how -- that we raised about how

16     to present those in the SOFAs and the SOLs.

17         Q.    Did you raise questions about how

18     those balances should be presented somewhere

19     else?   You limited your answer to the SOFAs and

20     the SOLs.   Was there some other place that you

21     were contemplating disclosing them and opted

22     either to disclose or not to?

23             MR. O'NEILL:   Object to form.

24             MR. LIPPS:   Objection.   Objection.

25         A.    As I mentioned before, they were

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 135 of 198

Page 135

C. Dondzila

1
2   excluded -- for my purposes and how we

3   interacted with the waterfall, they were not --

4   we were not privy or party to any of that and

5   how they were presented there, so that was the

6   cause for my exclusion, I guess, or whatever I

7   said by limiting my response.  I'm not aware of

8   anything else.

9        Q.   So they were listed in the schedules,

10  but not taken into account in the waterfall;

11  correct?

12       A.   I was not part of any decision of how

13  or if they were included in the waterfall.

14       Q.   Okay.  Do you know whether -- well,

15  strike that.  By the time the SOFAs and the

16  SOLs were filed in the bankruptcy, are you able

17  to estimate how much time you and your staff

18  had spent on the intercompany issues?

19       A.   No.

20       Q.   Fair to say hundreds of hours?

21            MR. LIPPS:   Objection.

22       A.   I don't know that I could put numbers

23  around it.

24       Q.   Certainly a lot of time, though;

25  correct?

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 136 of 198

Page 136

1                    C. Dondzila

2            MR. LIPPS:  Objection, asked and

3        answered.  Go ahead.

4        A.   It was definitely an area where we --

5    a focus, definitely an area of focus.

6        Q.   And you understood at least at the

7    time the SOFAs and the SOLs were filed, there

8    were differing potential treatments that would

9    be significant in the context of the

10   bankruptcy, either debt or equity; right?

11           MR. O'NEILL:  Objection.

12           MR. LIPPS:  Objection.  I think

13       you've already asked her about this, but

14       go ahead with the caution I don't want

15       you to reveal any conversations that you

16       had with counsel.

17       A.   I was aware that there would need to

18   be -- that there was a -- I was aware that the

19   characterization of intercompany balances as

20   debt or equity was a topic in the context of

21   the bankruptcy, yes.

22       Q.   And you were aware of that prior to

23   the filing of the SOFA and the SOLs; right?

24       A.   Yes.

25           MR. PERRY:  We take a break?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 137 of 198

Page 137

C. Dondzila

1

2      THE VIDEOGRAPHER:  The time is

3   2:31.  We're off the record.

4   (Recess taken.)

5      THE VIDEOGRAPHER:  The time is

6   2:42.  We're on the record.

7   (Dondzila Exhibit No. 15 was marked for

8   identification.)

9   BY MR. PERRY:

10     Q.   Ms. Dondzila, before you is Dondzila

11  Deposition Exhibit 15.  It's a copy of a Notice

12  of 30(b)(6) Deposition served by the ad hoc

13  group of junior secured noteholders in the

14  Residential Capital bankruptcy case.  It's

15  addressed to Residential Capital LLC and its

16  affiliated debtors.

17     My understanding, ma'am, is that

18  you've been designated as a representative of

19  ResCap LLC and its affiliated debtors to give

20  testimony on behalf of the debtors in

21  connection with topic number 16.  Is that

22  consistent with your understanding?

23     MR. LIPPS:  Yeah.  I'll just put on

24  the record I think we did confirm that

25  in an email, and I spoke to you briefly

Page 138

                    C. Dondzila

1

2      about it, that she is somebody that we

3      have designated for that topic as we

4      understand it.

5          MR. PERRY:  Okay.

6      Q.   Is that consistent with your

7  understanding, Ms. Dondzila?

8      A.   Yes, with 16 being all matters

9  concerning negotiations undertaken through the

10  Brokering Consumer Loans Project.

11      Q.   And other than conversations with

12  your counsel, have you had discussions with

13  anybody from the debtors in which they

14  authorized you to provide testimony on behalf

15  of the debtors with respect to number 16?

16      A.   I did not speak with anybody from the

17  debtors.  I only spoke to counsel.

18      Q.   Okay.  What is your understanding of

19  the dispute between the debtors and Ally with

20  respect to the Brokering Consumer Loans

21  Project?

22          MR. LIPPS:  I'll object.

23          MR. O'NEILL:  Objection.

24          MR. LIPPS:  Object to the form.

25      I'm not sure that's an accurate

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 139 of 198

Page 139

C. Dondzila

1

2    characterization.  But go ahead.

3        A.   I'm not aware that there's a dispute,

4    that there was a dispute between the debtors

5    and Ally.

6        Q.   Okay.  Did you -- you participated

7    in -- well, did you sit for any interviews with

8    the examiner appointed in these bankruptcy

9    cases?

10       A.   I sat for two interviews with a

11   special examiner that was appointed in the

12   ResCap bankruptcy case, yes.

13       Q.   And did you understand the examiner

14   to be, among other things, investigating causes

15   of action that the debtors might have against

16   Ally?

17       A.   Generally, that was my understanding,

18   yes.

19       Q.   And did you understand that one of

20   the causes of action the examiner was reviewing

21   was breach of contract claims arising out of

22   the Brokering Consumer Loans issue?

23            MR. LIPPS:  Objection to form.

24            MS. WU:  Objection to form.

25       A.   I understood that he asked me

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 140 of 198

Page 140

C. Dondzila

1

2  questions about that matter.  I had no reason

3  to know what his goals or objectives were in

4  that regard.

5      Q.   Have you reviewed any portion of the

6  examiner's financial report?

7      A.   I did not.

8      Q.   In connection with preparing to be a

9  30(b)(6) witness on topic number 16, did

10  anybody summarize the examiner's conclusions

11  with respect to the Brokering Consumer Loans

12  Project?

13          MR. LIPPS:  Well, I don't want you

14      to disclose any conversations that you

15      had with counsel, so I don't know what

16      you're asking her other than trying to

17      get into that discussion.

18          MR. PERRY:  She's a 30(b)(6)

19  witness.  I guess --

20          MR. LIPPS:  She's not a 30(b)(6)

21  witness on what the examiner did.

22          MR. PERRY:  If her testimony is not

23  going to rely upon and she's not going

24  to give answers with respect to what she

25  learned from counsel, that's fine.

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 141 of 198

Page 141

C. Dondzila

1   

2          MR. LIPPS:  That's right.  And she

3      said --

4          MR. PERRY:  If she's being prepped

5      and part of the way that you're

6      preparing her is telling her these are

7      the facts and these are not the facts,

8      and she's going to testify on behalf of

9      the business, I'm entitled to examine

10     her on these subjects.

11         MR. LIPPS:  I understand that.  But

12     the way you've asked the question I

13     think gets you inside of the discussion

14     with counsel.  She's already said she

15     didn't review the examiner report, so I

16     don't know what more you need on it.

17     Q.   Do the debtors have a view about

18 whether they have strong claims against Ally

19 with respect to the Brokering Consumer Loans

20 Project?

21         MS. WU:  Objection.

22         MR. O'NEILL:  Objection.

23         MR. LIPPS:  Objection.

24         MR. PERRY:  What's the nature of

25     the objection?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila    Pg 142 of 198

Page 142

1         C. Dondzila

2     MR. O'NEILL:  I say it's work

3  product.

4     MR. LIPPS:  Yeah, it is asking for

5  a legal conclusion.

6     MR. PERRY:  I'm asking for the

7  debtor's view.

8     MR. LIPPS:  On what?

9     MR. O'NEILL:  They have strong

10  legal claims?

11     MR. PERRY:  Yeah.

12     MR. LIPPS:  No, no.

13     MR. PERRY:  So you're not going to

14  permit the company to answer the

15  question about whether it has strong

16  legal claims?

17     MR. LIPPS:  The company will answer

18  questions about the brokering project

19  and the investigations that followed on

20  from that, but they're not -- the

21  company's not going to answer whether it

22  believes it has legal claims or not

23  legal claims.

24     MR. O'NEILL:  She's a 30(b)(6) on

25  negotiations undertaken through the

Page 143

C. Dondzila

1

2    Brokering Consumer Loans Project.

3    That's it.  Not on claims the company

4    might think it has.

5              MR. PERRY:  Okay.

6         Q.   Did you participate personally in the

7    negotiations undertaken through the Brokering

8    Consumer Loans Project?

9         A.   I did not participate directly in the

10   negotiations, no.

11        Q.   Who participated in those

12   negotiations?

13             MR. O'NEILL:  Objection.

14             MR. PERRY:  What's the nature of

15   the objection?

16             MR. O'NEILL:  It's unclear.  You're

17   asking her about your 30(b)(6) topic,

18   not something she necessarily

19   understands.  You phrased the --

20             MR. LIPPS:  She can answer, try and

21   answer what you've asked.  I didn't stop

22   her from doing that.

23             MR. PERRY:  I know you didn't, but

24   I was intrigued about the objection.

25             MR. LIPPS:  Yeah, go ahead.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila    Pg 144 of 198

Page 144

1           C. Dondzila

2      A.   Jim Young, as the chief financial

3  officer, would have been involved.  I do not

4  know who would have been involved on the Ally

5  Bank side.

6      Q.   Well, what's your understanding of

7  pre -- let's take pre-2009, what the

8  arrangement was between GMACM and Ally with

9  respect to the Brokering Consumer Loans

10 Project?

11           MR. LIPPS:  Pre-2009?  There wasn't

12      a broker's agreement.

13           MR. PERRY:  Okay.

14           MR. LIPPS:  So I'm not sure I know

15      what you're asking.  But if you know

16      what he's asking, go ahead.

17      Q.   Let's do it this way, Ms. Dondzila.

18 What is your understanding as the corporate

19 representative of the debtors what the

20 Brokering Consumer Loans Project was?

21      A.   There was an initiative at the end of

22 2008 that would change the operational and

23 business interactions between Residential

24 Capital, broadly, including its affiliates, and

25 Ally Bank specifically in connection with the

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 145 of 198

Page 145

1                    C. Dondzila

2  origination of and holding of loans,

3  residential mortgage loans, prior to their sale

4  to the -- into the secondary markets.

5      Q.    Okay.   And prior to the change in the

6  operation and business relationship between the

7  two entities, can you describe the operation

8  and business relationship of the two entities

9  with respect to -- with respect to this

10  particular project?

11      A.    Prior to the implementation of the

12  broker to bank agreement, using that as the

13  nomenclature for the actual form of the

14  agreement, GMAC Mortgage would have been the

15  named originator and would have funded loans in

16  its name, residential mortgage loans.   Some

17  portion of those loans would have been

18  subsequently sold to Ally Bank.   Ally Bank

19  would have held those loans and held them on

20  their balance sheet until such time as they

21  were pooled and sold -- well, sold from Ally

22  Bank back to GMAC Mortgage, who would then pool

23  those loans and sell them into the secondary

24  market.

25      Q.    What was the purpose of the sale of

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 146 of 198

Page 146

1                    C. Dondzila

2   the loans to Ally and then back?

3        A.   Ally provided -- would finance the

4   loans, so by the purchase, they would be

5   holding and financing those loans.

6        Q.   And the loans were pooled and then

7   sold by GMACM?

8        A.   That is correct.

9        Q.   Okay.   And if the value of the loans

10  went down below the amount of funds -- strike

11  that.

12            If the value -- if the loans were not

13  able to be sold for the amount that they were

14  acquired for, the funding that was provided for

15  the loans, who bore that risk of loss prior to

16  2009?

17            MR. LIPPS:   Objection to form, but

18       go ahead.

19       A.   There were separate agreements that

20  existed between the companies, GMAC Mortgage

21  and Ally Bank, one of which was an -- a

22  derivative contract between the two entities

23  that would have resulted economically in GMAC

24  Mortgage bearing the risk of a decline in value

25  of the loan, conversely benefiting from an

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 147 of 198

Page 147

1                            C. Dondzila

2    increase in the value of the loan.

3            Q.    And did that change at any time

4    during 2009?

5            A.    No.   There were no changes to that

6    agreement.   There were no changes to the

7    derivative agreement.

8            Q.    Okay.   Were there changes to any

9    other agreements -- well, let's start this way.

10   What were the varying agreements that

11   memorialized the relationship between GMACM and

12   Ally about this particular subject?

13               MS. WU:   Just to clarify, by

14       "Ally," you mean Ally Bank?

15               MR. PERRY:   Sure.

16               MR. LIPPS:   As it relates to the

17       sale and purchase of loans.

18               MR. PERRY:   Yes.

19           A.    There was a master mortgage loan

20   purchase and sale agreement, there was the

21   derivative that I just referenced.   It would

22   have been by differing people called the held

23   for sale swap or the pipeline swap.   And, once

24   executed, there was the broker agreement.

25   There was also a client agreement I believe is

1                    C. Dondzila

2   how we refer to it in the financial statements.

3           The client agreement governed the

4   sale of loans from -- or the -- I believe the

5   client agreement covered the purchase and sale

6   of loans between the two entities.  The

7   primary, though, in principal agreement that

8   did that was the master mortgage loan purchase

9   and sale agreement.

10      Q.    So broadly speaking, the idea was

11  GMACM would broker loans, Ally Bank would in

12  turn provide the funding for the loans.

13  Correct?

14          MR. LIPPS:  Talking about under the

15      broker agreement?

16          MS. WU:  Object.

17      Q.    Under the broker agreement.

18      A.    Under the broker agreement, Ally Bank

19  would underwrite and would fund in its name the

20  residential mortgage loan, yes.

21      Q.    And after Ally Bank funded in its

22  name the residential mortgage loan, it would

23  sell the loan to GMACM?  Is that right?

24      A.    Yes.

25      Q.    Okay.  And how long would that take

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 149 of 198

Page 149

1              C. Dondzila

2    for the sale to occur?  Did Ally hold the loan

3    on its books for a material amount of time?

4              MR. O'NEILL:  Object to form.

5              MR. LIPPS:  Two different

6        questions.  Which one do you want to

7        answer?

8              MS. WU:  Object to form.

9        Q.   Did Ally hold the loans on its books

10   for a material amount of time?

11              MR. LIPPS:  Ally Bank?

12              MR. PERRY:  Ally Bank.

13              MR. O'NEILL:  Objection.

14              MS. WU:  Objection.

15              MR. LIPPS:  Objection.

16        A.   No.

17        Q.   It would instantaneously sell them

18   back to GMACM; is that correct?

19              MR. LIPPS:  Objection.

20              MS. WU:  Objection.

21        A.   No.

22        Q.   Okay.  How long was it held on Ally

23   Bank's books, the loans?

24        A.   On average, 25 days.

25        Q.   And the loans were then sold back to

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 150 of 198

Page 150

1                    C. Dondzila

2    GMACM; correct?

3         A.    Yes.

4         Q.    And then the loans were pooled by

5    GMACM; is that right?

6         A.    Yes.

7         Q.    And GMACM, after it pooled a number

8    of loans, would ultimately sell them as part of

9    a securitization or some other transaction;

10   right?

11              MR. LIPPS:   Objection to form, but

12        go ahead.

13        A.    In 2009, it would have been pooled

14   and sold through either a Freddie, Fannie, or a

15   Ginnie securitization.   There would have been

16   no private label.

17        Q.    And how long were the loans pooled?

18   How long did it take for the pooling process to

19   occur, on average?

20              MR. LIPPS:   Objection.

21        A.    That part of the process was

22   effectively instantaneous.

23        Q.    And if the loans declined in value

24   for the roughly 25 days that they were held at

25   Ally Bank, who bore the risk of loss under

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 151 of 198

Page 151

1                    C. Dondzila

2    these agreements?   Which entity?

3         A.    GMAC Mortgage.

4         Q.    And conversely, if the loans

5    appreciated in value, is it correct that GMAC

6    Mortgage would be able to recognize the profit

7    on the loans?

8              MR. LIPPS:   Talking about the

9         broker agreement?

10             MR. PERRY:   On the sale of the

11        loan.

12             MR. LIPPS:   Under the broker

13        agreement.

14             MR. PERRY:   Under the broker

15        agreement.

16             MR. LIPPS:   Sale into secondary

17        market; there's a gain.

18             MR. PERRY:   Yes.

19        A.    So you're talking about two different

20   things, but the answer is yes, GMAC Mortgage

21   would benefit from an increase in value from

22   the point a loan was locked to the point that a

23   loan was ultimately resold back to GMAC

24   Mortgage.   And to the extent that there was any

25   gain recognized on the sale of that mortgage

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 152 of 198

Page 152

1                    C. Dondzila

2  into the secondary market through the pooling

3  process, GMAC Mortgage would have been entitled

4  to that gain as well.

5       Q.   Okay.   And under this arrangement,

6  what gain -- what was the profit opportunity

7  for Ally Bank?

8            MR. LIPPS:   Under the broker

9       arrangement?

10           MR. PERRY:   Yes.

11           MR. LIPPS:   Note my objection.

12      Answer if you can.

13      A.   Ally Bank's profit would have been

14 similar to any other underwriter who

15 underwrites and funds mortgage loans.   To the

16 extent there are fees that are collected, to

17 the extent that there are, you know, points

18 collected, to the extent that those are in

19 excess of their costs, those would be the

20 profits that they would have recognized.

21      Q.   Now, in August of 2009, did Ally Bank

22 change the way it recognized the revenue and

23 expenses from this arrangement?

24      A.   No.

25      Q.   Was there a switch to fair value

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 153 of 198

Page 153

1                    C. Dondzila

2      accounting by Ally Bank in August of 2009?

3              MR. LIPPS:  That she's aware of.

4          Q.    That you are aware of?

5              MR. LIPPS:  Because she's not Ally

6      Bank's designated.  Go ahead.

7          A.    Yes, I'm aware that Ally Bank for

8      loans funded after July 31 of 2009 made a fair

9      value election.

10          Q.    And did that affect, Ally Bank's fair

11      value election affect the economics from

12      GMACM's perspective?

13          A.    No.

14          Q.    So as a result of the fair value

15      election, it's your testimony that GMACM did

16      not retain -- receive less profit on the sale

17      of the loans than it otherwise would have?

18              MR. LIPPS:  Objection to form, but

19      go ahead.

20              MS. WU:  Objection to form.

21          A.    There was no impact from the fair

22      value election on the value of the loans.

23          Q.    Did Ally do anything in August of

24      2009 that led to GMACM receiving less profit on

25      the sale of the loans in connection with the

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 154 of 198

Page 154

1                        C. Dondzila

2    brokering arrangement?

3              MS. WU:   Objection to form.

4              MR. LIPPS:   Same objection.

5         A.    To my knowledge, Ally, in this case,

6    Bank, did not do anything to affect the

7    profitability recorded.

8         Q.    Now, did there come a time where Ally

9    required GMACM to reimburse Ally for revenues

10   that had been recognized in the first half of

11   2009?

12        A.    There was a reimbursement from GMAC

13   Mortgage to Ally Bank that related to that

14   period that was the result of an error in the

15   implementation of changes to the accounting

16   process.

17        Q.    And can you describe the error in

18   implementation of changes to the accounting

19   process?

20        A.    The profiles that were established,

21   which profiles direct the systems to put debits

22   and credits -- and debits and credits meaning

23   revenues and expenses -- and to record those in

24   the financial records of the company, there was

25   one item that continued to post and shouldn't

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 155 of 198

Page 155

1                    C. Dondzila

2  have, and that increased the revenues or

3  decreased the expenses, whichever way you want

4  to think about it, of GMAC Mortgage.   And that

5  was at the detriment of Ally Bank.

6       Q.    What was the item that continued to

7  post and shouldn't have?

8       A.    It was a line, I think the name of

9  the line on the ledger was a FAS 91 was the

10  descriptor.   It included some reference to FAS

11  91.

12       Q.    And do you have any knowledge of the

13  size of the purported error?

14       A.    The error that was identified and

15  reimbursed was approximately $48 million.   I

16  don't know if that includes the lost interest

17  or not, but it was in or around $48 million.

18       Q.    How was the error identified?

19       A.    In late 2011, a member of the Ally

20  Bank organization raised concerns about

21  recordation and recognition of revenue in the

22  context of this arrangement between Ally Bank

23  and GMAC Mortgage/ResCap.   That concern led to

24  a much more significant analysis on the part of

25  the finance team, finance and accounting team

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 156 of 198

Page 156

1                        C. Dondzila

2      at GMAC Mortgage, and included some members of

3      the Ally Bank accounting team.

4              That analysis was -- continued all

5      the way through to, I believe, the end of

6      February, early beginning of March, at which

7      point, after a fairly comprehensive review of

8      underlying documents, discussions with other

9      parties throughout the organization who were

10     part of the accounting or part of other parts

11     of the business process, that -- and also a

12     review of the governing legal documents,

13     including with outside counsel, we concluded

14     that there had been an error.

15             That information was summarized, was

16     shared with -- in my part, I'm aware was shared

17     with the audit committee at ResCap, and the

18     correction was made and the settlement was, I

19     believe, executed in March of 2012.

20         Q.    That's two months before the

21     bankruptcy; right?

22         A.    Yes, that is correct.

23         Q.    Okay.   And the individual that raised

24     the concern was Adam Glassner; is that correct?

25         A.    That is my understanding, yes.

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 157 of 198

Page 157

1          C. Dondzila

2     Q.    Did Mr. Glassner leave the company

3 thereafter?

4          MR. LIPPS:   By the company, you

5     mean Ally Bank?

6          MR. PERRY:   Ally Bank.

7     A.    I believe Mr. Glassner left Ally Bank

8 at the end of January of 2012 or the early part

9 of February 2012.

10     Q.    Do you know if he left as a result of

11 his concerns about this particular issue?

12     A.    I am not privy to that information,

13 as he was an -- an Ally Bank employee.

14     Q.    Now, KPMG was retained to perform an

15 investigation; right?

16          MR. LIPPS:   Retained by?  Are you

17     asking her whether she did it?

18     Q.    Do you know whether KPMG was retained

19 to perform an investigation?

20     A.    The head of internal audit, Ann

21 Cummings, an Ally Financial employee to my

22 knowledge, in partnership with the head of

23 global security of Ally Financial, did engage

24 KPMG to perform an investigation under their

25 collective direction.

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 158 of 198

Page 158

1                      C. Dondzila

2          Q.    So Ally retained KPMG to perform the

3    investigation; correct?

4          A.    That is correct.

5          Q.    Did ResCap or GMACM retain their own

6    advisors to perform an investigation on behalf

7    of GMACM?

8          A.    We did not.

9          Q.    Why not?

10         A.    Ally Financial, in terms of internal

11   audit and in terms of global security, provided

12   services to ResCap in those capacities, and we

13   leveraged the work of those experts jointly.

14         Q.    Did you understand the experts to

15   represent GMACM as well as Ally Financial?

16         A.    I did not understand that directly.

17         Q.    Did GMACM rely on the work of KPMG in

18   connection with their decision to -- well,

19   strike that.

20               How was the alleged accounting error

21   dealt with on GMACM's books?

22         A.    We reopened the -- well, they weren't

23   closed officially, but we recorded the loss

24   that -- the amount of the error that we had

25   calculated as an expense or loss in the income

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 159 of 198

Page 159

1           C. Dondzila

2   statement of GMAC Mortgage for the fiscal year

3   ended December 31, 2011.

4       Q.   Why wasn't it dealt with by just a

5   straight cash settlement?

6       A.   Debits have to equal credits, so

7   we -- if you -- I can make a cash settlement,

8   which would credit cash, but I have to have a

9   debit, and so my debit was that I had a loss,

10  which that was my earnings were overstated in a

11  prior period, so I had to recognize that loss.

12      Q.   Okay.  Was there any -- was there any

13  cash paid by GMACM in connection with the

14  settlement?

15      A.   That, I do not recall.

16      Q.   Do you know -- can you describe what

17  it was about the accounting practices between

18  the beginning of 2009 and later in 2009 --

19  well, strike that.

20           The -- were the accounting practices

21  with respect to the line item that you

22  discussed earlier in your testimony consistent

23  throughout 2009?

24      A.   No.

25      Q.   When were they changed?

Page 160

1                    C. Dondzila

2        A.    On or about the fair value election.

3        Q.    And when did the fair value election

4    occur?

5        A.    All loans funded subsequent to

6    January -- or July 31, 2009.

7        Q.    Okay.   And at the time of the fair

8    value election, why did no one go back to the

9    beginning of the year and change the accounting

10   treatment that ultimately was changed at the

11   time of the fair value election?

12       A.    It was a control issue and should

13   have been something that we would have picked

14   up, hence the designation as an error.

15       Q.    And Mr. Glassner's concern was not

16   the pre-July 31, 2009 error.   Mr. Glassner had

17   a concern that the post-July 31, 2009 change

18   was, in fact, detrimental to GMACM; right?

19           MR. LIPPS:   Objection to the

20       characterization, but go ahead.

21           MS. WU:   Objection.   Same

22       objection.

23       A.    I never spoke directly with

24   Mr. Glassner, and I don't know him to have

25   time-banded it to a period of post-August 1 or

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 161 of 198

Page 161

1          C. Dondzila

2    any other period.  I was aware that he raised

3    concerns that ResCap was entitled to more

4    revenue than they had been recognizing.

5         Q.    Okay.

6         A.    The period, I am not certain that he

7    made that clear.

8         Q.    And what did you understand

9    Mr. Glassner's concerns to be, particularly

10   about why ResCap was entitled to more revenue

11   than they were getting?

12        A.    Again, I never spoke directly with

13   Mr. Glassner.  I was just aware that he had

14   spoken to members of the leadership team and

15   that his concern was that ResCap was entitled

16   to more of the revenue than they were

17   receiving.  I had subsequently understood it to

18   be something to do with the revenue recognition

19   around what people internally started calling

20   premium pricing, but points, premium pricing,

21   etc.

22        Q.    And do you understand what

23   Mr. Glassner's position was about how points or

24   premium pricing ought to be recognized as

25   between Ally Bank and GMACM?

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 162 of 198

Page 162

1                    C. Dondzila

2        A.    We explored all the facets once the

3    issue was raised.    We were not limiting

4    ourselves to one direction or another.    We I

5    believe fairly comprehensively explored all

6    aspects of the relationship for the entire time

7    period covered.    So that included a

8    consideration of whether more revenue --

9    whether the revenue splits should have been in

10    a different direction, but we did review both

11    sides.

12        Q.    And when you say "we," who was it who

13    reviewed both sides?

14        A.    We had a fairly extensive team

15    internally within ResCap and certain

16    representatives from Ally Bank as well.

17    Myself, Jim Whitlinger, Nikki Rock, Ryan

18    McKendrick, Colleen Cowley.    We probably

19    brought in, you know, subject matter experts

20    from a variety of different parts of the

21    finance and accounting department.    Joe Cortese

22    was contributing and participating as the

23    controller at the time of Ally Bank.

24        Q.    Did Mr. Cortese attend all of the

25    meetings that you had on this subject?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 163 of 198

Page 163

1                    C. Dondzila

2            MS. WU:   Objection to form.

3        A.   I don't know that he attended every

4    meeting.

5        Q.   Did he attend most of the meetings on

6    this subject?

7        A.   Again, he was involved.  I don't know

8    if it was most, if it was some, or if it was --

9    I know it wasn't all.

10       Q.   It was between you and Mr. -- did

11   Mr. Cortese take the lead from the Ally Bank

12   side on the investigation?

13           MS. WU:   Objection to form.

14       A.   Yes, my understanding is that Joe

15   Cortese was -- in terms of the work that we

16   were doing prior to the investigation that was

17   undertaken by internal audit and global

18   security, that Joe Cortese was participating on

19   behalf of Ally Bank and was reporting to his

20   leadership team.

21       Q.   How many people were involved on the

22   Ally Bank side of the investigation?

23       A.   Well, so the investigation that

24   internal audit and global security performed,

25   there were more people because they conducted

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 164 of 198

Page 164

1                    C. Dondzila

2    interviews.  I would say that we probably had

3    working with our group, which predated that, it

4    would have been Joe Cortese, and then again as

5    there were subject matter experts that were

6    part of the original working group or otherwise

7    had knowledge, I'd say it was probably three or

8    four other people from the bank that would have

9    participated in some capacity.

10        Q.    About how long did -- prior to the

11   internal audit, global security investigation,

12   how long did the review that Mr. Cortese and

13   others did take?

14        A.    We started in the middle of December.

15   I recall that the issue was first brought to my

16   attention, you know, sort of the middle of

17   December of 2011.  And I believe that internal

18   audit was brought into the process in late

19   January of 2012.

20        Q.    Did ResCap have an internal audit

21   staff, its own internal audit staff?

22        A.    We did not.

23        Q.    Were ResCap's auditors at Deloitte &

24   Touche advised of the issue?

25        A.    Absolutely.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 165 of 198

Page 165

1             C. Dondzila

2        Q.    When were they advised?

3        A.    I would expect it would have come up

4   in January.  I can't be certain of the exact

5   date, but it would have come up in January of

6   2012.

7        Q.    Who were Ally's outside auditors?

8        A.    Deloitte & Touche.

9        Q.    And did you advise Deloitte & Touche

10  of the issue or did Mr. Cortese or somebody

11  else from Ally?

12        MS. WU:  You mean the bank?

13        MR. PERRY:  Sure.

14        A.    So I would have only dialogued with

15  Deloitte & Touche in the context of ResCap.

16  However, we would have obviously disclosed that

17  it was a matter that we were exploring that

18  related to a contract or an arrangement that we

19  had with Ally Bank.  And the same -- I believe

20  we at that point in time had the same partner

21  on our engagements, so they would have been

22  aware even though I was not representing Ally

23  Bank.

24        Q.    Did the FTI firm become involved in

25  the issue at all?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 166 of 198

Page 166

                        C. Dondzila

1

2        A.   I don't recall FTI being involved in

3  this one.

4        Q.   Did ResCap retain outside counsel in

5  connection with this issue?

6        A.   We did not uniquely retain outside

7  counsel for this issue in and of itself, no.

8        Q.   What do you mean by that answer?

9        A.   We used counsel that were -- we were

10 already working with.

11       Q.   Okay.  Was that restructuring

12 counsel?

13       A.   It was.

14       Q.   Was that Morrison & Foerster?

15       A.   Morrison & Foerster.

16       Q.   Did Ally Bank retain outside counsel

17 in connection with this issue?

18       A.   I don't know the answer to that

19 question.

20       (Dondzila Exhibit No. 16 was marked for

21       identification.)

22 BY MR. PERRY:

23       Q.    Before you is Dondzila Deposition

24 Exhibit Number 16.  Can you identify this

25 document?

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 167 of 198

Page 167

1                      C. Dondzila

2          A.    Yes, I can.

3          Q.    What is the document?

4          A.    This is the materiality analysis

5    under the Professional Guidelines SAP 99 and

6    108 related to the determination of the

7    significance of the error to previously issued

8    and currently to-be issued financial

9    statements.

10         Q.    Who drafted the memo?

11         A.    I did, sir.

12         Q.    Did you review any memos prepared by

13   Mr. Cortese with respect to this subject?

14              MR. LIPPS:  By "this subject," you

15         mean her materiality analysis?

16              MR. PERRY:  Yeah.

17         A.    I don't recall reviewing the Ally

18   Bank materiality memo, but I would not be

19   surprised if I had been provided a copy.  But I

20   don't recall reviewing it.

21         Q.    Did you cut and paste any pieces of

22   the Ally Bank materiality analysis?

23         A.    I did not.

24         Q.    Do you know whether -- well, let's do

25   number 7.

Page 168

1              C. Dondzila

2         (Dondzila Exhibit No. 17 was marked for

3         identification.)

4    BY MR. PERRY:

5         Q.    Before you is Dondzila Deposition

6    Exhibit 17.  Can you identify this document?

7         A.    It's a memo from Joe Cortese, the

8    Ally Bank chief accounting officer, to the Ally

9    Bank 2011 financial statement files.  And it --

10   the subject line being there "Materiality

11   analysis under professional standards SAP 99

12   and 108 in regards to the error."

13        Q.    And you'll see his subject line is

14   the exact same subject line as your subject

15   line; correct?

16        A.    Correct.

17             MR. LIPPS:  Objection.  The

18   document speaks for itself.

19        Q.    Did you review Mr. Cortese's memo

20   before it was finalized?

21             MR. LIPPS:  Objection, asked and

22   answered.  Go ahead.

23        A.    I would have no reason to have

24   reviewed his document, but could have received

25   it, but would have had no reason to have seen

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 169 of 198

Page 169

1                    C. Dondzila

2   this.

3        Q.   Did Mr. -- did you provide

4   Mr. Cortese with a copy of your memo prior to

5   finalizing?

6        A.   I do not recall it -- if I provided

7   it to Joe.

8        Q.   Do you recall Mr. Cortese reviewing

9   and commenting on your memo, Dondzila

10  Exhibit 16?

11       A.   I do not.

12       Q.   Who else reviewed Dondzila Exhibit 16

13  before it was finalized?

14       A.   I would have shared it with Jim

15  Whitlinger, chief financial officer at the

16  time.  Barb Westman in all likelihood also

17  participated in -- and had an opportunity to

18  review and comment on the memo.  It ultimately

19  was obviously provided to members of the audit

20  committee and other executive team members.

21       Q.   Did Mr. Cortese -- well, strike that.

22            Was this memo, Dondzila Exhibit 16,

23  provided to the audit committee?

24       A.   Yes.

25            MR. LIPPS:   Objection, asked and

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 170 of 198

Page 170

1                    C. Dondzila

2        answered.

3                THE WITNESS:  Sorry.

4        A.    Yes.

5        Q.    Do you know whether Mr. Cortese's

6    email, memorandum, was provided to the ResCap

7    audit committee?

8        A.    Joe Cortese's memo in regards to

9    materiality of Ally Bank would not have been

10   provided to the ResCap audit committee.

11       (Dondzila Exhibit No. 18 was marked for

12       identification.)

13   BY MR. PERRY:

14       Q.    Before you is Dondzila Deposition

15   Exhibit 19 [sic].  Can you identify the

16   document?

17       A.    I know this to be 18.

18            MR. PERRY:  Is it 18 or 19?

19            THE REPORTER:  It's 18, sir.

20       A.    These were materials that were

21   distributed to the members of the Residential

22   Capital LLC audit committee in connection with

23   a meeting on Tuesday, March 20, 2012.

24       Q.    Do you recall -- it says here the

25   meeting occurred at 7:30 a.m.  Is that

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 171 of 198

Page 171

1                           C. Dondzila

2    accurate, to the best of your recollection?

3         A.    To the best of my knowledge, that's

4    the time the meeting was held.

5         Q.    Was that a telephonic meeting?

6         A.    It was.

7         Q.    Where were you during the meeting?

8         A.    I don't recall where I was.

9         Q.    Did you take the call with other

10   members of your staff or your colleagues?

11        A.    I don't recall.

12        Q.    Were any representatives of Ally Bank

13   present at the meeting?

14        A.    No.

15        Q.    Did any representative of Ally Bank

16   receive any of these materials distributed to

17   the ResCap audit committee prior to the

18   distribution?

19        A.    The report of Ann Cummings and global

20   security would in all likelihood have been

21   distributed to Ally Bank, and that is a

22   component of the materials included.

23              There is an -- and that would include

24   various appendices that are attached to that

25   report, and also summaries of the global

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 172 of 198

Page 172

1                    C. Dondzila

2    security investigation report.  They could have

3    received copies of those.  I'm not privy to

4    whether they did or not, but those are not --

5    it would not surprise me if they had received

6    that information.

7         Q.   Your memorandum was supplied to the

8    audit committee; correct?

9         A.   It was.

10             MR. LIPPS:  Objection, asked and

11        answered.

12        Q.   And that's reflected at RC40022125;

13   correct?

14             MR. LIPPS:  It's the first page of

15        it.

16        A.   Correct.  The first page of the memo

17   is at that Bates number, correct.

18        Q.   If you go to the conclusion on the

19   last page, it says we -- the very last in

20   brackets, "We shared this memo with external

21   auditors who have concurred with the

22   conclusion.  We also shared the results of this

23   analysis with the audit committee on March" --

24   and then it's got an open date, "prior to

25   March," then it's got another open date,

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 173 of 198

Page 173

1                          C. Dondzila

2    "filing of the December 31, 2011 ResCap and

3    GMAC Mortgage annual financial statements."  Do

4    you see that?

5          A.    I do.

6          Q.    Was the memo updated at some point

7    after the meeting to reflect the fact that the

8    meeting had occurred?

9          A.    That would be consistent with my

10   expectation, yes.

11         Q.    Now, we looked at Dondzila Exhibit 16

12   previously.  It's dated March 10.  Do you know

13   whether Dondzila Exhibit 16 was edited in

14   advance of the audit committee meeting?

15         A.    I don't know.  It's possible.

16         Q.    Just to -- well, you'd agree with me

17   that Dondzila Exhibit 16 is a 12-page document,

18   whereas the copy of the memorandum provided to

19   the audit committee is a 13-page document;

20   right?

21              MR. LIPPS:   Objection.   The

22              document speaks for itself, but you can

23              make the comparison.

24         A.    Yes, that's correct.

25         Q.    In the intervening ten days between

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 174 of 198

Page 174

1                    C. Dondzila

2   your initial memoranda at Dondzila Exhibit 16

3   and the memorandum provided to the audit

4   committee, do you recall changes being

5   suggested by Ally Bank personnel?

6        A.    No.

7        Q.    Do you recall sharing Dondzila

8   Exhibit 16 with Ally Bank personnel?

9             MS. WU:  Objection.

10            MR. LIPPS:  Objection, asked and

11      answered.  Go ahead.

12            MS. WU:  Same.  Same objection.

13       A.    I don't recall, but could have.

14       Q.    And go back to the audit committee

15  meeting.  About how long did it last?

16            MR. LIPPS:  On the 20th?

17            MR. PERRY:  On the 20th.

18       A.    I don't recall that it went over the

19  scheduled hour.

20       Q.    And who spoke at the meeting?

21       A.    As I recall, Ann Cummings -- we'd

22  need to consult the minutes, but the chairman

23  of the audit committee would have called it to

24  order, Pam West, and Ann Cummings, along with

25  potentially could have been introduced by

1               C. Dondzila

2    Mr. Solomon, but Ann Cummings and the global

3    security representatives would have presented

4    their report, and upon completion of the audit

5    committee members' review of those materials

6    and any questions or answers for Ann, it would

7    have been handed over to me and I would have

8    been responsible for presenting the materiality

9    analysis.

10           Mr. Tom Robinson and Carol Larson,

11   who was the lead partner on the Ally Financial

12   audit, and the sort of relationship partner,

13   could have also been called upon to speak about

14   their conclusions, concurrence or otherwise,

15   with management's conclusion in this regard.

16   But we'd have to look at the minutes for

17   certainty.

18           MR. PERRY:  Why don't we -- I'm

19       getting a note on the tape so why don't

20       we give him a chance to change the tape,

21       and if you want to take a break.

22           THE VIDEOGRAPHER:  The time is

23       3:41.  We're off the record.

24       (Recess taken.)

25           THE VIDEOGRAPHER:  The time is

Page 176

1              C. Dondzila

2        3:48.  We're on the record.

3    BY MR. PERRY:

4        Q.    Who is Ann Cummings?

5        A.    Ann Cummings was the head of internal

6    audit for Ally Financial, Inc. at the time of

7    this investigation.

8        Q.    And who is Carol Larson?

9        A.    Carol Larson is the relationship and

10   lead partner from Deloitte & Touche for the

11   Ally Financial services that Deloitte provides.

12       Q.    Who is the audit partner at this

13   point in time for Residential Capital LLC?

14       A.    Tom Robinson.

15       Q.    Did Mr. Robinson provide any audit

16   services for Ally Bank as far as you know?

17       A.    I believe that Mr. Robinson did, in

18   fact, provide audit services to Ally Bank at

19   the time.

20       Q.    Was anybody from the Morrison

21   Foerster firm at the meeting?

22            MR. LIPPS:  By the meeting, you

23   mean the March 20 audit committee

24   meeting?

25            MR. PERRY:  Yeah.

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 177 of 198

Page 177

1                     C. Dondzila

2        Q.    Was anybody from the Morrison

3    Foerster firm at the March 20, 2012 audit

4    committee meeting?

5        A.    No, I don't believe any of the

6    attendees were from Morrison & Foerster.

7        Q.    And who did most of the talking at

8    the meeting?

9              MR. LIPPS:    I think that's been

10    asked and answered, but go ahead.    So

11    I'll note my objection.

12        A.    I don't know exactly how to split the

13    time, but I would guess that both Ann Cummings

14    on behalf of the work performed by herself and

15    global security, and in terms of presenting the

16    information from the experts that they hired,

17    KPMG, she and I would have probably shared

18    the -- done the lion's share of the talking at

19    the meeting.

20        Q.    Was anybody from KPMG actually at the

21    meeting?

22        A.    As I recall, there was at least one

23    representative on the phone from KPMG.

24        Q.    Is that -- did that person talk at

25    all?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 178 of 198

Page 178

1                    C. Dondzila

2        A.    I don't recall if he spoke.

3        Q.    Was that person identified on the

4   distribution here?

5        A.    No, I do not believe, no.

6        Q.    Did members of the audit committee

7   ask any questions during the meeting?

8        A.    Yes.

9        Q.    Who asked questions?

10       A.    We have a very active audit

11  committee, so I would not be surprised to have

12  gotten a number of questions from the chairman

13  of the audit committee, Pam West, and Ted

14  Smith.  I do not recall if Mr. Ilany or

15  Mr. Mack had any specific questions that they

16  asked.

17       Q.    Did anybody from the audit

18  committee -- well, strike that.

19            Was there any discussion at the audit

20  committee meeting about whether the accounting

21  treatment that was changed in August of 2009,

22  whether ResCap approved that change?

23            MR. LIPPS:  Objection to form.

24            MS. WU:  Same objection.

25       A.    What accounting change in 2009?

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 179 of 198

Page 179

1                        C. Dondzila

2        Q.      Well, as I understand your testimony,

3    when there was a change to fair value

4    accounting, that resulted in the accounting for

5    the brokered consumer loans being changed in a

6    way that affected the accounting and the

7    revenue recognized going forward.   Is that

8    fair?

9        A.     I wouldn't characterize it as an

10   accounting change.   I would characterize it as

11   an error in the underlying accounting process,

12   but it wasn't an accounting change.

13       Q.     Okay.   So it was an error that was

14   corrected in August of 2009?

15       A.     No, it's an error that was identified

16   in 2012 and corrected in 2011 financial

17   statements.

18       Q.     Okay.   But here's my question.   So in

19   August of 2009, something changed; right?

20           MR. LIPPS:   Objection, asked and

21   answered, but go ahead.

22           MS. WU:   Same objection.

23       A.     In August in 2009, yes, there was a

24   change to the operational accounting process as

25   a result of the fair value election.

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 180 of 198

Page 180

1                    C. Dondzila

2        Q.    And the change in the operational

3   accounting process, at least in your view,

4   corrected the error in the accounting process

5   at least up to July 31, 2009; right?

6        A.    So the answer is yes, but the error

7   actually persisted past August 1 of 2009

8   because it related to loans that were brokered

9   to the bank, and the error would manifest

10  itself when they were finally sold.

11          So as loans that were brokered to the

12  bank all the way up through July 31, those

13  loans -- we had losses that we incurred, or we

14  had -- the error manifested itself and

15  continued to manifest itself through the end of

16  2009 because it was more attached to the timing

17  of when the loans were funded and then sold.

18          So there was no issue with loans that

19  were funded after July 31 of 2009.

20        Q.    I think I understand.   And so when

21  you say that the error persisted past August 1,

22  2009, it persisted at least as it respected

23  loans brokered prior to August 1, 2009, but not

24  sold until after August 1, 2009; right?

25        A.    That is correct.

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 181 of 198

Page 181

1                       C. Dondzila

2          Q.    Okay.    And there was a change in the

3    operational accounting process which resulted

4    in loans brokered after August 1, 2009, not

5    having this error; correct?

6          A.    That is correct.

7          Q.    And so that I understand it, what was

8    the nature of the error that existed prior to

9    August 1, 2009?

10              MR. LIPPS:    On loans brokered prior

11        to?

12              MR. PERRY:    On loans brokered prior

13        to that date.

14              MR. LIPPS:    Just note my objection.

15        It's been asked and answered.    But go

16        ahead.

17        A.    There was a component of the

18    transaction that was included in the

19    recordation of those loans into the financial

20    records that carried a title that included in

21    some way, shape, or form, may not have solely

22    said this, but said FAS 91.    And for loans that

23    were brokered prior to July 31 or prior to

24    August 1 of 2009, that amount resulted in an

25    understatement of revenue for Ally Bank and an

1                    C. Dondzila

2   overstatement of revenue for GMAC Mortgage.

3   For loans originated after August -- after

4   July 31 of 2009, because there are no FAS 91

5   deferrals, the operational team removed that

6   line from the profiles in the accounting

7   recordation and it was no longer distorting the

8   revenue split between the two entities.

9        Q.    When you say distorting the revenue

10  split, so just focusing pre-August 1, 2009,

11  what was the revenue split that resulted from

12  the FAS 91 deferral being applied?

13       A.    Again, that was the approximately 47

14  or $48 million that we -- again I'm not sure if

15  that does or doesn't have the interest number

16  in it, but it was in that range.

17       Q.    And is there a way to break it out on

18  a particular loan-by-loan basis what aspect of

19  the loan was being -- resulted in revenue to

20  GMACM that changed after August 1, 2009?

21            MR. LIPPS:   Objection to form.

22       A.    If you look at the loan examples for

23  the respective periods, yes, you would be able

24  to identify what I'm describing.

25       Q.    Okay.  Do you recall as you sit here

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 183 of 198

Page 183

1                       C. Dondzila

2        today what the particular items were that

3        changed after August 1, 2009?

4              MR. LIPPS:  Objection, asked and

5        answered.  Go ahead.

6        A.   Again, it was -- I don't remember the

7        individual components of what was going to that

8        line that I just described that had the name in

9        whole or in part FAS 91.  But it's that amount.

10       Q.   Okay.  Now, did -- at the time the

11       change occurred and FAS 91 deferrals were no

12       longer applied, was there any GMACM employee

13       that either agreed or disagreed with that

14       change?

15       A.   We understood -- we, myself and my

16       team -- building the accounting that we did

17       because we, actually, GMAC Mortgage, did a fair

18       amount of the accounting, operational

19       accounting on behalf of Ally Bank, and we

20       understood that FAS 91 deferrals were no longer

21       appropriate in a fair value election schema,

22       accounting scheme.

23       Q.   And when did you come, you or your

24       team come to that understanding?

25       A.   As we were working through the

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 184 of 198

Page 184

1                        C. Dondzila

2    implementation to make that change on behalf of

3    the bank.

4          Q.    So this was in 2009?

5          A.    This would have been in 2009, yes.

6          Q.    Okay.    And did you discuss the

7    deferral -- this change in accounting treatment

8    with anybody that you reported to?

9          A.    Jim Young was aware at the same time

10   that Ally Bank made the election, Residential

11   Capital/GMAC Mortgage made the same election,

12   and so Jim Young as the chief financial officer

13   at the time would have been aware and would

14   have been required to approve us making the

15   fair value option election on behalf of GMAC

16   Mortgage and Residential Capital.

17         Q.    Well, did you have a conversation

18   with Jim Young where you said, look, in words

19   or in substance, making the fair value election

20   will result in less revenue to GMACM because of

21   the FAS 91 deferral issue?

22         A.    The fair value election did not

23   create or change the revenue distribution

24   between the two entities.    Implementing the

25   change that we needed to make for the fair

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 185 of 198

Page 185

1                    C. Dondzila

2   value election, unbeknownst to us, corrected an

3   error that we had that should have been made in

4   the broker to bank implementation.

5        Q.   Okay.   It's the unbeknownst part to

6   us that I'm focused on.   At some point, there's

7   a change to fair value accounting, and that

8   corrects what you've described is an error that

9   was previously extant for loans brokered prior

10  to August 1, 2009.

11            And my question is:   When did it

12  become known to you that the error had been

13  corrected in August 1, 2009?

14            MR. O'NEILL:   Objection,

15       mischaracterizes the witness's

16       testimony.

17            MR. LIPPS:   Same objection.

18            MS. WU:   Same objection.

19            MR. LIPPS:   Go ahead.

20       A.   That would have become known in

21  February of 2012.

22       Q.   Now, did the audit committee consider

23  taking the position, at least at the meeting

24  you were involved at -- involved with, taking

25  the position that the $47 million was not

Plaintiff's
Objection
185:5-187:16
Beyond the
scope of
affirmative
testimony

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 186 of 198

Page 186

1                        C. Dondzila

2    payable to Ally Bank?

3                   MR. LIPPS:   You know there was more

4       than one meeting, so I -- do you want it

5       just to be confined to one meeting or

6       the meetings that the audit committee

7       had?

8       Q.   Well, let me ask you this:   How many

9    audit committee meetings were you at concerning

10   this particular issue?

11      A.   I attended all audit committee

12   meetings unless I had a conflict, so I was an

13   expected attendee at every audit committee

14   meeting.

15      Q.   And how many audit committee meetings

16   do you recall the brokering agreement FAS 91

17   deferral issue being discussed?

18      A.   At least a handful.

19      Q.   Okay.   Was the meeting that occurred

20   on March 20, 2012 the final meeting on this

21   particular issue?

22      A.   I believe the answer to that is yes.

23      Q.   Okay.   And in -- during the March 20,

24   2012 audit committee meeting, do you recall any

25   discussion of GMACM taking the position that

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 187 of 198

Page 187

1                    C. Dondzila

2    the $47 million payment was not due, or the

3    $47 million correction was not appropriately

4    due to Ally Bank?

5         A.   Not at this meeting.  I don't recall

6    that being a topic of conversation.

7         Q.   Okay.  Do you recall GMACM -- do you

8    recall the topic of GMACM taking the position

9    that the $47 million payment was not due to

10   Ally Bank being the subject of conversation at

11   any other audit committee meeting that you

12   attended?

13        A.   I don't recall it coming up

14   explicitly in an audit committee meeting.  I

15   don't recall it being an explicit topic that we

16   discussed.

17        Q.   And with respect to the March 20,

18   2012 meeting, was there any discussion about

19   whether Residential Capital LLC had

20   sufficient -- or GMACM had sufficient solvency

21   to make the $47 million payment to correct the

22   FAS 91 deferral issue?

23             MR. LIPPS:  Objection to form,

24   assumes facts not in evidence.  Go

25   ahead.

1                    C. Dondzila

2          A.    As I recall, Residential Capital was

3    already in violation of its net worth

4    requirements at that point.   This would have

5    obviously made that situation -- would have

6    compounded that situation, but as I recall, we

7    were already below our requirement.   And there

8    could have been conversation about the fact

9    that this would put us below our required

10   threshold or would keep us below that.

11         Q.    Do you recall one way or another?

12         MR. LIPPS:   That discussion, or --

13         MR. PERRY:   Yeah, that discussion

14   at an audit committee meeting.

15         A.    I do recall discussing whether, at

16   this or potentially a previous, the -- a

17   previous meeting the applicability, if any, of

18   the outstanding commitment that Ally Financial

19   had made in connection with the December 2009

20   financial statements in terms of capital

21   support and what impact, if any, that would

22   have on our presentation or our materiality

23   analysis in the context of a prior period

24   error, meaning would we need to restate the

25   2009 financial statements, and what standing,

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 189 of 198

Page 189

1                          C. Dondzila

2   if any, would the agreement that Ally had had

3   at that point in time to support the net worth

4   of ResCap have on that analysis.   So I do

5   recall discussing that with the audit

6   committee.   I do not know which meeting it was

7   at.

8          Q.    So, just big picture, was Ally Bank a

9   lender to ResCap in any of these liquidity

10  facilities?

11         A.    Ally Bank was not a lender to ResCap,

12  it was a counterparty to various contracts but

13  was not a lender to ResCap.

14         Q.    Was there any concern either at the

15  March 20, 2012 audit committee meeting, or any

16  other meeting, that here you have a -- an

17  entity that's providing substantial credit

18  support to ResCap; right?   And they're

19  demanding a $47 million payment in March of

20  2012, when the entity is obviously in a lot of

21  financial distress, was that subject generally

22  discussed at any of the audit committee

23  meetings?

24              MR. LIPPS:   Objection to form.

25              MS. WU:   Same objection.

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 190 of 198

Page 190

1                    C. Dondzila

2              MR. LIPPS:    Compound.

3          A.    I'm not -- there were no

4      conversations that I would characterize

5      consistent with the way you described it that

6      occurred in any audit committee meetings I

7      attended.

8          Q.    Was there a concern that if ResCap

9      took a different view with respect to the

10     $47 million payment or settlement, that Ally

11     could or would take action with respect to any

12     of the liquidity facilities that it had

13     provided to ResCap?

14              MS. WU:    Talking about Ally Bank or

15          Ally Financial?    Because they're two

16          separate entities.

17              MR. PERRY:    Either Ally Bank or

18          Ally Financial.

19              MR. LIPPS:    Objection to form.

20              MS. WU:    Same objection.

21          A.    My involvement with the matter was to

22     determine what had happened and to participate

23     with the rest of management in concluding what

24     the answer was.    I was not party to any

25     conversations such as you're suggesting

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 191 of 198

Page 191

1                    C. Dondzila

2    about -- that there could be adverse

3    consequences to reaching a conclusion that was

4    different than what we ultimately reached.

5              MR. PERRY:  Give me 5 minutes.

6              THE VIDEOGRAPHER:  The time is

7        4:12.  We're off the record.

8        (Recess taken.)

9        (Dondzila Exhibit No. 19 was marked for

10       identification.)

11              THE VIDEOGRAPHER:  The time is

12       4:34.  We're on the record.

13   BY MR. PERRY:

14       Q.    Okay.  Before you is Dondzila

15   Deposition Exhibit 19.  Can you identify this

16   document?

17       A.    Yes, I can.  These are the minutes of

18   the meeting, the telephonic meeting of the

19   Residential Capital audit committee that had

20   been held on March 20, 2012, at 7:30 a.m.

21   Eastern.

22       Q.    There's a reference to Jack Levy from

23   Morrison Cohen.  Do you know who he

24   represented?

25       A.    I do not know who he represented.

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 192 of 198

Page 192

1                          C. Dondzila

2          Q.    Going to the second page, there's

3    a -- the middle paragraph starting with the

4    text "Referring to the written materials that

5    have been previously distributed," it goes down

6    and it says:    "Discussion included, among other

7    topics, quantitative and qualitative

8    assessments, matters associated with the

9    capital support agreements in place with Ally

10   at December 31, 2009 and '11, and consideration

11   of the 2009 restatement."

12          What do you recall the discussion

13   about -- what do you recall about the

14   discussion of matters associated with the

15   capital support agreements in place with Ally

16   at this audit committee meeting?

17          MR. LIPPS:    Objection, I think

18      that's been asked and answered, but go

19      ahead.

20          A.    That would have been in the context

21   of what impact, if any, those agreements that

22   were in place had in the matter of the

23   possibility of a restatement of the financial

24   statements, and the materiality of the error on

25   those previously issued 2009 financial

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 193 of 198

Page 193

C. Dondzila

2  statements, and anything that would ultimately,

3  if we decided it was not going to be restated,

4  be recorded in 2011's financial statements.

5       MR. PERRY:  I have no further

6    questions.

7       MR. LIPPS:  All right.  Anybody

8    else have any questions?  All right,

9    concluded.  We'll reserve the right to

10    read and sign.

11       THE VIDEOGRAPHER:  The time is

12    4:36.  We're off the record.

13

14    (Deposition adjourned at 4:36 p.m.)

15

16    _____

17              CATHY DONDZILA

18  SUBSCRIBED AND SWORN TO BEFORE ME

19  THIS _____ DAY OF _____, 2013.

20  _____

21  (Notary Public)

22  My Commission expires: _____

23

24

25

Page 194

C. Dondzila

1

2     C E R T I F I C A T E

3     DISTRICT OF COLUMBIA:

4

5          I, MARY ANN PAYONK, Shorthand Reporter,

6     do hereby certify:

7          That the witness whose deposition is

8     hereinbefore set forth was duly sworn, and that

9     such deposition is a true record of the

10    testimony given by such witness.

11         I further certify that I am not related

12    to any of the parties to this action by blood

13    or marriage, and that I am in no way interested

14    in the outcome of this matter.

15         IN WITNESS WHEREOF, I have hereunto set

16    my hand this 17th day of October, 2013.

17

18    _____

19    MARY ANN PAYONK, Shorthand Reporter

20    Washington, D.C.

21

22

23

24

25

Page 195

1        C. Dondzila

2      - INDEX TO WITNESSES -

3  CATHY DONDZILA                        PAGE

4      Examination by Mr. Perry              7

5      - INDEX TO EXHIBITS -

6  NO.                                 MARKED

7  Exhibit No. 1  . . . . . . . .        15

8  Exhibit No. 2  . . . . . . . .        29

9  Exhibit No. 3  . . . . . . . .        38

10 Exhibit No. 4  . . . . . . . .        39

11 Exhibit No. 5  . . . . . . . .        46

12 Exhibit No. 6  . . . . . . . .        49

13 Exhibit No. 7  . . . . . . . .        54

14 Exhibit No. 8  . . . . . . . .        66

15 Exhibit No. 9  . . . . . . . .        79

16 Exhibit No. 10  . . . . . . . .       105

17 Exhibit No. 11  . . . . . . . .       109

18 Exhibit No. 12  . . . . . . . .       123

19 Exhibit No. 13  . . . . . . . .       128

20 Exhibit No. 14  . . . . . . . .       130

21 Exhibit No. 15  . . . . . . . .       137

22 Exhibit No. 16  . . . . . . . .       166

23 Exhibit No. 17  . . . . . . . .       168

24 Exhibit No. 18  . . . . . . . .       170

25 Exhibit No. 19  . . . . . . . .       191

12-12020-mg   Doc 5803-6   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Cathy Dondzila   Pg 196 of 198

Page 196

1                    C. Dondzila
2  NAME OF CASE:  In Re Residential Capital
3  DATE OF DEPOSITION:  October 17, 2013
4         1.  To clarify the record.
          2.  To conform to the facts.
5         3.  To correct transcription error.
6

   Page _____ Line _____ Reason _____
7  From _____ to _____
8  Page _____ Line _____ Reason _____
   From _____ to _____
9

   Page _____ Line _____ Reason _____
10 From _____ to _____
11 Page _____ Line _____ Reason _____
   From _____ to _____
12

   Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
   From _____ to _____
15

   Page _____ Line _____ Reason _____
16 From _____ to _____
17 Page _____ Line _____ Reason _____
   From _____ to _____
18

19           _____
20                CATHY DONDZILA
21 SUBSCRIBED AND SWORN TO BEFORE ME
22 THIS _____ DAY OF _____, 2013.
23 _____
24 (Notary Public)
25 My Commission expires: _____

12-12020-mg    Doc 5803-6    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Cathy Dondzila    Pg 197 of 198

Page 193

1              C. Dondzila

2   statements, and anything that would ultimately,

3   if we decided it was not going to be restated,

4   be recorded in 2011's financial statements.

5              MR. PERRY:  I have no further

6        questions.

7              MR. LIPPS:  All right.  Anybody

8        else have any questions?  All right,

9        concluded.  We'll reserve the right to

10       read and sign.

11             THE VIDEOGRAPHER:  The time is

12       4:36.  We're off the record.

13

14       (Deposition adjourned at 4:36 p.m.)

15

16       _____

17              CATHY DONDZILA

18   SUBSCRIBED AND SWORN TO BEFORE ME

19   THIS ___18___ DAY OF ___November___, 2013.

20   _____

21   (Notary Public)

22   My Commission expires: ___12/31/2013___

23

24

25

**Deposition Errata Sheet**

***In re Residential Capital, LLC, et al.,***
**Case No. 12-12020(MG)**

Deponent:              Cathy Dondzila
Deposition Date:    October 17, 2013

| Citation | Testimony |
|----------|-----------|
| 19:6-7 | would have been reconciled |
| 20:14 | and ~~regulatory compliance with requirements~~ compliance with regulatory requirements. |
| 20:16 | implementation ~~of~~ by our |
| 35:25 | sweep of cash would have resulted ~~from~~ in the |
| 40:25 | of -- upon disposition of ~~the~~ ResCap's assets and |
| 45:16 | I'd have to ~~To~~ look at the financial statements. |
| 48:3 | There ~~was~~ were |
| 48:7 | Mortgage ~~with~~ to service |
| 58:10 | it was a payable, ~~it~~ you would credit interest |
| 63:11 | ~~Brandy~~ Brandee Frank? |
| 77:8 | form, it just depended |
| 84:22 | two sibling entities which would be treated through |
| 92:14 | ~~revolving~~ Revolver and LOC are recorded |
| 123:5 | Mr. Lipps to my left, Robert to my far left; |
| 123:7 | And I'm forgetting the last name of the other Alex from |
| 127:24 | ~~Res~~ Resi Holdings |
| 159:10 | which was that ~~was~~ my earnings |
| 167:5 | Professional Guidelines ~~SAP~~ SAB 99 |
| 168:11 | ~~SAP~~ SAB 99 |
| 182:13 | approximately $47 |
| 183:15 | We understood -- ~~we~~ me, myself and my |

Date:        11/17/13

Signed:      *Cathy Dondzila*
             Cathy Dondzila