Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   ------------------------X

5   In re:                    Case No. 12-12020(MG)

6   RESIDENTIAL CAPITAL, LLC,

7   et al.,

8              Debtors.

9   ------------------------X

10

11

12        30(b)(6) DEPOSITION OF RESIDENTIAL CAPITAL, LLC

13                and AFFILIATED DEBTORS

14              by TAMMY HAMZEHPOUR

15              New York, New York

16              October 18, 2013

17

18        Yellow Highlighting = JSN Designation
          Pink Highlighting = Plaintiff's Counter-Designation
19        Orange Highlighting = Joint Designation

20

21

22   Reported by:

     Bonnie Pruszynski, RMR

23   JOB NO. 67067

24

25

Page 2

1

2

3

4

5

6

7                              October 18, 2013

8                              10:05 a.m.

9

10

11

12          30(b)(6) deposition of Residential

13   Capital, LLC and affiliated debtors by TAMMY

14   HAMZEHPOUR, held at the offices of Morrison &

15   Foerster , 1290 Avenue of the Americas, New York,

16   New York, before Bonnie Pruszynski, a Registered

17   Professional Reporter, Registered Merit Reporter,

18   Certified LiveNote Reporter and  Notary Public of

19   the State of New York.

20

21

22

23

24

25

1

2          A P P E A R A N C E S:

3   MILBANK TWEED HADLEY & McCLOY

4   Attorneys for the Ad Hoc Group of Junior Secured

5   Noteholders

6          One Chase Manhattan Plaza

7          New York, New York 10005

8   BY:   DANIEL PERRY, ESQ.

9          HAILEY DEKRAKER, ESQ.

10

11   MORRISON & FOERSTER

12   Attorneys for the Debtor and the witness

13          1290 Avenue of the Americas

14          New York, New York 10104

15   BY:   CHARLES KERR, ESQ.

16          LORENZO MARINUZZI, ESQ.

17          ALEX LAURENCE, ESQ.

18          JENNIFER MARINES, ESQ.

19

20   KRAMER LEVIN NAFTALIS & FRANKEL

21   Attorneys for the Creditors' Committee

22          1177 Avenue of the Americas

23          New York, New York 10036

24   BY:   PHILIP KAUFMAN, ESQ.

25

Page 4

1

2      APPEARANCES (continued):

3

4      KIRKLAND & ELLIS

5      Attorneys for Ally

6              655 Fifteenth Street, N.W.

7              Washington, D.C. 20005

8      BY:   JODI WU, ESQ.

9

10     ALSTON & BIRD

11     Attorneys for Wells Fargo Bank as trustee

12             90 Park Avenue

13             New York, New York 10016

14     BY:   WILLIAM HAO, ESQ.

15

16     REED SMITH

17     Attorneys for Wells Fargo as collateral agent

18             599 Lexington Avenue

19             New York, New York 10022

20     BY:   DAVID KOCHMAN, ESQ.

21

22

23

24

25

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour    Pg 5 of 50

Page 5

1                     T. Hamzehpour

2              THE VIDEOGRAPHER:  This is the start

3       of tape labeled number one of the videotape

4       deposition of Tammy Hamzehpour in the matter

5       of In Re: Residential Capital, LLC, et al,

6       in the United States Bankruptcy Court for

7       the Southern District of New York.

8              This deposition is being held at

9       1290 Avenue of the Americas, New York,

10      New York, on October 18th, 2013, at

11      approximately 10:05 a.m.

12             My name is Robert Rinkewich from TSG

13      Reporting, Incorporated, and I am the legal

14      video specialist.  The court reporter is

15      Bonnie Pruszynski in association with TSG

16      Reporting.

17             Will counsel please introduce

18      yourself?

19             MR. KERR:  Charles Kerr of Morrison &

20      Foerster on behalf of the debtor and the

21      witness.

22             MR. LAWRENCE:  Alex Laurence from

23      Morrison & Foerster.

24             MS. MARINES:  Jennifer Marines from

25      Morrison & Foerster on behalf of the debtor.

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 6 of 50

Page 6

1        T. Hamzehpour

2        MR. MARINUZZI:  Lorenzo Marinuzzi,

3    Morrison & Foerster, on behalf on the

4    debtors.

5        MS. WU:  Jodi Wu from Kirkland &

6    Ellis on behalf of Ally.

7        MR. KAUFMAN:  Philip Kaufman, Kramer

8    Levin, on behalf of the creditors committee.

9        MR. HAO:  William Hao from Alston &

10    Bird on behalf of Wells Fargo Bank.

11        MR. KOCHMAN:  David Kochman from Reed

12    Smith on behalf of Wells Fargo.

13        MS. DeKRAKER:  Hailey DeKraker of

14    Milbank, Tweed, Hadley & McCloy on behalf of

15    the junior secured noteholders.

16        MR. PERRY:  Dan Perry from Milbank

17    Tweed.  I'm with Ms. DeKraker.

18        THE VIDEOGRAPHER:  Do we have

19    somebody on the telephone?

20        MR. KERR:  Yeah, there is.

21        Everybody who is on the phone, if you

22    could note your appearance.

23        MR. BINGHAM:  Bob Bingham with Zolfo

24    Cooper.

25        MR. POLSKI:  Larry Polski with Cleary

1           T. Hamzehpour

2      Gottlieb.

3           THE VIDEOGRAPHER:  Will the court

4      reporter please swear in the witness.

5           (Witness sworn.)

6  TAMMY HAMZEHPOUR,

7           called as a witness, having been first

8           duly sworn, was examined and testified

9           as follows:

10 EXAMINATION

11 BY MR. PERRY:

12      Q    Good morning, Ms. Hamzehpour.

13      A    Good morning.

14      Q    Have you ever been deposed before?

15      A    Yes.

16      Q    How many times?

17      A    Twice.

18      Q    Have you been deposed in this case

19 before?

20      A    Yes.

21      Q    And were both instances in this case?

22      A    No.

23      Q    Okay.  What was the other deposition?

24      A    The other deposition was a number of

25 years ago in connection with a business

1                    T. Hamzehpour

2    transaction that we did not complete, completely

3    unrelated to this.

4         Q     Okay.  So I'm not going to go over

5    the -- and you are an attorney; correct?

6         A     Yes.

7         Q     I'm not going to go over the ground

8    rules in great detail, but a couple of important

9    rules.

10              One, if you don't understand a

11    question that I am asking, please ask me to

12    rephrase, let me know, so I can clarify the

13    question, make sure we are both on the same page.

14              From time to time, counsel and, you

15    know, probably literally everybody at this table,

16    will object.  Unless the basis of the objection is

17    privilege, I would ask that you -- you answer the

18    question.

19              If you have a concern that my

20    question may cause you -- answering my question

21    may cause you to disclose privileged information,

22    you are entitled to ask for a break and consult

23    with your counsel about that.  Otherwise, I would

24    ask that you answer any pending questions before

25    we take a break.

12-12020-mg    Doc 5803-7    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Tammy Hamzehpour    Pg 9 of 50

Page 9

1                       T. Hamzehpour

2               On the subject of breaks, just let me

3       know when you want to break.  This is not an

4       endurance contest, and I am happy to break as

5       frequently as you'd like.

6           A       Okay.

7           Q       Do you have any questions for me

8       before we start?

9           A       No.

10          Q       Before you is a copy of Westman

11      Deposition Exhibit 1.  It's a 30(b)(6) notice

12      served on Residential Capital, LLC and its

13      affiliated debtors.

14              Do you understand, ma'am, that you

15      are appearing today pursuant to this notice?

16          A       Yes.

17          Q       And are you in fact authorized to

18      give sworn testimony on behalf of Residential

19      Capital, LLC and its affiliated debtors?

20          A       Yes.

21          Q       And just to make sure the record is

22      clear, am I correct that you will be giving

23      testimony with respect to deposition topic two,

24      sub-point four?

25              MR. KERR:  It's on page nine.

12-12020-mg    Doc 5803-7    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Tammy Hamzehpour    Pg 10 of 50

Page 10

1                       T. Hamzehpour

2          Q       It starts on page nine.

3          A       Yes.

4          Q       And am I correct that you will be

5    giving deposition testimony on topic two, sub six?

6          A       No.  It's the MBIA settlement.

7          Q       No.

8                  MR. KERR:  No, no.

9                  MR. KOCHMAN:  Sub six.

10                 MR. KERR:  Not sub six.  Two, six up

11         here.

12         A       Sorry about that, romanette six.

13                 MR. KERR:  Romanette six.

14         A       Romanette six.  Yes, that is correct.

15         Q       Okay.  And you will -- you are also

16   authorized to give testimony on topic four?

17         A       Yes.

18         Q       And topic 22; correct?

19         A       Yes.

20         Q       As to topic 22, do you have any

21   information with respect to the subject matter

22   identified in topic 22, in addition to -- in

23   addition to what might be gleaned from the face of

24   the contractual arrangements between the JSNs and

25   the debtors?

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 11 of 50

Page 11

T. Hamzehpour

2       MR. KERR:  Objection.

3       A       I -- I don't -- I'm not sure I

4  understand what you are asking.  I know there are

5  contractual agreements between the debtors and the

6  junior secured noteholders, but I don't -- I don't

7  know what you mean by "additional information."

8       Q       Okay.  You understand that there is a

9  dispute about whether Executive Trustee Services

10 LLC and Equity Investment I LLC are obligors under

11 the JSN security agreement and indenture; correct?

12      A       Yes.  We discussed that.

13      Q       And one could simply go look at the

14 JSN security agreement and indenture and come up

15 with the answer about whether these two entities,

16 Executive Trustee Services LLC and Equity

17 Investment I LLC, are obligors under that

18 agreement; right?

19      A       Yes.

20      Q       And the debtors have one reading of

21 the agreement, and the JSNs have a different

22 reading of the agreement; right?

23      A       That's what I have been told.

24      Q       Okay.  And putting aside just simply

25 reading the agreements, is there any information

Page 12

1                          T. Hamzehpour

2    that you have that would suggest that Executive

3    Trustee Services LLC and Equity Investment I LLC

4    are not obligors under the JSN security

5    agreement/indenture?

6                    MR. KERR:  Objection.

7         A       I'm not aware of anything outside the

8    bounds of the documents.

9         Q       In other words, so I take it you are

10   not aware of any negotiations between

11   representatives of the company and representatives

12   of the JSNs in connection with the security

13   agreement or the indenture that would bear on the

14   question of whether Executive Trustee Services LLC

15   and Equity Investment I LLC are obligors under

16   that agreement?

17                   MR. KERR:  Objection.

18        A       That's correct.

19                   (Hamzehpour Exhibit 1 marked for

20        identification as of this date.)

21                   MR. KERR:  What's this being marked

22        as?

23                   MR. PERRY:  Hamzehpour 1.

24        Q       Before you -- before you,

25   Ms. Hamzehpour, is Hamzehpour Deposition

Page 13

1                        T. Hamzehpour

2    Exhibit 1.  It's an e-mail from Barbara Westman to

3    you dated March 26, 2010, and it attaches a number

4    of documents.

5                Can you turn to the first attachment

6    to the document, which is a document entitled?

7    "RFC/GMACM Debt Forgiveness Procedures."

8        A       Yes.

9        Q       And I'm going to ask you to review

10   the document, and my question is:  Is this an

11   accurate summary of the pre-petition policies and

12   procedures with respect to debt forgiveness for

13   the debtors?

14       A       There is more detail in here than I

15   would be normally aware of, in terms of what the

16   accounting team does to monitor these, but this is

17   my understanding of how it worked, that the

18   accounting team had processes in place to monitor

19   upcoming changes in capital that might require or

20   seem to indicate a need for debt forgiveness,

21   bring those up through the CFO office for

22   approval.

23       Q       Okay.  And you have nothing to

24   believe, based on your review of the document,

25   that anything in here is inaccurate --

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 14 of 50

Page 14

1                          T. Hamzehpour

2          A        Right.

3          Q        -- correct?

4          A        Right.

5          Q        Now, I want to focus on the various

6  solvency or net worth requirements.

7          A        Um-hum.

8          Q        Did you understand that RFC had --

9  had net worth requirements for HUD and various

10  state regulators?

11          A        Yes.

12          Q        And similarly, did you understand

13  that GMACM had net worth requirements from Fannie

14  Mae and various lenders?

15          A        Yes.

16                   MR. KERR:    Objection.

17          Q        And do you believe those

18  requirements -- well, strike that.

19                   Is -- directing your attention to the

20  spreadsheet immediately following the document

21  that we have just been focused on, is this an

22  example of the accounting staff's analysis of

23  RFC's compliance with its various regulatory net

24  worth requirements?

25          A        That's what it appears to be, yes.

Plaintiff's Objection 14:12-16: objection to form; vague and ambiguous

Plaintiff's Objection 14:17-25: lack of personal knowledge (FRE 602); lack of foundation (FRE 602, 901, 903)

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 15 of 50

Page 15

T. Hamzehpour

1

2   Q      Okay.  And directing your attention

3   to the next attachment, which is separated by

4   the --

5   A      Separated by a blue sheet.

6   Q      -- blue sheets.

7   A      Okay.

8   Q      If you go -- flip over to the next

9   page.  Does this document appear to be --

10      MR. KERR:  What -- what page number

11   are you referring to?

12      MR. PERRY:  Exam 10362106.  I guess

13   this is a spreadsheet printed in native

14   format, and so it all bears the same Bates

15   label.

16      MR. KERR:  So what -- what -- I'm

17   sorry, what page within this?

18      MR. PERRY:  So I am looking at the

19   third page, which starts with a column

20   entitled "GMAC Mortgage, LLC Net Worth

21   Tests," and then reflects a summary of

22   requirements and goes through it.

23   Q      Ms. Hamzehpour, my question is:  Does

24   this appear to be an accurate summary of the

25   various net worth requirements that GMACM was

Plaintiff's
Objection
15:23-16:12
Lack of
personal
knowledge
(FRE 602);
lack of
foundation
(FRE 602,
901, 903)

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 16 of 50

Page 16

1                              T. Hamzehpour

2     required to subscribe to in 2010?

3                    MR. KERR:   Objection.

4          A        It appears to.   I couldn't tell you

5     if it's complete or not.   There were a number of

6     requirements, and I don't remember them all in

7     detail, but it appears to be pretty comprehensive.

8          Q        And this is -- these spreadsheets

9     analyzing net worth, compliance with net worth

10    requirements, you understood that the accounting

11    department prepared and monitored compliance with

12    those requirements in the ordinary course of

13    business?

14         A        Yes, that's true.

15         Q        Now, as I understand it, if there was

16    an expectation or a concern that either RFC or

17    GMACM or other entities would fail one of the

18    various net worth requirements, debt forgiveness

19    was one of the ways that the debtors used to put

20    that entity in compliance with the net worth

21    requirements; is that correct?

22         A        I think it's -- the CFO's office

23    would look at that, and decide whether or not

24    there were additional capital amounts that needed

25    to be allocated to that company to keep -- to

12-12020-mg    Doc 5803-7    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Tammy Hamzehpour    Pg 17 of 50

Page 17

T. Hamzehpour

2    maintain those requirements, yes.

3        Q        And that was done beginning in 2008;

4    correct?

5        A        There were events, I'm sure,

6    different times over the years when that was

7    required.  It, I don't believe, only began in

8    2008.  I wouldn't -- I wouldn't know exactly, but

9    I don't think it was a new concept --

10        Q        Okay.

11        A        -- in 2008.

12        Q        Do you know, other than RFC and

13    GMACM, which of the debtor entities had specific

14    net worth requirements?

15        A        Any of them that held certain state

16    licenses would have the corresponding capital

17    requirements in that state's regulation.  So, for

18    example, Homecomings Financial, during the time

19    that it held state mortgage banking licenses,

20    would have had capital -- regulatory capital

21    requirements.

22        Q        Would -- would Residential Capital,

23    LLC have had net worth requirements?

24        A        Not at the state level, but it had

25    requirements in its credit agreements.

Plaintiff's
Objection
17:3-11:
lack of
personal
knowledg
e (FRE
602)

12-12020-mg    Doc 5803-7    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Tammy Hamzehpour    Pg 18 of 50

Page 18

T. Hamzehpour

1

2    Q    Okay.

3    A    And with Fannie Mae.

4    Q    What about Executive Trustee Services

5    LLC?

6    A    Yes.  I think they held some state

7    licenses.

8    Q    And what were the debt facilities for

9    the debtor entities that had net worth

10    requirements?

11    A    The GMAC revolver and line of credit,

12    we had at one point a bank syndicate agreement

13    that had net worth requirements in it.  We had an

14    MSR facility with Citi that -- a lot of the

15    funding facilities were pretty consistent

16    across-the-board, because all the lenders wanted

17    the same level of covenant protections.

18    Q    And were there typically

19    cross-default provisions in the debt facilities?

20    A    Yes.

21    Q    And the -- the federal agencies, is

22    it true that the federal -- well, can you list the

23    federal agencies that had net worth requirements

24    for one or more of the debtors?

25    A    HUD, and although they are not

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 19 of 50

Page 19

1                    T. Hamzehpour

2     federal agencies, the GSEs had some level of

3     capital requirement, Fannie, Freddie, and I think

4     Ginnie Mae, but Ginnie Mae's may have fallen

5     underneath HUD.

6          Q      Before you is Westman Deposition

7     Exhibit 20.  It's an amended and restated

8     intercompany advance agreement between Homecomings

9     and Residential Funding.  Do you see in the upper

10    right corner there is a notation T222?

11         A      Yes.

12         Q      What is that?

13         A      I would think that is a -- what we

14    would call a T number, which is a number that

15    identified a Treasury document, a funding

16    facility.

17         Q      There are -- there's been a number of

18    these intercompany agreements produced in the

19    case.  Are those housed typically with the

20    Treasury department?

21         A      Yes.

22         Q      And is it Joe Ruland who is in charge

23    of the Treasury department?

24                MR. KERR:  Objection.

25         A      Joe Ruland most recently, although he

Page 20

T. Hamzehpour

1

2   is no longer with the company.  He went to one of

3   the purchasers of our assets back in February.

4        Q     And who is currently the head of the

5   Treasury department?

6        A     Paul Grande.

7        Q     Does Mr. Grande have historical

8   knowledge of the intercompany agreements that were

9   put in place?

10            MR. KERR:  Objection.

11       A     I don't -- I don't know.  He's been

12   with the company a number of years, so I imagine

13   he does, but I don't know personally.

14       Q     Do you know when he started?

15       A     No, I don't.

16            (Hamzehpour Exhibit 2 marked for

17       identification as of this date.)

18       Q     Before you is Hamzehpour Deposition

19   Exhibit 2.  It's an e-mail from James Young to Jim

20   Jones.  You are copied, and it attaches or it

21   includes an e-mail below, and the document was

22   produced with an attachment, several attachments.

23       A     Not a lot of data here.

24       Q     It's not my fault.

25            Let me ask you this:  What -- do you

Plaintiff's Objection 20:18-25:23 Lack of personal knowledge (FRE 602)

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 21 of 50

Page 21

1                    T. Hamzehpour

2    recall a forgiveness of roughly $2 billion in

3    intercompany debt by ResCap to the benefit of RFC?

4         A     I don't -- I don't have a specific

5    recollection of it.  I mean, obviously that's what

6    this is talking about, and you can see that from

7    the top page of the e-mail.

8         Q     Do you -- do you know why ResCap was

9    being asked to forgive $2 billion of indebtedness

10   to RFC in or around March of 2008?

11        A     Well, just based on this e-mail note,

12   it appears to be to replenish capital that's been

13   diminished by losses, operating losses at the RFC

14   level.

15        Q     And was there a concern in -- in

16   March of 2008, that RFC could be in default of its

17   tangible net worth requirements?

18        A     That is what it appears to say in

19   this e-mail.  There was a concern, they needed the

20   2 billion to proved adequate net worth to cover

21   financial covenants, yes.

22        Q     And just -- okay.  And so, let me ask

23   you this:  What -- what would happen -- what would

24   have happened to Residential Funding Company if it

25   defaulted on its tangible net worth requirements?

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 22 of 50

Page 22

1                    T. Hamzehpour

2    Let's start with governmental agencies, state and

3    federal agencies.

4                    MR. KERR:  Objection.

5         A         My understanding is that if you

6    report a quarterly financial to your licensing

7    agencies that doesn't show the appropriate capital

8    level, you are in danger of having them pull your

9    license to do business in that state.

10        Q         And would that be the case for

11   federal agencies as well?

12                   MR. KERR:  Objection.

13        A         The federal agencies are different.

14   It's not a license to do business, it's an issuer

15   approval to do business with them, so it's a

16   different situation, and yes, if the company did

17   not maintain required capital levels, they would

18   be in danger of -- of having that issuer approval,

19   seller servicer approval, whatever the GSE calls

20   it, of having that revoked.

21        Q         And as a practical matter, if

22   Residential Funding failed to maintain the

23   required capital levels in 2008, would it have

24   been able to continue to operate?

25                   MR. KERR:  Objection.

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 23 of 50

Page 23

1                    T. Hamzehpour

2          A       In 2008, Residential Funding was not

3  conducting a large amount of business directly

4  with the GSEs any longer because of the fact that

5  the securitization markets had been shut down by

6  then in the financial crisis, so, the impact is

7  more a breach of financial covenants than it would

8  be a fallout for that particular company from

9  Fannie or Freddie.

10         Q       And if it had breached its financial

11 covenants in March of 2008, would it have been

12 able to continue to operate?

13                 MR. KERR:   Objection.   Asked and

14         answered.

15         A       It would have triggered a

16 cross-default across all the company's credit

17 facilities, putting in danger everyone's ability

18 to operate.

19         Q       And the forgiveness of the

20 indebtedness in 2008 by Residential Capital at

21 least alleviated the danger that you just

22 testified to; correct?

23         A       Correct.

24         Q       And so, the forgiveness of

25 indebtedness from the perspective -- strike that.

Page 24

1                          T. Hamzehpour

2                  From the perspective of Residential

3    Capital, LLC, it received something in exchange

4    for the forgiveness of indebtedness from its

5    subsidiary; right?

6                  MR. KERR:   Objection.

7        A        I -- what it would have received is

8    additional equity in that subsidiary.   That would

9    be the accounting impact of the debt forgiveness,

10   is they would have an increased equity.

11       Q        And from -- just from a practical

12   standpoint, it also enabled the parent and the

13   subsidiary to continue to operate, not in breach

14   of its financial covenants and its debt

15   facilities; correct?

16       A        That's -- that's a result of it, yes.

17       Q        Do you know, was the -- did the Ally

18   board ultimately approve this particular debt

19   forgiveness in 2008?

20       A        I believe they would have.   I don't

21   have a specific recollection of it, but I believe

22   they would have.

23                  (Hamzehpour Exhibit 3 marked for

24          identification as of this date.)

25       Q        Before you is Hamzehpour Deposition

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 25 of 50

Page 25

1                     T. Hamzehpour

2     Exhibit 3.  It purports to be a memorandum from

3     James Young to the ResCap Executive Committee.  I

4     note that you are a copy.

5               The memo -- would you agree with me

6     that the memo appears to describe a proposed

7     forgiveness of $2 billion in indebtedness from

8     GMAC Residential Holding Company, LLC for the

9     benefit of GMAC Mortgage, LLC?

10          A       Could I just have a minute to read

11    it?

12          Q       Yes, please.

13          A       Okay.  I'm sorry, now, what was the

14    question?

15                  MR. PERRY:  Can you re-read the

16          question.

17                  (Record read.)

18          A       Yes.

19          Q       And did the forgiveness of

20    indebtedness requested in Hamzehpour Deposition

21    Exhibit 3 ultimately get consummated?

22          A       Based on the executed consent of the

23    Executive Committee, it appears that it was, yes.

24          Q       And similar to the forgiveness of

25    indebtedness that we just discussed between

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour    Pg 26 of 50

Page 26

1                            T. Hamzehpour

2        Residential Capital, LLC and Residential Funding

3        Company, LLC, did this forgiveness of indebtedness

4        allow GMACM to continue to operate in 2009?

5                    MR. KERR:   Objection.

6             A        What this request describes was a

7        negotiation with Fannie Mae as to where in the

8        organization it would test capital requirements.

9        I don't read that to mean that GMAC Mortgage's

10       ability to be a Fannie/Freddie issuer was in

11       danger.  This was just to test the capital limits

12       at that level rather than at ResCap.

13                    So, that is how I would read it.  I

14       don't -- I don't see this as being one where

15       anything was being pulled away, just changing how

16       Fannie Mae looked at our financial statements.

17            Q       Do you know why -- as I understand

18       the way the corporate structure works, there is an

19       intercompany balance between Residential Capital,

20       LLC and GMAC Residential Holding Company, LLC;

21       correct?

22            A       I think that's right, yes.

23            Q       And then an intercompany relationship

24       between GMAC Residential Holding Company, LLC and

25       GMACM; correct?

12-12020-mg    Doc 5803-7    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Tammy Hamzehpour    Pg 27 of 50

Page 27

1                         T. Hamzehpour

2        A        That's right.

3        Q        And the forgiveness contemplated here

4    was between GMAC Residential Holding Company, LLC

5    and GMACM; correct?

6        A        That's what this describes, yes.

7        Q        Do you know why there wasn't a

8    corresponding forgiveness of indebtedness between

9    Residential Capital, LLC and GMAC Residential

10   Holding Company, LLC?

11       A        No, I don't know.

12       Q        Now, from the perspective of GMAC

13   Residential Holding Company, LLC, what were the

14   benefits associated with the forgiveness

15   contemplated in Hamzehpour Deposition Exhibit 3?

16                MR. KERR:    Objection.

17       A        Residential Holding is -- it's just a

18   holding company, so, there wasn't any particular

19   benefit to it, I don't believe, although it -- it

20   has its own set of capital requirements.  This

21   would have been in 2009.  It was a guarantor under

22   the line of credit, the revolver, the bonds, so it

23   has its own -- you know, it has to maintain its

24   own solvency.

25                But I don't think it would have had

Page 28

T. Hamzehpour

1

2   any particular benefit from this debt forgiveness.

3        Q        Okay.   And from the perspective --

4   you referenced solvency.   From the perspective of

5   the entity forgiving indebtedness, did either you

6   or the accounting staff analyze whether, after

7   giving effect to the forgiveness, the forgiving

8   entity would remain solvent?

9        A        I did not.   It would not have been my

10  job to do that.   The finance team probably did.   I

11  don't know.

12       Q        So, your belief is that the finance

13  team analyzed the solvency of the forgiving

14  entity?

15                MR. KERR:   Objection.

16       A        I think the finance team analyzed the

17  capital requirements in -- similar to the

18  documents that we looked at earlier.   That --

19  that's the analysis they go through, is checking

20  to make sure they have maintained their required

21  capital levels.

22       Q        And as you testified, GMAC

23  Residential Holding Company had -- in 2009, had

24  its own liquidity and solvency requirements under

25  at least the financing documents; correct?

Plaintiff's Objection 28:12-21: Lack of personal knowledge (FRE 602)

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 29 of 50

Page 29

T. Hamzehpour

1

2     A       Right.  As a guarantor, it had to

3  comply with the financial covenants that were in

4  the document that were applicable to it, yes.

5     Q       And as between GMAC Residential

6  Holding Company and GMACM, there were different

7  sets of borrowers, entities to which there was a

8  guarantee and the like associated with those two

9  entities; right?

10            MR. KERR:  Objection.

11     Q       It's a bad question, let me rephrase

12  it.

13     A       Okay.

14     Q       The -- as between GMACM and GMAC

15  Residential Holding Company, there were different

16  sets of creditors with respect to those two

17  entities; right?

18     A       It's possible that GMACM had a

19  funding facility that its parent was not a party

20  to.  I don't remember specifically.

21            (Hamzehpour Exhibit 4 marked for

22            identification as of this date.)

23     Q       Before you is Hamzehpour Deposition

24  Exhibit 4.  Can you take a moment to review it.  I

25  have some questions.  You will see there are

Page 30

1                    T. Hamzehpour

2    redactions.

3         A        Sure.

4                  Okay.

5         Q        First of all, is -- whose text is --

6    is this your text that is in -- on the first page

7    of Hamzehpour Deposition Exhibit 4?

8                  MR. KERR:   What do you mean, "your

9    text"?

10        Q        Did you write this?   I mean, I can't

11   tell from the entire e-mail whether you are

12   cutting and pasting somebody else's writing or

13   whether you, yourself, wrote this.   Do you know?

14        A        I believe I wrote this.

15        Q        Okay.   Now, directing your attention

16   to the second-to-last full paragraph, you write:

17   "It's not in ResCap or the group's best interest

18   to release debt in excess of the amount needed to

19   meet the above goals, and for this reason the GMAC

20   Inc. board resolutions authorizing debt

21   forgiveness for certain ResCap subsidiaries refer

22   to releases up to a maximum amount."

23                 Do you see that?

24        A        Yes.

25        Q        Okay.   Why was it not in the -- well,

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 31 of 50

Page 31

1                              T. Hamzehpour

2     strike that.

3                    Why was it in the interest of the

4     lender to limit the amount of debt forgiveness

5     being effected?

6                    MR. KERR:   Objection.

7          A        In this instance, my recollection of

8     this is that the intercompany receivables from the

9     U.K. entities were one way that cash from

10    operations were repatriated back, so when there

11    was cash to be recovered, it would come back

12    through this repayment of intercompany.

13                   So, if you are releasing some portion

14    of that because you need to for regulatory

15    reasons, there is no reason to release any more

16    than you need to.

17         Q        Um-hum.

18         A        That's what I take from this note,

19    and that's my recollection of what happened here.

20         Q        Isn't that generally true of a

21    release of intercompany indebtedness?

22         A        I don't know if that's generally

23    true, but I know it was more formal with the

24    international companies because of the

25    cross-border nature.

Plaintiff's Objection 31:3-16: objection to form; vague and ambiguous

Plaintiff's Objection 31:20-25: lack of personal knowledge (FRE 602); objection to form; vague and ambiguous

Page 32

T. Hamzehpour

2  Q       Okay.  Just by way of example, why
3  would GMAC Residential Holding Company, LLC want
4  to release any more of the intercompany
5  indebtedness than required for the benefit of
6  GMACM to facilitate GMACM's negotiations with
7  Fannie Mae?
8              MR. KERR:  Objection.
9  A       I don't think it would have a desire
10 to do that.
11             (Hamzehpour Exhibit 5 marked for
12     identification as of this date.)
13 Q       Before you is Hamzehpour Deposition
14 Exhibit 5.
15 A       Yes.
16 Q       It's an e-mail, and there is an
17 attachment.  I am interested in the attachment.
18 A       Um-hum.
19 Q       The attachment purports to be a draft
20 of an intercompany advance agreement between
21 Residential Funding Company, LLC, acting as
22 lender, and Residential Capital, LLC, as borrower.
23             Do you see that?
24 A       Um-hum.  Um-hum.
25 Q       My question is:  Was an intercompany

Plaintiff's
Objection
32:2-10:
lack of
personal
knowledge
(FRE 602)

12-12020-mg    Doc 5803-7    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Tammy Hamzehpour    Pg 33 of 50

Page  33

1                    T. Hamzehpour

2    agreement of this nature ever executed?

3         A       I don't know.  Was this one executed?

4         Q       This one was not.  It's a draft.

5         A       I can't tell from this -- I don't

6    remember it.  I don't -- well, I wouldn't hold in

7    my memory every execution of an agreement, but I

8    don't remember it, and this sounds like this was a

9    first draft, so I don't know if it was later

10   executed.

11        Q       And I take it from your answer that

12   you don't have a recollection of why a -- at least

13   the Treasury folks were contemplating an

14   intercompany advance agreement between ResFund and

15   ResCap at this point?

16        A       I don't remember why.  This also

17   doesn't do anything to help prod my memory, but

18   there is not enough information here, so...

19        Q       Okay.  And who would know within the

20   debtors whether this agreement attached to

21   Hamzehpour Exhibit 5 was ever executed?

22        A       The Treasury team should know,

23   because they should have an executed copy of it in

24   their funding database.  This is also -- actually,

25   this e-mail doesn't even relate to the attached

Plaintiff's Objection 33:11-18: lack of personal knowledge (FRE 602); unduly prejudicial (FRE 403)

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 34 of 50

Page 34

1                     T. Hamzehpour

2        document, so, this e-mail refers to an

3        intercompany advance agreement between a U.K.

4        company and Residential Funding Company.

5              Q      Yeah.  I -- just for your benefit, I

6        see the text in the bottom paragraph is referring

7        to the attachment.

8              A      Oh, okay, sorry about that.  Sorry.

9        Just when I was reading it, it was like this

10       doesn't make sense.  But you are right, it does --

11       it must have had two attachments, so...

12             Q      Do you -- as I understand the

13       corporate allocation from Ally to the debtors,

14       there was -- as relates to GMACM, the corporate

15       allocation to GMACM and Residential Funding

16       Company, LLC, the allocation was made to

17       Residential Funding Company, LLC, and then there

18       was an intercompany to GMACM?

19             A      An allocation of what?  What

20       allocation are you talking about?

21             Q      Corporate expense.

22             A      Oh.  I don't know.

23             Q      Okay.

24             A      I wouldn't know how they do that.

25       You would have to ask finance.

12-12020-mg    Doc 5803-7    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Tammy Hamzehpour    Pg 35 of 50

Page 35

T. Hamzehpour

2    Q        Okay.  Do you recall the practice of

3    allocating corporate expenses from Ally to

4    Residential Funding Company and GMACM changing at

5    any point in time?

6        A        I don't remember being aware of it.

7    I knew generally that the parent allocated

8    expenses down to the subs, but I don't remember

9    having any knowledge or understanding of whether

10    they did it fairly or correctly or not.

11        Q        Okay.

12                (Hamzehpour Exhibit 6 marked for

13    identification as of this date.)

14        Q        Before you is Hamzehpour Exhibit 6.

15        A        Yes.

16        Q        It's an e-mail from -- covering the

17    first page is an e-mail from Mr. Young to

18    Mr. Marano.  You are copied.

19                And he writes:  "Tom, this is to give

20    you a heads-up on the most effective/quick

21    strategy we have to move cash out of RFC to

22    ResCap."

23                What do you recall -- strike that.

24                Was there an effort to evaluate ways

25    to move cash out of RFC sometime in late 2010?

Plaintiff's
Objection
35:11-36:3:
lack of
personal
knowledge
(FRE 602)

1                    T. Hamzehpour

2         A        Well, that's what this e-mail says,

3    so I imagine it was.

4         Q        And do you recall -- other than what

5    the e-mail says, do you recall the matters

6    discussed in Hamzehpour Exhibit 6?

7         A        Can I look at the rest of it --

8         Q        Sure.

9         A        -- because it will hopefully refresh

10   my memory.  Okay.  So, based on these attachments,

11   and the time frame, it does appear that there

12   were, you know, concerns about RFC's net worth and

13   discussions about how to manage as between RFC and

14   ResCap the cash balances and net worth.

15        Q        And do you know, ultimately, what the

16   debtors determined to do to address the concerns

17   about RFC's net worth?

18        A        I don't remember this in particular,

19   but the request for approval was to repay -- for

20   ResCap to repay a portion of an intercompany

21   payable and assume some liabilities.  I don't know

22   if that actually happened or not, but it looks

23   like this was at least proposed to the ResCap

24   board.

25        Q        Now, if you go to the talking

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 37 of 50

Page 37

1                    T. Hamzehpour

2    points --

3            A        Um-hum.

4            Q        -- that are the first exhibit, the

5    first attachment to the e-mail that is

6    Hamzehpour 6, there is a couple of different

7    suggested solutions.   I'm interested in the bottom

8    solution, which is default on requirement.

9            A        Um-hum.

10           Q        And my question is:   Is that a fair

11   summary of the consequences that would flow from

12   RFC defaulting on --

13           A        On the HUD --

14           Q        -- the suggested HUD net worth

15   requirement?

16           A        The suggested HUD net worth.

17                    MR. KERR:   Objection.

18           A        This, it looks like to me a

19   reasonable list of things that could happen if --

20   if RFC did not meet the HUD requirement.

21                    MR. PERRY:   Can we take a five-minute

22           break, Chuck?

23                    MR. KERR:   Sure.   Sure, sure, sure.

24                    THE VIDEOGRAPHER:   The time is

25           11:03 a.m.   We are off the record.

Page 38

1                    T. Hamzehpour

2              (Recess taken.)

3              THE VIDEOGRAPHER:  The time is 11:14

4       a.m.  We are on the record.

5    BY MR. PERRY:

6         Q      Ms. Hamzehpour, could you go back to,

7    I think it's Westman 20, the 30(b)(6) notice that

8    I showed you at the outset of the deposition.

9    Westman 1.

10        A      Yes.

11        Q      Directing your attention to topic

12   two, romanette six.

13        A      Yes.

14        Q      Is it the case that the debtors will

15   not take the position that the intercompany claims

16   are worthless or meritless at confirmation?

17              MR. KERR:  Objection.

18        A      I don't understand the question.

19        Q      Do the debtors intend to take a

20   position at confirmation about the value of the

21   intercompany claims?

22        A      My understanding is that the position

23   is that the intercompany claims are being settled.

24        Q      And they are being settled for no

25   value?

Plaintiff's
Objection
38:19-39:9
Irrelevant
(FRE 401,
402)

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 39 of 50

Page 39

1              T. Hamzehpour

2      A        Without any assignment of value.

3      Q        Okay.  But the debtors will not take

4  the position that the underlying claims themselves

5  are worthless or have no merit; correct?

6              MR. KERR:  Objection.

7      A        I don't -- I'm not sure that -- I

8  don't think I know the answer to that question,

9  actually.

10              MR. PERRY:  I have no further

11         questions.

12              MR. KERR:  Okay.  Any other

13         questions?

14              MR. KOCHMAN:  I'm going to have a few

15         questions on behalf of Wells Fargo, if we

16         could take like five minutes.

17              MR. KERR:  Sure.  Sure, sure, sure.

18              THE VIDEOGRAPHER:  The time is

19         11:16 a.m.  We are off the record.

20              MR. KERR:  Let's just take another

21         break.

22              (Recess taken.)

23              THE VIDEOGRAPHER:  The time is

24         11:23 a.m.  We are on the record.

25

Page 40

1                    T. Hamzehpour

2    EXAMINATION

3    BY MR. KOCHMAN:

4         Q      Good morning, Ms. Hamzehpour.  My

5    name is Dave Kochman of Reed Smith.

6         A      Good morning.

7         Q      I represent Wells Fargo in its

8    capacity as third priority collateral agent, and I

9    will continue with all of the rules that were

10   previously abided by in this deposition.  And I

11   just really have a few questions here.

12              I believe you testified earlier that

13   you have a familiarity with certain of the

14   underlying documents, and to be specific, I'm

15   talking about the indenture, the JSN security

16   agreement and the inter-creditor agreement.

17        A      I'm aware that they are -- that they

18   exist, yes.

19        Q      Have you reviewed those documents?

20        A      Not in a long time.

21        Q      When was the last time you recall

22   reviewing those documents?

23        A      Probably when they were put in place.

24        Q      Could you tell me your understanding

25   of the role of the third priority collateral agent

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 41 of 50

Page 41

T. Hamzehpour

1

in the context or as it relates to these

2

documents?

3

A      My recollection is that the

4

collateral agent for whichever funding facility we

5

were working with had to be provided with certain

6

types of lien release documents in order to

7

release collateral as we were selling it or

8

otherwise disposing of it.

9

Q      Was that your understanding with

10

respect to the JSN collateral?

11

A      Yes.  I think it applied

12

across-the-board to Ally, second lien and the

13

third lien.

14

Q      Do you recall what documents were to

15

be provided to the third priority collateral agent

16

in order to effectuate the lien releases?

17

A      Not in detail.  I believe it varied

18

by collateral.  Depending on what kind of

19

collateral and what was taking place, there were

20

different notices or certifications.

21

Q      Did there come a time that you

22

yourself provided an opinion of counsel to effect

23

certain of the releases?

24

A      I do believe that that did happen

25

Page 42

T. Hamzehpour

1
2  from time to time.  I don't think I was -- I don't

3  think it was always required, but I remember doing

4  it from time to time.

5       Q      Okay.  And in those times that you

6  recall doing it, what did you do to prepare your

7  certification of counsel?

8       A      Spoke to my capital markets

9  attorneys, who would have been working directly on

10  the transaction, and gotten comfort from them that

11  they were comfortable with the documents and the

12  release, and I rely on that.

13      Q      Do you recall if certain of the

14  documents -- strike that.

15             When you say you wanted to get

16  comfortable with the documents, what do you mean

17  by that?

18      A      With whether it was appropriate to

19  give the certification that was in the opinion.

20      Q      Okay.  And what -- how would you

21  determine whether the certification would be

22  appropriate?

23      A      By speaking to my -- the lawyers who

24  report to me, who worked directly with that unit,

25  understanding what it was they were asking me to

Page 43

1                    T. Hamzehpour

2  sign, and getting any questions that I had

3  answered.

4       Q      Do you have a recollection, in

5  providing your opinion of counsel, as to whether

6  or not you would be certifying that certain

7  provisions of the indenture agreement had been

8  satisfied?

9       A      I don't remember the text of what the

10 opinions required or the certifications.

11      Q      If I were to show you the indenture,

12 might that refresh your recollection?

13      A      It might.  If it has a template in

14 it, it's possible that -- yeah.

15           MR. KOCHMAN:  Let's just go off the

16      record for a second?

17           THE VIDEOGRAPHER:  The time is

18      11:27 a.m.  We are off the record.

19           (Recess taken.)

20           THE VIDEOGRAPHER:  The time is

21      11:29 a.m.  We are on the record.

22 BY MR. KOCHMAN:

23      Q      Ms. Hamzehpour, I showed you

24 Exhibit G to the indenture entitled "Form Opinion

25 of Counsel for Release of Collateral."  Did you

Page 44

1                        T. Hamzehpour

2    have an opportunity to review that?

3         A       Yes.

4         Q       Did that refresh your recollection as

5    to the opinion that you would be providing in

6    the -- pursuant to that form document?

7         A       The form -- yes.  The form document

8    provides that the opinion is that the officer

9    certificate is in the form required by the

10   indenture, and that there aren't any other

11   documents required to be delivered to the

12   collateral agent in connection with this release.

13               So, it's says those two things.

14        Q       And you have testified as to the

15   factual inquiry that you conducted before

16   providing this document?

17        A       Yes.

18        Q       Is there anything else that you did

19   beyond that?

20        A       No.

21        Q       Did you have an understanding as to

22   whether the third priority collateral agent was

23   going to rely conclusively upon your opinion of

24   counsel?

25               MR. KERR:  Objection.

Page 45

1                       T. Hamzehpour

2        A        I don't know what they rely on.  We

3   provide the documents that are required in the --

4   in the indenture, and I can't speak to anyone's

5   reliance on that.

6        Q        Did you have an understanding as to

7   whether any other party would have an obligation

8   to investigate the underlying facts upon which the

9   opinion of counsel was resting?

10                MR. KERR:  Objection.

11       A        No, I don't.  I don't know.

12       Q        I'm sorry?

13       A        I don't know.

14                      (Continued on next page

15                with witness jurat.)

16

17

18

19

20

21

22

23

24

25

12-12020-mg   Doc 5803-7   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tammy Hamzehpour   Pg 46 of 50

Page 46

1          T. Hamzehpour

2          MR. KOCHMAN:  No further questions.

3          MR. KERR:  Other questions?  Good.

4     Then I think we are done then.

5          THE VIDEOGRAPHER:  The time is

6     11:31 a.m.  We are off the record.

7               oOo

8          I,  TAMMY HAMZEHPOUR, the witness

9     herein, do hereby certify that the foregoing

10    testimony of the pages of this deposition to be a

11    true and correct  transcript, subject to the

12    corrections, if any,  shown on the attached page.

13

14    _____

15

16    Subscribed and sworn to before me this

17    _____day of _____,_____.

18

19    _____

20

21    NOTARY PUBLIC

22

23

24

25

Page 47

T. Hamzehpour

C E R T I F I C A T E

STATE OF NEW YORK        )

                         : SS.

COUNTY OF NEW YORK       )


                I, BONNIE PRUSZYNSKI, a Notary

Public with and for the State of New York,

do hereby certify:

     That TAMMY HAMZEHPOUR, the witness

whose deposition is hereinbefore set forth,

was duly sworn by me and that such deposition

is a true record of the testimony given by

the witness.

     I further certify that I am not related

to any of the parties to this action by

blood or marriage, and that I am in no way

interested in the outcome of this matter.

     IN WITNESS WHEREOF, I have hereunto

set my hand this 18th of October, 2013.


                    _____

                    Bonnie Pruszynski

1              T. Hamzehpour

2                I N D E X

3  WITNESS                              PAGE

4  TAMMY HAMZEHPOUR

5  Examination by Mr. Perry              7

6  Examination by Mr. Kochman           39

7

8

9            E X H I B I T S

10  Hamzehpour Exhibit 1 EXAM10362088       12

11  Hamzehpour Exhibit 2 EXAM11316929-932   20

12  Hamzehpour Exhibit 3 RC40006568-571     24

13  Hamzehpour Exhibit 4 EXAM11148024       29

14  Hamzehpour Exhibit 5 RCUCCJSN10745612-620  32

15  Hamzehpour Exhibit 6 EXAM11150308-311   35

16

17

18

19

20

21

22

23

24

25

Page 46

1                        T. Hamzehpour

2              MR. KOCHMAN:  No further questions.

3              MR. KERR:  Other questions?  Good.

4        Then I think we are done then.

5              THE VIDEOGRAPHER:  The time is

6        11:31 a.m.  We are off the record.

7                        oOo

8              I,  TAMMY HAMZEHPOUR, the witness

9        herein, do hereby certify that the foregoing

10       testimony of the pages of this deposition to be a

11       true and correct  transcript, subject to the

12       corrections, if any,  shown on the attached page.

13

14

15

16       Subscribed and sworn to before me this

17       ___6th__ day of __NOVember____, 2013 .

18

19

20

21       NOTARY PUBLIC

22                    LAURA GUIDO
                      Notary Public, State of New York
23                    No. 01GU6152891
                      Qualified in New York County
24         Commission Expires September 25, 2014

24

25

### Deposition Errata Sheet

*In re Residential Capital, LLC, et al.,*
**Case No. 12-12020(MG)**

Deponent:            Tammy Hamzehpour
Deposition Date:     October 18, 2013

| Citation | Testimony |
| --- | --- |
| 3:17 | Alexander ~~Laurence~~ Lawrence, ESQ |
| 5:22 | Alex ~~Laurence~~ Lawrence from Morrison & Foerster. |
| 37:21-22 | Can we take a five-minute break ~~Chuck~~ Chet? |
| 42:8-12 | I spoke to my capital markets attorneys, who would have been working directly on the transaction, and gotten comfort from them that they were comfortable with the documents and the release, and I ~~rely~~ relied on that. |

Date:        11-6-13

Signed:      Tammy Hamzehpour