Page 1

```
 1                   W. MARX
 2   UNITED STATES BANKRUPTCY COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------x
     In re:                       : Chapter  11
 4   RESIDENTIAL CAPITAL, LLC,    : Case No. 12-12020(MG)
     et al.,                      : Jointly Administered
 5              Debtors.          :
     ------------------------------x
 6   RESIDENTIAL CAPITAL, LLC,    :
     et al.,                      :
 7              Plaintiffs,       :
              v.                  : Adversary Proceeding
 8   UMB BANK, N.A., as successor : No. 13-01343(MG)
     indenture trustee under that :
 9   certain indenture, dated as of:
     June 6, 2008; and WELLS      :
10   FARGO BANK, N.A., third      :
     priority collateral agent and :
11   collateral control agent under:
     that certain Amended and     :
12   Restated Third Priority Pledge:
     and Security Agreement and   :
13   Irrevocable Proxy, dated as of:
     December 30, 2009,           :
14              Defendants.       :
     ------------------------------x
15   OFFICIAL COMMITTEE OF        :
     UNSECURED CREDITORS, on behalf:
16   of the estates of the Debtors,:
              Plaintiff,          :
17           v.                   : Adversary Proceeding
     UMB BANK, N.A., as successor  : No. 13-01277(MG)
18   indenture trustee under that :
     certain Indenture, dated as of:
19   June 6, 2008; and WELLS      : VIDEOTAPED DEPOSITION
     FARGO BANK, N.A. third       :        OF
20   priority collateral agent and :   WILLIAM MARX
     collateral control agent under:
21   that certain Amended and     :   New York, New York
     Restated Third Priority Pledge:   October 18, 2013
22   and Security Agreement and   :
     Irrevocable Proxy, dated as of:
23   December 30, 2009,           :
              Defendants.         :
24   ------------------------------x
25   Reported by: Kathy S. Klepfer  Job No. 66941
```

Yellow Highlighting = JSN Designation

Pink Highlighting = Plaintiff's designation or counter-designation

Orange Highlighting = Joint Designation

**The Debtors and Committee object to the JSNs' use of the deposition of Mr. Marx on the ground that this deposition may not be used under Bankruptcy Rule 7032.**

**The Debtors' counter-designations reflected herein are to be admitted, if at all, only upon admission of the JSNs' corresponding affirmative designation.**

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx    Pg 2 of 104

Page 2

1         W. MARX

2         October 18, 2013

3           9:54 a.m.

4

5      Videotaped deposition of WILLIAM

6   MARX, held at Kirkland & Ellis, LLP,

7   601 Lexington Avenue, New York, New

8   York, before Kathy S. Klepfer, a

9   Registered Professional Reporter,

10   Registered Merit Reporter, Certified

11   Realtime Reporter, Certified Livenote

12   Reporter, and Notary Public of the State

13   of New York.

14

15

16

17

18

19

20

21

22

23

24

25

1          W. MARX

2           A P P E A R A N C E S:

3    MORRISON & FOERSTER

4    Attorneys for the Debtors

5         1290 Avenue of the Americas

6         New York, New York  10104

7    BY:  DANIEL MATZA-BROWN, ESQ.

8

9    KRAMER LEVIN NAFTALIS & FRANKEL

10   Attorneys for the Committee of Unsecured Creditors

11        1177 Avenue of the Americas

12        New York, New York  10036

13   BY:  NORMAN SIMON, ESQ.

14

15   MILBANK TWEED HADLEY & McCLOY

16   Attorneys for the Ad Hoc Committee of Junior

17   Secured Creditors

18        International Square Building

19        1850K Street, N.W.

20        Washington, D.C.  20006

21   BY:  DAVID COHEN, ESQ.

22        One Chase Manhattan Plaza

23        New York, New York  10005

24   BY:  MATTHEW MADDOX, ESQ.

25

Page 4

1                    W. MARX

2         A P P E A R A N C E S:  (Cont'd.)

3

4   KIRKLAND & ELLIS

5   Attorneys for Ally Financial

6         555 California Street

7         San Francisco, California  94104

8   BY:  MARK McKANE, ESQ.

9         JULIA ALLEN, ESQ.

10        - AND -

11   ALLY FINANCIAL

12        200 Renaissance Center

13        Detroit, Michigan  48265

14   BY:  TRICIA DENNIS, ESQ.

15

16   REED SMITH

17   Attorneys for Wells Fargo Bank

18        599 Lexington Avenue

19        New York, New York  10022

20   BY:  MARK SILVERSCHOTZ, ESQ. (By telephone)

21

22

23

24

25

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 5 of 104

Page 5

1                    W. MARX

2        A P P E A R A N C E S:  (Cont'd.)

3

4  SEWARD & KISSEL

5  Attorneys for US Bank

6        One Battery Park Plaza

7        New York, New York  10004

8  BY:  MARK KOTWICK, ESQ.

9

10  ALSO PRESENT:

11        MICHAEL PINEIRO, Legal Video Specialist

12

13

14

15

16

17

18

19

20

21

22

23

24

25

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 6 of 104

Page 6

                          W. MARX

1                    THE VIDEOGRAPHER:  This is the start

2          of tape labeled number 1 of the videotaped

3          deposition of William Marx in the matter In

4          re Residential Capital, LLC.

5                    Today is October 18, 2013.  The time

6          is approximately 9:54 A.M.  Appearances have

7          already been noted by the court reporter.

8                    Will the court reporter please swear

9          in the witness.

10                           *  *  *

11         W I L L I A M   M A R X, called as a

12             witness, having been duly sworn by a Notary

13             Public, was examined and testified as

14             follows:

15     EXAMINATION BY

16     MR. COHEN:

17         Q.    Good morning, Mr. Marx.  I'm David

18     Cohen with Milbank Tweed Hadley & McCloy.  I

19     represent the Ad Hoc Committee of Junior Secured

20     Noteholders in the Residential Capital case.

21     I'm with my colleague Matthew Maddox.

22         A.    Good morning.

23         Q.    Have you ever been deposed before?

24         A.    Yes.

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 7 of 104

Page 7

1                        W. MARX

2       Q.    How many times?

3       A.    Once.

4       Q.    How recently was that deposition?

5       A.    Many years ago.

6       Q.    Okay.  Let me go over some ground

7  rules that hopefully will move this along

8  expeditiously this morning.

9             You understand that you are under

10  oath?

11      A.    Yes.

12      Q.    That your answers are subject to

13  penalties of perjury?

14      A.    Yes.

15      Q.    And that your testimony here is just

16  like testimony you would give in front of the

17  judge in court?

18      A.    Yes.

19      Q.    In order to keep the transcript clean,

20  the reporter is going to take down everything we

21  both say.  It's very important that you let me

22  finish my question before you begin your answer,

23  and I'll do my very best to extend the same

24  courtesy to you -- let you finish your answer

25  before I begin my question.  Okay?

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 8 of 104

Page 8

W. MARX

1

2     A.    Yes.

3     Q.    It's very important that all of your

4     answers be verbal.  Although there is a

5     videotape, the transcript must reflect all of

6     your answers; so it won't reflect a nod or a

7     gesture.

8     A.    Understood.

9     Q.    If any of my questions are unclear to

10    you, please let me know and I'll do my best to

11    clarify it.  Okay?

12    A.    Yes.

13    Q.    If you need to consult with your

14    attorney about anything, you can do that.  The

15    only thing I would ask is that you answer the

16    question that I have posed before you consult

17    with the attorney, unless it calls for matters

18    of privilege.

19    A.    Okay.

20    Q.    If you want to take a break at any

21    time, let me know.  I'll do my best to

22    accommodate you.

23    A.    Okay.

24    Q.    Who is your current employer?

25    A.    Ally Financial Inc.

Page 9

1                        W. MARX

2        Q.    What is your title at Ally Financial
3    Inc.?

4        A.    Executive Director of Tax Operations.

5        Q.    How long have you held that position?

6        A.    Just over seven years.

7        Q.    So 2006?

8        A.    Correct.

9        Q.    What are your responsibilities as the
10   Executive Director of Tax Operations at Ally
11   Financial Inc.?

12       A.    They varied over the years, but
13   anywhere from, you know, administrative matters
14   regarding the staff.   At different times I had
15   Tax Compliance, Tax Controversy, State and Local
16   Tax all reporting up to me.

17       Q.    What are your current responsibilities
18   now?

19       A.    My current responsibilities are really
20   dealing with matters mostly related to ResCap.

21       Q.    When you say "matters mostly related
22   to ResCap," what specific matters are you
23   referring to?

24       A.    Well, for -- for financial reporting
25   purposes, you know, ResCap has been written off

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 10 of 104

Page 10

1                           W. MARX

2    the books but, as a disregarded entity, they

3    remain part of our tax return until our interest

4    is canceled.  So we still have, you know, tax

5    data to gather periodically, tax returns to

6    prepare.

7               We've, up until recently, we've had

8    remote staffs in Fort Washington and

9    Minneapolis.  We're down to now one permanent

10   employee in Fort Washington, and so the rest is

11   helping to manage service providers to help us

12   continue to get that work done.

13      Q.    When you say "disregarded entity,"

14   what do you mean?

15      A.    Entities that are disregarded for

16   federal income tax purposes, meaning they are

17   treated as a division of Ally rather than

18   separate corporate entities.

19      Q.    When did ResCap become a disregarded

20   entity for federal tax purposes?

21      A.    Sometime in 2006 before the GM sale

22   was when it first became a disregarded entity.

23      Q.    Why did ResCap become a disregarded

24   entity in 2006 before the GM sale?

25               MR. McKANE:  To the extent you know.

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 11 of 104

Page 11

1                      W. MARX

2        A.        Yeah, that was all part of a

3    restructuring.   Prior to that period, ResCap,

4    most of its subsidiaries and other GMAC

5    subsidiaries were all C Corps included in the GM

6    consolidated federal tax return.   As part of the

7    sale, there was a restructuring to create a

8    large partnership.   GMAC LLC was a partnership,

9    and to effect that restructuring, pretty much

10   all of the domestic subsidiaries beneath GMAC

11   were converted to disregarded entities.

12       Q.      Okay.  Let me give you one more

13   instruction.  All of my questions, you can

14   assume they include the phrase "to the extent

15   you know."

16       A.      Understood.

17       Q.      I'm not asking you questions that --

18       A.      Believe me, if I don't know the

19   answer, I'll tell you.

20       Q.      Okay.  So we won't need your lawyer to

21   remind you of that.

22           MR. McKANE:  Well, let's be clear.  To

23       the extent that there's an objection for a

24       lack of foundation or calls for speculation,

25       I'll state it.

Page 12

W. MARX

1

2        MR. COHEN:  Okay.  You didn't state an

3    objection.  You said --

4        MR. McKANE:  I understand.

5        MR. COHEN:  -- "to the extent you

6    know."

7        MR. McKANE:  We're talking now about

8    going forward.

9        MR. COHEN:  I understand.  If you have

10    an objection, you can make it.

11        MR. McKANE:  I will.

12    BY MR. COHEN:

13    Q.    When you say that ResCap was mostly

14    written off Ally Financial Inc.'s books, what

15    did you mean?

16    A.    Meaning it was -- I don't -- if I used

17    the word "mostly," I think I misspoke.  It

18    was -- it was written down to a value of zero on

19    the books.

20    Q.    When was it written down to a value of

21    zero on the books?

22    A.    I -- I don't recall precisely.  I

23    believe it was in the quarter when the

24    bankruptcy filing occurred.

25    Q.    What were your responsibilities as the

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 13 of 104

Page 13

1                       W. MARX

2    Executive Director of Tax Operations in the 2009

3    to 2010 period?

4         A.    I believe at that time I would have

5    had responsibility for all the state and local,

6    federal tax compliance, again the operational

7    aspects of running the staff, and the -- I think

8    I had tax controversy at that time as well.

9         Q.    When you say "operations of running

10   the staff," what do you mean?

11        A.    More administrative things.  Budget

12   matters; making sure we have appropriate

13   contracts in place with our service providers;

14   you know, making sure we're spending our

15   budgeted money appropriately and trying to keep

16   it between, you know, within that budget.

17        Q.    Anything else?

18        A.    No.

19        Q.    When you say "tax controversy," what

20   do you mean?

21        A.    Audits.

22        Q.    Anything else?

23        A.    No.

24             MR. COHEN:   Let's mark as the first

25   exhibit a document that's entitled "Ad Hoc

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 14 of 104

Page 14

1                          W. MARX

2       Group of Junior Secured Noteholders Notice

3       of Subpoena to Ally Financial Inc."

4       A.     Okay.

5       Q.     Would you take a moment to review this

6  document?

7              (Marx Exhibit 1, Ad Hoc Group of

8       Junior Secured Noteholders Notice of

9       Subpoena to Ally Financial Inc., marked for

10      identification, as of this date.)

11             (Document review.)

12      A.     Okay.

13      Q.     Have you ever seen this document

14  before?

15      A.     I don't recall if I have seen it or

16  not.  I probably have because I know I would

17  have -- I may have been asked to submit

18  documentation for anything around the tax

19  allocation, but that may also be documents that

20  were already submitted for prior proceedings.

21  So I don't -- I just don't recall.

22      Q.     Would you turn to page 7 of Exhibit 1.

23      A.     I'm there.

24      Q.     Would you look at item number 7, which

25  says, "All matters relating to the first 2009

Page 15

1                        W. MARX

2    Tax Allocation Agreement and the Second 2009 Tax

3    Allocation Agreement"?

4         A.     Uh-huh.

5         Q.     Do you know that you have been

6    designated to testify on behalf of Ally

7    Financial Inc. as to those topics?

8         A.     Yes.

9         Q.     When did you find out that you were

10   designated to testify as to those topics?

11        A.     I don't know.  A number of weeks,

12   perhaps a couple months ago.  A while ago.

13               When is the date of this?

14        Q.     This document was served on October 4

15   of this year.

16        A.     So we scheduled my trip out here two

17   weeks ago, so...

18        Q.     What did you do to prepare for this

19   deposition?

20        A.     I reviewed documents that I could

21   locate that related to those tax allocation

22   agreements; discussed matters with our -- my

23   counsel and other members of the tax staff that

24   may have been knowledgeable about things going

25   on at that time.

Page 16

W. MARX

1

2     Q.     How many hours did you spend

3  discussing these matters with counsel?

4     A.     Nominal amount with respect to this

5  proceeding.

6     Q.     When you say "nominal amount," can you

7  give me an estimate of hours?

8     A.     Less than ten.

9     Q.     You said you also reviewed documents.

10  Were those your own documents that you reviewed?

11     A.     Some of them were and some of them

12  were not.

13     Q.     With respect to the documents that

14  were not your own, where did you get them?

15     A.     Many of them were documents that were

16  produced as part of the independent examiner

17  activity that went on earlier in the year.

18     Q.     What documents do you recall reviewing

19  to prepare for this deposition?

20     A.     Various and sundry e-mails on the

21  topic of tax allocation and tax attributes, some

22  financial statement information; I have seen

23  some ResCap Board resolutions related to the tax

24  allocation agreements, and I'm sure there are

25  others, but that's the major thrust of the

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 17 of 104

Page 17

1                        W. MARX

2   documentation.

3        Q.    You said you also discussed this

4   deposition with members of your staff.   Which

5   members of your staff did you discuss this

6   deposition with?

7        A.    The primary person that would have

8   been involved would have been James Aretakis,

9   who is our general tax counsel at this time,

10  former chief tax officer, and also Jay Frucci,

11  who is our current chief tax officer.

12       Q.    Was Mr. Aretakis with AFI in the 2009

13  to 2010 period?

14       A.    Yes.

15       Q.    What was his position then?

16       A.    As a part of that position he would

17  have been general tax counsel and -- that

18  timeframe, rather, he would have been general

19  tax counsel and part of it he was chief tax

20  officer.   I believe it was sometime in 2010 he

21  was elevated to chief tax officer.

22       Q.    And the second man was James Frucci?

23       A.    Jay, J-A-Y, F-R-U-C-C-I.

24       Q.    And he is the current chief tax

25  officer?

Plaintiff's Objection
17:3-18:2 Irrelevant
(FRE 401, 402)

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx    Pg 18 of 104

Page 18

1                           W. MARX

2        A.     He is.

3        Q.     What was his position, if any, in the

4    2009 to 2010 period?

5        A.     His title would have been executive

6    director something or other.  He may have been

7    senior -- senior director for part of that time

8    as well.  He was hired initially to be our

9    liaison with ResCap, the senior liaison.

10       Q.     When you say "hired to be the senior

11   liaison with ResCap," liaison as to what?

12       A.     As to understanding tax matters that

13   were happening at ResCap and making sure they

14   translated properly into our consolidated tax

15   return.

16       Q.     During the 2009-2010 period, did you

17   have any responsibilities at AFI for interfacing

18   with ResCap?

19       A.     I may have been involved with -- I

20   don't want to say random discussions --

21   discussions on certain matters, but it was not a

22   primary focus of my responsibilities.  But as a

23   member of senior tax leadership, I might have

24   been called to listen in, opine on things and,

25   you know, help reach consensus on resolution of

Page 19

1                    W. MARX

2    certain matters.

3        Q.    What was the reporting structure

4    between Mr. Frucci and you in the 2009 to 2010

5    period?

6        A.    It was independent.  We both reported

7    up to the chief tax officer.

8        Q.    So you two were --

9        A.    Peer level.

10       Q.    Let me finish my question.

11       A.    I'm sorry.

12       Q.    So if I were to diagram it, you would

13   be at a parallel level?

14       A.    Yes.

15       Q.    And you would report up to Mr.

16   Aretakis?

17       A.    Aretakis or his predecessor, Dina

18   Shapiro.

19       Q.    Do you know when Dina Shapiro stopped

20   being the chief tax officer?

21       A.    Let me clarify that.  I misspoke.  I

22   just called Dina was the senior executive who

23   hired Jay, but she left AFI almost immediately

24   upon him joining, so he would never have, as a

25   practical matter, reported to her.  He would

Page 20

                        W. MARX

1

2    have reported up to Jim.

3        Q.    Okay.  And do you recall when Mr.

4    Frucci was hired?

5        A.    Perhaps May/June timeframe of 2010, I

6    think.

7        Q.    What are the responsibilities of the

8    chief tax officer?

9        A.    Oh, boy.  Management of worldwide tax

10   matters; management of overall effective tax

11   rate.  It's really global management of all tax

12   matters.

13       Q.    Was one of the documents you reviewed

14   in preparing for this deposition Judge Gonzalez'

15   Examiner's Report?

16       A.    I have seen that report, yes.

17       Q.    Did you review that specifically in

18   connection with your preparation for this

19   deposition?

20       A.    I reread portions of it.

21            (Marx Exhibit 2, Report of Arthur J.

22       Gonzalez, As Examiner, marked for

23       identification, as of this date.)

24   BY MR. COHEN:

25       Q.    So, Mr. Marx, what the reporter has

Plaintiff's
Objection
20:21 – 021:06
Inadmissible
hearsay and
double hearsay
(FRE 802),
irrelevant (FRE
401, 402), lack
of personal
knowledge (FRE
602), lack of
foundation
(FRE 602, 901,
903),
incomplete
(FRE 106)

Page 21

W. MARX

1

2 handed you is, and we have labeled as Exhibit 2,

3 is a collection of pages from the Examiner's

4 Report that we may be talking about during this

5 deposition.

6        A.    Okay.

7        Q.    If for some reason you would like us

8 to give you the entire Examiner's Report, I

9 would be happy to do so.

10            MR. McKANE:  Did you bring it?

11            MR. MADDOX:  I have it on my iPhone.

12            MR. McKANE:  I do too.

13            MR. COHEN:  I could get it.

14            MR. McKANE:  I saw three boxes.  I was

15    wondering what was in it.

16            MR. COHEN:  That's the advantage of

17    being a New York-based firm.  You want it,

18    you can have it.

19            THE WITNESS:  Your generosity is

20    noted, but I'll pass.

21 BY MR. COHEN:

22        Q.    When the Examiner's Report first came

23 out, did you read the report?

24        A.    Again, I scanned the non-tax sections

25 and read the tax sections.

Plaintiff's
Objection
21:22-23:9
Inadmissible
hearsay and
double hearsay
(FRE 802),
irrelevant (FRE
401, 402), lack
of personal
knowledge
(FRE 602), lack
of foundation
(FRE 602, 901,
903),
incomplete
(FRE 106)

Page 22

1                         W. MARX

2        Q.    Did you read all of the tax sections?

3        A.    I believe so.

4        Q.    Did you search for your name in the

5   report --

6        A.    I did.

7        Q.    Okay.  Did you read all of the

8   sections where your name appeared?

9        A.    I did.

10       Q.    Did you find anything where the

11   examiner was talking about you that you

12   disagreed with when you read his report?

13            MR. McKANE:   Objection.  Overbroad.

14            You can answer.

15       A.    As I read through the report, I

16   remember reacting negatively to some of the

17   characterizations.  I couldn't cite examples,

18   specific examples of it, but I wasn't overly

19   surprised by the nature and the character of the

20   report given all of the interviews and

21   discussion previously.

22       Q.    So there's nothing that stands out in

23   your mind as you sit here today that you would

24   say the examiner just got this completely wrong?

25            MR. McKANE:   Objection.  Misstates

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 23 of 104

Page 23

1                        W. MARX

2        prior testimony.

3        Q.     You can answer.

4        A.     Sorry.   Other than I didn't agree with

5   generally the whole proposition, but, you know,

6   the statements of fact were generally true and

7   correct.   I don't know that I agreed with the

8   conclusions.   I don't know that I didn't, but,

9   you know, it's not my conclusion in the report.

10       Q.     You also just testified that you

11  weren't overly surprised by the nature and

12  character of the report given all of the

13  interviews and discussion previously.   What did

14  you mean by that?

15       A.     Meaning it was fairly clear during the

16  investigation that the direction of the

17  conclusion was going to be that the treatment of

18  ResCap with respect to tax allocation was not

19  fair.

20       Q.     How did that become fairly clear to

21  you during the investigation?

22            MR. McKANE:   And let me instruct you

23       not, in answering that question, to the

24       extent that you can, not to divulge any

25       attorney-client communications that you may

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 24 of 104

Page 24

1                      W. MARX

2          have had during that time period.

3          Q.      With your attorneys.

4          A.      Understood.

5                  Again, it was the overall tone and

6    direction of the questioning that led me to

7    believe that.

8          Q.      Anything else?

9          A.      No.

10         Q.      Are you familiar with the phrase "the

11   First 2009 Tax Allocation Agreement"?

12         A.      I am.

13         Q.      Are you familiar with that document?

14         A.      Very.

15         Q.      All right.  Let's mark that.

16                 (Marx Exhibit 3, Amended and Restated

17         Agreement for the Allocation of United

18         States Federal Income Taxes, bearing Bates

19         Nos. RC40016379 through 16384, marked for

20         identification, as of this date.)

21   BY MR. COHEN:

22         Q.      What does "tax allocation" mean?

23         A.      Tax allocation is a concept that

24   arises when two or more companies join in filing

25   a combined or consolidated tax return and

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 25 of 104

Page 25

1                              W. MARX

2    there's a sharing of the overall tax liability.

3        Q.      Anything else?

4        A.      That's how I would describe tax

5    allocation.

6        Q.      Does it also involve sharing of

7    overall tax benefits?

8        A.      Yes.  When I say tax liability, I mean

9    to say net tax liability, whether that's a plus

10   or a minus.

11       Q.      Okay.  Thank you.  With respect to the

12   First 2009 Tax Allocation Agreement with ResCap,

13   whose idea was it to propose this document?

14              MR. McKANE:  Objection to form.

15       A.      The -- it wasn't an idea to propose an

16   allocation agreement; it was a requirement under

17   the Operating Agreement.

18       Q.      What was the date of the Operating

19   Agreement?

20       A.      I don't know, the initial Operating

21   Agreement dates back to 2005, and I believe that

22   requirement was in that Operating Agreement, and

23   then there were more recent versions that

24   continued that requirement.

25       Q.      Between 2005 and the proposal of this

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 26 of 104

Page 26

1                    W. MARX

2    Exhibit 3, the First 2009 Tax Allocation

3    Agreement, was there an allocation agreement

4    between AFI and ResCap in place?

5         A.     There would have been various forms of

6    allocation agreements during that timeframe.

7    From the beginning of ResCap in 2005 through

8    11/30/2006 when they were part of the GM

9    consolidated group, there was an allocation

10   agreement in place.

11              Then beginning 12/1/2006 through some

12   date a year or two later, I don't recall, there

13   was a lapse where we failed to put in place an

14   agreement.  It was an oversight.  During that

15   time, ResCap was part of a passthrough

16   operation, so taxes were pretty nominal.

17              At some point in time, in connection I

18   believe it was with an issuance of debt,

19   somebody noted that, oh, there's supposed to be

20   a Tax Allocation Agreement requiring these

21   two-way payments, and there wasn't one in place.

22   So at that point one was drafted to be effective

23   retroactively to 12/1/06 up to that point in

24   time, and that agreement stayed in place up

25   until the provision of the new agreement.

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 27 of 104

Page 27

1                          W. MARX

2          Q.    Okay.  Who decided that the agreement

3     that was in place up to the provision of the new

4     agreement, and I saw you reference Exhibit 3,

5     which is the first two --

6          A.    Well --

7          Q.    Let me finish my question.

8                -- which is the First 2009 Tax

9     Allocation Agreement, who decided that that

10    agreement that had been in place should be

11    replaced with a new agreement?

12                MR. McKANE:   Objection to form.

13    Misstates testimony.

14                Go ahead.

15         A.    Let me clarify my answer, my previous

16    answer, and restate it.   I miss -- misspoke.

17                The 2006 allocation agreement would

18    have been effective until -- what was the

19    effective date proposed on these?   I believe it

20    was 11/1, when -- when the 2009 allocation

21    agreement was ultimately executed and put in

22    place, that was effective 11/1/2009.   So that

23    2006 agreement would have been effective up

24    until that date.

25         Q.    Okay.   When you say when the 2009

JSN Objection
27:25-28:6:
FRE 402 (Not relevant)
FRE 602, 701, 702
(Lacks foundation, calls
for expert opinion)

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 28 of 104

Page 28

1                          W. MARX

2    agreement was put into place, it was effective

3    11/1, you are referring to Exhibit 3?

4        A.      No, I'm referring -- I'm referring to

5    the second agreement, which I believe is the

6    effective agreement.

7        Q.      Okay.   Is it your view that Exhibit 3,

8    the First 2009 Tax Allocation Agreement, was

9    never effective?

10       A.      That is my view.

11       Q.      What is the basis of that view?

12       A.      It was never executed.

13       Q.      It was never executed by whom?

14       A.      By ResCap.

15       Q.      Was it executed by AFI?

16       A.      It was.

17       Q.      Why was it executed by AFI?

18               MR. McKANE:   Objection.   Overbroad.

19               Go ahead.

20       A.      It was, at that time, it was believed

21   that that was the allocation agreement that

22   would be put into place, so we were in the

23   process of executing it.

24       Q.      Who believed it was the allocation

25   agreement that would be put in place?

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 29 of 104

Page 29

1                          W. MARX

2          A.      Ally Tax did and apparently the

3   signatories that signed the allocation

4   agreement.

5          Q.      So the signatories on the Ally side

6   believed this was the deal that would be put in

7   place?

8          A.      At the time they signed it, yes.

9          Q.      And who is the one who made sure that

10   the logistics of getting it signed were done?

11   Who at Ally did that?

12          A.      That was me.

13          Q.      On what basis did you determine that

14   this was the agreement that Ally should sign?

15              MR. McKANE:    Objection to form.

16          Misstates prior testimony.

17          Q.      This being -- at what point did you

18   determine that AFI should sign Exhibit 3?

19          A.      I'm not sure how to answer that

20   question.    There was -- it was drafted.    It was

21   reviewed by various parties.    Various

22   adjustments and amendments were made to it.

23              At some point, we believed we had

24   consensus -- "we," being Ally Tax, believed we

25   had consensus that this would be the form of the

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 30 of 104

Page 30

1                                    W. MARX

2      agreement, so we set about to have it executed.

3            Q.      All right.   Did you have an

4      understanding as to whether ResCap agreed that

5      this was the form of agreement that should be

6      executed?

7            A.      I understand that the board had

8      reviewed it.   I know that the board's

9      independent counsel to -- or, counsel to the

10     independent directors had reviewed it and had --

11     we had some back and forth about some of the

12     language in it, and I understand that the board

13     had approved it to be executed.

14           Q.      And when you say the board had

15     approved "it" to be executed, you're referring

16     to Exhibit 3?

17           A.      Correct.

18           Q.      All right.   Who was responsible for

19     getting ResCap's signature on this agreement?

20           A.      I took control of gathering up

21     signatures from all around, you know, all of the

22     signatures.

23           Q.      Why did you think it was appropriate

24     to try and get ResCap's signature on this

25     agreement?

Plaintiff's
Objection
30:3-17
Irrelevant
(FRE 401,
402), lack of
personal
knowledge
(FRE 602),
lack of
foundation
(FRE 602,
901, 903)

Page 31

1                         W. MARX

2        A.      Because I did not believe the

3   agreement was enforceable and in place until it

4   was executed by all parties.

5        Q.      All right.   But it was your belief

6   that this agreement embodied the deal that you

7   had struck with ResCap; is that right?

8        A.      At the point in time that we were

9   beginning to execute it, yes.

10        Q.      Who drafted this agreement?

11        A.      Primarily, me.

12        Q.      Did you use an example?

13        A.      Restate.   I don't understand what

14   you're asking me.

15        Q.      Did you start with a blank Word

16   document or was there some other agreement that

17   you --

18        A.      No, it was --

19        Q.      Let me finish.

20            Did you start with a a blank Word

21   document or was there some other agreement you

22   used as a model?

23            MR. McKANE:   Objection to form.

24        A.      I would have started with a previously

25   drafted document.

Plaintiff's
Objection
31:5-9  Irrelevant
(FRE 401, 402),
unduly
prejudicial (FRE
403)

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 32 of 104

Page 32

W. MARX

1

2      Q.     All right.   Who negotiated this

3   agreement with ResCap on behalf of AFI?

4      A.     The primary parties would have been

5   myself and probably Jim Aretakis was involved in

6   some of those discussions.

7      Q.     And with whom on the ResCap side were

8   you negotiating this agreement?

9      A.     It was -- I'm trying to recall.  I

10  believe I distributed it to Tammy Hamzehpour,

11  who was their general counsel, and the

12  businessperson would have been Jim Young.

13     Q.     Are you aware of anybody else at

14  ResCap who would have been involved in those

15  discussions with the AFI people?

16     A.     Cathy Dondzila was signatory.  She may

17  have proposed some comments at a point in time,

18  but I would say the major driver would have been

19  Jim Young and Tammy and outside counsel.

20     Q.     Who was outside counsel?

21     A.     Morrison -- I always say this wrong.

22  It's either Morrison Cohen or Morrison Foerster.

23     Q.     All right.   Who on the AFI side had

24  responsibility for accepting or rejecting

25  changes that ResCap suggested?

Plaintiff's
Objection
32:2-12:
Irrelevant (FRE
401, 402)

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 33 of 104

Page 33

1                          W. MARX

2       A.     The primary contact would have been

3    through me and probably Jim Aretakis, and given

4    the timeframe, Jim would have been the CTO by

5    the time this was actually getting executed, I

6    think.  Is that right?  '10, '11, yeah.  So it

7    would have been Jim and I.

8       Q.     As between your responsibilities for

9    negotiating this document and Jim Aretakis', how

10   would you describe that divide?

11      A.     I was the person who was primarily,

12   you know, pushing the process along.  I drafted

13   the documents.  Then interested parties would

14   submit comments and suggestions and, you know,

15   they would be accepted, modified, rejected,

16   depending on what they were.

17      Q.     On the AFI side, who were the

18   interested parties who reviewed this document

19   before you sent it to ResCap?

20           MR. McKANE:  Objection to form.

21      A.     The parties would have included

22   myself, Jim Aretakis, probably Jay Frucci, David

23   DeBrunner, Cathy Quenneville, who was an officer

24   of one of the signatory companies, I believe,

25   was one of them, Anita Bhama, tax attorney --

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 34 of 104

Page 34

1                           W. MARX

2    not tax attorney, attorney on legal staff.  I

3    don't recall others at this point.

4        Q.    Who within AFI controlled the master

5    document?  Who was responsible for collecting

6    all of the comments and implementing them and

7    accepting or rejecting changes?

8        A.    Me.

9        Q.    When were the negotiations over the

10   First 2009 Tax Allocation Agreement completed?

11       A.    We began -- completed, it was sometime

12   late in 2010.  I don't recall the specific date.

13   I believe it was presented at an August board

14   meeting to the ResCap Board, and they approved

15   it pending some wording changes that were to be

16   suggested by their outside counsel, if I recall.

17            I might be mixing up the agreements.

18   That last piece may have related to the second

19   agreement, but it was sometime the second half,

20   late third quarter, early fourth quarter of

21   2010, I believe.

22       Q.    When did the negotiations over Exhibit

23   3, the First 2009 Tax Allocation Agreement,

24   begin?

25       A.    December of 2009.

Plaintiff's Objection 34:9-21 Irrelevant (FRE 401, 402), confusing (FRE 403), lack of personal knowledge (FRE 602)

Plaintiff's Objections 34:22-36:23 Irrelevant (FRE 401. 402), unduly prejudicial (FRE 403)

Page 35

1                        W. MARX

2        Q.      Why did it take so long to negotiate

3   this agreement?

4        A.       Initially, we hoped to have an

5   agreement in place for the year-end close in

6   2009, so it received a fair amount of attention

7   early on.   And then the urgency fell away,

8   nobody seemed to think it was critical, and you

9   know, the draft agreement sat in ResCap's hands

10  waiting for them to act on it, respond, until I

11  think it was mid 2010 when I started chasing

12  Tammy again saying, you know, where is this?

13  What's going on?

14              Their process of review with outside

15  counsel and with the board just took an

16  inordinate amount of time.   It was out of my

17  control.

18       Q.    When you started the process of

19  collecting signatures at AFI, you determined,

20  though, by that point that negotiations had been

21  completed, right?

22       A.     I believed them to be at that time,

23  yes.

24       Q.     And when you sent it to ResCap for

25  signature, you believed the negotiations had

Page  36

1                         W. MARX

2    been completed, right?

3         A.     Yes.

4         Q.     I believe you testified that you knew

5    ResCap was presenting this agreement to its

6    board of directors for approval, right?

7         A.     Yes.

8         Q.     You also believed that the document

9    that was being presented to ResCap's board of

10   directors for approval was the final agreement

11   with respect to the matters contained in the

12   document, right?

13              MR. McKANE:   Objection to form.

14        A.     At that point, I believe that was the

15   final version that was proposed for execution.

16        Q.     So the version that went to ResCap's

17   board, Exhibit 3, was the final deal, right?

18              MR. McKANE:   Objection to form.

19        A.     It was thought to be the final version

20   at that time.

21        Q.     It was thought to be the final version

22   at that time by you, right?

23        A.     Yes.

24        Q.     And do you have any reason to believe

25   that ResCap's board didn't believe it to be the

Page 37

1                        W. MARX

2    final version at that time?

3              MR. McKANE:  Objection to form.  Calls

4       for speculation.

5       A.      Yeah, I can't speak for the ResCap

6    Board.

7       Q.      Did you have any expectation that

8    ResCap was presenting a draft document that was

9    subject to further negotiation to its board of

10   directors?

11             MR. McKANE:  Same objection.

12      A.      I did not at that time.

13      Q.      When you drafted this document, you

14   did not add a provision that provided that the

15   agreement would only be effective and

16   enforceable upon being signed by all parties to

17   the agreement, did you?

18      A.      Those words are not in the agreement.

19   However, I intended and believed that the

20   signatory blocks made it clear that the document

21   wasn't effective until it was signed by the

22   parties.

23      Q.      So it was your belief that just

24   signature lines encompassed that point that I

25   just raised?

Plaintiff's Objection 37:7-12 Irrelevant (FRE 401, 402), confusing (FRE 403), lack of personal knowledge (FRE 602)

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 38 of 104

Page 38

1                           W. MARX

2              MR. McKANE:  Misstates testimony.

3         A.      Yes.

4         Q.      And none of the people, including the

5    legal counsel at AFI, suggested to you that you

6    add language including a provision that said the

7    agreement would only be effective and

8    enforceable upon being signed by all parties to

9    the agreement?

10             MR. McKANE:  I'm going to instruct you

11        not to answer to the extent that you just

12        asked him to divulge an attorney-client

13        communication regarding AFI.

14             To the extent you can answer the

15        question by setting aside any communications

16        you had with AFI counsel regarding the

17        contents of the agreement, you can answer.

18        A.      I decline to answer.

19        Q.      Let me ask you a broader question.

20   Did any of the people at AFI who reviewed and

21   provided comments to you suggest that the

22   agreement -- that you include language that the

23   agreement would be -- only be effective and

24   enforceable upon being signed by all parties to

25   the agreement?

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 39 of 104

Page 39

1                          W. MARX

2          MR. McKANE:  Same instruction

3      regarding privilege.

4      A.    Yeah, I -- I decline to answer.

5          MR. McKANE:  To the extent there are

6      others -- to the extent you recall, and it's

7      not an attorney at AFI, you can answer the

8      question.

9      A.    I'm quite certain that nobody would

10     have advised that because it strikes me as

11     language that perhaps would have been added.  I

12     don't know.  I have no recollection of that.

13     Q.    Okay.  Certainly there's no reason you

14     couldn't have included a provision like that in

15     the contract, right?

16     A.    I suppose it could have been included

17     if it was deemed necessary.

18     Q.    You testified earlier about the

19     concept of disregarded entity.

20          Was there a relationship between

21     ResCap's status as a disregarded entity and the

22     desire to have a Tax Allocation Agreement?

23          MR. McKANE:  Objection to form.

24     Vague.  Confusing.  Ambiguous.

25     A.    I'm not even sure I understand the

Page 40

W. MARX

1   question.

3   Q.   Okay.  Well, let's look at Exhibit 2,

4   which is the Examiner's Report, and if you would

5   turn to the page marked V-315.  Are you there?

6   A.   Uh-huh.

7   Q.   I'd like to direct your attention to

8   the first paragraph on that page where the

9   examiner says, "In connection with the

10  discussions in December 2009 about making ResCap

11  a disregarded entity for federal tax purposes

12  around November 1, 2009, AFI drafted the First

13  2009 Tax Allocation Agreement between ResCap and

14  AFI," and then in parens, "(and GMAC Mortgage,

15  LLC) to become effective November 1, 2009."

16       Do you see that sentence?

17  A.   I do.

18  Q.   Was there a relationship between the

19  discussions about making ResCap a disregarded

20  entity for federal tax purposes and AFI's desire

21  to have the First 2009 Tax Allocation Agreement

22  put in place?

23       MR. McKANE:   Same objections.

24  A.   No, the -- it wasn't a desire, as I

25  stated before, to have an allocation agreement

Plaintiff's Objection 40:18-41:15 Inadmissible hearsay and double hearsay (FRE 802), irrelevant (FRE 401, 402), unduly prejudicial (FRE 403), lack of personal knowledge (FRE 602), lack of foundation (FRE 602, 901, 903), incomplete (FRE 106)

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 41 of 104

Page 41

W. MARX

1

2  in place.    It was a requirement under the

3  Operating Agreement, and since circumstances

4  were changing and it was unclear whether or not

5  the existing 2006 agreement was adequate to meet

6  the needs in the changed circumstances, we

7  decided -- we, Ally Tax, decided what to draft a

8  more clear allocation agreement that would

9  reflect the new reality.

10      Q.    Okay.    Let's stay in that paragraph

11  and I'm going towards the middle -- I'll count.

12  Seven lines down, the examiner writes, "AFI

13  drafted the First 2009 Tax Allocation Agreement

14  to treat ResCap generally as if ResCap were a

15  standalone taxpayer."

16          Do you see that sentence?

17      A.    I do.

18      Q.    Do you agree with that sentence?

19      A.    Yes.

20      Q.    The next sentence says, "The

21  agreement, however, was more favorable to ResCap

22  than a pure standalone agreement or being left

23  as a disregarded entity without a federal income

24  tax allocation agreement in place because it

25  entitled ResCap to be paid for its tax benefits

Plaintiff's Objection 41:16-19 Inadmissible hearsay and double hearsay (FRE 802), irrelevant (FRE 401, 402), unduly prejudicial (FRE 403), lack of personal knowledge (FRE 602), lack of foundation (FRE 602, 901, 903), incomplete (FRE 106)

Plaintiff's Objection 41:20-42:15, Inadmissible hearsay and double hearsay (FRE 802), irrelevant (FRE 401, 402), unduly prejudicial (FRE 403), lack of personal knowledge (FRE 602), lack of foundation (FRE 602, 901, 903), incomplete (FRE 106)

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 42 of 104

Page 42

1                            W. MARX

2    that AFI could currently use even if ResCap

3    could not yet use the tax benefits on a

4    standalone basis."

5              Do you see that?

6    A.    I do.

7    Q.    Was that one of the goals of Exhibit

8    3, the First 2009 Tax Allocation Agreement?

9              MR. McKANE:   Objection to form, and --

10   A.    There was a provision in that draft

11   agreement that would have resulted in this

12   treatment as stated in the examiner's report.

13   Q.    Who put that provision in the draft

14   agreement?

15   A.    Well, I did.   I drafted the agreement.

16   Q.    Why did you put that provision in the

17   draft agreement?

18   A.    The primary driving reason for it was

19   ResCap, by the fourth quarter, was expected to

20   have a net deferred tax asset on its books

21   against which there would have been a full

22   valuation allowance.   In other words, an asset

23   that would be written down to a value of zero

24   for book purposes, impairing their equity by

25   that amount.

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 43 of 104

Page 43

1                            W. MARX

2                The theory or the hope that we were

3        pursuing -- we, Ally Tax -- at this time was

4        that if we had language to this effect in the

5        allocation agreement, and if the parent company

6        was not in a valuation allowance situation,

7        meaning a conclusion had been reached that it

8        was more likely than not that at the top of that

9        consolidated house all of those tax attributes

10       would be utilized in the carry-forward period,

11       the hope was that we would be able to, within

12       the accounting guidance, be able to treat that

13       as some type of a guarantee that would allow

14       ResCap to not have a valuation allowance since

15       at some point it would be likely that they would

16       receive benefit for those losses.

17           Q.    And you said that this was driven by a

18       fourth quarter issue on ResCap's financials?

19           A.    Just the facts that existed at the

20       time.   It wasn't a particular issue.

21           Q.    Okay.   But you understood that Exhibit

22       3, the First 2009 Tax Allocation Agreement, was

23       a longer term agreement; it wasn't just going to

24       deal with one quarter at ResCap?

25           A.    Yes.

Page 44

1                         W. MARX

2        Q.    Was that a benefit; that language in

3   the agreement a benefit to ResCap?

4        A.    If that provision had been invoked by

5   the facts, it would have resulted in better

6   treatment than ResCap would have been able to

7   obtain if it were filing its own tax return on a

8   standalone basis.

9        Q.    And who would --

10       A.    So it was a potential benefit.

11       Q.    Who would have been providing that

12  potential benefit to ResCap?

13       A.    AFI.

14       Q.    And that was a conscious decision on

15  the part of AFI to provide that potential

16  benefit?

17            MR. McKANE:   Objection to form.

18       Misstates testimony.

19       A.    It was a conscious choice of the tax

20  staff to propose that language.   It was not

21  vetted very far up the line with senior

22  management.

23       Q.    Did that language stay in the final

24  document that you presented to AFI for

25  signature?

1                        W. MARX

2        A.    Yes.

3        Q.    Did it stay in the final document that

4   was presented to the ResCap Board for signature?

5        A.    The final version of the first

6   agreement, yes.

7        Q.    So that language was not removed by

8   anyone at AFI?

9        A.    Not in the first agreement.

10       Q.    Was that benefit, that treatment

11   consistent with tax allocation agreements that

12   AFI had with other affiliates?

13       A.    It was consistent with allocation

14   agreements with our bank's subsidiary and our

15   insurance subsidiaries, both of which are

16   regulated entities, and that provision is

17   required by the regulators.   And there is no

18   such regulatory provision that would require it

19   in the ResCap situation.

20       Q.    So, even though it wasn't required in

21   the ResCap situation, when you drafted the

22   agreement, you chose to put that language in,

23   right?

24       A.    Right, for the aforementioned goal of

25   trying to preserve equity at the ResCap level.

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 46 of 104

Page 46

1                         W. MARX

2        Q.    Are you familiar with the phrase       Plaintiff's Objection
                                                      46:2-47:4, Irrelevant
3    "equity bump"?                                   (FRE 401, 402)

4        A.    Yes.   That's what I was just referring

5    to.

6        Q.    What does "equity bump" mean?

7              MR. McKANE:   He just answered the

8        question.

9        A.    Yes, it's the answer I gave with

10   respect to removing the valuation allowance

11   against the deferred tax assets, thereby

12   increasing net equity.

13       Q.    And that was one of the drivers for

14   including this language in the first --

15       A.    That was the primary driver.

16       Q.    Let me finish my question.

17       A.    Sorry.

18       Q.    That was one of the drivers for

19   including this language in the First 2009 Tax

20   Allocation Agreement, right?

21       A.    Yes.

22       Q.    Why was that one of the goals?

23       A.    Well, at the time the -- ResCap was

24   consistently challenged with respect to

25   maintaining adequate capital under its debt

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 47 of 104

Page 47

1                           W. MARX

2    covenants and anything that could be done to

3    preserve equity seemed to be a -- a good

4    objective.

5         Q.    Was that provision in Exhibit 3, the

6    First 2009 Tax Allocation Agreement, run by

7    AFI's outside auditors?

8              MR. McKANE:  Objection to form.

9         A.    I don't know that we ever shared the

10   draft agreement with them.  We discussed the

11   concept with them and, you know, the initial

12   reaction back was, well, it's an interesting

13   theory, let's think about whether that would

14   work.

15             We never got to a point of a formal

16   decision as to whether, under the accounting

17   guidance, this idea would have worked.

18        Q.    So they never gave you a final answer?

19        A.    Well, the facts changed in such a way

20   that it became moot.  By the end of the fourth

21   quarter, there were substantial losses recorded

22   at the AFI level that resulted in AFI also being

23   in a full valuation allowance with respect to

24   its deferred tax assets.  So that kind of made

25   the whole possibility of this -- this -- this

Page 48

1                        W. MARX

2    guarantee notion go away.

3        Q.    What was the date of the end of the

4    fourth quarter?

5        A.    December 31.

6        Q.    2009?

7        A.    Yes.

8        Q.    So, even though that issue went away

9    because of the AFI loss, you didn't revise the

10   draft Exhibit 3 to take out that language, did

11   you?

12       A.    I don't recall the significant time

13   gap between December 31 and when this thing got

14   picked up again, and the whole focus on tax

15   allocation had -- there was -- there was not a

16   lot of interest in it because it just was not an

17   urgent matter during that interim period, and

18   quite frankly, there was not a lot of thought

19   that went back when -- when we picked it back up

20   again, that issue was old and the -- it was an

21   oversight to go back and re-think whether that

22   should stay in the agreement or not.

23       Q.    You testified that it was you who

24   reached out to ResCap to get their comments back

25   sometime in 2010 on the agreement.  So you were

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 49 of 104

Page 49

W. MARX

1

2  really pushing them to turn it; is that right?

3      A.    Yes.   This was one of those

4  administrative tasks that fell under Tax

5  Operations, and I knew it was out there and at

6  some point we needed to have an agreement in

7  place.

8      Q.    Okay.  So, notwithstanding that your

9  view was that it wasn't an urgent matter, you

10 were still trying to get it done, right?

11     A.    Yes.

12     Q.    And when you picked it back up, there

13 was nobody who prevented you from reading the

14 agreement again, right?

15     A.    That's correct.

16     Q.    And you understood what was in the

17 agreement because you wrote the agreement,

18 right?

19     A.    That's correct.

20     Q.    I'd like you to look in Exhibit 2, the

21 Examiner's Report, on page V-316.  Let me know

22 when you're there.

23     A.    I am there.

24     Q.    In the first full paragraph on that

25 page, the examiner writes, "The First 2009 Tax

Plaintiff's
Objection
49:24-50:20
Inadmissible
hearsay and
double hearsay
(FRE 802),
irrelevant (FRE
401, 402),
unduly
prejudicial
(FRE 403), lack
of personal
knowledge
(FRE 602), lack
of foundation
(FRE 602, 901,
903),
incomplete
(FRE 106)

Page 50

W. MARX

1

2   Allocation Agreement went through a series of

3   revisions that resulted in substantial changes

4   to its operative provisions.   First, Morrison &

5   Foerster, counsel to ResCap, and Morrison Cohen,

6   counsel to the Independent Directors, reviewed a

7   December 14, 2009 draft and submitted their

8   collective comments on December 23, 2009.   Their

9   comments appear to have been rejected by AFI."

10      Do you recall when you got those

11  comments?

12      A.   I recall there were discussions with

13  them and we went back and forth over some

14  proposed changes.   I would need to see the

15  documentation of what the comments were to talk

16  about them.

17      Q.   But do you recall whether there were

18  discussions on the draft that you originally

19  provided to ResCap in December 2009?

20      A.   Yes, there were discussions.

21      Q.   Okay.   And then the discussions went

22  dormant to some point in 2010, right?

23      A.   Yes.

24      Q.   Okay.   At what point did AFI start to

25  analyze what it would cost AFI if this agreement

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 51 of 104

Page 51

1                      W. MARX

2    were implemented?

3              MR. McKANE:   Objection to form.

4        A.     I wouldn't characterize it as

5    analyzing what it would cost.   As part of our

6    normal tax return filing process, once the

7    return is completed, there's a 45-day period

8    provided in all of our allocation agreements to

9    settle up taxes amongst all of the subsidiaries.

10             So, immediately upon finalizing the

11   consolidated tax return, there would be a

12   process where we would start analyzing

13   entity-by-entity what their taxable income was

14   and, for the appropriate groups, what their

15   allocated tax might be.

16             So sometime on or about September 15,

17   I would estimate, of 2010, we would have had

18   sufficient data from the tax return to start

19   those allocation calculations, and what was put

20   in as a placeholder for ResCap, even though we

21   weren't finalized with the agreement, were

22   proforma calculations that would have mirrored

23   the first agreement.

24        Q.     Okay.   When you say you weren't

25   finalized with the agreement, what do you mean?

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 52 of 104

Page 52

1                          W. MARX

2        A.      Meaning the agreement wasn't finalized

3   and executed yet.

4        Q.      Well, AFI had executed it by that

5   point, hadn't it?

6        A.      I don't recall the dates.  They were

7   third quarter -- I believe, yes, I believe we

8   had.  I believe we had.

9        Q.      Okay.  And ResCap, to your

10  understanding, had not executed it yet, right?

11       A.      That's correct.

12       Q.      And one of the reasons ResCap had not

13  executed it yet is, even though it was your

14  responsibility to get their signature, you

15  hadn't sent them the packet; is that right?

16       A.      That is correct.

17       Q.      And after you started running the

18  calculations in mid September and you realized

19  what AFI's exposure under this contract would

20  be, you tried to get ResCap not to sign the

21  agreement, didn't you?

22              MR. McKANE:  Objection to form.

23       A.      I would not characterize it that way.

24  The sequence of events was the agreements were

25  executed in Detroit by the AFI people, and what

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 53 of 104

Page 53

1                           W. MARX

2    was intended to occur was Mr. Frucci was

3    planning to be in Minneapolis for some other

4    business reasons and we thought it would be

5    appropriate for him to take the binder with him,

6    sit down with Jim Young, walk him through, make

7    sure he got all the signatures, and as silly as

8    it may sound, he forgot the binder.  So he ends

9    up in Minneapolis without the binder, comes

10   back, and we thought, well, just take it the

11   next time you go.

12           Sat around a few more weeks, and we

13   realized that he didn't have any immediately

14   foreseeable travel plans, so said, you know

15   what, let's just overnight this thing to Jim,

16   which we did.  And timing was kind of uncanny.

17   It was right in that timeframe that we realized

18   the -- the size and scale of the potential

19   payments.  We said, wait a minute.  This feels

20   like it's bigger than something tax staff should

21   be doing on its own.

22       Q.    Okay.  When was Mr. Frucci supposed to

23   go to Minneapolis to present the binder to Mr.

24   Young to have ResCap sign it?

25       A.    I don't know.  Sometime in that --

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 54 of 104

Page 54

1                            W. MARX

2    sometime in September, I would guess.

3        Q.    Early September?

4        A.    I don't recall the dates.

5        Q.    But when AFI signed Exhibit 3, the

6    First 2009 Tax-Sharing Agreement, that signature

7    indicated its intent to be bound by the

8    agreement, right?

9        A.    That signature indicated the

10   signatories' understanding that that was an

11   authorized agreement and that they were

12   authorized to sign it.

13       Q.    And if they were authorized to sign

14   it, it signified AFI's intent to be bound by

15   that agreement, right?

16            MR. McKANE:    Objection.    It calls for

17       a legal conclusion.

18            To the extent you can answer based on

19       your lay understanding, you can answer.

20       A.    Yes, I would say that's correct.

21       Q.    Okay.    And if Mr. Frucci had taken the

22   binder to Minneapolis, it may well be that the

23   ResCap signature would have been on the binder.

24   So it's happenstance that ResCap didn't sign at

25   or about the time that AFI did, right?

Plaintiff's Objection
54:3-4, Incomplete (FRE 106),
lack of personal knowledge
(FRE 602), confusing (FRE
403)

Plaintiff's
Objection
54:5-12
Irrelevant
(FRE 401,
402), unduly
prejudicial
(FRE 403),
calls for legal
conclusion
(FRE 701, 702,
703), lack of
personal
knowledge
(FRE 602)

Plaintiff's Objection
54:13-20 Irrelevant
(FRE 401, 402),
unduly prejudicial
(FRE 403), calls for
legal conclusion
(FRE 701, 702, 703)

Plaintiff's
Objection
54:21-55:8
Irrelevant (FRE
401, 402),
unduly
prejudicial
(FRE 403), lack
of personal
knowledge/
speculative
(FRE 602)

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 55 of 104

Page 55

1                           W. MARX

2                 MR. McKANE:   Objection to form.   Calls

3        for speculation.

4        A.      Yeah, I can't -- I can't say with

5   certainty that Mr. Young would have signed the

6   agreements.   Perhaps he would have, perhaps he

7   would not have, but I can't say what would

8   happen if it didn't happen.

9        Q.      Well, certainly when you asked Mr.

10  Frucci to take the binder to Minneapolis to have

11  Mr. Young sign it, you knew that ResCap's board

12  had approved the agreement, right?

13       A.      Correct.

14       Q.      Do you have any reason to believe that

15  Mr. Young wouldn't have signed the agreement if

16  Mr. Frucci had carried the binder with him?

17                MR. McKANE:   Again, lack of

18        foundation.   Calls for speculation.

19       A.   I'm simply not going to speak for Mr.

20  Young.  It's a question for him.

21       Q.   So you have no reason to believe it?

22                MR. McKANE:   Objection to form.

23       A.   I have no reason to believe what?   I'm

24  sorry.

25       Q.   That Mr. Young wouldn't have signed

Plaintiff's Objection 55:9-56:4 Irrelevant (FRE 401, 402), unduly prejudicial (FRE 403), lack of personal knowledge/speculative (FRE 602)

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 56 of 104

Page 56

1                          W. MARX

2    that agreement?

3         A.      I have no reason to believe that, but

4    I don't know that he would have signed it.

5         Q.      Is there any reason during any point

6    between December 2009, when AFI and ResCap began

7    discussing this agreement, and August of 2010,

8    when a final draft was presented to and approved

9    by ResCap's board, that AFI couldn't have

10   estimated its obligations under the agreement?

11        A.      AFI could have done some proforma

12   calculations based on estimated taxable income.

13   However, our ability to estimate taxable income

14   and get it parsed by group was quite limited.

15   So those calculations would not have been

16   terribly precise or reliable, but it's possible.

17        Q.      Given that possibility, did AFI ever

18   make any attempt during that time period between

19   December 2009, when it first started negotiating

20   the agreement, and August 2010, when ResCap's

21   board approved the agreement, to model this at

22   all?

23        A.      No.

24        Q.      Why not?

25        A.      Probably -- I shouldn't say

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 57 of 104

Page 57

1                          W. MARX

2    "probably."

3              In my mind, and I've been responsible

4    for reviewing and preparing tax allocations for

5    a number of years, this particular provision

6    that had been in place with respect to other --

7    the bank and the insurance companies had never

8    resulted in the significant payment, it never --

9    simply had never been an issue of this

10   magnitude, and quite frankly, we just didn't

11   think down that next step and say, oh, let's

12   make sure we know what's coming.

13      Q.    Is it true that under Exhibit 3, if

14   this were the operative agreement, it would have

15   cost ResCap nothing; ResCap would not have been

16   making payments to AFI?

17              MR. McKANE:   Objection to form.   Calls

18      for speculation.

19      A.    No.   No.   I can answer that.   No,

20   that's not correct.

21      Q.    Under what circumstances would ResCap

22   have been making cash payments to AFI?

23      A.    Now let me clarify.   On a net basis,

24   for 2009, you're correct, there would have been

25   a payment to ResCap, but it would have been

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 58 of 104

Page 58

1                           W. MARX

2    reduced by the tax on the excess inclusion

3    income, which is a tax that cannot be offset by

4    operating losses.   So there -- there would have

5    been theoretical cash flowing in both

6    directions.

7          Q.    Let's look again at Exhibit 2, the

8    Examiner's Report.   Let's go to page V-317, and

9    in the first full paragraph about midway down,

10   there's a sentence that starts with, "The joint

11   ResCap-AFI tax memorandum..."

12         A.    Yes.

13         Q.    "...which was co-authored by Marx,

14   Young and Hamzehpour, summarized the history of

15   ResCap's federal tax classification and provided

16   a detailed analysis of the terms of the First

17   2009 Tax Allocation Agreement, ResCap's deferred

18   tax position, and the governance requirements

19   relevant to the decision to approve the

20   agreement."   Do you see that sentence?

21         A.    I do.

22         Q.    Why were you part of the group that

23   was writing a memo to ResCap's board?

24         A.    I was asked to review -- the memo was

25   drafted primarily by Ms. Hamzehpour, and I was

Plaintiff's Objection 58:7-61:3 Inadmissible hearsay and double hearsay (FRE 802), irrelevant (FRE 401, 402), unduly prejudicial (FRE 403), lack of personal knowledge (FRE 602), lack of foundation (FRE 602, 901, 903), incomplete (FRE 106)

Page 59

1                        W. MARX

2    asked to review it with respect to the tax

3    matters that were discussed therein just to make

4    sure that they were accurate, and I provided

5    comments.

6              I had really no input or involvement

7    with the governance portions of that memo and,

8    you know, some of the other pieces, but where

9    they talk specifically about what was in the

10   agreement and how it would operate, I made some

11   comments.

12       Q.    Were your comments accepted by ResCap?

13       A.    I -- I'm sure some of them were.  I

14   don't recall all the details of the comments

15   back and forth.  There was nothing controversial

16   or -- or -- what's the word I'm looking for?

17             The memo that she initially drafted

18   was largely on point.

19       Q.    So the final memo you had an

20   opportunity to review, and if there was anything

21   wrong, you had an opportunity to comment on it?

22       A.    Correct.

23       Q.    Was there anything in the final memo

24   that went to the board that you disagreed with?

25       A.    I don't believe so.

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 60 of 104

Page 60

1                           W. MARX

2       Q.     If you look at the indented paragraph

3   at the end of this page, it says, the first

4   bracket, "First 2009 Tax Allocation Agreement,"

5   close bracket, "generally provides that ResCap

6   will be allocated income taxes under a

7   hypothetical calculation that assumes ResCap to

8   be a standalone taxpayer, filing its own tax

9   returns, with full rights to make all accounting

10  method choices and tax elections available under

11  the law."  Do you see that?

12      A.     I do.

13      Q.     Is that a true statement?

14      A.     Yes.

15      Q.     Next sentence says, "However, in cases

16  where the consolidated return regulations allow

17  the AFI group of companies to benefit from net

18  operating losses, capital losses or foreign tax

19  credits before ResCap could benefit from them on

20  a standalone basis, the Agreement requires AFI

21  to pay GMAC Mortgage Group, LLC and GMAC

22  Mortgage Group LLC to currently pay ResCap for

23  those tax attributes."

24             Do you see that?

25      A.     I do.

Page 61

W. MARX

2    Q.    Is that a true statement?

3    A.    Yes.

4    Q.    "This is the only provision that

5    differs from standalone treatment for ResCap,

6    and in all cases can only be beneficial to

7    ResCap, i.e., it may allow the monetization of

8    tax benefits earlier, or in some cases where the

9    benefits would have expired and been permanently

10    lost by ResCap, if it had been [sic] a

11    standalone taxpayer."

12        Is that a true statement?

13    A.    It's imprecisely true.    I would have

14    said -- it says "in all cases can only benefit."

15    It could be neutral.    So it would be neutral or

16    it could benefit.    It could never be a

17    detriment.

18    Q.    Okay.

19        MR. McKANE:    Can we go off the record

20    for a second?

21        MR. COHEN:    Sure.

22        THE VIDEOGRAPHER:    The time is 10:56.

23    We're going off the record.

24        (Recess.)

25        THE VIDEOGRAPHER:    This is the start

Plaintiff's
Objection
61:4-61:17
Inadmissible
hearsay and
double hearsay
(FRE 802),
irrelevant (FRE
401, 402), unduly
prejudicial (FRE
403), lack of
personal
knowledge (FRE
602), lack of
foundation (FRE
602, 901, 903),
incomplete (FRE
106)

Page 62

W. MARX

1

2    of tape labeled number 2.  The time is

3    11:13.  We're back on the record.

4        MR. COHEN:  Would you read back my

5    last question and the witness's last answer,

6    please.

7        (Record read.)

8        (Marx Exhibit 4, Amended and Restated

9    Agreement for the Allocation of United

10    States Federal Income Taxes, bearing Bates

11    Nos. RC00028796 through 28801, marked for

12    identification, as of this date.)

13    BY MR. COHEN:

14        Q.    Mr. Marx, the reporter has handed you

15    a document marked Exhibit 4.  Do you recognize

16    this document?

17        A.    I do.

18        Q.    What is this document?

19        A.    This is the, I believe the second --

20    what has been referred to as the Second 2009, I

21    believe.

22        Q.    With respect to the Second 2009 Tax

23    Allocation Agreement, is it also true that this

24    document could only be a benefit or neutral to

25    ResCap?

Plaintiff's
Objection
62:08 – 063:06
Incomplete (FRE
106)

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 63 of 104

Page 63

1                              W. MARX

2           A.     As compared with?

3           Q.     The First 2009 Tax Allocation

4   Agreement.

5                  MR. McKANE:  Objection to form.

6           A.     I'm sorry.  Restate your question.

7           Q.     You testified that the First 2009 Tax

8   Allocation Agreement could only be a benefit or

9   neutral to ResCap; do you recall that?

10          A.     I do.

11          Q.     Is that same statement true with

12  respect to the Second 2009 Tax Allocation

13  Agreement?

14          A.     No.

15          Q.     So the Second 2009 Tax Allocation

16  Agreement could be detrimental to ResCap,

17  correct?

18          A.     No.  It is less beneficial than the

19  first, but not detrimental.

20          Q.     In what way is it less beneficial than

21  the first?

22          A.     It did not provide for the possibility

23  of the acceleration of monetizing tax attributes

24  that could not yet be used by ResCap on a

25  standalone basis.

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 64 of 104

Page 64

1                          W. MARX

2        Q.      Why didn't it so provide?

3        A.      Because that clause was removed -- why

4    didn't it -- that's the whole change from the

5    first draft to the second draft.  The decision

6    was made that AFI chose not to offer to

7    accelerate that benefit.

8        Q.      Why did AFI choose not to offer to

9    accelerate that benefit?

10       A.      My understanding is that matters of

11   capitalization of ResCap, at least in large

12   number, amounts over $50 million, was reserved

13   to the board, and we -- the company did not

14   choose to put in place an allocation agreement

15   that could result in capital contributions that

16   would not be subject to board approval.

17       Q.      Now, you drafted Exhibit 3, which was

18   the First 2009 Tax Allocation Agreement.  Did

19   you also draft Exhibit 4, which is the Second

20   2009 Tax Allocation Agreement?

21       A.      I did.

22       Q.      Were you the one who took out that

23   provision?

24       A.      Yes.

25       Q.      Was it your view that that provision

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 65 of 104

Page 65

1                              W. MARX

2  should be removed?

3        A.     I was not the decision-maker there,

4  but I understood why it was removed.

5        Q.     Who was the decision-maker there?

6        A.     I would say it was -- well, I can't

7  say.  I was -- I was informed by Jim Mackey that

8  he agreed that it should come out.  He was the

9  chief financial officer at the time.

10       Q.     When you say you were informed that

11 Jim Mackey agreed that it should come out, with

12 whom was he agreeing?

13       A.     With me.  We had a discussion, an

14 e-mail discussion back and forth, but I can't

15 say whether Jim made that discussion -- that

16 decision independently or if others were

17 involved.  I simply don't know.

18       Q.     What was your recommendation with

19 respect to whether that provision should come

20 out?

21       A.     I did not make a recommendation.  I --

22 I proposed alternatives, one being leave the

23 first draft as is or change the draft to remove

24 this language.

25       Q.     Did you have a view as to which was

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 66 of 104

Page 66

1                          W. MARX

2      the more desirable course for AFI?

3          A.      Really not my call to make.

4          Q.      So you didn't have a view?

5          A.      No.

6          Q.      Before -- let's go back to Exhibit 3.

7                  Before you embarked on getting the

8      signatures to Exhibit 3, the first allocation

9      agreement, did you check with in-house counsel

10     as to whether additional approvals were needed?

11         A.      The draft had been reviewed by

12     in-house counsel and I was not told of any

13     additional governance that was required.  I

14     don't recall if there was a specific discussion

15     about it or not.

16         Q.      Would you turn to page VII.K-29 in

17     Exhibit 2, which is the Examiner's Report.

18         A.      I'm sorry, K-29?

19         Q.      Yes.  Let me know when you're there.

20         A.      I am there.

21         Q.      Looking at the first full paragraph on

22     that page, the examiner writes, "When DeBrunner

23     signed the First 2009 Tax Allocation Agreement,

24     he believed he was acting under 'delegated

25     authority.'"  Do you see that sentence?

Plaintiff's Objection 66:6-67:14 Inadmissible hearsay and double hearsay (FRE 802), irrelevant (FRE 401, 402), unduly prejudicial (FRE 403), lack of personal knowledge (FRE 602), lack of foundation (FRE 602, 901, 903), incomplete (FRE 106), calls for legal conclusion (FRE 701, 702, 703)

Page 67

1                          W. MARX

2        A.     I do.

3        Q.     Do you know what is meant by

4    "delegated authority"?

5              MR. McKANE:   Objection to the extent

6        it calls for a legal conclusion.

7        A.     I understand the concept of authority

8    being delegated, yes.

9        Q.     What is your understanding of that

10   concept?

11       A.     That certain levels of management --

12   the board and certain levels of management are

13   granted various levels of authority to perform

14   functions, and it starts from the board on down.

15       Q.     Did you have an understanding as to

16   whether Mr. DeBrunner was acting under delegated

17   authority when he signed the First 2009 Tax

18   Allocation Agreement?

19              MR. McKANE:   Objection to form.

20              Are you asking now does he have an

21       understanding or are you asking then?

22              MR. COHEN:   I'll ask a different

23       question.

24   BY MR. COHEN:

25       Q.     Why did you ask Mr. DeBrunner to sign

Plaintiff's
Objection
67:25-68:13
Irrelevant (FRE
401, 402)

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 68 of 104

Page 68

1                          W. MARX

2    the First 2009 Tax Allocation Agreement?

3        A.    Because he was the chief accounting

4    officer for AFI at the time and that seemed an

5    appropriate level and function to be entering

6    into the Tax Allocation Agreement.

7        Q.    At the time you asked Mr. DeBrunner to

8    sign the First 2009 Tax Allocation Agreement,

9    did you have a belief as to whether he was

10   acting under delegated authority?

11       A.    Yes, I would have believed that or

12   else I wouldn't have asked him to sign the

13   document.

14       Q.    Okay.    The next sentence says, "AFI's

15   in-house counsel was of the same belief."

16           Is that a true statement?

17           MR. McKANE:    Objection.    Calls for

18       speculation.

19       A.    If it was in a memo that I wrote, I'm

20   sure that I was told that, yes.

21       Q.    Okay.    So let's go to the next

22   sentence.    "A September 9, 2010 memorandum

23   circulated by Marx provides that AFI's in-house

24   counsel advised that 'no additional governance

25   is required at the AFI level' in connection with

Plaintiff's Objection 68:14-70:16: Inadmissible hearsay and double hearsay (FRE 802), irrelevant (FRE 401, 402), unduly prejudicial (FRE 403), lack of personal knowledge (FRE 602), lack of foundation (FRE 602, 901, 903), incomplete (FRE 106)

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 69 of 104

Page 69

1                          W. MARX

2    the execution of the First 2009 Tax Allocation

3    Agreement."

4              Do you see that?

5       A.    I do.

6       Q.    Is that a true statement?

7       A.    I'm sure that it is.  Now that I see

8    this, I believe I remember that was perhaps part

9    of the buck slip or the transmittal letter that

10   circulated around for signature.

11      Q.    So you sought legal advice as to

12   whether AFI had authority to sign the agreement

13   without board approval, and you were told yes,

14   right?

15      A.    Apparently I was told --

16            MR. McKANE:  Objection to form.

17      A.    Apparently I was told that there was

18   no further governance needed to execute the

19   agreements.

20      Q.    What did you understand the advice

21   that no further governance was needed to mean?

22      A.    No further governance was needed.  I

23   mean, I don't know how more clearly to state

24   that.

25      Q.    What does "governance" mean in the

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 70 of 104

Page 70

1                          W. MARX

2    context of that sentence?

3          A.      Approvals.

4          Q.      Board approvals?

5          A.      Any approvals.

6          Q.      Okay.  So it was your understanding at

7    the time you asked Mr. DeBrunner to sign the

8    document that no further approvals were required

9    and that he could legally sign the document,

10   correct?

11         A.      At that time, yes.

12         Q.      And that it was based on your advice

13   with AFI -- your conversations and the advice

14   you received from AFI's in-house counsel,

15   correct?

16         A.      Yes.

17         Q.      Did there come a time when you tried

18   to convince ResCap not to sign the agreement?

19               MR. McKANE:    Objection to form.

20         A.      I would not say I tried to convince

21   them.  I suggested that there may be a problem

22   with the documents and that we would like to

23   propose changes, but, you know, I did not tell

24   them, you know, I didn't control what Jim Young

25   did.

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 71 of 104

Page 71

1                              W. MARX

2          Q.      What did you believe to be the problem

3    with the documents?

4          A.      The level of capital contributions

5    that were going to be required under the

6    agreement, and with the passage of time,

7    understanding the sensitivity around

8    capitalization of ResCap, I thought perhaps we

9    need more senior management attention to this.

10         Q.      Did you go back to in-house counsel on

11   that issue?

12         A.      I don't believe so.  I don't recall

13   that I did.  I believe I went directly to Jim

14   Mackey with the issue.

15         Q.      Okay.  So let me make sure I

16   understand this.  You went to in-house counsel

17   to ask whether additional approvals were needed,

18   you were told no, and then you went to Jim

19   Mackey, who was the CFO, to ask the same

20   question?

21         A.      No.

22                 MR. McKANE:  Objection to form.

23         A.      No.  I went to Jim Mackey to inform

24   him that we have a partially executed agreement

25   out there, and the result of which would be this

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 72 of 104

Page 72

1                     W. MARX

2    capital contribution, and I was seeking his

3    input as to how to proceed.

4        Q.    Why didn't you go back to in-house

5    counsel and raise the governance question again?

6        A.    I didn't realize it was a matter of

7    governance.  It was, in my mind, a matter of a

8    business issue, and in a large corporation, you

9    typically start with up your chain of command

10   when an issue arises.

11       Q.    What was the business issue that you

12   recognized?

13       A.    The potential large capital

14   contribution.

15       Q.    So it was the economics of the deal

16   that caused you to call Mr. Mackey?

17            MR. McKANE:   Objection to form.

18       Misstates testimony.

19       A.    It was -- it was a concern that Ally

20   Tax had gone beyond its authority or -- its

21   authority, I guess, to put in place an agreement

22   that was going to result in large capital

23   contributions to ResCap at a time when I was

24   aware that, over the passage of time, various

25   issues and transactions had occurred where

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 73 of 104

Page 73

1               W. MARX

2 capital contributions required board approval.

3     Q.     Would you describe that as a

4 governance issue?

5               MR. McKANE:  Objection.  Form.

6     A.     I didn't know at the time specifically

7 that it was a governance issue.  It was more a

8 business environment issue.  I was observing

9 this going on and thinking somebody above me

10 needs to know what's happening here.

11     Q.     At the time you raised this concern

12 with Mr. Mackey, were you aware that there were

13 signed copies from the AFI side of this

14 agreement out there floating around?

15     A.     Yes.

16     Q.     Did you do anything to gather copies

17 of those agreements?

18     A.     I did.

19     Q.     Why?

20     A.     Because we were unsure whether it was

21 appropriate to execute those documents.

22     Q.     Well, the documents had already been

23 executed, hadn't they?

24     A.     Partially.

25     Q.     Okay.  Why did you go about gathering

Plaintiff's
Objection
73:11-24
Incomplete (FRE
106)

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 74 of 104

Page 74

1                       W. MARX

2    the partially executed documents?

3         A.    Because it was not clear to me that,

4    at that point in time, that there had been an

5    appropriate level of senior management

6    involvement in the approval of these documents.

7         Q.    At the time you gathered the AFI

8    executed documents, did you have any belief as

9    to whether the contract was enforceable?

10        A.    I believed the contract not to be

11   enforceable at that time because it had not been

12   fully executed.

13        Q.    If the contract was not enforceable in

14   your view at the time, why would it matter if

15   there were AFI signed documents within AFI?

16        A.    Well, it wasn't -- if the documents

17   remained partially unexecuted, it wouldn't have

18   mattered.  The point of gathering the documents

19   was to hold off on full execution until such

20   time that it had received appropriate review.

21        Q.    Well, how would collecting documents

22   at AFI prevent full execution when ResCap

23   already had an AFI executed copy of the

24   document?

25              MR. McKANE:  Objection to form.

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 75 of 104

Page 75

1              W. MARX

2         Misstates prior testimony.

3         A.      The documents were not gathered from

4    AFI.   They were gathered from ResCap.

5         Q.      So you called ResCap and said, will        Plaintiff's Objection

6    you send us back the AFI executed documents?            75:5-12  Incomplete
                                                             (FRE 106)

7    A.      Yes.

8         Q.      Who did you talk to at ResCap about

9    that?

10        A.      Jim Young's administrative assistant,

11   and there was a subsequent discussion with Jim

12   explaining the concern.

13        Q.      What specifically did you discuss with

14   Mr. Young explaining the concern?

15        A.      The -- I'm just working from memory

16   here.   There was an e-mail that outlines the

17   discussion with Jim Young basically letting him

18   know that the agreement, as drafted, had an

19   unintended or unexpected consequence of very

20   large capital contributions that had not been

21   fully vetted at this end, the Ally end, and I

22   needed to talk to Jim Mackey about it and please

23   hold off on executing the documents.

24        Q.      What did he tell you?

25        A.      His reaction was he understood the

Page 76

1                       W. MARX

2    concern and was, you know, agreeable that the

3    document should not be executed if it was not

4    consistent with what Ally's senior management

5    would want to have in place.

6        Q.    Did he explain why that was his view?

7        A.    I don't recall that he did, no, not to

8    me directly.

9        Q.    Would you look at the Examiner's

10   Report at K-27.  Let me know when you're there.

11       A.    I am there.

12       Q.    Looking at the first paragraph after

13   the indented portion where the examiner notes

14   that, "AFI changed its mind after executing the

15   agreement when it calculated its expected

16   payment obligation to ResCap and realized that

17   its payment obligation to ResCap would be

18   hundreds of millions of dollars."

19           Do you see that sentence?

20       A.    I do.

21       Q.    Do you agree with that sentence?

22       A.    I do not.

23       Q.    What portion or portions of that

24   sentence don't you agree with?

25       A.    The characterization that AFI changed

Plaintiff's
Objection
76:12-77:22
Inadmissible
hearsay and
double hearsay
(FRE 802),
irrelevant (FRE
401, 402), unduly
prejudicial (FRE
403), lack of
personal
knowledge (FRE
602), lack of
foundation (FRE
602, 901, 903),
incomplete (FRE
106)

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 77 of 104

Page 77

1                              W. MARX

2      its mind.   AFI Tax changed its mind, had

3      concerns, and it became apparent that the

4      decision to produce and, you know, move this --

5      to propose this first allocation agreement

6      should have received more senior management

7      review.

8          Q.    Okay.   So if that sentence changed to,

9      "AFI Tax changed its mind after executing the

10     agreement when it calculated its expected

11     payment obligation to ResCap and realized that

12     its payment obligation to ResCap would be

13     hundreds of millions of dollars," you would

14     agree with that reformulation as a true

15     statement?

16         A.    I would agree that AFI raised concerns

17     that this agreement might not be acceptable to

18     senior management; reached out to senior

19     management for further review and advice.

20         Q.    When you say "senior management," to

21     whom are you referring?

22         A.    Jim Mackey.

23         Q.    Anyone else?

24         A.    I don't believe I had any discussions

25     with anybody more senior to Jim on this matter.

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 78 of 104

Page 78

1                          W. MARX

2      Q.      Do you not consider that the head of

3   AFI tax to be part of senior management?

4      A.      He is senior to me, but he's not part

5   of the Management Committee.   He's not part of

6   that top-level echelon of senior management.

7      Q.      Looking after the next indented

8   paragraph, the full paragraph that states, "If

9   there was any 'mistake' made here, it was AFI's

10  unilateral mistake in failing to anticipate the

11  magnitude of its monetary obligation under the

12  First 2009 Tax Allocation Agreement."   Do you

13  see that sentence?

14     A.      I do.

15     Q.      Do you agree with that sentence?

16     A.      I do not.

17             MR. McKANE:   Objection.   To the extent

18  you're asking him to interpret unilateral

19  mistake or bilateral mistake or any other

20  legal term, I object; but to the extent you

21  understand those terms in your lay

22  understanding, please answer.

23     A.      I do not agree with that.

24     Q.      What portion or portions of that

25  sentence do you not agree with?

JSN Objection
78:2-6  FRE
402 (Not
relevant)

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 79 of 104

Page 79

W. MARX

1

2      A.     I believe that Jim Young was in a

3  position to understand the potential for large

4  capital contributions.  I believe -- I don't

5  know if the ResCap Board was focused on that or

6  not, but I believe on the ResCap side, I've

7  subsequently learned about a restriction with

8  respect to the approvals for capital

9  contributions that I think ResCap would have

10  been aware of.

11      Q.     When you say, "I believe Jim Young was

12  in a position to understand the potential for

13  large capital contributions," what do you mean?

14      A.     I think he understood what the

15  agreement called for.

16      Q.     And by that do you mean -- do you

17  think Jim Young understood that there was the

18  possibility that AFI would be making substantial

19  capital contributions under the First 2009 Tax

20  Allocation Agreement?

21           MR. McKANE:  Objection to form.

22  Misstates the testimony.

23      A.     I do believe that.

24      Q.     And when you say that you've learned

25  on the ResCap side subsequently "about a

JSN Objection
79:24-81:17
FRE 402 (Not
relevant)

Page 80

1                        W. MARX

2    restriction with respect to approvals for

3    capital contributions that I think ResCap would

4    have been aware of," what do you mean by that?

5         A.    I -- I don't know how to more clearly

6    state that.

7         Q.    What restriction are you referring to?

8         A.    Subsequent to the drafting of these

9    agreements, I learned that there was a

10   reservation of authority at the Ally board level

11   that required board approval for capital

12   contributions in excess of $50 million, and I

13   would expect and believe that the Ally -- I'm

14   sorry, the ResCap Board and people at Jim

15   Young's level would have been aware of that.

16        Q.    So you believed at the time the ResCap

17   Board approved this and you had sent the

18   document to Jim Young for execution, ResCap was

19   both aware of the potential for large capital

20   contributions from AFI and was aware of the

21   board restriction at AFI on capital

22   contributions to ResCap?

23        A.    I don't know what they were aware of,

24   but I'm saying that the characterization of this

25   as, if there was a mistake, it was unilateral

JSN
Objection
80:16-81:17
FRE 602
(Lacks
personal
knowledge;
calls for
speculation)

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 81 of 104

Page 81

1                          W. MARX

2    doesn't strike me as correct.

3              I think ResCap was in the same

4    situation of being able to understand.  So if

5    there was a mistake made, it was a mutual

6    mistake, in my mind.

7       Q.    What makes you think that AFI viewed

8    receiving large capital contributions -- or,

9    strike that.  What makes you think that ResCap

10   viewed receiving large capital contributions

11   from AFI as a mistake?

12      A.    If they understood there was

13   governance required in order for such capital

14   contribution to be made, yet would still enter

15   into a agreement that would circumvent that

16   requirement, if it were valid, that seems to be

17   either a mistake or something else.

18      Q.    Other than the governance issue, do

19   you have any reason to believe that ResCap

20   viewed a contract receiving large capital

21   contributions from AFI as a mistake?

22              MR. McKANE:  Objection to the form.

23      A.    I can't say whether ResCap viewed this

24   contract as a mistake or not.  I can't speak for

25   ResCap.

Page 82

1                        W. MARX

2        Q.      Okay.    When you requested that Mr.

3    Young send you back the AFI signed copies of

4    Exhibit 3, the First 2009 Tax Allocation

5    Agreement, did he comply with that request?

6        A.      Yes.

7        Q.      So he sent them back to you?

8        A.      Yes.

9        Q.      What did you do with them?

10       A.      Once the final agreements were

11   executed, those were destroyed.    They were not

12   retained.

13       Q.      When you say "final agreements,"

14   you're referring to Exhibit 4?

15       A.      Is that the second signed agreement?

16       Q.      Yes.

17       A.      Correct.

18       Q.      Did you discuss whether those

19   agreements should be destroyed with anybody

20   before they were destroyed?

21       A.      No.    It never occurred to me that they

22   might be -- could be viewed as valid.

23       Q.      Who actually destroyed them?

24       A.      Probably me.

25       Q.      Why did you destroy them?

Plaintiff's Objections
82:2-83:17
Irrelevant (FRE 401,
402), unduly prejudicial
(FRE 403)

Page 83

1                          W. MARX

2        A.        They served no further purpose once we

3    had what I thought was the final allocation

4    agreement in place.

5        Q.        Were there signed copies of Exhibit 3,

6    the First 2009 Allocation Agreement, also within

7    AFI in its files?

8        A.        They were, no, not -- they were all

9    together in the binder.   There were multiple

10   copies in a binder, the intent being that each

11   signatory company would receive an originally

12   signed document once they were fully executed.

13   So they were all together, partially executed,

14   in one binder.

15       Q.        Where is that binder now?

16       A.        It's been disassembled and the

17   contents destroyed.

18       Q.        Did you destroy the AFI binder as

19   well?

20       A.        There was no AFI binder.   It was one

21   binder that was circulated around to all the

22   signers and all of them were together.   Only --

23   yeah, that's --

24       Q.        Okay.   I understand.

25                 Would you look at page K-19 of Exhibit

Plaintiff's
Objection
83:24-84:19,
Inadmissible
hearsay and
double hearsay
(FRE 802),
irrelevant (FRE
401, 402), unduly
prejudicial (FRE
403), lack of
personal
knowledge (FRE
602), lack of
foundation (FRE
602, 901, 903),
incomplete (FRE
106)

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 84 of 104

Page 84

1                          W. MARX

2    2, the Examiner's Report.

3          A.    I am there.

4          Q.    Looking at the first sentence of the

5    first paragraph on that page, the examiner

6    writes, "Despite having already signed the 2009

7    Tax Allocation Agreement around September 13,

8    2010, in October 2010, AFI had a change of heart

9    and decided that it did not want to move forward

10   with implementing the agreement."

11              Do you see that statement?

12         A.    I do.

13         Q.    Do you agree with that statement?

14         A.    Again, I would characterize AFI as AFI

15   Tax.

16         Q.    So if that -- if the word "tax" were

17   added after "AFI" in that sentence, you would

18   agree with that sentence?

19         A.    Yes.

20         Q.    Once you first determined that the

21   monetary impact of Exhibit 3, the First 2009 Tax

22   Allocation Agreement, what did you do?

23         A.    I notified Mr. Mackey of the

24   circumstances and asked for his input.

25         Q.    What did he tell you?

JSN Objection
84:25-85:9
FRE 802 (Hearsay)
FRE 1002 (Best evidence)

Page 85

1                        W. MARX

2        A.      There was a little back and forth on

3   the e-mail, but he asked what the alternatives

4   were, which I described to him, and I think the

5   ultimate resolution was he communicated with Jim

6   Young and they agreed not to execute the

7   document because it hadn't been fully socialized

8   or vetted at the Ally end and it was something

9   that would be discussed ongoing.

10       Q.      What period of time was AFI

11  considering what to do about this issue?

12       A.      It was a fairly short couple of days.

13       Q.      Do you recall when in September -- the

14  examiner says the contract was signed by AFI on

15  September 13.  Do you recall when this issue was

16  discovered?

17       A.      I don't recall the specific date, but

18  there are -- there's e-mails in the record.  The

19  e-mail from me to Jim Mackey describing the

20  circumstance would have been dated either that

21  day or perhaps the day after we discovered it.

22       Q.      Okay.  Would you turn -- we're going

23  back towards the front of the report to pages

24  V-321 and V-322 of the report.

25       A.      I'm there.

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 86 of 104

Page 86

W. MARX

1

2      Q.      All right.  So I'd like to focus your

3   attention on the last full sentence on page

4   V-321.  "Marx suggested that they let Young and

5   DeBrunner know that AFI's senior financial

6   management is reconsidering the tax allocation

7   approach and he will get back to them in

8   November 2010 with his modification plan."

9           Do you see that sentence?

10      A.      I do.

11      Q.      Is that a true sentence?

12           MR. McKANE:   Objection to form.

13      Q.      Is that a true statement?

14      A.      I believe it is, yes.

15      Q.      Okay.  And if you look at the footnote

16   there, it references an e-mail from you dated

17   October 15, 2010.

18           Does that refresh your recollection as

19   to the timing of when AFI discovered it didn't

20   like the economics of Exhibit 3, the First 2009

21   Tax Allocation Agreement?

22           MR. McKANE:   Objection to form.

23   Misstates prior testimony.

24      A.      It would have been -- that timeframe

25   is consistent with when we would have been

Plaintiff's Objection 86:15-87:6 Inadmissible hearsay and double hearsay (FRE 802), irrelevant (FRE 401, 402), unduly prejudicial (FRE 403), lack of personal knowledge (FRE 602), lack of foundation (FRE 602, 901, 903), incomplete (FRE 106)

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 87 of 104

Page 87

W. MARX

2    performing these initial calculations and when

3    those communications would have occurred.

4        Q.    So roughly a month after AFI had

5    signed the agreement, correct?

6        A.    Yes.

7        Q.    All right.  The next sentence says,

8    "Mackey agreed that he did not want to make

9    payments to ResCap, and he asked Marx, 'Do we

10   have to go back to them [ResCap], or can we just

11   ignore it?  Jim Y. and team are very focused on

12   other things, so they may not even think about

13   it."

14           Do you see that sentence?

15       A.    I do.

16       Q.    Do you recall Mr. Mackey asking you

17   that question?

18       A.    I believe it was in an e-mail, yes.

19       Q.    What did you understand him to mean

20   when he said "do we have to go back to them"?

21       A.    I think he was asking is this -- I

22   don't know.  I think it's clear.  Do we have to

23   go back to them?  Since it's a two-way contract,

24   it seemed clear to me, that, yeah, we're not

25   going to have a contract in place until

1                       W. MARX

2    everybody is in agreement and signed off.

3         Q.      Well, what if Mr. Young, instead of

4    returning all of the contracts to you, decided

5    to sign it instead?

6         A.      Then I think we would have had a

7    binding contract unless there was a problem with

8    authorization, which it appears there might have

9    been.

10        Q.      What do you mean when you say it

11   appears there might have been a problem with

12   authorization?

13        A.      I'm referring back to the $50 million

14   restriction that we spoke about earlier.

15        Q.      You, as a non-lawyer, don't have a

16   view as to whether authorization was needed or

17   not, do you?

18        A.      It seems apparent to me that an

19   agreement that could compel a capital

20   contribution in excess of the levels reserved

21   for the board would go beyond the authority of

22   myself and people that signed it.    That's my --

23   my lay view of it.    So I don't know if that

24   would be the ultimate conclusion or not.

25        Q.    Can you explain to me why you sought

Plaintiff's
Objection
88:3-9
Incomplete (FRE
106)

JSN Objection
88:10-14
FRE 402 (Not
relevant)

JSN Objection
88:18-22
FRE 402 (Not
relevant)
FRE 602, 701,
702 (Lacks
foundation, calls
for expert
opinion)

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 89 of 104

Page 89

W. MARX

1

2    legal advice before you asked Mr. DeBrunner to

3    sign the document but not after you thought

4    there may be a problem with authorization?

5              MR. McKANE:  Asked and answered

6        earlier in the day.

7    Q.    You can answer.

8              MR. McKANE:  No, you can restate your

9        earlier answer.

10    A.    As I believe my response was, and I do

11    believe it, an issue arose and I felt that it

12    most appropriate to start by going up my chain

13    of command.

14    Q.    And after you went up your chain of

15    command, did you do anything else?

16    A.    I did lots of things.

17    Q.    What else did you do?

18    A.    Well, eventually, we -- I redrafted

19    the agreement and reproposed it to the ResCap

20    people to represent to the board for approval.

21    That's the short version of what was done.

22    Q.    Is one of the things you did ask for

23    legal advice on the issue of corporate

24    governance?

25              MR. McKANE:  Asked and answered.

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 90 of 104

Page 90

W. MARX

2     A.    I do not believe I asked that question
3  at that point in time.

4     Q.    Prior to drafting, negotiating and
5  executing the Second 2009 Tax Allocation
6  Agreement, Exhibit 4, did you ask for legal
7  advice on the governance issue?

8     A.    I don't recall.  I would have go back
9  and look at the -- the transmittal letter and
10  the documentation around it.  I just don't
11  recall.

12     Q.    In your conversations with Mr. Young
13  when you presented Exhibit 4, which you have
14  acknowledged is less beneficial to ResCap than
15  the First Tax Allocation Agreement, why did you
16  believe ResCap would be amenable to a revised
17  contract?

18     A.    Because I don't -- did not then, nor
19  do I today, believe there's anything unfair or
20  unreasonable about the second agreement.

21     Q.    Why did you believe ResCap would want
22  a less favorable agreement as opposed to a more
23  favorable agreement?

24     A.    I didn't say that.  I'm sure they
25  would have preferred to take more favorable

JSN
Objection
90:21-91:25
FRE 602
(Lacks
personal
knowledge;
calls for
speculation)

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 91 of 104

Page 91

1                          W. MARX

2    treatment, but there was nothing unfair, and

3    that that provision in the first agreement I

4    would characterize as more than fair to ResCap

5    but not something required to be provided by

6    Ally.

7        Q.    Do you have any understanding as to

8    why ResCap was willing to give you back the Ally

9    signed copy of the first agreement and take a

10   less favorable agreement instead?

11       A.    Yes.

12       Q.    What is your understanding of that?

13       A.    My understanding is that initially Jim

14   Young recognized that, one, there might be some

15   governance issues, but I've also learned

16   subsequently that his view -- I'm paraphrasing

17   and I'm sure you'll ask him the same question --

18   was that Ally had been very supportive of ResCap

19   with respect to capitalization matters, had

20   supported them in a number of transactions, and

21   ResCap was very reliant upon Ally, and he did

22   not think it prudent to play "gotcha" with an

23   agreement that might not be what was appropriate

24   in the board's eyes or what was intended by the

25   board.

Page 92

¹                        W. MARX

²      Q.    Okay.  You said you've subsequently

³  learned that that was his view.  When did you

⁴  learn that that was his view?

⁵      A.    I believe I may have read it in the

⁶  Examiner's Report.  It may have come up in

⁷  discussions with counsel.  I don't recall the

⁸  specifics, but I know I have seen or heard that.

⁹      Q.    Okay.  Did you see or hear that

¹⁰ directly from Mr. Young?

¹¹     A.    No.

¹²     Q.    Okay.  The examiner in his report

¹³ concluded that AFI's obligations to ResCap under

¹⁴ the first Tax Allocation Agreement if it were in

¹⁵ effect would be approximately $1.77 billion.

¹⁶            Do you recall seeing that figure --

¹⁷     A.    I do.

¹⁸     Q.    -- in the report?

¹⁹            Do you have any reason to dispute that

²⁰ number?

²¹     A.    I think there's a flaw in the

²² calculation.

²³     Q.    What do you think is the flaw in the

²⁴ calculation?

²⁵     A.    The examiner included in the proceeds

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 93 of 104

Page 93

1                        W. MARX

2    available to settle the debt and the tax basis

3    the settlement amount, $750 million at the time,

4    would be $2.1 billion now, and it seems

5    incorrect to me that you would take into account

6    in a calculation of damages the payment of those

7    damages.   It just -- I think that calculation is

8    circular and that piece should be removed.

9        Q.    Other than that piece, do you have any

10   reason to think that -- I recognize that the

11   number changes, the $1.77 billion changes as a

12   result of you changing the inputs, but other

13   than that, did you have an issue with the way he

14   approached what he would characterize as AFI's

15   obligations under the First 2009 Tax Allocation

16   Agreement?

17            MR. McKANE:   Objection to form.

18        A.    I think that the format of the

19   calculation, having removed the settlement

20   amount, is a reasonable approach, theoretical

21   approach.   I have no view as to some of the

22   numbers he used as to proceeds, expected

23   proceeds on the sale of assets and whatnot.

24   That's a very subjective analysis.

25            So I would think that reasonable

Plaintiff's Objection 93:9-95:13 Inadmissible hearsay and double hearsay (FRE 802), irrelevant (FRE 401, 402), unduly prejudicial (FRE 403), lack of personal knowledge (FRE 602), lack of foundation (FRE 602, 901, 903), incomplete (FRE 106)

1                          W. MARX

2    people could disagree as to what those numbers

3    should be, but the approach seemed reasonable.

4        Q.    Okay.  Would you turn to page K-39 in

5    the Examiner's Report.

6        A.    I am there.

7        Q.    Looking at the second paragraph,

8    second sentence, the examiner writes, "When the

9    agreements are compared," he's talking about the

10   First and the Second 2009 Tax Allocation

11   Agreements, "there is little doubt that the

12   Second 2009 Tax Allocation Agreement placed

13   ResCap in a much worse position and provided no

14   benefit to ResCap at all."

15            Do you see that sentence?

16       A.    I do.

17       Q.    Do you agree that, as compared to the

18   First 2009 Tax Allocation Agreement, the Second

19   2009 Tax Allocation Agreement placed ResCap in a

20   much worse position?

21       A.    I would agree that the second

22   agreement was less beneficial to ResCap than the

23   first.

24       Q.    And by doing so, placed it in a much

25   worse position?

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 95 of 104

Page 95

1                    W. MARX

2        A.    Placed it in a -- there was the

3   potential for it to be in a worse position, yes.

4        Q.    In actuality, did it place it in a

5   worse position?

6        A.    Had the first agreement been in place

7   and followed, ResCap would have received cash

8   payments from Ally.  Under the second agreement,

9   it did not.

10       Q.    And the magnitude of those cash

11  payments would have been in the hundreds of

12  millions of dollars, correct?

13       A.    Yes.

14       Q.    So it was in a much worse position by

15  virtue of not receiving the hundreds of millions

16  of dollars in payments it would have received

17  under the first agreement that it did not

18  receive under the second agreement, right?

19            MR. McKANE:   Objection to form.

20       A.    That was one outcome of the change.

21  ResCap did, however, receive some wording

22  changes around clarifying the treatment of

23  carryovers as part of the settlement of the

24  second agreement.

25       Q.    And what benefit did that provide to

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 96 of 104

Page 96

1                          W. MARX

2    ResCap?

3         A.    It clarified that losses would be

4    available on a carryover and carry-back basis to

5    be utilized by ResCap in their standalone

6    calculation.

7         Q.    Have you done any -- have you made any

8    attempt to quantify that benefit to ResCap?

9         A.    It hasn't -- the facts have not yet

10   supported that.    They have been in a cumulative

11   loss pos- -- I should -- let me restate that.

12              I believe -- I want to say it was 2010

13   there was a positive taxable income at the

14   ResCap level that the '09 losses offset.    So

15   they did not in fact make a payment in that year

16   because the loss carryovers eliminated the need

17   for payment.

18         Q.    And do you know what the magnitude of

19   that benefit was?

20         A.    I'm working from memory.    My

21   recollection is the taxable income number was on

22   the order of $150 million, so roughly $50

23   million of tax.

24         Q.    Okay.  So it gave up, in agreeing to

25   the Second 2009 Tax Allocation Agreement in

Page 97

1                        W. MARX

2    place of the First 2009 Tax Allocation

3    Agreement, it gave up hundreds of millions of

4    dollars of benefit in exchange for realizing a

5    $50 million benefit; is that right?

6              MR. McKANE:  Objection to form.

7         Misstates prior testimony.

8         A.    Your statement presupposes that you

9    cut off at that point in time, but the agreement

10   would live on and work out, as it did, over

11   time.

12        Q.    But as we sit here today, if you look

13   at the two agreements -- and I realize we're

14   looking at it at a point in time -- it gave up

15   hundreds of millions of dollars of benefit on

16   the first agreement and realized a $50 million

17   benefit on the second agreement; is that right?

18             MR. McKANE:  Object to form.

19             Go ahead.

20        A.    If you assume -- yes, if you assume

21   the first agreement to have been valid and

22   enforceable and we moved to the second

23   agreement, yes, that's the math.

24        Q.    So I take it, given the $50 million

25   benefit that you just described, you disagree

12-12020-mg    Doc 5803-8    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: William Marx    Pg 98 of 104

Page 98

W. MARX

1

2    with the examiner's conclusion that the Second

3    2009 Tax Allocation Agreement provided no

4    benefit to ResCap at all?

5        A.    That is correct.

6        Q.    When AFI asked ResCap to send back the

7    signed -- the copies of the First Tax Allocation

8    Agreement that AFI had already signed and to

9    agree to the Second Tax Allocation Agreement,

10   did AFI provide any consideration to ResCap in

11   exchange for doing that?

12           MR. McKANE:  Objection to form.  Asked

13       and answered.

14       A.    I believe the second -- there was a

15   back and forth negotiation of the language in

16   the second agreement, and one of the concessions

17   we made was adding the language, the clarifying

18   language around net operating losses carrying

19   forward and backward.

20       Q.    Would you look at page K-40 of the

21   Examiner's Report.

22       A.    I am there.

23       Q.    It's the paragraph at the top of the

24   page, looking at the second sentence, the

25   examiner writes, "The only foreseeable

12-12020-mg   Doc 5803-8   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: William Marx   Pg 99 of 104

Page 99

W. MARX

1

2  consequence of ResCap's entry into the Second

3  2009 Tax Allocation Agreement was the issuance

4  of an obligation by ResCap to pay AFI amounts of

5  tax on account of excess inclusion income -- an

6  obligation that ResCap did not have prior to the

7  Second 2009 Tax Allocation Agreement because it

8  was a disregarded entity -- without any

9  corresponding right to be compensated for its

10  tax benefits."

11       Do you see that sentence?

12  A.    I do.

13  Q.    Do you agree with that sentence?

14  A.    I do not.

15  Q.    What portion or portions of that

16  sentence do you disagree with?

17  A.    I believe the first agreement as well

18  as the second agreement would have required

19  ResCap to pay tax on its excess inclusion

20  income.

21  Q.    Is there any other portion of that

22  sentence you disagree with?

23  A.    I thought that was the point of the

24  sentence.

25  Q.    Okay.  The sentence that follows says,

Page 100

1                        W. MARX

2    "Again, the Second 2009 Tax Allocation Agreement

3    contained no provision permitting any

4    possibility of payments being made to ResCap."

5              Do you see that sentence?

6    A.    I do.

7    Q.    Do you agree with that sentence?

8    A.    I do not.

9    Q.    Why don't you agree with that

10   sentence?

11   A.    I believe both the first and the

12   second agreements provided for two-way

13   sharing -- tax-sharing payments, depending on

14   the facts.

15             MR. COHEN:  Why don't we take five

16        minutes.  We may be done.

17             MR. McKANE:  That's the beauty of

18        efficiency.

19             THE VIDEOGRAPHER:  The time is 12:01

20        P.M.  We're going off the record.

21             (Recess.)

22             THE VIDEOGRAPHER:  The time is 12:12.

23        We're back on the record.

24             MR. COHEN:  Mr. Marx, we appreciate

25        your time today.  We pass the witness.

Page 101

1                    W. MARX

2          MR. McKANE:  We have no questions at

3    this time.

4          MR. SIMON:  Nothing from us.

5          THE VIDEOGRAPHER:  The time is 12:12.

6    That's the end of today's deposition.  We're

7    going off the record.

8                    oOo

9

10

11

12

13

14

15

16

17

18          _____

                  WILLIAM MARX

19

20    Subscribed and sworn to

      before me this     day

21    of          2013.

22

      _____

23

24

25

Page 102

1                      W. MARX

2

3                   CERTIFICATE

4    STATE OF NEW YORK )

                          :  ss

5    COUNTY OF NEW YORK)

6         I, Kathy S. Klepfer, a Registered

7    Merit Reporter and Notary Public within and

8    for the State of New York, do hereby

9    certify:

10        That WILLIAM MARX, the witness whose

11   deposition is herein before set forth, was

12   duly sworn by me and that such deposition is

13   a true record of the testimony given by such

14   witness.

15        I further certify that I am not

16   related to any of the parties to this action

17   by blood or marriage and that I am in no way

18   interested in the outcome of this matter.

19        In witness whereof, I have hereunto

20   set my hand this 18th day of October, 2013.

21

22   _____

         KATHY S. KLEPFER, RPR, RMR, CRR, CLR

23

24

25

1                        W. MARX

2                        INDEX

3    TESTIMONY OF W. MARX:                        PAGE

4    Examination by Mr. Cohen                        6

5

6    MARX EXHIBITS:                                PAGE

7    Exhibit 1, Ad Hoc Group of Junior Secured        14

8    Noteholders Notice of Subpoena to Ally

9    Financial Inc.

10   Exhibit 2, Report of Arthur J. Gonzalez,        20

11   As Examiner

12   Exhibit 3, Amended and Restated Agreement for    24

13   the Allocation of United States Federal Income

14   Taxes, bearing Bates Nos. RC40016379 through 16384

15   Exhibit 4, Amended and Restated Agreement for    62

16   the Allocation of United States Federal Income

17   Taxes, bearing Bates Nos. RC00028796 through 28801

18

19

20

21

22

23

24

25

Page 104

1                         W. MARX
2    NAME OF CASE:  In Re Residential Capital LLC
3    DATE OF DEPOSITION:  October 18, 2013
4    NAME OF WITNESS:  William Marx
5    Reason Codes:
6         1.  To clarify the record.
          2.  To conform to the facts.
7         3.  To correct transcription errors.
8    Page _____ Line _____ Reason _____
     From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25                   _____