

Page 1

UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

IN RE:

RESIDENTIAL CAPITAL, LLC, et al.

Civil Action No. 12-12020 (MG)

----------------------------------------X


        VIDEO DEPOSITION OF JOE CORTESE

            New York, New York

         Wednesday, October 30, 2013



                R E V I S E D




Reported by:

Rebecca Schaumloffel, RPR, CLR

Job No: 66994


            Yellow Highlighting = JSN Designations
            Pink Highlighting = Plaintiff's Designations & Counter-Designation
            Orange Highlighting = Joint Designations
            The Debtors' counter-designations reflected herein are to be admitted, if at
            all, only upon admission of the JSNs' corresponding affirmative designation.

Page 2

1

2          Wednesday, October 30, 2013

3                9:17 a.m.

4

5

6

7          Video deposition of Joe Cortese,

8  held at the offices of KIRKLAND & ELLIS, LLP,

9  601 Lexington Avenue, New York, New York

10  before Rebecca Schaumloffel, a Registered

11  Professional Reporter, Certified Livenote

12  Reporter and Notary Public of the State of

13  New York.

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2   A P P E A R A N C E S:

3

4      MORRISON & FOERSTER
             Attorneys for the Debtors
5            1290 Avenue of the Americas
             New York, New York 10104
6            BY:  ROBERT BAEHR, ESQ.

7

8

9      KRAMER LEVIN
             Attorneys for the Creditors
10           Committee
             1177 Avenue of the Americas
11           New York, New York 10036
             BY:  NORMAN SIMON, ESQ.

12

13

14

15     MILBANK TWEED HADLEY & McCLOY
             Attorneys for Junior Secured
16           Lenders
             1 Chase Manhattan Plaza
17           New York, New York 10005
             BY:  ATARA MILLER, ESQ.
18                KELLY ANN PRESSLER, ESQ.

19

20

      KIRKLAND & ELLIS
21           Attorneys for Ally
             655 Fifteenth Street, N.W.
22           Washington, D.C. 20005
             BY:  GREG SKIDMORE, ESQ.
23                KATE WOOLER, ESQ.

24

25

1

2

APPEARANCES (continued:)

3

4


DECHERT

5          Attorneys for Bank of New York
           1095 Avenue of the Americas

6          New York, New York 10036
           BY:  JAMES MOORE, ESQ.

7

8

9    ALSO PRESENT:

10

11          Matthew Smith, videographer

12          Francis Kuplicki, Esq,

13          David Kochman, Esq. Reed Smith

14

15          *           *           *

16

17

18

19

20

21

22

23

24

25

Page 5

1          J. CORTESE

2          THE VIDEOGRAPHER:   This begins

3     tape labeled number one of the

4     videotaped deposition of Joe Cortese,

5     in the matter of In re:   Residential

6     Capital, LLC, et al., for the United

7     States Bankruptcy Court for the

8     Southern District of New York.

9          This deposition is being held at

10    601 Lexington Avenue in New York, New

11    York, on October 30, 2013, at

12    approximately 9:17 a.m.

13         My name is Matthew Smith for TSG

14    Reporting, Incorporated.   I am the

15    legal video specialist.   The Court

16    Reporter is Rebecca Schaumloffel, in

17    association with TSG Reporting.   All

18    appearances have been noted for the

19    record.

20         Will the Court Reporter please

21    swear in the witness.

22    J O E   C O R T E S E, called as a witness,

23    having been first duly sworn by a Notary

24    Public of the State of New York, was

25    examined and testified as follows:

1            J. CORTESE

2   EXAMINATION BY

3   MS. MILLER:

4        Q.    Good morning, Mr. Cortese.

5        A.    Good morning.

6        Q.    My name is Atara Miller.  I am an

7   attorney with Milbank, Tweed, Hadley, &

8   McCloy.  We represent the ad hoc group of

9   junior secured note holders in this case.

10            I just want to start with a

11  couple of rules that will help the day

12  progress smoothly and quickly.

13            The first one is, as you know,

14  there is a Court Reporter taking down

15  everything that I say and everything that you

16  say, and so to make her life easier, if you

17  could not interrupt me when I am asking

18  questions.  Let me finish my question before

19  you give an answer and I will try to do the

20  same.  That way she won't have to try to

21  record two people at the same time.  And,

22  also, if you can give verbal answers instead

23  of nods of the head or grimaces or other kind

24  of nonverbal reactions or responses to

25  questions, that would also make her life a

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 7 of 237

Page 7

J. CORTESE

1

little bit easier.

2

        There may be times during today's

3

deposition that your counsel will object to a

4

question that I ask.  I am going to ask you

5

to answer the question that I asked, unless

6

you are specifically instructed by your

7

counsel not to answer the question.

8

        If at any time today you feel

9

like you need or want a break, just let me

10

know.  I will be happy to take one.  The only

11

thing that I am going to ask, if I have asked

12

you a question, that you answer the question

13

that's pending before we take a break.  Other

14

than that, I think we should be good.

15

    A.    Okay.

16

    Q.    So can you describe for me your

17

educational background?

18

    A.    I am -- I graduated from Widener

19

University with a Bachelor of Science degree

20

in accounting.  I have an MBA from Saint

21

Joseph's University in finance, and I am a

22

CPA, and licensed in the state of

23

Pennsylvania.

24

    Q.    When did you get your BS in

25

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 8 of 237

Page 8

1                        J. CORTESE

2    accounting?

3          A.    When?

4          Q.    Yes.

5          A.    1992.

6          Q.    And when did you get your MBA?

7          A.    I believe in 2001.

8          Q.    Since when have you been a CPA?

9          A.    Since 1996.

10         Q.    Do you hold any other

11   professional certifications?

12         A.    I do not.

13         Q.    Other than these formal degrees,

14   have you ever had any professional training

15   or courses?

16         A.    Yes.

17         Q.    What are those?

18         A.    Various, you know, industry

19   related training courses, you know, Green

20   Belt type of, you know, process improvement

21   type of things.

22         Q.    And can you describe your

23   employment history since the time that you

24   graduated from undergrad?

25         A.    Sure.  Upon graduation, I was --

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 9 of 237

Page 9

1          J. CORTESE

2    I was employed by Ernst & Young as -- in the

3    audit capacity, audit function for the firm.

4    I spent approximately three years with Ernst

5    & Young.  Then I went to work for IKEA

6    International as -- in their internal audit

7    department.  Then, subsequently, in their

8    accounting department.  From there, I moved

9    to GE Capital Mortgage Services, where I

10   worked in their accounting department, as

11   well.  After GE Capital, I worked for GMAC

12   Commercial Mortgage as their controller.

13   From there, I worked for Equity One as their

14   assistant controller.  After Equity One, I

15   moved to Luminent Mortgage Capital, again, as

16   -- in the controllership function.

17        Q.    Who was that, Lubinone?

18        A.    Luminent.  After Luminent, I with

19   went to work for ResCap in an accounting

20   policy role.  From ResCap, I transferred to

21   Ally Bank in my current function as chief

22   accounting officer for Ally Bank.

23        Q.    I am just going to walk through

24   them and see if I can figure out how long you

25   were -- get the chronology a little bit.

Page 10

1                          J. CORTESE

2        A.    Okay.

3        Q.    So how long did you work at IKEA?

4        A.    Approximately five years.

5        Q.    How many of those were in the

6   audit department?

7        A.    I believe four.

8        Q.    So about one year in the

9   accounting group?

10       A.    Correct.

11       Q.    Then, so I am at about 2000.  So

12   in about 2000, you went to GE Capital

13   Mortgage Services?

14       A.    Correct.

15       Q.    And how long did you work there?

16       A.    About a year and a half.

17       Q.    Then how long did you work at

18   GMAC Commercial Mortgage?

19       A.    Approximately four years.

20       Q.    At Equity One?

21       A.    I believe that was two years.

22       Q.    Luminent?

23       A.    A year and a half.

24       Q.    And then how long were you -- so

25   when did you join ResCap?

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 11 of 237

Page 11

1                    J. CORTESE

2         A.    I joined ResCap in 2008, July of

3    2008.

4         Q.    How long did you work for ResCap?

5         A.    One year.

6         Q.    So you moved to Ally Bank in July

7    of 2009?

8         A.    August of 2009, yes.

9         Q.    What were you -- I am going to

10   focus on your accounting experience, and

11   starting from your time at IKEA, what were

12   your duties and responsibilities when you

13   were in the accounting department?

14        A.    Specifically at IKEA?

15        Q.    At IKEA.

16        A.    At IKEA, I was -- my title was

17   Accounting Manager.  So I was responsible for

18   the accounting for the retail operations of

19   their -- of the North America operations.

20   So, you know, everything from recording

21   revenue to their expenses, month-end closes,

22   preparation of financial statements, that

23   type of thing.

24        Q.    And when you went to GE Capital

25   Mortgage Services, what were your duties and

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 12 of 237

Page 12

¹                    J. CORTESE

² responsibilities?

³         A.     I was responsible for the

⁴ accounting for their servicing operations,

⁵ specifically, their mortgage servicing

⁶ rights, various mortgage-backed securities

⁷ that the company owned.

⁸         Q.     When you say "responsible for

⁹ their mortgage servicing rights accounting,"

¹⁰ what does that mean?

¹¹         A.     It means recording the mortgage

¹² servicing rights on their financial

¹³ statements.

¹⁴         Q.     Were there other people

¹⁵ responsible for that at GE Capital Mortgage?

¹⁶         A.     Not specifically for their

¹⁷ accounting.  There were other teams

¹⁸ responsible for the -- for the valuation of

¹⁹ their MSR assets.

²⁰         Q.     So you were the person solely

²¹ responsible, with sole responsibility for the

²² accounting for the MSRs?

²³         A.     Correct.

²⁴         Q.     What about at GMAC Commercial

²⁵ Mortgage, when you were controller?

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 13 of 237

Page 13

1              J. CORTESE

2          A.    At GMAC Commercial, again, I was

3    in the controllership function, so I was

4    responsible for -- I was responsible for

5    basically every aspect of their financial

6    statements, their accounting for their loan

7    originations, accounting for their servicing,

8    expenses, month-end closes, preparation of

9    financial statements.

10         Q.    So is it fair to say that,

11   starting in 2000, you have continuously had

12   accounting responsibility for mortgage-based

13   assets?

14         A.    Correct.

15         Q.    In any of your previous

16   positions, were the companies that you were

17   employed by, did they have brokering

18   arrangements with third parties or affiliated

19   entities?

20         A.    If they did, I was not

21   responsible for those operations or those

22   accounting firms for broker services.

23         Q.    Do you know, or did any of those

24   other entities that you were employed by

25   engage in swaps related to their MSR,

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 14 of 237

Page 14

1                         J. CORTESE

2    limiting their risk and exposure on the MSR?

3         A.    GE Capital, I believe did hedge

4    their MSR.  I was not responsible for the

5    accounting for their derivatives and their

6    hedges of those assets.

7              Equity One also had MSR assets on

8    its books.  I was responsible for the

9    accounting for their derivatives and hedges

10   of that asset in my function there.

11             GMAC Commercial Mortgage did have

12   commercial mortgage servicing rights.  They

13   did not hedge them.

14        Q.    Luminent?

15        A.    Luminent did not have mortgage

16   servicing rights.

17        Q.    So now, moving onto ResCap, in

18   July of 2008 when you joined, what were your

19   duties and responsibilities there?

20        A.    I joined ResCap, specifically, in

21   a technical accounting capacity.  So I was

22   responsible for new GAAP emergence and

23   review, as well as implementation with their

24   operational accounting teams for any new

25   GAAP.  Responsibilities also included

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese    Pg 15 of 237

Page 15

<sup>1</sup>                        J. CORTESE

<sup>2</sup>  transaction review and technical accounting

<sup>3</sup>  assessment of those transactions.

<sup>4</sup>        Q.    What is technical accounting?

<sup>5</sup>        A.    It's -- I would describe it as

<sup>6</sup>  the analysis of general accepted accounting

<sup>7</sup>  principles.  Any other guidance, you know,

<sup>8</sup>  accounting related guidance that may be

<sup>9</sup>  issued by a -- by an authoritative body, and

<sup>10</sup>  its application to your operations.

<sup>11</sup>        Q.    So you were the GAAP guru?

<sup>12</sup>        A.    I wouldn't necessarily

<sup>13</sup>  characterize myself as that, but that was my

<sup>14</sup>  function.

<sup>15</sup>        Q.    So if there were questions about

<sup>16</sup>  GAAP accounting, they got directed to you?

<sup>17</sup>        A.    Typically.

<sup>18</sup>        Q.    And it was your responsibility to

<sup>19</sup>  review how ResCap was accounting for its

<sup>20</sup>  activities and to ensure it complied with

<sup>21</sup>  GAAP?

<sup>22</sup>        A.    Yes, that was part of that

<sup>23</sup>  function.

<sup>24</sup>        Q.    You mentioned new GAAP emergence

<sup>25</sup>  and review.  What does new GAAP emergence

Page 16

1                    J. CORTESE

2  mean?

3       A.    Again, if there was any new

4  standards that were issued by accounting

5  authoritative bodies.

6       Q.    Were there particular new GAAP

7  standards that were being issued in or around

8  2008 that you were specifically brought in to

9  address or focus on?

10      A.    There were.  I cannot

11 specifically name them at this time.

12      Q.    Do you have a recollection of

13 what they -- what subject matters they

14 generally related to?

15      A.    There was a number of, you know,

16 different -- different emerging guidelines

17 that came out during that time period.  It

18 was a very volatile time for the mortgage

19 industry.  So I don't recall specifically

20 which ones they were.

21      Q.    So when you say -- are you

22 referring specifically to GAAP guidelines

23 that related to the mortgage industry?

24      A.    Some of it was relevant to the

25 mortgage industry, and for those I would

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 17 of 237

Page 17

1           J. CORTESE

2   review them.

3       Q.    Would you review new GAAP

4   guidelines that were not related to the

5   mortgage industry?

6       A.    Typically not.  You know, we

7   would do an assessment.  We would do an

8   assessment whether it was related to our

9   operations and to our business.  But that was

10  about it.

11      Q.    Do you recall the general -- do

12  you have a general sense of what the new

13  standards were intended to address?

14      A.    I do not.

15      Q.    Do you recall any particular

16  standard or guideline that was emerging in

17  2008 when you joined ResCap?

18      A.    I really don't recall.

19      Q.    Do you recall any material change

20  in the GAAP accounting guidelines during the

21  time that you were at ResCap?

22      A.    Again, not specifically at this

23  time.  I just don't remember.

24      Q.    Do you know if there were any?

25           MR. SKIDMORE:  Objection.

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 18 of 237

Page 18

1                          J. CORTESE

2          Q.      Sorry, do you know if there were

3    any material changes to GAAP accounting

4    principles during the time that you were at

5    ResCap?

6          A.      I generally recall that there

7    were -- that there were.  Again, I don't

8    specifically recall exactly which ones they

9    were.

10         Q.      What did you mean when you said

11   that you were responsible for transaction

12   review?

13         A.      If there was a -- if the company

14   entered into a certain transaction that was

15   significant, unusual, maybe material in

16   nature, then part of my responsibilities were

17   to review that transaction and recommend

18   accounting treatment for it.

19         Q.      And how would you know if there

20   was a transaction that met those criteria?

21         A.      Typically, I was notified by my

22   manager.

23         Q.      And who was your manager?

24         A.      Cathy Dondzila.

25         Q.      Can you recall any transactions

Page 19

1           J. CORTESE

2    that you were involved in reviewing while at

3    ResCap?

4        A.    I don't recall specifically at

5    this time.

6        Q.    Do you recall whether there were

7    any transactions between Ally Bank and any

8    ResCap entities that you were responsible for

9    reviewing?

10       A.    Yes, there were some

11   transactions.

12       Q.    Do you recall what those

13   transactions were?

14       A.    Again, not specifically.

15       Q.    Do you recall if you were

16   responsible for reviewing any brokering

17   related transactions between Ally Bank and a

18   ResCap affiliate?

19           MR. SKIDMORE:   Objection.  We

20       are speaking about his time at ResCap;

21       is that right?

22           MS. MILLER:  Yes.

23       Q.    Still focusing, while you were at

24   ResCap?

25       A.    No, I do not recall reviewing

Page 20

1                         J. CORTESE

2    anything related to brokering or brokerage

3    operations.

4         Q.    And do you recall reviewing any

5    transactions related to hedging of MSRs

6    between Ally Bank and ResCap while you were

7    at ResCap?

8         A.    Again, I do not specifically

9    recall.

10        Q.    Do you have a general

11   recollection that you reviewed such

12   transactions while at ResCap?

13        A.    I would say there was a number of

14   transactions that I reviewed.  I do not

15   specifically recall which ones.

16        Q.    There were a number of

17   transactions related to MSR swap hedging that

18   you reviewed?

19        A.    Specifically related to any

20   number of different types of transactions.

21        Q.    Including MSR swaps?

22        A.    Potentially.

23        Q.    Do you recall whether there were

24   any overarching principles that governed

25   agreements between Ally Bank and GMAC

Page 21

1          J. CORTESE

2   Mortgage?

3        A.    Related to any specific topic?

4        Q.    Not related to any specific

5   topic.  Any agreements as between affiliate

6   entities, the bank on the one hand and --

7   sorry, the bank on the one hand and ResCap on

8   the other?

9        A.    As affiliates that operate very

10  closely amongst each other, there were a

11  number of agreements that governed a number

12  of different transactions between the two

13  entities.

14       Q.    Do you recall what those

15  agreements were?

16       A.    I don't have an inventory of them

17  all, no.

18       Q.    Okay.  Can you identify the ones

19  that you do remember?

20       A.    As an example, I can provide a

21  few.  There is a mortgage -- mortgage sale

22  and purchase agreement.  There were swap

23  agreements for the held for sale portfolios.

24  There were swap agreements for the MSR asset.

25  There were statements of work between the two

Page 22

1                          J. CORTESE

2    operations.  There were correspondent

3    agreements.  There were broker agreements, to

4    name a few.  That is not an all-inclusive

5    list.

6          Q.    I am going to come back to these.

7                Sorry, just so the record is

8    clear and that we are clear, if I say "the

9    bank," will you understand me to be including

10   old GMAC Bank and Ally Bank as appropriate in

11   the relevant time period that we are

12   discussing?

13         A.    Yes.

14         Q.    If I say ResCap, I am referring

15   to ResCap and it's affiliated entities,

16   including GMAC Mortgage?

17         A.    I understand.

18         Q.    If I say GMAC, you will

19   understand that that means GMAC Mortgage,

20   right?

21         A.    I understand.

22         Q.    Okay.  Was there also --

23               MR. SKIDMORE:  Hold on a second.

24   I'm sorry, I am not sure the last one

25   is -- so you are saying that GMAC will

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 23 of 237

Page 23

1              J. CORTESE

2       equal GMAC Mortgage, LLC?

3              MS. MILLER:  The transcript is

4       not accurate.  I said if I say GMAC-M.

5              MR. SKIDMORE:  Okay.  That's

6       fine.  Because I heard GMAC, too.  So

7       I just want to make sure we're clear,

8       because GMAC, clearly, does not, in

9       this context, equal that.

10             MS. MILLER:  Agreed.  GMAC-M.

11      Is that a term that you would use to

12      refer to GMAC Mortgage?

13             THE WITNESS:  I think we can

14      refer to that as G-M-A-C-M.

15             MS. MILLER:  All the letters.

16      Okay.  GMAC-M. I will try, but it is

17      going be tough.

18             THE WITNESS:  Whatever works for

19      you.

20             MR. SKIDMORE:  If you need

21      clarification, just ask.

22      Q.    Feel free.  If, at any time, you

23      are confused about what I am referring to, I

24      will be happy to give you more specificity.

25             Was there also an operating

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 24 of 237

Page 24

1           J. CORTESE

2  agreement between the bank and GMAC Mortgage?

3          MR. SKIDMORE:  Objection.

4      A.    I am not aware of a specific

5  operating agreement.  If you were specific,

6  maybe I can answer that.

7      Q.    Putting the agreements between

8  the entities to one side, were there any

9  other regulatory guidelines that governed the

10  relationship between the affiliates?

11          Sorry, strike that.

12          Putting the agreements between

13  the entities to one side, were there any

14  regulatory provisions or principles that

15  governed transactions between the bank and

16  GMAC Mortgage?

17          MR. SKIDMORE:  Object to form.

18      A.    As a -- as a bank governed by the

19  FDIC, the bank is subject to a number of

20  regulatory requirements related to affiliate

21  transactions.

22      Q.    Is one of those Federal Reserve

23  Act 23A?

24      A.    Yes.

25      Q.    Do you know what section -- can

1                          J. CORTESE

2    you tell me what section 23A provides?

3              MR. SKIDMORE:   Objection.

4         A.    I think that's more of a -- I

5    think that's more of a legal question and

6    interpretation, as opposed to an accounting

7    one.

8         Q.    Did you consider Section 23A in

9    your accounting analysis?

10        A.    In my role as -- at ResCap?

11        Q.    At ResCap, yes.

12        A.    Working with -- if there was an

13   analysis that I was performing, related to

14   the bank and in a transaction -- in a

15   transaction they may have with an affiliate,

16   I would consult with their chief accounting

17   officer for such considerations, yes.

18        Q.    As an accountant, what was your

19   understanding of the limitations that Section

20   23A placed on transactions between the bank

21   and GMAC Mortgage?

22        A.    Well, I will say, generally

23   speaking, the regulations are designed so

24   that the bank is not harmed by its

25   affiliates.  And with that, transactions have

1                    J. CORTESE

2    to generally be market-based and no worse --

3    no worse to the bank than it will receive

4    with the third-party transaction.  And that's

5    generally the principal that we operate

6    under.

7         Q.    Were there also limitations on

8    the number of loans that Ally Bank could

9    acquire from GMAC Mortgage?

10        A.    I believe what you are referring

11   to is -- is referred to as a 250.250

12   transaction.  And, yes, it is my

13   understanding that there were limitations.

14        Q.    Do you recall what those

15   limitations were?

16        A.    I do not specifically recall what

17   they are.

18        Q.    And if I said that under the

19   250.250 exemption, "The amount of the loan

20   aggregated with the amount of all other loans

21   purchased from the affiliate during the

22   preceding 12 calendar months by the bank and

23   its depository affiliates can be no more than

24   50% of the affiliates' loan originations

25   during that period."

Plaintiff's Objection
26:07-13, Irrelevant
(FRE 401, 402)

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 27 of 237

Page 27

1         J. CORTESE

2         Is that consistent with your

3    recollection of the 250.250 exemption?

4         MR. SKIDMORE:   Objection.

5    A.    I think, again, that is more of a

6    legal determination, and how it applies to

7    the code.

8    Q.    As an accountant, did you ever

9    look at whether 50% or -- as an accountant,

10   did you ever look at what percentage of loans

11   were being originated by an affiliate?

12   A.    Not in my capacity.  There were

13   others within the organization who were

14   tasked with performing that analysis.

15   Q.    Who was tasked with performing

16   that analysis?

17   A.    I believe it would be Deb Scott.

18   Q.    Who did Deb Scott work for?

19   A.    I believe -- I believe in 2009,

20   she was reporting to Al Galene (phonetic.)

21   Q.    Did you ever have any discussions

22   about the results of the analysis that was

23   being done by Deb Scott?

24   A.    Not specifically that I recall.

25   Q.    Did you ever hear anyone say that

Page 28

J. CORTESE

1

2  the bank was getting close to meeting the

3  limit of the 250.250 exemption?

4      A.    Over various time frames?  Yes, I

5  do understand that there was discussion

6  related to that.

7      Q.    And do you recall what the

8  discussion related to that was?

9      A.    Not specifically.

10     Q.    Let's step back for a minute.

11           Have you ever been deposed

12  before?

13           MR. SKIDMORE:  You can answer.

14     A.    I was deposed by the Special

15  Examiner.

16     Q.    And how many times were you

17  deposed by the Examiner?

18     A.    Once.

19     Q.    And in addition to being deposed

20  by the Examiner, did you have informal

21  meetings with the Examiner?

22           MR. SKIDMORE:  Hold on.  I just

23      want to clarify.  What he was calling

24      the deposition was an informal

25      interview by the Examiner.  It wasn't

Page 29

1                    J. CORTESE

2        an official deposition.  I just want

3        to make sure the record is clear.

4        Q.    Was there a Court Reporter who

5   was recording the questions and answers

6   during that interview?

7        A.    I believe that interview was

8   being recorded.

9        Q.    Have you ever seen a transcript

10  of that interview?

11       A.    I have not.

12       Q.    Have you ever asked to see a

13  transcript of that interview?

14       A.    I have not.

15       Q.    Did anyone ever offer to provide

16  a copy of that transcript of the interview to

17  you?

18       A.    No, they did not.

19       Q.    And how many -- you said there

20  was one, what you referred to as a

21  deposition, but we will understand that it

22  wasn't a formal deposition but a very

23  informal meeting with a Court Reporter who

24  was transcribing the discussions.

25              MR. SKIDMORE:  Objection.  He

Page 30

1                          J. CORTESE

2          didn't say that there was a Court

3          Reporter.  And he didn't say there was

4          a Court Reporter, and there wasn't

5          one.

6          Q.    Who was transcribing?

7                MR. SKIDMORE:  He didn't say

8          that it was being transcribed, either.

9          I believe he said it was being

10         recorded.

11         Q.    How was your interview recorded?

12         A.    I believe it was via video, audio

13    tape.

14         Q.    Audio or video?

15         A.    Audio.

16         Q.    Audio, okay.  And do you know

17    whether that audio tape was ever transcribed

18    into a written transcript?

19         A.    I am not aware.

20         Q.    Did you have any interviews with

21    the Examiner that were not recorded by audio

22    tape?

23                MR. SKIDMORE:  Objection.  If

24         you know.

25         A.    Not to my knowledge.

Page 31

J. CORTESE

1

2      Q.     Have you had more than one

3   interview with the Examiner?

4      A.     No.

5      Q.     Have you read the Examiner

6   Report?

7      A.     I have read certain sections of

8   it.

9      Q.     Did you read sections that

10   mentioned you?

11      A.     Yes.

12      Q.     Did you do a search for your name

13   in the Examiner Report?

14      A.     Yes.

15      Q.     And you read the sections where

16   your name was referenced?

17      A.     Generally.

18      Q.     And was there anything that, when

19   you were reading the examiner reports, the

20   portions of the Examiner Report discussing

21   your testimony that struck you as inaccurate?

22      A.     Yes.  Generally, I thought that

23   the -- that certain parts of it were

24   incomplete, basically resulting in inaccurate

25   conclusions.

Page 32

J. CORTESE

1

2      Q.    I don't need you to dispute his

3  conclusions, but which -- were there any

4  facts that you felt were inaccurate?  We will

5  get to the incomplete in a second.

6          But putting aside things that you

7  think weren't in the Examiner Report, is

8  there any -- were there any factual

9  statements about things that you were

10  involved in or that you said that were in the

11  Examiner Report that you believed were

12  untrue?

13          MR. SKIDMORE:  Objection.

14      A.    I don't specifically recall.

15      Q.    Do you recall that when -- do you

16  recall specifically thinking, "wow, that's

17  really wrong" when were you reading a fact

18  about something that you had said or done?

19          MR. SKIDMORE:  Objection.

20      A.    Again, generally, I thought that

21  the thought analysis that the Examiner laid

22  out was generally incomplete in nature.

23  Again, therefore, ending in an inaccurate

24  description.

25      Q.    So I don't need you to opine on

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 33 of 237

Page 33

1          J. CORTESE

2    his analysis or his conclusions because

3    that's not your job and that's not my job.  I

4    want you to focus on factual statements.

5          Were there any facts that you

6    recall reading and saying, "that's not true"

7    in your head?

8          MR. SKIDMORE:  Objection.

9    A.    I don't specifically recall.

10   Q.    And you mentioned that you

11   thought that certain parts were incomplete.

12   Can you tell me which factual points did you

13   feel were not included in the Examiner's

14   discussion?

15         MR. SKIDMORE:  Objection.

16   A.    I don't specifically recall which

17   ones.

18   Q.    Do you have any specific

19   recollection about what portions of the

20   Examiner Report you thought were incomplete?

21   A.    I do not.

22   Q.    What did you do to prepare for

23   today's deposition?

24   A.    My preparation consisted of

25   meeting with my attorneys.

Plaintiff's Objection
033:22 – 036:04
Irrelevant (FRE 401, 402)

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 34 of 237

Page 34

1                        J. CORTESE

2          Q.      How many times did you meet with

3     your attorneys?

4          A.      I met with them once.

5          Q.      And for how long?

6          A.      Approximately four hours.

7          Q.      Did you review any documents in

8     connection with your deposition today?

9          A.      I did.

10         Q.      What documents did you review?

11         A.      There were a number of documents.

12    Certain pieces of documents.  But I don't

13    have a complete list or inventory of those

14    documents to provide you.

15         Q.      Can you tell me which documents

16    you remember?

17         A.      We reviewed certain aspects of

18    the MSR swap agreement.  We reviewed certain

19    sections of the Examiner Report.  We reviewed

20    certain e-mails related to various topics,

21    internal e-mails.  That was basically the

22    breadth of what we reviewed.

23         Q.      When did you meet with your

24    lawyers?

25         A.      Yesterday afternoon.

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 35 of 237

Page 35

1                          J. CORTESE

2          Q.      Was that the first time you had

3    read portions of the Examiner Report that

4    related to you?

5          A.      No, I had previously read certain

6    sections of that report.

7          Q.      When was the first time that you

8    read it?

9          A.      I don't have an exact date.   It

10   was probably three weeks ago.

11         Q.      Have you read it more than twice,

12   or portions of it more than twice?

13         A.      I didn't read it more than once.

14         Q.      Did you review portions of the

15   Examiner Report yesterday?

16         A.      We did.

17         Q.      And you also reviewed portions of

18   the Examiner Report three weeks ago, right?

19         A.      Certain portions of it.

20         Q.      Did you review the -- any of the

21   same portions yesterday and three weeks ago?

22         A.      Potentially.

23         Q.      Why did you decide to review the

24   Examiner Report three weeks ago?

25         A.      Because I was notified of this

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 36 of 237

Page 36

1              J. CORTESE

2    deposition, so I thought it would be

3    interesting to see what that examination

4    report actually said.

5        Q.    And had you spoken to anyone at

6    the bank or at ResCap about the Examiner

7    Report before you actually read it three

8    weeks ago?

9        A.    No.

10       Q.    Did you know generally what the

11   Examiner concluded before you read it three

12   weeks ago?

13       A.    No.

14       Q.    Have you spoken to anyone at Ally

15   about your deposition today?

16       A.    I informed my manager that I had

17   a deposition.

18       Q.    Did you speak to anyone at Ally

19   about the Examiner Report?

20       A.    No.

21       Q.    Have you spoken to anyone at

22   ResCap about the Examiner Report?

23       A.    No.

24       Q.    Have you spoken to anyone at

25   ResCap about your deposition today?

Plaintiff's Designation 36:05 - 37:02 (in the event 33:22 – 36:04 is admitted over Plan Proponents' objection)

Page 37

1                    J. CORTESE

2        A.    No.

3        Q.    Did you review, either in whole

4    or in part, the expert report submitted by

5    Judge Lyons in this case?

6        A.    No, I did not.

7        Q.    What portions of the Examiner

8    Report did you review?

9        A.    I don't recall exactly what

10   section.  But it was, namely, the sections

11   were where I was referenced, namely related

12   to the broker agreement between Ally Bank and

13   GMAC Mortgage.

14        Q.    Did you review the section titled

15   "GMAC Mortgage Contracts With Ally Bank

16   Governing Loan Sales, Brokerage, Servicing

17   and Related Derivative Transactions"?

18        A.    I don't specifically recall that

19   title.

20        Q.    But you read the section that

21   related to the brokering agreements and the

22   swap agreements?

23             MR. SKIDMORE:  Objection.

24        A.    Yes.

25        Q.    What topics did the e-mails that

*Plaintiff's Objection
037:03 – 039:06
Irrelevant (FRE 401,
402)*

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese    Pg 38 of 237

Page 38

1                    J. CORTESE

2    you reviewed relate to?

3         A.    The topics, again, they were

4    internal e-mails, generally related to the

5    structure of the agreement and the income

6    recognition for the bank and for GMAC

7    Mortgage.

8         Q.    When you say, "structure of the

9    agreement," what agreement are you referring

10   to?

11        A.    The broker agreement between Ally

12   Bank and GMAC Mortgage.

13        Q.    Are there any e-mails related to

14   any other topics?

15        A.    I don't believe so.

16        Q.    Did you review any e-mails

17   related to the MSR swap?

18        A.    No.

19        Q.    Did you do anything else, other

20   than meet with your lawyer and review the

21   Examiner Report to prepare for today's

22   deposition?

23             MR. SKIDMORE:   Objection.

24        A.    No, I did not.

25        Q.    Did you review any -- did you go

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 39 of 237

Page 39

1                    J. CORTESE

2     back to some of your own personal old e-mails

3     and refresh your recollection about the

4     topics that you thought might be covered

5     today?

6          A.     No, I did not.

7          Q.     You said that at ResCap you were

8     responsible for technical accounting

9     assessment.   What is technical accounting

10    assessment?

11         A.     Oh, again, it's the review,

12    either of new emerging GAAP and treatment for

13    the company, or assessment of transactions

14    from an accounting standpoint, to ensure that

15    proper accounting is achieved.

16         Q.     What is "assessment of

17    transactions from an accounting standpoint"

18    entail?

19         A.     I would say that it would relate

20    to the review of a certain transaction that

21    they -- the business is either anticipating

22    entering into or did enter into.   Review of

23    that from, again, a GAAP and accounting

24    principle standpoint, and assessing the

25    proper accounting treatment for that

Page 40

1                       J. CORTESE

2    transaction.

3         Q.    So you aren't responsible for the

4    legal interpretation of the agreements,

5    right?

6         A.    That's right.

7         Q.    You weren't responsible for

8    determining what one party's rights were or

9    weren't under an agreement, right?

10        A.    Correct.

11        Q.    Who advised you on those issues?

12        A.    If we felt that the legal opinion

13   or legal review was -- wouldn't necessitate a

14   conclusion, then we generally consulted with

15   internal counsel.

16        Q.    Who were the internal counsel you

17   consulted with while at ResCap?  I'm still

18   focusing on your time at ResCap.

19        A.    Again, not related to a specific

20   transaction, but, generally, we would discuss

21   with Hugh Benton.

22        Q.    Do you recall any particular

23   instances when you asked Hugh Benton to help

24   you understand what an agreement, what a

25   contract between Ally Bank and GMAC Mortgage

Page 41

1                    J. CORTESE

2    meant so that you could figure out what the

3    appropriate accounting treatment would be?

4         A.    No, nothing specific.

5         Q.    But you recall asking him

6    specific questions?

7              MR. SKIDMORE:  Objection.

8         A.    Again, generally speaking, if we

9    had a question, we would consult with

10   ResCap's internal counsel, which was Hugh

11   Benton.

12        Q.    I am asking you if you ever

13   remember actually having a question that you

14   went to consult with Hugh Benton about?

15        A.    No, I do not specifically

16   remember.

17        Q.    Who reported to you when you were

18   at ResCap?

19        A.    While I was at ResCap, I did not

20   have any direct reports.

21        Q.    Who did you report to at ResCap?

22        A.    I report to Cathy Dondzila.

23        Q.    Who did Cathy report to?

24        A.    At one point, Cathy reported to

25   Jim Young.

Page 42

1              J. CORTESE

2      Q.    What was Cathy's position at

3  ResCap when you reported to her?

4      A.    Cathy was the chief accounting

5  officer for ResCap.

6      Q.    Why did you move from ResCap to

7  Ally in August of 2008 -- 2009?

8      A.    2009.  At that time, the bank's

9  chief accounting officer, Kim Walsh,

10 resigned.  That position was open.  And Cathy

11 moved me down into that position.

12     Q.    Why did Kim Walsh resign?

13     A.    I don't know.

14     Q.    You said Cathy moved you down

15 into that position.  Was that a demotion?

16     A.    I didn't perceive it as a

17 demotion.

18     Q.    Did you perceive it as a

19 promotion?

20     A.    I generally perceived it as a

21 lateral transfer.

22     Q.    The Cathy you are referring to is

23 Cathy Dondzila?

24     A.    Correct.

25     Q.    Is Cathy responsible for hiring

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 43 of 237

Page 43

J. CORTESE

1
2   Ally Bank accounting staff?

3            MR. SKIDMORE:   Objection.

4        A.    Cathy was -- Cathy, in her

5   capacity as chief accounting officer for

6   ResCap, was also the mortgage controller for

7   all of -- for all of GMAC.  So given that the

8   bank held substantial mortgage operations,

9   from a -- their own matrix reporting

10  standpoint, she was responsible for those --

11  for the accounting of those assets.

12            So Cathy recommended me to the

13  bank.  And, at the time, this position

14  directly reported to Lisa Gerner, who was the

15  bank's chief financial officer.  And Lisa --

16  Lisa took Cathy's recommendation and hired

17  me.

18       Q.    Did you have to submit an

19  application?

20       A.    No, I did not.

21       Q.    Did you have an interview with

22  Lisa before you were hired?

23       A.    I don't recall.

24       Q.    What was your relationship with

25  Cathy after you moved to Ally Bank?

Page 44

1                    J. CORTESE

2           MR. SKIDMORE:  Objection.

3      A.    Again, in Cathy's role as

4  mortgage controller, I had a dotted line

5  relationship to her.  So, again, I reported

6  directly to Lisa Gerner, the bank's chief

7  financial officer.  Again, as far as mortgage

8  responsibilities, accounting responsibilities

9  were concerned, I had a dotted line

10 relationship to Cathy.

11      Q.    Meaning that you sort of reported

12 to Cathy?

13           MR. SKIDMORE:  Objection to the

14      characterization.

15      Q.    What does "dotted line" mean?

16      A.    Meaning that, as Cathy had

17 oversight of mortgage assets within the bank,

18 I would -- if there was any mortgage related

19 topics related to the bank, I would work with

20 Cathy on them.

21      Q.    As a practical matter, who did

22 you report to on a regular basis?

23      A.    I directly reported to Lisa

24 Gerner.

25      Q.    Did you report to Cathy at all?

Page 45

J. CORTESE

1

2       A.     Not in a direct capacity.

3       Q.     Were you and Cathy now peers in

4  the hierarchal org structure?

5       A.     I didn't think so.  I think,

6  generally, Cathy had a higher stature than I

7  did.

8       Q.     What was your title when you

9  joined Ally Bank?

10      A.     I joined Ally Bank as the Chief

11  Accounting Officer.

12      Q.     So you had the same title as

13  Cathy at a different entity?

14      A.     Correct.

15      Q.     If Cathy suggested that she

16  thought you were wrong about something, would

17  you follow her direction?

18             MR. SKIDMORE:  Objection.

19      A.     I would assess -- I would assess

20  the situation on my own, and, again, in my

21  capacity, I would eventually make my own

22  conclusions.

23      Q.     I'm still trying to understand

24  what a dotted line relationship between you

25  and Cathy means for mortgage related topics.

Page 46

1                    J. CORTESE

2    Does that mean that Cathy was effectively

3    your superior on those issues?

4         MR. SKIDMORE:  Objection to the

5         characterization, and asked and

6         answered.  He has already told you

7         what -- as what that meant.

8         Q.    You can answer again.  I am slow

9    to pick it up.  So I will guess others are,

10   also.

11        A.    She -- I guess the best way I can

12   describe it is that she was charged with --

13   she was charged by GMAC to be responsible for

14   all of the mortgage assets within -- within

15   the entire GMAC organization.  So as the bank

16   held mortgage assets, we would -- I would

17   work with her on the account aspects and

18   accounting treatment for those assets.

19        Q.    What does "work with her" mean?

20        A.    It would be review -- it could be

21   review information with her.  It could be

22   review transactions with her.  Assess, you

23   know, create and assess policy with her.

24        Q.    What policies were you

25   responsible for creating at Ally Bank?

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 47 of 237

Page 47

1          J. CORTESE

2          A.    Generally speaking, I was not

3    responsible for creating any policies at Ally

4    Bank.   The company had an accounting policy

5    team.   It also had an accounting policy

6    committee.   Both Cathy and I served on the

7    accounting policy committee, and as a

8    committee, we would assess policy

9    development.   Again, any changes to such

10   policies related to new emerging GAAP that

11   had to be considered.

12        Q.    What were you referring to when

13   you said, "create and assess policies with

14   her"?

15        A.    Again, the Ally accounting

16   policies that were developed, we would review

17   and assess them and make sure that they were

18   consistently applied to our accounting

19   operations.

20        Q.    Did you create them?

21        A.    We added editorial and comments

22   to them.   But they were developed and created

23   by Ally's accounting policy group.

24        Q.    Were you part of that group?

25        A.    I was not part of that group.   I

Page 48

1                     J. CORTESE

2     was on the committee, the accounting policy

3     committee that reviewed and approved them.

4          Q.    Who else other than you and Cathy

5     was on the accounting policy review

6     committee?

7          A.    I don't have a complete list, but

8     generally members consisted of David

9     DeBrunner, who was Ally's corporate

10    controller.  And then other functional

11    controllers or other business entities within

12    Ally.

13         Q.    Did the accounting policy team

14    create accounting policies that also governed

15    ResCap?

16         A.    Yes.

17         Q.    Did ResCap create any of its own

18    accounting policies?

19               MR. SKIDMORE:   Objection.

20         A.    No, not to my knowledge.

21         Q.    Other than Cathy, were there any

22    other ResCap employees on the accounting

23    policy review committee?

24         A.    No, I do not recall anyone else.

25         Q.    Do you recall any other Ally

Plaintiff's Objection
048:13 – 20
Lack of personal
knowledge (FRE
602)

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 49 of 237

Page 49

1                    J. CORTESE

2    employees who were on the accounting policy

3    review committee?

4              MR. SKIDMORE:  Objection.

5         A.    Yes, I previously mentioned a

6    couple of them.  David DeBrunner for one, and

7    other -- other members of other business

8    units within Ally.

9         Q.    What were the other business

10   units within Ally that were involved in the

11   accounting policy review committee?

12             MR. SKIDMORE:  Objection.

13        A.    Again, I don't have a complete

14   list.  But the individual who was responsible

15   for accounting for North American operations

16   was on the committee, as an example.  The

17   person who was responsible for commercial

18   finance was on the committee.  Just to name a

19   couple.

20        Q.    Approximately how many people

21   were on the committee?

22        A.    I would say approximately ten.

23        Q.    When you were at ResCap, were you

24   a member of the committee?

25        A.    I was not.

Page 50

J. CORTESE

1

2    Q.    Did you become a member of the

3    committee immediately upon joining Ally Bank?

4    A.    Yes.

5    Q.    Are you still on the committee

6    today?

7    A.    I am.

8        MS. MILLER:  We have been going

9    about an hour.  Do you want to take a

10    quick break?

11        MR. SKIDMORE:  Sure.

12        THE VIDEOGRAPHER:  The time is

13    10:14 a.m.  We are off the record.

14        (Whereupon, a recess was held.)

15        THE VIDEOGRAPHER:  The time is

16    10:29 a.m.; we are on the record.

17    BY MS. MILLER:

18    Q.    Welcome back.  I am going to -- I

19    am handing the Court Reporter a document

20    that's going to be marked as Cortese Exhibit

21    1, and it is a document Bates stamped for

22    identification in this matter Ally_041818

23    through '0201224 -- sorry '225.

24        (Whereupon, Cortese Exhibit 1,

25    ALLY_041818 through '225 was marked

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 51 of 237

Page 51

1                          J. CORTESE

2              for identification as of this date by

3              the Reporter.)

4          Q.      And it's a document titled

5    Amended and Restated Operating Agreement and

6    it is dated as of November 27, 2006.

7                    Mr. Cortese, have you ever seen

8    this document before?

9          A.      I have not.

10         Q.      Have you ever heard reference to

11   this document?

12         A.      Perhaps general reference.

13   Nothing specific.

14         Q.      And if I could direct your

15   attention to page 5 of the document, and,

16   specifically, to Section 2B.    Just the

17   covenant section which starts "Each of GMAC

18   and ResCap as applicable agrees as follows."

19   And then it says in Subsection B, "except as

20   provided in Section 2C, ResCap shall not nor

21   shall it permit any of its subsidiaries to

22   engage in material transactions with or

23   originated through any GMAC affiliate unless

24   such transactions are on terms and conditions

25   that are consistent with those that parties

Plaintiff's Objection
051:14 – 053:16
Lack of personal
knowledge (FRE 602);
irrelevant (FRE 401,
402); calls for legal
conclusion

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 52 of 237

Page 52

1                    J. CORTESE

2    at arm's length would agree to and for fair

3    value."

4              Is that consistent with your

5    understanding of one of the terms that had to

6    be -- sorry, one of the conditions of

7    transactions between ResCap and Ally Bank?

8              MR. SKIDMORE:   Object to form.

9         A.   Again, I'll -- I don't understand

10   exactly what this -- what that paragraph

11   means.  But, again, as from a bank

12   perspective, the regulations that we are

13   required to follow generally means that the

14   transactions need to be arm's length with the

15   bank's affiliates.

16        Q.   When you were at ResCap, did you

17   understand that ResCap had to engage in arm's

18   length -- that transactions had to be arm's

19   length and market from ResCap's perspective,

20   also?

21        A.    Again, I don't think it was

22   necessarily relevant to the work I was doing.

23   If there were -- if ResCap was doing a

24   transaction with the bank, again, by, you

25   know, by default, you know, we had to

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 53 of 237

Page 53

1              J. CORTESE

2    consider the bank's regulations.  And it was

3    more from that perspective rather than

4    ResCap's.

5        Q.    Did the bank's regulations

6    require the transactions to be for fair

7    value?

8              MR. SKIDMORE:  Objection.

9        Q.    Sorry, let me restate.  Did the

10   bank's regulations require transactions with

11   its affiliates to be for fair value?

12             MR. SKIDMORE:  Objection.  Calls

13        for a legal conclusion.

14        A.    The transactions, again, under,

15   you know, under Regulation W, need to be

16   market based.

17        Q.    Did you ever hear anyone talk --

18   refer to the fact there was also an agreement

19   between ResCap and Ally Bank that required

20   the terms to be market based?

21             MR. SKIDMORE:  Objection.

22        A.    No, not that I am aware.

23             MS. MILLER:  I would like to

24   mark as Cortese Exhibit 2, a document

25   Bates stamped Ally_0201210 through

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 54 of 237

Page 54

1              J. CORTESE

2        '1225.

3              (Whereupon, Cortese Exhibit 2,

4        ALLY_0201210 through '1225 was marked

5        for identification as of this date by

6        the Reporter.)

7        Q.    Which is a document entitled

8   Master Mortgage Loan Purchase and Sale

9   Agreement dated July 1, 2008, Amended and

10  Restated as of July 1, 2008.

11              Mr. Cortese, is this a document

12  you have seen before?

13       A.    Yes, it is.

14       Q.    How do you refer to this

15  document?

16       A.    We generally refer to it as an

17  MMLPSA.

18       Q.    So I am going to say MMLPSA, and

19  we will understand this is the document we

20  are referring to?

21       A.    We will.

22       Q.    I notice on the top of this

23  document it says "Draft 6-26-08," but I also

24  see that there are signatures on the last

25  page of this document.  Do you have any

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 55 of 237

Page 55

1                          J. CORTESE

2    reason to believe that this is not the final

3    executed copy of the MML -- 2008 Amended and

4    Restated MMLPSA?

5          A.    I really wouldn't know.

6          Q.    You have no reason to believe

7    this is not the executed copy that has all

8    the signatures?

9          A.    Correct.

10         Q.    Can you describe to me generally

11   what the MMLPSA is?

12         A.    Generally, it was my

13   understanding that this is the agreement

14   which governed the purchase of loans from --

15   by GMAC Mortgage from Ally Bank.

16         Q.    I don't know if I am confused or

17   the transcript is confused.  Can you restate

18   that so we are clear?

19         A.    Sure.  It is generally my

20   understanding that this agreement covered the

21   purchase of loans by GMAC Mortgage from Ally

22   Bank.

23         Q.    That's what I thought you said.

24   The transcript said "to Ally Bank" and it

25   threw me off.  Problem with realtime.

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 56 of 237

Page 56

1                      J. CORTESE

2                Why does GMAC Mortgage purchase

3    loans from Ally Bank?

4                MR. SKIDMORE:   Objection.   Calls

5        for speculation.

6        A.    Bank was -- Ally Bank, at the

7    time, was a warehouser of loans.   The bank

8    utilized its low cost deposit base to hold

9    the loans prior to sale.   ResCap was the

10   seller, the named seller of these loans.   So

11   the bank, would, again, hold the loans until,

12   you know, time of eventual sale to a

13   third-party.   GMAC Mortgage would then buy

14   the loans from Ally Bank and then sell them

15   to the street.

16       Q.    Who specifically are you

17   referring to, what entities are you referring

18   to when you say "sell them to the street"?

19       A.    To a third-party, whether it be a

20   GSE, Fannie MAC (sic), Freddie May (sic) --

21   Fannie Mae, ResCap also sold to Ginnie Mae

22   and potentially to other third-party

23   non-government agencies.

24       Q.    Was this a change in the

25   structure of the origination and loan

Plaintiff's Objection
056:2 – 23
Lack of personal
knowledge/
speculative (FRE
602); irrelevant (FRE
401, 402)

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 57 of 237

Page 57

J. CORTESE

1

2  practices between Ally Bank and GMAC -- was

3  there a change in those practices as a result

4  of the MMLPSA?

5          MR. SKIDMORE:  Objection.

6      A.    I am not -- I wouldn't know.

7  When I entered the bank, this was the

8  governing document for those loan sales.  I

9  am not aware of what the previous terms --

10  any previous drafts would have said.

11      Q.    Do you know whether you were

12  hired in part because of the introduction of

13  the MMLPSA?

14          MR. SKIDMORE:  Objection.  When

15      you say "the introduction of the

16      MMLPSA," are you talking about this

17      version of the MMLPSA?

18          MS. MILLER:  I'm talking about

19      the 2008 MMLPSA becoming effective.

20          MR. SKIDMORE:  Right.  But the

21      MMLPSA has been in effect since 2001.

22      So I just want to make sure we are

23      clear on what we are talking about

24      when you say "the introduction of the

25      MMLPSA."

Page 58

1                    J. CORTESE

2        Q.     Do you know whether you were

3    hired at ResCap in part because of the going

4    effect of the July 2008 MMLPSA?

5              MR. SKIDMORE:   Objection.

6              Go ahead.

7        A.     I never had the understanding

8    that that was the reason I was hired.

9        Q.     Were you responsible for

10   overseeing the accounting related to the

11   MMLPSA?

12       A.     While I was at ResCap?

13       Q.     While you were at ResCap.

14       A.     No, I was not responsible for the

15   accounting.

16       Q.     And who was?

17       A.     It was a combination of the

18   bank's chief accounting officer at the time,

19   Kim Walsh, as well as ResCap's accounting

20   teams, from their perspective.

21       Q.     And when you were at Ally Bank,

22   did you assume responsibility for reviewing

23   the accounting treatment of transactions

24   under the MMLPSA?

25       A.     In my capacity as chief

Page 59

J. CORTESE

1

2   accounting officer, I was responsible for

3   ensuring the transactions were accurate, all

4   from the bank's perspective under this

5   agreement, and operationally speaking, ResCap

6   accounting teams were responsible for the

7   actual recording of those transactions.

8        Q.    Were you responsible for

9   reviewing ResCap's recording of the actual

10  transactions?

11       A.    I was responsible for the general

12  structure of the transaction, and ultimately

13  ensuring its accuracy on behalf of the bank.

14  I did not review and approve individual

15  transactions that occurred under the

16  agreement.

17       Q.    When you moved to Ally Bank, was

18  there already an accounting process in place

19  dealing with transactions that were occurring

20  under the 2008 MMLPSA?

21       A.    Yes, there was.

22       Q.    Were you briefed on the

23  accounting process when you joined?

24       A.    Not necessarily.  It was -- it

25  was knowledge that I obtained over a period

Page 60

1          J. CORTESE

2    of time while acting as chief accounting

3    officer for Ally Bank.

4        Q.    When you moved to Ally Bank and

5    assumed this responsibility, did you -- did

6    someone provide you with a copy of the MMLPSA

7    and explain its terms to you?

8        A.    Not to my recollection.

9        Q.    And how did you become aware of

10   the accounting treatment when you joined Ally

11   under the MMLPSA -- for transactions under

12   the MMLPSA when you joined Ally?

13           MR. SKIDMORE:   Objection.

14       A.    I would say just through the

15   normal course of my own due diligence to

16   develop knowledge of the accounting

17   transactions that were recorded on the bank's

18   general ledger.  It was an area that,

19   obviously, I wanted to gain further

20   knowledge on.

21       Q.    And who did you speak to?

22       A.    If I had any -- if I had any

23   questions or needed to speak to anyone about

24   these agreements, I would most likely speak

25   to Nikki Rock who was an accounting manager

Page 61

1                    J. CORTESE

2    at ResCap responsible for aspects of this --

3    of the transaction.  I would speak to

4    Linda Corrigan who was another accounting

5    manager at ResCap.  Again, responsible for

6    components of the transaction, and from a

7    legal perspective, I would speak to the

8    bank's in-house counsel, John Andrews.

9        Q.    Do you recall ever having

10   specific conversations with Nikki Rock about

11   the accounting treatment of transactions

12   under the MMLPSA?

13       A.    Nothing in specific manner.  More

14   general in nature.

15       Q.    What was the general subject

16   matter of those discussions?

17       A.    Again, if I had any questions for

18   her, it most likely related to the

19   derecognition treatment of loans at the bank,

20   potentially the pricing of those loans, how

21   the -- how the swaps interacted with the

22   pricing as well.

23       Q.    What is the derecognition

24   treatment of loans at the bank?

25       A.    Removing -- from the accounting

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 62 of 237

Page 62

1                    J. CORTESE

2    perspective, removing the loans from Ally

3    Bank's balance sheet.

4        Q.    And why were loans removed from

5    Ally Bank's balance sheet?

6        A.    If the loan was sold to GMAC

7    Mortgage, then we would remove it from Ally

8    Bank's balance sheet.

9        Q.    When you say "pricing," what are

10   you referring to?

11       A.    I am referring to the price that

12   GMAC Mortgage would purchase the loans at.

13       Q.    And what do you recall speaking

14   to Nikki Rock about regarding the price at

15   which GMAC Mortgage bought the loans at?

16       A.    I don't have any specific

17   recollection.

18       Q.    Do you recall any issues coming

19   up that you spoke to Nikki about?

20       A.    Again, not specifically.

21       Q.    Do you recall generally the

22   subject matter of those conversations?

23            MR. SKIDMORE:   Objection.   Asked

24        and answered.

25       A.    No.   Again, more so just how

Page 63

1                          J. CORTESE

2    that -- you know, how the pricing flowed,

3    timing of it, again, how it interrelated with

4    the swaps.

5         Q.    Which swaps are you referring to?

6         A.    Specifically, what we referred to

7    as the held-for-sale swap and the MSR swap.

8         Q.    Is the held-for-sale swap also

9    referred to as the pipeline swap?

10        A.    Yes, I think generally it is

11   referred to as pipeline swap as well.

12        Q.    Can you describe the HFS swap

13   for me?

14             MR. SKIDMORE:   Objection.

15        A.    From an accounting standpoint, I

16   can describe it.  Essentially, what that swap

17   did was to transfer any market price movement

18   as well as credit movement on a mortgage

19   loan.  Once that loan -- once that commitment

20   has been made to fund the loan by Ally Bank.

21   So, again, any changes in pricing of that

22   loan up through the funding date to also --

23   also through the sale date of that loan,

24   again, any of those market movement or if the

25   loan had a credit issue, would flow through

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 64 of 237

Page 64

1                       J. CORTESE

2    the swap to GMAC Mortgage.

3         Q.    You said through the funding date

4    and also through the sale date.

5         A.    Um-hum.

6         Q.    Is that one or the other or both?

7         A.    Through the time that Ally Bank

8    made a commitment to fund the loan through

9    the sale date.

10        Q.    And the sale date is before the

11   funding date, right?

12        A.    The sale date occurs after the

13   funding date.

14        Q.    After, right.  Trying to get out

15   of my home buyer perspective to mortgage

16   banker perspective.  It is hard.

17             So when you refer to the sale

18   date, you are referring to the sale of the

19   mortgage loan to third parties in the market

20   like GSEs and others?

21        A.    Specifically, the sale of the

22   mortgage loan from Ally Bank to GMAC

23   Mortgage.

24        Q.    Can you describe the MSR swap

25   for me?

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 65 of 237

Page 65

1              J. CORTESE

2              MR. SKIDMORE:   Objection.

3       A.     Sure.   Again, from an accounting

4    perspective, the MSR swap took any -- took

5    any P&L, any income statement and activity

6    related to the bank's MSR portfolio and

7    transferred that activity through the swap,

8    to GMAC Mortgage, and in return, the bank

9    received a market based LIBOR return.

10      Q.     Thanks.  I want to turn back to

11   the MMLPSA now.

12      A.     Okay.

13      Q.     Did you review this document

14   before December of 2011?

15      A.     I read it before December of

16   2011, sure.

17      Q.     Do you recall when the first time

18   you read the MMLPSA was?

19      A.     I don't specifically recall.

20      Q.     Do you recall whether it was

21   shortly after joining Ally, a year later,

22   two years later?

23      A.     It was probably shortly after I

24   joined Ally Bank.

Plaintiff's Objection
065:25 – 066:22
Impermissible lay
opinion (FRE 701, 702)

25      Q.     What's FAS 91?

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 66 of 237

Page 66

1                J. CORTESE

2        A.    Statement of accounting FAS 91

3    was the old terminology for -- generally for

4    GAAP guidance related to the accounting

5    treatment for loan origination cost and

6    expenses.

7        Q.    And what was the guidance under

8    FAS 91?

9        A.    Generally or specifically?

10        Q.    Generally and then I will ask you

11    more specifically.

12        A.    Generally, FAS 91 dictated that a

13    lender under a lower cost or market

14    accounting methodology should defer its

15    recognition of certain loan origination fees

16    and loan origination expenses.

17        Q.    And if I were looking at the

18    loans from a cost basis, would that deferral

19    decrease the cost basis of the loan?

20        A.    It would depend on -- it would

21    depend on whether you are deferring net

22    revenue or net expense.

23        Q.    So if I am deferring a net

24    expense, it would lower the cost basis,

25    right?

Plaintiff's Objection
066:23 – 068:18, Calls for
legal conclusion;
impermissible lay opinion
(FRE 701, 702)

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 67 of 237

Page 67

1                    J. CORTESE

2                    MR. SKIDMORE:    Objection.

3          Q.      Sorry.    If I am -- let me say it

4   the right way this time.    If I am deferring a

5   net income, it would reduce my cost basis,

6   right?

7                    MR. SKIDMORE:    Objection.

8          A.      That is correct.    If you are

9   deferring revenue, you would lower the cost

10  basis of that loan.

11         Q.      Conversely, if I was deferring an

12  expense, it would increase the cost basis of

13  the loan, right?

14                  MR. SKIDMORE:    Objection.

15         A.      That is correct.

16         Q.      Looking at Cortese Exhibit 2 and

17  the page numbered 2 in that document.

18  Section 1.9 is the definition of cost basis.

19  And it says, "The cost basis means with

20  respect to a mortgage loan, its net carrying

21  value as defined by accounting principles

22  generally accepted to the United States of

23  America as amended to include without

24  limitation the unpaid principal balance of

25  such mortgage loan plus or minus any premium

Page 68

1                J. CORTESE

2    or discount paid, net deferral fees or costs,

3    accrued interest and basis adjustments from

4    derivative loan commitments, hedge

5    accounting, or lower of cost or market

6    adjustments."

7              What does net carrying value mean

8    in this provision?

9              MR. SKIDMORE:  Objection.

10         Objection.

11         A.    The net carrying value is an

12    accounting term which basically represents

13    its UP -- the loan's unpaid principal balance

14    adjusted for those amounts -- those balances

15    that you just read.  Any discount, premium,

16    deferred fees or cost and any derivative and

17    hedge adjustments that you may make related

18    to that line.

19         Q.    So in a simple hypothetical where

20    there is a $100 loan that Ally Bank is

21    extending and Ally is receiving $10 in

22    points, what's the cost basis under this

23    definition?

24              MR. SKIDMORE:  Objection.  Calls

25         for a legal conclusion.

Plaintiff's
Objection
068:19 – 071:15
Calls for legal
conclusion;
impermissible lay
opinion (FRE 701,
702)

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 69 of 237

Page 69

1                    J. CORTESE

2        Q.     What's the net carrying value?

3        A.     So from accounting perspective, I

4    would say that the net carrying value of that

5    loan with a $100 unpaid principal balance and

6    the received $10 of revenue in your

7    simplified example would be $90.

8        Q.     If in addition to paying -- to

9    receiving $10 in revenue the bank also paid

10   $5 in broker fee, what would the net carrying

11   value be of that loan under my simple

12   hypothetical?

13       A.     If it included the $5 of broker

14   fee, that net carrying value would be 95.

15       Q.     Turning to the next page in

16   Cortese Exhibit 2, Section 1.24.    Definition

17   of purchase price.    What is the purchase

18   price with respect to first lien mortgage

19   loans?

20       A.     Sorry, what was -- could you

21   explain the question?

22       Q.     Under this agreement, what is the

23   purchase price with respect to first lien

24   mortgage loans?

25               MR. SKIDMORE:    Objection.

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 70 of 237

Page 70

1                        J. CORTESE

2          A.      Would you like me to read it?

3          Q.      Sure.    If you have a

4    recollection.    If this helps you.

5                  MR. SKIDMORE:    Objection.    Calls

6          for a legal conclusion.

7                  Go ahead.

8          A.      This document states that the

9    "Purchase price means with respect to a first

10   lien mortgage loan the Cost Basis plus

11   reserves associated with such first lien

12   mortgage loans."

13         Q.      And Cost Basis is capitalized,

14   right?

15         A.      It is.

16         Q.      You said that when you joined

17   Ally Bank the MMLPSA was obviously something

18   that you wanted to get more knowledge about.

19         A.      Um-hum.

20         Q.      Why was it obvious that you

21   wanted to get more knowledge about it?

22                 MR. SKIDMORE:    Objection.

23         A.      Simply because it was a specific

24   transaction that was recorded on the bank.

25         Q.      When you joined Ally Bank, had

Page 71

1                    J. CORTESE

2    the bank transitioned to fair value

3    accounting?

4         A.    Sorry, did the bank transition?

5         Q.    Had the bank already transitioned

6    when you joined in August of 2008?

7         A.    Yes.  The bank had --

8         Q.    Sorry, 2009.

9         A.    2009, thank you.  Yes, the bank

10   elected fair value accounting treatment for

11   any loan that was -- for any held-for-sale

12   loan that was originated beginning August 1st

13   of 2009.  Since I entered the bank in, I

14   believe the middle of -- August of 2009, that

15   treatment was already in place.

16        Q.    Did you have any discussions with

17   anybody at Ally Bank when you joined about

18   the impact that the change to fair value --

19   the election of fair value accounting had on

20   the MMLPSA?

21        A.    Not to my recollection, no.

22        Q.    Were you aware of the fact that

23   there was an impact resulting from the

24   election of fair value accounting?

25        A.    I was aware that the bank elected

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 72 of 237

Page 72

1                    J. CORTESE

2    fair value accounting, if that's what you

3    mean.

4        Q.    Did you know that in electing

5    fair value accounting, there was a change in

6    the way account -- transactions were being

7    accounted for under the MMLPSA?

8              MR. SKIDMORE:  Objection.

9        A.    No, not specifically.

10       Q.    Did there come a time when you

11   learned that?

12       A.    Yes.

13       Q.    When was that?

14       A.    I would say in late December of

15   2010.

16       Q.    And how did you become aware of

17   that?

18       A.    I received the E-mail from

19   Jim Young requesting to look into a matter

20   that he was made aware of regarding the gain

21   or loss on sale that the bank recognized.

22       Q.    Do you know why Jim Young was

23   asking you to look into the gain or loss on

24   sale that the bank recognized?

25       A.    My understanding was that

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 73 of 237

Page 73

1                    J. CORTESE

2    Adam Glassner mentioned a potential issue

3    that he thought was being made from an

4    accounting treatment standpoint and asked me

5    to investigate along with Cathy Dondzila.

6         Q.     If I told you that I thought that

7    was in December of 2011, would that refresh

8    your recollection about the time?

9         A.     It could have been 2011.  I could

10   have been wrong with the 2010 date.

11        Q.     What was the potential issue that

12   was identified regarding the bank's gain or

13   loss on the sale?

14        A.     I believe that Adam made a -- had

15   reason to believe that the fee recognition by

16   the bank was inappropriate and that he felt

17   that -- he felt that GMAC Mortgage should be

18   receiving more fee income than it

19   already was.

20        Q.     Do you know whether before the

21   bank elected fair value accounting it

22   recognized anything other than net interest

23   carry on transactions under the MMLPSA?

24             MR. SKIDMORE:   Objection.

25        A.     I was not aware.

Page 74

1               J. CORTESE

2       Q.    Do you know sitting here today

3   whether the bank recognized anything other

4   than net interest carry on the transactions

5   under the MMLPSA before it elected fair value

6   accounting?

7             MR. SKIDMORE:  Objection.

8       A.    Again, I don't have any -- I am

9   not specifically aware.

10      Q.    What did you do to investigate

11  the issue that was identified to you by

12  Mr. Young?

13      A.    Generally, a number of -- I would

14  say a number of different research items were

15  conducted.  We reviewed -- we reviewed the

16  specific transactions.  Again, what I would

17  say, this is -- this is -- this is really

18  specific to the transactions that fell under

19  the bank's broker-to-bank program and not all

20  origination transactions that the bank made

21  as lender.

22            So, again, you know, we looked

23  at -- we looked at various loan examples for

24  loans that were -- for broker loans that were

25  originated by the bank.  We looked at, again,

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 75 of 237

Page 75

1                    J. CORTESE

2    detailed examples of the -- of the specific

3    loan transactions that were recorded both

4    at -- both at the bank and at GMAC Mortgage.

5    We looked at the language that was within

6    some of the governing legal agreements

7    including the MMLPSA.   We also looked at the

8    project documents as we could -- as we could

9    find them related to the broker-to-bank

10   project.

11        Q.    When you say you looked at loan

12   examples at the bank and at GMAC Mortgage,

13   did you look at specific loan examples from

14   the January 1st, 2009, through July 31, 2009,

15   period as well as the period after

16   August 1st, 2009?

17        A.    Yes.

18        Q.    Was there a difference in how the

19   transactions were accounted for in the pre

20   August 1, 2009, period and the post August 1,

21   2009, period?

22        A.    Yes, there was.

23        Q.    And what was that difference?

24        A.    Specifically, that the bank's

25   origination fees and, you know, net of those

Page 76

1                    J. CORTESE

2   expenses during the, you know, during the

3   period of January 1 of 2009 through July 31st

4   of 2009, were transferred to GMAC Mortgage.

5   Post July 31st of 2009, that ceased.

6        Q.    And were the net origination --

7   sorry, were the origination fees net of

8   expenses transferred to GMAC Mortgage through

9   a FAS 91 deferral?

10       A.    No, they were not.

11       Q.    How did they get transferred?

12       A.    Operationally, they were

13  transferred by coding in a subsystem that

14  both the bank and ResCap utilized to track

15  loan level transactions, and those net --

16  that net fee amount was generalized over --

17  was generalized to ResCap out of the bank and

18  then a net settlement was performed to clear

19  out those -- to sell those amounts from an

20  intercompany standpoint.

21       Q.    What was the net effect from the

22  bank's perspective -- sorry, what was the net

23  effect of the transaction from the bank's

24  perspective pre August 1st, 2009, when

25  origination fees net of expenses were

Page 77

1                    J. CORTESE

2    transferred to GMAC Mortgage?

3         A.    So what was the net dollar

4    impact, is that what you are asking?

5         Q.    Right.   I don't need a specific

6    dollar amount.   But what categories of

7    revenue, if any, did the bank keep?

8         A.    Well, because of that -- because

9    of that transaction, the bank, again, just

10   for the -- just for the broker loan, loan

11   types, from the period of January 1, 2009,

12   through July 31, 2009, the net income was

13   basically representing the net interest

14   carry.

15        Q.    And what is net interest carry?

16        A.    Net interest carry represents the

17   interest earned on the loan while that loan

18   is residing on the bank's balance sheet.   Net

19   of the funding -- the funding expense, the

20   cost of funds for holding that loan.

21        Q.    Okay.   And when you said that

22   post August 1st, 2009, the practice ceased,

23   referring to origination fees, net of

24   expenses being transferred to GMAC Mortgage,

25   what is the net effect from the bank's

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 78 of 237

Page 78

1                          J. CORTESE

2       perspective?

3            A.      Post August 1st of 2009, the

4       bank -- the bank recognized the net interest

5       carry as well as the net origination fees and

6       expenses for originating that -- the loan.

7            Q.      Are net origination fees and

8       expenses deferred under FAS 91?

9                 MR. SKIDMORE:  Objection; vague.

10           A.      Under a lower of cost or market

11      accounting methodology, yeah, generally

12      certain origination fees and expenses would

13      be deferred under FAS 91 until the loan is

14      sold.

15           Q.      You said "certain origination

16      fees."  Are there -- what origination fees

17      and expenses would not be deferred under

18      FAS 91?

19           A.      Would not be?

20           Q.      Yes.

21                 MR. SKIDMORE:  Objection.

22           A.      For example, you have -- the

23      lender will incur, you know, a fair amount of

24      expenses to originate that -- to originate

25      the loan.  Not 100% of those expenses are not

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 79 of 237

Page 79

1          J. CORTESE

2    deferred under that treatment.  There is a --

3    there is a calculation that you will go

4    through to only defer certain parts of the

5    expense of the operational expenses for

6    originating that loan.  So it is not -- it is

7    not an all in 100% of those -- of those

8    operating expenses that would get deferred.

9        Q.    And do you have a sense of -- do

10   you have a relative sense of what percentage

11   of origination fees do not get deferred?

12       A.    I do not.

13       Q.    Do you know whether it is a small

14   fraction of all origination fees?

15            MR. SKIDMORE:  Objection.

16       A.    Again, I think it's a lot more

17   relevant on the expense side.  I have never

18   done an analysis to determine what amount

19   would, you know, what that amount would be

20   deferred as in -- in relation to its entire

21   population.

22       Q.    In connection with your

23   investigation that you undertook at

24   Mr. Young's request, did you seek legal

25   guidance regarding the meaning of the MMLPSA

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 80 of 237

Page 80

1                     J. CORTESE

2    or the interpretation of particular

3    provisions in that agreement?

4         A.    Yeah, I generally recall --

5              MR. SKIDMORE:  Hold on a second.

6    Just say yes or no.

7         A.    Yes.

8         Q.    And who did you speak to?

9         A.    John Andrews.

10        Q.    When you read the MMLPSA on your

11   own, did you have an understanding of what it

12   meant?

13             MR. SKIDMORE:  Objection.  You

14        are referring to the time before he

15        spoke to counsel?

16             MS. MILLER:  Yes.

17             MR. SKIDMORE:  Okay.

18        A.    I'd say I had a general

19   understanding as it applied to accounting

20   operations.

21        Q.    And what did you understand when

22   you first read the MMLPSA, what did you

23   understand that GMAC Mortgage -- sorry, on

24   what basis did you understand that GMAC

25   Mortgage had to purchase loans from Ally

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 81 of 237

Page 81

1                    J. CORTESE

2    Bank?

3              MR. SKIDMORE:  Objection.

4    Q.    Let me restate that question.

5    A.    Okay.

6    Q.    Did you have an understanding,

7    independent of any consultations with

8    lawyers, an accounting based understanding of

9    how GMAC Mortgage was supposed to calculate

10   what it paid to Ally to acquire a loan under

11   the MMLPSA?

12   A.    Yes, I had a, I would say a

13   general understanding of what price that GMAC

14   Mortgage would purchase the loans at.

15   Q.    And what was your general

16   understanding?

17   A.    My general understanding was that

18   they would purchase the loan assets

19   outstanding UPB to also include the -- any

20   deferred origination fees and expenses which

21   would have approximated the loan's carrying

22   value.

23   Q.    When you joined Ally Bank, how

24   was the -- what price was GMAC Mortgage

25   paying to acquire the loans?

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 82 of 237

Page 82

1                    J. CORTESE

2        A.        I don't think I understand the

3   question.

4        Q.        Well, how were loans being priced

5   under the MMLPSA for purchases by GMAC

6   Mortgage?

7                MR. SKIDMORE:    Objection.

8        A.        Again, it was my understanding

9   that the bank would receive the unpaid

10  principal balance of that loan.    Again, plus

11  or minus any of the deferred amount.

12       Q.        Going back to my simple example

13  of $100.    On a $100 mortgage loan, if the

14  bank received $10 in origination fees, how

15  much did GMAC Mortgage have to pay to acquire

16  that loan?

17                MR. SKIDMORE:    Objection.

18       A.        So if the EPB of the loan was 100

19  and the bank had deferred $10, then GMAC

20  Mortgage would pay 90 for that loan.

21       Q.        Were you involved in meetings

22  relating to revenue recognition and

23  assumptions related to the broker and

24  consumer loans to bank project in August of

25  2008?

1                          J. CORTESE

2          A.     Not to my recollection.

3          Q.     Were you familiar with -- sorry,

4   if I called the broker and consumer loans to

5   bank project BCL2B, number 2 B, will you

6   understand what I am referring to?

7          A.     Yes, I would.

8          Q.     Were you aware of the BCL2B

9   project in 2008?

10         A.     I was generally aware that there

11  was a project related to that, yes.

12         Q.     Were you aware that the project

13  was intended to address, among other things,

14  liquidity constraints at GMAC Mortgage?

15              MR. SKIDMORE:  Objection.

16         A.     I was not aware of that.

17         Q.     Did you understand, when you

18  joined ResCap, that GMAC Mortgage had

19  liquidity constraints?

20              MR. SKIDMORE:  Objection.

21         A.     Generally speaking, yes, I was

22  aware that -- that there were liquidity

23  constraints at ResCap in general.

24         Q.     And would broker and consumer

25  loans to the bank help with a liquidity

Plaintiff's Objection
083:17 – 84:22
Irrelevant (FRE 401,
402)

Page 84

1                    J. CORTESE

2    problem?

3                 MR. SKIDMORE:   Objection.

4         A.    At the time would I know that

5    or now?

6         Q.    Based on your general accounting

7    knowledge, do you know whether brokering and

8    consumer loans through the bank, to the bank

9    instead of having GMAC Mortgage fund them

10   directly, would help with a liquidity

11   constraint problem?

12        A.    Not related to my accounting

13   knowledge, but as a business person, yes, I

14   would think it would assist GMAC Mortgage

15   with its liquidity.

16        Q.    How would it assist GMAC Mortgage

17   with its liquidity?

18        A.    It will assist GMAC Mortgage with

19   its liquidity by transferring certain

20   originations to the bank so that the bank

21   will fund the loan as opposed to GMAC

22   Mortgage having to fund that loan directly.

23        Q.    Do you know whether brokering was

24   subject to the limitations that we discussed

25   earlier including the 250.250 exemption in

Page 85

1              J. CORTESE

2    Federal Reserve Act Section 23A?

3              MR. SKIDMORE:  Objection.

4         A.    Yeah, I'm not specifically aware

5    in my capacity.  It is more of a legal

6    determination.

7         Q.    Did you ever have any discussions

8    regarding the BCL2B project and the 250.250

9    exemption?

10        A.    As the project was underway?

11        Q.    Ever.

12        A.    I would say during my research

13   for the issue that Mr. Glassner brought up,

14   that was probably the first time.

15        Q.    And what did you -- what did you

16   learn about it?

17             MR. SKIDMORE:  Objection.  Ask

18        him first who he spoke with.

19        Q.    Who did you speak to?

20        A.    During my research?

21        Q.    Who did you speak to about the

22   BCL2B project and its connection to the

23   250.250 exemption?

24        A.    So if you are saying specific to

25   how the BCL2B project interrelated with the

Page 86

J. CORTESE

1

2    250.250 exemption, that was not in

3    consideration of the research work that I

4    performed.

5        Q.    Did you ever have any discussions

6    about the 250.250 exemption in connection

7    with the BCL2B project?

8        A.    Not to my recollection.

9        Q.    Do you recall seeing any

10    reference to the 250.250 exemption in

11    connection with the BCL2B project?

12        A.    Not to my recollection.

13        Q.    So when I asked did you ever have

14    any discussions regarding the BCL2B project

15    and the 250.250 exemption and you responded,

16    "as the project was underway," and I said,

17    "ever" and you said, "I would say during my

18    research for the issue that Mr. Glassner

19    brought up, that was probably the first

20    time," what were you referring to?

21        A.    I was referring just to the BCL2B

22    project.  Not with its interconnection with

23    the 250.250 exemption.

24        Q.    Had you ever heard of the BCL2B

25    project before December 2011?

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 87 of 237

Page 87

1              J. CORTESE

2       A.    I generally knew that -- that

3  there was a project that took place for the

4  bank to broker loans directly.

5       Q.    Did you have any discussions

6  regarding the BCL2B project before December

7  of 2011?

8       A.    Not to my recollection.

9            MS. MILLER:  I would like to

10           mark as Cortese Exhibit 3, a document

11           Bates stamped Exam 10770041 through

12           '52 which is an E-mail dated

13           August 11, 2008, actually, two e-mails

14           with that a date and an attachment.

15           (Whereupon, Cortese Exhibit 3,

16           EXAM 10770041 through '52 was marked

17           for identification as of this date by

18           the Reporter.)

19           MR. SKIDMORE:  I just want to

20           note for the record because I haven't

21           said this before, that I actually,

22           sitting here today, don't know what

23           the protocol is for this, so I want to

24           designate the transcript, at least for

25           now, at the highest level of

Page 88

J. CORTESE

1    confidentiality under the Protective

2    Order, and then, we will go back and

3    revisit it.  But just I don't want

4    to -- for now just going to do that

5    and I'll figure out what the right

6    protocol is.

7    Q.    Mr. Cortese, do you see, what is

8 the bottom piece of this chain?

9    A.    Sorry, clarify your question.

10    Q.    At the bottom of the document

11 with the Bates ending in '41, do you see that

12 to be a calendar invite?

13    MR. SKIDMORE:  Do you see what

14    she is referring to?

15    Q.    Where it says "From Kathy Linhoff

16 on behalf of Jill Horner" to a number of

17 people including yourself?

18    A.    It appears to be a calendar

19 invite.

20    Q.    And what's the date on this

21 document?

22    A.    On the calendar invite that was

23 sent by Kathy Linhoff?

24    Q.    Yes.

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 89 of 237

Page 89

J. CORTESE

1

2    A.    Says "Friday, August 8, 2008."

3    Q.    Do you see that the subject is

4  "Updated broker and consumer loans to bank

5  review signoff of review and expenses

6  recognition, assumptions and requirements"?

7    A.    I do.

8    Q.    And the note says, "Sorry,

9  meeting is rescheduled for Monday,

10 August 11th"?

11   A.    I do see that.

12   Q.    Does this refresh your

13 recollection about whether you had any

14 discussions relating to the BCL2B project and

15 revenue recognition and assumptions in 2008?

16   A.    No, it does not.

17   Q.    Who is Jill Horner?

18   A.    Jill Horner at the time, I

19 believe she was a finance manager at ResCap.

20   Q.    And you were employed by ResCap

21 at this time, right?

22   A.    Yes, I was.

23   Q.    And do you know whether you

24 attended this meeting?

25   A.    I do not recall if I did or not.

Page 90

1                        J. CORTESE

2        Q.    And Matthew Whitehead then sends

3   an E-mail, that's on the top of the page,

4   that says "Materials for the call at

5   3:00 p.m." dated Monday, August 11th and

6   attaches a document.  Do you recall ever

7   seeing this document before?

8        A.    Not specifically.

9        Q.    You don't doubt that you received

10  it, right?

11            MR. SKIDMORE:  Objection.

12        A.    I don't know specifically if I

13  received it or not.

14        Q.    But you see that you are listed

15  among the recipients, the cc parties on this

16  document, right?

17        A.    I see that I am.  I am not

18  specific if this is the exact document that

19  was attached to that E-mail.

20        Q.    Well, I will represent to you

21  this was produced to us as an E-mail with its

22  attachment and that the document behind the

23  slip sheet is in fact the document that was

24  identified as the attachment.

25        A.    Okay.

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 91 of 237

Page 91

J. CORTESE

1

2     Q.    Would you have reviewed this

3  document when you got it?

4     A.    I don't specifically recall.

5     Q.    Is it your general practice to

6  review documents that people E-mail to you?

7          MR. SKIDMORE:  Objection.

8     A.    I don't specifically recall

9  doing -- being tasked with doing much in the

10  way of work on the BCL2B project.

11     Q.    Do you know why you were included

12  in the calendar invite and the distribution

13  of materials?

14          MR. SKIDMORE:  Objection.

15     A.    I do not know exactly why I was

16  included.

17     Q.    Are you surprised to see that

18  this -- that these materials were sent

19  to you?

20          MR. SKIDMORE:  Objection.

21     A.    No, I'm not.

22     Q.    Why is it not surprising to you?

23          MR. SKIDMORE:  Objection.

24     A.    I think during the course of a

25  day, I get a number of e-mails that I am not

Page 92

J. CORTESE

1 specifically -- doesn't specifically relate

2 to me.

3      Q.    Just looking at the calendar

4 invite, can you tell me how many people were

5 invited were actual recipients of the

6 calendar invitation?

7           MR. SKIDMORE:  You are referring

8      to both the to and the cc fields or

9      are you referring to one or the other?

10          MS. MILLER:  I am in the to

11     field.  Not people copied on it, but

12     people who the calendar invite was

13     actually directed to.

14          MR. SKIDMORE:  Objection to the

15     characterization.

16          Go ahead.

17     A.    I count six people were invited.

18     Q.    And you are one of those six,

19 right?

20     A.    I appear to be.

21     Q.    Did you conduct any -- did you

22 have any discussions with Ally employees

23 regarding your investigation of the

24 Glassner -- of the issue identified by

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 93 of 237

Page 93

1           J. CORTESE

2    Glassner?

3           MR. SKIDMORE:   Objection.   Could

4      you clarify what you mean by Ally?

5      Q.    Sorry, did you have any

6    discussions with employees of Ally Bank

7    regarding your investigation of the

8    Glassner -- of the issues identified by

9    Glassner?

10     A.    I had discussions with my boss at

11   the time, who is Larry LaCombe.   I had

12   discussions with Jim Young.

13     Q.    Did you speak to anybody at

14   ResCap about the issues identified by

15   Mr. Glassner?

16     A.    I spoke with Nikki Rock.   I spoke

17   with Cathy Dondzila.   I had E-mail

18   correspondence with Jim Whitlinger.

19     Q.    Did you speak to anybody at AFI

20   regarding the issues identified by

21   Mr. Glassner?

22     A.    As part of the investigation, I

23   know I met with Anne Cummings who was AFI's

24   head internal auditor, as well as

25   representatives from AFI's global security

Page 94

J. CORTESE

1
2  department.

3       Q.    Did ResCap have internal

4  auditors?

5            MR. SKIDMORE:  Objection.

6       A.    I'm not specifically aware if

7  they did or not.

8       Q.    Did you speak to any ResCap

9  internal auditors regarding the investigation

10  of the issues identified by Mr. Glassner?

11       A.    I am not specifically aware if

12  ResCap had internal auditors or not.

13       Q.    So the answer, I am assuming, is

14  that you did not speak to anybody -- any

15  ResCap internal auditors about the

16  investigation of the issues identified?

17            MR. SKIDMORE:  Objection.

18       Q.    By Mr. Glassner?

19            MR. SKIDMORE:  Objection.

20       Mischaracterizes.

21       Q.    Well, you are unsure whether they

22  had them or not?

23       A.    That's correct.

24       Q.    So if they did have internal

25  auditors, did you speak to any of them?

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 95 of 237

Page 95

1                 J. CORTESE

2           MR. SKIDMORE:  Hold on.  That's

3       an incomplete hypothetical.  He can't

4       answer that question.  He may have

5       spoken to somebody and not known

6       whether they were an internal auditor

7       or not.

8       Q.    Did you speak to -- did any of

9   the people who you identified as having

10  spoken to from ResCap, do you believe that

11  any of them had audit functions, internal

12  audit functions?

13      A.    No, not to my knowledge.

14      Q.    Did you review materials from

15  2008 in connection with your investigation of

16  the issues identified by Mr. Glassner?

17      A.    If you are referring to project

18  material, yes, I did review certain pieces of

19  the project related material.  I don't know

20  exactly the date that that material was

21  produced.

22      Q.    When you say "project related

23  material," do you mean like a Power Point

24  presentation?

25      A.    There was a Power Point

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 96 of 237

Page 96

1              J. CORTESE

2    presentation that I reviewed, yes.

3        Q.    Were there any memos that you

4    reviewed?

5        A.    I don't recall specific memos

6    that I reviewed.

7        Q.    And did you have any -- did you

8    review any e-mails?

9        A.    There were -- there were some

10   e-mails from that time period that I did

11   review.

12       Q.    Did you ask anybody to go back

13   and search for and provide you with e-mails

14   from the people involved in the BCL2B project

15   from 2008?

16       A.    I specifically asked Deb Scott

17   who was an Ally Bank employee, and was on

18   that project team representing Ally Bank, for

19   any material she may have.

20       Q.    And did Deb Scott send you

21   e-mails?

22       A.    Deb Scott forwarded me one

23   E-mail, which was correspondence, I believe,

24   between Matthew Whitehead and Al Celini

25   related to the -- related to the project.

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 97 of 237

Page 97

1                    J. CORTESE

2            MS. MILLER:   I would like to

3       mark as Cortese 4 a document Bates

4       stamped EXAM 003975 through '3987.

5               (Whereupon, Cortese Exhibit 4,

6       EXAM 003975 through '3987 was marked

7       for identification as of this date by

8       the Reporter.)

9       Q.    Mr. Cortese, is this the E-mail

10   that you were referring to that Debra Scott

11   forwarded to you from Al Celini and

12   Matthew Whitehead?

13       A.    It is that E-mail, yes.

14       Q.    And Miss Scott wrote to you on

15   March 1st, 2012, and said, "This E-mail helps

16   support my basis of the broker project being

17   economically neutral to the bank."

18            What discussions did you have

19   about the BCL2B project being economically

20   neutral to the bank?

21       A.    I don't recall having much in the

22   way of detailed discussions related to what

23   that meant.

24       Q.    What's your understanding of what

25   it means for a project to be economically

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 98 of 237

Page 98

1                    J. CORTESE

2    neutral to the bank?

3                    MR. SKIDMORE:   Objection.

4         A.      I am not sure what that means.

5         Q.      From a business perspective,

6    based on your business experience, do you

7    know what it would mean if a transaction were

8    economically neutral to a party?

9         A.      I would generally say that and it

10   would mean that the entity would have a zero

11   net income impact to the transaction.

12        Q.      So you would also understand that

13   based on your accounting experience, right?

14                   MR. SKIDMORE:   Objection.

15        A.      No, I don't think accounting

16   really has concept of being economically

17   neutral.

18        Q.      Does it have a concept of zero

19   net impact -- net income impact?

20        A.      It is not really an accounting

21   concept, no.

22        Q.      How would you -- from an

23   accounting perspective, how would you refer

24   to a transaction that has no impact on an

25   income statement?

JSN Objection
98:12 - 99:05
Irrelevant (FRE
401, 402)

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 99 of 237

Page 99

1              J. CORTESE

2              MR. SKIDMORE:  Objection.

3         A.   I don't think I necessarily

4    would.  It's not a relevant term for

5    accounting concept.

6         Q.   Looking to the first E-mail in --

7    so, can you explain, this E-mail is a little

8    bit confusing, but can you explain your

9    understanding of, starting at the bottom, who

10   is writing what?

11             MR. SKIDMORE:  Objection.

12        A.   It appears to me that

13   Matthew Whitehead is writing the E-mail to

14   Al Celini.

15        Q.   And then, do you also understand,

16   based on the E-mail above that, that

17   Al Celini may have interlineated comments on

18   Matt Whitehead's E-mail where he says, "See

19   my comments in red below"?

20        A.   Yes, that appears to be what

21   occurred.

22        Q.   Looking at that bottom E-mail,

23   the first sentence says, "I wanted -- based

24   on our conversation on Friday, I wanted to

25   confirm that only revenue the bank is going

Plaintiff's Objection
099:06 – 100:09
Lack of personal
knowledge (FRE
602)

Page 100

1                    J. CORTESE

2    to recognize is the net carry, i.e., interest

3    income slash expense."

4              What does that mean?

5              MR. SKIDMORE:   Objection.

6         A.    It appears that Matthew Whitehead

7    is trying to make a confirmation that the

8    bank should only recognize net interest

9    carry.

10        Q.    Then it continues, "all of the

11   other income slash fees i.e., origination

12   fee, loan discount fee, income, open paren

13   points, rate lock fee, overage, shortage,

14   subsidies, underwriting fee, other ancillary

15   fees will be payable to the bank from the

16   borrower and not the mortgage company and

17   will be capitalized within the Cost Basis of

18   the loan, and essentially, sold to mortgage

19   as that Cost Basis as the purchase price."

20            Based on that, what is your

21   understanding of what the purchase price of

22   the loan would be?

23            MR. SKIDMORE:   Objection.

24        A.    I think the purchase price would

25   be as defined in the MMLPSA.    And I think

Plaintiff's Designation 100:10 - 22 (in the event 99:06 – 100:09 is admitted over Plan Proponents' objection)

JSN Objection 100:10 - 22 Irrelevant (FRE 401, 402)

JSN Objection 100:24 - 101:10 Irrelevant (FRE 401, 402)

Plaintiff's Designation 100:24 - 101:10 (in the event 99:06 – 100:09 is admitted over Plan Proponents' objection)

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 101 of 237

Page 101

1               J. CORTESE

2    that those two sentences are totally

3    conflicting.

4        Q.    So I am asking, can you explain,

5    from an accounting perspective, what the

6    second sentence means?

7            MR. SKIDMORE:   Objection.

8        A.    No, I cannot necessarily explain

9    from an accounting perspective what that

10   second sentence means.

11       Q.    What does it mean to capitalize

12   income and fees within the Cost Basis of a

13   loan?

14       A.    I believe that Whitehead is

15   referring to the deferment of those fees

16   under FAS 91?

17       Q.    You said the Cost Basis,

18   according to this E-mail, would be the

19   principal loan balance net of deferred fees

20   and expenses?

21           MR. SKIDMORE:   Objection.

22   Including asked and answered.

23       A.    It appears that's what

24   Matthew Whitehead is trying to ascertain.

25       Q.    What does it say in all caps

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 102 of 237

Page 102

1                           J. CORTESE

2    right after that sentence?

3        A.    It says "correct."

4        Q.    Then it says, it continues to

5    say, "All the traditional rev slash EXP

6    reimbursement items that normally be

7    recognized by the originator be borne by GMAC

8    B and capitalized into the loan basis

9    according to GAAP."

10             What does that mean?

11             MR. SKIDMORE:   Objection.

12        Q.    I will restate it.  Under GAAP,

13   what does it mean to capitalize the loan

14   basis?  I will restate that.

15             Under GAAP, what does it mean to

16   capitalize the traditional revenue and

17   expense reimbursement items into the loan

18   basis?

19        A.    I think that's a reference,

20   again, to the deferment as required by FAS 91

21   of origination fees and expenses into the

22   carrying value of the loan.

23        Q.    And it says "These items will not

24   resolve -- reside on the bank P&L."

25             What is the P&L?

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 103 of 237

Page 103

1                     J. CORTESE

2          A.    I believe that P&L is short for

3     profit and loss statement.  Otherwise

4     referred to as the income statement.

5          Q.    So did you understand that

6     sentence to mean that the fees and expenses

7     that are being deferred under FAS 91 will not

8     have an impact on the bank's income

9     statement?

10                MR. SKIDMORE:  Objection.

11         A.    I would say that that is what it

12    says.  I would not agree to it from an

13    accounting standpoint.

14         Q.    Who is Matthew Whitehead?

15         A.    I believe Matthew Whitehead was a

16    project manager working for ResCap.

17         Q.    Who is Al Celini?

18         A.    Al Celini, I believe, was the

19    chief operating officer for Ally Bank

20    while -- when I entered the bank.

21         Q.    What was Debra Scott's position

22    at this time?

23         A.    I am not exactly sure what her

24    position was.  Although, it is my

25    understanding that she was acting as a

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 104 of 237

Page 104

1              J. CORTESE

2    project management role on behalf of the bank

3    for this project.

4         Q.    And who is Elizabeth Matthey?

5         A.    I do not know.

6         Q.    What was Jill Horner's position

7    at this time?

8         A.    Again, I believe Jill Horner was

9    in the finance role working for ResCap at

10   this time.

11        Q.    When you say Debra Scott was in a

12   project management role, did you understand

13   that she was in a project management role

14   specifically with respect to the BCL2B

15   project?

16        A.    That's my subsequent

17   understanding.  Again, I was not at the bank

18   at the time.  So wasn't -- you know, wasn't

19   sure what her capacity was at that point in

20   time.

21        Q.    And do you know whether

22   Matthew Whitehead was also specifically in a

23   project management role with respect to the

24   BCL2B project?

25        A.    I don't know specifically.

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 105 of 237

Page 105

1                            J. CORTESE

2          Q.     And would Debra Scott have been

3   involved in discussions and negotiations

4   surrounding the BCL2B project in her

5   capacity -- in her project management role?

6          A.     Again, not being involved in that

7   project at the time or within the bank, I am

8   not sure exactly what her capacity was.

9          Q.     Did you speak to Debra Scott

10  about her role in the course of your

11  investigation of Mr. Glassner's --

12         A.     No, I did not --

13         Q.     -- allegation?

14         A.     -- speak with her specifically

15  about her role.

16         Q.     Did anybody tell you what her

17  role was?

18                MR. SKIDMORE:   Objection.

19         A.     Not that I am aware.

20         Q.     How did you speak to Debra Scott

21  in the course of your investigation?

22         A.     Because I understood that she

23  was -- that she worked on the project and was

24  also one of the last remaining people at the

25  bank who worked on the project.

Page 106

1                       J. CORTESE

2         Q.     Where did you get that

3    understanding?

4         A.     I don't specifically recall.

5         Q.     Did someone tell you that?

6         A.     I don't recall.

7         Q.     Going down or, I guess, starting

8    from the bottom five lines -- the second

9    to -- the third-to-last sentence from the

10   bottom, reads "This would effectively make

11   the bank P&L neutral to the way it currently

12   conducts business and would act essentially

13   as a funder of loans and not impacted by any

14   market or interest rate movement."

15            Do you know what P&L neutral

16   means?

17            MR. SKIDMORE:    Objection.

18        A.     Again, I think generally what he

19   was trying to state was that the bank would

20   not incur any net income or loss related to

21   this transaction.

22        Q.     If Ally Bank -- sorry, if GMAC

23   Mortgage purchased the loan from Ally, not

24   net of Ally's revenue, would Ally recognize

25   income on the purchase?

Plaintiff Objection
106:07 – 110:17
Lack of personal
knowledge (FRE 602);
impermissible lay
opinion (FRE 701,
702)

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 107 of 237

Page 107

1          J. CORTESE

2          MR. SKIDMORE:  Objection.

3      A.    Ally would -- Ally would -- Ally

4  Bank would recognize the deferred origination

5  fees and for cost upon sale to GMAC Mortgage

6  regardless of what that purchase price

7  would be.

8      Q.    So going back to my hypothetical

9  of a $100 mortgage and Ally Bank collects $10

10  in origination fees from the customer, and

11  then sells that mortgage to GMAC Mortgage for

12  $100, would Ally Bank recognize an income or

13  loss on that transaction?

14      A.    I think your hypothetical was

15  that it would -- it would sell -- the

16  purchase price would be 90, correct? $100 UPB

17  plus net of $10 of --

18      Q.    Well, I just gave you a new

19  hypothetical.

20      A.    New hypothetical, okay.

21      Q.    Where I have a mortgage for $100.

22      A.    Okay.

23      Q.    Principal balance of $100.  Ally

24  Bank collects $10 in origination fees from

25  the customer.

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 108 of 237

Page 108

1                    J. CORTESE

2        A.      Okay.

3        Q.      And then GMAC Mortgage buys it

4    from Ally Bank for the UPB not net of

5    origination fees.  How much would GMAC

6    Mortgage pay for that mortgage?

7                MR. SKIDMORE:   Objection.

8        A.      So with your hypothetical, the

9    bank would recognize the $10 of origination

10   fees in its income statement and that loan

11   would be sold to GMAC Mortgage at a price

12   of 100.

13       Q.      After August 1st, 2009, did Ally

14   Bank recognize origination fees as income on

15   its income statement?

16       A.      Related to broker loans?

17       Q.      Related to broker loans purchased

18   by GMAC Mortgage.

19       A.      Yes, upon sale of the loan to

20   GMAC Mortgage, the bank did recognize

21   origination fees, net of expenses, on its

22   income statement.

23       Q.      And did GMAC Mortgage purchase --

24   sorry, was the purchase price paid by GMAC

25   Mortgage net of origination fees?

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 109 of 237

Page 109

1          J. CORTESE

2                MR. SKIDMORE:  Objection.

3        Q.    Post August 1st, 2009?

4        A.    I believe it would include the

5    net origination fees.

6        Q.    Just clarify what you mean when

7    you say "include the net origination fees."

8    I want to make sure we are on the same page

9    here.

10        A.    So, again, whatever the --

11    whatever the net carrying value of that loan

12    at the time of sale would have been

13    representing the purchase price.

14        Q.    If Ally Bank received an

15    origination fee on a loan -- on a brokered

16    loan purchased by GMAC Mortgage, would the

17    purchase price be reduced by the origination

18    fee collected by Ally Bank post August 1st,

19    2009?

20                MR. SKIDMORE:  Objection.

21        A.    Yes, generally, it would be

22    reduced for origination fee.

23        Q.    Would it also be reduced for any

24    premiums received by Ally Bank -- sorry, let

25    me restate that.

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 110 of 237

Page 110

1                    J. CORTESE

2              Would it also be reduced for any

3    points received by Ally Bank?

4         A.    Points collected from the

5    borrower would -- no, post August -- post

6    August the 1st, points were recorded by Ally

7    Bank directly into its income statement.  It

8    would not impact the carrying value of the

9    loan.

10        Q.    So the purchase price -- the

11   price paid by GMAC Mortgage for the loan

12   would not be reduced by any points collected

13   by Ally Bank?

14             MR. SKIDMORE:  Object to form.

15        A.    Actual points collected from the

16   borrower, that is correct, it would not

17   reduce the price of the loan.

18             MR. SKIDMORE:  So we have been

19        going quite awhile.  When we get to a

20        stopping point here in a minute or

21        two --

22             MS. MILLER:  Yes.  Then we can

23        take a lunch break.

24             MR. SKIDMORE:  Yeah.

25        Q.    What if there was a premium on

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 111 of 237

Page 111

1                 J. CORTESE

2    the loan such that -- can you explain what a

3    premium -- what impact the premium -- a

4    premium would have on the cost or -- on the

5    revenue or expenses for Ally Bank?

6          A.    Do you mind defining "premium"?

7          Q.    A premium paid by the borrower or

8    a premium -- a premium mortgage elected by

9    the borrower.

10         A.    So are you referring to premium

11   pricing?

12         Q.    Right.   Premium pricing.

13         A.    So from an accounting standpoint,

14   premium pricing refers to a situation where

15   the -- where the lender is not receiving fees

16   from the borrower but is paying expenses

17   related to the origination of that loan.  The

18   premium pricing comes into play related to a

19   component of the market value of that loan

20   and what the lender can sell the loan for in

21   the secondary markets.  So when the loan was

22   originated by the bank, the premium pricing

23   was a component of the carrying value of the

24   loan with an offset to loan origination

25   income that was recognized on Ally Bank.

Page 112

1                    J. CORTESE

2        Q.    Would a borrower pay higher -- an

3   above market interest rate in a premium

4   pricing mortgage?

5             MR. SKIDMORE:  Objection.

6        A.    I wouldn't know.

7        Q.    Is that the general principle?

8             MR. SKIDMORE:  Objection.

9        A.    I think, generally, the borrower

10  is paying a market based interest rate for

11  that loan.

12       Q.    Is it a higher interest rate if

13  you have a premium pricing than if you don't?

14            MR. SKIDMORE:  Objection.

15       A.    Again, I wouldn't know.

16            MS. MILLER:  Now is a good time.

17            THE VIDEOGRAPHER:  The time is

18       12:13 p.m.; we are off the record.

19            (Whereupon, a lunch recess was

20       held.)

21

22

23

24

25

1        J. CORTESE

2        ***AFTERNOON SESSION***

3        THE VIDEOGRAPHER:  The time is

4    12:53 p.m.; we are on the record.

5  BY MS. MILLER:

6    Q.    Good afternoon, Mr. Glassner.

7    A.    Cortese.

8    Q.    I just gave you a whole new

9  identity.

10    A.    That's okay.

11    Q.    Sorry.  Looking at my documents.

12    A.    I hear ya.

13        MS. MILLER:  I would like to

14    mark as Cortese Exhibit 6 --

15        THE COURT REPORTER:  5.

16        MS. MILLER:  It was a tough

17    lunch break for me.

18        I would like to mark as Cortese

19    Exhibit 5, a document Bates stamped

20    ALLY_03861743 through '4.

21        (Whereupon, Cortese Exhibit 5,

22    ALLY_03861743 through '4 was marked

23    for identification as of this date by

24    the Reporter.)

25    Q.    Mr. Cortese, I am going to direct

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 114 of 237

Page 114

1                J. CORTESE

2    your attention to the E-mail at the bottom of

3    the first page, which is an E-mail from you

4    to Jim Young, dated December 15, 2011.  Do

5    you see that in this E-mail the third

6    sentence, you said, quote, "We believe that

7    the intent of the broker-to-bank initiative

8    was to not to have any piece of sale

9    execution revenue at the bank"?

10        A.     Yes, I do see that sentence.

11        Q.     When you wrote this on

12   December 15, 2011, did you believe that that

13   was a true statement?

14        A.     I would say that that was a very

15   preliminary statement.

16        Q.     Did you --

17        A.     And more research had to be

18   performed.

19        Q.     Did you believe it was true when

20   you wrote it on December 15th?

21             MR. SKIDMORE:   Objection.

22        A.     I think it was, again, a

23   preliminary statement.

24        Q.     Mr. Young was your boss, right?

25        A.     At that time, yes, he was.

Page 115

1                    J. CORTESE

2        Q.      You wouldn't have sent Mr. Young

3    an E-mail with a statement that you didn't

4    believe to be true, would you?

5        A.      I would not.

6        Q.      And you say at the end, at the

7    end of that paragraph, "We are working to

8    quantify the amount, however, for 2011

9    through November, it was 136 million."

10               Do you see that?

11       A.      I do see that.

12       Q.      Did you ever continue or complete

13   the project of quantifying the amount?

14       A.      No, because I think upon further

15   research, we discovered other items that led

16   us to conclude differently.

17       Q.      Did you do any initial

18   research -- did you get anymore updated

19   numbers than the $136 million number from

20   January 1, '11 through November?

21       A.      I don't recall that, no.

22       Q.      Who was work -- who specifically

23   was working with you on quantifying the

24   amount?

25       A.      It was Cathy Dondzila,

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 116 of 237

Page 116

1                         J. CORTESE

2    Nikki Rock, and myself that were researching

3    this issue.

4         Q.    And just so we are clear, what

5    amount were you working to quantify here?

6         A.    I don't recall what that

7    136 million represented at the time.

8         Q.    Going up to the second sentence,

9    in that E-mail, it says, you write, "The

10   consensus is that a piece of GOS is being

11   recorded in the bank as loan discount."  What

12   is GOS?

13        A.    GOS refers to gain on sale.

14        Q.    And then you continue, "We

15   believe that the intent of the broker to bank

16   initiative was to not have any piece of the

17   sale execution revenue at the bank."  And you

18   continue, "This treatment appears to have

19   begun in the beginning of 2009 when the

20   program started.  We are working to quantify

21   the amount, however, for 2011 through

22   November, it was 136 million."

23             Is the amount that you were

24   referring to the GOS that was being recorded

25   in the bank as loan discount?

1                        J. CORTESE

2        A.    Again, I would have to look back

3   to see exactly what that 136 million

4   represented.

5        Q.    But you wrote this E-mail, right?

6             MR. SKIDMORE:   Objection.

7        A.    I did write the E-mail, yes.

8        Q.    Do you recall whether you were

9   looking to quantify the gain on sale that was

10  being recorded at the bank?

11            MR. SKIDMORE:   Objection.   Asked

12       and answered.

13       A.    I don't specifically recall what

14  that $136 million represented.

15       Q.    I am not asking about the

16  136 million.   I am asking you if you recall

17  looking into, trying to quantify the gain on

18  sale that was being recorded in the bank as

19  loan discount?

20       A.    I don't specifically recall.

21       Q.    Do you recall, in connection with

22  your investigation of the issues identified

23  by Mr. Glassner, trying to quantify any

24  revenue by the bank?

25       A.    Could you clarify your question?

J. CORTESE

What revenue are you referring to?

Q.    Any revenue retained by the bank
in connection with the loan agreement --
sorry, the loan transactions under the
MMLPSA.

A.    I -- no, I recall that we
discovered an error relating to forwarding
excessive amounts of revenue to GMAC
Mortgage, and we quantified that related to
the broker transaction.

Q.    So your testimony is that you do
not recall doing any work to quantify revenue
that the bank retained in connection with the
transactions under the MMLPSA?

MR. SKIDMORE:  Objection;
mischaracterizes his testimony.

A.    Again, what I believe I stated
was that we quantified the amount of an
accounting error that was discovered through
this research.

Q.    Did you quantify anything else?

A.    I don't specifically recall.

Q.    Does the $136 million in this
E-mail refer to that error?

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese    Pg 119 of 237

Page 119

1          J. CORTESE

2          MR. SKIDMORE:  Objection.

3     A.    It does not refer to the

4    accounting error that we later discovered.

5     Q.    So it would appear that you

6    quantified something else?

7          MR. SKIDMORE:  Objection;

8     argumentative.

9     A.    Again, I don't specifically

10   recall what the $136 million represented.

11    Q.    But it is something other than

12   the piece that you said you didn't quantify?

13    A.    It's a number.

14    Q.    The E-mail continues, "This issue

15   does impact the amount of broker fee that

16   bank pays mortgage as the intent is for bank

17   to be neutral for originating consumer

18   loans."

19         What did you mean when you wrote

20   "the intent is for the bank to be neutral"?

21    A.    Again, this was a very

22   preliminary response.  Mr. Young sent an

23   E-mail to me at -- the evening of December

24   the 14th.  This response was December

25   the 15th.  Again, it was a very preliminary

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 120 of 237

Page 120

1                        J. CORTESE

2    review.

3         Q.    That's non-responsive.   I move to

4    strike the answer.

5              My question is, what did you mean

6    when you wrote "the intent is for bank to be

7    neutral"?

8              MR. SKIDMORE:   Objection.

9         A.    Again, it was a very preliminary

10   comment without looking at the full breadth

11   of information through the research.

12        Q.    Is your testimony -- I am asking

13   what you meant when you wrote the words "the

14   intent is for the bank to be neutral."   Not

15   whether it was preliminary or final.

16        A.    I think it was -- I think it was

17   in reference to the broker -- the bank

18   transaction and possibly what senior

19   management wanted to do with it.   It had

20   nothing to do with the accounting associated

21   with it.

22        Q.    What did you mean by "bank to be

23   neutral"?

24        A.    I think I meant that the bank's

25   net income should be zero related to this

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 121 of 237

Page 121

1                    J. CORTESE

2    transaction.  Which is inaccurate from an

3    accounting standpoint.

4        Q.    But it is what you wrote to

5    Mr. Young as the intent of the parties as you

6    believed it on December 15th, 2011, right?

7              MR. SKIDMORE:  Objection.

8        A.    That is what I wrote.

9              MS. MILLER:  I would like to

10    mark as Cortese Exhibit 6, a document

11    Bates stamped EXAM 12253153 through

12    '154.

13              (Whereupon, Cortese Exhibit 6,

14    EXAM 12253153 through '154 was marked

15    for identification as of this date by

16    the Reporter.)

17        Q.    Mr. Cortese, you have been handed

18    a document that's been marked Cortese

19    Exhibit 6, which is an E-mail from

20    Sylvia Ruby to you and a number of other

21    people dated December 16, 2011, which for

22    reference is the day after the E-mail we were

23    just looking at.  And it's sent high

24    importance and the subject says "2009 to 2011

25    HFS Consumer Broker to Bank."

Page 122

1                    J. CORTESE

2            Miss Sylvia writes "The attached

3    schedule shows the P&L recognized by the bank

4    at the time of origination funding related to

5    loan discount income, broker fee expense and

6    FAS 91 deferral, January to July '09 based on

7    the transaction recorded in GLS."

8            Do you understand what that

9    means?

10           MR. SKIDMORE:   Objection.

11       A.    Yes, I have a general -- excuse

12   me, general understanding of what that means.

13       Q.    What is your understanding?

14       A.    That for the period between

15   January 1, 2009, and through year to date,

16   November 2011, Miss Ruby provided a schedule

17   of the origination fees that were recorded

18   into discounted income broker fee expense of

19   FAS 91 on the bank related, solely related to

20   broker of loans.

21       Q.    And P&L, I think we said earlier,

22   is the equivalent to an income statement,

23   right?

24       A.    Correct.

25       Q.    And so this schedule that Miss

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese    Pg 123 of 237

Page 123

1                    J. CORTESE

2    Ruby prepared is showing profits and losses

3    or income, gains or losses as a result of the

4    transactions under the MMLPSA; is that right?

5         A.    Not under the MMLPSA.  Under the

6    accounting treatment for the bank's

7    origination -- origination fees and expenses.

8         Q.    And what is -- first of all, who

9    prepared -- who asked Miss Ruby to prepare

10   this schedule?

11        A.    I believe I asked her to

12   prepare it.

13        Q.    Why did you ask her to

14   prepare it?

15        A.    I believe at the time I wanted to

16   get an understanding of where these amounts

17   are recorded on the general ledger and the

18   balance of them.

19        Q.    And looking to -- to the

20   schedule, which is the next page of the

21   exhibit, Bates stamp ending '154, what did

22   the schedule that Miss Ruby prepared show

23   about profits and losses recognized by the

24   bank on origination fees related and other

25   fees?

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 124 of 237

Page 124

1                    J. CORTESE

2        A.      Anything specifically, you want

3    me to walkthrough the entire schedule?

4        Q.      Well, if you have a general

5    statement about what it shows, I will take

6    that.

7        A.      Okay.  It shows -- it shows the

8    borrower -- the net borrower paid and lender

9    paid fees that were recorded in the loan

10   discount account.  It also, in that account,

11   it includes the capital amounts that are

12   required price and then the amounts that were

13   recorded in that account.  It also shows that

14   the broker fee expense that the bank paid to

15   GMAC Mortgage recorded in another account,

16   and it shows a FAS 91 deferral amount that

17   was recorded in 2009 prior to the bank's fair

18   value election.

19       Q.      What we are looking at is the net

20   gain or loss from the bank's perspective; is

21   that right?

22       A.      What we were looking at is net

23   revenue that the bank recognized related to

24   origination and origination revenue and some

25   related expenses.

1          J. CORTESE

2          Q.    Before the bank made a fair value

3    election, would it have recognized any

4    origination revenue?

5              MR. SKIDMORE:    Objection.

6          Q.    On these transactions?

7              MR. SKIDMORE:    Objection.

8          A.    From the period of January 1st of

9    2009 through July 31st of 2009, the bank

10    would recognize, upon sale, the bank would

11    recognize these amounts in its income

12    statement.

13          Q.    What are "these amounts"?

14          A.    The net revenue and origination

15    of revenue and expenses that are depicted on

16    the schedule.

17          Q.    So --

18          A.    It would then, subsequently, for

19    those net amounts to GMAC Mortgage.

20          Q.    I am not sure I caught the end of

21    that.  So it would -- so it would -- did you

22    mean to say it would then subsequently

23    forward those in net amount to GMAC Mortgage?

24              Can you just answer the last

25    question again?

Page 126

1                  J. CORTESE

2              MR. SKIDMORE:   What is the last

3        question?

4          Q.     The last question is, you said

5    that "from the period of January 1st, 2009,

6    to July 31, 2009, the bank would recognize,

7    on sale, the bank would recognize these

8    amounts in its income statement," and I asked

9    "What are these amounts?"

10             Can you just restate what "these

11   amounts" are?

12             MR. SKIDMORE:   Objection.

13             Go ahead.

14         A.     These amounts relate to the

15   revenue -- the origination revenue and the

16   broker fee expense as depicted on the

17   schedule.

18         Q.     Okay.  So for a loan

19   originated -- sorry, for a loan purchased

20   before, in February of 2009, where would the

21   origination fees be on this schedule?  What

22   row and column would they be in?

23             MR. SKIDMORE:   Objection.

24         A.     Upon sale of that loan,

25   subsequent sale of that loan after

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 127 of 237

Page 127

J. CORTESE

1

2    origination to GMAC Mortgage, the bank would

3    recognize those fees in account 42510052 loan

4    discount income.

5        Q.    And so what is account 42160001,

6    which is the FAS 91 deferral at origination,

7    what is that number?

8        MR. SKIDMORE:  Objection.

9        A.    That -- that amount represented

10    the deferred amount as of July 31st of 2011,

11    the amount that was deferred under FAS 91.

12    And that amount -- that account 421600001

13    represents the income statement deferral of

14    that revenue.

15        Q.    So assuming there had been no

16    change to fair value accounting, on a going

17    forward basis, as those loans for which there

18    was a FAS 91 deferral recorded, as those

19    loans were sold, the origination fees would

20    have then been recorded as a credit in

21    account 42510052 offsetting the deferral

22    debit; is that right?

23        MR. SKIDMORE:  Objection.

24        A.    The -- yes, that is correct.

25        Q.    And so from a net income

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 128 of 237

Page 128

1                    J. CORTESE

2    statement perspective, there would -- you

3    would net to zero once all the loans that had

4    deferred origination fees were sold?

5        A.    No, we would not net to zero.  We

6    would recognize that deferred amount into

7    income.  We will reverse the deferral and

8    from a net P&L perspective recognize those

9    fees back into income.

10        Q.    Okay.  Looking at the loan

11    discount income account for 2010 and 2011, do

12    you see -- sorry, focusing specifically on

13    the loan discount, capital markets, RQDPR for

14    the year to date '11, 2011, do you see that

15    the number is 136 million and change?

16        A.    Yes.

17        Q.    Does that refresh your

18    recollection about what the 136 million in

19    Cortese Exhibit 5 was referring to?

20            MR. SKIDMORE:  Objection.

21        A.    No, it does not.  Because I would

22    have to look at my records to assure that

23    that is one in the same number.  I am not

24    sure if it is or not.

25        Q.    What is this 136 million

1              J. CORTESE

2   referring to?

3       A.    The $136 million represents the

4   capital markets required price that was

5   recognized into income by the bank from

6   January 1, 2011, through November 30th of

7   2011.

8       Q.    Did the bank recognize any of the

9   capital market required price as income for

10  loans sold before August 1st, 2009?

11      A.    Yes, it recognized $209,000.

12      Q.    And you know that that $209,000

13  relates to the period in 2009 before

14  August 1st?

15      A.    That's a good point, I do not

16  know that.  That's year to date 2009.

17      Q.    So that 209,000 might be

18  referring just to the period of August 2009

19  through year end, right?

20      A.    Potentially.  The schedule

21  doesn't say.

22      Q.    And can you tell me what amount

23  the bank recognized -- of capital market

24  required price the bank recognized as income

25  in 2010?

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 130 of 237

Page 130

1               J. CORTESE

2       A.    The bank recognized $113,920,108.

3       Q.    Does this document refresh your

4  recollection at all about whether you did an

5  analysis of revenues recognized by the bank

6  under loan transactions with GMAC Mortgage?

7            MR. SKIDMORE:   Objection.

8       A.    Yes.  I don't think I ever said

9  that I didn't do an analysis.

10      Q.    And looking at the loan discount

11  net borrower and lender paid row, what is

12  that referring to?

13      A.    That basically refers to fees

14  that were received directly from the

15  borrower, origination fees.   Net of any fees

16  that the bank paid to the borrower for

17  closing the loans.

18      Q.    Do you know why there is such a

19  dramatic decrease in the fees received

20  directly from the borrower from 2009 to 2010

21  and continuing into 2011?

22      A.    That is essentially related to

23  the advent of a premium pricing environment

24  that mortgage companies started to operate in

25  as interest rates decreased.   Due to that

Page 131

1                      J. CORTESE

2    time period, people were not paying to reduce

3    their interest rates on their loans any

4    further.

5         Q.    And for the period -- for 2010

6    and 2011, there was no FAS 91 deferral

7    amounts, right?

8         A.    That is correct.

9         Q.    And the same is true for the

10   period from August of 2009 through year end

11   '09, right?

12        A.    Correct.

13        Q.    Going down to the bottom under

14   Note A, there are a number of accounts, I

15   guess Note A might just be referring to the

16   "FAS 91 deferral at origination programmed in

17   GLS funding was comprised of the following

18   accounts." Please tell me if you know what

19   each of these accounts reflects.  What does

20   other pricing adjustment eclipse?

21        A.    I have a general knowledge of

22   what some of this stuff represents.  I don't

23   know for certain what they all -- what all

24   these accounts capture.

25        Q.    But this is generally breakdown

Page 132

J. CORTESE

1
2  by account of the FAS 91 deferral amounts?

3     A.    That is correct.

4     Q.    Did you have any discussions with

5  anybody at Ally or ResCap about the schedule?

6     A.    I don't specifically recall

7  having discussions.  I may have.  I just

8  don't recall.

9     Q.    Do you recall having discussions

10  with Cathy Dondzila about the amount of

11  income that was recognized by the bank after

12  August 1st, 2009?

13     A.    Again, generally, we discussed

14  it.  But, I don't have any specifics on what

15  we discussed or --

16     Q.    Do you recall whether you were

17  surprised to see how much income the bank had

18  accounted for under these transactions?

19        MR. SKIDMORE:  Objection.

20     A.    No, I wasn't.  I wasn't

21  surprised.  I saw them in my general ledger

22  every month.

23     Q.    Did you know whether

24  Cathy Dondzila was surprised?

25        MR. SKIDMORE:  Objection; calls

Page 133

1              J. CORTESE

2        for speculation.

3        A.    I wouldn't know if she was

4    surprised or not.

5              MS. MILLER:  I would like to

6    mark as Cortese Exhibit 7, a document

7    Bates stamped ALLY_0402192

8    through '195.

9              (Whereupon, Cortese Exhibit 7,

10   ALLY_0402192 through '195 was marked

11   for identification as of this date by

12   the Reporter.)

13        Q.    Mr. Cortese, you have been handed

14   a document that was marked Cortese Exhibit 7.

15   Do you recognize this document?

16        A.    I do.

17        Q.    Did you write it?

18        A.    Yes, I did.

19        Q.    It's a document titled Broker and

20   Consumer Loans to Bank, Assumption Review,

21   and it is dated February 26, 2012; is that

22   right?

23        A.    Yes.

24        Q.    And what is this document?

25        A.    This was a -- this was a note to

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 134 of 237

Page 134

1                    J. CORTESE

2    my files that I prepared in trying to piece

3    together what the broker project was trying

4    to accomplish from a fee recognition

5    standpoint.

6        Q.    If you turn to the last page of

7    the exhibit, there is a bullet point there

8    and you write "Documentation exists which

9    supports the project group's intent to record

10   origination fee and expenses on the bank and

11   have mortgage purchase the loan at this cost

12   level."

13           What did you mean by that?

14       A.    I think that what I was trying to

15   say there was that there is -- there is

16   information within some of the project

17   documents that would suggest that all of the

18   net revenue and expenses related to

19   originating a loan should somehow be

20   transferred to GMAC Mortgage.

21           MS. MILLER:   I would like to

22       mark as Cortese Exhibit 8, a document

23       Bates stamped EXAM 00015453 through

24       '15484.

25           (Whereupon, Cortese Exhibit 8,

Page 135

1                    J. CORTESE

2       EXAM 00015453 through '15484 was

3       marked for identification as of this

4       date by the Reporter.)

5       Q.    This appears to be an Outlook

6   calendar invite from Cathy Dondzila to you

7   and a number of other people dated

8   February 28, 2012, attaching a number of

9   documents, and I just want to direct your

10  attention to the third attachment, which

11  is -- starts with the Bates stamp ending

12  '456.  And it appears to be a Power Point

13  titled "Broker and Consumer Loans to Bank

14  Project, BCL2B, Legal Entity Revenue Expense

15  and Broker Fee Proposal, November 19, 2008."

16      Is this the Power Point

17  presentation that you were summarizing and

18  discussing in Exhibit 7 in your memo to

19  files, which we marked as Cortese Exhibit 7?

20      A.    Yes, it is.

21      Q.    And is this also the Power Point

22  presentation that you referred to earlier

23  today when you spoke about having reviewed

24  project materials?

25      A.    It is.

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 136 of 237

Page 136

1              J. CORTESE

2              MS. MILLER:   I would like to

3      mark as Cortese Exhibit 9, a document

4      Bates stamped EXAM 12253505 through

5      '5308.

6              (Whereupon, Cortese Exhibit 9,

7      EXAM 12253505 through '5308 was marked

8      for identification as of this date by

9      the Reporter.)

10     Q.      Mr. Cortese, you have been handed

11     a document marked as Exhibit 8 (sic), which

12     is an E-mail from you to Cathy Dondzila and a

13     number of other people dated February 27th,

14     2012, and what you write, "Please see

15     attached" -- sorry, Exhibit 9, for the

16     record.

17             Would you look at the attachment

18     to that E-mail and can you tell me what this

19     document is?

20     A.      This, again, is another document

21     that I prepared for research purposes to try

22     to catalog the relevant -- the language in --

23     the relevant language related to the broker

24     agreement and the transfer of loans under the

25     MMLPSA.  Again, trying to piece together the

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 137 of 237

Page 137

1                          J. CORTESE

2     role of the relevant language.

3            Q.      Looking at the second page of the

4     document, the first two paragraphs, is that a

5     summary of provisions in any agreement?

6            A.      That is a -- that is a summary of

7     operationally what was -- how the transfers

8     were being conducted from an operational

9     accounting standpoint, both from a prefair

10    value election and a postfair value election

11    time period.

12           Q.      And do you see in the prefair

13    value election period, you indicate that

14    "upon origination, the carrying value of the

15    loan on the bank consists of UPB plus or

16    minus discount slash premium collected from

17    borrower and CMRP, net deferred fees, FAS

18    91."  Then you continue that "Net deferred

19    fees consisted of premium slash discount

20    collected slash paid at closing.  The capital

21    markets required price, broker fee expense,

22    and a per unit deferral for internal costs."

23              Do you believe that's an accurate

24    description of what the carrying value of the

25    loan was prefair value election?

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 138 of 237

Page 138

1              J. CORTESE

2        A.     Yes, I believe that's an accurate
3   description.

4        Q.     Okay.   Postfair value election,
5   you write, "Upon origination, the carrying
6   value of the loan on the bank consists of the
7   UPB plus or minus discounts slash premium
8   selected from borrower and CMRP."

9              Do you see that?

10       A.     I do see that.

11       Q.     That's not the same as it was
12   under prefair value election, right?

13              MR. SKIDMORE:   Objection.

14       A.     That is correct.

15       Q.     And you believe that that's an
16   accurate description of the carrying value of
17   the loan on the bank postfair value election,
18   right?

19       A.     Yes.

20       Q.     And you conclude the first
21   paragraph under prefair value election saying
22   "Net revenue to the bank consisted of
23   interest carry only."

24              Do you believe that that was
25   accurate?

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 139 of 237

Page 139

1          J. CORTESE

2          MR. SKIDMORE:  Objection.

3      A.    The -- what I think I wrote in

4  here was that the carrying balances were

5  recognized and then another transaction

6  was -- occurred to transfer them to GMAC

7  Mortgage resulting in a net rev to the bank

8  consisting of only interest carry.

9      Q.    Okay.  So under prefair value

10  election, the net revenue to the bank

11  consisted of interest carry only, right?

12          MR. SKIDMORE:  Objection;

13      mischaracterizes the document.

14      A.    Yeah, at the end of all the

15  transactions, that's what the bank

16  recognized.

17      Q.    Under postfair value election, at

18  the end of all the transactions, net revenue

19  to the bank consisted of discount premium,

20  broker fee paid, and interest carry, right?

21          MR. SKIDMORE:  Objection.

22      A.    That's correct.

23      Q.    That's materially different from

24  the net impact -- the net revenue to the bank

25  under prefair value election, right?

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 140 of 237

Page 140

1          J. CORTESE

2               MR. SKIDMORE:  Objection.

3     A.    It is different.

4     Q.    Not insignificantly different,

5  correct?

6               MR. SKIDMORE:  Objection.

7     A.    Define insignificant.

8     Q.    This was a different -- this

9  would result in a difference over a couple of

10  years of a few hundred million dollars,

11  right?

12               MR. SKIDMORE:  Objection.

13     A.    Yeah, if you were to tie it back

14  to the schedule that we previously

15  reviewed, yes.

16               MS. MILLER:  I would like to

17  mark as Cortese Exhibit 10 a document

18  Bates stamp EXAM 1204290 through '913.

19            (Whereupon, Cortese Exhibit 10,

20  EXAM 1204290 through '913 was marked

21  for identification as of this date by

22  the Reporter.)

23     Q.    Mr. Cortese, I marked as

24  Exhibit 10, an E-mail chain between you and a

25  number of other people from March 2009.  Do

Page 141

1                    J. CORTESE

2   you see that?  I guess, February and March of

3   2009.

4               Does this refresh your

5   recollection whether you had any discussions

6   related to the 250.250 balance as it related

7   to the BCL2B project?

8       A.    No, I don't know if this relates

9   to the BCL2B project at all.  I don't know.

10  I haven't read through the whole thing yet.

11      Q.    Take your time to read through

12  it, but my question is whether this document

13  is looking at the 250.250 range, which is

14  running off as a result of the introduction

15  of the BCL2B project?

16      A.    This document represents a -- an

17  accounting error that was identified by

18  Kim Walsh, while she was the chief accounting

19  officer of Ally Bank, related to the true

20  sale of loans from GMAC Mortgage to Ally Bank

21  under the 250.250 program.

22      Q.    And what is a true sale under the

23  accounting principles?

24      A.    Whether or not, for accounting

25  purposes, the seller can derecognize that

Page 142

1                    J. CORTESE

2    loan off its balance sheet upon sale.

3         Q.    And what was the issue that was

4    flagged here?

5         A.    As I recall, because one of the

6    components under accounting guides is that --

7    that a seller to derecognize the asset from

8    its balance sheet needs to receive a legal

9    true sale opinion from counsel and because

10   we -- because GMAC Mortgage was not able to

11   obtain that true sale opinion, that it did --

12   the transaction did not qualify as an actual

13   sale, and therefore, should have been

14   recorded as unsecured -- as a secured

15   borrowing rather than a sale on GMAC

16   Mortgage's books.

17        Q.    What's the difference between

18   hedge accounting and lower cost or market

19   adjustments?

20        A.    Lower cost or market accounting,

21   basically, just represents -- just consists

22   of when you -- that you are carrying your

23   asset as carrying value and you do not write

24   that asset up to its fair value at any time.

25   Hedge accounting represents your treatment

Page 143

1          J. CORTESE

2    for derivatives and whether or not you can --

3    whether you can defer the mark-to-market

4    adjustment through your balance sheet or

5    whether or not you take it through your

6    income statement.

7          Q.    Which accounting applied to loans

8    sold to GMAC Mortgage before August 1st,

9    2009?

10         A.    I am not exactly sure because,

11   again, I was not in the bank at that time.

12   So I really can't answer that.

13         Q.    Do you have an understanding?

14         A.    Again, I am not exactly sure what

15   treatment that chief accounting officer at

16   that time was implying.

17         Q.    In connection with your

18   investigation in 2011, did you look at the

19   difference in how the bank was accounting for

20   the loans before and after it made a fair

21   value election?

22         A.    Between lower cost of market or

23   fair value?

24         Q.    Turning to the second page --

25   looking at the attachment to the E-mail that

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese    Pg 144 of 237

Page 144

1                    J. CORTESE

2      we marked as Cortese Exhibit 10, do you

3      recognize this as a memo that you wrote to

4      files dated January 6, 2009, related to GMAC

5      Mortgage to GMAC Bank transfer SAB 99 review?

6           A.     Yes, I do.

7           Q.     Is the SAB 99 referring to the

8      true sale analysis that you were just talking

9      about?

10          A.     No.   An SAB 99 analysis refers to

11     the analysis of an accounting error and

12     whether it is material or not to financial

13     statements.

14          Q.     And what are the considerations

15     in determining whether an accounting error is

16     material or not?

17          A.     I mean, generally, you look

18     through both qualitative and quantitative

19     analysis.   So qualitative is really just the

20     facts and circumstances surrounding the

21     accounting error.   And you also apply a

22     quantitative analysis as it relates to your

23     financial statements over a period of time

24     and its relative size of those financial

25     statements to the error at any given time.

Page 145

1                J. CORTESE

2        Q.    And what's required if an

3  accounting error is determined to be

4  material?

5                MR. SKIDMORE:    Objection.

6        A.      So, I think it -- it depends.

7  You know, it could mean -- typically, what

8  will happen is that if an accounting error is

9  considered to be material, it will kind of be

10  considered with other adjustments that are --

11  that may have been discovered during a

12  financial audit and a financial review prior

13  to filing your financial statements.    And

14  then the net impact of those adjustments are

15  considered whether or not actual adjustments

16  will need to be made to your financial

17  statements.    Or it could -- or it could mean

18  that you have to adjust your financial

19  statements to correct the error before they

20  are -- before, you know, before they are

21  filed.    It really depends on.

22        Q.    If the accounting error is

23  discovered after financial statements have

24  already been filed, and the net impact is

25  determined to be material, what happens?

Page 146

J. CORTESE

2      A.     Again, it really depends on the

3   facts and circumstances and, you know, the

4   company working with the auditors.   But, you

5   know, it can mean that you have to, you know,

6   refile your financial statements for those

7   periods of time.

8      Q.     And restate them?

9      A.     Yes, restate and refile.

10      Q.     So looking at the second page of

11   the memo to files, the very last sentence on

12   that page says, "Conversely upon sale of

13   the" -- under section heading current

14   accounting, it says, "Conversely upon sale of

15   the loans from the bank to mortgage under the

16   MMLPSA, the bank as transferor applies sale

17   accounting and derecognizes the mortgage loan

18   asset and mortgage's transferee records the

19   purchase of the mortgage loans at their Cost

20   Basis."

21           What are you referring to here?

22      A.     What I am referring to is that

23   when the bank sells loans to GMAC Mortgage,

24   the bank will remove those loans from its

25   balance sheet, and GMAC Mortgage, as a

Page 147

1                    J. CORTESE

2    purchaser of those loans, will put those

3    loans on its balance sheet.  Again, basically

4    at the same basis as the bank held those

5    loans at.

6         Q.    I am looking at page 4, the last

7    sentence on that page.  It says, "In order to

8    comply with Regulation 23A/B of the Federal

9    Reserve Act, which requires that transactions

10   that the bank enters into with affiliates

11   must be arm's length in nature or better but

12   cannot adversely impact the bank.  The

13   purchase price was intentionally set as the

14   bank's Cost Basis as defined in the loan.  As

15   such, the bank is reimbursed for any losses

16   incurred and all risk, and conversely, all

17   associated trading gains is transferred back

18   to mortgage."

19             What trading gains are you

20   referring to?

21        A.    So, again, trading gains would

22   represent when the loan is essentially sold

23   to a third-party.  Whether it be a GSE or a

24   third-party buyer, purchaser of these loans.

25   Since bank wasn't the initial seller or bank

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 148 of 237

Page 148

1            J. CORTESE

2  wasn't a seller, ultimate seller of these

3  loans, it wouldn't recognize any of those

4  trading gains.  That's what I meant by that

5  sentence.

6        Q.    So just so I am clear, are you

7  referring to trading gains under the MSR

8  swap?

9            MR. SKIDMORE:  Objection.

10       A.    No, it wouldn't be under the MSR

11  swap.

12       Q.    What -- how would -- how would

13  there be a recognition of trading gains?

14  Where are the trading gains coming from?

15           MR. SKIDMORE:  Objection.

16       A.    On what entity?

17       Q.    On -- as I read this, the bank

18  has trading gains, but they are being

19  transferred back to mortgage.  What I want to

20  know is how are the trading gains arising and

21  in what way or through what vehicle are they

22  being transferred back to mortgage?

23           MR. SKIDMORE:  Objection.

24       A.    So, if there was any -- if there

25  was any pricing change related to that loan,

Page 149

1                    J. CORTESE

2    it would have -- it would have gone through

3    the help for sell or pipeline swap, as you

4    referred to it, and come off the bank's books

5    through the swap and onto -- and be

6    recognized on GMAC Mortgage.

7                    MR. SKIDMORE:  We have been

8         going about an hour.  Can we take a

9         break soon?

10                   MS. MILLER:  Sure.  Now is a

11        good time.

12                   THE VIDEOGRAPHER:  The time is

13        1:50 p.m.; we are off the record.

14                   (Whereupon, a recess was held.)

15                   THE VIDEOGRAPHER:  The time is

16        2:05 p.m. we are on the record.

17   BY MS. MILLER:

18        Q.    Mr. Cortese, did there come a

19   time when you completed the investigation

20   that Mr. Young had charged you and

21   Cathy Dondzila with doing?

22        A.    Yes, there was an end time to

23   that research.

24        Q.    And when was that?

25        A.    It was approximately the early

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese    Pg 150 of 237

Page 150

1                    J. CORTESE

2    March time period.

3        Q.      Did you prepare a memo

4    summarizing your findings?

5        A.      A memo, yes, a SAB 99 memo was

6    prepared.

7        Q.      Did you prepare that memo?

8        A.      The memo was a collaboration

9    between myself and Cathy Dondzila.

10       Q.      Did you exchange drafts of the

11   memo?

12       A.      Yes.    Cathy took more of a role

13   in the initial drafting of the memo and she

14   provided the draft to me where I would

15   make -- add some comments and so it was a

16   collaboration.

17       Q.      Would it surprise you if I told

18   you that Cathy Dondzila testified that she

19   doesn't recall if she provided you with a

20   copy of her memo before it was finalized, and

21   she does not recall you commenting on her

22   memo at all?

23           MR. SKIDMORE:   Objection.

24       A.    I can't really speak to what

25   Cathy thought.

1                    J. CORTESE

2          Q.      But it's your testimony that you

3     provided comments to Cathy on the memo?

4          A.      Yes.    To the point where I had to

5     do a separate materiality and SAB 99 analysis

6     related to the bank's financial statements.

7     She would have to.

8          Q.      Did you prepare a copy -- sorry.

9     Did you provide a copy of your separate

10    SAB 99 analysis for the bank to Cathy?

11         A.      I don't recall if I did or not.

12    There was no reason for Cathy to have it in

13    her capacity of the ResCap's chief accounting

14    officer.

15         Q.      Wasn't Miss Dondzila also

16    responsible for all of the mortgage

17    origination activities at the bank generally?

18         A.      I think in that period of time, I

19    won't say so. The two entities were about to

20    deconsolidate, so I think -- you know, I

21    wasn't aware of the exact time period where

22    she wasn't -- where she would not be

23    responsible for the mortgage.  But in early

24    2012, it was going down that path.

25         Q.      You believe there was a time

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 152 of 237

Page 152

1                    J. CORTESE

2      before the entities were deconsolidated that

3      Cathy stopped being responsible for mortgage

4      related activities at the bank?

5          A.    Like I said, I don't know

6      officially if -- when she stopped that role.

7      But it was kind of around that time period.

8      From a functional standpoint.

9          Q.    Was there a reason for you to

10     have Cathy's memo in your capacity as Ally

11     Bank's chief accounting officer?

12               MR. SKIDMORE:    Objection.

13         A.    Her final memo related to ResCap

14     specifically, no, I don't think it would be.

15     Like I said, we collaborated on the memo as

16     it related to -- we conducted, you know, we

17     shared our research findings together.  We

18     agreed that the fact patterns, the

19     background, the conclusions were, you know,

20     were the same for both the bank and for

21     ResCap.  And from that, you know, from that

22     capacity, we, you know, we shared that

23     information and then we did separate, you

24     know, SAB 99 analysis based on our respective

25     organizations.

1                    J. CORTESE

2        Q.        You say "We did separate SAB 99

3    analysis," did you take Cathy's SAB 99

4    analysis for ResCap and modify it slightly to

5    apply to Ally Bank?

6        A.    I don't believe so.

7        Q.    Is it your belief that the SAB 99

8    memo that Cathy prepared with respect to

9    ResCap is substantially similar to the SAB 99

10   analysis that you prepared for Ally Bank?

11            MR. SKIDMORE:   Objection.

12       A.    Again, I don't know.   You mean in

13   format and same numbers, structure?   What do

14   you mean by "substantially similar"?

15       Q.    I mean, in words being used.

16   Would it surprise you that there are entire

17   paragraphs that are almost verbatim the same

18   in the two memos?

19            MR. SKIDMORE:   Objection.

20       A.    I think I just previously said

21   that to you, that we -- being in agreement

22   with the background, facts, circumstances,

23   inclusion, we did share those -- we did share

24   those pieces of the memo.   The analysis

25   itself, the qualification of whether or not

JSN Objection
153:2 - 10; Irrelevant
(FRE 401, 402)

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 154 of 237

Page 154

1           J. CORTESE

2    there was a material error or not under

3    SAB 99 was separate.

4        Q.    She doesn't remember the

5    collaboration with you based on her sworn

6    testimony.  So I am wondering if what

7    happened is she drafted the memo, you took it

8    and edited it, and then called it an Ally

9    Bank memo.

10           MR. SKIDMORE:  Objection.

11       That's not really a question.  It is

12       argumentative and it characterizes

13       testimony that we don't have in front

14       of us, and it is not really an exhibit

15       or anything else here.  If you want to

16       ask a different question, that's fine,

17       but he will not answer that question.

18           MS. MILLER:  What's the basis on

19       which you're instructing him not to

20       answer?

21           MR. SKIDMORE:  Has realtime

22       stopped?

23           MS. MILLER:  It has.

24           THE COURT REPORTER:  Off the

25       record.

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 155 of 237

Page 155

1           J. CORTESE

2           THE VIDEOGRAPHER:   The time is

3       2:13 p.m.; we are off the record.

4           (Whereupon, an off-the-record

5       discussion was held.)

6           THE VIDEOGRAPHER:   The time is

7       2:18 p.m.; we are on the record.

8           MR. SKIDMORE:   So the answer to

9       your question, it appears you are

10      trying to impeach this witness from

11      deposition testimony from some other

12      witness that we have not even seen and

13      there's not even an exhibit here.   It

14      is an unfair question.   If you want to

15      ask the question differently, then, he

16      is happy to answer it.   But the way

17      the question is asked, it is not even

18      a fair question.

19      Q.     Mr. Cortese, did you receive a

20      draft of -- or a draft or final version of

21      Miss Dondzila's memo sometime in March of

22      2012 and then edit it -- sorry, then take

23      that memo as the starting point for your

24      memo?

25      A.     Yes.   Cathy Dondzila did provide

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 156 of 237

Page 156

1                    J. CORTESE

2    me a draft of the memo that was being

3    prepared.  I provided edits and comments and

4    then she circulated it back to me, which then

5    I utilized that memo to prepare the Ally Bank

6    version.

7         Q.    How many rounds of comments did

8    you have with Cathy on this memo?

9         A.    I don't recall.

10        Q.    Do you recall having telephone

11   conversations about comments that you may

12   have given her?

13        A.    I don't recall.

14        Q.    Did you give her comments in

15   writing?

16        A.    I believe so.

17        Q.    Would you have sent them by

18   E-mail?

19        A.    Most likely.

20        Q.    So there should be a record in

21   your e-mails of a revised draft of this memo

22   reflecting your comments?

23             MR. SKIDMORE:  Objection.

24        A.    I would think so.

25        Q.    Would you have redlined it,

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 157 of 237

Page 157

1                    J. CORTESE

2    provided your comments in redline or would

3    you have just changed the document?

4         A.    Most likely would have been

5    redlined.

6         Q.    Do you know whether you had a lot

7    of changes to her draft or minor changes?

8         A.    Most likely they are minor

9    changes.

10        Q.    Do you recall if there were any

11   areas of discussion in her memo that you

12   disagreed with?

13        A.    No, I don't recall.

14        Q.    I will hand you a document that

15   was previously marked as Dondzila Exhibit 17.

16   Is this your memo to files dated -- sorry, is

17   this your memo to the Ally Bank 2011

18   financial statement files dated March 13,

19   2012, regarding SAB 99 and 108 analysis

20   broker-to-bank error?

21        A.    It appears to be.

22        Q.    And this is the memo that you

23   completed at the end of your investigation of

24   the issues raised concerning the income and

25   revenue being recognized by the bank that

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 158 of 237

Page 158

1              J. CORTESE

2    were raised by Mr. Glassner; is that right?

3        A.    It appears to be.

4        Q.    Do you have any doubt that it is?

5        A.    No.

6        Q.    And I would like to hand you a

7    document that was previously marked as

8    Dondzila Exhibit 16, which is a document

9    Bates stamped EXAM 12219169 through '80.

10            Does this look like -- is this

11   the memo that Cathy Dondzila prepared to the

12   ResCap 2011 financial statement files dated

13   March 10, 2012, regarding the SAB 99 and 108

14   analysis broker-to-bank error?

15            MR. SKIDMORE:  Objection.

16       A.    That's what the memo is titled.

17       Q.    Have you seen this document

18   before?

19       A.    I believe I have seen a draft of

20   it previously.  I don't think -- I don't

21   believe I ever saw the final version, her

22   final version.

23       Q.    Do you notice in the middle of

24   the second paragraph in Dondzila Exhibit 17,

25   I guess it's kind of down low for the second

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 159 of 237

Page 159

1                    J. CORTESE

2  sentence, but the second full sentence, you

3  wrote, "Given his assertion" -- and I'm

4  assuming you did write it, right?

5          MR. SKIDMORE:  Sorry, I am

6      confused.

7          MS. MILLER:  Dondzila

8      Exhibit 17.

9          MR. SKIDMORE:  Oh, okay.  Go

10     ahead, sorry.

11     Q.    Says "Given his assertion,

12 management of ResCap, Ally Bank, and Ally

13 Financial, Inc. took his concern seriously

14 including notification to the audit committee

15 of ResCap and Ally, Inc."

16          Were you involved in providing

17 notice to the audit committee of ResCap?

18     A.    I was not.

19     Q.    I read through Miss Dondzila's

20 memo, which was marked Dondzila 16.  I didn't

21 see her reference notification to the audit

22 committee or the fact that ResCap management

23 took this concern seriously.  Why didn't you

24 think that was -- why did you include that in

25 your memo?

1              J. CORTESE

2      A.    I don't recall.

3      Q.    Is it fair to assume that

4  information that's added in your memo was

5  information that you thought was important

6  to add?

7            MR. SKIDMORE:  Objection.

8      A.    I can't really answer that

9  question.  From aversion control standpoint,

10 if she decided to change her, you know, memo

11 up prior to me submitting my final comments

12 back, then that was her prerogative.  I can't

13 speak to, you know why she included or didn't

14 include verbiage that may have been in the

15 earlier draft.

16     Q.    So is it your understanding that

17 this language would have been in a draft that

18 you would have given to Cathy and that she

19 chose to disregard that?

20           MR. SKIDMORE:  Objection.

21     A.    Again, it most likely was an

22 earlier draft.  It was her prerogative to,

23 you know, tailor her memo as she found

24 appropriate.

25     Q.    Did you talk to her about why she

Page 161

J. CORTESE

1

2   wouldn't -- why that sentence wasn't included

3   in her memo?

4        A.    Since I did not see her final

5   memo, no, I don't believe I spoke to her

6   about that.

7        Q.    And what's your conclusion in

8   this memo?

9        A.    I'd say that our conclusion was

10  that there was an accounting error, which

11  occurred between the period of January 1,

12  2009, through July 31st of 2009 where the

13  bank was inappropriately transferred

14  approximately $47 million of revenue to its

15  affiliate GMAC Mortgage, and then from an

16  overall accounting conclusion, that in

17  relation to Ally Bank's overall financial

18  statements, that it was, you know, material

19  to our operations.

20       Q.    Do you recall when you first

21  became aware of this purported $47 million in

22  revenue that was inappropriately sent to GMAC

23  Mortgage in the January 1st to July 31, 2009,

24  period?

25       A.    Yes, I generally believe I became

Page 162

1                      J. CORTESE

2    aware of it, I want to say sometime in early

3    to mid-February of 2012.

4         Q.    Up until that point early to

5    mid-February of 2012, what has the focus of

6    your investigation been?

7              MR. SKIDMORE:   Objection.

8         A.    As far as what we were looking

9    at, what we were trying to review?   I think

10   our focus was, again, trying to review the

11   project documents, trying to review the

12   agreements, the relevant agreements and how

13   it matched up to the accounting treatment,

14   and, again, trying to ascertain that the

15   accounting, you know, during that time period

16   was performed accurately.

17        Q.    And who first suggested to you

18   that there were revenues given to GMAC

19   Mortgage, improperly given to GMAC Mortgage

20   between January 1st, 2009, and July 31, 2009?

21             MR. SKIDMORE:   Objection.

22        A.    I think we concurrently, for the

23   most part, came to that conclusion.   I recall

24   reviewing one last loan level example over a

25   weekend, seeing that that -- seeing that

Page 163

1                    J. CORTESE

2     there was a transaction that appeared to have

3     transferred the net origination revenue from

4     the bank to GMAC Mortgage, and knowing that

5     that appeared to be -- feeling that that was

6     inappropriate.   And later that day, Cathy

7     calling me as she knew the same thing on the

8     same example.

9         Q.    So when you said "we," you were

10    referring to yourself and Cathy Dondzila?

11              MR. SKIDMORE:   Objection.

12        A.    That's correct.

13        Q.    Why did you think it was

14    inappropriate for there to be a transfer of

15    the net origination fee from the bank to GMAC

16    Mortgage?

17        A.    Because it was our -- it was our

18    determination there wasn't a mechanism to

19    perform that transfer either under -- under

20    the legal agreements or our interpretation of

21    the legal agreements as well as the, you

22    know, any of the accounting principle

23    under GAAP.

24        Q.    When you say "our," again, you

25    are referring to you and Cathy?

Page 164

1                    J. CORTESE

2        A.      Correct.

3        Q.      What were the relevant accounting

4   principles under GAAP that you were

5   considering here?

6        A.      Well, you know, again, we would

7   look at specifically FASB 140, which relates

8   to the transfer of -- transfer and sale of

9   loans.  FAS 91, probably the two main

10  guidance related to the sale of the loan.

11       Q.      What specifically in FASB 140 or

12  FAS 91 told you that the transfer of net

13  origination from the bank to GMAC Mortgage

14  was inappropriate?

15            MR. SKIDMORE:  Objection.

16       A.      I think that's exactly it.  There

17  are no provisions within that guidance to

18  suggest that, you know, net revenue that the

19  bank earned should be transferred to a

20  third-party or affiliate upon a sale.

21       Q.      Is there anything in those

22  guidelines saying that it cannot be

23  transferred to an affiliate upon sale?

24            MR. SKIDMORE:  Objection.

25       A.      I don't think there is anything

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 165 of 237

Page 165

1                          J. CORTESE

2      specifically saying that it should or should

3      not be.   FAS 91 is simply a deferment of

4      income until the asset is sold.   Once the

5      asset is sold, you reverse that deferment and

6      you record it in your income statement.   You

7      do not transfer it to, you know, through a

8      sales mechanism.

9           Q.    Could parties contract it to

10     transfer it through a sales mechanism?

11          A.    I think that's potential,

12     depending, again, on the legal agreement that

13     may be in place that could possibly do it

14     through a swap mechanism or something

15     similar.

16               MS. MILLER:   Off the record for

17          one minute.

18               THE VIDEOGRAPHER:   The time is

19          2:35 p.m.; we are off the record.

20               (Whereupon, a recess was held.)

21               THE VIDEOGRAPHER:   The time is

22          2:38 p.m.; we are on the record.

23               MS. MILLER:   I would like to

24          mark as Cortese Exhibit 11, a document

25          Bates stamped EXAM 100988172 through

Page 166

1           J. CORTESE

2           '188.

3                (Whereupon, Cortese Exhibit 11,

4           EXAM 100988172 through '188 was marked

5           for identification as of this date by

6           the Reporter.)

7                MR. SKIDMORE:  Do you have a

8           copy?

9                MS. MILLER:  I do.

10    BY MS. MILLER:

11        Q.    Mr. Cortese, looking at the

12    bottom E-mail in Exhibit 11, does this

13    refresh your recollection about whether or

14    not you got a final draft of the memo from

15    Cathy Dondzila?

16        A.    Well, it looks like it -- Cathy

17    is asking for final comments from a few

18    individuals, including myself, prior to her

19    giving it to D&T.  I don't know if that

20    ascertains that was the final memo or not.  I

21    think at that point it would be considered a

22    draft.

23        Q.    She is kind of negative

24    auctioning to you, right?

25                MR. SKIDMORE:  I'm sorry, I

Page 167

                    J. CORTESE

1

2      don't see an attachment that's her

3      memo, am I missing it?

4           MS. MILLER:  I understand.  I am

5      just asking about the E-mail.

6           MR. SKIDMORE:  Right, but the

7      E-mail doesn't have an attachment

8      either.  You're talking about the

9      Cathy Dondzila E-mail?

10          MS. MILLER:  The Cathy Dondzila

11     E-mail that says "Unless I get an

12     objection from one of you by 1:00 p.m.

13     Eastern today, I am going to release

14     the memo to D&T at 1:00 p.m.  If

15     someone needs extra time, please just

16     let me know.  I would like to get this

17     done and out today so that we can

18     bring this to closure."

19          Q.   Do you understand that

20     Cathy Dondzila would have sent you or did

21     send you a draft of her memo sometime either

22     contemporaneous with this E-mail or before

23     this E-mail and said "unless one of you

24     objects, I am going final with this"?

25          MR. SKIDMORE:  Objection.

Page 168

J. CORTESE

1

2      A.    It appears she asked for comment

3  on the draft.  I can't conclude that was the

4  final memo that she forwarded to D&T or the

5  one that she provided to the audit committee.

6      Q.    Where do you see her asking for

7  comments?

8      A.    Isn't that basically what she's

9  asking, "Unless I guess an objection from one

10  of you by 1:00 p.m. today"?  It sounds like

11  provide any final comments related to the

12  memo.

13      Q.    Where I come from we call that

14  negative auctioning someone.  Not soliciting

15  comments but saying if you don't give me

16  comments, this is going out unless you say

17  stop.

18          MR. SKIDMORE:  That's not a

19      question.

20      Q.    Is that how you would understand

21  the phrase "unless I get an objection from

22  one of you, I am going to release the memo

23  to D&T"?

24      A.    I can't really comment on what

25  Cathy meant by that.

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 169 of 237

Page 169

J. CORTESE

1

2    Q.    But Mr. DeBrunner responds "I

3 have no objection," right?

4    A.    It appears that he did.

5    Q.    Do you recall whether on

6 March 14th, you had any comments or objection

7 to Cathy Dondzila sending her memo to

8 Deloitte and Touche?

9    A.    I don't recall if I did or I did

10 not.  I think she could have easily made

11 comments or changes herself before she

12 provided to D&T and the argument.  I won't

13 know that.

14    Q.    And the top E-mail is an E-mail

15 from you to the same group of people

16 indicating that you "processed the comments

17 contained in Cathy's draft as relevant to the

18 bank and provided the assessment to Deloitte

19 last night.  See attached."

20        Is it your understanding that the

21 memo that you wrote or that has your name on

22 it dated March 13th, that's attached to this

23 E-mail, was the final memo that you had

24 already sent to Deloitte and Touche the

25 previous night?

Page 170

1          J. CORTESE

2          MR. SKIDMORE:  Objection.

3     A.     Sorry, can you restate your

4  question, please?

5     Q.     Yeah.  Is the memo that's

6  attached to this E-mail your final memo that

7  you provided to Deloitte and Touche?

8     A.     I believe it to be.

9     Q.     Does this refresh your

10 recollection that you provided Cathy Dondzila

11 with the final version of your memo?

12    A.     Where does it state that I

13 provided her with the final -- with the final

14 memo?

15    Q.     She is on this E-mail, right, she

16 is a recipient to your E-mail?

17    A.     Got it.

18    Q.     And you just said this is your

19 final memo.  So my question is, does this

20 document, Cortese Exhibit 11, refresh your

21 recollection that you provided Miss Dondzila

22 with a copy of your final memo?

23    A.     Yeah, I guess if she was on this

24 E-mail stream and I responded to everybody,

25 to David DeBrunner with it, yes, by wrought,

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 171 of 237

Page 171

1                J. CORTESE

2    she received the final copy.  I don't think

3    she was the primary recipient of the memo,

4    though.

5              MS. MILLER:  I would like to

6        mark as Cortese Exhibit 12 a document

7        Bates stamped ALLY_0018237

8        through '244.

9              (Whereupon, Cortese Exhibit 12,

10       ALLY_0018237 through '244 was marked

11       for identification as of this date by

12       the Reporter.)

13       Q.    Mr. Cortese, do you recognize

14   this document?

15       A.    Yes, I believe I have seen this

16   before.

17       Q.    Is this a document you referred

18   to earlier as the "pipeline swap"?

19       A.    I believe it is one of the

20   schedules to the pipeline swap, yes.

21       Q.    And turning to the page with the

22   Bates ending '242, sorry, starting first at

23   the page Bates stamped '243, the provision

24   that says "payments."  It says "On each

25   payment date" -- it's the second-to-last

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 172 of 237

Page 172

1            J. CORTESE

2    page.  Last page before the signatures.  It

3    says "On each payment date, little i, if the

4    fair market value changed for the most recent

5    valuation period is positive, Party B will

6    pay to Party A an amount equal to such fair

7    market value change.  Or, two little i's, if

8    such fair market value change is negative,

9    Party A will pay to Party B an amount equal

10   to such fair market value change."

11           Is that your understanding of

12   what payments would be owed under the

13   schedule in the pipeline swap?

14       A.   So I think my interpretation of

15   that provision is that, again, during the

16   period of whether you have either a

17   commitment for a loan that would be held for

18   sale loan or if the loan was funded and

19   sitting on the bank's balance sheet, if there

20   was an increase in the value of that loan,

21   then that increase in value would be -- would

22   go through the swap and be sent to GMAC

23   Mortgage.

24           Conversely, if there was a

25   decrease in the value of that loan, that

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 173 of 237

Page 173

1                       J. CORTESE

2    decrease in value would also run through the

3    swap and GMAC Mortgage would pay the bank for

4    that loss.

5        Q.    And what period are we talking

6    about here, what period of time?

7              MR. SKIDMORE:    Objection.

8              Go ahead.

9        A.    Can you clarify that?

10       Q.    Change in market value between

11   when and when.

12             MR. SKIDMORE:    Objection.

13             Go ahead.

14       A.    The -- the overall swap, the

15   pipeline swap was -- will begin upon the

16   commitment date, again, when the loan -- when

17   Ally Bank would commit to fund the loan to a

18   borrower through the date that the loan was

19   eventually sold to GMAC Mortgage.

20       Q.    Okay.   And the date that the loan

21   was sold to GMAC Mortgage, is that the same

22   date as the date that the loan was funded?

23       A.    No, there were two different

24   dates.   Typically, bank would fund the loan.

25   It would sit on the bank's balance sheet

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 174 of 237

Page 174

1                    J. CORTESE

2    roughly 20 to 30 days and then GMAC Mortgage

3    would buy the loan from the bank.

4         Q.    So looking now at the page Bates

5    stamped '242 where it defines the term fair

6    market value change that was just used in the

7    provision regarding payments.  Do you see

8    that fair market value change is for funded

9    loans defined as the product of the funded

10   loan amount and the difference between the

11   funding fair market value and the lock fair

12   market value?

13        A.    I see that, yes.

14        Q.    There is no reference here to the

15   sale fair market value, right?

16             MR. SKIDMORE:  Objection.

17        A.    Sorry, I don't know what you mean

18   by that question.

19        Q.    What is fair market value change

20   in your words?

21             MR. SKIDMORE:  Objection.

22        A.    From a general accounting, you

23   know, operational standpoint, if that loan

24   is, say it is originated at par, at 1, and

25   the next day that loan moves to a fair value

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese    Pg 175 of 237

Page 175

1                        J. CORTESE

2    of 1 on 1, then that's a positive fair market

3    value change and the bank would take that one

4    and transfer it through the swap to GMAC

5    Mortgage.

6         Q.    What I am trying to understand

7    is, during what period we are calculating the

8    fair market value change?

9              MR. SKIDMORE:  Objection.

10        A.    That period began when the bank

11   entered into a locked agreement with the

12   borrower and ended upon the sale of that loan

13   to GMAC Mortgage.

14        Q.    Okay.  But the agreement says

15   that it's the difference between the funding

16   fair market value and the lock fair market

17   value, right?

18             MR. SKIDMORE:  Objection.  The

19        agreement speaks for itself.

20        A.    That's what it says.

21        Q.    And funding fair market value is

22   not the same as sale fair market value,

23   right?

24             MR. SKIDMORE:  Objection.

25        A.    I guess I don't know what you

Page 176

1                      J. CORTESE

2    mean by "sale of fair market value."

3        Q.    Sale date fair market value.

4        A.    Yeah, I don't know what the

5    definition of funding fair market value is.

6        Q.    Let's look down to it.  It is

7    below in Romanette viii.  Says "Funding fair

8    market value means in respect to the subject

9    transaction the fair market value of a loan

10   on the funding date as determined by the FMV

11   determination agent using customary market

12   valuation techniques."

13            Does that clarify that funding

14   fair market value is referring to the fair

15   market value on the date of funding?

16            MR. SKIDMORE:  Objection.  The

17        document speaks for itself.

18        A.    That's what it says.

19            MS. MILLER:  I would like to

20        mark as Cortese Exhibit 13 a document

21        Bates stamped ALLY_PEO_0877135

22        through '38.

23            (Whereupon, Cortese Exhibit 13,

24        ALLY_PEO_0877135 through '38 was

25        marked for identification as of this

Plaintiff's Objection
176:19 – 177:02
Irrelevant (FRE 401,
402)

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 177 of 237

Page 177

1                          J. CORTESE

2              date by the Reporter.)

3              Q.      Mr. Cortese, I have marked as

4    Exhibit 13, a memo that you wrote dated

5    March -- to files dated March 3rd of 2011,

6    the subject Ally Bank representation of

7    warranty position on affiliate mortgage loan

8    sales.

9                   Do you remember why you wrote

10   this memo?

11             A.    I believe I wrote this memo in

12   response to questions posed by the FAC and

13   Deloitte and Touche, our auditors related to

14   our position on the representation and

15   warrant reserves and applicability to Ally

16   Bank.

17             Q.    And what was your position on rep

18   and warranty reserves as it applied to Ally

19   Bank?

20             A.    Ultimately, that Ally Bank was

21   not required to record rep and warrant

22   reserves.

23             Q.    How did you reach that

24   conclusion?

25             A.    Essentially, the bank, as a -- in

Plaintiff's Objection
177:03 – 178:15
Irrelevant (FRE 401,
402)

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 178 of 237

Page 178

1            J. CORTESE

2    its servicer capacity is jointly and

3    severally liable for any representation of

4    warrant losses that the GSEs may put back.

5    However, that joint liability is also shared

6    with GMAC Mortgage as the seller.

7            Historically, GMAC Mortgage

8    recorded all of the losses associated with

9    representation and warranty claims posed by

10   the GSEs and because of that, I felt that the

11   likelihood that the bank would ever have to

12   pay rep and warrant reserve related to a loan

13   that GMAC Mortgage sold to the agencies was

14   removed and therefore, a reserve was not

15   required.

16        Q.    Looking at the discussion on the

17   page, the third page of the memo, the one

18   ending '137, in the middle of that page,

19   there is a paragraph in which you write,

20   "Although the bank is legally and

21   contractually obligated to the agencies,

22   there is an implicit agreement between the

23   bank and GMACM whereby GMACM assumes the full

24   obligation."

25            Did you consult with anybody

1           J. CORTESE

2    before you concluded that the bank is legally

3    and contractually obligated to the agencies?

4         A.    Yeah, I mean, I think I primarily

5    consulted with John Andrews or internal

6    counsel.

7         Q.    You wouldn't have included a

8    conclusion about the bank's legal and

9    contractual obligations in a memo to files

10   without having consulted with counsel, right?

11        A.    I would not.

12        Q.    And you note that there is an

13   implicit agreement.  Does that mean there was

14   no written agreement to this effect?

15            MR. SKIDMORE:  Objection.

16        A.    I don't know if there was a -- I

17   don't believe there was a written agreement.

18   I am not sure of that.  However, to the point

19   where Ally Bank and its history, up until

20   that point, never settled a rep and warrant

21   claim with the GSE there was establishment of

22   that implicit agreement.

23        Q.    Did you look for a written

24   agreement?

25        A.    I don't believe specifically.

1           J. CORTESE

2      Q.    Did you think that the existence

3  of a written agreement would have been

4  important?

5           MR. SKIDMORE:  Objection.

6      A.    It is not really entered into my

7  determination.  It is more of a legal

8  determination.

9      Q.    I am just wondering why you would

10  rely on an implicit agreement and not

11  specifically go out and look to see if there

12  is a written agreement governing this

13  particular issue?

14           MR. SKIDMORE:  Objection.

15      A.    Again, it was -- that fact

16  pattern was one component of the analysis.  I

17  also, again, spoke to internal counsel who --

18           MR. SKIDMORE:  Don't say what

19      internal counsel said.

20           THE WITNESS:  Okay.

21      Q.    Do you think internal counsel

22  would have told you if there was an explicit

23  -- would you have expected internal counsel

24  to tell if you there was an express agreement

25  that governed this particular issue?

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 181 of 237

Page 181

1          J. CORTESE

2          MR. SKIDMORE:  Objection.  Calls

3     for attorney/client privilege.  I

4     instruct the witness not to answer.

5          MS. MILLER:  I asked him if it

6     was his expectation, whether he would

7     have expected counsel to tell him if

8     there was an express agreement that

9     governed this issue.

10          MR. SKIDMORE:  His expectation

11     is based on his course of dealing with

12     his internal counsel, which is

13     attorney/client communications and he

14     is not going to answer that.

15          MS. MILLER:  He has already --

16     you have already produced and he has

17     already included the conclusions that

18     he got from counsel on this issue.

19     So, first of all, there is a waiver

20     here as to this particular issue.  And

21     second of all, I didn't ask him

22     whether he had any discussions.  I

23     didn't ask him if he asked his lawyer

24     to give it to him.  I am asking if his

25     lawyer is giving him an opinion that

Page 182

1              J. CORTESE

2   says that the bank is legally and

3   contractually obligated to the

4   agencies, if he would have expected

5   them to say but there is an agreement

6   between the bank and GMACM that says

7   that the bank is not on the hook here.

8   That's not asking for any legal advise

9   or solicitation of the advise of

10  counsel and is not privileged.

11      MR. SKIDMORE:  I will note for

12  the record there has been no waiver of

13  privilege.  He has not testified at

14  all about any opinions that -- or

15  communications that the attorney's

16  given him.  And I am not going to

17  allow him to testify in a way that

18  would potentially be asserted as a

19  waiver of privilege.

20      Now that you are arguing there

21  is a waiver of privilege, I have to

22  instruct the witness not answer to

23  protect my client's privilege.

24      MS. MILLER:  You are instructing

25  your client not to answer whether it

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 183 of 237

Page 183

J. CORTESE

1    would have been -- whether he would

2    have expected somebody to tell him

3    that there is an explicit agreement

4    between GMACM and the bank here that

5    governs the rep and warranty question?

6            MR. SKIDMORE:  Yes, because his

7    expectation would have to be based on

8    prior communications between himself

9    and that counsel.  That's the only way

10   he had any basis to have an

11   expectation.  So, yes, I am

12   instructing him not to answer because

13   I believe that the answer would

14   disclose attorney/client

15   communications.

16           MS. MILLER:  I think your

17   objection is wholly inappropriate, but

18   it is not an important enough issue to

19   press.  It is pretty clear.

20   Q.    Did you provide a copy of this

21   memo to John Andrews before you finalized it?

22   A.    I believe I did.

23   Q.    Mr. Cortese, could you explain

24   the MSR swap to me?

Page 184

1                    J. CORTESE

2             MR. SKIDMORE:  Objection.

3        A.    Would you like me to explain how

4    it worked or the accounting treatment of the

5    swap?

6        Q.    How it worked.

7             MR. SKIDMORE:  Objection.

8        A.    So, again, from operational

9    accounting standpoint, whatever -- whatever

10   net revenues were recognized by Ally Bank

11   were transferred through the swap.  So all

12   the net service fee income that the bank

13   collected, any gain on sale related to the

14   capitalization of the MSR, any mark-to-market

15   adjustments, either positive or negative to

16   Ally Bank income, all pass through the swap

17   and in return the bank received a LIBOR based

18   rate of return.

19       Q.    When you say "passed through the

20   swap," you mean were transferred from Ally

21   Bank to GMAC Mortgage?

22       A.    Correct.

23       Q.    So the state of play at the end

24   of the swap transaction is that Ally Bank is

25   holding the MSR and getting paid a fixed rate

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 185 of 237

Page 185

1        J. CORTESE

2   of -- well, I guess a floating rate of LIBOR

3   plus some basis and all of the upside gain or

4   risk is held by GMAC Mortgage; is that right?

5            MR. SKIDMORE:  Objection.

6       A.    Yeah, I think that's basically

7   accurate.

8       Q.    What loans did the MSR swap

9   relate to?

10      A.    It essentially related to any

11  loans that the bank was -- that had been sold

12  and where the bank is -- owns those mortgage

13  servicing rights.  Those were specific,

14  again, to loans that were sold to Fannie Mae

15  and Freddie Mac and the bank was the named

16  servicer.

17      Q.    Did it matter who sold the loans?

18           MR. SKIDMORE:  Objection.

19      A.    Really, during the time period

20  where the -- where GMAC Mortgage was the

21  counterparty to that swap, all of those loans

22  were ultimately sold by GMAC Mortgage.

23      Q.    And did it matter who originated

24  the loans?

25           MR. SKIDMORE:  Objection.

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 186 of 237

Page 186

1                    J. CORTESE

2        A.    Who the ultimate originator was,

3    no, I don't necessarily think it mattered.

4    At some point -- I am not sure about that

5    question.

6        Q.    Who was responsible for

7    implementing the MSR swap?

8              MR. SKIDMORE:  Objection.

9        Q.    From an accounting perspective.

10       A.    From operational accounting

11   perspective, it was ResCap's capital markets

12   accounting group that was responsible for

13   calculating and doing the accounting for the

14   swap.

15       Q.    Was anyone at Ally responsible,

16   at Ally Bank responsible for accounting for

17   the swap?

18       A.    Not specifically.  Again, in my

19   capacity, I was responsible for the oversight

20   of it from Ally Bank perspective, but we

21   weren't recording the debits and credits.

22   That was ResCap's team.

23       Q.    You weren't responsible for

24   overseeing the ResCap team, were you?

25       A.    No.

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 187 of 237

Page 187

1                    J. CORTESE

2        Q.      Did Ally provide any calculations

3    to ResCap regarding the amounts that were to

4    be -- that were owing under the MSR swap?

5                    MR. SKIDMORE:   Objection.

6        Q.      Sorry, about the amounts that

7    were to be transferred under the MSR swap.

8                    MR. SKIDMORE:   Objection.

9        A.      When you say "Ally," you mean

10   Ally Bank?

11       Q.      Yes.

12       A.      I think the only part that Ally

13   Bank accounting would provide is the net

14   service fee leg components of the swap.

15       Q.      What is the net service fee leg?

16       A.      The component of the swap that

17   related to the net service fee income that

18   the bank recognized.

19       Q.      How would ResCap get information

20   regarding the size of the MSR asset, of the

21   bank's MSR asset?

22       A.      ResCap's accounting team

23   performed the accounting for the MSR asset

24   itself.  So they worked hand in hand with

25   their capital markets team on, again, on the

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 188 of 237

Page 188

1                    J. CORTESE

2    valuation and the accounting for the MSR

3    asset.

4         Q.    When you are talking about "the

5    MSR asset," are you talking about the MSR

6    asset once it -- the MSR asset on whose

7    books?

8         A.    Ally Bank books.

9         Q.    So ResCap was responsible for MSR

10   asset accounting in Ally's books?

11             MR. SKIDMORE:    Objection.

12        A.    At that period of time, yes, they

13   were.

14        Q.    Who specifically was responsible

15   for that accounting?

16        A.    Ultimately, it was Cathy Dondzila

17   and, you know, day-to-day was Nikki Rock and

18   her team.

19        Q.    What was Nikki Rock's position?

20        A.    She was an accounting director

21   for ResCap.

22        Q.    Is there a specific area that she

23   was responsible for or specific area?

24        A.    I didn't manage her, but

25   generally, she was -- I understand her to be

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 189 of 237

Page 189

1                    J. CORTESE

2  responsible for the MSRs, hedging and

3  derivatives.   I think also the investment

4  securities.

5        Q.     Did anyone at Ally Bank verify to

6  see if -- I guess let me step back.

7              When the -- which way did money

8  flow under the MSR swap?

9              MR. SKIDMORE:   Objection.

10       A.     It really depends on the

11 settlement time period and what was taking

12 place as far as the underlying cash flows

13 were concerned.   There were times where net

14 money, you know, went out of the bank and

15 times where net money came into the bank.

16       Q.     And who, if anyone, within the

17 bank was responsible for verifying whether

18 the amounts of money flowing in or out of the

19 bank was accurate?

20             MR. SKIDMORE:   Objection.   Is

21       there a timeframe for these questions?

22       I guess I am confused.   These

23       agreements span for many, many years.

24             MS. MILLER:   He only joined the

25       bank in August of -- mid-August of

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 190 of 237

Page 190

1                    J. CORTESE

2          2009.  So let's presume he doesn't

3          have knowledge about what Ally Bank

4          was doing before that.  And let's go

5          from there forward.

6          Q.    Let's focus first on the 2009

7    period.  2009 and 2010 period when you were

8    at Ally Bank.

9          A.    Well, again, the way the process

10   worked was that Nikki Rock's team would

11   provide a supporting schedule that broke down

12   the individual components of the swap.  They

13   also, you know, within that worksheet

14   provided the necessary, you know, debits and

15   credits to draw entries that needed to be

16   recorded.  My team would review it for

17   reasonableness and then record that -- record

18   that entry on the books and records of Ally

19   Bank.

20              If that -- you know, if that net

21   amount required a cash outflow to the bank,

22   to GMAC Mortgage, my team would prepare the

23   wire request and initiate the wire transfer,

24   and conversely, if that, you know, that net

25   amount must stay as a payment to the bank, I

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 191 of 237

Page 191

1                    J. CORTESE

2    think Nikki Rock's team was responsible for

3    preparing the wire request, to transfer funds

4    to the bank.

5          Q.     When the bank was required to

6    make a cash payment to GMACM, was anyone in

7    your team tasked with doing a more detailed

8    review of the schedule other than a review

9    for reasonableness?

10         A.     No, not necessarily, there really

11   wasn't any necessity to do that.

12         Q.     Why wasn't there a necessity to

13   do that?

14         A.     Because I think, you know, I

15   think that, you know, you can trace back the

16   components of the swap back to your, you

17   know, back to your income statement.  So, for

18   example, if there was a, you know, if there

19   was a mark-to-market adjustment of, you know

20   a million dollars, I would see that

21   mark-to-market adjustment flowing through my

22   income statement and then I would -- you can

23   also see that being transacted through the

24   swap in the detail of the settlement sheet.

25         Q.     And when you joined Ally Bank in

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 192 of 237

Page 192

1                    J. CORTESE

2    mid -- or August of 2009, did you review the

3    actual swap agreement, the MSR swap

4    agreement?

5        A.    Yes.    At some point after I

6    joined the bank.

7        Q.    Did you have an understanding of

8    whether the fair market value adjustments

9    were intended to be made on the entirety of

10   the bank's MSR asset as reflected in its

11   balance sheet?

12            MR. SKIDMORE:    Objection.

13       A.    No, I -- I would say that the

14   intention was for the bank to not recognize

15   any net revenue related to the MSR asset or

16   expenses.  So if there was a mark-to-market

17   adjustment, again, say a million dollars,

18   that would have been recorded in our income

19   statement and then picked up in the swap.

20       Q.    Do you have an understanding of

21   whether the intention that you just described

22   differed from the actual MSR swap agreement?

23            MR. SKIDMORE:    Objection.  Calls

24       for a legal conclusion.

25       A.    Yeah, I don't know if there was a

1                         J. CORTESE

2    difference or not.

3         Q.    Well, you said that you looked at

4    the MSR swap agreement, right?

5         A.    I did, yeah, I have read that.

6         Q.    Did you develop an understanding

7    of the accounting and how it was supposed to

8    work when you were --

9         A.    Operational accounting, yes.

10        Q.    Did you understand from an

11   operational accounting whether the fair

12   market value schedule required payments on

13   increases or decreases in value of the whole

14   MSR asset as reflected on the balance sheet

15   as opposed to changes in the income

16   statement?

17             MR. SKIDMORE:   Objection.

18        A.    No, it was -- you know, it was my

19   understanding that it impacted -- what would

20   flow through the swap was not changes in the

21   balance sheet asset of the MSR but with

22   regard to amounts that were recorded in the

23   income statement of the bank.

24             MR. SKIDMORE:   We have been

25        going about another hour.  Take a

Page 194

1           J. CORTESE

2      break pretty soon.

3           MS. MILLER:  I don't have much

4      more, but I am happy to take a break.

5           MR. SKIDMORE:  Let's take a

6      quick break.

7           THE VIDEOGRAPHER:  The time is

8      3:18; we are off the record.

9           (Whereupon, a recess was held.)

10          THE VIDEOGRAPHER:  The time is

11     3:36 p.m.; we are on the record.

12   BY MS. MILLER:

13     Q.    Mr. Cortese, the Court Reporter

14   is marking as Cortese Exhibit 14, a document

15   Bates stamped ALLY_00411610 through '627.

16          (Whereupon, Cortese Exhibit 14,

17     ALLY_00411610 through '627 was marked

18     for identification as of this date by

19     the Reporter.)

20     Q.    Do you recognize this document?

21     A.    I am not -- I am not sure this

22   was the exact document that was in effect

23   when I entered the bank.  I can't tell.

24     Q.    Okay.  When you say "exact

25   document that was in effect," is this the

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 195 of 237

Page 195

1                    J. CORTESE

2    Pipeline Swap Agreement?

3        A.    I don't know if it is the exact

4    version that was in effect.

5        Q.    Sorry, correct the record.  This

6    is the MSR, not the Pipeline Swap Agreement.

7    So I will correct that.

8        A.    Okay.

9        Q.    Do you have any reason to believe

10   that this was not the MSR Agreement that was

11   in effect when you joined the bank in August

12   of 2009?

13            MR. SKIDMORE:  Objection.

14            If you know.

15       A.    Yeah, I can't --

16            MS. MILLER:  He knows if he has

17       a reason to believe or not.

18       A.    I can't determine if it was the

19   version that was in effect or not.

20       Q.    Did you review the MSR -- okay.

21   I would like to mark as Cortese Exhibit 15, a

22   document Bates stamped RC00027822

23   through '828.

24            (Whereupon, Cortese Exhibit 15,

25       RC00027822 through '828 was marked for

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 196 of 237

Page 196

                        J. CORTESE

1        identification as of this date by the

2        Reporter.)

3        Q.    I have marked as Cortese

4   Exhibit 15, the fair -- the fair market value

5   schedule to the MSR swap dated August 31,

6   2007.  Do you see that?

7        A.    I do.

8        Q.    Do you recognize -- is this a

9   document you have seen before?

10       A.    Yes, I believe it is.

11       Q.    And I would also like to mark as

12  Cortese Exhibit 16, a document Bates stamp

13  ALLY_PEO_042123 through '42130.

14            (Whereupon, Cortese Exhibit 16,

15       ALLY_PEO_042123 through '42130 was

16       marked for identification as of this

17       date by the Reporter.)

18       Q.    So, Mr. Cortese, looking first at

19  the document that we -- was just marked as

20  Exhibit 16 and the attachment to the E-mail,

21  the cover sheet is an E-mail from you dated

22  March 10, 2011, to a number of people with

23  the subject "Fed request."

24       A.    Um-hum.

Page 197

1                    J. CORTESE

2        Q.     Attached to it is what appears to

3   be a write-up that you prepared titled Ally

4   Bank Overview Accounting For Mortgage

5   Servicing Rights.  Do you see that?

6        A.     Yes, I do.

7        Q.     Did you, in fact, prepare this

8   memo?

9        A.     Yes, I did.

10       Q.     Did you send the memo to files or

11  something else?

12       A.     Sorry, what's your question?

13       Q.     Is this a memo to files?

14       A.     It was the memo to file and I

15  also think it was something -- it was -- part

16  of the intent of writing this memo was to

17  share it with the Federal Reserve examiners.

18       Q.     And why were the Federal Reserve

19  examiners interested in Ally Bank's

20  accounting for mortgage servicing rates?

21            MR. SKIDMORE:  Objection.

22       A.     I don't know.  I did not deal

23  with it directly.

24       Q.     Were you -- who asked you to

25  prepare this memo?

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 198 of 237

Page 198

1                     J. CORTESE

2           A.    I believe it was either

3    Lisa Gerner or Jim Young.

4           Q.    Did they explain to you why they

5    were asking you to prepare the memo?

6           A.    I don't recall specifically if we

7    discussed that.

8           Q.    Okay.    And do you see under

9    the -- under the title Hedging of MSR

10   Portfolios at the bottom of the first page

11   you state "In order to efficiently hedge the

12   exposure to its retained MSR asset, the bank

13   agreed to enter and is a swap transaction

14   with GMACM as documented by two schedules to

15   the ISDA Master Agreement between the bank

16   and GMACM effective June 2007."

17          A.    Yes, I see that sentence.

18          Q.    Does that refresh your

19   recollection about whether there was an

20   updated, sorry, whether the 2007 MSR

21   Agreement was the swap -- MSR Swap Agreement

22   that was effective when you joined the bank

23   in 2009?

24              MR. SKIDMORE:    Objection.

25          A.    The memo references the schedule

1                        J. CORTESE

2    that's dated August 31, 2007, that you

3    provided, Exhibit Cortese dash 15.  It does

4    not reference the Master ISDA Agreement that

5    you provided, Cortese dash 14.

6         Q.    It doesn't?  Doesn't it reference

7    the ISDA Master Agreement?

8              MR. SKIDMORE:  Objection.

9         A.    I think I stated that, as I wrote

10   it, "as documented by two schedules to the

11   ISDA Master Agreement between the bank and

12   GMACM effective June 2007."  I also note that

13   the schedule that you provided me was dated

14   August 31, 2007.

15        Q.    All right.  If you go back to

16   Cortese Exhibit 14, can you look at the

17   signature and the dates on that agreement.

18   You see there is a date under Robert Groody

19   signature of 6-12-07?

20        A.    Yes, I see that date.  I also

21   note that on the face, on page 1 of the

22   Master Agreement, the date is blank as to a

23   month and a day.

24        Q.    I understand.  So this agreement

25   was signed in June of 2007, right?

1          J. CORTESE

2               MR. SKIDMORE:  Objection.

3          A.    It appears that way.  I don't

4    know if it wasn't.  I wasn't there.

5          Q.    You mentioned that the fair

6    market value schedule is dated as of

7    August 31, 2007, not June 2007, right?

8          A.    Correct.

9          Q.    Okay.  If you look at page 6 of

10   the fair market value schedule, which is

11   Cortese Exhibit 15 -- before we go there, did

12   you use general ledger interchangeably with

13   balance sheet?

14         A.    No.  Your balance sheet is a

15   component of your general ledger.

16         Q.    What are the other components?

17         A.    Your income statement and your

18   statement of retained earnings.

19         Q.    And where in your general ledger

20   would you record an asset?

21         A.    You would record that in the

22   assets section of your general ledger.

23         Q.    Is that on your balance sheet or

24   your income statement?

25         A.    An asset would be recorded on

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese    Pg 201 of 237

Page 201

1                          J. CORTESE

2      your balance sheet.

3           Q.      Looking at the definitions on

4      page 6, I guess looking first at the payments

5      section, which is part 6D, it says "On the

6      valuation date, if the FMV change for the

7      most recent valuation date, is an increase in

8      the market value of recorded mortgage

9      servicing assets in the general ledger of

10     Party B, Party B will pay to Party A an

11     amount equal to the fair market value change.

12     Or sub 2, if such fair market value change is

13     a decline in the market value of recorded

14     mortgage servicing assets in the general

15     ledger, Party A will pay to Party B an amount

16     equal to the fair market value change."

17          A.      Um-hum.

18          Q.      Do you agree that this payment

19     section is looking at the mortgage servicing

20     assets in the general -- in the balance sheet

21     section of the general ledger?

22               MR. SKIDMORE:   Objection.

23          A.      So I think our accounting

24     position related to that language relates to

25     the definition of the fair market value

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 202 of 237

Page 202

1                    J. CORTESE

2    change, which states that in respect of the

3    subject transaction, means that FAS 156

4    mark-to-market for the valuation period as

5    recorded by Party B against the mortgage

6    servicing right asset.    Again, our

7    interpretation of that, FAS 156 relates to

8    the fair value treatment of your -- of the

9    mortgage servicing right asset.    And

10   specifically, that if elected, if you elect

11   fair value treatment for your mortgage

12   servicing right asset, you would have to mark

13   that asset to market on a regular basis.    So

14   our interpretation of that is that that

15   mark-to-market valuation, again, at the end

16   of a period, represents the amount that you

17   would transfer through to the swap.    Not

18   necessarily the complete balance sheet change

19   in your MSR.    It would not include a

20   capitalization under MSR.    That would

21   increase your MSR asset.

22          Q.     What does it mean -- I guess,

23   what are capitalization -- what is a

24   capitalization under MSR?

25          A.     An MSR asset is created at the

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 203 of 237

Page 203

J. CORTESE

2   point that the underlying loan is sold and

3   the seller maintains the right to service

4   that loan.   So based on that, the estimated

5   discounted servicing cash flow that you

6   expect to receive from servicing that loan

7   becomes your MSR asset and to place that

8   asset on your balance sheet is referred to as

9   a capitalization of your mortgage servicing

10   rights.   To make it an asset.

11       Q.    There is no distinction in this

12   agreement between different components of the

13   mortgage servicing right asset that's

14   reflected on the balance sheet, right?

15           MR. SKIDMORE:   Objection.   The

16       agreement speaks for itself.   It

17       includes all of its many parts.

18       A.    I don't know if there was a

19   distinction imbedded in this agreement

20   or not.

21       Q.    Do you know what the impact

22   would be if the -- if the bank originated an

23   MSR, how would that impact the balance, the

24   bank's balance sheet?

25       A.    If the bank originated an MSR

1                    J. CORTESE

2    from selling a loan and keeping the servicing

3    rights?

4         Q.     Right.

5         A.     It would increase the MSR asset.

6    It would be a positive increase to the MSR

7    asset.

8         Q.     What impact would that have on

9    the bank's income statement?

10        A.     It really depends.   It depends

11   on, namely, how that loan was originated,

12   what channel that loan came through and

13   whether or not -- whether or not the bank as

14   the originator of that loan already paid for

15   a component of that servicing right.

16        Q.     What is an example of a way

17   that -- what's a channel that a loan can come

18   through to the bank for a loan originated by

19   the bank?

20        A.     So the bank had a couple of

21   different lending channels at that time.   You

22   know, the main ones related to whether the

23   bank originated what we refer to as a

24   correspondent loan or if it directly

25   originated the loan through its retail

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 205 of 237

Page 205

1                          J. CORTESE

2   channel.  If the -- if the bank originated --

3   if the bank purchased the loan from a

4   correspondent, essentially what that means is

5   that the -- that loan was -- is already a

6   closed funded loan.  Another mortgage

7   originator already made that loan, to fund

8   that loan and the bank is buying that loan

9   from that -- from that original lender.  What

10  the bank will have to do to purchase that

11  loan from the original lender is to pay a

12  premium of the sale price that is directly

13  related to the servicing rights.  So the bank

14  is paying the -- paying the original lender a

15  premium on the loan for that lender to give

16  up the rights to service that loan.

17      Q.    And when the bank purchases a

18  correspondent loan from someone else, is it

19  considered to have been originated by the

20  bank?

21      A.    Yes, the bank classifies that as

22  a form of origination production.

23      Q.    Focusing first on loans

24  originated through a retail channel.  What

25  impact would that have on the income

1                           J. CORTESE

2    statement?

3           A.     So when the bank sold that loan,

4    that retail originated loan, it would -- the

5    capitalization of that associated MSR would

6    represent the, you know, 100% of the

7    estimated future cash flow related to the

8    servicing of that loan.  So if that is, you

9    know, say that cash flow is estimated to be

10   $100 over the estimated life of that loan,

11   the bank would record an MSR asset of 100 and

12   recording a gain on sale on its income

13   statement of 100.

14          Q.     And how would that work for a

15   correspondent loan, what impact would there

16   be on the balance sheet and on the income

17   statement?

18          A.     Correspondent loan would be a

19   little different from an income statement

20   recognition standpoint.  So if we purchased

21   the servicing from that correspondent and say

22   that, let's say for example, we paid that

23   correspondent $30 for that servicing, the

24   bank would already have on its balance sheet

25   a service release premium, SRP, that we would

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 207 of 237

Page 207

1                           J. CORTESE

2     call it, of 30 and that SRP is part of the

3     accounting value of the loan while it is

4     sitting in its held-for-sale portfolio.

5                 Once that, you know, once we sold

6     that loan, that $30 SRP would essentially be

7     reclassified to the MSR asset and then if

8     there was any -- any additional servicing,

9     estimated servicing cash flow, that would be

10    related to that loan and then that amount

11    would be recorded, it will be capitalized and

12    offset in an income statement.  So, again, if

13    we have that total estimated servicing was

14    100, we already capitalized 30, so the offset

15    to your income statement would be 70.

16                MS. MILLER:  I would like to

17         mark as Cortese Exhibit 17 a document

18         Bates stamped ALLY_00041799

19         through '807.

20                (Whereupon, Cortese Exhibit 17,

21         ALLY_00041799 through '807 was marked

22         for identification as of this date by

23         the Reporter.)

24         Q.    Mr. Cortese, I have marked as

25    Cortese Exhibit 17, a document dated

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 208 of 237

Page 208

1                          J. CORTESE

2    April 1st, 2011.   Do you recognize what this

3    document is?

4         A.    I do.

5         Q.    What is it?

6         A.    It's the confirmation of the

7    total return swap related to mortgage

8    servicing rights.

9         Q.    And were you involved in the

10   preparation of this document?

11        A.    My involvement with the

12   preparation of this document was related to

13   working with -- working with the capital

14   market team who was responsible for drafting

15   this confirmation, reviewing language,

16   accounting impact and also working with, you

17   know, Nikki Rock as the counterparty

18   responsible for the accounting on ResCap's

19   side.

20        Q.    Was part of what you were

21   responsible for, was part of the information

22   that you were responsible for giving to the

23   capital markets team information about how

24   accounting was actually accounting for the

25   MSR swap?

Page 209

1                 J. CORTESE

2        A.    Yeah, we, both Nikki and I, both

3  gave information to capital markets as to how

4  we were accounting for the mortgage servicing

5  rights swap.

6        Q.    Do you recall having discussions

7  with capital markets team about language that

8  should be included in this April 2011

9  confirmation to accurately reflect what

10  accounting was doing?

11        A.    Yeah, again, generally, I would

12  say yes, we, both Nikki and I, provided

13  comments back to capital markets related to

14  some of the language.

15        Q.    Do you know why this MSR swap

16  confirmation was entered into in April of

17  2011?

18        A.    I don't know specifically why.  I

19  did know that they -- that they wanted to

20  update the format and some of the language to

21  a more recent ISDA contract that was out -- I

22  know that was one component.  I would also

23  think they wanted to clarify some of the

24  components from the language standpoint.

25        Q.    What components do you recall

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 210 of 237

Page 210

1                    J. CORTESE

2    wanting to clarify?

3        A.    Again, just generally how it --

4    you know, how it worked, you know, what

5    components of the net revenue cash flows got

6    picked up in swap.

7        Q.    Do you recall having discussions

8    about the introduction of the term MSR

9    amount?

10            MR. SKIDMORE:  Objection.

11        Q.    On page 4 of the Agreement?  I

12    will restate my question.

13            Do you recall having discussions

14    about the introduction of the concept of MSR

15    amount in this confirmation?

16            MR. SKIDMORE:  Objection.

17        A.    Not specifically.

18        Q.    Do you recall that this was one

19    of the new concepts added to this

20    confirmation?

21            MR. SKIDMORE:  Objection to the

22    characterization.

23        A.    Again, I didn't think -- my

24    interpretation was that, you know, there was

25    nothing necessarily new that was being

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 211 of 237

Page 211

1          J. CORTESE

2     entered into this agreement.

3       Q.    Well, did the prior agreement

4    have the term MSR amount in it?

5             MR. SKIDMORE:  Objection.  The

6        agreement speaks for itself.

7       A.    I don't recall if it did or not.

8       Q.    Do you recall having discussions

9    about whether there should be express --  a

10   provision that expressly addresses the gain

11   or loss on the mortgage servicing asset?

12            MR. SKIDMORE:  Objection.

13      A.    Again, not specifically.  Again,

14   we were crafting it so that -- you know, as

15   the previous version was designed to transfer

16   any net revenue related to the MSR asset

17   through the swap.

18      Q.    Do you recall having discussions

19   about taking out the concept of

20   mark-to-market from this agreement?

21            MR. SKIDMORE:  Objection.

22      A.    No, I do not recall.

23      Q.    Do you recall having discussions

24   about the definition of monthly fair market

25   value change in this agreement?

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese    Pg 212 of 237

Page 212

1                     J. CORTESE

2        A.    Yeah, again, not specifically.

3        Q.    What do you recall generally that
4    you spoke about in that regard?

5        A.    Again, that -- capital markets
6    was charged with trying to provide more
7    clarifying language, you know, to the
8    agreement, and in that regard, from
9    accounting standpoint, we were advising on
10   how that swap has historically operated.

11       Q.    So this was an effort to have the
12   confirmation reflect what accounting was
13   actually doing?

14            MR. SKIDMORE:   Objection.

15       A.    No, not necessarily.   We were,
16   again, advising on what -- what our
17   accounting treatments historically have been.
18   I am not suggesting that that drove the
19   provisions of the agreement.

20       Q.    Did anyone send you either
21   piecemeal language or the agreement in
22   general and ask for your views on whether it
23   accurately captured the accounting treatment
24   that was being applied to the MSR swaps?

25       A.    Yeah, I believe they did.

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 213 of 237

Page 213

1                    J. CORTESE

2        Q.     Do you have any sense of what

3    impact there would have been had the fair

4    market value change been calculated not on

5    the difference in the value -- sorry, in the

6    gain or loss related to the MSR asset, but

7    instead to the full MSR asset as recorded on

8    the balance sheet?

9              MR. SKIDMORE:   Objection.

10       A.     So suggesting, when you say

11   "general loss," you mean from the

12   mark-to-market?

13       Q.     Right.

14       A.     As compared to just the change in

15   balance?

16       Q.     Right.

17       A.     I mean, if we were -- if we were

18   just talking about the net change in the

19   balance sheet, the asset from period to

20   period, then I think the impact would be that

21   the bank would be transferring value to GMAC

22   Mortgage that it already -- to the degree it

23   already paid for.

24       Q.    Do you have a sense of the

25   magnitude of the value that would have been

1              J. CORTESE

2    transferred from 2009 through 2011?

3            MR. SKIDMORE:  Objection.

4        A.    No, I really don't know what that

5    breakdown would be.

6        Q.    Do you have a sense of whether it

7    would be in the hundreds of millions?

8        A.    I really don't know.

9        Q.    Do you know whether it would be

10   in the billions?

11       A.    I don't think it would be in the

12   billions because our MSR asset was never

13   that big.

14           MS. MILLER:  I think I am done,

15       but if we can take a break, and I will

16       just look through my stuff.

17           MR. SKIDMORE:  Sure.  Is anyone

18       else asking questions?  Yeah, take a

19       break and then we'll come back.

20           THE VIDEOGRAPHER:  The time is

21       4:10 p.m.; we are off the record.

22           (Whereupon, a recess was held.)

23           THE VIDEOGRAPHER:  The time is

24       4:16 p.m.; we are on the record.

25           MS. MILLER:  I would like to

Page 215

1              J. CORTESE

2       mark as Cortese Exhibit 18, a document

3       Bates stamped RCJSNII00003347.

4              (Whereupon, Cortese Exhibit 18,

5       RCJSNII00003347 was marked for

6       identification as of this date by the

7       Reporter.)

8       Q.    Mr. Cortese, do you know what

9  this document is?

10      A.    Yeah, this appears to be a

11 quarterly certification that I was required

12 to provide to ResCap regarding the accounting

13 for any intercompany transactions between

14 Ally Bank and ResCap.

15      Q.    Okay.  So this intercompany

16 certification document related only to what I

17 recall Bullet 3 in certification being

18 intercompanies between Ally Bank on the

19 one hand and ResCap on -- Ally on the

20 one hand and ResCap on the other?

21             MR. SKIDMORE:  Objection.

22      A.    Specific to me was between Ally

23 Bank and ResCap.

24      Q.    Okay.  And we spoke earlier about

25 the impact that the -- that the fair value

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 216 of 237

Page 216

1          J. CORTESE

2    election had on certain income received from

3    the bank or recorded by the bank under the

4    MMLPSA Agreement, and my question is, do you

5    know if the bank assumed any new transaction

6    risks after 8-1-2009?

7              MR. SKIDMORE:   Objection.

8        A.    Can you define "new transaction

9    risk"?

10       Q.    Did the bank assume any risks

11   related to the loans that it was

12   purchasing -- that GMAC was purchasing that

13   it didn't previously have?

14             MR. SKIDMORE:   Objection.

15       Q.    That it didn't have between

16   January 1st, 2009, and July 31, 2009?

17             MR. SKIDMORE:   Objection.

18       A.    What I say is that the risk

19   structure between Ally Bank and GMAC Mortgage

20   remained the same.   And the bank as the

21   lender, the originator, the entity doing a

22   substantial amount of the origination and

23   closing was due to receive all of the net

24   revenues less expenses related to the

25   origination of that loan.   There is no change

Plaintiff's Objection
216:10 – 217:04, Calls
for speculation (FRE
602); calls for legal
conclusion

Page 217

1                     J. CORTESE

2    related to any future credit risk or interest

3    rate risk related to that loan once it was

4    originated.

5         Q.    Mr. Cortese, we took a number of

6    breaks today.  Did you at any time during

7    those breaks have discussion with your

8    counsel about the substance of your testimony

9    here?

10        A.    No, we did not.

11        Q.    Did you discuss any documents

12   that we spoke about today?

13        A.    No, we did not.

14             MS. MILLER:  That's all I have.

15             MR. SKIDMORE:  Okay.  I have a

16        few questions.

17   EXAMINATION BY

18   MR. SKIDMORE:

19        Q.    Can you pullout Exhibit 5 from

20   your stack.

21        A.    Okay.

22        Q.    Exhibit 5 is an E-mail that you

23   wrote to Jim Young on December 15th; is that

24   right?

25        A.    It is.

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese    Pg 218 of 237

Page 218

1            J. CORTESE

2       Q.    You discussed Exhibit 5 with

3   counsel for the JSNs earlier today in your

4   deposition; is that right?

5       A.    Yes, I did.

6       Q.    In that discussion you

7   referenced, on at least one occasion, that

8   the substance of the E-mail that's Exhibit 5

9   is a preliminary statement; is that right?

10      A.    That's correct.

11      Q.    What did you mean by "a

12  preliminary statement"?

13      A.    What I meant by this being

14  preliminary is that, again, this was a very

15  quick response to a very complicated

16  question.  Very complicated transaction.  So

17  to the point where Jim Young, you know, again

18  e-mailed me on December 14th, in the evening

19  of December 14th, I responded to him in the

20  afternoon of December 15th, to that effect I

21  was trying to provide him acknowledgement

22  that we were looking into it.  That we came

23  to some, you know, preliminary assessments

24  and that more work needed to be done.

25      Q.    So for how long had you been

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 219 of 237

Page 219

1                    J. CORTESE

2    looking at this issue at the time you sent

3    this E-mail to Jim Young on December 15th?

4         A.    Approximately, maybe six hours.

5    Five, six hours.

6         Q.    And when did you write or finish

7    your ultimate memo giving your conclusions on

8    this issue?

9         A.    On March the 13th of 2011.

10        Q.    Okay.   So about three months

11   later?

12        A.    Correct.

13        Q.    Did you do a substantial amount

14   of work in those three months to reach your

15   conclusion?

16        A.    Yes, we did.

17        Q.    The statements in Exhibit 5

18   regarding the -- where the sale execution

19   revenue should go, are those statements

20   correct?

21        A.    No.   Ultimately they proved to be

22   incorrect.

23        Q.    What was your ultimate conclusion

24   on this issue regarding the revenue under the

25   Broker Agreement?

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 220 of 237

Page 220

1                    J. CORTESE

2          A.      Our final conclusion was that

3     there was an accounting error that was made,

4     that, for a transaction that took place

5     between January the 1st of 2009 and July 31st

6     of 2009 whereby the bank was inappropriately

7     transferring its net origination revenue to

8     GMAC Mortgage.

9          Q.      Is that conclusion reflected in

10    the final memo of March 2012?

11         A.      Yes, it is.

12         Q.      Let's look now at Exhibit 7.

13         A.      Okay.

14         Q.      Let's refer to page -- the Bates

15    page ending '195, it is the last page of

16    Exhibit 7.  Counsel earlier referred your

17    attention to the first sentence on the page

18    that ends '195 of Exhibit 7.

19                 Do you see that first sentence?

20         A.      Yes.

21         Q.      Counsel asked if you had ever

22    seen documentation that may have suggested

23    that the conclusion in this sentence, do you

24    remember that?

25         A.      Yes.

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 221 of 237

Page 221

1                     J. CORTESE

2                     MS. MILLER:   Objection.

3          Q.     Counsel asked if you had ever

4    seen documents that suggested that

5    documentation exists which supports the

6    project groups intent to record origination

7    fee and expenses on the bank and have

8    mortgage purchase the loan at this cost

9    level.

10                    MS. MILLER:   Objection.

11         Q.     Do you recall that line of

12   questioning?

13                    MS. MILLER:   Objection.

14         A.     Yes, I do.

15         Q.     And those documents that you were

16   referencing in that answer, were those

17   documents conclusive in your view?

18         A.     No, they were not clear in my

19   view.

20         Q.     Why not?

21         A.     The project documents, as well as

22   some of the internal e-mails that we

23   reviewed, that was discussing, you know, fee

24   recognition and allocation, were very unclear

25   and in a lot of instances contradicted --

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 222 of 237

Page 222

1                    J. CORTESE

2    contradicted where that revenue should go.

3    So, for example, one project -- the project

4    dec suggested that the bank in its function

5    as the lender for the loan would recognize

6    all the origination fees, points, capital

7    markets require price and so on, net of the

8    broker fee.  And then later in that document,

9    it would say that those net fees would be

10   borne by GMAC Mortgage.

11            So again, there were

12   contradictory statements we found difficult

13   to ascertain exactly what management and the

14   project team intent was related to those --

15   related to that fee recognition.

16       Q.    Let's look at Exhibit 8.

17   Specifically on Exhibit 8, the Bates

18   ending '456.

19       A.    Okay.

20       Q.    In the document Exhibit 8 that

21   begins EXAM 15456, is this the presentation

22   you were just the referring to in your

23   answer?

24       A.    Yes, it is.

25       Q.    Okay.  Can you point to me the

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese    Pg 223 of 237

Page 223

1               J. CORTESE

2   inconsistencies that you were just

3   referring to?

4               MS. MILLER:   Objection.

5        A.     Yes.

6        Q.     Okay.  What page number should I

7   be looking at?

8        A.     If you look at EXAM page ending

9   in '59.

10       Q.     So the record is clear, you have

11  directed us to a page that's EXAM 15459

12  entitled Summary, page 4 of the dec; is that

13  right?

14       A.     That is correct.   Item number 3

15  says "GMACM will recognize broker fee.

16  Third-party passthrough, secondary market

17  sale, i.e., trade gain OMSR, in parenthesis."

18            It goes on to say that, in item

19  number 4, "GMAC bank will recognize fee

20  income, net carry, incur broker fee, and

21  underwriting expenses."  So, again, by --

22  that establishes on one level where the bank

23  is supposed to recognize that the fee income,

24  as well as the broker fee that it paid.

25       Q.     Are there other inconsistencies

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 224 of 237

Page 224

1                          J. CORTESE

2    in the document?

3         A.      There are.

4         Q.      Okay.   What other page should we

5    look at?

6         A.      If you look at the page, EXAM

7    page ending in '60.

8         Q.      So for the record, you directed

9    us to EXAM '15460, which is entitled Base

10   Assumptions and is slide 5 of the

11   presentation; is that right?

12        A.      That is right.

13        Q.      Describe what you see or what the

14   text means to you on page '15460 of

15   Exhibit 8.

16        A.      So in the middle of the page,

17   there is a bullet point that says "GMAC B

18   acting as the lender will remain P&L neutral

19   from the broker transaction with the

20   exception of the net interest carry."   It

21   then goes on to say, in the next point, that

22   "FAS 91 will be booked on GMAC B at loan

23   level to include deferrable fees and

24   expenses.   Will include the broker fee

25   expense."

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 225 of 237

Page 225

1                   J. CORTESE

2                   So, again, those are two very

3      contracting -- contrasting statements as

4      again, FAS -- the intention of FAS 91 is to

5      defer net origination revenue and then upon

6      sale to recognize that revenue, not to

7      transfer it upon the sale.

8         Q.    Let's look back at Exhibit 7 for

9      one minute.   Counsel had directed us

10     previously to the last page of Exhibit 7, but

11     I want to look at the first page of

12     Exhibit 7, and specifically, I guess, right

13     after the first three bullets on the first

14     page of Exhibit 7, there is a note paragraph.

15              Do you see that?

16        A.    I do.

17        Q.    The second sentence reads, the

18     second sentence of ALLY_'402192, Exhibit 7,

19     reads "Therefore, it was intended for the

20     bank to not just recognize net carry, but

21     also fee income net of broker expense."

22              Did I read that correctly?

23        A.    Yes, you did.

24        Q.    What does that sentence that you

25     wrote mean?

Page 226

1                    J. CORTESE

2          A.     That was, again, in reviewing

3    that -- the project dec, noting the

4    components of what was written in the project

5    dec suggesting that the bank should recognize

6    the net origination fee revenue which are

7    noted above in those three bullet points.

8          Q.     Can you pull out Exhibit 9

9    for me.

10               Exhibit 9 is an E-mail with a

11   document attached.  I want to direct your

12   attention to EXAM 12253507.  Counsel asked

13   you some questions about the first

14   two paragraphs of this page that begin

15   "prefair value election and postfair value

16   election."  Do you recall being asked about

17   those provisions?

18         A.     I do.

19         Q.     The description here of prefair

20   value election and post-value election, is

21   that a description of what the bank was doing

22   when you looked into this issue?

23               MS. MILLER:  Objection.

24         A.     Yes.

25         Q.     Let me ask that again.  What

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 227 of 237

Page 227

1                    J. CORTESE

2    are -- how would you characterize the

3    descriptions of prefair value election and

4    postfair value election on EXAM '12253507 of

5    Exhibit 9?

6         A.    So, again, by -- for the research

7    that Cathy Dondzila and I did conducted, this

8    was a summary of what the, you know, what the

9    carry value components of the held-for-sale

10   loans were and what ultimate revenue that the

11   bank recognized in a prefair value election

12   and postfair value election time period.

13        Q.    Is this intended to be a

14   description of what any contractual agreement

15   called for?

16             MS. MILLER:  Objection.

17        A.    No, it is not.  It's supposed to

18   reflect exactly what was -- what -- exactly

19   what the accounting was for those items

20   during those time periods.

21        Q.    Okay.  So it was intended to

22   reflect what accounting was done at that time

23   period?

24             MS. MILLER:  Objection.

25        A.    Correct.

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese    Pg 228 of 237

Page 228

J. CORTESE

2   MR. SKIDMORE:  No further

3   questions.

4   MS. MILLER:  I have some more.

5   EXAMINATION BY

6   MS. MILLER:

7   Q.   Mr. Cortese, looking at

8   Exhibit 8, in particular the Power Point

9   presentation that you were just asked some

10  questions about, is this a document that you

11  reviewed with counsel in preparation for

12  today's deposition?

13   MR. SKIDMORE:  Objection.  Calls

14  for privilege.  Instruct not to

15  answer.

16   MS. MILLER:  I am allowed to ask

17  whether he looked at a specific

18  document.  There is no privilege that

19  covers it.  The only arguable

20  privilege is asking for your

21  collection and selection of materials

22  in their entirety as work product.

23  Asking if he saw a particular document

24  is not covered by privilege.

25   MR. SKIDMORE:  The objection

Page 229

1                    J. CORTESE

2          stands.

3                MS. MILLER:  You are wrong.

4                MR. SKIDMORE:  Okay.

5                MS. MILLER:  You are going to

6      assert baseless privilege and stand

7      on it?

8                MR. SKIDMORE:  It's not

9      baseless.  I disagree.  I appreciate

10     that you have your opinion on what the

11     law is.  And I have my view on what

12     the law is, and I disagree with you.

13     So --

14               MS. MILLER:  You are wrong and

15     your objection makes clear that the

16     answer to that is yes.

17        Q.    Looking at the document page

18     number EXAM '00015459.  You indicated that

19     Bullet 3 and Bullet 4 are contradictory.  Can

20     you explain that to me?

21               MR. SKIDMORE:  Objection.

22               Go ahead.

23        A.    What I was saying was that they

24     are contradictory to other statements made in

25     the dec, in this Power Point dec.

Page 230

1                J. CORTESE

2       Q.    So can you tell me specifically

3    what document -- what other statement in this

4    dec you believe Point 3 is contradictory to?

5       A.    So Point 3 says "GMACM will

6    recognize broker fee, third-party

7    passthrough, secondary market trade gain, no

8    MSR."  It does not suggest that GMAC Mortgage

9    would recognize any other origination fees

10   that the bank would have collected or

11   recognized.  On page 15460, I'm sorry, hold

12   on.  Strike that.

13            On page '15461, as titled -- that

14   says "GMAC Mortgage broker will recognize,"

15   it says in Subtopic B it states, "Refunded

16   loans, fee income from the borrower for loan

17   origination and processing services performed

18   by third-party vendor, i.e., passthrough

19   fees."  In A it says "Lender-paid broker

20   fee," sales, operations.  So, again, I think

21   it is inconsistent between what GMAC Mortgage

22   and GMAC Bank were supposed to recognize.

23       Q.    I am still trying to follow you.

24   I am asking you for what provisions elsewhere

25   in this dec contradict number 3 on the

12-12020-mg   Doc 5803-9   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Joe Cortese   Pg 231 of 237

Page 231

1              J. CORTESE

2    summary page '15459?

3              MR. SKIDMORE:   Objection.   Asked

4       and answered.

5       Q.    Mr. Cortese, you weren't

6    personally involved in the BCL2B project when

7    it was happening, right?

8       A.    That's right, I was not directly

9    involved in that project.

10      Q.    And you weren't involved in

11   preparing or reviewing this Power Point

12   presentation in 2008, were you?

13      A.    That's correct.

14      Q.    You don't recall having any

15   discussions with anybody at the bank

16   regarding the purpose and intention of the

17   BCL2B project in 2008; is that right?

18      A.    Not in 2008, that's correct.

19

20

21      (Continued on next page to include

22   jurat.)

23

24

25

Page 232

1                     J. CORTESE

2          MS. MILLER:  I have no further

3     questions.

4          MR. SKIDMORE:  Thank you very

5     much.

6          THE VIDEOGRAPHER:  This

7     concludes today's deposition.  The

8     time is 4:39 p.m.; we are off the

9     record.

10          (Whereupon, at 4:39 p.m., the

11     Examination of this Witness was

12     concluded.)

13

14

15     _____

            JOE CORTESE

16

     Subscribed and sworn to before me

17     this _____ day of _____, 2013.

18     _____

            NOTARY PUBLIC

19

20

21

22

23

24

25

1

2        E X H I B I T S

3

4

5   EXHIBIT        EXHIBIT                    PAGE

6   NUMBER         DESCRIPTION

7   Exhibit 1      ALLY_041818 through          50

8                  '225

9   Exhibit 2      ALLY_0201210 through         54

10                 '1225

11  Exhibit 3      EXAM 10770041 through        87

12                 '52

13  Exhibit 4      EXAM 003975 through          97

14                 '3987

15  Exhibit 5      ALLY_03861743 through       113

16                 '4

17  Exhibit 6      EXAM 12253153 through       121

18                 '154

19  Exhibit 7      ALLY_0402192                133

20                 through '195

21  Exhibit 8      EXAM 00015453 through       135

22                 '15484

23  Exhibit 9      EXAM 12253505 through       136

24                 '5308

25

Page 234

1

2    Exhibit 10  EXAM 1204290 through      140

3                '913

4    Exhibit 11  EXAM 100988172 through    166

5                '188

6    Exhibit 12  ALLY_0018237              171

7                through '244

8    Exhibit 13  ALLY_PEO_0877135          176

9                through '38

10   Exhibit 14  ALLY_00411610 through     194

11               '627

12   Exhibit 15  RC00027822                195

13               through '828

14   Exhibit 16  ALLY_PEO_042123           196

15               through '42130

16   Exhibit 17  ALLY_00041799             207

17               through '807

18   Exhibit 18  RCJSNII00003347           215

19

20

21

22

23

24

25

12-12020-mg    Doc 5803-9    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Joe Cortese    Pg 235 of 237

Page 235

1

2                        I N D E X

3

4    EXAMINATION BY                          PAGE

5

6    MS. MILLER                                6

7    MR. SKIDMORE                            228

8    MS. MILLER                              217

9

10

11

12   INFORMATION AND/OR DOCUMENTS REQUESTED

13   INFORMATION AND/OR DOCUMENTS            PAGE

14                   NONE

15

16

17

18

19

20

21

22

23

24

25

Page 236

1

2        C E R T I F I C A T E

3

4   STATE OF NEW YORK        )

                     :   SS.:)

5   COUNTY OF NASSAU         )

6

7        I, REBECCA SCHAUMLOFFEL, a Notary

8   Public for and within the State of New York,

9   do hereby certify:

10       That the witness whose examination

11  is hereinbefore set forth was duly sworn and

12  that such examination is a true record of the

13  testimony given by that witness.

14       I further certify that I am not

15  related to any of the parties to this action

16  by blood or by marriage and that I am in no

17  way interested in the outcome of this matter.

18       IN WITNESS WHEREOF, I have hereunto

19  set my hand this 30th day of October, 2013.

20

        _____

21          REBECCA SCHAUMLOFFEL

22

23

24

25

Page 237

1                        WITNESS ERRATA SHEET
2   Witness Name: Joe Cortese
    Case Name: In Re:  Residential Capital
3   Date Taken: October 30, 2013
4    Page #_____   Line #_____
5       Should Read:  _____
6       Reason for Change: _____
7

     Page #_____   Line #_____
8

        Should Read:  _____
9

        Reason for Change: _____
10

11   Page #_____   Line #_____
12      Should Read:  _____
13      Reason for Change: _____
14

     Page #_____   Line #_____
15

        Should Read:  _____
16

        Reason for Change: _____
17

18   Page #_____   Line #_____
19      Should Read:  _____
20  Reason for Change: _____
21

    Witness Signature: _____
22

23

24

25